# EXHIBIT M

Helen Davis Chaitman (4266)
Becker & Poliakoff LLP
45 Broadway
New York, NY 10006
hchaitman@becker-poliakoff.com
*Attorneys for Diane and Roger Peskin,*
*Maureen Ebel, and a large group of other*
*customers*

**Hearing Date: May 5, 2010**
**Hearing Time: 10:00 a.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |

**OBJECTION TO THIRD APPLICATIONS OF IRVING H. PICARD, TRUSTEE,
AND BAKER & HOSTETLER LLP FOR ALLOWANCE OF INTERIM
COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF
EXPENSES INCURRED FROM OCTOBER 1, 2009 THROUGH JANUARY 31, 2010**

Diane and Roger Peskin, Maureen Ebel, and a large group of other customers of Bernard

L. Madoff Investment Securities, LLC ("Madoff") [1] ("Objectors"), by their attorneys, Becker &

Poliakoff LLP, object to the third applications for interim compensation of Irving H. Picard,

Trustee, and his counsel, Baker & Hostetler LLP ("B&H") and incorporate herein the objections

---

[1] Becker & Poliakoff LLP files this objection on behalf of the hundreds of customers it represents in these proceedings.

they filed (through Phillips Nizer LLP) to the first and second applications for interim

compensation of the Trustee and B&H.   This objection constitutes the objectors' offer of proof

and objectors' request that the Court schedule an evidentiary hearing at which they can submit

evidence substantiating the facts set forth herein.

1.      The Trustee was appointed by this Court at the request of the Securities Investor

Protection Corporation ("SIPC") in the proceeding instituted in the United States District Court

for the Southern District of New York on December 15, 2008 for the liquidation of Madoff under

the Securities Investor Protection Act, 15 U.S.C. § 78aaa, *et seq.* ("SIPA").

2.      In their third interim fee applications, the Trustee seeks allowance of fees of

$671,591 for the 123-day period from October 1, 2009 through January 31, 2010 and B&H seeks

allowance of fees of $23,884,085.  This works out to $5,460 in daily compensation (including

weekends and holidays) for the Trustee and $194,179 in daily compensation for B&H, again

including weekends and holidays.  Thus, together, the Trustee and B&H are seeking allowance

of compensation of $199,639 in daily compensation, including weekends and holidays or

$1,397,473 per week.

3.      The Trustee's most important statutory obligation under SIPA is to "promptly"

replace securities in Customers' accounts up to $500,000 in value.  15 U.S.C. § 78fff-3(a) and

4(c).

4.      As set forth in the Trustee's Amended Third Interim Report for the period ending

March 31, 2010 (the "Report"), 16,314 customer SIPC claims had been filed in this case of

which the Trustee had determined 12,249 as of March 31, 2010.  Report ¶ 78; ¶ 2.

5.      Through September 30, 2009, according to the Trustee's website, he had

determined only 3,062 claims and allowed only 1,641 of such claims.

2

http://www.madofftrustee.com/Status.aspx. The Trustee claimed that, as of September 30, 2009, of the 4,903 active accounts that Madoff had as of December 11, 2008, only 2,335 customers, whose claims total approximately $20 billion, actually lost money under the Trustee's net investment calculation, even though the November 30, 2008 balances on all the accounts totaled $64.8 billion. Thus, as of September 30, 2009, the Trustee had determined only approximately 70% of the claims *he acknowledged were valid* and he had denied SIPC insurance to the 2,569 account holders (and others) who had a negative net investment over the life of their accounts, going back for decades.

6.     As of March 31, 2010, the Trustee had not yet determined 4,065 claims. Many of the undetermined claims are of customers who are clearly entitled to SIPC insurance under the Trustee's methodology as approved by this Court. Yet the Trustee has not determined these claims. Moreover, in numerous instances, the Trustee has unjustifiably delayed paying SIPC insurance to customers whose claims he acknowledges are valid. This has caused, and continues to cause, unjustifiable devastation to customers to whom, as a matter of law, the Trustee has a fiduciary duty. This failure to pay customers whose claims the Trustee acknowledges are valid is justification for denial of any further compensation to the Trustee and his law firm until all of the customer claims are paid in full.

7.     The Trustee has allowed 2,011 claims for $5.3 billion and committed to pay $668 million, leaving $4.6 billion in over-the-limit claims (of the $20 billion that the Trustee has claimed was lost in Madoff). Report ¶ 2.

8.     As of February 28, 2010, SIPC had advanced $141,819,540.89 for administrative expenses and $602,440,855 for customer claims. Report ¶ 68.

3

9.      In March 2010, SIPC advanced $16,638,534 for administrative expenses and
$48,421,096 for customer claims.  Report ¶ 68.

10.      Thus, through March 31, 2010, SIPC had advanced a total of $158,458,074 for
administrative expenses or $2,365,045 per week.  And despite the expenditure of more than $2.3
million per week in professional fees and expenses, the Trustee has still not determined 4,065
customer claims after 16 months.

11.      During that same period of time, the Trustee and B&H claim to have "recovered"
approximately $1.5 billion for distribution to customers.  Report ¶ 1.  Of this amount, $946
million was simply sitting in bank accounts in Madoff's name at the time the Trustee was
appointed, including $301,407,190 at Mellon Bank, $233,500,000 at JP Morgan Chase, $300
million in securities, and $29 million at Bank of New York.  Bloomberg.com 1/29/09.

12.      The Trustee and B&H are acting in direct contravention of their fiduciary and
statutory duty to Customers and to the public and, in the process, are increasing exponentially
and unnecessarily the administrative costs of the estate, depleting SIPC funds that should be used
to pay Customer claims at a time when SIPC is insolvent.  Indeed, SEC Commissioner Mary
Schapiro testified before the House Subcommittee on Capital Markets, Insurance and
Government-Sponsored Enterprises on July 14, 2009:

> The tragic truth is there is not enough money available to pay off
> all the customer claims.

(7/14/09 Webcast at 52:51.)

13.      In the circumstances of this case which has bankrupted SIPC, the Trustee and
B&H have a conflict of interest which disables them from serving.  For this reason, and for the
other reasons set forth below as well as the reasons set forth in Objectors' first two objections,

4

Objectors file this objection and offer to prove the facts set forth herein at an evidentiary hearing

at a time set by the Court.  This objection constitutes their offer of proof.

## THE TRUSTEE AND B&H HAVE A CONFLICT OF INTEREST

14.    This Court has a fundamental obligation to monitor the integrity of proceedings

before it.  *In re Plaza Hotel Corp.,* 111 B.R. 882, 891 (B.E.D. Cal. 1990).

15.    The Trustee owes a fiduciary duty to Customers.  *See In re Adler, Coleman*

*Clearing Corp.*, 1998 Bankr. LEXIS 1076 (B. S.D.N.Y. Aug. 25, 1998) ("The parties agree that

a SIPA trustee owes a fiduciary duty to the customers and creditors of a liquidating broker dealer

akin to the fiduciary duty a bankruptcy trustee owes a debtor's estate and creditors"); *Germain v.*

*The Connecticut National Bank,* 988 F. 2d 1323, 1330 n. 8 (2d Cir. 1993).   A fiduciary duty is

the highest duty imposed by law.  *See Roberts v. Dayton Hudson Corp*., 914 F. Supp. 1421, 1423

(N.D. Tex. 1996); *see also Enzo Biochem, Inc. v. Johnson & Johnson,* 1992 U.S. Dist. LEXIS

15723, at *29 (S.D.N.Y. Oct. 15, 1992).

16.    The disinterestedness of a trustee's counsel is "so crucial to the proper functioning

of the bankruptcy system that a court may raise it and dispose of it whenever its sanctity is

questioned."  *In re Vebeliunas,* 231 B.R. 181 (B.S.D.N.Y. 1999), *citing In re Martin*, 817 F. 2d

175, 180 (1st Cir. 1978).  A "trustee/fiduciary must be free from any hint of bias," and "either an

appearance of impropriety or a potential conflict of interest . . . is a viable cause for removal" of

a trustee.  *In re AFI Holding, Inc*., 355 B.R. 139 (9th Cir. BAP 2006) (affirming bankruptcy

court's removal of Chapter 7 trustee).

17.    The attorney for a trustee must be "disinterested," meaning that the attorney does

not have an interest materially adverse to a party in interest in the bankruptcy.  *In re Marvel*

*Entertainment Group, Inc.,* 140 F. 3d 463, 476 (3d Cir. 1998).  *See* Collier Bankruptcy Manual §

5

101.13 ("professionals engaged in the conduct of a bankruptcy case should be free of the

slightest personal interest which might be reflected in their decisions concerning matters of the

debtor's estate or which might impair the high degree of impartiality and detached judgment

expected of them during the course of administration."). *See also, In re Crivello,* 134 F. 3d 831,

835 (7th Cir. 1998)*; In re Cook,* 223 B.R. 782, 798 (10th Cir. BAP 1998); *In re BH & P, Inc.,*

119 B.R. 35, 42 (D.N.J. 1990); *In re Leslie Fay Cos.,* 175 B.R. 525, 532 (B.S.D.N.Y.

1994)(counsel removed from all new matters in case where counsel was investigating financial

irregularities of debtor and did not disclose relationships with directors who were targets of

investigation).

18.    Aside from the disinterestedness standard in bankruptcy, under the Rules of

Professional Conduct, an attorney cannot represent adverse interests.  Rule 1.7(a) of the New

York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.7(a).  An attorney must avoid even

the "appearance of a conflict" pursuant to § 327(a) of the Bankruptcy Code.  *In re Hot Tin Roof,*

205 B.R. 1000, 1003 (1st Cir BAP 1997).  Here, B&H represents the Trustee who has a fiduciary

duty to Customers.  Yet, B&H is deliberately acting to delay and frustrate the payment of

Customer claims, even to the point of misrepresenting the law to destitute Customers who cannot

afford to retain their own counsel.  Such misrepresentation is grounds for denial of fees.  *See In*

*re Mercury*, 122 Fed. Appx. 528 (2d Cir. 2004) (affirming denial of compensation to firm that

acted as counsel for debtors and counsel for trustee, where the attorneys acted in the interest of

the trustee instead of debtors and incorrectly advised debtors regarding their rights to convert

Chapter 7 filing to Chapter 11 filing).  It also violates B&H's ethical obligations.  *See* Rule 4.1 of

the New York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.32 ("In the course of

representing a client, a lawyer shall not knowingly make a false statement of fact or law to a

third person.")

19.     Under SIPA, SIPC is deemed to be "disinterested."  15 U.S.C. §§ 78eee(b)(6)(A).

However, SIPA does not, and could not, provide that a trustee, who is not an employee of SIPC,

is "disinterested" or that an attorney retained by the Trustee is deemed, as a matter of law, to be

"disinterested," particularly in a case like this where the Trustee and his counsel have flatly

rejected the fundamental mandates of SIPA that were intended to protect customers.   In *In re

First State Securities Corp.,* 39 B.R. 26 (B.S.D. Fla. 1984), the bankruptcy court assumed,

without analysis or authority, that a trustee who, the court found, was a mere "puppet" of SIPC,

was entitled to the imputation of disinterestedness provided by 15 U.S.C. § 78eee(b)(6)(A).  The

court simply cited the statute which states:

> SIPC shall in all cases be deemed disinterested, and an employee of SIPC shall be
> deemed disinterested if such employee would, except for his association with
> SIPC, meet the standards set forth in this subparagraph.

Since neither the Trustee nor B&H is an employee of SIPC, this provision cannot insulate them

from the requirement that the Trustee and his counsel be free of any conflict of interest.

20.     The Trustee and B&H are far from "disinterested."  As they have demonstrated

repeatedly in this proceeding, they have a conflict of interest as a result of which they are barred

from receiving any compensation under established precedents and principles of professional

conduct.  *See In re Angelika Films 57th, Inc*., 246 B.R. 176 (S.D.N.Y. 2000) (affirming

bankruptcy court's denial **in its entirety** of fee application of debtor's counsel where counsel

represented debtor's principal in other matters and took actions in the bankruptcy that "placed

the interests of the Debtor's principal. . . over those of the Debtor.").  They thus should not

receive any compensation.

7

21.     Perhaps the most egregious evidence of the conflict of interest of the Trustee and

B&H is the Trustee's recent adversary proceeding against three New Jersey investors who had

filed suit in federal court in New Jersey against Stephen Harbeck, the President of SIPC, and

against the directors of SIPC, alleging that they had perpetrated a massive investment insurance

fraud because they had knowingly induced the plaintiffs, and the class of investors that the

plaintiffs seek to represent, into believing that SIPC insured their accounts for up to $500,000

based upon the customers' last statement (the "New Jersey Action").  A copy of the complaint in

the New Jersey Action is annexed hereto as **Exhibit A**.

22.     The New Jersey Action is not against the Trustee.  It is not even against SIPC.  It

is against Harbeck and the SIPC directors and alleges that the defendants breached their

obligations to customers by deliberately defrauding them as to the nature and extent of SIPC

insurance.  It seeks to hold the defendants personally liable for the damages the plaintiff/class

suffered and alleges that, under SIPC's by-laws, the defendants are not entitled to

indemnification for their bad faith conduct.  Thus, the New Jersey Action in no way affects the

Trustee or the liquidation of Madoff in this Court.

23.     Nevertheless, the Trustee and B&H took it upon themselves to file, in this Court,

an order to show cause for a temporary restraining order against the plaintiffs' proceeding with

the New Jersey Action, which this Court denied.  The Court set May 18, 2010 as the return date

of the Trustee's motion for a preliminary injunction.

24.     In his papers seeking a temporary restraining order, the Trustee inappropriately

argued the SIPC directors' case for them.  (A copy of the Trustee' April 9, 2010 Brief in support

of his request for injunctive relief is attached hereto as **Exhibit B**.)  For example, the Trustee

took it upon himself to argue to this Court that there is no basis for the New Jersey plaintiffs'

8

claims under the New Jersey Consumer Fraud statute. (Ex. B. at 4-5.) Thus, in a situation where

the New Jersey plaintiffs have alleged that the SIPC directors are not entitled to indemnification

for their fraudulent conduct, the Trustee and B&H have incurred administrative expenses that are

being paid by SIPC (out of SIPC's insurance fund which is insufficient to pay customer claims)

to defend the SIPC directors in the New Jersey action.

25.    Ignoring the New Jersey plaintiffs' specific allegations of fraud based upon

published assurances on SIPC's website that customers can prove their claims by simply

producing their last statements, the Trustee falsely alleged in his brief in this Court in support of

an injunction that:

> Not only are the New Jersey Plaintiffs' allegations false, they could not be true
> under any circumstances. SIPA has bifurcated the duties and obligations of the
> Trustee and those of SIPC. Significantly, the Trustee is charged with the day-to-
> day administration of the estate, which includes determining and satisfying
> customer claims, while it is SIPC's obligation to advance the Trustee enough
> money for each customer claim which he, in his sole discretion, has allowed, up
> to $500,000 if the claim is for securities. . . . SIPC could not have exhibited bad
> faith with respect to actions that it did not undertake—determining the appropriate
> method for the net equity calculation.

*Id*. at 38.

26.    The Trustee went so far as to state that he would reserve the right to challenge the

New Jersey federal court's certification of the plaintiffs' alleged class!

> In any event, class treatment under Federal Rule of Civil Procedure 23 could
> never be appropriate for the fraud suit alleged by the New Jersey Plaintiffs,
> among other reasons, because of issues of individualized reliance. The Trustee
> reserves the right to challenge the propriety of class certification if that becomes
> necessary.

*Id.* at 44-45 n.24:

27.    This conduct of the Trustee and B&H so severely compromises the Trustee and

B&H that their immediate disqualification is necessary to preserve the integrity of this

proceeding.  This is a case which receives worldwide attention because foreign investors

constitute the vast majority of the $64.8 billion of losses.  As pointed out in the objections to the

first two fee applications, both the Trustee and B&H have a disqualifying conflict of interest

because they have chosen to represent the interests of SIPC, the insurer, against the investors, the

insured.  Now they have gone even further, expending SIPC's limited funds to defend SIPC's

directors who are charged with perpetrating a massive investment insurance fraud in violation of

the New Jersey Consumer Fraud statute.

28.    It is well-recognized that a trustee and his counsel are not entitled to the award of

any fees where they are not disinterested and where they act to favor the debtor's directors over

the debtor's creditors.  *E.g., In re Angelika Films 57*[th] *Inc.,* 227 B.R. 29 (B.S.D.N.Y 1998)(fees

must be denied where professionals have interest or relationship that could "even faintly color"

the independence and impartiality required by the Bankruptcy Code); *In re Balco Equities Ltd.,*

345 B.R. 87 (B.S.D.N.Y. 2006)(debtor's law firm required to disgorge all fees for lack of

disinterestedness).

## CONCLUSION

For the foregoing reasons, Objectors ask the Court to set a date for an evidentiary hearing

at which they can prove the objections set forth herein.  The Trustee and B&H are disabled from

serving because, as they have demonstrated repeatedly in the first 16 months of their service,

they have a fundamental conflict of interest and are working solely to enrich SIPC at the expense

of the Customers to whom they owe a fiduciary duty.

April 28, 2010

BECKER & POLIAKOFF LLP


By: /s/ Helen Davis Chaitman
45 Broadway
New York, NY 10006
(212) 599-3322
*Attorneys for Diane and Roger Peskin, Maureen
Ebel, and a large group of other customers*

# EXHIBIT A

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
Case 2:10-cv-06394-WJM-MF   Document   Filed 02/14/10   Page 1 of 72
to the Chaitman Decl.   Pg 14 of 143

Helen Davis Chaitman (hdc-4266)
BECKER & POLIAKOFF, LLP
21 East Front Street – Suite 400
Redbank, New Jersey 07701
(908) 303-4568

and

45 Broadway
New York, New York 10006
(212) 599-3322
Attorneys for the Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-----------------------------------------------------------

LISSA CANAVAN, LESLIE GOLDSMITH, and
JUDITH KALMAN on behalf of themselves
and all others similarly situated,

                 Plaintiffs

vs.

STEPHEN HARBECK, ARMANDO J. BUCELO,
JR., TODD S. FARHA, WILLIAM H. HEYMAN,
WILLIAM S. JASIEN, DAVID G. NASON, MARK
S. SHELTON, and DAVID J. STOCKTON,

                 Defendants.

-----------------------------------------------------------

**COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiffs Lissa Canavan, Judith Kalman, and Leslie Goldsmith, on behalf of themselves

and all other similarly-situated investors in Bernard L. Madoff Investment Securities LLC

("Madoff"), for their complaint against Defendants Stephen Harbeck, Armando J. Bucelo, Jr.,

Todd S. Farha, William H. Heyman, William S. Jasien, David G. Nason, Mark S. Shelton, and

David J. Stockton (other than Harbeck, the "Directors"), allege as follows:

### Summary of Action

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 15 of 143

Case 2:10-cv-09054-TSH   PSL Document   Filed 02/24/10   Page 2 of 72

1.      This is a class action against the President of the Securities Investor Protection
Corporation ("SIPC"), and all of its Directors, to recover compensatory and punitive damages for
the defendants' perpetration of a fraudulent investment insurance scheme which has resulted in
billions of dollars of injury to class members.  The class members are Madoff customers who, as
a result of SIPC's deliberate misrepresentation of the nature and scope of insurance provided to
investors, have been denied their full SIPC insurance and have lost their entire investments (the
"Customers").  But for the promise of SIPC insurance, the Customers would not have invested
their funds with Madoff.

2.      The Customers are a protected class of creditors in the Madoff liquidation
proceeding instituted on December 15, 2008 under the Securities Investor Protection Act, 15
U.S.C. § 78aaa, *et seq.* ("SIPA").  Under SIPA, the Customers are entitled to the prompt
replacement of securities in their accounts, up to $500,000 in value, based upon their November
30, 2008 statements (their "Statutory Balances").

3.      Instead of replacing securities up to $500,000 based upon the Customers' Statutory
Balances, the defendants have devised a scheme to enrich SIPC and its members at the expense
of the Customers.

4.      In direct contradiction of their repeated representations to the Customers and in
violation of their statutory mandate, defendants have caused their designated trustee in the
Madoff case, Irving H. Picard (the "Trustee"), to refuse to pay SIPC insurance to any Customer
whose withdrawals exceeded his deposits, regardless of the amount of time the Customer
maintained the account.  In addition, as to those Customers who have received some payment
from SIPC, the payment is not equal to the Customers' Statutory Balances up to $500,000.
Rather, in breach of the representations the defendants made to the Customers and in defiance of

the plain language of SIPA, the payment is based upon the Customers' net investment over

generations of account holders.

5.      Thus, in direct violation of their statutory obligations and for the first time in

SIPC's history, defendants have taken the position that the Customers' accounts were not insured

for their Statutory Balances but only for their net investment ("SIPC's Net Investment Policy").

6.      At a time when the United States is in an economic crisis due, in large part, to the

unremitting greed of SIPC's members, the SEC-regulated broker/dealers (the "Financial Services

Industry"), SIPC is taking a position which is fraudulent as to the Customers, as well as to all

customers of the Financial Services Industry, and which is destructive of Congress' essential

purpose in enacting SIPA, *i.e.,* to instill investor confidence in the capital markets.

7.      The defendants' conduct in the Madoff case is in direct violation of SIPA, its

legislative history, the written representations made by SIPC on its own website and made by the

Financial Services Industry to securities customers since 1970 and continuing today, as well as in

direct contradiction to positions that Harbeck, and SIPC have taken in public statements and

court proceedings of prior SIPA liquidations.

8.      SIPC was formed pursuant to SIPA in 1970 to provide insurance to customers of

the Financial Services Industry against the dishonesty of an SEC-regulated broker/dealer, funded

by the Industry which constitutes SIPC's members.  Thus, the statutory scheme required the

Financial Services Industry to self-insure the honesty of its own broker/dealers.

9.      SIPA was enacted at the behest of the Financial Services Industry to relieve the

industry of the significant expense of registering securities in the names of individual investors

and to allow the industry to profit from holding securities in street name.  The inducement to

investors to assume the risks of having their securities held in street name was the promise that

3

their accounts were insured against the brokers' dishonesty by an insurance fund managed by

SIPC and funded by the Financial Services Industry.

10.     In derogation of its obligation to assess its members appropriately, and in defiance

of governmental and other warnings that SIPC would be under-funded in the event of the

liquidation of a large broker/dealer, SIPC provided virtually free insurance to the Financial

Services Industry for the 19 years preceding Madoff's collapse.

11.     According to Harbeck's December 9, 2009 testimony before the House Financial

Services Committee's Subcommittee on Capital Markets, Insurance, and Government-Sponsored

Enterprises (the "Subcommittee"), for a period of 19 years ending in 2008, and in defiance of

specific warnings from Congress that SIPC was seriously under-funded, the defendants

deliberately provided hundreds of billions of dollars of SIPC insurance to SIPC's members for a

flat fee of $150 per year per firm, regardless of the number of customers of each member.

SIPC's decision to provide insurance for $150 per year per firm coincided with a significant

increase in market volume.  Thus, although SIPC's exposure was increased exponentially due to

increased market volume, SIPC allowed the fund balance to decrease drastically in relation to

SIPC's risk.  Moreover, SIPC deliberately allowed $500 million in lines of credit to expire in

March 2009, well after Madoff's fraud was exposed.  Thus, as predicted by Congress, on

December 31, 2008 SIPC, by deliberate design, lacked sufficient funds to satisfy SIPC's

obligations to the Customers.

12.     The Madoff case exposes SIPC to insurance obligations in the range of $2.5

billion.  SIPC had only $1.7 billion in assets as of December 31, 2008.  SIPC could have funded

this obligation by utilizing the $1 billion line of credit available to it under SIPA from the SEC,

or utilizing the $1 billion line of credit available to it from a consortium of banks.  If it had done

so, SIPC would have had to assess its members to repay these loans.

13.     Instead, the defendants chose to have SIPC default on its obligations and they have

orchestrated a scheme to cheat the Customers of their promised insurance and to enrich the

Financial Services Industry at the expense of the Customers.

14.     Defendants have not only adopted their Net Investment Policy in order to cheat the

Customers.  They have also announced a policy of "clawing back" withdrawals made by

Customers from their accounts in excess of the deposits the Customers made, without giving the

Customers any adjustment for the diminishing value of the dollar over time.  In addition, they

have rejected the position of the Securities and Exchange Commission ("SEC") that Customers'

accounts should be adjusted for "constant dollars" so as to recognize that $1 invested in 1980 is

probably equivalent to $10 withdrawn in 2008.  (The policy to claw back withdrawals, with no

adjustment for the value of the dollar, is hereafter called the "Unfair Clawback Policy.")

15.     Pursuant to SIPA, the Directors have a statutory duty to determine the "policies

which shall govern the operations of SIPC."  15 U.S.C. § 78ccc(c)(1).  SIPC's Net Investment

Policy was adopted by the Directors in bad faith and in direct contravention of their statutory

duty, with the sole intention of saving SIPC billions of dollars by disqualifying thousands of

Customers from receiving SIPC insurance.  The Policy is in direct contravention of SIPA, its

legislative history, SIPC's regulations, and SIPC's representations to investors and to the courts

over the 38 years of its existence prior to the formulation of the Net Investment Policy.

16.     By virtue of SIPC's Net Investment Policy, the defendants have perpetrated a fraud

upon the Customers and are personally liable, jointly and severally, for the damages that SIPC's

Net Investment Policy has caused to Customers in the full amount of their lost investments.

17.     Similarly, SIPC's Unfair Clawback Policy is a bad-faith policy in direct
contravention of the purpose and intent of SIPA because it penalizes investors who placed their
savings in the Financial Services Industry in order to save for their retirement.  It was adopted by
the Directors solely to enrich SIPC at the expense of the Customers by increasing the fund of
customer property so as to enhance SIPC's subrogation claims.

### Parties

18.     Plaintiff Canavan holds a twenty percent (20%) interest in Lapin Children LLC
("Lapin"), a New Jersey limited liability company formed on May 15, 2000.  She deposited
funds with Lapin which were transferred to Madoff for the purpose of purchasing securities.
Thus, she is a "customer" under SIPA entitled to SIPC insurance.  Lapin's account with Madoff
had a value of $1,959,600.93 as of November 30, 2008, and Lapin filed a claim in the SIPA
liquidation for that amount.  Each member of Lapin is a customer of Madoff and is entitled to
SIPC insurance in an amount determined by his or her proportionate interest in Lapin, up to the
statutory maximum of $500,000.  Because Canavan holds a 20% interest in Lapin, she is entitled
to 20% of that amount, or $391,920.18, as SIPC insurance.  To date, Canavan has received no
SIPC insurance nor has she received a determination letter determining her claim.  She is
domiciled in New Jersey and resides at 526 Alosio Drive, River Vale, New Jersey 07675.

19.     Plaintiff Goldsmith was a Madoff investor who filed a claim in the SIPA
liquidation for $207,226.91, based on her November 30, 2008 statement.  Her claim was denied
in its entirety by the Trustee in a determination letter dated October 19, 2009, because she
purportedly withdrew $261,003.91 from her Madoff account and had deposited $200,000 in her
account: $100,000 at the account's inception in 1992 and $100,000 in 2002.  Thus she received

08-01789-cgm Doc 4169-16 Filed 06/15/11 Entered 06/15/11 19:56:51 Exhibit M
to the Chaitman Decl. Pg 20 of 143

Case 2:10-cv-06594-TSH FHS Document Filed 02/14/10 Page 1 of 72

no SIPC insurance.  Goldsmith has filed an Objection to the Trustee's determination.  She is

domiciled in New Jersey and resides at 30 Redcoat Drive, East Brunswick, New Jersey 08816.

20.     Plaintiff Kalman was a Madoff investor who filed a claim in the SIPA liquidation

with Daniel Kalman for $817,006.60.  Her claim was allowed only in the amount of $133,675.00

by the Trustee in a determination letter dated September 10, 2009, because the Kalmans

purportedly withdrew $31,000 from the account in 2006 and 2008, and had deposited

$164,675.00 in the account during the period 1993 through 2002.  The Trustee refused to give

any credit for a December 18, 2001 transfer from another Madoff account in the amount of

$53,723.66.  Kalman is domiciled in New Jersey and resides at 78 Forest Park Terrace, Monroe

Township, New Jersey 08831.

21.     Defendant Stephen Harbeck is the President of SIPC and its primary spokesperson.

Upon information and belief, Harbeck is domiciled at 4106 Robertson Boulevard, Alexandria,

VA 22309.

22.     Defendant Bucelo has been a member of SIPC's Board of Directors since 2002.

He was acting Chairman of the Board in 2002, became Vice Chairman of the Board in 2003, and

has been Chairman of the Board since 2005.  Upon information and belief, Bucelo is a principal

of the Law Offices of Armando J. Bucelo, Jr. and is domiciled at 3310 Granada Blvd., Coral

Gables, Florida 33134.

23.     Defendant Farha has been a member of SIPC's Board of Directors since 2006.  He

is currently the Vice Chairman of the Board.  Upon information and belief, Farha is domiciled in

345 Bayshore Blvd., PH GP13, Tampa, Florida 33606.

24.     Defendant Heyman has been a member of SIPC's Board of Directors since 2007.

Upon information and belief, he is the Vice Chairman and Chief Investment Officer of The

7

08-01789-cgm Doc 4169-16 Filed 06/15/11 Entered 06/15/11 19:56:51 Exhibit M
to the Chaitman Decl. Pg 21 of 143
Case 2:10-cv-06564-SH Document 60-2 Filed 02/14/11 Page 8 of 72

Travelers Companies, Inc. and is domiciled at 1111 Park Avenue, Unit 9C, New York, New York 10128.

    25.    Defendant Jasien has been a member of SIPC's Board of Directors since 2007. Upon information and belief, he is a Senior Vice President of ING Financial Advisers LLC and is domiciled at 7421 Dunquin Court, Clifton, Virginia 20124.

    26.    Defendant Nason has been a member of SIPC's Board of Directors since 2007. Upon information and belief, he was formerly an Assistant Secretary for Financial Institutions, United States Department of the Treasury and is currently the Managing Director of Promontory Financial Group LLC and is domiciled at 4455 33rd Street N., Arlington, Virginia 22207.

    27.    Defendant Shelton has been a member of SIPC's Board of Directors since 2007. Upon information and belief, he is the Managing Director and General Counsel Legal & Compliance US UBS Financial Services, Inc. and is domiciled at 1150 5th Avenue, Apt. 3C, New York, New York 10128.

    28.    Defendant Stockton has been a member of SIPC's Board of Directors since 2000. Upon information and belief, he is a Director of the Division of Research and Statistics, Board of Governors of the Federal Reserve System and is domiciled at 7606 Mineral Springs Court, Springfield, Virginia 22153.

**Jurisdiction and Venue**

    29.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2)(A) because: (1) the matter in controversy between the class members and Defendants exceeds $5,000,000 exclusive of interest, attorneys' fees, and costs, and (2) many of the class members are citizens of a State other than the States of citizenship of the Defendants.

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
to the Chaitman Decl.    Pg 22 of 143

Case 2:10-cv-06984-SH    JMC Document    Filed 02/24/10    Page 9 of 72

30.     The Court has personal jurisdiction over the Defendants pursuant to New Jersey

Court Rule 4:4-4, which extends jurisdiction to the limits of due process.  The Defendants

committed tortious acts which caused injury to plaintiffs in New Jersey, including falsely

assuring plaintiffs that their accounts were insured up to $500,000 by SIPC.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

### Class Action Allegations

32.     Plaintiffs bring this action as a class pursuant to Rule 23 of the Federal Rules of

Civil Procedure on behalf of themselves and all other customers of Madoff who are not entitled

to their full SIPC insurance under SIPC's Net Investment Policy (the "Class").

33.     Plaintiffs allege on information and belief that the Class consists of approximately

4,000 Customers.  The class is thus so numerous that joinder of all class members is impractical.

34.     Members of the Class may be identified from Madoff's records which have been in

the exclusive possession of the Trustee since December 15, 2008.  Members of the Class may be

notified of the pendency of this action by mail using a form of notice similar to that used in

securities class actions and similar to the notices that the Trustee has sent to Customers in the

Madoff case.

35.     The claims set forth in the complaint are common to each and every member of the

Class.

36.     Plaintiffs are proper representatives of the class because plaintiffs are members of

the Class and the claims asserted in this complaint are typical of the claims of all members of the

Class.  The claims of the plaintiffs are not subject to any unique defenses; nor do the interests of

any of the plaintiffs conflict with the interests of any other member of the Class.

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 23 of 143
Case 2:10-cv-00954-FSH   PG Document 1   Filed 02/24/10   Page 10 of 72

37.    Plaintiffs contend that the claims set out herein are proper for certification as a class action under the provisions of Rule 23 (b)(3) of the Federal Rules of Civil Procedure.

38.    Plaintiffs are able to fairly and adequately protect the interests of the Class.

39.    Plaintiffs have retained counsel competent and experienced in class, SIPA and fraud litigation.

40.    The questions of law and fact common to the Class predominate over any questions affecting individual members because the issue of the proper determination of net equity is a central issue in determining all Class members' claims, and all Class members have suffered from the defendants' fraud and bad faith failure to pay insurance to Class members.

41.    The class action is superior to other methods of adjudication because there are over 4,000 members in the Class and repeated individual litigation of the common issues shared by all Class members would deplete their resources and reduce the amount of recovery available to each member, particularly since litigation to establish the defendants' fraud and the proper measure of damages will be relatively costly and time consuming when compared to the amount of each individual claim.

**Allegations Common to All Claims**

**The Directors Are Subject to Suit**

42.    The defendants' fraudulent assurance of SIPC insurance up to $500,000 based upon each Customer's last statement and the Director's promulgation of SIPC's Net Investment Policy are bad faith actions in direct violation of SIPA's definition of "net equity," of the SIPA prohibition against SIPC changing the definition of "net equity," of the legislative history of SIPA, of the defendants' fiduciary obligation to customers of the Financial Services Industry,

and of their obligations to fulfill Congress' statutory mandate to instill investor confidence in the
capital markets.

43.    The sole justification for the Directors' Net Investment Policy is to enrich SIPC's
members, the Financial Services Industry, at the expense of the Customers.

44.    SIPA, 15 U.S.C. § 78ccc(c)(1), provides that "SIPC shall have a Board of Directors
which, subject to the provisions of this chapter, shall determine the policies which shall govern
the operations of SIPC."  Pursuant to SIPC's 2008 Annual Report, a "board of seven directors
determines policies and governs operations."

45.    The Directors are subject to suit for their bad faith promulgation of SIPC's Net
Investment Policy and Unfair Clawback Policy pursuant to 15 U.S.C. § 78kkk(c) which provides
that "Neither SIPC nor any of its Directors, officers or employees shall have any liability to any
person for any action taken or omitted in good faith under or in connection with any matter
contemplated by this chapter."  *See also, In re Adler, Coleman Clearing Corp.*, 1998 Bankr.
LEXIS 1076 (B. S.D.N.Y. Aug. 25, 1998) (SIPA "contemplates that customers of a liquidating
broker/dealer can sue SIPC when it has not acted in good faith in exercising its statutory rights
and obligations.").

46.    The defendants are not entitled to be indemnified for their defense costs or any
ultimate judgment in this case.  Under 15 U.S.C. § 78ccc(b)(3)(B), the defendants are only
entitled to indemnification for actions they have taken in good faith:

> In addition to the powers granted to SIPC elsewhere in this
> chapter, SIPC shall have the power. . . to adopt, amend and repeal,
> by its Board of Directors, such bylaws as may be necessary or
> appropriate to carry out the purposes of this chapter, including
> bylaws relating to . . . the indemnity of its officers, directors and
> employees (including any person acting as a trustee or otherwise in
> a liquidation proceeding) for liabilities and expenses actually and
> reasonably incurred by any such person in connection with the

defense or settlement of an action or suit if such person acted in
good faith and in a manner reasonably believed to be consistent
with the purposes of this chapter.

47.     Article 5 of SIPC's Bylaws, entitled "Indemnification of Directors, Officers and
Employees" sets forth the criteria under which "former, present or future" directors, officers or
employees of SIPC shall be indemnified by SIPC for "any pending. . . civil, criminal,
administrative or arbitrative action, suit or proceeding . . . by reason of such person being or
having been such director, officer or employee."

48.     However, pursuant to SIPA, the defendants may not be indemnified in this case
because the statutory indemnification only applies to actions taken "in good faith and in a
manner reasonably believed to be consistent with the purposes of this chapter."

**The Directors Have Acted in Bad Faith**

49.     SIPA was established to protect investors who entrust their money to the Financial
Services Industry against the dishonesty of an SEC-regulated broker/dealer.  SIPC was created,
under SIPA, to carry out the policies of SIPA and to assess its members and administer the
insurance fund for the protection of investors.

50.     Under SIPA, SIPC is charged with the responsibility of assessing its members fees
sufficient to cover the insurance risk that a dishonest broker will steal a customer's money or
securities.  The defendants were warned in 2003 that they were seriously under-funded and
would not be able to handle a major liquidation.  Nevertheless, the defendants persisted in
charging firms like Goldman Sachs and Merrill Lynch a token $150 per year to insure millions of
customers.

51.     Under SIPA, SIPC is obligated to insure each customer's account up to $500,000
for securities that the customer had a legitimate expectation belonged to him.  The insurance was

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
to the Chaitman Decl.    Pg 26 of 143

Case 2:10-cv-00954-FSH    Document 1    Filed 02/24/10    Page 13 of 72

intended by Congress to give investors confidence in the Financial Services Industry so that they would feel comfortable allowing their brokers to hold their securities in street name.

52.    In return for contributing to the insurance fund managed by SIPC, the Financial Services Industry gained access to hundreds of billions of dollars of street name securities which the Industry could use for its own profits while in the brokers' possession.

53.    In total derogation of their statutory responsibility, the defendants have managed SIPC so as to cheat investors out of the SIPC insurance to which they are indisputably entitled.

54.    At the same time, the defendants have favored the Financial Services Industry by charging each brokerage firm a mere $150 per year for the 19-year period ending in 2008 for the privilege of representing on every single trade confirmation issued by that firm that the customer's account was insured by SIPC up to $500,000.

55.    In order to minimize the insurance risk but in derogation of their statutory responsibilities, the defendants have continuously selected trustees in SIPA liquidations who act solely to enrich SIPC at the investors' expense.    In 2000, the media reported that lawyers for defrauded investors and some state securities regulators argued that

> SIPC, created by Congress in 1970, has defined its role so
> narrowly that it doesn't use enough of its resources to help victims
> of broker fraud.  Critics also say it too frequently doles out
> lucrative contracts to a handful of lawyers who keep the purse
> strings tight when overseeing the liquidation of failed brokerages.

August 7, 2000 article in The Street available at http://www.thestreet.com/story/1029090/1.html.

56.    The Trustee in the Madoff liquidation, Irving H. Picard, was quoted in the above article as being "personally offended" by any implication that he had been repeatedly hired by SIPC because he "kept payouts low."  But the article found that "the record seems to support at least some concerns of SIPC critics" since

08-01789-cgm Doc 4169-16 Filed 06/15/11 Entered 06/15/11 19:56:51 Exhibit M
to the Chaitman Decl. Pg 27 of 143
Case 2:10-cv-00954-FSH Document 1 Filed 02/24/10 Page 54 of 72

> In 1990, the SIPC fund had $570 million and paid out $134
> million, or almost 25% of its assets, to cover investor losses. That
> year it collected $65 million in fees from its members, based on a
> rate of 3/16 of 1% of each of their annual revenues
>
> By [1999], the SIPC fund had almost doubled to $1.1 billion, but
> with a similar caseload, the agency actually paid out less -- $122.7
> million, or only about 11% of the value of its fund – to cover
> customer losses.

(*Id.*). In addition, SIPC appointed former SIPC president Theodore Focht, as a trustee in a

liquidation in 1996, presumably because SIPC knew he would keep costs down by denying

claims. (*Id.*). As reported in the article, critics viewed Focht's appointment as creating an

"appearance of impropriety and inherent bias" since he, as a former SIPC president, would be

expected to "rubber stamp" SIPC's decisions. (*Id.*).

57.   Such cronyism and repeat utilization of lawyers, like Picard, who follow the

defendants' mandate to deny valid customer claims violates SIPC's statutory purpose to protect

investors. Picard, as SIPC Trustee, was chastised by one court for advancing a totally frivolous

argument in his attempt to defeat a valid customer claim, after he had tried to threaten and

intimidate the customer. In *In re Investors Center, Inc.,* 129 B.R. 339 (B.E.D.N.Y. 1991), Picard

was faced with customer claims for cash where the customers had received confirmations from

the broker that their securities had been sold. After the sale, the securities became worthless and

SIPC wanted to simply replace the worthless securities rather than pay the cash that was

reflected on the account statements. The court held that "Under [SIPC's] rules, each of the

objecting *claimants*, because of the receipt of written confirmation of a sale prior to the filing of

SIPC's application to liquidate Investors Center, has a claim for cash and not for securities and

the Trustee's determination otherwise is incorrect." The court wrote:

> Except that the Trustee appears to urge this most seriously, the Court would deem
> the contention too frivolous to even consider.

14

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 28 of 143

Case 2:10-cv-00994-FSH   Document 1   Filed 02/24/10   Page 15 of 72

58.   In rejecting Picard's argument, the court cited 17 C.F.R. 501(a)(1), (2) and stated "The Rules are as binding on the Trustee and on SIPC as they are on the public.  The Trustee is not free to ignore them or rewrite them." *Id.* at 348.

59.   Having proven his loyalty to SIPC, defendants chose Picard as the trustee in the Madoff case, at a compensation to his law firm of approximately $1 million per week.  In a repeat performance, Picard has fulfilled his mandate:  he has utterly ignored SIPA's definition of "net equity" as the balance in the customer's account as reflected in the customer's last statement and announced a totally new theory of SIPC's coverage.  Under Picard's theory, SIPC only insures the net investment of the customer.  By taking this position, SIPC has broken with 38 years of its history, with controlling Second Circuit authority, with the clear legislative history of SIPA, and with the repeated representations made by SIPC over the years to induce investors to entrust their life savings to the Financial Services Industry.  By their conduct, the defendants have caused the notices provided by all broker/dealers to their customers to be false and misleading.  Defendants have allowed Picard to cause havoc in the securities industry and devastation to the Customers.

60.   Thus, under the direction of the defendants, SIPC is a scam:  SIPC leads investors to believe that it protects them by "promptly" satisfying customer claims in a liquidation proceeding.  However, in fact, SIPC does everything in its power to defeat and delay payment on customer claims so as to enrich SIPC at the customers' expense.

**The false representations of insurance**

61.   Although SIPC has recently deleted from its website any reference to the word "insurance," it is well recognized that SIPC provides insurance.  Indeed, a Google search of "SIPC insurance" on September 4, 2009 brought up 2,790,000 items.  As one court put it:

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 29 of 143
Case 2:10-cv-00954-FSH   Document 1   Filed 02/24/10   Page 16 of 72

> The SIPC Fund is raised from compulsory assessments on all
> securities business paid by all registered securities brokers and
> dealers. 15 U.S.C. § 78ddd(d). In effect, therefore, the Fund is
> nothing more or less than a compulsory insurance premium
> mandated by federal law, collected from brokers but charged to all
> securities investors.
>
> In return, the creditor/customer who has suffered a loss gets what
> appears to be an independent, impartial claims analysis by an
> officer of a federal court, but all he *really* gets is a decision by the
> insurance company's claims agent, its captive trustee. 15 U.S.C. §
> 78fff-2(b).

*In re First State Securities Corp.*, 39 B.R. 26 (B.S.D. Fla. 1984) (emphasis in original).

62.     The legislative history of SIPC clearly establishes that its purpose was to "maintain

and administer an insurance fund which would provide coverage against customer losses. . .

resulting from broker-dealer firms' insolvency."  S.Rep. No. 91-1218, p. 1 (1970).  The Senate

described SIPC as "an insurance plan for the industry," and one of several "federally sponsored

insurance programs." *Id.* at 4 - 5, 7 – 9.

63.     As the SEC's Office of the Inspector General ("OIG") has acknowledged, SIPA

"was created to protect customers from losses resulting from broker-dealer failure, thereby

promoting investor confidence in the securities markets."  Oversight of Securities Investor

Protection Corporation, available at the OIG's website at http:www.sec-

oig.gov/Reports/AuditsInspections/2000/301fin.pdf.

64.     On December 30, 1970, when President Nixon signed SIPA into law, he made the

following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation
> establishes the Securities Investor Protection Corporation (SIPC), a private
> nonprofit corporation, which will insure the securities and cash left with
> brokerage firms by investors against loss from financial difficulties or failure of
> such firms.   . . . Just as the Federal Deposit Insurance Corporation protects the
> user of banking services from the danger of bank failure, so will the Securities
> Investor Protection Corporation protect the user of investment services.

16

08-01789-cgm    Doc 4139-16    Filed 06/15/11    Entered 06/15/11 19:56:57    Exhibit M
Case 2:10-cv-00059-FSH - PS Document 1    Filed 02/25/10    Page 17 of 21
to the Chaitman Decl.    Pg 30 of 143

http://www.presidency.ucsb.edu/ws/index.php?pid=2870.

65.    In its 1970 annual report, the SEC described SIPA's purpose as to "provide

insurance for customer accounts."  http://www.sec.gov/about/annual_report/1970.pdf (at 3).

66.    Numerous courts, including nine Court of Appeals decisions, have described SIPC

as managing an "insurance" fund. [1]

---

[1] *In re New Times Sec. Servs.*, 371 F.3d 68, 84-85 (2d Cir. 2004); *Securities Investor Protection Corp. v. BDO Seidman*, *LLP*, 222 F.3d 63, 69 (2d Cir. 2000) *Redington v. Touche Ross & Co.*, 592 F.2d 617 (2d Cir. 1978), *rev'd and remanded on other grounds*, 442 U.S. 560 (1979); *Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1316 (2d Cir. 1976); *SEC v. Albert & Maguire Sec. Co.*, 560 F.2d 569, 574 (3d Cir. 1977); *Foster v. National Union Fire Ins. Co.*, 902 F.2d 1316, 1317, 1320 (8th Cir. 1990); *United States v. White*, 553 F.2d 1137, 1138 (8th Cir. 1977); *In re Brentwood Secur., Inc.*, 925 F.2d 325, 326 (9th Cir. 1991); *SEC v. Securities Northwest, Inc.*, 573 F.2d 622, 624 (9th Cir. 1978); *Ahammed v. Secs. Investor Prot. Corp. (In re Primeline Secs. Corp.)*, 295 F.3d 1100, 1103, 1106 (10th Cir. 2002); *Securities Investor Protection Corp. v. Oberweis Secur., Inc., (In re Oberweis Secur., Inc.)*, 135 B.R. 842, 846 (B. N.D. Ill. 1991); *Schwartz v. Oberweis*, 826 F. Supp. 280, 286 (N.D. Ind. 1993); *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 621 F. Supp. 2d 513, 533-34 (N.D. Ohio 2009); *Flego v. Philips, Appel & Walden, Inc.*, 514 F. Supp. 1178, 1181 (D.N.J. 1981); *Morsemere Sav. & Loan Asso. v. Marston*, 500 F. Supp. 1253, 1261 (D.N.J. 1980)("The decision here was in November, 1977; *Lamb v. Connecticut General Life Ins. Co.*, 509 F. Supp. 560, 574 (D.N.J. 1980); *In re Omni Mut.*, 193 B.R. 678, 680 (S.D.N.Y. 1996); *Rich v. Touche Ross & Co.*, 415 F. Supp. 99 (S.D.N.Y. 1976); *Securities Investor Protection Corp. v. Charisma Sec. Corp.*, 371 F. Supp. 894, 899 (S.D.N.Y. 1974); *Handelman v. Weiss*, 368 F. Supp. 258, 263 (S.D.N.Y. 1973); *In re MV Secs., Inc.*, 48 B.R. 156, 161 (B. S.D.N.Y. 1985); *Securities Investor Protection Corp. v. Oberweis Secur., Inc., (In re Oberweis Secur., Inc.)*, 135 B.R. 842 (B. N.D. Ill. 1991); *United States v. LaScola*, 2007 U.S. Dist. LEXIS 46054 at *6 (D.R.I. June 25, 2007).

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
to the Chaitman Decl.    Pg 31 of 143
Case 2:10-cv-00954-FSH   Document 1   Filed 02/25/10   Page 58 of 70

67.     Consistent with its statutory purpose, SIPC actively promoted itself as an insurance

fund to insure investors against the fraud of their brokers.  For example, in 2003, Harbeck

represented that SIPC is a "safety net," available to promptly pay customer claims so that "their

assets [are not] tied up for months."  As quoted in a February 26, 2003 News Release available

on SIPC's website,  Harbeck said:

> The Park South case is a textbook illustration of why Congress
> created SIPC to protect investors at troubled brokerage firms.
> While misuse of customer cash and securities is uncommon, it is
> important for investors to know that **SIPC is here as a safety net
> when they need us in those situations.  SIPC's mission also was
> met here in terms of making sure that more than 2,000 Park
> South investors were not further victimized by having their
> assets tied up for months or longer in a bankrupt brokerage
> firm.**

http://www.sipc.org/media/release26feb03.cfm; emphasis added.  In fact, Harbeck has repeatedly

acted to delay and frustrate payment of customer claims.

68.     According to SIPC's bylaws, the Official Explanatory Statement that members of

SIPC are authorized to use is either

> Member of SIPC, which protects securities customers of its members up to
> $500,000 (including $100,000 for claims for cash).  Explanatory brochure
> available upon request or at www.sipc.org; or


> Member of SIPC.  Securities in your account protected up to $500,000.  For
> details, please see www.sipc.org.

18

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 32 of 143
Case 2:10-cv-00594-FSH   Document 1   Filed 02/24/10   Page 51 of 72

69.    Neither statement puts a customer on notice of SIPC's Net Investment Policy.
Rather, SIPC's approved disclosures were intended to mislead investors into believing that their
accounts were insured by SIPC up to $500,000 based upon their Statutory Balances.  Each
statement is authorized in SIPC's bylaws, which are prepared and amended by the Directors.
Yet, each is an affirmative misrepresentation because SIPC does not, in fact, protect customers
but, instead, deceives customers by reneging on its insurance obligations.

70.    Even today, SIPC's members misrepresent the nature and extent of SIPC insurance
in order to lure trusting investors to entrust their life savings to the Financial Services Industry.
Citigroup, one of SIPC's members, sent the following notification to its customers after the
Madoff loss:

> In the unlikely event of insolvency, if a shortfall exists between
> what was required to be segregated and what actually was, Citi
> Personal Wealth Management clients are further protected by the
> following types of insurance:

- SIPC Protection.  CGMI is a member of the Securities Investor
  Protection Corporation (SIPC), a federally mandated U.S. nonprofit
  corporation that protects investors if a broker-dealer becomes
  insolvent.  When a brokerage firm that is a member of SIPC fails,
  SIPC's role is to ensure that investors get back what belongs to
  them.  If, when SIPC and the trustee examine the client accounts at
  a failed broker-dealer, there is a shortfall in the amount of securities
  or cash owed clients due to record-keeping errors or fraud, the
  affected clients are protected by SIPC coverage.

> Each client with missing securities or cash will be reimbursed by
> SIPC up to a maximum of $500,000, of which $100,000 may be
> cash.  SIPC does not cover market losses, and it does not cover
> certain types of investments such as commodity futures contracts
> and fixed-annuity contracts.

71.    Vanguard, one of SIPC's members, assures its customers as follows:

SIPC Insurance provides protection for assets held by you in Vanguard Brokerage
accounts." (Vanguard Brokerage Services is a division of Vanguard Marketing
Corporation, which is a member of SIPC.

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 33 of 143
Case 2:10-cv-00954-FSH   Document 1   Filed 02/24/10   Page 20 of 72

72.    FINRA, in 2010, described SIPC as providing insurance to investors:

SIPC is a non-profit organization created in 1970 under the Securities Investor
Protection Act (SIPA) that provides limited insurance to investors on their
brokerage accounts if their brokerage firm becomes insolvent. All brokerage firms
that do business with the investing public are required to be members of SIPC.

73.    The SEC continues to publish descriptions of SIPC as an insurer:

SIPC is a private, not-for-profit corporation that insures the securities and cash in
customer accounts of member brokerage firms against failure of those firms.

http://www.sec-oig.gov/Reports/AuditsInspections/2003/355fin.htm

74.    The defendants are fully cognizant of the representations that are made to the

public by its members and they have actively encouraged their members to make such

representations.  Yet, on February 2, 2010, Picard's lawyer, David Sheehan, argued to

Bankruptcy Judge Burton Lifland that, in the legislative history, some Senators made an

"unfortunate" choice of words when they described SIPC as insurance.  He told Judge Lifland:

There's no insurance. There's no $500,000 that everyone gets a check for. I don't
understand why people don't get that.

75.    Over the course of many years, defendants have deliberately misled the public into

believing that SIPC insured their accounts up to $500,000 against the dishonesty of a broker.

They did this because it was in the financial interests of their members for trusting investors to

pour their life savings into the Financial Services Industry to be held in street name.

76.    However, defendants also maintained a deliberate policy, if a broker turned out to

be dishonest, to do everything possible to deny insurance to the victims.  In fact, the defendants

perpetuated a policy of blaming the victims for the dishonesty of their brokers.  In addition to

arguing that Madoff's fraud should be imputed to the Customers, Sheehan argued to Judge

Lifland on February 2, 2010:

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
Case 2:10-cv-00994-FSH - PS   Document 1   Filed 02/24/10   Page 21 of 72
to the Chaitman Decl.   Pg 34 of 143

the last customer statement, being a concoction of a fraudster, cannot be something upon which you rely. No one in their right mind would suggest you should use the last statement.

77.     Even though SIPC knew that it was grossly-underfunded, it continued to provide its members with essentially free SIPC insurance.  The $150 annual fund contribution was criticized in 2000 by Joe Borg, then Alabama's chief securities regulator, as "nothing."  August 7, 2000 article in The Street available at http://www.thestreet.com/story/1029090/1.html.  Yet, SIPC refused to raise the contribution until April 1, 2009, after the Madoff fraud was uncovered. As of April 1, 2009, member assessments were raised to ¼ of 1% of a member's net operating revenues ($150 minimum).  However, such small assessments can never make up for SIPC's failure to meaningfully assess contributions to the SIPC Fund from its members for the past 19 years.

78.     The following chart, compiled from information available in SIPC's annual reports for the years ending 1998 to 2008, shows that SIPC's annual revenues from member assessments and contributions have declined sharply after SIPC instituted a *de minimus* $150 annual assessment, while expenses, including salaries, employee benefits and directors' fees and expenses, have risen steeply during the same period.

| Year ended | Annual Revenues | Revenues from Interest on US Government Securities | Revenues from Member Assessments and Contributions and Interest on Assessments | Balance of Fund[2] | Salaries and Employee Benefits | Directors' Fees and Expenses |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | | |

[2] Information on the Balance of the Fund from 1994-1997 is not readily available on SIPC's website because it only contains Annual Reports from 1998 to 2008, and the 1998 Annual Report does not contain information on the Balance of the Fund in previous years.

| 1994 | 87,967,964 | 50,829,178 | 37,138,786 | | 2,654,204 | 16,183 |
|------|------------|------------|------------|---|-----------|--------|
| 1995 | 114,597,996 | 56,715,607 | 57,882,389 | | 2,511,153 | 15,171 |
| 1996 | 63,942,360 | 61,280,052 | 2,662,308 | | 2,611,595 | 16,913 |
| 1997 | 68,002,339 | 66,656,807 | 1,345,532 | | 2,629,970 | 15,754 |
| 1998 | 71,030,692 | 69,839,676 | 1,191,016 | 1,196,695,240 | 2,890,318 | 31,414 |
| 1999 | 72,563,507 | 71,424,040 | 1,139,467 | 1,129,653,262 | 3,119,030 | 20,997 |
| 2000 | 73,484,696 | 72,373,421 | 1,111,275 | 1,220,284,553 | 3,516,593 | 35,773 |
| 2001 | 72,398,309 | 71,308,629 | 1,089,680 | 1,184,157,015 | 4,234,246 | 20,436 |
| 2002 | 67,581,578 | 66,526,852 | 1,054,726 | 1,260,200,497 | 4,495,570 | 19,112 |
| 2003 | 64,857,513 | 63,770,520 | 1,086,993 | 1,249,116,852 | 5,329,547 | 42,114 |
| 2004 | 64,063,393 | 63,085,146 | 978,247 | 1,287,554,216 | 5,118,345 | 55,835 |
| 2005 | 63,685,901 | 62,754,357 | 931,544 | 1,286,092,231 | 5,244,719 | 31,124 |
| 2006 | 66,385,148 | 65,487,278 | 897,870 | 1,403,558,035 | 5,439,474 | 67,492 |
| 2007 | 68,525,925 | 67,670,369 | 855,556 | 1,522,257,439 | 5,818,841 | 71,107 |
| 2008 | 68,417,453 | 67,597,794 | 819,659 | 1,699,039,958 | 6,461,396 | 101,207 |

79.    According to SIPC's 2007 Annual Report, the distributions to customers during the 37 years of SIPC's existence totaled $15,731,156,000, of which virtually all ($15,408,636,000) came from the assets of liquidated firms and a mere $322,520,000 (net) came from SIPC.

80.    According to SIPC's 2008 Annual Report, the distributions to customers during the 38 years of SIPC's existence totaled $159,997,487,000, of which virtually all ($159,673,694,000) came from the assets of liquidated firms and a mere $323,793,000 (net) came from SIPC.

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 36 of 143
Case 2:10-cv-00954-FSH   Document 1   Filed 02/24/10   Page 23 of 72

81. In 2008, SIPC's expenditures were approximately ten times greater than they had been in the preceding 37 years, but such increases came almost exclusively from the debtors' estates. There was plainly not enough money to fund a liquidation where, as here, the debtor's estate is inadequate.

82. SIPC has spent more on administrative expenses than payments to investors during its entire existence. During the period 1971 to 2000, SIPC paid investors $233 million and paid attorneys like Picard $320 million. *See* Gretchen Morgenson, Investors Beware: Many Holes Weaken Safety Net for Victims of Failed Brokerages, N.Y. Times, September 25, 2000. The chart below shows payments to investors and administrative expenses for the years 2000 to 2008.

| Year Ended | Administration Expenses | Net SIPC Distributions to Customers |
|---|---|---|
| 2000 | $39,595,920 | $22,917,00 |
| 2001 | $22,177,869 | $113,429,000 |
| 2002 | $30,479,523 | $34,973,000 |
| 2003 | $23,179,660 | $18,304,000 |
| 2004 | $27,707,446 | ($49,362,000) |
| 2005 | $25,244,278 | ($3,167,000) |
| 2006 | $1,046,836 | ($49,289,000) |
| 2007 | $8,560,191 | $430,000 |
| 2008 | $18,479,409 | $1,273,000 |

83. Under SIPA, SIPC has a $1 billion line of credit with the Securities and Exchange Commission ("SEC"). *See* 15 U.S.C. § 78ddd(a)(c), (d), (e), (f), (g), and (h).

84.     In addition, SIPC had maintained lines of credit totaling $1 billion with a

consortium of banks until March 1, 2009, when it allowed $500 million of these lines of credit to

expire.  SIPC's decision to allow $500 million in lines of credit to expire, thus substantially

limiting the amounts it had available to pay investors, *after* it knew the dimensions of the Madoff

fraud, constituted an obvious bad faith action intended to cheat investors of their promised

insurance.

85.     Because there are at least 4,000 members of the Class, each of whom is likely

entitled to $500,000 in SIPC insurance if the Directors comply with SIPA, SIPC would need

approximately $1.5 billion, possibly as much as $2 billion, to pay all the Class claims in

accordance with SIPA.

86.     With the $1.7 billion in the SIPC Fund as of December 31, 2008, and the lines of

credit available to it, the defendants could easily have caused SIPC to fulfill its statutory

obligation to the Customers and avoid the financial devastation caused to the Customers as a

result of SIPC's breach of its statutory obligations if it had simply borrowed on its lines of credit

in order to "promptly" replace securities in Customers' accounts up to $500,000 each.

87.     Instead, with the complicity of the SEC, SIPC chose to abrogate its statutory

obligations.  Thus, ignoring SIPC's lines of credit, SEC Commissioner Mary Schapiro testified

before Congress on July 14, 2009:

> The tragic truth is there is not enough money available to pay off
> all the customer claims.

88.     The inadequacy of the SIPC fund was foreseen by the SEC.  In April 2003, the

SEC observed that

> the SIPC fund was at risk in the case of failure of one or more of
> the large securities firms.  **SEC found that even if SIPC were to
> triple the fund in size, a very large liquidation could deplete the**

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11   19:56:51   Exhibit M
to the Chaitman Decl.   Pg 38 of 143

Case 2:10-cv-00954-FSH   Document 1   Filed 02/25/10   Page 25 of 72

> **fund.  Therefore, SEC suggested that SIPC examine alternative
> strategies for dealing with the costs of such a large liquidation.
> SIPC management agreed to bring this issue to the attention of
> the Board of Directors, who evaluates the adequacy of the fund
> on a regular basis.**

July 2003 United States Accounting Office Report to Congressional Requesters, "Securities

Investor Protection:  Update on Matters Related to the Securities Investor Protection

Corporation."  Yet, the SIPC fund was not "tripled in size" after 2003.  Nor is there any

indication that the defendants, who were responsible for evaluating the adequacy of the fund,

took any action pursuant to the SEC's suggestion.

89.    Now that the "very large liquidation" foreseen by the SEC has come to pass, it is

plain that the Defendants have no "alternative strategies" to deal with the Customers' claims

other than to cheat them of the insurance to which they are statutorily entitled.

90.    In an effort to conceal their disastrous financial condition, the defendants

published, in the Notes to the 2008 Financial Statements attached to the 2008 Annual Report, a

patent misrepresentation of the Customer claims:

> In the Bernard L. Madoff Investment Securities LLC proceeding,
> the trustee, utilizing the customer records available from the
> computer files of the firm identified those accounts believed to be
> valid customers. In accordance with section 78lll (2) of SIPA, the
> definition of a "customer" includes a "person who has deposited
> cash with the debtor for the purpose of purchasing securities." The
> customer can be an individual, a corporation, a partnership, a
> pension plan or a "feeder fund." **The trustee then calculated the
> "net cash" positions (cash deposited less cash withdrawn) for
> each customers' account and where available, this information
> was compared to other source documentation including
> banking records and customer portfolio files. Based on that
> valuation, the trustee determined the customer's net equity
> and maximum claim allowed under SIPA. Including
> administrative costs, management estimates that the total
> charges to SIPC for this case to be approximately $1.4 billion.**
> As actual claims are processed, the trustee will determine the
> ultimate amount of payment for each claim.  Claims can be
> disputed, which among other factors, could cause the ultimate

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
to the Chaitman Decl.    Pg 39 of 143
Case 2:10-cv-00954-FSH    Document 1    Filed 02/24/10    Page 26 of 72

amount of the claims to differ from the current estimate. Any
changes in the estimate will be accounted for prospectively.

91.    The estimate that the Madoff case can be resolved for total charges of

"approximately $1.4 billion" is a deliberate misrepresentation of fact.  There were 4,093 active

Madoff accounts as of December 11, 2008.  In many instances, an account held the funds of

more than one Customer -- indeed, there have been more than 15,400 customer claims filed in

the Madoff case.  It is believed the Class encompasses at least 4,000 Customers.  Thus, even if

every penny of the $1.4 billion projected went to Customers whose funds were in active

accounts, that would mean that only 2,800 Customers' claims would be paid, leaving at least

1,200 Customers without payment.

92.    Yet, every penny of the projected $1.4 billion is not going to be paid to Customers

because SIPC has been paying administrative expenses for the Trustee, his law firm and other

professionals such as accountants in the amount of approximately $2 million per week.  The

Trustee has stated that he anticipates no distributions of customer property will be made to

Customers for at least five years.  Thus, the legal fees alone in the Madoff case may well exceed

$250 million and could reach $500 million, if continued at their present pace.  This is money that

SIPC should be using to pay Customers the insurance to which they are entitled.

93.    Indeed, under the defendants' direction, as of February 2, 2010, 14 months after his

appointment, Picard had paid SIPC insurance to only one-third of the customers whose claims he

acknowledged as valid.  By this conduct, Picard is preserving the funds in the SIPC fund to pay

the exorbitant professional fees, rather than to replace securities in each Customer's account up

to $500,000.

94.    SIPC's note to the financial statements also makes its agenda of refusing to pay

customers patently obvious.  The note begins with a description of how the Trustee is paying

26

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
Case 2:10-cv-00954-FSH    Document 1    Filed 02/25/10    Page 27 of 72
to the Chaitman Decl.    Pg 40 of 143

claims under SIPC's Net Investment Policy and then immediately states that costs will be kept to $1.4 billion. The cause and effect relationship is quite clear – because the Trustee is violating SIPA and betraying the trust of the American people by using SIPC's Net Investment Policy, the costs can be kept low enough to satisfy SIPC and its members. Unfortunately, SIPC's desire to keep its costs down is at the expense of the Customers whose interests Congress sought to protect when it enacted SIPA.

**SIPC's Net Investment Policy Is A Violation of Federal Law**

95.    Under the aegis of SIPC's Net Investment Policy, the Directors have created a new definition of "net equity," in direct contravention of SIPA, with the intention of depriving approximately 2,568 Customers of SIPC insurance entirely and drastically reducing the SIPC insurance paid to the 2,335 Customers whose claims SIPC recognizes as valid in some amount.

96.    Pursuant to this new definition, and in blatant disregard of SIPA, the defendants have denied SIPC insurance to anyone who does not have a net investment over the life of his investment with Madoff. Under the defendants' policy, an investor who invested $100,000 in 1970, which appreciated to $1,600,000 in 2008, is not entitled to any SIPC insurance if, over the course of 37 years, the investor took out $100,000 to pay taxes. Similarly, according to the defendants a Class member who had an IRA account from which the Class member took the annual withdrawals mandated by federal law and paid taxes on the money is not entitled to SIPC insurance if his mandatory withdrawals exceeded his investment.

97.    Pursuant to the defendants' Unfair Clawback Policy, an investor who invested $100,000 in 1970, which appreciated to $1,600,000 in 2008, would be subject to clawback by the Trustee if, during that 38-year period, the investor took out more than $100,000. According to

08-01789-cgm Doc 4169-16 Filed 06/15/11 Entered 06/15/11 19:56:51 Exhibit M
to the Chaitman Decl. Pg 41 of 143
Case 2:10-cv-00954-FSH - Document 1 Filed 02/24/10 Page 28 of 72

Picard, that investor would have to disgorge to Picard all funds withdrawn in the six years preceding the liquidation proceeding, in excess of $100,000.

98.     By ignoring SIPA, the defendants have necessitated the additional administrative expense of having "forensic" accountants determine the net investment of each Class member, in many cases encompassing 30 – 40 years of records. The "forensic" accountants, of course, are also being paid by SIPC with money which should be paid to Customers. The defendants' self-serving *legerdemain* is calculated to save SIPC billions of dollars and, at the same time, necessitates the incurrence of hundreds of millions of dollars of unnecessary administrative expenses that would be avoided if SIPC simply complied with the law.

99.     As a result of the defendants' bad faith failure to pay SIPC insurance, Customers have suffered tragic additional losses. Many Customers have been forced to sell their homes on a fire-sale basis in an extraordinarily depressed market, simply because they did not have the money to cover the monthly housing expenses for a sufficient period to sell their homes over a more reasonable time period. Customers have been forced to put loved ones into nursing homes because they could not afford to continue to support them in their own homes. The health of many Customers has deteriorated significantly from the stress and they have not had the money to be properly treated for their medical conditions.

100.   As a result of the defendants' Unfair Clawback Policy, Customers who were devastated by the loss of their life savings are now tortured by the prospect of losing the only money they have left in the world – the tax refunds they obtained from the Internal Revenue Service as a result of their theft losses.

**The Benefits of SIPA to the Financial Services Industry**

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
Case 2:10-cv-00954-FSH    Document 1    Filed 02/24/10    Page 52 of 72
to the Chaitman Decl.    Pg 42 of 143

101.    SIPA was enacted in 1970 at the behest of the Financial Services Industry which
was seeking to relieve itself of the administrative expense of having to register customer
securities with the issuing corporations every time a customer purchased new securities for his
account.  *See* Joel Seligman, *The Transformation of Wall Street:  A History of the Securities
Exchange Commission and Modern Corporate Finance,* 451 n.31 (1995) (Prior to enactment of
SIPA, "Stock certificates and related documents were 'piled halfway to the ceiling' in some
offices; clerical personnel were working overtime, six and seven days a week, with some firms
using a second or even a third shift to process each day's transactions.").

102.    In addition to being relieved of the administrative expense of salaries for people
whose sole function was to register securities, the Financial Services Industry wanted the
flexibility and profits that would come with investors allowing the firms to hold securities in
street name.  *See An Investor's Guide to the Alternatives of Holding Physical Certificates,*
published by the Securities Industry and Financial Market Association, available at
http://www.sifma.org/services/publications/pdf/PhysCertGuide2alternatives.pdf (stating that the
Securities Industry and Financial Market Association "strongly supports and encourages [street
name] type of ownership").

103.    Securities held in street name could be utilized by the brokerage firms to generate
profits for themselves.  The securities could be loaned out, could be sold and repurchased, and
could be borrowed against, while in the possession of the brokerage firms, whereas securities
directly registered in the name of the customer could not be utilized for any purpose by the
brokerage firms**.** *See, e.g.,* 17 C.F.R. 240.8c-1; 17 C.F.R. 15c-1.

104.    In order to induce investors to allow brokerage firms to hold securities in street
name, the Financial Services Industry realized it would have to provide some insurance to

29

08-01789-cgm Doc 4169-16 Filed 06/15/11 Entered 06/15/11 19:56:51 Exhibit M
to the Chaitman Decl. Pg 43 of 143

Case 2:10-cv-00594-FSH Document 1 Filed 02/24/10 Page 30 of 72

investors for the risk that a broker might be dishonest and steal the street name securities or not

purchase them in the first place. Hence, the Industry developed the idea of SIPA to provide

SIPC insurance to investors and, thereby, to induce them to invest in securities held in street

name. This would allow the Financial Services Industry to utilize the investors' securities for

their own enrichment while in the brokers' possession. As a result of the enactment of SIPA,

tens of billions of dollars was invested in the Financial Services Industry in street name

securities.

105. Yet, now SIPC, acting in bad faith through the defendants, is denying Customers

the insurance to which they are statutorily entitled, while having allowed its members, the

Financial Services Industry, to enjoy the billions of dollars of profits that they made by using

street name securities for the past 40 years.

**In Order To Enrich SIPC at the Customers' Expense, The Directors Have
Changed SIPA's Definition Of "Net Equity," Despite A Statutory Prohibition**

106. Pursuant to SIPA, the Trustee is obligated to "satisfy net equity claims of

customers." 15 U.S.C. § 78fff(a)(1)(A)-(B). SIPA defines "net equity" as the value of the

securities positions in the customer's account as of the SIPA filing date, less any amount the

customer owes the debtor. This is the Statutory Balance of each customer's account.

> The term "net equity" means the dollar amount of the account or accounts of a
> customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such
> customer if the debtor had liquidated, by sale or purchase on the filing date, all
> securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date. . .

15 U.S.C. §78lll(11).

107. Congress specifically prohibited SIPC from changing any definitions contained in

§ 78lll, which section includes the definition of "net equity." As stated in SIPA:

> SIPC shall have the power. . . to adopt, amend and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to . . .the definition of terms in this chapter, **other than those terms for which a definition is provided in section 78lll of this title. .**

15 U.S.C. § 78ccc(b)(4)(A) (emphasis added).  Because SIPC has no power to change the statutory definition of "net equity," the defendants have no power to allow the Trustee to use SIPC's Net Investment Policy.

108.   In a July 2003 and a May 2001 Report, the United States General Accounting Office ("GAO"), wrote:

> SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash and/or securities held at a failed firm**.  SIPC fulfills its mission** by initiating liquidation proceedings where appropriate and transferring customer accounts to another securities firm or returning the cash or securities to the customer **by restoring to the customer accounts the customer's "net equity."  SIPA defines net equity as the value of cash or securities in a customer's account as of the filing date, less any money owed to the firm by the customer, plus any indebtedness the customer has paid back** with the trustee's approval within 60 days after notice of the liquidation proceeding was published.

GAO Report to the Ranking Minority Member, Energy and Commerce Committee, House of Representatives entitled "Securities Investor Protection:  Steps Needed to Better Disclose SIPC Policies to Investors" dated May 2001 at 15; emphasis added; GAO Report to Congressional Requesters entitled "Securities Investor Protection: Update on Matters Related to the Securities Investor Protection Corporation" dated July 2003 at 6; emphasis added.

109.   The Second Circuit has recognized the statutory definition of net equity:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" corrected for "any indebtedness of such customer to the debtor on the filing date."

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
Case 2:10-cv-00594-FSH    Document 1    Filed 02/24/10    Page 52 of 72
to the Chaitman Decl.    Pg 45 of 143

*In re New Times Securities Services, Inc.*, 371 F.3d 68, 72 (2d Cir. 2004); *see also Securities Investor Protection Corp. v. BDO Seidman, LLP,* 49 F. Supp. 2d 644, 649 (S.D.N.Y. 1999) ("As defined by SIPA, 'net equity' is the amount that the broker would have owed a customer had it liquidated all the customer's holdings on the date SIPC filed for a protective decree, less any outstanding debt the customer owed to the broker."); *In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 61 n. 2 (B. S.D.N.Y. 1999) ("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

110.  The Southern District of New York Bankruptcy Court also adopted the statutory definition of "net equity" when it wrote, in the December 23, 2008 Order in the Madoff liquidation that:

> **ORDERED, that the Trustee be, and he hereby is, authorized to satisfy such customer claims and accounts** (i) by delivering to a customer entitled thereto "customer name securities," as defined in 15 U.S.C. §78*lll*(3); (ii) **by satisfying a customer's "net equity" claim, as defined in 15 U.S.C. §78*lll*(11),** by distributing on a ratable basis securities of the same class or series of an issue on hand *as* "customer property," as defined in 15 U.S.C. §78*lll*(4), and, if necessary, by distributing cash from such customer property or cash advanced by SIPC, or purchasing securities for customers as set forth in 15 U.S.C. §78fff-2(d) within the limits set forth in 15 U.S.C. §78fff-3(a); and/or (iii) by completing contractual commitments where required pursuant to 15 U.S.C. §78fff-2(e) and SIPC's Series 300 Rules, 17 C.F.R. §300.300 et seq., promulgated pursuant thereto; and it is further

> **ORDERED, that with respect to claims for "net equity," as defined in 15 U.S.C. § 78*lll*(11), the Trustee be, and he hereby is, authorized to satisfy claims out of funds made available to the Trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the Debtor available to satisfy such claims;**

December 23, 2008 Order at 5; emphasis added.

111.  In the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
Case 2:10-cv-00594-FSH    Document 1    Filed 02/24/10    Page 33 of 72
to the Chaitman Decl.    Pg 46 of 143

in their accounts, despite the fact that the broker had operated a Ponzi scheme for a lengthy

period and had never purchased the securities reflected on the customers' monthly statements.

112.    In fact, Harbeck assured the *New Times* bankruptcy court that customers would

receive securities up to $500,000 **including the appreciation** in their accounts.  As Harbeck

explained, if customers are led to believe that "real, existing" securities had been purchased for

their accounts, then those customers are entitled to get the full value of their securities positions

as of the filing date even if the securities had never been purchased:

>    MR. HARBECK:  **Even if they're not there.**
>
>    THE COURT:  Even if they're not there.
>
>    MR. HARBECK:  Correct.
>
>    THE COURT:  In other words, **if the money was diverted, converted –**
>
>    MR. HARBECK:  And the **securities were never purchased**.
>
>    THE COURT:  Okay.
>
>    MR. HARBECK:  **And, if those positions triple, we will gladly give the people
>    their securities positions**.

Hearing Transcript at 37-38, *In re New Times Sec. Servs. Inc.*, 371 F.3d 68 (B. E.D.N.Y. 2000)

(emphasis added).

113.    In a brief SIPC submitted to the Second Circuit in 2005, SIPC represented that its

policy was to honor the legitimate expectations of investors, even where the broker never

purchased the securities.  SIPC wrote:

>    [R]easonable and legitimate claimant expectations on the filing date are
>    controlling even where inconsistent with transaction reality.  Thus, for example,
>    **where a claimant orders a securities purchase and receives a written
>    confirmation statement reflecting that purchase, the claimant generally has a
>    reasonable expectation that he or she holds the securities identified in the
>    confirmation and therefore generally is entitled to recover those securities
>    (within the limits imposed by SIPA), even where the purchase never actually
>    occurred and the debtor instead converted the cash deposited by the**

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 47 of 143
Case 2:10-cv-00954-FSH   Document 1   Filed 02/25/10   Page 34 of 72

> **claimant to fund that purchase** . . . [T]his emphasis on reasonable and
> legitimate claimant expectations frequently yields much greater 'customer'
> protection than would be the case if transactional reality, not claimant
> expectations, were controlling, as this Court's earlier opinion in this liquidation
> well illustrates.

Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at 23-24 (citing

*New Times*)(emphasis added).

114.   The defendants' position in the Madoff case is directly contradicted, not only by

SIPC's treatment of customers in *New Times*, but also by a statement that SIPC's General

Counsel, Josephine Wang, gave to the press on December 16, 2008 – after Mr. Madoff's

confession --  wherein Ms. Wang acknowledged that a Customer is entitled to the securities in

his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if
> clients were presented statements and had reason to believe that the securities
> were in fact owned, the SIPC will be required to buy these securities in the open
> market to make the customer whole up to $500K each.  So if Madoff client
> number 1234 was given a statement showing they owned 1000 GOOG shares,
> even if a transaction never took place, the SIPC has to buy and replace the 1000
> GOOG shares.

December 16, 2008 Insiders' Blog,
http://www.streetinsider.com/Insiders+Blog/SIPCs+Role+In+Madoff-Of-All-
Scams+Could+Save+The+Stock+Market/4243249.html.

115.   The defendants' position conflicts with other federal statutes including the Internal

Revenue Code and ERISA.  For example,

(a)   IRS Form 4506 requires the IRS to destroy returns after seven years.  Yet,

the Trustee is refusing to pay SIPC insurance to Class members who cannot produce records of

deposits dating back 15 – 20 years.

(b)   Rev. Proc. 2009-09, issued by Commissioner Shulman on March 17,

2009, expressly recognizes the income earned by Class members, on which they paid taxes

08-01789-cgm Doc 4169-16 Filed 06/15/11 Entered 06/15/11 19:56:51 Exhibit M
Case 2:10-cv-00954-FSH - PS Document 1 Filed 02/24/10 Page 35 of 72
to the Chaitman Decl. Pg 48 of 143

annually. Yet, the Trustee has taken the position that the income earned by Class members is not their money.

(c)   Rev. Proc. 2009-20 provides for a five-year carryback of the theft loss. Yet, the Trustee has indicated he intends to "claw back" income withdrawn by Class members over the last six years.

(d)   Plaintiffs were required by law to take mandatory withdrawals from their IRA accounts, their family limited partnerships, and other entities. Yet, the Trustee is deducting from SIPC insurance the mandatory withdrawals that Class members took and paid taxes on.

116.   Because of SIPC's refusal to comply with SIPA's mandate that the Trustee "promptly" satisfy customer claims based on the Statutory Balances, 15 U.S.C. § 78fff-3(a) and 4(c), SIPC has decided that the Trustee needs a vast team of forensic accountants to pore through decades of records to determine each Class member's net investment before SIPC pays any amount to a Class member. Clearly, this is inconsistent with the statutory scheme and the legislative intent.

117.   The Class members' "securities positions" are readily ascertainable from their November 30, 2008 statements. Their net equity is simply the "securities positions" set forth on their last statements, less any amount due the broker/dealer.

**Defendants Are Destroying Investor Confidence In A Period of National Economic Crisis**

118.   The purpose of SIPA, as evidenced by its title, was to "protect" investors who allowed the Financial Services Industry to hold their life savings in street name securities. *See, e.g.,* H.R. Rep. No. 91-1613, at 3-4 (1970)("[SIPA] will reinforce the confidence that investors have in the U.S. securities markets."). *See also In re New Times*, 371 F.3d at 87 ("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities markets and protecting

35

broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 794 (6th Cir.

1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[ ] and

upgrade the financial responsibility requirements for registered brokers and dealers.")(citations

omitted).  SIPA attempted to do this initially by satisfying customers' "net equity" claims for

securities with actual securities only if the debtor held securities of the appropriate class and kind

to satisfy customers' claims, while otherwise customers would receive the cash equivalent of the

value of their securities on the filing date.  SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat.

1636, 1648-50 (1970); H.R. Rep. No. 95-746 (39-41)(statement of SIPC Chairman Hugh F.

Owens).

119.   When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest

shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments],

*[i.e.],* . . . **the failure to meet legitimate customer expectations of receiving what was in their**

**account at the time of their broker's insolvency**."  D 922 Cong. Rec. H. 36326 (daily ed. Nov.

1, 1977)(statement of Rep. Robert C. Eckhardt)(emphasis added).  See also Hearing on H.R.

8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. On Interstate

and Foreign Commerce, 94th Cong. 63 (1975)("The basic framework of the 1970 Act in regard to

satisfaction of customers' claims should be modified to better meet the legitimate expectations of

customers.") (report to the SIPC Board of Directors by the Special Task Force to consider

possible amendments to SIPA); Hearing on H.R. 8331 before the Subcomm. on Consumer

Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81

(1977) ("The proposed [1978] amendments carry out the Task Force recommendations and are

designed to make the Act more responsive to the reasonable expectations of investors.")

(statement of SIPC Chairman Hugh F. Owens); Hearing on H.R. 8064 Before the Subcomm. on

36

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:53   Exhibit M
to the Chaitman Decl.   Pg 50 of 143
Case 2:10-cv-00954-FSH   Document 1   Filed 02/24/10   Page 37 of 72

Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th

Cong. 161-162 ("[T]he principal purpose of these amendments is to meet more nearly the

reasonable expectations of brokerage firm customers.")(statement of SEC Commissioner Philip

A. Loomis, Jr.).

120.   A customer's reasonable expectations were that their actual securities, as shown on

their statements, would be returned to them "in the form they existed on the filing date."  H.R.

Rep. No. 95-746, at 21.  Thus, SIPA was amended to state that "[t]he trustee shall, to the extent

that securities can be purchased in a fair and orderly market, purchase securities as necessary for

the delivery of securities to customers in satisfaction of their claims for net equities. . ." 15

U.S.C. § 78fff-2(d); SIPA § 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978).

121.   Here, the legitimate expectations of the Customers was contained in the account

statements and trade confirmations they received.  They expected that their accounts held the

securities reflected therein.  Thus, recognizing Customer claims in the amount of their Statutory

Balances will further the goals of SIPA, as memorialized in the legislative history.

122.   Nor does the statute contain an exception where a dishonest broker, like Madoff,

never purchased the securities.  On the contrary, Congress specifically contemplated that

"securities positions" reflected in a customer's statements could include securities that were

never actually purchased.  The Senate and House Reports on the 1978 amendments to SIPA

show that SIPA was intended to cover securities that the broker-dealer did not actually purchase:

> Under present law, because securities belonging to customers may have been lost,
> improperly hypothecated, misappropriated, **never purchased** or even stolen, it is
> not always possible to provide to customers that which they expect to receive, that
> is, securities which they maintained in their brokerage account. . . By seeking to
> make customer accounts whole and returning them to customers in the form they
> existed on the filing date, the amendments. . . would satisfy the customers'
> legitimate expectations. . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
Case 2:10-cv-00564-FSH - JS Document 1    Filed 02/25/10    Page 58 of 72
to the Chaitman Decl.    Pg 51 of 143

> A customer generally expects to receive what he believes is in his account at the
> time the stockbroker ceases business.  But because securities may have been lost,
> improperly hypothecated, misappropriated, **never purchased**, or even stolen, this
> is not always possible.  Accordingly, [when this is not possible, customers] will
> receive cash based on the market value as of the filing date.

H.R. Rep. No. 95-746 at 21 (emphasis added).

123.   Thus, there is absolutely no support for the defendants' Net Investment Policy in
either SIPA or its legislative history.  Instead, the legislative history is in accordance with the
statute: Customers are entitled to claims in the amount of their Statutory Balances, consistent
with their legitimate expectations.

**SIPC And the SEC Consented to Controlling Second Circuit Authority
Entitling Customers to Claims In The Amount Of Their Statutory Balances**

124.   In *New Times*, the trustee and SIPC took precisely the position they are required to
take here, *i.e.,* that the claims of customers who received trade confirmations and account
statements reflecting the purchase of real securities should be allowed in the amount of their last
statements, even though the securities were never purchased.  Here, the Customers are in the
exact same position as the *New Times* customers whose claims were satisfied – they all received
statements showing securities positions in actual, existing securities.

125.   *New Times'* principal, William Goren, engaged in a "classic Ponzi scheme" where
new investors' money was used to pay earlier investors.  *In re New Times Sec. Servs. Inc.* ("*New
Times I"*), 371 F.3d 68, 72 n.2 (2d Cir. 2004).  However, while Madoff presented Customers
with trade confirmations and statements showing securities positions in real securities, only some
*New Times* customers were presented with statements showing investments in mutual funds that
actually existed (the "Existent Securities"); the remaining *New Times* customers received
statements showing that they were invested in money market funds that were totally fictitious
(the "Non-Existent Securities").  371 F.3d at 71-72.

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
Case 2:10-cv-00954-FSH   Document 1   Filed 02/25/10   Page 59 of 72
to the Chaitman Decl.   Pg 52 of 143

126.   In *New Times,* SIPC treated the two categories of customers differently.  SIPC applied the statutory net equity definition to the Existent Securities customers' claims by paying the claims according to the full value of those securities positions as of the date of the liquidation filing, and the Second Circuit endorsed that treatment.   However, with respect to customers whose statements showed Non-Existent Securities, SIPC used the net investment methodology that the Trustee and defendants are using in the Madoff liquidation.  The customers with Non-Existent Securities appealed SIPC's treatment.  The Second Circuit took particular note of SIPC's position:

> investors who were misled by Goren to believe that they were investing in mutual funds that in reality existed were treated much more favorably.  Although they were not actually invested in those real funds – because Goren never executed the transactions, the information that these claimants received on their account statements "mirrored what would have happened had the given transaction been executed."  [Br. for New Times Trustee and SIPC] at 7 n.6.  As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances.  *Id*.  The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims.  *Id*.  Furthermore, the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," in contrast to the "cash claimants" bringing this appeal, could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements. *Id*.

*New Times I*, 371 F.3d at 74.

127.   The Second Circuit found that the customer's legitimate expectations based on written confirmations and account statements control how a "net equity" claim is determined, citing SIPC's Series 500 Rules, 17 C.F.R. §§ 300.500-300.503, which confirm the importance of written confirmations.  The Court explained that "the premise underlying the Series 500 Rules [is] that a customer's 'legitimate expectations' based on written confirmations of transactions, ought to be protected."  371 F.3d at 87.  It noted that "Under the Series 500 Rules, whether a claim is treated as one for securities or cash depends not on what is *actually* in the customer's

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
to the Chaitman Decl.    Pg 53 of 143

Case 2:10-cv-00994-FSH    Document 1    Filed 02/25/10    Page 54 of 72

account, but on what the customer has been told by the debtor in written confirmations." *Id* at 86

(emphasis in original).  *See also In re Oberweis Sec., Inc*., 135 B.R. 842, 847 n. 1 (B. N.D. Ill.

1991) ("The court agrees with the trustee's argument that Congress did not intend to treat

customers without confirmations the same as those with confirmations; that customers with

confirmations have a legitimate expectation of receiving securities, but customers without

confirmations do not have the same expectation.").

128.    In contrast to those *New Times* customers whose statements showed Existent

Securities, the Second Circuit held that the net equity of *New Times* customers whose statements

showed Non-Existent Securities should be determined as the amount of money invested minus

any withdrawals.  *New Times I*, 371 F.3d at 88.   The court held that customer recoveries based

on "fictitious amounts in the firm's books and records would allow customers to recover

arbitrary amounts that necessarily have no relation to reality." *Id.* Obviously, customers whose

confirmations indicated the purchase of Non-Existent Securities could not have had a legitimate

expectation that they owned those securities. Thus, only when securities positions "necessarily

have no relation to reality," *i.e.*, are based on securities that *do not exist*, should a "cash in minus

cash out" methodology be employed.

129.    Here, each Customer received trade confirmations and account statements showing

investments in real securities.  Thus, each Customer had a legitimate expectation that he owned

the assets shown on his last statement and is entitled to a claim in the amount of the balance on

his November 30, 2008 statement.

130.    In 2006, a different Second Circuit panel considered related issues and found, once

again, "[i]t is a customer's legitimate expectations on the filing date . . . that determines the

availability, nature and extent of customer relief under SIPA." *In re New Times Sec. Servs., Inc*.

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
Case 2:10-cv-00994-FSH   Document 1   Filed 02/25/10   Page 54 of 72
to the Chaitman Decl.   Pg 54 of 143

463 F.3d 125, 128 (2d Cir. 2006) (*New Times II*).  The court added, in *New Times II,* that, in the

case of customers who believed they held fictitious securities:

> Because there were no such securities, and it was therefore impossible to
> reimburse customers with the actual securities or their market value on the filing
> date (the usual remedies when customers hold specific securities), the [*New Times
> I* Court] determined that the securities should be valued according to the amount
> of the initial investment.  The court declined to base the recovery on the rosy
> account statements telling customers how well the imaginary securities were
> doing, because treating the fictitious paper profits as within the ambit of the
> customers' "legitimate expectations" would lead to the absurdity of "duped"
> investors reaping windfalls as a result of fraudulent promises made on fake
> securities . . . The court looked to the initial investment as the measure for
> reimbursement because the initial investment amount was the best proxy for the
> customers' legitimate expectations.

*New Times II*, 463 F.3d at 129-30 (citations omitted).

131.   SIPC and the *New* Times Trustee valued Existent Securities customers' claims in

accordance with the statutory definition of net equity even when those claims included mutual

fund shares that were purchased through "dividend reinvestments," despite the fact that since the

initial securities had never been purchased, the customers **had received no dividends to**

**reinvest**.  Specifically:

> [I]nvestors who believed that their accounts held shares of mutual funds that
> actually existed (but were never purchased for their accounts) are having their
> claims (both as to shares of mutual funds never purchased by Goren and shares
> shown in customer statements as purchased through dividend reinvestment)
> satisfied by the Trustee up to the statutory maximum of $500,000.

Claimants' Joint Mem. of Law in Opposition to Joint Motion of Trustee and SIPC for Order

Upholding Determinations at 3, *SEC v. Goren*, 206 F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-

CV-970).

> [W]hereas the Trustee has disallowed that portion of the claim of [the Non-
> existent Securities] investors representing shares of [the Non-existent Securities]
> purchased through dividend reinvestment, the Trustee has allowed that portion of
> the mutual fund investors' claims [i.e., "Existent Securities" investors' claims] as
> represents shares of such mutual funds purchased by them through dividend
> reinvestment.

41

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:54    Exhibit M
to the Chaitman Decl.    Pg 55 of 143
Case 2:10-cv-00954-FSH    Document 1    Filed 02/25/10    Page 42 of 72

Limited Objection to Trustee's Determination of Claim at 6 n.4, *SEC v. Goren*, 206 F. Supp.2d

344 (E.D.N.Y. 2002) (No. 00-CV-970).

132.   SIPC and the Trustee described their method in the *New Times* liquidation:

> In every case [of an 'Existent Security' customer], the Trustee has been able to
> identify the actual mutual fund in question by cross-checking the information
> supplied by Goren on the customer statements, including share price information,
> with publicly available information and then been able to purchase that security.

Joint Mem. of Law in Support of Trustee's Motion for an Order Upholding the Trustee's

Determinations with Respect to Claims Filed for Investments in Non-Existent Money Market

Funds and Expunging Objections to Those Determinations, *SEC v. Goren*, F. Supp. 2d 344

(E.D.N.Y. 2002) (No. 00-CV-970).  They further stated that where customers' statements

reflected securities positions in closed mutual funds, "the Trustee properly gave the customers

cash equal to the filing date values of the closed mutual funds."  Reply Mem. in Further Support

of Trustee's Motion for Order Upholding Determinations at 20, *S.E.C. v. Goren*.

133.   Even when challenged regarding their position by customers of the "Non-existent

Securities," SIPC (and the SEC) stood by their approach with respect to the Existent Securities

customers.  In an *amicus curiae* brief, the SEC stated "[o]ur view [is] that when possible, SIPA

should be interpreted consistently with a customer's legitimate expectations based on

confirmations and account statements."  Br. of the SEC, Amicus Curiae, In Partial Support of the

Position of Appellants and In Partial Support of the Position of Appellees ("SEC Amicus Curiae

Brief") at 13, New Times I (No. 02-6166).

134.   The briefs filed by SIPC and the *New Times'* Trustee likewise stated that:

> In those cases [concerning the payment of interest and dividends on bona fide
> mutual funds] the claimants had an objectively legitimate expectation of receiving
> interest/dividends because the security in question had actually earned them.
> Here, the bogus mutual fund [the Ficitious New Age Fund] was never organized
> as a mutual fund and had no assets or investments.

42

Br. for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of New

Times Securities Services, Inc. and New Age Financial Services, Inc. and Securities Investor

Protection Corporation, at 38, *New Times I* (No. 02-6166).

135.   SIPC stated in its brief in *New Times II* that:

> [R]easonable and legitimate claimant expectations on the filing date are
> controlling even where inconsistent with transaction reality.  Thus, for example,
> **where a claimant orders a securities purchase and receives a written**
> **confirmation statement reflecting that purchase, the claimant generally has a**
> **reasonable expectation that he or she holds the securities identified in the**
> **confirmation and therefore generally is entitled to recover those securities**
> **(within the limits imposed by SIPA), even where the purchase never actually**
> **occurred and the debtor instead converted the cash deposited by the**
> **claimant to fund that purchase** . . . [T]his emphasis on reasonable and
> legitimate claimant expectations frequently yields much greater 'customer'
> protection than would be the case if transactional reality, not claimant
> expectations, were controlling, as this Court's earlier opinion in this liquidation
> well illustrates.

Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at 23-24 (citing *New*

*Times*)(emphasis added).  Thus, SIPC recognized that it is "claimant expectation," rather than

"transactional reality" that controls.

136.   There were no "imaginary securities" listed on the Madoff account statements.

Thus, *New Times II* does not apply. Yet, in direct contravention of SIPC's position in *New Times*,

in which SIPC "gladly" paid customers whose statement showed Existent Securities that were

never purchased their full claims, even if the actual securities' value had "triple[d]," here, the

Trustee has refused to recognize the Customers' Statutory Balances.

137.   The  Customers had the legitimate expectation that they owned real securities.

Indeed, they could have had no other expectation, based upon the trade confirmations and

account statements they received.  Thus, SIPC must employ the same method used in *New Times*

and honor Customer claims in the amount of their Statutory Balances.

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:54   Exhibit M
to the Chaitman Decl.   Pg 57 of 143
Case 2:10-cv-00594-FSH   Document 1   Filed 02/25/10   Page 54 of 72

**The Directors' Justification for SIPC'S Net Investment Policy Is Specious**

138.   SIPC has justified the Trustee's rejection of SIPA's definition of "net equity" by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme.  It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

www.foxbusiness.com/.../madoff-victims-greater-transparency-questions-linger/.   This justification is completely specious.  SIPA honors the legitimate expectation of the customer, even if the customer is dealing with a thief.  For precisely this reason, SIPC persuaded the Second Circuit to accept a thief's books and records in *New Times* as to all customers who had a legitimate expectation that their statements were accurate.

139.   In fact, SIPC's "thief" rationale was flatly rejected in *New Times I,* when the district court held that the Trustee's determination that holders of Non-Existent securities were not entitled to claims in the amount listed on their account statements erroneously 'hinged on the unilateral actions of the fraud-feasor who embezzled his client's funds.'"  371 F.3d at 75.  The Second Circuit did not take the fraud-feasor's role into account when vacating in part the district court's decision.

140.   Under the SIPA statutory scheme, the dishonesty of the broker is irrelevant to the allowance of customer claims.  The only issue in determining the amount of a customer's claim is whether the customer had a "legitimate expectation" that the assets reflected on his last statement belonged to him.

141.   After 14 months of investigation, the Trustee has identified only two Madoff investors who might not have had a "legitimate expectation" that their November 30, 2008 statements were accurate.  The Trustee has sued Jeffry Picower and Stanley Chais alleging that

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 58 of 143

Case 2:10-cv-00994-FSH - PS   Document 1   Filed 02/24/10   Page 45 of 72

they had extraordinary returns in their accounts and received restated account statements

showing retroactive $100 million losses.  Assuming these allegations are true, Picower and Chais

could not have had a "legitimate expectation" that their account statements were accurate.

However, the fact that the Trustee has identified one or two customers who may not have had a

legitimate expectation that their statements were accurate does not justify rejecting the statutory

definition of "net equity" and frustrating the legitimate expectations of 4,000 Customers.

**SIPC's Net Investment Policy Is Contrary To Its Practice For 38 Years**

142.   The Directors' defiance of SIPA's definition of net equity, despite the fact that

Customers received account statements and written confirmations showing investments in real

securities, is inconsistent with 38 years of SIPC's history.  Harbeck admitted as much in January

2009 when he announced: "We've modified our usual claim form to ask investors a question

that's unique to this case, which is how much money did you put in and how much money did

you take out."  (Jan. 6, 2009, CNBC).  He also stated that "[O]ne of the first things that we did . .

. was to modify our standard claim form to make sure that we asked the claimants themselves

what evidence they had in terms of money in and money out, because that's going to be one of

the critical factors."  (Jan. 5, 2009, Stephen Harbeck, testimony before House Financial Services

Committee).  In fact, the Madoff Class member Claim form contains the unprecedented

language:

> In particular, you should provide all documentation (such as
> cancelled checks, receipts from the Debtor, proof of wire transfers,
> etc.) of your deposits of cash or securities with the Debtor from as
> far back as you have documentation.  You should also provide all
> documentation or information regarding any withdrawals you have
> ever made or payments received from the Debtor.

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:54   Exhibit M
to the Chaitman Decl.   Pg 59 of 143
Case 2:10-cv-00954-FSH   Document 1   Filed 02/25/10   Page 46 of 72

143.   Thus, Harbeck recognized the unprecedented nature of SIPC's approach which, in fact, is inconsistent with the position it has taken in its 39 year history.   Indeed, SIPC always led investors to believe that SIPC insurance was based upon their last brokerage statement:

> In the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you.  This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement.

*See* SIPC/SIFMA brochure Understanding Your Brokerage Account Statements, at 5, SIPC Website 2009.

> How is the amount of a customer's claim determined?  The amount of the customer's claim, excluding any securities registered in his name and returned to him, is called his "net equity."  **The net equity of a customer's account is determined by adding the total value of cash and securities the firm owes the customer and subtracting the total value of cash and securities the customer owes the firm.**

*See* How SIPC Protects You at 14, 1994 (emphasis added), www.jprcapital.com/howsipc.pdf.

> A customer's "net equity" is, in general, what the broker owes the customer less what the customer owes the broker, exclusive of "specifically identifiable property."     Essentially, Section 6(c)(2)(A)(iv) [codified at 15 U.S.C. § 78lll(11)] defines "net equity" as the dollar amount of a customer's account determined after giving effect to the completion of any open contractual commitments (discussed below), excluding therefrom any specifically identifiable property reclaimable by the customer, and subtracting the indebtedness (if any) of the customer to the debtor from the sum which would have been owing by the debtor to the customer had the debtor liquidated all other securities and contractual commitments to the customer on the filing date.  In short, a customer's "net equity" claim is for a liquidated sum.

*See* SIPC Annual Report 1973, at 21.

144.   Having induced investor reliance upon the promise of SIPC insurance based upon the investors' last statement, the defendants cannot now change the rules, simply because they did not sufficiently assess their members to fund SIPC's liabilities.

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
to the Chaitman Decl.    Pg 60 of 143

Case 2:10-cv-00954-FSH    PS    Document 1    Filed 02/24/10    Page 47 of 72

**The Directors Have Violated SIPA's Mandate To "Promptly" Pay Customer Claims**

145.    Congress made absolutely clear its intent to minimize the devastation to customers

of an insolvent broker/dealer through prompt payment of SIPC insurance.  SIPA requires that

SIPC "promptly" pay SIPC insurance to investors of a liquidated brokerage firm:

> GENERAL PROVISIONS OF A LIQUIDATION PROCEEDING

> **(a) PURPOSES**

> The purposes of a liquidation proceeding under this chapter shall be—

> (1) **as promptly as possible** after the appointment of a trustee in such liquidation proceeding, and in accordance with the provisions of this chapter—

> (A) to deliver customer name securities to or on behalf of the customers of the debtor entitled thereto as provided in §78fff-2(c)(2) of this title; and

> (B) to distribute customer property and (in advance thereof or concurrently therewith) otherwise satisfy net equity claims of customers to the extent provided in this section.

> **PAYMENT TO CUSTOMERS.-SIPC shall promptly satisfy all obligations of the member to each of its customers relating to, or net equity claims** based upon, securities or cash by the delivery of securities or the effecting of payments to such customer (subject to the provisions of section8 (d) and section **9** (a) ) insofar as such obligations are ascertainable from the books and records of the member or are otherwise established to the satisfaction of SIPC.

15 U.S.C. **§**78fff-2(c)(2); emphasis added.  *See also,* 15 U.S.C. § 78fff-3(a).

146.    Congress intended for the trustee to promptly pay customer claims based upon the

debtor's books and records, without the filing of proofs of claim:

> **[SIPA] establishes procedures** for prompt orderly liquidation of SIPC members when required and **for making prompt distributions and payments on account of customers' claims without need for formal proofs of claim.**

47

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
Case 2:10-cv-00954-FSH    JS Document 1    Filed 02/25/10    Page 48 of 72
to the Chaitman Decl.    Pg 61 of 143

* * *

The committee also believes that **it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations.**

* * *

**Because of the difficulties involved in filing proofs of claim . . ., the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.**

See S. Rep. 91-1218, at 10, 11, 12 (1970), *reprinted in* Federal Securities Laws Legislative History 1933-1982, Vol. IV, at 4642, 4643, 4644 (1983) (emphasis added)).

147.   The Southern District of New York Bankruptcy Court has recognized Congress' intent that SIPC proceedings be conducted quickly in order to minimize the devastation to customers:

> Congress itself has commanded **swift** action. For example, the SEC and self-regulatory organizations are required to "**immediately notify**" SIPC of concerns about the financial stability of a SIPC member. 15 U.S.C.A. § 78eee(a)(1). A Court determining that a protective decree is warranted must "**forthwith**" appoint a trustee, 15 U.S.C.A. § 78eee(b)(3), and remove the case to a Court with jurisdiction over bankruptcy cases. 15 U.S.C.A. § 78eee(b)(4). The trustee is required to investigate the operation of the debtor's business and report its results to SIPC "**as soon as practicable**." 15 U.S.C.A. § 78fff-1(d). Among the stated purposes of a liquidation proceeding is to make customers whole "**as promptly as possible after the appointment of a trustee," 15 U.S.C.A. § 78fff(a), who is required to "promptly discharge . .** all obligations of the debtor to a customer relating to securities." 15 U.S.C.A. § 78fff-2(b). **SIPC fund moneys must be advanced to the trustee up to certain limits "to provide for prompt payment and satisfaction of . . . claims of customers."  15 U.S.C.A. § 78fff-3(a).  Congress has commanded customer damages to be repaired promptly.**

*In re Donald Sheldon & Co., Inc.*, 153 B.R. 661, 667 (B. S.D.N.Y. 1993); emphasis added.

48

148.   The December 23, 2008 order entered in the Madoff liquidation specifically

incorporates the time periods mandated by SIPA.  The Order states:

> ORDERED, that the Trustee be, and he hereby is, authorized to
> satisfy, **within the limits provided by SIPA**, those portions of any
> and all customer claims and accounts which agree with the
> Debtor's books and records, or are otherwise established to the
> satisfaction of the Trustee pursuant to 15 U.S.C. §78fff-2(b),
> provided that the Trustee believes that no reason exists for not
> satisfying such claims and accounts

December 23, 2008 Order at 5; emphasis added.

149.   Congress intended that SIPC would pay claims promptly so as to minimize the

impact on investors who were victimized by a dishonest broker/dealer.  The intent was that SIPC

would pay claims as quickly as the FDIC.  As stated in the legislative history of SIPA:

> The intention of SIPC, like the FDIC, is to minimize losses to and
> to maintain public confidence in the institutions the public deals
> with.

S. Rep. 91-1218, at 9, *reprinted in* Federal Securities Laws Legislative History 1933-

1982, Vol. IV, at 4641.

150.   According to the FDIC's website, "It is the FDIC's goal to make deposit insurance

payments within two business day[s] of the failure of the insured institution."

http://www.fdic.gov/consumers/banking/facts/payment.html.  Yet in the Madoff liquidation,

more than 14 months after the institution of the liquidation proceeding, the Trustee has paid

SIPC insurance to only one-third of the claimants who, he has determined, are entitled to SIPC

insurance.

151.   Yet Harbeck led investors to believe that SIPC would pay their claims within two –

three months.  As quoted in a November 15, 2007 article available on Kiplinger.com at

www.kiplinger.com/printstory.php?pid=12842, Harbeck stated:  "The fastest that an investor

could conceivably get back in control of one's account is one week" but he added that "In most

situations, it takes two to three months."  The article further stated that "the process can stretch

out even longer if the brokerage firm kept shoddy records."

152.   The brochure on SIPC's website, "How SIPC Protects You," also states that

"[m]ost customers can expect to receive their property in two to three months."  It notes that

delays of "several months" can take place where the broker's records are inaccurate and that

there might be delays in cases where the broker was involved in fraud, but does not state that

such delays will be substantial.

153.   Here, as part of the defendants' fraudulent scheme, they have mandated that SIPC

delay the payment of claims as much as possible.  In recognition of the unconscionable delay in

payment of SIPC insurance to destitute Customers, but without any statutory authority, the

Trustee established a "Hardship Program" pursuant to which Customers who, through the

disclosure of the most intimate personal information, are deemed in the Trustee's sole discretion

to be hardship cases, are entitled to receive "expedited" treatment.

154.   However, the Trustee has given himself more time to pay "hardship" cases than

SIPA contemplates a trustee will need to pay all customers.  The Trustee has given himself an

initial period of 20 days to decide whether or not an individual qualifies for the Hardship

Program.  If an individual does qualify, then his claim "will be expedited in the claims process"

but "the Trustee cannot guaranty the timing of determination of any claim."  (*Id.*). The best that

an individual can hope for is that, if his account was opened after January 1, 2006, "the Trustee

will endeavor to mail a determination of [the] claim within 20 days of [the] claim qualifying for

the Hardship Program."  (*Id.*). Thus, if an individual's account was opened after January 1, 2006,

the Trustee will "endeavor" (but does not promise) to mail a determination of claim within 40

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 64 of 143
Case 2:10-cv-00994-FSH - PS   Document 1   Filed 02/24/10   Page 51 of 72

days, but only if the Class member discloses absolutely everything about his finances first. Of course, the time between determination and payment can be another 60 days.

155.   There is no provision in SIPA that contemplates that a trustee will take 60 days to determine a claim, no matter when the investment was made. There is nothing in SIPA that restricts prompt payment to those who can demonstrate to the Trustee's satisfaction that they are suffering "hardship." There is nothing in SIPA which allows a trustee to provide for prompt payment to recent customers and delayed payment to long-standing customers. That is precisely why SIPA requires the Trustee to fix a customer's claim at his Statutory Balance.

156.   The conduct of the defendants and the Trustee has been particularly injurious to elderly investors. The Trustee has denied SIPC insurance to "hardship" Customers whose investments in Madoff date back 15-40 years who did not retain their records of deposits. The Trustee has taken the position that it is the Customer's burden to prove his investments and, if the Customer did not retain records from 15-40 years ago, the Customer loses and SIPC wins. In fact, the Trustee's counsel has informed Customers that the Trustee will not provide Customers with Madoff's own records – as to which the Trustee has exclusive access. Thus, even if the Trustee has a record of Customer deposits, the Trustee will not make those records available to the Customer. In this way, of course, SIPC can deny coverage to Customers who had no reason to, and did not, retain records of deposits going back 15-40 years.

157.   As to the remainder of the "hardship" cases, the Trustee has taken months to resolve "hardship" cases, during which the Trustee has sought to exact compromises from elderly, destitute Customers. In several instances, the Trustee's counsel have affirmatively misrepresented the law to "hardship" cases in order to induce them to accept from SIPC less than the sums to which they are indisputably entitled. In addition, the Trustee has regularly deducted

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 65 of 143
Case 2:10-cv-00954-FSH   Document 1   Filed 02/24/10   Page 52 of 72

from Customers' SIPC insurance alleged "preferences," despite the fact that SIPA does not

authorize such offsets and despite the fact that there is a substantial question as to whether the

preference provision of the Bankruptcy Code applies to Customers who simply received

distributions from their accounts of their own money, in the ordinary course of business of

themselves and Madoff.

158.   Under the Unfair Clawback Policy, defendants, through Picard, are attempting to

claw back funds from Customers whom Picard has already acknowledged are "Hardship Cases."

**SIPC Has Always Delayed Payment of Customer Claims In Violation of SIPA**

159.   Although SIPA mandates that securities be replaced in customers' accounts

"promptly," SIPA's strategy of delay is not new.  Indeed, as early as 1980, SIPC began its

strategy of bad faith delay in payment.  In *In re Investors Security Corp.*, 6 B.R. 415 (B.W.D. Pa.

1980), SIPC and the trustee argued that two accounts, one held by an investor individually and

one held jointly by the investor and his wife, should be treated as belonging to one "customer,"

thus making the investor and his wife entitled only to the statutory minimum, rather than twice

the statutory minimum.  The court found that the two accounts were held by two separate

customers, and ordered a judgment against the trustee in the statutory minimum at that time.

However, SIPC had successfully delayed for nearly five years from the date the claims were

filed.

160.   In a later proceeding in the same case, *In re Investors Security Corp.*, 30 B.R. 214

(B. W.D.Pa. 1983), SIPC and the trustee filed a motion for reconsideration and to alter

judgments after the court entered a judgment finding that two investors were "customers" within

the meaning of SIPC.  After reviewing all of the "expanded record, counsel's motions and their

brief in support thereof," the  court remained "firmly convinced that the [investors] fall squarely

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 66 of 143

Case 2:10-cv-00954-FSH - Document 1 - Filed 02/24/10 - Page 53 of 72

within the definition of 'customer' as set forth in the SIPA statute, and are therefore entitled to its
protection." However, SIPC obtained a delay of nearly eight months between the court's first
decision in favor of the investors and its second decision, reiterating its findings in favor of the
investors.

161. In *SIPC v. Ambassador Church Finance/Development Group, In*c., 788 F.2d 1208
(6th Cir. 1986), SIPC litigated for over seven and one half years the question of whether investors
were "customers" under SIPA, a question that the Sixth Circuit decided in favor of the investors.

162. In *In re C.J. Wright & Co., Inc*., 162 B.R. 597 (B. M.D. Fla. 1993), claimants
objected to the trustee's determination that they were not customers. The claimants had
deposited money with the debtor in the belief that the debtor was purchasing CD's with such
funds. The trustee argued that the funds were loans because CD's were never purchased with the
funds. The court found that the claimants did not intend to loan funds to the debtor, but entrusted
the monies with the debtor for the purposes of purchasing securities (the CD's). Thus, the court
ruled claimants were customers within the meaning of SIPA and had claims for cash. Yet,
through litigation, SIPC delayed paying such customers for over one year. Harbeck acted as
counsel for SIPC in the matter.

163. In *Schultz v. Omni Mutual, Inc*., 1993 U.S. Dist. LEXIS 18464 (S.D.N.Y. 1993),
the district court reversed the bankruptcy court's holding, which granted the trustee summary
judgment. The bankruptcy court had held that it did not have to reach the issue of whether
claimants were customers because their claim was grounded in fraud, negligence, breach of
contract and overreaching. On appeal, the district court found that there was a material issue of
fact as to whether the claimants had deposited money with the debtor and given the debtor's
agent a direction to invest their money. The district court further held that whether the claimants

53

were "customers" had to be resolved before determining how their claims for fraud, breach of

contract, negligence or overreaching might affect their SIPC coverage.  SIPC delayed paying the

claims for over one year.

164.   In *In re Primeline Securities Corp*, 295 F.3d 1100 (10th Cir. 2002), SIPC delayed

payment of customer claims for four years.  The bankruptcy court had ruled that claimants (and

others) were entitled to payments, but the trustee and SIPC had filed an appeal.  The district

court found that the claimants were not entitled to payments and were not "customers." The

Court of Appeals reversed and remanded the district court order denying customer status to

claimants with respect to funds each claimant sought to invest in debentures. The protective

order was entered in 1998, but the 10th Circuit decision was not entered until 2002.  Harbeck was

on the brief for SIPC and the trustee.

165.   In *In re Investors Center*, 129 B.R. 339 (B. E.D.N.Y. 1991), Irving Picard, as SIPC

Trustee, advanced the argument that customers with unexecuted sales orders were entitled to

securities and not the cash they would have received if the sales were executed.  Picard even

threatened, in letters rejecting the claims, that "if the sales transactions had been completed and

your account credited with the proceeds, the Trustee would have had the right to seek to avoid

the transactions as involving a fraudulent transfer under the Bankruptcy Code."  He withdrew his

threat to seek to avoid the transactions, but insisted that the claims were only for the securities

the customers sought to sell.  The court stated:  "Except that the Trustee appears to urge this

most seriously, the Court would deem the contention too frivolous to even consider."  In

rejecting Picard's argument, the court cited 17 C.F.R. 501(a)(1), (2) which mandates that the

customers had claims for cash, and not securities, and stated "**The Rules are as binding on the**

**Trustee and on SIPC as they are on the public.  The Trustee is not free to ignore them or
rewrite them.**" (emphasis added).

166.   Yet, just as they tried to do in *Investors Center*, SIPC, acting through defendants,
have rewritten SIPA to enrich the Financial Services Industry at the expense of the Customers.

**The Directors Have Ignored Serious Concerns Raised By The GAO and Congress**

167.   In 1999, Representative John D. Dingell raised concerns about SIPC's performance
and asked the GAO to "examine how the corporation determines the legitimacy of investor
claims and whether oversight of the corporation by the SEC is adequate."  June 22, 2001 New
York Times article, "U.S. Report Faults Agency That Oversees Investor Claims."

168.   The GAO Report issued in 2001 found that there were "significant deficiencies" in
SIPC, and Rep. Dingell told the New York Times that "SIPC's mission is to promote confidence
in securities markets by facilitating the prompt return of missing customer cash and/or securities
held at a failed firm.  However, the large number of claims denied in several recent high-profile
SIPC liquidation proceedings has raised concern that SIPC policies may unduly limit the actual
protection afforded consumers."  (*Id.*).

169.   Representative Paul E. Kanjorski was also quoted in the New York Times article as
stating that "According to the GAO, both the SIPC and the SEC have fallen short in their duty to
make sure that investors are informed on the actions they need to take to protect their interests.
Both Congress and the administration must address these concerns and deficiencies promptly,
especially as more Americans than ever – roughly 50 percent – are invested in the stock market.
(*Id.*).

170.   Representative Dingell was so agitated by SIPC's policies that he sent a letter to
the Acting Chairmen of the SEC and SIPC on June 20, 2001 regarding SIPC's deficiencies in the

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
Case 2:10-cv-00954-FSH   Document 1   Filed 02/24/10   Page 56 of 72
to the Chaitman Decl.   Pg 69 of 143

wake of the GAO report, and posted the letter to the Committee on Energy and Commerce's

website.  Specifically, Rep. Dingell stated that

> **the large number of claims denied in several recent high-
> profile SIPC liquidation proceedings have raised concerns that
> SIPC policies and practices may unduly limit the actual
> protection afforded customers**.  *See,* "Many
> Holes Weaken Safety Net for Victims of Failed Brokerages," The
> New York Times, Sept. 25, 2000; "Group Assails Insurer of
> Investors," The Washington Post, July 21, 1999; and "Many
> Unhappy Returns:  Ex-Stratton Customers still fighting to recoup
> $130m," Newsday, Dec. 20, 1998. (Emphasis added.)

171.   The 2001 GAO Report emphasized the importance of SIPC honestly explaining the

limits of its insurance protection to investors and indicated concerns with SIPC's performance.

172.   SIPC's then-president, Michael E. Don, issued a statement about the GAO report in

a June 22, 2001 press release on its website.  SIPC whitewashed the GAO report, stating that

"Contrary to some published reports, the GAO report does not find any significant deficiencies

on the part of SIPC and I encourage fair-minded individuals to read the report for themselves in

order to get an accurate grasp of what the GAO actually concluded."  SIPC further stated that it

prided itself on "the fact that the SEC has never found a significant problem of any kind in how

SIPC operates."  In the press release, SIPC also made some statements regarding its plans to

simplify and expand its brochure, "How SIPC Protects You," to make certain changes to its

website and to increase its investor education outreach activities, and represented that it had

taken such actions in response to the GAO report.

173.   Yet, despite its promises, SIPC ignored Rep. Dingell's concerns and certain of the

GAO recommendations.  In a July 2003 follow up report, GAO found that SIPC had not

remedied some of its deficiencies in educating the public.  July 2003 United States Accounting

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:57   Exhibit M
to the Chaitman Decl.   Pg 70 of 143
Case 2:10-cv-00054-FSH   PS Document 1   Filed 02/24/10   Page 57 of 72

Office Report to Congressional Requesters, "Securities Investor Protection:  Update on Matters

Related to the Securities Investor Protection Corporation" at 3-4.

174.   The July 2003 GAO Report also caused consternation in Congress.  On August 11,

2003, Rep. Barney Frank, then the Ranking Member of the Committee on Financial Services,

Rep. Paul E. Kanjorski, then the Ranking Member of the Subcommittee, and Rep. John D.

Dingell, then the Ranking Member on the Committee on Energy and Commerce, wrote to the

SEC, SIPC and the GAO regarding the GAO stating that the Congressmen "cannot overstate the

importance of the SIPC program in the ongoing effort to restore and maintain investor

confidence."

175.   In their August 11, 2003 letter, Reps. Frank, Kanjorski and Dingell declared that

they were "deeply troubled by th[e] state of affairs" at SIPC outlined the GAO Report.

Specifically, the SEC had found in an examination of SIPC that:

> (1) some statements in SIPC's brochure and Web site might
> overstate the extent of SIPC coverage and mislead investors; (2)
> there was insufficient guidance for SIPC personnel and trustees to
> follow when determining whether claimants have established valid
> unauthorized trading claims, one. . principle source of investor
> complaints; (3) SIPC had inadequate controls over the fees
> awarded to trustees and their counsel for services rendered and
> their expenses; (4) SIPC lacks a retention policy for records
> generated in liquidations where SIPC appoints an outside trustee;
> and (5) the SIPC fund was at risk in the case of failure of one or
> more of the large securities firms.

176.   Reps. Frank, Kanjorski and Dingell stated that this situation was "totally

unacceptable and [they] urge[d] SIPC to fix these shortcomings, which [they] consider[ed] to be

significant, with all deliberate speed before a major problem occurs."  Now, the "major

problem," foreseen by the SEC has come to pass in this case, and defendants' failure to remedy

SIPC's shortcomings has resulted in SIPC's fund being inadequate.

177.   The Congressmen "strongly agree[d]" with the statement in the GAO Report that:

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:53   Exhibit M
Case 2:10-cv-00954-FSH   Document 1   Filed 02/25/10   Page 58 of 72
to the Chaitman Decl.   Pg 71 of 143

> Disclosure has an important role in securities market regulation,
> and the Securities Investor Protection Corporation (SIPC) has a
> responsibility to inform investors of actions they can take to
> protect their investments and help ensure that investors are
> afforded the full protections allowable under the Securities
> Investor Protection Act of 1970 (SIPA).

*Id.*

178.   Reps Frank, Kanjorski and Dingell added that they agreed with the GAO

recommendation that SIPC revise its brochure to provide more specific references to links to

investor education information on the SEC web site and web sites of SROs such as NYSE and

NASD.  *Id.*

179.   In conclusion, the Congressmen requested that the GAO submit a follow-up report

by April 2004 on the SEC, SRO and SIPC progress in implementing GAO's recommendations

and addressing the "myriad issues raised by this report and identified by [their] letter, the

effectiveness of these reforms, and the need for any further actions."  *Id.*

180.   Despite the serious concerns raised by the Congressmen, SIPC once again issued a

rosy press release regarding the GAO Report.  In a August 11, 2003 statement by Harbeck, then-

General counsel, on SIPC's website, Harbeck stated that "[w]e are deeply gratified to see that the

General Accounting Office (GAO) follow up review of SIPC acknowledges the many and major

strides that we have made to address concerns originally outlined in the GAO report of June

2001."  He further stated that the Congressmen's concerns "already have been addressed," and

that "all of the issues . . are being resolved."  Yet, SIPC provided no concrete information

regarding the steps it was purportedly taking to address the concerns, other than increasing its

investor education efforts.

181.   While a July 9, 2004 letter report by GAO entitled "Follow-Up on GAO

Recommendations Concerning the Securities Investor Protection Corporation" stated that the

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 72 of 143
Case 2:10-cv-00954-FSH   PG Document 1   Filed 02/24/10   Page 59 of 72

SEC's "preliminary findings indicated that SIPC has taken steps to improve its policies and operations," the SEC staff was still in the process of determining whether SIPC's responses to the SEC's recommendations were adequate at that time.  Obviously, this case shows that SIPC did not adequately respond to the SEC's concerns despite Harbeck's promises in the August 11, 2003 press release.

**The Directors Have Ignored An Audit by the SEC Inspector General**

182.   The OIG had conducted an audit of SIPC, available at http://www.sec-oig.gov/Reports/Auditsinspections/2000/301fin.pdf, from June 1999 to October 1999.  The primary objective of the audit was "to evaluate the efficiency and effectiveness of the Commission's oversight of SIPC and to determine if oversight was in compliance with the Act."

183.   OIG made several recommendations for improving SIPC and stated that "Commission officials generally agree that the Commission's oversight of SIPC would be enhanced if SIPC would articulate more specifically the standards it employs for initiating and acting on claims in SIPA proceedings" and that it had "several other recommendations . . . that may enhance Commission oversight of SIPC."

184.   In the Audit, the OIG noted, by way of background, that SIPA was "created to protect customers from losses resulting from broker-dealer failure, thereby promoting investor confidence in the securities market."  The OIG further stated that "As interpreted, the Act protects customers whose securities were misappropriated, **never purchased**, or stolen." (emphasis added).  Thus, the OIG acknowledged that customers such as the Class members, whose securities were never purchased due to their broker's fraud, were entitled to SIPC insurance.

185.   The OIG made recommendations, listed as Recommendation A through K.

Recommendation A was that:

> The Division of Market Regulation ["MR"] should obtain from
> SIPC a statement setting forth the evidence necessary
> and the standard of proof SIPC uses in initiating and acting on
> claims in SIPC proceedings.  In addition, MR should inform SIPC
> that it should provide written documentation of its reasons for
> denying coverage in particular cases upon the request of MR and
> Enforcement.  This will allow the staff to evaluate SIPC's
> reasoning, taking into account other evidence available to the staff.

186.   Recommendation A was necessary because there had been disagreement between

MR, Enforcement and the Commission, on the one hand, and SIPC, on the other hand, regarding

whether the requirements of SIPA had been met, usually regarding whether there was a

"customer" under SIPA and whether the customer had purchased a "security" under SIPA.

While all disagreements had been resolved in the past, according to the audit, "[t]he staff

believes that the lack of specificity from SIPC as to the standards of proof it applies and the

evidence upon which it relies has made it more difficult for staff to resolve disagreements on

particular matters."  There is no indication that SIPC ever implemented Recommendation A.

187.   Recommendation B stated that "OCG, MR and Enforcement should request that

the Commission delegate authority to OGC to enter appearances in SIPC cases on a one-year

pilot basis."  The Commission had the authority under SIPA to enter an appearance and to take

positions on issues in a SIPC case which it had not exercised in the past, but in connection with

the audit, OGC, MR and Enforcement agreed that OGC staff should enter appearances in SIPC

cases on a one-year pilot basis.  There is no indication that SIPC ever implemented

Recommendation B.

188.   Recommendation C stated that "The Division of Market Regulation and OCIE

should conduct joint SIPC inspections and make joint recommendations" and Recommendation

D stated that "The Division of Market Regulation and OCIE should decide on a review schedule

and inspection scope for future SIPC inspections."

189.    Recommendation C and D were necessary because at the time of the audit, SIPC

had not been inspected since 1994, although in response to an earlier GAO recommendation, MR

had agreed to inspect SIPC every 4-5 years.  The auditors identified "several areas not addressed

on past SIPC inspections that could improve oversight effectiveness" including

- adequacy of SIPC policies, procedures, and/or standards used to determine

  whether a customer request to bring a liquidation proceeding (or claim submitted

  to the trustee during a proceeding) has merit under the Act;

- sufficiency of SIPC guidance given to trustees regarding (1) evidence

  (e.g., type and amount) necessary to establish a valid customer claim and (2)

  recognition of legal precedents in liquidation proceedings:

- propriety of SIPC decisions made regarding claims submitted to the

  trustee during a proceeding, given Act requirements;

- consistency of trustee actions in acting as a fiduciary to investors;

- comparison of the timeliness of each stage of claim processing during a

  liquidation compared to results from past inspections (e.g., 1994); and

- reasonableness of SIPC administrative expenses, including a comparison

  to amounts paid out in satisfaction of claims.

According to the audit, OCIE and MR planned a 2000 joint inspection and stated that the

inspection would cover the above issues.  There is no indication that inspections were performed

on a regular basis thereafter.

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
to the Chaitman Decl.    Pg 75 of 143
Case 2:10-cv-00954-FSH    Document 1    Filed 02/24/10    Page 52 of 71

190.   Recommendation E stated that "The Division of Market Regulation, Enforcement, NERO and OCIE should conduct periodic briefings on SIPC related issues."  Recommendation E was necessitated by the fact that there was "no formal mechanism for sharing SIPC information" internally and "MR, Enforcement and NERO officials stated that internal communications regarding SIPC could be improved."  There is no indication that SIPC ever implemented Recommendation E.

191.   Recommendation F stated that "The Division of Market Regulation, in coordination with OIEA, should review the current SIPC brochure for adequacy, and encourage SIPC to make appropriate changes," and Recommendation H stated that "The Office of Investor Education and Assistance should work with SIPC officials to have the SIPC brochure (or similar disclosures) included in CIC's catalog of publications."

192.   Recommendation F and H were designed to increase investor awareness.  As the Audit stated, "All officials believe that many investors do not sufficiently understand SIPC."  It identified a specific shortcoming in the then-current SIPC brochure, that it was "silent about notifying the firm in a timely manner of improper account activity and documenting this notice. An unauthorized trade may be difficult to prove if the customer has not documented a timely complaint to the broker."

193.   Recommendation F and H appear to have been implemented, at least in part.  In the 2000 SIPC Annual Report, the Message from the Acting Chairman stated that SIPC was working toward a spring 2001 re-launch of its website and rewriting its brochures in "plain English" as part of an investor education initiative whose aim was "to let investors know as clearly as possible not only what they can and should expect from SIPC in terms of protection, but also what is *not* covered by SIPC."  (Emphasis in original).  In the 2001 Annual Report, the Message

from the Acting Chairman indicated that the website overhaul and rewriting of SIPC's basic

brochure had been completed.  In the 2003 Annual Report, the Message from the Chairman and

Vice Chairman stated that "Materials have also been made available to the public through the

General Services Administration Federal Citizen Information Center in Pueblo, Colorado."

Subsequent annual reports indicated that SIPC would continue its educational efforts.

194.  Recommendation J stated that "The Division of Market Regulation, in consultation

with OCIE, should consider a formal policy requiring an independent review of the SIPC fund

and assessment structure regularly (e.g., every five years)."  Recommendation J was necessary

because although an independent consultant had determined in 1998 that the SIPC fund was

sufficient for the foreseeable future, "the consultant's conclusion was based on the current

soundness of the securities markets (e.g., if the need arose to liquidate a large broker-dealer, or

multiple broker-dealers, the SIPC Fund may not be sufficient)."

195.  SIPC made some token efforts at implementing this Recommendation.  The

Message from the Acting Chairman in SIPC's 2002 Annual Report indicated that a "study

addressing the magnitude of the risks confronting SIPC in today's rapidly developing securities

markets" had "concluded that SIPC's present resources are adequate to fulfill its obligations."  In

2003, the Message from the Chairman and Vice Chairman in SIPC's 2003 Annual Report stated

that:

> In the past, the Board periodically engaged independent
> consultants to assure use that the SIPC Fund was adequate to meet
> any foreseeable contingency. In 2003, we determined that SIPC
> should also have an independent ability to assess risks that might
> give rise to concern.  Accordingly, SIPC has brought a Risk
> Manager on board to advise on any developments that could affect
> SIPC's financial capacity.

196.  Fitch Risk Management was engaged by SIPC to conduct a review of the failure of

MJK Clearing, Inc. and to evaluate SIPC's risk management practices, and it prepared a January

31, 2003 report, entitled "Review of SIPC's Risk Profile and Practices:  The MJK Clearing

Event, the Securities Lending Exposure, Risk Management Practices and Capital Requirements"

The failure of MJK Clearing, Inc. was the largest loss in the history of SIPC to that date, with

losses in excess of $80 million.  The Fitch Risk Management Report noted that SIPC could not

effectively control the risks, monitor the fund's exposure or charge premiums based on the risk

assumed because of its limited mandate, and thus concluded that it was "crucial that SIPC

leverage the risk management resources of the regulatory agencies that are better positioned to

perform these functions, namely the [SEC] and the major Self Regulatory Organizations."  Fitch

Risk Management recommended that SIPC "petition the SEC to enforce improved disclosure

requirements and to implement expanded examination requirements."  Fitch Report at 37.  Yet,

there is no indication that SIPC ever did this.

197.   Moreover, the Report set forth specific recommendations that SIPC should take in

order to manage risks that impacted the SIPC fund.  The Report recommended that SIPC

establish a Risk Monitoring Team, which would consist of 1-2 experienced financial analysts (or

a third-party provider) that would raise specific concerns to the Board of Directors; that SIPC

institute a comprehensive risk monitoring process that would involve collecting data and

analyzing it to quantify the risks to the SIPC fund; that SIPC establish a review process that

involved the SEC and would allow SIPC to present the concerns that arose in its risk monitoring

process; and institute a formal process for the identification, control and review of risk factors.

*Id.* at 38-40.  The Report even contained a methodology that would quantify SIPC's risk

exposure.  *Id.* at 41).  Yet, there is no evidence that SIPC ever did anything to implement these

recommendations.

198.    Perhaps if SIPC had worked to manage its risks, it would have been able to raise
concerns about Madoff to the SEC.  The Executive Summary of the Report of Investigation by
the OIG, Case No. OIG-509 concluded that "despite numerous credible and detailed complaints,
the SEC never properly examined or investigated Madoff's trading and never took the necessary,
but basic, steps to determine if Madoff was operating a Ponzi scheme.  Had these efforts been
made with appropriate follow-up at any time beginning in June of 1992 until December 2008, the
SEC could have uncovered the Ponzi scheme well before Madoff confessed."

199.    FTI Consulting, in a September 29, 2009 Review and Analysis of OCIE
Examinations of Bernard L. Madoff Investment Securities, LLC, agreed that "OCIE examiners
made critical mistakes in nearly every aspect of their examinations of Madoff and BMIS and
missed significant opportunities to uncover Madoff's Ponzi scheme." If the SEC and SIPC had
been working together as recommended, this may not have occurred.  For example, the FTI
report found that the SEC examiners "did not understand how BMIS executed, cleared and
settled trades."  *Id* at 22.  Perhaps if they were instructed by SIPC as to the mechanisms of
trading practices, the SEC examiners would have realized that Madoff was a Ponzi scheme.

200.    In the 2007 Annual Report Message from the Chairman, Bucelo stated that
"Notwithstanding the record level of our financial resources, the Board charted a new study of
SIPC's capital adequacy by an outside consultant.  I am pleased to report that the size of the
SIPC Fund is sufficient to meet SIPC's mission.  The probability that the Fund will be exhausted
in a one year period is small."

201.    Yet, in the notes to SIPC's 2008 Financial Statements (annexed to SIPC's 2008
Annual Report), it states:

> In the event the SIPC Fund is or may reasonably appear to be
> insufficient for the purposes of SIPA, the Securities and Exchange

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 79 of 143

Case 2:10-cv-00954-FSH   Document 1   Filed 02/24/10   Page 66 of 72

> Commission is authorized to make loans to SIPC and, in that
> connection, the Commission is authorized to issue notes or other
> obligations to the Secretary of the Treasury in an aggregate amount
> not to exceed $1 billion.  In addition, SIPC maintained $1 billion
> revolving lines of credit with a consortium of banks, $500 million
> of which *expired effective March 1, 2009*."  (emphasis added).

Allowing a significant line of credit to expire does not fulfill the intent behind Recommendation

J.  Moreover, as detailed above, the SIPC fund is not adequate for the Madoff liquidation (and

thus would not have been adequate for any large liquidation).

202.    The Directors' failure to ensure that these recommendations were implemented

further proves that they have performed their duties in bad faith.

203.    Under New Jersey law, the Directors are liable for their bad faith failure to pay,

and delay in paying, SIPC insurance claims in accordance with the mandates of SIPA and with

the representations of insurance that were made to Customers for the first 38 years of SIPC's

existence.  *See Pickett v. Lloyd's*, 131 N.J. 457, 621 A.2d 445 (N.J. 1993) (finding that cause of

action for an insurance company's bad-faith refusal or delay of payment of a claim existed under

New Jersey law); *Diebold, Inc. v. Continental Casualty Co*., 2008 U.S. Dist. LEXIS 29308, at

*17 (D.N.J. Apr. 10, 2008) (stating that New Jersey recognized a cause of action for bad faith

denial of insurance claims).

### FIRST CLAIM FOR RELIEF
### BAD FAITH FAILURE TO PAY INSURANCE CLAIMS

204.    Plaintiffs, on behalf of themselves and the Class, repeat the allegations heretofore

stated.

205.    New Jersey law applies to the plaintiffs' claims because they are domiciled in New

Jersey.

206.    SIPC is an insurer that actively advertises directly and through its members that it

provides insurance coverage for investors up to $500,000.

207.   Plaintiffs and the Class members asserted claims in accordance with the
mechanism provided for by SIPC.

208.   Plaintiffs' and the Class members' claims were indisputable as a matter of law as
they were based on their "net equity" as defined by SIPA.

209.   Defendants wrongfully and in bad faith failed to "promptly" pay the claims under
the illegal SIPC Net Investment Policy, and had no fairly debatable reason for their failure to pay
such claims.

210.   Defendants wrongfully and in bad faith refused to pay the Customers' claims based
upon their Unfair Clawback Policy, claiming that SIPC had a right to offset against the
Customers' SIPC insurance any sum that the Customer withdrew in excess of the sums the
Customer deposited.

211.   Defendants had no good faith basis under SIPA for the adoption of the SIPC Net
Investment Policy and the Unfair Clawback Policy.

212.   Defendants knew or recklessly disregarded the lack of a reasonable basis for
SIPC's Net Investment Policy and the Unfair Clawback Policy.

213.   Defendants acted in egregious bad faith, maliciously and with wanton recklessness,
and in wanton and willful disregard of plaintiffs' and the Class members' rights.

214.   Due to Defendants' actions, plaintiffs and the Class members suffered damages and
consequential damages in an amount to be determined at trial.

215.   Plaintiffs and the Class members are entitled to an award of compensatory and
punitive damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**FRAUD**

67

08-01789-cgm   Doc 4169-16   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit M
to the Chaitman Decl.   Pg 81 of 143
Case 2:10-cv-00954-FSH   Document 1   Filed 02/24/10   Page 68 of 72

216.   Plaintiffs, on behalf of themselves and the Class, repeat the allegations heretofore stated.

217.   As described more fully above, Defendants made numerous misrepresentations of material fact, including allowing members to state that investments were "protected" by SIPC, which statements were designed and intended to induce Customers to invest their money with Madoff in the belief that their accounts were insured up to $500,000 by SIPC.

218.   Defendants acted with knowledge of the falsity of their misrepresentations for the purpose of fraudulently inducing plaintiffs and the Class members to place trust in the Financial Services Industry and in SIPC.

219.   Plaintiffs and the Class members justifiably relied upon Defendants' misrepresentations, which directly and proximately caused plaintiffs to suffer substantial damages.

220.   Due to defendants' actions, plaintiffs and the Class members suffered damages in an amount to be determined at trial.

221.   Defendants acted egregiously, in bad faith, maliciously and with wanton recklessness, and wanton and willful disregard of plaintiffs' and the Class members' rights.

222.   Plaintiffs and the Class members are entitled to an award of compensatory and punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT

223.   Plaintiffs, on behalf of themselves and the Class, repeat the allegations heretofore stated.

224.   Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.,* which prohibits "any unconscionable commercial practice, deception, fraud, false pretense,

false promise, misrepresentation or the knowing concealment, suppression or omission of any

material fact with intent that others rely upon such concealment, suppression or omission, in

connection with the sale or advertisement of any merchandise or real estate."

225.   The actions defendants took in violation of the New Jersey Consumer Fraud Act

include instituting and implementing business policies and practices intended to mislead

plaintiffs and the Class as to the amount of SIPC insurance to which they were entitled and the

ways in which SIPC insurance would protect them, including allowing members to state that

investments were "protected" by SIPC.  These false policies and practices were designed and

intended to induce plaintiffs and the Class to keep their investments in securities with Madoff in

the belief that their accounts were insured up to $500,000 by SIPC.

226.   Defendants also violated the New Jersey Consumer Fraud Act by intentionally

failing to disclose to plaintiffs and the Class that these misrepresentations were false for the

purpose of fraudulently inducing plaintiffs and the Class to place trust in the Financial Services

Industry and in SIPC.

227.   These affirmative misrepresentations and omissions in connection with the

marketing of SIPC insurance constitutes a violation of the New Jersey Consumer Fraud Act

because insurance is "merchandise," as defined under the New Jersey Consumer Fraud Act as

"any objects, wares, goods, commodities, services or anything offered, directly or indirectly to

the public for sale."  N.J.S.A. § 56:8-1.

228.   This Court has found that "The [New Jersey Consumer Fraud Act] does not apply

to a mere denial of benefits but does apply to alleged fraud in the sale, marketing or

advertisement of insurance policies."  *McCartney v. Transamerica Ins. & Inv. Group*, 2008 U.S.

Dist. LEXIS 61204, at *8 (D.N.J. Aug. 4, 2008) (*citing Lemelledo v. Beneficial Management*

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
to the Chaitman Decl.    Pg 83 of 143

Case 2:10-cv-00964-FSH    Document 1    Filed 02/25/10    Page 70 of 72

*Corp. of America*, 150 N.J. 255, 696 A.2d 546, 551 (N.J. 1997) ("although several lower courts

have held that the payment of insurance benefits is not subject to the [New Jersey Consumer

Fraud Act]" the statute does cover "the sale of insurance policies as goods and services that are

marketed to consumers"); *Yourman v. People's Sec. Life Ins. Co.*, 992 F. Supp. 696, 700 (D.N.J.

1998) (finding that the New Jersey Consumer Fraud Act does apply to the "sale and marketing of

insurance policies")).

229.   Plaintiffs and the Class suffered an ascertainable loss as a direct result of

Defendants' actions in violation of the New Jersey Consumer Fraud Act.

### FOURTH CLAIM FOR PROMISSORY ESTOPPEL

230.   Plaintiffs repeat the allegations heretofore stated.

231.   Defendants made a clear and definite promise to the Customers that each of their

investments would be insured up to $500,000 in the event their broker stole their money or their

securities.

232.   Defendants' promise was made directly to the Customers and indirectly through

SIPC's members, in this case, Madoff.

233.   Defendants made the promise and caused their members to make the promise with

the expectation that the Customers would rely upon it.

234.   The Customers reasonably relied upon the defendants' promises.

235.   The defendants' promises were deliberately false.

236.   The Customers suffered a definite and substantial detriment in reliance upon the

defendants' promises.

WHEREFORE, plaintiffs demand judgment as follows:

08-01789-cgm    Doc 4169-16    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit M
to the Chaitman Decl.    Pg 84 of 143

Case 2:10-cv-00954-FSH -PS   Document 1   Filed 02/24/10   Page 71 of 72

     1.     A determination that this action is a proper class action and certifying plaintiffs as Class Representatives under Federal Rule of Civil Procedure 23 and plaintiffs' counsel as lead counsel.

     2.     On the first claim, judgment against each of the defendants, jointly and severally, for compensatory, consequential and punitive damages for plaintiffs and each member of the Class for defendants' bad faith failure to pay insurance claims.

     3.     On the second claim, judgment against each of the defendants, jointly and severally, for compensatory and punitive damages for plaintiffs and each member of the Class for defendants' fraud.

     4.     On the third claim, judgment against each of the defendants, jointly and severally, for treble damages, attorneys' fees and costs under the New Jersey Consumer Fraud Act for Plaintiffs and for each member of the Class.

     5.     On the fourth claim, judgment against each of the defendants, jointly and severally, for promissory estoppel in the full amount of each Class member's loss as a result of defendants' breach of promise.

     6.     For judgment for the costs of suit and an award of attorneys' fees and costs.

     7.     For such other relief as the Court deems just and proper.

08-01789-cgm Doc 4169-16 Filed 06/15/11 Entered 06/15/11 19:56:51 Exhibit M
to the Chaitman Decl. Pg 85 of 143
Case 2:10-cv-00954-FSH -PS Document 1 Filed 02/24/10 Page 72 of 72

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiffs hereby demand a trial by jury of all issues

triable by right to a jury.

February 24, 2010

                                   BECKER & POLIAKOFF, LLP

                                   By s/s Helen Davis Chaitman (hdc-4266)
                                   21 East Front Street – Suite 400
                                   Redbank, New Jersey 07701
                                   (908) 303-4568

                                   and

                                   45 Broadway
                                   New York, New York 10006
                                   (212) 599-3322
                                   Attorneys for the Plaintiffs

# EXHIBIT B

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |

In re:

BERNARD L. MADOFF,

          Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-_____ (BRL) |
| v. | |
| LISSA CANAVAN, LESLIE GOLDSMITH and JUDITH KALMAN, themselves and to the extent they purport to represent a class of those similarly situated, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S APPLICATION FOR PRELIMINARY INJUNCTION, ENFORCEMENT OF STAY, DECLARATION THAT CANAVAN, GOLDSMITH AND KALMAN ACTION IS VOID *AB INITIO*, AND TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 6

A.   Commencement of the SIPA Proceeding ...................................................... 6

B.   The SIPA Trustee's Authority ....................................................................... 8

C.   SIPA and The Net Equity Dispute ................................................................ 9

D.   The New Jersey Plaintiffs Have Participated in This Liquidation Proceeding
Pursuant to the Claims Procedures Order and/or the Scheduling Order  Regarding
Net Equity And Continue to Do So ............................................................. 10

     1.   Lissa Canavan ................................................................................ 11

     2.   Leslie Goldsmith ........................................................................... 12

     3.   Judith Kalman ................................................................................ 12

E.   This Court's Net Equity Decision ............................................................... 13

F.   The New Jersey Plaintiffs' Allegations Are An Affront to This Court's
Jurisdiction ................................................................................................. 16

     1.   The New Jersey Plaintiffs' Allegations Challenge the Net Equity Decision....... 17

     2.   The New Jersey Plaintiffs' Allegations Repeat the *Peskin* Adversary
Proceeding..................................................................................... 20

     3.   The New Jersey Plaintiffs' Allegations Mimic Objections to the Fee
Applications................................................................................... 21

     4.   The New Jersey Plaintiffs' Allegations Raise the Same Issues as Customer
Objections Filed by Ms. Chaitman .................................................. 23

     5.   Current Status of the New Jersey Action ........................................ 24

ARGUMENT THE NEW JERSEY ACTION VIOLATES THE AUTOMATIC STAY
AND MUST OTHERWISE BE PRELIMINARILY ENJOINED ................................. 26

I.   The New Jersey Plaintiffs and Those Acting on Their Behalf Must Be Enjoined
From Circumventing This Court's Jurisdiction and Relitigating the Net Equity
Issue .......................................................................................................... 26

     A.   This Court Has Jurisdiction to Enjoin the New Jersey Plaintiffs........................ 27

          1.   Subject Matter Jurisdiction ....................................................... 27

          2.   Personal Jurisdiction ................................................................. 29

     B.   Standards for a Section 105(a) Injunction ......................................... 30

     C.   The New Jersey Action Threatens the Court's Jurisdiction and Seeks to
Relitigate the Net Equity Decision .................................................... 31

# TABLE OF CONTENTS
(cont'd)

**Page**

    1.    This Court Has Jurisdiction Regarding Net Equity ................................. 32

    2.    The New Jersey Plaintiffs Seek to Relitigate the Net Equity Decision and Must Be Enjoined ..................................................... 32

D.    The SIPC Defendants Have Not Acted in Bad Faith as a Matter of Law and Are Statutorily Immune From Suit by the New Jersey Plaintiffs ................ 36

II.    The New Jersey Action Violates the Automatic Stay ....................................... 39

A.    The New Jersey Action Seeks to Subvert the Claims Administration Process ...................................................................... 41

B.    The New Jersey Action Is Void *Ab Initio* ............................................ 45

III.    A Temporary Restraining Order Is Warranted ................................................ 46

CONCLUSION ................................................................................... 48

# TABLE OF AUTHORITIES

**Page**

## Cases

*Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281 (1970) ............................ 35

*BGW Assocs., Inc. v. Valley Broad. Co.*, 532 F. Supp. 1115 (S.D.N.Y. 1982) ........................ 36

*C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87
(Bankr. S.D.N.Y. 1988) ........................................................................................................ 31

*Canavan, et al. v. Harbeck, et al.*, No. 2:10-cv-00954-FSH-PS............................................ passim

*E. Refractories Co. v. Forty Eight Insulations*, 157 F.3d 169 (2d Cir. 1998).............................. 45

*Evans v. Ottimo*, 469 F.3d 278 (2d Cir. 2006) .......................................................................... 33

*Exch. Nat'l Bank of Chicago v. Wyatt*, 517 F.2d 453 (2d Cir. 1975) ......................................... 28

*Fed. Deposit Ins. Corp. v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125 (2d
Cir. 1992)............................................................................................................................... 45

*Fid. Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47 (2d Cir. 1976)........................ 45

*First Fid. Bank N.A., N.J. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.)*, 937 F.2d
833 (2d Cir. 1991)................................................................................................................. 30

*Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998) ............................................................... 31, 33

*Garrity v. Leffler (In re Neuman)*, 71 B.R. 567 (S.D.N.Y. 1987)......................................... 31, 34

*Granfinanciera S.A. v. Nordberg*, 492 U.S. 33 (1989) ............................................................. 30

*In re Adelphia Commc'ns Corp.*, 2006 WL 1529357 (Bankr. S.D.N.Y. June 5,
2006) ................................................................................................................................. passim

*In re Adelphia Commc'ns Corp.*, 298 B.R. 49 (S.D.N.Y. 2003) ................................................ 31

*In re Adelphia Commc'ns Corp.*, 307 B.R. 404 (Bankr. S.D.N.Y. 2004) ................................... 30

*In re AP Indus., Inc.*, 117 B.R. 789 (Bankr. S.D.N.Y. 1990) ............................................... passim

*In re Baldwin-United Corp.*, 57 B.R. 759 (S.D. Ohio 1985)...................................................... 33

*In re Baldwin-United Corp.*, 770 F.2d 328 (2d Cir. 1985) ........................................................ 35

*In re Burgess*, 234 B.R. 793 (D. Nev. 1999) ............................................................................ 39

*In re Calpine Corp.*, 354 B.R. 45 (Bankr. S.D.N.Y 2006) ........................................................ 31

*In re Chateaugay Corp.*, 109 B.R. 613 (S.D.N.Y 1990) ........................................................... 35

# TABLE OF AUTHORITIES
(cont'd)

**Page**

*In re Enivid*, 364 B.R. 139 (Bankr. D. Mass. 2007) .................................................. 31

*In re Enron Corp.*, 314 B.R. 524 (Bankr. S.D.N.Y. 2004) ........................................... 45

*In re HSM Kennewick, L.P.*, 347 B.R. 569 (Bankr. N.D. Tex. 2006) ............................ 39

*In re Ionosphere Clubs, Inc.*, 111 B.R. 423 (Bankr. S.D.N.Y. 1990) .......................... 31

*In re Johns-Manville Corp.*, 91 B.R. 225 (Bankr. S.D.N.Y. 1988) ....................... 32, 33

*In re Johns-Manville Corp.*, 97 B.R. 174 (Bankr. S.D.N.Y. 1989) ...................... 34, 46

*In re Keene Corp.*, 162 B.R. 935 (Bankr. S.D.N.Y. 1994) ........................................ 31

*In re Keene Corp.*, 164 B.R. 844 (Bankr. S.D.N.Y. 1994) ...................... 33, 34, 41, 45

*In re Lewellyn*, 26 B.R. 246 (Bankr. S.D. Iowa 1982) ................................................ 28

*In re Lyondell Chem. Co.*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009) ............................. 31

*In re MCEG Prods., Inc.*, 133 B.R. 232 (Bankr. C.D. Cal. 1991) ............................... 39

*In re New Times Sec. Servs., Inc.*, 463 F.3d 125 (2d Cir. 2006) ................................ 23

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355 (3d Cir. 2001) .................. 36

*In re Singer Co. N.V.*, 2000 WL 33716976 (Bankr. S.D.N.Y. Nov. 3, 2000) ............ 33, 34, 43, 45

*In re The 1031 Tax Group, LLC*, 397 B.R. 670 (Bankr. S.D.N.Y. 2008) ................................ 33

*Keller v. Blinder* (*In re Blinder Robinson & Co., Inc.*), 135 B.R. 892 (D. Colo. 1991) ..................................................................................................... 30

*Kusch v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 1998 WL 551972 (Bankr. S.D.N.Y. Aug. 24, 1998) ...................................................... 37, 38

*Langenkamp v. Culp*, 498 U.S. 42 (1990) .................................................................. 30

*Liberty Mut. Ins. Co. v. Off. Unsecured Creditors' Comm.* (*In re Spaulding Composites Co., Inc.*), 207 B.R. 899 (9th Cir. BAP 1997) ...................... 39

*LTV Corp. v. Back* (*In re Chateaugay Corp.*), 201 B.R. 48 (Bankr. S.D.N.Y. 1996) ..................................................................................................... 29

*LTV Steel Co., Inc. v. Bd. of Educ.* (*In re Chateaugay Corp.*), 93 B.R. 26 (S.D.N.Y. 1988) ....................................................................................... 31

## TABLE OF AUTHORITIES
(cont'd)

**Page**

*MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988) ........................................ 29

*Martin v. Graybar Elec. Co.*, 266 F.2d 202 (7th Cir. 1959) ........................................ 36

*Nat'l Union Fire Ins. Co. v. Camp* (*In re Gov't Sec. Corp.*), 972 F.2d 328 (11th Cir. 1992) ........................................ 28

*Peskin v. Picard*, 09-01272 (BRL) (Bankr. S.D.N.Y.) ........................................ passim

*Peskin v. Picard*, No. 09 CV 8730 (S.D.N.Y.) (JGK) ........................................ 21

*Publicker Indus. Inc. v. United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110 (2d Cir. 1992) ........................................ 28

*Rand v. Anaconda-Ericsson, Inc.*, 623 F. Supp. 176 (E.D.N.Y. 1985) ........................................ 35

*Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494 (N.Y. 1984) ........................................ 33

*Samuel C. Ennis & Co. v. Woodmar Realty Co.*, 542 F.2d 45 (7th Cir. 1976) ........................................ 36

*Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2010 WL 694211 (Bankr. S.D.N.Y. Mar. 1, 2010) ........................................ passim

*Statutory Comm. of Unsecured Creditors v. Motorola, Inc.* (*In re Iridium Operating LLC*), 285 B.R. 822 (S.D.N.Y. 2002) ........................................ 30

*Turner v. Davis* (*In re Inv. Bankers, Inc.*), 4 F.3d 1556 (10th Cir. 1993) ........................................ 28

*United States v. Int'l Bhd. of Teamsters*, 728 F. Supp. 1032 (S.D.N.Y. 1990) ........................................ 35, 36

*United States v. Madoff*, No. 08 MAG 2735 ........................................ 6

*United States v. Madoff*, No. 09 CR 213 (DC) ........................................ 7

*United States v. New York Tel.*, 434 U.S. 159 (1977) ........................................ 35

*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001) ........................................ 46

**Statutes**

11 U.S.C. § 105(a) ........................................ passim

11 U.S.C. § 362 ........................................ 34, 43

11 U.S.C. § 362(a) ........................................ 1

## TABLE OF AUTHORITIES
### (cont'd)

**Page**

11 U.S.C. § 362(a)(1) ............................................................................................ 41

11 U.S.C. § 362(a)(3) ....................................................................................... 39, 41

11 U.S.C. § 362(a)(6) ............................................................................................ 41

15 U.S.C. § 78aaa *et seq.* ....................................................................................... 1

15 U.S.C. § 78ccc(c)(2) ......................................................................................... 24

15 U.S.C. § 78eee(a)(3) ..................................................................................... 7, 39

15 U.S.C. § 78eee(a)(4)(A) ...................................................................................... 7

15 U.S.C. § 78eee(b)(2) .......................................................................................... 40

15 U.S.C. § 78eee(b)(2)(A)(i) ................................................................................. 29

15 U.S.C. § 78eee(b)(2)(B) ..................................................................................... 39

15 U.S.C. § 78eee(b)(2)(B)(i) ............................................................................ 1, 43

15 U.S.C. § 78eee(b)(3) ............................................................................................ 7

15 U.S.C. § 78eee(b)(4) ................................................................................ 7, 29, 40

15 U.S.C. § 78ff .......................................................................................................... 6

15 U.S.C. § 78fff(b) ..................................................................................... 8, 28, 30

15 U.S.C. § 78fff-1(a) .............................................................................................. 8

15 U.S.C. § 78fff-2(a)(2) .......................................................................................... 8

15 U.S.C. § 78fff-2(b) ....................................................................................... 38, 42

15 U.S.C. § 78fff-2(b)(1) ........................................................................................ 38

15 U.S.C. § 78fff-2(c)(3) ........................................................................................ 19

15 U.S.C. § 78fff-3(a) ................................................................................. 19, 38, 42

15 U.S.C. § 78j(b) ..................................................................................................... 6

15 U.S.C. § 78kkk(c) ......................................................................................... 36, 37

## TABLE OF AUTHORITIES
(cont'd)

**Page**

15 U.S.C. § 78*lll*(11) ........................................................................................... 9

15 U.S.C. § 78*lll*(7)(B) ........................................................................................ 6

28 U.S.C. § 1334 ................................................................................................ 29

28 U.S.C. § 1334(b) ..................................................................................... 27, 28

28 U.S.C. § 157(a) ............................................................................................ 27

28 U.S.C. § 157(b)(1) ....................................................................................... 28

28 U.S.C. § 157(b)(2)(A) ................................................................................. 28

28 U.S.C. § 157(b)(2)(B) ................................................................................. 28

28 U.S.C. § 1651 ............................................................................................... 35

**Other Authorities**

Jane Musgrave, *N.J. Lawyer and Madoff Victim Urges Palm Beach County
Victims to Flex Muscle in Payback Fight*, PALM BEACH POST, Jan. 9, 2010 .......................... 16

Leigh Kamping-Carder, *Madoff Cash In/Cash Out Ruling Heads to 2nd Cir.*, LAW
360, Mar. 9, 2010 ....................................................................................... 16

Noeleen G. Walder, *Bankruptcy Judge Backs Madoff Trustee's Payout
Calculations*, NEW YORK LAW JOURNAL, Mar. 2, 2010 .......................................... 16

Standing Order of Referral of Cases to Bankruptcy Judges of the United States
District Court for the Southern District of New York dated July 10, 1984 ............................. 27

**Rules**

Federal Rule of Bankruptcy Procedure 7065 ....................................................... 1, 31

Federal Rule of Civil Procedure 12(b)(6) ............................................................... 21

Federal Rule of Civil Procedure 23 ........................................................................ 45

**Regulations**

17 C.F.R. §§ 300.500–300.50 ............................................................................. 18

## TABLE OF AUTHORITIES
(cont'd)

**Page**

17 C.F.R. 240.10b-5...................................................................................................................... 6

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq*. ("SIPA"), and Bernard L. Madoff

("Madoff"), individually (collectively, the "Debtor"), by and through his undersigned counsel,

respectfully submits this Memorandum of Law in Support of his Application pursuant to

§ 362(a) and § 105(a) of the Bankruptcy Code, section 78eee(b)(2)(B)(i) of SIPA and Federal

Rule of Bankruptcy Procedure 7065, to enjoin Lissa Canavan ("Canavan"), Leslie Goldsmith

("Goldsmith") and Judith Kalman ("Kalman" and collectively, the "New Jersey Plaintiffs"),

those acting on their behalf or in concert or participation with them, and all defendants, from

proceeding with their putative class action pending in the United States District Court for the

District of New Jersey, captioned *Canavan, et al. v. Harbeck, et al*., No. 2:10-cv-00954-FSH-PS

(the "New Jersey Action"), and for a declaration that the suit is void *ab initio*, having been

brought in violation of the automatic stay. The New Jersey Action is a relitigation of this Court's

March 1, 2010 Memorandum Decision (the "Net Equity Decision") and its March 8, 2010 Order

adopting the Net Equity Decision (the "Net Equity Order") (Dkt. Nos. 1999 and 2022), usurps

the exclusive jurisdiction of this Court's jurisdiction and interferes with the administration of the

BLMIS estate. The Trustee further respectfully requests that this Court temporarily restrain the

New Jersey Plaintiffs and those acting on their behalf or in concert or participation with them,

and all defendants, from proceeding with the New Jersey Action until this Court determines the

propriety of the relief sought.

## PRELIMINARY STATEMENT

On or about February 24, 2010, the New Jersey Plaintiffs, through their lead counsel,

Helen Davis Chaitman of the law firm of Becker & Poliakoff, P.A., filed the New Jersey Action

in the United States District Court for the District of New Jersey (the "*Canavan* Complaint")

against the past and present Directors of the Securities Investor Protection Corporation ("SIPC"),

as well as its Chief Executive Officer/President (collectively, the "SIPC Defendants").[1]   The

gravamen of the New Jersey Action is that the New Jersey Plaintiffs and the putative class—all

of whom are claimants in the BLMIS liquidation proceedings—"as a result of SIPC's deliberate

misrepresentation of the nature and scope of insurance provided to investors, have been denied

their full SIPC insurance ..." in the BLMIS SIPA proceeding before this Court.[2]   The New Jersey

Plaintiffs allege that it is "by virtue of" what the New Jersey Plaintiffs call "SIPC's Net

Investment Policy" that "the defendants have perpetuated a fraud and are personally liable,

jointly and severally, for the damages that SIPC's Net Investment Policy has caused to customers

in the full amount of their lost investments."  (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 16.)

The New Jersey Plaintiffs disagree with the Trustee's definition of Net Equity, which was

adopted by this Court in its Net Equity Decision and Net Equity Order.  This Court ruled that Net

Equity must be evaluated on a cash-in/cash-out basis and cannot be based on a customer's last

account statement because "[i]t would be simply absurd to credit the fraud and legitimize the

phantom world created by Madoff when determining Net Equity."  *Sec. Investor Protection*

*Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (BRL), 2010 WL 694211, at *14 (Bankr.

S.D.N.Y. Mar. 1, 2010) ("*SIPC v. BLMIS*").

While facially grounded in "fraud," the New Jersey Action is little more than a

reargument of the "legitimate expectations" portion of the Net Equity briefing previously heard

by this Court.  The "fraud" as alleged in the New Jersey Action is that SIPC allegedly made

representations that every brokerage account was "insured" up to $500,000 and that the New

---

[1]  The New Jersey Plaintiffs did not name SIPC (the entity) as a defendant.

[2]  Affidavit of David J. Sheehan, sworn to on April 9, 2010 (the "April 9th Sheehan Aff."), Ex. A (*Canavan* Cmplt, ¶ 1).

Jersey Plaintiffs—and a putative class consisting entirely of BLMIS customers before this Court—relied on such representations to their detriment, and had legitimate expectations to recover up to $500,000, even if the money those customers are seeking to recover consists of fictitious profits.   Counsel for the New Jersey Plaintiffs strenuously made this exact same argument before this Court in connection with the litigation of, and the hearing on, the net equity issue.[3]  That argument was considered by this Court, and was soundly rejected:

> Because 'securities positions' are in fact nonexistent, the Trustee cannot discharge claims upon the false premise that customers' securities positions are what the account statements purport them to be.  Rather, the only verifiable amounts that are manifest from the books and records are the cash deposits and withdrawals. **Moreover, if customers' legitimate expectations are relevant to any determination other than whether customers hold 'claims for securities' or 'claims for cash,' they do not apply where they would give rise to an absurd result** . . . . The Trustee has properly satisfied expectations by providing all customers with 'claims for securities.'

*SIPC v. BLMIS*, 2010 WL 694211, at *10 (emphasis added) (citations omitted).  Accordingly, the New Jersey Plaintiffs and the putative class are not entitled to recover their fictitious profits and any "expectation" that they could keep those profits is nothing less than "absurd."

In the face of this Court's ruling, the New Jersey Plaintiffs now seek relief from a different federal court to attack the legal positions of the Trustee and SIPC taken before **this** Court—which is nothing more than a collateral attack on this Court's Net Equity Decision and Net Equity Order.  Significantly, the New Jersey Action is brought as a purported class action, and the New Jersey Plaintiffs thus seek to undo the holding and effect of the Net Equity Decision as to each and every customer before this Court who claims fictitious profits.  If the New Jersey

---

[3] Attached hereto as Appendix A is a chart which depicts the great degree of overlap among the *Canavan* Complaint and Ms. Chaitman's other pleadings and briefs before this Court.

Plaintiffs believe that this Court's Net Equity Decision and Order were incorrectly decided, the proper recourse is to appeal the decision, as counsel for the New Jersey Plaintiffs well knows, having filed a notice of appeal of the Court's Net Equity Decision on March 19, 2010. (Dkt. No. 2048.) Under no circumstances should they be permitted to pursue an action in another federal court with no relationship to the BLMIS SIPA liquidation proceeding that is before this Court, the administration of which is at the core of their claims.

The New Jersey Plaintiffs no doubt will argue that whether "additional damages" are available to them as a result of SIPC's alleged misrepresentations is an issue separate and apart from the Net Equity Decision and Order. However, the New Jersey Plaintiffs' allegations are inextricably intertwined with this Court's administration of the BLMIS SIPA proceeding. The "damages" suffered by the New Jersey Plaintiffs only arise as a result of their status as "customers" of BLMIS under SIPA and the denial of their customer claims by the Trustee in accordance with the SIPA statute and this Court's Net Equity Decision. While the New Jersey Plaintiffs attempt to cast their allegations as distinct from the BLMIS liquidation proceeding, they could not be more interconnected. Indeed, their claims to "insurance," as well as their claims to recover fictitious profits, are entirely dependent on a reversal of the Net Equity Decision issued by this Court.

Moreover, as the New Jersey Plaintiffs themselves admit, the damages they seek could only be predicated on a finding that the SIPC Defendants acted in bad faith: "[n]either SIPC nor any of its Directors, officers or employees shall have any liability to any person for any action taken or omitted in good faith . . . ." (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 45.) In light of this Court's Net Equity Decision and Net Equity Order adopting the Trustee's position on Net

Equity, there is simply no factual or legal support for allegations of bad faith by SIPC, much less the individual members of the SIPC Board of Directors or its CEO/President.

The New Jersey Plaintiffs' disagreement with this Court's administration of the BLMIS SIPA proceeding cannot be allowed to form the basis of an action against the SIPC Defendants. The proper forum for the New Jersey Plaintiffs' claims, no matter how frivolous, is this Court. The New Jersey Plaintiffs should not be permitted to circumvent this Court's jurisdiction by filing a duplicative action in another forum with no connection to this liquidation proceeding. Such blatant forum shopping only invites similar suits in courts all over the country. Moreover, as the New Jersey Action proceeds apace, with rapidly approaching deadlines for motions and return dates, the SIPC Defendants will be forced to litigate an action elsewhere which is inextricably connected to proceedings and decisions of this Court.[4] The Trustee also may need to get involved in the New Jersey Action, at a minimum to address all of the facts, history and proceedings that have taken place before this Court and their relevancy to the allegations and claims brought by the New Jersey Plaintiffs, and this will distract from the Trustee's work in the SIPA proceeding.

The New Jersey Plaintiffs' gripe with this Court's Net Equity Decision will be considered on appellate review. In the interim, the New Jersey Plaintiffs should not be permitted to ask another court to second-guess this Court's determination. Accordingly, the Trustee respectfully requests that the New Jersey Plaintiffs and those acting on their behalf or in concert with them, and all defendants, be enjoined from proceeding with the New Jersey Action. Because, as discussed below, the New Jersey Action has been brought in violation of stays imposed in this

---

[4]    Additional detail concerning the timing and need for relief is discussed herein.  With respect to upcoming deadlines in the New Jersey Action, *see also* discussion page 24 ("Current Status of the New Jersey Action").

proceeding under the Bankruptcy Code and SIPA, the Trustee also requests that the Court

declare the suit to be in violation of the stays and void *ab initio*.

## STATEMENT OF FACTS

From the inception of this liquidation proceeding, Ms. Chaitman, purporting to represent

numerous claimants, has been a vocal critic of the manner in which the Trustee and SIPC have

handled this matter.[5]   Through the press, adversary proceedings, hundreds of objections to

customer claims determinations, objections to the Trustee's and his counsel's fee applications,

and appeals, Ms. Chaitman has asserted her opposition to the Trustee's method of calculating net

equity, and has loudly voiced her view that the Trustee and SIPC have acted in bad faith in

denying Madoff's customers their fictitious profits.   Now taking a modified form in a different

forum, the New Jersey Action is a relitigation of prior Orders of this Court and the United States

District Court of the Southern District of New York ("District Court") dismissing her claims.

## A.    Commencement of the SIPA Proceeding

On December 11, 2008, Madoff was arrested by the FBI in his Manhattan home and was

criminally charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C.

§§ 78j(b), 78ff, and 17 C.F.R. 240.10b-5 in the District Court, captioned *United States v. Madoff*,

No. 08 MAG 2735.[6]   Also on December 11, 2008 (the "Filing Date"),[7] the Securities and

---

[5] *See, e.g.*, (i) Customers' Memorandum of Law in Opposition to Trustee's Motion for An Order Approving the Trustee's Re-Definition of "Net Equity" Under the Securities Investor Protection Act (Dkt. No. 755); (ii) Objection to First Applications of Irving H. Picard, Trustee, and Baker & Hostetler LLP for Allowance of Interim Compensation for Services Rendered and Reimbursement of Expenses Incurred From December 5, 2008 through April 30, 2009 (Dkt. No. 351); (iii) Objection to Second Applications of Irving H. Picard, Trustee, and Baker & Hostetler LLP for Allowance of Interim Compensation for Services Rendered and Reimbursement of Expenses Incurred from May 1, 2009 through September 30, 2009 (Dkt. No. 1055); (iv) Amended Complaint (Dkt. No. 39), *Peskin v. Picard*, 09-01272 (BRL) (Bankr. S.D.N.Y.) ("*Peskin*"); *see also* note 13, *infra*.

[6] On March 10, 2009, the criminal case was transferred to Judge Denny Chin in the United States District Court for the Southern District of New York and was assigned a new docket number, No. 09 CR 213 (DC).

[7] In this case, the Filing Date is the date on which the SEC commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* section 78*lll*(7)(B) of SIPA.

Exchange Commission ("SEC") filed a complaint in the District Court against defendants Bernard L. Madoff and BLMIS, Case No. 08-CV-10791 (the "SEC Action").

Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA. On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of the SEC Action with the application of SIPC.

On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part: (1) appointed the Trustee for the liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA; (2) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and (3) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

On March 12, 2009, Madoff pled guilty to an 11-count criminal information. At the March 12 Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (*See United States v. Madoff*, No. 09 CR 213 (DC), Dkt. No. 57, Plea Hr'g Tr. at 23:14-17.) In pleading guilty to the crimes he committed, Madoff admitted that, since at least the early 1990s, the investment advisory business of BLMIS was used to operate a Ponzi scheme. (*See* Allocution of Bernard L. Madoff, *United States v. Madoff*, No. 09 CR 213 (DC), (Dkt. No. 50) (the "Madoff Allocution"), at p. 2.) The criminal information to which Frank DiPascali, Jr., one of Madoff's co-conspirators, pled guilty on August 11, 2009 (the "DiPascali Information"), stated that the Ponzi scheme commenced at least as early as the 1980's. (*See* DiPascali Information at 3.) On June 29, 2009, Madoff was

sentenced to imprisonment of 150 years for his crimes and was ordered to make restitution to his victims.

## B.    The SIPA Trustee's Authority[8]

As a trustee appointed under SIPA, the Trustee is charged with recovering and distributing customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee in addition to the powers granted by SIPA.  Pursuant to section 78fff(b)  of SIPA, chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case, to the extent consistent with SIPA.

In aid of the execution of his duties under SIPA, this Court entered an Order on December 23, 2008, which, *inter alia*, specified the procedures for the filing, determination, and adjudication of claims against BLMIS in this proceeding ("Claims Procedures Order.").   (Dkt. No. 12.)  The Claims Procedures Order provides that, pursuant to section 78fff-2(a)(2) of SIPA, all claims against BLMIS are to be filed with the Trustee.  The Claims Procedures Order provides for the written determination by the Trustee of customer and creditor claims, and allows any claimant who opposes the Trustee's determination to file an objection with the Bankruptcy Court.  Thereafter, the Trustee is to obtain a date and time for a hearing before the Bankruptcy Court.

Consistent with his duties, the Trustee is marshalling BLMIS's assets, and is well underway in that process.  The Trustee has recovered more than $1.4 billion dollars in assets to

---

[8] The facts in this section regarding the Court-ordered claims administration process are drawn from the Trustee's Second Interim Report for the Period Ending October 31, 2009.  (Dkt. No. 1011.)

date    and    has    determined    more    than    12,250    customer    claims.
(*See* http://www.madofftrustee.com/ (*follow* "Claims Processing Status;" *follow* "News/Press
Releases" hyperlink, *then follow* 01/27/2010 "Madoff Trustee Announces Settlement of $220
Million" hyperlink).)

C.    **SIPA and The Net Equity Dispute**

SIPA provides a statutory framework for the satisfaction of customer claims in a
liquidation proceeding under SIPA.  SIPA provides that customers share *pro rata* in customer
property to the extent of their net equity, as defined in section 78*lll*(11) of SIPA ("Net Equity").
Within limits, SIPC advances funds to the trustee for the satisfaction of customers with valid Net
Equity claims, up to the amount of their Net Equity, if their ratable share of customer property is
insufficient to make them whole.

The Trustee has determined each customer's Net Equity by crediting the amount of cash
deposited by the customer into her BLMIS account, less any amounts withdrawn from her
BLMIS customer account, otherwise characterized by the New Jersey Plaintiffs as the "Net
Investment Method."  In a variety of different fora and pleadings, certain BLMIS investors have
argued that the Trustee's interpretation of Net Equity is incorrect and contrary to SIPA (the "Net
Equity Dispute").  They argue that the Trustee must allow their customer claims in the amount
shown on their last customer statements issued by BLMIS.

Because those customer statements issued by BLMIS were based on fictitious profits and
were entirely fraudulent, however, the Trustee has disregarded the statements for purposes of
claims determinations.  Instead, as required under SIPA and consistent with the treatment of
claims in prior SIPA proceedings and other Ponzi-scheme liquidations, the Trustee is allowing
claims in the amounts that a customer actually deposited with BLMIS, less the amounts that the
customer withdrew from the account.  Because the Net Equity Dispute is an issue of

comprehensive application in this liquidation proceeding, the Trustee moved for a briefing

schedule and hearing to resolve the Net Equity Dispute, and an Order followed (the "Scheduling

Order"). (Dkt. No. 437.) Thereafter, the Trustee filed his *Motion for an Order Upholding*

*Trustee's Determination Denying Customer Claims' For Amounts Listed on Last Statement,*

*Affirming Trustee's Determination of Net Equity and Expunging Those Objections With Respect*

*to The Determinations Relating to Net Equity* (the "Net Equity Motion"). (Dkt. No. 530.)

**D.    The New Jersey Plaintiffs Have Participated in This Liquidation Proceeding
Pursuant to the Claims Procedures Order and/or the Scheduling Order
Regarding Net Equity And Continue to Do So**

The New Jersey Plaintiffs are active litigants in the BLMIS SIPA proceeding pending

before this Court. In accord with the Claims Procedures Order, claims were filed for each of the

BLMIS accounts held by the New Jersey Plaintiffs, as further detailed herein. Moreover, briefs

opposing the Trustee's Net Equity Motion were filed on behalf of both Goldsmith and Lapin

Children LLC.[9] (*See Sonnenschein Investors' Opposition to the Trustee's Motion for an Order*

*Upholding Trustee's Determination Denying "Customer" Claims for Amounts Listed on Last*

*Statement, Affirming Trustee's Determination of Net Equity and Expunging Those Objections*

*With Respect to the Determinations Relating to Net Equity* (Dkt. No. 784) ("Sonnenschein

Opposition") (filed on behalf of, *inter alia*, Lapin Children LLC)); *Customers' Memorandum of*

*Law in Opposition to Trustee's Motion for an Order Approving the Trustee's Re-Definition of*

*"Net Equity" Under the Securities Investor Protection Act*, (Dkt. No. 755) (filed on behalf of,

*inter alia*, Goldsmith).) Additionally, all of the New Jersey Plaintiffs have filed objections to the

Trustee's determination of their claims.[10] (Dkt. Nos. 506, 569, and 2119.) Finally, Kalman's

---

[9] New Jersey Plaintiff Canavan holds an interest in Lapin Children LLC, discussed herein.

[10] New Jersey Plaintiff Canavan filed an objection to the Trustee's determination of the Lapin Children LLC's
claim, discussed more fully, *infra*.

BLMIS account was one of the accounts specifically included within the Trustee's Motion on Net Equity. (*See* Exhibit A to the Net Equity Motion) (Dkt. No. 530.) By these actions, the New Jersey Plaintiffs have voluntarily submitted themselves to the Bankruptcy Court's jurisdiction. Each of the New Jersey Plaintiff's involvement in the BLMIS SIPA proceeding is discussed in turn.

  **1. Lissa Canavan**

Lissa Canavan holds a 20% interest in Lapin Children LLC ("Lapin Children"), a New Jersey limited liability company formed on May 15, 2000. (April 9th Sheehan Aff, Ex. A, Cmplt, ¶ 18.) Eric Ginsburg, a manager of Lapin Children, filed a claim for the Lapin Children account, BLMIS Account No. 1CM624, on March 10, 2009. (April 9th Sheehan Aff., Ex. B.) At that time, Lapin Children appears to have been represented by Carole Neville of Sonnenschein, Nath & Rosenthal LLP. (*Id*.) No claim was filed by Canavan directly, though Canavan asserts that she is entitled to share in any distribution that may be paid on account of the Lapin Children claim. (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 18.) The Trustee denied the Lapin Children claim on March 23, 2010 because more money was withdrawn than deposited over the life of the account, resulting in a negative Net Equity. (April 9th Sheehan Aff., Ex. C.) In addition, on March 31, 2010, Ms. Chaitman, on behalf of Canavan, filed an objection to the Trustee's determination of the Lapin Children claim. (Dkt. No. 2119.)

The Scheduling Order required all counsel who participated in the Net Equity briefing to identify the BLMIS customers that they represented. Lapin Children was listed on Schedule A to the brief filed by Sonnenschein, Nath & Rosenthal LLP opposing the Trustee's Net Equity Motion. (*See* Sonnenschein Opposition) (Dkt. No. 784.) As a member of Lapin Children which, by and through its counsel, participated in and actively litigated the Net Equity dispute before this Court, Canavan has participated.

2.    **Leslie Goldsmith**

Goldsmith has a BLMIS account in her own name, BLMIS Account No. 1ZA328. Goldsmith filed a claim for that account on January 8, 2009.  (April 9th Sheehan Aff., Ex. D.) The Trustee denied her claim on October 19, 2009 because Goldsmith withdrew more funds than she deposited over the life of the account, leaving her with negative Net Equity.  (*Id.*, Ex. E.)  In other words, she was a "net winner" in Madoff's Ponzi scheme.  Ms. Chaitman filed an objection to the Trustee's determination of Ms. Goldsmith's claim on November 11, 2009.  (Dkt. No. 569.)

Goldsmith was listed on Exhibit A to the declaration filed in connection with the brief opposing the Trustee's Net Equity Motion by Ms. Chaitman.  (*See Declaration of Helen Davis Chaitman in Opposition to Trustee's Motion for an Order Approving the Trustee's Re-Definition of "Net Equity" Under the Securities Investor Protection Act*, (Dkt. No. 761).)  In addition, Ms. Chaitman filed a reply brief.  (*See Memorandum of Law on "Net Equity" in Reply to Memoranda of The Securities and Exchange Commission and Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited filed on behalf of Maureen Ebel, Diane Peskin, Roger Peskin*, (Dkt. No. 1096).)  Thus, through her counsel, Ms. Chaitman, Goldsmith directly participated in and actively litigated the Net Equity dispute before this Court.

3.    **Judith Kalman**

Kalman has a BLMIS account in the name of *Judith Kalman and Daniel Kalman, TIC*, BLMIS Account No. 1ZG032.  (April 9th Sheehan Aff., Ex. F.)  Judith Kalman and Daniel Kalman (collectively, the "Kalmans") filed two claims regarding their one account on February 17, 2009.[11]  (*Id.*)  On September 10, 2009, the Kalmans' claim was allowed in the amount of

---

[11] The Kalmans filed two claims for the same BLMIS account:  Claim No. 002462 and Claim No. 002503, the latter of which is duplicative of Claim No. 002462.  Thus, the two claims were combined for purposes of the Trustee's determination.

$133,675.00.  (*Id.*, Ex. G.)  The Kalmans filed an objection to the Trustee's determination on

October 8, 2009.  (Dkt. No. 506.)  Thereafter, on October 21, 2009, the Trustee mailed a check to

the Kalmans in that amount in full satisfaction of their claim after they executed an assignment

and release. (April 9th Sheehan Aff., Exs. H and I.)

        In connection with the Trustee's Net Equity Motion, the Trustee included 78 customer

claim objections that specifically raised the Net Equity Dispute in their objections.  (*See* Exhibit

A to the Trustee's Net Equity Motion) (Dkt. No. 530).  The Kalman objection was one of the 78

customer objections specifically included within the Net Equity Motion and on which the

Trustee sought a ruling.  On October 16, 2009, the Net Equity Motion papers were served upon

the Kalmans at their last known address, via first-class United States mail.  The Certificate of

Service dated October 16, 2009 evidencing service of the Motion on the Kalmans was

electronically filed with the Court on October 16, 2009.  (Dkt. No. 526.)  As relates to Net

Equity, the Kalmans' objection to their claim determination has been specifically ruled on by this

Court as set forth in the Net Equity Order and Decision.  Thus, the Kalmans have had a full and

fair opportunity to litigate the Net Equity Dispute.

**E.**    **This Court's Net Equity Decision**

        In accordance with the Claims Procedures Order and the Scheduling Order, on October

16, 2009, the Trustee submitted his memoranda of law and other papers in support of his motion

for an order (a) upholding the Trustee's determinations denying 78 customer claims for the

amounts listed on the last customer statement, (b) affirming the Trustee's determination of "net

equity," and (c) expunging those objections with respect to the determinations relating to "net

equity" (as defined earlier, the "Net Equity Motion").  (Dkt. No. 525.)  The Trustee argued that

the Net Investment Method of calculating Net Equity is the only one consistent with SIPA,

bankruptcy law, principles of equity, and common sense.   Over thirty briefs and twenty *pro se*

submissions were filed in response to the Trustee's Net Equity Motion.   Two customers, SIPC,

and the SEC filed papers in support of the Trustee's Net Equity Motion.   Briefing concluded on

January 15, 2010 and a hearing was held before this Court on February 2, 2010.

On March 1, 2010, this Court issued its decision on the Net Equity issue, approving the

Trustee's method of determining Net Equity (as defined earlier, the "Net Equity Decision"),

rejecting the arguments now put forward by the New Jersey Plaintiffs as "allegations."   *SIPC v.

BLMIS*, 2010 WL 694211, at *2.   In that decision and the accompanying Net Equity Order of

March 8, 2010, this Court upheld the Trustee's Net Investment Method of calculating Net

Equity.   The Court upheld the denial of claims of those customers whose withdrawals exceeded

their initial investments and subsequent deposits, therefore rendering them ineligible to

participate in a distribution from the estate.   *See generally SIPC v. BLMIS*, 2010 WL 694211, at

*7, 15.   In support of that holding, this Court determined that the plain language and the

legislative history of SIPA supports the adoption of the Trustee's method of determining Net

Equity:

> Because 'securities positions' [the term used in SIPA's definition
> of net equity] are in fact nonexistent, the Trustee cannot discharge
> claims upon the false premise that customers' securities positions
> are what the account statements purport them to be.   Rather, the
> only verifiable amounts that are manifest from the books and
> records are the cash deposits and withdrawals.   **Moreover, if
> customers' legitimate expectations are relevant to any
> determination other than whether customers hold 'claims for
> securities' or 'claims for cash,' they do not apply where they
> would give rise to an absurd result…The Trustee has properly
> satisfied expectations by providing all customers with 'claims
> for securities.'**

*SIPC v. BLMIS*, 2010 WL 694211, at *10 (emphasis added) (citations omitted).

This Court also concluded that the Trustee's calculation of Net Equity is consistent with the avoidance powers available to him under SIPA and the Bankruptcy Code. *See SIPC v. BLMIS*, 2010 WL 694211, at *10–11. Further, the Court noted that both equity and practicality favor utilizing the method proposed by the Trustee:

> Customer property consists of a limited amount of funds that are available for distribution. Any dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested. If the Last Statement Method were adopted, Net Winners would receive more favorable treatment by profiting from the principal investments of Net Losers, yielding an inequitable result.
>
> ***
>
> Equality is achieved in this case by employing the Trustee's method, which looks solely to deposits and withdrawals that in reality occurred.

*Id.* at *14–15.

Finally, this Court further held that the notion that SIPA provided some form of guaranteed insurance for fictitious profits was equally wrong: "SIPC payments . . . serve only to replace missing customer property and cannot be ascertained independently of the determination of a customer's *pro rata* share of customer property. Accordingly, the SIPA statute does not allow bifurcation of the claims process, with customers recovering SIPC payments based on the Last Statement Method, and recovering customer property shares based on the Net Investment Method." *Id.* at *9; *see also id.* at *1, n.6 (notion of SIPC advances as "insurance" was "strenuously controverted by the . . . [SEC], SIPC and the Trustee, and . . . is not supported by the controlling SIPA statute").

On March 8, 2010, this Court issued its order adopting the Trustee's Net Equity calculation and retained exclusive jurisdiction on "all matters relating to the interpretation or implementation of this [Net Equity] Order." (Dkt. No. 2020; Order at 4.) On that same date, the

Court also certified an appeal of the order directly to the United States Court of Appeals for the Second Circuit.  (*Id.*; *see also* Dkt. No. 2022.)  Notices of appeal of the Net Equity Order have been filed, including one by Ms. Chaitman.

**F.**    **The New Jersey Plaintiffs' Allegations Are An Affront to This Court's Jurisdiction**

Ms. Chaitman is both an indirect investor[12] in BLMIS and counsel to numerous customer claimants in this liquidation proceeding.  Both prior to and in the wake of the argument on Net Equity, Ms. Chaitman has been a vocal critic of this Court, making frequent statements to the press that implied that she and her clients were unable to get a fair hearing on the Net Equity Dispute before this Court, which she has appealed.[13]  Now, Ms. Chaitman seeks relief denied to her by this Court from the New Jersey District Court, feigning that the New Jersey Action has nothing to do with the BLMIS SIPA proceeding.  The allegations made in the New Jersey Action are indisputably virtually identical to her arguments and allegations already heard and decided by this Court.  *See, e.g.*, Appendix A attached hereto detailing overlap of arguments among multiple

---

[12] Ms. Chaitman and her cousin, Stephen Schwebel, shared BLMIS Account No. 1CM921, through an entity named *Chaitman/Schwebel LLC.*  (April 9th Sheehan Aff., Ex. J.)  The Trustee allowed the claim of Chaitman/Schwebel LLC in the amount of $2,000,000, and partially satisfied that claim by paying $500,000 to the LLC on August 13, 2009 after Ms. Chaitman and Mr. Schwebel executed an assignment and release.  (April 9th Sheehan Aff., Exs. K, L and M.)  On June 20, 2009, Ms. Chaitman filed an objection to the Trustee's determination of their claim on behalf of Chaitman/Schwebel LLC.  (Dkt. No. 283.)  In that objection, Ms. Chaitman raises many of the same arguments, including, *inter alia*, an objection to the Net Investment Method calculation of Net Equity.  (*Id.*)

[13] For example, in an article from the Palm Beach Post—written before this Court issued its Net Equity Decision— the author noted that Ms. Chaitman anticipated an adverse ruling, saying that she was "convinced she and other investors w[ould] lose the first round of the legal battle."  *See* Jane Musgrave, *N.J. Lawyer and Madoff Victim Urges Palm Beach County Victims to Flex Muscle in Payback Fight*, PALM BEACH POST, Jan. 9, 2010, *available at* http://www.palmbeachpost.com/news/n-j-lawyer-and-madoff-victim-urges-palm-171293.html.  The article recognized that Ms. Chaitman was anxious to appeal, and mentioned her desire for victims *instead* to "lobby Congress to get Picard to change his approach . . . [and] force [SIPC] to live up to its name . . ."  *Id.; see also* Leigh Kamping-Carder, *Madoff Cash In/Cash Out Ruling Heads to 2nd Cir.*, LAW 360, Mar. 9, 2010, *available at* http://www.law360.com/print_article/154320 (documenting Ms. Chaitman's impatience with the legal system's proper avenues for relief, quoting her as saying: "'It's in the public's interest that this issue be resolved as quickly as possible.'").

After Judge Lifland issued his decision, Ms. Chaitman expressed her disappointment with this Court's rulings, "call[ing] [its] ruling 'another example of Wall Street manipulating the law to enrich itself at the expense of Main Street, even though it is one of [SIPC's] own members who stole the investors' money.'"  Noeleen G. Walder, *Bankruptcy Judge Backs Madoff Trustee's Payout Calculations*, NEW YORK LAW JOURNAL, Mar. 2, 2010, *available at* http://www.law.com/jsp/nylj/ PubArticleFriendlyNY.jsp?id=1202444916101.

pleadings in this Court and in the New Jersey Action. In defiance of those prior rulings, Ms. Chaitman has now proceeded to yet another federal court with the implicit purpose of undermining this Court's rulings and jurisdiction. Although the New Jersey Action is styled as an action against the SIPC Defendants, it is merely a reiteration of Ms. Chaitman's failed arguments before this Court, both on Net Equity and related issues.

### 1.    The New Jersey Plaintiffs' Allegations Challenge the Net Equity Decision

On February 24, 2010, the New Jersey Plaintiffs, represented by Ms. Chaitman, filed and are maintaining their suit in the New Jersey District Court, effectively challenging this Court's jurisdiction and the Net Equity Decision. The New Jersey Action, filed against the SIPC Defendants on behalf of Canavan, Goldsmith, and Kalman, as well as on behalf of a putative class, seeks a ruling that would allow the New Jersey Plaintiffs and the putative class to recover their fictitious profits from the Madoff Ponzi scheme. The New Jersey Plaintiffs attack this Court's administration of BLMIS with respect to the determination of Net Equity and the Trustee's use of his avoidance powers to recover fictitious profits from BLMIS customers. The New Jersey Plaintiffs bring causes of action sounding in: (1) bad faith failure to pay insurance claims; (2) fraud; (3) violation of the New Jersey Consumer Fraud Act; and (4) promissory estoppel. (April 9th Sheehan Aff., Ex. A, Cmplt, ¶¶ 204–36.)

The New Jersey Plaintiffs allege that the "Net Investment Policy"—*i.e.*, SIPC's view that BLMIS customers should not be entitled to keep fictitious profits in perpetuation of the Ponzi scheme—is nothing less than a fraud: "[B]y virtue of SIPC's Net Investment Policy, the defendants have perpetuated a fraud and are personally liable, jointly and severally, for the damages that SIPC's Net Investment Policy has caused to customers in the full amount of their lost investments." (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 1.) The New Jersey Plaintiffs thus seek to achieve in the New Jersey District Court what they could not achieve before this Court—

a ruling that they were entitled to legitimately expect the return of their fictitious profits and the concomitant advance of $500,000.

Significantly, the allegations before the New Jersey District Court consist of little more than a regurgitation of the briefing before this Court filed by Ms. Chaitman detailing SIPC's public statements and the legislative history of SIPA, in an effort to persuade the New Jersey District Court that SIPC's position with respect to the proper interpretation of Net Equity is a fraud because it is purportedly contrary to the SIPA statute and formulations in other SIPA cases. (*Compare* April 9th Sheehan Aff., Ex. A, Cmplt, ¶¶ 95, 137, 142, 149–50 *with* Net Equity Brief (Dkt. No. 755) at 22, 12, 18, 36.)  Articulated yet another way, in both the *Canavan* Complaint and in briefing before this Court on Net Equity, the New Jersey Plaintiffs allege or argue that they had a "legitimate expectation" to be compensated by SIPC for their fictitious profits. (*Compare* April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 121 *with* Net Equity Brief (Dkt. No. 755) at 17.)  The New Jersey Plaintiffs further allege that SIPC is a form of guaranteed insurance for $500,000 per customer, regardless of the nature of the loss or the legal implications stemming from the same, which argument also was made in the Net Equity briefing before this Court. (*Compare* April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 51 *with* Net Equity Brief (Dkt. No. 755) at 24.)

All of these allegations—presented to this Court in connection with the Net Equity issue—already have been rejected by this Court in its Net Equity Decision and Order.  *See, e.g.*, *SIPC v. BLMIS*, 2010 WL 694211, at *10, 14.  This Court essentially ruled those arguments "absurd."  *Id.*  The "legitimate expectations" of a customer, to the extent they are relevant to anything other than determining whether a customer has a claim for cash or a claim for securities, *see* 17 C.F.R. §§ 300.500–300.50, are inapplicable where it would lead to an absurd

result.  *See, e.g.*, *SIPC v. BLMIS*,  2010 WL 694211, at *10.  Moreover, the funds advanced by

SIPC to the Trustee to satisfy allowed customer claims were deemed not to be guaranteed

"insurance" pursuant to 15 U.S.C. § 78fff-3(a), as the New Jersey Plaintiffs suggest, but rather,

are an advance against the "customer's *pro rata* share of customer property."  *See id.* at *9.  In

other words, there are no "insurance" funds to distribute in this liquidation proceeding, but

rather, SIPC funds are advanced to the Trustee to pay a customer against a valid Net Equity

claim—which claim does not include fictitious profits.

In a similar vein, the New Jersey Plaintiffs allege that SIPC's "clawback policy" is

fraudulent because they should be entitled to recover—at the expense of other customers who

have not yet been made whole—their fictitious profits:  "SIPC's Unfair Clawback Policy is a

bad-faith policy in direct contravention of the purpose and intent of SIPA. . . ."  (April 9th

Sheehan Aff., Ex. A, Cmplt, ¶ 17.)  As an initial matter, the so-called "clawback policy" is not a

policy of SIPC.  Rather, a SIPA trustee's right to avoid transfers is expressly provided by statute.

*See* 15 U.S.C. § 78fff-2(c)(3).   Furthermore, the New Jersey Plaintiffs' allegation directly

contravenes this Court's ruling that customers are not entitled to fictitious profits.  Finally, the

Trustee's use of his avoidance powers directly impacts the administration of the estate, which is

within this Court's exclusive jurisdiction. Indeed, the Trustee has already instituted major

avoidance litigation in this SIPA proceeding.

Significantly, the allegations in the Complaint are made against former and present

individual members of the SIPC Board of Directors and SIPC's CEO/President, not SIPC or the

Trustee.  While the SIPC Defendants may have a view as to the proper interpretation of net

equity, the decisions to implement the Net Investment Method and institute avoidance actions

were made by the Trustee in his capacity as a separate and independent fiduciary. Having already

sued the Trustee on virtually the same grounds and lost in the *Peskin* matter, Ms. Chaitman now

uses the guise of the New Jersey Action to sue the SIPC Defendants instead.  However, as the

New Jersey Plaintiffs themselves admit, there is a limitation to when the Board may be sued—

only when it has acted in bad faith.  (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 45.)  All of the

arguments as to the SIPC Defendants' purported bad faith in denying Madoff customers their

fictitious profits were presented to this Court in arguments on Net Equity, and not one of them

was accepted by this Court in its ruling.  (*See, e.g.*, Net Equity Brief at p. 3, 8–9, 12–13, 18, 25,

37.)

Nowhere is the New Jersey Plaintiffs' assault on this Court's rulings and jurisdiction

more glaring than in the fact that the New Jersey Action is brought as a putative class action.

Thus, the New Jersey Plaintiffs seek to recover on behalf of all customers—the majority of

whom are claimants before this Court in the BLMIS proceedings.  (April 9th Sheehan Aff., Ex.

A, Cmplt, ¶ 32.)

## 2. The New Jersey Plaintiffs' Allegations Repeat the *Peskin* Adversary Proceeding

The net equity briefing is only one of many instances in which Ms. Chaitman has raised

the issues alleged in the New Jersey Action.  On behalf of Diane and Roger Peskin, and Maureen

Ebel, all BLMIS customers, Ms. Chaitman filed a complaint in this Court seeking a declaration

that, *inter alia*, the Trustee's Net Equity interpretation is incorrect and that he is bound by SIPA

to allow a customer's claim at the balance shown on the customer's last BLMIS statement.

(*Peskin,* Am. Cmplt, ¶ 106.)  The Peskin complaint also alleges a claim for damages for an

alleged breach of fiduciary duty by the Trustee.  (*Id.*, Am. Cmplt. at ¶ 114.)  Much of the Peskin

complaint is devoted to describing the alleged bad acts of the Trustee, his alleged improper

interpretation and implementation of SIPA with regard to "net equity" and other issues, spurious

allegations regarding the purposes and history of SIPA and SIPC, as well as *ad hominem* attacks against the Trustee and SIPC.  (*See, e.g., id.,* Am. Cmplt., ¶ 13 ("In furtherance of his goal to protect the brokerage industry from further assessments by SIPC at the investors' expense . . . Picard intends to avoid paying SIPC insurance to…thousands of elderly Madoff investors . . ."); Am. Cmplt, ¶ 15 ("Harbeck's statement is a specious, bad faith rationalization of SIPC's goal, which is to save money for the brokerage community at the expense of innocent investors . . .").)

On July 17, 2009, the Trustee moved to dismiss the Peskin complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, to strike certain portions thereof.  (*Peskin*, Dkt. No. 11.) On August 17, 2009, Ms. Chaitman filed a sixty-two page memorandum of law, and supporting papers, in opposition to the Trustee's motion to dismiss the Peskin complaint.  (*Peskin*, Dkt. No. 30.)  A hearing was held before this Court on September 9, 2009, and an order and errata order dismissing the Peskin complaint followed on September 9 and 10, 2009, respectively (together, the "Peskin Order").

On September 18, 2009, Ms. Chaitman filed a notice of appeal of the Peskin Order, which has been fully briefed and is pending before the United States District Court for the Southern District of New York.  *Peskin v. Picard*, No. 09 CV 8730 (S.D.N.Y.) (JGK).

### 3.    The New Jersey Plaintiffs' Allegations Mimic Objections to the Fee Applications

On August 3, 2009, Ms. Chaitman filed a fifty-one page objection to the Trustee's and counsel's first interim fee applications in this Court (the "Fee Application Objection").  (*BLMIS*, Dkt. No. 351.)  Raising issues ancillary to the services and compensation of the Trustee and Baker Hostetler, the Fee Application Objection is essentially a reiteration of the Peskin complaint and the Net Equity Dispute. The Objection attempted to use Ms. Chaitman's prior arguments about the Net Equity Dispute as a basis for alleging that the Trustee and Baker

Hostetler have a conflict of interest and should be disqualified from serving. SIPC and the Trustee each filed a reply to the Fee Application Objection on August 3, 2009 and August 5, 2009, respectively. (*BLMIS*, Dkt. Nos. 357, 358.) A hearing was held before this Court on the Fee Applications on August 6, 2009.

At the hearing, the Trustee, counsel for the Trustee, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Fee Applications was reasonable. Ms. Chaitman was also heard and essentially asserted the same arguments set forth in her Fee Application Objection—that the Trustee's interpretation of "net equity" was contrary to SIPA. (*See, e.g.*, Transcript of Hearing on August 6, 2009 (Dkt. 381) ("8/6/09 Transcript") at 32 (Chaitman: "The statute mandates prompt payment of customer claims based upon their last statements. The statute even prohibits SIPC from changing the definition of net equity which is defined, in essence, as the last statement.").)

In response, this Court noted that Ms. Chaitman's dispute regarding Net Equity was raised in the context of the *Peskin* adversary proceeding, and thus was not properly before the Court regarding the Fee Application Objection. (8/6/09 Transcript at 32–33.) After due consideration, this Court found "no merit to the objections." (8/6/09 Transcript at 34.) This Court found that it had already held a disinterestedness hearing, at which there were no objections, and there were "no new facts that have come forward that would change the disinterestedness concept with respect to the fee application" before the Court. (8/6/09 Transcript at 34–35.) Thus, "despite the disagreement of methodology being applied here in this unique and unusual case," this Court held that the services rendered "have been reasonable, that they have been done responsibly and to this point have been with a salutary effect." (8/6/09 Transcript at 38.) The Court approved the Fee Applications. (*Id.*)

Ms. Chaitman filed an almost identical objection to the Trustee's second interim application for fees on December 14, 2009.  (Dkt. No. 1055.)  This Court similarly denied the second objection.  (Dkt. No. 1078.)  Ms. Chaitman filed motions in the Southern District of New York for leave to appeal each of the orders denying her objections to the fee applications.  The District Court for the Southern District of New York denied the first motion for leave to appeal on January 11, 2010 (Dkt. No. 1764.)  As the District Court noted in denying leave to appeal, "[a]lthough Objectants attempt to classify their objections as three distinct and separate issues, they all revolve around the methodology the Trustee used to compute net equity."  *See id.*, at 2. The second motion for leave to appeal is pending before that court.  The *Peskin* adversary proceeding and objections regarding the Fee Applications demonstrate that, having had her allegations and arguments rejected by this Court, as well as the Southern District Court, Ms. Chaitman is merely using different plaintiffs in an effort to relitigate the same issues in a different forum.

4.     **The New Jersey Plaintiffs' Allegations Raise the Same Issues as Customer Objections Filed by Ms. Chaitman**

Pursuant to the Claims Procedures Order, Ms. Chaitman has filed over 419 objections to the Trustee's determinations of customer claims on behalf of her clients.  In those objections, she objects to the Trustee's Net Equity calculation and reiterates the "legitimate expectations" argument.  *See, e.g.*, Objection to Trustee's Determination of Claim, (Dkt. No. 576, at ¶ 12) ("SIPC is statutorily bound to honor a customer's 'legitimate expectations'"); Objection to Trustee's Determination of Claim (Dkt. No. 1682, at ¶ 9) (same).)  In addition, she references the statements made by Mr. Harbeck and Ms. Wang which are now part of the *Canavan* Complaint, and asserts that *In re New Times* mandates that Net Equity be calculated using the amounts shown on the last BLMIS customer statement.  (*See, e.g.*, Objection to

Trustee's Determination of Claim, (Dkt. No. 576, at ¶ 14); Objection to Trustee's Determination

of Claim (Dkt. No. 1682, at ¶ 11).)

Under the Claims Procedures Order, after an objection is filed to a claim determination,

the Trustee is to schedule a hearing to resolve the objection.  The objections that Ms. Chaitman

has filed on behalf of her clients remain pending, and hearings will be scheduled in due course.

Thus, the issues in the *Canavan* Complaint are already before this Court.

### 5.    Current Status of the New Jersey Action

On March 16, 2010, counsel for the SIPC Defendants, Greenbaum, Rowe, Smith & Davis

LLP ("Greenbaum Rowe"), filed a letter with United States Magistrate Judge Patty Shwartz

requesting leave of court to file a motion to transfer venue of the New Jersey Action to this

Court.  (April 9th Sheehan Aff., Ex. Q.)  Ms. Chaitman responded by letter opposing the

Greenbaum Rowe request.  (April 9th  Sheehan Aff., Ex. R.)

Judge Shwartz conducted a telephonic conference with the parties on March 18, 2010.

(April 9th Sheehan Aff., Ex. S.)  On that same date, Judge Shwartz issued an order in which,

*inter alia*, the New Jersey Plaintiffs were granted until April 6, 2010 to decide whether to dismiss

the federal defendants.[14]  (*Id.*)  If the New Jersey Plaintiffs chose to proceed with their claims

against the federal defendants, Judge Shwartz required that the New Jersey Plaintiffs request a

telephone conference to discuss the motions that those defendants, or the United States as

substituted for them, may seek to bring.  (*Id.*)  If the New Jersey Plaintiffs chose to dismiss the

---

[14] Pursuant to section 78ccc(c)(2) of SIPA, the United States Treasury and the Federal Reserve Board each appoint
one SIPC Board Member from among the officers and employees of those two entities.  David Nason is a former
Treasury Director, and David Stockton is the current Federal Reserve Director.  Because their service on the Board
has been as federal employees, it is anticipated that the Department of Justice will enter an appearance on their
behalves.

federal defendants, then the private defendants were permitted to file a motion for transfer of venue no later than April 23, 2010. (*Id.*)

By a letter dated March 31, 2010, Ms. Chaitman informed the New Jersey District Court that she did not intend to dismiss the New Jersey Action as to the federal defendants. (April 9th Sheehan Aff., Ex. T.) The court then held a conference on April 5, 2010 to discuss, among other things, the New Jersey Plaintiffs' decision not to dismiss the federal defendants from the case. (April 9th Sheehan Aff., Ex. U. (Apr. 5, 2010 Order) at 1.) The court set a briefing schedule on the issue, with a return date of May 3, 2010. (*Id.* at 2.) At the April 5 conference, the court reiterated that the presence of the federal defendants in the New Jersey Action may be significant to its decision on transfer:

> THE COURT: Okay. Let me ask if you know, the non-federal defendants have asked about transfer. Do the federal defendants or the United States if it's substituted, does it have a view on that subject?
>
> MR. EHRLICH: Yes Your Honor, if the United States becomes a defendant and it's a typical FTCA suit, then venue would lie where the plaintiffs reside or the tort occurred. So it would either be the District of New Jersey or the District of the District of Columbia. And venue would not be proper in another district. And I don't believe that a bankruptcy judge in New York would have jurisdiction over a FTCA case.
>
> \*      \*      \*
>
> THE COURT: Let me just tell you what I would like to be sure is that whoever is going to decide – obviously if this gets delegated to me I'll know this information. But if Judge Hochberg in her normal course deals with this motion to transfer, somehow we need to ensure that in those briefs she's on notice that if the United States is substituted in, that there are limitations in terms of where venue would lie for the claims against them. I want to make sure that she's aware of that, because transfer is a discretionary act and I think she needs to have the full picture of the kind of big picture consequences on the case.

(April 9th Sheehan Aff., Ex. V at 14:4-14; 16:2-12.)   Importantly, the court engaged in no discussion of the other "big picture" issue relating to venue—that the New Jersey Plaintiffs' allegations were a relitigation of this Court's Net Equity Decision and Order, and that this Court has exclusive jurisdiction over the BLMIS SIPA proceedings, especially as it affects its orders and the administration of the estate.

The SIPC Defendants were given permission to file their transfer motion by April 23, 2010, with their answer or motion to dismiss due ten days after the resolution of that motion. (April 9th Sheehan Aff., Ex. U (Apr. 5, 2010 Order), at 2.)   Significantly though, the court denied the SIPC Defendants' request for a stay of discovery pending resolution of the motion to transfer:  "Judge Hochberg's case management approach and mine is to keep the case percolating along. . . discovery and moving the pretrial process along will advance the ball of the case regardless of the forum in which you are in."  (April 9th Sheehan Aff., Ex. V at 19:24-25; 20:3-5.)

Because the parties were waiting to hear Ms. Chaitman's position as to the federal defendants and a possible transfer, the Trustee deferred bringing this Application until now. However, given the deadlines set in the April 5, 2010 order and that discovery is not stayed, the Trustee believes he must act now.

## ARGUMENT

## THE NEW JERSEY ACTION VIOLATES THE AUTOMATIC STAY AND MUST OTHERWISE BE PRELIMINARILY ENJOINED

**I.    The New Jersey Plaintiffs and Those Acting on Their Behalf Must Be Enjoined From Circumventing This Court's Jurisdiction and Relitigating the Net Equity Issue**

As detailed above and in Appendix A annexed hereto, the claims and allegations by the New Jersey Plaintiffs are substantially identical to arguments raised in the context of the Net Equity Dispute, as well as other proceedings before this Court involving the New Jersey

Plaintiffs' counsel.  Having recycled their arguments made previously in this Court, the New Jersey Plaintiffs now attempt to argue them in a different federal forum.  Although the New Jersey Plaintiffs attempt to restyle their causes of action, the basis of their claims is inextricably connected to the proceedings before this Court and the Net Equity Decision.  This Court retained jurisdiction over these issues, and accordingly, should issue an injunction pursuant to section 105(a) of the Bankruptcy Code to protect its jurisdiction and the orderly administration of the BLMIS proceedings, as well as to prevent relitigation of the Net Equity Decision in the New Jersey District Court.

The New Jersey Plaintiffs submitted themselves to the jurisdiction of this Court for a determination with respect to their claims, and had a full and fair opportunity to litigate the net equity issues relating thereto.  They should not now be permitted to seek out a different forum to relitigate the same issues decided by this Court.

### A.    This Court Has Jurisdiction to Enjoin the New Jersey Plaintiffs

1.    Subject Matter Jurisdiction

This Court has subject matter jurisdiction to enjoin the New Jersey Plaintiffs, based on 28 U.S.C. §§ 1334(b) and 157(a) and the Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York dated July 10, 1984 (Ward, Acting C.J.).

Pursuant to 28 U.S.C. § 1334(b), district courts (and hence bankruptcy courts) have original jurisdiction of civil proceedings "arising under" and "arising in" and "related to" cases under title 11.  *See In re Adelphia Commc'ns Corp.*, 2006 WL 1529357, at *6 (Bankr. S.D.N.Y.

June 5, 2006); 28 U.S.C. § 1334(b).[15]  Furthermore, bankruptcy courts have jurisdiction to "hear

and determine . . . all core proceedings arising under title 11, or arising in a case under title 11, . .

. ."  28 U.S.C. § 157(b)(1).  Subsections 157(b)(2)(A) and (B) provide that core proceedings

include, but are not limited to, "matters concerning the administration of the estate," and the

"allowance or disallowance of claims against the estate."   In the Second Circuit the test for

determining whether "related to" jurisdiction exists is whether the outcome of a proceeding

"might have any 'conceivable effect' on the bankrupt estate," or if the proceeding has a

"significant connection" with the bankrupt estate.  *See Adelphia*, 2006 WL 1529357, at *6.;

*Publicker Indus. Inc. v. United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110, 114 (2d Cir.

1992).

    The New Jersey Action circumvents this Court's jurisdiction and seeks to undermine its

rulings dealing with the administration of the estate under the Net Equity Decision and the

claims determination and allowance process, and to satisfy claims against BLMIS through a

third-party action.  These activities fall within the "arising under," "arising in," and "related to"

jurisdiction to this Court.  *See, e.g.*, *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 91, 92

---

[15] A SIPA proceeding effectively is a bankruptcy proceeding and unless inconsistent with SIPA is to be treated as such.  Thus, SIPA § 78fff(b) specifies that to the extent consistent with SIPA, the proceeding is to "be conducted in accordance with and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7" of the Bankruptcy Code.  These are all the provisions that apply to a chapter 7 bankruptcy proceeding except for the special provisions of subchapters III through V of chapter 7 applying to stockbrokers, commodity brokers, and clearing banks.  Because the liquidation is conducted "as though" it were being conducted as a chapter 7 liquidation and "in accordance with" the provisions that apply to a chapter 7 case, all of the provisions, both procedural and substantive, that  apply to such a case apply to the SIPA proceeding, unless inconsistent with SIPA. *See Exch. Nat'l Bank of Chicago v. Wyatt*, 517 F.2d 453, 457–59 (2d Cir. 1975); *Nat'l Union Fire Ins. Co. v. Camp* (*In re Gov't Sec. Corp.*), 972 F.2d 328, 330, n.1 (11th Cir. 1992) (rejecting claim that §78fff(b) makes applicable only procedural and not substantive Bankruptcy Code provisions, as plain language of section "makes no such distinction, and explicitly incorporates ... the Bankruptcy Code."); *Turner v. Davis* (*In re Inv. Bankers, Inc.*), 4 F.3d 1556, 1564 (10th Cir. 1993) (§78fff(b) "indicates that Congress intended SIPA liquidation proceedings to be treated, in most important respects, identical to a traditional bankruptcy case under title 11."); *In re Lewellyn*, 26 B.R. 246, 253 (Bankr. S.D. Iowa 1982).

(2d Cir. 1988); *Adelphia*, 2006 WL 1529357, at *6–7; *In re AP Indus., Inc.*, 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990).

In addition, pursuant to SIPA § 78eee(b)(2)(A)(i) and § 78eee(b)(4), this Court has exclusive jurisdiction over BLMIS and its property, such that the Court has exclusive jurisdiction to decide claims against such property.  By seeking to have a different federal court decide the issue of net equity (*see, e.g.*, *Canavan* Complaint, at ¶ 208 ("Plaintiffs' and the Class members' claims were indisputable as a matter of law as they were based on their 'net equity' as defined by SIPA"); *id.* at ¶ 209 ("Defendants wrongfully and in bad faith failed to 'promptly' pay the claims under the illegal SIPC Net Investment Policy, and had no fairly debatable reason for their failure to pay such claims")), the New Jersey Plaintiffs are attempting to create and confer jurisdiction on another court, undermining SIPA.

Moreover, this Court has inherent ancillary jurisdiction concerning the New Jersey Actions beyond the statutory grant of authority, in order to interpret and enforce this Court's orders:

> Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant of jurisdiction under 28 U.S.C. § 1334. ("Bankruptcy Courts must have the ability to enforce prior orders and 'secure or preserve the fruits  and advantages of a judgment or decree rendered therein' …   The proceeding being ancillary and dependent, the jurisdiction of the  Court follows that of the original cause…") (quoting Local Loan Co) (citations omitted).

*LTV Corp. v Back (In re Chateaugay Corp.)*, 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996) (Lifland, J.), *aff'd in part*, 213 B.R. 633 (S.D.N.Y. 1997).

2.    Personal Jurisdiction

When the New Jersey Plaintiffs filed their claims and/or objections to the Trustee's determinations, they submitted themselves to the equitable jurisdiction of this Court, which

includes a consent to personal jurisdiction and a waiver of any right to a jury trial in respect of

the claims allowance process and avoidance actions:

> Respondents filed claims against the bankruptcy estate, thereby
> bringing themselves within the equitable jurisdiction of the
> Bankruptcy Court. Consequently, they were not entitled to a jury
> trial on the trustee's preference action.

*Langenkamp v. Culp*, 498 U.S. 42, 45 (1990).  By filing a proof of claim,[16] a creditor consents to

the bankruptcy court's equitable jurisdiction regarding the adjudication of matters related to that

claim, including avoidance actions.  *See, e.g.*, *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 59

n.14 (1989); *Statutory Comm. of Unsecured Creditors v. Motorola, Inc.* (*In re Iridium Operating*

*LLC*), 285 B.R. 822, 830–31 (S.D.N.Y. 2002) (holding that courts in Second Circuit have

consistently held adversary proceedings to be core matters due to filing of proof of claim); *In re*

*Adelphia Commc'ns Corp.*, 307 B.R. 404, 418 (Bankr. S.D.N.Y. 2004) ("when the [creditors]

filed proofs of claim in the bankruptcy court, they submitted to the equitable jurisdiction of th[at]

[c]ourt.").[17]

## B.    Standards for a Section 105(a) Injunction

Section 105(a) of the Bankruptcy Code, applicable here pursuant to section 78fff(b) of

SIPA, bestows on bankruptcy courts broad discretion to "issue any order 'necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]'. . . ."  *In re Enivid*, 364 B.R.

---

[16]  A customer claim filed in a SIPA action is the equivalent to a proof of claim for purposes of submission to jurisdiction.  "Therefore, like other creditors of the estate, a party filing a customer claim subjects himself to the process of allowance and disallowance of claims referred to in *Langenkamp* and *Granfinanciera*."  *Keller v. Blinder* (*In re Blinder Robinson & Co., Inc.*), 135 B.R. 892, 896–97 (D. Colo. 1991).  A customer claim in a SIPA liquidation is a species of preferred creditor.  *Id.* at 897 (citing *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 555 (S.D.N.Y. 1990)).

[17]  In addition, Canavan filed an objection on March 31, 2010 in this Court regarding the denial of the Lapin Children claim.  *See e.g., First Fid. Bank N.A., N.J. v. Hooker Invs., Inc.* (*In re Hooker Invs., Inc.*), 937 F.2d 833, 838 (2d Cir. 1991) (stating that a creditor who invokes bankruptcy court's equitable jurisdiction to establish a claim against a debtor's estate is also subject to procedures of equity in the determination of actions brought on behalf of estate).

139, 149 (Bankr. D. Mass. 2007).   The standard for a Rule 7065 injunction is inapplicable, and

the Court may enjoin suits if (i) a third party suit would impair the court's jurisdiction with

respect to a case before it or (ii) the third party suits threaten to thwart or frustrate the debtor's

reorganization efforts and the stay is necessary to preserve or protect the debtor's estate.[18]   *See In*

*re Calpine Corp.*, 354 B.R. 45, 48 (Bankr. S.D.N.Y 2006) *aff'd*, 365 B.R. 401 (S.D.N.Y. 2007);

*In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003) (quoting *In re Granite*

*Partners, L.P.*, 194 B.R. 318, 337 (Bankr. S.D.N.Y. 1996));   *In re Lyondell Chem. Co.*, 402 B.R.

571, 588 n.37 (Bankr. S.D.N.Y. 2009); *In re Keene Corp.*, 162 B.R. 935, 944 (Bankr. S.D.N.Y.

1994); *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990) *aff'd in part*, 124

B.R. 635 (S.D.N.Y. 1991); *Garrity v. Leffler* (*In re Neuman*), 71 B.R. 567, 571 (S.D.N.Y. 1987);

*C & J Clark Am., Inc. v. Carol Ruth, Inc.* (*In re Wingspread Corp.*), 92 B.R. 87, 92 (Bankr.

S.D.N.Y. 1988); *LTV Steel Co., Inc. v. Bd. of Educ.* (*In re Chateaugay Corp.*), 93 B.R. 26, 29

(S.D.N.Y. 1988); *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998).

### C.    The New Jersey Action Threatens the Court's Jurisdiction and Seeks to Relitigate the Net Equity Decision

This Court specifically held that: (1) customers were not entitled to fictitious profits and

that the last customer statements are therefore an invalid way to determine a customer's loss;

(2) no one could ever have a legitimate expectation that he or she would get to keep fictitious

profits; and (3) SIPC advances are based on the recovery a customer is entitled to—it is not a

form of guaranteed insurance, covering even fictitious profits.   *See SIPC v. BLMIS*, 2010 WL

694211, at *9, 10, 14.   Desperate for their fictitious profits, however, the *Canavan* Complaint

---

[18]   Notwithstanding that the Rule 7065 standard need not be satisfied here, it is.   There is no question that an
infringement on this Court's jurisdiction would constitute "irreparable harm."   *In re Adelphia Commc'ns Corp.*,
2006 WL 1529357, at *5.   Moreover, the Trustee is likely to succeed on the merits of his complaint that preliminary
injunctive relief is warranted given the New Jersey Plaintiffs' attempt to relitigate the Net Equity determination.   *See*
*id.* at *4–5.

seeks precisely to relitigate and challenge: (1) how net equity is calculated; (2) whether customers' legitimate expectations could ever be that they deserve fictitious profits; and (3) whether SIPC advances are a form of guaranteed insurance that insures the return of fictitious profits. The New Jersey Plaintiffs must be enjoined from having these issues heard again in another forum.

1.    <u>This Court Has Jurisdiction Regarding Net Equity</u>

In upholding the Trustee's determination of Net Equity, this Court specifically ordered that it "shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order." (Net Equity Order at 4.) The New Jersey Action is predicated entirely on this Court's determination of Net Equity, and this Court is authorized to enforce its jurisdiction by enjoining the New Jersey Plaintiffs from pursuing their Action. *See e.g.*, *Adelphia*, 2006 WL 1529357, at *5 ("it is manifestly proper, in my view, to invoke section 105(a) **'to enforce or implement' my earlier orders**, to prevent abuses of process, and to avoid such a blatant interference with the Debtors' reorganization in these chapter 11 cases.") (emphasis added); *In re Johns-Manville Corp.*, 91 B.R. 225, 228 (Bankr. S.D.N.Y. 1988) (The court's injunctive powers allow the court to "protect[] and enforce[e] its own decrees").

2.    The New Jersey Plaintiffs Seek to Relitigate the Net Equity
<u>Decision and Must Be Enjoined</u>

The New Jersey Action threatens to undo the equitable distribution of customer property, as determined in the Net Equity Decision, by substituting the New Jersey Plaintiffs' concept of "legitimate expectations" and equitable distribution for that of the Court. (*See, e.g.*, April 9th Sheehan Aff., Ex. A.) Were the New Jersey Plaintiffs to have their way, anyone dissatisfied with the Net Equity Decision could bring their own actions against SIPC to get more than their fair share of damages—"damages" in this instance being fictitious profits to which this Court has

determined they are not entitled. This conduct is just the sort of conduct prohibited time after time by the bankruptcy courts in numerous cases in this and other jurisdictions.[19]   *See, e.g.*, *In re Keene Corp.*, 164 B.R. 844, 849–54 (Bankr. S.D.N.Y. 1994); *In re AP Indus., Inc.,* 117 B.R. at 801–02; *In re Johns-Manville Corp.*, 91 B.R. at 228; *In re The 1031 Tax Group, LLC*, 397 B.R. 670, 684–85 (Bankr. S.D.N.Y. 2008); *In re Singer Co. N.V.*, 2000 WL 33716976, at *2 (Bankr. S.D.N.Y. Nov. 3, 2000) (Lifland, J.), *aff'd in part*, 2002 WL 999273 (S.D.N.Y.), *adhered to on reconsideration*, 2002 WL 31040349 (S.D.N.Y.), *vacated*, 2002 WL 31251621 (S.D.N.Y. 2002); *Apostolou*, 155 F.3d at 876; *Baldwin-United Corp. v. Paine Webber Group, Inc.* (*In re Baldwin-United Corp.*), 57 B.R. 759 (S.D. Ohio 1985).

The New Jersey Plaintiffs have filed customer claims with the Trustee, or claims have been filed on behalf of the accounts in which they have an interest. (*See* April 9th Sheehan Aff., Exs. B, D and F.)   Moreover, each of the New Jersey Plaintiffs has filed objections to those claims determinations that are pending before this Court.   (*See* Dkt. Nos. 506, 569 and 2119.) Finally, each has been and continues to be an active litigant in the Net Equity Dispute before this Court.   While they are clearly participants in this liquidation proceeding, the New Jersey Plaintiffs may only be eligible to share in the fund of customer property as permitted by the terms of this Court's Net Equity Decision.   Dissatisfied with the impact the Net Equity Decision will have on their recoveries in the BLMIS liquidation, they seek to avoid, through the New

---

[19] If this action were to be litigated before the New Jersey District Court, the SIPC Defendants would undoubtedly assert collateral estoppel.   *See Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006) (noting that collateral estoppel bars relitigation under New York law when "(1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action"); *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 500 (N.Y. 1984) ("The doctrine of collateral estoppel...precludes a party of relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.")

Jersey Action, this Court's jurisdiction and "disrupt the heart of the duties" of the bankruptcy

court.  *See In re Neuman*, 71 B.R. at 574.

This is exactly the situation in which a section 105(a) injunction is necessary to protect

the court's jurisdiction and the administration of the liquidation.  In *In re AP Industries, Inc.*, this

Court noted that a bankruptcy court has "authority under § 105 broader than the automatic stay

provisions of § 362 and may use its equitable powers to assure the orderly conduct of the

reorganization proceedings."  *In re AP Indus., Inc.*, 117 B.R. at 801 (citations omitted).  In that

case, the debtor sought to stay or enjoin actions commenced by a creditor against the debtor's

directors and other third parties that were brought because the creditor objected to a transaction

entered into by the debtor.  This Court found that it was appropriate to use section 105(a) to

enjoin the creditor's action, stating:

> this Court finds that it is also appropriate to issue an injunction
> pursuant to § 105 of the Code to stay the [creditor's] Actions in
> order to preserve and protect the Debtor's estate and reorganization
> prospects.  Not only may the outcome of the [creditor's] Actions
> affect the administration of this case, but the possibility of
> inconsistent judgments warrants the issuance of an injunction . . .

*In re AP Indus., Inc.*, 117 B.R. at 802;  *see also In re Singer Co. N.V.*, 2000 WL 33716976, at*7.

Similarly, in enjoining approximately 1,600 lawsuits commenced by a debtor's creditors

seeking to challenge certain asset transfers, the *Keene* court observed:

> [t]he Court cannot sanction a practice which permits creditors to
> assert general, indirect claims in order to achieve a greater
> distribution on a first come, first serve basis from assets which the
> trustee has standing to recover, and which, if recovered, will be
> available to satisfy the claims of all creditors.

*In re Keene Corp.*, 164 B.R. at 854.

Section 105(a) of the Bankruptcy Code is analogous to the All Writs Act.  *See In re*

*Johns-Manville Corp.*, 97 B.R. 174, 178 (Bankr. S.D.N.Y. 1989) (Lifland, J.); *In re Chateaugay*

*Corp.*, 109 B.R. 613, 612 (S.D.N.Y 1990).  The All Writs Act, 28 U.S.C. § 1651, provides that federal courts have the authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  Courts have consistently recognized that, under the All Writs Act, a federal court may issue an injunction to prevent interference with its determinations or jurisdiction.  *See, e.g.*, *United States v. New York Tel.*, 434 U.S. 159, 172 (1977) (finding that a court had the authority under the All Writs Act to compel a third-party private company to provide access to telephone lines to effectuate a wiretap order); *In re Baldwin-United Corp.*, 770 F.2d 328, 337 (2d Cir. 1985) (in the context of settlement negotiations, using the All Writs Act to enjoin non-parties from commencing actions in state court where the circumstances faced "threatened to frustrate proceedings in a federal action of substantial scope, which had already consumed vast amounts of judicial time…").

Significantly, the All Writs Act permits, *inter alia*, a court to enjoin actions if necessary to prevent relitigation, though "preservation of the federal court's jurisdiction or authority over an ongoing matter may justify an injunction," even before a federal judgment is reached.  *See, e.g.*, *In re Baldwin-United Corp.*, 770 F.2d at 335 (stating that "preservation of the federal court's jurisdiction or authority over an ongoing matter may justify an injunction"); *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970) (stating that "federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case");  *United States v. Int'l Bhd. of Teamsters*, 728 F. Supp. 1032, 1042–1044 (S.D.N.Y. 1990) (enjoining competing federal action essentially seeking to relitigate consent order); *Rand v. Anaconda-Ericsson, Inc.*, 623 F. Supp. 176, 189 (E.D.N.Y. 1985) (enjoining successive suits by shareholders as relitigation of decided matter); *BGW Assocs., Inc.*

*v. Valley Broad. Co.*, 532 F. Supp. 1115, 1117 (S.D.N.Y. 1982) (barring relitigation of issues decided by federal court); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 367–68 (3d Cir. 2001) (a court has jurisdiction to enjoin action to protect the integrity of class settlement where the court explicitly retained jurisdiction);[20] *Samuel C. Ennis & Co. v. Woodmar Realty Co.*, 542 F.2d 45, 49–50 (7th Cir. 1976) (protecting both parties and non-parties from the relitigation of issues decided by federal court in order to "preserve the full 'fruits and advantages' of the [prior] federal judgment").

Further, "judicial economy demands that similar issues not be litigated multiple times in different districts," and therefore, an injunction is warranted. *See Int'l Bhd.*, 728 F. Supp. at 1048. The New Jersey Plaintiffs' action to bring the same issues before two federal courts is not only improper forum shopping and counter to the jurisdiction of this Court, but also is contrary to the orderly and efficient administration of justice. *See, e.g.*, *Martin v. Graybar Elec. Co.*, 266 F.2d 202, 204 (7th Cir. 1959).

**D.    The SIPC Defendants Have Not Acted in Bad Faith as a Matter of Law and Are Statutorily Immune From Suit by the New Jersey Plaintiffs**

The *Canavan* Complaint is replete with accusations of bad faith. (*See e.g.*, April 9th Sheehan Aff., Ex. A, Cmplt, ¶¶ 209, 210.) However, all of these allegations are baseless as a matter of law. The New Jersey Plaintiffs concede, as they must, that SIPC is only subject to suit for actions taken in bad faith, and that under the express provisions of SIPA, they are immune from all other actions. *See id.*, Cmplt ¶ 45; SIPA § 78kkk(c) ("Neither SIPC nor any of its Directors, officers, or employees shall have any liability to any person for any action taken or omitted in good faith under or in connection with any matter contemplated by this chapter.");

---

[20] The claims administration process may be viewed essentially as a settlement process over which this Court has exclusive jurisdiction, making an injunction all the more necessary.

*Kusch v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 1998 WL 551972, at *32 (Bankr. S.D.N.Y. Aug. 24, 1998) *aff'd sub nom.*, *Adler, Coleman Clearing Corp. v. Mishkin*, 208 F.3d 202 (2d Cir. 2000) (quoting SIPA § 78kkk(c) and referring to SIPC's immunity under the statute).

As discussed above, this Court has ruled that the net equity calculation determined by the Trustee and endorsed by SIPC is correct, and that the New Jersey Plaintiffs' "legitimate expectations" argument is "absurd." Under these circumstances, there could be no bad faith. *In re Adler* is instructive. In *Adler*, the plaintiff account-holder sued SIPC and the SIPA trustee to recover from them compensatory and punitive damages for certain actions taken with respect to the plaintiff's account, allegedly, in bad faith. *Id.* at *1. Originally, the plaintiff moved the Court for an order directing the trustee to move her brokerage account and release her securities to another broker. The trustee and SIPC opposed her motion and after a hearing was held, her motion was denied. *Id.* at *3. The plaintiff filed an action, alleging, *inter alia*, that "because defendants, acting in concert and in bad faith, refused to deliver the securities in Kusch's account, they prevented her from selling them to NSCC at the same price that the trustee was selling customer securities" causing plaintiff to lose $1,396,182.23, the amount which would have been realized from such sale. *Id.* at *5. The plaintiff further alleged that SIPC manifested its bad faith by opposing her motion for immediate release of her securities. *Id.* at *32. The court held that trustee's actions with respect to the plaintiff's account were completely within his discretion and lawful. *Id.* "As such, SIPC's support of and authorization for those lawful acts cannot evidence bad faith." *Id.* Furthermore, if the Court were to adopt the plaintiff's argument, SIPC would be "subject to claims of self-interest and bad faith whenever it takes a position opposing any claim in a SIPA case." *Id.*

Similarly, here, the Trustee's determination of customers' claims using the Net Investment Method was not only lawful, but was deemed correct by this Court. *SIPC v. BLMIS*, 2010 WL 694211, at *2, 16. Thus, as in *Adler*, the Trustee's actions were completely lawful, and "SIPC's support of and authorization for those lawful acts cannot evidence bad faith." *In re Adler,* 1998 WL 551972, at *32. The New Jersey Plaintiffs' claims are baseless.

Not only are the New Jersey Plaintiffs' allegations false, they could not be true under any circumstances. SIPA has bifurcated the duties and obligations of the Trustee and those of SIPC. Significantly, the Trustee is charged with the day-to-day administration of the estate, which includes determining and satisfying customer claims, while it is SIPC's obligation to advance the Trustee enough money for each customer claim which he, in his sole discretion, has allowed, up to $500,000 if the claim is for securities. *See, e.g.*, § 78fff-2(b), 2(b)(1), and 3(a). SIPC could not have exhibited bad faith with respect to actions that it did not undertake—determining the appropriate method for the net equity calculation. The New Jersey Plaintiffs' attempt to impute the Trustee's actions to the SIPC Defendants, who are removed from the Trustee's decisions, wreaks of an end-run around the automatic stay of proceedings against the Trustee. Indeed, the New Jersey Plaintiffs' counsel has made similar allegations against the Trustee before this Court—unsuccessfully. (*See Peskin*, Am. Cmplt., Dkt. No. 39 at ¶¶ 2, 11–13, 85-86, 114–16; Opp. to Motion to Dismiss, Dkt. No. 30 at p. 2, 18-19, 30-31, 48.).

In sum, the SIPC Defendants are immune from the New Jersey Plaintiffs' suit because they could not have acted in bad faith for views endorsed by this Court with a full record of SIPC's alleged "bad conduct" before it. The New Jersey Plaintiffs and their counsel must be

enjoined from proceeding with their baseless and insulting action, which amounts to nothing more than a collateral attack on the Net Equity Decision.[21]

## II.    The New Jersey Action Violates the Automatic Stay

The filing of an application for a customer protective decree under SIPA puts into effect certain stays under the Bankruptcy Code.  Notice of the stays was given by the District Court in its Order, dated December 15, 2008, placing BLMIS into liquidation.  (Dist. Ct. Dkt. No. 4.)

Section 362(a)(3) of the Bankruptcy Code provides that the filing of an application for the entry of a protective decree under Section 5(a)(3) of SIPA (15 U.S.C. § 78eee(a)(3)) operates as a stay, applicable to all persons and entities, *inter alia*, of any act to exercise control over property of the estate.  *See* 11 U.S.C. § 362(a)(3).  Section 362(a)(3) is designed to prevent the dismemberment of the bankruptcy estate through interference, either directly or indirectly, with the trustee's control over estate property.  *See, e.g.*, *Liberty Mut. Ins. Co. v. Off. Unsecured Creditors' Comm.* (*In re Spaulding Composites Co., Inc.*), 207 B.R. 899, 908 (9th Cir. BAP 1997); *In re Burgess*, 234 B.R. 793, 799 (D. Nev. 1999); *In re HSM Kennewick, L.P.*, 347 B.R. 569, 572 (Bankr. N.D. Tex. 2006).  In particular, as this Court has long recognized, "Code section 362(a)(3) protects the *in rem* jurisdiction of the Court, and prohibits interference with the disposition of the assets that are under the Court's wing, whether or not the Debtor is named as a defendant as part of that effort.  And that is so without distinction as to the form the interference takes."  *Adelphia*, 2006 WL 1529357, at * 3; *see also In re MCEG Prods., Inc.*, 133 B.R. 232, 235 (Bankr. C.D. Cal. 1991).[22]

---

[21] To the extent the Court determines that the New Jersey Action should be heard (which it should not), that case belongs only before this Court, which retained jurisdiction on all matters relating to net equity, and the New Jersey Plaintiffs and their counsel should be enjoined from proceeding in other fora.

[22]  Furthermore, SIPA § 78eee(b)(2)(B) also provides for stay protection as to, *inter alia*, any suit against the debtor's property.

Protection of the Court's *in rem* jurisdiction is particularly important in a SIPA case as "exclusive jurisdiction over the debtor and its property wherever located" is vested initially in the District Court where SIPC files its application for a protective decree, *see* SIPA § 78eee(b)(2), and upon removal, in the Bankruptcy Court. *See* SIPA § 78eee(b)(4) (in relevant part, upon removal, the bankruptcy court acquires all of the jurisdiction of the district court). The SIPA application as to BLMIS was filed in the District Court for the Southern District of New York, and upon removal, this Court acquired exclusive jurisdiction over BLMIS and its property, and the concomitant exclusive jurisdiction to decide claims against such property.

In the present case, there is simply no doubt that the principal objective of the New Jersey Plaintiffs is to relitigate in another forum this Court's decision concerning the propriety of the Trustee's Net Equity calculus. The New Jersey Plaintiffs expressly challenge the propriety of that calculus throughout their Complaint and, in so doing, challenge the correctness of this Court's March 1 Net Equity Decision in favor of the Trustee by implication. (*See, e.g.,* Complaint ¶¶ 15, 16, 208-211.)

As this Court is well aware, the net equity issue is of vital importance in the resolution of thousands of "customer" claims in the BLMIS liquidation, and its resolution will affect the allocation and disposition of potentially literally billions of dollars worth of "customer property" through the BLMIS estate. Any finding in the New Jersey Action inconsistent with this Court's March 1 opinion resolving the net equity issue therefore would create enormous confusion in the distribution of the assets of the BLMIS estate and would severely compromise the orderly administration of the BLMIS liquidation proceeding. Further, in all likelihood, such a ruling would ultimately set the net equity issue before two different appellate courts, wasting further judicial resources, creating continued risk of judicial inconsistency, and deepening the confusion

surrounding customer satisfaction in the BLMIS liquidation. This is exactly the kind of interference proscribed by Section 362(a)(3).

The New Jersey Action also is brought in violation of other sections of the Bankruptcy Code providing that the filing of the SIPA application operates as a stay, *inter alia*, against recovery against the debtor for claims arising prior to the commencement of the case. *See* 11 U.S.C. §§ 362(a)(1) and (6). The automatic stay provision is thus broad, and "prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding." *In re AP Indus., Inc.*, 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) (Lifland, J.) (citations omitted). Similarly, in the SIPA context, the automatic stay prevents third parties from interfering with customer property and ensures its distribution in accord with the Court's administration of the estate.

The automatic stay is intended precisely to prevent creditors from obtaining payment "in preference to and to the detriment of other creditors . . ." *Id.* at 799 (citations omitted); *see also In re Keene Corp.*, 164 B.R. at 849 ("equality . . . is the governing principle").

A.    **The New Jersey Action Seeks to Subvert the Claims Administration Process**

By relitigating the Net Equity issue, there can be no question that the New Jersey Action attempts an end-run around this Court's orderly administration of the BLMIS liquidation. Under these circumstances, the New Jersey Plaintiffs—all of whom are before this Court precisely on the issue of the administration of their claims—should have sought to lift the automatic stay prior to filing the New Jersey Action. That they failed to do so speaks volumes of their fear that this Court would not permit their efforts to relitigate its rulings. And rightfully so.

In an effort to subvert the SIPA statute and its distribution mechanism that hinges upon a valid net equity claim, the New Jersey Plaintiffs cling to the entirely unfounded notion of

SIPC's independent "insurance" obligation. SIPC's obligations to customers, however, are only those specifically delineated in the SIPA statute. The SIPA statute permits SIPC to advance funds to the Trustee to satisfy allowed net equity claims, but only if customer property is insufficient to satisfy those claims. *See* SIPA § 78fff-3(a). Only customers who are entitled to share in customer property —*i.e.*, those with a valid net equity claim as "ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the *trustee*" (SIPA § 78fff-2(b) (emphasis added))— are eligible to be paid with a SIPC advance.

There is no general right to SIPC "insurance." There also is no "entitlement" to obtain payment from a SIPC advance outside of a SIPA proceeding. Whether a customer is eligible to be paid with a SIPC advance is entirely dependent upon the allowance of a valid net equity claim. As such, it is elementally connected to the SIPA liquidation proceeding and the Trustee's determination of customer claims within that proceeding. In fact, the New Jersey Plaintiffs, who couch their claims for relief as seeking compensatory and punitive damages, cannot avoid asserting that the basis for their claims is premised upon their status as "customers" of BLMIS, and that the SIPC Defendants have caused the Trustee to deny payment of the SIPC "insurance" where a customer's withdrawals exceeded deposits. (*See, e.g.*, *Canavan* Complaint, at ¶ 2 ("Under SIPA, the Customers are entitled to the prompt replacement of securities in their accounts, up to $500,000 in value, based upon their November 30, 2008 statements (their 'Statutory Balances')"; *Canavan* Complaint, at ¶4 ("[D]efendants have caused their designated trustee in the Madoff case, Irving H. Picard (the 'Trustee'), to refuse to pay SIPC insurance to any Customer whose withdrawals exceeded his deposits, . . . .".).) Further analysis of the *Canavan* Complaint elucidates that but for the denial of the New Jersey Plaintiffs' SIPA claims, there would be no controversy. Had this Court ruled in favor of the last statement method of

calculating net equity, as advocated by the New Jersey Plaintiffs, there also would be no ability, or need, to seek compensatory damages.  Thus, although not explicitly labeled as such, the New Jersey Action is an indirect attempt to recover on and satisfy their claims against BLMIS.  The Court can pierce this veiled attempt and recognize the true nature of the proceeding.

The New Jersey Plaintiffs seek to undermine the claims process, the Court's Net Equity Decision, the exclusive jurisdiction of the Court, and the orderly administration of the BLMIS estate by initiating and maintaining a lawsuit that seeks indirectly what they have not been able to obtain from this Court—a decision that they are entitled to a net equity claim (and therefore a SIPC advance)—based upon their last statement received.  It is difficult to imagine any greater attack on these proceedings—proceedings protected by the automatic stay—than suits filed in another jurisdiction that seek to undo the Court's administration of the BLMIS liquidation.  As was the case in *In re AP Industries*, the New Jersey Plaintiffs are attempting to "end run" the automatic stay and avoid the jurisdiction of this Court and the processes this Court has put into place consistent with SIPA.  *In re AP Indus., Inc.*, 117 B.R. at 799; *see also In re Singer Co. N.V.*, 2000 WL 33716976, at *2.[23]

The New Jersey Plaintiffs would no doubt have this Court believe that because they have brought their suit against the SIPC Defendants rather than against the Trustee, and because they are not seeking to recover their fictitious profits from the pot of customer property, that somehow they have steered clear of the automatic stay.  They are wrong.  Of further concern is that the New Jersey Action would directly impact the administration of the claims procedure before this

---

[23]  Similarly, the New Jersey Action violates the SIPA stay.  BLMIS was placed in liquidation under SIPA by order of the District Court on December 15, 2008.  Among other things, the Court ordered that "pursuant to 15 U.S.C. sec 78eee(b)(2)(B)(i), . . .any other suit against any  . . . trustee of the Defendant or its property, is stayed."  (SEC Action, Dkt. No. 4 at 3, *see also id.* at  2.)  As under section 362 of the Bankruptcy Code, the SIPA stay is intended to protect customers from receiving preferential treatment and maintain the integrity of the SIPA claims process.

Court.  Were they to prevail before the New Jersey District Court (even though unlikely at best), and that court were to determine that the New Jersey Plaintiffs and the BLMIS customers they purport to represent all had the legitimate expectation that they would be covered by SIPC "insurance" for their fictitious profits based on their last customer statements, that ruling would directly conflict with this Court's Net Equity Decision and Order.  If that were the case, the claims administration process established by this Court would be thrown into question, directly impacting the administration of the BLMIS liquidation.  Such an inconsistent ruling would thus wreak havoc on the orderly administration of the BLMIS liquidation.  The situation would be further exacerbated by conflicting decisions on appeal.  Given the litigiousness in the BLMIS case of the New Jersey Plaintiffs' counsel to date, an unfavorable ruling in New Jersey undoubtedly would give rise to an appeal by the New Jersey Plaintiffs to the Third Circuit. Thus, the *same issue* as to the proper interpretation of "net equity," pursued by the *same claimants* both in New York *and* in New Jersey, involving the *same debtor and arising out of the same facts*, would be reviewed not by one, but by two, Courts of Appeals at the same time. Inconsistent decisions by those Courts would create even more chaos in the administration of the BLMIS SIPA liquidation.

It is not just that the New Jersey Plaintiffs seek to circumvent this Court's jurisdiction and the orderly administration of the claims administration process, it is that they have not—and cannot—steer completely clear of this Court because, as discussed above, the allegations they seek to prove are inextricably intertwined with this Court's rulings.  The claims of the New Jersey Plaintiffs arise from the Madoff Ponzi scheme, and are being adjudicated by this Court in the claims administration process.  Indeed, each of the three New Jersey Plaintiffs has filed objections to claims determinations for accounts in which they have an interest, which are

pending before this Court.  Worse still, the New Jersey Plaintiffs seek to represent all of those

BLMIS customers who are already before this Court who have been denied their fictitious

profits.[24]  In other words, all of those customers would be before the New Jersey federal court in

an effort to get preferential treatment—which is forbidden by the automatic stay.  *See, e.g.*, *AP*

*Indus., Inc.*, 117 B.R. at 798–99; *In re Keene Corp.*, 164 B.R at 849.

### B.    The New Jersey Action Is Void *Ab Initio*

The New Jersey Plaintiffs have sought an end-run around this Court's jurisdiction to

compensate them in connection with claims which are properly before this Court.  The New

Jersey Action is an attempt to create confusion with respect to the definition of "net equity" and

thus, to dictate and to affect how property is to be distributed in the BLMIS SIPA proceeding.

As noted above, while pursuing their action in New Jersey, the New Jersey Plaintiffs are

simultaneously pursuing their claims in the BLMIS SIPA proceeding.  Thus, the New Jersey

Plaintiffs are utilizing the New Jersey Action to exercise control over estate property and to

recover on claims against BLMIS, thereby violating the automatic stay.  As such, their efforts

should be found to be void *ab initio*.  *See, e.g.*, *E. Refractories Co. v. Forty Eight Insulations*,

157 F.3d 169, 172 (2d Cir. 1998); *Fed. Deposit Ins. Corp. v. Hirsch* (*In re Colonial Realty Co.*),

980 F.2d 125, 137 (2d Cir. 1992); *In re Singer Co. N.V.*, 2000 WL 33716976, at *5; *In re Enron*

*Corp.*, 314 B.R. 524, 540–41 (Bankr. S.D.N.Y. 2004).[25]

---

[24] In any event, class treatment under Federal Rule of Civil Procedure 23 could never be appropriate for the fraud suit alleged by the New Jersey Plaintiffs, among other reasons, because of issues of individualized reliance.  The Trustee reserves the right to challenge the propriety of class certification if that becomes necessary.

[25]  Violations of the automatic stay are not taken lightly by courts, and the continued actions of the New Jersey Plaintiffs to subvert this Court's jurisdiction are contrary to the law and admonitions of this Court.  The Trustee submits that such actions are sanctionable as against the New Jersey Plaintiffs and/or their counsel, as this Court deems appropriate, including attorneys' fees incurred by the Trustee and his professionals in responding to and addressing these violations.  *See, e.g.*, *Fid. Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976); *In re AP Indus., Inc.* 117 B.R. at 802.

### III.    A Temporary Restraining Order Is Warranted

A federal bankruptcy court has authority to issue a temporary restraining order ("TRO")

against third-party actions commenced in other federal districts to prevent a party before it from

suffering irreparable harm.  *See, e.g.*, *Adelphia*, 2006 WL 1529357, at *1.  "The standards for a

TRO and preliminary injunction in this Circuit, which are not materially different, are well

established.  To prevail, the moving party must show: (a) that it will suffer 'irreparable harm in

the absence of an injunction' and '(b) either (i) a likelihood of success on the merits or

(ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and

a balance of hardships tipping decidedly in the movant's favor.'" *Id.* at *4. (quoting *Zervos v.

Verizon N.Y., Inc.*, 252 F.3d 163, 172 (2d Cir. 2001)).

It is clear that the Trustee can satisfy these standards.  The potential for irreparable harm

exists for at least two reasons.  First, "[t]he infringement on this Court's jurisdiction" alone

constitutes irreparable harm. *Id.* at *5; *see also In re Johns-Manville Corp.*, 97 B.R. at 181

(finding irreparable harm and enjoining suits that threatened the bankruptcy court's jurisdiction

to implement its order in chapter 11 proceeding).

Second, as discussed above, the New Jersey Action is now in discovery, as the court

denied the SIPC Defendants' request for a stay pending resolution of its transfer motion.  (April

9th Sheehan Aff., Ex. U at 2-3.)   Under these circumstances, a TRO is necessary to avoid

needless discovery which will divert SIPC's and the Trustee's attention from the proceedings

before this Court.

Moreover, the Trustee is likely to succeed in his request for an injunction under section

105(a), and at the very least he presents "sufficiently serious questions going to the merits"

which tip the "balance of hardships . . . in the [Trustee]'s favor." *See In re Adelphia Commc'ns*

*Corp.*, 2006 WL 1529357, at *4.[26]  As more fully discussed above, it takes only a glance at the facts to realize that the New Jersey Action is an egregious attempt by Chaitman and the New Jersey Plaintiffs to relitigate issues already presented to, and decided by, this Court.

Thus, it is evident that the Trustee has raised "serious questions" as to the New Jersey Plaintiffs' ability to proceed with their New Jersey Action, and has met the standards for issuance of a TRO.

---

[26]  As noted in *In re Adelphia Commc'ns Corp*, irreparable harm need not be shown when seeking an injunction under Bankruptcy Code § 105(a). *See id*. at *5.

## CONCLUSION

The Trustee respectfully requests that the New Jersey Plaintiffs, anyone acting on their behalf or in concert or participation with them, and all defendants, be enjoined from proceeding with the New Jersey Action and that the Court declare the action to be in violation of stays under the Bankruptcy Code and SIPA and, accordingly, void *ab initio*.  The Trustee further requests that the Court issue a TRO pending its determination of the propriety of the injunctive relief sought.

Dated:  New York, New York
        April 9, 2010                                _s/Keith R. Murphy_____

                                                     Baker & Hostetler LLP
                                                     45 Rockefeller Plaza
                                                     New York, New York 10111
                                                     Telephone: (212) 589-4200
                                                     Facsimile: (212) 589-4201
                                                     David J. Sheehan
                                                     Email: dsheehan@bakerlaw.com
                                                     Marc E. Hirschfield
                                                     Email: mhirschfield@bakerlaw.com
                                                     Deborah H. Renner
                                                     Email: drenner@bakerlaw.com
                                                     Keith R. Murphy
                                                     Email: kmurphy@bakerlaw.com
                                                     Seanna R. Brown
                                                     Email: sbrown@bakerlaw.com

                                                     *Attorneys for Irving H. Picard, Trustee for the*
                                                     *Substantively Consolidated SIPA Liquidation*
                                                     *of Bernard L. Madoff Investment Securities*
                                                     *LLC and Bernard L. Madoff*

300081348