# EXHIBIT S

# 10-2378-bk(L)

## 10-2676, 10-2677, 10-2679, 10-2684, 10-2685, 10-2687, 10-2691, 10-2693, 10-2694, 10-2718, 10-2737

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆ ◆

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLANTS

HELEN DAVIS CHAITMAN, ESQ.
PETER SCHUYLER, ESQ.
BECKER & POLIAKOFF, LLP
45 Broadway
New York, New York 10006
(212) 599-3322

*Attorneys for Appellants
listed on inside cover*

*Appellants Diane and Roger Peskin, Maureen Ebel, Alan and Rita English, Michael and Joan Epstein, Donald A. Benjamin, David Wingate, Sandra Busel Revocable Trust, Joel Busel Revocable Trust, Martin Lifton, Robert F. Ferber, Armand Lindenbaum, Linda Waldman, Mike Stein, Sondra and Norman Feinberg, ChaitmaniSchwebel LLC, Ronald Gene Wohl Credit Shelter Trust, Theresa Rose Ryan, Thomas A. Sherman, Barbara and Robert J. Vogel, Howard Israel, Nancy Feldman, David and Susan Glodstein, Brad E. Avergon and Cynthia B. Avergon and Ronnie Sue Ambrosino, Gross Associates, Sanford Harwood, Stephen and Leslie Ehrlich, Dara Norman Simons, Hannah P. Norman Revocable Trust, Paul Allen, Allen Family Trust, Cynthia and Ted Arenson, Jaqueline and Robert Avergon, William I. Bader, Berkowitz-Blau Foundation, Inc., Morrey Berkwitz, Roz and Hemy Bessel, Michael Brillante, Anna Cohn, Russel Dusek, Sabra and Marvin Englebardt Retirement Plan, Alan and Ritz English, Mark Feldman, Leonard Forrest Revocable Trust, Barbara and Richard Gaba, Sol Ganes, Kuntzman Family LLC, Carla Ginsburg, Sidney and Elaine Glodstein, Leslie Goldsmith, Susan Greer, WDG Associates Inc. Retirement Trust, Robert Halio, Estelle Harwood Family LP, Sanford Harwood Family LP, Toby Harwood, Annette Jungreis Trust, Saulius Kajota, Carol Kamenstein, Sloan Kamenstein, Tracy Kamenstein, Ken and Myrna Kohl, Miller Partnership, Miller Trust Partnership, Mishkin Family Trust, Grace Mishkin, William Mishkin, Carol and Stanley Nelson, Martin R. Harnick, Steven Norton, Preffer Family Trust, Realty Negotiators Inc. Defined Benefit Plan, Marvin and Roberta Plateis, Alan and Linda Rosenthal, Helen Saren-Lawrence, Elaine Schaffer Revocable Trust, Elaine Ruth Schaffer, Alice Schindler, Jeffrey Shankman, Herbert Silvera, Shirley Stone, Gunther Unflat, Carla Szymanski Revocable Trust, Whitman Partnership, Wohl George Partners LP, Robert Yaffe, Triangle Properties #39, and R.R. Rosenthal Associates*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate

Procedure, Appellants Diane and Roger Peskin, Maureen Ebel, and over 100

other customers[1] listed as part of this appeal hereby state that each of the

Appellants are either individuals or private entities that have no parent

corporation and have never issued any stock.


Dated:   New York, New York
         August 9, 2010

                BECKER & POLIAKOFF LLP


                By:  */s/ Helen Davis Chaitman*
                     Helen Davis Chaitman
                     Peter Schuyler

                45 Broadway
                New York, NY 10006
                Telephone: (212) 599-3322
                Facsimile: (212) 557-0295
                Email: hchaitman@becker-
                poliakoff.com

                *Attorneys for Diane and Roger*
                *Peskin, Maureen Ebel, and a large*
                *group of other customers*


---------------------

[1] *See* Declaration of Helen Davis Chaitman dated November 13, 2009
("Chaitman"), Docket No. 761, Exh. A, Joint Appendix at A577 (V. I).

# TABLE OF CONTENTS

Page

**STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION** .......................................................... 1

**QUESTIONS PRESENTED** .......................................................... 2

**DECISION BELOW** .......................................................... 3

**PRELIMINARY STATEMENT** .......................................................... 5

**STATEMENT OF FACTS** .......................................................... 6

    Preliminary comments .......................................................... 6

    1. Undisputed Facts Concerning BLMIS Accounts ........................... 7

    2. Undisputed Facts concerning Appellants ................................. 9

    3. Undisputed Facts Concerning the Trustee's Methodology ............. 11

    4. Undisputed Facts Concerning SIPC ...................................... 12

    5. SIPC's Position In This Case Is Unprecedented .......................... 13

**STANDARD OF REVIEW** .......................................................... 16

**ARGUMENT** .......................................................... 17

**I.    THE BC ERRED IN RELIEVING SIPC OF THE OBLIGATION TO INSURE ACCOUNTS OF CUSTOMERS WHO HAD A LEGITIMATE EXPECTATION THAT THEIR TRADE CONFIRMATIONS AND ACCOUNT STATEMENTS WERE ACCURATE** .......................................................... 17

    **A.    Congress Established An Insurance Fund for Defrauded Customers of SEC-Regulated Broker/Dealers** .......................................................... 17

    **B.    SIPC's Series 500 Rules Mandate Protection of a Customer's Legitimate Expectations Based on Receipt of Written Confirmations** .......................................................... 21

ii

# TABLE OF CONTENTS

Page

C.    The SEC and SIPC Took the Position, in This
Court, that Customers in The Same Position as
Appellants are Entitled to SIPC Insurance
Based upon Their Statutory Balances ...................... 22

D.    The Decision Distorts This Court's Holding in
*New Times* ................................................................. 28

E.    There is Nothing Inequitable About Holding
SIPC to its Statutory Obligations ............................. 31

F.    SIPC Is Prohibited From Changing the
Definition of Net Equity ............................................ 35

G.    The Statutory Definition of "Net Equity" Has
Been Accepted by Governmental Agencies and
the Courts .................................................................. 36

H.    The Decision Destroys Investor Confidence In
the Capital Markets .................................................. 40

II.    THE NET INVESTMENT METHOD IS AN IMPROPER
APPLICATION OF THE FRAUDULENT TRANSFER LAWS .. 42

III.    THE NET INVESTMENT METHOD VIOLATES THE
APPLICABLE STATUTE OF LIMITATIONS ........................... 46

A.    The Trustee Has No Right to Self-Effectuate
Fraudulent Transfer Judgments Beyond the
Statute of Limitations ................................................ 47

B.    The Trustee Has No Right to Self-Effectuate
Fraudulent Transfer Judgments for Transfers
that Pre-Date any Evidence of Fraud ...................... 53

IV.    SIPC IS JUDICIALLY ESTOPPED FROM RENEGING ON
ITS INSURANCE OBLIGATIONS ............................................. 55

A.    SIPC and the SEC Urged This Court to Take
the Position it Took in *New Times* ............................. 55

iii

# TABLE OF CONTENTS

**B.      SIPC and the SEC Are Bound By The Position They Took in *New Times* ............................... 60**

**V.    THE APPROPRIATE REMEDY FOR SIPC'S VIOLATION OF SIPA IS TO PUT CUSTOMERS IN THE POSITION THEY WOULD HAVE BEEN IF SIPC HAD FULFILLED ITS STATUTORY OBLIGATIONS ........................................ 61**

**CONCLUSION  ............................................................................. 62**

## TABLE OF AUTHORITIES

**Page**

*In re Adler Coleman Clearing Corp.*, 247 B.R. 51 (B.S.D.N.Y. 1999) ........................................................................... 37

*Ahammed v. Securities Investor Protection Corp.*, 295 F. 3d 1100 ...................................................................................... 21

*Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791 (6th Cir. 1995) ........................................................................... 40

*Bell & Beckwith v. McGraw,* 937 F.2d 1104 (6th Cir. 1991) ........................ 18

*In re Bennet Funding Group, Inc.,* 1999 Bankr. LEXIS 1843 (B.N.D.N.Y. April 19, 1999) ......................................... 44

*In re Bernard L. Madoff Investment Securities LLC*, 424 B.R. 122 (B.S.D.N.Y. 2010) ..................................................... passim

*In re Brentwood Securities, Inc.,* 925 F. 2d 325 (9th Cir. 1991) .................... 21

*In re Carrozzella & Richardson*, 286 B.R. 480 (D. Conn. 2002).................. 43

*Chambers v. Time Warner, Inc*., 282 F.3d 147 (2d Cir. 2002)........................ 9

*In re Contemporary Industries Corp.*, 564 F.3d 981 (8th Cir. 2009) ........................................................................... 49

*Donnell v. Kowell*, 533 F.3d 762 (9th Cir. 2008) ...................................... 44, 52

*Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427 (1st Dept. 2000) ........................................................................... 34

*In re Elrod Holdings Corp.*, 394 B.R. 760 (B.D.Del. 2008) ......................... 49

*In re Enron Corp.*, 419 F.3d 115 (2d Cir. 2005) ........................................... 17

*Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595 (2d Cir. 1991). ........................................................................... 43

*HSBC Bank USA v. Adelphia Commc'ns. Corp.*, 2009 U.S. Dist. LEXIS 10675 (W.D.N.Y. Feb. 12, 2009)................................. 60

## TABLE OF AUTHORITIES

**Page**

*In re Independent Clearing House Co.*, 77 B.R. 843 (D. Utah 1987) ................................................. 44, 52

*Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975)................... 46

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991)............................ 9

*Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*, 592 F.3d 347 (2d Cir. 2010)...................................... 9

*Mitchell v. Washingtonville Central School District*, 190 F.3d 1 (2d Cir. 1999).................................................. 55

*In re National Forge Co.*, 344 B.R. 340 (W.D.Pa. 2006).............................. 49

*Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003).................................................. 52

*In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) ................................................. passim

*In re New Times Secs. Servs., Inc.*, 463 F.3d 125 (2d Cir. 2006) ......... 4, 27, 28

*In re Oberweis Secs., Inc.*, 135 B.R. 842 (B. N.D. Ill. 1991) ........................ 26

*Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005)............................................ 16

*In re QSI Holdings, Inc.*, 571 F.3d 545 (6th Cir. 2009)................................ 50

*Redington v. Touche Ross & Co,* 592 F. 2d 617 (2d Cir. 1978).................... 20

*S.E.C. v. Byers,* 637 F. Supp. 2d 166 (S.D.N.Y. 2009) ........................... 38, 39

*S.E.C. v. Packer, Wilbur & Co.,* 498 F. 2d 978 (2d Cir. 1974) ..................... 18

*S.E.C. v. Securities Northwest, Inc.,* 573 F. 2d 622 (9th Cir. 1978).................................................. 21

*Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412 (1975)................................................. 41

## TABLE OF AUTHORITIES

**Page**

*Securities Investor Protection Corp. v. BDO Seidman, LLP,* 222
F. 3d 63 (2d Cir. 2000) .................................................. 20

*Securities Investor Protection Corp. v. BDO Seidman, LLP*, 49
F. Supp. 2d 644 (S.D.N.Y. 1999) ................................. 37

*Securities Investor Protection Corp. v. Morgan,* Kennedy &
*Co.,* 533 F. 2d 1314 (2d Cir. 1976)............................. 20

*Sender v. Buchanan*, 84 F.3d 1286 (10th Cir. 1996) ..................................... 52

*In re Sharp International Corp.*, 403 F.3d 43 (2d Cir. 2005)................... 43, 47

*Simon v. Safelite Glass Corp.*, 128 F.3d 68 (2d Cir. 1997) ........................... 55

*Steinberg v. Sherman,* No. 07-1001, 2008 U.S. Dist. LEXIS
35786 (S.D.N.Y. May 2, 2008) ..................................... 34

*In re Taubman*, 160 B.R. 964 (B.S.D. Ohio 1993)........................................ 53

*Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*, 599
N.Y.S.2d 816 (1st Dep't 1993)..................................... 43

*In re Unified Commercial Capital*, 260 B.R. 343 (B.W.D.N.Y.
2001) ................................................................... 44

*In re Unified Commercial Capital*, 2002 WL 32500567
(W.D.N.Y. 2002) ....................................................... 44

*United States v. White,* 553 F. 2d 1137 (8th Cir. 1977)................................. 20

*Visconsi v. Lehman Bros.*, 244 Fed. App'x 708 (6th Cir. 2007) ................... 44

*Warfield v. Alaniz*, 453 F. Supp. 2d 1118 (D. Ariz. 2006) ........................... 52

*Wright v. Union Central Life Ins.*, 304 U.S. 502 (1938) ............................... 46

## Statutes & Rules

11 U.S.C. § 101(53A) .................................................................... 49

## TABLE OF AUTHORITIES

Page

11 U.S.C. § 546(e) ........................................................................... passim

11 U.S.C. § 548 ........................................................................... 52

11 U.S.C. § 548(a)(1) ........................................................................... 44, 48

11 U.S.C. § 548(a)(1)(A) ........................................................................... 50

11 U.S.C. § 548(c) ........................................................................... 44

11 U.S.C. § 741(2) ........................................................................... 49

11 U.S.C. § 741(7) ........................................................................... 48

15 U.S.C. § 78aaa ........................................................................... 1

15 U.S.C. § 78ccc ........................................................................... 12

15 U.S.C. § 78ccc(b)(4)(A) ........................................................................... 36

15 U.S.C. § 78ddd(c) ........................................................................... 13

15 U.S.C. § 78eee(a)(3) ........................................................................... 1

15 U.S.C. § 78fff(a)(1)(A)-(B) ........................................................................... 35

15 U.S.C. § 78fff-2(b) ........................................................................... 3

15 U.S.C. § 78fff-2(c)(1)(B) ........................................................................... 32

15 U.S.C. § 78fff-2(c)(3) ........................................................................... 45

15 U.S.C. § 78fff-2(d) ........................................................................... 42

15 U.S.C. § 78fff-3 ........................................................................... 32

15 U.S.C. § 78fff-4 ........................................................................... 32

15 U.S.C. § 78fff-3(a) and 4(c) ........................................................................... 61

15 U.S.C. § 78ggg(b). ........................................................................... 22

# TABLE OF AUTHORITIES

**Page**

15 U.S.C. § 78lll ............................................................................................ 36

15 U.S.C. § 78lll(3) ....................................................................................... 38

15 U.S.C. § 78lll(4) ....................................................................................... 38

15 U.S.C. § 78lll(11) ................................................................................. passim

17 C.F.R. §§ 300.500-300.503 ...................................................................... 25

17 C.F.R. § 300.500 ....................................................................................... 21

17 C.F.R. § 300.502 .................................................................................... 4, 21

28 U.S.C. § 1291(b). ........................................................................................ 1

28 U.S.C. § 158(d)(2). ..................................................................................... 2

N.Y.C.P.L.R. § 213(1) ................................................................................... 51

N.Y.U.C.C. § 8-112(c) ................................................................................... 43

## Other Authorities

H.R. Rep. No. 91-1613 (1970) ....................................................................... 40

H.R. Rep. No. 95-746 (1977) ......................................................................... 42

S. Rep. No. 91-1218 (1970) ....................................................................... 5, 18

S. Rep. No. 95-763 (1978) ............................................................................. 19

08-01789-cgm   Doc 4169-22   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit S
to the Chaitman Decl.   Pg 13 of 77

Case: 10-2378   Document: 295   Page: 13   08/05/10   89855   76

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Diane and Roger Peskin, Maureen Ebel, and over 100 other customers ("Appellants")[2] of Bernard L. Madoff Investment Securities LLC ("BLMIS") appeal from the March 1, 2010 Decision and March 8, 2010 Order of the Bankruptcy Court for the Southern District of New York (Hon. Burton L. Lifland) (the "BC") (Special Appendix 7 and 60, respectively).  The Decision and Order granted the motion of Irving H. Picard, Trustee for the liquidation of BLMIS under the Securities Investor Protection Act, 15 U.S.C. §78aaa ("SIPA"), and held that a trustee appointed by the Securities Investor Protection Corporation ("SIPC") can determine the amount of a customer's claim without using the SIPA definition of "net equity," but rather based upon the net investment of the customer spanning a period of up to 45 years, if the broker had never purchased the customer's securities.  *See In re Bernard L. Madoff Investment Securities LLC*, 424 B.R. 122 (B.S.D.N.Y. 2010)(the "Decision").

The BC had jurisdiction pursuant to 15 U.S.C. §78eee(b)(4).  This Court has jurisdiction of this Joint Appeal pursuant to 28 U.S.C.

_____

[2] *See* Declaration of Helen Davis Chaitman dated November 13, 2009 ("Chaitman"), Docket No. 761, Exh. A, Joint Appendix ("A") at 577 (V. I).

1

§158(d)(2)(A).

The BC, on its own motion and pursuant to a joint request of the

Trustee and numerous customers including Appellants, certified an immediate

appeal to this Court pursuant to 28 U.S.C. §158(d)(2).  Appellants filed a

Notice of Appeal on March 19, 2010 (Docket No. 10-3188).  On April 7,

2010, the Appellants timely transmitted a Joint Petition for Permission of

Appeal, and this Court granted the petition on June 16, 2010.

## QUESTIONS PRESENTED

1.  Where customers' statements showed the purchase of real securities

issued by Fortune 100 companies at prices which were verifiable from third

party sources and, thus, customers had a legitimate expectation that their

statements were accurate, does SIPA permit a court to ignore the statutory

definition of "net equity," defined as the customer's last statement balance

(the "Statutory Balance")(15 U.S.C. §78*lll*(11)), simply because the broker

never purchased the securities?

2.   Does the Trustee have the power, in determining a customer's "net

equity" under SIPA, to self-effectuate fraudulent transfer judgments against

customers beyond the applicable statute of limitations under 11 U.S.C.

§546(e)?

2

## DECISION BELOW

The BC amended the SIPA statutory structure in two ways: First,
according to the BC, SIPC does not provide insurance.  424 B.R. at 134.  The
BC adopted the Trustee's view that money paid by SIPC to a customer
reduces the amount of money available to pay other customers, despite the
fact that SIPC is a third-party insurance company, funded by its members, the
SEC-regulated broker/dealers, and, thus, money paid by SIPC does not reduce
the funds available for distribution to customers.

Second, based upon its holding that SIPC does not provide insurance,
the BC held that it would be inequitable to comply with SIPA's mandated
definition of "net equity" in fixing each customer's claim.  The BC held that,
where a broker stole a customer's money and never purchased the securities
indicated on the customer's trade confirmations and monthly statements,
SIPA permits a customer's claim to be determined by calculating the
customer's net investment, over the life of the account, often comprising
generations of account holders (the "net investment method").

The BC relied upon 15 U.S.C. §78fff-2(b) which requires the Trustee to
"promptly discharge . . . all obligations of the debtor" insofar as they are
"ascertainable from the books and records of the debtor."  The BC held that

3

the definition of "net equity" in §78*lll*(11) is modified by §78fff-2(b), which

provides that the Trustee shall "discharge Net Equity claims only 'insofar as

such obligations are [1] ascertainable from the books and records of the

debtor or [2] are otherwise established to the satisfaction of the trustee.'"  424

B.R. at 135.  The BC reasoned that customers "'securities positions' can be

ascertained only by reference to the books and records of BLMIS" because

"[t]he account statements are entirely fictitious" and "[b]ecause 'securities

positions' are in fact nonexistent."  *Id.*

The BC disregarded the SIPC Series 500 Rules which mandate that

SIPC insurance be based upon the "legitimate expectations" of the customer,

not on the fraudulent books of a dishonest broker.  *See* 17 C.F.R. §300.502.

By so holding, the BC distorted this Court's holdings in *In re New Times*

*Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) ("*New Times*"), and *In re*

*New Times Secs. Servs., Inc*., 463 F.3d 125, 128 (2d Cir. 2006) ("*New Times*

*II*").

The BC accepted the Trustee's net investment method and ignored the

fact that it allowed the Trustee to self-effectuate preference judgments and

fraudulent transfer judgments going back decades beyond the statute of

limitations period.

4

## **PRELIMINARY STATEMENT**

The Decision's re-definition of "net equity" in the case of customers who had a legitimate expectation that their statements were accurate will deprive thousands of destitute customers of the insurance guaranteed to them by SIPA.  In order to induce the public to allow brokers to hold securities in "street name," Congress enacted SIPA in 1970 to provide SIPC insurance to customers of SEC-regulated broker/dealers.  Congress' purpose in creating SIPC was to "maintain and administer an insurance fund which would provide coverage against customer losses. . . resulting from broker-dealer firms' insolvency."  S.Rep. No. 91-1218, p. 1 (1970).  The Senate described SIPC as "an insurance plan for the industry," and one of several "federally sponsored insurance programs." *Id.* at 4-5, 7-9.

In light of its function as a quasi-governmental insurance company, SIPC's default on its obligations to BLMIS' customers is destructive not only to the customers but to the national interest in a stable capital market in the same way that a default by the FDIC would be devastating to the economy.

The definition of "net equity" is mandated by SIPA which contains no provision making the definition inapplicable in cases where a broker stole the customer's money and never purchased securities.  Appellants' trade

5

confirmations and monthly statements showed the purchase and sale of real

securities listed on the New York Stock Exchange, at accurate prices.  Thus,

Appellants had a legitimate expectation that their statements were accurate

and they are entitled to customer claims in the amount of their last statements.

## STATEMENT OF FACTS

**Preliminary comments**

The BC focused upon the type of fraud that Madoff perpetrated

although that is irrelevant to the issue of Appellants' right to SIPC insurance

based upon their legitimate expectations.  The facts concerning the Madoff

fraud were established solely by the Trustee, without any ability of the

investor body to challenge any of the Trustee's factual contentions.  The BC

incorrectly stated that the factual history regarding BLMIS' fraud is largely

undisputed.  424 B.R. at 126 n.11.  However, Appellants have never conceded

the correctness of the Trustee's account of Madoff's fraud, which depends on

the Declaration of Joseph Looby (A501 (V. I))("Looby"), the Trustee's

expert.  Appellants have been denied access to any of BLMIS' records and

they have been denied discovery.[3]  Hence Looby's Declaration is utterly

---

[3] *See* Docket No. 1013, Protective Order Denying Discovery Sought By
Lawrence R. Velvel, Hon. Burton R. Lifland, dated November 24, 2009.

untested. Nevertheless, the following facts are uncontested for purposes of
this appeal.

### 1. Undisputed Facts Concerning BLMIS Accounts

BLMIS was an SEC-regulated broker-dealer and a member of SIPC.
Looby ¶10. BLMIS maintained customer cash balances at J.P. Morgan Chase
Bank, N.A., which balances continually earned interest. *Id.* ¶¶17-19, 56. The
total net investment of all BLMIS customers was approximately $20 billion.
*Id.* ¶24. Thus, BLMIS was an income generating operation, at a minimum, to
the extent that it earned interest on $20 billion of customers' money.

BLMIS customers signed investment contracts upon opening their
accounts. *Id.* ¶35. The initial customer statements reflected the purchase of
securities and options "comparable to the amount of principal invested with
BLMIS." *Id.* ¶68.

Bernard L. Madoff and Frank DiPascali both pled guilty to a fraud
beginning in the early 1990's. Chaitman Exhs. W at A292 (V. II) and X at
A304-305 (V. II). Looby dated the fraud "on or around 1993" when BLMIS
installed its AS/400 computer system. *Id.* ¶¶15, 40, 41. There is no evidence
that the fraud began prior to the early 1990's.

---

7

The securities listed on Appellants' trade confirmations and account

statements were *bona fide* Fortune 100 company stocks, whose market prices

could all be verified in, *inter alia,* the Wall Street Journal.  *Id.* ¶¶49, 50, 62,

63); *see, e.g.,* Chaitman Exh. NN, A580 (V. II).  Every Appellant filed an

objection to the Trustee's determination of his claim in which he stated that

he received trade confirmations and monthly statements for every securities

transaction in the Account which accurately set forth the names and prices of

securities indicating the purchase and sale of Fortune 100 company stocks and

US Treasury securities.[4]

Because the BLMIS trade confirmations and monthly statements listed

real securities transactions at real prices, had the trades been executed as

represented the stated customer account balances would have accurately

reflected the customer's equity.  Of the thousands of securities named on the

BLMIS account statements, Looby found only one discrepancy:  According to

Looby, as late as 2008, customer statements reflected investment in the

Fidelity Brokerage Services LLC's "Fidelity Spartan U.S. Treasury Money

Market Fund."  However, according to Looby, "Fidelity has acknowledged

---

[4] *See, e.g.,* Docket No. 692 at ¶24.  Exh. 1 hereto lists the Docket entries for
all of Appellants' Objections.

8

that, from 2005 onwards, Fidelity did not offer participation in any such

money market fund for investment."  Looby ¶57.

Looby is incorrect.  In August 2005, the name of the fund was changed

slightly, but it remained open to new investors. On August 15, 2005, Fidelity

Hereford Trust filed a Form 197 with the Securities & Exchange Commission

("SEC") (SEC File No. 33-52577) announcing that the fund would be

renamed the Fidelity U.S. Treasury Money Market Fund. The Court may take

judicial notice of the filing with the SEC.  *Lindsay v. Morgan Stanley (In re*

*Morgan Stanley Info. Fund Sec. Litig.*), 592 F.3d 347, 355 (2d Cir. 2010);

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Kramer*

*v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

The trade confirmations and account statements sent to customers from

1993 on indicated that BLMIS engaged in a strategy whereby, five or six

times a year, BLMIS would purchase a basket of approximately 25 Fortune

100 company stocks, hold the positions for approximately one month, sell the

stocks and put the money in U.S. Treasuries.  Looby ¶48-50.

## 2. Undisputed Facts concerning Appellants

Appellants are, typically, people in their 70's, 80's or 90's, whose

assets, other than their homes, were invested in BLMIS.  They are often

struggling with serious medical issues.  Since December 11, 2008, many have

been forced to sell their homes in a down market in order to cover their living

expenses. They live in constant fear that the Trustee will sue them for the

amounts they withdrew from BLMIS in excess of their investments and will

take away their tax refunds or the sales proceeds of their houses because they

were long-time BLMIS investors who used their BLMIS accounts to fund

their retirements.  None of the Appellants had any suspicion of BLMIS'

criminality.  Chaitman ¶2, A564 (V. I).

Some of the Appellants received their BLMIS accounts as part of a

final, non-appealable divorce decree providing for equitable distribution of

marital assets. Although the divorce decree treated the BLMIS accounts as

having the values shown on the customer statements, the Trustee is

substantially reducing the value of the accounts through his net investment

method. These clients have no way of re-opening the divorce decrees to

restructure equitable distribution.  *Id.* ¶3.

Many of the Appellants received their BLMIS accounts as a gift from a

family member or following the death of a parent, whose estate paid taxes on

the value of the account as reflected on the customer statements. The law does

not permit the estates to amend their returns to recover taxes paid on these

10

accounts, despite the fact that, in many instances, the Trustee has credited

these accounts with $0 value.  *Id.* ¶4.

Some Appellants took mandatory distributions from their accounts,

either because they were over 70 years old and had IRA accounts, or because

they had partnership accounts which, under the applicable agreements,

required that all appreciation be withdrawn each year.  *Id.* ¶5.

All of the Appellants paid all required federal and state taxes on the

appreciation in the accounts.  *Id.* ¶6; *see* Objections cited in fn. 4.

### 3.  Undisputed Facts Concerning the Trustee's Methodology

For each claim that the Trustee has determined, he has netted out

deposits and withdrawals from inception of the account.  Some investors

opened their accounts with BLMIS in the 1960's.  Some investors opened

their accounts in the 1970's, 1980's or 1990's.  Many investors' accounts

were opened with transfers from older BLMIS accounts.  The Trustee has

generally given $0 credit for account balances pre-dating 1990 and has put

the burden on investors to come forward with documents proving deposits

earlier than 1990.  For example, here is the Trustee's calculation of the net

investment of one Appellant, as set forth in the Trustee's determination letter:

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| Table 1 — DEPOSITS | | | |
| 7/11/1994 | CHECK | $392,000.00 | $392,000.00 |
| 7/19/1994 | TRANS FROM 1A006330 | $1,028,908.98 | $618,790.23 |
| 10/17/1994 | TRANS FROM 1A006330 | $3,465.26 | $0.00 |
| 1/18/1995 | CHECK | $600,000.00 | $600,000.00 |
| 8/9/2001 | CHECK WIRE | $210,000.00 | $210,000.00 |
| 2/26/2003 | CHECK | $250,000.00 | $250,000.00 |
| **Total Deposits:** | | $2,484,374.24 | $2,070,790.23 |
| | | | |
| WITHDRAWALS | | | |

The Trustee is giving the customer credit for only $618,790.23 of a July 19, 1994 transfer of $1,028,908.98 from another Madoff account. That $618,790.23 represents, according to the Trustee, the net investment in Madoff Account No. 1A006330. Thus, the Trustee has self-effectuated a fraudulent conveyance judgment against the customer for withdrawals taken by the holder of Account No. 1A006330 going back more than 14 years.[5]

### 4. Undisputed Facts Concerning SIPC

Congress created SIPC as a nonprofit membership corporation comprised of all brokers and dealers registered under §15(b) of the Securities Exchange Act of 1934 with some exceptions. 15 U.S.C. §78ccc. SIPA authorized SIPC to assess its members up to ¼ of 1% of operating revenues.

---

[5] Docket No. 692.

*Id.* §78ddd(d)(1)(B).  For the entire period from 1996 – 2008, SIPC assessed

its members $150 per year for SIPC insurance.  Thus, Merrill Lynch paid

$150 per year for the privilege of assuring millions of customers that their

accounts were insured by SIPC up to $500,000.

In April 2003, the General Accounting Office ("GAO") brought to the

attention of SIPC the fact that it was grossly under-funded:

> the SIPC fund was at risk in the case of failure of one or more of
> the large securities firms.  SEC found that even if SIPC were to
> triple the fund in size, a very large liquidation could deplete the
> fund.  Therefore, SEC suggested that SIPC examine alternative
> strategies for dealing with the costs of such a large liquidation.
> SIPC management agreed to bring this issue to the attention of
> the Board of Directors, who evaluates the adequacy of the fund
> on a regular basis. [6]

Despite this letter, and others from members of the House Subcommittee on

Capital Markets, Insurance, and Government Sponsored Enterprises, SIPC did

not raise its assessment until 2009.  Chaitman Exh. DD, A464 (V. II).

## 5.  SIPC's Position In This Case Is Unprecedented

SIPC's position in this case, as approved by the BC, is inconsistent

with 38 years of SIPC's history.  Over the course of its 38-year existence,

---

[6] July 2003 United States Accounting Office Report to Congressional
Requesters, "Securities Investor Protection:  Update on Matters Related to the
Securities Investor Protection Corporation."  Chaitman Exh. CC, A421 (V.
II).

SIPC repeatedly promised customers that, if it turned out they dealt with a thief, SIPC would promptly replace securities up to $500,000 as reflected on the customers' last statements.  Appellants had no notice that, if their broker stole their money and never purchased their securities, their accounts were only insured for their net investment over generations.  Indeed, even today, SIPC's website assures investors that, in the event of a liquidation, they can prove the amount of their customer claim by producing the last statement they received from their broker.  Chaitman Exh. Q, A143 (V. II).

SIPC always led investors to believe that SIPC insurance was based upon their last brokerage statement:

> **In the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you.  This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement**.[7]

> How is the amount of a customer's claim determined?  The amount of the customer's claim, excluding any securities registered in his name and returned to him, is called his "net equity."  **The net equity of a customer's account is determined by adding the total value of cash and securities**

---

[7] Chaitman Exh. P, A130 (V. II):  SIPC/SIFMA brochure Understanding Your Brokerage Account Statements, at 5, SIPC Website 2009 (emphasis added).

**the firm owes the customer and subtracting the total value of cash and securities the customer owes the firm.[8]**

A customer's "net equity" is, in general, what the broker owes the customer less what the customer owes the broker, exclusive of "specifically identifiable property." Essentially, Section 6(c)(2)(A)(iv) [codified at 15 U.S.C. §78$lll$(11)] defines "net equity" as the dollar amount of a customer's account determined after giving effect to the completion of any open contractual commitments (discussed below), excluding therefrom any specifically identifiable property reclaimable by the customer, and subtracting the indebtedness (if any) of the customer to the debtor from the sum which would have been owing by the debtor to the customer had the debtor liquidated all other securities and contractual commitments to the customer on the filing date. In short, a customer's "net equity" claim is for a liquidated sum.[9]

Prior to this case, SIPC has never taken the position that it insures only the net investment where a customer's statement showed the ownership of real (as opposed to non-existent) securities. Stephen Harbeck, SIPC's President, admitted as much in January 2009 when he announced:

---

[8] Chaitman Exh. Q, A143 (V. II): How SIPC Protects You at 14, 1994 (emphasis added), www.jprcapital.com/howsipc.pdf.

[9] Chaitman Exh. S, A185 (V. II): SIPC Annual Report 1973 at 21.

15

We've modified our usual claim form to ask investors a
question that's unique to this case, which is how much money
did you put in and how much money did you take out.[10] . . .
One of the first things that we did . . . was to modify our
standard claim form to make sure that we asked the Customers
themselves what evidence they had in terms of money in and
money out, because that's going to be one of the critical
factors.[11]

In fact, the BLMIS Customer Claim form contains the unprecedented

language:

In particular, you should provide all documentation (such as
cancelled checks, receipts from the Debtor, proof of wire
transfers, etc.) of your deposits of cash or securities with the
Debtor from as far back as you have documentation.  You should
also provide all documentation or information regarding any
withdrawals you have ever made or payments received from the
Debtor.

## STANDARD OF REVIEW

The Court reviews *de novo* the BC's conclusions of law and its

application of law to the undisputed facts.  *See Pereira v. Farace*, 413 F.3d

330, 341 (2d Cir. 2005).  To the extent that the Decision is based upon the

BC's factual findings, this Court reviews those findings under a "clearly

---

[10] http://www.cnbc.com/id/15840232/?video=986665953&play=1
[11] http://financialservices.house.gov/Hearings/hearingDetails.aspx?NewsID=1
305

16

erroneous" standard. *See In re Enron Corp.*, 419 F.3d 115, 124 (2d Cir.

2005).

## ARGUMENT

**I.    THE BC ERRED IN RELIEVING SIPC OF THE
OBLIGATION TO INSURE ACCOUNTS OF CUSTOMERS
WHO HAD A LEGITIMATE EXPECTATION THAT THEIR
TRADE CONFIRMATIONS AND ACCOUNT STATEMENTS
WERE ACCURATE**

**A.    Congress Established An Insurance Fund for Defrauded
Customers of SEC-Regulated Broker/Dealers**

Congress enacted SIPA with the specific goal of instilling confidence

in the capital markets by insuring customer accounts against the risk that the

broker either stole the customer's money and never purchased the securities

reflected on the customer's statement or stole the securities.  Congressman

Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the
> 1970 Act, to be remedied by [the 1978 amendments] is the
> failure to meet legitimate customer expectations of receiving
> what was in their account at the time of their broker's
> insolvency.
>
>          *            *            *
>
> A customer generally expects to receive what he believes is in
> his account at the time the stockbroker ceases business. **But
> because securities may have been lost, improperly
> hypothecated, misappropriated, never purchased, or even
> stolen**, this is not always possible. Accordingly, [when this is not

17

possible, customers] will receive cash based on the market value
as of the filing date.  (Emphasis added.)[12]

*See also S.E.C. v. Packer, Wilbur & Co.,* 498 F. 2d 978, 984 (2d Cir. 1974)

(purpose of SIPA was to protect investors whose funds were

misappropriated).

SIPC was required to "maintain and administer an insurance fund

which would provide coverage against customer losses. . . resulting from

broker-dealer firms' insolvency."  S.Rep. No. 91-1218, p. 1 (1970).[13]  The

Senate described SIPC as "an insurance plan for the industry," and one of

several "federally sponsored insurance programs." *Id.* at 4-5, 7-9; *see also*

*Bell & Beckwith v. McGraw,* 937 F.2d 1104, 1106 (6th Cir. 1991) ("one

primary purpose of SIPA was to provide for the establishment of a fund to be

used to make it possible for the public customers in the event of the financial

insolvency of their broker, to recover that to which they are entitled . . .").

On December 30, 1970, when President Nixon signed SIPA into law,

he made the following statement:

I am signing today the Securities Investor Protection Act of
1970. This legislation establishes the Securities Investor
Protection Corporation (SIPC), a private nonprofit corporation,

---

[12] Chaitman Exh. C, A596 (V. I): H.R. Rep. 95-746 at 21 (1977).
[13] Chaitman Exh. B, A579 (V. I).

18

> **which will insure** the securities and cash left with brokerage
> firms by investors against loss from financial difficulties or
> failure of such firms. . . . **Just as the Federal Deposit Insurance
> Corporation** protects the user of banking services from the
> danger of bank failure, so will the Securities Investor Protection
> Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid=2870 (emphasis

added).

The Senate and House Reports on the 1978 amendments to SIPA show

that SIPA was intended to insure securities that the broker-dealer did not

actually purchase:

> Under present law, because securities belonging to customers
> may have been lost, improperly hypothecated, misappropriated,
> **never purchased** or even stolen, it is not always possible to
> provide to customers that which they expect to receive, that is,
> securities which they maintained in their brokerage account. . .
> By seeking to make customer accounts whole and returning them
> to customers in the form they existed on the filing date, the
> amendments . . . would satisfy the customers' legitimate
> expectations. . . .[14]

> A customer generally expects to receive what he believes is in
> his account at the time the stockbroker ceases business. But
> because securities may have been lost, improperly hypothecated,
> misappropriated, **never purchased**, or even stolen, this is not
> always possible. Accordingly, [when this is not possible,

---

[14] S. Rep. No. 95-763, at 2 (1978) (emphasis added).

19

customers] will receive cash based on the market value as of the
filing date.[15]

Since its enactment, numerous Courts of Appeals, including this Court,
have recognized that SIPC provides insurance. *See, e.g., Securities Investor
Protection Corp. v. Morgan,* Kennedy *& Co.,* 533 F. 2d 1314, 1316 (2d Cir.
1976)("SIPC claimed that the trust, and not each of its beneficiaries, was the
debtor's customer under SIPA; accordingly, SIPC recognized only one valid
insurance claim."); *Securities Investor Protection Corp. v. BDO Seidman,
LLP,* 222 F. 3d 63, 69 (2d Cir. 2000) ("The SIPC's standing as the subrogee
to the claims of Baron's customers rests on our holding in *Redington v.
Touche Ross & Co,* 592 F. 2d 617 (2d Cir. 1978), *rev'd and remanded on
other grounds,* 442 U.S. 560 (1979).  In *Redington,* we relied on principles of
insurance law to hold that the SIPC, as subrogee of the customers of a failed
broker-dealer, enjoyed a "general common-law right of equitable subrogation.
*Id.* at 624."); *United States v. White,* 553 F. 2d 1137, 1137 (8th Cir. 1977)("the
defense attempted to show that Bade was reimbursed . . . by a United States
government insurance corporation, . . . (SIPC)"); *In re Brentwood Securities,
Inc.,* 925 F. 2d 325, 326 (9th Cir. 1991)("We consider whether these investors

---

[15] Chaitman Exh. C, A596 (V. I): H.R. Rep. No. 95-746 at 21 (emphasis
added).

are protected by . . . (SIPA) . . . and are thus entitled to payments from the

insurance fund maintained by the . . . (SIPC).");  *S.E.C. v. Securities*

*Northwest, Inc.,* 573 F. 2d 622, 624 (9th Cir. 1978)("Broadly described, the

Act establishes a private, non-profit, membership corporation – the SIPC –

charged with administering an insurance fund . . .); *Ahammed v. Securities*

*Investor Protection Corp.,*  295 F. 3d 1100, 1106 ("SIPC insures investors

who deposit cash or securities with a broker . . . ").

**B.   SIPC's Series 500 Rules Mandate Protection of a Customer's
Legitimate Expectations Based on Receipt of Written
Confirmations**

In order to fulfill customer expectations and instill confidence in the

capital markets,  SIPC's Series 500 Rules, 17 C.F.R. §300.500, provide for

the classification of claims in accordance with the "legitimate expectations"

of a customer based upon the written confirmations sent by the broker-dealer

to the customer.  *See* 17 C.F.R. §300.502.  For 38 years of SIPC's existence, a

customer's SIPC claim was determined by the brokerage statements the

customer received, regardless of whether they were accurate.

Thus, based upon SIPC's own rules, it is irrelevant that BLMIS never

purchased the securities reflected on customers' trade confirmations.  The

only relevant fact in determining a customer's entitlement to SIPC insurance

21

is whether the customer had a "legitimate expectation" that he owned

securities. The BC did not address the fact that Appellants had a legitimate

expectation that they owned the securities listed on their last BLMIS

statements despite the fact that Looby confirmed the accuracy of the

statements and thus the legitimacy of Appellants' expectations. Looby ¶¶58-

71.

### C. The SEC and SIPC Took the Position, in This Court, that Customers in The Same Position as Appellants are Entitled to SIPC Insurance Based upon Their Statutory Balances

In 2004, the SEC and SIPC argued successfully in this Court that

customers in precisely the same position as Appellants were entitled to up to

$500,000 in replacement securities where they received statements from their

broker indicating that securities had been purchased for their account, even

though, in fact, the broker had never purchased any securities.[16] *See, e.g.,*

A430 (V. I), SIPC's Appellant's Brief, 2002 WL 32487939 at *7 n.6, *New

Times I* (No. 02-6166); Chaitman Exh. K, A101 (V. II): Brief of the SEC

("SEC Amicus Curiae Brief"), 2003 WL 24132250 at *6 n.1, *18 n.5, *New

Times I* (No. 02-6166).

---

[16] The SEC has plenary jurisdiction over SIPC and the power to enforce SIPA
against SIPC. 15 U.S.C. §78ggg(b). In this instance, the SEC has chosen not
to enforce the law to protect the victims of BLMIS' fraud.

22

In fact, at the bankruptcy court level, SIPC's president, Stephen Harbeck, assured the court that SIPC would replace securities, even if those securities had tripled in value.  As Mr. Harbeck acknowledged, if customers are led to believe that "real, existing" securities had been purchased for their accounts, those customers are entitled to the full value of their securities positions as of the filing date, even if the securities had never been purchased:

> MR. HARBECK:  **Even if they're not there**.
>
> THE COURT:  Even if they're not there.
>
> MR. HARBECK:  Correct.
>
> THE COURT:  **In other words, if the money was diverted, converted –**
>
> MR. HARBECK:  And the **securities were never purchased.**
>
> THE COURT:  Okay.
>
> MR. HARBECK:  **And, if those positions triple, we will gladly give the people their securities positions.**[17]

New Times' principal, William Goren, engaged in a "classic 'Ponzi scheme'" where new investors' money was used to pay earlier investors.  371 F.3d at 72 n.2.  Just as with BLMIS, New Times customers received

---

[17] July 28, 2000 Tr. at 37-38, *In re New Times Sec. Servs. Inc.* (B.E.D.N.Y. 2000) (emphasis added), A19 (V. III).

23

statements showing investments in real securities (the "Existent Securities"). However, in *New Times,* there was another group of customers who received statements showing that they were invested in money market funds that were totally fictitious (the "Non-Existent Securities").  371 F.3d at 71-72.

With the SEC's concurrence, SIPC treated the two categories of customers differently.  SIPC voluntarily applied the statutory "net equity" definition to the Existent Securities customers' claims by replacing securities to the full value of those customers' Statutory Balances up to $500,000.  This Court endorsed that treatment and that is precisely the treatment to which Appellants are entitled.

However, with respect to customers whose statements showed Non-Existent Securities, SIPC used the net investment methodology that the BC approved in this case.  SIPC reasoned that a customer whose statements showed Non-Existent Securities could not have had a legitimate expectation that the securities existed because they could not be replaced by SIPC and because they could not be confirmed or verified by the customer.

The customers with Non-Existent Securities appealed SIPC's treatment.  This Court took particular note of SIPC's position:

> investors who were misled by Goren to believe that they were
> investing in mutual funds that in reality existed were treated

24

much more favorably.  Although they were not actually invested
in those real funds – because Goren never executed the
transactions –the information that these claimants received on
their account statements "mirrored what would have happened
had the given transaction been executed."  [citation omitted].  As
a result, the Trustee deemed those customers' claims to be
"securities claims" eligible to receive up to $500,000 in SIPC
advances.  *Id.*  **The Trustee indicates that this disparate
treatment was justified because he could purchase real,
existing securities to satisfy such securities claims**.  *Id.*
Furthermore, **the Trustee notes that, if they were checking on
their mutual funds, the "securities claimants," in contrast to
the "cash claimants" bringing this appeal, could have
confirmed the existence of those funds and tracked the funds'
performance against Goren's account statements**. *Id.*

371 F.3d at 74 (emphasis added).

This Court held that the sole issue in determining a customer's claim in

a SIPA liquidation is whether the customer had a legitimate expectation,

based on written confirmations and account statements, that he owned the

securities.  The Court cited SIPC's Series 500 Rules, 17 C.F.R. §§300.500-

503, which mandate that an investor can rely upon the written confirmations

he receives from his broker and those written confirmations **alone** control the

investor's entitlement to SIPC insurance.  The Court explained that "the

premise underlying the Series 500 Rules [is] that a customer's 'legitimate

expectations,' based on written confirmations of transactions, ought to be

protected."  371 F.3d at 87.  It noted that:

25

> Under the Series 500 Rules, whether a claim is treated as one for securities or cash depends not on what is **actually** in the customer's account, but on what the customer has been told by the debtor in written confirmations.

*Id.* at 86 (emphasis in original). *See also In re Oberweis Secs., Inc.*, 135 B.R. 842, 847 n. 1 (B.N.D. Ill. 1991) ("The court agrees with the trustee's argument that Congress did not intend to treat customers without confirmations the same as those with confirmations; that customers with confirmations have a legitimate expectation of receiving securities, but customers without confirmations do not have the same expectation.").

In contrast to those New Times customers whose statements showed Existent Securities, this Court held that the net equity of New Times customers whose statements showed Non-Existent Securities should be determined as the customer's net investment because, otherwise, customers would be allowed "to recover arbitrary amounts that necessarily have no relation to reality." 371 F.3d at 88. Obviously, SIPC could not replace Non-Existent securities and customers whose confirmations indicated the purchase of Non-Existent Securities could not have had a legitimate expectation that they owned those securities; there was no place that they could confirm the existence or price of Non-Existent Securities. Thus, only when securities positions "necessarily have no relation to reality," *i.e.*, are based on securities

26

that do not exist, should a net investment methodology be employed in a
SIPA liquidation.

Here, each Appellant received contemporaneous written trade
confirmations showing the purchase and sale of real securities.  Thus, each
Appellant had a legitimate expectation that he owned the securities shown on
his last statement and is entitled to a claim in the amount of his Statutory
Balance.

In *New Times II*, a different Second Circuit panel considered related
issues and found, once again, "[i]t is a customer's legitimate expectations on
the filing date . . . that determines the availability, nature, and extent of
customer relief under SIPA."  *New Times II* at 128 (emphasis added).  This
Court noted that, in the case of customers who believed they held fictitious
securities:

> Because there were no such securities, and it was therefore
> impossible to reimburse customers with the actual securities or
> their market value on the filing date (the usual remedies when
> customers hold specific securities), the *New Times* court
> determined that the securities should be valued according to the
> amount of the initial investment.  The court declined to base the
> recovery on the rosy account statements telling customers how
> well the imaginary securities were doing, because treating the
> fictitious paper profits as within the ambit of the customers'
> "legitimate expectations" would lead to the absurdity of "duped"
> investors reaping windfalls as a result of fraudulent promises
> made on fake securities . . . The court looked to the initial

> investment as the measure for reimbursement because the initial
> investment amount was the best proxy for the customers'
> legitimate expectations.

*New Times II* at 129-30 (citations omitted).

## D. The Decision Distorts This Court's Holding in *New Times*

The BC ignored the focus, in the SIPC Series 500 Rules, on the

customer's "legitimate expectations" and distorted the *New Times* precedent.

The BC held that the "BLMIS account statements have 'no relation to

reality'" like the Fake Securities Claimants in New Times. . . . Madoff, like

the fraudster in *New Times*, essentially pulled the fictitious amounts from thin

air." 424 B.R. at 139.

Although conceding that the BLMIS statements listed real securities

(*id.* at 139), the BC tried to distinguish Appellants from the New Times

Existent Securities claimants by creating a fact which was contradicted by

Looby's own certification. The BC wrote that in *New Times* the

> initial investments were sufficient to acquire their securities
> positions, and the corresponding paper earnings 'mirrored what
> would have happened' had the fraudster purchased the
> securities as promised. [Citation omitted.] In contrast, the
> Madoff customers' initial investments were insufficient to
> acquire their purported securities position.

28

*Id.* at 140.  In the same vein, the BC commented that the BLMIS customers
"likely did not invest enough capital to buy even those securities listed on his
first BLMIS customer statement."  *Id.* at 128 n.15.

There is nothing in the record that would support these statements.
They flatly contradict Looby's admission that the initial customer statements
reflected the purchase of securities "comparable to the amount of principal
invested with BLMIS."  Looby ¶68.  The only inaccuracies that Looby
identified, in ¶106 of his declaration, were "many occurrences" that were
inaccurately priced; but he mentioned only one:

> We identified many occurrences where purported trades were
> outside the exchange's low/high price range for the trade date.
> For example, in one instance a monthly account statement for
> December 2006 reported a sale of Merck (MRK) with a
> settlement date of December 28, 2006. BLMIS records reflect a
> trade date of December 22, 2006 at a price of $44.61 for this
> transaction. However, the daily price range for Merck stock on
> December 22, 2006 was a low of $42.78 to a high of $43.42.

Accepting Looby's certification as true (and it is untested because the
BC refused to allow any customers to take discovery), the fact that, out of
thousands of trade confirmations, some showed slight variations from market
prices, is not sufficient to conclude that customers did not have a legitimate
expectation that they owned the securities on their statements.   Moreover,
regardless of the pricing, SIPC knows which securities to replace on

29

Appellants' statements and can buy those securities on the New York Stock

Exchange.  Thus, Appellants are entitled to have SIPC insurance based upon

their Statutory Balances.

The BC misapprehended this Court's rationale:  the focus is on a

customer's "legitimate expectations" rather than on the broker's fraud.  When

customers' statements show the purchase of real securities, the customers

have a legitimate expectation that they own those securities' positions and

SIPC has an obligation to insure those positions, up to $500,000 in

replacement securities.

In trying to distinguish the New Times customers whose statements

showed Existent Securities, the BC wrote:

> By contrast, customers who were induced to invest in mutual
> funds that in reality existed . . . were entitled to claims for
> securities, eligible to receive up to $500,000 in SIPC advances.
> *Id.* In addition, their net equity claims were based upon the
> "profits" reflected on their customer account statements.  These
> claimants received favorable treatment from the SIPA trustee
> because, *inter alia,* the trustee could purchase real securities to
> satisfy their claims, and the information shown on the account
> statements reflected what would have happened had the
> transactions been executed.

424 B.R. at 138.

The undisputed record before this Court establishes that Appellants are in precisely this position. Thus, there is no reason to treat them differently from the New Times customers whose statements showed Existent Securities.

There is no support for the BC's net investment method in either SIPA or its legislative history. Instead, the legislative history is in accordance with the statute: Appellants are entitled to claims in the amount of their Statutory Balances, consistent with their legitimate expectations.

## E. There is Nothing Inequitable About Holding SIPC to its Statutory Obligations

There is no basis in law or equity to relieve an insurance company of its insurance obligations to an insured. On the contrary, it would be grossly inequitable to allow SIPC to escape its insurance obligations after inducing customers to rely upon the promise of SIPC insurance. SIPC's position is no different from that of a homeowner's insurer who accepts premiums based upon the replacement value of a home and then decides, after a total loss, that the company was not insuring the current value of the home; it was simply insuring what the homeowner paid for the home 40 years earlier.

The Decision ignored SIPA's prohibition against SIPC changing the definition of "net equity," 15 U.S.C. §78*lll*(11), and imposed upon SIPA's clear statutory structure the Court's own notion of "fairness" based upon an

31

unfortunate categorization of BLMIS' victims as either "winners" or "losers."
In fact, all BLMIS investors were "losers" and there is no justification for
depriving any of them of the full SIPC insurance to which they are entitled.

The BC concluded that "winners" (people with a negative net
investment, such as 90-year-old IRA investors who took out mandatory
withdrawals for 20 years) would be unjustly rewarded at the expense of
"losers" (people who took out less than they invested) based upon a
hypothetical  presented in the Trustee's Reply Brief (Docket No. 1773, at 18-
19)(the "Trustee's hypothetical").  This hypothetical assumes that the division
of any property must be a "zero sum game," *i.e.,* money paid to one customer
will reduce the money available to pay another customer.  This assumption is
false because SIPC is a third-party insurer and money paid by SIPC does not
reduce the fund of customer property which is available under SIPA for
distribution to customers.  15 U.S.C. §§78fff-3, 4.

It is true that, under SIPA, the customer's "net equity" controls the
customer's entitlement to SIPC insurance and also the customer's pro rata
share of the fund of customer property.  15 U.S.C. §78fff-2(c)(1)(B).  To this
extent, distributions from the fund of customer property to "net winners" do
reduce the funds available to "net losers."  However, this is mandated by the

32

statute and only Congress can change it.

Moreover, the BC's adoption of a "net winner"/"net loser" categorization has no basis in the statute, for good reason. Let's assume that Mr. Jones invested $100,000 in Merrill Lynch in 1985 which grew to $500,000 in January 2008. Mr. Jones closed his Merrill Lynch account in January 2008 and invested the money in BLMIS. When BLMIS closed, he had not withdrawn any money. Thus, he is entitled, under the net investment method, to full SIPC insurance of $500,000 and the full appreciation on his investment from 1985. On the other hand, Mr. Smith invested $100,000 in Madoff in 1985, which grew to $500,000 by 2008. Over the course of 23 years, he withdrew $100,000 to pay taxes on the appreciation in his account. According to the Decision, Mr. Smith would not be entitled to any SIPC insurance, despite the fact that his final account balance was $500,000. Thus, the Decision establishes a new category of protected customers under SIPA – those that allowed their money to appreciate at firms other than the debtor. Clearly, this is insupportable under the statute.

The BC accepted the Trustee's hypothetical as justification for his view that "net winners" are not entitled to SIPC insurance whereas "net losers" are. Yet, the Trustee's hypothetical is specious for three reasons: First, the

Trustee treated $1.00 invested in 1970 as having the same value as $1.00 withdrawn in 2008. In fact, $1.00 in 1970 has the buying power of $5.54 in 2008.[18]

Second, the Trustee ignored the fact that, under New York law, Appellants are entitled to judgments against BLMIS for conversion and would be entitled to 9% prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at \*14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).   Thus, $1 stolen in 1980 would entitle the investor to a judgment for $13.50 in 2008.  Had the Trustee accurately accounted for these factors, all 4,093 account holders would have been entitled to SIPC insurance.

Third, the Trustee's hypothetical was based upon his assumption, not supported by any evidence before the Court, that the distribution to customers from the fund of customer property will be 20 cents on the dollar of allowed

---

[18] *See* "Relative Value Calculator – US $" based on Consumer Price Index (CPI) data from the U.S. Bureau of Labor Statistics, found at http://www.measuringworth.com/index.html.

34

claims.

Accepting the Trustee's hypothetical without analysis, and ignoring the fact that SIPC is a third-party insurer whose funds are not otherwise available to customers, the BC found that there would be a "profound negative impact" on "net losers" were the statutory definition of "net equity" used.  This was clear error because SIPA does not give each court that administers a SIPA liquidation the power to change the statute to suit that court's perception of what is fair and equitable.

**F.      SIPC Is Prohibited From Changing the Definition of Net Equity**

SIPA mandates that the Trustee "satisfy net equity claims of customers." 15 U.S.C. §78fff(a)(1)(A)-(B).  SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor:

> the dollar amount of the account or accounts of a customer, to be determined by  -
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. §78*lll*(11).

Congress specifically prohibited SIPC from changing any definitions contained in §78*lll*, including the definition of "net equity."  As stated in SIPA:

> SIPC shall have the power. . . to adopt, amend and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to . . . the definition of terms used in this chapter, **other than those terms for which a definition is provided in section 78lll of this title**. . .

15 U.S.C. §78ccc(b)(4)(A) (emphasis added).  Because SIPC has no power to change the statutory definition of "net equity," it was error for the BC to rule that the Trustee can employ his net investment definition of net equity.

**G.     The Statutory Definition of "Net Equity" Has Been Accepted by Governmental Agencies and the Courts**

The GAO, and all courts to consider the matter, have employed the statutory definition of "net equity."  For example, a May 2001 GAO Report stated:

> SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash and/or securities held at a failed firm.  **SIPC fulfills its mission . . . by restoring to the customer accounts the customer's "net equity."  SIPA defines net equity as the value of cash or securities in a customer's account as of the filing date, less any money owed to the firm by the customer, plus any indebtedness the customer has paid back** with the

36

trustee's approval within 60 days after notice of the liquidation proceeding was published.[19]

This Court applied the statutory method in *New Times*:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" corrected for "any indebtedness of such customer to the debtor on the filing date."

*New Times* at 72; *see also Securities Investor Protection Corp. v. BDO Seidman, LLP*, 49 F. Supp. 2d 644, 649 (S.D.N.Y. 1999), *aff'd*, 245 F.3d 174 (2d Cir. 2001) ("As defined by SIPA, 'net equity' is the amount that the broker would have owed a customer had it liquidated all the customer's holdings on the date SIPC filed for a protective decree, less any outstanding debt the customer owed to the broker."); *In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 61 n. 2 (B.S.D.N.Y. 1999) *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001) ("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

---

[19] Chaitman Exh. Z, A320 (V. II): GAO Report entitled "Securities Investor Protection:  Steps Needed to Better Disclose SIPC Policies to Investors," at 15; (emphasis added).

The BC itself in this case adopted the statutory definition of "net equity" in the Claims Procedure Order, Docket No. 12, entered at the inception of the case:

> **ORDERED, that the Trustee be, and he hereby is, authorized to satisfy such customer claims and accounts** (i) by delivering to a customer entitled thereto "customer name securities," as defined in 15 U.S.C. §78lll(3); (ii) **by satisfying a customer's "net equity" claim, as defined in 15 U.S.C. §78lll(11),** by distributing on a ratable basis securities of the same class or series of an issue on hand as "customer property," as defined in 15 U.S.C. §78lll(4) . . .; and it is further

> **ORDERED, that with respect to claims for "net equity," as defined in 15 U.S.C. §78lll(11), the Trustee be, and he hereby is, authorized to satisfy claims out of funds available to the Trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the Debtor available to satisfy such claims;**

Procedure Order at 5; (emphasis added).

In the recent case of *S.E.C. v. Byers,* 637 F. Supp. 2d 166 (S.D.N.Y. 2009)(Chin, J.), the SEC recommended that the district court approve the receiver's proposed distribution to investors based upon each investor's investment plus any reinvested earnings. *Id*. at 182-83. Like BLMIS, the *Byers* investors' funds were stolen and the securities on the statements were never purchased. Pursuant to the proposed formula, an investor's claim would include any distribution that the investor chose to "roll over" into his

38

account, even though such "distribution" never existed and did not correlate to an out of pocket loss. *Id.* The court noted in approving the plan that it was "formulated in cooperation with the SEC, which supports the Plan in its entirety." *Id.* at 168. The court also noted that it would be "cruel" to claw back funds from defrauded investors. *Id.* at 182.

The *Byers* court was not constrained by the "net equity" definition of SIPA because the debtor was not an SEC-regulated broker/dealer and the case was not a SIPA liquidation. Thus, the court only needed to determine whether the distribution plan was "fair and reasonable." 637 F. Supp. 2d at 174. Even without the constraints of SIPA, the court, with the SEC's blessing, used a formula equivalent to an investor's tax basis.

In this case, an investor's tax basis would be the amount shown on his December 31, 2007 BLMIS statement, adjusted for any investments or withdrawals that took place in 2008. Indeed, the Internal Revenue Service has recognized BLMIS customers' claims as the amount of their tax basis. *See* Rev. Proc. 2009-20. The *Byers* formula is consistent with SIPA in fixing a claim in the amount of the investors' last statement, since the customers' November 30, 2008 statements would reflect investments and withdrawals since the December 31, 2007 statement.

39

**H.      The Decision Destroys Investor Confidence In the Capital Markets**

The purpose of SIPA, as evidenced by its title, was to "protect"

investors and restore confidence in the capital markets.  *See, e.*g., H.R. Rep.

No. 91-1613, at 3-4 (1970) ("[SIPA] will reinforce the confidence that

investors have in the U.S. securities markets."); *see also New Times* at 87

("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in

the securities markets and protecting broker-dealer customers."); *Appleton v.*

*First Nat'l Bank of Ohio*, 62 F.3d 791, 794 (6th Cir. 1995) ("Congress

enacted [SIPA] to . . . restore investor confidence in the capital markets[ ] and

upgrade the financial responsibility requirements for registered brokers and

dealers.")(citations omitted).  As explained by the United States Supreme

Court:

> Following a period of great expansion in the 1960's, the
> securities industry experienced a business contraction that led to
> the failure or instability of a significant number of brokerage
> firms. Customers of failed firms found their cash and securities
> on deposit either dissipated or tied up in lengthy bankruptcy
> proceedings. In addition to its disastrous effects on customer
> assets and investor confidence, this situation also threatened a
> "domino effect" involving otherwise solvent brokers that had
> substantial open transactions with firms that failed. Congress
> enacted the SIPA to arrest this process, restore investor
> confidence in the capital markets, and upgrade the financial
> responsibility requirements for registered brokers and dealers.
> S.Rep. No. 91-1218, pp. 2-4 (1970); H.R.Rep. No. 91-1613, pp.
> 2-4 (1970).

40

*Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 415 (1975).

Following its creation, SIPC attempted to satisfy customers' "net equity" claims for securities with actual securities only if the debtor held securities of the appropriate class and otherwise customers would receive the cash equivalent of the value of their securities on the filing date.[20] When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments], [i.e.], . . . the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency."[21] A customer's reasonable expectations were that their

---

[20] SIPA §6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat. 1636, 1648-50 (1970); H.R. Rep. No. 95-746 (39-41)(statement of SIPC Chairman Hugh F. Owens).
[21] D 922 Cong. Rec. H. 36326 (daily ed. Nov. 1, 1977)(statement of Rep. Robert C. Eckhardt)(emphasis added). *See also* Hearing on H.R. 8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. On Interstate and Foreign Commerce, 94th Cong. 63 (1975) ("The basic framework of the 1970 Act in regard to satisfaction of customers' claims should be modified to better meet the legitimate expectations of customers.") (Report to the SIPC Board of Directors by the Special Task Force to consider possible amendments to SIPA); Hearing on H.R. 8331 before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81 (1977) ("The proposed [1978] amendments carry out the Task Force recommendations and are designed to make the Act more responsive to the reasonable expectations of investors.") (Statement of SIPC Chairman Hugh F. Owens); Hearing on H.R. 8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. on

actual securities, as shown on their statements, would be returned to them "in the form they existed on the filing date."  H.R. Rep. No. 95-746, at 21.  Thus, SIPA was amended to state that "[t]he trustee shall, to the extent that securities can be purchased in a fair and orderly market, purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities. . ." [22]

Here, the legitimate expectations of Appellants were based on the account statements and trade confirmations they received.  Thus, SIPA mandates that customer claims be recognized in the amount of their Statutory Balances and that SIPC replace securities based on the values on the November 30, 2008 statements.

## II.    THE NET INVESTMENT METHOD IS AN IMPROPER APPLICATION OF THE FRAUDULENT TRANSFER LAWS

Appellants are legitimate creditors of BLMIS based upon their Statutory Balances and, therefore, the Trustee has no right to utilize his net

---

Interstate and Foreign Commerce, 94th Cong. 161-162 ("[T]he principal purpose of these amendments is to meet more nearly the reasonable expectations of brokerage firm customers.")(statement of SEC Commissioner Philip A. Loomis, Jr.).

[22] 15 U.S.C. §78fff-2(d); SIPA §8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978).

investment method. [23]  Every payment Appellants received from BLMIS over the course of their investment reduced BLMIS' liability to them.  Thus, they gave fair consideration for every withdrawal from their accounts consistent with this Court's holding in *In re Sharp International Corp.*, 403 F.3d 43 (2d Cir. 2005).

In *Sharp*, the debtor fraudulently induced investors to invest funds with the debtor so that it could use those funds to pay down debt owed to its bank. The bank suspected the debtor of fraud and demanded repayment of its loan. *Id.* at 47-48.  Even under those circumstances, this Court held that the trustee failed to state a fraudulent transfer claim against the bank because the bank had a valid claim against the debtor which was repaid.  Thus, there was consideration for the repayment to the bank of the debt.  *Id.* at 56.

This Court wrote that a "'conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.'"  *Id.* at 54 (quoting *Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91, 599 N.Y.S.2d 816 (1st Dep't 1993)).

---

[23] Customers have enforceable claims against their brokers for the securities listed on their account statements.  *See* NYUCC §8-112(c); *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599-600 (2d Cir. 1991).

43

There is no reason for a different result in Ponzi scheme cases. *See In re Carrozzella & Richardson*, 286 B.R. 480, 491 (D. Conn. 2002)(creditors had a contractual right to the return of their investment and profits because there was a "dollar-for-dollar forgiveness of a contractual debt."); 2002 WL 32500567 at *8 (W.D.N.Y.) (trustee cannot recover profits from "an innocent investor, who has received a bargained-for, contractual interest payment, at a commercially reasonable rate"); *Visconsi v. Lehman Bros.*, 244 Fed. App'x 708, 713-4 (6th Cir. 2007) (investors were entitled to the fictitious profits indicated on their account statements); *In re Bennet Funding Group, Inc.,* 1999 Bankr. LEXIS 1843 (B.N.D.N.Y. April 19, 1999)(trustee cannot recover under 11 U.S.C. §548(a)(1) a transfer protected under §548(c) because the transfer satisfied an antecedent debt); *In re Independent Clearing House*, 77 B.R. 843, 857 (D. Utah 1987) (operator of Ponzi scheme received value for payments made to investor which reduced restitution claim).

While some circuits have invoked equitable principles to justify the avoidance of contractually required transfers in non-SIPA liquidations of Ponzi schemes (s*ee e.g., Donnell v. Kowell*, 533 F.3d 762, 776 (9th Cir. 2008), this approach has been criticized as being a policy decision that Congress alone should decide. *See In re Unified Commercial Capital*, 2002 WL

44

32500567 (W.D.N.Y. 2002) ("[I]f the avoidance and fraudulent-conveyance statues are to be used in order to effectuate an even further reallocation and redistribution where Ponzi schemes are involved, the decision to do so should come from Congress, not from the Courts.").

Congress' mandate in SIPA to honor the legitimate expectations of a customer cannot be overcome by a misapplication of the fraudulent transfer laws to investors through an SEC-regulated broker/dealer, particularly when that extraordinary remedy is utilized by a trustee to deprive customers of the SIPC insurance to which they are statutorily entitled.  While SIPA incorporates the avoidance provisions of the Bankruptcy Code to the extent they are not inconsistent with SIPA, SIPA does not provide the Trustee with the ability to deduct amounts he believes are voidable transfers from a customer's SIPC payment.  Instead, it merely provides that "the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11."  15 U.S.C. §78fff-2(c)(3).

Thus, the Trustee has no power to employ his net investment method to deprive investors of the SIPC insurance to which they are statutorily entitled.

45

If he believes he has a basis to sue investors on a fraudulent transfer theory,

he can do so after paying them their full SIPC insurance.

## III.   THE NET INVESTMENT METHOD VIOLATES THE APPLICABLE STATUTE OF LIMITATIONS

In upholding the Trustee's net investment method, the BC overlooked

the fact that, for purposes of determining customer claims, the Trustee has

self-effectuated fraudulent transfer judgments for transfers that predated the

beginning of the statute of limitations period – in some cases by decades.  The

BC wrote:

> The Net Investment Method harmonizes the definition of Net
> Equity with these avoidance provisions by similarly discrediting
> transfers of purely fictional amounts and unwinding, rather than
> legitimizing, the fraudulent scheme.  The Last Statement
> Method, by contrast, would create tension within the statute by
> centering distribution to customers on the very fictitious transfers
> the Trustee has the power to avoid.

424 B.R. at 136.

The BC failed to recognize the limits of due process of law.  In *Wright*

*v. Union Central Life Ins*., 304 U.S. 502, 518 (1938), the Supreme wrote that

Congress "may authorize the bankruptcy court to affect . . . property rights,

provided the limitations of the due process clause are observed."  Here, the

BC has approved a methodology which denies thousands of investors their

fundamental due process rights because it allows the Trustee to deprive them

46

of the SIPC insurance to which they are statutorily entitled based upon a
nullification of the applicable statutes of limitation.

### A. The Trustee Has No Right to Self-Effectuate Fraudulent Transfer Judgments Beyond the Statute of Limitations

Statutes of limitations are statutes of repose established by legislatures
in recognition of the fact that it would be unfair and unreasonable to force a
person to litigate a particular issue more than a certain number of years after
the occurrence giving rise to the claim. *See Johnson v. Railway Express
Agency, Inc.*, 421 U.S. 454, 473 (1975) (statute of limitations designed to
prevent the unfairness caused by "lost evidence, faded memories, and
disappearing witnesses, and to avoid unfair surprise.")

Yet, the BC has approved the Trustee's net investment method which
allows the Trustee to net out deposits and withdrawals going back generations
for purposes of determining the right to SIPC insurance. The unfairness of
the Trustee's net investment method is patent: he has put the burden on
innocent customers to produce complete bank records of their parents and
grandparents when no one reasonably can be expected to have retained
records that far back and no bank retains such records.

The Trustee's power to void customer withdrawals from their BLMIS
accounts is limited by the two-year statute of limitations in 11 U.S.C. §546(e).

47

This Section was amended in 2006 to significantly broaden its scope. It limits
a trustee's avoidance powers to those authorized under 11 U.S.C. §548(a)(1)
(providing only for actions for intentional fraud, going back only two years).
Section 546(e) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and
> 548(b) of this title, **the trustee may not avoid a transfer . . .**
> **that is a transfer made by . . . a stockbroker [or] financial**
> **institution, . . . in connection with a securities contract,** as
> defined in section 741(7) . . . that is made before the
> commencement of the case, except under section 548(a)(1)(A) of
> this title. (Emphasis added.)

Section 741(7)'s definition of a securities contract is all-
encompassing.[24] Certainly, the payments by BLMIS of withdrawals from
customers' accounts were transfers made by a stockbroker in connection with
a securities contract. It is undisputed that BLMIS was a stockbroker. A
stockbroker is a person

> (A) with respect to which there is a customer, as defined in
> Section 741(2) of this title; and (B) that is engaged in the

---

[24]   (7) "securities contract"-- (A) means--(i) a contract for the purchase, sale,
or loan of a security, . . . or option on any of the foregoing, including an
option to purchase or sell any such security, . . .  (vii) any other agreement or
transaction that is similar to an agreement or transaction referred to in this
subparagraph; . . . or (xi) any security agreement or arrangement or other
credit enhancement related to any agreement or transaction referred to in this
subparagraph, including any guarantee or reimbursement obligation by or to a
stockbroker . . .

48

> business of effecting transactions in securities – (i) for the
> account of others; or (ii) with members of the general public,
> from or for such person's own account.

11 U.S.C. §101(53A).  Appellants were "customers" for purpose of this

statute because they had "a claim against a person arising out of . . . (ii) a

deposit of cash, a security or other property with such person for the purpose

of purchasing or selling a security."  11 U.S.C. §741(2).

Since 2006, when the scope of §546(e) was significantly broadened,

courts have found that various types of transfers were shielded from a

trustee's avoidance powers by §546(e).  For example, in *In re Contemporary

Industries Corp*., 564 F.3d 981 (8th Cir. 2009), the Eighth Circuit held that

"settlement payments" could include payments received in exchange for non-

public stock and thus were exempt from avoidance under §546(e).  The court

relied on the plain meaning of the statute and rejected the arguments of the

corporation and its creditors that interpreting the statute to cover non-public

stock would not effectuate the statute's purpose of protecting the stability of

the financial markets.  *See also In re Elrod Holdings Corp.*, 394 B.R. 760

(B.D.Del. 2008) (holding that §546(e) applied to protect "settlement

payments" concerning non-public stock); *In re National Forge Co*., 344 B.R.

340 (W.D.Pa. 2006) (redemption of the class of stock that was not part of the

debtor's employee stock ownership plan, which was made by two transfers, a

49

transfer from the lenders to the corporation which then made transfers to the

shareholders, was a single integrated transaction protected under §546(e)).

In *In re QSI Holdings, Inc.*, 571 F.3d 545, 549 (6th Cir.), *pet. for cert.*

*filed*, 78 U.S.L.W. 3239 (Oct. 5, 2009), the Sixth Circuit held that, when

construing §546(e), "the sole function of the courts – at least where the

disposition required by the text is not absurd – is to enforce it according to its

terms."  In that case, the court held that payments to selling shareholders in a

leveraged buyout were in connection with a securities contract and thus

protected under §546(e).  The court held that, even though the financial

institution at issue never had "dominion or control" over the funds, the

transfer was still protected under §546(e) because the statute does not require

a beneficial interest over the funds to be acquired by the transferee.  *Id.* at

550.  Accordingly, the mere fact that BLMIS, from 1993, did not purchase the

securities listed on the customers' statements does not mean that the transfer

is not protected under §546(e), where the transfer falls within the plain

meaning of the section.

Under §546(e), the Trustee has no power to void preferential transfers

and his only power to void alleged fraudulent transfers is under 11 U.S.C.

§548(a)(1)(A), which limits fraudulent transfer actions to two years before the

50

filing of the case and only for intentional fraud.  This section provides as

follows:

> (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.[25]

The BC dismissed this central issue, even though it was briefed

extensively.  In footnote 30 of the Decision, the Court wrote:

> the application of section 546(e) of the Code to insulate transferees of Madoff's fictitious securities from avoidance actions is dubious. . . . In any event, the safe harbor provision explicitly excepts from its protection actual fraudulent transfers avoidable under section 548(a)(1)(A) of the Code.  See 11 U.S.C. §546(e).

Thus, the BC ignored the fact that, in contravention of §546(e), the Trustee

was applying his net investment method going back to the 1960's, in some

cases.

-----

[25] If the Trustee were not bound by §546(e) to a two-year statute of limitations, he would be bound by New York's six-year statute of limitations for fraudulent transfer actions.  N.Y.C.P.L.R. §213(1).

Even in non-SIPA liquidations of Ponzi schemes, courts have uniformly recognized that "the appropriate statute of limitations restricts the payments the Ponzi scheme investor may be required to disgorge. Only transfers made within the limitations period are avoidable." *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir.), *cert. denied* 1295 S. Ct. 640 (2008) (same); *see also Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1131 (D. Ariz. 2006), *aff'd* 569 F.3d 1015 (9th Cir. 2009) (same); *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1145-46 (C.D. Cal. 2003) (same).

The BC cited no decisions which would support utilizing a net investment method to void purported fraudulent transfers beyond the statute of limitations period. Indeed, it is clear that transfers beyond the statute of limitations are not voidable. *See, e.g., Donell,* 533 F.3d at 772; *Sender v. Buchanan*, 84 F.3d 1286, 1290 (10th Cir. 1996) (bankruptcy trustee can only recover transfers to defendant made during the one year prior to the bankruptcy under 11 U.S.C. §548); *In re Independent Clearing House Co.*, 77 B.R. 843, 887 (D. Utah 1987) ("Arguably, therefore, the trustee should be

able to recover all transfers without regard for the one-year limitation period. But under the current Code, in an adversary action he cannot."). [26]

### B.  The Trustee Has No Right to Self-Effectuate Fraudulent Transfer Judgments for Transfers that Pre-Date any Evidence of Fraud

Without any evidence of fraud before 1993, the BC had no justification for approving the application of the Trustee's net investment method to investors' transactions that pre-date 1993.  The Trustee has, in numerous instances, reduced the opening deposit in an account that was established in the 1980's or earlier by netting out the investment and disallowing any balances that existed as of the early 1990's.  The sole justification for this treatment is that BLMIS did not purchase the securities shown on customer statements and yet, the Trustee has offered no evidence that this practice started before BLMIS' acquisition of a new computer system in 1993.  Looby ¶¶14-15.

---

[26]  In *In re Taubman*, 160 B.R. 964 (B.S.D. Ohio 1993), the court held that the trustee could reach back to recover Ponzi scheme payments for an unlimited period, since the claim was brought within four years of discovery of the fraud and was thus timely under Ohio law.  However, this case pre-dated the amendment of 11 U.S.C. §546(e).  Moreover, it would be inconsistent with SIPA to allow the discovery rule to be used against a customer who had a legitimate expectation that his statements were accurate.

53

According to Looby, BLMIS' computer system was "designed to record and assist with the printing of the fictitious securities purportedly bought and sold by BLMIS, customer cash transactions, customer statements, trade confirmations, management reports, and Internal Revenue Service 1099 forms." *Id.* ¶40. Looby describes in detail the method by which the IBM AS/400 was used to create the fraudulent records of trades produced by Madoff. *Id.* ¶¶58-64. There is no indication in Looby's declaration that there was any fraud prior to the use of the IBM AS/400 in 1993.

Madoff stated in his Plea Allocution that "to the best of my recollection, my fraud began in the early 1990s." [27] In his interview with SEC Inspector General H. David Kotz, Madoff stated that, when the SEC investigated him in 1992 in connection with its investigation of Avellino and Bienes, the trades were real, and he produced DTC records to the SEC which proved that the trades occurred. [28]

DiPascali stated in his plea hearing that "from the early 1990s until December of 2008 I helped Bernard Madoff, and other people, carry out the

---

[27] Chaitman Exh. W at A292 (V. II).
[28] Chaitman Exh. X at A304-5 (V. II).

54

fraud that hurt thousands of people."[29]

There is no evidence indicating that the fraud began prior to 1993 and the BC had no basis to approve the Trustee's net investment method for the period prior to 1993.

## IV.   SIPC IS JUDICIALLY ESTOPPED FROM RENEGING ON ITS INSURANCE OBLIGATIONS

Judicial estoppel prevents a litigant from taking one position in one case and then, when it is convenient to do so, taking the opposite position in another case, as SIPC seeks to do here.  *See Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir. 1997) ("[j]udicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding.")*; see also Mitchell v. Washingtonville Central School District*, 190 F.3d 1 (2d Cir. 1999) (summary judgment appropriate where party judicially estopped from taking present position).

## A.   SIPC and the SEC Urged This Court to Take the Position it Took in *New Times*

SIPC repeatedly represented to this Court in *New Times* that payment of claims according to the SIPA definition of net equity was appropriate for

---

[29] Declaration of Seanna Brown, Exh. B, August 11, 2009 Tr. at 44:18-25, A319 (V. I).

those customers whose statements indicated that there were real securities in

their accounts.  The Trustee and SIPC are judicially estopped from reneging

on those representations.  SIPC represented to this Court in *New Times* that:

> Goren [the Ponzi scheme fraudster] also purported to sell . . .
> shares in mutual funds that actually existed. Investors in this
> fund scheme believed that Goren was purchasing bona fide
> mutual funds (e.g. Vanguard, Putnam, Kemper) for their
> accounts and received written confirmations of such purchases
> and monthly account statements. Although these transactions
> were never executed, the information provided on the account
> and confirmation statements mirrored what would have
> happened had the given transaction been executed. . . .
> Moreover, unlike the situation with respect to Claimants [for
> non-existent securities] here, the Trustee could identify the
> shares of the real securities involved and use SIPC advances to
> purchase missing securities to return to claimants.

A430 (V. I), SIPC's Appellant's Brief, 2002 WL 32487939 at *7 n.6, *New

Times I* (No. 02-6166).

In the New Times liquidation, SIPC and the trustee voluntarily valued

Existent Securities customers' securities positions in accordance with the

statutory definition of net equity even when those claims included mutual

fund shares that were purchased through "dividend reinvestments," despite

the fact that, since the initial securities had never been purchased, the

**customers had received no dividends to reinvest**.  SIPC and the SEC

explained:

> [I]nvestors who believed that their accounts held shares of
> mutual funds that actually existed (but were never purchased for
> their accounts) are having their claims (both as to shares of
> mutual funds never purchased by Goren and shares shown in
> customer statements as purchased through dividend
> reinvestment) satisfied by the Trustee up to the statutory
> maximum of $500,000. . . .[30]

> [W]hereas the Trustee has disallowed that portion of the claim of
> [the Non-existent Securities] investors representing shares of [the
> Non-existent Securities] purchased through dividend
> reinvestment, the Trustee has allowed that portion of the mutual
> fund investors' claims [i.e., "Existent Securities" investors'
> claims] as represents shares of such mutual funds purchased by
> them through dividend reinvestment.[31]

SIPC and the Trustee described their method in *New Times*:

> In every case [of an 'Existent Security' customer], the Trustee
> has been able to identify the actual mutual fund in question by
> cross-checking the information supplied by Goren on the
> customer statements, including share price information, with
> publicly available information and then been able to purchase
> that security.[32]

They further stated that where customers' statements reflected securities

positions in closed mutual funds, "the Trustee properly gave the customers

---

[30] Chaitman Exh. H, A19 (V. II): Claimants' Joint Memorandum at 3, *In re
New Times Sec. Services, Inc.* (B.E.D.N.Y.) (No. 00-CV-970).
[31] Chaitman Exh. F, A700 (V. I): Limited Objection to Trustee's
Determination at 6 n.4, *In re New Times Sec. Services, Inc.* (B.E.D.N.Y.) (No.
00-CV-970).
[32] Chaitman Exh. G, A711 (V. I): Joint Memorandum at 26, *In re New Times
Sec. Services, Inc.* (B.E.D.N.Y.) (No. 00-CV-970).

57

cash equal to the filing date values of the closed mutual funds." [33]

In their briefs, SIPC and the SEC repeated the view that SIPA protects the legitimate expectations of the customer, based upon the written confirmations the customer received from the broker.  In an *amicus curiae* brief, the SEC wrote:

> Our view [is] that when possible, SIPA should be interpreted consistently with a customer's legitimate expectations based on confirmations and account statements. [34]

The Trustee wrote in his brief in *New Times I* that:

> In those cases [concerning the payment of interest and dividends on bona fide mutual funds] the claimants had an objectively legitimate expectation of receiving interest/dividends because the security in question had actually earned them.  Here, the bogus mutual fund [the Fictitious New Age Fund] was never organized as a mutual fund and had no assets or investments.[35]

SIPC wrote in its brief in *New Times II* that:

> [R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality.  Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable

---

[33] Chaitman Exh. I, A71 (V. II): Reply Memorandum at 20, *In re New Times Sec. Services, Inc.* (B.E.D.N.Y.) (No. 00-CV-970).

[34] Chaitman Exh. K, A101 (V. II): Brief of the SEC ("SEC Amicus Curiae Brief"), 2003 WL 24132250 at *13, *New Times I* (No. 02-6166).

[35]  A414 (V. I): Brief for Appellants James W. Giddens as Trustee, 2002 WL 32487939 at *38, *New Times I* (No. 02-6166).

expectation that he or she holds the securities identified in the confirmation and therefore **generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase . . .** [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.[36]

Thus, SIPC recognized that it is "claimant expectations," rather than "transactional reality" that controls. This principle is at the very core of the entire SIPA statutory scheme.

There were no "imaginary securities" listed on the trade confirmations or monthly statements received by Appellants. Yet, in direct contravention of SIPC's position in *New Times*, in which SIPC "gladly" replaced securities with a value up to $500,000 for customers whose statements showed Existent Securities that were never purchased, even if the actual securities' value had "triple[d]," here, the BC has ruled that the Trustee can use his net investment method to reduce SIPC's liability. As a matter of law and equity, Appellants are entitled to be treated in the same manner as the holders of Existent

---

[36] A150 (V. III), Br. Of Appellant SIPC, 2005 U.S. 2nd Cir. Briefs LEXIS 259, at *35-36, (Dec. 30, 2005), *New Times II* (citing *New Times*)(emphasis added).

59

Securities in *New Times*.

**B.   SIPC and the SEC Are Bound By The Position They Took in *New Times***

*New Times* explicitly endorsed SIPC's procedure of paying the claims of those customers who believed they held real securities in accordance with their Statutory Balances, noting that "investors who were misled by Goren to believe that they were investing in mutual funds that in reality existed were treated much more favorably. . . The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims."   371 F.3d at 74.   Thus, this Court "accepted the claim at issue by rendering a favorable decision," as required for judicial estoppel.   *Simon*, 128 F.3d at 72.

Judicial estoppel ensures that "abandonment of a claim to obtain a litigation advantage precludes the later reassertion of that claim."   *HSBC Bank USA v. Adelphia Commc'ns. Corp.*, 2009 U.S. Dist. LEXIS 10675, at *46 (W.D.N.Y. Feb. 12, 2009).   SIPC plainly decided in *New Times* that its net investment method of claims of customers whose statements showed Non-Existent Securities would be more palatable to this Court if it was not also applied to the customers whose statements showed Existent Securities.   SIPC cannot now argue that "net equity" should be determined as "net investment"

60

even for customers whose statements showed accurately priced Existent

Securities.

## V.  THE APPROPRIATE REMEDY FOR SIPC'S VIOLATION OF SIPA IS TO PUT CUSTOMERS IN THE POSITION THEY WOULD HAVE BEEN IF SIPC HAD FULFILLED ITS STATUTORY OBLIGATIONS

Because of SIPC's defiance of SIPA's mandate that the Trustee

"promptly" replace securities in customers' accounts up to $500,000, 15

U.S.C. §78fff-3(a) and 4(c), the Trustee retained a vast team of forensic

accountants and lawyers to pore through decades of records to determine each

customer's net investment (through generations) before SIPC pays any

amount to a customer.  Even now, 20 months after the filing, approximately

2,000 customers' claims have not been determined.  Docket No. 794,

Trustee's Amended Third Report at ¶¶78, 2.

Nothing could be more destructive to Congressional intent to instill

confidence in the capital markets.  Customers' Statutory Balances are readily

ascertainable from their November 30, 2008 statements.  Their net equity is

simply the "securities positions" set forth on their last statements.

This Court should not allow SIPC to benefit from its deliberate

violation of its statutory obligations.  The Trustee's obligation to customers,

to whom he owes a fiduciary duty, is to require SIPC to promptly replace

61

securities in the customers' accounts up to a value of $500,000 as of

November 30, 2008.  Now, 20 months after the SIPC filing, SIPC should be

ordered to replace securities in each Appellants' account, at the Appellants'

selection of securities, up to $500,000 as valued on the November 30, 2008

statements or, alternatively, again at the election of each Appellant, SIPC

should be required to pay each Appellant the SIPC insurance to which he is

entitled, with interest at 9% from February 11, 2009.  Certainly, having defied

its statutory obligations, SIPC should not be permitted to profit from its

wrongful conduct.

## **CONCLUSION**

Appellants respectfully request that this Court reverse the Decision and

Order and remand with instructions for entry of an order requiring the Trustee

to replace securities at the selection of each Appellant, up to a value of

$500,000 based upon each Appellant's last statement or, at the election of

each Appellant, to pay up to $500,000 plus New York statutory interest of 9%

from February 11, 2009.

62

Dated:  New York, New York
        August 9, 2010

BECKER & POLIAKOFF LLP

By:  */s/ Helen Davis Chaitman*
     Helen Davis Chaitman
     Peter Schuyler

45 Broadway
New York, NY 10006
Telephone: (212) 599-3322
Facsimile: (212) 557-0295
Email: hchaitman@becker-
poliakoff.com

*Attorneys for Diane and Roger Peskin,*
*Maureen Ebel, and a large group of*
*other customers*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE
## <u>REQUIREMENTS AND TYPE STYLE REQUIREMENTS</u>

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 13,525 words, excluding the parts of the brief

of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally-spaced typeface using

Microsoft Word 2003 in size 14 Times New Roman font.

Dated:   New York, New York
       August 9, 2010

                       BECKER & POLIAKOFF LLP

                  By:   */s/ Helen Davis Chaitman*
                       Helen Davis Chaitman
                       Peter Schuyler

                       45 Broadway
                       New York, NY 10006
                       Telephone: (212) 599-3322
                       Facsimile: (212) 557-0295
                       Email: hchaitman@becker-
                       poliakoff.com

                       *Attorneys for Diane and Roger Peskin,*
                       *Maureen Ebel, and a large group of*
                       *other customers*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

In re:

**CERTIFICATE OF SERVICE**

BERNANRD L. MADOFF
INVESTMENT SECURITIES LLC,

No. 10-3188

　　　　　　　　　　Debtor.


　　　　I, Lourdes Blanco, hereby certify that on August 9, 2010 I caused a copy of

the Brief for Appellants Diane and Roger Peskin, Maureen Ebel and other

customers as listed on the inside cover of Appellants' Brief to be filed with the

Court electronically and served upon the parties in this action who receive

electronic service through CM/ECF.

August 9, 2010

　　　　　　　　　　　　　*/s/ Lourdes Blanco*
　　　　　　　　　　　　　Lourdes Blanco