Josephine Wang
General Counsel
SECURITIES INVESTOR PROTECTION
 CORPORATION
805 15th Street, N.W.
Suite 800
Washington, DC 20005
Telephone: (202) 371-8300
Facsimile: (202) 371-6728
Email: jwang@sipc.org

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (BRL) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

---

**MEMORANDUM OF LAW OF THE
SECURITIES INVESTOR PROTECTION CORPORATION
IN SUPPORT OF TRUSTEE'S MOTION FOR
AN ORDER APPROVING AN INITIAL ALLOCATION OF PROPERTY
TO THE FUND OF CUSTOMER PROPERTY AND
AUTHORIZING AN INTERIM DISTRIBUTION TO CUSTOMERS**

The Securities Investor Protection Corporation ("SIPC")[1] submits this memorandum of law in support of the motion ("Motion") of the Trustee ("Trustee") for the liquidation of Bernard

---

[1] SIPC is a party in interest as to all matters arising in a liquidation proceeding under the Securities Investor Protection Act ("SIPA"), "with the right to be heard on all such matters." 15 U.S.C. §78eee(d). References hereinafter to provisions of SIPA shall be to the United States Code, and for convenience, shall omit "15 U.S.C."

L. Madoff Investment Securities LLC ("BLMIS " or "Debtor") for an order ("Order") approving an initial allocation of property to the fund of customer property ("Allocation") and authorizing an interim distribution ("Distribution") to customers.

## **Preliminary Statement**

SIPA was enacted to, among other things, "restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." SIPC v. Barbour, 421 U.S. 412, 415 (1975) (citing S. Rep. No. 91-1218, at 2-4 (1970)). SIPA and the customer protection financial responsibility rules promulgated by the Securities and Exchange Commission ("SEC") ensure that customers receive the maximum protection possible in the event their broker-dealer fails financially and is liquidated under SIPA. The Trustee's collection, Allocation, and Distribution of "customer property" in accordance with the provisions of SIPA and other applicable statutory provisions, rules, and regulations demonstrates that the Congressionally-mandated SIPA scheme of protection is truly protection in fact for the customer victims of BLMIS.

The Trustee has recovered or entered into agreements to recover more than $7.6 billion[2] since his appointment about 30 months ago. This remarkable level of recovery would enable the Trustee to put about 44 cents of every dollar of net equity owed into the hands of each customer with an allowed claim but for various appeals and other litigation. Nevertheless, even with the Trustee's conservative approach in reserving funds from the Allocation and Distribution for

---

[2] The United States Attorney's Office for the Southern District of New York has amassed billions of dollars of assets that will be shared by BLMIS victims ("Forfeiture Fund") (Trustee's Motion, ¶94). The Trustee notes that many of the customer-distributees that will benefit from approval of this Motion also may participate in the distribution of the Forfeiture Fund (Trustee's Motion, ¶95). The Trustee further notes that he will take into account monies received from the Forfeiture Fund or this or subsequent Distributions so that "no claimant receives in this SIPA proceeding more than their net equity claim under SIPA." Id.

2

these appeals and litigation, entry of the proposed Order sought by the Trustee's Motion will put an average of more than $220,000 into the hands of customers.

## THE TRUSTEE'S PROPOSED ALLOCATION IS CONSISTENT WITH SIPA AND ITS PROVISIONS AND PURPOSES

### The Prologue

This liquidation proceeding is the aftermath of "the infamous Ponzi scheme perpetrated by [Bernard L.] Madoff through his investment company, BLMIS." SIPC v. BLMIS, 424 B.R. 122, 125 (Bankr. S.D.N.Y. 2010), appeal docketed, No. 10-2378-bk(L) (2d Cir.). Madoff did not engage in legitimate trading activity because "in Madoff's fictional world no trades were actually executed..." Id. Instead, what Madoff did was to use "customer funds to support operations and fulfill other investors' requests for distributions of profits to perpetuate his Ponzi scheme." Id. In fact, the "only verifiable transactions were the customers' cash deposits into, and cash withdrawals out of, their particular accounts. Ultimately, customer requests for payments exceeded the inflow of new investments, resulting in the Ponzi scheme's inevitable collapse." Id.

### SIPA Protection

The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that customers share ratably in the fund of customer property to the extent of their net equities, as defined in SIPA section 78lll(11). See SIPA section 78fff-2(c)(1)(B). Where the fund of customer property is not sufficient to make customers whole, the SIPA Trustee is entitled to obtain an advance from SIPC, up to the statutory limits, to pay each customer the amount by which the customer's net equity exceeds his or her ratable share of customer property. SIPA section 78fff-3(a). In other words, SIPC advances "serve only to replace missing customer property and cannot be ascertained independently of the determination

3

of a customer's pro rata share of customer property." SIPC v BLMIS, 424 B.R. at 134. In this liquidation proceeding, the Trustee has obtained almost $795 million in advances from SIPC to pay customer claims up to the statutory limits in partial or full satisfaction of their net equities. To the extent of these advances, SIPC is subrogated to the claims of the customers. SIPA section 78fff-3(a).[3]

The definition of customer property in SIPA[4] is expansive and designed to ensure that customer property is funded for the priority distribution to customers. See Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.), 286 B.R. 109, 132-133 (Bankr. D. Minn. 2002), aff'd, 2003 WL 1824937 (D. Minn. Apr. 07, 2003), aff'd, 371 F.3d 397 (8th Cir. 2004); Horwitz v. Sheldon (In re Donald Sheldon & Co.), 148 B.R. 385, 388-390 (Bankr. S.D.N.Y. 1992); 6 Collier on Bankruptcy ¶741.05, at 741-25 (16th ed. 2011) (citing SIPA section 78lll(4)(D)).

In the SIPA liquidation proceeding of MJK Clearing, Inc., the court found that there existed, as here, a massive shortfall of customer property. The court found that the debtor, pursuant to SEC Rule 15c3-3, 17 C.F.R. §240.15c3-3, should have segregated all cash in its

---

[3] As noted in the Trustee's Motion (at ¶88), "in light of the Net Equity Dispute and other considerations, SIPC has agreed to defer receipt of any subrogation amounts from this initial distribution." The Trustee will retain these funds "pending further developments in this case." Id.

[4] SIPA §78lll(4) provides:

The term 'customer property' means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted. The term 'customer property' includes --

(A) securities held as property of the debtor to the extent that the inability of the debtor to meet its obligations to customers for their net equity claims based on securities of the same class and series of an issuer is attributable to the debtor's noncompliance with the requirements of section 78$o$(c)(3) of this title and the rules prescribed under such section;
(B) resources provided through the use or realization of customers' debit cash balances and other customer-related debit items as defined by the Commission by rule;
(C) any cash or securities apportioned to customer property pursuant to section 78fff(d) of this title; and
(D) any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

4

possession for the benefit of customers, to the exclusion of other creditors. "The applicable laws, rules, and regulations referred to in subsection (D) of the 'Customer Property' definition in SIPA are found essentially in 17 C.F.R. §240.15c3-3, and is known as the 'Customer Protection Rule.'" MJK Clearing, 286 B.R. at 130. Because of the massive shortfall of customer property in that case, the court applied the plain meaning of the customer property definition in SIPA section 78lll(4)(D) as:

> a means to rectify any actions taken by, or with respect to, the debtor that results in such a shortfall. This clearly entails looking to the debtor's other, non-customer accounts such as banking accounts containing funds… to remedy the shortfall for the protection of customers.

Id. at 132.

The MJK court concluded that "SIPA's safeguards and protections, including a broad application of 15 U.S.C. §78lll(4)(D), act to limit any damage to public customers caused by the debtor, its officers, directors, and employees." Id. at 133.

The same expansive interpretation of customer property is applicable in this case. SIPA Section 78lll(4)(D) empowers the Trustee to maximize potential customer property by pursuing claims and causes of action held by the debtor, if the proceeds of such claims and causes of action would benefit the fund of customer property.

**The Trustee's Proposed Distribution Is Consistent With SIPA And Its Purposes**

The Trustee has recovered or entered into agreements to recover approximately $7.6 billion for the fund of customer property. Certain claimants have disputed the recovery of $5 billion from the Picower estate by appealing this Court's Picower Settlement Order to the District Court. Thus, the $5 billion remains in the Picower Escrow Account (Trustee's Motion, ¶60) and is not available for the Distribution to customers at this time.

Similarly, certain claimants have appealed from this court's order denying a motion to set aside the Trustee's settlement with the Levy Heirs ($220 million) to the District Court. Thus, another $220 million (although allocated) is held in reserve (Trustee's Motion, ¶¶45, 65) and is available for the Distribution to customers at this time.

Finally, the Trustee has reserved for the resolution of the Net Equity Dispute[5], which is currently sub judice with the Second Circuit, by setting the fictitious Statement Amount of $57,354,863,950.37 as the "denominator" for purposes of the proposed Distribution (Trustee's Motion, ¶71). But for the reserve, the "denominator" would be $17,265,885,837.54 under the Trustee's Net Investment Method (Trustee's Motion, ¶79). SIPC supports the use of such a conservative approach by the Trustee at this time.

These reservations on the proposed Allocation and Distribution clearly have an effect on the amount to be paid to customers with allowed claims at this time. The average payment amount to the allowed claims relating to 1,224 BLMIS accounts is $222,551.12 (Trustee's Motion, ¶11), or about 4% (Id., ¶81). But for the Picower appeal, the Distribution to customers with allowed claims would have been greater than three times more, or about 13% (Id., ¶82). With all reservations for disputed items lifted, the Distribution would have been greater than four times more or about 44 cents of every dollar of net equity owed to each of the allowed claims relating to 1,224 BLMIS accounts (Id., ¶84). Nevertheless, the Trustee's Motion is beneficial to each of these allowed claimants and should be granted.

SIPC strongly supports the Trustee's Motion.

---

[5] The Trustee has also reserved $57,481,783.75 (although allocated) from the Distribution pending the outcome of the Net Equity Dispute (Trustee's Motion, ¶¶ 46, 51, 65).

6

## Conclusion

Based on the foregoing, SIPC submits that the Trustee's Motion, with its proposed initial Allocation of property to the fund of customer property and its requested authorization of an interim Distribution to customers, should be granted.

Respectfully submitted,

/s/ Josephine Wang
JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior Associate General Counsel for
Dispute Resolution

SECURITIES INVESTOR
 PROTECTION CORPORATION
805 15th Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 371-8300
Email: jwang@sipc.org
Email: kbell@sipc.org

Date:  June 21, 2011