**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,

                           Plaintiff,

        v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                   Defendant.
--------------------------------------------------------X

In re:

BERNARD L. MADOFF

                   Debtor.
--------------------------------------------------------X

**FOR PUBLICATION**

Adv. Pro. No. 08-01789 (BRL)

SIPA LIQUIDATION

(Substantively Consolidated)

**ARGUING ON THE MOTION:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201
<u>By</u>:    David Sheehan
        Seanna R. Brown
        Bik Cheema

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

SECURITIES INVESTOR PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, DC 20005
Telephone: (202) 371-8300
Facsimile:  (202) 371-6728
<u>By</u>:    Josephine Wang
        Kevin H. Bell
        Christopher H. LaRosa

*Attorneys for the Securities Investor Protection Corporation*

SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E., Room 8115
Washington, DC 20549
Telephone: (202) 551-5148
Facsimile:  (202) 772-9260
<u>By</u>:      Katharine B. Gresham

*Attorneys for the Securities and Exchange Commission*

BARGER & WOLEN LLP
633 West Fifth Street, 47th Floor
Los Angeles, CA 90071
Telephone: (213) 680-2800
Facsimile:  (213) 614-7399
<u>By</u>:      John C. Holmes

*Attorneys for the Jewish Community Foundation of the Jewish Federation Council of Greater Los Angeles*

BECKER, GLYNN, MELAMED & MUFFLY LLP
299 Park Avenue
New York, NY 10171
Telephone: (212) 888-3033
Facsimile:  (212) 888-0255
<u>By</u>:     Chester B. Salomon

*Attorneys for Black River Associates, L.P. and its Members*

BECKER & POLIAKOFF LLP
45 Broadway, 11th Floor
New York, NY 10006
Telephone: (212) 599-3322
Facsimile:  (212) 557-0295
<u>By</u>:      Helen Davis Chaitman

*Attorneys for Diane and Roger Peskin, Maureen Ebel, and a large group of other customers*

BLITMAN & KING LLP
Franklin Center, Suite 300
443 North Franklin Street
Syracuse, NY 13204
Telephone: (315) 422-7111
Facsimile:  (315) 471-2623
<u>By</u>:      Jennifer A. Clark
          Charles E. Blitman
          Bernard T. King
          James R. LaVaute

*Attorneys for Bricklayers and Allied Craftsmen Local 2 Annuity Fund, Bricklayers and Allied*

*Craftworkers Local 2, Albany, New York, Health Benefit Fund, Bricklayers & Allied Craftworkers, Local No. 2, AFL-CIO Building Trade Employees Insurance Fund, Central New York Laborers' Pension Fund, Central New York Laborers' Training Fund, Construction Employers Association of CNY, Inc., Construction and General Laborers' Local No. 633, AFL-CIO, Engineers Joint Welfare Fund, Engineers Joint Training Fund, International Brotherhood of Electrical Workers Local Union No. 43 and Electrical Contractors Pension Fund, International Brotherhood of Electrical Workers Local No. 43 and Electrical Contractors Welfare Annuity Fund, Laborers' Local 103 Welfare Fund, New York State Lineman's Safety Training Fund, Oswego Roofers' Local 195 Annuity Fund, Roofers' Local 195 Health & Accident Fund, Syracuse Builders Exchange, Inc./CEA Pension Plan, Service Employees Benefit Fund, Service Employees Pension Fund of Upstate New York, S.E.I.U. Local 200 United, AFL-CIO, Syrabex, Inc., Syracuse Builders Exchange, Inc., U.A. Local 73, Plumbers & Fitters, AFL-CIO, Local 73 Retirement Fund, Upstate New York Bakery Drivers and Industry Pension Fund and Upstate Union Health and Welfare Fund*

KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
<u>By</u>:     Richard A. Cirillo
        Lauren W. Mitchell

*Attorneys for the NBK Investors*

Before: Hon. Burton R. Lifland
      United States Bankruptcy Judge

## MEMORANDUM DECISION AND ORDER GRANTING, TO THE EXTENT SET FORTH HEREIN, TRUSTEE'S MOTION TO AFFIRM TRUSTEE'S DETERMINATIONS DENYING CLAIMS OF CLAIMANTS WITHOUT BLMIS ACCOUNTS IN THEIR NAMES, NAMELY, INVESTORS IN FEEDER FUNDS

*Query: Is every investor whose funds find their way directly or indirectly into the nefarious clutches of Madoff deemed a "customer" for SIPA purposes?*

Before the Court is the motion (the "Customer Motion") of Irving H. Picard, Esq. (the "Trustee" or "Picard"), trustee for the substantively consolidated Securities Investor Protection Act[1] ("SIPA") liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff") seeking to affirm the Trustee's denial of the claims of certain claimants that invested, directly or indirectly, in various "feeder funds" that invested with BLMIS, filed pursuant to this Court's April 13, 2010 order setting a briefing schedule and scheduling a hearing on the Customer Motion (the "Scheduling Order") (Dkt. No. 2205). For the purposes of this decision, the Court has considered all papers filed in response to the Scheduling Order, including approximately 180 briefs and *pro se* submissions.[2] The Securities Investor Protection Corporation ("SIPC") and the Securities and Exchange Commission (the "SEC") submitted briefs in support of the Customer Motion.

Thousands of investors worldwide lost significant sums of money in the Madoff fraud without ever having set up an account or directly investing with BLMIS. Rather, they invested directly or indirectly in feeder funds, which, in turn, invested with BLMIS. As the majority of claims in this SIPA liquidation have been denied by the Trustee on the basis that claimants

---

[1] 15 U.S.C. §§ 78aaa *et seq.* References to sections of SIPA hereinafter shall replace "15 U.S.C." with "SIPA."

[2] A list of those filings is annexed as Exhibit 1 to the Declaration of Seanna R. Brown in Support of Trustee's Reply in Support of Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds (Dkt. No. 2996). While each of these filings has been thoroughly considered by the Court, only those arguments pertinent to adjudication of the instant Customer Motion targeting sixteen feeder funds are addressed herein.

invested only indirectly with BLIMS and lacked an account in their names,[3] the dispute concerning the definition of "customer" under SIPA is of utmost importance.

The parties sharply contest whether claimants (the "Objecting Claimants")[4] who invested in one or more of the sixteen feeder funds named in the Trustee's Customer Motion (the "Feeder Funds"),[5] which, in turn, invested with BLMIS, are "customers" as statutorily defined by SIPA, eligible to receive individual payments from the SIPC fund of up to $500,000.[6]

In essence, the question is whether the Objecting Claimants, who had no securities accounts at BLMIS, were not known to BLMIS, lacked privity and any financial relationship with BLMIS, lacked property interests in any Feeder Fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment discretion over Feeder Fund assets invested with BLMIS, received no accounts statements or other communications from BLMIS and had no transactions reflected on the books and records of BLMIS, nevertheless qualify as "customers" of BLMIS, simply on account of their ownership interests in the Feeder Funds.

In light of the plain language of SIPA and relevant case law, the Objecting Claimants do not qualify as "customers" under SIPA, "no matter how far that word is stretched in service to

---

[3] Out of a total of 16,518 claims filed in this SIPA liquidation, 16,516 or 99.99% have been determined.  Of those, the Trustee has denied 10,976 or 66.45% on the basis that these claims were filed by indirect claimants who did not have direct accounts at BLMIS in their names.  *See* http://www.madofftrustee.com (last visited June 28, 2011). These indirect claimants may have invested in one of the Feeder Funds at issue, in other feeders funds or in a variety of other investment vehicles that maintained accounts at BLMIS.

[4] A list of the Objecting Claimants is annexed as Exhibits 2 and 3 to the Declaration of David J. Sheehan in Support of the Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds ("Sheehan Decl." or "Sheehan Declaration") (Dkt. No. 2413).

[5] A list of the sixteen Feeder Funds, which are only a subset of all of the BLMIS feeder funds, as well as the nineteen Feeder Fund accounts at issue, are annexed as Exhibit 1 to the Sheehan Declaration.

[6] "Customer status in a SIPA proceeding is a preferred status which gives customers priority in the distribution of certain assets marshaled by the trustee as well as entitlement to advances from the SIPC fund."  *In re A.R. Baron Co.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998) (internal citations omitted); *see also In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 722 (Bankr. S.D.N.Y. 1998). ("A person whose claim against the debtor qualifies as a 'customer claim' receives preferential treatment in the distribution of assets from the debtor's estate.").

the equitable ends of SIPA." *SIPC v. Morgan Kennedy & Co.*, 533 F.2d 1314, 1317 (2d Cir. 1976). The Objecting Claimants lack any of the typical traits of a customer relationship with BLMIS since they "made no purchases, transacted no business, and had no dealings whatsoever with the broker-dealer in question . . . . Indeed, they could not have any such dealings since the broker-dealer held no property belonging to any individual [Objecting Claimant], in which such [Objecting Claimant] could trade or invest." *Id.* at 1318. Therefore, due to their "*complete anonymity and total incapacity to have dealings with the broker-debtor,*" the Objecting Claimants cannot be "customers" of BLMIS under SIPA. *Id.* (emphasis added). Bestowing customer status on the Objecting Claimants would "stretch[] that term wholly beyond its limits." *Id.* Accordingly, for the reasons set forth below and at oral argument, the Trustee's Customer Motion is GRANTED to the extent set forth herein.[7]

## BACKGROUND

### I.    PROCEDURAL HISTORY

On December 11, 2008, Madoff was arrested by federal agents and charged with securities fraud in violation of SIPA sections 78j(b), 78ff and 17 C.F.R. section 240.10b-5, in the United States District Court for the Southern District of New York (the "District Court"). That same day, the SEC filed a civil complaint in the District Court, alleging, *inter alia*, that Madoff and BLMIS were operating a Ponzi scheme through BLMIS's investment advisor activities. *S.E.C. v. Madoff, et al.*, No. 08-CV-10791 (the "Civil Action").

---

[7] Adjudication of the Customer Motion is limited to the claims of the Objecting Claimants insofar as they invested in one of the sixteen Feeder Funds at issue, which, in turn, invested with BLMIS through at least one of the nineteen Feeder Fund accounts at issue. *See* Sheehan Decl., ¶ 3, n.2; *infra* at p. 7. It does not include, *inter alia*, the claims of or involving (i) certain Objecting Claimants who may have held accounts at BLMIS in their own names; (ii) other feeder funds; or (iii) other types of entities. Whether these other claimants qualify as "customers" under SIPA will depend upon an analysis of the factual circumstances of their claims and how SIPA applies under those particular circumstances. *See Stafford v. Giddens (In re New Times Sec. Servs.)*, 463 F.3d 125, 128 (2d Cir. 2006) (finding a claimant must make a showing of customer status on a transaction-by-transaction basis).

6

On December 15, 2008, SIPC filed an application in the Civil Action seeking a decree that the customers of BLMIS are in need of the protections afforded by SIPA. The District Court granted SIPC's application and entered an order on December 15, 2008, placing BLMIS's customers under the protections of SIPA (the "Protective Order"). The Protective Order appointed Picard as trustee for the liquidation of the business of BLMIS, appointed Baker and Hostetler LLP as counsel to the Trustee, and removed the SIPA liquidation proceeding to this Court pursuant to SIPA sections 78eee(b)(3) and (b)(4).

On December 23, 2008, this Court approved an order, which sets forth a systematic framework for the filing, determination, and adjudication of claims in the BLMIS liquidation proceeding (the "Claims Procedure Order") (Dkt. No. 12). Pursuant to this order, all customer claims must be filed with the Trustee, who then determines the claims in writing. If the claimant does not object to the determination, it is deemed approved by this Court and binding on the claimant. If the claimant objects and files an opposition, the Trustee must obtain a hearing date and notify the claimant thereof.

Since then, the sixteen Feeder Funds all filed customer claims with the Trustee for each of the nineteen accounts at issue, which have yet to be determined by the Trustee since litigation is currently pending against the majority of them.[8] *See* Sheehan Decl., Exs. 4, 7, 10, 12, 15, 17, 19, 22, 25, 27, 29, 31, 33, 35, 37, 39, 41, 44, 47. The Objecting Claimants also filed claims in accordance with the Claims Procedure Order based on their direct or indirect investments in one or more of the Feeder Funds. *Id.* at Exs. 2, 3. The Trustee denied their claims on the basis that

---

[8] According to the Trustee, a review of the BLMIS books and records reflects that with the exception of two Feeder Fund accounts, the Feeder Funds are "net losers" who have deposited more than they have withdrawn. *See* Memorandum of Law in Support of Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds ("Trustee Mem. Law") (Dkt. No. 2411), p. 25; *SIPC v. BLMIS (In re BLMIS)*, 424 B.R. 122, 132 (Bankr. S.D.N.Y. 2010) (addressing classification of claimants as "net winners" and "net losers").

they were not "customers" as defined by SIPA. *See id.* at Ex. 3. The Objecting Claimants then objected to the Trustee's determinations of their claims.

The Trustee filed a motion requesting that this Court establish a briefing schedule and hearing date regarding the "customer" issue. *See* Dkt. No. 2052. The Court granted the motion on April 13, 2010, and entered the Scheduling Order that same day. The instant Customer Motion was subsequently filed by the Trustee.

## II.    THE FEEDER FUNDS[9]

The sixteen Feeder Funds, whose investors are the subject of the instant Customer Motion, consist of limited partnerships organized in Delaware or New York, a limited liability company organized in New York, and companies organized in either the Cayman Islands or the British Virgin Islands ("BVI"). More specifically, the Feeder Funds include (i) seven limited partnerships organized under Delaware law; (ii) one limited partnership organized under New York law; (iii) one limited liability company organized under New York law; (iv) three "exempted companies" organized under the laws of the Cayman Islands; (v) one "segregated portfolio company" organized under the laws of the Cayman Islands; and (vi) three "international business companies" organized under the laws of the BVI. *See* Trustee Mem. Law, p. 8, n.4. Further, they all share the following characteristics: (1) they were created as investment vehicles and are legal entities that are capable of owning property and suing or being sued; (2) they sold ownership interests in themselves, either directly or indirectly, to the Objecting Claimants and others, and used monies obtained from such sales for investment purposes; (3) their managers and administrators were responsible for managing and directing the

---

[9] The feeder funds that invested with BLMIS, both domestic and foreign, can be described as hedge funds that pool assets of investors, invest in financial instruments to generate a positive return and generally have a net asset value per share for each class of shares. In addition, their investors generally redeem shares on a monthly or quarterly cycle. *See* HEDGE FUNDS AND PRIME BROKERS 3, 4 (Mark Berman ed., Risk Books 2d ed. 2009).

Feeder Funds' investments; (4) they invested directly with BLMIS and maintained BLMIS accounts according to the books and records of BLMIS; and (5) they do not include ERISA plans (and other entities whose property is treated as ERISA plan property), trusts, or pass-through, self-directed, or custodial investment vehicles such as banks, brokers or dealers. *Id.* at p. 2.[10]

These Feeder Funds maintained a total of nineteen accounts at BLMIS. *See* Sheehan Decl., Exs. 5, 8, 11, 13, 16, 18, 20, 23, 26, 28, 30, 32, 34, 36, 38, 40, 42, 45, 48. To open a BLMIS account, account holders, including many of the Feeder Funds, executed a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements").[11] *See* Sheehan Decl., Exs. 6, 9, 14, 21, 24, 43, 46, 49. As investors in BLMIS, these Feeder Funds maintained named securities accounts at BLMIS, entrusted cash or securities to BLMIS to trade or invest in securities, and were responsible for making deposits and withdrawals from those accounts, though they yielded control to Madoff personally to invest on their behalf. *See, e.g.*, Sheehan Decl., Ex. 46, p. 33. Moreover, BLMIS sent account statements, confirmations and other documentation directly to the Feeder Funds. Accordingly, the books and records of BLMIS reflect the amounts owing and owed between the Feeder Fund and the estate for each of the nineteen accounts. *See* Greenblatt Decl., ¶ 13.

### III.    THE OBJECTING CLAIMANTS

In contrast, the Objecting Claimants did not maintain securities accounts at BLMIS, did

---

[10] Other entities that invested with BLMIS may also meet these five criteria but their claims are not being adjudicated in this Customer Motion. Objections have also been filed by other indirect investors, including those who may have invested in other entities meeting the above-mentioned criteria, which are likewise not being adjudicated herein. According to the Trustee, the entities and objections that are not included involve factual situations that are still being investigated by the Trustee. *See* Trustee Mem. Law, p. 2, n.2.

[11] According to the Trustee, the Account Agreements for certain of the Feeder Funds have not, to date, been located within BLMIS's books and records. Trustee Mem. Law, p. 9, n.6; Declaration of Matthew B. Greenblatt in Support of the Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds ("Greenblatt Decl.") (Dkt. No. 2412), ¶ 14.

not execute Account Agreements with BLMIS, did not entrust cash or securities to BLMIS to trade or invest in securities and did not receive any account documentation from BLMIS. Rather, they purchased ownership interests in the Feeder Funds themselves and received a limited partnership interest, an interest in a limited liability company or common shares in an offshore company.[12]    Indeed, prior to their investing in the Feeder Funds, the Objecting Claimants were provided with private placement memoranda, prospectuses, and other explanatory material explicitly stating: (i) the Feeder Funds were legal entities separate and apart both from BLMIS and from the Objecting Claimants themselves; (ii) each of the Objecting Claimants purchased an ownership interest in at least one of the Feeder Funds, and not in the assets of the Feeder Fund, *see, e.g.*, Sheehan Decl., Ex. 64, pp. 4-5; Ex. 69, pp. 5-6; (iii) the Objecting Claimants yielded the exclusive right to make all decisions concerning the investment and other disposition of Feeder Fund assets to managers of the Feeder Funds, including where or how to invest Feeder Fund assets, whether to use any particular investment vehicle, whether to open or close any Feeder Fund account at any financial institution, whether to make deposits into or withdrawals from any account held in the name of the Feeder Fund, including those at BLMIS, and whether to afford investment discretion to any third-party investment professional; and (iv) the Feeder Funds were not required to, nor did they, consult with any of the Objecting Claimants prior to issuing transactional instructions regarding Feeder Fund assets held in the Feeder Funds' BLMIS accounts. *See, e.g.*, Sheehan Decl., Ex. 53, p. 8; Ex. 61, p. 14; Ex. 64, p. 13; Ex. 65, p. 3; Ex. 71, pp. 10, 16; Ex. 74, p. 5.

    In addition, some Feeder Funds did not name BLMIS in their investor promotional materials.  *See* Response to Trustee's Determination of Claim Filed by James J. Trainor (Dkt. No.

---

[12] The exact nature of the Feeder Fund ownership interest purchased by each of the Objecting Claimants depends on the organizational form and structure of the entity in which the claimant invested.

1605), ¶ 1.  Further, many of the Feeder Funds did not assure that cash invested therein would be invested in the securities markets; these Feeder Funds were not required to invest in "securities" in accordance with SIPA section 78*lll*(14).  *See, e.g.*, Sheehan Decl., Ex. 80, p. 5.  Instead, under the terms of their governance documents, the Feeder Funds were permitted to invest in a wide variety of investments, such as "receivership certificates, certificates of beneficial interest . . . commodities contracts, futures contracts, forward contracts and any other instruments which are traded in normal channels of trading for securities and commodities."  *Id*.  In sum, there was no guarantee the Feeder Funds' assets would ultimately be invested with BLMIS.

## DISCUSSION

Despite strenuous efforts by the Objecting Claimants, this Court cannot find that they qualify for customer status under SIPA.  The Objecting Claimants are not "customers" under the plain language of SIPA or relevant case law, nor do they qualify as such under SIPA section 78fff-3(a)(5).  Further, the Objecting Claimants cannot establish they are "customers" under principles of agency, as the Feeder Funds were not agents of BLMIS.  Finally, equity cannot be invoked to achieve such status.

In order to be eligible for SIPA protection, a claimant must be a "customer" as statutorily defined:

> any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer.  The term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . . .

SIPA § 78*lll*(2) (as amended through Dec. 12, 2006).

Courts in this Circuit have construed the definition of a "customer" under SIPA in a

narrow manner.[13]  *See Stafford v. Giddens (In re New Times Sec. Servs.)*, 463 F.3d 125, 127 (2d Cir. 2006) ("Judicial interpretations of customer status support a narrow interpretation of the SIPA's provisions.") (internal quotations and citations omitted); *In re Omni Mut., Inc.*, 193 B.R. 678, 680 (S.D.N.Y. 1996) (holding that the definition of "customer" under SIPA "should be construed narrowly"); *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003) ("[C]ourts have consistently taken a restrictive view of the definition of a 'customer' under SIPA . . . ."). The Second Circuit has held "'customer' is a term of art and its everyday usage is not applied." *Arford v. Miller*, 239 B.R. 698, 701 (S.D.N.Y. 1999) (citations omitted), *aff'd sub nom., Arford v. Miller, (In re Stratton Oakmont)*, 210 F.3d 420 (2d Cir. 2000). It is to be construed within the context of the definitional section of SIPA and as interpreted by the courts.

The burden is on the claimant to establish he is a "customer" entitled to SIPA protection, and such a showing "is not easily met." *In re Klein, Maus & Shire, Inc.*, 301 B.R. at 418. A claimant must make such a showing on a transaction-by-transaction basis. *SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 277 (Bankr. S.D.N.Y. 1999), *aff'd sub nom., Arford v. Miller, (In re Stratton Oakmont, Inc.)*, 210 F.3d 420 (2d Cir. 2000) ("[A]n investor can be a customer vis-à-vis certain transactions but not others."). Accordingly, not all investors are deemed "customers" under SIPA.

## I.  THE OBJECTING CLAIMANTS DO NOT QUALIFY FOR CUSTOMER STATUS UNDER THE  PLAIN LANGUAGE OF SIPA OR RELEVANT CASE LAW

This case, at its core, revolves around the nature of the interests purchased by the Objecting Claimants in the Feeder Funds. The Objecting Claimants purchased ownership

---

[13] Courts in other circuits have also narrowly construed the definition of "customer." *See, e.g.*, *SIPC v. Pepperdine Univ. (In re Brentwood Sec., Inc.)*, 925 F.2d 325, 327 (9th Cir. 1991) ("SIPA [was] carefully crafted, precisely delineating the category of investors it protects."); *SIPC v. Wise (In re Stalvey & Assocs., Inc.)*, 750 F.2d 464, 472 (5th Cir. 1985) (finding that customer status under SIPA is subject to "a narrow interpretation").

interests in the Feeder Funds themselves, thereby investing *in*, and not *through*, the Feeder Funds.  In light of these interests, the facts and circumstances here indicate that the Objecting Claimants do not have a claim on account of a securities account with BLMIS, cannot establish that they entrusted cash or securities with BLMIS for the purpose of trading or investing in securities, and therefore lack "the type of fiduciary relationship with the debtor that characterizes customers in general."[14]  *Section by Section Explanation of H.R. 8331 Amendments to SIPA: Hearing before the Subcomm. on Sec. of the S. Comm. on Banking, Housing and Urban Affairs*, 95th Cong. 40 (1978).

As a foundational element, the Objecting Claimants do not have property interests in the Feeder Funds' assets entrusted with BLMIS by the Feeder Funds, which are separate legal entities structured as corporations, limited liability companies and limited partnerships in New York, Delaware, the Cayman Islands or the BVI.  Rather, the Objecting Claimants, who generally were either non-managing members or limited partners, purchased mere ownership interests in the Feeder Funds.  The cash that they used to make those purchases *became the sole property of the Feeder Funds*.  *See* William Meade Fletcher, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 31 (2011) ("[T]he capital or assets of the corporation are its property."); N.Y. LTD. LIAB. CO. § 601 ("A member has no interest in specific property of the limited liability company."); *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1075 n.22 (2d Cir. 1977) ("[A]s a general proposition limited partners have no property right in the partnership assets . . . ."); *Alley v. Clark*, 71 F. Supp. 521, 527 (E.D.N.Y. 1947) (holding that a limited partner does not have "an

---

[14] Under these particular circumstances, the constellation of cases addressing the customer issue suggests that the factors considered by this Court inform a determination of whether an individual qualifies as a "customer" under SIPA.  In light of the Objecting Claimants' lacking (i) specifically titled accounts reflected on BLMIS's books and records; (ii) property interests in the Feeder Fund account assets that were invested with BLMIS; (iii) entrustment of their own assets with BLMIS for the purpose of trading or investing in securities; and (iv) a fiduciary relationship akin to that of a broker investor relationship, the Court finds that based on the totality of circumstances, the Objecting Claimants cannot qualify as "customers" under SIPA.

interest, right or title in the assets of the partnership"); *In re Marriott Hotel Props. II Ltd. P'ship*, No. CIV-A-14961, 2000 WL 128875, at *15 (Del. Ch. Jan. 24, 2000) ("[T]he Delaware Revised Uniform Limited Partnership Act . . . has been interpreted to preclude the attempt to equate ownership interests in a partnership with ownership of partnership property."); *City of Wilmington v. Bassett Partners, L.P.,* No. 99C-09-140 (WCC), 2000 WL 1211513, at *3 (Del. Super. Ct. June 30, 2000) ("Regardless of the type of property (real, personal or mixed) that a limited partnership owns, the general partners and limited partners of the partnership have no interest in specific partnership property."); *Johnson v. Gore Wood & Co.*, [2002] 2 A.C. 1, p. 40 (Dec. 14, 2001) (Under UK common law, applicable in the Cayman Islands and the BVI,[15] "[a] company is a legal entity separate and distinct from its shareholders.  It has its own assets and liabilities and its own creditors.  The company's property belongs to the company and not to its shareholders.").   Indeed, an owner's interest in such entities is limited to an ownership share, which constitutes personal property separate and distinct from the assets of the entity, and the owner has no rights or power over entity assets.  *See City of Wilmington*, 2000 WL 1211513, at *2; *Alley*, 71 F. Supp. at 526-28; N.Y. LTD. LIAB. CO. § 601; *Johnson*, [2002] 2 A.C. 1 at p. 40.

> **A. The Objecting Claimants Do Not Have "A Claim on Account of Securities Received, Acquired, or Held by the Debtor . . . From or For the Securities Accounts of Such Person"**

As the Objecting Claimants lack any property interests in Feeder Fund assets that were invested with BLMIS, the Objecting Claimants do not have "a claim on account of securities received, acquired, or held by the debtor . . . from or for the securities accounts of such person," SIPA § 78*lll*(2), and therefore cannot be deemed "customers" under SIPA.

---

[15] Companies organized in the BVI or the Cayman Islands are governed by the common law of the United Kingdom to the extent that such law is consistent with the statutory law of the jurisdiction in question.  *See, e.g.*, Christopher Bickley, BERMUDA, BRITISH VIRGIN ISLANDS, AND CAYMAN ISLANDS COMPANY LAW, §§ 2.002, 3.001, 7.001 (3d ed. 2009).

This provision expressly and unequivocally makes clear that the claim of a securities claimant must relate to an account with the debtor. *Id.*; *see also SIPC v. Exec. Sec. Corp.*, 423 F. Supp. 94, 98 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 98 (2d Cir. 1977) ("[A] 'customer' is clearly limited to persons who maintain accounts with broker-dealers and who trade or invest through them."). Indeed, the existence of an account with the debtor is fundamentally linked to customer status under SIPA, and SIPA should not be construed to deem its references to securities accounts "inoperative or superfluous, void or insignificant." *APWU v. Potter*, 343 F.3d 619, 626 (2d Cir. 2003) (applying this basic tenet of statutory construction when interpreting Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ["CERCLA"]). For example, the section governing advances from SIPC's funds refers to, *inter alia*, "*a customer who holds accounts with the debtor.*" SIPA § 78fff-3(a)(2) (emphasis added). Similarly, "customer property" is defined as "cash and securities . . . received, acquired, or held . . . from or for the *securities accounts of a customer* . . . ." SIPA § 78*lll*(4) (emphasis added). Also, the definition of "net equity" refers to the "*account or accounts of a customer.*" SIPA § 78*lll*(11) (emphasis added); *see also* SIPA § 78fff-2(d) (providing that a trustee "shall, to the extent that securities can be purchased in a fair and orderly market, purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities . . . and for the transfer of customer accounts . . . *in order to restore the accounts of such customers* as of the filing date.") (emphasis added); SIPA § 78kkk(d) (providing that SIPC may prescribe the manner in which SIPC members "may display any sign or signs . . . *relating to the protection to customers and their accounts*") (emphasis added).

In the instant case, the Objecting Claimants did not have securities accounts at BLMIS or property interests in Feeder Fund account assets invested with BLMIS. Only the Feeder Funds

opened securities accounts at BLMIS for the purpose of trading in securities and typically executed Account Agreements before investing with BLMIS.  Moreover, the accounts at BLMIS are in the names of the Feeder Funds as the direct or beneficial owners of those accounts, and the books and records reflect deposits and withdrawals by the Feeder Funds from those accounts. *See* Sheehan Decl., Exs. 6, 9, 14, 21, 24, 43, 46, 49; Greenblatt Decl., ¶¶ 9, 17.  The Objecting Claimants, on the other hand, who invested only in the Feeder Funds and not with BLMIS, never opened accounts with BLMIS in their own names, never executed Account Agreements with BLMIS and never had any property interest in the assets in the Feeder Funds' accounts at BLMIS.[16]  As investors *in*, not *through*, the Feeder Funds, the Objecting Claimants cannot claim customer status through the Feeder Fund accounts at BLMIS.

Many of the Objecting Claimants cite to a portion of SIPA § 78*lll*(2), specifically, "[t]he term customer includes any person who has a claim against the debtor arising out of sales or conversions of such securities," arguing that since BLMIS converted their property, they should qualify for customer treatment under SIPA.  This reading of only a part of SIPA section 78*lll*(2) instead of in its entirety ignores the phrase "such securities."  "[S]uch securities" refers to the previous sentence, indicating "securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer *from or for the securities accounts of such person*[.]" (emphasis added); *see Corley v. U.S.*, 129 S. Ct. 1558, 1566 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (internal quotations omitted).  This conversion provision,

---

[16] Considering the above, the Court cannot find that the Objecting Claimants have "a claim on account of securities received, acquired, or held by the debtor . . . from or for the securities accounts of such person."  The Court declines, however, to hold as a universal principle that an investor must have a *specifically titled* account in the investor's name that *appears on the debtor's available books and records* as an express requirement for obtaining customer status.  There may be, for example, special circumstance accounts that provide for the equivalent of a specifically titled account.

therefore, applies only to claimants who have claims relating to securities accounts with the debtor. As discussed above, the Objecting Claimants never had any securities accounts in their names at BLMIS, nor did they have any property interests in Feeder Fund account assets invested with BLMIS. Therefore, the Objecting Claimants may not assert claims for conversion based on Feeder Fund property.[17]

### B. The Objecting Claimants Did Not Entrust Cash or Securities With BLMIS for the Purpose of Trading or Investing in Securities

Further, the Objecting Claimants failed to fulfill the "critical aspect of the customer definition" – they did not entrust cash or securities with the debtor for the purpose of trading or investing in securities. *In re New Times Sec. Servs., Inc.*, 463 F.3d 125, 128 (2d Cir. 2006) ("The critical aspect of the customer definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities.") (quoting *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995)); *see also Rosenman Family, LLC v. Picard*, 420 B.R. 108, 111 (S.D.N.Y. 2009), *aff'd*, 395 Fed. Appx. 766 (2d Cir. 2010), (holding Rosenman was a "customer" under SIPA because he entrusted funds with the debtor, BLMIS, for the purpose of investing in securities); *In re ESM Gov't Sec., Inc.*, 812 F.2d 1374, 1376 (11th Cir. 1987) ("[I]t is the act of *entrusting* the cash to the debtor for the purpose of effecting securities transactions that triggers the customer status provisions.") (citing *Sec. Investor Prot. Corp. v. Executive Sec. Corp.*, 556 F.2d 98 (2d Cir. 1977)) (emphasis in original); *SIPC v. Stratton Oakmont, Inc.*, 229

---

[17] Other Objecting Claimants contend they are "customers" because they have viable fraud claims against BLMIS. But claims based on fraud, misrepresentation or other torts may be entitled to only general creditor status to be paid from the general estate, which is separate from the customer property fund. *See SEC v. S.J. Salmon & Co.*, 375 F. Supp. 867, 871 (S.D.N.Y. 1974) ("[The investor] must pursue his fraud claim as a general creditor, and must look for its satisfaction to the debtor's general estate, not to the single and separate fund."); *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 421 (Bankr. S.D.N.Y 2003) ("[C]laims for damages resulting from a broker's misrepresentations, fraud or breach of contract are not protected [by SIPA]. Even if it is assumed that their losses were caused by fraud, breach of contract, or a similar theory, they are general creditors.") (internal citation omitted). Therefore, even if the Objecting Claimants have cognizable tort claims against BLMIS, those claims would not constitute "customer" claims.

B.R. 273, 279 (Bankr. S.D.N.Y. 1999) ("SIPA protects customers of registered broker-dealers who have entrusted to those broker-dealers cash . . . for the purpose of trading and investing."). Investors who do not entrust cash with the debtor for the purpose of trading or investing in securities typically qualify only as general unsecured creditors, and are not eligible to receive the benefit of SIPC advances. *See, e.g.*, *Executive Sec.*, 556 F.2d at 99 (declining to attribute customer status to claimants who lent securities to the debtor because they failed to entrust those securities to the debtor for the purposes of trading or investing in securities); *In re Hanover Square Sec.*, 55 B.R. 235, 238-39 (Bankr. S.D.N.Y. 1985) (same); *In re First Interregional Equity Corp.*, 290 B.R. 265, 279-80 (Bankr. D.N.J. 2003) (same).

The Objecting Claimants contend the definition of "customer" does not mandate direct entrustment of assets. In support, they cite to a portion of SIPA § 78*lll*(2), specifically, "[t]he term 'customer' includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities," emphasizing that the language of the statute does not require a *direct* deposit of cash with the debtor.[18] In addition, they cite to *Focht v. Heebner (In re Old Naples Sec., Inc.)*, 223 F.3d 1296, 1302-03 (11th Cir. 2000) ("*Old Naples*"), and *Ahammed v. SIPC (In re Primeline Sec. Corp.)*, 295 F.3d 1100, 1107 (10th Cir. 2002) ("*Primeline*") for the same proposition: customer status under SIPA does not depend upon where the funds were initially deposited or to whom cash was handed or a check was made payable.[19] Rather, the Objecting

---

[18] SIPC points out that this portion of the "customer" definition deals only with cash customers, not securities customers, and the Objecting Claimants undisputedly seek to recover as the latter. *See* Reply of the Securities Investor Protection Corporation in Support of Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in their Names, Namely, Investors in Feeder Funds (Dkt. No. 2993), p. 12.

[19] Some of the Objecting Claimants cite to *Old Naples* and *Primeline* for the additional proposition that investors who reasonably believe they are investing directly with the debtor may be deemed "customers." *Old Naples*, 223 F.3d at 1303 (one investor "believed that he was sending money to the brokerage"); *Primeline*, 295 F.3d at 1105 ("Claimants testified they believed they were investing with, through, or in Primeline."). Since the property at issue here belonged to the Feeder Funds and not to the Objecting Claimants, the point is irrelevant. Moreover, the Objecting Claimants' contention regarding their "beliefs" is dubious, as the offering memoranda for their purchases made clear in which entities the Objecting Claimants were investing.

Claimants assert that customer status under SIPA depends solely on whether there was "actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation" such that the brokerage firm "acquired control over all of the claimants' funds." *Old Naples*, 223 F.3d at 1302, 1304 (quotations omitted); *see also Primeline*, 295 F.3d at 1107 ("Whether a claimant deposited funds with the debtor does not depend simply on to whom claimants made their checks payable. The relevant inquiry is whether the brokerage firm actually received, acquired or possessed Claimants' property.") (internal citations omitted). The Objecting Claimants therefore seek customer status on the basis that they entrusted cash with BLMIS, albeit indirectly, for the purpose of trading or investing in securities, and BLMIS actually acquired such cash.

Yet, regardless of whether direct entrustment of assets is mandatory, *Old Naples* and *Primeline* involved claimants whose *own* money was ultimately invested with the debtor.[20] Here, however, there was never "actual receipt, acquisition, or possession *of the property of a claimant*" by BLMIS, *Old Naples*, 223 F.3d at 1302 (emphasis added), because when the Objecting Claimants gave money to the Feeder Funds to purchase ownership interests, such money became the sole property of the Feeder Funds. Accordingly, it was the Feeder Funds, and not the Objecting Claimants, who entrusted *fund-owned* assets with BLMIS. In addition, only the Feeder Funds entrusted their assets with BLMIS "for the purposes of trading securities," *In re New Times Sec. Servs., Inc.*, 463 F.3d at 128; the Objecting Claimants only entrusted cash with the Feeder Funds for the purpose of purchasing ownership interests in the Feeder Funds themselves. Consequently, the Objecting Claimants could not have entrusted cash with BLMIS

---

[20] *Old Naples* and *Primeline* also involved claimants who invested through a broker who acted in his capacity as an agent of the debtor. *See Old Naples*, 223 F.3d at 1303 (broker "acted as the *agent* of [the debtor]") (emphasis added); *Primeline*, 295 F.3d at 1108 (broker "had both actual and apparent authority to enter into securities transactions as an *agent* of [the debtor]") (emphasis added). This Court finds, however, that the Feeder Funds were not agents of BLMIS. *See infra* at section III.

for the purpose of trading or investing in securities.

### C.  The Objecting Claimants Lack a Fiduciary Relationship With BLMIS

Without securities accounts at, or entrusting securities or cash with, the debtor for the purpose of trading or investing in securities, the Objecting Claimants cannot establish the existence of a fiduciary relationship with BLMIS akin to that of an investor and its broker-dealer. *See SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1317 (2d Cir. 1976) ("*Morgan Kennedy*") ("Emphasis on the customer as investor and purchaser/trader has been a consistent theme in cases in [the Second] Circuit."); *Appleton*, 62 F.3d at 801 (holding that an investor who entrusts cash with the debtor for the purpose of trading or investing in securities "has a fiduciary relationship with the broker-dealer").  When determining customer status, courts assess "whether a particular transaction giving rise to a SIPA claim arose out of the type of fiduciary relationship generally characterizing the relationship between a broker-dealer and its customer."  *In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 725 (Bankr. S.D.N.Y. 1998); *see also SEC v. F.O. Baroff Co.*, 497 F.2d 280, 284 (2d Cir. 1974) (contrasting indicia of "the fiduciary relationship between a broker and his public customer" with characteristics of "an ordinary debtor-creditor relationship" in assessing whether investor was a "customer" under SIPA); *Appleton*, 62 F.3d at 801 (finding that an investor must at least have a "fiduciary relationship with the broker-dealer" to be "entitled to the protection of the Act.").

The Second Circuit's controlling decision in *Morgan Kennedy* denied customer status to employees who, like the Objecting Claimants, were indirect investors lacking this type of fiduciary relationship with the liquidating broker-dealer.  *Morgan Kennedy* involved a profit-sharing plan comprised of money paid by the debtor into a trust fund for the benefit of its employees.  The trust, managed by three trustees, included separate accounts for each employee. *Morgan Kennedy*, 533 F.2d at 1315.  The trustees invested trust assets with the brokerage house

through an account in their names, not in the names of the individual employees. As a result, none of the books and records of the brokerage house contained the names of the employees. The trustees communicated regularly with the brokerage house and exercised sole discretion and control over investment decisions. *Id*. After SIPA liquidation proceedings were commenced against the debtor and a trustee (the "Plan Trustee") was appointed, the Plan Trustee informed SIPC that he intended to treat all of the employee beneficiaries as separate "customers" entitled to their own SIPC advances. SIPC disputed the Plan Trustee's interpretation of "customer" and argued, instead, that only the trust and not each of its beneficiaries was the debtor's "customer" under SIPA.

The *Morgan Kennedy* court rejected the Plan Trustee's broad extension of the term "customer" to each individual employee beneficiary. Specifically, the court found, *inter alia*, (i) "none of the one hundred and eight [employees] would have had any standing as a 'customer' of the then-solvent broker-dealer to give any buy or sell order in the account"; (ii) "[t]he trust account itself was in the name of the Trustees who had the exclusive power to entrust the assets to the debtor, to invest and reinvest, and to purchase and trade securities in the account as they saw fit"; and (iii) "[t]he employee-beneficiaries in the case before us made no purchases, transacted no business, and had no dealings whatsoever with the broker-dealer in question respecting the trust account. Indeed, they could not have any such dealings since the broker-dealer held no property belonging to any individual employee, in which such employee could trade or invest." *Id*. at 1318.

The court found it "impossible to classify the . . . employees as 'customers' of the debtor," as the employees "were neither investors nor traders." *Id*. It therefore concluded, "[i]n short, the single trust account, represented by the Trustees collectively, possessed the required

21

attributes for customer status under SIPA" while the "employees possessed none of those attributes." *Id.* Accordingly, only the trust was the "true customer of the broker-dealer." *Id.* at 1321.

The Sixth Circuit in *Plumbers and Steamfitters Local 490 Severance and Ret. Fund v. Appleton (In re First Ohio Securities Co.)*, 39 F.3d 1181 (6th Cir. 1994) ("*First Ohio*"), extended the holding of *Morgan Kennedy*. Citing *Morgan Kennedy*, the bankruptcy court, whose decision was upheld by both the Ohio District Court and the Sixth Circuit Court of Appeals, stated:

> In this case, as in the *Morgan Kennedy & Co.* case, the individual participants in the Funds had no dealings with the broker-dealer and had no direct input into the investment decisions . . . . Therefore, this court concludes that the individual participants in the . . . Funds are not 'customers' as defined by SIPA, and therefore these claims should be denied.

*In re First Ohio Sec. Co.*, Case No. 590-0072 (Bankr. N.D. Ohio Dec. 23, 1991) (Dkt. No. 799) (Order Re: Objections to the Trustee's Determination of Claims).[21] Contrary to arguments made by many of the Objecting Claimants,[22] the rationale of *Morgan Kennedy* and *First Ohio* is applicable and controlling in the instant Customer Motion. Here, the Objecting Claimants do not satisfy the factors that the Second Circuit relied upon to determine customer status. The Feeder Funds, and not the Objecting Claimants, opened accounts in their own names with BLMIS; had property interests in the assets in their accounts at BLMIS; had dealings with, and were therefore

---

[21] The above-referenced order is attached to the Declaration of Christopher H. LaRosa in Support of Memorandum of Law of the Securities Investor Protection Corporation in Support of Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds (Dkt. No. 2415), Ex. 1, p. 17.

[22] Many of the Objecting Claimants contend that *Morgan Kennedy* is not on point because, *inter alia*, (i) the Feeder Funds, unlike the Plan Trustee in *Morgan Kennedy*, did not act at arm's length from BLMIS but rather acted as paid agents who passed money through to BLMIS; and (ii) the Objecting Claimants invested in the Feeder Funds with the intent to invest ultimately with BLMIS, while the employees in *Morgan Kennedy* were unaware that they had invested with the debtor. With regard to the first argument, as explained in detail below, the Feeder Funds were not agents of BLMIS. *See infra* at section III. With regard to the second argument, although some Feeder Funds identified BLMIS in their prospectuses or offering memoranda, others did not. More significantly, intent is of no consequence in light of the nature of the Objecting Claimants' investments in the Feeder Funds.

known to, BLMIS; had a fiduciary relationship with BLMIS; had the power to entrust their own assets to BLMIS for the purpose of investing or trading in securities; and controlled all investment decisions. *See Morgan Kennedy*, 533 F.2d at 1318; *see also In re Adler Coleman Clearing Corp.*, 204 B.R. at 118 (SIPA intended to protect claimants with "an unrestricted right to receive on demand the securities which belong to them") (quoting *In re Weis Sec., Inc.*, No. 73-CIV-2332, 1977 WL 1043, at *4 (S.D.N.Y. Sept. 29, 1977)).  Indeed, the Feeder Funds' various offering memoranda and prospectuses make clear that the Feeder Funds (i) required the Objecting Claimants to relinquish control over their investments to the Feeder Fund managers; (ii) retained discretion to invest the proceeds of the funds; and (iii) retained discretion to withdraw their investments from BLMIS and invest elsewhere.  *See, e.g.*, Sheehan Decl., Ex. 53, p. 8; Ex. 61, p. 14; Ex. 64, p. 13; Ex. 65, p. 3; Ex. 71, pp. 10, 16; Ex. 74, pp. 2, 5; Ex. 76, pp. 2, 9.  In sum, the right to manage the Feeder Funds and direct disposition of the Feeder Fund assets remained with the general partners or managing members of the Feeder Funds, who then delegated responsibility for investing part or all of the funds' assets.  *See, e.g.*, Sheehan Decl., Ex. 64, pp. 4-5 ("All decisions with respect to the general management of the Fund are made by the Manager, who has complete authority and discretion in the management and control of the business of the Fund . . . . [N]o person should invest in the Fund unless willing to entrust all aspects of the management of the Fund to the Manager, having evaluated its capacity to perform such functions."); Ex. 50, p. 4 ("[T]he General Partner shall have full, exclusive, and complete discretion in the management of the Partnership and the power on behalf of and in the name of the Partnership to take any action on behalf of the Partnership hereunder, to carry out any and all of the purposes of the Partnership."); Ex. 65, p. 13 ("Investors will become Limited Partners of the Partnership.  The Limited Partners cannot take part in the management or control of the

23

Partnership's business, which is the sole responsibility of the General Partner.").  In contrast, the Objecting Claimants had no direct financial relationship with BLMIS, as they invested either in the Feeder Funds or in entities that invested in the Feeder Funds.  The Objecting Claimants did not have securities accounts with, or property interests in, the Feeder Funds' accounts at BLMIS, entrust cash or securities to BLMIS to trade or invest in securities, or dictate the timing or amount of their investments with, or redemptions from, BLMIS.  In addition, the books and records of BLMIS have no record of their participation, if any, in the Feeder Funds' investments.

Like the *Morgan Kennedy* court, this Court is "hard pressed to discern any of the usual traits of a customer relationship between the [Objecting Claimants] and the debtor" as the Objecting Claimants "made no purchases, transacted no business, and had no dealings whatsoever with the broker-dealer in question . . . .  Indeed, they could not have any such dealings since the broker-dealer held no property belonging to any individual [Objecting Claimant], in which such [Objecting Claimant] could trade or invest." *Morgan Kennedy*, 533 F.2d at 1318.  Therefore, "[t]he argument that, notwithstanding their *complete anonymity and total incapacity to have dealings with the broker-debtor*, the [Objecting Claimants] were 'customers' of [the debtor] stretches that term wholly beyond its limits." *Id.* (emphasis added). Therefore, the Objecting Claimants lacked a fiduciary relationship with BLMIS akin to that of an investor and its broker-dealer.

At bottom, an analysis of SIPA's plain language and interpretive case law indicates the Objecting Claimants cannot be deemed "customers" under SIPA.  The Trustee therefore properly denied their customer claims and such denials are hereby affirmed.

## II. THE OBJECTING CLAIMANTS DO NOT QUALIFY FOR CUSTOMER STATUS UNDER SIPA SECTION 78fff-3(a)(5)

The Feeder Funds are not analogous to banks, brokers or dealers, whose customers may

qualify for SIPA protection under SIPA section 78fff-3(a)(5). SIPA section 78fff-3(a)(5) contemplates customer treatment for indirect investors under limited circumstances:

> [N]o advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established to the satisfaction of the trustee . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . *in which event each such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor.*

SIPA § 78fff-3(a)(5) (emphasis added); *see also Indus. Valley Bank and Trust Co. v. Collins (In re Albert & Maguire Sec. Co.)*, 419 F. Supp. 1171, 1177-78 (E.D. Pa. 1976) ("The sole exception to the proscription [of SIPC advances to a bank] is where the bank, as a customer of the broker, was acting for one of its own customers. The required advance from SIPC in such situation would benefit the 'customer' principal and not the agent bank."). Banks, brokers and dealers are entitled to receive payments only to the extent their claims arise from transactions for customers, and those customers are each deemed to be a separate "customer" for purposes of SIPA.

Many Objecting Claimants posit SIPA section 78fff-3(a)(5) is not applicable in the present case; the Feeder Funds were not banks, brokers or dealers acting on behalf of any of the Objecting Claimants in investing with BLMIS. Rather, the Feeder Funds were acting for themselves and on their own behalf. *See id.* at 1177 ("The obvious intent of [SIPA section 78fff-3(a)(5)] is to preclude banks *inter alia*, *which are acting on their own behalf* as 'customers' from the class to be benefited by the . . . provisions of SIPA.") (emphasis added).

Many Objecting Claimants posit SIPA section 78fff-3(a)(5) expressly affords SIPA protection to indirect investors such as the Objecting Claimants, and that protection is not limited solely to customers of banks, brokers or dealers. Yet, Congress's expressly setting forth certain exceptions implies the exclusion of all other situations as exceptions. *See id.* at 1178; *see also TRW Inc. v. Andrews*, 534 U.S. 19, 20 (2001) ("Where Congress explicitly enumerates certain

exceptions to a general prohibition, additional exceptions are not to be implied . . . ."); BLACK'S LAW DICTIONARY, Eighth Ed., p. 620 (*expressio unius est exclusio alterius* – the expression of one thing is the exclusion of another). Here, SIPA protection under section 78fff-3(a)(5) for indirect claimants is explicitly limited to customers of banks, brokers or dealers and does not include protection for hedge funds like the Feeder Funds, thereby precluding extension of SIPA protection to indirect investors such as the Objecting Claimants.

Other Objecting Claimants argue the Feeder Funds acted like introducing brokers by passing on the Objecting Claimants' property to BLMIS as the clearing broker and that, under SIPA, customers of introducing brokers are deemed "customers" of the clearing broker. *See* SIPA § 78fff-3(a)(5). The Feeder Funds differ from introducing brokers, however, in at least two critical ways. First, unlike brokers, the Feeder Funds are not (i) subject to the registration requirements of the SEC, (ii) members of SIPC, or (iii) subject to the Commodity Futures Trading Commission (the "CFTC") requirements or Financial Industry Regulatory Authority ("FINRA") regulations, and SIPA section 78fff-3(a)(5) provides protection only to brokers registered with the SEC pursuant to the Securities and Exchange Act of 1934 and SIPA section 78ccc(2)(A). Second, the Feeder Funds are distinct legal entities that accept money and securities from investors, make investment decisions, and hold securities of their own, whereas introducing brokers serve solely as conduits to other brokers.

Still other Objecting Claimants point out that hedge funds, like the instant Feeder Funds, did not exist when SIPA was enacted in 1970, and contend that if they did, the exception would be extended to them. Regardless, SIPA section 78fff-3(a)(5) does not provide an exception for mutual funds, which, like hedge funds, allow for indirect investment and were part of the investment landscape throughout the 1970s. *See generally Gordon v. Fundamental Investors,*

*Inc.*, 362 F. Supp. 41, 45-46 (S.D.N.Y. 1973). This is especially significant given that mutual funds, like hedge funds, are generally open to the small investors that SIPA was primarily designed to protect. Moreover, had Congress desired to extend the exception to hedge funds, it could have done so on one of the numerous occasions that it has amended SIPA since its enactment.

In sum, SIPA section 78fff-3(a)(5) does not support the Objecting Claimants' position. Rather, it clearly and solely excepts banks, brokers and dealers, and not the Feeder Funds.

### III. THE OBJECTING CLAIMANTS DO NOT QUALIFY FOR CUSTOMER STATUS UNDER PRINCIPLES OF AGENCY

Many of the Objecting Claimants try to achieve customer status by alleging an agency relationship between the Feeder Funds and BLMIS, without citation to any relevant supporting evidence or law. In the instant Customer Motion, however, the Feeder Funds were not agents of BLMIS.[23]

Under New York law, an agency relationship is established by "written or spoken words or other conduct *of the principal* which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 343 (S.D.N.Y. 2010) (quoting *Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Entm't Servs.*, No. 93-CIV-2680, 1996 WL 263008, at *7 (S.D.N.Y. May 17, 1996)) (emphasis added). Significantly, "[t]he alleged agent's authority . . . may be established *only by*

---

[23] Other Objecting Claimants posit that the Feeder Funds were *their* agents. Such argument is devoid of merit because Feeder Funds are not agents of their investors or shareholders. *See JN Realty LLC v. Estate of Marvin*, 268 F. Supp. 2d 231, 236 (E.D.N.Y. 2003) ("The principal-agent relationship which exists between the partners of an ordinary partnership is not present between the limited and general partners of a limited partnership.") (quoting *Friedson v. Lesnick*, No. 91-CIV-2133, 1992 WL 51543, at *3 (S.D.N.Y. Mar. 9, 1992)); *Regency Housing and Drilling Ltd. P'ship I v. Cohen*, No. 89C-DE-70, 1991 WL 190311, at **1-3 (Del. Super. Ct. Sept. 11, 1991) (finding general partners in Delaware limited partnership are not agents of limited partner); *see also* William Meade Fletcher, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 30 (2011) ("Ordinarily, the corporation is not the agent of the shareholders and does not act or hold property as agent for them"); RESTATEMENT (THIRD) OF AGENCY intro. (2006) ("[T]he defining characteristics of 'true agency' are not present in the relationship between a corporation's shareholders and its directors.").

27

*the words or conduct of the alleged principal*," and a finding of agency cannot be based upon the words or acts of a purported agent.  *In re Parmalat Sec. Litig.*, 640 F. Supp. 2d 243, 247 (S.D.N.Y. 2009) (emphasis added) (applying Illinois law but noting that "Illinois and New York definitions of an agency relationship do not differ in any material respect"); *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009).  Like actual authority, apparent authority "cannot be established by the actions or representations of the agent."  *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).  Further, "control" of the agent by the principal is a critical element necessary to establish an agency relationship.  *Amusement Indus., Inc.*, 693 F. Supp. 2d at 343-44 ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and *subject to his control*, and consent by the other so to act.") (quoting *Pan Am. World Airways, Inc v. Shulman Transp. Enters., (In re Shulman Transp. Enters.)*, 744 F.2d 293, 295 (2d Cir. 1984)) (emphasis added).

Here, it is clear the Feeder Funds were not agents of BLMIS: (i) no evidence has been offered suggesting the existence of an agency agreement between BLMIS and any of the Feeder Funds, nor suggesting that BLMIS ever manifested any intent to authorize the Feeder Funds to act on its behalf; (ii) some of the Feeder Funds invested capital in places other than BLMIS; (iii) some Feeder Funds' offering materials and prospectuses did not even mention BLMIS; and (iv) BLMIS did not control any of the Feeder Funds.  *See, e.g.*, Sheehan Decl., Ex. 71, p. 16 ("The General Partner [of the Feeder Fund] has . . . the sole right to hire or terminate [BLMIS as its Investment Advisor] . . . .").  Rather, the Feeder Funds' prospectuses and private placement memoranda patently reveal control remained with the general partners or managing members, who then delegated responsibility for investing part or all of the Feeder Funds' assets to BLMIS.

28

*See, e.g.*, Sheehan Decl.*,* Ex. 53, p. 8; Ex. 61, p. 14; Ex. 64, p. 13; Ex. 65, p. 3; Ex. 71, pp. 10,

16; Ex. 74, p. 5; Ex. 76, pp. 2.  Certain Objecting Claimants point to purported statements made

by Feeder Fund managers to them, and generally claim the Feeder Funds were conduits created

to channel money to BLMIS and yielded control over investment decisions to BLMIS.  Such

allegations, however, are not relevant: the putative *principal*, not the putative agent, must

manifest intent to confer authority upon the agent, and the conduct of the putative agent cannot

create an agency relationship.  *See In re Parmalat Sec. Litig.*, 640 F. Supp. 2d at 247; *Meisel*,

651 F. Supp. 2d at 110.  At best, statements to which these Objecting Claimants point merely

establish that some of the Feeder Funds chose to invest through BLMIS, and not that BLMIS

exercised control over the Feeder Funds or authorized them to act on its behalf.

Accordingly, the Objecting Claimants cannot achieve customer status through their

allegations of agency, as the Feeder Funds were not agents of BLMIS.

## IV. THE OBJECTING CLAIMANTS DO NOT QUALIFY FOR CUSTOMER STATUS UNDER PRINCIPLES OF EQUITY

As a last resort, many of the Objecting Claimants invoke equity and argue they should be

accorded customer status because SIPA is a remedial statute.  They contend that because the

losses are no less real for claimants who invested indirectly than they are for those who invested

directly in BLMIS, to deny the Objecting Claimants a remedy for the harms they suffered would

be contrary to SIPA's remedial purpose.

The Objecting Claimants' position cannot be correct, as not every individual who

suffered at the hands of Madoff is deemed a "customer" eligible for SIPA protection.  Customer

status under SIPA is not a shorthand designation for anyone who conducts business through a

broker-dealer: "SIPA protection is not an absolute privilege but a qualified one which depends

primarily on the nature of the claim and the purpose of the client's account with the defunct

broker-dealer." *SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 277 (Bankr. S.D.N.Y. 1999) (citation omitted). Indeed, "SIPA does not protect against all cases of alleged dishonesty and fraud." *Arford v. Miller*, 239 B.R. 698, 701-02 (S.D.N.Y. 1999). Rather, ensuring that only genuine "customers" of the debtor share in the fund of customer property maximizes their recovery, as well as furthers and preserves SIPA's remedial character. *See* SIPA § 78fff-2(c)(1). Extending customer status to the Objecting Claimants, who lack any fiduciary relationship with the broker-dealer and any property interests in assets held and invested there, would significantly reduce the recoveries of the claimants whom SIPA was enacted to protect, and would therefore severely erode SIPA's remedial foundations.

That this approach may seem inequitable to the Objecting Claimants is not compelling on its own. As the Second Circuit stated:

> [A]rguments based solely on the equities are not, standing alone, persuasive. If equity were the criterion, most customers and creditors of [the debtor] would be entitled to reimbursement for their losses. Experience, on the other hand, counsels that they will have to settle for much less. SIPA was not designed to provide full protection to all victims of a brokerage collapse. Its purpose was to extend relief to certain classes of customer.

*SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 983 (2d Cir. 1974); *see also Morgan Kennedy*, 533 F.2d at 1317, n.4; *SIPC v. Wise (In re Stalvey & Assocs., Inc.)*, 750 F.2d 464, 473 (5th Cir. 1985). The Court therefore finds the Objecting Claimants' equity arguments unpersuasive.

Although the Objecting Claimants do not have individual customer claims against BLMIS, it is likely they will be entitled to share in distributions of customer property from the BLMIS estate to the Feeder Funds in which they directly or indirectly invested, subject to the Objecting Claimants' respective agreements with the Feeder Funds. In fact, some Feeder Funds already have liquidators or receivers appointed to equitably distribute the Feeder Funds' assets.

*See, e.g.*, *In re Fairfield Sentry Ltd., et al.*, Case No. 10-13164 (Bankr. S.D.N.Y.) (BRL) (Dkt. Nos. 47, 48, 51) (recognition by this Court of the foreign liquidation proceeding of certain Fairfield entities as a foreign main proceeding under section 1517(b)(1) of the Bankruptcy Code); *Id.*, (Dkt. No. 77) ("In their capacities as the foreign representatives and liquidators of the [Fairfield] Debtors, [the liquidators] are responsible for all aspects of the [Fairfield] Debtors' business and are empowered to, *inter alia*, perform any acts, compromise claims, commence litigation, dispose of property and execute any deeds, receipts or other documents in the name and on behalf of the [Fairfield] Debtors.");[24] *New York v. Merkin*, Index No. 450879/2009 (N.Y. Sup. 2009) (Dkt. No. 14) (appointing Bart M. Schwartz as receiver for Ariel Fund and Gabriel Capital, L.P.); *Id.* (Dkt. No. 38) (appointing David B. Pitofsky as receiver for Ascot Partners, L.P.).

Indeed, it would be inappropriate for the Trustee to stop the Feeder Funds from independently determining which of their investors are entitled to share in fund property. All of the Feeder Funds are separate legal entities comprised of a network of rights and obligations to individuals, many of whom are not before this Court and have interests unknown to the Trustee. Permitting the Objecting Claimants to claim directly from BLMIS amounts they perceive to be theirs that, in fact, are owed to the Feeder Funds, would impact the proportionate interests of countless others who interacted with those funds. Moreover, due to a number of unknown variables, it is only fitting that Feeder Funds themselves resolve competing obligations. For example, as hedge fund management fees and other expenses are typically paid before individual investors receive a return, a Feeder Fund might dispute what portion of the value supposedly

---

[24] Of note, a settlement between the Foreign Representatives of the debtors, Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited, on the one one hand, and the Trustee, on the other hand, was recently approved by the Commercial Division of the High Court of Justice in the BVI. *See* Case No. 10-13164 (BRL), Dkt. No. 452.

represented by the Feeder Fund's BLMIS account could ultimately be paid to any particular owner or investor. *See, e.g.*, Sheehan Decl., Ex. 50, pp. 12, 16; Ex. 53, pp. 3, 5. Also, some of the Feeder Funds leveraged their BLMIS investments through loans from lending institutions that might also claim priority over investor distributions of net equity. Finally, many investors in the Feeder Funds have sued the Feeder Funds themselves, their managers, and related entities (many of which have claimed indemnity), with unpredictable effects on who ultimately will be entitled to current or future assets. Therefore, it is only appropriate the Feeder Funds, and not the Trustee, determine the specific amounts they owe to their own investors.

* * *

To the extent there is any doubt as to whether the Objecting Claimants are "customers" under SIPA, this Court defers to the interpretations of the SEC and SIPC, which both concur that the Objecting Claimants cannot be deemed "customers" of BLMIS. *See In re New Times Sec. Servs. Inc.*, 371 F.3d 68, 88 (2d Cir. 2004) ("SIPC and the SEC agree that such an approach is irrational and unworkable and *we defer to their unanimous and persuasive analysis . . . .*") (emphasis added); *id.* at 81, n.16 ("Even if we were to view the text of the Series 500 Rules as ambiguous, *we would defer to the SEC's and SIPC's common interpretation.*") (emphasis added).

At bottom, this Court affirms the Trustee's determination that the Objecting Claimants do not qualify as "customers" under SIPA, a position unanimously supported by both the SEC and SIPC.

## CONCLUSION

For all the reasons set forth herein, the Trustee's Customer Motion is hereby GRANTED

to the extent set forth herein.


**IT IS SO ORDERED.**


<u>Dated</u>: New York, New York
        June 28, 2011

                                        /s/ Burton R. Lifland
                                        UNITED STATES BANKRUPTCY JUDGE