# EXHIBIT E

# Part 1

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Keith R. Murphy
Marc Skapof
Geoffrey A. North
Seanna R. Brown
Jacqlyn R. Rovine

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> ROBERT L. SILVERMAN, WESTPORT NATIONAL BANK, a division of CONNECTICUT COMMUNITY BANK, N.A., and PSCC SERVICES, INC., <br><br> Defendants. | Adv. Pro. No. _____ |

## COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, for this complaint (the "Complaint") against Robert L. Silverman ("Silverman"), Westport National Bank ("WNB"), and PSCC Services, Inc. ("PSCCSI") (together, "Defendants") states as follows:

### NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by Madoff.    In early December 2008, BLMIS generated client account statements for its approximately 4,900 open client accounts at BLMIS.    When added together, these statements purport that clients of BLMIS had approximately $65 billion invested with BLMIS.    In reality, BLMIS had assets on hand worth only a small fraction of that amount.    On March 12, 2009, Madoff admitted to the fraudulent scheme, pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison.

2.      The Defendants were beneficiaries of this Ponzi scheme, receiving millions of dollars in avoidable and recoverable transfers from BLMIS's fraudulent investment advisory business (the "IA Business").    The transfers that Defendants received from BLMIS, directly or indirectly, are in fact stolen Customer Property,[2] as defined by statute.    The Trustee seeks, among other things, to avoid such transfers, preserve stolen Customer Property for the benefit of

---

[1] Future references to SIPA shall omit "15 U.S.C."

[2] SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property lawfully converted."

the estate, and recover *all* stolen property from the Defendants in whatever form it may now, or in the future, exist.

## JURISDICTION AND VENUE

3.    The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 502(d), 510(c), 544, 548(a), 550(a), and 551 of title 11 of the United States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York Debt. & Cred. Law § 270 *et seq.* (McKinney 2001), ("DCL")), New York Civil Practice Law and Rules 203(g) and 213(8) (McKinney 2001) ("CPLR"), and other applicable law for avoidance and recovery of fraudulent conveyances, and disallowance of and/or equitable subordination of the customer claim filed by WNB ("WNB Customer Claim"). The Trustee seeks to set aside transfers and preserve and recover the property for the benefit of the BLMIS estate.

4.    This is an adversary brought in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA § 78eee(b)(2)(A), (b)(4).

5.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (H), and (O).

6.    Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND, THE TRUSTEE, AND STANDING

7.     On December 11, 2008 (the "Filing Date"),[3] Madoff was arrested by the FBI for

violations of the criminal securities laws, including, *inter alia,* securities fraud, investment

adviser fraud, and mail and wire fraud, and was criminally charged with a multi-billion dollar

securities fraud scheme in violation of 15 U.S.C. §§ 78j(b) & 78ff and title 17, section 240.10b-5

of the Code of Federal Regulations in the United States District Court for the Southern District of

New York (the "District Court"), captioned *United States v. Madoff,* Case No. 08-MJ-2735. On

that same date, the SEC filed a complaint in the District Court against Madoff and BLMIS, Case

No. 08 CV 10791, alleging that Madoff and BLMIS engaged in fraud through the IA Business of

BLMIS.

8.     On December 12, 2008, the Honorable Louis L. Stanton of the District Court

entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the

"Receiver").

9.     On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), the Securities

Investor Protection Corporation ("SIPC") filed an application in the District Court alleging, *inter*

*alia,* BLMIS was not able to meet its obligations to securities customers as they came due and,

accordingly, its customers needed the protections afforded by SIPA. On that same date, pursuant

to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's

application.

---

[3] In this case, the Filing Date is the date on which the United States Securities & Exchange Commission
("SEC") commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a
receiver for the firm. *See* section 78*lll*(7)(B) of SIPA.

4

10.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree") which, in pertinent part:

    a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

    c.    removed the case to this Bankruptcy Court pursuant to SIPA § 78eee(b)(4); and

    d.    removed the Receiver for BLMIS.

11.    By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

12.    At a plea hearing (the "Plea Hearing") on March 12, 2009 in the case captioned *United States v. Madoff,* Case No. 09-CR-213 (DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) [ECF No. 50]. Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

13.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11, 2009 in the case captioned *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali

5

pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS at least as early as the 1980s. Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) [ECF No. 11].

14.     As the Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and fraudulent transfers to the detriment of other customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

15.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

16.     Pursuant to SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of sections 547 and 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

17.    The Trustee has standing to bring these claims pursuant to SIPA § 78fff-1(a) and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a.    WNB, PSCCSI, and Silverman received "Customer Property" as defined in SIPA § 78lll(4);

b.    BLMIS incurred losses as a result of the claims set forth herein;

c.    BLMIS's customers were injured as a result of the conduct detailed herein;

d.    SIPC has not reimbursed, and statutorily cannot fully reimburse, all customers for all of their losses;

e.    the Trustee will not be able to fully satisfy all claims;

f.    the Trustee, as bailee of Customer Property, can sue on behalf of the customer bailors;

g.    the Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "BLMIS Accountholders"). As of the date hereof, the Trustee has received multiple express unconditional assignments of the applicable BLMIS Accountholders' causes of action, which actions could have been asserted against WNB, PSCCSI, and Silverman. As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

h.    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding. SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.    the Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

18.    This and similar complaints are being brought to recapture monies paid to, or for the benefit of, BLMIS's customers, including monies that were subsequently transferred by BLMIS's investors to other entities, so that these recovered funds can be placed in the fund of Customer Property and be distributed in accordance with SIPA § 78fff-2(c)(1).

## DEFENDANTS

19.    Upon information and belief, Defendant Robert L. Silverman is an individual residing in Wilton, Connecticut. Upon information and belief, Silverman is the president and director of PSCCSI,[4] and was an officer and director of PSCC, Inc. Upon further information and belief, Silverman maintains a BLMIS Account in his name, BLMIS Account No. 1S0328 (the "Silverman BLMIS Account").

20.    Upon information and belief, Defendant Westport National Bank is a national bank and a division of Connecticut Community Bank, N.A. Upon information and belief, WNB was established on December 28, 1998 in Westport, Connecticut. WNB maintains a BLMIS Account in the name of Westport National Bank, BLMIS Account No. 1W0106 (the "WNB BLMIS Account").

21.    Defendant PSCC Services, Inc. is a corporation organized under the laws of the State of Connecticut and located in Westport, Connecticut. Silverman established PSCCSI in 1999 as a firm providing administrative and actuarial services for individuals and tax qualified benefit plans,[5] and serves as its president and director. Upon information and belief, PSCCSI is a successor in interest of PSCC, Inc., a corporation of which Silverman was a director and/or officer. Upon further information and belief, the names PSCCSi and PSCC, Inc. were used interchangeably, and each name served as a d/b/a name for the other entity.

## THE FRAUDULENT PONZI SCHEME

22.    BLMIS was founded in 1959 by Madoff and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as

---

[4] Upon information and belief, PSCCSI was the debtor in a Chapter 7 bankruptcy case, which is now closed, that was filed in the Bankruptcy Court for the District of Connecticut.

founder, chairman, chief executive officer, and sole owner, operated BLMIS together with
several of his friends and family members. BLMIS was registered with the SEC as a securities
broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).
By virtue of that registration, BLMIS is a member of SIPC. BLMIS had three business units: the
IA Business, market-making, and proprietary trading.

23.    Outwardly, Madoff ascribed the consistent success of the IA Business to his so-
called "split-strike conversion" strategy ("SSC Strategy"). Pursuant to that strategy, Madoff
purported to invest BLMIS customers' funds in a basket of common stocks within the S&P 100
Index—a collection of the 100 largest publicly traded companies. Madoff claimed that the basket
of stocks would mimic the movement of the S&P 100 Index. He also asserted that he would
carefully time purchases and sales to maximize value, and correspondingly, BLMIS customers'
funds would, intermittently, be out of the equity markets. While out of the market, those funds
were purportedly invested in United States Treasury bills or in mutual funds holding Treasury
bills.

24.    The second part of the SSC Strategy was the hedge of Madoff's stock purchases
with S&P 100 Index option contracts. Those option contracts functioned as a "collar," limiting
both the potential gains and the potential losses. Madoff purported to use proceeds from the sale
of S&P 100 Index call options to finance the cost of purchasing S&P 100 Index put options.

25.    BLMIS's IA Business customers received fabricated monthly or quarterly
statements showing that securities were held in, or had been traded through, their accounts. The
securities purchases and sales shown in such account statements never occurred and the profits
reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never purchased
any of the securities he claimed to have purchased for the IA Business's customer accounts. In

fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy. Madoff's SSC Strategy was entirely fictitious.

26.    At times prior to his arrest, Madoff generally assured customers and regulators that he conducted all trades on the over-the-counter market after hours. Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold any of the options described in customer statements. The Options Clearing Corporation, which clears all option contracts based upon the stocks of S&P 100 companies, has no record of the IA Business having bought or sold any exchange-listed options on behalf of any of IA Business customers.

27.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options. Rather, BLMIS used its IA Business customers' deposits to pay redemptions by other customers, and to make other transfers, which are avoidable by the Trustee. Many of these transfers were to enrich Madoff, his associates, his family, and others.

28.    The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers.

29.    The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

30.    At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

31.    Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

## THE TRANSFERS

The Initial Transfers to WNB

32.    According to BLMIS's records, WNB holds the WNB BLMIS Account with BLMIS, as set forth on Exhibit A.    WNB executed a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "WNB Account Agreements"), and delivered such documents to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

33.    The WNB Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The WNB BLMIS Account was held in New York, New York, and WNB sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #xxxxxxxxxxx703 (the "BLMIS Bank Account"), in New York, New York for application to the WNB BLMIS Account and the purported conducting of trading activities.    Between the date the WNB BLMIS Account was opened and the Filing Date, WNB made deposits through checks and/or wire transfers into the BLMIS Bank Account and/or received transfers from the WNB BLMIS Account.

11

34.  During the six years prior to the Filing Date, WNB received transfers from the WNB BLMIS Account, as set forth in Exhibits A and B, in the amount of $28,200,000 (the "WNB Six Year Transfers"), composed entirely of fictitious profits.  The WNB Six Year Transfers received by WNB constitute non-existent profits supposedly earned in the WNB BLMIS Account but, in reality, were other people's money.  WNB was an initial transferee of the Six Year Transfers, which are set forth in Exhibit A and column 11 of Exhibit B.

35.  The WNB Six Year Transfers are avoidable and recoverable under sections 544, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and DCL sections 273 – 279.

36.  During the two years prior to the Filing Date, WNB received transfers from the WNB BLMIS Account, as set forth in Exhibits A and B, in the amount of $9,900,000 (the "WNB Two Year Transfers").  The WNB Two Year Transfers received by WNB constitute non-existent profits supposedly earned in the WNB BLMIS Account but, in reality, were other people's money.  WNB was an initial transferee of the Two Year Transfers, which are set forth in Exhibit A and column 10 of Exhibit B.

37.  The WNB Two Year Transfers are avoidable and recoverable under sections 548, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

The Initial Transfers to Silverman

38.    According to BLMIS's records, Silverman holds the Silverman BLMIS Account with BLMIS, as set forth on Exhibit A. Silverman executed a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Silverman Account Agreements"), and delivered such documents to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

39.    The Silverman Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Silverman BLMIS Account was held in New York, New York, and Silverman sent funds to the BLMIS Bank Account in New York, New York for application to the Silverman BLMIS Account and the purported conducting of trading activities. Between the date the Silverman BLMIS Account was opened and the Filing Date, Silverman made deposits through checks and/or wire transfers into the BLMIS Bank Account and/or received transfers from the Silverman BLMIS Account.

40.    During the six years prior to the Filing Date, Silverman received transfers from the Silverman BLMIS Account, as set forth in Exhibits A and B, in the amount of $2,290,003 (the "Silverman Six Year Transfers"). The Silverman Six Year Transfers received by Silverman constitute non-existent profits supposedly earned in the Silverman BLMIS Account but, in reality, were other people's money. Silverman was an initial transferee of the Six Year Transfers, which are set forth in Exhibit A and column 11 of Exhibit B.

41.    The Silverman Six Year Profits are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and DCL sections 273 – 279.

42.    During the two years prior to the Filing Date, Silverman received transfers from the Silverman BLMIS Account, as set forth in Exhibits A and B, in the amount of $1,500,000 (the "Silverman Two Year Transfers"). The Silverman Two Year Transfers received by Silverman constitute non-existent profits supposedly earned in the Silverman BLMIS Account but, in reality, were other people's money. Silverman was an initial transferee of the Two Year Transfers, which are set forth in Exhibit A and column 10 of Exhibit B.

43.    The Silverman Two Year Transfers are avoidable and recoverable under sections 548, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

The Subsequent Transfers to PSCCSI and Silverman

44.    Upon information and belief, WNB and Silverman, through PSCCSI, offered clients of WNB ("WNB Participants") the ability to invest with BLMIS through the WNB BLMIS Account. Upon information and belief, WNB and PSCCSI charged WNB Participants various fees, including, among others, custodial, administration, service, record-keeping, and other fees for this arrangement.

45.    Upon information and belief, a portion of the avoidable WNB Six Year Transfers and the avoidable WNB Two Year Transfers—at least $9,381,320, as set forth in Exhibit C— were transferred from WNB in the form of fees to PSCCSI (the "Subsequent Transfers") for the benefit of Silverman.

46.     The Subsequent Transfers consist of Customer Property within the meaning of

SIPA § 78*lll*(4). The Subsequent Transfers, or the value thereof, are recoverable from PSCCSI

and Silverman by the Trustee pursuant to section 550(a) of the Bankruptcy Code.

47.     To the extent that any of the recovery counts may be inconsistent with each other,

they are to be treated as being pled in the alternative.

48.     The Trustee's investigation is ongoing and the Trustee reserves the right to (i)

supplement the information regarding the Transfers and any additional transfers, and (ii) seek

recovery of such additional transfers.

## CUSTOMER CLAIM

49.     WNB filed the WNB Customer Claim with the Trustee.

50.     The WNB Customer Claim has not yet been determined by the Trustee.

51.     On December 23, 2008, this Court entered an Order on Application for Entry of

an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying

Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief

("Claims Procedures Order") [ECF No. 12]. The Claims Procedures Order includes a process for

the determination and allowance of claims under which the Trustee has been operating. The

Trustee intends to resolve the WNB Customer Claim and any forthcoming objection to the

Trustee's determination of that claim through a separate hearing as contemplated by the Claims

Procedure Order.

## COUNT ONE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551
### Against WNB

52.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

53.     Each of the WNB Two Year Transfers was made on or within two years before the Filing Date.

54.     Each of the WNB Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

55.     Each of the WNB Two Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the WNB Two Year Transfers to or for the benefit of WNB in furtherance of a fraudulent investment scheme.

56.     Each of the WNB Two Year Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from WNB pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

57.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against WNB: (a) avoiding and preserving the WNB Two Year Transfers, (b) directing that the WNB Two Year Transfers be set aside, and (c) recovering the WNB Two Year Transfers, or the value thereof, from WNB for the benefit of the estate of BLMIS.

## COUNT TWO
### FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551
### Against WNB

58.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

59.     Each of the WNB Two Year Transfers was made on or within two years before the Filing Date.

60.     Each of the WNB Two Year Transfers constitute a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

61.     BLMIS received less than a reasonably equivalent value in exchange for each of the WNB Two Year Transfers.

62.     At the time of each of the WNB Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the WNB Two Year Transfers.

63.     At the time of each of the WNB Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

64.     At the time of each of the WNB Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

65.     Each of the WNB Two Year Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from WNB pursuant to section 550(a) and SIPA § 78fff-(2)(c)(3).

66.   As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against WNB: (a) avoiding and preserving the WNB Two Year Transfers, (b) directing that the WNB Two Year Transfers be set aside, and (c) recovering the WNB Two Year Transfers, or the value thereof, from WNB for the benefit of the estate of BLMIS.

**COUNT THREE**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 276, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**
**Against WNB**

67.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

68.   At all times relevant to the WNB Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

69.   Each of the WNB Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

70.   Each of the WNB Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the WNB Six Year Transfers to or for the benefit of WNB in furtherance of a fraudulent investment scheme.

71.   As a result of the foregoing, pursuant to DCL sections 276, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against WNB: (a) avoiding and preserving the WNB Six Year Transfers,

(b) directing that the WNB Six Year Transfers be set aside, and (c) recovering the WNB Six Year Transfers, or the value thereof, from WNB for the benefit of the estate of BLMIS.

### COUNT FOUR
### FRAUDULENT TRANSFER –NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551 Against WNB

72.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

73.    At all times relevant to the WNB Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

74.    Each of the WNB Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

75.    BLMIS did not receive fair consideration for the WNB Six Year Transfers.

76.    BLMIS was insolvent at the time it made each of the WNB Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the WNB Six Year Transfers.

77.    As a result of the foregoing, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against WNB: (a) avoiding and preserving the WNB Six Year Transfers, (b) directing that the WNB Six Year Transfers be set aside, and (c) recovering the WNB Six Year Transfers, or the value thereof, from WNB for the benefit of the estate of BLMIS.

19

## COUNT FIVE
## FRAUDULENT TRANSFER—NEW YORK DEBTOR AND CREDITOR LAW
## §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551
## Against WNB

78.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

79.    At all times relevant to the WNB Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

80.    Each of the WNB Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

81.    BLMIS did not receive fair consideration for the WNB Six Year Transfers.

82.    At the time BLMIS made each of the WNB Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the WNB Six Year Transfers was an unreasonably small capital.

83.    As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against WNB: (a) avoiding and preserving the WNB Six Year Transfers, (b) directing that the WNB Six Year Transfers be set aside, and (c) recovering the WNB Six Year Transfers, or the value thereof, from WNB for the benefit of the estate of BLMIS.