## EXHIBIT D

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

In re:

BERNARD L. MADOFF INVESTMENT

SECURITIES LLC,                              Index No.

                                            08-01789(BRL)

            Debtor.

-------------------------------------x

IRVING H. PICARD, as Trustee for the

Liquidation of BERNARD L. MADOFF

INVESTMENT SECURITIES LLC,


               Plaintiff,        Adv. Pro No.

                                 09-1172(BRL)

        V.


STANLEY CHAIS, et al,


               Defendants.


-------------------------------------x


                          May 5, 2010

                          United States Custom House

                          One Bowling Green

                          New York, New York 10004


            In Re:  Hearing


B E F O R E:

                HON. BURTON R. LIFLAND,

                        U.S. Bankruptcy Judge

2

1

A P P E A R A N C E S:

2

3

4        BAKER HOSTETLER, LLP

5        Attorneys for Irving H. Picard, SIPA Trustee

6        and Counsel for the Trustee

7             45 Rockefeller Plaza

8             New York, New York 10017

9        BY:   MARC E. HIRSCHFIELD, ESQ.

10                  -and-

11             DAVID J. SHEEHAN, ESQ.

12                  -and-

13             PAUL EYRE, ESQ.

14                  -and-

15             IRVING PICARD, ESQ.

16

17        LOEB & LOEB LLP

18        Attorneys for Picard v. Chais

19        Counsel for Stanley and Paula Chais

20             345 Park Avenue

21             New York, New York  10154

22        BY:   EUGENE R. LICKER

23                  -and-

24             WALTER H. CURCHACK, ESQ.

25

3

```
 1
 2    APPEARANCES:  (Continued)
 3
 4
 5          WINDELS MARK LANE & MITTENDORF, LLP
 6          Attorneys for Alan Nisselson Chapter 7 Trustee
 7               156 West 56th Street
 8               New York, New York  10019
 9          BY:   ALAN NISSELSON, ESQ.
10                    -and-
11               REGINA GRIFFIN, ESQ.
12
13
14
15          SILLS CUMMIS & GROSS P.C.
16          Attorneys for Chais Related Parties
17               One Riverfront Plaza
18               Newark, New Jersey  07102
19          BY:   PHILLIP WHITE, ESQ.
20                    -and-
21               ANDREW H. SHERMAN, ESQ.
22
23
24
25
```

4

1

2     APPEARANCES:  (Continued)

3

4

5           BECKER & POLIAKOFF, LLP

6                 Attorneys for Peskin, et al

7                 45 Broadway

8                 New York, New York 10006

9           BY:   PETER W. SMITH, ESQ.

10

11

12          SECURITIES INVESTOR PROTECTION CORPORATION

13                805 15th Street, Suite 800

14                Washington,  D.C.  20005

15          BY:   KEVIN H. BELL, ESQ.

16

17

18          KLESTADT & WINTERS, LLP

19          Attorneys for Michael Chasalow

20                International, Inc.

21                292 Madison Avenue

22                New York, New York 10017

23          BY:   TRACY L. KLESTADT, ESQ.

24

25

5

1                        PROCEEDINGS

2              THE COURT:  Bernard L. Madoff Investment

3     Securities, Debtor; Irving H. Picard, as Trustee versus

4     Stanley Chais, et al.

5                   MR. SMITH:   Good morning Your Honor.

6                   MR. SHEEHAN:   Good morning.  For the

7     record, David Sheehan with Baker Hostetler for Irving H.

8     Picard, as Trustee.   With me our my two colleagues, Marc

9     Hirschfield and Paul Eyre.  Each of us will respectfully

10    handle a certain portion of the Chais applications as I

11    refer to them.   Today we will be dealing with all the

12    defendants.  I guess the best way to put it, is that I we

13    will dealing with the Chais applications that are due March

14    8.  There are two other applications out there that will be

15    dealt with in today's hearing by my colleagues.

16                   MR. WHITE:   Good morning, Your Honor.

17                   THE COURT:  Good morning.

18                   MR. WHITE:  My name is Phillip White, and

19    with me is my colleague Andrew Sherman.   I think we

20    represent most of the defendants that Mr. Sheehan is

21    talking about.   We represent about 46 individuals and

22    entities that are listed, and there are some stipulations

23    that we will file with the Court. It be would be hard for

24    me to list them all here.   I would call them the Chais

25    related parties as to distinguish it from the fact that we

6

1   do not represent Mr. Stanley Chais, individually, himself.

2             MS. KLESTADT:   Tracy Klestadt, from the

3   law firm of Klestadt & Winters.  I represent Michael

4   Chasalow.

5             MR. WHITE:   I guess the first order of

6   business is our motion to dismiss under 12(b)(6) for

7   failure to state a claim.

8             I gather that we have agreed what we will

9   do is handle the motion seriatim so that would be first on

10   the agenda.  And the motion we filed on behalf of Mirie

11   Chase to dismiss for lack of personal jurisdiction would be

12   handled fairly quickly.

13             THE COURT: Sure.

14             MR. WHITE:   I guess I am better off at the

15   podium.  Is that what you would prefer, Your Honor?

16             THE COURT:   Whatever make you comfortable.

17             MR. WHITE:   I am new to the Bankruptcy

18   Court, Your Honor.  I would like to thank you for hearing

19   me and forgive my lack of experience in your courtroom.

20             THE COURT:   It is the same as every other

21   courtroom in the circuit that I know of except for the

22   Court of Appeals.

23             MR. WHITE:   Well, that is good to know,

24   Your Honor.

25             THE COURT:   We don't have lights that cut

7

1    you off.    Sometimes I cut you off.

2                    MR. WHITE:    My intention is to be

3    relatively quick, frankly, Your Honor, because I don't

4    think counsel's role in the motion to dismiss is to go over

5    everything that is in the briefs.

6                    The Court is well aware of the intricacies

7    of the laws of fraudulent conveyances, and other issues

8    that Your Honor may have that you would like to question me

9    about.  I don't intend to spend much time doing that kind

10   of thing.

11                   I would like to try to focus the Court on a

12   couple of key things that made this motion to dismiss

13   different than the run of the mill.   We all as litigators

14   are very accustomed to people getting sued and it feels

15   almost like an ordinary event.   Fraudulent conveyance I am

16   told by my colleagues in the bankruptcy bar is not an

17   extremely serious type of allegation.

18                   To me I want to ask the Court as I have to

19   suspend that feeling of routineness for a moment and put

20   yourself in the place of the children of Stanley Chais who

21   I do represent with the exception of Mr. Chasalow, who are

22   just ordinary people.   Obviously, very wealthy before

23   December of 2008, but who are human beings.

24                   In December of 2008 they woke up one

25   morning and find out their lives are changed because Bernie

8

1    Madoff turned out to be a pretty bad guy taking along other

2    people's money.

3                You know what?  They went to work that day

4    like other people and I suspect they got some sympathy and

5    whatnot from their colleagues in their community a few

6    months later though the complaint that has been filed here

7    trickles out and the result is probably very different.

8                Here they are accused of being active

9    participants in what is the largest, ugliest Ponzi scheme

10   in the history of the United States.

11               And while we may think of a fraudulent

12   conveyance as a kind of routine thing this complaint

13   alleges that they, in fact, stole $300 million of innocent

14   victims.

15               We should look at the 9(b) element, which

16   is the first one of the elements I would like to look at.

17               From the perspective of people who are

18   individuals, there are, of course, lots of entities I

19   represent as well, who are faced with that problem, these

20   people eventually see the complaint and they say, oh, my

21   goodness, what have I done.

22               What does this complaint tell me about what

23   evil things I have done to be lumped in with Bernie Madoff,

24   and perhaps my father who turns out to be allegedly not a

25   particularly good guy either.

1                When you look at the complaint, and I have

2       read it a few times, it doesn't say much.   It looks like

3       at the end of the day that these people are accused of

4       really the same things that any other investor in the

5       Madoff transactions have been.   They had accounts.   We

6       don't deny that.

7                They had distributions, quite substantial

8       distributions as it turns out.

9                The only other allegation is that in there

10      they had a famous father who turns out to be alleged to

11      have been very close with Bernie Madoff and had done some

12      bad things.

13               The rest of what is in the complaint has

14      nothing to do with them.   I would suggest to the Court

15      that the purpose of Rule 9(b) is to protect people like my

16      clients from this kind of overreaching.

17               They are supposed to be given particular

18      notice of what it is they did, not of what other people

19      did.

20               So when you think about, it is the

21      complaint alleges all kinds of things about what Stanley

22      Chais did, outsized returns, manufactured losses,

23      fabricated transactions, and the like.

24               There is no allegation that my people knew

25      about them, did them, ever spoke to Mr. Madoff or either,

10

1    never mind about their accounts or about these

2    transactions, or directed anything or what have you.

3              They are like anyone else, Your Honor, any

4    other investor who received distributions from Madoff.

5              Yet, they are treated completely

6    differently, Your Honor.   So to me it is really incumbent

7    on the Court here to do the gatekeeper function that 9(b)

8    contemplates.

9              I represent some 46 individuals and

10   entities.   There is not one allegation other than the

11   amounts that were withdrawn from the various accounts that

12   pertains to their specific situation.  The ones about what

13   Mr. Chais did or did not do, but there is no allegation

14   that they knew him.   The ones about the so-called red

15   flags that related to what general creditors, ordinary

16   folks might have known, is not specific to them.

17             Even the allegations that relate to some of

18   the specific transactions in what are called the Chais

19   family accounts, they might relate to one of the 40 people

20   or so that are the entities I represent but not to all of

21   them as a whole.

22             They are treated as some kind of monolithic

23   evil empire in this complaint and the reality is they are

24   not and there is no basis in the complaint for doing that.

25             I would urge the Court that given the

11

1    structure of the complaint to say to the Trustee, look, you

2    have overreached here with regard to these defendants.

3    You could have treated them differently, not alleged they

4    were active participants.   Not made claims for actual

5    fraudulent based fraudulent conveyances.   You chose not

6    to.   You have the obligation to come forward with the

7    goods on what each individual and each entity is alleged to

8    have done or to have knowledge of in those circumstances,

9    you can't treat them all as if they are extensions of the

10   family of Chais.

11            Now, the complaint deals with that a little

12   bit by saying that Stanley Chais and all of my clients are

13   alter egos of one another.

14            Well, the New York Law Department does not

15   that I am aware of and there has been no case cited by the

16   Trustee in his opening papers that suggests a human being

17   can be the alter ego of another human being.   Nor does the

18   complaint make any of the allegations that are normal to an

19   alter ego or piercing of the corporate veils type of

20   transaction, all of which would be subject to 9(b) and

21   which have a very heightened pleading standard.

22            So rather when we point this out in the

23   moving papers, rather than going back an amending the

24   complaint or explaining what further explanation there

25   would be or what have you, they respond by changing the

12

1    issue.   No longer are they saying that they solved the

2    problem of lack of specificity by alter ego kind of

3    allegations.   They switched it.   They say we are changing

4    to agency now.   Stanley Chais was the agent of all the

5    individuals and entities that Mr. White represents.

6              That is not even in the complaint.   So the

7    appropriate means for that, if they would have a basis for

8    that would be first totally inconsistent with the idea of

9    alter ego because in an alter ego claim, of course, the

10   person in charge of this case alleges that Stanley Chais

11   controls all the entities.   In an agency arrangement the

12   entities control the agent.

13             It is the complete opposite of one another.

14   There is no way this complaint could have given anyone

15   notice of that set of allegations and switching in

16   midstream without pleading it is not a fair game.   It

17   certainly can't satisfy the exigency requirement of 9(b),

18   Your Honor.

19             So, Your Honor, that is the main problem,

20   that all these people are lumped together as an entity.

21   This is no explanation of who did what.   And there is no

22   allegation that anyone did anything that is actually wrong.

23             On that basis all of the claims that are

24   predicated on actual fraud should be ripe for being

25   dismissed.

13

1          Frankly in this case at this point, the

2    normal repleading should not be done here.   It is over a

3    year later, if there are any new factual allegations that

4    is coming in, I think the Court should be assuming what the

5    in complaint is the best they should do otherwise they

6    couldn't amend it.

7          Let me move on to the next point.   For

8    every one of these fraudulent conveyance complaints, there

9    needs to be an allegation in each of the claims that each

10   of the entities was a net winner.   That is a requirement

11   in the context of a fraudulent conveyance claim.   It is a

12   Ponzi scheme.   We don't dispute that.

13          The opposition papers make a great deal of

14   how we are complaining or trying to argue the net equity in

15   a different format.   We didn't even submit papers with

16   regard to the net equity argument and my point is, the

17   Court has, of course, decided the method of calculation

18   that is going to be used, but it doesn't matter what method

19   the Court decides one way or the other for net equity.

20          The point is you can't figure out if you

21   are a net winner or loser other than on an account by

22   account basis, and by subtracting the amount that is

23   alleged to have deposited  against the amounts that are

24   alleged to have been withdrawn.

25          In the circumstances where many of these

14

1    accounts predate according to the allegations of the

2    complaint the creation of Madoff's Ponzi scheme in the

3    early '90s.  The complaint itself proves that there has to

4    be some actual deposits made in these accounts that would

5    be offset against the withdrawals.  There is no

6    allegations about any of that.

7             What there is a very lengthy list of

8    withdrawals that were made by my client and an allegation

9    well, they total up to some $300 million.  It must be more

10   than they put in and so, therefore, they must be net

11   winners.

12            That is not enough, Your Honor.  It gives

13   no individual defendant notice of what it is being accused

14   of.  They are not part of one giant scheme.  They are

15   individual trusts and human beings that had various

16   different accounts that are entitled to be given notice for

17   the amounts that they are alleged to have put in versus the

18   amounts they are alleged to have taken out.

19            So, therefore, there could be some

20   calculation by whatever means of net equity.  It is a

21   pleading fall-out, just like the failure to do 9(b) and

22   satisfy the specificities, to fail to allege property net

23   equity and even if there is net equity, other than in a

24   conclusory aggregate sort of way.

25            The last point I want to point out to the

15

1    Court is the issue about the statute of limitations and how

2    it works in this circumstance.

3           Your Honor, first of all, the main point I

4    am trying to get to is there cannot be claims that survive

5    this motion that go back more than six years since the

6    filing of the petition at a minimum.

7           The Court will know we made an argument it

8    ought to be go up to the date of the filing of the

9    petition.  I will leave that to the papers, but for the

10   moment let's assume that's the petition date of which six

11   years earlier is the cutoff.

12          The reason is actually relatively simple.

13          As to the New York DCL we all know it is

14   settled law in the Second Circuit, and in New York there is

15   no tolling available for constructive fraud claims under

16   the DCL for fraudulent conveyance.

17          So those claims, Your Honor, are limited to

18   the period immediately preceding the petition at a minimum.

19   I am not going to argue about the five months here.

20          As to the actual fraud claims to the extent

21   there is a claim of tolling that claim of tolling is based

22   upon the fact no one could have discovered it yet, the

23   complaint alleges that anyone could have discovered it.

24          So you can't have it both ways, Your Honor.

25   There is a dichotomy in the allegations of the complaint,

16

1    and while people are entitled to plead in the alternative

2    and are entitled to legal theories but not to alternative

3    facts.   The facts are the facts.   Either these facts were

4    sufficient for a mythical or a hypothetical creditor to

5    have discovered that Madoff was a fraudster or they were

6    not.

7                    That has opposite consequences for the

8    Trustee's complaints, on the one hand.   If you assume they

9    are on a valid basis on which a reasonable creditor or

10   ordinary creditor could have discovered the fraud, then you

11   do get tolling but you get no constructive fraud claims

12   because then you would have good faith.

13                   The other way around, Your Honor, to the

14   extent these things could not have been discovered, you get

15   tolling and no good faith.

16                   My point is what that means and what is

17   important from the standpoint from the people I represent,

18   is that the liabilities that they are faced with here are

19   contained to a six-year period that is measurable rather

20   than reaching back to the beginning of Madoff's

21   relationship with Stanley Chais or the beginning of the

22   accounts and entities that are involved here and I think

23   that even at this early stage of the proceeding given the

24   status of the law they are entitled to that comfort because

25   the law provides for it, and the pleadings that the Trustee

17

1    has set before the Court does not sufficiently plead any

2    basis for going back more than the six years.

3                Your Honor, if you have any questions,or

4    we could talk about inconsistencies, but I suspect you know

5    more about it than I do from your years on the bench, but I

6    am happy to entertain any questions you have.  I wanted to

7    focus the Court on those issue.

8                THE COURT:  Thank you.  Now, I will hear

9    from the other side.  Unless Mr. Klestadt thinks that it

10   is appropriate to speak now.

11               MR. KLESTADT:  Your Honor, I have a

12   separate motion for my client somewhat more -- perhaps a

13   couple of minutes of argument if I may.

14               THE COURT:  Why don't we just focus on the

15   arguments that have just come up.

16               MR. KLESTADT:  Very well, Your Honor.

17   Thank you.

18               MR. SHEEHAN:  Thank you, Your Honor.  I

19   think actually the beginning and end of Mr. White's

20   argument sort of answers several questions.  He spoke at

21   the beginning of ordinary people and that is who he

22   represents, but indeed that is exactly who the Trustee

23   represents in this proceeding.

24               All of the ordinary people who did not get

25   their money back, all of those people at the wrong end of

18

1    the Ponzi scheme, not like the ordinary people that got

2    hundreds of millions of dollars of fictitious profits.   He

3    represents the ordinary people who lost money in this case,

4    in this Ponzi scheme.

5              In the Ponzi scheme, Your Honor, he should

6    be able to get that money back from the other ordinary

7    people.   There is another thing that is important about

8    ordinary people.   You and I both know for the year

9    and-a-half in this case there are out there many people who

10   did not know what was going on.   They did not have Stanley

11   Chais involved for decades with Mr. Madoff on a virtual

12   daily basis as their dad, as the director of their family

13   trust, as the person who was involved in wide investments

14   throughout Madoff and his entire career practically.   They

15   did not have that.

16             They were out there duped totally.   I don't

17   have any question in mind that there is out there not one,

18   but many, if not dozens of hypothetical creditors that fit

19   right in that category.   They are not hypothetical but

20   very real and they didn't know.

21             Your Honor, those two points I think are

22   very salient in terms of where we should go with the

23   motion.   The other thing that really strikes me as I

24   listen to Mr. White, there used to be, and I think it is

25   still true that what we should be doing in a complaint is

19

1    giving our adversaries and the defendants a road map, to

2    let them know what is going on, what are we really talking

3    about here.   Listening to Mr. White I think we gave them

4    quite a road map.   I think he knows exactly what is going

5    on.   He knows that Stanley Chais together with his

6    children and all the various enterprises outlined in the

7    complaint were actively involved in investing with Madoff

8    for decades and taking out what they now know to be

9    fictitious profits.  We believe, and we have alleged that,

10   in fact, Mr. Chais knew and participated.

11            Just by way of example in the complaint we

12   give several really good examples, we could give dozens and

13   dozens, and I don't know if anyone asks us to prove that in

14   our complaint, but there is more than enough if we only

15   look at the manipulation of the accounts.   They are

16   backdated.

17            I don't know much about any investor,

18   sophisticated or otherwise, but certainly Mr. Chais and

19   presumably his family had some degree of sophistication and

20   would realize you really can't call up and change

21   statements six months after the transaction took place.

22            That doesn't happen to ordinary people.

23   That happens to extraordinary people like Mr. Chais and his

24   family.   That is why they have been sued.  That is why we

25   have outlined to them all of those transactions, dozens and

20

1    dozens and dozens of transactions going all the way back,

2    yes, and if you look it goes back into the 1980s.

3                    We believe, Your Honor, and we don't have

4    to prove it here today because we are not at a trial but we

5    will at trial prove that the Ponzi scheme went back into

6    the 1980s.

7                    In fact, Mr. DePasquale has stated that,

8    and the facts will come in to prove it that Mr. Chais was

9    well aware of it.

10                   It is not guilt by association.  We can't

11   ignore what is the reality.  He wants to bring reality into

12   the courtroom.   What is the reality?  The reality is this

13   is a family, and they talk to one another, and that money

14   transfers by Mr. Chais from one family account to another

15   family court.   He takes fictitious profits and puts them

16   into another family account.   He is not doing that

17   willy-nilly on his own.   It's done by people who know each

18   other.

19                   I don't mean to be facetious when I say

20   this but if this was such an allegation we would allege

21   that there is mishpocha.   You know what this means.

22   These people are all family.   They all talk to one

23   another.   That is obvious from everything that transpires

24   in terms of the transactions in these accounts.

25                   Going back to the beginning as it were,

21

1    what we have here is we have an allegation --

2                THE COURT:  The argument is it may be

3    obvious and inferred, but it is not in the pleading.

4                MR. SHEEHAN:   But, I believe, it is, Your

5    Honor, in this sense it outlines what Mr. Chais did.   That

6    is true in some detail, but it also outlines there are

7    things happening in these other accounts, not just in his.

8                It is enough to give you notice.  We didn't

9    prove it, I agree with that, but it's enough to give every

10   defendant in this case notice that there were extraordinary

11   profits that should have given you notice, where there were

12   transactions that were backdated,  that should have given

13   you notice and not least that there were hundreds of

14   millions of dollars of fictitious profits.

15               They are on the wrong end of the Ponzi

16   scheme, and the mere fact they were in it this long tells

17   the story.   There is more than enough in this complaint

18   that incorporates not Mr. Chais, but all of the other

19   participants here.

20               Look at it this way, Your Honor, just the

21   mere fact that they got fictitious profits alone, under the

22   bankruptcy statute as we have alleged, gives us the right

23   to get this money back.  Good faith or not, that is

24   fictitious profit.   That is what we alleged.

25               We have not, and I agree with Mr. White on

22

1    this, given him a final number.   That is because that

2    number will be going through some more accounting.   We do

3    need their books and records to get their checks.   This

4    fraudster, we have really torn apart his records and, we

5    are not sure of every nickel that went in and out.   We

6    know hundreds of millions of dollars from 1995 forward was

7    indeed taken, but we need to go back further.   We believe

8    it will establish that there is even more than money due

9    and owing, but that is subject to discovery.

10            We have not hidden the fact that it is out

11   there.   We are not sort of hiding everything here.

12   Everything is right in front of the entire group.   They

13   know exactly what is going on.

14            What will happen after this, after we get

15   past this motion will be the fact this will be ordinary

16   discovery.   If has been a year.   In the last year we

17   could have had a lot of discovery and been further along in

18   this case.   They would have real insight beyond what is in

19   the pleading.   But they have more than enough notice in

20   this pleading enough to put together their defense and know

21   what is going.

22            For example, Your Honor, each of these

23   involves a transaction.   We have given them all the

24   transactions, we have listed every one of them.

25            That is what is the heart and soul of the

23

1   case, Your Honor, are those transactions.  What more do

2   they want us to do?  If Your Honor wishes, and I don't mean

3   this in the way to be pejorative, but it would require

4   hundreds and hundreds and hundreds of pages of a complaint

5   to give you every one of those transactions and outline in

6   a way that we will do in discovery, and they will fully

7   realize everything that is going on.

8             If a pleading requires us to do that, fine,

9   we will go back to the drawing board and do that.   We

10  think we gave our adversary a summary of every transaction

11  that is involved, everyone who we are relying upon to prove

12  hundreds of millions of dollars of fictitious profits.

13  That is more than adequate for them to not only have notice

14  but to defend the case.   Those are the transactions that

15  are in play.

16            Two other things, Your Honor, before I sit

17  down.  Well, there is one point I would like to make, Your

18  Honor, and it is not hitting me.   I think I actually hit

19  it already now that I look at any notes, the statute of

20  limitations.

21            I, think first of all, my adversary has

22  conceded that we are right in the six-year period and that

23  six months should not be in play.

24            I think we do believe we have a

25  hypothetical creditor.  I do believe we could go back as

24

1    far as we can as long as we could establish, and it is our

2    burden and we accept it readily that the Ponzi scheme went

3    back to the date which all these transactions are in play.

4              I believe the law is in the favor of the

5    Trustee here to liberally allow him to go back and gather

6    in all of those fictitious profits, and all of the

7    misbegotten funds from this Ponzi scheme and to bring them

8    back in to be distributed, and given the facts of this case

9    as we have alleged them, I think we are entitled to do

10   that.

11             Thank you, Your Honor.

12             THE COURT: I have one issue that was

13   covered by Mr. White, and I didn't hear your responding to

14   it.  The agency theory which you have raised in your

15   brief, that is really not in the complaint itself.

16             Are you relying on this agency theory to

17   demonstrate fraudulent intent or are you really saying that

18   the mere fact of fraud is sufficient in itself.

19             I don't know where are you going in the

20   agency theory.  I could concede that both agents and

21   principal are involved in some parts of the transaction,

22   but I have difficulty in trying to separate them, and I

23   don't know where you are coming from in the complaint which

24   is not based on an agency theory but perhaps infers it.

25             MR. SHEEHAN:  I think it does, and that is

25

1   what we are trying to do in the brief.   Putting aside the

2   agency and the fact we develop it, I think you are right

3   about principal and agency here because it can go both ways

4   in this particular setting as facts develop.   But it was

5   inferred.   We are saying these folks were operating with

6   knowledge of each other because of the fact there is

7   knowledge of those accounts and they are talking to each

8   other about them.

9              THE COURT:   The principal and agency

10  theory raises and falls on the degree of control.   That

11  would be both ways.   I don't know that the complaint

12  spells out the control on the part of the principal being

13  the individual defendants in one issue and Chais being the

14  principal in another context and having control over all of

15  these accounts.

16             It may very well be that discovery points

17  outs that there are agreements, that are oral or written,

18  that give the individual defendants the right to make

19  demands to receive funds.   But I don't know that the

20  complaint specifically does that or may be inferred doing

21  that.

22             I haven't heard from you, but you aren't

23  condemned for writing on the theory of agency in your

24  brief, but not in the complaint.

25             MR. SHEEHAN:   Well, let me respond very

1    briefly to that, Your Honor.   I agree with you it is not

2    detailed in the complaint.   Mr. White points that out as

3    well.   As best I think it is, as Your Honor suggests, it

4    is inferred.   Clearly, I think we would have the right

5    through discovery to determine through the documents that

6    Your Honor has alluded to whether that exists or not.

7    What we were arguing in the complaint, which I think is a

8    fair argument is the fact that the knowledge that Mr. Chais

9    had, which clearly he had, I don't think anyone is

10   disputing that here, quite frankly, given the fact he was

11   working as he was with his family and doing what he was

12   doing, that knowledge could be imputed.   I think we have

13   the right to prove that.

14              That allegation is predicated upon an array

15   of facts, and that is that all these accounts over all

16   these years, the manipulation of those accounts by Mr.

17   Chais, and we do allege that he was in fact manipulating

18   those accounts and directing them.   There is no question

19   if in so doing that, he did it with the knowledge of the

20   accounts, and in doing that, that knowledge gets imputed.

21              That is where we are, Your Honor.

22              THE COURT: Okay.

23              Mr. White, do you want to respond?

24              MR. WHITE:   Just a couple of quick points.

25   First, it is not our role to dispute what is known or not

27

1    known what Stanley Chais did in the proceeding.   I feel I

2    would be remiss --

3              THE COURT:   I know Stanley Chais is not a

4    movant for dismissal.

5              MR. WHITE:   He is also not my client.   He

6    has a lawyer in the room.   I presume he will deny the

7    allegations in the claim when the time comes, I don't want

8    the record to stand uncorrected he didn't dispute it.   It

9    is not time to dispute it.   When the time comes we will

10   have to decide what to do and what is appropriate under the

11   circumstances.   We should not take it as a given as it

12   seems as counsel to the Trustee is suggesting that Stanley

13   Chais did all of these things.   I don't know whether he did

14   or did not.

15             My facts are as they are alleged in the

16   complaint.   Okay, that's fine for now.   The question is

17   the sufficiency of the allegation, not the truth of the

18   matter of the facts as they are asserted thus far.

19             It seems to be at the heart of Mr.

20   Sheehan's argument is that this is a family and they talk

21   to each other.   I am not sure what else might be implicit

22   in the mishpocha, not having expertise in Yiddish.

23             THE COURT:   I don't know how it figures out

24   in the record.   I don't know, it wasn't spelled out and I

25   am not sure the reporter knows it.

28

1          MR. SHEEHAN:   I will submit it separately.

2          MR. WHITE:   To the extent it is what he

3    says, and there is not something laden in that other than

4    these people are family, the allegation that these people

5    talk to each other.  You have to be kidding me, that is the

6    basis of suing someone for $300 million for publicly

7    humiliating them and saying they are were active

8    participants in an ugly scheme like this?  They talk to

9    each other because they are family members.  By the way,

10   the allegation that they talk to each other is not in the

11   complaint.  It didn't get in there.

12          I would like to know what basis for the

13   imputation that Mr. Sheehan talks about that they plead

14   because if all it is, people in families talk to each other

15   it seems to me that Mr. Sheehan needs to or the Trustee

16   needs to know some more about the Chais family before they

17   could make that allegation.

18          THE COURT: Well, his argument is that the

19   complaint is sufficient enough to embark on appropriate

20   discovery.

21          If he fails in the discovery, then he is

22   exposed to a plea for summary judgment.  So what we are

23   really dealing with today is whether there is enough here

24   to embark on appropriate discovery.  Family relationships

25   as an inference is pretty strong in that regard.

29

1          To look into those family relationships may

2     be that sufficient pleading here that suggests discovery is

3     appropriate under those circumstances.  He may never

4     succeed in showing that these people were nothing more than

5     distantly related people on the street that got the largess

6     of Stanley Chais just because he felt like doing something

7     good for someone.

8          On the other hand, a family relationship

9     and bond might be strong enough to create the inference

10    that there is this relationship.

11          MR. WHITE:  Well, Your Honor, I think we

12    have come to a sad day, frankly, by the fact that you are

13    related to someone would allow a quasi-government official,

14    if you will, to force you to the burden of explaining in a

15    public place your family relationships.  There needs to be

16    a basis for saying these people knew, and the fact your

17    father is whoever he is, is not a basis standing alone for

18    that or even the proper basis for an inference or pleading.

19          THE COURT: It may very well be that you are

20    correct, but we shouldn't be doing that until there is some

21    discovery.

22          MR. WHITE:  I think you have to plead

23    something and have a good faith basis for pleading it.

24    These are things that are missing in the claim.  The fact

25    that you are saying they are in the family, it is not that

30

1    sort of basis.  I would be very disappointed to find out

2    that I could be held responsible for what my father did on

3    the way to work this morning, when he had a car accident.

4                THE COURT:  The fact is you are not going

5    to establish it.

6                MR. WHITE:   There is a huge expense

7    involved in this kind of discovery that the Court is

8    contemplating.  My clients lost all of their money just

9    like all the other victims that Mr. Picard represents, and

10   for them to have to defend what seems to be a lawsuit not

11   based on much more than or other than association, which is

12   like we would like to say, is not a basis in the American

13   system for proceeding, thereby a basis for putting people

14   to the burden of defending this kind of a lawsuit.  The

15   Trustee needs to come up with something more, whether the

16   source of the money, meaning whether it came from Stanley

17   Chais or some other person is irrelevant to the purpose of

18   a fraudulent conveyance.  The question is what happened in

19   the accounts between Madoff securities on the one side and

20   my clients on the other.

21               The fact that the source of that funding of

22   those accounts came from Stanley Chais is not related to

23   that inquiry.  The idea Stanley Chais felt akin to them

24   and gave them money is not part of the fraudulent

25   conveyance analysis.  That is a question of showing if that

31

1    was intentional and people knew what was going on.  If it

2    is constructive that reasonable people would have noticed

3    it.  It is a relationship between them and Madoff

4    Securities, not between them, their father and Madoff

5    Securities.

6              I would urge the Court to look past that.

7              Beyond that, Your Honor, I don't think I

8    have anything further to add.  At this point I guess we

9    will rest and move on to the next motion.

10             MR. SHEEHAN:  I have one brief thing to say

11    just in response to this.  It will take only 30 seconds.

12             Sometimes in the course of the argument we

13    seem to lose our way, the basic principles.  This is a

14    motion to dismiss.

15             We allege Stanley Chais stole hundreds of

16    millions of dollars.  We alleged that is all fictitious

17    profits.  We have alleged that all those accounts, dozens

18    and dozens of those accounts in the name of his clients,

19    it's not their money, it is other people's money, they

20    didn't lose their money.  They lost money that belonged to

21    other people.  That is all alleged and that is all true

22    for the purpose of this motion.  That alone sustains us

23    today.  All of the others, it is just power techniques

24    asserted with this at this point, but the basic principle

25    in this case is the allegation of hundreds of millions of

32

1   dollars being taken away from other people and the Trustee

2   seeks to get it back.

3           Thank you, Your Honor.

4           MR. WHITE:   I have one more thing.  If we

5   could finish up with my people, first Tracy.

6           On the agenda is the motion we made by

7   Mirie Chase to dismiss for lack of personal jurisdiction.

8   This will take about 20 seconds.

9           The bottom line is this woman had an

10  account in Madoff.   She is an Israeli citizen who has no

11  contacts otherwise in the United States.

12          Apparently on the issue of what personal

13  jurisdiction is, while Stanley Chais was her agent, we are

14  led back to the question about agency, of course not found

15  in the pleading.   It is the burden of the plaintiff to lay

16  a basis for proper jurisdiction.   None has been alleged

17  here, Your Honor.

18          The theory argued in the motion, in the

19  papers in opposition is inconsistent with the basis alleged

20  in the complaint.

21          So, Your Honor, on that basis we would say

22  Ms. Chais ought to be dismissed in the case for lack of

23  personal jurisdiction.

24          MR. HIRSCHFIELD:  Good morning, Your Honor.

25  Marc Hirschfield, from the law firm of Baker Hostetler, on

33

1    behalf of the Trustee.

2              This is not the first time in this case

3    that Your Honor has had the chance to consider personal

4    jurisdictional issues.

5              In fact, Your Honor, just a few months ago

6    the Court issued a ruling in that context of another of the

7    Trustee adversary proceedings that ruled upon a motion to

8    dismiss for personal jurisdiction.

9              That was in Picard v Cohmad, and reported

10   at 418BR75.

11             In that decision the Court overruled the

12   motion to dismiss of two Swiss entities and found that the

13   Court had jurisdiction over them.

14             The standard is set forth in Your Honor's

15   ruling, so I won't repeat it here today, but the Trustee

16   easily meets that burden.

17             As a matter of fact, the facts are just as

18   compelling if not more so than the case in Cohmad.   Just

19   briefly the facts are these.

20             Mirie Chase -- and I would note that in

21   Madoff's records Mirie is spelled M-I-R-I-E versus M-I-R-I.

22   But these two accounts in BLMIS the first was opened in her

23   name and what we think was her Social Security number and

24   her address in Israel.  There is a checkmark in the box of

25   agency and it has Stanley Chais' name as being her agent.

34

1    Based on that, we could infer that we have alleged that

2    Stanley Chais is her agent.

3              Over the five-year period that Mr. Chais

4    maintained this account there are at least 11 transactions

5    in the account.   Money came in and money went out and

6    there was a transfer to another account, which I will get

7    to in a second.

8              One of the transactions I mentioned was a

9    check was made payable to Ms. Chais personally, a $20,000

10   check in April 2003, and in all this account was a net

11   winner of more than $288,000.

12             Let me mention a transfer out.

13             Well, in November of 2004, Ms. Chais

14   transferred $340,000 out of her account and closed it.   It

15   was transferred to another account, with her husband, Mark

16   Chais, who I should mention is her husband, and Mark Chais

17   and Stanley Chais' son.  So she is Stanley Chais'

18   daughter-in-law.   That joint account was held in her name

19   and her husband is as joint tenants.

20             That account had a spectre of transactions,

21   more than 50 transactions in totalbetween the time she

22   became a joint tenant in the account when Madoff collapsed

23   in 2008.

24             As a matter of fact, that account was a net

25   winner of 13 and-a-half million dollars.

35

1          So based upon these facts which the Court

2    on a motion to dismiss on jurisdictional grands treats that

3    as true, the Court has clear jurisdiction over Mr. Chais.

4          As I said, the Court in Cohmad cited a

5    standard.   I won't repeat it here.   But clearly, the

6    allegations are that Ms. Chais' conduct was such that it

7    relates to BLMSI and her actions do and, therefore, the

8    Court has specific jurisdiction.   It is clear she is

9    acting individually or acting through her or through her

10   husband directed transactions in these accounts.   This is

11   not a bad investment.

12         Certainly Madoff would from time to time

13   give money out to people who would ask for it, but you

14   would have to ask for it, he didn't give money out

15   indiscriminately.

16         Clearly, the fact there were redemptions

17   and transfers, someone had to ask for them.   Ms. Chais

18   said she did not personally ask for them, and I don't know

19   whether that is true or not.   We did not have discovery

20   yet, either she or someone acting on her behalf did because

21   we know the money came out.

22         Once we get a prima facie case of showing

23   that we had the jurisdiction they had the burden of going

24   forward showing they don't and they have not met that

25   burden.

36

1          What the court also has to do is to look to

2     see whether jurisdiction is reasonable under the due

3     process grounds for the same reason that the Court found in

4     Cohmad we found it is reasonable to exercise jurisdiction,

5     that is equally applicable here.

6          One thing I want to note is that is not in

7     our papers.  In the Cohmad decision Your Honor is citing

8     your prior decision that was reported at 63-BR422, it was

9     noted that it is possible for a person to waive

10    jurisdictional issues and, in fact, filing a notice of

11    appearance could do that.

12         Well, in fact, the notice of appearance was

13    filed on behalf Ms. Chais, is Mirie Chase as a party.   In

14    docket 13 in the case a notice was filed on her behalf as

15    well as other defendants represented by counsel.

16         On that basis alone we believe the Court

17    properly could exercise jurisdiction here.

18         For all these reasons we think the Court

19    clearly had jurisdiction and the Court should exercise good

20    judgment and allow this lawsuit to go forward.

21         Thank you, Your Honor.

22         MR. WHITE:  I have a two points to make,

23    Your Honor.   One, with regard to the stipulation and the

24    waiver, I have never heard of this before.

25         I recall this was an issue for us at the

37

1    time we were entering appearances.  I need time to go and

2    check the records because it certainly was not the

3    intention on our part because we were aware of this issue

4    at the time we were doing that.  So I am caught unaware at

5    this time by that argument.

6              The other point that I would like to make

7    to the Court is Mr. Hirschfield spoke about how it is not a

8    passive role.  Mrs. Chais has said it is a passive role,

9    that she does not ask for or direct any activity with

10   regard to these accounts.

11             There is nothing in the pleading to the

12   contrary, Your Honor.  Again, you are asking for things

13   that are not in there to fill in the gaps that could have

14   easily been plead properly.

15             So from there we say, Your Honor, that the

16   Trustee has not met the burden.

17             MR. KLESTADT:  Good morning, Your Honor.

18   Tracy Klestadt, from the law firm of Klestadt & Winters.

19   We represent Michael Chasalow, and have filed a separate

20   motion to dismiss.

21             Your Honor, on the 51-page complaint, only

22   paragraph 38 mentions Michael Chasalow.  And if I may quote

23   for the record it is the fourth line:

24             Defendant Michael Chasalow is a person

25   residing in Los Angeles, California.  On information and

38

1    belief Michael Chasalow was the husband of Emily Chasalow.

2    On information and belief Michael Chasalow is the

3    registered agent for the Brighton Company (phonetic) and

4    for his family foundation and an officer and/or director of

5    Onedaga, Inc. (phonetic).

6              Your Honor, that is the only mention

7    Michael Chasalow in the entire complaint.   Michael

8    Chasalow's name does not appear in the schedule of

9    transfers because we received no transfers.

10             Your Honor, this is a perfect example, as

11   Mr. Sheehan is referring to earlier, of a complaint that

12   does not provide a road map for allegations against Mr.

13   Chasalow because there are no allegations of fact against

14   Mr. Chasalow.

15             Mr. Chasalow happens to be a respected

16   professor of law at the UCLA law school.   His finances are

17   separate from those of his wife.

18             He is not alleged, Your Honor, to be a

19   Trustee of any of the family trusts.   There are no factual

20   allegations that he received any funds or that he directed

21   the transfer of any funds.

22             He is not alleged to be an immediate

23   transferee or subsequent transferee.

24             In the response that was filed by the

25   movant there is a statement alleging that Mr. Chasalow may

39

1    have had joint control or access to joint accounts but it

2    is not pled in the complaint.   This is a situation where

3    the assertion is guilt by association or guilt by family

4    relation.

5                    There is no factual allegation in the

6    complaint whatsoever, Your Honor.   This is no road map

7    and, I believe, Your Honor, it does not meet the requisite

8    detail of pleading anything to survive our motion to

9    dismiss.

10                   I would request Your Honor to entertain our

11   motion.

12                   Thank you.

13                   MR. HIRSCHFIELD:   Good morning, Your Honor.

14   I am still Marc Hirschfield from Baker Hostetler, so far as

15   I know.

16                   In a nutshell, Mr. Klestadt argues that

17   because Mr. Chasalow does not have his own account at BLMIS

18   he could not be held liable in our complaint.   This is a

19   very narrow and impermissible view of the law.

20                   In fact, the complaint alleges that Mr.

21   Klestadt mentioned that Mr. Chasalow is related to Emily

22   Chasalow Chais, Stanley's daughter and he is a registered

23   agent for the Brighton Company, and is either an officer of

24   director of Onedaga and the Chais family foundation.   These

25   entities withdrew millions and millions of dollars from

40

1    BLMIS and Emily had at least 11 accounts at BLMIS that is

2    either an account holder or beneficiary for, and they

3    withdrew more than $51 million since January of 1997.

4              The complaint does allege that all but one

5    of those accounts after 1998 went into a bank account for

6    Emily Chais.

7              Now, I will get back to that in a second.

8    The Trustee has alleged facts that show Mr. Chasalow's

9    relationship to various entities that are named in the

10   complaint.

11             We have the right to seek the return, the

12   avoidance of return of transfers to initial transferees and

13   subsequent transferees.

14             We have had no discovery here at all, as

15   Your Honor knows, and we are entitled to discovery to find

16   out exactly which transfers may have been gone to Mr.

17   Chasalow.

18             We know that some did -- and I will get to

19   that in a second -- but we know for a fact that some did.

20             The complaint does put him on notice we are

21   seeking in paragraph 166, the return of payments of

22   commissions or fees of transferring from one account or

23   another or by some other means.

24             Clearly, Mr. Klestadt knows he is being

25   sued for fraudulent transfer and that is either as an

41

1    initial transferee or subsequent transferee.

2              I mention that discovery here is

3    appropriate.  At the time we filed the complaint we have

4    information as to where Mr. Chasalow may have gotten

5    transfers.  We have since learned, on at least one

6    occasion, that $6.4 million from Emily Chais, she withdrew

7    from BLMIS went to a joint bank account with Mr. Chasalow.

8    So clearly it went to a joint bank account, where he had

9    control over those funds and would be an initial

10   transferee.

11             Had we not found this out independently we

12   could not have known it or alleged it.  At the time we

13   filed the complaint we didn't yet know that.  By discovery

14   we will found out exactly which transfers Mr. Chasalow had

15   gotten as an initial transferee and which ones he got as a

16   subsequent transferee.

17             Clearly, the complaint lists a slew of

18   transactions, and he has exclusively knowledge of, which

19   monies he may have received.

20             It is not appropriate to hold a Trustee to

21   a burden where he can't make allegations because he is not

22   taking discovery and does not have the information.  The

23   information is in their hands and they know it.  We will

24   learn it through discovery.  We would submit that the

25   reading of the law presented by the defendant here is

42

1    impermissibly narrow and we should be allowed to go forward

2    with discovery and to establish which transfers Mr.

3    Chasalow got through discovery as the initial transferee

4    and which funds he received as a subsequent transferee, and

5    then seek to avoid those transactions.

6                    Thank you, Your Honor.

7                    MR. KLESTADT:   Just very briefly, Your

8    Honor, the complaint does not say that.

9                    THE COURT:  -- well, that is true, the

10   complaint doesn't say it.   The brief does.   I have looked

11   at the brief.

12                   All these new facts are in there.   I could

13   just say I grant your motion with the right to replead

14   because I think the new facts do justify sustaining the

15   complaint.   This could be a waste of time, but if that is

16   the way it ought to be, I could do that.

17                   MR. KLESTADT:   I think given the fact they

18   have lumped my client in with this --

19                   THE COURT:  Now, you have separate facts

20   that bring your client into the focus of the Trustee's

21   complaint.

22                   MR. KLESTADT:   We may warrant a separate

23   motiion, so the Court may focus on what specifically would

24   be applicable or not applicable to my client.

25                   THE COURT:  As I say, I could grant your

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

43

1    motion but that just brings us back to unless you could

2    stipulate and direct the Trustee to replead with respect to

3    your client, based upon the old facts and the new facts

4    that have been admitted in discovery.

5                    MR. KLESTADT:   I could take that up with

6    my clients.   We raise that issue and, in fact, we raised

7    the issue of the Trustee repleading the case, but that was

8    rejected.

9                    THE COURT:  That would save everyone in the

10   case a lot of time and effort if you would let the Court

11   know.

12                   MR. WHITE:   I think we need a change of

13   personnel, now, Your Honor.

14                   MR. KLESTADT:   May I be excused, Your

15   Honor; I have an 11:30 before Judge Gonzales?

16                   THE COURT:  Go ahead.

17                   (Brief recess.)

18                   MR. HIRSCHFIELD:  Judge, one thing before

19   Mr. Eyre argues the motion to dismiss the counterclaims.

20                   Counsel has asked me to withdraw our

21   reliance on the pleadings on the appearance as a basis for

22   jurisdiction.   We did not give him a copy of that last

23   night and we apologize for that.   We will withdraw that

24   argument.   It is what it is.

25                   MR. EYRE:  Your Honor, may it please the

44

1    Court, Paul Eyre, from Baker Hostetler, representing the

2    Trustee.

3                    We have a motion to dismiss the

4    counterclaims filed by Stanley Chais, the father, his wife,

5    Pamela Chais, and various Appleby entities that are

6    controlled by Pamela Chais and the 1991 Chais family trust.

7                    Those entities, Your Honor, answered the

8    complaints and filed a four-count counterclaim.

9                    The four counts of the counterclaim are

10   tortious interference with business relations, conversion

11   and the Fifth Amendment count that is some form of due

12   process for the denial of counsel.

13                   All four counts are predicated on one

14   single act.

15                   That is, Your Honor, the act of the Trustee

16   in sending a letter to Goldman Sachs on March 6, 2009.

17                   A March 6 letter was sent to Goldman Sachs,

18   among other entities and basically that letter was sent to

19   put Goldman Sachs and others on notice of the Trustee's

20   position regarding assets that they may have obtained

21   directly or indirectly from BLMIS.

22                   Your Honor, it was also in the letter, the

23   letter was also sent to put Goldman Sachs and others on

24   notice of the automatic stay.

25                   The letter was sent pursuant to the

45

1    Trustee's exercise of his fiduciary duties.  In fact, some

2    would argue his obligation to send the letter to assist him

3    in marshalling the assets that would come into the estate

4    and be distributed among those individuals who lost

5    millions of dollars.

6            This is not the time for me to give the

7    opening statement on Stanley Chais.  I will resist that

8    urge, Your Honor.  The Court has heard enough about Mr.

9    Chais' relationship going back 30 years with Mr. Madoff,

10   it's been a close association.

11           I will however briefly explain to the Court

12   that the money is what is in the counterclaims, they are

13   complaining of the access of money.  The way the money

14   worked at the end was really quite simple.

15           The money would come out of Madoff, and it

16   would go to City National Bank in California.

17           City National Bank in California would then

18   have two buckets, or at least it was essentially two

19   buckets.

20           One bucket was for Chais family, all the

21   entities that are Stanley Chais, his wife, his children.

22   All those entities.

23           The second bucket was called the arbitrage.

24   That was what it was called by Madoff.  But that is three

25   entities, Pompom (phonetic), Landover and Brighton.   They

46

1   are entities in California where investors, people come

2   into these entities and for 30 years, or more than that,

3   perhaps, Stanley Chais was the one that these investors

4   gave their money to.   He, in Your Honor, would give the

5   money to Madoff.

6             There was only a brief time when Stanley

7   Chais did not have that role.   That is when he was sick.

8   I believe he went to Israel for a period of time and

9   installed his son Mark as the individual in charge of

10  Pompom, Landover and Brighton.

11            In any event, the money would come out and

12  be disbursed and money would actually go back to Stanley

13  Chais as his percentage of the Pompom, Landover and

14  Brighton.  If they did well, above 10 percent, which they

15  always did, he got a particular account.

16            Money would also go from City to an account

17  that Mr. Chais had at Goldman Sachs and that is in two

18  parts.   One I will call the liquid account, it has the

19  liquid assets.  The other is partnerships, real estate

20  partnerships.   So what happened here is, and it is very

21  important for these counterclaims that there is no

22  allegation, none, that the Trustee took money, that the

23  Trustee took property, that the Trustee exercised control

24  over any account.

25            There is no allegation, in fact, that the

47

1    Trustee had the power, had the authority or in any way

2    stopped money from going out of Goldman Sachs to Mr. Chais.

3                    What happened is as follows.   The Trustee

4    sends a letter and the Court I am sure is aware of these

5    types of letters.

6                    In that letter, the Trustee details his

7    legal position, relies on statutes.   He spells out the

8    statutes.

9                    He cites case law, Your Honor, and he says

10   this is our belief as to the current situation.

11                   Goldman Sachs then makes an independent

12   decision, or it's apparently an independent decision, to

13   not allow money to go out to Mr. Chais.

14                   That was a decision, Your Honor, that

15   Goldman Sachs made.   These counterclaims also claim that

16   because the letter was sent, Goldman Sachs was caused to do

17   something.

18                   I submit, Your Honor, that is facially

19   implausible for a number of reasons.   Number 1, as Mr.

20   Chais is fully aware, there were millions of dollars

21   potentially owed on those real estate investments.   And

22   what has been happening over time, as Madoff gave the money

23   to Chais, Chais was able to use that money to make his

24   capital calls to Goldman.

25                   When Madoff dried up, I am positive that

48

1   Goldman Sachs considered its own position and decided, gee,

2   we better worry a little bit about the pocket of money

3   sitting here, in case Mr. Chais is unable to make a capital

4   call.

5              So Goldman Sachs itself decides they won't

6   allow the money out.   Now, in fact, just so we are clear,

7   in fact, and this is important, money has gone out.

8   Plenty of money has gone out.

9              The Trustee even after the receipt of the

10  letter sent a letter to Goldman Sachs saying: The Trustee

11  agrees for money to come out for living expenses, medical

12  expenses.   In fact, as Your Honor knows, in September of

13  2009, Mr. Chais filed a motion to the Court, an order to

14  show cause.   We countered with a TRO.

15             There was an agreement reached, a consent

16  decree reached at this point, a consent order that

17  basically establishes a system for money going out for

18  counsel fees, for medical expenses, for living expenses. So

19  all of that is ongoing at the moment.

20             Getting back to the letter itself, I think

21  everyone now, and by everyone I mean certainly the Chais

22  entities and the Trustee, by which the Chais entities

23  conceded that the sending of the letter itself would not be

24  a tortious act.   And I think they would agree that the

25  sending of the letter would not be a tortious act.   That

49

1    is consistent with a number of cases cited in our brief.

2    The Kush (phonetic) case indicates, Kush must also

3    establish that the Trustee intentionally interfered with

4    the performance of her contract without an economic or

5    legal excuse or justification.

6              The recovery for a tort is not allowed

7    absent a showing that the defendant intended to harm the

8    plaintiff without an economic or legal excuse or

9    justification.

10             I believe that in their papers that Chais

11   has conceded that is indeed the sending of the letter is

12   indeed what the Trustees are required to do.  That is part

13   of their job to marshal assets.  So the actual sending of

14   the letter we believe, and I think it is conceded, cannot

15   be a tortious act.  The Chaises go on to say that perhaps

16   we conceded that, but the letter itself contained a

17   misrepresentation.  As best I am able to tell, they claim

18   that the letter misrepresents the definition of customer

19   property under 78fff2C3.

20             I will not argue that issue here today.

21   The Court is well aware of the Trustee's position, that

22   indeed assets sitting at Goldman Sachs on behalf of Mr.

23   Chais is customer property.

24             But regardless of that argument, Your

25   Honor, there could be no question that the Trustee acted in

50

1  good faith, good faith belief and that it was legally

2  justified in sending the letter.

3         The argument on Goldman Sachs is also that

4  it is facially implausible that Goldman Sachs upon

5  receiving the letter of the Trustee would not do its own

6  work, would not consider itself its own legal position,

7  would not examine its contract, would not do the things

8  that a Goldman Sachs would normally do.

9         In fact, when you read the counterclaim it

10  becomes obvious that one of the reasons the counterclaim

11  fails in addition to what I just stated.  Is that there was

12  no breach.

13         You can't have a tortious interference with

14  a contract, if the contract itself was not breached.

15         There are many references in the

16  counterclaim and in the document filed by the Chaises that

17  reference the agreement with Goldman.

18         We believe Your Honor can indeed look at

19  that.  It was not attached to the counterclaim, but it was

20  attached to our papers.

21         This document it is very clear, Your Honor,

22  that Goldman Sachs reserved the right on its own to

23  withhold funds.  There was no breach.  There has been no

24  breach of this contract.

25         From March, the receipt of the letter by

51

1    Goldman, until September of '09, Goldman could have been

2    sued by Chais.   Chais could have come to this Court.

3    Goldman could have come to this Court.   A lot of things

4    could have happened, and none happened until September of

5    '09 when Chais brought a motion before the Court and we

6    reached an agreement.

7                    Even if, for argument's sake, you could

8    make the argument that the Trustee misrepresented the law

9    in a letter that was his business judgment to send, and

10   even if you could argue that the letter caused Goldman

11   Sachs to breach a contract, which, of course, they didn't

12   breach, but even if you could make those arguments, we

13   believe further that the Trustee is immune from a lawsuit

14   for the sending of the letter.

15                   While we concede that the immunity is not

16   total, there is a qualified asset in the community, but I

17   can't think of a more relevant thing that a Trustee can do

18   such as sending this letter that should be protected by

19   immunity.

20                   I mean one could -- the argument has been

21   made, well, if he intentionally misstated something, if it

22   was a mistake he abrogates immunity.

23                   If everything the Trustee said in the

24   letter is true, which we believe it is, you don't need

25   immunity.  The reason trustees get immunity is for a

52

1    mistake, and you don't need that if everything the Trustee

2    is doing is absolutely correct.

3              In hindsight to go back and you said you

4    abrogated immunity because we conclude your definition of

5    customer property is not the definition we believe to be

6    the case, I think it misses the point entirely.

7              I think that the Chaises go on to say, and,

8    I believe, this is true, they then make the argument, well,

9    maybe by a mistake, maybe if the Trustee made an honest

10   justifiable mistake, he doesn't lose immunity but he will

11   lose immunity if he intentionally did something, if he

12   intentionally did something in the letter to misstate the

13   law.

14             I have a number of responses to that, Your

15   Honor.   The first is that there is absolutely nothing in

16   the complaint, nothing, that alleges facts that this

17   Trustee intentionally misstated something in a letter to

18   try to get Goldman Sachs to do something.

19             Your Honor, there is nothing in the

20   counterclaim other than the bald assertion that the Trustee

21   intentionally did something.   That is a legal conclusion

22   and, I believe, the Astroff (phonetic) case in 2009, and

23   the other case makes it very clear that is not acceptable.

24             Furthermore, it appears to me anyway, if a

25   Trustee, if the argument is, well, the Trustee tried to

53

1    fool Goldman Sachs by mistakenly putting a wrong law in

2    that you have actually put the cases in, you have put the

3    statute in, the causal connection between that letter and

4    Goldman's actions must indeed fall.

5              This is Goldman Sachs.  If anyone truly

6    believes that the Trustee is deliberately and intentionally

7    trying to fool Goldman Sachs into doing something they

8    otherwise would not do, the Trustee doesn't put in their

9    cites to the cases, all the things the Trustee did not.

10             I think that is facially implausible.  I

11   think as the Court is well aware, facial implausibility

12   does matter, it does matter in a complaint.

13             There are two other counts.  The count for

14   conversion, Your Honor, basically, it seems to me that we

15   took something, that the Trustee took something.

16             There is nothing in the complaint at all,

17   nothing, factually that would show the Trustee took

18   anything, had control over anything because he did not.

19             The only act he is accused of doing is

20   sending the letter.  That is the act.  The act of sending

21   a letter cannot control an account that is held at Goldman

22   Sachs by Mr. Chais.  That can't follow.

23             I think the conversion fails also.

24             One thing I failed to mention is even if

25   the Chaises were able to overcome the immunity, even if

54

1    they were able to overcome the causal connection, all those

2    things that I believe are reasons for the counterclaim to

3    fail, the actual statements in the letter itself are

4    privileged.

5             There is plenty of good law that says when

6    a Bankruptcy Court appointee sends out various things,

7    various letters, the content of those letters are

8    privileged.

9             The Chais defendants tried to distinguish

10    those cases.   What they say is, well, that is true if the

11    statements in the letter constitutes defamation and/or the

12    letter is going to someone who is part of the judicial

13    proceeding.   They said those are the only two times that

14    you get the privilege.

15             I found nothing in the case law, nothing

16    that supports the notion that it has to be defamatory, or

17    could only be letters that go to the proceeding that would

18    allow you to have the privilege.

19             I believe the privilege would extend to the

20    content of the letter.   That is a further reason that the

21    motion to dismiss should be granted.

22             The last count, Your Honor, is the Fifth

23    Amendment claim.   As I best understand it, it is as

24    follows:   It appears that the argument is that Mr. Chais

25    was denied access to counsel, counsel that Mr. Chais has

55

1   had, the law firm of Loeb & Loeb, for a good 30 years.

2              They are counsel that has been paid out of

3   the assets.   As I understand it, it has been paid

4   regularly.   The Trustee has agreed pursuant to the consent

5   decree to agree that money will go to pay legal fees.

6              Furthermore, and I think the fact of the

7   matter is he has always had counsel, he has always had it

8   all along.   I think it is also important, and I don't want

9   to get hung up on it, but it is true in a civil context

10  that the defendant is not necessarily denied access to

11  counsel if he has the right at all for access to counsel,

12  but it is also not a situation where he simply gets the

13  counsel of his choice.   That is not what the law requires.

14             The other argument, and I wouldn't belabor

15  the point, the Trustee is not an estate actor doing

16  something unconstitutionally to Mr. Chais.   He cannot do

17  that.   He is not an estate actor.

18             I could argue further, but to sum it up, I

19  basically say, I think this has to be conceded, the only

20  thing in the complaint that this Trustee is accused of

21  doing is that which every Trustee must do, which is attempt

22  as he knows best to be able to do to marshal the assets of

23  those people like the Chaises, who have taken out hundreds

24  of millions of dollars.

25             The Trustee has an obligation to try to get

56

1   that money back.   He is doing what a Trustee has to do.

2                   If doing what a Trustee has to do subjects

3   a Trustee to counterclaims of the sort here, the

4   counterclaims for conversion, counterclaims for tortious

5   interference, counterclaims for a violation of someone's

6   due process right, I would submit to the Court that we

7   would have a very hard time, having not done its job.

8                   Thank you very much, Your Honor, I

9   appreciate it.

10                  MR. LICKER:   Good morning, Your Honor.

11                  THE COURT:  Good morning.

12                  MR. LICKER:  Eugene Licker with my

13   colleague, Walter Curchak, from the law firm of Loeb &

14   Loeb, on behalf of the defendants, Stanley Chais, Pamela

15   Chais, Appleby Productions Ltd, and some of its related

16   entities.

17                  Going last has a lot of drawbacks, Your

18   Honor, and it only has one benefit.   It allows me to make

19   some commentary on what went on before, including the

20   argument I was not a part of.

21                  As Mr. White says there is a point where

22   Mr. Chais' lawyer comes out, and we have denied the

23   allegation in the complaint that has been submitted in the

24   answer that is before you today.   The answer, the

25   allegations which are taken as true for the purpose of this

57

1    motion.

2              The second thing I would say, Your Honor,

3    with all indulgence and apologies to the court reporter,

4    the noun that best describes this matter, I don't believe

5    is mishpocha, but I would choose mishigas.  On that note,

6    and I have given her the spellings, my best guess of

7    spellings on those.

8              I want to address what Mr. Eyre just had to

9    say.  With all due respect, I would ask you to dismiss

10   virtually all of it.  I have been doing this for 30 years,

11   and I have to say that this is the first defense of a

12   motion to dismiss that I heard that went so far into the

13   facts, and really at this point what I found to be the

14   Trustee's approach to this entire case.

15             So when Mr. Eyre gets up here and says I

16   wouldn't rehash the allegations against Mr. Chais, if you

17   recall in his opening brief, he did just that.

18             He, essentially, asked Your Honor to take

19   as true not the pleading that is before Your Honor on this

20   motion, but his pleading.  And even if we were assume that

21   Mr. Chais has done all of these terrible things and

22   frankly, there is not all that much in the complaint that

23   is plead specifically anyway, it is all paragraph 1 of 3 in

24   there.  It's all in one paragraph.

25             He has asked Your Honor to accept his

58

1    allegations as true rather than those in the counterclaim.

2    Now, as Your Honor well knows, this is a motion to dismiss.

3    The issue before the Court is not whether we prove our

4    claims, but whether we stated our claims, and it is our

5    pleading that is accepted as true.

6              So when Mr. Eyre goes through and tells you

7    how the Goldman Sachs account works, how monies were

8    transferred to City National Bank, leaving aside the fact

9    that Mr. Eyre is testifying on the basis of pure hearsay,

10   leaving aside he is not under oath, leaving a stipulated

11   fact that some of things he has presented as the facts are

12   wrong, it is all irrelevant.   It is all not competent

13   commentary on this motion.   This is a motion to dismiss

14   the counterclaims.

15             I would ask that Your Honor ignore what Mr.

16   Eyre tells you about the millions and millions of dollars.

17             THE COURT:   That is not the real issue

18   here.   You, I, and Mr. Eyre, know that this matter and

19   these allegations in the counterclaim come before me and

20   it's not for the first time, but there is also a history.

21   This Court has presided over the litigation involving the

22   Goldman Sachs account, and the consent order with respect

23   to it.

24             The real issue here is whether the sending

25   of that letter was a tortious act and the impact of that

59

1     and the freeing of the account, is the freeing of the

2     account an act of volition on the account of Goldman Sachs

3     that was triggered by the letter or not.

4            The account frankly was frozen, not by the

5     Trustee, but by Goldman Sachs.

6            I think the law will acknowledge that

7     Goldman Sachs is a pretty sophisticated target when it

8     comes to someone claiming an improper or tortious act, and

9     makes its own judgment as to whether or not it is

10     appropriate to freeze the account.

11            I think we can conclude that Goldman Sachs

12     made a judgment on the account.

13            MR. LICKER:  Right, Your Honor.

14            THE COURT:  Whatever its thinking was, I

15     don't think it is relevant here.

16            MR. LICKER:  Whatever its thinking was?

17            THE COURT:  Yes.

18            MR. LICKER:  Whatever Goldman's thinking

19     was?

20            THE COURT:  Yes. You will have to assume it

21     has done due diligence.

22            MR. LICKER:  Yes.

23            THE COURT:  And you cannot assume that

24     Goldman froze the account out of ignorance.

25            MR. LICKER:  I don't assume anything.

60

1          THE COURT:  These are real issue before me

2     and I agree with you, I don't care about all of the other

3     issues.   But it does come before me with somewhat of a

4     history involving the utilization of the money and a lot of

5     things that are contained in this counterclaim.

6          MR. LICKER:   But very much to the point,

7     Your Honor, I don't know what went through Goldman's mind.

8     I know what would go through my mind if I were counsel to

9     Goldman and got this letter, and we will talk about the

10    contents of the letter in a minute.

11          But that is what trials are for.   We will

12    find out what went through Goldman's mind.   We will find

13    out whether Goldman read these cases and said, you know,

14    that Baker Hostetler, those people were pretty smart and

15    got it right or they may have read those cases as we did

16    and said, you know what, the guys at Baker Hostetler got it

17    wrong.

18          THE COURT:  This is not a lawsuit against

19    Goldman Sachs, but the Trustee.

20          MR. LICKER:  It is not --

21          THE COURT:  Perhaps under the old theory it

22    should be.

23          MR. LICKER:   Every tortious interference

24    case, Your Honor, has two culpable parties.  When A induces

25    B to breach a contract with C, B has breached that contract

61

1    and is susceptible to, but it does not mean A is not.

2                  The question is did the letter that was

3    sent start a chain of events, of which the inevitable

4    result was Mr. Chais would lose control of his property and

5    the answer is yes, that is what we allege and we will show

6    at trial.

7                  Let me read to you, if I might, Your Honor,

8    just a small portion of this letter.  We will ask

9    ourselves is Goldman Sachs just deciding for itself without

10   any liability, any culpability on behalf of Mr. Picard or

11   is there something else going on.

12                 It is the last substantive paragraph, but

13   not the last paragraph, and it is important because -- I

14   will read the last paragraph:

15                 This letter places you on notice, (if you

16   were not already on notice), that because the funds

17   constitute, "customer property," not because we think that,

18   but because they do and, therefore, property of BLMIS

19   pursuant to SIPA, the Trustee will presume that any further

20   payment or disposition of the funds by you, whether or not

21   at the direction of your customer or depository, will, not

22   might, will be deemed a willful violation of the automatic

23   stay by the Bankruptcy Court.

24                 You are hereby instructed to refrain from

25   engaging in or permitting any transfers or dispositions of

62

1   the funds or other monies received from BLMIS without an

2   order of the Bankruptcy Court.

3                   Your failure to abide by this instruction

4   may subject you and/or the transferee to liability under 11

5   U.S.C. sections 549 and 550.

6                   In addition, any such transfer or

7   disposition may be deemed by the Bankruptcy Court to have

8   been made in bad faith and your liability may include

9   sanctions.

10                  Final paragraph, Your Honor.  Please

11  contact me as soon as possible for discuss compliance with

12  this letter.

13                  Signed Lauren J. Resnick, on behalf of

14  Baker Hostetler.

15                  Your Honor, yes, Goldman is smart people

16  and they have smart lawyers and they read this law, and

17  they could have decided not to be intimidated by these

18  bullying tactics but they did not, they did not.

19                  The letter, and we will talk about the

20  substance of the letter in a minute, is wrong.  The letter

21  does what Mr. Picard has done, vis-a-vis Mr. Chais from the

22  start, which is to presume guilt.

23                  The letter leverages off of loose language

24  in cases that utilize a legal fiction to align the SIPA

25  statute and Bankruptcy Code so as to avoid technical

63

1    defenses.

2              It says to the Goldman Sachses of the

3    world, the money that you hold, irrespective of what we

4    prove, we have not proved a thing, without a stroke of a

5    judicial pen, the money that you hold belongs to me, Irving

6    Picard.   It does not belong to Stanley Chais.

7              That is not true, Your Honor.   What is

8    true is the Trustee believes he can prove that is his

9    money, that he is going to -- and this is in March -- he is

10   going to interpose a complaint, he did in May, and he says

11   he will win and maybe he will, I don't believe so but maybe

12   he wins.   And when he wins, then it is his money.   But

13   what he was doing in March of '09 is taking that money,

14   taking dominion and control of that money.   And contrary to

15   Mr. Eyre's comments, the conversion claim says he took

16   dominion and control over that money, and that is the

17   element of conversion.   He just took control of the

18   account:

19              Please call to discuss compliance, please

20   call me so I will tell you, Goldman Sachs, what to do with

21   the account.

22              There are lot of lawyers in the room.   If

23   Goldman came to them and said what should I do, it is

24   no-brainer, don't give Stanley Chais the money.

25              Why?   What if the letter is wrong?   So

64

1   what?  You want to put up with a lawsuit and pay a lawyer

2   to defend.  No.  As night follows day, Goldman did not

3   only what Mr. Picard knew what they were going to do, it is

4   what he intended them to do.  That is why he sent the

5   letter.

6            On this motion to dismiss, Your Honor, we

7   are not here to resolve the facts but to talk about the

8   arguments.  Let's talk about the argument that Mr. Eyre

9   raises here.

10           First, it is Mr. Picard's duty to marshal

11  assets.  He said we have conceded that.  I don't know it

12  is his duty to send letters but it is his duty to marshal

13  assets.  I have no problem with him sending letters,

14  telegrams or e-mails.  All he has to do is get it right

15  and not wrong.  He has to not take my client's property.

16           But whether he was acting in good faith,

17  whether Goldman took the time to read those cases and

18  decided for itself what to do, those are all questions of

19  fact.  That is what trials are for, not things that are

20  cognizable on a motion to dismiss.

21           Is the letter true or false?  We will have

22  a trial about that.  We will find out whether the letter

23  is true or false.  But I would argue that the letter very

24  clearly is false.

25           What the Trustee has done is taken solace

65

1    in language in Park South, Hill 1 and Hill 2, that creates

2    a legal fiction.

3              And we could talk about it but it is very

4    clear the legal fiction is for purposes of standing because

5    of the language difference between SIPA and the Bankruptcy

6    Code.    That is it.

7              As the Second Circuit said in Colonial, and

8    that was not a SIPA case, but it does not matter at all to

9    this point.    The Court says if it were the case that the

10   property in the hands of the third party were property of

11   the estate, then you would not need to bring an action for

12   the Trustee to get it back.    You would just take it back.

13   It is his property.

14             The cause of action, says the Colonial

15   Court, is the property of the estate, not the property

16   itself.

17             It still has to go through the process of

18   convincing you, Your Honor, that it is their property.

19   That is the step they skipped.

20             By skipping that step, Your Honor, they

21   have harmed our client.    If was certainly Goldman Sachs

22   that pulled the trigger, but it cannot be said that

23   language in that letter is merely the Trustee stating his

24   opinion and saying to Goldman, you do what you want.    It

25   is clear what the intended and the probable result of

66

1    sending that letter would be.

2                    But, Your Honor, that is what we are going

3    to prove at trial.   Is the Trustee immune from suit?   No

4    it is not.   The truth is that he is immune for the

5    exercise of business judgment and this is not a business

6    judgment.   It is not a decision of when to sell or what

7    price to sell.   This is writing a letter, taking a

8    position that is legally bankrupt and because of that,

9    causing harm to a third party.

10                   Whether it is exercising business judgment,

11   though, it is a question of fact.   That is why we have

12   trials.

13                   Is the letter privileged?   I would have to

14   say this is one of the most creative arguments I have heard

15   in a long time.   But it is also one of the most vacuous.

16   The notion of privilege and I have litigated a number of

17   defamation cases, and I believe Your Honor has seen many

18   more than I have litigated, the notion of privilege is

19   unique to two causes of action, a cause of action for

20   defamation and for malicious prosecution.   Why?   Because

21   of the nature of those actions in a lawsuit, you are always

22   putting someone's reputation on the line.   You are saying

23   that someone did something wrong.

24                   If you don't privilege those matters, then

25   no one could ever sue for defamation.   That is why it

67

1   adheres.

2          The Trustee cited no case outside of the

3   defamation context, with two, well, one exception and one

4   case that they say it is an exception.  The latter is the

5   Weisman case, which grows out of the OPM leasing, where

6   Weisman's older brother, Mordecai, sued the trustee.  There

7   were three sentences.  It's in the absolutely wonderful

8   report that's reported by, and I am sure Your Honor is very

9   well familiar with it.

10          THE COURT: They are still making money in

11   selling the examiner's and Trustee's book.

12          MR. LICKER:   You can get it for free.

13          THE COURT:  Can you?  The bound copy is

14   about hundred and some-odd dollars.

15          MR. LICKER:   Is that right?

16          THE COURT:  I don't get any --

17          MR. LICKER:   It is absolutely wonderful, I

18   keep it on my shelf at all times.   I think it is the best

19   written book on fraud that there ever was.

20          In the report --

21          THE COURT: Just, as an aside, when you talk

22   about fraud and Madoff, it's kind of sophisticated or

23   unsophisticated.  The OPM fraud was essentially taking a

24   glass cocktail table, putting a contract on the table, a

25   flashlight underneath it and then forging the signatures.

68

1          MR. LICKER:   The image of Mordecai

2   Weissman with a flashlight on the table and then where it

3   is filled in is etched in my mind.   It is a wonderful

4   case.

5          THE COURT:   It is also interesting one of

6   them ending up marrying the photographer?

7          MR. LICKER:   I don't know.

8          THE COURT:   We don't know for sure about

9   the sex of the photographer.   It would be interesting to

10   find out.

11          MR. LICKER:   I want to interview the -- I

12   think Mordecai Weisman is out there, it is very, very

13   interesting.   His brother was mentioned as having a

14   no-show job, and having complicity in the fraud.   There

15   were three sentences in a several hundred page report.   He

16   sued for defamation and tortious interference and the whole

17   argument is you defamed me, therefore I can't do business

18   anymore.   It was a defamation case.   That is all it was.

19          The only other case that the Trustee has

20   found where the notion of privilege applies someplace else

21   is a case out of California applicable to Section 47 of the

22   California Civil Code that specifically privileges

23   materials that are presented in Court.   That is sui

24   generis.   It has got nothing to do with the case.

25          My favorite argument, which is the next

69

1    argument the Trustee makes, to the extent the privilege

2    only applies to defamation cases.   Well, this is a

3    defamation case.   The argument is it was about a letter

4    which has a false statement, that is defamation, that

5    causes an injury to the counterclaimant.   Therefore, this

6    must be a defamation case.

7                Your Honor, they left out the notion that

8    the falsehood has to be about the plaintiff.   This

9    falsehood is about money and they have left out the part

10   about reputation of damage.   We are not claiming that.

11   We are claiming other kind of damages, inability to access

12   funds.   This is not a defamation case.

13               Next, there is no breach.   Why do we know

14   there is not?  Mr. Eyre tells us that.  He is a very good

15   lawyer.   The fact he has read these contracts and he now

16   tells Your Honor there is no breach, that is interesting

17   but irrelevant.   That is why we have trials.

18               Indeed there is a breach.   There is

19   nothing in any of those contracts that says any third party

20   can decide when and if money could be released to Mr.

21   Chais.   But that is for trial.   That is not on a motion

22   to dismiss.

23               Finally, it is Goldman's fault, it is not

24   our fault.   Well, Your Honor, causation.   If this letter

25   had not made its way to Goldman Sachs, I guarantee you I

70

1  would not be standing here making this argument.  We would

2  not have been before you.

3            In terms of the elements of the various

4  causes of action there are a couple of technical arguments

5  that the Trustee makes in their reply brief.  I want to

6  address that because we did have a chance to do it on the

7  paper.

8            We argue tortious interference with

9  contracts and business relationships to the extent any of

10  the relationships between Mr. Chais and Goldman is extra

11  contract, that it is not dealt with by the contract, the

12  Trustee comes back and says and this really epitomizes the

13  Trustee's argument in this case, he comes back and says

14  there is no allegation of malice.  You have to allege

15  allege malice, and they quote the statute, which means

16  unlawful means or purpose.  They say they have an alleged

17  malice.

18            We have an alleged unlawful means,

19  referring to the conduct of the Trustee for sending a

20  letter that was untrue.  That is what unlawful means.

21            We don't say that the Trustee hates Mr.

22  Chais, that he has hatred or ill will towards him.  But

23  what we said was it was unlawful full means.

24            Mr. Eyre has misconstrued the

25  constitutional argument of what is happening here.  He is

71

1    remembering when the letter came in and we had some

2    problems getting money out of Goldman Sachs.  As you could

3    imagine, Your Honor, I might have made it my business to

4    mention all of this to Mr. Eyre and to ask him to

5    reconsider.  That would all go to good faith.  That is

6    factual, and not before you on this motion.  Mr. Eyre is

7    confusing what went on back then with what we are arguing

8    now.

9            What we argued back then is, hey, you may

10   be willing to dole out and make Mr. Chais come out to you

11   and say, I need to see the doctor this week, can I have

12   $100 to pay this bill, and you will say yes.  You are not

13   bad people or trying to kill the man.  But they were not

14   allowing us access to any funds to pay for the legal

15   defense and it affected the legal defense.  Yes, we stayed

16   on.  We wouldn't abandon the client.  But it affected the

17   legal defense.

18           But that is not what the fourth cause of

19   action is about.  It is very simple, Your Honor, under

20   Intercontinental, you could have private actors that act as

21   public actors who are subject to the state action

22   restrictions.  This is one of those situations and the

23   government is not allowed to take your property, which in

24   this case is control over this account without due process

25   and that is what they have done.

72

1          This is not a Sixth Amendment argument, but

2    a Fifth Amendment argument, and I want to make that clear.

3          Let me close with this.   I was here for

4    the first argument.   I heard Mr. Sheehan very passionately

5    argue to Your Honor about the thousands and thousands of

6    victims of the Madoff fraud.

7          I can't say anything different.   Obviously

8    a lot of people were hurt here.   I have nothing but

9    respect and Mr. Chais has nothing but respect for the

10   Trustee and his efforts to try to get money back to those

11   people.   That is a noble effort, and I am glad they are

12   people who willing to serve.

13         I would suggest that nothing about this

14   counterclaim will chill anyone's argument about serving in

15   that capacity, in the capacity as Trustee.   I think you

16   have their fee application on the calendar for this

17   afternoon that goes to that point.

18         But it does not give this Trustee or any

19   Trustee carte blanche to skip the judicial process.

20         If Mr. Picard can prove that Mr. and Mrs.

21   Chais and the Appleby entities, that all of our clients got

22   money they did not deserve he will get a judgment out of

23   Your Honor and it will be executable and they will recover.

24   They have to do those things first, though, Your Honor.

25         What they have done here and what they

73

1   tried to do without the stroke of a judicial pen is skip

2   Your Honor and go straight to judgment.   It is pure Alice

3   and Wonderland, punishment first and trial later.   That

4   they cannot do, and that is what the Trustee is liable for.

5   We will try to do that at trial.   We plead adequately the

6   four causes of actions.   It is fully before Your Honor, and

7   that is why the motion must be denied.

8                MR. EYRE:   I will make three brief points,

9   Your Honor.

10               On footnote 8 of our papers we cite the

11  fact that the Chaises reference the account, and the

12  contract with Goldman Sachs in numerous paragraphs of the

13  counterclaim.   179 to 182, 184 to 180, et cetera.   It is

14  also clear law, I believe, that a party should not be

15  allowed to escape the consequences of its own failure to

16  attach a document.

17               I believe the Court can consider that

18  Goldman Chais agreement in a motion to dismiss and it does

19  not convert that motion a summary judgment.

20               Secondly, the Chaises referenced the

21  Weissman case, this case has to do with privilege.   It says

22  briefly:   Under the law of New York statements that arise

23  in the Court of judicial proceedings and are relevant and

24  pertinent thereto are absolutely privilege.

25               The privilege protects statements

74

1    regardless of the speaker's state of mind, knowledge of

2    falsity or the jury that the statements caused.  The

3    privilege embraces anything that may possibly be pertinent

4    or which has enough awareness or connection with the

5    proceeding so that a reasonable man may think it is

6    relevant.  All doubts should be resolved in favor of its

7    relevancy or pertinency.

8              The third point I will make, in the letter

9    that the Trustee sent to Goldman and others, there are two

10   points about the letter that I would just like to just

11   raise.

12             Number 1, the letter does not mention Chais

13   in any respect.

14             The second point I would make is the

15   letter, encourages Goldman Sachs to do its own work and its

16   own due diligence, which they would do anyway, but the

17   letter does say, your failure to abide by these

18   instructions may subject you, et cetera.

19             It also says, in addition, any such

20   transfer or disposition may be deemed by the Bankruptcy

21   Court.  The idea when you put "may" into this, I would

22   submit Goldman Sachs would do it anyway, but the Trustee

23   was encouraged in making its own independent assessment of

24   the legality here and what they should do about it.

25             Thank you very much for your time, and I

75

1    appreciate it.

2                MR. LICKER:   I am tempted not to say

3    anything but I am a lawyer and I have to talk.

4                On the Weissman case, I am not sure what

5    Mr. Eyre's point was, but it applies to something other

6    than defamation cases, it went a little far.   When Judge

7    Cotell (phonetic) said immunity applies irrespective of the

8    knowledge of falsity.   There is a reason he use that

9    phrase, because he was addressing defamation and this not a

10   defamation case.

11               The letter speaks for itself.   I will tell

12   you what I would tell Goldman Sachs.   If does not matter

13   what we think Goldman Sachs was thinking.   We will find

14   that out at trial and at discovery.

15               This is a motion to dismiss.   Thank you

16   Your Honor.

17               THE COURT: There has been very little

18   discussion about one very important document, which has

19   been referred to, perhaps obliquely right now, but

20   paragraph 29 of the customer agreement gives Goldman Sachs

21   the complete authority to freeze funds at their own

22   discretion, totally.

23               If you read the rest of that particular

24   paragraph, they are a very independent actor, and what they

25   do is to be construed as an act of their own volition.

76

1              And that may be a very important factor in

2    my consideration of whether or not these counterclaims

3    stand,

4                        MR. SHEEHAN:  Thank you, Your Honor.

5                        MR. WHITE:   Thank you, Your Honor.

6                        MR. SHEEHAN:   Your Honor, there is one

7    last item here.  Well, there are quite few of them, it's

8    the fee applications and we have the Trustee and his

9    counsel as well as a number of other applications.

10                       (Brief recess.)

11                       MR. SHEEHAN:   Good morning, Your Honor.

12                       THE COURT:  Good morning.

13                       MR. SHEEHAN:  This is a return date of a

14   number of applications for interim allowance of fees on

15   behalf of a number of parties.

16                       There is only one objection that has been

17   filed that I am aware of.  That is in connection with the

18   application of Mr. Picard and by his counsel, Baker

19   Hostetler.

20                       THE COURT:  Well, there is a little

21   reaction which doesn't really appear to be an objection to

22   the fees but more to the substance to your rejection of a

23   claim on the part of one Dr. Rudolfo Dawlt (phonetic) in

24   Zurich, Switzerland, which if you would look at the way it

25   is titled, it refers to today's hearing but it seems to

1    really regard this particular claim and Trustee's rejection

2    of it.

3                So unless there is somebody who could

4    clarify it, I don't regard this specifically as an

5    objection to fees.

6                MR. SHEEHAN:   Your Honor, I have that

7    letter as well, I have it on my desk and I read it as you

8    did.  Even though it was captioned a claim, the letter was

9    characteristically an objection to the claim.  I turned it

10   over to our rejection people and they are handling it.

11               With regard to those applications, Your

12   Honor, not objected to.  I won't go into them.  I will go

13   into a brief detail and I would identify the firms

14   involved.  A number of them are firms retained by the

15   Trustee in connection with actions instituted in foreign

16   jurisdictions.

17               The first is Schiltz & Schiltz.  The next

18   is Higgs Johnson Truman Bodden & Company, Eugene F.

19   Collins, Willaim Barristers and Attorneys as Special

20   Counsel, Attias & Levy, Lovells LLP and Kugler Kandestin.

21               I will leave these sheets with the reporter

22   so she could have the spelling of these names, Your Honor.

23   All of these, these are all foreign counsel and there being

24   no objection, we would move those applications be approved.

25               I should note for the record that Mr. Bell

78

1    is here, ready to speak.

2              MR. BELL:   Kevin Bell, for the Securities

3    Investment Protection Corporation.

4              With respect to that cluster of special

5    counsel, SIPC has filed one recommendation and supports the

6    amounts requested by those various counsel and would

7    support the entry of an order approving those requests,

8    Your Honor.

9              THE COURT:  Does anyone want to be heard?

10             Well, definitially, for the purpose of this

11   proceeding, I am prepared and I do treat them as attorneys

12   for the Trustee --

13             MR. SHEEHAN:   Yes.

14             THE COURT: -- and they have the same

15   standing as the attorney for the Trustee for the purpose of

16   my granting allowance and in considering the position of

17   SIPC.

18             MR. SHEEHAN:   Thank you, Your Honor.

19             The other unopposed application has been

20   filed by Windels Marx, who is here in Court this morning.

21   Alan Nisselson and Regina Griffin are here today, Your

22   Honor.

23             As you well know, Your Honor, they have

24   appeared already before you in a number of capacities on

25   behalf of the Trustee.

79

1          We have been working cooperatively with

2   that firm in connection with a number of matters, some of

3   which have involved corporations of which the Madoff family

4   and other third parties had an interest.

5          Shortly you will be seeing complaints filed

6   with regard to at least two of them.

7          In addition to them, there are a number of

8   insiders where we have had conflicts because of their

9   relationship to the corporate clients that we had.   We

10  felt it was remote but nevertheless appropriate not to be

11  involved with those particular situation.

12         We have asked Windels Marx to handle those

13  as well.   They are not insignificant preference and

14  fraudulent conveyance actions.

15         I know that myself and the Trustee had very

16  much enjoyed working with Windels Marx, but beyond that we

17  feel there has been work that has been superb and we

18  strongly move that it be approved.

19         MR. BELL:   On behalf of SIPC we filed

20  another recommendation in support of the fees requested by

21  Windels Marx and would support an order by this Court.

22         THE COURT: Does anyone want to be heard?

23         I will grant the request by Windels Marx.

24  It may very well be they come under the same statute,

25  78fff5c, based upon the consolidation order, and the

80

1    approval of this Court as well as the real fact that they

2    have been working as attorneys in sort of a hybrid fashion

3    and now in a more direct fashion for the Trustee.

4                    MR. SHEEHAN:   Your Honor, I would just

5    point out that I will be turning to our application and

6    that Mr. Picard, the Trustee, would like to address the

7    Court.

8                    MR. PICARD:   Good afternoon, Your Honor.

9                    THE COURT:  Good afternoon.

10                    MR. PICARD:  Irving Picard,  SIPA Trustee.

11    This is my third application for interim compensation.   It

12    covers the four-month period ending January 31, 2010.

13                    For the period I seek a total $671,591.25,

14    of which $570,852.56 would be paid, and $100,738.69 will be

15    deferred until the further order of the Court.

16                    I also seek reimbursement of actual and

17    necessary expenses totalling $77.66.

18                    In connection with my fees, I would note

19    that my fees start with a 10 percent discount for my hourly

20    rates.

21                    In addition, as noted in the applications

22    that I will address in a little while, there are other

23    hours that have not been billed for.

24                    SIPC has filed a recommendation in support

25    of the interim fee application.  As I noted in my

81

1    application, the general estate will not be sufficient to

2    pay administrative expenses, which included paying for the

3    professional fees which are such as those you have already

4    approved, mine and Baker Hostetler's.

5                Under the circumstances, SIPC is required

6    to advance the funds to the Trustee to pay the amounts

7    awarded.   There is no difference between their

8    recommendation and the amounts applied for.   As you noted,

9    this status provide that the Court should award the amounts

10   recommended.

11               There is one objection that was filed by

12   Diane and Roger Peskin, Maureen Ebel and a large group of

13   investors.   As set forth in the response papers that we

14   have filed, the objection includes a number of arguments

15   that have previously been rejected by Your Honor.

16               The motion for leave to appeal, the first

17   fee application order was denied by the district court and

18   the second one on the second application is still pending.

19               The crux of the objections are as I see it

20   they are talking about, I have a conflict of interest.

21   They both stood there and they attempted to bolster their

22   argument by seeming to say since we have a disagreement on

23   various legal issues, that both I and Baker Hostetler

24   should be disqualified.

25               I personally and I am sure Baker does not

82

1    believe that provides a basis for disqualification and that

2    is what was set forth in the response.

3                  I won't belabor that point, Your Honor.

4    During the period of my application, a substantial amount

5    of time was spent in connection with moving customer claims

6    and dealing with objections to determinations Your Honor.

7    Your Honor had the briefing in that equity issue which you

8    decided in March.

9                  We started working on the next major group,

10   by which you have entered a scheduling order in April, that

11   will be heard during the fall.

12                 Before that time, Your Honor, you will be

13   seeing other objections coming before the Court on matters

14   that do not raise some of the nitty-gritty issues and some

15   of the more difficult issues and don't all fit together in

16   one package.

17                 The task of recovering assets is ongoing

18   and, as you know, it is international in scope.   As you

19   have heard, we have six or so foreign counsel, many of whom

20   have been instrumental in helping us locate people to

21   depose and also helping us follow the trail.

22                 My activities are generally set forth in my

23   application.   I also would refer Your Honor to the amended

24   third interim report that was filed in April.

25                 Next, turning to the claims, we received

83

1    16,312 customer claims from persons claiming to have lost

2    money in the Ponzi scheme.   That, of course, includes a

3    substantial number of people who are relying on their

4    November 30th statements.

5              As I previously reported, Your Honor, in

6    December of 2008, there were approximately 4,900 accounts

7    that were opened.   Thus, if you look at the bare numbers,

8    we have received more than 11,400 claims from persons who

9    did not have accounts in their respective names.

10             Many of these latter people were entities

11   invested through various types of funds, including pension

12   or profit-sharing trusts, family partnerships, limited

13   liability companies and the like.

14             Each claim has a story and each one is

15   reviewed before a determination letter is sent out.

16             As of January 31, we had determined 11,861

17   customer claims, allowing claims for more than 4.55 million

18   and SIPIC, at that point, it committed approximately 629

19   million dollars for advances.

20             I am pleased to report that as of April 30,

21   those numbers have increased.

22             On January 31, we had determined

23   approximately 72.7 percent and as of April 30, the number

24   is above 76 percent.

25             SIPC's commitment now is up to over 682.8

84

1   million dollars.

2                    In addition, during that period we resolved

3   a number of avoidance matters without requiring litigation

4   for an amount totalling approximately 262.4 million

5   dollars.

6                    Since then, there have been other

7   recoveries, including 220 million dollars from the Levy

8   family, and other recoveries that have been made during the

9   claims processing period.

10                    We are very hopeful, Your Honor, in the

11   very near future we will be announcing some significant

12   settlements that will put us in a position to do an

13   allocation and an interim distribution to customers.  We

14   are hopeful that the application will be filed and we could

15   have a hearing as of, perhaps, as early as late summer or

16   early fall.

17                    As set forth in my application during the

18   four-month period, the major areas in which I devoted time

19   out of the 947.7 hours, approximately 30 percent was spent

20   in connection with claims review.

21                    Approximately 154 hours in attending to

22   various Bankruptcy Court matters.

23                    133 hours were in case administration.

24   About 10 percent of the time was concerned with the

25   Trustee's investigation.

85

1      Based on my normal hourly rates during the

2   period I would be seeking expenses of 746,000 plus dollars.

3   But as I have indicated previously, I agreed with SIPC to

4   reduce my hourly rate by 10 percent.   That is a reduction

5   of about $75,000.   So as a result, I'm requesting

6   $671,591.25 of which $100,738.69 would be deferred.

7      Additionally, in consideration of good

8   billing practice I have written off or not billed

9   approximately $117,000.  I seek the discounted amount at

10  this time.

11      I would also seek $77.66, which are related

12  to some long distance telephone calls and travel.  As in

13  lawful travel.   In the past, as I have indicated, in both

14  the application and to the Court, I will pay over to Baker

15  Hostetler the full amounts of any interim compensation

16  expense reimbursement that is awarded or paid.

17      As I noted at the outset, SIPC has filed

18  its recommendation in support of the Trustee's application.

19      I would be happy to answer any questions

20  that Your Honor may have.

21      THE COURT:  Does anyone want to be heard?

22  Thank you.  Thank you, Mr. Smith.

23      MR. SMITH:  We have an objection to both

24  Mr. Picard and Baker Hostetler.   So maybe it make sense

25  for Mr. Sheehan to go on now and speak on behalf of Baker

86

1    Hostetler.

2              THE COURT:  Very well.

3              MR. SHEEHAN:  The arguments are well stated

4    in the pleadings.  Fees of $23.884,085.25 is being sought

5    and expenses of $390,204.85 satisfied.  The same arithmetic

6    applies for counsel to the Trustee, as far as the discount

7    and 15 percent holdback, Your Honor.

8              It is almost impossible for me here to

9    summarize exactly what we have done.  We have submitted to

10   your Honor unredacted time sheets which are voluminous as I

11   know Your Honor knows.

12             Suffice it to say there are multiple facets

13   to this case requiring the attention of many attorneys.

14   The difficulty in summarizing that is the size of it.

15             We have the customer claim process, for

16   example, and right now there are over 2,700 objections, and

17   that does not include the 1,900 that were filed with regard

18   to the customer status issue that is part of the scheduling

19   order.

20             In addition to that, Your Honor, there are

21   4,000 outstanding claims all of which have been to be

22   determined at this time.  Many of which involve, Your

23   Honor, individual issues, as Mr. Picard has indicated, of

24   ownership.

25             All of those require both a legal and

87

1    factual analysis in order to determine the status of who

2    the customers are as well as, obviously, the forensic

3    accounting in terms of establishing the amount that may be

4    due to the customer in the event of an allowed claim.

5               Needless to say, countless hours were spent

6    just on that and it is a top priority of the Trustee, and

7    we will move as aggressively as we can move those customer

8    claims going forward.

9               In addition to those, there are, of course,

10   other litigations that are filed before Your Honor and you

11   are familiar with that, including Chais, which was argued

12   before you this morning and many others, Picower, which is

13   in settlement discussions as has been well reported and a

14   number of others that are ongoing before Your Honor.

15              In addition to those, there are literally

16   dozens, if not hundreds of litigations that are being

17   reviewed and contemplated in connection with the over 20

18   billion dollars that was paid out in the short period of

19   time of about 24 months prior to the demise of the BLMIS.

20              Those constitute significant potential

21   recoveries by the Trustee of customer property.  We are

22   doing our very best to deal with those in an applicable

23   way.  It may very well be before the end of the year there

24   will be a significant number of claims that will be filed.

25              The approach of the Trustee throughout with

88

1    regard to both large and small, people who are net winners

2    and losers, who have received what we believe to be

3    preference and fraudulent conveyances consisting of false

4    profits, we have reached out to those folks.

5              And the feeder funds as well as the

6    individual funds, they require a great deal of time but we

7    believe it is the best approach.  This is a case in which

8    no one feels as though they win.  Everyone feels as though

9    they lost, the winner and the losers.  We recognize that.

10   We do our very, very best to work with them as best as we

11   can to work out an accommodation if we can.

12             Those that are significant, obviously, Your

13   Honor is going to see.  Those that are small, and there

14   are many that are very small, you don't as we are not

15   required under the rules.

16             But in each and every case we are in

17   contact with counsel especially with the feeder funds, but

18   in connection also with many of other individuals in

19   conducting our investigation and working out what we can in

20   negotiations and settlement.  If we can't do that, as I

21   have said, we will see a lot of complaints.  Those involve

22   the feeder fundss throughout Europe, Caribbean, British

23   Virgin Islands, the Caymans, and Bermuda.  That is why we

24   have all the counsel we retained, as each of those are

25   very, very complicated.

1          As is reflected in our time records, what

2     we have found is that Mr. Madoff became a securitized debt.

3     We found there are very sophisticated transactions

4     involving major financial institutions as well as the

5     feeder fundss, where multiple layers of debt were incurred

6     funded by the Madoff returns.   They were, as we all know,

7     available for years and years and there were steady

8     returns.   They were just the kind of returns that people

9     in the financial industry looked to securitize, to create

10    those instruments, swaps, and credit the swaps.

11          All of that is involved in the Madoff

12    enterprise involving not just Mr. Madoff but also involving

13    all the people with whom he dealt.   These are enormously

14    complicated an require a good deal of deconstruction and

15    each one of those represents hundreds and hundreds of

16    millions of dollars in potential recovery.

17          The efforts you can see from our records

18    reflect that as do things that don't appear necessarily in

19    the Court's record but are reflected in Your Honor's review

20    in the time records, but I can talk about them openly here,

21    they are reflected in our investigations and it's well

22    known to people on the other side.   We are not doing

23    things that counsel is not fully aware of because we are in

24    negotiation with most of them before proceeding with

25    litigation against them.

90

1          We are well aware of the statute and we are

2     well prepared to follow through with those if we have to.

3          In addition to all that work, there is an

4     ongoing array, a good deal of it before Your Honor, of what

5     I would call individual litigation that occurs just in the

6     administration of the estate.  Whether it be seeking

7     injunctive relief before Your Honor, whether it be dealing

8     with various motion practices that we have that is not

9     related to a specific litigation, and as Your Honor is

10    aware, there is a good deal of that occurs as well.

11         So we have multiple teams involved in each

12    of those endeavors, as again it's reflected in our time

13    records.

14         I believe that all of the work and I know

15    the SIPC Trustee agrees and supports it.  We are reviewed

16    very, very carefully.  I prepare that bill along with some

17    assistants working diligently every month.  I could tell

18    you for a fact there are many, many conversations with SIPC

19    where they review specifically who is at a meeting, how

20    many people are attending, how much time is spent, was it

21    productive, what were you specifically seeking to do.

22         This is by far not a rubber stamp.  This

23    is a very intensive review that takes place every month by

24    SIPC, with regard to this at two levels.  Both at the

25    assistant general counsel, Mr. Bell, who is here, as well

91

1    as by general counsel herself.

2                    So, Your Honor, when this arises before you

3    it arises before you after having thoroughly been reviewed

4    and approved by SIPC.   I would respectfully ask Your Honor

5    to approve our application.

6                    MR. BELL:   Your Honor, I thank Mr. Sheehan

7    for his talk about the exhaustive review that SIPC does

8    with regard to the Trustee and counsels monthly

9    applications pursuant to this Court's monthly compensation

10   order.

11                   There are many discussions about the fees.

12   There are many pages in the applications.   I could advise

13   the Court that each and every page is reviewed. Discussions

14   are had and decisions are made, and SIPC after that review,

15   with the concurrence of the Trustee and counsel, will

16   follow the monthly procedures order and pay.

17                   SIPC does that at two levels.   At my level,

18   I am the staff attorney on the case even though I have a

19   title.

20                   Then it is done by general counsel and the

21   general counsel and I have engage in extensive discussions

22   after I have had my extensive discussions with the Trustee

23   and its counsel.

24                   So the thoroughness of this review I could

25   assure the Court where we say, carefully evaluated, I think

92

1    you could use the words that we exhaustively evaluate the

2    applications.  We take this responsibility extremely

3    seriously.

4                    So we have done the review and we have

5    followed our recommendation by SIPC's general counsel, and

6    we support the entry of an order for the approval of the

7    applications as filed.

8                    MR. SMITH:   Good afternoon, Your Honor

9    Peter Smith of Becker & Poliakoff, on behalf of the

10   objection filed by the Peskins and other customers.

11                   Your Honor, I will just address the issue

12   of the most recent grounds contained in this objection, not

13   the ones that reiterate or reiterate from the first two

14   objections that were filed, but I would mention are subject

15   to appeals.  Specifically that the Trustee an his

16   counsel's involvement in the Canavan adversary proceeding

17   filed last month, around April 5 or so, in which the

18   Trustee and counsel seek to enjoin an action filed in the

19   district court in New Jersey.   On April 13, Your Honor

20   denied the application for a TRO.

21                   The hearing on the preliminary injunction

22   motion is rescheduled, pending some discovery disputes.

23                   The Trustee and his counsel we believe had

24   disqualified themselves, we believe, based on the positions

25   they have taken in the adversary proceeding because they

1    have essentially argued the position of the defendants in

2    that New Jersey action.   Therefore, they are directly

3    adverse to every customer who would benefit from a positive

4    judgment in that proceeding.

5             The Trustee and his counsel have made

6    substantive and procedural defenses, asserted them on

7    behalf of the defendants who are in the New Jersey action

8    that even the defendants themselves in the action have not

9    made.

10             All the defendants in that action have done

11   is to seek to have the action transferred here.   When it

12   gets here Your Honor will have a preview I suppose of all

13   the defenses that they will raise.

14             There is no basis, Your Honor, for them to

15   have done that in their papers.

16             I just want to give you a few examples of

17   what was contained in the motion for preliminary

18   injunction.

19             THE COURT:  This is a request for fees.

20             MR. SMITH:   What we argue, Your Honor,

21   that is --

22             THE COURT:  I am hearing more of a defense

23   with respect to the litigation that is pending before me.

24             MR. SMITH:   No, Your Honor, we will hear

25   more of that I suppose in the weeks to come, but the issue

94

1    right here --

2              THE COURT:  You say that they should not be

3    asking for fees for their involvement in the New Jersey

4    litigation.

5              MR. SMITH:   I don't think I said that.

6              THE COURT:  Isn't that what you are saying?

7              MR. SMITH:  Their fees for whatever they do

8    or have done in the New Jersey application are probably not

9    part of the application because I think this one cut off in

10   January.

11             THE COURT:  But, nevertheless, it is their

12   activities supports their argument that they have that it

13   has disabled them for asking for fees because they are

14   breaching some duties that they have.

15             MR. SMITH:   I believe that the breach of

16   duty is their loyalty to the customers.  And I think it is

17   very clear that any customer who would see those papers,

18   and customers are aware of what is going on in those

19   proceedings, they are aware of this fee application --

20             THE COURT:  One wonders when one peels it

21   away whether everyone under your theory could be disabled

22   under those same theories.

23             MR. SMITH:  Who else could be?

24             THE COURT: All counsel.

25             MR. SMITH:   No, only the counsel who took

95

1    the position contrary --

2                        THE COURT:  That is an opinion that you

3    have.

4                        MR. SMITH:  They are arguing the position

5    of the defendants.

6                        THE COURT: Let me hear you out.

7                        MR. SMITH:   Okay.   So, Your Honor, the

8    customers to whom the Trustee is supposed to be loyal can

9    only view the complaint for the preliminary injunction in

10   one way, which is that the Trustee and his counsel have put

11   that aside in this regard with respect to the persons who

12   the customers are suing to recover damages.  For that

13   reason it is impossible for there not to be an appearance

14   of a conflict of interest between the Trustee and Baker

15   Hostetler to whom they are supposed to be loyal in this

16   proceeding.

17                        For that reason, they should not receive

18   their fee and there should at least be an evidentiary

19   hearing as to whether they should be disqualified.

20                        THE COURT:  Thank you.

21                        MR. SMITH:   Your Honor.

22                        MR. SHEEHAN:   Your Honor, I don't intend

23   to argue the motion here.   I will say one thing.   I would

24   suggest there are a great many customers that would think

25   what we are doing in terms of trying to preserve this

96

1    Court's jurisdiction in connection with the net equity

2    ruling which is a whole thrust of why we are seeking to

3    have that case enjoined and why the people in New Jersey

4    are seeking to have it transferred here, there are a whole

5    host of customers who have bought that argument.  I will

6    leave it out there.

7              MR. SMITH:   Your Honor, I will say this

8    quickly, if the only goal was to protect the net equity

9    decision they would not have to raise defenses for the

10   defendants.   They could have stopped on the ground for the

11   preliminary injunction without saying all of the things

12   they said in their motion how the claims are without merit;

13   however there are procedural problems with that complaint.

14   They did not have to say anything further.   They have yet

15   to answer for why they did these things.

16              If it is not they are advocating on behalf

17   of those defendants, why on earth did they do it?  There is

18   no basis for it.   Thank you.

19              THE COURT:  Thank you.   I will overrule

20   your objection.   It is quite obvious that the objectors

21   here are on the other side of many litigations with the

22   Trustee.

23              It is always interesting that it would be

24   part of the practice, and it shouldn't be to try to disable

25   your adversaries or take a legal position based on the fact

1    you seek to disable counsel.

2            But as I have pointed out in my statements

3    previously, I think if one peels away all the interests

4    that the various parties represent, one might find very

5    easily an appearance of conflict of interest of counsel,

6    and I could think of several areas which were involved in

7    all of the litigations before me.

8            What is clear to me, and one of the reasons

9    I am rejecting the argument here, is that these objectors

10   and their counsel have been very active in creating new

11   litigation made of sandboxes in multiple jurisdictions,

12   which in some form indicates a disagreement with the

13   Court's net equity decision.

14           It is understandable that the objectors

15   would seek to have the Trustee disabled, but that is not a

16   ground here for arguing against the consideration by this

17   Court of the request for fees under 78 -- and I won't go

18   through all of the Es -- when SIPC finds the fees

19   appropriate and the disinterestedness of the Trustee has

20   already been measured in the early part of the proceeding,

21   that the statute has the words, "award the amounts

22   recommended."

23           I find no basis for finding that the

24   Trustee should be found to have an appearance of a conflict

25   of interest.   As a matter of fact, I think there is an

98

1    obligation wherever the administration of the Madoff estate

2    is a implicated for the Trustee to appear and deal with

3    that.

4              That essentially is the main argument that

5    is being made today, the additional argument that is being

6    expressed.

7              If you bring on litigation, it is obvious

8    that the Trustee has to go and react to it if that

9    litigation implicates the administration of the estate, and

10   that is apparently is the case here.

11             Objection is overruled.  The decision is

12   reserved with respect to all motions thus heard.

13             MR. SHEEHAN:   Your Honor, I have an order

14   that I would like to submit, if I may approach.

15             THE COURT:  Yes.

16             MR. SHEEHAN:   Thank you, Your Honor.

17             THE COURT:  It is unfortunate but more

18   litigation, more fees.

19             I have approved the order.

20             MR. SHEEHAN:   Thank you very much, Your

21   Honor.   Thank you for all your time.

22             THE COURT:  Thank you.

23

24              *      *      *

25

99

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK        }

                             }    ss.:

4    COUNTY OF NEW YORK       }

5                    I, MINDY CORCORAN, a Shorthand Reporter

6    and Notary Public within and for the State of New York, do

7    hereby certify:

8                    That I reported the proceedings in the

9    within entitled matter, and that the within transcript is a

10   true record of such proceedings.

11                   I further certify that I am not related, by

12   blood or marriage, to any of the parties in this matter and

13   that I am in no way interested in the outcome of this

14   matter.

15                   IN WITNESS WHEREOF, I have hereunto set my

16   hand this 5th day of May, 2010.

17        Mindy Rothman-    Digitally signed by Mindy Rothman-
          Corcoran         Corcoran
                           DN: cn=Mindy Rothman-Corcoran, c=US
18                         Reason: I am the author of this document
                           Date: 2010.05.10 15:05:41 -04'00'
          _____

          MINDY CORCORAN

19

20

21

22

23

24

25