# EXHIBIT H

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Estate of Bernard L. Madoff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Case No. 1:11-cv-00913 (CM) (MHD)<br><br>Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated)<br><br>**AMENDED COMPLAINT (REDACTED)**<br><br>**JURY TRIAL DEMANDED** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD.,<br><br>        Defendants. | |

IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

        Third-Party Plaintiff,

        v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, N.A., J.P. MORGAN
SECURITIES LLC, and J.P. MORGAN
SECURITIES LTD.,

        Third-Party Defendants.

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ........................................................................... 1

JURISDICTION AND VENUE .................................................................... 7

PARTIES ........................................................................................................ 8

    The Trustee ............................................................................................. 8

    The Defendants ................................................................................... 10

MADOFF'S INVESTMENT ADVISORY, MARKET MAKING, AND
PROPRIETARY TRADING BUSINESSES ...................................... 13

SIPA LIQUIDATION ............................................................................... 19

THE PLAYERS ......................................................................................... 21

    Relevant JPMC Business Segments .................................................. 21

    Relevant JPMC Divisions and Employees ....................................... 22

    Relevant JPMC Committees .............................................................. 24

    BLMIS Feeder Funds ......................................................................... 25

    Relevant BLMIS/JPMC Customers .................................................. 26

    Other Relevant Entities ...................................................................... 27

IGNORING THE EVIDENCE OF FRAUD, JPMC INVESTS IN AND
STRUCTURES PRODUCTS ON BLMIS FEEDER FUNDS ........... 27

    JPMC's Note Program ....................................................................... 27

    JPMC Starts Structuring and Issuing Products on BLMIS Feeder Funds ........... 29

    JPMC's Limited Due Diligence Led to Unanswered, Disturbing Questions
        Regarding Madoff and His Investment Strategy ..................... 30

    Undeterred by Evidence of Fraud, Equity Exotics Requests Approval from
        the Hedge Fund Underwriting Committee to Issue Approximately
        $1 Billion in BLMIS-Related Products .................................... 33

    The Investment Bank Continues to Ignore Red Flags ......................... 36

    Faced Again with Numerous Indications of Madoff's Fraud, JPMC
        Quietly Removes All of Its Assets from the BLMIS Feeder Funds ........ 43

    After the Fraud Was Revealed, JPMC Admitted Knowledge That Madoff
        Was a Fraud ............................................................................. 45

JPMC'S "LESSONS LEARNED" ............................................................. 48

LESSONS NOT LEARNED ..................................................................... 50

JPMC'S VIEW OF MADOFF AS SEEN FROM ACCOUNT ACTIVITY .................. 53

# TABLE OF CONTENTS
(continued)

Page

Madoff Finds a Banker to Assist Him in His Ponzi Scheme ............................... 53

The Establishment of Madoff's Account .................................................... 55

JPMC Had a Duty to Know Its Customer and to Monitor Its Customers'
Account Activity .................................................................... 57

JPMC Ignored a Warning from Another Financial Institution More Than
Ten Years Before the Ponzi Scheme Collapsed ....................... 59

JPMC Had a Duty to Know What Type of Business Madoff Was
Operating .......................................................................... 60

JPMC Ignored the Inconsistencies Between BLMIS's Financial
Statements, the Activity in the 703 Account, and BLMIS's
Purported Business .......................................................... 61

The FOCUS Reports Misrepresented Cash at JPMC .............................. 62

The FOCUS Reports Do Not Show JPMC's Loans to BLMIS .............. 64

The FOCUS Reports Underreport Loan Collateral .................................. 64

The FOCUS Reports Show Glaring Issues in BLMIS's Purported
Business ........................................................................ 65

JPMC Had a Duty to Investigate BLMIS's Account Activity, Which Was
Facially Inconsistent with Any Legitimate Business Purpose ................. 69

JPMC Was Aware of Anomalous Account Activity that Was Inconsistent
with BLMIS's Purported Business ......................................... 71

JPMC's Automated Account Monitoring Procedures Were Ineffectual ............. 74

JPMC Had a Duty to Investigate Suspicious Activity in BLMIS's Account ...... 75

JPMC Had a Duty to Take Action .................................................... 77

JPMC'S VIEW OF MADOFF THROUGH LOAN ACTIVITY ................................... 77

JPMC's Loans to Levy for BLMIS Investments ...................................... 77

JPMC Enabled the Fraud With Loans to BLMIS in 2005 and 2006 .................. 78

JPMC ALLOWED THE FRAUD TO CONTINUE ...................................... 82

THE TRANSFERS .................................................................. 83

Avoidable Obligations of Debtors ................................................... 83

Direct Transfers to JPMC .......................................................... 86

Subsequent Transfers to the Defendants ............................................ 88

CAUSES OF ACTION .............................................................. 91

## TABLE OF CONTENTS
(continued)

Page

AS AND FOR A FIRST CAUSE OF ACTION Fraudulent
Avoidable Obligations—New York Debtor and Creditor
Law §§ 276, 276-a, 278, and/or 279, and 11 U.S.C. §§ 544,
550(a), and 551 ........................................................................... 91

AS AND FOR A SECOND CAUSE OF ACTION Fraudulent
Avoidable Obligations —New York Debtor and Creditor
Law §§ 273, 278, and/or 279, and 11 U.S.C. §§ 544,
550(a), and 551 ........................................................................... 92

AS AND FOR A THIRD CAUSE OF ACTION Fraudulent
Avoidable Obligations —New York Debtor and Creditor
Law §§ 274, 278, and/or 279, and 11 U.S.C. §§ 544,
550(a), and 551 ........................................................................... 93

AS AND FOR A FOURTH CAUSE OF ACTION Fraudulent
Avoidable Obligations —New York Debtor and Creditor
Law §§ 275, 278, and/or 279, and 11 U.S.C. §§ 544,
550(a), and 551 ........................................................................... 93

AS AND FOR A FIFTH CAUSE OF ACTION Preferential
Transfers (Initial Transferee)—11 U.S.C. §§ 547(b),
550(a), and 551 ........................................................................... 94

AS AND FOR A SIXTH CAUSE OF ACTION Fraudulent
Transfers (Initial Transferee)—11 U.S.C. §§ 548(a)(1)(A),
550(a), and 551 ........................................................................... 96

AS AND FOR A SEVENTH CAUSE OF ACTION Fraudulent
Transfers (Initial Transferee)—11 U.S.C. §§ 548(a)(1)(B),
550(a), and 551 ........................................................................... 97

AS AND FOR AN EIGHTH CAUSE OF ACTION Fraudulent
Transfers (Initial Transferee)—New York Debtor and
Creditor Law §§ 276, 276-a, 278, and/or 279, and 11
U.S.C. §§ 544, 550(a), and 551 .................................................. 98

AS AND FOR A NINTH CAUSE OF ACTION Fraudulent
Transfers (Initial Transferee)—New York Debtor and
Creditor Law §§ 273, 278, and/or 279, and 11 U.S.C. §§
544, 550(a), and 551 .................................................................. 99

AS AND FOR A TENTH CAUSE OF ACTION Fraudulent
Transfers (Initial Transferee)—New York Debtor and
Creditor Law §§ 274, 278, and/or 279, and 11 U.S.C. §§
544, 550(a), and 551 ................................................................ 100

# TABLE OF CONTENTS
(continued)

Page

AS AND FOR AN ELEVENTH CAUSE OF ACTION Fraudulent
Transfers (Initial Transferee)—New York Debtor and
Creditor Law §§ 275, 278, and/or 279, and 11 U.S.C. §§
544, 550(a), and 551 .................................................................. 100

AS AND FOR A TWELFTH CAUSE OF ACTION Recovery of
All Fraudulent Transfers (Initial Transferee)—New York
Civil Practice Law and Rules 203(g) and 213(8), New York
Debtor and Creditor Law §§ 276, 276-a, 278, and/or 279,
and 11 U.S.C. §§ 544, 550(a), and 551 ...................................... 101

AS AND FOR A THIRTEENTH CAUSE OF ACTION
Preferential Transfers (Subsequent Transferee)—11 U.S.C.
§§ 547(b), 550(a), and 551 ......................................................... 102

AS AND FOR A FOURTEENTH CAUSE OF ACTION
Fraudulent Transfers (Subsequent Transferee) 11 U.S.C.
§§ 548(a)(1)(A), 550(a), and 551 ............................................... 104

AS AND FOR A FIFTEENTH CAUSE OF ACTION Fraudulent
Transfers (Subsequent Transferee) 11 U.S.C. §§
548(a)(1)(B), 550(a), and 551 .................................................... 105

AS AND FOR A SIXTEENTH CAUSE OF ACTION Fraudulent
Transfers (Subsequent Transferee)—New York Debtor and
Creditor Law  §§ 276, 276-a, 278, and/or 279, and 11
U.S.C. §§ 544, 550(a), and 551.................................................. 107

AS AND FOR A SEVENTEENTH CAUSE OF ACTION
Fraudulent Transfers (Subsequent Transferee)—New York
Debtor and Creditor Law §§ 273, 278, and/or 279, and 11
U.S.C. §§ 544, 550(a), and 551.................................................. 108

AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
Fraudulent Transfers (Subsequent Transferee)—New York
Debtor and Creditor Law §§ 274, 278, and/or 279, and 11
U.S.C. §§ 544, 550(a), and 551.................................................. 110

AS AND FOR A NINETEENTH CAUSE OF ACTION
Fraudulent Transfers (Subsequent Transferee)—New York
Debtor and Creditor Law §§ 275, 278, and/or 279, and 11
U.S.C. §§ 544, 550(a), and 551.................................................. 111

**TABLE OF CONTENTS**
(continued)

Page

AS AND FOR A TWENTIETH CAUSE OF ACTION Recovery
of All Fraudulent Transfers (Subsequent Transferee)—New
York Civil Practice Law and Rules 203(g) and 213(8), New
York Debtor and Creditor Law §§ 276, 276-a, 278, and/or
279, and 11 U.S.C. §§ 544, 550(a), and 551 ............................ 112

AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
Knowing Participation in a Breach of Trust .............................. 114

AS AND FOR TWENTY-SECOND CAUSE OF ACTION Aiding
and Abetting Fraud .................................................................... 118

AS AND FOR A TWENTY-THIRD CAUSE OF ACTION Aiding
and Abetting Breach of Fiduciary Duty ..................................... 122

AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION
Conversion ................................................................................. 126

AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION Aiding
and Abetting Conversion ........................................................... 127

AS AND FOR A TWENTY-SIXTH CAUSE OF ACTION Unjust
Enrichment ................................................................................. 131

AS AND FOR A TWENTY-SEVENTH CAUSE OF ACTION
Fraud on the Regulator .............................................................. 132

AS AND FOR A TWENTY-EIGHTH CAUSE OF ACTION
Contribution .............................................................................. 138

JURY TRIAL DEMAND ...................................................................... 146

Irving H. Picard ("Trustee"), as trustee for the substantively consolidated liquidation of

the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), and the estate of Bernard L.

Madoff, by and through his undersigned counsel, as and for his Amended Complaint against

JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P.

Morgan Securities Ltd. (collectively, "JPMC" or "Defendants"), states as follows:

## NATURE OF THE ACTION

> *" 'But the Emperor has nothing on at all!!!' said a little child."*

Hans Christian Andersen, The Emperor's New Clothes

> *"For whatever it[']s worth, I am sitting at lunch with Matt Zames who just told me that there is a well-known cloud over the head of Madoff and that his returns are speculated to be part of a [P]onzi scheme."*

John Hogan, Chief Risk Officer, Investment Bank, JPMC,
June 15, 2007

1.    The story has been told time and time again how Madoff duped the best and the

brightest in the investment community. The Trustee's investigation reveals a very different

story—the story of financial institutions worldwide that were keen to the fraud, and decidedly

turned a blind eye to it. While numerous financial institutions enabled Madoff's fraud, JPMC

was at the very center of that fraud, and thoroughly complicit in it. JPMC could not perform

even cursory due diligence on Madoff or BLMIS without bumping up against evidence of

Madoff's fraud. This is more than the story of a financial institution that knew or should have

known of the fraud. JPMC had before it the very nuts and bolts of the Ponzi scheme:  the

money customers deposited into BLMIS's main account was not used to buy or sell securities,

but instead was merely transferred to other customers in patterns that could serve no legitimate

business purpose. Millions of dollars routinely bounced back and forth between Madoff and one

of JPMC's most important customers, Norman Levy. JPMC could see that Madoff's regulatory

filings were materially inconsistent with BLMIS's actual finances. JPMC chose to enable

Madoff's fraud, not just through the various ways it participated in his activity, but by helping to

cover Madoff's naked theft with the imprimatur of a globally recognized financial institution.

2.    JPMC was Madoff's and BLMIS's primary banker for over 20 years, and was

responsible for knowing the business of its customers—in this case very large customers. From

1986 on, all of the money that Madoff stole from his customers passed through BLMIS's account

at JPMC, the so-called "703 Account," where it was commingled and ultimately washed. JPMC

had everything it needed to unmask and stop the fraud—it had unique information from which it

could have reached only one plausible conclusion:  Madoff was a fraud.

3.    Indeed, billions of dollars flowed through the 703 Account, but virtually none of

it was used to buy or sell securities as it should have been had BLMIS been legitimate.  Instead,

emblematic of a Ponzi scheme, the money in the 703 Account merely flowed back and forth

between Madoff and his customers. JPMC knew that Madoff was engaging in fraud based on

the obvious fact that the account activity reflected no legitimate business purpose. JPMC

allowed Madoff to funnel billions of dollars through the 703 Account by ignoring clearly illicit

transaction activity within that account—including billions of dollars in suspicious transactions

with its own private banking customers—and disregarding its own anti-money-laundering

policies.  If those large transactions that did not jibe with any legitimate business purpose

triggered any warnings, they were suppressed as the drive for fees and profits became a

substitute for common sense, ethics and legal obligations.

4.    Not only was JPMC aware that the 703 Account activity was inconsistent with

BLMIS's purported business of buying and selling securities, but it reviewed Financial and

Operational Combined Uniform Single Reports ("FOCUS Reports") that Madoff filed with the

Securities and Exchange Commission ("SEC"). The FOCUS Reports contained glaring

irregularities that should have been probed by JPMC. For example, not only did BLMIS fail to

report its loans from JPMC, it also failed to report any commission revenue. JPMC ignored

these material omissions in BLMIS's FOCUS Reports. By its silence, JPMC lent legitimacy and

cover to BLMIS's operations as JPMC collected hundreds of millions of dollars in fees and

profits and facilitated the largest financial fraud in history.

      5.     JPMC had yet further knowledge that Madoff engaged in banking activities with

no legitimate business purpose. According to two former employees of another financial

institution, in or about 1997, that institution observed and investigated Madoff's nearly daily

circular transactions between an account Madoff controlled at that financial institution and a

Madoff account at JPMC (then, The Chase Manhattan Bank ("Chase")). On virtually a daily

basis, a Madoff employee would physically deposit a check drawn on Madoff's account at the

other financial institution into his account at JPMC. The next day, funds in or near the same

amount—generally at least $1 million but less than $10 million—would be wired back from

Madoff's JPMC account to the account at the other financial institution. According to the

investigator at the other financial institution, now a former employee, as well as another former

employee, the investigator and others at the financial institution questioned Madoff's employees

about the transactions, and, having failed to receive a satisfactory explanation for the suspicious

account activity, that financial institution closed Madoff's account. Not only should the

suspicious activity have been as apparent to JPMC as it was to the other financial institution, but

following normal operating procedures, the financial institution's investigator would have

contacted his counterpart at JPMC regarding the suspicious transactions on two occasions: (1) in

the course of his inquiry; and (2) at the conclusion of the inquiry, to report that the other
financial institution was closing the account. The circular transactions in which JPMC
participated at this time presaged the same sort of circular transactions in which Madoff and
Levy would engage later within JPMC—transactions JPMC permitted to occur despite their
evident lack of legitimacy.

   6.  In addition to being Madoff's and BLMIS's banker, JPMC also profited from the
Ponzi scheme by selling structured products related to BLMIS feeder funds to its clients. In the
course of structuring these products, JPMC performed due diligence on BLMIS beginning in
2006, using information it obtained from those responsible at JPMC for the 703 Account, as well
as information provided by various BLMIS feeder funds. At some point between 2006 and the
Fall of 2008, if not before, JPMC unquestionably knew that:

     a.  BLMIS's returns were consistently too good—even in down markets—to
be true;

     b.  Madoff would not allow transparency into his strategy;

     c.  JPMC, one of the world's leading and most knowledgeable derivatives
dealers, could not identify, and Madoff refused to provide information on, his purported over-
the-counter ("OTC") counterparties;

     d.  BLMIS's auditor was a small, unknown firm;

     e.  Madoff and/or BLMIS had a conflict of interest by acting as the clearing
broker, sub-custodian, and sub-investment adviser;

     f.  feeder fund administrators could not reconcile the daily position numbers
they got from Madoff with any third party source to confirm their accuracy; and

4

g.    there was public speculation that Madoff operated a Ponzi scheme, or was engaged in other illegal activity, such as front-running.

7.    JPMC's due diligence yet again revealed fraud at BLMIS. But JPMC was not concerned with the devastating effect of fraud on investors. It was concerned only with its own bottom line, and did nothing but a cost-benefit analysis in deciding to become part of Madoff's fraud: "Based on overall estimated size of BLM strategy, . . . it would take [a] . . . fraud in the order of $3bn or more . . . for JPMC to be affected." JPMC also relied on the Securities Investor Protection Corporation ("SIPC") to protect its profits: "JPMorgan's investment in BLM . . . is treated as customer money . . . and therefore [is] covered by SIPC." By the Fall of 2008, in the midst of a worldwide economic downturn, the cost-benefit analysis had changed. JPMC, no longer comfortable with the risk of fraud, decided to redeem its $276 million in investments in BLMIS feeder funds. JPMC also received an additional fraudulent transfer of $145 million from BLMIS in June 2006.

8.    JPMC looked the other way, ignoring the evidence of fraud, even in the aftermath of other well-known frauds. In response to those who, prior to Madoff's arrest, found it "[h]ard to believe that [fraud] would be going on over years with regulators [sic] blessing," the Chief Risk Officer of JPMC's Investment Bank responded, "you will recall that Refco was also regulated by the same crowd you refer to below and there was noise about them for years before it was discovered to be rotten to the core." This was not the first time JPMC had looked the other way to garner revenue and accommodate important bank clients. In 2003, JPMC had been accused of the same sort of conduct in connection with the Enron fraud. As the SEC alleged in its complaint, JPMC aided and abetted Enron's manipulation of its financials through a series of complex financial transactions called "prepays." JPMC "was willing to engage in [these]

transactions because [it] generated substantial fees and as an accommodation to an important

client." Moreover, JPMC was recently sued in relation to its alleged participation in a Ponzi

scheme operated by Minnesota businessman, Tom Petters.

      9.     Indeed, JPMC's due diligence team was further concerned about fraud at BLMIS

in the wake of the Petters fraud. Some of these concerns centered on BLMIS's small, unknown

auditor, Friehling & Horowitz ("Friehling"):

> The "DD" [due diligence] done by all counterparties seems suspect. Given the
> scale and duration of the Petters fraud it cannot be sufficient that there's simply
> trust in an individual and there's been a long operating history . . . . Let's go see
> Friehling and Horowitz the next time we're in NY . . . to see that the address isn't
> a car wash at least.

      10.     In or about September 2008, as JPMC was re-evaluating its hedge fund

investments in the midst of the worldwide financial crisis, Alain Krueger, of JPMC's London

office, had a telephone call with individuals at Aurelia Finance, S.A. ("Aurelia Finance"), a

Swiss company that purchased and distributed JPMC's structured products. During the course of

that call, the individuals at Aurelia Finance made references to "Colombian friends" and insisted

that JPMC maintain its BLMIS-related hedge. That conversation triggered a concern that

Colombian drug money was somehow involved in the BLMIS-Aurelia Finance relationship,

which led to an internal investigation at JPMC of BLMIS and Aurelia Finance for money

laundering. Significantly, it was only when its own money was at stake that JPMC decided to

report BLMIS to a government authority.

      11.     As reported in the French press, by the end of October 2008, JPMC admitted in a

filing of suspicious activity made to the United Kingdom's Serious Organised Crime Agency

("SOCA") that it knew that Madoff was "too good to be true," and a likely fraud:

> (1) . . . [T]he investment performance achieved by [BLMIS's] funds . . . is so
> consistently and significantly ahead of its peers year-on-year, even in the

prevailing market conditions, as to appear too good to be true—meaning that it probably is; and

(2) the lack of transparency around Madoff Securities trading techniques, the implementation of its investment strategy, and the identity of its OTC option counterparties; and (3) its unwillingness to provide helpful information.

None of this information was new to JPMC—it had known it for years. It was only in an effort to protect its own investments that JPMC finally decided to inform a government authority about BLMIS. JPMC further sought permission from SOCA to redeem its Aurelia Finance-related investments and admitted that "as a result [of these issues with BLMIS] JPMC[] has sent out redemption notices in respect of one fund, and is preparing similar notices for two more funds."

12.    Incredibly, even when it admitted knowing that Madoff had to be a fraud in October 2008, JPMC still did nothing to stop the fraud. It did not even put a restriction on the 703 Account. JPMC made at least half a billion dollars in revenue off the backs of Madoff's victims as well as in excess of $400 million in fraudulent transfers. The Trustee seeks recovery of these funds as well as at least $19 billion in damages for JPMC's role in allowing the Ponzi scheme to continue unabated for years, with an exact amount to be determined at trial.

13.    It was Madoff himself who ultimately proclaimed his fraud to the world in December 2008, and the thread of the relationships allowing the fraud to exist and fester began to be revealed as well. JPMC's complicity in Madoff's fraud, however, remained disguised, cloaked by JPMC in the myth that Madoff acted alone and fooled JPMC. But that is the fable. What follows is the true story.

## JURISDICTION AND VENUE

14.    The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b) and 78fff-2(c)(3), §§ 105(a), 541, 544, 547, 548(a), 550(a), and 551 of 11 U.S.C. §§ 101, *et seq.* ("Bankruptcy Code"), the New York Fraudulent Conveyance Act (New

York Debtor and Creditor Law §§ 270, *et seq.* (McKinney 2001)), New York Civil Practice Law

and Rules (McKinney 2001), and other applicable law.

15.    This is an adversary proceeding brought in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (BRL) ("SIPA Proceeding") is pending.  This Court

has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 1334(e)(i), and

SIPA §§ 78eee(b)(2)(A), (b)(4).

16.    This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F), (H), and

(O).

17.    Venue in this district is proper under 28 U.S.C. § 1409.

**PARTIES**

**The Trustee**

18.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case under the Bankruptcy Code.  Chapters 1, 3, 5, and subchapters I and II of

chapter 7 of the Bankruptcy Code are applicable to this case to the extent consistent with SIPA

§ 78fff-1(b).

19.    In addition to the powers of a bankruptcy trustee, the Trustee has broader powers

granted by SIPA.

20.    The Trustee is a real party in interest and has standing to bring these claims

pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including §§ 323(b), 541, 544 and

704(a)(1), because, among other reasons:

      a.    BLMIS incurred losses as a result of the conduct set forth herein;

      b.    BLMIS customers and/or the customer property estate were injured as a

result of the conduct detailed herein;

      c.     SIPC cannot by statute advance sufficient funds to the Trustee to fully reimburse all BLMIS customers for all of their losses;

      d.     the Trustee will not be able to fully satisfy all claims;

      e.     JPMC received customer property as defined in SIPA § 78*lll*(4) as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted" ("Customer Property");

      f.     the Trustee, as representative of, and as bailee of, the Customer Property estate, can sue as a real party in interest to pursue Customer Property for equitable distribution;

      g.     to the extent the Trustee has received express assignments of certain BLMIS customer claims, which they could have asserted, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and palpable loss for which the Trustee is entitled to seek monetary damages;

      h.     SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding. SIPC has expressly assigned to the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds;

      i.     the Trustee has the power and authority to bring claims and to avoid and recover transfers pursuant to §§ 541, 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3); and

      j.     the Trustee has the rights and powers of any creditor under § 544 of the Bankruptcy Code.

21.    The Trustee also brings a contribution claim as a successor-in-interest to BLMIS
and a third-party plaintiff in the SIPA Proceeding.  BLMIS customers have filed thousands of
claims to date, and pursuant to Rule 14 of the Federal Rules of Civil Procedure and Rule 7014 of
the Federal Rules of Bankruptcy Procedure, the Trustee impleads JPMC as a third-party
defendant seeking contribution from JPMC to the extent it contributed to damages suffered by
BLMIS customers.

**The Defendants**

22.    Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a financial holding
company incorporated under Delaware law with its principal place of business at 270 Park
Avenue, New York, New York 10017.  JPMorgan Chase is one of the largest banking
institutions in the United States, with approximately $2.0 trillion in assets and $165.4 billion in
stockholders' equity as of December 31, 2009.

23.    JPMorgan Chase played a role in the Defendants' relationship with BLMIS and
the BLMIS feeder funds.  JPMorgan Chase created and implemented anti-money-laundering
policies that governed how the Defendants monitored the activity in the 703 Account.  Further,
JPMorgan Chase was involved in the products the Defendants structured and issued relating to
the BLMIS feeder funds and was repeatedly referenced in the term sheets for those products.

24.    Defendant JPMorgan Chase Bank, N.A. ("Chase Bank") is one of JPMorgan
Chase's main bank subsidiaries and is organized under the laws of the United States with its
principal place of business at 111 Polaris Parkway, Columbus, Ohio 43240.  Chase Bank is a
national banking association in the United States with locations in 23 states, including a location
in New York, New York.  Prior to November 2004, JPMorgan Chase Bank was a New York
state chartered bank, regulated by the New York State Banking Department.  On July 9, 2004,
JPMorgan Chase Bank requested approval to convert to a national banking association.  This

10

request was approved by the Office of the Comptroller of the Currency ("OCC") on October 13,
2004. At that time, the bank's name was changed to JPMorgan Chase Bank, N.A.

25.    Upon information and belief, the Risk Management Division of the Investment
Bank operates at least in part under the legal entity Chase Bank. Chase Bank also acted as
guarantor and common depository for products JPMC structured and issued related to the
BLMIS feeder funds.

26.    Defendant J.P. Morgan Securities LLC ("JPM Securities (US)") is the principal
non-bank subsidiary of JPMorgan Chase and is organized under the laws of Delaware. JPM
Securities (US)'s operations are conducted in JPMorgan Chase's New York, New York offices.
JPM Securities (US) is JPMorgan Chase's United States Investment Banking arm, through which
it conducts securities underwriting, dealing, and brokerage activities in the United States. JPM
Securities (US) is an SEC-registered broker-dealer and investment adviser, and a member of the
Financial Industry Regulatory Authority ("FINRA").

27.    Upon information and belief, JPMorgan Chase's Financial Institutions Group and
Broker/Dealer Group operate at least in part under the legal entity JPM Securities (US).

28.    Defendant J.P. Morgan Securities Ltd. ("JPM Securities (UK)") is organized
under the laws of England with its registered office at 125 London Wall, London, EC2Y 5AJ.
JPM Securities (UK) is JPMorgan Chase's United Kingdom Investment Banking arm, through
which it conducts securities underwriting, securities dealing, and brokerage activities. JPM
Securities (UK) is an indirect subsidiary of Chase Bank. JPM Securities (UK) routinely
conducts business in New York, New York and its employees regularly work with JPMorgan
Chase employees in the New York, New York offices and attend meetings at those offices.

29.    Upon information and belief, JPMorgan Chase's Equity Exotics & Hybrids Desk and the Equity Derivatives Group operate at least in part under the legal entity JPM Securities (UK). JPM Securities (UK) also played an integral role in structuring and issuing products related to the BLMIS feeder funds.

30.    This Court has personal jurisdiction over all of the Defendants captioned herein pursuant to New York Civil Practice Law and Rules 301 and 302, and Rule 7004 of the Federal Rules of Bankruptcy Procedure. All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.

31.    The Defendants have: (a) intentionally taken full advantage of the rights, benefits, and privileges of conducting business and/or transactions in the State of New York; (b) purposefully availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York, and by receiving Customer Property to their benefit; (c) derived significant revenue from New York; (d) maintained minimum contacts and/or general business contacts with New York in connection with the claims alleged herein; and (e) committed tortious acts both within and without New York, causing injury in New York, and (i) regularly do or solicit business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in New York, or (ii) expect or should reasonably expect the acts to have consequences in New York and derive substantial revenue from interstate and international commerce.

32.    JPMorgan Chase operates six business segments: Investment Banking, Commercial Banking, Treasury & Security Services, Asset Management, Retail Financial Services, and Card Services. Within or alongside these various business segments, JPMorgan Chase's activities are further divided among numerous divisions and groups.

12

33.    JPMorgan Chase does not operate its various business segments, divisions, and groups within the confines of separate legal entities. Rather, the firm operates through many legal entities under the enormous umbrella that is the financial holding company, JPMorgan Chase.

34.    Matt Zames, who heads Interest Rate Trading, Global Foreign Exchange, Public Finance, Global Mortgages, Tax-Oriented Investments, and Global Fixed Income, explained the significance of JPMorgan Chase's legal entities as "not relevant to how we run our business." Zames used himself as an example: "I guess I'm still an employee of [JPM Securities (US)]. Having said that, people that report to me are under [Chase Bank] as well."

35.    The Trustee brings this adversary proceeding against all Defendants because, upon information and belief, each Defendant, individually, participated in, promoted, aided and abetted the fraud. In addition, all of the Defendants operated as a single indivisible entity. Therefore, each of the Defendants is liable for the actions of the other Defendants.

## MADOFF'S INVESTMENT ADVISORY, MARKET MAKING, AND PROPRIETARY TRADING BUSINESSES

36.    BLMIS is a New York limited liability company that was wholly owned by Madoff. Founded in 1959, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as Founder, Chairman, and Chief Executive Officer, ran BLMIS together with several family members and a number of additional employees. BLMIS was registered with the SEC as a securities broker-dealer under § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By that registration, BLMIS became a member of SIPC. BLMIS had three business units: market making, proprietary trading, and investment advisory ("IA Business"). The IA Business was the locus of the fraud perpetrated by Madoff through BLMIS.

37.    Madoff operated his fraudulent IA Business in the same BLMIS offices from which he operated the market making and proprietary trading businesses. BLMIS functioned both as an investment adviser to its customers and a custodian of their securities. Its annual audits were purportedly performed by Friehling, an accounting firm of three employees, one of whom was semi-retired, with offices located in a strip mall in Rockland County, New York. The precise date on which BLMIS began offering investment advisory services has not been established, but it appears that BLMIS was offering such services as far back as the 1960s. The Trustee's investigation to date establishes that, to the extent records are available, BLMIS never acted as a true investment adviser in the interest of its customers.

38.    Madoff solicited billions of dollars from investors for his fraudulent IA Business. Initially, he told customers he would invest their funds pursuant to an arbitrage strategy. Then in the 1990s, Madoff purportedly began employing the Split Strike Conversion Strategy ("SSC Strategy"). Madoff represented that his strategy was to invest customer funds in a subset or "basket" of the common stocks that comprised the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that the baskets of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value. Several times a year, customer funds would purportedly move "into the market," which consisted of allegedly purchasing a basket of stocks and corresponding option hedges. Then customer funds were moved completely "out of the market" to purported investments in United States Treasury Bills ("T-bills") or in mutual funds holding T-bills until the next presumed trading opportunity arose. At the end of most quarters, the baskets were purportedly sold and the proceeds invested in T-bills or other money market funds.

14

39.     As part of the SSC Strategy, Madoff also concocted a fictitious hedging strategy for the baskets of stocks. He purported to purchase and sell S&P 100 option contracts correlated to the stocks in the baskets, thereby limiting both the downside risk associated with possible adverse price changes in the baskets of stocks and the profits associated with increases in underlying stock prices. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.

40.     The final customer statements issued by BLMIS for the month ending on November 30, 2008 falsely reflected that BLMIS customers had nearly $65 billion of net investments and related fictitious gains from those investments.

41.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in—or had been traded through—their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication. The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious. At his plea hearing, Madoff admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients, there is no record of BLMIS having cleared any purchase or sale of securities for customers of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities.

42.     Madoff generally assured customers and regulators that he purchased and sold the put and call options OTC rather than through an exchange. Yet, like the underlying securities,

the Trustee has yet to uncover any evidence that Madoff ever purchased or sold any of the
options described in customer statements. The Options Clearing Corporation, which clears all
exchange-traded option contracts based upon the stock of S&P 100 companies, has no record of
the IA Business having bought or sold any exchange-listed options on behalf of the IA Business
customers.

43.    To bolster that lie, Madoff periodically wired hundreds of millions of dollars from
the 703 Account to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London-
based entity substantially owned by Madoff and his family. MSIL wired those hundreds of
millions of dollars back into the bank accounts of BLMIS's proprietary trading and market
making businesses in an attempt to create a record of revenues.

44.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme
and Madoff concealed the ongoing fraud in an effort to hinder and delay other current and
prospective customers of BLMIS from discovering the fraud. The money received from
investors was overwhelmingly used to make the distributions to—or payments on behalf of—
other investors, and to make other transfers, all of which are avoidable by the Trustee. The
money sent to BLMIS for investment, in short, was simply used to keep the operation going and
to enrich Madoff, his associates, his family, and others, including JPMC, until such time as the
requests for withdrawals in December 2008 overwhelmed the flow of new investments and
caused the inevitable collapse of the Ponzi scheme.

45.    During the scheme, certain investors requested and received distributions of the
"profits" listed for their accounts that were nothing more than fictitious profits. Other investors,
from time to time, redeemed or closed their accounts, or removed portions of the purportedly

16

available funds, and were paid consistently with the statements they had been receiving. Some of those investors later re-invested part or all of those withdrawn payments through BLMIS.

46.    The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but in reality, because it was a Ponzi scheme, BLMIS did not have those gains to pay investors. BLMIS was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers.

47.    The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors, and to lure other investors into the Ponzi scheme.

48.    In an effort to hinder, delay, or defraud authorities from detecting the fraud, Madoff did not register BLMIS as an Investment Adviser, pursuant to 15 U.S.C. § 80b-3, until August 2006. This allowed Madoff to avoid scrutiny from the SEC that may have uncovered his true dealings, exposing the billions of dollars that flowed into BLMIS that Madoff used as his personal piggy bank.

49.    At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

50.    At all relevant times, and as more fully described herein, BLMIS was insolvent and Madoff, in carrying out his unlawful acts, directly and by wrongful domination and control of BLMIS:

17

Violated his fiduciary duties to the entire community of interests in BLMIS, including its good faith customers, creditors and other lawful stakeholders and claimants;

Totally abandoned, furnished no benefit to, and materially injured and defrauded BLMIS and its community of interests; and

Acted wholly outside the scope of his agency, employment, authority, capacity and power, and entirely for his own and for third parties' personal benefit and purposes.

In addition, JPMC knew or had notice of circumstances indicating that Madoff's unlawful acts, and the acts of BLMIS caused by his wrongful domination and control, in furtherance of the Ponzi scheme were not apparently for the carrying on of any business of BLMIS in the usual way and were in contravention of their authority, capacity and power.

51.    In or about January 2008, BLMIS filed with the SEC an Amended Uniform Application for Investment Adviser Registration. The application represented, among other things, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion. In actuality, in January 2008, BLMIS had 4,900 active customer accounts and purported assets under management of approximately $65 billion.

52.    Based upon the Trustee's ongoing investigation, it appears there were more than 8,000 customer accounts at BLMIS over the life of the Ponzi scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. In total, these statements showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth a fraction of that amount, most of which JPMC held in the 703 Account. Customer accounts had not accrued any real profits because no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, investors had lost nearly $19 billion in principal.

## SIPA LIQUIDATION

53.    On December 11, 2008 ("Filing Date"), Madoff was arrested by the Federal

Bureau of Investigation for violations of the criminal securities laws, including, *inter alia*,

securities fraud, investment adviser fraud, and mail and wire fraud, and was criminally charged

with operating a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b)

and 78ff and 17 C.F.R. § 240.10b-5, in the United States District Court for the Southern District

of New York ("District Court"), captioned *United States v. Madoff*, Case No. 08-MJ-2735.  On

that same date, the SEC filed a complaint in the District Court against Madoff and BLMIS, Case

No. 08-CV-10791, alleging that Madoff and BLMIS engaged in fraud through the IA Business.

54.    On December 12, 2008, the Honorable Louis L. Stanton of the District Court

entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the

"Receiver").

55.    On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an

application in the District Court alleging, *inter alia*, BLMIS was not able to meet its obligations

to securities customers as they came due and, accordingly, its customers needed the protections

afforded by SIPA.  On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to

combine its own action with SIPC's application.

56.    Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

a.    appointed the Trustee for the liquidation of the business of BLMIS

pursuant to SIPA § 78eee(b)(3);

b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to

SIPA § 78eee(b)(3);

   c. removed the case to the United States Bankruptcy Court for the Southern

District of New York ("Bankruptcy Court") pursuant to SIPA § 78eee(b)(4); and

   d. removed the Receiver for BLMIS.

 57. By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

 58. At a plea hearing on March 12, 2009 in the case captioned *United States v.*

*Madoff*, Case No. 09-CR-213 (DC), Madoff pled guilty to an eleven-count criminal information

filed against him by the United States Attorney's Office for the Southern District of New York.

Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of

[BLMIS]." (Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-

213 (DC) (S.D.N.Y. March 12, 2009) (Dkt. No. 50).)  Additionally, Madoff asserted: "[a]s I

engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (*Id.*)  Madoff was

sentenced on June 29, 2009 to 150 years in prison.

 59. On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to

participating in and conspiring to perpetuate the Ponzi scheme.  At a plea hearing on August 11,

2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS), DiPascali pled

guilty to a ten-count criminal information.  DiPascali admitted, among other things, that Madoff

had been operating a Ponzi scheme since at least the 1980s.  (Plea Allocution of Frank DiPascali

at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Dkt. No.

11).)

 60. By virtue of his appointment under SIPA, the Trustee has the responsibility to

recover and pay out Customer Property to BLMIS customers, assess claims, and liquidate any

other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, but such assets will not be sufficient to fully reimburse BLMIS customers for the billions of dollars they invested through BLMIS. Consequently, the Trustee must use his broad authority as expressed and intended by both SIPA and the Bankruptcy Code to pursue recovery for the victims of Madoff's fraud.

## THE PLAYERS

### Relevant JPMC Business Segments

61.    JPMorgan Chase operates six business segments: Investment Banking, Commercial Banking, Treasury & Security Services, Asset Management, Retail Financial Services, and Card Services. At least two of these six business segments, Investment Banking and Asset Management, played a role in JPMC's relationship with Madoff and BLMIS.

62.    *Investment Banking.* JPMC's Investment Bank services corporations, financial institutions, governments, and institutional investors in the areas of corporate strategy and structuring, capital-raising, risk management, market making, prime brokerage, and research.

63.    The Investment Bank was integral to fostering the relationship between JPMC and BLMIS. Multiple divisions within the Investment Bank were responsible for servicing and maintaining the 703 Account, structuring and issuing products related to BLMIS feeder funds, and assessing both the market and credit risks associated with BLMIS and BLMIS feeder funds.

64.    *Asset Management.* Asset Management provides wealth management services to institutions, high net worth individuals, and retail investors. JPMC's Private Bank operates through the Asset Management business segment. The Private Bank decided not to conduct business with BLMIS or BLMIS feeder funds after performing due diligence.

## Relevant JPMC Divisions and Employees

65.     *Equity Exotics & Hybrids Desk.* The Equity Exotics & Hybrids Desk ("Equity Exotics") is the division within JPMC's Investment Bank that was primarily responsible for structuring and issuing products related to BLMIS feeder funds. An "exotic" is any investment that is more complicated than simply buying a basket of stocks. Upon information and belief, Equity Exotics operates primarily out of JPMC's London office, and its members are employed by JPM Securities (UK).

66.     Jonathan "Bobby" Magee ran Equity Exotics during 2007 and 2008 when the group was structuring and issuing products related to BLMIS feeder funds. Andrea De Zordo, Neil McCormick, and Dimitrios Nikolakopoulos all worked at Equity Exotics under Magee's leadership. While McCormick and Magee are no longer employed by JPMC, De Zordo and Nikolakopoulos continue to work for JPMC.

67.     *Financial Institutions Group and Broker/Dealer Group.* JPMC's Financial Institutions Group ("FIG") is a division of the Investment Bank responsible for servicing banks, insurance companies, financial companies, and broker-dealers. The Broker/Dealer Group is a sub-division of FIG that works out of JPMC's New York, New York offices, and is responsible for managing the Investment Bank's relationship with clients that are broker-dealers. The Broker/Dealer Group was responsible for managing the 703 Account and for providing credit to BLMIS.

68.     Jane Buyers-Russo was head of the Broker/Dealer Group until her departure from JPMC in 2010. Richard Cassa, also a former employee, was the Client Relationship Manager in the Broker/Dealer Group responsible for BLMIS's accounts and credit requests. He also fielded requests from other divisions of JPMC to set up meetings with Madoff.

22

69.    *Equity Derivatives Group.* JPMC's Equity Derivatives Group ("EDG") provides equity financing and structured financing for its investors, including loans, exchange-traded funds, swaps, synthetic futures, and OTC options. EDG is part of the Investment Bank.

70.    Luke Dixon, a former JPMC employee, was an Executive Director in EDG and worked out of JPMC's London office. Scott Palmer worked alongside Dixon in EDG in London. Dixon and Palmer conducted due diligence on the BLMIS feeder funds in 2008.

71.    *Risk Management Division.* The Risk Management Division consists of approximately 940 individuals that manage both market risk and credit risk at the Investment Bank. The market risk sub-division assesses the riskiness of certain fund strategies, financial products, and securities, and assures that JPMC's financial exposures stay within internal risk guidelines. Credit risk manages the creditworthiness of transaction counterparties.

72.    John Hogan is the current Chief Risk Officer at JPMC's Investment Bank. He works primarily out of the New York offices.

73.    Brian Sankey is Chief Credit Officer and Deputy Chief Risk Officer and is currently responsible for all Credit Risk Management activities. Sankey reports directly to Hogan. Marco Bischof and James Coffman also work in Credit Risk Management. Andrew Cox works out of London in Global Credit Risk and Client Operations for Europe, the Middle East, and Africa.

74.    Richard Wise and Chen Yang work in Market Risk Management in New York, New York. Wise is the Head of Market Risk in the Equity Division, and Yang reports to Wise.

75.    These teams from credit risk and market risk, along with Hogan, reviewed and approved JPMC's structured products related to the BLMIS feeder funds.

76.    *Other Relevant Players.* Other key individuals include Matt Zames, who heads

Interest Rate Trading, Global Foreign Exchange, Public Finance, Global Mortgages, Tax-

Oriented Investments, and Global Fixed Income at JPMC's Investment Bank. Zames works in

JPMC's New York, New York offices. Zames told Hogan in 2007 that Madoff was rumored to

be operating a Ponzi scheme.

77.    Carlos Hernandez is the Head of Global Equities at JPMC's Investment Bank.

Hernandez works in JPMC's New York, New York offices, but runs JPMC's equity divisions in

a number of different countries. Hernandez was involved in reviewing and approving the

proposal regarding JPMC's structured products related to BLMIS feeder funds.

78.    Alain Krueger worked in the Structured Investments Distribution Marketing

division of JPMC's Investment Bank. Krueger worked out of JPMC's London office. He was

the JPMC representative who spoke to Aurelia Finance regarding JPMC's decision to redeem

from the BLMIS feeder funds.

79.    Michael Cembalest is a Chief Investment Officer at J.P. Morgan Global Wealth

Management, which is part of the Private Bank. Cembalest works out of JPMC's New York,

New York offices. Cembalest's group conducted due diligence on BLMIS and, after seeing all

of the red flags, chose not to invest with any BLMIS feeder funds.

**Relevant JPMC Committees**

80.    *Hedge Fund Underwriting Committee.* The Hedge Fund Underwriting

Committee ("HFUC") was a committee at JPMC comprised of senior business heads and

bankers, including individuals such as the Chief Risk Officer and the Heads of Equities,

Syndicated Leveraged Finance, Sales, and Hedge Funds. The purpose of the HFUC was to

ensure all senior partners who dealt with hedge funds were comfortable with proposals relating

to hedge funds. The HFUC was presented with Equity Exotic's proposal to structure and issue products around the BLMIS feeder funds. The HFUC has since dissolved.

81.    *Investment Bank Risk Committee.* JPMC's Investment Bank Risk Committee ("IBRC") meets weekly to discuss the universe of risk within the Investment Bank. The IBRC discusses activity in the markets, policy issues, operational issues, legal issues, and the Investment Bank's reputation. IBRC also received and reviewed the proposal by Equity Exotics.

## BLMIS Feeder Funds

82.    *Fairfield Sentry and Fairfield Sigma.* Both Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma") are funds run by the Fairfield Greenwich Group ("FGG"). Fairfield Sentry was among BLMIS's largest feeder funds. Fairfield Sigma invested all of its funds in Fairfield Sentry. JPMC invested in both of these funds in hedging its structured product exposure, and redeemed its interest in both funds the month before Madoff was arrested.

83.    *Herald.* Herald Fund s.p.c. ("Herald") was a BLMIS feeder fund managed by Herald Asset Management. However, day-to-day management was delegated under a service agreement to Bank Medici AG ("Bank Medici"). The founder and majority shareholder of Bank Medici was Sonja Kohn, who was not only a longtime friend of Madoff, but also played a key role in the fraud herself. JPMC purchased an interest in Herald as part of its hedging strategy and redeemed that interest prior to Madoff's arrest.

84.    *Lagoon.* Lagoon Trust Limited ("Lagoon") was another fund that fed money to BLMIS. Hermes Asset Management Limited ("Hermes") managed Lagoon. JPMC also invested in Lagoon to hedge its exposure to the fund's returns.

85.    *Rye Funds.* Rye Select Broad Market Portfolio Limited and Rye Select Broad Market Fund ("Rye Funds") were two funds that fed money to BLMIS and were managed by

Rye Investment Management, a division of Tremont Partners Inc. ("Tremont"). Equity Exotics requested approval for the issuance of hundreds of millions of dollars worth of products structured around the Rye Funds. That transaction was never approved.

86.     *Thema.* Thema International Fund plc ("Thema") was a BLMIS feeder fund managed by Bank Medici. Equity Exotics's proposal included an investment in Thema, but the investment was not approved.

**Relevant BLMIS/JPMC Customers**

87.     *Norman Levy.* Levy was an extremely important, preferred top-tier client of JPMC's Private Bank, whose relationship with JPMC and its predecessor firms spanned more than 64 years. Levy had close business relationships with senior executives at JPMC's predecessor banks, as well as at JPMC. These individuals included John McGillicuddy, former Chairman and Chief Executive Officer of Manufacturers Hanover and Chemical Bank, Walter Shipley, Chief Executive Officer from 1996 to 1999, and his successor, William Harrison (succeeded by Jamie Dimon). Levy was even provided an office at the Private Bank, which JPMC maintained for Levy even after the Private Bank had relocated. Levy also was a longtime customer of BLMIS. JPMC accordingly had visibility into both sides of Levy's transactions with Madoff.

88.     *Sterling Equities.* Sterling Equities Funding Co. and its related entities ("Sterling Equities") were founded by Fred Wilpon and Saul Katz in the 1970s as a vehicle to develop and invest in real estate. Sterling Equities had a longstanding relationship with JPMC, and both Fred Wilpon and Sterling Equities were customers of JPMC's Private Bank. Sterling Equities was also a longtime customer of BLMIS and its cash infusions of hundreds of millions of dollars helped keep the Ponzi scheme afloat. JPMC accordingly had visibility into both sides of Sterling Equities' transactions with Madoff.

26

**Other Relevant Entities**

89.    *Aurelia and Aurelia Finance.*  Aurelia Fund Management Limited ("Aurelia"), a

company incorporated in Bermuda, owned 25% of Hermes and provided Hermes with necessary

office facilities, equipment, and personnel to enable Hermes to carry out its investment

management function.  Aurelia Finance, the Swiss company that purchased and distributed

JPMC's structured products, is the parent company of Aurelia.

90.    *Rafale Partners.*  Rafale Partners Inc. ("Rafale Partners") was a fund that invested

in two BLMIS feeder funds.  Stated differently, Rafale Partners was a sub-feeder fund into

BLMIS.  Equity Exotics's proposal included an investment in Rafale Partners, but that

investment was never approved.

## IGNORING THE EVIDENCE OF FRAUD, JPMC INVESTS IN AND STRUCTURES PRODUCTS ON BLMIS FEEDER FUNDS

**JPMC's Note Program**

91.    In or about 2006, JPMC began considering various BLMIS feeder funds for the

purpose of structuring and issuing its own financial products based on those funds.

92.    JPMC started by gathering information on Fairfield Sentry and Lagoon.  By

February of 2006, JPMC had already visited FGG in connection with due diligence.  After the

visit, Yang wrote:

> I do have a few concerns and questions:  1) All trades are generated by Madoff's
> black box trading model and executed by Madoff.  It's not clear whether [FGG]
> has any discretion or control over the autopilot trading program. . . . 2) Is it
> possible to get some clarification as to how the fund made money during times of
> market distress? . . . how did they manage to get better than 3M T-Bill returns? . .
> . For example, from April to September 2002, the S&P 100 Index is down 30%,
> cash yielded 1%, and the Fund was able to generate over 6% returns.

93.    Yang was told during the same due diligence visit that FGG would not provide a

copy of Fairfield Sentry's trading agreement with BLMIS.  Yang therefore relied solely on a

verbal description of the investment guidelines and restrictions FGG had agreed upon
contractually with BLMIS.

94.     De Zordo and Bischof noted similar concerns with respect to Lagoon, Hermes,
and Aurelia. Bischof was surprised by the absence of a proper legal relationship between
BLMIS and Hermes, and wrote to De Zordo on November 11, 2006: "What continues to
surprise me is the fact that after their 14 years in the business and $1.5bn AUM, we seem to be
the first 'investor' spotting this lack of documentation around Lagoon and it's [sic]
upstream/downstream relationships." De Zordo responded that the key question was whether
JPMC as a firm should even be doing business with Hermes and Aurelia.

95.     About a week later, Bischof followed up with De Zordo after a call with Aurelia.
He wrote: "They have position level transparency once a month with 1 week delay, but don't
run risk analysis and don't have the know-how of how to do this. . . . It doesn't look pretty."

96.     JPMC already knew the identity of BLMIS's auditor, Friehling, and had known
the identity of the auditor for years. But, upon information and belief, it was not until early 2006
that JPMC performed even minimal due diligence on Friehling. Coffman noted that "a quick
check found that they [Friehling] are not registerred [sic] with the Public Company Accounting
Oversight Board, nor are they subject to peer reviews from the American Institute of Certified
Public Accountants. Additionally, they have no website to provide background on their
organization."

97.     Despite their suspicions, by early 2007, JPMC was exploring deals with other
BLMIS feeder funds—the Rye Funds and Thema.

98.     JPMC was eager to begin issuing structured products on BLMIS feeder funds.
After conducting only preliminary due diligence on these funds, and documenting concerns and

red flags related to BLMIS and these feeder funds, JPMC started structuring and issuing products tied to these feeder funds' returns.

## JPMC Starts Structuring and Issuing Products on BLMIS Feeder Funds

99.    By February 2007, JPMC already had over $65 million in BLMIS-related products in the pipeline. These products included a €5 million trade on Fairfield Sigma, two $25 million trades tied to Fairfield Sentry, and a $10 million trade on Thema.

100.    These products were developed by Equity Exotics. The majority of these products were structured to allow investors to collect returns tied to the returns of the BLMIS feeder funds. Investors typically leveraged their investments in order to reap greater rewards from a smaller investment. For example, in February 2007, JPMC was in the process of structuring a three-times leveraged certificate on Fairfield Sigma that would utilize borrowed funds to increase the amount invested. An investor who purchased a three-times leveraged certificate would effectively invest $100, and then JPMC would lend an additional $200 and invest the entire $300 in the agreed upon BLMIS feeder fund. This allowed the individual investors to earn returns as if they had actually invested $300, despite only providing $100 of their own money.

101.    JPMC continued to structure additional BLMIS-related products during the Spring of 2007. In March 2007, JPMC personnel were determining terms for deals on Fairfield Sentry, Fairfield Sigma, Herald, the Rye Funds, and Thema.

102.    On March 9, 2007, the BLMIS deals JPMC had in its pipeline totaled almost $100 million. And by March 19, 2007, JPMC was considering another deal with the Rye Funds that would have increased the value of JPMC's BLMIS-related products by $200 - $300 million.

**JPMC's Limited Due Diligence Led to Unanswered, Disturbing Questions Regarding Madoff and His Investment Strategy**

103.    In 2007, with hundreds of millions of dollars in deals ready to close, JPMC needed to get more comfortable with its exposure to Madoff. JPMC needed to conduct additional due diligence on each of these BLMIS feeder funds and, most importantly, on BLMIS directly. On February 15, 2007, Coffman wrote, "I would classify [BLMIS feeder funds] as a single fund, and therefore assume it falls under the $100mm limit . . . . Without actually getting to do due diligence on Madoff, I don't think we should consider going above that limit."

104.    Equity Exotics started by looking within its own company. Madoff and his family had maintained numerous accounts at JPMC or its predecessors since as far back as 1986. As Equity Exotics was in the midst of structuring hundreds of millions of dollars of BLMIS-related products, it contacted BLMIS's Client Relationship Manager in the Broker/Dealer Group, Cassa. Cassa offered to arrange a conference call between representatives of the Investment Bank and Madoff. On March 30, 2007, Cassa and members of JPMC's Risk Management Division spoke with Madoff.

105.    Even though the products JPMC was structuring would have led to increased investments in the BLMIS feeder funds, and therefore increased investments through BLMIS, Madoff explained that he disliked banks structuring products on his strategy. In particular, he made clear that he was not willing to engage in "full due diligence." Despite the potential benefit for BLMIS of growing its customer base, Madoff could not risk allowing serious due diligence inquiries as that would disclose the fraud.

106.    Having learned relatively little from speaking to Madoff, Equity Exotics reached out to the BLMIS feeder funds themselves to obtain additional information regarding the funds and BLMIS.

107.    JPMC began its investigation with Tremont. On April 11, 2007, representatives of JPMC met with Tremont's Chief Executive Officer, Bob Schulman, to discuss the Rye Funds and BLMIS. Shortly after the meeting, JPMC sent Tremont a list of additional questions regarding BLMIS. A number of these questions related to the counterparties to BLMIS's OTC options trading. JPMC asked whether BLMIS entered into the trading agreements on behalf of Tremont or in BLMIS's own name, and whether Tremont knew who the counterparties were. JPMC received a response which required more diligence. Tremont responded that, even though Tremont was the party entering into these agreements with the options counterparties, it did not know who the counterparties were. Upon information and belief, JPMC never verified any of Tremont's responses with third parties, or questioned the source of Tremont's information regarding the counterparties.

108.    Based on the limited due diligence JPMC performed on BLMIS through Tremont, Equity Exotics put together a "Transaction Approval Package." In addition to seeking approval for a number of different transactions involving the Rye Funds, the proposal summarized JPMC's due diligence. "We will be receiving full transparency on the program via trade statements from BLM, albeit on a delayed basis, and will be able to verify our risk analysis on an ongoing basis," Equity Exotics claimed, and "[t]he liquidity of the underlying portfolio, even assuming close to $15 billion in 'AUM' [assets under management] at Madoff, should be adequate to fully unwind the program without catastrophic slippage." The risk involved was noted and quickly dismissed based on nothing more than Madoff's reputation:

> Although SIPC, SEC and NASD [National Association of Securities Dealers] regulation on segregated customer accounts should protect us from financial distress at BLM, it would not necessarily protect us from wholesale malfeasance or fraud. That said, BLM has had a successful operating history for nearly 50 years and Bernie Madoff is [a] well regarded figure in this industry.

31

109.    JPMC received similar responses to questions posed to Herald regarding

counterparties:  (a) the trades were between the fund and the counterparty, not between BLMIS

and the counterparty; (b) the fund received collateral from all counterparties "except from very

few high quality parties"; and (c) "the fund trades with say 10+names at any moment in time,"

but Madoff was not willing to disclose the actual names of the counterparties.

110.    Tremont's and Herald's responses were particularly alarming given Madoff was

purportedly entering into OTC agreements with the options counterparties on behalf of the funds.

Thus, Tremont and Herald, and, upon information and belief, all of the other BLMIS feeder

funds, were supposedly entering into contracts with third parties whom they could not even

identify, much less assess counterparty creditworthiness.

111.    Again, despite alarming answers from Herald, Equity Exotics put together another

"Transaction Approval Package" entitled "Bank Medici AG—an access provider into the Bernie

Madoff strategy."  As key transaction strengths, Equity Exotics listed: "multiple layers of

oversight—although relying solely on Madoff for position level information, independent

weekly and monthly valuations are carried out by Bank Medici and the third party

Administrator," and "[p]ersonal relationship with Sonja Kohn," "[a]ccess to as secretive a

business as Madoff's, and the loyalty he presumably he [sic] feels towards her adds significant

comfort."  Key transaction weaknesses included that "investors, sub-Custodians, auditors etc rely

solely on Madoff produced statements and have no real way of verifying positions at Madoff

itself," and "[f]raud—given the significant reliance on BLM for verification of assets held, and

no real way to confirm those valuations, fraud presents a material risk."

112.    JPMC representatives also visited Rafale Partners and Bank Medici, and were

able to review BLMIS feeder funds' customer, option, and trading agreements.  Through that

review, JPMC learned that only certain feeder funds had agreements that explained BLMIS's trading strategy. JPMC suggested that the BLMIS feeder funds may be hesitant to press for more details because they did "not want to upset the relationship with Madoff."

113.    JPMC did not put its securities activities on hold to conduct due diligence on the funds. Rather, at the same time it was conducting these investigations, Equity Exotics was structuring additional BLMIS-related products with little to no regard for the disturbing information learned through its due diligence.

114.    Furthermore, despite these indicia of fraud, upon information and belief, JPMC did not inquire further. Instead, in June 2007, JPMC proceeded to prepare a $600 million proposal for additional investments in the Rye Funds and a $225 million proposal for investments in Herald.

115.    Following these proposals, Coffman was anticipating "a major head on collision with the business that wants to do an infinite amount of this activity with much less oversight." A full "collision" did not seem to occur. Concerns about potential fraud at BLMIS tempered only the **amount** that JPMC was willing to risk with BLMIS feeder funds, but not the underlying decision to invest in those funds.

## Undeterred by Evidence of Fraud, Equity Exotics Requests Approval from the Hedge Fund Underwriting Committee to Issue Approximately $1 Billion in BLMIS-Related Products

116.    Undeterred by the results of its cursory due diligence inquiries, in June of 2007, Equity Exotics presented a proposal to the HFUC requesting approval of "an overall BLM Strategy risk limit" which would carry a maximum potential exposure of $1.32 billion. This proposal included products ranging from $33 million to $667 million with eight different BLMIS feeder funds and sub-feeder funds, including the Rye Funds, Thema, Herald, Fairfield Sentry, Fairfield Sigma, Lagoon, and Rafale Partners. The majority of the products were anticipated to

come from transactions associated with the Rye Funds. Despite asking to structure $667 million worth of products around the Rye Funds, Equity Exotics explained in the proposal that Tremont had "no internal risk system in place to aggregate positions daily." Equity Exotics also stated, "we were unable to validate how this manual process [of checking trades] is performed, but feel reasonably confident that it is effective in terms of capturing major discrepancies."

117.    To be clear, Equity Exotics was not seeking approval to begin issuing products on BLMIS feeder funds. Equity Exotics was asking for permission to continue issuing these products in ever larger amounts. By the time Equity Exotics submitted this proposal, it had already executed over $130 million in trades based on Fairfield Sentry, Fairfield Sigma, and Lagoon. With the June 2007 proposal, Equity Exotics was requesting approval to issue an additional billion dollars of structured products, an amount the group acknowledged was in "significant excess of both individual as well as aggregate single manager limits" for hedge fund investments at JPMC.

118.    The proposal was submitted with a certain sense of urgency. At the time it was submitted, Equity Exotics had already arranged for $540 million worth of transactions to close at the end of June.

119.    On June 15, 2007, the HFUC met to consider the proposal. On the very same day, Hogan shared with his colleagues what he had learned from Zames, that it was well-known that Madoff was operating a Ponzi scheme: "For whatever its worth, I am sitting at lunch with Matt Zames who just told me that **there is a well-known cloud over the head of Madoff and that his returns are speculated to be part of a [P]onzi scheme**-he said if we google the guy we can see the articles for ourselves-Pls do that and let us know what you find." (Emphasis added.)

120.    Hogan warned, "you will recall that Refco was also regulated by the same crowd [SEC, NYSE, NASD] and there was noise about them for years before it was discovered to be rotten to the core. Hopefully this is not the case here but given Matt's view, I think we owe it to ourselves to investigate further."

121.    Nevertheless, Equity Exotics seemed eager to receive approval, and the further research on Madoff appears to have been limited to a Google search with no follow-up. Buyers-Russo asked one of her colleagues to "please have one of the juniors look into this rumor about Madoff that Hogan refers to below." The analyst forwarded an article about a proposed change in SEC regulations that would eliminate a loophole in the regulations governing broker-dealers. He speculated the loophole allowed broker-dealers to run "a '[P]onzi' scheme of sorts."

122.    Even though the article made no mention of Ponzi schemes and provided no suggestion as to why Madoff in particular would have had a "well-known cloud" over his head, upon information and belief, no further investigation was conducted—even after Zames told Hernandez that he believed his recollection was of a Wall Street Journal article from 2002 and therefore eliminated the possibility that the analyst's explanation based on a recently-proposed regulatory change was correct.

123.    Again, Hogan cautioned, "Mr. Madoff will not allow us to conduct any due diligence on him directly and we are forced to rely on the diligence of third parties. . . . I told Bobby [Magee] and Neil [McCormick] we don't do $1 bio 'trust me' deals and we need to do our own due diligence on Madoff or this wasn't going to happen." However, the only further "diligence" that appears to have been done was a phone call between Hogan and Madoff, which reassured Hogan enough to permit $250 million worth of "trust me" deals.

124.    When asked how he made the decision to approve $250 million of exposure to

BLMIS, Hogan explained that, in essence, he simply closed his eyes and guessed:

> [T]here's no math or magic around it—you know, a lot of what we do is more art
> than science, so I would like to tell you that I have prepared a model that told me
> 250 is the optimum number, but—you know, that's not the way it works in
> reality, and so I just use my best judgment to come up with that number.

**The Investment Bank Continues to Ignore Red Flags**

125.    For the remainder of 2007, Equity Exotics's enthusiasm for BLMIS-related

transactions remained strong despite uncovering additional red flags about Madoff, BLMIS, and

BLMIS feeder funds.

126.    In August 2007, while analyzing information provided by Herald, De Zordo noted

that despite T-bills rallying, "the move does not justify the magnitude of the gain that Bank

Medici is claiming."

127.    Equity Exotics also expressed skepticism about the information provided by

Fairfield, Lagoon, and Herald.  In November 2007, De Zordo and Nikolakopoulos were

organizing quarterly calls to funds to which JPMC had substantial exposure.  These funds

included Fairfield, Lagoon, and Herald.  When arranging meetings with these funds' managers,

Nikolakopoulos emphasized that they needed to meet with managers from all three funds in

order to "assess what the returns where [sic] driven from and ensure we get a consistent answer

from all three."

128.    Despite these concerns, JPMC remained committed to doing business with

Madoff—the potential upside reward for investing through Madoff was simply too good to pass

up even though there was a fraud.

129.    In March of 2008, JPMC acquired The Bear Stearns Companies Inc. ("Bear

Stearns").  Bear Stearns's share price began to precipitously drop and the company began

suffering from an extreme liquidity crunch in early March 2008. Unable to borrow enough funds to save itself, Bear Stearns started looking for outside options. On March 13, 2008, the CEO of Bear Stearns contacted Jamie Dimon. By March 16, JPMC had entered into an agreement to purchase Bear Stearns. JPMC started integrating the two businesses almost immediately.

130.    The integration involved combining business units and risk exposures across JPMC and Bear Stearns. In acquiring Bear Stearns, JPMC had significantly increased its hedge fund exposure. In order to bring its hedge fund exposure back within JPMC's internal limits, JPMC began to review its exposure and look for places to make cuts. This reduction process prompted JPMC to revisit and reconsider certain hedge fund transactions, including its transactions involving BLMIS feeder funds.

131.    By June of 2008, JPMC had approximately $150 million invested in Herald. These were direct investments by JPMC in the fund, presumably to hedge the bank's exposure on its structured products tied to Herald's returns. When JPMC learned that its main contact at Bank Medici, Andreas Pirkner, was departing, JPMC scheduled a meeting with Pirkner, his replacement, Andreas Schindler, and a handful of other individuals from Bank Medici. This meeting was crucial given JPMC's on-going struggle to get information from Bank Medici even with an established contact. The JPMC team, which included Palmer and Dixon, was sent to Vienna on July 7, 2008 to perform a "very thorough refresh" of its initial due diligence.

132.    Following this meeting, JPMC downgraded Herald's risk rating to the lowest rating of "5-E." Palmer noticed aspects of Herald's operation that caused him to direct JPMC to verify that Herald's assets actually existed at BLMIS. In hopes of gaining more transparency on Bank Medici and BLMIS, JPMC scheduled a follow-up meeting with Kohn for July 10, 2008.

133.    The meeting with Kohn proved to be equally disappointing for JPMC. Following this meeting, JPMC affirmed Herald's recently downgraded due diligence rating of 5-E. JPMC found that Kohn did not provide credible responses to a number of questions related to the managed accounts Bank Medici had with BLMIS. Given that Kohn was the only person at Bank Medici to have "any relationship of substance" with Madoff or BLMIS, it was incredibly troubling and telling that even she could not provide adequate responses to JPMC's questions.

134.    The lack of credible responses JPMC received from BLMIS feeder funds in 2008 was reminiscent of the answers JPMC received in 2007. The only difference between JPMC's due diligence efforts in 2007 and 2008 was that, in 2008, JPMC continued to investigate. However, as it had the previous year, JPMC kept its findings a secret.

135.    In September and October of 2008, in light of its increased hedge fund exposure in the wake of its acquisition of Bear Stearns and in view of the deteriorating economy, JPMC commenced an "exposure health check." This health check required JPMC to conduct broad due diligence on all BLMIS feeder funds in which it had invested or on which it had structured products. Palmer's team contacted the managers of Lagoon, Hermes, Fairfield Sentry, Fairfield Sigma, and Herald, as well as a number of fund custodians.

136.    Despite its previous investments in BLMIS-related funds, JPMC now urgently requested the following information: (a) each BLMIS feeder fund's net asset value, both at the end of the first quarter and as of the date of the request; (b) any visible redemptions currently in the pipeline; (c) whether the fund's liquidity profile experienced any changes; (d) whether the fund's service providers experienced any changes or events, specifically at BLMIS; (e) whether BLMIS experienced any changes or events; (f) whether the account documents between BLMIS and its feeder funds had been modified in any way; and (g) the percentage of fund assets

represented by structured products. Upon information and belief, anticipating that a number of the BLMIS feeder funds would be less than forthcoming with information, JPMC requested the BLMIS feeder funds' availability for follow-up questions.

137.    JPMC was asking many of the same questions it had asked more than a year before. Once again, JPMC received incomplete answers. The BLMIS feeder funds repeatedly found creative ways to dodge questions regarding their knowledge of Madoff and BLMIS.

138.    FGG evaded answering questions about counterparties by stating that the funds were currently in T-bills, so there were not (at that particular point in time) any counterparties.

139.    When JPMC asked Bank Medici to provide risk reports in or around April 2008, Kohn agreed to share the reports. However, nearly four months later, Kohn had not provided the reports and claimed that the parties needed to sign a confidentiality agreement first. A confidentiality agreement was unnecessary, given that information from the risk reports would be communicated via JPMC's "Measure Risk." Measure Risk, a leading risk and quantitative analytics provider to institutional hedge fund investors, maintained confidentiality by only providing JPMC with summary exposure and risk statistics. The confidentiality attained by the use of Measure Risk was explained to Bank Medici when it initially agreed to provide risk reports.

140.    Instead of continuing to be blinded by the potential reward of investing with BLMIS, this time, the JPMC due diligence team sought additional answers. The team met with Kohn and Amit Vijayvergiya, the Head of Risk Management at FGG, in October 2008. Following those meetings, Palmer circulated notes to his colleagues summarizing his findings.

141.    Palmer acknowledged: "Fairfield claims to have seen the 19th floor [where Madoff executed the SSC Strategy] but judging from the lack of thoroughness of some of their

other due diligence I am not entirely convinced that Madoff allowed them to actually enter the

trading area." When Palmer asked Vijayvergiya how BLMIS's trade information was put into

the order entry system, Vijayvergiya told Palmer that "he did not know and did not ask." These

answers by Vijayvergiya revealed that BLMIS feeder funds knew very little about Madoff's

operations, were extremely reluctant to push Madoff for answers, and, when they did get

answers, upon information and belief, they never attempted to verify those responses with

independent sources.

142.    This meeting also forced JPMC to again acknowledge the fact that none of the

funds knew who the counterparties were to their own options contracts. They relied solely on

Madoff's oral assertions that he dealt with 15-25 counterparties, that he strictly monitored the

risk level of each counterparty, and that the counterparties posted collateral for the put options.

Indeed, Vijayvergiya openly admitted that "Madoff refused to disclose the list of counterparties."

Vijayvergiya explained, "Madoff claimed that they did not want to disclose the list of

counterparties because they are worried that if the list gets into the market that the counterparties

would group together and either steal Madoff's strategy or otherwise somehow work against

Madoff." Kohn on the other hand, conceded that she had never even thought to ask Madoff who

the counterparties were, and she was reluctant to ask him about it now.

143.    JPMC was also reminded that BLMIS's auditor was Friehling—information it had

had for years as Madoff's and BLMIS's banker. Palmer noted that this was an "odd choice" and

questioned whether such a small firm was even competent to conduct an audit of an investment

firm with "$650m in shareholder capital." Despite Palmer's surprise, this was not the first time

that JPMC had access to such information. In as early as 2006, for example, Coffman conducted

due diligence on Friehling and, in October 2007, one of JPMC's own investors had inquired

about the identity of BLMIS's auditor. JPMC conducted no investigation beyond learning the names of BLMIS's auditor. Had JPMC looked further, it would have learned that Friehling was actually a three-person shop (and one of the three was retired or semi-retired) in a strip mall in Rockland County, New York—a **very** odd choice for a multi-billion dollar investment enterprise, and an indication of fraud.

144.    Had JPMC followed up on these simple facts sooner and expressed its concerns to regulators, the Ponzi scheme would have been stopped sooner.

145.    JPMC was again told that there was no independent process for confirming that the trades were executed or that the assets existed. BLMIS acted as the sub-advisor, sub-custodian, and broker-dealer to the BLMIS feeder funds. The "reconciliation" process that occurred between the funds' actual custodians, the funds' administrators, and the funds themselves could be described as follows: "Effectively all three parties receive a faxed confirmation from Madoff of the day's positions/trades and enter them into their system. The reconciliation is thus effectively one of data entry integrity as there is no reconciliation of source data to third parties."

146.    Palmer summarized his observations: "It's almost a cult [Madoff] seems to have fostered." Neither Kohn nor Vijayvergiya had been concerned by the lack of information Madoff provided. Rather, "they seem[ed] very defensive and almost scared of Madoff. They seem[ed] unwilling to ask him any difficult questions and seem[ed] to be considering his 'interests' before those of the investors."

147.    JPMC's findings were especially troubling, given earlier that month in October 2008, Petters had been arrested under suspicion of operating a $3.5 billion Ponzi scheme. Dixon, in response to Palmer's notes summarizing his meeting with Kohn and Vijayvergiya, drew

41

parallels between Petters and Madoff. He pointed out that they could not just rely on a long history and trust in an investment adviser, a mistake that investors with Petters were now regretting. In the face of the Petters fraud, Dixon suggested, "Let's go see Friehling and Horowitz the next time we're in NY . . . to see that the address isn't a car wash at least."

148. JPMC knew the critical questions to ask to avoid a situation like the Petters fraud. In fact, JPMC had asked such questions in 2007 and 2008. Unfortunately, it was not until late 2008 that JPMC was willing to admit that "[t]he 'DD' done by all counterparties seems suspect."

149. Further, JPMC's own due diligence in 2008 revealed: (a) lack of transparency; (b) resistance on Madoff's part to provide meaningful disclosure; (c) involvement of Madoff's family throughout BLMIS; (d) lack of effective due diligence and monitoring by the BLMIS feeder funds; (e) fear of Madoff preventing investors from asking any serious questions as long as performance was strong; (f) lack of an independent and competent auditor; and (g) unanswered questions regarding BLMIS's trading, as no one outside of Madoff understood how it was done.

150. These red flags were the same red flags JPMC discovered when it conducted its first round of due diligence more than a year before. JPMC chose then to ignore the red flags, and instead continue to structure and issue products that facilitated an investment of approximately $250 million in BLMIS feeder funds.

151. Again faced with this overwhelming evidence of fraud, Palmer belatedly suggested that it was a mistake for JPMC to "rely[] on Madoff's integrity (or Fairfield and Medici's belief in Madoff's integrity) and the quality of the due diligence work (initial and on-going) done by the custodians . . . to ensure that the assets actually exist and are properly custodied." In an effort to provide some level of comfort to himself and fellow JPMC

employees, Palmer noted that "if some[thing] were to happen with the funds, our recourse would
be to the custodians and whether they had been negligent or grossly negligent."

**Faced Again with Numerous Indications of Madoff's Fraud, JPMC Quietly Removes All of
Its Assets from the BLMIS Feeder Funds**

152.    In or about September 2008, a troubling conversation took place between Krueger
and representatives of Aurelia Finance. JPMC had sold its structured products to Aurelia
Finance, who in turn had sold the products to its clients. During the call, Krueger explained that
JPMC was going to be redeeming from Lagoon. The Aurelia Finance representatives repeatedly
opposed JPMC's plan. At two points in the conversation, the Aurelia Finance representatives
made threats to Krueger, referring to "Colombian friends" who could "cause havoc" and telling
Krueger "we know where to find you."

153.    As a result of this conversation, JPMC sent a document to SOCA conveying the
substance of the threats. This document also explained why JPMC had chosen to redeem its
interests in BLMIS feeder funds. In essence, JPMC knew Madoff was not operating a legitimate
business.

154.    In a letter to SOCA, JPMC's Vice President for the United Kingdom, Rebecca
Smith, wrote:

> Ultimately, the bank reached the same conclusion it had reached during its initial
> due diligence efforts in 2006 and 2007; JPMorgan was unable to obtain
> lookthrough transparency at the Feeder Fund level, did not have access to the
> identities of the counterparties to Madoff's OTC options, did not fully understand
> the relationship between the broker-dealer and the investment advisor, and noted
> the fact that the custodians did not actually hold the assets.

155.    JPMC sent a Suspicious Activity Report ("SAR") to SOCA. The document, dated
October 28, 2008, reads:

> JPMCB's [an acronym for "JPMorgan Chase Bank"] concerns around Madoff
> Securities are based (1) on the **investment performance** achieved by its funds
> which is so **consistently and significantly ahead of its peers**, year-on-year, even

in the prevailing market conditions, as to appear **too good to be true**—meaning that it probably is; and (2) the **lack of transparency** around Madoff Securities' trading techniques, **the implementation of its investment strategy**, and the **identity of its OTC option counterparties**; and (3) its unwillingness to provide helpful information. **As a result, JPMCB has sent out redemption notices in respect of one fund, and is preparing similar notices for two more funds.**

(Emphasis added.)

156.    On or about October 10, 2008, JPMC submitted requests to redeem approximately $13 million from Fairfield Sentry and €15 million from Fairfield Sigma. Later that month, JPMC requested redemptions totaling $154 million from Herald and an additional €72 million from Fairfield Sigma.

157.    JPMC also repeatedly rejected requests from clients to structure additional products tied to BLMIS during the Fall of 2008, each time relying on the fact that the funds at issue were invested with BLMIS.

158.    Following these redemptions, JPMC was careful not to discuss with third parties its redemptions from BLMIS-related products or its decision to cease any new involvement with BLMIS. Instead, when approached by clients that had an interest in BLMIS-related products, "[w]ithout disclosing too much, [JPMC] got rid of all the Madoff feeder[s]" from clients' lists of potential investments.

159.    In November 2008, Dixon stated, "only limited information has been historically available on anything related to Madoff. We have done some work but this served only to reinforce the fact that we don't have enough access to Madoff to render independent judgment." As a result, JPMC was attempting to divest itself of all of its BLMIS-related investments.

160.    JPMC's exit strategy was successful. By the time Madoff was arrested, JPMC had managed to redeem all but $35 million of its BLMIS feeder fund investments, due in large

part to the fact that its request to redeem its shares of Lagoon in late November had not yet been
satisfied.

161.    In redeeming its investments in the BLMIS-related funds, JPMC left itself fully
exposed with regard to its structured products.  JPMC was still required to pay its investors based
on the returns generated by the BLMIS feeder funds, which were generating positive returns
while the market was down.  But for JPMC's evidence about Madoff's fraud, this move would
have been counterintuitive.

162.    JPMC suspected Madoff was a fraud and quietly pulled its money out.

**After the Fraud Was Revealed, JPMC Admitted Knowledge That Madoff Was a Fraud**

163.    In the immediate aftermath of Madoff's confession, JPMC made a number of
disconcerting comments.  Palmer admitted Madoff's "[r]eturn seems a little too good to be true."
The day of Madoff's arrest, McCormick stated,

> We've got a lot wrong this year but we got this one right at least—I said it looked
> too good to be true on that call with you in Sep.  Despite suspecting it was dodgy
> I am still shocked to see this happen so suddenly.  I guess it's true that when the
> tide goes out you see who is swimming naked.

McCormick's criticisms of Madoff were in stark contrast to comments he had made in June 2007
following Hogan's decision to execute $250 million of business across products referencing
BLMIS.  Upset that the amount approved was not higher, McCormick complained that "it
sometimes feels very hard to make money."

164.    The comments continued as various individuals at JPMC stated matter-of-factly
that it was "statistically impossible" for BLMIS to have generated 1.25% returns every month for
years.

165.    Dixon admitted that he was not surprised to learn Madoff was a fraud.

Additionally, Palmer admitted that the Madoff fraud "wasn't completely unexpected but the

scale of it is still a shock."

166.    Even Hogan was relieved, noting that "Bobby F-ing Magee wanted to do $1bio of

[BLMIS-related products] and we made it $200mio--thank God."

167.    Cox acknowledged that JPMC's limited documentation on Aurelia violated basic

know your customer ("KYC") concepts:

> This document[ation] alone, irrespective of what's happen [sic], is probably a
> fireable offence based on my own KYC training.
>
> Marco told me last night he objected to dealing with Aurelia as there was no
> transparency, which maybe [sic] the reason for the statement in the document. I
> looked at Aurelia's website www.aurelia.com and they are prohibited from
> dealing with customers from US, UK, Switzerland and Bermuda. Now that's a
> red flag!

168.    Sankey best summarized JPMC's knowledge of the fraud and fear that JPMC's

knowledge would be revealed following Madoff's arrest when he stated, in reference to the June

15, 2007 meeting agenda for the HFUC where Equity Exotics requested approval to increase

JPMC's risk limit for BLMIS-related transactions to over $1 billion: "Perhaps best this never

sees the light of day again!!"

169.    Despite having knowledge of, or at least making a conscious decision to try to

avoid knowledge of, Madoff's fraud, JPMC chose to keep its knowledge private.  JPMC

approached BLMIS feeder funds and asked for them to keep JPMC's redemptions quiet.  On

December 17, 2008, Nikolakopoulos emailed FGG's Vijayvergiya to set up a call to discuss

"[c]onfidentiality in relation to investments or disinvestments by JPMorgan and any of its

affiliates in the two funds ([FGG] Sentry and Sigma)."

170.    JPMC took yet another self-congratulatory lap when it stated that while many of its Private Bank customers had invested with BLMIS "luckily we didn't place any there."

171.    Indeed, JPMC's Private Bank had made a conscious and informed decision to avoid doing business with Madoff. Following the fraud, JPMC's Cembalest distributed an email to Private Bank clients that commented on the Madoff situation. Cembalest told investors the Private Bank chose not to invest with any BLMIS feeder funds because it had "never been able to reverse engineer how they made money" and BLMIS "did not satisfy [their] requirement for administrative oversight."

172.    Cembalest provided a lengthy list of red flags that had informed the Private Bank's decision not to invest. These red flags included: (a) Madoff served as his own prime broker, custodian, *and* investment adviser; (b) Madoff utilized a three-person accounting firm in Rockland County, which was "almost unheard of for a fund of that size"; (c) while the Madoff feeder funds were audited by large, well-known accounting firms, those audits did not cover BLMIS; (d) the Private Bank's due diligence team was not allowed to meet Madoff; (e) Madoff did not charge fees for his money management services (essentially leaving billions of dollars on the table); (f) the volatility of Madoff's returns was only 2.5% over the preceding seventeen years, a period which included some of the most volatile capital markets in history; and (g) Madoff's fund "lost money in only 2 of 214 rolling quarterly periods since 1990."

173.    Cembalest also noted his suspicion after hearing Madoff speak at a conference in October of 2007, where Madoff had stated: "'In today's regulatory environment, it's virtually impossible to violate rules.'" Cembalest concluded that this type of attitude was the reason "why hedge fund due diligence is more than just looking at volatility and return patterns."

174.    Cembalest conceded that these "Oz-like signals . . . were too difficult to ignore." Ironically, it was Cembalest's own company that did ignore those signals and silently allowed Madoff to launder billions for decades, as alleged in detail below.

### JPMC'S "LESSONS LEARNED"

175.    On December 19, 2008, JPMC's IBRC held a meeting at which Yang and Wise presented a "postmortem of the Madoff transactions."

176.    Yang's and Wise's presentation included a chronology of the events surrounding JPMC's investments in BLMIS. They began by explaining how Equity Exotics had requested approval from the HFUC to increase JPMC's risk limit for Madoff-related transactions to over $1 billion—a request which "far exceeded the IBRC approved single HF limit of $100mm." They then recounted how a conference call with Madoff had been arranged in an attempt to gather due diligence information, but during the call Madoff "clearly expressed his dislike of doing structured products on his strategy and would not accommodate any direct due diligence on his firm."

177.    Both the positives and negatives of Equity Exotics's risk limit request were considered. The postmortem prepared by JPMC in December 2008 stated the following:

Cons:    **[T]he lack of ability to do a full due diligence on Madoff itself;**

**[T]he potential risk of fraud given the strategy was managed by Madoff in customer brokerage accounts**. This risk of fraud given the structure & set-up was correctly identified and flagged, but was considered at the time to be a remote likelihood given the Equity Exotics business sponsorship of the deal, sponsorship of Madoff by ICM and JPM's long standing (though limited) credit relationship with Madoff; and

**Inability to reconcile Madoff's returns with ostensible strategy**; alpha generation dependent on "black box" timing model: Risk modeled the split strike conversion strategy, confirmed its benign market risk but could not replicate the fund

returns and **suspected** that alpha may have been generated by
**front-running** via the market-making.  Risk consequently
request a background check—but nothing showed up.

(Emphasis added.)

178.    JPMC nevertheless approved Madoff exposure in the amount of $250 million—

despite the strong risk of fraud and suspicions that Madoff was engaged in illegal front-running.

JPMC redeemed most of its Madoff-related investments before his arrest.  As of December 11,

2008, JPMC had only $35 million in risk exposure to Madoff feeder funds, having previously

redeemed approximately $276 million.

179.    Yang's and Wise's presentation ended with a summary of lessons learned and red

flags:

| | |
|---|---|
| <u>Lessons Learned:</u> | **How much to bank on reputation and SEC regulation:** Reliance on Madoff's long standing reputation, 40yr of [sic] track record and good standing as a regulated entity.  At what level of notional risk does the possibility of fraud at a private, unrated custodian outweigh the potential profitability of the transaction? |
| | Reliance on third party due diligence is insufficient and risky; |
| | More rigorous background check on Madoff could have revealed additional red flag such as the questionable auditor used by Madoff; |
| | Fraud is possible even on an unprecedented scale and longevity; and |
| | Having risk transparency, control over assets and liquidity via a managed account platform greatly mitigate fraud risk. |
| <u>Red Flags:</u> | **No Transparency:**  No transparency on the black box timing model implemented by Madoff; |
| | **Unexplainable Returns:** Consistently smooth |

returns and low volatility appear too good to be true. .
. . Risk had concern on whether Madoff's prop
trading activities were appropriated [sic] Chinese
Walled from its market making business;

**Secrecy and Exclusivity:** No direct due diligence
and mystique of exclusive relationship with long
standing clients only. Madoff's dislike of structured
products;

**U[nu]sual Business Model:** commission based
revenue instead of fee based revenue despite of the
consistent double digital [sic] returns year over year;

**Restricted Information Access:** JPM could only
review sample trade tickets and trading agreements
with Madoff during onsite visit with access funds, but
was not able to obtain written copies of these
documents; and

**PPM Risk Disclosures:** fund assets are exposed to
credit risk of the sub custodian and primer [sic]
brokers.

180. The December 19, 2008 meeting minutes indicated that "[g]iven the red flags and

lessons learned, the group agreed that going forward we should not do business with any client

or counterparty—either directly or indirectly—who will not provide basic due diligence, without

exception."

## LESSONS NOT LEARNED

181. The "lessons" JPMC purportedly learned from its Madoff experience were lessons

it was supposed to have learned from its experience with prior frauds, including the Enron fraud.

In that fraud as well, JPMC participated in an illegal scheme while wearing "blinders" to the

evidence of fraud, all for profit and to accommodate important customers.

182. Enron was, until its bankruptcy filing in December 2001, number seven on the

Fortune 500 list of largest corporations in the United States and a valuable JPMC customer.

According to SEC allegations, between December 1997 and September 2001, JPMC loaned

Enron a total of $2.6 billion in the form of seven disguised loans, called "prepay" transactions.

The SEC, in its 2003 complaint against JPMC, alleged that these transactions were structured by

JPMC in a way that was designed to disguise that Enron was in fact receiving loans.

183.    The New York District Attorney's Office ("DANY") concurred, finding that

JPMC, along with another bank, had "knowingly structured the prepaid transactions with Enron

in a way that allowed Enron to engage in fraudulent accounting and to make its financial

statements less transparent."

184.    According to the SEC, JPMC "was willing to engage in the transactions because

they generated substantial fees and as an accommodation to an important client."

185.    As a result of the investigations by the SEC, DANY, and others into JPMC's

conduct with Enron, JPMC entered into a written agreement with the Federal Reserve Bank of

New York and the New York State Banking Department on July 28, 2003.  The parties agreed

their common goals were "that JPMC and its subsidiaries operate in compliance with applicable

safety and soundness standards and federal and state laws, rules and regulations" and that "JPMC

and its subsidiaries effectively manage their financial, operational, legal, reputational, and

compliance risks."

186.    Under the written agreement, JPMC agreed to, among other things, revise its

written credit risk management program to:  "ensure that the fundamental elements of the credit

risk management program, including due diligence, documentation, and exposure capture and

reporting, are in place and implemented for all counterparties and transactions;" "ensure that

credit decision-makers possess the necessary information concerning the counterparty's risk

profile to effectively fulfill their responsibilities;" and "ensure that such information is

appropriately detailed and transparent for review by other control functions."  JPMC further

agreed to submit "an acceptable written legal and reputational risk management program" that would include policies and procedures designed, at a minimum, to "[r]equire that thorough assessments of legal and reputational risks be incorporated into JPMC's and its subsidiaries' transactional approval process as well as into ongoing customer relationship and transaction monitoring activities."

187.    In connection with the settlement, District Attorney Robert Morgenthau released copies of a statement from JPMC pledging reform, and a letter he had sent to federal and state bank regulators detailing the results of the investigation.  In that letter, Mr. Morgenthau noted that "[b]ankers—and the lawyers and accountants they employ—**all need to take off the blinders** and judge the appropriateness of interrelated transactions as a whole" rather than merely examine whether "each separate component of a set of interrelated transactions, viewed in isolation, falls within statutory and regulatory limits."  (Emphasis added.)

188.    Notably, at around the same time it was investigating JPMC's dealings with Enron, DANY investigated JPMC for enabling another customer, Beacon Hill Services Corporation ("Beacon Hill"), to operate a multi-billion dollar illegal money transmitting business in New York from 1997 until authorities shut it down in 2003.  JPMC should have recognized several red flags raised by Beacon Hill's business activity.  For example, Beacon Hill conducted much of its business with offshore shell corporations and exchange houses in South America, and beneficiaries of wire transfers were often unidentified and unknowable, as they were often identified only as "customer" or "valued customer."  JPMC's London office had shut down Beacon Hill's accounts years earlier, in 1994, and JPMC knew that Beacon Hill did not have a license to operate a money transmitting business in New York.

189.    These and numerous other high-profile misdeeds involving JPMC alerted it to the need to exercise careful oversight and control over its major accounts to avoid additional failures and liabilities. JPMC represented to state and federal regulators and its shareholders that its policies and procedures for oversight and control would be improved. Yet JPMC continued its practice of turning a blind eye to facts evincing illegal activities by its important customers.

## JPMC'S VIEW OF MADOFF AS SEEN FROM ACCOUNT ACTIVITY

190.    JPMC was well positioned to see fraudulent activity because JPMC had access to vast amounts of financial information about Madoff and BLMIS. It was apparent from the transactions in the 703 Account that Madoff was not using the account to buy or sell securities, which is virtually all BLMIS was supposed to be doing through the IA Business. Nor could Madoff's market making or proprietary trading businesses serve as cover for this account activity, as these businesses would have also engaged in the purchase or sale of securities. But instead of investigating the glaring absence of securities activity in what was purported to be BLMIS's operating accounts, or in the JPMC accounts of BLMIS's counterparties, JPMC moved billions of dollars of stolen property for Madoff in and out of the 703 Account for well over a decade. At the same time, JPMC was collecting an estimated half a billion dollars in fees, interest payments, and revenue from the ability to use BLMIS customer funds on deposit. JPMC also profited from the use of funds on deposit of those other JPMC customers who were also BLMIS customers.

### Madoff Finds a Banker to Assist Him in His Ponzi Scheme

191.    In order to run his Ponzi scheme, Madoff needed a bank account to provide his customers with a sense that he was operating a legitimate investment advisory business. Having a bank account would allow Madoff to receive customer investments and then transfer that money out of the account to perpetuate the Ponzi scheme.

192.    But this account did not look like a normal broker-dealer account.  Customer

funds came in, but those funds were not segregated or transferred to separate sub-accounts.  In

addition, the account would not show massive outflows to purchase securities or massive inflows

when those securities were sold.

193.    Moreover, the account showed highly suspicious activity, including multi-million

dollar transactions conducted by check, and inexplicable "roundtrip" patterns of multi-million

dollar wire transfers between Madoff and certain of his customers.

194.    In its 2003 Annual Report to shareholders, JPMC reported that it "recognized the

need to rebuild trust in financial institutions, including [its] own," that it "revised and enhanced

[its] internal risk management processes and policies," and commenced a "multi-year initiative

to reengineer specific components of the credit risk infrastructure."  JPMC's Board of Directors

had reviewed and revised JPMC's corporate governance practices and restructured JPMC's

credit risk organization.  JPMC's 2003 Report also noted that JPMC was in the process of

assessing and improving operational risk processes and tools.

195.    In its 2004 Annual Report, JPMC reported that it had implemented an "internally-

designed operational risk architecture model" that would, when fully implemented, allow JPMC

to consolidate information relevant to risks arising from such issues as client service and

selection; business practices; fraud, theft and malice; and other issues it considered to be

operational risk events in a single web-based tool accessible across JPMC.

196.    The unusual activity that was conducted in the 703 Account was visible to JPMC,

which had to approve the negotiation of these large checks and wire transfers.  Such activity

required further investigation under relevant law and prudent business practices.  It should have

triggered not only investigation by the banker in charge of the account, but should also have

triggered the bank's anti-money-laundering ("AML") monitoring system. Long before the

passage of the USA Patriot Act in 2001 ("Patriot Act"), and with greater force after Congress

passed the Patriot Act, banks such as JPMC were required to monitor their customers'

transactions to detect and prevent money laundering and other suspicious activities. The Patriot

Act reinforced this obligation and underscored the importance of implementing robust detection

systems.

197.    What Madoff needed was a bank that would be willing to look the other way, and

would ignore the anomalous account activity as well as notifications from its AML monitoring

system.

198.    Madoff found that bank. JPMC ignored decades of suspicious and inexplicable

activity in the 703 Account, even when its monitoring system alerted JPMC to unusual activity.

In return, JPMC earned hundreds of millions of dollars in revenue from its relationship with

Madoff. JPMC's complicity protected its valued relationships with some of the largest BLMIS

customers, such as Levy, and allowed JPMC to collect revenue from these relationships. JPMC

made money, Madoff made money, and the Ponzi scheme's largest enablers made money, while

BLMIS's customers whose money was entrusted to JPMC lost billions of dollars.

**The Establishment of Madoff's Account**

199.    Madoff opened the 703 Account at Chemical Bank in 1986. Chemical Bank went

through a series of mergers and acquisitions, and ultimately became Chase Bank. As the bank

went through these transitions, Madoff's accounts stayed with it.

200.    Madoff used the 703 Account to serve the purported IA Business at BLMIS.

Because BLMIS initially operated as a sole proprietorship, the account was opened in Madoff's

name. In 2002, after BLMIS became a limited liability company, the account was placed in the

name of BLMIS. At all relevant times, JPMC knew that the 703 Account held the money of

customers who had entrusted it to Madoff and BLMIS's IA Business, was a fiduciary account in

nature, holding funds impressed with a trust, and that Madoff and BLMIS owed fiduciary

obligations to the BLMIS customers.  As alleged herein, JPMC knew that Madoff and BLMIS

were breaching their fiduciary obligations to their customers.  Upon information and belief,

JPMC knew that virtually all of the money that Madoff commingled in the 703 Account was held

for investment advisory clients that were beneficiaries of a relationship of high trust and

confidence owed to them by Madoff directly, and many of them, trustees and fiduciaries in their

own right, delegated their own duties to Madoff by entrusting money to him to manage in his full

discretion. Indeed, it was a matter of public record that Madoff served as a trustee for retirement

accounts, pension plans and trusts. (*See* Internal Revenue Bulletin, 2005-37, List of Nonbank

Trustees and Custodians, Sep. 12, 2004, *available at*  http://www.irs.gov/irb/2005-

37_IRB/ar15.html.)  Upon information and belief, JPMC knew that, in addition to his

discretionary investment advisory business, one of Madoff's primary business activities, which

he provided for expressly and at length in BLMIS's operating agreement, was the exercise of

fiduciary powers as a trustee or custodian for retirement plans, and that hundreds of trusts,

retirement and pension plans, foundations, partnerships and estates entrusted their money to the

703 Account.

201.    Madoff and BLMIS were assigned a relationship manager in the Broker/Dealer

Group of the Investment Bank at JPMC.  In the mid-1990s, Cassa became their relationship

manager.  He managed the Broker/Dealer Group's relationship with Madoff and BLMIS, and

was in charge of their accounts, including the 703 Account.  When Cassa retired in March 2008,

Mark Doctoroff took over as the Client Relationship Manager.

202.    Despite JPMC's own understanding about Madoff's activities, which culminated in a report to the British authorities, the 703 Account was still open and operating without any restrictions at the time of Madoff's arrest.

## JPMC Had a Duty to Know Its Customer and to Monitor Its Customers' Account Activity

203.    Federal legislation and regulations have long required banks to have an AML program.  One element of these programs is monitoring customer account activity in order to detect possible fraud, money laundering, or other improper activity.  These requirements were first established by the Bank Secrecy Act ("BSA") and federal banking regulations.  31 U.S.C. § 5311; 12 C.F.R. § 208.63.  All of the federal banking agencies have substantially identical requirements.  Thus, those parts of JPMC under the supervision of the OCC would have the same obligations.  The Patriot Act reinforced these obligations and underscored the importance of implementing robust detection systems to ensure that money launderers and terrorists would not be able to use the United States financial system to further their crimes.

204.    One purpose of these requirements is to ensure that banks, which are often in the best position to identify potentially illegal activity, will closely observe the transactions taking place in their clients' accounts.  The legislation and regulations also provide guidance to banks and other financial institutions regarding how to best achieve that goal, and what actions to take once suspicious activity is identified.

205.    Section 352 of the Patriot Act and the banking regulations require financial institutions to institute an AML program that includes four pillars:  (1) designation of an individual or individuals responsible for managing BSA compliance; (2) a system of policies, procedures, and internal controls to ensure ongoing compliance; (3) training for appropriate personnel; and (4) independent testing of compliance.  12 C.F.R. § 208.63.

206.    Financial institutions must also fully understand the business in which their customers are engaged. This duty, referred to as the responsibility to "know your customer" ("KYC"), is critical to determining what activity was suspicious. 12 C.F.R. § 208.62. Institutions viewing account activity need a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest an illegal enterprise. The KYC duty also pre-dated the Patriot Act. Not only was it suggested by such guidelines as the Federal Reserve's BSA Examination Manual of 1995 and Supervisory Letter on Private Banking Activities, SR 97-19 (SUP), but it was standard industry practice.

207.    This regulatory guidance directed financial institutions like JPMC to perform on-site visits to their clients, obtain and review financial statements to corroborate the sources of the clients' wealth, and to review media reports regarding their clients.

208.    It was also standard industry practice for financial institutions to perform KYC on their clients. Many financial institutions have entire departments devoted to this one task and to making sure KYC is performed thoroughly and is constantly monitored and recorded. JPMC has a KYC department for each of its lines of business.

209.    Having been caught before for turning a blind eye to fraud in order to profit and accommodate an important customer (Enron), and having warranted to regulators that it had improved its oversight protection, JPMC knew better than to rely on a customer's public reputation in place of diligence.

210.    While JPMC may have created AML and KYC programs that facially met the requirements of the Patriot Act and related regulations, those programs were not effectively executed.

**JPMC Ignored a Warning from Another Financial Institution More Than Ten Years
Before the Ponzi Scheme Collapsed**

211.    JPMC had yet further knowledge that Madoff engaged in banking activities with
no legitimate business purpose. According to two former employees of another financial
institution, in or about 1997, that institution observed and investigated Madoff's nearly daily
circular transactions between an account Madoff controlled at that financial institution and a
Madoff account at JPMC (then, The Chase Manhattan Bank ("Chase")). On virtually a daily
basis, a Madoff employee would physically deposit a check drawn on Madoff's account at the
other financial institution into his account at JPMC. The next day, funds in or near the same
amount—generally at least $1 million but less than $10 million—would be wired back from
Madoff's JPMC account to the account at the other financial institution. According to the
investigator at the other financial institution, now a former employee, as well as another former
employee, the investigator and others at the financial institution questioned Madoff's employees
about the transactions, and, having failed to receive a satisfactory explanation for the suspicious
account activity, that financial institution closed Madoff's account. Not only should the
suspicious activity have been as apparent to JPMC as it was to the other financial institution, but
following normal operating procedures, the financial institution's investigator would have
contacted his counterpart at JPMC regarding the suspicious transactions on two occasions:  (1) in
the course of his inquiry; and (2) at the conclusion of the inquiry, to report that the other
financial institution was closing the account. The circular transactions in which JPMC
participated at this time presaged the same sort of circular transactions in which Madoff and
Levy would engage later within JPMC—transactions JPMC permitted to occur despite their
evident lack of legitimacy.

**JPMC Had a Duty to Know What Type of Business Madoff Was Operating**

212.    The first step in identifying suspicious activity is for a bank to determine what its

clients' normal business activity would look like.  Federal Financial Institutions Examination

Council BSA/AML Examination Manual of June 2005.  This step can be accomplished in many

ways, including by meeting with the client and learning about the client's business, conducting

on-site due diligence visits to review the client's business operations, and reviewing the client's

financial statements.

213.    One of the ways in which JPMC purportedly discharges its KYC duty is by

assigning a sponsor to each account.  The sponsor becomes the person in charge of ensuring the

bank has sufficient information about the client and the client's business to identify suspicious

activity.                              REDACTED

214.    The sponsor for the 703 Account through early 2008 was Cassa.  When asked

about his duties as a client sponsor at his Rule 2004 bankruptcy examination, Cassa responded

that **he did not even know what a client sponsor was,** much less that he was the sponsor for

Madoff's and BLMIS's accounts.  He had received no training regarding his duties as a client

sponsor and had taken no action to discharge those duties.  When shown a document in which he

had recertified that he had performed his duties as a client sponsor, Cassa stated that he did not

have any recollection of the duties of a sponsor or of the recertification process.

215.    JPMC claims that it utterly failed to "know its customer" when it came to Madoff

and BLMIS.  Shockingly, after decades of hosting Madoff's and BLMIS's checking account,

Cassa, the client representative who had been in charge of the 703 Account, claimed, "I don't

know what the checking account was used for." He claimed that he did not know whether it was used for market making activities, investment advisory services, both, or neither.

216.    Cassa's claim of ignorance about Madoff's business rings hollow in the face of facts known to JPMC. Cassa did receive financial statements from BLMIS on a regular basis. These statements included FOCUS Reports, as described below. According to Cassa, JPMC reviewed these FOCUS Reports. As detailed within, the FOCUS Reports contained glaring irregularities.

## JPMC Ignored the Inconsistencies Between BLMIS's Financial Statements, the Activity in the 703 Account, and BLMIS's Purported Business

217.    JPMC was in possession of at least fifteen regulatory filings of BLMIS, of which even a cursory review would have revealed numerous inconsistencies and falsehoods. These reports included two annual audited financial statements ("Annual Audited Reports") and thirteen quarterly FOCUS Reports, which report on periods between November 1, 2004 and September 30, 2008. Upon information and belief, Cassa began receiving quarterly FOCUS Reports from BLMIS as early as October 2001, at the time the Patriot Act was passed.

218.    As a broker-dealer operating through 2008, BLMIS was required under SEC Rule 17a-5 to file FOCUS Reports with the SEC. These reports are basic financial and operational reports that set forth, among other information, assets, liabilities, revenues, and expenses of the company.

219.    In addition, under SEC Rule 17a-5(d), BLMIS was required to file Annual Audited Reports. These Annual Audited Reports must contain information about income, cash flows, changes in stockholders', partners', or sole proprietors' equity, and changes in liabilities. These reports are public, except where the statement of financial condition is bound separately

from the balance of the Annual Audited Reports, in which case the balance is deemed confidential.

220.    Furthermore, when Equity Exotics began working with Cassa and the Broker/Dealer Group to conduct due diligence on Madoff and BLMIS feeder funds in 2006 and 2007, Equity Exotics requested BLMIS FOCUS Reports as part of the due diligence it conducted.

221.    Coffman specifically suggested that his team review the FOCUS Reports, stating in February 2006 that JPMC "should assess quality and detail of regulatory FOCUS Reports from the firm. They are not necessarily audited, but we derive comfort knowing that regulatory reports are presented to and reviewed by SEC and exchanges, and firms can be penalized significantly if statements prove to be fraudulent or inaccurate."

222.    In March 2006, Coffman stated again that JPMC should scan the FOCUS Reports to ensure that BLMIS was not "another possible Refco." The FOCUS Reports contained numerous discrepancies and fraudulent statements suggesting that BLMIS was a fraud.

223.    On January 25, 2007, Cassa acknowledged receipt of the FOCUS Report for the period of October 1, 2006 through December 31, 2006 ("December 2006 FOCUS Report"). The December 2006 FOCUS Report revealed numerous inconsistencies and irregularities that would have been readily apparent to JPMC as BLMIS's banker and that should have prompted further investigation of Madoff and BLMIS by JPMC.

### The FOCUS Reports Misrepresented Cash at JPMC

224.    Both the FOCUS Reports and Annual Audited Reports require broker-dealers to list the amount of cash on hand at the broker-dealer, as well as all of its other assets and liabilities. BLMIS's FOCUS Reports often did not show assets and liabilities that JPMC knew

should have been reported, including: (a) cash held in JPMC accounts; (b) loans provided to

BLMIS by JPMC; and (c) related collateral on the loans JPMC extended to BLMIS.

225.    BLMIS consistently underreported the amount of cash it held on its FOCUS

Reports—a fact which JPMC knew by virtue of its maintenance of the 703 Account.  On an

almost nightly basis, JPMC swept funds from the 703 Account into overnight deposits.  Upon

information and belief, for reporting purposes, the funds in the 703 Account and the overnight

deposits are considered "cash" and were visible to JPMC.  JPMC knew that the cash in the 703

Account and the overnight deposits often exceeded the "cash" reported by BLMIS in its FOCUS

Reports and Annual Audited Reports.

226.    For example, the December 2006 FOCUS Report listed $4,882,332 as the amount

of cash on hand.  As of December 31, 2006, the ending balance of the 703 Account was

$394,700 and the amount in overnight deposits was $295 million, totaling $295,394,700 of cash

on hand.  Thus, from the view of JPMC, there was a $290,512,368 difference between the

amount of cash BLMIS purported to have and the cash balances known to JPMC.  Thus, it was

readily apparent to JPMC that BLMIS was not reporting the full amount of cash it had on hand.

JPMC was uniquely positioned to discover and investigate this false statement by BLMIS

because it had access to the precise dollar amounts held in the 703 Account and overnight

deposits.

227.    BLMIS's underreporting of its cash position was not isolated to the December

2006 FOCUS Report.  In nearly every reporting period since December 31, 2006, BLMIS's

FOCUS Reports and Annual Audited Reports significantly underreported the amount of cash

BLMIS purported to hold, as compared to the amount BLMIS actually held in the 703 Account

and in overnight deposits.  JPMC was in possession of at least eight FOCUS Reports and two

Audited Annual Reports between December 2006 and September 2008, providing it with

numerous opportunities to discover that Madoff was underreporting BLMIS's cash position and

making fraudulent statements to the SEC.

### The FOCUS Reports Do Not Show JPMC's Loans to BLMIS

228.    Nor were irregularities and inconsistencies limited to the reporting of BLMIS's

cash position. An entity filing a FOCUS Report must report "Bank loans payable." JPMC made

a loan to BLMIS of $95 million in November 2005 that was not repaid until June 2006. Yet the

FOCUS Report for the period ending December 2005 ("December 2005 FOCUS Report")—a

report in JPMC's possession—reported that BLMIS had no bank loan obligations outstanding.

Based on its own information, JPMC knew this was false.

### The FOCUS Reports Underreport Loan Collateral

229.    Madoff underreported BLMIS's loan collateral, a fact also visible and known to

JPMC. The FOCUS Report must include "Securities and spot commodities owned at market

value—U.S. and Canadian government obligations" and "encumbered securities." JPMC's

November 2005 $95 million loan to BLMIS was collateralized by a $100 million Federal Home

Loan Bank Bond. Madoff should have reported the bond as "Securities and spot commodities

owned at market value—U.S. and Canadian government obligations." The amount reported on

the December 2005 FOCUS Report, $72,232,950, was less than the $100 million of the value of

the bond that JPMC knew BLMIS to be holding. Moreover, the December 2005 FOCUS Report

should have listed the bond under "encumbered securities," which was left blank. Again, on the

basis of its own information, JPMC could determine that Madoff was falsely reporting BLMIS's

financial information.

### The FOCUS Reports Show Glaring Issues in BLMIS's Purported Business

230.    The FOCUS Reports and Annual Audited Reports revealed glaring inconsistencies with the business in which BLMIS was purportedly engaged—a business that JPMC was required to know as part of its KYC obligations. As the broker to its investment adviser accounts, BLMIS was expected to report commission revenue. Prior to September 2006, Madoff did not record any commission revenue on the FOCUS Report "Commissions" revenue line. Nor did Madoff report commission revenue on BLMIS's Annual Audited Reports prior to October 2006. JPMC was in possession of at least seven FOCUS Reports and Annual Audited Reports filed prior to September 30, 2006, none of which listed any commission revenue. Even a cursory review of the FOCUS Reports and Annual Audited Reports should have prompted an investigation by JPMC.

231.    BLMIS registered with the SEC as an Investment Adviser in August 2006. The FOCUS Reports and Annual Audited Reports filed by BLMIS after that time included amounts listed for "Commissions." JPMC was in possession of at least nine FOCUS Reports and Annual Audited Reports filed for periods including or after September 2006. Comparing the revenue reported in the Annual Audited Reports for the fiscal years immediately before and after BLMIS registered as an investment adviser demonstrates the significance of the newly reported commission revenue. For the fiscal year ended 2005, Madoff reported no commission revenue at all. By contrast, for the fiscal year ended 2007, Madoff reported $103,174,848 of commission revenue which represented over 60% of total BLMIS revenues for the year. The sudden shift by Madoff to begin reporting commission revenue should have raised questions as to the change in the business and prompted further investigation by JPMC as part of its ongoing KYC duties. Instead, JPMC ignored blatant misrepresentations in violation of its duties to monitor and understand the business of its customers.

232.    In the December 2006 FOCUS Report, Madoff reported $23,921,497 as the amount of commissions on transactions in exchange-listed securities executed on an exchange. Other than commissions on transactions in exchange-listed securities, Madoff disclosed no other commission revenue on the December 2006 FOCUS Report. Specifically, Madoff reported no commission revenue for: (1) "Commissions on transactions in exchange listed equity securities executed over-the-counter," (2) "Commissions on listed options transactions," and (3) "All other securities commissions." As BLMIS's well-known trading strategy—of which JPMC was familiar based on the 2006 investigation by Equity Exotics—consisted of trading S&P 100 equities and options, JPMC should have expected Madoff to report commissions relating to options (whether they were listed or OTC), which he did not.

233.    The FOCUS Reports and Annual Audited Reports that were in JPMC's possession did not reflect the activity that would be expected of a broker to its investment adviser accounts. BLMIS's FOCUS Reports and Annual Audited Reports did not include: (a) customer receivables, such as margin accounts; (b) customer payables, such as positive cash balances held by BLMIS on behalf of customers; or (c) a computation for reserve requirements for customer activity as required by the SEC under Rule 15c3-3, all of which would be reported by a broker-dealer with managed investment accounts. The fact that BLMIS's financial reporting was entirely inconsistent with the business in which it was purportedly engaging was readily apparent to JPMC as a result of the FOCUS Reports, and should have been reviewed and investigated by JPMC as part of its ongoing KYC duties.

234.    For example, the December 2005 FOCUS Report had no amounts recorded under the captions "Receivables from customers" and "Payable to customers." In addition, the credit

and debit balance amounts in customer security accounts that form the basis for the computation

for the Rule 15c3-3 reserve requirement were left blank.

235.    The failure to report financial information demonstrating customer activity was

not isolated to the December 2005 FOCUS Report.  None of the FOCUS Reports and Annual

Audited Reports in JPMC's possession—at least fifteen in total—included customer receivables

or customer payables, and none included customer account balances in their computations for

15c3-3 reserve requirements.

236.    For all of the above reasons, the FOCUS Reports were glaringly misleading,

which was obvious to others who reviewed them.  For example, shortly after Madoff's arrest,

Robert Rosenkranz of Acorn Partners, a fund of funds manager and an investment adviser to

high net worth individuals, reflected in an email that Acorn had performed due diligence on

Madoff and concluded "that fraudulent activity was highly likely."  Specifically, the email stated

that Acorn "reviewed the [BLMIS] audit report . . . which showed no evidence of customer

activity whatsoever, neither accounts payables to or accounts receivables from customers."

237.    Acorn succinctly described the indicia of fraud that led it to conclude years prior

that Madoff was a fraud.

We had considered investing in a Madoff managed account, and decided to pass
for reasons that give a useful insight into our due diligence process.

First, we ascertained that the description of the strategy (purchase of large cap
stocks versus sale of out of the money calls) appeared to be inconsistent with the
pattern of returns in the track record, which showed no monthly losses.

Second, we persuaded a Madoff investor to share with us several months of his
account statements with Madoff.  These revealed a pattern of purchases at or close
to daily lows and sales at or close to daily highs, which is virtually impossible to
achieve.  Moreover, the trading volumes reflected in the account (projected to
reflect his account's share [of] Madoff's purported assets under management at
the time) were vastly in excess of actually reported trading volumes.

Third, we noted that Madoff operated through managed accounts, rather than by setting up a hedge fund of his own. That was suspicious inasmuch as hedge fund fees are typically much higher than the brokerage commissions Madoff was meant to be charging. We suspected the requirement for annual hedge fund audits was the reason he wanted to avoid that approach. We knew that when his clients are audited, their auditors simply look at the account statements and transaction reports generated by the brokerage firm; they don't investigate the books of the brokerage firm itself.

Fourth, although brokerage firms are required to provide annual audit reports, the investor appeared not to have received any. With considerable perseverance, we obtained audit reports filed with the SEC, which were prepared by an utterly obscure accounting firm located in Rockland County New York.

Fifth, we reviewed the audit report itself, which showed no evidence of customer activity whatsoever, neither accounts payables to or accounts receivable from customers. They appeared to be the reports of a market maker, not of a firm that at the time was meant to have some $20 billion of customer accounts.

Taken together, these were not merely warning lights, but a smoking gun. The only plausible explanation we could conceive was that the account statements and trade confirmations were not bona fide but were generated as part of some sort of fraudulent or improper activity.

238.    All of the information flagged by Acorn through proper, independent, and reasonable due diligence, was information that was known by JPMC. JPMC was in possession of the FOCUS Reports and Annual Audited Reports that it reviewed as part of its KYC and AML duties, as well as part of its due diligence process for its own investments linked to BLMIS. Moreover, it had access to information not known to those such as Acorn—which accurately concluded that fraud was "the only plausible explanation" based on far less information than was available to JPMC—as a result of JPMC's visibility into the 703 Account and its knowledge regarding its own lending activity with BLMIS.

239.    JPMC was in a unique position to uncover the many inconsistencies contained in the FOCUS Reports and Annual Audited Reports. Yet, it ignored falsehoods that were readily apparent on the face of the FOCUS Reports and Annual Audited Reports, and in doing so, substantially assisted the Ponzi scheme.

### JPMC Had a Duty to Investigate BLMIS's Account Activity, Which Was Facially Inconsistent with Any Legitimate Business Purpose

240.    Not only did JPMC fail to "know" Madoff or BLMIS, but it also failed to investigate activity that was suspicious regardless of whether JPMC thought Madoff and BLMIS were using the 703 Account to operate a market making business, an investment advisory business, or any other legitimate enterprise.

241.    JPMC's written AML policy created two avenues of transaction monitoring.

REDACTED

JPMC knew that the transaction activity in the 703 Account could not have been linked to a legitimate business purpose, and this fact should have been flagged by both JPMC personnel and its automated monitoring system.

242.    JPMC was aware that Madoff and BLMIS were operating at least two businesses: a market making business and the IA Business. But the activity in the 703 Account did not match up with either of these enterprises.

243.    If JPMC had believed Madoff was using the 703 Account for market making, the bank would have likely seen regular transactions in the account with other brokerage firms with which BLMIS was trading. If Madoff had been using the 703 Account for the IA Business, JPMC would have seen billions of dollars leaving the 703 Account and going to purchase stocks and equities, and corresponding multi-billion dollar inflows as BLMIS sold those securities. In the interim, JPMC should have seen tens of billions of dollars—nearly all of the IA Business's assets under management—moved into T-bills, as that was part of Madoff's purported investment strategy.

69

244.    Instead, what JPMC saw was massive outflows of money that were in no way linked to customer accounts or stock and options trading. Money would come into the 703 Account as customers invested additional funds with Madoff. An overwhelming majority of funds would then go directly back out to customers in the form of redemptions. Any balance that remained in the 703 Account was invested in short-term securities such as overnight sweeps, commercial paper, and certificates of deposit.

245.    JPMC was therefore aware that Madoff was not using the money in the 703 Account to buy or sell securities.

246.    JPMC also faced regular account activity that would have been suspicious regardless of the type of business JPMC thought Madoff was running. The 2000 OCC BSA/AML Handbook identified numerous "red flags" that financial institutions needed to consider as part of their transaction monitoring procedures. These red flags included: (a) unexplained repetitive or unusual patterns of activity; (b) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; (c) spikes in customer activity with little or no explanation; and (d) wire activity with offshore banking centers or financial secrecy havens. The 703 Account exhibited all of these types of transactions, and exhibited them repeatedly.

247.    In addition, much of this account activity occurred between Madoff and other JPMC customers. Most notably, the party transacting with Madoff most often and in the largest dollar amount, receiving almost $76 billion in payments from the 703 Account between December 1998 and September 2005, was JPMC's long-time Private Bank customer and IA Business customer, Norman Levy.

**JPMC Was Aware of Anomalous Account Activity that Was Inconsistent with BLMIS's
Purported Business**

248.    The activity in the 703 Account was not only inconsistent with BLMIS's stated

business, but it would have been suspicious in any context.

249.    The 703 Account repeatedly exhibited textbook "red flags" and high risk activity

including:

a.    *Repetitive Transactions:* Madoff frequently engaged in repeated

transactions with the same parties, often on the same days, with no obvious purpose.

b.    *Large Dollar Transactions:* The 703 Account reflected a pattern of large

dollar transactions. Between 1998 and 2008, Madoff transferred nearly $84 billion out of the

703 Account to just four customers. These transactions represented over 75% of the wires and

checks that flowed out of the 703 Account to BLMIS customers. It also was typical for Madoff,

through the 703 Account, to enter into individual transactions with the BLMIS feeder funds for

hundreds of millions of dollars.

c.    *Spikes in Activity:* The 703 Account showed occasional spikes in overall

activity, which should have prompted further investigation by JPMC. Shortly before the

beginning of the credit crisis, over the period beginning in the first quarter of 2006 and ending in

the first quarter of 2007, there was a significant increase in the total dollar amount transacted in

the 703 Account. This increase in activity included a significant increase not only in third party

wires but also in book transfer activity. During this period, the average dollar amount of each

transaction increased by over $60 million, from $17 million to $78 million.

d.    *Wire Activity with Offshore Entities:* Through the 703 Account, Madoff

frequently engaged in transactions with high risk, offshore entities. For example, between 2004

and 2008, the 703 Account's international wire transfers with high and medium risk jurisdictions accounted for 83% of the total dollar value of international wire transfers.

        e.    *Check Activity:*  In addition, many transactions in the 703 Account involved hand-written checks totaling hundreds of millions of dollars in a single day.  This is not only unusual on its face, but it is particularly unusual given that BLMIS would issue multiple checks on the same day to the same customer.  At the very least, this activity should have prompted a check-fraud investigation, which would have revealed more suspicious behavior.

        f.    *Private Banking:*  The counterparties to many of these transactions were both BLMIS customers and JPMC private banking customers.  Private banking has long been considered a high-risk activity.  That is because private bank accounts generate lucrative fees, which provide an incentive for private bankers to ignore client activity that is illegal or violates internal bank policy.  Private banking has frequently served as a vehicle for money laundering, and particularly money laundering involving cross-border wire transfers.  Thus, when JPMC saw billions of dollars of transfers between the 703 Account and accounts held at JPMC's Private Bank, it should have been highly suspicious.  Moreover, given that those accounts were held by JPMC, the bank had visibility into both sides of the transactions.  It had only to review its internal account records to determine whether there was a legitimate explanation for the transaction history.

    250.    Madoff's transactions with two of BLMIS's biggest customers—Levy and Sterling Equities—illustrate these irregularities.  Of the top fifteen counterparties to transactions with the 703 Account, twelve were feeder funds.  Two of the remaining counterparties were Levy and Sterling Equities, both of which enabled Madoff's Ponzi scheme.  Notably, both Levy and Sterling Equities were also JPMC private banking customers, rendering both sides of their

transactions with Madoff visible to JPMC. These transactions were highly unusual and

inconsistent with BLMIS's purported business, and should have prompted investigation by

JPMC.

251.    For example, during 2002, Madoff initiated outgoing transactions to Levy in the

precise amount of $986,301 hundreds of times—318 separate times, to be exact. These highly

unusual transactions often occurred multiple times on a single day.

252.    As another example, from December 2001 to March 2003, the total monthly

dollar amounts coming into the 703 Account from Levy were almost always equal to the total

monthly dollar amounts going out of the 703 Account to Levy. There was no clear economic

purpose for such repetitive transactions that had no net impact on Levy's account at BLMIS.

253.    There was a huge spike in activity between Levy and the 703 Account in

December 2001. In that month alone, Madoff engaged in approximately $6.8 billion worth of

transactions with Levy. Shortly thereafter, Levy's activity with the 703 Account decreased

dramatically.

254.    In addition, the majority of Levy's transactions with the 703 Account were

conducted by check. For example, in December 2001, the 703 Account received checks from

Levy, each in the amount of $90 million, on a daily basis—a pattern of activity with no

identifiable business purpose.

255.    JPMC was acutely aware of Levy's close relationship with Madoff, identifying

Madoff as "Levy's close friend and trader," who had helped increase Levy's wealth from $180

million in 1986 to $1.5 billion in 1998.

256.    Upon information and belief, JPMC never meaningfully investigated the connection between Madoff and Levy. The activity in Levy's account confirmed that there was no legitimate explanation for the suspicious transactions in the 703 Account.

257.    Instead of investigating these transactions, JPMC was primarily concerned about maintaining a relationship with Levy and Madoff and maintaining a role in the Levy family's finances after Levy's death in 2005. JPMC and Madoff were both designated executors of Levy's estate. As alleged herein, JPMC prioritized its relationships with Levy and Madoff over its compliance with regulations that required banks to monitor customer accounts.

258.    Also unusual were significant transactions between Madoff and Sterling Equities, another JPMC private banking customer. Sterling Equities transacted more than $1 billion with the 703 Account. Like Levy, Sterling Equities engaged in multi-million dollar transactions with Madoff using checks, including depositing two $10 million checks with Madoff that both cleared the same day in 2005, each one coded by JPMC as "teller."

259.    JPMC profited not only from having the 703 Account, but also from its relationships with Levy and Sterling Equities, including the revenue it realized on their private banking accounts with JPMC. No matter how inexplicable the transaction—hundreds of millions of dollars being punted between a private banking account and the 703 Account with no apparent economic purpose for either party, and multi-million dollar transactions being conducted via a series of handwritten "teller" checks rather than a single wire transfer—JPMC executed the transactions, charged fees, reviewed the FOCUS Reports it knew to be false, and otherwise disregarded its obligations.

**JPMC's Automated Account Monitoring Procedures Were Ineffectual**

260.    The 703 Account's unusual activity should have triggered JPMC's automated account monitoring system as well.                    REDACTED

REDACTED

261.    JPMC's transaction monitoring system failed to issue alerts even when analyzing highly suspicious activities with respect to Madoff and BLMIS.    REDACTED

However, even though the formula identified many instances of suspicious activity in the 703 Account, the system almost never issued alerts. This prompted compliance personnel at JPMC to ask, after Madoff's arrest, "Why didn't the DDA Account (xxxxx1703) alert . . . ?"

262.    Between June 2005 and September 2008,    REDACTED

Yet, during that period, only one account alert was analyzed.

263.    Taking March 2008 as an example, during that month there were approximately $1.1 billion in transactions in the 703 Account. This value was so high    REDACTED

Remarkably, JPMC's transaction monitoring system noted the unusual activity but did not consider it unusual enough to warrant an alert. No alert was analyzed in March 2008.

**JPMC Had a Duty to Investigate Suspicious Activity in BLMIS's Account**

264.    Once suspicious activity is identified, a bank must further investigate to determine whether there could be a legitimate explanation for the activity or, rather, if it is indicative of illegal activity.    REDACTED

75

REDACTED

Upon information and belief, in the face of repeated indications of suspicious transaction activity in the 703 Account, as well as comments from individuals within JPMC regarding the legitimacy of Madoff's operations, JPMC never conducted any diligent investigation of the activity in the 703 Account or filed a SAR with the United States government.

265.    Despite the frequency with which transactions in the 703 Account were far outside the normal levels, between 2005 and 2008, JPMC analyzed only a single account alert.

REDACTED

266.                                    REDACTED

267.    Finally, the reviewer noted that he could not locate a KYC file for BLMIS and, regardless, concluded the investigation.                    REDACTED

268.    Even when Zames raised the issue in 2007 that Madoff was operating a Ponzi scheme, no one at JPMC appears to have looked at the transactions in the 703 Account, even

though it was a JPMC account. Madoff's and BLMIS's Client Relationship Manager and account sponsor, Cassa, learned of Zames's claim, but took no action whatsoever.

269.    JPMC blatantly disregarded its own compliance policies, the very same ones they touted after the Enron fraud.

## JPMC Had a Duty to Take Action

270.    Knowing that the activity in the 703 Account was not consistent with the purported business purpose of the account, and faced with evidence that illegal activity was occurring, JPMC had a duty to take action, not to participate in a breach of fiduciary duty, and to prevent the further diversion of fiduciary assets. As another financial institution did when confronted with similar activity, JPMC should at a minimum have questioned Madoff and/or BLMIS and, when it failed to receive a credible explanation for the bizarre activity, closed the account.

271.    Instead, JPMC took no action. The 703 Account was still operating without any restrictions when Madoff was arrested on December 11, 2008. Upon information and belief, JPMC did not convey its concerns to authorities or regulators other than British authorities in 2008.

272.    JPMC willfully turned a blind eye to indicia of fraud at BLMIS based upon information available to it. Instead, JPMC simply continued to do business with Madoff and BLMIS and, up until Madoff's arrest, the 703 Account was still operating without any restrictions.

## JPMC'S VIEW OF MADOFF THROUGH LOAN ACTIVITY

### JPMC's Loans to Levy for BLMIS Investments

273.    In addition to the activity in the 703 Account, there were a number of other red flags that should have been raised for JPMC concerning Madoff's suspicious loan activity.

77

These loans, which involved Levy and another longtime friend of Madoff, BLMIS investor, and JPMC private banking accountholder, Carl Shapiro, were characteristic of fraud. However, as with all red flags surrounding Madoff's activity within the bank, JPMC willfully turned a blind eye.

274.    From at least 1996 through 2005, Levy and his children obtained credit facilities through JPMC and other banks, using funds borrowed under these credit lines to leverage investments with Madoff.

275.    In 1996, for example, the same year Chemical Bank acquired Chase, Levy had $188 million in outstanding loans, which he used to fund Madoff investments.

276.    JPMC appropriately referred to these investments as "special deals." Indeed, these deals were special for all involved: (a) Levy enjoyed Madoff's inflated return rates of up to 40% on the money he invested with Madoff; (b) Madoff enjoyed the benefits of large amounts of cash to perpetuate his fraud without being subject to JPMC's due diligence processes; and (c) JPMC earned fees on the loan amounts and watched the "special deals" from afar, escaping responsibility for any due diligence on Madoff's operation.

277.    On the one hand, JPMC endorsed and helped fuel Levy's "special deals" with Madoff, continuously extending loans to Levy to finance these deals. On the other hand, JPMC advised the rest of its Private Bank customers not to invest with Madoff—a fact made known to JPMC's private banking customers after Madoff's arrest.

**JPMC Enabled the Fraud With Loans to BLMIS in 2005 and 2006**

278.    Shortly after Levy's death, JPMC began lending money directly to BLMIS, using Federal Home Loan Bank Bonds extended to Madoff from Shapiro as collateral. JPMC conducted an inadequate credit review before extending the loans, deciding instead to immediately begin earning interest.

78

279.    In November 2005, JPMC requested approval for a fully collateralized $100 million broker loan to BLMIS.  Shortly thereafter, BLMIS borrowed $95 million from JPMC, which as previously described, was not reported in the BLMIS FOCUS Reports.

280.    Enrica Cotellessa-Pitz, a Controller for BLMIS, requested the initial $95 million on BLMIS's behalf in a letter sent to JPMC on November 14, 2005.  Prior to receiving the letter, Daniel Bonventre, BLMIS's Head of Operations, had spoken with Evadney Sandiford in JPMC's Broker/Dealer Group regarding BLMIS's large loan request.

281.    Cotellessa-Pitz requested that JPMC credit the 703 Account with the $95 million, and use a bond in another account that Madoff held with JPMC as collateral—account number xx3414 ("Geoserve Account").

282.    The Geoserve Account contained a Federal Home Loan Bank Bond in the principal amount of $100 million, due April 8, 2009.  According to JPMC's records, the $100 million bond was "receive[d] free" from Shapiro on November 4, 2005.

283.    Madoff credited the value of the bond to a number of IA Business accounts held by Shapiro's family members, and, in addition, Madoff paid Shapiro approximately 30% interest on the bond.  Madoff paid the interest quarterly, depositing the payments into various accounts at JPMC held by Shapiro's family members.

284.    JPMC credited $95 million to the 703 Account on November 14, 2005—the same day Cotellessa-Pitz requested the funds.  JPMC immediately began to earn money off of the loan, collecting $198,081.60 in interest for November 2005, and $374,062.50 in interest for December 2005.

285.    Quickly thereafter, Bonventre, on BLMIS's behalf, requested an additional $50 million in a letter addressed to JPMC, dated January 18, 2006.  Similar to BLMIS's prior loan

request, Bonventre directed JPMC to credit the 703 Account with the funds, using the bonds held
in the Geoserve Account as collateral.

286.    That same day, on January 18, 2006, Bonventre sent an additional letter
requesting JPMC to accept two more Federal Home Loan Bank Bonds into the Geoserve
Account. One bond was worth $9 million and the other was worth $45 million, together totaling
$54 million. As before, JPMC's records indicate that BLMIS received these bonds "free" from
Shapiro, yet Madoff paid an annual interest rate of approximately 30% on the securities to
various Shapiro family customer accounts at JPMC. In response to Bonventre's requests, JPMC
credited the 703 Account with $50 million on January 23, 2006.

287.    With the loan to BLMIS now increased by $50 million, JPMC reaped the benefits
of that arrangement, collecting even greater amounts in interest. JPMC collected substantial
interest in connection with these transactions with Madoff: $443,689.23 for January 2006;
$552,057.30 for February 2006; $620,781.25 for March 2006; $625,564.23 for April 2006; and
$668,862.85 for May 2006.

288.    Having collected over $3.4 million in interest since BLMIS's initial loan request
on November 14, 2005, JPMC stopped accumulating profits on June 1, 2006. On that date,
Madoff sent a letter to JPMC requesting a decrease in BLMIS's loan amount to zero, and
authorizing JPMC to debit the $145 million principal amount of the loan from the 703 Account.
JPMC did as Madoff requested, and debited $145 million from the 703 Account that same day.

289.    As with most of JPMC's due diligence—or lack thereof—regarding Madoff,
JPMC made no effort to determine the solvency or financial condition of BLMIS prior to
extending these loans.

290.    For instance, in a November 2005 credit memo that JPMC prepared requesting approval for a fully collateralized $100 million broker loan for BLMIS, JPMC relied solely on BLMIS's historical performance and Madoff's reputation in the community to find comfort in its exposure and conclude that BLMIS would be able to repay the loan.

291.    Moreover, in summarizing BLMIS's supposed financial stability in that memorandum, Raffale Cardone, a credit officer at JPMC, stated that BLMIS's assets "are comprised primarily of broker-dealer receivables and securities inventory."

292.    Upon information and belief, JPMC again failed to conduct any independent investigation into BLMIS's solvency or financial condition, relying exclusively on BLMIS's unaudited financial statements in its April 2006 credit memo, stating:  "As expected, [BLMIS's] revenues were nearly entirely driven by trading income."

293.    Both credit memoranda's conclusions ran afoul of sound banking practices and JPMC's own policies, which mandate that financial analyses of the borrowing customer be based on audited financial statements.

294.    Furthermore, upon information and belief, JPMC's credit staff made no site visits to observe BLMIS's operations.  Site visits are generally a required part of a sound credit review process, designed to ensure that the lending institution has an adequate understanding of the borrower's business operations.

295.    Once again, JPMC's failure to follow its internal policies and standard banking practices perpetuated Madoff's fraud at the expense of BLMIS customers.

## JPMC ALLOWED THE FRAUD TO CONTINUE

> *"The Emperor felt very silly for he knew that the people were right but he
> thought, 'The procession has started and it must go on now!' So the Lords
> of the Bedchamber held their heads higher than ever and took greater
> trouble to pretend to hold up the train which wasn't there at all."*

Hans Christian Andersen, The Emperor's New Clothes

296.    Evidence of Madoff's fraud permeated every facet of JPMC.  It ran from the

Broker/Dealer Group, where Madoff and BLMIS maintained a bank account that no one honestly

could have believed was serving any legitimate purpose, to Equity Exotics, where JPMC learned

of the red flags inherent in Madoff's investment strategy, to JPMC's London office, which

learned that individuals might be laundering money through BLMIS feeder funds, to the Private

Bank, which maintained intimate relationships with one of Madoff's largest customers, to

Treasury & Security Services, which was responsible for investing the balance of the 703

Account in short-term securities.

297.    The various divisions of JPMC that were involved with Madoff communicated

with each other about Madoff.  When Equity Exotics wanted to set up a meeting with Madoff,

and when the Risk Management Division needed to obtain BLMIS's financial documents, they

knew to contact Madoff's and BLMIS's relationship manager in the Broker/Dealer Group.  The

Broker/Dealer Group also communicated with the Private Bank when customers at the Private

Bank were interested in investing with Madoff, and with Treasury & Security Services when the

relationship manager was trying to find new products that he could market to Madoff.

298.    The various individuals and divisions of JPMC regularly interacted to gain

additional information about business opportunities.  But those channels were only utilized for

the purpose of increasing JPMC's fees and profits.  JPMC is liable for Madoff's fraud because it

was uniquely positioned for 20 years to see the fraud and put a stop to it.  The due diligence

performed by JPMC was not reasonable, independent or adequate in light of the clear evidence
of fraudulent activity at BLMIS. JPMC allowed the "procession" to continue, and the fraud to
continue unabated.

## THE TRANSFERS

### Avoidable Obligations of Debtors

299.    Madoff and BLMIS incurred obligations to the Defendants in the form of loans in
the amount of $145,000,000, which are avoidable under § 544 of the Bankruptcy Code and
§§ 273-276 of the New York Debtor and Creditor Law as actual and constructive fraudulent
conveyances ("Avoidable Obligations"). The Avoidable Obligations include a $95 million loan,
on or about November 14, 2005, and a $50 million loan, on or about January 23, 2006, which
were part of keeping BLMIS afloat and, therefore, part of the fraudulent scheme. The incurrence
of the Avoidable Obligations occurred in connection with, and in furtherance of, the Ponzi
scheme and the Defendants infused and maintained BLMIS with capital which enabled the
continuation of the fraud during a time that the Defendants knew or should have known that
BLMIS was engaged in fraudulent activity. As described more fully below, the Defendants
loaned money to BLMIS at a time when they lacked good faith, were on notice of fraudulent
activity in the 703 Account, and knew or should have known of BLMIS's insolvency, such that
the Avoidable Obligations are avoidable. The repayment of principal and interest thereon was
not on account of valid antecedent debts and is also avoidable and recoverable.

300.    Under § 276 of the New York Debtor and Creditor Law, the Avoidable
Obligations were incurred with the actual intent to hinder, delay, or defraud creditors of BLMIS.
At or about the time that BLMIS incurred the Avoidable Obligations, the 703 Account was
reaching dangerously low levels of liquidity, and the Ponzi scheme was at risk of collapsing.
The Avoidable Obligations provided liquidity to continue the Ponzi scheme, and were incurred

with the actual intent to hinder, delay, or defraud creditors of BLMIS. BLMIS incurred the
Avoidable Obligations, upon information and belief, to continue to make payments to customers
to perpetuate the fraud.

301.    Moreover, under §§ 273-275 of the New York Debtor and Creditor Law, the
Avoidable Obligations were incurred when BLMIS was insolvent, when BLMIS had
unreasonably small capital, and/or when BLMIS was unable to pay its debts as they matured.
BLMIS was a massive Ponzi scheme, which as a matter of law was insolvent from its inception
and, therefore, never capable of fulfilling its obligations to its creditors.

302.    BLMIS did not receive fair consideration for the Avoidable Obligations at the
time they were incurred. At the time of the incurrence of the Avoidable Obligations, the
Defendants knew or should have known of fraudulent activity at BLMIS, and that the proceeds
would be used for a fraudulent purpose. BLMIS did not receive fair consideration for the
Avoidable Obligations because, among other things, Defendants participated in the fraud by
lending funds, on actual or inquiry notice, of a fraudulent scheme, maintaining the 703 Account,
ignoring fraudulent activity, and, accordingly, enabling the Ponzi scheme by further allowing for
the dissipation of assets.

303.    As alleged herein, the Defendants lacked good faith at the time the Avoidable
Obligations were incurred by disregarding, among other things, the following indicia of
fraudulent activity:

a.    Since at least the 1990s, the transactions taking place in the 703 Account
did not coincide with a legitimate enterprise and could only be explained by fraud;

b.    Since at least the 1990s, there were large repetitive transactions in the 703 Account, frequent high and low spikes in value and volume of transactions in the 703 Account, and frequent transactions between offshore entities and the 703 Account;

c.    Since at least the 1990s, there was frequent use of multi-million dollar, hand-written checks;

d.    Since at least the 1990s, there was suspicious activity between the 703 Account and a number of the Defendants' other clients, including, but not limited to, Levy and Sterling Equities;

e.    In December of 2001, activity existed that appeared to resemble a check-fraud scheme;

f.    Since at least 2004, Madoff submitted false information to the SEC in BLMIS's FOCUS Reports;

g.    The Defendants knew, no later than 2006, that BLMIS returns were too good to be true and could not be reconciled with market conditions;

h.    The Defendants knew, no later than 2006, that there was a lack of transparency surrounding BLMIS;

i.    The Defendants knew, no later than 2006, that BLMIS's auditor was unregistered, not subject to peer review, and had no website; and

j.    The Defendants knew, no later than 2006, that activity existed that was not consistent with a legitimate business or with the purchase or sale of securities.

304.    The loans from the Defendants to BLMIS also did not provide reasonably equivalent value or fair consideration to BLMIS because the incremental liquidity pumped into

the Ponzi scheme only served to perpetuate the fraud. The Avoidable Obligations are null and void because the Defendants lacked good faith when they entered into the loan agreements.

305.    The Avoidable Obligations should be set aside under §§ 273-276 of the New York Debtor and Creditor Law.

**Direct Transfers to JPMC**

306.    The Defendants received transfers directly and indirectly from BLMIS and Madoff. Over the life of the Defendants' relationships with Madoff and BLMIS, the Defendants received direct transfers from BLMIS of, at a minimum, a purported security interest in the bonds in the Geoserve Account, loan repayments, interest on loans, and account fees (collectively the "Initial Transfers"). Prior to the Filing Date, BLMIS transferred at least $149,080,088 to the Defendants in the form of Initial Transfers, including direct transfers during the ninety days preceding the Filing Date ("Preference Period Initial Transfers"), during the two years preceding the Filing Date ("Two Year Initial Transfers"), and during the six years preceding the Filing Date ("Six Year Initial Transfers"). A chart showing the Initial Transfers of which the Trustee is currently aware is attached as Exhibit A.

307.    Under § 276 of the New York Debtor and Creditor Law, the Initial Transfers were made with actual intent to hinder, delay or defraud BLMIS's creditors. The Initial Transfers were not made on account of a valid antecedent debt, were made at a time when the Defendants knew or should have known that BLMIS was insolvent or engaging in fraudulent activity.

308.    Moreover, under §§ 273-275 of the New York Debtor and Creditor Law, the Initial Transfers were made at a time when BLMIS was insolvent, when BLMIS had unreasonably small capital, and when BLMIS was unable to pay its debts as they matured. BLMIS was a Ponzi scheme that, as a matter of law, was insolvent from its inception and, therefore, never capable of fulfilling its obligations to its creditors.

309.    Because the Avoidable Obligations can be set aside and avoided under New York

Debtor and Creditor Law, the Bankruptcy Code, and applicable provisions of SIPA, all payments

in connection with the Avoidable Obligations can be set aside and avoided.  Accordingly, the

repayment of the principal amount of $145,000,000, which occurred on or about June 1, 2006,

plus any interest paid thereon or related fees by BLMIS to the Defendants are avoidable and

recoverable.

310.    The repayment of principal and payment of interest and any fees were not made

for fair consideration because there was no valid antecedent debt.  BLMIS made those payments

in connection with the fraudulent Ponzi scheme and the payment of such funds to the Defendants

adversely affected BLMIS's ability to meet its obligations to customers and creditors, and the

estate was unfairly diminished.  The Defendants debited the 703 Account to repay the Avoidable

Obligations when Defendants knew or should have known that BLMIS was insolvent or

engaging in fraudulent activity.

311.    The debiting of the 703 Account, and the application of the funds to satisfy the

Avoidable Obligations, was not a proper setoff.  The Defendants were on actual or inquiry notice

that the funds in the 703 Account consisted of deposits of customer money ostensibly for the

purpose of trading securities and were, therefore, held in a fiduciary capacity by BLMIS for the

benefit of its customers.  The 703 Account contained the funds of BLMIS's customers and,

therefore, any setoffs by the Defendants were improper.  Madoff improperly authorized the

debiting of the 703 Account with funds entrusted to it by customers for the purchase and sale of

securities and not to satisfy valid obligations of BLMIS.  The application of funds in the 703

Account to satisfy the Avoidable Obligations and the interest were, in fact, avoidable fraudulent

conveyances.

312. BLMIS's transfer of a lien in the bonds is an avoidable conveyance. The Defendants lacked good faith when they took a security interest in the bonds and were on notice of fraud at BLMIS and, therefore, were not bona fide purchasers for value. Accordingly, because the loans were not properly secured and were not incurred for fair value, the repayment thereof depleted and diminished the value of the estate's assets remaining available to creditors.

313. At the time BLMIS transferred, at a minimum, $590,000 in fees to the Defendants in connection with the Defendants' maintenance of the 703 Account, the Defendants knew or should have known of fraudulent activity at BLMIS. The Defendants did not provide value or fair consideration to BLMIS insofar as the Defendants knew or should have known that any "maintenance" of the 703 Account merely perpetuated fraudulent activity.

314. The Preference Period Initial Transfers, Two Year Initial Transfers, and Six Year Initial Transfers are avoidable and recoverable under §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), applicable provisions of New York Civil Practice Law and Rules 203(g) and 213(8), and §§ 273-279 of the New York Debtor and Creditor Law.

**Subsequent Transfers to the Defendants**

315. The Defendants also received fraudulent transfers from BLMIS indirectly when they redeemed their interests in Fairfield Sentry, Fairfield Sigma, and Herald.

316. Fairfield Sentry and Herald were BLMIS customers. BLMIS transferred funds directly to Fairfield Sentry when Fairfield Sentry made withdrawals from BLMIS. Fairfield Sentry then transferred those funds to the Defendants when the Defendants redeemed their interests in Fairfield Sentry in November 2008. In addition, BLMIS transferred funds directly to Herald when Herald made withdrawals from BLMIS. Herald then transferred those funds to the Defendants when the Defendants redeemed their interests in Herald.

317.    Fairfield Sigma, on the other hand, did not have an account with BLMIS. Fairfield Sigma invested all of its funds in Fairfield Sentry. Thus, BLMIS transferred funds to Fairfield Sentry. Fairfield Sentry then transferred funds to Fairfield Sigma when Fairfield Sigma redeemed its interest in Fairfield Sentry. Fairfield Sigma then transferred those funds to the Defendants when the Defendants redeemed their interests in Fairfield Sigma in November 2008.

318.    Upon information and belief, Fairfield Sentry and Herald received direct transfers from BLMIS during the 90 days preceding the Filing Date ("Preference Period BLMIS Customer Transfers"), during the two years preceding the Filing Date ("Two Year BLMIS Customer Transfers"), and during the six years preceding the Filing Date ("Six Year BLMIS Customer Transfers"). The Preference Period BLMIS Customer Transfers, Two Year BLMIS Customer Transfers, and Six Year BLMIS Customer Transfers (collectively "BLMIS Customer Transfers") are avoidable and recoverable under §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and applicable provisions of New York Civil Practice Law and Rules 203(g) and 213(8) and §§ 273-279 of the New York Debtor and Creditor Law.

319.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid and to recover the BLMIS Customer Transfers.

320.    The Trustee incorporates by reference the complaints filed in the following actions: *Picard v. Fairfield Sentry Ltd.*, No. 09-01239 (BRL) (Bankr. S.D.N.Y. filed May 18, 2009) (Amended Complaint filed July 20, 2010) (Dkt. No. 23), and *Picard v. HSBC, Herald Fund SPC, et al.*, No. 09-01364 (BRL) (Bankr. S.D.N.Y. filed July 15, 2009) (Amended Complaint filed December 5, 2010) (Dkt. No. 34). Charts showing the BLMIS Customer Transfers of which the Trustee is currently aware for Fairfield Sentry and Herald are attached as

Exhibits B and C, respectively. A chart showing the subsequent transfers from Fairfield Sentry to Fairfield Sigma of which the Trustee is currently aware is attached as Exhibit D.

321.    Some or all of the BLMIS Customer Transfers were subsequently transferred to the Defendants when they redeemed their interests in Fairfield Sentry, Fairfield Sigma, and Herald, respectively. These payments to the Defendants constitute recoverable subsequent transfers of the avoidable BLMIS Customer Transfers ("Subsequent Transfers").

322.    The portion of the Preference Period BLMIS Customer Transfers that was subsequently transferred to the Defendants will be referred to as the "Preference Period Subsequent Transfers." The portion of the Two Year BLMIS Customer Transfers that was subsequently transferred to the Defendants will be referred to as the "Two Year Subsequent Transfers." The portion of the Six Year BLMIS Customer Transfers that was subsequently transferred to the Defendants will be referred to as the "Six Year Subsequent Transfers." Prior to the Filing Date, JPMC received at least $167,530,580.09 and €87,052,875.00, totaling approximately $276,346,673.84, in Subsequent Transfers. A chart showing the Subsequent Transfers of which the Trustee is currently aware is attached as Exhibit E.

323.    The Preference Period Subsequent Transfers, Two Year Subsequent Transfers, and Six Year Subsequent Transfers, or the value thereof, are recoverable from the Defendants pursuant to § 550(a) of the Bankruptcy Code.

324.    The Defendants knew or should have known of fraudulent activity in connection with the transfers they received directly or indirectly from BLMIS and Madoff and/or that the transfers might have been made for a fraudulent purpose.

325.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

## CAUSES OF ACTION

326.    The Trustee's investigation is on-going and the Trustee reserves the right to
amend and (i) supplement the Complaint, including but not limited to, information on the
Avoidable Obligations, Initial Transfers, Subsequent Transfers, and any additional transfers, and
(ii) seek recovery of additional transfers and damages.

327.    The Trustee alleges each cause of action against each and every Defendant.

### AS AND FOR A FIRST CAUSE OF ACTION
*Fraudulent Avoidable Obligations—New York Debtor and Creditor Law §§ 276, 276-a, 278,*
*and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

328.    The Trustee repeats and realleges allegations 1 through 327, as though fully
realleged herein.

329.    At all times relevant to the Avoidable Obligations, there have been one or more
creditors who have held and still hold matured or unmatured unsecured claims against BLMIS
that were and are allowable under § 502 of the Bankruptcy Code or that were and are not
allowable only under § 502(e) of the Bankruptcy Code.

330.    Each of the Avoidable Obligations constitutes a conveyance by BLMIS as defined
in § 270 of the New York Debtor and Creditor Law.

331.    Each of the Avoidable Obligations was incurred by BLMIS with the actual intent
to hinder, delay, or defraud the creditors of BLMIS.  BLMIS incurred the Avoidable Obligations
in furtherance of a fraudulent investment scheme.

332.    Each of the Avoidable Obligations was received by the Defendants with the actual
intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Avoidable
Obligations, and/or future creditors of BLMIS.

333.    As a result of the foregoing, pursuant to §§ 276, 276-a, 278, and/or 279 of the
New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the Bankruptcy Code, and SIPA

91

§ 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding the Avoidable Obligations; (b)

directing that the Avoidable Obligations be set aside; (c) recovering the repayment associated

with the Avoidable Obligations, or the value thereof, from the Defendants for the benefit of the

estate of BLMIS; and (d) recovering attorneys' fees from the Defendants.

### AS AND FOR A SECOND CAUSE OF ACTION
#### Fraudulent Avoidable Obligations —New York Debtor and Creditor Law §§ 273, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551

334.    The Trustee repeats and realleges allegations 1 through 333, as though fully

realleged herein.

335.    At all times relevant to the Avoidable Obligations, there have been one or more

creditors who have held and still hold matured or unmatured unsecured claims against BLMIS

that were and are allowable under § 502 of the Bankruptcy Code or that were and are not

allowable only under § 502(e) of the Bankruptcy Code.

336.    Each of the Avoidable Obligations constitutes a conveyance by BLMIS as defined

in § 270 of the New York Debtor and Creditor Law.

337.    BLMIS did not receive fair consideration for the Avoidable Obligations.

338.    BLMIS was insolvent at the time it incurred each of the Avoidable Obligations or,

in the alternative, BLMIS became insolvent as a result of each of the Avoidable Obligations.

339.    As a result of the foregoing, pursuant to §§ 273, 278, and/or 279 of the New York

Debtor and Creditor Law, §§ 544, 550(a), 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3),

the Trustee is entitled to a judgment: (a) avoiding the Avoidable Obligations; (b) directing that

the Avoidable Obligations be set aside; and (c) recovering the repayment associated with the

Avoidable Obligations, or the value thereof, from the Defendants for the benefit of the estate of

BLMIS.

92

## AS AND FOR A THIRD CAUSE OF ACTION
*Fraudulent Avoidable Obligations —New York Debtor and Creditor Law §§ 274, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

340.    The Trustee repeats and realleges allegations 1 through 339, as though fully realleged herein.

341.    At all times relevant to the Avoidable Obligations, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

342.    Each of the Avoidable Obligations constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

343.    BLMIS did not receive fair consideration for the Avoidable Obligations.

344.    At the time BLMIS incurred each of the Avoidable Obligations, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Avoidable Obligations was an unreasonably small capital.

345.    As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544, 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding the Avoidable Obligations; (b) directing that the Avoidable Obligations be set aside; and (c) recovering the repayment associated with the Avoidable Obligations, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## AS AND FOR A FOURTH CAUSE OF ACTION
*Fraudulent Avoidable Obligations —New York Debtor and Creditor Law §§ 275, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

346.    The Trustee repeats and realleges allegations 1 through 345, as though fully realleged herein.

93

347.   At all times relevant to the Avoidable Obligations, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

348.   Each of the Avoidable Obligations constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

349.   BLMIS did not receive fair consideration for the Avoidable Obligations.

350.   At the time BLMIS incurred each of the Avoidable Obligations, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

351.   As a result of the foregoing, pursuant to §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding the Avoidable Obligations; (b) directing that the Avoidable Obligations be set aside; and (c) recovering the repayment associated with the Avoidable Obligations, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A FIFTH CAUSE OF ACTION
*Preferential Transfers (Initial Transferee)—11 U.S.C. §§ 547(b), 550(a), and 551*

352.   The Trustee repeats and realleges allegations 1 through 351, as though fully realleged herein.

353.   At the time of each of the Preference Period Initial Transfers, the Defendants were "creditors" of BLMIS within the meaning of § 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

94

354.    Each of the Preference Period Initial Transfers constitutes a transfer of an interest

of BLMIS in property within the meaning of § 101(54) of the Bankruptcy Code and pursuant to

SIPA § 78fff-2(c)(3).

355.    Each of the Preference Period Initial Transfers was to or for the benefit of the

Defendants.

356.    Each of the Preference Period Initial Transfers was made for or on account of an

antecedent debt owed by BLMIS before such transfer was made.

357.    Each of the Preference Period Initial Transfers was made while BLMIS was

insolvent.

358.    Each of the Preference Period Initial Transfers was made during the 90-day

preference period under § 547(b)(4) of the Bankruptcy Code.

359.    Each of the Preference Period Initial Transfers enabled the Defendants to receive

more than they would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code;

(ii) the transfers had not been made; and (iii) the Defendants received payment of such debt to

the extent provided by the provisions of the Bankruptcy Code.

360.    Each of the Preference Period Initial Transfers constitutes a preferential transfer

avoidable by the Trustee pursuant to § 547(b) of the Bankruptcy Code and recoverable from the

Defendants as initial transferees or the entities for whose benefit such transfers were made

pursuant to § 550(a) of the Bankruptcy Code.

361.    As a result of the foregoing, pursuant to §§ 547(b), 550(a), and 551 of the

Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding

and preserving the Preference Period Initial Transfers; (b) directing that the Preference Period

Initial Transfers be set aside; and (c) recovering the Preference Period Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Fraudulent Transfers (Initial Transferee)—11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551

362.    The Trustee repeats and realleges allegations 1 through 361, as though fully realleged herein.

363.    Each of the Two Year Initial Transfers was made on or within two years before the Filing Date.

364.    Each of the Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

365.    Each of the Two Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the Two Year Initial Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

366.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendants pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

367.    As a result of the foregoing, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Fraudulent Transfers (Initial Transferee)—11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551

368.    The Trustee repeats and realleges allegations 1 through 367, as though fully realleged herein.

369.    Each of the Two Year Initial Transfers was made on or within two years before the Filing Date.

370.    Each of the Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

371.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Initial Transfers.

372.    At the time of each of the Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Initial Transfers.

373.    At the time of each of the Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

374.    At the time of each of the Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

375.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendants pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

376.    As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding

and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers

be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the

Defendants for the benefit of the estate of BLMIS.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
*Fraudulent Transfers (Initial Transferee)—New York Debtor and Creditor Law §§ 276, 276-a, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

377.    The Trustee repeats and realleges allegations 1 through 376, as though fully

realleged herein.

378.    At all times relevant to the Six Year Initial Transfers, there have been one or more

creditors who have held and still hold matured or unmatured unsecured claims against BLMIS

that were and are allowable under § 502 of the Bankruptcy Code or that were and are not

allowable only under § 502(e) of the Bankruptcy Code.

379.    Each of the Six Year Initial Transfers constitutes a conveyance by BLMIS as

defined in § 270 of the New York Debtor and Creditor Law.

380.    Each of the Six Year Initial Transfers was made by BLMIS with the actual intent

to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Six Year Initial Transfers

to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

381.    Each of the Six Year Initial Transfers was received by the Defendants with the

actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six Year

Initial Transfers, and/or future creditors of BLMIS.

382.    As a result of the foregoing, pursuant to §§ 276, 276-a, 278, and/or 279 of the

New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the Bankruptcy Code, and SIPA

§ 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year

Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c) recovering the

Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate

of BLMIS; and (d) recovering attorneys' fees from the Defendants.

### AS AND FOR A NINTH CAUSE OF ACTION
*Fraudulent Transfers (Initial Transferee)—New York Debtor and Creditor Law §§ 273, 278,
and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

383.    The Trustee repeats and realleges allegations 1 through 382, as though fully

realleged herein.

384.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

§ 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the

Bankruptcy Code.

385.    Each of the Six Year Initial Transfers constitutes a conveyance by BLMIS as

defined in § 270 of the New York Debtor and Creditor Law.

386.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

387.    BLMIS was insolvent at the time it made each of the Six Year Initial Transfers or,

in the alternative, BLMIS became insolvent as a result of each of the Six Year Initial Transfers.

388.    As a result of the foregoing, pursuant to §§ 273, 278, and/or 279 of the New York

Debtor and Creditor Law, §§ 544, 550(a), 551 of the Bankruptcy Code, and SIPA

§ 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year

Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering

the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the

estate of BLMIS.

### AS AND FOR A TENTH CAUSE OF ACTION
*Fraudulent Transfers (Initial Transferee)—New York Debtor and Creditor Law §§ 274, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

389.    The Trustee repeats and realleges allegations 1 through 388, as though fully realleged herein.

390.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

391.    Each of the Six Year Initial Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

392.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

393.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Initial Transfers was an unreasonably small capital.

394.    As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544, 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
*Fraudulent Transfers (Initial Transferee)—New York Debtor and Creditor Law §§ 275, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

395.    The Trustee repeats and realleges allegations 1 through 394, as though fully realleged herein.

396.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

397.    Each of the Six Year Initial Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

398.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

399.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

400.    As a result of the foregoing, pursuant to §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A TWELFTH CAUSE OF ACTION
*Recovery of All Fraudulent Transfers (Initial Transferee)—New York Civil Practice Law and Rules 203(g) and 213(8), New York Debtor and Creditor Law §§ 276, 276-a, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

401.    The Trustee repeats and realleges allegations 1 through 400, as though fully realleged herein.

402.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

403.    At all times relevant to the Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

404.    Each of the Initial Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

405.    Each of the Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Initial Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

406.    Each of the Initial Transfers was received by the Defendants with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

407.    As a result of the foregoing, pursuant to New York Civil Practice Law and Rules 203(g) and 213(8), §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Defendants.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
*Preferential Transfers (Subsequent Transferee)—11 U.S.C. §§ 547(b), 550(a), and 551*

408.    The Trustee repeats and realleges allegations 1 through 407, as though fully realleged herein.

409.    At the time of each of the Preference Period BLMIS Customer Transfers,
Fairfield Sentry and Herald were each a "creditor" of BLMIS within the meaning of § 101(10) of
the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

410.    Each of the Preference Period BLMIS Customer Transfers constitutes a transfer
of an interest of BLMIS in property within the meaning of § 101(54) of the Bankruptcy Code
and pursuant to SIPA § 78fff-2(c)(3).

411.    Each of the Preference Period BLMIS Customer Transfers was to or for the
benefit of Fairfield Sentry or Herald.

412.    Each of the Preference Period BLMIS Customer Transfers was made for or on
account of an antecedent debt owed by BLMIS to Fairfield Sentry or Herald before such transfer
was made.

413.    Each of the Preference Period BLMIS Customer Transfers was made while
BLMIS was insolvent.

414.    Each of the Preference Period BLMIS Customer Transfers was made during the
90-day preference period under § 547(b)(4) of the Bankruptcy Code.

415.    Each of the Preference Period BLMIS Customer Transfers enabled Fairfield
Sentry or Herald to receive more than each would receive if: (i) this case was a case under
chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferees
received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

416.    Each of the Preference Period BLMIS Customer Transfers constitutes a
preferential transfer avoidable by the Trustee pursuant to § 547(b) of the Bankruptcy Code.

417.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and
Herald to avoid the Preference Period BLMIS Customer Transfers pursuant to § 547(b) of the

Bankruptcy Code, and to recover the Preference Period BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code.

418.    The Defendants were immediate or mediate transferees of some portion of the Preference Period BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Preference Period Subsequent Transfers").

419.    Each of the Preference Period Subsequent Transfers was made directly or indirectly to or for the benefit of the Defendants.

420.    As a result of the foregoing, pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Preference Period Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
### Fraudulent Transfers (Subsequent Transferee)
### 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551

421.    The Trustee repeats and realleges allegations 1 through 420, as though fully realleged herein.

422.    The Two Year BLMIS Customer Transfers were made on or within two years before the Filing Date.

423.    Each of the Two Year BLMIS Customer Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

424.    Each of the Two Year BLMIS Customer Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the Two Year BLMIS Customer Transfers to or for the benefit of Fairfield Sentry or Herald in furtherance of a fraudulent investment scheme.

425.    Each of the Two Year BLMIS Customer Transfers constitutes a fraudulent

transfer avoidable by the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and

recoverable from Fairfield Sentry or Herald pursuant to § 550(a) of the Bankruptcy Code and

SIPA § 78fff-2(c)(3).

426.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and

Herald to avoid the Two Year BLMIS Customer Transfers pursuant to § 548(a)(1)(A) of the

Bankruptcy Code, and to recover the Two Year BLMIS Customer Transfers pursuant to § 550(a)

of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

427.    The Defendants were immediate or mediate transferees of some portion of the

Two Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined

earlier, "Two Year Subsequent Transfers").

428.    Each of the Two Year Subsequent Transfers was made directly or indirectly to, or

for the benefit of, the Defendants.

429.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to

§§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering

the Two Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of

the estate of BLMIS.

### AS AND FOR A FIFTEENTH CAUSE OF ACTION
*Fraudulent Transfers (Subsequent Transferee)*
*11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551*

430.    The Trustee repeats and realleges allegations 1 through 429, as though fully

realleged herein.

431.    The Two Year BLMIS Customer Transfers were made on or within two years

before the Filing Date.

432.    Each of the Two Year BLMIS Customer Transfers constituted a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

433.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year BLMIS Customer Transfers.

434.    At the time of each of the Two Year BLMIS Customer Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year BLMIS Customer Transfers.

435.    At the time of each of the Two Year BLMIS Customer Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

436.    At the time of each of the Two Year BLMIS Customer Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

437.    Each of the Two Year BLMIS Customer Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(B) of the Bankruptcy Code and recoverable from Fairfield Sentry or Herald pursuant to § 550(a) and SIPA § 78fff-2(c)(3).

438.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Two Year BLMIS Customer Transfers pursuant to § 548(a)(1)(B) of the Bankruptcy Code, and to recover the Two Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

439.    The Defendants were immediate or mediate transferees of some portion of the Two Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Two Year Subsequent Transfers").

440.   Each of the Two Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

441.   As a result of the foregoing, the Trustee is entitled to a judgment pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), recovering the Two Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### Fraudulent Transfers (Subsequent Transferee)—New York Debtor and Creditor Law §§ 276, 276-a, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551

442.   The Trustee repeats and realleges allegations 1 through 441, as though fully realleged herein.

443.   At all times relevant to the Six Year BLMIS Customer Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

444.   Each of the Six Year BLMIS Customer Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

445.   The Six Year BLMIS Customer Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Six Year BLMIS Customer Transfers to or for the benefit of Fairfield Sentry or Herald in furtherance of a fraudulent investment scheme.

446.   Each of the Six Year BLMIS Customer Transfers was received by Fairfield Sentry or Herald with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six Year BLMIS Customer Transfers, and/or future creditors of BLMIS.

107

447.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Six Year BLMIS Customer Transfers pursuant to § 544 of the Bankruptcy Code, and §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Six Year BLMIS Customer Transfers and attorneys' fees pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

448.    The Defendants were immediate or mediate transferees of some portion of the Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Six Year Subsequent Transfers").

449.    Each of the Six Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

450.    Each of the Six Year Subsequent Transfers was received by the Defendants with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six Year Subsequent Transfers, and/or future creditors of BLMIS.

451.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers, or the value thereof, and attorneys' fees from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
*Fraudulent Transfers (Subsequent Transferee)—New York Debtor and Creditor Law §§ 273, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

452.    The Trustee repeats and realleges allegations 1 through 451, as though fully realleged herein.

453.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

108

§ 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the
Bankruptcy Code.

454.    Each of the Six Year BLMIS Customer Transfers constitutes a conveyance by
BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

455.    BLMIS did not receive fair consideration for the Six Year BLMIS Customer
Transfers.

456.    BLMIS was insolvent at the time it made each of the Six Year BLMIS Customer
Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year
BLMIS Customer Transfers.

457.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and
Herald to avoid the Six Year BLMIS Customer Transfers pursuant to § 544 of the Bankruptcy
Code, and §§ 273, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the
Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA §
78ff-2(c)(3).

458.    The Defendants were immediate or mediate transferees of some portion of the Six
Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined
earlier, "Six Year Subsequent Transfers").

459.    Each of the Six Year Subsequent Transfers was made directly or indirectly to, or
for the benefit of, the Defendants.

460.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to
§§ 273, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551
of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers,
or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
### Fraudulent Transfers (Subsequent Transferee)—New York Debtor and Creditor Law §§ 274, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551

461.    The Trustee repeats and realleges allegations 1 through 460, as though fully realleged herein.

462.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

463.    Each of the Six Year BLMIS Customer Transfers constituted a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

464.    BLMIS did not receive fair consideration for the Six Year BLMIS Customer Transfers.

465.    At the time BLMIS made each of the Six Year BLMIS Customer Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year BLMIS Customer Transfers was an unreasonably small capital.

466.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Six Year BLMIS Customer Transfers pursuant to § 544 of the Bankruptcy Code, and §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

467.    The Defendants were immediate or mediate transferees of some portion of the Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Six Year Subsequent Transfers").

110

468.    Each of the Six Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

469.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A NINETEENTH CAUSE OF ACTION
### Fraudulent Transfers (Subsequent Transferee)—New York Debtor and Creditor Law §§ 275, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551

470.    The Trustee repeats and realleges allegations 1 through 469, as though fully realleged herein.

471.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

472.    Each of the Six Year BLMIS Customer Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

473.    BLMIS did not receive fair consideration for the Six Year BLMIS Customer Transfers.

474.    At the time BLMIS made each of the Six Year BLMIS Customer Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

475.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Six Year BLMIS Customer Transfers pursuant to § 544 of the Bankruptcy Code, and §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the

111

Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA

§ 78fff-2(c)(3).

476.   The Defendants were immediate or mediate transferees of some portion of the Six

Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined

earlier, "Six Year Subsequent Transfers").

477.   Each of the Six Year Subsequent Transfers was made directly or indirectly to, or

for the benefit of, the Defendants.

478.   As a result of the foregoing, the Trustee is entitled to a judgment pursuant to

§§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551

of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers,

or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A TWENTIETH CAUSE OF ACTION
*Recovery of All Fraudulent Transfers (Subsequent Transferee)—New York Civil Practice Law
and Rules 203(g) and 213(8), New York Debtor and Creditor Law §§ 276, 276-a, 278, and/or
279, and 11 U.S.C. §§ 544, 550(a), and 551*

479.   The Trustee repeats and realleges allegations 1 through 478, as though fully

realleged herein.

480.   At all times relevant to the BLMIS Customer Transfers, the fraudulent scheme

perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of

BLMIS.

481.   At all times relevant to the BLMIS Customer Transfers, there have been one or

more creditors who have held and still hold matured or unmatured unsecured claims against

BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not

allowable only under § 502(e) of the Bankruptcy Code.

112

482.    Each of the BLMIS Customer Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

483.    The BLMIS Customer Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the BLMIS Customer Transfers to or for the benefit of Fairfield Sentry or Herald in furtherance of a fraudulent investment scheme.

484.    Each of the BLMIS Customer Transfers was received by Fairfield Sentry or Herald with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the BLMIS Customer Transfers, and/or future creditors of BLMIS.

485.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the BLMIS Customer Transfers pursuant to § 544 of the Bankruptcy Code, New York Civil Practice Law and Rules 203(g) and 213(8), §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

486.    The Defendants were immediate or mediate transferees of some portion of the BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Subsequent Transfers").

487.    Each of the Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

488.    Each of the Subsequent Transfers was received by the Defendants with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Subsequent Transfers, and/or future creditors of BLMIS.

489.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to New

York Civil Practice Law and Rules 203(g) and 213(8), §§ 276, 276-a, 278, and/or 279 of the

New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and

SIPA § 78fff-2(c)(3) recovering the Subsequent Transfers, or the value thereof, from the

Defendants for the benefit of the estate of BLMIS and recovering attorneys' fees from the

Defendants.

## AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
### Knowing Participation in a Breach of Trust

490.    The Trustee repeats and realleges allegations 1 through 489, as though fully

realleged herein.

491.    In purporting to act as investment advisers, Madoff and/or BLMIS had fiduciary

duties to BLMIS customers.  Madoff and/or BLMIS were in a position of superior knowledge

and expertise to BLMIS customers, who reposed their trust and confidence in Madoff and/or

BLMIS.  This created a relationship of high trust and confidence whereby Madoff and/or BLMIS

were entrusted with the funds BLMIS customers deposited into the 703 Account.

492.    The Defendants knew that Madoff and/or BLMIS were operating an investment

advisory business or, at a minimum, were operating as broker-dealers with authority over

discretionary accounts, and in that capacity were using the 703 Account as a fiduciary account.

For example, since the 1990s, the Defendants knew that Madoff and/or BLMIS had discretionary

control over Levy's money, managing to increase Levy's wealth from $180 million to $1.5

billion.

493.    In addition, since at least 2006, the Defendants knew, among other things, that

Madoff and/or BLMIS were registered investment advisers, as evinced by public filings, and that

Madoff and/or BLMIS were exercising discretion over their customer accounts.

494.   Moreover, since at least 2007, the Defendants knew that Madoff and/or BLMIS were implementing a discretionary strategy, as indicated in Equity Exotics's proposal. The Defendants were also told by BLMIS customers that Madoff and/or BLMIS had discretion to choose the counterparties to all of their customers' options trades, and that BLMIS customers showed JPMC copies of the customer, option, and trading agreements between BLMIS and its customers. Indeed, no later than 2007, the Defendants were structuring products based on BLMIS feeder funds and investing directly in those feeder funds.

495.   JPMC further knew that many BLMIS customers were fiduciaries and trustees in their own right who had delegated their fiduciary duties to Madoff and that Madoff exercised fiduciary powers as a trustee or custodian for retirement plans.

496.   Madoff and/or BLMIS breached this trust by misappropriating and diverting the BLMIS customer funds in the 703 Account.

497.   The Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by misappropriating and diverting the customer funds in the 703 Account. At a minimum, the Defendants knew of suspicious transactions in the 703 Account that would have led a reasonably prudent person to suspect that Madoff and/or BLMIS were misappropriating and diverting the funds of IA Business customers, and the Defendants failed to inquire whether Madoff and/or BLMIS were misappropriating and diverting those funds. Reasonable inquiry would have revealed that the only plausible explanation for the suspicious transactions was that Madoff and/or BLMIS were misappropriating and diverting the customer funds in breach of their fiduciary duties.

498.   The Defendants knew since at least the 1990s that the transactions taking place in the 703 Account did not coincide with any legitimate enterprise, and thus could only plausibly be

explained by fraud. For example, in December 2001, the Defendants were aware of what appeared to be a check-fraud scheme between Madoff and/or BLMIS and Levy. The Defendants were also aware of highly suspicious activity in the 703 Account, including: the utter absence of securities purchases with customer funds and the distribution of such funds to other BLMIS customers instead; large, repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; the regular use of hand-written checks for millions of dollars; and the suspicious activity between the 703 Account and clients of the Private Bank, including Levy. No later than January 2007, the Defendants' automated transaction monitoring system alerted the Defendants to this unusual activity.

499.    The Defendants were aware since at least 2004 that Madoff and/or BLMIS submitted false information to the SEC. The FOCUS Reports Madoff provided to the SEC and Defendants contained glaring inaccuracies. The Defendants reviewed and thus knew that the information in the FOCUS Reports dramatically misstated BLMIS's cash on hand and omitted loans, and that the reports showed no evidence of any BLMIS customer accounts.

500.    After performing minimal due diligence on Madoff and BLMIS and the BLMIS feeder funds, the Defendants knew Madoff was engaging in fraud, or consciously avoided such knowledge. Since at least 2006, the Defendants knew, among other things, that: Madoff's and/or BLMIS's returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding Madoff and/or BLMIS, including that BLMIS feeder funds would not give the Defendants access to their account agreements with Madoff and/or BLMIS; and Madoff's and/or BLMIS's auditor was unregistered and was not subject to peer review.

501.    Since at least 2007, the Defendants knew, among other things, that:  Madoff did not want anyone to perform due diligence on BLMIS; Madoff would not tell the BLMIS feeder funds the names of the counterparties to the options transactions BLMIS was purportedly entering into on their behalf; there was no independent verification of the trades Madoff was supposedly executing for his customers; there was no verification that any of BLMIS customers' assets existed; Madoff and/or BLMIS were rumored to be running a Ponzi scheme or engaging in illegal front-running; there were similarities between Madoff's operation of BLMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BLMIS feeder funds in response to their questions about Madoff and/or BLMIS.  No later than 2007, the Defendants acknowledged there was a substantial risk that Madoff and/or BLMIS were a fraud.

502.    Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among other things, that:  certain BLMIS feeder funds refused to answer the Defendants' questions about Madoff and BLMIS; there were similarities between Madoff's operations of BLMIS and the Petters fraud; and Madoff's family members had critical roles at BLMIS.  No later than September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the BLMIS feeder funds in which the Defendants had invested, was likely engaged in illegal activity relating to a BLMIS feeder fund.

503.    In October 2008, the Defendants admitted that the information they learned no later than 2006 led them to believe that Madoff and/or BLMIS were a fraud.  It was this concern that led the Defendants to submit requests to redeem their interests in the BLMIS feeder funds in October 2008.  After Madoff's arrest, employees of the Defendants admitted that they were not surprised to hear Madoff was operating a Ponzi scheme.

504.    Despite this knowledge, the Defendants moved billions of dollars in and out of the

703 Account at Madoff's behest and allowed BLMIS customers' funds to be used to make

payments to Madoff, as well as to his friends and family, and to fund redemptions from other

investors, rather than to purchase securities.  The Defendants allowed Madoff and/or BLMIS to

misappropriate billions of dollars from the 703 Account, in breach of Madoff's and/or BLMIS's

duties as fiduciaries.

505.    The Defendants are therefore liable for all funds Madoff and/or BLMIS

misappropriated from the 703 Account after the point at which the Defendants knew or through

reasonable inquiry would have known that Madoff and/or BLMIS were misappropriating those

funds.

506.    As a result of the Defendants' knowing participation in this breach of trust,

customers, creditors, and/or BLMIS lost billions of dollars.  At a minimum, the Defendants'

actions resulted in a loss of approximately $19 billion.

### AS AND FOR TWENTY-SECOND CAUSE OF ACTION
### Aiding and Abetting Fraud

507.    The Trustee repeats and realleges allegations 1 through 506, as though fully

realleged herein.

508.    Madoff committed a massive fraud through BLMIS.  The Defendants had actual

knowledge of the fraud and lent substantial assistance to Madoff and/or BLMIS in committing

the fraud.  At a minimum, the Defendants consciously avoided knowledge of the fraud.  The

Defendants suspected a fraud and realized there was a high probability of fraud, but refrained

from confirming it, in order to later deny knowledge of the fraud.  The Defendants' actions

proximately caused the fraud that resulted in billions of dollars in damages to customers,

creditors, and/or BLMIS.

509.    The Trustee brings this claim against all Defendants because, upon information
and belief, each Defendant, individually, aided and abetted the fraud. In addition, all of the
Defendants operated as a single, indivisible entity. Therefore, each of the Defendants is liable
for the actions of the other Defendants.

510.    Madoff committed one of the largest frauds in history through BLMIS. Madoff
told customers that their money would be invested pursuant to the SSC Strategy, but instead stole
that money and did not purchase securities as he claimed. The Ponzi scheme has resulted in
billions of dollars in losses to customers, creditors, and/or BLMIS.

511.    The Defendants knew, or at least consciously avoided knowledge, of the fraud.
The Defendants knew since at least the 1990s that the transactions taking place in the 703
Account did not coincide with any legitimate enterprise, and thus could only be plausibly
explained by fraud. In December 2001, the Defendants were aware of what appeared to be a
check-fraud scheme between Madoff through BLMIS and Levy, involving BLMIS's sending
checks to Levy in the same amount daily. The Defendants were also aware of highly suspicious
activity in the 703 Account, including: large, repetitive transactions; up and down spikes in the
value and volume of transactions; frequent transactions with offshore entities; the regular use of
hand-written checks for millions of dollars; and suspicious activity between the 703 Account and
clients of the Private Bank, including Levy. No later than January 2007, the Defendants'
automated transaction monitoring system alerted the Defendants as to this unusual activity.

512.    The Defendants were aware since at least 2004 that Madoff through BLMIS
submitted false information to the SEC. The FOCUS Reports Madoff through BLMIS provided
to the SEC and Defendants contained glaring inaccuracies. The Defendants reviewed and thus

knew that the information in the FOCUS Reports dramatically misstated BLMIS's cash on hand, omitted loans, and that the reports showed no evidence of any customer accounts.

513.     After performing minimal due diligence on Madoff, BLMIS, and the BLMIS feeder funds, the Defendants knew Madoff through BLMIS was engaging in fraud, or consciously avoided such knowledge.  Since at least 2006, the Defendants knew, among other things, that: BLMIS's returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding Madoff and/or BLMIS, including that BLMIS feeder funds would not give the Defendants access to their account agreements with BLMIS; and BLMIS's auditor was unregistered and was not subject to peer review.

514.     Since at least 2007, the Defendants knew, among other things, that:  Madoff did not want anyone to perform due diligence on BLMIS; Madoff would not tell the BLMIS feeder funds the names of the counterparties to the options transactions BLMIS was purportedly entering into on their behalf; there was no independent verification of the trades BLMIS was supposedly executing for its customers; there was no verification that any of BLMIS's customers' assets existed; Madoff and/or BLMIS were rumored to be running a Ponzi scheme or engaging in illegal front-running; there were similarities between Madoff's operations at BLMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BLMIS feeder funds in response to their questions about BLMIS.  No later than 2007, the Defendants acknowledged there was a substantial risk that Madoff and/or BLMIS were a fraud.

515.     Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among other things, that:  certain BLMIS feeder funds refused to answer the Defendants' questions about Madoff and BLMIS; there were similarities between Madoff's operations at BLMIS and

the Petters fraud; and Madoff's family members had critical roles at BLMIS. No later than

September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the

BLMIS feeder funds in which the Defendants had invested, was likely engaged in illegal activity

relating to a BLMIS feeder fund.

516.    In October 2008, the Defendants admitted that the information they learned no

later than 2006 led them to believe that Madoff and/or BLMIS were a fraud. It was this concern

that led the Defendants to submit requests to redeem their interests in the BLMIS feeder funds in

October 2008. After Madoff's arrest, employees of the Defendants admitted that they were not

surprised to hear Madoff was operating a Ponzi scheme.

517.    The Defendants knew Madoff was a fraud. At a minimum, the Defendants were

repeatedly faced with evidence that there was a high probability of fraud, and made a conscious

decision not to confirm that fact.

518.    The Defendants substantially assisted Madoff through BLMIS in committing the

fraud by, among other things: funneling approximately $250 million into BLMIS by way of the

Defendants' investments in BLMIS feeder funds; lending Madoff through BLMIS over one

hundred million dollars without which the Ponzi scheme could not have continued; lending

Levy, one of BLMIS's largest customers, over one hundred million dollars that Levy then

invested with BLMIS; allowing Madoff through BLMIS to use the 703 Account to run the Ponzi

scheme; executing transfers at Madoff's and/or BLMIS's behest and honoring hand-written

checks for tens of millions of dollars that were necessary for the operation of the Ponzi scheme;

providing short-term investment vehicles that generated revenue necessary for the continuation

of the Ponzi scheme; choosing not to execute its AML policy, which it touted to its customers,

by effectively failing to provide an account sponsor to the 703 Account; ignoring over ninety

instances of irregular activity in the 703 Account, and dismissing the one alert that was issued in January 2007; providing unsupervised Private Bank accounts to some of BLMIS's biggest customers; and ignoring false statements made by Madoff through BLMIS in regulatory filings.

519.    The Defendants' assistance was a proximate cause of the fraud. Without the Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme for over two decades.

520.    As a result of the Defendants' aiding and abetting Madoff's and/or BLMIS's fraud, customers, creditors, and/or BLMIS lost billions of dollars. At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion.

### AS AND FOR A TWENTY-THIRD CAUSE OF ACTION
#### Aiding and Abetting Breach of Fiduciary Duty

521.    The Trustee repeats and realleges allegations 1 through 520, as though fully realleged herein.

522.    Madoff and/or BLMIS owed a fiduciary duty to BLMIS customers. Madoff and/or BLMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme and stealing billions of dollars from BLMIS customers. JPMC knowingly participated in the breach, causing harm to customers, creditors, and/or BLMIS. At a minimum, the Defendants consciously avoided knowledge of the breach. The Defendants suspected Madoff and/or BLMIS were breaching a fiduciary duty and realized there was a high probability Madoff and/or BLMIS were breaching a fiduciary duty, but refrained from confirming it, in order to later deny knowledge of the breach.

523.    The Trustee brings this claim against all Defendants because, upon information and belief, each Defendant, individually, aided and abetted the breach of fiduciary duty by Madoff and/or BLMIS. In addition, all of the Defendants operated as a single, indivisible entity. Therefore, each of the Defendants is liable for the actions of the other Defendants.

524.    Madoff and/or BLMIS were in a fiduciary relationship with BLMIS's customers. Madoff and/or BLMIS were in a superior position over BLMIS's customers, which required those customers to repose trust and confidence in Madoff and/or BLMIS. In addition, pursuant to various account agreements BLMIS's customers executed, Madoff and/or BLMIS, agreed to take BLMIS's customers' money and invest it pursuant to the SSC Strategy. Instead, Madoff and/or BLMIS took their money and used it to benefit Madoff and others close to him.

525.    The Defendants knew Madoff and/or BLMIS had a fiduciary duty to BLMIS's customers and that Madoff and/or BLMIS breached that duty. The Defendants were aware that BLMIS was a broker-dealer and an investment adviser, and had reviewed account agreements in which BLMIS agreed to invest customers' money pursuant to specific terms.

526.    The Defendants also knew, or at least consciously avoided the knowledge that, Madoff and/or BLMIS breached that fiduciary duty by engaging in fraud. The Defendants knew since at least the 1990s that the transactions taking place in the 703 Account did not coincide with any legitimate enterprise, and thus could only plausibly be explained by fraud. In December 2001, the Defendants were aware of what appeared to be a check-fraud scheme between Madoff and/or BLMIS and Levy, involving BLMIS's sending checks to Levy in the same amount daily. The Defendants were also aware of highly suspicious activity in the 703 Account, including:  large, repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; the regular use of hand-written checks for millions of dollars; and the suspicious activity between the 703 Account and clients of the Private Bank, including Levy. No later than January 2007, the Defendants' automated transaction monitoring system alerted the Defendants to this unusual activity.

527.    The Defendants were aware since at least 2004 that Madoff and/or BLMIS submitted false information to the SEC. The FOCUS Reports Madoff and/or BLMIS provided to the SEC and Defendants contained glaring inaccuracies. The Defendants reviewed and thus knew that the information in the FOCUS Reports dramatically misstated BLMIS's cash on hand and omitted loans, and that the reports showed no evidence of any customer accounts.

528.    After performing minimal due diligence on Madoff and/or BLMIS and the BLMIS feeder funds, the Defendants knew Madoff and/or BLMIS were engaging in fraud, or consciously avoided such knowledge. Since at least 2006, the Defendants knew, among other things, that: BLMIS's returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding BLMIS, including that BLMIS feeder funds would not give the Defendants access to their account agreements with BLMIS; and BLMIS's auditor was unregistered and was not subject to peer review.

529.    Since at least 2007, the Defendants knew, among other things, that: Madoff did not want anyone to perform due diligence on BLMIS; Madoff would not tell the BLMIS feeder funds the names of the counterparties to the options transactions BLMIS was purportedly entering into on their behalf; there was no independent verification of the trades BLMIS was supposedly executing for its customers; there was no verification that any of BLMIS's customers' assets existed; Madoff and/or BLMIS were rumored to be running a Ponzi scheme or engaging in illegal front-running; there were similarities between Madoff's operations of BLMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BLMIS feeder funds in response to their questions about BLMIS. No later than 2007, the Defendants acknowledged there was a substantial risk that Madoff and/or BLMIS were a fraud.

530.    Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among
other things, that:  certain BLMIS feeder funds refused to answer the Defendants' questions
about Madoff and BLMIS; there were similarities between Madoff's operations of BLMIS and
the Petters fraud; and Madoff's family members had critical roles at BLMIS.  No later than
September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the
BLMIS feeder funds in which the Defendants had invested, was likely engaged in illegal activity
relating to a BLMIS feeder fund.

531.    In October 2008, the Defendants admitted that the information they learned no
later than 2006 led them to believe that Madoff and/or BLMIS were a fraud.  It was this concern
that led the Defendants to submit requests to redeem their interests in the BLMIS feeder funds in
October 2008.  After Madoff's arrest, employees of the Defendants admitted that they were not
surprised to hear Madoff and/or BLMIS were operating a Ponzi scheme.

532.    The Defendants knew Madoff and/or BLMIS were breaching a fiduciary duty to
BLMIS's customers.  At a minimum, the Defendants were repeatedly faced with evidence that
there was a high probability Madoff and/or BLMIS were breaching a fiduciary duty, and made a
conscious decision not to confirm that fact.

533.    The Defendants participated in, and provided substantial assistance to, Madoff's
and/or BLMIS's breach of fiduciary duty by, among other things:  funneling approximately $250
million into BLMIS by way of the Defendants' investments in BLMIS feeder funds; lending
Madoff, and/or BLMIS, over one hundred million dollars without which the Ponzi scheme could
not have continued; lending Levy, one of BLMIS's largest customers, over one hundred million
dollars that Levy then invested with BLMIS; allowing Madoff and/or BLMIS to use the 703
Account to run the Ponzi scheme; executing transfers at Madoff's and/or BLMIS's behest and

honoring hand-written checks for tens of millions of dollars that were necessary for the operation

of the Ponzi scheme; providing short-term investment vehicles that generated revenue necessary

for the continuation of the Ponzi scheme; choosing not to execute its AML policy, which it

touted to its customers, by effectively failing to provide an account sponsor to the 703 Account;

ignoring over ninety instances of irregular activity in the 703 Account, and dismissing the one

alert that was issued in January 2007; providing unsupervised Private Bank accounts to some of

BLMIS's biggest customers; and ignoring false statements made by Madoff and/or BLMIS in

regulatory filings.

534.    The Defendants' assistance was a proximate cause of the breach.  Without the

Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate

the Ponzi scheme for over two decades.

535.    As a result of the Defendants' aiding and abetting this breach of fiduciary duty,

customers, creditors, and/or BLMIS lost billions of dollars.  At a minimum, the Defendants'

actions resulted in a loss of approximately $19 billion.

### AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION
#### Conversion

536.    The Trustee repeats and realleges allegations 1 through 535, as though fully

realleged herein.

537.    JPMC debited in excess of $145 million from the 703 Account to satisfy a debt

purportedly owed to it by BLMIS.  In doing so, JPMC exercised unauthorized dominion and

control over funds that it knew BLMIS held as a fiduciary on behalf of customers—specifically

identifiable Customer Property—in derogation of BLMIS customers' rights.

538.    BLMIS customers have a possessory right and interest in the billions of dollars

they invested with BLMIS, which was ultimately deposited at JPMC into the 703 Account.

539.    These investment funds constitute customer property under SIPA and are recoverable by the Trustee.

540.    At the time JPMC debited the $145 million from the 703 Account, JPMC was on notice that the account was comprised of investor funds. Thus, JPMC's debit from the 703 Account has resulted in the wrongful conversion of Customer Property. JPMC is therefore liable for having wrongfully converted these monies and is now obligated to return all such monies.

### AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION
#### Aiding and Abetting Conversion

541.    The Trustee repeats and realleges allegations 1 through 540, as though fully realleged herein.

542.    Through the IA Business, Madoff and/or BLMIS converted billions of dollars of Customer Property.

543.    BLMIS customers have a legal right and interest in the billions of dollars they personally invested with BLMIS. Madoff and/or BLMIS exercised unauthorized dominion and control over this Customer Property in derogation of BLMIS customers' rights, by failing to invest Customer Property in securities. Instead, Madoff and/or BLMIS used BLMIS customers' money to make payments to friends and family and to fund redemptions of other investors. Madoff's and/or BLMIS's unauthorized use of Customer Property resulted in the wrongful conversion of BLMIS customers' specifically identifiable funds.

544.    JPMC had actual knowledge of the conversion and lent substantial assistance to Madoff and/or BLMIS in converting these monies. At a minimum, JPMC consciously avoided knowledge of the conversion. JPMC suspected, and even realized there was a high probability, that Madoff and/or BLMIS were converting BLMIS customers' money, but refrained from confirming its suspicions in order to later deny knowledge of the conversion. JPMC's actions

127

proximately caused the conversion that resulted in billions of dollars in damages to customers, creditors, and/or BLMIS.

545.    JPMC was aware that Madoff and/or BLMIS were a broker-dealer and an investment adviser, and had reviewed account agreements in which Madoff and/or BLMIS agreed to invest BLMIS customers' money pursuant to specific terms.

546.    Madoff and/or BLMIS converted billions of dollars of BLMIS customers' money. Madoff and/or BLMIS told BLMIS customers that he would invest their money pursuant to the SSC Strategy, but instead stole that money and did not purchase securities as he claimed.

547.    JPMC also knew, or at least consciously avoided knowing, that Madoff and/or BLMIS did not purchase securities but instead stole BLMIS customers' money. JPMC knew since at least the 1990s that the inexplicable transactions taking place in the 703 Account did not coincide with any legitimate securities investment, and thus could only be explained by fraud. In December 2001, JPMC was aware of what appeared to be a check-fraud scheme between Madoff and/or BLMIS and Levy. JPMC was also aware of highly suspicious activity in the 703 Account, including: large, repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; the regular use of hand-written checks for millions of dollars; and suspicious activity between the 703 Account and clients of the Private Bank, including Levy. No later than January 2007, JPMC's automated transaction monitoring system alerted it to this unusual activity.

548.    JPMC was aware since at least 2004 that Madoff and/or BLMIS submitted false information to the SEC. The FOCUS Reports Madoff and/or BLMIS provided to the SEC and JPMC contained glaring inaccuracies. JPMC reviewed and thus knew that the information in the

FOCUS Reports dramatically misstated Madoff's and/or BLMIS's cash on hand and that the

reports showed no evidence of any customer accounts.

549.    After performing minimal due diligence on Madoff and/or BLMIS and the

BLMIS feeder funds, JPMC knew Madoff and/or BLMIS were engaging in fraud, or consciously

avoided such knowledge.  Since at least 2006, JPMC knew, among other things, that:  Madoff's

returns were "too good to be true" and could not be reconciled with market conditions; there was

a lack of transparency surrounding Madoff and/or BLMIS, including that BLMIS feeder funds

would not give JPMC access to their account agreements with BLMIS; and BLMIS's auditor

was unregistered and was not subject to peer review.

550.    Since at least 2007, JPMC knew, among other things, that:  Madoff and/or

BLMIS did not want anyone to perform due diligence on BLMIS; Madoff and/or BLMIS would

not tell the BLMIS feeder funds the names of the counterparties to the options transactions

BLMIS was purportedly entering into on their behalf; there was no independent verification of

the trades BLMIS was supposedly executing for its customers; there was no verification that any

of BLMIS customers' assets existed; Madoff and/or BLMIS were rumored to be running a Ponzi

scheme or engaged in illegal front-running; there were similarities between Madoff's operations

at BLMIS and the Refco fraud; and JPMC was receiving inconsistent answers from the BLMIS

feeder funds in response to their questions about Madoff and/or BLMIS.  No later than 2007,

JPMC acknowledged there was a substantial risk that Madoff and/or BLMIS were a fraud.

551.    Since at least 2008, and prior to Madoff's arrest, JPMC knew, among other

things, that:  certain BLMIS feeder funds refused to answer JPMC's questions about BLMIS and

Madoff; there were similarities between Madoff's operations at BLMIS and the Petters fraud;

and Madoff's family members had critical roles at BLMIS.  No later than September 2008,

JPMC learned that Aurelia Finance, an entity linked to one of the BLMIS feeder funds in which
JPMC had invested, was likely engaged in illegal activity relating to a BLMIS feeder fund.

552.    In October 2008, JPMC admitted that the information it learned no later than 2006
led it to believe that Madoff and/or BLMIS were running a fraud.  It was this concern that led
JPMC to submit requests to redeem its interests in the BLMIS feeder funds.  After Madoff's
arrest, individuals employed by JPMC admitted that they were not surprised to hear Madoff
and/or BLMIS were operating a Ponzi scheme.

553.    JPMC substantially assisted Madoff and/or BLMIS in converting Customer
Property.  JPMC funneled approximately $250 million into BLMIS through its investments in
BLMIS feeder funds; lent BLMIS and Madoff over one hundred million dollars without which
the Ponzi scheme could not have continued; lent Levy, one of BLMIS's largest customers, over
one hundred million dollars that Levy then invested with Madoff and/or BLMIS; allowed
Madoff and/or BLMIS to use the 703 Account to run the Ponzi scheme; executed transfers at
Madoff's and/or BLMIS's behest and honored hand-written checks for tens of millions of dollars
that were necessary for the operation of the Ponzi scheme; provided short-term investment
vehicles that generated revenue necessary for the continuation of the Ponzi scheme; chose not to
execute its AML policy, which it touted to its customers, by effectively failing to provide an
account sponsor to the 703 Account; ignored over ninety instances of irregular activity in the 703
Account, dismissing the one alert that was issued in January 2007; provided unsupervised Private
Bank accounts to some of Madoff's and/or BLMIS's biggest customers; and ignored false
statements made by Madoff and/or BLMIS in regulatory filings.

554.    JPMC's assistance was a proximate cause of the conversion. Without it, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme for over two decades.

555.    As a result of the Defendants' aiding and abetting Madoff's and/or BLMIS's conversion, customers, creditors, and/or BLMIS lost billions of dollars. At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion.

### AS AND FOR A TWENTY-SIXTH CAUSE OF ACTION
#### Unjust Enrichment

556.    The Trustee repeats and realleges allegations 1 through 555, as though fully realleged herein.

557.    JPMC has unjustly benefitted through its receipt of Customer Property—benefits that JPMC acquired only as a result of perpetuating and participating in Madoff's and/or BLMIS's Ponzi scheme.

558.    Since 2002, JPMC received approximately $149 million from BLMIS—approximately $4 million in the form of fee and interest payments and $145 million in repayment of loans. JPMC also benefitted from Customer Property by receiving deposits of this property into the 703 Account. JPMC kept the 703 Account open until Madoff's arrest in December 2008 and used the balance in the 703 Account to earn an estimated $500 million in fees and profits.

559.    JPMC earned these benefits at the expense of BLMIS customers, creditors, and/or BLMIS, and cannot justly retain them. Faced with the prospect of losing fees and profits, JPMC chose to ignore compelling evidence of Madoff's and/or BLMIS's fraud. For example, JPMC was privy to the abnormal activity in the 703 Account, suspicious and inadequate information received from BLMIS feeder funds while conducting due diligence in anticipation of structuring and issuing products, and a plethora of other evidence of fraud, as detailed above.

560.   JPMC helped perpetuate Madoff's and/or BLMIS's fraud by ignoring the evidence of fraud, and continuing to use the Customer Property in the 703 Account for its own enrichment.

561.   Equity and good conscience require full restitution of the monies received by JPMC, directly and indirectly, from BLMIS. This includes not only the Customer Property JPMC received directly from BLMIS, but also any profits made from its use of this money. Additionally, any profits and fees JPMC earned through its use of the Customer Property deposited in the 703 Account is recoverable by the Trustee as restitution.

## AS AND FOR A TWENTY-SEVENTH CAUSE OF ACTION
### Fraud on the Regulator

562.   The Trustee repeats and realleges allegations 1 through 561, as though fully realleged herein.

563.   JPMC is or has been regulated by both federal and New York state agencies. Until November 2004, New York state regulated JPMorgan Chase Bank.

564.   Pursuant to the regulations of these agencies, JPMC was required to report to regulators any suspicious activity in the accounts of JPMC customers. JPMC also was required to create and implement policies and procedures for identifying potentially illegal activity. Then, following the Enron fraud, JPMC was required to implement and report to various regulators its commitment to improve its policies and procedures for oversight and control.

565.   The Trustee is informed and believes based on the facts currently available, as detailed above, that JPMC omitted and misrepresented material facts to both federal and state regulators. JPMC defrauded these regulators to the detriment of customers, creditors, and/or BLMIS.

566.    Throughout its relationship with BLMIS, Madoff, and certain BLMIS customers, JPMC had access to a wealth of information about Madoff's and/or BLMIS's illegal activities. Among other things, this information revealed inconsistencies between BLMIS's financial statements, activity in the 703 Account, and BLMIS's purported business, and indicated that Madoff and/or BLMIS were engaged in illegal activities.

567.    JPMC had yet further knowledge that Madoff engaged in banking activities with no legitimate business purpose. According to two former employees of another financial institution, in or about 1997, that institution observed and investigated Madoff's nearly daily circular transactions between an account Madoff controlled at that financial institution and a Madoff account at JPMC (then, The Chase Manhattan Bank ("Chase")). On virtually a daily basis, a Madoff employee would physically deposit a check drawn on Madoff's account at the other financial institution into his account at JPMC. The next day, funds in or near the same amount—generally at least $1 million but less than $10 million—would be wired back from Madoff's JPMC account to the account at the other financial institution. According to the investigator at the other financial institution, now a former employee, as well as another former employee, the investigator and others at the financial institution questioned Madoff's employees about the transactions, and, having failed to receive a satisfactory explanation for the suspicious account activity, that financial institution closed Madoff's account. Not only should the suspicious activity have been as apparent to JPMC as it was to the other financial institution, but following normal operating procedures, the financial institution's investigator would have contacted his counterpart at JPMC regarding the suspicious transactions on two occasions: (1) in the course of his inquiry; and (2) at the conclusion of the inquiry, to report that the other financial institution was closing the account. The circular transactions in which JPMC

participated at this time presaged the same sort of circular transactions in which Madoff and

Levy would engage later within JPMC—transactions JPMC permitted to occur despite their

evident lack of legitimacy.

568.    The Defendants knew that Madoff and/or BLMIS were breaching their fiduciary

duties by misappropriating the customers' funds in the 703 Account.  At a minimum, the

Defendants knew of suspicious transactions in the 703 Account that would have led a reasonably

prudent person to suspect that Madoff and/or BLMIS were misappropriating the funds of IA

Business customers, and the Defendants failed to inquire whether Madoff and/or BLMIS were

misappropriating those funds.  A reasonable inquiry would have revealed that the only plausible

explanation for the suspicious transactions was that Madoff and/or BLMIS were

misappropriating the customers' funds in violation of their fiduciary duties.

569.    The Defendants knew since at least the 1990s that the transactions taking place in

the 703 Account did not coincide with any legitimate enterprise, and thus could only plausibly be

explained by fraud.  In December 2001, the Defendants were aware of what appeared to be a

check-fraud scheme between Madoff and/or BLMIS and Levy.  The Defendants were also aware

of highly suspicious activity in the 703 Account, including:  large, repetitive transactions; up and

down spikes in the value and volume of transactions; frequent transactions with offshore entities;

the regular use of hand-written checks for millions of dollars; and the suspicious activity between

the 703 Account and clients of the Private Bank, including Levy.  No later than January 2007,

the Defendants' automated transaction monitoring system alerted the Defendants to this unusual

activity.

570.    The Defendants were aware since at least 2004 that Madoff and/or BLMIS

submitted false information to the SEC.  The FOCUS Reports Madoff and/or BLMIS provided to

the SEC and Defendants contained glaring inaccuracies. The Defendants reviewed and thus

knew that the information in the FOCUS Reports dramatically misstated BLMIS's cash on hand,

omitted loans, and that the reports showed no evidence of any customer accounts.

571.    After performing minimal due diligence on Madoff and/or BLMIS and the

BLMIS feeder funds, the Defendants knew Madoff and/or BLMIS were engaging in fraud, or

consciously avoided such knowledge. Since at least 2006, the Defendants knew, among other

things, that: BLMIS's returns were "too good to be true" and could not be reconciled with

market conditions; there was a lack of transparency surrounding BLMIS, including that BLMIS

feeder funds would not give the Defendants access to their account agreements with BLMIS; and

BLMIS's auditor was unregistered and was not subject to peer review.

572.    Since at least 2007, the Defendants knew, among other things, that: Madoff did

not want anyone to perform due diligence on BLMIS; Madoff would not tell the BLMIS feeder

funds the names of the counterparties to the options transactions BLMIS was purportedly

entering into on their behalf; there was no independent verification of the trades BLMIS was

supposedly executing for its customers; there was no verification that any of BLMIS customers'

assets existed; Madoff and/or BLMIS were rumored to be running a Ponzi scheme or engaging in

illegal front-running; there were similarities between Madoff's operation of BLMIS and the

Refco fraud; and the Defendants were receiving inconsistent answers from the BLMIS feeder

funds in response to their questions about Madoff and/or BLMIS. No later than 2007, the

Defendants acknowledged there was a substantial risk that Madoff and/or BLMIS were a fraud.

573.    Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among

other things, that: certain BLMIS feeder funds refused to answer the Defendants' questions

about Madoff and BLMIS; there were similarities between Madoff's operation of BLMIS and

135

the Petters fraud; and Madoff's family members had critical roles at BLMIS. No later than September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the BLMIS feeder funds in which the Defendants had invested, was likely engaged in illegal activity relating to a BLMIS feeder fund.

574.    JPMC is required under the Bank Secrecy Act, the Patriot Act, and was required under New York laws and regulations, to file reports with appropriate regulators when it discovers suspicious activity by any of its customers. Such activity includes, *inter alia*, transactions where the bank has a substantial basis for believing a criminal violation is occurring, transactions involving potential money laundering, and transactions that have no business or apparent lawful purpose or are not the sort in which the particular customer would normally be engaging. As alleged in detail above, there were numerous suspicious transactions with Levy and Sterling Equities in the 703 Account, which should have triggered investigations and reports to regulators. Nor did the 703 Account serve a legitimate business purpose, as money in that account did not go to buy or sell securities. The only plausible explanation was that Madoff and/or BLMIS were engaging in fraud. Based on the Trustee's investigation to date, the Trustee has no reason to believe that JPMC made reports to federal or state regulators concerning suspicious activity in the 703 Account. Although there was no legitimate business purpose for the activity in the 703 Account, the 703 Account was never closed, which would have been consistent with reports to regulators for such egregious conduct.

575.    JPMC is required under the Bank Secrecy Act, the Patriot Act, and was required under New York laws and regulations, to maintain rigorous anti-money-laundering policies and procedures. Because of its participation in the Enron fraud, JPMC was required to be more vigilant in overseeing and reporting suspicious activity in the 703 Account. If it had followed its

136

purported improved procedures, the regulators would have had information that would have led to the uncovering of the Ponzi scheme, because the only plausible explanation was that Madoff and/or BLMIS were engaging in fraud.

576.    Based on the information uniquely available to JPMC, JPMC knew that the only plausible explanation regarding the business engaged in through Madoff and/or BLMIS was fraud. JPMC therefore knowingly failed to communicate these facts to regulators, despite its obligation to do so.

577.    In light of the above information, JPMC's failure to fully and accurately report to regulators was reckless and evidence of conscious misbehavior on the part of JPMC. JPMC ignored its duty to monitor the 703 Account, various materials from Madoff and/or BLMIS, its commitment to effectively manage risk following the SEC's enforcement action, and its internal policies and procedures aimed at detecting the numerous red flags surrounding BLMIS's operations.

578.    JPMC's failure to fully and accurately report allowed it to maintain a number of profitable relationships with important Private Bank clients and continue to earn hundreds of millions of dollars in revenue.

579.    As one of the world's largest banks, and one that advertised itself as the gold standard of compliance, JPMC lent Madoff's and/or BLMIS's operation legitimacy and cover that was reasonably relied upon by the BLMIS customers who transferred money to Madoff and/or BLMIS.

580.    JPMC proclaimed itself to be a bank that substantially complied with all applicable banking laws and regulations. JPMC intended for BLMIS customers to rely upon its

137

commitment to compliance when they were transacting business with JPMC through deposits into the 703 Account.

581.    Given JPMC's global reputation and its boasts about its compliance, BLMIS customers reasonably relied on JPMC to adequately monitor and fully and accurately report on Madoff and/or BLMIS. BLMIS customers reasonably relied on JPMC's representations when they chose to continue giving money to Madoff and/or BLMIS. If JPMC had not defrauded federal and state regulators, the holes in JPMC's compliance programs and the fraudulent activity in the 703 Account would have been exposed to BLMIS customers.

582.    Likewise, JPMC proximately caused the loss to customers, creditors, and/or BLMIS. When JPMC finally decided to inform regulators that Madoff was a fraud, it concurrently attempted to redeem all of its interests in BLMIS and Madoff related investments. JPMC knew that exposing the fraud to regulators would lead to the collapse of BLMIS and the disintegration of Customer Property. By its own action, in attempting to redeem its investment, JPMC acknowledged that its failure to report information to regulators would result in massive losses to BLMIS customers.

583.    As a result of the Defendants' fraud upon federal and state regulators, customers, creditors, and/or BLMIS lost billions of dollars. At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion.

### AS AND FOR A TWENTY-EIGHTH CAUSE OF ACTION
#### Contribution

584.    The Trustee repeats and realleges allegations 1 through 583, as though fully realleged herein.

585.    JPMC and BLMIS acted in concert as joint tortfeasors.

586. Without JPMC's tortious conduct, Madoff would have been unable to run BLMIS as the Ponzi scheme that went unabated for so many years. The actions taken by JPMC facilitated the harm committed and augmented the injury suffered by BLMIS customers.

587. By contributing to Madoff's fraud and enabling Madoff's Ponzi scheme, JPMC proximately caused the damages suffered by BLMIS's customers.

588. To date, the Trustee has allowed approximately $6.9 billion in customer claims. Furthermore, the Trustee has advanced almost $800 million in SIPC funds, and there is currently a motion pending to distribute approximately $272 million to BLMIS's customers. More money will be distributed as additional recoveries of BLMIS Customer Property are made.

589. The Trustee, acting as a successor-in-interest to BLMIS, brings this claim against the Defendants to the extent they contributed to the damages suffered by BLMIS's customers who have filed customer claims in the SIPA Proceeding.

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

i. On the First Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding the Avoidable Obligations; (b) directing that the Avoidable Obligations be set aside; (c) recovering the repayment associated with the Avoidable Obligations, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Defendants;

ii.  On the Second Claim for Relief, pursuant to §§ 273, 278, and/or 279 of

the New York Debtor and Creditor Law, §§ 544, 550(a), 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment:  (a) avoiding the Avoidable Obligations; (b) directing that the

Avoidable Obligations be set aside; and (c) recovering the repayment

associated with the Avoidable Obligations, or the value thereof, from the

Defendants for the benefit of the estate of BLMIS;

iii.  On the Third Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the

New York Debtor and Creditor Law, §§ 544, 550(a) and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment:  (a) avoiding the Avoidable Obligations; (b) directing that the

Avoidable Obligations be set aside;  and (c) recovering the repayment

associated with the Avoidable Obligations, or the value thereof, from the

Defendants for the benefit of the estate of BLMIS;

iv.  On the Fourth Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the

New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment:  (a) avoiding the Avoidable Obligations; (b) directing that the

Avoidable Obligations be set aside; and (c) recovering the repayment

associated with the Avoidable Obligations, or the value thereof, from the

Defendants for the benefit of the estate of BLMIS;

v.  On the Fifth Claim for Relief, pursuant to §§ 547(b), 550(a), and 551 of

the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

140

judgment: (a) avoiding and preserving the Preference Period Initial Transfers; (b) directing that the Preference Period Initial Transfers be set aside; and (c) recovering the Preference Period Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

vi.    On the Sixth Claim for Relief, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

vii.    On the Seventh Claim for Relief, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

viii.    On the Eighth Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants

for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Defendants;

ix.   On the Ninth Claim for Relief, pursuant to §§ 273, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

x.   On the Tenth Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

xi.   On the Eleventh Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

xii.   On the Twelfth Claim for Relief, pursuant to New York Civil Practice

Law and Rules 203(g) and 213(8), §§ 276, 276-a, 278, and/or 279 of the

New York Debtor and Creditor Law, §§ 544, 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment: (a) avoiding and preserving the Initial Transfers; (b) directing

that the Initial Transfers be set aside; (c) recovering the Initial Transfers,

or the value thereof, from the Defendants for the benefit of the estate of

BLMIS; and (d) recovering attorneys' fees from the Defendants;

xiii.   On the Thirteenth Claim for Relief, pursuant to §§ 547(b), 550(a), and 551

of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to

a judgment recovering the Preference Period Subsequent Transfers, or the

value thereof, from the Defendants for the benefit of the estate of BLMIS;

xiv.   On the Fourteenth Claim for Relief, pursuant to §§ 548(a)(1)(A), 550(a),

and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is

entitled to a judgment recovering the Two Year Subsequent Transfers, or

the value thereof, from the Defendants for the benefit of the estate of

BLMIS;

xv.   On the Fifteenth Claim for Relief, pursuant to §§ 548(a)(1)(B), 550(a), and

551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is

entitled to a judgment recovering the Two Year Subsequent Transfers, or

the value thereof, from the Defendants for the benefit of the estate of

BLMIS;

.

xvi.  On the Sixteenth Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or

279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and

551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is

entitled to a judgment recovering the Six Year Subsequent Transfers, or

the value thereof, and attorneys' fees from the Defendants for the benefit

of the estate of BLMIS;

xvii.  On the Seventeenth Claim for Relief, pursuant to §§ 273, 278, and/or 279

of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of

the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment recovering the Six Year Subsequent Transfers, or the value

thereof, from the Defendants for the benefit of the estate of BLMIS;

xviii.  On the Eighteenth Claim for Relief, pursuant to §§ 274, 278, and/or 279 of

the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment recovering the Six Year Subsequent Transfers, or the value

thereof, from the Defendants for the benefit of the estate of BLMIS;

xix.  On the Nineteenth Claim for Relief, pursuant to §§ 275, 278, and/or 279 of

the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment recovering the Six Year Subsequent Transfers, or the value

thereof, from the Defendants for the benefit of the estate of BLMIS;

xx.  On the Twentieth Claim for Relief, pursuant to New York Civil Practice

Law and Rules 203(g) and 213(8), §§ 276, 276-a, 278, and/or 279 of the

New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment recovering the Subsequent Transfers, or the value thereof, from

the Defendants for the benefit of the estate of BLMIS, and recovering

attorneys' fees from the Defendants;

xxi. On the First through Twentieth Claims for Relief, pursuant to common

law and New York Civil Practice Law and Rules 5001 and 5004, awarding

the Trustee prejudgment interest from the date on which the Subsequent

Transfers were received by JPMC;

xxii. On the Twenty-First through the Twenty-Fifth and the Twenty-Seventh

Claims for Relief, compensatory and/or consequential damages of

approximately $19 billion, and, as permitted by law, exemplary and

punitive damages, with the specific amounts of compensatory, exemplary

and punitive damages to be determined at trial;

xxiii. On the Twenty-Eighth Claim for Relief, contribution for JPMC's

proportionate share of damages suffered by BLMIS customers, in an

amount to be determined at trial;

xxiv. On the First through the Twentieth and the Twenty-Sixth Claims for

Relief, disgorgement of profits and fees received by JPMC in connection

with the conduct alleged herein in favor of the Trustee for the benefit of

BLMIS's estate and the Customer Property estate;

145

xxv. On the Twenty-Sixth Claim for Relief, restitution of monies JPMC received from Madoff and/or BLMIS and any profits earned through JPMC's use of these monies;

xxvi. Establishment of a constructive trust over the proceeds of the Initial Transfers, Subsequent Transfers, and unjust enrichment to JPMC in favor of the Trustee for the benefit of BLMIS's estate and the Customer Property estate;

xxvii. On all claims for relief, an accounting of all Initial Transfers and Subsequent Transfers regarding interest, fees, profits, and any other financial benefit in connection with the Initial Transfers, Subsequent Transfers, and the Avoidable Obligations, relating to the 703 Account from the time of its inception;

xxviii. Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xxix. Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims so triable.

Dated: New York, New York
       June 24, 2011

/s Deborah H. Renner
Baker & Hostetler LLP
David J. Sheehan
Email: dsheehan@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Tracy L. Cole
Email: tcole@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com

Seanna R. Brown
Email:  sbrown@bakerlaw.com
Marc Skapof
Email:  mskapof@bakerlaw.com
George Klidonas
Email:  gklidonas@bakerlaw.com
Matthew J. Moody (admission pending)
Email:  mmoody@bakerlaw.com

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and Estate of
Bernard L. Madoff*

and

Jessie M. Gabriel (admission pending)
Email:  jgabriel@bakerlaw.com
Jennifer A. Vessells
(*pro hac vice* admission pending)
Email:  jvessells@bakerlaw.com
Lauren M. Hilsheimer
(*pro hac vice* admission pending)
Email:  lhilsheimer@bakerlaw.com
Lindsey D'Andrea
(*pro hac vice* admission pending)
Email:  ldandrea@bakerlaw.com

Capitol Square, Suite 2100
65 East State Street
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616

147

*Of Counsel*:

Mark A. Kornfeld
Email: mkornfeld@bakerlaw.com
Oren J. Warshavsky
Email: owarshavsky@bakerlaw.com
Gonzalo S. Zeballos
Email: gzeballos@bakerlaw.com
Timothy Scott Pfeifer
Email: tpfeifer@bakerlaw.com

and

Thomas D. Warren
Email: twarren@bakerlaw.com

PNC Center
1900 East 9th Street, Suite 3200
Cleveland, Ohio 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740