Hearing Date: October 5, 2011 at 10:00 a.m.
Objection Deadline: September 22, 2011 at 12:00 p.m.

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Marshall R. King (MK-1642)

*Attorneys for UBS AG*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>      Plaintiff.<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>      Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>      Debtors. | |

**UBS AG'S OBJECTION TO THE TRUSTEE'S MOTION FOR (I) A REPORT
AND RECOMMENDATION TO THE DISTRICT COURT FOR THE APPOINTMENT
OF SPECIAL DISCOVERY MASTERS; (II) AN ORDER ESTABLISHING
PROCEDURES FOR ELECTRONIC DATA ROOMS; AND (III) AN ORDER
<u>MODIFYING THE JUNE 6, 2011 LITIGATION PROTECTIVE ORDER</u>**

UBS AG ("UBS") respectfully submits this objection to the Motion (the "Motion," Docket No. 4290) of Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, for (i) a report and recommendation for the appointment of special discovery masters; (ii) an order establishing procedures for an electronic data room; and (iii) modification of the Litigation

Protective Order, dated June 6, 2011.[1] In support of this Objection, UBS respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Trustee's Motion is reminiscent of the classic definition of *chutzpah*: "when a man kills both his parents and begs the court for mercy because he's an orphan." Alex Kozinski & Eugene Volokh, *Lawsuit, Shmawsuit*, 103 Yale L.J. 463, 467 (1993).

2. Here, the Trustee concedes that he made promises of confidentiality to more than 400 third parties, including individualized promises to approximately 70 third parties, and, as a result, was able to obtain more than 5 million documents that the third parties otherwise would have refused to produce. Motion ¶ 9. The Trustee admits that he used this massive trove of information to commence more than 900 adversary proceedings seeking to recover customer property from nearly 5,000 defendants. *Id.* ¶ 10. Further, just two months before filing this Motion, the Trustee specifically agreed to affirm the validity of his existing confidentiality agreements in order to obtain concessions from third parties concerning the use of confidential material and the procedures for handling future productions of confidential material.

3. Now, however, the Trustee asks this Court to relieve him of the obligations that he voluntarily undertook and from which he greatly benefitted, asserting simply that he now finds those obligations inconvenient and burdensome. The Trustee now asks this Court to endorse a discovery plan that would enable widespread availability of UBS's confidential documents to its direct competitors, to potential adversaries who would otherwise not have

---

[1] The most recent version of the Trustee's proposed orders, distributed on September 22, 2011, is attached hereto as Exhibit A (the "Modified Proposed Orders"). We understand that this version is what the Trustee plans to present to the Court.

access to such documents, and to others with no legitimate reason for inspecting UBS's documents. This Court should refuse the Trustee's request, for several reasons.

4. First, the Trustee has not demonstrated "extraordinary circumstances" or "compelling need" to overcome the presumptive unfairness of modifying a protective order that was relied upon by third parties in producing documents. Here, moreover, the circumstances are entirely of the Trustee's own making: No one forced the Trustee to enter into individualized agreements with third parties governing the confidentiality of documents. Rather, he *chose* to make those confidentiality promises, presumably recognizing that the benefits of obtaining information in a timely fashion outweighed whatever burden he would face in later using the documents. Having thus obtained the benefits of his agreement, the Trustee presents no justification for being relieved of the burdens.

5. Second, even if the burdens of the confidentiality agreements could not have been anticipated at the time the Trustee sought documents from third parties – a matter on which the Trustee presents no evidence – the Trustee fails to explain why circumstances have so radically changed from just two months before this Motion, when the Trustee specifically reiterated the validity of the past confidentiality agreements in order to obtain compromises from various parties (including UBS) set forth in the June 6, 2011 Litigation Protective Order (attached hereto as Exhibit B). At that time, the Trustee well understood the scope of the litigation that he had commenced, the complexity of discovery issues, and the fact that he might be requested to produce documents that had previously been produced to the Trustee by third parties. The Litigation Protective Order – the result of several months of negotiation between the Trustee and various third parties (including UBS) – accommodated those concerns, and was specifically conditioned on the continued validity of existing confidentiality agreements. The fact that the

Trustee returns to this Court just two months later seeking to abrogate this condition raises significant questions about whether the Trustee ever intended to abide by his agreement. In any event, because the Litigation Protective Order reflected a compromise of positions, the Trustee is not entitled to modify certain provisions without undoing the entire agreement.

6. <u>Finally</u>, even if there were a basis for relieving this Trustee from his own agreements to make his job easier in this case, it would be counterproductive for this Court to do so because it will make the jobs of other trustees harder. Third parties need to have confidence that confidentiality agreements entered into by SIPA or bankruptcy trustees will be honored, or else they will refuse to produce confidential documents to such trustees in the first place. Enabling trustees to escape their promises will undermine this confidence, impeding the ability of trustees to do their jobs. The Court should not facilitate the Trustee's short-term convenience at the expense of long-term effectiveness.

## **BACKGROUND**

7. On December 18, 2009, the Trustee submitted to this Court a Motion for Entry of Protective Order (Docket No. 1093). At the time the Trustee filed his motion, he had already commenced fourteen adversary proceedings related to this action, and he "expect[ed] to commence additional adversary proceedings in the future." Trustee's Motion for Entry of Protective Order ¶ 6.

8. On February 3, 2010, following his "negotiations with various constituents," the Trustee submitted an amended proposed protective order. Notice of Filing of Amended Proposed Protective Order (Docket No. 1848) at 2.

9. On February 16, 2010, this Court entered a protective order (Docket No. 1951, the "Initial Protective Order"), which adopted, nearly *verbatim*, the amended proposed protective

order proffered by the Trustee. A copy of the Initial Protective Order – which, as explained below, currently governs the documents produced to date by UBS and its subsidiaries – is attached as Exhibit C.

10. Under the terms of the Initial Protective Order, parties were permitted to designate documents and information as **CONFIDENTIAL** if:

> (a) in the good faith judgment of the party designating the material as CONFIDENTIAL such material contains proprietary business information, personal financial information, personal identifying information, or other information the disclosure of which would breach a legal or contractual obligation or (b) otherwise is subject to protection under section 107(b) or (c) of the United States Bankruptcy Code, Bankruptcy Rule 9018 and/or other applicable law.

Initial Protective Order ¶ 2.

11. Once designated as **CONFIDENTIAL**, the Trustee was precluded from disclosing the documents or information to persons other than those who were described in the Initial Protective Order. Initial Protective Order ¶ 5. Among other things, the Initial Protective Order prohibited disclosure of **CONFIDENTIAL** material produced in one adversary proceeding in a separate adversary proceeding to which the producing party was not a party. *Id.* ¶ 25.

12. The Initial Protective Order contemplated that the Trustee might receive a subpoena or other request for production of **CONFIDENTIAL** material, and provided a procedure pursuant to which the designating party would be notified and given a chance to object and seek Court protection. *Id.* ¶ 24. Failing such action, the Trustee would be free to comply with the request for production. *Id.*

5

13. If the Trustee believed that **CONFIDENTIAL** designations were not justified, the Initial Protective Order provided a mechanism for raising and resolving such objections. *See* Initial Protective Order ¶ 8.

14. On several occasions subsequent to the entry of the Initial Protective Order, UBS and certain of its subsidiaries produced documents and information to the Trustee, designating certain documents and information as **CONFIDENTIAL** under the terms of the Initial Protective Order. UBS relied on the terms of the Initial Protective Order in producing the documents and information. Indeed, UBS's willingness to produce such documents, and its agreement to compromise regarding the scope of the productions, was expressly conditioned on the Trustee's agreement that the documents would be treated as **CONFIDENTIAL** under the Initial Protective Order. *See, e.g.*, Letter from M. King to D. Renner & B. Pergament, dated November 8, 2010 (attached hereto as Exhibit D). The Trustee accepted UBS's documents subject to those conditions.

15. On February 1, 2011, after contending that the Initial Protective Order was no longer workable despite having been drafted and approved by the Trustee and the Court, the Trustee moved to amend the Initial Protective Order, and sought to abrogate all prior confidentiality agreements made with third parties. Trustee's Motion for Entry of Litigation Protective Order (the "February 2011 Motion") (Docket No. 3819) ¶ 20.

16. On May 26, 2011, following numerous objections by parties whose individual confidentiality agreements were being invalidated, including UBS, the Trustee agreed that the prior confidentiality agreements would remain unimpaired. The Trustee proudly proclaimed that, after months of negotiation, he had resolved nearly all objections by agreeing to modify the proposed Litigation Protective Order so that it "no longer abrogates prior confidentiality

6

agreements that the Trustee entered into with various parties." Trustee's Response to Objection to Motion for Entry of Litigation Protective Order (Docket No. 4097) at 2. The Trustee also agreed to "limit[] the sharing and use of confidential information across cases and among parties." *Id.*

17.  UBS would not have agreed to the other provisions of the Litigation Protective Order were it not for the Trustee's agreement to maintain the existence and validity of prior confidentiality agreements and the other concessions made by the Trustee. UBS specifically obtained the Trustee's agreement that UBS would be governed by its prior confidentiality agreement, which incorporated the terms of the Initial Protective Order. *See* Letter from M. King to, and counter-signed by, J. Selby, dated May 17, 2011 (the "UBS-Trustee Agreement," attached hereto as Exhibit E). In the UBS-Trustee Agreement, the Trustee expressly agreed that "the confidentiality of the documents previously produced by UBS will continue to be governed by the terms of the February 16, 2010 Protective Order." *Id.*

18.  On June 6, 2011, this Court entered the Litigation Protective Order (Docket No. 4137).

19.  The Litigation Protective Order explicitly protects the confidentiality designations made pursuant to the individual confidentiality agreements entered into between producing parties and the Trustee. The Litigation Protective Order provides:

> All designations of material as **CONFIDENTIAL** made after the date of the entry of this Order shall be controlled by this Order. *To the extent that a producing party and a receiving party have entered into an agreement regarding the confidentiality or non-disclosure of documents or discovery materials, such agreements shall only apply to documents or materials produced prior to the entry of this Order.*

7

Litigation Protective Order ¶ 19 (emphasis added). As noted, the Trustee agreed to this provision after months of negotiation with the objecting parties, and after UBS and the other objecting parties made significant concessions on other aspects of the Litigation Protective Order.

20. The Litigation Protective Order further provided that it would "remain in full force and effect until further order of this Court *at the close of* Adv. Proc. No. 08-01789." Litigation Protective Order ¶ 20 (emphasis added).

21. Now, just two months later, well before the "close" of this proceeding, and after agreeing, in no uncertain terms, to hold documents confidential under certain specific terms, the Trustee seeks to renege on such promises as a matter of sheer convenience.

## THE OBJECTIONABLE ASPECTS OF THE MODIFIED PROPOSED ORDERS

22. The Trustee's Motion proposes wholesale revisions to the regime governing his handling of confidential documents produced by third parties, and UBS joins the objections filed by other parties with respect thereto. UBS submits this objection to highlight the most egregious and objectionable aspect of the Modified Proposed Orders.

23. Notwithstanding his prior promises of confidentiality that induced UBS and others to produce their confidential documents, and notwithstanding that he (and the Court) reaffirmed the validity of those agreements just a few months ago, the Trustee now seeks to abrogate those agreements and the Court's order endorsing them. Instead of the protections that UBS and others were promised and relied upon, the Trustee proposes to disclose UBS's confidential documents to thousands of people, including lawyers representing UBS's competitors and its potential litigation adversaries.

24. The Trustee's modifications to the existing Litigation Protective Order, including establishment of a second electronic data room ("E-Data Room 2"), effectively allow carte-blanche access to all documents UBS has previously produced, unless UBS is able to satisfy a much higher standard than currently governs UBS's documents. Having obtained such documents with the express agreement to preserve their confidentiality, the Trustee now seeks to vitiate his promise of confidentiality because, he claims, it is too burdensome to keep. The result of the Trustee's bait-and-switch here is that UBS's confidential documents may become accessible far and wide, to the attorneys for thousands of parties.

25. The Trustee seeks to "supersede" the UBS-Trustee Agreement with what he calls a "limited modification" because, he contends, his promises of confidentiality have become "unworkable." Motion ¶ 23. He provides no evidence that the UBS-Trustee Agreement is "unworkable," nor how it has suddenly become so in the last two months. Moreover, making UBS's documents available to 5,000 parties, and replacing the existing confidentiality standards with a much more stringent standard, is hardly a "limited modification."

26. Any "protections" the Trustee currently proposes to provide are illusory considering that any requesting party's "Outside Litigation Counsel" would have unfettered access to any and all documents previously designated as "Confidential Material" by any producing party and thereafter placed in E-Data Room 2. Modified Order Establishing Procedures for Electronic Data Rooms at 3. Once Outside Litigation Counsel have gained access to E-Data Room 2, the Trustee places no limitation whatsoever on the documents that counsel will be able to review – any confidential document that is located in E-Data Room 2 will be viewable by each and every attorney who gains access to E-Data Room 2. *Id*. Among the 5,000

9

parties whose lawyers will have access to E-Data Room 2 are competitors of UBS, as well as potential litigation adversaries.

27.     The Trustee argues that each attorney accessing E-Data Room 2 will need to sign a non-disclosure agreement, thus protecting UBS and other third parties.  But with counsel for 5,000 parties, located in over thirty countries (February 2011 Motion ¶ 6), obtaining access to documents, "non-disclosure" is an entirely illusory concept; the documents will already have been widely disclosed.  Further, with so many parties having access to documents, enforcement of the non-disclosure agreements will be next to impossible.

28.     In the first proposed incarnation of the Litigation Protective Order, the Trustee tried to create a similar standard for widespread access:  the order would have allowed the Trustee to "use productions made by one defendant or Producing Party in any litigation." February 2011 Motion ¶ 9(d).  Facing widespread objection, the Trustee agreed to limit disclosure based on the terms currently agreed to in his agreement with UBS.

29.     Moreover, the Trustee's belief that allowing review of confidential documents by all counsel will somehow reduce the Trustee's burden is speculative at best, and mistaken at worst.  The Trustee's proposals contemplate that if a party wishes to obtain production of copies of Confidential Material out of E-Data Room 2, the Trustee would still have to provide notice to the producing party and negotiations would ensue if the producing party objects to production. Modified Order Establishing Procedures for Electronic Data Rooms at 6-8.  These are precisely the procedures that the Trustee contends present such a burden under the current confidentiality agreements.  And yet, parties given access to confidential documents in E-Data Room 2 will have every incentive to ask for a broad range of documents, including confidential documents.

There is no reason to believe that the subsequent notification and negotiation process will be any less protracted under the Trustee's current proposals.

### THE TRUSTEE HAS NOT AND CANNOT MEET THE LEGAL STANDARD FOR MODIFYING THE EXISTING PROTECTIVE ORDER

30.    "In the Second Circuit, a party seeking to modify a protective order must make a showing of 'some extraordinary circumstance or compelling need.'" *In re Almatis B.V.*, 2010 WL 4877868, at *6 (Bankr. S.D.N.Y. Nov. 24, 2010) (quoting *Med. Diagnostic Imaging, PLLC v. Carecore Nat'l, LLC*, 2009 WL 2135294, at *1 (S.D.N.Y. July 16, 2009)). "[I]f previously-entered protective orders have no presumptive entitlement to remain in force, parties would resort less often to the judicial system for fear that such orders would be readily set aside in the future." *SEC v. TheStreet.com*, 273 F.3d 222, 229-30 (2d Cir. 2001).

31.    It is, moreover, "presumptively unfair for courts to modify protective orders which assure confidentiality and upon which the parties have reasonably relied." *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir. 2005) (internal quotation omitted). In cases such as this, "the mere fact th[at] information was disclosed pursuant to a protective order suggests that reliance can be presumed." *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 434 (S.D.N.Y. 1993).

32.    Here, the Trustee's Motion presents just such a circumstance. UBS and many other parties have produced information to the Trustee subject to, and in reliance on, the terms of the Initial Protective Order, the Litigation Protective Order and/or the individual confidentiality agreements, which the Trustee and this Court expressly provided would remain valid and in effect until the end of this proceeding. UBS reasonably and justifiably expected that the Trustee would honor his explicit agreement to those confidentiality protections. In agreeing to strictly protect confidentiality, the Trustee was able to obtain documents and information that he would

11

otherwise have been unable to obtain, or that he might have obtained only after extensive litigation and passage of time.

33. Having greatly benefitted from his promises of confidentiality, the Trustee now seeks retroactively to negate the protections that UBS and others counted on, without making any showing of "compelling need" or "extraordinary circumstance" as to why the protections of the existing confidentiality agreements should be modified.

34. It is not enough that the Trustee seeks to "more efficiently and effectively facilitate discovery and the potential use of confidential information in the adversary proceedings." Motion ¶ 35. Similar reasoning has been rejected as insufficient to overcome the existing terms of a protective order. *See, e.g.*, *Med. Diagnostic Imaging*, 2009 WL 2135294, at *2 ("Plaintiffs fail[ed] to identify an extraordinary circumstance or a compelling need to justify modification" where sole justifications were that discovery would be facilitated and made less expensive and less duplicative; "the need for efficiency . . . is hardly an extraordinary or compelling circumstance"); *Maryland Cas. Co. v. W.R. Grace & Co.*, 1994 WL 419787, at *3 (S.D.N.Y. Aug. 10, 1994) ("Although fostering judicial economy and avoiding duplicative discovery are laudable goals[,] . . . they hardly amount to extraordinary circumstances or compelling need."); *cf. Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir. 1979) (a protective order should not be modified "merely to accommodate the Government's desire to inspect protected testimony for possible use in a criminal investigation").

35. An effort to make discovery more efficient, moreover, was precisely the reason offered by the Trustee in his prior effort to modify the governing confidentiality provisions. *See* February 2011 Motion ¶ 9 ("In broad terms, the Litigation Protective Order seeks to facilitate discovery and litigation, and ease the burden of the litigation on the Court and the parties…").

That effort resulted in the agreed-upon Litigation Protective Order, which expressly *preserved* the existing confidentiality agreements among the parties. Having reached that compromise, the Trustee should not be permitted to renege on his promises.

36. The fact that the Trustee himself sponsored the terms of the Initial Protective Order, which is incorporated into the UBS-Trustee Agreement, and the Litigation Protective Order, which expressly preserved the validity of the existing confidentiality agreements, is ample enough reason to deny the Trustee's request for modifications. *See Ionosphere*, 156 B.R. at 431 ("As a party to the stipulations which became the basis of the Protective Orders, ALPA cannot now object to the Protective Orders."). Given that the Litigation Protective Order, the Initial Protective Order and the individual confidentiality agreements all facilitated the Trustee's investigation by giving him access to information that otherwise would not have been produced, the Trustee simply should not be able to change the rules that he himself set.

37. Even if this Court found a basis for relieving this Trustee from his own agreements, the precedent of such a move would negatively impact future production negotiations with similarly situated trustees. Protective orders serve an important purpose. *See Martindell*, 594 F.2d at 295 (noting that a "vital function of a protective order … is to 'secure the just, speedy, and inexpensive determination' of civil disputes … by encouraging full disclosure of all evidence that might be conceivably relevant"); *Med. Diagnostic Imaging*, 2009 WL 2135294, at *1 ("Protective orders facilitate the disclosure of all relevant evidence, encourage the provision of testimony that might otherwise be withheld, and facilitate the settlement of litigation."). Third parties need assurance that agreements entered by SIPA or bankruptcy trustees can *actually* be relied upon. Otherwise, such producing parties will simply refuse production to such trustees in the first place, thereby preventing trustees from getting evidence

they seek or, at a minimum, greatly slowing down the speed of production and increasing the cost of obtaining compliance with subpoenas and other requests for information. This Court should not accommodate this Trustee's short-term convenience – relieving him from obligations that he specifically agreed to – at the expense of long-term effectiveness for future trustees. This Trustee has now twice consented to this Court entering protective orders that promise "[t]his Order shall remain in full force and effect until further order of this Court *at the close of* Adv. Proc. No. 08-01789." Initial Protective Order ¶ 28 (emphasis added); Litigation Protective Order ¶ 20 (emphasis added). This Court should deny the Trustee's latest attempt to upset the reasonable expectations of third parties such as UBS.

## CONCLUSION

For the foregoing reasons, this Court should deny the Trustee's Motion.

Dated: New York, New York
September 22, 2011

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

 /s/ Marshall R. King
Marshall R. King (MK-1642)

200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for UBS AG*

14