TANNENBAUM HELPERN SYRACUSE
& HIRSCHTRITT LLP
900 Third Avenue
New York, New York 10022
Telephone: 212-508-6700
Facsimile: 212-371-5207

*Attorneys for:*
*Neil E. Botwinoff*
*Robert E. Helpern*
*Joel S. Hirschtritt*
*Ralph A. Siciliano*
*Vincent J. Syracuse and*
*Michael G. Tannenbaum*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES, L.L.C.,<br><br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |

## OBJECTIONS TO DETERMINATION OF CLAIMS

Neil E. Botwinoff, Robert E. Helpern, Joel S. Hirschtritt, Ralph A. Siciliano, Vincent J. Syracuse and Michael G. Tannenbaum (collectively, the "Objecting Claimants"), by and through their counsel, Tannenbaum Helpern Syracuse & Hirschtritt LLP, hereby file objections ("Objections") to the Determination of Claims described below.

**Introduction**

1.  The Objecting Claimants invested a total of $545,110 with Bernard L. Madoff Investment Securities, LLC ("BLMIS") and, having never withdrawn any portion of their investments, each of the Objecting Claimants lost their entire investment as a result of the massive fraud perpetrated by Bernard L. Madoff ("Madoff").

2.  In or about March of 2009, the Objecting Claimants each filed timely claims in this proceeding with the estate of the debtor, BLMIS, seeking to recover the amounts of their investments with BLMIS under the insurance program provided by the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq.* (the "SIPA Claims"). Copies of the SIPA Claims are annexed hereto as Exhibit 1.

3.  As discussed in greater detail below, the assets that were invested by the Objecting Claimants with BLMIS were owned and controlled directly by the Objecting Claimants through separate individual retirement accounts. While the monies were held by BLMIS in an account in the name of P.J. Administrator, LLC ("PJ Administrator"), that entity acted solely as an administrator with respect to such assets as an accommodation to the Objecting Claimants, it did not collect a fee for its administrative services, and it did not own the assets in the account at BLMIS which was maintained on behalf of the Objecting Claimants. Consequently, the Objecting Claimants were "customers" of BLMIS at the time the loss occurred and are entitled to recovery of those funds under SIPA.

4.  Irving H. Picard, the Trustee appointed for the estate of BLMIS in this proceeding (the "Trustee"), duly acknowledged the SIPA Claims as timely filed and designated such claims as Claim Nos. 06434 (Neil E. Botwinoff), 006430 (Robert E. Helpern), 006432 (Joel S.

Hirschtritt), 006433 (Ralph A. Siciliano), 0006431 (Vincent J. Syracuse) and 006429 (Michael G. Tannenbaum).

5. The Trustee issued a "Notice of Trustee's Determination of Claim" denying the SIPA Claims under 15 U.S.C. § 78111(2) because "[b]ased on a review of available books and records of BLMIS by the Trustee's staff, you [the Objecting Claimants] did not have an account with BLMIS." Copies of the notices denying each of the SIPA Claims are annexed hereto as Exhibit 2.

6. By agreement between the Objecting Claimants and the Trustee, the time for the Objecting Claimants to file objections to the Trustee's denial of their claims was extended to November 14, 2011.

7. For the reasons stated below, the Objecting Claimants object to the denial of their SIPA Claims and request that the SIPA Claims be paid from the insurance maintained by the Securities Investor Protection Corporation.

**General Background and The Objecting Claimants' Initial Investment in BLMIS**

8. In 1996 and 1997, each of the Objecting Claimants initially invested with BLMIS through individual self-directed accounts (the "Self-directed Accounts") in a profit sharing plan (the "Profit-Sharing Plan") that was sponsored by Tannenbaum Helpern Syracuse & Hirschtritt LLP, the law firm of which they are all members.

9. In order to facilitate the Objecting Claimants' investments with BLMIS through their Self-directed Accounts, the Profit-Sharing Plan transferred monies from the Self-directed Accounts to P.J. Associates Group, L.P. ("PJ Associates"), a pass-through entity which administered the Objecting Claimants' assets through an account maintained with BLMIS. PJ Associates, like its predecessor, PJ Administrator, never owned the monies that were invested

3

with BLMIS by the Objecting claimants through the Self-directed Accounts, and the Objecting Claimants never held any limited partnership or other ownership interest in PJ Associates. PJ Associates acted solely as an administrator on behalf of the Objecting Claimants with respect to the funds that were invested.

**PJ Administrator Assumes the Responsibilities of PJ Associates**

10. In 2003, PJ Administrator, a Delaware limited liability company, assumed the responsibilities of PJ Associates as the administrator for the funds invested by the Objecting Claimants with BLMIS.

11. The Trustee admitted in an Amended Complaint which he filed against PJ Administrator and other parties (annexed to these Objections as Exhibit 3, ¶46) that the sole member of PJ Administrator is North Peak, L.L.C., a Delaware limited liability company, which was owned by American Securities Management L.P. The Objecting Claimants never held a membership or other ownership interest in PJ Administrator.

12. As was the case with PJ Associates, the Objecting Claimants continued to own the assets that were invested with BLMIS, and PJ Administrator acted solely as an administrator on behalf of the Objecting Claimants with respect to those assets.

**The Objecting Claimants' Investments in BLMIS
Are Converted to IRA Rollover Accounts**

13. In or about July of 2006, the Profit-Sharing Plan changed its plan administrator from Professional Pensions Inc. ("PPI") to The Vanguard Group ("Vanguard").

14. Because Vanguard did not manage investments that were being made through PJ Administrator, the Objecting Claimants were required to establish individual retirement accounts if they wanted to continue investing in BLMIS.

4

15. As a result, in August of 2006, the Profit-Sharing Plan withdrew all of the monies that the Objecting Claimants invested with BLMIS through the account administered by PJ Administrator, and all of those funds were deposited into separate individual retirement accounts for each of the Objecting Claimants which were maintained at Bear, Stearns & Co., Inc. ("IRA Rollover Accounts"). Approximately three weeks later, all of the money in the IRA Rollover Accounts maintained at Bear Stearns was reinvested in BLMIS through the account administered by PJ Administrator.

16. All of the monies that the Objecting Claimants invested with BLMIS through their IRA Rollover Accounts remained with BLMIS and was lost as a result of Madoff's Fraud.

17. The chart below reflects the monies that each of the Objecting Claimants had initially invested with BLMIS and the value of their investments as of December 11, 2008 based on the records of BLMIS (the "Claimed Amounts"):

| Objecting Claimant | Original Monies Invested | Value of Investment as of December 11, 2008 |
|---|---|---|
| Neil E. Botwinoff | $15,668 | $56,027.89 |
| Robert E. Helpern | $78,337 | $279,999.44 |
| Joel S. Hirschtritt | $107,380 | $311,686.10 |
| Ralph A. Siciliano | $10,000 | $36,189.26 |
| Vincent J. Syracuse | $25,000 | $90,548.05 |
| Michael G. Tannenbaum | $308,725 | $510,387.44 |

**Relationship Between PJ Administrator and the Objecting Claimants**

18. Annexed to these Objections as Exhibit 4 are Account Administration Agreements entered into between each of the Objecting Claimants and PJ Administrator in 2003

5

(the "Administration Agreements"). The Administration Agreements provide, among other things, that:

- The Administration Agreement is "by and among P.J. Administrator LLC, as administrator (the 'Administrator'), and the account participants set forth on Schedule A (each, an 'Account Participant,' and collectively, the 'Account Participants')." (Administration Agreement, p. 1.)

- "each Account Participant has invested funds in a discretionary investment management account (the "Account") managed by Bernard L. Madoff Securities LLC or one or more of its affiliates ("Madoff") or desires to do so;" (Administration Agreement, p. 1.)

- "Each Account Participant hereby appoints the Administrator to serve as administrator for the Account in accordance with the terms of this Agreement and the Administrator hereby accepts such appointment." (Administration Agreement ¶2.)

- "The Administrator shall use commercially reasonable efforts to deliver to Madoff or its designee instructions or other communications concerning the addition or withdrawal of funds to the Account in accordance with the instructions of the Account Participants, to the extent consistent with the Account Agreement." (Administration Agreement ¶4[a].)

- "Each Account Participant agrees to provide written notice of withdrawal of funds from the Account or deposit of funds into the Account to the Administrator at least 10 business days before the effective date of such withdrawal or deposit." (Administration Agreement ¶4[c].)

- "The Account Participants understand and acknowledge that the Administrator shall have no discretionary authority over the investment of assets held in the Account; except the Administrator shall have the right to cause the Accountant [sic] Participant's interest in the Account to be liquidated in connection with the resignation by the Administrator as provided in Section 8." (Administration Agreement ¶5.)

- "The Administrator does not have any interest in the Account or Account Assets." (Administration Agreement ¶7.)

6

- "The Administrator shall not receive any compensation for its services. Account Participants shall be responsible for all expenses, disbursements and advances incurred or made by the Administrator in connection with this Agreement or the Account, including without limitation with respect to accounting and legal expenses and any insurance or bond that the Administrator may (although it is not required to) maintain in respect of the Account and the amounts held therein." (Administration Agreement ¶11.)

- "This Agreement shall not be construed to create among the parties, or their respective successors or assigns, the relationship of co-partners, joint venturers or any other similar relationship, the existence of which hereby is expressly denied by each of the parties." (Administration Agreement ¶13[b].)

19. The terms of the Administration Agreement recited above clearly demonstrate that: (a) the Objecting Claimants owned the assets that were invested with BLMIS, and PJ Administrator had no ownership interest in those assets; (b) PJ Administrator was acting solely as an administrator with respect to the assets invested with Madoff; (c) the Objecting Claimants did not have an ownership or any other interest in PJ Administrator; (d) the Objecting Claimants had total control and authority over the assets that were invested with BLMIS, and PJ Administrator had no discretion or investment authority with respect to such assets, except for its right to withdraw the investment from BLMIS in the event that PJ Administrator resigned; and (e) no payments or other fees were paid by the Objecting Claimants to PJ Administrator with respect to their investments with BLMIS and the Objecting Claimants were responsible for all expenses relating to the account maintained in the name of PJ Administrator with BLMIS.

20. As discussed below, the foregoing terms of the Administration Agreement demonstrate that the Objecting Claimants were "customers" of SIPA and their SIPA Claims should be paid.

**Legal Argument**

21. The Objecting Claimants object to the Trustee's determination for the reasons set forth herein and for such additional reasons as have been, or may be, set forth by other objectors who are similarly situated to the Objecting Claimants, and for the purpose of preserving any rights which may be recognized for persons who made investments with BLMIS.

22. The Objecting Claimants should be treated as "customers" of BLMIS under SIPA because they owned the assets which were held in the account maintained by PJ Administrator on their behalf with BLMIS. This "property interest" was deemed a "foundational element" of customer status in a recent decision by Judge Burton R. Lifland which affirmed the Trustee's denial of SIPA claims by investors in certain investment funds which invested with BLMIS (the "Feeder Funds"). In *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, Adv. Pro. No. 08-01789, slip op. at 13 (Bankr. S.D.N.Y. June 28, 2011) (hereinafter referred to as "Slip Op. at __"), Judge Lifland noted that:

> [a]s a foundational element, the [Feeder Fund investors] do not have property interests in the Feeder Funds' assets entrusted with BLMIS by the Feeder Funds, which are separate legal entities structured as corporations, limited liability companies and limited partnerships in New York, Delaware, the Cayman Islands or the BVI. Rather, the [Feeder Fund investors], who generally were either non-managing members or limited partners, purchased mere ownership interests in the Feeder Funds. The cash that they used to make those purchases *became the sole property of the Feeder Funds.*

*Id., (emphasis in original) (internal citations omitted).*

23. Accordingly, Judge Lifland held that "[a]s the [Feeder Fund investors] lack any property interests in the Feeder Fund assets that were invested with BLMIS, the [Feeder Fund investors] do not have 'a claim on account of securities received, acquired, or held by the debtor

8

. . . from or for the securities accounts of such person,'" SIPA § 78lll(2), and therefore cannot be deemed 'customers' under SIPA." Slip Op. at 14.

24.     In sharp contrast to the Feeder Fund investors, the Administration Agreement between the Objecting Claimants and PJ Administrator clearly states that PJ Administrator "does not have any interest in the Account or Account Assets." (Administration Agreement, ¶7.) (The "Account" is defined in the Administration Agreement as the investment management account maintained with BLMIS. (Administration Agreement, ¶1.) Since PJ Administrator held no interest in the assets, title to the Objecting Claimants' pro rata share of those assets clearly rested with the Objecting Claimants. Also, as noted above, *supra* at p. 7, unlike the Feeder Fund investors, the Trustee has conceded (and the Administration Agreement clearly states [¶13(b)]) that the Objecting Claimants are not shareholders, limited partners or members of PJ Administrator. This is not a situation, therefore, where the Objecting Claimants own an interest in the entity which, in turn, owns the assets held in BLMIS. Here, the assets held with BLMIS are owned *directly* by the Objecting Claimants.

25.     A further critical distinction between the Feeder Funds and PJ Administrator is that, unlike the Feeder Funds, PJ Administrator had "no discretionary authority over the investment of assets held in the [BLMIS] Account." (Administration Agreement ¶5.) The Trustee himself cited such investment authority as a key factor in urging Judge Lifland to deny the Feeder Fund investors' SIPA claims. (*See* "Memorandum of Law in Support of Trustee's Motion to Affirm Trustee's Determination Denying Claims of Claimants without BLMIS Accounts in their Names, Namely, Investors in Feeder Funds," dated June 11, 2010, Adv. Pro. No. 08-01789, docket entry number 2411, p. 2: "the Feeder Funds' manager and administrator,

9

not the Objecting Claimants, had responsibility for managing and directing the Feeder Funds' investments . . . .")

26. Judge Lifland also cited this factor in his decision affirming the Trustee's denial of the Feeder Fund investors' claims: "In sum, the right to manage the Feeder Funds and direct disposition of the Feeder Fund assets remained with the general partners or managing members of the Feeder Funds, who then delegated responsibility for investing part of all of the funds' assets." Slip. Op. at 23.[1] Similarly, in *SIPC v. Morgan Kennedy & Co.*, the fact that the trustees of an employee profit-sharing plan had the sole power to make investment decisions was cited as a factor in the Second Circuit's holding that the plan beneficiaries were not "customers" under SIPA. 533 F.2d 1314, 1318 (2d Cir. 1976).

27. PJ Administrator had no such investment authority over the Objecting Claimants' assets that were invested with BLMIS; in fact, the Administration Agreement (¶5) expressly precluded PJ Administrator from exercising such authority. PJ Administrator was just that: an *administrator* of the funds invested by the Objecting Claimants.

28. The fact that the Objecting Claimants had sole discretion over the investment decisions concerning their assets held in the BLMIS account, including the decision regarding whether to make deposits and withdrawals, strongly supports the conclusion that they were "customers" of BLMIS under SIPA and are entitled to the insurance coverage provided by SIPC.

29. The Supreme Court has stated that "Congress' primary purpose in enacting the SIPA and creating the SIPC was . . . the protection of investors." *See SIPC v. Barbour*, 421 U.S. 412, 421 (1975). When a brokerage firm, like BLMIS, is a member of SIPC, SIPC may intervene

---

[1] The Objecting Claimants do not agree with the conclusion reached by Judge Lifland in his decision involving the Feeder Fund investors or with the arguments propounded by the Trustee in support of that decision. Nevertheless, even assuming, *arguendo*, that the factors cited by Judge Lifland and the Trustee concerning "customer" status under SIPA were correct, those factors would support a finding of "customer" status for the Objecting Claimants here.

in the firm's bankruptcy proceedings, gather the assets of the brokerage firm's "customers," and distribute those assets directly to them. *See* 15 U.S.C. § 78aaa *et seq.* If the brokerage firm lacks sufficient assets to refund the customer's claim, SIPC may then advance monies to the customer from the SIPC fund. *See* 15 U.S.C. § 78fff-3.

30. "SIPA is remedial legislation. As such it should be construed liberally to effect its purposes" of protecting the investments of customers of broker-dealers and investment advisors. *In re First State Securities Corp.*, 34 B.R. 492, 496 (S.D. Fla. 1980), citing *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The fundamental purpose of the SIPA was to protect the public in the event that the entities with whom they dealt went bankrupt, or were otherwise unable to satisfy their customer agreements. *SEC v. SJ. Salmon & Co., Inc.*, 375 F. Supp. 867, 871 (S.D.N.Y. 1974) ("The principal purpose of the [Securities Investor Protection] Act was to protect investors against financial losses arising from the insolvency of their brokers."); *SEC v. Schreiber Bosse & Co., Inc.*, 368 F. Supp. 24 (N.D. Ohio 1973).

31. SIPA defines a "customer" as:

> [A]ny person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . .

15 U.S.C. §78lll(2).

32. The Objecting Claimants fall within section 78lll(2) under a plain reading of the statute. The Objecting Claimants' funds were invested in BLMIS. There is no substantive

11

difference between the Objecting Claimants and other investors who invested funds directly in BLMIS. The Objecting Claimants suffered the same harm as investors who invested their Funds with BLMIS and whose claims were allowed by the Trustee.

33.    A claimant's status as a "customer" under the statute does not depend on the person or entity to whom he handed his cash or made his check payable, or even where the funds were initially deposited. *In re Old Naples Secs., Inc.*, 223 F.3d 1296, 1302-03 (11th Cir. 2000). Instead, customer status under the statute depends on whether there was "actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation" like BLMIS, such that the brokerage firm "acquired control over all of the claimants' funds" as BLMIS did here. *Id.* at 1302-04. As shown above, there was "actual receipt, acquisition or possession" by BLMIS of the Objecting Claimants' property, and BLMIS "acquired control" over such property.

34.    Under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted the Objecting Claimants' funds, that fact also entitles the Objecting Claimants to prejudgment interest. *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 WL 1968297, at *5 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S. 2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

**Conclusion**

35. Based on the foregoing, the Objecting Claimants' claims should be allowed or recognized as claims under SIPA and the Claimed Amounts should be paid to the Objecting Claimants, with interest.

Dated: November 14, 2011
      New York, New York

                              TANNENBAUM HELPERN SYRACUSE
                              & HIRSCHTRITT LLP

                              /s/ David J. Kanfer
                              By: David J. Kanfer
                                    kanfer@thsh.com
                              900 Third Avenue
                              New York, New York 10022
                              Telephone: 212-508-6700
                              Facsimile: 212-371-5207

                              *Attorneys for Objecting Claimants*