**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jacqlyn R. Rovine
Email: jrovine@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*And Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (BRL) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**TRUSTEE'S SIXTH INTERIM REPORT**
**FOR THE PERIOD ENDING SEPTEMBER 30, 2011**

# TABLE OF CONTENTS

**Page**

I.      EXECUTIVE SUMMARY ................................................................. 1

II.     BACKGROUND ........................................................................... 3

III.    FINANCIAL CONDITION OF ESTATE........................................... 3

IV.     ADMINISTRATION OF THE ESTATE ........................................... 5

    A.    Marshaling And Liquidating The Estate Assets ..................... 5

    B.    Retention Of Professionals ................................................... 6

V.      CLAIMS ADMINISTRATION......................................................... 6

    A.    Claims Processing................................................................. 6

        i.      Customer Claims.................................................... 6

        ii.     General Creditor Claims ........................................ 7

        iii.    The Trustee Has Kept Customers Informed Of The Status Of The Claims Process ................................................................ 8

        iv.     The Hardship Program............................................ 8

    B.    Objections To Claims Determinations.................................. 10

    C.    Settlements Of Customer Claims Disputes........................... 11

VI.     PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA ......... 12

    A.    Net Equity Dispute............................................................. 12

    B.    "Customer" Definition ....................................................... 14

VII.    RECOVERIES AND CONTINGENCIES ......................................... 16

    A.    Recoveries Accomplished During Prior Report Periods ....... 16

    B.    Recoveries Accomplished During This Report Period........... 16

    C.    Appeals Of Earlier Settlements........................................... 18

VIII.   LITIGATION............................................................................. 20

        i.      The Bankruptcy Court........................................... 20

            (a)    Case-Wide Procedures ................................. 20

            (b)    *Picard v. Cohmad Sec. Corp.*...................... 22

            (c)    *Picard v. Peter B. Madoff, et al* ................. 23

        ii.     The District Court ................................................ 25

            (a)    *Picard v. J. Ezra Merkin, et al* ................... 25

            (b)    The HSBC Action ........................................ 27

## TABLE OF CONTENTS
### (continued)

**Page**

(c)    The J.P. Morgan and LuxAlpha Actions ..................................... 28

(d)    The Kohn Action.................................................................... 29

(e)    Motions to Withdraw the Reference In Avoidance Actions ........ 30

IX.    INITIAL ALLOCATION OF FUNDS AND DISTRIBUTION TO CUSTOMERS ...... 33

    A.    The Customer Fund.................................................................... 33

    B.    The General Estate .................................................................... 35

X.    INTERNATIONAL INVESTIGATION AND LITIGATION ........................................ 36

    i.    Austria and Italy.................................................................... 37

    ii.    Bermuda .................................................................... 37

    iii.    BVI and the Cayman Islands ................................................ 37

    iv.    England .................................................................... 38

    v.    Gibraltar .................................................................... 39

    vi.    Ireland .................................................................... 39

    vii.    Switzerland and Luxembourg ............................................... 40

XI.    FEE APPLICATIONS AND RELATED APPEALS .................................................... 40

CONCLUSION.................................................................................................................. 45

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, Esq. (the "Trustee"), as trustee for the substantively consolidated liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the "Debtors"), respectfully submits his Sixth Interim Report (this "Report") pursuant SIPA § 78fff-1(c) and this Court's Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief entered on December 23, 2008 (the "Claims Procedures Order") (ECF No. 12).[2]  Pursuant to the Claims Procedures Order, the Trustee shall file additional interim reports every six (6) months.  This Report covers the period between April 1, 2011 and September 30, 2011 (the "Report Period").

## I.  EXECUTIVE SUMMARY

1.    This Report Period saw several significant milestones in this liquidation.  The Trustee made an initial distribution from his recoveries to BLMIS customers of over $325 million relating to 1,232 BLMIS accounts.  The Trustee entered into settlements with two of the largest feeder funds at BLMIS, amongst other settlements.  This Court issued a decision upholding the Trustee's definition of "customer" under SIPA.  And importantly, the Second Circuit Court of Appeals affirmed the Bankruptcy Court's decision that upheld the Trustee's

---

[1] For convenience, subsequent references to SIPA will omit "15 U.S.C."

[2] All ECF references refer to pleadings filed in the main adversary proceeding pending before this Court, *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y.) (BRL), unless otherwise noted.

"Net Investment Method" for determining the value of net equity claims in this liquidation and blessed the manner in which the Trustee has unwound Madoff's fraud.

2.    As the District Court recognized, the Trustee "has worked relentlessly over nearly three years to bring assets that passed through BMIS back into the customer fund, in order to restore nearly $20 billion in customer losses." *Picard v. J.P. Morgan Chase & Co.*, No. 11 Civ. 00913, 2011 WL 5170434, at *1 (S.D.N.Y. Nov. 1, 2011) (CM).  Having successfully recovered over 50% of the principal lost in the Ponzi scheme thus far, the Trustee's efforts have been invaluable to all customers of BLMIS.

3.    During this Report Period, the Trustee and his counsel (including, but not limited to, Baker & Hostetler LLP ("B&H"), Windels Marx Lane & Mittendorf, LLP ("Windels Marx"), and Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), and various international special counsel retained by the Trustee as described in ¶ 25 of the Fifth Interim Report (ECF No. 4072) and *infra* ¶ 117 ("International Counsel") (collectively, "Counsel")) focused on the nuts-and-bolts of litigating hundreds of individual cases before the Bankruptcy Court and District Court, and dozens of international courts.

4.    This Report is meant to provide an overview of the efforts engaged in by the Trustee and his team of professionals in unwinding the largest Ponzi scheme in history.  Billions of dollars and thousands of people and entities located across the world are relevant to this undertaking.  The Trustee has worked diligently to coordinate the administration, investigation, and litigation to maximize efficiencies and reduce costs.

5.    All Interim Reports and other pertinent information are located on the Trustee's website, www.madofftrustee.com.

2

## II.    BACKGROUND

6.    The Trustee's prior interim reports, each of which is fully incorporated herein,[3] have detailed the circumstances surrounding the filing of this case and events that took place during prior phases of this proceeding.

## III.    FINANCIAL CONDITION OF ESTATE

7.    No administration costs, including the compensation of the Trustee and his counsel, are being paid out of any recoveries obtained by the Trustee for the benefit of BLMIS customers.  Rather, the fees and expenses of the Trustee and of all counsel to the Trustee and consultants are paid from administrative advances from the Securities Investor Protection Corporation ("SIPC"), as are all administrative costs incurred by the Trustee.  Payment of these costs has no impact on recoveries that the Trustee has obtained and will obtain because the costs are chargeable to the general estate.  Recoveries from litigation, settlements, and other means will be available in their entirety for the satisfaction of customer claims.

8.    A summary of the financial condition of the estate as of September 30, 2011 is provided in Exhibit A attached hereto.  The administrative expenses required for this liquidation include the maintenance of the BLMIS office, including rent payments (although this has decreased substantially since the sale of the market making operation), monthly payment of Trustee fees, legal fees, and consultant fees (all approved by SIPC), and the digitizing of records and costs associated with determining customer claims.

---

[3] Prior reports covered the periods from December 11, 2008 to June 30, 2009 (the "First Interim Report") (ECF No. 314); July 1, 2009 to October 31, 2009 (the "Second Interim Report") (ECF No. 1011); November 1, 2009 to March 31, 2010 (the "Amended Third Interim Report") (ECF No. 2207); April 1, 2010 to September 30, 2010 (the "Fourth Interim Report") (ECF No. 3038); and October 1, 2010 to March 31, 2011 (the "Fifth Interim Report) (ECF No. 4072).

9.      As detailed in <u>Exhibit A</u>, as of September 30, 2011, the Trustee had requested and SIPC had advanced over $1.2 billion, of which approximately $785.3 million was used to pay allowed customer claims up to the maximum SIPA statutory limit of $500,000 per account[4] and $434 million was used for administrative expenses.

10.     The Trustee maintains a regular operating account with Citibank.  As of September 30, 2011, the funds in this account totaled over $23 million.

11.     The Trustee maintains an Insured Money Market account with Citibank.  As of September 30, 2011, the total value of this account was over $135 million.

12.     The Trustee maintains a preferred custody interest-bearing account with Citibank. As of September 30, 2011, the balance of the preferred custody account was over $881 million, which consisted of $871 million in United States Treasury Bills and over $10 million in cash assets and mutual funds.

13.     The Trustee maintains a second preferred interest-bearing account with Citibank. As of September 30, 2011, the balance in the second preferred custody account was over $1 billion, which consisted of short-term investments in United States Treasury Bills and mutual funds.

14.     The Trustee maintains a brokerage account with Morgan Joseph TriArtisan LLC, (formerly Morgan Joseph & Co., Inc.), clearing through J.P. Morgan Clearing Corp.  As of September 30, 2011, the total value of the Trustee's Morgan Joseph account was approximately $295.9 million.

---

[4] The Trustee must receive an executed assignment and release form from each customer before releasing an advance of funds from SIPC.  Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims that have been determined is less than the amount of SIPC advances committed by the Trustee.

15.    The Trustee maintains a distribution account with Citibank.  As of September 30, 2011, the funds in this account totaled over $313 million.

## IV.    ADMINISTRATION OF THE ESTATE

### A.    Marshaling And Liquidating The Estate Assets

16.    The Trustee and his Counsel have worked diligently to investigate, examine, and evaluate the Debtor's activities, assets, rights, liabilities, customers, and other creditors.  Thus far, the Trustee has been successful in recovering or entering into agreements to recover a significant amount of assets for the benefit of customers, totaling approximately $8.7 billion. For a more detailed discussion of prior recoveries, *see* Section V.B. of the First Interim Report, Section IV of the Second, Amended Third, and Fourth Interim Reports, and Section VII of the Fifth Interim Report.

17.    The Trustee has identified claims in at least eight derivative shareholder class action suits that BLMIS filed before the Trustee's appointment arising out of its proprietary and market making desk's ownership of securities.  As of the Sixth Interim Report, the Trustee had received distributions from seven of these class action settlements totaling over $91,000.  The Trustee has not and will not receive any distributions from the eighth class action settlement.  In addition, the Trustee has identified claims that BLMIS may have in 101 other class action suits also arising out of its proprietary and market making activities.  The Trustee has filed proofs of claim in seventy-five of these cases and, based on a review of relevant records, declined to pursue claims in twelve additional cases.  Subject to the completion of a review of relevant records, the Trustee intends to file claims in the remaining fourteen cases.  As of September 30, 2011, the Trustee has recovered approximately $288,000 from settlements relating to nineteen of the seventy-five claims filed directly by the Trustee, of which over $66,000 was recovered during this Report Period.

5

18.    On May 16, 2011, the Trustee and B&H filed a Motion for an Order Pursuant to SIPA § 78fff-2(a) and Sections 363 and 105(A) of the Bankruptcy Code Authorizing the Sale of Estate Property seeking the authority to retain an auctioneer to sell an 1958 Aston Martin MK III Drop Head Coupe (the "Aston Martin), title of which was previously held by Peter Madoff. (ECF No. 4069).  The Bankruptcy Court held a hearing on this Motion on June 15, 2010 and entered an Order directing the retention of the auctioneer.  (ECF No. 4165).  On August 19, 2011, the Aston Martin was included in the Monterey Auction in Monterey, California and sold to the highest bidder for $225,000.  (ECF No. 4377).  The proceeds were placed in a bank account maintained by the Trustee for distribution to BLMIS customers.

**B.    Retention Of Professionals**

19.    In addition to the professionals already retained by the Trustee, during this Report Period and pursuant to orders of this Court the Trustee retained Osborne & Osborne, P.A. as special probate counsel in Florida (ECF No. 4018) and UGGC & Associés to represent him in France (ECF No. 4038).

## V.    CLAIMS ADMINISTRATION

**A.    Claims Processing**

**i.    Customer Claims**

20.    In December 2008, the Trustee sought the Court's approval for the implementation of a customer claims process that would accord with SIPA.  In particular, the Court directed the Trustee to publish notice of the commencement of the liquidation proceeding and specified the procedures for filing, determining, and adjudicating customer claims pursuant to the Claims Procedures Order.  (ECF No. 12).  For a detailed overview of that process and the Trustee's reconciliation process, see sections VII of the First, Second, and Amended Third Interim Reports, and section VI of the Fourth and Fifth Interim Reports.

21.     As of September 30, 2011, the Trustee had received 16,518 customer claims and determined or deemed determined all but two of them.  Of those determined, the Trustee allowed 2,419 claims and committed to pay approximately $795 million in cash advances from SIPC.  This is the largest commitment of SIPC funds of any SIPA liquidation proceeding and greatly exceeds the total aggregate payments made in all SIPA liquidations to date.  As of September 30, 2011, the Trustee had allowed over $6.9 billion in customer claims.

22.     Of the remaining determined customer claims, 13,679 were denied, twelve were determined as asserting no claim, and 153 were withdrawn.  253 claims have been "deemed determined," meaning that the Trustee has instituted litigation against those claimants.  The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under Section 502(d) of the Bankruptcy Code.  Accordingly, such claims will not be allowed until the avoidance actions are resolved by settlement or otherwise and the judgments rendered against the claimants in the avoidance actions are satisfied.  The two undetermined customer claims remain under review by the Trustee and Counsel.

**ii.     General Creditor Claims**

23.     As of September 30, 2011, the Trustee had received 427 timely and twenty-one untimely filed secured and unsecured priority and non-priority general creditor claims totaling approximately $1.7 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 427 claims and $1.7 billion, the Trustee has received ninety-four general creditor claims and forty-nine broker-dealer claims totaling approximately $264.9 million.  At this time, the BLMIS estate has no funds from which to make distributions to priority/non-priority general creditors and/or broker dealers, discussed further *infra* in Section IX.B.

### iii.    The Trustee Has Kept Customers Informed Of The Status Of The Claims Process

24.     Throughout the liquidation proceeding, the Trustee has kept customers, interested parties, and the public informed of his efforts by maintaining the Trustee Website, www.madofftrustee.com, a toll-free customer hotline, conducting a Bankruptcy Code § 341(a) meeting of creditors on February 20, 2009, and responding to the multitude of phone calls, e-mails, and letters received on a daily basis, both from claimants and their representatives.

25.     The Trustee Website allows claimants to e-mail their questions directly to the Trustee's professionals, who follow up with a return e-mail or telephone call to the claimants. As of September 30, 2011, the Trustee and his professionals had received and responded to more than 6,100 e-mails via the Trustee Website from BLMIS customers and their representatives.

26.     The toll-free customer hotline provides status updates on claims, addresses claimants' questions or concerns, and offers confirmation to claimants that their claims were received.  As of September 30, 2011, the Trustee, B&H, and the trustee's professionals had fielded more than 7,500 hotline calls from claimants and their representatives.

27.     In sum, the Trustee and his team have endeavored to respond in a timely manner to every customer inquiry and ensure that the customers are as informed as possible about various aspects of the BLMIS proceeding.

### iv.    The Hardship Program

28.     Simultaneously with the commencement of claims administration, the Trustee established the Hardship Program to accelerate the determination of claims and the receipt of SIPC protection up to $500,000 for individual account holders who suffer hardship.   An individual could qualify for the Hardship Program if he or she filed a claim and was: (i) unable to pay for necessary living or medical expenses; (ii) over 65 years old and forced to reenter the

work force after retirement; (iii) declaring personal bankruptcy; (iv) unable to pay for the care of dependents; or (v) suffering from extreme financial hardship beyond the identified circumstances.

29.     As of December 11, 2010, the Trustee had received 394 Hardship Program applications.  The Trustee obtained advances from SIPC and issued 117 checks to hardship applicants with allowed claims.  The Trustee also worked in good faith with approved applicants to reconcile any disputed portions of their claims.  Of the 394 Hardship Program applications received prior to December 11, 2010, the Trustee assessed the information provided and, in the exercise of his discretion, decided not to commence avoidance actions against 249 applicants who submitted applications to the Hardship Program.

30.     The Trustee expanded the Hardship Program with a second phase as he instituted avoidance actions.  The Trustee has consistently expressed that while the law requires the Trustee to pursue avoidance actions to recover customer property, he will not pursue avoidance actions against BLMIS accountholders suffering proven hardship.  Realizing that he could forego an avoidance action only if the accountholder shared their financial information with him, the Trustee announced in November 2010 that the Hardship Program would focus on avoidance action defendants and requested that accountholders come forward to share information regarding their hardship.  Through applications voluntarily submitted to the Hardship Program, the Trustee has worked with a substantial number of accountholders who were subject to avoidance actions to confirm their hardship status and forego the pursuit of an avoidance action.

31.     In the second phase of the Hardship Program, as of September 30, 2011, the Trustee had received 342 Hardship Program applications from avoidance action defendants relating to 219 adversary proceedings.  After reviewing the facts and circumstances presented in

these applications and, in many cases, requesting additional verifying information, to date the Trustee has or is in the process of dismissing 129 avoidance actions against the related defendants. As of September 30, 2011 many of the applications were in various stages of review. The Trustee has also extended the time for applicants to answer or otherwise respond to avoidance action complaints while their hardship applications are pending.

32.    The Trustee established a Hardship Program Hotline with a telephone number and electronic mail address. A large number of potential applicants have been assisted by the Trustee through the use of the Hotline, and the Trustee urges customers to continue using this resource and the Hardship Program if they believe they qualify. Further information and applications are available on the Trustee's website, www.madofftrustee.com.

**B.**    **Objections To Claims Determinations**

33.    As required by the Claims Procedures Order and described in each Determination Letter sent by the Trustee, claimants of BLMIS have thirty days from the mailing of a Determination Letter to object to the Trustee's determination of their claim. Claimants that disagree with the Trustee's determination of their claim must file with the Court a written opposition setting forth the grounds of disagreement and provide the Trustee with the same. A hearing date will be obtained by the Trustee, and claimants will be notified of that date. As of September 30, 2011, 2,310 objections (which includes duplicates, amendments, and supplements) had been filed with the Court. These objections relate to approximately 4,296 unique claims and approximately 1,149 BLMIS accounts.

34.    The following objections, among others, have been asserted: (i) Congress intended a broad interpretation of the term "customer" and the statute does not limit the definition to those who had a direct account with the Debtor; (ii) the Trustee should determine claims based upon the BLMIS November 30, 2008 statement as opposed to the Trustee's Net

10

Investment Method; (iii) claimants should receive interest on deposited amounts; (iv) the Trustee must commence an adversary proceeding against each claimant in order to avoid paying gains on claimants' investments; (v) claimants paid income taxes on distributions and their claims should be adjusted by adding all amounts they paid as income taxes on fictitious profits; (vi) each person with an interest in an account should be entitled to the SIPC advance despite sharing a single BLMIS account; and (vii) there is no legal basis for requiring the execution of a Partial Assignment and Release prior to prompt payment of a SIPC advance.

35.    The Trustee has departed from past practice in SIPA proceedings and paid or committed to pay the undisputed portion of any disputed claim in order to expedite payment of SIPC protection to customers, while preserving their rights to dispute the total amount of their claim.

**C.    Settlements Of Customer Claims Disputes**

36.    The Trustee has continued settlement negotiations with customers who withdrew funds from their BLMIS Accounts within ninety days of the Filing Date.  Such withdrawals are preferential transfers recoverable by the Trustee under Bankruptcy Code §§ 547(b) and 550(a), which are applicable in this proceeding pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3).  To settle potential preference actions against these customers, the Trustee has proposed that the customers agree to authorize the Trustee to deduct the preferential amount from the initial payment advanced by SIPC pursuant to section 78fff-3(a)(1) of SIPA.  The allowed claim is thus calculated based on the amount of money the customer deposited with BLMIS for the purchase of securities, less subsequent withdrawals, plus the preferential amount.  The customer will be entitled to receive an additional distribution from the Customer Fund based on the total amount of the allowed claim.  *See* Section IX for information about the Trustee's initial distribution of over $325 million to BLMIS customers.

37.     As of September 30, 2011, the Trustee had reached agreements with approximately 440 customers, recovering over $1.7 billion in litigation, pre-litigation, and avoidance action settlements.  These litigation, pre-litigation, and avoidance action settlements have allowed the Trustee to avoid the litigation costs that would have been necessary to obtain and collect judgments from these customers.

## VI.     PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA

### A.     Net Equity Dispute

38.     For purposes of determining each customer's "net equity," as that term is defined under SIPA, the Trustee credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the "Trustee's Net Investment Method").  Some claimants argued that the Trustee is required to allow customer claims in the amounts shown on the November 30, 2008 customer statements (the "Net Equity Dispute").

39.     This Court issued a decision on March 1, 2010 upholding the Trustee's Net Investment Method as the only interpretation consistent with the plain meaning and legislative history of the statute, controlling Second Circuit precedent, and considerations of equity and practicality.  (ECF No. 2020); *In re Bernard L. Madoff Inv. Securities LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).  The Court certified an immediate appeal to the United States Court of Appeals for the Second Circuit (ECF No. 2467), which heard oral argument on March 3, 2011.

40.     On August 16, 2011, the Second Circuit affirmed the Bankruptcy Court's decision and the Trustee's Net Investment Method, holding that it would have been "legal error" for the Trustee to discharge claims for securities under SIPA "upon the false premise that customers' securities positions are what the account statements purport them to be."  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 241 (2d Cir. 2011).  Any calculation other than the Net

12

Investment Method would "aggravate the injuries caused by Madoff's fraud." *Id.* at 235. Instead, the Net Investment Method prevents the "whim of the defrauder" from controlling the process of unwinding the fraud. *Id.* at 241.

41.    Under the Second Circuit's decision, the relative position of each BLMIS customer account must be calculated based on "unmanipulated withdrawals and deposits" from its opening date through December 2008. *Id.* at 238. If an account has a positive cash balance, that accountholder is owed money from the estate. As a corollary, if an account has a negative cash balance, the accountholder owes money to the estate. Both the recovery and distribution of customer property in this case are centered on the principle that the Trustee cannot credit "impossible transactions." If he did, then "those who had already withdrawn cash deriving from imaginary profits in excess of their initial investment would derive additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed." *Id.*

42.    First, the Second Circuit found, "in the context of this Ponzi scheme—the Net Investment Method is . . . more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud . . . and 'avoid[s] placing some claims unfairly ahead of others.'" *Id.* at 242 n.10 (quoting *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 463 (S.D.N.Y. 2001)). Thus, the Trustee is obligated to use the avoidance powers granted by SIPA and the Bankruptcy Code to prevent one class of customers— the "net winners" or those with avoidance liability—from having the benefit of Madoff's fictitious trades at the expense of the other class of customers—the "net losers" or those who have yet to recover their initial investment.

43.    Second, the Circuit explained that "notwithstanding the BLMIS customer statements, there were no securities purchased and there were no proceeds from the money entrusted to Madoff for the purpose of making investments." *Id.* at 240. Therefore any

"[c]alculations based on made-up values of fictional securities would be 'unworkable' and would create 'potential absurdities.'" *Id*. at 241 (quoting *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 88 (2d Cir. 2004)). Thus, the Circuit rejected reliance upon the BLMIS account statements, finding that, to do otherwise, "would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations." *Id.* at 235.

44.     On September 6, 2011, certain claimants filed a petition for panel rehearing, or, in the alternative, for rehearing *en banc*. *See* No. 10-2378 (ECF Nos. 505, 537). The panel that determined the appeal considered the request for panel rehearing, and the active members of the Court considered the request for rehearing *en banc*, and, on November 8, 2011, both denied the petition. (ECF No. 551).

## B.     "Customer" Definition

45.     The Trustee's position is that only those claimants who maintained an account at BLMIS constitute "customers" of BLMIS, as defined in section 78*lll*(2) of SIPA. Where it appears that claimants did not have an account in their names at BLMIS ("Claimant Without An Account"), they are not customers of BLMIS under SIPA and the Trustee has denied their claims for securities and/or a credit balance.

46.     On June 11, 2010, the Trustee filed a Motion For An Order To Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds. (ECF Nos. 2410-2413, 2416). The Motion addressed only those claimants whose claims emanated from their direct or indirect investments in sixteen so-called Feeder Funds that, in turn, had accounts with and invested directly with BLMIS.[5]

---

[5] Claims of employee benefit plans that contended they were subject to ERISA were excluded from the Motion, even if they had invested in one of the Feeder Funds, *see* ECF No. 3062, pp. 10-11, and will have the objections to their claims denials adjudicated shortly. (Motion for an

47.     This Court held a hearing on October 19, 2010.  On June 28, 2011, the Court issued a Memorandum Decision and Order affirming the Trustee's denial of these claims, (ECF Nos. 3018, 4193, 4209); *Sec. Inv. Protection Corp. v. Bernard L. Madoff Investment Sec. LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011).

48.     This Court found that, in light of the plain language of SIPA and relevant case law, the investor-claimants did not qualify as "customers" under SIPA.  The Court found that the objecting claimants invested in, not through, the Feeder Funds, and had no individual accounts at BLMIS.  It was the Feeder Funds who entrusted their monies with BLMIS for the purpose of trading or investing in securities—the touchstone of "customer" status—whereas the objecting claimants purchased ownership interests in the Feeder Funds.  The Court held that, absent a direct broker-dealer relationship with BLMIS, the objecting claimants sought a definition of "customer" that stretched the term beyond its limits.

49.     The Court put it succinctly: the objecting-claimants who invested in sixteen feeder funds did not qualify as "customers" because they "had no securities accounts at BLMIS, were not known to BLMIS, lacked privity and any financial relationship with BLMIS, lacked property interests in any Feeder Fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment discretion over Feeder Fund assets invested with BLMIS, received no accounts statements or other communications from BLMIS and had no transactions reflected on the books and records of BLMIS . . ." *Sec. Inv. Protection Corp.*, 454 B.R. at 290.

50.     Twenty-seven Notices of Appeal were filed and the appeals are pending before United States District Judge Denise L. Cote.  *See* No. 11 Civ. 05683 (S.D.N.Y.) (DLC).

---

Order to Schedule Hearing on "Customer" Issue as it Relates to ERISA, ECF No. 4432; ERISA Scheduling Order, ECF No. 4507).

## VII.    RECOVERIES AND CONTINGENCIES

### A.    Recoveries Accomplished During Prior Report Periods

51.    In the Fifth Interim Report, the Trustee reviewed the significant settlements entered into during that and prior report periods.  Prior to this Report Period, the Trustee had recovered over $7.6 billion for the benefit of BLMIS customers.  Fifth Interim Report ¶¶ 54-64.

### B.    Recoveries Accomplished During This Report Period

52.    During this Report Period, the Trustee settled fourteen cases for a minimum payment of over $56 million.

53.    In addition, on September 22, 2011, this Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, "Tremont") in the amount of $1.025 billion.  *Picard v. Tremont Group Holdings, Inc.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y.) (BRL) (ECF No. 38).  In this settlement, Tremont agreed to deliver $1.025 billion into an escrow account, which will ultimately be placed into the Customer Fund.  Upon the release of the settlement payments from the escrow account, the Trustee will allow certain customer claims related to Tremont.  Two objections to the settlement agreement were filed by non-BLMIS customers, both of which were overruled by this Court.  Following entry of this Court's Order Granting Trustee's Motion for Entry of Order Approving Agreement (ECF No. 38), certain objectors filed an appeal of the settlement on September 30, 2011 (ECF No. 40) that is pending before United States District Judge George B. Daniels.  *See* No. 11 Civ. 7330 (S.D.N.Y.) (GBD).

54.    On June 10, 2011, this Court approved a settlement agreement between the Trustee and the Joint Liquidators for Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited (collectively, the "Fairfield Funds").  *Picard v. Fairfield Sentry et al.*,

Adv. Pro. No. 09-1239 (Bankr. S.D.N.Y.) (BRL) (ECF No. 95).  On July 13, 2011, the Court

entered consent judgments between the Trustee and Fairfield Lambda Limited in the amount of

$52.9 million (ECF No. 108), Fairfield Sentry Limited in the amount of $3.054 billion (ECF No.

109) and Fairfield Sigma Limited in the amount of $752.3 million (ECF No. 110).  One

objection was filed by plaintiffs in a derivative action allegedly on behalf of Fairfield Sentry

Limited, which was overruled by this Court on June 7, 2011.  (ECF. No. 92).

55.    Under the terms of this settlement, Fairfield Sentry Limited agreed to permanently

reduce its net equity claim from approximately $960 million to $230 million.  Additionally, the

Joint Liquidator for the Fairfield Funds agreed to make a $70 million payment to the Customer

Fund.  The Joint Liquidator also agreed to assign to the Trustee all of the Fairfield Funds' claims

against the Fairfield Greenwich Group management companies, officers, and partners; the

Trustee retained his own claims against the management defendants.  Further, the Trustee and

the Liquidators agreed to share future recoveries in varying amounts, depending on the nature of

the claims.  On or about July 8, 2011, Fairfield Sentry transferred $16 million to the Trustee, and

the Trustee allowed Fairfield Sentry's claim of $78 million.  When the remaining $46 million is

paid, the Trustee will increase the allowed claim by $152 million to $230 million.

56.    On July 7, 2011, this Court approved a settlement between the Trustee,

Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. (collectively, the "Greenwich

Funds"), wherein this Court entered judgment against Greenwich Sentry, L.P. in an amount over

$206 million and against Greenwich Sentry Partners, L.P. in an amount over $5.9 million.

*Picard v. Fairfield Sentry et al.*, Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y.) (BRL) (ECF No.

107).  Three objections were filed to the proposed settlement agreement, but were subsequently

withdrawn prior to this Court's July 7, 2011 Order.  In this settlement, the Greenwich Funds

agreed to permanently reduce their net equity claim from approximately $143 million to over

$37 million, for a combined reduction of over $105.9 million.   Additionally, the Greenwich

Funds assigned the Trustee all of their claims against Fairfield Greenwich Group management,

as well as agreed to share with the Trustee any recoveries they accomplish against service

providers.

57.      To implement this settlement agreement, the Court must confirm the plan in the

jointly administered Chapter 11 proceeding of Greenwich Sentry, L.P. and Greenwich Sentry

Partners, L.P.  *In re Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P.*, Adv. Pro. No.

10-16229 (Bankr. S.D.N.Y.) (BRL).   The plan confirmation hearing is scheduled for December

22, 2011.

58.      Thus, the Trustee entered into settlement agreements during this Report Period

that, once approved by this Court, will bring over $1.1 billion into the Customer Fund.

## C.      Appeals Of Earlier Settlements

59.      On February 18, 2010, this Court approved a pre-litigation settlement between the

Trustee and the Estate of Norman F. Levy.  (ECF No. 1964).   This settlement resulted in the

return of $220 million (the "Levy Settlement").   On February 18, 2011, certain customers moved

to set aside the Court's Order approving the Levy settlement.   (ECF No. 3861).   The Court

denied the motion (ECF No. 3984), and the claimants filed an appeal on April 11, 2011.  (ECF

No. 4005).   The parties fully briefed the appeal during this Report Period and the matter remains

pending before United States District Judge Deborah A. Batts.   *See* No. 11 Civ. 03313

(S.D.N.Y.) (DAB).   Accordingly, the Trustee must reserve these funds pending the appeal.

60.      Through the end of this Report Period, the Trustee recovered over $272 million as

a result of preference and other settlements that were made pursuant to agreements subject to the

Net Equity Dispute.   While the Second Circuit has rendered its decision on the Net Equity

Dispute, the Trustee must maintain those funds in reserve until there is a final, nonappealable order on the Net Equity Dispute.

61.    On January 13, 2011, this Court entered an Order approving the $5 billion settlement between the Trustee and the Estate of Jeffry M. Picower (the "Picower Settlement Order"). *Picard v. Picower*, Adv. Pro. No. 09-01197 (Bankr. S.D.N.Y.) (BRL). BLMIS claimants Adele Fox ("Fox") and Susanne Stone Marshall ("Marshall"), who brought actions against Picower in Florida, appealed the Picower Settlement Order. (ECF No. 45, 49). The appeals, briefed by the Trustee during this Report Period, will be heard on November 28, 2011 by United States District Judge John G. Koeltl. *See* No. 11 Civ. 01328 (S.D.N.Y.) (JGK).

62.    The Government's forfeiture action against Jeffry M. Picower resulted in the additional recovery of more than $2.2 billion (the "Picower Forfeiture") and is intertwined with the Trustee's Picower settlement. *$7,206,157,717 On Deposit at JPMorgan Chase, NA in the Account Numbers Set Forth on Schedule A*, No. 10 Civ. 09398 (S.D.N.Y.) (TPG). On January 14, 2011, Fox filed both a Motion to Intervene in that action and a claim against the Picower Forfeiture funds, which the Government opposed. (ECF Nos. 6-8, 10, 14). On May 23 and 24, 2011, the Honorable Thomas P. Griesa denied Fox's Motion and claim and entered a final order of forfeiture in favor of the United States. (ECF No. 17). On July 18, 2011, Fox filed a notice of appeal and an appellate brief, which is pending before the Second Circuit. (No. 11-2898 (2d Cir.)).

63.    The Trustee will receive the Picower settlement through entry of either a final, nonappealable order approving the Picower Settlement or a final, nonappealable order of forfeiture in the Government's action. Upon either event, the Trustee will seek the transfer of $5 billion to the BLMIS estate and Customer Fund.

## VIII.   LITIGATION

64.    In addition to the decisions relating to the interpretation of SIPA by this Court and the Second Circuit, summarized above, there have been major developments during this Report Period in the Bankruptcy Court and District Court in the avoidance actions, "bad faith" avoidance actions, and bank/feeder fund litigation.

### i.    The Bankruptcy Court

### (a)    Case-Wide Procedures

65.    During this Report Period, the Trustee filed several motions before this Court to establish procedures to ensure the efficient administration of hundreds of proceedings against more than four thousand defendants located in at least thirty countries.  These procedures will ensure compliance with the Bankruptcy Code and SIPA, consistency, and transparency.

66.    Prior to this Report Period, the Trustee, B&H attorneys, counsel for WNBC-TV, NBC News, CNBC, and the New York Times Company, and counsel for various interested defendants worked to determine whether certain information contained in the Trustee's complaints would remain under seal or redacted in accordance with the procedures established by the Court's November 10, 2010 Order Approving the Litigation Case Management Procedures (the "Litigation Procedures Order").  On April 12, 2011, the Court entered an Order directing the Trustee to unseal certain information relating to the financial institutions and maintain the seal on certain information relating to charitable organizations.  (ECF No. 4009).

67.    On April 26, 2011, certain BLMIS claimants filed a Motion to Compel the production of a report of the Trustee's investigative activities and financial affairs of BLMIS.  (ECF No. 4045).  B&H attorneys opposed the Motion as a premature and improper discovery demand, and the Court denied the Motion on these grounds on June 21, 2011.  (ECF No. 4180).  The claimants filed a Motion for Leave to Appeal the Court's Order, which was denied by the

20

District Court on August 18, 2011.  *See* No. 11 MC 00277 (S.D.N.Y.) (RMB) (ECF No. 5).  In

that decision, the Court noted that "questions that arise during the course of the bankruptcy

proceeding concerning the appropriate scope of discovery and that do not involve controlling

questions of law are left to the sound discretion of the court that is fully familiar with the entire

proceeding – the bankruptcy judge."  *Id.* at 4 (internal quotation and citation omitted).

68.     On February 24, 2011, the Trustee and B&H filed a Motion for an Order

Establishing Procedures for Electronic Data Rooms.  (ECF No. 3869).  The Trustee seeks to

allow discovery for all adversary proceedings of certain documents supporting some of the key

elements of the Trustee's claims, while balancing the privacy interests of BLMIS customers and

others.  A renewed Motion for An Order Establishing Procedures for Electronic Data Rooms was

filed on August 5, 2011.  (ECF No. 4290).  A hearing on the Motion is scheduled to be held on

December 21, 2011.

69.     On March 14, 2011, the Trustee and B&H filed a Motion for Entry of a Litigation

Protective Order to govern the use of confidential materials in the adversary proceedings.  (ECF

No. 3928).  A hearing on the Motion was held on June 1, 2011, during which the remaining

disagreements were settled on the record.  The Court entered the Order on June 6, 2011.  (ECF

No. 4137).  On August 5, 2011, the Trustee submitted a Motion for An Order Modifying the

June 6, 2011 Litigation Protective Order that would allow the Trustee to use the Electronic Data

Rooms in the adversary proceedings.  (ECF No. 4290).  A hearing on this Motion is scheduled to

be held on December 21, 2011.

70.     On July 25, 2011, the Trustee and B&H filed a Motion for an Order Setting Time

to Respond to the Summons and Complaint for Foreign Defendants in Adversary Proceedings to

facilitate the procedural aspects of adversary proceedings involving defendants located outside

the United States. (ECF No. 4268). Once the Trustee effectuates service on those foreign defendants, the defendants have thirty days from that date to answer the complaints. The Court entered the Order on August 9, 2011. (ECF No. 4295).

71. On August 5, 2011, the Trustee and B&H filed a Motion for a Report and Recommendation to the District Court for the Appointment of Special Discovery Masters. (ECF No. 4290). The Trustee seeks the appointment of two Masters to assist in resolving the numerous discovery disputes that will arise in the adversary proceedings. A hearing on the Motion is scheduled to be held on December 21, 2011.

### (b)    Picard v. Cohmad Sec. Corp.

72. On June 22, 2009, the Trustee and B&H commenced an adversary proceeding against Madoff-insiders Cohmad Securities Corporation, Maurice ("Sonny") J. Cohn, Marcia B. Cohn, and several other defendants (the "Cohmad Defendants"). *Picard v. Cohmad Sec. Corp.*, Adv. Pro. No. 09-01305 (Bankr. S.D.N.Y.) (BRL). The Complaint seeks to avoid and recover of fictitious profits withdrawn by the Cohmad Defendants and the return of commissions and fees transferred directly from BLMIS to Sonny Cohn and Cohmad. On October 8, 2009, the Trustee filed an Amended Complaint. (ECF No. 82). The Cohmad Defendants filed numerous Motions to Dismiss, which the Trustee and B&H opposed. (ECF No. 135).

73. On August 1, 2011, the Bankruptcy Court filed its Memorandum Decision and Order Denying Defendants' Motions to Dismiss Trustee's Complaint. (ECF No. 209). The Court found that the Trustee adequately pled that the transfers received by the Cohmad Defendants in excess of their principal were not transferred for reasonably equivalent value, and Cohmad and Sonny Cohn lacked good faith in receiving commissions from Madoff. *Picard v. Cohmad Sec. Corp.*, 2011 WL 3274077, at *10 (Bankr. S.D.N.Y. Aug. 1, 2011).

22

74.    Certain of the Cohmad Defendants filed a Motion for Leave to Appeal, (ECF No. 212-213), briefed by the Trustee and B&H during this Report Period, which is pending before United States District Judge Thomas P. Griesa.  *See* No. 11 MC 00337 (S.D.N.Y.) (TPG).

### (c)    Picard v. Peter B. Madoff, et al.

75.    On October 2, 2009, the Trustee and B&H commenced an adversary proceeding against Peter Madoff, Andrew Madoff, Shana Madoff, and Mark Madoff (the "Family Defendants").[6]  *Picard v. Peter B. Madoff*, Adv. Pro. No. 09-01503 (Bankr. S.D.N.Y.) (BRL). The Complaint seeks to avoid and recover preferential transfers, fraudulent transfers, and damages for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting.  On March 15, 2010, the Family Defendants filed a Motion to Dismiss the Complaint.  (ECF Nos. 13-19).  The Trustee and B&H opposed the Motion.  (ECF No. 25).

76.    On September 22, 2011, the Bankruptcy Court filed its Memorandum Decision And Order Denying In Part And Granting In Part Defendants' Motion To Dismiss Trustee's Complaint.  (ECF No. 55); *Picard v. Peter B. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, --- F.3d ---, 2011 WL 4434632 (Bankr. S.D.N.Y. Sept. 22, 2011).  The Court upheld the Trustee's common law claims for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting.  In so doing, the Court determined that the Trustee's common law claims: (i) were not barred by the doctrine of *in pari delicto* or the related *Wagoner* Rule because the Family Defendants were alleged to be insiders and fiduciaries of BLMIS; and (ii) were not preempted by the Martin Act because those claims were unrelated to the fraudulent investment advice given by Madoff to customers of the IA Business.  The Bankruptcy Court also ruled that

---

[6] The Estate of Mark Madoff was substituted in the proceeding after Mark Madoff's death in December 2010, and Andrew Madoff was named the Executor of the Estate of Mark Madoff. (ECF No. 47).

because the New York Attorney General has no enforcement power under the Martin Act to bring the types of claims asserted in the Trustee's Complaint, which do not require proof of scienter, the common law claims would not interfere with the Martin Act's statutory enforcement mechanism.

77.    The Bankruptcy Court dismissed the Trustee's claims seeking to recover actual fraudulent transfers, certain of the Trustee's claims based upon a theory of constructive fraud, claims seeking to recover preference transfers, claims seeking to recover subsequent transfers, and claims seeking to recover based on a theory of the Family Defendants' conversion.  The Court dismissed these claims for a failure to identify the transfers with the requisite particularity, noting that "[r]ectifying the majority of these pleading deficiencies upon amendment should not prove to be a Herculean task."  *In re Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 4434632 at *7. The Court granted leave to the Trustee to amend his complaint.

78.    On October 6, 2011, Andrew Madoff and the Estate of Mark Madoff filed a Motion for Leave to Appeal the Bankruptcy Court's decision, (ECF No. 56-57), which is pending before United States District Judge William H. Pauley, III.  *See* No. 11 MC 00379 (S.D.N.Y.) (WJP).  Oral argument on the Motion is scheduled for November 22, 2011.

79.    The Trustee filed an Amended Complaint on November 7, 2011 that identified the date and amount of each transfer alleged in the action.  (ECF No. 64).  The Amended Complaint also increased the amount sought from the Family Defendants from over $198 million to over $226 million.  This increase is due, in part, to the Trustee's investigation of the compensation received by Messrs. Andrew and Mark Madoff from the proprietary trading and market-making business that came, in some measure, from BLMIS customer money, transferred from BLMIS's

IA business to Madoff's London-based entity, Madoff Securities International Ltd. ("MSIL"), then to Messrs. Andrew and Mark Madoff as "commission income."

### ii.    The District Court

#### (a)    Picard v. J. Ezra Merkin, et al.

80.    On May 7, 2009, the Trustee and B&H commenced an adversary proceeding against sophisticated money manager and Madoff associate J. Ezra Merkin and his funds, Gabriel Capital, L.P., Ariel Fund Ltd., Ascot Partners, L.P., and Gabriel Capital Corporation (collectively, the "Merkin Defendants").  *Picard v. J. Ezra Merkin*, Adv. Pro. No. 09-01182 (Bankr. S.D.N.Y.) (BRL).  The Complaint alleges that Merkin knew or should have known that Madoff's IA business was predicated on fraud, and seeks the avoidance and recovery of almost $500 million in preference payments and fraudulent transfers from the Merkin Defendants.  On August 6, 2009, the Trustee and B&H filed an Amended Complaint.  (ECF No. 10).

81.    On November 4, 2009, Bart M. Schwartz, as Receiver ("Receiver") of defendants Ariel Fund Limited and Gabriel Capital, L.P., filed a Motion to Dismiss the Complaint, as did the remaining defendants to the proceeding.  (ECF No. 16, 22).  The Trustee opposed the Motions.  (ECF No. 29-30).  The Trustee and B&H received leave to file a Second Amended Complaint, (ECF No. 46), and did so on December 23, 2009 (ECF No. 49).  The Merkin Defendants renewed their Motions to Dismiss (ECF No. 53, 55), which the Trustee opposed (ECF No. 62-63).

82.    On November 17, 2010, the Bankruptcy Court filed its Memorandum Decision and Order Granting in Part and Denying in Part Defendants' Motions to Dismiss Trustee's Complaint.  (ECF No. 84); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010).  The Court first held that the Trustee sufficiently pleaded his federal and state law claims seeking to avoid and to recover actual fraudulent transfers.  The

Court also held that the Funds were not, at the pleading stage, entitled to dismissal of the
Bankruptcy Code-based actual fraudulent transfer claims pursuant to the 548(c) "good faith
transferee" affirmative defense.  Second, the Bankruptcy Court held that the Trustee sufficiently
pleaded his federal and state law claims seeking to avoid and to recover constructive fraudulent
transfers.  In addition, the Bankruptcy Court held that the Funds were not, at the pleading stage,
entitled to dismissal of the Bankruptcy Code-based constructive fraudulent transfer claims
pursuant to the 546(e) "safe harbor" affirmative defense.

83.    The Receiver filed a Motion for Leave to Appeal the Court's Memorandum
Decision and Order.  (ECF No. 90); 11 MC 00012 (S.D.N.Y.) (KMW).  On August 31, 2011,
United States District Judge Kimba M. Woods denied the Motion.  *Picard v. Merkin* (*In re
Bernard L. Madoff Inv. Sec. LLC*), No. 11 MC 00012, 2011 WL 3897970 (S.D.N.Y. Aug. 31,
2011).  Judge Wood found that there were no "substantial grounds for difference of opinion as to
the correctness of the standards relied on by the Bankruptcy Court in its refusal—at the pleading
stage—to dismiss on the grounds of [the Merkin Defendants'] § 546(e) affirmative defense." *Id.*
at *12.  In doing so, Judge Wood noted that the Merkin Defendants cited "no decision in which a
Ponzi scheme operator, who allegedly did not execute any trades, was deemed at the pleading
stage to be a 'stockbroker' for purposes of § 546(e)." *Id.*  Nor, Judge Wood noted, had the
defendants cited any "decision in which an agreement was deemed to be a 'securities contract'
within the meaning of the Bankruptcy Code, where that agreement (a) merely authorized one
party to conduct future trades on behalf of another party, and (b) did not, by its terms, effect the
purchase, sale, or loan of a security between the parties." *Id.* at *25.

84.    The case is now proceeding in the Bankruptcy Court, and a pre-trial conference
was held on November 8, 2011.

26

**(b)      The HSBC Action**

85.      On July 15, 2009, the Trustee and B&H commenced an adversary proceeding against a handful of HSBC entities and international feeder funds in the financial services industry that transferred funds to and from BLMIS. *Picard v. HSBC Bank plc*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (BRL) (the "HSBC Action"). After further investigation, the Trustee filed an Amended Complaint on December 5, 2010, expanding the pool of defendants to thirteen HSBC entities and forty-eight individuals and entities, and alleging that over 33% of all monies invested in Madoff's Ponzi scheme were funneled by and through these defendants. (ECF No. 35).

86.      The thirteen HSBC-related defendants and, separately, UniCredit S.p.A. and Pioneer Alternative Investment Management Limited moved to withdraw the reference. On April 14, 2011, United States District Judge Jed S. Rakoff withdrew the reference to consider the Trustee's standing to assert common law claims. (ECF No. 19, 23).

87.      On May 3, 2011, the same defendants filed Motions to Dismiss. (ECF Nos. 24-27). The Trustee and SIPC opposed the Motions. (ECF Nos. 32-36). On July 28, 2011, the District Court dismissed the Trustee's common law claims, holding that the Trustee lacked standing, under any theory, to assert them. *Picard v. HSBC Bank plc*, 454 B.R. 25, 37-38 (S.D.N.Y. 2011). This reduced the Trustee's claims in the HSBC Action from approximately $8.9 billion to less than $2.2 billion. The Court returned the remainder of the HSBC Action to the Bankruptcy Court for further proceedings.

**(c)      The J.P. Morgan and LuxAlpha Actions**

88.      On December 2, 2010, the Trustee and B&H commenced an action against J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd (the "J.P. Morgan Defendants"). *Picard v. JPMorgan Chase*, Adv. Pro.

No. 10-04932 (Bankr. S.D.N.Y.) (BRL) (the "J.P. Morgan Action").  Because the Complaint was

initially filed under seal, the Trustee subsequently filed versions of the Complaint that removed

the redactions as to certain information on February 3, 2011 and April 14, 2011.

89.    On February 8, 2011, the J.P. Morgan Defendants moved for withdrawal of the

reference.  No. 11 Civ. 00913 (S.D.N.Y.) (CM).  The District Court granted the Motion on May

4, 2011.  (ECF No. 30).

90.    On November 23, 2010, the Trustee and B&H commenced an action against UBS

AG, numerous other UBS entities (together, the "UBS Defendants"), Access International

Advisors LLC, numerous other Access entities, and several individuals.  *Picard v. UBS AG*, Adv.

Pro. No. 10-04285 (Bankr. S.D.N.Y.) (BRL) (the "Luxalpha Action").  On June 21, 2011, the

UBS Defendants moved for withdrawal of the reference.  No. 11 Civ. 04212 (S.D.N.Y.) (CM).

On July 14, 2011, the District Court accepted the LuxAlpha Action as related to the J.P. Morgan

Action.

91.    On July 3, 2011, the J.P. Morgan Defendants filed a Motion to Dismiss.  (ECF

Nos. 32-34).  On August 1, 2011, the UBS Defendants filed a Motion to Dismiss.  (ECF Nos. 17,

18).  The Trustee filed an Amended Complaint in the J.P. Morgan Action on June 24, 2011.

(ECF No. 50).  The Trustee filed an Amended Complaint in the LuxAlpha Action on August 17,

2011.  (ECF No. 23).  On August 1, 2011, the J.P. Morgan Defendants renewed their Motion to

Dismiss.  (ECF Nos. 56-58).  The Trustee and SIPC opposed the Motions.  (J.P. Morgan, ECF

Nos. 61-66; LuxAlpha, ECF No. 27).

92.    On November 1, 2011, the District Court dismissed the Trustee's common law

claims in both the J.P. Morgan and LuxAlpha Actions.  (J.P. Morgan, ECF No. 70; LuxAlpha,

ECF No. 36); *Picard v. J.P. Morgan Chase & Co.*, No. 11 Civ. 00913, 2011 WL 5170434

(S.D.N.Y. Nov. 1, 2011) (CM).   The Court returned the remainder of the Actions to the Bankruptcy Court for further proceedings.

93.     On November 10, 2011, the Trustee filed in the J.P. Morgan Action a motion to direct entry of final judgment under Federal Rule of Civil Procedure 54(b) as to Counts Twenty-One through Twenty-Eight of the Amended Complaint.  (ECF Nos. 71, 72).

### (d)     The Kohn Action

94.     On December 10, 2010, the Trustee and B&H commenced an adversary proceeding against Sonja Kohn, Bank Medici, UniCredit Bank Austria AG, UniCredit S.p.A., and dozens of individuals, trusts, and nominee companies that the Trustee alleges masterminded a vast illegal scheme and conspired to feed over $9.1 billion of other people's money into Madoff's Ponzi scheme.  *Picard v. Kohn*, Adv. Pro. No. 10-05411 (Bankr. S.D.N.Y.) (BRL) (the "Kohn Action").  On February 3, 2011, the Trustee filed an Amended Complaint.

95.     On February 22, 2011, UniCredit S.p.A. moved to withdraw the reference.  No. 11 Civ. 01181 (S.D.N.Y.) (JSR).  The Trustee and SIPC opposed the Motion.  (ECF No. 15-17). United States District Judge Jed S. Rakoff granted the Motion on June 6, 2011 to consider the Trustee's standing to assert common law claims, as well as to consider whether the Trustee's RICO claims against UniCredit S.p.A. are otherwise barred.  (ECF Nos. 34, 55, 56).

96.     On July 25, 2011, certain defendants filed Motions to Dismiss the RICO and common law claims.  (ECF Nos. 38-41, 44-47, 49-50).  The Trustee and SIPC opposed the Motions.  (ECF Nos. 51-54).  Oral argument was held on October 5, 2011, and the Court reserved decision.

**(e)**    **Motions to Withdraw the Reference In
Avoidance Actions**

97.    In addition to the District Court's withdrawal of the reference in certain bank and

feeder fund actions described above, each of which implicated issues of the Trustee's standing to

bring common law claims, defendants in avoidance actions against whom no common law

claims were asserted have filed motions to withdraw the reference of the Trustee's avoidance

actions.

**(1)**    **The Katz-Wilpon Action**

98.    On December 7, 2010, the Trustee and B&H commenced an adversary

proceeding against Saul Katz, Fred Wilpon, and dozens of individuals, trusts, and entities

seeking approximately $1 billion.  *Picard v. Saul B. Katz*, Adv. Pro. No. 10-05287 (Bankr.

S.D.N.Y.) (BRL) (the "Katz-Wilpon Action").  The Complaint seeks to avoid and recover

fictitious profits, as well as principal investments made by the Katz-Wilpon Defendants, because

the Trustee alleges that they knew or should have known that Madoff's IA business was

predicated on fraud.

99.    On May 26, 2011, the Katz-Wilpon Defendants moved for withdrawal of the

reference.  No. 11 Civ. 03605 (S.D.N.Y.) (JSR) (ECF No. 1).  On July 5, 2011, the District Court

withdrew the reference to consider:    (i) whether, in connection with the Katz-Wilpon

Defendants' affirmative defense of good faith to the Trustee's fraudulent conveyance claims,

SIPA (which incorporates the Bankruptcy Code) and the NYDCL improperly impose a

retroactive duty of inquiry on the Katz-Wilpon Defendants that they did not previously have

under federal securities laws; (ii) whether the Katz-Wilpon Defendants were owed an antecedent

debt by BLMIS as set forth on their customer statements that would preclude the Trustee's

fraudulent conveyance claims; and (iii) whether Bankruptcy Code § 546 provides a "safe harbor"

for the fraudulent transfers made by BLMIS to the Katz-Wilpon Defendants.  (ECF No. 19; ECF No. 33, Tr. 32-34).

100.    On July 7, 2011, the Katz-Wilpon Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment.  (ECF Nos. 20-28).  The Trustee and SIPC opposed the Motion.  (ECF Nos. 29-32).

101.    On September 27, 2011, the District Court dismissed the Trustee's claims based on constructive fraud under the Bankruptcy Code, actual and constructive fraud under the New York Debtor & Creditor Law, and for recovery of subsequent transfers pursuant to § 550 of the Code, holding that the "safe harbor" affirmative defense set forth in Bankruptcy Code § 546(e) is a bar—at the pleading stage—to those claims.  (ECF No. 40); *Picard v. Katz*, --- F.Supp.2d ----, 2011 WL 4448638 (S.D.N.Y. Sept. 27, 2011).  This decision reduced the Trustee's claims in the Katz-Wilpon Action from approximately $1 billion to less than $400 million.  In addition, in connection with the Trustee's fraudulent conveyance claims, the decision articulated a new heightened subjective standard of "willful blindness" that appears to be akin to a "conscious avoidance" standard derived from the criminal law context.  Finally, the Court held as a matter of law that Bankruptcy Code § 502(d) is "overridden" in a SIPA proceeding by SIPA §78fff-2(c)(3).

102.    On October 9, 2011, the Trustee and SIPC filed Motions requesting the District Court to direct entry of final judgment under Federal Rule of Civil Procedure 54(b) on Counts Two through Ten of the Amended Complaint and to certify to the Court of Appeals under 28 U.S.C. § 1292(b) an interlocutory appeal of the Court's rulings concerning "willful blindness" with respect to the Trustee's remaining claims.  (ECF Nos. 45-47).  The Motions remain pending before the District Court.

103.    Briefing on the proper calculation of the Katz-Wilpon Defendants' avoidance liability and the Trustee's right to a jury followed.  (ECF Nos 50-53, 60-63).  The Court entered a Case Management Plan, and a trial is scheduled to begin on March 19, 2012.  (ECF No. 42).

**(2)    Other Motions to Withdraw the
Reference in Avoidance Actions**

104.    As of the date of this Report, defendants in 264 avoidance actions commenced by the Trustee in the Bankruptcy Court have filed forty-six motions to withdraw the reference.

105.    For example, on June 2, 2011, James Greiff, a defendant in a "good faith" avoidance action, moved for withdrawal of the reference of the Trustee's avoidance action that sought the return of over $2.8 million in fictitious profits Greiff received from BLMIS within six years of the Filing Date.  *Picard v. Greiff*, Adv. Pro. No. 10-04357 (Bankr. S.D.N.Y.) (BRL), No. 11 Civ. 03775 (JSR).  On September 16, 2011, the District Court withdrew the reference to, *inter alia*, consider the effect of Bankruptcy Code §§ 546(e) and 548(c) on the Trustee's claims. (ECF No. 19).  A Motion to Dismiss has been filed in that case, (ECF No. 23), which the Trustee opposed.  (ECF Nos. 30-31).  Oral argument was held before the Honorable Jed S. Rakoff on November 10, 2011.

106.    In the Trustee's action against the Luxembourg Investment Fund and Landmark Investment Fund Ireland (the "LIF Defendants"), UBS entities, and other defendants, which was commenced on December 7, 2010, a motion for withdrawal of the reference was also filed. *Picard v. UBS AG*, Adv. Pro. No. 10-05311 (Bankr. S.D.N.Y.) (BRL); No. 11 Civ. 04213 (S.D.N.Y.) (CM) (the "LIF Action").  On July 27, 2011, the District Court denied the Motion as to LIF Defendants because the claims against them "are garden-variety bankruptcy issues." (ECF No. 12).  The District Court returned the LIF Defendants to the Bankruptcy Court for further proceedings.

107.    In total, eleven motions to withdraw the reference have been granted by the District Court. Six motions await the District Court's ruling, and twenty-seven motions have yet to be heard. Of the eleven in which the reference has been withdrawn, motions to dismiss have been granted in four actions, and two motions to dismiss are pending.

## IX.    INITIAL ALLOCATION OF FUNDS AND DISTRIBUTION TO CUSTOMERS

### A.    The Customer Fund

108.    In order to protect customers of an insolvent broker-dealer such as BLMIS, Congress established a statutory framework pursuant to which customers of a debtor in a SIPA liquidation are entitled to preferential treatment in the distribution of assets from the debtor's estate. The mechanism by which customers receive preferred treatment is through the creation of a Customer Fund, as defined in SIPA § 78*lll*(4), which is distinct from a debtor's general estate. Customers holding allowable claims are entitled to share in the Customer Fund based on each customer's Net Equity as of the filing date, to the exclusion of general creditors. SIPA § 78fff-2(c).

109.    In order to make interim distributions from the Customer Fund, the Trustee must determine or be able to sufficiently estimate: (a) the total value of customer property available for distribution (including reserves for disputed recoveries, such as the Levy Settlement and Net Equity Dispute), and (b) the total net equity of all allowed claims (including reserves for disputed claims). Each element of the equation—the customer property numerator and the net equity claims denominator—is inherently complex in a liquidation of this magnitude.

110.    There are many unresolved issues in this liquidation proceeding that will require the maintenance of substantial reserves. Nonetheless, the liquidation proceeding progressed to a stage at which it was possible for the Trustee, on an interim basis, to determine: (a) the allocation of property to the customer fund, or the "numerator" (taking reserves into account); (b) the

amount of allowable net equity claims, or the "denominator" (also taking reserves into account); and (c) the calculation of each customer's minimum ratable share of the Customer Fund.

111.   On May 4, 2011, the Trustee filed a motion seeking entry of an order approving an initial allocation of property to the Customer Fund, and authorizing an interim distribution to customers whose claims have not been fully satisfied because their net equity claims as of the filing date exceeded the statutory SIPA protection limit of $500,000 (the "Allocation Motion"). (ECF No. 4048).   The Allocation Motion was unopposed, and the Court entered the Order Approving the Trustee's Initial Allocation of Property to the Fund of Customer Property and Authorizing An Interim Distribution to Customers on July 12, 2011.  (ECF No. 4217).

112.   On October 5, 2011, Trustee distributed to BLMIS customers approximately $325 million—more than the amount initially approved by the Court—relating to 1,232 BLMIS accounts.[7]  Thirty-nine payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been previously fully satisfied.

113.   The allocation and distribution was initial and interim in nature because the Trustee anticipates: (i) recovering additional assets through litigation and settlements, and (ii) resolving the issues on appeal that require reserves.  Indeed, despite having recovered or entered into settlement agreements to recover approximately $8.7 billion, only approximately $325 million was available to the Trustee for distribution because of the net equity dispute, appeals of the Levy and Picower settlements, the net loser accounts that are in litigation, and other issues requiring reserves.  Final resolution of these appeals and disputes will permit the Trustee to reduce the reserves he is required to maintain, which would allow for a greater distribution to customers in the future.  As the Trustee has recovered or entered settlement agreements to

recover over 50% of the principal lost in Ponzi scheme by customers with net equity claims, a distribution to customers without any reserves would be significant. The Trustee expects to seek authorization for further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.

**B.**    **The General Estate**

114.    If the Trustee were able to fully satisfy the net equity claims of the BLMIS customers, any funds remaining would be allocated to the general estate and distributed in the order of priority established in Bankruptcy Code § 726. SIPA § 78fff(e).

115.    All BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—are general creditors of the BLMIS estate. The Trustee is working diligently on behalf of the entire BLMIS estate and seeks to satisfy all creditor claims in this proceeding.

**X.**    **INTERNATIONAL INVESTIGATION AND LITIGATION**

116.    The Trustee's international investigation and recovery of BLMIS estate assets involves, among other things: (i) identifying the location and movement of estate assets abroad; (ii) becoming involved in litigation brought by third parties in foreign courts, by appearance or otherwise, to prevent the dissipation of funds properly belonging to the estate; (iii) bringing actions before United States and foreign courts and government agencies to recover customer property for the benefit of the customers and creditors of the BLMIS estate; and (iv) retaining International Counsel to assist the Trustee in these efforts, where necessary. More than seventy of the actions filed in this Court involve international defendants, and the Trustee also has

---

[7] A small number of checks are pending distribution and await the completion of certain documentation.

actions pending in the United Kingdom, Bermuda, the British Virgin Islands (BVI), Gibraltar, and the Cayman Islands, among other countries.

117.    The Trustee has retained the following International Counsel to assist him in investigations and represent him and the BLMIS estate in any foreign proceedings that have arisen or may arise in connection with BLMIS: (i) Taylor Wessing – England and the British Commonwealth; (ii) Higgs & Johnson (formerly Higgs Johnson Truman Bodden & Co.) – Cayman Islands; (iii) Williams Barristers & Attorneys – Bermuda; (iv) Attias & Levy – Gibraltar; (v) Eugene F. Collins – Ireland; (vi) Schiltz & Schiltz – Luxembourg; (vii) SCA Creque – BVI; (viii) Kugler Kandestin L.L.P. – Quebec, Canada; (ix) Werder Vigano – Switzerland; (x) Graf & Pitkowitz Rechtsanwälte GmbH – Austria, and (xi) UGGC & Associés – France.  The Trustee will continue to seek court approval to retain professionals as necessary and appropriate to conduct investigations and represent him wherever estate assets may be found around the globe.

118.    The following summarizes key litigation involving foreign defendants in the Bankruptcy Court and in foreign courts:

**i.    Austria and Italy**

119.    The Trustee has actively investigated certain banks, institutions, and individuals located in these jurisdictions.  The Kohn and HSBC Actions, both discussed above, name several Austrian and Italian defendants, including Sonja Kohn, Bank Austria, and UniCredit S.p.A.

**ii.    Bermuda**

120.    The Trustee is actively investigating various BLMIS-related entities, their officers and directors, and transfers of funds to and through Bermuda.  The Trustee is also monitoring proceedings in the Supreme Court of Bermuda involving several BLMIS-related entities.  In addition, in December 2010, the Trustee filed protective actions in Bermuda against several

HSBC-related entities in order to preserve the Trustee's ability to bring causes of action in that jurisdiction, as well as an action in the Bankruptcy Court against Bermuda-based Whitechapel Management Limited. *Picard v. Whitechapel Management Ltd.*, Adv. Pro. No. 10-05402 (Bankr. S.D.N.Y.) (BRL).

### iii.    BVI and the Cayman Islands

121.    The Trustee has discovered and is actively investigating the involvement of no fewer than twenty BVI-based feeder funds that funneled money into the Ponzi scheme. In particular, the Trustee has investigated and filed complaints in the Bankruptcy Court against BVI-based Kingate Global Fund Ltd., Kingate Euro Fund Ltd., the Bank of Bermuda, Thybo Asset Management Ltd., Thybo Global Fund Ltd., Thybo Return Fund Ltd., Thybo Stable Fund Ltd., Hermes International Fund Limited, Lagoon Investment Limited, Thema Fund Ltd, Thema Wise Investments Ltd., Lagoon Investment Trust, Defender Limited, Equity Trading Portfolio, and Granadilla Holdings Limited. *See, e.g., Picard v. Kingate*, Adv. Pro. No. 09-01161 (Bankr. S.D.N.Y.) (BRL); *Picard v. Thybo*, Adv. Pro. No. 09-01365 (Bankr. S.D.N.Y.) (BRL); *Picard v. Defender Limited*, Adv. Pro. No. 10-05229 (Bankr. S.D.N.Y.) (BRL). In addition, the Trustee has filed numerous claim forms against several feeder funds in the BVI that preserve the Trustee's right to pursue claims in that jurisdiction.

122.    The Trustee has investigated and filed complaints in the Bankruptcy Court against Cayman Islands-based Harley International (Cayman) Ltd., *Picard v. Harley*, Adv. Pro. No. 09-01187 (Bankr. S.D.N.Y.) (BRL), Herald Fund SPC, and Primeo Fund, the latter two of which are defendants in the HSBC Action. The Trustee has also filed a complaint in the Cayman Islands against Harley International (Cayman) Ltd. A hearing date for fall of 2012 has been set for the determination of preliminary issues in both the Harley and Primeo actions.

123.    Finally, on September 22, 2011, the Trustee petitioned the Bankruptcy Court to enjoin an action for a declaratory judgment of non-liability brought by Maxam Absolute Return Fund, L.P. in the Cayman Islands against the Trustee.  *Picard v. Maxam Absolute Return Fund, L.P.*, Adv. Pro. No. 10-05342 (Bankr. S.D.N.Y.) (BRL) (ECF Nos. 42-44).  On October 12, 2011, the Court enjoined the action based on Maxam's violation of the Bankruptcy Court's automatic stay.  (ECF No. 54).

### iv.    England

124.    The Trustee, who was granted recognition as a foreign representative for the purpose of gathering evidence, has continued to investigate MSIL and work with MSIL's joint liquidators ("MSIL Liquidators").  In December 2010, the Trustee filed suit in England, together with MSIL (in liquidation) against MSIL's former directors and Sonja Kohn.  In connection with that lawsuit, the Trustee is seeking freezing orders and document disclosure in several European jurisdictions.  In addition, the Trustee has filed protective claims in England against Kingate-related individuals and entities and against HSBC and related entities.

### v.    Gibraltar

125.    After extensive investigation, the Trustee brought both domestic and Gibraltar-based actions against Vizcaya Partners Ltd. ("Vizcaya"), Banque Jacob Safra (Gibraltar) Ltd. ("Bank Safra"), Asphalia Fund Ltd. ("Asphalia"), Zeus Partners Ltd. ("Zeus"), and Siam Capital Management ("Siam").  *Picard v. Vizcaya*, Adv. Pro. No. 09-01154 (Bankr. S.D.N.Y.) (BRL).  Vizcaya, Siam, Asphalia, and Zeus failed to appear or answer the Trustee's amended complaint in the Bankruptcy Court and, accordingly, B&H drafted and prepared a Motion for Default Judgment against those defendants.  The Bankruptcy Court granted that Motion on August 3, 2010.  Thereafter, Zeus and the Trustee entered into a stipulation pursuant to which the Trustee agreed to vacate the default judgment against Zeus, and Zeus agreed not to oppose the Trustee's

application to the Supreme Court of Gibraltar for the transfer of over $60 million that had been held in Zeus's account at Bank Safra and was placed in the custody of the Gibraltar Supreme Court. The Bankruptcy Court approved the stipulation on November 23, 2010.

126.   The Trustee filed an application in the Gibraltar Supreme Court for the repatriation of those funds to the United States, which was recently granted. Those funds were deposited in the Court's registry on August 8, 2011.

127.   The Trustee is also in the process of serving a protective action in Gibraltar to preserve his right to sue Vizcaya, Bank Safra, Asphalia, Zeus, Siam, Banque J. Safra (Suisse) SA, and Pictet et Cie for $180 million in transfers received from BLMIS.

### vi.   Ireland

128.   The Trustee investigated Ireland-based Thema International Fund plc and included the feeder fund as a defendant in the HSBC Action.

### vii.   Switzerland and Luxembourg

129.   In 2010, the Trustee filed two lawsuits in the Bankruptcy Court against Switzerland-based UBS AG and other UBS-related entities and various feeder funds, management companies, and individuals. The proceedings are discussed *supra* ¶¶ 88-92, 106.

### XI.   FEE APPLICATIONS AND RELATED APPEALS

130.   Objections have been filed to six of seven fee applications submitted by the Trustee and B&H. Discussions of the objections to the first through fifth fee applications, and related motions for leave to appeal the Court's orders granting the Trustee and B&H's fee applications and overruling those objections, are discussed more fully in the Trustee's Amended Third Interim Report ¶¶ 186-90, the Trustee's Fourth Interim Report ¶¶ 163-166, and the Trustee's Fifth Interim Report ¶¶ 134-143.

131.    On April 18, 2011, the Trustee and his counsel filed the Sixth Application for

Interim Compensation for Services Rendered Reimbursement of Actual and Necessary Expenses

Incurred with the Bankruptcy Court.  (ECF No. 4022).  Counsel and international special counsel

also filed applications for Interim Professional Compensation.  (ECF Nos. 4023-4034).  On May

4, 2011, amended fee applications were filed for Taylor Wessing, Windels Marx, and Williams

Barristers & Attorneys, and the Trustee filed an amended Notice of Hearing.  (ECF Nos. 4052-

4055).  The Court held a hearing on June 1, 2011.

132.    At the fee hearing, the Trustee, his counsel, and SIPC were heard and provided a

description of the services rendered and the reasons for which the compensation sought in the

Sixth Interim Fee Application was reasonable.

133.    Counsel for the Trustee also addressed the objection and eleventh-hour reply filed

on behalf of "Marsha Peshkin and over 800 other Customers of Bernard L. Madoff" (the

"Peshkin Objectors").  (ECF Nos. 4088, 4116).  These papers argued, among other things, that

the fees paid to the Trustee and B&H and the amount of time and number of attorneys working

on the Madoff liquidation were excessive, SIPC expects to recoup its administrative advances

and the Trustee can no longer pursue avoidance actions because the Trustee was on track to

recover sufficient funds to satisfy the customer claims, and the settlements entered into by the

Trustee that returned billions to the Customer Fund were not large enough.

134.    Counsel for the Trustee stated that his team had devoted considerable time to the

Madoff liquidation, and had the results to show for it: "We are in this case for 902 days as of

today.  902 days in which this [T]rustee . . . has . . . garnered to the estate 8 million dollars a

day."  Sixth App. Hr'g Tr. 19, June 1, 2011.  And while the Compensation Period covered only

four months of work, the fees reflected almost two years of effort: "You don't file over 1,000

lawsuits before the statute runs in December of 2010 without intense efforts by a big team of people. That's just focusing on the litigation. On top of that . . . we had 16,000 claims [to process]." *Id.* at 20. Unraveling "the financial fabric of international finance community" was arduous, and "[w]e had to do all the work to find out where all that money went." *Id.* at 23. "Unraveling that fraud, bringing it to the attention of the courts, litigating those issues is exactly where all that time, money and effort has been spent. And I submit, with great results, as noted at the outset and the money collected by the [T]rustee." *Id.* at 23.

135.    Counsel for the Trustee explained that SIPA does not limit the Trustee's avoidance powers to the value of the Customer Fund and that the Peshkin Objectors cannot choose an arbitrary date to limit the amount of allowed claims. *Id.* at 23-25.

136.    Finally, Counsel for the Trustee explained that those who disagreed with the Trustee's litigation or settlements could not relitigate those disagreements during the fee application process, especially when the objections had already been rejected in their proper venue. *Id.* at 26-27.

137.    The Court heard argument from the Trustee, SIPC, and counsel for the Peshkin Objectors, and found:

> With respect to the kinds of services that have been rendered here, the amounts requested, this is by any stretch of the imagination one of the largest most complex sets of litigation that have come down the pike. It's measured both in quality and quantity in the thousands with deadlines that have come upon everyone under the statute so that the December deadline requiring thousands of new law suits to be filed is something that was anticipated and it is a big stretch for any law firm or any organization to deal with. The chart that has been presented here [that was created by the Trustee and B&H] as an illustration of the enormous and complex activity involving just one feeder fund with billions of dollars involved, lawsuits all over the world and here is indeed forms a predictor of the continuation of the kind of litigation that's involved here.

*Id.* at 45-46.

138.    One particular argument made in the Peshkin Objectors' reply, in which the Peshkin Objectors claimed that the way in which Trustee and B&H were allegedly compensated violates the United States Constitution, received the special attention of the Court for being designed to receive media attention, instead of judicial consideration.    *Id.* at 39, 46-47. Ultimately, the Court overruled the Peshkin Objectors on all points, explaining, "The objection filed and all pertinent parts is a repackaging of the prior interim fee objections.  There is nothing or any -- there is no argument that's set forth in the objection that does provide any basis for the Court to deviate from the statutory language that is determinative of this application for fees." *Id.* at 47.  The Bankruptcy Court subsequently entered the Sixth Interim Fee Order approving the Sixth Interim Fee Application.  (ECF No. 4125).

139.    On June 15, 2011, the Peshkin Objectors filed a Motion for Leave to Appeal the Sixth Interim Fee Order and supporting papers seeking interlocutory review of the Sixth Interim Fee Order.  (ECF No. 4168, 4171).  On June 29, 2011, the Trustee filed an Opposition to the Motion for Leave to Appeal.  (ECF No. 4197).  SIPC also filed an Opposition.  (ECF No. 4169). The Motion remains *sub judice* at the District Court.  No. 11 MC 00265 (S.D.N.Y.).

140.    On September 21, 2011, the Trustee and his counsel filed the Seventh Application for Interim Compensation for Services Rendered Reimbursement of Actual and Necessary Expenses Incurred with the Bankruptcy Court.  (ECF No. 4376).  Counsel and international special counsel also filed applications for Interim Professional Compensation.  (ECF Nos. 4379-4391).  No objections were filed.  The Court held a hearing on October 19, 2011.

141.    During the hearing, the Bankruptcy Court characterized SIPC's handling of the fee review process as proper and consistent with SIPA:

> I have reviewed the type of review that SIPC has engaged in, in order to come to
> its opinion and recommendation that the fees are reasonable, appropriate, that the

42

discounts based upon some of their insistence have been taken, and the standards they've used in making that determination are pretty much the standards that are applicable here in the Southern District or elsewhere under Title 11. That is the rules, statutes, and considerations as to the way fees are looked at in an insolvency proceeding, and I am quite satisfied that their review is and has been appropriate, so that I'm not in a position to say that the review is such that it challenges the outcome.

Seventh App. Hr'g Tr. 25-26, Oct. 19, 2011. The Court also recognized that the fees would

likely increase in future compensation periods:

Indeed, I am well aware that since the period that's already under discussion here for purposes of a fee, the trustee has been thrust into highly complex multiple-party litigation in this and many other courts, and those litigations have major significance to the administration of this SIPC proceeding. So looking forward on a trajectory, I do see that the administrative course to all parties, both the SIPC trustee and the SIPC proceeding and all of the adversaries who are engaged in very significant litigation embrace internationally, that under those circumstances, one may have the expectation that costs of administration to all parties involved will either remain the same or will increase.

*Id.* at 27.

142. The Bankruptcy Court subsequently entered the Seventh Interim Fee Order

approving the Seventh Interim Fee Application. (ECF No. 4471). No Motion for Leave to

Appeal the Seventh Interim Fee Order was filed.

43

## CONCLUSION

143.     The foregoing report represents a summary of the status of this proceeding and

the material events that have occurred through September 30, 2011, unless otherwise indicated.

This Report will be supplemented and updated with further interim reports.

Dated:  New York, New York
         November 15, 2011

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jacqlyn R. Rovine
Email: jrovine@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC And Bernard L. Madoff*

Respectfully submitted,

*s/ Irving H. Picard*
_____
Irving H. Picard
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Email: ipicard@bakerlaw.com

*Trustee for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and
Bernard L. Madoff*

44