# EXHIBIT A

# DRAFT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No: _____

A & G GOLDMAN PARTNERSHIP, individually
and on behalf of a class of similarly situated Plaintiffs,

vs.

CAPITAL GROWTH COMPANY;
DECISIONS, INC.;                                    **COMPLAINT-CLASS ACTION**
FAVORITE FUNDS;
JA PRIMARY LIMITED PARTNERSHIP;                      **Jury Trial Demanded**
JA SPECIAL LIMITED PARTNERSHIP;
JAB PARTNERSHIP;
JEMW PARTNERSHIP;
JF PARTNERSHIP;
JFM INVESTMENT COMPANIES;
JLN PARTNERSHIP;
JMP LIMITED PARTNERSHIP;
JEFFRY M. PICOWER SPECIAL COMPANY;
JEFFRY M. PICOWER, P.C.;
THE PICOWER FOUNDATION;
THE PICOWER INSTITUTE OF MEDICAL RESEARCH;
THE TRUST F/B/O GABRIELLE H. PICOWER;
BARBARA PICOWER, individually, and as
Executor of the Estate of Jeffry M. Picower,
and as Trustee for the Picower Foundation
and for the Trust f/b/o Gabriel H. Picower.
_____/

Plaintiff, A & G Goldman Partnership, through their undersigned attorneys, on its own

behalf and on behalf of a similarly situated class of plaintiffs, hereby sues the Defendants and

allege the following based upon the investigation by Plaintiffs' counsel, which includes: (1)

review of filings made by the trustee (the "Trustee") in the bankruptcy proceeding concerning

Bernard L. Madoff Investment Securities, LLC ("BLMIS") including the documents filed in

connection with the Bankruptcy Estate settlement with the Defendants in December 2010 and

# DRAFT

later which contained new information as to Picower's control of BLMIS and the existence and

extent of the Picower margin loan described therein; (2) review of the filings contained in the

action commenced by the Securities and Exchange Commission against Bernard L. Madoff

("Madoff"); and (3) a review of documents and pleadings contained in the criminal proceeding

brought against Madoff.  This investigation has also included a review of publically available

documents filed by or on behalf of the Defendants, including documents prepared by the Picower

Foundation, as well as pleadings filed by the Trustee and by the Defendants in connection with

various actions brought by the Trustee in the BLMIS bankruptcy.  Plaintiffs believe that

substantial additional evidentiary support exists to support the allegations set forth herein.

## INTRODUCTION AND SUMMARY OF CLAIMS

1.      Madoff is widely regarded as the crook of the century and the primary beneficiary

of the largest Ponzi scheme in history, which he operated through BLMIS.  In fact, however,

Madoff was not the most substantial beneficiary of the Ponzi scheme.  The Defendants were.

The accounting performed by the Madoff bankruptcy Trustee reveals that the Defendants

received at least $7.2 billion of BLMIS customers' cash.  This figure is astounding not only in

absolute terms, but also because it represents almost 40% of the approximately $18 billion of the

total assets of all BLMIS customers.

2.      While Madoff and a few employees operated the Ponzi scheme on a day to day

basis, they did so under the direction and control of the Defendants who participated in the fraud

for their own benefit by directing the creation of false books and records at BLMIS.  The

Defendants instructed Madoff and his employees to make false transactions and book entries to

document allegedly profitable securities transactions in the Defendants' BLMIS accounts that in

fact never occurred, but instead provided the Defendants with the returns that they "wanted to

2

# DRAFT

achieve."  BLMIS complied, which allowed the Defendants to steal billions of dollars of BLMIS customers' assets in the form of the fictitious profits based on the false trading documentation.

3.      This securities class action lawsuit is filed on behalf of all BLMIS customers whose BLMIS account statements as of the date of the BLMIS bankruptcy reflected net account values in excess of the amount that such customers actually received from BLMIS to date and who have not received and are not eligible to receive any payment directly or indirectly from the Securities Investor Protector Corporation ("SIPC").  The Plaintiff and all class members are BLMIS customers who have not and will not receive any payments from SIPC or payments from the Madoff/BLMIS estate.

4.      This action alleges only control person liability as against the Defendants under section 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").  The Defendants' control over the day to day financial records of BLMIS, along with the astounding amount of fictitious profits that the Defendants withdrew from BLMIS, establishes the Defendants' pervasive and fraudulent operational control of BLMIS.  The Defendants exerted their control over BLMIS to steal securities and cash assets belonging to the class members.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and under Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5.

6.      This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and under § 27 of the Exchange Act, 15 U.S.C. §78aa.  At all relevant times the principal place of business of most of the Defendants was Palm Beach, Florida.

HF 7090467v.4 #99999/1000

# DRAFT

Substantial acts, if not all of the acts, committed in the furtherance of the control relationship occurred in the state of Florida.

7.    Venue is proper in this district pursuant to § 27 of the Exchange Act ,15 U.S.C. §78aa, 28 U.S.C. §1391(b), because several of the Defendants reside or are headquartered in this judicial district, and the acts and transactions alleged herein occurred in substantial part in this judicial district.

8.    In connection with the wrongs alleged herein, the Defendants used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities and the facilities of national securities markets.

## THE PARTIES

9.    Plaintiff A & G Goldman Partnership is a New York partnership with its principal place of business in the State of New York.  Plaintiff brings this class action on behalf of itself and a putative class of persons similarly situated for damages and other relief arising from the Defendants' wrongful conduct described herein.

10.    Jeffry M. Picower ("Picower") was a resident of Palm Beach, Florida, and Fairfield, Connecticut, prior to and at the time of his death on October 25, 2009.  Picower was a highly sophisticated investor, accountant and attorney who participated in the Madoff Ponzi scheme for over 20 years, knowing that he was participating in a fraud.  Picower had vast experience in the purchase and sale of businesses, including health care and technology companies.  He had also been personally responsible for managing hundreds of millions, if not billions, of dollars of assets, and he had developed uncommon sophistication in trading securities and evaluating returns therefrom.  Upon information and belief, Picower was closely associated with Madoff, both in business and socially, for the last 30 years.  Picower held an individual

4

# DRAFT

BLMIS account in the name of "Jeffry M. Picower," with an account address of 1410 South Ocean Boulevard, Palm Beach, Florida.  Picower was a trustee of the Picower Foundation, and Chairman of the Board of Defendant Decisions Incorporated.

11.    Defendant Barbara Picower is the Executor of the Estate of Jeffry M. Picower, which is being probated in the State of New York.

12.    Defendant Barbara Picower is a person residing at 1410 South Ocean Boulevard, Palm Beach, Florida 33480.  Barbara Picower is Picower's surviving spouse.  According to the Trustee, Barbara Picower holds an individual account at BLMIS in the name "Barbara Picower," with the account address of 1410 South Ocean Boulevard, Palm Beach, Florida 33480, and Barbara Picower is trustee for Defendant Trust f/b/o Gabrielle H. Picower, an officer and/or director of Defendant Decisions Incorporated, and trustee and Executive Director of the Picower Foundation.

13.    Defendant Decisions Incorporated is a corporation organized under the laws of Delaware with a principal place of business at 950 Third Avenue, New York, New York 10022 and an alternate mailing address on its BLMIS account listed as 22 Saw Mill River Road, Hawthorne, New York, 10532.  According to the Trustee, the Decisions Incorporated office in Hawthorne was merely a store-front office through which little or no business was conducted, and Decisions Incorporated is a general partner of Defendants Capital Growth Company, JA Primary Limited Partnership, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JLN Partnership, JMP Limited Partnership and Jeffry M. Picower Special Co.

14.    Defendant Capital Growth Company purports to be a limited partnership with a mailing address for its BLMIS account listed at 22 Saw Mill River Road, Hawthorne, New York,

5

# DRAFT

10532, care of Decisions Incorporated. According to the Trustee, Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of Capital Growth Company, and Decisions Incorporated and Picower transact/transacted business through this entity.

15.    Defendant JA Primary Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594. According to the Trustee, Defendant Decisions Incorporated and/or Picower serves/served as General Partner or Director of JA Primary Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this entity.

16.    Defendant JA Special Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York, New York 10594.  According to the Trustee, Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JA Special Limited Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

17.    According to the Trustee, Defendant JAB Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JAB Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

18.    According to the Trustee, Defendant JEMW Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River

6

# DRAFT

Road, Hawthorne, New York, 10532; and Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JEMW Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

19.    According to the Trustee, Defendant JF Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JF Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

20.    According to the Trustee, Defendant JFM Investment Company is an entity through which Decisions Incorporated, and/or Picower transact/transacted business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and JFM Investment Company is a Limited Partner of Capital Growth Company, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of JFM Investment Company.

21.    According to the Trustee, Defendant JLN Partnership is a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Decisions Incorporated and/or Picower serve/served as General Partner or Director of JLN Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

22.    Defendant JMP Limited Partnership is a limited partnership organized under the laws of Delaware, with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594.    According to the Trustee, Decisions Incorporated and/or Picower serve/served as

7

# DRAFT

General Partner or Director of JMP Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

23.    According to the Trustee, Defendant Jeffry M. Picower Special Co. is an entity through which Decisions Incorporated, and/or Picower transact/transacted business, with a mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Jeffry M. Picower Special Co.

24.    According to the Trustee, Defendant Favorite Funds is an entity through which Picower transacted business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Favorite Funds.

25.    According to the Trustee, Defendant Jeffry M. Picower P.C. purports to be a limited partnership with a listed mailing address at 25 Virginia Lane, Thornwood, New York, New York 10594, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Jeffry M. Picower P.C., and Decisions Incorporated, and/or Picower transact/transacted business through this defendant entity.

26.    Defendant Picower Foundation is a trust organized for charitable purposes with Picower listed as donor, and Picower and Barbara Picower, among others, listed as Trustees during the relevant time period. Picower Foundation's addresses are reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480 and 9 West 57th Street, Suite 3800, New York, New York 10019.

8

# DRAFT

27.     According to the Trustee, Defendant Picower Institute for Medical Research is a nonprofit entity organized under the laws of New York, with a principal place of business at 350 Community Drive, Manhasset, New York 11030.

28.     According to the Trustee, Defendant Trust f/b/o Gabrielle H. Picower is a trust established for beneficiary Gabrielle H. Picower, who is the daughter of Picower and Barbara Picower, with Defendant Barbara Picower listed as trustee, and the trust's BLMIS account address reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480.

29.     On information and belief, the Defendants listed in paragraphs 13 through 28 (collectively the "Picower Entity Defendants") were dominated, controlled and used as a mere instrumentality of Picower to advance his interests in, and to participate in and control, the Madoff Ponzi scheme.  Thus, the Picower Entity Defendants are the alter egos of Jeffry Picower and of each other.

## THE MADOFF FRAUD AND PICOWER'S CONTROL

### Madoff Admits to Committing Securities Fraud

30.     BLMIS is a New York Limited Liability Corporation that was wholly owned by Madoff.  BLMIS was founded in 1959.  Madoff as Founder, Chairman, Chief Executive Officer, and sole shareholder ran BLMIS as his alter ego with several family members and a few employees.  BLMIS was registered with the SEC as a Securities Broker Dealer under § 15 of the Exchange Act.

31.     The portion of the BLMIS customer business at issue was operated pursuant to account documentation which afforded BLMIS a power of attorney and complete discretion over trading in the relevant BLMIS accounts.  BLMIS described its trading strategy to customers falsely as involving a complicated option strategy which generated consistent returns.

9

# DRAFT

32.    The BLMIS program of comingled options and stock trading were securities and investment contracts under the Exchange Act and customer "participation" therein involved the purchase and sale of securities.

33.    BLMIS customers received monthly statements showing the purchase and sales of securities in their accounts along with the profits purportedly realized from these securities transactions.  But the transactions reported on these statements were a fabrication.  The securities transactions described in the monthly statements either never occurred or rarely occurred, and the profits reported were entirely fictitious.  Madoff admitted at his plea hearing that he had never purchased any of the securities in BLMIS customer accounts.  Following an extensive and lengthy investigation, the Trustee for BLMIS has stated that, except for isolated individual transactions, there is no record of BLMIS having purchased or sold any securities in BLMIS customer accounts.

34.    The money that customers paid to BLMIS in connection with their investment contracts with BLMIS was not used to purchase securities as described, but instead was used to make distributions to other investors, primarily to the Defendants.

35.    On December 11, 2008, Madoff was arrested by federal agents and charged with criminal violation of the federal securities laws, including securities fraud, investment advisor fraud, and mail and wire fraud. On the same day, the SEC filed a complaint in the United States District Court for the Southern District of New York against Madoff and BLMIS, also alleging that Madoff and BLMIS engaged in securities fraud.  *See* **Exhibit "A"** hereto.

36.    On December 15, 2008, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B) of the Securities and Investor Protection Action

HF 7090467v.4 #99999/1000

# DRAFT

("SIPA"), SIPC filed an application in the District Court alleging that BLMIS was not able to meet its obligations to its securities customers as they came due and that such customers needed the protections afforded by SIPA.

37.     Also on December 15, 2008, the District Court appointed Irving H. Picard, Esq., as trustee ("Trustee") for the substantively consolidated liquidation of Madoff's estate and of BLMIS under SIPA.

38.     On March 10, 2009, the federal government filed an eleven count criminal information against Madoff in the case styled *United States v. Madoff*, 09-CR-213 (S.D.N.Y.). *See* **Exhibit "B"** hereto.

39.     On March 12, 2009, Madoff plead guilty to all eleven-counts of the criminal information, including Count I for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  *See* **Exhibit "C"** hereto at 4-5; 35.  As a result of the guilty plea, it is indisputable that Madoff and BLMIS, which he wholly owned and controlled, violated § 10(b) of the Exchange Act and Rule 10b-5.

### Through Picower's Direct Participation and Control, the Defendants Become the Primary Beneficiaries of the Madoff Fraud.

40.     Each Defendant is an entity or individual operating as part of a control group of BLMIS.  The Defendants are commonly controlled or were commonly controlled by Picower and his wife Barbara Picower.

41.     The volume, pattern and practice of the Defendants' fraudulent withdrawals from BLMIS and their control over fraudulent documentation of underlying transactions at BLMIS establishes the Defendants' "control person" liability under the federal securities laws.

42.     Picower, now deceased, was a sophisticated investor, accountant and lawyer. Picower, directly and through the Defendants, had a very close relationship with Madoff.

11

# DRAFT

Picower knew Madoff for decades and was an investor in BLMIS since at least the 1980s. Madoff served as a Trustee for one of Picower's foundations, the Picower Institute for Medical Research.

43.    Through the other Defendants and through his relationship with Madoff, Picower became privy to information about BLMIS and its operations not available to other customers.

44.    In interviews with author Diana Henriquez, Madoff stated that Jeffry Picower knew of the existence of his scheme and that Jeffry Picower was taking fraudulent profits from the BLMIS customer accounts.

45.    Picower was able to control BLMIS and use BLMIS as "a personal piggy bank" by withdrawing funds for various entities he controlled, even if there was no legitimate underlying profitable transaction warranting a distribution of such funds.

46.    In fact, the Defendants benefited in a much more substantial way than Madoff and his family.    The Trustee has alleged in an adversary action against the Defendants that the Defendants received at least $7.2 billion from BLMIS, net of their investments.  *See* Trustee's Complaint, **Exhibit "D"** hereto and Trustee's Response to Mot. to Dismiss, **Exhibit "E"** hereto.

47.    The Picower Defendants were far and away the primary beneficiaries of the Madoff fraud, having received almost 40% of the approximately $18 billion lost by BLMIS customers.

48.    In order to realize and withdraw their false profits, Picower, through the Defendants and other agents, directed and effected false trading documentation at BLMIS with respect to the Defendants' BLMIS accounts.

49.    The Defendants directed BLMIS to prepare fraudulent trading records and fraudulent trading results, which effected returns in their accounts based upon transactions which

12

# DRAFT

in fact never took place. Picower directly and through the other Defendants initiated, directed, coordinated and cause to be effected false records and back dated records at BLMIS, which resulted in the appearance of trading profits in these accounts. Picower then withdrew these false profits from the Defendant accounts. This direction of trading activity and direction of preparation of false trading records over a multi-year period shows control of the specific fraudulent activity which constituted the underlying Ponzi scheme and the underlying violations of 10b-5 engaged in by BLMIS.

50. The false trading documentation maintained by BLMIS shows that the Defendants' accounts generated annual rates of return well in excess of any conceivable rates of return for the relevant trading strategy in these accounts. For example, two of the BLMIS accounts controlled by Picower generated annual rates of return of over 100% for four consecutive years from 1996 through 1999. According to the Trustee "between 1996 and 2007 defendants' 24 regular trading accounts enjoyed 14 instances of supposed annual returns of more than 100%. . . ." During this time period the annual rates of return for certain of defendants' accounts ranged from 120% to over 550%. In actuality, Picower directly and through the Picower defendants used his ability to control the BLMIS records maintained to cause the preparation of trading records which purported to show these trading profits, which in fact never occurred. By orchestrating the creation of these false trading records, Picower enabled himself to transfer proceeds from these purported transactions to his own account and then to third party bank accounts which he controlled. The funds he withdrew belonged to other BLMIS customers including the class members.

51. The pattern of transactions in the Defendants' accounts reveals their fraudulent nature. Picower and the other Defendants received fraudulent profits from the various Madoff

HF 7090467v.4 #99999/1000

# DRAFT

accounts from at least December 1995 through December 2008. Each quarter, Picower, directly and through the other Defendants and other agents, directed the withdrawal of large sums of money divided into odd numbers spread over many of the Defendant accounts. When added together, these withdrawals usually equaled large even numbered sums. For example, on January 2, 2003, Picower withdrew $1,378,852 from his JLM Partnership account, yet the total withdrawals across all the Defendant accounts for that single day amounted to $250 million.

### An Illustration of Picower's Control:
### The $6 Billion Decisions Incorporated Margin Loan

52.     Several BLMIS accounts controlled by Picower and operated under the name of Decisions, Inc. provide concrete examples of Picower's control over BLMIS. Picower, directly and through the other Defendants, was able to withdraw "funds" from the Decisions, Inc. account in the form of a "loan" of approximately *$6 billion*, even though the account had no trading activity or cash or related assets to support such borrowing. The terms and amounts of the "loan" became known in connection with the December 2010 settlement between the Trustee and the Defendants.

53.     Borrowing in a brokerage account is regulated by margin rules established by the Federal Reserve System and by the New York Stock Exchange. These rules limit the amount that an account holder can borrow from his or her securities account based upon the value of securities that can be used as collateral for the loan. Picower was able to borrow almost $6 billion in the Decisions, Inc. account (*i.e.*, steal it from other BLMIS account) without the requisite collateral.

54.     The operations of the Decisions account establishes Picower's control of the cash flows at BLMIS and his unfettered ability to remove money from the BLMIS customer accounts for his own benefit and as he saw fit. The Decisions, Inc. accounts were the primary source of

14

# DRAFT

the Picower Defendants' cash withdrawals from BLMIS.  These accounts reflect virtually no trading activity and virtually no securities positions or other collateral for loans from this account.

55.    Picower, directly and through the other Defendants, made distribution requests and directed cash withdrawals from this account ranging from $50 million to $150 million five or more times per year for a total of approximately $6 billion.   These withdrawals were inconsistent with legitimate business activity and inconsistent with margin regulations that would permit such a loan only if the account maintains substantial collateral equal to approximately twice the amount of such loans.  Picower's ability to make such irregular withdrawals without collateral and in a manner inconsistent with applicable regulations shows that he controlled cash flow and the cash distributions at BLMIS during the relevant time period.  At all relevant times Picower and the Picower defendants knew that the withdrawals could only be the property of other BLMIS customers, including the plaintiff and other class members.

### Further Illustration of the Picower defendants Control: Directing
### BLMIS to Backdate False Transactions to Create Fictitious Profits

56.    The Defendants' control of BLIMS's operations was such that they were able to direct BLMIS employees to create and document false and non-existent securities transactions, which, in turn, were designed to generate fictitious profits for Picower to withdraw from the Defendants' BLMIS accounts.

57.    The Defendants' ability to reconfigure for their own fraudulent purpose the actual trading records maintained by BLMIS, a highly regulated broker and investment advisor, shows that the Defendants exercised control over the day to day operations of BLMIS and specifically over the trading activity that constituted a  violation of the securities laws.

HF 7090467v.4 #99999/1000

# DRAFT

58.    By way of example, as stated in the Trustee's complaint, on or about April 24, 2006, Defendant Decisions, Inc. opened a new account with BLMIS known as the Decisions, Inc. 6 account.  This account was opened with a wire transfer of $125 million.  The Defendants instructed BLMIS to back date trades in this account to January 2006, which was four months prior to the time the account was actually opened.  BLMIS employees carried out the Defendants' direct instructions and fabricated and back dated trades in the Decision 6 account. This resulted in the net value of the account increasing by almost $40 million, or 30%, in less than two weeks after it "actually opened."  The Defendants' ability to affect back dated trades in the Decisions 6 account generated phony paper profits which had appreciated only on a hindsight basis and represented part of a continuous pattern of the Picower defendants directing the falsification of trading records at BLMIS, which allowed Picower to pilfer from other BLMIS accounts.

59.    By way of further example, on or about December 29, 2005, Picower's assistant April Friehlich, acting on behalf of the Defendants, faxed BLMIS a letter signed by Picower that directed BLMIS to "realize" a gain of $50 million in the Picower accounts.  Upon direction from Picower and Friehlich, BLMIS sold large amounts of stock in Agilent Technologies and Intel Corporation in various Defendant accounts on a back dated basis.  Friehlich directed the sales of large amounts of these purported securities on or about December 29, 2005, requesting that the sales be booked to take place on an earlier date, *i.e.*, December 8 or 9.  BLMIS backdated the trades at Picower's direction and on Picower's behalf for the purpose of generating phony paper profits of approximately $46.3 million, which made up most of Picower's requested $50 million distribution.

16

# DRAFT

60.     Picower, on behalf of the Defendants, directed and caused BLMIS to affect other back dated transactions generating phony profits.  During December 2005, the Defendants purported to purchase the following securities on margin in their accounts: Google, Diamond Offshore Drilling, Inc., and Burlington Resources, Inc.  This resulted in a purported gain of almost $80 million.  These purchases purportedly occurred between January 12 and 20, 2005 but were fictitious, as the transactions actually occurred eleven months later in December 2005. Defendants caused BLMIS to create false book and record entries in order to create a phony $80 million profit on "transactions" that did not take place on the dates recorded on BLMIS's records.

61.     The Defendants also directed and orchestrated the preparation of false statements in May 2007, which reflected millions of dollars in securities transactions which reportedly took place in earlier in 2007, but which in fact did not take place at all.

## CLASS ACTION ALLEGATIONS

62.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).  The definition of the Plaintiff class in this action is: (1) all brokerage customers of BLMIS who at any time entrusted securities or cash to BLMIS and at such time granted to BLMIS or its employees or agents trading authority and discretion with respect to assets in such brokerage accounts for trading in the BLMIS stock/options trading program (the "BLMIS Discretionary Trading Program"); and (2) who have not received the full account value of their BLMIS account(s) as of the date of the BLMIS bankruptcy/SIPC liquidation; and (3) who have not received and are not eligible to receive any payments directly or indirectly from SIPC or from the BLMIS estate on behalf of SIPC (the "Class").  The Class excludes the Defendants named herein and members of the Madoff family.

17

# DRAFT

63.    The Class meets the requirements for class certification under Rule 23(a) of the Federal Rules of Civil Procedure.

a.    *Numerosity.*  The members of the class are so numerous that joinder of all members is impracticable.  Based on disclosures made by the SIPA Trustee the Class has thousands of members.  Class members may be identified from records maintained by BLMIS and the SIPA Trustee.  The members of the class may be notified of the pendency of this action by mail or otherwise using a form of notice similar to that customarily used in securities class actions.

b.    *Commonality.*  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are whether the Federal Securities Laws specifically §20(a) of the Exchange Act was violated by defendants as alleged herein, whether members of the class have sustained damages as a result thereof and if so what is the proper measure of such damages.

c.    *Typicallity.*  Plaintiff's claims are typical of the claims of members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law as alleged herein.

d.    *Adequacy.*  Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class.  Plaintiff has retained competent and experienced counsel in class and securities litigation.

64.    This class action also meets the requirements of Federal Rule of Civil Procedure 23(b)(3).  The common issues outlined herein predominate over any individual issues in the case.

HF 7090467v.4 #99999/1000

# DRAFT

A class action is superior to all other available methods of the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the class to individually address the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## TOLLING THE STATUTE OF LIMITATIONS

65.    Any applicable statute of limitations with respect to Plaintiff's claims has been tolled since no later than February 16, 2010, by the filing of the class action complaint against all of the Defendants named here in the action captioned *Adele Fox, Individually and On Behalf of a Class of Similarly Situated v. Barbara Picower, Individually, and as Executor of the Estate Of Jeffry M. Picower, et al.,* case no. 10-80252-CV-Ryskam/Vitunac (S.D. Fla.).  *See American Pipe and Construction Company v. Utah*, 414 U.S. 538, 552 (1974); *In re World Comm Securities Litigation*, 496 F.3d 245 (2d Cir. 2007).

## BLMIS'S VIOLATION OF §10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

66.    BLMIS is currently subject to a federal bankruptcy proceeding, enjoys the benefit of the bankruptcy automatic stay, and thus cannot be named as a defendant in this action.  Based upon: (1) the complaints filed by the Justice Department against Madoff and his guilty plea, (2) the complaints filed by the SEC against  Madoff and BLMIS, and (3) the factual allegations made by the Trustee against BLMIS in the many claims he has filed in the bankruptcy proceeding, it is beyond dispute that BLMIS engaged in the largest Ponzi scheme in U.S. history and committed a substantial violation of the § 10(b) of the Exchange Act and Rule 10b-5 during the Class Period.

19

# DRAFT

67.     BLMIS was a New York limited liability company wholly owned by Madoff. BLMIS operated from its principle place of business at 885 Third Avenue, New York, NY. Madoff was Founder, Chairman, Chief Executive Officer and the sole shareholder of BLMIS.

68.     Madoff ran BLMIS together with several family members and a few employees subject to the controlling influence of the Picower Defendants. BLMIS was registered with the SEC as a securities broker dealer under section 15 of the Securities Exchange Act.

69.     Class members purchased securities issued by BLMIS, which consisted of a discretionary trading account purportedly investing in stock and options and operated pursuant to a power of attorney (the "BLMIS Discretionary Trading Program").  Each class member received monthly statements purportedly reflecting the securities in their account, the trading activity during the month, and the profits earned over the relevant time period. The monthly statements for customer accounts depicted consistent profits on a monthly basis and rarely, if ever, showed loses.

70.     In fact, the monthly statements and the purported trading and profits reflected therein were entirely fictitious.  At his criminal plea hearing, Madoff admitted that neither he nor any BLMIS employee ever purchased any of the securities described in the monthly statements. The Trustee has investigated the substance activity in the accounts and, with the exception of isolated transactions for certain clients other than class members, there is no record of BLMIS having purchased or sold any securities..

71.     Madoff has admitted, and it is a fact, that BLMIS and the BLMIS Discretionary Trading Program operated as a Ponzi scheme and Madoff and other BLMIS employees concealed this ongoing fraud in an effort to hinder and delay customers of BLMIS from discovering this fraud.  The fraud involved overt material misrepresentations on monthly account

HF 7090467v.4 #99999/1000

# DRAFT

statements and confirmations representing transactions which did not take place as well as reporting false profits.

72.     The Ponzi scheme also involved the direct theft of customer assets in the BLMIS Discretionary Trading Program by Madoff, his family, and by certain favored customer including the Picower Defendants.

73.     Monies received from investors in connection with the BLMIS Discretionary Trading Program were not invested as described by BLMIS in confirmations and monthly statements, but instead were used to make distributions to selected other investors, primarily Madoff and the controlling Picower Defendants.

74.     The money sent to BLMIS for investment in the BLMIS Discretionary Trading Program was in fact stolen by Madoff and the Picower Defendants.

75.     In or about December 2008, the Ponzi scheme collapsed when customer redemptions in the BLMIS Discretionary Trading Program overwhelmed the amount of money which was being placed in new BLMIS accounts.  As result of the Ponzi scheme, Madoff and his family defalcated at least $800 million of *bona fide* customer assets, and the Picower Defendants defalcated at least $7.2 billion.  The BLMIS Ponzi scheme also involved the preparation and publication to investors and brokerage customers of false BLMIS audit reports prepared by Frielich and Horowitz as members of a three person accounting firm in Rockland County, New York.   BLMIS provided the financial reports to regulators and investors in the BLMIS Discretionary Trading Program for the purpose of their reliance thereon.  The accounting reports falsely reported that Madoff was effecting customer transactions and that BLMIS was profitable and generating customer profits in customer accounts.

21

# DRAFT

76.    At all times relevant hereto, the BLMIS's actual liabilities were billions of dollars greater than its assets.  As a result, BLMIS and the BLMIS Discretionary Trading Program were rendered insolvent by the Ponzi scheme. Customer assets were effectively stolen by Madoff and the Picower Defendants in connection with this Ponzi scheme.

77.    The  BLMIS  securities  fraud  involved  the  overt  and  continuing  material misrepresentations with respect to the trading activity and profits in the BLMIS Discretionary Trading Program, the use of materially false accounting statements, and the theft of customer securities and cash in connection with the ongoing Ponzi scheme.

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder By Non-Defendant BLMIS as Predicate for Count I Herein

78.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

79.    During the Class Period, BLMIS carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) misappropriate the assets of BLMIS customers who purchased securities issued by BLMIS in connection with the BLMIS Discretionary Trading Program, as alleged herein; and (ii) cause brokerage customers of BLMIS and investors in the BLMIS Discretionary Trading Program to entrust securities for safe-keeping with BLMIS during the Class Period.  In furtherance of this unlawful scheme, plan, and course of conduct, BLMIS and its agents, including Madoff took the actions set forth herein.  As a result, Plaintiff and the other members of the Class suffered damages in connection with the undisclosed and unauthorized theft of their securities, cash assets and the misappropriation of the proceeds thereof, as alleged above.

80.    BLMIS (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements  of  materials  fact  and/or  omitted  to  state  material  facts  necessary  to  make  the

22

# DRAFT

statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon brokerage customers who entrusted assets to BLMIS and who purchased securities issued by BLMIS in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

81.     As part and in furtherance of this conduct, BLMIS engaged in an ongoing scheme to misappropriate funds which constituted the proceeds of sales of customers' securities.

82.     BLMIS directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misappropriate funds which constituted the proceeds of sales of securities (or the securities themselves or cash) held by BLMIS as securities custodian and broker for Plaintiff and the Class members.

83.     BLMIS made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading, and they employed devices, schemes and artifices to defraud, and engaged in acts, practices, and a course of conduct in an effort to mislead and misappropriate the assets of BLMIS brokerage customers and participants in the BLMIS Discretionary Trading Program.   Such misconduct included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about BLMIS and the BLMIS Discretionary Trading Program, its financial performance and its business operations in the light of the circumstances under which they were made, not misleading, and which included engaging in manipulative and deceptive transactions, practices and courses of business which operated as a fraud and deceit upon the customers of BLMIS and participants in the BLMIS Discretionary

23

# DRAFT

Trading Program during the Class Period, including the surreptitious and unauthorized theft of customer assets and securities.

84.     BLMIS had actual knowledge of the misrepresentations and omissions of material facts set forth herein.   BLMIS's material misrepresentations and/or omissions were done knowingly for the purpose and effect of inflating BLMIS' financial results and to enrich defendant and the Picower Defendants.   At all relevant times, BLMIS was aware of the dissemination of artificially inflated financial information to the investing public which it knew was materially false and misleading.

85.     As a result of the manipulative and deceptive conduct and the dissemination of the materially false and misleading information as set forth above, Plaintiffs and the Class members suffered injury.

86.     At the time of the misrepresentations, omissions and manipulative and deceptive conduct, Plaintiff and other members of the Class were ignorant of their falsity  and believed them to be true, and they were ignorant of the manipulative and deceptive conduct complained of herein.  Had Plaintiffs and the other members of the Class known the truth regarding BLMIS's materially false statements and deceptive and manipulative conduct alleged above, which were not disclosed during the Class Period, Plaintiff and other members of the Class would not have entrusted their assets with BLMIS or purchased the BLMIS securities.

87.     By virtue of the foregoing, BLMIS has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

88.     As a direct and proximate result of BLMIS's wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with the undisclosed and

HF 7090467v.4 #99999/1000

# DRAFT

unauthorized sale of their securities and the misappropriation of the proceeds thereof, as alleged above.

## COUNT I

### VIOLATIONS OF 20(a) OF THE EXCHANGE ACT AS AGAINST THE PICOWER DEFENDANTS

89.     Plaintiff repeats and re-alleges each and every allegation contained above as it fully set forth herein.

90.     The Defendants acted collectively as a control group of BLMIS within the meaning of § 20(a) of the Exchange Act as alleged herein.

91.     The Defendants had the power to influence and control, and did in fact directly influence and control, the decision making at BLMIS, the record keeping at BLMIS, and the recording of securities transactions at BLMIS.

92.     The Defendants had the power to influence and control, and did in fact directly influence and control, the flow of funds and assets in and out of BLMIS and the BLMIS Discretionary Trading Program, even when this flow of funds and assets did not correspond to actual trading activity; this resulted in the distribution of billions of dollars of false profits to the Defendant control group.

93.     The Defendants had access to the books and records of BLMIS, and used these books and records as an instrumentality to divert and steal funds from other BLMIS Discretionary Trading accounts for the Defendants' benefit.

94.     The Defendants, either directly or through Picower, had direct involvement in the day to day operations, record keeping, and financial management of BLMIS.  The Defendants

HF 7090467v.4 #99999/1000

# DRAFT

had and employed the power to control and influence actual transactions giving rise to the securities violations alleged herein.

95.     As set forth above and in the complaint filed by the Justice Department against Madoff, in the complaint filed by the SEC against Madoff and BLMIS, and in the numerous complaints filed by the Trustee, BLMIS violated § 10b of the Exchange Act and Rule 10b-5 by its acts and omissions and by engaging in a massive Ponzi scheme.

96.     By virtue of their position as a control group, the Defendants are jointly and severally liable pursuant to § 20(a) of the Exchange Act.

97.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and other members of the Class have suffered damages.

WHEREFORE, Plaintiffs pray for relief and judgment against the Defendants as follows:

A.     Determining that this action is a proper class action;

B.     designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as class counsel;

C.     awarding compensatory damages in favor of Plaintiff and other class members against all the Defendants jointly and severally, for all damages sustained as a result of the Defendants wrong- doing in an amount to be proven at trial, including interest;

D.     awarding Plaintiff and the Class the reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     such other and further relief as the Court may deem just and proper.


DATED: this ___ day of December, 2011, by:

HF 7090467v.4 #99999/1000

# DRAFT

BEASLEY HAUSER KRAMER
& GALARDI, P.A.
505 South Flagler Drive, Suite 1500
West Palm Beach, Florida 33401
Telephone:  (561) 835-0900
Facsimile:  (561) 835-0939
galardi@beasleylaw.net

By:    *s/ Draft*
James W. Beasley, Jr.
Florida Bar No. 145750
Joseph G. Galardi
Florida Bar No. 180572

-and-

Lesley Blackner, Esquire
Florida Bar No. 654043
BLACKNER, STONE & ASSOCIATES
123 Australian Avenue
Palm Beach, FL  33480
(561)659-5754
(561)659-3184 (fax)
lblackner@aol.com
*Co-counsel for Plaintiff and the Class*

HF 7090467v.4 #99999/1000