# EXHIBIT D

Westlaw.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Irving H. PICARD, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,
Plaintiff,
v.
JPMORGAN CHASE & CO., JPMorgan Chase
Bank, N.A., J.P. Morgan Securities LLC, and J.P.
Morgan Securities Ltd., Defendants.
Irving H. Picard, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,
Plaintiff,
v.
UBS AG, et al., Defendants.

Nos. 11 civ. 913(CM), 11 civ. 4212(CM).
Nov. 1, 2011.

**Background:** Securities Investor Protection Act
(SIPA) trustee of bankrupt securities broker whose
principal had engaged in massive Ponzi scheme
brought cause of action against third parties that al-
legedly aided and abetted firm's principal in con-
nection with this scheme, and defendants moved to
dismiss, following withdrawal of reference, on
ground that trustee lacked standing to pursue such
customer claims.

**Holdings:** The District Court, Colleen McMahon,
J., held that:
(1) SIPA trustee did not have standing to pursue
common law claims against third parties that al-
legedly aided and abetted principal of bankruptcy
securities firm in massive Ponzi scheme perpetrated
on firm's customers, either in representative capa-
city on behalf of customers or as successor in in-
terest to bankrupt firm;
(2) SIPA trustee, in strong-arm capacity as hypo-
thetical judgment creditor that first extended credit
as of the commencement of bankruptcy case, could
not sue based on wrongs that occurred before such

credit was extended;
(3) SIPA trustee could not rely on New York law of
contribution in order to pursue recovery, for pro
rata payments which he would have to make, from
third party banks and feeder funds that allegedly
aided and abetted firm's principal in deceiving
firm's customers;
(4) SIPA did not independently create bailment re-
lationship between SIPA trustee and customers of
bankrupt brokerage firm; and
(5) SIPA trustee could not utilize common law
equitable subrogation theory as basis for pursuing
customer claims.

Motion granted; claims dismissed.

West Headnotes

**[1] Bankruptcy 51 ⚡0**

51 Bankruptcy
Standing requirement assures that an Article III
"case or controversy" exists by allowing only those
with actual legal injury to bring suit in federal
court. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[2] Bankruptcy 51 ⚡0**

51 Bankruptcy
Judge-made, prudential limitations on standing
foster appropriate judicial restraint.

**[3] Bankruptcy 51 ⚡0**

51 Bankruptcy
Foremost among prudential standing require-
ments is rule that party must assert his own legal
rights and interests, and cannot rest his claim to re-
lief on legal rights or interests of third parties.

**[4] Bankruptcy 51 ⚡0**

51 Bankruptcy
Standing is threshold issue in all cases, since
putative plaintiffs lacking standing are not entitled

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

to have their claims litigated in federal court.

**[5] Securities Regulation 349B ⚖0**

349B Securities Regulation
    Securities Investor Protection Act (SIPA) trust-ee did not have standing to pursue common law claims against third parties that allegedly aided and abetted principal of bankrupt securities firm in massive Ponzi scheme perpetrated on firm's cus-tomers, either in representative capacity on behalf of customers or as successor in interest to bankrupt firm, to which was imputed the misconduct of its principal. Securities Investor Protection Act of 1970, § 1 et seq., as amended, 15 U.S.C.A. § 78aaa et seq.

**[6] Securities Regulation 349B ⚖0**

349B Securities Regulation
    Securities Investor Protection Act (SIPA) trust-ee lacks standing under the Bankruptcy Code, as in-corporated into SIPA, to pursue claims that prop-erly belong to customers of bankrupt securities firm; he is empowered to pursue only those claims that properly belonged to firm before it entered bankruptcy. Securities Investor Protection Act of 1970, § 1 et seq., as amended, 15 U.S.C.A. § 78aaa et seq.

**[7] Bankruptcy 51 ⚖0**

51 Bankruptcy
    Bankruptcy trustee has no standing generally to sue third parties on behalf of estate's creditors, but may assert only claims held by the bankrupt corpor-ation itself.

**[8] Bankruptcy 51 ⚖0**

51 Bankruptcy
    Bankruptcy trustee steps into the shoes of debt-or for purpose of bringing property into estate and, for that reason, possesses only the rights of debtor.

**[9] Equity 150 ⚖0**

150 Equity
    Equitable doctrine of in pari delicto mandates that courts will not intercede to resolve dispute between two wrongdoers.

**[10] Principal and Agent 308 ⚖0**

308 Principal and Agent
    Acts of agents, and the knowledge they acquire while acting within scope of their authority, are presumptively imputed to their principals.

**[11] Bankruptcy 51 ⚖0**

51 Bankruptcy
    Trustee, in strong-arm capacity as hypothetical judgment lien creditor, may invoke whatever rem-edies are provided by state law to judgment lien creditors to satisfy their judgments against debtor. 11 U.S.C.A. § 544(a)(1).

**[12] Bankruptcy 51 ⚖0**

51 Bankruptcy
    Creditor claims to which trustee succeeds, in strong-arm capacity as judgment lien creditor, are to be ascertained as of date of debtor's bankruptcy filing and not at an anterior point of time. 11 U.S.C.A. § 544(a)(1).

**[13] Securities Regulation 349B ⚖0**

349B Securities Regulation
    Securities Investor Protection Act (SIPA) trust-ee, in strong-arm capacity as hypothetical judgment creditor that first extended credit as of the com-mencement of bankruptcy case, could not sue based on wrongs that occurred before such credit was ex-tended, when banks and feeder funds allegedly aided and abetted bankrupt securities firm's princip-al in perpetrating massive Ponzi scheme on firm's customers; strong-arm statute did not provide a means for SIPA trustee to assert such customer claims. 11 U.S.C.A. § 544(a)(1); Securities Investor Protection Act of 1970, § 1 et seq., as amended, 15 U.S.C.A. § 78aaa et seq.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

**[14] Bankruptcy 51 ☞0**

51 Bankruptcy
   Bankruptcy trustee may maintain only a general claim, for injury to all creditors of estate; his right to bring claim depends on whether the action vests in trustee as assignee for benefit of creditors or, on the other hand, accrues to specific creditors.

**[15] Bankruptcy 51 ☞0**

51 Bankruptcy
   When right to relief and the benefits of relief are peculiar to individual or groups of creditors, right is not a generalized one that belongs to debtor's estate, and that may be pursued by trustee.

**[16] Bankruptcy 51 ☞0**

51 Bankruptcy
   Bankruptcy trustee, standing in shoes of debtor, cannot pursue claims debtor could not.

**[17] Bankruptcy 51 ☞0**

51 Bankruptcy
   Debtor's interests in property, such as will become assets of estate once bankruptcy petition is filed, are defined by state law. 11 U.S.C.A. § 541(a).

**[18] Contribution 96 ☞0**

96 Contribution
   Lynchpin of New York contribution statute is common liability for the same injury. McKinney's CPLR 1401.

**[19] Contribution 96 ☞0**

96 Contribution
   Under New York law, obligation for contribution is triggered only when one joint tortfeasor is compelled under state law to pay damages arising out of a tort or tort-like injury. McKinney's CPLR 1401.

**[20] Contribution 96 ☞0**

96 Contribution
   New York's statutory contribution scheme requires some form of compulsion, that is, the party seeking contribution must have been compelled in some way, such as through the entry of judgment, to make payment against which contribution is sought. McKinney's CPLR 1401.

**[21] Contribution 96 ☞0**

96 Contribution
   Securities Investor Protection Act (SIPA) trustee could not rely on New York law of contribution in order to pursue recovery, for pro rata payments which he would have to make to customers of bankrupt securities firm, from third party banks and feeder funds that allegedly aided and abetted firm's principal in perpetrating Ponzi scheme on customers; SIPA trustee's obligation to make pro rata payments to firm customers did not arise in tort, but pursuant to SIPA's distributive scheme, and thus did not arise out of "same injury" as that underlying alleged liability of such third party banks and feeder funds. Securities Investor Protection Act of 1970, § 1 et seq., as amended, 15 U.S.C.A. § 78aaa et seq.

**[22] Contribution 96 ☞0**

96 Contribution
   Source of right of contribution under state law must be obligation imposed by state law.

**[23] Securities Regulation 349B ☞0**

349B Securities Regulation
   Securities Investor Protection Act (SIPA) trustee did not have standing, as enforcer of subrogation rights belonging to the Securities Investor Protection Corporation (SIPC), to pursue claims on behalf of customers of defunct brokerage firm against third parties which allegedly aided and abetted firm's principal in massive Ponzi scheme perpetrated on these customers; as plain language of the Securities Investor Protection Act (SIPA) made clear, the SIPC was subrogated only to customer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
(Cite as: 2011 WL 5170434 (S.D.N.Y.))

Page 4

net equity claims against estate, and not to all cus-
tomer claims against third parties. Securities In-
vestor Protection Act of 1970, § 9(a)(5), 15
U.S.C.A. § 78fff-3(a)(5).

**[24] Courts 106 🔑0**

106 Courts
    When court is reversed on basis that it lacks
subject matter jurisdiction, none of its other hold-
ings has precedential value.

**[25] Securities Regulation 349B 🔑0**

349B Securities Regulation
    Securities Investor Protection Act (SIPA) trust-
ee of bankrupt securities firm, by stepping into
firm's shoes, did not become bailee of customer
funds that firm had acquired by means of deception,
through massive Ponzi scheme perpetrated by
firm's principal. Securities Investor Protection Act
of 1970, § 1 et seq., as amended, 15 U.S.C.A. §
78aaa et seq.

**[26] Bailment 50 🔑0**

50 Bailment
    Thief can never attain status of bailee.

**[27] Securities Regulation 349B 🔑0**

349B Securities Regulation
    Securities Investor Protection Act (SIPA) did
not independently create bailment relationship
between SIPA trustee and customers of bankrupt
brokerage firm, so as to allow SIPA trustee to pur-
sue, as customer's bailee, claims which predated
trustee's appointment against third parties that al-
legedly aided and abetted firm's principal in
massive Ponzi scheme perpetrated on customers;
trustee was not seeking to return any recovered
bailments to individual bailors, as bailee would, but
was instead seeking to distribute customer property
pro rata, pursuant to SIPA's distribution scheme.
Securities Investor Protection Act of 1970, § 1 et
seq., as amended, 15 U.S.C.A. § 78aaa et seq.

**[28] Securities Regulation 349B 🔑0**

349B Securities Regulation
    Given that Congress had conferred a limited
right of subrogation on the Securities Investor Pro-
tection Corporation (SIPC), only to the extent of
customers' net equity claims, Securities Investor
Protection Act (SIPA) trustee could not utilize com-
mon law equitable subrogation theory as basis for
pursuing common law claims which customers of
bankrupt securities firm had against third parties for
allegedly aiding and abetting firm's principal in per-
petrating massive Ponzi scheme against them in
manner that would undermine the SIPA distribution
scheme. Securities Investor Protection Act of 1970,
§ 9(a)(5), 15 U.S.C.A. § 78fff-3(a)(5).

**[29] Statutes 361 🔑0**

361 Statutes
    When Congress creates one remedy, and limits
its scope, court should be extremely hesitant before
implying a broader remedy.

Timothy J. Burke, James E. Lahm, Patrick K. Slyne
, Stull, Stull & Brody, Los Angeles, CA, for Repex
Ventures S.A.

Helen Davis Chaitman, Becker & Poliakoff, P.A.,
New York, NY, for Marhsa Peshkin.

Lindsay D'Andrea, Lauren M. Hilsheimer, Deborah
H. Renner, Jennifer A. Vessells, Thomas D. Warren
, Baker & Hostetler LLP, Columbus, OH, for Irving
H. Picard.

Joseph R. DeMatteo, Bernfeld, DeMatteo & Bern-
feld, LLP, New York, NY for Network for Investor
Action and Protection.

Stephen R. DiPrima, Emil Kleinhaus, Douglas K.
Mayer, John F. Savarese, Meredith Lewis Turner,
Wachtell, Lipton, Rosen & Katz, New York, NY,
for J.P. Morgan Securities LLC, JPMorgan Chase
& Co. and JPMorgan Chase Bank, N.A.

Christopher H. LaRosa, Securities Investor Protec-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

tion Corp., Washington, DC, for Securities Investor Protection Corp.

DECISION AND ORDER GRANTING DEFEND-
ANTS' MOTION TO DISMISS CERTAIN COM-
MON LAW CLAIMS
COLLEEN McMAHON, District Judge.
I. BACKGROUND

**\*1** Bernard Madoff conducted a massive Ponzi scheme through his investment firm, Bernard L. Madoff Investment Securities, LLC ("BMIS"). After it was uncovered in December 2008, Madoff was arrested, BMIS went into bankruptcy, and the Securities Investor Protection Corporation ("SIPC") applied to this Court (Stanton, J.) to commence a liquidation proceeding under the Securities Investor Protection Act ("SIPA").[FN1] The application was granted, the Court appointed a trustee, and the case was removed to Bankruptcy Court pursuant to SIPA. (Am.Compl.¶¶ 53–57.). *See* 15 U.S.C. § 78eee(a), (b)(3), (b)(4).

SIPA was enacted in 1970 to restore confidence to the securities market by providing additional protections for the customers of failed securities brokers. *See Sec. Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). In essence, SIPA authorizes a trustee to create and fund a pool of assets within the failed broker's bankruptcy estate that is intended solely to compensate the customers for their "net equity" held by the broker. The funds collected by the trustee are then paid ratably (or, where possible, in full) to the customers before any distribution is made to other creditors. The effect is to prioritize those customers and to provide them a speedier alternative to a traditional bankruptcy claim. *See* 15 U.S.C. §§ 78fff, 78fff-1 and 78fff–2.

The SIPA trustee appointed to administer the customer fund for the BMIS customers is Irving Picard (the "Trustee"). He has worked relentlessly over nearly three years to bring assets that passed through BMIS back into the customer fund, in order to restore nearly $20 billion in customer losses. *See*

*generally* Trustee's Fifth Interim Report (May 16, 2011). The efforts with which we are concerned are directed at several banks and investment funds that the Trustee alleges facilitated or willfully failed to uncover Madoff's scheme.

In *Picard v. JPMorgan Chase & Co.,* No. 11 civ. 913—commenced as an adversary proceeding in the BMIS liquidation—the Trustee seeks billions of dollars in avoidance and common law damages claims against JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd. (together, the "JPMorgan Defendants"). Madoff maintained a bank account with JPMorgan, referred to as the "703 Account," through which he funneled the money coming into and going out of BMIS over the life of his scheme. *See In re BLMIS,* 424 B.R. at 128–29.

The Amended Complaint asserts common law damages claims for aiding and abetting fraud and breach of fiduciary duty, "fraud on the regulator," unjust enrichment, conversion, aiding and abetting conversion, knowing participation in a breach of trust, and contribution. (JPM Am. Compl. ¶¶ 490–589 (Counts 21–28).) These common law claims are premised on the Trustee's allegation that the JPMorgan Defendants, as Madoff and BMIS's primary banker, knew, should have known, or consciously avoided discovering, that BMIS was not engaged in lawful securities trading, but was illegally misappropriating customer funds. (*Id.*). The Trustee alleges that by this failure the JPMorgan Defendants substantially assisted, or knowingly participated in the scheme, breaching duties they owed to BMIS's customers, and aiding and abetting BMIS's breach of such duties. The Trustee seeks damages on those customers' behalf, in the amount of approximately $19 billion. (*Id.* (Prayer for Relief).) Importantly, the Trustee's claim for contribution (Count 28) is the only one that seeks redress for an injury to BMIS itself, rather than BMIS's thousands of customers. (*Id.* ¶¶ 584–89.)

**\*2** In *Picard v. UBS AG,* No. 11 civ. 4212 like-

Page 6

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

wise commenced as an adversary proceeding in the BMIS liquidation—the Trustee seeks, in addition to avoidance claims, billions of dollars in damages against UBS AG and several of its affiliates (together, the "UBS Defendants"),[FN2] two so-called "feeder funds" for BMIS that were allegedly sponsored and serviced by the UBS Defendants,[FN3] and Access International Advisers LLC and several of its affiliates (the "Access Defendants").[FN4] I refer to these Defendants together as the "UBS and Feeder Fund Defendants," and refer to the JP Morgan and UBS and Feeder Fund Defendants collectively as "Defendants."

The Trustee alleges that the UBS and Feeder Fund Defendants were aware that BMIS was likely engaged in fraud, but despite that knowledge sponsored two "feeder funds" that invested heavily BMIS. UBS thereby lent the prestige of its name to the funds, and created the appearance of overseeing them. In reality, however, UBS delegated custodial and supervision functions to Madoff himself, ultimately helping Madoff attract additional European investors in BMIS, and willfully turning a blind eye in order to collect lucrative fees for servicing the funds. The Access Defendants are alleged to have joined in this scheme by marketing the feeder funds to investors, despite knowing, or consciously avoiding knowing, that BMIS was a fraud, and misrepresenting to investors that Access performed rigorous due diligence.

The Amended Complaint asserts common law causes of action for aiding and abetting BMIS's fraud, breach of fiduciary duty, and conversion; knowing participation in a breach of trust; conversion; unjust enrichment; money had and received; and contribution. (UBS Am. Compl. ¶¶ 349–466 (Counts 12–28).) The Trustee seeks approximately $2 billion. (*Id.* (Prayer for Relief).) As in the JP-Morgan action, with respect to all causes of action except contribution, the Trustee seeks damages on behalf of BMIS's customers, rather than BMIS itself.

The JPMorgan Defendants moved to withdraw the bankruptcy reference; I granted that motion this May. *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 454 B.R. 307 (S.D.N.Y.2011). The non-bankruptcy claims in the UBS case have likewise been withdrawn. (*See* Case No. 11 civ. 4212, Docket No. 14.) The basis for withdrawal was to consider substantial issues of non-bankruptcy federal law, in particular whether: (1) the Trustee has standing to pursue common law claims against third parties, like the Banks, on behalf of BMIS's customers; and, (2) if so, whether the Securities Litigation Uniform Standards Act ("SLUSA") nevertheless precludes those claims. *Id.; see also Picard v. HSBC Bank PLC,* 450 B.R. 406 (S.D.N.Y.2011).

On June 1, 2011, the JPMorgan Defendants moved to dismiss the Trustee's original complaint. In lieu of responding, the Trustee filed the Amended Complaint, the allegations of which are set out above. The JPMorgan Defendants moved to dismiss again on August 1, 2011. The UBS and Feeder Fund Defendants moved as well, joining the JPMorgan Defendants' arguments. The Trustee filed an Amended Complaint in the UBS case on August 17, 2011, and the UBS Defendants' arguments are deemed directed to that, rather than the original complaint. (*See* Case No. 11 civ. 4212, Docket No. 28.) Defendants argue that the Trustee lacks standing to bring common law claims on behalf of BMIS's customers because he is limited under Chapter 11 of the Bankruptcy Code and SIPA to vindicating the interests of BMIS only. They therefore seek dismissal of all common law claims.[FN5]

*3 While these motions were being briefed, substantially identical arguments persuaded Judge Rakoff to dismiss the Trustee's common law claims against HSBC and several of its affiliates for lack of standing. *Picard v. HSBC Bank PLC,* 454 B.R. 25 (S.D.N.Y.2011). For the reasons discussed below, I am persuaded as well. The motions to dismiss the Trustee's common law claims are therefore GRANTED in the JPMorgan and UBS cases.

II. DISCUSSION

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
(Cite as: 2011 WL 5170434 (S.D.N.Y.))

[1][2][3][4] The standing requirement assures that an Article III "case or controversy" exists by allowing only those with actual legal injury to bring suit in federal court; moreover, judge-made "prudential" limitations on standing foster appropriate judicial restraint. "Foremost among the prudential requirements is the rule that a party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Wight v. BankAmerica Corp.,* 219 F.3d 79, 86 (2d Cir.2000) (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). "Because standing is jurisdictional under Article III of the United States Constitution, it is a threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court." *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 117 (2d Cir.1991) ( *"Wagoner"* ); *see also Breeden v. Kirkpatrick & Lockhart, LLP,* 268 B.R. 704, 708–09 (S.D.N.Y.2001), *aff'd,* 366 F.3d 94 (2d Cir.2003).

[5] Three propositions, convincingly established in Judge Rakoff's recent opinion and equally applicable here, demonstrate that the Trustee lacks standing to pursue his common law claims against Defendants.

[6][7] *First,* the Trustee lacks standing under the Bankruptcy Code, as incorporated into SIPA, to pursue claims that properly belong to creditors—here, BMIS's customers. Instead, he is empowered to pursue only those claims that properly belonged to the debtor before it entered bankruptcy. "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Wagoner,* 944 F.2d at 118 (citing *Caplin v. Marine Midland Grace Trust Co. of N.Y.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972)); *see also Wornick v. Gaffney,* 544 F.3d 486, 490 (2d Cir.2008); *Wight,* 219 F.3d at 86; *In re Mediators, Inc.,* 105 F.3d 822 (2d Cir.1997); *Hirsch v. Arthur Andersen & Co.,* 72

F.3d 1085, 1093 (2d Cir.1995).

[8] There is good reason for this rule: formally, the Trustee steps into the shoes of the debtor for the purpose of bringing property into the bankruptcy estate, and as such possesses only the rights of the debtor. *See* 11 U.S.C. § 541(a)(1). There is no indication in either the Bankruptcy Code or SIPA that Congress intended to give the Trustee power to pursue claims that are not the property of the debtor. "A party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Wagoner,* 944 F.2d at 118.

*4 Practically, giving the Trustee the power to pursue claims on behalf of creditors would usurp the creditors' right to determine whether and in what forum to vindicate their legal injuries, and would raise difficult issues of preclusion. *Caplin,* 406 U.S. at 431–32. Moreover, as the Second Circuit pointed out in *Mediators,* were the Trustee empowered to pursue the claims of third party creditors, "the debtor's assets would be depleted to enforce rights possessed by third parties and defendants would face the danger of duplicative recoveries." 105 F.3d at 826 (citing *Barnes v. Schatzkin,* 215 A.D. 10, 212 N.Y.S. 536 (1st Dep't 1925)).

Here, there is no doubt that the common law causes of action in the Amended Complaints, premised on a Ponzi scheme of unprecedented scope and duration orchestrated by BMIS, belong to the creditors, not to BMIS. *See Hirsch,* 72 F.3d at 1093 (collecting cases). Thus, the Trustee cannot pursue them in his role as such.

[9] *Second,* the Trustee cannot purse these common law claims on behalf of the debtor, BMIS. This is a consequence of the equitable doctrine of *in pari delicto,* which "mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner v. KPMG LLP,* 15 N.Y.3d 446, 464, 912 N.Y.S.2d 508, 938 N.E.2d 941 (2010).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

[10] Here, *in pari delicto* would preclude Madoff from recovering against Defendants, and, under general principles of agency law, his wrongdoing as BMIS's agent is imputed to BMIS itself. "[T]he acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals." *Id.* at 465, 912 N.Y.S.2d 508, 938 N.E.2d 941. The result is that (1) BMIS could not have sued Defendants for the alleged scheme, and (2) the Trustee-standing the shoes of BMIS-cannot do so either. *HSBC,* 454 B.R. at 37–38. "Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Wight,* 219 F.3d at 87. Thus, the Trustee lacks standing to pursue these claims either as a representative of the creditors or as the successor of the debtor.

*Third,* the Trustee fails to establish any other basis for standing. The Trustee does not have a right to contribution under New York law, when the source of his obligation to the creditors is SIPA, rather than any tort claims that the creditors may eventually pursue against the debtor. Moreover, SIPA does not give the Trustee the power to pursue claims on behalf of creditors, any more than the Bankruptcy Code does. *See* 15 U.S.C. § 78fff-l(a) (SIPA trustee has "same" powers as a Chapter 11 trustee). Nor is SIPA consistent with the subrogation and bailment theories asserted by the Trustee. Thus, the Trustee lacks standing to pursue his common law claims against Defendants.

The Trustee strains to avoid these dispositive conclusions by raising a novel theory of standing. The Trustee points out that he is empowered, by 11 U.S.C. § 544(a), to stand in the shoes of a hypothetical judgment creditor that extended credit to BMIS at the commencement of its bankruptcy in order to seek certain recoveries from third parties. He argues that that power allows him to effectively step into the shoes of all BMIS's actual creditors for the purpose of pursuing common law claims against Defendants. As discussed below, this theory is not supported by the statute's text and history or by any persuasive case law, and its adoption would undermine the limitations on trustee standing established in *Caplin* and enforced by courts in this and other circuits for nearly forty years.

**\*5** The Trustee's remaining arguments for standing under New York's contribution statute and SIPA are mere reformulations of those already rejected by Judge Rakoff. They are no more persuasive to me than they were to him. *See HSBC,* 454 B.R. at 29–38.

*A. Section 544(a)*

The Trustee concedes, as he must, that *Caplin* and its progeny in this Circuit, including *Wagoner, Hirsch, Mediators* and other cases, stand squarely for the proposition that a Chapter 11 bankruptcy trustee lacks standing to pursue creditor claims. However, the Trustee would limit this rule to section 541 of the Bankruptcy Code, and find a distinct source of standing to pursue pre-petition creditor claims under section 544(a).

[11] Section 544(a) of the Bankruptcy Code provides, in pertinent part, as follows:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
(Cite as: 2011 WL 5170434 (S.D.N.Y.))

Page 9

obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists ...

Under this section, "the trustee hypothetically extends credit to the debtor at the time of filing and, at that moment, obtains a judicial lien on all property in which the debtor has any interest that could be reached by a creditor." *Musso v. Ostashko,* 468 F.3d 99, 104–05 (2d Cir.2006) (citing *In re Kors, Inc.,* 819 F.2d 19, 22–23 (2d Cir.1987)) (other citations omitted). As the Tenth Circuit has explained, "Congress has fashioned a legal fiction [that] permits the trustee ... to assume the guise of a creditor with a judgment against the debtor. Under that guise, the trustee may invoke whatever remedies provided by state law to judgment lien creditors to satisfy judgments against the debtor." *Zilkha Energy Co. v. Leighton,* 902 F.2d 1520, 1523 (10th Cir.1990).

The purpose of this section is to allow the trustee in bankruptcy to cut off any secret or unperfected liens on debtor property that would bind the debtor itself, but not the debtor's judgment creditor, who typically enjoys top priority under state creditor/debtor laws. "Pursuant to this section, the trustee in bankruptcy can avoid unperfected liens on property belonging to the bankruptcy estate." *Kors,* 819 F.2d at 22; *see also In re Canney.* 284 F.3d 362, 374 (2d Cir.2002) (same); 5 Collier on Bankruptcy § 544.01 (16th ed.2011). Thus, "The advantage of this status derives not from the Bankruptcy Code but, rather, from the relevant state law defining creditor rights." *Musso,* 468 F.3d at 105.

**\*6** The upshot of sections 544 and 541 is that, in addition to all property and rights belonging to the debtor at the commencement of its bankruptcy, "Any property of the debtor upon which a judgment creditor might obtain a lien under state law flows to the bankruptcy estate" for the benefit of all creditors. *Id.*

*1. Standing to pursue customer claims*

The Trustee first argues that he can use section 544(a), not only to avoid interests in BMIS's property inferior to those of a judgment creditor, but also to step into the shoes of any actual creditor in order to pursue its pre-petition common law claims against third parties—here, the Defendants.

The problems with this theory are legion. Foremost is that its conclusion—the Trustee is empowered to pursue the pre-petition common law claims of actual creditors—does not follow from its premise—that the Trustee has the powers of a judgment creditor "that extends credit to the debtor at the commencement of the case." 11 U.S.C. § 544(a)(1), (2). The Trustee does not argue that New York law allows a judgment creditor to seek its recovery against a debtor by appropriating causes of action against third parties that belong, not to the debtor, but to the debtor's other creditors. Nor could he; the result would be preposterous.

[12][13] Moreover, a hypothetical judgment creditor who extends credit at the commencement of the liquidation would not possess any cause of action or any other right that accrued before he extended credit. Thus, under the statute (and its predecessors), "the rights of creditors—whether they are existing or hypothetical—to which the trustee succeeds are to be ascertained as of 'the date of bankruptcy,' not at an anterior point of time." *Lewis v. Manufacturers Nat. Bank of Detroit,* 364 U.S. 603, 607, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961); *see also In re Southwest Supermarkets, LLC,* 325 B.R. 417, 425–26 (Bnkr.D.Ariz.2005). Insofar as the customers' claims here allege pre-petition wrongs, a hypothetical judgment creditor that first extended credit at the commencement of the bankruptcy proceeding would not thereby obtain the rights of those prior creditors—leaving aside the absurdity of permitting a subsequent judgment creditor to assume the legal rights of unrelated creditors in the first place. After all, "if the hypothetical judgment lien creditor extended credit only on the date of commencement of the bankruptcy case, how can she sue based on a wrong that occurred before the extended credit?" *In*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

*re Greater Southeast Community Hospital Corp.,* 333 B.R. 506, 520 (Bnkr.D.D.C.2005).

Finally, the Trustee's reading would obviate the remainder of section 544 itself, which provides for the avoidance of preferences in favor of creditors. If the Trustee were empowered to pursue *any* creditor's claims under section 544(a), there would be no need to specify its power to assert *some* creditors' fraudulent conveyance or avoidance claims in section 544(b).

Thus, the Trustee's reading of section 544(a) is inconsistent its language, the other subsections of section 544, and common sense. It is also inconsistent with precedent. If the Trustee were right, his theory would render the Supreme Court's decision in *Caplin* a dead letter, along with *Wagoner* and its progeny in this Circuit. In *Caplin,* the Supreme Court held that a Chapter 10 trustee, overseeing the reorganization of a financial firm, could not sue an indenture trustee—a third party—on behalf of debenture holders—i.e., creditors of the failed firm. The bases of that conclusion were noted above: allowing the reorganization trustee standing to pursue claims not belonging to the debtor, but to its creditors, is not within the power granted by Congress, and raises difficult preclusion problems. Likewise, basing its holding on *Caplin,* the Second Circuit in *Wagoner* held that the same factors preclude standing for a Chapter 11 bankruptcy trustee. Thus, it is settled law that the standing analysis for a bankruptcy trustee asks whether the claim "belongs" to the debtor—in which case the trustee can pursue it—or to creditors—in which case the Trustee cannot.

**\*7** The Trustee's only response is to claim that the section 544(a) predecessor, section **70c** of the Bankruptcy Act, was not in effect when the liquidation at issue in *Caplin* commenced. But as the JP-Morgan Defendants thoroughly demonstrate, that claim is just plain wrong. *See* JPMorgan's Reply, at 20–22 (collecting sources); *see also* UBS Reply, at 10 (same); *Lewis,* 364 U.S. at 603 (relying on 544(a) predecessor during period Trustee claims it

was not in effect). And even if the Trustee were right, he would still need to explain how a judgment creditor under New York law is empowered to satisfy his claim by pursuing common law claims against third parties that belong to other, actual creditors.

In fact, the history of section 544 subsequent to *Caplin* further belies the Trustee's interpretation. During the 1978 revision of the bankruptcy laws, an addition was proposed as section 544(c) that would have specifically overruled *Caplin* 's limitation on trustee standing. However, that provision was not included in the final bill. While Congress' unexplained failure to enact subsection (c) does not *necessarily* mean that subsection (a) must be read consistently with *Caplin* —after all, subsection (c) could conceivably have been omitted because it was found to be superfluous in light of subsection (a)—its failure to act does confirm what the plain language of subsection (a) already conveys: a trustee does not have standing to pursue claims that belong to creditors rather than the estate. *See In re Ozark Restaurant Equip. Co., Inc.,* 816 F.2d 1222, 1228 (8th Cir.1987).

For these reasons, the Trustee's theory has been rejected in numerous persuasive cases, including cases from at least three Circuit Courts of Appeals. *See, e.g., Ozark,* 816 F.2d at 1228; *In re Bradley,* 326 Fed. Appx. 838 (5th Cir.2009); *In re Icarus Holding. LLC,* 391 F.3d 1315, 318 n. 4 (11th Cir.2004); *E.F. Hutton & Co., Inc. v. Hadley,* 901 F.2d 979, 985–87 (11th Cir.1990); *see also In re Teligent, Inc.,* 307 B.R. 744, 749 (Bnkr.S.D.N.Y.2004); *In re Granite Partners, L.P.,* 194 B.R. 318, 323–25 (Bnkr.S.D.N.Y.1996); *In re Greater Southeast,* 333 B.R. at 520.

Meanwhile, the cases on which the Trustee relies do not support his position. *See St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688 (2d Cir.1989); *Koch Refining v. Farmers Union Cent. Exchange, Inc.,* 831 F.2d 1339 (7th Cir.1987) . Those cases address the issue whether a corporate alter ego or "veil piercing" claim against a debtor's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
(Cite as: 2011 WL 5170434 (S.D.N.Y.))

Page 11

owners "belongs" to the debtor—and hence the trustee—or to the creditors directly. If the former, the trustee, and the trustee alone, has the power to bring the claim, and the automatic stay precludes creditors from proceeding individually. If the latter, it is the trustee that lacks standing. *St. Paul Fire* and *Koch* interpreted the controlling state law to make such alter ego claims property of the debtor rather than the creditors.

**\*8** Here, by contrast, there is no dispute to whom the common law claims belong—the Trustee acknowledges they are the customers', and not the debtor's. *St. Paul Fire* does not stand for the proposition that the Trustee can pursue claims that belong individually to the creditors—just the opposite. If that were the rule, the Second Circuit's lengthy discussion establishing ownership of the claims in the Trustee would have been unnecessary. See 884 F.2d at 702–05; *see also Koch,* 831 F.2d at 1344–45; *In re Ozark,* 816 F.2d at 1225.

The Trustee nevertheless seizes on language in *St. Paul Fire* and *Koch* that suggests that when a claim is "general" to all creditors, and any one of them could bring the claim and all would benefit in the same way by establishing it, the trustee may assert the claim "on behalf of" the creditors. However, the analysis in *St. Paul Fire* and *Koch* is employed consistently with *Caplin* to determine which claims should be considered debtor property. Courts that follow this approach reason that allowing individual creditors to pursue certain claims common to all of them would result in the kind of rush to judgment and inconsistent adjudications that the bankruptcy laws exists to avoid. Thus, to further the goals of the bankruptcy laws generally, such claims should be deemed vested in the trustee, with exclusive standing to pursue them for the benefit of all creditors. See, e.g., *Koch,* 831 F.2d at 1349 ("[A] single creditor may not maintain an action on his own behalf against a corporation's fiduciaries if that creditor shares in an injury common to all creditors and has personally been injured only in an indirect manner."); *see also Pereira v. Farace,* 413

F.3d 330, 342 (2d Cir.2005); *In re Keene Corp.,* 164 B.R. 844, 853–54 (Bnkr.S.D.N.Y.1994).

But here, the Trustee's claims are not being brought on behalf of all BMIS's creditors, and could not be brought by any given one of them. In contrast to the alter ego claims asserted in *Koch* and *St. Paul Fire,* they are not derivative but direct claims. "To determine whether an action accrues individually to a claimant or generally to the corporation, a court must look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors." *Koch,* 831 F.2d at 1349. The Trustee admits that he pursues these claims to recover the net equity of some of the claimants against the BMIS estate. These are not claims that BMIS, the corporate debtor, could have asserted against Defendants, and therefore they are not "common" to the corporation and its creditors.

It is true that allowing the Trustee to pursue claims that belong properly to individual creditors would accrue to the benefit of all creditors by augmenting the bankruptcy estate. But under settled law, this is not enough to make them "general" within the meaning of *Koch* and *St. Paul Fire. See Pereira,* 413 F.3d at 342; *In re Stanwich Financial Services Corp.,* 317 B.R. 224 (Bnkr. D.Conn 2004). Rather, any recovery on these claims will not necessarily accrue to the benefit of all creditors harmed by the fraud, at least not in the same way. Taking one example, a "net winner" in the Madoff scheme may have been damaged in the amount of his final investment by Defendants' alleged wrongdoing, but he will not be benefited by the Trustee's recovery, which goes into the customer fund and then directly (and only) to the "net losers." *See In re Bernard L. Madoff Inv. Securities LLC,* 654 F.3d 229, 2011 WL 3568936 (2d Cir.2011) (affirming Trustee's interpretation of "net equity" under SIPA). Even if the Trustee recovers all customer losses and provides excess to the general fund, a net winner may share in the recovery only ratably,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

while a net loser, a different class of creditor, re-covers its claims against the estate in full.

*9 [14][15] "A trustee may maintain only a general claim. His right to bring a claim 'depends on whether the action vests in the trustee as an assignee for the benefit of creditors or, on the other hand, accrues to specific creditors.' " *Koch,* 831 F.2d at 1349. Requiring an equal right and interest in all creditors is the only justification for vesting exclusive standing in the trustee. Where, as here, the right to relief and the benefits of relief are peculiar to individual or groups of creditors, the right is not a generalized one that belongs to the debtor's estate.

Admittedly, some courts have read *Koch* to support a reading of section 544(a) that gives a trustee standing to pursue claims that belong to the creditors and not the debtor. *See, e.g., Lumbard v. Maglia, Inc.,* 621 F.Supp. 1529 (S.D.N.Y.1995); *Sender v. Mann,* 423 F.Supp.2d 1155 (D.Colo.2006); *In re MS55, Inc.,* 2007 WL 2669150 (D.Colo.2007). However, the dominant trend, in this Circuit and others, has been to reject those cases and adhere to the general rule that the trustee only has standing to pursue claims of the debtor. *See Pereira,* 413 F.3d at 342; *Icarus,* 391 F.3d at 1319 n. 4 (collecting cases); *In re Stanwich,* 317 B.R. at 227–28 (rejecting the Trustee's reading of *St. Paul Fire* ). The Seventh Circuit has clarified that its own law is consistent with *Caplin* and *Wagoner,* and inconsistent with the Trustee's theory here:

> We do not question the right of a trustee in bankruptcy to maintain a "veil piercing" suit on behalf of the bankrupt corporation (citing, among other things, *Koch* and *St. Paul Fire* ), but the qualification "on behalf" must be stressed. If the corporation is injured by the shareholders' disregard of corporate formalities, or stated differently but equivalently if a claim against the shareholders arising from their disregard of corporate formalities is the property of the corporation, then the trustee can sue; otherwise he cannot....

> When a third party has injured not the bankrupt corporation itself but a creditor of that corporation, the trustee in bankruptcy cannot bring suit against the third party. He has no interest in the suit.

*Steinberg v. Buczynski,* 40 F.3d 890, 892–93 (7th Cir.1994) (Posner, J.).

Thus, I conclude that section 544(a) of the Bankruptcy Code does not give the Trustee standing to pursue claims that are concededly the property of the creditors directly, and not the property of the debtor.

*2. Standing to pursue BMIS claims*

The Trustee also argues, albeit briefly, that section 544(a) allows him to pursue common law causes of action that belong to BMIS. He points out that a judgment creditor can satisfy his judgment by appropriating choses in action that belong to the debtor under New York law. Thus, he continues, he can appropriate BMIS's claims against Defendants.

The Trustee is right, but wrong, because BMIS's causes of action against Defendants are worthless under the doctrine of *in pari delicto. See Picard v. HSBC,* 454 B.R. at 37–38. As discussed above, Madoff could not recover against Defendants for their joint frauds, breaches of fiduciary duty, conversion, etc.; Madoff's complicity is imputed to BMIS under the law of agency; and the Trustee succeeds only to the rights of BMIS. Completing the analysis, a hypothetical judgment creditor can likewise only succeed to the interest BMIS has in its (worthless) common law claims.

*10 [16] The Trustee argues that a judgment creditor somehow takes the debtor's legal rights free of the debtor's equitable disability to recover on them, because of its favored status. There is some appeal to this argument, but its consequence runs afoul of controlling law, the *Wagoner* rule in particular. It has already been determined in this Circuit that a bankruptcy trustee, standing in the shoes of the debtor, cannot pursue claims the debtor

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

could not. If *Wagoner* could be avoided by allowing the trustee to step out of the debtor's shoes and into a hypothetical judgment creditor's shoes under section 544(a), and then back into the debtor's shoes by executing on the debtor's common law claims without debtor's legal disability, then *Wagoner* would be avoided in every case, effectively overruling it. Convenient legal fictions should not be employed to overrule binding precedent *sub silentio.*

Finally, such a fiction is not even necessary, because the Trustee already succeeds to all the debtor's choses in action by virtue of section 541(a)(1), which provides that the estate is comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case."

Thus, section 544(a) does not provide the Trustee standing to pursue the common law claims at issue in these cases.

*B. Contribution*

*1. Introduction*

The Trustee next argues that because his claim for contribution is brought on behalf of BMIS, and is not subject to the defense of *in pari delicto,* he has standing to pursue it against Defendants. However, because the Trustee's obligation to pay arises not from the common law of New York, but from SIPA, he is not "subject to liability for damages" for the "same injury to property" caused by Defendants. He thus fails to state a claim for contribution under New York law. *See HSBC.* 454 B.R. at 37–38.

*2. The Trustee fails to state a claim for contribution*

[17] 11 U.S.C. § 541, incorporated in SIPA, provides that BMIS's liquidation estate is comprised of "all legal and equitable interests of the debtor in property as of the commencement" of the bankruptcy case. This includes any causes of action BMIS had before it entered bankruptcy. "A debtor's

interests in property, including causes of action, are defined by state law, and become assets of the estate once the bankruptcy petition is filed," *In re Ionosphere Clubs, Inc.,* 156 B.R. 414, 436–37 (S.D.N.Y.1993), *aff'd,* 17 F.3d 600 (2d Cir.1994).

[18] The Trustee relies on C.P.L.R. 1401, New York's contribution statute, to assert a claim on BMIS's behalf. It says in pertinent part that,

two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought.

C.P.L.R. 1401. "[T]he lynchpin of New York's contribution provision is common liability for the same injury." *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.,* 2007 WL 1434901, at *8 (N.D.N.Y. May 11, 2007).

*11 The Trustee argues that the BMIS estate possesses a pre-petition cause of action under New York law for contribution that he has standing to pursue: BMIS and Defendants, he argues, are "subject to liability for damages for the same ... injury to property," namely the customers losses caused by the parties' joint fraud. Thus, the Trustee can "claim contribution" against Defendants "whether or not an action has been brought" by the customers against them, "or a judgment has been entered" in the customers' favor against them. Moreover, this claim, unlike any other BMIS might have, is not barred by the doctrine of *in pari delicto,* because even thought parties seeking contribution are necessarily *in pari delicto,* the statute provides a cause of action.

[19][20][21] However, C.P.L.R. 1401 is triggered only when one joint tortfeasor is compelled under state law to pay damages arising out of a tort or tort-like injury. "New York's statutory contribution scheme requires some form of compul-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
(Cite as: 2011 WL 5170434 (S.D.N.Y.))

sion; that is, the party seeking contribution must have been compelled in some way, such as through the entry of a judgment, to make the payment against which contribution is sought." *NYSEG,* 2007 WL 1434901, at *7; *see also* C.P.L.R. 1402 ("The amount of contribution to which a person is entitled shall be the excess paid by him over and above his equitable share of the judgment recovered by the injured party."). Here, the Trustee does not allege that he, as successor to BMIS, is presently or ever will be compelled to pay any damages—i.e., that he is "subject to liability to damages"—at all. *See* C.P.L.R. 1401 ("two or more persons who are subject to liability for damages ...").

The Trustee acknowledges that, "The compulsion to pay in this case is the Trustee's obligation to pay customer claims *under SIPA .*" Trustee's JP-Morgan Br. at 26 (emphasis added). But this "compulsion" (or "liability") is not based on state law fraud claims against BMIS by its customers; therefore, it is not based on the "same injury" allegedly caused by Defendants. Put otherwise, the Trustee's obligation to pay the "net winner" BMIS customers their ratable share arises, not from state law, but from SIPA; but the Banks' liability to BMIS's customers, if any, arises, not from SIPA, but from New York tort law. Therefore, the Trustee fails to adequately allege a right to relief under New York's contribution statute.

[22] The fact that "federal courts, including Th[e Supreme] Court, have recognized a right to contribution under state law in cases in which state law supplied the appropriate rule of decision," does not aid the Trustee here. *Northwest Airlines, Inc. v. Transport Workers Union of America. AFL–CIO,* 451 U.S. 77, 96–97 n. 38, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). "The source of a right of contribution under state law must be an obligation imposed *by state Jaw.*" *LNC Inv., Inc. v. First Fidelity Bank, Nat. Ass'n,* 935 F.Supp. 1333, 1349 (S.D.N.Y.1996) (emphasis added). By contrast, where the liability that is the basis for the contribution claim is "entirely a creature of federal statute,"

the Trustee must rely on federal, not state, contribution law. *Northwest Airlines,* 451 U.S. at 97–98. "[W]hether contribution is available in connection with a federal statutory scheme [like SIPA] is a question governed solely by federal law." *Lehman Brothers, Inc. v. Wu,* 294 F.Supp.2d 504, 504–05 n. 1 (S.D.N.Y.2003); *see generally Northwest Airlines,* 451 U.S. at 90–101.

**\*12** Thus, where, as here, contribution is sought for a liability created by federal statute, cases recognizing a state law right to contribution are simply "inapposite," *id.* at 96–97 n. 38, and the Trustee must rely on federal law for any contribution claim. And the Trustee does not allege in his Amended Complaint or argue in his brief that either SIPA or federal common law creates a right to contribution for payments he is required make under SIPA.

Judge Rakoff made this point in his *HSBC* decision: "The Trustee asserts a claim for contribution based on the fact that he has to pay customer claims pursuant to SIPA. Given that these payments are being made pursuant to a comprehensive statutory scheme, however, the Court concludes that the Trustee cannot rely on state law to seek contribution where a right to contribution is not expressly provided by a federal statute." 454 B.R. at 37–38. Because the facts here are identical—the Trustee fails to assert that he his compelled by New York law to pay tortlike damages compulsion to pay tortlike damages under New York law—Judge Rakoff's conclusion is equally valid here. As another of my colleagues, Judge Koetl, explained in another recent decision: "The plaintiff brings a claim for contribution in connection with a federal statutory scheme that does not provide a right of action for contribution. The plaintiff cannot use New York State common law as an end-around to make a claim for contribution that it could not make under the federal statutory scheme." *KBL Corp. v. Arnouts,* 646 F.Supp.2d 335, 341 (S.D.N.Y.2009).

Thus, the Trustee identifies no legal basis for contribution, and therefore lacks standing on that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

ground as well.

*C. Standing as common law bailee or equitable subrogee*
Having failed to ground standing in either the Bankruptcy Code or New York's law of contribution, the Trustee's final argument is that SIPA empowers him to do more than a typical Chapter 11 trustee can; or, more precisely, that he is so empowered, SIPA notwithstanding. He argues first that SIPA impliedly creates a common law bailment, which permits him to bring causes of action arising out of damage to the customer fund. In addition, he argues that he can pursue customer causes of action that SIPC could pursue as an equitable subrogee of customer net equity claims.

Judge Rakoff rejected these contentions, *HSBC,* 454 B.R. at 30–36; I do as well.

*1. SIPA does not give to bailees or subrogees standing to pursue customers' common law claims against third parties*
Chief Judge Preska succinctly set forth the history and purpose of SIPA as follows:

Congress enacted [SIPA] after a business contraction in the securities industry led to a rash of failures among brokerage firms. After that contraction, "customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings." SIPA was intended to "arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." SIPA created a new form of liquidation proceeding that was "applicable only to member firms, designed to accomplish the completion of open transactions and the speedy return of most customer property." Those investors who had left identifiable securities in their names with the broker-dealer or cash balances to be used for investment purposes (which collectively constitute "net equity claims") are entitled to receive such securities and cash from the liquidator before other credit-

ors may share in the estate. The Act contemplates that customers' claims will be satisfied to the greatest extent possible from the bankrupt brokerage firm.

**\*13** *Sec. Investor Protection Corp. v. BDO Seidman, LLP,* 49 F.Supp.2d 644, 649 (S.D.N.Y.1999) (internal citations omitted), *aff'd,* 222 F.3d 63 (2d Cir.2000); *see also Sec. Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); *Appleton v. First Nat. Bank of Ohio,* 62 F.3d 791, 794 (6th Cir.1995); *Mishkin v. Peat. Marwick, Mitchell & Co.,* 744 F.Supp. 531, 555–56 (S.D.N.Y.1990) (collecting legislative history).

SIPA accomplishes its purpose by empowering SIPC, once it has identified a failing or failed securities broker, to seek a protective order from a court. The court, in turn, appoints a liquidating trustee and refers the case to Bankruptcy Court, where it proceeds more or less like a Chapter 11 proceeding. *See* 15 U.S.C. § 78eee(a), (b), § 78fff(b). The difference between a SIPA and a non-SIPA liquidation is that customer "net equity" claims are given priority over the claims of the broker's other creditors (e.g., its landlord or any unsecured lenders). *See id.* § 78fff–2. The SIPA trustee is "vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11." *Id.* § 78fff–1(a).

One of the purposes of a SIPA liquidation is to "to enforce rights of subrogation as provided in this chapter." *Id.* § 78fff(a)(3). The only such rights arise, not in favor of the trustee, but in favor of SIPC. *Id.* § 78ccc. In addition to overseeing securities brokers and, when necessary, seeking protective orders for failing ones, SIPC also helps assure prompt payments to customers by advancing funds to the SIPA trustee to satisfy net equity claims. *Id.* § 78fff–3. SIPC obtains these funds through assessments against regulated brokers. *See id.* §§ 78ddd.

[23] The right to subrogation referred above is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
(Cite as: 2011 WL 5170434 (S.D.N.Y.))

found in section 78fff–3(a)(5):

> To the extent moneys are advanced by SIPC to the trustee to pay or otherwise satisfy the claims of customers, in addition to all other rights it may have at law or in equity, SIPC shall be subrogated to the claims of such customers with the rights and priorities provided in this chapter, except that SIPC as subrogee may assert no claim against customer property until after the allocation thereof to customers as provided in section 78fff–2(c) of this title.

This section has been interpreted to grant SIPC statutory subrogation rights only to the extent that it satisfies customer net equity claims against the customer fund. *See Picard v. HSBC,* 454 B.R. at 33–34; *Redington v. Touche Ross & Co.,* 592 F.2d 617, 624 (2d Cir.1978), *rev'd on other grounds, Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Moreover, this right is expressly subordinated to the fulfillment of all customer net equity claims. Section 78fff–2(c), part of the distribution priority scheme, provides that the fund of customer property is to be distributed ratably to customers before any allocation is made to SIPC on a subrogation basis. In other words, SIPC is not entitled to customer property unless there is enough to satisfy all customer net equity claims. Thus, under SIPA's plain language, neither SIPC nor the Trustee has standing to assert statutory subrogation rights against third parties.

**\*14** Nor is there any hint in SIPA that a trustee has the powers of a common law bailee to pursue third party claims on the customers' behalf. As Judge Rakoff pointed out, that statute is silent on bailment, granting the trustee the "same" powers as a chapter 11 trustee. HSBC, 454 B.R. at 29–33.

The Trustee quite candidly admits that his bailment and subrogation theories are not founded on the SIPA statute at all, but rather on common law and equitable principles. Given that both SIPC and the Trustee are creations of SIPA, designed with a very specific purpose in mind, this is a remarkable

admission. To support reading these sources of law into the SIPA structure, the Trustee relies on almost exclusively on the Second Circuit's decision in *Redington,* to which I turn. *See* 592 F.2d at 617.

*2. Redington*

In *Redington,* a securities broker, Weis, went into SIPA liquidation after its outside accountant, Touche & Ross, failed to identify accounting fraud. The trustee argued that Touche Ross thereby violated the requirements of section 17(a), and sought recovery on that basis on behalf of Weis' customers. *Redington v. Touche Ross & Co.,* 428 F.Supp. 483 (S.D.N.Y.1977). It also brought a number of claims under State law.[FN6]

The District Court dismissed the complaint for want of subject matter jurisdiction. It declined to imply a private right of action under section 17(a) in favor of Weis' customers. Because the complaint failed to state any federal claim, the District Court declined to exercise pendent jurisdiction over SIPC's and the trustee's common law claims (for breach of contract, negligence, and malpractice) and dismissed the complaint. The District Court never addressed whether SIPC or the SIPA trustee had standing to bring a section 17(a) claim, or any other claim, on behalf of Weis' customers; it simply held that no federal claim existed and threw the lawsuit out.

The Court of Appeals reversed the District Court's conclusion that no private right of action should be implied in a favor of the broker's customers. *Redington v. Touche Ross & Co.,* 592 F.2d 617 (2d Cir.1978). It then proceeded to address the question the District Court had never reached: did SIPC or the SIPA trustee have standing to bring "the action" on behalf of Weis' customers? The Second Circuit concluded that they did, either as subrogee of the customers' claims pursuant to general equitable principles or as the bailee of the customers' property. *Id.* at 624–25.

The Supreme Court later overturned the Second Circuit's determination that Weis' customers had a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

private right of action under section 17(a) of the Exchange Act. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). In a footnote, the Court announced that it was "unnecessary" to reach the "other rulings" by the Court of Appeals, notably its determinations that SIPC and the SIPA trustee had standing to assert the customers' claims under section 17(a). *Id.* at 567 n. 9. On remand, the Second Circuit summarily dismissed the complaint, after concluding (as the District Court judge had originally) that there was no basis for federal jurisdiction if the complaint failed to state a cause of action under section 17(a). *Redington v. Touche Ross & Co.,* 612 F.2d 68 (2d Cir.1979).

*\*15* The Trustee argues that the *Redington* court's decision granting SIPC and a SIPA trustee standing to pursue customer claims as a common law subrogee and bailee remains good law, because the Supreme Court did not expressly overrule the Second Circuit on this point. Some judges of this circuit agree with the Trustee. *See, e.g., SIPC v. BDO,* 49 F.Supp.2d at 653–54 (concluding that *Redington* still controls); *cf SIPC v. BDO,* 222 F.3d at 69, 72 (assuming without deciding *Redington* remains binding); *In re Park South Sec. LLC,* 326 B.R. 505, 515–17 (Bnkr.S.D.N.Y.2005) (same). Others, however, do not. More than twenty years ago, the Honorable Milton Pollack of this court concluded that *Redington* was not good law. *Mishkin v. Peat. Marwick, Mitchell & Co.,* 744 F.Supp. 531 (S.D.N.Y.1990). Much more recently, my colleague, the Honorable Jed S. Rakoff, has reached the same conclusion. *HSBC,* 454 B.R. at 35.

[24] Judge Rakoff relied on the rule that, when a court is reversed on the basis that it lacks subject matter jurisdiction, none of its other holdings has precedential value. Because no basis for federal jurisdiction existed after the section 17(a) claim was dismissed, *see Redington,* 612 F.2d at 69, *on remand from* 442 U.S. at 560, the other *Redington* holdings—including its pronouncement on stand-

ing—lack precedential value. *See HSBC,* 454 B.R. at 34–35 (citing *Labarbera v. Clestra Hauserman, Inc.,* 369 F.3d 224, 226 n. 2 (2d Cir.2004); *Gutierrez v. Fox,* 141 F.3d 425, 426 (2d Cir.1998)). Let me elaborate further on Judge Rakoff's discussion of this point.

The Supreme Court long ago held that when a case presents two questions—whether a cause of action exists, and if so whether a given party has standing to assert it—the "merits" question is the "threshold" inquiry, and standing is not to be reached unless a cause of action exists. *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). In *National Railroad,* as in *Redington,* the District Court dismissed a cause of action under a federal statute for failure to state a claim, and then dismissed the case for lack of jurisdiction. As in *Redington,* the Court of Appeals reinstated it, concluding both that the cause of action existed and that the plaintiffs were proper parties to enforce it.

On further appeal, the Supreme Court noted that three separate questions were presented by the motion to dismiss—whether the private action right exists, whether the District Court has subject matter jurisdiction, and whether the plaintiffs have standing. Nevertheless, the Court recognized that:

> however phrased, the threshold question clearly is whether the Amtrak Act or any other provision of law creates a cause of action whereby a private party such as the respondent can enforce duties and obligations imposed by the Act; for *it is only if such a right of action exists that we need consider whether the respondent had standing to bring the action* and whether the District Court had jurisdiction to entertain it.

*\*16 Id.* at 456 (emphasis added). As in *Redington,* the Supreme Court found no private right of action existed and reversed, without separately addressing the Circuit Court's conclusion that the plaintiffs there had standing.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
(Cite as: 2011 WL 5170434 (S.D.N.Y.))

So while the Trustee is correct that standing is *often* a "threshold" inquiry, *see Nnebe v. Daus,* 644 F.3d 147, 156 (2d Cir.2011), *National Railroad* holds that it *is not* the threshold inquiry when the very existence of a claim for relief is open to question. Rather, the "merits" question is *the* threshold issue. It is only if the purported cause of action exists that it even becomes necessary to address standing.

The District Court in *Redington* acted in conformity with *National Railroad;* it did not bother to address standing to bring any claim, state or federal, once it determined that no private right of action exists under section 17(a). Similarly, and equally correctly, the Second Circuit addressed standing only *after* it became necessary to do so—that is, only after it decided to imply the asserted federal private right of action.

But once the Supreme Court told the Second Circuit that no private right of action existed under federal law, whatever the Second Circuit said about standing was rendered superfluous. Its finding on standing should never have been made; it was not necessary to the determination of the case.

The Trustee of course argues that *Redington* should be read as holding broadly that the SIPA trustee has standing as a bailee and a subrogee to bring any sort of claim on behalf of the broker's customers—not just a section 17(a) claim. Assuming without deciding that *Redington* can be read so broadly, if it was intended to so hold, then the Court of Appeals went beyond what was necessary to its decision—which was to find a basis for federal jurisdiction and then assign standing to pursue that federal claim. If one argues that the reasoning underlying that narrow holding applies equally to all other causes of action held by the customers, the obvious retort is that the holding that reasoning undergirded was rendered meaningless by the Supreme Court's reversal. In the absence of a section 17(a) cause of action, any suggestion that the trustee and SIPC can pursue other claims did not actually decide anything in the case, and so becomes

mere dictum. It is holdings, not reasoning, that bind later courts; as Judge Calabresi effectively put the point, "Holdings—what is necessary to a decision—are binding. Dicta—no matter how strong or how characterized—are not." *U.S. v. Garcia,* 413 F.3d 201, 231–32 n. 2 (2d Cir.2005) (Calabresi, J., concurring).

In short, the Supreme Court's reversal on the threshold issue means that the Second Circuit should never have reached standing. Whatever its reasoning in the course of (erroneously) reaching the standing question surely cannot bind a lower court.

Judge Rakoff also observed that *Redington* 's subrogation analysis was undermined by a subsequent amendment to SIPA, establishing the current priority scheme. *Id.* at 36. As discussed above, this scheme subordinates any subrogation right belonging to SIPC to the full payment of all customer net equity claims. As further discussed below, *Redington* 's theory of subrogation is inconsistent with the current SIPA scheme. Under no theory of which I am aware does a decision remain good law after the passage of a superseding statute that renders its analysis patently faulty.

**\*17** Thus, I conclude that *Redington* 's statements regarding bailee and subrogee standing are no longer good law, and have not been since *Redington* was reversed, long ago, and therefore do not bind me.

### 3. The Trustee's theories fail
Without *Redington* to prop them up, the Trustee's arguments collapse under their own weight.

#### a. Bailment
[25][26]  First, the Trustee is not a bailee of customer funds by virtue of stepping into the shoes of BMIS. This is due to the common law rule that a thief can never take the status of a bailee. *See, e.g., Pivar v. Graduate School of Figurative Art of N.Y. Academy of Art,* 290 A.D.2d 212, 735 N.Y.S.2d 522 (1st Dep't 2002). Madoff, and hence BMIS, ac-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

quired the customers' funds through deception with the intent to appropriate them unlawfully. As BMIS was not a bailee, the Trustee cannot be.[FN7]

[27] Nor does SIPA independently create a bailment relationship. The only "entrusting" of property it accomplishes is empowering of the Trustee to collect and distribute the customer fund. But that entrusting necessarily takes place only *after* the customers' property has been damaged. In a different situation, for example, if a SIPA customer fund was deposited in a bank account at JPMorgan, and an employee stole those funds, I may be willing to recognize the Trustee's right to sue as bailee for the destruction of the funds in his possession. But that is not like what happened here. The Trustee was not in possession of customer funds when the alleged torts took place. He was not even appointed. In other words, even entertaining the possibility that SIPA creates a bailment relationship with respect to the customer funds, it necessarily does not arise until the wrongs of third parties and the debtors have already taken place. Thus, there is no damage to the property that the Trustee as bailee of those funds could pursue.

Perhaps an additional example is in order: If I park my car in a city garage and another customer scratches it while it's parked there, the garage may have standing as my bailee to go after the other customer. But if, instead, a stranger scratches my car while I'm sitting in traffic, and I afterward park it in the garage, what interest could the garage possibly have in going after the stranger? Since it was not my bailee when the injury to property took place, the garage would have no legal standing to vindicate that injury. My subsequently arising bailment certainly does nothing to change that fact.

In any event, treating SIPA as creating a bailment through force of law is fanciful to begin with. *See HSBC,* 454 B.R. at 32–33. SIPA does not "entrust" possession of the customer fund to anyone. Rather, it simply points the trustee toward the provisions of the Bankruptcy Code for finding and liquidating the debtor's property wherever it can be found. The result of those efforts is the customer fund. Thus, there is no handing over of property at all. And as Judge Rakoff pointed out, there is no understanding that customer property will be returned in substantially the same form in which it was given, in light of SIPA's ratable distribution scheme. Thus, there is neither a handing over of property nor an expectation of giving it back. *See Herrington v. Verrilli,* 151 F.Supp.2d 449, 457 (S.D.N.Y.2001).

*18 In conclusion, SIPA does not create or contemplate a bailment relationship, and the Trustee's theory of common law bailment ignores that he was not in possession of property when it was damaged by Defendants. He stands in no better position than the hypothetical parking garage operator, suing strangers for injuries that occurred before I ever parked my car with it. He thus lacks standing to vindicate the customers' claims against Defendants.

*b. Subrogation*
[28] The Trustee's arguments for equitable subrogation fare no better.

The relevant statutory provisions are set forth above. The upshot, again, is that SIPC's statutory subrogation right is a limited one: it permits claims only to the extent of customers' net equity claims against the customer, and not against any other party; moreover, it is subordinated to the payment of customer net equity claims.

[29] When Congress creates one remedy, and limits its scope, a court should be extremely hesitant before implying a broader remedy. The Trustee therefore eschews any argument that Congress actually intended to create a subrogation right for customer common law claims against third parties. Instead, he argues that equity provides that right, SIPA notwithstanding.

However, the creation of SIPC contemporaneously with its limited right to recovery makes it more than just unlikely that Congress intended a different remedy. It also means that Congress's pur-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
(Cite as: 2011 WL 5170434 (S.D.N.Y.))

poses and objectives may be frustrated by implying a further remedy under state law. In other words, Congress must be assumed to have provided a limited remedy for a reason. Recognizing an additional remedy anyway therefore risks undermining the Congressional scheme.

In this case, more than inference supports the conclusion that no further subrogation remedy should be implied. As Judge Rakoff observed, allowing SIPC, or the Trustee as its assignee, to pursue subrogated net equity claims against third parties upsets the distribution priority of SIPA itself. SIPC is to recover the extent of its "fronted" net equity payments, but only after the customers have recovered their net equity claims. *See* 15 U.S.C. §§ 78fff–3(a), 78fff–2(c)(1)(B), (C). The Trustee's theory would effectively permit SIPC to jump the line. *HSBC,* 454 B.R. at 33–34; *see also Holmes v. Sec. Investor Protection Corp.,* 503 U.S. 258, 270–71, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (casting doubt on SIPC's theory of equitable subrogation); *Mishkin,* 744 F.Supp. at 557–58 (rejecting theory). Nor can the insertion of the phrase "in addition to all other rights it may have at law or in equity" into § 78fff–3(a) overcome these specific, concrete statutory impediments.

I therefore conclude that the Trustee lacks standing to pursue equitable subrogation rights of SIPC, to the extent they exist, when to do so would undermine the SIPA distribution scheme.[FN8]

### III. CONCLUSION

The Trustee lacks standing to pursue the common law claims against Defendants. Counts 21 to 28 of the Amended Complaint in the JPMorgan case (No. 11 civ. 913, Docket # 50), and Counts 12 through 28 of the Amended Complaint in the UBS case (No. 11 civ. 4212, Docket # 23), are therefore DISMISSED. The Court further directs that what remains of adversary proceedings Nos. 10–4932(BRL) and 10–4285(BRL) be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order.

**\*19** The Clerk of Court is instructed to close the motions at 11 Civ. 913, Dockets Nos. 32 and 56, and those at 11 Civ. 4212, Dockets Nos. 1, 16 and 17.

FN1. The interested reader is directed to the following cases for further factual context: *In re Bernard L. Madoff Inv. Sec. LLC,* 424 B.R. 122, 125–32 (Bankr.S.D.N.Y.2010); *In re Beacon Assocs. Litig.,* 745 F.Supp.2d 386, 393–94 (S.D.N.Y.2010); *Anwar v. Fairfield Greenwich Ltd.,* 728 F.Supp.2d 372, 387, 389–90 (S.D.N.Y.2010); *In re Tremont Sec. Law, State Law & Ins. Litig.,* 703 F, Supp.2d 362, 367–68 (S.D.N.Y.2010).

FN2. The affiliates are UBS (Luxembourg) SA, UBS Fund Services (Luxembourg) SA, and UBS Third Party Management Company SA.

FN3. These Defendants are Luxalpha, one of the funds, now in liquidation, and its Directors, Roger Hatmann, Ralf Schroeter, Rene Egger, Alain Hondequin, Hermann Kranz, Bernard Stiehl, Patrick Littaye, and Pierre Delandmeter; and Groupement Financier, the other fund, and its Directors, Defendant Littaye and Claudine Magon de la Villehuchet.

FN4. The affiliated persons and entities are Access International Advisors Europe Limited, Access International Adviser Ltd., Access Partners (Suisse) S.A., Access Management Luxembourg S.A., Access Partners S.A. (Luxembourg), and several individuals who ran or worked for the Access group of companies, Defendants Littaye, Villehuchet, Delandmeter and Theodore Dumbauld.

FN5. Although the Court is only interested in the standing and SLUSA issues that necessitated withdrawal of the bankruptcy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)
**(Cite as: 2011 WL 5170434 (S.D.N.Y.))**

reference, the JPMorgan Defendants have briefed several additional ones. Their arguments, and the Trustee's responses thereto, are not considered in deciding this motion.

FN6. These claims duplicated claims that had been asserted in an earlier filed action by SIPC and the SIPA trustee in the New York State Supreme Court. The first-filed State court suit remained pending all the while.

FN7. SIPC struggles heroically in its brief to establish the Trustee's standing as successor bailee to BMIS—invoking federal common law, SEC Rule 15c3–3, and several cases of ancient vintage—but ultimately fails to persuade. *See* SIPC Brief, at 13–23.

FN8. The Trustee makes no allegation that he has been assigned any customer claims against the Banks, and therefore does not rely on any assignment for standing. The issue is thus not ripe for adjudication. *See Picard v. HSBC,* 454 B.R. at 36–37 (rejecting assignee theory).

S.D.N.Y.,2011.
Picard v. JPMorgan Chase & Co.
--- B.R. ----, 2011 WL 5170434 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.