# EXHIBITS

I. Notice of Trustee's Determination of Claim

   Extension of Time until February 7, 2010 to file objection to Denial of Claim

II. February 24, 2009 Letter from Beacon detailing various Siegel IRA Capital Account amounts.

III. Various Material in Support of Objection.

IV. Letter from Beacon confirming compliance with 25 percent requirement of Department of Labor Regulation 29 CFR Sect. 2510.3-101(f)(1).

Exhibit I

**BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

In Liquidation

**DECEMBER 11, 2008[1]**

**NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM**

December 8, 2009

HOWARD SIEGEL IRA
154 PORTO VECCHIO WAY
PALM BEACH GARDENS, FL 33418

Dear HOWARD SIEGEL IRA:

**PLEASE READ THIS NOTICE CAREFULLY.**

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim designated as Claim No. 006180:

Based on a review of available books and records of BLMIS by the Trustee's staff, you did not have an account with BLMIS. Because you did not have an account, you are not a customer of BLMIS under SIPA as that term is defined at 15 U.S.C. § 78*lll* (2). Accordingly, your Claim for securities and/or a credit balance is **DENIED**.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after December 8, 2009, the date on which the Trustee mailed this notice.

---

1 Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
Attn: Claims Department
45 Rockefeller Plaza
New York, New York 10111

**Irving H. Picard**

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

EXHIBIT I

YAHOO! MAIL Classic

# RE: extension of time to file objection to denial of SIPC claim

Monday, December 21, 2009 4:58 PM

From: "May, James W." <jmay@bakerlaw.com>
To: hsiegel99@yahoo.com

Extension until February 7, 2010 granted.

---

**From:** hsiegel99@yahoo.com [mailto:hsiegel99@yahoo.com]
**Sent:** Monday, December 21, 2009 4:54 PM
**To:** May, James W.
**Subject:** extension of time to file objection to denial of SIPC claim

Thank you for granting an extension until February8,2010 in which to file my wrritten objection to the denial of my SIPC claim designated as claim No.006180.As we agreed in our telephone conversation,please confirm the grant of this extension via return e-mail.Thank you for your attention to this matter.

Howard Siegel

---

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

EXHIBIT II

BEACON/ANDOVER GROUP
ALTERNATIVE INVESTMENTS

123 Main Street, Suite 900
White Plains, New York 10601

T 914.385.0525
F 914.948.0051

February 24, 2009

Mr. Howard Siegel
154 Porto Vecchio Way
Palm Beach Gardens, Florida 33418

Re: Beacon Associates LLC II with Howard Siegel IRA

Dear Mr. Siegel:

The total unaudited value of the Howard Siegel IRA's capital account with Beacon Associates LLC II at November 30, 2008 was $2,302,426.68. This includes the investment with Bernard L. Madoff Investment Securities which was subsequently written off completely as of December, 2008.

The total unaudited value of the IRA account at December 31, 2008 was $620,326.35 reflecting the Madoff write-off.

The IRA's approximate percentage interest in Beacon Associates LLC II at November 30, 2008 (before the Madoff write-off) was 0.47%.

At November 30, 2008, Beacon Associates LLC II's direct investment in Bernard L. Madoff Investment Securities represented approximately 72.71% of the entire fund.

The net equity of the Howard Siegel IRA in Beacon Associates LLC II (excess of contributions less withdrawals) at December 1, 2008 is $1,580,677.

This letter supersedes our previous letter to you dated February 19, 2009 as we have refined the percentages slightly.

Beacon Associates Management Corp.,
Managing Member

MADOFF LOSS

NOVEMBER 30, 2008 IRA CAPITAL ACCOUNT $2,302,426.68
x 72.71%

MADOFF LOSS $1,674,125.55

TOTAL DEC. 1, 2008 IRA NET EQUITY $1 580 677 x 72.71%
ATTRIBUTALE TO BLMIS ACCOUNT $1,1493,10
SIPC RECOVERY $500,000

00436158.

BEACON ASSOCIATES LLC II

EXHIBIT III

time prior to such transfer. Upon dissolution of SIPC, none of its net assets shall inure to the benefit of any of its members.

**(f) SECTION 78t(a) OF THIS TITLE NOT TO APPLY**

The provisions of subsection (a) of section 78t of this title shall not apply to any liability under or in connection with this chapter.

**(g) SEC STUDY OF UNSAFE OR UNSOUND PRACTICES**

Not later than twelve months after December 30, 1970, the Commission shall compile a list of unsafe or unsound practices by members of SIPC in conducting their business and report to the Congress (1) the steps being taken under the authority of existing law to eliminate those practices and (2) recommendations concerning additional legislation which may be needed to eliminate those unsafe or unsound practices.

**§78*lll*. DEFINITIONS**

For purposes of this chapter, including the application of the Bankruptcy Act* to a liquidation proceeding:

**(1) COMMISSION**

The term "Commission" means the Securities and Exchange Commission.

**(2) CUSTOMER**

The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral

See Rules identifying Accounts of "Separate Customers" of SIPC members attached. whereby Howard Siegel IAA is deemed to have its own customer account by virtue of its beneficial ownership of its proportionate share of customer account 1B0118 Beacon Associates LLC I+II

* Pub. L. No. 95-598, § 308 (a) – (o), 92 Stat. 2674-2676 (1978), struck all references to "the Bankruptcy Act" and substituted references to title 11 of the United States Code. It failed, however, to strike this reference to the Bankruptcy Act and substitute a reference to the Bankruptcy Code or title 11 of the United States Code.



security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities, but does not include—

(A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or

(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

(3) CUSTOMER NAME SECURITIES

The term "customer name securities" means securities which were held for the account of a customer on the filing date by or on behalf of the debtor and which on the filing date were registered in the name of the customer, or were in the process of being so registered pursuant to instructions from the debtor, but does not include securities registered in the name of the customer which, by endorsement or otherwise, were in negotiable form.

(4) CUSTOMER PROPERTY

The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted. The term "customer property" includes—

(A) securities held as property of the debtor to the extent that the inability of the debtor to meet its obligations to customers for their net equity claims based

on securities of the same class and series of an issuer is attributable to the debtor's noncompliance with the requirements of section 78*o*(c)(3) of this title and the rules prescribed under such section;

(B) resources provided through the use or realization of customers' debit cash balances and other customer-related debit items as defined by the Commission by rule;

(C) any cash or securities apportioned to customer property pursuant to section 78fff(d) of this title; and

(D) any other property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

**(5) DEBTOR**

The term "debtor" means a member of SIPC with respect to whom an application for a protective decree has been filed under section 78eee(a)(3) of this title or a direct payment procedure has been instituted under section 78fff-4(b) of this title.

**(6) EXAMINING AUTHORITY**

The term "examining authority" means, with respect to any member of SIPC (A) the self-regulatory organization which inspects or examines such member of SIPC, or (B) the Commission if such member of SIPC is not a member of or participant in any self-regulatory organization or if the Commission has designated itself examining authority for such member pursuant to section 78iii(c) of this title.

**(7) FILING DATE**

The term "filing date" means the date on which an application for a protective decree is filed under section 78eee(a)(3) of this title, except that—

EXHIBIT III

Checkpoint Contents
Pension & Benefits Library
Pension & Benefits Source Materials
ERISA, DOL & PBGC Regulations & Committee Reports
DOL Final Regulations and Interim Rules
PART 2510 Definitions of Terms Used in Subchapter C, D, E, F, and G of This Chapter
§§2510.3-1 -- 2510.3-102
§2510.3-101 Definition of "plan assets"—plan investments.

Miscellaneous Nontax Regulations

# 29 CFR §2510.3-101 Definition of "plan assets"—plan investments.

## (a) In general.

*

(1) This section describes what constitute assets of a plan with respect to a plan's investment in another entity for purposes of Subtitle A, and Parts 1 and 4 of Subtitle B, of Title I of the Act and section 4975 of the Internal Revenue Code. Paragraph (a)(2) of this section contains a general rule relating to plan investments. Paragraphs (b) through (f) of this section define certain terms that are used in the application of the general rule. Paragraph (g) of this section describes how the rules in this section are to be applied when a plan owns property jointly with others or where it acquires an equity interest whose value relates solely to identified assets of an issuer. Paragraph (h) of this section contains special rules relating to particular kinds of plan investments. Paragraph (i) describes the assets that a plan acquires when it purchases certain guaranteed mortgage certificates. Paragraph (j) of this section contains examples illustrating the operation of this section. The effective date of this section is set forth in paragraph (k) of this section.

*

(2) Generally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, in the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that:

BEACON IS NOT AN OPERATING COMPANY (SEE DEFINITION) AND THE EQUITY PARTICIPATION IS SIGNIFICANT.

(i) The entity is an operating company, or

(ii) Equity participation in the entity by benefit plan investors is not significant.

Therefore, any person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the investing plan.

## (b) Equity interests and publicly-offered securities.

SKIP

(1) the term "equity interest" means any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features. A profits interest in a partnership, an undivided ownership interest in property and a beneficial interest in a trust are equity interests.

SKIP

(2) A "publicly-offered security" is a security that is freely transferable, part of a class of securities that is widely held and either—

(i) Part of a class of securities registered under section 12(b) or 12(g) of the Securities Exchange Act of 1934, or

(ii) Sold to the plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is registered under the Securities Exchange Act of 1934 within 120 days (or such later time as may be allowed by the Securities and Exchange Commission) after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred.

(3) For purposes of paragraph (b)(2) of this section, a class of securities is "widely-held" only if it is a class of securities that is owned by 100 or more investors independent of the issuer and of one another. A class of securities will not fail to be widely-held solely because subsequent to the initial offering the number of independent investors falls below 100 as a result of events beyond the control of the issuer.

(4) For purposes of paragraph (b)(2) of this section, whether a security is "freely transferable" is a factual question to be determined on the basis of all relevant facts and circumstances. If a security is part of an offering in which the minimum investment is $10,000 or less, however, the following factors ordinarily will not, alone or in combination, affect a finding that such securities are freely transferable:

(i) Any requirement that not less than a minimum number of shares or units of such security be transferred or assigned by any investor, provided that such requirement does not prevent transfer of all of the then remaining shares or units held by an investor;

(ii) Any prohibition against transfer or assignment of such security or rights in respect thereof to an ineligible or unsuitable investor;

(iii) Any restriction on, or prohibition against, any transfer or assignment which would either result in a termination or reclassification of the entity for federal or state tax purposes or which would violate any state or federal statute, regulation, court order, judicial decree, or rule of law;

(iv) Any requirement that reasonable transfer or administrative fees be paid in connection with a transfer or assignment;

(v) Any requirement that advance notice of a transfer or assignment be given to the entity and any requirement regarding execution of documentation evidencing such transfer or assignment (including documentation setting forth representations from either or both of the transferor or transferee as to compliance with any restriction or requirement described in this paragraph (b)(4) of this section or requiring compliance with the entity's governing instruments);

(vi) Any restriction on substitution of an assignee as a limited partner of a partnership, including a general partner consent requirement, provided that the economic benefits of ownership of the assignor may be transferred or assigned without regard to such restriction or consent (other than compliance with any other

restriction described in this paragraph (b)(4) of this section;

(vii) Any administrative procedure which establishes an effective date, or an event, such as the completion of the offering, prior to which a transfer or assignment will not be effective; and

(viii) Any limitation or restriction on transfer or assignment which is not created or imposed by the issuer or any person acting for or on behalf of such issuer.

## (c) Operating company.

*(1)* An "operating company" is an entity that is primarily engaged, directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital. The term "operating company" includes an entity which is not described in the preceding sentence, but which is a "venture capital operating company" described in paragraph (d) or a "real estate operating company" described in paragraph (e).

*(2)* **Reserved.**

## (d) Venture capital operating company.

*(1)* An entity is a "venture capital operating company" for the period beginning on an initial valuation date described in paragraph (d)(5)(i) and ending on the last day of the first "annual valuation period" described in paragraph (d)(5)(ii) (in the case of an entity that is not a venture capital operating company immediately before the determination) or for the 12 month period following the expiration of an "annual valuation period" described in paragraph (d)(5)(ii) (in the case of an entity that is a venture capital operating company immediately before the determination) if--

(i) On such initial valuation date, or at any time within such annual valuation period, at least 50 percent of its assets (other than short-term investments pending long-term commitment or distribution to investors), valued at cost, are invested in venture capital investments described in paragraph (d)(3)(i) or derivative investments described in paragraph (d)(4); and

(ii) During such 12 month period (or during the period beginning on the initial valuation date and ending on the last day of the first annual valuation period), the entity, in the ordinary course of its business, actually exercises management rights of the kind described in paragraph (d)(3)(ii) with respect to one or more of the operating companies in which it invests.

*(2)*

(i) A venture capital operating company described in paragraph (d)(1) shall continue to be treated as a venture capital operating company during the "distribution period" described in paragraph (d)(2)(ii). An entity shall not be treated as a venture capital operating company at any time after the end of the distribution period.

(ii) The "distribution period" referred to in paragraph (d)(2)(i) begins on a date

SKIP

established by a venture capital operating company that occurs after the first date on which the venture capital operating company has distributed to investors the proceeds of at least 50 percent of the highest amount of its investments (other than short-term investments made pending long-term commitment or distribution to investors) outstanding at any time from the date it commenced business (determined on the basis of the cost of such investments) and ends on the earlier of—

(A) The date on which the company makes a "new portfolio investment", or

(B) The expiration of 10 years from the beginning of the distribution period.

(iii) For purposes of paragraph (d)(2)(ii)(A), a "new portfolio investment" is an investment other than—

(A) An investment in an entity in which the venture capital operating company had an outstanding venture capital investment at the beginning of the distribution period which has continued to be outstanding at all times during the distribution period, or

(B) A short-term investment pending long-term commitment or distribution to investors.

*(3)*

(i) For purposes of this paragraph (d) a "venture capital investment" is an investment in an operating company (other than a venture capital operating company) as to which the investor has or obtains management rights.

(ii) The term "management rights" means contractual rights directly between the investor and an operating company to substantially participate in, or substantially influence the conduct of, the management of the operating company.

*(4)*

(i) An investment is a "derivative investment" for purposes of this paragraph (d) if it is—

(A) A venture capital investment as to which the investor's management rights have ceased in connection with a public offering of securities of the operating company to which the investment relates, or

(B) An investment that is acquired by a venture capital operating company in the ordinary course of its business in exchange for an existing venture capital investment in connection with:

*(1)*

A public offering of securities of the operating company to which the existing venture capital investment relates, or

SKIP

(2) A merger or reorganization of the operating company to which the existing venture capital investment relates, provided that such merger or reorganization is made for independent business reasons unrelated to extinguishing management rights.

(ii) An investment ceases to be a derivative investment on the later of:

(A) 10 years from the date of the acquisition of the original venture capital investment to which the derivative investment relates, or

(B) 30 months from the date on which the investment becomes a derivative investment.

*(5)* For purposes of this paragraph (d) and paragraph (e)—

(i) An "initial valuation date" is the later of—

(A) Any date designated by the company within the 12 month period ending with the effective date of this section, or

(B) The first date on which an entity makes an investment that is not a short-term investment of funds pending long-term commitment.

(ii) An "annual valuation period" is a preestablished annual period, not exceeding 90 days in duration, which begins no later than the anniversary of an entity's initial valuation date. An annual valuation period, once established may not be changed except for good cause unrelated to a determination under this paragraph (d) or paragraph (e).

(e) **Real estate operating company.** An entity is a "real estate operating company" for the period beginning on an initial valuation date described in paragraph (d)(5)(i) and ending on the last day of the first "annual valuation period" described in paragraph (d)(5)(ii) (in the case of an entity that is not a real estate operating company immediately before the determination) or for the 12 month period following the expiration of an annual valuation period described in paragraph (d)(5)(ii) (in the case of an entity that is a real estate operating company immediately before the determination) if:

*(1)* On such initial valuation date, or on any date within such annual valuation period, at least 50 percent of its assets, valued at cost (other than short-term investments pending long-term commitment or distribution to investors), are invested in real estate which is managed or developed and with respect to which such entity has the right to substantially participate directly in the management or development activities; and

*(2)* During such 12 month period (or during the period beginning on the initial valuation date and ending on the last day of the first annual valuation period) such entity in the ordinary course of its business is engaged directly in real estate management or development activities.

**(f) Participation by benefit plan investors.**

*(1)* Equity participation in an entity by benefit plan investors is "significant" on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25 percent or more of the value of any class of equity interests in the entity is held by benefit plan investors (as defined in paragraph (f)(2)). For purposes of determinations pursuant to this paragraph (f), the value of any equity interests held by a person (other than a benefit plan investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded.

*(2)* A "benefit plan investor" is any of the following—

(i) Any employee benefit plan (as defined in section 3(3) of the Act), whether or not it is subject to the provisions of Title I of the Act,

INCLUDES IRA'S

(ii) Any plan described in section 4975(e)(1) of the Internal Revenue Code,

(iii) Any entity whose underlying assets include plan assets by reason of a plan's investment in the entity.

*(3)* An "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. For purposes of this paragraph (f)(3), "control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

**(g) Joint ownership.** For purposes of this section, where a plan jointly owns property with others, or where the value of a plan's equity interest in an entity relates solely to identified property of the entity, such property shall be treated as the sole property of a separate entity.

**(h) Specific rules relating to plan investments.** Notwithstanding any other provision of this section—

*(1)* Except where the entity is an investment company registered under the Investment Company Act of 1940, when a plan acquires or holds an interest in any of the following entities its assets include its investment and an undivided interest in each of the underlying assets of the entity:

(i) A group trust which is exempt from taxation under section 501(a) of the Internal Revenue Code pursuant to the principles of Rev. Rul. 81-100, 1981-1 C.B. 326,

(ii) A common or collective trust fund of a bank,

(iii) A separate account of an insurance company, other than a separate account that is maintained solely in connection with fixed contractual obligations of the insurance company under which the amounts payable, or credited, to the plan and to any participant or beneficiary of the plan (including an annuitant) are not affected in any manner by the investment performance of the separate account.

SKIP

*(2)* When a plan acquires or holds an interest in any entity (other than an insurance company licensed to do business in a State) which is established or maintained for the purpose of offering or providing any benefit described in section 3(1) or section 3(2) of the Act to participants or beneficiaries of the investing plan, its assets will include its investment and an undivided interest in the underlying assets of that entity.

*(3)* When a plan or a related group of plans owns all of the outstanding equity interests (other than director's qualifying shares) in an entity, its assets include those equity interests and all of the underlying assets of the entity. This paragraph (h)(3) does not apply, however, where all of the outstanding equity interests in an entity are qualifying employer securities described in section 407(d)(5) of the Act, owned by one or more eligible individual account plan(s) (as defined in section 407(d)(3) of the Act) maintained by the same employer, provided that substantially all of the participants in the plan(s) are, or have been, employed by the issuer of such securities or by members of a group of affiliated corporations (as determined under section 407(d)(7) of the Act) of which the issuer is a member.

*(4)* For purposes of paragraph (h)(3), a "related group" of employee benefit plans consists of every group of two or more employee benefit plans—

(i) Each of which receives 10 percent or more of its aggregate contributions from the same employer or from members of the same controlled group of corporations (as determined under section 1563(a) of the Internal Revenue Code, without regard to section 1563(a)(4) thereof); or

(ii) Each of which is either maintained by, or maintained pursuant to a collective bargaining agreement negotiated by, the same employee organization or affiliated employee organizations. For purposes of this paragraph, an "affiliate" of an employee organization means any person controlling, controlled by, or under common control with such organization, and includes any organization chartered by the same parent body, or governed by the same constitution and bylaws, or having the relation of parent and subordinate.

**(i) Governmental mortgage pools.**

*(1)* Where a plan acquires a guaranteed governmental mortgage pool certificate, as defined in paragraph (i)(2), the plan's assets include the certificate and all of its rights with respect to such certificate under applicable law, but do not, solely by reason of the plan's holding of such certificate, include any of the mortgages underlying such certificate.

*(2)* A "guaranteed governmental mortgage pool certificate" is a certificate backed by, or evidencing an interest in, specified mortgages or participation interests therein and with respect to which interest and principal payable pursuant to the certificate is guaranteed by the United States or an agency or instrumentality thereof. The term "guaranteed governmental mortgage pool certificate" includes a mortgage pool certificate with respect to which interest and principal payable pursuant to the certificate is guaranteed by:

(i) The Government National Mortgage Association;

*(ii) The Federal Home Loan Mortgage Corporation; or*

(iii) The Federal National Mortgage Association.

**(j) Examples.** The principles of this section are illustrated by the following examples:

*(1)* A plan, P, acquires debentures issued by a corporation, T, pursuant to a private offering. T is engaged primarily in investing and reinvesting in precious metals on behalf of its shareholders, all of which are benefit plan investors. By its terms, the debenture is convertible to common stock of T at P's option. At the time of P's acquisition of the debentures, the conversion feature is incidental to T's obligation to pay interest and principal. Although T is not an operating company, P's assets do not include an interest in the underlying assets of T because P has not acquired an *equity* interest in T. However, if P exercises its option to convert the debentures to common stock, it will have acquired an equity interest in T at that time and (assuming that the common stock is not a publicly-offered security and that there has been no change in the composition of the other equity investors in T) P's assets would then include an undivided interest in the underlying assets of T.

*(2)* A plan, P, acquires a limited partnership interest in a limited partnership, U, which is established and maintained by A, a general partner in U. U has only one class of limited partnership interests. U is engaged in the business of investing and reinvesting in securities. Limited partnership interest in U are offered privately pursuant to an exemption from the registration requirements of the Securities Act of 1933. P acquires 15 percent of the value of all the outstanding limited partnership interests in U, and, at the time of P's investment, a governmental plan owns 15 percent of the value of those interests. U is not an operating company because it is engaged primarily in the investment of capital. In addition, equity participation by benefit plan investors is significant because immediately after P's investment such investors hold more than 25 percent of the limited partnership interests in U. Accordingly, P's assets include an undivided interest in the underlying assets of U, and A is a fiduciary of P with respect to such assets by reason of its discretionary authority and control over U's assets. Although the governmental plan's investment is taken into account for purposes of determining whether equity participation by benefit plan investors is significant, nothing in this section imposes fiduciary obligations on A with respect to that plan.

*(3)* Assume the same facts as in paragraph (j)(2), except that P acquires only 5 percent of the value of all the outstanding limited partnership interests in U, and that benefit plan investors in the aggregate hold only 10 percent of the value of the limited partnership interests in U. Under these facts, there is no significant equity participation by benefit plan investors in U, and, accordingly, P's assets include its limited partnership interest in U, but do not include any of the underlying assets of U. Thus, A would not be a fiduciary of P by reason of P's investment.

*(4)* Assume the same facts as in paragraph (j)(3) and that the aggregate value of the outstanding limited partnership interests in U is $10,000 (and that the value of the interests held by benefit plan investors is thus $1000). Also assume that an affiliate of A owns limited partnership interests in U having a value of $6500. The value of the limited partnership interests held by A's affiliate are disregarded for purposes of determining whether there is significant equity participation in U by benefit plan investors. Thus, the percentage of the aggregate value of the limited partnership interests held by benefit plan investors in U for purposes of such a determination is approximately 28.6% ($1000/$3500). Therefore there is significant benefit plan investment in T.

*(5)* A plan, P, invests in a limited partnership, V, pursuant to private offering. There is significant equity participation by benefit plan investors in V. V acquires equity positions in the companies in which it invests, and, in connection with these investments, V negotiates terms that give it the right to participate in or influence the management of those companies. Some of these investments are in publicly-offered securities and some are in

securities acquired in private offerings. During its most recent valuation period, more than 50 percent of V's assets, valued at cost, consisted of investments with respect to which V obtained management rights of the kind described above. V's managers routinely consult informally with, and advise, the management of only one portfolio company with respect to which it has management rights, although it devotes substantial resources to its consultations with that company. With respect to the other portfolio companies, V relies on the managers of other entities to consult with and advise the companies' management. V is a venture capital operating company and therefore P has acquired its limited partnership investment, but has not acquired an interest in any of the underlying assets of V. Thus, none of the managers of V would be fiduciaries with respect to P solely by reason of its investment. In this situation, the mere fact that V does not participate in or influence the management of all its portfolio companies does not affect its characterization as a venture capital operating company.

*(6)* Assume the same facts as in paragraph (j)(5) and the following additional facts: V invests in debt securities as well as equity securities of its portfolio companies. In some cases V makes debt investments in companies in which it also has an equity investment; in other cases V only invests in debt instruments of the portfolio company. V's debt investments are acquired pursuant to private offerings and V negotiates covenants that give it the right to substantially participate in or to substantially influence the conduct of the management of the companies issuing the obligations. These covenants give V more significant rights with respect to the portfolio companies' management than the covenants ordinarily found in debt instruments of established, creditworthy companies that are purchased privately by institutional investors. V routinely consults with and advises the management of its portfolio companies. The mere fact that V's investments in portfolio companies are debt, rather than equity, will not cause V to fail to be a venture capital operating company, provided it actually obtains the right to substantially participate in or influence the conduct of the management of its portfolio companies and provided that in the ordinary course of its business it actually exercises those rights.

*(7)* A plan, P, invests (pursuant to a private offering) in a limited partnership, W, that is engaged primarily in investing and reinvesting assets in equity positions in real property. The properties acquired by W are subject to long-term leases under which substantially all management and maintenance activities with respect to the property are the responsibility of the lessee. W is not engaged in the management or development of real estate merely because it assumes the risks of ownership of income-producing real property, and W is not a real estate operating company. If there is significant equity participation in W by benefit plan investors, P will be considered to have acquired an undivided interest in each of the underlying assets of W.

*(8)* Assume the same facts as in paragraph (j)(7) except that W owns several shopping centers in which individual stores are leased for relatively short periods to various merchants (rather than owning properties subject to long-term leases under which substantially all management and maintenance activities are the responsibility of the lessee). W retains independent contractors to manage the shopping center properties. These independent contractors negotiate individual leases, maintain the common areas and conduct maintenance activities with respect to the properties. W has the responsibility to supervise and the authority to terminate the independent contractors. During its most recent valuation period more than 50 percent of W's assets, valued at cost, are invested in such properties. W is a real estate operating company. The fact that W does not have its own employees who engage in day-to-day management and development activities is only one factor in determining whether it is actively managing or developing real estate. Thus, P's assets include its interest in W, but do not include any of the underlying assets of W.

*(9)* A plan, P, acquires a limited partnership interest in X pursuant to a private offering. There is significant equity participation in X by benefit plan investors. X is engaged in the

business of making "convertible loans" which are structured as follows: X lends a specified percentage of the cost of acquiring real property to a borrower who provides the remaining capital needed to make the acquisition. This loan is secured by a mortgage on the property. Under the terms of the loan, X is entitled to receive a fixed rate of interest payable out of the initial cash flow from the property and is also entitled to that portion of any additional cash flow which is equal to the percentage of the acquisition cost that is financed by its loan. Simultaneously with the making of the loan, the borrower also gives X an option to purchase an interest in the property for the original principal amount of the loan at the expiration of its initial term. X's percentage interest in the property, if it exercises this option, would be equal to the percentage of the acquisition cost of the property which is financed by its loan. The parties to the transaction contemplate that the option ordinarily will be exercised at the expiration of the loan term if the property has appreciated in value. X and the borrower also agree that, if the option is exercised, they will form a limited partnership to hold the property. X negotiates loan terms which give it rights to substantially influence, or to substantially participate in, the management of the property which is acquired with the proceeds of the loan. These loan terms give X significantly greater rights to participate in the management of the property than it would obtain under a conventional mortgage loan. In addition, under the terms of the loan, X and the borrower ratably share any capital expenditures relating to the property. During its most recent valuation period, more than 50 percent of the value of X's assets valued at cost consisted of real estate investments of the kind described above. X, in the ordinary course of its business, routinely exercises its management rights and frequently consults with and advises the borrower and the property manager. Under these facts, X is a real estate operating company. Thus, P's assets include its interest in X, but do not include any of the underlying assets of X.

*(10)* In a private transaction, a plan, P, acquires a 30 percent participation in a debt instrument that is held by a bank. Since the value of the participation certificate relates solely to the debt instrument, that debt instrument is, under paragraph (g), treated as the sole asset of a separate entity. Equity participation in that entity by benefit plan investors is significant since the value of the plan's participation exceeds 25 percent of the value of the instrument. In addition, the hypothetical entity is not an operating company because it is primarily engaged in the investment of capital (i.e., holding the debt instrument). Thus, P's assets include the participation and an undivided interest in the debt instrument, and the bank is a fiduciary of P to the extent it has discretionary authority or control over the debt instrument.

*(11)* In a private transaction, a plan, P, acquires 30% of the value of a class of equity securities issued by an operating company, Y. These securities provide that dividends shall be paid solely out of earnings attributable to certain tracts of undeveloped land that are held by Y for investment. Under paragraph (g), the property is treated as the sole asset of a separate entity. Thus, even though Y is an operating company, the hypothetical entity whose sole assets are the undeveloped tracts of land is not an operating company. Accordingly, P is considered to have acquired an undivided interest in the tracts of land held by Y. Thus, Y would be a fiduciary of P to the extent it exercises discretionary authority or control over such property.

*(12)* A medical benefit plan, P, acquires a beneficial interest in a trust, Z, that is not an insurance company licensed to do business in a State. Under this arrangement, Z will provide the benefits to the participants and beneficiaries of P that are promised under the terms of the plan. Under paragraph (h)(2), P's assets include its beneficial interest in Z and an undivided interest in each of its underlying assets. Thus, persons with discretionary authority or control over the assets of Z would be fiduciaries of P.

**(k) Effective date and transitional rules.**

(1) In general, this section is effective for purposes of identifying the assets of a plan on or after March 13, 1987. Except as a defense, this section shall not apply to investments in an entity in existence on March 13, 1987, if no plan subject to Title I of the Act or plan described in section 4975(e)(1) of the Code (other than a plan described in section 4975 (g)(2) or 4975(g)(3)) acquires an interest in the entity from an issuer or underwriter at any time on or after March 13, 1987 except pursuant to a contract binding on the plan in effect on March 13, 1987 with an issuer or underwriter to acquire an interest in the entity.

(2) Notwithstanding paragraph (k)(1), this section shall not, except as a defense, apply to a real estate entity described in section 11018(a) of Pub. L. 99-272.

51 Fed. Reg. 41280, 11/13/86; 51 Fed. Reg. 47226, 12/31/86.
END OF DOCUMENT -
© 2009 Thomson Reuters/RIA. All rights reserved.

BEACON/ANDOVER GROUP

ALTERNATIVE INVESTMENTS

EXHIBIT IV

123 Main Street, Suite 900
White Plains, New York 10601

T 914.385.0525
F 914.948.0051

Jules L. Smith
Blitman & King LLP
The Powers Building, Suite 500
16 West Main Street
Rochester New York 14614-1606

December 17, 2010

Dear Mr. Smith,

This letter serves to confirm that as of Nov 30, 2008 and currently more than 25% of Beacon Associates LLC I's assets under management were from ERISA funds. In addition, as of November 30, 2008 and currently more than 25% of Beacon Associates LLC II's assets were from ERISA funds.

Beacon Associates LLC I

By: Beacon Associates Management Corp.

By: [signature]
Joel Danziger, President

BEACON ASSOCIATES LLC I