Marc J. Kurzman (MK 2962)
SANDAK HENNESSEY & GRECO, LLP
707 Summer Street, 3rd Floor
Stamford, CT 06901
Tel: (203) 425-4200
Fax: (203) 325-8608
Email: mkurzman@shglaw.com

Peter N. Wang (PW 9216)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Phone: (212) 682-7474
Fax: (212) 687-2329
E-mail: pwang@foley.com

*Co-Counsel for Orthopaedic Specialty Group, P.C. Defined Contribution Pension Plan Participants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, <br><br> Defendant. | SIPA LIQUIDATION <br><br><br> Adv. Pro. No. 08-01789 (BRL) |

-----------------------------------------------------

In re:

BERNARD L. MADOFF,

        Debtor.

-----------------------------------------------------

**MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION FOR
AN ORDER AFFIRMING DETERMINATIONS DENYING CLAIMS
<u>OVER ERISA-RELATED OBJECTIONS</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 2

    The OSG Plan ........................................................................................................ 2
    Entrustment of the Plan's Assets to BLMIS ........................................................... 4
    The Individual Participants' Net Equity Claim ...................................................... 6

ARGUMENT .................................................................................................................. 8

I.    THE OSG PLAN PARTICIPANTS ARE ENTITLED TO A SIPC ADVANCE FOR THE
FULL AMOUNT OF ALL CONTRIBUTIONS MADE TO THEIR INDIVIDUAL PLAN
ACCOUNTS WHICH WERE TRANSFERRED TO BLMIS ........................................... 9

    A.    The OSG Plan Participants Meet SIPA's Definition of "Customer" ................. 9
    B.    The Trustee's Rationale for Denying the OSG Plan Participants' Customer Claims is
Inconsistent with SIPA and ERISA ...................................................................... 11
    C.    The Second Circuit's *Morgan, Kennedy* Decision Creates No Bar to the OSG Plan
Participant's Customer Claims .............................................................................. 14
    D.    Recent Supreme Court Case Law Recognizes That Participants' Individual Benefits
Under 401(k) Defined Contribution Profit Sharing Plans Should Be Safeguarded ........... 17
    E.    The *Waddell* Opinion Recognized That Participants Could Still Be Considered
"Customers" Despite Not Having Individual Accounts With the Broker ............... 19
    F.    The OSG Plan Participants' Status as Customers is Supported by this Court's Ruling on
the Trustee's Feeder Funds Motion ...................................................................... 21

II.    AT THE MINIMUM THE OSG PLAN PARTICIPANTS ARE ENTITLED TO A SIPC
ADVANCE FOR THEIR 401(k) AND ROLLOVER CONTRIBUTIONS ENTRUSTED TO
BLMIS ......................................................................................................................... 23

REQUEST FOR EVIDENTIARY HEARING AND RESERVATION OF RIGHTS ................. 24

CONCLUSION ............................................................................................................. 25

## TABLE OF AUTHORITIES

CASES

*Ahammed v. SIPC (In re Primeline Sec. Corp.)*,
  295 F.3d 1100 (10th Cir. 2002) .......................................................................23

*Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791 (6th Cir. 1995)...........................9

*Exch. Nat'l Bank of Chicago v. Wyatt*,
  517 F.2d 453 (2d Cir. 1975) ...........................................................................8

*Focht v. Heebner (In re Old Naples Sec., Inc.)*, 223 F.3d 1296 (11th Cir. 2000) ........23

*Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge*,
  93 F.3d 1171 (3d Cir. 1996) ..........................................................................22

*In re Bernard L. Madoff Inv. Sec. LLC*,
  654 F.3d 229 (2d Cir. 2011) ........................................................................ 8-9

*In re Cardinal Health, Inc. ERISA Ltig*,
  424 F. Supp. 2d 1002 (S.D. Ohio 2006) ...........................................................11

*In re Investors Security Corp.*,
  6 B.R. 420 (W.D. Pa. 1980)...........................................................................10

*In re New Times Securities Services, Inc.*,
  463 F.2d 125 (2d Cir. 2006) ...........................................................................9

*In re Waddell Jenmar Securities, Inc.*,
  126 B.R. 935 (Bankr. E.D.N.C. 1991)......................................................... 19-21

*Kanawi v. Bechtel Corp.*,
  254 F.R.D. 102 (N.D. Cal. 2008).....................................................................22

*Laniok v. Advisory Committee of the Brainerd Manufacturing Company Pension Plan*,
  935 F.2d 1360 (2d Cir. 1991) .........................................................................13

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
  552 U.S. 248 (2008)................................................................................. 17-19

*Massachusetts Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985)....................................................................................17

*Oppenheimer & Co., Inc., v Neidhardt*,
  56 F.3d 352 (2d Cir. 1995) .......................................................................16, 23

*Rosenman Family LLC v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),*
    401 B.R. 629 (Bank. S.D.N.Y. 2009) ...................................................................9, 11

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC,*
    454 B.R. 285 (Bankr. S.D.N.Y. 2011) ................................................................. 21-23

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC,*
    11-CV-06565-DLC (S.D.N.Y. Jan. 4, 2012), ECF No. 14 ....................................21, 23

*SEC v. Morgan, Kennedy & Co., Inc.,*
    No. 73 Civ. 1057, 1975 WL 399 (S.D.N.Y. June 10, 1975) .................................15

*SIPC v. Morgan, Kennedy & Co., Inc.,*
    533 F.2d 1314 (2d Cir. 1976) ("*Morgan, Kennedy*") ................................. 14-16, 18

## STATUTES

15 U.S.C. § 78*lll*(2)..............................................................................................8-11, 24-25

17 C.F.R. § 300.101(b) ...........................................................................................14

29 U.S.C. § 1102(a)(2) ...........................................................................................12

29 U.S.C. § 1103(a) ................................................................................................11

29 U.S.C. § 1108(c)(3) ...........................................................................................12

Conn. Gen. Stat. § 42a-8-501 (West 2011) ...........................................................15

I.R.C. §  401(k) .......................................................................................................12

N.Y. U.C.C. Law §8-102(a)(17) ............................................................................15

N.Y. U.C.C. Law §8-501(b)(2), (3) .......................................................................15

Pub. L. 95-600, 92 Stat. 2826 (Nov. 6, 1978) ......................................................12

Pension Protection Act of 2006, Pub. L. No. 109-280  § 902 (Aug. 17,2006)..............18

## OTHER AUTHORITIES

Employee Benefit Research Institute, *Facts from EBRI: Retirement Trends in the United
    States Over the Past Quarter-Century* (June 2007)................................................13

Fed. R. Bankr. P. 9014(c), (d)................................................................................ 24-25

H.R. 13308, 91st Cong. §7(d) (Aug. 4, 1969) .......................................................11

S. 2348, 91st Cong. §7(d) (June 9, 1969) ..............................................................11

The individual participants in the Orthopaedic Specialty Group P.C. Defined Contribution Pension Plan a/k/a the Orthopaedic Specialty Group P.C. 401(k) Plan ("OSG Plan" or "Plan"), by and through their attorneys, hereby file this Memorandum of Law in Opposition to the Trustee's Motion for an Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections (the "Motion"). Accompanying this Memorandum of Law, and cited to herein, are the affidavits of Dr. Henry Backe and Mr. David Gershoni.

## PRELIMINARY STATEMENT

The Trustee has denied the Customer Claims of 117 individual participants in the Orthopaedic Specialty Group Defined Contribution Pension Plan (the "OSG Plan Participants" or "Plan Participants") whose retirement savings were entrusted to Bernard L. Madoff Investment Securities ("BLMIS") and wiped out by the Ponzi scheme perpetuated by Bernard Madoff. Those OSG Plan Participants are identified in Appendix 1.

The Trustee contends that the OSG Plan Participants are not entitled to the statutory protection afforded to them by the Securities Investor Protection Act ("SIPA") – which protections include the critically important advance of SIPC funds to reimburse their "net equity" losses. The Trustee's contention is untenable. If there was ever a group of people entitled to SIPA protection it is the OSG Plan Participants. They entrusted *their own money* to BLMIS for the purchase of securities with the expectation that their savings (which would hopefully grow through the efforts of BLMIS) would be available to them when they retired. Through no fault of their own, the trust they put into BLMIS was misplaced, resulting in devastating financial losses. SIPA provides protection against such losses – including a SIPC advance of up to $500,000 -- a threshold that would compensate most of the OSG Plan Participants for their net equity losses. As a result of the Trustee's overly narrow construction of SIPA, the OSG Plan Participants have been deprived of that protection. The Trustee's denial of the OSG Plan

Participants' Customer Claims should be overruled.

## BACKGROUND

### The OSG Plan

Orthopaedic Specialty Group, P.C. ("OSG") has been in existence for over 75 years. Affidavit of Henry Backe dated January 16, 2012 ("Backe Aff.") ¶ 4. It has since the 1970's maintained a retirement plan, now the OSG Plan, for its employees, who include doctors (a minority of the OSG Plan Participants), nurses, x-ray technicians, medical assistants, therapists and administrative personnel. Backe Aff. ¶¶ 4-5.

The OSG Plan has been designed in compliance with, and subject to, Sections 401(a) and 401(k) of the Internal Revenue Code of 1986, as amended ("Code"). Backe Aff. ¶ 5. An individual Plan account is created for each OSG employee who participates in the OSG Plan. Backe Aff. ¶ 8. The Plan is funded by:

    a) 401(k) contributions: OSG Plan Participants who are current employees of OSG can elect to have a certain amount or percentage of their salary, which would otherwise be paid to them in cash contributed on a pre-tax basis to their individual account in the Plan;

    b) Rollover contributions: Funds held for the benefit of OSG Plan Participants under other employers' qualified employee benefit plans and individual retirement accounts can generally be transferred into their individual accounts in the Plan. (Likewise, upon termination of employment, OSG Plan Participants are generally permitted to transfer the vested portion of their individual accounts in the Plan to their new employer's qualified employee benefit plan or an individual retirement account.);

    c) Safe harbor contributions: For purposes of satisfying certain non-discrimination requirements under Section 401(k) of the Code, OSG makes a special non-elective

2

contribution, of up to 3% of compensation, to the accounts of all employees eligible to participate in the Plan, regardless of whether the employee-participants make salary reduction contributions to the Plan, and regardless of whether OSG makes any discretionary profit sharing contributions to the Plan during the year; and

d) <u>Profit sharing contributions</u>:  OSG has the discretion to make annual non-elective contributions, which are allocated among the OSG Plan Participants in the proportion that the compensation of each Participant bears to the aggregate compensation of all of the OSG Plan Participants.

Backe Aff. ¶ 7.

Each OSG Plan Participant is immediately 100% vested in his/her 401(k) contributions, safe harbor contributions, and rollover contributions.  Backe Aff. ¶ 8; see also Summary Plan Description ("SPD") at p. 10 and 23.[1]  An OSG Plan Participant must, however, complete three years of service with OSG to have a non-forfeitable right to the profit sharing contributions made by OSG on his/her behalf.  Backe Aff. ¶ 8; SPD at p. 10.  OSG Plan Participants can withdraw the funds in their individual Plan accounts upon the occurrence of certain specified events, including the employee-participant's termination of employment, normal retirement date (i.e., age 65), attainment of age 59½, death, total and permanent disability, and certain financial hardships (in the event of a financial hardship, an employee-participant can elect a distribution from 401(k) contributions only).  Backe Aff. ¶ 9; SPD at pp. 13-18.  Withdrawal of rollover contributions can be made at any time.  SPD at p. 15.  Notably, OSG Plan Participants are permitted to take out loans against their individual accounts within the Plan (essentially loaning themselves their own money) -- a right they exercise not infrequently.  Backe Aff. ¶ 9; SPD at

---

[1] The SPD in effect during the time the Plan maintained an account at BLMIS is attached as Exhibit A to the Backe Affidavit.

pp. 11-13.

## Entrustment of the Plan's Assets to BLMIS

In 1992 the OSG Plan trustees opened an account with BLMIS and began transferring the assets of the Plan to BLMIS. Backe Aff. ¶ 11. They opened a single account with BLMIS to hold all Plan assets. OSG periodically deposited with BLMIS, for investment in securities, funds that collectively represented OSG Plan Participant 401(k) contributions, OSG Plan Participant rollover contributions, profit sharing contributions and safe harbor contributions. Backe Aff. ¶ 12.

The OSG Plan Participants were advised of the transfer of the Plan's assets to BLMIS and, after 1992, were continuously updated concerning BLMIS' stewardship of their retirement savings (as reported by BLMIS). Backe Aff. ¶ 13. Conversely, the nature of the Plan, and the interests of the OSG Plan Participants in the Plan assets, was explained to BLMIS. The executives of BLMIS were well aware that the Plan's assets belonged to the OSG Plan Participants. Backe Aff. ¶ 14.

BLMIS generated credit advices for each deposit made by OSG into the Plan's BLMIS account and provided to OSG thousands of trade confirmations purporting to show that the funds entrusted by the OSG Plan Participants for the purchase of securities had in fact been used to purchase securities. Backe Aff. ¶¶ 12, 21.

The value and performance of the Plan's BLMIS account was reported by BLMIS in quarterly Portfolio Management Reports. That information was in turn provided by OSG to its outside pension administrator, Pentec Pension Actuaries and Consultants ("Pentec"), which maintained the individual account ledgers for each OSG Plan Participant showing his/her allocable share of the Plan's BLMIS account. Pentec provided reports to each Plan Participant regarding his/her account balance (based on the contributions to his/her account, withdrawals

4

from the account, and reported investment gains or losses, minus administrative expenses). Backe Aff. ¶ 21.

At the inception of the relationship between OSG and BLMIS, the trustees of the Plan dealt primarily with Maurice "Sonny" Cohn (Bernard Madoff's partner in Cohmad Securities). Backe Aff. ¶ 15. There were periodic discussions between the trustees and Mr. Cohn regarding investment objectives and how the Plan's account should be invested to meet the needs and goals of the OSG Plan Participants whose funds had been entrusted to BLMIS. Backe Aff. ¶ 15. Cohn was explicitly informed that the OSG Plan was funded by OSG employees and that substantial portions of the funds deposited by OSG with BLMIS were salary contributions and, in some cases, transfers of individual retirement accounts and proceeds from the surrendered life insurance policies owned by OSG Plan Participants. Backe Aff. ¶ 16.

In or about 1997, the trustees of the OSG Plan began dealing directly with BLMIS' Chief Financial Officer, Frank DiPascali. DiPascali was made aware, as Cohn had been before him, of how the Plan's account was funded, and that it was maintained for the benefit of the OSG Plan Participants who had individual accounts in the OSG Plan. Backe Aff. ¶ 17. The Plan's trustees met every 12-18 months with Cohn and later DiPascali to discuss the performance of the Plan's BLMIS account and how it should be diversified to accommodate the needs of OSG employees who were at the beginning of their careers (longer term investors) and the needs of those employees who would soon be retiring (investors who would need earlier access to their retirement funds). The need to protect the capital of the OSG Plan Participants and avoid risky investments was explicitly discussed with BLMIS' representatives. Backe Aff. ¶ 18.

Although DiPascali was aware that the Plan's BLMIS account held pooled assets that belonged to the individual OSG Plan Participants, he insisted that the OSG Plan Participants not

contact him with individual investment questions. Rather, he required that all communications with the OSG Plan be through the Plan trustees (except at the annual meeting where he fielded questions from non-trustee Plan Participants). Backe Aff. ¶ 20. Nevertheless, the personal financial advisor of at least one OSG Plan Participant, a senior OSG physician, communicated directly with DiPascali, and memorialized that communication, noting that DiPascali acknowledged that the physician's "account" at BLMIS was a percentage of the Plan's pooled assets, and that upon retirement, BLMIS would determine what amount belonged to that physician and would transfer that amount to another Madoff-related institution to be held as an IRA account. See Affidavit of David P. Gershoni dated January 12, 2012 ("Gershoni Aff.") ¶¶ 6-7.

**The Individual Participants' Net Equity Claim**

According to the BLMIS statements, as of November 30, 2008, the Plan's assets were worth in excess of $33,000,000. Backe Aff. ¶ 22 and Exhibit D thereto. Of that amount, the "net equity" entrusted by the OSG Plan Participants to BLMIS -- i.e. the value of their 401(k) contributions and rollover contributions, and the profit sharing and safe harbor contributions made on their behalf -- was approximately $10.9 million.[2]  Backe Aff. ¶ 23 and Exhibit E thereto. As reflected in Exhibit E to the Backe Affidavit:

- More than $4.3 million of the Plan Participants' net equity represented their contributions of their own salary.

- More than $5 million of the Plan Participants' net equity represented OSG contributions made on behalf of the OSG Plan Participants and credited to their

---

[2] The Trustee has acknowledged that the Plan deposited at least $10.094 million with the Plan. *See* Appendix 2 to this Memorandum of Law. For purposes of the Trustee's Motion, it is unnecessary to resolve the discrepancy between that amount and the amount entrusted to BLMIS as derived from the records of OSG and its outside pension consultant.

individual accounts within the Plan. Subject to the short vesting requirement for profit sharing contributions, those funds belong to the individual Plan Participants.

- Roughly $913,000 of the Plan Participants' net equity represented other funds owned by the Plan Participants and held at one time in other employers' qualified employee benefit plans and individual retirement accounts. Those funds were "rolled over" into the OSG Plan Participants' individual accounts within the OSG Plan.

- Roughly $636,000 of the Plan Participants' net equity represented the proceeds of life insurance policies which had been surrendered by certain OSG physicians.

The Trustee assumed control of BLMIS effective December 15, 2008. On March 4, 2009, Customer Claims were submitted to the Trustee on behalf of the OSG Plan Participants seeking "SIPC coverage" only to the extent of each OSG Plan Participant's net equity (Appendix 1 contains the Trustee's file-stamp acknowledging receipt of such Customer Claims). The Customer Claims (along with the Customer Claim submitted on behalf of the Plan) included: (i) detailed information concerning the amounts entrusted to BLMIS and credited to each OSG Plan Participants' Plan account; and (ii) a letter brief setting forth the legal basis for the Plan Participants' Claim.[3] An example of the detailed information submitted with each Customer Claim is attached as Exhibit F to the Backe Affidavit. The Customer Claims of the other OSG Plan Participants were in similar form.

By notices dated October 22, 2010, the Trustee denied the OSG Plan Participants' Claims

---

[3] A copy of the letter brief was filed with the Court as part of the OSG Plan Participants' Objection to Trustee's Determination of Claims dated November 18, 2010.

("Adverse Determination").[4] The notices did not address the OSG Plan Participants' evidentiary

submission or legal brief. Rather, they simply stated as follows:

> Based on a review of available books and records of BLMIS by the
> Trustee's staff, you did not have an account with BLMIS. Because
> you did not have an account, you are not a customer of BLMIS
> under SIPA as that term is defined at 15 U.S.C. §78*lll*(2).
> Accordingly, your claim for securities and/or a credit balance is
> **DENIED.**

Backe Aff. ¶ 28 and Exhibit G thereto.

The OSG Plan Participants timely filed an objection to the Trustee's adverse

determination on November 18, 2010. Docket No. 3195.

## ARGUMENT

"The principal purpose of SIPA is to protect investors against financial losses arising

from the insolvency of their brokers." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 239

(2d Cir. 2011) (internal quotations and citations omitted). "SIPA provides this protection by

ensuring that claimants who deposited cash with a broker 'for the purpose of purchasing

securities'. . .are treated as customers with claims for securities." *Id.* at 236, citing 15 U.S.C. §

78*lll*(2)(B)(i). As the Court of Appeals for the Second Circuit has noted, "[i]n any event, SIPA

covers potentially a <u>multitude of situations; no one size fits all</u>." 654 F.3d at 241 (emphasis

added); *See also Exch. Nat'l Bank of Chicago v. Wyatt*, 517 F.2d 453, 459 n. 12 (2d Cir. 1975)

(where court explained SIPA "liquidation procedures have been carefully designed to allow

flexibility").

The OSG Plan Participants are precisely the type of innocent investors SIPA was

designed to protect. Funds were entrusted to BLMIS by and on behalf of the OSG Plan

Participants which were diverted for use in a Ponzi scheme. While the OSG Plan Participants

---

[4] The Trustee allowed the Plan's Customer Claim, but the $500,000 SIPC advance to the Plan results in a *de minimus* recovery for the OSG Plan Participants.

did not open 117 separate accounts with BLMIS, Congress did not craft SIPA to apply only to individual "account holders." Rather, "customer" status under the statute is accorded to any person who entrusts cash to a broker/dealer for the purpose of purchasing securities. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 236. That is exactly what the OSG Plan Participants did here.

**I.    THE OSG PLAN PARTICIPANTS ARE ENTITLED TO A SIPC ADVANCE FOR THE FULL AMOUNT OF ALL CONTRIBUTIONS MADE TO THEIR INDIVIDUAL PLAN ACCOUNTS WHICH WERE TRANSFERRED TO BLMIS**

### A. The OSG Plan Participants Meet SIPA's Definition of "Customer"

SIPA provides protection to the customers of a defunct broker/dealer in the form of a right to share ratably in "customer property" entrusted to the broker/dealer and a right to a SIPC advance in the event that customer property is insufficient to make the customers whole. *In re New Times Securities Services, Inc.*, 463 F.2d 125, 127 (2d Cir. 2006). The statute defines "customer" as follows:

> The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes...any person who has deposited cash with the debtor for the purpose of purchasing securities, and...any person who has a claim against the debtor arising out of sales or conversions of such securities...

15 U.S.C. § 78*lll*(2).

The "critical aspect of the 'customer' definition [as used in SIPA] is the entrustment of cash or securities to the broker-dealer *for the purposes of trading securities*." 654 F.3d at 236

quoting *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995).[5]

Almost all of the OSG Plan Participants entrusted *their own funds* to BLMIS via 401(k) contributions,[6] and the assets held in OSG's BLMIS account can be precisely allocated to the deposits made by or on behalf on each of the OSG Plan Participants. *See* Exhibit E to the Backe Affidavit. SIPA imposes no requirement that one receive statements directly from the broker/dealer in order to qualify as a customer. Rather, SIPA provides coverage to those who deposit cash with the broker/dealer - untethered to any requirement that an individual customer account with the broker/dealer be established for such person. *See* 15 U.S.C. § 78*lll*(2); *In re Investors Security Corp.*, 6 B.R. 420, 426 (W.D. Pa. 1980).

Furthermore, BLMIS was explicitly told, and clearly recognized, that the assets of the Plan account were owned by the Plan Participants.[7] BLMIS purportedly invested the funds entrusted to them by the OSG Plan Participants in a manner designed to accommodate the needs of OSG Plan Participants in different stages of their careers. In fact, an individual OSG Plan Participant's financial advisor memorialized a conversation with BLMIS' Chief Financial Officer, in which the CFO acknowledged that the Plan Participant owned a percentage of the "pooled assets" held in the Plan's BLMIS account. Gershoni Aff. ¶¶ 6-7. Therefore, although the OSG Plan Participants may not have received account statements directly from BLMIS, they certainly regarded themselves, and were regarded by BLMIS, as trading customers who entrusted funds with BLMIS for purposes of purchasing securities. Therefore the Plan Participants qualify

---

[5] This Court addressed the question of who should be afforded customer status under SIPA in *Rosenman Family LLC v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 401 B.R. 629, 635 (Bank. S.D.N.Y. 2009), *aff'd on other grounds*, 395 Fed. Appx. 766 (2d Cir. 2010), and determined that plaintiffs were customers because, "the mere 'act of *entrusting*...cash to the debtor for the purpose of effecting securities transactions...triggers customer status....'" (emphasis in original). Here, it is clearly the case that the OSG Plan Participants entrusted their funds to BLMIS for this purpose, and should be afforded customer status.

[6] Monies were also entrusted by OSG to BLMIS on behalf of all of the OSG Plan Participants in the form of employer non-elective and safe harbor contributions.

[7] OSG Plan Participants were discouraged from engaging directly with BLMIS per the direction of BLMIS' Chief Financial Officer, Frank DiPascali.

as customers under SIPA.

## B. The Trustee's Rationale for Denying the OSG Plan Participants' Customer Claims is Inconsistent with SIPA and ERISA

The Trustee's October 22, 2010 denial of the OSG Plan Participants' Customer Claims is based exclusively on the following rationale: "Based on a review of the available books and records of BLMIS...you did not have an account with BLMIS. Because you did not have an account with BLMIS, you are not a customer of BLMIS under SIPA as that term is defined at 15 USC §78*lll*(2)." However, there is no requirement in Section 78*lll*(2) that a "customer" be designated by the broker/dealer as an account holder. Rather, Section 78*lll*(2) accords customer status to a person who:

1. has a securities-related claim arising from the "account of such person[]" -- without explanation as to whether the account must be in the name of such person or held for such person's benefit,[8] OR

2. deposited cash with the broker-dealer for the purposes of purchasing securities – untethered to a requirement that an "account of such person" be opened or maintained at the broker-dealer.[9]

Furthermore, 401(k) plans such as the OSG Plan were created to comply with the Code, but also implicate federal statutes, including the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). "ERISA 'protect[s]...the interest of participants in employee benefit plans and their beneficiaries..., by establishing standards of conduct, responsibility, and

---

[8] SIPA imposes no requirement that the broker-dealer "recognize" the name of a customer claimant in a SIPC liquidation. In the first draft of the SIPA legislation, SIPC explicitly would not have been required to recognize as a customer any person whose name or interest as the owner of any portion of an account was not disclosed on the records of the broker-dealer, "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. §7(d) (June 9, 1969); H.R. 13308, 91st Cong. §7(d) (Aug. 4, 1969). The final bill dropped this restriction.
[9] *See Rosenman*, 401 B.R. at 635.

11

obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and access to the federal courts." *In re Cardinal Health, Inc. ERISA Ltig*, 424 F. Supp. 2d 1002, 1016 (S.D. Ohio 2006) (internal citations omitted). "ERISA accomplishes this goal by mandating that private retirement plan assets are to be held in trust for the exclusive benefit of plan participants and beneficiaries." *Id.* (*citing* 29 U.S.C. § 1103(a)). "ERISA requires such plans to name fiduciaries who shall have the authority to control and manage the operation and administration of the plan." *Id.* (*citing* 29 U.S.C. § 1102(a)(2)). "These fiduciaries need not be independent parties; the employer or plan sponsor may appoint its own 'officer, employee, agent, or other representative' to serve in a fiduciary capacity." *Id.* (*citing* 29 U.S.C. § 1108(c)(3)). Thus, the assets held in an ERISA retirement plan are by definition held for the benefit of plan participants (and their beneficiaries) -- and an ERISA account can not be divorced from its beneficiaries as posited by the Trustee.

In 1978, Congress added Section 401(k) to the Tax Code. The law went into effect on January 1, 1980.[10] Pursuant to Section 401(k), employers could add a cash or deferred arrangement to their traditional profit sharing plans. This meant that for the first time, employee-participants were allowed to elect to contribute on a pre-tax basis, a portion of their own salary to a retirement plan maintained for their benefit. The pre-tax contributions as well as earnings on an account are taxed only when withdrawn (*e.g.*, upon retirement). This revolutionized the design and, in particular, the funding of profit sharing, defined contribution plans.

Employers have the discretion whether or not to make matching contributions to their workers' 401(k) accounts. Many companies match employee contributions to some extent, paying extra money into the employee's 401(k) account as an incentive for the employee to save

---

[10] *Revenue Procedure Act of 1978, P.L. 95-600, 92 Stat. 2826 (Nov. 6, 1978).* The Internal Revenue Service ("IRS") did not publish regulations for Section 401(k) of the Code until 1981.

more money for retirement. Alternatively, the employer may make profit sharing contributions into the 401(k) plan, or just contribute a fixed percentage of the employee's wages. These contributions may vest over several years as an inducement to the employee to stay with the employer.

As a result, because of the significant tax savings enjoyed by employees who make pre-tax contributions to 401(k) profit sharing plans, over the last 30 years, 401(k) profit sharing plans have steadily increased in popularity and overtaken defined benefit pension plans as the country's dominant type of employer-sponsored retirement program. While there were approximately 148,000 private-sector, employer-sponsored defined benefit pension plans in the early 1980s, that number had dwindled to 47,000 by 2004. *See* Employee Benefit Research Institute, *Facts from EBRI: Retirement Trends in the United States Over the Past Quarter-Century* (June 2007), available at *http://ebri.org/pdf/publications/facts/0607fact.pdf.* By contrast, there were approximately 341,000 private-sector, employer-sponsored 401(k), defined contribution plans in 1980 and approximately 653,000 in 2004. *See id.*

Clearly, the intent of Congress, with respect to its original enactment of 401(k), and its numerous revisions to 401(k) over the years, was to encourage employee participation in employer-sponsored retirement plans, and maximize the amount of capital set aside for employees' retirement. *See Laniok v. Advisory Committee of the Brainerd Manufacturing Company Pension Plan*, 935 F.2d 1360, 1365 (2d Cir. 1991) ("the Congress that enacted ERISA sought to improve the equitable character of private retirement plans and to encourage increased participation in them. . . .").

Having done exactly what Congress encouraged them to do -- participate in an employer sponsored pension plan -- the Trustee has now pulled the rug out from under the OSG Plan

Participants by denying them customer status under SIPA. The Trustee's denial of the OSG Plan

Participants' Customer Claims is completely inconsistent with the protective scheme created by

ERISA and SIPA.

### C. The Second Circuit's *Morgan, Kennedy* Decision Creates No Bar to the OSG Plan Participant's Customer Claims

In *SIPC v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314 (2d Cir. 1976) ("*Morgan,*

*Kennedy*") -- a decision that predated the statutory creation of 401(k) retirement plans -- the

Second Circuit held that an employee's contingent interest in an employer-funded retirement plan

was inadequate to qualify the employee as a "customer" under SIPA. The employer in *Morgan,*

*Kennedy*, Reading Body Works, Inc. ("Reading"), established a profit sharing plan funded

exclusively through *employer* contributions based upon the *employer*'s net earnings. 533 F.2d at

1315. Under the Reading profit sharing plan, employees could earn "credits" or a percentage

interest (not an ownership interest) in the trust fund created by and funded by Reading according

to annual compensation levels and consecutive years of service. While separate accounts for

each employee were maintained in the records of the trust to reflect an employee's accumulated

credits and the current value of the account based on those credits, an employee could not gain

access to any of the funds deposited by Reading into the trust fund until his/her termination of

employment with Reading. *See Morgan, Kennedy*, 533 F.2d at 1315.

The trustees of the trust fund opened an account with Morgan, Kennedy in the trustees'

names. *Id.* After Morgan, Kennedy was placed into SIPC liquidation in 1973, the trustees

submitted a customer claim for the plan on behalf of the trust. *Id.* The SIPC Trustee informed

SIPC that he intended to treat the one hundred and eight beneficiaries of the trust as separate

customers of the debtor, entitling each to maximum SIPC coverage per customer. SIPC

disagreed with that approach.[11] *Id.* at 1315-16. The bankruptcy court upheld that SIPC Trustee's

treatment of the trust beneficiaries as "customers" of the debtor. *Id.* at 1315-16. The district

court upheld the bankruptcy court's ruling. *SEC v. Morgan, Kennedy & Co., Inc.*, No. 73 Civ.

1057, 1975 WL 399 (S.D.N.Y. June 10, 1975). The district court interpreted SIPC's rule

101(b)[12], in order to "look beyond the formalities of 'title' and account designations to protect

the 'persons' affected with the kind of substantial interest Congress cared about. The analogy, if

not decisive, is sound and useful." *SEC v. Morgan, Kennedy & Co., Inc.*, 1975 WL 399 at *1.

The Second Circuit reversed the district court's ruling, concluding that the *employer-funded* profit sharing plan's individual employee participants were not customers of Morgan,

Kennedy. 533 F.2d at 1317-18. The Second Circuit cited the following characteristics of

Reading's traditional profit sharing plan in making its determination to deny the employee's

"customer" status: (a) contributions to the plan were made solely by the employer; (b) the

invested funds did not belong to the individual employee-participants; (c) the employee-

participants had no property interest, no claim reducible to a specific monetary sum, only, at

most, an interest in the trust res; (d) the broker had no dealings with the participants; (e) the

financial relationship was solely between the employee-participants and their employer, and not

the employee-participants and the broker-dealer; (f) the trustees of the traditional profit-sharing

---

[11] At the time of the *Morgan, Kennedy* opinion, the pre-1978 definition of "customer" was at issue. The 1978 amendment has no material impact on the analysis.

[12] SIPC Rule 101(b) currently states "An account held with a member by an agent or nominee for another person as a principal or beneficial owner shall, except as otherwise provided in these rules, be deemed to be an individual account of such principal or beneficial owner." 17 C.F.R. § 300.101(b). Similarly, New York and Connecticut law recognize that a plan participant in a 401(k) plan can have a property interest in the actual financial asset (this is true even if a securities intermediary, like BLMIS, does not have a book entry in the name of the participant). *See* N.Y. U.C.C. Law §8-501(b)(2), (3) (which states that "a person acquires a securities entitlement if a securities intermediary. . .(2) receives a financial asset from the person or underlines acquires a financial asset for the person and, in either case, accepts it for credit to the person's securities account, or (3) becomes obligated under other law, regulation, or rule underlines to credit a financial asset to the person's securities account.") (emphasis added); Conn. Gen. Stat. §42a-8-501 (West 2011). Under these statutes, the OSG Plan Participants would have a securities entitlement, meaning that they have rights and property interest with respect to a financial asset. N.Y. U.C.C. Law §8-102(a)(17); Conn. Gen. Stat. §42a-8-501 (West 2011).

plan, and not the employee-participants, had the exclusive power to entrust assets to the broker-dealer for investment purposes; and (g) the profit sharing plan trust account was in the name of the plan's trustees and not the individual employee-beneficiaries. 533 F.2d at 1315, 1318.

The typical 401(k) plan, including the OSG Plan, is easily distinguished from the plan at issue in *Morgan, Kennedy*. 401(k) profit sharing plans, which were legislatively created years after the *Morgan, Kennedy* opinion, allow participants to make pre-tax contributions of their own money to their individual accounts. This revolutionized the design and, in particular, the funding of retirement plans.

Under the OSG Plan, the Plan Participants: (a) contribute their own money to the Plan; (b) control how much they invest, withdraw from, or "roll over" into the Plan[13]; (c) enjoy an immediate non-forfeitable right to their salary contributions and rollover contributions made to the Plan which can be withdrawn (under certain circumstances) or borrowed; and (d) have an identifiable and non-contingent interest in the Plan assets reducible to a specific monetary sum.

The key distinction between the profit sharing plan reviewed in *Morgan, Kennedy* and the OSG Plan is that the funds contributed to the OSG Plan include deferred income of the OSG Plan Participants and funds "rolled" into the OSG Plan by Plan Participants from other qualified retirement plans or their IRA accounts. As such, unlike the participants in *Morgan, Kennedy*, the OSG Plan Participants entrusted *their own capital* to  BLMIS for purposes of purchasing securities.  This personal investment of capital by the Plan Participants was the essential ingredient missing from *Morgan, Kennedy*, and the fundamental reason the *Morgan, Kennedy*

---

[13] In *Morgan, Kennedy* the employer had the exclusive discretion to determine the amount to be contributed or invested in the traditional profit sharing plan. *See* 533 F.2d at 1318; *see also, Oppenheimer & Co., Inc., v Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995) (distinguishing *Morgan, Kennedy*, and concluding that a trust beneficiary, as the beneficial owner of the assets held in trust, was a "customer" for purposes of arbitrating a claim before the National Association of Securities Dealers, even though a trustee was responsible for making investment decisions and managing the assets of a trust).

court held that the plan participants were not "investors" and, therefore, not customers. *See* 533 F.2d at 1318.

Furthermore, in *Morgan, Kennedy*, the Second Circuit emphasized the Reading employees' "complete anonymity" and "total incapacity to have dealings with the broker/dealer". As demonstrated in the affidavits of Dr. Henry Backe and David Gershoni, while BLMIS discouraged a direct dialogue between the OSG Plan Participants and BLMIS staff, there were in fact dealings between Plan Participants and BLMIS. Therefore, to the extent *Morgan, Kennedy* has any precedential value here, it actually supports, rather than defeats, the claim of the OSG Plan Participants.

### D. Recent Supreme Court Case Law Recognizes That Participants' Individual Benefits Under 401(k) Defined Contribution Profit Sharing Plans Should Be Safeguarded

In *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, n.1 (2008), the United States Supreme Court reviewed and discarded the Court's prior decision in *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985), holding that if an ERISA-governed plan fiduciary engages in misconduct with respect to the plan, such plan fiduciary is personally liable to the plan, and not to individual plan participants with rights under such plan. *See* 473 U.S. at 140. The Court analyzed the right of an individual 401(k) plan participant to sue for losses to his individual account based upon the alleged improper actions of plan fiduciaries in administering his individual account.[14] *Id.* at 250-51. Recognizing that 401(k) plans now dominate the current retirement plan scene in the United States, and noting that Congress' intent was to protect retirement plan participants and beneficiaries from the consequences of fiduciary mismanagement and breaches of duty, the *LaRue* Court concluded that participants in a defined

---

[14] Under prior law, such a lawsuit was thought to be impermissible based upon the Court's decision in *Russell*. *See Id.*

contribution retirement plan, such as the OSG Plan, could sue to recover the impaired value of the assets in their individual accounts maintained for their benefit under the plan. In other words, whether fiduciary misconduct affects the amount of funds in one individual account under a 401(k) profit sharing plan or threatens the solvency of an entire 401(k) plan, the harmed participant(s) should be entitled to recoup the losses they would otherwise suffer from the responsible fiduciary. *Id.*

The Supreme Court's decision in *LaRue* portends the extension of customer status under SIPA to 401(k) participants who entrust their own monies to a broker/dealer through a 401(k) plan. In contrast to the plan reviewed by the Second Circuit in *Morgan, Kennedy*, it is a lynchpin of 401(k) plan design that each individual participant has the right to contribute his or her own salary in the 401(k) plan's investment funds. And, as discussed earlier, Congress, for its part, has consistently developed legislation to encourage participants to contribute their own money in such plans.[15] It is illogical that Congress would encourage contributions to 401(k) plans without offering the umbrella of SIPC protection to individual 401(k) plan investors, as is offered to other members of the public who invest in securities.

Denying the OSG Plan Participants customer status under SIPA would contravene the purpose and legislative history of SIPC, *see Morgan, Kennedy*, 533 F.2d at 1317 (noting that "both the legislative history of [SIPA] and its use since enactment have stressed protection to, and equality of treatment of, the public customer who entrusted securities to a broker for some purpose connected with participation in the securities markets"), which reflects a strong

---

[15] For instance, in 2006, Congress amended both the Code and ERISA to provide that an employer, without an employee's affirmative consent, could automatically deduct amounts from an employee's pay and contribute such amounts to an individual account established on the employee's behalf under the employer's 401(k) profit sharing plan. See Section 902 of the Pension Protection Act of 2006, P.L. 109-280 (Aug. 17,2006). Here, it is important to keep in mind that even if an employer adds an "automatic enrollment" feature to its 401(k) profit sharing plan, an affected employee-participant retains the investment discretion to discontinue any deductions which would otherwise be made from his or her salary pursuant to such automatic enrollment feature.

Congressional intent to protect the public from fraudulent activities of broker-dealers. Furthermore, denying the OSG Plan Participants customer status would be inconsistent with the Supreme Court's reasoning set forth in *LaRue*. 552 U.S. at 255-56 (recognizing that Congress enacted ERISA to protect the financial integrity of ERISA-governed plans, the Court held that §§ 409 and 502(a)(2) of ERISA authorized individual 401(k) plan participants' recovery for plan fiduciaries' breaches that impaired the value of assets in their individual accounts under the 401(k) plan).

The OSG Plan Participants knew that the Plan was investing their money with BLMIS. They received from Pentec reports of how their individual Plan accounts were fairing based on the quarterly performance reports provided by BLMIS to OSG. When they elected to contribute a portion of their salary and rollover funds to the Plan they did so with the knowledge that such contributions were being invested with BLMIS. Given these facts, simple logic dictates that OSG Plan Participants viewed themselves as customers of BLMIS. Thus, the connection lacking in *Morgan, Kennedy* - investment by participants of their own funds in the profit sharing plan and with the broker-dealer - is not absent here.[16] Therefore, the OSG Plan Participants should be regarded as "customers" of BLMIS for SIPA purposes.

### E. The *Waddell* Opinion Recognized That Participants Could Still Be Considered "Customers" Despite Not Having Individual Accounts With the Broker

Individual participants in a defined contribution retirement plan attain customer status under SIPA as long as their assets actually are deposited with a broker-dealer. *See In re Waddell Jenmar Securities, Inc.*, 126 B.R. 935, 940 (Bankr. E.D.N.C. 1991), *aff'd*, 991 F.2d 792 (4th Cir. 1993). That is precisely the situation with the OSG Plan Participants. In *Waddell*, Salisbury

---

[16] The *Morgan, Kennedy* decision does not discuss the relevance of individual participant's rollover contribution investments in 401(k) profit sharing plans.

19

Animal Hospital ("SAH") created an employee pension and profit sharing plan. The plan was administered by Waddell Benefit Plans, Inc. ("WBP"), a company that offered pension and profit sharing plan design, implementation and administration. Waddell was an affiliate of Waddell Jenmar Securities ("Jenmar"), a broker-dealer. Guilford Waddell was the President of both companies. SAH maintained its pension plan account at Jenmar; the individual participants apparently did not have individual accounts opened in their names at Jenmar or its clearing firm, but WBP "assisted the plan's trustees in establishing and maintaining separate ledger accounts in the name of each of the SAH claimants, which accounts were credited with the amounts of each annual contribution allocated to each participant." *Id.* at 939-40.

SAH made five annual employer contributions to the plan from 1981 to 1985 by checks payable to WBP. Waddell misappropriated a substantial portion of the plan funds and never deposited them with Jenmar's clearing firm, and never followed investment instructions to purchase securities with respect to those funds. When Jenmar was placed into SIPC liquidation, the plan participants filed SIPC customer claims as individual customers of Jenmar to recover the stolen money. *Id* at 939-40.

The court held that when Jenmar actually received plan funds, each SAH affected plan participant was a "customer of the broker-dealer for that transaction." *Id.* at 940. However, the court denied the participants' customer claims for the misappropriated funds intended for the purchase of securities because those funds never reached Jenmar. *Id.* In other words, had Waddell not stolen SAH's checks before they were received by Jenmar, the plan participants would have been considered "customers" of Jenmar for purpose of a SIPC claim.

*Waddell* supports the OSG Plan Participants' Customer Claims. The OSG Plan had a plan administrator, Pentec, who created ledger accounts for each participant, and provided

reports to each participant regarding their account balance, just like WBP in *Waddell*. And, just like *Waddell*, the account maintained with the broker/dealer was set up in the name of the Plan, not in the name the participants. But here, unlike *Waddell*, the OSG Plan's deposits were delivered to BLMIS. The affected OSG Plan Participants should, under the *Waddell* analysis, be regarded as "customers" of BLMIS. *Id.* at 940.

### F.  The OSG Plan Participants' Status as Customers is Supported by this Court's Ruling on the Trustee's Feeder Funds Motion

This Court's ruling of the Trustee's so-called Feeder Fund motion, and Judge Cote's decision affirming that ruling, further supports the OSG Plan Participants' Customer Claims. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC,* 454 B.R. 285 (Bankr. S.D.N.Y. 2011), *aff'd,* 11-CV-06565-DLC (S.D.N.Y. Jan. 4, 2012), ECF No. 14 (the "Feeder Funds Motion"). At issue in the Feeder Funds Motion were sixteen feeder funds which held nineteen accounts with BLMIS. *Id.* at 292-293. The feeder funds were set up as separate legal entities such that when the feeder fund claimants invested in the fund, their investment became property of the fund and they no longer maintained any control over their investment.

In determining whether investors in these feeder funds were "customers" within the meaning of SIPA, this Court concluded, and the district court affirmed, that when the feeder funds invested in BLMIS, the feeder funds were investing their own property—not the property of the feeder fund claimants. 454 B.R. at 297; 11-CV-06565-DLC, at pp. 13, 20. The feeder fund claimants were investing *"in, not through"* the feeder funds. 454 B.R. at 297. This Court also held that the feeder fund claimants were not customers because the "Feeder Funds, and not the Objecting Claimants, opened accounts in their own names with BLMIS; had property interests in the assets in their accounts at BLMIS; had dealings with, and were therefore known to, BLMIS; had a fiduciary relationship with BLMIS; had the power to entrust their own assets

21

to BLMIS for the purpose of investing or trading in securities; and controlled all investment decisions." *Id.* at 301 (citations omitted)(footnote added).  This Court also focused its attention on how the feeder fund claimants were completely anonymous to BLMIS and had no dealings with BLMIS to support that the feeder fund claimants were customers. *Id.* at 301.

The OSG Plan Participants are not analogous to the feeder fund claimants.  Once the feeder fund claimants invested in the feeder funds, their investment became property of the feeder fund, and the feeder funds, in turn, invested their own capital with BLMIS.  In contrast, when the OSG Plan Participants contributed their own money to their individual Plan accounts, they retained ownership of those funds, as well as the funds contributed to their accounts by OSG (subject to the three year vesting requirement for profit sharing contributions).  The OSG Plan Participants used the OSG Plan as an investment vehicle, investing through the Plan, not in the Plan.[17]

Moreover, there was no relationship between the feeder fund claimants and BLMIS.  In contrast, BLMIS acknowledged a relationship with the OSG Plan Participants and purportedly created an investment strategy around their needs.  In fact, the OSG trustees met <u>annually</u> with BLMIS representatives to discuss the performance of the OSG Plan's BLMIS account and how that account could be diversified to meet the needs of both the OSG employees who were at the beginning of their careers (and thus longer term investors) and the needs of those employees who would soon be retired (and thus would need earlier access to their 401(k) funds).  DiPascali acknowledged that the investments were set up in such a way that each individual participant in the OSG Plan could gain access to his or her portion of the Plan assets when and as needed.  *See*

---

[17] BLMIS, which was both the OSG Plan's investment adviser and broker/dealer, stood in a traditional fiduciary relationship with the OSG Plan Participants.  *See, e.g., Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge*, 93 F.3d 1171, 1179 - 82 (3d Cir. 1996) (broker-dealer that provided investment advice to pension plan was a plan fiduciary); *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 109 (ND. Cal. 2008) (individual participants in pension plan have standing to sue plan's investment adviser for breach of fiduciary duty.).

Gershoni Aff. ¶¶ 6-7.

The key to determining the customer status of feeder fund investors was whether their "*own* money was ultimately invested with the debtor." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC,* 454 B.R. 285, 299, citing *Focht v. Heebner* (*In re Old Naples Sec., Inc.*), 223 F.3d 1296, 1302-03 (11th Cir. 2000)[18]; *Ahammed v. SIPC* (*In re Primeline Sec. Corp.*), 295 F.3d 1100, 1107 (10th Cir. 2002). "…, it was the Feeder Funds, and not the Objecting Claimants, who entrusted *fund-owned* assets with BLMIS." 454 B.R. at 299. The district court held that, "BLMIS did not receive, acquire, or possess any property of the appellants [the feeder fund claimants] because the property at issue belonged solely to the Feeder Funds." 11-CV-06565-DLC, at p. 16. Thus, the feeder fund claimants could not fulfill the critical aspect of the 'customer' definition, namely "the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." 11-CV-06565-DLC, at p. 17. Unlike the feeder funds claimants, the OSG Plan Participants were investing their *own* money and entrusting their *own* assets with BLMIS.

## II.    AT THE MINIMUM THE OSG PLAN PARTICIPANTS ARE ENTITLED TO A SIPC ADVANCE FOR THEIR 401(k) AND ROLLOVER CONTRIBUTIONS ENTRUSTED TO BLMIS

As shown above, the Second Circuit in *Morgan, Kennedy*, and the Sixth Circuit in *First Ohio*, refused to recognize pension plan participants as customers under SIPA because the pension funds in those matters were solely employer-funded plans. Both cases are distinguishable from this case, for the reasons set forth above. However, should the Court feel

---

[18] In *In re Old Naples*, the court did not strictly apply the definition of "customer" allowing investors who had given their money to an individual broker rather than the brokerage firm to be considered customers. 223 F.3d 1302-03; *see also Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d at 357 (individuals were "customers" of NASD member broker-dealer entitling them to arbitrate with the broker-dealer under the NASD arbitration code, even though their funds were never deposited into an account opened in their name, but were deposited instead into an account in the name of a third party fraudster).

constrained by the rulings in these cases, the OSG Plan Participants should at least be treated as customers of BLMIS to the extent of the amounts of their individual capital contributions to the Plan - insofar as there can be no doubt or disagreement that these contributions of their own capital were intended for investments in securities through BLMIS. In other words, under all circumstances, this Court should require the Trustee to treat the OSG Plan Participants as customers of BLMIS to the extent of their 401(k) contributions and rollover contributions.

## REQUEST FOR EVIDENTIARY HEARING AND RESERVATION OF RIGHTS

The OSG Plan Participants respectfully submit that they have established, as a matter of law, their status as "customers" of BLMIS as defined in 15 U.S.C. § 78*lll*(2). Absent such a determination as a matter of law, the OSG Plan Participants have, at the minimum, raised material disputed factual issues concerning their relationship with BLMIS which requires an evidentiary hearing pursuant to Federal Rules of Bankruptcy Procedure, Rule 9014(d) in order to adjudicate the Trustee's Motion. The OSG Plan Participants hereby invoke their right to such a hearing.

Additionally, the OSG Plan Participants reserve their right to supplement their Memorandum of Law based on additional facts that are developed during the course of these proceedings, including any discovery relating to the Trustee's Motion under Federal Rules of Bankruptcy Procedure, Rule 9014(c).

## CONCLUSION

The OSG Plan Participants have established that they entrusted *their funds* to BLMIS for the purpose of purchasing securities. Accordingly, each is a "customer" of BLMIS as that term is defined at 15 U.S.C. § 78*lll*(2).

Treating the OSG Plan Participants as customers of BLMIS is also compelled by the policies behind ERISA, which protects the interests of retirement plan beneficiaries in defined contribution retirement plans, and Section 401(k) of the Code, which allows and indeed encourages pre-tax, employee contributions to qualified retirement plans, such as the OSG Plan. Through these statutory enactments, Congress has enabled the American worker, through his or her employer-sponsored retirement program, to become an investor in the equity securities markets. As a result, the Supreme Court recognized in *LaRue* that 401(k) profit sharing plans are now the dominant retirement program maintained by employers in the United States. Because SIPC was designed by Congress to protect individual investors from the insolvency of their stock brokers, and, most importantly, because the OSG Plan Participants made individual decisions to entrust their own funds to BLMIS through a 401(k) profit sharing plan, SIPC coverage should be extended to each of the OSG Plan Participants, to the full extent of their vested interest (employee and employer contributions) in their individual Plan accounts.

In the alternative, if this Court feels constrained by prior case law which holds that participants of retirement plans funded solely by the employer are not entitled to individual SIPC coverage, the OSG Plan Participants respectfully request that the Trustee to be directed to treat each of the OSG Plan Participants as a "customer" of BLMIS to the extent of their individual contributions to the Plan (*i.e.*, elective compensation deferrals and rollover contributions).

Dated: New York, New York
      January 17, 2012

*/s/ Peter N. Wang*
Peter N. Wang
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Fax: (212) 687-2329
E-mail:pwang@foley.com

and

Marc J. Kurzman (MK 2962)
SANDAK HENNESSEY & GRECO, LLP
707 Summer Street, 3rd Floor
Stamford, CT 06901
Tel: (203) 425-4200
Fax: (203) 325-8608

*Co-Counsel for Orthopaedic Specialty Group, P.C.*
*Defined Contribution Pension Plan Participants*

# Appendix 1
# to OSG Plan Participants'
# Memorandum of Law

# Orthopaedic Specialty Group PC
# Defined Contribution Pension Plan



## LIST OF PARTICIPANTS FILING CUSTOMER CLAIMS

RECEIVED
MAR 0 4 2009

### Volume 1

1. Alexander, Linda
2. Armstrong, Kai
3. Awad, John
4. Ayala, Ivette
5. Backe, Henry
6. Basta, Angela
7. Belchak, Jeanne
8. Belcher, Kim
9. Bell, Janet
10. Bindelglass, David
11. Bjork, Joan
12. Brenia, Cynthia
13. Brittis, Dante
14. Broadhurst, Linda
15. Butler, Barbara
16. Carney, Wilhelmina
17. Cash, Lorina
18. Casimiro, Joan
19. Castro, Rosaura
20. Christy, Brian
21. Chymeryc, Tracey
22. Cimino, William
23. Ciskowski, Michael
24. Collazo, Carmen
25. Commaille, Nancy
26. Constantino, Janet
27. Cortez, Jessica
28. Council, Brooke
29. Crasilli, Lisa
30. Dawe, Robert
31. Delgado, Ailleen
32. Delucia, Kathy
33. Delucia, Lisa
34. Dmowski, Brigette
35. Edelman, Sue
36. Falkowski, Barbara
37. Favazza, Donna
38. Fournier, Cynthia
39. Franzese, Sarah

### Volume 2

40. Gallant, Scott
41. Giarratano, Valerie
42. Glover, Pam
43. Gonzalez, Maria
44. Gutierrez, Diana
45. Hagerty, June
46. Hash, Stacy
47. Haydon-Ryan, Amy
48. Heibler, Carol
49. Hermele, Herbert
50. Heske, Nancy
51. Ianotti, Erika
52. Janik, Laura
53. Kalapir, Daniela
54. Kettles, Christina
55. Kirschenbaum, Lawrence
56. Kross, Rayna
57. Kwok, Patrick
58. Langeland, Rolf
59. Laviolette, Cuschine
60. Lay, Nicole
61. Lewkowicz, Martha
62. Libretti, George
63. Lilly, Stacy
64. Lomax, Marissa
65. Lorenzo, Laura
66. Makar, Karen
67. Malin, Joel
68. Martino, Donna
69. Mastroianni, Elizabeth
70. Maxwell, Karen
71. Mcaleer, Sarah
72. Mikos, Kathleen
73. Moore, Diana
74. Morrison, Murray
75. Nagy, Kim
76. Noll, Noreen
77. Nowlan, Patricia
78. Otero, Patricia
79. Padilla, Taina

### Volume 3

80. Panapada, Caroline
81. Parisi, Madelyn
82. Pelton, Melissa
83. Perez, Edna
84. Petrowsky, Ryan
85. Petrucelli, Joyce
86. Piccolo, Jennifer
87. Pimpinella, Suzanne
88. Platt, Candace
89. Raschke, Barbara
90. Ripley, Denise
91. Rivera, Yesenia
92. Rodriguez-Ortiz, Raquel
93. Rosa, Isabel
94. Rosado, David
95. Rosiello, Tita
96. Saffir, Michael
97. Sammartano, Claudia
98. Santos, Ivelisse
99. Schaefer, Linda
100. Schneider, Christine
101. Shear, Perry
102. Simpson, Lynn
103. Slattery, Elizabeth
104. Soviero, Fiore
105. St. Cloud, Carline
106. Stanton, Robert
107. Stasolla, Rebecca
108. Stevens, Tiffany
109. Stockmal, Nicole
110. Stopka, Ania
111. Teixeira, Susana
112. Towle, Simone
113. Turner, Monica
114. Uhlan, Cynthia
115. Vargas, Candace
116. Viola, Kathie
117. Wilmot, Jane

RECEIVED
MAR 0 4 2009

# Appendix 2
# to OSG Plan Participants'
# Memorandum of Law

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]


## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM


September 11, 2009

Orthopaedic Specialty Group PC
75 Kings Highway Cutoff
Fairfield CT 06430


Dear Orthopaedic Specialty Group PC:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1O0004 designated as Claim Number 006261:

Your claim for a credit balance of $300,000.00 and for securities is **DENIED**. No securities were ever purchased for your account.

Your claim is **ALLOWED** for $9,704,855.19, which was the balance in your BLMIS Account on the Filing Date based on the amount of money you deposited with BLMIS for the purchase of securities, less subsequent withdrawals, as outlined in Table 1, attached hereto.

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

Your **ALLOWED CLAIM** of $9,704,855.19 will be satisfied in the following manner:

The enclosed **PARTIAL ASSIGNMENT AND RELEASE** must be executed, notarized and returned in the envelope provided herewith. Upon receipt of the executed and notarized **PARTIAL ASSIGNMENT AND RELEASE**, the Trustee will make a partial satisfaction of your **ALLOWED CLAIM** by sending you a check in the amount of $500,000.00, with the funds being advanced by Securities Investor Protection Corporation pursuant to section 78fff-3(a)(1) of SIPA. In addition, you will be entitled to receive an additional distribution based upon your **ALLOWED CLAIM** from the fund of customer property, if any.

It is the Trustee's intent, pursuant to SIPA, to submit a Motion for an order of the Bankruptcy Court to allocate assets he has collected and will collect between the fund of customer property and the general estate and to distribute customer property *pro rata* among allowed claimants, such as you. In a decision in this case, Rosenman Family, LLC v. Picard, 401 B.R. 629, 634 (Bankr. S.D.N.Y. 2009), the Bankruptcy Court stated:

> The customer estate is a fund consisting of customer property and is limited exclusively to satisfying customer claims. In re Adler Coleman Clearing Corp. (Adler Coleman II), 216 B.R. 719, 722 (Bankr. S.D.N.Y. 1998) ("A SIPA trustee, distributes 'customer property' exclusively among the debtor's customers...."); see also 15 U.S.C. § 78*lll*(4). Accordingly, Customers, as defined by SIPA § 78*lll*(2), enjoy a preferred status and are afforded special protections under SIPA. See New Times Securities, 463 F.3d at 127; Adler Coleman, 195 B.R. at 269."

Id. at 634.

It is not known at this time when the Trustee will be filing such allocation and distribution motion.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after September 11, 2009, the date on which the Trustee mailed this notice.

2

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10011

_____
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc:    Jeffrey Plotkin, Esq.
       Day Pitney LLP
       One Canterbury Green
       Stamford, CT 06901

3

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| 1/10/1992 | CHECK WIRE | $1,150,000.00 |
| 6/9/1992 | CHECK WIRE | $45,000.00 |
| 7/16/1992 | CHECK WIRE | $50,000.00 |
| 4/22/1993 | CHECK | $75,000.00 |
| 7/9/1993 | CHECK | $70,000.00 |
| 8/24/1993 | CHECK | $50,000.00 |
| 3/31/1994 | CHECK | $78,000.00 |
| 11/18/1994 | CHECK WIRE | $523,855.19 |
| 4/3/1995 | CHECK | $100,000.00 |
| 5/16/1995 | CHECK | $35,000.00 |
| 9/23/1996 | CHECK | $190,000.00 |
| 3/31/1997 | CHECK | $100,000.00 |
| 5/2/1997 | CHECK | $50,000.00 |
| 7/11/1997 | CHECK | $50,000.00 |
| 8/21/1997 | CHECK | $38,000.00 |
| 1/20/1998 | CHECK | $125,000.00 |
| 2/20/1998 | CHECK | $40,000.00 |
| 3/16/1998 | CHECK | $50,000.00 |
| 4/17/1998 | CHECK | $50,000.00 |
| 5/21/1999 | CHECK | $30,000.00 |
| 10/29/1999 | CHECK | $45,000.00 |
| 4/17/2000 | CHECK | $100,000.00 |
| 5/30/2000 | CHECK | $90,000.00 |
| 6/19/2000 | CHECK | $30,000.00 |
| 7/26/2000 | CHECK | $25,000.00 |
| 8/28/2000 | CHECK | $40,000.00 |
| 9/27/2000 | CHECK | $85,000.00 |
| 11/17/2000 | CHECK | $50,000.00 |
| 3/1/2001 | CHECK | $100,000.00 |
| 7/5/2001 | CHECK | $115,000.00 |
| 7/23/2001 | CHECK | $75,000.00 |
| 8/13/2001 | CHECK | $25,000.00 |
| 10/30/2001 | CHECK | $120,000.00 |
| 4/11/2002 | CHECK | $120,000.00 |
| 7/11/2002 | CHECK | $125,000.00 |

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| 9/6/2002 | CHECK | $250,000.00 |
| 3/14/2003 | CHECK | $300,000.00 |
| 6/6/2003 | CHECK | $140,000.00 |
| 6/26/2003 | CHECK | $80,000.00 |
| 8/19/2003 | CHECK | $80,000.00 |
| 11/10/2003 | CHECK | $160,000.00 |
| 11/17/2003 | CHECK | $70,000.00 |
| 12/26/2003 | CHECK | $320,000.00 |
| 4/16/2004 | CHECK | $200,000.00 |
| 7/6/2004 | CHECK | $300,000.00 |
| 9/20/2004 | CHECK | $125,000.00 |
| 3/17/2005 | CHECK | $225,000.00 |
| 4/29/2005 | CHECK | $100,000.00 |
| 5/31/2005 | CHECK | $225,000.00 |
| 7/5/2005 | CHECK | $275,000.00 |
| 11/14/2005 | CHECK | $100,000.00 |
| 10/18/2006 | CHECK | $225,000.00 |
| 11/13/2006 | CHECK | $275,000.00 |
| 3/23/2007 | CHECK | $300,000.00 |
| 8/17/2007 | CHECK | $325,000.00 |
| 11/2/2007 | CHECK | $900,000.00 |
| 2/26/2008 | CHECK | $375,000.00 |
| 8/19/2008 | CHECK | $200,000.00 |
| 10/31/2008 | CHECK | $200,000.00 |
| 12/1/2008 | CHECK | $300,000.00 |
| **Total Deposits:** | | $10,094,855.19 |

| | WITHDRAWALS | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 1/15/1999 | CHECK | ($40,000.00) |
| 7/17/2006 | CHECK | ($100,000.00) |
| 5/2/2007 | CHECK | ($250,000.00) |
| **Total Withdrawals:** | | ($390,000.00) |
| **Total deposits less withdrawals:** | | $9,704,855.19 |