# BEACON ASSOCIATES LLC II

Confidential Offering Memorandum

**Beacon Associates Management Corp.**
**123 Main Street**
**Suite 900**
**White Plains, New York  10601**
**Tel:  (914) 948-1556**
**Fax:  (914) 948-0051**

11063601.19

# BEACON ASSOCIATES LLC II

## CONFIDENTIAL OFFERING MEMORANDUM

**Company:** Beacon Associates LLC II

**Securities Offered:** Limited Liability Company Interests

**Minimum Initial Purchase:** $500,000

**Investment Objective:** To provide above average rates of return while attempting to minimize risk by utilizing trading and investment strategies, both directly and indirectly, including through other investment pools.

\* \* \*

THIS OFFERING IS NOT A PUBLIC OFFERING.   THESE SECURITIES HAVE NOT BEEN REGISTERED OR QUALIFIED WITH, NOR APPROVED OR DISAPPROVED BY, THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), THE COMMODITY FUTURES TRADING COMMISSION ("CFTC") OR ANY STATE REGULATORY AUTHORITY, NOR HAS THE SEC, THE CFTC OR ANY REGULATORY AUTHORITY DETERMINED IF THIS CONFIDENTIAL OFFERING MEMORANDUM IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

\* \* \*

THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICT=ION IN WHICH SUCH OFFER OR SOLICITATION IS NOT LAWFUL, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

\* \* \*

**August 9, 2004**

_____                    _____
**Book No.**                                                            **Name of Offeree**

11063601.19

Interests in Beacon Associates LLC II (the "Company") will be issued only on the basis of the information and representations contained in this Confidential Offering Memorandum and its exhibits (collectively, the "Memorandum"), and no other information or representation has been authorized.

Any purchase made by any person on the basis of statements or representations not contained in, or inconsistent with, information herein shall be solely at the risk of the purchaser. Neither delivery of this Memorandum nor anything stated herein should be taken to imply that any information herein is correct as of any time subsequent to the date hereof.

This Memorandum constitutes an offer only if the name of an offeree appears in the appropriate space provided on the prior page of this Memorandum and only if delivery of this Memorandum is properly authorized by the Company. This Memorandum has been prepared by the Company solely for the benefit of qualified persons interested in the proposed sale of Interests, and any reproduction of this Memorandum, in whole or in part, or the divulgence of any of its contents, without the prior written consent of the Company, is prohibited.

FOR GEORGIA RESIDENTS ONLY: THESE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE "GEORGIA SECURITIES ACT OF 1973" AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

FOR FLORIDA RESIDENTS ONLY: PURSUANT TO THE LAWS OF THE STATE OF FLORIDA, IF SALES ARE MADE TO FIVE (5) OR MORE INVESTORS IN FLORIDA, ANY FLORIDA INVESTOR MAY, AT HIS OPTION, WITHDRAW, UPON WRITTEN (OR TELE-GRAPHIC) NOTICE, ANY PURCHASE HERE-UNDER WITHIN A PERIOD OF THREE (3) DAYS AFTER (A) THE INVESTOR FIRST TENDERS OR PAYS TO THE COMPANY, AN AGENT OF THE COMPANY OR AN ESCROW AGENT THE CONSIDERATION REQUIRED HEREUNDER, (B) THE INVESTOR DELIVERS HIS EXECUTED SUBSCRIPTION AGREE-

MENT OR (C) THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH INVESTOR, WHICHEVER OCCURS LATER.

The Interests have not been registered under the United States Securities Act of 1933 and are being offered as a private placement under Rule 506 thereunder. The Company is not a registered investment company under the Investment Company Act of 1940 in reliance on Rule 3(c)(l) thereunder.

DO NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE.

IF YOU ARE IN ANY DOUBT ABOUT THE CONTENTS OF THIS MEMORANDUM, YOU SHOULD CONSULT YOUR FINANCIAL OR LEGAL ADVISOR(S).

THE INTERESTS ARE SPECULATIVE SECURITIES. THE VALUE OF THE INTERESTS MAY GO DOWN AS WELL AS UP.

**Contents**        **Page**

CFTC Exemption ................................................ ii

Summary ......................................................... 1

Investment Objectives
and Strategies ........................................... 11

Risk Factors.................................................... 15

The Company and its Management.................. 26

Conflicts of Interest......................................... 29

Fees and Expenses........................................... 30

Offering of Interests ........................................ 31

Suitability Requirements and Offering
Limitations ............................................... 33

Terms of the LLC Agreement .......................... 35

Employee Benefit Plan Considerations............ 40

Income Tax Considerations.............................. 44

Reports and Other Information......................... 48

Form of Limited Liability
Company Agreement .................... Exhibit A

Privacy Notice ....................................... Exhibit P

Form of Subscription
Documents .................................... Exhibit S

---

## CFTC EXEMPTION

---

**PURSUANT TO AN EXEMPTION UNDER COMMODITY FUTURES TRADING COMMISSION ("CFTC") REGULATIONS, NEITHER THE MANAGING MEMBER NOR ANY OTHER PERSON IS REQUIRED TO REGISTER WITH THE CFTC AS A COMMODITY POOL OPERATOR ("CPO") IN CONNECTION WITH THE OPERATION OF THE COMPANY'S SERIES 1 (AS DEFINED HEREIN).  AS A RESULT, UNLIKE A POOL WHICH IS REQUIRED TO HAVE A REGISTERED CPO, THE MANAGING MEMBER WILL NOT BE REQUIRED TO DELIVER A DISCLOSURE DOCUMENT (CONTAINING CERTAIN CFTC PRESCRIBED DISCLOSURE) IN CONNECTION WITH THE OPERATION OF SERIES 1 (AS DEFINED HEREIN), AND A CERTIFIED ANNUAL REPORT TO THE COMPANY'S SERIES 1 INVESTORS.  A CLAIM OF EXEMPTION HAS BEEN FILED EFFECTUATING THIS EXEMPTION.**

**ELIGIBILITY FOR THIS REGISTRATION EXEMPTION IN RESPECT OF THE OPERATION OF SERIES 1 OF THE COMPANY IS SET FORTH IN SECTION 4.13(a)(3) OF THE CFTC'S REGULATIONS, AND IS BASED ON THE FACT THAT (I) THE OFFER AND SALE OF THE INTERESTS IN SERIES 1 ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ARE NOT AND WILL NOT BE MARKETED TO THE PUBLIC IN THE UNITED STATES AS A VEHICLE FOR TRADING IN THE COMMODITY FUTURES OR COMMODITY OPTIONS MARKETS; (II) SERIES 1 OF THE COMPANY WILL ALLOCATE NO MORE THAN 50% OF ITS ASSET VALUE TO INVESTEE FUNDS THAT TRADE IN COMMODITY INTERESTS; AND (III) PARTICIPANTS IN SERIES 1 ARE LIMITED TO "ACCREDITED INVESTORS," TRUSTS ESTABLISHED BY ACCREDITED INVESTORS FOR THEIR FAMILY MEMBERS, AND "KNOWLEDGEABLE EMPLOYEES," ALL AS SET OUT IN THE SUBSCRIPTION DOCUMENTS.**

11063601.19

## SUMMARY

This Summary is qualified in its entirety by the more detailed information appearing elsewhere in the this Memorandum, including in the Limited Liability Company Agreement (the "**LLC Agreement**") and the Subscription Agreement appearing as Exhibits A and S, respectively.

**The Company**

Beacon Associates LLC II (the "**Company**") is a New York limited liability company. The Company is establishing two Series of Interests. Series 1 and 2 Interests will participate in all Company investments on a pro rata basis, except that only Series 1 will be permitted to engage in any investment activity involving futures contracts and options thereon.

The Company currently conducts its investment and trading activities through Beacon Associates LLC I, an affiliated fund currently organized as a New York limited liability company. Unless the context otherwise requires, the Company and Beacon Associates LLC I collectively will be referred to as the "**Fund**."

**Managing Member**

Beacon Associates Management Corp. (the "**Managing Member**"), a New York corporation, is the managing member of the Company and Beacon Associates LLC I. The Managing Member makes all investment allocation and reallocation decisions on behalf of the Fund. The Managing Member also administers the business and affairs of the Fund. The Managing Member is wholly owned by Joel Danziger, Esq., Harris Markhoff, Esq., and their immediate families.

**Investment Objective and Strategies**

**Objective**. The Fund employs trading and investment strategies, both directly and indirectly, including through other investment pools, with the objective of providing above-average rates of return, while attempting to minimize risk.

**Strategies**. The Fund has flexibility to make a broad range of investments, to act opportunistically, and to employ several investment strategies, including, but not limited to, securities strategies involving stocks, (common and preferred), bonds, (corporate and government), stock and index options, and other financial (including derivative) instruments and forward contracts, as well as strategies involving futures contracts and

1

options thereon, and rights and interests pertaining thereto (Series 1 only).

**Asset Allocation**.  A significant portion of the Fund's assets are allocated to a strategy adopted by the Managing Member involving a portfolio of large cap stocks hedged with options ("**Large Cap Strategy**").  The balance of the Fund's assets are allocated among independent investment managers ("**Managers**"), indirectly through investment in other investment funds ("**Investment Pools**") which the Managers manage.  The Fund has not invested, and has no present intention of investing in any foreign Investment Pools.  The Fund's assets are allocated and reallocated among strategies and to and from Managers by the Managing Member, following consultation by the Managing Member with Ivy Asset Management Corp. (the "**Investment Consultant**") and the Managing Member's Advisory Board.

**Current Manager Allocation**.  As of the date of this Memorandum, in addition to the Large Cap Strategy, the Fund utilizes four Managers which manage the balance of the Fund's assets through four separate Investment Pools.

**There is no assurance that the Fund's trading objectives and strategies will be implemented successfully.  An investment in the Company involves a high degree of risk.**

**Use of Margin**

The Large Cap Strategy does not utilize leverage.  However, margin may be used by the Managers to attempt to increase returns in accordance with applicable regulatory guidelines.

**Manager Selection**

Both quantitative and qualitative criteria are factored into the evaluation of Managers, including analyses of: type of trading program; risk control; duration and speed of recovery from drawdowns; experience; organizational infrastructure; and degree of correlation, with traditional investments indices.

Analysis of the performance records of existing and prospective Managers is combined with evaluation of a number of less tangible qualitative factors in an effort to identify Managers who have a low degree of cross-correlation with each other, and whose collective trading results have historically demonstrated substantial returns while making use of various hedging techniques in an attempt to limit risk..

**Investment Powers and Restrictions**

Except with respect to the trading of futures contracts, the Managing Member is not bound by any fixed guidelines in allocating the Fund's assets.  Specific positions and the identity

of the Managers will not be disclosed except as required by law or by financial reporting rules. Each Manager determines the extent to which the assets allocated to it are invested. The Fund may only allocate up to 50% of Series 1 net assets to futures related strategies. Series 2 may not participate in any futures related investments. In addition, the Fund does not allocate any assets to Managers engaged in market timing of mutual fund shares, and has no intention to do so. All funds received by the Fund will be maintained in the Fund's name.

**Investment Consultant**

Pursuant to an agreement between the Managing Member and Ivy Asset Management Corp., a Delaware corporation ("**Investment Consultant**"), the Investment Consultant provides advice to the Managing Member with respect to Manager selection and allocation of the Company's assets among Managers and Investment Pools, and also provides certain administrative and accounting services to the Managing Member. The Investment Consultant does not have any discretion to invest or allocate the Fund's assets. All investment and allocation decisions are made in the sole discretion of the Managing Member. The Investment Consultant is registered as an investment adviser under the Investment Advisers Act of 1940 (the "**Advisers Act**") and as a commodity trading adviser ("**CTA**") under the Commodity Exchange Act, as amended (the "**CE Act**").

**Conflicts of Interest**

Various conflicts of interest exist. Subscribers are directed to the section entitled "Conflicts of Interest" for this discussion.

**Risks Factors**

Subscribers are directed to the section entitled "Risk Factors" for a more detailed discussion of the various risks of this investment. Some of the more important risks are as follows:

- The Fund is dependent on the judgment and abilities of the Managing Member and of the Managers for its success.

- Investments in the securities and futures markets are speculative, volatile, and carry a high degree of risk.

- The Fund's ability to leverage its investments is likely to amplify its net profits and losses.

- Hedging strategies that do not correlate well with Fund investments may increase losses.

- The Fund is not diversified in its investments and currently allocates a substantial portion of its assets to a single strategy

adopted by the Managing Member.

- You will not be able to participate in the management or control of the Company and will have limited voting rights.

- Your Interest in the Company will be illiquid because it is not readily saleable, transfers and assignments must be approved by the Managing Member, and withdrawals are permitted only at the end of each quarter upon 60 days' notice.

- You will be taxed on your share of the Company's taxable income whether or not any cash is distributed to you.

**Securities Offered**

Limited Liability Company Interests in the Company (inclusive of Membership Economic Interests) (collectively referred to as the "Interests" unless the context otherwise requires) are being continually offered on a monthly basis in two Series of Interests: Series 1 and Series 2. The Company is accepting subscriptions as of the first day of each month, or at such additional times as the Managing Member, in its discretion, may determine. Only subscribers or their representatives who are well known to the Managing Member, the Investment Consultant, or their principals will be admitted as Members. All proceeds received in connection with subscriptions will be held by the Company in an interest-bearing account until invested. All interest earned on accepted subscription funds will belong to the Company. Interests of each Series will be valued separately at the close of business on the last business day preceding your admission date. The assets and liabilities of each Series will be separate and distinct from each other. The only difference between the two Series is that Series 2 is not permitted to share in profits or losses from any futures related investments, whereas Series 1 is permitted to do so.

**Membership Status**

If you are accepted as a subscriber, you will be admitted to the Company as a Member on the first day of a month, or at such other time as the Managing Member, in its discretion, may determine. Interests will be valued at their Net Worth at the close of business on the last business day preceding your admission date.

**Minimum Investment**

Your minimum initial investment must be at least $500,000, unless the Managing Member, in its discretion, determines that a lower amount is acceptable. No selling commissions are being charged. Contributions must be in cash.

| | |
|---|---|
| **Additional Capital Contributions** | If you are an existing Member, you may make additional investments in $25,000 increments on the first day of any month, or in such other amounts or at such other times as the Managing Member, in its discretion, may determine. Additional contributions must be in cash. |
| **Suitability** | This offering is being made pursuant to: |

- Rule 506 of Regulation D under the Securities Act of 1933 (the "**1933 Act**") Act, which exempts non-public offerings of securities from registration with the SEC;

- Section 3(c)(1) of the Investment Company Act of 1940 (the "**1940 Act**"), which limits the Fund to 100 investors; and

- Series 1 only, Rule 4.13(a)(3) of the CFTC's Regulations.

This offering is primarily for "Accredited Investors". Series 1 Interests also may be offered to trusts established by Accredited Investors for family members and "Knowledgeable Employees" as defined in CFTC Rules. Series 2 Interests only may be sold to a limited number of non-Accredited Investors. The categories of "Accredited Investor" are set forth in the Subscription Documents appearing as Exhibit S to this Memorandum.

You should view an investment in a Series of the Fund within the context of your overall investment strategy. It is recommended that you invest funds in a Series which are earmarked for intermediate to longer-term investment.

An investment in the Company is suitable for you only if you have adequate means of providing for your current needs and personal contingencies and have no need for liquidity in this investment. An investment in the Company should not be made by you if (i) you cannot afford a loss of principal, or (ii) you have not carefully read, or do not understand, the terms of this offering.

This offering is not suitable for you if you are a charitable remainder trust. If you are a retirement plan you should pay careful attention to the sections of this Memorandum entitled "Employee Benefit Plan Considerations" and "Income Tax Considerations."

**The Managing Member, in its discretion, may decline to admit you as a Member for any reason.**

| | |
|---|---|
| **Use of Proceeds** | The net proceeds of this offering will be used as investment capital in the ordinary course of the Fund's investment activities. |
| **Liability** | You will not generally be liable for obligations of the Company or any Series in excess of your capital contribution(s). |
| **Allocation of Profits and Losses** | Net profits and net losses generally will be allocated for financial and tax purposes to your Capital Account in the proportion that your Capital Account bears to all other Capital Accounts of the Series in which you are invested on the last day of each applicable accounting period. Your Capital Account balance will be equal to your proportionate share of the Net Worth of the Series in which you are invested, and is referred to as your "Interest" in the Company.  Pursuant to the LLC Agreement, 1% of the net profits of each Series each year are allocated to the Managing Member, without regard to net profits or net losses in that Series for any other year.  Each Member also will have a tax capital account for income tax purposes. |
| **Expenses** | **Ongoing Costs and Expenses**.   The Company bears its proportionate share of all Fund expenses (either directly or indirectly), including (i) transaction costs and investment related expenses incurred in connection with the Fund's trading activities, including brokerage, broker-dealer markups, clearing, margin interest, and custodial expenses (both direct and indirect), (ii) routine legal, accounting, auditing, tax preparation, and related fees and expenses, (iii) expenses associated with the continuous offering of Interests, (iv) extraordinary expenses (e.g., litigation costs and indemnification obligations), if any, (v) the Fund's proportionate share of the expenses of any Investment Pool in which it invests which are not otherwise enumerated, including advisory fees to Managers, and (vi) the Managing Member fees described below.  The expenses of the Fund will be shared equitably by each Series, as applicable. |
| | **Overhead Expenses**.   The Company (either directly or indirectly) also pays for all customary direct and indirect overhead and operating expenses incurred in the Managing Member's operation of the Fund in an amount not to exceed one percent (1%) per annum of each Series' Net Worth (the "**1% Limit**"), as adjusted for withdrawals, new admissions, or additional contributions of Members. The Managing Member will be reimbursed for all such costs up to the 1% Limit to the extent the Managing Member advances them.  The Managing Member will be responsible for all of its overhead and operating costs in excess of the 1% Limit. |

| | |
|---|---|
| **Managing Member Fees** | On or before the end of each month, a management fee on account of such month is paid to the Managing Member as compensation for services rendered in an amount equal to 1/8 of 1% of the value of each Member's Capital Account at the end of the prior month (a 1½% annual rate).  The Managing Member pays a portion of its fee to the Investment Consultant pursuant to an agreement between the parties for services rendered by the Investment Consultant to the Managing Member. |
| **Withdrawals** | Capital Account withdrawals may be made at the end of each calendar quarter (each, a "**Withdrawal Date**").  You must give the Managing Member at least 60 days' prior written notice before each withdrawal. The Managing Member may modify the foregoing withdrawal restrictions for hardship reasons or other good cause shown.  Facsimile notice is acceptable to initiate your notice of withdrawal, but remittance of withdrawal payments to you will not be made until the Managing Member has received a manually executed withdrawal notification form from you in good order. |
| **Mandatory Withdrawals** | The Managing Member may, in its discretion, require your mandatory withdrawal from the Company, in whole or in part, upon prior written notice to you. |
| **Withdrawal Payments** | The Managing Member will attempt to distribute 90% of any amount withdrawn from your Capital Account within 90 days after a Withdrawal Date.  The balance will be paid to you (without interest) within 30 days after receipt by the Company of the audited financial statements with respect to the year to which the withdrawal relates. Under extraordinary circumstances, the Managing Member may delay withdrawal payments to you until such time as the extraordinary circumstance no longer exists. Reserves also may be taken in appropriate circumstances until the Company's Net Worth can be confirmed.  The Managing Member intends that payments to you with respect to withdrawals generally will be in cash. At the discretion of the Managing Member these payments also may be in kind, in whole or in part. However, except possibly in connection with the liquidation of the Company, the Managing Member does not intend to distribute any securities to any Member. |
| **Distributions** | Profits will be automatically reinvested, and distributions to you, if any, will be made only on a limited basis at the discretion of the Managing Member.  No distributions are planned.  To the extent that distributions are made, they will be allocated pursuant to the same formula as profits and losses. |

| | |
|---|---|
| **Member Reports** | Within 30 days after the end of each fiscal quarter, the Managing Member will mail to all Members an unaudited report relating to each Member's investment for the prior quarter. |
| | Within 120 days after the end of each year, the Managing Member will send each person who was a Member at any time during the year an audited annual financial statement of the Company, including the Series in which you participate.  The Company also will send to each Member annual tax information for the preparation of such Member's income tax returns and any additional financial or other report that is required by any governmental or regulatory authority having jurisdiction over the affairs of the Company. |
| **Assignability and Transferability of Interests** | The assignability and transferability of the Interests is restricted.  There will be no public or secondary market for the sale of the Interests. |
| **Term** | The Company will be terminated upon the happening of any of the following events (i) the withdrawal, removal, dissolution or bankruptcy of the Managing Member, unless a new managing member is substituted pursuant to the Company's LLC Agreement, or another managing member exists at the time of the event, or (ii) the determination of the Managing Member. |
| **Counsel** | Katten Muchin Zavis Rosenman, New York, New York. |
| **Auditors** | Friedberg, Smith & Co., P.C., Bridgeport, Connecticut. |
| **Federal Income Taxation** | The Company expects to continue to be taxed as a partnership for federal income tax purposes.  Each prospective investor should satisfy himself as to the income tax consequences of an investment in the Company with specific reference to his own tax situation by obtaining advice from his own tax counsel before purchasing an Interest in the Fund.  See "Income Tax Considerations." |
| **Additional Information** | You are invited to contact the Managing Member for a further explanation of the terms and conditions of this offering of Interests.  The Managing Member will provide you with any additional non-proprietary information that you may request to the extent the Managing Member possesses such information or can acquire it without unreasonable effort or expense. Requests for all non-proprietary information should be directed to Joel Danziger or Harris Markhoff at the office of the Managing Member at 123 Main Street, Suite 900, White Plains, New York 10601; telephone (914) 948-1556; facsimile (914) 948-0051. |

| | |
|---|---|
| **Definition of Terms** | Various terms used in this Memorandum are defined in the LLC Agreement (Exhibit A hereto).  Terms which are not defined have the same meanings given to them in the LLC Agreement. |
| **Use of this Memorandum** | This Memorandum is important, and should be read in its entirety, along with all the exhibits, before you decide whether to subscribe for an Interest in the Company.  You should consult with your financial or legal advisors, as needed, before you make an investment decision. |

**How to Subscribe**

- ✓ If you are investing in the Company for the first time, you must review, complete and return all subscription documents to the Managing Member pursuant to the instructions set forth in Exhibit S.

- ✓ If you are an existing Member in the Company seeking to add to your investment, you only need to complete, sign and return the short-form subscription form appearing at the end of Exhibit S.

- ✓ Subscription documents should be faxed to the Managing Member at (914) 948-0051 to begin the subscription process. An original of these documents should then be sent to the Managing Member at 123 Main Street, Suite 900, White Plains, New York 10601, Attention:  Joel Danziger, together with your subscription payment to the extent it is not separately sent by wire transfer.

- ✓ Subscription documents must be received and accepted by the Managing Member, and cleared subscription funds in the full amount of the subscription must be credited to the Company's account, before you will be admitted as a Member or, if you are an existing Member, before your additional investment becomes effective.

- ✓ Neither the Company nor the Managing Member accepts any responsibility for errors in facsimile or other transmission of subscription documents or subscription funds.

**Anti-Money Laundering**

**Verification of Subscribers' Identities and Subscription Sources**.  In order to comply with applicable U.S. anti-money laundering laws and regulations, as well as to implement the Fund's anti-money laundering program, the Company will require a detailed verification of each subscriber's identity and the source of the funds for each subscriber's payment prior to the acceptance of a subscription and may require additional documentation at any time, including, but not limited to, upon a

| | |
|---|---|
| **Anti-Money Laundering (continued)** | withdrawal and/or distribution.  The amount of detail required will depend on the circumstances of each investor. |

By way of example, an individual may be required to produce a copy of a passport, together with evidence of his/her address, date of birth and a letter of reference from a bank or attorney.  If a subscriber is a corporate subscriber, the Fund may require production of a certified copy of its certificate of incorporation (and any change of name), memorandum and articles of association (or equivalent), incumbency certificate, and the names, dates of birth, addresses, and passport information for its directors and/or officers.  In addition, the Company may require similar detailed information for some or all beneficial owners and may require certain entity subscribers to certify as to their compliance with applicable anti-money laundering laws and regulations.

The details given above are by way of example only, and the Company reserves the right to request such information as it deems necessary to verify a subscriber's identity and the source of a subscriber's subscription payment, and/or to comply with applicable anti-money laundering laws and regulations.  In the event of delay or failure by a subscriber to produce any information required for verification purposes, the Company may refuse to accept a subscriber's Subscription Documents and all subscription monies relating thereto, or may refuse to honor a withdrawal request until proper information has been provided by such subscriber.

**Suspicious Activities**.  If the Company or the Managing Member has a suspicion that a payment to the Fund (by way of subscription or otherwise) or a payment from the Fund (by way of withdrawal or otherwise) contains the proceeds of criminal conduct, the Company or the Managing Member may report such suspicion to the appropriate authorities.   Neither the Company, nor the Managing Member, nor any agent of the Company will incur any liability for adhering to the Fund's responsibilities under its anti-money laundering program, and will be indemnified by the subscriber for any losses which the Company or the Managing Member and their principals or agents may incur for doing so.

**Prohibited Investors**. If the Company determines that any investor is a prohibited investor, the Company may, among other things, freeze that investor's assets in the Company and notify appropriate legal authorities.

# INVESTMENT OBJECTIVES AND STRATEGIES

## Investment Process and Selection Methodology

The Company does not directly engage in investment and trading activities. Rather, the Company has invested all of its assets in Beacon Associates LLC I for that purpose. Beacon Associates LLC I is an affiliated fund organized as a New York limited liability company. The Company does, however, retain the right to make its own investment and trading decisions in the future, in whole or in part, but has no present intention to do so. Unless the context otherwise requires, the Company and Beacon Associates LLC I are collectively referred to as the **"Fund."**

The Managing Member (after consultation with the Investment Consultant and the Managing Member's Advisory Board) allocates and reallocates the Fund's assets. The Managing Member also reviews the Fund's portfolio of investments on a regular basis.

The Managing Member is responsible for selecting the Fund's strategies and for selecting the Managers and the Investment Pools they manage, and for monitoring the Fund's performance and for monitoring the Managers' adherence to their stated investment strategies and objectives. Managers chosen by the Managing Member may employ investment strategies that include, without limitation, investing in, trading, buying (on margin or otherwise), selling (including short sales), and otherwise acquiring, holding, disposing of, and dealing in listed and unlisted, publicly- and privately-offered, securities.

Both quantitative and qualitative criteria are factored into the evaluation of Managers, including analyses of: type of trading program; risk control; duration and speed of recovery from drawdowns; experience; organizational infrastructure; and degree of correlation with traditional investments such as stocks and bonds.

Analysis of the performance records of existing and prospective Managers is combined with evaluation of a number of less tangible qualitative factors in an effort to identify Managers whose (i) collective trading results have historically demonstrated substantial returns, while making use of various hedging techniques in an attempt to limit risk and, (ii) strategies and/or investments have a low degree of cross-correlation with each other and with the Managing Member's Large Cap Strategy.

The Managing Member cannot assure the Fund's success or profitability. The success of the Fund will depend upon a variety of factors, many of which are beyond the control of the Managing Member. The level of risk associated with the Fund's investments will vary depending on a number of factors, including without limitation, the success of the strategy adopted by the Managing Member, the specific mix of Managers, their strategies at any particular time, and market conditions.

11063601.19

The Managing Member (after consulting with the Investment Consultant and the Managing Member's Advisory Board), selects strategies and Managers that are not generally available to the investing public (the access to which and whom might otherwise be limited or unavailable), and in the case of Managers, which satisfy one or more criteria including, but not limited to, extensive management experience; consistent and/or superior historical performance for the investment style and strategies employed by the Manager; the use of hedging strategies as part of the Manager's investment approach; diversification benefits relative to other Managers; a quality and stable organization; a market independent (market neutral) investment approach; and an ability to consistently and effectively apply its investment approach. Certain criteria may be emphasized above others in the selection and retention of particular Managers and strategies.

The Managing Member's approach focuses to a large extent on qualitative considerations regarding trading strategy adopted by the Managing Member for investment and the selection of Managers. The evaluation and due diligence process may vary among Managers and will be dependent on each Manager's individual disclosure practice. The Managing Member will utilize its subjective evaluation to determine the most effective asset allocation to maximize returns.

The Managing Member may allocate and reallocate assets to and from strategies and Managers at any time and from time to time. The Managing Member intends to restrict the number of Managers to which assets are allocated, thereby creating a greater concentration of investments and, perhaps, greater volatility.

While the Managing Member intends to invest the portion of the Fund's assets not committed to the Managing Member's Large Cap Strategy with Managers, the proceeds of the offering may be invested at different intervals and in different proportions at times because each of the Managers may have (i) different subscription intervals in which investments may be made in their Investment Pools, and (ii) different requirements with respect to the stipulated size of investments. Furthermore, the individual Managers may impose limits on the maximum allowable investment, which may limit the Fund's ability to invest in the manner or at the times deemed optimal by the Managing Member.

PROSPECTIVE INVESTORS IN THE COMPANY SHOULD BE AWARE THAT THE SUCCESS OF THE FUND'S INVESTMENT PORTFOLIO WILL DEPEND TO A GREAT EXTENT ON THE SUCCESS OF THE MANAGING MEMBER'S LARGE CAP STRATEGY AND THE ABILITY OF THE MANAGING MEMBER TO SELECT MANAGERS, NOT NECESSARILY ON THE SPECIFIC IDENTITIES OF THE MANAGERS THEMSELVES OR THE PERFORMANCE OF ANY PARTICULAR MANAGER(S). THE IDENTITIES OF MANAGERS ARE PROPRIETARY INFORMATION OF THE FUND. MANAGERS SELECTED FOR THE FUND MAY CHANGE FROM TIME TO TIME. IT IS INTENDED THAT A SIGNIFICANT PORTION OF THE FUND'S INVESTMENT PORTFOLIO WILL CONTINUE TO BE INVESTED IN THE MANAGING MEMBER'S LARGE CAP STRATEGY, THEREBY ELIMINATING THE PROTECTION THAT DIVERSIFICATION MAY OTHERWISE PROVIDE.

The methods and strategies described above are intended as generalities, are not comprehensive and are intended to allow the Managing Member broad discretion in identifying investment opportunities. The Managing Member has the right to alter the Fund's investment

strategies and priorities without prior notice to the Fund and the Members if it believes that such changes are appropriate in view of then current or expected market, business or economic conditions.

**Current Allocation**

As of the date of this Memorandum, a significant portion of the Fund's assets are allocated to a strategy adopted by the Managing Member involving investment in a portfolio of Large Cap stocks hedged with options. Except as described below under "Uninvested Cash Balances," the balance of the Fund's assets are allocated among four Managers, each of which invests through four separate Investment Pools. The Fund has no current allocation with any Manager engaged in market timing of mutual fund shares and has no intention to do so.

**Strategies of the Managing Member and Current Managers**

1.  The Managing Member's current investment strategy involves a significant portion of the Fund's assets and includes investments in a portfolio of Large Cap Stocks and the utilization of various hedging techniques with the primary objective being preservation of capital while achieving the maximum possible investment return.

2.  The strategies currently employed by the Manager trading one Investment Pool in which a minority of the Fund's assets currently is invested include:

    •   Hedge/arbitrage activities, consisting of related securities arbitrage, closed-end fund arbitrage, convertible arbitrage, merger arbitrage, Reg D custom convertibles, and fixed income arbitrage. This group of activities is designed to be unaffected by stock and bond market fluctuations and provide an extra measure of profitability in times of market adversity;

    •   Long-term equity-oriented situations, including private equity, venture capital, energy, and special situations;

    •   Distressed securities, emphasizing process-driven and activist situations which are expected to be uncorrelated with the stock and bond markets; and

    •   Short stocks and other portfolio protection trades, such as index put options or volatility swaps.

3.  The strategies currently employed by the Manager trading another Investment Pool with a minority of the Fund's assets involves the use of a long/short strategy of investing in securities of publicly traded companies believed to be undervalued (long positions) or overvalued (short positions), with an emphasis on the small-cap sector (defined as companies with a capitalization of at least $400,000,000) with the rest of the portfolio invested in larger cap stocks. The median capitalization of stocks in this manager's portfolio is $2.5 billion. This Investment Pool seeks to manage market risk and to enhance portfolio returns through the flexible use of hedging, including selling stocks short. The Investment Pool's portfolio is concentrated in a relatively small number of equity positions and therefore this Investment Pool is not diversified. Moreover, this

13

Manager has historically utilized a greater percentage of long positions than short positions.

4.      The strategies currently employed by the Manager trading another Investment Pool with a minority of the Fund's assets involve investment in a portfolio of securities of distressed and out-of-favor companies, including corporate bonds, convertible bonds, high-yield bonds, bank debt, trade claims, and equities.   To minimize risk, the Investment Pool diversifies its portfolio across a broad spectrum of securities, companies, and industries. Distressed securities are found among companies that are currently in a reorganization under applicable bankruptcy laws, companies that are restructuring debt obligations outside of court, companies that are liquidating assets to pay creditors, and companies that have recently been restructured.   Securities of out-of-favor companies are found among companies in out-of-favor industries, and situations where the market has overreacted to an event or series of events, such as the potential for (or initiation of) significant litigation.  An important part of the strategy involves shorting the securities of companies that the Manager believes may become distressed in the future.

5.      The strategies currently employed by the Manager trading another Investment Pool with a minority of the Fund's assets include "event driven investing."  Event driven investing involves the purchase or sale of securities of companies which are undergoing substantial changes.  Among other opportunities, the Fund invests in securities of companies that are selling assets, leaving or entering new businesses, changing their capital structures or that are the subject of a publicly announced acquisition, merger, tender offer, exchange offer, liquidation or other corporate reorganization.

The Manager seeks to achieve absolute returns from event driven investing which are not dependent on overall stock market advances or declines or fluctuations in interest rates or currencies.  Generally, the Manager will seek to reduce or eliminate such market or other risks inherent in its portfolio by employing a variety of hedging techniques including the purchase or sale of, among other things, options on market or sector indices, futures contracts, or structured derivative products.

**Futures Investment Restrictions**

The Managing Member will not permit the Fund (i) to engage in futures or related transactions other than through Investment Pools, or (ii) allocate to Investment Pools trading futures contracts or options thereon (x) any Series 2 assets, or (y) more than 50% of the fair market value of Series 1 assets.

**Uninvested Cash Balances**

Uninvested assets are from time to time maintained in interest bearing instruments or accounts.

*      *      *

**The Fund may in the future employ additional Managers to manage a portion of the Fund's assets, whether through investments in Investment Pools, and/or directly or indirectly in managed accounts.  It is anticipated that such Managers will utilize investment strategies consistent with the Fund's investment objective.**

14

## RISK FACTORS

The identification of attractive investment opportunities is difficult and involves a significant degree of uncertainty. Returns generated from the Fund's investments may not adequately compensate Members for the business and financial risks assumed. The Fund will be subject to those market risks common to funds investing in all types of instruments. Among the risks subscribers should consider are the following:

### Business and Trading Risks

**No Guarantee of Profit**

There is no assurance that the Fund will (i) achieve its investment objectives, (ii) provide an acceptable return to investors, or (iii) not incur substantial losses.

**Dependence on the Managing Member and Fund's Managers**

The overall success of the Fund depends on the Managing Member's ability to select strategies and Managers. No assurance can be given that the strategy or strategies to be used or the Managers selected will be successful under all or any market conditions. Past performance is not necessarily indicative of future profitability, and no strategy can consistently determine which security to purchase or sell at a profit.

**Independence of Fund's Managers**

The Fund does not control its Managers, their choice of investments, or other investment decisions which are totally within the control of the selected Managers.

**High Risk Investments**

Substantial risks are involved in trading and investing in securities. The prices of securities are highly volatile and market movements are difficult to predict. Moreover, many of the Fund's investments are inherently speculative. The short-term performance of the Fund's investments may fluctuate significantly as the Managers pursue the Fund's strategy to achieve gains over the longer term. The Company is therefore not suitable for short-term investment.

**Concentration of Investments**

Except with respect to futures related investments, the Fund is not limited in the amount of its assets which may be committed to any one strategy or Manager, resulting in a lack of diversification, and potentially increasing volatility.

11063601.19

**Leveraging Strategies**

Trading securities on margin and the use of leverage in general can increase the profit potential of an investment portfolio, but can also increase the risk of loss. The exact amount of leverage used (inclusive of options transactions) will depend on market conditions and the discretion of the Managers. Any leveraging strategies that the Managers employ should be expected to increase transaction costs, interest expenses and other costs and expenses. In addition, margin trading requires the pledge of portfolio securities as collateral, and margin calls can result in the requirement to pledge additional collateral or to liquidate holdings, which can result in the necessity of selling portfolio securities at substantial losses that would not otherwise be realized. No assurance can be given that use of margin and other leverage will not result in material losses.

**Short Sales**

The Fund may, from time to time, sell securities short in an attempt to realize a gain through a decline in the market value of the securities sold short. Through the use of short selling, the Fund will be able to engage in "hedging" transactions. This means that the Fund may, through the Investment Pools it invests in, purchase and hold those securities which the Managers believe are likely to increase in market value and, at the same time, sell or be short in other securities in an attempt to realize gain or protect the value of the Fund's portfolio against declines in security prices. Thus, any short sales will be engaged in on a selective basis, with a view towards making profits as well as protecting the equity of the Members in declining markets, although no such profits or protection can be assured.

A short sale is effected by selling a security that the Investment Pool does not own. In order to make delivery to the purchaser, the Investment Pool must borrow the security and may have to pay a premium to the lender of the security. In so doing, the Investment Pool will become obligated to replace that security, whatever its price may be at the time the Investment Pool purchases it for delivery to the lender. The Investment Pool must also pay to the lender of the security the dividends or interest payable during such period.

An Investment Pool will realize a gain from selling short if the price of the security declines between the date of the short sale and the date on which it purchases securities to replace those borrowed. An Investment Pool will incur a loss if the price increases between the date of the short sale and the date on which it purchases securities to replace those borrowed.

Potential losses on short positions are greater than potential losses on securities owned by an Investment Pool, since the Investment Pool is obligated to purchase the security and return it to the person from whom it has borrowed, regardless of the cost. When a security is heavily shorted or in limited supply in the market, an Investment Pool, in order to cover its short position, may have to pay a higher price to replace the security since it will be competing for the supply with other short sellers as well as with purchasers of regular "long" positions.

The Investment Pools may also engage in short sales "against-the-box" when it contemporaneously owns or has the right to obtain securities identical to those sold short without the payment of further consideration. Such sales may be used by an Investment Pool temporarily

to defer the realization of gain or loss for federal income tax purposes on securities then owned by the Investment Pool. An Investment Pool may also realize short-term gain or loss on short sales "against-the-box" by covering the short position through a subsequent purchase. See "Income Tax Considerations."

Gains and losses on short sales are generally treated as short-term capital gains. See "Income Tax Considerations".

## Options Trading

Stock options trading involves various risks.

The purchaser of put or call options runs the risk of losing the entire investment in the option in a relatively short period of time. The uncovered writer of a call option (i.e., the seller of a call option who does not own the underlying security) is subject to loss if the price of the underlying security rises above the option's strike price. Similarly, the uncovered writer of a put option is subject to loss if the price of the underlying security declines in price below the option's strike price.

The writer of a call option who owns the underlying security is subject to the full risk of the position in the underlying security in exchange for the option premium received when the option is sold. In addition, such an investor has given up the opportunity for gain in the underlying security above the option exercise price, in exchange for the option premium received. The writer of a put option with a short position in the underlying security is subject to the corresponding risks.

Stock options are volatile in price, and the market for such options may be subject to distorted pricing at times of stress in financial markets. Government and exchange regulation of equity options and intervention in equity options transactions pose additional risks. Such actions may cause rapid price movements or may restrict liquidity in certain instruments.

## Limited Liquidity of Certain Investments

At various times, the markets for securities purchased or sold by the Investment Pools may be "thin" or illiquid, making purchases or sales at desired prices or in desired quantities difficult or impossible. This could present a problem in realizing the prices quoted and in effectively trading the position(s). In addition, certain Managers trading Investment Pools may invest in securities of private companies and privately issued securities of public companies. The Managers may not be able to readily dispose of such non-publicly traded securities and, in some cases, may be contractually prohibited from disposing of such investments for a specified period of time. It is possible that the foregoing could have an effect on the ability of the Fund to comply on a timely basis with all withdrawal requests.

## Trading Limitations

For all securities, including options, listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances. Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Fund to loss.

17

**Foreign Securities**

Foreign securities historically have been highly volatile and may involve greater risks than comparable U.S. investments.  The application of foreign tax laws (e.g., the imposition of withholding taxes on dividend or interest payments) or confiscatory taxation may also affect investment in foreign securities.  Foreign securities markets also may be less liquid and less subject to governmental supervision than in the United States.  The Fund's Managers may or may not hedge the foreign currency exposure resulting from differences in the value of the U.S. Dollar and the currency in which the foreign securities trade.

**Economic Conditions**

Changes in economic conditions, including, for example, interest rates, inflation rates, industry conditions, competition, technological developments, political and diplomatic events and trends, tax laws and innumerable other factors, can affect substantially and adversely the business and prospects of the Company.  None of these conditions is within the control of the Managing Member.

**Managing Member's Large Cap Investment Strategy**

For this strategy to be successful, the long positions and options hedges must be well correlated in terms of price and instrument availability.  Market conditions (e.g., insufficient volume, volatility or momentum) may not be conducive to a successful implementation of this strategy.  In addition, the Fund assumes a significant counterparty credit risk in executing this strategy because of the amount of assets committed to it.

**Arbitrage and Event Driven Risks**

The trading operations of one or more of the Fund's Investment Pools may involve arbitraging between a security and its announced buy-out price (or other forms of "risk arbitrage"), or between or among two or more securities.  This means, for example, that such Investment Pools may purchase (or sell) securities (i.e., on a current basis) and take offsetting positions in options in the same or related securities.  To the extent the price relationships between such positions remain constant, no gain or loss on the positions will occur.  These offsetting positions entail substantial risk that the price differential could change unfavorably causing a loss to the position.  In addition, Managers may establish positions in anticipation of events which never occur, or occur differently than expected, thereby causing losses.

**Purchases of Securities and Other Obligations Of Financially Distressed Companies**

One or more of the Fund's Investment Pools may purchase securities and other obligations of companies that are experiencing significant financial or business distress, including companies involved in bankruptcy, or other reorganization and liquidation proceedings.  Acquired investments may include senior or subordinated debt securities, bank loans, promissory notes, and other evidences of indebtedness, as well as payables to trade creditors.  Although such purchases may result in significant returns, they involve a substantial degree of risk and may not show any return for a considerable period of time.  In fact, many of these securities and investments ordinarily remain unpaid unless and until the company

18

reorganizes and/or emerges from bankruptcy proceedings, and as a result may have to be held for an extended period of time.  The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial distress is unusually high.  Moreover, there are inherent difficulties in accurately valuing some of these securities.

### Small and Micro-Cap Stocks

Small and micro-cap companies offer investment opportunities and additional risks. These companies may not be well known to the investing public, may not be significantly owned by institutional investors and may not have steady earnings growth.  In addition, the securities of such companies may be more volatile in price, have wider spreads between their bid and ask prices and have significantly lower trading volumes than larger capitalization stocks.  As a result, the purchase or sale of more than a limited number of shares of a small or micro-cap security may affect its market price.

### Swaps and Other Derivatives

The Managers of one or more of the Fund's Investment Pools may engage in swap transactions and other forms of derivative instruments which seek to modify the investment performance of particular securities, interest rates, indices, or markets on a leveraged or unleveraged basis.  Swap transactions may involve interest rates, currencies, indices or other financial instruments and are principal-to-principal transactions in which performance is the responsibility of the individual counterparty and not an organized exchange or clearinghouse. Other derivatives may include collateralized mortgage obligations ("**CMOs**") and stripped mortgage backed securities ("**SMBSs**").  Substantial risks are involved in borrowing and lending against such instruments.  The prices of these instruments are volatile, market movements are difficult to predict and financing sources and related interest rates are subject to rapid change. One or more markets may move against the positions held, thereby causing substantial losses.  In addition, such instruments carry the additional risk of failure to perform by the counterparty to the transaction.  Government policies, especially those of the Federal Reserve Board and foreign central banks, have a profound effect on interest and exchange rates, which in turn affect prices of derivative instruments.  Many other unforeseeable events, including actions by various government agencies and domestic and international political events, may cause sharp market fluctuations.

### Repurchase and Reverse Repurchase Agreements Present Certain Risks

The Managers may engage in repurchase and reverse repurchase agreements as part of their cash management procedures.

In the case of default by the transferee of a security in a reverse repurchase agreement, the Fund as transferor runs the risk that the transferee may not deliver the security when required.  In the event of the bankruptcy or other default of a transferor of a security in a repurchase agreement, the Fund as transferee could experience both delays in liquidating the underlying security and losses, including:  (a) a possible decline in the value of the collateral during the period while the Fund seeks to enforce its rights thereto; (b) possible subnormal levels

11063601.19

of income and lack of access to income during this period; and (c) expenses of enforcing its rights.

### Risks From Manager Hedging Activities

The Managers of Investment Pools generally may employ various hedging techniques to attempt to reduce the risk of the investments they hold. If the Managers analyze market conditions incorrectly, employ a strategy that is not optimal, or other adverse conditions prevail, the Managers' hedging techniques could result in a loss, regardless of the intent with which the position(s) were established. Further, a particular hedge may not be available with respect to a particular investment and even if available, may not perfectly match the position which is sought to be hedged. The Managers also may fail to hedge at all. All of these factors may increase the Fund's volatility and/or losses.

### Special Risks Associated with Futures Trading

*Speculative Nature:* Futures prices are highly volatile. Price movements for commodity futures contracts which the Fund (through the Investment Pools) may trade are influenced by, among other things, changing supply and demand relationships, government, trade, fiscal, and economic events and changes in interest rates. Governments from time to time intervene, directly and by regulation, in certain markets, often with the intent to influence prices directly.

*Lack of Liquidity:* The CFTC has jurisdiction to establish, or cause exchanges to establish, position limits with respect to all futures traded on exchanges located in the United States and may do so, and any exchange may impose limits on positions on that exchange. No such limits presently exist in the forward contract market or on certain non-U.S. exchanges.

United States commodity exchanges may limit fluctuations in futures contracts prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." During a single trading day no trades may be executed at prices beyond the daily limit. Once the price of a particular commodity futures contract has increased or decreased to the limit point, positions in the commodity futures contract can be neither established nor liquidated unless traders are willing to effect trades at or within the limit. Futures prices have occasionally moved the daily limit for several consecutive days with little or no trading. Similar occurrences could prevent the Investment Pools from promptly liquidating unfavorable positions and subject the Fund to substantial losses which could exceed the margin initially committed to such trades. In addition, even if futures prices have not moved the daily limit, the Fund may not be able to execute futures trades at favorable prices if little trading in such contracts is taking place (a "thin" market).

*Margin:* The low margin deposits normally required in futures trading permit an extremely high degree of leverage. Accordingly, a relatively small price movement may result in immediate and substantial gain or loss to the Fund. For example, if at the time of purchase 10% of the price of a futures contract is deposited as margin, a 10% increase in the price of the futures contract would, if the contract were then closed out, result in a doubling of the amount deposited as margin, whereas a 10% decrease would result in a total loss of the margin deposit, in each

case before any deduction for the trading commission. Investments leveraged to this extent may result in gains or losses in excess of the amount invested by an Investment Pool.

*Reduced CFTC Oversight*:  The CFTC has adopted a new regulatory framework imposing three levels of regulatory oversight on commodities transactions. The applicability of a particular level of oversight will depend upon the type of commodity and market involved in the transaction. The Managing Member anticipates that the Fund's futures trading program will be subject to the lowest level of CFTC regulation and oversight.

*Trading on Non-U.S. Exchanges*:  The Investment Pools may trade in futures and forward contracts on exchanges located outside the United States where CFTC regulations do not apply. Some non-U.S. exchanges, in contrast to U.S. exchanges, are "principal markets" in which performance with respect to a contract is the responsibility only of the individual member with whom the trader has entered into a contract and not of the exchange or clearinghouse, if any.  In the case of trading on non-U.S. exchanges, the Investment Pools will be subject to the risk of the inability of, or refusal by, the counterparty to perform with respect to such contracts. It is also possible that the Fund will not have the same access to certain trades as do various other participants in non-U.S. markets. Due to the absence of a clearinghouse system on many non-U.S. markets, such markets are significantly more susceptible to disruptions, which may include prolonged suspensions of trading and involuntary settlement of positions at artificial prices, than on United States exchanges.

*Trading in Currencies*:  Trading in the interbank market also may expose the Investment Pools to a risk of default since failure of a bank or other financial institution with which the Fund has forward contracted would likely result in a default, and thus possibly substantial losses to the Fund.  In addition, the Investment Pools may be exposed in the interbank market to risks associated with any government or market action that might suspend or restrict trading or otherwise render illiquid, in whole or in part, their positions.

**Possible Adverse Effects of Increasing the Assets Managed by the Fund's Managers**

Managers are limited in the amount of assets they can successfully manage by both the difficulty of executing substantially larger trades in order to reflect larger equity under management and the restrictive effects of speculative position limits and possible market illiquidity. The rates of return recognized on the trading of a limited amount of assets may have little relationship to those a Manager can reasonably expect to achieve trading larger amounts of funds. The Managers have not agreed to limit the amount of additional equity they may manage. There can be no assurance that a Manager's strategies will not be adversely affected by the additional equity represented by additions made by the Fund or otherwise.

**Managers' Limited Capacity**

There is no assurance that the Fund's Managers will, as a result of capacity constraints, agree to manage as much of the Fund's assets as the Managing Member determines to allocate to the Managers.   There is also no assurance that a Manager will not terminate its relationship with the Fund.

## Competition

The Fund will engage in investment and trading activities which are highly competitive with other investment and trading programs including those of mutual funds and other financial institutions, investment banks, broker/dealers, commercial banks, insurance companies and pension funds, as well as private investors, all of whom may have investment objectives similar to those of the Fund.  These competitors may have substantially greater resources than the Fund and may have substantially greater experience than the Managers.

## Company Risks

## Limited Rights of Members

Members do not take part in the management or control of the Company and have limited voting rights.  Members have to rely on the Managing Member to manage and conduct the affairs of the Company.  Management of the Company includes, but is not limited to, decisions concerning (i) allocation and reallocation of the Fund's assets to the Managing Member's Large Cap Strategy and to Managers, (ii) making distributions to the Members, (iii) admitting new Members, and (iv) retaining service providers.

## Illiquid Nature of Interests

Interests may be acquired for investment purposes only and not with a view to their resale or other distribution.  Interests will not be registered under the Securities Act, in reliance on an exemption under Regulation D promulgated under the Securities Act.  The LLC Agreement substantially restricts the transferability or assignability of Interests.  The Managing Member's consent is a condition to any permitted assignee becoming a substitute Member and such consent is within its sole discretion.  In addition, you may only withdraw from the Company at the end of each calendar quarter on at least 60 days' prior written notice to the Managing Member.  Moreover, full payment with respect to a withdrawn Interest will not be made at the time of withdrawal.  Under extraordinary circumstances, the Company may delay withdrawal payments until such time as the extraordinary circumstance no longer exists.  If, as a result of some change in circumstances arising from an event not presently contemplated, you wish to transfer all or part of your Interest, and even if all conditions to such a transfer are met, you may find no transferee for your Interest due to market conditions or the general illiquidity of the Interests.

Conversely, the Managing Member may require you to withdraw all or a portion of your Capital Account at any time on prior written notice.  All such required withdrawals are in the sole discretion of the Managing Member.

## Withdrawing Members are Creditors of the Company

Between the Withdrawal Date and the date on which any withdrawal proceeds are paid to you, you will be a creditor of the Company subject to the same risks as any other creditor of the Company, including the possibility that the Company may be unable to pay all or a portion of the withdrawal proceeds to you.  In addition, if a reserve is established for contingent liabilities, the reserved portion will remain subject to the risk of the Company's activities.

11063601.19

**Amounts to be Paid to each Manager are based on Each Manager's Individual Performance**

Any performance-based fees to be paid to a Manager will be based on the individual performance of that Manager, irrespective of the overall performance of the Fund. The fact that the performance-based fees are individually calculated exposes the Fund to the risk of paying a Manager during periods when the Fund's Net Worth decreases and of having its assets actually depleted by performance-based fee payments.

**Absence of Custodian**

The Fund does not have a separate custodian of the assets allocated to its current Managers. Although the Managing Member endeavors to verify the integrity of its Managers and broker it utilizes, there is always the risk that they could mishandle or convert the securities or assets under their control  Assets of the Fund which are maintained in cash either pending investment or to pay Fund expenses are maintained at J.P. Morgan Chase Bank, 191 Mamaroneck Avenue, White Plains, NY 10601.

**Liability and Indemnification**

Neither the Managing Member nor its shareholders, officers, directors, employees, or affiliates, or the Advisory Board Members of the Managing Member, will be liable, responsible or accountable in damages or otherwise to the Company, any Series, or any of the Members for any act or omission performed or omitted to be performed by it or them in a manner reasonably believed by it or them (i) to be within the scope of the authority granted to it or them by the LLC Agreement, and (ii) to be in the best interests of the Company, a Series, or the Members (collectively, "**Good Faith Acts**"), except when such action or failure to act is found to be the result of gross negligence, fraud, or willful misconduct. The Managing Member and its shareholders, officers, directors, employees, and affiliates, and the Advisory Board Members of the Managing Member, will be indemnified by each Series solely from its assets for any loss or expenses suffered or sustained by them as a result of their Good Faith Acts so long as such loss or liability did not result from the indemnified person's gross negligence, fraud or willful misconduct. In addition, none of the foregoing shall have liability to the Company, a Series or its Members, and shall be fully indemnified for any loss or expense suffered by it or them which result from the actions or inactions of Managers and other agents who/which were selected with reasonable care. The Company may purchase insurance to cover such liabilities.

**Other Activities of Investment Consultant**

As a global leader in alternative investment fund-of-funds portfolio management, the Investment Consultant and its affiliates provide investment advice to a wide range of clients, including other investment vehicles and partnerships, many of which have assets far greater than those of the Fund and some of which are engaged in substantially the same trading and investment activities as the Fund. Due to its varying interests, the Investment Consultant is faced with a number of inherent conflicts of interest in the course of its involvement with the investment and trading activities of the Company, including dividing its time among the operations of the various entities with which it is involved.

23

## Statutory Regulations and Non-Registration

The Company is subject in certain respects to regulation by the Securities and Exchange Commission (the "**SEC**"). However, the Company is not required to be registered under the 1933 Act or the 1940 Act (or any similar state law). Thus, except for certain anti-fraud protections, investors in the Company are not afforded the protection provided by such legislation, which, among other things, requires that an investment company's board of directors, including a majority of disinterested directors, approve certain of its activities and contractual relationships, and prohibits an investment company from engaging in certain transactions with its affiliates. The Managing Member is exempt from registration under the Advisers Act as an investment adviser and under the CE Act as a CPO in connection with its operation of the Company. In addition, any Investment Pool in which Series 1 invests which utilizes futures and related instruments will either have to have a registered CPO or be exempt from having such a registered CPO.

## Regulatory Changes

Legislation may be enacted or regulations may be issued which generally could affect the operation of the Company (or an investment therein). There is no way to know if or when any such changes may be implemented. For example, on July 14, 2004 the SEC voted to propose rules which, if adopted, would have the effect of requiring hedge fund managers (such as the Managing Member) to register with the SEC as investment advisers. If the proposed rules are adopted, the Managing Member will become subject to various regulatory requirements not currently applicable to it.

## Potential Conflicts of Interest

The Fund is subject to various conflicts of interest arising out of its various relationships. See "Conflicts of Interest."

## Tax Factors

The Fund expects to continue to be treated as a partnership for federal income tax purposes. Accordingly, you will be taxed on your share of any taxable income of the Company whether or not any cash is distributed to you, and your income tax liability with respect to your share of the Company's taxable income, if any, may exceed the cash distributed to you. Because the Fund expects to make debt-financed investments, this investment may generate unrelated business taxable income for tax-exempt investors, and this investment, therefore, is not suitable for you if you are a charitable remainder trust, and might not be suitable for you if you are tax-exempt and do not wish to be allocated income that is taxable to you.

Your ability to deduct your share of Company expenses and losses, if any, including capital losses, may be subject to various limitations. Also, the Company might sustain losses after the end of a year, so that if you do not withdraw from the Company as of that year-end, you might never receive the profits on which you have been taxed. Thus, the income tax effects of the Company's transactions may differ from the economic consequences to you.

11063601.19

Information returns filed annually by the Company may be audited by the Internal Revenue Service or other tax authorities. An audit may result in an audit of or adjustments to a Member's tax return and could involve additional expenses for you.

The Company may be unable to provide a final Schedule K-1 for you for any given year by April 15 of the following year. Accordingly, you may be required to obtain an extension of the filing date for your income tax returns at the federal, state and local levels.

You are strongly urged to consult your own tax advisors about the federal, state and local tax consequences of an investment in the Company. Tax consequences may differ depending on your circumstances, and could be affected by future changes in the tax laws. No tax ruling is being sought as to any tax matters. See generally, "Income Tax Considerations."

## ERISA Plan Fiduciaries

Fiduciaries acting on behalf of employee benefit plan investors and individual retirement accounts (or IRAs) who are considering the purchase of an Interest must ensure that the purchase of an Interest is not prohibited under the governing documents of the Plan or IRA and the requirements of applicable law, including the requirements of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"). See "Employee Benefit Plan Considerations" hereafter for certain risk factors and other considerations relevant to you.

## Valuation of Assets

The Managing Member relies on the Managers of Investment Pools for the valuations of these vehicles for purposes of calculating each Series' Net Asset Value and preparing the Company's financial statements and reports and tax information. Other assets are valued by the Managing Member. There is no assurance that these valuations will be accurate or, when applicable, received on a timely basis.

11063601.19

# THE COMPANY AND ITS MANAGEMENT

The Company was formed as a New York Limited Liability Company on January 20, 1995 and commenced operations on March 1, 1995.

## The Managing Member

The Managing Member of both the Company and Beacon Associates LLC I is Beacon Associates Management Corp. (the "**Managing Member**"), a New York corporation formed in 1995. The Managing Member directs the business operations and affairs of the Fund, and makes all allocation and reallocation decisions concerning the Fund's assets. The Managing Member has engaged the Investment Consultant (described below) to assist it with allocating and reallocating the Fund's assets among Managers and Investment Pools, and to provide certain administrative and accounting services to the Managing Member. The Managing Member also consults with its Advisory Board periodically. The principals of the Managing Member are described below. The Managing Member is located at 123 Main Street, Suite 900, White Plains, New York 10601; telephone (914) 948-1556.

## Principals of the Managing Member

The directors and officers of the Managing Member are as follows:

| Name | Office | Business Address |
|---|---|---|
| Joel Danziger | President and Director | Danziger & Markhoff LLP<br>123 Main Street<br>Suite 900<br>White Plains, New York 10601 |
| Harris Markhoff | Vice President, Secretary, Treasurer and Director | Danziger & Markhoff LLP<br>123 Main Street<br>Suite 900<br>White Plains, New York 10601 |

Messrs. Danziger and Markhoff have held the above offices since the formation of the Managing Member, and will continue to serve in these capacities until their successors are elected and qualified. Joel Danziger and Harris Markhoff own (beneficially and of record) 100% of the issued and outstanding voting shares of the Managing Member (constituting 1% of the outstanding stock of the Managing Member). All of the non-voting common stock of the Managing Member (constituting 99% of the total outstanding stock of the Managing Member) is held by the immediate families of Messrs. Danziger and Markhoff. Messrs. Danziger and

26

Markhoff will devote the necessary amount of time to carry out the operations and administration of the Managing Member. However, both individuals are and will be engaged substantially full-time in other business and professional activities.

**Joel Danziger** is a partner of the law firm of Danziger & Markhoff LLP. He is a graduate of Columbia College, holds a J.D. degree from Yale Law School and has been engaged in the private practice of law since 1958. He is a resident of Bedford, New York.

**Harris Markhoff** is a partner of the law firm of Danziger & Markhoff LLP. He is a graduate of Columbia College, holds an LL. B. degree from Columbia University Law School and has been engaged in the private practice of law since 1963. He is a resident of Pound Ridge, New York.

The Managing Member and its shareholders may, in the future, sell shares of the Managing Member to persons other than those named above and such other persons may be elected as officers and directors of the Managing Member. However, other than with respect to transfers to immediate family members, the shareholders and directors of the Managing Member have no present intention to do so.

## Affiliates

The Managing Member is an affiliate of the law firm of Danziger & Markhoff LLP. The officers and directors of the Managing Member are officers and directors of:

1.    **Andover Associates Management Corp. ("AAMC")**, a Delaware corporation, which is the sole general partner of Andover Associates, L.P. I and an affiliate, two private investment funds (collectively, "**Andover**"). Joel Danziger and Harris Markhoff also are the principal shareholders of AAMC. Andover was formed in 1992 to engage in diversified investment activities. Andover allocates a substantial portion of its assets to the same Large Cap Strategy as employed by the Fund. With regard to the balance of Andover's assets, Andover has granted exclusive discretionary trading authority to a number of independent investment managers.

2.    **Warm Springs Associates Corp. ("WSAC")**, the sole general partner of Warm Springs Limited Partnership, another private investment fund ("**Warm Springs**"). Joel Danziger and Harris Markhoff are the principal shareholders of WSAC. Warm Springs was formed in May, 1983 to engage in diversified investment activities. Warm Springs has granted exclusive discretionary trading authority to a number of independent investment managers and the general partner of Warm Springs has not participated, and does not intend to participate, in its investment and trading decisions.

## Investment Company and Investment Manager Status

The Company is not registered as an investment company under the 1940 Act, and the Managing Member is not registered as an Investment Adviser under the Advisers Act, in each case based upon available exemptions from registration. Series 1 of the Company is considered to be a commodity pool under Part 4 of the CFTC's Regulations, but is exempt from having a registered CPO under Rule 4.13(a)(3). See CFTC Exemption on page (ii).

11063601.19

**The Investment Consultant**

The Managing Member has engaged the Investment Consultant, Ivy Asset Management Corp., a wholly owned subsidiary of The Bank of New York Company Inc., to provide advice to the Managing Member with respect to Manager selection and allocation of the Company's assets among Managers and Investment Pools, and to provide certain administrative services to the Managing Member.  The Investment Consultant is a registered Investment Adviser under the Advisers Act, with approximately $13 billion of assets under management.  The Investment Consultant is a global leader in alternative investment fund-of-funds portfolio management. Since 1984, the Investment Consultant's clients have participated in niche styles and sophisticated strategies of investing.  The Investment Consultant's clientele includes Fortune 500 companies, defined benefit plans, multi-national insurance corporations, high net worth investors, global investment banking firms, foundations and endowments, Taft-Hartley pension plans, private family businesses, offshore investors and and corporate entities, professional money managers, registered investment companies, and the Investment Consultant's principals and employees.

The Investmentt Consultant's staff of approximately 125 includes 25 research analysts and other senior investment professionals who devote 100% of their time to researching, reviewing, monitoring, and analyzing current and prospective investment managers, 21 Certified Public Accountants, 13 CFA Charterholders and 8 CFA candidates.

**Fiduciary Responsibility of the Managing Member**

The Managing Member has a responsibility to the Company's Members to exercise good faith and fairness in all dealings affecting the Company.  Members who have questions concerning the responsibilities of the Managing Member should consult their legal counsel. In the event that a Member believes that the Managing Member has violated its fiduciary duty to the Company's Members, a Member may seek legal relief for itself or on behalf of the Company under applicable U.S. federal or state laws or require an accounting by the Managing Member. See Section 6 of Article VII of the LLC Agreement attached as Exhibit A for the "Managing Member's Standard of Care."

28

# CONFLICTS OF INTEREST

## General

The responsibilities and interests of the Managing Member may at times be inconsistent with the interests of the Members.

## Activities of the Managing Member and its Principals

The Managing Member is not under any obligation to devote its full time to the business of the Fund, but is only required to devote such time and attention to the affairs of the Fund as it may deem appropriate. In addition, the Managing Member or its principals may be involved with a limited number of other investment vehicles for which it or they may be compensated, and in that connection the Managing Member may decide to invest the funds of one or more of these vehicles, rather than the Fund's assets, with a particular Manager. To date, the shareholders of the Managing Member have, through their ownership of the stock of the corporate general partners of Warm Springs Limited Partnership and Andover, engaged in investment activities similar to those in which the Fund is engaged.

## Multiple Representations of Counsel

Katten Muchin Zavis Rosenman, counsel to the Fund, also represents the Managing Member in connection with this transaction, as well as other affiliated entities. Various conflicts may arise as a result. In addition, the officers, directors and principal shareholders of the Managing Member are partners of the law firm of Danziger & Markhoff LLP. Danziger & Markhoff LLP may perform actuarial and other administrative services for some prospective investors. Danziger & Markhoff LLP may also render legal services for prospective investors and with regard to retirement plan investors, their respective plan employers, participants and beneficiaries with respect to matters unrelated to this offering of Interests. No prospective investor may rely on Danziger & Markhoff LLP or any partner or associate of such firm in connection with such prospective investor's evaluation of the merits and risks of an investment in the Interests.

11063601.19

# FEES AND EXPENSES

| **DESCRIPTION** | **AMOUNT** | **WHO PAYS**[*] |
|---|---|---|

**The Company will be responsible (directly or indirectly) for its proportionate share of the Fund's expenses, including:**

| DESCRIPTION | AMOUNT | WHO PAYS |
|---|---|---|
| Expenses associated with the continuing offering of Interests. | Legal, accounting, filing, printing and other fees as incurred. | The Fund. |
| Direct and indirect customary overhead expenses incurred by the Managing Member in operating the Company, including rent, telephone, postage, supplies, employee compensation and benefits, insurance, and other administrative expenses. | a)  Up to 1% of each Series' Net Worth per annum, as adjusted for withdrawals, new admissions, or additional contributions of Members ("1% Limit"). | a)  The Fund. |
|  | b)  Over 1% per annum. | b)  The Managing Member |
| Transaction costs and investment related expenses incurred in connection with the Fund's direct and indirect trading activities, including, brokerage, broker-dealer mark-ups, clearing, margin interest, and custodial expenses. | As incurred. | The Fund. |
| Routine legal, accounting, auditing, tax preparation and related fees and expenses. | As incurred. | The Fund |
| The Fund's proportionate share of the expenses of any Investment Pools in which the Fund invests, including fees to Managers for trading the Investment Pool's assets. | As incurred. | The Investment Pools (and then charged proportionately to the Fund). |
| Managing Member Fee | 1/8 of 1% of the value of each Member's Capital Account at the end of the prior month (a 1½% annual rate), without regard to any additions for the month in which the fee is paid. | The Fund |
| Investment Consultant Fee | A portion of the Managing Member Fee, as agreed. | The Managing Member |
| Extraordinary expenses (including litigation costs and indemnification obligations). | If, and as, incurred. | The Fund |

---

[*] Expenses which are allocated to the Company are shared equitably by the two Series consistent with each Series' permitted activities.

11063601.19

**OFFERING OF INTERESTS**

### Description

The Company is offering Interests in two Series without any selling commissions. You must contribute a minimum of $500,000 (subject to the right of the Managing Member, in its discretion, to modify this requirement).

### New Subscribers

If you are a new subscriber and your subscription application is accepted, you will be admitted into either Series 1 or Series 2 of the Company as a Member at the beginning of a month (or at such other times as the Managing Member, in its discretion, shall determine), provided a completed and fully executed subscription agreement is received timely by the Managing Member.

### Existing Members

If you are an existing Member wishing to purchase additional Interests, you generally will be subject to a $25,000 subscription minimum (subject to the right of the Managing Member, in its discretion, to modify this requirement).

### Your Interest in the Company

All contributions by you will be combined to determine your Interest in the Series in which you participate. Each Member will only have one Interest in the Company.

### Subscription Proceeds

All funds received in connection with subscriptions are held by the Company in an interest-bearing account at J.P. Morgan Chase Bank until accepted, or until returned to subscribers. All interest realized on accepted subscription funds are for the benefit of the Company. The maximum size of the offering is subject to the discretion of the Managing Member. ALL SUBSCRIPTIONS ARE IRREVOCABLE. THE MANAGING MEMBER MAY, HOWEVER, REJECT ANY SUBSCRIPTION, IN WHOLE OR IN PART, IN ITS DISCRETION, AND MAY TERMINATE THE OFFERING OF INTERESTS AT ANY TIME.

### Use of Proceeds

The net proceeds to the Company from the sale of Interests will be used as trading and investment capital.

**Finder's Fees**

The Managing Member may pay broker's, finder's or similar fees to third parties in connection with the referral of a subscriber to the Managing Member and/or the Company. All of such fees are for the account of, and shall be paid for by, the Managing Member and not the Company.

**Form of Payment**

Capital contributions (whether initial or additional) must be in cash at the time of subscription. Cleared funds must be received before you will be admitted as a Member.

**How to Subscribe**

See "Summary—How to Subscribe" at page 9.

The Managing Member has the power to impose such additional restrictions as it may think necessary for the purpose of ensuring that no Interest is acquired or held by any person or persons in circumstances (whether directly or indirectly affecting such person or persons), which, in the opinion of the Managing Member, might result in the Company incurring any adverse regulatory finding or penalty or other liability or suffering any pecuniary or other disadvantage which the Company might not otherwise have incurred or suffered. The Managing Member also has the power to admit "Special Limited Partners" under terms and conditions which are different from other Members.

11063601.19

## SUITABILITY REQUIREMENTS AND OFFERING LIMITATIONS

### General

An investment in the Company is suitable for you if you have no need for liquidity in this investment and have adequate means of providing for your current needs and personal contingencies. An investment in the Company is not suitable for you if you (i) cannot afford a loss of principal, or (ii) have not (either alone or in conjunction with a financial advisor) carefully read, or do not understand, this Memorandum. If you are a tax exempt entity you should pay careful attention to the section of this Memorandum entitled "Income Tax Considerations" and "Employee Benefit Plan Considerations." **The Managing Member, in its discretion, may decline to admit any subscriber for any reason. This offering is not suitable for charitable remainder trusts and other tax exempt entities not wishing to, or which are unable to, be subject to unrelated business taxable income ("UBTI").**

### Private Placement

This offering is being made pursuant to Rule 506 of Regulation D under the 1933 Act, which exempts non-public offerings of securities from federal registration.

There is no established market for the Interests, and it is not expected that any public market will develop. The sale of the Interests has not been registered under the 1933 Act. The Interests may not be resold unless they are subsequently registered under the 1933 Act or an exemption from registration is available to you. Rule 144 of the 1933 Act may not be available to you in connection with any resales.

### Accredited Investor and Other Requirements

In order for you to be admitted as a Member of Series 1, the Managing Member must have reasonable grounds to believe that you are either (i) an "Accredited Investor" within the meaning of Regulation D under the 1933 Act, (ii) a trust established by an Accredited Investor for family members, or (iii) a "Knowledgeable Employee" as defined under CFTC Rules. Accredited Investors include, but are not limited to:

- individuals (including IRA, 401(k) or other self-directed retirement plan accounts of individuals) whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000, or who had individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who has a reasonable expectation of reaching the same level in the current year;

- corporations, partnerships, LLCs, trusts or similar entities with total assets in excess of $5,000,000 that were not formed for the purpose of investing in the Company; and

- entities in which all the participants are Accredited Investors.

**The various categories of "Accredited Investor" are more fully set forth in the Subscription Documents attached as Exhibit S.**

### 100 Person Limitation

The Company is limiting the number of Members to 100 so that the Company will not be required to register as an investment company under Section 3(c)(1) of the 1940 Act.

### Anti-Money Laundering Requirements

See "Summary – Anti-Money Laundering" at pages 9 and 10.

34

## TERMS OF THE LLC AGREEMENT

The following is a description of certain of the provisions governing the Company, which are set forth in the LLC Agreement as they are expected to be in effect as of April 1, 2004, after certain proposed amendments currently pending before the Members are adopted. The description of the terms of the LLC Agreement is qualified in its entirety by reference to the form of such LLC Agreement attached hereto as Exhibit A. Capitalized terms used in this section but not defined in this Memorandum have the meanings given to them in the LLC Agreement. Other provisions of the LLC Agreement may be important to you and are not described below. Accordingly, you are encouraged to read the LLC Agreement in its entirety before subscribing.

**Management and Control**

The Managing Member has exclusive authority to control the management of the day-to-day business operations and all other aspects of the Company, other than certain events which are subject to approval of a specified percentage in interest of Members as provided in the LLC Agreement. The Managing Member has the right to employ Managers, attorneys, accountants and other personnel. The Managing Member may own, operate and invest in other interests and business ventures.

**Liability of Managing Member**

The doing of any act or the failure to do any act by the Managing Member, the effect of which may cause or result in loss, liability, damage or expense to the Company or its Members, shall not subject the Managing Member, or its officers, directors, shareholders, employees or affiliates to any liability to the Company or to the Members, except that the Managing Member may be so liable if it is grossly negligent or engages in reckless or intentional misconduct or a knowing violation of law.

**Indemnification**

See "Risk Factors—Indemnification of the Managing Member."

**Liability of Members**

As a Member, you should not generally be held liable for obligations of the Series in which you participate in excess of your capital contribution(s). In addition, the LLC Agreement provides that the assets and liabilities of each Series will be segregated from the assets and liabilities of all other Series. All capital contributions are discretionary. You may, however, be liable (i) for such portion, if any, of a distribution of capital which is in violation of applicable New York law and which is required to be returned to the Company pursuant to such Act, and (ii) for any funds or property of a Series wrongfully distributed to you.

35

**Allocation of Profits and Losses**

Net profits and net losses generally are allocated for financial and tax purposes to your Capital Accounts in the proportion that your Capital Account bears to all other Capital Accounts of the Series in which you participate on the last day of each applicable accounting period. Your Capital Account balance is equal to your proportionate share of the Net Worth of the Company. The Managing Member is allocated 1% of each year's net profits, without regard to the net profits or net losses for any other year.

**Federal Income Tax Allocations**

For purposes of allocating the Company's Capital Gains and Capital Losses among the Members, a Tax Capital Account is established and maintained for you and each other Member, reflecting the tax results of Company operations to each Member. As of the close of each fiscal year, the capital gain and capital loss of each Series shall be determined for each accounting period during such fiscal year, and generally shall be allocated in the same way as net profits and net losses for book Capital Account purposes, except as required by Section 704(c) of the Code.

**Calculation of Net Worth**

A Series' "Net Worth" means the total assets of the Series (which for this purpose includes the Company's interest in Beacon Associates LLC I plus any cash or cash equivalents it may have), less all Series liabilities, each determined on the basis of generally accepted accounting principles in the United States, consistently applied under the accrual method of accounting ("**GAAP**"). The Net Worth of a Series is equal to the sum of the Capital Account balances of all Members of that Series. The Net Worth of an Interest is the Capital Account balance of a Member over the Capital Account balances of all Members of the Series in which the Member participates multiplied by the Capital Account balances of all Members of that Series. Net Worth and Net Worth per Interest will be calculated as of the closing of business on the last business day of each month in each year, on each Withdrawal Date, and such other date(s) as the Managing Member determines (each, a "**Valuation Date**"). Securities held directly by the Fund are valued by the Managing Member at their fair market value as of the Valuation Date (or if a Valuation Date is not a business day, on the immediately preceding business day). Investments in Investment Pools are valued pursuant to the valuations submitted to the Fund by the Managers of the Investment Pools, which valuations the Fund expects to accept. All values assigned by the Managing Member are final, binding and conclusive on all of the Members.

**Withdrawals**

Withdrawals are permitted at the end of each quarter on at least 60 days' prior written notice to the Managing Member (each a "**Withdrawal Date**"). Partial withdrawals are permitted. There is no cost to a Member for a withdrawal.

The Managing Member may modify the foregoing withdrawal restrictions for hardship reasons or other good cause shown. Facsimile notice is acceptable to initiate your notice of

36

withdrawal, but remittance of withdrawal payments to you will not be made until the Managing Member has received a manually executed withdrawal notification form in good order from you.

The withdrawal of a Member will not cause the dissolution of the Company.

**Mandatory Withdrawals**

The Managing Member may, in its sole discretion, require you to withdraw from the Company for any reason upon prior written notice to you. The timing of a mandatory withdrawal shall be determined by the Managing Member in its discretion.

**Withdrawal Payments**

The Managing Member intends that payments with respect to withdrawals will be in cash, but also may be in kind, in whole or in part, in the Managing Member's discretion.

The Managing Member generally will distribute 90% of withdrawal payments from your Capital Account within 90 days after the Withdrawal Date. The balance will be paid to you (without interest) within 30 days after receipt by the Managing Member of the Company's audited financial statements with respect to the year in which the withdrawal occurs. In addition, if the Managing Member believes that extraordinary circumstances exist, including, but not limited to, the existence of material contingent liabilities of the Company in amounts not yet finally ascertainable, the Managing Member's inability to cause a Fund Manager to liquidate Fund positions as of a Withdrawal Date, or due to a default or delay in payments due the Company from the Fund, or the Managing Member decides in the exercise of its reasonable discretion not to liquidate positions in the Fund on a disadvantageous basis, or other significant administrative or other hardships exist (collectively, "**Hardships**"), the Company may in turn delay withdrawal payments to you, or potentially suspend withdrawals entirely, in which event those payments and/or withdrawals will be reinstituted as soon as practicable following the end of the Hardships.

**Distributions**

Distributions are at the discretion of the Managing Member. Profits are intended to be reinvested and no distributions are intended to be made. To the extent that the Managing Member determines to make distributions, the Managing Member intends to make distributions in cash.

**Transferability of Members' Interests**

The LLC Agreement imposes limits on the sale, transfer or assignment of your Interest. To the extent that any sale, transfer or assignment is permitted, the assignee will not become a substituted Member in your place, without the prior written consent of the Managing Member, which consent shall be granted or withheld in the discretion of the Managing Member.

11063601.19

## Amendment of LLC Agreement

Generally, the LLC Agreement may be amended with the consent of the Managing Member and with the consent of Members owning generally at least 51% of the Interests. In some cases, however, the consent of Members owning a greater percentage of Interests is required to adopt amendments. In addition, an amendment which is particular to a Series must be approved by the Members owning the requisite percentage of Interests in that Series. No amendment may decrease a Limited Partner's share of the profits, losses or capital without that Limited Partner's consent. In addition, the Managing Member may amend the LLC Agreement without the consent of Members as long as Members are not negatively and materially affected thereby. No amendment may decrease a Member's share of the profits, losses or capital without that Member's consent.

## Dissolution, Liquidation and Termination

The Company shall be dissolved, liquidated and its affairs wound up, upon the happening of any of the following events:

(i)     the withdrawal, removal, bankruptcy or dissolution of the sole Managing Member unless a substitute managing member is designated by the Managing Member or the stockholders of the Managing Member, as the case may be, as permitted in the LLC Agreement or, absent such a designation, a new managing member is selected by Members owning at least 75% of the Interests in the Company without regard to Series;

(ii)    an election by the Managing Member in its sole discretion, to terminate the Company, or if there is more than one Managing Member, by the unanimous agreement of the Managing Members; or

(iii)   a termination required by operation of law.

Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Company has wound up its business and affairs, the Certificate of Formation of the Company has been cancelled and the assets of the Company have been liquidated and distributed as provided by the LLC Agreement.

Upon dissolution of the Company, the Managing Member, or liquidating trustee if one is appointed, will wind up the affairs of the Company and liquidate such of the Company's assets as it considers appropriate, determining in its discretion, the time, manner and terms of any sale or other disposition thereof. The Managing Member or liquidating trustee will first apply and distribute the Company's assets on a Series-by-Series basis to the payment of all taxes, debts and other obligations and liabilities of each Series to creditors, including the Managing Member for any fees owed to it and to other Members who are creditors (or establish a reserve therefor), and then apply any remaining proceeds of such liquidation to all Members of each Series in proportion and to the extent of the positive balances in their respective Capital Accounts.

However, if, on dissolution of the Company, the Managing Member or the liquidating trustee shall determine that an immediate sale of part or all of the Company's assets would cause undue loss to the Company, the Managing Member or the liquidating trustee may, in order to avoid such losses: defer the liquidation of, and withhold from distribution for a reasonable time, any assets of a Series except those necessary to satisfy debts and liabilities of the Series; and/or distribute to the Members non-cash assets, such as undivided interests in any Company assets and liquidate only such assets as are necessary in order to pay the debts and liabilities of a Series.

When the Managing Member or liquidating trustee has complied with the foregoing, the Members shall execute, acknowledge and cause to be filed an instrument evidencing the cancellation of the Certificate of Formation, after which the Company will be formally wound up.

**Accounting Period and Method**

The Company has adopted a December 31 Fiscal Year, and keeps its books and records based on the accrual method of accounting.

## EMPLOYEE BENEFIT PLAN CONSIDERATIONS

The Company may, subject to the limitation below and the other limitations herein, accept subscriptions from (i) Individual Retirement Accounts, Keogh Plans which cover only self-employed persons and their spouses and no common law employees and from employee benefit plans which cover only the sole proprietor or stockholder of a business and his or her spouse (collectively, "**Individual Retirement Funds**"); Employee Benefit Plans subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA Plans**"); and (iii) government plans, church plans, foreign plans, etc. (collectively, "**Non-ERISA Plans**"). Individual Retirement Funds, ERISA Plans that are Tax exempt, and Non-ERISA Plans are collectively referred to as "Benefit Plan Investors."

Section 404(a)(1) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and the regulations promulgated thereunder by the United States Department of Labor ("**DOL**") provide as a general rule that a fiduciary with respect to an ERISA Plan must discharge his duties with respect to the ERISA Plan in a prudent manner and must consider several factors in determining whether to enter into an investment or engage in an investment course of action. If a fiduciary with respect to any such ERISA Plan acts imprudently with regard to selecting an investment or an investment course of action for such ERISA Plan, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such imprudence. Among the factors that should be considered are (i) the diversification and liquidity of the ERISA Plan's portfolio; (ii) the potential return on the proposed investment and the effect on that return if any portion of the Company's income constitutes "unrelated business taxable income" (see "Income Tax Considerations"); (iii) the place the proposed investment would occupy in the ERISA Plan's portfolio taken as a whole; and (iv) whether the proposed investment is in accordance with the documents and instruments governing the ERISA Plan.

The acceptance of a subscription by the Company from a Benefit Plan Investor does not constitute a representation or judgment by the Company that an investment in the Company is an appropriate investment for that entity or that such an investment meets the legal requirements applicable to such entity. Those considering the purchase of Membership Interests on behalf of an ERISA Plan or an Individual Retirement Fund first must ensure that the ERISA Plan or Individual Retirement Fund has been properly established in accordance with the Code and the rules, regulations and existing interpretations thereunder and that the ERISA Plan or Individual Retirement Fund is adequately funded. After an ERISA Plan or Individual Retirement Fund has been properly established and adequately funded and if the purchase of Membership Interests is not prohibited under the governing documents of the ERISA Plan or Individual Retirement Fund, the trustee or custodian of the ERISA Plan or Individual Retirement Fund who decides to do so or who is instructed to do so can subscribe for a Membership Interest.

Generally, under ERISA, the ERISA Plan trustees or duly authorized investment managers (within the meaning of section 3(38) of ERISA) have exclusive authority and discretion to manage and control assets of the Plan. ERISA also imposes certain duties and

responsibilities on persons who are deemed to be fiduciaries (within the meaning of Section 3(21) of ERISA), and prohibits such persons from entering into transactions involving Plan assets with various parties in interest (within the meaning of section 3(14) of ERISA) with respect to the ERISA Plans.  If such a "prohibited transaction" is entered into, certain excise taxes may be payable by the party in interest (but not the ERISA Plan or, generally, the ERISA Plan's trustees acting as such) and the ERISA Plan fiduciaries may be liable to the ERISA Plan for any losses incurred.  Similar rules apply to Individual Retirement Funds.

Depending upon the percentage of Membership Interests purchased by Benefit Plan Investors relative to purchases by other permitted investors, the underlying assets of the Company may be considered to be assets of the ERISA Plans and Individual Retirement Funds investing in the Company ("**Plan Assets**").  Under a regulation of the DOL, when an ERISA Plan or Individual Retirement Fund acquires an equity interest in an entity such as the Company, which interest is not a publicly offered security, as is the case with the Membership Interests, the underlying assets of the Company will not be deemed plan assets if, in the aggregate, less than 25% of the Membership Interests (excluding Membership Interests held by the Managing Member or its affiliates) are held by Benefit Plan Investors (which includes ERISA Plans, Individual Retirement Funds and Non-ERISA Plans).  If such Benefit Plan Investors own 25% or more of the Membership Interests (excluding Membership Interests held by the Managing Member or its affiliates), the underlying assets of the Company will constitute plan assets.  The DOL regulation provides that the 25% of ownership test applies at the time of an acquisition by any person of Membership Interests.  In addition, an Advisory opinion of the DOL takes the position that a redemption of an equity interest by an investor constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining Membership Interests), thus triggering an application of the 25% test at the time of the redemption.  The Managing Member anticipates that 25% or more of the Membership Interests (excluding Membership Interests held by the Managing Member or its affiliates) will continue to be held by Benefit Plan Investors, and accordingly, the underlying assets of the Company will continue to be deemed to be plan assets of the investing ERISA Plans and Individual Retirement Funds.

Since the assets of the Company are, and are expected to continue to be deemed to be, plan assets, the Managing Member is, and will continue to be, a fiduciary with respect to that portion of each investing ERISA Plan and Individual Retirement Fund that is invested in the Company.  In such circumstances, the general prudence and fiduciary responsibility provisions of ERISA are, and will continue to be, applicable both to the Managing Member with respect to each investment made by the Company and to the entity or entities chosen by the Managing Member to invest the Company's funds.  By virtue of application of the Plan Asset Rules above, in the event that any transaction would or might constitute a prohibited transaction under ERISA or the Code and a statutory, class or individual exemption from the prohibited transaction provisions of ERISA for such transaction or transactions does not apply or cannot be obtained from the DOL (or the Managing Member determines not to seek such an exemption), the Managing Member reserves the right, upon notice to, but without the consent of, any Member, mandatorily to redeem any Member which is an ERISA Plan or an Individual Retirement Fund, or a Non-ERISA Plan investor.

The Managing Member is not registered as an investment Advisor under the Investment Advisors Act of 1940, and, as a result, the Managing Member is not an investment manager (within the meaning of section 3(38) of ERISA) with respect to the investing ERISA Plans. Under ERISA, to the extent that the management of an ERISA Plan's assets is delegated to an investment manager (within the meaning of Section 3(38) of ERISA), the trustees of the ERISA Plan do not have exclusive discretion to manage the Plan's assets nor are they responsible or liable for any act of such investment manager. However, because neither the Managing Member nor the Company's "Investment Managers" are investment managers (within the meaning of section 3(38) of ERISA), to the extent that the trustees of an ERISA Plan purchased, or determine to purchase, Membership Interests, they have, and will have, responsibility for managing the ERISA Plan's assets invested in the Company, and they are, and will be, responsible (and potentially liable) for the acts of the Managing Member and the Company's "Investment Managers" as if the trustees had themselves performed such acts. However, to the extent that the management of an ERISA Plan's assets have been or are delegated to an investment manager (within the meaning of Section 3(38) of ERISA), who in turn purchased or purchases a Membership Interest on behalf of an ERISA Plan, the purchasing investment manager, and not the trustees of that ERISA Plan, should be responsible (and potentially liable) for the acts of the Managing Member and the Company's "Investment Managers."

Section 408(a)(5) of the Internal Revenue Code of 1986, as amended (the "**Code**"), provides that the assets of an IRA may not be commingled with other property except in a common trust or investment fund. A prohibited commingling of the assets of an IRA in other than a common trust fund or common investment fund could result in the disqualification of the IRA and a deemed distribution of the IRA's assets to the beneficiary of the IRA.

Although the Company is not a common trust fund or common investment fund, for the reasons discussed below, the Company has been advised by counsel that an investment in the Company by an IRA should not be deemed to involve a prohibited commingling of IRA assets. While the assets of the Company, under certain circumstances discussed above, may be deemed to be "plan assets", that term applies solely for purposes of Title I of ERISA and Section 4975 of the Code, but not to Section 408(a)(5) of the Code. Accordingly, although there is no direct authority on this matter, for purposes of the prohibition against the commingling of IRA assets, no such commingling should occur because the sole interest of an investing IRA would be its Membership Interests, and not the underlying assets of the Company.

The Managing Member has acquired, and shall maintain, a fidelity bond satisfying the requirements of Section 412 of ERISA with respect to the assets of the Company owned by all ERISA Plans.

Regardless of whether the Company is treated as a plan asset (and in any event), Interests of the Company held by an ERISA Plan will be considered plan assets. For ERISA Plans subject to ERISA, ERISA requires that the indicia of ownership of its plan assets be held within the jurisdiction of the U.S. district courts. ERISA Plan fiduciaries thus need to ensure compliance with the requirement to maintain the indicia of ownership of their Interests within the jurisdiction of the U.S. district courts, as required by ERISA.

Plan fiduciaries are responsible for complying with any reporting and disclosure requirements under ERISA or the Code resulting from an investment in the Company.  A Form 5500 (annual Return/Report) is required to be filed by certain Plans investing in the Company.  Pursuant to DOL regulations, ERISA Plans investing in the Company would need to include on their Form 5500 information relating to the fair market value of the Plan's investment in the Company as of the close of the Plan's fiscal year.  As a result, if the Plan's fiscal year differs from the Company's fiscal year, the Plan investor may not be able to obtain valuation information of its Units as of the end of the Plan's fiscal year.  However the applicable instructions for the Plan's 5500 authorize the Plan Trustee to make a good faith determination of such valuation.

Certain Plans may include the assets of governmental plans which are not subject to ERISA and church plans which often will not be subject to ERISA.  Also, the above-described prohibited transaction provisions do not apply to governmental plans or church plans.  However, such Plans are subject to prohibitions against certain related-party transactions under Section 503 of the Code, which prohibitions operate similar to the above-described prohibited transaction rules.  In addition, the fiduciary of any governmental or church plan must consider applicable state or local laws, if any, and the restrictions and duties of common law, if any, imposed upon such plan before making an investment in the Company.

*    *    *

**If you are an Individual Retirement Fund, ERISA Plan or non-ERISA Plan you should consult with your tax or legal counsel regarding the consequences under ERISA and the Code of your investment in the Company.**

43

## INCOME TAX CONSIDERATIONS

The following is a summary of certain federal tax considerations which may be relevant to you as a prospective Member. It is impractical to set forth all aspects of federal tax law which may bear upon your Interest in the Company.  The tax considerations discussed below are necessarily general and may vary depending upon your particular circumstances.

The discussion of federal income tax consequences that follows is based on the Internal Revenue Code of 1986, as presently amended (the "**Code**"), judicial decisions and administrative regulations, rulings and practice, all of which are subject to change.  The Company has not sought a ruling from the Internal Revenue Service ("**IRS**") or an opinion of legal counsel as to any federal tax matters. **YOU MUST CONSULT WITH AND RELY ON YOUR OWN PROFESSIONAL TAX ADVISORS AS TO THE TAX CONSEQUENCES TO YOU OF THIS INVESTMENT.**

It is expected that, under current tax law, the Company and Beacon Associates LLC I will each continue to be treated as a partnership that is not a publicly traded partnership and will not be a taxable entity for federal income tax purposes.  Accordingly, it is not anticipated that the Fund will pay any corporate income tax.  You will be required to include in your own income tax return each year your allocable share of the Company's income, gain, loss and deduction, and must determine your tax liability, if any, with respect to your share of the Company's taxable income (both as they relate to your applicable Series), whether or not you have received or will receive any cash distributions from the Company.  The deductibility of capital losses is limited, and your ability to deduct your share of certain expenses allocated to you also may be limited, as discussed below.  Furthermore, the Fund does not intend to distribute profits.  Consequently, your tax liability with respect to your share of Company taxable income is anticipated to exceed the cash, if any, distributed to you in a given year.

You may deduct Company tax losses only to the extent of your tax basis in your Interest.  Generally, tax basis is the total amount of your cash contribution to the Company reduced (but not below zero) by your share of any distributions, losses and expenses, and increased by your share of Company taxable income and tax gains.  However, if you are subject to "at-risk" limitations (generally applicable to non-corporate taxpayers and closely-held corporations), you can only deduct losses to the extent you are at-risk.  The at-risk amount is similar to tax basis, except that it does not include any amount borrowed on a nonrecourse basis by the Company or from someone with an interest in the Company.

When you receive cash from the Company, either through a distribution or a partial redemption, you will not be subject to tax on that cash until distributions exceed your tax basis in your Interest.  For federal income tax purposes, all amounts invested by you in the Company are included in your tax basis in your Interest.  You cannot recognize a loss with respect to partial redemptions until your entire Interest is fully redeemed.  Your gain or loss on a redemption (or

44

sale) of an Interest generally will be long-term capital gain or loss, to the extent of the portion of your Interest that was held for more than 12 months, or short-term capital gain or loss, to the extent of the portion of your Interest that was held for 12 months or less.  You will begin a new holding period each time you make an additional investment in the Company as to a portion of your Interest.

Under current federal income tax law, for non-corporate Members, net short-term capital gains are taxed at the same rates as ordinary income, whereas a top tax rate of 15% applies to net capital gain (i.e., the excess of net long-term capital gains over net short-term capital losses).  If you are a non-corporate Member, the excess of your share of Company capital losses over your share of Company capital gains is deductible only against your capital gains from this and other sources, plus up to $3,000 of ordinary income each year.  Unused capital losses may be carried forward indefinitely and used to offset capital gains plus up to $3,000 of ordinary income each year, but may not be carried back.  As a result of these limitations, among others described herein, if you are an individual you should anticipate that your share of the capital losses, if any, from this investment will not materially reduce your federal income taxes arising from your ordinary income from this and other sources.

Under the LLC Agreement, profits and losses of the Company are allocated among the Members for purposes of determining the amount payable on withdrawal of a Member's capital account balance.  Since gain or loss on the investments generally would not be recognized for tax purposes until sold or disposed of, discrepancies may result between a Member's economic gain or loss and his share of the gain or loss reported by the Company for tax purposes.

Income and losses from this investment will not be treated as income or loss from a passive activity for purposes of the passive activity loss limitations.  Accordingly, for most Members, taxable income from this investment will not be permitted to be offset by passive activity losses from other investments, and tax losses from this investment will not be affected by these limitations, based on the Treasury Regulations currently in effect.

An individual's miscellaneous itemized deductions, including his investment expenses, are deductible in any year for regular income tax purposes only to the extent that they exceed 2% of his adjusted gross income, and are not deductible at all for alternative minimum tax purposes.  The deductible portion, if any, of such expenses is further reduced by an amount equal to the lesser of 3% of an individual's adjusted gross income in excess of $100,000 (indexed for inflation), or 80% of the individual's otherwise allowable miscellaneous itemized deductions.  The Managing Member will determine, in consultation with the Company's accountants and without consulting with the Members, whether and to what extent a position can be taken that the Company is engaged in a trade or business, such that an individual Member's allocable share of Company expenses are not subject to these limitations.  The Company's tax return positions will not be binding on the IRS, and could be challenged.

Expenses of offering Interests are not deductible.

The Code places a limitation upon the deductibility of interest on funds borrowed to acquire or carry assets held for investment by taxpayers other than corporations.  If you are a non-corporate Member, you will be subject to this limitation in calculating the deductible portion

of your interest expense with respect to your investment in the Company.  The application of this limitation to you will depend on your overall tax situation and should be reviewed by you with your personal tax advisor.

The Managing Member currently anticipates that the Company's gain or loss from its securities transactions will be primarily capital gain or loss.  The Company's gain (if any) from certain transactions involving securities with market discount or contracts or options on foreign currency will be treated as ordinary income.

"Section 1256 Contracts" include most options traded on U.S. exchanges such as options on stock indices, domestic futures contracts other than securities futures contracts, and certain foreign currency contracts.  For tax purposes, Section 1256 contracts that remain open at year-end are treated as if they were sold at year-end.  Gain or loss on Section 1256 contracts is characterized as 60% long-term capital gain or loss and 40% short-term capital gain or loss, regardless of how long the contracts are held.

Anti-straddle or wash sale rules may apply to losses (if any) generated from certain securities transactions that could preclude the current deduction (in whole or in part) of those losses.  The application of the short sale rules to the Fund's gains (if any) from short sale transactions generally will require that each gain be treated as short-term capital gains.  So-called "constructive sale" rules may require the Fund to recognize taxable gain with respect to appreciated securities at the time of a short-against-the-box transaction in such securities, although the Managing Member will endeavor to structure these transactions to avoid the application of these rules.

Plans subject to ERISA, Individual Retirement accounts and other entities exempt from federal income taxation under Section 501(a) of the Code are subject to taxation under Section 511 of the Code on their UBTI, which includes taxable income or gain derived from "debt-financed" property.  A tax-exempt Member will be required to include in its computation of UBTI, its pro rata share of the portion (which will vary from year to year) of the Fund's taxable income that is attributable to "debt financed" securities.  Accordingly, this investment is not suitable for charitable remainder trusts, and might not be suitable for certain other tax-exempt investors.

Treasury Regulations directed at abusive tax shelter activity apply to transactions not conventionally regarded as tax shelters.  Among other things, the Regulations require certain disclosures by certain persons who directly or indirectly participate in a "reportable transaction," as defined.  Any transaction involving an actual or deemed acquisition of an asset generally is a reportable transaction if it generates gross tax losses (whether or not offset by income or gains) in excess of specified amounts, unless the transaction comes within one of several exclusions.  While the exclusions generally cover most customary trading activity, they do not cover certain types of foreign currency and arbitrage transactions, among others.  Accordingly, it is possible that the Fund may participate in one or more reportable transactions.  In that event, the Company would be required to file an IRS Form 8886 with its tax return, which may increase the likelihood of an audit, and maintain a list identifying those persons who were allocated tax losses from the reportable transaction(s) in excess of specified amounts.  (The amounts are, for taxpayers other than C corporations, $2 million from one or more reportable transactions in any

46

taxable year, $4 million from one or more reportable transactions over any six-year period, or $50,000 of ordinary loss from any foreign currency transaction that is not otherwise excluded from the application of these rules.)  A Member that is allocated tax losses from reportable transactions equal to or greater than the specified amounts must file an IRS Form 8886 with its own tax return for each year that the Member reports tax losses from the reportable transaction(s).

Each Member should consult with its own tax advisor concerning the possible application of the foregoing disclosure and investor list maintenance requirements to this investment.

Each year, Members will receive a Schedule K-1 from the Company as determined by the Company's accountants, reporting their allocable share of the taxable income or loss of the Company.  A final Schedule K-1 might not be provided to Members for any given fiscal year until after April 15 of the following year.  Accordingly, Members may be required to obtain an extension of the filing date for their income tax returns at the federal, state and local levels.

The Company's income tax returns may be audited, and such audit could lead to an audit of your tax return.  Such audits could result in the determination of tax deficiencies unrelated to the Company.  Audit changes made to the Company's tax returns would result in corresponding changes to your tax return, and would be binding on you under most circumstances. Furthermore, interest paid on tax deficiencies generally is non-deductible by non-corporate and certain corporate Members.

Each Member may be liable for state and local income taxes payable in the state or locality in which it is a resident or doing business.  The income tax laws of each state and locality may differ from the above discussion of federal income tax laws, and may impose additional limitations on the deductibility of losses and expenses that are reported by the Company or otherwise treated as investment advisory expenses.

The Company may be subject to foreign taxes, including withholding taxes, on its investments in foreign securities, if any.  Such taxes may be deductible or creditable in determining a Company 's U.S. income tax liability (if any), subject to applicable tax law limitations.

*     *     *

**You should consult with your own professional tax advisor concerning the applicability of state and local taxes to your investment in the Company.  In addition, the foregoing summary is not intended as a substitute for professional tax advice, nor does it purport to be a complete discussion of all tax consequences that could apply to this investment. Accordingly, you must consult your own tax advisor with respect to the effects of this investment on your own tax situation.**

11063601.19

# REPORTS AND OTHER INFORMATION

**Company Books**

The Managing Member keeps the Company's books of account in accordance with GAAP.  The Company's books are kept at the principal office of the Company and may be inspected by you or your authorized representative during reasonable business hours on reasonable prior written notice to the Managing Member.

**Reports and Other Filings**

During the year, Members will be furnished with unaudited quarterly reports concerning the Company's activities for the prior quarter.  Following the end of each year, the Company will send Members (i) an annual report, and (ii) annual tax information necessary for completion of a Member's tax returns.  In addition, the Company will make all required state and federal filings with respect to the sale of the Interests required under state Blue Sky laws and SEC Regulation D, respectively.   Members will not receive copies of these filings.

**Counsel**

Katten Muchin Zavis Rosenman, New York, N.Y. act as counsel to the Company and to the Managing Member in connection with the offering of Interests and the operation of the Company and Beacon Associates LLC I.

**Auditors**

Friedberg, Smith & Co., P.C., Bridgeport, Connecticut acts as the Company's independent certified public accountant.

**Information Available**

Prior to the sale of any Interests, the Managing Member will make available to you or your representative the opportunity to ask questions of, and receive answers from representatives of, the Managing Member concerning any aspect of this investment and to obtain any additional non-proprietary information, to the extent the Managing Member possesses such information or can acquire it without unreasonable effort or expense. Any requests for additional non-proprietary information should be directed by you to Joel Danziger or Harris Markhoff at (914) 948-1556; facsimile (914) 948-0051.  **A copy of the Company's Privacy Policy is set forth as Exhibit P to this Memorandum.**

11063601.19