Helen Davis Chaitman  
Becker & Poliakoff LLP  
45 Broadway  
New York, NY 10006  
hchaitman@becker-poliakoff.com  
*Attorneys for Jacqueline Green Rollover*  
*Account and Wayne Green Rollover*  
*Account*

Hearing Date: May 23, 2011 at 10:00 A.M.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>       Plaintiff,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>       Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>       Debtor. | |

**CLAIMANTS' OPPOSITION TO TRUSTEE'S MOTION**
**FOR COURT APPROVAL OF HIS DENIAL OF CLAIMS OF INVESTORS UNDER**
**ERISA-PROTECTED PLANS**

{N0007731 2}

**PRELIMINARY STATEMENT**

Jacqueline Green Rollover Account and Wayne D. Green Rollover Account (the "Greens") invested in Bernard L. Madoff Investment Securities LLC ("BLMIS") through WDG Associates Inc. Retirement Trust, a qualified pension plan (the "Plan") established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq* Each of the Greens is a "customer" under the Securities Investor Protection Act ("SIPA") to the extent of their vested interest in their segregated accounts for the following reasons:

First, the Greens qualify as "customers" under the plain meaning of SIPA because they deposited money with BLMIS for the purpose of purchasing securities. There is no requirement under SIPA that investors have accounts in their own name. The critical issues are whether an investor entrusts the broker with cash for the purpose of purchasing securities and whether the money is actually received by the broker. Here, the Greens directed that their retirement funds be deposited with BLMIS, the funds were received by BLMIS, and the Greens personally communicated with BLMIS personnel about their funds. Therefore, they qualify as customers under SIPA.

Second, the Second Circuit's decision in *SIPC v. Morgan, Kennedy Co.*, 533 F.2d 1314 (2d Cir. 1976), upon which the Trustee relies, is inapposite. In that case, the court was dealing with a large pension plan funded by a corporation for its employees where only the trustees of the pension plan had the power to determine where the funds would be invested and where the employees' interests did not vest until they retired  Here, on the contrary, the Plan was funded, in part, by the Greens and, at all times, the Plan kept records of the precise amount of money that belonged to the Greens. Moreover, the other relevant factors examined by the court in *Morgan, Kennedy* weigh in favor of recognizing the Greens' customer status and other courts have, in

{N0007731 2}                                          2

fact, recognized individual ERISA participants as customers in similar circumstances.

## FACTUAL BACKGROUND

The Greens respectfully refers the Court to the declarations of Wayne D. Green and Jacqueline Green, both dated January 14, 2012 and submitted in opposition to the Trustee's Motion.

## ARGUMENT

### I.    UNDER, SIPA, THE CLAIMANTS ARE CUSTOMERS

The words of a statute are dispositive unless they are ambiguous. *See Kmart Corp. v. Cartier, Inc.,* 486 U.S. 281, 281 (1988) ("[i]f the statute is clear and unambiguous, courts must give effect to Congress' unambiguously expressed intent"); *Tyler v. Douglas,* 280 F.3d 116, 122 (2d Cir. 2001) ("[t]his court will look first to the plain language of a statute and interpret it by its ordinary, common meaning. If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words") (citations omitted); *accord Greenery Rehab Group, Inc. v. Hammon*, 150 F.3d 226, 231 (2d Cir. 1998) (""If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words.")

The Trustee is bound by the statutory definition of "customer" in SIPA:

> The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer. **The term "customer" includes any person who has deposited cash with the debtor for the purpose of purchasing securities . . . [and] any person who has a claim against the debtor arising out of sales or conversions of such securities**.

{N0007731 2}                                3

15 U.S.C. § 78lll(2); emphasis added.

The Trustee relies on the fact that the Greens did not have accounts in their own names with BLMIS. However, there is no requirement in SIPA that a customer have his funds held in an account in his name. In fact, in the first draft of SIPA, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. Section 7(d)(June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (Aug.4, 1969). The final bill dropped this restriction. Thus, clearly, Congress intended that customers would include investors through accounts in the names of others.

The fact that the funds were not *directly* delivered to BLMIS by the Greens is not determinative of their status as customers. *See Ahammed v. SIPC (In re Primeline Sec. Corp.*, 295 F.3d 1100, 1107 (10th Cir. 2002) (upholding determination that investors were "customers" of the debtor under SIPA even though investors made out their checks to a different entity); *see also Focht v. Heebner (In re Old Naples Securities, Inc.)*, 223 F.3d 1296, 1302 (11th Cir. 2000) ("Whether a claimant 'deposited cash with the debtor,' however, does not . . . depend simply on to whom the claimant handed her cash or made her check payable, or even where the funds were initially deposited.")

Instead, the critical inquiry is whether there was 'actual receipt, acquisition or possession of the property of a claimant by brokerage firm under liquidation[,]'" *i.e.*, whether a claimant entrusted cash to the broker dealer for effectuation of a securities transaction. *SIPC v. Wise (In re Stalvey & Assoc.)*, 750 F.2d 464, 469 (5th Cir. 1985) (quoting *SEC v. Kenneth Bove & Co.*, 378 F. Supp. 697, 700 (S.D.N.Y. 1974)); *see also SIPC v. Pepperdine University (In re*

{N0007731 2}                                                4

*Brentwood Securities, Inc.)*, 925 F.2d 325 (9th Cir. 1991) ("An investor is entitled to compensation from the SIPC only if he has entrusted cash or securities to a broker-dealer who becomes insolvent; if an investor has not so entrusted cash or securities, he is not a customer and therefore not entitled to recover from the SIPC trust fund.") .

As the Greens' declarations establish, the funds were deposited in their individual accounts within the Plan's account and then, pursuant to the specific instructions of the Greens, the funds were forwarded to BLMIS for the purpose of purchasing securities. The fact that BLMIS may not have "recognized" each of the Greens' names or sent them individual account statements is irrelevant to their status as "customers" as defined under SIPA because the Greens' funds at BLMIS were easily traceable to them and because the funds were deposited with BLMIS for the purpose of purchasing securities. Entrustment of funds is all that is required under SIPA to establish customer status. Therefore, the Greens are entitled to SIPC insurance and to claims against the fund of customer property.

Judge Cote's decision in *Aozora Bank Ltd. v. Securities Investor Protection Corporation, et. al.*, Case No. 11-CV-6553 (DLC), affirming denial of customer status to BLMIS claimants who invested through feeder funders does not govern this litigation (the "Feeder Fund Decision"). Judge Cote determined that "BLMIS did not receive, acquire, or possess any property of the appellants because the property at issue belonged solely to the Feeder Funds." Feeder Fund Decision at 16. Judge Cote concluded that "the moment each appellant used assets to purchase an ownership interest in a Feeder Fund, those assets became property not of the appellants but of the Feeder Fund." *Id.* at 16-17. Here, the Greens are not analogous to the feeder fund claimants because the Greens retained ownership of the funds that they and their employer contributed to their individual accounts. The Greens used the Plan as an investment

vehicle, investing through the Plan, not in the Plan. Furthermore, the Greens were not unknown to BLMIS like the feeder fund investors because they exchanged communications with BLMIS employees, primarily Frank DiPascali.

## II. THE TRUSTEE'S REFUSAL TO RECOGNIZE CLAIMANTS AS "CUSTOMERS" DEFEATS SIPA'S REMEDIAL PURPOSE

The Trustee's position violates not only the clear mandate of the statute but also its intent. SIPA was enacted by Congress in 1970 to afford protection to securities "customers in the event broker-dealers with whom they transact business encounter financial difficulties and are unable to satisfy their obligations." *S.E.C. v. Alan F. Hughes, Inc.*, 461 F.2d 974, 977 (1972); *SIPC v. Barbour*, 421 U.S. 412, 415 (1975) ("Congress enacted the SIPA . . . to restore investor confidence in the capital markets[,] and upgrade the financial responsibility requirements for the registered brokers and dealers.).

As indicated in the House Report, the legislation was intended to accomplish two goals:

> it will establish immediately a substantial reserve fund which will provide protection to customers of broker-dealers similar to that formerly provided by the exchange trust funds. This will reinforce the confidence that investors have in the U.S. securities markets. In addition, the reported bill would provide for a strengthening of the financial responsibilities of broker-dealers.

H. Rep. No. 91-1613, 91st Cong., 2d Sess. (1970), 3.

On December 30, 1970, when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms. . . . **Just as the Federal Deposit Insurance Corporation protects the user of banking services from the danger of bank failure, so**

> **will the Securities Investor Protection Corporation protect the
> user of investment services.**

http://www.presidency.ucsb.edu/ws/index.php?pid=2870 (emphasis added).

The Trustee's failure to recognize the Greens as "customers" under SIPA is inconsistent with the requirement that SIPA, as a remedial statute, must be interpreted broadly. *In re First State Securities Corp.*, 34 B.R. 492, 496 (Bankr. S. D. Fla. 1983) ("SIPA is remedial legislation. As such it should be construed liberally to effect its purpose. . . . The purpose is the protection of the insolvent brokers' customers.") (citations omitted.); *accord In re Bell & Beckwith*, 66 B.R. 703, 705 (N.D. Ohio 1986) (same). If the Trustee's interpretation is upheld, he will deprive the Greens of the protections that were intended to be afforded by SIPA, including the advance of the SIPC funds. Hence, his narrow interpretation is inconsistent with the statutory purpose of SIPA.

**III.    THIS CIRCUIT'S HOLDING IN *MORGAN, KENNEDY* DOES NOT BAR THE GREENS' CLAIMS**

The Trustee argues that the Greens' claims are barred under *SIPC v. Morgan, Kennedy Co.*, 533 F.2d 1314 (2d Cir. 1976). In fact, *Morgan, Kennedy* supports the conclusion that Claimants are customers under SIPA. In *Morgan, Kennedy,* a company created an employee profit sharing plan in the form of a trust with three trustees, allowing company employees a contingent right to share in the trust corpus at the time of their retirement. 533 F.2d at 1315. Only the trustees acting collectively could decide how to invest the trust funds. Moreover, the identities of the trust beneficiaries and their respective shares were inherently speculative because each employee's interest in the trust was unvested and payable only on retirement. *Id.*

Morgan Kennedy then became insolvent. *Id.* at 1315-16.  In concluding that the trustee, not the employees, was a "customer" under SIPA, the Second Circuit cited the following characteristics of the Morgan, Kennedy plan:

(a) all the contributions to the plan were made solely by the employer;

(b) none of the funds in the broker's hands belonged to the individual employee-participants;

(c) the employees' participation in the plan amounted only to a bookkeeping entry in the employer's books;

(d) the financial relationship, insofar as the traditional profit sharing plan was concerned, was solely between the employee-participants and their employer, and not the employee-participants and the broker-dealer;

(e) the trustees of the traditional profit-sharing plan, and not the employee-participants, had the exclusive power to entrust assets to the broker-dealer for investment purposes; and

(f) the profit sharing plan trust account was in the name of the plan's trustees and not the individual employee-beneficiaries.  *See id.* at 1318.

These factors applied to the Greens' Plan compel a different result.  With respect to the Greens' Plan:

(a) contributions were made by both the employer and the Greens;

(b) the Greens had the exclusive investment authority and had authority to roll over their funds into the Plan;

(c) the Greens had direct dealings with BLMIS, primarily Bernard Madoff's right-hand man, Frank DiPascali;

(d) the Greens had vested interests in the funds; and

{N0007731 2}                               8

(e) all assets of the Plan were allocated to separate accounts, maintained in the name of each participant and beneficiary of the Plan.

In *Morgan, Kennedy,* the court was troubled by the fact that the individual participants' claims could not be reduced to a specific monetary sum because, at the time of the liquidation of *Morgan, Kennedy,* the account held no property belonging to individual employees. The participant's interest in the plan did not vest until the participant earned a specified amount of service credit under the plan, and the employees only became entitled to benefits upon retirement based on the participant's age, years of service and final compensation at the point of retirement. *See Morgan, Kennedy*, 533 F.2d at 1318. Here, on the contrary, the Plan in which the Greens invested was comprised exclusively of individual, distinct and segregated participant accounts and the Greens had vested interests in the funds in those accounts. Accordingly, at any given point in time, the Greens' account balances were readily determinable, based upon the Plan's records.

Therefore, the factors that led the Second Circuit considered relevant in *Morgan, Kennedy* compel the conclusion here that the Greens are "customers" entitled to a customer claim under SIPA.

### IV. THE FOURTH CIRCUIT HAS RECOGNIZED THE GREENS' ENTITLEMENT TO CUSTOMER STATUS

In *In re Waddell Jenmar Securities, Inc.,* 126 B.R. 935, 940 (Bankr. E.D.N.C. 1991), *aff'd,* 991 F.2d 792 (4th Cir. 1993), the claimants were employees of Salisbury Animal Hospital, P.A. ("SAH") who were participants in the SAH pension and profit sharing plan. *See id.* at 939-40. The plan was administered by Waddell Benefit Plans, Inc ("WBP"), a company that offered pension and profit sharing plan design, implementation and administration. Each participant's interest was clearly documented. As the court described:

{N0007731 2}                                                    9

> As administrator of the SAH plan, WBP assisted the plan's trustees in establishing and maintaining separate ledger accounts in the name of each of the SAH claimants, which accounts were credited with the amounts of each annual contribution allocated to each participant, and their allocable shares of any prior year's contributions which had become forfeitures since the last plan year. . . . Following the close of each plan year, WBP assisted the plan's trustees in providing each of the SAH claimants with an individualized account statement showing the account balance at the beginning of each year, any changes during the year, the amount of SAH's contributions, including forfeitures, for that year allocated to his or her account, and the account balance at the end of the year.

*Id.*

WBP was an affiliate of Waddle Jenmar Securities ("Jenmar"), a broker-dealer. Guilford Waddell was the President of both, Jenmar and WBP. SAH maintained its pension plan account at Jenmar; the individual participants apparently did not have individual accounts opened in their names at Jenmar or its clearing firm. *See id.*

SAH made five employer contributions to the plan, all of which were made by checks payable to WBP. The plans' funds were supposed to be used to purchase securities through the broker-dealer but Waddell misappropriated a substantial portion of the plan funds and never followed investment instructions to purchase securities with respect to those funds. When Jenmar was placed into a SIPC liquidation, the plan participants filed SIPC claims as individual customers of Jenmar to recover the stolen money. *See id.* at 939-40.

The court held that those participants whose funds were deposited with the broker were customers under SIPA but that participants whose funds never reached the broker were not customers.

> **When Jenmar actually did receive plan funds from WBP to purchase securities, the SAH affected employee was a "customer" of the broker-dealer for that transaction.** The SAH claimants, however, were not "customers" with respect to the transactions upon which their claims are based. Although they may

> have instructed Mr. Waddell as agent of Jenmar to purchase securities on behalf of their accounts, *none* of the plan's funds were delivered to Jenmar to effectuate the purchases. The funds were clearly misappropriated, but the funds were essentially stolen from the plan and never reached the broker-dealer, Jenmar.

*Id.* at 940; emphasis added. Notably, the court recognized individual participants as "customers" despite the fact that the contributions were made by checks payable to the plan administrator rather than the broker-dealer directly. The only requirement was that the participant's funds were actually deposited with the broker. *See id.* at 940.

## V. THE TRUSTEE'S INTERPRETATION OF "CUSTOMER" CONFLICTS WITH ERISA

Congress enacted ERISA to protect retirement assets of working people. *See Resolution Trust Corp. v. Financial Institutions Retirement Fund*, 71 F.3d 1553 (10th Cir. 1995) ("A cardinal principle of ERISA is that the assets of a pension plan shall be held for the exclusive purpose of providing benefits to participants and their beneficiaries."); *accord* 29 U.S.C. § 101(a) ("The Congress finds . . . that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest).

In *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248 (2008), the Supreme Court analyzed §§ 502(a)(2) and 409 of ERISA to determine if a participant in a defined contribution plan can bring a cause of action in his own name for breach of fiduciary duty against the plan administrator whose improper actions in administering the participant's individual account caused depletion of the participant's interest in the plan. *See id.* at 250-51. The Court discussed and ultimately rejected the reasoning of its earlier decision, *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985), in which it held that an ERISA-governed plan fiduciary of a profit sharing plan is personally liable for misconduct *only* to the plan, and not to individual plan

{N0007731 2}                                      11

participant. The Court noted that "*Russell's* emphasis on protecting the 'entire plan' from fiduciary misconduct reflects the former landscape of employee benefit plans" and that the retirement plan "landscape has changed." *LaRue*, 552 U.S. at 254. Clearly, the shift in the retirement plan "landscape" is towards protecting individual participants as opposed to the plan entity. The Trustee's denial of "customer" status of the Greens is inconsistent with this new trend.

The Trustee's interpretation is similarly irreconcilable with ERISA's prohibition against holding plan assets in the names of individual plan participants. ERISA provides that "all assets of an employee benefit plan shall be held in trust by one or more trustees." 11 U.S.C. § 1103. When public policies of both SIPA and ERISA are considered together, the only way to fairly accomplish their protective objectives is to recognize individual plan participants, like the Greens, as "customers" under SIPA. To hold otherwise is to destroy the retirement security of average hard working citizens who believed their retirement funds were protected by SIPC.

Lastly, BLMIS' role as a fiduciary to the Greens pursuant to ERISA undercuts the Trustee's argument that no relationship existed between the Plan and BLMIS. "ERISA identifies two types of fiduciaries: named fiduciaries and functional fiduciaries." *Solis v. Plan Ben. Services, Inc.*, 620 F. Supp. 2d 131, 142 (D. Mass. 2009) (citing *Beddall v. State St. Bank and Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998)). A person is a functional fiduciary with respect to a plan to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). "The key determinant of whether a person qualifies as a functional fiduciary is whether that person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets (such as by rendering investment advice)." *Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998) (citing *O'Toole v. Arlington Trust Co.*, 681 F.2d 94, 96 (1st Cir. 1982)); *see also Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 74 F.3d 20, 22 (1st Cir. 1996) (recognizing that execution of administrative tasks is generally insufficient to hold someone as functional fiduciary).

BLMIS did not simply have influence over the investment decisions for the Greens' assets; it had the ultimate decision-making authority. BLMIS exercised authority and control over the management and disposition of the Plan's assets. Therefore, as a result of BLMIS' authority and control over the assets, BLMIS owed fiduciary duties to the Greens, like any other ERISA plan administrator or trustee. Pursuant to ERISA, the Plan held the funds in trust for its beneficiaries, including the Greens. *See* 11 U.S.C. § 1103. That status was not lost when those funds were entrusted to BLMIS for purchase of securities. Thus, the Trustee's argument that no relationship existed between BLMIS and the Plan is unavailing.

## CONCLUSION

For the reasons stated herein, the Greens respectfully request that this Court hold that they are entitled to an advance from SIPC and a claim against the fund of customer property.

January 17, 2012

        **BECKER & POLIAKOFF LLP**

        By:   /s/ Helen Davis Chaitman
        45 Broadway
        New York, NY 10006
        (212) 599-3322
        *Attorneys for Jacqueline Green Rollover Account*
        *and Wayne Green Rollover Account*

{N0007731 2}        13