Baker & Hostetler LLP                          Hearing Date:   May 23, 2012
45 Rockefeller Plaza                           Hearing Time:  10:00 A.M. EST
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jorian Rose
Email: jrose@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
And Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> Bernard L. Madoff <br><br> Debtor. | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S**
**MOTION FOR AN ORDER AFFIRMING TRUSTEE'S**
**DETERMINATIONS DENYING CLAIMS OVER ERISA-RELATED OBJECTIONS**

# TABLE OF CONTENTS

**Page(s)**

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     BACKGROUND ...................................................................................... 3

    A.      The Madoff Fraud And BLMIS SIPA Case Filing ................................. 3

    B.      The Feeder Fund Customer Motion, Decision, And Appeal ................... 5

    C.      The Motion To Determine The "Customer" Status Of ERISA Claimants
          Without An Account .............................................................................. 6

III.    STATEMENT OF FACTS ........................................................................ 7

    A.      The Objecting ERISA Claimants Fall Into Two Basic Categories ......... 7

        1.      The "Individual Claimants" Claim To Be Individual Participants
             In Plans With BLMIS Accounts ................................................... 7

        2.      The "Plan Claimants" Had No BLMIS Accounts But Claim To
             Have Invested In Entities That Did ............................................... 9

IV.     ERISA APPLICABILITY ....................................................................... 12

    A.      Certain Claimants Have Not Established That ERISA Applies To Them ........... 12

V.      ARGUMENT ......................................................................................... 14

    A.      The ERISA Claimants Are Not "Customers" Under SIPA And Thus Have
          No Cognizable Claims…………………………………………………… 14

        1.      SIPA Provides Preferred Protection For "Customers" Only. ................. 14

        2.      To Be A "Customer," One Must Either Be An Account Holder Or
             Fall Within A Specific SIPA Exception ................................................ 15

             a.      The Definition Of "Customer" Under SIPA Requires
                     An Account…………………………………………………...15

             b.      The Sole Statutory Exceptions To The Account
                     Requirement Do Not Apply Here………………………………19

             c.      The Only Other Cases In Which "Customer" Status Has
                     Existed Is When The Absence Of An Account Is
                     Attributable To The Misfeasance Of The Broker Or
                     Its Agents………………………………………………………..20

             d.      The Legislative History Is Consistent With The Account
                     Requirement……………………………………………………..21

        3.      ERISA Is Subordinated To SIPA And Does Not Affect
             Customer Status ....................................................................... 22

    B.      The Individual Claimants Also Are Not "Customers" Because
          Their Account-Holding ERISA Plans Own The Plan Funds,
          Through The Plan Trustees ................................................................. 23

i

## TABLE OF CONTENTS

**Page(s)**

1.    Defined Contribution Plan Assets Are "Owned" By The Plan, Through the Plan's Trustee(s) .................................................................... 24

2.    In *Morgan Kennedy*, The Second Circuit Held That Benefit Plan Beneficiaries Are Not "Customers" Under SIPA .................................... 27

C.    The Plan Claimants Also Are Not "Customers" Because ERISA Does Not Give Them An Ownership Interest In The Account Holders ............................. 32

1.    The Plan Asset Regulation And ERISA Do Not Affect Property Rights ..................................................................................................... 32

2.    The Trust Regulation Does Not Support The Plan Claimants' Arguments .............................................................................................. 38

D.    A Fiduciary Relationship With The Broker Is A Necessary, But Not Sufficient, Aspect of "Customer" Status Under SIPA ......................................... 39

E.    The Court Should Defer To SIPC's Interpretations Of SIPA ............................. 41

F.    The ERISA Claimants Have Other Avenues To Recover The Loss Of Their Plans' Investments ....................................................................................... 41

G.    The Facts Cited By ERISA Claimants Neither Raise ERISA Issues Nor Issues Of Material Fact ......................................................................................... 42

VI.    CONCLUSION ............................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adler, Coleman Clearing Corp.*,
216 B.R. 719 (Bankr. S.D.N.Y. 1998)......................................................................14

*In re Adler, Coleman Clearing Corp.*,
277 B.R. 520 (Bankr. S.D.N.Y. 2002)......................................................................18

*Ahammed v. Sec. Investor Prot. Corp. (In re Primeline Sec. Corp.)*,
295 F.3d 1100 (10th Cir. 2002) ...............................................................................20

*In re Albert & Maguire Sec. Co.*,
419 F. Supp. 1171 (E.D. Pa. 1976) ..........................................................................19

*In re Ames Dept. Stores, Inc.*,
582 F.3d 422 (2d Cir. 2009)......................................................................................18

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372, 388 (S.D.N.Y. 2010)................................................................9

*Aozora Bank Ltd. v. Sec. Investor Prot. Corp (In re Bernard L. Madoff Inv. Sec., LLC)*,
11 Civ. 5683 et al. 2012 WL 28468 at *2 (S.D.N.Y. Jan 4, 2012)................................ *passim*

*Arford v. Miller*,
210 F.3d 420 (2d Cir. 2000).....................................................................................15

*Auburn Hous. Auth. v. Martinez*,
277 F.3d 138 (2d Cir. 2002).....................................................................................18

*In re Beacon Assocs. Litig.*,
745 F. Supp. 2d 386 (S.D.N.Y. 2010).................................................................3, 11

*In re Bernard L. Madoff Inv. Sec. LLC*,
654 F.3d 229 (2d Cir. 2011).................................................................................3, 17

*In re Citigroup ERISA Litig.*,
662 F.3d 128, 135 (2d Cir. 2011)..............................................................................39

*Duel v. Hollins*,
241 U.S. 523, 527-29 (1916) ....................................................................................14

*In re First Interregional Equity Corp.*,
290 B.R. 265 (Bankr. D.N.J. 2003) .....................................................................16, 40

*Focht v. Heebner (In re Old Naples Sec., Inc.)*,
223 F.3d 1296, 1301 (11th Cir. 2000) ......................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

*In re Francisco*,
204 B.R. 799, 801 (Bankr. M.D. Fla. 1996) ........................................................................12

*Gandhi v. Sitara Capital Management, LLC*,
689 F. Supp. 2d 1004, 1015 (N.D. Ill. 2010) ....................................................................38

*Goldweber v. Sterling Equities Associates et al.*,
Case 1:10-cv-05786 (PAC) ..............................................................................29, 42

*Howell v. Motorola, Inc.*,
633 F.3d 552, 567 (7th Cir. 2011) ..................................................................................30

*Holland v. Dines (In re Oberweis Sec., Inc.)*,
1992 Bankr. LEXIS 780, Fed. Sec. L. Rep. (CCH) P96890 (Bankr. N.D. Ill. May 21,
1992) ....................................................................................................................41

*In the Matter of Investors Sec. Corp.*,
6 B.R. 420 (Bankr. W.D. Pa. 1980) ..............................................................................20

*In re J. P. Jeanneret Associates, Inc.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2011).........................................................10, 36, 41

*In re Klein, Maus & Shire, Inc.*,
301 B.R. 408 (Bankr. S.D.N.Y. 2003) .........................................................................15

*Kurzweil v. Phillip Morris Co. Inc.*,
2001 WL 25700, No. 94 CIV. 2373(MBM) et al, (S.D.N.Y. Jan. 10, 2001) ........................31

*LaRue v. DeWolff, Boberg & Associates, Inc.*,
552 U.S. 248, 262 (2008) ............................................................................24, 25, 26

*Lingis v. Dorazil*,
132 S. Ct. 96 (2011).......................................................................................................30

*Mackey v. Lanier Collection Agency & Service Inc.*,
486 U.S. 825 (1988)........................................................................................................24

*Milgram v. Orthopedic Associates Defined Contribution Pension Plan*,
666 F.3d 68 (2d Cir. 2011)..........................................................................25, 26

*In re New Times Sec. Servs., Inc.*,
371 F.3d 68 (2d Cir. 2004)...........................................................................................41

*In re Omni Mutual, Inc.*,
193 B.R. 678 (S.D.N.Y. 1996).......................................................................................15

*Oppenheimer & Co., Inc. v. Neidhart*,
56 F.3d 352 (2d Cir. 1995)............................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

*Orthopaedic Specialty Group P.C. v. Pentec, Inc.*,
  2011 Conn. Super. LEXIS 2383,  (Conn. Super. Ct. Sept. 13, 2011)................................29, 42

*In re Ottowa Cartage, Inc.*,
  55 B.R. 371 (N.D. Ill. 1985) ................................................................................23

*Pettus v. Morgenthau*,
  554 F.3d 293 (2d Cir. 2009)................................................................................18

*Pfeil v. State Street Bank and Trust Co.*,
  No. 10-2302 (6th Cir. February 22, 2012) .............................................................30

*Plumbers and Steamfitters Local 490 Severance and Retirement Fund v. Appleton (In re First Ohio Sec. Co.)*,
  No. 93-133, 1994 WL 599433 (6th Cir. Nov. 1, 1994) ...........................................28

*SEC v. Ambassador Church*,
  679 F.2d 608, 614 (6th Cir. 1982) .......................................................................21

*SEC v. F.O. Baroff Co.*,
  497 F.2d 280 (2d Cir. 1974)................................................................................15

*SEC v. Packer, Wilbur & Co.*,
  498 F.2d 978, 983 (2d Cir. 1974)....................................................................15, 31

*SEC v. S. J. Salmon & Co.*,
  375 F. Supp. 867 (S.D.N.Y. 1974).......................................................................14

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
  454 B.R. 285 (Bankr. S.D.N.Y. 2011)....................................................5, 6, 20, 36

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*,
  424 B.R. 122, 130-131 (Bankr. S.D.N.Y. 2010)................................................3, 14

*Sec. Investor Prot. Corp. v. Exec. Sec. Corp.*,
  423 F. Supp. 94, (S.D.N.Y. 1976)..........................................................................6

*Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*,
  533 F.2d 1314 (2d Cir. 1976)................................................................14, 27, 28, 31

*Sec. Investor Prot. Corp v. Pepperdine Univ. (In re Brentwood Sec., Inc.)*,
  925 F.2d 325 (9th Cir. 1991) ..........................................................................14, 15

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*,
  229 B.R. 273 (Bankr. S.D.N.Y. 1999)....................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

*Sec. Investor Prot. Corp v. Wise (In re Stalvey & Assocs., Inc.)*,
    750 F.2d 464, 471 & n.4 (5th Cir. 1985) ..............................................................18

*Stafford v. Giddens (In re New Times Sec. Servs.)*,
    463 F.3d 125, 127 (2d Cir. 2006)...............................................................14, 40

*In re Sterling Die Casting Co., Inc.*,
    118 B.R. 205 (E.D.N.Y. 1990) ..............................................................................23

*United States v. Johnson*,
    529 U.S. 53 (2000)..................................................................................................20

*In re Waddell Jenmar Sec., Inc.*,
    126 B.R. 935 (Bankr. E.D.N.C. 1991), *aff'd*, 991 F.2d 792 (4th Cir. 1993) ....................30, 31

## STATUTES

11 U.S.C. § 96e (repealed 1979) .................................................................................14

15 U.S.C. § 78aaa, *et seq.* ("SIPA") ..................................................................... *passim*

29 U.S.C. § 1001, *et seq.*...........................................................................................1

29 U.S.C. §§ 1001-1003 ..............................................................................................33

29 U.S.C. §§ 1001-1191(c).........................................................................................22

29 U.S.C. § 1002(21) ...................................................................................................33

29 U.S.C. § 1002(38) ...................................................................................................33

29 U.S.C. § 1002(42) ...................................................................................................32

29 U.S.C. §§ 1021-1031 ..............................................................................................33

29 U.S.C. § 1021(f) ......................................................................................................33

29 U.S.C. § 1023(b)(3) .................................................................................................34

29 U.S.C. §1024 ...........................................................................................................13

29 U.S.C. §§ 1101-1130................................................................................................34

29 U.S.C. § 1103(a) .....................................................................................................24

29 U.S.C. § 1104(c) .....................................................................................................29

29 U.S.C. § 1132(a) .......................................................................................................7

# TABLE OF AUTHORITIES

**Page(s)**

29 U.S.C. § 1132(d)(1)-(2) .................................................................................25

29 U.S.C. § 1144(d) .................................................................................23, 38

Del. Code Ann. tit. 6, § 17-701 (West 2011) ...............................................36

ERISA § 409(a).................................................................................................25

ERISA § 502(d)(1)-(2).....................................................................................25

N.Y. Ltd. Liab. Co. Law § 601 (McKinney 2011) .......................................36

## RULES

17 C.F.R. § 240.15c3-1 .....................................................................................17

17 C.F.R. § 240.15c3-3 .....................................................................................17

17 C.F.R. § 240.17a-3 .......................................................................................17

26 C.F.R. § 1.408-2(e) .......................................................................................8

29 C.F.R. Parts 2509, 2510, and 2550, 51 FR 41262-01, 1986 WL 116042 (F.R.) (Nov.
13, 1986) ........................................................................................................35

29 C.F.R. § 2509.75-2........................................................................................36

29 C.F.R. § 2510.3-101......................................................................................32

29 C.F.R. § 2510.3-101(a) ............................................................................33, 35

29 C.F.R. § 2510.3-2(d) ....................................................................................12

29 C.F.R. § 2520.104-1 *et seq.* ........................................................................13

29 C.F.R. § 2550.403a-1....................................................................................38

29 C.F.R. § 2550.403b-1(3) ..............................................................................39

29 C.F.R. § 2550.404c-1(b)(2)..........................................................................25

29 C.F.R. § 2550.404c-1(d)(2)(i).......................................................................30

29 C.F.R. § 2550.404c-1(d)(2)(ii)......................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## OTHER AUTHORITIES

DOL Advisory Opinion 2011-10A ............................................................................................37

H.R. 18109, 91st Cong. § 36(g) (1970) ..................................................................................22

H.R. 18458, 91st Cong. § 35(m)(13)(C)(1970) .......................................................................22

H.R. Rep. No. 95-746, 95th Cong., at 33-34, 54 (1977)..........................................................22

Hearings before the Subcomm. on Sec. of the S. Comm. on Banking and Currency, 91st
   Cong. 257, 296 (1970) .....................................................................................................22

S. 2348, 91st Cong. § 2(7) (1969)...........................................................................................21

S. 2348, Amendment in the Nature of a Substitute, 91st Cong. § 2(5) (1970)............................21

S. 3989, 91st Cong. § (35)(j)(8)(1970) ...................................................................................21

WILLIAM MEADE FLETCHER, *FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS* § 31
   (2010) .............................................................................................................................36

Pursuant to this Court's ERISA Scheduling Order of November 8, 2011 (ECF No. 4507), Irving H. Picard, trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), by and through his undersigned counsel, respectfully submits this Memorandum in Support of the Trustee's Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections, to affirm the denial of those customer claims and to adjudicate objections filed by claimants who argue that the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and related regulations confer on them "customer" status, as that term is defined by section 78*lll*(2) of SIPA.[1]

The Trustee, in support of the Trustee's Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections (ECF No. 4521) (the "ERISA Motion"), states as follows:

## I.
## PRELIMINARY STATEMENT

SIPA was designed to return cash and/or securities to brokerage account holders when a broker suffers financial collapse. The ERISA Claimants, despite not holding brokerage accounts at BLMIS and not being customers of BLMIS in any sense of the word, argue that ERISA provisions nonetheless entitle them to priority treatment as BLMIS "customers" under SIPA. But SIPA is clear that only the account-holding entity itself is a "customer" of BLMIS. This reading of the plain language of the statute is also supported by its legislative history and case law, including prior decisions in this very case. No provision of ERISA changes that result.

---

[1] The Securities Investor Protection Act, 15 U.S.C. § 78aaa, *et seq.* For convenience, future reference to SIPA will not include "15 U.S.C.".

The ERISA Claimants argue that they are customers because, they contend, they deposited money with BLMIS, even though they are not the ones who actually deposited the money with BLMIS. They argue that under ERISA, they have a property right in the funds deposited with BLMIS, either as participants in a self-directed plan that held the BLMIS account, or as a plan that purchased shares in an account-holding entity that they claim falls under ERISA's plan asset regulation.

But these arguments are contrary to Supreme Court and Second Circuit precedent as well as the provisions of ERISA. ERISA does not change the commercial law governing property ownership, and—by its own terms—ERISA is not to be interpreted to alter or supersede any other federal law such as SIPA. And under governing law, including ERISA, a plan's trustee, not its participant investors, is the legal owner of the plan's property, even in a self-directed plan.

Moreover, the "plan asset" regulation cited by the ERISA Claimants does not create a continued property right in the monies after they are invested; rather, it creates a legal fiction for limited purposes—(i) to expand the universe of ERISA fiduciaries with an obligation towards plans, (ii) to determine whether any so-called "prohibited transactions" have been committed, and (iii) to broaden certain reporting requirements—and nothing more. And even if such fiduciary obligations apply, that fact would not create SIPA "customer" status where it did not otherwise exist. It merely creates a potential general estate claim for breach of such duty. The position of the Securities Investor Protection Corporation ("SIPC") on these matters is in accord with that of the Trustee and is entitled to deference.

Accordingly, while the plans and their participants may have remedies under ERISA against plan fiduciaries for having contributed to the losses they have experienced, they are not "customers" for the purposes of SIPA.

2

## II.
## BACKGROUND

**A.    The Madoff Fraud And BLMIS SIPA Case Filing**

By now, the basic facts of the Madoff fraud are widely known and have been recounted

in numerous decisions.  *See, e.g., In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir.

2011); *In re Beacon Assocs. Litig*., 745 F. Supp. 2d 386, 393-94 (S.D.N.Y. 2010).  As described

in *Beacon Associates*:  "Madoff's investment company, [BLMIS], had operated since

approximately 1960.  Madoff . . . claimed he utilized a 'split-strike conversion strategy' to

produce consistently high rates of return on investment.[2]  The split-strike conversion strategy

supposedly involved buying a basket of stocks listed on the Standard & Poor's 100 index and

hedging through the use of options."  745 F. Supp. 2d at 393.

"However, Madoff did not actually engage in any trading activity."  *Id*. at 393-94.

"Instead, Madoff generated false paper account statements and trading records; if a client asked

to withdraw her money, Madoff would pay her with funds invested by other clients."  *Id*. at 393-

94.  "On December 11, 2008, news broke that Madoff had been operating a multi-billion dollar

Ponzi scheme for nearly twenty years. Madoff pleaded guilty to securities fraud and related

offenses on March 12, 2009, and was subsequently sentenced to 150 years in prison."  *Id.* at 394.

On December 11, 2008, the Securities and Exchange Commission ("SEC") filed a

Complaint in the United States District Court for the Southern District of New York against

defendants Madoff and BLMIS, No. 08 Civ. 10791 (LLS) (the "Civil Case").  On December 15,

2008, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of the Civil Case

with an application filed by SIPC.  Thereafter, pursuant to SIPA § 78eee(a)(3), SIPC filed an

---

[2] For certain other accounts, Madoff purported to engage in an equally imaginary but purportedly more profitable
variant.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*,
424 B.R. 122, 130-131 (Bankr. S.D.N.Y. 2010).

application the District Court alleging, *inter alia*, that the Debtor was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

On December 15, 2008, the District Court entered an order pursuant to SIPA which, in pertinent part: appointed Irving H. Picard as trustee for the liquidation of the business of BLMIS, pursuant to section 78eee(b)(3) of SIPA; appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; removed the case to this Bankruptcy Court pursuant to section 78eee(b)(4) of SIPA; and authorized the Trustee to take immediate possession of the property of the debtor, wherever located.

Under SIPA, the Trustee is responsible for recovering and distributing customer property to a broker's customers, assessing claims, and liquidating other assets of the firm for the benefit of the estate and its creditors. A SIPA trustee has the general powers of a bankruptcy trustee, in addition to the powers granted by SIPA. SIPA § 78fff-1(a). The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that "customers," as defined in SIPA § 78*lll*(2), share *pro rata* in "customer property," defined in SIPA § 78*lll*(4), to the extent of their "net equity," defined in SIPA § 78*lll*(11). For each customer with a valid net equity claim, if the customer's share of customer property does not make him whole, SIPC advances funds to the SIPA trustee up to the amount of the customer's net equity, not to exceed $500,000. SIPA § 78fff-3(a).

On December 23, 2008, this Court entered an order (the "Claims Procedures Order") that, *inter alia*, specified the procedures consistent with these SIPA provisions for the filing, determination, and adjudication of customer claims. (ECF No. 12). Accordingly, the Trustee determines claims, claimants may object to the Trustee's determination of a claim by filing an

objection in this Court, and the Trustee must request a hearing date for the objection and notify

the objecting claimant thereof.  *Id.*

**B.**    **The Feeder Fund Customer Motion, Decision, And Appeal**

Before this ERISA briefing, the Bankruptcy Court addressed a motion by the Trustee

seeking to affirm his determinations that certain claimants lacking BLMIS accounts were not

"customers" under SIPA.  On June 11, 2010, the Trustee filed a Motion For An Order To Affirm

Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their

Names, Namely, Investors in Feeder Funds.  (ECF Nos. 2410-2413, 2416).  The motion

addressed those claimants whose claims emanated from their direct or indirect investments in 16

so-called "Feeder Funds" that, in turn, had accounts with and invested directly with BLMIS.  The

funds were essentially hedge funds structured as various kinds of limited partnerships or other

commercial entities.[3]  At the hearing on that matter, counsel for the Trustee informed the Court

that the Trustee would carve out from the Feeder Fund briefing the question of the impact of

ERISA and related regulations on the determination of "customer" status under SIPA.

On June 28, 2011, the Bankruptcy Court issued an order (the "Feeder Fund Order")

affirming the Trustee's denial of the claims of the Feeder Fund claimants.  *See Sec. Investor*

*Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 454 B.R. 285 (Bankr.

S.D.N.Y. 2011), *aff'd sub. nom. Aozora Bank Ltd. v. Sec. Investor Prot. Corp (In re Bernard L.*

*Madoff Inv. Sec., LLC)*, 11 Civ. 5683 *et al.* 2012 WL 28468 at *2 (S.D.N.Y. Jan 4, 2012).

In affirming the Trustee's denial of these claims, the Bankruptcy Court found that "[i]n

light of the plain language of SIPA and relevant case law, the objecting claimants [did] not

---

[3] These funds included, *inter alia*, Beacon Associates LLC (Account 1B0118), Andover Associates LP (Account 1A0061), and Fairfield Sentry Limited (Accounts 1FN069 and 1FN070.)  *See* Exhibit 1 to Declaration of David Sheehan in Support of the Trustee's Motion To Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts In Their Names, Namely, Investors In Feeder Funds. (ECF No. 2413).

qualify as 'customers' under SIPA". *Id.* at 290.  The court found that the Feeder Fund claimants

invested in, not through, the Feeder Funds, and had no individual accounts at BLMIS.  *Id.* at 295.

It was thus the Feeder Funds which entrusted their monies with BLMIS for the purpose of

trading or investing in securities—the touchstone of "customer" status—whereas the objecting

claimants purchased ownership interests in the Feeder Funds.  *Id.* at 299.

On January 4, 2012, the District Court affirmed the Bankruptcy Court's decision.  *See*

*Aozora Bank Ltd. v. Sec. Investor Prot. Corp (In re Bernard L. Madoff Inv. Sec., LLC)*, 11 Civ.

5683 *et al.*, 2012 WL 28468 (S.D.N.Y. Jan 4, 2012).

**C.**    **The Motion To Determine The "Customer" Status Of ERISA Claimants Without
An Account**

On October 5, 2011, the Trustee moved before the Bankruptcy Court for an order

establishing a briefing schedule and hearing to affirm the claims determinations with respect to,

and adjudicate the objections of, ERISA Claimants who lacked accounts with BLMIS.  (ECF No.

4432).  The Bankruptcy Court entered a scheduling order on November 8, 2011 (the "Scheduling

Order").  (ECF No. 4507).

In its ERISA Motion, the Trustee sought an order: (i) affirming the Trustee's denial of the

ERISA Claimants' claims, and (ii) overruling the objections to the Trustee's claims

determinations insofar as the claimants objected to the Trustee's interpretation of the term

"customer" on the basis of ERISA and related regulations.  Under the Scheduling Order, any

objections or arguments raised by the ERISA Claimants that are unrelated to ERISA will be

resolved at a later date.

# III.
# STATEMENT OF FACTS

## A.    The Objecting ERISA Claimants Fall Into Two Basic Categories

The ERISA Claimants who have filed oppositions fall into two basic categories, termed

the "Individual Claimants" and the "Plan Claimants."  Both claim to be "customers" under SIPA

despite not having BLMIS accounts of their own.

### 1.    The "Individual Claimants" Claim To Be Individual Participants In Plans With BLMIS Accounts

The individual plan participant claimants ("Individual Claimants") are people who allege

that they are individual participants in plans that had BLMIS accounts.  The Individual

Claimants contend that each of them should each be treated as a separate "customer" with

respect to the plan account.  Included in this category are:

- Eric S. Saretsky and the Sterling Plan Administrator, purporting to speak on

  behalf of Eric S. Saretsky individually and also, on behalf of all of the other

  Sterling Equities Associates Employees Retirement Plan participants

  (collectively, "Sterling Individual Claimants").[4]  The actual BLMIS account at

  issue is 1KW182 in the name of Sterling Equities Employees Retirement Plan

  (hereafter, the "Sterling Plan Account," and its holder, the "Sterling Plan").  The

  Sterling Plan offered a small number of investment options to participants other

---

[4] Neither Mr. Saretsky nor the Sterling Plan Administrator (who is not identified in their brief) has established any legal basis for filing a brief to assert rights that they claim that other Sterling Plan participants hold individually as direct personal rights.  Nothing in 29 U.S.C. § 1132(a) (cited in the Sterling Brief, as defined below) permits a fiduciary to assert individual rights of plan participants.   It is confined to such things as suing other fiduciaries for breach of fiduciary duty or seeking injunctions of ERISA violations or other equitable plan enforcement.  Similarly, its provisions for suits by participants also do not extend to one participant asserting individual rights of another participant.  *See* p. 1, Memorandum of Law In Support Of Objection To The Motion For An Order Affirming The Trustee's Determinations Denying Claims Over ERISA-Related Objections ("Sterling Brief," ECF No. 4643), p.1.

than putting their money into the BLMIS Sterling Plan Account, but the vast

majority of the Sterling Plan money in fact went to BLMIS.

- The 117 claim-filing participants in the Orthopaedic Specialty Group P.C.
  Defined Contribution Pension Plan ("Orthopaedic Individual Claimants").  The
  BLMIS account at issue is 1O0004 in the name of Orthopaedic Specialty Grp PC
  Defined Contribution Pension Plan (hereafter, the "Orthopaedic Plan Account,"
  and its holder, "Orthopaedic Plan").  The Orthopaedic Plan put essentially all of
  its money into its BLMIS account and offered no alternate options to participants.

- Jacqueline Green Rollover Account and Wayne D. Green Rollover Account
  (collectively, the "Green Individual Claimants"),[5] who allegedly invested through
  what they describe as a qualified pension plan known as the WDG Associates Inc.
  Retirement Trust ("WDG Trust"). The actual BLMIS account at issue is 1ZA538
  in the name of WDG Trust (hereafter, the "Green Plan Account").  The Green
  Individual Claimants do not state whether WDG Trust or any predecessor is a
  defined contribution plan or a participant directed plan.

---

[5] It is unclear whether Jacqueline and Wayne Green claim to be acting individually, and if not, whether they have standing to appear, and in what capacity.  Jacqueline Green describes herself as both "trustee" and "beneficiary" of something that she refers to as the "Jacqueline Green Rollover Account" or the "Jacqueline Green EE Rollover Account," and the opposition filed regarding Jacqueline Green purports to be filed on behalf of the "Jacqueline Green Rollover Account."  Similarly, Wayne D. Green describes himself as both "trustee" and "beneficiary" of something that he refers to as the "Wayne Green Rollover Account" or the "Wayne D. Green EE Rollover Account," and the opposition filed regarding Wayne Green purports to be filed on behalf of the "Wayne Green Rollover Account."  There is no explanation of whether the rollover accounts, under any name, are justiciable entities capable of bringing suit in their own names, or what sorts of entities they claim to be.  To the extent that these are IRA accounts that are rolled over from some other retirement plan, an individual cannot be a trustee or custodian of an IRA; only banks and "non-bank trustees" can.  *See* § 408(a) of the Internal Revenue Code; 26 C.F.R. § 1.408-2(e).

In each of these cases, the underlying plan of the Individual Claimants submitted a claim of its own, covering all the money purportedly in its respective BLMIS plan account.  *See, e.g.,* Sterling Brief, p.4.

### 2.    The "Plan Claimants" Had No BLMIS Accounts But Claim To Have Invested In Entities That Did

The second category (the "Plan Claimants") claim to be ERISA-regulated plans or individual retirement accounts ("IRA") that invested directly or indirectly in a BLMIS account-holder entity such as a hedge fund or trust.  Each of the Plan Claimants seeks to be a customer distinct from the account holder entity that was on the books and records of BLMIS.  It does not appear that participants of any of the respective Plan Claimants, as opposed to the plans themselves, seek customer status.[6]  The Plan Claimants include:

- J.X. Reynolds & Co., Deferred Profit Sharing Plan ("Reynolds Plan"), who invested in The Petito Investment Group ("Petito"), a BLMIS account holder (account number 1ZA003) which is apparently a general partnership with JX Reynolds & Co. as one of its partners.

- Ltd. Editions Media, Inc. Defined Benefit Pension Plan UA Dtd. 2/9/99, Claimant ("Ltd. Ed. Plan") which purchased a limited partnership interest in Fairfield Sentry Limited ("Fairfield"), a feeder fund incorporated in the British Virgin Islands[7] that was a subject of the Feeder Fund Order.

- Upstate New York Bakery Drivers and Industry Pension Fund ("Upstate NY Plan"), which invested in Income Plus Investment Fund ("Income Plus Trust"), a

---

[6] While the Trustee believes this to be the case, it is unclear with respect to the Fisch Claimants, discussed *infra*, which ERISA plans if any are actually involved.

[7] *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 388 (S.D.N.Y. 2010).

formal trust managed by Jeanneret Associates and which allegedly qualified as a

"Group Trust" within the meaning of Internal Revenue Ruling 81-100 and which

invested about a third of its assets with BLMIS.[8]

- A group of 37 plans[9] of various sorts (collectively, the "Construction Plans") that

  invested in either Income Plus Trust or in one or more of the following other

---

[8] *See In re J. P. Jeanneret Associates, Inc.*, 769 F. Supp. 2d 340, 349, 358, 360 (S.D.N.Y. 2011). The *Jeanneret* court found that the interests investors purchased in Income Plus Trust qualify as "securities."

[9] These consist of the following:

Bricklayers and Allied Craftsmen Local 2 Annuity Fund;
Bricklayers and Allied Craftworkers Local 2, Albany, New York, Health Benefit Fund;
Bricklayers and Allied Craftworkers Local 2, Albany, New York, Pension Fund;
Building Trade Employers Insurance Fund;
Central New York Laborers' Annuity Fund;
Central New York Laborers' Health and Welfare Fund;
Central New York Laborers' Pension Fund;
Central New York Laborers' Training Fund;
Engineers Joint Welfare Fund;
Engineers Joint Training Fund;
International Brotherhood of Electrical Workers Local Union No.43 and Electrical Contractors Pension Fund;
International Brotherhood of Electrical Workers Local No. 43 and Electrical Contractors Welfare Fund;
I.B.E.W. Local 139 Pension Fund;
I.B.E.W. Local 241 Pension Fund;
I.B.E.W. Local 241 Welfare Benefits Fund;
I.B.E.W. Local 325 Annuity Fund;
I.B.E.W. Local 325 Pension Fund;
I.B.E.W. Local 910 Annuity Fund;
I.B.E.W. Local 910 Pension Fund;
I.B.E.W. Local 910 Welfare Fund;
I.B.E.W. Local 1249 Pension Fund;
Laborers' Local 103 Annuity Fund;
Laborers' Local 103 Welfare Fund;
Laborers' Local 103 Pension Fund;
New York State Lineman's Safety Training Fund;
Oswego Laborers' Local No. 214 Pension Fund;
Plumbers, Pipefitters and Apprentices Local No. 112 Health Fund;
Roofers' Local 195 Annuity Fund;
Roofers' Local 195 Health & Accident Fund;
Roofers' Local 195 Pension Fund;
Syracuse Builders Exchange, Inc./CEA Pension Plan;
SEIU 1199 Upstate Pension Fund;
Service Employees Benefit Fund;
Service Employees Pension Fund of Upstate New York;
Local 73 Retirement Fund;
Local 73 Annuity Fund; and
Upstate Union Health & Welfare Fund.

10

entities which had direct or indirect interests in BLMIS accounts:  Andover

Associates LLC I ("Andover"), a New York limited liability company; Beacon

Associates LLC I  ("Beacon I"), a New York limited liability company;[10] or

Beacon Associates LLC II ("Beacon II"), a New York limited liability company

which invested mostly or exclusively in Beacon I and did not hold a BLMIS

account.[11]

- Howard Siegel, on behalf of the Howard Siegel IRA ("Siegel"), who states that he

    invested in Beacon II, and seeks to be a customer by reason of the account held

    directly or indirectly by Beacon I (Siegel never claims to have had a direct

    investment in Beacon I).

- Several individuals (the "Fisch Claimants")—Paul and Deborah Fisch, Michael

    Fisch, and Steven Fisch (collectively, the "Fisch Claimants")—each of whom

    claim to have invested 401k funds in a BLMIS account, apparently account

    1ZA081, in the name of P J F N Investors L P ("PJFN").  Each wrote a letter to

    the court but otherwise failed to explain the nature of their investment.  It seems

    from some of their underlying claim materials, however, that some or all of the

    underlying funds were from IRAs, not 401(k)s.  All of the Fisch Claimant funds at

    issue were apparently used to purchase, for their retirement accounts or otherwise,

---

[10] *See Beacon Associates*, 745 F. Supp. 2d at 396 n.6.

[11] According to *Beacon Associates*, Beacon II was formed for the purpose of investing in Beacon I. 745 F. Supp. 2d at 396 n.6; *see also* Beacon Associates LLC II Confidential Offering Memorandum dated August 9, 2004 at 11 ("The Company [Beacon II] does not directly engage in investment and trading activities. Rather, the Company has invested all of its assets in Beacon Associates LLC I for that purpose. Beacon Associates LLC I is an affiliated fund organized as a New York limited liability company. The Company does, however, retain the right to make its own investment and trading decisions in the future, in whole or in part, but has no present intention to do so.") (Ex. D to Affidavit of Jennifer A Clark, Esq. In Opposition to Trustee's Motion for an Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections (ECF No. 4635-1)).

shares in PJFN, and those PJFN shares (rather than anything owned by PJFN)

show as "assets" on the Fisch Claimant retirement account statements.

The Individual Claimants and the Plan Claimants are hereinafter collectively referred to

as the "ERISA Claimants."[12]   The BLMIS account-holding entities in which the Plan Claimants

directly or indirectly invested, plus the three plans which themselves held BLMIS accounts

(Sterling Plan, Orthopaedic Plan, and WDG Trust), are hereinafter collectively referred to as the

"Account Holders."

**IV.**
**ERISA APPLICABILITY**

**A.    Certain Claimants Have Not Established That ERISA Applies To Them.**

By the Scheduling Order, the hearing on the Trustee's motion has been limited to issues

arising under ERISA.  Certain claimants have not established that ERISA applies to them at all.

The Greens, the Fisches, JX Reynolds, and Ltd. Ed. Plan each failed to provide in accordance

with the Scheduling Order the underlying documentation of the plan they claim is subject to

ERISA.

Moreover, certain claimants appear to have, or be, IRA accounts and other purported

"rollover" accounts.  ERISA generally does not apply to IRA accounts,[13] even if they are IRA

accounts that were "rolled over" from an ERISA-regulated plan.  As the court held in *In re

Francisco*, 204 B.R. 799, 801 (Bankr. M.D. Fla. 1996), "[t]here is nothing in the Congressional

Record or in the language of the legislation dealing with ERISA, to indicate that ERISA was

---

[12] The use of the term "ERISA Claimants" does not mean that the Trustee believes they are necessarily subject to ERISA, as discussed *infra.*

[13] The sole exception is for a very limited class of IRAs funded or endorsed by employers or otherwise described in 29 C.F.R. § 2510.3-2(d).  Notwithstanding this, the Plan Asset Regulation (discussed *infra*), does also apply to IRAs for the purpose of interpreting an Internal Revenue Code section that creates potential tax liability for fiduciaries engaging in prohibited transactions.

designed to include IRAs within the definition of 'employee benefit program or a plan.'"  For

example, of the ERISA Claimants, Siegel concededly is an IRA, the accounts of the Fisch

Claimants appear to be (in whole or in part) as well, and the Green Individual Claimants have not

fully explained the nature of their "rollover" accounts.

Other issues arise from the lack of required plan filings. All ERISA-regulated tax-

qualified plans (and some tax-qualified plans that are not ERISA regulated) are required to file

an Annual Form 5500.[14]  Neither Seigel nor the Fisch Claimants appears to have filed such forms

and certain others did not do so consistently.  The Trustee also has pending discovery

outstanding as to the Reynolds Plan and intends to commence discovery on other ERISA

Claimants, because the history of the related accounts and of the multiple sources of

contributions to them, among other things, raise questions as to whether they meet ERISA

qualifications.[15]

Rather than litigate the potentially fact-intensive question of ERISA application at this

point, however, the Trustee suggests that their ERISA status be assumed for purposes of the

scheduled hearing on the ERISA Motion, and litigated further only if the result of the hearing

makes further fact-finding on this point necessary.

---

[14]  *See* 29 U.S.C. §1024, 29 C.F.R. § 2520.104-1 *et seq.*

[15] The Trustee reserves all ERISA coverage issues, even if not specified here. Certain claimants failed to provide
appropriate documentation, as required by the Scheduling Order.

**V.**

**ARGUMENT**

A.    **The ERISA Claimants Are Not "Customers" Under SIPA And Thus Have No Cognizable Claims.**

1.    **SIPA Provides Preferred Protection For "Customers" Only.**

"The 'principal purpose' of SIPA is 'to protect investors against financial losses arising from the insolvency of their brokers.'" *Stafford v. Giddens (In re New Times Sec. Servs.)*, 463 F.3d 125, 127 (2d Cir. 2006), quoting *SEC v. S. J. Salmon & Co.*, 375 F. Supp. 867, 871 (S.D.N.Y. 1974). Before the enactment of SIPA and its predecessor statute, Section 60e of the former Bankruptcy Act, 11 U.S.C. § 96e (repealed 1979), customers of a bankrupt stockbroker could not reclaim their cash or securities unless they could trace them specifically after placing them into their broker's hands; if they could not do so, they were simply considered general creditors. *Duel v. Hollins*, 241 U.S. 523, 527-29 (1916). Because serious inequities could and did result from these requirements, Congress enacted section 60e of the Bankruptcy Act of 1937, which was expanded upon and tailored by Congress with the creation of SIPA in 1970, to address the unique problems of stockbroker failures.

SIPA established a fund of customer property in which all "customers" share ratably and to the exclusion of general creditors. *See In re Bernard L. Madoff Inv. Sec. LLC,* 424 B.R. at 133 ("Separate from the general SIPA estate, a fund of 'customer property' is established for priority distribution exclusively among the debtor's customers."); *In re Adler, Coleman Clearing Corp.,* 216 B.R. 719, 722 (Bankr. S.D.N.Y. 1998) (same); SIPA §§ 78fff-2(b), 78fff-2(c)(1), 78*lll*(4). In addition, only "customers" are entitled to receive an advance from the SIPC Fund. *See* SIPA § 78fff-3(a); *Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1316 (2d Cir. 1976); *SIPC v. Pepperdine Univ. (In re Brentwood Sec., Inc.)*, 925 F.2d 325, 327 (9th Cir. 1991),

14

*Aozora,* 2012 WL 28468 at *1-2.  Thus, "customer" status is a preferred one that is not to be conferred lightly.

Not all victims of a brokerage collapse are protected as "customers" under SIPA.  *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 983 (2d Cir. 1974).  *See also, e.g., In re Omni Mutual, Inc.*, 193 B.R. 678, 680-81 (S.D.N.Y. 1996).  "Customer" has a specialized statutory definition under SIPA.  SIPA § 78*lll*(2).  SIPA was "carefully crafted, precisely delineating the category of investors it protects." *Brentwood Sec.*, 925 F.2d at 327.

The burden is on a claimant to establish that he is, in fact, a "customer" entitled to SIPA protection.  *See, e.g., In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003).  As courts have narrowly construed the definition of "customer," that burden of proof "is not easily met."  *Id.*  Not only is such a showing difficult, a claimant must make such a showing on a transaction-by-transaction basis.  *See, e.g., SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 n.2 (2d Cir. 1974); *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 229 B.R. 273, 277 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. Arford v. Miller,* 210 F.3d 420 (2d Cir. 2000).

## 2.    To Be A "Customer," One Must Either Be An Account Holder Or Fall Within A Specific SIPA Exception

### a.    The Definition Of "Customer" Under SIPA Requires An Account

The definition of "customer" in SIPA requires a customer to be an account holder or a person for whom an account should have been opened.  In other words, a "customer" is the person who actually entrusted the property to the broker and who would have been entitled to demand its direct return from the broker had no broker insolvency occurred.  The "customer" definition provides:

> The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer *from or for the securities accounts of such person*

15

for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of *such* securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . . .

SIPA § 78*lll*(2) (as amended through Dec. 12, 2006) (emphasis added).[16]

The "customer" definition thus has three parts. The first part, which refers to those who have "claims on account of securities received, acquired, or held . . . from or for the securities account" of the "customer" plainly contemplates that the "customer" have a securities account with the broker. The second part of the definition "includes any person who has a claim against the debtor arising out of sales or conversions of *such* securities"—namely, the securities referenced in the first part of the definition,  So that aspect of the "customer" definition also requires a "customer" to have a securities account.

The third part of the definition includes "any person who has deposited cash with the debtor for the purpose of purchasing securities."  Certain of the ERISA Claimants argue that this aspect of the "customer" definition does not require a securities account.  But "a customer is clearly limited to persons who maintain accounts with broker-dealers and who trade or invest through them."  *Sec. Investor Prot. Corp. v. Exec. Sec. Corp.,* 423 F. Supp. 94, 98 (S.D.N.Y. 1976)*, see also Aozora,* 2012 WL 28468, at *5 (citing *Exec. Sec.* with approval); *In re First Interregional Equity Corp.*, 290 B.R. 265, 273-74 (Bankr. D.N.J. 2003) (to be a customer, "the securities or cash must have been received, acquired, or held 'from or for the securities account' of the claimant").

Indeed, as the SEC—the agency statutorily charged with regulating brokers and with interpreting Title 15, which includes SIPA—explained in its brief to the bankruptcy court with

---

[16] In 2010, after the start of this case, an amendment to SIPA slightly reorganized and amended the "customer" definition in a manner irrelevant to these issues.

16

respect to the Feeder Fund motion, the act of depositing cash with a brokerage firm for the

purpose of purchasing securities also triggers an account requirement.  Depositing cash with a

broker for the purpose of purchasing securities "creates an obligation that must be entered on the

firm's books and records as cash held for the account of the person who deposited the money.

Thus SIPA's 'customer' definition, which expressly refers to securities held for the account of a

person, also encompasses cash held *for the account of a person*."  Mem. of Law of the SEC

Supporting Trustee's Determinations Denying The Claims of Certain Feeder Fund Claimants,

ECF No. 2849, at 4 (emphasis added) (hereafter, the "SEC Feeder Fund Brief").  *See generally*

17 C.F.R. §§ 240.15c3-1, 240.15c3-3, and 240.17a-3 (enacted under the Securities and Exchange

Act of 1934.)  The ERISA Claimants did not provide money to BLMIS in a manner that would

or should have caused BLMIS to open an account for trading in their individual names.

Moreover, as the District Court set forth in *Aozora,* many other provisions of SIPA also

contemplate that a customer must have a securities account with the broker.  *See id.* at *4 (citing

to SIPA § 78fff-3(a)(2), which provides that "a customer who holds accounts with the debtor in

separate capacities shall be deemed to be a different customer in each capacity"; SIPA § 78fff-

2(f), which provides that the SIPC trustee may "transfer to another member of SIPC . . . all or

any part of the account of a customer of the debtor."; and SIPA § 78fff-2(a)(1), which directs

that notice of the commencement of SIPA proceedings be "mailed to each person who, from the

books and records of the debtor, appears to have been a customer of the debtor with an open

account within the past twelve months.").  And the Second Circuit has held that "net equity"—

which determines how, proportionally,  "customers" share preferentially in the broker's

"customer property"—is to be calculated by reference to the broker's books and records, and the

information available in a broker's books and records is the information relating to its accounts.

17

*See Aozora* at *4 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 237 (2d Cir.

2011); *see also* SIPA § 78*lll*(11) (defining "net equity" as "the dollar amount of the *account or*

*accounts* of a customer") (emphasis added); *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520,

557 (Bankr. S.D.N.Y. 2002) ("Claimants with valid 'customer claims' share in the fund of

'customer property,' separate from the general estate, to the extent of the 'net equity' *in that*

*account*") (emphasis added).[17]  Thus, "[c]ustomer status 'in the air' is insufficient to confer the

SIPA's protection on a given transaction."  *Sec. Investor Prot. Corp. v. Wise (In re Stalvey &*

*Assocs., Inc.)*, 750 F.2d 464, 471 & n.4 (5th Cir. 1985).[18]

As none of the ERISA Claimants had accounts with BLMIS, and as they did not deposit

money with BLMIS under circumstances in which an account should have been opened on their

behalf, they are not "customers" under SIPA.  In contrast, the Account Holders opened securities

accounts at BLMIS, the accounts were in the names of the Account Holders, the books and

records reflect deposits and withdrawals by the Account Holders from their accounts, and

BLMIS sent account statements and confirmations to the Account Holders.  Only the authorized

signatories of the Account Holders had the legal authority to make investments through, or

withdraw money from, the BLMIS account.

The ERISA Claimants' arguments ignore the fact that the Account Holders themselves

are "customers" under SIPA.  What the ERISA Claimants seem to be arguing is that *both* they

---

[17] "[W]hen construing the plain text of a statutory enactment, we do not construe each phrase literally or in isolation. Rather, we attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Pettus v. Morgenthau*, 554 F.3d 293, 297 (2d Cir. 2009).  "[T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute." *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002). One must consider the "broader context of the statute as a whole."  *In re Ames Dept. Stores, Inc.*, 582 F.3d 422, 427 (2d Cir. 2009) (citation omitted).

[18] The Construction Plans brief cited *Stalvey* for the proposition that a designation of an account was "a tenuous ground" for determining customer status, but the account the court was talking about was a bank account that improperly mentioned the broker, not an account at the brokerage itself for the would-be SIPC customer. *Stalvey*, 750 F.2d at 470 ("the bank's styling of the bonds in [the broker's] name is inexplicable").

and the Account Holders are customers of BLMIS concerning the exact same transactions, despite the fact that only the Account Holders had accounts at BLMIS.  Nothing in the "customer" definition countenances this result.

**b.    The Sole Statutory Exceptions To The Account Requirement Do Not Apply Here**

SIPA provides three exceptions to the rule that indirect investors, as opposed to account holders, cannot be "customers," but these exceptions do not apply here.  Section 78fff-3(a)(5) of SIPA provides that when a bank, broker, or dealer—all of which are statutorily ineligible for SIPC advances—places an investment with an insolvent broker-dealer on behalf of a non-bank, non-broker, or non-dealer client, SIPA treats the underlying client, not the bank, broker, or dealer acting as the client's fiduciary or agent, as the "customer" of the debtor for SIPC advance purposes. *See* SIPA § 78fff-3(a)(5).  *See In re Albert & Maguire Sec. Co.,* 419 F. Supp. 1171, 1177-78 (E.D. Pa. 1976) ("The sole exception to the proscription [of SIPC advances to a bank] is where the bank, as a customer of the broker, was acting for one of its own customers.  The required advance from SIPC in such situation would benefit the 'customer' principal and not the agent bank.").

Congress created this exception, but did not extend it beyond banks, brokers, and dealers.  As the district court held in *Aozora*, "[w]hen Congress wished to extend SIPA's protections to investor accounts held at entities other than the "debtor" broker/dealer, SIPA did so explicitly. . . . This provision would have been superfluous if the scope of the term "customer" in § 78*lll*(2) were broad enough to cover customers of third party entities."  2012 WL 28468 at *4.  The district court noted that "[w]hen Congress provides exceptions in a statute, it does not follow that courts have authority to create others.  Rather, [t]he proper inference . . . is that Congress

considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *Id.* at

*5 (quoting *United States v. Johnson*, 529 U.S. 53, 58 (2000)) (internal quotations omitted).[19]

None of the entities that the ERISA Claimants invested in are banks, brokers, or dealers

that are eligible for the Section 78fff-3(a)(5) exception.  Accordingly, this exception does not aid

the ERISA Claimants.

### c.    The Only Other Cases In Which "Customer" Status Has Existed Is When The Absence Of An Account Is Attributable To The Misfeasance Of The Broker Or Its Agents

The sole cases cited by the ERISA Claimants where "customer" status was recognized

without an account are circumstances in which cash was deposited with the brokerage or

pursuant to the explicit instructions of an agent of the brokerage, such that the brokerage should

have opened an account had the known intentions of the would-be customer been honored.

Thus, in *Focht v. Heebner (In re Old Naples Securities, Inc.),* 223 F.3d 1296, 1301 (11th Cir.

2000), and *Ahammed v. Securities Investor Protection Corporation (In re Primeline Securities

Corporation)*, 295 F.3d 1100, 1107 (10th Cir. 2002), the putative customers handed over their

money to an intermediary who failed to open a brokerage account on their behalf.  Had the

money been properly handled, it would have resulted in the establishment of accounts containing

assets to which the putative customers had title and over which they had control (Primeline

customers even filled out new account forms), and securities would have been purchased directly

for them.  *See also In the Matter of Investors Sec. Corp.*, 6 B.R. 420, 424-425 (Bankr. W.D. Pa.

---

[19] As noted by Judge Lifland in *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities Inc. (In re Madoff)*, 454 B.R. 285, 303-304 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. Aozora Bank v. Securities Investor Protection Corporation (In re Bernard L. Madoff Investment Securities, LLC)*, 2012 WL 28468 (S.D.N.Y. Jan 4, 2012), Congress did not even deign to include an exception for mutual funds when the statute was enacted, or during any of the subsequent amendments to it, even though such funds were part of the investment landscape when SIPA was enacted and catered to just the type of small investor that SIPA was designed to protect. *Id.*

1980) (money delivered to brokerage agent for purpose of purchasing securities); *SEC v. Ambassador Church,* 679 F.2d 608, 614 (6th Cir. 1982) (where church entrusted bonds to broker for sale, it was a "customer" under SIPA even if broker did not open the appropriate account, because "[i]t is not likely that Congress . . . intended to make eligibility for protection depend on whether the broker complied with rules of the SEC or practices of the trade.").

Here, in contrast, none of the ERISA Claimants were investing in a manner that should have resulted in a separate BLMIS account in their own name and under their own control. The Plan Claimants were directly or indirectly purchasing interests in entities that themselves had BLMIS accounts, and which were directly entitled to deal with the assets in those accounts. The Individual Claimants sent money to a plan trust that held a BLMIS account in the name of the plan trust and under the control of the plan trustees. Accordingly, the cases that they cite do not support treating either of these groups of ERISA Claimants as "customers."

### d. The Legislative History Of SIPA Is Consistent With The Account Requirement

The legislative history of SIPA[20] supports the conclusion that SIPA is designed to benefit account holders only, except where the specific statutory exceptions in Section 78fff-3(a)(5) apply. As first introduced, SIPA defined "insured customer account" as "the net amount due any customer from his account maintained with an insured broker or insured dealer . . . ." S. 2348, 91st Cong. § 2(7) (1969). Two amendments were then proposed to expand the coverage: one as to accounts representing beneficial interests, S. 2348, Amendment in the Nature of a Substitute, 91st Cong. § 2(5) (1970), and the other, proposed by the SEC, covering situations where multiple beneficial parties were represented by an agent. S. 3989, 91st Cong. § (35)(j)(8)(1970). A

---

[20] This legislative history was set out in this bankruptcy case in greater detail by the SEC in the SEC Feeder Fund Brief.

securities industry task force, in contrast, put forward a proposal in which the payment would be strictly by account.  H.R. 18109, 91st Cong. § 36(g) (1970).

As a result of a compromise agreement between the SEC and the security industry task force, a single bill was put forward that formed the basis for the SIPA legislation as enacted. Hearings before the Subcomm. on Securities of the S. Comm. on Banking and Currency, 91st Cong. 257, 296 (1970).  This contained a new provision (identical to what is now § 9(a)(5) of SIPA), applicable to customers of banks and broker-dealers that have accounts with broker-dealers, that provided that "each such customer of such broker or dealer or bank shall be a separate customer of the debtor."  H.R. 18458, 91st Cong. § 35(m)(13)(C)(1970).  The compromise proposal, with modifications, was adopted in the final SIPA legislation.  See SIPA of 1970, § 6(c)(2)(A), 84 Stat. 1636.[21]; SIPA § 78fff-3(a)(5).  Thus, the history of the SIPA legislation as finally enacted reflects no intent to expand "customer" beyond account holders except in the particular instances actually specified in the statutory exceptions.

### 3.       ERISA Is Subordinated To SIPA And Does Not Affect Customer Status

Nothing in ERISA would cause plans or plan participants to have a greater claim to "customer" status than they would absent ERISA.  ERISA provides that it shall have no effect on other federal statutes:

> (d) Alteration, amendment, modification, invalidation, impairment, or supersedure of any law of the United States prohibited
>
> Nothing in this subchapter[22] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided

---

[21] The 1978 amendments to SIPA changed the definition to make clear that persons who lend securities to a broker-dealer and receive consideration for their loans are not deemed "customers."  H.R. Rep. No. 95-746, 95th Cong., at 33-34, 54 (1977).

[22] The ERISA subchapter in question (Subchapter I, "Protection of Employee Benefit Rights," 29 U.S.C. §§ 1001-1191(c)), covers all the provisions of ERISA at issue here.

in sections 1031 and 1137(b) of this title)[23] or any rule or regulation issued under any such law.

29 U.S.C. § 1144(d).

Case law confirms ERISA's subordinate status vis-à-vis other federal statutes. *See, e.g., In re Sterling Die Casting Co., Inc.*, 118 B.R. 205, 208 (E.D.N.Y. 1990) (finding it "abundantly clear that Congress intended the statute [ERISA] to be subordinate to all federal laws unless otherwise provided. ERISA's specific provision precluding interferences with the operation of federal law, renders the Bankruptcy Code superior and therefore effective over any ERISA provision to the contrary"); *In re Ottowa Cartage, Inc.* 55 B.R. 371, 377-78 (N.D. Ill. 1985) ("ERISA § 1144(d) explicitly states the Act's provisions do not override other federal laws. . . . [T]he all-embracing language of ERISA § 1144(d) reflects Congress has already chosen to subordinate ERISA's policies to those of conflicting federal statutes.").

The definition of "customer" is expressly set forth in SIPA. SIPA § 78*lll*(2). As a result, the fact that a plan is subject to ERISA cannot affect the "customer" definition under SIPA as applied to that plan or its participants in the manner proposed by the ERISA Claimants. The ERISA Claimants' arguments amount to an attempted end-run around SIPA § 78*lll*(2) and ERISA § 1144(d). They should be overruled.

**B.      The Individual Claimants Also Are Not "Customers" Because Their Account-Holding ERISA Plans Own The Plan Funds, Through The Plan Trustees**

The ERISA Claimants are not "customers" for another, independent reason: the Account Holders, not the ERISA Claimants, own the account property, and ERISA does nothing to change the applicable property law that causes this to be so. The "customer" definition requires that it be the customer's cash that is deposited with the broker for the purpose of purchasing

---

[23] Neither of these exceptions is relevant.

securities, and it was not the ERISA Claimants' property that was deposited with BLMIS for that purpose. *See Aozora*, 2012 WL 28468, at *6 (claimants also not "customers" because the cash deposited belonged to the account holders, not the claimants). As to the Individual Claimants, it was the plan itself that owned, and deposited, the cash with BLMIS for purposes of purchasing securities. And in the case of the Plan Claimants, it was the Account Holder in which they directly or indirectly invested that owned the property that was invested with BLMIS. ERISA does nothing to alter these basic facts of commercial law.

## 1.   Defined Contribution Plan Assets Are "Owned" By The Plan, Through The Plan's Trustee(s)

The Individual Claimants argue that they are SIPA customers because they own their individual "accounts" within their plans. But title to the assets of an ERISA-regulated plan are held and owned by the plan's trustees, even if the plan permits its participants and beneficiaries to "self-direct" (i.e., where individual participants and beneficiaries have some say in how the plans' fiduciaries should invest the assets). *See* 29 U.S.C. § 1103(a); *see also LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 262 (2008) (Thomas, J., concurring) ("ERISA requires a plan's combined assets to be held in trust and legally owned by the plan trustees"). All the property held by the trust is subject to expenses and obligations of the trust itself.[24] In this regard, an ERISA-regulated plan trust is a legal entity like any other. It can sue and be sued, and is subject to suits for obligations such as rent and fees as well as torts.[25] *See Mackey v. Lanier*

---

[24] This is true even for vested accounts; not all money in the plans at issue here is automatically vested. *See, e.g,* Affidavit of Henry Backe In Support Of The OSG Plan Participants' Customer Claims (ECF No. 4632, p.4 ¶ 8 (Orthopaedic Plan) (hereinafter "Backe Affidavit").

[25] The account requirement in ERISA reflects that many things other than the defined contributions can affect the size of a participant's account:

> (34) The term "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses,

*Collection Agency & Service Inc.*, 486 U.S. 825, 831-33 & n.8 (1988); *Milgram v. Orthopedic*

*Assocs. Defined Contribution Pension Plan*, 666 F.3d 68, 72(2d Cir. 2011); citing 29 U.S.C.

§ 1132(d)(1)-(2) (ERISA § 502(d)(1)-(2)) ("ERISA provides that [a]n employee benefit plan

may sue or be sued under this subchapter as an entity" and that any resulting money judgment

"shall be enforceable only against the plan.").

In *LaRue*, the Supreme Court considered whether a participant in a defined contribution

plan could sue a fiduciary under ERISA section 409(a).  That section allows a fiduciary of a plan

to be sued "to make good to such plan any losses to the plan" resulting from fiduciary breaches.

In *LaRue*, the breach only affected the size of the individual plan account of one participant, the

plaintiff.  The plaintiff complained that while he directed his employer (the plan administrator) to

make certain changes in the investments in his account, his employer failed to cause his

directives to be carried out, resulting in a smaller individual account for plaintiff.[26]

The Supreme Court held that that plaintiff participant could bring the section 409(a)

action against his employer "on behalf of [the] plan", *LaRue,*552 U.S. at 253.[27]  Justice Thomas

explained that this was appropriate since such a suit was still a suit for recovery to a plan for plan

losses as required by the statute:    "The allocation of a plan's assets to individual accounts for

bookkeeping purposes does not change the fact that *all the assets in the plan remain plan assets*.

A defined contribution plan is not merely a collection of unrelated accounts . . . [o]f course, a

---

and any forfeitures of accounts of other participants which may be allocated to such participant's
account.

29 U.S.C.  § 1002.

[26] As *LaRue* reflects, plan participants must rely upon the plans to carry out their investment choices.  Not only must investment decisions of a participant in an ostensibly self-directed plan be implemented through the plan trust, there are circumstances under which a plan fiduciary can properly refuse to implement the investment instructions of such a participant, and even circumstances when the plan fiduciary has a legal duty to refuse to implement them.  552 U.S. at 250-25; *see* 29 C.F.R.  § 2550.404c-1(b)(2) and (d)(2)(ii).

[27] Here, the plan directly filed its own net equity claim against BLMIS.

participant suing to recover benefits on behalf of the plan is not entitled to monetary relief payable directly to him; rather, *any recovery must be paid to the plan.*"  *LaRue,* 552 U.S. at 262-263 & n.* (Thomas, J., concurring) (emphasis added).

The Second Circuit recently addressed this very issue.  In *Milgram*, the Second Circuit expressly held that a plan trust itself is the actual owner of a defined contribution plan's assets: "Plan assets therefore become 'benefits' only when they are finally distributed to the participant at the time of retirement.  Indeed, prior to that point, a participant cannot truly be said to have a claim to any particular assets in the trust corpus."  666 F.3d at 74.  "Rather," the Second Circuit held, "all of the Plan's undistributed assets are legally owned by the trustee and managed for the benefit of all plan participants, with gains and losses shared by them on a pro rata basis.  A single participant's 'account' is merely a bookkeeping entry that is used at the time of his retirement to determine what benefits he is entitled to receive."  *Id.*  Accordingly, the Court held that a judgment against the plan as a whole could be satisfied by garnishing the plan assets as a whole, even if it caused the amounts of individual participant accounts to be proportionately reduced. *Id.* at 77.  The Court further emphasized that "[b]y design, participants in a defined contribution plan bear the risk that the value of their accounts will be reduced as a result of actions taken by the plan administrator . . ."  *Milgram*, 666 F.3d at 76.

It is thus settled law that benefit plans, rather than their participants, own the funds contributed to the plan, even where, as here, they involve ERISA-governed defined contribution plans.  Consequently, as between the Individual Participants and their Account Holder plan, only the BLMIS account-holding plan can have deposited cash with BLMIS for purchasing securities within the meaning of SIPA, and only the plan can be a "customer" as a result.

### 2. In *Morgan Kennedy*, The Second Circuit Held That Benefit Plan Beneficiaries Are Not "Customers" Under SIPA

In the leading case on the "customer" definition under SIPA, *Securities Investor Protection Corporation v. Morgan, Kennedy & Co.*, 533 F.2d 1314 (2d Cir. 1976) ("*Morgan Kennedy*"), the Second Circuit held that indirect investors like the ERISA Claimants were not "customers." *Morgan Kennedy* involved a retirement profit-sharing plan. The profit-sharing plan money was held in a trust fund headed by three trustees. The money was paid in by Reading Body Works, Inc., based upon its net earnings, for the benefit of its employees. Employees had certain vested and nonforfeitable interests in the trust funds, payable upon the employee's termination of employment. The trust maintained separate accounts for each employee. The money was invested solely by the trustees, through an account in the name of the trustees. The employees' names did not appear in the records of the debtor broker-dealer. *Id*. at 1315.

The Second Circuit rejected the argument, advanced by both the employees and the SIPA trustee, that each employee was a separate "customer" entitled to a SIPC advance. The Court noted that "[e]mphasis on the customer as investor and purchaser/trader has been a consistent theme in cases in this Circuit." *Id.* at 1317. "Against this background," the Court held, "it is impossible to classify the Reading employees as 'customers' of the debtor. The one hundred and eight beneficiaries were neither investors nor traders." *Id.* at 1318. The Court noted that "none of the one hundred and eight [employees] would have had any standing as a 'customer' of the then-solvent broker-dealer to give any buy or sell order in the account." *Id.* Furthermore, "[t]he trust account itself was in the name of the Trustees who had the exclusive power to entrust the assets to the debtor, to invest and reinvest, and to purchase and trade securities in the account as they saw fit." *Id.*

27

In short, as the Court noted, "[t]he employee-beneficiaries in the case before us made no purchases, transacted no business, and had no dealings whatsoever with the broker-dealer in question respecting the trust account.  Indeed, they could not have any such dealings since the broker-dealer held no property belonging to any individual employee, in which such employee could trade or invest."  *Id.*  Thus, the Court concluded, "[t]he argument that, notwithstanding their complete anonymity and total incapacity to have dealings with the broker-debtor, the Reading employees were 'customers' of Morgan Kennedy stretches that term wholly beyond its limits." *Id.* [28]  The *Morgan Kennedy* reasoning was followed by the Sixth Circuit in *Plumbers and Steamfitters Local 490 Severance and Retirement Fund v. Appleton (In re First Ohio Securities Co.)*, No. 93-133, 1994 WL 599433 (6th Cir. Nov. 1, 1994) (holding a pension fund, not its participants, to be the SIPA "customer" of a failed brokerage).

*Morgan Kennedy* is on all fours with respect to the Individual Claimants.  The Sterling Individual Claimants and the Orthopaedic Individual Claimants have tried to distinguish the case on the grounds that it was decided before the advent of defined benefit (and in the case of the Sterling Plan, wholly or partially self-directed) retirement plans.  But that is a distinction without a difference.  The Sterling Individual Claimants and Orthopaedic Individual Claimants, as such, had no right to issue instructions to BLMIS regarding any of the account assets. As discussed above*,* none of the Individual Claimants "owned" the property in the BLMIS account.  As between themselves and the plan trustees, only the trustees, on behalf of the plan, had the right to trade in the accounts.  Moreover, if the plan trustees chose to eliminate BLMIS as an option (or

---

[28] The *Morgan Kennedy* court also held that under the SIPC Series 100 Rules, individual customer status "for each individual owning some portion of, or interest in, [a] particular account" was "explicitly forbidden."  533 F.2d at 1319-20.  "If the available maximum of a SIPC advance depended upon the number of parties jointly holding an account," the Court noted, "individuals could arbitrarily expand that figure at will. Such a result is obviously repugnant to the plain meaning of the statute and to the intent of Congress in passing it."  *Id*. at 1321.

as the only plan option) for investment and substitute something else instead, the Individual

Claimants (in their participant capacities) would have had no ability to prevent it. So far as the

BLMIS brokerage firm was concerned, it had one customer, and that was the plan itself.

Moreover, while the Sterling and Orthopaedic Individual Claimants argue that BLMIS

knew *of* the existence of participants, no objector argues that BLMIS actually *knew* each of the

Individual Claimants and kept track of their separate plan investment statistics.  Indeed, it would

be impossible to calculate "net equity" and to determine net winners and net losers on an

Individual Claimant basis from the books and records of BLMIS.  BLMIS did not keep records

of money coming in and out except on an Account Holder level, and only the Plans themselves

are responsible for determining the many costs, reallocations, forfeitures, and other factors that

can affect the internal plan accounts of Individual Claimants.

The Sterling and Orthopaedic Individual Claimants argue that the participants controlled

their plan accounts.[29]  The Sterling Individual Claimants (through a plan fiduciary purporting to

argue on their behalf) in particular argue that "participants of plans governed by Section 404(c)

of ERISA are individually responsible" for investment decisions and "the administrator is not

responsible," citing 29 U.S.C. § 1104(c).  But the only "investment decision" the Sterling

Individual Claimants could make as to BLMIS was whether to direct the plan administrator to

send certain funds to the Sterling BLMIS account (which contained the vast majority of the

BLMIS investments), as opposed to one of the few other options chosen by those in control of

the Sterling Plan.  In the case of the Orthopaedic Plan, the only decision the Individual Claimants

---

[29] These arguments are at core inconsistent with the positions taken by Sterling individual participants in *Goldweber v. Sterling Equities Associates et al., Case 1:10-cv-05786 (PAC)*, in which they sought to hold plan fiduciaries to be the responsible parties for the Madoff debacle.  *See also Orthopaedic Specialty Group P.C. v. Pentec, Inc.*, 2011 Conn. Super. LEXIS 2383, (Conn. Super. Ct. Sept. 13, 2011) (in which the Orthopaedic Plan trustees sue a plan advisor for failing to protect them from Madoff-related fiduciary responsibility to their plan participants).

could make was whether to put money into the plan at all—much of the Plan was funded strictly

by employer contributions—as no "option" other than BLMIS even existed. Regardless, the case

law is clear that it is the plan trustees' responsibility to select adequate investment options and

managers, and the plan cannot offload those responsibilities on their participants.  As the Sixth

Circuit recently recognized, "if the purposes of the [Section 404(c)] safe harbor is to relieve a

fiduciary of responsibility 'for decisions over which it had no control,' . . . then it follows that the

safe harbor should not shield the fiduciary for a decision which it *did* control, such as the

selection of plan participant investment options."  *Pfeil v. State Street Bank and Trust Co.,* No.

10-2302 at  (6th Cir. February 22, 2012), (see Exhibit "3" to the accompanying declaration of

David J. Sheehan) (citing *Howell v. Motorola, Inc.,* 633 F.3d 552, 567 (7th Cir)., *cert. denied sub*

*nom. Lingis v. Dorazil,* 132 S. Ct. 96 (2011) and 29 C.F.R. § 2550.404c-1(d)(2)(i)).[30]

Nonetheless, the Sterling Brief goes to great length to argue a collateral issue to the

customer question—namely, whether or not the plan and administrators are liable to the

participants.  The 404(c) status and self-direction, even if proven, do not change the fact that the

plan communicated with BLMIS, withdrew and deposited money with BLMIS, had sole

authority with respect to the account, and is the owner of the account.

Certain of the Plan Participants cite to a district court case from the Fourth Circuit, *In re*

*Waddell Jenmar Securities, Inc.*, 126 B.R. 935 (Bankr. E.D.N.C. 1991), *aff'd*, 991 F.2d 792 (4th

Cir. 1993), for the proposition that individual plan participants should be treated as separate

customers under ERISA.  But in *Waddell*, the "customer" issue hinged on the court's factual

determination of whether the brokerage had ever actually received the relevant funds or property.

---

[30] For purposes of this motion, the Trustee does not need to explore whether offering the option to place money into
a BLMIS plan account and ceding all say over how it was invested thereafter to Madoff was either a suitable option,
or one that was suitably described.

The court did not reach the question of whether individual plan participants, as opposed to the plan itself, should be treated as customers under SIPA. *See Waddell,* 126 B.R. 935 at 944 n.9 (whether the plan-related claims should be one aggregate claim or the individual participants should each have a claim "would only be relevant if the aggregate allowed claims exceeded the SIPC claim limit. That is not the case here, and that issue need not be addressed.").[31]

*Oppenheimer & Co., Inc. v. Neidhart,* 56 F.3d 352 (2d Cir. 1995), another case cited by the ERISA Claimants, is also inapposite. *Neidhart* held that a non-plan trustee and his sole beneficiary[32] could proceed to arbitration as a customer (in a non-SIPA colloquial sense) of Oppenheimer & Co, where the fraudulent action of an Oppenheimer agent was the only reason that plaintiffs lacked a separate Oppenheimer account. *Id.* at 357. *Neidhart* is neither a SIPA case nor an ERISA case and its conclusions did not depend on either statute.

The Individual Claimants also cite to *Kurzweil v. Phillip Morris Companies Inc. et al.,* 2001 WL 25700, No. 94 CIV. 2373(MBM) (S.D.N.Y. Jan. 10, 2001). But in that case, in which the District Court allowed individual defined contribution plan beneficiaries to participate in a securities settlement, the court was not interpreting SIPA. Rather, the court relied upon its equitable discretion to give maximum remedial effect to persons who were in actuality hurt by the fraud. In contrast, under SIPA, "'[a]rguments based solely on the equities are not, standing alone, persuasive. . . . SIPA was not designed to provide full protection to all victims of a brokerage collapse.'" *Morgan Kennedy*, 533 F.2d. at 1317 & n.4 (quoting *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 983 (2d Cir. 1974)).

---

[31] Where the *Waddell* brokerage—as opposed to the plan administrator who was also a broker there—actually had received the customer property (and thus should have opened an account), the court allowed a corresponding claim. *Id.* at 946.

[32] The trustee and his beneficiary were joint plaintiffs from the start, and it does not appear from the opinion that the other side was trying to litigate the issue of whether just one or the other of them should be allowed to proceed to represent the financial interest at stake.

**C.**    **The Plan Claimants Also Are Not "Customers" Because ERISA Does Not Give Them An Ownership Interest In The Account Holders**

The Plan Claimants, as with the Individual Claimants, are also not "customers" under SIPA because they do not own the property entrusted to BLMIS.  Rather, the Account Holder in which they directly or indirectly invested owned the property.

**1.**    **The Plan Asset Regulation And ERISA Do Not Affect Property Rights**

The Plan Claimants rely on 29 C.F.R. § 2510.3-101 (the "Plan Asset Regulation") for the proposition that they own an undivided interest in property of a feeder fund or third party trust— a BLMIS Account Holder—that was sent to BLMIS.  Specifically, the Plan Claimants contend that they are "customers" because "their property" was sent to BLMIS.  They argue that this property right arises from the Plan Asset Regulation, which provides that plan assets include "both the equity interest and an undivided interest in each of the underlying assets of the [Account Holder] entity" if "benefit plan investors" hold "25 percent or more of the value of [a] class of equity interests" in that Account Holder. [33]  They also cite (for the same proposition) to 29 U.S.C. § 1002(42), which incorporates the definition of "plan assets" set forth in the Plan Asset Regulation, with certain limiting exceptions.

But the Plan Claimants misconstrue the Plan Asset Regulation.  The regulation deems a plan to have "an undivided interest in each of the underlying assets of the entity" solely for purposes of defining the scope of fiduciary obligations under specified sections of ERISA (and for the purpose of certain specified tax and reporting provisions under ERISA and the Internal

---

[33] None of the Plan Claimants have adequately documented that the 25% threshold was met at all relevant times and by all relevant entities.  The relevant times, for purposes of the argument that they "entrusted cash" to BLMIS, would be at each time that money in which they claim an interest was transmitted to BLMIS.  Since certain of the entities in which the Plan Claimants invested were not direct account holders at BLMIS, *e.g.* Beacon II, the Plan Claimants would also have to trace the effect of the Plan Asset Regulation on each entity within the chain for each of those periods.   Because this is likely to require a great deal of additional discovery and evidence, the Trustee would ask the Court to defer any hearing on such evidence unless it rules on this motion.

Revenue Code as well).  The Plan Asset Regulation does not purport to involve, much less

change, the ownership of property as a matter of commercial law.

The Plan Asset Regulation creates a specialized definition of "plan assets" for use in

interpreting particular provisions of ERISA and the Internal Revenue Code.  The regulation

describes what constitute assets of a plan with respect to a plan's investment in another entity

"for purposes of subtitle A, and parts 1 and 4 of subtitle B, of title I of the Act and section 4975

of the Internal Revenue Code," and not for any other purpose:

> Sec. 2510.3-101  *Definition of "plan assets"*—plan investments.
>
> (a) In general.
>
> (1) This section describes what constitute assets of a plan with respect to a plan's investment in another entity *for purposes of subtitle A, and parts 1 and 4 of subtitle B, of title I of the Act and section 4975 of the Internal Revenue Code. . . . .*

(emphasis added).

The only statutes that the Plan Asset Regulation thus applies to are:

- Subtitle A of ERISA, "General Provisions", 29 U.S.C. §§ 1001-1003.

  This Subtitle contains definitions, including those of "fiduciary", 29

  U.S.C. § 1002(21), and "investment manager" (a type of fiduciary), 29

  U.S.C. § 1002(38), which are defined in part by a relationship to plan

  assets; it also contains provisions about the intended scope and purpose of

  ERISA.

- Portions of Subtitle B, "Regulatory Provisions," specifically:

  - Part 1, "Reporting and Disclosure" 29 U.S.C. §§ 1021-1031.  This

    part sets out reporting requirements applicable to pension plans,

    including notices and reports on plan assets.  For example, 29

    U.S.C. § 1021(f) requires certain information on assets to be

included in defined benefit plan funding notices, and 29 U.S.C. §

1023(b)(3) details the requirements for asset schedules that must

be in annual reports by plans.

    o  Part 4, "Fiduciary Responsibility," 29 U.S.C. §§ 1101-1130.

These sections define the scope of fiduciary responsibility in

relation to employee benefit plans and detail what plan fiduciaries

must do, and what they cannot do, in relation to plans and their

assets.

- Section 4975 of the Internal Revenue Code, 26 U.S.C. § 4975.  This section

  imposes a tax on certain forms of prohibited transactions involving employee

  benefit plans (*e.g.*, fiduciaries engaging in personal transactions as to plan assets,

  such as buying them for themselves.)

While ERISA itself has many other provisions,[34] the Plan Asset Regulation has no

application outside of these specifically referenced sections of ERISA and the Internal Revenue

Code.

The stated purpose of the Plan Asset Regulation is to expand the scope of fiduciary

responsibility when a plan or plans, viewed together, own 25 percent of more of the equity

interests in a particular entity, and other requirements are met.  In this circumstance, the Plan

Asset Regulation extends fiduciary responsibility to the managers of the entity:  "Therefore, any

person who exercises authority or control respecting the management or disposition of such

---

[34] Subtitle B itself includes five other parts not covered by this regulation, including Part 2, "Participation and Vesting," Part 3, "Funding," Part 5, "Administration and Enforcement," and Parts 6 and 7 (dealing with group health plans).

underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the investing plan."  29 C.F.R. § 2510.3-101(a).

The 49 page document promulgating the Plan Asset Regulation,  29 C.F.R. Parts 2509, 2510, and 2550, 51 FR 41262-01, 1986 WL 116042 (F.R.) (Nov. 13, 1986) (seeExhibit "4" to the accompanying declaration of David J. Sheehan), reflects the limited purpose of the regulation.  Like the Plan Asset Regulation itself, it begins by describing its limitation to defining what constitute plan assets for select portions of ERISA and the Internal Revenue Code: "This document contains a final regulation that describes what constitute assets of a plan for purposes of certain provisions of Title I of the Employee Retirement Income Security Act of 1974 and the related prohibited transaction provisions of the Internal Revenue Code  . . . ."  *Id.* at 1.

The Department of Labor set out three reasons for promulgating the Plan Asset Regulation.  All relate to fiduciary issues.  First, it said, absent the regulation "it would be relatively easy for an investment manager to avoid compliance with the fiduciary responsibility provisions of ERISA by indirectly providing investment management services to plans through a separate legal entity." . . .  Second, it explained that while ERISA specifically addressed traditional forms of collective investment that are generally available only to larger plans, it failed to address limited partnerships and other forms of collective investment arrangements that allow economies of scale and are "especially suited for the purposes of smaller plans." Therefore, without a regulation subjecting those other forms of collective investment to the fiduciary responsibility rules of ERISA, "the full protections of those rules would be available for larger plans, but would not be available for smaller plans.". . . Third, given the limitations of

the statute and its legislative history, without the regulation "uncertainty about the scope of the fiduciary responsibility rules will persist . . . ." *Id.* at 5-6.

On the same day that the Plan Asset Regulation was enacted, the Department of Labor also amended its Interpretive Bulletin 75-2, 29 C.F.R. § 2509.75-2 to discuss it. The interpretive bulletin said that under the final regulation dealing with the definition of "plan assets," . . . "the assets of certain entities in which plans invest would include 'plan assets' *for purposes of the fiduciary responsibility provisions of the Act*" (emphasis added).

The Feeder Fund decisions recognized that fund entities generally are the actual legal owners of the money invested in them, regardless of how they promise to invest it, and that this makes the funds, rather than their investors, the only cognizable "customers" under SIPA. *See generally Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. Aozora Bank v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec., LLC)*, 2012 WL 28468, at *6-7 (S.D.N.Y. Jan 4, 2012); *see generally* William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 31 (2010) ("[T]he capital or assets of the corporation are its property"); N.Y. Ltd. Liab. Co. Law § 601 (McKinney 2011) ("[A] member has no interest in specific property of the limited liability company"); Del. Code Ann. tit. 6, § 17-701 (West 2011) (same as to limited partnership property). The Plan Claimants suggest that the Plan Asset Regulation should disturb these fundamental principles of commercial law.[35] But nothing in the Plan Asset Regulation suggests, much less states, that it

---

[35] *Jeanneret,* a recent Southern District of New York case involving Income Plus Trust (and involving at least some of the same Plan Claimants that seek relief as to Income Plus Trust here), likewise recognized that the plans investing in Income Plus Trust do not own its assets. It required the plan investors to sue derivatively "to recover monies lost by Income Plus to Madoff," because the relevant claim "belongs to Income Plus, not directly to the Fund's investors." 769 F. Supp. 2d at 370. It further noted that any recovery by Income Plus Trust would presumably ultimately be distributed to the Income Plus Trust investors "in accordance with the terms of their agreement." That is no different from the situation here, where any BLMIS recovery by an Account Holder would presumably be so distributed to the Plan Claimants and Individual Claimants.

reaches beyond its intended purpose within its limited ERISA confines, and the Department of

Labor's many statements about it are similarly circumscribed.

This limited scope of the Plan Asset Regulation is the only interpretation of it that could

possibly be correct. If as a matter of commercial law "an undivided interest in each of the

underlying assets of the entity" was owned by every plan that invested in, for example, Beacon

Associates, beginning at the moment (if any) that plan ownership crossed the 25% threshold,

only to flicker out of existence and reappear at such points (if any) that the threshold changed,[36]

the Beacon Associates fund entity would be paralyzed to buy or sell anything at all. No third

party could effectively deal with it or its assets, or have any confidence that it could obtain good

title in any sale by the fund.[37] Every time one of the constituent plans (or even any non-ERISA

investors) tried to redeem shares of the fund, the fund would be unable to act to liquidate them

out because every one of its assets would also be jointly the property of all of its other ERISA

investors. The very purpose of creating a separate investment entity, rather than a loose coalition

of plans that tried to act in parallel, would be eviscerated. That cannot be the law, and no case or

statute cited by the claimants finds otherwise.[38]

In addition, even if the Department of Labor had expressly provided in the Plan Asset

Regulation that ERISA plans should be treated as SIPA "customers"—which it did not do—

---

[36]The putative plan ownership would also appear and disappear depending on how well the fund entity meets any of the three "operating company" exceptions set out in the Plan Asset Regulation at subparts c, d, and e – which tests apply as frequently as quarterly.

[37] That is even setting aside the question of how the fund or any person dealing with it are supposed to determine which of the fund investors actually *are* ERISA qualified plans, a subject that is also not that easy for someone, especially a plan outsider, to determine. *See, e.g.,* 29 C.F.R. § 2510.3-1, 2, and 3 (defining "plan" for purposes of ERISA), and Section IV *supra*.

[38] This includes DOL Advisory Opinion 2011-10A, cited at 10 n. 8 of the Construction Plans' opening brief. That opinion neither says nor implies that the Plan Asset Regulation affects "ordinary notions of property rights" except as those "notions" might otherwise be used in the interpretation of the specific ERISA statutory provisions covered by the Plan Asset Regulation itself.

ERISA's subordination provision, 29 U.S.C. § 1144(d), would prevent such a regulation from taking effect. Such a provision would directly conflict with the SIPA distribution scheme, by creating an additional, non-statutory exception to the basic SIPA protection of account holders only.

Not surprisingly, the cases that have interpreted the Plan Asset Regulation in the 25 years since its enactment have used it to determine fiduciary issues and prohibited transaction and reporting issues with respect to ERISA-regulated plans, not to determine disputes over ownership rights. *See, e.g., Gandhi v. Sitara Capital Management, LLC*, 689 F. Supp. 2d 1004, 1015 (N.D. Ill. 2010) (citing the Plan Asset Regulation for the proposition that "an ERISA plan's equity investment in another entity . . ., which investment is neither a publicly-offered security nor a security issued by a registered investment company, imposes a fiduciary duty on persons who control or advise the entity.") And the Plan Claimants' briefs cite to no case law (and the Trustee was unable to locate any case law) holding that this regulation affects title ownership as a matter of property law.

### 2.     The Trust Regulation Does Not Support The Plan Claimants' Arguments

The opening brief filed by the Construction Plans also cites to 29 C.F.R. § 2550.403a-1 "Establishment of trust," to support its argument that BLMIS was a plan fiduciary for those Plan Claimants who invested in Income Plus Trust, Andover, Beacon I, and Beacon II. While their argument is not entirely clear, the Construction Plans Brief cites this regulation for the proposition that BLMIS "held their assets in trust" and contends that this regulation somehow transforms each of the investing plans into individual customers of BLMIS pursuant to SIPA. Construction Plans Brief, at 15-16, 19.[39]

---

[39] As already discussed, the ERISA statute expressly prevents its provisions from interfering with or altering

But 29 C.F.R. § 2550.403a-1 does not create a trust where there otherwise is none. Rather, it provides an obligation on the part of the named trustees of a plan to hold the assets of the plan in a formal trust pursuant to a trust agreement: "Except as otherwise provided in § 403b-1, all assets of an employee benefit plan shall be held in trust by one or more trustees pursuant to a written trust instrument." *Id.* And if the assets are those which are affected by the Plan Asset Regulation, they do not even have to be kept in a trust. 29 C.F.R. § 2550.403b-1(3) expressly excludes the assets of Plan Asset Regulation entities from the trust requirement: "If the assets of an entity in which a plan invests include plan assets by reason of the plan's investment in the entity, the requirements of paragraph (a) of this section are satisfied with respect to such investment if the indicia of ownership of the plan's interest in the entity are held in trust on behalf of the plan by one or more trustees."

**D.      A Fiduciary Relationship With The Broker Is A Necessary, But Not Sufficient, Aspect of "Customer" Status Under SIPA**

Many of the ERISA Claimants have asserted that various provisions of ERISA create a fiduciary relationship between BLMIS and themselves. As a preliminary matter, not all the ERISA Claimants have proven that a fiduciary relationship actually existed,[40] or what the scope of that relationship was.[41] But in any event, even if some form of fiduciary relationship was created by virtue of ERISA, that fact does not turn the ERISA Claimants into "customers" for purposes of SIPA.

_____

competing federal statutory enactments such as the SIPA distribution scheme.

[40] *See*, for example, the discussion of whether some of the ostensible ERISA Claimants are governed by ERISA at all. Section III, *infra*.

[41] *See generally In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011) (even where a person is shown to be an ERISA fiduciary, a person may be an ERISA fiduciary with respect to certain matters but not others, and in suits alleging breach of fiduciary duty, the threshold question is whether the defendants were acting as fiduciaries when taking the action subject to complaint.)

In *Aozora*, the appellant claimants argued that allegations in the Trustee's related

adversary proceeding complaint meant "that BLMIS owed the appellants a fiduciary duty . . . ."

2012 WL 28468, at *6. Nevertheless, the district court concluded they still needed to meet the

"customer" definition criteria, holding that "even if the appellants' reading of the Amended

Complaint is correct, the allegations in the Amended Complaint do not suggest that the

appellants are 'customers' of BLMIS under SIPA." *Id.* at *9.

In *In re First Interregional Equity Corp.*, 290 B.R. 265 (Bankr. D.N.J. 2003), the court

explained that the "fiduciary" requirement is an addition to, not a replacement for, the statutory

elements of the SIPA customer definition. The court first discussed the basic elements of the

statutory "customer" definition. It then found that "[i]n addition . . . courts have consistently

emphasized two factors which govern the customer status of particular claimants: (1) the

transactions in which they were engaged and which form the basis of their claim of customer

status must have been related to investment, trading or participation in the securities market; and

(2) the transactions must have arisen out of the type of fiduciary relationship which generally

characterizes the relationship between a broker-dealer and its customers." 290 B.R at 273-74

(citations omitted). "Thus," the court concluded, "*in addition* to the requirements of the statutory

definition, these two latter factors must *also* be satisfied." *Id.* at 274 (emphasis added).

Moreover, even if the ERISA Claimants had a cognizable cause of action for breach of

fiduciary duty against BLMIS, that cause of action would not create a "customer claim" that

entitles them to a priority share of "customer property," any more than would a claim for fraud or

any other tort or contract right. *See, e.g., Stafford v. Giddens (In re New Times Sec. Servs.)*, 463

F.3d 125, 129-130 (2d Cir. 2006) (claimants were no longer SIPA customers even though they

were fraudulently induced by their broker to swap securities for promissory notes, because SIPA

does not protect against all cases of alleged dishonesty and fraud); *Holland v. Dines (In re Oberweis Securities, Inc.),* 1992 Bankr. LEXIS 780, *19-24, Fed. Sec. L. Rep. (CCH) P96890 (Bankr. N.D. Ill. May 21, 1992) (claimant asserting, among other things, breach of fiduciary duty was not entitled to customer status as a matter of law even assuming the allegations were true). A breach of fiduciary duty claim could be pursued, but in the context of this case (in which all BLMIS assets have been ruled to be "customer property"), it would not result in a separate payment unless and until all SIPA customers are paid in full for their "net equity"—a term that is also specifically defined by reference to a customer's accounts.  SIPA §§ 78fff-2(c)(1), 78*lll*(11).

### E.    The Court Should Defer To SIPC's Interpretations Of SIPA

To the extent that the language of SIPA leaves any doubt as to whether the appellants are "customers," this Court should defer to the interpretations of SIPA by SIPC, which has determined that the Account Holders, not the ERISA Claimants, are the customers of BLMIS.  In *In re New Times Securities Services, Inc.*, 371 F.3d 68, 75 (2d Cir. 2004), the Second Circuit deferred to the interpretations of SIPA by the SIPC and the SEC.  *See id.* at 81, 88.  This Court should similarly embrace the conclusions regarding SIPA of the entity primarily charged with enforcing it.

### F.    The ERISA Claimants Have Other Avenues To Recover The Loss of Their Plans' Investments

The ERISA Claimants may receive their respective portions of any distributions to the Account Holders on the net equity claims of those Account Holders.[42]  And ERISA Claimants might assert damages claims against those that were responsible for their Plan's involvement in BLMIS, as occurred in the *In re J.P. Jeanneret Associates* case, and as the plan trustees of the

---

[42]  The Trustee has already made an interim distribution of approximately $800 million to customers that included distributions to some of the Account Holders.

Orthopaedic Plan acknowledged (in their suit against an advisor) might be asserted against them by their own participants. *See Orthopaedic Specialty Group P.C. v. Pentec, Inc.,* 2011 Conn. Super. LEXIS 2383, (Conn. Super. Ct. Sept. 13, 2011). *See also Goldweber v. Sterling Equities Associates et al., Case 1:10-cv-05786 (PAC)* (recently settled class action against plan fiduciaries by, among others, Sterling Individual Claimants).   But they cannot seek a direct preferential distribution of customer property. That would violate the plain language of SIPA, ignore the nature of the ERISA Claimant's investments, and upset the customer property distribution scheme.

**G.    The Facts Cited By ERISA Claimants Neither Raise ERISA Issues Nor Issues Of Material Fact**

Certain of the ERISA Claimants make fact-based arguments that are not grounded in ERISA.  Nor would they manage to turn the ERISA Claimants into BLMIS "customers" even if true.

For instance, some of the ERISA Claimants argue that they should qualify as "customers" because they had actual contact with BLMIS despite the fact that the accounts were not in their names.  This is not an ERISA issue, and the sporadic and incidental contacts alleged would not be material even if accurate.  The allegations include the following:

- The Reynolds Plan claims that it delivered one check directly to BLMIS in 1999 with a cover letter explaining it was "for the Petito Investment Group Account – ZA003."  The other checks that it made out to BLMIS were apparently delivered to Petito, who dealt directly with BLMIS.

- The Greens claim that each of them communicated with BLMIS regarding the "Account" (which they define as the WDG BLMIS account, as opposed to any "Segregated Account" that Jacqueline or Wayne Green claim to have held within

42

the WDG plan.)[43]  Jacqueline Green and Wayne Green were the representatives
authorized by the WDG Plan to communicate with BLMIS on its behalf, so there
is nothing unusual about these communications.

- Dr. Henry Backe, an Orthopaedic Individual Claimant who was also a plan trustee
  of the Orthopaedic Plan (and thus one of the ones speaking with Frank DiPascali
  of BLMIS on behalf of the plan), states that he asked a personal rollover question
  of Frank DiPascali in 2002.  Backe Affidavit, ECF No. 4632, ¶¶ 2, 12, 19. This
  appears to be nothing more than a potential client communication.

- Dr. Murray Morrison (one of the Orthopaedic Individual Claimants and one of the
  original trustees of the Orthopaedic Plan as amended), relies on the statement that
  his investment advisor had direct contact with Frank DiPascali of BLMIS a few
  days before Madoff was arrested, concerning, among other things, the
  hypothetical potential for a rollover of Dr. Morrison's purported share of the
  Orthopaedic Plan into a separate account of his own.  See Affidavit of David P.
  Gershoni, ECF No. 4633.  That rollover never occurred. This, too, is nothing
  more than a communication in respect of a potential client.

- The Orthopaedic Brief[44]  claims that Frank DiPascali at BLMIS knew that
  participants in the plan existed (as opposed to knowing who they were) and was
  "made aware . . .of how the Plan's account was funded" (i.e., that the Plan was
  funded by part employer contributions and part individual contributions.)

---

[43] Declaration In Opposition To Trustee's Motion To Affirm Denial Of Claim ("J. Green Declaration"), ECF No. 4638, at p. 2, Declaration In Opposition To Trustee's Motion To Affirm Denial Of Claim ("W. Green Declaration"), ECF No. 4640, at p. 2.

[44] Memorandum of Law in Opposition To Trustee's Motion For An Order Affirming Determinations Denying Claims Over ERISA-Related Objections (ECF 4631).

Orthopaedic Brief, p. 5.  It concedes that Mr. DiPascali "required that all

communications with the [Orthopaedic] plan be through the Plan trustees", a fact

that it backs up by affidavit.  Its further implication that Mr. DiPascali fielded

questions from non-trustee Plan Participants at "the annual meeting" is not

supported in any way by the cited affidavit.  Moreover, the closest thing to an

"annual meeting" that is described is a meeting of "*[t]he Plan's trustees* . . .every

12-18 months with . . .DiPascali to discuss the performance of the Plan's BLMIS

account . . . ."  Backe Affidavit, ECF No. 4632, pp. 5-6 (emphasis added).   Even

if these meetings occurred and included plan participants,  they would amount to

at most the equivalent of a "shareholder" meeting of a corporation.

None of these sporadic and minimal contacts, even if assumed to be true, could overcome

the claims of the Account Holders themselves—the entities that owned the plan assets, that had

the sole authority to make withdrawals, that opened the accounts, whose interests are

ascertainable from the books and records of BLMIS, and that received all the account

statements—to the accounts and the property deposited in them.  Consequently, they cannot

create an issue of fact as to "customer" status.  *See* section V.B.2 *supra*.

Certain ERISA Claimants also appear to argue that trusts and other entities should be

disregarded whether ERISA applies or not, or that accounts with more than one beneficial holder

should in general be counted as more than a single "customer" under SIPA.  Such issues are not

the subject of the current motion.

## VI.
## CONCLUSION

For all of the foregoing reasons, the Trustee's motion should be granted, and the Court

should hold that ERISA provides no basis on which a person not otherwise a "customer" within

the meaning of SIPA should be treated as one.

Dated: New York, New York
March 2, 2012

Of Counsel:

Baker & Hostetler LLP
3200 National City Center
Cleveland, Ohio 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
Brian A. Bash
Email: bbash@bakerlaw.com
Thomas D. Warren
Email: twarren@bakerlaw.com
Wendy J. Gibson
Email: wgibson@bakerlaw.com

By: */s/ David J. Sheehan*

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jorian L. Rose
Email: jrose@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively*
*Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment*
*Securities LLC and Bernard L. Madoff*