# EXHIBIT 4

Westlaw.

51 FR 41262-01, 1986 WL 116042 (F.R.)                                                                     Page 1

RULES and REGULATIONS

DEPARTMENT OF LABOR

Pension And Welfare Benefits Administration

29 CFR Parts 2509, 2510, and 2550

Final Regulation Relating to the Definition of Plan Assets

Thursday, November 13, 1986

**\*41262** AGENCY: Department of Labor.

ACTION: Final regulation.

SUMMARY: This document contains a final regulation that describes what constitute assets of a plan for purposes of certain provisions of Title I of the Employee Retirement Income Security Act of 1974 (ERISA, or the Act) and the related prohibited transaction provisions of the Internal Revenue Code (the Code). This document also contains a redesignation of the rule relating to guaranteed governmental mortgage pool certificates that was originally codified at 29 CFR 2550.401b-1. There has been considerable uncertainty regarding what constitute "plan assets" for purposes of ERISA, and the regulation will provide guidance to plan fiduciaries, participants and beneficiaries of plans and other affected parties.

DATES: The final regulations will be effective March 13, 1987. In general, the final regulations will apply for purposes of identifying plan assets at any time after March 13, 1987. The final regulations also contains certain transitional provisions.

FOR FURTHER INFORMATION CONTACT: John S. Hunter, Office of Regulations and Interpretations, Pension and Welfare Benefits Administration, (202) 523-7901 or Shelby J. Hoover or Daniel J. Maguire, Plan Benefits Security Division, Office of the Solicitor, U.S. Department of Labor, Washington, DC 20210, (202) 523-8658 or (202) 523-9595, respectively. For matters concerning Executive Order 12291, the Regulatory Flexibility Act or the Paperwork Reduction Act, contact Gary Hendricks, Office of Policy, Planning and Research, Pension and Welfare Benefits Administration, (202) 523-7933. These are not toll free numbers.

Background

*I. History of the Regulation*

On January 8, 1985, the Department of Labor (the Department) published a notice in the Federal Register containing a proposed regulation that would characterize the assets of certain entities in which plans invest as including plan assets, with the result that the managers of those entities would be considered "fiduciaries" subject to the fiduciary responsibility provisions of ERISA.[FN1] The notice gave an opportunity for interested persons to comment on the proposal.

FN1 Proposed regulation 29 CFR 2510.3-101 (50 FR 961). That document also

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

gave notice of withdrawal of a previously proposed regulation (45 FR 38084, June 6, 1980) and the withdrawal of most of the provisions of another previously proposed regulation (44 FR 50363, August 28, 1979) both of which dealt with the definition of plan assets. The Department also noted that the regulation, if adopted, would contain a revision and clarification of Interpretive Bulletin 75-2 (29 CFR 2509.75-2).

On February 15, 1985, the Department published a notice in the Federal Register containing an amendment modifying the effective date provision of the proposed regulation.[FN2]

FN2 50 FR 6362.

A public hearing on the proposal was held in Washington, DC, on May 6, 7 and 8, 1985 at which time more than 45 commentators made oral presentations. At the conclusion of the hearing, the record in the proceeding was held open until June 30, 1985, in order to permit the filing of additional submissions.[FN3]

FN3 Transcript of Hearing for May 8, 1985, at 110.

The Department has received more than 700 letters of comment regarding the proposal. The final regulation has been substantially revised in response to the comments received and the testimony at the public hearing.

The following discussion summarizes the proposed regulation and the major issues raised by the commentators and explains the Department's reasons for adopting the final regulation that is published with this notice.

*II. Overview of the "Plan Assets" Issue*

The proposed plan assets regulation described the circumstances under which the assets of an entity in which a plan invests will be considered to include "plan assets" so that the manager of the entity would be subject to the fiduciary responsibility rules of ERISA. Under ERISA, persons who exercise discretionary authority or control over the assets of a plan or who provide investment advice for a fee with respect to such assets are "fiduciaries" subject to the fiduciary responsibility provisions of the Act.[FN4] Thus, identifying a plan's assets is a critical step in identifying plan fiduciaries. Moreover, the fiduciary responsibility provisions of ERISA include prohibited transaction provisions which restrict the manner in which fiduciaries may deal with the assets of a plan.[FN5] In general, a fiduciary may not use the assets of a plan to engage in transactions with "parties in interest" to the plan or plans for which he is acting.

FN4 See section 3(21) of ERISA.

FN5 See section 406 of ERISA. The prohibited transaction provisions of ERISA are complemented by section 4975 of the Code which imposes an excise tax on disqualified persons who engage in prohibited transactions.

In ERISA, the term "fiduciary" is defined broadly and in functional terms. Fiduciary status is determined with reference to a person's activities with respect to a plan; it does not depend upon any formal undertaking or agreement.[FN6] In the Department's view, there are many situations where a plan, although nominally investing its assets in a separate entity, is as a practical matter retaining the persons who manage the entity to provide investment management services for the plan. For example, some institutional managers— such as banks and insurance companies—have traditionally pooled the assets of several plans for purposes of collective investment, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 FR 41262-01, 1986 WL 116042 (F.R.)

plans typically participate in such a fund by acquiring investment units evidencing an interest in the fund. More recently, limited partnerships have been used as devices for the collective investment of plan assets.

> FN6 See H.R. Rep. No. 1280, 93d Cong., 2d Sess., 323 (1974) (the Conference Report).

Although ERISA does not explicitly define what constitute "plan assets", it does deal specifically with certain kinds of collective investment arrangements. Section 401(b)(1) of ERISA provides that, in the case of a plan which invests in any security issued by an investment company registered under the Investment Company Act of 1940, the assets of the plan will be deemed to include such security, but will not, solely by reason of the plan's acquisition of the security, be deemed to include any assets of the investment company.[FN7] Similarly, section 401(b)(2) of ERISA provides that when a plan acquires a "guaranteed benefit policy" from an insurance company, the assets of the plan include the policy, but do not include any of the underlying assets of the insurance company issuing the policy.

> FN7 The Conference Report indicates that this statutory exclusion was included in ERISA in view of the existence of regulation under the Investment Company Act and because interests in registered investment companies must be widely held. Conference Report at 296. Section 3(21)(B) of ERISA also indicates that neither a registered investment company, its investment adviser nor its principal underwriter is deemed to be a fiduciary by reason of a plan's investment in the investment company, except insofar as such investment company or its investment adviser or principal underwriter acts in connection with an employee benefit plan covering employees of such company, adviser or underwriter.

ERISA also includes provisions which indicate that the underlying assets of certain kinds of collective funds do **\*41263** include "plan assets."[FN8] Thus, the Act contains special reporting and disclosure provisions where some or all of the assets of a plan are held in an insurance company separate account or a bank common or collective trust fund.[FN9] In addition, the legislative history accompanying ERISA clearly indicates that the assets of such traditional investment funds should be considered "plan assets" subject to the fiduciary responsibility rules of the Act.[FN10]

> FN8 In such case, a plan's assets would include its interest in the fund and an undivided interest in each of the underlying assets of the fund.

> FN9 Section 103(b)(3)(G) of the Act.

> FN10 "[I]nsurance companies are to be responsible under the general fiduciary rules with respect to assets held under separate account contracts and the assets of these contracts are to be considered as plan assets . . ." Conference Report, at 296. "The conferees understand that it is common practice for banks, trust companies and insurance companies to maintain pooled investment funds for plans. . . . Banks, etc. that operate such pooled investment funds are, of course, plan fiduciaries."Conference Report, at 316.

In the Department's view, it would be unreasonable to suppose that Congress intended that the protections of the fiduciary responsibility provisions of the Act which are applicable where a plan directly retains a manager of its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 FR 41262-01, 1986 WL 116042 (F.R.)

investments would not be applicable where the manager is retained indirectly through investment by the plan in a collective investment fund. It would also appear to be inconsistent with the broad functional definition of "fiduciary" in ERISA if persons who provide services that would cause them to be fiduciaries if the services were provided directly to plans are able to circumvent the fiduciary responsibility rules of the Act by the inter-position of a separate legal entity between themselves and the plans (for example, by providing services to a limited partnership in which plans invest). However, neither ERISA itself nor the legislative history of the Act provides a clear indication of the extent to which the fiduciary responsibility provisions of the Act are intended to apply when a plan invests in another entity which may be a vehicle for collective investment of plan funds. In developing a regulation to address this issue the Department has taken into account the public comments on the proposed regulation and the testimony at the public hearing, the express statutory provisions of ERISA, the relevant legislative history and the existing federal regulatory structure applicable to entities in which plans invest.

*III. Description of the Proposed Regulation*

In order to determine when an investment is an arrangement for the indirect provision of investment management services, the proposed regulation established a "look-through" rule pursuant to which a plan would, in cases where the rule applies, be considered to have acquired an interest in the underlying assets of an entity in which it invests so that the assets of the entity would include "plan assets." To define the scope of the look-through rule, the proposed regulation also established a series of exceptions to the rule. The proposed regulation reflected a general policy determination that the fiduciary responsibility provisions of the Act should apply to an entity in which a plan invests only if: (1) The plan's investment is such that it has an opportunity to participate in the earnings of the entity; (2) the entity itself is an investment fund; and (3) there is some indication that interests in the entity are offered especially to plans. Although, as discussed below, the Department has made several modifications to the regulation in response to the comments received, this general policy approach is reflected in the final regulation.

The first exclusion in the proposed regulation was for plan investments that are not "equity interests". This exclusion reflected a determination that only those investments which provide a plan with an opportunity to share in the success or failure of the entity to which the investment relates are likely to be vehicles for the indirect provision of investment management services. Under the proposal, "equity interests" were defined generally as interests in an entity other than instruments which are treated as indebtedness under local law and which have no substantial equity features.

The second exclusion was for "publicly-offered" securities, that is securities that are registered under the federal securities acts and which are widely-held and freely transferable. The exclusion did not extend to securities that are offered primarily to tax exempt investors.

The third exclusion was for entities in which there was no "significant" plan investment. This exclusion was intended to deal with investments in entities in which there has been no special solicitation of plan investors. Under the proposal, plan investment was "significant" if ERISA plans and certain other kinds of benefit plans own more than 20 percent of any class of outstanding equity interests in an entity.

The fourth exclusion related to "operating companies"—companies that are primarily engaged in the production or sale of a product or service other than the investment of capital. The proposal also specifically described certain "real estate operating companies" and "venture capital operating companies" which were treated as operating companies.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The proposed regulation also provided that the assets of certain entities would always include "plan assets." These included bank collective trust funds, most insurance company separate accounts and entities that are wholly owned by plans. The proposal also provided that the assets of entities, other than insurance companies licensed to do business in a state, that are established for the purpose of providing benefits to participants of investing plans would include plan assets. This provision was intended to apply primarily to so-called "multiple employer trusts."

As proposed, the plan assets regulation would have been effective 90 days after it was published in final form. Under a transitional rule, however, the regulation would not apply to entities which accepted no new plan investments after June 30, 1986.

The Final Regulation

*I. The Look-Through Rule for Plan Investments*

A. Comments on the General Approach of the Regulation

Several persons who submitted comments on the proposed regulation suggested that the Department should not establish any look-through rule with respect to plan investments in other entities. These commentators indicated that, in their view, references in ERISA to the "assets" of a plan should in all cases be considered to refer to a plan's investment and not to the underlying assets of the entity in which it invests. Some of the commentators suggested that the Department does not have the authority to issue a regulation characterizing the assets of a separate legal entity in which a plan invests as "plan assets". Even assuming that the Department has this authority, the commentators stated, there is no sufficiently compelling policy reason for adopting a look-through rule. With respect to these points, the commentators pointed out that the Department recognized, in its Interpretive Bulletin 75-2, that the assets of an entity in which a plan invests *41264 generally are not "plan assets".[FN11] According to the commentators, the Interpretive Bulletin is a correct and proper interpretation of ERISA, and the Department should not depart from that rule.

FN11 29 CFR 2509.75-2.

Other commentators suggested that even if the Department adopts a look-through rule, different standards should be applied in determining when that rule is applicable. Several of these commentators urged the Department to adopt a rule based solely upon the degree of plan investment in an entity. Under the rule suggested by the commentators, the assets of an entity in which a plan invests would include plan assets only if aggregate plan investment exceeds a specified percentage of total investment in the entity (such as 80 percent) or only if aggregate plan investment in the entity exceeds some lesser percentage (such as 50 percent) and one plan or group of related plans holds more than 10 percent of the aggregate outstanding investments in the entity. Finally, some commentators suggested that the look-through rule should apply only where a single plan or group of related plans owns more than a specified percentage of the outstanding equity interests in an entity.

B. The Final Regulation

As noted above, the final regulation adheres to the general approach of the proposed regulation although a number of specific changes have been made.

In the Department's view, the regulation is necessary for several reasons. First, in the absence of a regulation it

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

would be relatively easy for an investment manager to avoid compliance with the fiduciary responsibility provisions of ERISA by indirectly providing investment management services to plans through a separate legal entity. This result would be inconsistent with the broad, functional definition of fiduciary in ERISA as well as Congress's intention that fiduciary status should be imposed on all persons conducting certain specified activities on behalf of plans rather than merely on those who expressly agree to be fiduciaries.

Second, since many collective investment arrangements—such as limited partnerships—allow realization of economies of scale, they are often especially suited for the purposes of smaller plans. Moreover, testimony at the public hearing on the proposed regulation indicated that the traditional forms of collective investment specifically addressed in ERISA—bank collective trust funds and insurance company separate accounts—are generally available only to larger plans. Thus, if other forms of collective investment that are suitable for small plans are not subject to the fiduciary responsibility rules of ERISA, the full protections of those rules would be available for larger plans, but would not be available for smaller plans.

Third, although the legislative history and the statute itself provide specific guidance regarding the application of the fiduciary responsibility rules to certain traditional forms of collective investment, they do not describe how those rules should apply to other forms of collective investment. Thus, if the Department does not adopt a regulation, uncertainty about the scope of the fiduciary responsibility rules will persist until such time as the issue is settled in litigation. This uncertainty would, in the Department's view, be detrimental to plans as well as to persons marketing investments to plans.

The Department also believes that the general approach of the proposed regulation, which takes into account the nature of the plan's investment, the nature of the entity to which the investment relates, and the nature of other investors, is the most appropriate way of distinguishing investments that are vehicles for the indirect provision of investment management services from those that are not. In this respect, the Department has concluded that, although the degree of plan investment in an entity is relevant to a determination whether the underlying assets of an entity include plan assets, that factor alone should not be dispositive.

Finally, the Department believes that it has authority under ERISA to promulgate the final regulation set forth here.[FN12]

> FN12 The Department notes that not only does section 505 of ERISA contain a broad grant of rulemaking authority, but that in section 11018(d) of Pub. L. 99-272 Congress has expressly instructed the Department to issue a final regulation defining "plan assets" by December 31, 1986.

*II. Scope of the Regulation*

A. The Proposed Regulation

The proposed regulation described what constitute "plan assets" with respect to a plan's investment in another entity for purposes of Subtitle A (definitional and coverage provisions) and Parts 1 and 4 (reporting and disclosure and fiduciary provisions) of Subtitle B of Title I of ERISA and for purposes of section 4975 of the Internal Revenue Code (excise tax provisions relating to prohibited transactions).[FN13] Since it applied to the prohibited transaction provisions of the Code as well as Title I of ERISA, the proposed regulations would have affected not only investments by plans that are subject to Title I (Title I plans), but also investments by plans that are not subject to Title I, but which are described in section 4975 of the Code.[FN14] These plans include

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

primarily individual retirement accounts (IRAs) and certain plans which are qualified for favorable tax treatment under the Code that cover only self-employed individuals.

FN13 Thus, as discussed in the preamble to the proposed regulation, the regulation is not relevant to "minimum standards" issues, such as matters relating to vesting and funding. With respect to the reporting and disclosure provisions of ERISA, the Department recognized that special difficulties are presented in reporting transactions involving collective investment funds whose assets include plan assets and therefore published a proposed alternative method of compliance for such entities (proposed regulation 29 CFR 2520.103-12 (50 FR 3362, January 24, 1985)). As discussed below, the Department is also publishing this regulation in final form in today's Federal Register.

FN14 Section 102 of Reorganization Plan Number 4 of 1978 (43 FR 47713, October 17, 1978), effective December 31, 1978 (44 FR 1065, January 3, 1979), transferred the authority of the Secretary of the Treasury to issue regulations under most provisions of section 4975 of the Code, including those provisions to which the definition of the term "plan assets" is relevant, to the Secretary of Labor.

B. Comments Received

The Department received several comments which expressed concern about the effect that the proposed regulation might have on investment opportunities for IRAs. In addition, several commentators raised questions regarding the extent to which the regulation should apply to plans other than Title I plans. In this respect, some commentators and a witness at the public hearing on the proposal emphasized that investment decisions with respect to IRAs are generally made by the persons for whom the accounts are established and that these investments thus differ substantially from those typically made by employer-sponsored plans. Finally, one commentator urged the Department to clarify whether the reference to "plan" in paragraph (a)(2) of the proposal refers to "benefit plan investors" (which include certain plans that are not subject to either Title I of ERISA or section 4975 of the Code) or only to plans described either in Title I of ERISA or in section 4975(e)(1) of the Code.

C. The Final Regulation

The final regulation will apply to determinations of what constitute "plan *41265 assets" for all purposes under the definitional provisions of ERISA and parts 1 and 4 of Title I of ERISA and section 4975 of the Internal Revenue Code. Thus, it will apply to investments made by IRAs and other plans described in section 4975(e)(1) of the Code in addition to plans that are subject to the requirements of Title I of ERISA. The Department has determined that, even though there may be differences between IRAs and Title I plans that affect the kinds of investments made by such plans, there is a need for consistent application of the prohibited transaction rules of ERISA and the related excise tax provisions of the Code. In this respect, it appears clear that Congress intended that the prohibited transaction excise tax provisions would not only operate to discourage the direct or indirect use of the assets of an IRA for purposes unrelated to retirement needs, but that they also would apply to transactions involving persons who are fiduciaries by reason of providing investment management services to such accounts.[FN15] Although, as noted above, most of the Department of the Treasury's authority under section 4975 of the Code has been transferred to the Department, the Department has consulted with the Department of the Treasury regarding the scope of the final regulation.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN15 Congress expressly made prohibited transactions with respect to certain plans that are not covered by Title I of ERISA subject to the excise tax imposed by section 4975. Moreover, section 4975 expressly distinguishes between prohibited transactions that benefit beneficiaries of IRAs and those that do not: Section 408(e)(2)(A) and section 408(e)(4) of the Code provide that an individual retirement account will lose its tax exempt status if any of the assets of the account are used to engage in a prohibited transaction for the benefit of an individual who has established an account or who is a beneficiary of the account, and section 4975(c)(3) of the Code provides for the abatement of the excise tax that would otherwise be imposed with respect to such a prohibited transaction. No similar abatement is provided for other kinds of prohibited transactions involving IRAs, however.

*III. Definition of Equity Interest*

A. The Proposed Regulation

Under the proposed regulation, the assets of a plan would not have included an interest in the assets of an entity in which it invests unless the plan acquires an "equity interest" in the entity. Paragraph (b)(1) of the proposal stated that the term "equity interest" means any interest in an entity "other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features." That paragraph also provided that a profits interest in a partnership, an undivided ownership interest in property and a beneficial interest in a trust would be treated as equity interests.

The preamble to the proposal indicated that, while the question whether a plan's interest is an "equity interest" is an inherently factual one, an instrument will not fail to be a debt instrument merely because it has certain equity features—such as additional variable interest and conversion rights—that are incidental to the primary fixed obligation. In addition, an example in the proposal indicated that a plan would not acquire an "equity interest" at the time that it purchases a convertible debenture if the conversion feature is incidental to the primary obligation to pay principal and interest. However, the example also indicated that the plan would acquire an "equity interest" at the time that it exercises its option to convert the debenture to stock of the issuing corporation.

B. Discussion of Comments and the Terms of the Final Regulation.

1. Applicable Law. Several commentators noted that the proposal did not specify which state's law would control with respect to a determination whether a plan has invested in a debt instrument. One commentator indicated that the law of the state in which the entity is formed should control. Some commentators suggested that the exclusion in the regulation should apply to any instrument that is treated as indebtedness under local law, regardless of the extent to which the instrument has equity features.

—The Final Regulation

The reference to local law in the definition of equity interest in the final regulation is the same as the reference in the proposal. In the Department's view, the reference to local law provides an initial frame of reference for determinations whether an interest is indebtedness. With respect to the question of which law applies for purposes of determining whether an instrument is treated as indebtedness under "applicable local law," the Department intends that such determinations should be made under the law governing questions regarding interpretation of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

instrument.

2. Substantial Equity Features. Some commentators requested that the Department provide a more meaningful explanation of when certain equity features will be considered "incidental" to the primary fixed obligation for purposes of the definition of equity interest. Several commentators specifically requested additional guidance regarding how the "substantial equity features" element of the definition would apply to hybrid investments. One commentator suggested that the Department include a list of common equity features in the final regulation and provide in the regulation that the existence of any two of these features would constitute "substantial equity features". However, other commentators acknowledged that it is extremely difficult to characterize accurately an instrument that has both debt and equity features. Nonetheless, these commentators suggested that some certainty could be provided in this area if the Department established safe harbors under which certain hybrid instruments would not be considered "equity interests." Some commentators advocated a safe harbor based on the approach taken in the regulations proposed by the Department of the Treasury under section 385 of the Code, i.e., that the instrument be characterized as debt or equity according to its predominant characteristic. [FN16] One commentator suggested an alternative safe harbor for hybrid instruments which are considered "indebtedness" under state law and which have an effective annual interest rate on the fixed obligation portion equal to at least 60 percent of the current "applicable federal rate" under section 1274(d) of the Code. [FN17] Another commentator proposed a safe harbor for hybrid instruments which contain certain characteristics typical of many securities offered by real estate firms. Finally, one commentator requested that the text of the regulation should state explicitly the principle established in the example discussed above, i.e., that the mere presence of a conversion right which is incidental to the primary fixed obligation does not create an "equity interest" until such a right is exercised.

> FN16 Formerly 26 CFR 1.385-1—1.385-10 (adopted December 29, 1980 and withdrawn August 8, 1983).

> FN17 Section 1274 of the Code establishes rules for imputing a rate of interest to certain debt instruments; the "applicable Federal rate" is one element in making such a determination.

—The Final Regulation

The Department has decided not to modify the regulation to specify more precisely when equity features of a debt instrument become "substantial". As demonstrated by the comments on this issue, there are a vast number of different kinds of equity features, each of which provide investors with different opportunities to participate in the earnings of an entity. Thus, whether any particular investment has substantial equity features is an inherently factual question that must be *41266 resolved on a case-by-case basis. In making such a determination, however, it would be appropriate, in the Department's view, to take into account whether the equity features of an instrument are such that a plan's investment in the instrument would be a practical vehicle for the indirect provision of investment management services. Nonetheless, as reflected in the definition of equity interest, the Department has concluded that the mere fact that a debt instrument has some equity features does not require characterization of the instrument as an equity interest.

3. Timing. A number of comments addressed the issue of when a determination should be made that a particular instrument is debt or equity. Several commentators expressed concern with the implication in the proposal that characterization of an instrument as debt or equity might change over time. One commentator advocated that a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

determination of the character of an instrument be made at the time of its initial issuance. Another commentator suggested that the characterization of an instrument at the time of issuance should control unless a significant change is made to the terms of the instrument itself. Other commentators suggested that a determination of whether an instrument creates a debt or equity interest should be made at the time of the plan's investment.

—The Final Regulation

The definition of equity interest in the final regulation in effect provides that characterization of an instrument as debt or equity is made continuously during a plan's holding of the instrument. Thus, for example, if a plan acquires an instrument which is debt at the time of acquisition, but due to changing market conditions the equity features become significant, the instrument would then be characterized as an "equity interest." This approach will provide for uniform treatment among plan investors, because the characterization given a particular class of securities will not be different for different plan investors depending solely on when the plans happened to make the investment, and will assure that plans' holdings of instruments that provide a significant opportunity to participate in the earnings of the issuer will be tested under the other rules in the regulation in order to determine whether the investments are vehicles for the indirect provision of investment management services.

*IV. The "Publicly-Offered" Exception*

A. The Proposed Regulation

As noted above, the look-through rule in the proposed regulation would not have applied in the case of a plan's investment in "publicly-offered" securities. Thus, the managers of an issuer of publicly-offered securities would not have been considered ERISA fiduciaries solely by reason of a plan's acquisition of such securities.

Paragraph (b)(2) of the proposed regulation defined "publicly-offered securities" as securities which are widely-held, freely transferable, and part of a class of securities registered pursuant to section 12(b) or 12(g) of the Securities Exchange Act of 1934, or sold to a plan from a public offering pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is subsequently registered under the 1934 Securities Act. The proposal also indicated that a security would not be publicly-offered if it is part of an offering that is directed primarily to tax-exempt entities. The Department indicated in the preamble to the proposal that, although a determination whether a security is offered primarily to tax-exempt entities would be made on a case-by-case basis, a security would be considered to be offered primarily to such entities if it is subject to restrictions on transfer that result, or are likely to result, in the security being acquired primarily by tax-exempt entities, or if the disclosure materials relating to the offering indicate that the investment is intended primarily for such entities.

With respect to the "free transferability" requirement, the Department stated in the preamble to the proposal that the extent to which any particular restriction affects the free transferability of a security is a factual question to be resolved on a case-by-case basis.

B. Discussion of Comments and the Terms of the Final Regulation

1. "Primarily to Tax Exempt Investors" Limitation. The limitation to the publicly-offered exception that made the exception unavailable in the case of offerings primarily to tax-exempt investors was the single most controversial provision of the proposal, and a large number of commentators urged the Department to delete the limitation. These comments were made principally by sponsors of real estate limited partnerships designed especially

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

for plan investors and by certain real estate investment trusts (REITs).

The commentators argued that public real estate partnerships are sufficiently different from traditional pooled investment funds in which plans participate that plan investments in such partnerships should not be considered the functional equivalent of retaining the general partner to provide investment management services. Moreover, the commentators described at some length the scope of regulation of public real estate partnerships under federal and state securities laws. These commentators contended that widely-held, freely transferable securities issued by public real estate partnerships are similar to equity securities issued by registered investment companies, the underlying assets of which are not treated as plan assets under ERISA.[FN18]

> FN18 See section 3(21)(B) and 401(b)(1) of ERISA, discussed above.

The commentators also argued that if the underlying assets of a publicly-offered real estate partnership are considered to include plan assets, and if managers of public real estate partnerships are treated as ERISA fiduciaries, it would be extremely difficult, if not impossible, for many partnerships with large numbers of plan investors to comply with the ERISA prohibited transaction rules. In this respect, the commentators noted that, due to the high minimum investment requirements for participation in bank and insurance company pooled real estate vehicles, REITS and public real estate partnerships are the primary means by which small and medium sized plans invest in real estate.

Most of the commentators urged the Department to delete the "primarily to tax-exempt investors" limitation entirely so that the publicly-offered exception would be available for securities offerings directed particularly to plans. Some commentators also suggested, however, that if a limitation to the publicly-offered exception were retained in the final regulation, it should apply only to offerings made primarily to Title I plans.

—The Final Regulation

The Department has deleted the primarily offered limitation from the publicly-offered exception in the final regulation. Thus, the assets of an entity whose securities are widely-held, freely transferable and registered under the federal securities acts would not include plan assets even where those securities are offered primarily, or even exclusively, to plans. Consequently, the managers of such entities would not be ERISA fiduciaries merely because there is plan investment in the entity.

*41267 The primary basis for the proposed publicly-offered exception was to prevent the regulation from operating to create inadvertent ERISA fiduciaries. The manager of a publicly-offered entity typically is not able to control plan investment in the entity and often is not readily able to determine whether a particular investor is, or is not, a plan. In these circumstances, the Department concluded that it would be inappropriate to impose fiduciary responsibility on the entity's managers—even where the entity is an investment fund—merely because plans happen to invest in the entity.[FN19]

> FN19 See the discussion of the similar publicly-offered exception in the Department's 1979 plan assets proposal (44 FR 50364-5, August 28, 1979).

The limitation to the publicly-offered exclusion in the 1985 proposal was based on the Department's conclusion that, where a securities offering in an investment fund is made especially to plans, the primary rationale for the publicly-offered exception would not be applicable because the issuer of securities that are offered primarily to plans cannot be said to have "inadvertently" assumed fiduciary responsibilities that might result from plan in-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 FR 41262-01, 1986 WL 116042 (F.R.)

vestment. Based on the comments received concerning the limitation, however, the Department has reexamined the role of the publicly-offered exception.

In deciding to delete the limitation, the Department has considered the existing federal regulatory structure relating to companies that invest and reinvest capital. In enacting the Investment Company Act of 1940, Congress created a system of substantive federal regulation for companies that invest in securities, but did not extend such regulation to companies that invest in property other than securities. Thus, although publicly-offered securities of companies which invest in property other than securities (such as real estate) are subject to the disclosure-oriented Securities Act of 1933 and Securities Exchange Act of 1934, these companies generally are not subject to substantive federal regulation of their business activities. Congress specifically recognized that the Investment Company Act would result in such differing regulatory treatment. In this respect, the legislative history of the Investment Company Act indicates that Congress found that investment funds consisting of securities are particularly susceptible to abuse because securities are typically highly liquid investments.[FN20] Moreover, the staff of the Securities and Exchange Commission has recognized this distinction several times in expressing opinions regarding the scope of the Investment Company Act.[FN21]

> FN20 See H.R. Rep. No. 2639, 76th Cong., 3d Sess. 7 (1940).

> FN21 See, e.g., Merrill, Lynch, Pierce, Fenner & Smith Inc., [1982] Fed. Sec. L. Rep. (CCH) 77,089 at 77,750 (October 5, 1981).

As discussed above, the Department has concluded that the plan assets regulation is essential in order to protect fundamental principles under the fiduciary responsibility provisions of ERISA and to implement Congress's intent in enacting ERISA. In formulating the final regulation, however, the Department has also taken into account Congressional decisions implementing other federal policies. In the Department's view, it would be inappropriate, in the absence of compelling reasons for doing so, to take a regulatory position here which would disrupt the Congressional balancing of policy interests that is reflected in the federal securities laws. Thus, the Department has balanced the apparent need to apply the fiduciary responsibility provisions of ERISA to the issuers of publicly-offered securities against the intrusion on other federal regulatory policies that would result from such application. In this respect, it appears that, although public offerings have been developed which take into account the particular investment needs of plans, there is no clear indication that plan investments in such offerings have on the whole operated to the detriment of the investing plans or their beneficiaries.[FN22]

> FN22 In individual cases, a plan's investment in publicly-offered securities of companies which invest in property other than securities (which are thus not regulated by the Investment Company Act of 1940) might result in losses to the plan and in some cases such losses may be attributable to the misconduct of the manager of the entity to which the securities relate. The Department, however, has not identified the kind of pattern of abuse that would provide a sufficiently compelling reason for applying a look-through rule to plan investments in such securities. Of course, if such a pattern of abuse were to develop, the Department would need to reexamine its conclusions.

Accordingly, the Department has determined that the benefits of extending the ERISA fiduciary responsibility rules to the managers of issuers of such securities are outweighed by the disruption of other federal regulatory policies which would result from such a rule.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Department also believes that the "widely-held" and "freely transferable" requirements under the publicly-offered exception will provide plan investors two significant protections: (1) The ability to liquidate an unattractive investment; and (2) diminution of concentration of ownership in any one investor due to the large number of investors in the entity so that it will be less likely that the entity's managers will engage in transactions for the benefit of persons related to any particular investor.

The Department also notes that investing plan fiduciaries have a duty to carefully evaluate plan investments in publiclyoffered securities that are issued by entities that are similar to investment funds. A plan fiduciary is obligated under ERISA to consider all relevant information in making investment decisions.[FN23] Thus, whether the underlying assets of an entity include "plan assets" is one factor that a plan fiduciary should consider in making a decision to invest in an entity.

FN23 See 29 CFR 2550.404a-1(b)(1).

2. The Widely-Held Requirement. Some commentators also suggested that the final regulation clarify the term "widely-held" as it is used in the publicly-offered exception. In general, these comments stated that the Department should include in the final regulation a statement made in the preamble to the 1979 plan assets proposal to the effect that interests in an entity ordinarily will be considered "widely-held" if they are held by 100 or more persons. Commentators on behalf of REITs particularly stressed this point, noting that under section 856 of the Internal Revenue Code a REIT must have 100 or more investors to qualify for favorable tax treatment. Other commentators suggested that the "widely-held" requirement be replaced by a limitation on the amount of the outstanding interests in an entity that could be held by any single investor (for example, 5 percent). According to the commentators, this test would assure that no plan investor would be able to exercise a controlling influence over the entity's management.

—The Final Regulation

In the final regulation, the Department has provided a more precise definition of the term "widely-held" as it is used in the publicly-offered exception. Under the final regulation, securities will be considered "widely-held" only if they are part of a class of securities purchased and held by 100 or more persons who are independent of the issuer and of one another.[FN24] This bright line test was chosen to provide as much clarity and certainty as possible. The requirement that the investors be independent of each other and the *41268 management of the entity to which the investment relates will assure that this aspect of the publicly-offered exception will not be subject to manipulation, for example, by the issuance of securities to affiliates of the issuer or to small groups of related investors.

FN24 Securities will not, however, be considered to fail this test if subsequent to issuance, events beyond the issuer's control cause the securities to be held by fewer than 100 independent investors.

3. The Free Transferability Requirement. A number of commentators also urged that the Department either eliminate the free transferability element of the publicly-offered exception or that it specifically indicate that customary restrictions on the transfer of limited partnership and REIT interests will not cause those interests to fail to meet the requirement. In general, the commentators suggested that the Department indicate that four categories of restrictions would be permissible. These included restrictions necessary to comply with: (1) Applicable federal or state securities laws; (2) federal or state tax law; (3) state partnership laws; or (4) reasonable administrative processing needs.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Public real estate partnerships and REITs also specifically requested that the Department make it clear that the existence of a right of first refusal will not cause a security to fail to be freely transferable. In the case of partnerships, the commentators noted, a right of first refusal (i.e., a requirement that an issuer be provided an opportunity to acquire securities that an investor wishes to sell before they may be sold to another party) is a useful way of preventing the premature termination or liquidation of the partnership for tax purposes; the commentators also indicated that in the case of REITs, a right of first refusal helps assure that the REIT will not lose its qualification for favorable tax treatment under section 856 of the Code.

Some commentators also suggested that the final regulation should provide that the free transferability requirement is met if investors have the ability to freely assign the economic benefits of ownership of securities even though the original investor retains legal title to the securities.

The commentators also noted that REITs and public real estate partnerships frequently require prior approval by a general partner or other co-investors as a condition to transfer of a limited partnership interest. The commentators indicated that this kind of restriction, as well as suitability standards for potential transferees, aid REITs and limited partnerships in meeting requirements under state and federal tax and securities laws, and they urged the Department to make it clear that such requirements would not affect the free transferability of securities.

Some commentators also requested that the final regulation make it clear that reasonable administrative fees could be imposed with respect to the transfer of securities without affecting the free transferability of the securities.

—The Final Regulation

In general, the Department has concluded that a determination whether a security is considered freely transferable is a factual one to be made on the basis of the circumstances of each case. Nonetheless, because the comments demonstrate that many federal and state requirements exist which might be considered to affect the "free transferability" of a security, the Department has also determined that some additional clarification is necessary. In the opinion of the Department, the minimum amount which can be purchased by an investor is a characteristic of a securities offering which will frequently affect the ability of an investor to liquidate his investment. For example, where the amount of the minimum investment is relatively low, the securities which are the subject of the offering are more likely to be widely distributed and it is more likely that the securities can be easily liquidated. Conversely, where the amount of the minimum investment is relatively high, there are likely to be more limited opportunities to dispose of the securities.

Based on the information submitted by commentators, the Department has concluded that where a minimum investment in a public offering is $10,000 or less, the securities in question are likely to be widely distributed. Thus, although a determination whether securities offered in a public offering in which the minimum investment is $10,000 or less are freely transferable is ultimately a factual question under the final regulation, paragraph (b)(4) contains a list of eight types of permissible restrictions which ordinarily will not, alone or in combination, affect a finding that such securities are freely transferable. These permissible restrictions are derived from the special transitional rule for publicly-offered real estate companies in Public Law 99-272.[FN25] The enumerated restrictions include restrictions necessary to permit partnerships to comply with applicable federal and state laws, to assure favorable treatment under federal or state tax law, and to meet reasonable administrative processing needs. Thus, the final regulation in effect establishes a presumption that securities will be considered freely transferable, notwithstanding the existence of the enumerated restrictions, where they are part of an offer-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing in which the minimum investment is $10,000 or less.[FN26]

> FN25 Section 11018(a) of Pub. L. 99-272, in effect establishes an effective date provision for the final plan assets regulation to the extent that it would characterize the assets of publicly-offered real estate entities as including plan assets. This provision is discussed in more detail below.

> FN26 On the basis of the record, it appears to the Department that the offering value of minimum investment units of widely distributed collective investment vehicles is $10,000 or less. Thus, with regard to those collective investment vehicles with minimum investment units valued within this range, the Department has determined that a plan's ability to dispose of its investment would not, in general, be greatly affected by the permissible restrictions listed in paragraph (b)(4).

In those cases where the minimum investment exceeds $10,000, whether a security is freely transferable will be determined under the final regulation based on all the relevant facts and circumstances. In such cases, the minimum investment restriction as well as any other type of restriction applicable to a security should be considered in determining whether the security is freely transferable. The Department emphasizes, however, that the existence of the kinds of restrictions on transfer that fit within one or more of the specific categories discussed above would not necessarily result in a determination that securities are not freely transferable, even where the minimum permitted investment in the securities exceeds $10,000. However, the presumption that such restrictions do not affect the free transferability of the securities would not be available in these circumstances.

The Department believes these rules will allow publiclyoffered entities to meet certain federal and state requirements while still assuring that the publicly-offered exclusion in the final regulation will only apply to securities which in fact provide a plan investor a reasonable opportunity to liquidate its investment.

*V. The Significant Participation Exception*

A. The Proposed Regulation

Under the proposal, the underlying assets of an entity in which a plan invests would have included plan assets only if equity participation in the entity by benefit plan investors is "significant." The proposal indicated that equity participation in an entity would be "significant" on any date if, immediately after the most recent acquisition of any equity interest in the entity, 20 percent or more of the value of any class of equity interests is held by "benefit plan investors". The proposal **\*41269** defined the term "benefit plan investor" to include: (1) Any employee pension or welfare benefit plan whether or not the plan is subject to Title I of ERISA; (2) any plan described in section 4975(e)(1) of the Internal Revenue Code; and (3) any entity whose underlying assets include plan assets by reason of plan investment in the entity.

The preamble to the proposed regulation indicated that the significant participation test was based on the Department's conclusion that where there is substantial plan investment in an investment fund there is an expectation on the part of the investing plans that the assets of the fund will be managed in furtherance of the objectives of the investing plans and that in such circumstances the manager of the fund is likely to take the objectives of the investing plans into account in making investment decisions for the fund.

Finally, equity interests in an entity held by any person who would be a fiduciary if the assets of the entity in-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

cluded plan assets (as well as any equity interests held by an affiliate of such a person) were disregarded for purposes of the significant participation test in the proposed regulation.

B. Discussion of Comments and the Terms of the Final Regulation

A number of commentators objected to various aspects of the significant participation test. In particular, they asserted: (1) That the definition of the term "benefit plan investor" was too broad; (2) that the 20 percent test for "significant" plan investment was too low; (3) that the degree of investment by plan investors changes constantly and cannot be controlled by an entity's management, and that, even in an initial offering, the manager of an entity may not know the degree of plan investment. The commentators also stated that the significant participation exception is especially important in cases involving private offerings which do not meet the "publicly-offered security" exception. These entities are primarily venture capital companies and certain real estate companies.

1. The 20 Percent Limitation. Several commentators suggested modification of the 20 percent figure used in the significant participation test. These commentators contended that 20 percent ownership of a class of equity securities by benefit plan investors is not sufficient to establish the existence of the two factors on which the test was predicated—i.e., special solicitation of plan investors and an expectation on the part of the plan investors that the assets of the entity will be managed in furtherance of their investment objectives.

The commentators stated that much of the nation's private capital is now concentrated in benefit plans and that, accordingly, it is quite possible that as much as 50 percent of an entity's equity capital may be provided by benefit plans without any special solicitation of such investors. Moreover, the commentators asserted that there is no reason to assume that a group of plan investors owning only 20 percent of an entity's outstanding securities will be able to influence the management of the entity. For these reasons, the commentators urged the Department to adopt a 50 percent test.

In addition, some commentators expressed the belief that even a 50 percent limitation would not necessarily be consistent with the underlying rationale for the exception. These commentators stated that where no single plan or group of related plans owns a large interest in an entity, benefit plan investment can be insignificant for purposes of influencing an entity's investment policies even where it is in excess of 50 percent of the aggregate investment in the entity. These commentators suggested that the final regulation should include two percentage tests related to plan investments: one relatively high percentage test which would be intended to identify cases where there has been special solicitation of plan investments by an entity's management and a smaller percentage limitation relating to individual plan investment to identify cases where a particular investor has the potential to influence the entity's business objectives.

Some commentators requested that the percentage test be applied on the basis of aggregate ownership of all classes of equity securities of a single entity rather than on a class by class basis.

Some commentators also objected to the exclusion of the value of equity interests owned by the entity manager (or its affiliates) in calculating whether there is significant plan investment in an entity. These commentators asserted that such an exclusion effectively lowers the percentage test, making it much more likely that there will be significant plan investment, without providing any additional evidence that the entity is managing its assets in furtherance of benefit plan investment goals.

—The Final Regulation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

In the final regulation, the Department has increased the threshold percentage for the significant participation test to 25 percent. Although this revision makes the "safe harbor" provided by the significant participation test available to entities in which there is a slightly greater degree of plan investment, the Department has retained the general approach of the proposal.

With respect to the comments urging a more substantial increase in the threshold percentage, the Department notes that the significant participation test was intended to provide a mechanical test which would permit entity managers and investing plans to more easily analyze the consequences under the regulation of an investment where characterization of the investment under other provisions of the regulation (such as the operating company exception) is unclear. The Department believes that such a safe harbor rule must be formulated narrowly in order to prevent its use as a method of evading the application of the fiduciary responsibility rules of ERISA. Thus, in the Department's view, the exception should apply only where plan investment is not so substantial that any special solicitation of plan investments is likely to have occurred and where there is no reasonable expectation that the investment policies of the entity will be affected by the special objectives of the plan investors.

The Department has also concluded that it is necessary to apply the significant participation test to each class of securities and to disregard investments by the entity's managers and their affiliates for purposes of applying the test. In the Department's view, without these restrictions the test could be easily manipulated so as to avoid a determination that plan investment is significant, even where plans provide a substantial degree of the entity's capital and constitute most of the outside investors in the entity. None of the comments suggested ways of avoiding this potential for manipulation.

2. Benefit Plan Investor Definition. Several commentators suggested that the Department should narrow the definition of "benefit plan investor" to include only Title I plans (or only plans subject to ERISA or the prohibited transaction provisions of the Code). These commentators argued that since Congress did not believe the protections of the fiduciary responsibility rules are necessary for plans that are not subject to Title I, it would be inappropriate for the Department to take non-covered plans into account in determining whether an entity holds plan assets. The commentators also noted that, in some circumstances, an entity has no means of determining whether an investor is a "benefit plan investor". In addition, *41270 some commentators suggested that different categories of benefit plan investors may not necessarily have similar investment goals. For example, according to the commentators, foreign plans which are included in the "benefit plan investor" definition, but are not subject to ERISA, might have different objectives than domestic plans.

—The Final Regulation

The Department has adopted the definition of "benefit plan investor" as it was proposed. In reaching this decision, the Department has considered two factors. First, as noted above, the safe harbor rule embodied in the significant participation test is intended to exclude only those entities in which plan investment is so insignificant that it is unlikely that such investment has been especially sought or that the investment objectives of the entity will be influenced by the plan investors. In the Department's view, a broad definition of benefit plan investor is necessary in order to avoid manipulation of the significant participation test. Although the specific investment objectives of different kinds of plans may vary, the Department has concluded that unless all kinds of plans are taken into account for purposes of the test, entity managers would be able to avoid ERISA fiduciary status by rationing investments to plans that are covered by ERISA and offering the remaining investments to other plans that are not covered. Thus, it has concluded that all benefit plan investments should be taken into account in determining whether aggregate investment by plans is more than incidental.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

With respect to the definition of benefit plan investor, the Department emphasizes that (as noted in the preamble to the proposed regulation) nothing in the regulation imposes responsibilities on fund managers with respect to plan investors that are not subject to ERISA or to the prohibited transaction provisions of the Code. Plan investors that are not subject to these statutes are merely taken into account for purposes of determining whether plan investment in the aggregate is "significant." This point is made clear in an example that was included in the proposed regulation and which is also included in the final regulation (see paragraph (j)(2) of the final regulation).

3. Timing of Calculations of Significant Plan Participation. Several commentators noted that since compliance with the significant participation test would be tested after each new investment, the test could operate in such a way that the consequences of a plan's investment in an entity for plan assets purposes might be affected by subsequent events. In this respect, the commentators contended that the proposal could create administrative burdens for the managers of investment vehicles because frequent changes in the degree of plan ownership could cause frequent changes in the entity's status under the plan assets regulation and because it would be difficult to determine whether an entity meets the requirements for the exception at any particular time.

The commentators suggested two possible changes to address the problems that might be created under the approach of the proposed regulation. First, some commentators suggested that determinations of significant plan investment should be made as of the most recent acquisition of any equity interest in an entity from an issuer or an underwriter. Second, some commentators suggested that determinations of significant plan investment should be made only once with respect to each plan investment in an entity, at the time of the plan's investment. Under this approach, an entity's managers would have fiduciary obligations only to plans that invest in the entity at times when aggregate plan investment exceeds the threshold percentage.

—The Final Regulation.—The Department has decided that the regulation should not be revised to permit determinations of significant participation less frequently than the proposal required, i.e., after each new investment. Such continual testing assures consistent treatment of all plan investors in an entity and provides for more accurate characterization of the degree of plan investment in an entity at a given time. The Department also notes that, because of the broad publicly-offered exception that has been included in the final regulation, interests in most of the entities for which the significant participation exception will be dispositive are privately-offered. It should be relatively easy for managers of a privately-offered entity to identify plan investors and to determine whether or not there is significant benefit plan investor participation in an entity. Thus, many of the practical problems of compliance that were identified by the commentators (most of which related to large, public offerings) would not exist under the final regulation.

The significant participation test is not intended to affect the consequences of a plan's investment in debt or publicly-offered securities. Thus, for example, if an investment fund issues a class of publicly-offered securities in which plans invest and issues a second class of equity securities in a private placement exclusively to plans, then the assets of the plans that acquired the privately-offered securities would include an interest in the underlying assets of the fund (because participation in the fund by benefit plan investors is significant since all of the private class of securities is held by plans). However, the assets of the plans that purchased the publicly-offered securities would consist only of those securities and would not include an interest in any of underlying assets of the issuer. Thus, the managers of the investment fund would be fiduciaries only with respect to the plans that purchased the privately-offered securities.

*VI. Operating Companies*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

A. In General

1. The Proposed Regulation. The proposed regulation also contained an exception to the look-through rule of the proposal for plan investments in "operating companies." This exclusion was intended to distinguish between companies that carry on an active trade or business, and which thus are not likely vehicles for the indirect provision of investment management services, from investment funds which may well serve as conduits for the provision of such services. Under the proposed regulation, the term "operating company" included any company that is primarily engaged, either directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital.

The proposal also contained definitions describing two specific kinds of operating companies: "venture capital operating companies" and "real estate operating companies". Venture capital companies and many real estate companies have characteristics of both operating companies and investment funds, and the specific definitions were intended to provide guidance in determining whether the operating company exclusion would be available for such companies.

2. Comments Relating to the General Operating Company Definition and Discussion of the General Definition in the Final Regulation. Most of the comments received by the Department with respect to the operating company exception raised issues with respect to venture capital operating companies and real estate operating companies. These comments are discussed below. *41271 However, several commentators urged the Department to clarify how companies engaged in various different kinds of businesses would be treated under the general operating company definition. These included comments filed on behalf of persons engaged in such activities as equipment leasing and oil and gas ventures.

—The Final Regulation

In general, whether a particular company is, or is not, an operating company under the final regulation is a factual question to be resolved taking into account the particular characteristics of the entity under consideration. As demonstrated by the comments, companies in which plans invest engage in a vast number of different activities. Although in most cases it is relatively easy to characterize an entity as either an operating company or an investment fund, some companies do carry on both kinds of activities. The Department has concluded, however, that, other than with respect to real estate companies and venture capital companies, it would be impractical to provide detailed guidance concerning the types of activities necessary for characterization as an operating company. Accordingly, the general operating company definition in the final regulation is the same as that in the proposal.

B. The Venture Capital Operating Company Exception

1. The Proposed Regulation. Under the proposed regulation, there were two elements to the definition of "venture capital operating company". First, at least 85 percent of the firm's assets (not including short-term investments) would have been required to be invested in "venture capital investments" or "derivative investments" (as defined in the proposed regulation). Second, a venture capital firm would have been required to actually exercise "management rights" in at least one of the portfolio companies in which it invests. The proposed regulation also indicated that whether an entity meets the 85 percent test is determined annually on a fixed date and that assets would be valued at their fair market value.

A "venture capital investment" was defined in the proposal as an investment in an enterprise with respect to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

which the investor has or obtains "management rights" and certain "derivative" investments which are related to investments which provide for management rights.

The term "management rights" was defined in the proposal as rights to substantially participate in, or substantially influence the conduct of, the management of an enterprise. The preamble to the proposed regulation stated that the fact that the holder of corporate securities has the right to appoint one or more directors of the corporation would indicate that the securities are venture capital investments, as would the fact that a representative of the holder of such securities serves as a corporate officer. The preamble also suggested that special rights to examine the books of a nonpublic entity and the fact that an investment constitutes a significant portion of the equity capitalization of a nonpublic issuer may be indicative of management rights.

An example in the proposed regulation indicated that a company must also actually exercise management rights in the ordinary course of its business, and not on a sporadic basis in order to be treated as a venture capital operating company. The proposed regulation also indicated that it is sufficient for a venture capital company to actually participate in the management of only one company in order to meet this requirement. The preamble to the proposal made it clear, however, that substantial resources must be devoted to management efforts.

2. Discussion of Comments and the Terms of the Final Regulation. Several venture capital firms commented on the venture capital operating company definition of the proposed regulation. There were three main aspects of the proposal which most concerned these commentators. First, the commentators expressed reservations about the requirement that 85 percent of a venture capital operating company's assets must be invested in companies with respect to which it obtains management rights. Second, the commentators were also concerned with certain aspects of the method of determining compliance with the 85 percent test and the method of valuing securities for purposes of that test. Third, the commentators requested the Department to clarify in the final regulation what kinds of investment covenants and other rights constitute "management rights." The commentators' concerns with each of these aspects of the proposal, and the Department's conclusions with respect to these points, are discussed below.

a. The Percentage Test. Most of the venture capital commentators suggested that the Department lower the 85 percent test. Their primary argument was that the 85 percent level does not allow enough flexibility for ordinary venture capital activities and would operate to deprive venture capital companies of the opportunity to diversify investments.

The problem most frequently voiced by the commentators was that the 85 percent test would effectively preclude participation in "later stage" financings because management rights have been ceded to early and middle stage investors and later stage investors ordinarily do not acquire those rights. The commentators expressed similar concerns with respect to investments in newly issued public securities of emerging growth companies because management rights typically are not given in public offerings. According to the commentators, a lower percentage test would also provide venture capital companies with more flexibility to respond to fluctuations in the business cycle.

The most frequently suggested alternative to the 85 percent test was a 50 percent test. However, several commentators suggested alternative levels between 60 percent and 85 percent.

—The Final Regulation

In the final regulation, the Department has replaced the 85 percent test in the definition of venture capital operat-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing company with a 50 percent test. In the Department's view, this level provides venture capital companies with flexibility to respond to changing economic conditions and will enable venture capital companies to diversify investments and thus mitigate the risk associated with venture capital investments. Since companies must devote at least half of their assets on an ongoing basis to venture capital investments, however, the Department is also of the view that the exclusion for venture capital operating companies will continue to be confined to those companies that have demonstrated a substantial ongoing commitment to the venture capital business.

b. Computation of the Percentage Test and Valuation of Assets. Several commentators also suggested alternatives to the annual determination of compliance with the percentage test in the definition of venture capital operating company and with the requirement that such computation be based on the fair market value of the company's assets. Specifically, some commentators suggested that compliance with the percentage standard should be determined on an acquisition basis.[FN27] Finally, several *41272 commentators suggested that a company's assets should be valued at book value (generally cost) rather than fair market value for purposes of determining compliance with the percentage test.

> FN27 Under an acquisition test, a company, once it has initially complied with the applicable percentage test, would cease to be treated as a venture capital operating company only if it makes an investment that is not a venture capital investment the effect of which would be to cause the initial cost of the company's non-venture capital investments to exceed the applicable percentage of the initial cost of all the company's investments.

Some commentators also indicated that compliance with the annual valuation test in the proposed regulation would be particularly difficult for venture capital companies that have recently been formed as well as for venture capital companies that are winding up their affairs.

—The Final Regulation

The Department has made several revisions to the computational aspects of the definition of venture capital operating company.

First, in the final regulation, assets are to be valued at their cost for purposes of applying the 50 percent test. This modification should eliminate the difficulties that were identified by the commentators in valuing assets for which there is no recognized market. Moreover, the Department has determined that valuing assets at cost is a more appropriate way of applying the percentage test because that method focuses on the degree of a company's commitment of resources to venture capital activities and because, under that method, a company's compliance with the percentage test will not be affected by the relative success or failure of venture capital investments relative to other investments.

Second, the Department has modified the annual method of determining compliance with the percentage test. Under the revised test, a venture capital operating company must meet the 50 percent standard when it first makes long-term investments.[FN28] Thereafter, a company is treated as a venture capital operating company if on any day during an annual "valuation period" it complies with the 50 percent test. In the Department's view, the use of an annual valuation period will provide venture capital companies with some additional flexibility in complying with the annual 50 percent test while assuring that an entity's compliance with the requirements for treatment as a venture capital operating company is regularly tested.[FN29]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 FR 41262-01, 1986 WL 116042 (F.R.)

FN28 In the case of an existing venture capital or real estate company, the initial valuation date is any date designated by the company within the 12 month period ending on the effective date of the regulation.

FN29 As in the proposed regulation, short-term investments pending long-term commitment are disregarded for purposes of applying the 50 percent test. In the final regulation, the Department has also made it clear that short-term investments made pending distributions to investors also may be disregarded. The Department intends that the investments which are disregarded under this exclusion would be confined to investments—such as commercial paper and similar instruments—that are in fact short-term and which in fact are held by the venture capital company pending long-term investment or distribution to investors. Thus, a venture capital operating company could not hold a portfolio of short-term investments indefinitely and continue to disregard them for purposes of the 50 percent test.

A "valuation period" is a fixed period which must occur annually, which may not exceed 90 days in duration, and which must begin no later than the anniversary of the date on which the company first becomes a venture capital operating company. The operation of the percentage test is illustrated by the following example: A venture capital company, A, makes a long-term investment on July 15, 1987 and immediately after such investment, A meets the 50 percent test described in paragraph (d)(1)(i). A's "initial valuation date" is July 15, 1987 (see paragraph (d)(1)). Since the initial annual valuation period must begin no later than the anniversary of the initial valuation date (see paragraph (d)(5)(ii)), A's first valuation period may begin no later than July 15, 1988. A establishes the period from July 15 until October 12 as its annual valuation period. Since the regulation provides that a company which complies with the 50 percent test on its initial valuation date is treated as a venture capital operating company until the end of its first valuation period (see paragraph (d)(1)), A does not need to demonstrate compliance with the 50 percent test until October 12, 1988. Thereafter, A must comply with the percentage test on at least one day within the period that begins with July 15 and ends with October 12 of each year.[FN30]

FN30 However, the company for "good cause"—such as a change in fiscal year for independent business reasons—may change the fixed annual valuation period.

Third, the definition of venture capital operating company also includes a special rule for companies that are in the process of distributing assets to investors.[FN31] Under this rule, once a venture capital operating company elects to enter a "distribution period" (after it has distributed 50 percent of its assets, on a cost basis, to investors) it will continue to be treated as a venture capital operating company for the remainder of the distribution period. However, under this rule, a company that has elected to begin a distribution period will cease to be treated as a venture capital operating company if it makes any new portfolio investment (an investment in a company in which the venture capital operating company has not maintained a venture capital investment at all times since the beginning of the distribution period) or upon the expiration of 10 years after the beginning of the distribution period. For example, assume that a venture capital operating company makes three investments. Investment A is a venture capital investment and had a cost of $500,000. Investment B is also a venture capital investment and had a cost of $250,000. Investment C is not a venture capital investment and had a cost of $200,000. Assume further that the venture capital operating company sells Investment A for $1,000,000 and distributes the proceeds to investors in the venture capital company. After this sale, the venture capital operating company may elect to enter a distribution period because it has distributed the proceeds of at least 50 percent of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

its total investments valued at cost. If the company elects to enter a distribution period, it will continue to be treated as a venture capital operating company notwithstanding that it may thereafter fail to satisfy the annual 50 percent test (for example, by selling Investment B, the remaining venture capital investment, and distributing the proceeds to investors before selling Investment C, the non-venture capital investment). This treatment would continue until the earliest of (1) the date the venture capital operating company distributes all of its assets, (2) the date 10 years from the beginning of the distribution period, or (3) the date on which the company makes a "new portfolio investment."

> FN31 The Department notes that distributions of assets (or proceeds) in this context could also include in-kind distributions.

c. Venture Capital Investments. A number of commentators suggested that the Department expand the definition of management rights. These commentators urged particularly that a venture capital company should be considered to have acquired management rights in cases where it participates in a syndication in which management rights are given only to a lead investor. The commentators indicated that syndications are common in the venture capital industry and that *41273 management rights acquired by the lead investor in a syndicate should in effect be attributed to the other investors in such syndicate.

Several commentators also suggested that the Department treat "later stage" investments in portfolio companies as venture capital investments even though management rights with respect to the company have been ceded to early stage investors. These commentators urged that the final regulation indicate that if a portfolio company grants management rights to any investor (or group of investors) these management rights will be deemed also to have been granted to later stage investors so long as management rights remain in effect at the time subsequent investors acquire securities from the company. In the alternative, some commentators suggested several characteristics of later stage investments which should be treated as indicative of the existence of management rights. These included: special rights to examine books and records of an issuer, appointment of an employee of a venture capital fund to serve as a corporate officer of a public or nonpublic issuer, investment in five percent or more of the voting securities of an issuer, and rights to redeem securities, preemptive rights, or rights of co-sale with respect to a public or nonpublic issuer.

Other commentators suggested that the final regulation make it clear that newly issued public securities of emerging growth companies would be considered venture capital investments.

Several commentators also suggested revisions to the definition of "derivative investments" in the proposed regulations. These commentators noted that venture capital investors sometimes lose management rights with respect to an investment for reasons other than an initial public offering—for example, as a result of a merger or reorganization. These commentators suggested that securities acquired in exchange for venture capital investments as a result of such changes in corporate structure should be treated as derivative investments.

Some commentators also expressed concern that the standards in the proposed regulation limiting the period during which an investment may be treated as a derivative investment might have the effect of forcing a venture capital company to dispose of a derivative investment at an inopportune time. These commentators suggested that a derivative investment should in all cases continue to be treated as such an investment until the expiration of some stated period after it first becomes a derivative investment.

Finally, some commentators suggested that a venture capital fund of funds (which invests in numerous venture capital companies and in turn sells shares to plans) should be excluded from plan asset treatment by expanding

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the definition of "venture capital investments" to include investments in an entity which is a "venture capital operating company".

—The Final Regulation

The general definition of venture capital investments in the proposed regulation has been retained in the final regulation. The comments on the proposed regulation and the testimony at the public hearing demonstrated that venture capital companies engage in a variety of different kinds of investment activities and that the kinds of rights to participate in management that such companies obtain vary widely. Thus, it is difficult to develop standards of general application regarding what constitute venture capital investments. In addition, it would be extremely difficult, if not impossible, to fashion a definition that would be responsive to the points made by the commentators, but which would not be so inclusive that virtually any investment would qualify as a venture capital investment. In this respect, the 50 percent test in the final regulation will provide substantially greater flexibility to venture capital companies than the 85 percent test included in the proposal, particularly since determinations of compliance with the percentage test will be made on the basis of the cost of investments. Thus, the Department has concluded that there is less need for additional guidance regarding the precise scope of the term "venture capital investments".

The Department has made some clarifying modifications to the definition of venture capital investment, however. First, the regulation has been revised to make it clear that management rights must be direct contractual rights running from an operating company to a venture capital operating company. Thus, under the final regulation, management rights that are acquired by the lead investor in a syndication would not be attributed to other companies that participate in the syndication and therefore the investments through the syndication would not be venture capital investments for companies other than the lead investor.

Similarly, where management rights may be exercised only by a group of investors acting together, those rights would not be attributed to the individual members of the group. In these circumstances, an individual member of the group has a right to participate in collective decisions with respect to the group's management rights, but it has not itself obtained rights to influence, or participate in, the management of a portfolio company. However, where members of such a group of investors appoint one lead investor to act on behalf of the group, the group has effectively delegated its contractual management rights to the lead investor and that investor would therefore be considered to have obtained management rights with respect to its investment even though it exercises those rights pursuant to an agreement with the group rather than pursuant to an agreement directly with the portfolio company. In addition, the Department notes that different venture capital investors in a single entity may obtain different kinds of management rights. For example, in a syndication arrangement, the lead venture capital investor may obtain a contractual right to appoint a member of the portfolio company's board while other venture capital investors in the syndication may contract for other kinds of management rights.

Second, the Department has modified the definition of "venture capital investment" in the proposal to make it clear that portfolio companies in which venture capital operating companies invest must themselves be operating companies. As noted above, venture capital operating companies have characteristics of passive investment funds as well as operating company characteristics. The exclusion for venture capital operating companies is based on the Department's determination that the "operating" activities of such companies predominate because they obtain and exercise management rights in portfolio companies that are actively engaged in the production or sale of a product or service other than the investment of capital. Thus, this revision is consistent with the purposes underlying the venture capital operating company exception as well as with the Department's understand-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing of the activities of venture capital companies. Where a company is primarily engaged in the business of investing in venture capital operating companies, however, its relationship to the management of companies that actually produce or sell a product or service is much more remote. Accordingly, as revised, the definition of venture capital investment does not extend to investments in venture capital operating companies. Thus, the venture capital operating company exception would not be available for a venture capital fund of *41274 funds even where such a fund obtains management rights with respect to the venture capital operating companies in which it invests.

Third, the Department has modified the examples in the final regulation relating to venture capital companies to avoid an implication that management rights may only be acquired with respect to nonpublic companies.

Fourth, the Department has modified the definition of derivative investments to include certain securities acquired in a merger or corporate reorganization (provided the merger or reorganization is undertaken for independent business reasons other than extinguishing an investor's management rights) and to provide that a derivative investment will retain its status until the later of 10 years after the acquisition of the original venture capital investment to which the derivative investment relates, or 30 months after the investment becomes a derivative investment.

d. Small Business Investment Companies. Some commentators suggested that the Department specifically include small business investment companies (SBICs) within the definition of a "venture capital operating company". SBICs are created under the Small Business Investment Company Act of 1958, the commentators noted, and are investment firms created for the exclusive purpose of providing growth capital and management support for new and growing small business concerns. These companies are licensed and regulated by the Small Business Administration. The commentators noted that SBICs are similar to venture capital operating companies and are subject to oversight by another federal agency. Thus, the commentators argued, the policy considerations supporting other exclusions from the proposed regulation (particularly the venture capital operating company exception and the exclusion for registered investment companies) also support exclusion of SBICs.

—The Final Regulation

The Department has decided not to include a specific reference to small business investment companies in the definition of an "operating company" because many of the practical problems of compliance identified by the commentators would not exist under the final regulation due to changes made to the "venture capital operating company" exception. The Department has also concluded that it would be inappropriate to treat a SBIC as an additional specific kind of "operating company" unless it satisfies the definition of "operating company" provided in the final regulation, which includes the modified definition of a "venture capital operating company". Thus, a small business investment company may qualify as a venture capital operating company under the final regulation if it invests at least 50 percent of its assets (valued at cost) in operating companies as to which it has or obtains management rights. Moreover, a small business investment company that initially meets the requirements for treatment as a venture capital operating company would, of course, be subject to the "distribution period" rule, discussed above, with respect to determinations regarding its continued qualification.

C. The Real Estate Operating Company Exception

1. The Proposed Regulation. As noted above, the proposed regulation also contained an exception from plan asset treatment for "real estate operating companies." This provision was similar to the venture capital operating company exception. Thus, the term "real estate operating company" was defined as a company at least 85 per-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

cent of the assets of which are devoted directly to the management or development of real estate. As with the venture capital operating company exception, the proposal provided for an annual determination of compliance with the percentage test and assets would have been valued at their fair market value.

The preamble to the proposed regulation indicated that, to qualify as a real estate operating company, a firm must actively participate in, or influence, management decisions with respect to the properties in which it has an interest. The preamble also stated that the enterprise must in fact devote substantial resources to its management and development activities.

The proposal also included several examples illustrating the operation of the real estate operating company exception. One example indicated that a company may qualify for the exception notwithstanding that some of its real estate management and development activities are performed by independent contractors. Another example indicated that an entity may acquire rights to manage or develop real estate through the acquisition of certain kinds of mortgages on real property as well as through the acquisition of equity ownership interests. Another example in the proposed regulation made it clear, however, that mere equity ownership of real property is not sufficient to qualify for the real estate operating company exception.

2. Discussion of Comments and the Terms of the Final Regulation. As in the case of the proposed definition of venture capital operating company, several commentators expressed concern that the 85 percent test incorporated in the definition of real estate operating company would be too restrictive and thus that the exception would not extend to actively managed real estate companies which should be treated as operating companies. Several commentators also expressed concern about various aspects of the requirement that a real estate operating company be involved "directly" in the management or development of real estate. The comments with respect to each of these issues are discussed in more detail below.

a. The Percentage Test. Several commentators asserted that the 85 percent requirement was not sufficiently flexible and might deprive real estate companies of the opportunity to make certain advantageous real estate investments. A number of these commentators suggested that the Department adopt a 50 percent test. Such a test, they suggested, would be sufficient to meet the Department's concern that the exception be available only to those real estate firms that have made a substantial ongoing commitment to active real estate management or development activities, but would also provide additional flexibility to real estate firms. Another commentator suggested a "two tier" alternative to the 85 percent test. Under this approach, a firm would initially qualify for treatment as a real estate operating company if a specified, relatively high, percentage of its assets are devoted to real estate management and development activities. After the company meets this initial qualification test, however, it would not lose its qualification unless the percentage of assets devoted to real estate management or development activities falls below another, lower percentage. Another group of commentators suggested that the Department adopt a percentage level between 50 and 80 percent (such as 60 or 70 percent) in lieu of the 85 percent test in the proposed rule.

Finally, several commentators suggested that the Department indicate more clearly whether real estate which is owned and actively managed or developed by an entity would be considered assets "devoted to" the management or development of real estate.

—The Final Regulation

The Department has decided that an entity should be treated as a real estate *41275 operating company if at least 50 percent of its assets are invested in real estate which is managed or developed and with respect to which the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

entity has the right to substantially participate directly in the management or development activities. Further, in the ordinary course of its business, the entity must actually engage in real estate management or development activities. This approach is consistent with the approach taken with respect to venture capital operating companies and implements similar policy objectives—to ensure that only those entities which demonstrate a substantial ongoing commitment to managing and developing real estate will qualify for treatment as real estate operating companies—while providing additional flexibility to companies that are engaged in the real estate business. In addition, for the reasons discussed above with respect to venture capital operating companies, the Department has concluded that determinations of a company's status as a real estate operating company should be made during an annual valuation period rather than on a fixed valuation date and that assets should be valued at their cost rather than fair market value for purposes of determining whether a company complies with the test.[FN32]

> FN32 As in the case of the venture capital operating company exception, a company may disregard short-term investments pending long-term commitment or distribution to investors. As discussed in more detail above with respect to the definition of venture capital operating company, the Department intends this exclusion to apply only to a limited category of investments.

Moreover, the definition of real estate operating company has been revised to conform more closely to the venture capital operating company definition. Thus, the cost of an entity's entire investment in real estate which is actually managed or developed will be taken into account for purposes of applying the percentage test provided the entity has the right to participate in such management or development activities.

b. Manaqement or Development of Real Estate. Several commentators expressed concern about the portion of the definition of real estate operating company that relates to the requirement that a specified percentage of the company's assets be devoted "directly" to the management or development of real estate. Most of these commentators urged the Department to make it clear that the reference to "direct" management or development of real estate does not require that a company's real estate management or development activities be performed by the company's own employees in order for the company to qualify for the exception. These commentators asserted that no legitimate policy purpose would be served if the regulation implicitly or expressly includes such a requirement because a company is not the less engaged in real estate management or development activities because it conducts its business through independent contractors than it would be if it conducts such activities solely through its own employees.

Several commentators also requested the Department to clarify what would constitute "management or development" of real estate in certain circumstances. Specifically, those commentators requested that the Department make it clear that certain activities that involve leasing, particularly shopping center management, should be considered real estate management activities for purposes of the definition of real estate operating company.

In addition, some commentators urged the Department to expand the principle (illustrated in one of the examples) that a real estate operating company could obtain management or development rights through investments in mortgages. Specifically, they urged that management activity should include the management of mortgage loan portfolios, including servicing mortgages and identifying appropriate mortgage investments.

—The Final Regulation

Under the final regulation, a company will not fail to qualify for treatment as a real estate operating company solely because it uses independent contractors (including affiliates of general partners) exclusively in conducting

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

its real estate management or development activities. This is made clear in an example in the final regulation (see paragraph (j)(8)). Based on the comments received, it appears that independent contractors are widely used in the real estate industry and that often using an independent contractor may be the most efficient way of managing property. Thus, the regulation indicates that the fact that a particular entity does, or does not, have its own employees who engage in real estate development or management activities would be only one factor in determining whether an entity is actively managing or developing real estate.

With respect to comments raising issues as to whether particular kinds of conduct constitute management or development activities, the Department has concluded that a determination whether a company is actively involved in the management or development of a particular parcel of real estate is ultimately a factual question that must be resolved on a case by case basis. In the Department's view, however, an entity would not be engaged in the management or development of real estate for purposes of the definition of real estate operating company in the final regulation merely because it services mortgages on real property. [FN33] The Department has added an example to the regulation to illustrate the application of the management or development standard in certain circumstances. This example (paragraph (j)(8)) indicates that certain management activities associated with shopping center leasing may qualify as management activities.

> FN33 Some commentators suggested that private mortgage pools are similar to guaranteed governmental mortgage pools under 29 CFR 2550.401b-1 redesignated under this regulation as 29 CFR 2510.3101(i)) and should receive similar treatment. The Department believes there are differences between those mortgage investments which are guaranteed by agencies or instrumentalities of the federal government and other mortgage pools which do not provide for such guarantees. The Department also notes, however, that many private mortgage pools may qualify for the publicly-offered exception in the final regulation.

*VII. Entities That Always Hold Plan Assets.*

A. Group Trusts, Bank Common and Collective Trust Funds and Insurance Company Separate Accounts.

1. The Proposed Regulation. Under the proposed regulation, the assets of insurance company separate accounts, group trusts and bank common or collective trust funds would generally include plan assets regardless of any other provisions of the proposal. Thus, for example, the proposed regulation provided that an insurance company managing a pooled separate account would be subject to the fiduciary responsibility rules of ERISA even though the account might otherwise qualify as a real estate operating company.

The proposal also stated, however, that the rule described above would not apply to a separate account registered as an investment company under the Investment Company Act of 1940 or to insurance company separate accounts that are maintained solely in connection with fixed contractual obligations of the insurance company under which the amounts payable to the plan and to any annuitant under the plan are not affected in any manner by the investment performance of the account.

2. Discussion of the Comments and Terms of the Final Regulation. *41276 Representatives of several insurance companies and banks urged the Department to revise the regulation so that it would apply to separate accounts and bank common and collective trust funds in the same manner as it applies to other entities in which plans invest, thereby permitting separate accounts and common and collective trust funds to take advantage of the exceptions to the look-through rule, for example, the publicly-offered security exception and the real estate operat-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 FR 41262-01, 1986 WL 116042 (F.R.)

ing company exception. These commentators argued that separate accounts and common and collective trust funds are no different from other arrangements involving the pooling of investments of two or more plans in terms of the types of portfolio investments, the potential return or the services performed by the managers of the funds.

In addition, one commentator noted that some group trusts are also registered as investment companies under the Investment Company Act of 1940 and urged the Department to extend the exclusion relating to separate accounts that are registered investment companies to include registered investment companies that are also group trusts.

—The Final Regulation

In general, the Department has adopted the provisions relating to group trusts, bank common and collective trust funds and insurance company pooled separate accounts as they were proposed. This approach conforms with the express requirements of ERISA and the relevant legislative history.[FN34] Moreover, these provisions are also consistent with interpretive positions taken by the Department regarding group trusts, bank collective trust funds, and insurance company separate accounts.[FN35] The Department has, however, modified the final regulation to make it clear that the assets of a group trust or bank common or collective trust fund do not include plan assets if the trust is registered as an investment company under the Investment Company Act of 1940.[FN36] This modification is consistent with the rule for insurance company separate accounts and with sections 3(21)(B) and 401(b)(1) of ERISA.

> FN34 See "Overview of the Plan Assets Issue," above, for a discussion of the statutory provisions and legislative history relating to bank common and collective trust funds and insurance company separate accounts.

> FN35 See, e.g., DOL Advisory Opinion 82-31A (group trusts), preamble to the proposed Prohibited Transaction Class Exemption 78-19, 42 FR 54887 (October 11, 1977) (separate accounts), and preamble to Prohibited Transaction Class Exemption 80-51, 45 FR 49709 (July 25, 1980) (bank common and collective trust funds).

> FN36 The final regulation also includes the exception set forth in the proposed regulation for insurance company separate accounts that are maintained solely in connection with certain guaranteed obligations of an insurance company. The Department notes that this provision deals solely with the issue of whether such a separate account holds "plan assets." By including such an exception, the Department is not, however, addressing any issues which may arise under sections 403(c)(1) or 404(a) of ERISA with respect to the use of such separate accounts.

The Department emphasizes that even though the other exceptions in the regulation do not apply to a plan's investment in a group trust, bank common or collective trust fund or insurance company separate account, those exceptions might be applicable to a trust's or separate account's portfolio investments. Thus, for example, although the assets of an insurance company separate account always include plan assets under the final regulation, the underlying assets of the issuer of publicly-offered securities acquired by the separate account would not include plan assets.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

B. Entities that are Wholly-Owned by a Plan.

1. The Proposed Regulation. The proposed regulation also provided that when a plan owns all of the outstanding equity interests in an entity, the assets of the plan include those equity interests and all of the underlying assets of the entity. This provision reflected the Department's conclusion that when a plan is the sole owner of an entity there is no meaningful difference between the assets of the entity and the assets of the plan. Under the proposal, this rule applied without regard to the nature of the business activities of an entity owned by a plan. Thus, the assets of an operating company that is owned entirely by a plan would have been considered plan assets.

2. Discussion of Comments Received and the Terms of the Final Regulation. A number of commentators objected to the proposed rule relating to entities that are wholly-owned by plans. These commentators indicated that many wholly-owned entities are operating companies and that the operating company exception should be available for such entities. According to the commentators, it would be extremely difficult for the officers and employees of an operating company to manage the assets of the company in accordance with the fiduciary responsibility provisions of ERISA, particularly the prohibited transaction rules. Several commentators emphasized that the special rule for wholly-owned companies would be particularly disruptive to employee stock ownership plans (ESOPs).

—The Final Regulation

The final regulation generally retains the rule relating to entities that are wholly-owned by a plan and extends the rule to entities wholly-owned by a "related group" of plans.[FN37] The Department continues to believe that, as a general matter, where all of the outstanding equity interests in an entity are owned by a plan, there is no practical difference between the assets of the plan and the assets of the entity which is owned by the plan. The extension of the rule to entities wholly-owned by a related group of plans will assure that or more plans this rule will not be subject to manipulation, for example, by the purchase of the entire equity interest in an entity by two defined benefit plans, one of an employer and one of an affiliate of that employer. Finally, the Department has made a minor modification to the wholly-owned rule to make it clear that an entity will be considered wholly-owned by a plan even in those instances where shares are owned by others due to a state law requiring such ownership.

> FN37 A related group of plans is defined as two or more plans each of which receives 10 percent or more of its aggregate contributions from the same employer (or members of the same controlled group of corporations) or each of which is maintained by, or pursuant to a collective bargaining agreement negotiated by the same employee organization or affiliated organizations. The concept of a related group of plans is also used in the regulation published elsewhere in the Federal Register today which provides a reporting and disclosure alternative method of compliance for plans which invest in certain entities whose underlying assets include plan assets.

Under the final regulation, the rule relating to wholly-owned entities would not apply, however, in the case of one or more eligible individual account plan(s) (as defined in section 407(d)(3) of the Act) maintained by the same employer and which own(s) qualifying employer securities (described in section 407(d)(5) of the Act), provided that substantially all of the participants in the plan(s) are, or have been, employed by the issuer of such securities or by members of a group of affiliated corporations of which the issuer is a member.[FN38] In gener-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

al, *41277 under section 407(d)(3) of the Act the term eligible individual account plan includes profit-sharing, stock bonus, thrift or savings plans and employee stock ownership plans. In such circumstances, the consequences under the final regulation of the plan's ownership of the employer securities would be determined under the other provisions of the regulation. For example, if an eligible individual account plan owns all of the outstanding stock of an operating company that is an employer of substantially all of the participants in the plan, then the operating company exception would be applicable, and accordingly the assets of the plan would include the employer securities, but would not include any interest in the underlying assets of the employer.

> FN38 For purposes of this provision, whether a corporation is an affiliate of another corporation is determined by applying the definition of "affiliate" in section 407(d)(7) of the Act. In general, under that definition, a "corporation" is an affiliate of another corporation if it is a member of a "controlled group of corporations" of which such latter corporation is a member, applying the principles of section 1563(a) of the Internal Revenue Code, but using a 50 percent ownership test rather than the 80 percent ownership test set forth in section 1563(a).

The provision relating to qualifying employer securities is consistent with provisions of ERISA which permit certain individual account plans to hold up to 100 percent of their assets in qualifying employer securities in order to provide an incentive to employees by allowing them to participate in the earnings of the employer through plan investments.[FN39]

> FN39 See section 404(a)(2), 407(d)(3), and 407(b) of ERISA; see also S. Rep. No. 383, 93d Cong., 1st Sess. 32-33, 100 (1973).

*VIII. Effective Date/Transitional Rule Provision*

A. The Proposed Regulation

The proposed general effective date for the regulation was 90 days after publication of the final rule. In addition, the proposed regulation indicated that once the regulation becomes effective it would apply to all plan assets determinations made after the effective date with respect to plan investments, regardless of when those investments are made. Thus, under the general effective date provision, the plan assets regulation would apply to both new and existing plan investments. The proposal also included a transitional rule, however, under which the regulation would not apply to plan investments in certain entities.

The proposed transitional rule had two requirements. First, the entity seeking coverage under the rule was required to be in existence on June 30, 1986. Second, the transitional rule would have applied only if no plan acquires an interest in the entity from an issuer or an underwriter at any time after June 30, 1986, except pursuant to a binding contract in effect on that date.[FN40] The preamble to the proposal indicated that plan assets determinations for entities that qualify for the transitional relief would be made taking into account the provisions of ERISA itself, the legislative history of ERISA, the Department's rules and regulations and relevant judicial decisions.

> FN40 As originally proposed, the transitional rule required that an entity be in existence on January 4, 1985 and that no plan acquire an interest in the entity after May 8, 1985. On February 15, 1985 the Department published an amendment to the proposal which extended the expiration date to June 30, 1986.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 FR 41262-01, 1986 WL 116042 (F.R.)

B. Comments Received

A large number of commentators on the proposed regulation urged the Department to modify the effective date provision. Several commentators objected to the general approach reflected in the effective date provision of the proposal and urged the Department to apply the regulation only to new plan investments. Most of the comments, however, urged the Department to modify the expiration date of the transitional rule. These suggestions fell into two categories. The first, and most frequent, suggestion was that the expiration date for the transitional rule should be set at a specified number of days after publication of the final rule (or, as suggested by some commentators, at the later of June 30, 1986 or a set number of days after issuance of the final rule). The comments varied with respect to the period that would be appropriate. Some commentators suggested that a 90 day period would be sufficient; others indicated that 180 days would be appropriate. The second approach, suggested by only a few commentators, was to move the expiration date of the transitional period to some other fixed date beyond June 30, 1986.

Some commentators sought clarification of whether certain contractual arrangements to acquire additional securities (i.e., warrants) entered into before the expiration date of the transitional rule would be considered binding contracts under that rule. Those commentators suggested that a plan's exercise of warrants after the expiration date should not cause the entity to lose its qualification for transitional relief.

C. Public Law 99-272

Section 11018 of Pub. L. 99-272 establishes a statutory transitional rule for the application of the plan assets regulation to the extent it would apply to certain publicly-offered real estate entities that are described in the statute. This statutory provision has two primary effects. First, it prohibits the application of the plan assets regulation to plan investments in public real estate companies that have certain characteristics. In general, the statutory limitation applies only to publicly-offered real estate companies which first offer interests to plans on or before a date 120 days after the date of publication of the final regulation and in which no plan invests on or after a date 270 days from the date of publication of the regulation. Second, the statute provides that the assets of a public real estate company that meets the requirements described above would not include plan assets if they would not have been characterized as plan assets under Interpretive Bulletin 75-2 or under any of the Department's previous proposed plan assets regulations. Section 11018 of Pub. L. 99-272, however, does not prohibit the application of the regulation to such a publicly-offered real estate entity to the extent the regulation would provide a defense (i.e., to the extent the assets of the entity would not include plan assets under the final regulation).

D. The Final Regulation

The Department has decided that the general approach reflected in the effective date/transitional rule provisions should be retained as proposed. To amend the effective date so that the regulation would apply only to new plan investments would delay the implementation of a final regulation because many plans have substantial outstanding long-term investments and thus it may be several years until all, or even most, of these assets are held in investments made after the effective date. Moreover, if the regulation were applied only to new plan investments, similarly situated plan investors would have different rights and remedies based solely on the date of their investment in an entity.

The Department has concluded, however, that both the effective date of the regulation and the expiration of the transitional period should be set at the later of January 1, 1987 or a date 120 days from the date of publication of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the regulation. This provision will assure that affected persons will have time to assess the impact of the final regulation before the expiration of the transitional period.

The Department has also decided that warrants acquired by a plan before the expiration of the transitional period should not be considered binding contracts for purposes of the transitional rule. The binding contract provision of the transitional rule is intended to assure that the relief provided by that rule will remain available even where a *41278 plan makes new equity investments in an entity after the expiration of the transitional period if the plan had obligated itself to make the investment before the expiration date. If the provision were to apply where the plan merely has an option to make such additional equity investments (but is not obligated to make the investment), an issuer could effectively continue to offer interests to plans indefinitely by issuing a large amount of warrants before the expiration of the transitional period.

The assets of most of the publicly-offered real estate companies described in section 11018 of Pub. L. 99-272 would not include plan assets because plan investments in securities issued by such companies would ordinarily qualify under the publicly-offered exception in the final regulation. The statutory transitional rule also applies, however, to a few entities that, in the absence of the availability of transitional relief, might hold plan assets under the final regulation.[FN41]

> FN41 These include entities the interests in which are not widely-held because they are held by less than 100 independent investors (see section 11018(a)(1)(C)(i) of Pub. L. 99-272) and certain partnerships organized prior to the enactment of Pub. L. 99-272 in which plans have acquired interests in a private placement which have a value of less than $20,000.

In view of the provisions of section 11018 of Pub. L. 99-272, the effective date provision of the final regulation also provides that the regulation will not apply, except as a defense, to entities that qualify for the statutory transitional relief. Under this rule, plan investments in a publicly-offered real estate entity that is described in section 11018(a) of Pub. L. 99-272, but which do not qualify for the publicly-offered exception (because, for example, there are not 100 independent investors) would nonetheless not be subject to the regulation. Of course, this additional rule would only be applicable to investments in entities that meet all of the requirements of section 11018(a), including the requirement that interests in the entity are first offered to plans before the expiration of 120 days from the date of publication of the regulation and the requirement that the entity refrain from offerings to plans after 270 days from the date of publication of the regulation. However, since the additional rule does not apply to the extent the final regulation provides a defense, a real estate company that does qualify for the publicly-offered exception under the final regulation may rely on that exception as soon as the regulation becomes effective.

The Department has also decided that other entities that are described in the transitional rule (i.e., entities in which no plan acquires an interest from an issuer or underwriter after the effective date), should also be permitted to rely on the final regulation after it becomes effective to the extent it provides a defense. Thus, for example, even though the transitional rule would be available for an operating company in which there are no new plan investments after the effective date of the final regulation (whether or not the entity is described in section 11018(a) of Pub. L. 99-272) the company's managers may nonetheless rely on the operating company exception of the regulation as a defense to allegations of misconduct by plan investors that are predicated on the managers' status as ERISA fiduciaries. In the Department's view, this rule will assure consistent treatment for similarly situated entities under the final regulation.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*IX. Revision and Clarification of Interpretive Bulletin 75-2*

As indicated in the preamble to the proposed regulation, the Department has revised Interpretive Bulletin 75-2 to coordinate it with the final regulation. As revised, the interpretive bulletin indicates that the rules established by the final "plan assets" regulation apply only for purposes of identifying plan assets on or after the effective date of the regulation and that the interpretive bulletin is effective for periods prior to that date and for investments that are subject to the transitional rule.

The remainder of the Interpretive Bulletin which discusses certain prohibited transactions under section 406 of ERISA (and section 4975 of the Code), is not affected by the final "plan assets" regulation. Also, the Department notes that the portion of Interpretive Bulletin 75-2 dealing with contracts or policies of insurance is not affected by the regulation being issued here.

The Department does not intend to effect any substantive change in the rules in the interpretive bulletin by making these revisions.[FN42]

> FN42 In this regard, the Department notes that the final paragraph of Interpretive Bulletin 75-2 states that the Department would consider a fiduciary who makes or retains an investment in a corporation or partnership for the purpose of avoiding the application of the fiduciary responsibility provisions of the Act to be in contravention of the provisions of section 404(a) of the Act. However, it is the Department's view that the mere fact a fiduciary makes or retains an investment in a corporation or partnership which does not hold plan assets under the final regulation does not mean the fiduciary has engaged in a transaction for the purposes of avoiding the application of the fiduciary responsibility rules within the meaning of the final paragraph of Interpretive Bulletin 75-2.

*X. Reporting and Disclosure*

As noted above, the regulation will apply for purposes of the reporting and disclosure requirements of ERISA as well as to the definitional provisions of the Act and the fiduciary responsibility provisions. As indicated in the proposed regulation, the Department is aware that special difficulties are presented in reporting transactions involving collective investment funds whose assets include plan assets. In order to deal with these issues, the Department published a proposed alternative method of compliance with the reporting and disclosure requirements for entities whose assets include "plan assets." [FN43] The alternative method is similar to the procedure established under the statutory and regulatory provisions now governing reporting for plan assets held in bank collective trust funds, insurance company separate accounts and master trusts. The final alternative method of compliance is being published separately in today's Federal Register.

> FN43 50 FR 3362, January 24, 1985.

*XI. Guaranteed Governmental Mortgage Pool Certificates*

The proposed regulation indicated that the Department's existing regulation dealing with governmental mortgage pools would be redesignated and incorporated into the final plan assets regulation. Thus, paragraph (i) of the final regulation sets forth the rule relating to governmental mortgage pools that now appears at 29 CFR 2550.401b-1.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*XII. Miscellaneous Issues*

A. Definition of Fiduciary

Paragraph (a)(2)(ii) of the proposed regulation stated that any person who has authority or control respecting the management or disposition of the underlying assets of any entity whose assets include plan assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the investing plan.

Several commentators suggested that the Department indicate that the provision quoted above was not intended to expand the definition of fiduciary in section 3(21)(A) of ERISA and section 4975(e)(3) of the Code or to affect the principles set forth in Interpretive Bulletins 75-5 and 75-8.[FN44]

> FN44 See 29 CFR 2509.75-5 and 2509.75-8.

The final regulation is not intended to address issues relating to the kinds of activities with respect to plan assets that would cause a person to be a fiduciary. Thus, where the underlying *41279 assets of an entity include plan assets, determinations whether a person is a fiduciary with respect to such assets would be made under the standards set forth in section 3(21) of ERISA, and the Department's regulations, including Interpretive Bulletins 75-5 and 75-8. In this respect, the Department has, in accordance with the suggestion of one commentator, modified paragraph (a)(2) of the regulation to conform to the language of section 3(21) of ERISA.

B. Burden of Proof

In the preamble to the proposed regulation, the Department indicated that the burden of showing that the operating company exception or the significant participation exception applies, should be assigned to the person making that assertion. Some commentators objected to this observation, asserting that the Department does not have the authority to change normal judicial standards regarding burden of proof.

The observations regarding burden of proof in the preamble to the proposed regulation were not intended to effect any change in normal judicial standards relating to burden of proof, but rather to provide a clear indication of the Department's intent. The Department has also endeavored to draft the final regulation in such a way that, in practice, the burden of proof with respect to matters regarding application of the regulation will be assigned in the manner described in the preamble to the proposal.

C. Jointly Owned Property

The proposed regulation provided that where a plan owns property jointly with others, or where the value of a plan's equity interest relates solely to identified property of an entity, such property would be considered for purposes of the regulation as the sole property of a separate entity.

Some commentators suggested that where an independent investor enters into a venture with a plan pursuant to which it holds property jointly with the plan, such an independent investor is acting on its own behalf and is not, directly or indirectly, providing any investment advisory or investment management services to the plan. According to the commentators, it would be inappropriate to impose fiduciary responsibilities on the independent investor in such cases. Other commentators urged the Department to make it clear that plan "investments" in the hypothetical entity contemplated by the jointly owned property rule would be subject to the exceptions in the regulation, for example, the operating company exception.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Department has retained the jointly owned property rule in the final regulation because it has concluded that the rule is essential in order to prevent circumvention of the other provisions of the regulation. However, the extent of any investor's fiduciary responsibilities in cases where the rule applies would depend on the kind of activities that the investor conducts with respect to the property.[FN45]

> FN45 See the discussion regarding the definition of fiduciary at Part XII, A, above.

The Department does intend that the exceptions in the regulation would be applicable to plan investments in the hypothetical entity contemplated by the jointly owned property rule. Thus, for example, if a plan jointly owns a parcel of real property with others, that property may be considered a real estate operating company if the conditions to that exception are met.

Regulatory Flexibility Act

The Department has determined that this regulatory action would not have any significant economic effect on small plans or small business entities. First, small employee benefit plans (those with fewer than 100 participants) virtually never invest in privately placed pools such as those offered by venture capital or real estate organizations. Small plans tend to invest in pools whose certificates are publicly-offered. The underlying assets of these pools are not plan assets under the final rule. Hence, small plans would not generally be affected by the regulation. In rare instances, a small plan could lose money under the final regulation as compared to the 1985 proposal since under the final regulation a fiduciary will not be managing the plan's assets and, thus, the plan will not have a potential ERISA claim if losses occur.

Second, some smaller entities like those dependent on venture capital or real estate pools as sources of financing also have a stake in this regulation. The final regulation, however, substantially reduces the impact on most entities affected by the regulation. Most venture capital pools either do or will meet the 50 percent management test, and all such entities that accept less than 25 percent plan monies are exempt. Moreover, even if less plan money is made available, other investors are expected to fill this gap. To the extent that plan investments decrease, rates of return on these investments will increase, thereby drawing more non-plan monies into these industries. On balance, it is expected that the regulation will not substantially affect the amounts of money available to finance new ventures and real estate developments.

Executive Order 12291

The Department has determined that the final regulatory action would not constitute a "major rule" as that term is used in the Executive Order 12291 because the action would not result in: an annual effect on the economy of $100 million; a major increase in costs or prices for consumers, individual industries, government agencies, or geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States based enterprises to compete with foreign-based enterprises in domestic or export matters.

The Department has prepared an evaluation of the cost impact of the final regulation which states that the maximum cost impact of the regulation would be $41 million; however, the Department anticipates that the actual cost impact will be much lower.

Paperwork Reduction Act

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The final plan assets regulation does not contain any new information collection requirements and does not modify any existing requirements. Some plans which have invested in entities affected by the regulation may have additional reporting requirements by virtue of the underlying assets of the entities clearly being considered plan assets, others may have less than they do currently. Since these burdens have, on average, already been included in the burden for the annual reports (Form 5500 series), the regulation will not result in any additional burden in the aggregate.

Statutory Authority

The regulation is adopted pursuant to the authority contained in section 505 of ERISA (Pub. L. 93-406, 88 Stat. 894; 29 U.S.C. 1135) and under section 102 of Reorganization Plan No. 4 of 1978 (43 FR 47713, October 17, 1978), effective December 31, 1978 (44 FR 1065, January 3, 1979); 3 CFR Part 1978 Comp., 332, under section 11018(d), Pub. L. 99-272 (100 Stat. 82); and Under Secretary of Labor's Order No. 1-86.

List of Subjects

*29 CFR Part 2509*

Employee Benefit Plans, Employee Retirement Income Security Act, Fiduciaries, Pensions, Pension and Welfare Benefits Administration, Plan assets, Trusts and trustees.

**\*41280** *29 CFR Part 2510*

Employee Benefit Plans, Employee Retirement Income Security Act, Pensions, Pension and Welfare Benefits Administration, Plan assets.

*29 CFR Part 2550*

Employee Benefit Plans, Employee Retirement Income Security Act, Employee Stock Ownership Plans, Exemptions, Fiduciaries, Investments, Investments foreign, Party in interest, Pensions, Pension and Welfare Benefits Administration, Prohibited transactions, Real estate, Securities, Surety bonds, Trusts and trustees.

For the reasons set out in the preamble, Chapter XXV of Title 29 of the Code of Federal Regulations is amended as set forth below.

PART 2509—INTERPRETIVE BULLETINS RELATING TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 19741. The authority citation for Part 2509 is revised to read as set forth below and the authority citations following all the sections in Part 2509 are removed.

AUTHORITY: 29 U.S.C. 1135.

Section 2509.75-1 also issued under 29 U.S.C. 1114.

Section 2509.75-10 and § 2509.75-2 also issued under 29 U.S.C. 1052, 1053, 1054. Secretary of Labor's Order No. 1-86.

29 CFR § 2509.75-2

2. In Part 2509, § 2509.75-2 is revised to read as follows:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

29 CFR § 2509.75-2

§ 2509.75-2 Interpretive bulletin relating to prohibited transactions.

On February 6, 1975, the Department of Labor issued an interpretive bulletin, ERISA IB 75-2, with respect to whether a party in interest has engaged in a prohibited transaction with an employee benefit plan where the party in interest has engaged in a transaction with a corporation or partnership (within the meaning of section 7701 of the Internal Revenue Code of 1954) in which the plan has invested.

On November 13, 1986 the Department published a final regulation dealing with the definition of "plan assets". See § 2510.3-101 of this title. Under that regulation, the assets of certain entities in which plans invest would include "plan assets" for purposes of the fiduciary responsibility provisions of the Act. Section 2510.3-101 applies only for purposes of identifying plan assets on or after the effective date of that section, however, and § 2510.3-101 does not apply to plan investments in certain entities that qualify for the transitional relief provided for in paragraph (k) of that section. The principles discussed in paragraph (a) of this Interpretive Bulletin continue to be applicable for purposes of identifying assets of a plan for periods prior to the effective date of § 2510.3-101 and for investments that are subject to the transitional rule in § 2510.3-101(k). Paragraphs (b) and (c) of this Interpretive Bulletin, however, relate to matters outside the scope of § 2510.3-101, and nothing in that section affects the continuing application of the principles discussed in those parts.

a. Principles applicable to plan investments to which § 2510.3-101 does not apply. Generally, investment by a plan in securities (within the meaning of section 3(20) of the Employee Retirement Income Security Act of 1974) of a corporation or partnership will not, solely by reason of such investment, be considered to be an investment in the underlying assets of such corporation or partnership so as to make such assets of the entity "plan assets" and thereby make a subsequent transaction between the party in interest and the corporation or partnership a prohibited transaction under section 406 of the Act.

For example, where a plan acquires a security of a corporation or a limited partnership interest in a partnership, a subsequent lease or sale of property between such corporation or partnership and a party in interest will not be a prohibited transaction solely by reason of the plan's investment in the corporation or partnership.

This general proposition, as applied to corporations and partnerships, is consistent with section 401(b)(1) of the Act, relating to plan investments in investment companies registered under the Investment Company Act of 1940. Under section 401(b)(1), an investment by a plan in securities of such an investment company may be made without causing, solely by reason of such investment, any of the assets of the investment company to be considered to be assets of the plan.

(b) Contracts or policies of insurance. If an insurance company issues a contract or policy of insurance to a plan and places the consideration for such contract or policy in its general asset account, the assets in such account shall not be considered to be plan assets. Therefore, a subsequent transaction involving the general asset account between a party in interest and the insurance company will not, solely because the plan has been issued such a contract or policy of insurance, be a prohibited transaction.

(c) Applications of the fiduciary responsibility rules. The preceding paragraphs do not mean that an investment of plan assets in a security of a corporation or partnership may not be a prohibited transaction. For example, section 406(a)(1)(D) prohibits the direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of the plan and section 406(b)(1) prohibits a fiduciary from dealing with the assets of the plan in his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

own interest or for his own account.

Thus, for example, if there is an arrangement under which a plan invests in, or retains its investment in, an investment company and as part of the arrangement it is expected that the investment company will purchase securities from a party in interest, such arrangement is a prohibited transaction.

Similarly, the purchase by a plan of an insurance policy pursuant to an arrangement under which it is expected that the insurance company will make a loan to a party in interest is a prohibited transaction.

Moreover, notwithstanding the foregoing, if a transaction between a party in interest and a plan would be a prohibited transaction, then such a transaction between a party in interest and such corporation or partnership will ordinarily be a prohibited transaction if the plan may, by itself, require the corporation or partnership to engage in such transaction.

Similarly, if a transaction between a party in interest and a plan would be a prohibited transaction, then such a transaction between a party in interest and such corporation or partnership will ordinarily be a prohibited transaction if such party in interest, together with one or more persons who are parties in interest by reason of such persons' relationship (within the meaning of section 3(14)(E) through (I)) to such party in interest may, with the aid of the plan but without the aid of any other persons, require the corporation or partnership to engage in such a transaction. However, the preceding sentence does not apply if the parties in interest engaging in the transaction, together with one or more persons who are parties in interest by reason of such persons' relationship (within the meaning of section 3(14)(E) through (I)) to such party in interest, may, by themselves, require the corporation or partnership to engage in the transaction.

Further, the Department of Labor emphasizes that it would consider a fiduciary who makes or retains an investment in a corporation or partnership for the purpose of avoiding the application of the fiduciary responsibility provisions of the Act to be in contravention of the provisions of section 404(a) of the Act.

PART 2510—DEFINITIONS OF TERMS USED IN SUBCHAPTERS C, D, E, F, AND G OF THIS CHAPTER3. The authority citation for Part 2510 is revised to read as set forth below and the authority citations following all the sections in Part 2510 are removed.

Authority: Sec. 3(2), 111(c), 505, Pub. L. 93-406, 88 Stat. 852, 894, (29 U.S.C. 1002(2), 1031, 1135); Secretary of Labor's Order No. 27-74, 1-86 and Labor-Management Services Administration Order No. 2-6, unless otherwise noted.

Section 3-101 is also issued under Sec. 102 of Reorganization Plan No. 4 of 1978 (43 FR 47713, October 17, 1978), effective December 31, 1978 (44 FR 1065, January 3, 1978); 3 CFR 1978 Comp. 332, and section 11018(d) of Pub. L. 99-272, 100 Stat. 82.

29 CFR § 2510.3-101

4. Part 2510 is amended by adding a new § 2510.3-101 in the appropriate place to read as follows:

29 CFR § 2510.3-101

§ 2510.3-101. Definition of "plan assets"—plan investments.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(a) In general. (1) This section describes what constitute assets of a plan with respect to a plan's investment in another entity for purposes of Subtitle A, and Parts 1 and 4 of Subtitle B, of Title I of the Act and section 4975 of the Internal Revenue Code. Paragraph (a)(2) of this section contains a general rule relating to plan investments. Paragraphs *41281 (b) through (f) of this section define certain terms that are used in the application of the general rule. Paragraph (g) of this section describes how the rules in this section are to be applied when a plan owns property jointly with others or where it acquires an equity interest whose value relates solely to identified assets of an issuer. Paragraph (h) of this section contains special rules relating to particular kinds of plan investments. Paragraph (i) describes the assets that a plan acquires when it purchases certain guaranteed mortgage certificates. Paragraph (j) of this section contains examples illustrating the operation of this section. The effective date of this section is set forth in paragraph (k) of this section.

(2) Generally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, in the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that—

(i) The entity is an operating company, or (ii) Equity participation in the entity by benefit plan investors is not significant.

Therefore, any person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the investing plan.

(b) "Equity interests" and "publicly-offered securities". (1) The term "equity interest" means any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features. A profits interest in a partnership, an undivided ownership interest in property and a beneficial interest in a trust are equity interests.

(2) A "publicly-offered security" is a security that is freely transferable, part of a class of securities that is widely held and either—

(i) Part of a class of securities registered under section 12(b) or 12(g) of the Securities Exchange Act of 1934, or

(ii) Sold to the plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is registered under the Securities Exchange Act of 1934 within 120 days (or such later time as may be allowed by the Securities and Exchange Commission) after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred.

(3) For purposes of paragraph (b)(2) of this section, a class of securities is "widely-held" only if it is a class of securities that is owned by 100 or more investors independent of the issuer and of one another. A class of securities will not fail to be widely-held solely because subsequent to the initial offering the number of independent investors falls below 100 as a result of events beyond the control of the issuer.

(4) For purposes of paragraph (b)(2) of this section, whether a security is "freely transferable" is a factual question to be determined on the basis of all relevant facts and circumstances. If a security is part of an offering in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

which the minimum investment is $10,000 or less, however, the following factors ordinarily will not, alone or in combination, affect a finding that such securities are freely transferable:

(i) Any requirement that not less than a minimum number of shares or units of such security be transferred or assigned by any investor, provided that such requirement does not prevent transfer of all of the then remaining shares or units held by an investor;

(ii) Any prohibition against transfer or assignment of such security or rights in respect thereof to an ineligible or unsuitable investor;

(iii) Any restriction on, or prohibition against, any transfer or assignment which would either result in a termination or reclassification of the entity for federal or state tax purposes or which would violate any state or federal statute, regulation, court order, judicial decree, or rule of law;

(iv) Any requirement that reasonable transfer or administrative fees be paid in connection with a transfer or assignment;

(v) Any requirement that advance notice of a transfer or assignment be given to the entity and any requirement regarding execution of documentation evidencing such transfer or assignment (including documentation setting forth representations from either or both of the transferor or transferee as to compliance with any restriction or requirement described in this paragraph (b)(4) of this section or requiring compliance with the entity's governing instruments);

(vi) Any restriction on substitution of an assignee as a limited partner of a partnership, including a general partner consent requirement, provided that the economic benefits of ownership of the assignor may be transferred or assigned without regard to such restriction or consent (other than compliance with any other restriction described in this paragraph (b)(4)) of this section;

(vii) Any administrative procedure which establishes an effective date, or an event, such as the completion of the offering, prior to which a transfer or assignment will not be effective; and

(viii) Any limitation or restriction on transfer or assignment which is not created or imposed by the issuer or any person acting for or on behalf of such issuer.

(c) "Operating company". (1) An "operating company" is an entity that is primarily engaged, directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital. The term "operating company" includes an entity which is not described in the preceding sentence, but which is a "venture capital operating company" described in paragraph (d) or a "real estate operating company" described in paragraph (e).

(d) "Venture capital operating company". (1) An entity is a "venture capital operating company" for the period beginning on an initial valuation date described in paragraph (d)(5)(i) and ending on the last day of the first "annual valuation period" described in paragraph (d)(5)(ii) (in the case of an entity that is not a venture capital operating company immediately before the determination) or for the 12 month period following the expiration of an "annual valuation period" described in paragraph (d)(5)(ii) (in the case of an entity that is a venture capital operating company immediately before the determination) if—

(i) On such initial valuation date, or at any time within such annual valuation period, at least 50 percent of its as-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 FR 41262-01, 1986 WL 116042 (F.R.)

sets (other than short-term investments pending long-term commitment or distribution to investors), valued at cost, are invested in venture capital investments described in paragraph (d)(3)(i) or derivative investments described in paragraph (d)(4); and

(ii) During such 12 month period (or during the period beginning on the initial valuation date and ending on the last day of the first annual valuation period), the entity, in the ordinary course of its business, actually exercises management rights of the kind described in paragraph (d)(3)(ii) with respect to one or more of the operating companies in which it invests.

**\*41282** (2)(i) A venture capital operating company described in paragraph (d)(1) shall continue to be treated as a venture capital operating company during the "distribution period" described in paragraph (d)(2)(ii). An entity shall not be treated as a venture capital operating company at any time after the end of the distribution period.

(ii) The "distribution period" referred to in paragraph (d)(2)(i) begins on a date established by a venture capital operating company that occurs after the first date on which the venture capital operating company has distributed to investors the proceeds of at least 50 percent of the highest amount of its investments (other than short-term investments made pending long-term commitment or distribution to investors) outstanding at any time from the date it commenced business (determined on the basis of the cost of such investments) and ends on the earlier of—

(A) The date on which the company makes a "new portfolio investment", or

(B) The expiration of 10 years from the beginning of the distribution period.

(iii) For purposes of paragraph (d)(2)(ii)(A), a "new portfolio investment" is an investment other than—

(A) An investment in an entity in which the venture capital operating company had an outstanding venture capital investment at the beginning of the distribution period which has continued to be outstanding at all times during the distribution period, or

(B) A short-term investment pending long-term commitment or distribution to investors.

(3)(i) For purposes of this paragraph (d) a "venture capital investment" is an investment in an operating company (other than a venture capital operating company) as to which the investor has or obtains management rights.

(ii) The term "management rights" means contractual rights directly between the investor and an operating company to substantially participate in, or substantially influence the conduct of, the management of the operating company.

(4)(i) An investment is a "derivative investment" for purposes of this paragraph (d) if it is—

(A) A venture capital investment as to which the investor's management rights have ceased in connection with a public offering of securities of the operating company to which the investment relates, or

(B) An investment that is acquired by a venture capital operating company in the ordinary course of its business in exchange for an existing venture capital investment in connection with:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1) A public offering of securities of the operating company to which the existing venture capital investment relates, or

(2) A merger or reorganization of the operating company to which the existing venture capital investment relates, provided that such merger or reorganization is made for independent business reasons unrelated to extinguishing management rights.

(ii) An investment ceases to be a derivative investment on the later of:

(A) 10 years from the date of the acquisition of the original venture capital investment to which the derivative investment relates, or

(B) 30 months from the date on which the investment becomes a derivative investment.

(5) For purposes of this paragraph (d) and paragraph (e)—

(i) An "initial valuation date" is the later of—

(A) Any date designated by the company within the 12 month period ending with the effective date of this section, or

(B) The first date on which an entity makes an investment that is not a short-term investment of funds pending long-term commitment.

(ii) An "annual valuation period" is a preestablished annual period, not exceeding 90 days in duration, which begins no later than the anniversary of an entity's initial valuation date. An annual valuation period, once established may not be changed except for good cause unrelated to a determination under this paragraph (d) or paragraph (e).

(e) "Real estate operating company". An entity is a "real estate operating company" for the period beginning on an initial valuation date described in paragraph (d)(5)(i) and ending on the last day of the first "annual valuation period" described in paragraph (d)(5)(ii) (in the case of an entity that is not a real estate operating company immediately before the determination) or the expiration of an annual valuation period described in paragraph (d)(5)(ii) (in the case of an entity that is a real estate operating company immediately before the determination) if:

(1) On such initial valuation date, or on any date within such annual valuation period, at least 50 percent of its assets, valued at cost (other than short-term investments pending long-term commitment or distribution to investors), are invested in real estate which is managed or developed and with respect to which such entity has the right to substantially participate directly in the management or development activities; and

(2) During such 12 month period (or during the period beginning on the initial valuation date and ending on the last day of the first annual valuation period) such entity in the ordinary course of its business is engaged directly in real estate management or development activities.

(f) Participation by benefit plan investors. (1) Equity participation in an entity by benefit plan investors is "significant" on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25 percent or more of the value of any class of equity interests in the entity is held by benefit plan investors (as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

defined in paragraph (f)(2)). For purposes of determinations pursuant to this paragraph (f), the value of any equity interests held by a person (other than a benefit plan investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded.

(2) A "benefit plan investor" is any of the following—

(i) Any employee benefit plan (as defined in section 3(3) of the Act), whether or not it is subject to the provisions of Title I of the Act,

(ii) Any plan described in section 4975(e)(1) of the Internal Revenue Code,

(iii) Any entity whose underlying assets include plan assets by reason of a plan's investment in the entity.

(3) An "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. For purposes of this paragraph (f)(3), "control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(g) Joint ownership. For purposes of this section, where a plan jointly owns property with others, or where the value of a plan's equity interest in an entity relates solely to identified property of the entity, such property shall be treated as the sole property of a separate entity.

(h) Specific rules relating to plan investments. Notwithstanding any other provision of this section—

(1) Except where the entity is an investment company registered under the Investment Company Act of 1940, when a plan acquires or holds an interest in any of the following entities its assets include its investment and an undivided interest in each of the underlying assets of the entity:

**\*41283** (i) A group trust which is exempt from taxation under section 501(a) of the Internal Revenue Code pursuant to the principles of Rev. Rul. 81-100, 1981-1 C.B. 326,

(ii) A common or collective trust fund of a bank,

(iii) A separate account of an insurance company, other than a separate account that is maintained solely in connection with fixed contractual obligations of the insurance company under which the amounts payable, or credited, to the plan and to any participant or beneficiary of the plan (including an annuitant) are not affected in any manner by the investment performance of the separate account.

(2) When a plan acquires or holds an interest in any entity (other than an insurance company licensed to do business in a State) which is established or maintained for the purpose of offering or providing any benefit described in section 3(1) or section 3(2) of the Act to participants or beneficiaries of the investing plan, its assets will include its investment and an undivided interest in the underlying assets of that entity.

(3) When a plan or a related group of plans owns all of the outstanding equity interests (other than director's qualifying shares) in an entity, its assets include those equity interests and all of the underlying assets of the entity. This paragraph (h)(3) does not apply, however, where all of the outstanding equity interests in an entity are qualifying employer securities described in section 407(d)(5) of the Act, owned by one or more eligible indi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

vidual account plan(s) (as defined in section 407(d)(3) of the Act) maintained by the same employer, provided that substantially all of the participants in the plan(s) are, or have been, employed by the issuer of such securities or by members of a group of affiliated corporations (as determined under section 407(d)(7) of the Act) of which the issuer is a member.

(4) For purposes of paragraph (h)(3), a "related group" of employee benefit plans consists of every group of two or more employee benefit plans—

(i) Each of which receives 10 percent or more of its aggregate contributions from the same employer or from members of the same controlled group of corporations (as determined under section 1563(a) of the Internal Revenue Code, without regard to section 1563(a)(4) thereof); or

(ii) Each of which is either maintained by, or maintained pursuant to a collective bargaining agreement negotiated by, the same employee organization or affiliated employee organizations. For purposes of this paragraph, an "affiliate" of an employee organization means any person controlling, controlled by, or under common control with such organization, and includes any organization chartered by the same parent body, or governed by the same constitution and bylaws, or having the relation of parent and subordinate.

(i) Governmental mortgage pools. (1) Where a plan acquires a guaranteed governmental mortgage pool certificate, as defined in paragraph (i)(2), the plan's assets include the certificate and all of its rights with respect to such certificate under applicable law, but do not, solely by reason of the plan's holding of such certificate, include any of the mortgages underlying such certificate.

(2) A "guaranteed governmental mortgage pool certificate" is a certificate backed by, or evidencing an interest in, specified mortgages or participation interests therein and with respect to which interest and principal payable pursuant to the certificate is guaranteed by the United States or an agency or instrumentality thereof. The term "guaranteed governmental mortgage pool certificate" includes a mortgage pool certificate with respect to which interest and principal payable pursuant to the certificate is guaranteed by:

(i) The Government National Mortgage Association;

(ii) The Federal Home Loan Mortgage Corporation; or

(iii) The Federal National Mortgage Association.

(j) Examples. The principles of this section are illustrated by the following examples:

(1) A plan, P, acquires debentures issued by a corporation, T, pursuant to a private offering. T is engaged primarily in investing and reinvesting in precious metals on behalf of its shareholders, all of which are benefit plan investors. By its terms, the debenture is convertible to common stock of T at P's option. At the time of P's acquisition of the debentures, the conversion feature is incidental to T's obligation to pay interest and principal. Although T is not an operating company, P's assets do not include an interest in the underlying assets of T because P has not acquired an equity interest in T. However, if P exercises its option to convert the debentures to common stock, it will have acquired an equity interest in T at that time and (assuming that the common stock is not a publicly-offered security and that there has been no change in the composition of the other equity investors in T) P's assets would then include an undivided interest in the underlying assets of T.

(2) A plan, P, acquires a limited partnership interest in a limited partnership, U, which is established and main-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

tained by A, a general partner in U. U has only one class of limited partnership interests. U is engaged in the business of investing and reinvesting in securities. Limited partnership interests in U are offered privately pursuant to an exemption from the registration requirements of the Securities Act of 1933. P acquires 15 percent of the value of all the outstanding limited partnership interests in U, and, at the time of P's investment, a governmental plan owns 15 percent of the value of those interests. U is not an operating company because it is engaged primarily in the investment of capital. In addition, equity participation by benefit plan investors is significant because immediately after P's investment such investors hold more than 25 percent of the limited partnership interests in U. Accordingly, P's assets include an undivided interest in the underlying assets of U, and A is a fiduciary of P with respect to such assets by reason of its discretionary authority and control over U's assets. Although the governmental plan's investment is taken into account for purposes of determining whether equity participation by benefit plan investors is significant, nothing in this section imposes fiduciary obligations on A with respect to that plan.

(3) Assume the same facts as in paragraph (j)(2), except that P acquires only 5 percent of the value of all the outstanding limited partnership interests in U, and that benefit plan investors in the aggregate hold only 10 percent of the value of the limited partnership interests in U. Under these facts, there is no significant equity participation by benefit plan investors in U, and, accordingly, P's assets include its limited partnership interest in U, but do not include any of the underlying assets of U. Thus, A would not be a fiduciary of P by reason of P's investment.

(4) Assume the same facts as in paragraph (j)(3) and that the aggregate value of the outstanding limited partnership interests in U is $10,000 (and that the value of the interests held by benefit plan investors is thus $1000). Also assume that an affiliate of A owns limited partnership interests in U having a value of $6500. The value of the limited partnership interests held by A's affiliate are disregarded for purposes of determining whether there is significant equity participation in U by benefit plan investors. Thus, the percentage of the aggregate value of the limited partnership interests held by benefit plan investors in U for purposes of such a determination is approximately 28.6% ($1000/$3500). Therefore there is significant benefit plan investment in T.

(5) A plan, P, invests in a limited partnership, V, pursuant to a private offering. There is significant equity participation by benefit plan investors in V. V acquires equity positions in the companies in which it invests, and, in connection with these investments, V negotiates terms that give it the right to participate in or influence the management of those companies. Some of these investments are in publicly-offered securities and some are in securities acquired in private offerings. During its most recent valuation period, more than 50 percent of V's assets, valued at cost, consisted of investments with respect to which V obtained management rights of the kind described above. V's managers routinely *41284 consult informally with, and advise, the management of only one portfolio company with respect to which it has management rights, although it devotes substantial resources to its consultations with that company. With respect to the other portfolio companies, V relies on the managers of other entities to consult with and advise the companies' management. V is a venture capital operating company and therefore P has acquired its limited partnership investment, but has not acquired an interest in any of the underlying assets of V. Thus, none of the managers of V would be fiduciaries with respect to P solely by reason of its investment. In this situation, the mere fact that V does not participate in or influence the management of all its portfolio companies does not affect its characterization as a venture capital operating company.

(6) Assume the same facts as in paragraph (j)(5) and the following additional facts: V invests in debt securities as well as equity securities of its portfolio companies. In some cases V makes debt investments in companies in which it also has an equity investment; in other cases V only invests in debt instruments of the portfolio com-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

pany. V's debt investments are acquired pursuant to private offerings and V negotiates covenants that give it the right to substantially participate in or to substantially influence the conduct of the management of the companies issuing the obligations. These covenants give V more significant rights with respect to the portfolio companies' management than the covenants ordinarily found in debt instruments of established, creditworthy companies that are purchased privately by institutional investors. V routinely consults with and advises the management of its portfolio companies. The mere fact that V's investments in portfolio companies are debt, rather than equity, will not cause V to fail to be a venture capital operating company, provided it actually obtains the right to substantially participate in or influence the conduct of the management of its portfolio companies and provided that in the ordinary course of its business it actually exercises those rights.

(7) A plan, P, invests (pursuant to a private offering) in a limited partnership, W, that is engaged primarily in investing and reinvesting assets in equity positions in real property. The properties acquired by W are subject to long-term leases under which substantially all management and maintenance activities with respect to the property are the responsibility of the lessee. W is not engaged in the management or development of real estate merely because it assumes the risks of ownership of income-producing real property, and W is not a real estate operating company. If there is significant equity participation in W by benefit plan investors, P will be considered to have acquired an undivided interest in each of the underlying assets of W.

(8) Assume the same facts as in paragraph (j)(7) except that W owns several shopping centers in which individual stores are leased for relatively short periods to various merchants (rather than owning properties subject to long-term leases under which substantially all management and maintenance activities are the responsibility of the lessee). W retains independent contractors to manage the shopping center properties. These independent contractors negotiate individual leases, maintain the common areas and conduct maintenance activities with respect to the properties. W has the responsibility to supervise and the authority to terminate the independent contractors. During its most recent valuation period more than 50 percent of W's assets, valued at cost, are invested in such properties. W is a real estate operating company. The fact that W does not have its own employees who engage in day-to-day management and development activities is only one factor in determining whether it is actively managing or developing real estate. Thus, P's assets include its interest in W, but do not include any of the underlying assets of W.

(9) A plan, P, acquires a limited partnership interest in X pursuant to a private offering. There is significant equity participation in X by benefit plan investors. X is engaged in the business of making "convertible loans" which are structured as follows: X lends a specified percentage of the cost of acquiring real property to a borrower who provides the remaining capital needed to make the acquisition. This loan is secured by a mortgage on the property. Under the terms of the loan, X is entitled to receive a fixed rate of interest payable out of the initial cash flow from the property and is also entitled to that portion of any additional cash flow which is equal to the percentage of the acquisition cost that is financed by its loan. Simultaneously with the making of the loan, the borrower also gives X an option to purchase an interest in the property for the original principal amount of the loan at the expiration of its initial term. X's percentage interest in the property, if it exercises this option, would be equal to the percentage of the acquisition cost of the property which is financed by its loan. The parties to the transaction contemplate that the option ordinarily will be exercised at the expiration of the loan term if the property has appreciated in value. X and the borrower also agree that, if the option is exercised, they will form a limited partnership to hold the property. X negotiates loan terms which give it rights to substantially influence, or to substantially participate in, the management of the property which is acquired with the proceeds of the loan. These loan terms give X significantly greater rights to participate in the management of the property than it would obtain under a conventional mortgage loan. In addition, under the terms of the loan, X and the borrower

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ratably share any capital expenditures relating to the property. During its most recent valuation period, more than 50 percent of the value of X's assets valued at cost consisted of real estate investments of the kind described above. X, in the ordinary course of its business, routinely exercises its management rights and frequently consults with and advises the borrower and the property manager. Under these facts, X is a real estate operating company. Thus, P's assets include its interest in X, but do not include any of the underlying assets of X.

(10) In a private transaction, a plan, P, acquires a 30 percent participation in a debt instrument that is held by a bank. Since the value of the participation certificate relates solely to the debt instrument, that debt instrument is, under paragraph (g), treated as the sole asset of a separate entity. Equity participation in that entity by benefit plan investors is significant since the value of the plan's participation exceeds 25 percent of the value of the instrument. In addition, the hypothetical entity is not an operating company because it is primarily engaged in the investment of capital (i.e., holding the debt instrument). Thus, P's assets include the participation and an undivided interest in the debt instrument, and the bank is a fiduciary of P to the extent it has discretionary authority or control over the debt instrument.

(11) In a private transaction, a plan, P, acquires 30% of the value of a class of equity securities issued by an operating company, Y. These securities provide that dividends shall be paid solely out of earnings attributable to certain tracts of undeveloped land that are held by Y for investment. Under paragraph (g), the property is treated as the sole asset of a separate entity. Thus, even though Y is an operating company, the hypothetical entity whose sole assets are the undeveloped tracts of land is not an operating company. Accordingly, P is considered to have acquired an undivided interest in the tracts of land held by Y. Thus, Y would be a fiduciary of P to the extent it exercises discretionary authority or control over such property.

(12) A medical benefit plan, P, acquires a beneficial interest in a trust, Z, that is not an insurance company licensed to do business in a State. Under this arrangement, Z will provide the benefits to the participants and beneficiaries of P that are promised under the terms of the plan. Under paragraph (h)(2), P's assets include its beneficial interest in Z and an undivided interest in each of its underlying assets. Thus, persons with discretionary authority or control over the assets of Z would be fiduciaries of P.

(k) Effective date and transitional rules. (1) In general, this section is effective for purposes of identifying the assets of a plan on or after [March 13, 1987]. Except as a defense, this section shall not apply to investments in an entity in existence on [March 13, 1987], if no plan subject to Title I of the Act or plan described in section 4975(e)(1) of the Code (other than a plan described in section 4975(g)(2) or 4975(g)(3)) acquires an interest in the entity from an issuer or underwriter at any time on or after [March 13, 1987] except pursuant to a contract binding on the plan in effect on [March 13, 1987] with an issuer or underwriter to acquire an interest in the entity.

(2) Notwithstanding paragraph (k)(1), this section shall not, except as a defense, apply to a real estate entity described in section 11018(a) of Pub. L. 99-272.

**\*41285** PART 2550—RULES AND REGULATIONS FOR FIDUCIARY RESPONSIBILITY5. The authority citation for Part 2550 is revised to read as set forth below and the authority citations following all the sections in Part 2550 are removed.

Authority: 29 U.S.C. 1135. Section 2550.407c-3 also issued under 29 U.S.C. 1107. Section 2550.412-1 also issued under 29 U.S.C. 1112. Section 2550.414b-1 also issued under 29 U.S.C. 1114. Secretary of Labor Order No. 1-86.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 FR 41262-01, 1986 WL 116042 (F.R.)                                    Page 49

29 CFR § 2550.401b-1

6. Part 2550 is amended by removing § 2550.401b-1.

Signed at Washington, DC, this 6th day of November, 1986.

Dennis M. Kass.

Assistant Secretary, Pension and Welfare Benefits Administration, U.S. Department of Labor.

[FR Doc. 86-25512 Filed 11-12-86; 8:45 am]

BILLING CODE 4510-29-M

51 FR 41262-01, 1986 WL 116042 (F.R.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.