Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jorian Rose
Email: jrose@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
And Bernard L. Madoff*

Hearing Date: May 23, 2012
Hearing Time: 10:00 A.M. EST

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| Bernard L. Madoff | |
| Debtor. | |

**SUR-REPLY OF TRUSTEE IN FURTHER SUPPORT OF
TRUSTEE'S MOTION FOR AN ORDER AFFIRMING
TRUSTEE'S DETERMINATIONS DENYING CLAIMS OVER
ERISA-RELATED OBJECTIONS**

Pursuant to this Court's ERISA Scheduling Order of November 8, 2011 (ECF No. 4507), Irving H. Picard, trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), by and through his undersigned counsel, respectfully submits this Sur-Reply of Trustee In Further Support of the Trustee's Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections,[1] to affirm the denial of those customer claims and to adjudicate objections filed by claimants who argue that the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and related regulations confer on them "customer" status, as that term is defined by section 78*lll*(2) of SIPA,[2] and states as follows:

## I.
## PRELIMINARY STATEMENT

Neither the objections to the ERISA Motion nor the reply briefs as to those objections provide any support for the proposition that ERISA has any effect on customer status under SIPA, or that ERISA changes property law in the manner alleged. The Trustee contends that the ERISA issues can be decided as a matter of law. He is not challenging, for purposes of this immediate hearing only, the existence of certain facts[3] such as that the underlying plans are regulated by ERISA, and that the property of the Account Holders through which Plan Claimants

---

[1] The Trustee's Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections (ECR No. 4521), hereafter, the "ERISA Motion". Terms not otherwise defined herein shall have the meaning given them in the ERISA Motion and in the Memorandum in Support of the Trustee's Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections (ECR No. 4703), hereafter, the "Trustee's Prior ERISA Brief." Unless otherwise indicated, page number references to documents will be to the page numbers as printed on those documents rather than to the actual overall page count.

[2] The Securities Investor Protection Act, 15 U.S.C. § 78aaa, *et seq.* For convenience, future reference to SIPA will not include "15 U.S.C.".

[3] *See* Trustee's Prior ERISA Brief at pp. 12-13, 42-44.

2

claim, constitutes "Plan Assets" within the meaning of the Plan Asset Regulation.[4] If the Court decides that those facts are relevant, the Trustee would request completion of discovery and a hearing at a later date.

The five reply briefs were filed by or on behalf of the following ERISA Claimants:

(1) The J. X. Reynolds & Co. Deferred Profit Sharing Plan ("Reynolds Plan", and the brief, the "Reynolds Plan Reply");

(2) The Jacqueline and Wayne Green Rollover Accounts (the "Green Individual Accounts", and the brief, the "Green Individual Accounts Reply");

(3) The 37 Plan Claimants represented by Blitman & King LLP (collectively, the "Construction Plans", and the brief, the "Construction Plans Reply");

(4) Eric S. Saretsky and the unidentified Administrator of the Sterling Equities Associates Employee Retirement Plan, purportedly on behalf of all Sterling plan participants[5] (collectively, the "Sterling Individual Claimants", and the brief, the "Sterling Individuals Reply"); and

(5) A group styled as the individual participants in the Orthopaedic Specialty Group P.C. Defined Contribution Pension Plan ("Orthopaedic Individual Claimants", and the brief, the "Orthopaedic Individuals Reply").

Two of the reply briefs—the Reynolds Plan Reply and the Construction Plans Reply—are on behalf of Plan Claimants who contend that they should be treated as customers despite investing, directly or indirectly, in the third-party entities that actually held the BLMIS accounts. The other three—the Green Individual Accounts Reply, the Orthopaedic Individuals Reply, and

---

[4] 29 C.F.R. § 2510.3-101.

[5] Eric S. Saretsky and the Administrator still purport to be acting on behalf of all Sterling Plan participants, despite never having identified a legal entitlement to do so, their prior stated ERISA statutory basis having been repudiated by the Trustee. Nothing they say in the reply changes the fact that they lack standing to speak on behalf of the other Sterling Plan participants.

the Sterling Individuals Reply—are on behalf of Individual Claimants who contend that they should be treated as separate customers despite the fact the relevant BLMIS accounts were opened by, maintained by, and held in the name of their plans.

None of the briefs contradict the Trustee's basic arguments that ERISA has no bearing on whether the claimants are SIPA customers. These basic arguments are:

- SIPA customer status is conferred only on persons who have, or at least are supposed to have, their own brokerage accounts (but for a limited statutory exception not applicable here.) In other words, the "customer" is the person who actually owned the property and entrusted the property to the broker.[6] This is the same person who would have been entitled to demand its direct return from the broker had no broker insolvency occurred – a critical point, since SIPA is primarily about returning customer property to the customers;

- ERISA cannot modify the SIPA distribution scheme because the relevant ERISA provisions are expressly subordinate to SIPA as a matter of statute;

- That plans (the "Plan Claimants"), notwithstanding the Plan Asset Regulation, own neither the BLMIS accounts of the entities in which they invested, nor the property deposited into those accounts;

- ERISA does not cause the individual pension plan participants (the "Individual Claimants"), as opposed to their plan and its trustees, to own and control the money that their plans placed in the plans' BLMIS accounts; and

---

[6] As also discussed in the Trustee's Prior ERISA Brief at p.15—which certainly did not "abandon" the entrustment argument.

4

- That fiduciary obligations under ERISA, even assuming they exist here, would not suffice to transform any otherwise ineligible person into a SIPA customer.

The Green Individual Accounts Reply and the Reynolds Plan Reply appear to raise no ERISA issues at all; instead, they make customer arguments divorced from ERISA.[7] The Scheduling Order provided that the court at this juncture "will only consider the Trustee's construction of the term 'customer' as it relates to ERISA." Consequently, the Trustee will not further address the issues raised in these two replies.[8] The Orthopaedic Individuals Reply, and the Sterling Individuals Reply attempt to argue that the *LaRue* and *Milgram* cases cited by the Trustee are either irrelevant or distinguishable, and that actual ownership is not critical anyway. *LaRue* and *Milgram* are directly on point and ownership is critical to establish customer status under ERISA. The Construction Plans Reply concedes that actual ownership is critical, but contends that the Plan Asset Regulation confers it and that even if it does not, they have some sort of beneficial or contract ownership anyway. The Construction Plans also, incredibly and without explanation, contend that none of the entities with accounts at BLMIS in which they invested, are customers of BLMIS; only they are. The arguments of both the Plan Claimants and the Individual Claimants seek to expand ERISA beyond its statutory limits, and should be rejected.

---

[7] Despite the Reynolds Plan Reply claims to the contrary, the Trustee has never conceded that "some sort of relationship with BLMIS" would entitle an indirect claimant to customer status.

[8] The Trustee will briefly note, however, that case law clearly establishes that the "customer" term is to be construed narrowly, not the reverse. *See, e.g., Aozora Bank Ltd. v. Sec. Investor Prot. Corp (In re Bernard L. Madoff Inv. Sec., LLC)*, 11 Civ. 5683 *et al.*, 2012 WL 28468 (S.D.N.Y. Jan 4, 2012) at *4 *(*"The Second Circuit has noted that "[j]udicial interpretations of 'customer' status support a narrow interpretation of SIPA's provisions."") (citing *In re New Times Sec. Servs., Inc.,* 463 F.3d 125, 127 (2d Cir. 2006)). Moreover, the argument that legislative history shows that the SIPA legislation originally required an express account but was amended to remove the requirement, is readily explained by the legislative history discussed in the Trustee's Prior ERISA Brief at pp. 21-22. The statute as passed was a compromise on the issue of account ownership that made an express statutory exception (SIPA § 78fff-3(a)(5)) for certain clients of brokers, dealers, or banks, and for no other indirect investors. Even if the Trustee does not further respond to any particular point raised in the Reply Briefs, he does not waive any argument.

## II.
## ARGUMENT

### A.    The Plan Claimants' Replies

The Construction Plans Reply continues to press the argument that ERISA causes plans to have an overriding and undivided statutorily granted ownership interest in the property of the Account Holders. The Construction Plans attempt to advance this argument by refocusing in the reply on an ERISA definitional section rather than on the Plan Asset Regulation itself, and by citing a barrage of case law and advisory opinions that are not on point.

The Construction Plan Claimants argue that ERISA quietly preempted state property law more than 20 years ago. It did not. ERISA plan asset rules (whether statutory or regulatory) have nothing to do with determining actual ownership rights in property. As set forth in the Trustee's Prior ERISA Brief, the ERISA Plan Asset Regulation simply explains how to interpret the term "plan assets" when it is used in particular sections of ERISA Title I, where it is accorded a specialized meaning intended to differ from its common dictionary one, and in a related Internal Revenue Code section. The intent of that specialized meaning, as expressly confirmed by the United States Department of Labor when promulgating the Plan Asset Regulation, was to give particular boundaries to ERISA fiduciary and reporting requirements. It did not alter state property law rights or other federal property law rights determined outside of ERISA.

The definitional section of the ERISA statute has no different intent or effect on property ownership than does the Plan Asset Regulation. Like the Plan Asset Regulation to which it refers, the statute is self-limiting, applying only to Title I of ERISA. *Cf. De Breceni v. Graf Bros. Leasing, Inc.,* 828 F.2d 877, 879-80 (1st Cir. 1987) (ERISA Title I definition applies strictly to that title; definition of the same term, even as used elsewhere in ERISA, is up to the

6

courts). The definitional section of Title I of ERISA relied upon by the Construction Plans[9] begins:

> "29 U.S.C. § 1002. Definitions
>
> *For purposes of this subchapter*[10]: . . .
>
> (42) the term "plan assets" means plan assets as defined by such regulations as the Secretary may prescribe, . . . ." (emphasis added).

In other words, it starts out by explaining that it is creating a statutorily defined term solely for purposes of Title I of ERISA. It then refers right back to the Plan Asset Regulation. It imposes certain restrictions on what the Plan Asset Regulation may do, rather than setting out a complete definition of its own. The statue does nothing to support their argument.

Neither of the two Plan Claimant replies—the Construction Plans Reply or the Reynolds Reply—cited a single case or advisory opinion that used the Plan Asset Regulation, or the ERISA plan asset "definition," to determine ownership of property for commercial law purposes rather than for interpreting requirements of Title I of ERISA. The only cited opinion that even indirectly addressed the question of whether such a use would be appropriate, Advisory Opinion to Alden J. Bianchi, Opinion No. 2003-05A, 2003 WL 1901900 (Dep't of Labor April 10, 2003) ("DOL Adv. Op. 2003-05A"), concluded that it would not.

The advisory opinions string-cited in the Construction Plans Reply:

---

[9] This provision was added in 2006, approximately 18 years after the Plan Asset Regulation was adopted. Par. (42). Pub. L. 109-280, Sec. 611(f), added par. (42). Pub. L. 109-280, title VI, Sec. 611(f), title IX, Secs. 905(a), 906(a)(2)(A), title XI, Secs. 1104(c), 1106(a), Aug. 17, 2006, 120 Stat. 972, 1050, 1051, 1060.

[10] Subchapter I, "Protection of Employee Benefit Rights" covers only what is known as ERISA Title I, which is codified at 29 U.S.C. Sections 1001 through 1191(c), and consists of Subtitle A and B.

7

(1) answer whether "the assets of a trust would constitute assets of an employee welfare benefit plan *for purposes of Title I of ERISA"*, Advisory Opinion to Mr. Thomas Veal, Opinion No. 94-31A, 1994 WL 501646 (Dep't of Labor Sept. 9, 1994)(emphasis added);

(2) answer "whether anything in Title I of ERISA" precludes an employer from retaining stock received as a result of demutualization, while recognizing that actual ownership issues are outside the scope of Title I of ERISA, DOL Adv. Op. 2003-05A, 2003 WL 1901900;

(3) determine whether a policy is an asset of the plan that would have to be reported or submitted under ERISA provisions (in this opinion, the legal ownership for non-ERISA purposes was part of the fact stipulation that the Department of Labor relied upon in issuing the opinion— namely, that the employer "would have all rights of ownership under the Policy" and "neither the Plan nor any participant or beneficiary of the Plan would have . . .any beneficial interest in the Policy"), Advisory Opinion to Mr. James A. Kinder, Opinion No. 92-02A, 1992 WL 15175 (Dep't of Labor Jan. 17, 1992);

(4) determine whether payments by a trust to a pension plan would constitute "prohibited transactions under section 406" of ERISA and section 4975 of the Internal Revenue Code (both concerning fiduciary-related transactions), Advisory Opinion to Mr. Bruce Cooper, Opinion No. 2011-10A, (Dep't of Labor Dec. 16, 2011) ("DOL Adv. Op. 2011-10A") (*available at* http://www.dol.gov/ebsa/regs/aos/ao2011-10a.html);

(5) determine "the duties and responsibilities under ERISA", including fiduciary status, of various persons with respect to the allocation and distribution of mutual fund settlement proceeds to plans and plan participants, Field Assistant Bulletin, No. 2006-01 (Dep't of Labor April 19, 2006) (*available at* http://www.dol.gov/ebsa/regs/fab_2006-1.html);

(6) determine whether litigation proceeds from a tobacco settlement should be treated as plan assets once in the hands of policy holders and would therefore have to be held in trust, not inure to the employer's benefit, and be "subject to, among other things, the fiduciary responsibility provisions of ERISA section 404, the prohibited transaction provisions of ERISA section 406 and the bonding requirements of section 412", Advisory Opinion to Joel A. Mintzer, Esq., Opinion No. 2005-08A (Dep't of Labor May 11, 2005);

(7) determine whether assets of a grantor trust "would constitute assets of an employer welfare benefit plan *for purposes of Title I of ERISA*", Advisory Opinion to Mr. Thomas Meagher, Opinion No. 1999-08A (Dep't of Labor May 20, 1999) (*available at* http://www.dol.gov/ebsa/regs/AOs/ao1999-08a.html) (emphasis added); and

(8) answer a question "concerning the Department's regulatory exemption from the annual reporting requirements for certain small welfare benefit plans under . . . ERISA", Advisory Opinion to Mr. Norman K. Pellerino, Opinion No. 2005-92-24A (Dep't of Labor Nov. 11, 1992) (*available at* http://www.dol.gov/ebsa/regs/AOs/ao1999-08a.html).

Each of these advisory opinions used the plan asset rules solely for their intended purpose: interpreting and enforcing the statutory and regulatory requirements placed on ERISA fiduciaries. It is in this same limited context—interpreting and enforcing the statutory and regulatory requirements of ERISA fiduciaries—that these advisory opinions (as well as some of the cited case law) contain references to resorting to non-ERISA law. In order to determine whether to treat something as a "Plan Asset" under Title I of ERISA, they sometimes look to non-ERISA law since the Plan Asset Regulation does not attempt to cover all fact situations that are relevant to ERISA Title I issues. For those fact situations that it does not cover, the blanks get filled in by non-ERISA law.

As explained previously, the scope of the Plan Asset Regulation is expressly limited to certain portions of the ERISA statute. Thus, in cases considering Title I issues, a statement, for example, about employing ordinary notions of property rights "[i]n situations outside the scope of the plan assets—plan investments regulation (29 C.F.R. 2510.3-101)," DOL Adv. Op. 2011-10A, is self-limiting on its face. Both context and the actual language confirm that the Plan Asset Regulation does not affect those "ordinary notions" of property law outside of interpretation of specific ERISA provisions. Rather, the statements simply point out the converse: that those "ordinary notions" of property law will sometimes affect interpretations of Title I of ERISA.

These eight advisory opinions did not attempt to determine issues of commercial law ownership. Moreover, DOL Adv. Op. 2003-05A, 2003 WL 1901900, expressly disavowed the propriety of attempting to do so. It noted: "The question of whether the employer or the beneficiaries of the termination annuity contract are the *actual* owners of the demutualization proceeds received by the employer as the named policyholder of the annuity is not within the jurisdiction of the Department of Labor under Title I of ERISA. Rather, this issue is governed by the terms of the contract and applicable state law." *Id*. (emphasis added). It could hardly be more clear that the Department of Labor does not consider ERISA to extend to issues of actual ownership as a matter of commercial law. And even if the Department of Labor had been given authority under ERISA to change commercial law rules, it did not exercise that authority. The Plan Asset Regulation is a rule of ERISA construction only, and says so on its face.

The cited cases are equally inapposite. *Secretary of Labor v. Doyle,* No. 10-3598, 2012 U.S. App. LEXIS 6215 (3d Cir. Mar. 27, 2012) concerns an action brought by the Secretary of Labor against persons for breach of their fiduciary duties to ERISA-regulated plans. The "plan

10

asset" issue in the case was referenced only in the context of defining fiduciary duties (the stated function of the Plan Asset Regulation) rather than for ownership issues. Further, the Plan Asset Regulation was ultimately pronounced irrelevant on the facts of the case. *Id.* at *1, 43. *Bank of New York v. Janowick*, 470 F.3d 264, 269, 273 (6th Cir. 2006), a demutualization case, was about actual ownership of property, not about the Plan Asset Regulation, which was not even mentioned in passing (nor was its statutory counterpart). The Court decided the matter based on state property law, and approvingly cited DOL Adv. Op. 2003-05A, 2003 WL 1901900, the advisory opinion which pronounces such actual ownership issues to be the province of contract terms and state law, not of Title I of ERISA. *Id.,* 407 F.3d at 269. *Jackson v. United States,* 555 U.S. 1163, 1163 (2009), involved a one-sentence vacating of the conviction of two defendants under a statute that deals with embezzlement or theft from a pension plan. The decision was vacated after the United States Solicitor General advised the court that on further reflection, the Justice Department had been incorrect in pursuing the conviction, because unpaid contributions (the subject of the conviction) are not pension plan assets. The Plan Asset Regulation does not deal with such contributions and was not at issue. *See generally* Brief of Solicitor-General, *Jackson v. United States*, 2009 U.S. S.Ct. Briefs LEXIS 3517. And *Kalda v. Sioux Valley Physician Partners, Inc.,* 481 F.3d 639, 643 (8th Cir. 2007), only concerns assets of a plan for purposes of fiduciary responsibilities; the decision concerned a breach of fiduciary duty action.

      The Construction Plans also assert (for the first time) that they also have a contract-based actual ownership interest arising under state law. In the case of Income Plus, they also argue that they have a state law ownership interest due to trust law principles and due to the mandates of

the Internal Revenue Code.[11]  These do not appear to be arguments that fall within the purview of ERISA, but in any event, they are also incorrect.

A review of the cited section of the offering memorandum for the Beacon funds shows that, in context, the offering memorandum does nothing more than warn that investments in the fund may be subject to the Plan Asset Regulation, with the normal consequent ERISA fiduciary ramifications.  It says, "Depending upon the percentage of Membership Interests purchased by Benefit Plan Investors . . ., the underlying assets of the Company *may be considered to be* assets of the ERISA Plans and Individual Retirement Funds investing in the Company ("Plan Assets"). Under a regulation of the Department of Labor,  . . .the underlying assets of the Company will not be *deemed* plan assets if, in the aggregate, less than 25%  of  the  Membership  Interests (excluding  Membership  Interests  held  by  the  Managing  Member or its affiliates) are held by Benefit Plan Investors . . . . Since the assets of the Company are, and are expected to continue to be *deemed to be*, plan assets, the Managing Member is, and will continue to be, a fiduciary . . . ." Clark Aff. in Opp'n to Tr.'s Mot (Dkt. No. 4635-1) ("Clark Aff."), Ex. D at 22 (emphasis added).  The section then continues to discuss fiduciary ramifications, including prohibited transactions, in more detail.  *Id.*  The Andover offering memorandum has similar language. Clark Aff. Ex. F at pp. 37- 38.

Nonetheless, the offering memoranda also have all the usual provisions about the Managing Member having sole control, about the investing members having limitations on

---

[11] The Internal Revenue Code says nothing about what people actually own, just what they are treated as owning for tax purposes.  For example, the fact that an entity is a "pass through" entity for income tax purposes does not mean that the assets of that entity are the direct property of its shareholder.  *See, e.g.,* N.Y. Ltd. Liab. Co. Law § 601 ("a member has no interest in specific property of the limited liability company").  The additional materials cited by the Construction Plans Reply are also inapposite.  The "group trust" ruling issued by the Internal Revenue Service in Rev. Rul. 81-100, 1981-1 C.B. 326 (Construction Plans' Reply at 20) simply sets forth the conditions under which ERISA-regulated plans that happen to have tax-exempt trusts under IRC Section 501(a) can pool their assets without losing that tax-exempt status.

12

redemption rights, and on the investing members having no rights to redeem property in kind. *See* Clark Aff. Ex. F, pp. 4, 22-23, 34-35; Ex. J, pp. 3, 6, 21, 34-36; Ex. K, pp. 4, 22, 35-37; *see also* Articles of Incorporation and Operating Agreement of Beacon Associates LLC, Clark Aff. Ex. G, pp.21-23 (including power to pledge property). They also have provisions for any necessary liquidation of the Andover or Beacon entities and payment of their debts before final distributions to investing members.[12] Clark Aff. Ex. F, p. 36; Ex. J, p. 37; Ex. K, pp. 38-39. In short, their provisions do not indicate that the investing members, as opposed to the entity, have commercial law-type ownership of any of the assets.

When discussing Income Plus, the Construction Plans try to equate having a beneficial interest in a trust with having the equivalent of outright ownership. However, it is not the same, and the differences are significant for SIPA purposes. The *Morgan Kennedy* case confirmed that a beneficial interest in a trust will not suffice to turn the beneficiaries into "customers" of the brokerage in which the trust maintains an account. *Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1318 (2d Cir. 1976).

*In re Luna,* 406 F.3d 1192 (10th Cir. 2005), a fiduciary case cited in the Construction Plans Reply, held that a "plan asset" beneficial ownership right is only as broad as the interest that underlies it—so where a promise to make contributions was at issue, the plan asset was the contractual right to contributions, not the potential contribution money itself. *Id.* at 1199-1200.

---

[12] The liquidation prospect brings up another point about the Plan Asset Regulation: it makes no effort to set out relative proportions of interests in the property of an entity within the 25% rule, as it surely would need to do for liquidation or other purposes if it were setting out a rule of commercial law. It simply says that (for its stated purposes) each benefit plan has an "undivided" ownership interest in all property of the entity. It does nothing to either qualify or quantify this for purposes of the competing interests of other plans, non-plan investors, and creditors of the entity itself. (If the entity has debts, does it have any property to pay them with if all its members are benefit plans, for example? What about if only some of them are? How is that available property measured if so? How can any of it be liquidated?) This is yet another example of how the interpretation put forth by the Construction Plans is completely unworkable, as well as contradicting the plain language of the Plan Asset Regulation as to its scope.

13

This is comparable with common notions of bankruptcy law, in which interests in property will become assets of the bankruptcy estate only to the extent of that interest under ordinary principles of law. *See* 11 U.S.C. § 541(a)(1) (the bankruptcy estate consists of "all legal or equitable interests of the debtor in property . . . .")

If there was any doubt on the ownership question, the Income Plus Trust agreement itself puts that question to rest. It expressly provides in relevant part, referring to "Participating Entities" such as the Construction Plans: "2.4  Ownership. No Participating Entity or person having an interest in a Participating Entity shall own or have any rights with respect to any particular asset of the Group Trust Fund, any Investment Fund or any part thereto."

In addition, SIPA is designed to return customer property, not to create new rights to brokerage account property for those who would not have had such rights absent a SIPA liquidation or direct payment proceeding. The definition of a "customer" in SIPA establishes who is entitled to payment of customer property under all the varieties of SIPC interventions. See, e.g., SIPA §§ 78fff-2(b) (payments by Trustee), 78fff-4(c) (payments by SIPC under direct payment procedure); *cf.* SIPA § 78fff-2(f) (satisfaction of customer claims by transferring account in whole or in part to another broker.) Under the theories advanced by the ERISA Claimants, however, a beneficiary of a trust should be able to bypass the trust and obtain payment directly in a SIPA proceeding, even though the beneficiary surely could not do so absent such an event. Any retirement plan participant could similarly be able to ignore plan restrictions to directly access retirement trust assets.

Nothing in SIPA leads to such a radical result. Instead, it points clearly to one conclusion—as between Account Holders and claimants with interests in Account Holders, unless a specific statutory exception applies, the "customer" is the Account Holder—*i.e.*, the one

14

who is entitled to control the account and withdraw property from it. *See, e.g., In re Weis Sec., Inc.*, 1977 U.S. Dist. LEXIS 13734, at *10 (S.D.N.Y. Sept. 29, 1977), quoting H. Rep. No. 91-1613, 91st Congr. 2d Sess. (1970) (SIPA was intended to protect those customers with "an unrestricted right to receive on demand these securities which belong to them"); *accord, In re Adler, Coleman Clearing Corp.*, 204 B.R. 111, 118 (Bankr. S.D.N.Y. 1997). Accordingly, the Plan Claimants are not SIPA customers.

B.      **The Individual Claimants Replies**

Neither the Orthopaedic Individual Claimants nor the Sterling Individual Claimants can escape the consequences that *Milgram*[13] and *LaRue*[14] have on their claims. These Second Circuit and Supreme Court cases hold that a defined contribution plan is the legal owner of assets in the employee benefit plan, not any of the individual participants.

The Orthopaedic Individual Claimants unconvincingly try to distinguish the Orthopaedic Plan from the *Milgram* plan, which, like the Orthopaedic Plan, was a defined contribution plan.[15] The Orthopaedic Individual Claimants argue that vested OSG participants are entitled to 100% of their accounts at any time. But that is the description of a checking account, not a retirement

---

[13] *Milgram v. Orthopedic Associates Defined Contribution Pension Plan*, 666 F.3d 68 (2d Cir. 2011).

[14] *LaRue v. DeWolff, Boberg & Assoc., Inc.*, 552 U.S. 248 (2008).

[15] The Orthopaedic Individual Claimants make their claims about their own plan by providing to the Court not the plan itself, but only a summary description of the plan, which "summary documents, important as they are, . . .do not themselves constitute the terms of the plan", as the Supreme Court recently concluded in *CIGNA Corp. v. Amara*, 131 S.Ct. 1866, 1878 (2011). *See* Orthopaedic Specialty Group, P.C. 401(K) Pension Plan Summary Plan Description January 1, 2002, Ex. A. to Affidavit Of Henry Backe In Support Of The OSG Plan Participants' Customer Claims (ECR 4632) (hereafter, "Backe Aff.") Even that summary plan description is of dubious authenticity, since it has blanks in it. *Id.* at pp. 9, 25. It also appears to suggest that there was more than one investment option for participants, *id.* at pp. 1, 8-9, which is wholly inconsistent with allegations the Orthopaedic Plan trustees have made in two professional negligence lawsuits they filed in Connecticut state court in 2010 in the wake of the Madoff scandal. Both of those lawsuits complain that the Orthopaedic Plan trustees were unprotected by section 404(c) of ERISA at the time the Madoff fraud was revealed, precisely because the advisors had not previously recommended changing to a participant-directed plan having multiple investment options. *See Orthopaedic Specialty Group P.C. v. Pentec, Inc.,* 2011 Conn. Super. LEXIS 2383 at *5-6, 13 (Conn. Super. Ct. Sept. 13, 2011).

plan, and the Orthopaedic Plan's provisions (to the extent disclosed by them) do not support that assertion. *See* Backe Aff, Ex. A pp. 11-16. Moreover, since the Orthopaedic Individual Claimants describe their plan as a 401(k) plan, their argument also cannot be true as a matter of statute. Title 26, section 401(k)(2) of the United States Code limits withdrawals to when a certain age is attained or to when certain triggering events occur.

Next, they assert that it was the claimants' own money that was invested. But none of the reasoning in *Milgram* relies on the source of the contribution.

They also try to distinguish *Milgram* by implying that the Orthopaedic Plan alone has vesting rights. Vesting, however, is a statutory requirement of all ERISA pension plans, *see* 29 U.S.C. § 1053, and nothing in *Milgram* suggests that its plan was otherwise.

They also contend that their funds are held for the exclusive benefit of participants. But this, too, is a required feature of all ERISA regulated plans, *see* 29 U.S.C. § 1103(c)(1), and the *Milgram* court even recites comparable "exclusive benefit" language as being contained in the plan in that case. *Milgram*, 666 F.3d at 77.

The Othopaedic Individual Claimants also contend that the quotations from Justice Thomas's concurrence in *LaRue* are dicta. But the central issue in *LaRue* was whether an individual participant can bring suit under ERISA Section 502(a)(2) for a problem affecting his account, even though Section 502(a)(2) on its face requires that the action be brought for the benefit of the *plan*. The entire point of the quoted sections was that, as the majority found, the lawsuit in question would be for the benefit of the plan and thus should not be dismissed since the plan owned even the individual defined contribution account assets. It was directly relevant to the outcome. *LaRue*, 552 U.S. at 253, 262.

More important, the Othopaedic Individual Claimants miss the real point of *Milgram* and *LaRue* – that, as provided by ERISA itself, a defined contribution plan (or any plan) is a separate entity that can sue and be sued, and owns the property entrusted to it, regardless of how and by whom it was contributed.  *See Milgram*, 666 F.3d at 74, 76-77; *LaRue*, 552 U.S. at 253, 262.

Similarly, the Sterling Individuals Reply tries to dismiss *LaRue* and *Milgram* as simply providing that "plan participants should have a direct right to seek recovery of losses from those investments." But *LaRue* required any such action to be brought for the plan, with proceeds paid to the plan. *LaRue*, 552 U.S. at 253, 262. *Milgram* was not about recovery of losses from investments at all, but rather about the individual participant plaintiff being paid by the plan what the plan owed him—even if it meant that other self-directed plan participants would lose some of the money attributed to their individual plan accounts as a result. *Milgram*, 666 F.3d at 74, 76-77.

None of the attempted distinctions have any merit. In fact, as the Second Circuit made clear in *Milgram*, 666 F.3d at 74, 76-77, plans like the Orthopaedic and Sterling Plans own the money contributed to the plan. Regardless of whether an individual participant asked the plan to place it at BLMIS, it was (in the language of SIPA case law) "entrusted" to BLMIS by the plan itself, in every way that is meaningful under the SIPA provision that includes as a customer "any person who has deposited cash with the debtor for the purpose of purchasing securities." SIPA § 78*lll*(2).

# III.
# CONCLUSION

For all of the reasons set out in this and his prior briefing, the Trustee's Motion should be granted, and the Court should hold that ERISA provides no basis on which a person not otherwise a "customer" within the meaning of SIPA should be treated as one.

| | |
|---|---|
| Dated: New York, New York<br>April 20, 2012<br><br>Of Counsel:<br><br><br>Baker & Hostetler LLP<br>3200 National City Center<br>Cleveland, Ohio 44114<br>Telephone: (216) 621-0200<br>Facsimile: (216) 696-0740<br>Brian A. Bash<br>Email: bbash@bakerlaw.com<br>Thomas D. Warren<br>Email: twarren@bakerlaw.com<br>Wendy J. Gibson<br>Email: wgibson@bakerlaw.com | By: */s/ David J. Sheehan*<br><br>**BAKER & HOSTETLER LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Email: dsheehan@bakerlaw.com<br>Jorian L. Rose<br>Email: jrose@bakerlaw.com<br>Seanna R. Brown<br>Email: sbrown@bakerlaw.com<br>Bik Cheema<br>Email: bcheema@bakerlaw.com<br><br>*Attorneys for Irving H. Picard,*<br>*Trustee for the Substantively*<br>*Consolidated SIPA Liquidation of*<br>*Bernard L. Madoff Investment*<br>*Securities LLC and Bernard L. Madoff* |

300208367