**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*And Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**TRUSTEE'S SEVENTH INTERIM REPORT**
**FOR THE PERIOD ENDING MARCH 31, 2012**

# TABLE OF CONTENTS

**Page**

I.      EXECUTIVE SUMMARY ................................................................. 1

II.     BACKGROUND ............................................................................ 4

III.    FINANCIAL CONDITION OF ESTATE ........................................... 4

IV.     ADMINISTRATION OF THE ESTATE ............................................ 5

    A.    Marshaling And Liquidating The Estate Assets ................... 5

    B.    Retention Of Professionals ................................................. 6

V.      CLAIMS ADMINISTRATION ......................................................... 7

    A.    Claims Processing .............................................................. 7

        i.     Customer Claims .......................................................... 7

        ii.    General Creditor Claims ............................................. 7

        iii.   The Trustee Has Kept Customers Informed Of The Status Of The Claims Process ......................................... 8

        iv.    The Hardship Program ................................................ 9

    B.    Objections To Claims Determinations ............................... 11

    C.    Settlements Of Customer Claims Disputes ........................ 12

VI.     PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA ....... 13

    A.    Net Equity Dispute ........................................................... 13

    B.    "Customer" Definition ...................................................... 15

        i.     Feeder Fund Claimants ............................................ 15

        ii.    ERISA Claimants ..................................................... 17

VII.    RECOVERIES AND CONTINGENCIES ........................................ 18

    A.    Recoveries Accomplished During Prior Report Periods ..... 18

    B.    Recoveries Accomplished During This Report Period ........ 19

    C.    Earlier Settlements ........................................................... 21

VIII.   LITIGATION ............................................................................. 26

    A.    The District Court—Motions to Withdraw the Reference, Motions to Dismiss and Related Appeals ........................... 26

        i.     The HSBC Action ..................................................... 27

        ii.    The JPMorgan Action ............................................... 28

        iii.   The Kohn Action ...................................................... 30

        iv.    The Katz-Wilpon Action ........................................... 31

# TABLE OF CONTENTS
(continued)

**Page**

|   |   |   |   |   |
|---|---|---|---|---|
| | v. | Subsequent Motions to Withdraw and Motions to Dismiss in Other Trustee Cases | 35 |
| | vi. | The Administrative Order & Motion Practice | 38 |
| B. | The Bankruptcy Court and Related Appeals | | 39 |
| | i. | *Picard v. Cohmad Sec. Corp.* | 39 |
| | ii. | *Picard v. Peter B. Madoff, et al.* | 40 |
| | iii. | *Picard v. J. Ezra Merkin, et al.* | 43 |
| | iv. | *Picard v. Enrica Cotellessa-Pitz, et al.* | 45 |
| | v. | *Picard v. Friedman, et al.* | 46 |
| | vi. | *Picard v. Richard M. Glantz, et al.* | 46 |
| | vii. | *Picard v. David L. Kugel, et al.* | 47 |
| | viii. | *Picard v. Joel R. Levey* | 48 |
| | ix. | *Picard v. Michael Lieberbaum, et al.* | 49 |
| | x. | *Picard v. Irwin Lipkin, et al.* | 50 |
| | xi. | Subsequent Transferee Actions | 51 |
| | xii. | Case-Wide Procedures | 51 |
| C. | Injunction Proceedings | | 52 |
| | (a) | *Picard v. Fox*, Adv. Pro. No. 10-03114 (BRL), Case Nos. 10-04652, 10-cv-07101, and 10-cv-07219 (JGK); *Picard v. Picower*, Adv. Pro. No. 09-01197 (BRL), Case Nos. 11-cv-01328, 11-cv-01298 (JGK) | 53 |
| | (b) | *Picard v. Stahl*, Adv. Pro. No. 10-03268 (BRL), Case Nos. 11-cv-02246, 11-cv-02135, 11-cv-02392 (AKH), Case Nos. 11-5421 and 11-5428 (2d Cir.) | 54 |
| | (c) | *Picard v. Hall*, Adv. Pro. No. 12-01001 (BRL) | 55 |
| | (d) | *Picard v. Maxam Absolute Return Fund et al.*, Adv. Pro. No. 10-05342 (avoidance action)(BRL); Case No. 11-cv-08629 (appeal) (JPO) | 56 |
| | (e) | *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (avoidance action); Adv. Pro. No. 12-01092 (injunction action) | 57 |
| IX. | INITIAL ALLOCATION OF FUNDS AND DISTRIBUTION TO CUSTOMERS | | 58 |
| A. | The Customer Fund | | 58 |
| B. | The General Estate | | 60 |

## TABLE OF CONTENTS
(continued)

**Page**

X.    INTERNATIONAL INVESTIGATION AND LITIGATION........................................ 60

      i.    Austria and Italy.................................................................. 61

      ii.    Bermuda.......................................................................... 61

      iii.    BVI and the Cayman Islands .................................. 61

      iv.    England ............................................................... 62

      v.    Gibraltar ............................................................. 63

      vi.    Ireland ................................................................ 64

      vii.    Lichtenstein........................................................ 64

      viii.    Switzerland and Luxembourg ................................. 64

XI.    FEE APPLICATIONS AND RELATED APPEALS.................................................... 64

    A.    Appeal of Fifth Fee Order.................................................... 64

    B.    Eighth Fee Application ....................................................... 67

CONCLUSION............................................................................................................. 68

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, Esq. (the "Trustee"), as Trustee for the substantively consolidated liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the "Debtors"), respectfully submits his Seventh Interim Report (this "Report") pursuant to SIPA § 78fff-1(c) and this Court's Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief entered on December 23, 2008 (the "Claims Procedures Order") (ECF No. 12).[2]   Pursuant to the Claims Procedures Order, the Trustee shall file additional interim reports every six (6) months.  This Report covers the period between October 1, 2011 and March 31, 2012 (the "Report Period").

## I.   EXECUTIVE SUMMARY

1.     As recognized by the District Court, the Trustee "has worked relentlessly over nearly three years to bring assets that passed through [Bernard L. Madoff Investment Securities LLC] back into the customer fund, in order to restore nearly $20 billion in customer losses." *Picard v. J.P. Morgan Chase & Co.*, No. 11 Civ. 00913, 2011 WL 5170434, at *1 (S.D.N.Y. Nov. 1, 2011) (CM).  Through pre-litigation and other settlements, the Trustee has successfully recovered, or reached agreements to recover, more than $9 billion—over 50% of the principal lost in the Ponzi scheme by those who filed claims—for the benefit of all customers of BLMIS.

---

[1] For convenience, subsequent references to SIPA will omit "15 U.S.C."

[2] All ECF references refer to pleadings filed in the main adversary proceeding pending before this Court, *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y.) (BRL), unless otherwise noted.

2.      Indeed, during this Report Period, the Trustee has entered into several significant settlements that have enhanced the fund of customer property (the "Customer Fund").  For example, the Trustee reached a $326 million settlement with the Internal Revenue Service without litigation.  The Trustee also reached a settlement with the Katz-Wilpon defendants, which obviated the need and expense of a protracted trial and appeals process.  In the feeder fund cases, the Trustee settled with the Mount Capital and Trotanoy funds (the latter of which remains subject to this Court's approval), again avoiding expensive and protracted litigation.  Finally, settlements were reached with a number of individuals.  All of these recovered funds will go to the Customer Fund for equitable distribution to BLMIS customers with allowed claims.  These settlements mark the continued progress that the Trustee has made in this liquidation.

3.      Appeals of several of the Trustee's significant settlements were determined in the Trustee's favor during this Report Period.  United States District Judge John G. Koeltl affirmed this Court's decision approving the settlement with Jeffry Picower, upholding both the $5 billion settlement and the permanent injunction.  Similarly, an attempt to overturn a $220 million settlement with the heirs of Norman F. Levy was also rejected by United States District Judge Deborah A. Batts.  Judge Batts held that this Court was well within its discretion in approving the settlement and rejecting attempts to vacate this Court's prior order.[3]

4.      In addition to settlement activity, the Trustee and his counsel (including, but not limited to, Baker & Hostetler LLP ("B&H") and Windels Marx Lane & Mittendorf, LLP ("Windels Marx"), and various special counsel retained by the Trustee ("Special Counsel") (collectively, "Counsel")), continued to litigate hundreds of individual cases before the

---

[3] Both Judge Koeltl's and Judge Batts's orders have been appealed to the Second Circuit.  *See In re Bernard L. Madoff*, Nos. 10-4652 (ECF No. 47) and 11-1298 (ECF No. 19) (S.D.N.Y.); *Peshkin v. Jeanne Levy-Church, et al.*, No. 12-816 (2d Cir.).

Bankruptcy Court, District Court, Second Circuit Court of Appeals, the United States Supreme Court, and dozens of international courts.

5.      The Trustee made his first interim distribution from the Customer Fund during this Report Period, distributing approximately $325 million to customers with allowed claims.[4] When combined with the approximately $791 million of advances by the Securities Investor Protection Corporation ("SIPC"),[5] the Trustee has distributed over $1.1 billion to BLMIS customers to date.  He remains cognizant, however, of the need to distribute additional funds as soon as possible.  Although the Trustee's recoveries for customers have been significant, appeals and other litigations limit the Trustee's ability to distribute these funds.  For example, appeals of the $5 billion Picower settlement are pending.  Other funds affected by appeals include the $1.025 billion Tremont settlement, the Levy settlement, as well as reserves relating to the "net equity" appeal.  Until those appeals are fully resolved and the funds are collected, the monies cannot be allocated to the Customer Fund or distributed to BLMIS customers with allowed claims.

6.      Moreover, once a final, unappealable decision is reached on net equity, there are additional matters contingent upon that ruling, including financial enhancements such as constant dollar, interest, and the time value of money.  All of these matters will be heard by the courts in due course and, until resolved, will require reserves.  The Trustee, however, is committed to

---

[4] After March 2012, he distributed an additional $2.0 million to those who qualified for the first interim distribution.  In addition, there is another $2.6 million that has been allocated but not distributed pending receipt of an executed assignment and release.

[5] SIPC has committed to pay over $800 million to date.  The difference between the amount committed to pay by SIPC and the amount actually advanced to customers depends on whether the Trustee has received an executed assignment and release from the customer. Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims is less than the amount of SIPC advances committed by the Trustee.

resolving these issues expeditiously in order to make additional distributions to BLMIS customers as soon as possible.

7.        This Report is meant to provide an overview of the efforts of the Trustee and his team of professionals in unwinding the largest Ponzi scheme in history.  Billions of dollars and thousands of people and entities located across the world are involved in this effort.  The Trustee continues to work diligently to coordinate the administration, investigation, and litigation to maximize efficiencies and reduce costs.

8.        All Interim Reports, along with a complete docket and substantial information about this liquidation proceeding, are located on the Trustee's website, www.madofftrustee.com.

9.        The United States Government Accountability Office also issued a report during this Report Period on certain aspects of this liquidation which may be of interest to customers, creditors, and other parties.  A copy can be located at http://www.gao.gov/products/GAO-12-414.

## II.    BACKGROUND

10.       The Trustee's prior interim reports, each of which is fully incorporated herein,[6] have detailed the circumstances surrounding the filing of this case and the events that have taken place during prior phases of this proceeding.

## III.    FINANCIAL CONDITION OF ESTATE

11.       No administration costs, including the compensation of the Trustee and his counsel, are being paid out of recoveries obtained by the Trustee for the benefit of BLMIS

---

[6] Prior reports cover the periods from December 11, 2008 to June 30, 2009 (the "First Interim Report") (ECF No. 314); July 1, 2009 to October 31, 2009 (the "Second Interim Report") (ECF No. 1011); November 1, 2009 to March 31, 2010 (the "Amended Third Interim Report") (ECF No. 2207); April 1, 2010 to September 30, 2010 (the "Fourth Interim Report") (ECF No. 3038); October 1, 2010 to March 31, 2011 (the "Fifth Interim Report) (ECF No. 4072); and April 1, 2011 to September 30, 2011 (the "Sixth Interim Report) (ECF No. 4529).

customers. Rather, the fees and expenses of the Trustee, his counsel and consultants, and administrative costs incurred by the Trustee are paid from administrative advances from the Securities Investor Protection Corporation ("SIPC"). These costs are chargeable to the general estate and have no impact on recoveries that the Trustee has or will obtain. Thus, recoveries from litigation, settlements, and other means will be available in their entirety for the satisfaction of customer claims.

12.    A summary of the financial condition of the estate as of March 31, 2012 is provided in Exhibit A attached hereto.

13.    This summary reflects cash, cash equivalents, and other short-term liquid assets in the amount of approximately $184 million and securities in the amount of over $2.5 billion.

14.    As detailed in Exhibit A, as of March 31, 2012, the Trustee has requested and SIPC had advanced over $1.3 billion, of which approximately $791 million was used to pay allowed customer claims up to the maximum SIPA statutory limit of $500,000 per account,[7] and approximately $536 million was used for administrative expenses.

## IV.    ADMINISTRATION OF THE ESTATE

### A.    Marshaling And Liquidating The Estate Assets

15.    The Trustee and his Counsel have worked diligently to investigate, examine, and evaluate the Debtor's activities, assets, rights, liabilities, customers, and other creditors. Thus far, the Trustee has been successful in recovering or entering into agreements to recover a significant amount of assets for the benefit of customers, totaling over $9.1 billion. For a more detailed discussion of prior recoveries, *see* Section V.B. of the First Interim Report, Section IV

---

[7] The Trustee must receive an executed assignment and release form from each customer before releasing an advance of funds from SIPC. Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims that have been determined is less than the amount of SIPC advances committed by the Trustee.

of the Second, Amended Third, and Fourth Interim Reports, Section VII of the Fifth Interim Report, and Section IV of the Sixth Interim Report.

16.    The Trustee has identified claims in at least eight derivative shareholder class action suits that BLMIS filed before the Trustee's appointment arising out of its proprietary and market making desk's ownership of securities.  As of the Seventh Interim Report, the Trustee had received distributions from seven of these class action settlements totaling over $91,000.  The Trustee has not and will not receive any distributions from the eighth class action settlement.  In addition, the Trustee has identified claims that BLMIS may have in one hundred and eleven other class action suits also arising out of its proprietary and market making activities.  The Trustee has filed proofs of claim in eighty-two of these cases and, based on a review of relevant records, has declined to pursue claims in sixteen additional cases.  Subject to the completion of a review of relevant records, the Trustee intends to file claims in the remaining thirteen cases.  As of March 31, 2012, the Trustee has recovered approximately $359,000 from settlements relating to twenty-six of the eighty-two claims filed directly by the Trustee, of which approximately $71,000 was recovered during this Report Period.

**B.    <u>Retention Of Professionals</u>**

17.    In addition to the professionals already retained by the Trustee, during this Report Period and pursuant to orders of this Court, the Trustee retained Greenfield Stein & Senior, LLP, as probate counsel in New York (ECF No. 4457), Browne Jacobson LLP, as conflict counsel in the United Kingdom (ECF No. 4519), and Soroker-Agmon, as special counsel to represent him in Israel (ECF No. 4570).  A complete list of counsel currently retained by the Trustee is listed in the Notice of Hearing on Eighth Applications for Interim Compensation For Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred by Applications From June 1, 2011 through September 30, 2011.  (ECF. No. 4693).

## V.    CLAIMS ADMINISTRATION

### A.    Claims Processing

#### i.    Customer Claims

18.    During the Report Period, the Trustee allowed $411,178,370.90 in customer claims, primarily relating to the customer claims of Greenwich Sentry and Mount Capital Funds. This brings the total amount of allowed claims as of March 31, 2012 to $7,371,969,433.20.  The Trustee has paid or committed to pay approximately $800.1 million in cash advances from SIPC. This is the largest commitment of SIPC funds of any SIPA liquidation proceeding and greatly exceeds the total aggregate payments made in all SIPA liquidations to date.

19.    During the Report Period, the Trustee reduced claims by approximately $6,847,005.00.

20.    As of March 31, 2012, there are 243 claims relating to 192 accounts that are "deemed determined," meaning that the Trustee has instituted litigation against those accountholders and related parties.  The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under section 502(d) of the Bankruptcy Code.  Accordingly, such claims will not be allowed until the avoidance actions are resolved by settlement or otherwise and the judgments rendered against the claimants in the avoidance actions are satisfied.  Of the 16,519 claims received by the Trustee, only two remain undetermined and are under review by the Trustee and Counsel.

#### ii.    General Creditor Claims

21.    As of March 31, 2012, the Trustee had received 427 timely and twenty-one untimely filed secured and unsecured priority and non-priority general creditor claims totaling approximately $1.7 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 427 claims and $1.7

7

billion, the Trustee has received ninety-four general creditor claims and forty-nine broker-dealer claims totaling approximately $264.9 million.  At this time, the BLMIS estate has no funds from which to make distributions to priority/non-priority general creditors and/or broker dealers.

### iii.    The Trustee Has Kept Customers Informed Of The Status Of The Claims Process

22.    Throughout the liquidation proceeding, the Trustee has kept customers, interested parties, and the public informed of his efforts by maintaining the Trustee Website, www.madofftrustee.com, a toll-free customer hotline, conducting a Bankruptcy Code § 341(a) meeting of creditors on February 20, 2009, and responding to the multitude of phone calls, e-mails, and letters received on a daily basis, both from claimants and their representatives.

23.    The Trustee Website was re-launched during the Report Period and now includes features that allow the Trustee to share more information with claimants, their representatives, and the general public with regard to the ongoing recovery efforts and the overall liquidation. In addition to containing the Trustee's court filings, media statements, and weekly information on claims determinations, the Trustee Website now includes up-to-date information on the status of Customer Fund recoveries, an "Ask the Trustee" page where questions of interest are answered and updated, a letter from the Chief Counsel to the SIPA Trustee on litigation matters, a detailed distribution page, an FAQ's page, and a timeline of important events.  The Trustee Website is monitored and updated on a daily basis. Public response to the upgrades performed on the Trustee Website has been positive.  Monthly visits nearly tripled at the end of the first quarter in 2012, compared to the end of the fourth quarter of 2011, and the number of hits and repeat visitors to the Trustee Website have both more than doubled in the same period.

24.    In addition, the Trustee Website allows claimants to e-mail their questions directly to the Trustee's professionals, who follow up with a return e-mail or telephone call to the

claimants.  As of March 31, 2012, the Trustee and his professionals had received and responded to more than 6,596 e-mails via the Trustee Website from BLMIS customers and their representatives.

25.     The toll-free customer hotline provides status updates on claims and responses to claimants' questions and concerns.  As of March 31, 2012, the Trustee, B&H, and the Trustee's professionals had fielded more than 7,708 hotline calls from claimants and their representatives.

26.     In sum, the Trustee and his team have endeavored to respond in a timely manner to every customer inquiry and ensure that the customers are as informed as possible about various aspects of the BLMIS proceeding.

### iv.     The Hardship Program

27.     At the commencement of claims administration, the Trustee established the Hardship Program to accelerate the determination of claims and the receipt of SIPC protection up to $500,000 for individual account holders who were dealing with hardship.  An individual could qualify for the Hardship Program if he or she filed a claim and was: (i) unable to pay for necessary living or medical expenses; (ii) over 65 years old and forced to reenter the work force after retirement; (iii) declaring personal bankruptcy; (iv) unable to pay for the care of dependents; or (v) suffering from extreme financial hardship beyond the identified circumstances.

28.     As of December 11, 2010, the Trustee had received 394 Hardship Program applications.  The Trustee obtained advances from SIPC and issued 118 checks to hardship applicants with allowed claims.  The Trustee also worked in good faith with approved applicants to reconcile any disputed portions of their claims.  Of the 394 Hardship Program applications received prior to December 11, 2010, the Trustee assessed the information provided and, in the

exercise of his discretion, decided not to commence avoidance actions against 249 hardship applicants.

29.      The Trustee expanded the Hardship Program into a second phase as he instituted avoidance actions.  While the law requires the Trustee to pursue avoidance actions to recover customer property, the Trustee has stated that he will not pursue avoidance actions against BLMIS accountholders suffering proven hardship.  In order to forego an avoidance action, the Trustee needed financial information about the accountholder.  Thus, the Trustee announced in November 2010 that the Hardship Program would focus on avoidance action defendants and requested that accountholders come forward to share information regarding their hardships.  Through this program, the Trustee has worked with a substantial number of hardship applicants who were subject to avoidance actions to confirm their hardship status and forego the pursuit of an avoidance action.

30.      In the second phase of the Hardship Program, as of March 31, 2012, the Trustee had received 476 applications from avoidance action defendants relating to 303 adversary proceedings.  After reviewing the facts and circumstances presented in each application and, in many cases, requesting additional verifying information, the Trustee has dismissed, or is in the process of dismissing, 158 avoidance actions against the related defendants.  As of March 31, 2012, many of the applications were in various stages of review.  The Trustee has also extended the time for applicants to answer or otherwise respond to avoidance action complaints while their hardship applications are pending.

31.      The Trustee established a Hardship Program Hotline with a telephone number and electronic mail address.  A large number of potential applicants have been assisted by the Trustee through the use of the Hotline, and the Trustee urges customers to continue using this resource

and the Hardship Program if they believe they qualify. Further information and applications are available on the Trustee's website, www.madofftrustee.com.

**B.**     **Objections To Claims Determinations**

32.     As required by the Claims Procedures Order and described in each Determination Letter sent by the Trustee, claimants of BLMIS have thirty days from the mailing of a Determination Letter to object to the Trustee's determination of their claim. Claimants that disagree with the Trustee's determination of their claim must file with the Court a written opposition setting forth the grounds of disagreement and provide the Trustee with the same. A hearing date will be obtained by the Trustee, and claimants will be notified of that date. As of March 31, 2012, 2,312 objections (which includes duplicates, amendments, and supplements) have been filed with the Court. These objections relate to approximately 4,307 unique claims and approximately 1,152 BLMIS accounts.

33.     The following objections, among others, have been asserted: (i) Congress intended a broad interpretation of the term "customer" and the statute does not limit the definition to those who had a direct account with the Debtor; (ii) the Trustee should determine claims based upon the BLMIS November 30, 2008 statement as opposed to the Trustee's Net Investment Method; (iii) claimants should receive interest on deposited amounts; (iv) the Trustee must commence an adversary proceeding against each claimant in order to avoid paying gains on claimants' investments; (v) claimants paid income taxes on distributions and their claims should be adjusted by adding all amounts they paid as income taxes on fictitious profits; (vi) each person with an interest in an account should be entitled to the SIPC advance despite sharing a single BLMIS account; and (vii) there is no legal basis for requiring the execution of a Partial Assignment and Release prior to prompt payment of a SIPC advance.

34.    The Trustee has departed from past practice in SIPA proceedings and paid or committed to pay the undisputed portion of any disputed claim in order to expedite payment of SIPC protection to customers, while preserving their right to dispute the total amount of their claim.

C.    **Settlements Of Customer Claims Disputes**

35.    The Trustee has continued settlement negotiations with customers who withdrew funds from their BLMIS Accounts within ninety days of the Filing Date.  Such withdrawals are preferential transfers recoverable by the Trustee under Bankruptcy Code §§ 547(b) and 550(a), which are applicable in this proceeding pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3).  To settle potential preference actions against these customers, the Trustee has proposed that the customers agree to authorize the Trustee to deduct the preferential amount from the initial payment advanced by SIPC pursuant to section 78fff-3(a)(1) of SIPA.  The allowed claim is thus calculated based on the amount of money the customer deposited with BLMIS for the purchase of securities, <u>less</u> subsequent withdrawals, <u>plus</u> the preferential amount.  The customer will be entitled to receive an additional distribution from the Customer Fund based on the total amount of the allowed claim.  *See* Section IX for information about the Trustee's initial distribution of over $325 million to BLMIS customers.

36.    As of March 31, 2012, the Trustee had reached agreements relating to 450 accounts and with the IRS (which did not have a BLMIS account), recovering over $2.1 billion in litigation, pre-litigation, and avoidance action settlements.  These litigation, pre-litigation, and avoidance action settlements have allowed the Trustee to avoid the litigation costs that would have been necessary to obtain and collect judgments from these customers.

## VI.    PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA

### A.    Net Equity Dispute

37.    For purposes of determining each customer's "net equity," as that term is defined under SIPA, the Trustee credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the "Trustee's Net Investment Method").  Some claimants argued that the Trustee is required to allow customer claims in the amounts shown on the November 30, 2008 customer statements (the "Net Equity Dispute").

38.    This Court issued a decision on March 1, 2010 upholding the Trustee's Net Investment Method as the only interpretation consistent with the plain meaning and legislative history of the statute, controlling Second Circuit precedent, and considerations of equity and practicality.  (ECF No. 2020); *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).  The Court certified an immediate appeal to the United States Court of Appeals for the Second Circuit (ECF No. 2467), which heard oral argument on March 3, 2011.

39.    On August 16, 2011, the Second Circuit affirmed this Court's decision and the Trustee's Net Investment Method, holding that it would have been "legal error" for the Trustee to discharge claims for securities under SIPA "upon the false premise that customers' securities positions are what the account statements purport them to be."  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 241 (2d Cir. 2011).  Any calculation other than the Net Investment Method would "aggravate the injuries caused by Madoff's fraud."  *Id.* at 235.  Instead, the Net Investment Method prevents the "whim of the defrauder" from controlling the process of unwinding the fraud. *Id.* at 241.

40.    Under the Second Circuit's decision, the relative position of each BLMIS customer account must be calculated based on "unmanipulated withdrawals and deposits" from

its opening date through December 2008. *Id.* at 238. If an account has a positive cash balance, that accountholder is owed money from the estate. As a corollary, if an account has a negative cash balance, the accountholder owes money to the estate. Both the recovery and distribution of customer property in this case are centered on the principle that the Trustee cannot credit "impossible transactions." If he did, then "those who had already withdrawn cash deriving from imaginary profits in excess of their initial investment would derive additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed." *Id.*

41.    First, the Second Circuit found, "in the context of this Ponzi scheme—the Net Investment Method is . . . more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud . . . and 'avoid[s] placing some claims unfairly ahead of others.'" *Id.* at 242 n.10 (quoting *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 463 (S.D.N.Y. 2001)). Thus, the Trustee is obligated to use the avoidance powers granted by SIPA and the Bankruptcy Code to prevent one class of customers— the "net winners" or those with avoidance liability—from having the benefit of Madoff's fictitious trades at the expense of the other class of customers—the "net losers" or those who have yet to recover their initial investment.

42.    Next, the Second Circuit explained that "notwithstanding the BLMIS customer statements, there were no securities purchased and there were no proceeds from the money entrusted to Madoff for the purpose of making investments." *Id.* at 240. Therefore any "[c]alculations based on made-up values of fictional securities would be 'unworkable' and would create 'potential absurdities.'" *Id.* at 241 (quoting *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 88 (2d Cir. 2004)). Thus, the Second Circuit rejected reliance upon the BLMIS account statements, finding that, to do otherwise, "would have the absurd effect of treating fictitious and

14

arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations." *Id.* at 235.

43.     On September 6, 2011, certain claimants filed a petition for panel rehearing, or, in the alternative, for rehearing *en banc*.  *See* No. 10-2378 (ECF Nos. 505, 537).  The panel that determined the appeal considered the request for panel rehearing, and the active members of the Court considered the request for rehearing *en banc*, and, on November 8, 2011, both denied the petition.  (ECF No. 551).

44.     During this Report Period, three petitions for writ of certiorari were filed and the Net Equity Dispute is now pending before the U.S. Supreme Court.  *See Sterling Equities Associates, et al. v. Picard;* No. 11-968 (U.S. Sup.); *Ryan, et al. v Picard*; No. 11-969 (U.S. Sup.); and *Velvel v. Picard;* No. 11-986 (U.S. Sup.).  On March 9, 2012, the Trustee filed briefs in opposition to the petitions.  Reply briefs were filed in the *Velvel* and *Ryan* matters on March 19 and 20, respectively.  Thereafter, the Supreme Court requested the Solicitor General to file a brief by April 30, 2012.

## B.     "Customer" Definition

### i.     Feeder Fund Claimants

45.     The Trustee's position is that only those claimants who maintained an account at BLMIS constitute "customers" of BLMIS, as defined in section 78*lll*(2) of SIPA.  Where it appears that claimants did not have an account in their names at BLMIS ("Claimant Without An Account"), they are not customers of BLMIS under SIPA and the Trustee has denied their claims for securities and/or a credit balance.

46.     On June 11, 2010, the Trustee filed a Motion For An Order To Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds.  (ECF Nos. 2410-2413, 2416).  The Motion addressed only

those claimants whose claims emanated from their direct or indirect investments in sixteen so-called Feeder Funds that, in turn, had accounts with and invested directly with BLMIS.

47.    This Court held a hearing on October 19, 2010.  On June 28, 2011, the Court issued a Memorandum Decision and Order affirming the Trustee's denial of these claims, (ECF Nos. 3018, 4193, 4209); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011).

48.    This Court found that, in light of the plain language of SIPA and relevant case law, the investor-claimants did not qualify as "customers" under SIPA.  The Court found that the objecting claimants invested in, not through, the Feeder Funds, and had no individual accounts at BLMIS.  It was the Feeder Funds who entrusted their monies with BLMIS for the purpose of trading or investing in securities—the touchstone of "customer" status—whereas the objecting claimants purchased ownership interests in the Feeder Funds.  The Court held that, absent a direct broker-dealer relationship with BLMIS, the objecting claimants sought a definition of "customer" that stretched the term beyond its limits.

49.    This Court put it succinctly: the objecting-claimants who invested in sixteen feeder funds did not qualify as "customers" because they "had no securities accounts at BLMIS, were not known to BLMIS, lacked privity and any financial relationship with BLMIS, lacked property interests in any Feeder Fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment discretion over Feeder Fund assets invested with BLMIS, received no accounts statements or other communications from BLMIS and had no transactions reflected on the books and records of BLMIS . . ." *Sec. Inv. Protection Corp.*, 454 B.R. at 290.

50.    Twenty-seven Notices of Appeal were filed and the appeals were assigned to United States District Judge Denise L. Cote.  *See* No. 11 Civ. 05683 (S.D.N.Y.) (DLC).  On

January 4, 2012, Judge Cote affirmed the June 28, 2011 order of this Court. *See Aozora Bank Ltd. v. Sec. Prot. Investor Corp.*, 2011 U.S. Dist. LEXIS 150753 (S.D.N.Y. Jan. 4, 2012). In that decision, Judge Cote determined in light of SIPA, the "most natural reading of the 'customer' definition' excludes persons like the appellants who invest in separate third-party corporate entities like their Feeder Funds, that in turn invest their assets with the debtor." *Id.* at *19. Thus, the District Court held that the Feeder Funds were the BLMIS customers and the appellants were precluded from seeking separate recoveries as additional SIPA claimants. *Id.* at *23.

51.     On January 6, 2012, four appeals were taken from Judge Cote's decision to the United States Court of Appeals for the Second Circuit. *See Bricklayers and Allied Craftsman Local 2 Annuity Fund, et al. v. Securities Investor Protection Corporation, Irving H. Picard*, No. 12-410; *Securities Investor Protection Corporation, Irving H. Picard v Rosamilia, et al.*, No. 12-437; *Securities Investor Protection Corporation, Irving H. Picard v. Kruse, et al.*, No. 12-483; and *Upstate New York Bakery Drivers and Industry Pension Fund v. Securities Investor Protection Corporation, Irving H. Picard*, No. 12-529 (2d Cir.). Briefing is currently scheduled to extend through Fall 2012.

**ii.     ERISA Claimants**

52.     Carved out from the above briefing and proceedings was the impact of ERISA and related regulations on the determination of "customer" status under SIPA. Accordingly, on October 5, 2011, the Trustee moved before this Court for an order establishing a briefing schedule and hearing to affirm the claims determinations with respect to, and adjudicate the objections of ERISA claimants. (ECF No. 4432). The Bankruptcy Court entered a scheduling order on November 8, 2011 (ECF No. 4507).

53.     On November 14, 2011, the Trustee filed his Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections (ECF No. 4521) (the

17

"ERISA Motion").  On or around January 17, 2012, approximately eighteen opposition briefs to the ERISA Motion were filed on behalf of various ERISA claimants.  (ECF Nos. 4625-4628, 4631-4633, 4635, 4637-4643, 4652-4654).   On March 2, 2012, the Trustee filed his Memorandum in Support of the Trustee's Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections (ECF No. 4703).  On April 2, 2012, five replies to the ERISA Motion were filed on behalf of various ERISA claimants (ECF Nos. 4746, 4748, 4750, 4755, 4756).  The Trustee's sur-reply was filed on April 20, 2012.

54.    During the pendency of the above briefing, certain ERISA claimants also filed motions to withdraw the reference on the ERISA Motion from this Court to the District Court. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 CV 01039 (S.D.N.Y.) (DLC), on behalf of J.X. Reynolds & Co. Deferred Profit Sharing Plan, Jacqueline Green Rollover Account and Wayne D. Green Rollover Account; *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*; No. 12 CV 01139 (S.D.N.Y. (DLC), on behalf of 37 ERISA Plan claimants.  On February 28, 2012 and March 1, 2012, these motions were accepted as related to the appeals decided by Judge Cote in *Aozora Bank*, 2011 U.S. Dist. LEXIS 150753 (S.D.N.Y. Jan. 4, 2011), discussed above, and were re-assigned to her Honor.  Judge Cote withdrew the reference on April 20, 2012.

## VII.    RECOVERIES AND CONTINGENCIES

### A.    Recoveries Accomplished During Prior Report Periods

55.    In the Sixth Interim Report, the Trustee reviewed the significant settlements entered into during that and prior report periods.  Prior to this Report Period, the Trustee had recovered or reached agreements to recover approximately $8.7 billion for the benefit of BLMIS customers.  Sixth Interim Report ¶¶ 52-63.

**B.**     <u>Recoveries Accomplished During This Report Period</u>

56.     During this Report Period, the Trustee settled 23 cases for a minimum of approximately $395 million. Currently, the Trustee has successfully recovered or reached agreements to recover more than $9 billion.

57.     On October 4, 2011, a $43.5 million settlement between the Trustee and Mount Capital Fund, Ltd., a British Virgin Islands company in liquidation and Mount Capital Asset Subsidiary Limited, a British Virgin Islands company in liquidation (collectively, the "Mount Capital Companies") was approved by this Court. *Picard v. Mount Capital Fund LTD, et al.;* Adv. Pro. No. 10-05123 (Bankr. S.D.N.Y.) (BRL). (ECF No. 17). Under the settlement, Mount Capital paid $43.5 Million to the Trustee. Mount Capital received an allowed customer claim in the SIPA proceeding in the amount of $294,860,547.82 and received a SIPC customer advance under SIPA § 78fff-a(a).

58.     On December 21, 2011, a $326 million settlement between the Trustee and the United States of America, on behalf of the Internal Revenue Service, was approved by this Court. (ECF No. 4602). One limited objection was filed by Pasifin Co. Inc., which will be addressed in the resolution of the Pasifin objection to the Trustee's determination of Pasifin's claim. (ECF No. 4597). The Trustee determined that BLMIS debited the accounts of 145 foreign account holders for alleged U.S. federal income tax withholding and paid to the IRS such withheld amounts related to alleged dividends. However, because no securities were purchased and thus no dividends were ever received by BLMIS, no amounts should have been withheld and transferred to the IRS. After receipt of the settlement payment, the specific accounts at issue were credited for the amounts transferred from 2002–2008. If eligible, a pro rata distribution was made to those accounts from the fund of customer property in accordance with the Trustee's previous Allocation Motion and this Court's corresponding Order.

59. On February 27, 2012, the Trustee filed a motion pursuant to Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedures for approval of the settlement by and between the Trustee and the Estate of Dorothy Becker, and William P. Becker, Daniel I. Becker, and David M. Becker, individually and in their capacities as co-executors of The Estate of Dorothy Becker (the "Becker Defendants"), *Picard v. Becker, et al.*, Adv. Pro. No. 10-04620 (Bankr. S.D.N.Y.) (BRL). (ECF No. 13). The settlement agreement resulted in a cash payment of $556,017.00 to the Trustee for the benefit of the BLMIS estate and the Customer Fund. No objections to the motion were filed. By order dated April 3, 2012, the Court approved the settlement between the Trustee and the Becker Defendants.

60. The Trustee successfully negotiated a settlement with defendant Trotanoy Investment Company, Ltd. ("Trotanoy") in *Picard v. Trotanoy, et al.*; Adv. Pro. No. 10-05208 (Bankr. S.D.N.Y.) (BRL). A motion to approve the settlement was filed on March 26, 2012. (ECF No. 50). Trotanoy has settled with the Trustee in the approximate amount of $28,960,000.00. Under the terms of the settlement, Trotanoy will have an allowed customer claim in the SIPA proceeding in the amount of $65,267,299.00 and shall be entitled to a SIPC customer advance under SIPA § 78fff-a(a). The hearing on the motion to approve the settlement is scheduled for May 10, 2012 before this Court.

61. On April 13, 2012, the Trustee filed in the District Court a Motion for Settlement for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002(a)(3) and 9019(a) of the Federal Rules of Bankruptcy Procedure Approving Settlement Agreement in the Katz Wilpon Matter in the amount of $162 million. *Picard v. Saul B. Katz*, Case No. 11 Civ. 03605 (S.D.N.Y.) (the "Katz-Wilpon Action"). (ECF Nos. 184-187).

62.    Thus, the Trustee entered into settlements during and subsequent to this Report Period that, if approved by this Court, will bring approximately $586 million into the Customer Fund.

## C.    Earlier Settlements

63.    On February 18, 2010, this Court approved a pre-litigation settlement between the Trustee and the Estate of Norman F. Levy.  (ECF No. 1964).  This settlement resulted in the return of $220 million (the "Levy Settlement").  One year later, on February 18, 2011, certain customers moved to set aside the Court's Order approving the Levy Settlement.  (ECF No. 3861).  This Court denied the motion (ECF No. 3984), and the claimants filed an appeal on April 11, 2011.  (ECF No. 4005).

64.    On February 16, 2012, United States District Judge Deborah A. Batts issued a Memorandum and Order affirming this Court's order of March 30, 2011.  *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec.*, No. 11 Civ. 03313, 2012 U.S. Dist. LEXIS 21740 (S.D.N.Y. Feb. 16, 2012) (DAB).  The District Court found that bankruptcy courts need not conduct a "mini-trial" of all the facts underlying settlement disputes and are entitled to rely upon the opinions of the trustee, the parties, and their attorneys.  *Id.* at *12.  Thus, the District Court held that this Court did not abuse its discretion in denying the motion to vacate the settlement. *Id.* at *7.  The claimants subsequently appealed Judge Batts's decision to the Second Circuit. *See Peshkin v. Levy-Church*, No. 12-816 (2d Cir.).  Briefing is currently scheduled through Fall 2012.  Because an appeal was taken from the District Court's order, the $220 million must remain in reserve and cannot be distributed to BLMIS customers until the appeal is finally resolved.

65.    On June 10, 2011, this Court approved a settlement agreement between the Trustee and the Joint Liquidators for Fairfield Sentry Limited, Fairfield Sigma Limited, and

Fairfield Lambda Limited (collectively, the "Fairfield Funds"). *Picard v. Fairfield Sentry et al.*, Adv. Pro. No. 09-1239 (Bankr. S.D.N.Y.) (BRL) (ECF No. 95). On July 13, 2011, the Court entered consent judgments between the Trustee and Fairfield Lambda Limited in the amount of $52.9 million (ECF No. 108), Fairfield Sentry Limited in the amount of $3.054 billion (ECF No. 109), and Fairfield Sigma Limited in the amount of $752.3 million (ECF No. 110). One objection was filed by plaintiffs in a derivative action allegedly on behalf of Fairfield Sentry Limited, which was overruled by this Court on June 7, 2011. (ECF. No. 92).

66.     Under the terms of this settlement, Fairfield Sentry Limited agreed to permanently reduce its net equity claim from approximately $960 million to $230 million. Additionally, the Joint Liquidator for the Fairfield Funds agreed to make a $70 million payment to the Customer Fund. To date, the Fairfield Sentry Joint Liquidators have paid $24 million, of which $16 million was in cash and the $8 million balance was an offset against funds owed by the Trustee to Fairfield Sentry. The Joint Liquidator also agreed to assign to the Trustee all of the Fairfield Funds' claims against the Fairfield Greenwich Group management companies, officers, and partners; the Trustee retained his own claims against the management defendants. Further, the Trustee and the Liquidators agreed to share future recoveries in varying amounts, depending on the nature of the claims. On or about July 8, 2011, Fairfield Sentry transferred $16 million to the Trustee, and the Trustee allowed Fairfield Sentry's claim of $78 million. When the remaining $46 million is paid, the Trustee will increase the allowed claim by $152 million to $230 million.

67.     On July 7, 2011, this Court approved a settlement between the Trustee, Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. (collectively, the "Greenwich Funds"), wherein this Court entered judgment against Greenwich Sentry, L.P. in an amount over $206 million and against Greenwich Sentry Partners, L.P. in an amount over $5.9 million.

*Picard v. Fairfield Sentry et al.*, Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y.) (BRL) (ECF No. 107). Three objections were filed to the proposed settlement agreement, but were subsequently withdrawn prior to this Court's July 7, 2011 Order. In this settlement, the Greenwich Funds agreed to permanently reduce their net equity claim from approximately $143 million to over $37 million, for a combined reduction of over $105.9 million. Additionally, the Greenwich Funds assigned the Trustee all of their claims against Fairfield Greenwich Group management, as well as agreed to share with the Trustee any recoveries they accomplish against service providers.

68.     To implement this settlement agreement, the Court was required to confirm the plan in the jointly administered Chapter 11 proceeding of Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. *In re Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P.*, Adv. Pro. No. 10-16229 (Bankr. S.D.N.Y.) (BRL). The plan confirmation hearing was held on December 22, 2011. The plan was confirmed subject to the resolution of issues unrelated to the settlement with the Trustee. Those matters have been resolved. The effective date of the plan was February 24, 2012. With the settlement becoming effective, claims against the Fairfield Greenwich Group management have been assigned to the Trustee, Greenwich Sentry, and Greenwich Sentry Partners, and the BLMIS customer claims have been allowed in the amount of $35,000,000.00 and $2,011,304.00, respectively.

69.     In addition, on December 21, 2011, this Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, "Tremont") in the amount of $1.025 billion. *Picard v. Tremont Group Holdings, Inc.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y.) (BRL) (ECF No. 38). In this settlement, Tremont agreed to deliver

$1.025 billion into an escrow account, which will ultimately be placed into the fund of customer property. Upon the release of the settlement payments from the escrow account, the Trustee will allow certain customer claims related to Tremont. Two objections to the settlement agreement were filed by non-BLMIS customers, both of which were overruled by this Court. This Court entered an Order Granting Trustee's Motion for Entry of Order Approving Agreement (ECF No. 38).

70.    Certain objectors filed an appeal of the Tremont settlement on September 30, 2011. *See Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC v. Tremont Group Holdings, Inc., et al.*, No. 11 Civ. 7330 (S.D.N.Y.) (GBD) ECF No. 1. Thereafter, Tremont filed a motion to dismiss the appeal, which was subsequently joined by motions filed by the Trustee and parties subject to the settlement. (ECF Nos. 4, 6, 8, 12, and 14). The non-BLMIS customers who commenced the appeal opposed the dismissal. (ECF Nos. 15, 16). This matter has been fully briefed and is pending in the United States District Court before Judge George B. Daniels.

71.    On January 13, 2011, this Court entered an Order approving the $5 billion settlement between the Trustee and the Estate of Jeffry M. Picower (the "Picower Settlement Order"). *Picard v. Picower*, Adv. Pro. No. 09-01197 (Bankr. S.D.N.Y.) (BRL). BLMIS claimants Adele Fox ("Fox") and Susanne Stone Marshall ("Marshall"), who brought actions against Picower in Florida, appealed the Picower Settlement Order. (ECF Nos. 45, 49). On March 26, 2012, Judge John G. Koeltl of the District Court issued an Opinion and Order affirming the Bankruptcy Court's Automatic Stay Order and Order approving the settlement between the Trustee and the Picower Defendants and permanently enjoining certain duplicative or derivative actions against the Picower Defendants. *In re Bernard L. Madoff*, 2012 U.S. Dist.

LEXIS 41262 (S.D.N.Y. Mar. 26, 2012). Notices of appeal were filed on April 24, 2012. *See In re Bernard L. Madoff*, Nos. 10-4652 (ECF No. 47) and 11-1298 (ECF No. 19) (S.D.N.Y.).

72.     A forfeiture action against the estate of Jeffry M. Picower resulted in the additional recovery of more than $2.2 billion to the United States Government (the "Picower Forfeiture"), which is intertwined with the Trustee's Picower settlement. *See United States v. $7,206,157,717 On Deposit at JPMorgan Chase, NA in the Account Numbers Set Forth on Schedule A*, No. 10 Civ. 09398 (S.D.N.Y.) (TPG). On January 14, 2011, Fox filed both a Motion to Intervene in that action and a claim against the Picower Forfeiture funds, which the Government opposed. (ECF Nos. 6-8, 10, 14). On May 23 and 24, 2011, the Honorable Thomas P. Griesa denied Fox's Motion and claim and entered a final order of forfeiture in favor of the United States. (ECF No. 17). On July 18, 2011, Fox filed a notice of appeal before the Second Circuit. (No. 11-2898 (2d Cir.)). During this Report Period, Fox filed an appellate brief (ECF No. 33), to which the Government responded by filing a motion to dismiss on January 26, 2012 (ECF No. 44). On April 17, 2012, the Second Circuit summarily dismissed the appeal. *See* Order (citing to *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) (defining when an action lacks an arguable basis in law or fact) (ECF No. 83)).

73.     The Trustee will receive the Picower settlement through entry of either a final, nonappealable order approving the Picower Settlement or a final, nonappealable order of forfeiture in the Government's action. Upon either event, the Trustee will seek the transfer of $5 billion to the BLMIS estate and the Customer Fund.

74.     Through the end of this Report Period, the Trustee recovered approximately $318.8 million as a result of preference and other settlements that were made pursuant to agreements subject to the Net Equity Dispute. While the Second Circuit has rendered its

decision on the Net Equity Dispute, the issue is now before the United States Supreme Court.

The Trustee must continue to maintain those funds in reserve until there is a final, nonappealable

decision on the Net Equity Dispute.

## VIII.  LITIGATION

75.     In addition to the decisions relating to the interpretation of SIPA by this Court and

the Second Circuit, and the decisions relating to settlements, as summarized above, other major

developments have occurred during this Report Period in the Bankruptcy Court and District

Court in the Trustee's avoidance actions and bank/feeder fund litigation. As the Trustee has more

than 1,000 lawsuits pending, this Report does not discuss each of them in detail but instead

endeavors to provide a summary of those matters with the most activity during the Report

Period.

### A.     The District Court—Motions to Withdraw the Reference, Motions to Dismiss and Related Appeals

76.     Many of the defendants in the litigations brought by the Trustee have moved to

withdraw the reference from this Court to the District Court.  These motions commenced with

the HSBC, JPMorgan, UBS, and Kohn Actions. These complaints had common law and/or

RICO claims in addition to avoidance counts under the Bankruptcy Code.  Then, the defendants

in the Katz/Wilpon avoidance action moved to withdraw the reference, which was granted by the

District Court.  Subsequently, hundreds of defendants began seeking similar relief.  The District

Court has withdrawn the reference in numerous cases and heard or has pending before it

numerous motions to dismiss.  On March 5, 2012, this Court entered an administrative order

directing all defendants in the Trustee's litigations to file motions to withdraw the reference by

April 2, 2012.  As of the date of this Report, defendants in 768 avoidance actions commenced by

the Trustee in the Bankruptcy Court have filed approximately 438 motions to withdraw the reference and filed approximately 400 joinders to these motions.

### i.    The HSBC Action

77.    On July 15, 2009, the Trustee and B&H commenced an adversary proceeding against a handful of HSBC entities and international feeder funds in the financial services industry that transferred funds to and from BLMIS.  *Picard v. HSBC Bank plc*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (BRL) (the "HSBC Action").  After further investigation, the Trustee filed an Amended Complaint on December 5, 2010, expanding the pool of defendants to thirteen HSBC entities and forty-eight individuals and entities, and alleging that over 33% of all monies invested in Madoff's Ponzi scheme were funneled by and through these defendants into BLMIS. (ECF No. 35).

78.    The thirteen HSBC-related defendants and, separately, UniCredit S.p.A. and Pioneer Alternative Investment Management Limited, moved to withdraw the reference.  On April 14, 2011, United States District Judge Jed S. Rakoff withdrew the reference to consider the Trustee's standing to assert common law claims.  (ECF Nos. 19, 23).

79.    On May 3, 2011, the same defendants filed Motions to Dismiss.  (ECF Nos. 24-27).  The Trustee and SIPC opposed the Motions.  (ECF Nos. 32-36).  On July 28, 2011, the District Court dismissed the Trustee's common law claims, holding that the Trustee lacked standing, under any theory, to assert them.  *Picard v. HSBC Bank plc*, 454 B.R. 25, 37-38 (S.D.N.Y. 2011).  This reduced the Trustee's claims in the HSBC Action from approximately $8.9 billion to less than $2.2 billion.  The Court returned the remainder of the HSBC Action to this Court for further proceedings.

80.    On December 15, 2011, the Trustee appealed the District Court decision to the Second Circuit. *See Picard v. HSBC Bank PLC, et al., 11-5175 and Picard v. HSBC Bank PLC,*

*et al.*, No. 11-5207 (2d Cir.)  The Trustee filed his appellate briefs on February 16, 2012, and

SIPC intervened in the appeals.  (ECF Nos. 76-85; 76-80).  The Trustee's and SIPC's replies to

the oppositions are due on April 26, 2012.

81.      The District Court returned several of the Trustee's bankruptcy claims to this

Court.  However, at the end of March 2012, various defendants in this action moved to withdraw

the reference from this Court.  Those motions remain pending.

### ii.      The JPMorgan Action

82.      On December 2, 2010, the Trustee and B&H commenced an action against

JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P.

Morgan Securities Ltd (the "JPMorgan Defendants").  *Picard v. JPMorgan Chase*, Adv. Pro. No.

10-04932 (Bankr. S.D.N.Y.) (BRL) (the "JPMorgan Action").  On February 8, 2011, the

JPMorgan Defendants moved for withdrawal of the reference.  No. 11 Civ. 00913 (S.D.N.Y.)

(CM).  The District Court granted the Motion on May 4, 2011.  (ECF No. 30).

83.      On November 23, 2010, the Trustee and B&H commenced an action against UBS

AG, numerous other UBS entities, Access International Advisors LLC, numerous other Access

entities, several individuals and the Luxalpha SICAV and Groupement Financier funds.  *Picard

v. UBS AG*, Adv. Pro. No. 10-04285 (Bankr. S.D.N.Y.) (BRL) (the "Luxalpha Action" and the

"Luxalpha Defendants").  On June 21, 2011, the Luxalpha Defendants moved for withdrawal of

the reference.  No. 11 Civ. 04212 (S.D.N.Y.) (CM).  On July 14, 2011, the District Court

withdrew the reference and accepted the Luxalpha Action as related to the JPMorgan Action.

84.      On July 3, 2011, the JPMorgan Defendants filed a Motion to Dismiss.  (ECF Nos.

32-34).  The Trustee filed an Amended Complaint in the JPMorgan Action on June 24,

2011.  (ECF No. 50).  On August 1, 2011, the JPMorgan Defendants renewed their Motion to

Dismiss.  (ECF Nos. 56-58).  On August 1, 2011, the Luxalpha Defendants (with the exception

of some of the individual defendants) filed a Motion to Dismiss.  (ECF Nos. 17, 18). The Trustee filed an Amended Complaint in the Luxalpha Action on August 17, 2011, and the Luxalpha Defendants' Motion to Dismiss was deemed directed at the Amended Complaint. (ECF No. 23).  The Trustee and SIPC opposed the Motions. *JPMorgan*, (ECF Nos. 61-66); *Luxalpha*, (ECF No. 27).

85.    On November 1, 2011, the District Court dismissed the Trustee's common law and contribution claims in both the JPMorgan and Luxalpha Actions (the "November 1 Order").  *Picard v. J.P. Morgan Chase & Co.*, No. 11 Civ. 00913, 2011 WL 5170434 (S.D.N.Y. Nov. 1, 2011) (CM).  The Court returned the remainder of the Actions to this Court for further proceedings.

86.    On November 10, 2011, the Trustee filed a motion to direct entry of final judgment under Federal Rule of Civil Procedure 54(b) as to Counts Twenty-One through Twenty-Eight of the Amended Complaint in the JPMorgan Action.  (ECF Nos. 71, 72). On November 30, 2011, the District Court held that there was no just reason for delay and certified its November 1 Order as final (the "JPMorgan Rule 54(b) Judgment").  (ECF No. 74).  On December 5, 2011, the District Court held that there was no just reason for delay and certified its November 1 Order as final as to the Luxalpha Defendants (the "Luxalpha Rule 54(b) Judgment").  (ECF No. 38).  The JPMorgan Rule 54(b) Judgment was then entered on December 1, 2011 and the Luxalpha Rule 54(b) Judgment was entered on December 7, 2011. *JPMorgan*, (ECF No. 75); *Luxalpha*, (ECF No. 39).

87.    On February 16, 2012, the Trustee filed his briefs appealing the November 1 Order in both the JPMorgan and Luxalpha Actions, and SIPC intervened in the appeals. *See Picard v. JPMorgan Chase & Co., et al.,* 11-5044 (2d Cir.) and *Picard v. UBS AG, et al.,* 11-

5051 (2d Cir.).  On April 5, 2012, the JPMorgan and Luxalpha Defendants opposed the respective appeals of the November 1 Order.  The Trustee's and SIPC's replies to the oppositions are due on April 26, 2012.

### iii.    The Kohn Action

88.     On December 10, 2010, the Trustee commenced an adversary proceeding against against Sonja Kohn ("Kohn"), Bank Medici, UniCredit Bank Austria AG ("Bank Austria"), UniCredit S.p.A. ("UniCredit), Pioneer Asset Management ("Pioneer"), Alessandro Profumo ("Profumo"), and dozens of individuals, trusts, and nominee companies.  *Picard v.* Kohn, Adv. Pro. No. 10-5411 (BRL).  The Trustee alleges that the Defendants participated in an illegal scheme and conspired to feed over $9.1 billion into Madoff's Ponzi scheme.

89.     On February 22, 2011, UniCredit, Bank Austria, Pioneer, and Profumo moved to withdraw the reference.  *Picard v. Kohn*, No. 11 Civ. 01181 (S.D.N.Y.) (JSR).  The Trustee and SIPC opposed the Motion.  (ECF Nos. 15-17).  On June 6, 2011, United States District Judge Jed S. Rakoff granted the Motion to consider the Trustee's standing to assert his RICO claims and to determine whether those claims are otherwise barred.  (ECF Nos. 34, 55, 56).

90.     On July 25, 2011, UniCredit, Bank Austria, Pioneer, and Profumo filed Motions to Dismiss the Trustee's RICO and common law claims.  (ECF Nos. 38-41, 44-47, 49-50).  The Trustee and SIPC opposed the Motions.  (ECF Nos. 51-54).  On February 22, 2012, Judge Rakoff dismissed the RICO and common law claims as to those Moving Defendants and returned the remainder of the claims to this Court.  (ECF No. 69).

91.     Since the April 2, 2012 administrative order, thirty-two of the Kohn Defendants have moved to withdraw the reference, including UniCredit and Pioneer (ECF. Nos. 70-75), Bank Austria AG (ECF Nos. 1-4), and Kohn and certain of her family members and related companies (ECF Nos. 89-94).  This is the first time that Kohn has appeared in this action.

92.     On April 5, 2012, the Trustee filed with the Second Circuit a stipulation of

withdrawal of the appeal, without prejudice, which effectively stays the appeal of Judge Rakoff's

February 22, 2012 ruling as to the Trustee's RICO claims, previously filed March 21, 2012, until

April 6, 2013.  (ECF No. 70).

93.     On April 6, 2012, the Trustee filed the Second Amended Complaint and Amended

RICO Case Statement in the Bankruptcy Court.  (ECF. No. 97).

### iv.     The Katz-Wilpon Action

94.     On December 7, 2010, the Trustee and B&H commenced an adversary

proceeding against Saul Katz, Fred Wilpon, and dozens of individuals, trusts, and entities

seeking approximately $1 billion.  *Picard v. Saul B. Katz*, Adv. Pro. No. 10-05287 (Bankr.

S.D.N.Y.) (BRL) (the "Katz-Wilpon Action").  The Complaint seeks to avoid and recover

fictitious profits, as well as principal investments made by the Katz-Wilpon Defendants, because

the Trustee alleged that they knew or should have known that Madoff's IA business was

predicated on fraud.

95.     On May 26, 2011, the Katz-Wilpon Defendants moved for withdrawal of the

reference.  No. 11 Civ. 03605 (S.D.N.Y.) (JSR) (ECF No. 1).  On July 5, 2011, the District Court

withdrew the reference to consider: (i) whether, in connection with the Katz-Wilpon Defendants'

affirmative defense of good faith to the Trustee's fraudulent conveyance claims, SIPA (which

incorporates the Bankruptcy Code) and the New York Debtor & Creditor Law improperly

impose a retroactive duty of inquiry on the Katz-Wilpon Defendants that they did not previously

have under federal securities laws; (ii) whether the Katz-Wilpon Defendants were owed an

antecedent debt by BLMIS as set forth on their customer statements that would preclude the

Trustee's fraudulent conveyance claims; and (iii) whether Bankruptcy Code § 546 provides a

"safe harbor" for the fraudulent transfers made by BLMIS to the Katz-Wilpon Defendants. (ECF No. 19; ECF No. 33, Tr. 32-34).

96.    On July 7, 2011, the Katz-Wilpon Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. (ECF Nos. 20-28). The Trustee and SIPC opposed the Motion. (ECF Nos. 29-32).

97.    On September 27, 2011, the District Court dismissed the Trustee's claims based on constructive fraud under the Bankruptcy Code, actual and constructive fraud under the New York Debtor & Creditor Law, and for recovery of subsequent transfers pursuant to § 550 of the Code, holding that the "safe harbor" affirmative defense set forth in Bankruptcy Code § 546(e) is a bar—at the pleading stage—to those claims. (ECF No. 40); *Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011). This decision reduced the Trustee's claims in the Katz-Wilpon Action from approximately $1 billion to less than $400 million. In addition, in connection with the Trustee's fraudulent conveyance claims, the decision articulated a new heightened subjective standard of "willful blindness" that appears to be akin to a "conscious avoidance" standard derived from the criminal law context. Finally, the Court held as a matter of law that Bankruptcy Code § 502(d) is "overridden" in a SIPA proceeding by SIPA §78fff-2(c)(3).

98.    On October 9, 2011, the Trustee and SIPC filed Motions requesting the District Court to direct entry of final judgment under Federal Rule of Civil Procedure 54(b) on Counts Two through Ten of the Amended Complaint and to certify to the Court of Appeals under 28 U.S.C. § 1292(b) an interlocutory appeal of the Court's rulings concerning "willful blindness" with respect to the Trustee's remaining claims. (ECF Nos. 45-47). On January 17, 2012, the Court denied the Trustee's motion to direct entry of final judgment. (ECF No. 78).

99.    Briefing on the calculation of the Katz-Wilpon Defendants' avoidance liability and the Trustee's right to a jury followed. (ECF Nos. 50-53, 60-63). The Court entered a Case Management Plan, and scheduled trial to begin on March 19, 2012. (ECF No. 42). On November 23, 2011, the Court granted the Trustee's request for a jury trial. (ECF No. 71).

100.    The parties engaged in discovery from September 28, 2011 to January 13, 2012. (ECF No. 42). During the discovery period, counsel for the Trustee subpoenaed the Katz-Wilpon Defendants and twenty-six third parties for documents, receiving and reviewing a total of over 130,000 documents. During the discovery period, the Katz-Wilpon Defendants produced 75,000 documents and third parties produced 55,000 documents. The parties also conducted twenty-four depositions, including eight depositions of Katz-Wilpon Defendants or their affiliates, four depositions of expert witnesses and twelve depositions of third-party witnesses.

101.    On November 22, 2011, the Trustee provided to the Katz-Wilpon Defendants the expert reports of Steve Pomerantz, Bruce Dubinsky, Harrison J. Goldin, Lisa Collura, and Matthew Greenblatt. The Katz-Wilpon Defendants provided to the Trustee the expert report of John Maine. On January 26, 2012, the Defendants moved to exclude expert witnesses Harrison J. Goldin and Steve Pomerantz. (ECF Nos. 80, 101, 105). That same day, the Trustee moved to exclude Defendants' expert witness John Maine. (ECF Nos. 82-84). The parties exchanged opposition briefs on these motions to exclude on February 9, 2012 and reply briefs on February 16, 2012. (ECF Nos. 112-117, 130-131, 136-137). On February 23, 2012, the Court held oral argument on the exclusion of these expert witnesses and, ruling from the bench, granted all three motions, excluding the testimony of Goldin, Pomerantz and Maine. (ECF Nos. 139-140).

102.    On January 26, 2012, the Katz-Wilpon Defendants filed a Motion for Summary Judgment on the Trustee's remaining claims. (ECF Nos. 79, 86-87, 90-99, 103-104, 109-110).

That same day, the Trustee filed a Motion for Partial Summary Judgment with respect to fictitious profits. (ECF Nos. 81, 85, 88-89, 100, 102, 107-08).

103.    On February 23, 2012, the Court held oral argument on the Trustee's Motion for Partial Summary Judgment and the Katz-Wilpon Defendants' Motion for Summary Judgment. (ECF Nos. 139-140). In a March 5, 2012 order, the Court denied the Katz-Wilpon Defendants' Motion for Summary Judgment and granted the Trustee's Motion for Partial Summary Judgment in the amount of two-year fictitious profit transfers. (ECF No. 142).

104.    On March 12, 2012, the Trustee filed five Motions *in limine* seeking to: (i) bar references to the Trustee's legal fees, (ii) exclude evidence and arguments relating to the inaction and/or failures of the Securities and Exchange Commission, (iii) exclude from character witnesses Robert Morgenthau, Sandy Koufax, Michael Dowling and Robert Rosenthal, (iv) exclude evidence and arguments relating to the BLMIS-Merrill Lynch technology partnership and (v) deem statements made by Sterling Stamos employees in the course of their employment admissions of the Katz-Wilpon Defendants. (ECF Nos. 147-152, 154-158, 160-163, 167-168, 170-172). The Katz-Wilpon Defendants filed two Motions *in limine* seeking to: (i) bar use of the so-called prejudicial phrase "Other People's Money" and (ii) exclude Sterling Stamos documents. (ECF Nos. 143-146, 153, 159, 164-166, 169, 173).

105.    On March 14, 2012, the Court issued an order holding that the burden of proving the absence of willful blindness under 11 U.S.C. § 548(c) rested with the Katz-Wilpon Defendants. (ECF No. 177).

106.    On March 16, 2012, the Friday before the start of trial, the parties entered a Memorandum of Understanding outlining the parameters of a settlement in the amount of $162 million, which is the amount of fictitious profits withdrawn over the six-year period. (ECF No.

180).  Judge Rakoff reviewed the terms of the Memorandum of Understanding on March 19, 2012, at which time he set April 13, 2012 as the date for the parties to enter a final Settlement Agreement and for the Trustee to file a Bankruptcy Rule 9019 motion for an order approving the settlement.  (ECF Nos. 182-83).

107.    On April 13, 2012, the Trustee filed a Motion for Settlement for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002(a)(3) and 9019(a) of the Federal Rules of Bankruptcy Procedure Approving Settlement Agreement (ECF Nos. 184-87).

> **v.** **Subsequent Motions to Withdraw and Motions to Dismiss in Other Trustee Cases**

108.    After the reference was withdrawn in the Katz-Wilpon matter, defendants in both "good faith" and "bad faith" cases began to move to withdraw the reference and marked their cases as related to the Katz-Wilpon Action.

109.    The Honorable Jed S. Rakoff granted withdrawal of the reference of the Trustee's avoidance actions including, *Picard v. Greiff*, No. 11 Civ. 3775 (S.D.N.Y.); *Picard v. Blumenthal*, No. 11 Civ. 4293 (S.D.N.Y.); *Picard v. Hein*, No. 11 Civ. 4936 (S.D.N.Y.); *Picard v. Goldman, et. al*, No. 11 Civ. 4959 (S.D.N.Y.); and *Picard v. Flinn Investments, LLC, et al.*, No. 11 Civ. 5223 (S.D.N.Y.).  Subsequently, briefing schedules for Motions to Dismiss were set for each of these five actions.

110.    In *Picard v. Greiff*, No. 11 Civ. 3775, a Motion to Dismiss was filed on July 7, 2011 addressing: (i) whether the Trustee may, consistent with non-bankruptcy law, avoid transfers that Madoff Securities purportedly made in order to satisfy antecedent debts; (ii) whether, in light of this District Court's decision in *Picard v. Katz*, 11 U.S.C. § 546(e) applies, limiting the Trustee's ability to avoid transfers; and (iii) whether the Trustee can avoid as profits only what defendants received in excess of their investment during the two year lookback period

of section 548, or instead, the excess they received over the course of their investment with Madoff. The Trustee filed his opposition to the Motion to Dismiss on October 26, 2011, to which a reply brief was filed by the defendant on November 2, 2011. Oral argument was held on November 10, 2011 and this matter is presently *sub judice*.

111.    In *Picard v. Blumenthal*, No. 11 Civ. 4293, a Motion to Dismiss was filed on November 11, 2011 addressing: (i) whether the Trustee may, consistent with non-bankruptcy law, avoid transfers that Madoff Securities purportedly made in order to satisfy antecedent debts; (ii) whether, in light of this District Court's decision in *Picard v. Katz*, 11 U.S.C. § 546(e) applies, limiting the Trustee's ability to avoid transfers; and (iii) whether provisions of the Internal Revenue Code that heavily tax undistributed portions of IRAs prevent the Trustee from avoiding IRA distributions that would otherwise be taxed. The Trustee filed an opposition brief on December 2, 2011 and a reply brief was filed by the defendant on December 9, 2011. Oral argument was held on December 16, 2011 and this matter is presently *sub judice*.

112.    In *Picard v. Hein*, No. 11 Civ. 4936, and *Picard v. Kara Fishbein Goldman*, *et al.*, No. 11 Civ. 4959, separate Motions to Dismiss were filed on January 4, 2012, but both addressed: (i) whether the Trustee may, consistent with non-bankruptcy law, avoid transfers that Madoff Securities purportedly made in order to satisfy antecedent debts; (ii) whether, in light of this District Court's decision in *Picard v. Katz*, 11 U.S.C. § 546(e) applies, limiting the Trustee's ability to avoid transfers; and (iii) whether provisions of the Internal Revenue Code that heavily tax undistributed portions of IRAs prevent the Trustee from avoiding IRA distributions that would otherwise be taxed. The Trustee opposed the Motions in separate briefings both due January 25, 2012. The parties filed respective reply briefs on February 3, 2012. Oral argument was held together for both actions on February 10, 2012 and this matter is presently *sub judice*.

113.     In *Picard v. Flinn Investments LLC, et al.*, No. 11 Civ. 5223, a Motion to Dismiss was filed addressing: (i) whether the Trustee may, consistent with non-bankruptcy law, avoid transfers that Madoff Securities purportedly made in order to satisfy antecedent debts; (ii) whether, after the United States Supreme Court's recent decision in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), final resolution of claims to avoid transfers as fraudulent requires an exercise of "judicial power," preventing the bankruptcy court from finally resolving such claims; and (iii) whether, if the bankruptcy court cannot finally resolve the fraudulent transfer claims in this case, it has the authority to render findings of fact and conclusions of law before final resolutions.  On December 19, 2011, the parties agreed to a settlement, and stipulated to the dismissal of the action, which was so ordered by Judge Rakoff on January 9, 2012.

114.     On February 29, 2012, Judge Rakoff granted withdrawal of the reference to the Bankruptcy Court with respect to the Trustee's avoidance actions in five cases:  *Picard v. Avellino* (No. 11-cv-3882); *Picard v. Elins Family Trust* (No. 11-cv-4772); *Picard v. Greenberger* (No. 11-cv-4928); *Picard v. The M&B Weiss Family Limited Partnership* (No. 11-cv-6244); and *Picard v. Shapiro* (No. 11-cv-5835).  The Court withdrew the reference for the limited purpose of determining the following five issues:  (i) whether SIPA and other securities laws alter the standard the Trustee must meet in order to show that a defendant did not receive transfers in "good faith" under 11 U.S.C. §548(c); (ii) whether the Trustee may, consistent with non-bankruptcy law, avoid transfers that BLMIS purportedly made in order to satisfy antecedent debts; (iii) whether, in light of this Court's decision in *Picard v. Katz*, 11 U.S.C. § 546(e) applies, limiting the Trustee's ability to avoid transfers; (iv) whether, after the United States Supreme Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), final resolution of claims to avoid transfers as fraudulent requires an exercise of "judicial power," preventing the bankruptcy

37

court from finally resolving such claims; and (v) whether, if the bankruptcy court cannot finally resolve the fraudulent transfer claims in this case, it has the authority to render findings of fact and conclusions of law before final resolution. Motions to dismiss on these five issues will be filed based on the briefing schedules established by the District Court.

115. In *Picard v. Maxam*, No. 11-cv-7428, the Defendants moved to withdraw the reference on May 13, 2011, but pursuant to a stipulation, the Trustee and the Defendants agreed to dismiss certain claims and to have all remaining bankruptcy claims proceed before this Court. However, on October 20, 2011, the Defendants moved to withdraw the reference for a second time. On March 6, 2012, oral arguments were held before the Judge Rakoff, who granted the withdrawal of the reference on March 13, 2012, for the limited purpose of addressing: (i) whether the Trustee may, consistent with non-bankruptcy law, avoid transfers that BLMIS purportedly made in order to satisfy antecedent debts; (ii) whether 11 U.S.C. § 546(e) applies to this case, limiting the Trustee's ability to avoid transfers; (iii) whether the securities laws, including SIPA, 15 U.S.C. § 78aaa *et seq.*, alter the standard that the Trustee must meet in order to show that defendants did not receive transfers in "good faith"; and (iv) whether 15 U.S.C. § 78fff-2(c)(3), allows customers who have received avoidable transfers to pursue those transfers as creditors of the estate. A motion to dismiss on these four issues will be filed based on the briefing schedule established by the District Court.

116. In total, approximately 165 motions to withdraw the reference were filed and approximately 393 joinders were filed to those motions in the Bankruptcy Court between February 3, 2011 and March 5, 2012.

### vi.    The Administrative Order & Motion Practice

117. On March 5, 2012, this Court issued the "Administrative Order Establishing Deadline For Motions To Withdraw The Reference." This Order specified that any motion to

withdraw filed after April 2, 2012 would be automatically regarded as untimely.  Judge Rakoff,

in a subsequent order dated March 27, 2012, indicated to "all parties that the April 2 deadline

will be strictly enforced."  Between the entry of the Administrative Order on March 5, 2012 and

the April 2, 2012 deadline, 265 motions to withdraw the reference were filed.

118.    As of the date of this Report, defendants in 768 avoidance actions commenced by

the Trustee in this Court have filed approximately 438 motions to withdraw the reference and

filed approximately 400 joinders to these motions.

**B.    The Bankruptcy Court and Related Appeals**

119.    During this period of voluminous activity before the District Court on motions to

withdraw the reference, motions to dismiss, and trial preparation, adversary proceedings that had

not been withdrawn to the District Court proceeded before this Court.  Certain decisions of this

Court in the matters described herein were appealed to the District Court and decided by various

judges of that Court.  After entry of the Administrative Order, certain defendants in these actions

moved to withdraw the reference from this Court.

**i.    *Picard v. Cohmad Sec. Corp.***

120.    On June 22, 2009, the Trustee and B&H commenced an adversary proceeding

against Madoff-insiders Cohmad Securities Corporation, Maurice ("Sonny") J. Cohn, Marcia B.

Cohn, and several other defendants (the "Cohmad Defendants").  *Picard v. Cohmad Sec. Corp.*,

Adv. Pro. No. 09-01305 (Bankr. S.D.N.Y.) (BRL).  The Complaint seeks to avoid and recover of

fictitious profits withdrawn by the Cohmad Defendants and the return of commissions and fees

transferred directly from BLMIS to Sonny Cohn and Cohmad.  On October 8, 2009, the Trustee

filed an Amended Complaint.  (ECF No. 82).  The Cohmad Defendants filed numerous Motions

to Dismiss, which the Trustee and B&H opposed.  (ECF No. 135).

121.    On August 1, 2011, the Bankruptcy Court filed its Memorandum Decision and Order Denying Defendants' Motions to Dismiss Trustee's Complaint.  (ECF No. 209).  The Court found that the Trustee had adequately pled that the transfers received by the Cohmad Defendants in excess of their principal were not transferred for reasonably equivalent value, and that Cohmad and Sonny Cohn lacked good faith in receiving commissions from Madoff.  *Picard v. Cohmad Sec. Corp.*, 2011 WL 3274077, at *10 (Bankr. S.D.N.Y. Aug. 1, 2011).

122.    Certain of the Cohmad Defendants filed a Motion for Leave to Appeal, (ECF Nos. 212-13), briefed by the Trustee and B&H, which remains pending before United States District Judge Thomas P. Griesa.  *See* No. 11 MC 00337 (S.D.N.Y.) (TPG).

123.    The parties have engaged in discovery.  The Trustee has served discovery on all parties, and discovery is ongoing.

124.    In March and April 2012, the Cohmad Defendants moved to withdraw the reference from this Court.

**ii.    *Picard v. Peter B. Madoff, et al.***

125.    On October 2, 2009, the Trustee and B&H commenced an adversary proceeding against Peter Madoff, Andrew Madoff, Shana Madoff, and Mark Madoff (the "Family Defendants").    *Picard v. Peter B. Madoff*, Adv. Pro. No. 09-01503 (Bankr. S.D.N.Y.) (BRL).  The Complaint sought to avoid and recover preferential transfers, fraudulent transfers, and damages for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting.    On March 15, 2010, the Family Defendants filed a Motion to Dismiss the Complaint. (ECF Nos. 13-19).  The Trustee and B&H opposed the Motion.  (ECF No. 25).

126.    On September 22, 2011, this Court filed its Memorandum Decision And Order Denying In Part And Granting In Part Defendants' Motion To Dismiss Trustee's Complaint.  (ECF No. 55); *Picard v. Peter B. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*,

2011 WL 4434632 (Bankr. S.D.N.Y. Sept. 22, 2011). The Court upheld the Trustee's common law claims for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting. In so doing, the Court determined that the Trustee's common law claims: (i) were not barred by the doctrine of *in pari delicto* or the related *Wagoner* Rule because the Family Defendants were alleged to be insiders and fiduciaries of BLMIS; and (ii) were not preempted by the Martin Act because those claims were unrelated to the fraudulent investment advice given by Madoff to customers of the IA Business. The Court also ruled that because the New York Attorney General has no enforcement power under the Martin Act to bring the types of claims asserted in the Trustee's Complaint, which do not require proof of scienter, the common law claims would not interfere with the Martin Act's statutory enforcement mechanism.

127. The Court dismissed the certain of the Trustee's claims for a failure to identify the transfers with the requisite particularity, noting that "[r]ectifying the majority of these pleading deficiencies upon amendment should not prove to be a Herculean task." *In re Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 4434632, at *7. The Court granted leave to the Trustee to amend his complaint.

128. On October 6, 2011, Andrew Madoff and the Estate of Mark Madoff filed a Motion for Leave to Appeal the Bankruptcy Court's decision, (ECF Nos. 56-57), which was assigned to United States District Judge William H. Pauley, III. *See* No. 11 MC 00379 (S.D.N.Y.) (WJP). On December 22, 2011, Judge Pauley issued a decision denying the Motion for Leave to Appeal.

129. On November 7, 2011, the Trustee filed an Amended Complaint that identified the date and amount of each transfer alleged in the action. (ECF No. 64). The Amended Complaint also increased the amount sought from the Family Defendants from over $198 million

to over $226 million.  This increase was due, in part, to the ongoing nature of the Trustee's investigation, which uncovered additional fraudulent transfers to the Family Defendants in various forms.

130.    On December 23, 2011, the Trustee filed a Motion for Leave to File a Second Amended Complaint (ECF No. 71).  In his Proposed Second Amended Complaint, the Trustee sought to name as defendants Mark Madoff's widow, Stephanie S. Mack, Mark Madoff's ex-spouse, Susan Elkin, and Andrew Madoff's wife, Deborah Madoff (collectively, the "Spouse Defendants").  The Trustee also sought to add additional fraudulent transfer claims against the initial defendants, as well as subsequent transferee claims against both the initial and the Spouse Defendants.  Lastly, the Trustee sought to make certain clarifications with regard to previously asserted fraudulent transfer claims.  The Spouse Defendants and Andrew Madoff, individually and as Executor of the Estate of Mark Madoff, opposed the Motion (ECF Nos. 89, 91, 94 and 96).

131.    The Bankruptcy Court heard oral arguments on the Trustee's Motion on April 3, 2012.  (ECF No. 108).  On April 4, 2012, the Court issued a Memorandum Decision and Order Denying in Part and Granting in Part the Trustee's Motion for Leave to File a Second Amended Complaint.  (ECF No. 106).  The Court granted the Trustee leave to name Stephanie S. Mack and Deborah Madoff as defendants with respect to certain common law causes of action as to which the statute of limitation had not yet run.  The Court denied leave to name the Spouse Defendants as defendants with respect to the bankruptcy causes of action and certain common law causes of action for which the statute of limitation had expired.  The Court granted the Trustee leave to pursue additional fraudulent transfer claims against the initial defendants, as well as subsequent transferee claims against both the initial defendants and the Spouse

42

Defendants. Finally, the Court granted the Trustee leave to make the necessary clarifications with regard to previously asserted claims.

132.    On April 2, 2012, putative defendants Stephanie S. Mack and Deborah Madoff moved to withdraw the reference in this case, notwithstanding that they were not yet named as defendants (ECF Nos. 100, 104). In their moving papers (ECF Nos. 101, 105), Ms. Mack and Ms. Madoff noted that while they had not yet been named as defendants, they were nevertheless filing the motion to withdraw the reference by the Court-instituted April 2, 2012 deadline out of an abundance of caution. They both argued, in part, that the cases against them should be heard by the District Court, relying on the Supreme Court decision in *Stern v. Marshall*. While Ms. Mack's motion sought withdrawal of the reference only with respect to the claims against her, Ms. Madoff's motion sought to withdraw the reference with respect to the entire case. Ms. Madoff also filed a separate motion to withdraw the reference in the related action filed against her by the Trustee, *Picard v. Deborah Madoff, et al.*, Adv. Pro. No. 10-05332 (ECF Nos. 22, 23).

133.    Discovery has commenced in this action and is ongoing. On February 7, 2012, Andrew Madoff and the Estate of Mark D. Madoff served the Trustee with requests for documents. On February 24, 2012, the Trustee served requests for documents on Peter Madoff, Shana Madoff, Andrew Madoff and the Estate of Mark D. Madoff.

### iii.    *Picard v. J. Ezra Merkin, et al.*

134.    On May 7, 2009, the Trustee and B&H commenced an adversary proceeding against sophisticated money manager and Madoff associate J. Ezra Merkin and his funds, Gabriel Capital, L.P., Ariel Fund Ltd., Ascot Partners, L.P., and Gabriel Capital Corporation (collectively, the "Merkin Defendants"). *Picard v. J. Ezra Merkin*, Adv. Pro. No. 09-01182 (Bankr. S.D.N.Y.) (BRL). The Complaint alleges that Merkin knew or should have known that

Madoff's IA business was predicated on fraud, and seeks the avoidance and recovery of almost $500 million in preference payments and fraudulent transfers to the Merkin Defendants.  On August 6, 2009, the Trustee and B&H filed an Amended Complaint.  (ECF No. 10).

135.    On November 4, 2009, Bart M. Schwartz, as Receiver ("Receiver") of defendants Ariel Fund Limited and Gabriel Capital, L.P., filed a Motion to Dismiss the Complaint, as did the remaining defendants in the proceeding.  (ECF Nos. 16, 22).  The Trustee opposed the Motions.  (ECF No. 29-30).  The Trustee and B&H received leave to file a Second Amended Complaint, (ECF No. 46), and did so on December 23, 2009 (ECF Nos. 49).  The Merkin Defendants renewed their Motions to Dismiss (ECF Nos. 53, 55), which the Trustee opposed (ECF Nos. 62-63).

136.    On November 17, 2010, this Court filed its Memorandum Decision and Order Granting in Part and Denying in Part Defendants' Motions to Dismiss Trustee's Complaint. (ECF No. 84); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010).  The Court first held that the Trustee sufficiently pleaded his federal and state law claims seeking to avoid and to recover actual fraudulent transfers.  The Court also held that the Funds were not, at the pleading stage, entitled to dismissal of the Bankruptcy Code-based actual fraudulent transfer claims pursuant to the section 548(c) "good faith transferee" affirmative defense.  Second, the Bankruptcy Court held that the Trustee sufficiently pleaded his federal and state law claims seeking to avoid and to recover constructive fraudulent transfers.  In addition, the Bankruptcy Court held that the Funds were not, at the pleading stage, entitled to dismissal of the Bankruptcy Code-based constructive fraudulent transfer claims pursuant to the section 546(e) "safe harbor" affirmative defense.

137.    The Receiver filed a Motion for Leave to Appeal the Court's Memorandum Decision and Order.  (ECF No. 90); 11 MC 00012 (S.D.N.Y.) (KMW).  On August 31, 2011, United States District Judge Kimba M. Wood denied the Motion.  *Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*), No. 11 MC 00012, 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011).  Judge Wood found that there were no "substantial grounds for difference of opinion as to the correctness of the standards relied on by the Bankruptcy Court in its refusal—at the pleading stage—to dismiss on the grounds of [the Merkin Defendants'] § 546(e) affirmative defense."  *Id.* at *12.  In doing so, Judge Wood noted that the Merkin Defendants cited "no decision in which a Ponzi scheme operator, who allegedly did not execute any trades, was deemed at the pleading stage to be a 'stockbroker' for purposes of § 546(e)."  *Id.*  Nor, Judge Wood noted, had the defendants cited any "decision in which an agreement was deemed to be a 'securities contract' within the meaning of the Bankruptcy Code, where that agreement (a) merely authorized one party to conduct future trades on behalf of another party, and (b) did not, by its terms, effect the purchase, sale, or loan of a security between the parties."  *Id.* at *25.

138.    This Court entered a Discovery Order on December 7, 2011.  On April 2, 2012, Bart M. Schwartz, as Receiver of Defendants Ariel Fund Limited and Gabriel Capital, L.P., filed a motion to withdraw the reference and marked the Merkin case as related to the Katz/Wilpon matter.

### iv.    *Picard v. Enrica Cotellessa-Pitz, et al.*

139.    On November 12, 2010, the Trustee and B&H commenced an adversary proceeding against Enrica Cotellessa-Pitz ("Pitz"), BLMIS's former Controller, and her husband.  The Trustee alleges that Pitz played a key role in disguising the Ponzi scheme.  (Adv. Pro. No. 10-4213).  Pitz was responsible for closing BLMIS's books each month and preparing FOCUS Reports and annual audited financial statements, along with her other responsibilities.

140.    Prior to December 19, 2011, the Trustee negotiated a settlement with the defendants and was in the process of reducing the settlement to writing. Prior to the finalization of the settlement, however, a criminal information was filed against Pitz on December 19, 2011 and she subsequently entered a guilty plea. In connection with Pitz's plea, the government is pursuing a forfeiture of her assets. The Trustee is presently awaiting the completion of the criminal forfeiture proceeding.

### v.    *Picard v. Friedman, et al.*

141.    On December 9, 2010, the Trustee commenced an adversary proceeding in this Court, seeking to recover fraudulent transfers from S. Donald Friedman, Saundra Friedman, Ari Friedman, Broadway-Elmhurst Co. LLC and NTC & Co. LLP. NTC & Co. LLP was subsequently voluntarily dismissed as a defendant. (Adv. Pro. No. 10-5395). The Complaint alleges that the defendants received fraudulent transfers from BLMIS in bad faith. The Complaint was amended on March 31, 2011 to add allegations concerning newly-discovered transfers after defendants sought to dismiss the action on February 18, 2011. The defendants answered the Amended Complaint on May 13, 2011.

142.    During the Report Period, the case entered the discovery phase. All written discovery requests and responses, excluding requests for admissions, were served. The Trustee also commenced a rolling document production. On March 30, 2012, Defendants moved to withdraw the reference to the District Court. The Motion was docketed as No. 12-02343 (S.D.N.Y.) (JSR). A briefing schedule has not yet been set. Discovery in the Trustee's action will continue to proceed pending a decision from the District Court resolving the Motion.

### vi.    *Picard v. Richard M. Glantz, et al.*

143.    On December 9, 2010, the Trustee and B&H commenced an adversary proceeding against Richard Glantz and several related individuals and entities. The Trustee

alleges that Richard Glantz, and his deceased father, Edward Glantz, created and managed entities that pooled many millions of dollars of investor funds to be funneled into BLMIS. (Adv. Pro. No. 10-5394). The Trustee further alleges that, after Richard Glantz, Edward Glantz and entities they created and managed were sued by the SEC for violations of the federal securities laws and were permanently enjoined from future securities laws violations, Richard Glantz and Edward Glantz arrived at a new arrangement with Madoff which resulted in Richard Glantz and Edward Glantz receiving fraudulent side payments. In addition, Richard Glantz continued to funnel his own money, his family's money, and other people's money into BLMIS though new entities. The Trustee alleges that the defendants collectively withdrew more than $113,000,000.00 in principal and profit from BLMIS.

144. During the Report Period, several defendants were dismissed from the Complaint for reasons including financial hardship, evidence provided by defendants that they did not receive any transfers, and settlement. To date, the Trustee has dismissed thirteen defendants in this matter. There are twenty-six defendants remaining in this adversary proceeding.

145. On February 1, 2012, all but one of the remaining defendants moved in this Court to dismiss the complaint. The Trustee and counsel for the defendants subsequently entered into a stipulation, which was so ordered by the Court on April 2, 2012, pursuant to which the Trustee has until May 16, 2012 to amend the Complaint. The Defendants may either supplement their motion to dismiss or file a new motion by June 27, 2012.

146. On March 31, 2012, the remaining defendant filed a motion to withdraw the reference, which is pending before Judge Rakoff. *See* No. 12-cv-02778 (S.D.N.Y.) (JSR).

**vii.    *Picard v. David L. Kugel, et al.***

147. On November 12, 2010, the Trustee filed a complaint, alleging bad faith, against David L. Kugel ("Kugel"), his family members, and the family's related trusts and investment

partnerships seeking the return of more than $22 million in fraudulent transfers.  (Adv. Pro. No. 10-4217).  Subsequent to the filing of the Complaint, the United States Attorney's Office began to investigate Kugel. The defendants filed a motion to withdraw the bankruptcy reference, No. 11-cv-04227 (JSR), which was assigned to Judge Rakoff, but later withdrew the motion after Judge Rakoff refused to stay briefing on the motion once Kugel began cooperating with the U.S. Attorney's Office.

148.    On November 21, 2011, Kugel pled guilty to participating in and conspiring to perpetuate the Ponzi scheme (*United States v. Kugel*, Case No. 10-CR-228-LTS–7).  Among other things, Kugel admitted that the Ponzi scheme had been in existence at BLMIS since at least the early 1970s. At his plea hearing, Kugel pled guilty to a six-count criminal information and agreed to forfeit substantially all of the defendants' assets.  On November 22, 2011, the Trustee dismissed the adversary proceeding against the defendants as part of Kugel's plea arrangement with the United States Attorney's Office.

### viii.    *Picard v. Joel R. Levey*

149.    On November 23, 2010, the Trustee and B&H commenced an adversary proceeding against Joel Levey ("Levey"), who was a partner in Telfran Associates Ltd. ("Telfran Associates"). Telfran Associates and its general partner Telfran Associates Corp. (together, "Telfran"), while supposedly operating as an unregistered investment company selling unregistered securities to the public, were actually funneled money to BLMIS though the accounting firm owned and operated by Frank Avellino and Michael Bienes (defendants in other of the Trustee's avoidance actions).  (Adv. Pro. No. 10-4282).  After the SEC permanently enjoined Telfran from selling unregistered securities, Madoff entered into a new arrangement with Levey pursuant to which Levey was compensated directly by BLMIS through a fraudulent side payment for referring former Telfran investors to BLMIS and a guaranteed rate of return on

Levey's individual investment account.   The Complaint seeks to avoid and recover fictitious profits and principal.

150.   Mr. Levey is also a defendant in "good faith" avoidance actions in connection with his role as a trustee and/or beneficiary of various trusts.

151.   Mr. Levey filed a motion to withdraw the reference on March 29, 2012.  Also, during this Report Period, initial disclosures were exchanged and the Trustee filed a case management plan.

### ix.    *Picard v. Michael Lieberbaum, et al.*

152.   On December 10, 2010, the Trustee brought an avoidance action against husband and wife Michael and Cynthia Lieberbaum (collectively, the "Lieberbaums"), seeking to recover $2,364,600 in principal and fictitious profits.  (Adv. Pro. No. 10-05406).   The Trustee alleges that the Lieberbaums profited from the Ponzi scheme and from a personal relationship with the Madoffs through the annual receipt of side, off-the-books payments of thousands of dollars of cash, which spanned approximately thirty years.  In addition to the cash, in or around 1989, Mr. Lieberbaum, who was a broker at Morgan Stanley, also orchestrated an arrangement with Madoff, whereby Madoff allegedly allowed Mr. Lieberbaum to use BLMIS's name and BLMIS's trading account to trade options for himself.  Because the Lieberbaums received hundreds of thousands of dollars in cash from BLMIS and because Mr. Lieberbaum acted with Madoff to violate several FINRA, NASD, and other regulations, the Complaint alleges that the Lieberbaums knew or should have known that BLMIS was involved in fraudulent activity.

153.   The Lieberbaums filed an answer to the Trustee's complaint, counterclaims, and a demand for a jury trial on April 18, 2011.  On August 25, 2011, the Court entered a Case Management Plan.  On February 21, 2012, the Court entered an Amended Case Management Plan. During the course of discovery, the Trustee served document requests on various third

parties and took the depositions of several third-party witnesses. Defendants served document requests on the Trustee, and the Trustee is in the process of preparing his objections and responses. Dispositive motions must be filed by April 1, 2013.

### x.    *Picard v. Irwin Lipkin, et al.*

154.    On November 12, 2010, the Trustee and B&H commenced an adversary proceeding against defendants and former BLMIS employees Irwin Lipkin and Eric Lipkin, and their family members. (Adv. Pro. No. 10-4218). Irwin Lipkin is the father of Eric Lipkin. Irwin Lipkin became associated with BLMIS in 1964 and subsequently retired as its Controller. Among other duties, Irwin Lipkin assisted Madoff in conducting monthly reviews of the customer accounts and performed internal audits of the purported security positions held by BLMIS. Eric Lipkin administered BLMIS's 401k plan and its payroll until its collapse. Eric Lipkin also played an active role in assisting in the perpetuation of the Ponzi scheme by, among other things, identifying non-existent counterparties for stock and option trades that were requested by the SEC and fabricating trade blotters and other trade related documentation in the event regulators requested additional information. The Complaint seeks $9,175,967.00 in damages.

155.    Eric Lipkin was subsequently charged with a six count indictment by the United States Attorney's Office, asserting that he manufactured customer statements to reflect false holdings of customer accounts and falsified the books and records of BLMIS. Eric Lipkin entered into a cooperation agreement and, on June 6, 2011, pleaded guilty to all six counts. His sentencing is scheduled for June 15, 2012. The Trustee is continuing to pursue litigation against the remaining non-indicted defendants.

### xi.    Subsequent Transferee Actions

156.    Since October 1, 2011, the Trustee has filed 33 new actions seeking the recovery of subsequent transfers from BLMIS feeder funds.  To date, the Trustee has brought a total of 68 adversary proceedings seeking recovery of just over $6 billion in subsequent transfers from 111 defendants who redeemed money from Fairfield Sentry Limited, Fairfield Sigma Limited, Fairfield Lambda Limited,  Harley International (Cayman) Ltd., Kingate Global Fund Ltd., and Kingate Euro Fund Ltd.  The Trustee has completed service of process in all but 15 adversary proceedings, for which the Trustee is currently in the process of effectuating international service of process.

157.    To date, the subsequent transferee defendants have filed 58 motions seeking to withdraw the reference in 36 different adversary proceedings. In addition to the motions to withdraw the reference, one motion to dismiss has been filed by a subsequent transferee defendant in the Bankruptcy Court.

### xii.    Case-Wide Procedures

158.    During this and prior Report Periods, the Trustee filed several motions before this Court to establish procedures to ensure the efficient administration of hundreds of proceedings against more than four thousand defendants located in at least thirty countries.  These procedures will ensure compliance with the Bankruptcy Code and SIPA, consistency, and transparency.

159.    On February 24, 2011, the Trustee and B&H filed a Motion for an Order Establishing Procedures for Electronic Data Rooms.  (ECF No. 3869).  The Trustee seeks to allow discovery for all adversary proceedings of certain documents supporting some of the key elements of the Trustee's claims, while balancing the privacy interests of BLMIS customers and others.  A renewed Motion for An Order Establishing Procedures for Electronic Data Rooms was filed on August 5, 2011.  (ECF No. 4290).  On January 12, 2012, the Court entered an Order

(ECF No. 4624) establishing expanded access to Electronic Data Room 1, which includes documents relating to BLMIS's insolvency and BLMIS's fraud.

160.    On March 14, 2011, the Trustee and B&H filed a Motion for Entry of a Litigation Protective Order to govern the use of confidential materials in the adversary proceedings.  (ECF No. 3928).  A hearing on the Motion was held on June 1, 2011, during which the remaining disagreements were settled on the record.  The Court entered the Order on June 6, 2011.  (ECF No. 4137).  On August 5, 2011, the Trustee submitted a Motion for An Order Modifying the June 6, 2011 Litigation Protective Order that would allow the Trustee to use the Electronic Data Rooms in the adversary proceedings.  (ECF No. 4290).  The hearing on the motion for an order modifying the June 6, 2011 Litigation Protective Order has been postponed and the issue is to be heard at a later date pending resolution of discovery related issues and motions to withdraw the reference.

161.    On August 5, 2011, the Trustee and B&H filed a Motion for a Report and Recommendation to the District Court for the Appointment of Special Discovery Masters.  (ECF No. 4290).  The Trustee seeks the appointment of two Masters to assist in resolving the numerous discovery disputes that will arise in the adversary proceedings.  The hearing on the motion for the appointment of special discovery masters has been postponed and the issue is to be heard at a later date pending resolution of discovery related issues and motions to withdraw the reference.

## C.    Injunction Proceedings

162.    The Trustee has commenced numerous injunction actions seeking to enjoin third-party lawsuits brought against defendants who also have been named as defendants in the Trustee's avoidance actions. During the Report Period, there were significant developments in the Bankruptcy Court and the District Court with respect to the Trustee's injunction proceedings,

including with respect to third-party actions against the estate of Jeffry Picower and related entities (the "Picower Defendants"), members of the Madoff family (the "Family Defendants"), the estate of Stanley Chais and related entities (the "Chais Defendants"), the Maxam Absolute Return Fund L.P. and related entities (the "Maxam Defendants"), and Steven Mendelow and related entities (the "Mendelow Defendants").   Through these proceedings, the Trustee has sought to enforce the automatic stay established by section 362 of the Bankruptcy Code and to enjoin third-party actions under section 105 of the Code in order to facilitate the orderly administration of the BLMIS liquidation, and to preserve assets from which the Trustee may recover for the benefit of all BLMIS customers.   As a result of his efforts, very significant rulings favoring the estate have been obtained.

      **(a)**     ***Picard v. Fox*, Adv. Pro. No. 10-03114 (BRL), Case Nos. 10-04652, 10-cv-07101, and 10-cv-07219 (JGK); *Picard v. Picower*, Adv. Pro. No. 09-01197 (BRL), Case Nos. 11-cv-01328, 11-cv-01298 (JGK)**

163.   On March 31, 2010, the Trustee commenced an adversary proceeding in this Court, *Picard v. Fox* (Adv. Pro. No. 10-03114), seeking to enjoin third-party actions that were commenced against the Picower Defendants by Adele Fox, Susanne Marshall, and classes they purport to represent (the "Fox Plaintiffs").

164.   Following significant briefing and argument, this Court held that: (i) the automatic stay and the December 15, 2008 stay order of the District Court apply, and hence the third-party actions are void *ab initio*; and (ii) preliminarily enjoined the actions pending the Trustee's settlement with the Picower Defendants or completion of the Trustee's Picower litigation.  *Picard v. Fox*, 429 B.R. 423 (Bankr. S.D.N.Y. 2010).  The Fox Plaintiffs appealed the decision to the District Court.

165.   In connection with the Trustee's avoidance action in *Picard v. Picower* (Adv. Pro. No. 09-01197), the Trustee subsequently reached a settlement with the Picower Defendants.  The

Trustee then moved for approval of his settlement with the Picower Defendants and for the issuance of a permanent injunction in connection therewith.  On January 13, 2011, the Bankruptcy Court issued an order approving the settlement and granting the requested injunction.  (ECF No. 43.)  The Fox Plaintiffs appealed this decision as well.

166.    The appeals were consolidated, and the propriety of the Bankruptcy Court's rulings as to the injunctions and the settlement was argued by the Trustee and the Fox Plaintiffs on December 19, 2011.  On March 26, 2012, U.S. District Judge John G. Koeltl issued a written opinion affirming the Bankruptcy Court's opinion in *Fox,* and the order approving the settlement between the Trustee and the Picower Defendants, and the related injunction.  *Picard v. Fox*, 2012 WL 990829 (S.D.N.Y. Mar. 26, 2012).  Judge Koeltl held that the Trustee's settlement with the Picower Defendants was "extraordinarily beneficial" to the BLMIS estate, and that the third-party actions were "substantively duplicative" with the Trustee's Picower litigation.  *Id.* at *1, *9.  Judge Koeltl also held that the third-party actions commenced by the Fox Plaintiffs were properly enjoined because they "plainly [. . .] jeopardize[d] the estate's ability to recover fraudulently transferred assets from the Picower Defendants . . . ."  *Id.* at *14.  On April 24, 2012, notices of appeal were filed to Judge Koeltl's order.

        **(b)**     ***Picard v. Stahl*, Adv. Pro. No. 10-03268 (BRL), Case Nos. 11-cv-02246, 11-cv-02135, 11-cv-02392 (AKH), Case Nos. 11-5421 and 11-5428 (2d Cir.)**

167.    On May 27, 2010, the Trustee commenced an adversary proceeding in the Bankruptcy Court, *Picard v. Stahl* (Adv. Pro. No. 10-03268), seeking to enjoin third-party actions commenced against the Madoff Defendants by Richard Stahl, Reed Abend, and a number of other unrelated plaintiffs (collectively, the "Stahl Plaintiffs").

168.    The Bankruptcy Court found that the automatic stay and the December 15, 2008 stay order of the District Court applied, and held that the third-party actions are void *ab initio* as

against the Family Defendants.  As an alternative part of the ruling, the Bankruptcy Court also preliminarily enjoined the actions pending the completion of the Trustee's litigation against the Family Defendants.  *Picard v. Stahl*, 443 B.R. 295 (Bankr. S.D.N.Y. 2011).  Several of the Stahl Plaintiffs appealed this decision.

169.    Following briefing and argument, on November 17, 2011, U.S. District Judge Alvin K. Hellerstein issued a bench ruling and summary order affirming the Bankruptcy Court's opinion.  (*See* Transcript of November 17, 2011 hearing, *Fairfield Retirement Program v. Picard*, Case No. 11-cv-2392 (S.D.N.Y.) ("Stahl Transcript").  Judge Hellerstein found that the third-party actions created "a waste of personal assets that the trustee seeks to recover" and that "the profusion of [the third-party] lawsuits makes it extremely difficult for the trustee to run his lawsuit expeditiously and economically in the interests of the creditors of the estate."  (Stahl Transcript at 36.)  Judge Hellerstein recognized that "it's the rationale behind Section 362 and Section 105 to favor the trustee . . . ," and held that a preliminary injunction was proper "to allow the trustee the ability to pursue his actions and obtain rulings and finality on those rulings because the trustee is acting for the benefit of all creditors and not just a few."  (*Id.* at 31).

170.    The Stahl Plaintiffs have filed joint appeals of Judge Hellerstein's ruling with the Second Circuit, which are pending under Case Nos. 11-5421 and 11-5428.  The Trustee and his counsel are currently working on briefing and related matters for the appeals.

(c)    *Picard v. Hall*, Adv. Pro. No. 12-01001 (BRL)

171.    On January 4, 2012, the Trustee commenced an adversary proceeding in the Bankruptcy Court captioned *Picard v. Hall* (Adv. Pro. No. 12-01001), seeking to enjoin several third-party actions against the Chais Defendants commenced by Douglas Hall, Steven Heimoff, and certain other plaintiffs, including the Office of the California Attorney General (collectively, the "Hall Plaintiffs").

172.     The actions brought by the Hall Plaintiffs', among other things, threaten assets of the estate and the administration of the estate, and therefore the Trustee sought to enjoin the actions while his case against the Chais Defendants proceeds.  The Hall Plaintiffs filed briefs in opposition to the Trustee's application, and the Trustee has been preparing reply papers.  The appeal is scheduled to be fully briefed by May 1, 2012, and a hearing has been scheduled for May 17, 2012.

      **(d)**    ***Picard v. Maxam Absolute Return Fund et al.*, Adv. Pro. No. 10-05342 (avoidance action)(BRL); Case No. 11-cv-08629 (appeal) (JPO)**

173.     In his avoidance action against the Maxam Defendants, *Picard v. Maxam Absolute Return Fund et al.* (Adv. Pro. No. 10-05342), the Trustee moved to enjoin an action commenced by the Maxam Defendants against Irving Picard in the Cayman Islands in violation of the automatic stay and the *Barton* doctrine.  Through that action, the Maxam Defendants sought relief in a foreign court that they were not liable on the claims brought by the Trustee in the United States.

174.     Following briefing and argument, on October 12, 2011, the Bankruptcy Court issued a bench memorandum decision and order agreeing with the Trustee and granting his application on the grounds that the Cayman Islands action violated the automatic stay, the District Court Stay Orders, SIPA, and the *Barton* doctrine.  *See Picard v. Maxam Absolute Return Fund L.P.*, 460 B.R. 106 (Bankr. S.D.N.Y. 2011).  In the decision, the Bankruptcy Court recognized that the bankruptcy automatic stay has worldwide reach.  *See id.* at 115.

175.     The Maxam Defendants have appealed the injunction order to the District Court.  The appeal is pending before Judge J. Paul Oetken as Case No. 11-cv-08629.   The appeal was fully briefed by the Trustee and the Maxam Defendants as of January 20, 2012.  A hearing has not yet been scheduled.

(e)    ***Picard v. Mendelow***, Adv. Pro. No. 10-04283 (avoidance action); Adv. Pro. No. 12-01092 (injunction action)

176.    On January 18, 2011, Steven Mendelow ("Mendelow") moved in the Trustee's pending avoidance action, *Picard v. Mendelow* (Adv. Pro. No. 10-04283), seeking to enjoin a third-party action against the Mendelow Defendants commenced by Larry Warshaw and Carol Warshaw as Trustees for Carol Ann Enterprises, Inc. Pension Plan (the "Warshaw Trustees"). (ECF No. 6.)

177.    Following extensive efforts to resolve the issue of whether the Warshaw Trustee's action should be stayed, on February 23, 2012, the Trustee commenced an adversary proceeding, *Picard v. Warshaw et al.* (Adv. Pro. No. 12-01092), seeking to enjoin third-party actions commenced by the Warshaw Trustees, and by other plaintiffs naming the Mendelow Defendants as defendants in two other third-party actions (collectively, the "Warshaw Plaintiffs").

178.    After commencement of the Trustee's injunction action, the parties continued to discuss the issue in an effort to resolve the matter and obtain the injunction.  As a result of the Trustee's efforts, on March 13, 2012, the Court entered an agreed and so-ordered stipulation between the Trustee and the Warshaw Plaintiffs fully resolving the Trustee's injunction action. As set forth in the so-ordered stipulation, the Warshaw Plaintiffs voluntarily agreed to stay prosecution of their claims against the Mendelow Defendants in the third-party actions pending final resolution of the Trustee's avoidance action against the Mendelow Defendants, with certain minor exceptions to conduct discovery as to Mendelow in connection with their claims against other defendants.  Pursuant to the stipulation, the Trustee agreed to dismiss without prejudice the injunction complaint.  On the same day, March 13, 2012, Mendelow withdrew his motion for a preliminary injunction.

## IX.    INITIAL ALLOCATION OF FUNDS AND DISTRIBUTION TO CUSTOMERS

### A.    The Customer Fund

179.    In order to protect customers of an insolvent broker-dealer such as BLMIS, Congress established a statutory framework pursuant to which customers of a debtor in a SIPA liquidation are entitled to preferential treatment in the distribution of assets from the debtor's estate.  The mechanism by which customers receive preferred treatment is through the creation of a Customer Fund, as defined in SIPA § 78*lll*(4), which is distinct from a debtor's general estate.  Customers holding allowable claims are entitled to share in the Customer Fund based on each customer's Net Equity as of the filing date, to the exclusion of general creditors.  SIPA § 78fff-2(c).

180.    In order to make interim distributions from the Customer Fund, the Trustee must determine or be able to sufficiently estimate: (a) the total value of customer property available for distribution (including reserves for disputed recoveries, such as the Levy Settlement and Net Equity Dispute), and (b) the total net equity of all allowed claims (including reserves for disputed claims).  Each element of the equation—the customer property numerator and the net equity claims denominator—is inherently complex in a liquidation of this magnitude.

181.    There are many unresolved issues in this liquidation proceeding that will require the maintenance of substantial reserves.  Nonetheless, the liquidation proceeding progressed to a stage at which it was possible for the Trustee, on an interim basis, to determine: (a) the allocation of property to the customer fund, or the "numerator" (taking reserves into account); (b) the amount of allowable net equity claims, or the "denominator" (also taking reserves into account); and (c) the calculation of each customer's minimum ratable share of the Customer Fund.

182.    On May 4, 2011, the Trustee filed a motion seeking entry of an order approving an initial allocation of property to the Customer Fund, and authorizing an interim distribution to

customers whose claims have not been fully satisfied because their net equity claims as of the filing date exceeded the statutory SIPA protection limit of $500,000 (the "Allocation Motion"). (ECF No. 4048). The Allocation Motion was unopposed, and the Court entered the Order Approving the Trustee's Initial Allocation of Property to the Fund of Customer Property and Authorizing An Interim Distribution to Customers on July 12, 2011. (ECF No. 4217).

183. On October 5, 2011, the Trustee distributed to BLMIS customers approximately $325 million—more than the amount initially approved by the Court—relating to 1,232 BLMIS accounts.[8] Thirty-nine payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously. After March 2012, he distributed an additional $2.0 million to those who qualified for the first interim distribution. In addition, there is another $2.6 million that has been allocated but not distributed pending receipt of an executed assignment and release.

184. The allocation and distribution was initial and interim in nature because the Trustee anticipates: (i) recovering additional assets through litigation and settlements, and (ii) resolving the issues on appeal that require reserves. Indeed, only approximately $325 million was available to the Trustee for distribution because of the Net Equity Dispute, appeals of the Levy and Picower settlements, the net loser accounts that are in litigation, and other issues requiring reserves. Final resolution of these appeals and disputes will permit the Trustee to reduce the reserves he is required to maintain, which would allow for a greater distribution to customers in the future. As the Trustee has recovered or entered into settlement agreements to recover over 50% of the principal lost in the Ponzi scheme by customers with net equity claims, a distribution to customers without any reserves would be significant. The Trustee expects to

---

[8] A small number of checks are pending distribution and await the completion of certain documentation.

seek authorization for further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.

## B.    The General Estate

185.    If the Trustee were able to fully satisfy the net equity claims of the BLMIS customers, any funds remaining would be allocated to the general estate and distributed in the order of priority established in Bankruptcy Code § 726 and SIPA § 78fff(e).

186.    All BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—are general creditors of the BLMIS estate.  The Trustee is working diligently on behalf of the entire BLMIS estate and seeks to satisfy all creditor claims in this proceeding.

## X.    INTERNATIONAL INVESTIGATION AND LITIGATION

187.    The Trustee's international investigation and recovery of BLMIS estate assets involves, among other things: (i) identifying the location and movement of estate assets abroad; (ii) becoming involved in litigation brought by third parties in foreign courts, by appearance or otherwise, to prevent the dissipation of funds properly belonging to the estate; (iii) bringing actions before United States and foreign courts and government agencies to recover customer property for the benefit of the customers and creditors of the BLMIS estate; and (iv) retaining International Counsel to assist the Trustee in these efforts, when necessary.  More than seventy of the actions filed in this Court involve international defendants, and the Trustee also has actions pending in the United Kingdom, Bermuda, the British Virgin Islands (BVI), Gibraltar, and the Cayman Islands, among other countries.

188.    The following summarizes key litigation involving foreign defendants in the Bankruptcy Court and in foreign courts.

### i.    Austria and Italy

189.    The Trustee has actively investigated certain banks, institutions, and individuals located in these jurisdictions.  The Kohn and HSBC Actions, both discussed above, name several Austrian and Italian defendants, including Sonja Kohn, Bank Austria, and UniCredit S.p.A.

### ii.    Bermuda

190.    The Trustee is actively investigating various BLMIS-related entities, their officers and directors, and transfers of funds to and through Bermuda.  In addition, in December 2010, the Trustee filed protective actions in Bermuda against several HSBC-related entities in order to preserve the Trustee's ability to bring causes of action in that jurisdiction, as well as an action in the Bankruptcy Court against Bermuda-based Whitechapel Management Limited.  *Picard v. Whitechapel Management Ltd.*, Adv. Pro. No. 10-05402 (Bankr. S.D.N.Y.) (BRL).  The Trustee is also participating in winding-up proceedings in the Supreme Court of Bermuda involving several BLMIS-related entities.

### iii.    BVI and the Cayman Islands

191.    The Trustee has discovered and is actively investigating the involvement of no fewer than twenty BVI-based feeder funds that funneled money into the Ponzi scheme.  In particular, the Trustee has investigated and filed complaints in the Bankruptcy Court against BVI-based Kingate Global Fund Ltd., Kingate Euro Fund Ltd., the Bank of Bermuda, Thybo Asset Management Ltd., Thybo Global Fund Ltd., Thybo Return Fund Ltd., Thybo Stable Fund Ltd., Hermes International Fund Limited, Lagoon Investment Limited, Thema Fund Ltd, Thema Wise Investments Ltd., Lagoon Investment Trust, Defender Limited, Equity Trading Portfolio, and Granadilla Holdings Limited.  *See, e.g.*, *Picard v. Kingate*, Adv. Pro. No. 09-01161 (Bankr. S.D.N.Y.) (BRL); *Picard v. Thybo*, Adv. Pro. No. 09-01365 (Bankr. S.D.N.Y.) (BRL); *Picard v. Defender Limited*, Adv. Pro. No. 10-05229 (Bankr. S.D.N.Y.) (BRL).  In addition, the Trustee

has filed numerous claim forms against several feeder funds in BVI that preserve the Trustee's right to pursue claims in that jurisdiction.

192.    The Trustee has investigated and filed complaints in the Bankruptcy Court against Cayman Islands-based Harley International (Cayman) Ltd., *Picard v. Harley*, Adv. Pro. No. 09-01187 (Bankr. S.D.N.Y.) (BRL), Herald Fund SPC, and Primeo Fund, the latter two of which are defendants in the HSBC Action.  The Trustee has also filed a complaint in the Cayman Islands against Harley International (Cayman) Ltd.  A hearing date of Fall 2012 has been set for the determination of preliminary issues in both the Harley and Primeo actions.  The Trustee has applied for a stay of the Cayman proceedings against Primeo and Harley pending the resolution of the U.S. proceedings against Primeo.  The hearing on that application is set for mid-May 2012.

193.    Finally, on September 22, 2011, the Trustee petitioned this Court to enjoin an action for a declaratory judgment of non-liability brought by Maxam Absolute Return Fund, L.P. in the Cayman Islands against the Trustee.  *Picard v. Maxam Absolute Return Fund, L.P.*, Adv. Pro. No. 10-05342 (Bankr. S.D.N.Y.) (BRL) (ECF Nos. 42-44).  On October 12, 2011, the Court enjoined the action based on Maxam's violation of the automatic stay.  (ECF No. 54).

### iv.    England

194.    The Trustee, who was granted recognition as a foreign representative for the purpose of gathering evidence, has continued to investigate MSIL and work with MSIL's joint liquidators ("MSIL Liquidators").  In December 2010, the Trustee filed suit in England, together with MSIL (in liquidation) against MSIL's former directors and Sonja Kohn.  In connection with that lawsuit, the Trustee and the MSIL Liquidators sought freezing orders and document disclosure from Sonja Kohn.  In early 2012, the Court issued a freezing and disclosure order against Sonja Kohn and granted BLMIS access to the results of the disclosure order.  In addition,

the Trustee has filed protective claims in England against Kingate-related individuals and entities and against HSBC and related entities. Also, the Trustee has been granted permission for a written intervention in *Rubin v. Eurofinance*, presently before the Supreme Court of the UK. Oral argument is set for late May 2012.

### v.    Gibraltar

195.    After extensive investigation, the Trustee brought both domestic and Gibraltar-based actions against Vizcaya Partners Ltd. ("Vizcaya"), Banque Jacob Safra (Gibraltar) Ltd. ("Bank Safra"), Asphalia Fund Ltd. ("Asphalia"), Zeus Partners Ltd. ("Zeus"), and Siam Capital Management ("Siam"). *Picard v. Vizcaya*, Adv. Pro. No. 09-01154 (Bankr. S.D.N.Y.) (BRL). Vizcaya, Siam, Asphalia, and Zeus failed to appear or answer the Trustee's amended complaint in this Court. Accordingly, this Court granted the Trustee's Motion for Default Judgment on August 3, 2010. Thereafter, Zeus and the Trustee entered into a stipulation pursuant to which the Trustee agreed to vacate the default judgment against Zeus, and Zeus agreed not to oppose the Trustee's application to the Supreme Court of Gibraltar for the transfer of over $60 million that had been held in Zeus's account at Bank Safra and was placed in the custody of the Gibraltar Supreme Court. The Bankruptcy Court approved the stipulation on November 23, 2010.

196.    The Trustee filed an application in the Gibraltar Supreme Court for the repatriation of those funds to the United States, which was granted. Those funds were deposited in the Court's registry on August 8, 2011.

197.    The Trustee has also served a protective action in Gibraltar to preserve his right to sue Vizcaya, Bank Safra, Asphalia, Zeus, Siam, Banque J. Safra (Suisse) SA, and Pictet et Cie for $180 million in transfers received from BLMIS.

### vi. Ireland

198.    The Trustee investigated Ireland-based Thema International Fund plc and included the feeder fund as a defendant in the HSBC Action.  The Trustee has continued to investigate this fund and related entities and issued subpoenas in connection with the investigation.

### vii. Lichtenstein

199.    In early 2012, the Trustee joined the criminal proceedings against Sonja Kohn and Ursula Rachel-Ceszczynski as a private participant.

### viii. Switzerland and Luxembourg

200.    In 2010, the Trustee filed two lawsuits in the Bankruptcy Court against Switzerland-based UBS AG and other UBS-related entities and various feeder funds, management companies, and individuals, discussed above.

## XI.    FEE APPLICATIONS AND RELATED APPEALS

### A.    Appeal of Fifth Fee Order

201.    Objections have been filed to six of the eight fee applications submitted by the Trustee and B&H.  Discussions of the objections to the first through sixth fee applications, and related motions for leave to appeal the Court's orders granting the Trustee and B&H's fee applications and overruling those objections, are discussed more fully in the Trustee's Amended Third Interim Report ¶¶ 186-190, the Trustee's Fourth Interim Report ¶¶ 163-166, the Trustee's Fifth Interim Report ¶¶ 134-143, and the Trustee's Sixth Interim Report ¶¶ 131-142.

202.    On November 19, 2010, the Trustee and his counsel filed the Fifth Application for Interim Compensation for Services Rendered Reimbursement of Actual and Necessary Expenses Incurred with the Bankruptcy Court (ECF No. 3207) (the "Fifth Interim Fee Application"), which was approved by order dated December 14, 2010 (the "Fifth Interim Fee Order").

203.    On December 7, 2010, Diane and Roger Peskin and certain other customers represented by Helen Davis Chaitman, Esq., (the "Movants") filed an objection to the Fifth Interim Fee Application in this Court (the "Fifth Objection").   (ECF No. 3308).   The Fifth Objection was substantially similar to the four prior Objections filed by the Movants in that the Movants raised the repeatedly-rejected argument that the Trustee and B&H are not disinterested. Movants further insisted, based on nothing but speculation, that there will be sufficient funds for the Trustee to "pay all claims in full and reimburse SIPC in full for its administrative expenses" based upon the Trustee's success in recovering substantial amounts to the estate.   Movants base this oversimplified assumption on the fact that the Trustee had, to that date, allowed approximately $6 billion in customer claims, while his recoveries, if certain settlements are finally approved, will total approximately $7.6 billion.

204.    At the fee hearing held on December 14, 2010 (the "Fifth Interim Fee Hearing"), the Trustee, his counsel, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Fifth Interim Fee Application was reasonable.   The Trustee, his counsel, and SIPC also provided the Court with detailed explanations as to why there was not, at that time, a reasonable expectation that SIPC would recoup its administrative expenses.

205.    The Trustee explained that while the then-current value of allowed customer claims was $6 billion, because there is significant litigation pending against entities and individuals who also have claims against the estate, the amount of allowed claims will only increase as parties pay back certain avoidable transfers to the estate and/or as claims objections and the Trustee's claims under section 502(d) of the Bankruptcy Code are resolved.   *See* Fifth App. Hr'g Tr. 15, Dec. 14, 2010.   Moreover, the Trustee and his counsel advised the Bankruptcy

Court of the risks associated with the litigations he has commenced against numerous defendants, very few of which have been resolved to date. *Id.* at 15-17.

206.    Similarly, counsel for SIPC stated that while there was a hope that at some point there would be a reasonable expectation of recoupment, none existed at this time. *Id.* at 24-25. Counsel for SIPC referenced a letter from the President of SIPC to Congress, attached to the Fifth Objection as <u>Exhibit K</u>, indicating that the amount of principal lost in Madoff's fraud was approximately $17.3 billion. *Id.* at 25.    Accordingly, SIPC's counsel stated that "at some point in time when the Trustee is able to recover over twenty billion dollars maybe we would be at a point where there would be no [sic] reasonable expectation." *Id.* at 26.

207.    Ignoring the above explanations, counsel for Movants stated that "after two years, he has only allowed $5.8 billion dollars of the seventeen billion in possible claims.    And he hasn't told you today why that is." *Id.* at 28.    Counsel for Movants then further argued that it is possible that the Trustee never intends to allow remaining claims, speculating in accordance with her own hypothetical that "if we assume that's true for a second, then it's virtually inconceivable that there won't be enough money to pay all the allowed claims in full and to fully reimburse SIPC . . ." *Id.*

208.    In overruling the Fifth Objection, Judge Lifland stated, "I do not find that the objectors have made any strong point with respect to objecting to the fees that have been requested here today." *Id.* at 33.    This Court found that, at that time, there was no reasonable expectation of recoupment by SIPC. *Id.* at 32.    Moreover, "notwithstanding the statutory command that [the Bankruptcy] Court shall approve the fees," Judge Lifland noted that he was "very well aware of the Herculean effort being utilized in the litigation arena to recoup funds for

the benefit of the victims."  *Id.*  The Bankruptcy Court subsequently entered the Fifth Interim Fee

Order approving the Fifth Interim Fee Application.

209.    On December 28, 2010, Movants filed a Motion for Leave to Appeal the Fifth Fee

Order and supporting papers seeking interlocutory review of the Fifth Interim Fee Order.  (ECF

No. 3594).  Movants argued that the Fifth Interim Fee Order should be reversed because the

Bankruptcy Court purportedly failed to properly review the Fifth Fee Application and, once

again, that the Trustee and his counsel have a conflict of interest that renders them not

disinterested.  On January 11, 2011, the Trustee filed an Opposition to the Motion for Leave to

Appeal.  (ECF No. 3672).  On January 17, 2011, Movants filed a Reply.  (ECF No. 3710).

210.    During this Report Period, the District Court denied the motion for leave to appeal

the Fifth Fee Order.

> Whether a liquidation proceeding under SIPA is "without a reasonable
> expectation of recoupment" is a factual determination.  The statutory language
> "without reasonable expectation of recoupment" requires a determination by the
> Bankruptcy court, based on the facts in the liquidation proceedings it is
> supervising, that there is no reasonable expectation that the trustee's and trustee's
> counsel's fees, which are to be advanced by SIPC, will be reimbursed by the
> debtor's estate.  Movants presented no such facts to the Bankruptcy Court from
> which it could determine that SIPC has a reasonable expectation of recoupment of
> the administrative funds advanced to the Trustee and B&H and have not done so
> here.  The outstanding claims exceeded the estate's assets and will be subject to
> the vagaries of litigation.

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 11 MC 285 (S.D.N.Y.) (RPP),

2011 WL 6057927 (S.D.N.Y Dec. 6, 2011).

**B.    Eighth Fee Application**

211.    On February 17, 2012, the Trustee and his counsel filed the Eighth Application

for Interim Compensation for Services Rendered Reimbursement of Actual and Necessary

Expenses Incurred with the Bankruptcy Court.  (ECF No. 4676).  Counsel and international

special counsel also filed applications for Interim Professional Compensation. (ECF Nos. 4678-4692). No objections were filed. The Court held a hearing on March 15, 2012.

212. At the fee hearing, the Trustee, his counsel, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Eighth Interim Fee Application was reasonable.

213. During the hearing, this Court acknowledged the worldwide efforts that both the Trustee and his counsel have undertaken and approved the applications:

> Well, having heard the description and being well aware of the worldwide activities stared off by Bernie Madoff and the sequelae [sic] is left for everybody else to follow all the trails and the trails do lead almost everywhere in the world. It is clear under the circumstances that a Herculean effort to follow those trails has been involved both with counsel herein the United States and counsel overseas.

Eighth App. Hr'g Tr. 16, March 15, 2012.

214. Moreover, this Court recognized that because Madoff "put this matter on the world stage," litigation has ensued around the world, with well-financed litigators on the other side of many of litigations that the Trustee is involved in, the costs for which may equal or even exceed the costs of the Trustee and his counsel. Eighth App. Hr'g Tr. 26-27, March 15, 2012. Moreover, this Court recognized that the Trustee's fees generated almost $9 billion for BLMIS customers—a worthy result. *Id.* at 27.

215. The Bankruptcy Court subsequently entered the Eighth Interim Fee Order approving the Eighth Interim Fee Application. (ECF No. 4735). No motion for leave to appeal the Eighth Interim Fee Order was filed.

## **CONCLUSION**

216. The foregoing report represents a summary of the status of this proceeding and the material events that have occurred through March 31, 2012, unless otherwise indicated. This Report will be supplemented and updated with further interim reports.

Dated:  New York, New York
       April 25, 2012

Respectfully submitted,

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*s/ Irving H. Picard*
Irving H. Picard
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Email: ipicard@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC And Bernard L. Madoff*

*Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*