**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY  10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**TRUSTEE'S OPPOSITION TO MOTIONS OF CLASS ACTION**
**PLAINTIFFS TO PROCEED WITH THEIR PROPOSED CLASS ACTIONS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

FACTS ................................................................................................................... 3

I.    BACKGROUND AND PROCEDURAL HISTORY ....................................... 3

    A.    The Stay Orders .......................................................................... 3

    B.    The Trustee's Recovery of Assets and the Court-Ordered Claims
        Administration Process ................................................................. 4

    C.    The Second Circuit's Affirmance of This Court's Net Equity
        Decision ....................................................................................... 5

II.    THE TRUSTEE'S PROCEEDINGS AGAINST THE PICOWER
     DEFENDANTS ............................................................................................ 7

    A.    The Picower Complaint ............................................................... 7

    B.    The Picower Settlement ............................................................... 8

    C.    The District Court Decision ....................................................... 10

    D.    The Forfeiture Action ............................................................... 14

    E.    The Class Action Complaints .................................................... 14

        1.    The Class Definitions .................................................... 14

        2.    The Allegations in the Class Action Complaints Mimic the
            Trustee's Allegations .................................................... 16

        3.    The Class Action Plaintiffs Seek Fraudulently Transferred
            Funds ............................................................................ 17

        4.    The Allegations in the Class Action Complaints Mimic
            those in the Fox and Marshall Complaints that Have Been
            Held to be Duplicative and Derivative of the Trustee's
            Action ........................................................................... 18

ARGUMENT ....................................................................................................... 19

THE CLASS ACTIONS SHOULD NOT BE ALLOWED TO PROCEED ............... 19

I.    THE CLASS ACTION PLAINTIFFS ARE ENJOINED FROM
    PURSUING THE CLASS ACTIONS ........................................................... 20

# TABLE OF CONTENTS
## (Continued)

Page

A.    The Class Action Claims are Duplicative and Derivative of the Trustee's Claims .................................................................................... 20

B.    The Nomenclature of a Claim Is Irrelevant .......................................................... 22

1.    Courts Consider the Substance of the Claim Asserted ............................ 22

2.    An Examination of the Class Action Complaints Reveals the True Nature of the Claims..................................................... 23

3.    The Use of a "Securities Claims" Label Cannot Save the Class Action Claims................................................................... 26

C.    The Picower Class Actions Imperil the Trustee's Ability to Enter Into Future Settlements ......................................................................... 27

II.   THE PICOWER CLASS ACTIONS VIOLATE THE AUTOMATIC STAY AND THE STAY ORDERS ................................................................... 28

III.  THE TRUSTEE HAS STANDING TO SEEK ENFORCEMENT OF THE PERMANENT INJUNCTION, AUTOMATIC STAY AND STAY ORDERS.................................................................................................... 32

CONCLUSION.................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*AP Indus., Inc. v. SN Phelps & Co.* (*In re AP Indus., Inc.*),
   117 B.R. 789 (Bankr. S.D.N.Y. 1990) ................................................................28

*Cunningham v. Brown*,
   265 U.S. 1 (1924) ..............................................................................................15

*FDIC v. Hirsch* (*In re Colonial Realty Co.*),
   980 F.2d 125 (2d Cir. 1992) .......................................................19, 20, 22, 28

*Fisher v. Apostolou*,
   155 F.3d 876 (7th Cir. 1998) .................................................................22, 31, 33

*Grubin v. Rattet* (*In re Food Mgmt. Grp., LLC*),
   380 B.R. 677 (Bankr. S.D.N.Y. 2008) ................................................................33

*In re Adler, Coleman Clearing Corp.*,
   263 B.R. 406 (Bankr. S.D.N.Y. 2001) .................................................................6

*In re Bernard L. Madoff Inv. Sec. LLC*,
   654 F.3d 229 (2d Cir. 2011) ...........................................................2, 5, 6, 15

*In re Dreier LLP*,
   429 B.R. 112 (Bankr. S.D.N.Y. 2010) .................................................13, 20, 21, 27

*In re Dreier*,
   Nos. 10 Civ. 4758 & 5669, 2010 WL 3835179 (S.D.N.Y. Sept. 10, 2010) ............................21

*In re Ionosphere Clubs, Inc.*,
   156 B.R. 414 (S.D.N.Y. 1993) .............................................................................12

*In re Saint Vincent's Catholic Med. Ctrs. of New York*,
   449 B.R. 209 (S.D.N.Y. 2011) .............................................................................32

*In re Saunders*,
   101 B.R. 303 (Bankr. N.D. Fla. 1989) .................................................................29

*In re Swallen's, Inc.*,
   205 B.R. 879 (Bankr. S.D. Ohio 1997) ..........................................................22, 31

*Jackson v. Novak* (*In re Jackson*),
   593 F.3d 171 (2d Cir. 2010) ................................................................................30

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*Keene Corp. v. Coleman* (*In re Keene Corp.*),
  164 B.R. 844 (Bankr. S.D.N.Y. 1994) ......................................................................22, 30, 31

*Koch Refining v. Farmers Union Cent. Exch., Inc.*,
  831 F.2d 1339 (7th Cir.1987) ...........................................................................................33

*McHale v. Alvarez* (*In re 1031 Tax Grp. LLC*),
  397 B.R. 670 (Bankr. S.D.N.Y. 2008) ...........................................................................22, 30

*Picard v. Fox*,
  429 B.R. 423 (Bankr. S.D.N.Y. 2010) ....................................................................2, 27, 28, 30

*Picard v. Fox* (*In re Madoff*),
  No. 10 Civ. 4652, 2012 WL 990829 (S.D.N.Y. Mar. 26, 2012) ................................... passim

*Picard v. HSBC Bank plc*,
  454 B.R. 25 (S.D.N.Y. 2011) ...........................................................................................32

*Picard v. JP Morgan Chase & Co.*,
  468 B.R.84 (S.D.N.Y. 2011) ............................................................................................32

*Picard v. Stahl* (*In re Bernard L. Madoff Inv. Sec. LLC*),
  443 B.R. 295 (Bankr. S.D.N.Y. 2011) ............................................................................ passim

*Rittmaster v. Painewebber Grp., Inc.* (*In re Painewebber Ltd. P'ships Litig.*),
  147 F.3d 132 (2d Cir. 1998) ...........................................................................................27

*Ryan v. Picard*,
  No. 11-969, 2012 WL 396524 (U.S. Feb. 3, 2012) .................................................................6

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Bernard L. Madoff Inv. Sec. LLC* ),
  424 B.R. 122 (Bankr. S.D.N.Y. 2010) .......................................................................... passim

*S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc.* (*In re S.I. Acquisition, Inc.*),
  817 F.2d 1142, 17 C.B.C.2d 207 (5th Cir. 1987) ...................................................................33

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
  884 F.2d 688 (2d Cir. 1989) ......................................................................................... passim

*Sterling Equities Assocs. v. Picard*,
  No. 11-968, 2012 WL 396523 (U.S. Feb. 3, 2012) .................................................................6

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Travelers Indemnity Co. v. Statutory & Hawaii Direct Action Settlement Counsel* (*In re Johns–Manville Corp.*),
No. 11 Civ. 1312, 2012 WL 667084 (S.D.N.Y. Mar. 1, 2012) ...............................................12

*United States v. $7,206,157,717 on Deposit at JP Morgan Chase Bank, N.A.*,
274 F.R.D. 125 (S.D.N.Y. 2011) ......................................................................................13, 14, 32

*Velvel v. SIPC*,
No. 11-986, 2012 WL 441279 (U.S. Feb. 6, 2012) ........................................................6, 7, 8

**STATUTES**

11 U.S.C. § 105 ........................................................................................................................12

11 U.S.C. § 105(a) ........................................................................................................... passim

11 U.S.C. § 362(a) ..............................................................................................................22, 28, 30

11 U.S.C. § 362(a)(1) ..........................................................................................................28, 30, 31

11 U.S.C. § 362(a)(3) ...............................................................................................................29, 33

11 U.S.C. § 362(a)(6) ...............................................................................................................30, 31

11 U.S.C. § 541 ........................................................................................................................33

11 U.S.C. § 541(a) ....................................................................................................................30

11 U.S.C. § 541(a)(1) ...............................................................................................................29

15 U.S.C. §§ 78aaa *et. seq.* ......................................................................................................1

15 U.S.C. § 78fff-1 ...................................................................................................................4

15 U.S.C. § 78fff-2(a)(3) ..........................................................................................................4

15 U.S.C. § 78*lll*(11).................................................................................................................5

**OTHER AUTHORITIES**

H.R. Rep. No. 95-595 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6296-97......................28

S. Rep. No. 95-989 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5835 ...............................28

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et. seq.*, by his undersigned counsel, hereby opposes the motions by A&G Goldman Partnership ("A&G Goldman") and Pamela Goldman ("Pamela Goldman," and with A&G Goldman, the "Class Action Plaintiffs"), dated December 13, 2011 (the "Motions"). The Motions seek to lift the automatic stay and request a determination that the putative securities class actions they want to file in federal court in Florida (the "Picower Class Actions") against the estate of Jeffry Picower and related defendants (the "Picower Defendants") do not violate the order issued by this Court (the "Settlement Order") on January 13, 2011 and affirmed on appeal by the District Court on March 26, 2012, issuing a permanent injunction (the "Picower Injunction") and approving the Trustee's settlement with the Picower Defendants (the "Picower Settlement").

## PRELIMINARY STATEMENT

In December 2010, the Trustee, along with the United States Attorney's Office for the Southern District of New York, achieved a remarkable recovery for victims of Madoff's Ponzi scheme when they settled with the Picower Defendants for over $7.2 billion. Significantly, that figure accounts for every cent of the Picower Defendants' net withdrawals from BLMIS. In an effort to circumvent this Court's administration of the BLMIS estate and obtain recoveries outside of the liquidation, the Class Action Plaintiffs have simply copied the Trustee's substantive allegations against the Picower Defendants and re-labeled them as securities fraud claims in order to argue that they fall outside the scope of the claims released in the Picower Settlement and barred by the Picower Injunction. They do not.

This Court, as affirmed by the Second Circuit in its "Net Equity Decision", directed the Trustee to distribute recoveries to Madoff's victims based on their net investment in BLMIS, without regard to fake profits that appeared on their customer statements. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Bernard L. Madoff Inv. Sec. LLC*), 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd*, *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision"). Unhappy with the Net Equity Decision, the Class Action Plaintiffs seek to certify classes of BLMIS's "net winners" and "net losers," thus creating a "shadow estate" which mirrors the BLMIS customer estate. Nothing could be a greater assault on this Court's jurisdiction, as the Class Action Plaintiffs seek to circumvent the Net Equity Decision, disrupt the orderly, *pro rata* distribution scheme of SIPA, and interfere with the Picower Settlement recently affirmed by Judge Koeltl, by obtaining a double recovery from the Picower Defendants. The Class Action Plaintiffs seek recovery on the same claims settled by the Trustee, believing that so long as they simply re-label the claims and seek recovery "in addition to" the $7.2 billion recovery obtained through the Picower Settlement, that somehow they will not be barred. They are mistaken—their actions are in direct contravention of the Picower Settlement which, by its terms, includes the Picower Injunction. Were these putative class actions to go forward, not only might the Court's jurisdiction to administer the BLMIS estate be compromised, but, so, too, would the Trustee's ability to reach settlements with other defendants.

Indeed, the Picower Class Actions are no different from the Fox and Marshall class actions, brought by some of the very same plaintiffs' counsel here, which this Court held to be duplicative or derivative of the Trustee's claims, and which the District Court affirmed as barred by the automatic stay and the Picower Injunction. *Picard v. Fox*, 429 B.R. 423 (Bankr. S.D.N.Y.

2010), *aff'd*, No. 10 Civ. 4652 (JGK), 2012 WL 990829 (S.D.N.Y. Mar. 26, 2012) (Koeltl, J.).[1]

Just as in counsels' prior attempts to sue the Picower Defendants, there is no privity alleged, or

any other special relationship between the Class Action Plaintiffs and the Picower Defendants.

Rather, the only claims asserted are generalized claims that – no matter the nomenclature –

belong exclusively to the estate.  Tellingly, were the Class Action Plaintiffs to litigate their

claims, they would rely on the same evidence supporting the Trustee's claims.  As the District

Court held with respect to the Fox and Marshall putative class actions:  "In substance, the claims

asserted in the Florida Actions are duplicative of those asserted in the Trustee's . . . Action, and

they are therefore the property of the estate, and cannot be asserted . . . notwithstanding the

Appellants' renaming of the causes of action . . . ."  *Fox*, 2012 WL 990829, at \*10.

The Class Action Plaintiffs' complaints are a transparent effort to undermine the

Settlement Order and have a fourth bite at the Net Equity Decision through serial litigation.  The

Class Action Plaintiffs' attempts to erode the finality and closure of the Picower Settlement must

be rejected.  Accordingly, the Trustee respectfully requests that the Motions be denied.

## FACTS

## I.    BACKGROUND AND PROCEDURAL HISTORY[2]

### A.    The Stay Orders

The District Court issued certain stay orders on December 15, 2008, December 18, 2008,

and February 9, 2009 (the "Stay Orders") to facilitate the administration of the BLMIS estate.

Specifically, on December 15, 2008, the District Court entered a stay order, declaring that "all

persons and entities are stayed, enjoined and restrained from directly or indirectly . . . interfering

---

[1] The District Court's decision is on appeal.  (*See* Notice of Appeal, *In re BLMIS*, 11-CV-1328, ECF No. 17, April 24, 2012.)

[2] The full background of the bankruptcy proceedings has been recounted numerous times, and need not be repeated here.  *See, e.g., Fox*, 2012 WL 990829, at \*1-2; *In re BLMIS*, 424 B.R. at 125-33.

with any assets or property owned, controlled or in the possession of [BLMIS]." (*See* December

15 Stay Order ¶ IV (reinforcing the automatic stay); *see also* December 18 Stay Order ¶ IX ("no

creditor or claimant against [BLMIS], or any person acting on behalf of such creditor or

claimant, shall take any action to interfere with the control, possession, or management of the

assets subject to the receivership."); February 9 Stay Order ¶ IV (incorporating and making

permanent the December 18 Stay Order).)

      **B.**      **The Trustee's Recovery of Assets and the Court-Ordered Claims
Administration Process**

As a trustee appointed under SIPA, the Trustee is charged with recovering and

distributing customer property to BLMIS's customers, assessing claims, and liquidating other

assets of the firm for the benefit of the estate and its creditors. *See* 15 U.S.C. § 78fff-1. To date,

the Trustee has recovered, or entered into agreements to recover, over $9 billion for victims of

the Ponzi scheme. (*See* Seventh Trustee's Interim Report For The Period Ending March 31,

2012 ¶ 1, Adv. Pro. No. 08-1789 (Bankr. S.D.N.Y.) (ECF No. 4793) (Apr. 25, 2012).)

Following the Trustee's appointment, this Court entered a Claims Procedures Order to

implement a customer claims process under SIPA. In accordance with that Order, the Trustee

has developed a comprehensive claims administration process for the intake, reconciliation, and

resolution of these customer claims. By July 2, 2009, the mandatory statutory bar date for filing

claims under § 78fff-2(a)(3) of SIPA, the Trustee received more than 16,000 customer claims.

(*See* Trustee's Second Interim Report for the Period Ending Oct. 31, 2009, Adv. Pro. No. 08-

1789 (ECF No. 1011 ¶ 84).)

The Class Action Plaintiffs were among those that submitted customer claims to the

Trustee prior to the statutory bar date. A&G Goldman Partnership submitted claim 015036 for

BLMIS account number 1G0304, which was denied by the Trustee because it had withdrawn

more funds than it deposited.  (*See* Affidavit of Matthew Cohen in Support of Trustee's

Opposition ("Cohen Aff.") ¶ 3; Objection, Adv. Pro. No. 08-1789 (ECF No. 492).)  Pamela

Goldman submitted customer claims for BLMIS account numbers 1G0233 and 1G0094, which

the Trustee allowed.  (Cohen Aff. ¶ 4.)  Through SIPC advances and an interim distribution from

the fund of customer property, Pamela Goldman's claims for her two accounts have been fully

satisfied.  (*Id.* ¶ 5.)

### C.    The Second Circuit's Affirmance of This Court's Net Equity Decision

The statutory framework for the satisfaction of customer claims in a SIPA liquidation

proceeding provides that customers share *pro rata* in customer property to the extent of their net

equity, as defined in § 78*lll*(11) of SIPA.  *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at

124-25.  SIPC advances funds for customers with a valid net equity claim, up to the amount of

their net equity, if their ratable share of customer property is insufficient to make them whole.

*Id.* at 125.  The Trustee has determined customers' net equity by crediting the amount of cash

deposited by the customer into their BLMIS account, less any amounts withdrawn from their

BLMIS customer account, otherwise referred to by the claimants as the "Net Investment

Method."

On March 1, 2010, this Court approved the Trustee's method for determining net equity.

*Id.*  It determined that the plain language and the legislative history of SIPA support the adoption

of the Trustee's calculation of net equity:

> Because "securities positions" are in fact nonexistent, the Trustee
> cannot discharge claims upon the false premise that customers'
> securities positions are what the account statements purport them
> to be.  Rather, the only verifiable amounts that are manifest from
> the books and records are the cash deposits and withdrawals.

*Id.* at 135.

5

The Second Circuit affirmed this Court's holding in the Net Equity Decision.  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 235 ("Mr. Picard's selection of the Net Investment Method was more consistent with the statutory definition of 'net equity' than any other method advocated by the parties or perceived by this Court.").  The Second Circuit rejected certain customers' assertion that customers should be entitled to recover whatever was on their last customer account statement, because those statements were entirely fictitious, reflecting fake profits and fake trades.  *Id.*

In rejecting customers' arguments that their net equity claim amount was the amount reflected on their last statement, the Second Circuit explained:

> The statutory definition of "net equity" does not require the Trustee to aggravate the injuries caused by Madoff's fraud. Use of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations.

*Id.*  The Second Circuit also concluded that the Trustee's calculation of net equity is consistent with the avoidance powers available to him under SIPA and the Bankruptcy Code:

> As the bankruptcy court ruled, "SIPA and the [Bankruptcy] Code intersect to . . . grant a SIPA trustee the power to avoid fraudulent transfers for the benefit of customers."  *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 136.  The objecting BLMIS claimants point out that no avoidance power has been invoked in this case. True, however—in the context of this Ponzi scheme—the Net Investment Method is nonetheless more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud, *see* 11 U.S.C. § 548(a)(1)(A), and "avoid[s] placing some claims unfairly ahead of others,"  *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 463 (Bankr. S.D.N.Y. 2001).

*Id.* at 242 n.10.  There are currently three petitions for *certiorari* pending before the Supreme Court of the United States on the net equity issue.  *Ryan v. Picard*, No. 11-969, 2012 WL 396524

(U.S. Feb. 3, 2012);[3] *Sterling Equities Assocs. v. Picard*, No. 11-968, 2012 WL 396523 (U.S.

Feb. 3, 2012) (slated to be withdrawn); *Velvel v. Sec. Inv. Prot. Corp.*, No. 11-986, 2012 WL

441279 (U.S. Feb. 6, 2012).

## II.    THE TRUSTEE'S PROCEEDINGS AGAINST THE PICOWER DEFENDANTS

### A.    The Picower Complaint

The Trustee filed a complaint against the Picower Defendants on May 12, 2009.  The

complaint identified more than $6.7 billion in withdrawals that the Trustee alleged the Picower

Defendants had received from BLMIS.  (*See* Picower Compl. ¶¶ 57, 63(b), 67.)  The complaint

alleged that the Picower Defendants knew or should have known that BLMIS was engaged in

fraudulent activity and sought recovery of the entire amount known at the time of filing to have

been transferred from BLMIS to the Picower Defendants throughout the history of the Picower

Defendants' accounts.  (*Id.* ¶¶ 3, 4, 28, 57, 65-67.)

After filing the complaint against the Picower Defendants, the Trustee identified

additional transfers from BLMIS to the Picower Defendants.  In the Trustee's Opposition to the

Picower Defendants' Motion to Dismiss, the Trustee indicated that, with these additional

fraudulent transfers, the total amount of net withdrawals sought by the Trustee was more than

$7.2 billion.  (*See* Mem. of Law in Opp'n to Def.'s Partial Mot. To Dismiss at 2, Adv. Pro. No.

09-01197 (BRL) (Sept. 30, 2009) (ECF No. 11) ("Based upon the Trustee's investigation to date,

Picower was instead the biggest beneficiary of Madoff's scheme, having withdrawn either

directly or through the entities he controlled more than $7.2 billion of other investors' money.").)

Before amending the complaint to reflect the additional fraudulent transfers, the Trustee began

engaging in settlement negotiations with the Picower Defendants.

---

[3] The *Ryan* petition has been brought by the some of the same plaintiffs' counsel that brought the instant motion and the Fox and Marshall class actions.

### B.    The Picower Settlement

While the Trustee's fraudulent transfer action was pending against the Picower

Defendants, the Government was in discussions with counsel for the Picower Defendants.  (*See*

Mem. Of Law in Supp. Of Trustee's Mot. for Entry of an Order Approving the Picower

Settlement, at 7-8, Adv. Pro. No. 09-01197 (BRL) (Dec. 17, 2010) (ECF No. 25) (the "9019

Mem.").)  The Trustee and the United States Attorney for the Southern District of New York

ultimately coordinated their efforts to reach agreement with Barbara Picower and the Picower

estate, providing closure and finality to the Picower Defendants in exchange for the return of

their net withdrawals from BLMIS.  (*Id.* at 11-12.)

As a result of months of extensive negotiations among all three parties, the Trustee and

the Picower Defendants reached an agreement (the "Settlement Agreement") under which the

Picower estate agreed to return $5 billion to the BLMIS estate (the "Bankruptcy Settlement

Amount").  (*See* 9019 Mem. at 11.)  In addition to the $5 billion, the Picower estate agreed to

forfeit approximately $2.2 billion (the "Government Settlement Funds") to the United States

Attorneys' Office for the Southern District of New York.  (*Id.*)  When the Bankruptcy Settlement

Amount and the Government Settlement Funds are combined, the result is that, without

litigation, 100 percent of the net withdrawals received by the Picower Defendants over the

lifetime of their investments with BLMIS have been made available for distribution to BLMIS

victims, whether under SIPA or the forfeiture remission process.  (*See Id*. at 3.)

In exchange for the return of 100% of net withdrawals, the Settlement Agreement

mandates the dismissal of the Trustee's action against the Picower Defendants upon entry of a

final, non-appealable order approving the Settlement Agreement.  (*See* 9019 Mem. Ex. A at 5.)

The Settlement Agreement further provides for the release of the Picower Defendants from all

claims that the Trustee brought or could have brought against them in connection with BLMIS.

8

(*Id.* Ex. A at 4.)  To prevent putative plaintiffs from filing lawsuits that are duplicative or

derivative of the claims that the Picower Defendants settled, the Trustee sought a narrowly-

tailored permanent injunction from this Court under section 105(a) (the "Picower Permanent

Injunction"):

> enjoining any BLMIS customer or creditor of the BLMIS estate
> who filed or could have filed a claim, anyone acting on their behalf
> or in concert or participation with them, or anyone whose claim in
> any way arises from or relates to BLMIS or the Madoff Ponzi
> scheme, from asserting any claim against the Picower BLMIS
> Accounts (as identified on Attachment A to the Settlement
> Agreement) and the Picower Releasees (as identified on
> Attachment C to the Settlement Agreement) that is duplicative or
> derivative of the claims brought by the Trustee, or which could
> have been brought by the Trustee, against the Picower Defendants.

(*Id.* Ex. A at 5-6.)

The Picower Injunction excludes from its scope actions where there is an independent

basis on which to bring suit and instead enjoins claims the assertion of which would impact the

administration of the BLMIS liquidation.  (*See* 9019 Mem. at 23.)  The Trustee specifically

agreed to use his reasonable best efforts to obtain the permanent injunction and to litigate any

appeals of the permanent injunction, and the injunction was identified by the Picower Defendants

as an essential part of the settlement.  (*Id.* at 27.)

The settlement was memorialized in the Settlement Agreement, which provides that

Barbara Picower, as executor of Jeffry M. Picower's estate, would, for the benefit of BLMIS

victims, upon execution of a forfeiture stipulation with the Government, transfer $7,206,157,717

to an escrow account (*see* 9019 Mem. Ex. A at 4).  That transfer occurred on December 17,

2010.  (*See id.* Ex. B.)

The Government Settlement Funds were released from escrow shortly thereafter, and will

be distributed to victims of BLMIS in accordance with Department of Justice regulations upon

entry of a final, non-appealable forfeiture order. (*See* 9019 Mem. at 12-13.) Similarly, the

Bankruptcy Settlement Amount, currently held in escrow, will be released to the Trustee upon

the earlier of entry of a final, non-appealable order approving the Settlement Agreement or a

final, non-appealable order approving the forfeiture. (*Id.* Ex. A at 4.) As discussed further

herein, the Second Circuit recently dismissed an appeal of a District Court decision denying a

motion to intervene in the Government's forfeiture action. *See United States v. Fox*

(*$7,206,157,717 on Deposit at JP Morgan Chase Bank, N.A., in the accounts set forth on*

*Schedule A*), 11-CV-2898 (April 17, 2012) (ECF No. 83).

### C.    The District Court Decision

The distribution of the proceeds of the Picower Settlement has been held up by meritless

appeals. Fox, also represented by the Beasley Hauser Kramer & Galardi P.A. firm, who brought

putative class actions in federal court in Florida (the "Florida Actions"), which were enjoined

and further held to be violative of the automatic stay by this Court, appealed from the order

approving the Picower Settlement. (*See* Notice of Appeal, *In re Bernard L. Madoff Inv. Sec.*

*LLC*, 11-CV-1328 (Feb. 25, 2011) (ECF No. 1).) Judge John G. Koeltl decisively rejected the

appeal in a lengthy decision (the "District Court Decision"). In affirming this court's approval of

the Picower Settlement, the District Court held that the automatic stay applied to the Florida

Actions and upheld the Permanent Injunction. The District Court Decision categorically

forecloses all of the arguments advanced by movants here. *Fox*, 2012 WL 990829, at *18 ("In

sum, the settlement agreement is fair and reasonable, and the permanent injunction that was

issued in connection with the settlement agreement was a proper use of the Bankruptcy Court's

power under § 105(a) to protect the BLMIS estate and the Bankruptcy Court's continuing

jurisdiction over this massive SIPA liquidation.").

10

On appeal, Judge Koeltl considered three issues which are also relevant here: (1) the

application of the automatic stay to the Florida Actions; (2) whether the "tort" claims asserted in

the Florida Actions were duplicative or derivative of the Trustee's fraudulent conveyance claims

against the Picower Defendants; and (3) the propriety of the Permanent Injunction as an integral

part of the Picower Settlement.  On all three issues, the District Court agreed with the Trustee.

*See id.*

With regard to the application of the automatic stay, the District Court, citing *St. Paul*

*Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989), held that the Florida

Actions were based on the same conduct as the Trustee's Action.  *Fox*, 2012 WL 990829, at *8.

The Court observed that the Florida complaints failed to identify any acts by the Picower

Defendants that were directed to the Appellants or any duties owed by the Picower Defendants to

the Appellants.  *Id.*  The Court concluded that the wrongs pleaded by the Trustee and the

Appellants were the same and that those wrongs affected each BLMIS investor and BLMIS itself

equally because the Picower Defendants received funds that were comprised of other customers'

money.  *Id.*  As was the case in *St. Paul*, the Court concluded that "the claims asserted in the

Florida Actions are, at bottom, 'general ones' that seek to recover for an injury that was inflicted

… by a single set of actions that harmed BLMIS and all BLMIS customers in the same way and

for the same reason."  *Id.* (citing *St. Paul*, 884 F.2d at 701).

The District Court also concluded that the claims asserted by the Appellants could have

been asserted by any creditor of BLMIS.  *Fox*, 2012 WL 990829, at *9.  The Appellants

attempted to avoid this fact by suggesting they were seeking different damages, such as the time-

value of their money and taxes paid; their argument failed because these damages were no

different than those suffered by every BLMIS customer.  *Id.*  Based on the fact that there was no

11

substantive difference between the Trustee's claims and the Appellants' claims, and because the

Appellants' claims were common to all creditors and duplicative of the Trustee's claims, the

District Court concluded that the Bankruptcy Court had correctly determined that the claims

asserted by the Appellants were property of the BLMIS estate and, therefore, subject to the

automatic stay. *Id.*

The District Court quickly disposed of the Appellants' assertions that, because the causes

of action sound in tort, they are not subject to the automatic stay. The Court found that "[t]o the

extent that the Appellants urge that the claims asserted in the Florida Actions are not property of

the estate by virtue of the names of the causes of action asserted, this argument is unpersuasive."

*Id*. at *10. The Court noted that the meaning of "property of the estate" is broad and observed

that courts in this district have looked past the nominal title of the cause of action to assess

whether the claim is duplicative or derivative of a claim that belongs to the Trustee. *Id*. (citing *In

re Ionosphere Clubs, Inc.*, 156 B.R. 414, 439 (S.D.N.Y. 1993)). The District Court concluded

that the Appellants' claims were duplicative of the Trustee's and, as such, were precluded by the

automatic stay. *Fox*, 2012 WL 990829, at *10. Moreover, after noting that such a determination

was not necessary because the Bankruptcy Court correctly held that the Florida Actions violated

the automatic stay and were therefore void *ab initio*, the District Court stated that the Bankruptcy

Court was well within its powers to enjoin the Florida Actions under section 105 of the

Bankruptcy Code. *Id*. at *13. The Court held that the Picower Injunction was proper because

the Florida Actions threatened the estate's ability to recover fraudulently transferred assets and

because the Florida Actions interfered with the Bankruptcy Court's jurisdiction over the distribution of estate funds.[4]  *Id*. at *14.

Attempts by the Appellants to avoid the operation of the automatic stay by relying on the *Wagoner* Rule were also unsuccessful.  The Court held that because the Appellants' claims were duplicative of claims the Trustee had already asserted, the *Wagoner* Rule had no application.  *Id*. at *12.  Further, the Court noted that there was no authority for the Appellants' argument that the mere possibility that a claim may be subjected to a defense based on the *Wagoner* Rule or *in pari delicto* could make that claim an independent one and not one that is property of the estate: "To apply *Wagoner* here, where the Trustee did not bring the Florida Actions, would perversely require ruling on a hypothetical controversy over the Trustee's standing to bring an action that the Trustee never brought . . . ."  *Id.*

Finally, the Court considered the appropriateness of the Picower Injunction as part of the Settlement Order.  Citing *In re Dreier LLP*, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010), the Court concluded that a bankruptcy court could, in approving a settlement, permanently enjoin actions that are derivative or duplicative of claims brought by the Trustee.  *Fox*, 2012 WL 990829, at *15.  Noting once again that the Appellants' claims were not independent, the Court held that because the claims being released were the estate's, the estate was the appropriate party to settle them.  *Id*. at *17.  The Court also stated that, even to the extent that the injunction could be considered to constitute a nonconsensual release of a third party, the circumstances of the case were sufficiently unusual to justify it, given the value of the Picower Settlement to the overall

---

[4] The District Court found that its recent decision in *Travelers Indemnity Co. v. Statutory & Hawaii Direct Action Settlement Counsel (In re Johns–Manville Corp.)*, No. 11 Civ. 1312, 2012 WL 667084 (S.D.N.Y. Mar. 1, 2012) supported an affirmance of the Picower Settlement and Injunction, given that the Picower Settlement was the product of "arm's length bargaining, and the injunction of derivative claims like the Florida Actions was part of that bargain."  *Fox*, 2012 WL 990829, at *17.

estate and the importance of the ability of the Bankruptcy Court to issue narrow injunctions to

the achievement of settlements and the administration of the estate.  *Id.*

Nothing in the instant Motions compels a different outcome.

### D.    The Forfeiture Action

Fox also moved to intervene in the Government's forfeiture action, which the District

Court denied, holding that Fox's dispute was with the Net Equity Decision, and that Fox had no

claim to the forfeited assets.  *See generally United States v. $7,206,157,717 on Deposit at JP

Morgan Chase Bank, N.A.*, 274 F.R.D. 125 (S.D.N.Y. 2011).  Fox appealed from the District

Court's order and the United States Attorney for the Southern District of New York moved to

dismiss the appeal as "frivolous."  (Affirmation of Assistant U.S. Att'y ¶ 4.); *United States v.

$7,206,157,717 on Deposit at JP Morgan Chase Bank, N.A.*, 11-CV-2898 (2d Cir. Jan. 26, 2012)

(ECF No. 44).  The United States' Attorney's Office subsequently submitted a letter to the Clerk

of the Court for the United States Court of Appeals for the Second Circuit, highlighting the

importance of the Koeltl decision, and its application.  *Id.* (April 4, 2012) (ECF No. 74).  On

April 17, 2012, the Second Circuit dismissed the appeal as frivolous.  *Id.* (April 17, 2012) (ECF

No. 83).

### E.    The Class Action Complaints

As discussed above, the Class Action Plaintiffs are BLMIS customers who have

participated in the claims resolution process.  The classes they purport to represent are nothing

less than all BLMIS customers.

### 1.    The Class Definitions

The Motions seek permission to file two putative class actions in the United States

District Court for the Southern District of New York:  (1) *Pamela Goldman, individually and on

behalf of a class of similarly situated Plaintiffs v. Estate of Jeffry Picower, et al.* (the "Pamela

Goldman Complaint"); and (2) *A&G Goldman Partnership, individually and on behalf of a class of similarly situated Plaintiffs v. Estate of Jeffry Picower, et al.* (the "A&G Goldman Complaint" and together with the Pamela Goldman Complaint, the "Class Action Complaints"). (*See* Lift-Stay Mots., No. 08-01789 (ECF Nos. 4580-1; 4581-1).)

Pamela Goldman seeks to certify a class consisting of:

> (1) all brokerage customers of BLMIS who at any time entrusted securities or cash to BLMIS and at such time granted to BLMIS or its employees or agents trading authority and discretion with respect to assets in such brokerage accounts for trading in the BLMIS stock/options trading program (the "BLMIS Discretionary Trading Program"); and (2) who have not received the full account value of their BLMIS account(s) as of the date of the BLMIS bankruptcy/SIPC liquidation; and (3) *who have not received sufficient payments directly or indirectly from SIPC or from the BLMIS estate on behalf of SIPC to cover the full amount of their losses* (the "Class").

(Pamela Goldman Compl. ¶ 62 (emphasis added).)

A&G Goldman seeks to certify the following class:

> (1) all brokerage customers of BLMIS who at any time entrusted securities or cash to BLMIS and at such time granted to BLMIS or its employees or agents trading authority and discretion with respect to assets in such brokerage accounts for trading in the BLMIS stock/options trading program (the "BLMIS Discretionary Trading Program"); and (2) who have not received the full account value of their BLMIS account(s) as of the date of the BLMIS bankruptcy/SIPC liquidation; and (3) *who have not received and are not eligible to receive any payments directly or indirectly from SIPC or from the BLMIS estate on behalf of SIPC* (the "Class").

(*See* A&G Goldman Compl. ¶ 62 (emphasis added).)

Thus, while Pamela Goldman seeks to represent so-called "net losers," A&G Goldman seeks to represent "net winners." Together, they seek to represent customers and creditors already before this Court, and for whom this Court has already determined equitable distributions in accordance with the net equity method approved by the Second Circuit. *In re Bernard L.*

*Madoff Inv. Sec. LLC*, 424 B.R. at 142 ("Net Winners and Net Losers, equally innocent in Madoff's Ponzi scheme, should not be treated disparately.  Accordingly, the circumstances of this case 'call strongly for the principle that equality is equity.'") (quoting *Cunningham v. Brown*, 265 U.S. 1, 13 (1924)).  The Picower Class Actions thus seek to create a "shadow estate," which would award a greater amount to customers than approved by this Court by pretending that their actions are separate and apart from the Trustee's action against the Picower Defendants and the settlement achieved by the Trustee.  They are not independent in the least— relying on little more than the Trustee's allegations in the guise of securities claims.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 237.

**2.      The Allegations in the Class Action Complaints Mimic the Trustee's Allegations**

The Picower Class Actions are inextricably intertwined with the Trustee's action, as they both allege that Picower asserted control over BLMIS, and is thus in part responsible for the Ponzi scheme and the harm to victims.

The Class Action Plaintiffs make identical substantive allegations against the Picower Defendants.  They allege that BLMIS violated Section 10(b) of the Exchange Act, while Picower, as a "control person" with respect to BLMIS, violated Rule 10b-5 of the Exchange Act.  (*See, e.g.,* Pamela Goldman Compl. ¶¶ 4, 41; A&G Goldman Compl. ¶¶ 4, 41.)  The basis of their claims against the Picower Defendants comes from the Trustee's Complaint, which the Class Action Plaintiffs copied, almost verbatim.[5]  For example, both the Trustee's Complaint and the Class Action Complaints allege:

---

[5] A chart comparing the Class Action Complaints to the Trustee's Complaint is attached as Exhibit A hereto.  This chart also compares the Class Action Complaints to the Fox and Marshall class action complaints, as addressed further *infra*.

- Picower dominated and controlled the Picower Entity Defendants.  (*Compare* Pamela Goldman Compl. ¶ 29, *and* A&G Goldman Compl. ¶ 29, *with* Tr.'s Compl. ¶ 53.)

- BLMIS customers received monthly or quarterly statements that purported to show securities held in their accounts, but these statements and the transactions appearing thereon were almost completely fabricated.  (*Compare* Pamela Goldman Compl. ¶ 33, *and* A&G Goldman Compl. ¶ 33, *with* Tr.'s Compl. ¶ 21.)

- The money received by BLMIS customers was not used to purchase securities, but instead was used to make distributions to other investors.  (*Compare* Pamela Goldman Compl. ¶¶ 34, 73, *and* A&G Goldman Compl. ¶¶ 34, 73, *with* Tr.'s Compl. ¶ 24.)

- Picower, and not Madoff, was the largest beneficiary of Madoff's fraud, withdrawing more than $7.2 billion of other people's money.  (*Compare* Pamela Goldman Compl. ¶¶ 1, 46, 47, *and* A&G Goldman Compl. ¶¶ 1, 46, 47, *with* Tr.'s Mem. Of Law in Opp. to Mot. to Dismiss at 2.)

- Picower directed BLMIS to create fraudulent trading records including back-dated trades.  (*Compare* Pamela Goldman Compl. ¶ 49, *and* A&G Goldman Compl. ¶ 49, *with* Tr.'s Compl. ¶ 4.)

- Picower used the BLMIS account in the name of Decisions Inc. as the primary source of cash withdrawals from BLMIS despite this account reflecting little trading activity and few holdings.  (*Compare* Pamela Goldman Compl. ¶ 54, *and* A&G Goldman Compl. ¶ 54, *with* Tr.'s Compl. ¶ 63(d).)

- Picower directed the preparation of false statements in May 2007 that reflected trades which from months earlier that did not occur.  (*Compare* Pamela Goldman Compl. ¶ 61, *and* A&G Goldman Compl. ¶ 61, *with* Tr.'s Compl. ¶ 63(f).)

In sum, the wrongs alleged by the Trustee have been repeated, re-packaged, and given new labels by the Class Action Plaintiffs in an attempt to create independent claims where none exist.

### 3.    The Class Action Plaintiffs Seek Fraudulently Transferred Funds

At bottom, the Class Action Plaintiffs base their purported federal securities laws violations on the Picower Defendants' withdrawals from BLMIS:  "The volume, pattern and practice of the Defendants' fraudulent withdrawals from BLMIS and their control over fraudulent documentation of underlying transactions at BLMIS establishes the Defendants'

'control person' liability under the federal securities laws."  (Pamela Goldman Compl. ¶ 41;

A&G Goldman Compl. ¶ 41.)

In addition, the Class Action Complaints allege wrongdoing by Picower on the basis that

"Jeffry Picower knew of the existence of his scheme and that Jeffry Picower was taking

fraudulent profits from the BLMIS customer accounts."  Similarly, the Class Action Complaints

allege that there was no corresponding value provided to BLMIS in exchange for the fraudulent

withdrawals:  "Picower was able to control BLMIS and use BLMIS as 'a personal piggy bank'

by withdrawing funds for various entities he controlled, even if there was no legitimate

underlying profitable transaction warranting a distribution of such funds."  (*Compare* Pamela

Goldman Compl. ¶ 45, *and* A&G Goldman Compl. ¶ 45, *with* Tr.'s Compl. ¶ 66; *see also* Pamela

Goldman Compl. ¶ 51; A&G Goldman Compl. ¶ 51 ("The pattern of transactions in the

Defendants' accounts reveals their fraudulent nature.  Picower and the other Defendants received

fraudulent profits from the various Madoff accounts from at least December 1995 through

December 2008.  Each quarter, Picower, directly and through the other Defendants and other

agents, directed the withdrawal of large sums of money divided into odd numbers spread over

many of the Defendant accounts.").)

The Class Action Plaintiffs' claims thus turn on Picower's receipt of fraudulent

transfers—the very allegation that forms the basis of the Trustee's Complaint and the Picower

Settlement.

### 4.    The Allegations in the Class Action Complaints Mimic those in the Fox and Marshall Complaints that Have Been Held to be Duplicative and Derivative of the Trustee's Action

Not only do the Class Actions mimic the allegations in the Trustee's action, but they also

mimic the allegations in the Fox and Marshall class action complaints that the District Court has

held to be duplicative and derivative of the Trustee's Action.  *See Fox*, 2012 WL 990829, at *11.

Indeed, the Class Action Plaintiffs simply cut and paste allegations from the Fox and

Marshall complaints – which were first copied from the Trustee's Complaint.  For example, the

Class Action Plaintiffs allege:

- Picower directed withdrawals from the Decisions, Inc. account in amounts between $50 million and $150 million five or more times a year for a total of approximately $6 billion.  *Compare* Pamela Goldman Compl. ¶ 55, *and* A&G Goldman Compl. ¶ 55, *with* Fox Compl. ¶ 51, *and* Marshall Compl. ¶ 51.

- Picower instructed BLMIS to backdate trades in the Decisions, Inc. 6 account to January 2006, which was before the account was even opened. As a result of the fabrication/backdating of trades, the purported net value of securities in the Decisions, Inc. 6 account by the end of April 2006 had increased by almost $40 million, for a return of 30% in less than two weeks of "purported trading." *Compare* Pamela Goldman Compl. ¶ 58, *and* A&G Goldman Compl. ¶ 58, *with* Fox Compl. ¶ 56-57, *and* Marshall Compl. ¶ 56-57.

- Picower's ability to affect backdated trades in the Decisions, Inc. 6 account generated phony paper profits which had appreciated only on a hindsight basis and represented part of a continuous pattern of the Picower Defendants directing the falsification of trading records at BLMIS, which allowed Picower to pilfer from other BLMIS accounts.  *Compare* Pamela Goldman Compl. ¶ 58, *and* A&G Goldman Compl. ¶ 58, *with* Fox Compl. ¶ 58, *and* Marshall Compl. ¶ 58.

- Certain Picower accounts had annual returns greater than 100%, including accounts with returns between 120% and 550%.  *Compare* Pamela Goldman Compl. ¶ 50, *and* A&G Goldman Compl. ¶ 50, *with* Fox Compl. ¶ 43, *and* Marshall Compl. ¶ 43.

As set out in detail in Exhibit A, attached hereto, the Class Action Complaints are simply a re-

packaging of claims that have twice been held to be barred as duplicative or derivative of the

Trustee's claims.

## ARGUMENT

### THE CLASS ACTIONS SHOULD NOT BE ALLOWED TO PROCEED

Any prosecution of the Picower Class Actions would be in violation of the Picower

Injunction recently affirmed by Judge Koeltl in the District Court, the automatic stay and the

Stay Orders.  The Picower Class Actions violate the Picower Injunction entered by this Court as

an integral part of the Picower Settlement because the claims asserted by the Class Action

Plaintiffs are entirely duplicative and derivative of the claims settled by the Trustee, despite their

false labels as securities claims.  Further, contrary to the assertions in the Motions, the

prosecution of the Picower Class Actions would be in direct violation of the automatic stay and

the Stay Orders entered in this liquidation.  Just as the District Court recently determined in

*Picard v. Fox*, actions asserting generalized claims that seek to recover for an injury inflicted on

all BLMIS investors may only be brought by the Trustee.  *Fox*, 2012 WL 990829, at *8.

The facts of the instant case are substantially identical to those in *Fox*, and the same

result is mandated.  As in *FDIC v. Hirsch* (*In re Colonial Realty Co.*), 980 F.2d 125, 133 (2d Cir.

1992), "[a]bsent a claim against the debtor, there is no independent basis for the action against

the transferee."  The Class Action Plaintiffs should not be permitted to circumvent the Net

Equity Decision and create a parallel distribution process allowing recovery outside of and in

contravention of the procedures established in these liquidation proceedings.  The Motions

should be denied.

## I.    THE CLASS ACTION PLAINTIFFS ARE ENJOINED FROM PURSUING THE CLASS ACTIONS

### A.    The Class Action Claims are Duplicative and Derivative of the Trustee's Claims

The District Court Decision affirmed the issuance of the Picower Injunction as part of the

Picower Settlement, concluding that "a bankruptcy court may enjoin actions that are derivative

or duplicative of claims brought by the trustee or that could have been brought by the trustee in

the first instance." *Fox*, 2012 WL 990829, at *15 (citing *In re Dreier*, 429 B.R. at 133-34).

Despite the allegations of the Class Action Plaintiffs to the contrary, the claims they allege are

completely duplicative of the fraudulent transfer claims settled by the Trustee as part of the

Picower Settlement and are therefore enjoined.

As was the case in *Fox*, the Class Action Plaintiffs have not and cannot allege any relationship with the Picower Defendants that could form the basis for an independent claim. The Class Action Plaintiffs allege that Picower, in his position as a "control person" at BLMIS, harmed the Class Action Plaintiffs. (*See* Pamela Goldman Compl. ¶¶ 4, 40; A&G Goldman Compl. ¶¶ 4, 40.) Significantly, the only "harm" or "bad acts" alleged stem from the operation of the Ponzi scheme. There is no separate, independent basis for liability against Picower other than his alleged conduct in connection with Madoff's Ponzi scheme, nor any privity or special relationship alleged between the Class Action Plaintiffs and Picower. Indeed, each of the Class Action Plaintiffs purports to be a customer or creditor of BLMIS and the relationship between the Class Action Plaintiffs and the Picower Defendants is based entirely on each plaintiff's status as such. This is exactly the same scenario as the District Court described in *Fox*, "[t]he Florida Actions, like Picard's New York Action, are based upon the same conduct by the Picower Defendants: involvement in the Madoff Ponzi scheme, and the transfer of billions of dollars in BLMIS-held customer funds to the Picower defendants." *Fox*, 2012 WL 990829, at *8.

Fundamentally, but for their investment with BLMIS, and any claim they may have arising out of that investment, the Class Action Plaintiffs would have no allegations to bring against the Picower Defendants – the only effect that the Picower Defendants' actions are alleged to have had upon the Class Action Plaintiffs is the depletion of their BLMIS accounts – the same as every other customer who is already within the purview of this proceeding. Nonetheless, the Class Action Plaintiffs are attempting to secure different treatment for themselves than that mandated by the Net Equity Decision. In a similar case, the District Court, in upholding a permanent injunction in the *Dreier* Ponzi scheme, stated that the challenger's "grandiose assertion that he is unique and should be hand-picked from a heap of victims whose property was

likewise stolen by Dreier as part of his fraudulent scheme lacks both factual and legal support."

*In re Dreier*, Nos. 10 Civ. 4758 & 5669, 2010 WL 3835179, at *4 (S.D.N.Y. Sept. 10, 2010)

(Batts, J.).  The same is true here.

> **B.** **The Nomenclature of a Claim Is Irrelevant**

> **1.** **Courts Consider the Substance of the Claim Asserted**

The District Court has confirmed that this Court should look to the substance of the Class

Action Complaints, rather than the nomenclature used by the Class Action Plaintiffs to frame

their supposedly "direct" causes of action.  *Fox*, 2012 WL 990829, at *10; *see also Picard v.*

*Stahl* (*In re Bernard L. Madoff Inv. Sec. LLC*), 443 B.R. 295, 312 (Bankr. S.D.N.Y. 2011).  More

specifically, courts should look "to the underlying wrongs as pleaded in the complaint and

whether the plaintiff alleges a particularized injury" to determine whether a claim properly

belongs to the Trustee.  *McHale v. Alvarez* (*In re 1031 Tax Grp. LLC*), 397 B.R. 670, 679

(Bankr. S.D.N.Y. 2008); *see also In re Swallen's, Inc.*, 205 B.R. 879, 884 (Bankr. S.D. Ohio

1997) (relying on *In re Colonial Realty* to find that third party actions, purportedly seeking relief

"of an entirely different character from that which the debtor could assert," violated § 362(a)

because the plaintiffs were "seeking redress for the very same acts which are the basis of the

claims dealt with in the [Debtor's] Settlement Agreement").

Regardless of the nomenclature, a claim is derivative if "(1) the claim alleges a general,

indirect injury to the creditor, (2) the creditor's standing to sue the third party depends on its

status as a creditor of [the debtor], and (3) the successful prosecution [by the Trustee of his suit]

will increase the assets available to all creditor claims."  *Keene Corp. v. Coleman* (*In re Keene*

*Corp.*), 164 B.R. 844, 854 (Bankr. S.D.N.Y. 1994).  It is not the label affixed to the claims, but

rather the harm that is alleged, that determines whether a claim is independent.  *St. Paul*, 884

F.2d at 701 ("These claims, although pleaded as claims personal to [plaintiff], if they are

property of the corporation or are claims available to all creditors, are claims regarding the transfer of property to the estate" and therefore properly brought by the bankruptcy trustee); *see also In re 1031 Tax Grp.*, 397 B.R. at 680–84.  In fact, the Seventh Circuit has explained:

> While the . . . [p]laintiffs' claims are not "property of" the . . . estate, it is difficult to imagine how those claims could be more closely "related to" it.  They are claims to the same limited pool of money, in the possession of the same defendants, as a result of the same acts, performed by the same individuals, as part of the same conspiracy.

*Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998).

In the District Court Decision, the Court considered whether the fact that the Appellants' claims sounded in tort affected the analysis of the duplicative nature of the claims.  It found that it did not:

> "[i]f potential creditors could bypass the automatic stay injunction by simply pleading around it, even when the substance of their claims – the wrongful acts pleaded, the relationships and duties between the actors, the nature of the damages suffered – was identical to the substance of an action already brought by a trustee, the bankruptcy laws' core purpose would be severely undermined, because some potential creditors could obtain payment of their claims in preference to and to the detriment of other creditors simply by styling their pleadings as sounding in tort."

*Fox*, 2012 WL 990829, at *10.

The same conclusion is required here – regardless of the title given to the Class Action Plaintiffs' claims, they cannot be meaningfully separated from those of the Trustee.

### 2.    An Examination of the Class Action Complaints Reveals the True Nature of the Claims

As set out in detail in Exhibit A, attached hereto, the Class Action Complaints are based, almost verbatim, on the Trustee's pleadings.  (*See, e.g.*, Pamela Goldman Compl. ¶ 34; A&G Goldman Compl. ¶ 34 ("The money that customers paid to BLMIS in connection with their investment contracts with BLMIS was not used to purchase securities as described, but instead

was used to make distributions to other investors, primarily to the Defendants."); Tr.'s Compl. ¶

24 ("The money received from investors was not set aside to buy securities as purported, but

instead was primarily used to make the distributions to—or payments on behalf of—other

investors."); Pamela Goldman Compl. ¶ 1; A&G Goldman Compl. ¶ 1 ("In fact, however,

Madoff was not the most substantial beneficiary of the Ponzi scheme.  The Defendants were.

The accounting performed by the Madoff bankruptcy Trustee reveals that the Defendants

received at least $7.2 billion of BLMIS customers' cash . . . ."); Tr.'s Mem. of Law in Opp. to

Mot. to Dismiss at 2 ("Based upon the Trustee's investigation to date, Picower was instead the

biggest beneficiary of Madoff's scheme, having withdrawn either directly or through the entities

he controlled more than $7.2 billion of other investors' money."))

The Class Action Complaints allege that Picower, in his position as a "control person" at

BLMIS, harmed the Class Action Plaintiffs.  (Pamela Goldman Compl. ¶¶ 4, 40; A&G Goldman

Compl. ¶¶ 4, 40.)  But this "harm" relates only to BLMIS' and Madoff's conduct in running a

Ponzi scheme.  For example, the Class Action Complaints allege that the Picower Defendants

controlled BLMIS by directing the creation of false books and records at BLMIS.  (Pamela

Goldman Compl. ¶¶ 2,4; A&G Goldman Compl. ¶¶ 2,4.)  Moreover, they allege that each of the

Picower Defendants "is an entity or individual operating as part of a control group of BLMIS."

(Pamela Goldman Compl. ¶¶ 40, 45; A&G Goldman Compl. ¶¶ 40, 45.)  Essentially, by virtue of

his position, the Class Action Plaintiffs submit that Picower was essentially a cohort or alter ego

of BLMIS:

> The [Picower] Defendants directed BLMIS to prepare fraudulent
> trading records and fraudulent trading results, which effected
> returns in their accounts based upon transactions which in fact
> never took place.  Picower directly and through the other
> Defendants initiated, directed, coordinated and cause to be effected
> false records and back dated records at BLMIS, which resulted in

the appearance of trading profits in these accounts.  Picower then
withdrew these false profits from the Defendant accounts.  This
direction of trading activity and direction of preparation of false
trading records over a multi-year period shows control of the
specific fraudulent activity which constituted the underlying Ponzi
scheme and the underlying violations of 10b-5 engaged in by
BLMIS.

(Pamela Goldman Compl. ¶ 49; A&G Goldman Compl. ¶ 49.)  The Class Action Complaints

further allege instances where Picower purportedly exerted control over BLMIS: (1) Picower

was able to obtain a $6 billion loan from BLMIS without having the requisite collateral in his

account, (Pamela Goldman Compl. ¶¶ 52-55; A&G Goldman Compl. ¶¶ 52-55); and (2) Picower

directed BLMIS to backdate false transactions to create fictitious profits, (Pamela Goldman

Compl. ¶¶ 56-61; A&G Goldman Compl. ¶¶ 56-61).  All of these alleged activities were

performed or carried out by Madoff and BLMIS and precipitated not only the initial liquidation

of BLMIS, but also the very lawsuit that the Trustee originally filed against Picower and his

estate.  Thus, the Class Action Complaints reveal that the Class Action Plaintiffs' allegations are

derivative and duplicative not only of the Trustee's action against the Picower Defendants, but

also the proofs of claim plaintiffs have filed against the BLMIS estate.

The Class Action Complaints also make it clear that they are seeking to recover

fraudulent transfers.  For example, as discussed above, the Class Action Complaints state:

"Picower was able to control BLMIS and use BLMIS as 'a personal piggy bank' by withdrawing

funds for various entities he controlled, even if there was no legitimate underlying profitable

transaction warranting a distribution of such funds."  (Pamela Goldman Compl. ¶ 45; A&G

Goldman Compl. ¶ 45.)  Even a cursory examination of the Class Action Plaintiffs' claims

reveals that "[i]n substance, the claims asserted … are duplicative of those asserted in the

Trustee's New York Action… notwithstanding the [Class Action Plaintiffs'] renaming of the

causes of action asserted."  *Fox*, 2012 WL 990829, at *10.

The Class Action Complaints are likewise based on the same operative facts underlying

the BLMIS Ponzi scheme.  Were the Class Action Plaintiffs to prosecute their claims, they

would rely on the same evidence supporting the Trustee's claims and would burden the estate for

its evidence.  Were every litigant dissatisfied with the Net Equity Decision to advance such

derivative and duplicative claims, the Trustee would be overwhelmed with repetitive,

burdensome, and distracting discovery requests.

### 3.      The Use of a "Securities Claims" Label Cannot Save the Class Action Claims

The Class Action Plaintiffs' attempt to distinguish their claims by labeling them as

"securities claims" has been specifically rejected by this Court.  In *Picard v. Stahl*, the Trustee

sought to enjoin a number of parties including, but not limited to, the Lautenberg Foundation,

from bringing third party actions.  *Stahl*, 443 B.R. at 303-04.  The Lautenberg defendants

brought suit against Peter Madoff alleging, *inter alia*, violations of section 10(b) of the Exchange

Act, Rule 10b-5, breach of fiduciary duty, negligent misrepresentation, negligence, and aiding

and abetting breach of fiduciary duty.  This Court enjoined the Lautenberg defendants from

continuing with these claims because they were duplicative and derivative of claims asserted by

the Trustee against Peter Madoff.  *Id.* at 311-15.  The Court should give no more weight to the

Class Action Plaintiffs' "securities claims."

The Class Action Plaintiffs allege no independent wrongs because independent wrongs

do not exist.  The Class Action Plaintiffs are merely attempting to recover fraudulent transfers of

funds from BLMIS to Picower, which claims belong to the Trustee and have been settled by the

Trustee for the benefit of all BLMIS investors with allowed claims.  As was the case in *Fox*,

"there ultimately is no substantive difference between the claims already asserted by the Trustee,

on behalf of the BLMIS estate in the New York Action, and those claims asserted in the Florida

Actions." *Fox*, 2012 WL 990829, at *9.

### C.    The Picower Class Actions Imperil the Trustee's Ability to Enter Into Future Settlements

The Class Action Plaintiffs essentially seek a double recovery from the Picower

Defendants because those defendants have already returned their allegedly fraudulent transfers

pursuant to the Picower Settlement.  The possibility of claims like those alleged by the Class

Action Plaintiffs is the very reason the Picower Defendants made the Permanent Injunction a

necessary component of the Picower Settlement.  The Class Action Plaintiffs' efforts to recover

on derivative and duplicative claims from a pool of funds separate from the settlement amount

run counter to the idea of settlement.  The Trustee has full authority to compromise and settle

estate claims and, having done so, the Class Action Plaintiffs are bound by that settlement

because the "damages" they seek are identical to the Trustee's recovery.

This Court has recognized the necessity of third party releases in a bankruptcy liquidation

in *In re Dreier*, in which this Court held:

> The Trustees are the sole parties with standing to prosecute
> avoidance claims, and the application of the automatic stay reflects
> the recognition that a creditor's attempt to recover its claim against
> the estate from [a third party] will interfere with Trustees' ability
> to pursue recoveries for the benefit of all creditors of the estates.
> The same interference will occur if the Bankruptcy Court cannot
> enjoin similar suits on a permanent basis. Absent that power, the
> Trustees will be hampered in their ability to pursue and ultimately
> settle fraudulent transfer claims from a transferee fearful of paying
> twice for the same transfer—once on the Trustees' claim and a
> second time on the derivative claim.

429 B.R. at 133 (internal citations omitted).  If the Picower Class Actions are permitted to go

forward, the Trustee will be "hampered" in his "ability to pursue and ultimately settle fraudulent

transfer claims" with other defendants who will be fearful of paying twice.  *Id.*; *see Fox*, 429

B.R. at 435.  Such a result would have a detrimental impact on the administration of the estate and flies in the face of "strong judicial policy in favor of settlements." *Rittmaster v. Painewebber Grp., Inc.* (*In re Painewebber Ltd. P'ships Litig.*), 147 F.3d 132, 138 (2d Cir. 1998).  The Permanent Injunction must be enforced to assure future settlors that the Trustee's claims against them can be resolved with finality.

## II.    THE PICOWER CLASS ACTIONS VIOLATE THE AUTOMATIC STAY AND THE STAY ORDERS

Even if the Class Action Plaintiffs were not permanently enjoined from pursuing their claims, which they are, the Picower Class Actions violate the automatic stay and the Stay Orders because the claims alleged therein are general claims that are duplicative of those of the Trustee. *Fox*, 2012 WL 990829, at *9 ("Because the claims asserted in the Florida Actions are general claims common to all BLMIS investors that are substantively duplicative of the Trustee's fraudulent transfer action, the Bankruptcy Court correctly found that the claims asserted in the Florida Actions were property of the estate.")

The automatic stay encompassed in 11 U.S.C. § 362(a) "is one of the most fundamental bankruptcy protections and applies broadly to 'give[] the debtor a breathing spell' and to prevent creditors from 'obtain[ing] payment of the[ir] claims in preference to and to the detriment of other creditors.'" *Fox*, 429 B.R. at 430 (quoting H.R. Rep. No. 95-595, at 340 (1977) *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6296-97; S. Rep. No. 95-989, at 49 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5835); *see also Fox*, 2012 WL 990829, at *7; *AP Indus., Inc. v. SN Phelps & Co.* (*In re AP Indus., Inc.*), 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990).  Actions taken in violation of the automatic stay are void *ab initio*.  *In re Colonial Realty Co.*, 980 F.2d at 137.

Section 362(a)(1) bars "the commencement or continuation . . . of a judicial . . . or other action or proceeding against the debtor . . . or to recover a claim against the debtor . . . ."  11

U.S.C. § 362(a)(1).  Contrary to the assertions made by the Class Action Plaintiffs, a "claim

against the debtor" encompasses claims against third parties that, as with those at issue here, are

tantamount to claims against the debtor, including fraudulent transfer actions.  *See, e.g., In re

Colonial Realty Co.*, 980 F.2d at 132; *Fox*, 2012 WL 990829, at *7.  As the Second Circuit

explained in *Colonial Realty*:

> While a fraudulent transfer action may be an action against a third
> party, it is also an action "to recover a claim against the debtor."
> **Absent a claim against the debtor, there is no independent
> basis for the action against the transferee.**  Moreover, the
> creditor can only recover property or value thereof received from
> the debtor sufficient to satisfy the creditor's claims against the
> debtor.  This interpretation is consistent with the legislative history
> of § 362(a)(1).

*Id.* at 132 (citing *In re Saunders*, 101 B.R. 303, 305-06 (Bankr. N.D. Fla. 1989) (emphasis

added)).  The Second Circuit accordingly has held that the automatic stay "extends to common

claims against the debtor's alter ego or others who have misused the debtor's property in some

fashion."  *St. Paul*, 884 F.2d at 701.  *St Paul* is directly applicable to this case as the court held

that, if the claims could be brought by any creditor, and even if they are brought against a third

party, they belong to the Trustee:

> **If a claim is a general one, with no particularized injury arising
> from it, and if that claim could be brought by any creditor of
> the debtor, the trustee is the proper person to assert the claim**,
> and the creditors are bound by the outcome of the trustee's action.
> **Although the claims raised by [plaintiff] are not against the
> debtor but are against a third party, the same reasoning
> applies.**  The claims, if proved, would have the effect of bringing
> the property of the third party into the debtor's estate, and thus
> would benefit all creditors.  It therefore would be illogical to
> distinguish between this type of claim against a third party and a
> claim against the debtor.

*Id.* at 701 (emphasis added).

Judge Koeltl followed the reasoning set forth in *St. Paul* in the District Court Decision and held that where there was no duty owed directly to the appellants in that proceeding, the claims will be treated as general ones "that seek to recover for an injury that was inflicted not by specific acts of the Picower defendants directed toward the Appellants themselves . . . ." *Fox*, 2012 WL 990829, at *8.  Because Picower's alleged "control" of BLMIS and withdrawal of BLMIS funds injured all customers of BLMIS, the Class Actions are tantamount to claims against the debtor that may only be asserted by the Trustee.

Further, the automatic stay bars "any act to obtain possession of property of the estate or property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  "Property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), "wherever located and by whomever held," 11 U.S.C. § 541(a), including causes of action possessed by the debtor at the time of filing.  *Jackson v. Novak* (*In re Jackson*), 593 F.3d 171, 176 (2d Cir. 2010).  Claims, such as those asserted by the Class Action Plaintiffs, which seek to redress harms common to all creditors and allege no particularized injury, can be asserted only by the Trustee, and are therefore property of the estate.  *See Fox*, 429 B.R. at 430-31; *In re 1031 Tax Grp.*, 397 B.R. at 680-84.  Ultimately, the wrongful acts alleged in the Class Action Complaints harmed every BLMIS investor in the same way.  *See Fox*, 2012 WL 990829, at *8.

In addition, the Picower Class Actions are violative of section 362(a)(6), which bars "any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C.  § 362(a)(6).  The Picower Class Actions are facially against the Picower Defendants, but in substance, seek to recover claims against the debtor, as the claims are duplicative of those of the Trustee.

30

Whether characterized as property of the estate, a claim against the debtor, or an attempt to recover a claim against the debtor under § 362(a), it is well settled that claims based on a generalized injury common to all creditors can be brought only by the Trustee and may not be maintained by any individual creditor or group of creditors. *See, e.g., Fox,* 2012 WL 990829, at *8 (where there is no duty owed specifically to the claimant, the claim is a general one that belongs to the trustee); *St. Paul*, 884 F.2d at 701 ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim"); *In re 1031 Tax Grp.*, 397 B.R. at 679 (looking "to the underlying wrongs as pleaded in the complaint and whether the plaintiff alleges a particularized injury" to determine that despite its label, claim belonged to the trustee); *In re Keene Corp.*, 164 B.R. at 850-55 (claims are barred by automatic stay where they allege generalized, indirect injury based on creditor status and recovery would benefit the estate); *Apostolou*, 155 F.3d at 879 ("The trustee is also the only party who can sue to represent the interests of the creditors as a class."); *In re Swallen's, Inc.*, 205 B.R. at 884. As the bankruptcy court found in *In re Keene*, "[e]ven if [such] claims are not, themselves, property of the estate, they represent attempts by creditors to collect claims against the debtor from third parties which the trustee is authorized to recover under his or her 'strong arm' or avoiding powers" and are stayed by § 362(a)(1). 164 B.R. at 855.

The fact that the Picower Class Actions do not claim to seek the proceeds of the Picower Settlement (Motions at 10) does not assist the Class Action Plaintiffs because they nevertheless assert claims that belong to the Trustee, which are precluded by the automatic stay and the Stay Orders. Accordingly, all claims advanced by the Class Action Plaintiffs are foreclosed.

### III.    THE TRUSTEE HAS STANDING TO SEEK ENFORCEMENT OF THE PERMANENT INJUNCTION, AUTOMATIC STAY AND STAY ORDERS

Whether or not the Trustee has standing to bring the causes of action set forth in the Class Action Complaints has no bearing on the bankruptcy court's ability to enforce the Permanent Injunction and the automatic stay.  The Trustee is not seeking to assert securities claims against the Picower Defendants.  The Trustee has successfully resolved his claims against the Picower Defendants and is now attempting to ensure that the ongoing administration of the BLMIS estate is not threatened by the prosecution of duplicative actions and the creation of a "shadow" estate.

The purpose of sections 105(a) and 362(a) is to prevent third parties from bringing actions that will interfere with the equitable administration of the bankruptcy estate.  *See, e.g.*, 11 U.S.C. §§ 362(a)(6) and (a)(3) (barring "any act to collect, assess or recover a claim against the debtor . . ."); 11 U.S.C. § 105(a) (allowing the court to "issue any order . . . necessary or appropriate to carry out the provisions of [Title 11].").

The Class Action Plaintiffs cite no authority, and the Trustee is aware of none, for the proposition that despite their plain language, sections 362(a) and 105(a) do not bar an act to recover a claim against the debtor or otherwise interfere with the orderly administration of the estate unless the court first determines that the Trustee would have standing to assert the identical claims in a hypothetical proceeding that he or she has not yet brought.  *See Stahl*, 443 B.R. at 315 n.22 (Bankr. S.D.N.Y. 2011) ("Whether the Trustee is *in pari delicto* with the Debtor and therefore lacks standing under *Wagoner* would be appropriate for this Court's review only upon an appropriate objection to the Trustee's attempt to assert such claims himself, and only in the confines of that action."); *see also Fox*, 2012 WL 990829, at *12-13.

The Class Action Plaintiffs' argument that two decisions by the district court, *Picard v. HSBC Bank plc*, 454 B.R. 25 (S.D.N.Y. 2011) and *Picard v. JP Morgan Chase & Co.*, 468

B.R.84 (S.D.N.Y. 2011), somehow authorize them to pursue duplicative claims is unavailing. (Motions at 9.)  Indeed, the Judge that authored the *HSBC* opinion has recognized the bankruptcy court's authority to enjoin third party actions that violate the automatic stay or threaten to interfere with estate assets or the court's jurisdiction.  *See In re Saint Vincent's Catholic Med. Ctrs. of N.Y.*, 449 B.R. 209, 217-19 (S.D.N.Y. 2011) (Rakoff, J.) (discussing with approval this Court's enforcement of automatic stay and preliminary injunction regarding Fox and Marshall).

Nothing in *HSBC* or *JP Morgan* addresses the fatal deficiencies in the Class Action Plaintiffs' claims:  they are violative of the Picower Settlement and they seek to "redress harms common to all victims of Madoff's massive Ponzi scheme that, consistent with the purposes of the automatic stay, belong exclusively to the Trustee."  *Stahl*, 443 B.R. at 314.

In addition, the Class Action Plaintiffs submit that Picower was essentially a cohort or alter ego of BLMIS by alleging that Picower directed the back-dating of trades and exerted control over BLMIS on many occasions.  (Pamela Goldman Compl. ¶ 49, 52-61; A&G Goldman Compl. ¶ 49, 52-61.)  The Class Action Plaintiffs also allege that Picower was an insider of BLMIS and thus (i) *in pari delicto* has no application and (ii) their theory of liability is identical to an alter ego claim.  Significantly, courts have widely held that an alter ego claim belongs to the Trustee and not creditors.  *See St. Paul*, 884 F.2d at 701; *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc.* (*In re S.I. Acquisition, Inc.*), 817 F.2d 1142, 17 C.B.C.2d 207 (5th Cir. 1987) (alter ego action is property of the estate and attempt by party other than trustee or debtor in possession to bring action is stayed by section 362(a)(3)); *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339 (7th Cir. 1987).  The Class Action Plaintiffs, therefore, have no standing to bring these claims because they belong to the Trustee.

In any event, it is the nature of bankruptcy law that claims become property of the bankruptcy estate pursuant to section 541 of the Bankruptcy Code "subject to whatever infirmities (such as an in *pari delicto* [sic] defense) that may have existed" before the bankruptcy. *Grubin v. Rattet* (*In re Food Mgmt. Grp., LLC*), 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008). Whatever the infirmities of a particular theoretical legal claim, however, "[t]he trustee is . . . the only party who can sue to represent the interests of the creditors as a class." *Apostolou*, 155 F.3d at 879; *see also St. Paul*, 884 F.2d at 701.

The Bankruptcy Court is not divested of subject matter jurisdiction to enforce the Permanent Injunction or the automatic stay simply because the Class Action Plaintiffs seek to bring claims that they contend the Trustee could not bring.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Motions be denied.

Dated: May 2, 2012
New York, New York

BAKER & HOSTETLER LLP

_____/s/ David J. Sheehan_____
45 Rockefeller Plaza
New York, New York 10111
Telephone:  212.589.4200
Facsimile:  212.589.4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Deborah H. Renner
Email:  drenner@bakerlaw.com
Tracy L. Cole
Email:  tcole@bakerlaw.com
Keith R. Murphy
Email:  kmurphy@bakerlaw.com
Marc Skapof
Email: mskapof@bakerlaw.com
Amy E. Vanderwal
Email:  avanderwal@bakerlaw.com
Matthew J. Moody
Email:  mmoody@bakerlaw.com
George Klidonas
Email:  gklidonas@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the estate of Bernard L. Madoff*

300200628