# EXHIBIT A

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| In fact, however, Madoff was not the most substantial beneficiary of the Ponzi scheme. The Defendants were. The accounting performed by the Madoff bankruptcy Trustee reveals that the Defendants received at least $7.2 billion of BLMIS customers' cash . . . *See* Pamela Goldman Compl. ¶ 1; A&G Goldman Compl. ¶ 1. | Based upon the Trustee's investigation to date, Picower was instead the biggest beneficiary of Madoff's scheme, having withdrawn either directly or through the entities he controlled more than $7.2 billion of other investors' money. *See* Tr.'s Mem. of Law in Opp. to Mot. to Dismiss pg. 2. | Defendants were, as a group, the largest beneficiaries of the Ponzi scheme, converting and receiving billions of dollars from the accounts of innocent Madoff and BLMIS customers. *See* Fox Compl. ¶ 1; Marshall Compl. ¶ 1.<br><br>According to the Trustee, BLMIS made payments and other transfers to the Defendants totaling over $7.2 billion more than Defendants deposited, including $6.7 billion from 1995 to 2008. *See* Fox Compl. ¶ 38; Marshall Compl. ¶ 38. |
| While Madoff and a few employees operated the Ponzi scheme on a day to day basis, they did so under the direction and control of the Defendants who participated in the fraud for their own benefit by directing the creation of false books and records at BLMIS. The Defendants instructed Madoff and his employees to make false transactions and book entries to document allegedly profitable securities transactions in the Defendants' BLMIS accounts that in fact never occurred, but instead provided the Defendants with the returns that they "wanted to achieve." BLMIS complied, which allowed the Defendants to steal billions of dollars of BLMIS customers' assets in the form of the fictitious profits based on the false trading documentation. *See* Pamela Goldman Compl. ¶ 2; A&G Goldman Compl. ¶ 2. | Additionally, on information and belief, Picower, directly and/or through and/or with the assistance of Freilich, directed fictitious, backdated trades in order to achieve fictitious gains or losses in earlier periods. For example, BLMIS records reflect several conversations beginning around May 14, 2007 between "April" and BLMIS employees about gains that the Picower Foundation "need[ed] during Jan & Feb [20]06." On information and belief, "April" is [Defendant] April Freilich. Since any legitimate gains or losses in January or February 2006 had to have been achieved more than one year before these conversations even occurred, Freilich and Defendants knew or should have known that they were participating in fraudulent activity. *See* Tr.'s Compl. ¶ 63(f). | In fact, relevant documents and information show that Picower and the Defendants directed BLMIS to prepare account statements for the Defendants reflecting not actual trading results but the rates of return Picower "wanted to achieve". BLMIS complied with these directions, and the vast majority of the purported "profits" in the Defendants' accounts were not a result of the actual purchase and sale of securities. *See* Fox Compl. ¶ 7; Marshall Compl. ¶ 7. |
| Picower was a highly sophisticated investor, accountant and attorney who participated in the Madoff Ponzi scheme for over 20 years, knowing that he was participating in a fraud. Picower had vast experience in the purchase and sale of businesses, including health care and technology companies. He had also been personally | Defendant Jeffry M. Picower ("Picower") is a sophisticated investor and businessman who invested in BLMIS over many decades through 24 entity and/or personal accounts. According to a 2002 Forbes article entitled "Unaccountable," Picower is a former attorney, accountant and tax shelter promoter who has been active in the financial industry for more than | Picower was a highly sophisticated investor, accountant and attorney who participated in the Madoff Ponzi scheme for over 20 years, knowing that he was participating in a fraud. Picower had vast experience in the purchase and sale of businesses, including health care and technology companies. He had also been personally responsible for |

i

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| responsible for managing hundreds of millions, if not billions, of dollars of assets, and he had developed uncommon sophistication in trading securities and evaluating returns therefrom. Upon information and belief, Picower was closely associated with Madoff, both in business and socially, for the last 30 years. Picower held an individual BLMIS account in the name of "Jeffry M. Picower," with an account address of 1410 South Ocean Boulevard, Palm Beach, Florida. Picower was a trustee of the Picower Foundation, and Chairman of the Board of Defendant Decisions Incorporated. *See* Pamela Goldman Compl. ¶ 10; A&G Goldman Compl. ¶ 10. | 25 years. He maintains residences at 1410 South Ocean Boulevard, Palm Beach, Florida 33480 and 4900 Congress Street, Fairfield, Connecticut 06824. Upon information and belief, Picower has been closely associated with Madoff on both a business and social level for the last 30 years. Picower holds an individual BLMIS account in the name "Jeffry M. Picower," with the account address reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480. Upon information and belief, Picower is trustee for the Picower Foundation and Chairman of the Board of Defendant Decisions Incorporated. *See* Tr.'s Compl. ¶ 34. | managing hundreds of millions, if not billions, of dollars of assets, and he had developed uncommon sophistication in trading securities and evaluating returns therefrom, Upon information and belief Picower was closely associated with Madoff, both in business and socially, for the last 30 years. Picower held an individual BLMIS account in the name of "Jeffry M. Picower," with an account address of l4l0 South Ocean Boulevard, Palm Beach, Florida. Picower was a trustee of the Picower Foundation, and Chairman of the Board of Defendant Decisions Incorporated. *See* Fox Compl. ¶ 13; Marshall Compl. ¶ 13. |
| Defendant Barbara Picower is a person residing at 1410 South Ocean Boulevard, Palm Beach, Florida 33480. Barbara Picower is Picower's surviving spouse. According to the Trustee, Barbara Picower holds an individual account at BLMIS in the name "Barbara Picower," with the account address of 1410 South Ocean Boulevard, Palm Beach, Florida 33480, and Barbara Picower is trustee for Defendant Trust f/b/o Gabrielle H. Picower, an officer and/or director of Defendant Decisions Incorporated, and trustee and Executive Director of the Picower Foundation. *See* Pamela Goldman Compl. ¶ 12; A&G Goldman Compl. ¶ 12. | Defendant Barbara Picower is a person residing at 1410 South Ocean Boulevard, Palm Beach, Florida 33480. Upon information and belief, Barbara Picower is married to Picower. Upon information and belief, Barbara Picower holds an individual account at BLMIS in the name "Barbara Picower," with the account address reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480. Upon information and belief, Barbara Picower is trustee for Defendant Trust FBO Gabrielle H. Picower, an officer and/or director of Defendant Decisions Incorporated and trustee and Executive Director of the Picower Foundation. *See* Tr.'s Compl. ¶ 35. | Defendant Barbara Picower is a person residing at l4l0 South Ocean Boulevard, Palm Beach, Florida 33480. Barbara Picower is Picower's surviving spouse, According to the Trustee, Barbara Picower holds an individual account at BLMIS in the name "Barbara Picower," with the account address of l4l0 South Ocean Boulevard, Palm Beach, Florida 33480, and Barbara Picower is trustee for Defendant Trust f/b/o Gabrielle H. Picower, an officer and/or director of Defendant Decisions Incorporated, and trustee and Executive Director of the Picower Foundation. *See* Fox Compl. ¶ 15; Marshall Compl. ¶ 15. |
| Defendant Decisions Incorporated is a corporation organized under the laws of Delaware with a principal place of business at 950 Third Avenue, New York, New York 10022 and an alternate mailing address on its BLMIS account listed as 22 Saw Mill River Road, Hawthorne, New York, 10532. According to the Trustee, the Decisions Incorporated office in Hawthorne was merely a store-front office | Defendant Decisions Incorporated ("Decisions") is a corporation organized under the laws of Delaware with a principal place of business at 950 Third Avenue, New York, New York 10022 and an alternate mailing address or its BLMIS account listed as 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, the Decisions office in Hawthorne was merely a store-front office through which little or no business was conducted. Upon | Defendant Decisions Incorporated is a corporation organized under the laws of Delaware with a principal place of business at 950 Third Avenue, New York, New York 10022 and an alternate mailing address on its BLMIS account listed as 22 Saw Mill River Road, Hawthorne, New York, 10532. According to the Trustee, the Decisions Incorporated office in Hawthorne was merely a store-front office through which little or no |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| through which little or no business was conducted, and Decisions Incorporated is a general partner of Defendants Capital Growth Company, JA Primary Limited Partnership, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JLN Partnership, JMP Limited Partnership and Jeffry M. Picower Special Co. *See* Pamela Goldman Compl. ¶ 13; A&G Goldman Compl. ¶ 13. | information and belief, Decisions is a general partner of Defendants Capital Growth Company, JA Primary Limited Partnership, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JLN Partnership, JMP Limited Partnership and Jeffry M. Picower Special Co. *See* Tr.'s Compl. ¶ 37. | business was conducted, and Decisions Incorporated is a general partner of Defendants Capital Growth Company, JA Primary Limited Partnership, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JLN Partnership, JMP Limited Partnership and Jeffry M. Picower Special Co. *See* Fox Compl. ¶ 16; Marshall Compl. ¶ 16. |
| Defendant Capital Growth Company purports to be a limited partnership with a mailing address for its BLMIS account listed at 22 Saw Mill River Road, Hawthorne, New York, 10532, care of Decisions Incorporated. According to the Trustee, Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of Capital Growth Company, and Decisions Incorporated and Picower transact/transacted business through this entity. *See* Pamela Goldman Compl. ¶ 14; A&G Goldman Compl. ¶ 14. | Upon information and belief, Defendant Capital Growth Company purports to be a limited partnership with a mailing address for its BLMIS account listed at 22 Saw Mill River Road, Hawthorne, New York, 10532, care of Decisions Incorporated. Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of Capital Growth Company, and Decisions Incorporated, Picower, and/or Freilich transact business through this entity. *See* Tr.'s Compl. ¶ 38. | Defendant Capital Growth Company purports to be a limited partnership with a mailing address for its BLMIS account listed at 22 Saw Mill River Road, Hawthorne, New York, 10532, care of Decisions Incorporated. According to the Trustee, Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of Capital Growth Company, and Decisions Incorporated and Picower transact/transacted business through this entity. *See* Fox Compl. ¶ 17; Marshall Compl. ¶ 17. |
| Defendant JA Primary Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594. According to the Trustee, Defendant Decisions Incorporated and/or Picower serves/served as General Partner or Director of JA Primary Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this entity. *See* Pamela Goldman Compl. ¶ 15; A&G Goldman Compl. ¶ 15. | Defendant JA Primary Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594. Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of JA Primary Partnership, and Decisions Incorporated, Picower, and/or April Freilich transact business through this defendant entity. *See* Tr.'s Compl. ¶ 39. | Defendant JA Primary Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594. According to the Trustee, Defendant Decisions Incorporated and/or Picower serves/served as General Partner or Director of JA Primary Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this entity. *See* Fox Compl. ¶ 18; Marshall Compl. ¶ 18. |
| Defendant JA Special Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York, New York 10594. According to the Trustee, Defendant Decisions Incorporated | Defendant JA Special Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York, New York 10594. Upon information and belief, Defendant Decisions Incorporated and/or | Defendant JA Special Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York, New York 10594. According to the Trustee, Defendant Decisions Incorporated |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| and/or Picower serve/served as General Partner or Director of JA Special Limited Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity. *See* Pamela Goldman Compl. ¶ 16; A&G Goldman Compl. ¶ 16. | Defendant Picower serves as General Partner or Director of JA Special Limited Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity. *See* Tr.'s Compl. ¶ 40. | and/or Picower serve/served as General Partner or Director of JA Special Limited Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity. *See* Fox Compl. ¶ 19; Marshall Compl. ¶ 19. |
| According to the Trustee, Defendant JAB Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JAB Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity. *See* Pamela Goldman Compl. ¶ 17; A&G Goldman Compl. ¶ 17. | Upon information and belief, Defendant JAB Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of JAB Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity. *See* Tr.'s Compl. ¶ 41. | According to the Trustee, Defendant JAB Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JAB Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity. *See* Fox Compl. ¶ 20; Marshall Compl. ¶ 20. |
| According to the Trustee, Defendant JEMW Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JEMW Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity. *See* Pamela Goldman Compl. ¶ 18; A&G Goldman Compl. ¶ 18. | Upon information and belief, Defendant JEMW Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of JEMW Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity. *See* Tr.'s Compl. ¶ 42. | According to the Trustee, Defendant JEMW Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JEMW Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity. *See* Fox Compl. ¶ 21; Marshall Compl. ¶ 21. |
| According to the Trustee, Defendant JF Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JF Partnership, and Decisions Incorporated, and/or Picower | Upon information and belief, Defendant JF Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, l0532. Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of JF Partnership, and Decisions Incorporated, Picower, and/or Freilich | According to the Trustee, Defendant JF Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JF Partnership, and Decisions Incorporated, and/or Picower transact/transacted business |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| transact/transacted business through this Defendant entity. *See* Pamela Goldman Compl. ¶ 19; A&G Goldman Compl. ¶ 19. | transact business through this defendant entity. *See* Tr.'s Compl. ¶ 43. | through this Defendant entity. *See* Fox Compl. ¶ 22; Marshall Compl. ¶ 22. |
| According to the Trustee, Defendant JFM Investment Company is an entity through which Decisions Incorporated, and/or Picower transact/transacted business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and JFM Investment Company is a Limited Partner of Capital Growth Company, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of JFM Investment Company. *See* Pamela Goldman Compl. ¶ 20; A&G Goldman Compl. ¶ 20. | Upon information and belief, Defendant JFM Investment Company is an entity through which Decisions Incorporated, Picower and/or Freilich transact business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, JFM Investment Company is a Limited Partner of Capital Growth Company, and Decisions Incorporated and/or Picower serves as General Partner or Director of JFM Investment Company. *See* Tr.'s Compl. ¶ 44. | According to the Trustee, Defendant JFM Investment Company is an entity through which Decisions Incorporated, and/or Picower transact/transacted business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and JFM Investment Company is a Limited Partner of Capital Growth Company, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of JFM Investment Company. *See* Fox Compl. ¶ 23; Marshall Compl. ¶ 23. |
| According to the Trustee, Defendant JLN Partnership is a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Decisions Incorporated and/or Picower serve/served as General Partner or Director of JLN Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity. *See* Pamela Goldman Compl. ¶ 21; A&G Goldman Compl. ¶ 21. | Upon information and belief, Defendant JLN Partnership is a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, Decisions Incorporated and/or Picower serves as General Partner or Director of JLN Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity. *See* Tr.'s Compl. ¶ 45. | According to the Trustee, Defendant JLN Partnership is a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 70532; and Decisions Incorporated and/or Picower serve/served as General Partner or Director of JLN Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity. *See* Fox Compl. ¶ 24; Marshall Compl. ¶ 24. |
| Defendant JMP Limited Partnership is a limited partnership organized under the laws of Delaware, with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594. According to the Trustee, Decisions Incorporated and/or Picower serve/served as General Partner or Director of JMP Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity. *See* Pamela Goldman Compl. ¶ 22; A&G Goldman Compl. ¶ 22. | Defendant JMP Limited Partnership is a limited partnership organized under the laws of Delaware, with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594. Upon information and belief, Decisions Incorporated and/or Picower serves as General Partner or Director of JMP Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity. *See* Tr.'s Compl. ¶ 46. | Defendant JMP Limited Partnership is a limited partnership organized under the laws of Delaware, with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594, According to the Trustee, Decisions Incorporated and/or Picower serve/served as General Partner or Director of JMP Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity. *See* Fox Compl. ¶ 25; Marshall Compl. ¶ 25. |
| According to the Trustee, | Upon information and belief, | According to the Trustee, Defendant |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| Defendant Jeffry M. Picower Special Co. is an entity through which Decisions Incorporated, and/or Picower transact/transacted business, with a mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Jeffry M. Picower Special Co. *See* Pamela Goldman Compl. ¶ 23; A&G Goldman Compl. ¶ 23. | Defendant Jeffry M. Picower Special Co. is an entity through which Decisions Incorporated, Picower and/or Freilich transact business, with a mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, Decisions Incorporated and/or Picower serves as General Partner or Director of Jeffry M. Picower Special Co. *See* Tr.'s Compl. ¶ 47. | Jeffry M. Picower Special Co. is an entity through which Decisions Incorporated, and/or Picower transact/transacted business, with a mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Jeffry M. Picower Special Co. *See* Fox Compl. ¶ 26; Marshall Compl. ¶ 26. |
| According to the Trustee, Defendant Favorite Funds is an entity through which Picower transacted business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Favorite Funds. *See* Pamela Goldman Compl. ¶ 24; A&G Goldman Compl. ¶ 24. | Defendant Favorite Funds is an entity through which Picower transacts business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, Decisions Incorporated and/or Picower serves as General Partner or Director of Favorite Funds. *See* Tr.'s Compl. ¶ 48. | According to the Trustee, Defendant Favorite Funds is an entity through which Picower transacted business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Favorite Funds. *See* Fox Compl. ¶ 27; Marshall Compl. ¶ 27. |
| According to the Trustee, Defendant Jeffry M. Picower P.C. purports to be a limited partnership with a listed mailing address at 25 Virginia Lane, Thornwood, New York, New York 10594, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Jeffry M. Picower P.C., and Decisions Incorporated, and/or Picower transact/transacted business through this defendant entity. *See* Pamela Goldman Compl. ¶ 25; A&G Goldman Compl. ¶ 25. | Upon information and belief, Defendant Jeffry M. Picower P.C. purports to be a limited partnership with a listed mailing address at 25 Virginia Lane, Thornwood, New York, New York 10594. Upon information and belief, Decisions Incorporated and/or Picower serves as General Partner or Director of Jeffry M. Picower P.C., and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity. *See* Tr.'s Compl. ¶ 49. | According to the Trustee, Defendant Jeffry M. Picower P.C. purports to be a limited partnership with a listed mailing address at 25 Virginia Lane, Thornwood, New York, New York 10594, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Jeffry M. Picower P.C., and Decisions Incorporated, and/or Picower transact/transacted business through this defendant entity. *See* Fox Compl. ¶ 28; Marshall Compl. ¶ 28. |
| Defendant Picower Foundation is a trust organized for charitable purposes with Picower listed as donor, and Picower and Barbara Picower, among others, listed as Trustees during the relevant time period. Picower Foundation's addresses are reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480 and 9 West 57th Street, Suite 3800, New York, New York 10019. *See* Pamela | Upon information and belief, Defendant Picower Foundation is a trust organized for charitable purposes with Picower listed as donor and Picower and Barbara Picower, among others, listed as Trustees. Picower Foundation's addresses are reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480 and 9 West 57th Street, Suite 3800, New York, New York 10019. *See* Tr.'s Compl. ¶ 50. | Defendant Picower Foundation is a trust organized for charitable purposes with Picower listed as donor, and Picower and Barbara Picower, among others, listed as Trustees during the relevant time period. Picower Foundation's addresses are reported as l4l0 South Ocean Boulevard, Palm Beach, Florida 33480 and 9 West 57th Street, Suite 3800, New York, New York 10019. *See* Fox Compl. ¶ 29; |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| Goldman Compl. ¶ 26; A&G Goldman Compl. ¶ 26. | | Marshall Compl. ¶ 29. |
| According to the Trustee, Defendant Picower Institute for Medical Research is a nonprofit entity organized under the laws of New York, with a principal place of business at 350 Community Drive, Manhasset, New York 11030. *See* Pamela Goldman Compl. ¶ 27; A&G Goldman Compl. ¶ 27. | Upon information and belief, Defendant Picower Institute for Medical Research is a nonprofit entity organized under the laws of New York, with a principal place of business at 350 Community Drive, Manhasset, New York 11030. *See* Tr.'s Compl. ¶ 51. | According to the Trustee, Defendant Picower Institute for Medical Research is a nonprofit entity organized under the laws of New York, with a principal place of business at 350 Community Drive, Manhasset, New York 11030. *See* Fox Compl. ¶ 30; Marshall Compl. ¶ 30. |
| According to the Trustee, Defendant Trust f/b/o Gabrielle H. Picower is a trust established for beneficiary Gabrielle H. Picower, who is the daughter of Picower and Barbara Picower, with Defendant Barbara Picower listed as trustee, and the trust's BLMIS account address reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480. *See* Pamela Goldman Compl. ¶ 28; A&G Goldman Compl. ¶ 28. | Defendant Trust FBO Gabrielle H. Picower is a trust established for beneficiary Gabrielle H. Picower, who upon information and belief is the daughter of Picower and Barbara Picower, with Defendant Barbara Picower listed as trustee and the trust's BLMIS account address reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480. *See* Tr.'s Compl. ¶ 52. | According to the Trustee, Defendant Trust f/b/o Gabrielle H, Picower is a trust established for beneficiary Gabrielle H. Picower, who is the daughter of Picower and Barbara Picower, with Defendant Barbara Picower listed as trustee, and the trust's BLMIS account address reported as l4l0 South Ocean Boulevard, Palm Beach, Florida 33480. *See* Fox Compl. ¶ 31; Marshall Compl. ¶ 31. |
| On information and belief, the . . . [Picower Entity Defendants] were dominated, controlled and used as a mere instrumentality of Picower to advance his interests in, and to participate in and control, the Madoff Ponzi scheme. Thus, the Picower Entity Defendants are the alter egos of Jeffry Picower and of each other. *See* Pamela Goldman Compl. ¶ 29; A&G Goldman Compl. ¶ 29. | On information and belief, the . . . [Picower Entities] in dealing with BLMIS have been dominated by and used merely as the instrument of Picower to advance his personal interests rather than corporate ends. As set forth herein, Picower exercised complete dominion over the Picower Entities in dealing with BLMIS, which he knew or should have known was predicated on fraud. As a result, the Picower Entities functioned as alter egos of Picower and no corporate veil can be maintained between them. *See* Tr.'s Compl. ¶ 53. | On information and belief the . . . [Picower Entity Defendants] were dominated, controlled and used as a mere instrumentality of Picower to advance his interests in, and to participate in, the Madoff Ponzi scheme. Thus, the Picower Entity Defendants are the alter egos of Picower and of each other. *See* Fox Compl. ¶ 32; Marshall Compl. ¶ 32. |
| BLMIS is a New York Limited Liability Corporation that was wholly owned by Madoff. BLMIS was founded in 1959. Madoff as Founder, Chairman, Chief Executive Officer, and sole shareholder ran BLMIS as his alter ego with several family members and a few employees. BLMIS was registered with the SEC as a Securities Broker Dealer under § 15 of the Exchange Act. *See* Pamela Goldman Compl. ¶ 30; A&G Goldman Compl. ¶ 30. | BLMIS is a New York limited liability company that is wholly owned by Madoff. Founded in 1959, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 | |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| | U.S.C. § 78*o*(b). By that registration, BLMIS is a member of SIPC. BLMIS had three business units: investment advisory (the "IA Business"), market making and proprietary trading. *See* Tr.'s Compl. ¶ 19. | |
| BLMIS customers received monthly statements showing the purchase and sales of securities in their accounts along with the profits purportedly realized from these securities transactions. But the transactions reported on these statements were a fabrication. The securities transactions described in the monthly statements either never occurred or rarely occurred, and the profits reported were entirely fictitious. Madoff admitted at his plea hearing that he had never purchased any of the securities in BLMIS customer accounts. Following an extensive and lengthy investigation, the Trustee for BLMIS has stated that, except for isolated individual transactions, there is no record of BLMIS having purchased or sold any securities in BLMIS customer accounts. *See* Pamela Goldman Compl. ¶ 33; A&G Goldman Compl. ¶ 33. | Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in—or had been traded through—their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication. The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts. Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients other than the Defendants, there is no record of BLMIS having cleared any purchase or sale of securities at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities. *See* Tr.'s Compl. ¶ 21. | The Defendants' account records reflect, and Defendants were aware of, or should have been of, the fact that Madoff and BLMIS booked in their accounts fictional profits from fictional trading. Upon information and belief, no purchases or sales of securities in the Defendants' BLMIS accounts ever actually occurred. Upon information and belief, no purchases or sales of securities in the class members' BLMIS accounts ever actually occurred. *See* Fox Compl. ¶ 8; Marshall Compl. ¶ 8. |
| The money that customers paid to BLMIS in connection with their investment contracts with BLMIS was not used to purchase securities as described, but instead was used to make distributions to other investors, primarily to the Defendants. *See* Pamela Goldman Compl. ¶ 34; A&G Goldman Compl. ¶ 34. | The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to—or payments on behalf of—other investors. *See* Tr.'s Compl. ¶ 24. | Picower, the other Defendants, and their agents directly participated in the Madoff Ponzi scheme, and knew or should have known that the funds used to pay the Defendants' fictional profits could have only come from the accounts of other BLMIS customers. Picower and Defendants converted the cash in other innocent BLMIS customer accounts for their own personal benefit with the acquiescence and assistance of Madoff and BLMIS. *See* Fox Compl. ¶ 9; Marshall Compl. ¶ 9. |
| On December 11, 2008, Madoff was arrested by federal agents and charged with criminal violation of the federal securities laws, | On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, | |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| including securities fraud, investment advisor fraud, and mail and wire fraud. On the same day, the SEC filed a complaint in the United States District Court for the Southern District of New York against Madoff and BLMIS, also alleging that Madoff and BLMIS engaged in securities fraud. *See* Pamela Goldman Compl. ¶ 35; A&G Goldman Compl. ¶ 35. | *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains pending in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS. *See* Tr.'s Compl. ¶ 9. | |
| On December 15, 2008, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B) of the Securities and Investor Protection Action ("SIPA"), SIPC filed an application in the District Court alleging that BLMIS was not able to meet its obligations to its securities customers as they came due and that such customers needed the protections afforded by SIPA. *See* Pamela Goldman Compl. ¶ 36; A&G Goldman Compl. ¶ 36. | On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA. *See* Tr.'s Compl. ¶ 11. | |
| Also on December 15, 2008, the District Court appointed Irving H. Picard, Esq., as trustee ("Trustee") for the substantively consolidated liquidation of Madoff's estate and of BLMIS under SIPA. *See* Pamela Goldman Compl. ¶ 37; A&G Goldman Compl. ¶ 37. | Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C.§78eee(b)(3). *See* Tr.'s Compl. ¶ 12(a). | |
| Picower, now deceased, was a sophisticated investor, accountant and lawyer. Picower, directly and through the Defendants, had a very close relationship with Madoff. Picower knew Madoff for decades and was an investor in BLMIS since at least the 1980s. Madoff served as a Trustee for one of Picower's foundations, the Picower Institute for Medical Research. *See* Pamela Goldman Compl. ¶ 42; A&G Goldman | Defendant Picower is a sophisticated investor, accountant and lawyer who has organized buyouts of health care and technology companies since at least the 1980s. He has reportedly known Madoff for decades, and has been invested in BLMIS since at least the 1980s. Madoff served as a trustee of the Picower Institute for Medical Research. *See* Tr.'s Compl. ¶ 58.<br><br>Picower and, through him, the other Defendants therefore enjoyed an | Picower was a highly sophisticated investor, accountant and attorney who participated in the Madoff Ponzi scheme for over 20 years, knowing that he was participating in a fraud. . . . Upon information and belief Picower was closely associated with Madoff, both in business and socially, for the last 30 years. *See* Fox Compl. ¶ 13; Marshall Compl. ¶ 13. |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| Compl. ¶ 42. | unusually close relationship with Madoff. *See* Tr.'s Compl. ¶ 59. | |
| Through the other Defendants and through his relationship with Madoff, Picower became privy to information about BLMIS and its operations not available to other customers. *See* Pamela Goldman Compl. ¶ 43; A&G Goldman Compl. ¶ 43. | Picower and, through him, the other Defendants, therefore enjoyed an unusually close relationship with Madoff, and were privy to information and dealings not known to other BLMIS investors. *See* Tr.'s Compl. ¶ 59. | |
| Picower was able to control BLMIS and use BLMIS as "a personal piggy bank" by withdrawing funds for various entities he controlled, even if there was no legitimate underlying profitable transaction warranting a distribution of such funds. *See* Pamela Goldman Compl. ¶ 45; A&G Goldman Compl. ¶ 45. | This entanglement permitted Madoff, at his whim and desire, to engage in innumerable financial transactions wherein he essentially used BLMIS as his personal "piggy bank," . . . *See SIPC v. BLMIS*, Adv. Pro. No. 08-1789 (BRL), ECF No. 196 (S.D.N.Y. May 5, 2009) (Mem. of Law in Support of Joint Mot. for Entry of Order Substantively Consolidating the Estate of Bernard L. Madoff Into the SIPA Proceeding of Bernard L. Madoff Investment Securities LLC)<br><br>The Transfers were, in part, false and fraudulent payments of nonexistent profits supposedly earned in the Accounts ("Fictitious Profits"). *See* Tr.'s Compl. ¶ 66. | By directly instructing Madoff and BLMIS employees to book such phony transactions which generated phony profits, the Defendants controlled and enabled the fraud to convert the funds of other innocent BLMIS account holders. *See* Fox Compl. ¶ 111; Marshall Compl. ¶ 111. |
| In fact, the Defendants benefited in a much more substantial way than Madoff and his family. The Trustee has alleged in an adversary action against the Defendants that the Defendants received at least $7.2 billion from BLMIS, net of their investments. *See* Pamela Goldman Compl. ¶ 46; A&G Goldman Compl. ¶ 46.<br>The Picower Defendants were far and away the primary beneficiaries of the Madoff fraud, having received almost 40% of the approximately $18 billion lost by BLMIS customers. *See* Pamela Goldman Compl. ¶ 47; A&G Goldman Compl. ¶ 47. | Based upon the Trustee's investigation to date, Picower was instead the biggest beneficiary of Madoff's scheme, having withdrawn either directly or through the entities he controlled more than $7.2 billion of other investors' money. *See* Tr.'s Mem. of Law in Opp. to Mot. to Dismiss pg. 2. | Defendants were, as a group, the largest beneficiaries of the Ponzi scheme, converting and receiving billions of dollars from the accounts of innocent Madoff and BLMIS customers. *See* Fox Compl. ¶ 1; Marshall Compl. ¶ 1.<br><br>According to the Trustee, BLMIS made payments and other transfers to the Defendants totaling over $7.2 billion more than Defendants deposited, including $6.7 billion from 1995 to 2008. *See* Fox Compl. ¶ 38; Marshall Compl. ¶ 38. |
| The Defendants directed BLMIS to prepare fraudulent trading records and fraudulent trading results, which effected returns in their accounts based upon transactions which in fact never took place. Picower directly and through the | Picower and the other Defendants also knew or should have known that they were reaping the benefits of manipulated purported returns, false documents and fictitious profit. For example, some purported "trades" in Defendants' accounts supposedly took | In fact, relevant documents and information show that Picower and the Defendants directed BLMIS to prepare account statements for the Defendants reflecting not actual trading results but the rates of return Picower "wanted to achieve". |

x

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| other Defendants initiated, directed, coordinated and cause to be effected false records and back dated records at BLMIS, which resulted in the appearance of trading profits in these accounts. Picower then withdrew these false profits from the Defendant accounts. This direction of trading activity and direction of preparation of false trading records over a multi-year period shows control of the specific fraudulent activity which constituted the underlying Ponzi scheme and the underlying violations of 10b-5 engaged in by BLMIS. *See* Pamela Goldman Compl. ¶ 49; A&G Goldman Compl. ¶ 49. | place before the relevant direction from the Defendants, or even before the relevant account was opened or funded. BLMIS records further suggest that not only was Picower aware (or at a minimum, should have been aware) that BLMIS was creating backdated transactions, but that Picower and/or his agent may have used backdated documents to direct such backdated trades themselves. *See* Tr.'s Compl. ¶ 4. | BLMIS complied with these directions, and the vast majority of the purported "profits" in the Defendants' accounts were not a result of the actual purchase and sale of securities. *See* Fox Compl. ¶ 7; Marshall Compl. ¶ 7.<br><br>In fact, upon information and belief, Picower and the other Defendants, with the assistance of Picower's associate April C. Freilich ("Freilich"), directed fictitious and backdated trades, with the consent of Madoff, BLMIS and their agents, to manufacture profits and losses in accordance with an overall fraudulent trading strategy developed by Picower. *See* Fox Compl. ¶ 48; Marshall Compl. ¶ 48. |
| The false trading documentation maintained by BLMIS shows that the Defendants' accounts generated annual rates of return well in excess of any conceivable rates of return for the relevant trading strategy in these accounts. For example, two of the BLMIS accounts controlled by Picower generated annual rates of return of over 100% for four consecutive years from 1996 through 1999. According to the Trustee "between 1996 and 2007 defendants' 24 regular trading accounts enjoyed 14 instances of supposed annual returns of more than 100%. . . ." During this time period the annual rates of return for certain of defendants' accounts ranged from 120% to over 550%. In actuality, Picower directly and through the Picower defendants used his ability to control the BLMIS records maintained to cause the preparation of trading records which purported to show these trading profits, which in fact never occurred. By orchestrating the creation of these false trading records, Picower enabled himself to transfer proceeds from these purported transactions to his own account and then to third party | Defendants' accounts regularly earned extraordinary and implausibly high rates of return. For example, Picower's "Decision Inc. #3" and "Decision Inc. #4" regular trading accounts purportedly earned annual rates of return over 100% for four consecutive years, from 1996-1999, inclusive. The annual rates of return for these accounts during the period from 1996 to 1999 ranged from a "low" of approximately 120% to a high of over 550%. Nor were these isolated or unusual occurrences; Picower's "Decision Inc. #2" account, for example, purported to earn over 950% in 1999. Indeed, between 1996 and 2007, Defendants' 24 regular trading accounts enjoyed 14 instances of supposed annual returns of more than 100% and 25 in which the annual returns purportedly exceeded 50%. On information and belief, the high returns reported on Defendants' accounts were a form of compensation by Madoff to Picower for perpetuating the Ponzi scheme by investing and maintaining millions of dollars in BLMIS. *See* Tr.'s Compl. ¶ 63(a).<br><br>These implausibly high purported returns have enabled Picower and the other Defendants to collectively withdraw more than $6.7 billion since | The Defendants' "buy and hold strategy" purportedly generated extraordinary and implausibly high annual rates of return. For example, two of the BLMIS accounts controlled by Picower generated annual rates of return of over 100% for four consecutive years from 1996 through 1999. According to the Trustee: "Between 1996 and 2007 defendants24 regular trading accounts enjoyed 14 instances of supposed annual returns of more than 100%. . . ." During this time period the annual rates of return for certain of Defendants' accounts ranged from l20% to over 550%. Other Defendant accounts had documented earnings of almost 1000%. *See* Fox Compl. ¶ 43; Marshall Compl. ¶ 43. |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| bank accounts which he controlled. The funds he withdrew belonged to other BLMIS customers including the class members. *See* Pamela Goldman Compl. ¶ 50; A&G Goldman Compl. ¶ 50. | December 1995. At least $5.1 billion of that sum was over and above any funds deposited by Defendants and constituted money belonging to victims of the fraud. *See* Tr.'s Compl. ¶ 63(b). | |
| The operations of the Decisions account establishes Picower's control of the cash flows at BLMIS and his unfettered ability to remove money from the BLMIS customer accounts for his own benefit and as he saw fit. The Decisions, Inc. accounts were the primary source of the Picower Defendants' cash withdrawals from BLMIS. These accounts reflect virtually no trading activity and virtually no securities positions or other collateral for loans from this account. *See* Pamela Goldman Compl. ¶ 54; A&G Goldman Compl. ¶ 54. | For example, Decisions maintained several accounts with BLMIS. One of those accounts, "Decisions Inc.," was used by Picower and the other Defendants as the primary source of cash withdrawals from BLMIS. The account reflected little trading activity and relatively few holdings, but Picower directed quarterly distributions from this account in the millions to hundreds of millions of dollars throughout the 1990s and 2000s. *See* Tr.'s Compl. ¶ 63(d). | The several BLMIS accounts of Defendant Decisions Incorporated, which was controlled by Picower, provide concrete examples of the obviously fictitious profits Defendants received as a result of their participation in the Ponzi scheme. *See* Fox Compl. ¶ 49; Marshall Compl. ¶ 49.

These accounts were a primary source of Defendants' cash withdrawals from BLMIS during the relevant time period, yet the accounts reflected virtually no trading activity and very few purported securities positions. *See* Fox Compl. ¶ 49; Marshall Compl. ¶ 49. |
| Picower, directly and through the other Defendants, made distribution requests and directed cash withdrawals from this account ranging from $50 million to $150 million five or more times per year for a total of approximately $6 billion. *See* Pamela Goldman Compl. ¶ 55; A&G Goldman Compl. ¶ 55. | Prior to the Filing Date, BLMIS made payments or other transfers (collectively, the "Transfers") totaling over $6.7 billion to one or more of the Defendants. The Transfers were made to or for the benefit of one or more of the Defendants and include, but are not limited to, the Transfers listed on Exhibit B. *See* Tr.'s Compl. ¶ 57; *see also* Tr.'s Compl. Ex. B. | Picower and Freilich directed the withdrawals from the Decisions Incorporated account even though the account maintained a large negative cash balance of more than $6 billion and there was not enough cash in the account to cover the withdrawals. *See* Fox Compl. ¶ 50; Marshall Compl. ¶ 50. |
| The Defendants' control of BLMIS's operations was such that they were able to direct BLMIS employees to create and document false and non-existent securities transactions, which, in turn, were designed to generate fictitious profits for Picower to withdraw from the Defendants' BLMIS accounts. *See* Pamela Goldman Compl. ¶ 56; A&G Goldman Compl. ¶ 56.

The Defendants' ability to reconfigure for their own fraudulent purpose the actual trading records maintained by BLMIS, a highly regulated broker and investment advisor, shows that | On or about April 24, 2006, Decisions opened a sixth account with BLMIS ("Decisions 6") by wire transfer on April 18 of $125 million. BLMIS promptly began "purchasing" securities in the account, but it backdated the vast majority of these purported transactions to January 2006. By the end of April, a scant 12 days later, the purported net equity value of the account was over $164 million, a gain of $39 million, or a return of more than 30% in less than two weeks of purported trading. The reason for this massive gain: the Decisions 6 April 2006 customer account statement reflected 57 purported purchases of securities between January 10 and January 24, | That Picower, the other Defendants, and Madoff and BLMIS actively conspired to steal the funds of the Plaintiff and the class members is also evidenced by the fact that many purported trades in the Defendants' accounts were back dated. Picower purportedly "sold" positions on a fabricated earlier date to generate phony profits. *See* Fox Compl. ¶ 54; Marshall Compl. ¶ 54.

For example, as stated in the Trustee's Complaint, on or about April 24, 2006, Decisions Incorporated opened a new account with BLMIS known as the "Decisions Incorporated 6" ("Decisions 6") account by a wire |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| the Defendants exercised control over the day to day operations of BLMIS and specifically over the trading activity that constituted a violation of the securities laws. *See* Pamela Goldman Compl. ¶ 57; A&G Goldman Compl. ¶ 57.<br><br>By way of example, as stated in the Trustee's complaint, on or about April 24, 2006, Defendant Decisions, Inc. opened a new account with BLMIS known as the Decisions, Inc. 6 account. This account was opened with a wire transfer of $125 million. The Defendants instructed BLMIS to back date trades in this account to January 2006, which was four months prior to the time the account was actually opened. BLMIS employees carried out the Defendants' direct instructions and fabricated and back dated trades in the Decision 6 account. This resulted in the net value of the account increasing by almost $40 million, or 30%, in less than two weeks after it "actually opened." The Defendants' ability to affect back dated trades in the Decisions 6 account generated phony paper profits which had appreciated only on a hindsight basis and represented part of a continuous pattern of the Picower defendants directing the falsification of trading records at BLMIS, which allowed Picower to pilfer from other BLMIS accounts. *See* Pamela Goldman Compl. ¶ 58; A&G Goldman Compl. ¶ 58. | 2006, almost three months before the account was opened or funded. Defendants knew or should have known that the account that they opened in April could not legitimately have purchased securities in January, and that the $125 million deposited on April 18 could not legitimately have grown by more than 30% in less than two weeks, which, annualized, would have resulted in a rate of return of more than 750%. The majority of the securities "purchased" in January were "purchased" near the lowest prices for the period from January to April 2006, and were purportedly chosen in order to create an unusually high unrealized gain by the end of April. *See* Tr.'s Compl. ¶ 63(e). | transfer on April 18, 2006 of $125 million. *See* Fox Compl. ¶ 55; Marshall Compl. ¶ 55.<br><br>Picower instructed BLMIS to backdate trades in this account to January 2006, which was before the Decisions 6 account was even opened. *See* Fox Compl. ¶ 56; Marshall Compl. ¶ 56.<br><br>As a result of the fabrication/backdating of trades, the purported net value of securities in the Decisions 6 account by the end of April 2006 had increased by almost $40 million, for a return of 30% in less than two weeks of "purported trading". *See* Fox Compl. ¶ 57; Marshall Compl. ¶ 57.<br><br>Picower's scheme to backdate trades in Decisions 6 was designed to generate phony paper profits in the account by picking stocks which had appreciated on a "hindsight basis," and represented part of a continuous pattern of false generation of profits which enabled Picower and the Defendants to pilfer other BLMIS customer accounts for actual cash based upon phony booked profits. *See* Fox Compl. ¶ 58; Marshall Compl. ¶ 58. |
| By way of further example, on or about December 29, 2005, Picower's assistant April Friehlich, acting on behalf of the Defendants, faxed BLMIS a letter signed by Picower that directed BLMIS to "realize" a gain of $50 million in the Picower accounts. Upon direction from Picower and Friehlich, BLMIS sold large amounts of stock in Agilent Technologies and Intel | BLMIS records, together with Picower's own documents, further suggest Picower's and his agents' complicity in the fraud, through two additional backdated trades in December 2005. On or around December 29, 2005, April Freilich, acting on behalf of Picower, faxed to BLMIS a letter signed by Picower that directed BLMIS to "pick up long term capital gains in the accounts listed below before December 31, 2005" | On or around December 29, 2005, Freilich, acting on Picower's behalf, faxed BLMIS a letter signed by Picower, that directed BLMIS to realize a gain of $50 million. Upon instruction from Picower and/or Freilich, BLMIS "sold" large amounts of Agilent Technologies and Intel Corporation stock in various Defendant accounts on a backdated basis. Freilich directed the sale of large amounts of these |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| Corporation in various Defendant accounts on a back dated basis. Friehlich directed the sales of large amounts of these purported securities on or about December 29, 2005, requesting that the sales be booked to take place on an earlier date, i.e., December 8 or 9. BLMIS backdated the trades at Picower's direction and on Picower's behalf for the purpose of generating phony paper profits of approximately $46.3 million, which made up most of Picower's requested $50 million distribution. *See* Pamela Goldman Compl. ¶ 59; A&G Goldman Compl. ¶ 59. | across five Decisions accounts. The letter further directed BLMIS to realize $50,000,000 in gains, and attached the relevant "portfolio appraisal" statements for the five Decisions accounts listed in the letter. Each "portfolio appraisal," created by Picower and/or his agents, purported to show the securities held in each account, the date they were "purchased," the quantity held, and also purported to calculate the unrealized gain or loss on each security based on the market values as of November 30, 2005, the date of the "portfolio appraisal." According to Picower's own "portfolio appraisals," none of these Decisions accounts held more than 11 different securities, and three of these accounts held 5 or fewer securities as of November 30, 2005. *See* Tr.'s Compl. ¶ 63(i).<br><br>Upon Picower's instruction, BLMIS "sold" Agilent Technologies ("Agilent") and Intel Corporation ("Intel") across these accounts, realizing a long-term gain of approximately $46.3 million, a significant majority of the requested gain. According to the account statements generated by BLMIS for December 2005—and forwarded to Picower and his agents—these trades purportedly settled around December 8 and 9, 2005, approximately 3 weeks before the relevant instruction was sent to BLMIS. Picower's failure to question BLMIS' apparent clairvoyance suggests that Picower knew that BLMIS was backdating trades. *See* Tr.'s Compl. ¶ 63(i)(*i*). | purported securities on or about December 29, 2005, requesting that the sales be booked to take place on an earlier date, *i.e.*, December 8th or 9th. These trades were backdated by Picower and BLMIS for the purpose of generating phony "paper" profits of approximately $46.3 million, making up most of Picower's requested $50 million gain. *See* Fox Compl. ¶ 62; Marshall Compl. ¶ 62. |
| Picower, on behalf of the Defendants, directed and caused BLMIS to affect other back dated transactions generating phony profits. During December 2005, the Defendants purported to purchase the following securities on margin in their accounts: Google, Diamond Offshore Drilling, Inc., and Burlington Resources, Inc. This resulted in a purported gain of almost $80 | In December 2005, BLMIS also created backdated "purchases" on margin of Google, Diamond Offshore Drilling ("Diamond") and Burlington Resources, Inc. ("Burlington") across all of the referenced accounts. These "purchases"—with purported settlement dates between January 12 and January 20, 2005—were entirely fictitious and were reflected for the first time in the BLMIS-created account statements issued at the end | Also according to the Trustee, Picower and BLMIS backdated other purported securities transactions during December 2005, including purported purchases on margin of Google, Diamond Offshore Drilling, Inc., and Burlington Resources, Inc. across several of Defendants' accounts, which resulted in a purported gain for Picower of almost $80 million. These purchases purportedly occurred between |

xiv

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| million. These purchases purportedly occurred between January 12 and 20, 2005 but were fictitious, as the transactions actually occurred eleven months later in December 2005. Defendants caused BLMIS to create false book and record entries in order to create a phony $80 million profit on "transactions" that did not take place on the dates recorded on BLMIS's records. *See* Pamela Goldman Compl. ¶ 60; A&G Goldman Compl. ¶ 60. | of December 2005. This backdated trading activity resulted in an immediate purported 12-month unrealized "gain" for Picower of approximately $79 million and a portfolio value of over $155 million as of the end of December as a result of the increase in the market value of these securities during the calendar year. . . . Picower's failure to question or to repudiate these trades—indeed, he benefited from them by being paid dividends and by selling the positions years later—is evidence of Picower's awareness of BLMIS' fraudulent activities. *See* Tr.'s Compl. ¶ 63(i)(*ii*). | January 12 and 20, 2005, but they were entirely fictitious, as the transactions were first reflected 11 months later in Defendants' December 2005 BLMIS account statements. *See* Fox Compl. ¶ 63; Marshall Compl. ¶ 63. |
| The Defendants also directed and orchestrated the preparation of false statements in May 2007, which reflected millions of dollars in securities transactions which reportedly took place in earlier in 2007, but which in fact did not take place at all. *See* Pamela Goldman Compl. ¶ 61; A&G Goldman Compl. ¶ 61. | Additionally, on information and belief, Picower, directly and/or through and/or with the assistance of Freilich, directed fictitious, backdated trades in order to achieve fictitious gains or losses in earlier periods. *See* Tr.'s Compl. ¶ 63(f).<br><br>On May 18, 2007, Freilich indicated the Foundation needed "$20 mil in gains" for January and February and "want[ed] 18% for year[] 07 appreciation," but that she had to check the numbers ''with Jeff.'' On information and belief, "Jeff" is Defendant Jeffry Picower. Five days later, on May 23, Freilich told BLMIS that the numbers she had provided earlier were wrong, and the Foundation "needs only $12.3 mil [in gains] for" January and February 2007. *See* Tr.'s Compl. ¶ 63(f)(*i*). | For example, according to the Trustee's Complaint, on May 18, 2007, Freilich indicated that the Foundation needed "$20 mil in gains" for January and February and "want[ed] 18% for year[] 07 appreciation," but that she had to check the numbers "with Jeff." Upon information and belief, "Jeff" is Picower, Five days later on May 23, 2007, and presumably after consulting with Picower, Freilich told BLMIS that the numbers she provided earlier were wrong, and the Foundation "needs only $12.3 mil [in gains] for" January and February 2007. *See* Fox Compl. ¶ 60; Marshall Compl. ¶ 60. |
| Class members purchased securities issued by BLMIS, which consisted of a discretionary trading account purportedly investing in stock and options and operated pursuant to a power of attorney (the "BLMIS Discretionary Trading Program"). Each class member received monthly statements purportedly reflecting the securities in their account, the trading activity during the month, and the profits earned over the relevant time period. The monthly statements for customer accounts depicted consistent profits on a | For certain accounts in the IA Business, BLMIS purported to participate in a capital appreciation/depreciation strategy, depending on whether the customer sought to generate gains or losses. For example, the strategy was executed by either purporting to purchase small groups of securities transactions near lows and then purporting to sell those same securities at highs, or by purporting to sell securities near highs and then purporting to repurchase those securities near lows. *See* Tr.'s Compl. ¶ 20. | |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
|---|---|---|
| monthly basis and rarely, if ever, showed loses.  See Pamela Goldman Compl. ¶ 69; A&G Goldman Compl. ¶ 69. | | |
| Madoff has admitted, and it is a fact, that BLMIS and the BLMIS Discretionary Trading Program operated as a Ponzi scheme and Madoff and other BLMIS employees concealed this ongoing fraud in an effort to hinder and delay customers of BLMIS from discovering this fraud.  See Pamela Goldman Compl. ¶ 71; A&G Goldman Compl. ¶ 71. | For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff concealed the ongoing fraud in an effort to hinder and delay other current and prospective customers of BLMIS from discovering the fraud.  See Tr.'s Compl. ¶ 24. | At a plea hearing on March 12,2009 in Madoff pled guilty to the eleven-count criminal information and admitted under oath that he "operated a Ponzi scheme through, . . [BLMIS] . . . . See Fox Compl. ¶ 35; Marshall Compl. ¶ 35<br><br>Madoff also admitted that, during the relevant time period, he never actually invested any of the funds he received from BLMIS customers, instead depositing the funds into a bank account, Madoff never actually purchased and sold securities in BLMIS customer accounts, instead using client funds simply to pay other, different, clients' purported returns and redemption of principal. See Fox Compl. ¶ 36; Marshall Compl. ¶ 36 |
| Monies received from investors in connection with the BLMIS Discretionary Trading Program were not invested as described by BLMIS in confirmations and monthly statements, but instead were used to make distributions to selected other investors, primarily Madoff and the controlling Picower Defendants.  See Pamela Goldman Compl. ¶ 73; A&G Goldman Compl. ¶ 73. | The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to - or payments on behalf of - other investors. The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others, including Defendants . . . See Tr.'s Compl. ¶ 24. | Madoff also admitted that, during the relevant time period, he never actually invested any of the funds he received from BLMIS customers, instead depositing the funds into a bank account, Madoff never actually purchased and sold securities in BLMIS customer accounts, instead using client funds simply to pay other, different, clients' purported returns and redemption of principal. See Fox Compl. ¶ 36; Marshall Compl. ¶ 36 |
| In or about December 2008, the Ponzi scheme collapsed when customer redemptions in the BLMIS Discretionary Trading Program overwhelmed the amount of money which was being placed in new BLMIS accounts. . . . The BLMIS Ponzi scheme also involved the preparation and publication to investors and brokerage customers of false BLMIS audit reports prepared by Frielich and Horowitz as members of a three person accounting firm in Rockland County, New York. BLMIS provided the financial | The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others, including Defendants, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.  See Tr.'s Compl. ¶ 24.<br><br>Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting | |

| **Class Action Pleadings** | **Trustee's Pleadings** | **Fox/Marshall Pleadings** |
| --- | --- | --- |
| reports to regulators and investors in the BLMIS Discretionary Trading Program for the purpose of their reliance thereon. The accounting reports falsely reported that Madoff was effecting customer transactions and that BLMIS was profitable and generating customer profits in customer accounts. *See* Pamela Goldman Compl. ¶ 75; A&G Goldman Compl. ¶ 75. | firm in Rockland County, New York. Of the three employees at the firm, one employee was an assistant and one was a semiretired accountant living in Florida. *See* Tr.'s Compl. ¶ 31. | |
| At all times relevant hereto, the BLMIS's actual liabilities were billions of dollars greater than its assets. As a result, BLMIS and the BLMIS Discretionary Trading Program were rendered insolvent by the Ponzi scheme. Customer assets were effectively stolen by Madoff and the Picower Defendants in connection with this Ponzi scheme. *See* Pamela Goldman Compl. ¶ 76; A&G Goldman Compl. ¶ 76. | At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS. At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital. *See* Tr.'s Compl. ¶ 32. | |

300244597