UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
SECURITIES INVESTOR PROTECTION          :
CORPORATION,                            :
                                        :
                Plaintiff,              :        12 MC 115 (JSR)
                                        :
                -v-                     :        OPINION AND ORDER
                                        :
BERNARD L. MADOFF INVESTMENT            :
SECURITIES LLC,                         :
                                        :
                Defendant.              :
------------------------------------- x
                                        :
In re:                                  :
                                        :
MADOFF SECURITIES                       :
------------------------------------- x
PERTAINS TO THE FOLLOWING CASES:        :
                                        :
Picard v. Greiff, 11 Civ. 3775;         :
Picard v. Blumenthal, 11 Civ. 4293;     :
Picard v. Goldman, 11 Civ. 4959;        :
Picard v. Hein, 11 Civ. 4936;           :
and cases listed in Appendix A.         :
------------------------------------- x

JED S. RAKOFF, U.S.D.J

        A "Ponzi" scheme, by definition, involves the use of funds

received from new victims to pay monies transferred to prior victims

who seek to withdraw the promised returns on their investments. A

perennial issue when the scheme topples is whether and to what extent

such transferred funds can be recaptured by a representative of the

debtor's estate or otherwise. See generally In re Bernard L. Madoff

Inv. Sec. LLC, 654 F.3d 229, 231 (2d Cir. 2011). Often, moreover, the

resolution of this issue is partly a function of just what kind of

Ponzi scheme was involved and what specialized laws were applicable

thereto. Thus, in the case of the massive Ponzi scheme perpetrated by

Bernard L. Madoff through the instrument of his securities brokerage

business, Bernard L. Madoff Investment Securities ("Madoff

Securities"), the issue of how to apportion the monies already paid

to innocent investors raises complicated questions involving the

interaction of federal securities laws, federal bankruptcy laws, and

New York State debtor and creditor laws.[1]

In the instant four cases -- and eighty other cases listed in

Appendix A to this Opinion and Order, to which these rulings are, on

consent, also made applicable -- Irving Picard, the trustee for the

Madoff Securities estate appointed under the Securities Investor

Protection Act ("SIPA"), 15 U.S.C. § 78aaa et seq., seeks to "avoid"

(and thereby recapture), pursuant to 11 U.S.C. §§ 548(a)(1)(A) & (B),

§ 550(a), and comparable provisions of New York law incorporated by

reference under § 544(b), various prior transfers made by Madoff

Securities to these defendants. The defendants, in turn, move to

dismiss these claims.

The complaints in these cases, of which the Amended Complaint in

Picard v. Blumenthal, 11 Civ. 4293, dated December 2, 2011 ("AC") is

---

[1] Accordingly, this Court previously withdrew the reference of these
cases to the Bankruptcy Court in order to resolve issues that require
substantial interpretation of non-bankruptcy federal law.

typical,[2] each set forth the following allegations. For many years prior to filing for bankruptcy, Madoff Securities -- a securities broker-dealer registered with the Securities and Exchange Commission ("SEC") under § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b) -- purported to operate three business units: an investment advisory unit, a market making unit, and a proprietary trading unit. AC ¶ 19. Clients investing in the investment advisory unit, including the defendants here, signed either a "Customer Agreement," an "Option Agreement," a "Trading Authorization Limited to Purchases and Sales of Securities and Options," or some combination of the three (collectively, the "account agreements"). Id. ¶ 35.[3] Pursuant to these agreements, Madoff Securities purported to make securities investments on the clients' behalf. Id. ¶ 36. Accordingly, Madoff Securities sent monthly or quarterly statements to each of its investment advisory clients showing the securities that Madoff Securities claimed to hold for the client and the trades that it

---

[2] See also the Amended Complaint in Picard v. Hein dated January 25, 2012; the Amended Complaint in Picard v. Goldman dated January 25, 2012; and the Complaint in Picard v. Greiff dated November 12, 2010.
[3] The Court agrees with defendants that it may take cognizance on these motions of the terms of these agreements, since the agreements are referenced in the complaints. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (permitting consideration of "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit" (quoting Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993))). All these agreements indicated that Madoff Securities would trade securities on the clients' behalf. See Declaration of Carole Neville dated January 4, 2012 in Picard v. Hein, 11 Civ. 4936 ("Neville Decl.") Ex. D.

claimed to have executed on the client's behalf during the applicable period. Id. ¶ 22.

In reality, the investment advisory unit of Madoff Securities never, or almost never, made the trades or held the securities described in the statements it sent to investment advisory clients, at least during all years here relevant. Id. ¶ 22.[4] Instead, Madoff Securities operated its investment advisory division as a Ponzi scheme. Id. ¶ 25. Thus, when clients withdrew money from their accounts with Madoff Securities, they did not actually receive returns on successful investments, but instead only the very money that they and others had deposited with Madoff Securities for the purpose of purchasing securities. Id.

Defendants contend that these allegations fail to state a claim against them. On a motion to dismiss under Rule 12(b)(6), a court must assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Additionally, "[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." Pani v. Empire Blue

---

[4] By contrast, according to the Declaration of Joseph Looby, the Trustee's forensic accountant, which the Trustee submitted to the Bankruptcy Court and which it seems clear was relied on by the Trustee in drafting the instant complaints, the "market making and proprietary business units appear to have been largely involved in legitimate trading with institutional counterparties and utilized live computer systems." Neville Decl. Ex. C ("Looby Decl.") ¶ 28.

4

Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998).

The defendants first argue that 11 U.S.C. § 546(e) prohibits the Trustee from avoiding transfers under sections 544 and 548(a)(1)(B), i.e., the provisions that, respectively, incorporate New York law and permit avoidance of constructively fraudulent transfers. The Court has previously concluded that § 546(e) "precludes the Trustee from bringing any action to recover from any of Madoff's customers any of the monies paid by Madoff Securities to those customers except in the case of actual fraud." Picard v. Katz, 462 B.R. 447, 452 (S.D.N.Y. 2011). Under ordinary principles of collateral estoppel, this determination likely bars the Trustee from relitigating the issue against these defendants, who are for all relevant purposes similarly situated to the defendants in Katz. See Evans v. Ottimo, 469 F.3d 278, 281 (2d Cir. 2006) ("Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action.").

Nonetheless, the Court has considered the matter de novo, and, having done so, again concludes, essentially for the reasons stated in Katz, incorporated here by reference, that the rulings there apply equally to the instant cases. Because the Trustee raises some arguments here that were not raised in Katz, however, a few further words may be in order.

Section 546(e) provides that:

5

Notwithstanding sections 544 [and] 548(a)(1)(B) . . . of
this title, the trustee may not avoid a transfer that is a
. . . settlement payment, as defined in section 101 or 741
of this title, made by or to (or for the benefit of) a . . .
stockbroker . . . or that is a transfer made by or to (or
for the benefit of) a . . . stockbroker . . . in connection
with a securities contract, as defined in section
741(7) . . . .

The Trustee argues that § 546(e) does not apply in these cases
because Madoff Securities was not a "stockbroker" under the Bankruptcy
Code and/or because defendants' withdrawals from their accounts were
neither "settlement payment[s]" nor payments made "in connection with
a securities contract." The arguments are unpersuasive.

As to whether Madoff Securities was a "stockbroker" under the
Bankruptcy Code, section 101(53A) of the Code defines "stockbroker" to
include entities that "engage[] in the business of effecting
transactions in securities."[5] Overall, Madoff Securities, which was
registered as a stockbroker with the SEC, clearly engaged in
securities transactions. Even though the complaints here allege that
Madoff Securities' investment advisory division did not actually
engage in securities transactions, see AC ¶ 22, the Trustee's
accountant's analysis on which that allegation was based also
concluded that Madoff Securities as a whole engaged in "legitimate
trading" through its market making and proprietary divisions. Looby
Decl. ¶ 28. Indeed, it was only by virtue of such trading and its
other trappings of legitimacy that Madoff Securities could maintain

---

[5] Section 101(53A) also requires a stockbroker to have a "customer, as
defined in section 741." The Trustee does contend that Madoff
Securities lacked customers.

6

its registration with the SEC. See id. ¶ 30 (noting that Madoff
Securities' market making and proprietary trading divisions generated
"outputs for regulatory review including FINRA [and] the Securities &
Exchange Commission ('SEC')"). Thus, even assuming the truth of the
allegation that Madoff Securities' investment advisory division never
traded securities on behalf of clients, Madoff Securities nonetheless
qualifies as a stockbroker by virtue of the trading conducted by its
market making and proprietary trading divisions. See In re Baker &
Getty Fin. Servs., Inc., 106 F.3d 1255, 1262 (6th Cir. 1997) (applying
§ 101(53A)'s definition "not on a customer-by-customer basis," but
instead on the basis of "the underlying business at issue").

    Alternatively, even if one artificially separated Madoff
Securities into its component parts for purposes of § 546(e) -- so
that Madoff Securities could somehow be said to be a stockbroker and
not a stockbroker -- Madoff Securities clearly held itself out to all
its customers, including its investment advisory clients, as a firm
engaged in the business of effecting transactions in securities. Those
clients, the defendants here, having every reason to believe that
Madoff Securities was actually engaged in the business of effecting
securities transactions, have every right to avail themselves of all
the protections afforded the customers of stockbrokers, including the
protection offered by § 546(e).

    Turning to the Trustee's argument that defendants' withdrawals
from their Madoff Securities accounts did not constitute transfers "in
connection with a securities contract, as defined in section 741(7),"

7

the definition of securities contract includes, _inter alia_, "a master
agreement that provides for an agreement or transaction referred to in
clause (i)" -- _i.e._, "a contract for the purchase, sale, or loan of a
security" -- and "any security agreement . . . related to any
agreement or transaction referred to in this subparagraph, including
any guarantee or reimbursement obligation by or to a stockbroker."
§ 741(7)(a)(i), (x), & (xi). Under this definition, the account
agreements between Madoff Securities and the defendants clearly
qualify as securities contracts. The Trustee's complaints explicitly
acknowledge that the "Account Agreements were to be performed . . .
through securities trading activities." AC ¶ 35. Moreover, the
complaints further allege that the defendants had a specific idea of
what performance under the agreements entailed, since Madoff
Securities promised "that their funds would be invested in a basket of
common stocks within the S&P 100 Index" and that it would "hedge such
purchases with option contracts." AC ¶ 21. Thus, the "Trading
Authorization Limited to Purchases and Sales of Securities and
Options" specifically "authorizes Bernard L. Madoff . . . to buy, sell
and trade in stocks." Neville Decl. Ex. D. Similarly, the "Option
Agreement" authorizes Madoff Securities "to carry accounts ('Option
Accounts') for . . . transactions in option contracts." _Id._ Finally,
the "Customer Agreement" makes numerous references to securities
transactions, such as requiring that such transactions "shall be
subject" to the securities laws and permitting the customer, "upon

8

appropriate demand, to receive physical delivery of fully paid
securities in the Customer's Account." Id.

Each of these agreements constitutes a "securities contract"
under § 741(7), and Madoff Securities thus made transfers to
defendants "in connection with a securities contract." As described
above, each agreement qualifies as a "a master agreement that provides
for" the purchase and sale of securities. § 741(7)(a)(x). The
complaints themselves acknowledge that the defendants invested with
Madoff Securities in the expectation that Madoff Securities would
perform under the account agreements by purchasing specific
securities. AC ¶¶ 21, 35.[6]

The fact that the transfers that the Trustee seeks to avoid under
§ 544 and § 548(a)(1)(B) are transfers "made by . . . [a] stockbroker
. . . in connection with a securities contract" is alone sufficient to
bring them within the "safe harbor" of § 546(e). Alternatively,
however -- although the Court concedes it is a closer question -- the
Court concludes that the defendants' withdrawals from their accounts
constituted "settlement payments" from a stockbroker and therefore
fall within the coverage of § 546(e) for that independent reason.
Section 741(8) defines a settlement payment as "a preliminary
settlement payment, a partial settlement payment, an interim
settlement payment, a settlement payment on account, a final

---

[6] Alternatively, the account agreements also qualify as securities
contracts under § 741(7)(a)(xi) because they "related to an[]
agreement or transaction" in securities, and they obligated Madoff
Securities, a stockbroker, to reimburse customers.

9

settlement payment, or any other similar payment commonly used in the securities trade." The Second Circuit has interpreted this "extremely broad" definition to apply, <u>inter alia</u>, to "the transfer of cash or securities made to complete [a] securities transaction." <u>Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.</u>, 651 F.3d 329, 334 (2d Cir. 2011) (citations omitted).

Although the Trustee, sounding a familiar theme, argues that, because Madoff Securities did not trade securities on behalf of its investment advisory clients, withdrawals by those clients did not complete any securities transactions, this ignores the fact that what clients had contracted for was Madoff Securities' implementation of its investment strategy and that the clients' withdrawals therefore constituted partial settlement of these securities contracts. Under those contracts, the clients exchanged money for access to an investment strategy that would be implemented over time, creating, if the strategy was successful, an obligation that was settled when payment was made, in whole or part, from Madoff Securities to the defendants.

From the defendants' perspective, then, withdrawals from their Madoff Securities accounts completed securities transactions. Just as a broker who sells a security to a third party on behalf of a customer does not complete the transaction until the customer gains control over the resulting money, <u>see</u> 17 C.F.R. § 240.15c1-1(b)(4), so a broker that executes a discretionary strategy on behalf of a customer does not complete its transaction until the customer has regained

10

control over whatever funds result from the implementation of the
strategy. This approach comports with <u>Enron</u>, where the Second Circuit
found that an issuer's retirement of debt completed a transaction in
securities even though it did not involve the purchase or sale of a
security. 651 F.3d at 336-37. Accordingly, the defendants' withdrawals
completed securities transactions and constituted settlement payments
under § 741(8) and <u>Enron</u>.

The Trustee's more global response to all the above is that
defrauded clients of Madoff Securities cannot avail themselves of
§ 546(e)'s protections because such customers are not within the ambit
of those the statute was designed to protect. As the Second Circuit
noted in <u>Enron</u>, Congress enacted § 546(e)'s safe harbor in 1982 as a
means of "minimiz[ing] the displacement caused in the commodities and
securities markets in the event of a major bankruptcy affecting those
industries." 651 F.3d at 334 (quoting H.R. Rep. No. 97-420, at 1
(1982), <u>reprinted in</u> 1982 U.S.C.C.A.N. 583, 583). The Trustee reads
this as limiting § 546(e)'s coverage to bankruptcy proceedings
involving legitimate brokerage firms and transactions -- as if
disruptive securities bankruptcies were not commonly the end-result of
massive fraud. <u>See, e.g.</u>, <u>Enron</u>, 651 F.3d at 331-32. But whereas some
courts in this Circuit have accepted this argument, <u>e.g.</u>, <u>In re
MacMenamin's Grill Ltd.</u>, 450 B.R. 414, 428 (Bankr. S.D.N.Y. 2011)
(postulating a purported "illegal conduct exception to section
546(e)"), in this Court's view it cannot survive the broad and literal
interpretation given § 546(e) in <u>Enron</u>. <u>See generally</u> <u>In re Plassein</u>

11

Int'l Corp., 590 F.3d 252, 257-58 (3d Cir. 2009); In re QSI Holdings,
Inc., 571 F.3d 545, 549 (6th Cir. 2009); Contemporary Indus. Corp. v.
Frost, 564 F.3d 981, 986-87 (8th Cir. 2009).

　　　Most fundamentally this is because, as stated in Katz, "courts
must presume that a legislature says in a statute what it means and
means in a statute what it says there." Conn. Nat'l Bank v. Germain,
503 U.S. 249, 253-54 (1992). Indeed, to deviate from what Congress has
clearly and constitutionally decreed is a power the judiciary does not
possess. See Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004). Nothing
in the express language of § 546(e) suggests that it is not designed
to protect the legitimate expectations of customers, as well as the
securities market in general, even when the stockbroker is engaged in
fraud.

　　　Moreover, the Trustee's arguments wholly overlook the fact that
§ 546(e), by its plain terms, already contains an exception for
certain kinds of fraud. Specifically, § 546(e) permits the Trustee to
avoid actually fraudulent transfers under § 548(a)(1)(A). The Trustee
offers no explanation for why Congress, if it had in fact wanted to
enact the general fraud exception the Trustee advocates, did not
express that intention in the statute, when it did express its desire
to exempt § 548(a)(1)(A).

　　　Finally, the application of § 546(e) to the instant case is, in
fact, wholly consistent with the legislative history cited by the
Trustee. Indeed, given the magnitude of Madoff Securities -- 4,900
clients and $65 billion under management in 2008, AC ¶ 31 -- avoidance

of its transfers to clients, who included other investment businesses, would likely cause the very "displacement" that Congress hoped to minimize. See Enron, 651 F.3d at 339; Neville Decl. Ex. B, Trustee's First Interim Report dated July 9, 2009 ¶¶ 99, 101.[7]

The Court concludes, therefore, that § 546(e) bars the Trustee from pursuing the claims here made under § 548(a)(1)(B) and § 544. Conversely, however, § 546(e) does not bar the Trustee from pursuing the claims he here makes under § 548(a)(1)(A) and § 550(a). Section 548(a)(1)(A) permits the Trustee to avoid transfers that Madoff Securities made during the two years prior to bankruptcy "with actual intent to hinder, delay, or defraud any" of its creditors. Moreover, where the Trustee can avoid an initial transfer under § 548(a)(1)(A), § 550(a) then allows the Trustee to recover "the property transferred" from "any immediate or mediate transferee of [the] initial transfer."

---

[7] The Trustee makes two final arguments that require only brief responses. First, the Trustee argues that § 546(e) conflicts with SIPA because "applying the safe harbor provision would eliminate most avoidance powers granted to a trustee under SIPA, negating its remedial purpose." In re Bernard L. Madoff Inv. Securities, LLC, 440 B.R. 243, 267 (Bankr. S.D.N.Y. 2010). However, SIPA gives the Trustee "the same powers and title with respect to the debtor and the property of the debtor . . . as a trustee in a case under Title 11." 15 U.S.C. § 78fff-1(a). Thus, SIPA expressly incorporates the limitations Title 11 places on trustee's powers, including § 546(e). Second, the Trustee contends that applying § 546(e) conflicts with a recent Second Circuit decision by "hav[ing] the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations." In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 235 (2d Cir. 2011). But, in fact, the decision cited does not even mention § 546(e). Taken literally, moreover, the Trustee's position would have "the absurd effect" of displacing even statutes of limitation, which prevent the Trustee from recovering any fictitious profits that a client received more than six years prior to the date on which Madoff Securities filed for bankruptcy. In re Bernard L. Madoff Inv. Sec. LLC does not permit the Trustee to suspend the whole legal order in pursuit of a result he regards as equitable.

13

Here, as in <u>Katz</u>, the complaints plainly allege that "Madoff

Securities' transfers during the two-year period were made with actual

intent to defraud present and future creditors, <u>i.e.</u>, those left

holding the bag when the scheme was uncovered." 462 B.R. at 453. Thus,

the Court concludes that the Trustee has adequately pled a prima facie

case under § 548(a)(1)(A).[8]

---

[8] As described below, the defendants argue based on § 548(c) that they
have provided value for the transfers they received from Madoff
Securities. To the extent that any defendant argues that such value
not only entitles her to invoke the affirmative defense provided by
§ 548(c), but also prevents the Trustee from establishing a prima
facie case, the Court, as in <u>Katz</u>, rejects that argument. Greiff, for
example, argues that transfers that satisfy a debtor's creditors do
not defraud its other creditors. See <u>In re Sharp Int'l Corp</u>, 403 F.3d
43, 54 (2d Cir. 2005) ("A conveyance which satisfies an antecedent
debt made while the debtor is insolvent is neither fraudulent nor
otherwise improper, even if its effect is to prefer one creditor over
another." (quoting <u>Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.</u>,
191 A.D.2d 86, 90-91 (1st Dep't 1993)). This line of reasoning traces
back to <u>Boston Trading Grp., Inc. v. Burnazos</u>, 835 F.2d 1504 (1st Cir.
1987), then-Judge Breyer's exposition of the history of bankruptcy
avoidance law. Under <u>Boston Trading</u>, "[t]he basic object of fraudulent
conveyance law," as opposed to preferential conveyance law, "is to see
that the debtor uses his limited assets to satisfy <u>some</u> of his
creditors; it normally does not try to choose among them." <u>Id.</u> at
1509. Thus, "to find an actual intent to defraud creditors when, as in
our example, an insolvent debtor prefers a less worthy creditor, would
tend to deflect fraudulent conveyance law from one of its basic
functions (to see that an insolvent debtor's limited funds are used to
pay <u>some</u> worthy creditor), while providing it with a new function
(determining <u>which</u> creditor is the more worthy)." <u>Id.</u> at 1511. Judge
Breyer gave three examples in which a conveyance diminished the amount
of resources available to creditors: (1) where a debtor transfers
resources to someone the debtor expects will use them for the debtor's
benefit, (2) where a debtor transfers property to a friend or family
member, and (3) where a debtor exchanges assets creditors can reach
for assets they cannot. <u>Id.</u> at 1508.
    Nonetheless, <u>Sharp</u> and <u>Boston Trading</u> do not govern this case
because the Trustee has adequately alleged that transfers not only
preferred one creditor over another, but also defrauded Madoff
Securities' creditors and depleted the funds available to pay any of
them. See <u>In re Bayou Group, LLC</u>, 362 B.R. 624, 638 (Bankr. S.D.N.Y.
2007) ("In contrast to the lawful and disclosed payment of a valid
contractual antecedent debt in <u>Sharp</u>, the redemption payments at issue
here of non-existent investor account balances as misrepresented in

Nonetheless, the defendants can prevail on their motion to dismiss these claims if they prove that, "on the face of the complaint[s]," they can invoke the affirmative defense provided by § 548(c). Section 548(c) prevents the Trustee from avoiding transfers under § 548(a)(1)(A) if the transferee "takes for value and in good faith." The parties primarily dispute whether the defendants received transfers from Madoff Securities "for value."[9]

fraudulent financial statements were themselves inherently fraudulent and constituted an integral and essential component of the fraudulent Ponzi scheme alleged in the amended complaints."). While they do not fall within any of the three paradigmatic examples described by Judge Breyer, Madoff Securities' transfers defrauded creditors and diminished the assets available to them by, among other things, extending the life of the Ponzi scheme. In order to perpetuate its fraud, Madoff Securities had to make transfers in accordance with the fraudulent account statements it issued. Perpetuating the fraud harmed creditors. Madoff Securities' did not simply funnel money from one client to another. Instead, it also squandered money by, for example, purchasing the appearance of a legal enterprise, see Looby Decl. ¶ 27 (neither the market making nor the proprietary trading division "would have been viable without the fraudulent" investment advisory division), and funding Madoff's lavish lifestyle. The longer the scheme lasted, then, the larger the gap between Madoff Securities' debts and its ability to pay became. Moreover, as described in greater detail below, the defendants have shown neither that they could have enforced their claims for profits against Madoff Securities nor that their claims shared the same priority with those of other debtors. Accordingly, because transfers of profits depleted the estate's resources without providing offsetting benefits, the transfers at issue here prevented the use of Madoff Securities' funds to pay creditors.

[9] While the Trustee does not allege that the defendants either knew of the fraud or should have known of it, he argues that, if the Court finds that defendants took "for value," it should impute Madoff Securities' bad faith to defendants because Madoff Securities acted as their agent. Cf. Kirchner v. KPMG LLP, 15 N.Y.3d 446, 465 (2010) ("[T]he acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals."). However, "when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, the presumption that knowledge held by the agent was disclosed to the principal fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose." Ctr. v. Hampton Affiliates, 66 N.Y.2d 782, 784 (1985), cited with approval in

15

Under § 548(d)(2)(A), "value" includes "satisfaction . . . of a[n] . . . antecedent debt of the debtor." The Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). "Claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). "When the Bankruptcy Code uses the word 'claim' -- which the Code itself defines as a 'right to payment,' 11 U.S.C. § 101(5)(A) -- it is usually referring to a right to payment recognized under state law." Travelers Cas. & Sur. Co. v. Pac. Gas and Elec. Co., 549 U.S. 443, 451 (2007). Nonetheless, state law need not apply if "some federal interest requires a different result." Butner v. United States, 440 U.S. 48, 55 (1979), cited with approval in Travelers, 549 U.S. at 451.

The defendants argue that, under applicable New York State law, they had a claim against Madoff Securities for the amounts it transferred. The Second Circuit has found that investors in Madoff Securities "are customers with claims for securities within the meaning of SIPA." In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d at 236. The New York Uniform Commercial Code provides that "a person acquires a security entitlement if a securities intermediary . . . indicates by book entry that a financial asset has been credited to

_____

Kirchner, 15 N.Y.3d at 466. Thus, because the Trustee's allegations describe in detail how Madoff Securities "engaged in a scheme to defraud" these defendants, the Trustee cannot impute Madoff Securities' bad faith to them.

16

the person's securities account." § 8-501(b)(1). That person has such
an entitlement "even though the securities intermediary does not
itself hold the financial asset." Id. § 8-501(c).

According to the defendants, these state law entitlements reflect
the federal securities scheme, under which customers do not receive
certificates for their securities, but instead must rely on statements
required by Rule 10b-10. See 17 C.F.R. § 240.10b-10. Defendants argue
that state law emphasizes "book entry" because investors have no other
means for enforcing their rights. The fact that Madoff Securities
engaged in fraud does not suspend the application of the securities
law. See SEC v. Zandford, 535 U.S. 813, 819 (2002) ("[The SEC] has
maintained that a broker who accepts payment for securities that he
never intends to deliver, or who sells customer securities with intent
to misappropriate the proceeds, violates § 10(b) and Rule 10b-5."). 
Moreover, defendants argue that, despite the fraud, they had a claim
for benefit-of-the-bargain damages. See Visconsi v. Lehman Bros.,
Inc., 244 F. App'x 708, 713-14 (6th Cir. 2007) ("Plaintiffs thus could
have reasonably believed that they were entitled to the full $37.9
million balance shown, regardless of the amounts of their previous
deposits and withdrawals."). Thus, defendants conclude that their
monthly or quarterly statements from Madoff Securities, AC ¶ 22, gave
them a claim against Madoff Securities, that Madoff Securities'
transfers discharged its liability on defendants' claim, and that the
defendants thus took "for value" under § 548(d)(2)(A).

17

Notwithstanding these arguments, however, the Court concludes
that those transfers from Madoff Securities to defendants that
exceeded the return of defendants' principal, _i.e._, that constituted
profits, were not "for value." Unlike the situation under § 546(e),
Congress has here created no "safe harbor" to shelter receipts that
might otherwise be subject to avoidance. Accordingly, in this context,
the transfers must be assessed on the basis of what they really were;
and they really were artificial transfers designed to further the
fraud, rather than any true return on investments.

It is not surprising, therefore, that every circuit court to
address this issue has concluded that an investor's profits from a
Ponzi scheme, whether paper profits or actual transfers, are not "for
value." See Donell v. Kowell, 533 F.3d 762, 771-72 (9th Cir. 2008)
("Amounts transferred by the Ponzi scheme perpetrator to the investor
are netted against the initial amounts invested by that individual. If
the net is positive, the receiver has established liability . . . .").
In the context of Ponzi schemes:

> [t]he injustice in allowing [a fortunate investor] to retain
> his profit at the expense of the defrauded investors is
> avoided by insisting on commensurability of consideration.
> [The fortunate investor] is entitled to his profit only if
> the payment of that profit to him, which reduced the net
> assets of the estate now administered by the receiver, was
> offset by an equivalent benefit to the estate.

Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995) (Posner, J.); see
In re Hedged-Invs. Assocs., 84 F.3d 1286, 1290 (10th Cir. 1996)
("Because she had no claim against HIA Inc. for damages in excess of
her original investment, HIA Inc. had no debt to her for those

18

amounts. Therefore, the transfers could not have satisfied an antecedent debt of HIA Inc., which means HIA Inc. received no value in exchange for the transfers.").

The defendants cite only one case in which defrauded investors recovered the amounts reflected on fraudulent brokerage statements: Visconsi v. Lehman Bros., Inc., 244 F. App'x 708, 713-14 (6th Cir. 2007). The immediate cases differ from Visconsi in three important respects. First, unlike in Visconsi, the Court has no reliable basis on which to determine how defendants would have benefited from their bargains with Madoff Securities. See 244 F. App'x at 713 ("In fact, the fictitious statements issued by Lehman, which were designed to track Plaintiffs' funds as if they had been properly invested, indicate that Plaintiffs' accounts would have grown to more than $37.9 million (even accounting for the withdrawal of more than $31.3 million)." (emphasis added)). Here, in contrast, Madoff Securities' statements did not "track [defendants'] funds as if they had been properly invested," but instead constituted an integral part of the fraud, AC ¶ 22, consistently representing favorable returns based on trading that could not have occurred, Looby Decl. ¶¶ 62, 63, 72, & 103.

Second, the court in Visconsi considered innocent investors alongside a defendant who, although not the perpetrator of fraud, "was aware of significant irregularities in [the perpetrator's] practices at the time of [its] purchase of this part of SG Cowen's business, and purchased it despite this knowledge," id. at 714 n.2, whereas here, in

19

contrast, the Court considers the defendants relative to other investors, many of whom were equally innocent. Conferring the benefit of the bargain where a more culpable party bears the cost differs from doing so where similarly situated investors, who have no hope of realizing the benefits of their bargains, bear that cost.

Third, the court in <u>Visconsi</u> did not focus on investors' status as creditors when giving them the benefit of the bargain, but instead on "the harm suffered." <u>Id.</u> at 713. Defendants have undoubtedly suffered harm as a result of investing with Madoff Securities, but they have not shown that this harm in any way corresponds to the amounts reflected on customer statements. Thus, the Court sees no reason to depart from the general rule that investors in a Ponzi scheme did not receive their profits "for value."

The defendants also argue that the circuit court precedents that permitted avoidance dealt with equity investors rather than creditors. For example, at least one court has found that a Ponzi scheme "received a dollar-for-dollar forgiveness of a contractual debt" where it paid investors "agreed upon interest" at a "reasonable" rate. <u>In re Carrozzella & Richardson</u>, 286 B.R. 480, 491 (D. Conn. 2002). Defendants implicitly refer to the long recognized principle that, while an insolvent corporation may not pay a dividend to its shareholders, <u>see</u> N.Y. Gen. Bus. Law § 510, subject to the preference provisions, it may pay its creditors, <u>see</u> <u>Sharp</u>, 403 F.3d at 54-55. According to defendants, a concern for finality underlies the preferential treatment of creditors: "to permit in every case of the

payment of a debt an inquiry as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear." Banque Worms v. BankAmerica Int'l, 77 N.Y.2d 362, 372 (1991).

While the law does provide some support for defendants' distinction between equity investors and creditors, in the immediate context, it is a distinction without a difference. Unlike in Carrozzella, where investors in a Ponzi scheme contracted for "reasonable" interest on their investments, 286 B.R. at 490-91, here the defendants faced the same risks as equity investors. See In re Bayou Group, LLC, 439 B.R. 284, 337 (S.D.N.Y. 2010) (distinguishing Carrozzella because the "fictitious profits Appellants received were not promised to them when they initially invested in the Bayou Funds"). Indeed, had Madoff Securities invested as promised, it would have purchased a basket of equity shares in large, publicly traded companies for defendants. AC ¶ 21. Like equity investors, rather than contracting for a definite return on their investment, defendants contracted for another to use its best efforts to try to generate a profit. Any entitlement defendants had to a return on their investment, then, depended on a representation that Madoff Securities had in fact generated a profit. The complaints allege that Madoff Securities' representations in this regard were wholly fraudulent. Thus, defendants, in effect, ask the Court to enforce the fraud on the ground that the vehicle of this particular Ponzi scheme, in contrast

21

to others, styled itself as a stockbroker. Such a distinction pays only lip service to the underlying realities of the Ponzi scheme, and the Court rejects it. While defendants correctly point out that a general rule that prevented creditors from retaining payments from a fraud would create great uncertainty, see Banque Worms, 77 N.Y.2d at 372, the rule adopted here applies very narrowly, reaching only this unusual kind of "creditor," whose claims to profits depend upon enforcing fraudulent representations, see In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d at 241.[10]

Finally, the Court finds that, even if the defendants had enforceable claims for the amounts reported on their brokerage statements, a conclusion that satisfaction of those claims gave "value" to Madoff Securities would conflict with SIPA. Satisfaction of an antecedent debt gives value to an estate because the "basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors," not "to choose among them." Boston Trading Grp., 835 F.2d at 1509. SIPA, however, does choose among creditors. Specifically, SIPA differentiates between the fund of "customer property" and the "general estate." See 15 U.S.C. § 78fff-2(c)(1) (allowing customers to participate in the distribution of the general estate if customer property does not satisfy their net equity claims). Section 78lll(4) defines customer property as "cash

_____

[10] The defendants might well establish, for example, that under a "constant dollar" approach, Madoff Securities owed them a reasonable return of interest on their investment. This Court, however, has declined to withdraw the reference to address this question, and the bankruptcy court will decide it on remand.

22

and securities . . . at any time received, acquired, or held by or for
the account of a debtor from or for the securities accounts of a
customer, and the proceeds of any such property transferred by the
debtor." In a SIPA proceeding, the trustee allocates customer property
according to statutorily-established priorities. Id. § 78fff-2(c)(1).
Customers, including the defendants and others who invested with
Madoff Securities, In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d at
236, "share ratably in such customer property on the basis and to the
extent of their respective net equities." 15 U.S.C. § 78fff-2(c)(1)(B)
(emphasis added).

Whenever customer property does not suffice to pay priority
claims, SIPA permits the trustee to "recover any property transferred
by the debtor which . . . would have been customer property if and to
the extent that such transfer is voidable or void under the provisions
of Title 11." Id. 78fff-2(c)(3). In other words, the Trustee can
invoke the avoidance provisions such as § 548(a)(1)(A) to recover
"customer property" for distribution according to SIPA's priorities.
The Second Circuit has recently held that the Trustee correctly
concluded that customers, like defendants, who withdrew more from
their Madoff Securities accounts than they deposited have no "net
equity," and thus cannot benefit from priority distributions under
§ 78fff-2(c)(1). In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d at
233.

To allow defendants, who have no net equity claims, to retain
profits paid out of customer property on the ground that their

23

withdrawals satisfied creditor claims under state law would conflict with the priority system established under SIPA by equating net equity and general creditor claims. Indeed, as described above, courts typically find that satisfaction of antecedent debt provides value to the debtor because the fraudulent transfer provisions do not try "to choose among" a debtor's creditors. SIPA, however, prioritizes net equity claims over general creditor claims. Moreover, SIPA specifically connects its priority system to its incorporation of the fraudulent transfer provisions, empowering a trustee to invoke those provisions "[w]henever customer property is not sufficient to pay in full" the priority claims. 15 U.S.C. § 78fff-2(c)(3). A presumption that the fraudulent transfer provisions do not choose between creditors should not and logically cannot apply to frustrate the Trustee's efforts to satisfy priority claims.

The situation here is exactly the one for which SIPA provides. The Trustee cannot satisfy the claims described in 15 U.S.C. § 78fff-2(c)(1)(A)-(D). AC ¶ 18. The defendants have no net equity claims, but nonetheless have allegedly received fraudulent transfers of customer property. Id. Thus, the Trustee may, upon appropriate proof, avoid those fraudulent transfers of customer property for distribution in accordance with SIPA's priorities. In other words, the Court finds that, when determining whether an transferee provides value, SIPA requires consideration not only of whether the transfer diminishes the resources available for creditors generally, but also whether it depletes the resources available for the satisfaction of customers'

24

net equity claims and other priority claims.[11] As described above, a different approach would ignore both SIPA's distinctions between creditors and its specific concern for the depletion of the fund of "customer property" available for distribution according to customers' "net equities." Neither bankruptcy law nor state law require the Court to disregard SIPA in this fashion. See 15 U.S.C. § 78fff(b); Travelers, 549 U.S. at 451. Because defendants' withdrawals allegedly depleted the resources available for satisfying priority claims without satisfying such claims, the Court finds that they did not take "for value."[12]

Two of the defendants, Blumenthal and Hein, also argue that, even if they did not receive their profits for value, provisions of the Internal Revenue Code ("IRC") prohibit the Trustee from certain

---

[11] The defendants have argued that, because SIPA creates priority claims only after a SIPA liquidation has commenced, priority claims have no bearing on whether a transferee has provided value. According to defendants, since state law hypothetically governs what claims exist before a SIPA liquidation, a court considering whether a SIPA trustee may avoid transfers of customer property cannot refer to the priorities SIPA creates. This approach, however, completely ignores that SIPA empowers a trustee to avoid transfers to recover customer property in order to pay priority claims. 15 U.S.C. § 78fff-2(c)(3). Had Congress wanted to give the Trustee only a general power to avoid fraudulent transfers, it could have relied on § 78fff-1(a), which amply serves that purpose. Instead, it explicitly empowered the Trustee to recover fraudulent transfers in order to satisfy claims that would not exist before the commencement of a SIPA proceeding. Defendants' narrow temporal argument disconnects the powers conferred by § 78fff-2(c)(3) from the purpose specifically described, effectively rendering § 78fff-2(c)(3) a superfluous reiteration of the general grant of power conferred by § 78fff-1(a).

[12] Having concluded that defendants' customer statements do not entitle them to § 548(c)'s affirmative defense, the Court need not address the further issue of whether the Trustee could have avoided any obligations those statements created by invoking § 78fff-1(a) and § 78fff-2(c)(3).

avoiding withdrawals from individual retirement accounts ("IRAs") that

they held with Madoff Securities.[13] Specifically, 26 U.S.C.

§ 401(a)(9)(C) requires minimum distributions from IRAs beginning when

the beneficiary reaches the age of 70 ½, and § 4974(a) imposes a tax

of 50% on any portion of the minimum amount that the IRA fails to

distribute. According to Hein and Blumenthal, these provisions "ensure

that the beneficiary uses the IRA in his retirement years." Rousey v.

Jacoway, 544 U.S. 320, 332 (2005). Hein and Blumenthal argue that many

courts have found that trustees cannot avoid transfers that the law

requires as fraudulent. See In re Whaley, 190 B.R. 818, 822 (Bankr.

N.D. Miss. 1995) (finding that payments of alimony could not be

avoided because debtor "was under a court order to make these

payments").

In contrast to Whaley, however, the Internal Revenue Code did not

require Madoff Securities to make any payment, but instead ostensibly

required Hein and Blumenthal to receive payments. Thus, no third party

---

[13] Hein and Blumenthal also invoke state law, but it provides them no
support. While N.Y. C.P.L.R. § 5205(c) exempts money in certain
trusts, including IRAs, from "application to the satisfaction of a
money judgment," § 5205(c)(5) specifically provides that the exemption
does not apply to "[a]dditions to" the trust that are "fraudulent
conveyances." Although Hein and Blumenthal argue that § 5205(c)(5)
applies only to additions to an IRA, and not distributions from it,
§ 5205(d)(1) exempts distributions from IRAs only where "the
principal . . . is exempt under subdivision (c)." Thus, where Madoff
Securities fraudulently transferred profits into Hein's and
Blumenthal's IRAs, distributions of those profits are not protected by
§ 5205(d)(1). Since Madoff Securities apparently did not segregate
customer accounts as it claimed to do, Looby Decl. ¶ 18, the record
before the Court suggests that additions to and distributions from
IRAs occurred simultaneously in the form of payment to the transferee.

comparable to the alimony-recipient sought to enforce the law's

requirements against Madoff Securities, and avoidance of transfers

will not deprive any such third party of its legal rights. Having

rejected the claim that Madoff Securities owed the defendants the

profits that it transferred to them, the Court declines to conclude

that Hein and Blumenthal may now keep their profits because they

feared that the IRC would deprive them of half of a benefit to which

they had no entitlement. Furthermore, where Congress intends to exempt

certain types of transfers from avoidance, it does so not by

implication through other law, but instead directly through the

fraudulent transfer provisions. <u>See, e.g.</u>, 11 U.S.C. § 548(a)(2)

(exempting certain "charitable contribution[s]" from avoidance under

§ 548(a)(1)(B)); <u>see also</u> § 547(c)(7) (preventing avoidance of

"domestic support obligation[s]" as preferences). Accordingly, the

Court concludes that the IRC does not require dismissal of the

Trustee's claims under § 548(a)(1)(A) and § 550(a).

As for the calculation of how much the Trustee may recover under

these claims, the Court adopts the two-step approach set forth in

<u>Donell v. Kowell</u>, 533 F.3d 762, 771-72 (9th Cir. 2008). First, amounts

transferred by Madoff Securities to a given defendant at any time are

netted against the amounts invested by that defendant in Madoff

Securities at any time. Second, if the amount transferred to the

defendant exceeds the amount invested, the Trustee may recover these

net profits from that defendant to the extent that such monies were

transferred to that defendant in the two years prior to Madoff

27

Securities' filing for bankruptcy. Any net profits in excess of the amount transferred during the two-year period are protected from recovery by the Bankruptcy Code's statute of limitations. See 11 U.S.C. § 548(a)(1).

In sum, for the reasons stated above as well as the reasons set forth in Picard v. Katz, 462 B.R. 447 (S.D.N.Y. 2011), as amended by 2012 WL 127397 (S.D.N.Y. Jan. 17, 2012), the Court dismisses all of the Trustee's claims except those proceeding under § 548(a)(1)(A) and § 550(a). The Clerk of the Court is hereby directed to close the motions to dismiss in the four above-captioned cases and the eighty additional cases set forth in Appendix A so that all these cases may -- except to the extent required by a subsequent motion to withdraw -- now be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        April 30, 2011

28

**Appendix A**

| Defendants | Adv. Pro. Docket No. (Bankr. S.D.N.Y.) | Docket No. (S.D.N.Y.) |
|---|---|---|
| Gary Albert, individually and his capacity as shareholder of Impact Designs Ltd. | 10-04966 | 11-04390 |
| Aspen Fine Arts Co. | 10-04335 | 11-04391 |
| The Aspen Company and Harold Thau | 10-05070 | 11-04400 |
| Jan Marcus Capper | 10-05197 | 11-04389 |
| Norton Eisenberg | 10-04576 | 11-04388 |
| P. Charles Gabriele | 10-04724 | 11-04481 |
| Stephen R. Goldenberg | 10-04946 | 11-04483 |
| Ruth E. Goldstein | 10-04725 | 11-04371 |
| Harnick Bros. Partnership and Gary Harnick individually and as general partners of The Harnick Brothers Partnership | 10-05157 | 11-04729 |
| John Denver Concerts, Inc. Pension Plan Trust and Harold Thau as the Trustee | 10-05089 | 11-04387 |
| Anita Karimian | 10-04706 | 11-04368 |
| Lester Kolodny | 10-04515 | 11-04502 |
| Laurence Leif | 10-04601 | 11-04392 |
| Steven V. Marcus Seperate Property of the Marcus Family Trust; The Marcus Family Limited Partnership; Steven V. Marcus, individually and in his capacity as Trustee of the Steven V. Marcus Separate Property of the Marcus Family Trust, General Partner of the Marcus Family Limited Partnership and Guardian of O.M., K.M. and H.M; and Denise C. Marcus, in her capacity as Trustee of the Steven V. Marcus Separate Property of the Marcus Family Trust | 10-04906 | 11-04504 |
| Trust U/W/O Harriette Myers | 10-05401 | 11-04397 |
| Robert Potamkin and Alan Potamkin | 10-04352 | 11-04401 |
| Potamkin Family Foundation, Inc. | 10-05069 | 11-04398 |
| Delia Gail Rosenberg and Estate of Ira S. Rosenberg | 10-04978 | 11-04482 |
| Miriam Ross | 10-05020 | 11-04480 |
| Leon Ross | 10-04723 | 11-04479 |
| Richard Roth | 10-05136 | 11-04501 |
| Lynn Lazarus Serper | 10-04737 | 11-04370 |
| Harold A. Thau | 10-04951 | 11-04399 |
| William M. Woessner Family Trust, Sheila A. Woessner Family Trust, William M. Woessner | 10-04741 | 11-04503 |

| | | |
|---|---|---|
| individually, and as Trustee of the William M. Woessner Family Trust and the Sheila A. Woessner Family Trust, Sheila A. Woessner, individually, and as Trustee of the William M. Woessner Family Trust and the Sheila A. Woessner Family Trust | | |
| Elbert R. Brown, Viola Brown, and Do Stay Inc. | 10-05398 | 11-05155 |
| Lewis Franck individually and in his capacity as Trustee for the Florence Law Irrevocable Trust dtd 1/24/05 | 10-04759 | 11-04723 |
| Michael Mathias, Individually and in his capacity as Joint Tenant of the Michael Mathias and Stacey Mathias J/T WROS, and Stacey Mathias, Individually and in her capacity as Joint Tenant of the Michael Mathias and Stacey Mathias J/T WROS | 10-04824 | 11-04725 |
| Nur C. Gangji Trust Dated 10/16/00, a Virginia trust, and Nur C. Gangji, as trustor, as trustee, and as an individual | 10-04754 | 11-04724 |
| Joseph S. Popkin Revocable Trust DTD 2/9/2006 a Florida trust, Estate of Joseph S. Popkin, Robin Pokin Logue as trustee of the Joseph S. Popkin Revocable Trust Dated Feb. 9, 2006, as the personal representative of the Estate of Joseph S. Popkin, and as an individual | 10-04712 | 11-04726 |
| Bernard Seldon | 10-04848 | 11-04727 |
| Jonathan Sobin | 10-04540 | 11-04728 |
| Patrice M. Auld, Merritt Kevin Auld, and James P. Marden | 10-04343 | 11-05005 |
| Boslow Family Limited Partnership et al. | 10-04575 | 11-05006 |
| Bernard Marden Profit Sharing Plan et al. | 10-05168 | 11-05007 |
| Helene R. Cahners Kaplan et al. | 10-05042 | 11-05008 |
| Charlotte M. Marden et al. | 10-05118 | 11-05008 |
| Robert Fried and Joanne Fried | 10-05239 | 11-05156 |
| Jordan H. Kart Revocable Trust & Jordan H. Kart | 10-04718 | 11-05157 |
| James P. Marden et al. | 10-04341 | 11-05158 |
| Marden Family Limited Partnership et al. | 10-04348 | 11-05160 |
| Norma Fishbein | 10-04649 | 11-05161 |
| Norma Fishbein Revocable Trust et al. | 10-04814 | 11-05162 |
| Oakdale Foundation Inc. et al. | 10-05397 | 11-05163 |
| Bruce D. Pergament et al. | 10-05194 | 11-05216 |
| Sharon A. Raddock | 10-04494 | 11-05217 |
| The Murray & Irene Pergament Foundation, Inc. et al. | 10-04565 | 11-05218 |

| | | |
|---|---|---|
| David S. Wallenstein | 10-04467 | 11-05219 |
| Avram J. Goldberg et al. | 10-05439 | 11-05220 |
| Pergament Equities, LLC et al. | 10-04944 | 11-05221 |
| Wallenstein/NY Partnership & David S. Wallenstein | 10-04988 | 11-05222 |
| Bell Ventures Limited et al. | 10-05294 | 11-05507 |
| Kelman Partners Limited Partnership et al. | 10-05158 | 11-05513 |
| Barbara J. Berdon | 10-04415 | 11-07684 |
| Laura E. Guggenheimer Cole | 10-04882 | 11-07670 |
| Sidney Cole | 10-04672 | 11-07669 |
| Epic Ventures, LLC & Eric P. Stein | 10-04466 | 11-07681 |
| Ida Fishman Revocable Trust et al. | 10-04777 | 11-07603 |
| The Frederica Ripley French Revocable Trust et al. | 10-05424 | 11-07622 |
| Alvin Gindel Revocable Trust & Alvin Gindel | 10-04925 | 11-07645 |
| Rose Gindel Trust et al. | 10-04401 | 11-07601 |
| S & L Partnership et al. | 10-04702 | 11-07600 |
| Joel I. Gordon Revocable Trust & Joel I. Gordon | 10-04615 | 11-07623 |
| Toby T. Hobish et al. | 10-05236 | 11-07559 |
| Helene Cummings Karp Annuity & Helene Cummings Karp | 10-05200 | 11-07646 |
| Lapin Children LLC | 10-05209 | 11-07624 |
| BAM L.P. et al. | 10-04390 | 11-07667 |
| David R. Markin et al. | 10-05224 | 11-07602 |
| Stanley T. Miller | 10-04921 | 11-07579 |
| The Murray Family Trust et al. | 10-04510 | 11-07683 |
| Estate of Marjorie K. Osterman et al. | 10-04999 | 11-07626 |
| Neil Regger Profit Sharing Keogh & Neil Reger | 10-05384 | 11-07577 |
| Eugene J. Ribakoff 2006 Trust et al. | 10-05085 | 11-07644 |
| Sage Associates et al. | 10-04362 | 11-07682 |
| Sage Realty et al. | 10-04400 | 11-07668 |
| The Norma Shapiro Revocable Declaration of Trust Under Agreement Dated 9/16/2008 et al. | 10-04486 | 11-07578 |
| Estate of Jack Shurman et al. | 10-05028 | 11-07625 |
| Barry Weisfeld | 10-04332 | 11-07647 |