Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Adv. Case No. 08-01789-brl

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SECURITIES INVESTOR PROTECTION CORPORATION,

8                   Plaintiffs,

9           v.

10   BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, ET AL.,

11

12                   Defendants.

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15

16                   U.S. Bankruptcy Court

17                   One Bowling Green

18                   New York, New York

19

20                   June 19, 2012

21                   11:05 AM

22

23   B E F O R E :

24   HON BURTON R. LIFLAND

25   U.S. BANKRUPTCY JUDGE

1     HEARING RE:  Picower Class Action Plaintiffs for a

2     determination that the Commencement of the Securities Class

3     Action Lawsuits Against Non-Debtor Parties is Not Prohibited

4     by a Permanent Injunction Issued by this Court or Violative

5     of the Automatic Stay (HOLDING DATE)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Nicole Yawn

```
 1   A P P E A R A N C E S :

 2   HERRICK, FEINSTEIN LLP

 3        Attorneys for the Plaintiffs, A & G Goldman and Pamela

 4        Goldman

 5        2 Park Avenue

 6        New York, NY 10016

 7

 8   BY:  FREDERICK E. SCHMIDT, ESQ.

 9

10   BAKER HOSTETLER

11        Attorneys for the Trustee

12        45 Rockefeller Plaza

13        New York, NY 10111

14

15   BY:  DAVID J. SHEEHAN, ESQ.

16        TRACY COLE, ESQ.

17        JOSHUA ALKIN, ESQ.

18

19   RICHARD STONE, ESQ.

20        Attorney for Plaintiffs, A & G Goldman and Pamela

21        Goldman

22

23

24

25
```

Page 4

1                    P R O C E E D I N G S

2              THE COURT:  Be seated, please.

3              Yeah.  Madoff?

4              UNIDENTIFIED SPEAKER:  Madoff.

5              THE COURT:  Okay.

6              MR. SCHMIDT:  Good morning, Your Honor.  Frederick

7     Schmidt, from Herrick, Feinstein, counsel for A & G Goldman

8     and Pamela Goldman.

9              MR. STONE:  Richard Stone, also counsel for the

10    Goldmans.

11             MR. ALKIN:  Joshua Alkin, also (indiscernible -

12    00:33:05:).

13             MR. SHEEHAN:  Good morning, Your Honor.  David

14    Sheehan, from Baker Hostetler, for the trustee.

15             MS. COLE:  Tracy Cole, also from Baker Hostetler.

16             THE COURT:  Go ahead.

17             MR. SCHMIDT:  Thank you, Your Honor.  First of

18    all, I'd -- I'd like to thank Your Honor for accommodating

19    us and bringing us in at 11:00.  One of our counsel was

20    flying up from Florida, and this enabled him to come up this

21    morning, rather than having to come here last night.

22             Your Honor, we're here to seek an order from Your

23    Honor that our class action, securities law class action,

24    yet to be filed that we intend to file in the Southern

25    District of Florida, does not violate Your Honor's permanent

Page 5

1    injunction that was contained in an order dated

2    January 13th, 2011.

3              THE COURT:  Oh, by the way, in the interim, since

4    I did accommodate you with that extra hour, I repaired to

5    chambers between matters, fired up the computer, and guess

6    what I saw?  First thing on my screen.  Court of Appeals

7    dismissing the Fox/Marshall matter, which figures very

8    prominently in today's hearing.

9              MR. SCHMIDT:  I didn't see that, Your Honor,

10   because we were on the subway on the way down.

11       (Laughter)

12             THE COURT:  Well, I didn't see it until I just

13   accommodated you.

14             MR. SCHMIDT:  But, in -- in any event, Your Honor,

15   as -- as I'll get into, we don't believe that the -- the Fox

16   and the Marshall matter is -- is particularly important in

17   this.  It's certainly not the same claim.  They're --

18   they're vastly different claims, and, quite frankly, we have

19   no issue with the -- the decisions that were reached in the

20   Fox/Marshall appeals.

21             Again, our claim is completely different.  It's

22   completely premised on federal securities law, so we have

23   different damages.  We have different injuries.  The -- the

24   claims accrued at different times.  The Fox/Marshall claims

25   were based on RICO and similar state law conversion, unjust

Page 6

1    enrichment, conspiracy, things that the estate really would

2    have the same claim on.  They would be derivative.  They

3    would be duplicative of what the trustee would be able to

4    bring on behalf of the estate.

5             In contrast, our claims are premised on federal

6    securities law, the -- the Exchange Act of 1934.  We are

7    asserting claims under 20(a), which provides for control

8    person liability.  The class action complaint that we intend

9    to file --

10            THE COURT:  Picower being the control person?

11            MR. SCHMIDT:  Picower being the control person.

12   That's correct, Your Honor.

13            The complaint that we would like to file alleges

14   that the commingled discretionary securities trading account

15   that -- that BLMIS -- BLMIS, Bernie L. Madoff Securities,

16   Inc., is a separate security.  So, when people invested in

17   that, they were, in essence, purchasing a security.

18            I don't think that it's very controversial that

19   BLMIS clearly committed securities frauds on a number of

20   people, and, but for the SIPRA (ph) proceeding, there would

21   be a multitude of lawsuits seeking to hold BLMIS in -- in --

22   or seeking to hold BLMIS liable for those violations.  Here,

23   we're seeking to go after Picower, which is a third party,

24   non-debtor defendant, and the control person liability,

25   under 20(a), reads as follows.

Page 7

1          "Every person who directly or indirectly controls

2     any person liable under any provision of this chapter or of

3     any rule or regulation thereunder shall also be liable

4     jointly and separately with and to the same extent as such

5     controlled person to any person to whom such controlled

6     person is liable."  Here, the controller is the Picower

7     defendants.  The controllee was BLMIS.

8          This type of claim cannot be derivative or

9     duplicative, and -- and those words I use, because they were

10    contained in Your Honor's permanent injunction.  No claim

11    can be brought against a third party under that injunction

12    that is either derivative or duplicative of claims that the

13    trustee brought or the trustee could have brought.

14          Here, these securities law claims are neither

15    duplicative nor derivative.  First of all, the trustee lacks

16    standing to bring -- to assert the securities claims,

17    because BLMIS was neither a -- was -- was not a purchaser of

18    its own securities.  It was a seller, but it wasn't a

19    purchaser, and it didn't incur any damages as a result of

20    its sale.

21          Under the Blue Chip Stamps v. Manor Drug Stores,

22    which is Supreme Court case 421 U.S. 723, the Supreme Court

23    stated that only purchasers and sellers of -- of securities

24    had standing to bring actions under 10(b), 10(b)(5), and, by

25    extension, 20(a) of the Exchange Act.  We cite several other

Page 8

1    cases in our brief for -- for that proposition.

2            Here, BLMIS clearly didn't purchase its own

3    securities, and, when it sold its own securities to

4    defrauded investors, it actually received a benefit.  It

5    received a cash-in to perpetrate and -- and -- and continue

6    its scam, and, while that may be harmful for the company in

7    the long-term, there are -- there's ample case law that

8    says, in the short-term, there is a benefit that's given to

9    the corporation in that regard.

10           So it didn't suffer any damages as a seller, and

11   it wasn't a purchaser.  So therefore, it wouldn't have

12   standing to assert a 20(a) claim or a federal securities

13   claim.

14           We've also cited numerous cases in our reply brief

15   and our brief -- original moving brief, which establish that

16   federal securities law claims belong to the shareholders.

17   They don't belong to the corporation or, by extension, a --

18   a trustee that sits in a corporation's shoes, and, just very

19   briefly, we cite the Seven Seas Petroleum case, Fisher (ph)

20   v. Apostelu (ph), Reliance Acceptance Group, Farmmore (ph)

21   Security -- Farmmore, Inc., Oaks v. Lipson (ph) and Granite

22   Partners, and, last but not least, Hirsch v. Arthur

23   Andersen, which was a 2nd Circuit case in 1995, where the

24   trustee sued the accountant, the debtors' former accountants

25   under a securities law basis, and, at least on the piece

Page 9

1       where the trustee had sued based upon the accountants'

2       distribution of misleading offering memoranda, that was

3       clearly, the 2nd Circuit said, the province of shareholders,

4       and the trustee didn't have standing to -- to assert those

5       claims.

6               Next, Your Honor, a section 20(a) claim, by its

7       terms, cannot be derivative.  Under 20(a), a plaintiff must

8       show that there's a primary violator.  Here, primary

9       violator is clearly BLMIS, and you cannot sue derivatively

10      on behalf of that primary violator.  We've cited to the --

11      the Maxim Integrated Products case and the VeriSign case for

12      that proposition.

13              The trustee has asserted an opposition to -- to

14      our motion, and, as -- as we read it, it's premised solely

15      on the argument that his fraudulent -- his avoidance

16      actions, the trustee's avoidance action that he asserted

17      against the Picower and defendants, is essentially the same

18      as our securities law claims.  Again, going back to -- to

19      what I've just been over, the trustee wouldn't have standing

20      to assert those, so that's clearly not the case.

21              But, when you take a look at really -- and you dig

22      down and see what these claims are, it's clear, and it's

23      apparent that the securities law claims are not the same as

24      the avoidance action claims that the trustee asserted.  The

25      trustee asserted that the Picower defendants received $7.2

1   billion in fraudulent transfers during the course of the

2   case.

3           In contrast -- and so, his damages were the $7.2

4   billion.  All the money that came out of the estate and went

5   to the Picower defendants, the $7.2 billion, were the

6   damages, and that was the extent of the damages in that --

7   in that action.

8           In contrast, the -- the -- the securities claim

9   seeks damages which are calculated by the difference that

10  they actually paid for the securities as opposed to what

11  they were worth.  Had the securities law violations not been

12  apparent here or had they been disclosed, clearly, what they

13  invested would have been much less, in terms of value, than

14  what the -- the actual value of the -- the security was.

15          There were different injuries.  The damages to the

16  class action claims are based on the failure of the Picower

17  defendants to make disclosures and to otherwise supervise

18  and prevent the fraudulent sale of securities.  Whereas, the

19  trustee's claims were the -- for the return of monies that

20  were fraudulently transferred.

21          They accrued at different times.  The fraudulent

22  transfer claims accrued every time money went out from BLMIS

23  to the Picower defendants.  Our -- our claims accrued when

24  the -- each investor purchased its -- it's own security.

25          The trustee seeks to combine or conflate the two

Page 11

1    claims by saying, well, if you look at the class action

2    complaint, it's replete with the allegations that we made in

3    our fraudulent transfer action, and, certainly, when you do

4    look at the complaint, that's in there.  However, the

5    fraudulent transfers were the whole reason for the trustee's

6    complaint.  The fraudulent transfers, in contrast with --

7    with our complaint, are merely evidence of the Picower

8    control over the debtor, and that's a necessary element

9    under 20(a).

10            It's not the whole reason.  It's not the entire

11   claim that we have, and it -- it -- it is merely a single

12   element.  The trustee's claim couldn't survive without those

13   allegations.  Our claim could, and we've cited numerous

14   cases that say, while the existence of common facts and

15   common defendants does not necessarily or does not bestow

16   standing on a trustee to assert a claim that belongs to

17   shareholders, and, again, I cite the Seven Seas Petroleum,

18   Fisher and Apostelu, and Reliance Acceptance Group for that

19   proposition.

20            The trustee also argues that St. Paul Marine v.

21   PepsiCo, the 2nd Circuit case from a few years back, brings

22   our claims within the ambit of the trustee's jurisdiction,

23   and that case said the claims must be property of the debtor

24   under state law, and the creditor must not be able to allege

25   any direct injury traceable to the non-debtor third party.

Page 12

1    If those two elements are -- are met, then the trustee would

2    be permitted to assert the claims, and the -- the -- the

3    third party would not be able to be sued by the harmed

4    investors outside of the estate.

5           Here, however, we have claims that aren't shared

6    by the estate, because the trustee doesn't have standing to

7    assert the claims.  They're different claims.  St. Paul was

8    different.  St. Paul was an alter ego claim, and the 2nd

9    Circuit went through an analysis that said, "Well, in this

10   case, both the estate and the corporation had an alter ego

11   claim, and so did the -- the shareholders and the

12   investors."

13          But here, there is no shared claim.  The trustee

14   simply doesn't have standing to assert the claim, and

15   securities law claims belong only to the purchasers of the

16   securities.  Also, BLMIS did not suffer any injury from the

17   purchase of the securities.

18          There are also cases that we've cited that says,

19   look, just because the claims are assertable by more than

20   one entity doesn't mean that the claims are property of the

21   estate, particularly in -- cite to Seven Seas Petroleum,

22   where they said, "We also wish to dispel any notion that a

23   claim belongs to the estate or is otherwise only assertable

24   by the trustee merely because it could be brought by a

25   number of creditors instead of just one."

Page 13

```
 1              And here, there is something, I think, that's been

 2     a little bit overlooked, because of the focus on customer

 3     claims.  We all know that, in this case, any distributions

 4     are going to be made to the customers, and it's very

 5     unlikely that the trustee will cover sufficient funds to pay

 6     all customer claims in full.

 7              However, there's a whole other class of -- or --

 8     or classes, perhaps, of creditors in this case who would not

 9     be part of the class action.  We've got the window washers,

10     the vendors, the landlords of the world, who clearly weren't

11     purchasers of the customer claims, but are creditors

12     nonetheless in this estate.

13              So, when you tie all that up, it's clear that

14     St. Paul does not transform what otherwise would not be a

15     trustee claim into a trustee claim, and that's sort of where

16     -- brings me into the Fox and Marshall claims, because that

17     was heavily premised on the fact that -- and -- and -- and

18     findings that were made -- that the actions there, the

19     claims there were essentially -- you -- you label them

20     different, but they're essentially fraudulent conveyance

21     claims.

22              Here, it's completely different.  They're -- the

23     St. Paul weighed heavily in the Fox and Marshall decisions,

24     because similar -- it -- it -- it was all premised on the

25     estate sharing the same claim.  Here, we simply don't have
```

Page 14

1     that, and so, the Fox and Marshall decisions are really,

2     while interesting and tangentially related, not controlling

3     here.

4               THE COURT:  Of course, the trustee --

5               MR. SCHMIDT:  And the last thing --

6               THE COURT:  -- argues quite the opposite.

7               MR. SCHMIDT:  I -- the trustee argues to the

8     opposite.

9               THE COURT:  The trustee even argues that your

10    whole securities argument is something that is akin to the

11    emperor having no clothes.

12              MR. SCHMIDT:  Well, that, I respectfully submit,

13    is -- is --

14              THE COURT:  And that it comes about based upon the

15    experience with the Fox/Marshall litigation.  And, by the

16    way, as I understand it, same counsel involved in

17    Fox/Marshall is sitting alongside you here in this case.

18              MR. SCHMIDT:  Yes, same counsel.  I -- I wasn't

19    involved --

20              THE COURT:  But these arguments weren't advanced

21    in Fox/Marshall, either, although, apparently, they're not

22    different now.  The passage of time hasn't changed, so the

23    arguments are an outgrowth of a reaction to how the

24    litigation went in Fox/Marshall.

25              MR. SCHMIDT:  Well, I think it's -- it's a

Page 15

1   different claim here, and, you know, the Fox/Marshall --

2           THE COURT:  Well, that's -- that's the beauty of

3   in hindsight and trying to get around whatever litigation

4   has already operated, based upon the same set of facts.

5   Facts haven't changed.

6           MR. SCHMIDT:  The same -- facts haven't changed,

7   Your Honor.

8           THE COURT:  Fox/Marshall and -- and now.  Only

9   Picower has morphed into being the control person for Bernie

10  Madoff.  I wonder if -- how Bernie Madoff would react to

11  that if we had him here today.

12      (Laughter)

13          MR. SCHMIDT:  I'm not sure how he would react to

14  that.  He may throw up his arms and say --

15          THE COURT:  I don't think he gives credit to

16  anybody but himself for what happened.

17      (Laughter)

18          MR. SCHMIDT:  He -- he -- he may --

19          THE COURT:  Go ahead.

20          MR. SCHMIDT:  He may very well think, yes, Picower

21  was controlling me, or he may say that, but God knows what

22  he would say, Your Honor.

23          But, to address Your Honor's concerns, while we do

24  have common counsel here, it's not a common plaintiff.  The

25  claims are different.  Clearly, the law is that securities

Page 16

1    law claims are not property of the estate.  When I looked at

2    it -- and I wasn't involved in the Fox and Marshall

3    litigation.  When I looked at it --

4              THE COURT:  You had an "aha" moment.

5              MR. SCHMIDT:  Huh?

6              THE COURT:  You had an "aha" moment, when you

7    looked at it.

8              MR. SCHMIDT:  To -- to borrow something from one

9    of the -- the TV commercials, I think -- I wouldn't quite

10   call it an "aha" moment, but I did look at it, and I said,

11   "Well, these claims are completely different," because those

12   claims could be closely -- so closely related to the trustee

13   claim so as to really be the same claim.  They were seeking

14   the same money.  It was the same $7.2 billion.

15             Again, I go back to the fact that our -- the --

16   the allegations in our complaint of the fraudulent transfers

17   are merely an illustration of the control that -- that

18   Picower had.  These are different duties.  They're different

19   plaintiffs.  Whether or not the suit is ultimately

20   successful, I would submit, is really a question for the --

21   for the trial court in -- in that action, should we be

22   permitted to proceed.

23             I would note, however, Your Honor, that our

24   proceeding with that action really has no -- no bearing on

25   what the trustee can and can't do in this -- in this court

Page 17

1    with this case as a whole.  The trustee said, well, you

2    know, it'll make it more difficult for us to -- to settle

3    claims.  We don't -- we're not aware of any other defendant

4    in any adversary proceeding the trustee has made where --

5    where you could argue with a straight face that they somehow

6    controlled the debtor.  There's no 20(a) liability.  So, at

7    best, it's a hypothetical concern.

8              And then, last but not least, Your Honor, the

9    settlement, the $7.2 billion -- again, we're not trying to

10   attack that $7.2 billion settlement.  Kudos to the trustee

11   for -- for bringing that in.

12             Rather, it's -- it's now final.  The appeal of the

13   government forfeiture order has been dismissed.  It's a

14   final order.  The settlement has become final, and that

15   money should be coming into the estate.

16             We're not looking to attack that.  It should have

17   no desultory defect -- or effect on the trustee's settlement

18   of other actions.

19             Also, because the settlement is now final, there's

20   really -- and -- and this goes back to Your Honor's decision

21   in Cohmad in the Jaffe case.  There's nothing left -- left

22   to administer in this -- in this piece.

23             The settlement's final.  The estate's gotten all

24   the money that were transferred out back in, and, as I said,

25   the claims are different.  The claims are not duplicative.

Page 18

1    They're not derivative.  The case law says that, and so, we

2    respectfully request that Your Honor issue an order stating

3    that they are not duplicative of derivative.

4                THE COURT:  With respect to the Cohmad matter,

5    that's not applicable in this case at all.  That case turned

6    on the -- the preservation of jurisdiction and the

7    settlement documents, and there's a Supreme Court case,

8    author, Scalia, which really informed this Court's position

9    on Cohmad.  It is totally different and not -- not

10   supportive of your claim here today.

11               MR. SCHMIDT:  We had picked up on it, Your Honor,

12   because of the -- the -- the arguments that the trustee had

13   made, but, clearly, Your Honor was here, and Your Honor

14   ruled on it.  I -- I wasn't sitting here.  I -- I only know

15   what I read.  So we'll -- we'll leave it at that,

16   Your Honor.

17               MR. SHEEHAN:  When I went to law school, first

18   year, I had a professor who said to me, "You know, when you

19   have a case where the law's against you and the facts are

20   against you, the first thing you try to do is change the

21   law," and that didn't work out so hot here.  As Your Honor

22   has indicated, Fox has been affirmed.  Judge Koeltl found

23   that the injunction Your Honor entered initially in this

24   case was appropriate.  I won't recite all the reasons why.

25               So what do we do then?  Can't change the law.

1   Let's change the facts.  Let's create a security out of

2   whole cloth, a security called B-L-M-I-S security, that,

3   until the advent of this proceeding, had no existence in the

4   last three-and-a-half years of this Bankruptcy's Court's

5   overseeing of this case.  Never happened.  Never existed.

6           The 703 account, the slush fund created by Bernie

7   Madoff all of a sudden morphs into -- I have to read it -- a

8   commingled discretionary securities trading account.  I

9   don't know where that comes from.  Doesn't exist.  Never

10  did.  Never was what they were doing.

11          What it was was money in, money out.  There was no

12  trading going on.  There was no account utilized by him.  As

13  a matter of fact, it wasn't even the nominated at

14  15(c)(3)(3) account, which it would have to have been, if it

15  was being used to buy and sell securities.

16          So factually, there's no basis for any of this,

17  but that -- more to the point is this.  What it really

18  demonstrates is is that what we have here, again, is the

19  same attempt to end-run Your Honor's decision on net equity,

20  as happened in the earlier case, and, as Judge Koeltl

21  pointed out, was exactly what was happening there is

22  happening here, too.

23          Why?  Because what we're dealing with here is,

24  yes, we have different plaintiffs, but they're the same.

25  They both filed customer claims.  One of them actually was a

Page 20

```
 1    net loser.  The other was a net winner, not dissimilar from

 2    Fox/Marshall.

 3              They both filed claims, not as shareholders, which

 4    is what they're now alleging they are, but they are, in

 5    fact, customers, customers who sought to invest with Bernie

 6    Madoff and, unfortunately, fell victim to his fraud.  They

 7    are, therefore, no different than Fox and Marshall, and,

 8    while my adversary suggests that this 20(a) allegation is

 9    somehow new and creates something different, Your Honor will

10    recall that what they were actually arguing in Fox/Marshall

11    was exactly that they lost their investment income.  Does it

12    sound familiar?

13              It sounds just like somebody suing for securities

14    fraud.  They lost their investment income, and they weren't

15    looking to get the 7.2, at least they morphed into that, as

16    well.  They said, "No, we want money beyond the 7.2."  Well,

17    all of those changes of positions by Fox and Marshall were

18    unavailing, just as they should be unavailing here.

19              The premise that Your Honor utilized to bash in

20    the relief that we received in Picowers (sic) all are still

21    intact today, all -- what we have before us is a derivative

22    claim, clearly.  It's not just simply that -- and we do have

23    this -- that every allegation of substance in their

24    complaint was copied from our complaint.

25              I'm starting to think they're -- maybe we should
```

Page 21

1   go back and notice quiddy (ph).  But, in any event, they

2   take our entire complaint and copy it, and that is all the

3   wrongdoing --

4           THE COURT:  You never copyrighted your complaint.

5           MR. SHEEHAN:  I know.  What they're -- you know,

6   that -- that, well, so it's going nowhere, Your Honor.  But,

7   in any event --

8       (Laughter)

9           MR. SHEEHAN:  I don't think that's going to

10  happen.

11          But the point is is that they -- they copy the

12  entire complaint, and that's what they did in Fox, and, in

13  Fox, Your Honor and Judge Koeltl both found that, clearly,

14  what that demonstrated was is that their claims were

15  derivative of the same activities that we were alleging as

16  the trustee, and what does that mean?

17          What that means is -- now, I'm not going to

18  belabor this too long, Your Honor, but it demonstrates that

19  this is a generalized claim.  This is a claim that belongs

20  to every one of the people who are claimants in this case,

21  and St. Paul teaches us that.  That St. Paul teaches us

22  that, when there's a generalized claim, it's brought by the

23  trustee, and the only way we're going to be able to protect

24  that is for Your Honor to utilize the injunctive power of

25  this Court.

Page 22

1          That's why we have the automatic stay.  That's why

2     we have 105.  The only way to protect a trustee's ability to

3     do that and do whatever he's supposed to do is to enjoin

4     others from engaging in the activity that my colleagues are

5     trying to do here.

6          My colleagues also mentioned Seven Seas and a

7     whole litany of other cases.  As Your Honor has pointed out,

8     all those cases were available to Fox and Marshall.  All

9     those cases were reviewed by Your Honor, and all of those

10    cases were reviewed by Judge Koeltl, and all of them soundly

11    rejected for the proposition that there was an independent

12    claim that was orbiting around the Fox/Marshal allegations.

13         It's the same way there is no independent claim

14    here.  There should, therefore, be the same result, a

15    rejection of those line of cases as controlling here and

16    that the judge -- judge's decision in -- in -- by

17    Judge Koeltl is the one that we should be following here

18    today.

19         One -- one last point I would like to make, Your

20    Honor, and that is is that the injunction -- and I think

21    it's very, very important point that, I think, Judge Koeltl

22    made and, I think, Your Honor made it, as well, and that is

23    this.  The injunction was part of the bargain here.  $7.2

24    billion -- closure was required.

25         We were not going to subject the Picower

Page 23

1     defendants to multiple lawsuits derived from the same set of

2     facts and circumstances that resulted in that settlement.

3     It was a very critical and important part of the settlement.

4              Judge Koeltl did a fine job of outlining that in

5     detail, and I know Your Honor is well-aware of it, and I

6     think it's a very important element here.  Yes, the

7     settlement itself was extraordinary.  It's beyond the

8     standard or reasonableness, but, just as important is that

9     the injunction be part and parcel of that to give the relief

10    that was bargained for and they're entitled to.

11             Thank you, Your Honor.

12             MR. SCHMIDT:   Thanks, Your Honor.  I'll be brief.

13             My colleague mentioned that security was created

14    out of whole cloth.  Respectfully, Your Honor, that's --

15    that-- that's not an accurate statement, but regardless,

16    that really goes to the merits of the underlying lawsuit,

17    not whether the claim is duplicative or derivative.

18             The lawsuit will stand or fall on its own.  The

19    allegation and the proof will stand and fall on its own,

20    whether there is a security or whether there's not a

21    security.

22             The fact that co-counsel also was co-counsel for

23    other plaintiffs in a -- who are also seeking to sue the

24    same defendants should not prejudice this claim and this

25    plaintiff.  It's simply is -- is not what a decision should

Page 24

1    be based upon.

2            As we say over and over again, the fact that

3    there's some common facts, you have common defendants

4    doesn't render a claim which the trustee has no standing to

5    assert to be derivative.  There's -- there's ample case law

6    on that.

7            It is clearly not generalized.  There are hundreds

8    of other creditors, which the trustee points to or -- or

9    reported in his -- his last report who would not be members

10   of the class.  They were the vendors and -- and other types

11   of -- of creditors who were not customers.

12           The fact that the class action plaintiffs may be

13   -- are -- are customers, as well doesn't render this somehow

14   the trustee's province, and the -- and -- and the fact that

15   the injunction was part of the bargain that he drove with

16   the settlement -- we have no quarrel with that.  Our

17   argument is that the injunction does not bar us.  It's not

18   duplicative and not -- and not derivative.  To -- to hold

19   otherwise would be to expand what that injunction says, and

20   I don't believe that that was what was bargained for or --

21   or what that was the intent.

22           MR. STONE:  Your Honor, may I address the Court

23   just for one second?

24           THE COURT:  Sure.

25           MR. STONE:  The Court's talked about the fact that

1   I am common counsel.  I think that's largely irrelevant.

2   This is a separate federal securities claim.

3                THE COURT:  Your co-counsel has already stated

4   that.

5                MR. STONE:  No, Your Honor.

6                THE COURT:  Do you have anything to add?

7                MR. STONE:  Yes, I do.  There is an independent

8   duty here that my counsel is not addressing.  Section 20(a)

9   sets up a duty for a control person, a federally-created

10  right, a federally-created duty that's independent of the

11  state law claims that we brought.  That's the action we're

12  bringing.

13               The Picowers had a duty to supervise, monitor,

14  report on, and make sure that BLMIS was operating correctly.

15  I've been a securities lawyer for 30 years.  This is a very

16  solid 20(a) claim.

17               Picower controlled the day-to-day operations of

18  this entity.  He made entries into the books of record that

19  were false.  He took out money on a regular basis and

20  treated it as a piggy bank.  It's not uncommon to have two

21  control persons, both Madoff and Picower for the control

22  persons.

23               THE COURT:  Well, that set of facts or that

24  argument -- there will be many more than two.

25               MR. STONE:  I -- I'm unaware of any other, Your

Page 26

1    Honor.  Only aware of two that had that level of control.

2           THE COURT:  Well, maybe you ought to take a look

3    at all the litigation that's going on --

4           MR. STONE:  I've seen that, but I don't believe

5    they had that level of control, Your Honor.

6           THE COURT:  All right.  Thank you, counsel.

7           MR. STONE:  But there is an independent duty here.

8           THE COURT:  Is there anything else?

9        (No audible response)

10          At the risk of redundantly -- and even, that's a

11   bad chip-off -- quoting Yogi Berra, this, again, is, again,

12   a déjà vu all over again.  The class action plaintiffs here

13   are, indeed, using inventive pleading, which essentially is

14   to side-step the automatic stay and the Picower injunction,

15   and, yes, I do find that the litigation and the law that was

16   set forth in Fox/Marshall applies robustly here.

17          I am going to deny the request for relief here,

18   and I will issue an opinion with respect to the denial,

19   either today or tomorrow.

20          UNIDENTIFIED SPEAKER:  Thank you very much,

21   Your Honor.

22          THE COURT:  I also find it --

23          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

24          THE COURT:  -- interesting that, just minutes

25   before I came out here, the 2nd Circuit dismissed the

Page 27

1    Fox/Marshall matter.

2              UNIDENTIFIED SPEAKER:  Good news.

3              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

4              THE COURT:  Thank you.

5         (Whereupon, these proceedings were concluded at 11:38

6    AM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3                            RULINGS

4                                                    Page        Line

5    **Motion for Request for Relief**              26           17

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 29

1                    C E R T I F I C A T I O N

2

3    I, Nicole Yawn, certified that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6    Nicole Yawn   Digitally signed by Nicole Yawn
                   DN: cn=Nicole Yawn, o=Veritext, ou,
                   email=digital@veritext.com, c=US
                   Date: 2012.06.20 15:19:09 -04'00'

7    NICOLE YAWN

8

9    Veritext

10   200 Old Country Road

11   Suite 580

12   Mineola, NY 11501

13

14   Date:  June 20, 2012

15

16

17

18

19

20

21

22

23

24

25