**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jorian Rose
Email: jrose@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

Hearing Date: August 22, 2012
Hearing Time: 10:00 A.M. (EST)
Objection Deadline: August 8, 2012
Reply Deadline: August 15, 2012

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |

**MOTION FOR AN ORDER APPROVING SECOND ALLOCATION OF PROPERTY**
**TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING SECOND**
**INTERIM DISTRIBUTION TO CUSTOMERS**

# TABLE OF CONTENTS

**Page**

I.      EXECUTIVE SUMMARY ............................................................................... 1

II.     THE LIQUIDATION PROCEEDING ....................................................... 10

III.    ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA ......... 12

    A.      Allocation of Property........................................................................ 12

    B.      Distributions Under SIPA ................................................................ 13

    C.      Allocation Of Assets To The Customer Fund And Related Reserves ................ 14

        i.      Assets In Trustee's Possession As Of June 30, 2012............................. 16

        ii.     Picower Funds............................................................................ 16

        iii.    Undisputed Recoveries To The BLMIS Estate Since The First
                Allocation and First Interim Distribution ............................... 17

        iv.     Disputed Recoveries ................................................................... 20

        v.      Summary Of Requested Allocation ......................................... 22

    D.      Determination Of Allowable Net Equity Claims & Related Reserves .............. 23

IV.     CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR
       SECOND ALLOCATION AND SECOND INTERIM DISTRIBUTION ................. 25

    A.      No Interim Distribution Of General Estate......................................... 29

V.      DEPARTMENT OF JUSTICE FORFEITURE FUNDS................................ 30

VI.     MISCELLANEOUS ................................................................................. 31

    A.      Notice ............................................................................................ 31

    B.      Waiver Of Memorandum Of Law...................................................... 31

VII.    CONCLUSION....................................................................................... 31

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L.

Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this motion (the "Motion")

pursuant to SIPA §§ 78*lll*(4), 78fff(a)(1)(B), 78fff-2(b), and 78fff-2(c)(1), and Rule 9013 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking entry of an order (1)

approving the second allocation of property ("Second Allocation") to the fund of customer

property ("Customer Fund"); and (2) authorizing a second pro rata interim distribution ("Second

Interim Distribution") to customers whose claims for customer protection under SIPA have been

allowed for amounts exceeding the SIPA statutory advance limits and not already satisfied by the

initial pro rata interim distribution.    This Court has jurisdiction over this Motion pursuant to

SIPA §§ 78eee(b)(2), 78eee(b)(4), 28 U.S.C. §§ 157 and 1334, and Bankruptcy Rule 5005.    This

Motion is based upon the law set forth below as well as the facts set forth in the affidavit of

Matthew Cohen ("Cohen Aff."), filed herewith.    In support of this Motion, the Trustee alleges

and represents as follows:

## I.    <u>EXECUTIVE SUMMARY</u>

1.    In order to protect customers of an insolvent broker-dealer such as BLMIS,

Congress established a statutory framework pursuant to which customers of a debtor in a SIPA

liquidation are entitled to preferential treatment in the distribution of assets from a debtor's

estate.    The mechanism by which customers receive preferred treatment is through the creation

of a fund of "customer property" as defined in SIPA § 78*lll*(4), which is distinct from a debtor's

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

general estate.  Customers holding allowable claims are entitled to share pro rata in the Customer

Fund based on each customer's "net equity" as of the filing date, to the exclusion of general

creditors.  SIPA § 78fff-2(c).

2.    In this case, for purposes of determining each customer's "net equity," the Trustee

credited the amount of cash deposited by the customer into his BLMIS account, less any amounts

already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the

"Trustee's Net Investment Method").  Some claimants argued that the Trustee was required to

allow customer claims in the amounts shown on the November 30, 2008 customer statements

(the "Last Statement Method," creating the "Net Equity Dispute").  Litigation over the Net

Equity Dispute has now proceeded through this Court,[2] the Second Circuit,[3] and the Supreme

Court of the United States.

3.    On June 25, 2012, the Supreme Court denied two petitions for a writ of certiorari

to the United States Court of Appeals for the Second Circuit; a third petition was withdrawn.[4]

Thus, a final nonappealable order has been entered on the Net Equity Dispute, upholding the

Trustee's Net Investment Method and making those funds that had previously been held in

reserve for this issue available for distribution.

4.    In addition, the Trustee received $5 billion from the settlement of his litigation

captioned *Picard v. Picower*, Adv. Pro. 09-1197 (BRL) ("Picower Settlement").  Intertwined

with the Trustee's Picower Settlement is a forfeiture action against the Picower estate that

---

[2] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

[3] *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision").

[4] *Velvel v. Picard*, No. 11-986, 2012 U.S. LEXIS 4771, 80 U.S.L.W. 3707 (U.S. June 25, 2012); *Ryan v. Picard*, No. 11-969, 2012 U.S. LEXIS 4713, 80 U.S.L.W. 3707 (U.S. June 25, 2012); *Sterling Equities Assoc. v. Picard*, No. 11-968, 183 L. Ed. 2d 65, 2012 U.S. LEXIS 4305 (2012).

resulted in the additional recovery of more than $2.2 billion to the United States Government
(the "Picower Forfeiture").   Under the terms of the escrow agreement executed in connection
with the Picower Settlement and Picower Forfeiture, the Picower Settlement is remitted to the
Trustee upon entry of either a final, nonappealable order approving the Picower Settlement or a
final, nonappealable order approving the Picower Forfeiture.  (ECF No. 43).  The forfeiture order
became final and nonappealable on July 16, 2012.  Thereafter, the $5 billion Picower Settlement
was remitted to the Trustee.

5.      With the resolution of the Net Equity Dispute and the receipt of the $5 billion
Picower Settlement, the Trustee now stands ready to make a second significant distribution to
customers with allowed claims.  There is, however, an outstanding issue that could severely limit
the Trustee's ability to distribute the bulk of the funds that he has recovered for the benefit of
customers.

6.      In order to make distributions from the Customer Fund, the Trustee must
determine or be able to sufficiently estimate: (a) the total value of customer property available
for distribution, or the "numerator" (including reserves for disputed recoveries), and (b) the total
net equity of all allowed claims, or the "denominator" (including reserves for disputed claims).
The Trustee calculates reserve amounts on a "worst-case" basis, such that the ultimate resolution
of disputed amounts will not adversely affect any customers' allowed or disputed net equity
distributions.

7.      On May 4, 2011, the Trustee moved for an initial allocation and pro rata interim
distribution of the Customer Fund ("First Allocation" and "First Interim Distribution").  On July
12, 2011, this Court ordered the First Allocation and First Interim Distribution, in which the
Trustee allocated $2.6 billion to the Customer Fund and distributed $335.5 million on allowed

- 3 -

claims relating to 1,243 accounts, or about 4.6% of each customer's allowed claim, unless the claim was fully satisfied.

8.      At that time, the issue requiring the largest reserve, and the cause for the disparity between the amounts allocated and distributed, was the Net Equity Dispute.  As discussed above, however, the Supreme Court permitted the Trustee's Net Investment Method, upheld by this Court and the Second Circuit, to stand.  As a result, a separate but related question of whether claimants are entitled to an increase of their claims based on the time that elapsed while their monies were deposited with BLMIS ("Time-Based Damages") is now ripe and relevant to the Second Distribution.  More than 1,240 objections have been filed relating to the Time-Based Damages issue ("Objecting Claimants"), and the Trustee has filed a motion with this Court to schedule briefing and a hearing on that issue (the "Time-Based Damages Motion").  (Cohen Aff. ¶ 20).

9.      In those objections, the Objecting Claimants argue that they are entitled to Time-Based Damages, calculated in a variety of ways that they believe will result in increases to their customer claims and payments from the Customer Fund.[5]  The various methods can be summarized as follows: (a) claimants are entitled to prejudgment interest under CPLR § 5001(a) at the New York statutory rate of 9%; (b) claimants are entitled to the "time value" of money, which may include a measure of inflation; and (c) claimants are entitled to an increase of their claim in the form of expectation and other damages theories.

10.     These arguments are specious at best.  SIPA contains no reference to inflationary adjustments in the statute.  Nor have courts construed SIPA as such. *See SIPC v. Ambassador*

---

[5] The application of Time-Based Damages does not uniformly increase customer distributions.  Instead, it results in a re-allocation of the customer fund largely from net losers to other net losers, and in limited instances, to net winners.

*Church Financ.*, 788 F. 2d 1208, 1212 (6th Cir. 1986) ("Since the definition of 'net equity' does not include interest, we hold that the SIPA does not authorize the SIPC to pay interest, either to the trustee or directly to the debtor's customers."); *In re New Times Sec. Servs.*, 371 F.3d 68, 88 (2d Cir. 2003) (holding that claimants' net equity should be valued "according to the cash they initially provided to the Debtors to purchase the Funds and should not include any bogus interest or dividend reinvestments").

11.    Nor do the adjustments have any basis in common law.  They are normally relevant only where they are specifically proved as an element of damages, or where a statutory scheme or a contract specifically permits them, and SIPA does not do so.  In fact, as case law demonstrates, customer claims under SIPA do not include damages arising from fraud, breach of contract, or harm caused by a broker's failure to buy, sell, or pay when instructed to do so by its customer.   *See, e.g.*, *Stafford v. Giddens (In re New Times Sec. Servs.)*, 463 F.3d 125, 129-30 (2d Cir. 2006) (holding SIPA does not protect against cases of dishonesty and fraud where customers were fraudulently induced by broker to swap securities for promissory notes); *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 421 (S.D.N.Y. 2003) ("Because claims for damages do not involve the return for customer property entrusted to the broker they are not the claims of 'customers' under SIPA . . . Even if it is assumed that their losses were caused by fraud, breach of contract, or a similar theory, they are general creditors.").

12.    This is because SIPA is designed to return customer property to customers, rather than compensate them for injuries caused by a broker's fraud.  Claims for breach of contract or fraud are "not within the protection afforded by the Act," but rather are general estate claims. *See Sec. Investor Prot. Corp. v. Horizon Sec., Inc.*, No. 72 CV 5112 (S.D.N.Y. May 31, 1974); *cf. In re Lehman Brothers Inc.*, No. 08-1420 (Bankr. S.D.N.Y. July 10, 2012) (ECF No. 5139)

(holding claims for "soft dollars" were breach of contract claims that could only be asserted as general estate claims, rather than customer claims under SIPA). Thus, to the extent any damages, interest, or time value of money were to be awarded to claimants, such a claim could only be appropriately paid from the general estate rather than the Customer Fund, in accordance with the priorities under SIPA.

13.     Federal courts have recently confirmed that even where prejudgment interest is appropriately within the court's discretion—which the Trustee respectfully submits is not the case here—the New York rate of 9% set forth in the CPLR is not used because it no longer has any relation to normal interest rates in the commercial world. *See Sriraman v. Patel*, 761 F. Supp. 2d 23, 26-27 (E.D.N.Y. 2011) ("Nine percent, in my view, is an absurd judgment rate in this day and age for any claim . . . By not indexing the interest rate in CPLR § 5004, New York law effectively creates a windfall for plaintiffs, who likely will recover far more in interest received from a defendant than had they made a short-term investment of a like amount of money.").

14.     Finally, to permit Time-Based Damages as part of a net equity claim would be inconsistent with the Second Circuit's Net Equity Decision because any funds used to pay time-based damages out of the Customer Fund would be paid at the expense of "net losers," who have not yet recouped their initial investment.

15.     Even though no reading of the statute supports an interest re-calculation or damages in the form of a preferred customer claim, because the Time-Based Damages issue remains an outstanding objection, the Trustee must establish a reserve amount for this contingency.

16.     A Time-Based Damages reserve significantly limits the amount of funds that can be distributed in this Second Interim Distribution.  If the Trustee were not required to maintain a reserve on this issue, he would be able to distribute $3.019 billion, or 41.826% of each customer's allowed claim, unless the claim is fully satisfied.  By contrast, with a Time-Based Damages reserve of 3% ("3% Reserve"), the Trustee can only distribute $2.427 billion, or 33.541% of each customer's allowed claim, unless the claim is fully satisfied.  With a Time-Based Damages reserve of 9% ("9% Reserve")—which is the highest rate Objecting Claimants have asserted they are entitled to—the Trustee can only distribute $1.493 billion, or 20.563% of each customer's allowed claim, unless the claim is fully satisfied.  For customers with allowed claims who have waited patiently for the last three and a half years to receive the fruits of the Trustee's success, the difference between these distribution percentages cannot be overstated.

17.     Because maintaining such a large reserve significantly diminishes the Trustee's ability to distribute recovered funds to customers with allowed claims, the Trustee's counsel wrote to various Objecting Claimants, asking whether they would stipulate to a Time-Based Damages reserve of no higher than 3%, an amount which is greater than the consumer price index.  Counsel for the Trustee noted the inherent unfairness in forcing customers with allowed claims to wait through years of litigation before the amounts held in reserve can be released to them.  Indeed, by establishing the 3% Reserve, the Trustee would be able to distribute $934,417,985.80 more to customers than if the Trustee were required to maintain the 9% Reserve.

18.     The Trustee received few responses to the Reserves Reduction Letter.  Counsel for several Objecting Claimants agreed that in light of the harm to customers with allowed

claims, it was appropriate to reduce the Time-Based Damages reserve to 3%. Several other attorneys objected to reducing the reserve.

19.     Despite the opposition voiced by the latter group of attorneys, SIPA, case law, and common sense strongly suggest that even if Objecting Claimants were to obtain some sort of Time-Based Damages as part of a net equity claim—something the Trustee argues is impermissible—it is unlikely that a court would award damages at a 9% interest rate. The Trustee seeks permission to distribute as much of the recovered funds as he is permitted, to aid those customers with allowed claims in receiving a significant distribution without further delay. Thus, the Trustee moves for an order to make a distribution with a 3% Reserve.

20.     The Trustee must, however, ensure that customers receive a distribution promptly. Appeals from an order on this Motion could potentially preclude *any* distribution to customers. Thus, if objections to this Motion are filed that cannot be resolved prior to the entry of an order, the Trustee will submit an order that establishes the Time-Based Damages reserve at 9%, a percentage agreed-to by the parties, or a percentage directed by the Court (the "Greater than 3% Reserve"). This will permit a distribution to proceed, even if it is in a diminished amount due to Objecting Claimants' unwillingness to agree to a reasonable reserve for the Time-Based Damages contingency.

21.     Thus, by way of this Motion, the Trustee seeks to distribute, with the 3% Reserve, more than $2.427 billion (with an additional $3.036 billion available for distribution to certain "net loser" accounts, if the claims relating to their accounts become allowed prior to the time the distribution is made).[6] These distributions will be paid on claims relating to 1,229 BLMIS

---

[6] If all of the "net loser" accounts were allowed prior to the distribution, the total distribution would be approximately $5.463 billion. SIPC's subrogation claim is approximately $85.764 million, which, as discussed herein, SIPC has currently deferred pending further developments in this proceeding.

- 8 -

accounts.  The average payment amount to those 1,229 BLMIS accounts will be approximately $1.975 million.  Thirty-nine payments will go to claimants who qualified for hardship status under the Trustee's claims hardship program.  If approved, and when combined with the amounts from the First Allocation and First Interim Distribution, claims relating to 1,067 accounts will be fully satisfied.

22.    If the Trustee is forced to submit an order with a 9% Reserve, the Trustee will seek to distribute approximately $1.493 billion (with an additional approximate $1.862 billion available for distribution to certain "net loser" accounts, if the claims relating to their accounts become allowed prior to the time the distribution is made).  These distributions would be paid on claims relating to 1,229 BLMIS accounts.  The average payment amount to those 1,229 BLMIS accounts will be approximately $1.215 million.  Thirty-nine payments will go to claimants who qualified for hardship status under the Trustee's claims hardship program.  If approved, and when combined with the amounts from the First Allocation and First Interim Distribution, claims relating to 986 accounts will be fully satisfied.

23.    The practical effect of this determination and recalculation is to permit a second interim distribution to customers whose claims have not been fully satisfied because the net equity of their respective accounts as of the Filing Date[7] exceeded the statutory SIPA protection limit of $500,000 and were not satisfied by the First Interim Distribution.  Thus, by way of this Motion, the Trustee seeks permission to make a Second Allocation and Second Interim Distribution.

---

[7] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* SIPA § 78*lll*(7)(B).

24.     The proposed Second Allocation and Second Interim Distribution are interim in nature. The Trustee anticipates recovering additional assets through litigation and settlements. Final resolution of certain disputes will permit the Trustee to reduce the reserves he is required to maintain, which will allow him to make additional distributions to customers in the future. The Trustee will seek authorization for these further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.[8]

## II.     THE LIQUIDATION PROCEEDING

25.     Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11" to the extent these provisions are consistent with SIPA.

26.     SIPA affords special protection to "customers," as defined in SIPA § 78*lll*(2), who receive preferential treatment by having their claims satisfied ahead of general creditors. *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (recognizing that a "person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment"). The amounts owed to each customer are determined by valuing his or her "net equity," defined in SIPA § 78*lll*(11), as of the Filing Date.

27.     As of June 30, 2012, the Trustee has received 16,519 customer claims. (Cohen Aff. ¶ 4). As of June 30, 2012, the Trustee has determined 16,280 of those claims. (*Id.* ¶ 4).

---

[8] The Trustee seeks permission to include in the Second Interim Distribution those claims that are allowed between the time an order is entered on this Motion and the date of the Second Interim Distribution.

- 10 -

The Trustee allowed 2,436 claims and committed to pay approximately $802.3 million in funds advanced to him by SIPC. (*Id.*). To date, the allowed claims total over $7.47 billion. (*Id.*).

28.    Of the remaining determined customer claims, 13,679 were denied, 12 were determined as asserting no claim, and 153 were withdrawn. (*Id.* ¶ 5). Two hundred and thirty-seven claims relating to 187 accounts are currently categorized as "deemed determined," meaning that the Trustee has instituted litigation against those claimants. (*Id.*). The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under section 502(d) of the Bankruptcy Code. Accordingly, such claims will not be allowed until the avoidance action is resolved by settlement or otherwise and any judgment rendered against the claimant in the avoidance action is satisfied. Two customer claims filed by insiders remain to be determined, as they are still under review by the Trustee's staff; the value of these claims has been reserved in the proposed distribution. (*Id.*).

29.    As of June 30, 2012, the Trustee has received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. Of these 448 claims, 94 are general creditor claims and 49 are broker-dealer claims, which together total approximately $264.9 million of the $1.7 billion.[9] (*Id.* ¶ 6).

30.    2,312 docketed objections have been filed to the Trustee's claims determinations relating to approximately 4,037 claims, which will be noticed for hearing if necessary. (*Id.* ¶ 7).

---

[9] The 448 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor and service claims. (Cohen Aff. ¶ 7). They do not include "customer" claims, even though each "customer" claim—both those allowed and denied—has a "general creditor" component. All BLMIS creditors, including customers whose claims were allowed, customers whose claims were denied, and general creditors, may have claims as general creditors against BLMIS for misrepresentation, fraud, and breach of contract (assuming they filed claims). Customers who filed customer claims need not have specifically filed claims as general creditors to protect such rights.

These 2,312 objections relate to approximately 1,152 BLMIS accounts.  (*Id.*).  The objections raise various issues, including the proper interpretation of "net equity" (now resolved), the right to interest or time value of money, and whether the Trustee's calculation of allowed claims amounts are correct, the latter two being among those for which the which the Trustee is reserving.

## III.    ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA

### A.    Allocation of Property

31.    SIPA sets forth a bipartite statutory framework that gives customers priority over general creditors of the broker-dealer.  Pursuant to SIPA § 78fff-2(c)(1)(B), all customers with allowed claims share ratably in the fund of customer property.  Pursuant to SIPA § 78fff-2(c), general creditors and customers, to the extent of their respective unsatisfied net equities, share in any general estate.  Estate property not allocable to the fund of customer property is distributed in the order of priority established in section 726 of the Bankruptcy Code.  SIPA § 78fff(e).  Any property allocated to the fund of customer property that is not necessary to satisfy customer and other priority claims will become part of the general estate.  SIPA § 78fff-2(c).

32.    According to SIPA § 78*lll*(4), "customer property" consists of "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

33.    Among the assets that comprise "customer property" are "any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers . . ."  SIPA § 78*lll*(4)(D).  Under SIPA § 78*lll*(4)(D), a trustee is permitted to look to the property of the debtor to rectify the actions taken by the debtor that resulted in a shortfall in customer property.  *See Ferris, Baker, Watts v.*

- 12 -

*Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 132 (Bankr. D. Minn. 2002) ("Application

of the plain meaning of 15 U.S.C. § 78*lll*(4)(D) provides a means to rectify any actions taken by,

or with respect to, the debtor, that results in such a shortfall. . . . Thus, if the debtor failed to set

aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78*lll*(4)(D) would

require the trustee to correct the debtor's error.").

34.    Thus, if the trustee determines that there is a shortfall in assets such that customer

property is insufficient to satisfy net equity claims, then he may look to other assets of the debtor

and allocate property to the fund of customer property.

35.    SIPA liquidations generally take a broad and inclusive customer-related approach

to the allocation of property.  For example, in *In re Park South Securities, LLC*, 99% of the

debtor's estate was allocated to customer property.  *See* Order, No. 03-08024A (Bankr. S.D.N.Y.

Oct. 30, 2008) (ECF No. 201).[10]  Consistent with prior liquidations, the Trustee expects to

allocate the vast majority of the BLMIS estate to the Customer Fund, inasmuch as here,

recovered property either belonged to customers or was derived from the misuse of customer

property.

---

[10] *Accord SIPC v. Lehman Brothers, Inc.*, Adv. Pro. No. 08-01420, Motion for Order Approving Allocation of Property of the Estate at 27-28, n.33 (Bankr. S.D.N.Y. Oct. 5, 2009) (ECF No. 1866) (allocating "most" of debtor's assets to customer property); *In re Vision Inv. Grp., Inc.*, Adv. Pro. No. 97-1035B, Order Approving Third and Final Report and Final Accounting of the Securities Investor Protection Corporation (Bankr. W.D.N.Y. Dec. 13, 2005) (allocating 95% of debtor's estate to customer property); *In re Klein Maus & Shire, Inc.*, Adv. Pro. No. 00-8193A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property); *In re MJK Clearing*, 286 B.R. at 132 (allocating 100% the debtor's assets as customer property); *In re A.R. Baron & Co., Inc.*, Order Approving Final Report and Account and Related Relief, Adv. Pro. No. 96-8831A (Bankr. S.D.N.Y. Feb. 10, 2004) (allocating 99% of the debtor's assets to customer property); *In re Hanover, Sterling & Co.*, Adv. Pro. No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002) (allocating 75% of debtor's estate to customer property).

B.    **Distributions Under SIPA**

36.    The SIPA distribution scheme, while complex, can be distilled to a simple equation.  Each customer is entitled to his or her *pro rata* share of customer property.  To determine the percentage that each allowed customer will receive from the fund of customer property in an interim distribution, the aggregate amount collected to date by the trustee and allocated to customer property is divided by the aggregate amount of net equity claims allowed by the trustee.  The percentage result is then to be applied to each net equity claim to determine a customer's *pro rata* share.  The equation is as follows:

$$\frac{\text{Fund of Customer Property (``Numerator'')}}{\text{Allowable Customer Net Equity Claims (``Denominator'')}} = \text{Customer } Pro\ Rata \text{ Share}$$

37.    SIPA § 78fff-2(c)(1) establishes the order of distribution of customer property.  The second and third priorities of distribution are relevant here.  The second priority is to distribute customer property among customers based on their filing date net equities.  SIPA § 78fff-2(c)(1)(B).  The third priority is to distribute customer property to SIPC as subrogee.  SIPA § 78fff-2(c)(1)(C).  Thereafter, any customer property remaining becomes part of the general estate.

38.    The amount advanced by SIPC to the Trustee in full or partial satisfaction of a customer claim is based on the difference between the customer's net equity and his share of customer property, subject to the $500,000 limit of SIPA's statutory protection.  The SIPC advance does not reduce the customer's net equity or his claim against customer property.  If the sum of the amount of a customer's SIPC advance and any subsequent distribution of customer property exceeds the customer's net equity, SIPC has the right to recoup its advance from the excess.  In effect, SIPC becomes subrogated to the claims of customers to the extent it has made

- 14 -

advances but cannot seek recovery from customer property as to any individual customer until the customer has been fully satisfied.  SIPA §§ 78fff-3(a), 78fff-2(c)(1).

### C.    Allocation Of Assets To The Customer Fund And Related Reserves

39.    As this Court previously found in its Net Equity Decision, and as numerous courts in civil and criminal proceedings have also found, Madoff did not engage in securities trading on behalf of BLMIS customers.   Madoff used customer funds to support operations and fulfill requests for redemptions to perpetuate a Ponzi scheme.   Thus, payment of "profits" to any one customer in fact came from another customer's deposit of funds.   In essence, all of the funds withdrawn by BLMIS customers were simply other people's money.

40.    BLMIS had an obligation to set aside sufficient assets to cover its statutory obligations to customers.  *See* Securities Exchange Act Rule 15c3-3; 17 C.F.R. § 240.15c3-3.[11] The assets of BLMIS and Madoff are insufficient to cover those obligations.

41.    For these reasons, and because it is not uncommon for almost all property available to a broker-dealer to be deemed "customer property," the Trustee seeks the Court's approval to allocate to the Customer Fund virtually all cash and cash equivalents currently in his possession that was not previously allocated—$5,501,375,994.66—which includes the Picower Settlement.  (Cohen Aff. ¶ 8).  *See First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 362-66 (D.N.J. 1986) (describing and approving SIPA allocation and distribution scheme similar to that proposed by

---

[11] SIPA's definitional paragraphs were amended in 1978 to incorporate in the "customer property" definition any other property of the debtor's estate which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers.  Thus, to the extent that prior to the Filing Date BLMIS failed to maintain cash and securities in compliance with the Net Capital Rule issued by the SEC (Rule 15c3-1), as affected by the Customer Protection Rule (Rule 15c3-3) (both issued pursuant to the Exchange Act, 15 U.S.C. § 78*o*(c)(3)(A)), the Trustee is required to allocate property as necessary to remedy such non-compliance.  The Customer Protection Rule effectively requires that a broker-dealer maintain control of all property that would have to be delivered to customers in the event of a liquidation: either the securities themselves or their value in the form of cash (or equivalents), and cash sufficient to pay net cash obligations to customers.

Trustee).  When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the total amount allocated will be $8,119,350,424.92.  Of the $8,119,350,424.92 allocated to the Customer Fund, $335,499,915.98 was distributed to customers with allowed claims as part of the First Interim Distribution.  In connection with the First Interim Distribution, an additional $417,364,436.12 was reserved for accounts in litigation and $8,499,781.66 of SIPC subrogation was deferred. Therefore, the total amount available for the Second Interim Distribution will be $7,357,986,291.16.

         **i.**        **Assets In Trustee's Possession As Of June 30, 2012**

       42.       The Form SIPC 17 completed by the Trustee each month lists all of the recoveries and assets in the Trustee's possession.  In the Trustee's Form SIPC 17 for the period ending on June 30, 2012 ("June 30 SIPC 17 Form"), attached hereto as Exhibit A, the Trustee reports that he has recovered approximately $3.119 billion.[12]  These funds were primarily derived from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS estate; (b) pre-litigation and litigation settlements; (c) customer preference recoveries; (d) the sale of assets; (e) refunds; and (f) earnings on the Trustee's investment and money market accounts.   In addition, subsequent to the filing of the June 30, 2012 SIPC 17 Report, the $5 billion Picower Settlement was remitted to the Trustee, bringing the total recovery to approximately $8.119 billion.

       43.       To the extent additional settlements are reached and/or become final prior to the entry of an order on this Motion, the Trustee will allocate and distribute those recoveries in accordance with the formula set forth herein.

---

[12] In addition, the Trustee has in his possession a *de minimis* amount of unliquidated assets.

- 16 -

ii.   **Picower Funds**

44.    Under the terms of the escrow agreement, the Picower Settlement is released to the Trustee upon entry of either a final, nonappealable order approving the Picower Settlement or a final, nonappealable order of forfeiture in the Picower Forfeiture.  As discussed above, the Picower Forfeiture order became final on July 16, 2012.  Thus, the Trustee received the funds, which had been held in escrow in the form of U.S. Treasury Bills.

iii.   **Undisputed Recoveries To The BLMIS Estate Since The First Allocation and First Interim Distribution**

45.    In the Motion on the First Allocation and First Interim Distribution submitted to the Court on May 4, 2011, the Trustee reported total recoveries of $2,617,974,430.26.  The Trustee has recovered additional funds for the estate from multiple parties and sources since that time.

46.    On June 10, 2011, this Court approved a settlement agreement between the Trustee and the Joint Liquidators for Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited (collectively, the "Fairfield Funds").  *Picard v. Fairfield Sentry et al.*, Adv. Pro. No. 09-1239 (Bankr. S.D.N.Y.) (BRL) (ECF No. 95).  On July 13, 2011, the Court entered consent judgments between the Trustee and Fairfield Lambda Limited in the amount of $52.9 million (ECF No. 108), Fairfield Sentry Limited in the amount of $3.054 billion (ECF No. 109), and Fairfield Sigma Limited in the amount of $752.3 million (ECF No. 110).

47.    Under the terms of this settlement, Fairfield Sentry Limited agreed to permanently reduce its net equity claim from approximately $960 million to $230 million.  Additionally, the Joint Liquidator for the Fairfield Funds agreed to make a $70 million payment to the Customer Fund.  To date, the Fairfield Sentry Joint Liquidators have paid approximately $26.3 million, of which approximately $16 million in cash was transferred on or about July 8, 2011 and

approximately $2.3 million was transferred on or about January 14, 2012. The remaining $8 million balance was an offset against funds owed by the Trustee to Fairfield Sentry. The Joint Liquidator also agreed to assign to the Trustee all of the Fairfield Funds' claims against the Fairfield Greenwich Group management companies, officers, and partners; the Trustee retained his own claims against the management defendants. Further, the Trustee and the Liquidators agreed to share future recoveries in varying amounts, depending on the nature of the claims. The Trustee has allowed Fairfield Sentry's claim of $78 million; when the remaining $43.7 million is paid, the Trustee will increase the allowed claim by $152 million to $230 million.

48.    On July 7, 2011, this Court approved a settlement between the Trustee, Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. (collectively, the "Greenwich Funds"), wherein this Court entered judgment against Greenwich Sentry, L.P. in an amount over $206 million and against Greenwich Sentry Partners, L.P. in an amount over $5.9 million. *Picard v. Fairfield Sentry et al.*, Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y.) (BRL) (ECF No. 107). In this settlement, the Greenwich Funds agreed to permanently reduce their net equity claim from approximately $143 million to over $37 million, for a combined reduction of over $105.9 million. Additionally, the Greenwich Funds assigned the Trustee all of their claims against Fairfield Greenwich Group management, as well as agreed to share with the Trustee any recoveries they accomplish against service providers.

49.    To implement this settlement agreement, the Court was required to confirm the plan in the jointly administered Chapter 11 proceeding of Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P. *In re Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P.*, Adv. Pro. No. 10-16229 (Bankr. S.D.N.Y.) (BRL). The plan confirmation hearing was held on December 22, 2011. The plan was confirmed subject to the resolution of issues unrelated to the

- 18 -

settlement with the Trustee. Those matters have been resolved. The effective date of the plan was February 24, 2012. With the settlement becoming effective, claims against the Fairfield Greenwich Group management have been assigned to the Trustee, and the Greenwich Funds' BLMIS customer claims have been allowed in the amount of $35 million and more than $2 million, respectively.

50.    On October 4, 2011, a $43.5 million settlement between the Trustee and Mount Capital Fund, Ltd., a British Virgin Islands company in liquidation, and Mount Capital Asset Subsidiary Limited, a British Virgin Islands company in liquidation, (collectively, the "Mount Capital Companies") was approved by this Court. *Picard v. Mount Capital Fund LTD, et al.*, Adv. Pro. No. 10-05123 (Bankr. S.D.N.Y.) (BRL) (ECF No. 17). Under the settlement, Mount Capital paid $43.5 million to the Trustee. Mount Capital received an allowed customer claim in the SIPA proceeding in the amount of $294,860,547.82 and received a SIPC customer advance under SIPA § 78fff-a(a).

51.    On December 21, 2011, this Court approved a $326 million settlement between the Trustee and the United States of America, on behalf of the Internal Revenue Service ("IRS"). (ECF No. 4602). The Trustee determined that BLMIS debited the accounts of 145 foreign account holders for alleged U.S. federal income tax withholding and paid to the IRS such withheld amounts related to alleged dividends. However, because no securities were purchased and thus no dividends were ever received by BLMIS, amounts withheld in the six-year period have been credited to the relevant accounts.

52.    In the settlement, the Trustee agreed to set aside almost $103 million as a reserve to satisfy any judgments, settlements, or administrative decisions against the IRS, the United States, or the Trustee that are entered with respect to certain payments. The Trustee may release

the reserve two years and sixty days after December 21, 2011; however, if there are any pending claims at that time, the Trustee and the United States will confer to determine an appropriate amount to reserve to satisfy the hypothetical pending claims. Thus, the Trustee seeks approval to allocate the full amount to the settlement to the Customer Fund, though the Trustee will hold $103 million in reserve.

53.    On May 10, 2012, a settlement in the amount of more than $28.9 million between the Trustee and defendant Trotanoy Investment Company, Ltd. ("Trotanoy") in *Picard v. Trotanoy, et al.*, Adv. Pro. No. 10-05208 (Bankr. S.D.N.Y.) (BRL), was approved by this Court. Under the terms of the settlement, Trotanoy will have an allowed customer claim in the SIPA proceeding in the amount of approximately $65 million and shall be entitled to a SIPC customer advance under SIPA § 78fff-a(a).

54.    In addition to the above settlements, the Trustee has recovered approximately $84.6 million since the First Allocation and First Interim Distribution as a result of preference settlement, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries. (Cohen Aff. ¶ 14). Therefore, the Trustee seeks approval to allocate the full amount of these recoveries to the Customer Fund.

### iv.    Disputed Recoveries

55.    One of the more significant pre-litigation settlements approved by this Court was entered into by the Trustee and the estate of Norman F. Levy. Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement By and Among the Trustee and Jeanne Levy-Church and Francis N. Levy (ECF No. 1964). This settlement resulted in the return of $220 million to the BLMIS estate. (Cohen Aff. ¶ 16). Certain claimants, represented by the law firm of Becker & Poliakoff, LLP, moved to vacate this settlement ("Levy Appeal"). This Court denied the motion to vacate,

and on appeal, the District Court affirmed.  (ECF No. 3984; *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec.*, No. 11 Civ. 03313, 2012 U.S. Dist. LEXIS 21740 (S.D.N.Y. Feb. 16, 2012) (DAB)).  The District Court decision is now on appeal to the Second Circuit.  *See Peshkin v. Levy-Church, et al.*, No. 12-0816-bk (2d Cir.).  Because the proceeds of the Levy settlement remain the source of dispute, the Trustee is prevented from distributing these funds to customers at this time.  The Trustee allocated the full amount of this settlement to the Customer Fund in the First Allocation, though the Trustee will hold the $220 million in reserve pending the Levy Appeal.

56.    On December 21, 2011, this Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, "Tremont") in the amount of $1.025 billion.  *Picard v. Tremont Group Holdings, Inc.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y.) (BRL) (ECF No. 38).  In this settlement, Tremont agreed to transfer $1.025 billion into an escrow account after the order approving the settlement became final.  Upon the release of the settlement payments from the escrow account, the Trustee will allow certain customer claims related to Tremont.  Two objections to the settlement agreement were filed by non-BLMIS customers, both of which were overruled by this Court.  This Court entered an Order Granting Trustee's Motion for Entry of Order Approving Agreement (ECF No. 38).

57.    Certain objectors filed an appeal of the Tremont settlement on September 30, 2011.  *See Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC v. Tremont Group Holdings, Inc., et al.,* No. 11 Civ. 7330 (S.D.N.Y.) (GBD) ECF No. 1.  Thereafter, Tremont filed a motion to dismiss the appeal, which was subsequently joined by motions filed by the Trustee and parties subject to the settlement.  (ECF Nos. 4, 6, 8,

12, and 14).   The non-BLMIS customers who commenced the appeal opposed the dismissal. (ECF Nos. 15, 16).   On June 27, 2012, Judge George B. Daniels of the District Court granted the motion to dismiss the appeal, and judgment was entered on June 28.   (ECF Nos. 35, 36).   The Trustee will move this Court for another allocation and distribution order once those funds are available.

58.        As of June 30, 2012, the Trustee has recovered $3,119,350,424.92 as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries.   Of the total amount recovered, $115,190,556.49 remains subject to a final ruling as to how net equity claims are to be determined.[13]   (Cohen Aff. ¶ 20).   Although the Second Circuit's Net Equity Decision on the Net Investment Method is now final, the Objecting Claimants argue that any time-based damages should be part of their net equity claims.   Thus, the Trustee will hold the $115,190,556.49 in reserve pending the outcome of the Time-Based Damages Motion.   (Id.).   Therefore, the Trustee seeks approval to allocate the full amount of these preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries that were not previously allocated to the Customer Fund; however, $115,190,556.49 will not be available for distribution at this time.   (Id.).

### v.        Summary Of Requested Allocation

59.        The Trustee, in this Motion, seeks to allocate $5,501,375,994.66 to the Customer Fund.   When combined with the $2,617,974,430.26 billion that was allocated to the Customer Fund in connection with the First Allocation, the total amount allocated will be $8,119,350,424.92.   Of the $8,119,350,424.92 allocated to the Customer Fund, $335,499,915.98

---

[13] These agreements provide that if the court enters a final, nonappealable order overruling the Net Equity Decision (such that each customer's net equity in this proceeding shall be calculated according to the Last Statement Method), the funds returned to the BLMIS estate shall revert to the claimants.

was distributed to customers with allowed claims as part of the First Interim Distribution.  In connection with the First Interim Distribution, an additional $417,364,436.12 was reserved for accounts in litigation and $8,499,781.66 of SIPC subrogation was deferred. Therefore, the total amount available for the Second Interim Distribution will be $7,357,986,291.16. Of the $7,357,986,291.16 in available funds, $220 million must be held in reserve pending the outcome of the Levy Appeal, $103 million must be held in reserve relating to the IRS settlement, and $115,190,556.49 must be held in reserve pending the outcome of the Time-Based Damages Motion.  (*Id.* ¶ 21.)

60.     The Trustee does not seek to allocate any funds to the General Estate at this time.

**D.     Determination Of Allowable Net Equity Claims & Related Reserves**

61.     For distribution purposes, the Customer Fund numerator is only one half of the equation.  In order to calculate each customer's *pro rata* share of customer property, the Trustee also needs to establish the denominator, or the amount of allowable net equity claims.

62.     If the Trustee had determined all customer claims and his determinations were final either through the passage of time or judicial determination, the denominator would simply equal the amount of allowed claims.  Because the Trustee seeks to make a Second Interim Distribution prior to a final determination of all customer claims and certain disputes are pending, the Trustee cannot use as the denominator the amount of allowed claims as of this date.  Doing so could result in an uneven distribution to customers, in violation of SIPA and the Bankruptcy Code, because there could be insufficient funds to distribute to claimants whose claims are allowed in the future.  Instead, the Trustee must project as to the amount of all allowable net equity claims and establish sufficient reserves to ensure that all possibly-eligible claimants receive a pro rata distribution, should their claims be allowed.  In order to do so, he must maintain sufficient reserves.

63.     As discussed above, Time-Based Damages is a contingency for which the Trustee must reserve.  Maintaining a 9% Reserve comes at the direct expense of "net loser" customers with allowed claims by forcing them to wait years while that issue is litigated.  Because the likelihood of a 9% interest rate as a net equity claim is slim, the Trustee moves this Court for a 3% Reserve, which is sufficient to protect the interest of Objecting Claimants but also balances the harm to customers with allowed claims.

64.     The Trustee has calculated the Time-Based Damages reserve by applying a 3% interest rate to positive account balances.  Thus, for purposes of this Motion, the Trustee seeks to set the denominator at $20,134,952,000.83 (the "3% Time-Based Damages Reserve Denominator").  (Cohen Aff. ¶ 23).

65.     If objections to the 3% Reserve are filed that cannot be resolved prior to the entry of an order, the Trustee will submit an order that uses the 9% Reserve or Greater than 3% Reserve.  By applying a 9% interest rate to positive account balances, the denominator would be $30,522,630,443.18 (the "9% Time-Based Damages Reserve Denominator").  (Cohen Aff. ¶ 24).

66.     Certain accountholders decided against filing a claim in this proceeding, even though they may have had allowable net equity claims.  The statutory bar date to file claims was July 2, 2009.  SIPA § 78fff-2(a)(3).  Thus, a failure to file a claim by that date means that there is no distribution that can be made to these accounts.  No reserves are maintained for these accounts.

67.     Further, certain accountholders have entered into final settlements not contingent on the Net Equity Dispute.  No reserves are maintained for these accounts.

68.     There are no additional reserves required for any future avoidance recoveries by the Trustee because such recoveries will be added to both the numerator and the denominator by

operation of section 502(h) of the Bankruptcy Code.  Any subsequent recovery coupled with a corresponding claim for the same amount cannot adversely affect the distribution because the addition of any amount to both the numerator and denominator can only result in an increase, not a decrease, of the *pro rata* distribution to any customer.

69.    Finally, the Second Circuit's ruling on Net Equity Dispute effectively determined the ancillary issue regarding the net equity calculation of accounts that received transfers from other BLMIS accounts.  In accordance with the Second Circuit's ruling, the Net Investment Method has been applied to every BLMIS account, regardless of whether it received transfers from other BLMIS accounts.  As such, reserves need not be maintained relating to accounts with transfers from other BLMIS accounts.

## IV.    CALCULATION OF *PRO RATA* SHARE OF CUSTOMER FUND FOR SECOND ALLOCATION AND SECOND INTERIM DISTRIBUTION

70.    SIPA § 78fff-2(c)(1) establishes, in pertinent part, that a customer is to receive his ratable share from the fund of customer property.  To the extent the customer's share has been fully satisfied through an advance of funds by SIPC, SIPC steps into the shoes of the customer as subrogee and receives that customer's share of customer property.  In that manner, a customer does not receive a double recovery on his claim that was already fully satisfied by the SIPC advance.

71.    As set forth above and in the Cohen Affidavit, the Trustee proposes to allocate $5,501,375,994.66 to the Customer Fund at this time.  When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the total amount allocated will be $8,119,350,424.92.  Of the $8,119,350,424.92 allocated to the Customer Fund, $335,499,915.98 was distributed to customers with allowed claims as part of the First Interim Distribution.  In connection with the First Interim Distribution,

an additional $417,364,436.12 was reserved for accounts in litigation and $8,499,781.66 of SIPC

subrogation was deferred. Therefore, the total amount available for the Second Interim

Distribution will be $7,357,986,291.16. (Cohen Aff. ¶ 25). Of that amount, $6,753,548,677.28

is available for distribution (the "Net Customer Fund"). (*Id.*). The difference between those

amounts—$604,437,613.89—represents the catch-up payment the Trustee will owe customers

from the First Allocation and First Interim Distribution if a ruling requires the calculation of

Time-Based Damages at 3%, as well as the reserves related to the Levy Appeal, the IRS

settlement, and the outcome of the Time-Based Damages Motion. (*Id.*).

72.     The 3% Time-Based Damages Reserve Denominator is $20,134,952,000.83. (*Id.*

¶ 26). To determine the percentage of each allowed customer net equity claim that can be

satisfied from the Customer Fund, the Net Customer Fund is divided by the 3% Time-Based

Damages Reserve Denominator, resulting in the following percentage (the "3% Scenario"):

$$\frac{\$6,753,548,677.28 \quad (\text{Net Customer Fund})}{\$20,134,952,000.83 \ (3\% \text{ Time-Based Damages Reserve Denominator})} = 33.541\%$$

73.     Under the 3% Scenario, a total of 1,229 accounts will receive a distribution of

approximately 33.541% of their net equity claim. (Cohen Aff. ¶ 27). Of these 1,229 accounts,

181 will become fully satisfied, bringing the total of fully satisfied account holders to 1,067

(1,048 accounts will remain partially satisfied and will be entitled to participate in future

distributions). (*Id.*).

74.     An additional 182 accounts that are currently "deemed determined" could receive

a distribution if and when the status of their claims moves from "deemed determined" to

allowed. (*Id.* ¶ 28). Seventy-five of the 182 accounts would be fully satisfied by the SIPC

advance. The remaining 107 accounts would receive both a SIPC advance and a distribution in

accordance with the Trustee's Motion and his First Allocation and First Interim Distribution.

(*Id.*).  Thirteen of the remaining 107 accounts would be fully satisfied by the First and Second Interim Distributions.  (*Id.*).

75.    If, however, the Trustee is forced to distribute with a 9% Reserve due to objections, the 9% Time-Based Damages Reserve Denominator would be $30,522,630,443.18. (*Id.* ¶ 29).  Under the 9% Reserve scenario, $5,501,375,994.66 would be allocated to the Customer Fund.  (*Id.*).  When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the total amount allocated will be $8,119,350,424.92.  Of the $8,119,350,424.92 allocated to the Customer Fund, $335,499,915.98 was already distributed to customers with allowed claims as part of the First Interim Distribution. In connection with the First Interim Distribution, an additional $417,364,436.12 was reserved for accounts in litigation and $8,499,781.66 of SIPC subrogation was deferred. Therefore, the total amount available for the Second Interim Distribution will be $7,357,986,291.16.   Of that amount, $6,276,374,797.49 would be available for distribution (again, the "Net Customer Fund").  (Cohen Aff. ¶ 29.).  The difference between those amounts—$1,081,611,493.67—represents the catch-up payment the Trustee will owe customers from the First Allocation and First Interim Distribution if a ruling requires the calculation of Time-Based Damages at 9%, as well as the reserves related to the Levy Appeal, the IRS settlement, and the outcome of the Time-Based Damages Motion.  (*Id.*).

76.    To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the 9% Time-Based Damages Reserve Denominator, resulting in the following percentage (the "9% Scenario"):

$6,276,374,797.49   (Net Customer Fund)                              = 20.563%
$30,522,630,443.18 (9% Time-Based Damages Reserve
Denominator)

77.       Under the 9% Scenario, a total of 1,229 accounts will receive a distribution of
approximately 20.563% of their net equity claim.  (Cohen Aff. ¶ 31).  Of these 1,229 accounts,
100 will become fully satisfied, bringing the total of fully satisfied account holders to 986 (1,129
accounts will remain partially satisfied and will be entitled to participate in future distributions).
(*Id.*).

78.       An additional 182 accounts that are currently "deemed determined" could receive
a distribution if and when the status of their claims moves from "deemed determined" to
allowed.  (*Id.* ¶ 32).  Seventy-five of the 182 accounts would be fully satisfied by the SIPC
advance.  The remaining 107 accounts would receive both a SIPC advance and a distribution in
accordance with the Trustee's Motion and his earlier distribution motion.  (*Id.*).  Eight of the
remaining 107 accounts would be fully satisfied by the first and second interim distributions.
(*Id.*).

79.       The following chart provides an example of the two distribution scenarios for a
customer with an allowed claim of $800,000:

| Category | Customer Pro Rata Share | Allowed Amount | SIPC Advance | First Interim Distribution | Customer Pro Rata Amount From Second Interim Distribution | SIPC Subrogation | Amount of Second Interim Distribution to Customer | Total To Customer (SIPC Advance + Distributions) |
|---|---|---|---|---|---|---|---|---|
| 3% Scenario | 33.541% | $800,000.00 | $500,000.00 | $36,816.00 | $268,328.00 | $5,144.00 | $263,184.00 | $800,000.00 |
| 9% Scenario | 20.563% | $800,000.00 | $500,000.00 | $36,816.00 | $164,504.00 | $0.00 | $164,504.00 | $701,320.00 |

80.       Whether under the 3% or 9% Scenario, the Trustee has determined that, at this
time, each customer's ratable share of the Net Customer Fund shall be no less than 25.165% of

the customer's net equity claim, which includes the 4.602% customers received subject to the

First Allocation and First Interim Distribution. (*Id.* ¶ 34). If the Trustee is successful in his

efforts to use the 3% Reserve, each customer's ratable share of the Net Customer Fund shall be

no less than 38.143%. (*Id.*).

81.     SIPC is entitled to receive repayment as to any given customer to the extent the

customer's claim was fully repaid by a combination of the SIPC advance and the Trustee's initial

distribution. *See In re Bell & Beckwith*, 104 B.R. 842, 852-55 (Bankr. N. D. Ohio 1989), *aff'd*,

937 F.2d 1104 (6th Cir. 1991). SIPC, as subrogee, is entitled to receive partial repayment of its

cash advances to the Trustee pursuant to SIPA § 78fff-3(a)(1). SIPC, however, has agreed to

defer receipt of any subrogation amounts from this Second Allocation and Second Interim

Distribution. Instead, any monies that would otherwise be paid to SIPC will be, at present,

retained by the Trustee pending further developments in the case.

82.     As noted above, the Trustee is making an interim distribution of the undisputed

property allocated to the Customer Fund. The numbers contained herein are based on recoveries

and claims allowed as of June 30, 2012, and the $5 billion Picower Settlement received shortly

thereafter. To the extent additional claims are allowed or additional recoveries are made, the

Trustee will distribute funds consistent with the formulas set forth in this Motion.

A.      **No Interim Distribution Of General Estate**

83.     Under SIPA § 78fff(e), funds from the general estate satisfy the administrative

costs and expenses of a Debtor's estate and a liquidation proceeding. To the extent the general

estate is insufficient, SIPC makes advances to the Trustee for the payment of such costs and

expenses. SIPA § 78fff-3(b)(2). All administrative advances made by SIPC are recoverable

from the general estate under section 507(a)(2) of the Bankruptcy Code. SIPA

§§ 78eee(b)(5)(E), 78fff(e). The general estate is distributed in accordance with section 726 of

the Bankruptcy Code, with section 507(a)(2) expenses receiving second priority.[14]    SIPA
§ 78fff(e).

84.    As noted previously, the Trustee has received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion.    The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.    Of these 448, 101 are general creditor claims and 94 are broker-dealer claims which together total approximately $264.9 million of the $1.7 billion.    Inasmuch as the Trustee proposes to allocate no assets to the General Estate, there are no funds in the General Estate from which to make a distribution to general creditors at this time.    Accordingly, "[no] purpose would be served" by the examination of or the institution of actions seeking to disallow such claims.    *See* 11 U.S.C. § 704(5).

## V.    DEPARTMENT OF JUSTICE FORFEITURE FUNDS

85.    The United States Attorney's Office for the Southern District of New York ("USAO") has forfeited billions of dollars of assets relating to the fraud that occurred at BLMIS (the "Forfeiture Fund").    Victims are entitled to petition for mitigation or remission of forfeiture in accordance with the criteria set forth in 28 C.F.R. Part 9.    The Government may contract with a special master to notify petitioners, process petitions, and make recommendations with regard to forfeited property.    28 C.F.R. § 9.9(c).    Pursuant to this authority, the Department of Justice has announced that it will retain Mr. Picard to serve as special master to assist the USAO and the Department of Justice ("DOJ") in the petition process to be conducted in connection with BLMIS-related forfeitures, in accordance with applicable regulations.    Thus, when finalized, Mr. Picard will wear "two hats," one as SIPA Trustee and one as DOJ special master.

---

[14] There are no § 507(a)(1) expenses in this liquidation proceeding.

86.    It is anticipated that many of the customers to whom the Trustee proposes to distribute pursuant to this Motion may also be eligible for distributions from the Forfeiture Fund. Any determination as to the amounts owed to a claimant—whether a "customer" under SIPA or a "victim" under the forfeiture regulations—will take into account monies received from either fund such that no claimant receives in this SIPA proceeding more than their net equity claim under SIPA.

## VI.    MISCELLANEOUS

### A.    Notice

87.    Pursuant to Bankruptcy Rules 2002(a)(6), 2002(f)(8), and 2002(h), the Trustee has given notice of the hearing on the Trustee's Motion by first class mail, postage prepaid, to all claimants that filed a claim. Pursuant to the Order Establishing Notice Procedures (ECF No. 4650), the Trustee has given notice of the hearing on the Trustee's Motion to via email and/or U.S. Mail to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) all persons who have filed notices of appearance in the BLMIS proceeding. The Trustee believes that no further notice need be given of this or any further matter in the proceeding.

### B.    Waiver Of Memorandum Of Law

88.    The Trustee respectfully requests that this Court waive the requirement under Local Bankruptcy Rule 9013-1(b) for the submission of a separate memorandum of law or, alternatively, deem this Motion as satisfying that requirement.

## VII.    CONCLUSION

89.    This Motion and the relief requested by the Trustee are consistent with the policy and purposes underlying SIPA and are in the best interests of the customers of BLMIS, the Debtor estate, and its creditors.

90.    No prior application for the relief sought herein has been made to this or any other Court.

91.    **WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a) approving (i) the proposed Second Allocation of property to the Customer Fund and to the General Estate; (ii) the proposed Second Interim Distribution of the Customer Fund; and (b) granting such other and further relief as may be deemed just and proper.

Dated:  July 26, 2012                                  Respectfully submitted,


                                                       */s/ David J. Sheehan*
                                                       David J. Sheehan
                                                       Email: dsheehan@bakerlaw.com
                                                       Jorian Rose
                                                       Email: jrose@bakerlaw.com
                                                       Seanna R. Brown
                                                       Email: sbrown@bakerlaw.com
                                                       **Baker & Hostetler LLP**
                                                       45 Rockefeller Plaza
                                                       New York, New York  10111
                                                       Tel: (212) 589-4200
                                                       Fax: (212) 589-4201

                                                       *Attorneys for Irving H. Picard, Trustee*
                                                       *for the Substantively Consolidated SIPA*
                                                       *Liquidation of Bernard L. Madoff Investment*
                                                       *Securities LLC and Bernard L. Madoff*