**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant.<br>In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |

**AFFIDAVIT OF MATTHEW COHEN IN SUPPORT OF THE TRUSTEE'S MOTION FOR AN ORDER APPROVING THE SECOND ALLOCATION OF PROPERTY TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING SECOND INTERIM DISTRIBUTION TO CUSTOMERS**

STATE OF CALIFORNIA    )
              ) ss:
COUNTY OF LOS ANGELES  )

    Matthew Cohen, being duly sworn, deposes and says:

    1.  I am a Managing Director of AlixPartners LLP. I make this affidavit to transmit to the Court information relevant to the motion by Irving H. Picard, trustee ("Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), for an Order Approving the Trustee's Second Allocation of Property to the Fund of Customer Property and Authorizing Second Interim Distribution to Customers (the "Motion").

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

300256097

2. AlixPartners has served as the Trustee's Claims Agent and as the accountant for the BLMIS estate since December of 2008 pursuant to SIPA § 78fff-1(a)(1). As the Claims Agent, AlixPartners was responsible for both mailing the notice of the liquidation and claim forms to potential claimants and causing the notice of the liquidation to be published. AlixPartners has also been responsible for processing all claims submitted to the Trustee and assisting the Trustee in reviewing each customer claim filed to determine whether the asserted claim amount agrees with the "net equity" for that account. In addition, as the accountants for the BLMIS estate, AlixPartners has assisted and continues to assist the Trustee in accounting for the assets of the BLMIS estate, including the cash and cash equivalents available to the Trustee.

3. I have been actively involved in the liquidation of BLMIS and the claims process since December 2008 and have personal knowledge of the matters set forth herein.

### The Claims Process

4. As of June 30, 2012, the Trustee has received 16,519 customer claims. As of June 30, 2012, the Trustee has determined 16,280 of those claims. The Trustee allowed 2,436 claims and committed to pay approximately $802.3 million in funds advanced to him by SIPC. To date, the allowed claims total over $7.47 billion.

5. Of the remaining determined customer claims, 13,679 were denied, 12 were determined as asserting no claim, and 153 were withdrawn. Two hundred and thirty-seven claims relating to 187 accounts are currently categorized as "deemed determined," meaning that the Trustee has instituted litigation against those claimants. Two customer claims filed by insiders remain to be determined, as they are still under review by the Trustee's staff; the value of these claims has been reserved in the Second Interim Distribution.

6. As of June 30, 2012, the Trustee has received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7

billion. Of these 448 claims, 94 are general creditor claims and 49 are broker-dealer claims, which together total approximately $264.9 million of the $1.7 billion.

7. The 448 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor and service claims. 2,312 docketed objections have been filed to the Trustee's claims determinations relating to approximately 4,037 claims, which will be noticed for hearing if necessary. These 2,312 objections relate to approximately 1,152 BLMIS accounts.

## Recoveries by the Trustee

8. In the Motion filed on May 4, 2011 for the initial allocation and pro rata interim distribution ("First Allocation" and "First Interim Distribution"), the Trustee allocated $2,617,974,430.26 to the fund of customer property ("Customer Fund"). The Trustee seeks the Court's approval to allocate an additional $5,501,375,994.66 to the Customer Fund. These funds were primarily derived from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS estate; (b) pre-litigation and litigation settlements; (c) customer preference recoveries; (d) the sale of assets; (e) refunds; and (f) earnings on the Trustee's investment and money market accounts. Of the total $8,119,350,424.92 that will be allocated to the Customer Fund, $335,499,915.98 was distributed to customers with allowed claims as part of the First Interim Distribution. An additional $417,364,436.12 was reserved for accounts in litigation and $8,499,781.66 of SIPC subrogation was deferred. Therefore, the total amount available for the Second Interim Distribution will be $7,357,986,291.16.

9. In the First Allocation and First Interim Distribution, the Trustee reported total recoveries of $2,617,974,430.26. The Trustee has recovered additional funds for the estate from multiple parties and sources since that time.

10. Under a settlement approved by this Court on June 10, 2011, the Joint Liquidators for Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited transferred approximately $16 million in cash to the Trustee on or about July 8, 2011 and approximately $2.3 million on or about January 14, 2012. The $18.3 million is available for allocation and distribution.

11. On October 4, 2011, a $43.5 million settlement between the Trustee and Mount Capital Fund, Ltd., a British Virgin Islands company in liquidation, and Mount Capital Asset Subsidiary Limited, a British Virgin Islands company in liquidation, (collectively, the "Mount Capital Companies") was approved by this Court. Under the settlement, Mount Capital paid $43.5 million to the Trustee. The $43.5 million is available for allocation and distribution.

12. On December 21, 2011, this Court approved a $326 million settlement between the Trustee and the United States of America, on behalf of the Internal Revenue Service. (ECF No. 4602). In the settlement, the Trustee agreed to set aside almost $103 million as a reserve to satisfy any judgments, settlements, or administrative decisions against the IRS, the United States, or the Trustee that are entered with respect to certain payments. The Trustee may release the reserve two years and sixty days after December 21, 2011; however, if there are any pending claims at that time, the Trustee and the United States will confer to determine an appropriate reserve amount to satisfy the pending claims. The Trustee seeks approval to allocate the full amount of the settlement to the Customer Fund, though the Trustee will hold $103 million in reserve.

13. On May 10, 2012, a settlement in the amount of more than $28.9 million between the Trustee and defendant Trotanoy Investment Company, Ltd. ("Trotanoy") in *Picard v. Trotanoy, et al.*, Adv. Pro. No. 10-05208 (Bankr. S.D.N.Y.) (BRL), was approved by this Court.

300256097                                                  4

Under the terms of the settlement, Trotanoy paid $28.9 million to the Trustee. The $28.9 million is available for allocation and distribution at this time.

14. In addition to the above settlements, Trustee has recovered approximately $84.6 million for the estate from multiple parties and sources since the First Allocation and First Interim Distribution as a result of preference settlement, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries. The $84.6 million is available for allocation and distribution at this time.

15. On June 8, 2012, the United States Court of Appeals for the Second Circuit issued a mandate dismissing the appeal of the United States Government's $2.2 billion forfeiture action against the Picower estate, which was intertwined with the Trustee's $5 billion settlement of his litigation captioned *Picard v. Picower*, Adv. Pro. 09-1197 (BRL). The deadline to file a petition for certiorari expired on July 16, 2012. Thus, the forfeiture order is final and nonappealable, and the $5 billion has been released to the Trustee. The $5 billion is available for allocation and distribution at this time.

16. The $220 million settlement with the estate of Norman F. Levy, entered into in February 2010, was affirmed by the District Court and is now on appeal to the Second Circuit. Because the proceeds of the Levy settlement remain the source of dispute, the Trustee is prevented from distributing these funds to customers at this time. The Trustee allocated the full amount of the settlement to the Customer Fund in the First Allocation, and the Trustee will continue to hold the $220 million in reserve pending the appeal.

17. On December 21, 2011, this Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, "Tremont") in the amount

of $1.025 billion. In this settlement, Tremont agreed to transfer $1.025 billion into an escrow account after the order approving the settlement became final. Because the proceeds of the Tremont settlement remain the source of dispute, the Trustee has not yet received these funds. Thus, the $1.025 billion is not available for allocation and distribution at this time.

18. For purposes of determining each customer's "net equity," as that term is defined under SIPA, the Trustee credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the "Trustee's Net Investment Method"). Some claimants argued that the Trustee was required to allow customer claims in the amounts shown on the November 30, 2008 customer statements (the "Last Statement Method," creating the "Net Equity Dispute"). Litigation over the Net Equity Dispute has now proceeded through this Court, the Second Circuit, and the Supreme Court of the United States.

19. On June 25, 2012, the Supreme Court denied two petitions for a writ of certiorari to the Second Circuit; a third petition was withdrawn. Thus, a final nonappealable order has been entered on the Net Equity Dispute, upholding the Trustee's Net Investment Method and making those funds that had previously been held in reserve for this issue available for distribution.

20. As of June 30, 2012, the Trustee has recovered $3,119,350,424.92 as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries. In addition, subsequent to the filing of the June 30, 2012 SIPC 17 Report, the $5 billion Picower Settlement was remitted to the Trustee, bringing the total recovery to $8,119,350,424.92. Of the total amount recovered, $115,190,556.49 remains subject to a final ruling as to how net equity claims are to be determined. Although the Second Circuit's Net

Equity Decision on the Net Investment Method is now final, more than 1,240 objections have been filed arguing that they are entitled to an increase of their claims based on the time that elapsed while their monies were deposited with BLMIS ("Time-Based Damages"). Thus, the Trustee will hold the $115,190,556.49 in reserve pending the outcome of the briefing and a hearing on that issue (the "Time-Based Damages Motion"). Therefore, the Trustee seeks approval to allocate the full amount of these preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries that were not previously allocated to the Customer Fund, though the Trustee will hold the $115,190,556.49 in reserve pending the Time-Based Damages Motion.

21. In sum, the Trustee seeks to allocate an additional $5,501,375,994.66 to the Customer Fund. When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the total amount allocated will be $8,119,350,424.92. Of the $8,119,350,424.92 allocated to the Customer Fund, $335,499,915.98 was distributed to customers with allowed claims as part of the First Interim Distribution. In connection with the First Interim Distribution, an additional $417,364,436.12 was reserved for accounts in litigation and $8,499,781.66 of SIPC subrogation was deferred. Therefore, the total amount available for the Second Interim Distribution will be $7,357,986,291.16. Of the $7,357,986,291.16 in available funds, $220 million must be held in reserve pending the outcome of the Levy Appeal, $103 million must be held in reserve relating to the IRS settlement, and $115,190,556.49 must be held in reserve pending the outcome of the Time-Based Damages Motion.

The table below summarizes this calculation.

| Category | Amount |
|---|---|
| SIPC 17 Receipts (June 30, 2012) | $3,119,350,424.92 |
| Picower | $5,000,000,000.00 |
| **Sub-Total** | **$8,119,350,424.92** |
|  |  |
| 1st Interim Distribution Deductions |  |
|    Allowed Accounts | $335,499,915.98 |
|    Deemed Determined Accounts | $417,364,436.12 |
|    SIPC Subrogation | $8,499,781.66 |
|  |  |
| **Amount Available for Second Interim Distribution** | **$7,357,986,291.16** |
|  |  |
| Current Reserves |  |
|    Levy Appeal | $220,000,000.00 |
|    IRS Settlement Stipulation | $103,000,000.00 |
|    Settlements containing the Net Equity Clause | $115,190,556.49 |
| **Amount Available for Second Interim Distribution After Reserves** | **$6,919,795,734.67** |

### The Net Investment Method Denominator

22.     The Trustee's Net Investment Method Denominator is the allowed amount of all accounts that have an allowed claim plus the net cash balance for all accounts into which more funds were deposited than withdrawn for which a claim has been filed, but not yet allowed. As of June 30, 2012, the Trustee's Net Investment Method denominator is $16,544,201,081.19. This number is subject to change as additional accounts are determined.

### The Net Equity Reserve Denominator

23.     As stated above, the Net Investment Method denominator is $16,544,201,081.19. When Time-Based Damages at a 3% rate are added to the Time-Based Damages balances for allowed and deemed determined accounts, the denominator increases from $16,544,201,081.19 to $20,134,952,000.83 (the "3% Time-Based Damages Reserve Denominator").

### The "Time-Based Damages" 9% Reserve Denominator

24.     As stated above, the Net Investment Method denominator is $16,544,201,081.19. When Time-Based Damages at a 9% rate are added to the Time-Based Damages balances for allowed and deemed determined accounts, the denominator increases from $16,544,201,081.19 to $30,522,630,443.18 (the "9% Time-Based Damages Reserve Denominator").

### Interim Calculation of *Pro Rata* Share
### Distribution of Customer Fund

25.     As set forth above, the total amount available for the Second Interim Distribution will be $7,357,986,291.16.  Of that amount, $6,753,548,677.28 is available for distribution (the "Net Customer Fund").  The difference between those amounts—$604,437,613.89—represents the catch-up payment the Trustee will owe customers from the First Allocation and First Interim Distribution if a ruling requires the calculation of Time-Based Damages at 3%, as well as the reserves related to the Levy Appeal, the IRS settlement, and the outcome of the Time-Based Damages Motion

26.     The 3% Time-Based Damages Reserve Denominator is $20,134,952,000.83.  To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the 3% Time-Based Damages Reserve Denominator, resulting in the following percentage (the "3% Scenario"):

$$\frac{\$6{,}753{,}548{,}677.28 \text{ (Net Customer Fund)}}{\$20{,}134{,}952{,}000.83 \text{ (3\% Time-Based Damages Reserve Denominator)}} = 33.541\%$$

27.     Under the 3% Scenario, a total of 1,229 accounts will receive a distribution of approximately 33.541% of their net equity claim.  Of these 1,229 accounts, 181 will become fully satisfied, bringing the total of fully satisfied account holders to 1,067 (1,048 accounts will remain partially satisfied and will be entitled to participate in future distributions).

28. An additional 182 accounts that are currently "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Seventy-five of the 182 accounts would be fully satisfied by the SIPC advance. The remaining 107 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion and his First Allocation and First Interim Distribution. Thirteen of the remaining 107 accounts would be fully satisfied by the First and Second Interim Distributions.

29. If, however, the Trustee is forced to distribute with a 9% Reserve due to objections, the 9% Time-Based Damages Reserve Denominator would be $30,522,630,443.18. Under the 9% Reserve, $5,501,375,994.66 would be allocated to the Customer Fund. When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the total amount allocated will be $8,119,350,424.92. Of the $8,119,350,424.92 allocated to the Customer Fund, $335,499,915.98 was distributed to customers with allowed claims as part of the First Interim Distribution. In connection with the First Interim Distribution, an additional $417,364,436.12 was reserved for accounts in litigation and $8,499,781.66 of SIPC subrogation was deferred. Therefore, the total amount available for the Second Interim Distribution will be $7,357,986,291.16. Of that amount, $6,276,374,797.49 would be available for distribution (again, the "Net Customer Fund"). The difference between those amounts—$1,081,611,493.67—represents the catch-up payment the Trustee will owe customers from the First Allocation and First Interim Distribution if a ruling requires the calculation of Time-Based Damages at 9%, as well as the reserves related to the Levy Appeal, the IRS settlement, and the outcome of the Time-Based Damages Motion.

300256097                                    10

30. To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the 9% Time-Based Damages Reserve Denominator, resulting in the following percentage (the "9% Scenario"):

$$\frac{\$6{,}276{,}374{,}797.49 \text{ (Net Customer Fund)}}{\$30{,}522{,}630{,}443.18 \text{ (9\% Time-Based Damages Reserve Denominator)}} = 20.563\%$$

31. Under the 9% Scenario, a total of 1,229 accounts will receive a distribution of approximately 20.563% of their net equity claim. Of these 1,229 accounts, 100 will become fully satisfied, bringing the total of fully satisfied account holders to 986 (1,129 accounts will remain partially satisfied and will be entitled to participate in future distributions).

32. An additional 182 accounts that are currently "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Seventy-five of the 182 accounts would be fully satisfied by the SIPC advance. The remaining 107 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion and his earlier distribution motion. Eight of the remaining 107 accounts would be fully satisfied by the first and second interim distributions.

33. The following chart provides an example of the two distribution scenarios for a customer with an allowed claim of $800,000:

| Category | Customer Pro Rata Share | Allowed Amount | SIPC Advance | First Interim Distribution | Customer Pro Rata Amount From Second Interim Distribution | SIPC Subrogation | Amount of Second Interim Distribution to Customer | Total To Customer (SIPC Advance + Distributions) |
|---|---|---|---|---|---|---|---|---|
| 3% Scenario | 33.541% | $800,000.00 | $500,000.00 | $36,816.00 | $268,328.00 | $5,144.00 | $263,184.00 | $800,000.00 |
| 9% Scenario | 20.563% | $800,000.00 | $500,000.00 | $36,816.00 | $164,504.00 | $0.00 | $164,504.00 | $701,320.00 |

300256097

11

34. Whether under the 3% or 9% Scenario, the Trustee has determined that, at this time, each customer's ratable share of the Net Customer Fund shall be no less than 25.165% of the customer's net equity claim, which includes the 4.602% customers received subject to the First Allocation and First Interim Distribution. If the Trustee is successful in his efforts to use the 3% Reserve, each customer's ratable share of the Net Customer Fund shall be no less than 38.143%.

By: */s/ Matthew Cohen*
Matthew Cohen

State of California
County of Los Angeles

Subscribed and sworn to me (or affirmed) before me, Ramona Louise Carter, Notary Public, on this 20th day of July, 2012 by Matthew Cohen, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

WITNESS my hand and official seal.

*/s/ Ramona Louise Carter*
**Ramona Louise Carter, Notary Public**
Commission # 1807578
Qualified in Los Angeles County
*Commission Expires: August 23, 2012*