Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 08-01789

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5

6  In the Matter of:

7

8  SECURITIES INVESTOR PROTECTION CORPORATION

9                              Plaintiff,

10  V.

11

12  BERNARD MADOFF INVESTMENT SECURITIES, LLC. ET AL,

13

14                              Defendants,

15  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16              U.S. Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              August 29, 2012

21              10:03 AM

22

23  B E F O R E:

24  HON BURTON LIFLAND

25  U.S. BANKRUPTCY JUDGE

Page 2

1    TRIAL RE: 08-01789-brl Securities Investor Protection

2    Corporation v. Bernard L. Madoff Investment Securities,

3    LLC. et al

4

5    (Cc-4951) Eight Application Of Windels Marx Lane &

6    Mittendorf, LLP For Allowance Of Interim Compensation For

7    Services Rendered And Reimbursement Of Actual And Necessary

8    Expenses Incurred From October 1, 2011 Through January 31,

9    2012 For Windels Marx Lane & Mittendorf, LLP, Special

10   Counsel, Period: 10/01/11 To 01/31/2012, Fee:

11   $3,203,844.60, Expenses $24,142.98

12

13   (cc-4937)  Application Of Eugene F. Collins As Special

14   Counsel To The Trustee For Allowance Of Interim

15   Compensation For Services Rendered And Reimbursement Of

16   Actual And Necessary Expenses Incurred From October 1, 20

17   II Through January 31,2012 For Eugene F. Collins,

18   Special Counsel, Period: 10/1/2011 To 1/31/2012,

19   Fee:$4724.98, Expenses: $44.99.

20

21   (cc-4938) Application Of Schiltz & Schiltz As Special

22   Counsel To The Trustee For Allowance Of Interim

23   Compensation For Services Rendered And Reimbursement Of

24   Actual And Necessary Expenses Incurred From October I,

25   2011 Through January 31,2012 For Schiltz & Schiltz,

Page 3

1   Special Counsel, Period: 10/1/2011 To 1/31/2012,

2   Fee:$31324.35, Expenses: $2821.49.

3

4   (cc-4939) Application Of Higgs & Johnson (Formerly Higgs

5   Johnson Truman Bodden & Co.) As Special Counsel To The

6   Trustee For Allowance Of Interim Compensation For

7   Services Rendered And Reimbursement Of Actual And

8   Necessary Expenses Incurred From October I, 2011 Through

9   January 31,2012 For Higgs Johnson Truman Bodden & Co.,

10  Special Counsel, Period: 10/1/2011 To 1/31/2012,

11  Fee:$74979.00, Expenses: $2423.24.

12

13  (cc-4940) Application Of Soroker-Agmon As Special Counsel

14  To The Trustee For Allowance Of Interim Compensation For

15  Services Rendered And Reimbursement Of Actual And Necessary

16  Expenses Incurred From September 20, 20 II Through January

17  31,2012 For Soroker-Agmon, Special Counsel, Period:

18  9/20/2011 To 1/3112012, Fee:$216160.74, Expenses: $3377.18.

19

20  (cc-4941) Application Of Graf & Pitkowitz Rechtsanwalte

21  GMBH As Special Counsel To The Trustee For Allowance Of

22  Interim Compensation For Services Rendered And

23  Reimbursement  Of Actual And Necessary Expenses Incurred

24  From October 1, 2011 Through January 31, 2012 For Graf &

25  Pitkowitz Rechtsanwalte GMBH, Special Counsel, Period:

1    10/1/2011 To 1/31/2012, Fee:$499110.69, Expenses:

2    $16937.56.

3

4    (cc-4942) Application Of SCA Creque As Special Counsel To

5    The Trustee For Allowance Of Interim Compensation For

6    Services Rendered And Reimbursement Of Actual And

7    Necessary Expenses Incurred From October 1, 2011 Through

8    January 31, 2012 For SCA Creque, Special Counsel, Period:

9    10/1/2011 To 1/31/2012, Fee:$259062.59, Expenses: $1900.00.

10

11   (cc-4947) Application Of Attias & Levy As Special Counsel

12   To The Trustee For Allowance Of Interim Compensation For

13   Services Rendered And Reimbursement Of Actual And

14   Necessary Expenses Incurred From October 1, 2011 Through

15   January 31,2012 For Attias & Levy, Special Counsel,

16   Period: 10/1/2011 To 1/31/2012, Fee:$45845.67, Expenses:

17   $1104.43.

18

19   (cc-4943) Application Of Young Conaway Stargatt & Taylor

20   LLP As Special Counsel To The Trustee For Allowance Of

21   Interim Compensation For Services Rendered And

22   Reimbursement Of Actual And Necessary Expenses Incurred

23   From October 1, 2011 Through January 31,2012 For Young

24   Conaway Stargatt & Taylor, LLP, Special Counsel, Period:

25   10/112011 To 113112012, Fee:$24589.80, Expenses:$967.27.

Page 5

1    (cc-4936) Ninth Application Of Trustee And Baker &

2    Hostetler LLP For Allowance Of Interim Compensation For

3    Services Rendered And Reimbursement Of Actual And

4    Necessary Expenses Incurred From October I, 2011 Through

5    January 31,2012 For Baker & Hostetler, L.L.P., Trustee's

6    Attorney, Period:10/1/2011 To 113112012, Fee:$48107863.8,

7    Expenses: $866625.44.

8

     Seanna Brown 212 589 4230

9

10   (cc-4944)  Application Of Williams, Barristers & Attorneys

11   As Special Counsel To The Trustee For Allowance Of

12   Interim Compensation For Services Rendered And

13   Reimbursement Of Actual And Necessary Expenses Incurred

14   From October 1, 2011 Through January 31, 2012 For

15   Williams, Barristers & Attorneys, Special Counsel, Period:

16   10/1/2011 To 1/31/2012, Fee:$418955.09, Expenses: $0.00.

17

18   (cc-4945) Application Of Taylor Wessing As Special Counsel

19   To The Trustee For Allowance Of Interim Compensation For

20   Services Rendered And Reimbursement Of Actual And

21   Necessary Expenses Incurred From October 1, 2011 Through

22   January 31, 2012 For Taylor Wessing, Special Counsel,

23   Period: 10/1/2011 To 1/31/2012, Fee:$1071518.18, Expenses:

24   $529103.58.

25

Page 6

1    (cc-4946) Application Of UGGC & Associates As Special

2    Counsel To The Trustee For Allowance Of Interim

3    Compensation For Services Rendered And Reimbursement Of

4    Actual And Necessary Expenses Incurred From October 1,

5    2011 Through January 31,2012 For UGGC & Associes, Special

6    Counsel, Period: 10/1/2011 To 1/31/2012, Fee:$63850.89,

7    Expenses: $799.49.

8

9    (cc-4948) Application Of Werder Vigano As Special Counsel

10   To The Trustee For Allowance Of Interim Compensation For

11   Services Rendered And Reimbursement Of Actual And

12   Necessary Expenses Incurred From October 1, 2011 Through

13   January 31, 2012 For Werder Vigano, Special Counsel,

14   Period: 10/1/2011 To 1/31/2012, Fee:$1744.96, Expenses:

15   $0.00.

16

17   (cc-4949) Application Of Greenfield Stein & Senior, LLP As

18   Special Counsel To The Trustee For Allowance Of Interim

19   Compensation For Services Rendered And Reimbursement Of

20   Actual And Necessary Expenses Incurred From October 1,

21   2011 Through January 31,2012 For Greenfield Stein &

22   Senior, LLP, Special Counsel, Period: 10/1/2011 To

23   1/31/2012, Fee:$25051.56, Expenses: $631.85.

24

25

1   (cc-4950) Application Of Browne Jacobson, LLP As Special

2   Counsel To The Trustee For Allowance Of Interim

3   Compensation For Services Rendered And Reimbursement Of

4   Actual And Necessary Expenses Incurred From October 27,

5   2011 Through January 31, 2012 For Browne Jacobson, LLP,

6   Special Counsel, Period: 10/1/2011 To 1/31/2012, Fee:

7   $15780.46, Expenses: $2703.59.

8

9   (cc-4920) Motion For Order Scheduling Hearing On Trustees

10  Motion Affirming Denial Of Time-Based Damages Adjustment To

11  Customer Claims.

12  David Sheehan 212-589-4200

13

14  Adj From 8/9/2012; Adj From 8/23/12; Adj From 8/29/2012

15  Stricken - Rescheduled Adj. To 9/5/2012

16

17

18

19

20

21

22

23

24

    Transcribed by:  Lee M. Sapp

25

**Page 8**

```
 1   A P P E A R A N C E S :

 2   BAKER HOSTETLER

 3        Attorneys for Trustee

 4        45 Rockefeller Plaza

 5        New York, New York 10111

 6

 7   BY:  DAVID SHEEHAN, ESQ.

 8

 9   Securities Inv. Protection Corporation

                  TH
10        805 15  St., NW., Suite 800

11        Washington, D.C. 20005-2215

12

13   BY:  KEVIN BELL, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 9

1    P R O C E E D I N G S

2           MR. SHEEHAN: Morning, Your Honor.

3           THE COURT: Good morning.

4           MR. SHEEHAN: I think the -- the only matter on

5    Your Honor's calendar today are a number of applications for

6    interim allowance of fees and expenses in the Madoff matter

7    if I'm correct.  And I'd like to just to dive right into

8    those if I could.

9           THE COURT: Sure.

10          MR. SHEEHAN: I should note for the record --

11          THE COURT: This matter always draws a lot of media

12   attention outside the courtroom but --

13          MR. SHEEHAN: I know.

14          THE COURT: -- inside the courtroom --

15          MR. SHEEHAN: I guess they must be all in that

16   other courtroom you know with the TV cameras or something I

17   don't know.

18          THE COURT: Well they're also working over there to

19   ratchet up a lot of fees as well.

20          MR. SHEEHAN: For the record, Your Honor, I'd just

21   like to go through each of these applications and I know I

22   should as I was going to say no for the record.  There is no

23   objection that's been filed to any of the fee application

24   before Your Honor this morning including that of Baker

25   Hostetler matter.

Page 10

1          As Your Honor well knows this is an extraordinary

2     proceeding involving jurisdictions throughout the world.

3     And we have retained counsel to assist the trustee in those

4     endeavors and I'd just like to quickly survey them and in

5     effect report to Your Honor orally at least in general about

6     what those folks are doing and why they were engaged.  And

7     some of them have been long standing such as the first which

8     is Mr. Collins of Ireland.  As you know very early on we

9     were trying -- trying to chase the money as it were for a

10    variety of different feeder funds.  The Thema Fund was a

11    very major fund located in Ireland that had been fed by

12    several of the other funds.  We retained counsel to monitor

13    those proceedings.  Made the decision early not to appear

14    there and have continued with that approach to date.  So

15    therefore the time there is relatively minimum, it's only

16    twenty two hours but in essence it's to monitor what was

17    going on there and keep an eye on it.  Our interest are not

18    really imperiled by not proceeding there because the monies

19    that we're looking for from the other funds such as King

20    Gate are more accurately located in BBI and Bermuda where

21    we're very, very active and in London as well.

22          The other -- next firm is from Luxemburg, Schiltz

23    & Schiltz.  The Trustee interestingly enough has been sued

24    in Luxemburg by a number of the investors who are obviously

25    dissatisfied with the outcome of Madoff.  Along with I

Page 11

1    should note hundreds of other folks that have been sued as

2    well.  We are responding to that.  Shiltz is handling that

3    matter.  We don't see it as a serious matter or a

4    substantive matter but he has been sued there.  Question is

5    whether or not we quite frankly bring it before Your Honor

6    and say you can't be sued you can only be sued here.  Right

7    now we haven't decided to do that nor is there any urgency

8    for us to bring that before Your Honor.

9           The next is Higgs & Johnson that's the Cayman

10   Islands.  There's two matters there.  Harley is one of the

11   more interesting sort of impacts as some of the other things

12   that we're probably going to discuss next week.  Harley made

13   a decision not to file a claim.  And obviously it was a

14   conscious decision.  They had over a five hundred million

15   dollar ($500m) claim when they made it but we had a billion

16   dollar ($1b) fraudulent transfer claim against them.  So

17   they decided to avoid the jurisdiction probably on the basis

18   that it was highly unlikely the trustee here was going to

19   collect any money so why bother to file.

20          Since then we've been actively engaged with them.

21   They're talking to us.  When you start to add nine ($9b) to

22   eleven billion ($11b) dollars to distribute people get

23   interested in perhaps having a claim.  So now they're

24   talking to us about that.  That's going to be a long drawn

25   out affair.  We have a statutory bar date.  We have a lot of

Page 12

1    hurdles to overcome there.  I don't think that's going to

2    happen and there's no real money on the table as yet but as

3    a result we have activity going back and forth with the

4    Cayman Islands and what's occurring there because there is

5    ongoing litigation there.  There is a liquidator appointed a

6    fiduciary who continues to try to pursue what he can but has

7    very limited resources.  And that's the principle reason

8    we've been talking is with the idea that if we could come up

9    with a way that we could honor some of their claim that

10   would give him the ability to work with us in a

11   collaborative way to pursue third parties that obviously are

12   from -- from our perspective obviously responsible for the

13   monies no longer being with Harley.  That -- so that's the

14   efforts of Higgs and Johnson.

15          Soroker and Agmon one of the more interesting

16   cases that we have.  It's in Israel it involves Magnify as

17   the source of these funds.  Magnify took a hundred and

18   thirty five million dollars ($5m) of fictitious profits out

19   of BLMIS over a course of fifteen to twenty years through a

20   series of different individuals most of it ended up in the

21   hands of Yishai Horowitz Association which is a not for

22   profit organization in Israel.  We have filed suit against

23   Yishai Horowitz's application to wind down and to be able to

24   close its books.  We have frozen that and have actively

25   cooperated with the Israeli government and they are working

Page 13

1  with us to pursue that.  At the same time there is a
2  principle individual named Yar Green.  We named him in our
3  litigation here before Your Honor for Magnify and we are
4  pursuing that as well and have prepared pleadings to pursue
5  most of the assets that ended up circuitously going through
6  a variety of different channels and then ending up -- most
7  of them in Mr. Green's and his relatives hands.  To that is
8  a very active litigation and you can see substantial hours
9  by the Soroker firm there.
10            And next is Graf & Pitkowitz
                                           in -- in Austria.

11  In Austria we have not filed any litigation.  What we do
12  have is active ongoing participation in the criminal
13  proceedings.  As Your Honor knows we have different
14  procedures here in the United States obviously you're
15  involvement with the US Attorney's Office has been one of
16  support and collaboration while we don't participate in
17  their proceedings obviously.
18            Well in Europe they have a different approach as
19  Your Honor is I'm sure well aware.  And then in Austria what
20  we have is a participant -- actually recognized as a
21  participant in the proceedings.  Mr. Picard has as the
22  Trustee registered as a victim.  As a result we can actually
23  participate in those proceedings we can appear and be
24  present while witnesses are being interviewed by the
25  prosecutor.  We can actually give the prosecutor questions

Page 14

1    to ask.  We get access to the documents there.  This has

2    been an invaluable resource for us in chasing and finding

3    the assets that obviously passed through Bank Medici back

4    Austria and Sonja Kohn as well as other -- Euro Valor and a

5    number of other feeder funds that she created as part of

6    this scheme that orbited in Austria.  So we have Graf and

7    Pitkowitz there on a regular basis working with us on those

8    efforts.

9         SCA Creque is located in BBI.  BBI's a very active

10   forum for us for a number of reasons.  One is is that we

11   have King Gate there.  King Gate is a major target for us.

12   There's over a billion dollars at stake there.  The two

13   individuals are Serretti and Grasso.  We've sued them here.

14   We also filed a provisional lawsuit in London as well in the

15   United Kingdom because that's where they both reside.  They

16   created quite a -- an artifice here that B -- in BBI we have

17   counsel helping us with regard to King Gate which is the

18   actual fund itself.  In Bermuda is King Gate Management

19   Limited both of these entities by the way have liquidators

20   so we deal with the liquidators so we deal with the

21   liquidators for both of those.  And what we're trying to

22   work out is a collaborative arrangement with both of those

23   liquidators.  We're closer quite frankly with one than the

24   other.  With the idea that eventually what we'll be able to

25   do is is to assist them by honoring their claims, work out a

Page 15

1    financial arrangement.  And it's a very difficult

2    negotiation that we have going on with them.  Third party

3    sources some of this is in the news, Your Honor, has

4    probably seen it where DBSI has been sued by King Gate

5    trying to enforce its agreement for eight hundred and twenty

6    five million dollars ($825m) with the recent events turning

7    up the value of the claims that's become even more intense.

8    And we have participants that are part of that deal.  Perry

9    being sued by you know another entity with regard to they

10   want a piece of the deal.  So what has now happened is as a

11   result of what we've been able to achieve quite frankly and

12   the value that the Trustees brought to these claims we have

13   very interesting litigation taking place between major

14   financial institutions and hedge funds over what has become

15   a secondary market in the customer claims associated with

16   Madoff.  And that's actually what's happening here.

17        And a good deal of that will depend upon what

18   success we do have with regard to King Gate and ultimately

19   Serretti and Grasso traveling through BBI up to Bermuda and

20   then eventually into the United Kingdom.  And that firm the

21   Creque Firm has been very, very helpful to us since there's

22   a lot of act -- active litigation there as Your Honor well

23   knows from the Fairfield case unfortunately not our

24   Fairfield case the other Fairfield case.

25        Then we have Bermuda that's -- I don't need to

Page 16

1    repeat that is again King Gate.  The Barristers there assist

2    us with the King Gate management as I mentioned earlier the

3    management company for King Gate.

4           Next is Keller -- Taylor Wessing.  Taylor Wessing

5    is probably the most interesting situation for us and one

6    that Your Honor I think given your chapter fifteen

7    background will find most interesting.  What we've engaged

8    in there is a cooperative agreement which Your Honor has

9    approved with Mr. Akers who was appointed liquidator for the

10   MSIL.  That was Mr. Madoff's London operation used by him to

11   create the impression that trades were taking place in the

12   European market.  Of course we all now know that never

13   happened.

14          But in any event as a result of those activities

15   his family was actively involved there Peter and the sons.

16   He was obviously actively involved.  We have all the

17   directors and Sonja Kohn was a major player in the MSIL

18   operation.  So we have joined in a litigation that's been

19   instituted by Mr. Akers under a collaboration agreement

20   where all the funds based principally around two reasons.

21   One is Mr. Picard is now as Mr. Madoff was in fact the

22   ninety nine percent owner of MSIL.  So since we

23   substantively consolidated he is the sole share holder in

24   effect where alternatively he has the largest claim

25   literally hundreds of millions of dollars that -- of money

Page 17

1    that round tripped through MSIL and never made it back to

2    BLMIS.

3            So we are collaborating with the idea that we will

4    ultimately win that lawsuit and be able to bring back into

5    the estate through MSIL monies that will ultimately come

6    here and benefit the BLMIS customers who were obviously

7    defrauded through this scheme.  We've also as I said

8    instituted there a case against Sonja Kohn.  Sonja Kohn as

9    we've alleged here in the rico action and which is still

10   pending against her.  There were other parties that have

11   been dismissed in the circuit but we have instituted an

12   action separately against her there and we brought as Your

13   Honor is again I'm sure aware a freezing order which allows

14   us to have a worldwide freeze against all of her assets that

15   was entered by the court after a full week of hearings in

16   which we presented evidence through Taylor Wessing with

17   regard to her activities and which he found very strong

18   evidence in our favor.  That ultimately as you would have in

19   any injunction setting a very strong likelihood of success.

20   As a result of that we have as I say worldwide injunction

21   freezing order against her assets she has had very difficult

22   time coming forward and being -- we now have a contempt

23   proceeding against her cause she's failed to identify assets

24   which we know exists and have brought to the attention of

25   the court in which she failed to reveal.  So this is turning

1  into a collateral fight with her that ultimately may ult --

2  end up in liability funding against her because of her

3  failure to perform.

4       And since it is a freezing order, that is

5  application throughout Europe, we've taking that order and

6  we've gone to Austria with it, we've gone to Gibraltar with

7  it. So the firms that I mentioned earlier Graf Pitkowitz

8  have assisted us with that in Austria.  We're also going to

9  travel with it to Israel where we understand they will also

10  recognize the validity of the order.  So --

11       THE COURT: Have you had any report as to what has

12  been captured by the freezing orders?

13       MR. SHEEHAN: So far it's about twenty million

14  pounds (£20,000000), Your Honor.  Consisting mostly of

15  properties that she has in England and bank accounts that

16  she has in Austria and in Luxemburg.  So we've -- and we've

17  had cooperation again I'll leave out those parts because

18  they take place on a daily basis.  We've had cooperation

19  with the Luxemburg and Austrian authorities but again using

20  your local counsel to make that happen.

21       So we're up to twenty million pounds (£20,000000)

22  it's a start, in this case -- any other case that would

23  sound like a lot of money.  In this case it doesn't but it's

24  -- it's a start as I said earlier and hopefully it will lead

25  to eventually a lot more monies down the road.

1    The next firm is the firm that doesn't have a lot

2    of time, its a hundred and seventy three hours that's the

3    UGGC Firm that's in France.  We don't have any active

4    litigation in France but there's an ongoing active criminal

5    investigation there.  Again not unlike Austria we are filed

6    as a participant and again can participate in those

7    proceedings.  We have again as a result of that have had

8    access to a good deal of documentation and its part of our

9    overall investigation.

10    Gibraltar I mentioned it earlier.  This is a case

11    that early on was before Your Honor that's the Vysya matter.

12    That eventually perhaps will be tried here at some point.

13    And as you'll recall we initially very early on found

14    seventy five million dollars ($75m) sitting there.  We've

15    been able to bring most of it back here.  It's now deposited

16    with this court.  And eventually will be dealt with here.

17    We also again are pursuing the freezing order against Sonja

18    Kohn and her related active -- related entities in Gibraltar

19    so that firm is assisting us there.

20    Next is Switzerland.  There's very little going on

21    there as you can see from the hours only a 3.6 hours.  Again

22    that's -- Sonja Kohn resides there.  We keep an eye on that

23    through an investigator.  And we had monitoring of court

24    proceedings there but it's been very little activity.  She's

25    very quiet in Switzerland.

Page 20

1          Then the next one is in a firm -- well we actually

2     have a firm -- two other firms that we've hired that are not

3     if you will foreign firms.  Well one's foreign, I shouldn't

4     say that.  The other foreign firm that we have hired is

5     Brown Jacobson as conflict counsel in the United Kingdom.

6     As Your Honor well knows Taylor Wessing is a major

7     international law firm as a result on several occasions

8     we've run into conflict situations so we've hired Brown

9     Jacobson who come in and assisted us with regard to various

10    pleadings.  They've assisted us with regard to the Rubin

11    decision and making appearances there where we did ask the

12    court to permit us to make a filing in connection with the

13    Rubin appeal.  We were permitted to do so and did file an

14    amicas brief.  So we've been active on that front as well.

15          Then the other firm that I would mention is

16    Greenfield Stein and Senior they are our estate counsel

17    here.  What we have found is is that when we go out to other

18    jurisdictions, Massachusetts, Florida and others --

19    unfortunately this case has been a (Unintelligible) standing

20    at this point and given the nature of some of the individual

21    claimants there and some of -- and there are defendants who

22    many -- the avoidance actions their passed on.  And we've

23    needed to get the assistance of State counsel to help us

24    file claims and to file proper notices and to do the things

25    that are necessary to preserve the trustees causes of action

Page 21

1    and that's what Greenfield has been assisting us with.

2           Then there is two other firms before I get to

3    Baker, Your Honor, your very familiar with both of them.

4    One is of course Windels Marx who has been with us almost

5    throughout the course of these proceedings.  I need not

6    repeat the history Your Honor's very well familiar with it.

7    And Mr. Nistle (Phonetic) since appointment as trustee and

8    he continues in that capacity and we've utilized that very

9    well with regard to actions that he has brought in

10   connection with as Your Honor knows the Madoff Corporations

11   a lot of money we've alleged came out of BLMIS and purchased

12   interest in a variety of different corporations such as

13   Madoff Energy, Madoff Family and a number of others.  And we

14   have pursued those and Windels Marx has been very active,

15   done a very excellent job pursing those as well as handling

16   some of the other insider litigation that we -- we had a

17   conflict with.  We also had an issue with Bank of New York,

18   they handled that issue for us as well.  Across the board

19   obviously a very, very, very fine job.

20          And then last but not least is Young Conaway and

21   that's because Windels incredibly enough you know so I have

22   conflicts in a case of this size and magnitude.  So on

23   occasion we've had to look to Young Conaway to assist us and

24   they have done the same as Windels, they've been first rate

25   in terms of their support and everything that we've done.

Page 22

1              So that in a very brief and summary way, Your

2      Honor, is to support that we've received without mentioning

3      what Baker has done over the last reporting period which is

4      from September through January of last year into January of

5      this year.  And I would ask Your Honor in light of the fact

6      that there is no objection and what the trustee submits is

7      very valuable services of all these law firms in achieving

8      the results that the trustee has achieved that they be

9      approved.

10             THE COURT: Does anyone want to be heard?

11             MR. BELL: Your Honor, Kevin Bell on behalf of the

12     Securities Investor Protection Corporation SIPC supports the

13     entry of an order approving of all of the fee applications

14     mentioned by Mr. Sheehan so far.

15             THE COURT: Is there anyone else?  Thank you all.

16     Interestingly the courts role is kind of curved in

17     connection with these fees.  There are what informs the

18     court's position concerning these applications is a pair of

19     bookends in the statue on one side.  And both they're almost

20     identical.  On one side of the statute it says the court

21     shall approve.  On the other side of the bookend the court

22     must approve.  And so those bookends inform the court's

23     position and three requirements have been made.  And in this

24     case all three requirements have been made.  Number one that

25     the fees are paid and not out of the estate at all are not

Page 23

1    paid by SIPC itself so none of the customers or victims here

2    are affected by the application.

3            Second there is no reasonable expectation of

4    recovery of these fees which would ultimately go back to

5    SIPC if there was that expectation.  And the third that SIPC

6    itself recommends approval of the fees so the court's

7    position based upon an act of Congress back in 1978 is that

8    the court actually must approve the -- the fees.

9            However in connection with the fee requests so far

10   here today it should be recognized that we're dealing with

11   what we all believe is the largest fraudulent Ponzi scheme

12   in history.  And it also given the litigious state of our

13   legal system maybe the most litigated estate in -- in

14   history which raise thousands of or hundreds if not

15   thousands of adversaries against the trustee on one side and

16   some very talented litigating opposition on the other side.

17   So that one can expect that the fees involved in this form

18   of litigation can be rather large.

19           Also interestingly as large as the fraud has been

20   to date with the exception of what hold back there is there

21   has been an enormous amount of recovery that's been achieved

22   on the part of the trustee and counsel which is measured in

23   many, many, many billions of dollars.  And we can witness

24   the distribution that's been approved of at least two point

25   four billion dollars ($2.4b) last week.  So given all of

Page 24

```
 1    those circumstances the court's evaluation of the fee

 2    request is somewhat joined or somewhat joins the position of

 3    SIPC in recommending approval.  Which I do approve and I'll

 4    entertain an order in that regard.

 5              MR. SHEEHAN: All right thank you, Your Honor.

 6    Your Honor, just -- just before I do I do have the order

 7    here and I will hand it up in a moment.  What I didn't move

 8    but which I can but in light of your -- Your Honor's

 9    comments I was going to go through a recitation of the work

10    that Baker Hostetler's done over the last reporting period.

11    But Your Honor has intimate familiarity with it and if

12    there's anyone in the world who knows what we've been doing

13    it's certainly you in terms of the motions to withdraw the

14    reference and what's already there --

15              THE COURT: There's another Judge in the district

16    court who should be here.

17              MR. SHEEHAN: There is a certain Judge in the

18    district court who has another intimate familiarity but I

19    think he knows exactly what he's doing as well so you're

20    familiar with our motions to withdraw the reference, the

21    motions to dismiss, the various litigation activity before

22    Your Honor.  The enormous discovery efforts that we're

23    engaging in and thank -- by the way I have -- very happy to

24    report that working with the binding arbitrator has been a

25    wonderful thing for all of us.  I think it's moving the
```

Page 25

1    cases forward.  We're getting work done which is very, very

2    helpful to all sides.  And Judge Signowski's (Phonetic) done

3    as you would expect a first rate job.  So all of that is in

4    our reports.  You know that we have active litigation with

5    Mr. Merkin and the Maxim case.  During the reporting period

6    very active in the Katz Wilpon situation which is heavily

7    reported in that time frame.  So I could go through in a

8    greater detailed but I know Your Honor's familiar with it

9    and given Your Honor's earlier comments I would simply move

10   that the Baker Application also be approved.

11          THE COURT: The application is granted.

12          MR. SHEEHAN: All right.  Your Honor, if I may I'd

13   like to hand up the order?

14          THE COURT: Sure.  I've approved the order.

15          MR. SHEEHAN: Thank you very much, Your Honor.  I

16   think we're done for the day.

17          THE COURT: Thank you all.

18          MR. SHEEHAN: Thank you.

19          MR. BELL: Thank you, Your Honor.

20

21          (Whereupon proceedings concluded at 10:27 a.m.)

22

23

24

25

Page 26

1                          RULINGS

2                                                 Page        Line

3    Application For Fees And Expenses Approved    23          25

4    Baker Application Granted                     25          11

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 27

1              C E R T I F I C A T I O N

2

3    I, Lee M. Sapp, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5    **Lee M**          Digitally signed by Lee M
                         Sapp

6    **Sapp**           DN: cn=Lee M Sapp, o, ou,
                         email=digital1@veritext.com,
                         c=US
7                        Date: 2012.08.30 16:15:33
                         -04'00'

8    AAERT Certified Electronic Transcriber CET**D-596

9

10   Veritext

11   200 Old Country Road

12   Suite 580

13   Mineola, NY  11501

14

15                     Date:  August 30, 2012

16

17

18

19

20

21

22

23

24

25