**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　　Defendant | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　　　Debtor |  |

**MEMORANDUM OF LAW OF THE**
**SECURITIES INVESTOR PROTECTION CORPORATION**
**IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER**
**AFFIRMING TRUSTEE'S CALCULATIONS OF NET EQUITY**
**AND DENYING TIME-BASED DAMAGES**

JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior Associate General Counsel
 For Dispute Resolution

CHRISTOPHER H. LAROSA
Senior Associate General Counsel –
 Litigation

LAUREN T. ATTARD
Assistant General Counsel

SECURITIES INVESTOR
 PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, D. C.  20005
Telephone: (202) 371-8300

Date: October 12, 2012
Washington, D.C.

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................1

ISSUE ...................................................................................................................4

STATEMENT OF FACTS ......................................................................................4

ARGUMENT .........................................................................................................5

    I.     OVERVIEW OF SIPA ...............................................................................5

            The History of SIPA ..............................................................................5

            1.     Stockbroker Liquidations Before 1938............................................5

            2.     Section 60e of the Bankruptcy Act .................................................5

            3.     SIPA As Enacted in 1970 ................................................................6

            4.     SIPA As Amended ...........................................................................7

            5.     SIPC and Its Funds...........................................................................7

            6.     Use of SIPC Funds to Satisfy Customer Claims.............................7

            7.     Nature of a SIPA Proceeding...........................................................8

             8.     The Burden of Proof ........................................................................9

    II.    WHERE CONGRESS INTENDS AN INFLATION
          ADJUSTMENT, IT SAYS SO ................................................................10

            1.     Constant Dollar Examples and the Legislative Intent....................10

            2.     No Statutory Authority to Re-Define Net Equity .........................14

                    A.    Inconsistency between SEC Rule 15c3-3
                        and SIPA ..............................................................................15

                         i.   The Customer Protection Scheme...................................16

                         ii.  The Distribution Scheme ................................................18

## TABLE OF CONTENTS

(cont.)                                                                                                    **PAGE**

III.    THERE IS NO SIPA PROTECTION FOR
        GENERAL CREDITORS......................................................................................20

IV.    THE OUTCOME IS NO DIFFERENT IN BANKRUPTCY...............................23

V.    A COURT MAY NOT ADJUST A CUSTOMER'S
       NET EQUITY IN THE NAME OF EQUITY ......................................................25

       1.    The Limits of Equitable Relief ..................................................................25

       2.    Time-Based Damages Do Not Achieve Equity
             In the Context of a SIPA Case ..................................................................28

CONCLUSION................................................................................................................31

## TABLE OF AUTHORITIES

**CASES:**                                                                                                    **PAGE**

In re Adler Coleman Clearing Corp., 204 B.R. 111 (Bankr. S.D.N.Y. 1997) ...............................10

In re Adler, Coleman Clearing Corp., 216 B.R. 719 (Bankr. S.D.N.Y. 1998) ..............................18

Appleton v. First Nat'l Bank of Ohio, 62 F.3d 791 (6th Cir. 1995) ................................................18

In re A. R. Baron Co., 226 B. R. 790 (S.D.N.Y. 1998) ...............................................................22

Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC),
     362 B. R. 624 (Bankr. S.D.N.Y. 2007) ...............................................................................24

In re Bell & Beckwith, 124 B.R. 35 (Bankr. N.D. Ohio 1990) ....................................................23

In re Bernard L. Madoff Inv. Sec. LLC, 424 B.R. 122 (Bankr. S.D.N.Y. 2010),
     aff'd, 654 F.3d 229 (2d Cir. 2011), reh'g and reh'g en banc den. (2d Cir. Nov. 08, 2011),
     cert. dismissed, __ U.S. __,132 S. Ct. 2712 (2012), and cert. den., __ U.S. __,
     2012 WL 396489 and 2012 WL 425188 (Jun. 25, 2012) ..............................................1, 18

Bingham v. Zolt, 810 F.Supp. 100 (S.D.N.Y. 1993) ....................................................................22

In re Brentwood Securities, Inc., 925 F.2d 325 (9th Cir. 1991) ............................................10, 23

Brown v. Sec'y of Health & Human Services, 46 F.3d 102 (1st Cir. 1995) ..................................14

Central Bank v. First Interstate Bank, 511 U.S. 164 (1994) .........................................................11

Christian Brothers High School Endowment v. Bayou No Leverage Fund, LLC
     (In re Bayou Group, LLC), 439 B. R. 284 (S.D.N.Y. 2010) ...............................................24

Connecticut Nat'l Bank v. Germain, 503 U.S. 249 (1992) ...........................................................12

In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86 (2d Cir. 2003) ..........................25-26, 28

Dist. of Columbia v. United States, 67 Fed. Cl. 292 (Fed. Cl. 2005) ...........................................14

Dole Food Co. v. Patrickson,  538 U.S. 468 (2003) .....................................................................11

Duel v. Hollins, 241 U.S. 523 (1916) ...........................................................................................5

In re Enron Corp., 279 B.R. 695 (Bankr. S.D.N.Y. 2002)..............................................................9

Exchange National Bank of Chicago v. Wyatt, 517 F.2d 453 (2d Cir. 1975) .................................8

# TABLE OF AUTHORITIES
### (cont.)

**CASES:**                                                                                      **PAGE**

Gowan v. Westford Asset Mgmt LLC (In re Dreier LLP),
462 B. R. 474 (Bankr. S.D.N.Y. 2011) .................................................................. 23-24

In re Hanover Square Securities, 55 B.R. 235 (Bankr. S.D.N.Y. 1985) .........................................9

In re Kalikow, 602 F.3d 82 (2d Cir. 2010) ...................................................................25

In re Klein, Maus & Shire, Inc., 301 B.R. 408 (Bankr. S.D.N.Y. 2003) .................................10, 22

Lang v. Commissioner, 289 U. S. 109 (1933) ................................................................ 12

In re Lloyd Secs., Inc., 75 F.3d 853 (3d. Cir. 1996) ........................................................8

Moran v. Goldfarb, 2012 WL 2930210 (S.D.N.Y. July 16, 2012) ................................................30

In re MV Securities, Inc., 48 B.R. 156 (Bankr. S.D.N.Y. 1985) ...................................................22

Nathanson v. N.L.R.B., 344 U. S. 25 (1952) .....................................................................9

In re New Times Securities Services, Inc., 371 F.3d 68 (2d Cir. 2004) .........................................8

In re New Times Securities Services, Inc., 463 F.3d 125 (2d Cir. 2006) .........................13, 21, 24

Nordtvedt v. C.I.R., 116 T.C. 165 (2001),
    aff'd, 22 F. App'x 790 (9th Cir. 2001) .......................................................... 15-16

Matter of Oberweis Sec., Inc., 135 B.R. 842 (Bankr. N. D. Ill. 1991) .........................................22

In re O.P.M. Leasing Services, Inc., 60 B.R. 679 (Bankr. S.D.N.Y. 1986) ...................................9

Rolf v. Blyth, Eastman Dillon & Co., Inc., 637 F.2d 77 (2d Cir. 1980)...........................................22

Sandstrom v. Principi, 358 F.3d 1376 (Fed. Cir. 2004).................................................................21

Saunders v. Claytor, 629 F.2d 596 (9th Cir. 1980),
    cert. den., 450 U.S. 980 (1981) ...........................................................................14

Schultz v. Omni Mutual, Inc., [1993-94] Fed. Sec. L. Rep.
    (CCH) ¶98,095 (S.D.N.Y. 1993) ...................................................................10

SEC v. Aberdeen Securities Co., 480 F.2d 1121 (3d Cir.),
    cert. den. sub nom., Seligsohn v. SEC, 414 U.S. 1111 (1973) ...........................................8

iv

# TABLE OF AUTHORITIES
### (cont.)

**CASES:**                                                                           **PAGE**

SEC v. Albert & Maguire Sec. Co., 378 F. Supp. 906 (E.D. Pa. 1974) .........................................8

SEC v. Capital Consultants LLC, 2002 WL 32502450
   (D. Or. Dec. 5, 2002), aff'd, 397 F.3d 733 (9th Cir. 2005) ..............................................24

SEC v. Credit Bancorp, Ltd., 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000),
   aff'd, 290 F.3d 80 (2d Cir. 2002).........................................................................................24

SEC v. F. O. Baroff, 497 F.2d 280 (2d Cir. 1974).........................................................................21

SEC v. S. J. Salmon & Co., 375 F.Supp. 867 (S.D.N.Y. 1974) ....................................................22

SEC v. Packer, Wilbur & Co., 498 F.2d 978 (2d Cir. 1974) ...............................................7, 23, 30

SIPC v. Ambassador Church Finance/Development Group, Inc.,
   788 F.2d 1208 (6th Cir.), cert. den. sub nom.,
   Pine Street Baptist Church v. SIPC, 479 U.S. 850 (1986).............................................8, 21

SIPC v. Barbour, 421 U.S. 412 (1975) ...............................................................................6, 8, 18

SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314 (2d Cir),
   cert. den. sub nom., Trustees of the Reading Body Works, Inc. v. SIPC,
   426 U. S. 936 (1976)...........................................................................................................23

SIPC v. Stratton Oakmont, Inc., 229 B. R. 273 (Bankr. S.D.N.Y. 1999),
   aff'd sub nom., Arford v. Miller (In re Stratton Oakmont, Inc.),
   239 B.R. 698 (S.D.N.Y. 1999), aff'd, 210 F.3d 420 (2d Cir. 2000)...................... 9-10, 22

In re Smart World Technologies, LLC., 423 F.3d 166 (2d Cir. 2005) .........................................25

In re Stratton Oakmont, Inc., 2003 WL 22698876 (S.D.N.Y. Nov. 14, 2003)............................22

Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp).,
   479 F.3d 167 (2d Cir. 2007)..................................................................................................9

Upton v. SEC, 75 F.3d 92 (2d Cir. 1996) ...................................................................................18

W. Virginia v. United States, 479 U. S. 305 (1987) ....................................................................22

# TABLE OF AUTHORITIES
### (cont.)

**STATUTES AND RULES:**                                                      **PAGE**

Securities Investor Protection Act, as amended, 15 U.S.C. §

78ccc(a)(2)(A) ..................................................................................................................7
78ccc(b)(4) ....................................................................................................................15
78ccc(b)(4)(A) ..............................................................................................................15
78ddd .............................................................................................................................7
78ddd(f) ..........................................................................................................................7
78ddd(g) ..........................................................................................................................7
78ddd(h) ..........................................................................................................................7
78fff(a)(4) ........................................................................................................................8
78fff(b) .......................................................................................................................8, 26
78fff-2(b) .......................................................................................................................10
78fff-2(b)(1) .....................................................................................................................9
78fff-2(c)(1) .....................................................................................................................8
78fff-2(c)(1)(B) .......................................................................................................19, 28
78fff-3(a) ..................................................................................................................7, 9, 12
78fff-3(a)(1) ...................................................................................................................12
78fff-3(d) ........................................................................................................................12
78fff-3(e) ..................................................................................................................12, 27
78jjj(c) .............................................................................................................................27
78lll(2) .............................................................................................................................21
78lll(3) ..............................................................................................................................7
78lll(4) .........................................................................................................................7, 18
78lll(7) .............................................................................................................................13
78lll(11) ...............................................................................................................13, 15, 27

Bankruptcy Act 1938 (repealed), 11 U.S.C. §

96(e) .........................................................................................................................5, 8, 9
96(e)(2) .............................................................................................................................6

Securities Exchange Act of 1934, 15 U.S.C. §

78o(c)(3)(A) ...................................................................................................................17

10 U.S.C. §

2302d(a)(1) ....................................................................................................................11

## TABLE OF AUTHORITIES
### (cont.)

**STATUTES AND RULES:**                                                    **PAGE**

10 U.S.C. §

2306a ............................................................................................................11
2430(a)(2) ....................................................................................................11
2445a(2) .......................................................................................................11
12525(d) .......................................................................................................11

11 U.S.C. §

104 ................................................................................................................26
104(a) ...........................................................................................................26
105(a) ..................................................................................................... 25-28

17 U.S.C. §

801b(2)(A)(ii) ...............................................................................................11

31 U.S.C. §

1105(e)(1)(A) ...............................................................................................11

41 U.S.C. §

109(b) ...........................................................................................................11
1908(c)(1) .....................................................................................................11
3502(g) .........................................................................................................11

50 U.S.C. §

415a-1(e)(3) .................................................................................................11

Rules of the U. S. Securities and Exchange Commission, 17 C.F.R. §

240.15c3-3 ..............................................................................................16, 17
240.15c3-3a ..................................................................................................17
240.15c3-3(b) ...............................................................................................17
240.15c3-3(c) ...............................................................................................17
240.15c3-3(d) ...............................................................................................17
240.15c3-3(e)(1) ..........................................................................................17

## TABLE OF AUTHORITIES
### (cont.)

**OTHER STATUTORY PROVISIONS:**                                                    **PAGE**

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010)...................................................................8, 27

Pub. L. No. 91-598, 84 Stat. 1653 (1970)......................................................................17

Pub. L. No. 95-283, 92 Stat. 249 (1978)..................................................................7, 17, 26

Pub. L. No. 95-598, 92 Stat. 2549 (1978).......................................................................7

Pub. L. No. 96-433, 94 Stat.1855 (1980).......................................................................26

**LEGISLATIVE MATERIALS:**

H. R. Rep. No. 96-1321 (1980),
    reprinted in 1980 U.S.C.C.A.N. 3874-3875 ......................................................... 26-27

Report of Special Study of Securities Markets of the
    Securities and Exchange Commission, H.R. Doc. No. 95,
    88th Cong., 1st Sess., Pt. 1 (1963) .........................................................................5, 6

S. Rep. No. 91-1218 (1970) ...........................................................................................6

H.R. Rep. No. 91-1613 (1970), reprinted in 1970 U.S.C.C.A.N. 5255..........................6

**RELEASES:**

Adoption of Rule 15c3-3 under the Securities Exchange Act of 1934,
    Exchange Act Release No. 9856 (Nov. 10, 1972) ...............................................18

Exchange Act Rel. No. 9856, [1972-1973 Transfer Binder]
    Fed. Sec. L. Rep. (CCH) ¶ 79,083 (Nov. 13, 1972)...........................................16

Recognition of Foreign Broker-Dealer Regulation, Exchange
    Act Release No. 27018, 54 Fed. Reg. 30087 (July 18, 1989)..............................17

Reserves and Related Measures Respecting the Financial
    Responsibility of Brokers and Dealers, Exchange Act Release
    No. 9388, 36 Fed. Reg. 22312 (Nov. 24, 1971)..................................................17

## TABLE OF AUTHORITIES
### (cont.)

**PUBLICATIONS AND TREATISES:**                                      **PAGE**

2 Collier on Bankruptcy ¶105.01[2] (16th ed. 2010)......................................................25

Jim Chen, The Price of Macroeconomic Imprecision: How Should the
    Law Measure Inflation, 54 Hastings L. J. 1375 (July 2003)...............................................21

Michael P. Jamroz, The Customer Protection Rule, 57 Bus. Law. 1069 (2002)..........................17

Steven D. Lofchie, Lofchie's Guide to Broker-Dealer Regulation  (3d ed. 2005).......................17

## PRELIMINARY STATEMENT

In a liquidation proceeding under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), a customer receives, on a priority basis, satisfaction of his "net equity." Net equity is the difference between what the broker owes the customer and what the customer owes the broker. In the case at hand, the customer's net equity is the difference between the amount of the customer's deposits with the brokerage, Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the amount of the customer's withdrawals. This Bankruptcy Court confirmed that the latter calculation of net equity by the Trustee for the liquidation of BLMIS ("Trustee") is consistent with SIPA. The Court of Appeals for the Second Circuit agreed with this Court, and the Supreme Court declined to review the question.[1]

Now, nearly four years into the liquidation, the calculation of net equity seemingly resolved, the Trustee should be able to distribute the sums that he has amassed and satisfy customers' net equities, without further delay. Regrettably, that is not the case. Yet other constructions of net equity have been advanced seeking to alter the straightforward application and plain meaning of net equity. Although the exact formulation is unclear, one theory would appear to require the re-calculation of every deposit and every withdrawal by every investor to account for the effects, if any, of inflation on net equity. Another would apply an interest factor to net equity. Another theory holds that investors should receive the interest that would have been earned had their money been invested. The Trustee refers to this litany of theories as "time-based damages." Their application is unprecedented. In the more than 40 year history of SIPA liquidations, there has never been a recalculation of net equity based on time-based damages.

---

[1]  In re Bernard L. Madoff Inv. Sec. LLC, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), aff'd, 654 F.3d 229 (2d Cir. 2011), reh'g and reh'g en banc den. (2d Cir. Nov. 08, 2011), cert. dismissed, __ U.S. __,132 S. Ct. 2712 (2012), and cert. den., __ U.S. __, 2012 WL 396489 and 2012 WL 425188 (Jun. 25, 2012).

The reasons are simple. There is no statutory authority for the recalculation and the recalculation is inconsistent with SIPA.

Nevertheless, supporters of time-based damages would argue that they believed that their money had been invested in securities and the recalculation therefore gives effect to their reasonable expectations. Their reasoning is faulty for a number of reasons, some of which are listed below.

First, there is no guaranteed return on investments. Securities go up in value and they go down in value. A $100 investment today may be worth twice the amount next year, or it may be worth $0. There is no "constant" in investing and a suggestion that a constant dollar meets the customer's reasonable expectation suggests that the expectation is not reasonable at all.

Second, SIPA protects the customer against the loss of cash and securities on deposit with the broker-dealer. If a customer deposits $1,000 with his broker today, and intends to buy, but still has not bought any, securities with his $1,000 when he closes his account years later, the amount in his account is still $1,000 and that is the amount that he receives upon withdrawal. In a SIPA liquidation, protection of the customer against the loss of his $1,000 is what SIPA provides. Under a time-based damages approach, the investor would do better in bankruptcy than if the firm were solvent. The investor would receive $1,000 and more – an objective inconsistent with the law where customer property is a finite amount.

Third, as adopted in 1970, SIPA strengthened the protection of customer assets by requiring the Securities and Exchange Commission ("SEC") to enact rules to protect customer assets. An SEC Rule, the "Customer Protection Rule," adopted pursuant to a mandate in SIPA, requires broker-dealers to segregate customer assets and to hold the assets in or under the broker-dealer's custody or control. The SIPA protection largely works hand-in-glove with the Customer

2

Protection Rule.  Customer assets must be segregated and held by the brokerage but if those assets are converted and the brokerage fails financially, SIPC advances, within limits, are available to replace the property that was entrusted to the broker-dealer but is now missing.  The SIPC advances should be no greater than the amount of missing customer property.  In the instant case, the amount of customer property in the custody of the broker-dealer was not the value of the fictitious trades.  Securities were not bought and the values attributed to the fictitious trades were fictional amounts which, if honored, would cause investors to receive a windfall from the fraud.  Instead, the amount on deposit was the amount of real principal that remained, after customer withdrawals, which BLMIS should have segregated but instead converted to its own use.  Because SIPC advances should not be more than the amount of customer property that is subject to segregation but that is missing, requiring SIPC to advance more than customers' net deposits undermines the interrelatedness between the Customer Protection Rule and SIPC advances, and  changes the intended roles of SIPA and SIPC within the larger scheme of federal securities regulation.

Fourth, awarding customers time-based damages compensates customers for damages that they *might* have suffered -- "might," because there is no guarantee that even if their monies had been invested, the amount of their investment would not have been lost.  In reality, payment of time-based damages is compensation for the damage the customer might have suffered as a result of his funds not having been invested.  However, claims for damages are general creditor, and not "customer," claims under SIPA, and are ineligible for SIPA protection and priority consideration.

Fifth, any justification for a recalculation would no doubt rest on the Court's general authority to issue orders to carry out the provisions of Title 11 and on its power to do equity.  But

neither the provisions of Title 11 that apply to a SIPA case nor SIPA authorize the recalculations

sought in this instance.  Indeed, as discussed _infra_, SIPA expressly prohibits any re-definition of

net equity.  A bankruptcy court cannot violate the Bankruptcy Code in the name of equity.

Moreover, whether a recalculation in fact would do equity in this case is speculative at best.

What is certain is that the application of time-based damages is arbitrary, leads to random results,

will increase the cost of the proceeding, foster further delay in the satisfaction of claims, and set

a precedent in SIPA cases that has no basis in the law.

The Trustee has filed a motion for an order to affirm his calculations of net equity and

deny time-based damages ("Motion").  For the above reasons and others, as discussed below,

SIPC supports the Trustee's Motion.

## ISSUE

> Whether a customer's net equity is subject to recalculation for
> time-based damages where no statutory authority for the re-
> calculation exists, the recalculation would be inconsistent with
> SIPA, and the recalculation effectively compensates the investor
> for his damages which damage claims are general creditor, and not
> protected "customer," claims under SIPA.

SIPC submits that the customer's claim is not subject to recalculation for time-based

damages and that to the extent that it is, and the value of the claim is thereby increased, the

amount of the increase is a general creditor, and not a customer, claim under SIPA.

## STATEMENT OF FACTS

The facts of this matter are set forth in the Trustee's memorandum of law in support of

his Motion.

4

## ARGUMENT

## I. OVERVIEW OF SIPA

The issue at hand is an important one for the administration of SIPA. A ruling adverse to the Trustee will have substantial repercussions not only in this BLMIS liquidation proceeding, but potentially in every SIPA proceeding in this jurisdiction. Customers would not only have their "customer" claims satisfied out of customer property and SIPC funds, but their general creditor damage claims as well. Whether this expanded scope of protection is salutary or not, it is not the protection intended by Congress when it enacted SIPA. Because an understanding of the nature of the SIPA proceeding and the scope of SIPA protection are critical to a resolution of the issue, the nature of the proceeding and scope of protection are examined preliminarily below.

### The History of SIPA

### 1.    Stockbroker Liquidations Before 1938

Before 1938, customers of a bankrupt stockbroker were considered as general creditors if they could not reclaim cash or securities which they could trace into the broker's possession. Duel v. Hollins, 241 U.S. 523, 527-29 (1916). Because serious inequities could and did result from these requirements, Congress enacted section 60e of the Bankruptcy Act in 1938, 11 U.S.C. §96e (repealed 1979).[2]

### 2.    Section 60e of the Bankruptcy Act

Section 60e of the former Bankruptcy Act allowed "cash customers," as defined in the Act, to reclaim fully paid securities which were "specifically identifiable" as their property. Otherwise, customers' cash, securities, or property of a similar character (not "specifically

---

[2] Report of Special Study of Securities Markets of the Securities and Exchange Commission, H. R. Doc. No. 95, 88th Cong., 1st Sess., Pt. 1, at 411 (1963). (Under §60e, the rights of customers "are not dependent upon the fortuitous circumstances ... of the extent to which securities can be traced to the stockbroker's pledgee." Id. at 412.)

identifiable"), comprised a "single and separate fund."  That fund was used to satisfy claims (other than for specifically identifiable property) of the "single and separate class of creditors" on a pro rata basis, subject only to prior payment of certain administrative expenses.  11 U.S.C. §96e(2) (repealed 1979).

### 3.    SIPA As Enacted in 1970

Because the single and separate fund usually was inadequate, section 60e did not prevent customer losses.  As the rate of failures accelerated in 1969 and 1970, Congress responded to the crisis by enacting SIPA.  S. Rep. No. 91-1218, at 4 (1970).  See also H.R. Rep. No. 91-1613, at 1 (1970), reprinted in 1970 U.S.C.C.A.N. 5255; SIPC v. Barbour, 421 U.S. 412, 415 (1975).  SIPA created SIPC and, among other things, established procedures for liquidating financially troubled broker-dealers that are members of SIPC.

Like section 60e, SIPA established a "single and separate fund" in which all "customers" in the "single and separate class of creditors" shared pro rata and to the exclusion of general creditors.  To the extent customers' claims could not be satisfied from the single and separate fund, SIPC's funds were used, within the limits of protection, to augment the single and separate fund.  Customers whose net equity claims could not be satisfied from the combined sources of SIPC advances and the single and separate fund, then shared pro rata with general creditors in the general estate.  Thus, those who fit the definition of "customer" under section 60e or SIPA were accorded preferential treatment in the form of a priority over general creditors.  See Report of Special Study of Securities Markets of the Securities and Exchange Commission, H.R. Doc. No. 95, 88th Cong., 1st Sess., Pt. 1, at  411-412 (1963).

4.      **SIPA As Amended**

In 1978, SIPA was amended[3] to provide greater flexibility to SIPC in satisfying customer claims in an expeditious fashion.  The essential elements of a SIPA proceeding remained unchanged.  The concept of a "single and separate fund" was altered to a fund of "customer property," section 78lll(4), encompassing a somewhat broader range of assets.  The concept of "specifically identifiable property" was abolished, and only customers to whom a "customer name security" was owed, that is, a security registered in the customer's name or in the process of registration on the filing date, section 78lll(3), could receive the security back outright, without regard to the limits of SIPA protection.

5.      **SIPC and Its Funds**

SIPC is a non-profit corporation whose members include most interstate broker-dealers.  Membership in SIPC is automatic upon registration as a broker or dealer with the SEC under section 15b of the Securities Exchange Act of 1934.  SIPA §78ccc(a)(2)(A).

SIPA requires SIPC to establish a fund via assessments upon its members.  §78ddd.  If SIPC's funds should become inadequate, SIPA authorizes a borrowing against the U.S. Treasury currently up to $2.5 billion.  §§78ddd(f), (g), and (h).  These resources are available for the satisfaction of customer claims within certain limits.

6.      **Use of SIPC Funds to Satisfy Customer Claims**

The SIPC fund is "a quasi-public fund" which provides "relief to certain classes of customers."  SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983, 985 (2d Cir. 1974).  Under section 78fff-3(a), SIPC may advance to the trustee, in order to satisfy net equity claims of

---

[3] Pub. L. No. 95-283, 92 Stat. 249 (1978); Pub. L. No. 95-598, 92 Stat. 2549 (1978).

customers, not more than $500,000 per customer, of which no more than $100,000[4] may be

used to satisfy that portion of a claim which is for cash rather than for securities. SIPA does not

attempt to make all customers whole and SIPC's role is carefully delineated. It contemplates

that customers' claims will be satisfied to the maximum extent possible from the assets of the

defunct member firm. Thus, customers share on a pro rata basis in any fund of customer

property and any general estate. §78fff-2(c)(1). SIPC's funds supplement those assets within

the limits and in the manner provided by the statute.

### 7.    Nature of a SIPA Proceeding

Notwithstanding the special protection afforded customers, a SIPA proceeding

essentially is a bankruptcy liquidation. §78fff(a)(4). See, e.g., Exchange National Bank of

Chicago v. Wyatt, 517 F.2d 453, 457-459 (2d Cir. 1975); In re Lloyd Securities, Inc., 75 F.3d

853, 858 (3d Cir. 1996); SIPC v. Ambassador Church Finance/Development Group, Inc., 788

F.2d 1208, 1210 (6th Cir.), cert. den. sub nom., Pine Street Baptist Church v. SIPC, 479 U.S.

850 (1986). With its roots in section 60e of the Bankruptcy Act, a SIPA liquidation effectively

is an ordinary bankruptcy liquidation remodeled to achieve the special purposes of SIPA. See

SEC v. Albert & Maguire Securities Co., 378 F. Supp. 906, 909, 911 (E.D. Pa. 1974); SEC v.

Aberdeen Securities Co., 480 F.2d 1121, 1123 (3d Cir.), cert. den. sub nom., Seligsohn v. SEC,

414 U.S. 1111 (1973). Under SIPA section 78fff(b), the "liquidation proceeding shall be

conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5

---

[4] Prospectively, the limit of protection for cash claims has been increased to $250,000 although
the overall limit of protection continues to be $500,000 per customer. See Dodd-Frank Wall
Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, §929H, 124
Stat. 1376, 1856-1857 (2010). Even if the increase were not prospective only, it still would not
affect the BLMIS customers inasmuch as their claims, consistent with the law of this Circuit,
were considered as securities claims, each subject to the $500,000 limit of protection. In re New
Times Securities Services, Inc., 371 F.3d 68, 86 (2d Cir. 2004).

and subchapters I and II of chapter 7" of the Bankruptcy Code, but only to the extent consistent with SIPA.

**8.      The Burden of Proof**

"Customer" status in a SIPA proceeding is a preferred status that gives customers priority over other creditors in the distribution of certain assets marshaled by the trustee.  In re Hanover Square Securities, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment").   SIPA derives from subsection "e" of section 60 of the Bankruptcy Act which was entitled "Preferred Creditors."   Because of the availability of SIPC funds, one who qualifies as a customer in a SIPA proceeding may be paid, within the limits of protection, even when the debtor's estate has no assets.  §§78fff-2(b)(1) and 78fff-3(a).

In an ordinary bankruptcy, claimants seeking a preferred status bear the burden of showing that their claims are entitled to priority status.  See  In re Enron Corp., 279 B.R. 695, 705 (Bankr. S.D.N.Y. 2002) ("The claimant has the burden of establishing entitlement to the priority.")  See also Nathanson v. N.L.R.B., 344 U. S. 25, 29 (1952) ("[I]f one claimant is to be preferred over others, the purpose should be clear from the statute."); Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp)., 479 F.3d 167, 172 (2d Cir. 2007) ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed." [citation omitted]); In re O.P.M. Leasing Services, Inc., 60 B.R. 679, 680 (Bankr. S.D.N.Y. 1986).  The same rule applies to a SIPA case.  SIPC v. Stratton Oakmont, Inc., 229 B. R. 273, 278 (Bankr. S.D.N.Y.) (just as creditors in bankruptcy have the burden of proving priority status, claimants in a SIPA case have the burden of proving they are "customers" and that their net equity is "customer property"), aff'd sub nom., Arford v. Miller (In re Stratton Oakmont, Inc.), 239 B.R. 698

(S.D.N.Y. 1999), aff'd, 210 F.3d 420 (2d Cir. 2000). Provisions of SIPA make clear the claimant's burden by requiring that a debtor's obligations to its customers be "ascertainable from the books and records of the debtor" or "otherwise established to the satisfaction of the trustee." Section 78fff-2(b) (emphasis added). Furthermore, the satisfaction of a claim "may be conditioned upon the trustee requiring claimants to execute, in a form to be determined by the trustee, appropriate receipts, supporting affidavits, releases and assignments." Id. Thus, in a SIPA proceeding, the burden of proof rests with the party seeking customer status, see In re Klein, Maus & Shire, Inc., 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003) ("SIPA clearly places the burden of proof to establish customer status on the claimant"); In re Adler Coleman Clearing Corp., 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997); Schultz v. Omni Mutual, Inc., [1993-94] Fed. Sec. L. Rep. (CCH) ¶98,095 at p. 98,763 (S.D.N.Y. 1993); In re Brentwood Securities, Inc., 925 F.2d 325, 328 (9th Cir. 1991) (claimants have burden of proving that they are customers by establishing that they entrusted cash or securities to the broker), and the claimant's burden of proving "customer" status is as to each transaction. See SIPC v. Stratton Oakmont, Inc., 229 B.R. at 277 ("[A]n investor can be a customer vis-à-vis certain transactions but not others").

## II.  WHERE CONGRESS INTENDS AN INFLATION ADJUSTMENT, IT SAYS SO

### 1.  Constant Dollar Examples and the Legislative Intent

Constant dollars  requires an adjustment of the value of a dollar to account for the fact that due to inflation, a dollar may have more or less buying power in one year than in another year.  Thus, for example, according to a Dept. of Labor, Bureau of Labor Statistics, Consumer Price Index ("CPI"), inflation calculator, a person who spent $100 in 1980 to buy goods would

had to have spent $261.29 for the same purchase in 2008, when BLMIS was placed in liquidation.[5]

The concept of constant dollars is not new, but where Congress intends a constant dollar recalculation, Congress expressly has said so. There are many examples of statutory constant dollar provisions; what they have in common is that each refers specifically to constant dollars and provides the authority for a recalculation on that basis. One example of such a provision is the following:

> 10 U.S.C. §2306a. Cost or pricing data: truth in negotiations
>
> * * * *
>
> (7) Effective on October 1 of each year that is divisible by 5, each amount set forth in paragraph (1) shall be adjusted to the amount that is equal to the *fiscal year 1994 constant dollar* value of the amount set forth. * * * [emphasis added]

Other randomly chosen constant dollar references are at 10 U.S.C. §2302d(a)(1); 10 U.S.C. §2445a(2); 10 U.S.C. §12525(d); 17 U.S.C. §801(b)(2)(A)(ii); 31 U.S.C. §1105(e)(1)(A); 50 U.S.C. §415a-1(e)(3); 41 U.S.C. §1908(c)(1); 41 U.S.C. §109(b); 41 U.S.C. §3502(g); and 10 U.S.C. §2430(a)(2).

The above list is not exhaustive, but it shows that where Congress intends a constant dollar recalculation, it knows how to require one and the fact that it has not is meaningful. Cf., Dole Food Co. v. Patrickson, 538 U.S. 468, 476 (2003) ("Where Congress intends to refer to ownership in other than the formal sense, it knows how to do so." Absence of language indicates lack of intent.); Central Bank v. First Interstate Bank, 511 U.S. 164, 176-177 (1994) (That Congress did not use the words "aid" and "abet" in the statute shows a lack of intent to impose

---

[5]  The inflation calculations herein are based on the CPI inflation calculator at U. S. Dept. of Labor, Bureau of Labor Statistics, Inflation Calculator at http://www.bls.gov/data/inflation_calculator.htm.

aiding and abetting liability.); <u>Connecticut Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992)

("[C]ourts must presume that a legislature says in a statute what it means and means in a statute

what it says there." [citations omitted]).  This is well-illustrated in SIPA where Congress has

provided for an inflation adjustment to the SIPC cash advance, but significantly, requires none

with respect to the calculation of net equity.

There is no mistaking the requirement of an inflation adjustment with regard to the SIPC

cash advance only: the Congressional mandate is clear, detailed, and specific.[6]  Thus, under a

2010 Dodd-Frank amendment to SIPA, <u>see</u> <u>supra</u>, Congress increased the limit of protection for

cash claims from $100,000 to $250,000 and required SIPC to determine no later than January 1,

2011, and every five years thereafter, whether the limit of cash protection should be adjusted for

inflation.  The index to be used in calculating the inflation adjustment, namely, the Personal

Consumption Expenditures Chain-Type Price Index or any successor index to it published by the

Department of Commerce, is specified in SIPA, as are the factors to be considered by SIPC in

determining whether an adjustment is warranted, the date on which any adjustment is to take

effect, and when the amount of the adjusted cash advance is to be rounded down.  <u>See</u> SIPA

§§78fff-3(a)(1) and 78fff-3(d) and (e) (2010).  In contrast, SIPA is completely silent with respect

to any recalculation of net equity based on constant dollars.  The reason is obvious: no such

---

[6]    Currently, under SIPA, each eligible customer is protected against the loss of his cash and
securities up to $500,000.  Of the $500,000, up to $250,000 can be used to satisfy the customer
who is owed cash only and no securities.  Significantly, under Dodd-Frank, while increasing the
cash advance limit and providing for an adjustment of it for inflation, Congress made no change
to the overall limit of protection, leaving it at $500,000.  <u>See</u> SIPA §78fff-3(a).  The fact that
Congress could have adjusted other amounts for inflation, but chose not to, is clear evidence that
where Congress has not provided for an inflation adjustment, none is intended.  In this regard, it
is a long-standing rule that when a provision is carefully included in one section of a statute and
omitted in another section, it should not be implied in the place at which it is omitted.  <u>Lang v.
Commissioner</u>, 289 U. S. 109, 112 (1933).  In short, "<u>expressio</u> <u>unius</u> <u>est</u> <u>exclusio</u> <u>alterius</u>" is
fitting here.

recalculation is intended or, as later discussed, allowed.  Rather, under the net equity definition, the value of a customer's securities positions is arrived at by calculating the sum owed to the customer as if, on the "filing date" under SIPA section 78lll(7), the debtor had liquidated all securities positions of the customer.[7]    See SIPA § 78lll(11).  Cash, under the net equity definition, has the same nominal dollar value on the filing date as when it was entrusted to the broker.  The amount of the customer's indebtedness is calculated as the amount owed by the customer to the broker on the filing date.  Id.

In the case at hand, there were no securities in customers' accounts and therefore, none to value.  The pre-ordained fictitious prices given to the non-existent securities positions that were invented by BLMIS are of no help since treating the prices as real would only give the customers a windfall and allow them to profit from the fraud.  Cf., In re New Times Securities Services, Inc., 463 F.3d 125, 130 (2d Cir. 2006) (referring to a previous decision in New Times in which the court had concluded that "treating the fictitious paper profits as within the ambit of the customers' 'legitimate expectations' would lead to the absurdity of 'duped' investors reaping windfalls as a result of fraudulent promises made on fake securities.").  Valuing at more than face value the cash that was entrusted by customers to BLMIS requires statutory authority.  But the obvious source for such authority – the net equity definition -- contains no adjustment for inflation.  To the contrary, by valuing customers' accounts according to the amounts actually held at the firm as of the filing date, and making no provision for an inflation adjustment, the definition of "net equity" implicitly prohibits such an adjustment.

---

[7]    In this case, the "filing date" relates back to the date of appointment of a receiver for BLMIS in a case brought against the firm by the SEC.  See SEC v. Bernard L. Madoff, No. 08 Civ. 10791 (S.D.N.Y.), and SIPA section 78lll(7).

### 2. No Statutory Authority to Re-Define Net Equity

If a court is to adjust an amount for inflation or interest, it must have the statutory authority to do so.[8]  Thus, for example, in <u>Saunders v. Claytor</u>, 629 F.2d 596, 598 (9th Cir. 1980), <u>cert</u>. <u>den</u>., 450 U.S. 980 (1981), the Ninth Circuit, concluding that it lacked statutory authority, reversed a lower court decision that adjusted an award for inflation in order to provide back pay in "constant dollars" in a Title VII employee discrimination suit.  In so holding, the court stated: "The inflation factor in this case is very similar to an award of interest in that both types of awards are meant to compensate the victim for the belated receipt of employment pay….  In essence, the inflation factor adjustment is a disguised interest award, which is not permitted under present law."  In <u>Brown v. Sec'y of Health & Human Services</u>, 46 F.3d 102, 111 (1st Cir. 1995), the First Circuit noted that "[h]ad Congress wanted to require the Secretary to make periodic adjustments for inflation, it could easily have said so in the statute, and indeed has done so in other instances …"  In <u>Dist. of Columbia v. United States</u>, 67 Fed. Cl. 292, 340 (Fed. Cl. 2005), the court observed that "[s]tatutory entitlement to prejudgment interest or a cost escalation factor must be established for the United States to be held liable for these types of claimed costs. …"  And in a tax case, <u>Nordtvedt v. C.I.R.</u>, 116 T.C. 165, 169-70 (2001), <u>aff'd</u>, 22 F. App'x 790 (9th Cir. 2001), the court remarked that "when Congress intends for inflation to be taken into account, it does so by providing for it by statute."  The court noted that where the language of a statute is clear, "unequivocal evidence of legislative purpose" must be shown before a court will depart from the plain words of the statute.  Ultimately, the court concluded that the "legislative history of the statutes relevant to this case contains no evidence that Congress intended that there

---

[8]    It bears mention that prior to its demise, BLMIS did not contract with customers to pay interest, nor did it credit interest payments on free credit balances.

14

be any adjustment to account for inflation. As with the statutes, the regulations also contain no mention of inflation adjustments." 116 T.C. at 169-170 and n.2.

The same is true here. The statutory definition of net equity contains no reference to an adjustment for inflation or interest. Congress expressly has provided elsewhere in SIPA for such an adjustment but not with respect to net equity. Given the foregoing, the burden of proving that an adjustment is permissible is impossibly high. If net equity does not already allow for an inflation or interest adjustment, then an attempt to incorporate such a provision into it, redefines net equity. But that is strictly forbidden under SIPA. Thus, while SIPA section 78ccc(b)(4) gives SIPC the power to define terms by rule, SIPA section 78ccc(b)(4)(A) expressly prohibits such rulemaking for "those terms for which a definition is provided in section 78lll of this title…." Net equity is defined at subsection (11) of section 78lll. SIPC has no authority to change the definition by rule, and no third party can change the definition by any other means.

In the face of no statutory authority and indeed, the strict prohibition against re-defining net equity, and in the absence of "unequivocal evidence" of legislative intent to allow an inflation or interest factor to be applied to net equity, a court need look no further. Nevertheless, there are many other reasons why the application of time-based damages is improper. These are examined below.

> A.    **Inconsistency between SEC Rule 15c3-3 and SIPA**

The fact that a recalculation of net equity would create an inconsistency between SIPA and other customer protection provisions of the securities laws is further proof that time-based damages do not apply.

SIPA protection is part of a broader federal scheme of protection in which SIPA, to a large extent, works hand-in-glove with certain SEC regulations whose primary focus is the

safeguarding of customer assets. One of those rules, the "Customer Protection Rule" or SEC Rule 15c3-3, 17 C.F.R. §240.15c3-3, is especially key. The amount of customer property required to be segregated under SEC Rule 15c3-3 generally should mirror the amount of customer property owed to customers. Because SIPA, within limits, provides the funding to replace missing customer property that was entrusted to the broker, the amount of SIPC advances should never be larger than the amount of that property. The application of time-based damages, however, creates an imbalance between the Rule and SIPA since instead of being at least approximately the same amount, the value of allowed customer claims would always exceed the amount of customer property deposited with the broker and subject to segregation under the Rule. As discussed below, this outcome is inconsistent with the SEC's objective in adopting the Rule and the nature of SIPA protection.

### i.    The Customer Protection Scheme

In 1972, the protection of customer assets was strengthened pursuant to a mandate in SIPA. That year, the SEC adopted its Rule 15c3-3, 17 C.F.R. §240.15c3-3, "to furnish the protection for the integrity of customer funds and securities as envisioned by Congress when it amended Section 15(c)(3) of the [Securities Exchange Act of 1934 ("Exchange Act")] by adopting Section 7(d) of [SIPA]." *See* Exchange Act Rel. No. 9856, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,083 at 82,343 (Nov. 13, 1972). SIPA required Commission rules to "provide safeguards with respect to the financial responsibility and related practices of brokers and dealers including, but not limited to, the acceptance of custody and use of customers' securities, and the carrying and use of customers' deposits or credit balances ...."

16

15 U.S.C. § 78<u>o</u>(c)(3)(A).[9]  Against the backdrop of that directive, the Commission adopted Rule

15c3-3 requiring broker-dealers promptly to obtain possession, and thereafter maintain physical

possession or "control," of all "fully-paid" and "excess margin" securities held by the firm for

customers.  <u>See</u> 17 C.F.R. §§ 240.15c3-3(b)-(d).  Securities brokers were prohibited from using

customer securities in their business and could not sell them without customer authorization or

otherwise use them.  <u>See</u> Steven D. Lofchie, <u>Lofchie's Guide to Broker-Dealer Regulation</u> 481

(3d ed. 2005).

Brokers also were subject to regulation with respect to the treatment of customer cash.

Consistent with a formula prescribed in Rule 15c3-3a, a broker-dealer would have to calculate

weekly the amount of its net cash obligations to customers.  <u>See</u> 17 C.F.R. §§ 240.15c3-3(e)(1),

240.15c3-3a.  <u>See also</u> Michael P. Jamroz, <u>The Customer Protection Rule</u>, 57 Bus. Law. 1069,

1095-96 (2002).  The firm would then have to keep in a "special reserve bank account for the

exclusive benefit of customers" a deposit equal to the amount under the Rule 15c3-3a

calculation.  <u>See</u> 17 C.F.R. § 240.15c3-3(e)(1).  This account would have to be "separate from

any other bank account of the broker or dealer."  <u>See</u> <u>id.</u>

The objective of Rule 15c3-3 was to "*achieve a virtual 100 percent protection to*

*customers* with respect to 'the carrying and use of customers' deposits or credit balances' which

is mandated by section 7(d) of [SIPA]."  <u>Reserves and Related Measures Respecting the</u>

<u>Financial Responsibility of Brokers and Dealers</u>, Exchange Act Release No. 9388, 36 Fed. Reg.

22312 (Nov. 24, 1971) (emphasis added).    <u>See</u> <u>Recognition of Foreign Broker-Dealer</u>

<u>Regulation</u>, Exchange Act Release No. 27018, 54 Fed. Reg. 30087, 30091 (July 18, 1989)

---

[9]  Pub. L. No. 91-598, § 7(d), 84 Stat. 1653 (1970).  Section 7(d) of the 1970 version of SIPA
directly amended the language of section 15(c)(3) of the Securities Exchange Act of 1934.
Section 7(d) of SIPA was renumbered to section 11(d) in 1978.  <u>See</u> Pub. L. No. 95-283, 92 Stat.
260 (1978).

(stating that the purpose is "to protect customer funds and securities from general creditors of the broker-dealer in the event of a sudden liquidation").  See also Upton v. SEC, 75 F.3d 92, 96 (2d Cir. 1996) ("The purpose of the Rule is clear:  'to insure that customers' funds held by a broker-dealer . . . are deployed in safe areas of the broker-dealer's business related to servicing his customers, or to the extent that the funds are not deployed in these limited areas, that they be deposited in a reserve bank account.'  Adoption of Rule 15c3-3 under the Securities Exchange Act of 1934, Exchange Act Release No. 9856 (Nov. 10, 1972)").

In this regard, SIPA complements the broker's custodial obligations by ensuring that to the extent of any such missing customer property, SIPC funds are available, within limits, to make up the difference if the brokerage is liquidated under SIPA.  In that manner, SIPA protects the property entrusted by or on behalf of customers to the broker by shoring up, and working in tandem with, the segregation requirements to achieve a cohesive scheme of protection of such assets.  See SIPC v. Barbour, 421 U.S. 412, 413 (1975) ("[SIPC] was established by Congress as a nonprofit membership corporation for the purpose, inter alia, of providing financial relief to the customers of failing broker-dealers with whom they had left cash or securities on deposit."); In re Bernard L. Madoff Inv. Secs. LLC, 654 F.3d at 236 ("the 'critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities,'" quoting  Appleton v. First Nat'l Bank of Ohio, 62 F.3d 791, 801 (6th Cir. 1995)); In re Adler, Coleman Clearing Corp., 216 B.R. 719, 725 (Bankr. S.D.N.Y. 1998).

### ii.  The Distribution Scheme

Under SIPA section 78lll(4), customer property includes "property unlawfully converted."  Because SIPA protects the custodial function, the amount advanced by SIPC is not more than the amount of customer property deposited with the broker by or for customers and

that subsequently is missing. Supporters of time-based damages presumably would disagree and argue that the SIPA protection should extend to the return of assets plus some inflation or interest factor. If correct, their view would alter the SIPA statutory scheme by inflating the value of claims against customer property. When seen through the prism of SIPA protection, their approach holds no water.

In a SIPA proceeding, customer property is shared pro rata by customers. SIPA §78fff-2(c)(1)(B). Customer property is a finite amount measured by the actual cash and securities entrusted to the broker. Because customers are entitled to the return of their property, it would make no sense for Congress to inflate the value of customer claims against customer property. If a customer deposits $100 with a broker and is owed $100, why should he receive more than $100? Customer property being a fixed amount, if the customer does receive more, it is at the expense of other customers. To illustrate: as previously mentioned, under a CPI inflation calculator, $100 in 1980 dollars is equal to $261.29 in 2008 dollars. Under a time-based damages approach, a customer (Customer "A") who deposited $100 with BLMIS in 1980 would have a claim for $261.29 in 2008 against the fund of customer property, even though his contribution to customer property was only $100. By the same token, a different customer (Customer "B") who deposits $100 in 2008 would only have a claim for $100, the amount of his contribution on the 2008 "filing date" of the BLMIS case. Significantly, because the adjustment is one-sided, that is, only the claims against, but not the value of, property available for distribution can be inflated, the result, when customer property is distributed pro rata to customers, is that more of Customer B's dollars are used to pay Customer A, leaving fewer dollars for Customer B. Ironically, in the context of this case, because A deposited fewer dollars (because they are based on a 1980 valuation) than B did in 2008, but is being paid in 2008

19

dollars, by taking the money of Peter (Customer B) to pay Paul (Customer A), instead of stopping the Ponzi scheme, time-based damages perpetuates it.

### III.  <u>THERE IS NO SIPA PROTECTION FOR GENERAL CREDITORS</u>

Under a time-based damages approach, because the claims artificially become larger against a fund of customer property that is comprised of a limited amount of real deposits, the shortfall or amount of missing customer property always will be larger than if no inflation or interest factor had been applied.  The supporters of time-based damages would argue that SIPC funds should be used to compensate investors for the shortfall.   They are wrong for the many reasons discussed above.  They also are wrong because the SIPC advance does not necessarily equalize claims.  Thus, in the case of Customers A and B above, because A deposited only 1980 dollars but is being paid in 2008 dollars, A does better than B in the distribution of customer property.   Assume that instead of a deposit of $100 each, A and B each deposited $1.5 million into their BLMIS accounts, A in 1980 dollars and B in 2008 dollars.  Due to an inflation adjustment, A claims $3,919,350.73 (the value of his 1980 $1.5 million in 2008 dollars) and receives a larger share of customer property than B whose claim is only for $1.5 million.   The amount of customer property is such that after the distribution of customer property and the advance to each of $500,000 in SIPC funds, neither is made whole.   In that event, notwithstanding the SIPC advance, Customer A still does better than Customer B because of his larger claim (in 2008 dollars), and smaller contribution (in 1980 dollars), to customer property.

There is another reason why the position that SIPC advances should be used to pay the inflated claims is wrong.  Presumably, the supporters of time-based damages would argue that their claims should be inflated to remunerate them as much as possible for their real or putative losses.  But what the SIPA proceeding seeks to return to each customer is the amount that the

customer entrusted to the broker, that is, the actual amount of his deposit with the broker.  That

sum does not include interest.[10]   See SIPC v. Ambassador Church Finance/Development Group,

Inc., 788 F.2d 1208, 1212 (6th Cir.) ("Since the definition of 'net equity' does not include

interest, we hold that the SIPA does not authorize the SIPC to pay interest, either to the trustee or

directly to the debtor's customers."), cert. den. sub nom., Pine Street Baptist Church v. SIPC,

479 U.S. 850 (1986).  Nor does it include any sum that the customer might be entitled to above

and beyond his net deposit as compensation for any harm suffered as a result of BLMIS having

lied to him.  Such compensation represents the customer's damages, and damages, under SIPA,

are not eligible for SIPA protection.  Claims for damages are not the claims of "customers," that

is, persons eligible for SIPA protection, but, they are, at best, the claims of general creditors.  See

In re New Times Securities Services Inc., 463 F.3d 125, 127 (2d Cir. 2006) ("customers" qualify

for priority treatment under SIPA), and SIPA §78lll(2).

Arbitrarily increasing the amount of the customer's deposit, whether by application of an

inflation or other interest factor, is no more than an award of interest on the customer's claim and

compensates the customer for the loss that he might or might not have suffered had his funds

been invested.  See Jim Chen, The Price of Macroeconomic Imprecision: How Should the Law

Measure Inflation, 54 Hastings L. J. 1375, 1380 (July 2003) ("What is casually called 'interest'

in fact reflects the time value of money.").  See also Sandstrom v. Principi, 358 F.3d 1376, 1380

(Fed. Cir. 2004) ("Economists use interest, COLAs, indices, and various other mechanisms to

translate time series of nominal dollars into meaningful constant dollars.  They may apply

different labels at different times, but the purpose of all such adjustment mechanisms is

---

[10]   Indeed, persons who deposit funds with the broker solely for the purpose of earning interest
or for any non-investment or market related purpose are not "customers" under SIPA.  See SEC
v. F. O. Baroff, 497 F.2d 280 (2d Cir. 1974).

21

identical."); <u>Bingham v. Zolt</u>, 810 F.Supp. 100, 102 (S.D.N.Y. 1993) ("main function of an award of prejudgment interest is to fully compensate a plaintiff for damages suffered. <u>See Rolf v. Blyth, Eastman Dillon & Co., Inc</u>., 637 F.2d 77 (2d Cir. 1980) ("An award of prejudgment interest is in the first instance, compensatory…")."); <u>W. Virginia v. United States</u>, 479 U. S. 305, 310 n.2 (1987) ("Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress.").

The law is clear that claims for damages are not "customer" claims under SIPA whether the damages result from a broker's failure to invest, misrepresentations, or breach of contract, or from ordinary market loss. <u>See In re Stratton Oakmont, Inc</u>., 2003 WL 22698876, at *5 (S.D.N.Y. Nov. 14, 2003) ("court's conclusion that SIPA does not protect against losses that occur as a result of fraud, breach of contract, or other broker wrongdoing, does apply"); <u>Arford v. Miller</u>, 239 B.R. at 701-702 ("SIPA does not protect against all cases of alleged dishonesty and fraud"); <u>In re A. R. Baron Co</u>., 226 B. R. 790, 796 (S.D.N.Y. 1998) ("well established that claims based on a debtor's failure to execute securities trades are not 'customer' claims which a trustee may satisfy with SIPC funds or Customer Property"); <u>SEC v. S. J. Salmon & Co</u>., 375 F.Supp. 867, 870-871 (S.D.N.Y. 1974); <u>In re Klein, Maus & Shire, Inc</u>., 301 B.R. 408, 421 (Bankr. S.D.N.Y. 2003) ("even if it is assumed that their losses were caused by fraud, breach of contract, or a similar theory, they are general creditors."); <u>In re MV Securities, Inc</u>., 48 B.R. 156, 160-161 (Bankr. S.D.N.Y. 1985) (SIPA protects customers having cash or securities on deposit with the broker.  It is not a vehicle for the litigation of fraud claims and securities law violations); <u>Matter of Oberweis Sec., Inc</u>., 135 B.R. 842, 846 (Bankr. N. D. Ill. 1991) ("failure to execute an order to buy securities gives rise to a breach of contact claim for damages, but is not a

22

customer claim protected by the SIPA"); In re Bell & Beckwith, 124 B.R. 35, 36 (Bankr. N. D.

Ohio 1990) ("several courts have held that SIPA does not protect customer claims based on fraud

or breach of contract.").  In this regard, SIPA does not purport to remedy every harm, and an

argument to the contrary has no support in the law.  See SIPC v. Morgan, Kennedy & Co., 533

F.2d 1314, 1317 n.4 (2d Cir.) (SIPA not designed to accord full compensation to all injured by

brokerage collapse), cert. den. sub nom., Trustees of the Reading Body Works, Inc. v. SIPC, 426

U. S. 936 (1976); SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983 (2d Cir. 1974) ("SIPA was

not designed to provide full protection to all victims of a brokerage collapse."); In re Brentwood

Securities, Inc., 925 F.2d 325, 330 (9th Cir. 1991) (SIPA "does not comprehensively protect

investors from the risk that some deals will go bad or that some securities issuers will behave

dishonestly.").

## IV.  THE OUTCOME IS NO DIFFERENT
## IN BANKRUPTCY

Supporters of time-based damages might also argue that authority for a recalculation of

net equity lies in the Bankruptcy Code.  There too, they are mistaken.

A SIPA proceeding is to be conducted in accordance with, and as though, it were being

conducted under almost all of the Title 11 provisions that apply to a Chapter 7 liquidation, to the

extent consistent with SIPA.  If Title 11 required a different analysis than the one provided here,

the provisions in question of Title 11 supporting that theory would be deemed not to apply

because they would be inconsistent with SIPA.  But the fact is that even under the Code, the

outcome is the same.   The Code provides no authority to enhance the claims of customers

through time-based damages.

In bankruptcy, courts have held that the "general rule in Ponzi scheme cases is that net

winners must disgorge their winnings."   Gowan v. Westford Asset Mgmt LLC (In re Dreier

LLP), 462 B. R. 474, 485 (Bankr. S.D.N.Y. 2011).   See Bayou Superfund, LLC v. WAM

Long/Short Fund II, L.P. (In re Bayou Group, LLC), 362 B. R. 624, 636 (Bankr. S.D.N.Y. 2007)

("[V]irtually every court to address the question has held unflinchingly 'that to the extent that

investors have received payments in excess of the amounts they have invested, those payments

are voidable as fraudulent transfers.'" [citations omitted]); In re New Times Securities Services,

Inc., 463 F.3d 125, 130 (2d Cir. 2006) (in Ponzi scheme, initial investment is the measure for

reimbursement).   Moreover, even in bankruptcy, there is no entitlement to pre-judgment interest

in addition to the return of the original investment amount.   As stated by the court in Christian

Brothers High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC),

439 B. R. 284, 337 (S.D.N.Y. 2010):

> Appellants also argue that the fictitious profits they received
> should be treated as pre-judgment interest.   This novel argument,
> unsupported by any case law, is unpersuasive.   The pre-judgment
> interest remedy does not provide an independent cause of action
> that accrues to Appellants' benefit at the moment of redemption.   It
> is a make-whole remedy ordered by the Court once a final
> judgment for a sum certain is entered, * * *, and no such judgment
> has been entered here.   Moreover, Appellants collected the debt
> owed them – their initial investment – and thus there is no sum
> upon which pre-judgment interest could attach.   [citation omitted].

See SEC v. Capital Consultants LLC, 2002 WL 32502450, at *2 (D. Or. Dec. 5, 2002) (in

receivership case, return of principal is the correct approach even though it "ignores the time

value of money, which can be significant with the older and larger accounts"), aff'd, 397 F.3d

733 (9th Cir. 2005); SEC v. Credit Bancorp, Ltd., 2000 WL 1752979, at *41 (S.D.N.Y.  Nov. 29,

2000) ("net investment approach may affect different investors differently, but it does not have

an unfair or disproportionate impact on older investors."), aff'd, 290 F.3d 80 (2d Cir. 2002).

## V.  A COURT MAY NOT ADJUST A
## CUSTOMER'S NET EQUITY IN
## THE NAME OF EQUITY

### 1.  The Limits of Equitable Relief

Finally, it is likely that the time-based damages supporters will base their request for relief on the equitable powers of this Bankruptcy Court.  Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11]."  11 U.S.C. § 105(a).  Despite the seemingly broad language of the provision, the Second Circuit and other courts have long recognized that the power conferred by Section 105(a) is subject to important limitations.  See, e.g., In re Kalikow, 602 F.3d 82, 96-97 (2d Cir. 2010).  See also 2 Collier on Bankruptcy ¶ 105.01[2] (16th ed. 2010) ("Collier") ("[I]t should be universally recognized that the power granted to the bankruptcy courts under section 105 is not boundless and should not be employed as a panacea for all ills confronted in the bankruptcy case").  In this regard, that power can only be exercised within the confines of the Bankruptcy Code to facilitate the implementation of another Code provision, and cannot be used to create substantive rights that are otherwise unavailable under applicable law, to alter rights that are so available, or to override the mandates of other Code sections or of other state or federal statutes.  See, e.g., In re Kalikow, 602 F.3d at 96-97; In re Smart World Technologies, LLC., 423 F.3d 166, 183-84 (2d Cir. 2005); In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 92 (2d Cir. 2003).  See also 2 Collier ¶ 105.01[2].  In fact, as the courts in this jurisdiction have emphasized, while Section 105(a) generally may be used to preserve a right explicitly conferred in another section of the Bankruptcy Code, it may not be used to advance a "general bankruptcy concept or objective" not grounded in a particular Code provision.  See, e.g., In re Kalikow, 602 F.3d at 97.  In short, the section does not

"constitute a roving commission to do equity." Id. at 96 (quoting Dairy Mart, 351 F.3d at 92).

Consistent with these limitations, section 105(a) has not been invoked to adjust the amount of a

creditor's claim for inflation. And for good reason. Any invocation of the section for that

purpose would be inconsistent with section 104 of the Bankruptcy Code. In the latter section,

Congress expressly provided that the dollar amounts identified in certain Code provisions are

subject to automatic adjustment for inflation on a periodic basis. See 11 U.S.C. § 104(a). By

negative implication, Congress thus reserved to itself the power to provide for inflation

adjustments with respect to those provisions not identified in section 104(a). Any invocation of

section 105(a) by a bankruptcy court to make an inflation adjustment outside of the context of

section 104 thus would override the limitations inherent in the latter provision, and therefore

would exceed the scope of the equitable power conferred by section 105(a). The same logic

limits the application of section 105(a) in the context of SIPA. SIPA incorporates by reference

certain provisions of the Bankruptcy Code, including section 105(a), to the extent consistent with

SIPA. See SIPA § 78fff(b). Through its amendments to SIPA, Congress repeatedly has

indicated that no section of the statute should be read to provide for an automatic inflation

adjustment, except where Congress has mandated such adjustments in clear and explicit

language. Congress periodically has amended SIPA to increase the limits of SIPA protection,

and most recently, as discussed above, potentially to increase the cash advance for inflation, thus

indicating that Congress intended that SIPA provide for no such increase automatically. See

Pub. L. No. 95-283, § 9, 92 Stat. 249, 265 (1978) (raising overall limit of protection from

$50,000 to $100,000, and raising limit on cash claims from $20,000 to $40,000); Pub. L. No. 96-

433, § 1(1) and (2), 94 Stat. 1855 (1980) (raising overall limit to $500,000 and cash limit to

$100,000). See also, e.g., H. R. Rep. No. 96-1321, at 1-2 (1980), reprinted in 1980

U.S.C.C.A.N. 3874-3875 (1980 increases in protection limits were enacted due to "the substantial size of the SIPC trust fund, *inflation*, and the well-recognized need to provide for further customer confidence in dealing with individual securities firms") (emphasis added). Moreover, as discussed above, in 2010, as part of Dodd-Frank, Congress again amended SIPA to increase the limit on SIPC protection for cash claims, and for the first time provided for the periodic adjustment of that limit to reflect inflation. See Dodd-Frank § 929H; SIPA § 78fff-3(e). At the same time, however, Congress increased other dollar limits in SIPA, without any provision for inflation adjustment. See, e.g., Dodd-Frank § 929V; SIPA § 78jjj(c) (increasing the maximum amount of the fine for prohibited acts from $50,000 to $250,000). Again, the explicitness and specificity of the inflation adjustment provision included in the cash limit increase, coupled with the omission of such a provision in connection with other limit increases, confirms that Congress understood and intended that, absent an express provision for automatic inflation adjustment, Congress reserves to itself the right to make such adjustments by statute.

In this light, it is clear that Section 105(a) does not empower the Court to adjust the amount of a "net equity" claim for inflation. SIPA's definition of "net equity" in section 78lll(11) contains no language either authorizing such an adjustment, or even suggesting that such an adjustment might be made. Moreover, for the reasons stated, SIPA's history and architecture indicate that Congress did not intend to confer upon the bankruptcy courts any authority to make such adjustments, and instead intended to reserve to itself the power to provide for inflation adjustments when and as it deems necessary. See supra. Accordingly, in the absence of explicit Congressional authorization, a decision by this Court providing for the adjustment of the amount of a "net equity" claim for inflation would override Congress's clearly reserved prerogative. It also both would create and alter substantive rights - conferring upon certain "customer" claimants

a new right to additional "net equity" relief and, in so doing, altering the ratable shares of all "customers" to the fund of customer property - acts well beyond the scope of the equitable authority provided in section 105(a).  Cf., SIPA § 78fff-2(c)(1)(B) (providing for the ratable allocation of "customer property" to "customers" on the basis, and to the extent, of their respective net equities).

### 2. Time-Based Damages Do Not Achieve Equity In The Context of a SIPA Case

A bankruptcy court is to exercise its equitable powers only to carry out the provisions of the Bankruptcy Code "rather than to further the purposes of the Code generally, or otherwise to do the right thing."  In re Dairy Mart Convenience Stores, Inc., 351 F.3d at 92.   But even assuming, arguendo, that the latter were the standard, it is far from certain or even likely that time-based damages would further the purposes of the Code or be the "right thing."  First, it bears emphasis that the fact that Congress has offered no guidance in this regard is proof that no recalculation is intended or appropriate.  Along these lines, in the absence of statutory authority, the choice of the index to be applied is random.  In the same vein, how the inflation factor is to be applied -- to each and every deposit and withdrawal or to balances only; daily, monthly, quarterly or yearly; whether amounts are to be rounded up or down -- are all unknowns and for a reason.  Second, to apply the arbitrary indexing or interest factor to every deposit and every withdrawal, and every transfer between and among accounts, would take untold amounts of time and effort and be done at great administrative expense  to the detriment of general creditors in cases where a general estate exists.  Third, the inflation adjustment would have to be applied across the board, that is, not only to the transactions of net losers but to those of net winners and others.  Who would benefit from this exercise is unknown --  no doubt some net losers, but to a certainty, net winners who would become net losers, insiders, wrongdoers and others who

already would have had the benefit of the wrongful possession of the funds of others, made use

of those funds, and then, have the added benefit of having to return less or nothing to the estate

because of "inflation," in order to obtain a larger amount than they deposited with the brokerage.

Consider, for example, the hypothetical of a Madoff family member who deposits $1 million into

his BLMIS account in 1980 and whose account "grows," due to fictitious profit.  The family

member withdraws $1.5 million which includes some fictitious profit during a period that makes

the transfer subject to avoidance.  Under the correct calculation of net equity, the Trustee could

sue in avoidance, and ultimately, the family member would return $1.5 million to the estate and

have a claim for the return of his $1 million in principal.  In contrast, if a CPI inflation index is

applied, the $1 million in 1980 dollars would be worth $2,612,900.49 in 2008 dollars.    The

Madoff family member would have benefitted from the use and enjoyment of the $1.5 million.

Moreover, due to the application of the inflation index, he would be deemed <u>not</u> to have

withdrawn more than deposited.  Thus, ostensibly, the family member would keep the $1.5

million and have a claim for the difference of $1,112,900.49.[11]    This contrast in the different

outcomes between cash in/cash out ("CICO") and CPI applications is illustrated in the below

chart.

| Year | Transaction Type | CICO | CPI |
|------|------------------|------|-----|
| 1980 | Deposit | $1,000,000.00 | $2,612,900.49 |
| 2008 | Withdrawal | ($1,500,000.00) | ($1,500,000.00) |
| **Net** | | ($500,000.00) | $1,112,900.49 |

---

[11]    Because the claimant is an insider, the Trustee would have many defenses as to why the insider should be barred from any recovery whatsoever.  The point, however, is that the recalculation places the insider in a better position than he should be, and arguably creates more challenges for the Trustee to have to surmount.

As to such investors in the BLMIS case, whether the claimant is an insider or not, the

observations of the court in a receivership case are apposite:

> Although Uchitel may have suffered as an investor in Stein's
> Ponzi scheme, his argument regarding entitlement to interest in
> this suit defies reason and ignores the fact that he received profits
> that belong to all of Stein's victims on a *pro rata* basis.

Moran v. Goldfarb, 2012 WL 2930210, at *9 (S.D.N.Y. July 16, 2012).

Ultimately, regardless of the impact, equity has no place in the interpretation and

calculation of "net equity."  As the Second Circuit stated in SEC v. Packer, Wilbur & Co., 498

F.2d 978, 983 (2d Cir. 1974):

> However, arguments based solely on the equities are not, standing
> alone, persuasive.  If equity were the criterion, most customers
> and creditors of Packer Wilbur, the bankrupt, would be entitled to
> reimbursement for their losses.  Experience, on the other hand,
> counsels that they will have to settle for much less.  SIPA was not
> designed to provide full protection to all victims of a brokerage
> collapse.  Its purpose was to extend relief to certain classes of
> customers.

## CONCLUSION

For the foregoing reasons, the Trustee's motion to affirm his calculations of net equity and deny time-based damages should be granted.

Respectfully submitted,

/s/ Josephine Wang
JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior Associate General Counsel
  For Dispute Resolution

CHRISTOPHER H. LAROSA
Senior Associate General Counsel –
  Litigation

LAUREN T. ATTARD
Assistant General Counsel

SECURITIES INVESTOR
  PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, D.C.  20005
Telephone: (202) 371-8300
Facsimile: (202) 371-6728
E-mail: jwang@sipc.org
E-mail: kbell@sipc.org
E-mail: clarosa@sipc.org
E-mail: lattard@sipc.org

Date:  October 12, 2012
Washington, D. C.