Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
dsheehan@bakerlaw.com
Jorian Rose
jrose@bakerlaw.com
Seanna R. Brown
sbrown@bakerlaw.com
Bik Cheema
bcheema@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC And
Bernard L. Madoff*

Hearing Date: January 10, 2013
Hearing Time:  10:00 A.M. EST
Objection Deadline: November 12, 2012

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**MEMORANDUM OF LAW IN SUPPORT OF
TRUSTEE'S MOTION FOR AN ORDER AFFIRMING
TRUSTEE'S CALCULATIONS OF NET EQUITY
AND DENYING TIME-BASED DAMAGES**

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ............................................................................. 1

II. BACKGROUND......................................................................................................... 3

    A.    The Madoff Fraud And BLMIS SIPA Case Filing ................................. 3

    B.    Net Equity Dispute.................................................................................... 5

    C.    The Claimants ........................................................................................... 6

    D.    The SIPA Statute...................................................................................... 6

III. ARGUMENT ............................................................................................................ 8

    A.    Based Upon The Plain Language of SIPA, The Trustee's Determination
           Not To Include Time-Based Damages Is Proper. ................................... 8

    B.    SIPA Cases Reject Time-Based Damages As A Component Of Net Equity
           Claims. ................................................................................................... 11

    C.    Under SIPA, Claims For Fraud and Damages Are At Most General  Estate
           Claims, Not Customer Claims. ............................................................. 12

    D.    Requiring The Trustee To Recalculate Net Equity Based On Time-Based
           Damages Is Contrary To SIPA's Federal Scheme That Prioritizes The
           Return of Customer Property Over Damages. ...................................... 14

    E.    SIPA Works Together With The Securities Laws To Ensure That
           Customer Property Is Returned To Customers. .................................... 18

    F.    The Net Investment Method Is Consistent With Traditional Approaches
           To Ponzi Recoveries and Distributions................................................. 20

          1.    In Both SIPA and Non-SIPA Ponzi Cases, Cash-In/Cash-Out
               (Without Interest Adjustment) Is The Standard Distribution
               Approach................................................................................. 20

          2.    Net Equity Should Be Interpreted Consistently With Fraudulent
               Transfer Law Which Recognizes Only Cash Paid In As An Offset
               To Liability. ........................................................................... 22

    G.    The Trustee Has Determined That Using The Net Investment Method Is
           Not Clearly Inferior To Adjusting Net Equity Based Upon Time-Based
           Damages, And That Determination Is Entitled To Deference............................ 24

          1.    Return of Principal Is The Trustee's First Priority. ................................ 24

          2.    A Time-Based Damages Adjustment Creates More Harm Than
               Good................................................................................................. 25

           3.    The Feeder Funds Dominate The Reallocated Funds. ............................ 27

IV. CONCLUSION........................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abrams v. Eby (In re Young)*,
294 F. 1 (4th Cir. 1923) ..........................................................................................20

*Beacon Assocs. Mgmt. Corp. v. Beacon Assocs. LLC I*,
725 F. Supp. 2d 451 (S.D.N.Y. 2010)........................................................................29

*CFTC v. Equity Fin. Group, LLC*,
No. 04-1512 RBK AMD, 2005 WL 2143975 (D.N.J. Sept. 2, 2005) ....................21

*CFTC v. Franklin*,
652 F. Supp. 163 (W.D. Va. 1986), *rev'd on other grounds sub nom. Anderson v.
Stephens*, 875 F.2d 76 (4th Cir. 1989) ...................................................................21

*CFTC v. Hoffberg*,
No. 93 C 3106, 1993 WL 441984 (N.D. Ill. Oct. 27, 1993)....................................21

*CFTC v. Topworth Int'l, Ltd.*,
205 F.3d 1107 (9th Cir.1999) ..................................................................................20

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou
Group, LLC)*,
439 B.R. 284 (S.D.N.Y. 2010)...........................................................................18, 23

*Connecticut Nat'l Bank v. Germain*,
503 U.S. 249 (1992)..................................................................................................10

*Cunningham v. Brown*,
265 U.S. 1 (1924)......................................................................................................22

*Dicello v. Jenkins (In re Int'l Loan Network, Inc.)*,
160 B.R. 1 (Bankr. D.D.C. 1993) ...........................................................................23

*Donnell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) ..............................................................................22, 25

*Duel v. Hollins*,
241 U.S. 523 (1916)..................................................................................................15

*Exch. Nat'l Bank of Chicago v. Wyatt*,
517 F.2d 453 (2d Cir. 1975)........................................................................................7

*Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*,
286 B.R. 109 (Bankr. D. Minn. 2002) *aff'd* No. 01–4257 RJK, 2003 WL 1824937 (D.
Minn. Apr. 7, 2003), *aff'd* 371 F.3d 397 (8th Cir. 2004).......................................17

# TABLE OF AUTHORITIES
(continued)

*First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.),*
   59 B.R. 353 (D.N.J. 1986) ................................................................................9, 16, 17

*Focht v. Athens (In re Old Naples Sec., Inc.),*
   311 B.R. 607 (M.D. Fla. 2002) ...........................................................................11, 20

*Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP),*
   462 B.R. 474 (Bankr. S.D.N.Y. 2011) .......................................................................23

*Hill v. Spencer Sav. & Loan Assoc. (In re Bevill, Bresler & Schulman, Inc.),*
   94 B.R. 817 (D.N.J. 1989) .........................................................................................17

*Holland v. Dines (In re Oberweis Sec., Inc.),*
   No. 89 B 11283, 1992 WL 119272 (Bankr. N.D. Ill. May 21, 1992)........................13

*In re Adler Coleman Clearing Corp.,*
   198 B.R. 70 (Bankr. S.D.N.Y. 1996)...........................................................................7

*In re Beacon Assocs. Litig.,*
   745 F. Supp. 2d 386 (S.D.N.Y. 2010)..........................................................................3

*In re Bernard L. Madoff Inv. Sec. LLC,*
   424 B.R. 122 (Bankr. S.D.N.Y. 2010) ......................................................................5, 6

*In re Bernard L. Madoff Inv. Sec. LLC,*
   654 F.3d 229 (2d Cir. 2011), *reh'g and reh'g en banc den.* (2d Cir. Nov. 08, 2011),
   *cert. dismissed,* 132 S. Ct. 2712 (2012), *cert. den.*, 2012 WL 396489, 2012 WL
   425188 (Jun. 25, 2012)) ..................................................................................... *passim*

*In re June S. Jones Co.,*
   52 B.R. 810 (Bankr. D. Or. 1985)..............................................................................13

*In re Klein, Maus & Shire, Inc.,*
   301 B.R. 408 (Bankr. S.D.N.Y. 2003) .......................................................................13

*In re Lehman Bros. Inc.,*
   474 B.R. 139 (Bankr. S.D.N.Y. 2012) .....................................................................8, 14

*In re New Times Sec. Servs.,*
   371 F.3d 68 (2d Cir. 2004)..........................................................................................12

*In re North Atlantic & Gulf S.S. Co., Inc.,*
   204 F. Supp. 899 (S.D.N.Y. 1962)..............................................................................13

*In re Unified Commercial Capital,*
   260 B.R. 343 (Bankr. W.D.N.Y. 2001) ......................................................................23

## TABLE OF AUTHORITIES
(continued)

*In re Weis Sec., Inc.*,
  73 Civ. 2332, 1976 WL 820 (S.D.N.Y. Aug. 2, 1976) ...........................................12

*McKenny v. McGraw (In re Bell & Beckwith)*,
  104 B.R. 852 (Bankr. N.D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991) ..................8, 17

*Mfg'rs. Hanover Trust Co. v. Drysdale Sec. Corp.*,
  801 F.2d 13 (2d Cir. 1986)......................................................................................18

*Moran v. Goldfarb*,
  No. 09 Civ. 7667 (RJS), 2012 WL 2930210 (S.D.N.Y. July 16, 2012) ...................22

*Official Cattle Contract Holders Comm. v. Commons (In re Tedlock Cattle Co., Inc.)*,
  552 F.2d 1351 (9th Cir. 1977) ................................................................................20

*Rafoth v. Bailey (In re Baker & Getty Fin. Serv., Inc.)*,
  88 B.R. 792 (Bankr. N.D. Ohio 1988) ....................................................................23

*Rosenman Family, LLC v. Picard (Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv.
  Sec. LLC)*,
  401 B.R. 629 (Bankr. S.D.N.Y. 2009), *aff'd* 420 B.R. 108 (S.D.N.Y. 2009), *aff'd* 395
  Fed. Appx. (2d Cir. 2010).......................................................................................17

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) ...............................................................................22, 25

*Sec. & Exch. Comm'n v. Aberdeen Sec. Co.*,
  480 F.2d 1121 (3d Cir. 1973)....................................................................................9

*Sec. & Exch. Comm'n v. Albert & Maguire Sec. Co.*,
  378 F. Supp. 906 (E.D. Pa. 1974) .............................................................................7

*Sec. & Exch. Comm'n v. AmeriFirst Funding*,
  No. 3:07-CV-1188-D, 2008 WL 919546 (N.D. Tex. Mar. 13, 2008)......................21

*Sec. & Exch. Comm'n v. F.O. Baroff Co.*,
  497 F.2d 280 (2d Cir. 1974)......................................................................................7

*Sec. & Exch. Comm'n v. First Sec. Co. of Chicago*,
  366 F. Supp. 367 (N.D. Ill. 1973), *aff'd in part, rev'd in part on other grounds*, 507
  F.2d 417 (7th Cir. 1974) .........................................................................................15

*Sec. & Exch. Comm'n v. Funding Res. Group*,
  No. 3-98-CV-2689-M, 2004 WL 1189996 (N.D. Tex. May 27, 2004)...................21

*Sec. & Exch. Comm'n v. Howard Lawrence & Co., Inc.*,
  74 Civ. 193, 1975 Bankr. LEXIS 15 (Bankr. S.D.N.Y. Feb. 14, 1975) .................13

TABLE OF AUTHORITIES
(continued)

Page(s)

*Sec. & Exch. Comm'n v. Packer, Wilbur & Co.*,
    498 F.2d 978 (2d Cir. 1974)............................................................................6

*Sec. & Exch. Comm'n v. Pavarini*,
    No. 88 CIV. (LLS) 4897, 1989 WL 49365 (S.D.N.Y. May 3, 1989).....................21

*Sec. & Exch. Comm'n v. S. J. Salmon & Co.*,
    375 F. Supp. 867 (S.D.N.Y. 1974).....................................................................13

*Sec. & Exch. Comm'n v. Sec. Investor Prot. Corp.*,
    No. 11-mc-678 (RLW), 2012 WL 2550485 (D.D.C. July 3, 2012).........................14

*Sec. Investor Prot. Corp. v. Ambassador Church Fin. Dev. Gr'p, Inc.*,
    788 F.2d 1208 (6th Cir. 1986) .......................................................................11, 12

*Sec. Investor Prot. Corp. v. Barbour*,
    421 U.S. 412 (1975)...................................................................................6, 7, 16

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
    454 B.R. 285 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. Aozora Bank Ltd. v. Sec.
    Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 11 Civ. 5683 (DLC),
    2012 WL 28468 (S.D.N.Y. Jan. 4, 2012) ...........................................................28

*Sec. Investor Prot. Corp. v. C.J. Wright & Co., Inc. (In re C.J. Wright & Co.)*,
    162 B.R. 597 (Bankr. M.D. Fla. 1993) ...........................................................11, 20

*Sec. Investor Prot. Corp. v. Horizon Sec., Inc.*,
    72 Civ. 5112, slip op. (S.D.N.Y. May 31, 1974) .................................................14

*Sec. Investor Prot. Corp. v. Wise (In re Stalvey & Assocs., Inc.)*,
    750 F.2d 464 (5th Cir. 1985) ............................................................................13

*Sender v. Buchanan (In re Hedged–Invs. Assocs., Inc.)*,
    84 F.3d 1286 (10th Cir. 1996) ..........................................................................22

*Sriraman v. Patel*,
    761 F. Supp. 2d 23 (E.D.N.Y. 2011) .................................................................18

*Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*,
    463 F.3d 125 (2d Cir. 2006)..........................................................................12, 13

*Tepper v. Chichester*,
    285 F.2d 309 (9th Cir. 1960) ...........................................................................15

*Von Gunten v. Neilson (In re Slatkin)*,
    243 Fed. Appx. 255 (9th Cir. 2007)....................................................................22

## TABLE OF AUTHORITIES
(continued)

**STATUTES**

7 U.S.C. § 2014 ...............................................................................................................10

11 U.S.C. § 96(e) (repealed 1979) ...........................................................................15, 16

11 U.S.C. § 104 .............................................................................................................10

11 U.S.C. § 548(a)(1)(A) ..............................................................................................23

12 U.S.C. § 1712a .........................................................................................................10

15 U.S.C. § 78bbb .........................................................................................................19

15 U.S.C. § 78ccc ............................................................................................................7

15 U.S.C. § 78ddd ...........................................................................................................7

15 U.S.C. § 78ddd(f) .....................................................................................................10

15 U.S.C. § 78ddd(h) .....................................................................................................10

15 U.S.C. § 78eee(a)(4) ...................................................................................................4

15 U.S.C. § 78eee(b)(3) ...................................................................................................4

15 U.S.C. § 78eee(b)(4) ...................................................................................................4

15 U.S.C. § 78fff-1(a) ......................................................................................................4

15 U.S.C. § 78fff-2(c)(1) ...............................................................................................12

15 U.S.C. § 78fff-2(c)(3) ...............................................................................................23

15 U.S.C. § 78fff-3(a) ..............................................................................................4, 5, 8

15 U.S.C. § 78fff(b) .........................................................................................................7

15 U.S.C. § 78fff–2(b) .....................................................................................................9

15 U.S.C. § 78fff–2(c)(3) ..............................................................................................22

15 U.S.C. § 78jjj ............................................................................................................10

15 U.S.C. § 78*lll*(2) ........................................................................................................4

15 U.S.C. § 78*lll*(4) ........................................................................................................4

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

15 U.S.C. § 78*lll*(11)...............................................................................................4, 8, 9

20 U.S.C. § 1087rr...........................................................................................................10

20 U.S.C. § 1134b............................................................................................................10

20 U.S.C. § 1135d............................................................................................................10

20 U.S.C. § 2007..............................................................................................................10

42 U.S.C. § 415................................................................................................................10

42 U.S.C. § 907a..............................................................................................................10

42 U.S.C. § 1395f.............................................................................................................10

42 U.S.C. § 1395i-5..........................................................................................................10

42 U.S.C. § 1395m............................................................................................................10

42 U.S.C. § 1395ss............................................................................................................10

42 U.S.C. § 1395u.............................................................................................................10

42 U.S.C. § 1395ww..........................................................................................................10

42 U.S.C. § 1395x.............................................................................................................10

42 U.S.C. § 1396r-8..........................................................................................................10

42 U.S.C. § 1758...............................................................................................................10

42 U.S.C. § 3796...............................................................................................................10

42 U.S.C. § 5026...............................................................................................................10

42 U.S.C. § 5174...............................................................................................................10

42 U.S.C. § 1395*l*...........................................................................................................10

C.P.L.R. § 5001.................................................................................................................18

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124
    Stat. 1376 (2010)...........................................................................................................8

**OTHER AUTHORITIES**

17 C.F.R. § 240.15c3-3a Ex. A.........................................................................................19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

17 C.F.R. § 240.15c3–3(e)........................................................................................19

6 *Collier on Bankruptcy* ¶ 740.LH[1] (16th ed. 2012) ..........................................15, 16

12 *Collier on Bankruptcy* ¶ 12.01 (16th ed.) .............................................................14

H.R. Rep. No. 91-1613 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5255 .......................16

Michael E. Don & Josephine Wang, *Stockbroker Liquidations Under the Securities
    Investor Protection Act and Their Impact on Securities Transfers*, 12 Cardozo L. Rev.
    (1990).....................................................................................................................16

Norman J. Singer*, Sutherland Statutory Construction: Statutes and Statutory
    Construction* § 46.07 (6th ed. 2000) .......................................................................10

Reserves and Related Measures Respecting the Financial Responsibility of Brokers and
    Dealers, Exchange Act Release No. 9,388, 36 Fed. Reg. 22 (proposed Nov. 24, 1971).........19

Irving H. Picard, trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and for Bernard L. Madoff ("Madoff") (collectively, "Debtor"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in Support of Trustee's Motion For An Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based Damages, to affirm the Trustee's determination that net equity, as that term is defined under SIPA, does not include interest, time value of money, or inflation adjustments such as constant dollar (collectively, "Time-Based Damages"),[2] and the affidavits of Bik Cheema ("Cheema Aff.") and Robert J. Rock ("Rock Aff.") in further support, and states as follows:

## I.

## PRELIMINARY STATEMENT

This Court and the Second Circuit have upheld the Trustee's calculation of net equity based upon the cash-in/cash-out or "net investment" method as the most appropriate method for calculating "net equity" in this liquidation, rather than relying on the fraudulent brokerage statements issued by BLMIS. Certain BLMIS customers seek to alter the court-approved net equity calculation used by the Trustee to impose Time-Based Damages for the period of time that their funds were deposited with BLMIS. Nothing in law or in equity, however, supports this approach.

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

[2] There are numerous theories of law that claimants have raised, all of which seek some increase in their customer claims based upon the amount of time they invested with BLMIS. Most commonly, they seek an increase in their claims based on the time they were invested with BLMIS using the New York prejudgment rate of 9% per annum, lost opportunity cost damages, or the consumer price index to take inflation into account. The Trustee is using "Time-Based Damages" as an umbrella term.

As a threshold matter, the plain language of SIPA does not countenance altering the net equity calculation to account for Time-Based Damages. Nothing in the definition of net equity mentions interest, inflation, or any other such damages. Moreover, the Trustee's determination of net equity should be ascertainable through the broker's books and records, and the books and records of BLMIS do not support imposition of Time-Based Damages here. Nor does such support exist in SIPA's legislative history, the related statutory framework, or prior case law. SIPA does not provide for adjustments to customers' net equity claims for damages arising from a broker's misrepresentations, breach of contract, or fraud; such damages are at most general estate claims. Requiring the Trustee to alter the net equity calculation based upon Time-Based Damages would also be inconsistent with the recovery and distribution approach reflected in most Ponzi cases, and would conflict with the scope of the Trustee's avoidance powers.

Equity also does not support recalculating net equity claims to include Time-Based Damages. Until there are sufficient recoveries to return all principal losses to customers, revising the method by which net equity is calculated frustrates that objective. The effect of including Time-Based Damages as part of a net equity claim is to take funds currently earmarked to repay net losers who have not recovered their principal and shift those funds to pay those who have already received all of their principal as well as fictitious profits.

Finally, if Time-Based Damages were included as part of the allowed customer claim in this SIPA liquidation, the bulk of the reallocated distributions would be redistributed among feeder funds, rather than compensating individual investors. In those instances, the stated purpose underlying Time-Based Damages—to compensate earlier individual investors based on the duration of their investment with BLMIS—would not be met. Instead, the feeder funds (which mainly invested in the last 10 years of the Ponzi scheme) would be the largest

beneficiaries of the reallocated Time-Based Damages payments, because they comprise a disproportionate share of the BLMIS customer class and overall net equity claims. Those funds would distribute the additional recoveries based on their own criteria, and not based on duration of investment. In addition, hundreds of customer claims have traded hands since the commencement of this proceeding. Awarding Time-Based Damages thus would not serve the purpose for which they are intended in most instances, would be extraordinarily expensive, would create enormous delays, and would create arbitrary results. Accordingly, the Trustee respectfully submits that no Time-Based Damages can be awarded as part of net equity claims and that the cash-in/cash-out method remains the proper approach to calculating net equity.

## II.

## BACKGROUND

### A.    The Madoff Fraud And BLMIS SIPA Case Filing

The basic facts of the Madoff fraud are widely known and have been recounted in numerous decisions. *See, e.g., In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 231 (2d Cir. 2011), *reh'g and reh'g en banc den.* (2d Cir. Nov. 08, 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), and *cert. den.*, 2012 WL 396489 and 2012 WL 425188 (Jun. 25, 2012)); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 393-94 (S.D.N.Y. 2010). Madoff purported to be trading on behalf of his investment advisory clients using split-strike conversion and other strategies. But Madoff did not engage in trading activity on behalf of his clients. "Instead, Madoff generated false paper account statements and trading records; if a client asked to withdraw her money, Madoff would pay her with funds invested by other clients." *Beacon Assocs. Litig.*, 745 F. Supp. 2d at 393-94.

On December 11, 2008, federal agents arrested Madoff, revealing the existence of the largest Ponzi scheme in history. With customer property entrusted to BLMIS dispersed through

3

the Ponzi scheme, BLMIS was insolvent and unable to meet its obligations to its customers as those obligations came due.  On December 11, 2008, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court against Madoff and BLMIS, captioned *Sec. & Exch. Comm'n v. Madoff*, No. 1:08-cv-10791-LLS (S.D.N.Y. filed Dec. 11, 2008), alleging fraud through the investment advisor activities of BLMIS. The SEC consented to the consolidation of its case with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, SIPC filed an application under SIPA § 78eee(a)(4) alleging that because of its insolvency, BLMIS needed SIPA protection.  The District Court appointed the Trustee under SIPA § 78eee(b)(3) and removed the proceeding to this Court under SIPA § 78eee(b)(4).

Under SIPA, the Trustee is responsible for, among other things, recovering and distributing customer property to a broker's customers, assessing claims, and liquidating other assets of the firm for the benefit of the estate and its creditors.  A SIPA trustee has the general powers of a bankruptcy trustee, in addition to the powers granted by SIPA.  SIPA § 78fff-1(a). The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that "customers," as defined in SIPA § 78*lll*(2), share *pro rata* in "customer property," defined in SIPA § 78*lll*(4), to the extent of their "net equity," defined in SIPA § 78*lll*(11).  For each customer with a valid net equity claim, if the customer's share of customer property does not make her whole, SIPC advances funds to the SIPA trustee up to the amount of the customer's net equity, not to exceed $500,000 (the amount applicable to this case).  SIPA § 78fff-3(a).

On December 23, 2008, this Court entered a claims procedures order. ECF No. 12. Pursuant to that order, the Trustee determined claims for customer protection under SIPA, claimants may object to the Trustee's determination of a claim by filing an objection in this

Court, and the Trustee requests a hearing date for the objection and notifies the objecting claimant thereof. *Id.*

## B.    Net Equity Dispute

For purposes of determining each customer's "net equity" under SIPA, the Trustee credited the amount of cash deposited by the customer into her BLMIS account less any amounts withdrawn from that BLMIS customer account (the "Net Investment Method"). Some claimants argued that the Trustee was required to allow customer claims in the amounts shown on the November 30, 2008 customer statements (the "Last Statement Method"). This Court ordered a briefing schedule and a hearing limited to determining whether the Net Investment Method or the Last Statement Method governs. This Court did not consider the Time-Based Damages issues raised here.

After extensive briefing and a hearing, this Court issued a decision on March 1, 2010 upholding the Net Investment Method as the only interpretation consistent with the plain meaning and legislative history of the statute, controlling Second Circuit precedent, and considerations of equity and practicality. *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010). This Court certified an appeal to the Second Circuit.

On August 16, 2011, the Second Circuit affirmed this Court's decision and the Trustee's use of the Net Investment Method, holding that it would have been "legal error" for the Trustee to discharge claims for securities under SIPA "upon the false premise that customers' securities positions are what the account statements purport them to be." *Bernard L. Madoff Inv. Sec.*, 654 F.3d at 241 (internal citation omitted). The Second Circuit further held that the Trustee's "selection of the Net Investment Method was more consistent with the statutory definition of 'net equity' than any other method advocated by the parties or perceived by this Court." *Id.* at 235. It noted that "SIPA serves dual purposes: to protect investors, and to protect the securities market

5

as a whole," and that "calculating 'net equity' based on the Net Investment Method effectuates these purposes." *Id.* The Second Circuit denied rehearing and rehearing en banc, and the Supreme Court denied certiorari. *Ryan v. Picard, cert denied*, 80 U.S.L.W. 3707 (U.S. June 25, 2012) (No. 11-969); *Velvel v. Picard*, *cert denied*, 80 U.S.L.W. 3707 (U.S. June 25, 2012) (No. 11-986).[3]

## C.    The Claimants

In the parlance of this case, claimants have been divided into two categories. A "net winner" is a BLMIS customer who withdrew more funds from BLMIS than she deposited; thus, she received all of her principal plus some of other customers' money. A "net loser" is a BLMIS customer who withdrew from BLMIS less than she deposited with BLMIS, and who thus did not receive her principal back in full. The Trustee expects that some customers currently treated as net winners will argue that if net equity were recalculated based upon Time-Based Damages, they should be treated as net losers.

## D.    The SIPA Statute

Congress's goals in enacting SIPA were to prevent the failure of brokerage houses, restore investor confidence after a period of contraction in the securities industry, and upgrade financial responsibility requirements for registered broker-dealers. *See Sec. Investor Prot. Corp. v. Barbour*, 421 U.S. 412, 415 (1975); *Sec. & Exch. Comm'n v. Packer, Wilbur & Co.*, 498 F.2d 978, 980 (2d Cir. 1974) (SIPA "was a legislative effort to reinforce the flagging confidence in the securities market by providing an extra margin of protection for the small investor").

---

[3] Certiorari was also dismissed with respect to one petition. *Sterling Equities Assocs. v. Picard*, 132 S. Ct. 2712 (June 4, 2012).

With SIPA, Congress also created SIPC, a nonprofit, private membership corporation to which most registered broker-dealers are required to belong.  SIPA § 78ccc; *see also Sec. & Exch. Comm'n v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974) ("[t]he object of [SIPA], and the function of the [SIPC] it created, is to protect the public customers of securities dealers from suffering the consequences of financial instability in the brokerage industry.").  The SIPC Fund, a congressionally mandated protection program, is authorized under section 78ddd of SIPA and is designed to protect the customers of SIPC member broker-dealers from loss in case of the financial failure of a SIPC-member brokerage house.

SIPA created a form of liquidation proceeding applicable only to SIPC member firms and designed to return customer property promptly.  *See Barbour,* 421 U.S. at 416.  A liquidation under SIPA is essentially a bankruptcy proceeding. *See, e.g., Exch. Nat'l Bank of Chicago v. Wyatt*, 517 F.2d 453, 457-459 (2d Cir. 1975); *In re Adler Coleman Clearing Corp*., 198 B.R. 70, 74 (Bankr. S.D.N.Y. 1996).  Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11," except where doing so would be inconsistent with SIPA provisions.  *See* SIPA § 78fff(b); *Adler Coleman Clearing*, 198 B.R. at 74.  SIPA is supported by "both the bankruptcy provision in the United States Constitution and also by the commerce clause." *Sec. & Exch. Comm'n v. Albert & Maguire Sec. Co.*, 378 F. Supp. 906, 911 (E.D. Pa. 1974).

7

**III.**

**ARGUMENT**

**A.**    **Based Upon The Plain Language of SIPA, The Trustee's Determination Not To Include Time-Based Damages Is Proper.**

At its core, SIPA is designed to return to customers the property they entrusted to their brokers for securities trading. The pro rata distribution of customer property is based upon "net equity" as defined by SIPA. SIPA §§ 78*lll*(11), 78fff-2(c)(1)(B). Where a customer has a net equity claim, and the customer's claim cannot be immediately satisfied from the fund of customer property, an advance from SIPC is available to the extent allowed under SIPA. *See* SIPA § 78fff-3(a); s*ee also McKenny v. McGraw (In re Bell & Beckwith),* 104 B.R. 852 (Bankr. N.D. Ohio 1989), *aff'd,* 937 F.2d 1104 (6th Cir. 1991). Accordingly, a customer's net equity determines the share that each customer will receive of the "customer property" of BLMIS, and the presence or absence of net equity determines whether any SIPC advance should be made.

Net equity is set out as a formula in SIPA, and nothing in the formula allows for interest, inflation adjustments, or other Time-Based Damages. The Second Circuit has held that net equity is to be calculated based upon two provisions of SIPA. First, under section 78*lll*(11) of SIPA,[4] "net equity" is defined in relevant part as "the dollar amount of the account or accounts of a customer, to be determined by . . . (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus (B) any indebtedness of such customer to the debtor on the filing date[.]"

---

[4] The net equity definition of SIPA has since been amended in ways not relevant to this issue. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (herineafter "Dodd-Frank"). The Dodd-Frank amendments do not apply to this case. *See Id.* at § 4; s*ee also In re Lehman Bros. Inc.*, 474 B.R. 139, 146 n.7 (Bankr. S.D.N.Y. 2012) (SIPA statute in effect at the time of filing date governs). In any event, Dodd-Frank did not alter the net equity definition to account for Time-Based Damages.

8

SIPA § 78*lll*(11).[5]  Second, SIPA "provides that the Trustee should make payments to customers based on 'net equity' insofar as the amount owed to the customer is 'ascertainable from the *books and records* of the debtor or [is] otherwise established to the *satisfaction of the trustee.*'" *Bernard L. Madoff Inv. Sec.*, 654 F.3d at 237 (quoting SIPA § 78fff–2(b)) (emphasis in original). "When the terms of the statute are read together," the Second Circuit held, "the statute directs that a SIPA trustee should determine a customer's entitlement to recover 'net equity' based both on the statutory definition of that term and by reference to the books and records of the debtor." *Id.*

Reading these two provisions together, nothing in SIPA would require a trustee to calculate net equity based upon interest, inflation adjustments, or other Time-Based Damages. First, nowhere does the definition of net equity mention interest, inflation, or any other such adjustment.  Rather, the definition calls for calculating net equity based upon the amount that "would have been owed by the debtor" to a customer "if the debtor had liquidated . . . all securities positions of such customer."   SIPA §78*lll*(11).   And as the Trustee reasoned in adopting the Net Investment Method, there were no securities positions that were purchased for the accounts of customers, and thus none to be liquidated—so the "dollar amount of the account" at issue would simply be the amounts deposited, offset by the amounts withdrawn.  *See Sec. & Exch. Comm'n v. Aberdeen Sec. Co.*, 480 F.2d 1121, 1127 (3d Cir. 1973) (where securities never came into existence, claimant is entitled to "cash which the broker has, or should have been holding").

---

[5] "The net equity of each customer is a dollar figure calculated by determining what would have been realized by the customer had the securities credited to his or her account been liquidated on the filing date and by adding to that sum any cash owed to the customer in the form of cash credit balances.  From this is subtracted any indebtedness owed to the broker on the filing date." *First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 364 (D.N.J. 1986).

Moreover, as the Second Circuit held, a SIPA trustee also "should determine a customer's entitlement to recover 'net equity' . . . by reference to the books and records of the debtor." *Bernard L. Madoff Inv. Sec.*, 654 F.3d at 237. And nothing in the books and records of the debtor reflects interest payments, inflationary adjustments, or other Time-Based Damages that BLMIS had either promised or granted to particular customers. The books and records of BLMIS reveal the cash owed to BLMIS customers, but provide no basis to award interest or other inflationary enhancements to funds in customer accounts as part of the net equity calculus.

Finally, although Congress expressly provided for interest and inflation-based adjustments in other parts of SIPA, it failed to do so in the net equity definition. For example, in the recent amendments to SIPA, Congress allowed for some statutory limits to rise with inflation. Pub. L. 111-203, secs. 929H(a), 983(b), 124 Stat. 1856, 1931 (2010). And SIPA also has provisions for interest for late payments by brokers to SIPC, and on loans from the SEC to SIPC. SIPA §§78jjj, 78ddd(f), (h). Congress's decision to provide for inflation and interest adjustments in other parts of SIPA, but not in the net equity definition, further supports the Trustee's determination not to reallocate net equity based upon Time-Based Damages.[6] *Cf. Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citations omitted); 2A Norman J. Singer*, Sutherland Statutory Construction: Statutes and Statutory Construction* § 46.07 (6th ed. 2000) ("Where one section of a statute contains a particular provision, omission of

---

[6] That Congress knows how to include inflation adjustments when it wants to is evident from many different statutes, of which the following are just a small sample: 7 U.S.C. § 2014, 11 U.S.C. § 104, 12 U.S.C. § 1712a, 20 U.S.C. § 1087rr, 20 U.S.C. § 1134b, 20 U.S.C. § 1135d, 20 U.S.C. § 2007, 42 U.S.C. § 415, 42 U.S.C. § 907a, 42 U.S.C. § 1395f, 42 U.S.C. § 1395i-5, 42 U.S.C. § 1395*l*, 42 U.S.C. § 1395m, 42 U.S.C. §§ 1395u and 1395x, 42 U.S.C. § 1395ss, 42 U.S.C. § 1395ww, 42 U.S.C. § 1396r-8, 42 U.S.C. § 1758, 42 U.S.C. § 3796, 42 U.S.C. § 5026, 42 U.S.C. § 5174. While Congress has amended SIPA many times, and has increased specific statutory limits on account of inflation, Congress has never changed the definition of net equity to reflect either inflationary allowances or other allowances for the time value of money.

the same provision from a similar section is significant to show different legislative intent for the two sections.").

**B.**      **SIPA Cases Reject Time-Based Damages As A Component Of Net Equity Claims.**

With no statutory basis for allowing customer claims based upon Time-Based Damages, cases that have considered interest-based adjustments to net equity have rejected such claims. For example, in the *Old Naples* SIPA liquidation, also a Ponzi scheme, the district court rejected a claim for interest, holding that only the return of principal was appropriate: "SIPA does not provide for the payment of any interest to customer/claimants."   *Focht v. Athens (In re Old Naples Sec., Inc.)*, 311 B.R. 607, 616, 617 (M.D. Fla. 2002).  The court rejected the calculation of net equity in a manner that would cause the customer fund to pay out more money than was initially invested in the Ponzi scheme, finding such a result to be "not consistent with the goals of SIPA, which does not purport to make all victimized investors whole but only to partially ameliorate the losses of certain classes of investors."  *Id.* at 617-18.

In *Securities Investor Protection Corporation v. C.J. Wright & Co., Inc. (In re C.J. Wright & Co.)*, 162 B.R. 597, 610 (Bankr. M.D. Fla. 1993), investors sought recovery of interest on certificates of deposit that had never been purchased.  The court found that because the "debtor misappropriated these funds, claimants have a claim for that which they entrusted to debtor as customer property: the principal amount that was to be invested."  *Id.*  But the court rejected the recovery of interest as part of the net equity claim, holding that "net equity as defined in SIPA does not contain any reference to providing interest on claims to customers. Thus the most that claimants are entitled to receive is the return of the principal invested."  *Id.*

In the SIPA proceeding of *Securities Investor Protection Corporation v. Ambassador Church Finance Development Group, Inc.,* 788 F.2d 1208, 1210 (6th Cir. 1986), the Sixth Circuit affirmed the lower court's refusal to pay interest, even though there was more than a

seven-year delay in paying claims.  "Since the definition of 'net equity' does not include interest," the Sixth Circuit held, "we hold that SIPA does not authorize the SIPC to pay interest, either to the trustee or directly to the debtor's customers. . . .  'Congress could have specifically provided for payment of interest out of the funds of SIPC, but did not do so.'"  *Id*. at 1212; *see also In re New Times Sec. Servs.*, 371 F.3d 68, 88 (2d Cir. 2004) (The "SEC and SIPC are in agreement that the Claimants' net equity should be valued according to the cash they initially provided to the Debtors to purchase the Funds and should not include any bogus interest or dividend reinvestments.").  Thus, no case law supports the payment of interest here.

C.    **Under SIPA, Claims For Fraud and Damages Are At Most General Estate Claims, Not Customer Claims.**

Unlike an ordinary bankruptcy case, a SIPA liquidation gives priority to payment of customer net equity claims from the customer property estate, as distinguished from claims of general creditors, which are paid from the general estate.  *See In re Weis Sec., Inc.*, 73 Civ. 2332, 1976 WL 820, at *6 (S.D.N.Y. Aug. 2, 1976).  Each estate has distinct characteristics and purposes.  The customer property estate comprises customer property held by the debtor, which is earmarked to satisfy customer net equity claims.  SIPA § 78fff-2(c)(1).  Customers receive priority in the allocation and distribution of customer property and share ratably in the customer property fund to the extent of the net equity in their customer claims.  *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006).  By contrast, the general estate is made up of the debtor's remaining assets to satisfy the claims against that estate.  Customer property is not available to satisfy general creditors' claims unless and until all customer net equity claims have been fully satisfied.

Claims for damages are non-priority general creditor claims paid from the general estate.  Such claims include those arising from fraud, breach of contract, or harm caused by the broker

12

failing to buy, sell, or pay when instructed to do so by its customer. *See, e.g., In re Klein, Maus
& Shire, Inc.*, 301 B.R. 408, 421 (Bankr. S.D.N.Y. 2003) ("Because claims for damages do not
involve the return of customer property entrusted to the broker they are not the claims of
'customers' under SIPA . . .  Even if it assumed that their losses were caused by fraud, breach of
contract, or a similar theory, they are general creditors"); *Sec. & Exch. Comm'n v. Howard
Lawrence & Co., Inc.*, 74 Civ. 193, 1975 Bankr. LEXIS 15 (Bankr. S.D.N.Y. Feb. 14, 1975)
(broker's failure to act on customer's sell order was not net equity claim but breach of contract or
fraud claim); *Sec. Investor Prot. Corp. v. Wise (In re Stalvey & Assocs., Inc.)*, 750 F.2d 464, 469
(5th Cir. 1985) (SIPA protects against particular risks associated with broker-dealer insolvencies
and does not provide general insurance against investment risk or investment fraud); *Holland v.
Dines (In re Oberweis Sec., Inc.),* No. 89 B 11283, 1992 WL 119272, at *7-9 (Bankr. N.D. Ill.
May 21, 1992) (rejecting customer status on breach of fiduciary duty claim); *In re June S. Jones
Co.*, 52 B.R. 810, 814 (Bankr. D. Or. 1985) (citing *Sec. & Exch. Comm'n v. S. J. Salmon & Co.*,
375 F. Supp. 867, 871 (S.D.N.Y. 1974)) (claims for rescission or fraud are general claims under
SIPA and are not entitled to preferred "customer status"); *see also New Times Sec. Servs.*, 463
F.3d at 129-30 (claimants not customers under SIPA when fraudulently induced by broker to
swap securities for promissory notes); *cf. In re North Atlantic & Gulf S.S. Co., Inc.*, 204 F. Supp.
899, 911 (S.D.N.Y. 1962) (damages claims were general unsecured claims not priority customer
claims under Chandler Act).

The reason damages are not included as part of a customer's claim is that SIPA's core
purpose is to return customer property held by a broker-dealer, and damages are additional to
return of property.  "SIPA is designed to protect securities investors against losses stemming
from the failure of an insolvent or otherwise failed broker-dealer to properly perform its role as

the custodian of customer cash and securities." *Sec. & Exch. Comm'n v. Sec. Investor Prot. Corp.*, No. 11-mc-678 (RLW), 2012 WL 2550485, at *4 (D.D.C. July 3, 2012) (quoting 12 *Collier on Bankruptcy* ¶ 12.01 (16th ed.)). Accordingly, SIPA is designed not to compensate customers for injuries until after customers have their property returned to them. As noted in *Securities Investor Protection Corporation v. Horizon Securities, Inc.*, 72 Civ. 5112, slip op. at 5-6 (S.D.N.Y. May 31, 1974), "[t]he history of SIPA and the entire tenor of the Act clearly shows the Congressional intent to protect the small investor public from losses (to the limited extent specified) resulting from a failing broker's inability on the 'filing date' to deliver cash or stock belonging to the customer." *Id.* Accordingly, claims such as for those for breach of contract are not "within the protection afforded by the Act," but are instead part of the debtor's general estate. *Id.*

Some claimants have suggested that net equity should be adjusted to reflect what customers would have earned if their monies had been in a legitimate fund that used the strategy Madoff purported to use, or otherwise adjusted to reflect lost opportunity to invest in legitimate investments. But, however these theories are couched, they seek damages from BLMIS for its fraud, and these are at most general estate claims, not customer claims. In fact, not only are such damage claims not covered by the definition of "net equity," a claimant lacks SIPA "customer" status for such claims. *See Lehman Bros. Inc.*, 474 B.R. 139, 149 (Bankr. S.D.N.Y. 2012) (claimants did not satisfy "customer" requirement where they only held only held general estate claims).

**D.    Requiring The Trustee To Recalculate Net Equity Based On Time-Based Damages Is Contrary To SIPA's Federal Scheme That Prioritizes The Return of Customer Property Over Damages.**

SIPA presents a comprehensive federal scheme that is focused on return of property to the exclusion of conflicting state law. Before the enactment of SIPA and its immediate

predecessor, the Chandler Act,[7] when a broker became insolvent, the treatment of property in the hands of a broker was determined by state law.  *See Duel v. Hollins,* 241 U.S. 523, 527-29 (1916); *Tepper v. Chichester*, 285 F.2d 309, 311 (9th Cir. 1960).  Those creditors unable to establish a specific entitlement to property in the broker's possession under applicable state law were relegated to general creditor status.  The differences in these state laws resulted in disparity in the treatment of similarly-placed customers depending on the court and applicable law.  The Chandler Act was designed to cure this by displacing "otherwise applicable state law" in favor of uniform rules that would achieve a "greater approximation to equality in distribution."  6 *Collier on Bankruptcy* ¶ 740.LH[1] (16th ed. 2012).

Specifically, the Chandler Act served to displace state law that determined distribution rights and instead treated customer cash and securities as a part of a "single and separate fund." The "single and separate fund" pooled the assets of all customers and distributed to them ratably on a priority basis to the exclusion of general creditors.  As noted in *Securities & Exchange Commission v. First Securities Company of Chicago*, 366 F. Supp. 367, 371 (N.D. Ill. 1973), *aff'd in part, rev'd in part on other grounds*, 507 F.2d 417 (7th Cir. 1974), "[t]he creation of a 'Single and Separate Fund' was based upon Congressional acceptance of the custom of security houses of putting all securities into a 'common pot.'  Thus, having been a participant in that common pot appears to be determinative of 'customer' classification."  But specifically identifiable securities would still be returned directly to the customer, instead of becoming part of the single and separate fund, if the customer could prove—under a consistent federal rule— that the fully paid security had remained in identical form in the broker's possession, or had been

---

[7] Chandler Act, ch. 575, §60e, 52 Stat. 840 (1938) (codified at 11 U.S.C. § 96(e) (1976)) (repealed 1979).

allocated to or physically set aside for her for a specified period of time.  *See generally Bevill*, 59

B.R. 353, 367-68 (D.N.J. 1986).

Pro rata distributions were based on the net equity of the customer's account.  Net equity

was defined by excluding the specifically identifiable securities, and then "subtracting the

indebtedness of the customer to the stockbroker from the sum which would have been owing by

the stockbroker to the customer had the stockbroker liquidated, by sale or purchase on the date of

bankruptcy, the remaining securities or security commitments of the customer."  11 U.S.C.

§ 96(e) (repealed 1979); s*ee Bevill,* 59 B.R. at 366.

Section 60e of the Chandler Act ultimately proved inadequate for protection of brokerage

customers, as demonstrated in the late 1960s, when an unprecedentedly high volume of trading

resulted in widespread accounting and reporting mistakes at brokerage houses.  *See* Michael E.

Don & Josephine Wang, *Stockbroker Liquidations Under the Securities Investor Protection Act*

*and Their Impact on Securities Transfers*, 12 Cardozo L. Rev. 509, 510-11, 521-22 (1990).

Congress responded by enacting SIPA in 1970.  S. Rep. No. 91-1218 (1970); *see also*

H.R. Rep. No. 91-1613 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5255; *Barbour*, 421 U.S. at 415.

The essential distributional principles of the Chandler Act were incorporated into SIPA.  6

*Collier on Bankruptcy* ¶ 740.LH[1].  Like the Chandler Act, SIPA created a "single and separate

fund" in which all "customers" shared pro rata and to the exclusion of general creditors.  If

customers could specifically identify their own securities in accordance with statutory standards,

they could receive them without them becoming part of the single and separate fund, as they had

under the Chandler Act.  SIPA made only "minor variations" in the description of specifically

identifiable property and the resulting content of the single and separate fund.  *Bevill,* 59 B.R. at

359.  In 1978, SIPA was amended and the "single and separate fund" became the more inclusive

fund of "customer property." The result was that customers would get pro rata shares of either money or their own securities or both, based on the specific net equity formula in SIPA. *See id.* at 367-69.

The effect of the Chandler Act and SIPA was to preempt the use of state law and common law in determinations relating to customer property to create a uniform and formulaic treatment of stockbroker customers. *See Rosenman Family, LLC v. Picard (Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*, 401 B.R. 629, 636 n.12 (Bankr. S.D.N.Y. 2009), *aff'd* 420 B.R. 108 (S.D.N.Y. 2009), and *aff'd* 395 Fed. Appx. (2d Cir. 2010). ("Rosenman seems to couch his claims for relief in state or common law. However, such claims, even if they existed, would be superseded by the Supremacy Clause of the United States Constitution."); *Bevill,* 59 B.R. at 378 (state law entitling customer to possession of customer property would be inconsistent with SIPA and preempted under Supremacy Clause); *see also Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 129 (Bankr. D. Minn. 2002) *aff'd* No. 01–4257 RJK, 2003 WL 1824937 (D. Minn. Apr. 7, 2003), and *aff'd* 371 F.3d 397 (8th Cir. 2004) (same); *Bell & Beckwith*, 104 B.R. at 859 (same); *Hill v. Spencer Sav. & Loan Assoc. (In re Bevill, Bresler & Schulman, Inc.)*, 94 B.R. 817, 826-27 (D.N.J. 1989) (same).

Accordingly, the preemptive effect of SIPA and its legislative foundations reflect the fact that net equity is to be determined within the four corners of the SIPA statute, to eliminate state-law variations in customer property recoveries. The efforts here to reallocate net equity based upon Time-Based Damages considerations, many of which emanate from state laws regarding interest, and all of which depend upon individual considerations other than the amount of principal losses, run contrary to SIPA's uniform federal scheme.

For example, certain claimants have suggested that they are entitled to damages under New York's 9% prejudgment interest statute, running from the date of deposit. Use of a state law interest rate to artificially inflate a customer's net equity claim under SIPA would reintroduce the variability of state law into customer treatment.[8] And state law interest rate differences could result in tens of billions of dollars of differences in customer claims.[9] Congress preempted this disparity by enacting the Chandler Act, and then SIPA.

SIPA's uniform federal scheme requires a ratable division of property, without regard to the specific facts of any one customer's loss. Moreover, SIPA and its predecessor statutes demonstrate Congress's unwillingness to have customer recoveries depend on variations in state law. Rather, they evidence Congress's intention to preempt state law in order to create a uniform and formulaic ratable distribution of the customer fund on account of customers claims.

**E.     SIPA Works Together With The Securities Laws To Ensure That Customer Property Is Returned To Customers.**

The net equity and customer property definitions of SIPA are designed to work in conjunction with the broader securities laws that determine how brokers must hold, and account for, customer property. Indeed, SIPA provides that "the provisions of the Securities Exchange Act of 1934 [the "1934 Act"] apply as if this chapter constituted an amendment to, and was

---

[8] New York's C.P.L.R. § 5001 is inapplicable here in any event. It applies only to the state law causes of action referenced in it. *See Mfg'rs. Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 28 (2d Cir. 1986) (reversing lower court because prejudgment interest under NY CPLR § 5001 is not applicable to federal securities laws claims, only to New York state law claims). SIPA is not a New York state law. Also, New York's CPLR § 5001 authorizes interest only "upon a sum awarded," which requires a judgment in favor of a claimant. *See Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 337-38 (S.D.N.Y. 2010). There is no judgment in the context of the SIPA claims process to which prejudgment interest could attach.

[9] Even if prejudgment interest could attach in these circumstances, the 9% rate set forth under New York law is unreasonable and the Trustee would be well within his discretion to reject it. A court within the Second Circuit recently rejected the 9% rate, noting that it is "an absurd judgment rate in this day and age for any claim." *Sriraman v. Patel*, 761 F. Supp. 2d 23, 26-27 (E.D.N.Y. 2011). While it may have been reasonable when first enacted in 1981, when the federal funds rate was as high as 19.1%, it is not under current conditions, which include a federal funds rate that has been running at less than 1% for years. *Id.*

included as a section of, such Act."  *See* SIPA § 78bbb.  Allowing for the recovery of Time-Based Damages as a component of net equity would be in conflict with the 1934 Act and the rules promulgated by the SEC pursuant to the 1934 Act.  Certain of these rules are intended to protect customer assets and provide for a corpus of property available for distribution to customers in the event of a liquidation.  If a broker is holding all "customer property" in the manner required by securities laws, those amounts are intended to correspond to SIPA net equity claims as they exist on the filing date.

SEC rules require brokers to hold customer cash in a separate account from broker cash. 17 C.F.R. § 240.15c3–3(e).  This rule was enacted to implement a requirement added to the 1934 Act by SIPA.[10]  And nothing in this rule requires brokers to take into account time value of money, inflation, interest, or other deviations from the actual cash amount held by a broker for a customer. *Id.*  Nor do they require the amount of cash held by a broker in a segregated fund for its clients to be inflated by such factors.  17 C.F.R. § 240.15c3-3a Ex. A.

If, however, Time-Based Damages were an element of the net equity calculation, then the holdings of customer property required by the 1934 Act regulations could never be sufficient to return property to customers.  Consider a case in which the broker held enough cash to transfer to each customer the cash that is supposed to be in her account.  The use of Time-Based Damages would mean that some customers might not receive all their cash because other customers might receive *more* than the cash that the broker rightfully held for them.  Consequently, Time-Based

---

[10] In its Notice of Proposed Rule Making as to Rule 15c3-3, the SEC explained, "The proposed rules and amendments are designed to implement the provisions of section 15(c) (3) of the Exchange Act which were added by section 7(d) of the Securities Investor Protection Act of 1970 (the SIPC Act)." Reserves and Related Measures Respecting the Financial Responsibility of Brokers and Dealers, Exchange Act Release No. 9,388, 36 Fed. Reg. 22, 312 (proposed Nov. 24, 1971).

Damages are at odds with the comprehensive structure of customer protection under SIPA and the 1934 Act.

**F.    The Net Investment Method Is Consistent With Traditional Approaches To Ponzi Recoveries and Distributions.**

**1.    In Both SIPA and Non-SIPA Ponzi Cases, Cash-In/Cash-Out (Without Interest Adjustment) Is The Standard Distribution Approach.**

In Ponzi scheme cases, payments are routinely made pro rata among victims based on their net cash investment. In the instant case, as the Second Circuit found, the only customer property held by BLMIS was derived from customer deposits. *Bernard L. Madoff Inv. Sec.*, 654 F.3d at 232. The securities that appeared on the customer statements were neither bought nor paid for, nor did the investment reflect any exposure to marketplace risk. Rather, the trades and the returns reflected Madoff's imagination. Consequently, the Second Circuit affirmed the Trustee's adoption of the Net Investment Method to calculate net equity.

Given that the relevant transactions are deposits and withdrawals of cash, there is no principled basis for manipulation of the cash amounts as between equally innocent victims. In Ponzi scheme cases, including all prior SIPA cases involving Ponzi schemes, recoveries are traditionally divided pro rata based on the unaltered net cash investment. *See, e.g., Old Naples*, 311 B.R. at 616 (SIPA case) (Ponzi scheme participants in SIPA case entitled to receive only the amount invested less any payments received) (*citing C.J. Wright*, 162 B.R. at 610 (SIPA case)); *CFTC v. Topworth Int'l, Ltd.,* 205 F.3d 1107, 1115-16 (9th Cir.1999) (upholding net investment method); *Official Cattle Contract Holders Comm. v. Commons (In re Tedlock Cattle Co., Inc.),* 552 F.2d 1351 (9th Cir. 1977) (non-SIPA case) (investors in Ponzi scheme to be treated pro rata on "cash-in-cash-out" basis) (following *Abrams v. Eby (In re Young)*, 294 F. 1 (4th Cir. 1923) (non-SIPA case) (claimant who already received back amount of initial investment could not share in false profits that had been paid at the expense of other equally innocent investors));

20

*CFTC v. Hoffberg,* No. 93 C 3106, 1993 WL 441984 (N.D. Ill. Oct. 27, 1993) (non-SIPA case) (payments made based on cash paid in, netting out from the recoveries the dollar amounts already taken out of scheme); *Sec. & Exch. Comm'n v. AmeriFirst Funding,* No. 3:07-CV-1188-D, 2008 WL 919546 (N.D. Tex. Mar. 13, 2008) (non-SIPA case) (payments made on cash paid in netted against cash removed from scheme); *CFTC v. Equity Fin. Group*, LLC, No. 04-1512 RBK AMD, 2005 WL 2143975 (D.N.J. Sept. 2, 2005) (non-SIPA case) (pro rata distribution based on initial investment, with previously paid "profits" offset); *Sec. & Exch. Comm'n v. Funding Res. Group*, No. 3-98-CV-2689-M, 2004 WL 1189996 (N.D. Tex. May 27, 2004) (non-SIPA case) (in equity receivership arising out of Ponzi scheme, no claim or further recovery allowed to "victim" who had already received back more than he had paid in); *Sec. & Exch. Comm'n v. Pavarini*, No. 88 CIV. (LLS) 4897, 1989 WL 49365, at *2-3 (S.D.N.Y. May 3, 1989) (non-SIPA case) (approving net investment-based pro rata distribution plan); *CFTC v. Franklin*, 652 F. Supp. 163, 169-70 (W.D. Va. 1986), *rev'd on other grounds sub nom. Anderson v. Stephens*, 875 F.2d 76 (4th Cir. 1989) (non-SIPA case) (pro rata recovery based on initial investment, net of profits).

Giving money to earlier investors beyond the return of their principal merely shifts money from later investors who have not yet recovered their investments, rather than from the wrongdoer. For this reason, equitable remedies that would normally be available to victims of fraud, such as tracing and constructive trusts, are routinely rejected in Ponzi scheme cases. For example, in the original Ponzi scheme, the Supreme Court rejected the use of a tracing presumption that the lower courts had applied, observing that the "rule is useful to work out equity between a wrongdoer and a victim; but when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds perpetrated against a myriad of victims, the

case is different." *Cunningham v. Brown,* 265 U.S. 1, 13 (1924). In that case involving "equally innocent victims," the court found that the circumstances "call strongly for the principle that equality is equity, and this is the spirit of the bankrupt law." *Id.*

The Second Circuit highlighted this point in upholding the Net Investment Method in this case: "As the bankruptcy court observed, '[a]ny dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested.'" *Bernard L. Madoff Inv. Sec.*, 654 F.3d at 235. The Second Circuit rejected having "those who had already withdrawn cash deriving from imaginary profits in excess of their initial investment" derive "additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed." *Id*. at 238. It should be no different here.

> **2.      Net Equity Should Be Interpreted Consistently With Fraudulent Transfer Law Which Recognizes Only Cash Paid In As An Offset To Liability.**

Under SIPA, the Trustee is authorized to use bankruptcy avoidance powers to recover transfers of customer property for distribution to customers. SIPA § 78fff–2(c)(3). Ponzi case law establishes that the Trustee is entitled to recover all transfers made to an investor in excess of an investor's principal payments into the scheme. *See, e.g., Donnell v. Kowell*, 533 F.3d 762 (9th Cir. 2008) (amounts in excess of initial investment may be recovered from an innocent investor); *Von Gunten v. Neilson (In re Slatkin),* 243 Fed. Appx. 255, 259 (9th Cir. 2007) (rejecting suggestion that "a Ponzi scheme operator's use of investors' money has value and that investors are entitled to a credit for the 'use value' of that money"); *Sender v. Buchanan (In re Hedged–Invs. Assocs., Inc.),* 84 F.3d 1286, 1290 (10th Cir. 1996); *Scholes v. Lehmann,* 56 F.3d 750, 757-58 (7th Cir. 1995); *Moran v. Goldfarb*, No. 09 Civ. 7667 (RJS), 2012 WL 2930210, at *9 (S.D.N.Y. July 16, 2012) (only amount invested in Ponzi scheme is exempt from recovery; the amount protected cannot be inflated by "deemed" interest at the New York judgment interest

rate); *Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP)*, 462 B.R. 474, 485 (Bankr.

S.D.N.Y. 2011) ("investors may retain distributions from an entity engaged in a Ponzi scheme to

the extent of their investments, while distributions exceeding their investments constitute

fraudulent conveyances which may be recovered by the Trustee;" no allowance for interest);

*Dicello v. Jenkins (In re Int'l Loan Network, Inc.)*, 160 B.R. 1, 16 (Bankr. D.D.C. 1993)

(defendants could offset amount of principal but not additional expenses or value provided to the

debtor); *Rafoth v. Bailey (In re Baker & Getty Fin. Serv., Inc.)*, 88 B.R. 792 (Bankr. N.D. Ohio

1988) (Ponzi scheme investor liable for amounts that exceeded investment because debtors did

not receive reasonably equivalent value).[11]

The Second Circuit harmonized the net equity definition with the power granted to the

SIPA trustee under SIPA § 78fff-2(c)(3) to avoid fraudulent transfers, stating that "in the context

of *this* Ponzi scheme—the Net Investment Method is . . . more harmonious with provisions of the

Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud, *see* 11

U.S.C. § 548(a)(1)(A), and avoid[s] placing some claims unfairly ahead of others." *See Bernard*

*L. Madoff Inv. Sec.,* 654 F.3d at 242 n.10 (emphasis in original).

It would be inconsistent with the Trustee's statutorily provided avoidance powers to

interpret net equity in such a way as to require the Trustee to *make* distributions to claimants in

excess of their principal invested when, in accordance with existing law, the Trustee is

simultaneously entitled to use his fraudulent transfer powers to *recover* all transfers of customer

---

[11] The sole exception to this rule exists when the defendants has a contractual entitlement to a specific, commercially reasonable rate of interest. *See, e.g.*, *In re Unified Commercial Capital*, 260 B.R. 343, 351 (Bankr. W.D.N.Y. 2001); *cf. Bayou Group,* 439 B.R. at 337 (rejecting claim that fictitious profits fall within exception because they were not promised to them when they initially invested in debtor). No BLMIS customer contractually bargained for interest payments in his brokerage account.

property made in excess of principal investments.  Yet that is what could happen if Time-Based

Damages were deemed to be part of a customer's "net equity."

G.    **The Trustee Has Determined That Using The Net Investment Method Is Not Clearly Inferior To Adjusting Net Equity Based Upon Time-Based Damages, And That Determination Is Entitled To Deference.**

The Second Circuit recognized that "in many circumstances a SIPA trustee may, and

should, exercise some discretion in determining what method, or combination of methods, will

best measure 'net equity,'" and that "a reviewing court could and should accord a degree of

deference to such an exercise of discretion so long as the method chosen by the trustee allocates

'net equity' among the competing claimants in a manner that is not clearly inferior to other

methods under consideration." *Bernard L. Madoff Inv. Sec.*, 654 F.3d at 238 n.7; s*ee also* SIPA

78fff-2(b) (customer claim payments to be based on establishing claims "to the satisfaction of the

trustee.").

As set forth above, the use of Time-Based Damages contravenes the plain language of

SIPA, the purpose of SIPA, the securities laws generally, the preemptive effect of SIPA, and the

long-standing treatment of Ponzi schemes.  As such, it is inappropriate.  But to the extent the

Trustee has discretion to consider net equity adjustments based upon Time-Based Damages, he

has exercised his discretion not to do so because he believes the Net Investment Method to be

"not clearly inferior"—in fact, superior—not only for the reasons set forth above but also

because using the Time-Based Damages Method would create inequities greater than those it

attempts to cure.  This decision, as the Second Circuit has held, is entitled to deference.

1.    **Return of Principal Is The Trustee's First Priority.**

There is not enough customer property in the estate at this time to return 100% of

principal investments in BLMIS to customers.  For this reason, any Time-Based Damages

recalculation would have the effect of reallocating distributions of property among customer

claimants.  This adjustment would reallocate what would have been principal repayment to some net losers to interest payments to other net losers and net winners (who have already received a return of principal).  In choosing among methods, the Trustee believes the most equitable method is simply to repay customers their net principal invested before any adjustments for interest are made, consistent with the mandate of SIPA.  If and when customers receive 100% of their principal, it may then be appropriate to determine how to allocate the excess in accordance with applicable SIPA provisions.

The Trustee is sympathetic to the plight of all BLMIS customers, including those that invested for long periods of time.  However, the length of investment is only one of many variables that create unequal hardship between BLMIS customers.  In fact, the particular inequities vary from customer to customer.  Thus, while it may at first blush seem fair that a customer receive some "profits," that is only true as between the customer and BLMIS.  Between customers, however, one customer should not be permitted to benefit from the fraud at the expense of other customers even though she is innocent.  *See, e.g.*, *Scholes*, 56 F.3d at 757-58 (investor should not be permitted to benefit from fraud at later investor's expense merely because he was not to blame for fraud); *see also Donnell*, 533 F.3d at 779.  The Trustee believes it is impossible to weigh the individual circumstances of each customer in making distributions.  It is clear, however, that a reallocation for Time-Based Damages is a "zero-sum game" and not in the interest of the customer class as a whole.

### 2.   A Time-Based Damages Adjustment Creates More Harm Than Good.

In analyzing whether an adjustment is appropriate in this case, the Trustee asked his claims agent to perform an analysis of the effect of an inflationary adjustment on the amount of

claims and distributions.[12]  *See* Rock. Aff.  Following this analysis, the Trustee has determined that there are practical reasons that also weigh against any proposed Time-Based Damages adjustment to net equity.

    *Delay and Cost.*  Almost four years into this SIPA proceeding, the Trustee has made great progress.  *See generally* Trustee's Seventh Interim Report For The Period Ending March 31, 2012.  ECF No. 4793.  A readjustment of claims as proposed would require that the Trustee once again perform a transaction-by-transaction, account-by-account, review.[13]  It is expected to take as long as twelve months to perform this analysis and reissue determination letters to effectuate a Time-Based Damages adjustment.  It is further expected that there would be objections to those redetermination letters that could cause years of delay in reaching final resolution and distributions, including appeals and the proliferation of legal issues.  Furthermore, the Trustee expects a concomitant increase in administration costs in the tens of millions of dollars.

    *Settlements*.  The Trustee's position on most, if not all, of the settlements reached thus far is that they would be unaffected by such redeterminations.  The Trustee expects, however, that this position would be challenged by numerous settling parties seeking to "undo" settlements.

---

[12] The Trustee asked his claims agent to perform a limited analysis to understand the potential effects of an inflationary adjustment, using the assumption that the Trustee collected $10 billion for distribution from the customer fund.  These calculations were made using the monthly reported U.S. Department of Labor Bureau of Labor Statistics, Consumer Price Index, All Urban Consumers, U.S. city average.  Rock Aff. ¶ 4.  Although the analysis therein did not encompass other indices or interest rates, the Trustee believes that the results from use of other indices or interest rates would be similar and likely more pronounced where the rates are higher.

[13] If the Court determines that Time-Based Damages are required, there would be significant additional work to ensure that the effect of any court-ordered adjustment rate on each account is correct, including, among other things, appropriate adjustments for settlements.  In that eventuality, the Trustee would request a further proceeding on the specific method to be used for adjustment, and potentially on other related issues concerning specific claim amounts for the customer accounts at issue.

The effects on the pace of this proceeding and the resultant litigation would be dramatic and would likely lead to further delay and costs in connection with future distributions to customers.

*Reduction to the Customer Fund*.    A Time-Based Damages adjustment would undoubtedly be used by defendants as defenses to the Trustee's avoidance actions.[14]  The amount subject to the defenses—and the resulting potential effect on recoveries should the defendants prevail in this argument—would depend on the interest rate applied.   Under any of the Time-Based Damages formulations, however, the amount the Trustee would otherwise be able to recover would be subject to risk of reduction.   Depending on the interest factor, the amount at risk would be hundreds of millions of dollars to billions of dollars if those defendants are successful in their arguments.   Because any adjustment may provide a shield to that extent if such defenses are upheld, it is estimated that the Trustee's avoidance recoveries could be reduced by as much as approximately $330 million, using an inflationary adjustment.  Rock. Aff. ¶ 9.  In comparison, the total amount to be reallocated using an inflationary adjustment is approximately $575 million.   Rock Aff. ¶ 8.   And on an aggregate level, the inflationary adjustment would create new claimants (who were formerly net winners), and larger claims from both previous net winners and certain other net losers.

> **3.      The Feeder Funds Dominate The Reallocated Funds.**

Of the current estimate of approximately $17.3 billion in customer claims that are expected to be allowed, in excess of $12 billion relate to the claims of feeder funds.  As a result of the size of investment by feeder funds versus accounts held by individuals or other non-institutional investors, the majority of the reallocated funds for such an adjustment would go to

---

[14] Avoidance action defendants have already sought to make such arguments, and the Trustee has already and will continue to oppose them.

the feeder funds.  Rock Aff. ¶ 13.  The top ten accounts that would benefit from an inflation adjustment (in that their distribution amounts would increase) would be feeder funds.  Rock Aff. ¶ 11.  The ten accounts that lose the most from such an adjustment (in that their distribution amounts decrease) would be feeder funds.  Rock Aff. ¶ 12.

While the Trustee is mindful that there are many individual investors behind these funds, it is important point to note that:

- Feeder funds invested mainly in late 1990s and 2000s.  Thus, the majority of the reallocated dollars will go to feeder funds who invested in the last ten years.

- The feeder fund is the "customer" under SIPA, not the underlying investor in the Feeder Fund.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 454 B.R. 285, 307 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. Aozora Bank Ltd. v. Sec. Investor Prot. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 11 Civ. 5683 (DLC), 2012 WL 28468, at *7 (S.D.N.Y. Jan. 4, 2012).

- Because the feeder fund is the customer, the redistribution will not be based on the length of investment of individual investors in the feeder fund.  The amount that the Trustee redistributes (whether positive or negative) will be based on the time that the feeder fund itself was a customer—which will not necessarily correspond to the length of any individual's investment with the feeder fund.[15]  Accordingly, if the aim of this adjustment is to give

---

[15] The transaction-by-transaction records for a feeder fund's deposits and withdrawals with BLMIS are not identical to the deposit and withdrawal records of the individual investors at the feeder fund.  Thus, for each deposit and withdrawal made from BLMIS, there is not necessarily a corresponding deposit and withdrawal by individual investors at the feeder fund level.  For example, Investor A makes a deposit with its feeder fund.  The feeder fund does not make a corresponding deposit with BLMIS for that amount.  Instead, the feeder fund may use Investor A's money to fund a redemption request from Investor B rather than make a withdrawal for BLMIS for that amount.

*individuals* an adjustment based on the time they invested, the majority of the reallocation would not accomplish this aim.

- Even if the feeder funds could perform the necessary analysis to determine the correct Time-Based Damages allocation at the investor level, it is unclear whether they would do so for purposes of distributions to their investors. Any positive or negative reallocation would likely be spread among the feeder fund's investors based on their own internal governing documents and not based on the length of their investment. *See, e.g., Beacon Assocs. Mgmt. Corp. v. Beacon Assocs. LLC I*, 725 F. Supp. 2d 451, 464 (S.D.N.Y. 2010) (in contrast to BLMIS SIPA distributions governed by net equity, Beacon's Operating Agreement requires that Beacon's assets be distributed in accordance with the proportion that each member's capital account bears to all other capital accounts).

- Hundreds of customer claims, including those of feeder funds, have been traded. *See, e.g.*, Affidavit of Mailing, ECF Nos. 5034, 5035. Accordingly, many original claimants' interests have become attenuated.

## IV.

### CONCLUSION

For all of the reasons set out above, the Trustee's Motion should be granted. The Court should uphold the Trustee's determination that net equity should be calculated based upon the Trustee's Net Investment Method, without any adjustments for Time-Based Damages.

Dated: New York, New York
October 12, 2012

By: */s/ David J. Sheehan*

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jorian L. Rose
Email: jrose@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com

Baker & Hostetler LLP
3200 National City Center
Cleveland, Ohio 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
Brian A. Bash
Email: bbash@bakerlaw.com
Thomas D. Warren
Email: twarren@bakerlaw.com
Wendy J. Gibson
Email: wgibson@bakerlaw.com

*Attorneys for Irving H. Picard,
Trustee for the Substantively
Consolidated SIPA Liquidation of
Bernard L. Madoff Investment
Securities LLC and Bernard L. Madoff*