UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　Plaintiff-Applicant,<br><br>　　　　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　　Debtor. | |

**DECLARATION OF ROBERT J. ROCK IN CONNECTION WITH THE TRUSTEE'S MOTION FOR AN ORDER AFFIRMING THE TRUSTEE'S CALCULATION OF NET EQUITY AND DENYING TIME-BASED DAMAGES**

I, Robert J. Rock, pursuant to 28 U.S.C. § 1746, declare as follows:

1.　　I am a Managing Director with AlixPartners, LLP, which has served Irving H. Picard, trustee ("Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), as the claims agent for the BLMIS Trustee (the "Claims Agent") since December of 2008 pursuant to SIPA § 78fff-1(a)(1).

2.　　AlixPartners, LLP currently serves as the Claims Agent in this proceeding and has served as the only Claims Agent since the inception of this proceeding. I am a Managing Director in the Financial Advisory Services Group of AlixPartners, LLP, located in Southfield, MI, and personally have greater than 30 years of combined experience in accounting, investigative/forensic accounting and financial consulting in bankruptcy and restructuring

300261288

matters. I am a certified public accountant ("CPA"), with both a Bachelor's degree in Business Administration (concentration in accounting) and a Master's Degree in Business Administration from the University of Michigan. I have testified in over 20 cases throughout the country during the past 5 years and have authored 5 publications including the *Financial Handbook for Bankruptcy Professionals* (co-authored by Jay Alix, Robert J. Rock and Ted Stenger, second edition - 1996), published by West Publishing Co.

3. I make this declaration based upon personal information and knowledge and in connection with the Trustee's motion and memorandum of law for an order approving the motion affirming the Trustee's calculations of net equity and denying Time-Based Damages (the "Time-Based Damages Motion").[1] My work, along with the work of my staff, has been limited to the analysis of the Time-Based Damages issue as described herein.

4. I have performed certain calculations related to Time-Based Damages. These calculations included adjusting for inflation the transactions for all active BLMIS accounts for which a customer claim was filed (the "Inflationary Adjustment"). Specifically, to account for inflation, I made these calculations using the monthly reported U.S. Department of Labor Bureau of Labor Statistics, Consumer Price Index, All Urban Consumers, U.S. city average and used adjustments to the account balances as of April 30, 2012. I did not perform calculations using any other indexes. We analyzed all transactions between 1981 and December 2008 for these BLMIS accounts. While I made an Inflationary Adjustment to the accounts based on all transactions, I did not apply an interest expense to an account during the period that such account

---

[1] The capitalized term Time-Based Damages shall have the meaning ascribed to it in the Time-Based Damages Motion.

holder was a net winner.[2] While the Inflationary Adjustment represents a fair approximation of the relative effects of such an adjustment, there would be significant additional work necessary to perform a transaction-by-transaction, account-by-account review to ascertain the exact revised balance for any specific account. Just to use one example, I used the account data without adjusting for any settlement that may have taken place between the Trustee and any account holder. The reason I did not take settlements into account is because the impact could not be predicted with a sufficient degree of accuracy without specific in-depth analyses across the hundreds of settled accounts.

5. After making the Inflationary Adjustment for each customer account, I performed an analysis to determine the effect such adjustment would have on distributions. Purely for the purposes of this analysis, I assumed the Trustee recovered $10 billion on account of all customer claims in this proceeding.[3]

6. If the Inflationary Adjustment was determined appropriate by the Court, there would be an overall increase in allowed claims in the amount of approximately $2.9 billion.

7. Also after the Inflationary Adjustment, approximately 175 net winners under the Net Investment Method[4] would likely argue that they would be net losers from a purely mathematical standpoint. If successful, they would seek to receive reallocated distributions of

---

[2] A "net winner" is a BLMIS customer who withdrew more funds from BLMIS than she deposited; thus, she received all of her principal plus some of other customers' money. For the purposes of this analysis, I include in the net winner population those account holders that withdrew an amount equal to the amount they deposited.

[3] The assumption of $10 billion in total distributions is solely for the purposes of this analysis and does not represent an estimation of any kind of the total recoveries that the Trustee may ultimately collect and distribute.

[4] "Net Investment Method" is a term used by the Trustee to describe how he calculated "net equity" by crediting the amount of cash deposited by the customer into her BLMIS account less any cash amounts withdrawn from that BLMIS customer account.

approximately $85 million that would have otherwise gone to net losers[5] who haven't received return of their principal.

8. Assuming total recoveries of $10 billion and the current estimate of total allowed claims of $17.3 billion, there would not be enough money to make all net losers whole. Accordingly, an Inflationary Adjustment could result in an aggregate reallocation of approximately $575 million from distributions of customer property to other net losers and net winners.

9. It is my understanding that the Trustee has commenced avoidance actions against certain parties who withdrew more money from BLMIS than they deposited, and those parties have asserted defenses to the avoidance actions based upon, among other things, the amount of their deposits in BLMIS. I have determined that the differential between the total net winner balances under the Net Investment Method and the balances for those same accounts after the Inflationary Adjustment would decrease by an amount equal to approximately $330 million. If successful in their avoidance action defenses, there could be a potential reduction in the amounts the Trustee would otherwise be able to recover (depending on the outcome of avoidance action proceedings not at issue here).

10. Of the approximate $17.3 billion allowable customer claims currently estimated under the Net Investment Method, in excess of $12.2 billion relate to customer claims of entities that have been identified to us as feeder funds. After the Inflationary Adjustment, the total amount of customer claims would increase to approximately $20.2 billion and there would be approximately $14.3 billion relating to customer claims of feeder funds.

---

[5] A "net loser" is a BLMIS customer who withdrew less funds from BLMIS than she deposited with BLMIS, and who thus did not receive her principal back in full.

11. The 10 accounts that receive the largest share of the reallocated dollars by amount would be feeder funds accounts, which would increase in the approximate amount of $399 million.

12. The 10 accounts that lose the largest share of the reallocated dollars by amount would be feeder funds accounts, which would decrease in the approximate amount of $329 million.

13. Feeder funds' net deposit amounts[6] were so large between 1998 and 2008 that the majority of the customer property to be reallocated on account of the Inflationary Adjustment would move among those feeder funds.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 12, 2012
Southfield, MI

Robert J. Rock
Managing Director
AlixPartners, LLP

Subscribed and sworn to before me this
12th day of October, 2012

_____
Notary Public
Patricia Ellen Luchin
My Commission Expires: July 5, 2014

PATRICIA ELLEN LUCHIN
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jul 5, 2014
ACTING IN COUNTY OF OAKLAND

---

[6] The net of deposits less withdrawals.