**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION | Adv. Pro. No. 08-01789 (BRL). |
| Plaintiff-Applicant | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC | |
| Defendant. | |
| In re: | |
| Bernard L. Madoff | |
| Debtors. | |

**TRANSFER OF ALLOWED CLAIM FOR SECURITY**

A CLAIM HAS BEEN SUBMITTED IN THIS CASE, DESIGNATED AS CLAIM NO. **006237.** Transferee hereby gives evidence pursuant to certain Claims Trading Procedures approved by Order of the above-captioned Court dated November 10, 2010 [Dkt. No. 3138], of the transfer of the allowed claim[*] referenced in this evidence for security.

FORTRESS CREDIT CORP.
_____
Name of Transferee

RYE SELECT BROAD MARKET FUND, LP
_____
Name  of Transferor

Additional information concerning such transfer is set forth in Exhibit "A" hereto.

_____

[*]  Allowance of the allowed claim is subject to the terms and conditions of that certain Settlement Agreement, dated as of July 25, 2011, among the undersigned transferor, the other parties thereto and Irving H. Picard, the trustee in this case.

**Name and Address where notices to transferee should be sent:**

Constantine M. Dakolias
c/o Fortress Investment Group
1345 Avenue of the Americas
New York, NY 10105
Phone: (212) 798-6100

*with copies to:*

James K. Noble III
c/o Fortress Investment Group
1345 Avenue of the Americas
New York, NY 10105
Phone: (212) 798-6100

Brandon Baer
c/o Fortress Investment Group
1345 Avenue of the Americas
New York, NY 10105
Phone: (212) 479-5349

and

Douglas Urquhart
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
douglas.urquhart@weil.com
Phone: (212) 310 8001
Fax: (212) 310 8007

**Name and Address where notices to transferor should be sent:**

James McCormick
c/o Tremont Group Holdings, Inc.
Corporate Center at Rye
555 Theodore Fremd Avenue
Rye, NY 10580
jmccormick@tremont.com
Phone: (914) 925-1143
Fax: (914) 925-4043

*with copies to:*

Peter C. Manbeck
Chapman and Cutler LLP
330 Madison Avenue
New York, NY 10017
manbeck@chapman.com
Phone: (212) 655-2525
Fax: (212) 655-2526

and

Seth M. Schwartz
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
seth.schwartz@skadden.com
Phone: (212) 735-2710
Fax: (917) 777-2710

**Name and Address where payments should be sent (if different from above):**

Settlement Agent LLC
c/o Tremont Group Holdings, Inc.
Corporate Center at Rye, 555 Theodore Fremd Avenue
Rye, NY 10580
Attention: James McCormick, General Counsel

*with copies of payment advices to:*

Constantine M. Dakolias
c/o Fortress Investment Group
1345 Avenue of the Americas
New York, NY 10105
Phone: (212) 798-6100

US_ACTIVE:\43737578\12\45968.0043

I declare under penalty of perjury that the information provided herein is true and correct to the best of my knowledge.

By: _____     Date: ___11/ 6/ 12_____
   Transferee/Transferee's Agent

*Penalty for making a false statement: fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.*

[Transfer of Allowed Claim for Security]

## EXHIBIT A

### Assignment for Security

Rye Select Broad Market Fund, LP ("Assignor"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby transfer and assign for security purposes unto Fortress Credit Corp., its successors and assigns ("Assignee"), all rights, title, and interests in and to Assignor's allowed claim in the amount of U.S. $1,647,687,625.00 (plus the Assignee Additional Claim Amount), as stated in the Settlement Agreement, dated as of July 25, 2011 (the "Settlement Agreement"), among Assignee, the other parties thereto and Irving H. Picard, the trustee ("Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC, under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.*, substantively consolidated with the estate of Bernard L. Madoff in Case No. 08-01789, identified by Claim No. 006237 (the "Allowed Claim")[*] in proceedings pending before the United States Bankruptcy Court for the Southern District of New York. The terms of this assignment for security are set forth in that certain Amended and Restated Security Agreement, dated as of October 29, 2012, between the Assignor and the Assignee, a copy of which is attached to this Transfer of Allowed Claim for Security as Exhibit "B" (the "Security Agreement"). "Assignee Additional Claim Amount" shall mean the amount of the Additional Claim Amount (as defined in the Settlement Agreement) allocated to the allowed claim of the Assignor in accordance with the terms of the Settlement Agreement.

This Agreement and the rights and obligations of the parties under this Agreement shall be governed by, and construed and interpreted in accordance with, the law of the State of New York. Each of the parties hereto submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the courts of the State of New York or the courts of the United States of America for the Southern District of New York, in each case, located in the Borough of Manhattan, the City of New York and appellate courts from any thereof and consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same.

Without limiting the terms of the Security Agreement, Assignor hereby certifies by this assignment the following:

1)      Assignee will be recognized as holding a valid and perfected security interest in the Allowed Claim, and subject to the terms and conditions of the Security Agreement, will be recognized as the valid owner of the Allowed Claim. All distributions on account of the Allowed Claim will be sent to the following:

> Settlement Agent LLC
> c/o Tremont Group Holdings, Inc.
> Corporate Center at Rye, 555 Theodore Fremd Avenue

---

[*] Allowance of the allowed claim is subject to the terms and conditions of the Settlement Agreement.

Rye, NY 10580
Attention: James McCormick, General Counsel
Claim No. 006237
Allowed Claim Amount: $1,647,687,625.00 (plus the Assignee Additional Claim Amount)

*with copies of payment advices to:*

Constantine M. Dakolias
c/o Fortress Investment Group
1345 Avenue of the Americas
New York, NY 10105
Phone: (212) 798-6100

2)      The Allowed Claim Amount constitutes the entire amount of the Claim and has not been reduced by any prior payment from the Trustee on account of the Allowed Claim.

3)      As more fully set forth in Sections 4.4(c) and (d) of the Security Agreement, Assignor shall remain fully liable for, and have the right to, the performance of all of its obligations in respect of the Allowed Claim, and Assignee shall not have any obligation or liability by reason of or arising out of the transfer of the Allowed Claim for security.

4)      In the event of an Event of Default (as such term is used in the Security Agreement) or any other event that shall require a change in or, a clarification to, the provisions hereof in accordance with the terms of the Security Agreement, Assignee is authorized to contact AlixPartners LLP or any other claims agent retained by the Trustee to provide further instructions with respect to the Allowed Claim.

[SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, dated the 6th of _November 2012_.

Assignor: RYE SELECT BROAD MARKET
FUND, LP

By: TREMONT PARTNERS, INC., its
General Partner

By: _Lynn O. Keeshan_
Name: Lynn O. Keeshan
Title: President

[Signature Page to (Rye Select Broad Market Fund, LP) Assignment for Security]

Assignee: FORTRESS CREDIT CORP.

By: _____
Name: Constantine M. Dakolias
Title:   President

[Signature Page to (Rye Select Broad Market Fund, LP) Assignment for Security]

**<u>EXHIBIT B</u>**

[SECURITY AGREEMENT]

AMENDED AND RESTATED SECURITY AGREEMENT

Dated as of October 29, 2012


between

RYE SELECT BROAD MARKET FUND, LP

as Borrower


and


FORTRESS CREDIT CORP.,
as Lender

3231053.04.08.B.DOC
7001084

## TABLE OF CONTENTS

Page

ARTICLE I    DEFINED TERMS    1

    Section 1.1    Definitions ........................................................................................1
    Section 1.2    Certain Other Terms ........................................................................6

ARTICLE II    GRANT OF SECURITY INTEREST; CASH COLLATERAL
    ACCOUNT    6

    Section 2.1    Collateral..........................................................................................6
    Section 2.2    Grant of Security Interest in Collateral.............................................7
    Section 2.3    Cash Collateral Account and Borrower Collateral Accounts ............7
    Section 2.4    Investment of Funds..........................................................................8

ARTICLE III    REPRESENTATIONS AND WARRANTIES    8

    Section 3.1    Title; No Other Liens........................................................................8
    Section 3.2    Perfection and Priority......................................................................8
    Section 3.3    Jurisdiction of Organization; Chief Executive Office .......................9
    Section 3.4    Locations of Books and Records .......................................................9
    Section 3.5    Claims ...............................................................................................9
    Section 3.6    Specific Collateral...........................................................................10
    Section 3.7    Enforcement.....................................................................................10
    Section 3.8    Representations and Warranties of the Loan Agreement ..................10

ARTICLE IV    COVENANTS    10

    Section 4.1    Maintenance of Perfected Security Interest; Further
                Documentation and Consents ..........................................................10
    Section 4.2    Changes in Locations, Name, Etc ....................................................10
    Section 4.3    Notices .............................................................................................11
    Section 4.4    Claims ..............................................................................................11
    Section 4.5    Compliance with Loan Agreement ..................................................14
    Section 4.6    Authorization to File Financing Statements ....................................14

ARTICLE V    REMEDIAL PROVISIONS    14

    Section 5.1    Code and Other Remedies ...............................................................14
    Section 5.2    Payments in Respect of Collateral ...................................................16

ARTICLE VI    MISCELLANEOUS    17

    Section 6.1    Reinstatement...................................................................................17
    Section 6.2    Release of Collateral........................................................................17
    Section 6.3    Amendments in Writing...................................................................18
    Section 6.4    Notices .............................................................................................18
    Section 6.5    Successors and Assigns ....................................................................18
    Section 6.6    Counterparts.....................................................................................18
    Section 6.7    Severability ......................................................................................18
    Section 6.8    GOVERNING LAW.........................................................................18
    Section 6.9    WAIVERS OF JURY TRIAL ..........................................................18
    Section 6.10    WAIVER OF NOTICE REQUIREMENT .......................................18
    Section 6.11    Limited Recourse .............................................................................18
    Section 6.12    Collateral Matters Relating to Holders of Secured Obligations ...........19
    Section 6.13    Pledged Causes of Action ................................................................19
    Section 6.14    Effect of Amendment and Restatement............................................20

## ANNEXES AND SCHEDULES

Annex 1              Form of Notice of Transfer of Claim for Security
Schedule 1           Filings
Schedule 2           Jurisdiction of Organization; Chief Executive Office
Schedule 3           Claims
Schedule 6.13(d)   Commercial Tort Claims

This AMENDED AND RESTATED SECURITY AGREEMENT, dated as of October 29, 2012, is by and between RYE SELECT BROAD MARKET FUND, LP (the *"Borrower"*) and FORTRESS CREDIT CORP., for itself and as agent for the other Secured Parties (in such capacities, together with its successor and permitted assigns in such capacities, the *"Lender"*) and is an amendment and restatement of that certain Security Agreement dated as of June 28, 2011, as amended prior to the date hereof (as so amended, the *"Existing Security Agreement"*) pursuant to which the Borrower granted to the Lender security interests in certain rights and properties of the Borrower described therein.

## ARTICLE I

## DEFINED TERMS

Section 1.1    Definitions.    (a) Capitalized terms used herein without definition are used as defined in the Term Loan Agreement, dated as of June 28, 2011, between the Borrower and the Lender (as amended, supplemented or otherwise modified from time to time, the *"Loan Agreement"*).

(b)    The following terms have the meanings given to them in the UCC and terms used herein without definition that are defined in the UCC have the meanings given to them in the UCC (such meanings to be equally applicable to both the singular and plural forms of the terms defined): *"account"*, *"account debtor"*, *"as-extracted collateral"*, *"chattel paper"*, *"deposit account"*, *"farm products"*, *"general intangible"*, *"health-care-insurance receivable"*, *"instrument"*, *"investment property"*, *"proceeds"*, *"record"*, *"securities account"* and *"security."*

(c)    The following terms shall have the following meanings:

*"Account Bank"* means the United States bank, securities intermediary or other financial institution acceptable to the Lender at which the Borrower maintains the Cash Collateral Account.

*"Affiliate Security Agreement"* means the Amended and Restated Security Agreement, dated as of October 29, 2012, by and between Affiliate Borrower and Lender, as the same may be amended, supplemented or otherwise modified from time to time.

*"Agreement"* means this Amended and Restated Security Agreement.

*"Amendment No. 1 Effective Date"* means September 27, 2011.

*"Approved Counsel"* means, with reference to any Pledged Cause of Action and for purposes of Section 5.1(f) hereof (i) Skadden, Arps, Slate, Meagher & Flom LLP (including such other law firms as may operate under the name of "Skadden, Arps, Slate, Meagher & Flom" or "Skadden" in jurisdictions other than the State of New York), and (ii) any other law firm as shall have been approved in writing by the Lender.

*"Available CCA Funds"* means, as of any date of determination, the amount of funds then on deposit in the Borrower Collateral Accounts.

*"Bankruptcy Code"* means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

*"Bankruptcy Court"* means the United States District Court for the Southern District of New York, having jurisdiction over the SIPA Liquidation, and, to the extent of any removal under section 78eee of SIPA, the unit of such District Court constituted pursuant to section 151 of title 28 of the United States Code.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure.

"*Borrower Collateral Accounts*" means, collectively, the RBM Collateral Accounts and the RPL Collateral Accounts.

"*Borrower Related Party*" means any Affiliate of the Borrower or any officer, director, partner (whether a limited partner or a general partner), equity holder or employee of the Borrower or such Affiliate.

"*Cash Collateral Account*" means that certain deposit account (or, at the option of the Borrower, a securities account) maintained in the name of the Settlement Agent LLC at the Account Bank for the purpose of receiving payments in respect of the Claims of Borrower, and claims of Affiliate Borrower and the claims of Rye Insurance from the Trustee pursuant to the Settlement Agreement as provided in the Disbursing Agent Agreement and the Settlement Agent Agreement.

"*Cause of Action*" means (a) any action, claim, lawsuit or cause of action of the Borrower against any Person, to the extent that any such action, claim, lawsuit or cause of action arises from or in connection with or otherwise relates to (i) the Claims or (ii) the Borrower's account at or investments with the Debtors.

"*Claim Amount*" means $2,946,177,625.00; *provided* that, if any decreases described in the following clause (x) shall occur, the Claim Amount shall be deemed to be decreased in an aggregate amount equal to the lesser of (x) the aggregate amount of any decreases after the Closing Date in the allowed Claims and Affiliate Borrower Claims in the SIPA Liquidation and (y) $10,000,000.

"*Claim Documents*" mean each of the agreements, bills, invoices, stipulations, proofs of claim, orders, books, records, contracts and any other documents (whether now existing or hereafter arising), which evidence, create, give rise to, amend or modify the Claims; excluding any that may be Privileged Information.

"*Claims*" mean any and all claims (as the term "claim" is defined in section 101(5) of the Bankruptcy Code) of the Borrower against any of the Debtors or their respective estates, including, without limitation, those reflected in the Settlement Agreement or any Proof of Claim, any claims arising from the assumption or rejection of any executory contract or unexpired lease with any of the Debtors to which the Borrower is a party, any claims by the Borrower against or arising as a result of any judgment or settlement of the Trustee Action (including, without limitation, any claims under section 550 or 553 of the Bankruptcy Code or SIPA) and any claims of the Borrower against the Debtors allowed by order of the Bankruptcy Court or agreement of the Trustee. "Claims" shall also include (i) any rights to funds forfeited to the United States Attorneys' Office for the Southern District of New York, the United States Department of Justice or any other governmental entity, relating to the fraud that occurred at the Debtors, including, without limitation, the right to file any petition for mitigation or remission of forfeiture and receive or retain any proceeds distributed to victims in connection therewith and (ii) Pledged Causes of Action.

"*Class Action Stipulation*" means Stipulation of Partial Settlement for *In Re: Tremont Securities Law, State Law and Insurance Litigation* (File No.: 08 CIV.11117(TPG), dated as of February 23, 2011, by and among the Borrower and certain of its Affiliates and the other parties listed therein.

"*Closing Date*" means June 28, 2011.

- 2 -

"*Collateral*" has the meaning specified in *Section 2.1*.

"*Commercial Tort Claims*" has the meaning specified in the UCC.

"*Contractual Obligation*" means, with respect to any Person, any provision of any security issued by such Person or of any document or undertaking (other than a Loan Document) to which such Person is a party or by which it or any of its property is bound or to which any of its property is subject.

"*Control Agreement*" means, with respect to any deposit account, any securities account or securities entitlement, an agreement among the Lender, the Borrower and the financial institution or other Person at which the Borrower maintains such account or with which such entitlement or contract is carried for the Borrower, effective to grant "control" (as defined under the applicable UCC) over such account to the Lender.

"*CPA Retention Accounts*" means, collectively, the RBM CPA Retention Account and the RPL CPA Retention Account.

"*CPA Retention Amount*" means, as of any date of determination, the lesser of (i) $150,500,000 *minus* the Paid Participation Amount, or (ii) the amount that the Borrower and the Lender in good faith agree is equal to fifty percent (50%) of the maximum amount of future payments that the Borrower and the Affiliate Borrower could be required to make to Dolos under Section 2 of the Claim Participation Agreement.

"*Debtors*" mean, collectively, Bernard L. Madoff Investment Securities LLC, Bernard L. Madoff, and all of its or his affiliates, subsidiaries and insiders who are or become debtors in, or the subject of, the SIPA Liquidation.

"*Defensive Action*" means any Cause of Action brought, commenced or filed by the Borrower against any Person as a counter-claim, cross-claim, claim for contribution, insurance or indemnity in connection with any action, claim, lawsuit or cause of action against the Borrower by a third person, in each case, to the effect that such other Person (and not the Borrower) should bear the cost of harm to such third person that is asserting such action, claim, lawsuit or cause of action against the Borrower.

"*Deposit Account Control Agreement*" means the Deposit Account Control Agreement, dated as of October 29, 2012, among Settlement Agent LLC, Wells Fargo Bank, National Association, as the Account Bank, and Lender.

"*Disallowance Proceeding*" has the meaning specified in *Section 4.4(c)*.

"*Disbursing Agent*" means Wells Fargo Bank, N.A., as Disbursing Agent under the Disbursing Agent Agreement, or any successor thereto.

"*Disbursing Agent Agreement*" means the Disbursing Agent Agreement, dated as of October 29, 2012, between Settlement Agent LLC and the Disbursing Agent.

"*Dolos*" means DOLOS III—E LLC, a Delaware limited liability company, and its successors and assigns.

- 3 -

"*Electronic Transmission*" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System or other equivalent service.

"*Excess Balance*" means, as of any date of determination, the excess, if any, of the Available CCA Funds over the sum of (i) the Immediate Obligations, and (ii) the CPA Retention Amount.

"*Excluded Cause of Action*" means any Cause of Action to be assigned, released, settled or terminated under Sections 8 and 9 of the Settlement Agreement or under the Class Action Stipulation.

"*Immediate Obligations*" means, as of any date of determination, all Secured Obligations that are then due for payment or will become due for payment on either of the two immediately following Business Days.

"*Impairment*" has the meaning specified in *Section 3.5(b)*.

"*Net Equity Method*" means the method used to calculate claims in the SIPA Liquidation with respect to customer accounts equal to the difference, over the life of any such customer account, between the total amount deposited in such customer account and the total sum withdrawn from such customer account as set forth in the Net Equity Method Order.

"*Net Equity Method Order*" means that certain *Order (1) Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Customer Statement; (2) Affirming Trustee's Determination of Net Equity; and (3) Expunging Those Objections with Respect to the Determinations Relating to Net Equity*, dated March 8, 2010 [EFC. No. 2020].

"*Notice of Transfer of Claim for Security*" means evidence of the transfer of claims for security pursuant to Rule 3001(e)(4) of the Bankruptcy Rules and certain Claims Trading Procedures approved by order of Bankruptcy Court dated November 10, 2010 [Dkt. No. 3138] in the form attached hereto as *Annex 1*.

"*Paid Participation Amount*" means, as of any date of determination, the aggregate amount of payments then or theretofore made by the Borrower or the Affiliate Borrower to Dolos under Section 2 of the Claim Participation Agreement.

"*Participation Obligation*" means any obligation of the Borrower or the Affiliate Borrower to make payments to Dolos under Section 2 of the Claim Participation Agreement.

"*PCOA Default*" means:

> (a)    any Event of Default under clause (a), (f), (g), (h) or (j) of Section 7 of the Loan Agreement; or

> (b)    any Event of Default under clause (c) of Section 7 of the Loan Agreement occurring as a result of any breach of the covenants contained in (i) Section 5.6, 6.1, 6.2, 6.3, 6.4, 6.5, 6.11 or 6.12 of the Loan Agreement; (ii) Section 3 or 5(a) of the Claim Participation Agreement; or (iii) Section 2.3, 4.4(a) or 6.13(c), (d) or (f) of this Agreement.

"*Permitted Investments*" means so long as the Cash Collateral Account and Borrower Collateral Accounts are maintained pursuant to the Disbursing Agent Agreement, each of the money market funds set forth on Exhibit A to the Disbursing Agent Agreement.

"*Pledged Causes of Action*" means all (a) Causes of Action against any Person brought, commenced or filed by the Borrower or its Affiliates (but not any other Person), whether such suit, action, arbitration or other proceeding is brought, commenced or filed either before or after the Amendment No. 1 Effective Date, and (b) any and all rights of recovery or payment under Causes of Action against any Person that have been or may be asserted, brought, commenced or filed by, for or on behalf of the Trustee or any liquidating trust or other vehicle established for the compensation of claimants against or victims of the Debtors or their respective estates (whether or not the recovery or payment is received through the Trustee or such liquidating trust or other vehicle), *but excluding*, in each case, Excluded Causes of Action.

"*Privileged Information*" means documents or information that is protected from disclosure or discovery under attorney-client, attorney-work product, or any other applicable privilege under state or federal law.

"*Proof of Claim*" means, collectively, any customer claims or other proofs filed by the Borrower in the SIPA Liquidation, including, without limitation, the customer claim, dated March 3, 2009 and received by the Trustee on or before March 4, 2009, filed by the Borrower with respect to account #1T0027 in the amount of $1,639,171,625.

"*Proof of Claim Amount*" means $1,639,171,625.

"*RBM Collateral Accounts*" means the RBM General Account and the RBM CPA Retention Account.

"*RBM CPA Retention Account*" means that certain deposit account (or, at the option of the Borrower, a securities account) that is created and maintained at the Account Bank as the "RBM CPA Retention Account" pursuant to the Disbursing Agent Agreement.

"*RBM General Account*" means that certain deposit account (or, at the option of the Borrower, a securities account) that is created and maintained at the Account Bank as the "RBM General Account" pursuant to the Disbursing Agent Agreement.

"*RBM Share of CPA Retention Amount*" means, as of any date of determination, 42.9% of the CPA Retention Amount on such date.

"*RPL Collateral Accounts*" means the RPL General Account and the RPL CPA Retention Account.

"*RPL CPA Retention Account*" means that certain deposit account (or, at the option of the Affiliate Borrower, a securities account) that is created and maintained at the Account Bank as the "RPL CPA Retention Account" pursuant to the Disbursing Agent Agreement.

"*RPL General Account*" means that certain deposit account (or, at the option of the Affiliate Borrower, a securities account) that is created and maintained at the Account Bank as the "RPL General Account" pursuant to the Disbursing Agent Agreement.

"*RPL Share of CPA Retention Amount*" means, as of any date of determination, 57.1% of the CPA Retention Amount on such date.

"*Rye Insurance*" means Rye Select Broad Market Insurance Fund, L.P., a Delaware limited partnership.

"*Secured Obligations*" has the meaning specified in *Section 2.2.*

"*Sell*" means, with respect to any property, to sell, convey, transfer, assign, license, lease or otherwise dispose of, any interest therein or to permit any Person to acquire any such interest, including, in each case, through a sale and leaseback transaction or through a sale, factoring at maturity, collection of or other disposal, with or without recourse, of any notes or accounts receivable. Conjugated forms thereof and the noun "*Sale*" have correlative meanings.

"*Settlement Agent Agreement*" means the Settlement Agent Agreement dated as of October 29, 2012 among Rye Broad Market, Rye Portfolio, Rye Insurance and Settlement Agent LLC.

"*SIPA*" means title 15 of the United States Code, 15 U.S.C. §§ 78aaa *et seq.*

"*SIPA Liquidation*" means that certain proceeding for the liquidation of Bernard L. Madoff Investment Securities LLC and the substantially consolidated estate of Bernard L. Madoff pending under SIPA and currently pending in the Bankruptcy Court as if it were a case under chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code, under *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, Adv. Pro. No. 08-01789 (BRL).

"*Trustee Action*" means that certain adversary proceeding filed by the Trustee in the SIPA Liquidation against the Borrower and certain of its Affiliates and currently pending as *Picard v. Tremont Group Holdings, Inc. et al.*, Adv. Proc. No. 10-05310 (BRL).

"*UCC*" means the Uniform Commercial Code as from time to time in effect in the State of New York; *provided, however,* that, in the event that, by reason of mandatory provisions of any applicable Requirement of Law, any of the attachment, perfection or priority of the Lender's security interest in any Collateral is governed by the Uniform Commercial Code of a jurisdiction other than the State of New York, "*UCC*" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of the definitions related to or otherwise used in such provisions.

Section 1.2    Certain Other Terms.    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. The terms "*herein*", "*hereof*" and similar terms refer to this Agreement as a whole and not to any particular Article, Section or clause in this Agreement. References herein to an Annex, Schedule, Article, Section or clause refer to the appropriate Annex or Schedule to, or Article, Section or clause in this Agreement. Where the context requires, provisions relating to any Collateral when used in relation to the Borrower shall refer to the Borrower's Collateral or any relevant part thereof.

## ARTICLE II

## GRANT OF SECURITY INTEREST; CASH COLLATERAL ACCOUNT

Section 2.1    Collateral.    For the purposes of this Agreement, all of the following property now owned or at any time hereafter acquired by the Borrower or in which the Borrower now has or at any time in the future may acquire any right, title or interest is collectively referred to as the "*Collateral*":

- 6 -

(a)    all Claims and all accounts, chattel paper, deposit accounts, general intangibles, instruments, investment property (and any related supporting obligations) evidencing, creating, giving rise to or pertaining to such Claims; and all Commercial Tort Claims that are "Pledged Causes of Action" included in the definition of "Claims" described on Schedule 6.13(d) hereto and on any supplement thereto received by the Lender pursuant to Section 6.13(d); and

(b)    all Claim Documents and all rights to receive any cash, interest, fees, expenses, damages, penalties and/or other amounts in respect of or in connection with the Claims or the Claim Documents, including, without limitation, any securities and/or other distributions made by any Debtor in respect of the Claims, whether under or pursuant to any plan of reorganization or liquidation in the SIPA Liquidation or otherwise; and

(c)    all rights of the Borrower under the Settlement Agent Agreement and the Disbursing Agent Agreement, and all rights to or in respect of the Cash Collateral Account and RBM Collateral Accounts maintained thereunder; and

(d)    to the extent not otherwise included, all proceeds of the foregoing;

*provided, however*, that "*Collateral*" shall not include any Privileged Information, any voting rights or any right to, or right to control or make determinations with respect to, the Trustee Action or any Excluded Causes of Action.

Section 2.2    Grant of Security Interest in Collateral.  The Borrower, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations of the Borrower (the "*Secured Obligations*"), hereby grants, assigns, transfers, mortgages, pledges and hypothecates to the Lender for the benefit of the Secured Parties, and grants to the Lender for the benefit of the Secured Parties, a Lien on and security interest in, all of its right, title and interest in, to and under the Collateral of the Borrower.

Section 2.3    Cash Collateral Account and Borrower Collateral Accounts.

(a)    The Borrower agrees not later than the Base Term Loan Borrowing Date to cause Settlement Agent LLC to: (i) establish the Cash Collateral Account with the Account Bank, (ii) enter into the Disbursing Agent Agreement providing for at least 62.9375% of payments remitted under the Settlement Agreement to be allocated (without further direction or action by Settlement Agent LLC, the Borrower or any other Person) and remitted to the RBM General Account, and (iii) enter into the Deposit Account Control Agreement with respect to the Cash Collateral Account.

(b)    The Borrower agrees not later than the Base Term Loan Borrowing Date to cause Settlement Agent LLC to: (i) establish the RBM General Account and the RBM CPA Retention Account, (ii) enter into the Deposit Account Control Agreement with respect to the RBM General Account, and (iii) enter into the Deposit Account Control Agreement with respect to the RBM CPA Retention Account. Upon the payment in full in cash of all Loans and accrued interest and fees (including any Prepayment Premium) as required under *Section 2.3(b) (Mandatory Prepayments)* of the Loan Agreement and the deposit of the CPA Retention Amount in the CPA Retention Accounts, and so long as no Event of Default has occurred and is continuing, the Lender shall provide written instructions to the Disbursing Agent under the Disbursing Agreement designating Settlement Agent LLC (on behalf of the Borrower) as authorized to provide instructions to make withdrawals from the RBM General Account (unless and until the Lender delivers an access termination notice under the Deposit Account Control Agreement with respect to such RBM General Account); *provided*, that such withdrawals shall only be made in

accordance with the terms of the Loan Documents.  At all times until the CPA Retention Amount is reduced to zero, the Lender shall have exclusive control of the RBM CPA Retention Account.

(c)    Lender agrees that it will only send an access termination notice with respect to the Cash Collateral Account or the RBM General Account (to the extent that, at any time, Settlement Agent is permitted under the terms of the Disbursing Agent Agreement and the Deposit Account Control Agreement to give written instructions or have access to the RBM General Account as set forth in clause (b) above), upon the occurrence and during the continuance of an Event of Default.  The Lender agrees that during any period in which it has exclusive control of the RBM Collateral Accounts, it will timely cause the application (or, where applicable, the transfer) of available funds in accordance with the provisions of Section 4.4(a) hereof.  The Lender (on behalf of the Secured Parties) agrees that during any period in which it has exclusive control of the Cash Collateral Account following the giving of an access termination notice, upon written request of the Borrower (accompanied by such information and supporting detail as the Lender may reasonably require), it will direct or cause the payment of amounts deposited into the Cash Collateral Account (to the extent that such amounts are in the possession or control of the Lender or Dolos) and required to be paid by Settlement Agent LLC to Rye Insurance pursuant to Section 2.01(a) of the Disbursing Agent Agreement and Section 3.2 of the Settlement Agent Agreement be remitted to the Settlement Agent (in a manner in which they can be promptly remitted to Rye Insurance) or to the RSBMIF Account.

Section 2.4    Investment of Funds.  Settlement Agent LLC, on behalf of the Borrower, shall be permitted to direct the Account Bank to invest and reinvest any and all funds held overnight (or longer) on deposit in the Cash Collateral Account or the RBM Collateral Accounts in (and only in) Permitted Investments in accordance with Section 1.03 of the Disbursing Agent Agreement.  All such Permitted Investments and any interest and income received thereon and the net proceeds realized on the sale or redemption thereof shall be credited to the Cash Collateral Account or the applicable Borrower Collateral Account as specified in the Disbursing Agent Agreement.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

To induce the Lender and the other Secured Parties to enter into the Loan Documents, the Borrower hereby represents and warrants each of the following to the Lender and the other Secured Parties:

Section 3.1    Title; No Other Liens.  Except for the Lien granted to the Lender for the benefit of the Secured Parties pursuant to this Agreement, the Trustee Action, the Settlement Agreement and other Liens permitted to exist on any Collateral under the Loan Agreement, the Borrower owns each item of the Collateral free and clear of any and all Liens or claims of others.  The Borrower (a) is the record and beneficial owner of the Collateral pledged by it hereunder constituting instruments or certificates and (b) has rights in or the power to transfer each other item of Collateral in which a Lien is granted by it hereunder, free and clear of any other Lien (but subject to the Trustee Action and the Settlement Agreement).

Section 3.2    Perfection and Priority.  The security interest granted pursuant to this Agreement constitutes a valid and continuing perfected security interest in favor of the Lender for the benefit of the Secured Parties in all Collateral subject, for the following Collateral, to the occurrence of the following: (i) in the case of all Collateral in which a security interest may be perfected by filing evidence of the transfer of claims for security under Rule 3001(e)(4) of the Bankruptcy Rules, the completion of the filing of the Notice of Transfer of Claim for Security with the Bankruptcy Court (which has been duly executed

- 8 -

and delivered to the Lender), (ii) in the case of all Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the completion of the filings and other actions specified on *Schedule 1* (which, in the case of all filings and other documents referred to on such schedule, have been delivered to the Lender in completed and duly authorized form), (iii) and the entry into the Deposit Account Control Agreement as contemplated by Section 2.3 hereof. Such security interest shall be prior to all other Liens on the Collateral except for Liens permitted to exist on the Collateral under the Loan Agreement and subject to the Trustee Action and the Settlement Agreement. Except as set forth in this *Section 3.2*, all actions by the Borrower necessary or desirable to protect and perfect the Lien granted hereunder on the Collateral have been duly taken.

Section 3.3    Jurisdiction of Organization; Chief Executive Office.    The Borrower's jurisdiction of organization, legal name and organizational identification number, if any, and the location of the Borrower's chief executive office or sole place of business, in each case as of the date hereof, is specified on *Schedule 2* and such *Schedule 2* also lists all jurisdictions of organization, legal names and locations of the Borrower's chief executive office or sole place of business for the five years preceding the date hereof.

Section 3.4    Locations of Books and Records.    On the date hereof, the Borrower's books and records concerning the Collateral are kept at the locations listed on *Schedule 2* and such *Schedule 2* also lists the locations of such books and records for the five years preceding the date hereof.

Section 3.5    Claims.    In each case, subject to the Trustee Action and the Settlement Agreement:

(a) The Proof of Claim has been duly and timely filed in the SIPA Liquidation in the Proof of Claim Amount. The Proof of Claim has not been revoked, withdrawn, amended or modified, and no right thereunder has been waived or modified in any respect, and all statements in such Proof of Claim are true and correct as of the date hereof. The Proof of Claim was filed prior to any bar date which may have been established by the Bankruptcy Court for filing such proofs of claim in the SIPA Liquidation.

(b) Except as set forth on *Schedule 3*, as of the Closing Date, (i) no objections have been made to the Proof of Claim Amount or any other part of the Claims, (ii) none of the Claims is subject to any counterclaim, defense or claim (including any preference or fraudulent conveyance claim) or right of set-off, reduction, recoupment, disgorgement, impairment, avoidance, disallowance or subordination by the Debtors or any other entity (including without limitation by any state or federal governmental agency or commission), nor are any distributions to be made in respect of the Claims subject to any of the foregoing (the occurrence of any of the foregoing, an "*Impairment*") and (iii) no payment has been received by or on behalf of the Borrower in full or partial satisfaction of the Claims.

(c) The Borrower has delivered to the Lender true, correct and complete copies of the Proof of Claim.

(d) The Borrower is not an insider within the meaning of section 101(31) of the Bankruptcy Code, and is not a member of any creditors' committee appointed in the SIPA Liquidation.

(e) Upon the Bankruptcy Court order approving the Settlement Agreement becoming a final order in accordance with the terms of the Settlement Agreement, the allowed Claims of the Borrower in the SIPA Liquidation together with the allowed Affiliate Borrower Claims in the SIPA Liquidation are not less than the Claim Amount.

- 9 -

Section 3.6    Specific Collateral.  None of the Collateral is or is proceeds or products of farm products, as-extracted collateral, health-care-insurance receivables or timber to be cut.

Section 3.7    Enforcement.  Except for the filing of the Notice of Transfer of Claim for Security and UCC filings, no Permit, notice to or filing with any Governmental Authority or any other Person or any consent from any Person is required for the exercise by the Lender or any other Secured Party of its rights (including voting rights) provided for in this Agreement or the enforcement of remedies in respect of the Collateral pursuant to this Agreement, including the transfer of any Collateral, except as may be required in connection with the disposition of any portion of the Collateral by laws affecting the offering and sale of securities generally or any approvals that may be required to be obtained from any bailees or landlords to collect the Collateral.

Section 3.8    Representations and Warranties of the Loan Agreement.  The representations and warranties made by the Borrower in *Section 4 (Representations and Warranties)* of the Loan Agreement are true and correct on each date as required by *Section 3.2* of the Loan Agreement.

ARTICLE IV

COVENANTS

The Borrower agrees with the Lender and other Secured Parties to the following, as long as any Loan or Participation Obligation remains outstanding, subject in each case to the Borrower's right to defend and take such actions with respect to the Trustee Action (including settlement thereof) as contemplated in this Agreement, and the approval of the Settlement Agreement with the consent of Lender as contemplated in the Loan Agreement:

Section 4.1    Maintenance of Perfected Security Interest; Further Documentation and Consents.  (a)  The Borrower shall (i) not use or permit the Collateral to be used unlawfully or in violation of any provision of any Loan Document or any Requirement of Law or any policy of insurance covering the Collateral and (ii) not enter into any Contractual Obligation or undertaking materially restricting the right or ability of the Borrower or the Lender or any other Secured Party to Sell the Collateral.

(b)    The Borrower shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in *Section 3.2* and shall defend such security interest and such priority against the claims and demands of all Persons.

(c)    The Borrower shall furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other documents in connection with the Collateral as the Lender may reasonably request, all in reasonable detail and in form and substance reasonably satisfactory to the Lender; *provided* that the Borrower shall not be required to provide Privileged Information.

(d)    At any time and from time to time, upon the written request of the Lender, the Borrower shall, for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, (i) promptly and duly execute and deliver, and have recorded, such further documents, including an authorization to file (or, as applicable, the filing of) any financing statement or amendment under the UCC (or other filings under similar Requirements of Law) in effect in any jurisdiction and any document necessary or desirable to be filed with the Bankruptcy Court with respect to the security interest created hereby and (ii) take such further action as the Lender may reasonably request to maintain the Lien created hereunder as a first priority perfected Lien.

- 10 -

Section 4.2    Changes in Locations, Name, Etc.  Except upon 30 days' prior written notice to the Lender and delivery to the Lender of all documents reasonably requested by the Lender to maintain the validity, perfection and priority of the security interests provided for herein, the Borrower shall not do any of the following:

(i)    change its jurisdiction of organization or its location, in each case from that referred to in *Section 3.3*; or

(ii)    change its legal name or organizational identification number, if any, or corporation, limited liability company, partnership or other organizational structure to such an extent that any financing statement filed in connection with this Agreement would become misleading.

Section 4.3    Notices.  The Borrower shall promptly notify the Lender in writing of its acquisition of any interest hereafter in property that is of a type where a security interest or lien must be or may be registered, recorded or filed under, or notice thereof given under, any federal statute or regulation or the Bankruptcy Code with respect to the perfection or priority of the security interest in the Collateral.

Section 4.4    Claims. (a) Distributions with respect to Claims.  The Borrower shall appoint Settlement Agent LLC as its agent for collection of all payments and distributions with respect to the Claims and shall irrevocably direct the Trustee to make all such payments and distributions into the Cash Collateral Account. Promptly upon obtaining knowledge that the Trustee will be making a distribution (or additional distributions) the Lender, the Borrower, the Affiliate Borrower and Settlement Agent LLC shall cooperate and share information as necessary to permit the preparation of a preliminary report setting forth (with respect to such distribution) the total amount expected to be deposited into the Cash Collateral Account and the date of such expected deposit, the total amount expected to be allocated by Settlement Agent LLC to the Borrower and the Affiliate Borrower and the RBM General Account and RPL General Account pursuant to Section 2.01(a) of the Disbursing Agent Agreement and Section 3.2 of the Settlement Agent Agreement, amounts (including Loans and accrued interest and fees (including any Prepayment Premium)) required to be paid by the Borrowers in respect of such distribution under *Section 2.3(b) (Mandatory Prepayments)* of the respective Loan Agreements, the CPA Retention Amount and the RBM Share of CPA Retention Amount and the RPL Share of CPA Retention Amount to be held on deposit in or transferred to the CPA Retention Accounts, amounts payable by the Borrower and the Affiliate Borrower under the Claim Participation Agreement, and the amount of any Excess Balance. On the Business Day that available funds in respect of any distribution are deposited in the Cash Collateral Account, and after giving effect to the transfers required by Section 2.1(a) of the Disbursing Agent Agreement to the RBM General Account and the RPL General Account, the following transfers shall be made from the RBM Collateral Accounts in the following order to the extent of funds available in the specified accounts (in each case, calculated after giving effect to the transfers and payments specified in Section 4.4(a) of the Affiliate Security Agreement):

(i)    From the RBM General Account, to the Lender, all amounts necessary to make mandatory prepayments of the Borrower Loans (including principal, accrued interest and fees and any Prepayment Premium) required to be paid by the Borrower pursuant to Section 2.3(b) (Mandatory Prepayments) of the Borrower Loan Agreement;

(ii)    From the RBM General Account, to the Lender, any amounts due in respect of Guaranteed Obligations;

(iii)    From the RBM General Account, to the RBM CPA Retention Account the amount necessary to cause the balance of such account to equal the RBM Share of the CPA Retention Amount;

(iv)    From the RBM CPA Retention Account, after giving effect to clause (iii) immediately above, to Dolos in an amount equal to any amounts then due to Dolos from the Borrower under Section 2(a) of the Claim Participation Agreement until the balance in the RBM CPA Retention Account has been reduced to zero;

(v)    From the RBM General Account, any amounts then due to Dolos from the Borrower under Section 2(a) of the Claim Participation Agreement that are or remain due after giving effect to clause (iv) immediately above; and

(vi)    If either (A) after giving effect to clauses (i) through (iii) above no amounts are then due to Dolos under clauses (iv) and (v), the Retention Funding Condition is satisfied and an Excess Balance exists, or (B) after giving effect to clauses (i) through (iii) above amounts are then due to Dolos under clauses (iv) and/or (v) and have been paid, the Retention Funding Condition is satisfied and an Excess Balance coincides therewith, the Allocable Excess Balance shall be made available to the Borrower from the RBM General Account. For these purposes, (i) the "Retention Funding Condition" will be satisfied if the balance in the RBM CPA Retention Account equals or exceeds the RBM Share of CPA Retention Amount and the balance in the RPL CPA Retention Account equals or exceeds the RPL Share of CPA Retention Amount, and (ii) the "Allocable Excess Balance" will equal the excess of the balance in the RBM Collateral Accounts over the sum of (A) the RBM Share of CPA Retention Amount, and (B) 63.7920% of the Immediate Obligations.

During any period in which the Lender has exclusive control of any of the above accounts from which a payment is to be made, if available funds in the affected account are received prior to 3:00 p.m. New York City time, then the Lender shall cause the above payments and transfers to be made on the same Business Day as such funds are received, or if received after such time, on the next Business Day. During any period in which Settlement Agent LLC (on behalf of the Borrower) is permitted to direct the disposition of amounts in the RBM General Account, the Borrower shall cause such payments to be made in accordance with the Loan Documents.

(b)    Voting Rights. Both before and during the continuance of any Event of Default, the Borrower shall be entitled to exercise all voting, consent and similar rights with respect to the Claims; *provided, however*, that no vote shall be cast, consent given or right exercised or other action taken by the Borrower (except for the defense of the Trustee Action) that would impair the Collateral or be inconsistent with or result in any violation of any provision of any Loan Document. In exercising such rights, the Borrower shall not engage in any act or conduct, or make any omission, that will result in the Impairment of the Claims or any distributions and/or payments made in respect thereof or that will be materially prejudicial to the Lender or the other Secured Parties.

(c)    Defense of Claims. In the event a third party (including, without limitation, the Debtors or the Trustee) commences any proceeding (including, without limitation, a proceeding initiated by the filing of a complaint, motion, objection, demand letter, pleading, or other proceeding, the result of which will, if successful, result in a disallowance of the Claims or an objection to or modification of the Settlement Agreement (a "*Disallowance Proceeding*")), the Borrower shall provide prompt written notice to Lender of the commencement of such a Disallowance Proceeding and shall thereafter provide Lender with copies of pleadings and correspondence sent to or received from third parties; *provided*, notwithstanding the foregoing, the Borrower shall not be required to provide any Privileged Information

- 12 -

or any information that, in the Borrower's sole discretion (exercised in good faith), poses any risk of waiving any attorney-client, work-product or other privilege of confidentiality which may exist in connection with the Trustee Action or any Disallowance Proceeding or any other litigation to which the Borrower is a party. Lender agrees and acknowledges that the Borrower has not in any way assigned, and retains for itself, sole control over the defense of the Trustee Action and the Disallowance Proceeding (whether such control is exercised before or after the occurrence of an Event of Default), subject only to the Borrower's obligation to consult with the Lender as to the settlement of the Trustee Action and to the Lender's consent right with respect to amendments or modifications to the Settlement Agreement after the date hereof pursuant to *Section 6.11* of the Loan Agreement; *provided, further,* that neither the Borrower's defense of such Disallowance Proceeding or Trustee Action, nor any settlement or judicial resolution thereof, shall in any way limit the Borrower's obligations to the Lender and other Secured Parties under this Agreement or the Loan Documents. Subject to the Borrower's right to defend the Trustee Action set forth above, the Borrower shall not engage in any act or conduct, or make any omission, that will result in the Impairment of the Claims or any distributions and/or payments made in respect thereof. Subject to the Borrower's right to defend the Trustee Action set forth above, the Borrower shall not make any settlement or adjustment in any Disallowance Proceeding without the Lender's prior written consent, which consent shall in all cases be promptly provided, unless such settlement, adjustment or other resolution would (A) require the Lender or any other Secured Party to undertake the performance of any obligations not otherwise required under the terms of this Agreement; (B) result in the Lender or any other Secured Party incurring liability for which it is not indemnified under any Loan Document; (C) result in the Lender or any other Secured Party receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for the Claims than is received by other creditors holding claims of the same class or type as the Claim; or (D) be materially prejudicial to the Lender or any other Secured Party.

(d)    <u>Performance in Respect of Collateral</u>. The Borrower shall at all times remain fully liable for the performance of all of its obligations in respect of the Collateral to the same extent as if the assignment or grant of security interests contained herein had not been executed, all in accordance with and pursuant to the terms and provisions thereof, and the Lender or any other Secured Party shall not have any obligation or liability by reason of or arising out of the assignment or the Borrower's grant of security interests hereunder, and the Lender or any other Secured Party shall not be required or obligated in any manner to perform or fulfill any obligations of the Borrower in respect of the Collateral or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it, or present or file any claim, or take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time. The Borrower and the Lender acknowledge and agree that the Lender or any other Secured Party is not assuming hereunder or otherwise, and the Lender or any other Secured Party shall not be responsible for, any liabilities or obligations of the Borrower to the Debtors or to any other person.

(e)    <u>Case Status</u>. The Borrower shall inform the Lender of the status of discussions with respect to the plan of liquidation or any other material developments in the SIPA Liquidation affecting the Borrower, including, without limitation, any developments with respect to the Net Equity Method Order, and the commencement of any litigation, appeal, action or other proceeding against the Borrower seeking to disallow, reduce, subordinate or otherwise challenge any portion of the Claims and, in each case, shall provide to the Lender prompt notice and, at the Lender's request, copies of all material pleadings, motions, applications, judicial or financial information and other documents filed in connection therewith; *provided,* notwithstanding the foregoing, the Borrower shall not be required to provide any Privileged Information that, in the Borrower's sole discretion (exercised in good faith), poses any risk of waiving any attorney-client, work-product or other privilege of confidentiality which may exist in connection with the Trustee Action or any Disallowance Proceeding.

- 13 -

(f)    Notice of Transfer of Claim for Security.  Contemporaneously with the occurrence of the Closing Date and the delivery to the Lender of its signature to the Existing Security Agreement, the Borrower executed and delivered to the Lender in the form attached hereto as *Annex 1* a Notice of Transfer of Claim for Security.

Section 4.5    Compliance with Loan Agreement.  The Borrower agrees to comply with all covenants and other provisions applicable to it under the Loan Agreement, including *Section 8.6 (Payment of Expenses and Indemnities)* of the Loan Agreement and agrees to the same submission to jurisdiction as that agreed to by the Borrower in the Loan Agreement.

Section 4.6    Authorization to File Financing Statements.  The Borrower authorizes the Lender and its Affiliates, counsel and other representatives, at any time and from time to time, to file or record financing statements, amendments to financing statements, and other filing or recording documents or instruments with respect to the Collateral in such form and in such offices as the Lender reasonably determines appropriate to perfect the security interests of the Lender under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby as "all assets of the debtor", "all personal property of the debtor' or words of similar effect.  The Borrower hereby also authorizes the Lender and its Affiliates, counsel and other representatives, at any time and from time to time, to file continuation statements with respect to previously filed financing statements.    A photographic or other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction.

ARTICLE V

REMEDIAL PROVISIONS

Section 5.1    Code and Other Remedies.  (a) UCC Remedies.  During the continuance of an Event of Default, the Lender may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any Secured Obligations, all rights and remedies of a secured party under the UCC or any other applicable law; provided that, except for collection of proceeds thereof, the sole remedies with respect to Pledged Causes of Action shall be as set forth in Sections 5.1(f) and 5.2 below.  Neither (i) the Borrower's right to defend the Trustee Action nor (ii) the Borrower's right to defend any other law suit, action, claim, arbitration, mediation or other proceeding against the Borrower, is Collateral and no exercise of the remedies described in the preceding sentence shall purport to sell, assign, transfer or impair such right.  Nothing in this Section 5.1 shall limit the Borrower's rights (i) to defend the Trustee Action as set forth in Section 4.4(c), or (ii) provided for in Section 6.13 hereof.  For the avoidance of doubt, the second sentence of Section 5.2(c) shall not limit Borrower's rights under Section 6.13(e).

(b)    Disposition of Collateral.  Without limiting the generality of the foregoing, during the continuance of an Event of Default, the Lender may sell, grant an option or options to purchase and deliver its rights with respect to the Collateral (or enter into Contractual Obligations to do any of the foregoing), provided it shall disclose to any purchaser that the Borrower's right to defend the Trustee Action is not Collateral and the purchaser shall not have any right to sell, assign, transfer or impair such right.

(c)    Application of Proceeds.  The Lender shall apply the cash proceeds of any action taken by it pursuant to this *Section 5.1*, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any Collateral or in any way relating to the Collateral or the rights of the Lender or any other Secured Party hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Secured

- 14 -

Obligations then due, as set forth in the Loan Documents (including Section 4.4(a) hereof), and only after such application and after the payment by the Lender of any other amount required by any Requirement of Law, need the Lender account for the surplus, if any, to the Borrower.

(d)    Direct Obligation.    Neither the Lender nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, the Borrower or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor. All of the rights and remedies of the Lender and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and are not exclusive of any other rights or remedies provided by any Requirement of Law; except that its rights to enforce with respect to the Collateral shall be solely as set forth herein. To the extent it may lawfully do so, the Borrower absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Lender or any other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by the Lender or any other Secured Party of any rights hereunder. If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(e)    Commercially Reasonable.    To the extent that applicable Requirements of Law impose duties on the Lender to exercise remedies in a commercially reasonable manner, the Borrower acknowledges and agrees that it is not commercially unreasonable for the Lender to do any of the following:

(i)    fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Lender to prepare any Collateral for disposition;

(ii)    fail to obtain Permits, or other consents, for access to any Collateral to Sell or for the collection or Sale of any Collateral, or, if not required by other Requirements of Law, fail to obtain Permits or other consents for the collection or disposition of any Collateral;

(iii)    fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)    advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as the Borrower, for expressions of interest in acquiring any such Collateral;

(v)    dispose of assets in wholesale rather than retail markets; or

(vi)    disclaim disposition warranties, such as title, possession or quiet enjoyment.

The Borrower acknowledges that the purpose of this *Section 5.1* is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Lender or any other Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this *Section 5.1*.

(f)    Notwithstanding anything in this Security Agreement and the Loan Documents to the contrary, but subject to Section 6.13 hereof, the sole remedies of Lender (whether for itself or with

- 15 -

respect to any Secured Party) with respect to any Collateral that is a Pledged Cause of Action during the continuance of an Event of Default shall be as set forth in this Section 5.1(f) and in Section 5.2 below:

    (i)    Lender shall have the right under the UCC and applicable law to cause the Borrower to pay over any and all cash proceeds of such Pledged Cause of Action received by the Borrower;

    (ii)    at such time as such Pledged Cause of Action has been reduced to a money judgment and is not subject to any stay (whether by operation of law or court order) to the extent that the Borrower is not taking commercially reasonable action to collect on such money judgment the Lender may collect the proceeds of such Pledged Cause of Action pursuant to Section 9-607 of the UCC;

    (iii)    during the continuance of a PCOA Default, with respect to any Pledged Cause of Action that is not a Defensive Action, Lender may exercise the rights and remedies of a secured party under part 6 of Article 9 of the UCC, or to the extent that Article 9 of the UCC does not apply to any Pledged Cause of Action, any other applicable law; provided, that notwithstanding the foregoing (a) Lender and each Secured Party by accepting the benefits hereof, covenants and agrees neither Lender nor any Secured Party shall assign or purport to assign its rights (whether before or after an Event of Default) to a person other than Fortress Credit Corp. or DOLOS III-E LLC or an Affiliate of either thereof; and (b) so long as Borrower is represented by Approved Counsel with respect to such Pledged Cause of Action and is prosecuting such Pledged Cause of Action with commercially reasonable diligence in light of the expected recovery, neither Lender nor any Secured Party shall have any right to control or direct the conduct of the litigation or prosecution of such Pledged Cause of Action; and

    (iv)    during the continuance of a PCOA Default, with respect to any Defensive Action, Lender may exercise the rights and remedies of a secured party under part 6 of Article 9 of the UCC or to the extent that Article 9 of the UCC does not apply to any Pledged Cause of Action, any other applicable law; provided, that notwithstanding the foregoing (a) Lender and each Secured Party by accepting the benefits hereof, covenants and agrees neither Lender nor any Secured Party shall assign or purport to assign its rights (whether before or after an Event of Default) to a person other than Fortress Credit Corp. or DOLOS III-E LLC or an Affiliate of either thereof; and (b) so long as Borrower is represented by Approved Counsel with respect to such Pledged Cause of Action, neither Lender nor any Secured Party shall have any right to control or direct the conduct of the litigation or prosecution of such Pledged Cause of Action.

In the event that the Borrower is not represented by Approved Counsel in any Pledged Cause of Action, in addition to any other rights and remedies provided in this Section 5.13(f), the Lender and the other Secured Parties shall have the right to appoint an independent litigation manager acceptable to the Lender and the other Secured Parties to assume control and direction of the litigation or prosecution of such Pledged Cause of Action, including, without limitation, retaining, instructing or removing any legal counsel with respect to such Pledged Cause of Action.

    Section 5.2    Payments in Respect of Collateral. (a) In addition to, and not in substitution for, any similar requirement in the Loan Agreement, if required by the Lender at any time during the continuance of an Event of Default, any payment in respect of the Collateral, when collected by the Borrower, shall be promptly (and, in any event, within two Business Days) deposited by the Borrower into the Cash Collateral Account, subject to withdrawal by the Lender as provided in *Section 5.1(c)*. Until so turned over, such payment shall be held by the Borrower in trust for the Lender for the benefit of the Secured Parties, segregated from other funds of the Borrower. Each such deposit of proceeds of

- 16 -

Collateral shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit. Notwithstanding the foregoing, the Borrower shall not be required to so deposit or segregate any such payments (or portion thereof) which, if deposited into the Cash Collateral Account, would create or increase an Excess Balance.

(b)    At any time during the continuance of an Event of Default the Borrower shall, upon the Lender's request, deliver to the Lender photocopies of all Claim Documents.

(c)    Anything herein to the contrary notwithstanding, the Borrower shall remain solely responsible to observe and perform all the conditions and obligations to be observed and performed by it under the Loan Documents and the Settlement Agreement, all in accordance with the terms of any agreement giving rise thereto. No Secured Party shall have any obligation or liability under any agreement giving rise to the Collateral by reason of or arising out of any Loan Document or the receipt by such Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any obligation of the Borrower under or pursuant to any agreement giving rise to any portion of the Collateral, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

ARTICLE VI

MISCELLANEOUS

Section 6.1    Reinstatement. The Borrower agrees that, if any payment made by the Borrower or other Person and applied to the Secured Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by the Lender or any other Secured Party to the Borrower, its estate, trustee, receiver or any other party, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, any Lien or other Collateral securing the Borrower's liability hereunder shall have been released or terminated by virtue of the foregoing, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of the Borrower in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

Section 6.2    Release of Collateral. (a) Upon (A) payment and satisfaction in full of all Loans and other Secured Obligations (other than any contingent obligation for indemnity or increased costs), (B) receipt by the Lender of reasonable assurance as to payment of contingent obligations for indemnities or increased costs reasonably expected to mature after such time, which assurance may be in the form of pledge of collateral for such purpose or by the provision of a third party guaranty or indemnity or any other means reasonably acceptable to the Lender and (C) to the extent required by the Lender, receipt of liability release from the Borrower in form and substance reasonably acceptable to the Lender, the Collateral shall be released from the Lien created hereby and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Lender and the Borrower hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Borrower. The Borrower is hereby authorized to file UCC amendments and appropriate court documents at such time evidencing the termination of the Liens so released. At the request of the Borrower following any such termination, the Lender shall deliver to the Borrower any

- 17 -

Collateral of the Borrower held by the Lender hereunder (including, without limitation, all Available CCA Funds subject to its direction) and execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such termination, including evidence of the transfer of claims pursuant to Rule 3001 of Bankruptcy Rules with the Bankruptcy Court .

Section 6.3    Amendments in Writing.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with *Section 8.1 (Amendments and Waivers)* of the Loan Agreement.  When providing any waiver, or consenting to any amendment, supplement or modification, the Lender shall be conclusively presumed to be acting both for itself as Lender and for Dolos with respect to the Claim Participation Agreement.

Section 6.4    Notices.  All notices, requests and demands to or upon the Lender or the Borrower hereunder shall be effected in the manner provided for in *Section 8.3 (Notices)* of the Loan Agreement.

Section 6.5    Successors and Assigns.  This Agreement shall be binding upon the successors and assigns of the Borrower and shall inure to the benefit of the Lender and its successors and assigns; *provided, however*, that the Borrower may not assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Lender.

Section 6.6    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or by Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

Section 6.7    Severability.  Any provision of this Agreement being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of this Agreement or any part of such provision in any other jurisdiction.

Section 6.8    GOVERNING LAW.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

Section 6.9    WAIVERS OF JURY TRIAL.    TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWER AND THE LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

Section 6.10    WAIVER OF NOTICE REQUIREMENT.    THE BORROWER HEREBY WAIVES ANY NOTICE REQUIREMENT IMPOSED BY RULE 3001(E) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.

Section 6.11    Limited Recourse.  The Obligations of the Borrower under this Agreement are payable solely from the Collateral (except to the extent set forth in *Section 8.17* of the Loan Agreement) and recourse with respect thereto shall be limited in accordance with *Section 8.17* of the Loan Agreement.

- 18 -

Section 6.12    Collateral Matters Relating to Holders of Secured Obligations.  The benefit of this Agreement and the other Loan Documents and of the provisions relating to the Collateral shall extend to and be available in respect of any Secured Obligations arising under the Loan Documents or otherwise and each person who holds a Secured Obligation, by accepting the benefits of this Agreement and the other Loan Documents, becomes bound by the terms of this Agreement and the other Loan Documents the same as if they were a party hereto and thereto.

Section 6.13    Pledged Causes of Action.

(a)    Notwithstanding anything in this Agreement or in any other Loan Document to the contrary, with respect to the grant of a security interest in Pledged Causes of Action, the Borrower (i) shall not have any duty or obligation to bring or assert against any Person any Pledged Cause of Action or to participate in any class or other action filed on behalf of customers or victims of the Debtors or their bankruptcy estates, it being understood that the failure to pursue or assert a Pledged Cause of Action shall not constitute an Impairment of any Claim or a breach of any obligation or covenant to maintain or preserve the Collateral or any property of the Borrower; (ii) unless an Event of Default has occurred and is continuing, shall have the right, after bringing, filing or asserting a Pledged Cause of Action, to abandon, dismiss, terminate or otherwise decline to pursue such Pledged Cause of Action if the Borrower, in its sole discretion, shall determine that continuing or pursuing such Pledged Cause of Action may expose the Borrower to expense or risk of liability; and (iii) at any time that an Event of Default has occurred and is continuing, the Borrower shall have the right, after bringing, filing or asserting a Pledged Cause of Action, to abandon, dismiss, terminate or otherwise decline to pursue such Pledged Cause of Action if the Borrower shall have determined that continuing or pursuing such Pledged Cause of Action may expose the Borrower to expense or risk of liability and shall have obtained the consent of the Lender, which consent shall not be unreasonably withheld or delayed.

(b)    Notwithstanding anything in this Agreement or in any other Loan Document to the contrary, except as expressly provided in clause (d) below, the Borrower makes no representation or warranty (i) that any Pledged Cause of Action exists or is owned by the Borrower, (ii) whether any counterclaim, offset or defense may exist with respect to any Pledged Cause of Action, (iii) that the Borrower's rights with respect to any Pledged Cause of Action may, under applicable law, be assigned, or (iv) what filings or notices may, under applicable law, be necessary or desirable to perfect the assignment of the Borrower's rights with respect to any Pledged Cause of Action or whether any such filings or notices have been made or provided.

(c)    The Borrower shall promptly notify the Lender if any Pledged Cause of Action is asserted, brought, commenced or filed by, for or on behalf of the Borrower and, thereafter, shall (i) inform the Lender of the status of discussions with respect to any Pledged Cause of Action or any other material developments related thereto, including, without limitation, providing the Lender with copies of such documents or other information as may be requested by Lender, and (ii) at any time when a PCOA Default shall have occurred and be continuing, reasonably consult with Lender and its counsel as to the conduct of such Pledged Cause of Action; provided, notwithstanding the foregoing, the Borrower shall not be required to provide any Privileged Information that, in the Borrower's sole discretion (exercised in good faith), poses any risk of waiving any attorney-client, work-product or other privilege of confidentiality which may exist in connection with such Pledged Cause of Action or other litigation then currently pending or overtly threatened in writing against such Borrower.

(d)    The Borrower represents and warrants to the Lender and the other Secured Parties that all Commercial Tort Claims constituting Pledged Causes of Action that have been asserted, brought, commenced or filed by, for or on behalf of the Borrower are listed on Schedule 6.13(d) (as supplemented by the Borrower from time to time in accordance with this Section 6.13(d)).  The Borrower

- 19 -

agrees that if, after the Amendment No. 1 Effective Date, a Commercial Tort Claim constituting a Pledged Cause of Action is asserted, brought, commenced or filed by, for or on behalf of the Borrower, (i) the Borrower shall promptly (and in any event, within 5 Business Days thereof) deliver to the Lender a notice of the existence and nature of such Commercial Tort Claim and a supplement to Schedule 6.13(d) containing a specific description of such Commercial Tort Claim, (ii) the provisions of Section 2.1 shall apply to such Commercial Tort Claim and (iii) any supplement to Schedule 6.13(d) delivered pursuant to this Section 6.13(d) shall, after the receipt thereof by the Lender, become part of Schedule 6.13(d) for all purposes hereunder other than in respect of representations and warranties made prior to the date of such receipt.

(e)    Each Secured Party hereby covenants and agrees that to the extent that the Secured Party becomes the owner of any Pledged Cause of Action (whether before or after default or following foreclosure or any other exercise of remedies with respect to the Pledged Causes of Action under the Security Agreement) it shall indemnify and hold the Borrower and each Borrower Related Party harmless from any and all damages, judgments, settlement payments, reasonable attorneys' fees and other reasonable costs or expenses incurred in the defense of any claims or causes of action asserted by any Person against the Borrower or any such Borrower Related Party in any proceedings controlled or managed by such Secured Party with respect to any Pledged Cause of Action ("Losses") except to the extent that such Losses result from the gross negligence or willful misconduct of the Borrower or such Borrower Related Party in the defense of any such claim or cause of action, in each case, as determined in a final, non-appealable judgment by a court of competent jurisdiction. Each Loss payable hereunder shall be paid in full by such Secured Party within thirty (30) days after written demand therefor by the Borrower (together with reasonable backup documentation supporting such reimbursement request). Lender may offset any liability for Losses against any amounts then due and owing by Borrower under the Loan Documents. To the extent that the Secured Parties both become owners of or jointly control or manage any Pledged Cause of Action, their obligations under this Section 6.13(e) shall be joint and several. The obligations under this Section 6.13(e) shall survive termination of this Agreement, and shall not be excused by any default under the Loan Documents or foreclosure on the Collateral. In no event shall the obligations of the Lender or any Secured Party under this Section 6.13(e) exceed the aggregate amount of Proceeds of the Collateral received by the Lender or such Secured Party.

(f)    With respect to Proceeds of Pledged Causes of Action, the Borrower shall (i) to the extent practicable in light of the resolution of such Pledged Cause of Action, direct that all payments with respect to such Pledged Cause of Action be made to the Cash Collateral Account, and (ii) in all other circumstances, upon receipt of cash Proceeds with respect to Pledged Causes of Action, (A) immediately notify the Lender of the receipt of such amounts and (B) promptly (and in any event within two Business Days) remit such amounts to the Cash Collateral Account, in each case in the foregoing clauses (i) and (ii), for application as Proceeds of Claims in accordance with the provisions of the Loan Documents.

Section 6.14    Effect of Amendment and Restatement. This Agreement amends and restates the Existing Security Agreement and is not intended to be or operate as a novation or an accord and satisfaction of the Existing Security Agreement or any Loan Document or the Obligations evidenced or provided for thereunder. Without limiting the generality of the foregoing, the Borrower agrees that notwithstanding the execution and delivery of this Agreement, the Liens previously granted to the Lender for the benefit of the Secured Parties pursuant to the Existing Security Agreement shall be and remain in full force and effect and that any rights and remedies of the Lender and the Secured Parties thereunder and obligations of the Borrower thereunder shall be and remain in full force and effect, shall not be affected, impaired or discharged thereby and shall secure all of the Borrower's indebtedness, obligations and liabilities to the Lender and the Secured Parties under the Loan Documents. Nothing herein contained shall in any manner affect or impair the priority of the Liens created and provided for by the Loan Documents as to the indebtedness which would be secured thereby prior to giving effect hereto.

- 20 -

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each of the undersigned has caused this Amended and
Restated Security Agreement to be duly executed and delivered as of the date first above written.

RYE SELECT BROAD MARKET FUND, LP
as borrower

By: Tremont Partners, Inc., its sole general partner

By: _____
Name: Lynn O. Keeshan
Title:    President

FORTRESS CREDIT CORP.
as Lender

By: _____
Name:
Title:

*[Signature Page to Amended and
Restated Security Agreement]*

IN WITNESS WHEREOF, each of the undersigned has caused this Amended and Restated Security Agreement to be duly executed and delivered as of the date first above written.

RYE SELECT BROAD MARKET FUND, LP
as borrower

By: Tremont Partners, Inc., its sole general partner

By: _____
      Name:
      Title:

FORTRESS CREDIT CORP.
as Lender

By: _____
      Name: Constantine M. Dakolias
      Title:  President

*[Signature Page to Amended and Restated Security Agreement]*

**ANNEX 1**
**Form of Notice of Transfer of Claim for Security**

[See attached.]

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION<br><br>　　　　　　　　Plaintiff-Applicant<br><br>　　　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC<br><br>　　　　　　　　Defendant. | Adv. Pro. No. 08-01789 (BRL).<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>Bernard L. Madoff<br><br>　　　　　　　　Debtors. | |

**TRANSFER OF ALLOWED CLAIM FOR SECURITY**

　　　A CLAIM HAS BEEN SUBMITTED IN THIS CASE, DESIGNATED AS CLAIM NO. **006237.** Transferee hereby gives evidence pursuant to certain Claims Trading Procedures approved by Order of the above-captioned Court dated November 10, 2010 [Dkt. No. 3138], of the transfer of the allowed claim[*] referenced in this evidence for security.

FORTRESS CREDIT CORP.
――――――――――――――――――
Name of Transferee

RYE SELECT BROAD MARKET FUND, LP
――――――――――――――――――
Name of Transferor

Additional information concerning such transfer is set forth in Exhibit "A" hereto.

――――――――――――――

[*]　Allowance of the allowed claim is subject to the terms and conditions of that certain Settlement Agreement, dated as of July 25, 2011, among the undersigned transferor, the other parties thereto and Irving H. Picard, the trustee in this case.

**Name and Address where notices to transferee should be sent:**

Constantine M. Dakolias
c/o Fortress Investment Group
1345 Avenue of the Americas
New York, NY 10105
Phone: (212) 798-6100

*with copies to:*

James K. Noble III
c/o Fortress Investment Group
1345 Avenue of the Americas
New York, NY 10105
Phone: (212) 798-6100

Brandon Baer
c/o Fortress Investment Group
1345 Avenue of the Americas
New York, NY 10105
Phone: (212) 479-5349

and

Douglas Urquhart
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
douglas.urquhart@weil.com
Phone: (212) 310 8001
Fax: (212) 310 8007

**Name and Address where notices to transferor should be sent:**

James McCormick
c/o Tremont Group Holdings, Inc.
Corporate Center at Rye
555 Theodore Fremd Avenue
Rye, NY 10580
jmccormick@tremont.com
Phone: (914) 925-1143
Fax: (914) 925-4043

*with copies to:*

Peter C. Manbeck
Chapman and Cutler LLP
330 Madison Avenue
New York, NY 10017
manbeck@chapman.com
Phone: (212) 655-2525
Fax: (212) 655-2526

and

Seth M. Schwartz
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
seth.schwartz@skadden.com
Phone: (212) 735-2710
Fax: (917) 777-2710

**Name and Address where payments should be sent (if different from above):**

Settlement Agent LLC
c/o Tremont Group Holdings, Inc.
Corporate Center at Rye, 555 Theodore Fremd Avenue
Rye, NY 10580
Attention: James McCormick, General Counsel

*with copies of payment advices to:*

Constantine M. Dakolias
c/o Fortress Investment Group
1345 Avenue of the Americas
New York, NY 10105
Phone: (212) 798-6100

2

I declare under penalty of perjury that the information provided herein is true and correct to the best of my knowledge.

By: _____      Date: _____

Transferee/Transferee's Agent

*Penalty for making a false statement:  fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 & 3571.*

[Transfer of Allowed Claim for Security]

## EXHIBIT A

### Assignment for Security

Rye Select Broad Market Fund, LP ("Assignor"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby transfer and assign for security purposes unto Fortress Credit Corp., its successors and assigns ("Assignee"), all rights, title, and interests in and to Assignor's allowed claim in the amount of U.S. $1,647,687,625.00 (plus the Assignee Additional Claim Amount), as stated in the Settlement Agreement, dated as of July 25, 2011 (the "Settlement Agreement"), among Assignee, the other parties thereto and Irving H. Picard, the trustee ("Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC, under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.*, substantively consolidated with the estate of Bernard L. Madoff in Case No. 08-01789, identified by Claim No. 006237 (the "Allowed Claim")[*] in proceedings pending before the United States Bankruptcy Court for the Southern District of New York. The terms of this assignment for security are set forth in that certain Amended and Restated Security Agreement, dated as of October 29, 2012, between the Assignor and the Assignee, a copy of which is attached to this Transfer of Allowed Claim for Security as Exhibit "B" (the "Security Agreement"). "Assignee Additional Claim Amount" shall mean the amount of the Additional Claim Amount (as defined in the Settlement Agreement) allocated to the allowed claim of the Assignor in accordance with the terms of the Settlement Agreement.

This Agreement and the rights and obligations of the parties under this Agreement shall be governed by, and construed and interpreted in accordance with, the law of the State of New York. Each of the parties hereto submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the courts of the State of New York or the courts of the United States of America for the Southern District of New York, in each case, located in the Borough of Manhattan, the City of New York and appellate courts from any thereof and consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same.

Without limiting the terms of the Security Agreement, Assignor hereby certifies by this assignment the following:

1)    Assignee will be recognized as holding a valid and perfected security interest in the Allowed Claim, and subject to the terms and conditions of the Security Agreement, will be recognized as the valid owner of the Allowed Claim. All distributions on account of the Allowed Claim will be sent to the following:

> Settlement Agent LLC
> c/o Tremont Group Holdings, Inc.
> Corporate Center at Rye, 555 Theodore Fremd Avenue

---

[*] Allowance of the allowed claim is subject to the terms and conditions of the Settlement Agreement.

Rye, NY 10580
Attention: James McCormick, General Counsel
Claim No. 006237
Allowed Claim Amount: $1,647,687,625.00 (plus the Assignee Additional Claim Amount)

*with copies of payment advices to:*

Constantine M. Dakolias
c/o Fortress Investment Group
1345 Avenue of the Americas
New York, NY 10105
Phone: (212) 798-6100

    2)    The Allowed Claim Amount constitutes the entire amount of the Claim and has not been reduced by any prior payment from the Trustee on account of the Allowed Claim.

    3)    As more fully set forth in Sections 4.4(c) and (d) of the Security Agreement, Assignor shall remain fully liable for, and have the right to, the performance of all of its obligations in respect of the Allowed Claim, and Assignee shall not have any obligation or liability by reason of or arising out of the transfer of the Allowed Claim for security.

    4)    In the event of an Event of Default (as such term is used in the Security Agreement) or any other event that shall require a change in or, a clarification to, the provisions hereof in accordance with the terms of the Security Agreement, Assignee is authorized to contact AlixPartners LLP or any other claims agent retained by the Trustee to provide further instructions with respect to the Allowed Claim.

[SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, dated the ___ of _____.

Assignor: RYE SELECT BROAD MARKET
FUND, LP

By:  TREMONT  PARTNERS,  INC.,  its
General Partner


By: _____
Name:
Title:

Assignee: FORTRESS CREDIT CORP.


By: _____
Name: Constantine M. Dakolias
Title:  President

US_ACTIVE:\43737578\11\45968.0043

## EXHIBIT B

[SECURITY AGREEMENT]

**SCHEDULE 1**
**Filings**

| Filing Type | Jurisdiction |
|---|---|
| UCC-1 Financing Statement | Delaware – Secretary of State |
| Notice of Transfer of Claim for Security | Bankruptcy Court |

**SCHEDULE 2**
**Jurisdiction of Organization; Chief Executive Office**

| Legal Name | Chief Executive Office | Jurisdiction of Organization |
|---|---|---|
| Rye Select Broad Market Fund, LP | c/o Tremont Group Holdings, Inc.<br>Corporate Center at Rye<br>555 Theodore Fremd Avenue<br>Rye, New York 10580 | Delaware |

**SCHEDULE 3**
<u>**Claims**</u>

None.

**SCHEDULE 6.13(d)**
**Commercial Tort Claims**

None.