**LOWENSTEIN SANDLER PC**
Bruce Buechler, Esq. (BB 0324)
Nicole Stefanelli, Esq. (NS 4100)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

    -and-

1251 Avenue of the Americas, 18th Floor
New York, NY 10020
Tel: (212) 262-6700
Fax: (212) 262-7402
*Attorneys for the Irrevocable Charitable Remainder Trust of*
*Yale Fishman and the Glenn Akiva Fishman Charitable Remainder Unitrust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                Debtor. | |

**OBJECTION TO TRUSTEE'S MOTION FOR AN ORDER AFFIRMING TRUSTEE'S
CALCULATIONS OF NET EQUITY AND DENYING TIME-BASED DAMAGES**

       The Irrevocable Charitable Remainder Trust of Yale Fishman (the "Yale Trust") and the

Glenn Akiva Fishman Charitable Remainder Unitrust (the "Glenn Trust," and together with the

24349/2
12/03/2012 22051599.2

Yale Trust, the "Trust Claimants"), by and through their undersigned attorneys, hereby objects (the "Objection") to the Motion for an Order Affirming Trustee's Calculations of Net Equity and Denying Time-based Damages (the "Motion") filed by Irving H. Picard (the "Trustee"), the trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff") under the Securities Investor Protection Corporation Act, 15 U.S.C. § 78aaa, *et seq.* ("SIPA").  In support of their Objection, the Trust Claimants state as follows:

## BACKGROUND TO THE CLAIM OF THE YALE TRUST

1. The Yale Trust was formed pursuant to a written agreement.

2. On August 24, 1998, the Yale Trust opened an account with BLMIS, Account No. 1CM543 (the "Yale Account").

3. On December 11, 2008, Madoff was arrested and charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. 240.10b-5.  That same day, the Securities and Exchange Commission filed a civil action alleging that Madoff and BLMIS were operating a Ponzi scheme through BLMIS's investment advisor activities.  On December 15, 2008, the above-captioned liquidation was commenced pursuant to SIPA.

4. On December 23, 2008, the Court issued an order (the "Claims Procedure Order") [Dkt. No. 12] directing the Trustee to disseminate notice and claim forms to BLMIS customers and setting forth claim-filing deadlines.

5. The Claims Procedure Order further provided that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, ***and the reason therefor*** . . . ."  Claims Procedure Order at 6 (emphasis added).

6.  On or about February 12, 2009, the Yale Trust timely filed a claim, Claim No. 004568 (the "Yale Claim"), in the amount of $1,502,029.40.[1]

7.  On April 27, 2010, the Trustee sent the Determination Letter to the Yale Trust stating that the Yale Claim is denied. A copy of the Determination Letter is annexed hereto as Exhibit A.

8.  Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Determination Letter, between August 24, 1998 and December 11, 2000, $2,000,000.00 in cash was deposited into the Yale Account. *See* Exhibit A at 4.

9.  Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Determination Letter, between April 14, 1999 and July 21, 2004, the Yale Trust withdrew a total of $515,778.87 in cash. *See* Exhibit A at 4.

10. No other cash withdrawals were made from the Yale Account.

11. Assuming the Trustee's records are correct, the "net equity" in the Yale Account based on the "cash in/cash out approach" embraced by the Trustee calculates to $1,484,221.13 ($2,000,000.00- $515,778.87), ignoring all alleged fictitious gains.

12. Between September 29, 2004 and January 31, 2005, the Yale Trust attempted to transfer the then balance in the Yale Account of $3,352,581.72 to an independent public charity called the Judaic Heritage Foundation, Inc. which owned BLMIS Account No. CM56830 (the "Transferee Account"). However, no actual funds or securities were actually transferred from the Yale Account to the Transferee Account.

13. As set forth in Table 1 annexed to the Determination Letter, the Trustee claims that, during the period from August 24, 1998 through January 31, 2005, a total of $2,000,000.00 in cash was deposited into the Yale Account and a total of $3,868,360.59 was withdrawn from the Yale Account. However, the Trustee has inexplicably "adjusted" the amount of the withdrawals to $2,000,000.00. *See* Exhibit A at 4.

---

[1] Both the Yale and Glenn Trusts agree with the dollar amounts for deposits and cash withdrawals (but not transfers to other BLMIS accounts) set forth on the Trustee's Determination Letters annexed hereto as Exhibits A and B.

14. The Yale Trust timely filed an *Objection to the Trustee's Determination of Claim* on May 25, 2010 [Docket No. 2337].

15. As is now known to the Court, and conceded by the Trustee, the $2,000,000.00 in cash that was deposited into the Yale Account between 1998 and 2000 was actually stolen by Madoff and no transfer of funds or securities to the Transferee Account actually occurred. The only withdrawals that were made from the Yale Account were the cash withdrawals totaling $515,778.87 (based on the Trustee's records). Accordingly, the Yale Account has "net equity" of $1,484,221.13 and the Yale Trust is therefore entitled to a claim in the amount of at least $1,484,221.13. The Yale Trust does not have a "Zero Balance" as alleged by the Trustee in the Motion. Accordingly, the Motion as to the Yale Trust must be denied and the Yale Trust determined to have a claim in the amount of at least $1,484,221.13.

## BACKGROUND TO THE CLAIM OF THE GLENN TRUST

16. The Glenn Trust was formed pursuant to a written agreement.

17. On December 15, 1998, the Glenn Trust opened an account with BLMIS, Account No. 1CM552 (the "Glenn Account").

18. On or about June 20, 2009, the Glenn Trust timely filed a claim, Claim No. 011058 (the "Glenn Claim"), in the amount of $1,488,494.00.

19. On April 27, 2010, the Trustee sent the Determination Letter to the Glenn Trust stating that the Glenn Claim is denied. A copy of the Determination letter is annexed hereto as Exhibit B.

20. Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Determination Letter, between December 15, 1998 and December 29, 2000, $2,000,000.00 in cash was deposited into the Glenn Account. *See* Exhibit B at 4.

21. Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Determination Letter, between April 14, 1999 and July 21, 2004, the Glenn Trust withdrew a total of $513,410.00 in cash. *See* Exhibit B at 4.

-4-

22.     No other cash withdrawals were made from the Glenn Account.

23.     Assuming the Trustee's records are correct, the "net equity" in the Glenn Account based on the "cash in/cash out approach" embraced by the Trustee calculates to $1,486,590.00 ($2,000,000.00- $513,410.00), ignoring all alleged fictitious gains.

24.     Between September 29, 2004 and January 31, 2005, the Glenn Trust attempted to transfer the then balance in the Glenn Account of $3,200,746.41 to the Transferee Account. However, no actual funds or securities were actually transferred from the Glenn Account to the Transferee Account.

25.     As set forth in Table 1 annexed to the Determination Letter, the Trustee claims that, during the period from December 15, 1998 through January 31, 2005, a total of $2,000,000.00 in cash was deposited into the Glenn Account and a total of $3,714,156.41 was withdrawn from the Glenn Account. However, the Trustee has inexplicably "adjusted" the amount of the withdrawals to $2,000,000.00. *See* Exhibit B at 4.

26.     The Glenn Trust timely filed an *Objection to the Trustee's Determination of Claim* on May 25, 2012 [Docket No. 2341].

27.     As is now known to the Court, and conceded by the Trustee, the $2,000,000.00 in cash that was deposited into the Glenn Account between 1998 and 2000 was actually stolen by Madoff and no transfer of funds or securities to the Transferee Account actually occurred. The only withdrawals that were made from the Glenn Account were the cash withdrawals totaling $513,410.00 (based on the Trustee's records). Accordingly, the Glenn Account has "net equity" of $1,486,590.00 and the Glenn Trust is therefore entitled to a claim in the amount of at least $1,486,590.00. The Glenn Trust does not have a "zero balance" as alleged by the Trustee in the Motion. Accordingly, the Motion as to the Glenn Trust must be denied and the Glenn Trust determined to have a claim in the amount of $1,486,590.00

28.     Both the Glenn Trust and Yale Trust are charitable organizations. Thus, the recoveries on their respective claims will be used for donations to charity, and not for the individual benefit of those that established the Trusts.

## OBJECTION

### A. Fictitious Transfers Do Not Constitute Withdrawals for Purposes of Calculating "Net Equity"

29. In asserting that the Yale and Glenn Claims have a zero balance, the Trustee takes the position that despite his admission in the Determination Letters that both the Yale and Glenn Accounts originally had a total of $2,000,000.00 in cash deposited into each Account, that fictitious transfers to the Transferee Account should reduce their claims. The Trustee alleges that both the Yale and Glenn Trusts are neither net winners or losers, but have an unexplained "zero balance." The Trustee's position is factually incorrect because in his calculations, the Trustee included fictitious transfers to the Transferee Account (adjusted downward to $2,000,000 by the Trustee for some unknown reason), which he characterized as "withdrawals." Oddly, it appears that the Trustee is asserting that the Yale and Glenn Accounts have a zero balance based on the last statement issued to them by BLMIS, yet the Trustee has consistently argued (and won before this Court and the Second Circuit) that one cannot rely upon customer account statements issued by BLMIS.

30. The alleged transfers to the Transferee Account never actually occurred and clearly are not "withdrawals" for the purposes of calculating "net equity." The Yale and Glenn Trusts are "net losers" because no actual funds were transferred from the Yale and Glenn Accounts with BLMIS to another account at BLMIS (the Transferee Account). Because all Madoff/BLMIS transfers, statements and trading records were fictitious, the Trustee cannot be heard to argue that fictitious journal entries by the mastermind of Ponzi schemes equates to actual transfers of funds from the Yale and Glenn Accounts to another BLMIS account controlled by others. The Trustee cannot argue both sides of the same coin. Thus, the Yale and Glenn Trusts are "net losers" based on the cash in/cash out methodology as set forth in paragraphs 15 and 27 above and their claims must be allowed.

31. Pursuant to the Motion, the Trustee has determined each customer's "net equity" by calculating the amount of cash deposited by the customer into their BLMIS account, minus

-6-

any cash amounts withdrawn from their BLMIS customer account, otherwise known as the cash in/cash out approach. Motion at ¶ 7. The Court has upheld the "cash in/cash out approach." *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd, In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011), *reh'g and reh'g en banc den.* (2d Cir. Nov. 8, 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *cert. den.*, 2012 WL 396489, 2012 WL 425188 (June 25, 2012).

32.     In discussing the definition of "net equity" under SIPA, the Court noted that "the BLMIS books and records expose a Ponzi scheme where no securities were ever ordered, paid for or acquired." 424 B.R. at 135. Thus, the Court held that "the Trustee cannot discharge claims upon the false premise that customers' securities positions are what the account statements purport them to be. Rather, the only verifiable amounts that are manifest from the books and records are the cash deposits and withdrawals." *Id.* The Court further held that "[e]quality is achieved in this case by employing the Trustee's method, which looks solely to deposits and withdrawals that in reality occurred." *Id.* at 141.

33.     While the Court did not specifically address transfers between customer accounts, the Court made it clear that net equity is to be calculated by crediting the amount of actual cash deposited by the customer into his BLMIS account, minus any actual cash withdrawn or transfers "that in reality occurred." *Id.* The purported transfers from both the Yale and Glenn Accounts to the Transferee Account transfers do not constitute "withdrawals" for the purposes of calculating net equity because those transfers never occurred. No real funds or securities were transferred. As the Second Circuit stated, "Madoff generated fictitious paper account statements and trading records in order to conceal the fact that he engaged in no trading activity whatsoever." *Madoff*, 654 F. 3d at 231. The only withdrawals from the Yale and Glenn Accounts that actually occurred were the actual cash withdrawals. Again, the Second Circuit stated "the only accurate entries reflected the customers' cash deposits and withdrawals." *Id.* at 232. Based on the "cash in/cash out method," the Yale Account has "net equity" of $1,484,221.13 and the Glenn Account

-7-

has "net equity" of $1,486,590.00. Accordingly, the Court must overrule the Trustee's Motion as to the Yale and Glenn Claims.

34. For the foregoing reasons, the Trust Claimants dispute the Trustee's Determination Letters and object to the Motion. The Trustee's denial of both the Yale and Glenn Claims is not supported due to the simple incontrovertible fact that the only cash withdrawals from the Yale Account totaled $515,778.87 and from the Glenn Account totaled $513,410.00 (based on the Trustee's records as set forth in the Determination Letters). Because no other cash withdrawals were made from the Yale and Glenn Accounts and the transfers to the Transferee Account never actually occurred, the "net equity" in the Yale Account is at least $1,484,221.13 and the "net equity" in the Glenn Account is at least $1,486,590.00. Thus, both are "net losers," not creditors with a zero balance, and therefore the Trustee should be directed to allow and pay their respective claims.

B. **The Trustee is Barred from Denying the Yale and Glenn Claims Under the Doctrine of Judicial Estoppel**

35. The fictitious journal entries of Madoff purporting to transfer non-existent funds to the Transferee Account are no different than the fictitious gains fabricated by Madoff that the Trustee has refused to recognize in determining customer claims as accepted by the Court in its Opinion which was affirmed by the Second Circuit Court of Appeals. The Trustee should be held to his own standard and criteria: if fictitious gains are not to be considered (as they never occurred), neither should fictitious transfers be considered (as they too never occurred). It is inconsistent for the Trustee to argue that "fictitious gains that were fabricated"[2] by Madoff should be ignored, yet, at the same, argue, in order to deny a customer claim, that fictitious transfers did occur. As this Court held, "the only verifiable transactions were the customers' cash deposits into, and cash withdrawals out of, their particular accounts." *Madoff*, 424 B.R. at 122. This does not include transfers to other BLMIS accounts. As such, the Trustee is barred

---

[2] *See*, Trustee's Determination Letters, Exhibits A and B at 2.

from denying the Yale and Glenn Claims under the doctrine of judicial estoppel as well as the doctrine of equitable estoppel.

36.  The doctrine of judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding." *In re Venture Mortgage Fund, L.P.*, 245 B.R. 460, 471 (Bankr. S.D.N.Y. 2000), *aff'd*, 282 F.3d 185 (2d Cir. 2002). Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The purpose of judicial estoppel is to "protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* *See also Rosenshein v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996) ("Judicial estoppel is invoked . . . to prevent the party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process.").

37.  In the Second Circuit, two factors must be satisfied for the doctrine of judicial estoppel to apply: (i) the party against whom estoppel is asserted took an inconsistent position in a prior proceeding, and (ii) the first tribunal adopted the inconsistent position in some manner, such as by rendering a favorable judgment. *In re Venture Mortgage Fund*, 245 B.R. at 472. The doctrine does not depend upon prejudice to the party invoking it. *Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., New York Branch (In re Galerie Des Monnaies of Geneva, Ltd.)*, 55 B.R. 253, 260 (Bankr. S.D.N.Y. 1985), *aff'd*, 62 B.R. 224 (S.D.N.Y. 1986).

38.  In this case, both factors are satisfied. The Trustee took the position that because BLMIS created fictitious transactions in a fictitious market, customer claims should not include fictitious gains and should be calculated only on a "cash in/cash out" method. *See* Mem. of Law in Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying Customer Accounts at 40-43 [Docket No. 525]. *See also Madoff*, 424 B.R. at 125. The Court granted the Trustee's prior motion and held that the Trustee's method of determining "net

equity" was the appropriate way to calculate customer claims in this proceeding, *See id.* at 134-35, 142. This ruling was affirmed by the Second Circuit.

39. In the Motion, the Trustee is now attempting to reverse the legal and factual position he previously took in the prior motion that resulted in the Court's March 1, 2010 opinion, and affirmed by the Second Circuit, by claiming that fictitious transfers that never occurred should be considered in calculating "net equity" while fictitious gains should be ignored. Under the doctrine of judicial estoppel (and equitable estoppel), such action is impermissible and the Trustee is barred from employing this inconsistent position in order to deny the Yale and Glenn Claims.

C. **The Trustee is Barred from Denying the Yale and Glenn Claims Under the Law of the Case Doctrine**

40. The Trustee is likewise barred from denying the Yale and Glenn Claims under the law of the case doctrine.

41. The law of the case doctrine is a rule of law that dictates that "a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent states of the same litigation." *Perreca v. Gluck*, 262 F. Supp. 2d 269, 272 (S.D.N.Y. 2003) (quoting *In re Korean Air Lines Disaster*, 798 F. Supp. 755, 759 (E.D.N.Y. 1992) (citation omitted)). The law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *DiLaura v. Power Auth.*, 982 F.2d 73, 76 (2d Cir. 1992) (quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)); *see also NLRB v. Coca-Cola Bottling Co.*, 55 F.3d 74, 77-78 (2d Cir. 1995).

42. The purpose of the law of the case doctrine is to avoid reopening what has already been decided. *Manley v. Mazzuca*, Case No. 01-civ-5178, 2007 WL 4233013 at *3 (S.D.N.Y. Nov. 30, 2007). Thus, "'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Id.* (quoting *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*, LLP, 322

-10-

F.3d 147, 167 (2d Cir. 2003)).  Courts generally depart from the law of the case only where there is a change in controlling law, when new evidence becomes available, to correct a clear error, or prevent manifest injustice.  *DiLaura v. Power Auth.,* 982 F.2d at 76.

43.     Here, none of these "good reasons" to depart from the law of the case are present and the Court's prior ruling, as affirmed by the Second Circuit, that the Trustee's method of determining "net equity" was the appropriate way to calculate customer claims in this proceeding constitutes the "law of the case."  Thus, the Trustee should not be permitted to argue, in order to deny the Yale and Glenn Claims, that fictitious transfers that never occurred when the "law of the case" requires the Trustee to ignore "fictitious gains that were fabricated" by Madoff in determining "net equity."  Accordingly, under the law of the case doctrine, the Trustee is barred from denying the Yale and Glenn Claims.

D.  **The Trustee Has Failed To Set Forth Any Legal or Factual Basis for Disallowing the Yale and Glenn Claims in Full**

44.     The Trustee's Motion sets forth no legal or factual basis for disallowing the Yale and Glenn Claims in full.  The Declaration of Bik Cheema in support of the Trustee's Motion [Docket No. 5040] fails to set forth any facts by which the Court could determine that the Trust Claimants' respective claims have a "zero balance" or that would rebut the *prima facie* validity of the Trust Claimants' respective claims.  The Trust Claimants timely filed their proofs of claim and Objections to the Trustee's Determination Letters [Docket Nos. 2337 and 2341].

45.     The party objecting to the claim has the burden of going forward and introducing evidence sufficient to rebut the presumption of validity.  *In re Campano*, 293 B.R. 281, 285 (D.N.H. 2003).  In order to shift the burden to the Trust Claimants, the Trustee would need to provide the Court with "evidence equal in force to the prima facie case … which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."  *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) (citation omitted).  *See also, In re Rockefeller Ctr. Props.*, 272 B.R. 525, 539 (Bankr. S.D.N.Y. 2000) ("Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to

meet the usual burden of proof to establish the validity of the claim."). The Trust Claimants respectfully submit that the failure of the Declaration of Bik Cheema to submit any evidence is tantamount to an admission that the Trustee concedes the facts set forth in the Yale and Glenn Claims and their prior Objections filed by the Trust Claimants on May 25, 2010 [Docket Nos. 2337 and 2341]. The Claims, Objections and the Trustee's Determination Letters clearly demonstrate that the Yale and Glenn Claims do not have a zero balance, but rather still have cash in their respective Accounts or, alternatively, are net losers according to the Trustee's calculation of net equity. Therefore, the Trust Claimants' respective claims must be allowed.

46. The Determination Letters themselves are inadequate to rebut the *prima facie* validity of the Yale and Glenn Claims as provided in section 502(a) of the Bankruptcy Code and Rule 3001(f) of the Federal Rules of Bankruptcy Procedure.

47. Furthermore, the Determination Letters violate general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based. As this Court has stated,

> The best practice is to denominate an objection to a claim as just that. The body of the objection should identify the claim. It should also, at a minimum, allege those facts necessary to support the objection . . . and provide a description of the theories on which it is based. In short, proofs of claim have been held analogous to complaints initiating civil actions; an objection to a claim should therefore meet the standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses.

*In re Enron Corp.*, 2003 Bankr. LEXIS 2261, *25 (Bankr. S.D.N.Y. Jan. 13, 2003) (quoting 9 *Collier on Bankruptcy* ¶ 3007.01[3] (footnotes omitted)).

48. Finally, the table attached to each of the Determination Letters, which purportedly calculates "net equity" in each Account, based on the "cash in/cash out approach" embraced by the Trustee, is unsubstantiated and does not reflect the fact that any transfer of actual funds or securities to the Transferee Account actually occurred. Thus, the Determination Letters support the Trust Claimants' position. Accordingly, the Court must overrule the Trustee's Motion and

determine that the Yale Trust is entitled to a claim of at least $1,484,221.13 and that the Glenn Trust is entitled to a claim of at least $1,486,590.00.

E.   **The Trustee is Barred from Denying the Yale and Glenn Claims Because the Alleged Transfers Occurred Outside of the Applicable Two-Year Look-Back Period**

49.   Assuming, *arguendo*, that the fictitious transfers to the Transferee Account are considered withdrawals for purposes of calculating "net equity," such withdrawals were made outside of the applicable two-year look-back period and, therefore, are not avoidable by the Trustee.

50.   The only source of the Trustee's avoidance power is section 548(a)(1)(A) of the Bankruptcy Code, which limits avoidance to transfers that occurred within two years prior to the date of the filing of the petition. *See* 11 U.S.C. § 548(a)(1)(A). While section 544(b) of the Bankruptcy Code adopts "applicable [state] law" for avoidance actions, the Trustee is bound by section 548(a)(1)(A) by virtue of the "safe harbor" provisions contained in section 546(e) of the Bankruptcy Code and thus cannot avail himself of any longer state law look-back period.

51.   Section 546(e) of the Bankruptcy Code provides that "[n]otwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section . . . 741 of this title, made by or to (or for the benefit of) a . . . stockbroker . . . or that is a transfer made by or to (or for the benefit of) a . . . stockbroker, in connection with a securities contract, as defined in section 741(7) . . . ***except under section 548(a)(1)(A) of this title***." 11 U.S.C § 546(e) (emphasis supplied).

52.   As recognized by District Court Judge Rakoff in an opinion relating to one of the myriad of BLMIS clawback proceedings pending before him, because BLMIS was a registered stockbrokerage firm, the liabilities of customers are subject to the "safe harbor" provisions of section 546(e) of the Bankruptcy Code. *Picard v. Katz*, 462 B.R. 447, 451 (S.D.N.Y. 2011). "'By restricting a bankruptcy trustee's power to recover payments that are otherwise avoidable under the Bankruptcy Code, the safe harbor stands 'at the intersection of two important national legislative policies on a collision course - the policies of bankruptcy and securities law.'" *Id.* at

451 (quoting *In re Enron Creditors Recovery Corp.*, 651 F.3d 329, 334 (2d Cir. 2011). As further recognized by Judge Rakoff, the kind of contract BLMIS had with its customers is a "securities contract" as defined in section 741(7) of the Bankruptcy Code and "all payments made by [BLMIS] to its customers" are "settlement payments" as defined in section 741(8) of the Bankruptcy Code. Judge Rakoff recently bolstered this ruling when he dismissed claims by the Trustee seeking to claw back six years or more of profits and held that the Trustee may only avoid transfers that BLMIS made during the two years prior to bankruptcy "with actual intent to hinder, delay, or defraud any" of its creditors. *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 (JSR), slip op. at 13 (S.D.N.Y. April 30, 2012).

53. While this Court has taken a different view on the invocation of section 546(e) – holding that certain defendants' section 546(e) defense was "premature" and, even if the defense were timely, the Court could not find as a matter of law the section 546(e) applied to the transactions at issue, *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243, 267 (Bankr. S.D.N.Y. 2010), *leave to appeal denied*, 2011 U.S. Dist. LEXIS 97647 (S.D.N.Y. August 31, 2011), such ruling is inapposite to the purpose of the safe harbor provisions of section 546(e). As noted by Judge Rakoff, Congress enacted section 546(e) "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Picard v. Katz*, 462 B.R. at 452. In the case of Madoff's fraud involving over $60 billion and thousands of customers, it is clear that permitting the avoidance of transfers other than those permitted under the safe harbor provisions of section 546(e) of the Bankruptcy Code would have a substantial negative effect of the financial markets. *Id.*

54. Between September 29, 2004 and January 31, 2005, the Yale Trust attempted to transfer the then balance in the Account of $3,352,581.72 to the Transferee Account. Between September 29, 2004 and January 31, 2005, the Glenn Trust attempted to transfer the then balance in the Glenn Account of $3,200,746.41 the Transferee Account. However, as noted above, no actual funds or securities were actually transferred from the Yale or Glenn Accounts to the

Transferee Account. These were fictitious transfers or journal entries. Even should this Court determine that the fictitious journal entries to the Transferee Account are withdrawals for purposes of calculating "net equity," the Trustee may not deny the Yale and Glenn Claims because such transfers occurred more than two years prior to December 15, 2008 (the date on which the liquidation was commenced pursuant to SIPA). Thus, the alleged transfers to the Transferee Account cannot be avoided under section 548(a)(1)(A) of the Bankruptcy Code. Therefore, the Trustee should be precluded from arguing transfers to another Madoff account are effectively recoverable by the Trustee by offsetting them in the calculation of net equity.

55. Further, the Trustee is time barred from commencing an avoidance action against the Yale and Glenn Accounts or the Transferee Account to recover the alleged transfers. The statute of limitations to commence a clawback action has long expired. The import of section 546(e) in this case is that the Trustee would never have been permitted to avoid the alleged transfers as they occurred outside the two-year look-back period. Thus, the Trustee is barred from denying the Yale and Glenn Claims.

F.  **The Trust Claimants are Entitled to Prejudgment Interest**

56. Because Madoff converted the Trust Claimants' funds, the Trust Claimants are entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.*S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion). Under New York state law, which is applicable here, the Trust Claimants are entitled to prejudgment interest at a rate of nine percent (9%) per annum computed from December 11, 2000 for the Yale Trust and from December 29, 2000 for the Glenn Trust (these are the dates of the last deposits to each Account). *See* N.Y.C.P.L.R. § 5001 ("Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred.

Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."); N.Y.C.P.L.R. § 5004 ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."). *See Entron, Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 131 (2d Cir. 1984) (holding that under New York choice of law principles, the allowance of prejudgment interest is controlled by the law of the state whose law governs the main claim); *Patch v. Stanley Works (Stanley Chem. Co. Div.)*, 448 F.2d 483, 494 n.18 (2d Cir. 1971) (noting a "consistent line" of cases holding that under New York choice of law principles, "the allowance of prejudgment interest is controlled by the rule of the jurisdiction whose law determines liability"). Accordingly, the Trust Claimants are entitled to prejudgment interest of nine percent (9%) per annum on $1,484,221.13 and $1,486,590.00, respectively.

57. In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007).

58. In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.) (district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

59. Accordingly, the Trust Claimants are entitled to a claim in the amount of at least $1,484,221.13 for the Yale Claim and $1,486,590.00 for the Glenn Claim plus prejudgment interest of nine percent (9%) per annum pursuant to New York state law.

**WHEREFORE**, the Trust Claimants respectfully request that the Court (i) deny the Motion as to their Claims, (ii) grant the Yale Trust an allowed claim in the amount of at least $1,484,221.13 plus prejudgment interest of nine percent (9%) per annum pursuant to New York state law from December 11, 2000, (iii) grant the Glenn Trust an allowed claim in the amount of at least $1,486,590.00 plus prejudgment interest of nine percent (9%) per annum pursuant to New York State law from December 29, 2000; (iv) direct SIPC to provide each of the Yale and Glenn Trusts with a $500,000 advance pursuant to 15 U.S.C. § 78fff-3(a), (v) grant each of the Yale and Glenn Trusts an unsecured claim against the estate in the amount of at least $984,221.13 and $986,590.00 (their respective claims minus their $500,000 SIPC advances) plus interest; and (vi) grant the Yale and Glenn Trusts such other and further relief as this Court deems just and equitable.

Dated: December 3, 2012

**LOWENSTEIN SANDLER PC**

By: _/s/ Bruce Buechler_
Bruce Buechler, Esq. (BB 0324)
Nicole Stefanelli (NS 4100)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

-and-

1251 Avenue of the Americas, 18th Floor
New York, NY 10020
Tel: (212) 262-6700
Fax: (212) 262-7402
*Attorneys for the Irrevocable Charitable Remainder Trust of Yale Fishman and the Glenn Akiva Fishman Charitable Remainder Unitrust*