MORGAN, LEWIS & BOCKIUS LLP
Bernard J. Garbutt III
101 Park Avenue
New York, New York 10178
Ph.: 212-309-6000

*Attorneys for Customer-Claimant The Kostin Co.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                  Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                  Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                  Debtor. | |

**MEMORANDUM OF LAW OF CUSTOMER-CLAIMANT
THE KOSTIN CO. IN OPPOSITION TO THE
TRUSTEE'S MOTION FOR AN ORDER AFFIRMING TRUSTEE'S
<u>CALCULATIONS OF NET EQUITY AND DENYING TIME-BASED DAMAGES</u>**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1
PROCEDURAL HISTORY.......................................................................................................... 2
BACKGROUND ......................................................................................................................... 2
ARGUMENT ............................................................................................................................... 5
I.  THE TRUSTEE'S MOTION SHOULD BE DENIED ....................................................... 5
CONCLUSION............................................................................................................................ 8

The Kostin Co. respectfully submits this memorandum of law in opposition to the Trustee's "Motion For An Order Affirming Trustee's Calculations of Net Equity And Denying Time-Based Damages," dated October 12, 2012 (see, e.g., Docket Entry ("D.E.") No. 5039, referred to as the "Trustee's Motion"). The Kostin Co. was a customer of Bernard L. Madoff Investment Securities LLC ("BLMIS")[1] and an <u>innocent victim</u> of the alleged fraud by Bernard L. Madoff ("Madoff").

**PRELIMINARY STATEMENT**

The Trustee seeks a determination that "net equity," as he perceives that term, does not include what he calls "Time-Based Damages." The Trustee states:

> There are numerous theories of law that claimants have raised, all of which seek some increase in their customer claims based upon the amount of time they invested with BLMIS. Most commonly, they seek an increase in their claims based on the time they were invested with BLMIS using the New York prejudgment rate of 9% per annum, lost opportunity cost damages, or the consumer price index to take inflation into account. The Trustee is using "Time-Based Damages" as an umbrella term.

Trustee's Motion, at 1, n.2. Solely for purposes of this motion, the Kostin Co. refers to the theories described by the Trustee in this quote and to any other method of adjustment to a claim in this manner (including the so-called "constant dollar" method), collectively, as the "time value of money."[2]

Not all of Madoff's victims are equal, nor should they all be treated the same. The Kostin Co. had invested with BLMIS since <u>1972</u>. The claim of the Kostin Co. should be

---

[1] See Complaint, dated Nov. 12, 2010, <u>Picard v. Kostin Company, et al.</u>, Adv. Pro. No. 10-4950 (BRL) (Bankr. S.D.N.Y.) (D.E. No. 1)(the "Complaint" or "Comp."), a true and correct copy of which is attached as Exhibit "A" to the Declaration of Bernard J. Garbutt III, dated December 3, 2012 (the "Garbutt Decl."). As noted in the Complaint, the Kostin Co. and others are named as defendants in an adversary proceeding brought by the Trustee.

[2] The Kostin Co. does not concede that any adjustment to a claim to account for the time value of money is "time-based damages."

DB1/ 71688192.4

adjusted in some way to account for the time value of money. The Trustee's method would inequitably and arbitrarily penalize an early investor like the Kostin Co. for no reason other than its misfortune in entrusting its money to BLMIS many years ago, and many years before the fraud even began, let alone before it was revealed. Some adjustment for the time value of money would conform to the unquestioned economic reality and common sense.

## PROCEDURAL HISTORY

On or about March 3, 2009, the Kostin Co. submitted to the Trustee a customer claim. Comp., ¶ 46; Garbutt Decl., ¶ 3, Exh. "B." The Trustee sent the Kostin Co. a "Notice of Trustee's Determination of Claim" denying that claim in its entirety. Comp., ¶ 47; Garbutt Decl., ¶ 4, Exh. "C." The Kostin Co. then filed and served its "Objection to Trustee's Determination of Claim," dated November 11, 2010 (see D.E. No. 3151, the "Objection"). Comp., ¶ 48; Garbutt Decl., ¶ 5, Exh. "D" (the Objection is hereby incorporated herein by reference).

## BACKGROUND

In or around 1972, the Kostin family formed the Kostin Co. as a private partnership, which was to be used as an investment vehicle. Also in or around 1972, the Kostin Co. opened an account at BLMIS in order to have BLMIS invest in securities for the Kostin Co. (the "Account").[3] Thus, the Kostin Co. was and is a "customer" of BLMIS, as defined by SIPA. See 15 U.S.C. § 78lll(2). The Trustee concedes this point.[4] From the opening of the Account until the beginning of December 2008 (when BLMIS was placed into liquidation under SIPA), BLMIS regularly sent the Kostin Co. account statements, trade confirmations, and other reports.

---

[3]    Although, the Kostin Co. Account was numbered 1-K0060 as of December 11, 2008, predecessor accounts were numbered 1-01117-1-4 and 1-01125-3.

[4]    See, e.g., Comp., ¶¶ 7 & 38-39, & Exhs. "A" to "C" thereto.

See Comp., ¶ 26.  The Kostin Co.'s final account statement for the Account, which is dated November 30, 2008, reflects that the Kostin Co. owns, and the Account contains, securities and also that the Account had a net market value of $120,908,112.39.  Garbutt Decl., ¶ 6, Exh. "E."

The Kostin Co. also contends, based upon information available to it at this time, that Madoff's alleged fraud began no earlier than the "early 1990s."  According to the Trustee, there were two types of accounts at BLMIS, "split-strike conversion" and non-split-strike conversion.  Comp., ¶¶ 24-25.  For the Kostin Co. Account, a non-split-strike conversion account, in the late 1980s, BLMIS applied a buy and hold strategy for purposes of capital appreciation, purchased (or sold short) a small group of securities, and traded infrequently for the account.  For example, as of December 31, 1989, Account held long six, household-name stocks, all of which had been purchased prior to October 22, 1987, and one of which had been purchased as far back as March 1982.  See Garbutt Decl., Exhs. "F" to "H."

As of December 31, 1989, the Kostin Co. had a total equity balance in its account of $12,784,825.  The Kostin Co. received a BLMIS account statement dated as of December 31, 1989 (the "12/31/89 Stmt.") reflecting this.  Garbutt Decl., ¶ 7, Exh. "F."  The Kostin Co. received trade confirmations from BLMIS evidencing the trades for each of the securities listed on the 12/31/89 Stmt, Garbutt Decl., ¶ 8, Exh. "G," and also received account statements for the appropriate months reflecting those trades.  Garbutt Decl., ¶ 9, Exh. "H."  BLMIS also sent the Kostin Co. a "Report For The Period From 1/01/89 To 12/31/89" (the "12/31/89 Report," Garbutt Decl., ¶ 10, Exh. "I"), stating that, as of December 31, 1989, the Kostin Co. Account had an "INITIAL INVESTMENT" of $5,192,347.90 and a "TOTAL EQUITY" of $12,784,825.26, which reflects the market value of the securities on the 12/31/89 Stmt.

Available, pre-discovery information indicates that Madoff's fraud began no earlier than

3

the "early 1990s." Indeed, at his plea allocution, Madoff himself stated that "[t]o the best of my recollection, my fraud began in the early 1990s. At that time, the country was in a recession and this posed a problem for investments in the securities markets."[5] At the time of that statement during his plea allocution, Madoff had <u>no</u> reason to lie – he had already pled guilty and admitted his guilt. Moreover, the facts that he tied the beginning of his fraud to a circumstance, <u>i.e.</u>, the recession in the early 1990s, and that the circumstance undeniably existed,[6] lend even more credibility to Madoff's statement. Additionally, in his interview with SEC Inspector General H. David Kotz, Madoff stated that, when the SEC investigated him in <u>1992</u>, as of that time, BLMIS' trades were real, and Madoff produced DTCC records to the SEC that proved that the trades were real.[7] Madoff's statements are supported by Frank DiPascali ("DiPascali"), a high-level BLMIS supervisor, who also stated at his plea allocution that "from the <u>early 1990s</u> until December of 2008 I helped . . . carry out the fraud . . . ."[8]

---

[5] Transcript, dated Mar. 12, 2009, No. 09-cr-00213 (S.D.N.Y.) (D.E. No. 57), Garbutt Decl., ¶ 11, Exh. "J," at 25:12-15 (for guilty pleas and admissions, <u>see</u> <u>id.</u> at 4:1, 5:1, 24:5-8, 35:1-25, 36:1-25); <u>see also</u> Comp., ¶ 17. Most recently, a news article reported that Madoff purportedly sent emails to a reporter stating that certain trading was legitimate through the early 1990s. See Michele Dargan, <u>Bernie Madoff emails, claiming Picower and Shapiro portfolios were legitimate, to appear in 'Forbes' article</u>, PALM BEACH DAILY NEWS, March 21, 2012, <u>available</u> <u>at</u> http://www.palmbeachdailynews.com/news/madoff/bernie-madoff-emails-claiming-picower-and-shapiro-portfolios-2252751.html (last visited December 2, 2012) (Garbutt Decl., ¶ 12, Exh. "K.").

[6] It is undeniable that a recession occurred in the early 1990s. <u>See</u>, <u>e.g.</u>, <u>Turner Broad. Sys., Inc. v. F.C.C.</u>, 520 U.S. 180, 212 (1997) ("a recession in 1990-1992"); <u>O'Sullivan v. New York Times</u>, 37 F. Supp. 2d 307, 309 (S.D.N.Y. 1999) ("The recession of the early 1990's . . . .").

[7] Garbutt Decl., ¶ 13, Exh. "L," at 8.

[8] Transcript, dated Aug. 11, 2009, No. 09-cr-00764 (S.D.N.Y.) (D.E. No. 12) (Garbutt Decl., ¶ 14, Exh. "M") at 44:18-20 (emphasis added); <u>see also</u> <u>id.</u> at 46:9-15; 47:5-15.

4

**ARGUMENT**

I. **THE TRUSTEE'S MOTION SHOULD BE DENIED**

For all of the reasons stated below, the Trustee's motion should be denied.

The Kostin Co. is entitled to an adjustment to its claim representing the time value of money, and specifically reserves the right to argue for any particular method of such adjustment once a decision is rendered on the Trustee's motion. The Kostin Co. does not specifically advocate herein for any particular method of adjustment.

Only to the extent that they are factually and legally applicable to the circumstances of the Kostin Co., the Kostin Co. joins in, and hereby incorporates by reference, the applicable legal arguments of other litigants that have submitted oppositions to the Trustee's Motion in this matter. Specifically, only to the extent that they are legally and factually applicable to the circumstances of the Kostin Co., the Kostin Co. joins in, and hereby incorporates by reference, the applicable legal arguments in the "Customers' Brief Opposing Trustee's Motion for an Order Rejecting an Inflation Adjustment to the Calculation of 'Net Equity'" filed by, inter alia, Loeb & Loeb LLP on behalf of its clients Alan and Norma Aufzien and family, the Evenstad family parties, and Gorvis LLC. However, in joining in any such arguments, the Kostin Co. does not concede that BLMIS did not trade or purchase securities. The Kostin Co. also specifically hereby incorporates by reference herein the arguments made in its Objection.

The Kostin Co. opposes the Trustee's motion for an order approving the Trustee's proposed net equity calculation, which ignores what he calls "time-based damages" theories, such as the time value of money.[9] The Trustee's efforts to disregard these basic economic

---

[9] Under the umbrella of "time-based damages," the Trustee lumps together various economic principles which recognize the reality that the value of money changes over time. See Trustee's Brief, D.E. 5039, at 1, n.2. The Kostin Co. does not concede that these economic principles are "time-based damages."

5

concepts, which acknowledge that the value of money changes over time, are completely out-of-step with reality. Even the SEC has acknowledged that investors and customer-claimants are treated fairly "by taking into account the economic reality that a dollar invested in 2008 has a different value than a dollar invested twenty years earlier." SEC SDNY Net Equity Brief, Dec. 11, 2009, Adv. Pro. No. 08-01789 (BRL) (Bankr. S.D.N.Y) (D.E. 1052), at p. 4.

Indeed, as the Deputy Solicitor of the SEC testified before Congress:

In the SEC's view, to achieve a fair and economically accurate allocation among Madoff customers who invested and withdrew funds in different historical periods, it is appropriate to convert the dollars invested into 'time-equivalent' or constant dollars. This constant-dollar approach is rooted in the classic economic concept of the time value of money and will result in greater fairness across different generations of Madoff investors-in effect, treating early investors and later investors alike in terms of the real economic value of their investments.

See Statement of Michael A. Conley, Deputy Solicitor, Securities and Exchange Commission, before the Committee on House Financial Services Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Madoff Ponzi Scheme, December 9, 2009, 2009 WL 4647561, at *9.

The Second Circuit, in upholding some aspects of the Trustee's approach to net equity calculations, deliberately left open the question of whether time-based damages are a mandatory part of the net equity calculations. See In re Bernard L. Madoff Investment Secs. LLC, 654 F.3d 229, 235 n.6 (2d Cir. 2011) ("We express no view on whether the Net Investment Method should be adjusted to account for inflation or interest, an issue on which the bankruptcy court has not yet ruled on, which is not before us on this interlocutory appeal."). Judge Rakoff in the Southern District of New York has reached a similar conclusion, noting that customer-claimants "might well establish, for example, that under a 'constant dollar' approach, Madoff Securities owed

6

them a reasonable return of interest on their investment." In re Madoff Securities, No. 12 Misc. 00115 (JSR) (S.D.N.Y. Apr. 30, 2012) (D.E. 72) at 22, n.10.

Consideration of the time value of money is consistent with SIPA's goal of protecting investor expectations and the interest in equitably resolving customer-claimants' claims. SIPA's legislative history emphasizes Congress' intention that the statute protect customers' reasonable and legitimate expectations. In 1978, amendments to SIPA were passed in order to "make SIPA more responsive to the reasonable expectations of public investors and to provide investors with greater protection against the financial failure of stock-brokers, thereby enhancing investor confidence in the securities markets." H.R. Rep. No. 95-746, at 21 (1977). While the Second Circuit has determined that expectation damages based on BLMIS customers' last account statements are untenable because the BLMIS statements were fictitious, see In re Bernard L. Madoff Investment Secs. LLC, 654 F.3d 229, 235 (2d Cir. 2011), there is no such fiction in the fact that BLMIS held the Kostin Co.'s money for an extended period of time and therefore owes the Kostin Co. some additional amount to account for the time value of money. The Kostin Co.'s claim should be calculated based on the reasonable expectation of the Kostin Co. that the money invested with BLMIS was not placed into a isolated vacuum, but instead acted like other currency invested within the United States' economy, which is subject to interest, inflation, constant dollar fluctuation, and/or similar adjustments, which recognize that the value of money changes over time.

The "constant dollar" method referenced by the SEC may partially equalize the valuation of deposits between customer-claimants that invested for short terms and customer-claimants that invested for long terms, however it does not go far enough. For example, it does not address the lost investment opportunities (i.e., the opportunity cost) borne by customer-claimants who

were long-term investors, such as the Kostin Co. The Kostin Co. began investing with BLMIS in 1972. The Kostin Co. could have invested elsewhere, had the company known of Madoff's activities, whenever they began.

## **CONCLUSION**

For the reasons set forth above, the Trustee's motion should be denied.

Dated: New York, New York
December 3, 2012

                                           MORGAN, LEWIS & BOCKIUS LLP

                                           By:    /S/
                                           Bernard J. Garbutt III
                                           101 Park Avenue
                                           New York, New York 10178
                                           Ph.: (212) 309-6000

                                           *Attorneys for Customer-Claimant The Kostin Co.*

# Schedule "A"

**1. Claimant's Interest in this Matter:**

- The Kostin Company had an account at BLMIS and had invested with BLMIS since 1972.

**2. Timely-Filed Customer claim:**

- Customer Claim filed on or about March 3, 2009, attached to Garbutt Declaration as Exhibit B.

**3. The Docket Number of Objection to the Trustee's Claim Determination:**

- Adv. Pro. No. 08-01789 (BRL), Docket Entry 3151,

**4. Other submissions to this Court or any other related to this liquidation proceeding, if applicable:**

- The Kostin Co. is a defendant in Adv. Pro. No. 10-04950.  Relevant submissions include:
    - Docket Entry 7, Notice of Appearance of Bernard J. Garbutt (3/16/11)
    - Docket Entry 17, Notice of Mediation Referral (9/1/11)
    - Docket Entry 19, Notice of Mediator Section (9/14/11)
    - Docket Entry 25, Motion to Withdraw the Reference (3/29/12)
    - Docket Entry 26, Memorandum of Law in Support of Defendants' Motion to Withdraw the Reference (3/29/12)
    - Docket Entry 28, Stipulation Extending Time to Conclude Mediation (Extending Time to Conclude Mediation up to and including December 14, 2012) (6/27/12)
- A complete copy of the docket sheet for Adv. Pro. No. 10-04950 is attached to the Garbutt Declaration as Exhibit N.