Adjourned Hearing Date:  February 13, 2013
Adjourned Hearing Time:  10:00 A.M. EST
Adjourned Objection Deadline:  December 3, 2012

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

.................................................................... x

SECURITIES INVESTOR PROTECTION                :
CORPORATION,                                                    :
                                                                            :
                                      Plaintiff,             :    Adv. Pro. No. 08-1789 (BRL)
                                                                            :
                   v.                                               :    SIPA LIQUIDATION
                                                                            :
BERNARD L. MADOFF INVESTMENT           :    (substantively consolidated)
SECURITIES LLC,                                              :
                                                                            :
                                      Defendant.          :
.................................................................... x
In re:                                                                 :
                                                                            :
BERNARD L. MADOFF,                                     :
                                                                            :
                                      Debtor.              :
.................................................................... x


**CUSTOMERS' BRIEF OPPOSING TRUSTEE'S MOTION
FOR AN ORDER REJECTING AN INFLATION
<u>ADJUSTMENT TO THE CALCULATION OF "NET EQUITY"</u>**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................... iii

SUMMARY OF ARGUMENT ................................................................................ 1

ARGUMENT ........................................................................................................ 3

1.  The Trustee's unadjusted method for calculating net equity is "clearly inferior" to an inflation adjusted calculation method and thus should be rejected as an abuse of the Trustee's limited discretion. ........................................................ 3

    A.  The SEC has unequivocally supported a "constant dollar" adjustment – a direction that SIPC, statutorily subordinate to the SEC, has inexplicably failed to follow. ........................................................ 4

    B.  Fairness requires an inflation adjustment to "net equity." ...................... 7

        (i)  Courts routinely acknowledge that equity requires adjustment for inflation – as do financiers, economists, governmental policy makers, commentators and ordinary people. ................... 7

        (ii)  The Trustee and SIPC are wrong in their central thesis that equity always requires taking money from so-called "net winners" to give to so-called "net losers" who invested decades later. ................................................................................. 9

2.  The Trustee's and SIPC's other arguments in support of an unadjusted calculation of net equity do not withstand scrutiny, further demonstrating that their approach is "clearly inferior." ............................................................ 12

    A.  SIPA's text and purpose support an inflation adjustment to "net equity." ................................................................................................. 12

        (i)  Since SIPA's definition of "net equity" does not expressly deal with a decades-long fraud, this Court and other judges in this case have looked to the statute's equitable and customer-protection purposes ................................................. 12

        (ii)  The Second Circuit and District Court made clear that an inflation adjustment to "net equity" may be a viable approach. ............... 14

        (iii)  The SIPA provisions that require current valuations support an inflation adjustment. ....................................................... 15

(iv)    SIPA's legislative history and purpose support an inflation adjustment. .................................................................................17

(v)    SEC Rule 15c3-3 also lends support to, rather than undermines, an inflation adjustment. ...............................................................18

B.    Case law supports an inflation adjustment...........................................20

(i)    The cases cited by the Trustee and SIPC are neither relevant nor controlling. ..........................................................................20

(ii)    Emerging case law in analogous settings supports an inflation adjustment. ...............................................................22

C.    That an inflation adjustment could reduce the Trustee's potential fraudulent transfer recoveries is irrelevant.  In fact, additional SIPC advances resulting from the adjustment could offset any revenue loss to the estate...................................................................................24

D.    The argument that applying an inflation adjustment would create additional expense and delay is not convincing, particularly since the Trustee admits he has already substantially completed the computations necessary to make that adjustment.......................................................25

CONCLUSION....................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                    **PAGE(S)**

*Appleton v. First Nat'l Bank of Ohio*,
  62 F.3d 791 (6th Cir. 1995) ...................................................................................14

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...........................................................................................19

*In re Bernard L. Madoff Inv. Secs. LLC*,
  654 F.3d 229 (2d Cir. 2011)......................................................................... passim

*In re C.J. Wright & Co., Inc.*,
  162 B.R. 597 (Bankr. M.D. Fla. 1993) ...............................................................21

*In re Carrozzella & Richardson*,
  286 B.R. 480 (Bankr. D. Conn 2002) .............................................................22, 23

*CFTC v. Walsh*,
  No. 11-1516 (2d Cir.).........................................................................................23

*Kouba v. Allstate Ins. Co.*,
  No. S-77-99, 1981 WL 27108 (E.D. Ca. Sept. 24, 1981) .....................................21

*In re Madoff Secs.*,
  476 B.R. 715 (Bankr. S.D.N.Y. 2012)...............................................................14

*In re Murel Holding Corp.*,
  75 F.2d 941 (2d Cir. 1935).....................................................................................4

*In re New Times Sec. Serv., Inc.*,
  371 F.3d 68 (2d Cir. 2005) ........................................................................... passim

*In re NextWave Personal Comm'ns, Inc.*,
  244 B.R. 253 (Bankr. S.D.N.Y. 2000) ............................................................ 19-20

*In re Old Naples Secs., Inc.*,
  311 B.R. 607 (Bankr. M.D. Fla. 2002) ...........................................................20, 21

*Oliveri v. Delta S.S. Lines, Inc.*,
  849 F.2d 742 (2d Cir. 1988)...................................................................................7

*Proctor & Gamble Distrib. Co. v. Sherman*,
  2 F.2d 165 (S.D.N.Y. 1924)...................................................................................7

*Saunders v. Claytor*,
  629 F.2d 596 (9th Cir. 1980) ...............................................................................21

*SEC v. Credit Bancorp, Ltd.*,
 290 F.3d 80 (2d Cir. 2002).........................................................................17

*SEC v. Packer, Wilbur & Co., Inc.*,
 498 F.2d 978 (2d Cir. 1974).......................................................................18

*SIPC v. Ambassador Church Fin. Dev. Group*,
 788 F.2d 1208 (6th Cir. 1986) .........................................................5, 21, 22

*SIPC v. Barbour*,
 421 U.S. 412 (1975)....................................................................................18

*Till v. SCS Credit Corp.*,
 541 U.S. 465 (2004)......................................................................................7

*In re Unified Commercial Capital, Inc.*,
 260 B.R. 343 (Bankr. W.D.N.Y. 2001),
 *aff'd*, 2002 WL 32500567 (W.D.N.Y. June 21, 2002) .............................23

*United States v. Will*,
 449 U.S. 200 (1980)............................................................................4, 7, 16

## STATUTES

11 U.S.C. § 548(c) ............................................................................................20

15 U.S.C. § 78fff-2(b)............................................................................15, 16, 19

15 U.S.C. § 78fff-2(c)..........................................................................................10

15 U.S.C. § 78fff-2(c)(1)(B)................................................................................17

15 U.S.C. § 78lll(11)............................................................................................13

## OTHER AUTHORITIES

17 C.F.R. Part 211 58 F.R. 32843-01, 1993 WL 199253 ..............................7-8

17 C.F.R. § 240.15c-3-3(a)(5) .....................................................................18, 19

17 C.F.R. § 240.15c3-3(b)(1) (2012)..................................................................19

922 Cong. Rec. H. 36326 (1977) .......................................................................17

*Application of Securities Investor Protection Act of 1970*, 23 A. L.R. Fed. 157 (1975)...............13

Fed. R. Bankr. P. 2018(a) ....................................................................................1

Fed. R. Bankr. P. 9014(a) ....................................................................................1

iv

Fed. R. Evid. 201(b)..............................................................................................................9

GAO Report of Sept. 2012, Secs. Investor Prot. Corp., Customer Outcomes in the Madoff
Liquidation Proceeding, GAO 12-991 (Sept. 13, 2012) ............................................................8

Madoff Ponzi Scheme, Capital Markets, Ins. & Gov't Sponsored Enters., House Fin. Servs.,
2009 WL 4647561 (Dec. 9, 2009) .....................................................................................5, 10

Bureau of Labor Statistics CPI Inflation Calculator,
http://data.bls.gov/cgi-bin/cpicalc.pl....................................................................................10

FDIC Insurance Coverage Basics,
http://www.fdic.gov/deposit/deposits/insured/basics.html .....................................................18

FINRA, Smart Investing: Evaluating Performance
http://www.finra.org/investors/smartinvesting/advancedinvesting/evaluatingperforma
nce/ ......................................................................................................................................8

Sinclair & McPherson, *The Sad Tale of Multiple Overlapping Transfers: Part IV,*
29 Am. Bankr. Inst. J. 18, 70 (May 2010) ..............................................................................8

*In re Waipawa Finance Co. Ltd.,*
2011 NZCCLR 14 (7 Feb. 2011, NZHC CIV-2010-441-465) ...............................................24

This brief is submitted on behalf of a group of defrauded Madoff customers identified on the attached schedule A (collectively, the "Customers").[1]  The Customers oppose the Trustee's request that this Court approve his decision to ignore the effect of inflation in determining the "net equity" of customer claims (the "Trustee's Motion").

## SUMMARY OF ARGUMENT

The Second Circuit explicitly left open the issue raised by the Trustee's Motion:  whether a customer's "net equity" should be adjusted to account for inflation.  The Trustee and SIPC assert that no such adjustment is legally permitted.  They also argue that ignoring inflation is more equitable than applying to all claims a universal, widely accepted inflation adjustment (or "constant dollar" adjustment, as phrased by the SEC) that allows fair treatment across the generations of defrauded Madoff victims.

The Trustee and SIPC are wrong, both on the equities and the law.  A method that adjusts "net equity" to account for inflation – as was urged by the SEC nearly three years ago – is demonstrably fairer to customers and is more consistent with SIPA and its protective aims than

---

[1]  The Customers' fact patterns vary.  Some have filed claims in the SIPA proceeding.  Of those customers, some have challenged the Trustee's determination of their "net equity."  Some Customers have filed no claims but are defendants in the Trustee's fraudulent transfer suits.  All have standing to challenge the Trustee's Motion because an adverse determination would significantly and adversely affect their economic interests.  *See, e.g.,* Bankruptcy Rule 9014(a) (requiring that "reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.").

Additionally, in the Notice of Trustee's Determination of Claim, which the Trustee sent to all customer/claimants, the Trustee represented that if the courts "determine that the Trustee is incorrect in his interpretation of 'net equity' . . . the trustee will be bound by that order and will apply it retroactively to all previously determined customer claims. . . ."  A copy of a representative Notice is annexed as Exhibit A to the accompanying declaration of Gregory Schwed filed in support of this brief (the "Schwed Decl.").

Similarly, Customers who have not filed claims but are targets of the Trustee's fraudulent transfer lawsuits have standing because the Trustee asserts that the defendants' fraudulent transfer exposure is equal to their unadjusted "net equity" calculation.  The Customers dispute the Trustee's legal analysis, and certain avoidance defendant Customers are filing with this Court a motion requesting intervention under Bankruptcy Rule 2018(a) in an effort to be heard on this important matter.

the method proposed by the Trustee and SIPC.  The Trustee's unadjusted method arbitrarily

penalizes early customers for no reason other than their misfortune in entrusting their money to

Madoff many years before the fraud unraveled.  An inflation adjustment would put all customers

on equal economic footing by modifying the Trustee's "net investment" method to conform to

unquestioned economic reality and common sense.  *See* Point 1(B) below.

The Second Circuit has held that if the Trustee's method is "clearly inferior" to a

competing method, the Trustee's approach should be rejected.  Here, the Trustee's method,

which ignores economic reality, is "clearly inferior" to a method that makes an adjustment that

takes into account the effect of inflation over time.  *See* Point 1 below.  Moreover, the Trustee

admits that his expert has already largely completed the calculations necessary to implement to

an inflation adjustment.  Accordingly, such an adjustment seemingly could be given effect

without meaningful expense or delay.  *See* Point 2(D), below.  The Trustee's refusal to

implement an inflation adjustment is thus an abuse of his limited discretion and should be given

no deference.

The Trustee claims that the law prohibits a "constant dollar" adjustment.  It plainly does

not.  As further described below, SIPA's definition of "net equity" is silent on the issue of an

inflation adjustment and does not accommodate a decades-long fraudulent scheme of this nature.

*See* Point 2(A).  The Customers are aware of no court that has ruled on the fair treatment of

defrauded broker-dealer customers where the losses have been spread over such a long period.

In such uncharted waters, courts construing other SIPA provisions have been largely

guided by general legislative purpose, equitable considerations and common sense.  This type of

interstitial interpretation was deployed by the Second Circuit in both the *Net Equity Decision* and

*New Times* (both defined below).  A comparable level of judicial pragmatism is required here to

reach the fair result:  an inflation adjustment to ensure that customers with early and later

deposits are treated equally.

The Customers ask this Court (1) to determine that the calculation of "net equity" must

be adjusted for inflation (or deflation, as the case may be) and (2) to direct the Trustee, SIPC and

(if the SEC desires to participate) the SEC to confer with the Customers regarding the specific

protocols to be used in adjusting the "net equity" calculation for inflation.  The parties should be

required to report to the Court on the status of their efforts to reach agreement on those issues

and, if agreement cannot be reached, the matter should be determined after further proceedings.

## ARGUMENT

**1.     The Trustee's unadjusted method for calculating net equity is
         "clearly inferior" to an inflation adjusted calculation method and
         thus should be rejected as an abuse of the Trustee's limited discretion.**

The Trustee's and SIPC's views on "net equity" are entitled to no deference in these

circumstances and should be rejected.  In *In re Bernard L Madoff Inv. Secs. LLC*, the Second

Circuit stated that "in many circumstances a SIPC trustee may, and should, exercise some

discretion in determining what method, or combination of methods, will best measure 'net

equity.'  We have no reason to doubt that a reviewing court could and should accord a degree of

deference to such exercise of discretion so long as the method chosen by the trustee allocates 'net

equity' among the competing claimants in a manner that **is not clearly inferior** to other methods

under consideration."  654 F.3d 229, 238 at n.7 (2d Cir. 2011) (the "*Net Equity Decision*")

(internal quotations omitted) (emphasis added).  The Second Circuit further explained that the

views of "SIPC are entitled to respect, but only to the extent that [they have] the power to

persuade." *Id.* at 234.  (Internal citations omitted).

Here, the Trustee's unadjusted method for calculating net equity is "clearly inferior" to

one that incorporates an inflation adjustment because it ignores the economic reality that money

generally loses value over time.  A dollar deposited with Bernard L. Madoff Investment

Securities ("Madoff Securities") many years ago was unquestionably worth more than an

inflation-eroded dollar deposited just prior to the bankruptcy filing.

The time value of money has been understood and incorporated into financial

transactions for centuries, and the concept has long been expressly recognized in this Circuit.

*See*, *e.g.*, *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935) ("[P]ayment ten years

hence is not generally the equivalent of payment now.") (Hand, J.).  The SEC has repeatedly

urged an inflation adjustment in this very case.  Yet the Trustee and SIPC ask this Court to

ignore this fundamental economic truth.  *See*, *e.g.*, *United States v. Will*, 449 U.S. 200, 220

(1980) (acknowledging the "ravages of inflation").  The Trustee's method, which uses only

nominal, unadjusted numbers, does not take into account the corrosive effect of inflation on an

early customer's "net equity" computation.  The Trustee's unadjusted approach is thus "clearly

inferior" to a uniformly applied inflation adjustment that would treat all generations of defrauded

Madoff customers equally and fairly.  SIPC's arguments lack the power to persuade for these

same reasons.

> **A.     The SEC has unequivocally supported a "constant
> dollar" adjustment – a direction that SIPC, statutorily
> <u>subordinate to the SEC, has inexplicably failed to follow</u>.**

Nearly three years ago, on December 9, 2009, the Deputy Solicitor of the SEC appeared

before the House Subcommittee on Capital Markets to present the SEC's view on calculating

Madoff customers' "net equity."  The SEC stated that while it preferred the Trustee's cash-

in/cash-out method over the only competing method then being litigated (the "final account

statement method"), the Trustee's method should be modified to account for inflation.  The

SEC's rationale is comprehensive and persuasive, so it is quoted in full:

"While the final account statement approach favors earlier customers at the expense of later customers, the SEC is also sensitive to the corresponding fairness concerns under the cash-in/cash-out method.  That method of calculating net equity favors later customers at the expense of earlier customers by treating a dollar invested in 1987 as having the same value as a dollar invested in 2007.  To illustrate this concern, assume that one claimant invested $100 in the Madoff firm in 1987, a second claimant invested $100 in 2007, and neither withdrew any funds from their accounts.  Under the cash-in/cash-out approach advocated by SIPC and the Trustee, the net equity of both claimants would be $100.  But because, in basic economic terms, $100 in 1987 dollars is worth $183 in 2007 dollars (http://data.bls.gov/cgi-bin/cpicalc.pl), the claimant who invested $100 in Madoff's firm 21 years before the firm collapsed has suffered a much more substantial real-world loss than a claimant who invested $100 only one year before the collapse.

"In the SEC's view, to achieve a fair and economically accurate allocation among Madoff customers who invested and withdrew funds in different historical periods, it is appropriate to convert the dollars invested into "time-equivalent" or constant dollars.  This constant-dollar approach is rooted in the classic economic concept of the time value of money and will result in greater fairness across different generations of Madoff investors – in effect, treating early investors and later investors alike in terms of the real economic value of their investments.

"The issue of calculating net equity in constant dollars has not arisen before in SIPA cases, probably because many Ponzi-type schemes are of relatively short duration, and the inequity among those who invested at different points in time is less striking.  But the Madoff fraud – which lasted for 20-plus years – puts this issue into stark relief.  In light of the silence of SIPA regarding the payment of interest and of a Court of Appeals decision [*SIPC v. Ambassador Church Fin./Dev. Group*, 788 F.2d 1208 (6th Cir. 1986) (*see* Point 2(B) below)] suggesting, in a distinct factual circumstance, that interest may not be applied to customer claims under SIPA, the Commission considered whether calculating net equity in constant dollars would be inconsistent with that case.  Under the facts of this case, the Commission believes that the use of constant dollars can be distinguished from the payment of interest discussed in that Sixth Circuit case and that the best reading of SIPA and the cases interpreting it is that net equity here should be calculated in constant dollars."  SEC Policy Statement at 8 (Schwed Decl. Ex. B), *also found at Madoff Ponzi Scheme, Capital Markets, Ins. & Gov't Sponsored Enters., House Fin. Servs.,*  2009 WL 4647561 at *9-10 (Dec. 9, 2009) (emphasis added).

Soon thereafter, the SEC filed with this Court a Memorandum similarly urging for the

adoption of a "constant dollar" adjustment to net equity:

"The Commission believes . . . that in determining customer claims under the cash-in/cash-out method, the amount of the payment should be calculated in

constant dollars by adjusting for the effects of inflation (or deflation). Because customers will be receiving *pro rata* distribution from the limited pool of assets recovered for the [Madoff Securities] estate, calculating claims in constant dollars treats all investors fairly by taking into account the economic reality that a dollar invested in 2008 has different value than a dollar invested twenty years earlier." SEC Memorandum on Net Equity issue (Dec.11, 2009) Docket No. 1052 at 1.

The SEC (which, as explained below, has supervisory authority over SIPC) is thus on record before Congress and this Court as vigorously advocating the major policy and fairness arguments for a "constant dollar" or inflation adjustment – a view that the SEC also urged in the Second Circuit. *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 10-2378, Docket No. 296, at 17. Yet in their collective 60 pages of briefing, the Trustee and SIPC fail even to mention the SEC's persuasive analysis, let alone explain why it should be rejected.

SIPC's failure to recommend that the Trustee follow the SEC's "constant dollar" approach is particularly odd, given SIPC's statutory subservience to the SEC. The Second Circuit has previously reminded SIPC of this hierarchy: "SIPA invests the SEC with plenary authority to supervise the SIPC," and "SIPA drafters seem to have anticipated substantial and vigorous oversight of SIPC by the SEC." *In re New Times Sec. Serv., Inc.*, 371 F.3d 68, 77 (2d Cir. 2005) ("*New Times*") (citations omitted) (rejecting SIPC interpretation limiting customer protection, in favor of more expansive SEC statutory reading).[2]

---

[2] The Trustee and SIPC may argue that the SEC's position is somehow tainted by a controversy concerning an alleged conflict of interest of the SEC's former general counsel, David Becker. Yet as of this writing, over a year after that issue became public, the SEC has not revoked or modified its unequivocal support of a "constant dollar" adjustment to account for inflation. Whatever Mr. Becker's role in supporting an inflation adjustment, the SEC's 2009-2010 statements remain persuasive and almost certainly constituted the considered view of the SEC as a whole. A widely publicized September 22, 2011 letter to Congress (Schwed Decl., Ex. C) signed by 52 signatories – a virtual "Who's Who" of the private securities bar, many of whom had held major SEC positions – defended Mr. Becker's integrity and legal acuity, calling him "one of the most talented lawyers of his generation." The letter then opined that the SEC's support of the "constant dollar" modification was a true consensus view in the SEC: "Finally, many of us are former SEC senior officers or staff, and based on our many years of experience at and with the agency, we can affirm that any significant SEC decision receives broad consideration. Sometimes 20 or more sets of eyes will fall on a single recommendation memo, and decisions by the five SEC commissioners are usually made in a large meeting room that is packed with very experienced and intelligent senior and junior staff members. In that

*(footnote continued on next page)*

**B.**    **Fairness requires an inflation adjustment to "net equity."**

    **(i)**    **Courts routinely acknowledge that equity requires adjustment for inflation– as do financiers, economists, governmental policy makers, commentators and ordinary people.**

Concern about the "ravages of inflation" goes back to the founding of this country.  *See Will*, 449 U.S. at 220.  As Alexander Hamilton explained over two centuries ago during the debate about protecting federal judges' salaries from decrease:  "It will readily be understood that the fluctuations in the value of money, and in the state of society, rendered a fixed rate of compensation [of judges] in the Constitution inadmissible.  What might be extravagant today might in half a century become penurious and inadequate."  *Id.*  More recently, the Supreme Court has explicitly recognized, in a bankruptcy cram-down context, that creditors must receive compensation for "the time value of their money."  *Till v. SCS Credit Corp.*, 541 U.S. 465, 467 (2004).

Within this jurisdiction, the impact of inflation and time value of money has also long been recognized as a critical component of fairness.  *See, e.g., Proctor & Gamble Distrib. Co. v. Sherman*, 2 F.2d 165, 166 (S.D.N.Y. 1924) (Hand, J.) ("Whatever may have been our archaic [notions] about interest, in modern financial communities a dollar today is worth more than a dollar next year, and to ignore the interval as immaterial is to contradict well-settled beliefs about value."); *see also Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 746 (2d Cir. 1988) ("[A] dollar received in the future will almost surely have less purchasing power than a dollar has today").

Even apart from its endorsement of "constant dollar" in this case, the SEC has long recognized the principle of the time value of money.  *See* Staff Accounting Bulletin No. 92, 17

---

environment, any views perceived as being contrary to the public interest are quickly and vigorously challenged and ultimately disregarded."  *Id.* at 3.

C.F.R. Part 211, available at 58 F.R. 32843-01, 1993 WL 199253 (F.R.) (June 14, 1993)

(discussing the appropriate discount rate for estimating environmental or product liabilities;

rationale for applying discount rate is to account for time value of money).

FINRA, in straight-talking guidance to market participants, also acknowledges the

concept:  "Inflation means your money loses value over time.  It's the reason that a dollar in

1950 could buy a lot more than a dollar in 2010.  The calculation of return that takes inflation

into account is called real return.  <u>You'll also see inflation-adjusted dollars called real dollars.</u>"

*See* FINRA, Smart Investing: Evaluating Performance http://www.finra.org/investors/

smartinvesting/advancedinvesting/evaluatingperformance/ (last visited December 3, 2012)

(emphasis added).

The Government Accountability Office (the investigative arm of Congress charged with

examining matters relating to the receipt and payment of public funds) similarly recognized the

principle in its recent Madoff-related Report.  *See* GAO Report of Sept. 2012, Secs. Investor

Prot. Corp., Customer Outcomes in the Madoff Liquidation Proceeding, GAO 12-991, at 49

(Sept. 13, 2012) ("Even if the government surrenders tax revenue as Madoff customers realize

tax relief, the U.S. government collected and had use of tax receipts for multiple years. . . .

Given the time value of money, and difficulty in capitalizing on benefits, this is advantageous to

the government, tax practitioners and others[.]"); *see also* Sinclair & McPherson, *The Sad Tale

of Multiple Overlapping Transfers: Part IV*, 29 Am. Bankr. Inst. J. 18, 70 (May 2010) ("[I]t

would be inexcusable to adopt a supposedly equitable formula – where investors who have

invested money with Madoff for years, and some for decades – and to ignore the time value of

money."  To ignore inflation "over decades does no equity whatsoever.")

The foregoing authorities largely distill common sense, because the underlying concept is simple to grasp and widely appreciated.  Even the economically unsophisticated know full well that $10 was worth more thirty years ago than it is today.[3]

> (ii)    **The Trustee and SIPC are wrong in their central thesis that equity always requires taking money from so-called "net winners" to give to so-called "net losers" who invested decades later.**

The Trustee openly rejects the fundamental economic and equitable truth that money loses value over time as a result of inflation.  He proclaims:  "Equity also does not support recalculating net equity claims to include Time-Based Damages."  Tr. Mem. at 2.  The Trustee continues:

> "Until there are sufficient recoveries to return all principal losses to customers, revising the method by which net equity is calculated frustrates that objective. The effect of including Time-Based Damages as part of the net equity claim is to take funds currently earmarked to repay net losers who have not yet recovered their principal and shift those funds to pay those who have already received all their principal as well as fictitious profits."  *Id.*

This statement does not stand up to even cursory analysis.  The supposedly dire example identified by the Trustee – a possible diversion of funds from nominal "net losers" to nominal "net winners" – is in fact exactly what <u>should</u> happen in appropriate cases.

Take, for example, a hypothetical Customer A, who deposited $1 million in 1988 and withdrew $1,050,000 twenty years later, just before the 2008 bankruptcy filing.  Customer B, in

---

[3] The Customers are not currently submitting expert reports or testimony because the appropriateness and fairness of an inflation adjustment are concepts of which judicial notice can be taken.  *See* Federal Rule of Evidence 201(b) (court may take judicial notice of facts that are "generally known within the trial court's territorial jurisdiction" or that are capable of accurate and ready determination by resort to "sources whose accuracy cannot be reasonably questioned.").  Also, the Scheduling Order on this issue provided only that those opposing the Trustee's Motion "shall file a memorandum of law in opposition" and makes no provision for evidentiary proceedings on the scheduled hearing date.  September 5, 2012 Scheduling Order [Docket No. 5022 at 3].  The Order also provided that "[a]ny other issues raised by Objecting Claimants will be resolved in subsequently scheduled hearings."  *Id.* at 4.  If the Court desires expert testimony or reports or additional evidence on the issues of whether an inflation adjustment is appropriate and how such an adjustment would be given effect, the Customers reserve the right to make such submissions at such a subsequent hearing.

contrast, deposited $1 million in late November 2008 and a week later withdrew $950,000.  In

the Trustee's tunnel-vision view, Customer A is a $50,000 so-called "net winner" and is liable

for $50,000 in a clawback suit.  Customer B is a $50,000 so-called "net loser" and thus has a

$50,000 net equity claim.  Further assume, for simplicity of analysis, that these two are the only

customers, so the system is a "zero sum game" – that is, whatever is given to one customer is

taken away from the other.  (The Trustee indeed asserts that any reallocation would be a "zero

sum game" on page 25 of the Tr. Mem.) [4]

By the Trustee's logic, the Trustee would sue Customer A for a $50,000 fraudulent

transfer and redistribute that $50,000 to Customer B.  Both would then end up with exactly the

same nominal amount:  $1 million.  In reality, though, Customer A has of course been far more

injured by the Madoff fraud than Customer B.  To be sure, Customer B lost $50,000, or 5%.  But

even if Customer A gets to keep the $50,000 in excess of his deposit, Customer A has suffered a

far greater real economic loss.  The $1,050,000 Customer A got back in inflation-ravaged 2008

dollars is worth little more than one-half (in fact, approximately $575,000) of the $1 million

invested in 1988, twenty years earlier.  *See* Bureau of Labor Statistics CPI Inflation Calculator

http://data.bls.gov/cgi-bin/cpicalc.pl (last visited December 3, 2012).  Thus, in the real world

where money loses value over time – not some fanciful Platonic world dreamed up by the

Trustee and SIPC – Customer A has suffered over a 42% real loss on his or her investment,

compared to a mere 5% loss for Customer B.  Yet the Trustee would wrest money from

---

[4] The Madoff Securities case is not truly a zero sum game.  If a constant dollar approach is adopted, SIPC likely will need to make additional payments to Madoff Securities' victims.  While SIPC payments are technically called "advances," if, as may be the case here, the estate ultimately lacks sufficient funds to pay net equity claims in full, those advances will not be fully repaid to SIPC.  15 U.S.C. § 78fff-2(c).  In that event, any additional SIPC advances would increase the pot of funds to be paid to Madoff victims at no overall expense to customers – a desirable outcome for Madoff's victims and an outcome that is consistent with the customer protection aims of SIPA.  *See* Point 2(C) below.

Customer A through a fraudulent transfer suit and give the proceeds to Customer B.  Far from achieving equity, the approach urged by the Trustee and SIPC would compound the unfairness and harm that has been visited on Customer A as a result of Madoff's fraud.

SIPC devotes an entire subsection to the claim that "Time-Based Damages Do Not Achieve Equity."  SIPC Mem. at Point V(2).  The effort badly fails.  The centerpiece of SIPC's fairness argument is an example showing how a constant dollar adjustment would significantly increase the "net equity" claim of a very early hypothetical customer.  And why, in SIPC's view, is that unfair?  Because the adjustment could end up increasing the claims of early customers who happen to be "insiders," "wrongdoers," and "Madoff family member[s]."  *Id*. at 28-29.

This argument is a clumsy attempt to provoke judicial indignation by claiming that an inflation adjustment must be wrong because it could possibly benefit some malefactors.  The problems with this concept are many.  First, the Customers here are decidedly not "insiders," "wrongdoers," or "Madoff family members."  Like the vast majority of Madoff's victims, the Customers here deposited their funds with Madoff Securities in good faith, and the Trustee concedes that they had no knowledge of or involvement in the fraud.

Moreover, in the federal court-supervised bankruptcy setting, wrongdoers and insiders do not benefit.  SIPC admits as much in its own brief:  "Because the claimant is an insider, the Trustee would have many defenses as to why the insider should be barred from any recovery whatsoever."  *Id*. at n.11.  Those defenses include equitable subordination, lack of good faith, recharacterization, unclean hands and others.  Accordingly, this imaginary parade of miscreants walking away with inflated claims would simply not happen.

Finally, SIPC's argument could impugn <u>any</u> fair-minded reform, simply by claiming that it might benefit a handful of wrongdoers.  SIPC's argument is as fatuous as opposing cost-of-living increases in Social Security because some recipients might not be nice people.

The bottom line is that the Trustee's and SIPC's repeatedly invoked shibboleth – that it would be unjust to give any customer a net equity claim for more than principal before all customers have been paid all their principal – is just wrong.  Their contention depends entirely on the misguided premise that the effects of inflation have no relevance in deciding what is just and fair.  The Trustee's central argument is thus belied not just by common sense but by countless pronouncements from the bench and the worlds of finance, business and government.

**2.      The Trustee's and SIPC's other arguments in support of an
        unadjusted calculation of net equity do not withstand scrutiny,
        <u>further demonstrating that their approach is "clearly inferior</u>."**

The Trustee and SIPC argue that an inflation adjustment is barred by SIPA and the case law, and that such an adjustment would reduce the Trustee's fraudulent transfer recoveries and generate additional cost and delay.  These arguments are unpersuasive.  In fact, SIPA's text and the customer-protection purpose support an inflation adjustment, and the Trustee's practical and financial arguments are groundless.

**A.      SIPA's text and purpose support
        <u>an inflation adjustment to "net equity</u>."**

**(i)      Since SIPA's definition of "net equity" does not
        expressly deal with a decades-long fraud, this Court
        and other judges in this case have looked to the
        <u>statute's equitable and customer-protection purposes</u>.**

The Trustee and SIPC argue that a "constant dollar" adjustment is somehow precluded by SIPA.  It is not.  In fact, SIPA is silent on how to address a decades-long fraudulent scheme

where it is alleged that no securities are actually purchased.[5]  "Net equity" is defined as the dollar amount of the account, as determined by calculating "the sum which would have been owed by the debtor to such customer <u>if the debtor had liquidated . . . all securities positions of such customer</u> . . . [less any loans taken by the customer]."  15 U.S.C. § 78lll(11) (emphasis added).  As noted by this Court and the Second Circuit, this statutory language cannot be applied cleanly here because, despite what any customer statement showed, the Trustee has alleged that no actual securities were purchased.  As a result, in its prior decisions on net equity, both this Court and the Second Circuit necessarily expanded the analysis beyond the relatively unhelpful "plain language."

It was in this context that the Second Circuit recognized, as discussed above, that the Trustee has discretion to implement a variety of approaches to calculating "net equity," so long as that approach is not "clearly inferior" to a competing approach.  *Net Equity Decision*, 654 F.3d at 238 n.7.  The narrow and inflexible interpretation of SIPA that is being urged by the Trustee and SIPC is inconsistent with this limited discretion.

The Second Circuit also held that "the statutory language does not prescribe a single means of calculating 'net equity' that applies in the numerous circumstances that may arise in a SIPA liquidation."  *Id.* at 235.  The Second Circuit further stated that "[t]he two competing methods of calculating 'net equity' proposed by the parties to this litigation are the only two methods at issue here.  We do not hold that they are the only possible approaches to calculation of 'net equity' under SIPA."  *Id.* at n.5.

---

[5] This statutory gap is not surprising.  SIPA was enacted in 1970, following a series of conventional brokerage house liquidations, receiverships and bankruptcies that resulted from a serious business contraction disrupting the industry in 1969-1970.  *Annotation. Validity, Construction, and Application of Securities Investor Protection Act of 1970*, 23 A.L.R. Fed. 157, 179 (1975).  Large-scale, long-term Ponzi-type frauds did not surface until several decades later:  Bayou (2005); Stanford, Madoff (2008); Petters, WG Trading (Westridge) (2009).

These judicial pronouncements clearly indicate that SIPA should be applied flexibly, consistent with the fundamental notion that SIPA is a remedial statute that should be construed liberally to carry out its customer-protection purpose.  *See New Times*, 371 F.3d at 84 ("These statutory goals – promoting investor confidence and providing protection to investors – are better served by the SEC's broader reading of section 9(a)(1) [§ 78fff-3]."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995) (broadly construing SIPA to effectuate its remedial purpose).  The overly rigid interpretation of SIPA urged by the Trustee and SIPC undermines this concept of flexibility and fails to achieve SIPA's protective aims.

### (ii)     The Second Circuit and District Court made clear that an inflation adjustment to "net equity" may be a viable approach.

Far from ruling in favor of the Trustee's restrictive and inferior interpretation of SIPA, the Second Circuit made clear that the "constant dollar" issue would need to be addressed and decided in this Court after further briefing:  "We express no view on whether the Net Investment Method should be adjusted to account for inflation or interest, an issue on which the bankruptcy court has not yet ruled and which is not before us on this interlocutory appeal."  *Net Equity Decision*, 654 F.3d at 235 n.6.  The Second Circuit also noted the SEC's support for the "constant dollar" adjustment:  "The SEC further argued that the Net Investment Method should be applied using inflation-adjusted dollars."  *Id.* at 234 n.4.

In declining to withdraw the reference on this issue, District Judge Rakoff also framed an adjustment for inflation as a live and viable alternative:  "The defendants might well establish, for example, that under a 'constant dollar' approach, Madoff Securities owed them a reasonable return of interest on their investment."  *In re Madoff Secs.*, 476 B.R. 715, 727 n.10 (Bankr. S.D.N.Y. 2012) (emphasis added).

### (iii)    The SIPA provisions that require current valuations support an inflation adjustment.

Inferential support for an inflation adjustment also derives from other parts of SIPA that implicitly recognize the time value of money.  For example, SIPA requires that in making distributions to customers, "all securities[6] shall be valued as of the close of business on the filing date."  15 U.S.C. § 78fff-2(b) (emphasis added).  Embedded in this statutory directive is an inflation-based assumption.  While securities prices are affected by many influences, inflation is undeniably a factor.  To survive, companies necessarily must adjust to inflationary pressures.  Over the long term, those adaptations are generally reflected in higher equity values.  Take, for example, a customer who placed an order for Exxon shares in 1987 at the then-market price of $10 a share.  The brokerage house ultimately fails in 2012.  In this setting, the customer receives under SIPA a "net equity" claim in the amount of the shares' 2012 market value – about $87.  SIPA does not relegate the customer to the original $10 paid for the Exxon stock in 1987.

By analogy, an inflation adjustment to cash works better than the Trustee's unadjusted method in conforming to SIPA's requirement that "net equity" must be based on the value of the customer's investments "as of the close of business on the filing date."  15 U.S.C. § 78fff-2(b).  While "net cash in" is the appropriate baseline for net equity, that cash must be measured as of the petition date in order to take into account the inflationary erosion of earlier deposits.

The Trustee and SIPC argue that it is somehow dispositive that Congress provided for explicit inflation adjustments in some parts of SIPA, but not here.  *See*, *e.g*., Tr. Mem. at 10.

---

[6] The Trustee acknowledges that customers have claims for securities, not cash, because they received account statements indicating that securities had been purchased for their accounts.  *See* Tr. Mem. at 25-26; *see also New Times*, 371 F.3d at 86 (holding that "whether a claim is treated as one for securities or cash depends not on what is actually in the customer's account but on what the customer has been told by the debtor in written confirmations.").

However, Congress never had occasion to mention any kind of inflation adjustment in defining "net equity." Such an adjustment would have made no sense in the plain-vanilla broker liquidation context. In the typical broker-dealer insolvency, the remedy is straightforward: the customer gets a "net equity" claim in the amount of the then-current value of the securities. As noted above, an inflation adjustment would be unnecessary in that setting because it inheres in the remedy. The customer gets the benefit of current stock pricing, which would reflect inflation or deflation, as the case may be.

The Trustee and SIPC also try, without success, to exploit the statutory requirement that "net equity" must generally be "ascertainable from the books and records of the debtor." 15 U.S.C. § 78fff-2(b). Tr. Mem. at 9. Their logic is that the Madoff Securities books and records are silent about adjusting anything to account for inflation; therefore, the Trustee is somehow barred from making that adjustment. This argument fails for at least two reasons. First, an inflation or "constant dollar" adjustment is plainly "ascertainable" from Madoff Securities' "books and records." The Trustee claims that Madoff Securities kept accurate records of all deposit and withdrawal transactions – including the date of all such transactions. As a result, appropriate inflation adjustments can be made with confidence. Second, as recognized by the Second Circuit in the *Net Equity Decision*, nothing in the statute suggests that the Trustee must be slavishly tethered to using <u>only</u> the unadjusted amounts reflected in the books and records. SIPA does not bar the Trustee from applying a fair, uniformly applicable adjustment (like the CPI promulgated by the Bureau of Labor Statistics) to neutralize what the Supreme Court has called the "ravages of inflation." *Will*, 449 U.S. at 220.

### (iv)    SIPA's legislative history and purpose
### <u>support an inflation adjustment.</u>

SIPA was designed to ensure that a customer of a failed brokerage firm "receive[s] what he believes is in his account at the time the stockbroker ceases business." H.R. Rep. No. 95-746 at 21 (1977). Amendments to SIPA were adopted by Congress in 1978 to further this purpose. *See*, *e.g.*, D 922 Cong. Rec. H. 36326 (daily ed. No. 1, 1977) (statement of Rep. Robert C. Eckhardt) ("One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 Amendments], is the failure to meet <u>legitimate customer expectations</u> of receiving what was in their account at the time of the broker's insolvency.") (emphasis added); *see also* SEC *Amicus* Brief, *In re Bernard L. Madoff Inv. Secs. LLC*, No. 10-2378, Docket No. 296, at 17 (2d Cir. 2012) (arguing that a "constant dollar" adjustment remedy "best effectuates SIPA's purpose of assuring that customers receive the assets that should be in their accounts when a brokerage firm fails"). No reasonable investor would expect cash held by a third party for decades to be unadjusted, completely exposed to inflation. Adjusting net equity for inflation comports with this expectation in a way that is entirely consistent with the *Net Equity Decision* because it uses an objective, universally applicable methodology that is entirely independent of the fraudulent Madoff Securities account statements.

Additional support for an inflation adjustment can be inferred from SIPA's requirement that a SIPC trustee allocate customer property "to customers of such debtor, <u>who shall share ratably</u> in such customer property on the basis of their respective net equities." 15 U.S.C. § 78fff-2(c)(1)(B) (emphasis added). Implicit in the "ratable" sharing requirement is the concept of fair allocation. *See*, *e.g.*, *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 89 (2d Cir. 2002) ("[T]he use of a pro rata distribution has been deemed especially appropriate for fraud victims of a 'Ponzi scheme.'"). The Congressional objective of fairness can be satisfied only by recognizing

the equitable and economic reality that those who lost their money decades or years ago were damaged more than those who lost the same nominal amount yesterday.

Finally, an inflation adjustment is also far superior to the Trustee's approach in promoting SIPA's express goal of maintaining confidence in the securities markets.  *See*, *e.g.*, *SIPC v. Barbour*, 421 U.S. 412, 415 (1975) (one of Congress's goals in enacting SIPA was to "restore investor confidence in capital markets"); *SEC v. Packer, Wilbur & Co., Inc.*, 498 F.2d 978, 980 (2d Cir. 1974) (SIPA "was a legislative effort to reinforce the flagging confidence in the securities market").  The Trustee's proposed unadjusted approach, if upheld, would send a troubling signal to customers and to the securities markets as a whole that SIPA does not protect long-term investments in the context of a long-running fraud.  Customers would even have a wasteful and unintended incentive to regularly flip their investments from one broker to another, so they could update the stale, unadjusted cash valuations that the Trustee advocates here. Worse, some customers could entirely lose confidence in watered-down SIPC protection and shift their funds into investments with more realistic inflation protection.  *See*, *e.g.*, FDIC Insurance Coverage Basics, http://www.fdic.gov/deposit/deposits/insured/basics.html (last visited December 3, 2012) ("FDIC insurance covers depositors' accounts at each insured bank, dollar-for-dollar, including principal <u>and any accrued interest through the date of the insured bank's closing</u>, up to the insurance limit.") (emphasis added).

(v)    **SEC Rule 15c3-3 also lends support to, rather
than undermines, an inflation adjustment.**

The Trustee and SIPC also assert that SEC Rule 15c3-3's customer property protections preclude a constant dollar adjustment because the value of the inflation-adjusted customer claims could exceed the amount of customer property that must be segregated under the Rule.  *See* Tr. Mem. at 19; SIPC Mem. at 15-20.  But if anything, Rule 15c3-3 actually supports a constant

dollar adjustment when calculating customer SIPA claims.  Rule 15c3-3 requires segregation of

the amount of customer fully paid securities and the broker's excess margin net obligations to

customers.  17 C.F.R. § 240.15c3-3(b)(1) ("A broker or dealer shall promptly obtain and shall

thereafter maintain the physical possession or control of all fully-paid securities and excess

margin securities carried by a broker or dealer for the account of customers.").  The Rule values

securities at their <u>current</u> market value, not simply their original purchase price.  *See, e.g.,* 17

C.F.R. § 240.15c-3-3(a)(5) (defining "excess margin securities" as "securities . . . carried for the

account of a customer having a market value in excess of 140 percent of the total of the debit

balances in the customer's account or accounts . . .").  As with the SIPA requirement that "all

securities shall be valued as of the close of business on the filing date" (15 U.S.C. § 78fff-2(b),

discussed in Section 2(a) above), the current value of securities captures all inflationary

adjustments.  Market pricing is based on the economic premise of efficient markets, which

assumes that the market itself corrects or self-adjusts over time for events like inflation.  *See,*

*e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) ("Recent empirical studies have tended to

confirm Congress' premise that the market price of shares traded on well-developed markets

reflects all publicly available information[.]").  In short, Rule 15c3-3's segregation requirement

embodies a core economic premise that incorporates any necessary inflation adjustment.

It is also revealing that the SEC saw no Rule 15c3-3 obstacle when it unequivocally and

repeatedly supported a "constant dollar" adjustment.  *See* Point 1(A) above.  SIPC and the

Trustee are thus necessarily making the dubious claim that they know more about the meaning of

an SEC Rule than the SEC itself.

Finally, even assuming, *arguendo*, that Rule 15c3-3 conflicted with SIPA, statutes take

precedence over conflicting administrative rules and regulations.  *See, e.g., In re NextWave*

*Personal Comm'ns, Inc.*, 244 B.R. 253, 276 (Bankr. S.D.N.Y. 2000) (collecting cases).  For

these reasons, the Trustee's and SIPC's Rule 15c3-3 argument has no validity.

> **B.** **Case law supports an inflation adjustment.**

> **(i)** **The cases cited by the Trustee and SIPC**
> **are neither relevant nor controlling.**

The Trustee urges rejection of an inflation adjustment based on case law rejecting

customer/claimant arguments that they should be entitled to the imaginary investment returns

promised by the fraudster.  *See* Tr. Mem. at Point C.  These cases are not on point, in large part

because a universally applicable inflation adjustment is not the same as individualized victim

claims for interest or damages, typically based on the fraudster's promise.[7]  Indeed, none of the

cases cited by the Trustee expressly dealt with a universally applied, conservative measure that

covered only the time-value of money, such as the CPI, as proposed by the Customers here.

For example, in the Trustee's very first case citation, *In re Old Naples Secs., Inc.*, 311

B.R. 607, 617 (Bankr. M.D. Fla. 2002) (Tr. Mem. at 11), the Trustee neglects to point out that

the customer/claimants in that case were asking the court to approve their full SIPC claim

without deducting the so-called "interest" payments they received from the fraudster.  The

claimants "were promised a risk-free investment with a 30-to 45-day return of principal plus a

guaranteed percentage return on principal, usually 7%." *Id.* at 610.  Annualized, those promised

returns ranged from 56% to 84%.  In contrast, the Customers here are not asking for validation of

the Madoff account statement returns.  Rather the Customers here seek only a universally applied

---

[7] The right to assert substantive state law remedies as "value" defenses under Bankruptcy Code 548(c) has been briefed and is currently awaiting a decision by Judge Rakoff.  Whatever Judge Rakoff ultimately decides, the issue in this Court is different:  whether the Trustee must adjust the SIPA "net equity" computation to take into account the effects of inflation over time.

adjustment to account for inflation (or deflation), which would have the effect of treating all customers fairly.

The next case cited by the Trustee (on which *Old Naples* relied) is *In re C.J. Wright & Co., Inc.*, 162 B.R. 597 (Bankr. M.D. Fla. 1993). Trustee Mem. at 11. In that case as well, the issue was whether claimants could keep (and not have deducted from their claims) interest they expected to receive from their certificates of deposit. Those CDs were fraudulent and were never purchased. Accordingly, the court rejected this attempt to benefit from the fraudster's fictional rate of return – much the same rationale used by this Court and by the Second Circuit in the *Net Equity Decision*. This decision is thus distinguishable for the same reason as *Old Naples*.

*Old Naples* and *C.J. Wright* also involved Ponzi schemes that had relatively short durations, ranging from months to a few years. The "constant dollar" issue was apparently never even raised or discussed, possibly because the adjustment might have had only minimal or no effect. Those cases are accordingly irrelevant.

SIPC also cites *Saunders v. Claytor*, 629 F.2d 596, 598 (9th Cir. 1980) (SIPC Mem. at 14), in which the Court refused to adjust for inflation a federal employee's Title VII discrimination award. But the Court's ruling was based on federal sovereign immunity and "in *dicta*, indicated that an inflation correction factor may be an appropriate remedy for private sector Title VII plaintiffs." *Kouba v. Allstate Ins. Co.*, No. S-77-99, 1981 WL 27108, at *8 (E.D. Ca. Sept. 24, 1981).

The SEC, in urging application of the "constant dollar" adjustment, referred to one possibly *contra* case that it considered worthy of mention. *See* Point 1(A) above. That case, *SIPC v. Ambassador Church Fin. Dev. Grp., Inc.*, 788 F.2d 1208 (6th Cir. 1986), is cited by both the Trustee and SIPC for the proposition that "SIPA does not authorize the SIPC to pay interest,

either to the trustee or directly to the debtor's customers." *Id*. at 1212.  But the SEC was

ultimately untroubled by the case, concluding that "the use of constant dollars can be

distinguished from the payment of interest discussed in that Sixth Circuit case."  SEC policy

statement at 8 (Schwed Decl. Ex. B), *also found at Madoff Ponzi Scheme*, 2009 WL 4647561 at

*10.  And indeed *Ambassador Church* is readily distinguishable.  That case had nothing to do

with the issue presented by the Trustee's Motion:  the equities as among customers, based on the

timing of their deposits and withdrawals.  Rather, the issue there was a contention by customers

that they were entitled to <u>post</u>-petition interest for the more than seven years it took SIPA to get

around to paying their claims.  *Ambassador Church*, 788 F.2d at 1210-11.  In rejecting that

argument, the court's first ground of decision was the longstanding general rule that "[u]nder

bankruptcy law, with certain exceptions not applicable in this case, a court cannot award

postpetition interest against the debtor's estate unless the surplus exists."  *Id*.  The Court

supplemented this reasoning by stating:  "Furthermore, the rule reflects the broad equitable

principle that creditors should not be disadvantaged vis-à-vis one another by legal delays

attributable solely to the time-consuming procedures inherent in the administration of the

bankruptcy laws."  *Id.* (internal quotations omitted).

The *Ambassador Church* rationale accordingly has no relevance here.  The Customers are

not claiming the right to post-petition interest.  Moreover, even if the case were read in the way

urged by the Trustee, the decision would not be binding on courts in this Circuit.

> **(ii)    Emerging case law in analogous
> settings supports an inflation adjustment.**

Some well-reasoned cases have held that a good-faith Ponzi-scheme investor is entitled to

an adjustment for interest in the context of an avoidance action defense.  *See, e.g., In re*

*Carrozzella & Richardson*, 286 B.R. 480, 484 n.7 (Bankr. D. Conn 2002) (allowing assertion of

contract-based interest that was "not unreasonably high"); *In re Unified Commercial Capital, Inc.*, 260 B.R. 343, 351 (Bankr. W.D.N.Y. 2001), *aff'd,* 2002 WL 32500567 (W.D.N.Y. June 21, 2002) (same; noting "universally accepted fundamental commercial [principle] that, when you loan an entity money for a period of time in good faith, you have given value and are entitled to a reasonable return").

The Trustee ignores *Carrozzella* and attempts to distinguish *Unified* by noting that the decision turned on the Ponzi schemer's promise of a specific contractual interest rate to the customer. Tr. Mem. at 23. But in fact, the Customers' equitable argument here is stronger than the claims of defendants in those cases. The Customers are not seeking ratification of any fraudulently promised interest rate. Rather, the Customers ask only for a judicially approved, universally applied inflation adjustment that gives no Customer a profit but does place all Madoff victims on an equal economic footing.[8]

In short, whether to adjust customers' "net equity" to account for inflation is an issue of first impression. This absence of on-point law is not surprising, given that massive, long-term Ponzi frauds are uncommon and of relatively recent vintage. *See* footnote 5, above. However, some law is beginning to emerge in non-SIPA contexts. Currently awaiting decision in the Second Circuit is an investor claim for a "constant dollar" adjustment in the W.G. Trading (Westridge) Ponzi fraud, a non-SIPA equity receivership. *See CFTC v. Walsh*, No. 11-1516 (2d Cir.).

---

[8]   The Customers are not currently arguing that any specific method must be used to make an appropriate "constant dollar" adjustment. The CPI-U (All-Urban Consumers) is widely used and the Trustee admits he has himself adopted this measure in calculating the effects of a "constant dollar" adjustment. *See* Point 2(C), below. But alternative methods of adjustment may also be appropriate in this case as well. The Trustee's refusal to adopt any inflation adjustment, however, is an abuse of discretion. *See* Point 1(A), above.

Also, the High Court of New Zealand (citing the SEC's position in this case) held that, in a 20-year Ponzi scheme, "constant dollar" would represent the "fairer distribution," in view of the goal of trying to "equalize as much as possible the same dollar value between investors whenever they invested their money." *In re Waipawa Finance Co. Ltd.*, 2011 NZCCLR 14 (7 Feb. 2011, NZHC CIV-2010-441-465) (annexed to the Schwed Declaration as Exhibit D). While New Zealand precedent is obviously not binding here, it is noteworthy that a significant Commonwealth jurisdiction has approved the universal principle that fairness requires inflation adjustment.

### C. That an inflation adjustment could reduce the Trustee's potential fraudulent transfer recoveries is irrelevant. In fact, additional SIPC advances resulting from the adjustment could offset any revenue loss to the estate.

The Trustee's Motion is accompanied by a declaration of Robert J. Rock (the "Rock Decl."), a Managing Director of Alix Partners, LLP. Mr. Rock opines that if an inflation adjustment were made, "the differential between the total net winner balances under the Net Investment Method [the Trustee's unadjusted method] and the balances for those same amounts after the Inflationary Adjustment would decrease by an amount equal to approximately $330 million." Rock Decl. at ¶ 9. The implication is that an inflation adjustment is a bad idea because it would limit the money the Trustee could recover in his fraudulent transfer lawsuits.

This argument has no legal or equitable force. The Customers recognize that maximizing the value of avoidance recoveries to a bankrupt estate is an important practical objective. But this goal cannot be achieved at the expense of legitimate defenses, or by ignoring the equitable and policy limitations on such recoveries.

In fact, adjusting for inflation will likely increase the aggregate amounts available for distribution to customers, thus furthering SIPA's remedial purpose. An inflation adjustment

would require SIPC to inject more funds into the estate to cover the increased "net equity" claims of customers with earlier deposits. *See* footnote 4, above. These advances would never need to be repaid by the estate if (as may be the case here) the Trustee is unable to satisfy customer claims in full. It is therefore far from clear that the net effect of a "constant dollar" adjustment would mean less total money for distribution to Madoff's victims.

> **D. The argument that applying an inflation adjustment would create additional expense and delay is not convincing, particularly since the Trustee admits he has already substantially completed the computations necessary to make that adjustment.**

The Trustee argues that a "constant dollar" adjustment "creates more harm than good." Tr. Mem. at Point G(2) (section title). The Trustee trots out one potential horror after another: adjusting the claims "would require that the Trustee once again perform a transaction-by-transaction, account-by-account, review"; it would take "as long as twelve months to perform"; objections could cause "years of delay"; and the Trustee would incur additional administration costs of "tens of millions of dollars." *Id.*

This "administrative burden" argument is undermined by the Trustee's own papers. First, the Trustee admits that he has already done virtually all of the computations necessary to make the "constant dollar" adjustment.[9] Indeed, Mr. Rock admits that he performed calculations that "included adjusting for inflation the transactions for all active Madoff Securities accounts for which a customer claim was filed," and he used the Bureau of Labor Statistic's CPI to do so. Rock Decl. at ¶ 4. In other words, most, if not all, of the adjustment work has already been done.

---

[9] The Rock Decl. was submitted to show how an adjustment could alter the landscape of claim holders and clawback defendants. But this showing is irrelevant because any adjustment, of any kind, will likely benefit some and not others. The Trustee's point is valid only if the proposed adjustment is unfair. An inflation adjustment is fair, so the argument has no force. For example, the Trustee complains that some feeder funds would gain and some would lose under "constant dollar." Tr. Mem. at Point G(3). But there is no inherent injustice in such a re-allocation, which would be based entirely on the inflation adjustment principles discussed in this brief.

The expense of this work is a "sunk cost"; it accordingly is not a legitimate factor in the Trustee's future budgeting calculus.

The Trustee warns that if an inflation adjustment were adopted, "there would still be significant additional work" to do. Trustee Mem. at n.13. But given what Mr. Rock has already conceded, this additional marginal effort would likely be immaterial. Decades ago, the computations to adjust the net dollars for inflation might have been unduly burdensome or time-consuming. But in this era of personal computers and off-the-shelf spreadsheets, even complex calculations of this type can be done easily, quickly and cheaply. Given Alix Partners' sophistication and access to state-of-the-art financial analytical tools, it is hard to imagine that polishing up this already-performed analysis would require an inordinate additional effort.

Furthermore, any additional costs are borne by SIPC, not the Madoff Securities estate. While expenses paid by SIPC are technically deemed "advances," SIPC's right to repayment is subordinated to payment in full of all customers' net equity claims. *See* footnote 4, above. The "statutory goals" of SIPA are "promoting investor confidence and providing protection to investors." *New Times*, 371 F.3d at 84. Any additional cost to SIPC would be a small price to pay for a distribution mechanism that furthers these goals and achieves fairness across the spectrum of defrauded Madoff victims.

Moreover, any additional computational expense would, in the larger scheme, amount to little more than rounding error, considering the vast sums the Trustee has already spent administering the case. Even if the incremental cost of adjustment was, as the Trustee claims, $10 million, it would represent less than 2% of the more than $550 million in administrative costs already incurred by the Trustee. Any additional expense to make the inflation adjustment

would be money well spent because it would further the fundamental goal of equitably distributing funds to Madoff's victims.

Finally, any delay resulting from the implementation of an inflation adjustment could easily have been avoided by the Trustee. The Customers raised their entitlement to a time value adjustment as early as June 2009. Had the Trustee been concerned with delay, he could have set the issue for earlier briefing or prepared alternative calculations so that an inflation adjustment could be implemented seamlessly when the issue was finally determined. The Customers' right to an inflation adjustment should not be prejudiced by the Trustee's failure to take those steps.

## CONCLUSION

For the foregoing reasons, the Customers request, along with any other relief that may be just and proper, that the Court dispose of the Trustee's Motion as follows:

(1)  The Trustee's request for a determination that no time-value adjustments are required for net equity claims should be <u>denied</u>, and the request by the Customers for a determination that all net equity claims should be adjusted to account for the effects of inflation, should be <u>granted</u>.

(2)  The Trustee and SIPC should be directed to confer with the Customers and, if the SEC desires to participate, the SEC, regarding the Trustee's inflation calculations described in the Rock Declaration and the propriety of the underlying assumptions and adjustment protocols used by the Trustee. The parties should be required jointly to report to the Court, by a date to be set by the Court, concerning the status of their efforts to reach agreement on those issues.

(3)  If, by the reporting date to be set by the Court, the parties cannot reach agreement on the issues identified in paragraph (2) above, the matter should be submitted to the Court for determination after further briefing and argument on a schedule to be set by the Court, upon notice to all claimants and proposed intervenors.

Dated:   New York, New York
         December 3, 2012

Respectfully submitted,

LOEB & LOEB LLP


By: /s/ P. Gregory Schwed
    P. Gregory Schwed
    Walter H. Curchack
    Daniel B. Besikof
    345 Park Avenue
    New York, NY  10154
    Tel:  (212) 407-4000
    Fax:  (212) 407-4990

*Attorneys for Alan and Norma Aufzien and family;
the Evenstad family parties; Gorvis LLC; and The
Koff Living Trust*

K&L GATES LLP
Richard A. Kirby
Laura K. Clinton
1601 K Street NW
Washington, DC  20006-1600
Tel:  (202) 778-9000
Fax:  (202) 778-9100

*Attorneys for the Customers identified on Schedule
A as being represented by K&L Gates LLP*

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Elise S. Frejka
Jason S. Rappaport
1177 Avenue of the Americas
New York, New York  10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000

*Attorneys for the Customers identified on Schedule
A as being represented by Kramer Levin Naftalis &
Frankel LLP*

MILBERG LLP
Matthew Gluck
Matthew A. Kupillas
Jennifer L. Young
Joshua E. Keller
One Pennsylvania Plaza
New York, New York  10119
Tel: (212) 594-5300
Fax: (212) 868-1229

*Attorneys for the Customers identified on Schedule
A as being represented by Milberg LLP*

SCHULTE ROTH & ZABEL LLP
Marcy Ressler Harris
Jennifer M. Opheim
Mark D. Richardson
919 Third Avenue
New York, New York  10022
Tel:  (212) 756-2000
Fax:  (212) 593-5955

*Attorneys for HHI Investment Trust #2*

SEEGER WEISS LLP
Parvin K. Aminolroaya
77 Water Street, 26th Floor
New York, New York  10005
Tel: (212) 584-0700
Fax: (212) 584-0799

*Attorneys for the Customers identified on Schedule
A as being represented by Seeger Weiss LLP*

SNR DENTON US LLP
Carole Neville
1221 Avenue of the Americas
New York, New York  10020-1089
Tel:  (212) 768-6700
Fax:  (212) 768-6800

*Attorneys for the Customers identified on Schedule
A as being represented by SNR Denton US LLP*

## Schedule A

## The Customers

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Alan F. Aufzien and Norma K. Aufzien JT/WROS | 1CM198 | 004252 | 944 | 10-04483 | Loeb & Loeb LLP[10] |
| Jonathan M. Aufzien | 1CM802 | 3407 | 945 | 10-04483 | Loeb & Loeb LLP |
| Lisa Aufzien | 1CM800 | 4170 | 946 | 10-04483 | Loeb & Loeb LLP |
| Leslie Aufzien Levin | 1CM799 | 5557 | 947 | 10-04483 | Loeb & Loeb LLP |
| Meredith Aufzien Bauer | 1CM801 | 4901 | 948 | 10-04483 | Loeb & Loeb LLP |
| Kenneth L. Evenstad Revocable Trust u/a/d May 2, 2000 | 1E0139 1U0023 | N/A | N/A | 10-04933 10-04952 | Loeb & Loeb LLP |
| SEW Preferred Limited Partnership | 1S0512 | 14160 | N/A | 10-04945 | Loeb & Loeb LLP |
| MBE Preferred Limited Partnership | 1M0219 | 14302 | N/A | 10-04952 | Loeb & Loeb LLP |
| Mark B. Evenstad Revocable Trust u/a dated January 30, 2003 | 1E0170 | N/A | N/A | 10-04512 | Loeb & Loeb LLP |
| Serene Warren Revocable Trust U/A/D September 15, 2005 | 1W0126 | N/A | N/A | 10-04520 | Loeb & Loeb LLP |
| Gorvis LLC | 1G0118 | N/A | N/A | 10-04544 | Loeb & Loeb LLP |
| The Koff Living Trust | 1K0207 | N/A | N/A | 10-04926 | Loeb & Loeb LLP |

---

[10] In addition to the Customers set forth on this Schedule A, Loeb & Loeb LLP submits this brief on behalf of each of the defendants in the avoidance actions to which those Loeb-represented Customers are parties.

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Estate Of Doris M. Pearlman; Heidi Pearlman, In Her Capacity As Personal Representative Of The Estate Of Doris M. Pearlman; Jill Beth Pearlman, In Her Capacity As Personal Representative Of The Estate Of Doris M. Pearlman; Heidi Pearlman, In Her Capacity As Co-trustee Of The Doris M. Pearlman Revocable Trust; Jill Beth Pearlman, In Her Capacity As Co-trustee Of The Doris M. Pearlman Revocable Trust; Heidi Pearlman, As Subsequent Beneficiary; Jill Beth Pearlman, As Subsequent Beneficiary; The Doris M. Pearlman Revocable Trust, As A Subsequent Beneficiary; Marvin A. Goldenberg, As A Subsequent Beneficiary | 1P0099 | 006373 006869 015649 015652 | N/A | 10-04504 | K&L Gates LLP |
| United Congregations Mesora | 1U0013 | N/A | N/A | 10-05110 | K&L Gates LLP |
| Chesed Congregations of America | 1C1221 | N/A | N/A | 10-05054 | K&L Gates LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| South Ferry Building Company, A New York Limited Partnership; Emanuel Gettinger Abraham Wolfson Zev Wolfson, In His Capacity As Trustee U/i/t F/b/o Aaron Wolfson And Alisa Wolfson Zev Wolfson, Individually A. Trust Aa. Trust A.o.n. Trust Aaron Trust Abraham Adeff Abraham Trust Abraham N. Trust Al. Trust Alisa Trust A.n. Trust Goldie Appelgrad, Individually Goldie Appelgrad, In Her Capacity As A Joint Tenant Of Simcha & Goldie Applegrad, As J/t/w/r/o/s Simcha Appelgrad, Individually Simcha Appelgrad, In His Capacity As A Joint Tenant Of Simcha & Goldie Applegrad, As J/t/w/r/o/s David G. Aviv Miriam Beren B.F.&W. Realty Company, A New York Limited Partnership Helen Elbaum, In Her Capacity As Custodian For Zelda Elbaum And Ruth Elbaum Zelda Elbaum Razel Faskowitz Roslyn Gettinger Morris Goldstein Samuel Goldstein | 1S0451 | N/A | N/A | 10-04488 | K&L Gates LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Israel Grossman | | | | | |
| Kalman Halpern | | | | | |
| Zevi Harris | | | | | |
| Joseph Katz, | | | | | |
| Bessie Kaufman, Individually | | | | | |
| Bessie Kaufman, In Her Capacity As Joint Tenant Of David & Bessie Kaufman, As J/t/w/r/o/s | | | | | |
| David Kaufman, Individually | | | | | |
| David Kaufman, In His Capacity As Joint Tenant Of David & Bessie Kaufman, As J/t/w/r/o/s | | | | | |
| Sara Klein, Individually | | | | | |
| Sara Klein, In Her Capacity As Joint Tenant Of Joint Tenant Of Sol & Sara Klein, As J/t/w/r/o/s | | | | | |
| Sol Klein, Individually | | | | | |
| Sol Klein, In His Capacity As Joint Tenant Of Sol & Sara Klein, As J/t/w/r/o/s | | | | | |
| Albert Kleinman | | | | | |
| Moses Leiter, Individually | | | | | |
| Moses Leiter, In His Capacity As Joint Tenant Of Moses & N. Zwi Leiter, J/t/w/r/o/s | | | | | |
| N. Zwi Leiter, Individually | | | | | |
| N. Zwi Leiter, In Her Capacity As Joint Tenant Of Moses & N. Zwi Leiter, J/t/w/r/o/s | | | | | |
| Gerda Levinsohn | | | | | |
| Hyman Mandelbaum | | | | | |
| Max Mandis, Individually | | | | | |
| Max Mandis, In His Capacity As Joint Tenant Of Max Mandis & Freda Rosenberg, As J/t/w/r/o/s | | | | | |
| Anthony Margadonna, Individually | | | | | |
| Anthony Margadonna, In His Capacity As Joint Tenant Of Anthony & Julia Margadonna, As | | | | | |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| J/t/w/r/o/s Julia Margadonna, Individually | | | | | |
| Julia Margadonna, In Her Capacity As Joint Tenant Of Anthony & Julia Margadonna, As J/t/w/r/o/s | | | | | |
| Clara Meth | | | | | |
| Morris Milewski | | | | | |
| Morris Nussbaum | | | | | |
| Mary Peters | | | | | |
| R. Trust | | | | | |
| R.a. Trust | | | | | |
| Rebecca Trust | | | | | |
| Irving Rosen | | | | | |
| Freda Rosenberg, Individually | | | | | |
| Freda Rosenberg, In Her Capacity As Joint Tenant Of Max Mandis & Freda Rosenberg, As J/t/w/r/o/s | | | | | |
| Leo Schechter | | | | | |
| Benjamin Schenker, Individually | | | | | |
| Benjamin Schenker, In His Capacity As Joint Tenant Of Benjamin & Minnie Schenker, As J/t/w/r/o/s | | | | | |
| Minnie Schenker, Individually | | | | | |
| Minnie Schenker, In Her Capacity As Joint Tenant Of Benjamin & Minnie Schenker, As J/t/w/r/o/s | | | | | |
| Mildred Shapiro, Individually | | | | | |
| Mildred Shapiro, In Her Capacity As Joint Tenant Of Rabbi Solomon B. & Mildred Shapiro, As J/t/w/r/o/s | | | | | |
| Rabbi Solomon B. Shapiro, Individually | | | | | |
| Rabbi Solomon B. Shapiro, In His Capacity As Joint Tenant Of Rabbi Solomon B. & Mildred Shapiro, As J/t/w/r/o/s | | | | | |
| Leon Shiffman | | | | | |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Lee Siegmund | | | | | |
| Nachema Singer | | | | | |
| Sarah Spindell | | | | | |
| Chaim Twerksy, Individually | | | | | |
| Chaim Twerksy, In His Capacity As A Joint Tenant Of Chaim & Rachel Twersky, As J/t/w/r/o/s | | | | | |
| Rachel Twersky, Individually | | | | | |
| Rachel Twersky, In Her Capacity As A Joint Tenant Of Chaim & Rachel Twersky, As J/t/w/r/o/s Ernest Wachtel, Individually | | | | | |
| Ernest Wachtel, In His Capacity As Joint Tenant Of Ernest & Rose Wachtel, As J/t/w/r/o/s | | | | | |
| Rose Wachtel, Individually | | | | | |
| Rose Wachtel, In Her Capacity As Joint Tenant Of Ernest & Rose Wachtel, As J/t/w/r/o/s | | | | | |
| Max Well | | | | | |
| Chana Wolfson | | | | | |
| Helen Younger | | | | | |
| Aaron Zeitlin, Individually | | | | | |
| Aaron Zeitlin, In His Capacity As Trustee For Abraham Trust | | | | | |
| Aaron Zeitlin, In His Capacity As Trustee For Rebecca Trust | | | | | |
| Aaron Zeitlin, In His Capacity As Trustee For Alisa Trust | | | | | |
| Aaron Zeitlin, In His Capacity As Trustee For Aaron Trust | | | | | |
| Aaron Zeitlin, In His Capacity As Trustee For Abraham N. Trust | | | | | |
| Aaron Zeitlin, In His Capacity As Trustee For | | | | | |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| R.a. Trust<br>Aaron Zeitlin, In His Capacity As Trustee For Ai. Trust<br>Aaron Zeitlin, In His Capacity As Trustee For Aa. Trust<br>Aaron Zeitlin, In His Capacity As Trustee For A.n. Trust<br>Aaron Zeitlin, In His Capacity As Trustee For R. Trust<br>Aaron Zeitlin, In His Capacity As Trustee For A. Trust<br>Aaron Zeitlin, In His Capacity As Trustee For A.o.n. Trust<br>Rachel Zeitlin | | | | | |
| Lanx BM Investments, LLC<br>The Lanx Fund II, LP<br>Wolfson Cousins, LP<br>Edara Partnership | 1L0228 | N/A | N/A | 10-04384 | K&L Gates LLP |
| Wolfson Equities<br>Aaron Wolfson, Individually<br>The Aaron Wolfson 1983 Trust<br>The Abraham Wolfson 1983 Trust<br>The Alisa Wolfson Safier 1983 Trust<br>The Daniel Wolfson 1983 Trust<br>The Elishiva Wolfson 1983 Trust<br>The Nadine R. Wolfson 1991 Trust<br>The Rebecca Wolfson Wolmark 1983 Trust<br>The Wolfson Trust | 1W0108 | N/A | N/A | 10-05220 | K&L Gates LLP |
| Ezriel Munk, In His Capacity As Trustee Of The Wolfson Descendants 1983 Trust<br>Ezriel Munk, In His | 1Z0027 | N/A | N/A | 10-04374 | K&L Gates LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Capacity As Trustee The ZW 1999 Trust Wolfson Descendants 1983 Trust Zev Wolfson ZW 1999 Trust ZWD Investments, LLC | | | | | |
| Aaron Wolfson Abraham Wolfson Emmanuel Gettinger South Ferry #2 LP South Ferry Building Company Zev Wolfson | 1S0447 | N/A | N/A | 10-04350 | K&L Gates LLP |
| James Lowrey, Individually James Lowrey, In His Capacity As General Partner Of Turtle Cay Partners James Lowrey, In His Capacity As Personal Representative Of The Estate Of Marianne Lowrey James Lowrey, In His Capacity As Trustee For The Marianne B. Lowrey Trust James Lowrey In His Capacity As Successor Partner Of Coldbrook Associates Partnership The Estate Of Marianne Lowrey Turtle Cay Partners Coldbrook Associates Partnership, Individually Coldbrook Associates Partnership,  In Its Capacity As General Partner Of Turtle Cay Partners Trust Created For The Benefit Of Jessica Lee Lowrey Under Article Second Of A Certain Trust Agreement Dated August | 1CM585 1CM832 1CM880 | N/A | N/A | 10-04387 | K&L Gates LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| 29, 1984 Trust Created For The Benefit Of Tracy Mcdonald Lowrey Under Article Second Of A Certain Trust Agreement Dated August 29, 1984 | | | | | |
| Trust Created For The Benefit Of Whitney Hanlon Lowrey Under Article Second Of A Certain Trust Agreement Dated August 29, 1984 | | | | | |
| Jessica Lee Lowrey, Individually | | | | | |
| Jessica Lee Lowrey, In Her Capacity As Personal Representative Of The Estate Of Marianne Lowrey | | | | | |
| Jessica Lee Lowrey, In Her Capacity As Trustee For The Marianne B. Lowrey Trust | | | | | |
| Jessica Lee Lowrey, In Her Capacity As Successor Partner Of Coldbrook Associates Partnership | | | | | |
| Tracy Mcdonald Lowrey Lenehan, Individually | | | | | |
| Tracy Mcdonald Lowrey Lenehan, In Her Capacity As Personal Representative Of The Estate Of Marianne Lowrey | | | | | |
| Tracy Mcdonald Lowrey Lenehan,in Her Capacity As Trustee For The Marianne B. Lowrey Trust | | | | | |
| Tracy Mcdonald Lowrey Lenehan, In Her Capacity As Successor Partner Of Coldbrook Associates Partnership | | | | | |
| Whitney Hanlon Lowrey Gaeta, Individually | | | | | |
| Whitney Hanlon Lowrey Gaeta, In Her Capacity As | | | | | |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Personal Representative Of The Estate Of Marianne Lowrey | | | | | |
| Whitney Hanlon Lowrey Gaeta, In Her Capacity As Trustee For The Marianne B. Lowrey Trust | | | | | |
| Whitney Hanlon Lowrey Gaeta, In Her Capacity As Successor Partner Of Coldbrook Associates Partnership | | | | | |
| Larry B. Alexander, In His Capacity As Personal Representative Of The Estate Of Marianne Lowrey | | | | | |
| Larry B. Alexander, In His Capacity As Trustee For The Marianne B. Lowrey Trust | | | | | |
| Larry B. Alexander, In His Capacity As Successor Partner Of Coldbrook Associates Partnership | | | | | |
| The Marianne B. Lowrey Trust | | | | | |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Ambassador Shoe Corp. | IEM280 | N/A | N/A | 10-04340 | Kramer Levin Naftalis & Frankel LLP[11] |
| NTC& Co LLP FBO Arthur M. Siskind | IS0231 | N/A | N/A | 10-04365 | Kramer Levin Naftalis & Frankel LLP |
| Lillian Berman Goldfarb | 1G0087 | 009059 | N/A | 10-04366 | Kramer Levin Naftalis & Frankel LLP |
| Estate of Helene Abraham | 1AO125 | N/A | N/A | 10-04372 | Kramer Levin Naftalis & Frankel LLP |
| Estate of Alexander Abraham | 1A0129 | N/A | N/A | 10-04372 | Kramer Levin Naftalis & Frankel LLP |
| Richard A. Broms Revocable Trust | 1EM029 | N/A | N/A | 10-04373 | Kramer Levin Naftalis & Frankel LLP |
| Carol Nelson & Stanley Nelson J/T WROS | 1ZA284 | 000480 | N/A | 10-04377 | Kramer Levin Naftalis & Frankel LLP |
| Lyle A. Berman Revocable Trust U/A DTD 6/18/04 | 1B0015 | N/A | N/A | 10-04382 | Kramer Levin Naftalis & Frankel LLP |
| Douglas Rimsky | 1CM156 | 012150 | N/A | 10-04388 | Kramer Levin Naftalis & Frankel LLP |
| Douglas Rimsky C/F Margaret Rimsky | 1CM283 | N/A | N/A | 10-04388 | Kramer Levin Naftalis & Frankel LLP |
| Douglas Rimsky C/F Sarah Rimsky | 1CM284 | N/A | N/A | 10-04388 | Kramer Levin Naftalis & Frankel LLP |
| Rimsky Family Ltd. Partnership | 1CM337 | N/A | N/A | 10-04388 | Kramer Levin Naftalis & Frankel LLP |

[11] In addition to the Customers set forth on this Schedule A, Kramer Levin Naftalis & Frankel LLP submits this brief on behalf of each of the defendants in the avoidance actions to which those Kramer Levin-represented Customers are parties, with the exception of the following avoidance actions: (i) Picard v. Rosenfield (represent Robert Rosenfield only); (ii) Picard v. Lehrer (represent Stuart Stein, Arthur Siskind, Arthur J. Feibus, Jamat Company, LLC, and The Mestro Company only); (iii) Picard v. Trust U/W/O Thomas Langbert F/B/O Evelyn Langbert (represent Trust U/W/O Thomas Langbert F/B/O Evelyn Langbert, Evelyn Langbert, and Fred Dechowitz (deceased), only); and (iv) Picard v. Meyer Goldman (represent Neil S. Goldman only).

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Estate of Robert Rimsky | 1CM386 | N/A | N/A | 10-04388 | Kramer Levin Naftalis & Frankel LLP |
| Article Third Trust U/W Jeanne Rimsky | 1CM387 | 014282 | N/A | 10-04388 | Kramer Levin Naftalis & Frankel LLP |
| Robert A. Meister | 1M0074 | N/A | N/A | 10-04409 | Kramer Levin Naftalis & Frankel LLP |
| Theresa Berman Revocable Trust | 1B0268 | N/A | N/A | 10-04416 | Kramer Levin Naftalis & Frankel LLP |
| The Olesky Survivors Trust dated 2/27/84 | 1EM142 | N/A | N/A | 10-04427 | Kramer Levin Naftalis & Frankel LLP |
| Malcolm L. Sherman | 1EM193 | 014417 | N/A | 10-04430 | Kramer Levin Naftalis & Frankel LLP |
| AGAS Company LP | 1CM225 | N/A | N/A | 10-04431 | Kramer Levin Naftalis & Frankel LLP |
| Fred Schwartz & Allyne Schwartz JT WROS | 1CM621 | 012137 | N/A | 10-04431 | Kramer Levin Naftalis & Frankel LLP |
| AHT Partners, L.P. | 1A0116 | 011191 | N/A | 10-04439 | Kramer Levin Naftalis & Frankel LLP |
| BWA Ambassador Inc. | 1B0101 | N/A | N/A | 10-04452 | Kramer Levin Naftalis & Frankel LLP |
| Greenman Family Foundation | 1CM254 | 013434 | N/A | 10-04479 | Kramer Levin Naftalis & Frankel LLP |
| Lester Greenman | 1CM272 | 011759 | N/A | 10-04479 | Kramer Levin Naftalis & Frankel LLP |
| Stewart Katz & Judith Katz J/T WROS | 1CM274 | 005511 | N/A | 10-04479 | Kramer Levin Naftalis & Frankel LLP |
| Bernard Greenman Marital Deduction Trust U/A/D 3/22/91 | 1G0086 | 013433 | N/A | 10-04479 | Kramer Levin Naftalis & Frankel LLP |
| Michael Goldstein | 1G0264 | 000790 | N/A | 10-04482 | Kramer Levin Naftalis & Frankel LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Michael Goldstein #2 | 1G0265 | 000791 | N/A | 10-04482 | Kramer Levin Naftalis & Frankel LLP |
| Michael Goldstein #3 | 1G0266 | 000792 | N/A | 10-04482 | Kramer Levin Naftalis & Frankel LLP |
| Indian Wells Partnership | 1H0069 | 014416 | N/A | 10-04484 | Kramer Levin Naftalis & Frankel LLP |
| NTC & CO FBO Geoffrey S. Rehnert | 1R0201 | N/A | N/A | 10-04556 | Kramer Levin Naftalis & Frankel LLP |
| Meyer Goldman | 1G0232 | N/A | N/A | 10-04567 | Kramer Levin Naftalis & Frankel LLP |
| Karen Siff Exkorn | 1EM195 | 070171 | N/A | 10-04587 | Kramer Levin Naftalis & Frankel LLP |
| Collingwood Group | 1CM850 | N/A | N/A | 10-04640 | Kramer Levin Naftalis & Frankel LLP |
| Rubin Family Investments Partnership | 1CM601 | N/A | N/A | 10-04521 | Kramer Levin Naftalis & Frankel LLP |
| Shirley S. Siff Trust 1989 DTD 12/02/89 | 1EM198 | 014422 | N/A | 10-04641 | Kramer Levin Naftalis & Frankel LLP |
| NTC & CO FBO Marc B. Wolpow | 1W0067 | N/A | N/A | 10-04646 | Kramer Levin Naftalis & Frankel LLP |
| Marc Wolpow | 1W0100 | N/A | N/A | 10-04646 | Kramer Levin Naftalis & Frankel LLP |
| The Marc B. Wolpow 1995 Family Trust | 1W0117 | N/A | N/A | 10-04646 | Kramer Levin Naftalis & Frankel LLP |
| Audax Group LP | 1AO120 | N/A | N/A | 10-04651 | Kramer Levin Naftalis & Frankel LLP |
| Carol Nelson | 1ZA283 | 000495 | N/A | 10-04658 | Kramer Levin Naftalis & Frankel LLP |
| NTC & CO FBO Carol Nelson | 1ZR265 | 000531 | N/A | 10-04658 | Kramer Levin Naftalis & Frankel LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Gordon Associates | 1G0302 | N/A | N/A | 10-04684 | Kramer Levin Naftalis & Frankel LLP |
| NTC & CO FBO Robert M. Siff | 1ZR207 | 011614 | N/A | 10-04705 | Kramer Levin Naftalis & Frankel LLP |
| NTC & CO Maurice Rosenfield FTC | 1R0151 | N/A | N/A | 10-04736 | Kramer Levin Naftalis & Frankel LLP |
| Lawrence A. Siff | 1EM196 | 013410 | N/A | 10-04745 | Kramer Levin Naftalis & Frankel LLP |
| NTC & CO FBO Kay Morrissey | 1M0072 | 011200 | N/A | 10-04767 | Kramer Levin Naftalis & Frankel LLP |
| Ludmilla Goldberg | 1G0272 | 000794 | N/A | 10-04811 | Kramer Levin Naftalis & Frankel LLP |
| Heller Bros Partnership Ltd. | 1H0126 | 013890 | N/A | 10-04863 | Kramer Levin Naftalis & Frankel LLP |
| NTC & CO FBO James Morrissey | 1M0071 | 011199 | N/A | 10-04874 | Kramer Levin Naftalis & Frankel LLP |
| Branch Family Development LLC | 1B0225 | N/A | N/A | 10-04949 | Kramer Levin Naftalis & Frankel LLP |
| Mathew & Evelyn Broms Investment Partnership | 1EM028 | N/A | N/A | 10-04985 | Kramer Levin Naftalis & Frankel LLP |
| Carol Lederman | 1ZB358 | N/A | N/A | 10-04990 | Kramer Levin Naftalis & Frankel LLP |
| Lucerne Foundation | 1CM197 | N/A | N/A | 10-05055 | Kramer Levin Naftalis & Frankel LLP |
| James Heller | 1H0024 | N/A | N/A | 10-05061 | Kramer Levin Naftalis & Frankel LLP |
| Love & Quiches Ltd Pension Plan | 1CM118 | N/A | N/A | 10-05066 | Kramer Levin Naftalis & Frankel LLP |
| Susan Axelrod | ICM327 | 000222 | N/A | 10-05066 | Kramer Levin Naftalis & Frankel LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| D Stone Industries Inc. Profit Sharing Plan | IS0201 | 014303 | N/A | 10-05068 | Kramer Levin Naftalis & Frankel LLP |
| The Lyle Berman Family Partnership | IB0242 | N/A | N/A | 10-05071 | Kramer Levin Naftalis & Frankel LLP |
| Bertram Bromberg Trust UAD 5/26/06 | 1B0069 | 009098 | N/A | 10-05080 | Kramer Levin Naftalis & Frankel LLP |
| Gloria Bromberg Trust UAD 5/26/06 | 1B0125 | 003174 | N/A | 10-05080 | Kramer Levin Naftalis & Frankel LLP |
| NTC & CO FBO Bertram Bromberg | 1B0172 | 009097 | N/A | 10-05080 | Kramer Levin Naftalis & Frankel LLP |
| Susan Jane Stone | 1S0199 | 070198 | N/A | 10-05084 | Kramer Levin Naftalis & Frankel LLP |
| Daniel Stone | 1S0210 | 009029 | N/A | 10-05084 | Kramer Levin Naftalis & Frankel LLP |
| Howard Vogel Retirement Plan | 1CM262 | N/A | N/A | 10-05090 | Kramer Levin Naftalis & Frankel LLP |
| Eugenia G. Vogel | 1CM312 | N/A | N/A | 10-05090 | Kramer Levin Naftalis & Frankel LLP |
| Howard Vogel | 1CM754 | N/A | N/A | 10-05090 | Kramer Levin Naftalis & Frankel LLP |
| Harry Schick | 1S0035 | 000330 | N/A | 10-05096 | Kramer Levin Naftalis & Frankel LLP |
| NTC & CO FBO Robert M. Siff | 1ZR215 | 011615 | N/A | 10-05100 | Kramer Levin Naftalis & Frankel LLP |
| Lichter Family Partnership | 1EM115 | N/A | N/A | 10-05129 | Kramer Levin Naftalis & Frankel LLP |
| The Robert M. Siff Trust - 1990 | 1EM197 | N/A | N/A | 10-05138 | Kramer Levin Naftalis & Frankel LLP |
| Joyce Moscoe Rev Tst Agmt DTD 10/91 | 1EM130 | N/A | N/A | 10-05140 | Kramer Levin Naftalis & Frankel LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Estate of Elaine Cooper | 1ZB530 | N/A | N/A | 10-05167 | Kramer Levin Naftalis & Frankel LLP |
| Jeffrey H. Fisher Separate Property Revocable Trust DTD 6/7/2007 | 1F0217 | Claim not determined | Claim not determined | 10-05247 | Kramer Levin Naftalis & Frankel LLP |
| Stanley I Lehrer & Stuart M Stein JT WROS | 1L0013 | 004003 | N/A | 10-05259 | Kramer Levin Naftalis & Frankel LLP |
| RIP Investments, LP | 1CM222 | N/A | N/A | 10-05289 | Kramer Levin Naftalis & Frankel LLP |
| David A. Wingate | 1CM581 | 009781 | N/A | 10-05327 | Kramer Levin Naftalis & Frankel LLP |
| Marc B. Fisher | 1F0164 | 010658 | N/A | 10-05336 | Kramer Levin Naftalis & Frankel LLP |
| Falcon Associates, L.P. | 1F0171 | N/A | N/A | 10-05336 | Kramer Levin Naftalis & Frankel LLP |
| Trust U/W/O H Thomas Langbert FBO Evelyn Langbert | 1L0003 | 012232 | N/A | 10-05382 | Kramer Levin Naftalis & Frankel LLP |
| Evelyn Langbert | 1L0119 | Claim not determined | Claim not determined | 10-05382 | Kramer Levin Naftalis & Frankel LLP |
| James Heller Family LLC | 1H0170 | N/A | N/A | 10-05419 | Kramer Levin Naftalis & Frankel LLP |
| Mark & Carol Enterprises Inc. | 1M0209 | 013453 | N/A | 10-05432 | Kramer Levin Naftalis & Frankel LLP |
| NTC & CO FBO Mark T. Lederman | 1ZR313 | 013452 | N/A | 10-05432 | Kramer Levin Naftalis & Frankel LLP |
| CAJ Associates LP | 1ZB363 | 013291 | N/A | 10-05440 | Kramer Levin Naftalis & Frankel LLP |
| Jewish Association for Services for the Aged | IZA995 | 011196 | N/A | 11-02773 | Kramer Levin Naftalis & Frankel LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Potamkin Family Investments, Inc. | 1P0108 | 005313 | N/A | N/A | Milberg LLP[12] |
| Lexie Potamkin | 1P0113 | 005310 | | N/A | Milberg LLP |
| Jerry Guberman | 1ZR060 | 010171 | 382 | N/A | Milberg LLP |
| Judith Rock Goldman | 1ZW013 | 009794 | 396 | N/A | Milberg LLP |
| Anita Karimian | 1ZW019 | 010930 | 397 | 10-04706 | Milberg LLP |
| Albert J. Goldstein u/w FBO Ruth E. Goldstein | 1ZA736 | 009316 | 398 | 10-04725 | Milberg LLP |
| Ann Denver | 1ZA470 | 009710 | 409 | N/A | Milberg LLP |
| Norton A. Eisenberg | 1CM296 | 008937 | 435 | 10-04576 | Milberg LLP |
| Harold A. Thau | 1ZA467 | 009522 | 450 | 10-04951 | Milberg LLP |
| Harold A. Thau | 1ZR261 | 009523 | 451 | N/A | Milberg LLP |
| The Aspen Company | 1ZA471 | 009528 | 452 | 10-05070 | Milberg LLP |
| Stephen R. Goldenberg | 1CM391 | 010950 | 460 | 10-04946 | Milberg LLP |
| Michael Silverstein & Sandra Silverstein J/T WROS | 1ZA569 | 004678 | 548 | N/A | Milberg LLP |
| Judith G. Damron | 1ZA244 | 001150 | 574 | N/A | Milberg LLP |
| Onesco International, Ltd | 1FR121 | 009658 | 668 | N/A | Milberg LLP |
| Amy Thau Friedman | 1ZA468 | 009525 | 669 | N/A | Milberg LLP |
| Michael H. Ostrove and Lisa Ostrove | 1CM360 | 008589 | 670 | N/A | Milberg LLP |
| Kenneth D. Bane 2006 Trust | 1B0217 | 010437 | 671 | N/A | Milberg LLP |
| Lester Kolodny | 1K0138 | 001066 | 672 | 10-04515 | Milberg LLP |
| William M. Woessner | 1CM275 | 000802 | 673 | 10-04741 | Milberg LLP |
| Michael E. Thau | 1ZB275 | 009524 | 676 | | Milberg LLP |
| Jan Marcus Capper | 1EM468 | 011109 | 680 | 10-05197 | Milberg LLP |
| John Denver Concerts, Inc. Pension Plan Trust | 1ZB085 | 009526 | 687 | 10-05089 | Milberg LLP |
| Aspen Fine Arts Co. | 1EM381 | 009406 | 707 | 10-04335 | Milberg LLP |
| Aspen Fine Arts Co. Defined Contribution Plan | 1EM320 | 009020 | 708 | N/A | Milberg LLP |
| Potamkin Family Foundation I, Inc. | 1P0107 | 005312 | 709 | 10-05069 | Milberg LLP |
| Robert & Lexie Potamkin | 1P0097 | 011264 | 710 | N/A | Milberg LLP |
| Jerry Guberman Trust Dated 12/23/93 | 1ZA407 | 009416 | 711 | N/A | Milberg LLP |
| Trust U/W/O Harriette Myers | 1CM316 | 009521 | 712 | 10-05401 | Milberg LLP |

---

[12] The Declaration of Bik Cheema, filed with the Trustee's motion papers, identifies C.V.I.G.V.F. (Lux) Master S.a.r.l., Gary Harnick, and The Harnick Brothers Partnership as Customers represented by Milberg LLP.  Milberg LLP does not currently represent these Customers.

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Judith Rock Goldman | 1ZA490 | 009795 | 867 | N/A | Milberg LLP |
| Anita Karimian | 1ZA142 | 010932 | 870 | 10-04706 | Milberg LLP |
| The Marcus Family Limited Partnership | 1EM248 | 002880 | 872 | 10-04906 | Milberg LLP |
| Steven V. Marcus Separate Property Marcus Family Trust | 1EM469 | 002882 | 873 | 10-04906 | Milberg LLP |
| Diana Melton Trust, Dated 12/5/05 | 1ZA699 | 008648 | 874 | N/A | Milberg LLP |
| Ernest Melton | 1ZR043 | 008647 | 875 | N/A | Milberg LLP |
| Melton Family LLC | 1ZA894 | 008649 | 876 | N/A | Milberg LLP |
| Robert Horowitz & Harlene Horowitz as Trustees of the Horowitz Family Trust | 1H0084 | 009145 | 885 | N/A | Milberg LLP |
| Charles Gabriele | 1CM431 | 009180 | 886 | 10-04724 | Milberg LLP |
| Ruth E. Goldstein | 1ZA735 | 009314 | 912 | 10-04725 | Milberg LLP |
| Marvin Schlachter | 1S0185 | 010954 | 913 | N/A | Milberg LLP |
| Trudy Schlachter | 1S0293 | 011044 | 915 | N/A | Milberg LLP |
| Ruth E. Goldstein | 1ZR125 | 009315 | 941 | 10-04725 | Milberg LLP |
| Albert Family Retirement LP | 1CM379 | 006902 | 1019 | N/A | Milberg LLP |
| 2427 Parent Corporation | 1T0058 | 005311 | 1020 | N/A | Milberg LLP |
| Forecast Designs Retirement Trust | 1F0140 | 008441 | 1047 | N/A | Milberg LLP |
| June Pollack T/O/D to Keith L. Pollack and Cary G. Pollack | 1CM884 | 000530 | 1080 | N/A | Milberg LLP |
| Robert Potamkin | 1P0089 | 011263 | 1777 | N/A | Milberg LLP |
| Joseph Sloves | 1S0403 | 007959 | 1949 | N/A | Milberg LLP |
| Linda Berger & Howard Berger J/T WROS | 1ZB547 | 005115 | 1998 | N/A | Milberg LLP |
| Aspen Fine Arts Co. Defined Contribution Plan | 1EM414 | 011426 | 2029 | N/A | Milberg LLP |
| John Malkovich Pension Plan & Trust | 1ZB131 | 007013 | 2120 | N/A | Milberg LLP |
| Gary Albert | 1CM015 | 009762 | 2192 | 10-04390 | Milberg LLP |
| The Adina Michaeli Revocable Trust | 1ZR305 | 007983 | 2214 | N/A | Milberg LLP |
| Richard Roth | 1R0103 | 000711 | 2271 | 10-05136 | Milberg LLP |
| Michael Roth | 1R0102 | 000722 | 2272 | N/A | Milberg LLP |
| Jonathan Michaeli | 1ZR304 | 007984 | 2277 | N/A | Milberg LLP |
| Dr. Lynn Lazarus Serper | 1EM243 | 010195 | 2346 | N/A | Milberg LLP |
| Laurence Leif | 1L0142 | 001204 | 2351 | 10-04601 | Milberg LLP |
| Gerald Blumenthal | 1B0166 | 006832 | 2366 | 10-04582 | Milberg LLP |
| Michael Roth | 1R0057 | 000715 | 2373 | N/A | Milberg LLP |
| Lynda Roth | 1R0054 | 000721 | 2374 | N/A | Milberg LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Diane Sloves as Tstee Under Rev Tst Agreement Dtd 10/13/00 for the Benefit of D Sloves | 1S0274 | 009122 | 2409 | N/A | Milberg LLP |
| Richard Roth | 1R0060 | 000710 | 2448 | 10-05136 | Milberg LLP |
| Florence Roth | 1R0047 | 000712 | 2449 | N/A | Milberg LLP |
| Delia Gail Rosenberg | 1R0250 | 011095 | 2509 | N/A | Milberg LLP |
| William M. Woessner & Sheila A. Woessner | 1CM191 | 000450 | 2766 | 10-04741 | Milberg LLP |
| Advent Management Corp. Pension Plan and Trust | 1ZA466 | 009527 | 3266 | N/A | Milberg LLP |
| John G. Malkovich | 1ZB237 | 009529 | 3601 | N/A | Milberg LLP |
| HHI Investment Trust #2 | 1-H0076 | 013546 | 558 | 10-05404 | Schulte Roth & Zabel LLP |
| Douglas G. Brown, Trustee of the Douglas G. Brown Revocable Trust | 1B0139 | 015094 | 2439 | N/A | Seeger Weiss LLP[13] |
| Elbert R. Brown Trustee UTD 12/29/88 | 1B0073 | 002263 | 2288, 3122 | 10-05398 | Seeger Weiss LLP |
| Elbert R. Brown Trustee UTD 12/29/88 | 1B0142 | 002696 | Claim not determined | 10-05398 | Seeger Weiss LLP |
| Elizabeth Harris Brown | 1B0140 | 001691 | 2146 | N/A | Seeger Weiss LLP |
| Lawrence I. Brown and Barbara Brown JTWROS | 1B0154 | 002892 | 2845 | N/A | Seeger Weiss LLP |
| Viola Brown Trustee UTD 12/29/88 | 1B0078 | 002317 | 2343, 3121 | 10-05398 | Seeger Weiss LLP |
| Viola Brown Trustee UTD 12/29/88 | 1B0128 | 002695 | Claim not Determined | 10-05398 | Seeger Weiss LLP |
| Katharine Brown Trust | 1B0141 | 004020 | 1136 | N/A | Seeger Weiss LLP |
| Do Stay, Inc. | 1D0040 | 002266 | 2820 | 10-05398 | Seeger Weiss LLP |
| Export Technicians | 1ZA794 | 014260 | 436 | N/A | Seeger Weiss LLP |
| Lewis R. Franck | 1ZA440 | 015368 | 733 | 10-04759 | Seeger Weiss LLP |
| Nur C. Gangji Trustee under Nur C Gangji Trust | 1ZA201 | 008827 | 854 | N/A | Seeger Weiss LLP |
| Martin Gelman and Michale Dancer JT/WROS | 1ZB516 | 008502 | 705 | N/A | Seeger Weiss LLP |
| Irving Gerberg | 1ZG029 | 014262 | 484 | N/A | Seeger Weiss LLP |

---

[13] The Declaration of Bik Cheema, filed with the Trustee's motion papers, identifies SPCP Group LLC and Orthopaedic Specialty Group as Customers represented by Seeger Weiss LLP. Seeger Weiss does not currently represent these Customers.

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Marilyn Cohn Gross | 1ZA409 | 007054 | 718 | N/A | Seeger Weiss LLP |
| Barbara Harris | 1H0092 | 002704 | 2753 | N/A | Seeger Weiss LLP |
| Deborah G. Katz and Deborah Katz as Custodian for Alexander and Jason Katz TIC | 1KW202 | 001841 | 2013 | N/A | Seeger Weiss LLP |
| Andrew Katz and Deborah Katz JT | 1KW342 | 001850 | 2014 | N/A | Seeger Weiss LLP |
| Jack Kaufman and Phyllis Kaufman JTWROS | 1KW142 | 006571 | 2221 | N/A | Seeger Weiss LLP |
| Robin I. Logue and Peter Logue as cotrustees of the Logue Family Revocable Trust | 1L0329 | 008883 | 2389 | N/A | Seeger Weiss LLP |
| Michael Mathias and Stacey Mathias JTWROS | 1M0100 | 002619 | 2963 | N/A | Seeger Weiss LLP |
| Joseph S. Popkin Revocable Trust Dtd 2/9/06 Robin Popkin Logue | 1ZA121 | 008885 | 861 | 10-04712 | Seeger Weiss LLP |
| Paul J. Robinson | 1EM299 | 000469 | 370 | N/A | Seeger Weiss LLP |
| Barbara Schlossberg | 1ZG022 | 000328 | 706 | N/A | Seeger Weiss LLP |
| Bernard Seldon (IRA) | 1ZR050 | 006615 | 453 | N/A | Seeger Weiss LLP |
| Dorothy B. Seldon Revocable Living Trust | 1ZA437 | 006616 | 696 | N/A | Seeger Weiss LLP |
| NTC & Co. FBO Leila F. Sobin | 1S0457 | 006479 | 829 | N/A | Seeger Weiss LLP |
| Leila F. Sobin | 1EM210 | 008499 | 2408 | N/A | Seeger Weiss LLP |
| Jonathan Sobin | 1EM208 | 008501 | 2469 | 10-04540 | Seeger Weiss LLP |
| Gary M. Weiss | 1CM281 | 010541 | 816 | 10-04241 | Seeger Weiss LLP |
| Leslie Weiss | 1CM277 | 008654 | 717 | 10-04241 | Seeger Weiss LLP |
| Melvyn I. Weiss and Barbara J. Weiss JTWROS | 1CM241 | 014261 | 3039 | 10-04241 | Seeger Weiss LLP |
| Westben Corp. | 1CM336 | 008931 | 2185 | N/A | Seeger Weiss LLP |
| NTC & CO. FBO MARSHA PESHKIN (028652) | 1ZR312 | 002628 | 439 | N/A | SNR Denton US LLP[14] |
| Michael Mann and Meryl Mann | 1CM363 | 009823 | 461 | 10-04390 | SNR Denton US LLP |

---

[14] In addition to the Customers set forth on this Schedule A, SNR Denton US LLP submits this brief on behalf of each of the defendants in the avoidance actions to which those SNR Denton-represented Customers are parties.

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| Barry Weisfeld | 1CM584 | 009817 | 462 | 10-04332 | SNR Denton US LLP |
| NTC & CO. FBO STANLEY T MILLER (030438) | 1ZR284 | 007112 | 538 | 10-04921 | SNR Denton US LLP |
| NTC & CO. FBO HAROLD J HEIN (88539) | 1ZR192 | 009824 | 780 | 10-04861 | SNR Denton US LLP |
| Trust U/W of Bernice L Rudnick, Cecil N Rudnick, ET AL Trustees | 1EM351 | 004485 | 777 | N/A | SNR Denton US LLP |
| Estate of Helen Shurman | 1S0509 | 008358 | 741 | 10-05028 | SNR Denton US LLP |
| ROBERT T SCHOEN MD AND CYNTHIA B FRENCH J/T WROS | 1CM305 | 010156 | 896 | N/A | SNR Denton US LLP |
| ELLIOT J GOLDSTEIN MD PC MONEY PURCHASE PENSION TRUST | 1CM255 | 007981 | 895 | N/A | SNR Denton US LLP |
| NTC & CO FBO Donald Snyder | 1CM392 | 000007 | 894 | 10-4765 | SNR Denton US LLP |
| S R F PARTNERS | 1R0098 | 011080 | 892 | N/A | SNR Denton US LLP |
| LI RAM LP | 1ZB067 | 009323 | 891 | 10-05236 | SNR Denton US LLP |
| David R Markin 2003 Trust | 1C1324 | 002656 | 811 | 10-05224 | SNR Denton US LLP |
| Jennifer Kelman Revocable Trust DTD 12/22/04 | 1K0150 | 009821 | 810 | 10-05158 | SNR Denton US LLP |
| NTC & CO. FBO MARVIN F BRUCE (46421) | 1CM399 | 013905 | 812 | N/A | SNR Denton US LLP |
| NEIL REGER PROFIT SHARING KEOGH | 1CM534 | 009791 | 834 | 10-05384 | SNR Denton US LLP |
| NTC & CO. FBO SIDNEY HOROWITZ (46854) | 1CM408 | 010209 | 814 | N/A | SNR Denton US LLP |
| BAM LP | 1CM579 | 009822 | 815 | 10-04390 | SNR Denton US LLP |
| ELIZABETH D FRENCH | 1CM008 | 009786 | 835 | 10-05424 | SNR Denton US LLP |
| ALVIN GINDEL REVOCABLE TRUST AGREEMENT | 1G0396 | 010207 | 863 | 10-04925 | SNR Denton US LLP |
| NTC & Co. FBO Toby Hobish | 1H0135 | 009322 | 1094 | 10-05236 | SNR Denton US LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| DAVINA GREENSPAN LORI FRIEDMAN JT WROS | 1ZA194 | 001974 | 864 | N/A | SNR Denton US LLP |
| ROBERT T. SCHOEN AND CYNTHIA B. FRENCH | 1CM305 | 010156 | 1119 | N/A | SNR Denton US LLP |
| ELIZABETH D. FRENCH | 1CM008 | 009786 | 1118 | 10-05424 | SNR Denton US LLP |
| NORMA SHAPIRO (IRA) | 1S0467 | 009819 | 2082 | 10-04486 | SNR Denton US LLP |
| Robert C. Lapin, IRA | 1CM559 | 007051 | 2142 | N/A | SNR Denton US LLP |
| Lapin Children LLC c/o Eric Ginsburg | 1CM624 | 006964 | 2202 | 10-05209 | SNR Denton US LLP |
| Norma Shapiro Trustee | 1S0337 | 009826 | 2253 | 10-04486 | SNR Denton US LLP |
| Sage Realty | 1S0316 | 010157 | 2297 | 10-04400 | SNR Denton US LLP |
| Trust U/W/O Philip L. Shapiro | 1S0338 | 009825 | 2375 | 10-04486 | SNR Denton US LLP |
| Barbara Berdon | 1B0145 | 010279 | 2379 | 10-04415 | SNR Denton US LLP |
| The Rose Gindel Revocable Trust | 1G0397 | 010208 | 2384 | 10-04401 | SNR Denton US LLP |
| Laura E. Guggenheimer Cole | 1C1258 | 009721 | 2744 | 10-04882 | SNR Denton US LLP |
| Maurice S. Sage Foundation | 1S0549 | 010205 | 2944 | N/A | SNR Denton US LLP |
| Sage Associates | 1S0547 | 010206 | 2945 | 10-04362 | SNR Denton US LLP |
| Sage Associates II | 1S0548 | 010203 | 2946 | N/A | SNR Denton US LLP |
| Rosenthal Family LLC | 1R0108 | 009487 | 3014 | N/A | SNR Denton US LLP |
| Elaine Stein Roberts | 1L0013 | 011552 | 3235 | 10-05259 | SNR Denton US LLP |
| ELAINE ROBERTS | 1E0158 | 013369 | 3371 | 10-05259 | SNR Denton US LLP |
| JOEL GOLDBERG PENSION PROFIT SHARING PLAN | 1E0158 | 013370 | 3371 | 10-05259 | SNR Denton US LLP |
| ERIC P. STEIN IRA | 1E0158 | 013371 | 3371 | 10-05259 | SNR Denton US LLP |
| LENA M. STEIN TRUST | 1E0158 | 013372 | 3371 | 10-05259 | SNR Denton US LLP |
| ERIC P. STEIN FBO JONAH M. STEIN 1995 TRUST | 1E0158 | 013373 | 3371 | 10-05259 | SNR Denton US LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| ALEXANDER A. STEIN TRUST | 1E0158 | 013374 | 3371 | 10-05259 | SNR Denton US LLP |
| LOREN W. STEIN | 1E0158 | 013375 | 3371 | 10-05259 | SNR Denton US LLP |
| MARGOT STEIN | 1E0158 | 013376 | 3371 | 10-05259 | SNR Denton US LLP |
| SHARON STEIN | 1E0158 | 013377 | 3371 | 10-05259 | SNR Denton US LLP |
| EPIC VENTURES LLC C/O ERIC P STEIN | 1E0158 | 013378 | 3371 | 10-04466 | SNR Denton US LLP |
| ROBERT W. RENFIELD LIVING TRUST | 1E0158 | 013380 | 3371 | 10-05259 | SNR Denton US LLP |
| MONA AND ALAN FISHER | 1E0158 | 013381 | 3371 | 10-05259 | SNR Denton US LLP |
| MARILYN AND EDWARD KAPLAN | 1E0158 | 013382 | 3371 | 10-05259 | SNR Denton US LLP |
| GEORGE AND SARAH BERMAN | 1E0158 | 013383 | 3371 | 10-05259 | SNR Denton US LLP |
| JOEL GOLDBERG PENSION PROFIT SHARING PLAN (NOT FIRST TRUST) | 1E0158 | 013384 | 3371 | 10-05259 | SNR Denton US LLP |
| LAUREN GOLDBERG IRA | 1E0158 | 013385 | 3371 | 10-05259 | SNR Denton US LLP |
| GREG GOLDBERG IRA | 1E0158 | 013386 | 3371 | 10-05259 | SNR Denton US LLP |
| KERRI GOLDBERG IRA | 1E0158 | 013387 | 3371 | 10-05259 | SNR Denton US LLP |
| MMRN ASSOCIATES C/O MALCOM SAGE | 1M0124 | 010204 | 3585 | N/A | SNR Denton US LLP |
| SIDNEY COLE | 1CM333 | 000347 | | 10-04672 | SNR Denton US LLP |
| KELMAN PARTNERS LIMITED PARTNERS, et al. | 1K0081 | 013106 | N/A | 10-05158 | SNR Denton US LLP |
| IDA FISHMAN REVOCABLE TRUST, PAUL S. SHURMAN | 1F0018 | N/A | N/A | 10-04777 | SNR Denton US LLP |
| JOEL I. GORDON REVOCABLE TRUST U/A/D 5/11/94 and JOEL I. GORDON | 1CM201 | 3015 | | 10-04615 | SNR Denton US LLP |
| HELENE CUMMINGS KARP ANNUITY, and HELENE CUMMINGS KARP | 1k0183 | 009820 | N/A | 10-05200 | SNR Denton US LLP |
| THE MURRAY FAMILY TRUST, et al. | 1CM342 | 011290 | N/A | 10-04510 | SNR Denton US LLP |

| Customer | Account No. | Customer Claim No. | Objection Docket No. | Adversary Proceeding | Law Firm |
|---|---|---|---|---|---|
| ESTATE OF MARJORIE K. OSTERMAN, et al. | 1KW049 | 9936 | N/A | 10-04999 | SNR Denton US LLP |
| EUGENE J. RIBAKOFF 2006 TRUST, et al | 1R0178 | 14348 | N/A | 10-05085 | SNR Denton US LLP |
| America-Israel Cultural Foundation | 1CM252 | N/A | N/A | 10-05058 | SNR Denton US LLP |