Adjourned Hearing Date:  February 13, 2013
Adjourned Hearing Time:  10:00 A.M. EST
Adjourned Objection Deadline:  December 3, 2012

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

SECURITIES INVESTOR PROTECTION  :
CORPORATION,                    :
                                :
            Plaintiff,          :    Adv. Pro. No. 08-1789 (BRL)
                                :
        v.                      :    SIPA LIQUIDATION
                                :
BERNARD L. MADOFF INVESTMENT SECURITI :    (substantively consolidated)
LLC,                            :
                                :
            Defendant.          :
------------------------------------------------------------ x
In re:                          :
                                :
BERNARD L. MADOFF,              :
                                :
            Debtor.             :
------------------------------------------------------------ x

## DECLARATION OF P. GREGORY SCHWED IN SUPPORT OF CUSTOMERS' BRIEF OPPOSING TRUSTEE'S MOTION FOR AN ORDER REJECTING AN INFLATION ADJUSTMENT TO THE CALCULATION OF "NET EQUITY"

I, P. Gregory Schwed, hereby declare under penalty of perjury pursuant to Section

1746 of title 28 of the United States Code:

1.      I am submitting this declaration (this "Declaration") in support of the

Customers' Brief Opposing Trustee's Motion for an Order Rejecting an Inflation

Adjustment to the Calculation of "Net Equity" (the "Opposition Brief").

2.      I am an attorney admitted to practice before this Court and a partner of

Loeb & Loeb LLP, attorneys for Alan and Norma Aufzien and the other customers

identified as being represented by Loeb & Loeb LLP on schedule A of the Opposition

Brief.

3.    Attached as Exhibit A to this Declaration is a true and correct copy of the

Notice of Trustee's Determination of Claim that was served upon Mr. and Mrs. Aufzien

on or about October 19, 2009 (the "Determination Notice").  Upon information and

belief, a determination notice substantially similar to the Determination Notice was

served on all Madoff Securities customers who filed claims in the above-referenced SIPA

liquidation.

4.    Attached as Exhibit B to this Declaration is a true and correct copy of the

transcript of the testimony of Michael A. Conley, Deputy Solicitor of the Securities

Exchange Commission (the "SEC") before the Committee on House Financial Services

Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises

from December 9, 2009.

5.    Attached as Exhibit C to this Declaration is a true and correct copy of a

September 22, 2011 letter to congress signed by 52 signatories, many of whom held

major positions with the SEC, which, among other things, supports the integrity of David

Becker and opined that the SEC's support of the "constant dollar" modification was a

true consensus view in the SEC.

6.    Attached as Exhibit D to this Declaration is a true and correct copy of the

decision of the High Court of New Zealand (citing the SEC's position in this case) in *In

re Waipawa Finance Co. Ltd*., 2011 NZCCLR 14 (7 Feb. 2011), NZHC CIV-2010-441-

465.

Dated:  December 3, 2012              _____/s/ P. Gregory Schwed_____
                                      P. Gregory Schwed

# EXHIBIT A

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]

### NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

October 19, 2009

Alan F. Aufzien and Norma K. Aufzien
JT/WROS
**REDACTED**
Fairfield, NJ  07004

Dear Mr. and Ms. Aufzien:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1CM198 designated as Claim Number 004252:

Your claim for a credit balance of $7,878.00 and for securities is **DENIED**.  No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $1,750,000.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $1,700,000.00).  As noted, no securities were ever purchased by BLMIS for your account.  Any and all profits reported to you by BLMIS on account statements were fictitious.

---

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B).  Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($50,000.00) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after October 19, 2009, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:**  You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern  District of  New York
One Bowling Green
New York, New York  10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York  10111

_____
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

MADC0131_00000009

# EXHIBIT B

2009 WL 4647561
CQ Transcriptions
Copyright (c) 2009 CQ Transcriptions, LLC

Testimony
December 09, 2009

House of Representatives
Financial Services
Capital Markets, Insurance and Government Sponsored Enterprises

Madoff Ponzi Scheme

Statement of Michael A. Conley
Deputy Solicitor
Securities and Exchange Commission

Committee on House Financial Services
Subcommittee on Capital Markets, Insurance and Government
Sponsored Enterprises

December 9, 2009

Introduction

Chairman Kanjorski, Ranking Member Garrett, and members of the
Subcommittee, thank you for the opportunity to appear before you
today on behalf of the Securities and Exchange Commission to
discuss the Securities Investor Protection Act of 1970 (SIPA),
and specifically the Commission's views regarding the liquidation
of Bernard L. Madoff Investment Securities LLC being conducted by
the Securities Investor Protection Corporation (SIPC). My name is
Michael Conley, and I am the SEC's Deputy Solicitor.

Before I discuss the legal issues that are the focus of my
testimony, I want to make clear that the Commissioners and staff
of the SEC are keenly aware of the devastating losses that Madoff
s fraud has caused to the thousands of investors who entrusted
him with their money.

We know that many-if not most-of Madoffs victims have had their
lives up-ended. At the SEC, Chairman Schapiro has urged all of us
to learn from the experience and reform the way we operate.
Already, we are revitalizing our Enforcement Division, revamping
the way we handle tips and complaints, seeking whistleblower
authority, creating a new division to focus on risk, expanding
training, seeking adequate and reliable funding, and hiring more
personnel with skill sets critical to addressing new challenges

that face investors and the capital markets. In response to the
Madoff matter, we proposed rules to better protect clients of
investment advisors from

theft and abuse by assuring clients that their accounts contain
the funds that their investment advisers and account statements
say they contain.

With regard to issues concerning the Madoff liquidation, I can
assure you that the Commission and its staff have been and remain
committed to ensuring that Madoff investors' interests are
protected in the ongoing liquidation proceeding. Claims for
losses suffered by the Madoff investors are determined under
SIPA, but the statute does not provide a clear answer to some key
questions related to claims by Madoff account holders. In
particular, the statute does not expressly address how to
calculate the 'net equity' in a customer's account when a
brokerdealer has engaged in the sort of fraudulent scheme Madoff
perpetrated here. The answer to that question is essential to
determining the proper value of the Madoff customers' claims. The
bankruptcy court will soon hear arguments on the competing
theories of valuing customer claims that have been advanced by
claimants and the SIPC Trustee. My testimony describes the
structure of SIPA in protecting brokerage customers, the existing
case law, the competing theories of claim valuation in the Madoff
case, and the views of the Commission regarding the appropriate
way to measure 'net equity' on the facts of this case.

The Commission appreciates the real world consequences of the
bankruptcy court's decision on how customers' claims should be
valued. The recommendation the Commission will make to that court
is based on what the Commission believes is the best reading of
SIPA and the decisions that have interpreted that statute. The
Commission is cognizant of the fact that the total pool of
customer money available to distribute to claimants is limited.
Unfortunately, we know that there will not be enough money in
that pool to compensate all the victims for their losses. As
such, the customer money allocated to one Madoff victim will
affect the money that is available to compensate other victims.
The bankruptcy court's task-and the Commission's goal in making
its recommendation-is to arrive at the fairest way, consistent
with the law, of dividing that limited pool of money.

The Securities Investor Protection Act

Congress enacted SIPA in 1970 after serious and persistent
financial problems in the securities industry led to a number of
brokerage firm bankruptcies that resulted in substantial losses
by those firms' customers. The statute was designed to protect

brokerage customers when a firm fails and cash and securities are
missing from customers' accounts. Congress wanted to ensure that
when brokerage firms fail, customers could quickly obtain the
cash and securities that should be in their brokerage accounts or
receive some measure of compensation if those assets were
missing. By establishing those protections, Congress sought to
avoid the inevitable weakening of confidence in the U.S.
securities markets that would occur if customers were afraid to
entrust their funds and securities to broker-dealers.

Through SIPA, Congress created SIPC, which is a membership
corporation made up of securities broker-dealers registered with
the SEC. Generally, SIPA requires the SEC, the Financial Industry
Regulatory Authority, and other industry self-regulatory
organizations to inform SIPC when a brokerage firm is approaching
financial difficulty. If SIPC then determines that the brokerage
firm has failed or is in danger of failing to meet its
obligations to customers, SIPC may then bring a customer
protection proceeding for the purpose of returning to the firm's
customers the cash and securities that are owed by the firm to
its customers even if those securities are missing. SIPC
designates a Trustee and counsel, who are appointed by a federal
district court judge, and then the matter is referred to the
appropriate bankruptcy court to oversee the firm's liquidation.

As part of that proceeding, the failed brokerage's customers have
claims for net equity based upon securities and cash shown on the
books and records of the brokerage firm or otherwise established
to the satisfaction of the Trustee. After the Trustee determines
a customer's net equity claim, the Trustee satisfies the claim
with a pro rata distribution from customer property. The term
customer property includes all of the cash and securities that
the broker-dealer received or acquired from customers or for
customers' accounts, and the proceeds of any property transferred
by the brokerage firm (including property unlawfully converted).
The Trustee attempts to recover as much missing property as
possible, which can include bringing preference and fraudulent
transfer actions.

If the amount of securities and cash in the fund of customer
property is inadequate to satisfy customers' net equity claims,
the Trustee makes payments from the SIPC Fund of up to $500,000
per customer to cover claims for missing securities and cash-with
coverage for missing cash limited to $100,000. The SIPC Fund,
which currently has assets of approximately $1.2 billion, is
funded through assessments on SIPC's member firms. If the Fund is
insufficient to satisfy customer claims, SIPC may request a loan
from the SEC. The SEC, in turn, is authorized under SIPA to
issues notes or other obligations to the Secretary of the

Treasury, up to $1 billion, to obtain the money to loan to SIPC.
Typically, customers first receive payments from the SIPC Fund,
and thereafter receive payments from the fund of customer
property as assets are recovered over the course of the SIPA
proceeding. In the case of Madoff, customer property, even after
it is supplemented by payments from the SIPC Fund, will not be
sufficient to satisfy customers' net equity in full.

Congress amended SIPA in 1978 to require that, where possible,
trustees satisfy claims for securities that are missing from
customer accounts with actual securities, rather than paying
their value as of the date the SIPC proceeding was filed. Both
the Senate and House reports on the 1978 amendments make clear
that SIPA's protection extends to securities that are not in the
account because the broker never purchased them, even though the
customer ordered the purchase and the trade was confirmed by the
broker.

Although it is clear that SIPA does not cover losses by customers
who are fraudulently induced to purchase or sell securities, SIPA
does protect against fraudulent conduct when it involves the
conversion of funds that customers intended to be used for
securities purchases.

Case Law

In the case In re New Times Securities Services, Inc., 371 F.3d
68 (2d Cir. 2004), the Second Circuit addressed a question
Congress did not consider when it enacted SIPA: to what extent
does SIPA apply when a brokerage fails after taking customer
funds based on a promise to invest in specified securities that
turn out to be fictitious? The case involved a Ponzi scheme in
which customers were solicited to invest in money market funds.
Several of the funds (Vanguard and Putnam) were real funds, but
another group of funds (the New Age funds) did not exist and were
simply fabricated by the promoter. In all cases, the money was
never invested, but converted by the firm's principal, Charles
Goren, for his own use.

The Second Circuit agreed with SIPC that the net equity of the
New Times customers who were told that their money would be
invested in the Vanguard and Putnam funds (and whose account
statements falsely showed that such purchases had been made)
should be calculated differently under SIPA than the net equity
of the customers who were told their money was being invested in
the fictitious New Age funds. The investors who gave Goren money
to purchase Vanguard and Putnam money market funds were in the
same position as any customer whose broker simply fails to make
an investment that has been confirmed by the broker-dealer. Under

settled law, those customers' net equity reflected the market
value of the Vanguard and Putnam securities that had been paid
for and were shown on their account statements but, in fact, had
never been purchased.

But the Court concluded that the customers who were solicited to
invest in the nonexistent New Age funds were in a different
position. Because those securities were fictitious and could
never have been acquired, the Court held that basing net equity
on the fabricated returns shown on customer account statements
would be inconsistent with SIPA. Instead, the Court concluded
that those customers' net equity should be calculated based on
their initial cash investment-which served as a 'proxy' for the
securities the customers believed they were purchasing.

The Madoff case

The Madoff liquidation does not fall neatly within the situations
expressly addressed by SIPA or dealt with in cases interpreting
the statute. The Madoff case involves a variation of the
fictitious investment scenario addressed in New Times and raises
a new question: how does SIPA 6 apply when customers' brokerage
statements show non-existent positions in real securities that
the broker concocted after the fact to support pre-determined
fictional investment returns? Although Madoff claimed to have
developed a so-called 'split-strike conversion strategy,' the
strategy was in fact a complete fraud.

Madoff instructed his key lieutenant, Frank DiPascali, to
generate credible annual returns for the strategy of between 10
and 17 percent. DiPascali implemented the strategy by
periodically selecting-after the fact-weighted baskets of stocks
in the S&P 100 index and booking fictitious trades in these
stocks to achieve Madoff s targeted returns. With the benefit of
hindsight, DiPascali picked advantageous historical prices, with
purchases often near the lows and sales near the highs, to create
the appearance of a profit.

A computer allocated the fictitious trades to individual Madoff
customer accounts and generated separate trade confirmations and
account statements for each account based on its pro rata share
of the purported trading. None of the transactions shown on the
customers' account had been requested by the customer, and none
of the transactions actually occurred. Instead, Madoff was
operating a classic Ponzi scheme in which the invested funds of
newer investors were converted and used to pay fictitious returns
to older investors to keep the scheme from being discovered.

Methods for Valuing Customer Claims

Two primary approaches have been proposed for establishing the value of claims by Madoff customers. The first is known as the 'final account statement method.' Under this method, it is argued that the net equity in customer accounts should be based upon the securities positions shown on the final account statements customers received before the Madoff firm was placed in liquidation. Because customers rely on the information in their account statements to keep track of their investments, proponents of this method contend that these documents reflect their 'legitimate expectations' of what was in customer accounts when the Madoff firm failed.

The second principal approach to resolving customer claims is the 'cash-in/cash-out' method. Proponents of this method contend that because the account statements show fictitious transactions and returns that are part of an overall fraudulent scheme, the securities positions shown on those statements are not a legitimate basis for determining the customers' net equity. Instead, they argue that net equity must be determined by crediting the amount of cash the customer deposited in the account, and subtracting any amounts withdrawn from the account.

Madoff s firm was placed in a SIPA liquidation proceeding in early December 2008. The Trustee informed Madoff's customers at the official meeting of creditors on February 20, 2009, that claims would be based on the cash customers had invested less the cash they had withdrawn -the cash-in/cash-out method. Many customers have filed objections to the Trustee's determinations. Most of those customers contend that their net equity should be based upon the securities positions shown on their final account statements. The bankruptcy court currently is in the process of resolving the dispute between the Trustee and the objecting claimants over which of the two methods should be used.

There is no dispute that the Madoffcustomer claims are to be treated as claims for securities for purposes of the SIPA limits and thus are eligible for up to $500,000 from the SIPC Fund. The critical question is how to calculate the customers' net equity. The answer is not immediately apparent, as the facts here differ from the typical SIPC case in which courts have concluded that customers' net equity can be determined by the securities positions shown on the customers' account statements.

That was the situation with the New Times customers who directed the broker to invest in the Vanguard and Putnam funds. The broker had committed to buy specific existing securities, and customers paid for those purchases. The broker did not buy those securities, though he sent out confirmations and account

statements that purported to show the purchase of those
securities. There, the customers' net equity was based on the
value, as of the date the SIPA proceeding was filed, of the
securities shown on their account statements. Those statements
accurately reflected the securities positions that the customers
had instructed the broker to purchase and expected to be in their
accounts. By contrast, the account statements and confirmations
Madoff sent to customers reflected fabricated securities
positions, based on hindsight, that were designed to facilitate
his fraudulent scheme. Most Madoff customers expected that he
would invest their money through legitimate trading in real
securities. Instead, through no fault of those customers, Madoff
opted out of the market in favor of a wholly fictitious series of
transactions with predetermined outcomes.

The situation also is not exactly like that of the customers in
New Times who were solicited to invest in the non-existent New
Age funds. There, the court concluded that the customers' net
equity could not be based on the fictitious amounts shown on
their account statements because basing recovery on the
transactions in non-existent securities reflected on those
statements would allow customers to recover amounts that had no
relation to reality. In this case, by contrast, the securities on
the account statements Madoff sent to customers were real
securities.

The question the bankruptcy court will have to resolve is whether
the Madoff brokerage customers are more like the New Times
customers who directed the broker to purchase securities that
actually existed (which would support the final account statement
approach to calculating net equity) or more like the New Times
customers who directed the broker to invest their money in
securities that turned out to be non-existent (which would
support the cash-in/cash-out method of calculating net equity).

The SEC's Recommendation

The Madoff case raises difficult issues. Based on an analysis of
SIPA, its legislative history, and cases that have applied it,
the Commission is recommending to the bankruptcy court that
customer claims should be determined through the cash-in/cash-out
method advocated by the Trustee and SIPC-with an additional
adjustment to ensure that the investors' claims in this long-
running scheme are valued most accurately and fairly.

The Commission is basing its recommendation on the conclusion
that the claims of the Madoff investors cannot be valued based on
the balance shown on their final account statements. Although
this approach would allow most Madoff account holders to receive

payments on their claims, those payments would be based on
account balances reflecting amounts that Madoff himself concocted
that bear no relation to reality. The account statements Madoff
sent to the customers showed the results of a Ponzi scheme
designed as an investment program, with positions selected after
the fact to produce pre-determined results. Neither SIPA nor any
of the cases interpreting that statute can be read to support an
approach that would value claims based on the fictitious
investment returns of such a scheme.

Madoff essentially promised customers that he would pick
'winning' stocks for them, did not tell them which stocks he
would purchase, waited to see which stocks did well, and then
falsely reported that he selected stocks that met their
investment expectations. The account statements that Madoff sent
to his customers were illegitimate tallies of a fraudulent scheme
and provide no basis for calculating those customers' net equity.
Therefore, the Commission has concluded that the most reasonable
way to measure the value of the Madoff customers' net equity is
to look to the money those customers invested with Madoff as a
proxy for the unspecified investments in securities (the split-
strike conversion strategy) Madoff told them he would make for
their accounts.

The Commission's recommendation resembles what would likely be
the outcome in a private suit by a customer challenging the
distribution of assets on the same facts. Although the customer
could establish that the broker had committed fraud, and could
recover her initial investment (less withdrawals), she would not
be able to recover as damages the amounts shown on the final
account statements because they were based on fraudulent
backdating of trades through hindsight. The fraud did not cause
the customer to lose actual proceeds that were (or could have
been) the product of legitimate trading. The same principles are
relevant in calculating the Madoff customers' net equity under
SIPA. In this case, the only reliably determinable transactions
are the cash deposits and withdrawals those customers made to and
from their brokerage accounts.

By contrast, where a customer directs a broker to buy a specific
security, the customer pays for that security, and the broker
does not buy the security but sends a false confirmation of the
transaction to the customer, the customer presumably could obtain
a judgment in a private action requiring the broker either to
purchase the missing security for the customer's account or to
pay the customer the current market value of the security. On the
same facts, a customer's net equity under SIPA would likewise
reflect the market value of the security the broker committed to
buy, the customer paid for, and the broker-dealer falsely

confirmed having purchased. In such a situation, the Trustee
would either go into the market and buy the security for the
customer's account or credit the customer with the market value
of the security as of the filing date.

In addition, it is important to note that basing customers' net
equity on the fictitious balances on their final account
statements would do nothing to increase the fund of customer
property-it would simply reallocate it. It is clear that there
will not be enough money in the fund of customer property to pay
out the $65 billion that Madoff falsely reported was in customer
accounts when the firm failed. The Trustee has estimated that he
may be able to recover as much as $8 billion to distribute to
claimants. Using the final account statement approach would have
the effect of favoring early investors-many of whom withdrew all
or more than the principal they invested with Madoff--over later
investors-some of whom withdrew little or none of what they
invested and will not receive a distribution equal even to their
principal.

While the final account statement approach favors earlier
customers at the expense of later customers, the SEC is also
sensitive to the corresponding fairness concerns under the
cashin/cash-out method. That method of calculating net equity
favors later customers at the expense of earlier customers by
treating a dollar invested in 1987 as having the same value as a
dollar invested in 2007. To illustrate this concern, assume that
one claimant invested $100 in the Madoff firm in 1987, a second
claimant invested $100 in 2007, and neither withdrew any funds
from their accounts. Under the cash-in/cash-out approach
advocated by SIPC and the Trustee, the net equity of both
claimants would be $100. But because, in basic economic terms,
$100 in 1987 dollars is worth $183 in 2007 dollars
(http://data.bls:gov/cg-bin/cpicatc.pl.), the claimant who
invested $100 in Madoff s firm 21 years before the firm collapsed
has suffered a much more substantial real-world loss than a
claimant who invested $100 only one year before the collapse.

In the SEC's view, to achieve a fair and economically accurate
allocation among Madoff customers who invested and withdrew funds
in different historical periods, it is appropriate to convert the
dollars invested into 'time-equivalent' or constant dollars.
This constant-dollar approach is rooted in the classic economic
concept of the time value of money and will result in greater
fairness across different generations of Madoff investors-in
effect, treating early investors and later investors alike in
terms of the real economic value of their investments.

The issue of calculating net equity in constant dollars has not

arisen before in SIPA cases, probably because many Ponzi-type
schemes are of relatively short duration, and the inequity among
those who invested at different points in time is less striking.
But the Madoff fraud which lasted for 20-plus years-puts this
issue into stark relief. In light of the silence of SIPA
regarding the payment of interest and of a Court of Appeals
decision suggesting, in a distinct factual circumstance, that
interest may not be applied to customer claims under SIPA, the
Commission considered whether calculating net equity in constant
dollars would be inconsistent with that case. Under the facts of
this case, the Commission believes that the use of constant
dollars can be distinguished from the payment of interest
discussed in that Sixth. Circuit case and that the best reading
of SIPA and the cases interpreting it is that net equity here
should be calculated in constant dollars.

It also is the Commission's view that the constant-dollar method
will have limited application to the calculation of net equity in
other liquidations under SIPA. In a SIPA liquidation, a
claimant's net equity is determined by calculating the net value
on the filing date of the securities positions and cash shown on
the books and records of the broker-dealer. Where the claimant's
account statement and the books and records of the broker-dealer
are consistent, there is no need to adjust that net equity value
for inflation, because it is determined in current dollars as of
the filing date. Calculating net equity in constant dollars
should be necessary only where (1) the customer has a claim for
securities, and (2) the claimant's account statement does not
match the books and records of the broker-dealer either because
(a) the securities are fictitious, or (b) the securities
positions were the product of a fraudulent scheme. In calculating
the customer's net equity under these circumstances, as in New
Times, the money that the customer gave the firm to purchase
securities serves as a proxy for the securities positions that
were not and-critically--could not legitimately have been
purchased. When the customer's net equity is calculated using
cash as a proxy for securities positions, it is appropriate to
calculate net equity in constant dollars.

Conclusion

The Madoff case poses difficult questions regarding the
appropriate method for calculating the value of customers' claims
in the absence of clear direction from either the statute or
existing case law. The Commission's recommendation to the
bankruptcy court is based on a determination that calculating the
net equity of Madoff customer accounts using a constantdollar,
cash-in/cash-out method is most consistent with the purposes of
the statute and provides the greatest degree of fairness.

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

I thank you again for the opportunity to appear before you today.
I would be pleased to answer any questions you may have.

MICHAEL A. CONLEY
Deputy Solicitor
Securities and Exchange Commission

**End of Document**                                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

September 22, 2011

Hon. Spencer Bachus, Chairman
Hon. Barney Frank, Ranking Member
Committee on Financial Services

Hon. Darrell E. Issa, Chairman
Hon. Elijah Cummings, Ranking Member
Committee on Oversight and Government Reform

Hon. Randy Neugebauer, Chairman
Hon. Michael E. Capuano, Ranking Member
Subcommittee on Oversight and Investigations
of the Committee on Financial Services

Hon. Patrick T. McHenry, Chairman
Hon. Mike Quigley, Ranking Member
Subcommittee on TARP, Financial Services and Bailouts of Public and
Private Programs of the Committee on Oversight and Government Reform

RE:    Joint Subcommittee Hearing on "Potential Conflicts of Interest at the SEC"
(Thursday, September 22, 2011, 2 pm, 2128 Rayburn HOB)

Members of Congress:

We are senior members of the private securities bar. We write in support of David
Becker and to raise several points that we feel are important for you to consider.

**Importance of Ethics Compliance.** We will begin by applauding your efforts to
assure and enhance compliance with ethical requirements at the SEC and across government.
We likewise applaud the SEC's ongoing efforts to improve its operations and in particular its
internal procedures to enhance ethical behavior and compliance. Our comments below are
limited to matters relating to your consideration today of David Becker and the role he played
at the SEC as it tried to work its way through the wreckage of the Madoff tragedy, which
began with Madoff's December 2008 confession to having perpetrated a colossal fraud that
tricked investors, multiple regulators and the financial services industry participants who
dealt with him daily.

We understand all that has been said, rightly, about avoiding even the "appearance" of
a conflict of interest, even where no actual conflict exists. And we all wish that – in the heat
of battle in dealing with Madoff and numerous other crisis issues – more attention had been
paid to these issues, and that we did not have to consider what is before the subcommittees at
this time.

**Evaluating David Becker.** With the foregoing acknowledged, we agree with SEC
Chairman Mary Schapiro's public statement yesterday afternoon that David Becker is "a
talented, highly skilled lawyer and a dedicated civil servant." In similar vein, we agree that
Chairman Schapiro correctly commented in February, on David's departure from the SEC,
that "David's wise counsel has guided the Commission through a gauntlet of complex legal

and policy issues. His experience and deep knowledge of the Commission and the securities laws has served the agency and the American people brilliantly."

Many of us have worked for years with David, both in senior SEC positions and in private practice, on a wide variety of legal matters. We have also worked with him on bar committee matters. Based on our long-term and detailed observations, David has consistently shown himself to be of the highest moral and ethical fiber and a strong advocate for justice and the public interest.

David is one of the most talented lawyers of his generation. After starting his legal career as the editor-in-chief of the Columbia Law Review and then as a law clerk for Supreme Court Justice Stanley Reed, he spent decades as a valued securities law counselor and senior partner at two of our country's top law firms. The SEC was indeed fortunate to have a lawyer of David's mettle and caliber perform not one but two periods of public service at the agency. Between 1998 and 2002, he served the SEC first as Deputy General Counsel and later as General Counsel. He then returned for a second tour of duty as General Counsel from 2009 until 2011, the period here under consideration.

**Involvement in Madoff Deliberations.** When Mary Schapiro took the helm as SEC Chairman, we were facing the worst financial crisis in 80 years. She wisely realized that the SEC would need to respond effectively to the crisis and work with Congress on difficult and complex legislative and rulemaking proposals. Recognizing that this was a time when a person of broad experience in SEC and private practice would be needed to serve as the SEC's chief legal officer, Chairman Schapiro approached David and asked if he would consider returning to the SEC as General Counsel.

Any suggestion that David acted for personal gain, instead of in the interests of the investors victimized by Madoff, frankly makes no economic sense whatsoever. Saying yes to Chairman Schapiro's request that he return to the SEC would mean that David would lose millions of dollars, representing the difference between his senior law firm partnership income and what would be his government pay. Nor would the job give him any new resume credential, as he had previously been SEC General Counsel and was already acknowledged as one of the leading securities lawyers in the country. Yet at considerable financial sacrifice to himself and his family, David said yes and returned to the SEC as General Counsel.

The current debate has focused on the SEC's position on whether or not Madoff victims should be compensated with just the return of their invested principal or whether they should also get a basic interest-like payment as well. Notably, however, the SEC did not oppose the Madoff trustee's separate determination that Madoff victims should not retain so-called "phantom profits" – the amounts that the victims thought they had made as income from Madoff's investment program on the amounts they had originally invested. The SEC not opposing the trustee's phantom profits point was obviously substantially against David's personal financial interests and had a much greater impact than any basic interest payment to Madoff victims might have had for David.

As has been publicly acknowledged by all involved, David immediately disclosed his mother's investment with Madoff on returning to the SEC and got ethical clearance to participate in Madoff-related discussions. He told Chairman Schapiro that his mother had invested, and received the ethics opinion that he would not have to recuse himself from

2

Madoff-related deliberations.  It is acknowledged that at least five other senior SEC officers knew of his mother's investment.

Finally, many of us are former SEC senior officers or staff, and based on our many years of experience at and with the agency, we can affirm that any significant SEC decision receives broad consideration.  Sometimes 20 or more sets of eyes will fall on a single recommendation memo, and decisions by the five SEC commissioners are usually made in a large meeting room that is packed with very experienced and intelligent senior and junior staff members.  In that environment, any views perceived as being contrary to the public interest are quickly and vigorously challenged and ultimately disregarded.

*          *          *

In conclusion, we urge that David Becker's considerable contributions to the SEC and our nation be recognized and that the points we have raised above be considered as part of your deliberations.  Thank you for your consideration of this letter.

Very truly yours,

Diane E. Ambler
K&L Gates LLP

Jay G. Baris
Morrison & Foerster LLP

Jeffrey D. Bauman
Professor of Law and
Co-Director of the Center for the
Study of the Legal Profession
Georgetown University Law Center

Alan Berkeley
K&L Gates LLP

Paul R. Berger
Debevoise & Plimpton LLP

Gregory S. Bruch
Willkie Farr & Gallagher LLP

W. Hardy Callcott
Bingham McCutchen LLP

Stephen J. Crimmins
K&L Gates LLP

Andrew J. Donohue
Morgan Lewis & Bockius LLP

Marc B. Dorfman
Foley & Lardner LLP

Meyer Eisenberg
Senior Research Scholar and Lecturer-in-Law,
Columbia University School of Law

Linda Fienberg
Former Executive Assistant to SEC Chairman
and Associate General Counsel

Matthew P. Fink
Former President, Investment Company Institute

Kayla Gillen
Former PCAOB Board Member

Barry Goldsmith
Gibson, Dunn & Crutcher LLP

Ralph C. Ferrara
Dewey & LeBoeuf LLP

Joseph I. Goldstein
Murphy & McGonigle PC

Elizabeth P. Gray
Willkie Farr & Gallagher LLP

Michael Halloran
Haynes & Boone LLP

Paul Huey-Burns
Bryan Cave LLP

Dennis Garris
Alston & Bird LLP

Jerry A. Isenberg
Murphy & McGonigle PC

Dixie L. Johnson
Fried Frank Harris Shriver & Jacobson LLP

Roberta S. Karmel
Centennial Professor of Law and Co-Director of
The Dennis J. Block Center for the Study of
International Business Law
Brooklyn Law School

Stanley Keller
Edwards Angell Palmer & Dodge LLP

Ricard G. Ketchum,
Chairman and Chief Executive Officer
Financial Industry Regulatory Authority

Andrew M. Klein
Schiff Hardin LLP

Amy Natterson Kroll
Bingham McCutchen LLP

Carmen J. Lawrence
Fried Frank Harris Shriver & Jacobson LLP

Joseph Lombard
Murphy & McGonigle PC

David M. Lynn
Morrison & Foerster LLP

Michael D. Mann
Richards Kibbe & Orbe LLP

John McCarthy
General Counsel, GETCO

Carol M. McGee
Alston & Bird LLP

Kathryn B. McGrath

Helane Morrison
Hall Capital Partners LLC

Allan S. Mostoff
Dechert LLP
President, Mutual Fund Directors Forum

Charles M. Nathan
Latham & Watkins LLP

Thomas C. Newkirk
Jenner & Block LLP

John F. Olson
Visiting Professor
Georgetown University Law Center
Former Chair, ABA Committees on
Federal Regulation of Securities and
Corporate Governance

Mark Perlow
K&L Gates LLP

Richard M. Phillips
K&L Gates LLP

Harvey L. Pitt
Chief Executive Officer
Kalorama Partners, LLC
Kalorama Legal Services, PLLC

Therese Pritchard
Bryan Cave LLP

Laura S. Pruitt
Schiff Hardin LLP

David Silver
Former President, Investment Company Institute

Julie A. Smith
Willkie Farr & Gallagher LLP

Marianne K. Smythe

Honorable Stanley Sporkin
U.S. District Court Judge (Retired)

Ann Yvonne Walker
Wilson Sonsini Goodrich & Rosati

F. Joseph Warin
Gibson, Dunn & Crutcher LLP

Susan Ferris Wyderko
Executive Director, Mutual Fund Directors Forum

# EXHIBIT D

1 of 3 DOCUMENTS: New Zealand Company and Commercial Law Reports/2011/Re Waipawa Finance Company Ltd (in liq) - [2011] NZCCLR 14 - 7 February 2011

Pages: 1

# Re Waipawa Finance Company Ltd (in liq) - [2011] NZCCLR 14

High Court Napier
CIV-2010-441-465

25 January; 7 February 2011
Ronald Young J

***Liquidation -- Whether Companies Act 1993 or Securities Act 1978 should apply -- Whether funds can be traced -- Whether funds held in name of both companies should be pooled -- Whether investors in both companies should share funds without considering which company their funds invested in -- What is fairest method of distribution of funds -- Whether investors' claims should include accrued unpaid interest -- Whether all amounts previously paid to investors should be treated as withdrawal of capital -- Whether constant dollar approach should be applied to distribution of funds -- Whether investors due very small sums should receive distribution -- Reimbursement of tax paid to IRD remains unresolved -- "debt security" -- Securities Act 1978, ss 2, 36, 37.***

Warren Picket was the sole shareholder of Waipawa Holdings Ltd and the largest shareholder in Waipawa Finance Company Ltd. Over 20 years, a total of almost $19m was invested with Mr Pickett (by over 200 investors) through the Waipawa companies. Mr Pickett misappropriated much of the invested money and less than $1m has been recovered. Mr Pickett operated an accountancy practice and investors believed their invested money was "on call". Mr Pickett did not provide a prospectus, investment statement or trust deed, nor did he publish any financial statements. There were no independent trustees for either of the Waipawa companies.

Investors' funds were received by Mr Pickett, who appeared to allocate the funds randomly between the Waipawa companies and to move funds between the two regularly in order to meet the commitments of either company as they arose, typically being payments of resident withholding tax (RWT) to IRD and repayments to investors.

Most investors appeared to be giving money to Mr Pickett or his accountancy firm without instructing which Waipawa company was to be invested in, and without being told which of the companies they were investing in. It was impossible to trace any particular investor's funds. Investors received six-monthly statements which showed the funds invested and identified an interest rate. Typically, interest accrued, and would not be paid unless the investors requested it. In fact, the interest portion of the individual investments was fictitious. If a withdrawal (of interest or capital) was requested the money would be transferred to the investor's account the following day.

RWT was paid by the Waipawa companies in respect of the fictitious interest credited to investors' accounts. The issue of RWT and whether a sum will be "recovered" from IRD has not been resolved.

**Held:** (in requesting draft orders to the liquidators be provided for approval, and in ordering that copies of this proceeding and the judgment be served on the Commissioner of Inland Revenue)

(1) The Securities Act 1978 is to apply to the funds held by the liquidators (not the Companies Act 1993 as the matter was brought under). The facts established the investments made with Waipawa were debt securities under the Act (see [8], [60]).

(2) Under the Act, the funds were never "owned" by the Waipawa companies and, therefore, are not available in the liquidation of either company. The funds were "owned" by the investors and held in trust by Waipawa Holdings and Waipawa Finance for the investors. Since the funds held belong to the investors, if the money could be traced it should be. The funds held by the liquidators of Waipawa could not be traced (see [13], [14], [60]).

(3) The only rational basis for distribution of the funds is pooling the money from both companies, and the investors in both companies should share in the funds without considering which company their funds were invested in (see [19], [60]).

(4) The pari passu method of distribution of the funds should be applied, the pari passu method being fairer than distribution in accordance with *Devaynes v Noble; Clayton's Case* (1816) 35 ER 781 or "the North American method" (both alternative methods were reviewed) (see [26], [60]).

(5) Investors' claims should not include accrued unpaid interest. In fact there was no interest earned. The interest component of the statements sent to the investors was fictitious. The reasoning applied here followed the reasoning applied in United States authorities (see [30], [31], [60]).

(6) Amounts previously paid by the Waipawa companies to investors should be treated as withdrawal of capital, being consistent with excluding accrued unpaid interest and in line with United States authorities (see [34], [60]).

(7) The constant dollar approach should be applied to the distribution of the funds: the intention being to try and equalise as much as possible the same dollar value between investors whenever they invested their money (see [57], [60]).

(8) Investors who are due very small sums which would be less than the cost of distributing them, should not receive a distribution at all, and those funds should be available as part of the pool for distribution among those who do qualify (see [60]).

(9) The reimbursement of non-resident and resident withholding tax paid by the Waipawa companies to the IRD in respect of the fictitious interest credited to investors' accounts remains unresolved. When it is resolved, there may be different issues affecting the distribution of any sum "recovered" from IRD from those resolved here relating to the distribution of the other recovered funds (see [62]).

**Cases mentioned in judgment**

*Devaynes v Noble; Clayton's Case* (1816) 35 ER 781.

*McKenzie v Alexander Associates Ltd (No 2)* (1991) 5 NZCLC 67,046 (HC).

*International Investment Unit Trust, Re* [2005] 1 NZLR 270 (HC).

*Securities Investor Protection Corporation v Bernard L Madoff Investment Securities LLC* (United States Bankrupcy Court, Southern District of New York, No 08-01789, 1 March 2010).

**Application**

This was an application by the liquidators, JR Palairet and GC Edwards, seeking directions as to how they should distribute the remaining funds to the investors.

*SA Barker* and *B Balderstone* for the liquidators.

*H Rennie QC* as amicus curiae.

*D Chan* for the investors.

# RONALD YOUNG J.

*Introduction*

[1] Warren Pickett is the sole shareholder of Waipawa Holdings Ltd and the largest shareholder in Waipawa Finance Ltd (collectively "Waipawa"). For over 20 years clients, friends, family and acquaintances invested money with him through the Waipawa companies. In total almost $19m was invested (including accumulated interest) by over 200 investors. Mr Pickett misappropriated much of this money during the 20 years, and less than $1m has been able to be recovered. The liquidators seek directions from this Court as to how they should distribute these remaining funds to the investors.

**[2]** The parties represented before me, the investors and the liquidators, together with Mr Rennie appointed as an amicus by this Court, agree upon the questions for me to answer in this judgment and all but one of the answers. Mr Chan on behalf of the investors has identified eight issues for resolution by the Court. I therefore consider each in turn.

*Does the Securities Act 1978 or the Companies Act 1993 apply to the fund recovered?*

**[3]** As Mr Chan identified it is necessary to determine which Act applies to the funds held by the liquidators so that the funds can be properly characterised and, in turn, the appropriate method of calculating the investors' claims undertaken. I agree with all counsel that the Securities Act applies and that, therefore, the funds held by the liquidators are on trust for the benefit of the investors.

**[4]** To understand why the Securities Act applies it is necessary to understand how the money came to Mr Pickett and how he used the funds. Mr Pickett operated an accountancy practice. Investors invested the money with him believing the money was "on call" and would therefore be available to withdraw should they ask. Mr Pickett provided no prospectus, investment statement or trust deed to identify how the money was to be invested. He did not publish any financial statements nor were there any independent trustees appointed for either Waipawa Holdings or Waipawa Finance.

**[5]** Typically, the funds were received from investors by him. He would then decide whether the funds were to be allocated to Waipawa Finance or Waipawa Holdings. The investors received a six-monthly statement which showed the funds invested and identified an interest rate. Typically, interest accrued and would not be paid unless the investors requested it. If an investor requested withdrawal of all or any of the funds held in their name they contacted Mr Pickett's office, made the request and the following day the money was transferred to their account.

**[6]** The Securities Act, in part, restricts the offer of securities to the public (Part 2). I am satisfied that what was involved here was a security in terms of the Act. Section 2D(1)(b) defines security as including a debt security.

**[7]** Section 2 defines debt security as including:

> ... any interest in or right to be paid money that is, or is to be, deposited with, lent to, or otherwise owing by, any person ...

**[8]** The facts establish that the money paid by investors to Mr Pickett and allocated to either of the companies was money that they had either deposited or lent to or was otherwise owing by either of the Waipawa companies. Accordingly, the investments made with Waipawa were debt securities under the Act.

**[9]** The Act, however, only allows the establishment of a security where there is a registered prospectus relating to that security. Section 37(1) provides:

> **37.**   **Void irregular allotments** -- (1) No allotment of a security offered to the public for subscription shall be made
> unless at the time of the subscription for the security there was a registered prospectus relating to the security.

**[10]** As I have noted at [4] there was no registered prospectus relating to the advances made by the various investors. In those circumstances, therefore, s 37(4) applies. It provides:

> (4)   Any allotment made in contravention of the provisions of this section shall be invalid and of no effect.

**[11]** As a result, as Mr Chan identified, there being no valid allotment of the securities Waipawa was obliged to repay the investors' funds immediately. Section 37(5) provides:

> (5)   Where subscriptions for securities are received by or on behalf of an issuer, but, by virtue of this section, the securities may not be allotted, or for any reason the securities are not allotted, the issuer shall ensure that --
> (a)   *Repealed*
> (b)   The subscriptions, together with such interest (if any) as has been earned thereon, are repaid to the subscribers as soon as reasonably practicable.

**[12]** Until repayment is made these funds are held in trust by Waipawa for the investors.[1]

**[13]** Thus the funds have never been "owned" by Waipawa and are not therefore available in the liquidation of either company. The funds are "owned" by the investors and held in trust by Waipawa Holdings and Finance for them.

*Tracing*

**[14]** Having established that the money held by the liquidators belongs to the investors a question arises as to whether or not any money can be traced to individual investors. Where there can be tracing there should be tracing.[2] Mr Edwards (one of the liquidators) in his evidence, has made it clear that it is impossible to trace any particular investors' funds. No challenge is made to this claim.

**[15]** In those circumstances, therefore, there can be no order tracing any funds held by the liquidators to individual investors.

*Pooling*

**[16]** The issue here is whether the funds held by Waipawa Finance and Waipawa Holdings should be treated as two separate funds so that those investors in Waipawa Finance would receive only those funds held by Finance and so with Holdings' funds. The alternative approach is a single pool of investors and a single pool of money of Waipawa Finance and Waipawa Holdings funds.

**[17]** The basis on which it is said there should be pooling is set out in the affidavit of Mr Edwards in this way:

> 18.    There is no discernable pattern which shows a distinction in the method of operation of Finance on the one hand and Holdings on the other hand, in that:
> 
> (a)    Most Investors appeared to be giving money to Warren Pickett or his accountancy firm, without being told or understanding whether their funds would be shown as advances to Finance on the one hand or Holdings on the other.
> 
> (b)    The only evidence to the contrary is in respect of two investors being:
> 
> (i)    The Eldon D Foote Foundation, shown as a creditor of Holdings as from 1 June 1994 including as at the date of Liquidation the sum of $157,657.52, but not a creditor of Finance; and
> 
> (ii)    John Victor Mogey shown as a creditor of Holdings as from at latest 1 July 1994, including as at the date of Liquidation, the sum of $2,677,189.73, but not a creditor of Finance. 19. However, there were payments made by transfers from the Holdings' bank account to the credit of Finance, including to its bank account. As at the Date of Liquidation (7 August 2008) our enquiries show that the amount owing by Finance to Holdings is $3,684,671.22 (which represents approximately 20% of the total amount owing to Investors of Holdings). The movement of funds between the two companies happened regularly. It seems to us from our analysis of such movements that Pickett simply moved funds to meet commitments of either company that arose. Typically, these were payments of resident withholding tax to the Commissioner of Inland Revenue and repayments to Investors. The amount of the inter-company claim is the balance at the Date of Liquidation taking into account movements of funds between the two companies.

**[18]** Further, it is clear from the statements made by Mr Pickett to the Serious Fraud Office when he was prosecuted, that investors did not instruct Mr Pickett to invest their funds in a particular Waipawa company nor was there any rational basis on which he distinguished between the two companies when allocating invested funds.

**[19]** In those circumstances the only rational basis for distribution is pooling the money from both Waipawa Holdings and Waipawa Finance and pooling the investors in both companies.[3]

*Which method of distribution should be applied?*

**[20]** As Mr Chan identified there are three potential ways in which funds held by the liquidators could be distributed. They are:

(a)    in accordance with *Clayton's Case*;[4]
(b)    "the North American method"; or
(c)    pari passu.

**[21]** I agree with counsel that the fairest method, in the sense of being the least unjust to individual investors, is the pari passu method.

**[22]** The rule in *Clayton's Case* encompasses the proposition that the first investment is treated (in a case such as this) as the first investment to have been lost. And so from the funds available the latest investors are paid in full with the earlier investors paid pari passu.

**[23]** It is well established law that the rule in *Clayton's Case* can be displaced by evidence or inferences as to investors' intentions.[5] Here, the dissipation of the Waipawa investors' money occurred to satisfy repayment demands from new investors, theft of the money by Mr Pickett to fund his lifestyle and business losses. In those circumstances it could not have been the investors' intention that the latest investors be paid in full. In any event, such a distribution would be substantially unjust and unfairly advantaged later investors. I therefore agree with counsel that the distribution should not be on the basis of the rule in *Clayton's Case*.

**[24]** The North American method is described in *Re International Investment Unit Trust* in this way:

> [35] The North American separate account approach requires determining the proportion of each investor's funds used to contribute to the funds in each of the bank accounts from which realisations were made. The account to which the funds were initially deposited must be ascertained. If there were transfers between accounts, the share held by each investor in the transferring account must be calculated at the date of transfer. Once an investor's share in each account is calculated they are totalled to determine overall entitlement.

**[25]** This approach was criticised and rejected in *Re International Investment Unit Trust*. Without undertaking a critique of its application in this case I agree with counsel that the use of such a method in this case would be unfair, unreasonably expensive and almost certainly impossible to ensure accuracy.

**[26]** The appropriate method in this case must be the pari passu method. Investors gave no particular directions to Mr Pickett as to how their money was to be applied. Mr Pickett essentially allocated the funds randomly to either one of the two companies. The money then disappeared into an overall fund. Some money was invested, some money was held on call, and some money was stolen, typically to either fund Mr Pickett's lifestyle or to make up for his own losses on investments.

**[27]** It is now impossible to effectively identify what money is what. All counsel agree that distribution in proportion to investment is the fairest method of distribution in the present case subject only to the proposition of the application of a "constant dollar" approach to the *pari passu* method. I will return to that aspect at the end of this judgment.

*Should investors' claims include accrued unpaid interest?*

**[28]** Mr Pickett sent each investor in Waipawa a six-monthly statement showing their original capital sum invested together with accumulated interest (between 12.5 and 13.5 per cent). Of the $19m outstanding, approximately $8m is capital and $11m interest. However, Waipawa did not earn any interest on the money invested. The interest component of the statements sent to the investors was purely fictitious.

**[29]** As Mr Chan said in his submissions the capital sum invested was trust money owned by the investors. The interest earned, however, was not trust money. It did not in fact exist. It was no more than a record that Mr Pickett kept of what Waipawa had agreed to pay its investors, an arrangement in contravention of the Securities Act (see [3]-[12]).

**[30]** The exclusion of fictitious interest from valid investors' claims has been the subject of several United States' authorities.[6] The reasoning applied there applies here. What must be stressed and understood is that the interest portion of the investment was fictitious. It was, as Mr Chan observed, part of Mr Pickett's long elaborate fraud. I agree with Mr Chan when he said:

> If the trust money held by the liquidators were used to pay interest it would be tantamount to furthering the fraud committed by Mr Pickett.

**[31]** I conclude therefore that the investors' claims should not include any accrued unpaid interest.

*Should amounts previously paid by Waipawa to investors be treated as payment of interest or withdrawal of capital?*

**[32]** The issue that arises here relates to whether funds withdrawn by investors prior to liquidation should be debited against the investor's interest account, firstly, and only when the interest is fully paid should it be deducted from the investor's capital account or should it be treated solely as a withdrawal of capital.

**[33]** I agree with counsel that the only proper course, given the fictitious nature of the interest, is that all withdrawals must be treated as a withdrawal of capital. As Mr Chan noted:

> It would be wrong to treat any payments to investors as being payments of interest. That would be allowing one investor's trust money to be used to pay another investor's profit and tantamount to confirming Mr Pickett's fraud.

**[34]** This approach is consistent with my view that the investor's claims should not include accrued unpaid interest (see [28]-[31]). Such an arrangement was accepted without comment in *Re International Investment Unit Trust*. The same issue arose in the Madoff case which treated the withdrawals as capital only. All withdrawals by investors should therefore be treated as withdrawals of capital only.

*Should resident and non-resident withholding tax paid by Waipawa to the IRD be taken into account?*

**[35]** Withholding tax was paid by the Waipawa companies to the IRD. It was paid with respect to the fictitious interest credited by Waipawa to investors' accounts. As I understand it the liquidators have given notice to the IRD seeking repayment of the withholding tax paid. That issue remains unresolved and will be the subject of comment by me at the end of this judgment.

**[36]** In those circumstances the only sensible course is to ignore the withholding tax issue until the issue of any IRD reimbursement is resolved.

*Constant dollar approach*

**[37]** Mr Rennie as amicus invited me to consider the "constant dollar" approach as part of the pari passu method of distribution. Mr Chan opposed the constant dollar approach saying it is not appropriate in the present case. The liquidators took a neutral position.

**[38]** My function is to give directions for the distribution of the fund which I consider to be the most equitable in the circumstances as between the investors. The pool is limited. And so any adjustment in favour of a particular class of investor inevitably has effects on other investors.

**[39]** The constant dollar proposal is intended to reflect the fact that $100 invested, say 20 years ago, is worth "more" than the $100 invested in 2007, when the scheme "failed". The intention is, therefore, to "equalise" the value of each dollar invested by recognising the 1987 dollar is worth "more" than the 2007 dollar (the dates 1987 and 2007 are only examples).

**[40]** The United States Securities Exchange Commission (SEC) in submissions to Congress[7] on compensation issues relating to the Madoff case considered that to achieve fair compensation for those who lost money, each dollar invested should be converted into a "time equivalent or constant dollar". They said:

> This constant-dollar approach is rooted in the classic economic concept of the time value of money and will result in greater fairness across different generations of Madoff investors - in effect, treating early investors and later investors alike in terms of the real economic value of their investments.

**[41]** Further, the SEC said:

> The issue of calculating net equity and constant dollars has not arisen before in SIPA cases probably because many ponzi-type schemes are of relatively short duration, and the inequity among those who invested at different points in time is less striking. But the Madoff fraud - which lasted for 20-plus years - puts this issue into stark relief.

**[42]** Here Mr Pickett's ponzi scheme also lasted for more than 20 years. The SEC went on to consider whether there was a conflict between the disregard of the payment of interest in calculating loss and in "calculating net equity in constant dollars". They said:

Under the facts of this case, the Commission believes that the use of constant dollars can be distinguished from the payment of interest ...

[43] The submissions from the SEC to Congress were made in the context of a discussion regarding the equitable sharing of compensation through a statutory scheme for Mr Madoff's victims. They were therefore made in a different context than in this case. Here I am concerned with the distribution of investors' money between investors.

[44] However, as Mr Rennie points out, there is no reason why the same principles could not be applied in this case. The inequality this approach is designed to "cure" is the assumption that $100 invested in 1987 is the same "value" as $100 invested in 2007. Given the effects of inflation over time then that cannot be so. In this sense, therefore, such an adjustment to the $100 invested, depending on the timing of the investment, does reduce the unfairness of a pari passu scheme. Such an adjustment will give a greater share of the pool of money to the early investors and a lesser amount to the later investors. (An example is given to illustrate, from Mr Rennie's submissions, how a constant dollar approach would work.) In the example there are two investors - one invests $100 in 1987, the other $100 in 2007. The 1987 $100 is worth $183 in 2007 terms to account for inflation. Therefore for every $100 available to the two investors for distribution the 1987 investor will receive 183/283 or $64.66 and the 2007 investor $33.34.

[45] Mr Chan identified five reasons why he said such an arrangement was either unnecessary or wrong, or more directly, not necessary to ensure an equitable division between the investors. I consider each reason in turn.

[46] First, he submits that the earlier investors money could not be seen to have increased the value of the investment pool over time given that Mr Pickett stole most of these early invested funds. No interest or earnings were made from these earlier investments. It would therefore be artificial to compensate earlier investors for a non-existent increase in value.

[47] There is no evidence as to the source of the funds now available for distribution. No tracing of funds is possible (see [13] and [14]). It is, as Mr Rennie pointed out, just as possible that early invested funds were used for some of the investments which produced the funds now available for distribution and that a later investor had his money immediately stolen by Mr Pickett. This point, therefore, does not in my view count against the constant dollar approach.

[48] Second, Mr Chan submitted that the claimed disadvantage to earlier investors on a pari passu division without a constant dollar adjustment was all relative. It was likely that earlier investors' money had been lost years ago thus the current fund would mostly be made up of late investors' money. Given this circumstance the pari passu proposal for division favoured earlier investors and no further adjustment in their favour was necessary.

[49] Mr Chan said the fact that most earlier investors' money had been long stolen reflected the rationale for the rule in *Clayton's Case* which if applied in a case such as this would seriously disadvantage earlier investors. Thus the application of the pari passu rule, Mr Chan stressed, mitigated the disadvantage of *Clayton's Case* but no further "compensation" (by virtue of the constant dollar approach) was required.

[50] However, as I have noted, there is no real evidence of the source of the funds now left for distribution. The thefts appear to have occurred throughout the time the investments were made. The source of the current fund was money in Waipawa bank accounts, returns on investments made by Mr Pickett and money directly from the sale of Mr Pickett's assets. Thus there is no real evidence to support Mr Chan's underlying contention of substantial early investor loss.

[51] The third point relates to the rule in *Clayton's Case* and the presumed intention of investors. As Mr Chan noted the rule in *Clayton's Case* is built around a presumed intention of the parties which in appropriate circumstances (as here) gives rise to a different intention. Here, the distribution of the losses (and the assets)

pro rata amongst all investors is the presumed intention in the circumstances. Mr Chan's point is that there is nothing to suggest that the investors intended that there be a further overlay on the pari passu distribution of a constant dollar approach.

[52] I agree with Mr Rennie's response that if the investors were asked they would say they were entitled to interest on their investments given what they had been promised by Mr Pickett. A distribution based on this intention would favour the early investors far more than a constant dollar approach. And so equalising the value of the capital invested for distribution purposes (the constant dollar approach) is a modest reflection of investor intention that some recognition of longer term investment be made.

[53] Fourth, the investors say, through Mr Chan, that the constant dollar approach inappropriately rewards longer term investors who chose to risk their money over time. This observation is based on the proposition that all investments involve risk and a long term investor takes an extended risk, or a greater risk than a short term investor.

[54] Mr Chan says:

> The constant dollar approach would in effect "reward" him for that risk at the expense of later investors who risk their money for a much shorter period.

[55] I accept the general proposition behind Mr Chan's submissions. However, I do not see the constant dollar approach as "rewarding" early investors. The intention of such an approach is to equalise the position as between early and later investors rather than reward risk.

[56] Finally, the investors say that there is no precedent for a constant dollar approach where the pari passu approach has been used. My task is to identify what I consider to be an equitable formula for the distribution of the remaining investment funds given the facts of this case. The fact that there is no precedent for the use of the constant dollar approach does not therefore seem to me to be relevant.

[57] I consider that there will be a fairer distribution of the fund if the constant dollar approach is used. I accept in doing so that given there is a limited fund, the earlier investors will get a bit more, and the later investors will inevitably get a bit less. But the intention is to try and equalise as much as possible the same dollar value between investors whenever they invested their money.

[58] Such an adjustment to the pari passu distribution should only be directed by me if the calculations necessary to give effect to the constant dollar proposal can be easily and inexpensively achieved. The liquidators have advised that they can inexpensively undertake the necessary calculations for at least the last 10 years of the scheme. I assume, therefore, that all investors who had invested money earlier than 10 years will for the purpose of this calculation be assumed to have invested at 10 years prior to the liquidation of the companies. If I am wrong in this counsel can advise by memorandum.

[59] Some investors will, pursuant to the scheme of distribution I direct, receive very small amounts which will exceed the costs of distributing the money to them. I direct that the liquidators may exclude these investors from the distribution. These funds may be retained in the pool available for distribution amongst those investors who qualify for distribution.

[60] In summary:

    (a)    I am satisfied that the Securities Act applies to these funds and the funds are trust funds held by the liquidators on behalf of the investors;

    (b)    I am satisfied that the funds held by the liquidators of Waipawa cannot be traced;

    (c)    I am satisfied that the funds held in the name of Waipawa Finance and Waipawa Holdings should be pooled and the investors in Waipawa Finance and Waipawa Holdings should share in these funds without considering which company their funds were invested in;

    (d)    the pari passu method of distribution of the funds should be applied;

    (e)    investors' claims should not include accrued unpaid interest;

    (f)    amounts previously paid by Waipawa to investors should be treated as withdrawal of capital;

    (g)    the constant dollar approach, as I have specified at [57] should be applied to the distribution of the funds; and

    (h)    investors who are due very small sums which would be less than the cost of distributing them should not receive a distribution and those funds should be available as part of the pool for distribution amongst those who do qualify.

[61] The final form of the directions reflecting this judgment to the liquidators should be provided to me by counsel in draft form for my approval.

[62] As to non-resident and resident withholding tax, as I have noted (see [35] and [36]) the reimbursement of this tax by IRD remains unresolved. The Commissioner of Inland Revenue is not a party to this litigation. However, I cannot complete resolution of this litigation until the fate of the claim for reimbursement of the tax is known. There may be

different issues affecting distribution of any sum "recovered" from IRD than have been resolved in this decision relating to the distribution of other recovered funds.

**[63]** I therefore adjourn this aspect of the directions application sine die. I order copies of these proceedings and this judgment be served on the Commissioner of Inland Revenue. I invite the Commissioner to indicate his view of the liquidators request for reimbursement of the tax paid by Waipawa Holdings and Waipawa Finance on behalf of investors as resident or non-resident withholding tax within eight weeks from the date of this judgment.

**[64]** Assuming the Commissioner is able to do so and he accepts that some or all of the tax paid is refundable then I invite counsel for the two parties, the liquidators and the investors and Mr Rennie to file and exchange submissions as to how I should distribute these funds. Such submissions should be made to the Court two weeks after receipt of any memorandum on behalf of the Commissioner. A further fixture may then be required; if so, preferably before me.

**[65]** I assume that all costs would be paid from the funds recovered by the liquidators. Should any counsel take a different view then memoranda can be filed.

### FOOTNOTES

1 Securities Act 1978, s 36A.

2 *McKenzie v Alexander Associates Ltd (No 2)* (1991) 5 NZCLC 67,046 (HC); *Re International Investment Unit Trust* [2005] 1 NZLR 270 (HC).

3 See also *Re International Investment Unit Trust* [2005] 1 NZLR 270 (HC) at [18] and [76].

4 *Devaynes v Noble; Clayton's Case* (1816) 35 ER 781.

5 *Re International Investment Unit Trust.*

6 *Securities Investor Protection Corporation v Bernard L Madoff Investment Securities LLC* (United States Bankruptcy Court, Southern District of New York, No 08-01789, 1 March 2010).

7 Michael A Conley, US Securities Exchange Commission. Statement Before the Capital Markets, Insurance and Government Sponsored Enterprises Subcommittee, United States House of Representatives (December 9, 2009).

*Reported by:* Edith Shelton.