John W. Avery                                    Hearing Date: February 13, 2013
Dominick V. Freda                                Hearing Time: 10:00 a.m.
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549
(202) 551-5143

Alistaire Bambach
Patricia Schrage
Securities and Exchange Commission
New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281-1022
(212) 336-0163

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : |
| | : |
| | : |
| Plaintiff, | : Adv. Pro. No. 08-1789 (BRL) |
| | : SIPA Liquidation |
| v. | : (Substantively Consolidated) |
| | : |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : |
| | : |
| Defendant. | : |
| | : |
| In re: | : |
| | : |
| BERNARD L. MADOFF, | : |
| | : |
| Debtor. | : |

---

**MEMORANDUM OF LAW OF THE SECURITIES AND EXCHANGE COMMISSION**
**SUPPORTING A CONSTANT DOLLAR APPROACH TO VALUING CUSTOMERS'**
**NET EQUITY CLAIMS FOR FICTITIOUS SECURITIES POSITIONS**

**INTRODUCTION**

This Court's Order of September 5, 2012, modified on November 7, 2012, established a schedule for consideration of the Trustee's Motion for an Order Affirming Trustee's Calculation of Net Equity and Denying Time-Based Damages in this proceeding under the Securities Investor Protection Act ("SIPA").  Pursuant to that Order, the Securities and Exchange Commission respectfully submits this Memorandum of Law objecting to the Trustee's and the Securities Investor Protection Corporation's ("SIPC") position that customers' net equity can never be calculated in "constant" dollars; that is, in dollars adjusted to reflect the effects of inflation over time.

As this Court determined (and the Second Circuit confirmed), the customers of Bernard L. Madoff Investment Securities LLC ("BLMIS") have claims for securities (as opposed to claims for cash), but, because the securities positions shown on their final account statements were fictitious, the customers' claims must be valued not by the customary reference to their securities positions, but by reference to the cash they deposited with BLMIS less any they withdrew, *i.e.*, their "net investment."  In calculating the value of a customer's claim for securities under these narrow circumstances, the Commission does not believe that the Court is limited to the face value of the dollars deposited into the customer's account, less the face value of the dollars withdrawn from the account.  Although the calculation of customer net equity must be made by reference to the cash in/cash out, we believe the value of the dollars invested may, when warranted, be adjusted to reflect the differences in the value of those dollars at relevant points of time, such as the time of the deposit, the time of any withdrawal, and the filing date of the liquidation.  Such an inflation adjustment should provide a more accurate calculation of the real-dollar value of the customer's net investment; however, whether such an adjustment should

be made in a given case (or in this case) should be guided by a consideration of the relative costs

and benefits of doing so, including the impact of administrative delay and additional cost to the

bankruptcy estate, as well as the economic impact on claimants and any settled expectations they

may have at the time of determination of their claim.  Thus, in this case, where (1) the customers

have claims for securities, but (2) those claims must be valued by reference to the customers' net

investments rather than by reference to their securities positions at the time of the liquidation,

(3) an adjustment to account for inflation will provide a more accurate valuation of customer net

equity, and (4) such an adjustment may be warranted, provided that the benefits of doing so

outweigh the costs.  The Commission does not at this time have the data necessary to make an

informed evaluation of the benefits or of the costs of making an inflation adjustment in this case.

We believe that the trustee may be in possession of relevant data.  Accordingly, the Commission

has not made any determination as to whether or not an inflation adjustment should be made

because the Commission cannot fully assess the costs and benefits of doing so.  The Commission

believes that the Court should determine the ultimate appropriateness of using constant dollars

based on the Court's own evaluation of the benefits and costs of making an inflation adjustment.

## STATEMENT OF FACTS

Bernard L. Madoff Investment Securities LLC ("BLMIS") was a securities broker-dealer

registered with the Commission and a member of SIPC.  Madoff, the firm's principal, operated

BLMIS as a Ponzi scheme.  The customers of BLMIS deposited money with the firm that they

were told would be invested in securities pursuant to Madoff's so-called "split-strike conversion

strategy."  Although the customers received confirmations documenting securities transactions

implementing this strategy and monthly statements listing the securities positions held for the

customers' accounts, the money the customers deposited was never invested in securities for

their accounts.  The trades shown on the confirmations and monthly statements had been created

by selecting prices from previously reported trading data that would produce consistently positive

returns.  Instead of making the investments, Madoff used customer deposits to pay other

customers who requested withdrawals from their accounts and for his own purposes.  After the

scheme collapsed in December 2008, BLMIS was placed in liquidation under SIPA.

      The Trustee appointed to oversee the liquidation determined customer "net equity" claims

using a "cash-in/cash-out" or "net investment" method, according to which each customer's net

equity was equal to the money the customer had deposited with BLMIS less any withdrawals.

BLMIS customers filed with this Court objections to the Trustee's determination of claims using

the net investment method, and instead sought payments for the net equity in their accounts based

upon the securities positions shown on the last account statements they received from BLMIS

before it failed.  The Commission filed a brief in this Court agreeing generally with the Trustee

that under the facts of this case net equity should be determined by customers' net investment

amounts, but noting that it favored calculating the amount of the payment in constant dollars to

adjust for the effects of inflation (or deflation).  The Court agreed that net equity should be

determined based on the net investment method, but withheld a decision as to whether these

calculations should be made in constant dollars.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff

Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010)

("*BLMIS I*").  On appeal, the Court of Appeals for the Second Circuit affirmed, but also declined

to reach the constant dollars issue.  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir.

2011) ("*BLMIS II*").  Certain BLMIS customers petitioned the Supreme Court for writs of

-3-

certiorari to review the Second Circuit's decision.  The Supreme Court denied certiorari on June 25, 2012.

On September 5, 2012, this Court issued an order setting a schedule, modified on November 7, 2012, for litigating whether investors' net investments should be calculated in constant dollars.  On October 12, 2012, the Trustee, supported by SIPC, filed a motion indicating that he does not believe that customers' net equity can ever be determined in constant dollars.  In other words, under the Trustee's approach, a customer's deposit of $1,000 in 1988 would be treated as being equal to a different customer's $1,000 deposit in 2008.  But these amounts are not equal in value:  due to the effects of inflation, a $1,000 deposit in 1988 is equal to roughly $1,797 in 2008 dollars.  The Commission opposes the Trustee's and SIPC's view for the reasons provided below.

## ARGUMENT

The Commission believes that using constant dollars is an accurate way to calculate customer net equity under the narrow set of factual circumstances presented here, where customers have claims for fictitious securities or securities positions that cannot be valued except by reference to the customer's net investment; provided that, the decision to make such an adjustment must rest on the Court's consideration of the costs and benefits of doing so.  The purpose of SIPA is to assure that customers receive the assets that should be in their accounts when a brokerage firm fails.  SIPA protects customers who give money to brokers with the direction that it be used to purchase securities, even though the broker never purchased the securities.  In such a situation, the customer in a SIPA liquidation of the failed broker-dealer is entitled (up to specified limits) to the missing securities that the broker should have, but did not,

-4-

purchase, or the market value of those securities on the date the liquidation proceeding was

begun. When this is not possible—either because the securities that should have been in the

customer's account are fictitious or, as here, the trading scheme is fictitious—the customer's

claim must be satisfied with cash, even though the customer's claim is a claim for securities. As

this Court determined, and the Second Circuit agreed, the value of such a claim may be

calculated by reference to the amount of cash the customer deposited with the broker, less any

amounts the customer withdrew prior to the liquidation. In that circumstance, because the *value*

of the cash deposited or withdrawn by the customers will have varied over time as a result of

inflation (or deflation), we believe an adjustment to account for the effects of inflation offers a

more accurate valuation of the customer's claim and may be appropriate if the benefits of making

such an adjustment outweigh the costs of doing so.

We recognize that various factors may bear on whether to apply a constant dollars

adjustment in a particular case. Excessive delay or greatly increased administrative costs may

outweigh any perceived benefits to claimants. And the effect on claimants' settled expectations

of applying an adjustment may also counsel against doing so. The Commission takes no position

on where the balance of these concerns falls in this case.

## I.    Use of constant dollars is consistent with SIPA.

Enacted in 1970 in response to substantial investor losses from a number of brokerage

firm bankruptcies, SIPA "was designed to facilitate the return of the property of customers of

insolvent brokerage firms or, where this cannot be done, to reimburse such customers if their

property has been lost or misappropriated." *SEC v. S.J. Salmon & Co.*, 375 F. Supp. 867, 871

(S.D.N.Y. 1974); *also* H.R. Rep. No. 91-163, at 2 (indicating that the "primary purpose" of SIPA

-5-

was to provide investors protection when their brokerage firm "encounters financial troubles").

Congress amended the Act in 1978 to ensure that it would "satisfy customers' legitimate

expectations" by requiring trustees to satisfy claims for securities that are missing from customer

accounts (even when the securities were "never purchased") with actual securities, rather than

paying their filing date value.  S. Rep. No. 95-763, at 2; *also* H.R. Rep. No. 95-746, at 2, 21.

Consistent with its primary purpose of ensuring that a customer "receive[s] what he believes is in

his account at the time the stockbroker ceases business," SIPA protects against fraudulent

conversion of investor funds intended to be used for securities purposes.  *Id.*; *also* S. Rep. No.

95-763, at 2.

    The Act establishes procedures for liquidating failed broker-dealers in a manner intended

"to distribute customer property and (in advance thereof or concurrently therewith) otherwise

satisfy net equity claims of customers."  Section 6(a)(1)(B).  In a liquidation, a fund of "customer

property" is established for priority distribution among customers of the failed broker-dealer.

Section 8(c)(1)(B).  "Customer property" is defined as "cash and securities . . . at any time

received, acquired, or held by or for the account of a debtor from or for the securities accounts of

a customer, and the proceeds of any such property transferred by the debtor, including property

unlawfully converted."  Section 16(4).  Customers share ratably in the fund of customer property

to the extent of an individual customer's "net equity."  Sections 8(c)(1)(B), 9(a).  In the event the

customer property fund is insufficient to satisfy every customer's "net equity" claim, SIPC

advances money from the customer protection fund to the SIPA trustee to satisfy each customer's

"net equity" claim up to $500,000 per customer, including up to $100,000 (since increased to

$250,000) for claims for "cash."  Section 9(a).

-6-

Generally, "net equity" is defined as "the dollar amount of the account or accounts of a customer, to be determined by . . . calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . . ."  Section 16(11).[1]  The Trustee is required to "discharge . . . all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer . . . insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee."  Section 8(b).

In the case of BLMIS, customers' accounts never held actual securities, only cash. Madoff never actually purchased securities for any of the accounts as he had promised.  This raises a question under SIPA.  Do the customers only have claims for cash, or do they have claims for securities—the securities that Madoff should have, but did not, purchase with that cash?  The Second Circuit addressed that question in an earlier case, *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 72 (2d Cir. 2004).  *New Times* involved a Ponzi scheme in which certain customers were solicited to invest in a non-existent money market fund.  The Second Circuit considered whether the customers were entitled to claims for securities (coverage up to $500,000) or were limited to claims for cash (coverage up to $100,000).  The court, "defer[ring] to the SEC's persuasive interpretation of the statute," ruled that the customers had claims for

---

[1]      This definition does not provide an express treatment for "cash," but courts have interpreted "net equity" to include the cash that should be in the account when the firm fails. *SEC v. Aberdeen Sec.*, 480 F.2d 1121, 1127 (3d Cir. 1973) ("We have no doubt … that the 'dollar amount' of a customer's account includes his cash which the broker has, or should have been holding.").  "Net equity," therefore, consists of a customer's "cash balance and the securities account valued as of the filing date." *Id*.

*securities*. *Id.* at 71.  Because the customers directed that their money be used to purchase

securities and received confirmations and account statements reflecting securities purchases, the

court found that they were entitled to claims for securities (as the Commission argued) and not

limited to claims for cash (as SIPC and the trustee argued).  *Id.* at 86.  The court reasoned that the

"statutory goals—promoting investor confidence and providing protection to investors—are

better served by the SEC's broader reading."  *Id*. at 84.  The Second Circuit reaffirmed this

position in *BLMIS II*, 654 F.3d at 235 (BLMIS claimants "are customers with claims for

securities").

      Although the BLMIS customers have claims for securities, there are no actual securities

to be valued.  As a result, a customer's "net equity" claim must be determined by the books and

records of the firm, which in this case referenced the amount of cash the customer invested,

minus any withdrawals, as this Court determined and the Second Circuit confirmed.  Under these

circumstances, because the customer's claim is not a claim for cash but a claim for securities that

cannot be valued except by reference to cash in/cash out, the Commission believes it may be

appropriate in this case for the claim to be adjusted to account for the effects of inflation;

provided that the benefits of such an adjustment outweigh the costs.  We do not believe that

SIPA forecloses calculating customers' net equity in this case in constant dollars, which we

believe should provide the most accurate valuation of the customer's claim in this case.

      Indeed, here the Second Circuit expressly recognized that SIPA does not "say specifically

how 'net equity' should be calculated if a dishonest broker failed to place a customer's funds into

the security market, notwithstanding that the customer 'deposited cash with the debtor for the

purpose of purchasing securities' . . . ."  *BLMIS II*, 654 F.3d at 237-38 (quoting SIPA Section

-8-

16(2)(b)(i)).  The Court, however, affirmed the Trustee's use of the cash-in/cash-out method as

the appropriate measure of "net equity" as defined by SIPA, in part because it "achieve[d] a fair

allocation of the available resources among the customers . . . ."  *Id.* at 238, 240.  Using constant

dollars in these limited circumstances also achieves a fair allocation by calculating customers'

net equity in amounts that reflect the actual value of their investments.  For example, assume that

two BLMIS customers invested $1000 twenty years apart—one in 1988, and the other in

2008—and that neither withdrew any funds from their accounts.  Applying the CPI to 1988

dollars, however, values the first investor's $1000 investment at roughly $1797 in 2008, when

BLMIS failed.  Calculating these two investors' net equity as $1000 would thus treat the two

investors quite differently.  *See, e.g., Clinchfield Coal Co. v. Fed. Mine Safety & Hlth. Comm'n*,

895 F.2d 773,778-79 (D.C. Cir. 1990) ("It seems obvious that $100 in 1990 is not full

compensation for $100 due in 1980.").  Using constant dollars, on the other hand, gives equal

value to each customer's investment.

It should be noted that an adjustment for inflation would not be necessary or appropriate

to the extent that a customer has a claim for cash, as where the customer's account contains cash

but no securities and the customer has not yet directed the broker to use the cash to purchase

securities.  *See, e.g., In re C.J. Wright & Co.*, 162 B.R. 597, 609 (Bankr. M.D. Fla. 1993).  For

such claims for cash, the trustee looks to the books and records of the broker to determine what

cash was supposed to be in the customer's account.  If the account was interest bearing, any

accrued interest should be reflected as additional cash in the account.  If the account was not

interest bearing, the customer would have no expectation of protection against inflation.  And if,

for example, the books and records are inaccurate or missing, the trustee may consider other

evidence to establish the claim to his satisfaction.  In any event, there would be no need for an

adjustment for either inflation or for interest in the case of a claim for cash.

 Nor would an adjustment for inflation be necessary or appropriate to the extent that a

customer has a claim for non-fictitious securities (or securities position), that is, securities that

can be replaced or otherwise valued.  There, the customer's claim is one for the value of those

securities on the filing date.  Again, the trustee would look to the books and records of the broker

to determine what securities were supposed to be in the customer's account.  The trustee may

also consider other evidence to establish the claim to his satisfaction.  And, as noted above,

where the broker confirmed a purchase of particular securities for a customer but did not do so,

the customer has a claim under SIPA for those securities, rather than a claim for the cash

entrusted to the broker to purchase the securities.  *See BLMIS II*, 654 F.3d at 236 ("claimants

who deposited cash with a broker 'for the purpose of purchasing securities' . . . are treated as

customers with claims for securities") (quoting SIPA Section 16(2)).  The value of the securities

that are, or should have been, in the customer's account are valued as of the filing date of the

liquidation.  *See In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 71, 74 (2d Cir. 2004)

(calculating customer claims as of filing-date value of securities positions in real securities that

were never actually purchased for customer accounts); *BLMIS II*, 654 F.3d at 238 (noting that

"the Last Statement Method may be especially appropriate where . . . customers authorize or

direct purchases of specific stocks").  Consequently, there would be no need to adjust for

inflation in this circumstance either.

 However, where it is not possible to determine the value of the securities that should have

been purchased, either because the securities are fictitious or, as here, the trading scheme was

-10-

fictitious, we believe an adjustment for inflation makes sense.  Although it is not possible to

value the securities that should have been acquired but were not, it *is* possible to value the cash

entrusted to the broker for that purpose as of the filing date by adjusting for the effects of

inflation from the date the cash was given to the broker until filing date.

     This use of "constant" dollars is well accepted when comparing the value of cash at

different points in time.  As Professor Mankiw explains:

> [P]rice indexes are used to correct for the effects of inflation when
> comparing dollar figures from different times.  This type of correction
> shows up in many places in the economy.  When some dollar amount is
> automatically corrected for changes in the price level by law or contract,
> the amount is said to be indexed for inflation.
>
> For example, many long-term contracts between firms and unions include
> partial or complete indexation of the wage to the consumer price index.
> Such a provision is called a cost-of-living allowance, or COLA.  A COLA
> automatically raises the wage when the consumer price index rises.
>
> Indexation is also a feature of many laws.  Social Security benefits, for
> example, are adjusted every year to compensate the elderly for increases in
> prices.  The brackets of the federal income tax—the income levels at
> which the tax rates change—are also indexed for inflation.

N. GREGORY MANKIW, ESSENTIALS OF ECONOMICS 338-39 (6th ed. 2012).  "Constant dollars" or

"real dollars" refers to dollar values after adjustment for inflation.  *See* U.S. Census Bureau,

Historical Income Tables–Current versus Constant (or Real) Dollars, http://www.census.gov

/hhes/www/income/data/historical/dollars.html.  Subject to the considerations discussed below,

the Commission believes that an inflation adjustment should be made to better calculate the

value of the customer's claim for securities by recognizing the value of the customer's

investment in constant dollars.  We also note that unlike an adjustment for interest, which would

necessarily require a judgment about the risk of the investment (a judgment that may be

impossible in the case of fictitious securities or, as here, Madoff's fictitious trading scheme), an

adjustment for inflation does not require any such speculation by the Court, it is entirely neutral.[2]

## II.    Adjusting for inflation does not constitute an impermissible payment of interest.

The Trustee and SIPC are incorrect when they argue that using constant dollars to

determine net equity is the functional equivalent of paying interest, which courts have generally

ruled is not available under SIPA.  In the leading case, *SIPC v. Ambassador Church Fin./Dev.

Group*, 788 F.2d 1208 (6th Cir. 1986), the lower court had awarded interest during the 7½ years a

failed broker-dealer's customers challenged the SIPA trustee's determination that they were not

entitled to recovery under SIPA.  The court of appeals agreed with the trustee that interest was

not allowed:  "Since the definition of 'net equity' does not include interest, we hold that SIPA

does not authorize the SIPC to pay interest, either to the trustee or directly to the debtor's

customers." *Id.* at 1212.

This decision concerning "interest" should not be extended to exclude a constant dollars

calculation of the Madoff investors' claims.  Unlike in *Ambassador*, the issue here is not the

availability of interest for the period after the customer net equity has been (or should have been)

determined, but, rather, the method for determining net equity in the first place.  As shown,

customers' claims for securities in this case are represented by the cash that the customer

---

[2]     Section 929H of Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L.
No. 111-203, 124 Stat. 1376, 1856-57 (2010), requires SIPA's Board of Directors to periodically
determine whether to apply an inflationary adjustment to the maximum amount of standard cash
advances under Section 78fff-3, and directs that, if such an adjustment is deemed appropriate, it
be made using the Personal Consumption Expenditures Chain-Type Price Index (or any
successor index thereto), published by the Department of Commerce.  We recommend that, if the
court determines that an inflationary adjustment is warranted here, it would be appropriate to
apply this index.

invested less any cash that the customer was repaid.  But the value of that cash over the period a

customer was invested with Madoff was not constant; it generally went down over time due to

inflation.  For purposes of calculating net equity, using constant dollars does not amount to

paying interest on the cash invested (which would guarantee a *return* as compensation for lost

investment opportunity), but merely recognizing that the value of that cash as a representation of

the intended investment in securities is not eroded.

For example, the U.S. Treasury issues a marketable security that includes both an

inflationary adjustment as well as a fixed interest rate.  Treasury Inflation-Protected Securities

(TIPS) are marketable securities whose principal is adjusted by changes in the Consumer Price

Index.  In other words, the principal amount of the security increases with inflation and decreases

with deflation, but a fixed interest rate is paid at set periods on the adjusted principal amount.

*See Sale and Issue of Marketable Book-Entry Treasury Bills, Notes, and Bonds*, 62 Fed. Reg. 846

(Jan. 6, 1997).  The Treasury regulations draw a distinction between the "inflation-adjusted

principal" of the securities and the "interest rate" paid on the inflation-adjusted principal.  31

C.F.R. § 356.2.  The TIPS program even allows the inflation-indexed securities to be "stripped"

into two components, an inflation-adjusted principal component and an interest component.  31

C.F.R. § 356.31(e) and (f).

Indeed, the Supreme Court has distinguished between compensating a party for the effects

of inflation as opposed to using interest to compensate that party for the lost time-value of its

money.  In *Kansas v. Colorado*, 533 U.S. 1, 9 n.2, 13 (2001), the Court affirmed a Special

Master's recommendation to adjust damages for inflation—but not to award prejudgment

interest—for the portion of the damages award that was incurred when Colorado was unaware

-13-

that it was in breach of a water-rights agreement with Kansas.  The Special Master's Report,
which the Court adopted, distinguished adjusting past damages to present-day dollar amounts,
which "simply ensures that inflation does not erode the value of money," from prejudgment
interest, which "compensate[s] for the lost use of the money in the intervening time."  2000 WL
34508307, at *37.  Notably, even Colorado conceded that adjusting the damages for inflation
would be appropriate, and thus did not oppose adjusting the $9 million initial damages to $21
million in present dollars to account for the effects of inflation.  *Id.* at *44, *46; 533 U.S. at 9
n.2.[3]

    Other courts, too, have recognized this distinction.  Courts apply an interest rate to a
damages award "to compensate a plaintiff for the loss of use of money that the plaintiff otherwise
would have earned" on the amount unlawfully withheld.  *Chandler v. Bombardier Cap., Inc.*, 44
F.3d 80, 83 (2d Cir. 1994).  But, as the *Chandler* court recognized, this calculation is distinct
from any adjustment for the effects of inflation, which accounts for the "diminished purchasing
power" of money, but "does not compensate for loss of use of the money in the intervening
time."  *Id.*  Courts have therefore rejected calculations of prejudgment interest based upon an
inflation adjustment because doing so would not compensate a plaintiff for "the capacity of
wealth to generate more wealth."  *Clinchfield Coal*, 895 F.2d at 780.  *See also United States v.
City of Warren*, 138 F.3d 1083, 1096 (6th Cir. 1998) ("merely adjusting the dollars the plaintiff

---

[3]    *See also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594, 662 (1997) (affirming
decertification of a class partly because the proposed global settlement inadequately represented
the divergent interests of class members with immediate claims against the settlement fund and
the interests of future claimants in an "inflation-protected fund for the future").

would have earned to compensate for diminished purchasing power because of inflation does not

compensate for the lost use of the money in the intervening time").

   Calculating BLMIS customers' net equity claims in constant dollars similarly does not

compensate the victims of Madoff's fraud for the money they could have earned by investing in

an alternative investment product for the period of time that Madoff held their funds to perpetrate

his scheme.  Rather, using constant dollars to determine customer claims merely adjusts

customers' deposits and withdrawals to account for the effects of inflation and deflation during

this period.  This is by no means the same as granting investors interest on their investments.

**III.    Using constant dollars is not inconsistent with the "Customer Protection Rule."**

   SIPC and the Trustee argue that constant dollars may not be applied here because to do so

would result in an incongruity between total customer net equity and the amount of customer

property that a broker is required to hold in reserve pursuant to Commission Rule 15c3-3, 17

C.F.R. 240.15c3-3.  Any incongruity, however, was caused by the nature of Madoff's fraudulent

scheme, not the Commission's attempt to more accurately value the net equity claims of the

victims of Madoff's fraud by adjusting for inflation.

   Rule 15c3-3 imposes on brokerage firms obligations to protect both customer securities

and customer funds to ensure that there will be sufficient assets to meet customer net equity

claims upon a firm's liquidation.  *See Net Capital Requirements for Brokers and Dealers*, Exch.

Act Rel. No. 21651 (Jan. 11, 1985), 50 Fed. Reg. 2690 (Jan. 18, 1985); *Broker-Dealers;*

*Maintenance of Certain Basic Reserves*, Exch. Act. Rel. No. 9856 (Nov. 10, 1972), 37 Fed. Reg.

25224 (Nov. 29, 1972).  Generally, this requires the firm to meet possession and control

requirements for securities, to set up a reserve account for the exclusive benefit of customers, and

-15-

to maintain in that account an amount computed in accordance with a formula set by Rule 15c3-3a. SIPC and the Trustee contend that, because this formula's treatment of cash does not provide for adjusting customer funds for constant dollars, the customer reserves would never be sufficient to return customer property in the event of a liquidation. In a typical SIPA liquidation, this may be true. But that ignores the context of this specific liquidation. BLMIS maintained only a *de minimis* amount in its reserve account. In liquidations such as this, a shortfall in the reserve account is to be expected because the Ponzi scheme would not be reflected on the firm's official books and records. As noted, it is only in the limited circumstances such as exist in a Ponzi scheme that the justification for using constant dollars arises, and any disparity between customer net equity and the amount of the reserve is a result of the fraudulent scheme rather than the application of a constant dollar adjustment.

## IV.   The Court should consider other factors in concluding whether an inflation adjustment is appropriate in a particular case.

Although under the narrow circumstances presented in this case an inflation adjustment should provide a more accurate valuation of the customer's claim, we believe the Court must consider the costs and benefits of making such an adjustment. Because of the unusually long duration of Madoff's Ponzi scheme, the effects of inflation may be more pronounced than in a case of a scheme of shorter duration, so the benefits of an adjustment here may be significant. Given what has already transpired in this complex litigation proceeding, the costs of making an adjustment may be high, both in terms of administrative costs and the likely delays in making payments. Also, many of the customers may have relied on the trustee's unadjusted calculation of their claims made many months ago. There are likely to be administrative costs, time delays,

-16-

additional litigation, and the possibility of upsetting customers' expectations regarding the

trustee's determination of their claims, expectations upon which the customers may have relied.

These potential costs should be weighed against the benefits that using a constant dollar approach

would provide to customers of an insolvent broker.  The Commission does not at this time have

the data necessary to make an informed evaluation of the benefits or of the costs of making an

inflation adjustment in this case.  We believe that the trustee may be in possession of relevant

data.  Accordingly, the Commission has not made any determination as to whether or not an

inflation adjustment should be made because the Commission cannot fully assess the costs and

benefits of doing so.  The Commission believes that the Court should determine the ultimate

appropriateness of using constant dollars based on the Court's own evaluation of the benefits and

costs of making an inflation adjustment.

## CONCLUSION

For the foregoing reasons, while the Commission supports the application of constant dollars when determining the value of customers' net equity claims for nonexistent securities positions in a SIPA liquidation proceeding, the Commission takes no position on whether the Court should utilize this approach in light of the facts and circumstances presented here.

Respectfully submitted

Dated: New York, NY
December 10, 2012

By: /s/ Patricia Schrage
Patricia Schrage (PS 1753)
Securities and Exchange Commission
New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281-1022
(212) 336-0163

and

John W. Avery, Deputy Solicitor
Dominick V. Freda, Senior Litigation Counsel
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549
(202) 551-5143 (Freda)

Of Counsel:
Alistaire Bambach

-18-