Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-99000-brl

4    Adm. Case No. 08-01789-brl

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    SECURITIES INVESTOR PROTECTION CORPORATION,

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   SECURITIES INVESTOR PROTECTION CORPORATION,

12                Plaintiff,

13           v.

14   BERNARD L. MADOFF INVESTMENT SECURITIES,

15   LLC, ET AL.,

16                Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18                U.S. Bankruptcy Court

19                One Bowling Green

20                New York, New York

21

22                December 19, 2012

23                10:08 AM

24

25

Page 2

1    B E F O R E :

2    HON. BURTON R. LIFLAND

3    U.S. BANKRUPTCY JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1   Hearing re:  Adversary Proceeding: 08-01798-brl Securities

2   Investor Protection Corporation v. Bernard L. Madoff

3   Investment Securities, LLC. et al.

4   (cc-5097) Tenth Application of Trustee and Baker & Hostetler

5   LLP for Allowance of Interim Compensation for Services

6   Rendered and Reimbursement of Actual and Necessary Expenses

7   Incurred from February 1, 2012 through June 30, 2012 for

8   Baker & Hostetler, L.L.P., Trustee's Attorney, period:

9   2/1/2012 to 6/30/2012, fee: $61671551.85, expenses:

10  $1,038,317.74.

11

12  Hearing re:  (cc-5096) Ninth Application of Windels Marx

13  Lane & Mittendorf, LLP for Allowance of Interim Compensation

14  for Services Rendered and Reimbursement of Actual and

15  Necessary Expenses Incurred from February 1, 2012 through

16  June 30, 2012 for Windels Marx Lane & Mittendorf, LLP,

17  Special Counsel, period: 2/1/2012 to 6/30/21, fee:

18  $2,986,228.90, expenses: $20,442.30.

19

20  Hearing re:  (5098) Application of Eugene F. Collins as

21  Special Counsel to the Trustee for Allowance of Interim

22  Compensation for Services Rendered and Reimbursement of

23  Actual and Necessary Expenses Incurred from February 1, 2012

24  through June 30, 2012 for Eugene F. Collins, Special

25  Counsel, period: 2/1/2012 to 6/30/2012, fee: $1,741.50,

Page 4

1    expenses: $213.05.

2

3    Hearing re:  (5099) Application of Schiltz & Schiltz as

4    Special Counsel to the Trustee for Allowance of Interim

5    Compensation for Services Rendered and Reimbursement of

6    Actual and Necessary Expenses Incurred from February 1, 2012

7    through June 30, 2012 for Schiltz & Schiltz, Special

8    Counsel, period: 2/1/2012 to 6/30/2012, fee: $45,509.76,

9    expenses: $2,958.15.

10

11   Hearing re:  (5100) Application of Higgs & Johnson (formerly

12   Higgs Johnson Truman Bodden & Co.) as Special Counsel to the

13   Trustee for Allowance of Interim Compensation for Services

14   Rendered and Reimbursement of Actual and Necessary Expenses

15   Incurred from February 1, 2012 through June 30, 2012 for

16   Higgins Johnson Truman Bodden & Co., Special Counsel,

17   period: 2/1/2012 to 6/30/2012, fee: $109,995.75, expenses:

18   $13,189.15.

19

20   Hearing re:  (5101) Application of Soroker - Agmon as

21   Special Counsel to the Trustee for Allowance of Interim

22   Compensation for Services Rendered and Reimbursement of

23   Actual and Necessary Expenses Incurred from February 1, 2012

24   through June 30, 2012 for Soroker - Agmon, Special Counsel,

25   period: 2/1/2012 to 6/30/2012, fee: $363,326.31, expenses:

Page 5

1    $3,445.07.

2

3    Hearing re:  (5102) Application of Graf & Pitkowitz

4    Rechtsanwalte GmbH as Special Counsel to the Trustee for

5    Allowance of Interim Compensation for Services Rendered and

6    Reimbursement of Actual and Necessary Expenses Incurred from

7    February 1, 2012 through June 30, 2012 for Graf & Pitkowitz

8    Rechtsanwalte GmbH, Special Counsel, period: 2/1/2012 to

9    6/30/2012, fee: $656,636.18, expenses: $30,701.66.

10

11   Hearing re:  (5103) Application of SCA Creque as Special

12   Counsel to the Trustee for Allowance of Interim Compensation

13   for Services Rendered and Reimbursement of Actual and

14   Necessary Expenses Incurred from February 1, 2012 through

15   June 30, 2012 for SCA Creque, Special Counsel, period:

16   2/1/2012 to 6/30/2012, fee: $114,284.97, expenses:

17   $1,993.00.

18

19   Hearing re:  (5104) Application of Young Conaway Stargatt &

20   Taylor LLP as Special Counsel to the Trustee for Allowance

21   of Interim Compensation for Services Rendered and

22   Reimbursement of Actual and Necessary Expenses Incurred from

23   February 1, 2012 through June 30, 2012 for Young Conaway

24   Stargatt & Taylor, LLP, Special Counsel, period: 2/1/2012 to

25   6/30/2012, fee: $119,857.50, expenses: $11,497.85.

Page 6

1

2    Hearing re:  (5105) Application of Williams, Barristers &

3    Attorneys as Special Counsel to the Trustee for Allowance of

4    Interim Compensation for Services Rendered and Reimbursement

5    of Actual and Necessary Expenses Incurred from February 1,

6    2012 through June 30, 2012 for Williams, Barristers &

7    Attorneys, Special Counsel, period: 2/1/2012 to 6/30/2012,

8    fee: $328,668.12, expenses: $0.

9

10   Hearing re:  (5106) Application of Taylor Wessing as Special

11   Counsel to the Trustee for Allowance of Interim Compensation

12   for Services Rendered and Reimbursement of Actual and

13   Necessary Expenses Incurred from February 1, 2012 through

14   June 30, 2012 for Taylor Wessing, Special Counsel, period:

15   2/1/2012 to 6/30/2012, fee: $2,625,051.76, expenses:

16   $1,211,136.84.

17

18   Hearing re:  (5107) Application of UGGC & Associes as

19   Special Counsel to the Trustee for Allowance of Interim

20   Compensation for Services Rendered and Reimbursement of

21   Actual and Necessary Expenses Incurred from February 1, 2012

22   through June 30, 2012 for UGGC & Associes, Special Counsel,

23   period: 2/1/2012 to 6/30/2012, fee: $84,834.98, expenses:

24   $0.

25

1   Hearing re:  (5108) Application of Werder Vigano as Special

2   Counsel to the Trustee for Allowance of Interim Compensation

3   for Services Rendered and Reimbursement of Actual and

4   Necessary Expenses Incurred from February 1, 2012 through

5   June 30, 2012 for Werder Vigano, Special Counsel, period:

6   2/1/2012 to 6/30/2012, fee: $30,585.15, expenses: $0.

7

8   Hearing re:  (5109) Application of Greenfield Stein &

9   Senior, LLP as Special Counsel to the Trustee for Allowance

10  of Interim Compensation for Services Rendered and

11  Reimbursement of Actual and Necessary Expenses Incurred from

12  February 1, 2012 through June 30, 2012 for Greenfield Stein

13  & Senior, LLP, Special Counsel, period: 2/1/2012 to

14  6/30/2012, fee: $5,799.60, expenses: $53.88.

15

16  Hearing re:  (5110) Application of Browne Jacobson, LLP as

17  Special Counsel to the Trustee for Allowance of Interim

18  Compensation for Services Rendered and Reimbursement of

19  Actual and Necessary Expenses Incurred from February 1, 2012

20  through June 30, 2012 for Browne Jacobson, Special Counsel,

21  period: 2/1/2012 to 6/30/2012, fee: $73,480.81, expenses:

22  $12.65.

23

24  Hearing re:  (5111) Application of Osborne & Osborne, P.A.

25  as Special Counsel to the Trustee for Allowance of Interim

Page 8

1   Compensation for Services Rendered and Reimbursement of

2   Actual and Necessary Expenses Incurred from February 1, 2012

3   through June 30, 2012 for Osborne & Osborne, P.A., Special

4   Counsel, period: 2/1/2012 to 6/30/2012, fee: $1,375.20,

5   expenses: $0.

6

7   Hearing re:  (5113) Application of Attias & Levy as Special

8   Counsel to the Trustee for Allowance of Interim Compensation

9   for Services Rendered and Reimbursement of Actual and

10  Necessary Expenses Incurred from February 1, 2012 through

11  April 30, 2012 for Attias & Levy, Special Counsel, period:

12  2/1/2012 to 4/30/2012, fee: $12,832.49, expenses:

13  $1,279.73.(related document(s)5112).

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Dawn South

Page 9

1    A P P E A R A N C E S :

2    BAKER HOSTETLER

3         Attorney for the Trustee

4         45 Rockefeller Plaza

5         New York, NY 10111

6

7    BY:  DAVID J. SHEEHAN, ESQ.

8

9    SECURITIES INVESTOR PROTECTION CORPORATION

10        Attorney for SIPC

11        805 15th St., N.W.

12        Suite 800

13        Washington, D.C. 20005-2215

14

15   BY:  KEVIN H. BELL, ESQ.

16

17

18

19

20

21

22

23

24

25

Page 10

```
 1              P R O C E E D I N G S

 2              THE COURT:  Be seated, please.

 3              MR. SHEEHAN:  David Sheehan, Baker Hostetler, on

 4      behalf of the trustee.

 5              There are a number of matters on this morning I

 6      know on your calendar with regard to the Madoff matter.  The

 7      only uncontested one is the fee applications that we are

 8      making on an interim basis on behalf of the trustee as

 9      counsel -- special counsel that we've retained in foreign

10      jurisdictions as well as conflict counsel, one of who is

11      here with us today.

12              In light of the heavy calendar, in the past what

13      I've done, Your Honor, is I've gutted you a fairly deep

14      summary with regard to each of the activities of the various

15      foreign counsel as well as that which is engaged in by the

16      trustee.  However, in light of your calendar I can make that

17      much more brief here this morning in light of the fact that

18      there are no objections and the statutory mandate is with

19      the approval of SIPC the Court must, as Your Honor knows,

20      enter the order that is submitted and approved by SIPC.

21              So I mean to foreshorten this morning, it's a very

22      important moment and certainly this case for us, but at the

23      same time I realize Your Honor has a lot of other things

24      before you to which there are objections and to which

25      perhaps you'd rather devote your time.
```

1          THE COURT:  I will leave it to you.  This is your

2     opportunity to explain what you're doing.  A lot of the

3     players who are on the other side of many of the equations,

4     the litigating equations --

5          MR. SHEEHAN:  Okay.

6          THE COURT:  -- are here this morning.  They may or

7     may not appreciate what you have to say, but you can --

8       (Laughter)

9          MR. SHEEHAN:  Well, I respect their right to

10    disagree.  Well then very -- thank you very much, Your

11    Honor.

12          What I will do is, as I've done in the past, I

13    will start with what is happening in each of the foreign

14    jurisdictions and I'll highlight the activities of each of

15    the foreign counsel that we have retained and what they've

16    been doing in the reporting period for which we are seeking

17    compensation here this morning.

18          THE COURT:  This is information that's of interest

19    of many of your adversaries in the later proceedings this

20    morning.

21          MR. SHEEHAN:  They'll probably use it against me.

22       (Laughter)

23          THE COURT:  Probably.

24          MR. SHEEHAN:  I know these guys.  But any way.

25          But seriously, Your Honor, the first one is Eugene

1   F. Collins.  Collins is our counsel and has been our counsel

2   since the very beginning.  As Your Honor knows there is the

3   Thema fund that's located there, there's multiple

4   litigations involving the Thema fund and Citrix (ph) and a

5   number of other interested parties that we pursue there.

6           We are not active in litigation there, we monitor

7   litigation which is why Mr. Collins' hours are 4.5, so

8   there's not a lot of time spent by him, but we maintain an

9   active presence there so that we can keep on eye on what

10  activity is taking place in the Irish ports.

11          The next one is Schiltz & Schiltz.  Schiltz &

12  Schiltz is in Luxembourg, they are our counsel there that

13  have worked with us in a number of capacities.

14          First of all we do work closely with the

15  Luxembourg prosecutor there, we have a participation

16  agreement as we have in other jurisdictions with that

17  prosecutor and he assists us and we assist him with regard

18  to certain discovery issues.

19          In addition there is a third-party action against

20  the trustee, which actually has an application before Your

21  Honor seeking to enjoin that action here, but at the same

22  time it is proceeding in Luxembourg and Schiltz & Schiltz

23  respects the trustee in connection with that action.

24          Next is Higgs & Johnson.  They're in the Cayman

25  Islands.  The Cayman Islands, as Your Honor knows, is the

1    host government in many of the feeder funds that are before

2    Your Honor as defendants in these cases.

3         A number of things have happened in the Caymans.

4    Liquidators were appointed in a number of the funds and we

5    of course have active litigation there as a protective

6    action in addition to the actions that we filed here in the

7    Bankruptcy Court.  Those actions proceed, we do participate,

8    we're there on a fairly regular basis.

9         The assistance of local counsel was essential in

10    dealing with those courts, and Higgs & Johnson has been with

11    us, as I say, from the beginning, and they have

12    approximately 210 hours for the work that they've done

13    through this reporting period.

14         Next one is Israel, and that's Soroker & Agmon.

15    That is a case that Your Honor has some familiarity with

16    because before you have been a number of motions to dismiss

17    on personal jurisdiction grounds and the companion matter

18    filled here in the Bankruptcy Court.  This is the Magnify

19    case.

20         Magnify was a customer of BOMIS, but we had traces

21    of approximately $135 million of fictitious profits that

22    left through Magnify, made its way into Israel through

23    initially a fellow named Albert Angoin (ph), and Albert

24    Angoin turned it over to Mr. Green, Mr. Green runs the Ushi

25    Horowitz (ph) Foundation.  All that money we have traced

Page 14

1    through all of those different organizations and

2    individuals, and at this time we have instituted an action

3    in Israel, handled by Soroker & Agmon, seeking to forestall

4    a dissolution of Ushi Horowitz so that we will preserve all

5    the books and records and continue to pursue and trace the

6    money as it proceeds through Israel and to a number of

7    various other corporations.

8              That's been very active in the last six months, it

9    will continue to be so -- or I should say the reporting

10   period and in the last six months -- and I think it will

11   continue to be so.  In fact we are -- we have a hearing

12   scheduled in February with regard to the -- in which the

13   trustee will be testifying -- not trustee himself, but his

14   representative will be there -- and we will be actively

15   participating in that.

16             Next is --

17             THE COURT:  And that's part and parcel of

18   litigation discovery going on in both France and England; is

19   that correct?

20             MR. SHEEHAN:  That is true, Your Honor.  The

21   tentacles of this are we recently did take a deposition in

22   Switzerland with regard to Dr. Bruner (ph) who is the

23   initial lawyer who put together the corporate paperwork that

24   structured both Ushi Horowitz and worked with Mr. Yarbreen

25   (ph) in connection with getting that done.  So we took his

Page 15

1   deposition in connection with the personal jurisdiction

2   motions that are here that have been made by several

3   individuals, including Mr. Bruner, suggesting that he was

4   not here.

5           We've also taken discovery in England in

6   connection with there's involvement we believe with Sonya

7   Cohen (ph) in connection with her activities in Israel and

8   we're connecting her assets into Magnify as well.  So that's

9   all happening at the same time.

10          Then we have Graf & Pitkowitz which is our firm

11  Austria.  Austria is very similar to what is occurring in

12  Luxembourg, we do participate there.

13          As Your Honor knows that's the home of Bank Medici

14  and Bank Austria, two of the principal defendants in the

15  Sonya Cohen lawsuit that has been brought here.  We have

16  also brought a lawsuit against Sonya Cohen in the United

17  Kingdom, I'll get to that in a minute.

18          In Austria what we are doing is working very

19  closely with the prosecutor there who is conducting an

20  investigation of both of those banks as well as Sonya Cohen.

21  We are again a named participant, we have shared a good deal

22  of discovery with them and they have shared discovery with

23  us.  It has become a very fruitful source of our work in the

24  Sonya Cohen cases that are principally going forward in the

25  United Kingdom at this time.

Page 16

1            The other activity -- I should say the next firm

2      is -- is the SCA Creque firm, that is in BVI.

3            BVI as Your Honor also knows is the home of many

4      of the other feeder funds that are there.  King Gate (ph)

5      principal among them.  We've been very active in the King

6      Gate litigation in BVI and in Bermuda as well as here in the

7      United States.  That is proceeding fairly actively.

8            There is an official receiver that was just

9      appointed and now being challenged by the liquidators in

10     Bermuda with regard to approximately $100 million sitting in

11     the Bank of Bermuda which we are obviously participating in

12     as well as in BVI.

13            As I say, we're there often with them in

14     connection with a number of different applications that are

15     made by the liquidators there.

16            The next is Bermuda and that's the Williams firm.

17     Again, BVI is prominent among the participants there.  I

18     just related to you the activities that are occurring with

19     regard to the bank account, the liquidators, and the

20     official receiver appointed there.

21            As a matter of fact the official receiver came

22     about as a result of activities engaged in by the trustee.

23     There initially -- the receiver appointed there was an

24     accounting firm that had been initially retained by Suradi &

25     Gracco (ph)  who are the principal defendants in that

Page 17

1    litigation.  We objected to that.  There was a hearing held

2    on that.  The counts were dismissed and the official

3    receiver was appointed by the courts of Bermuda at the

4    trustee's request.

5              And Williams Barristers assisted us in all of

6    those activities.

7              The largest application, over 6,000 hours, is by

8    the firm of Taylor Wessing.  Taylor Wessing is our counsel

9    in London.

10             In London what we have are several matters that

11   are pending.  The most prominent of which right now and is

12   scheduled for trial in July -- or June I should say of next

13   law is the case against Mr. Bernard Madoff's directors of

14   his London operation, MSIL.

15             We also have sued there the other directors, which

16   would include Peter Madoff, soon to be sentenced and

17   therefore not a participant any longer in the proceeding,

18   Andrew Madoff who is to participate in defending the

19   litigation, as well as Sonya Cohen is also part of that

20   litigation for the $65 million that she was paid for

21   allegedly providing what we believe to be phony, as it were,

22   research to them and was actually just a payoff by

23   Mr. Madoff, which we've alleged in those proceedings with

24   regard to people that she introduced to and through her

25   feeder funds that she created in Europe.  So that's a very

1    active piece of litigation.

2            What's actually happening right now is as Your

3    Honor knows the courts in London operate on the basis of

4    prepared statements.  We have written statements being

5    prepared by all of our witnesses.  Those statements are then

6    submitted.  We then had the opportunity not to take

7    discovery but at the time of the hearing to cross-examine

8    those witnesses based upon those statements, et cetera.

9            Since it is intimately related to what we're doing

10   in the Madoff family matter we've had a -- which is still

11   continuing here in the United States -- we are actively

12   working with the people in London, Taylor Wessing, to help

13   them prepare those witness statements to assist them with

14   regard to insolvency as an issue there.  There are issues of

15   ratification that have been raised as a defense, so

16   insolvency would defeat that, so we're working with them on

17   those issues as well.  So there's a lot of activity that's

18   going on there.

19           At the same time, as Your Honor knows, the Rubin

20   decision just recently was decided by the Court of Appeals

21   in London.  While that appeal was pending we applied -- the

22   trustee I should say -- applied to become an amicus in that

23   proceeding.  It was permitted.  We worked with Taylor

24   Wessing, we did prepare a submission to the court in support

25   of the earlier decision.  Unfortunately it didn't work out

Page 19

1   quite that way.  We are continuing to participate in Rubin

2   and as progeny we think it will come up in Bermuda in

3   connection with King Gate.  It certainly will surface in

4   other jurisdictions.  We believe it has a very narrow

5   holding.  We do not think it actually eliminates Cambridge

6   Gas.  I think Cambridge Gas is still good law and we're

7   going to continue to argue that.

8            Obviously we have to take that into account with

9   regard to how we proceed here in the United States with our

10  defaults, assuming we continue to do that, and how we then

11  proceed with them in the various jurisdictions and the

12  commonwealth, and that's another area where Taylor Wessing

13  has been of great assistance was to work with us.

14           And then last but not least is King Gate.  King

15  Gate, as I've mentioned several times, is prominent in many

16  jurisdictions.  BVI, Bermuda, and in London, as well as here

17  in the United States where we have an active litigation

18  ongoing which is being defended by Quinn Emanuel on behalf

19  of the liquidators.

20           That litigation in the UK has been somewhat

21  dormant because of the activities going on in the -- in

22  Bermuda and in BVI, but we have had several things occur

23  there.  We requested the assistance in terms of witnesses

24  and other things in support of activities and the island and

25  Taylor Wessing has been of great assistance to us there.

Page 20

```
 1              Then continuing we have UGGC & Associes, that's a
 2    French law firm in France.  What we have ongoing is an
 3    active investigation.  Many of the people who invested
 4    through Lasofa (ph) and the Luxembourg oriented feeder funds
 5    were in fact French citizens.
 6              The French have been up until recently not as
 7    cooperative as we would have liked, but we've actually had
 8    through the successful efforts of our local counsel, as well
 9    as the trustee, have been able to again arrange for a
10    participation in the French criminal proceedings which
11    originally were closed and have been reopened and have been
12    reopened as a result of I think, indirectly at least, some
13    of the materials that we presented to them with regard to
14    the activities of the people like Sonya Cohen and others and
15    her colleagues that were intimately involved in raising the
16    funds out of France that were then went to Lasofa, Bank
17    Metici, and into the Sonya Cohen enterprise.  So they've
18    been very, very helpful to us.
19              Of late we see the prospect for additional
20    documents and things coming there to us not only in that
21    case but in others.
22              Attias & Levy, today is their last day here before
23    Your Honor.  Attias & Levy is a firm in Gibraltar.  They've
24    been very, very helpful to us, but the principal partner
25    there left and switched law firms, and, quite frankly, given
```

Page 21

1    the quality of his work he was a former attorney general in

2    Gibraltar, someone that we have had great success with.  We

3    followed him to his new law firm.

4            So Attias & Levy today is, as I say,  the last

5    time it's going to appear before Your Honor.

6            Through the reporting period they've been of great

7    assistance to us in a couple of endeavors.  As Your Honor

8    knows very, very early on we discovered about $150 million

9    had left and gone interest a number of enterprises, Zeus

10   among them, located in Gibraltar.  We went after them and

11   were lucky enough to land at least on $75 million that was

12   still there, locked that money up and we had a very

13   interesting battle going on there.

14           While that was happening Rubin came down.  And one

15   of the side benefits of Rubin, even before it got decided by

16   the Court of Appeals was, is that there was a real concern

17   because we had a judgment here entered in this court, a

18   default judgment, that they were concerned with them being

19   used against them in Gibraltar.  So what they did is they

20   came in here -- and Your Honor will recall this -- asked to

21   vacate that judgment so they could actually litigate the

22   case here.  They have appeared here and the $75 million has

23   actually been transferred to this court and that will be

24   decided hopefully in 2013.

25           So there was a side benefit to Rubin in its brief

Page 22

1   existence where we did get a result that was beneficial to

2   the proceeding.  That's why we still continue to follow

3   Rubin and why we think it's very important to this case

4   overall.

5          The thinking of, you know, internationalism I

6   think is the correct way that we should be looking at the

7   bankruptcy laws and how they should be enforced, and it's

8   certainly that the trustee is going to be supportive of.

9          So at the end of the day what we have in Gibraltar

10  is a continuing action there against other defendants who

11  have refused obviously to submit to the jurisdiction of this

12  court and we are continuing to litigate with them there.

13  And as I say, we have followed our counsel to a new firm and

14  you'll be hearing about them in future fee applications.

15         Then we have a firm in Switzerland, this is a very

16  minor retention, it's Werder Vigano.  Again, this is a

17  situation where as Your Honor knows recently we had to take

18  a deposition there.  There is a very, very strong balking

19  statue in Switzerland with regard to your ability to take

20  depositions, take documents, even take documents out of the

21  country.  And in fact they criminalize that kind of

22  activity.  Therefore we needed the guidance of someone who

23  is very familiar with the Swiss laws concerning those

24  balking statutes.  This firm stepped in and assisted us in

25  that regard.

Page 23

1              At the same time we have also (indiscernible -

2     00:16:32) as it were for the Swiss prosecutors who are also

3     looking into this.  So far we've been rebuffed, we haven't

4     had the success there that we've had with -- in Luxembourg

5     and in France and in Austria, but we're hopeful that over

6     time the initial reluctance of the Swiss authorities to talk

7     to us will abate and they will in fact talk to us and we

8     will have some success there as well.

9              Then last, but not least, in terms of foreign

10    counsel we have Browne Jacobson.  Browne Jacobson is another

11    United Kingdom law firm.  As you might suspect, given the

12    size and scope of the Madoff international fraud, we have

13    found that Taylor Wessing has conflicts along with obviously

14    Baker Hostetler in the United States has had conflicts.

15             So we've retained Browne Jacobson in a couple of

16    matters where they've been of assistance to us.  They also

17    assisted us quite frankly in the Rubin matter as well.  And

18    they have helped us with regard to the King Gate matter as

19    well because there have actually been a few conflicts down

20    the road with regard to some of the (indiscernible -

21    00:17:32) entities that were involved in the King Gate

22    enterprise.

23             So those are all of the foreign counsel that we

24    have before Your Honor this morning.

25             In addition to the foreign counsel there are of

Page 24

```
1     course other counsel that we've retained.

2              First and foremost is Windels Marx, and we have

3     with us today Mr. Nisselson who's here, he's in the

4     courtroom, and Howard is here today, okay, and Howard Simon

5     is here, two partners who are principally involved in

6     connection with that.

7              Your Honor is very familiar with the history with

8     regard to the appointment of the Chapter 7 trustee and where

9     we went with that in terms of retaining him and continuing

10    to work with him in a number of matters.

11             We've had conflicts throughout this case as you

12    would imagine in a case of this size.  Windels Marx has done

13    a superb job of doing that.  I know Your Honor has seen them

14    here before you on a number of matters that recently they

15    have settled, like Ivy and Beacon and Andover where we have

16    great success in terms of bringing significant monies to the

17    estate.  That kind of activity is a hallmark of what they do

18    every day.  They've been a tremendous asset to us.

19             Unfortunately, given again the size of the case

20    they too have conflicts.  So we have a second conflicts

21    counsel, Young Conaway, and they have also come in.  And I'm

22    not sure -- lower level, but they've been very, very helpful

23    to the trustee and to Windels Marx in terms of working on

24    these cases together.

25             Then in --
```

Page 25

```
 1              THE COURT:  And Young Conaway has no conflicts?

 2         (Laughter)

 3              UNIDENTIFIED SPEAKER:  Not yet.

 4              MR. SHEEHAN:  Well --

 5              THE COURT:  Not as yet, is that --

 6              MR. SHEEHAN:  -- none that they've brought to my

 7    attention of late, but I haven't had that problem recently.

 8              Then the last two firms, it's sort of an inside

 9    into the case, is that we have two probate firms.  Given the

10    nature of this fraud and this longevity a number of the

11    complaints and a number of the defendants have passed on.

12    We have retained counsel both in Florida and in New York

13    State.  And in Florida it is Greenfield Stein & Senior --

14    oh, I'm sorry -- in Florida it's Osborne & Osborne, and in

15    New York it's Greenfield Stein & Senior.

16              Both of those firms have been retained by us to

17    assist the trustee in preserving claims that he may have

18    against these individuals who have passed on against the

19    estates.

20              They've also assisted us with regard to causes of

21    action we've instituted against individuals who have passed

22    on.

23              So those are all of the counsel that have been

24    retained by the trustee and have been of tremendous support

25    to him throughout the reporting people for which we seek
```

Page 26

1    compensation here this morning.

2            And as I said at the outset, none of those

3    individuals have had an objection to their fees.

4            Last but not least is the trustee and his counsel,

5    Baker Hostetler.  Your Honor sees us on a fairly regular

6    basis so you know what we're all about.  The news media

7    carries daily reports of what we do, but let me just briefly

8    summarize for the reporting period what I believe are the

9    highlights of what transpired during the first six months of

10   last year.

11           One of them of course was the one that probably

12   got the most publicity and will continue to have the most

13   publicity throughout the case now was of course the Katz

14   Wilpalm (ph) matter which was actively litigated for the

15   first three months of last year, and also intensively

16   engaged in settlement negotiations with Governor Cuomo who

17   was appointed by Your Honor as the mediator.  That case

18   occupied a great deal of our firm's time in terms of getting

19   it prepared to trial.

20           Through the offices of Governor Cuomo we were able

21   to obtain a very deep, deep financial insight into the

22   entire matter which led the trustee to the conclusion, which

23   Your Honor is aware of, that this should be a settlement

24   that we arrived at which was then presented to and at that

25   point the matter had been withdrawn before Judge Rakoff.  We

Page 27

1    presented that to him.  And that settlement was approved.

2            I think to the benefit of the estate and there

3    already has been a significant -- millions and millions of

4    dollars have been paid into the estate as a result of that

5    settlement and we are very comfortable that going forward

6    the wisdom of that settlement will become even more apparent

7    to everyone.

8            Perhaps one of the most interesting things that

9    occurred as a result of that settlement, as Your Honor

10   knows, there is a tremendous clinch trading exercise going

11   on in connection with the Madoff claims.  I think it's the

12   premier distressed debt available out there is a Madoff

13   claim as a matter of fact.

14           And what was happening is when the Katz Wilpalm

15   case was being litigated the market sort of receded somewhat

16   resulting in some other litigation, which we also

17   participated in, and that is the litigation involving King

18   Gate and the liquidators and DBSI, Deutsche Bank, in

19   connection with the financing of the sale of that claim.

20           Once we settled and the market changed all of a

21   sudden the liquidators wanted to do a little bit of

22   different talking about it because they thought the value of

23   the claim went up and maybe they didn't get such a good deal

24   either.

25           But those kinds of activities occur almost daily

1    in our case because of the nature of the claims and the

2    success that this trustee has had.  Mr. Picard has put

3    $9 billion into the hands of these customers and distributed

4    over three and a half billion of it, all of which as the

5    result of the activities that I've outlined here this

6    morning and which are continuing ongoing every day.

7              We also have had the success, as Your Honor knows,

8    of having your opinion ultimately approved not only by the

9    Second Circuit but (indiscernible - 00:22:51) with regard to

10   the net equity calculation and how we pay our customers.

11   And that resulted in -- that distribution that I eluded to a

12   moment ago, which was a little bit outside the reporting

13   period but worth noting here this morning -- and that is

14   over two and a half billion dollars was sent out as a result

15   of finally having net equity decided, and we did not have to

16   keep a reserve with regard to final statements.  That also

17   occurred principally during the reporting period.

18             All throughout that reporting period there's

19   active litigation going on here in the United States, the

20   Merkin (ph) litigation as Your Honor knows where you've

21   appointed Judge Nitkowski (hp) who's doing a spectacular job

22   as the mediator in that case with regard to all the

23   discovery activity that we have there.  That was a major

24   matter during that period.

25             We have other litigations that are occurring

1    throughout, as I've indicated, throughout the Caribbean and

2    Europe where we are there on a fairly regular basis.  As I

3    speak there are two of our lawyers today in London helping

4    to prepare for the insolvency analysis that will be

5    presented next June in the courts in the United Kingdom.

6            So those kind of activities are daily, they occur

7    throughout the case, and actually quite frankly throughout

8    the world as we speak.

9            So that is in summary what we've been doing over

10   the last -- first six months of last year.  No one has

11   objected to our application here this morning.  I would

12   respectfully request that Your Honor approve the

13   applications of all the petitioners here today.

14           I think Mr. Bell wants to say someone from SIPC.

15           THE COURT:  Mr. Bell?

16           MR. BELL:  Your Honor, SIPC has been entrusted

17   by --

18           THE COURT:  But you role and very interesting and

19   strong under the statute because it's one of the rare places

20   in the statute where the word "shall" comes up and the word

21   shall applicable to fee requests in SIPC is that if SPIC

22   recommends the payment of the fees the Court shall approve

23   them, which is one of the rare places where I don't have

24   much discretion unless you have something negative to say.

25           MR. BELL:  Well, Your Honor, I would like to --

1   this is Kevin Bell on behalf of the Securities Investor

2   Protection Corporation.

3          Because of the entrustment of such responsibility

4   to this corporation by Congress in Section 78-EEE(b)(5)(C) I

5   want to make sure to the Court that SIPC's review of each of

6   these applications and each and every page of the invoices

7   and each and every entry of time has been done not only by

8   myself but by the general counsel, because we take this

9   responsibility where the Court has a shall do something very

10   -- at a very high level.

11          I would call your attention to the SIPC

12   recommendation that is at docket number 5152, particularly

13   paragraph 5, where you will see some of the results of the

14   discussion that SIPC has after its extremely thorough review

15   with trustee's counsel regarding adjustments that happen

16   after that very thorough and complete review.

17          We have dialogue with regard to each and every

18   invoice and those invoices, when you size them up, equal

19   more than eight feet tall for this application period for

20   all of these applicants, and we look at that very carefully

21   because of that responsibility.

22          So we have submitted recommendations at dockets

23   548 through 551 with recommendations in support of all these

24   applications.  And we support all the interim applications

25   as amended and request the Court to approve the fees as

Page 31

1    amended -- the applications as amended.

2          We also support the final application of Attias &

3    Levy and the payment of the funds held back on previous

4    applications by Attias & Levy.

5          And we are open to any questions the Court may

6    have about SIPC's oversight and review of these fee

7    applications if you have any.  But we recommend that the

8    Court would approve the fees as submitted.

9          THE COURT:  To some extent I'm very familiar with

10   the lot of the activities that are described, especially

11   with respect to trustee's counsel and Windels Marx and some

12   of the others.  It's almost on a daily basis that matters

13   involving the worldwide efforts that come before my desk, so

14   I'm not at all surprised that the amount before me today,

15   which I think is approaching some $70 million, has been the

16   subject to an oversight function by SIPC performing its

17   assigned role.

18          I'm satisfied that SIPC has done its due diligence

19   appropriately and I do find under the circumstances that I

20   have no trouble in implementing the shall requirement by

21   Congress in approving the request here today.

22          MR. BELL:  Thank you, Your Honor.

23          THE COURT:  Which I note are subject to

24   substantial holdbacks.

25          MR. SHEEHAN:  Your Honor, I have orders prepared.

Page 32

```
 1              THE COURT:  I'll entertain them.

 2              MR. SHEEHAN:  I actually have two orders, Your

 3    Honor.  One -- just so Your Honor -- one is the omnibus

 4    order, but I have a separate order for Attias & Levy because

 5    it is a final order for them.

 6              THE COURT:  Very well.

 7              MR. SHEEHAN:  All right, thank you.

 8         (Pause)

 9              THE COURT:  I have approved the order.

10              MR. SHEEHAN:  Thank you, Your Honor.

11              MR. BELL:  Thank you, Your Honor.

12              UNIDENTIFIED SPEAKER:  Thank you very much, Your

13    Honor.

14         (Whereupon these proceedings were concluded at 10:36

15    AM)

16

17

18

19

20

21

22

23

24

25
```

Page 33

1                        I N D E X

2

3                         RULINGS

4                                          Page       Line

5    All Motion for Fee Applications        31         21

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    AAERT Certified Electronic Transcriber CET**D-408

9

10   Veritext

11   200 Old Country Road

12   Suite 580

13   Mineola, NY 11501

14   Date:  December 21, 2012

15

16

17

18

19

20

21

22

23

24

25