**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

Hearing Date: March 13, 2013
Hearing Time: 10:00 A.M. (EST)
Objection Deadline: March 6, 2013

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES INVESTOR PROTECTION
CORPORATION,

          Plaintiff-Applicant,

          v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

          Defendant.

In re:

BERNARD L. MADOFF,

          Debtor.

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

(Substantively Consolidated)

## MOTION FOR AN ORDER APPROVING THIRD ALLOCATION OF PROPERTY TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING THIRD INTERIM <u>DISTRIBUTION TO CUSTOMERS</u>

# TABLE OF CONTENTS

**Page**

I.    EXECUTIVE SUMMARY ................................................................................. 1

II.   THE LIQUIDATION PROCEEDING .............................................................. 6

III.  ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA ........... 8

    A.    Allocation of Property .......................................................................... 8

    B.    Distributions Under SIPA ..................................................................... 9

    C.    Allocation Of Assets To The Customer Fund And Related Reserves ................ 10

        i.     Assets In Trustee's Possession As Of January 31, 2013 ......................... 12

        ii.    Tremont Funds ...................................................................... 13

        iii.   Levy Funds ........................................................................... 14

        iv.    Other Recoveries To The BLMIS Estate Since The Second
            Allocation and Second Interim Distribution .............................. 14

        v.     Disputed Recoveries ............................................................... 16

        vi.    Summary Of Requested Allocation ......................................... 17

    D.    Determination Of Allowable Net Equity Claims & Related Reserves ............... 18

IV.   CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR
      THIRD ALLOCATION AND THIRD INTERIM DISTRIBUTION ............................ 20

    A.    No Interim Distribution Of General Estate ....................................... 22

V.    DEPARTMENT OF JUSTICE FORFEITURE FUNDS ................................ 23

VI.   MISCELLANEOUS ...................................................................................... 24

    A.    Notice ........................................................................................ 24

    B.    Waiver Of Memorandum Of Law ....................................................... 24

VII.  CONCLUSION ............................................................................................ 24

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this motion (the "Motion") pursuant to SIPA §§ 78*lll*(4), 78fff(a)(1)(B), 78fff-2(b), and 78fff-2(c)(1), and Rule 9013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking entry of an order (1) approving the third allocation of property ("Third Allocation") to the fund of customer property ("Customer Fund"); and (2) authorizing a third pro rata interim distribution ("Third Interim Distribution") to customers whose claims for customer protection under SIPA have been allowed for amounts exceeding the SIPA statutory advance limits and not already satisfied by the first and second pro rata interim distributions. This Court has jurisdiction over this Motion pursuant to SIPA §§ 78eee(b)(2), 78eee(b)(4), 28 U.S.C. §§ 157 and 1334, and Bankruptcy Rule 5005. This Motion is based upon the law set forth below as well as the facts set forth in the affidavit of Matthew Cohen ("Cohen Aff."), filed herewith. In support of this Motion, the Trustee alleges and represents as follows:

## I.    <u>EXECUTIVE SUMMARY</u>

1.    In order to protect customers of an insolvent broker-dealer such as BLMIS, Congress established a statutory framework pursuant to which customers of a debtor in a SIPA liquidation are entitled to preferential treatment in the distribution of assets from a debtor's estate. The mechanism by which customers receive preferred treatment is through the creation of a fund of "customer property" as defined in SIPA § 78*lll*(4), which is distinct from a debtor's

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

general estate.  Customers holding allowable claims are entitled to share pro rata in the Customer

Fund based on each customer's "net equity" as of the filing date, to the exclusion of general

creditors.  SIPA § 78fff-2(c).

2.      In order to make distributions from the Customer Fund, the Trustee must

determine or be able to sufficiently estimate: (a) the total value of customer property available

for distribution, or the "numerator" (including reserves for disputed recoveries), and (b) the total

net equity of all allowed claims, or the "denominator" (including reserves for disputed claims).

The Trustee calculates reserve amounts on a "worst-case" basis, such that the ultimate resolution

of disputed amounts will not adversely affect any customers' allowed or disputed net equity

distributions.

3.      In this case, for purposes of determining each customer's "net equity," the Trustee

credited the amount of cash deposited by the customer into his BLMIS account, less any amounts

already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the

"Trustee's Net Investment Method").  Some claimants argued that the Trustee was required to

allow customer claims in the amounts shown on the November 30, 2008 customer statements

(the "Last Statement Method," creating the "Net Equity Dispute").  Litigation over the Net

Equity Dispute has now proceeded through this Court,[2] the Second Circuit,[3] and the Supreme

Court of the United States.[4]  The Trustee's Net Investment Method was upheld.

---

[2] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

[3] *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision").

[4] Two petitions for writ of certiorari were denied by the Supreme Court of the United States on June 25, 2012.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Ryan v. Picard*, 133 S.Ct. 24 (2012); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Velvel v. Picard*, 133 S.Ct. 25 (2012).  A third petition

4.    On May 4, 2011, the Trustee moved for an initial allocation and pro rata interim distribution of the Customer Fund ("First Allocation" and "First Interim Distribution").  On July 12, 2011, this Court ordered the First Allocation and First Interim Distribution, in which the Trustee allocated approximately $2.6 billion to the Customer Fund and distributed approximately $499.8 million on allowed claims relating to 1,299 accounts, or 4.6% of each customer's allowed claim, unless the claim was fully satisfied.  Because the Net Equity Dispute was outstanding at the time of the First Allocation Motion, the Trustee, with the Court's approval, set a reserve for that issue.

5.    On July 26, 2012, the Trustee moved for a second allocation and pro rata interim distribution of the Customer Fund ("Second Allocation" and "Second Interim Distribution").  On August 22, 2012, this Court ordered the Second Allocation and Second Interim Distribution, in which the Trustee allocated approximately $5.5 billion to the Customer Fund and distributed approximately $3.6 billion on allowed claims relating to 1,285 accounts, or 33.556% of each customer's allowed claim, unless the claim was fully satisfied.

6.    At the time of the Second Allocation Motion, a final, nonappealable order had been entered on the Net Equity Dispute, upholding the Trustee's Net Investment Method.  As a result of that ruling, a separate but related question of whether claimants are entitled to an increase of their claims based on the time that elapsed while their monies were deposited with BLMIS ("Time-Based Damages") was relevant to the Second Allocation Motion.  In its order approving the Second Allocation Motion (ECF No. 4997), the Court required the Trustee to maintain a reserve for the Time-Based Damages Dispute at not less than 3% ("the 3% Reserve").

---

for writ of certiorari was dismissed.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. dismissed sub nom. Sterling Equities Assocs. v. Picard*, 132 S.Ct. 2712 (2012).

The Time-Based Damages Dispute is currently being litigated before this Court and remains an issue for which the Trustee must reserve.

7.        On September 22, 2011, this Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, "Tremont") in the amount of $1.025 billion.  *Picard v. Tremont Group Holdings, Inc.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y.) (BRL) (ECF No. 38).  Two objections to the settlement agreement were filed by parties who were not BLMIS customers, both of which were overruled by this Court.  This Court entered an Order Granting Trustee's Motion for Entry of Order Approving Agreement.  (ECF No. 38).

8.        Certain objectors filed an appeal of the Tremont settlement on October 18, 2011. *See Picard v. Tremont Group Holdings, Inc., et al.,* No. 11 Civ. 7330 (S.D.N.Y.) (GBD) (ECF No. 1).  Thereafter, Tremont filed a motion to dismiss the appeal, which was subsequently joined by motions filed by the Trustee and parties subject to the settlement.  (ECF Nos. 4, 6, 8, 12, and 14).  The same parties who commenced the appeal—who were not BLMIS customers—opposed the dismissal.  (ECF Nos. 15, 16).  On June 26, 2012, United States District Judge George B. Daniels granted the motion to dismiss and a judgment was entered on the docket on June 28, 2012.  (ECF No. 36).  The objectors subsequently filed a Notice of Appeal on July 27, 2012. (ECF No. 37).  The Second Circuit so-ordered a stipulation of dismissal of the appeal on October 25, 2012.  (ECF No. 39); No. 12-3052 (2d Cir.) (ECF No. 58).

9.        Pursuant to the Tremont settlement, Tremont delivered $1.025 billion into an escrow account on November 6, 2012.  The settlement payment was released from the escrow

- 4 -

account to the Trustee on February 8, 2013.  Accordingly, the Trustee allowed certain customer claims related to Tremont.

10.     With these and other additional funds, the Trustee now stands ready to make a third significant distribution to customers with allowed claims.  The practical effect of this determination and recalculation is to permit a third interim distribution to customers whose claims have not been fully satisfied because the net equity of their respective accounts as of the Filing Date[5] exceeded the statutory SIPA protection limit of $500,000 and were not satisfied by the First Interim Distribution or the Second Interim Distribution.

11.     Thus, by way of this Motion, the Trustee seeks to distribute, with the 3% Reserve, approximately $504.9 million (with an additional $305.6 million available for distribution to certain "net loser" accounts, if the claims relating to their accounts become allowed prior to the time the distribution is made, or reserved, if not allowed).[6]  These distributions will be paid on claims relating to 1,103 BLMIS accounts.  The average payment amount to those 1,103 BLMIS accounts will be approximately $457,800.  Twenty-six payments will go to claimants who qualified for hardship status under the Trustee's claims hardship program.  If approved, and when combined with the amounts from (i) the First Allocation and First Interim Distribution and (ii) the Second Allocation and Second Interim Distribution, claims relating to 1,106 accounts will be fully satisfied.

12.     The proposed Third Allocation and Third Interim Distribution are interim in nature.  The Trustee anticipates recovering additional assets through litigation and settlements.

---

[5] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* SIPA § 78*lll*(7)(B).

[6] If all of the "net loser" accounts were allowed prior to the distribution, the total distribution would be approximately $809.8 million ($809,784,929.93).  If this occurred, SIPC's subrogation claim through this Third Allocation would be approximately $108.7 million ($108,701,291.33).

Final resolution of certain disputes will permit the Trustee to reduce the reserves he is required to maintain, which will allow him to make additional distributions to customers in the future. The Trustee will seek authorization for these further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.[7]

## II.    THE LIQUIDATION PROCEEDING

13.    Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11" to the extent these provisions are consistent with SIPA.

14.    SIPA affords special protection to "customers," as defined in SIPA § 78*lll*(2), who receive preferential treatment by having their claims satisfied ahead of general creditors. *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (recognizing that a "person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment"). The amounts owed to each customer are determined by valuing his or her "net equity," defined in SIPA § 78*lll*(11), as of the Filing Date.

15.    To date, the Trustee has received 16,519 customer claims. (Cohen Aff. ¶ 4). To date, the Trustee has determined 16,517 of those claims. (*Id.* ¶ 4). The Trustee allowed 2,499 claims and committed to pay approximately $806.7 million in funds advanced to him by SIPC. (*Id.*). To date, the allowed claims total over $11 billion. (*Id.*).

---

[7] The Trustee seeks permission to include in the Third Interim Distribution those claims that are allowed between the time an order is entered on this Motion and the date of the Third Interim Distribution.

16.    Of the remaining determined customer claims, 13,680 were denied, 12 were determined as asserting no claim, and 153 were withdrawn.  (*Id.* ¶ 5).  One hundred seventy-three claims are currently categorized as "deemed determined," meaning that the Trustee has instituted litigation against those claimants.  (*Id.*).  The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under section 502(d) of the Bankruptcy Code.  Accordingly, such claims will not be allowed until the avoidance action is resolved by settlement or otherwise and any judgment rendered against the claimant in the avoidance action is satisfied.  Two customer claims filed by insiders remain to be determined, as they are still under review by the Trustee's staff; the value of these claims has been reserved in the proposed distribution.  (*Id.*).

17.    As of January 31, 2013, the Trustee has received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 448 claims, 94 are general creditor claims and 49 are broker-dealer claims, which together total approximately $264.9 million of the $1.7 billion.[8]  (*Id.* ¶ 6).

18.    2,311 docketed objections have been filed to the Trustee's claims determinations relating to approximately 4,300 claims, which will be noticed for hearing if necessary.  (*Id.* ¶ 7).  These 2,311 objections relate to approximately 1,155 BLMIS accounts.  (*Id.*).  The objections raise various issues, including the proper interpretation of "net equity" (now resolved), the right

---

[8] The 448 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor and service claims.  (Cohen Aff. ¶ 6).  They do not include "customer" claims, even though each "customer" claim—both those allowed and denied—has a "general creditor" component.  All BLMIS creditors, including customers whose claims were allowed, customers whose claims were denied, and general creditors, may have claims as general creditors against BLMIS for misrepresentation, fraud, and breach of contract (assuming they filed claims).  Customers who filed customer claims need not have specifically filed claims as general creditors to protect such rights.

to interest or time value of money, and whether the Trustee's calculation of allowed claims amounts are correct, the latter two being among those for which the Trustee is reserving.

## III.    ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA

### A.    Allocation of Property

19.    SIPA sets forth a bipartite statutory framework that gives customers priority over general creditors of the broker-dealer.  Pursuant to SIPA § 78fff-2(c)(1)(B), all customers with allowed claims share ratably in the fund of customer property.  Pursuant to SIPA § 78fff-2(c), general creditors and customers, to the extent of their respective unsatisfied net equities, share in any general estate.  Estate property not allocable to the fund of customer property is distributed in the order of priority established in section 726 of the Bankruptcy Code.  SIPA § 78fff(e).  Any property allocated to the fund of customer property that is not necessary to satisfy customer and other priority claims will become part of the general estate.  SIPA § 78fff-2(c).

20.    According to SIPA § 78*lll*(4), "customer property" consists of "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

21.    Among the assets that comprise "customer property" are "any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers . . ."  SIPA § 78*lll*(4)(D).   Under SIPA § 78*lll*(4)(D), a trustee is permitted to look to the property of the debtor to rectify the actions taken by the debtor that resulted in a shortfall in customer property.  *See Ferris, Baker, Watts v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 132 (Bankr. D. Minn. 2002) ("Application of the plain meaning of 15 U.S.C. § 78*lll*(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall. . . . Thus, if the debtor failed to set

- 8 -

aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78*lll*(4)(D) would require the trustee to correct the debtor's error.").

22.     Thus, if the trustee determines that there is a shortfall in assets such that customer property is insufficient to satisfy net equity claims, then he may look to other assets of the debtor and allocate property to the fund of customer property.

23.     SIPA liquidations generally take a broad and inclusive customer-related approach to the allocation of property.  For example, in *In re Park South Securities, LLC*, 99% of the debtor's estate was allocated to customer property.  *See* Order, No. 03-08024A (Bankr. S.D.N.Y. Oct. 30, 2008) (ECF No. 201).[9]  Consistent with prior liquidations, the Trustee expects to allocate the vast majority of the BLMIS estate to the Customer Fund, inasmuch as here, recovered property either belonged to customers or was derived from the misuse of customer property.

## B.     Distributions Under SIPA

24.     The SIPA distribution scheme, while complex, can be distilled to a simple equation.  Each customer is entitled to his or her pro rata share of customer property.  To determine the percentage that each allowed customer will receive from the fund of customer property in an interim distribution, the aggregate amount collected to date by the Trustee and

---

[9] *Accord SIPC v. Lehman Brothers, Inc.*, Adv. Pro. No. 08-01420, Motion for Order Approving Allocation of Property of the Estate at 27-28, n.33 (Bankr. S.D.N.Y. Oct. 5, 2009) (ECF No. 1866) (allocating "most" of debtor's assets to customer property); *In re Vision Inv. Grp., Inc.*, Adv. Pro. No. 97-1035B, Order Approving Third and Final Report and Final Accounting of the Securities Investor Protection Corporation (Bankr. W.D.N.Y. Dec. 13, 2005) (allocating 95% of debtor's estate to customer property); *In re Klein Maus & Shire, Inc.*, Adv. Pro. No. 00-8193A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property); *In re MJK Clearing*, 286 B.R. at 132 (allocating 100% the debtor's assets as customer property); *In re A.R. Baron & Co., Inc.*, Order Approving Final Report and Account and Related Relief, Adv. Pro. No. 96-8831A (Bankr. S.D.N.Y. Feb. 10, 2004) (allocating 99% of the debtor's assets to customer property); *In re Hanover, Sterling & Co.*, Adv. Pro. No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002) (allocating 75% of debtor's estate to customer property).

allocated to customer property is divided by the aggregate amount of net equity claims allowed

by the Trustee.  The percentage result is then to be applied to each net equity claim to determine

a customer's pro rata share.  The equation is as follows:

$$\frac{\text{Fund of Customer Property (“Numerator”)}}{\text{Allowable Customer Net Equity Claims (“Denominator”)}} = \text{Customer Pro Rata Share}$$

25.    SIPA § 78fff-2(c)(1) establishes the order of distribution of customer property.

The second and third priorities of distribution are relevant here.  The second priority is to

distribute customer property among customers based on their filing date net equities.  SIPA

§ 78fff-2(c)(1)(B).  The third priority is to distribute customer property to SIPC as subrogee.

SIPA § 78fff-2(c)(1)(C).  Thereafter, any customer property remaining becomes part of the

general estate.

26.    The amount advanced by SIPC to the Trustee in full or partial satisfaction of a

customer claim is based on the difference between the customer's net equity and his share of

customer property, subject to the $500,000 limit of SIPA's statutory protection.  The SIPC

advance does not reduce the customer's net equity or his claim against customer property.  If the

sum of the amount of a customer's SIPC advance and any subsequent distribution of customer

property exceeds the customer's net equity, SIPC has the right to recoup its advance from the

excess.  In effect, SIPC becomes subrogated to the claims of customers to the extent it has made

advances but cannot seek recovery from customer property as to any individual customer until

the customer has been fully satisfied.  SIPA §§ 78fff-3(a), 78fff-2(c)(1).

C.    **Allocation Of Assets To The Customer Fund And Related Reserves**

27.    As this Court previously found in its Net Equity Decision, and as numerous courts

in civil and criminal proceedings have also found, Madoff did not engage in securities trading on

behalf of BLMIS customers.  Madoff used customer funds to support operations and fulfill

requests for redemptions to perpetuate a Ponzi scheme. Thus, payment of "profits" to any one customer in fact came from another customer's deposit of funds. In essence, all of the funds withdrawn by BLMIS customers were simply other people's money.

28.    BLMIS had an obligation to set aside sufficient assets to cover its statutory obligations to customers. *See* Securities Exchange Act Rule 15c3-3; 17 C.F.R. § 240.15c3-3.[10] The assets of BLMIS and Madoff are insufficient to cover those obligations.

29.    For these reasons, and because it is not uncommon for almost all property available to a broker-dealer to be deemed "customer property," the Trustee seeks the Court's approval to allocate to the Customer Fund virtually all cash and cash equivalents currently in his possession that was not previously allocated -- $1,198,067,071.04 -- which includes the Tremont funds. (Cohen Aff. ¶ 8). *See First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 362-66 (D.N.J. 1986) (describing and approving SIPA allocation and distribution scheme similar to that proposed by Trustee).

30.    When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation and the $5,501,375,994.66 that was allocated to the Customer Fund in connection with the Second Allocation, the total amount allocated will be $9,317,417,495.96. Of the $9,317,417,495.96 allocated to the Customer Fund, $499,811,090.36 was distributed to customers with allowed claims as part of the First Interim Distribution, and

---

[10] SIPA's definitional paragraphs were amended in 1978 to incorporate in the "customer property" definition any other property of the debtor's estate which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers. Thus, to the extent that prior to the Filing Date BLMIS failed to maintain cash and securities in compliance with the Net Capital Rule issued by the SEC (Rule 15c3-1), as affected by the Customer Protection Rule (Rule 15c3-3) (both issued pursuant to the Exchange Act, 15 U.S.C. § 78*o*(c)(3)(A)), the Trustee is required to allocate property as necessary to remedy such non-compliance. The Customer Protection Rule effectively requires that a broker-dealer maintain control of all property that would have to be delivered to customers in the event of a liquidation: either the securities themselves or their value in the form of cash (or equivalents), and cash sufficient to pay net cash obligations to customers.

$3,626,392,284.40 was distributed to customers with allowed claims as part of the Second Interim Distribution.  In connection with the First Interim Distribution, an additional $298,650,269.15 was reserved for accounts in litigation, and $8,518,205.56 of SIPC subrogation was deferred.  In connection with the Second Interim Distribution, an additional $2,177,641,988.54 was reserved for accounts in litigation, and $79,974,653.74 of SIPC subrogation was deferred. Therefore, the total amount available for the Third Interim Distribution will be $2,626,429,004.21.  Of this amount, $442,804,436.42 must be held in reserve for the Levy settlement appeal ($220 million), the IRS settlement ($103 million) and non-preference related settlement payments for accounts with net equity clauses ($119,804,436.42), leaving a total of $2,183,624,567.79 available for distribution.  Further, the reserve for the Time-Based Damages issue for the First and Second Distributions is $1,209,576,109.93, resulting in the numerator of $974,048,457.86.

### i.    Assets In Trustee's Possession As Of January 31, 2013

31.    The Form SIPC 17 completed by the Trustee each month lists all of the recoveries and assets in the Trustee's possession.  In the Trustee's Form SIPC 17 for the period ending on December 31, 2012 ("December 31 SIPC 17 Form"), attached hereto as Exhibit A, the Trustee reports that he has recovered approximately $8.292 billion.[11]  These funds were primarily derived from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS estate; (b) pre-litigation and litigation settlements; (c) customer preference recoveries; (d) the sale of assets; (e) refunds; and (f) earnings on the Trustee's investment and money market accounts.

---

[11] In addition, the Trustee has in his possession a *de minimis* amount of unliquidated assets.

32.     To the extent additional settlements are reached and/or become final prior to the entry of an order on this Motion, the Trustee will allocate and distribute those recoveries in accordance with the formula set forth herein.

### ii.     Tremont Funds

33.     On September 22, 2011, this Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, "Tremont") in the amount of $1.025 billion. *Picard v. Tremont Group Holdings, Inc.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y.) (BRL) (ECF No. 38). Two objections to the settlement agreement were filed by parties who were not BLMIS customers, both of which were overruled by this Court. This Court entered an Order Granting Trustee's Motion for Entry of Order Approving Agreement (ECF No. 38).

34.     Certain objectors filed an appeal of the Tremont settlement on October 18, 2011. *See Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC v. Tremont Group Holdings, Inc., et al.,* No. 11 Civ. 7330 (S.D.N.Y.) (GBD) ECF No. 1. Thereafter, Tremont filed a motion to dismiss the appeal, which was subsequently joined by motions filed by the Trustee and parties subject to the settlement. (ECF Nos. 4, 6, 8, 12, and 14). The same parties who commenced the appeal—who were not BLMIS customers—opposed the dismissal. (ECF Nos. 15, 16). On June 26, 2012, United States District Judge George B. Daniels granted the motion to dismiss and a judgment was entered on the docket on June 28, 2012. (ECF No. 36). The objectors subsequently filed a Notice of Appeal on July 27, 2012. (ECF No. 37). The Second Circuit so-ordered a stipulation of dismissal of the appeal on October 25, 2012. (ECF No. 39); No. 12-3052 (2d Cir.) (ECF No. 58).

35.    In the Tremont settlement, Tremont agreed to deliver $1.025 billion into an escrow account, which was done on November 6, 2012.  The settlement payment was released from the escrow account to the Trustee on February 8, 2013.  Accordingly, the Trustee has allowed certain customer claims related to Tremont.

### iii.    Levy Funds

36.    One of the more significant pre-litigation settlements approved by this Court was entered into by the Trustee and the estate of Norman F. Levy.  Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement By and Among the Trustee and Jeanne Levy-Church and Francis N. Levy (ECF No. 1964).  This settlement resulted in the return of $220 million to the BLMIS estate.  (Cohen Aff. ¶ 12).

37.    Certain claimants moved to vacate this settlement ("Levy Appeal").  This Court denied the motion to vacate, and on appeal, the District Court affirmed.  (ECF No. 3984; *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec.*, No. 11 Civ. 03313, 2012 U.S. Dist. LEXIS 21740 (S.D.N.Y. Feb. 16, 2012) (DAB)).  The Second Circuit issued a summary order affirming the judgment of the District Court.  *See Peshkin v. Levy-Church, et al.*, No. 12-816-cv, 2012 U.S. App. LEXIS 26101 (2d Cir. Dec. 21, 2012) (ECF No. 98).  The Trustee allocated the full amount of this settlement to the Customer Fund in the First Allocation.  The time period to further challenge these rulings in the Supreme Court of the United States does not expire until March 21, 2013 and, as a result, the Trustee will not distribute the Levy funds in this Third Distribution.

### iv.    Other Recoveries To The BLMIS Estate Since The Second Allocation and Second Interim Distribution

38.    In the Motion on the Second Allocation and Second Interim Distribution submitted to the Court on July 26, 2012, the Trustee reported total recoveries of

$5,501,375,994.66 that were not previously allocated. When combined with recoveries of $2,617,974,430.26 reported in the First Allocation and First Interim Distribution submitted on July 12, 2011, the total recoveries as of the Second Allocation and Second Interim Distribution were $8,119,350,424.92. The Trustee has recovered additional funds for the estate from multiple parties and sources since that time.

39.    On December 4, 2012, this Court approved a settlement agreement between the Trustee and individuals, feeder funds and entities related to, among others, the Beacon Associates Management Corporation, Andover Associates Management Corporation and Ivy Asset Management. Order Approving Settlement, *Picard v. Beacon Assocs. LLC*, No. 10-05356 (Bankr. S.D.N.Y. Dec. 4, 2012) (ECF No. 49). Under the terms of the settlement, the defendants paid $24 million to the Customer Fund, which represents a return of 100 percent of the defendants' withdrawals from BLMIS during the six-year period prior to the commencement of the liquidation of BLMIS, plus additional recoveries for direct withdrawals and subsequent transfers made to various defendants. In addition, the defendants, who acted as feeder fund managers, advisors and/or consultants in one or more BLMIS feeder funds, will forego all fees otherwise due to them that would be paid out of distributions by the BLMIS estate.

40.    On June 10, 2011, this Court approved a settlement agreement between the Trustee and the Joint Liquidators for Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited (collectively, the "Fairfield Funds"). *Picard v. Fairfield Sentry et al.*, Adv. Pro. No. 09-1239 (Bankr. S.D.N.Y.) (BRL) (ECF No. 95). On July 13, 2011, the Court entered consent judgments between the Trustee and Fairfield Lambda Limited in the amount of $52.9 million (ECF No. 108), Fairfield Sentry Limited in the amount of $3.054 billion (ECF No. 109), and Fairfield Sigma Limited in the amount of $752.3 million (ECF No. 110).

41.     Under the terms of this settlement, Fairfield Sentry Limited agreed to permanently reduce its net equity claim from approximately $960 million to $230 million.  Additionally, the Joint Liquidator for the Fairfield Funds agreed to make a $70 million payment to the Customer Fund with an initial payment of $24 million due upon execution of the agreement.  Per the agreement, Fairfield Sentry Limited received an allowed claim of $78 million upon the receipt of the initial payment, and the allowed claim amount would increase to $230 million upon receipt of the $70 million payment obligation.  Approximately $16 million in cash was transferred on or about July 8, 2011, and the remaining $8 million balance was an offset against funds owed by the Trustee to Fairfield Sentry.   The Joint Liquidator also agreed to assign to the Trustee all of the Fairfield Funds' claims against the Fairfield Greenwich Group management companies, officers, and partners; the Trustee retained his own claims against the management defendants.  Further, the Trustee and the Liquidators agreed to share future recoveries in varying amounts, depending on the nature of the claims.  On November 28, 2012, the remaining $46 million payment obligation was satisfied, and the Trustee increased Fairfield Sentry's allowed claim to $230 million.

42.     In addition to the above settlements, the Trustee has recovered approximately $103.2 million since the Second Allocation and Second Interim Distribution as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries.  (Cohen Aff. ¶ 14).  Therefore, the Trustee seeks approval to allocate the full amount of these recoveries to the Customer Fund.

## v.     **Disputed Recoveries**

43.     As of December 31, 2012, the Trustee has recovered $9,317,417,495.96 as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries.  Of the total amount recovered, $1,357,903,492.06 remains

subject to a final ruling as to how net equity claims are to be determined.[12]   (Cohen Aff. ¶ 17).

Although the Second Circuit's Net Equity Decision on the Net Investment Method is now final,

the Objecting Claimants argue that any time-based damages should be part of their net equity

claims.  Thus, the Trustee will hold the $1,357,903,492.06 in reserve pending the outcome of the

Time-Based Damages Motion.  (*Id.*).  Therefore, the Trustee seeks approval to allocate the full

amount of these preference settlements, litigation and pre-litigation settlements, interest income,

and other miscellaneous recoveries that were not previously allocated to the Customer Fund;

however, $224,018,613.18 will not be available for distribution at this time.  (*Id.*).

### vi.    Summary Of Requested Allocation

44.    The Trustee, in this Motion, seeks to allocate an additional $1,198,067,071.04 to

the Customer Fund.   When combined with the $2,617,974,430.26 that was allocated to the

Customer Fund in connection with the First Allocation and the $5,501,375,994.66 that was

allocated to the Customer Fund in connection with the Second Allocation, the total amount

allocated will be $9,317,417,495.96.  Of the $9,317,417,495.96 allocated to the Customer Fund,

$499,811,090.36 was distributed to customers with allowed claims as part of the First Interim

Distribution and $3,626,392,284.40 was distributed to customers with allowed claims as part of

the Second Interim Distribution.  In connection with the First Interim Distribution, an additional

$298,650,269.15 was reserved for accounts in litigation, and $8,518,205.56 of SIPC subrogation

was   deferred.     In   connection   with   the   Second   Interim   Distribution,   an   additional

$2,177,641,988.54   was   reserved   for   accounts   in   litigation,   and   $79,974,653.74   of   SIPC

subrogation   was   deferred.   Therefore,   the   total   amount   available   for   the   Third   Interim

---

[12] These agreements provide that if the court enters a final, nonappealable order overruling the Net Equity Decision (such that each customer's net equity in this proceeding shall be calculated according to the Last Statement Method), the funds returned to the BLMIS estate shall revert to the claimants.

Distribution will be $2,626,429,004.21. Of this amount, $442,804,436.42 must be held in reserve for the Levy settlement appeal ($220 million), the IRS settlement ($103 million) and non-preference related settlement payments for accounts with net equity clauses ($119,804,436.42), leaving a total of $2,183,624,567.79 available for distribution. Further, the reserve for the Time-Based Damages issue for the First and Second Distributions is $1,209,576,109.93, resulting in the numerator of $974,048,457.86.

45.     The Trustee does not seek to allocate any funds to the General Estate at this time.

**D.    Determination Of Allowable Net Equity Claims & Related Reserves**

46.     For distribution purposes, the Customer Fund numerator is only one half of the equation. In order to calculate each customer's pro rata share of customer property, the Trustee also needs to establish the denominator, or the amount of allowable net equity claims.

47.     If the Trustee had determined all customer claims and his determinations were final either through the passage of time or judicial determination, the denominator would simply equal the amount of allowed claims. Because the Trustee seeks to make a Third Interim Distribution prior to a final determination of all customer claims and certain disputes are pending, the Trustee cannot use as the denominator the amount of allowed claims as of this date. Doing so could result in an uneven distribution to customers, in violation of SIPA and the Bankruptcy Code, because there could be insufficient funds to distribute to claimants whose claims are allowed in the future. Instead, the Trustee must project as to the amount of all allowable net equity claims and establish sufficient reserves to ensure that all possibly-eligible claimants receive a pro rata distribution, should their claims be allowed. In order to do so, he must maintain sufficient reserves.

48.     As discussed above, Time-Based Damages is a contingency for which the Trustee must reserve. Per the Court's order (ECF No. 4997), the Trustee has calculated this reserve by

applying a 3% interest rate to positive account balances.  Thus, for purposes of this Motion, the Trustee seeks to set the denominator at $20,683,128,614.97 (the "3% Time-Based Damages Reserve Denominator").  (Cohen Aff. ¶ 20).

49.     Certain accountholders decided against filing a claim in this proceeding, even though they may have had allowable net equity claims.  The statutory bar date to file claims was July 2, 2009.  SIPA § 78fff-2(a)(3).  Thus, a failure to file a claim by that date means that there is no distribution that can be made to these accounts.  No reserves are maintained for these accounts.

50.     Further, certain accountholders have entered into final settlements not contingent on the Net Equity Dispute.  No reserves are maintained for these accounts.

51.     There are no additional reserves required for any future avoidance recoveries by the Trustee because such recoveries will be added to both the numerator and the denominator by operation of section 502(h) of the Bankruptcy Code.  Any subsequent recovery coupled with a corresponding claim for the same amount cannot adversely affect the distribution because the addition of any amount to both the numerator and denominator can only result in an increase, not a decrease, of the pro rata distribution to any customer.

52.     Finally, the Second Circuit's ruling on Net Equity Dispute effectively determined the ancillary issue regarding the net equity calculation of accounts that received transfers from other BLMIS accounts.  In accordance with the Second Circuit's ruling, the Net Investment Method has been applied to every BLMIS account, regardless of whether it received transfers from other BLMIS accounts.  As such, reserves need not be maintained relating to accounts with transfers from other BLMIS accounts.

## IV.    CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR THIRD ALLOCATION AND THIRD INTERIM DISTRIBUTION

53.     SIPA § 78fff-2(c)(1) establishes, in pertinent part, that a customer is to receive his ratable share from the fund of customer property.  To the extent the customer's share has been fully satisfied through an advance of funds by SIPC, SIPC steps into the shoes of the customer as subrogee and receives that customer's share of customer property.  In that manner, a customer does not receive a double recovery on his claim that was already fully satisfied by the SIPC advance.

54.     As set forth above and in the Cohen Affidavit, the Trustee proposes to allocate $1,198,067,071.04 to the Customer Fund at this time.  When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation and the $5,501,375,994.66 that was allocated to the Customer Fund in connection with the Second Allocation, the total amount allocated will be $9,317,417,495.96.  Of the $9,317,417,495.96 allocated to the Customer Fund, $499,811,090.36 was distributed to customers with allowed claims as part of the First Interim Distribution, and $3,626,392,284.40 was distributed to customers with allowed claims as part of the Second Interim Distribution.  In connection with the First Interim Distribution, an additional $298,650,269.15 was reserved for accounts in litigation, and $8,518,205.56 of SIPC subrogation was deferred. In connection with the Second Interim Distribution, an additional $2,177,641,988.54 was reserved for accounts in litigation, and $79,974,653.74 of SIPC subrogation was deferred.  Therefore, the total amount available for the Third Interim Distribution will be $2,626,429,004.21.  (Cohen Aff. ¶ 18).  Of that amount, $974,048,457.86 is available for distribution (the "Net Customer Fund").  (*Id.* ¶ 21).  The difference between those amounts—$1,652,380,546.35—represents the reserves required for

net loser accounts currently in litigation, the Levy Appeal, the IRS settlement, and the outcome of the Time-Based Damages Motion. (*Id.*).

55.     The 3% Time-Based Damages Reserve Denominator is $20,683,128,614.97 (*Id.* ¶ 20). To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the 3% Time-Based Damages Reserve Denominator, resulting in the following percentage (the "3% Scenario"):

$$\frac{\$974,048,457.86 \text{ (Net Customer Fund)}}{\$20,683,128,614.97 \text{ (3\% Time-Based Damages Reserve Denominator)}} = 4.709\%$$

56.     Under this scenario, a total of 1,103 accounts will receive a distribution of approximately 4.709% of its net equity claim.  (Cohen Aff. ¶ 23).  Of these 1,103 accounts, 31 will become fully satisfied, bringing the total of fully satisfied account holders to 1,106 (1,072 accounts will remain partially satisfied and will be entitled to participate in future distributions). (*Id.*).

57.     An additional 120 accounts that are currently "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed.  (*Id.* ¶ 24).  Forty-three of the 120 accounts would be fully satisfied by the SIPC advance.  The remaining 77 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion and his Second Allocation and Second Interim Distribution.  (*Id.*).  Eleven of the remaining 77 accounts would be fully satisfied by the First, Second and Third Interim Distributions.  (*Id.*).

58.     SIPC is entitled to receive repayment as to any given customer to the extent the customer's claim was fully repaid by a combination of the SIPC advance and the Trustee's distributions.  *See In re Bell & Beckwith*, 104 B.R. 842, 852-55 (Bankr. N. D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991).  SIPC, as subrogee, is entitled to receive partial repayment of its

cash advances to the Trustee pursuant to SIPA § 78fff-3(a)(1).  If all of the "net loser" accounts were allowed prior to the distribution, SIPC's subrogation claim through this Third Allocation would be approximately $108.7 million ($108,701,291.33).  Based on the "net loser" accounts that have been allowed and have returned a signed Partial Assignment and Release (PAR) through this third distribution, however, SIPC's subrogation claim is approximately $102.8 million.  This amount will be released to SIPC.

59.    As noted above, the Trustee is making an interim distribution of the undisputed property allocated to the Customer Fund.  The numbers contained herein are based on recoveries and claims allowed as of January 31, 2013.  To the extent additional claims are allowed or additional recoveries are made, the Trustee will distribute funds consistent with the formulas set forth in this Motion.

A.    <u>No Interim Distribution Of General Estate</u>

60.    Under SIPA § 78fff(e), funds from the general estate satisfy the administrative costs and expenses of a Debtor's estate and a liquidation proceeding.  To the extent the general estate is insufficient, SIPC makes advances to the Trustee for the payment of such costs and expenses.  SIPA § 78fff-3(b)(2).  All administrative advances made by SIPC are recoverable from the general estate under section 507(a)(2) of the Bankruptcy Code.  SIPA §§ 78eee(b)(5)(E), 78fff(e).  The general estate is distributed in accordance with section 726 of the Bankruptcy Code, with section 507(a)(2) expenses receiving second priority.[13]  SIPA § 78fff(e).

61.    As noted previously, the Trustee has received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7

---

[13] There are no § 507(a)(1) expenses in this liquidation proceeding.

billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. Of these 448, 94 are general creditor claims and 49 are broker-dealer claims which together total approximately $264.9 million of the $1.7 billion. Inasmuch as the Trustee proposes to allocate no assets to the General Estate, there are no funds in the General Estate from which to make a distribution to general creditors at this time. Accordingly, "[no] purpose would be served" by the examination of or the institution of actions seeking to disallow such claims. *See* 11 U.S.C. § 704(5).

## V.    DEPARTMENT OF JUSTICE FORFEITURE FUNDS

62.    The United States Attorney's Office for the Southern District of New York ("USAO") has forfeited billions of dollars of assets relating to the fraud that occurred at BLMIS (the "Forfeiture Fund"). Victims are entitled to petition for mitigation or remission of forfeiture in accordance with the criteria set forth in 28 C.F.R. Part 9. The Government may contract with a special master to notify petitioners, process petitions, and make recommendations with regard to forfeited property. 28 C.F.R. § 9.9(c). Pursuant to this authority, the Department of Justice has retained Richard C. Breeden to serve as special master to assist the USAO and the Department of Justice ("DOJ") in the petition process to be conducted in connection with BLMIS-related forfeitures, in accordance with applicable regulations.

63.    It is anticipated that many of the customers to whom the Trustee proposes to distribute pursuant to this Motion may also be eligible for distributions from the Forfeiture Fund. Any determination as to the amounts owed to a claimant—whether a "customer" under SIPA or a "victim" under the forfeiture regulations—will take into account monies received from either fund such that no claimant receives in this SIPA proceeding more than his or her net equity claim under SIPA.

## VI.    MISCELLANEOUS

### A.    Notice

64.    Pursuant to Bankruptcy Rules 2002(a)(6), 2002(f)(8), and 2002(h), the Trustee has given notice of the hearing on the Trustee's Motion by first class mail, postage prepaid, to all claimants that filed a claim.  Pursuant to the Order Establishing Notice Procedures (ECF No. 4650), the Trustee has given notice of the hearing on the Trustee's Motion via email and/or U.S. Mail to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) all persons who have filed notices of appearance in the BLMIS proceeding. The Trustee believes that no further notice need be given of this or any further matter in the proceeding.

### B.    Waiver Of Memorandum Of Law

65.    The Trustee respectfully requests that this Court waive the requirement under Local Bankruptcy Rule 9013-1(b) for the submission of a separate memorandum of law or, alternatively, deem this Motion as satisfying that requirement.

## VII.    CONCLUSION

66.    This Motion and the relief requested by the Trustee are consistent with the policy and purposes underlying SIPA and are in the best interests of the customers of BLMIS, the Debtor estate, and its creditors.

67.    No prior application for the relief sought herein has been made to this or any other Court.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a) approving (i) the proposed Third Allocation of Property to the Customer Fund and to the General Estate; (ii) the proposed Third Interim Distribution of the Customer Fund; and (b) granting such other and further relief as may be deemed just and proper.

Dated:  February 13, 2013                    Respectfully submitted,


                                             */s/ David J. Sheehan*
                                             David J. Sheehan
                                             Email: dsheehan@bakerlaw.com
                                             Seanna R. Brown
                                             Email: sbrown@bakerlaw.com
                                             Heather R. Wlodek
                                             Email: hwlodek@bakerlaw.com
                                             **Baker & Hostetler LLP**
                                             45 Rockefeller Plaza
                                             New York, New York  10111
                                             Tel: (212) 589-4200
                                             Fax: (212) 589-4201

                                             *Attorneys for Irving H. Picard, Trustee*
                                             *for the Substantively Consolidated SIPA*
                                             *Liquidation of Bernard L. Madoff Investment*
                                             *Securities LLC and Bernard L. Madoff*