**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**AFFIDAVIT OF MATTHEW COHEN IN SUPPORT OF THE TRUSTEE'S MOTION FOR AN ORDER APPROVING THE THIRD ALLOCATION OF PROPERTY TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING THIRD INTERIM DISTRIBUTION TO CUSTOMERS**

CITY OF WASHINGTON      )
                                              )  ss:
DISTRICT OF COLUMBIA  )

Matthew Cohen, being duly sworn, deposes and says:

1. I am a Managing Director of AlixPartners LLP ("AlixPartners"). I make this affidavit to transmit to the Court information relevant to the motion by Irving H. Picard, trustee (the "Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), for an Order Approving the Trustee's Third Allocation of Property to

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

the Fund of Customer Property and Authorizing Third Interim Distribution to Customers (the "Motion").

2. AlixPartners has served as the Trustee's Claims Agent and as the accountant for the BLMIS estate since December of 2008 pursuant to SIPA § 78fff-1(a)(1). As the Claims Agent, AlixPartners was responsible for both mailing the notice of the liquidation and claim forms to potential claimants and causing the notice of the liquidation to be published. AlixPartners has also been responsible for processing all claims submitted to the Trustee and assisting the Trustee in reviewing each customer claim filed to determine whether the asserted claim amount agrees with the "net equity" for that account. In addition, as the accountants for the BLMIS estate, AlixPartners has assisted and continues to assist the Trustee in accounting for the assets of the BLMIS estate, including the cash and cash equivalents available to the Trustee.

3. I have been actively involved in the liquidation of BLMIS and the claims process since December 2008 and have personal knowledge of the matters set forth herein.

**The Claims Process**

4. To date, the Trustee has received 16,519 customer claims. To date, the Trustee has determined 16,517 of those claims. The Trustee allowed 2,499 claims and committed to pay approximately $806.7 million in funds advanced to him by SIPC. To date, the allowed claims total over $11 billion.

5. Of the remaining determined customer claims, 13,680 were denied, 12 were determined as asserting no claim, and 153 were withdrawn. One hundred and seventy-three claims are currently categorized as "deemed determined," meaning that the Trustee has instituted litigation against those claimants. Two customer claims filed by insiders remain to be determined, as they are still under review by the Trustee's staff; the value of these claims has been reserved in the proposed distribution.

2

6. As of January 31, 2013, the Trustee has received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion. These 448 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor and service claims. Of these 448 claims, 94 are general creditor claims and 49 are broker-dealer claims, which together total approximately $264.9 million of the $1.7 billion.

7. 2,311 docketed objections have been filed to the Trustee's claims determinations relating to approximately 4,300 claims, which will be noticed for hearing, if necessary. These 2,311 objections relate to approximately 1,155 BLMIS accounts.

## Recoveries by the Trustee

8. In the Motion filed on May 4, 2011 for the initial allocation and pro rata interim distribution ("First Allocation" and "First Interim Distribution"), the Trustee allocated $2,617,974,430.26 to the fund of customer property ("Customer Fund"). In the Motion filed on July 26, 2012 for the second allocation and second pro rata interim distribution ("Second Allocation" and "Second Interim Distribution"), the Trustee allocated $5,501,375,994.66 to the Customer Fund. The Trustee seeks the Court's approval to allocate an additional $1,198,067,071.04 to the Customer Fund. These funds were primarily derived from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS estate; (b) pre-litigation and litigation settlements; (c) customer preference recoveries; (d) the sale of assets; (e) refunds; and (f) earnings on the Trustee's investment and money market accounts. Of the total $9,317,417,495.96 that will be allocated to the Customer Fund, $499,811,090.36 was distributed to customers with allowed claims as part of the First Interim Distribution, and $3,626,392,284.40 was distributed to customers with allowed claims as part of the Second Interim Distribution. In connection with the First Interim Distribution, an additional $298,650,269.15 was reserved for

3

accounts in litigation, and $8,518,205.56 of SIPC subrogation was deferred. In connection with the Second Interim Distribution, an additional $2,177,641,988.54 was reserved for accounts in litigation, and $79,974,653.74 of SIPC subrogation was deferred. Therefore, the total amount available for the Third Interim Distribution will be $2,626,429,004.21.

9. In the First Allocation and First Interim Distribution, the Trustee reported total recoveries of $2,617,974,430.26. In the Second Allocation and Second Interim Distribution, the Trustee reported total recoveries of $5,501,375,994.66. The Trustee has recovered additional funds for the estate from multiple parties and sources since that time.

10. On June 10, 2011, this Court approved a settlement between the Trustee and the Joint Liquidators for Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited (collectively, the "Fairfield Funds"). On July 13, 2011, this Court entered consent judgments between the Trustee and Fairfield Lambda Limited in the amount of $52.9 million, Fairfield Sentry Limited in the amount of $3.054 billion and Fairfield Sigma Limited in the amount of $752.3 million. Under the terms of the settlement, the Joint Liquidators for the Fairfield Funds agreed, *inter alia*, to make a $70 million payment to the Customer Fund with an initial payment of $24 million due upon execution of the agreement. Approximately $16 million in cash was transferred to the Trustee on or about July 8, 2011, and the remaining $8 million balance was an offset against funds owed by the Trustee to Fairfield Sentry. On November 8, 2012, the remaining $46 million payment obligation was satisfied. The $46 million is available for allocation at this time.

11. On December 4, 2012, this Court approved a $24 million settlement between the Trustee and individuals, feeder funds and entities related to, among others, the Beacon

4

Associates Management Corporation, Andover Associates Management Corporation and Ivy Asset Management. $23,882,870.83 of the $24 million is available for allocation at this time.

12. The $220 million settlement with the estate of Norman F. Levy, entered into in February 2010, was affirmed by the District Court, and the Second Circuit issued a summary order affirming the judgment of the District Court. The Trustee allocated the full amount of this settlement to the Customer Fund in the First Allocation. The time period to further challenge these rulings in the Supreme Court of the United States does not expire until March 21, 2013 and, as a result, the Trustee will not distribute the Levy funds at this time.

13. On September 22, 2011, this Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, "Tremont") in the amount of $1.025 billion. In this settlement, Tremont agreed to deliver $1.025 billion into an escrow account, which was done on November 6, 2012. The settlement payment was released from the escrow account on February 8, 2013. The $1.025 billion is available for allocation at this time.

14. In addition to the above settlements, the Trustee has recovered approximately $103.2 million since the Second Allocation and Second Interim Distribution as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries. The $103.2 million is available for allocation at this time.

15. For purposes of determining each customer's "net equity," as that term is defined under SIPA, the Trustee credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the "Trustee's Net Investment Method"). Some claimants argued that the Trustee was required to allow customer claims in the amounts shown on the November 30, 2008

5

customer statements (the "Last Statement Method," creating the "Net Equity Dispute"). Litigation over the Net Equity Dispute has now proceeded through this Court, the Second Circuit, and the Supreme Court of the United States.

16.    On June 25, 2012, the Supreme Court denied two petitions for a writ of certiorari to the Second Circuit; a third petition was withdrawn. Thus, a final nonappealable order has been entered on the Net Equity Dispute, upholding the Trustee's Net Investment Method and making those funds that had previously been held in reserve for this issue available for distribution.

17.    As of December 31, 2012, the Trustee had recovered $9,317,417,495.96 as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries. Of the total amount recovered, $1,357,903,492.06 remains subject to a final ruling as to how net equity claims are to be determined. Although the Second Circuit's Net Equity Decision on the Net Investment Method is now final, the Objecting Claimants argue that any time-based damages should be part of their net equity claims. Thus, the Trustee will hold the $1,357,903,492.06 in reserve pending the outcome of the Time-Based Damages Motion (the "Time-Based Damages Motion"). Therefore, the Trustee seeks approval to allocate the full amount of these preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries that were not previously allocated to the Customer Fund; however, $224,018,613.18 will not be available for distribution at this time.

18.    In sum, the Trustee seeks to allocate an additional $1,198,067,071.04 to the Customer Fund. When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation and the $5,501,375,994.66 that was allocated to the

6

Customer Fund in connection with the Second Allocation, the total amount allocated will be $9,317,417,495.96. Of the $9,317,417,495.96 allocated to the Customer Fund, $499,811,090.36 was distributed to customers with allowed claims as part of the First Interim Distribution, and $3,626,392,284.40 was distributed to customers with allowed claims as part of the Second Interim Distribution. In connection with the First Interim Distribution, an additional $298,650,269.15 was reserved for accounts in litigation, and $8,518,205.56 of SIPC subrogation was deferred. In connection with the Second Interim Distribution, an additional $2,177,641,988.54 was reserved for accounts in litigation, and $79,974,653.74 of SIPC subrogation was deferred. Therefore, the total amount available for the Third Interim Distribution will be $2,626,429,004.21. Of this amount, $442,804,436.42 must be held in reserve for the Levy settlement ($220 million), the IRS settlement ($103 million) and non-preference related settlement payments for accounts with net equity clauses ($119,804,436.42), leaving a total of $2,183,624,567.79 available for distribution.

The table below summarizes this calculation.

| Category | Amount |
|---|---|
| SIPC 17 Receipts (December 31, 2013) | $8,292,417,495.96 |
| Tremont | $1,025,000,000.00 |
| **Sub-Total** | **$9,317,417,495.96** |
|  |  |
| 1st and 2nd Interim Distribution Deductions |  |
|     Allowed Accounts | $4,126,203,374.76 |
|     Deemed Determined Accounts | $2,476,292,257.69 |
|     SIPC Subrogation | $88,492,859.30 |
|  |  |
| **Amount Available for Third Interim Distribution** | **$2,626,429,004.21** |
|  |  |
| Current Reserves |  |
|     Levy Appeal | $220,000,000.00 |
|     IRS Settlement Stipulation | $103,000,000.00 |
|     Settlements containing the Net Equity Clause | $119,804,436.42 |
| **Amount Available for Third Interim Distribution After Reserves** | **$2,183,624,567.79** |

### The Net Investment Method Denominator

19.  The Trustee's Net Investment Method Denominator is the allowed amount of all accounts that have an allowed claim plus the net cash balance for all accounts into which more funds were deposited than withdrawn for which a claim has been filed, but not yet allowed. As of January 31, 2013, the Trustee's Net Investment Method denominator is $17,534,955,950.55. This number is subject to change as additional accounts are determined.

### The "Time-Based Damages" 3% Reserve Denominator

20.  As stated above, the Net Investment Method denominator is $17,534,955,950.55. When Time-Based Damages at a 3% rate are added to the Time-Based Damages balances for allowed and deemed determined accounts, the denominator increases from $17,534,955,950.55 to $20,683,128,614.97 (the "3% Time-Based Damages Reserve Denominator").

8

**Interim Calculation of *Pro Rata* Share
Distribution of Customer Fund**

21.     As set forth above, the total amount available for the Third Interim Distribution will be $2,183,624,567.79. Of that amount, $974,048,457.86 is available for distribution (the "Net Customer Fund"). The difference between those amounts—$1,209,576,109.93—represents the catch-up payment the Trustee will owe customers from the First and Second Allocations and First and Second Interim Distributions if a ruling requires the calculation of Time-Based Damages at 3%.

22.     The 3% Time-Based Damages Reserve Denominator is $20,683,128,614.97. To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the 3% Time-Based Damages Reserve Denominator, resulting in the following percentage (the "3% Scenario"):

$$\frac{\$974{,}048{,}457.86 \text{ (Net Customer Fund)}}{\$20{,}683{,}128{,}614.97 \text{ (3\% Time-Based Damages Reserve Denominator)}} = 4.709\%$$

23.     Under this scenario, a total of 1,103 accounts will receive a distribution of approximately 4.709% of its net equity claim. Of these 1,103 accounts, 31 will become fully satisfied, bringing the total of fully satisfied account holders to 1,106 (1,072 accounts will remain partially satisfied and will be entitled to participate in future distributions).

24.     An additional 120 accounts that are currently "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Forty-three of the 120 accounts would be fully satisfied by the SIPC advance. The remaining 77 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion and his earlier distribution motions. Eleven of the remaining 77 accounts would be fully satisfied by the First, Second and Third Interim Distributions.

25. At this time, each customer's ratable share of the Net Customer Fund should be no less than 42.867% of the customer's net equity claim, which includes the 4.602% customers received subject to the First Allocation and First Interim Distribution and the 33.556% customers received subject to the Second Allocation and Second Interim Distribution.[2]

By: */s/ Matthew Cohen*
Matthew Cohen

City of Washington
District of Columbia

Subscribed and sworn to me (or affirmed) before me, Mary Ann Sluga, Notary Public, on this 13th day of February, 2013 by Matthew Cohen, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

WITNESS my hand and official seal.

*/s/ Mary Ann Sluga*
Mary Ann Sluga, Notary Public
Qualified in District of Columbia
*Commission Expires: September 14, 2016*

---

[2] Each customer's ratable share may be less than 42.867% for those BLMIS accounts that are fully satisfied.