**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

.................................................................... x
SECURITIES INVESTOR PROTECTION          :
CORPORATION,                            :
                                        :
                    Plaintiff,          :    Adv. Pro. No. 08-1789 (BRL)
                                        :
         v.                             :    SIPA LIQUIDATION
                                        :
BERNARD L. MADOFF INVESTMENT            :    (substantively consolidated)
SECURITIES LLC,                         :
                                        :
                    Defendant.          :
.................................................................... x
In re:                                  :
                                        :
BERNARD L. MADOFF,                      :
                                        :
                    Debtor.             :
.................................................................... x

**CUSTOMERS' SUPPLEMENTAL BRIEF OPPOSING TRUSTEE'S MOTION**
**FOR AN ORDER REJECTING AN INFLATION**
**ADJUSTMENT TO THE CALCULATION OF "NET EQUITY"**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

RELEVANT FACTS ..............................................................................................................2

A.    The Trustee's Briefing Asserted that Administrative Cost, Burden, and Delay
Should Prevent an Inflation Adjustment. ...........................................................................2

B.    The Trustee's Written Discovery Responses Admitted that His Cost Assertions
Were Unsupported Legal Arguments. ................................................................................4

C.    The Trustee's Witnesses Confirm that the Cost of Making An Inflation
Adjustment Is Minimal. ....................................................................................................5

DISCUSSION .........................................................................................................................9

I.    The Trustee Has Failed to Demonstrate That an Inflation Adjustment Would
Entail Significant Cost, Burden, or Delay. ........................................................................9

    A.    The Trustee's Unsupported Administrative Burden Allegations Are
Contradicted By His Own Witnesses. ..............................................................10

    B.    In Any Event, The Trustee Is Estopped From Arguing That Delay and
Cost Should Preclude an Inflation Adjustment, Because He Deliberately
Deferred this Issue for Later Resolution. ..........................................................19

II.   The Benefits Of An Inflation Adjustment Outweigh THE Potential Costs. .....................22

    A.    The Court May Consider Basic Economic Principles in its Assessment. .............22

    B.    A Basic Inflation Analysis Demonstrates the Incredible Inequity of
Failing to Recognize The Time Value Of Money. ..............................................23

CONCLUSION .....................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Commodity Futures Trading Comm'n v. Walsh*,
 No. 11-1516-cv(L), 2013 WL 1324054 (2d Cir. April 3, 2013)........................................ 3

*In re Bernard L. Madoff Inv. Sec. LLC*,
 654 F.3d 229 (2d Cir.  2011)................................................................................... 10, 19

*In re CCT Communs., Inc.*,
 420 B.R. 160 (Bankr. S.D.N.Y. 2009) ............................................................................ 21

*In re MF Global Inc.*,
 No. 11-2790, 2012 Bankr. LEXIS 1801 (Bankr. S.D.N.Y. Apr. 24, 2012)..................... 21

*In re New Times Sec. Servs.*,
 371 F.3d 68 (2d Cir. 2004)............................................................................................ 9, 10

*In re Stone Barn Manhattan LLC*,
 405 B.R. 68 (Bankr. S.D.N.Y. 2009) .............................................................................. 21

*New Hampshire v. Maine*,
 532 U.S. 742 (2001)......................................................................................................... 21

*Oliveri v. Delta S.S. Lines, Inc.*,
 849 F.2d 742 (2d Cir. 1988)............................................................................................ 22

*Peskin v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),*
 413 B.R. 137 (Bankr. S.D.N.Y. 2009) ............................................................................ 20

*SIPC v. Madoff*,
 08-01789 (ECF 2) (Dec. 23, 2008) ................................................................................. 15

*Skidmore v. Swift & Co.*,
 323 U.S. 134 (1944)......................................................................................................... 10

*U.S. v. Will*,
 449 U.S. 200,
 101 S. Ct. 471, 66 L.Ed.2d 392 (1980) .......................................................................... 22

*United States v. Rodriguez*,
 292 Fed. Appx. 411 (5th Cir. 2008)................................................................................. 21

## Federal Rules

Fed. R. Evid. 201(b)(2) ............................................................................................................. 22

FRCP 30(b)(6) ................................................................................................................ 6

**Federal Statutes**

15 U.S.C. § 78(b) .......................................................................................................... 15

**Other Authorities**

31A C.J.S. Evidence § 140 ........................................................................................... 22

Bureau of Labor Statistics, CPI Inflation Calculator, available at http://data.bls.gov/cgi-
   bin/cpicalc.pl ........................................................................................................ 23

Cavanaugh, Matthew Edward,
   *Legal Applications of Modern Finance*,
   31 QUINNIPIAC L. REV. 119 (2013) ...................................................................... 22

*Legal Applications of Modern Finance*,
   31 QUINNIPIAC L. REV. 119, 124 (2013) ............................................................. 22

## INTRODUCTION

This supplemental brief is submitted on behalf of a group of defrauded Madoff customers (collectively, the "Customers")[1] to address the Trustee's claims about the costs of calculating and implementing an inflation adjustment to customer "net equity" amounts.  For all of the reasons set forth in the Customers' previous memorandum of law, a method for calculating net equity that includes an adjustment to account for inflation – or the time value of money – is demonstrably fairer to customers and, particularly in this case, more consistent with SIPA and its protective aims than the method proposed by the Trustee and SIPC.  Indeed, the time value of money has been understood and incorporated into financial transactions for centuries, and the concept has long been expressly recognized in this Circuit.  The SEC agrees, having on multiple occasions stated that the calculation of net equity should include an inflation adjustment under the facts of this case.

In the SEC's most recent submission on this issue, it confirmed that using an inflation adjustment here would provide "a more accurate valuation of the customer's claim."  The SEC, taking into account the Trustee's assertions that the administrative costs of such an adjustment were prohibitive, suggested that the Court consider both the costs and benefits of providing for an inflation adjustment, acknowledging that the SEC did not then have sufficient information to fully assess the costs.  This brief addresses precisely the question the SEC left open:  whether the costs outweigh the benefits of an inflation adjustment.   As detailed below, the Trustee's own evidence refutes his

---

[1]  The Customers are identified on Schedule A to their prior brief.  Individual Customer's circumstances vary.  *See* Customers' Brief Opposing Trustee's Motion for an Order Rejecting an Inflation Adjustment to the Calculation of "Net Equity," Dec. 3, 2012 (ECF 5133) ("Customer Br."), at Sch. A, n. 1.

assertions about the costs of calculating and implementing an inflation adjustment. Indeed, the Trustee's counsel confirmed that even an orangutan could do the math required. The Trustee's costs are minimal in relation to the potential benefits to Customers.

**RELEVANT FACTS**

**A.    The Trustee's Briefing Asserted that Administrative Cost, Burden, and Delay Should Prevent an Inflation Adjustment.**

On October 12, 2012, the Trustee submitted a brief in support of his Motion requesting that the Court authorize him to ignore the time value of money in calculating customer claims. The Trustee's brief asserted, for the first time in the four-year history of this case, that he should be permitted to ignore the time value of money because he would face a significant administrative burden in applying an inflation adjustment. *See* Memorandum of Law in Support of Trustee's Motion for an Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based Damages at 25-29 (ECF 5039) ("Tr. Mem.").

Specifically, the Trustee asserted that an inflation adjustment would require a "transaction-by-transaction, account-by-account review" that could "take as long as twelve months to perform" and cost "tens of millions of dollars." *Id*. at 26. In a footnote, the Trustee cited the time necessary to determine adjustments for settled accounts as his sole example of the difficulty in conducting this analysis. *Id*. at n. 13. In support of these factual contentions, the Trustee offered the Declaration of Robert J. Rock, a Principal at AlixPartners ("Rock Decl.") (ECF 5041). Like the Trustee's Memorandum, the Rock Declaration claimed that "there would be significant additional work necessary to perform a transaction-by-transaction, account-by-account review to ascertain the exact

-2-

revised balance without adjusting for any specific account." Rock Decl. ¶ 4. It also cited

only one example of this purported complexity – the analysis of certain settlements. *Id.*

The Customers disputed the Trustee's allegations about burden and delay. *See*

Customer Br. at 25-27. The SEC likewise submitted a brief opposing the Trustee's

Motion and supporting an inflation adjustment on both legal and equitable grounds. *See*

Memorandum of Law of the Securities and Exchange Commission Supporting a Constant

Dollar Approach to Valuing Customers' Net Equity Claims for Fictitious Securities

Positions, Dec. 10, 2012 (ECF 5142) ("SEC Br."). The SEC analyzed the issue and

concluded that "an inflation adjustment should provide a more accurate calculation of the

real-dollar value of the customer's net investment." The SEC further observed,

"[b]ecause of the unusually long duration of Madoff's Ponzi scheme, the effects of

inflation may be more pronounced than in a case of a scheme of shorter duration, so the

benefits of an adjustment here may be significant." *Id.* at 1, 16.[2] However, the SEC

stopped short of an unconditional recommendation to adjust because of the state of the

evidentiary record:

> Although under the narrow circumstances presented in this case an
> inflation adjustment should provide a more accurate valuation of the
> customer's claim, we believe the Court should consider the costs and
> benefits of making such an adjustment.
>
> . . .

---

[2]  The SEC position here contrasts with the position it took in a recent SEC/CFTC joint
receivership involving the Westridge Ponzi scheme. There, the SEC supported the equity
receiver's decision not to implement an inflation adjustment under the facts of that case.
*See Commodity Futures Trading Comm'n v. Walsh*, No. 11-1516-cv(L), 2013 WL
1324054 (2d Cir. April 3, 2013). As the Second Circuit opinion makes clear, the *Walsh*
case is no precedent for the issue now before the Court because of the unique powers of
an equity receiver in a government enforcement case and because, unlike *Walsh*, this case
is governed by SIPA.

The Commission does not at this time have the data necessary to make an informed evaluation of the benefits or of the costs of making an inflation adjustment in this case. We believe the Trustee may be in possession of relevant data.

SEC Br. at 16-17. The record does not reflect that any customer filed in support of the Trustee's unadjusted claim computation method. By contrast, "approximately 1,200 objections have been filed in response to the Trustee's determination of claims, arguing an entitlement to Time-Based Damaged on behalf of approximately 1,600 claimants." Declaration of Bik Cheema in Support of Trustee's Motion for an Order Affirming Net Equity and Denying Time-Based Damages, Oct. 12, 2012 (ECF 5040).

**B.      The Trustee's Written Discovery Responses Admitted that His Cost Assertions Were Unsupported Legal Arguments.**

In January 2013, the Court authorized the Customers to take discovery on the Trustee's factual assertions. *See* Amended Time-Based Damages Sch. Order, Jan. 23, 2013 (ECF 5212). The Customers propounded document requests to which the Trustee responded. *See* Declaration of Richard A. Kirby ("Kirby Decl."), Ex. A.

The Customers requested production of any information or documents providing a factual basis for the Trustee's assertions that making an inflation adjustment would result in undue burden, cost, or delay. They specifically sought the factual basis for the Trustee's assertions that an adjustment would require a "transaction-by-transaction, account-by-account review" that could "take as long as twelve months to perform" and cost "tens of millions of dollars." *See* Kirby Decl. Ex. A at Request Nos. 6, 7, 8, and 11.

The Trustee did not produce a single document in response to these requests, asserting that they were "beyond the permissible scope of discovery" because they "related to the Trustee's legal arguments in the Motion." *Id.* The Trustee only agreed to

produce documents reflecting Mr. Rock's analysis and calculations in relation to his

declaration, and referred the Customers to that material in his responses.  *Id.*

**C.      The Trustee's Witnesses Confirm that the Cost of Making An Inflation Adjustment Is Minimal.**

At his deposition, Mr. Rock testified that the Trustee provided him with (1) the

complete underlying account and transaction data for 8,097 Madoff Securities accounts;

(2) an assumption as to the methodology of implementing an inflation adjustment; and

(3) the inflation index (CPI) to be employed.  Rock Dep. 15:18-16:25; 29:6-30:10.[3]  Mr.

Rock understood that the account data that he was provided had previously been

developed and extensively tested by others at AlixPartners and other Trustee advisors,

such that he should assume that it was reliable.  *Id.* 24:5-20.

Mr. Rock described his analysis as follows:

> [T]he assignment was to perform calculations, constant dollar calculations
> making certain assumptions and then provide various analyses to counsel,
> which they had requested.  And so we were provided data [and] given
> various assumptions.  We checked some figures.  We did calculations.
> We reviewed it.  We discussed with counsel some of our findings.  Did
> additional calculations.  Additional summaries and so on.  And so we went
> through . . . two or three iterations for example of calculations.

Rock Dep. 13:20-14:9.  Once the calculation model was tested and confirmed, he applied

the model to the underlying data, utilizing an Excel formula to calculate a final inflation-

adjusted claim amount for each account.   Rock Dep. 47:7-18.  Mr. Rock conceded that

including additional transactions or accounts in this analysis would take minimal work:

> Q.      And how much additional work would that entail [to perform
> inflation adjustments to cover all the accounts]?
>
> A.      "How much," in a sense of what?
>
> Q.      How long would that take you?

---

[3] All of the cited Rock deposition testimony may be found at Kirby Decl. Ex. B.

> A.    I don't think that would be that much from the length of time standpoint.  I think it would be a matter of essentially including another 220,000 transactions in the calculation file, but a computer can do the calculations really quickly.

> Q.    How much additional work would that entail for you to set up that formula for that purpose?

> A.    Not that much.

Rock Dep. 49:18-50:7.  The Trustee's counsel confirmed the ease of making inflation adjustments in an era of computerized spreadsheets.  When Mr. Rock was asked about what would be involved in making a CPI adjustment on a simple account, counsel responded for the witness: "[w]ouldn't take much.  I think an orangutan could answer that question."  Rock Dep. 150:22-24.

With the information given him by the Trustee, it took Mr. Rock just two weeks to conduct an inflation adjustment for every transaction in almost every customer account from 1981 to the present.  Rock Dep. 19:14-20:7; 9:19-9:25.  For all accounts, except 517 that required further analysis due to settlements or open litigation, Mr. Rock's work was essentially complete.  Rock Dep. 118:13-119:4 (Rock was unable to identify any additional work that would be necessary to complete the calculations for those accounts).  Indeed, Mr. Rock calculated the inflation-adjusted claim information to the penny using an inflation factor for every single day from January 1, 1981 to December 31, 2008.  Rock Dep. 45:13-22.  Thus, Mr. Rock calculated an inflation adjustment for the 7,580 of the 8,097 accounts in a period of two weeks and for a cost of under $120,000.  Rock Dep. 120:23-121:12.

Vineet Sehgal of AlixPartners (the Trustee's designated representative under FRCP 30(b)(6)), confirmed in his testimony that Mr. Rock had already substantially conducted an inflation adjustment using the Trustee's assumed methodology.  With the

exception of the subset of 517 accounts in which there were settlements or pending

litigation that he asserted required special consideration, the only remaining task that Mr.

Sehgal identified to finalize the inflation adjustment calculation was quality control:

> Q.      But as we've seen from – at least as Mr. Rock explained to us, that
> inflation adjustment has already – the math has already been done on those
> accounts, correct?
>
> A.      The preliminary math has been complete.  There are some tasks
> associated with finalization of the account balances which have not been
> completed.
>
> Q.      Can you tell me what those tasks are?
>
> A.      Sure.  Like I said, there is a comprehensive QC that needs to occur
> with all these transactions to make sure that everything is working as it's
> supposed to be.  You know, we're going to test sample accounts, we're
> going to test accounts that have huge swings, we're going to test accounts
> that have small swings, and look for data anomalies.

Sehgal Dep. 55:10-56:3.[4]  Thus, the Trustee's own representative acknowledged that

*conducting* an inflation adjustment calculation would not cause any significant burden,

cost, or delay.  Rather, Sehgal suggested a completely different administrative burden in

the *implementation* of an adjustment due to the "bankruptcy process":

> A.      What the trustee's asserting here is that account by account and
> transaction by transaction, and the cost and the burden he's referring to is
> the bankruptcy process that's associated with that math change to these
> accounts, that what's going to take the 12 to the 18 months. . . .
>
> Q.      So it's – to put it in your words, it's the bankruptcy process that
> you've described?
>
> A.      That's right.
>
> Q.      Moving on to the same page [Trustee Brief at 26], where the
> sentence at the bottom of that paragraph, under "Delay and Cost," it says,
> "Furthermore, the trustee expects a concomitant increase in administrative
> costs in the tens of millions of dollars."

---

[4] All of the cited Sehgal deposition testimony may be found at Kirby Decl. Ex. C.

Can you tell me what the component of that tens of millions of dollars is?

A.    It's going to be associated with the bankruptcy process that I just described. . . .

Sehgal Dep. 61:2-9; 65:14-66:4.   Mr. Sehgal's understanding of the necessity for the "bankruptcy process" he described, however, was based on unidentified sources, rather than any independent analysis: "This is the process that we used for the first determination of all these accounts, and *from what I'm told*, this is the process that we're probably going to take when the second redetermination happens."  Sehgal Dep. 104:5-9 (emphasis added).   Mr. Sehgal assumed that the Trustee would necessarily re-calculate claims from scratch, rather than relying on already verified data.

According to Mr. Sehgal, the bankruptcy process would require over a year and tens of millions of dollars because it involves, among other things, the creation of an entirely new model, months of testing the model and results by both AlixPartners and FTI Consulting, and then five levels of professional review for each account.   Sehgal Dep. 61:8-63:19.   In short, Mr. Sehgal asserted that an inflation adjustment would require redoing the entire claims process, invaliding all the work the Trustee has already completed.

The Customers retained Timothy Hart, an expert forensic accountant with experience in insolvency, claim valuation, legal disputes, and investigations, to review and respond to the Trustee's factual claims.   Mr. Hart's assignment involved reviewing the Trustee's financial assertions related to implementing an inflation adjustment, including the evidence he provided to support these assertions.   *See* Expert Report of T. Hart, filed herewith ("Hart Decl.").   Mr. Hart reviewed the Trustee's statements, his discovery responses, and the testimony of the Trustee's witnesses.   *See* Hart Decl. ¶ 7,

App. B.  He confirmed that the Trustee's calculation of net equity for customer claims ignores the time value of money, a fundamental and basic concept in finance.  *Id.* ¶ 11. As both Mssrs. Rock and Sehgal grudgingly acknowledged, the construction of a model to adjust for time value is, in Mr. Hart's experience, neither complex nor difficult.  *Id.* ¶¶ 28-30. Based on the specific work done in this matter, Mr. Hart concluded that an inflation adjustment "should be straight forward and should not be time consuming."  *Id.* ¶ 30.

Because the "failure to account for the time value of money in the valuation of a claim provides a windfall to the customers who invested in the latest years of the scheme at the expense of the earlier investors," Mr. Hart concluded that sound financial principles and basic equity require a time-value component be applied to customer claims.  *Id.* ¶ 16.  Indeed, it is his opinion that "distributions from the estate made on a basis that fails to account for the time value of money will result in an inappropriate financial result."  *Id.* ¶ 17.

**DISCUSSION**

**I.      THE TRUSTEE HAS FAILED TO DEMONSTRATE THAT AN INFLATION ADJUSTMENT WOULD ENTAIL SIGNIFICANT COST, BURDEN, OR DELAY.**

The SEC supports the Customer's request for an inflation adjustment, provided that it will not result in undue cost or burden, while the Trustee and SIPC oppose making such an adjustment.  The Second Circuit has previously ruled that when the SEC and SIPC disagree on the administration of SIPA, the SEC's view is entitled to deference to the extent persuasive, but SIPC's is not.  This is because the SEC has supervisory authority over SIPC and "Congress did not intend for the Commission's interpretation of SIPA to be overruled by deference to the entity that was made subject to the

Commission's oversight." *In re New Times Sec. Servs.*, 371 F.3d 68, 80 (2d Cir. 2004). To side with SIPC and the Trustee and against the SEC here would "impermissibly undermine the statutory hierarchy." *Id*.

The SEC invited the Trustee to provide information supporting his assertions regarding the cost and burden associated with an inflation adjustment. The Trustee has failed to substantiate his claim that any significant cost or burden would justify deviating from the SEC's conclusion that an inflation adjustment is appropriate in this case. Accordingly, the SEC's view is entitled to deference. *Id*. (holding that the SEC was entitled to deference under *Skidmore v. Swift & Co*., 323 U.S. 134 (1944), and noting that "the SEC is responsible for regulating broker-dealers, administering the securities exchanges and protecting the public interest"). Judicial deference to the SEC's position on the merits must be considered in determining whether the Trustee's approach is "clearly inferior" to allowing an inflation adjustment. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 238 (2d Cir. 2011) (court must evaluate whether trustee's proposed methodology "allocates 'net equity' among the competing claimants in a manner that is not clearly inferior to other methods under consideration.").

For the reasons stated in the Customer's initial brief and those described below, the Trustee's administrative cost and burden claims are contrived and unsubstantiated, and thus SIPA permits an inflation adjustment on these facts. The Trustee's contrary approach is clearly inferior and should be rejected by this Court.

> ### A.    The Trustee's Unsupported Administrative Burden Allegations Are Contradicted By His Own Witnesses.

Despite tailored discovery directed to his cost assertions, the Trustee has produced *no* evidence supporting his argument that conducting an inflation adjustment would

require a "transaction-by-transaction, account-by-account review" that could "take as long as twelve months to perform" and cost "tens of millions of dollars." Tr. Mem. at 26. To the contrary, the Trustee's consultant performed an inflation adjustment on most accounts over the course of two weeks for less than $120,000. The Trustee's exaggerated statements about the purported delay and cost associated with implementing an inflation adjustment should not be given any weight by the Court when considering the benefits of the adjustment.

> **1.    Contrary to the Trustee's assertions that an adjustment would be burdensome and time consuming to calculate, his own consultants conducted an inflation adjustment on almost every account in a two-week period.**

On behalf of the Trustee, Mr. Rock calculated an inflation adjustment on almost every account and every transaction in just two weeks. Rock Dep. 19:14-20:7; 9:19-9:25. Mr. Rock explained that he had never worked on Madoff matters before being engaged to conduct the inflation adjustment assignment. Rock Dep. 9:22-25. He confirmed that the Trustee provided him with all the necessary data to conduct an inflation adjustment. Rock Dep. 19:14-20:7; 9:19-9:25; *see also id.* 118:13-119:4. Mr. Rock's testimony confirmed that he was able to use data that was already compiled, available, and verified through quality controls to conduct the computation. *Id.* He also confirmed, as did the Trustee's representative, that the application of an inflation adjustment to existing transaction and claim data is purely mathematical. Rock Dep. 47:7-18. Indeed, far from the Trustee's assertions that the analysis would require months of time and millions of

dollars, Mr. Rock substantially completed the inflation adjustment in a period of two weeks and for a cost of under $120,000.  Rock Dep. 120:23-121:12.[5]

> ### 2.    For the vast majority of accounts, quality control is the significant remaining task, and the Trustee's representative conceded that such measures consist of modest sampling.

With the exception of a subset of 517 accounts in which there were settlements or pending litigation allegedly requiring special scrutiny, the only remaining task that the Trustee's witnesses identified to finalize the inflation adjustment calculation was quality control.  However, even the Trustee's witnesses acknowledge that any reasonable quality control would not support the Trustee's exaggerated cost and burden assertions.

The Trustee's claims administrator and forensic accountant have spent four years collecting and analyzing transaction and account data.  The Trustee has sufficient confidence in the reliability of that data to have issued determinations for all filed customer claims except those in litigation.  Claim determination letters setting forth all of the account transactions were already disseminated to customers, providing them ample opportunity to point out any inaccuracies.

Because the Trustee claims to have thoroughly vetted the underlying transaction and account data over the several years that this matter has been pending, the validity of the adjusted account information does not require re-verifying the data from scratch.  Such a process would serve no useful purpose.  Rather, quality control measures for an

---

[5]  Customers ask the Court to reserve deciding the proper methodology for determining an inflation adjustment.  Customer Br. at 3, 27.  Likewise, the Trustee "request[ed] a further proceeding on the specific method to be used for adjustment."  Trustee Mem. at 26 n.13; *see also* Rock Dep. at 38:7-17 (not offering opinion as to appropriate methodology).  "[T]he mechanical implementation of whatever exact method the court might specify to account for inflation would not be complicated and could be accomplished in a matter of weeks."  Hart Decl. ¶ 30 .

arithmetical inflation adjustment need only test the application of the new calculation, not the underlying data.  As conceded by Mr. Sehgal, such tests are typically done through sampling and other common verification techniques: "we're going to test sample accounts, we're going to test accounts that have huge swings, we're going to test accounts that have small swings, and look for data anomalies."  Sehgal Dep. 55:18-56:3.

Thus, even the Trustee's own witnesses do not support his claims that an inflation adjustment would require a burdensome "transaction-by-transaction, account-by-account review."  That kind of extensive due diligence may have been necessary in the early stages of this case, as the Trustee and his consultants attempted to compile accurate data from the records of a criminal enterprise.  But now, for the vast majority of accounts, an inflation adjustment is a mechanical application of the computer program.

Mr. Hart also confirmed the limited nature of quality control measures that would be required here.  Indeed, based on his experience and the specific work done in this matter, Mr. Hart concluded that an adjustment "should be straight forward and should not be time consuming."  Hart Decl. ¶ 30.  The quality control for this global adjustment would involve sampling a limited number of random accounts or accounts that display anomalous or unexpected changes.  *Id.*  It is simply not credible to suggest that the process would require starting from scratch on each and every account, take 12-18 months, and cost tens of millions of dollars.  *Id.* ¶ 27.

> **3.    The Trustee's contention that an inflation adjustment would require an entirely new claims process that could be a source of delay and cost ignores the Court's authority to establish efficient procedures.**

Confronted with the complete lack of evidence to support the claim that conducting the inflation *analysis* would be the source of any significant additional work,

the Trustee shifted his argument to focus on the burden of quality checking that adjustment. Having failed to support that contention with any reasonable data, the Trustee's representative suggested instead that the revised claims *process* required by SIPC would result in undue burden, cost, and delay:

> A. [I]f the court orders us to, say, move away from cash in and cash out and utilize a CPI adjustment to all these accounts. Like we said, the initial math is there, all the transactions have been adjusted. We would have to validate all the transactions, and get comfortable that these result[s] are accurate, and then we would have, you know – likely have FTI Consulting write their own model, run all their transactions and reconcile that with this. I think these two processes, the reconciliation and validation, would probably be done in about a month and a half. . . . .

> But, again, that's only associated with the math part. *What the trustee's asserting here is that account by account and transaction by transaction, and the cost and the burden he's referring to is the bankruptcy process that's associated with that math change to these accounts, that what's going to take the 12 to the 18 months.*

> Q. Can you explain that further for me, please?

> A. Sure. . . . . The determination process for 3,800 accounts is going to be very extensive. We followed the process set out by SIPC for us, the process that they follow in all their cases, to say these accounts actually went through five different levels of review before they got determined. They went through an AlixPartners review, they went through an FTI Consulting review, they went through a SIPC personnel review, they went to a trustee's counsel review, and finally a review by the [customer] counsel before an account gets determined.

> *So if we're changing the net equity of an account, if we're going away from cash in and cash out and applying a CPI, and redetermining all those accounts, all 3,800 accounts are going to need to go through a determination process similar to the one that they went through with [sic] the first time.*

Sehgal Dep. 61:8-63:19 (emphasis added). Mr. Sehgal's assertion that any inflation adjustment would require a new five-level review and vetting process, however, was simply based on what he was told, presumably by the Trustee. Sehgal Dep. 104:5-9.

Even if that is what SIPC asks for, however, the Court would not be required to authorize this cumbersome and wasteful administrative duplication of effort.

The Trustee says he would need to re-start the claim determination process from scratch, including new notice periods and open-ended objection opportunities. That assumption has no basis in the governing law, nor does it make sense given the history of this liquidation. Nothing in SIPA requires that the claims determination process be reopened on all issues if the Court orders a new globally applicable claims adjustment methodology.[6]

At the outset of the case in 2008, the Court established procedures to provide customers with notice of their claim and an opportunity to object to the Trustee's determination. *See* Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing Other Relief., *SIPC v. Madoff*, 08-01789 (ECF 2) (Dec. 23, 2008). The purpose of these procedures was to provide for both the efficient administration of the liquidation and appropriate due process with opportunities for judicial review.[7] If the Court orders an inflation adjustment, its decision

---

[6] If SIPC nonetheless insists on an elaborate process for implementing an inflation adjustment, then that may be its prerogative since it bears the costs of such a process until customer claims are paid in full. *See* Section 9(b) of SIPA, 15 U.S.C. § 78(b). But SIPC's costs, to the extent that they exceed what this Court finds are necessary to assure a fair implementation of an inflation adjustment, are costs that should not be weighed by the Court in determining whether to implement an inflation adjustment. Likewise, time delay that may result from SIPA's five-step control process should not be held against Customers.

[7] The claim determination letters note that claims may be readjusted if a court changes the net equity methodology, which mitigates any concern over customer expectations or reliance on the Trustee's determination of their claims.

will be the law of the case and not proper grounds for objection to the claim redetermination.[8]

### 4. The Trustee's claim that adjusting settled claims or accounts in litigation would result in dramatic costs is contradicted by his own statements and does not otherwise withstand scrutiny.

Finally, the Trustee also argues that a global adjustment might unwind settlements and could raise the specter of ancillary litigation:

> The Trustee's position on most, if not all, of the settlements reached thus far is that they would be unaffected by such redeterminations [i.e., inflation adjustment]. The Trustee expects, however, that this position would be challenged by numerous settling parties seeking to 'undo' settlements. The effects on the pace of this proceeding and the resultant litigation would be dramatic and would likely lead to further delay and costs in connection with future distributions to customers.

Tr. Mem. at 26-7. The argument is internally inconsistent. If the Trustee is correct that "most, if not all" of the settlements "would be unaffected by such redetermination," then it does not follow that those redeterminations would generate vast amounts of expensive litigation. By the Trustee's own reasoning, any challenges to readjustments would be frivolous and could presumably be disposed of summarily and on a consolidated basis.

Moreover, the Trustee's representative told an entirely different story. Mr. Sehgal testified that there were 517 settlements in total and, of those, "over 400" have a provision stating that if the Trustee's net equity methodology is successfully challenged, the claims provided in those settlements would gain the benefit of an inflation adjustment, where applicable. Sehgal Dep. 49:14-50:5. If it is true that the vast majority of settlements in fact include an adjustment provision as described by Mr. Sehgal, there

---

[8] For example, the Court could fashion a reasonable objection opportunity for customers who believe that the Trustee misapplied the Court-ordered inflation adjustment methodology to their account. Such an objection opportunity would be unlikely to generate a significant volume of collateral litigation.

would be no dispute that the inflation adjustment would apply to those accounts. The principal likely source of dispute in that scenario would be how to apply an inflation adjustment to claim amounts that were compromised. While the Customers acknowledge that applying an inflation adjustment to an account for which there was a settlement with unique terms could require some additional evaluation, it is an exaggeration to claim that such an analysis would be unduly burdensome.

For most settlement accounts, the work required to apply an inflation adjustment is not particularly difficult.[9] For example – to choose one publicly filed settlement – in *Picard v. Trotanoy Inv. Co., Ltd.*, the Trustee brought a preference action against Trotanoy to avoid a $28,960,000 transfer that the company had received during the preference period. *See* Motion to Approve Compromise, Adv. Proc. No. 10-05208, Mar. 26, 2012 (ECF 50). Before settlement, Trotanoy had a net equity claim of $36,307,299.69. *Id.* at Ex. A ¶ E. The settlement agreement between the parties provided that Trotanoy would return 100 percent of the preference payment. In return, the Trustee would provide Trotanoy with an allowed claim of $65,267,299.69 – its original net equity claim plus the preference payment it returned to the estate. *Id.* at Ex. A ¶¶ 1-2. The settlement provided that Trotanoy would get the benefit of any change to the net equity methodology, as determined by a final and unappealable court order. *Id.* at Ex. A ¶ 2.

---

[9] Indeed, at least some of it is already underway. Mr. Rock ran some calculations but did not complete an inflation adjustment for a subset of several hundred accounts that had settlements or pending litigation. Rock Dep. 117:11-119:4. For those accounts, Mr. Rock testified that his colleagues at AlixPartners had preliminarily analyzed how they might be affected by an inflation adjustment, but the analysis was not completed and he was instructed to "wipe out those adjustment columns" from his final analysis. Rock Dep. 117:25-118:2.

In this example, the data underlying all of Trotanoy's deposit and withdrawal transactions is at the Trustee's fingertips, as it is for other Madoff accounts. As a result, adjusting for inflation on that account would be relatively straightforward – the analysis would be conducted as if Trotanoy had never made its preference withdrawal and inflation was calculated based on its original net investment amounts. Indeed, this account, notwithstanding the settlement, was so straightforward that Mr. Rock had already completed the settlement analysis and included the results in his final calculations. Sehgal Dep. 83:6-17.

It may be that not every settlement will be as amenable to an inflation adjustment as the Trotanoy example. In some cases, the allowed claim amount may be a compromise figure that does not clearly identify which transactions were included or excluded. But the universe of such settlements is discrete and readily identifiable by the Trustee. Moreover, for those settlements where the Trustee made a deliberate decision to include a provision allowing for recalculation of the claim amount should the net equity methodology be altered, the Trustee drafted that provision, and the intent of the parties to allow for such a recalculation should be honored, not held against the customers as an undue burden. Such a result would have the effect of rendering a term of the contract null and void.

Suggesting the recalculation would end up costing "tens of millions of dollars," the Trustee implies that an inflation adjustment would unleash a storm of lawsuits. But this contention also does not hold up to examination. Even assuming that some customers chose to litigate because they were displeased with an inflation adjustment, that litigation would not add to the Trustee's costs. Any such customers would be joining

the contested proceeding that is now unfolding before this Court.  Presumably, they would align themselves with the Trustee and SIPC, not increase their litigation costs.

> **B.** **In Any Event, The Trustee Is Estopped From Arguing That Delay and Cost Should Preclude an Inflation Adjustment, Because He Deliberately Deferred this Issue for Later Resolution.**

The Trustee should not be heard to argue that it is too late in the proceedings to apply an inflation adjustment to customer claims, since the Customers attempted to achieve resolution of this issue years ago.  The Trustee now urges that an inflation adjustment would purportedly "create [] more harm than good" because it would allegedly cause undue delay and cost.  Tr. Mem. at 26.  Yet, any such delay and cost is of the Trustee's own making.  Customers sought to have the inflation issue adjudicated years ago as part of the "net equity" briefing that began in this Court in 2009, and as part of another omnibus briefing schedule thereafter.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 234 (2d Cir. 2011) (noting that the "bankruptcy court reserved decision on the issue of whether the Net Investment Method should be adjusted to account for inflation or interest").  Rather than have the matter decided at that time, the Trustee intentionally delayed resolution of this issue.  As such, the Trustee is estopped from arguing that resolving the issue at this time will result in undue delay and cost.

On August 27, 2009, the Trustee filed a Motion for an Order to Schedule Hearing on "Net Equity" Issue (ECF No. 395).  The Motion specifically noted that numerous customers had objected to their respective claim determinations on the basis "that the calculation should reflect the time value of money."  *See* Motion for an Order to Schedule Hearing on "Net Equity" Issue at ¶ 5.  On September 9, 2009, the Court held a hearing on the Trustee's Motion.  At the hearing, some Customers urged that the "net equity" calculation issues should include "interest and the cost of the money."  Transcript at 31:3-

7 (ECF No. 503).   On September 11, 2009, the Court issued an Order granting the Trustee's Motion and ruling that "it is in the best interests of all customers for this Court to limit the Net Equity Issue to the determination of the definition of net equity (cash in/cash out vs. account statement balance as of November 30, 2008 vs. cash in plus interest minus cash out), . . . with a final scheduling order . . . to be submitted to this Court in due course."  *Peskin v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),* 413 B.R. 137, 146 (Bankr. S.D.N.Y. 2009.  The Court, by referring to "cash in plus interest minus cash out," was inviting briefing in 2009 on precisely the issue at hand:  an inflation adjustment for claims determination.

Notwithstanding the Court's order, the Trustee submitted to the Court a scheduling order that omitted the issue of interest or an inflation adjustment, instead purporting to limit the "net equity" briefing to include within its scope only arguments relating to two calculation methodologies – cash in/cash out vs. final account statement. *See* Notice of Settlement of an Order Scheduling Adjudication of "Net Equity" Issue (ECF No. 421).  The Trustee also emailed the Court a letter urging that the issue of an inflation adjustment should be decided at a later date.   *See* Kirby Decl. Ex. D. Specifically, the Trustee argued that including in the "net equity" briefing arguments relating to interest or an inflation adjustment would "complicate" the "net equity" issue and "is more appropriately the subject of an ancillary proceeding," but that the Trustee "sees no reason to delay consideration of the Interest Issue and will promptly move for a scheduling order on that issue."  *Id*.  Rather than promptly moving for resolution of this issue, the Trustee waited more than three years later to raise it.

Thus, despite the Customers' efforts to obtain a ruling on this issue years ago, the Trustee successfully persuaded the Court to defer it.  The Trustee is therefore estopped from arguing that resolution of the issue now will result in undue delay and cost.

Courts apply judicial estoppel to "prohibit [] parties from deliberately changing positions according to the exigencies of the moment."  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  "[J]udicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *Id*. at 749; *see also In re Stone Barn Manhattan LLC*, 405 B.R. 68, 78 (Bankr. S.D.N.Y. 2009) ("The dispositive problem with the BHS&B Committee's argument is that it is flatly contradictory to the position the parties took previously.").

Judicial estoppel applies because the Trustee was previously successful in delaying resolution of the inflation or "constant dollar" issue, yet he now inconsistently argues that applying an inflation adjustment would create "years of delay" and litigation expense.  *See In re CCT Communs., Inc*., 420 B.R. 160, 169 (Bankr. S.D.N.Y. 2009) (holding that application of judicial estoppel is appropriate where "the party's position [is] clearly inconsistent with its earlier position; . . . . the party . . . succeeded in persuading a court to accept that party's earlier position; and . . . the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped").  Had the issue been briefed years ago, as the Customers requested, it could have been resolved by now.

Even if judicial estoppel does not apply, the purported delay and cost raised by the Trustee is of his own making and is not a basis to deny the Customers relief.  *See In re MF Global Inc.*, No. 11-2790, 2012 Bankr. LEXIS 1801, at *29 (Bankr. S.D.N.Y. Apr.

-21-

24, 2012 (ordering SIPA trustee to redo thousands of releases and holding that any corresponding "administrative burden" was a "self-inflicted wound" created by the trustee); *accord United States v. Rodriguez*, 292 Fed. Appx. 411, 411-12 (5th Cir. 2008) ("The Government cannot justify a warrantless search on the basis of exigent circumstances of its own making.").  The Trustee intentionally chose to bifurcate the resolution of the "net equity" and "constant dollar" issues, guaranteeing a more lengthy and expensive litigation.  This self-created delay and expense is not an appropriate basis to deprive the Customers of a proper determination of their claims.

## II.   THE BENEFITS OF AN INFLATION ADJUSTMENT OUTWEIGH THE POTENTIAL COSTS.

### A.   The Court May Consider Basic Economic Principles in its Assessment.

In their principal brief, the Customers highlighted the weight of judicial and other precedent that supports the equities of an inflation adjustment.  Customer Br. at 7-8. Underlying those arguments is the fact that the principle of the time value of money – that a dollar today is more valuable than a dollar ten years from now – is firmly embedded in our economic and legal systems.  Customers accordingly ask that the Court take judicial notice, pursuant to Fed. R. Evid. 201(b)(2), that an adjustment for inflation is a common and fair way to recognize the time value of money.[10]  To the extent that the

---

[10]   The fundamental economic principle undergirding the concept and application of interest are appropriate subjects for the Court's judicial notice.  *See* 31A C.J.S. Evidence § 140 ("Courts may take judicial notice of the fair earning powers of money, or invested capital, and judicial notice may be taken of interest rates prevailing during a specified period, although according to other authority, historic market interest rates are not a proper subject for judicial notice. Courts have taken judicial notice of historical inflation rates and of a particular period of inflation.") (citations omitted); *U.S. v. Will*, 449 U.S. 200, 220, 101 S. Ct. 471, 66 L.Ed.2d 392 (1980) (recognizing inflation as "a phenomenon known in [the era of the Framers] as it is in ours"); *Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 746 (2d Cir. 1988) (recognizing that "a dollar received in the future will almost

Court is not prepared to take judicial notice of such facts, the Customers proffer the testimony of Timothy Hart.

### B.    A Basic Inflation Analysis Demonstrates the Incredible Inequity of Failing to Recognize The Time Value Of Money.

Mr. Hart, an expert forensic accountant with experience in insolvency, legal disputes, and investigations, reviewed and responded to the Trustee's financial assertions related to implementing an inflation adjustment, including the evidence he provided to support these assertions. *See* Hart Decl. ¶¶ 2, 10.  Based on the specific work done in this matter, Mr. Hart concluded that basic equity, in addition to sound financial principles, require application of a time value adjustment to customer claims, and that the Trustee's method of calculating "net equity" fails to do so.  As set forth in his affidavit:

> It is commonly understood that the customer who invested a dollar in 1985 contributed a more valuable dollar than the customer who invested their dollar in 2005 because inflation eroded the buying power of that dollar over that twenty year period.  An. adjustment for at least inflation to the dollar invested in 1985 is required to account for the twenty years in this example.

Hart Decl. 12.  Thus, according to Mr. Hart, "the failure to account for the time value of money in the calculation of a claim value also results in claim amounts that are inconsistent with even the most basic financial principles.  Accordingly, distributions from the estate made on a basis that fails to account for the time value of money will

---

surely have less purchasing power than a dollar has today" and that "a dollar received today may be invested and produce a larger sum of money in the future"); Cavanaugh, Matthew Edward, *Legal Applications of Modern Finance*, 31 QUINNIPIAC L. REV. 119, 124 (2013) ("[O]ur legal system is no stranger to TVM [time value of money]. The system has used, with varying degrees of success, the TVM principle for centuries."); *see also* Bureau of Labor Statistics, CPI Inflation Calculator, available at http://data.bls.gov/cgi-bin/cpicalc.pl (allows user to compute the present-day value of a specified amount of money from a specified year in the past).

result in an inappropriate financial result." *Id*. ¶ 17.  Indeed, the "failure to account for the time value of money in the valuation of a claim provides a windfall to the customers who invested in the latest years of the scheme at the expense of the earlier investors." *Id*. ¶ 16.

In order to examine the relative effects of the Trustee's decision to not apply an inflation adjustment, Mr. Hart examined 21 customer accounts that each have a total "net equity" claim of exactly $1 million.  *Id*. ¶ 19.  A comparison of two of those 21 accounts illustrates the inequitable effects of the Trustee's approach.  Account A[11] invested $1 million in 1993 and had no withdrawals.  Account S invested $1 million on December 8, 2008 – immediately before the bankruptcy.  The Trustee's methodology would treat each claim the exact same.  By contrast, applying the Rock methodology, Account A would have an inflation adjusted claim of $1.469 million.  Thus, not applying a standard inflation adjustment methodology results in a 32 percent downward variance in claim amount for Account A.  *Id*. ¶¶ 19-21.  According to Mr. Hart:

> The Trustee's decision to not apply an inflation adjustment to otherwise similarly situated accounts has the effect of undervaluing the early customer's claim.  The Trustee's Net Equity Method is inconsistent with basic principles of economics, standard methods of valuation, and fundamental fairness.  The foregoing clearly illustrates the need to adjust the claims for inflation and the inequity that results form the Trustee's decision not to do so.

Hart Decl. ¶ 22.

In Mr. Hart's experience, and contrary to the Trustee's claims, the construction of a model to adjust for time value is neither complex nor difficult, and his review of the

---

[11]   Mr. Hart conducted his analysis on real accounts based on the data provided by Mr. Rock.  Pursuant to the Customers' agreement with the Trustee not to disclose individual account data, the Customers will remit the identities of these accounts to the Trustee under separate cover.

Trustee's statements, his discovery responses, and the testimony of the Trustee's witnesses indicates that the Trustee's consultants have already constructed such a model here. *Id.* ¶ 28. According to Mr. Hart, implementation of that model and making an inflation adjustment will not require great resources. [T]he process to calculate the claims and review these claims using an inflation adjusted calculation method should be straight forward and should not be time consuming." *Id.* ¶ 30. In other words, the benefits of including an inflation adjustment outweigh the relatively small costs.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in their initial brief, the Customers request, along with any other relief that may be just and proper, that the Court dispose of the Trustee's Motion as follows:

(1)       The Trustee's request for a determination that no time-value adjustments are required for net equity claims should be denied, and the request by the Customers for a determination that all net equity claims should be adjusted to account for the effects of inflation, should be granted;

(2)       The Trustee and SIPC should be directed to confer with the Customers and, if the SEC desires to participate, the SEC, regarding the Trustee's inflation calculations described in the Rock Declaration and the propriety of the underlying assumptions and adjustment protocols used by the Trustee. The parties should be required jointly to report to the Court, by a date to be set by the Court, concerning the status of their efforts to reach agreement on those issues; and

(3)       If, by the reporting date to be set by the Court, the parties cannot reach agreement on the issues identified in paragraph (2) above, the matter

should be submitted to the Court for determination after further briefing

and argument on a schedule to be set by the Court, upon notice to all

claimants and proposed intervenors.

Dated:  April 26, 2013                         Respectfully submitted,
Washington, D.C.

                                               K&L GATES LLP


                                               By:    /s/ Richard A. Kirby
                                                   Richard A. Kirby
                                                   Laura K. Clinton
                                                   Scott P. Lindsay
                                                   1601 K Street NW
                                                   Washington, DC 20006-1600
                                                   Tel:  (202) 778-9000
                                                   Fax:  (202) 778-9100


                                               DENTONS
                                               Carole Neville
                                               1221 Avenue of the Americas
                                               New York, NY 10020-1089

                                               Tel: (212) 768-6700
                                               Fax: (212) 768-6800

                                               LOEB & LOEB LLP
                                               P. Gregory Schwed
                                               Walter H. Curchack
                                               Daniel B. Besikof
                                               345 Park Avenue
                                               New York, NY  10154
                                               Tel:  (212) 407-4000
                                               Fax:  (212) 407-4990

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Philip Bentley
Elise S. Frejka
Jason S. Rappaport
1177 Avenue of the Americas
New York, NY  10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000


MILBERG LLP
Matthew Gluck
Matthew A. Kupillas
Jennifer L. Young
Joshua E. Keller
One Pennsylvania Plaza
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229


SCHULTE ROTH & ZABEL LLP
Marcy Ressler Harris
Jennifer M. Opheim
Mark D. Richardson
919 Third Avenue
New York, New York 10022
Tel:  (212) 756-2000
Fax:  (212) 593-5955


SEEGER WEISS LLP
Parvin K. Aminolroaya
77 Water Street, 26th Floor
New York, NY 10005
Tel: (212) 584-0700
Fax: (212) 584-0799


*Attorneys for individual customers listed at Schedule A to the Customers' Brief Opposing
Trustee's Motion for an Order Rejecting an Inflation Adjustment to the Calculation of
"Net Equity," Dec. 3, 2012 (ECF 5133)*