UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

.................................................................... x

SECURITIES INVESTOR PROTECTION
CORPORATION,

                        Plaintiff,

                    v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                    Defendant.

.................................................................... x

In re:

BERNARD L. MADOFF,

                    Debtor.

.................................................................... x

Adv. Pro. No. 08-1789 (BRL)

SIPA LIQUIDATION

(substantively consolidated)

## DECLARATION OF RICHARD A. KIRBY IN SUPPORT OF CUSTOMERS' SUPPLEMENTAL BRIEF OPPOSING TRUSTEE'S MOTION FOR AN ORDER REJECTING AN INFLATION ADJUSTMENT TO THE CALCULATION OF "NET EQUITY"

I, Richard A. Kirby, hereby declare as follows:

      1.      I am a partner of K&L Gates LLP ("K&L Gates") with offices located at 1601 K

Street, NW, Washington, DC, 20006-1600, Washington, D.C.  My firm serves as one of the

counsel to the group of defrauded Madoff Securities customers (collectively, the "Customers") in

the above-captioned proceeding.  I am authorized to make this Declaration on the Customers'

behalf.

1

2.        Attached hereto as <u>Exhibit A</u> is a true and correct copy of Trustee Irving H.

Picard's Responses And Objections to Customers' Request For Production of Documents dated

February 22, 2013.

3.        Attached hereto as <u>Exhibit B</u> is a true and correct copy of excerpts from the

deposition of Robert J. Rock taken on March 27, 2013.

4.        Attached hereto as <u>Exhibit C</u> is a true and correct copy of excerpts from the

deposition of Vineet Sehgal taken on April 12, 2013.

5.        Attached hereto as <u>Exhibit D</u> is a true and correct copy of a letter the Trustee

emailed to the Court on September 11, 2009.


I declare under penalty of perjury that the foregoing is true and correct.

                              /s/ Richard A. Kirby
                              Richard A. Kirby

Dated:  April 26, 2013
Washington, D.C.

**CERTIFICATE OF SERVICE**

I certify that on April 26, 2013, I arranged for electronic filing of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

attorneys of record via the CM/ECF system.

 s/ Richard A. Kirby
Richard A. Kirby (*Pro Hac Vice*)
K&L GATES LLP
1601 K Street, NW
Washington, DC  20006-1600
Phone: (202) 778-9000
Fax: (202) 778-9100
Email:  richard.kirby@klgates.com

K:\0310703\00001\20815_LKC\20815P22JD

# EXHIBIT A

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Karin S. Jenson
Jorian Rose
Seanna Brown
Bik Cheema

*Attorneys for Irving H. Picard,*
*Trustee for the SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | SIPA LIQUIDATION <br> Adv. Pro. No. 08-01789 (BRL) <br><br> (substantively consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**TRUSTEE IRVING H. PICARD'S RESPONSES AND OBJECTIONS TO
CUSTOMERS' REQUEST FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Rules 7026 and

7034 of the Federal Rules of Bankruptcy Procedure and all applicable Local Civil Rules, Irving

1

H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, et seq. ("SIPA"), and Bernard L. Madoff ("Madoff"), by and through his counsel, Baker & Hostetler LLP, hereby responds to the Customers' Request for Production of Documents (the "Request") served on December 17, 2012, in connection with the Trustee's Motion for an Order Affirming the Trustee's Calculation of Net Equity and Denying Time-Based Damages, dated October 12, 2012 (the "Motion").

## GENERAL OBJECTIONS

The Trustee sets forth the following General Objections which are hereby fully incorporated into each and every numbered response:

1.    The Trustee objects to this Request to the extent that it seeks to enlarge and/or expand the scope of discovery as set forth by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of this District and this Court, and any other applicable rules and procedures. The Trustee will respond to these Requests consistent with these rules.

2.    The Trustee objects to the Request to the extent that production of the documents sought would violate the Protective Order entered on June 6, 2011, in the matter of *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC, et al.*, Adv. Pro. No. 08-01789 (BRL) (the "Protective Order"), or any amendments to or subsequent orders that may be entered in this case, any applicable orders entered by any other court of competent jurisdiction, and/or any other applicable federal or state law.

2

3.    The Trustee further objects to the extent documents responsive to this Request are in the possession, custody, and control of, and/or may be more reasonably obtained from, third parties and/or the Customers.

4.    The Trustee objects to any request seeking documents concerning communications between the Trustee and the Securities Investor Protection Corporation ("SIPC"), and/or any regulator or governmental agency, including, without limitation, the Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA"), the Federal Bureau of Investigation ("FBI"), the United States Attorney's Office ("USAO") for the Southern District of New York, or any grand jury, on the grounds that such communications are deemed confidential and are protected by the attorney-client privilege, the common interest privilege, the investigatory privilege, and/or the bankruptcy crimes investigation privilege. In addition, the Trustee objects to the production of any such communications on the grounds that they are protected under the work product doctrine.

5.    The Trustee objects to any request that seeks documents that are protected by the investigatory privilege, as that privilege was articulated in *Fiero Bros., Inc. v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 95-08102 JLG, 1999 WL 1747410 (S.D.N.Y. Dec. 8, 1999). The investigatory privilege is "a qualified common law privilege protecting civil, as well as criminal law-enforcement investigatory files from civil discovery." *Id.* at 3. The Trustee is a SIPA Trustee entrusted with the responsibility to locate and recover the assets of BLMIS and distribute those assets to injured investors. The documents in the files of the Trustee are shielded from discovery in civil litigation by the investigatory privilege.

6.    The Trustee objects to any request that seeks documents that are protected by the bankruptcy crimes investigation privilege, as that privilege was articulated in *In re Stockbridge*

*Funding Corp.*, 153 B.R. 654 (Bankr. S.D.N.Y. 1993). The bankruptcy crimes investigation privilege extends the law enforcement privilege to bankruptcy trustees, protecting investigatory materials that relate to crimes or potential crimes committed by insolvent debtors, in this instance BLMIS. The Trustee's investigation and liquidation of BLMIS has required an intensive review of the mechanism by which Bernard Madoff perpetuated a multi-billion dollar Ponzi scheme. The materials covered by the bankruptcy crimes privilege extend beyond the communications to the federal enforcement agencies regarding the criminal conduct to include witnesses, evidence and information gathered in the investigation.

7.    The Trustee objects to any request that otherwise seeks the production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges, and/or work product doctrine.

8.    The Trustee objects to any request that seeks the production of documents that include any information that is of a private and sensitive nature, the disclosure of which would violate the rights of privacy, secrecy and/or confidentiality that belongs to others, and/or that would otherwise violate any existing confidentiality agreements. Any documents that the Trustee agrees to produce that are branded "Confidential" are to remain confidential pursuant to the governing June 6, 2011, Protective Order. Any documents that the Trustee agrees to produce that are branded "Attorneys' Eyes Only" are not to be distributed beyond the attorneys listed on pages 5 and 6 of the Request and their professionals. These documents have not been redacted for personally identifiable information ("PII"). Pursuant to the Protective Order and applicable laws, the Customers are obligated to redact PII should these documents be used or disclosed in this or any other adversary proceeding. The Trustee also objects to producing any documents that are subject to a court order.

9.     The Trustee objects to many of these requests, as set forth in more detail below, on the ground that the burden or expense of producing the information called for outweighs the likely benefit, considering the needs of the case and the importance of the request in resolving the issues in dispute. *See* Fed. R. Civ. P. 26(g)(1)(B)(iii). In considering the elevated burdens that a Trustee faces in producing information, the Bankruptcy Court has noted that "[t]he purpose of discovery is to uncover facts, not to pose insuperable barriers to the assertion of a cause of action by a trustee in bankruptcy who is necessarily handicapped by lack of first-hand knowledge." *Lipshie v. Cablevision of Brookline (In re Geauga Trenching Corp.)*, 102 B.R. 304, 311 (Bankr. E.D.N.Y. 1989) (denying motion to compel Trustee to supplement answers to Interrogatories because he answered to the best of his ability).

10.     The Trustee objects to these requests to the extent they seek information that could be obtained by a more appropriate mode of discovery, is redundant or duplicative of information already obtained, is premature, is unnecessarily cumulative, and/or is more easily obtained from some other source that is more convenient, less burdensome, or less expensive. The Trustee further objects to any request that seeks information already in Customers' possession, is otherwise publicly available or is primarily or exclusively within Customers' possession, custody, or control.

11.     The Trustee further objects to any request seeking information that is irrelevant, immaterial and/or unnecessary or not reasonably calculated to lead to the discovery of relevant or admissible evidence.

12.     As the Trustee's investigation and discovery are ongoing, the Trustee responds to this Request subject to, and without waiving, the right to change, modify, supplement or clarify

5

the objections and responses contained herein at any time. These responses are made without prejudice to the Trustee's right to produce subsequently discovered evidence.

13.    Providing a document in response to a request does not mean that the Trustee admits that the document or the information contained therein is relevant, material, competent, or admissible. The Trustee does not waive his objection to the request pursuant to which the information was produced. The Trustee specifically reserves the right to object on any grounds to the introduction of any documents produced or any information contained therein for any reason, including, without limitation, to the relevancy, admissibility or materiality of the information, or that the Request is in not any way reasonably calculated to lead to the discovery of admissible evidence.

14.    The Trustee's specific objections to a request or lack thereof should not be construed to mean that documents responsive to that request exist. Similarly, the statement that the Trustee will produce documents in response to any particular request should not be construed to mean that any such documents exist but rather that efforts will be made to search the universe of documents in connection with that particular request.

15.    Nothing in these responses is intended to be or may be construed as a waiver of the attorney-client privilege, the work product doctrine, the common interest privilege, the investigatory or bankruptcy crimes investigation privileges and/or any other privilege, doctrine, or immunity. In the event that a document or information subject to the foregoing privileges and protections is produced, the production of such document or information is purely inadvertent and unintended and is not in any way a waiver of the applicable privilege or other protection from disclosure. The Trustee reserves the right to seek the return of any inadvertently produced documents.

16.    These responses are based on information available at the present time to the Trustee.

17.    The foregoing General Objections are incorporated by reference into each and/or all of the following responses.  By setting forth specific objections below, the Trustee does not, and does not intend to, limit or restrict these General Objections; however, the Trustee may reiterate specific objections to any of the document requests below without waiver of any objection not specifically stated.

## SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.    The Trustee objects to the "Definitions" and "Instructions" to the extent they deviate from, conflict with, or impose greater obligations than the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and the Local Rules of this District and this Court, including, but not limited to, the purported definitions of terms set forth in Definitions 1(a-g).

2.    The Trustee objects to Definition No. 1 regarding the term, "Alix Partners, LLP," Definition No. 7 of You to include Alix, and Instruction No. 3 that the Request calls for documents "within the Trustee's possession, custody or control, including documents within the possession of Alix."  The Request is directed to the Trustee and Robert J. Rock and therefore for purposes of this Response, the Trustee will construe the definition of Alix to be limited to Robert J. Rock.

3.    The Trustee objects to Definition No. 2 regarding the terms "and" and "or" as vague, ambiguous, unduly burdensome and beyond the scope of the Trustee's obligations pursuant to the Federal Rules of Civil Procedure.  The Trustee does not know what is meant by "all responses that might otherwise be construed to be outside its scope."

7

4.     The Trustee objects to Definition No. 7 regarding the terms "You" and "Your" as overbroad and unduly burdensome to the extent they would apply to anyone other than the Trustee, and also to the extent they would apply to the Trustee in any capacity other than his role as Trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC.

5.     The Trustee objects to Instruction No. 2 as overbroad, unduly burdensome, and beyond the scope of what is required pursuant to the Federal Rules of Civil Procedure.  The Trustee is in possession of a massive document collection of BLMIS data, hosted in multiple databases and currently consisting of more than 28,800,000 documents (4.0 terabytes of data), exclusive of third-party documents.

6.     The Trustee objects to Instruction No. 3 as overbroad, unduly burdensome, and beyond the scope of what is required pursuant to the Federal Rules of Civil Procedure.

7.     The Trustee objects to Instruction No. 4 as overbroad, unduly burdensome, and beyond the scope of what is required pursuant to the Federal Rules of Civil Procedure.

8.     The Trustee objects to Instruction No. 5 as overbroad, unduly burdensome, and beyond the scope of what is required pursuant to the Federal Rules of Civil Procedure.

9.     The Trustee objects to Instruction No. 7 to the extent it purports to impose obligations beyond those required by the Federal Rules of Civil Procedure and other applicable rules.

## SPECIFIC OBJECTIONS AND RESPONSES TO INDIVIDUAL REQUESTS

### Document Request No. 1

All documents or information providing the factual basis for the statements and conclusions in the Rock Declaration.

**Response to Request No. 1**

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7, which are hereby specifically incorporated by reference.

Subject to and without waiver of the foregoing Specific and General Objections, the Trustee responds that he will produce all responsive, non-privileged documents containing Mr. Rock's analyses and calculations in connection with the Declaration of Robert J. Rock submitted in connection with the Trustee's Motion for an Order Affirming the Trustee's Calculation of Net Equity and Denying Time-Based Damages, dated October 12, 2012 (the "Rock Declaration"), conditioned on the Customers' agreement that all produced documents be treated Attorneys' Eyes Only pursuant to General Objection 8 and not disseminated beyond the counsel listed on pages 5 and 6 of the Customers' Request and their professionals.

**Document Request No. 2**

All documents containing the "calculations related to Time-Based Damages," as referenced in the Rock Declaration. *See* Rock Declaration ¶ 4.

**Response to Request No. 2**

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7, which are hereby specifically incorporated by reference.

Subject to and without waiver of the foregoing Specific and General Objections, the Trustee responds that he will produce all responsive, non-privileged documents containing Mr.

9

Rock's analyses and calculations in connection with the Rock Declaration, conditioned on the Customers' agreement that all produced documents be treated Attorneys' Eyes Only pursuant to General Objection 8 and not disseminated beyond the counsel listed on pages 5 and 6 of the Customers' Request and their professionals.

**Document Request No. 3**

All documents describing or evidencing the "significant additional work necessary" to implement an inflation adjustment to customer net equity calculations.  Rock Declaration ¶ 4.

**Response to Request No. 3**

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7, which are hereby specifically incorporated by reference.

Subject to and without waiver of the foregoing Specific and General Objections, the Trustee responds that he will produce all responsive, non-privileged documents containing Mr. Rock's analyses and calculations in connection with the Rock Declaration, conditioned on the Customers' agreement that all produced documents be treated Attorneys' Eyes Only pursuant to General Objection 8 and not disseminated beyond the counsel listed on pages 5 and 6 of the Customers' Request and their professionals.

**Document Request No. 4**

All documents containing or describing the analysis performed by Mr. Rock to ascertain how an inflation adjustment to customer net equity claims would purportedly affect distributions to customers.  Rock Declaration ¶ 5.

10

**Response to Request No. 4**

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7, which are hereby specifically incorporated by reference.

Subject to and without waiver of the foregoing Specific and General Objections, the Trustee responds that he will produce all responsive, non-privileged documents containing Mr. Rock's analyses and calculations in connection with the Rock Declaration, conditioned on the Customers' agreement that all produced documents be treated Attorneys' Eyes Only pursuant to General Objection 8 and not disseminated beyond the counsel listed on pages 5 and 6 of the Customers' Request and their professionals.

**Document Request No. 5**

All documents or information providing the factual basis for the conclusions described in paragraphs 6 through 13 of the Rock Declaration.

**Response to Request No. 5**

The Trustee objects to this Request on the grounds that it is duplicative of Requests No. 1 through 4.

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7, which are hereby specifically incorporated by reference.

Subject to and without waiver of the foregoing Specific and General Objections, the Trustee responds that he will produce all responsive, non-privileged documents containing Mr.

Rock's analyses and calculations in connection with the Rock Declaration, conditioned on the Customers' agreement that all produced documents be treated Attorneys' Eyes Only pursuant to General Objection 8 and not disseminated beyond the counsel listed on pages 5 and 6 of the Customers' Request and their professionals.

**Document Request No. 6**

All documents or information providing the factual basis for the assertion that implementation of an inflation adjustment to net equity would necessitate a "transaction-by-transaction, account-by-account review." Trustee's Memorandum at 26.

**Response to Request No. 6**

The Trustee objects to this Request on the grounds that it is beyond the permissible scope of discovery. Discovery related to the Trustee's legal arguments in the Motion is not permitted under the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure or the Local Rules of this District and this Court, and any other applicable rules and procedures as referenced in General Objection No. 1.

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7, which are hereby specifically incorporated by reference.

Subject to and without waiver of the foregoing Specific and General Objections, the Trustee responds that he will produce all responsive, non-privileged documents containing Mr. Rock's analyses and calculations in connection with the Rock Declaration, conditioned on the Customers' agreement that all produced documents be treated Attorneys' Eyes Only pursuant to

12

General Objection 8 and not disseminated beyond the counsel listed on pages 5 and 6 of the Customers' Request and their professionals.

### Document Request No. 7

All documents or information providing the factual basis for the assertion that "[i]t is expected to take as long as twelve months to perform" an inflation adjustment "and reissue determination letters . . . ." Trustee's Memorandum at 26.

### Response to Request No. 7

The Trustee objects to this Request on the grounds that it is beyond the permissible scope of discovery. Discovery related to the Trustee's legal arguments in the Motion is not permitted under the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure or the Local Rules of this District and this Court, and any other applicable rules and procedures as referenced in General Objection No. 1.

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7, which are hereby specifically incorporated by reference.

### Document Request No. 8

All documents or information providing the factual basis for the assertion that an inflation adjustment could "increase . . . administration costs in the tens of millions of dollars." Trustee's Memorandum at 26.

13

**Response to Request No. 8**

The Trustee objects to this Request on the grounds that it is beyond the permissible scope of discovery. Discovery related to the Trustee's legal arguments in the Motion is not permitted under the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure or the Local Rules of this District and this Court, and any other applicable rules and procedures as referenced in General Objection No. 1.

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7, which are hereby specifically incorporated by reference.

**Document Request No. 9**

All documents discussing or analyzing the effect of an inflation adjustment on feeder funds as compared to individual customers.

**Response to Request No. 9**

The Trustee objects to this Request on the grounds that it is beyond the permissible scope of discovery. Discovery related to the Trustee's legal arguments in the Motion is not permitted under the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure or the Local Rules of this District and this Court, and any other applicable rules and procedures as referenced in General Objection No. 1.

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7, which are hereby specifically incorporated by reference.

14

Subject to and without waiver of the foregoing Specific and General Objections, the Trustee responds that he will produce all responsive, non-privileged documents containing Mr. Rock's analyses and calculations in connection with the Rock Declaration, conditioned on the Customers' agreement that all produced documents be treated Attorneys' Eyes Only pursuant to General Objection 8 and not disseminated beyond the counsel listed on pages 5 and 6 of the Customers' Request and their professionals.

**Document Request No. 10**

Documents summarizing or compiling the number and nature of "the settlements reached thus far" by the Trustee.  Trustee's Memorandum at 26; Rock Declaration ¶ 4.

**Response to Request No. 10**

The Trustee objects to this Request on the grounds that it is vague and ambiguous as to the "nature of 'the settlements reached thus far by the Trustee.'"

The Trustee objects to this Request on the grounds that it is beyond the permissible scope of discovery.  Discovery related to the Trustee's legal arguments in the Motion is not permitted under the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure or the Local Rules of this District and this Court, and any other applicable rules and procedures as referenced in General Objection No. 1.

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7 and 10, which are hereby specifically incorporated by reference.

Subject to and without waiver of the foregoing Specific and General Objections, the Trustee responds that he will produce all responsive, non-privileged documents containing Mr.

Rock's analyses and calculations in connection with the Rock Declaration, conditioned on the Customers' agreement that all produced documents be treated Attorneys' Eyes Only pursuant to General Objection 8 and not disseminated beyond the counsel listed on pages 5 and 6 of the Customers' Request and their professionals.

**Document Request No. 11**

To the extent not included within the foregoing requests, any other documents that support the Trustee's argument that implementation of an inflation adjustment will result in undue burden, cost, or delay.

**Response to Request No. 11**

The Trustee objects to this Request on the grounds that it is duplicative of Requests 1 – 10.

The Trustee objects to this Request on the grounds that it is beyond the permissible scope of discovery. Discovery related to the Trustee's legal arguments in the Motion is not permitted under the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure or the Local Rules of this District and this Court, and any other applicable rules and procedures as referenced in General Objection No. 1.

The Trustee objects to this Request to the extent that it seeks production of documents protected by the attorney-client, common interest, investigatory and bankruptcy crimes investigation privileges and/or the work product doctrine as referenced in General Objections 4 – 7, which are hereby specifically incorporated by reference.

Subject to and without waiver of the foregoing Specific and General Objections, the Trustee responds that he will produce all responsive, non-privileged documents containing Mr. Rock's analyses and calculations in connection with the Rock Declaration, conditioned on the

Customers' agreement that all produced documents be treated Attorneys' Eyes Only pursuant to

General Objection 8 and not disseminated beyond the counsel listed on pages 5 and 6 of the

Customers' Request and their professionals.


**Dated: February 22, 2013**              /s/ _David J. Sheehan_
                                          Baker & Hostetler LLP
                                          45 Rockefeller Plaza
                                          New York, NY 10111
                                          Telephone: (212) 589-4200
                                          Facsimile: (212) 589-4201
                                          David J. Sheehan
                                          Karin S. Jenson
                                          Jorian Rose
                                          Seanna Brown
                                          Bik Cheema

                                          _Attorneys for Irving H. Picard,_
                                          _Trustee for the Substantively Consolidated_
                                          _SIPA Liquidation of Bernard L. Madoff_
                                          _Investment Securities LLC and Bernard L._
                                          _Madoff_

17

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served this 22nd day of

February, 2013 by First Class mail and electronic mail upon the following:

Matthew Gluck, Esq.
Matthew A. Kupillas, Esq.
Jennifer L. Young, Esq.
Joshua E. Keller, Esq.
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119

*Attorneys for Customers identified as being represented by Milberg LLP*

P. Gregory Schewed, Esq.
Walter H. Curchack, Esq.
Daniel B. Besikof
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154

*Attorneys for Alan and Norma Aufzien and family; the Evenstad family parties; Gorvis LLC; and The Koff Living Trust*

Richard A. Kirby, Esq.
Laura K. Clinton, Esq.
K&L Gates LLP
1601 K Street NW
Washington, DC 20006-1600

*Attorneys for the Customers identified as being represented by K&L Gates LLP*

Philip Bentley, Esq.
Elise S. Frejka, Esq.
Jasdon S. Rappaport
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

*Attorneys for the Customers identified as being represented by Kramer Levin Naftalis & Frankel LLP*

Parvin K. Aminolroaya, Esq.
Seeger Weiss LLP

77 Water Street, 26th Floor
New York, NY 10005

*Attorneys for the Customers identified as being represented by Seeger Weiss LLP*

Carole Neville, Esq.
SNR Denton US LLP
1221 Avenue of the Americas
New York, NY 10020-1089

*Attorneys for the Customers identified as being represented by SNR Denton US LLP*

*Karin S. Jenson*
*An Attorney for Irving H. Picard, Esq., Trustee*
*for the Liquidation of Bernard L. Madoff*
*Investment Securities LLC*

# EXHIBIT B

Page 1

1

2    UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------)
     SECURITIES INVESTOR PROTECTION
4    CORPORATION,
5              Plaintiff-Applicant,
6        vs.                        Adv. Pro. No.
                                    08-01789(BRL)
7    BERNARD L. MADOFF INVESTMENT
     SECURITIES LLC,
8
               Defendant.
9    ------------------------------)
     In re:
10
     BERNARD L. MADOFF,
11
               Debtor.
12   ------------------------------)
13
                  CONFIDENTIAL
14        SUBJECT TO PROTECTIVE ORDER
15
16      DEPOSITION OF ROBERT J. ROCK
17           New York, New York
18            March 27, 2013
19
20
21
22
23
24   Reported by:
     Linda Salzman
25

Page 9

1          R. Rock - Confidential
2    they're serving as the claims agent in this
3    proceeding.
4          The firm may have had other
5    advisory or consulting roles early on.    I
6    know the firm has been involved in the matter
7    for several years.  And may have even gotten
8    involved prior to Mr. Picard becoming --
9    getting appointed, so the firm's been
10   involved for quite a few years, and what all
11   the roles have been, I couldn't tell you
12   specifically.
13        Q.   Do you understand what the term
14   "claims agent" means?
15        A.   I have a lay understanding, yeah.
16        Q.   When was the first time you
17   personally became involved in anything
18   relating to the Madoff matter?
19        A.   Would have been, I believe,
20   September timeframe of 2012.
21        Q.   September 2012?
22        A.   Yeah.  I was not involved in
23   anything at all in the Madoff matter prior to
24   this case, excuse me, getting involved with
25   my Declaration.

Page 13

1              R. Rock - Confidential

2    court and that lays out procedures.

3              You know, I wouldn't want to try to

4    give my own interpretation, when we know in

5    fact there's an order out there, so I'm not

6    sure what you mean.

7         Q.   Okay.

8              Why don't we turn back to your

9    Declaration and ask you to turn to paragraph

10   3 of that Declaration.  And I ask you to

11   refer to the last sentence of paragraph 3.

12             It reads:

13             "My work, along with the work of my

14   staff, has been limited to the analysis of

15   the time-based damages issue as described

16   herein."

17             And can you describe for me what

18   your assignment was with respect to this

19   matter?

20        A.   Yes, I would say in general the

21   assignment was to perform calculations,

22   constant dollar calculations making certain

23   assumptions and then provide various analyses

24   to counsel, which they had requested.

25             And so we were provided data given

Page 14

```
 1          R. Rock - Confidential
 2   various assumptions.  We checked some
 3   figures.  We did calculations.  We reviewed
 4   it.  We discussed with counsel some of our
 5   findings.  Did additional calculations.
 6   Additional summaries and so on.
 7          So we went through, as you learned
 8   from yesterday when we met, two or three
 9   iterations for example of calculations.  But
10   in general it was to prepare an analysis
11   demonstrating, given certain assumptions what
12   the impacts of constant dollar calculation
13   would be as relates -- impacts would be on
14   the claims as well as certain customer
15   accounts.
16          Would some go up, would some go
17   down.  "Yes" is the obvious answer.
18          So my understanding in general was
19   to perform a calculation.  Not to arrive at
20   what the final legal opinions or anything
21   like that would be.
22      Q.   When you say assumptions, I'd like
23   you to be -- to explain to me what your
24   understanding of the assumptions were you
25   asked to make with respect to the analysis?
```

Page 15

1        R. Rock - Confidential
2        A.    And I'll try to list them for you.
3    If I miss some, if I remember during the day
4    or if it pops into my head, I might
5    supplement the list.
6             But one assumption in our
7    calculations was make the assumption that the
8    recovery by the estate would be $10 billion.
9             So when we did our cash payment
10   calculations, we needed to have a feel for
11   what amount would be allowed to be
12   distributed and divvy that up amongst the
13   accounts, so that's an assumption we made or
14   were told to make.
15            Second assumption is as it relates
16   to SIPC, is if there's a $500,000 per account
17   cap.
18            Third assumption -- these aren't in
19   any order, but a third one is we would
20   utilize the BLS consumer price index.  I've
21   got it listed here, the consumer price index,
22   all urban customers, U.S. city average, it's
23   a lengthy title, but for purposes of arriving
24   at the time, value of money or constant
25   dollar calculation, use that statistic.

Page 16

1          R. Rock - Confidential

2          A fourth would be that we were

3    provided with a detailed file of, that

4    contained certain information, such as

5    account numbers, all activity within those

6    accounts.

7          By "activity," I'm talking ins and

8    outs, cash-wise and/or transfers between

9    accounts.

10          We were provided with information

11    as it relates to in that file, inter-account

12    transfers, and as we discussed yesterday,

13    there were -- the information provided on

14    that analysis provided on that to essentially

15    arrive at a cap for those transfers of

16    available cash in the account.

17          Information also provided about

18    whether a claim had been filed was included

19    in that file, so now I'm in a subset of the

20    information we were provided where a claim

21    had been filed yes or no for that account,

22    whether the account had activity or not,

23    whether there had been any transactions on

24    the account at all, whether the account was a

25    feeder fund or not.

Page 19

1              R. Rock - Confidential

2    would like you to review the document, and

3    for the record today, tell us what that

4    document is.

5         A.    Okay.  Give me a second here.

6              Without checking every page -- can

7    I ask a question, do you mind?

8         Q.   Sure.

9         A.   Is this a copy of what we provided

10   to you yesterday?

11        Q.   Correct.

12        A.   Great.  Without checking every

13   page, I'll accept that.

14              This document, I believe, and it's

15   Rock 2, but the Bates number is Rock 038 on

16   the cover page of this file, I believe that

17   this file represents the original file that

18   we were provided by counsel that included

19   many of the things that I mentioned on the

20   record already.

21        Q.   About the assumptions that you were

22   being --

23        A.   About the information that was

24   provided.  I think it falls under the

25   assumption category because we were given

Page 20

1          R. Rock - Confidential

2      this and essentially assume these are the

3      transactions, assume this is the activity,

4      and assume that this labeling is active or

5      inactive or claim filed or not filed.

6              Did you want me to walk through it

7      in more detail, or no?

8          Q.   I think if I coach you through

9      that, I think it might be easier to walk

10     through --

11         A.   That's fine.  I didn't know if you

12     wanted me to go further.

13         Q.   Let's just turn to the second page

14     of this document, which is labeled, "Table of

15     Contents."

16             And then behind the Table of

17     Contents is a listing of various files.  And

18     can you just walk through what these various

19     files are for the record?

20         A.   Yes.  This Table of Contents page,

21     this has a description of, it's labeled here

22     as reports, but essentially on the native

23     file there's a tab for each of these and then

24     each includes that file or report.

25             So the first tab is the

Page 24

1             R. Rock - Confidential

2        Q.    Okay.

3        A.    I can't remember -- it looks like

4    on this one we did not recopy the headings.

5        Q.    Do you have any reason to believe

6    that the information and data that you were

7    provided was not reliable?

8        A.    I have no basis one way or the

9    other.  I haven't done any work so I accepted

10   it as is.

11       Q.    Okay.

12       A.    Nothing has been told to me.  I

13   have not become aware of anything that says

14   it's not reliable, but I have not done any

15   testing.

16       Q.    So basically in preparing your

17   report, you just assumed the reliability of

18   the estate?

19       A.    I accepted it for purposes of the

20   calculations.  So that's all I did.

21       Q.    So let's go back to the index

22   page --

23       A.    Contents?

24       Q.    Contents page.

25       A.    Yes.

Page 29

1           R. Rock - Confidential

2    not be that voluminous.  It's maybe going to

3    be however many pages it would take to put

4    the months for those 28 years on.  This is

5    not that voluminous a file.

6         Q.   Let's go back to the Table of

7    Contents page on Rock 2.  There is an account

8    population file.

9              Can you describe what that account

10   population file is?

11        A.   This file is provided and it

12   contains some of the information I described

13   earlier.  It's got account number, whether or

14   not a particular account has been included in

15   the analysis.  Whether there's a claim filed,

16   if something has been excluded from the

17   analysis, there's a reason given.

18              Far two columns, whether it's a

19   feeder fund, yes or no.  Is it an active

20   account, yes or no.

21              Similar to the last two tabs that

22   we looked at included in this Rock Exhibit 2

23   is the top page from that file, and the

24   bottom page from the file.  This would be a

25   fairly voluminous one because this includes

Page 30

1          R. Rock - Confidential

2    8,097 different accounts.

3          Q.    Okay.

4               And what did you understand the

5    8,097 accounts to be?

6          A.    My understanding was it was the set

7    -- first of all, it was given to us as, I

8    assume this is the population of all possible

9    accounts that can be included for purposes of

10   this analysis.

11         Q.    Okay.

12              And just so that I understand it,

13   on the labels that are across the top of the

14   first page, you did not do any independent

15   determination as to whether these should be

16   included or not included, this was given to

17   you?

18         A.    I want to make sure I understand

19   the question.

20         Q.    This file represents in Rock 2 the

21   file as provided to you by counsel?

22         A.    Yes, it does.

23         Q.    Okay.

24              So when it says, "to be included,

25   reason for exclusion," all that information

Page 38

1           R. Rock - Confidential

2   method that we utilized in our calculations.

3           We weren't told to utilize that.

4   We could have used either of these two in our

5   calculations.  We just felt that was the

6   easiest.  It's a very common method.

7      Q.   But you were not asked to provide

8   an opinion or otherwise about what

9   methodology to use.  You simply used this

10  methodology that you were provided; is that

11  correct?

12     A.   We used a very commonly used

13  methodology.  We weren't asked to determine

14  is there one preferred over another because I

15  don't think there is.  The calculation

16  actually includes two different -- each of

17  these methods is included in this.

18     Q.   Essentially the -- arithmetically

19  they reach the same result?

20     A.   Absolutely.  Not just essentially,

21  but absolutely, yeah.

22     Q.   Let's just finish and exhaust what

23  we know about this file -- what you know

24  about this file.

25           The transfer model example, could

Page 45

1           R. Rock - Confidential

2       A.    That's fine.

3       Q.    Look at the second sentence.   You

4  say in the first sentence:

5           "I have performed certain

6  calculations related to time-based damages."

7           In the second sentence, you say:

8           "These calculations included

9  adjusting for inflation the transactions for

10  all active BLMIS accounts for which a

11  customer claim was filed (the 'inflationary

12  adjustment')."

13           Explain to me what you mean by

14  adjusting for inflation the transactions for

15  all active accounts.

16       A.    Simply that.   There was a separate

17  CPI factor for each day throughout the

18  period, and then there was a calculation

19  performed of each of the transactions in the

20  file that we ultimately utilized, so there's

21  some -- once again, this says where a claim

22  was filed and an active account.

23           So we did not do calculations on

24  the inactive accounts or where there was no

25  claim filed.

Page 47

1              R. Rock - Confidential

2              So that he would bring that

3    transaction amount up to the December 2008

4    date.  It's now been impacted for constant

5    dollars.  I'm sorry, I'm not sure exactly if

6    that answers your question.

7         Q.   But functionally, when you say you

8    did the calculation, in other words, in

9    today's computer world, is it my

10   understanding what you did, you applied a

11   formula for a spreadsheet and then pushed the

12   button and then it implemented the

13   calculation; is that correct?

14        A.   Yeah, and since it's a pretty large

15   file, it didn't -- we're pretty anxious in

16   this current day and age.  It didn't hit

17   immediately like you all want because it's a

18   big file.

19             But if you go back to Rock Exhibit

20   2, one of the files in here was the CPI file

21   by day.

22        Q.   Correct.

23        A.   So that was one of the pieces that

24   was included in the formula calculation, so

25   that's why this file was prepared that way.

Page 49

1              R. Rock - Confidential

2    calculation on something that's irrelevant,

3    I'm trying to understand what the purpose of

4    the question is.

5         Q.    Assume that we may disagree with

6    the relevance.  What I'm asking you about the

7    question is, what additional work would you

8    need to do to do a computation for all

9    accounts, even those accounts that did not

10   file claims, for example?

11        A.    For example, all you would do then

12   in your hypothetical, if you said Mr. Rock,

13   you've done calculations on 400 accounts, if

14   I asked you to perform calculations on the

15   other 3,600 accounts, what would I need to

16   do, I would need to include all those

17   transactions and do the same calculation.

18        Q.    And how much additional work would

19   that entail?

20        A.    "How much," in a sense of what?

21        Q.    How long would that take you?

22        A.    I don't think that would be that

23   much from the length of time standpoint.  I

24   think it would be a matter of essentially

25   including another 220,000 transactions in the

Page 50

1              R. Rock - Confidential

2    calculation file, but a computer can do the

3    calculations really quickly.

4         Q.   How much additional work would that

5    entail for you to set up that formula for

6    that purpose?

7         A.   Not that much.

8         Q.   Okay.  I want to return to Rock 1

9    which is your -- paragraph 4?

10        A.   Yeah.

11        Q.   And in that third sentence, which

12   says, "Specifically," are you with me?

13        A.   Yes, I'm there.

14        Q.   "Specifically to account for

15   inflation, I made these calculations using

16   the monthly report" -- and I'm going to skip

17   over to -- and I'm just going to call it the

18   CPI index for this purpose -- "and used

19   adjustments to account balances as of April

20   30, 2012."

21             Okay.

22             What is this adjustments to the

23   account balances as of April 30, 2012?  What

24   do you mean by that?

25        A.   The only thing I'm aware of is the

Page 117

1            R. Rock - Confidential

2    you would need to reach a resolution and then

3    impact this analysis for that.

4            So those would be two levels of

5    activity that would need to be done.

6        Q.   So we have a population, as I

7    understand it, in this group as 4,394

8    accounts.  Is that what's the total --

9        A.   That's what we've done our

10   calculation on, yes.

11       Q.   You're saying there's the

12   settlement accounts, plus the 100 in which

13   there's got to be more examination of those

14   numbers, that's your understanding from

15   counsel?

16       A.   It's my understanding based upon

17   our review, calculations we did, questions we

18   provided to both counsel and AlixPartners,

19   people that had worked on this information,

20   you know, whoever put together these

21   adjustment amounts, that, in fact, when we

22   started looking at things, and I don't know

23   what they did, but they -- my assumption is

24   after we raised our questions and issues,

25   they said:  Okay, wipe out those adjustment

Page 118

1              R. Rock - Confidential

2    columns.  We need to do more work on each and

3    every one of those to make sure we're

4    comfortable with them.

5         Q.    So let's assume that's 517, which

6    is all the records plus the 100, that's 617?

7         A.    Okay.

8         Q.    You still have to run computations

9    of 4,394 is the number of accounts.  Let's

10   take 600 off of that.  So that's 3,700 and

11   change, right?

12        A.    Whatever it comes out to be, yeah.

13        Q.    For those accounts that aren't

14   affected by settlements or affected by these

15   100 unresolved issues, what else needs to be

16   done with respect to those accounts, in your

17   judgment, that would not -- what additional

18   work would need to be done in order to not be

19   able to rely on the number in column E?

20        A.    I don't know.  I don't know if

21   there's additional work that would need to be

22   done on those accounts, excluding all those

23   accounts that had disputes and were settled

24   or still have disputes.

25              Excluding all those, if there's

Page 119

1          R. Rock - Confidential

2    additional work to be done on the remainder,

3    I'm not sure.  I'm not aware of specific work

4    right now, but there might be.

5          Q.    You just don't know?

6          A.    I don't know, correct.  To get to

7    that column, which is entirely separate from

8    the payment calculation, yeah, okay.

9          Q.    I would like to take you back to

10   the 38, which is Rock 2.  You've testified

11   that, and if you look at the tabs that are

12   the adjustment tabs in this column, and the

13   explanation of adjustments, and then the

14   balance of adjustment columns that you were

15   given, and you recall that you described that

16   those were numbers that were given to you?

17         A.    Yes.

18         Q.    Okay.

19              And then you described -- you told

20   us earlier that you spent a fair amount of

21   time going back and forth with counsel about

22   how to make adjustments to your computation

23   to reflect what the information that you'd be

24   given in these adjustment balances, correct?

25         A.    No.

Page 120

1          R. Rock - Confidential

2      Q.    You didn't spend any time doing

3    that?

4      A.    I didn't say a fair amount of time.

5    We did calculations and then had questions

6    and then discussions, but some of them dealt

7    with the adjustment columns.  Others dealt

8    with other things unrelated to the adjustment

9    columns, so there wasn't an analysis by us

10   specifically of the adjustment columns.

11         You know what I'm saying?  So we

12   had questions that were a variety of things.

13   Seemed like a number of them dealt with the

14   adjustment columns, but it wasn't a specific

15   analysis for just that, and I wouldn't say it

16   was a ton of time as compared with other

17   things.

18     Q.    Well, can you give me an estimate

19   of how much time was involved in the

20   discussion of these adjustment columns?

21     A.    No.  Hours, but I don't know how

22   much.

23     Q.    You said to me earlier that your

24   estimate of the amount of time that you

25   billed with respect to this matter in

Page 121

1        R. Rock - Confidential

2   preparation of your declaration was roughly

3   in the 120,000 range?

4        A.    That's not what I said.  What I

5   said is I gave you a high number and said it

6   was less than.

7        Q.    Less than that?

8        A.    Less than that.  So whether it's 90

9   or 102, I don't know.  I'm not giving an

10  estimate of 120.

11       Q.    So it's in that order of magnitude?

12       A.    It's under that order of magnitude.

13       Q.    Under that order of magnitude.

14  Okay, fair enough.

15            My question is this:  Did that

16  number that you gave us include any time

17  spent in connection with the preparation for

18  today?

19       A.    It's all the time that's been

20  incurred up through a couple of days ago when

21  I took a look at it.

22            In other words, there was some time

23  in like yesterday, for example, it would be

24  yesterday and us kind of organizing the files

25  and copying them.

Page 150

1          R. Rock - Confidential
2     rules.  You don't like them, you can go
3     to court.  You either wrap it up or
4     we're done.
5          What do you got?
6          MR. SCHWED:  I'm asking him what,
7     from the mechanical point of view, would
8     be necessary on that account in order to
9     bring it up to inflation adjustment,
10    that hypothetical account.  I'm not
11    asking about the --
12         MR. SHEEHAN:  Which hypothetical
13    account?
14         MR. SCHWED:  The $2 million --
15         MR. SHEEHAN:  He already answered
16    that.
17         MR. SCHWED:  Maybe you could
18    refresh my recollection.  What was his
19    answer?
20         MR. SHEEHAN:  It wouldn't take very
21    much.  2000 to 2008, $1 million.  No
22    other transactions.  Wouldn't take much.
23    I think an orangutan could answer that
24    question.
25         MR. SCHWED:  That's a good answer.

Page 160

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                                :  ss.

5    COUNTY OF NEW YORK      )

6

7              I, Linda Salzman, a Notary Public

8        within and for the State of New York,

9        do hereby certify:

10             That ROBERT J. ROCK, the witness

11       whose deposition is hereinbefore set

12       forth, was duly sworn by me and that

13       such deposition is a true record of the

14       testimony given by the witness.

15             I further certify that I am not

16       related to any of the parties to this

17       action by blood or marriage, and that I

18       am in no way interested in the outcome

19       of this matter.

20             IN WITNESS WHEREOF, I have

21       hereunto set my hand this 1st day of

22       March, 2013.

23

24             _____

25                    Linda Salzman

# EXHIBIT C

Page 1

1
2      UNITED STATES BANKUPTCY COURT
       SOUTHERN DISTRICT OF NEW YORK
3
       - - - - - - - - - - - - - - - - - - -x
4
       SECURITIES INVESTOR PROTECTION
5      CORPORATION,
6                        Plaintiff-Applicant,
7             vs.                    Adv. Pro. No.
                                     08-01789(BRL)
8      BERNARD L. MADOFF INVESTMENT
       SECURITIES LLC,
9
                         Defendant.
10
       - - - - - - - - - - - - - - - - - - -x
11
12     In re:
13     BERNARD L. MADOFF,
14                       Debtor.
15     - - - - - - - - - - - - - - - - - - -x
16
17            -- C O N F I D E N T I A L --
18        30(b)(6) DEPOSITION OF VINEET SEHGAL
                  New York, New York
19                 April 12, 2013
20
21     Reported by:
22     Helen Mitchell
23
24
25

Page 49

SEHGAL - CONFIDENTIAL

1

2     A     Well, all those accounts -- the

3    517 accounts entered into settlement agreements

4    with the trustee.  We have calculated the math

5    part, the CPI adjustment, for all 8,000

6    accounts.  There's still some process left

7    within the math itself.  We have got the initial

8    output out of a model, but it hasn't been

9    thoroughly validated, it hasn't been thoroughly

10   reconciled, and it hasn't gotten through a

11   thorough QC process, which it will need to if we

12   ever move away from cash in and cash out and

13   toward the CPI adjustment.

14          But those 517 accounts in

15   particular, they entered into settlement

16   agreements with the trustee.  Over 400 of those

17   agreements have the net equity provision in

18   them.

19     Q    What do you mean, the net equity

20   provision?

21     A    The trustee stated within those

22   settlement agreements, say if by chance the

23   court orders the trustee to move away from the

24   cash in/cash out and finds that methodology

25   incorrect, and instructs him to use methodology

Page 50

1              SEHGAL - CONFIDENTIAL

2    different than cash in and cash out -- for

3    example, CPI here -- the trustee will

4    retroactively visit those settlements and

5    discuss next steps with the settling party.

6         Q     It is your understanding that

7    there is a common theme to those settlement

8    agreements, or is each one sui generis?

9         A     The settlement agreements are very

10   unique.  There's not really a generic settlement

11   model that was utilized by the trustee.

12        Q     And are you aware of an analysis

13   that has been done as to -- are you aware of

14   whether --

15              MR. KIRBY:  Strike that, let me

16         start over again.

17        Q     Are you aware whether the trustee

18   has conducted a preliminary analysis as to what

19   adjustments would be made on those accounts?

20        A     No.  There was a good faith effort

21   on the part of my team to say, you know, we're

22   comparing cash in and cash out against CPI, so

23   what we really wanted to provide counsel here,

24   when this process started, was to say, look, if

25   we don't move away from -- here's cash in and

Page 55

SEHGAL - CONFIDENTIAL

1

2    two categories that I just mentioned.

3             All those state within the

4    determination letter to say if there's any

5    change in the trustee's calculation of cash in

6    and cash out, and the court rules to apply a

7    different methodology, the trustee will

8    retroactively revisit that determination and

9    redetermine that account.

10            Q    But as we've seen from -- at least

11   as Mr. Rock explained to us, that inflation

12   adjustment has already -- the math has already

13   been done on those accounts; correct?

14            A    The preliminary math has been

15   complete.  There are some tasks associated with

16   finalization of the account balances which have

17   not been completed.

18            Q    Can you tell me what those tasks

19   are?

20            A    Sure.  Like I said, there is a

21   comprehensive QC that needs to occur with all

22   these transactions to make sure that everything

23   is working as it's supposed to be.  You know,

24   we're going to test sample accounts, we're going

25   to test accounts that have huge swings, we're

Page 56

1               SEHGAL - CONFIDENTIAL

2    going to test accounts that have small swings,

3    and look for data anomalies.

4               When we first created the cash in

5    and cash out books and records -- FTI Consulting

6    was involved in this case as well, ran their own

7    independent process, and we reconciled every

8    single account and every single transaction with

9    FTI Consulting on a cash in and cash out basis

10   to make sure we were both coming to the same

11   answer.

12              Right now, for all 8,000-plus

13   accounts, and all 500,000 cash transactions that

14   make up the account histories for all those

15   8,000 accounts, we reconciled to the penny with

16   FTI Consulting.  To my knowledge, they don't

17   have a model created on CPI, and I would think

18   that they would need to do the same exact

19   exercise and reconcile each of those accounts

20   and each of those transactions with those -- if

21   we do move away from cash in and cash out.

22        Q      And tell me what the components of

23   that analysis would be.

24        A      Can you rephrase that?

25        Q      Well, you've told us that you

Page 61

1              SEHGAL - CONFIDENTIAL

2    formula for doing that, what would your estimate

3    be going forward of what it would cost to do a

4    quality control analysis of the results of that?

5    Would you have an estimate of what it would cost

6    for you to do that?

7            A      Well, let just use CPI as an

8    example, if the court orders us to, say, move

9    away from cash in and cash out and utilize a CPI

10   adjustment to all these accounts.  Like we said,

11   the initial math is there, all the transactions

12   have been adjusted.  We would have to validate

13   all the transactions, and get comfortable that

14   these result are accurate, and then we would

15   have, you know -- likely have FTI Consulting

16   write their own model, run all their

17   transactions and reconcile that with this.

18              I think those two processes, the

19   reconciliation and validation, would probably be

20   done in about a month and a half.

21          Q      A month and a half?

22          A      That's right.

23          Q      And do you have an estimate of the

24   man hours that would be involved in that?

25          A      No, I don't.  But, again, that's

Page 62

SEHGAL - CONFIDENTIAL

1
2    only associated with the math part.  What the
3    trustee's asserting here is that account by
4    account and transaction by transaction, and the
5    cost and the burden he's referring to is the
6    bankruptcy process that's associated with that
7    math change to these accounts, that's what's
8    going to take the 12 to the 18 months.
9              Q     Can you explain that further for
10   me, please?
11             A     Sure.
12                   Like I said before, the trustee's
13   received direct claims for about 4500 accounts,
14   and if you exclude the 500 that we talked about
15   that are in settlement and the 120 that are
16   currently in litigation, he's determined 3800
17   accounts.
18             Q     Correct.
19             A     All those accounts in the
20   determination letter, it clearly states that if
21   the trustee moves away from cash in and cash out
22   due to a court order, he will redetermine those
23   accounts.
24             Q     Correct.
25             A     The determination process for 3800

Page 63

                SEHGAL - CONFIDENTIAL
1

2    accounts is going to be very extensive.  We

3    followed the process set out by SIPC for us, the

4    process that they follow in all their cases, to

5    say these accounts actually went through five

6    different levels of review before they got

7    determined.  They went through an Alix Partners

8    review, they went through an FTI Consulting

9    review, they went through a SIPC personnel

10   review, they went to a trustee's counsel review,

11   and finally a review by the counsel before an

12   account gets determined.

13            So if we're changing the net

14   equity of an account, if we're going away from

15   cash in and cash out and applying a CPI, and

16   redetermining all those accounts, all 3800

17   accounts are going to need to go through a

18   determination process similar to the one that

19   they went through with the first time.

20            Q    So you're suggesting that it would

21   be more than a QC analysis, a quality control?

22            A    The quality control analysis is

23   only associated with the math component.  The

24   redetermination of accounts is a separate

25   component.  That's the bankruptcy process.

Page 65

SEHGAL - CONFIDENTIAL

1
2   date for 2200 accounts.  The balances in all
3   those accounts are going to change.  We're going
4   to need to catch those accounts up or adjust
5   their distribution in the next distribution that
6   needs to occur.
7            So a combination of all those,
8   which are not concurrent by any means.  You have
9   to finish redetermination of the accounts, you
10  have to resolve the objections, you have to
11  figure out what's going to happen with the
12  settlements, and finally get the distributions,
13  is what the trustee is saying is going to take
14  12 to 18 months.  It's not the math component.
15       Q    So it's -- to put it in your
16  words, it's the bankruptcy process that you've
17  described?
18       A    That's right.
19       Q    Moving on to the same page, where
20  the sentence at the bottom of that paragraph,
21  under "Delay and Cost," it says, "Furthermore,
22  the trustee expects a concomitant increase in
23  administrative costs in the tens of millions of
24  dollars."
25            Can you tell me what the component

1              SEHGAL - CONFIDENTIAL

2     of that tens of millions of dollars is?

3              A    It's going to be associated with

4     the bankruptcy process that I just described.

5     If we're going to need to take care of all the

6     redeterminations, figure out -- revisit every

7     single settlement and figure out what needs to

8     happen with all those, deal with the new

9     objections that are coming in, work on the math

10    part, the validation, reconcile this information

11    with FTI Consulting, and finally adjust

12    distributions in all those accounts, and in that

13    process, which I think will last 12 twelve to 18

14    months, will certainly cost tens of millions of

15    dollars.

16            Q     Let's talk about that.

17                  When you say "tens of millions of

18    dollars," you mean $10 million or $90 million?

19            A     I don't exactly know, but you can

20    imagine this is, you know, a pretty large case,

21    and if you introduce this kind of a process to

22    redetermine all these accounts, and that has to

23    go through, you know, FTI review, Alix Partners

24    review, SIPC review, trustee's counsel review,

25    the trustee's review, readjusting all those

Page 83

1                    SEHGAL - CONFIDENTIAL

2       looked at before, I had asked you to refer to

3       item 16 -- column 16.

4                    Do you recall that?

5               A       Yes.

6               Q       That is 1FRO45, and it's my

7       understanding that that represents the Trotanoy

8       account.

9               A       Yes.

10              Q       And my question is, the inflation

11      adjustment that has already been made by

12      Mr. Rock for this account -- the math has

13      already been done for the adjustment; is that

14      your understanding?

15              A       It appears he's calculated what

16      the CPI value is going to be on this account,

17      yes.

18              Q       So let's talk about what are the

19      components that would need to be done to reach a

20      final determination as to what the adjusted

21      claim amount would be, assuming the court were

22      to accept this methodology for -- order the

23      trustee to do an inflation adjustment using the

24      methodology that Mr. Rock applied.

25              A       So going back to what I stated

Page 104

SEHGAL - CONFIDENTIAL

1

2         A       I really don't have an opinion on

3    that at this point.  All I know, this is the

4    process that SIPC's used in all of its cases.

5    This is the process that we used for the first

6    determination of all these accounts, and from

7    what I'm told, this is the process that we're

8    probably going to take when the second

9    redetermination happens.  So I haven't really

10   put into thought of what's reasonable and what's

11   not reasonable.

12        Q       You just have no view as to

13   whether it's reasonable?

14        A       No.

15             MR. KIRBY:  I have no further

16             questions.

17             MR. SHEEHAN:  Okay.  My objection

18             was that he's not here as an expert, but

19             I didn't want to say that and have him

20             start saying, "Well, I'll not an

21             expert."  I let him answer it and then I

22             put my objection on the record.

23             (Time noted:  1:29 p.m.)

24

25

Page 106

1

2                    C E R T I F I C A T E

3

4          I, HELEN MITCHELL, a Shorthand

5     Reporter and Notary Public, do hereby

6     certify:

7          I reported the proceedings in the

8     within-entitled matter, and that the

9     within transcript is a true record of

10    such proceedings.

11         I further certify that I am not

12    related, by blood or marriage, to any of

13    the parties in this matter and that I am

14    in no way interested in the outcome of

15    this matter.

16         IN WITNESS WHEREOF, I have

17    hereunto set my hand this 15th day

18    of April, 2013.

19

20                    _____

21                        HELEN MITCHELL

22

23

24

25

# EXHIBIT D

Baker Hostetler

Baker&Hostetler LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

David J. Sheehan
direct dial: 212.589.4616
dsheehan@bakerlaw.com

September 11, 2009

**VIA ELECTRONIC MAIL**

Honorable Burton R. Lifland
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

Re:   *Securities Investor Protection Corporation v. Bernard L. Madoff Investment
      Securities LLC*, 08-1789 (BRL) (Substantively Consolidated)

Dear Judge Lifland:

        Baker Hostetler serves as counsel to Irving H. Picard (the "Trustee"), the
Trustee for the substantively consolidated liquidation proceedings of Bernard L. Madoff
Investment Securities LLC ("BLMIS") and Bernard L. Madoff.

        As stated during the proceedings before your Honor on September 9, please
find enclosed a Notice of Settlement of Proposed Order regarding the "net equity"
dispute (the "Net Equity Dispute").   We have conferred with counsel and have
incorporated, to the extent possible, their suggested revisions to the proposed order.

        The Trustee and counsel for interested parties agree upon the framing of at
least two points of the Net Equity Dispute: (1) whether a customer's "net equity" under
SIPA is equal to "cash in/cash out"; or (2) whether a customer's "net equity" under
SIPA is equal to the value of the securities positions and credit balance reflected in the
customer's last statement.

        At the hearing on September 9, Milberg LLP proposed an additional issue to be
included within the Net Equity Dispute, namely – if the Trustee's cash in/cash out
methodology for purposes of "net equity" is correct, whether customers are entitled to
interest on their cash deposited with BLMIS (the "Interest Issue").[1]   The Court initially
indicated its reluctance to expand the Net Equity Dispute beyond the basic issues as

---

[1] Although Milberg LLP raised this particular issue in the objection filed on behalf of Martin
Rappaport on June 18, 2009, it was not included in the response filed by Milberg on September
3, 2009 in response to the Trustee's Motion for a scheduling order on net equity, nor was it
discussed between counsel prior to the hearing on September 9.

Hon. Burton R. Lifland
September 11, 2009
Page 2

articulated in the prior paragraph. (*See* Transcript, 31:20-24). Counsel for the Trustee did not have an objection at that time.

Upon further reflection, the Trustee concurs with the Court's initial view that the Interest Issue is indeed an ancillary issue that is best dealt with as the subject of a separate proceeding. This issue is only relevant to the extent that the Court rules that the Trustee's methodology concerning net equity is correct. If this Court or any higher court were to rule that a customer's net equity is equal to the amounts shown on their customer statement, then the Interest Issue is not implicated.

In light of the above, it is the Trustee's view that the Interest Issue has no bearing on the proper interpretation of the statutory definition of "net equity" under the Securities Investor Protection Act. Instead, it appears to be an argument based on common law principles and equity as to what distribution a customer should be entitled to in a Ponzi scheme, such as is present here.

As it is an issue separate and apart from the statutory interpretation of "net equity," and one that only arises upon a certain determination of the proper interpretation of "net equity," it is more appropriately the subject of an ancillary proceeding. Consideration of the Interest Issue within the confines of the Net Equity Dispute only serves to complicate what should be a pristine, discrete issue of great importance to this liquidation proceeding. In keeping with your Honor's mandate to "keep it simple," the Trustee submits that the resolution of the Interest Issue is best decided in a separate proceeding.

That is not to suggest that the Interest Issue is not also important. The Trustee sees no reason to delay consideration of the Interest Issue and will promptly move for a scheduling order on the that issue, along with other ancillary issues to be presented to the Court, in accordance with the record before the Court on September 9, 2009, and this Court's Memorandum Decision and Order Granting Trustee's Motion to Dismiss Plaintiff's Complaint dated September 10, 2009 ("Ancillary matter raised by various parties will be the subject of separate scheduling orders, similar to the protocols established in the Final Scheduling Order").[2]

---

[2] To the extent that the Memorandum Decision and Order entered on September 10, 2009 mandates consideration of the Interest Issue in the Net Equity Dispute, the Trustee seeks relief from that portion of the Order for the reasons set forth herein and requests that the Court permit that issue to be addressed within a separate proceeding.

Hon. Burton R. Lifland
September 11, 2009
Page 3

   Counsel from Milberg LLP would like the Interest Issue included in the Net Equity Dispute and we understand they may be submitting an objection to the Court regarding the same.  Should the Court wish to hear further from the Trustee or other parties regarding these issues, we are of course available at anytime that is convenient for the Court and counsel copied on this letter.

Respectfully,

David J. Sheehan

DJS/srb

cc:  Helen Davis Chaitman
   Matthew Gluck
   Jonathan Landers
   Barry Lax
   Brian Neville
   Carol Neville