UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
................................................................................
SECURITIES INVESTOR PROTECTION
CORPORATION,
Plaintiff,

v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
Defendant.
:
:
Adv. Pro. No. 08-1789 (BRL)
SIPA LIQUIDATION
(substantively consolidated)


................................................................................
In re:
BERNARD L. MADOFF,
Debtor.
................................................................................

_____

EXPERT REPORT OF TIMOTHY H. HART, CPA, CFE
_____

## I. Introduction

1) The law firms of K&L Gates LLP, Kramer Levin Naftalis & Frankel LLP, Loeb & Loeb LLP, Milberg LLP, SNR Denton and Seeger Weiss LLP on behalf of their clients (collectively referred to as the "Customers"), various customers of Bernard L. Madoff Investment Securities ("Madoff Securities") have engaged me as an expert. I have been asked to provide an expert declaration and potentially expert testimony relating to an inflation adjusted claim method or inflation adjustment in this litigation.

## II. Qualifications for Rendering Opinions

2) I am a forensic accountant experienced in insolvency, legal disputes and investigations. I have significant experience with insolvencies in the insurance industry and providing expert opinions on the subjects of damages and accounting. I have been recognized for the past three years by *Who's Who Legal* as one of the top damages experts in international arbitration. I am a Certified Public Accountant and Certified Fraud Examiner, and I hold a Bachelor of Business Administration degree from the University of Notre Dame.

3) I started my career in 1984 with Arthur Andersen as an auditor. I became a partner at Arthur Andersen in 1996 and I practiced there until 2002. From 2002 to 2008, I was a Managing Director at Navigant Consulting where I was the co-leader of its Global Disputes and Investigation practice, which was comprised of over 500 professionals. In 2008, I joined Huron Consulting Group ("Huron") where I was a Vice President and Managing Director. I was the leader of the Disputes segment of Huron's Accounting & Financial Consulting practice. When Huron exited the disputes and investigations business, I founded a new firm Credibility Consulting LLC ("Credibility") doing business as Credibility International where I am president of the company. The scope of services requested by the Customers and summarized in this report is within my experience and qualifications.

4) Certain of my experiences are of particular relevance to this assignment. These include:

- In the late 1980s, I spent approximately two years involved in an investigation of Drexel Burnham & Lambert's High Yield Bond operation. Among other things, this

- work involved customer level account analysis and tracing of security transactions during the period preceding the bankruptcy of the investment bank.

- From the early 1990s and into this decade, as an independent financial consultant to the National Organization of Life and Health Insurance Guaranty Associations ("NOLHGA"), I provided a wide range of financial advice including the calculation and administration of contract holder claims, guaranty association coverage and asset distributions in state court supervised rehabilitations and liquidations involving more than twenty five troubled insurers. Those insurers typically had customer accounts numbering between the tens of thousands to in excess of one hundred thousand, usually involving a wide variety of contract types. The aggregate value of the customer accounts for each insurer typically ranged from hundreds of millions of dollars to in excess of $13 billion. This insurance insolvency work often entailed recalculating customer accounts on a transaction-by-transaction basis utilizing a variety of fees and earning rates for many years before the insolvency up until the claim measurement date. In certain cases, my work involved the calculation of what are called "shadow accounts," where I calculated on a contract-by-contract basis whether contract holders had actually received certain rates of return from their old contracts over a multi-year period. I have advised clients in various insolvency cases about the costs and benefits of performing account level transactional analysis.

- In a case involving the solvency plan for the central trading bank of Czechoslovakia, after that country split, I prepared a claim that required the recalculation of numerous loans to account for all transactions and the calculation of a variable interest rate based upon the investment portfolio of the bank over multiple years.

- As a damages expert, I have more than 25 years of experience performing valuations and lost profit calculations requiring careful accounting for the time value of money and ascertaining financial values as of particular dates.

5) A copy of my curriculum vitae ("CV") is attached hereto as Appendix A. A listing of all other cases in which I have testified as an expert in trial, arbitration or deposition is included in

my CV as well as a listing of the insurance insolvencies that I have helped to resolve. I have not authored any publications in the previous ten years.

6) Credibility is being paid hourly for our work related to this matter at rates ranging from $250 to $525 per professional hour. This compensation is not contingent on the conclusions reached or ultimate resolution of this matter. In addition to professional fees, Credibility is reimbursed for reasonable and necessary out-of-pocket expenses incurred.

## III.   Documents Relied Upon

7) This report summarizes work that I and staff working under my direction have performed in connection with this matter. While conducting my analysis and forming my opinions, I have considered information obtained from numerous sources, including the documents and information produced in this matter, discussions with others, my prior experience, and information gained from public information sources. The documents I have relied upon are listed on Appendix B.

## IV.   Background

8) Among other things, the current dispute involves whether to apply an inflation adjusted method for the determination of the customer claims. The Trustee refers to his cash in/cash out method as the "net investment method"[1] and also as the "Trustee's Calculations of Net Equity."

9) The Trustee claims that the application of an inflation adjusted method will cause a significant delay (taking as many as twelve months to calculate and reissue determination letters, and possibly years longer to resolve potential objections and legal proceedings) and cost "tens of millions of dollars."[2]

---

[1] MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER AFFIRMING TRUSTEE'S CALCULATIONS OF NET EQUITY AND DENYING TIME-BASED DAMAGES, page 10.
[2] MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER AFFIRMING TRUSTEE'S CALCULATIONS OF NET EQUITY AND DENYING INFLATION ADJUSTED DAMAGES, page 35: "Delay and Cost. Almost four years into this SIPA proceeding, the Trustee has made great progress. See generally Trustee's Seventh Interim Report For The Period Ending March 31, 2012. ECF No. 4793. A readjustment

10) My assignment involves providing my expert opinion and reviewing the financial assertions made by the Trustee relating to an inflation adjusted method including the evidence he has provided to support these assertions. Specifically, I have been asked for my opinion on:

- The financial theory and implications of an inflation adjustment on the claim amounts;

- The impact of an inflation adjustment; and

- The efforts and costs for calculating an inflation adjustment on all accounts.

## V.    Inflation adjusted method and the time value of money

11) The Trustee's Calculation of Net Equity fails to account for the time value of money in any way. The Trustee's Calculation of Net Equity treats every dollar the same whether it was invested in 1985 or 2005. Not accounting for the time value of money is inconsistent with basic principles of economics, standard methods of valuation, and fundamental fairness.

12) It is commonly understood that the customer who invested a dollar in 1985 contributed a more valuable dollar than the customer who invested their dollar in 2005 because inflation eroded the buying power of that dollar over that twenty year period. An adjustment for at least inflation to the dollar invested in 1985 is required to account for the change in real value of the dollar over the twenty years in this example.

13) Introduction to finance courses teach the basic principles of finance and the time value of money is the most basic and fundamental of those principles. According to the <u>Principles of Corporate Finance</u>, "The first basic principle of finance is that *a dollar today is worth more than a dollar tomorrow*, because the dollar today can be invested to start earning interest immediately. Financial managers refer to this as the time value of money."[3] The time value

---

of claims as proposed would require that the Trustee once again perform a transaction-by-transaction, account-by-account, review. It is expected to take as long as twelve months to perform this analysis and reissue determination letters to effectuate a Time Based Damages adjustment. It is further expected that there would be objections to those redetermination letters that could cause years of delay in reaching final resolution and distributions, including appeals and the proliferation of legal issues. Furthermore, the Trustee expects a concomitant increase in administration costs in the tens of millions of dollars."

[3] Principles of Corporate Finance, Brealey, Myers and Allen, Ninth Edition, page 14.

of money is, for example, the foundation of the calculation of present value and future values which are both basic concepts in finance and valuation.

14) The time value of money can be illustrated with a couple of simple examples. First, if it is assumed that $1,000 was invested to earn simple interest at a rate of 3%, that $1,000 would be worth $1,030 at the end of one year. So, having the $1,000 at the start of the first year is $30 more valuable than having $1,000 at the start of year two. Second, focusing on inflation, if the annual inflation rate is 2%, then a person would need $1,020 at the end of a year to have the real purchasing power of $1,000 at the start of the year. Both examples show that ignoring the time value of money results in undervaluing the dollar in the earlier years.

15) In the real world, there are countless examples of how the time value of money is incorporated into financial decision making and transactions. For a consumer, the time value of money is a key consideration in the determination of consumer credit such as a car loan or mortgage, based in part upon the duration of each type of loan. For investors in long term capital projects, such as businesses or governments, the expected cash outflows and inflows are studied carefully using present value and future value analysis to account for the time value of money. Financial firms, like an insurance company, take time value of money into account in determining the payouts for retirement options such as annuities as the lump sum immediate payment is less than the total value of the amount scheduled to be paid to an annuitant electing to take payments over time. Accordingly, the time value of money is very widely utilized and a common concept.

16) The failure to account for the time value of money in the valuation[4] of a claim provides a windfall to the customers who invested in the latest years of the scheme at the expense of the earlier investors. Valuations of all types carefully account for the timing of cash flows as

---

[4] Valuing a Business, Pratt and Niculita, Fifth Edition, page 56: The time value of money is a critical concept in valuation. The difference in timing of receipt or payment of cash must be accounted for based upon the time value of money.

this is the cornerstone of the discounted cash flow method[5] used in valuation. To properly value a claim, the very same concepts should be applied. Otherwise, fundamental concepts of valuation will be ignored and the resulting claims will not have proper comparative financial or economic value and will result in unfair distributions based on those claims.

17) The failure to account for the time value of money in the calculation of a claim also results in claim amounts that are inconsistent with even the most basic financial principles. Accordingly, in my opinion, distributions from the estate made on a basis that fails to account for the time value of money will result in an inappropriate financial result.

## VI. Comparison of Trustee's Net Equity method and an inflation adjusted method for calculation of claims in illustrative accounts

18) I have reviewed the inflation adjusted calculations performed by AlixPartners, including electronic copies of those calculations. These calculations use the Consumer Price Index ("CPI") to adjust the transactions in the accounts for inflation.

19) To compare the two claim methods, I sorted all of the claim amounts by the cash in/cash out amounts and compared the cash in/cash out amounts to the same inflation adjusted figures. Then, for illustrative purposes, I selected all of the accounts that deposited exactly $1 million more than they withdrew. This group of accounts included a total of 21 accounts with only two showing any withdrawal activity. Under the Trustee's cash in/cash out method, each of these accounts has a claim for $1 million. I then sorted these 21 accounts from largest to smallest based on the inflation adjusted calculation performed by AlixPartners. For each account, I summarized the cash transactions by year.

20) As I had expected, these 21 accounts clearly illustrate the basic financial sense of the inflation adjusted calculation. For example, Account A[6] had the oldest deposit dating back

---

[5] Valuing a Business, Pratt and Niculita, Fifth Edition, pages 62 and 1071. Discount Cash Flow Method is a method within the income approach whereby the present value of future expected net cash flows is calculated using a discount rate.

[6] The Customers and Trustee agreed to keep specific account information confidential. These examples are derived from specific account data. The identity of these accounts are being remitted to the Trustee under separate cover.

to 1993 and not surprisingly had the highest inflation adjusted claim value of $1.469 million. On the other hand, Account S had a single deposit of $1 million on December 8, 2008 and had an inflation adjusted claim of exactly $1 million. This illustration using actual accounts makes financial sense as the customer's $1 million deposited in 1993 that had grown with inflation for 15 years was worth far more than the single $1 million customer deposit in December 2008. The rest of these similarly situated accounts follow the same pattern where dollars that were invested earlier have greater claim amounts when adjusted for inflation. Please see Appendix C for this illustrative analysis of these $1 million accounts.

21) Another way to look at the example that compares the 1993 deposit to the 2008 deposit is to look at the real loss that the 1993 investor will suffer in comparison to the 2008 investor. Simply, if the 1993 investor's inflation adjusted claim is $1.469 million and that investor is only granted a claim of $1 million, that 1993 investor is harmed by 32% as $1 million is just 68% of the $1.469 million inflation adjusted amount.

22) The Trustee's decision to not apply an inflation adjustment to otherwise similarly situated accounts has the effect of undervaluing the early customer's claim. The Trustee's Net Equity method is inconsistent with basic principles of economics, standard methods of valuation, and fundamental fairness. The foregoing clearly illustrates the need to adjust the claims for inflation and the inequity that results from the Trustee's decision to not do so.

## VII. An inflation adjustment benefits individual accounts more than feeder funds

23) I am unaware of any financial or other reason to differentiate between different types of claimants in determining whether to adjust for inflation. However, the Rock Declaration includes analysis of the net change in claim amounts in aggregate for the feeder funds under the inflation adjusted calculation and the Trustee's Net Equity method. To understand the impact of a change in claims valuation method, the most important element to look at is the relative change in the claimants' claim amount as compared to total allowed claims, as that percentage will dictate how much of each dollar distributed will go

Page 8 of 12

to each claimant or group of claimants. The following table summarizes the Rock Declaration analysis of the change in feeder fund and total claims:

|  | Net Equity | Time-Based | % Change |
|---|---|---|---|
| Individual | $ 5.1 | $ 5.9 |  |
| Feeder | 12.2 | 14.3 |  |
| Total | $ 17.3 | $ 20.2 |  |
|  |  |  |  |
| Individual | 29.48% | 29.21% | -0.27% |
| Feeder | 70.52% | 70.79% | 0.27% |
| Total | 100.00% | 100.00% |  |

24) The analysis above shows that in aggregate, according to the analysis in the Rock Declaration, 0.27% of the total claim value moved from individual accounts to feeder fund accounts. In my opinion, this movement between individual customer claims and feeder fund claims is immaterial.

25) Additionally, Mr. Rock's analysis shows that the increase in distributions to non-feeder fund claims is significantly larger than the increase in distributions to feeder funds claims. Mr. Rock provided an analysis of the monetary impact that an inflation adjustment would have on a hypothetical $10 billion distribution. Mr. Rock's analysis identifies both claims that would receive an increased distribution from the inflation adjustment and claims that would receive a decreased distribution from the adjustment.

|  | Decrease | Increase | Net |
|---|---|---|---|
| Feeder Funds | $ (393,780,023) | $ 408,622,780 | $ 14,842,757 |
| Non-Feeder Funds | $ (181,256,084) | $ 292,764,764 | $ 111,508,680 |
|  |  |  |  |
| Totals | $ (575,036,107) | $ 701,387,544 | $ 126,351,437 [7] |

26) The result of Mr. Rock's analysis shows that feeder funds would have a net increase in distributions of $14.8 million, while non-feeder fund accounts would have a much larger net increase in distributions of $111.5 million. In other words, according to Mr. Rock's analysis, individual account holders benefit more than feeder funds from an inflation adjustment.

---

[7] BH-ROCK0000001 "Answers" tab (7) Breakout of Winners and Losers; Mr. Rock compiled the amounts in the Decease and Increase columns and I simply netted those two amounts to create the column entitled "Net".

Page 9 of 12

The reason for this increase in net distributions in this scenario is due to an increase in Securities Investors Protection Corp ("SIPC") coverage that would result from the increased claims amounts.

## VIII. The Trustee's estimates of cost and delay are unsupported and overstated as to accounting, financial and administrative issues

27) The Trustee represents in his pleadings that a change from Trustee's Net Equity method to an inflation adjusted method would take as many as twelve months, during which time the Trustee would have to recalculate claims from scratch and reissue determination letters, and that these efforts would cost tens of millions of dollars, including the cost of resulting legal proceedings. These representations are not reasonable or supported by the evidence. Indeed, these representations are contradicted by the testimony of AlixPartners.

28) The difficulty and costs alleged to be associated with the redetermination are clearly not related to financial or accounting activities. A model to calculate inflation adjusted claims has already been constructed. This much was made clear from the Rock Declaration, the Rock and Sehgal depositions, and the documents produced by the Trustee in connection with the Rock deposition. The cost of constructing that model is a sunk cost as it has already been spent. Mr. Sehgal testified that it took him and a team of four about a month to build the model.[8] Neither Mr. Rock nor Mr. Sehgal provided any substantive or specific justification for why accounting for the 400 to 500 accounts which have been settled would be inordinately difficult. In my opinion, applying an inflation adjustment to settlement accounts will require review of the settlement terms, comparison of the allowed customer claim to the underlying transaction data, and application of the inflation adjustment model to the underlying transactions reflected in the allowed claim. Where the allowed claim represents a compromise figure, a reasonable blended inflation rate based on the underlying account transactions may be used.

---

[8] In my opinion, if Mr. Sehgal's time estimate is correct, five man-months is a very long time to spend constructing a model as simple as the model required for inflation adjusted damages.

Page 10 of 12

29) Furthermore, the review process for redetermination of calculations outlined by Mr. Sehgal is not reasonable because it is redundant, repetitive and not necessary to test the mechanical calculation that would be employed to adjust customer accounts for inflation. Specifically, Mr. Sehgal outlined a quality control process under which AlixPartners, FTI Consulting, SIPC, counsel to the Trustee and the Trustee himself would all need to perform an extensive review of the financial models and the underlying data.  Yet, Mr. Sehgal testified that the data underlying the transactions in every single account were already extensively tested when the Trustee's Net Equity method was initially applied.  Given that fact, there is no reason to retest the underlying transaction data in each account.  The previous testing of the customer account data should be relied upon, if done properly, which I presume it was.

30) In my opinion, the process to calculate the claims and review these claims using an inflation adjusted calculation method should be straight forward and should not be time consuming. First, once an exact inflation adjusted model is agreed-upon, the modification of the model built by AlixPartners should not be complicated because the transaction data remains constant.  It will require modest adjustments to the existing mathematical model and proper accounting for the 400 to 500 settlements.  I would not expect that any model would need to be built from scratch given the existing inflation adjusted model that has already been prepared and used by AlixPartners.  Then, the quality review process should focus on testing that the appropriate CPI index has been used and that the formulas in the model consistently apply those CPI factors.  This testing can be accomplished by selecting a sample for testing using a low tolerable error and a high confidence level along with a review of accounts that changed on an unusual percentage basis.  Considering the years of experience that the AlixPartners team has with this claims data, I would expect the quality control review of the calculations to be done within a matter of weeks unless the model they build produces significant errors, which I would not expect.

31) I have not been asked at this time to comment on the particular method selected by AlixPartners to account for inflation.  However, due to the robust data set that accounts for

Page 11 of 12

all historic cash transactions and the existence of the model that has been built to incorporate CPI, I am confident that the mechanical implementation of whatever exact method the court might specify to account for inflation would not be complicated and could be accomplished in a matter of weeks.

## IX.  Signature

Respectfully submitted,

_Timothy H. Hart_

Timothy H. Hart

April 26, 2013



# Timothy H. Hart

### Curriculum Vitae
Tim is a forensic accountant experienced in the financial and quantitative aspects of international and domestic disputes and investigations. Tim has provided expert testimony in multi-million and billion US dollar disputes in forums around the world. He has assisted clients with many large accounting and financial fraud investigations. Tim has deep expertise in insurance insolvency situations.

### Professional Experience
Prior to founding Credibility International in 2010, Tim was with: (1) Huron Consulting from 2008 to 2010 as a vice president and head of the Accounting & Financial Consulting practice; (2) Navigant Consulting from 2002 to 2008 as a managing director, member of the management committee and leader of the Disputes & Investigations practice; (3) Arthur Andersen where he began as a staff auditor in 1984 and finishing as a partner in 2002 where he was a regional practice leader; and (4) Prime Capital where he managed the equipment lease portfolio from 1990 to 1991.

### Disputes
Since 1984, Tim has analyzed the financial aspects of disputes in all forms of dispute resolution. He has testified in hearings and trials, submitted expert testimony or served as an arbitrator primarily relating to accounting, damages, valuation, economics and financial issues in the following matters:

*International Disputes Testimony:*
- Oxus Gold plc v. Republic of Uzbekistan; *Expropriation;* UNCITRAL Arbitration. Filed an expert report on damages in February 2013. Dispute involves the valuation of investments in gold and other mineral mining interests in Uzbekistan. (Engaged by respondent; parties from England & Uzbekistan)
- Supervisión y Control S.A. v. Republic of Costa Rica; *Breach of Contract;* ICSID Case No. ARB/12/4. Filed an expert report on damages in January 2013. Dispute involves the appropriate tariffs for the national vehicle inspection services concession in Costa Rica. (Engaged by respondent; parties from Spain & Costa Rica)
- Crystallex International Corporation v. Bolivarian Republic of Venezuela; *Expropriation;* ICSID Case No. ARB/11/2. Filed an expert report on damages in November 2012. Dispute involves the valuation of an investment in a gold mining concession in Venezuela. (Engaged by respondent; parties from Canada & Venezuela)
- Franck Charles Arif v. Republic of Moldova; *Expropriation*; International Centre for Settlement of Investment Disputes (ICSID) Case No. ARB/11/23. Testified in Paris in November 2012. Filed expert reports on damages in October and May 2012. Dispute involves the investment in duty free shops at an airport in Moldova and on the Moldovan/Romanian border. (Engaged by respondent; parties from France & Moldova)
- Telecom Egypt Company v. Vodafone Egypt Telecommunications, Vodafone Group Plc, Vodafone Europe BV, Vodafone International Holdings BV; *Breach of Contract*; Cairo Regional Center for International Commercial Arbitration (CRCICA) arbitration 650 of the year 2009. Filed expert reports on damages in October 2012, January 2011 and November 2011. Dispute involves an agreement between the fixed line operator and a wireless operator on matters of interconnect and other settlement charges. (Engaged by claimant; parties from Egypt)
- Highbury International AVV and Ramstein Trading Inc. v. Bolivarian Republic of Venezuela; *Expropriation;* ICSID Case No. ARB/11/1. Testified in Washington in August 2012. Filed expert reports on damages in May 2012 and December 2011. Dispute involves the valuation of an investment in gold and diamond mining concessions in Venezuela. (Engaged by respondent; parties from Netherlands & Venezuela)
- Merck Sharpe & Dohme (I.A.) Corp. v. The Republic of Ecuador; *Denial of Justice*; UNCITRAL Arbitration Case No: 2012-10. Filed expert reports regarding the financial condition of the claimant in July and August 2012. Dispute involves a request for interim measures involving a $150 million judgment in Ecuador. (Engaged by respondent; parties from US and Ecuador)
- International College of IT and Management (U.S.A.) v. Troy State University; *Breach of Contract*; International Chamber of Commerce (ICC) case number 16 892/VRO. Testified in New York in February 2012. Filed expert reports on damages in August and December 2011. Dispute involved college programs in Vietnam. (Engaged by respondent; parties from Vietnam & US)



# Timothy H. Hart

*International Disputes Testimony Continued:*

- The Egyptian Company for Mobile Phone Services (Mobinil) v. Telecom Egypt Company; *Breach of Contract*; Cairo Regional Center for International Commercial Arbitration (CRCICA) arbitration 644 of the year 2009. Filed expert reports on damages in January 2012 and December 2010. Dispute involves an agreement between the fixed line operator and a wireless operator on matters of interconnect and other settlement charges. (Engaged by respondent; parties from Egypt)
- Regis Paillardon v. Archer-Daniels-Midland Company and ADM Latin America, Inc.; *Breach of Contract*; American Arbitration Association (AAA) International Centre for Dispute Resolution case number 50180T004310. Testified in Miami in September 2011 as damages expert. Filed an expert report in July 2011. Dispute involves a joint venture dealing in agricultural commodities. (Engaged by respondent; parties from Venezuela & US)
- Fluviomar International Limited v. MMX Corumbá Mineracáo S.A. and MMX Metálicos Corumbá Ltda; *Breach of Contract*; Society of Maritime Arbitrators. Filed a post-award affidavit in the U.S. District Court Southern District of New York in July 2011. Testified in New York in August 2010. Filed an expert report on damages in June 2010. Dispute involved a shipping contract for iron ore and pig iron. (Engaged by respondent; parties from Argentina & Brazil)
- Diners Club Ecuador S.A. v. Diners Club International Ltd; *Breach of Contract*; ICC case number 15540/JRF. Testified in London in July 2010 as damages expert. Filed expert reports on damages in May 2010 and October 2009. Dispute involved the operation of payment card operations in Ecuador. (Engaged by respondent; parties from Ecuador & US)
- British Sky Broadcasting Limited and Sky Subscriber Services Limited v. Electronic Data Systems Limited and Electronic Data Systems Corporation: *Breach of Contract*; Testified in the High Court of Justice, Queen's Bench Division – Technology and Construction Court (England & Wales) in July 2008 as damages expert and filed a joint memorandum of the experts following the judgment in February 2010. Filed a number of expert reports in respect of costs and lost benefits from August 2007 through June 2008 on breach of contract and negligent misrepresentation claims relating to a customer relationship management system. Matter settled following award. (Engaged by defendant)
- Vannessa Ventures Ltd. v. Bolivarian Republic of Venezuela; *Expropriation;* ICSID case No. ARB(AF)/04/6. Filed expert reports on damages in January 2010 and March 2009. Dispute involves the valuation of a gold mine in Venezuela. (Engaged by respondent; parties from Canada & Venezuela)
- Diners Club (Singapore) Pte. Ltd., Diners Club (NZ) Ltd., Diners Club (Malaysia) Sdn. Bhd. v. Diners Club International Ltd; *Breach of Contract*; ICC case number 15339/JEM. Testified in London in December 2009 as damages expert. Filed expert reports in September and February 2009. Dispute involved the operation of payment card operations in Singapore, New Zealand and Malaysia. (Engaged by respondent; parties from Malaysia, New Zealand, Singapore & US)
- S&T Oil Equipment & Machinery LTD. v. The Government of Romania; *Expropriation*; ICSID case No. ARB/07/13. Filed expert reports on damages in July 2009 and December 2008. Dispute involved the privatization of an ammonia plant in Romania. Matter discontinued due to lack of payment by claimant. (Engaged by respondent; parties from US & Romania)
- MMX Corumbá Mineracáo LTDA and MMX Trade & Shipping LLC v. Eregli Demir Ve Çelik Fabrikalari; *Breach of Contract*; International Court of Arbitration, ICC case number 16056/VRO. Filed an expert report on damages in July 2009. Dispute involved a supply contract for iron ore involving parties from Brazil, Turkey and the US. Matter settled. (Engaged by claimant; parties from Brazil & Turkey)
- Nejapa Power Company, LLC v. Comisión Ejecutiva Hidroeléctrica Del Río Lempa; *Breach of Contract*; Testified in April 2009 in Washington as damages expert. Filed expert reports in March 2009 and October 2008 in an international arbitration conducted under the rules of the UN Commission on International Trade Law on dispute relating to a power purchase agreement in El Salvador. (Engaged by respondent; parties from US & El Salvador)
- FLAG Telecom Group Limited v. Videsh Sanchar Nigam Limited; *Breach of Contract*; ICC case number 13 638/JNK/EBS. Testified in The Hague in November 2007 as damages expert. Filed expert reports in October and May 2007 on lost profits claim relating to international telecommunications and the Indian market. Claimant awarded damages in an amount presented by Hart. (Engaged by respondent; parties from UK & India)
- UEG Araucaria Ltda. v. Companhia Paranaense de Energia; *Breach of Contract*. Filed expert reports in May and December 2005 in an ICC case on the losses sustained by a consortium of investors contracted to build a gas-fired thermal power plant in Brazil. Matter settled. (Engaged by claimant; parties from US & Brazil)
- Noble Ventures v. The Government of Romania; *Expropriation;* ICSID case No. ARB/01/11. Filed expert reports in January and August 2004. Dispute involved the privatization of a steel company and related assets in Romania. The tribunal returned a decision awarding no damages to the claimant. (Engaged by respondent; parties from US & Romania)
- GAMI Investments, Inc. v. The Government of the United Mexican States; *Expropriation*; NAFTA. Filed expert reports in February 2004 and February 2003. Matter involved the valuation of the investment in five sugar mills and the damages related to an expropriation in Mexico. The mills were returned just prior to the hearings. (Engaged by claimant; parties from US & Mexico)



## Timothy H. Hart

*International Disputes Testimony Continued:*

- Ceskoslovenska Obchodni Banka (CSOB) v. The Slovak Republic; *Breach of Contract;* ICSID case No. ARB/97/4. Testified as damaged expert in April 2003. Filed expert reports in August 2001 and November 1999. Dispute involved the moneys owed related to the obligations of the Slovak Republic relating to the debt of the foreign trade bank of the former Czechoslovakia. Award for claimant of $877 million. (Engaged by claimant; parties from Czech Republic & Slovak Republic)
- Americas and Caribbean Power Limited v. The Cooperative Republic of Guyana; *Investment Dispute*; Private arbitration. Served as the chair of the panel of Arbitrators in March 2003 relating to a dispute over tariffs and the required capital investments. (Engaged as the chair of the panel; parties from US & Guyana)
- MCI Global Resources, Inc. And MCI International, Inc., V. Metro Position Sdn. Bhd.; *Breach of Contract;* ICC, Case No. 9134/CK. Testified in September 1997 in Paris. Filed an expert Report in May 1997. Dispute involved pre-paid calling cards. (Engaged by claimant; parties from US & Malaysia)

*US Disputes Testimony:*

- Oral Cancer Prevention International, Inc. v. OraPharma. Inc., Johnson & Johnson, and Johnson & Johnson Consumer Companies, Inc.; *Breach of Contract*; American Arbitration Association, case no. 13 122 Y 01477 12. Testified in a hearing in New York in February 2013. Filed an expert report on damages in December 2012. Dispute involves the sales of an oral cancer detection product. (Engaged by claimant)
- John DeGroote Services, LLC, et. al. v. F. Edwin Harbach, et. al.; *Breach of Fiduciary Duties;* Circuit Court Fairfax, Virginia, civil action no. 2011-10612. Filed an expert report on damages in January 2013. Dispute involves claims against a former officer and the directors of BearingPoint related to events preceding bankruptcy. (Engaged by defendant)
- John Garamendi v. Altus Finance S.A. et al; *Fraud*; U.S. District Court for the Central District of California, case no. CV-99-02829 (CWx). Testified in jury trial in October 2012 and deposition in August 2009. Filed an expert report on damages in April 2009 involving the insolvency of Executive Life Insurance Company and the fraud involving the French government. (Engaged by plaintiff)
- Spanski Enterprises, Inc. v. Telewizja Polska S.A.; *Breach of Contract*; U.S. District Court for the Southern District of New York, case no. CV 10 CV 4933. Filed expert reports on damages in April and May 2012. Testified in deposition in June 2012. Dispute involves distribution rights for Polish television content for broadcast and Internet distribution in the Americas. (Engaged by defendant)
- BDO Seidman LLP v. Morgan Lewis & Bockius LLP; *Professional Negligence, Legal Malpractice, Breach of Fiduciary Duty, Fraud, Breach of Contract*; Superior Court for the District of Columbia. Filed an affidavit in April 2012 and testified in deposition in November 2011. Filed expert reports on damages in January 2012 and October 2011. Dispute involves legal advice to the accounting firm in general and their tax products business. Dismissed on summary judgment. (Engaged by plaintiff)
- PSM Holding Corp v. National Farm Financial Corporation et al; *Breach of Contract, Fraud*; U.S. District Court for the Central District of California, case no. CV 05-8891 MMM (FMOx). Testified in deposition and filed an expert report as the court appointed expert on valuation in March 2012. Dispute involves claims for restitution relating to an insurance company that was improperly transferred and later returned to the original owner. (Engaged as court appointed expert)
- Petrus W. Roelvink, Ph.D v. Medimmune, LLC; *Wrongful Termination;* AAA. Filed an expert report on damages in February 2011 involving lost back pay and future lost compensation. Matter settled before the hearing. (Engaged by respondent)
- Fifth Third Bank v. Transamerica Life Insurance Company and Clark Consulting, Inc.; *Breach of Contract, Breach of Fiduciary Duty, Professional Negligence, Fraud, Negligent Misrepresentation and Insurance Bad Faith;* U.S. District Court Southern District of Ohio Western Division. Testified in deposition in January 2010. Filed an expert report on damages in November 2009. Dispute involved the performance of investments supporting Bank Owned Life Insurance. Matter settled before trial. (Engaged by defendants)
- Invensys Building Systems, Inc. et al. v. Aztec Energy Partners, Inc. et al.; *Tortious Interference*; Federal District Court for the Northern District of Georgia 1:03-CV-1727 (BBM). Filed an expert report in February 2004 on lost profit damages and valuation of the loss of enterprise value relating to the departure of key employees and their actions in an energy controls business. (Engaged by plaintiff)
- Eplus, Inc. v. Centura Bank; *Breach of Contract*; AAA case number 16 Y 168 00417 01. Filed an expert report on damages in January 2002. Testified in deposition in June 2002. Matter involved a post-acquisition dispute relating to an equipment leasing company. Case settled. (Engaged by plaintiff)
- DCV Holdings, Inc. v. ConAgra, Inc. and DuPont et al.; *Breach of Contract and Antitrust;* Delaware Superior Court case No. 98C-06-301-JEB. Testified in deposition in November 2001. Filed an expert report in October 2001. Matter involved a post purchase dispute involving alleged breach of warranties. (Engaged by defendants)



## Timothy H. Hart

*US Disputes Testimony Continued:*

- MCI WorldCom Communications, Inc. v. Electronic Data Systems Corporation, et al.; *Breach of Contract*; AAA, Arbitration No. 13-Y-180-00223-01. Filed an expert report in July 2001 rebutting the opinions of an economist and accountant regarding issues of damages and liability in a case involving an outsourcing contract valued at over $6 billion. (Engaged by plaintiff)
- Bernard B. Fulk III v. Washington Service Associates et al.; *Breach of Contract*; Delaware State Chancery Court case no. 17747. Filed affidavit testimony in May 2001 providing findings and opinions regarding the application of Generally Accepted Accounting Principles as related to the potential dissolution of a business. (Engaged by defendant)
- District of Columbia – City Council; *Legislative*; Hearings on proposed legislation, the New Economy Transformation Act of 2000, July 2000. Testified on the potential fiscal impact to the District of Columbia resulting from the economic and tax incentives in the proposed legislation. The legislation as proposed became law. (Engaged by bill sponsors)
- CSX Corporation v. Norfolk Southern Corporation; *Breach of Contract;* AAA. Testified in September 1999. Dispute involved the appropriate treatment of the Philadelphia headquarters office lease under the transaction agreement related to the split of Conrail. Testimony involved the application of Generally Accepted Accounting Principles and the economics of the lease transaction. (Engaged by plaintiff)
- Callaghan v. Gruner & Jahr; *Breach of Contract;* AAA. Testified in June 1999. Dispute involved the application of Generally Accepted Accounting Principles pertaining to computation of income and assets related to contractual compensation. (Engaged by plaintiff)
- Richard Hines v. Win Laboratories; *Breach of Contract;* Virginia State Court. Testified in deposition in February 1999. Dispute involved a claim for a bonus on the basis of lost profits related to the manufacture and sale of personal computers. (Engaged by defendant)
- H.G. Smithy v. Cushman & Wakefield; *Breach of Contract;* Arbitration October 1998. Served as arbitrator; Dispute involved the calculation of the purchase price on the sale of a real estate management company portfolio including the appropriate revenue to consider and treatment of overhead expenses.
- D'Andrea v. American Communications Services Inc.; *Breach of Contract;* Anne Arundel County Court, Maryland. Testified in deposition in June 1998. Filed an expert report in May 1998. Matter involved an employment dispute with testimony on internal controls and the operations of accounting and finance departments. (Engaged by plaintiff)
- Group Hospitalization and Medical Services, Inc., v. Policy Management Systems Corporation; *Breach of Contract;* US District Court, District of Columbia, Civil Action No. 97cv790. Testified on damages in deposition in May 1998. Filed an expert report in March 1998. Dispute involved royalty and commissions due under the contract. (Engaged by plaintiff)
- The Rehabilitation of Mutual Benefit Life; *Insolvency;* New Jersey Chancery Court, Docket No. C-91-00109. Filed affidavit in January 1998. The affidavit testimony provided the methodology and calculations necessary to file a claim on behalf of the state life and health insurance guaranty associations for creditor claims arising prior to the rehabilitation of the company.
- Liquidation of Coastal States Life; *Insolvency;* Fulton County (Georgia) Superior Court. Testified at trial in September 1996. Liquidation hearing relating to Coastal States Life Insurance Company. Testimony related to the financial condition of the company and the reinsurance transaction proposed to take care of the affected policyholders.
- Emhart/Dynapert v. Universal Instruments; US District Court, Albany, NY; *Patent Infringement;* Testified as to lost profit damages in 1991. Filed an expert report in 1991. (Engaged by plaintiff)

**Corporate Restructuring / Insolvency**

Tim has assisted stakeholders in troubled financial situations involving restructuring and insolvency, including the following:

- Provided financial, accounting, systems, project management and transaction services relating to insolvencies including: Guaranty Security Life Insurance Company (1991 - 1993), Mutual Benefit Life Insurance Company (1992 – 1994), Investment Life Insurance Company of America (1993- 1994), Consolidated National life Insurance Company (1994), Alabama Life Insurance Company (1994), American Educators Life Insurance Company (1994), Mutual Security Life Insurance Company (1994), Summit National Life Insurance Company (1994), Monarch Life (1994 - 2001), Fidelity Bankers Life Insurance Company (1995 – 2000), National American Life (1995), Executive Life Insurance Company (1996 – 2001), Coastal States Life (1996), American Standard Life Insurance Company (1997-1999); Statesman National Life Insurance Company (1999); Thunor Trust companies (1999-2001); Reliance Insurance Company (2001); London Pacific Life & Annuity (2002-2004); Life and Health Insurance Company of America (2004); Executive Life Insurance Company of New York (2007-2008); Standard Life Insurance Company of Indiana (2008-2011); Shenandoah Life Insurance Company (2009-2011)



# Timothy H. Hart

### Corporate Restructuring / Insolvency Continued:
- Assisted a financial services regulator in the special examination of a company providing advice on asset valuation issues. (2009-2010)
- Negotiated the multi-million dollar sale of telecommunication assets from a lease portfolio to reduce debt. Coordinated the due diligence with the buyer and implementation of the equipment sale agreement. (1991)

### Investigations
Tim has performed a wide range of forensic accounting investigations including situations involving alleged accounting fraud, asset defalcation and violation of regulations or company policy. The following are representative of Tim's investigative experience:
- Performed investigation of sales practices on behalf of top management of a medical device company (2009).
- Performed a special examination focused upon the distressed assets of a large life insurer on behalf of a state insurance commissioner (2009).
- Performed independent investigation on behalf of the audit committee of the board of directors of a chemical company that was undergoing an SEC investigation (2005-2006).
- Performed independent investigation on behalf of the audit committee of the board of directors of a medical practice company that was undergoing an SEC investigation (2005).
- Performed independent investigations on behalf of the special committees of the board of directors of two for-profit post-secondary education providers responsive to various federal investigations (2005-2006).
- Performed an independent accounting investigation on behalf of the audit committee of a medical device company responsive to an SEC investigation. (2003-2004)
- Performed an investigation and litigation support relating to a cable company involving a wide range of accounting and operational issues (2003-2004).
- Performed an accounting investigation of a retailer responsive to an SEC investigation to identify the causes of a balance sheet misstatement including interviews of top management and operating personnel in concert with forensic accounting review of the related accounts (2002-2003).
- Provided litigation support including forensic accounting and investigative services for counsel to an audit firm in response to the congressional, civil, SEC and criminal investigations and litigation involving an energy company (2002).
- Engaged by the board of a parent company to investigate and then restructure an insurance brokerage (2000).
- Coordinated a team to provide a consortium of law firms with financial analysis, document production, distribution and retrieval of information involving an investment bank's junk bond operation (1987-1989).
- Investigated and quantified the amount embezzled from a not-for-profit over a two and one half year period (1988).

### Audit
Tim performed audits primarily focused upon regulated and government entities.

### Speeches
- "*Financial Services – The Broken Promises*"; University of Notre Dame Mendoza School of Business Ethics Week, February 2012

### Education and professional certifications
- Bachelor of Business Administration, University of Notre Dame 1984
- Certified Public Accountant 1986, licensed in Washington, D.C.
- Certified Fraud Examiner 2002

**Expert Report of Timothy H. Hart**
**Documents Relied Upon**

Appendix B

| Document | Date | Bates Number |
|---|---|---|
| MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER AFFIRMING TRUSTEE'S CALCULATIONS OF NET EQUITY AND DENYING TIME-BASED DAMAGES | 10/12/2012 | |
| DECLARATION OF ROBERT J. ROCK IN CONNECTION WITH THE TRUSTEE'S MOTION FOR AN ORDER AFFIRMING THE TRUSTEE'S CALCULATION OF NET EQUITY AND DENYING TIME-BASED DAMAGES | 10/12/2012 | |
| CUSTOMERS' BRIEF OPPOSING TRUSTEE'S MOTION FOR AN ORDER REJECTING AN INFLATION ADJUSTMENT TO THE CALCULATION OF "NET EQUITY" | 12/3/2012 | |
| Deposition of Robert J. Rock | 3/27/2013 | |
| 30(b)(6) Deposition of Vineet Sehgal | 4/12/2013 | |
| Corporate Finance, Ross, Westerfield and Jaffe, Seventh Edition | | |
| Valuing a Business, Pratt and Niculita, Fifth Edition | | |
| Principles of Corporate Finance, Brealey, Myers and Allen, Ninth Edition | | |
| Transactions Remaining-No Settlement Adjustments or Removals.xlsx | | BH-ROCK0000001 |

Illustrative example of the 21 accounts with exactly $1 million more deposits than withdrawals

| Account | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total | Sum of December 2008 Constant Dollar Value | Sum of Transfer Amount Adjusted for CPI | Sum of Transfer Amount Adjusted for Cash In / Cash Out |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | (1,000,000) | | | | | | | | | | | | | | | | (1,000,000) | (1,469,099) | (1,000,000) | (1,000,000) |
| B | | | | (1,000,000) | | | | | | | | | | | | | (1,000,000) | (1,345,029) | (1,000,000) | (1,000,000) |
| C | | | | (1,000,000) | | | | | | | | | | | | | (1,000,000) | (1,339,032) | (1,000,000) | (1,000,000) |
| D | | | | | (1,000,000) | | | | | | | | | | | | (1,000,000) | (1,301,721) | (1,000,000) | (1,000,000) |
| E | | | | | | | | | | | (3,000,000) | 900,000 | | 0 | 1,000,000 | 100,000 | (1,000,000) | (1,297,947) | (1,000,000) | (1,000,000) |
| F | | | | | | (1,000,000) | | | | | | | | | | | (1,000,000) | (1,288,162) | (1,000,000) | (1,000,000) |
| G | | | | | | (1,000,000) | | | | | | | | | | | (1,000,000) | (1,288,162) | (1,000,000) | (1,000,000) |
| H | | | | | | | | (1,500,000) | | | | 200,000 | 300,000 | | | | (1,000,000) | (1,259,010) | (1,000,000) | (980,141) |
| I | | | | | | | | (1,000,000) | | | | 0 | | | | | (1,000,000) | (1,227,264) | (1,000,000) | (1,000,000) |
| J | | | | | | | | | | (1,000,000) | | | | | | | (1,000,000) | (1,169,232) | (1,000,000) | (1,000,000) |
| K | | | | | | | | | | (1,000,000) | | | | | | | (1,000,000) | (1,159,559) | (1,000,000) | (1,000,000) |
| L | | | | | | | | | | | (1,000,000) | | | | | | (1,000,000) | (1,145,657) | (1,000,000) | (1,000,000) |
| M | | | | | | | | | | | | (1,000,000) | | | | | (1,000,000) | (1,129,044) | (1,000,000) | (1,000,000) |
| N | | | | | | | | | | | | | (1,000,000) | | | | (1,000,000) | (1,081,420) | (1,000,000) | (1,000,000) |
| O | | | | | | | | | | | | | (1,000,000) | | | | (1,000,000) | (1,063,907) | (1,000,000) | (1,000,000) |
| P | | | | | | | | | | | | | | | (1,000,000) | | (1,000,000) | (1,038,594) | (1,000,000) | (1,000,000) |
| Q | | | | | | | | | | | | | | | (1,000,000) | | (1,000,000) | (1,038,594) | (1,000,000) | (1,000,000) |
| R | | | | | | | | | | | | | | | (1,000,000) | | (1,000,000) | (1,010,959) | (1,000,000) | (1,000,000) |
| S | | | | | | | | | | | | | | | | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) |
| T | | | | | | | | | | | | | | | | (1,000,000) | (1,000,000) | (960,757) | (1,000,000) | (1,000,000) |
| U | | | | | | | | | | | (1,000,000) | | | | | | (1,000,000) | (839,953) | (736,360) | (570,000) |

**Notes:**
1. Account T had a single deposit of $1 million on 24-June-08.  The CPI was negative during the approximate six months until the valuation date in December 2008 which caused the time-value calculation to be lower than the cash in/cash out calculation.
2. Account U had transfer activity which causes the time value calculation to be lower than the $ 1 million deposit.