JOSEPHINE WANG
General Counsel
KEVIN H. BELL
Senior Associate General Counsel
  For Dispute Resolution
CHRISTOPHER H. LAROSA
Senior Associate General Counsel-Litigation
SECURITIES INVESTOR
  PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, D.C.  20005
Telephone:  (202) 371-8300
E-Mail: jwang@sipc.org
kbell@sipc.org
clarosa@sipc.org


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>       Plaintiff-Applicant, <br><br>       v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>       Defendant. | SIPA LIQUIDATION <br><br> Case No. 08-1789 (BRL) <br><br> (Substantively consolidated) |
| In re: <br><br> MADOFF SECURITIES | |

**MEMORANDUM OF THE**
**SECURITIES INVESTOR PROTECTION CORPORATION**
**IN SUPPORT OF TRUSTEE'S MOTION TO AFFIRM DETERMINATIONS OF**
**CLAIMS OF CLAIMANTS WITHOUT BLMIS ACCOUNTS**

Pursuant to Section 78eee(d) of the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa et seq. ("SIPA"),[1] and to this Court's scheduling order of April 13, 2010, the Securities Investor Protection Corporation ("SIPC") hereby submits this memorandum of law in support of the motion ("Motion") of Irving H. Picard ("Trustee"), as trustee for the consolidated liquidation of Bernard L. Madoff Investment Securities, LLC ("BLMIS") and Bernard L. Madoff, for entry of an order upholding the Trustee's determinations denying the claims for "customer" relief filed with the Trustee by a group of claimants ("Claimants") who did not have accounts at BLMIS or any other relationship with it.

## ISSUE

Whether Claimants are not "customers" of BLMIS under SIPA given that they did not have accounts at BLMIS, were not known to BLMIS, entrusted no cash or securities to BLMIS, and received no account statements or similar communications from BLMIS, and claim "customer" status solely on the basis of their investments in certain hedge funds which themselves were customers of BLMIS?

## SUMMARY OF ARGUMENT

Claimants here are indistinguishable from the claimants in In re Bernard L. Madoff Secs. LLC, 708 F.3d 422 (2d Cir. 2013) ("BLMIS"). In the latter case, this Court upheld the Trustee's determinations denying the claims of a group of investors who purchased shares in various BLMIS feeder funds that, in turn, invested a significant portion of their assets either directly through BLMIS or in other funds that invested through BLMIS. See SIPC v. Bernard L. Madoff Inv. Sec. LLC, 454 B.R. 285, 295 (Bankr. S.D.N.Y. 2011). Both the United States District Court for the Southern District of New York ("District Court") and the Second Circuit

---

[1]  Section 78eee(d) of SIPA provides that SIPC shall be deemed to be a party in interest as to all matters arising in a liquidation proceeding under SIPA, with the right to be heard on all such matters. References herein to provisions of SIPA shall be to the United States Code, and for convenience, shall omit "15 U.S.C."

upheld this Bankruptcy Court's decision, the latter reasoning that the claimants in the case never entrusted property to BLMIS, had no cognizable property interest in any property so entrusted, and therefore could not qualify as "customers" within the meaning of the term as defined in SIPA.  See BLMIS, 708 F.3d at 426-28; Aozora Bank Ltd. v. SIPC, 480 B.R. 117 (S.D.N.Y. 2012) ("Aozora").

The same reasoning applies with equal force here.  Claimants were hedge fund investors who themselves had no relationship with BLMIS and did not maintain accounts there.  They did not entrust cash or securities to BLMIS, their identities were unknown to BLMIS, they issued no transactional instructions regarding assets held at BLMIS, and received no account statements or other communications from BLMIS concerning the status of any such assets.   Under the governing terms of Claimants' hedge fund investments, Claimants held ownership interests in the funds themselves, not in the funds' assets.  Claimants had no right to manage the hedge funds in which they invested, and likewise had no right to direct the disposition of fund assets.  The funds were not required to, and did not, consult Claimants concerning the investment and disposition of fund assets.  Moreover, as the funds were legal entities separate and distinct from Claimants, fund assets were owned by the hedge funds, not by Claimants, who had no property rights in those assets.

In fact, like the claimants in the BLMIS litigation, Claimants here are indistinguishable from a group of employee-benefit plan beneficiaries denied "customer" status in SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314, 1317 (2d Cir.), cert. den., 426 U.S. 936 (1976) ("Morgan Kennedy").  In that case – which was effectively ratified by Congress through the subsequent adoption of amendments to SIPA that did nothing to alter the rule announced in the case – a trust created pursuant to an employer-sponsored profit-sharing plan, not the employee-

beneficiaries of the plan, had an account at the liquidating broker-dealer.  Like Claimants here, the Morgan Kennedy beneficiaries did not entrust the assets held in the account to the broker-dealer, had no property rights in those assets, and had no power to direct the disposition of the assets.  The Second Circuit concluded that the beneficiaries lacked any of the necessary indicia of "customer" status under SIPA and therefore denied their claims for "customer" relief.

The Court of Appeals extended that precedent to BLMIS feeder fund investors earlier this year.  See BLMIS, 708 F.3d at 426-28.  Claimants here are identically situated to that earlier group of claimants, and the denial of their "customer" claims should be upheld for the same reasons articulated by this Court and the Second Circuit in that case.  See id.; BLMIS, 454 B.R. at 295.

## FACTS AND PROCEDURAL BACKGROUND

The "customer" claims at issue rest exclusively on the ownership interest that each Claimant purchased in a hedge fund.

### I.  Hedge Funds Generally

A hedge fund pools the investment capital of its investors and invests that capital, generally in financial instruments, in order to generate a positive return.  Hedge funds are not required to register with the SEC under the Securities Act of 1933, are not required to report periodically to the SEC, and typically, issue securities in private offerings that are not registered with the SEC.  See 15 U.S.C. §80a-3(c)(1) and 3(c)(7).  The absence of regulatory oversight enables and facilitates the "leverage[ing]…and other speculative investment practices" often pursued by hedge funds, strategies that "may increase the risk of investment loss."[2]    Hedge

---

[2] Hedging Your Bets: A Heads Up on Hedge Funds and Funds of Hedge Funds (U. S. Securities and Exchange Commission), Investor Bulletin: Hedge Funds – PDF available at www.sec.gov/investor/alerts/ib-hedgefunds.pdf

funds calculate a net asset value per share for each class of shares, and generally redeem shares on a monthly or quarterly cycle.  Hedge Funds and Prime Brokers (Mark Berman ed., 2d ed. 2009) at 3, 4 ("Berman").  Hedge funds may be simple, single-entity operations, but are often complex, "tiered," multi-entity enterprises in which, for example, one or more "feeder funds" invests assets in a "master fund" that, in turn, aggregates and invests "feeder fund" investment capital.

In order to minimize tax liability, hedge funds are often incorporated offshore, typically in low (or no) tax jurisdictions such as the Cayman Islands, the British Virgin Islands, or Bermuda.  Berman at 10.  Alternatively, funds are sometimes organized under U.S. law as limited partnerships, with limited partnership interests sold to investors.  In either case, hedge funds rarely pay tax at the entity level under the tax law of the country in which they are organized.  Id. at 3.

## II. Claimants' Hedge Fund Investments

In this case, Claimants invested in one or more of twelve hedge funds ("Hedge Funds" or "Funds").  (See Declaration of David J. Sheehan ("Sheehan Decl.") ¶¶ 10, 11, Ex. 1, 2.) Those Funds consisted of: (1) two exempted companies organized under the laws of the Cayman Islands; (2) two companies organized under the laws of Luxembourg, each as a "société d'investissement à capital variable" ("SICAV"); (3) one "international business company" organized under the laws of the Bahamas; (4) one exempted umbrella mutual fund company organized under the laws of Bermuda; (5) one open-ended investment company organized under the laws of Ireland; (6) one protected cell investment company organized under

the laws of Guernsey; and (7) four limited liability companies ("LLCs") organized under the laws of the British Virgin Islands.  (See Sheehan Decl. ¶¶ 8-10, 44-57, 68, Ex. 1-3, 35-48, 59.)

All of the Hedge Funds share the following characteristics: (1) they are legal persons separate from their owners, and are therefore capable of separately owning property and suing and being sued; (2) they sold ownership interests in themselves, either directly or indirectly, to Claimants, and used the sales proceeds to make investments; (3) their managers and administrators were responsible for making those investments; (4) they invested directly with BLMIS and, according to the books and records of BLMIS, maintained accounts there; (5) they are not banks or securities broker-dealers.  (See Sheehan Decl. ¶¶ 48-61, Ex. 39-52.)

The Hedge funds maintained a total of twelve accounts with BLMIS, in most instances denominated in the name of the relevant Hedge Fund or otherwise labeled such that the Fund was identified as the sole owner of an account held nominally in the name of a custodian. (Sheehan Decl. ¶ 8, Ex. 1.)  In one case, Fund assets were directed to a BLMIS account held in the name of the Fund's subsidiary.  (See Sheehan at ¶¶ 42-44, 57, Ex. 33-35, 48.)

In order to open accounts at BLMIS, the Hedge Funds executed a number of account agreements, including, a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options.  (Cohen Decl. ¶ 9; Sheehan Decl. ¶¶ 15, 18, 20, 25, 28, 31, 34, 37, 40, 43, 67, Ex. 6, 9, 11, 16, 19, 22, 25, 28, 31, 34, 58.)  In contrast, Claimants did not execute account agreements with BLMIS, did not entrust cash or securities to BLMIS to trade or invest in securities, and did not receive any account-related documentation from BLMIS.  (See Sheehan Decl. ¶ 12 .)  Instead, Claimants purchased ownership interests in the Hedge Funds themselves, and each Claimant therefore received for

his or her ownership an interest in an entity of the kind identified above. (<u>See</u> Sheehan Decl. ¶¶ 48-61, Ex. 39-52)

Consistent with the foregoing, the books and records of BLMIS reflect the accounts held by, or for, the Hedge Funds, and the deposits and withdrawals made from those accounts by the Funds, but do not reflect any such deposits or withdrawals made by Claimants from those accounts. (<u>See</u> Declaration of Matthew Greenblatt ¶¶ 6, 8, 12; Sheehan Decl. ¶ 12.)

## <u>ARGUMENT</u>

Claimants' opposition to the Trustee's determinations denying their customer claims represents an attempt to avoid the effect and reality of the entity form. Like the earlier litigation culminating in the <u>BLMIS</u> opinion, this case turns on the fact that Claimants purchased ownership interests in the Hedge Funds – legal entities separate from Claimants that held assets in their own names - thereby investing <u>in</u>, not <u>through</u>, those Funds. As a result, they had no cognizable interest in any of the assets held by the Funds, and cannot establish that they ever entrusted cash or securities to BLMIS for the purpose of trading in the securities markets, the <u>sine</u> <u>qua</u> <u>non</u> of "customer" status under SIPA. In fact, Claimants had no legally cognizable relationship of any kind with BLMIS, let alone "the type of fiduciary relationship with the debtor that characterizes customers…" <u>Securities Investor Protection Act Amendments: Hearing before the Subcomm. on Sec. of the S. Comm. on Banking, Housing and Urban Affairs</u>, 95th Cong. 40 (1978) (section by section explanation of H.R. 8331 amendments to SIPA).

# I.    "CUSTOMER" STATUS UNDER SIPA

## A.  In general

In a SIPA liquidation, claimants who qualify as "customers" receive preferred treatment in several ways.  "Customers" share ratably in the fund of "customer property" – consisting generally of the cash and securities held by the liquidating broker-dealer for customers – on the basis and to the extent of their respective "net equities," and to the exclusion of general creditors.  See SIPA §78fff-2(b) and (c)(1).  See also Stafford v. Giddens (In re New Times Secs. Servs., Inc.), 463 F.3d 125, 128-29 (2d Cir. 2006); McKenny v. McGraw (In re Bell & Beckwith), 937 F.2d 1104, 1106-08 (6th Cir. 1991); In re Bernard L. Madoff Investment Secs., Inc., 424 B.R. 122, 133 (Bankr. S.D.N.Y. 2010), aff'd, 654 F.3d 229 (2d Cir. 2011), cert. dismissed, 132 S. Ct. 2712 (2012), and cert. den., 133 S.Ct. 24 and 133 S.Ct. 25 (2012) ("In re BLMIS").  To the extent that the fund of customer property is insufficient to satisfy the claims of customers in full, SIPA permits SIPC to make advances to the trustee, within the statutory limits of protections, from the SIPC Fund – a "quasi-public" fund established and administered by SIPC.  See SIPA § 78ddd.  See also SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983-85 (2d Cir. 1974) ("Packer Wilbur"); In re BLMIS, 424 B.R. at 133.  In this regard, SIPC may advance to the SIPA trustee not more than $500,000 per customer.  See SIPA § 78fff-3(a).  See also In re BLMIS, 424 B.R. at 133; In re A.R. Baron & Co., 226 B.R. 790, 794-795 (Bankr. S.D.N.Y. 1998).

Consistent with the exclusivity of relief available to SIPA "customers," the term "customer" is narrowly construed.  See, e.g., BLMIS, 708 F.3d at 426; Morgan Kennedy, 533 F.2d at 1316-1317.  The obligations of a liquidating broker-dealer to a claimant for "customer" relief must be ascertainable from the broker-dealer's books and records, or must be established

"to the satisfaction of the trustee."  See SIPA § 78fff-2(b).  Accordingly, a claimant seeking

"customer" status has a heavy burden to prove his or her entitlement to it.  See In re Brentwood

Securities, Inc., 925 F.2d 325, 328 (9th Cir. 1991) (claimants have burden of proving that they

are customers by establishing that they entrusted cash or securities to the broker); SIPC v.

Stratton Oakmont, 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999), aff'd sub nom., Arford v. Miller,

239 B.R. 698 (S.D.N.Y. 1999), aff'd, 210 F.3d 420 (2d Cir. 2000).

### B.  The elements of customer status

Under SIPA, with exclusions not applicable here, the term "customer" means:

> [A]ny person (including any person with whom the debtor deals as
> principal or agent) who has a claim on account of securities
> received, acquired, or held by the debtor in the ordinary course of
> its business as a broker or dealer from or for the securities accounts
> of such person for safekeeping, with a view to sale, to cover
> consummated sales, pursuant to purchases, as collateral security, or
> for purposes of effecting transfer.  The term "customer" includes
> any person who has a claim against the debtor arising out of sales
> or conversions of such securities, and any person who has
> deposited cash with the debtor for the purpose of purchasing
> securities…

See SIPA § 78lll(2) (2008).  As this definition reflects, "customer" status under SIPA is not a

shorthand designation for anyone who does business through a broker-dealer.  See Morgan

Kennedy, 533 F.2d at 1316.  On the contrary, the plain language of the "customer" definition,

the legislative history to SIPA, and the cases decided under SIPA all confirm that, in order to

qualify for "customer" status, a claimant at least must be able to satisfy the following criteria:

(1) the entrustment of cash or securities to the debtor; (2) a direct account or fiduciary

relationship with the debtor; (3) the power to direct the disposition of account assets; and (4) an

intention to trade in the securities markets.  See, e.g.; BLMIS, 708 F.3d at 426-27; New Times,

463 F.3d at 128-29; Morgan Kennedy, 533 F.2d at 1317; SEC v. F.O. Baroff Co., 497 F.2d 280,

282 & n. 2 (2d Cir. 1974).  SIPA's purposes, as evident in its legislative history, provide ample

support for these criteria. [3]

In <u>BLMIS</u>, the Second Circuit applied these principles, and its own precedent in <u>Morgan Kennedy</u>, in holding that a group of claimants who invested in BLMIS feeder funds, but had no relationship with BLMIS itself, were not BLMIS "customers" within the meaning of SIPA. <u>BLMIS</u>, 708 F.3d at 426-27.  The Court emphasized that the claimants had not entrusted any property to BLMIS, and thus failed to satisfy "the critical aspect of the 'customer' definition." <u>Id.</u> at 426.  In elaborating on this point, the Court explained that:

> The record shows that they [the claimants]: (1) had no direct financial relationship with BLMIS, (2) had no property interest in the assets that the Feeder Funds invested with BLMIS, (3) had no securities accounts with BLMIS, (4) lacked control over the Feeder Funds' investments with BLMIS, and (5) were not identified or otherwise reflected in BLMIS's books and records.

<u>Id.</u> at 426-27.

## II.    CLAIMANTS ARE NOT BLMIS "CUSTOMERS"

### A.  Claimants had no legally cognizable relationship with BLMIS

Claimants here are indistinguishable from the claimants in <u>BLMIS</u> and, like those beneficiaries, have none of the indicia of a "customer" relationship with the liquidating broker-dealer.  None of Claimants had an account at BLMIS, none entrusted cash or securities to BLMIS to trade or invest in securities and none received any account statement or other communication from BLMIS.  Instead, each Claimant purchased an ownership interest –

---

[3]    Satisfaction of these criteria is necessary, but not always sufficient, to establish "customer" status.  A claimant's knowledge, participation in, or willful ignorance of a broker-dealer's misconduct may disqualify a claimant from "customer" relief, even where the criteria described above have been met.  <u>See</u>, <u>e.g.</u>, <u>Packer Wilbur</u>, 498 F.2d at 984-85 (claimant who violates securities laws as part of transaction in question is disqualified from "customer" status); <u>In re Adler, Coleman Clearing Corp.</u>, 277 B.R. 520, 558-59 (Bankr. S.D.N.Y. 2002) (claimant who is willfully ignorant of wrongful nature of subject transaction may be denied "customer" status).

typically common shares or a limited partnership interest – in a Hedge Fund.  The Hedge Funds, not Claimants, were the customers of BLMIS.  Unlike the Hedge Funds, Claimants did not entrust cash or securities to BLMIS, did not make the decision to do so, and had no power to make that decision or to prevent or reverse the decisions made by the Hedge Funds.  Claimants neither had, nor exercised, any power over the assets held in the Hedge Funds' accounts at BLMIS.  No Claimant ever withdrew, or was authorized to withdraw, assets from any of the Hedge Funds' accounts or placed any transactional order with respect to those assets, for instance, and no Claimant had any power to do so.

Likewise, Claimants had no assurance of any indirect investment in the securities markets.  Entities like the Hedge Funds constitute legal personalities separate and distinct from their owners, and the owners therefore have no property rights in the assets of such entities. See, e.g., Johnson v. Gore Wood & Co., [2002] 2 A.C. 1, [2001] B.C.C. 820, 858 (H.L.) ("Johnson") (appeal taken from Ct. App.) (under the common law of the United Kingdom, "[a] company is a legal entity separate and distinct from its shareholders.  It has its own assets and liabilities and its own creditors.  The company's property belongs to the company and not to its shareholders"); [4] Macaura v. Northern Assurance Co. Ltd., [1925] A.C. 619 (shareholder has no

---

[4] Companies and LLCs organized in the Cayman Islands, the British Virgin Islands, the Bahamas, Bermuda, and Guernsey are all governed by the common law of the United Kingdom to the extent that such law is consistent with the statutory law of the jurisdiction in question. See, e.g., Christopher Bickley, Bermuda, British Virgin Islands, and Cayman Islands Company Law ("Bickley") §§ 2.002, 3.001, 7.001 (3d ed. 2009); Simon v. Helmot, [2012] UKPC 5, 2012 WL 608642 (Ct. App. Guernsey March 7, 2012) ("The English common law has persuasive force in Guernsey in areas not governed by Guernsey statutes or Guernsey customary law"); Companies (Guernsey) Law 2008 § 276 (as amended); Armbrister v. Lightbourn, [2012] UKPC 40, 2012 WL 6044077 (Ct. App. Commonwealth of the Bahamas Dec. 11, 2012) (common law of England forms the basis of the law of the Bahamas); Islamic Investment Co. of the Gulf (Bahamas) Ltd. v. Symphony Gems N.V., 2002 WL 346969 (EWCA (QB) Feb. 13, 2002) ("[T]he Bahamas is a common law jurisdiction in which the English common law is deemed to apply whenever local legislation is silent").

legal right to any property owned by the company); Salomon v. Salomon & Co., [1897] A.C. 22 (H.L.) (a company that is a legal entity owns its assets and liabilities).[5]  See also Aozora, 480 B.R. at 124-25.  Cf., 1 Fletcher Cyclopedia of the Law of Corporations § 31 (2012) ("[T]he capital or assets of the corporation are its property, and the shares evidenced by the stock certificates are the property of the shareholders, which do not carry the capital property or any profits until they have been declared and vested as dividends…"); Berman at 16 ("The company structure is similar across the world…A company has a legal personality separate and apart from its shareholders").  In fact, an owner's interest in such an entity is limited to his or her ownership share, which constitutes personal property separate and distinct from the assets of the entity, and the owner has no rights regarding, and no power over, entity assets.  See, e.g., Johnson, [2002] 2 A.C. 1, [2001] B.C.C. 820 at 858.

Consistent with the foregoing, each of the Claimants that bought an ownership interest in a Hedge Fund, invested in the Fund, not in the Fund's assets.  The only rational interest of an investor in this position was in having the value of the investor's ownership interest rise.  How that occurred – and specifically, whether it did so through securities investments, or through some other investment vehicle such as, for example, commodity futures – was logically of little importance to such an investor.  Although the Hedge Funds chose to invest in securities through BLMIS, they were not obligated to do so, and could have elected other investments from the investment vehicles permitted by their governing documents.  A Claimant thus had no assurance that the Hedge Fund in which the Claimant invested would itself invest in securities.

---

[5] For the reasons discussed at length in the Trustee's memorandum, the same principle exists and is applicable under the laws of Luxembourg and Ireland.  See, e.g., Ronan Keane, Company Law § 11.01 (4th ed. 2007) (recognizing that Salomon v. Salomon & Co. remains generally controlling under Irish law and that, in accordance with that case, a company "is an artificial legal entity separate and distinct from the members of which it is composed").

The fact that the Hedge Funds may have elected to fund their accounts at BLMIS with some or all of the assets supplied by Claimants does not make Claimants SIPA "customers." Once Claimants purchased ownership interests in the Hedge Funds, the cash that Claimants used to make those purchases became property of the Hedge Funds, not that of Claimants. Accordingly, each of the Claimants held an interest in a Hedge Fund, not in the Hedge Fund's securities investments. Claimants are thus no different from the claimants in <u>BLMIS</u> or the employee-beneficiaries in <u>Morgan Kennedy</u>, and, like them, do not qualify for "customer" status under SIPA.

## **CONCLUSION**

For the reasons stated, this Court should grant the Trustee's Motion.

Dated: Washington, D.C.
        June 27, 2013

                        Respectfully submitted,

                        SECURITIES INVESTOR PROTECTION
                          CORPORATION

                        JOSEPHINE WANG
                        General Counsel

                        KEVIN H. BELL
                        Senior Associate General Counsel
                          For Dispute Resolution


                        <u>/s/ Christopher H. LaRosa</u>
                        CHRISTOPHER H. LAROSA
                        Senior Associate General Counsel – Litigation

                        805 15th Street, N.W., Suite 800
                        Washington, D.C. 20005
                        Telephone: (202) 371-8300