**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor | |

**REPLY MEMORANDUM OF LAW OF THE**
**SECURITIES INVESTOR PROTECTION CORPORATION**
**IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER**
**AFFIRMING TRUSTEE'S CALCULATIONS OF NET EQUITY**
**AND DENYING TIME-BASED DAMAGES**

JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior Associate General Counsel
 For Dispute Resolution

CHRISTOPHER H. LAROSA
Senior Associate General Counsel –
Litigation

LAUREN T. ATTARD
Assistant General Counsel

SECURITIES INVESTOR
 PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, D. C.  20005
Telephone: (202) 371-8300

Date: July 18, 2013
Washington, D.C.

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................1

ARGUMENT ...............................................................................................................2

I.    SIPA UNAMBIGUOUSLY PRECLUDES THE USE OF AN INFLATION ADJUSTMENT IN THE CALCULATION OF "NET EQUITY" AND THERE IS THERFORE NO BASIS FOR DEFERENCE TO THE COMMISSION'S CONTRARY POSITION ........................................................3

    A.    The Position of the Commission Is Not Entitled to <u>Chevron</u> Deference ......................................................................................4

    B.    The Position of the Commission Is Not Entitled to <u>Skidmore</u> Deference ......................................................................................7

    C.    The Application of an Inflation Factor and the Orderly Liquidation of the Debtor............................................................10

        1.    *Expressio Unius Est Exclusio Alterius* ...............................10

        2.    The Limits of SIPA Protection .............................................15

        3.    The Inconsistency of the SEC's Position ............................16

        4.    The Orderly Liquidation....................................................19

II.    THE ATTEMPT TO ADJUST NET EQUITY CLAIMS FOR INFLATION IS A BACK-DOOR ATTEMPT TO OBTAIN PREJUDGMENT INTEREST ON A CLAIM WITHOUT THE BENEFIT OF A JUDGMENT.........................21

    A.    Inflation As A Component Of Prejudgment Interest .................................22

    B.    Prejudgment Interest Without The Judgment ............................................26

III.    AN INFLATION ADJUSTMENT IS INAPPROPRIATE....................................29

CONCLUSION................................................................................................34

# TABLE OF AUTHORITIES

**CASES:**                                                                                        **PAGE**

In re 785 Partners LLC, 470 B.R. 126 (Bankr. S.D.N.Y. 2012)....................................................26

Appleton v. First Nat'l Bank of Ohio, 62 F.3d 791 (6th Cir. 1995) ...............................................15

In re A. R. Baron Co., 226 B.R. 790 (Bankr. S.D.N.Y. 1998) .......................................................21

In re Arcade Publ'g., Inc., 455 B.R. 373 (Bankr. S.D.N.Y. 2011) ..........................................27, 28

Arford v. Miller, 239 B.R. 698 (S.D.N.Y. 1999), aff'd, 210 F.3d 420 (2d Cir. 2000)..................20

Barton v. SIPC, 182 B.R. 981 (Bankr. D.N.J. 1995) .....................................................................21

In re Bernard L. Madoff Inv. Securities LLC, 654 F.3d 229 (2d Cir. 2011),
    cert. dismissed, 132 S. Ct. 2712 (2012),
    and cert. den., 133 S. Ct. 24 and 133 S. Ct. 25 (2012)...................................15, 16, 20, 31

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988) ...............................................................5

Boykin v. KeyCorp, 521 F.3d 202 (2d Cir. 2008) ...........................................................................8

In re Brentwood Securities, Inc., 925 F.2d 325 (9th Cir. 1991) ...............................................15, 20

Cartoon Network LP, LLLP v. CSC Holdings, Inc., 536 F.3d 121 (2d Cir. 2008),
    cert. den. sub nom., Cable News Network v. CSC Holdings, Inc.,
    129 S. Ct. 2890 (2009).................................................................................................8, 10

Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,
    273 F.3d 481 (2d Cir. 2001), cert. den., 549 U.S. 1252 (2007) .......................................5, 8

CFTC v. Walsh, 712 F.3d 735 (2d Cir. 2013) ................................................................17, 18, 20

Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984) ...............................3, 4

Christensen v. Harris County, 529 U.S. 576 (2000) .......................................................................6

City of Milwaukee v. Cement Div., Nat. Gypsum Co., 515 U.S. 189 (1995) ...............................25

City of Omaha v. CBS Corp., 2011 WL 2119734 (S.D.N.Y. May 24, 2011,
    aff'd, 679 F.3d 64 (2d Cir. 2012)....................................................................................6, 8

Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132 (2d Cir. 2002) ..................................................5

In re CNB Intern., Inc., 440 B.R. 31 (W.D.N.Y. 2010)................................................................24

# TABLE OF AUTHORITIES

**CASES:**                                                                                              **PAGE**

In re Connecticut Nat. Bank, 928 F.2d 39 (2d Cir. 1991)...........................................................24

CSI Hydrostatic Testers, Inc. v. Commissioner, 103 T.C. 398, 1994 WL 466342 (1994)..............5

De La Mota v. U.S. Dep't of Educ., 412 F.3d 71 (2d Cir. 2005) ....................................... 4-6, 8, 10

English v. Ecolab, Inc., 2008 WL 878456 (S.D.N.Y. 2008) ........................................................8, 9

Fed. Elec. Comm'n v. Political Contributions Data, Inc., 943 F.2d 190 (2d Cir. 1991) ................8

Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581 (2004) .......................................................3

Hollie v. Korean Air Lines Co., 834 F.Supp. 65 (S.D.N.Y. 1993)................................................23

Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406 (S.D.N.Y. 2001) .......32

Kansas v. Colorado, 533 U.S. 1 (2001) ........................................................................................25

Kansas v. Colorado., No. 105, ORIGINAL, 2000 WL 34508307 (Aug. 31, 2000) .....................25

In re Klein, Maus & Shire, Inc., 301 B.R. 408 (Bankr. S.D.N.Y. 2003) ......................................21

Kruse v. Wells Fargo Home Mortgage, Inc., 383 F.3d 49 (2d Cir. 2004)......................................3

Estate of Landers v. Leavitt, 545 F.3d 98 (2d Cir. 2008),
      revised (Jan. 15, 2009), cert. den., 129 S. Ct. 2878 (2009)....................................3, 4, 5, 6

Landgraf v. USI Film Products, 511 U.S. 244 (1994) ..................................................................13

Library of Congress v. Shaw, 478 U.S. 310 (1986)................................................................22, 23

McKenny v. McGraw (In re Bell & Beckwith), 937 F.2d 1104 (6th Cir. 1991) ...........................16

In re Methyl Tertiary Butyl Ether Products Liability Litig.,
      559 F.Supp. 2d 424 (S.D.N.Y. 2008).............................................................................8, 9

In re Milham, 141 F.3d 420 (2d Cir.), cert. den., 525 U.S. 872 (1998).......................................26

Nat'l Res. Def. Council, Inc. v. U.S. Consumer Prod. Safety Commission,
      597 F.Supp.2d 370 (S.D.N.Y. 2009)..............................................................................8, 9

In re New Times Sec. Serv., Inc., 371 F.3d 68 (2d Cir. 2004) ....................... 3, 4-5, 6, 7, 8, 13, 30

## TABLE OF AUTHORITIES

**CASES**:                                                                                      **PAGE**

Matter of Oberweis Securities, Inc., 135 B.R. 842 (Bankr. N. D. Ill. 1991) ...............................20

Plumbers and Steamfitters Local 490 Severance and Retirement Fund v. Appleton
    (In re First Ohio Securities Co.), 1994 WL 599433 (6th Cir. 1994)...................................13

Retirement Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v.
    Bank of New York Mellon, 2012 WL 1108533 (S.D.N.Y. April 3, 2012) ...................6, 8

Riegel v. Medtronic, Inc., 128 S. Ct. 999 (2008).............................................................5

Rotimi v. Gonzales, 473 F.3d 55 (2d Cir. 2007)..............................................................4

SEC v. Albert & Maguire Sec. Co., 560 F.2d 569 (3d Cir.1977)..................................31

SEC v. Howard Lawrence & Co., 1 B.C.D. 577 (Bankr. S.D.N.Y. 1975) ...................21

SEC v. Packer, Wilbur & Co., 498 F.2d 978 (2d Cir. 1974) ..................................... 1-2

Securities Investor Protection v. BLMIS, 454 B.R. 285 (Bankr. S.D.N.Y. 2011) .......14

In re 785 Partners LLC, 470 B.R. 126 (Bankr. S.D.N.Y. 2012)..................................26

Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45 (2d Cir. 1984).......................23

SIPC v. Associated Underwriters, Inc., 423 F.Supp. 168 (D. Utah 1975)....................31

SIPC v. Stratton Oakmont, Inc., 229 B.R. 273 (Bankr. S.D.N.Y.), aff'd sub nom.,
    Arford v. Miller, 239 B.R. 698 (S.D.N.Y. 1999),
    aff'd, 210 F.3d 420 (2d Cir. 2000)...............................................................27, 33

Skidmore v. Swift & Co., 323 U.S. 134 (1944).........................................................7, 8

Sriraman v. Patel, 761 F.Supp.2d 23 (E.D.N.Y. 2011)...............................................29

Till v. SCS 18 Credit Corp., 541 U.S. 465 (2004)......................................................19

Tucson Medical Center v. Sullivan, 947 F.2d 971 (D.C. Cir. 1991) ...........................24

United States v. Mead Corp., 533 U.S. 218 (2001) ..........................................4, 5, 7, 8

# TABLE OF AUTHORITIES

**CASES:**                                                                                          **PAGE**

U.S. For Use And Benefit of Evergreen Pipeline v. Merrit-Meridian Const. Corp.,
     890 F.Supp. 1213 (S.D.N.Y. 1995), aff'd, in part, and vacated, in part,
     95 F.3d 153 (2d Cir. 1996) .................................................................................24

U. S. v. City of Warren, Mich., 138 F.3d 1083 (6th Cir. 1998) ....................................26

Valentine Properties Associates, L.P. v. U.S. Dep't of Housing and Urban Development,
     501 F.App'x 16 (2d Cir. 2012) ......................................................................4, 5

Walker v. Eggleston, 2006 WL 2482619 (S.D.N.Y. 2006) ..........................................9

Woodling v. Garrett Corp., 813 F.2d 543 (2d Cir. 1987) .............................................23

WPIX, Inc. v. ivi, Inc., 691 F.3d 275 (2d Cir. 2012), cert. den., 133 S. Ct. 1585 (2013) ..............3

## STATUTES AND RULES:

Securities Investor Protection Act, as amended, 15 U.S.C. §

78ccc(b)(4) ...............................................................................................................10, 11
78ccc(e)(2)(A) ..........................................................................................................12
78ccc(e)(2)(A)-(D) ...................................................................................................13
78fff(b) .....................................................................................................................26
78fff-3(a) ..................................................................................................................16
78fff-(3)(e) ...............................................................................................................9
78fff-(3)(e)(1) ..........................................................................................................11-12
78fff-(3)(e)(2) ..........................................................................................................12
78fff-(3)(e)(3) ..........................................................................................................12
78fff-(3)(e)(4) ..........................................................................................................12
78fff-(3)(e)(5) ..........................................................................................................12
78fff-(3)(e)(5)(A)-(C) ..............................................................................................12
78lll(4) ......................................................................................................................15
78lll(4)(E) .................................................................................................................17
78lll(11) ....................................................................................................................4, 9, 10

United States Bankruptcy Code, 11 U.S.C. §

101(5) .......................................................................................................................27
101(5)(a) ...................................................................................................................27-28
104 ............................................................................................................................14
502(a) .......................................................................................................................27
1325(a)(5) .................................................................................................................19

# TABLE OF AUTHORITIES

**STATUTES AND RULES:**                                                                                        **PAGE**

42 U.S.C. §

415(i) ..................................................................................................................................21
1382f ..................................................................................................................................21


N.Y. CPLR §

5001(a) ...............................................................................................................................27
5001(c) ...............................................................................................................................27


**LEGISLATIVE MATERIALS:**

Dodd-Frank Wall Street Reform and Consumer Protection Act,
        Pub. L. No. 111-203, §929H, 124 Stat. 1376 (2010) .................................................11, 13

## PRELIMINARY STATEMENT

The Securities Investor Protection Corporation ("SIPC") submits this reply to the briefs in opposition to the motion of the Trustee to affirm his calculation of net equity and to deny time-based damages in this liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §78aaa et seq. ("SIPA")[1]

The claimants take a few different positions and seek a few different remedies in their oppositions to the Trustee's motion.  Some claimants ask that net equity be recalculated for inflation.  For them, the starting point is the position of the Securities and Exchange Commission ("SEC" or "Commission") in this matter: the recalculation of net equity based on an inflation factor is permissible under SIPA and whether the inflation factor should be applied depends on whether the benefits of its application outweigh the burden and costs.  While the SEC takes no position on whether a recalculation for inflation is appropriate in this case, these claimants, in contrast, contend that there is no burden and that any costs, whether significant or not, are outweighed by the benefit they perceive to the claimants.  Other claimants argue that net equity should be adjusted not necessarily by an inflation factor but by an amount of interest that should be applied at a rate of 9% per annum.   Yet other claimants express no preference, contending that net equity should be adjusted for inflation or interest.

A common refrain throughout the opposing briefs is that "fundamental fairness" requires one or the other or both outcomes.  But the positions of the claimants and the SEC ignore what the Second Circuit recognized long ago: that the enforcement of a federal statute according to its terms, rather than the equities standing alone, is what governs in a SIPA case.  See SEC v.

---

[1]    Some of the objections challenge the Trustee's computation of net equity other than on the inflation or interest grounds.  Those aspects of the objections are not at issue and therefore, are not addressed here.

Packer, Wilbur & Co., 498 F.2d 978, 983 (2d Cir. 1974). This Court should not substitute the judgment of the supporters of time-based damages for that of Congress under the highly questionable guise of "fairness." Congress has not provided in SIPA for an adjustment of net equity based on an inflation or interest factor; application of time-based damages is inconsistent with SIPA and undermines it; and instead of promoting fairness, time-based damages arbitrarily favor an unidentified segment of investors over, and at the expense of, others.[2]

## ARGUMENT

According to the SEC, the use of constant dollars arises "only in the limited circumstances such as exist in a Ponzi scheme." SEC Brief at 16.[3] The SEC offers no guidance as to the exact situations in which the "circumstances" might be present, indeed, leaving it to this Court to decide whether the circumstances are present even in this case. The Commission also posits that if this Court decides that the circumstances warrant, the Court is to apply a Personal Consumption Expenditures Chain-Type Price Index inflation factor even though that is the factor that Congress has specified be used in a section of SIPA that does not apply here. Id. at 12 n.2. The unprecedented position of the Commission is arbitrary, untenable under the law, and creates confusion for the administration of this and future liquidations under SIPA. For these reasons, as

---

[2]  As discussed infra, some investors who support time-based damages may receive less than if no inflation or interest adjustment is made. This is due to two factors: (i) because the amount of customer property remains fixed while the value of claims increases, the proportionate share of customer property per customer is smaller; and (ii) because the limit of SIPC protection is capped at $500,000 per customer. Until the per customer share of customer property is calculated, it is difficult to know whether the position of the customer is improved or not and whether in supporting the application of time-based damages, the investor endorses a position that hurts or helps him.

[3]  Memorandum of Law of the Securities and Exchange Commission Supporting a Constant Dollar Approach to Valuing Customers' Net Equity Claims for Fictitious Securities Positions (Doc. 5142) ("SEC Br.")

2

discussed more fully below, the Commission's position in this matter does not warrant
deference, and the claimants' reliance upon the SEC gives them no support.

### I.    SIPA UNAMBIGUOUSLY PRECLUDES THE USE OF AN INFLATION ADJUSTMENT IN THE CALCULATION OF "NET EQUITY" AND THERE IS THEREFORE NO BASIS FOR DEFERENCE TO THE COMMISSION'S CONTRARY POSITION

The initial question in examining whether an agency's interpretation of a statute is
entitled to judicial deference is whether the statute or statutory provision in question is
ambiguous.  See, e.g., Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004)
("Deference to [an agency's] statutory interpretation is called for only when the devices of
judicial construction have been tried and found to yield no clear sense of congressional intent");
WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 279 (2d Cir. 2012), cert. den., 133 S. Ct. 1585 (2013);
Estate of Landers v. Leavitt, 545 F.3d 98, 104 (2d Cir. 2008), revised (Jan. 15, 2009) ("We only
consider whether we should defer to the agency's interpretation of the statute, however, upon
finding the statute ambiguous"), cert. den., 129 S. Ct. 2878 (2009); Kruse v. Wells Fargo Home
Mortgage, Inc., 383 F.3d 49, 55 (2d Cir. 2004).   Where the statute is clear - or where
Congressional intent can be discerned from the face of the statute - then the courts, "as well as
the agency, must give effect to the unambiguously expressed intent of Congress," and the
agency's interpretation is not entitled to deference.  See, e.g., Chevron U.S.A., Inc. v. Nat. Res.
Def. Council, Inc., 467 U.S. 837, 842 (1984); WPIX, 691 F.3d at 279 ("To ascertain Congress's
intent…we begin with the statutory text; if its language is unambiguous, no further inquiry is
necessary"); In re New Times Sec. Serv., Inc., 371 F.3d 68, 80 (2d Cir. 2004) ("New Times").
In contrast, where the statute is ambiguous, the agency's interpretation may be eligible for

3

deference under one of two standards established by the Supreme Court - <u>Chevron</u> deference or <u>Skidmore</u> deference.  <u>See</u> <u>United States v. Mead Corp.</u>, 533 U.S. 218, 226-31 (2001).

In the present case, there is nothing ambiguous about SIPA's net equity definition.  As discussed, that definition does not provide for the adjustment of a customer's "net equity" for inflation, or based on any other measure of time value.  <u>See</u> SIPA § 78<u>lll</u>(11).  Moreover, Congress's inclusion of specific inflation-adjustment provisions in another part of the statute, and the other statutory features discussed below and in SIPC's main brief, confirm that Congress did not intend any such adjustment to customers' net equity.  The Commission's attempt to legislate by its say-so is not entitled to either <u>Chevron</u> or <u>Skidmore</u> deference.

## A.  <u>The Position of the Commission Is Not Entitled to Chevron Deference</u>

An agency's interpretation of a statute qualifies for <u>Chevron</u> deference when Congress delegates to the agency authority to make rules carrying the force of law in furtherance of the statute, and the agency adopts the interpretation in question in the exercise of that authority.  <u>See</u> <u>Mead</u>, 533 U.S. at 228-30; <u>Valentine Properties Associates, L.P. v. U.S. Dep't of Housing and Urban Development</u>, 501 F.App'x. 16, 18 (2d Cir. 2012) ("The <u>Chevron</u> framework applies when an agency passes regulations through notice and comment");  <u>Landers</u>, 545 F.3d at 105; <u>Rotimi v. Gonzales</u>, 473 F.3d 55, 57 (2d Cir. 2007); <u>De La Mota v. U.S. Dep't of Educ.</u>, 412 F.3d 71, 79 (2d Cir. 2005) (agency interpretation must have been promulgated with "lawmaking pretense in mind" in order to qualify for <u>Chevron</u> deference).  Where applicable, <u>Chevron</u> deference requires a court to defer to an agency's interpretation of an ambiguous statute unless that interpretation is "arbitrary, capricious, or manifestly contrary to the statute."  <u>Chevron</u>, 467 U.S. at 844.  <u>See</u> <u>Valentine Properties</u>, 501 F.App'x. at 18; <u>De La Mota</u>, 412 F.3d at 78; <u>New</u>

4

<u>Times</u>, 371 F.3d at 80.  As both the Supreme Court and the Second Circuit have recognized, the overwhelming majority of agency interpretations accorded <u>Chevron</u> deference are rules promulgated in "regulations issued through notice and comment or adjudication, or in another format authorized by Congress for use in issuing 'legislative' rules." <u>Landers</u>, 545 F.3d at 106 (quoting <u>Cmty. Health Ctr. v. Wilson-Coker</u>, 311 F.3d 132, 138 (2d Cir. 2002)).  <u>See also</u> <u>Mead</u>, 533 U.S. at 230 ("[T]he overwhelming number of our cases applying <u>Chevron</u> deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication"); <u>Valentine Properties</u>, 501 F. App'x at 17.

Warranting a different level of consideration and standing in marked contrast to the aforementioned situations are agency positions taken in the course of litigation that lack the "rigorous consideration, and public scrutiny that justify <u>Chevron</u> deference." <u>See</u> <u>De La Mota</u>, 412 F.3d at 80; <u>Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York</u>, 273 F.3d 481, 490-91 (2d Cir. 2001), <u>cert. den.</u>, 549 U.S. 1252 (2007).  In the same vein, the Supreme Court has emphasized that "an <u>amicus</u> brief interpreting a statute is entitled, at most, to deference under <u>Skidmore v. Swift</u>...," a lesser standard of deference discussed <u>infra</u>.  <u>Riegel v. Medtronic, Inc.</u>, 128 S. Ct. 999, 1009, 1016 n. 8 (2008) (Ginsburg, J. dissenting, endorsed in majority opinion).  Likewise, where an agency's current litigation position is inconsistent with its longstanding interpretation of a statute, the current position will not be accorded deference.  <u>See</u> <u>CSI Hydrostatic Testers, Inc. v. Commissioner</u>, 103 T.C. 398, 409, 1994 WL 466342 (1994) (no deference due to Commissioner's interpretation where it is neither longstanding nor a matter of public record upon which the public is entitled to rely when planning its affairs).  <u>See</u> <u>also</u> <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 212 (1988) (declining to give deference to

5

"agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice"). The Second Circuit has made clear that statutory interpretations contained in policy statements, agency manuals, enforcement guidelines, and statements on agency websites do not warrant Chevron deference. See Landers, 545 F.3d at 106; De La Mota, 412 F.3d at 79. See also Christensen v. Harris County, 529 U.S. 576, 587 (2000); Retirement Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon, 2012 WL 1108533, at * 6 (S.D.N.Y. April 3, 2012) ("BONY") (interpretive guidance published on SEC website not entitled to deference); City of Omaha v. CBS Corp., 2011 WL 2119734, at *7 (S.D.N.Y. May 24, 2011) (same), aff'd, 679 F.3d 64 (2d Cir. 2012).

In 2004, the Second Circuit applied these principles to the question of whether Chevron deference was due to a position taken by the Commission in an amicus brief concerning whether, under SIPA, a customer claim for fictitious securities is properly treated as a claim for cash or securities. See New Times, 371 F.3d at 80-82. The Court concluded that the Commission's position was not entitled to such deference for the following three reasons:

(1)    Absence of a Rule or Regulation: "[A]lthough the SEC has clearly had the power to draft rules to address this ambiguity in SIPA, the interpretation proffered in its (amicus) brief has never been articulated in any rule or regulation" promulgated using a notice-and-comment procedure;

(2)    Novelty of the Position: "[T]he position taken by the SEC in its brief is one that has not previously been articulated in *any* form..." and was expressed for the first time in an amicus brief (emphasis in original); and

6

(3)    <u>SIPC's Disagreement</u>: "[T]he SEC's historical relationship with SIPC and SIPC's arguably greater familiarity with the provisions of SIPA are yet additional reasons to decline to apply <u>Chevron</u> deference to the SEC's interpretation of SIPA."  <u>See</u> <u>New Times</u>, 371 F.3d at 80-82.

Similar factors militate against <u>Chevron</u> deference here.  Over the course of more than forty years and more three hundred SIPA liquidations prior to this one, the Commission has not once suggested that the amount of any customer claim subject to satisfaction with cash should be expressed in "constant dollars," or, indeed, adjusted in any way to reflect inflation or any other measure of the time value of money.  On the contrary, the Commission's current position is entirely unprecedented.  Moreover, the Commission did not introduce that position through the quasi-legislative notice and comment procedures reserved for formal rule-making.  Instead, the Commission has asserted formally its "constant dollars" position for the first time in a brief in litigation, a method lacking the "regularity, rigorous consideration, and public scrutiny" necessary for <u>Chevron</u> deference.

## B.  <u>The Position of the Commission Is Not Entitled to Skidmore Deference</u>

In general, where <u>Chevron</u> deference is inappropriate, an agency's statutory interpretation may still be eligible for some level of deference under the Supreme Court's decision in <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944).  <u>See</u> <u>Mead</u>, 533 U.S. at 234.  Unlike <u>Chevron</u> deference, however, <u>Skidmore</u> deference is not mandatory and requires only that the court accord to an agency interpretation a level of deference, if any, merited by "the thoroughness evident in its [(the interpretation's)] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power

to control." Skidmore, 323 U.S. at 144.  See also Mead, 533 U.S. at 234; Boykin v. KeyCorp,

521 F.3d 202, 208 (2d Cir. 2008); De La Mota, 412 F.3d at 80; New Times, 371 F.3d at 83.  A

reviewing court may conclude that no deference under Skidmore is owed to an agency

interpretation that is deficient in one or more of these characteristics, as the Second Circuit and

lower courts regularly have found.  See, e.g., English v. Ecolab, Inc., 2008 WL 878456, at *5

(S.D.N.Y. 2008) ("Weight and deference need not be given to interpretations that are

inconsistent, not contemporaneous to enactment of the statute, or stale").  See also BONY, 2012

WL 1108533, at **5-6; City of Omaha, 2011 WL 2119734, at *7; Boykin, 521 F.3d at 208 (no

Skidmore deference for informal, unpublished "practice" described in HUD letter); De La Mota,

412 F.3d at 80; Nat'l Res. Def. Council, Inc. v. U.S. Consumer Prod. Safety Commission, 597 F.

Supp.2d 370, 392 (S.D.N.Y. 2009) ("NRDC"); In re Methyl Tertiary Butyl Ether ("MTBE")

Products Liability Litig., 559 F.Supp.2d 424, 440 (S.D.N.Y. 2008) ("MTBE").

Under Skidmore, as under Chevron, courts have been skeptical of agency interpretations

first announced in litigation, particularly those at odds with either the language or purpose of the

relevant statute.  See, e.g., Cartoon Network LP, LLLP v. CSC Holdings, Inc., 536 F.3d 121, 129

(2d Cir. 2008) (agency opinion not entitled to deference under Skidmore where it failed to

account for statute's language), cert. den. sub nom., Cable News Network v. CSC Holdings, Inc.,

129 S. Ct. 2890 (2009); De La Mota, 412 F.3d at 80 (a "'position adopted [by an agency] in the

course of litigation lacks the indicia of expertise, regularity, rigorous consideration, and public

scrutiny that justify Chevron deference.'  Catskill Mountains, 273 F.3d at 491.  Such

endorsements also lack the thoroughness required for Skidmore respect."); Fed. Elec. Comm'n v.

Political Contributions Data, Inc., 943 F.2d 190, 196 (2d Cir. 1991) (agency advisory opinion

8

unreasonable, in part, because it was inconsistent with statute's purpose); <u>NRDC</u>, 597 F.Supp.2d at 392 (interpretation that undermined purpose of statute was not entitled to <u>Skidmore</u> deference); <u>English</u>, 2008 WL 878456, at *5; <u>MTBE</u>, 559 F.Supp.2d at 440; <u>Walker v. Eggleston</u>, 2006 WL 2482619, at **5, 6 (S.D.N.Y. 2006).

In the present case, the Commission's view that the "net equity" definition enables, but does not require, the Court to adjust for "constant dollars" the amount of customer claims subject to satisfaction with cash has no foundation in SIPA. The "net equity" definition itself contains no language suggesting, let alone providing, that such an adjustment is permissible, and the balance of the statute indicates the contrary. <u>See</u> SIPA § 78<u>lll</u>(11). In this regard, as discussed below, where Congress intended an inflation adjustment in the SIPA or even the bankruptcy context, it has expressly said so, with specificity, and left no room for the exercise of judicial discretion. <u>See</u> <u>id.</u> §78fff-3(e).

Certainly, there is nothing in SIPA that provides that the Court may pick and choose whether to make inflation adjustments to "net equity" valuations, as the Commission suggests. The Commission makes the vague observation that limits the application of the inflation factor to the "circumstances such as exist in a Ponzi scheme," but then does not elaborate on what specific circumstances it believes to be sufficient, and does not commit to "constant dollar" adjustments even in the present case. Needless to say, the Commission is unable to identify any provision of SIPA that supports its position, instead arguing essentially that, because Congress did not expressly prohibit the use of inflation adjustments in the valuation of customer "net equities," the Court is free to use them.

9

But the Commission draws precisely the wrong inference from Congress's silence.  As discussed below, the fact that Congress felt the need to provide expressly for inflation adjustments elsewhere in SIPA indicates that it considered any such adjustments to be exceptional and a departure from the statutory norm.  As a consequence, again, Congress's failure to provide for adjustments to "net equity" valuation by an inflation or interest factor reflects its intent not to allow such adjustments.  Because the position of the Commission is inconsistent with SIPA and lacks any power to persuade, it is not entitled to deference, even under <u>Skidmore</u>.  <u>See</u>, <u>e.g.</u>, <u>Cartoon Network</u>, 536 F.3d at 129; <u>De La Mota</u>, 412 F.3d at 80.

## C. <u>The Application of an Inflation Factor and the Orderly Liquidation of the Debtor</u>

### 1. <u>Expressio Unius Est Exclusio Alterius</u>

The reasons why a recalculation of net equity for time-based damages is improper are straightforward.  First and foremost, Congress has not provided for such a re-calculation,  and indeed, to the contrary, has expressly forbidden any change to the net equity definition as set forth in SIPA.  Under SIPA section 78ccc(b)(4), SIPC is authorized

> to adopt, amend, and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of [SIPA], including rules relating to --
>
> (A)    the definition of terms used in [SIPA], other than those terms for which a definition is provided in section 78<u>lll</u> of [15 U.S.C.].

Because net equity is defined at section 78<u>lll</u>(11) of SIPA, it cannot be re-defined.  Under section 78<u>lll</u>(11), net equity essentially is the difference between what the customer owes the broker and what the broker owes the customer.  The definition contains no readjustment for time-based

damages, and revising the calculation in that fashion would re-define net equity, and run counter

to SIPA section 78ccc(b)(4).

Even assuming, arguendo, that the net equity definition could be modified, the absence

of any time-based damages adjustment to the definition of net equity is no oversight. Congress

plainly knows how to require an inflation adjustment and if it had intended such an adjustment to

net equity, it would have so provided. For example, in 2010, Congress amended SIPA under the

Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-

203, §929H, 124 Stat. 1376, 1856-1857 (2010). Among other things, under Dodd-Frank,

Congress raised the level of protection under SIPA with respect to cash claims, that is, the

"standard maximum cash advance," from $100,000 per customer to $250,000. Id. This meant

that if customer cash that had been entrusted to a broker was missing, SIPC could advance up to

$250,000 to satisfy the customer's valid claim for the cash. Under Dodd-Frank, Congress also

provided for a possible inflation adjustment to the maximum cash advance. Thus, as currently

revised, SIPA section 78fff-3(e)(1) provides:

> Not later than January 1, 2011, and every 5 years thereafter, and
> subject to the approval of the Commission as provided under
> section 3(e)(2) [15 U.S.C. §78ccc(e)(2)], the Board of Directors of
> SIPC shall determine whether an inflation adjustment to the
> standard maximum cash advance amount is appropriate. If the
> Board of Directors of SIPC determines such an adjustment is
> appropriate, then the standard maximum cash advance amount
> shall be an amount equal to
>
> (A) $250,000 multiplied by
>
> (B) The ratio of the annual value of the Personal Consumption
>     Expenditures Chain-Type Price Index (or any successor index
>     thereto), published by the Department of Commerce, for the
>     calendar year preceding the year in which such determination
>     is made, to the published annual value of such index for the

11

calendar year preceding the year in which this subsection was
enacted.

In formulating the inflation adjustment in SIPA, Congress was specific.  Thus, Congress

provided that index values used in calculating inflation adjustments are to be the values most

recently published by the Department of Commerce (§78fff-3(e)(1)); it included a rounding-

down provision if the re-calculated cash advance amount is not a multiple of $10,000 (§78fff-

3(e)(2)); it required publication by the SEC in the Federal Register of the standard maximum

cash advance whenever reconsideration of the amount is warranted, and a report by SIPC to

Congress of the same (§78fff-3(e)(3)); it specified an implementation period of any revised cash

advance (§78fff-3(e)(4)); it enumerated factors that the SIPC Board of Directors is to consider in

evaluating whether an inflation adjustment is appropriate (§78fff-3(e)(5)).  With respect to the

latter, it required the SIPC Board, in deciding whether to adjust the cash advance for inflation, to

consider the state of the SIPC Fund and the economic conditions affecting SIPC member broker-

dealers; the potential problems impacting SIPC members; and any other factors the Board deems

appropriate.  SIPA §78fff-3(e)(5)(A)-(C).  Moreover, the adjustment of the amount is not to

occur in a vacuum.  Even after the SIPC Board considers the requisite factors, its determination

to adjust the amount for inflation is subject to approval by the SEC.  However, that approval can

occur only after the SEC publishes notice of the SIPC proposal and provides interested persons

with an opportunity to submit "written data, views, and arguments with respect to such proposed

rule change."  SIPA §78ccc(e)(2)(A).  Thereafter, the Commission either may approve the

proposal or institute proceedings to determine wither the proposal should be disapproved.  The

proceedings entail notice to the public of the grounds for disapproval and an opportunity for a

hearing.  In order to approve a proposal by SIPC to adjust the cash advance for inflation, the

12

Commission must find that the proposed adjustment is in the public interest and consistent with the purposes of SIPA.  If the Commission disapproves the proposal, it must find good cause for doing so and publish its reasons.  SIPA §78ccc(e)(2)(A)-(D).

In putting in place the aforementioned procedures prior to any inflation adjustment, Congress recognized the possible impact of an inflation adjustment on the SIPC Fund and on SIPC members; included an opportunity for interested parties to participate in the decision-making process; and imposed on the Commission an obligation to make specific findings in order to approve a proposed inflation adjustment and to explain its reasons if it failed to approve it.  This elaborate process is the diametric opposite of the unilateral expression of opinion by the Commission in its current brief.  It bears mention that the cash inflation provision does not apply in the case at hand.  The claims of the BLMIS customers were allowed as claims for securities and not claims for cash.[4]  Therefore, the BLMIS customers were not subject to the then-in effect $100,000 limit of protection for cash claims, but eligible for the higher limit of SIPC protection of $500,000 per customer.   In any event, the change in the limit of protection for cash claims from $100,000 to $250,000 applies only prospectively to cases initiated after the effective date of the Dodd-Frank amendments of July 22, 2010, nearly two years after the start of the BLMIS case.  See Dodd-Frank, §4, 124 Stat. 1390.  See also Landgraf v. USI Film Products, 511 U.S. 244, 273 (1994) (court has "long embraced a presumption against statutory retroactivity").

---

[4]   See New Times, 371 F.3d at 87.  But cf., Plumbers and Steamfitters Local 490 Severance and Retirement Fund v. Appleton (In re First Ohio Securities Co.), 1994 WL 599433 (6th Cir. 1994).

The specificity of the inflation provision in SIPA makes the inconsistency of the Commission's position with SIPA palpable. On the one hand is the extended process established by Congress in SIPA in order for an inflation adjustment even to be considered and to take effect, if at all, only prospectively after a certain date. On the other hand, and in juxtaposition, is the adjustment of net equity for inflation on the say-so of the SEC, with no opportunity for public comment, no notice to SIPC or its members to evaluate the impact of an adjustment, and even before the potential inflation adjustment that Congress <u>has</u> sanctioned in SIPA is to occur. Compounding the arbitrariness of the position of the Commission is its suggestion that the inflation factor to be applied potentially by this Court is the factor that Congress has required be used in adjusting the maximum cash advance for inflation. Nowhere has Congress authorized the adjustment of net equity for time-based damages let alone any related inflation factor.[5]

As this Court previously recognized in a different case in this liquidation proceeding, *expressio unius est exclusio alterius.* <u>Securities Investor Protection v. BLMIS</u>, 454 B.R. 285, 303 (Bankr. S.D.N.Y. 2011). The expression of one thing is the exclusion of another. The fact that Congress provided for an adjustment of inflation in one circumstance implies that it did not intend the same in all other circumstances. Indeed, if such adjustments could occur on mere pronouncements by the SEC, there would be no role for Congress in the matter. In fact, that is not the case. The position of the SEC is a usurpation of the role of Congress and, as such, is worthy of no deference.

---

[5]    That Congress is specific when it wants an inflation factor to be applied also finds support in the Bankruptcy Code. Thus, in 11 U.S.C. section 104, Congress has enumerated the amounts to be adjusted for inflation under the Code, the dates on which such adjustments are to occur, the index factor to be applied in the calculation, the rounding of the adjusted amount, in addition to requiring publication in the Federal Register of the adjusted amounts, and making the adjustments prospective only in application.

14

## 2.  The Limits of SIPA Protection

Incorporating as it does provisions of the Bankruptcy Code, SIPA provides a remedy to customers and creditors, but the protection is limited, and the relief is administered in an orderly way.  Among other reasons, the position of the Commission warrants no deference because (i) there is no authority for it; and (ii) its position is inconsistent with the SIPA scheme of protection.

Under the net equity definition, each customer has a claim for the net amount of cash or securities entrusted to the custody of the broker for the account of the customer.  As the Second Circuit noted, "SIPA is intended to expedite the return of *customer property*, and SIPC provides advances on customer property."  In re Bernard L. Madoff Inv. Securities LLC, 654 F.3d 229, 240 (2d Cir. 2011) (emphasis in original), cert. dismissed, 132 S. Ct. 2712 (2012), and cert. den., 133 S. Ct. 24 and 133 S. Ct. 25 (2012) ("Madoff").  As the Court further noted, customer property is defined under SIPA as "'cash and securities … at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.' 15 U.S.C. §78lll(4))." Id.

Entrustment of cash or securities to the broker is the sine qua non of "customer" status and protection.  Id. at 236, citing Appleton v. First Nat'l Bank of Ohio, 62 F.3d 791, 801 (6th Cir. 1995); In re Brentwood Securities, Inc., 925 F.2d 325, 327 (9th Cir. 1991).  For property to have been entrusted to the broker, cash and/or securities must have been placed in the care of the broker for the customer.  The latter is what is returned to the customer.  If the customer has $100 on deposit with the broker when it is placed in SIPA liquidation, the customer is entitled to the

15

return of his $100.  Likewise, if the customer is owed 10 shares of stock, his claim is for the 10 shares of stock.  Importantly, as the Second Circuit noted, "SIPA is intended to expedite the return of *customer property*, and SIPC provides 'advances' on customer property."  <u>Madoff</u>, 654 F.3d at 240 [emphasis in original].  As customer property is gathered by the trustee, the advances made by SIPC are returned to it as to any customer fully satisfied through an advance of SIPC funds.  <u>See</u> SIPA §78fff-3(a), and <u>McKenny v. McGraw (In re Bell & Beckwith)</u>, 937 F.2d 1104, 1108 (6th Cir. 1991).

Other than providing for the return of customer property, within specified limits, the availability of SIPC funds is not intended to place the customer in any better position than he would have been had the brokerage not failed.  If the customer deposits $100 with the broker and the broker steals it, the broker has stolen $100 and not $110 simply because $100 in one year may be worth $110 in a later year. The availability of SIPC advances merely expedites the return of the $100 to the customer, and nothing more.  If the customer sustained damages from the actions of the broker, including time-related damages, recovery for those damages is not available from SIPC.  As discussed below, the claim of the investor in that regard lies against the debtor and its general estate.

### 3.  <u>The Inconsistency of the SEC's Position</u>

In the ordinary course of business, there should be no difference between the amount of customer property custodied with the broker-dealer and the net amount owed to customers.  SEC regulations, such as Rule 15c3-3 discussed in SIPC's main brief, by requiring broker-dealers to segregate certain customer assets, and by other protective measures established by SEC rule,

guard against that.  See SIPC Br. at 15-18.[6]  See also SIPA §78lll(4)(E).  If the view of the SEC

and the claimants is accepted, however, there always would be a deficiency in customer property

where an inflation factor or interest is deemed to apply.  Because the inflated amount would

exceed the actual amount of customer property on deposit, a deficiency is inevitable.  Since it

would be an amount owed to customers, in the view of the SEC and the claimants, the amount of

the deficiency would be payable by SIPC.  Yet, no provision in SIPA defines customer property

to include a time-based damages factor.  Although customer property includes "property

unlawfully converted," the only amount of property that could be converted is the actual amount

of property deposited with the brokerage and stolen.

Nevertheless, the SEC and the claimants read into SIPA a time-based damages provision

where there is none.  And, although the Commission observes that "it is only in the limited

circumstances such as exist in a Ponzi scheme that the justification for using constant dollars

arises," the Commission fails to identify the precise situations in which an inflation factor is to

apply.  SEC Br. at 16.  Indeed, the SEC's position in CFTC v. Walsh, 712 F.3d 735 (2d Cir.

2013) ("Walsh"), points up the lack of clarity in the SEC's current position.  Although Walsh

involved a Ponzi scheme that lasted more than 13 years before the firm was placed under the

control of a receiver, the Commission opposed the request by long-term investors for an inflation

adjustment.  There, the SEC, together with the Commodity Futures Trading Commission, stated

as follows:

> The civil agencies believe net investment--dollar in, dollar out--*pro
> rata* distribution plan is the best and most fair approach under the

---

[6]  Memorandum of Law of the Securities Investor Protection Corporation In Support of Trustee's
Motion for an Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based
Damages (Doc. No. 5036) ("SIPC Br.")

circumstances of this Ponzi-scheme case because it yields a substantial recovery for all investors. Some long-term investors have advocated that rather than employing a net investment model, the Court should instead implement a constant dollar approach-- adding an inflation adjuster--when calculating an investor's distribution. Although the use of a constant dollar approach may be appropriate in certain instances, the facts of this matter do not, at the outset, warrant its use here. Currently, the Receiver has marshaled sufficient assets so that under a *pro rata* distribution method, it will distribute to each investor approximately 89% of their net contributions or investment. The CFTC and SEC believe that these funds should be distributed without an inflation adjustment.

The SEC and CFTC hope, however, that the Receiver will be able to obtain additional funds through the liquidation of various assets owned by the Defendants and Relief Defendants, as well as through several clawback actions the Receiver has filed. In the event that the Receiver acquires funds to distribute in excess of 100% of the net contributions of investors, the Court may wish to consider ordering a hybrid approach where future distributions in excess of 100% of the net contributions be [*sic*] calculated on a *pro rata* basis and adjusted to give effect to inflation.

712 F.3d at 744.

Although it is not entirely clear why in Walsh, the Commission would express a view that seems to be at odds with and, at a minimum, casts confusion on, the position that it takes here, the fact is that under the orderly liquidation scheme of SIPA, the outcome desired by the Commission in Walsh in some measure is the outcome provided by Congress in SIPA. Customer property is shared, pro rata, by customers to the extent of their net equities, unadjusted for damages. If customer property is missing, SIPC advances the difference, within the limits of protection per customer. To the extent that the investor has lost more than the actual customer property deposited for his account with the broker, the investor has a general creditor claim for damages which, if valid, is payable out of the general estate collected by the Trustee and satisfied

18

in the order provided under the Bankruptcy Code.  Hence, as in <u>Walsh</u>, the investor recovers the

actual amount of his investment.  If the Trustee is able to recover additional sums, the investor

may share, <u>pro rata</u>, in the distribution of those funds, with other general creditors, to the extent

of any valid claim for damages.

### 4.   **The Orderly Liquidation**

The claimants make much of the position of the SEC before the Second Circuit and

elsewhere with regard to the applicability of time-based damages in this case.  It is noteworthy,

however, that although the SEC is incorrect in its view of the availability of time-based damages

in a SIPA case, ultimately, it has expressed no view on whether or not time-based damages

should apply here.  It also is noteworthy that in <u>Walsh</u>, the Second Circuit commented as follows

with regard to the issue at hand:

> KCERA has not cited any authority that supports the proposition
> that an inflation adjustment is required as a matter of law when
> there is to be a distribution of assets to a group of similarly situated
> victims and those assets are insufficient to make all of the victims
> whole.  Although KCERA argues that "the Supreme Court has
> made clear [that] to satisfy the goal of treating 'similarly situated
> creditors similarly' by applying sound 'objective economic
> analysis,' creditors should receive compensation for 'the *time value
> of their money*,'" (KCERA brief on appeal at 27 (quoting *Till v.
> SCS 18 Credit Corp.*, 541 U.S. 465, 477 (2004) (emphasis in
> brief)), *Till* involved a bankruptcy case and a statutory provision,
> 11 U.S.C. § 1325(a)(5), "[t]he text of [which wa]s consistent with
> the view that the appropriate discount rate [for use in a bankruptcy
> cramdown proceeding] should reflect . . . the time value of
> money," 541 U.S. at 483 n.25 (internal quotation marks omitted).
> There is no such statutory provision governing enforcement actions
> such as those at issue here.

19

> Nor are the other cases cited by KCERA as requiring calculations to account for the time value of money applicable here. They involved such issues as the adequacy of a state tax refund or, in private civil actions, the proper calculation of the amount of damages needed to make the claimant whole. None of them involved governmental enforcement actions in which there are numerous victims and insufficient assets to provide complete compensation.
>
> KCERA's argument that "the SEC repeatedly urg[ed] an inflation adjustment in the *Madoff* litigation" (KCERA brief on appeal at 25) is beside the point. The inflation issue was not ruled on in the bankruptcy court in that litigation, *see In re Madoff*, 654 F.3d at 234, and this Court expressly declined to opine as to whether such an adjustment should be made, *see id.* at 235 n.6.

712 F.3d at 755.

The test for determining whether a claimant is a customer or a general creditor was stated by the court in <u>Matter of Oberweis Securities, Inc.</u>, 135 B.R. 842 (Bankr. N. D. Ill. 1991).  In denying customer status to an investor seeking the dividends that would have been earned by the investor had the broker invested the funds of the investor as instructed, the Court observed that:

> This damage would have occurred even if the debtor had not become insolvent.  Thus, this claim is not within the purview of what SIPA seeks to protect, since this loss is not a direct result of the debtor's insolvency.

135 B.R. at 846.  <u>See</u> <u>Arford v. Miller</u>, 239 B.R. 698, 701 (S.D.N.Y. 1999), <u>citing</u> <u>In re Brentwood Securities Inc.</u>, 925 F.2d at 327 (to be eligible for SIPA protection, claimants must show "that the losses they suffered were a result of that brokerage house's insolvency"), <u>aff'd</u>, 210 F.3d 420 (2d Cir. 2000).  Any loss in value in the instant case did not arise from the broker's financial failure, but from the fraud perpetrated upon investors by BLMIS and its failure to invest as represented to customers.  It is well-settled that consequential losses resulting from the failure

20

of a broker to execute trades as promised, breach of contract, fraud, or misrepresentation, are damage claims of a general creditor, and not "customer" claims. See In re Klein, Maus & Shire, Inc., 301 B.R. 408, 421 (Bankr. S.D.N.Y. 2003) ("Even if it is assumed that their losses were caused by fraud, breach of contract, or a similar theory, they are general creditors."); In re A. R. Baron Co., 226 B.R. 790, 796 (Bankr. S.D.N.Y. 1998) ("failure to execute trades are not 'customer' claims which a trustee may satisfy with SIPC funds or Customer Property.  Rather, these claims are general unsecured breach of contract claims."); Barton v. SIPC, 182 B.R. 981, 985 (Bankr. D.N.J. 1995) ("test for whether a claim sounds in contract is whether the brokerage firm would have had to reach into its pocket to cover the difference between funds in the account and the amount of the claim."); SEC v. Howard Lawrence & Co., 1 B.C.D. 577, 579 (Bankr. S.D.N.Y. 1975) ("SIPA does not protect customer claims based on fraud or breach of contract."). As discussed below, no authority relied upon by the Commission suggests otherwise.

## II.    THE ATTEMPT TO ADJUST NET EQUITY CLAIMS FOR INFLATION IS A BACK-DOOR ATTEMPT TO OBTAIN PREJUDGMENT INTEREST ON A CLAIM WITHOUT THE BENEFIT OF A JUDGMENT

As a preliminary matter, it must be emphasized that there is no statutory or other authority for an inflation adjustment of net equity.  In arguing that application of an inflation factor is well-accepted, the SEC relies upon an excerpt from a publication that notes that price indexes are commonly used to correct the effects of inflation.  One example cited by the author of the publication are cost-of-living adjustments in Social Security benefits.  See SEC Br. at 11. But authority exists for those adjustments by statute.  See, e.g., 42 U.S.C. § 415(i) and 42 U.S.C. § 1382f.

21

In contrast, no authority is present in this case. Instead, to support its position, the Commission draws a false distinction between "prejudgment interest," which it claims is only used for compensation for the "lost use of the money," and inflation, which accounts for the "diminished purchasing power" of money. But the SEC's generalization is unsupported by the case law and is insufficient to transform a general creditor claim for damages into a "customer" claim. The fact is that inflation is a component of prejudgment interest which, under applicable law, is available only upon the entry of a judgment. The instant request for an inflation adjustment is simply a request for an award of prejudgment interest without the benefit of a judgment.

## A.  Inflation As A Component Of Prejudgment Interest

Application of an inflation factor is the application of prejudgment interest to the amount of an allowed claim. Library of Congress v. Shaw, 478 U.S. 310 (1986) ("Shaw"), is instructive in this regard. Shaw involved a race discrimination case in which instead of awarding interest on attorney fees, the lower court increased the amount of the lodestar (the number of hours expended multiplied by the hourly rate) to compensate the attorney for a delay in payment. Although the central issue in Shaw is irrelevant to the case at hand, in resolving the issue, the Court made two observations that are significant here. One, it noted that "[p]rejudgment interest … is considered as damages." 478 U.S. at 321. And two, in response to an assertion that "[i]nterest and a delay factor … have distinct purposes: the former compensates for loss in the use of money, while the latter compensates for loss in the value of money," the Court noted that it was "not persuaded. Interest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money." The Court further observed:

22

> When interest is awarded, as it was in this case, it is computed by
> multiplying a particular rate of interest by the amount of the award.
> An interest rate reflects not only the real opportunity cost of
> capital, but also the inflation rate.…  Thus, loss of value due to
> delay is an element of an interest adjustment.

478 U.S. at 322 n.7.

The District Court for the Southern District of New York has observed that "the issue of
what rate of prejudgment interest applies . . . is complicated by the surprising lack of legislative
guidance and the resulting inconsistency in the prejudgment interest rates used by the
courts." Hollie v. Korean Air Lines Co., 834 F.Supp. 65, 69 (S.D.N.Y. 1993).  Nevertheless,
courts have awarded prejudgment interest at a rate that mimics inflation.  For example, as the
Second Circuit explained in a case involving the New York State wrongful death statute: "The
purpose of the statute is to compensate for pecuniary injuries suffered by the distributees of
decedent's estate.  The prejudgment interest provision implements this goal by ensuring that the
distributees are compensated for the time value of the income stream the decedent would have
earned between death and the entry of judgment." Shu-Tao Lin v. McDonnell Douglas Corp.,
742 F.2d 45, 51 (2d Cir. 1984) (quotations and citations omitted), cited with approval in
Woodling v. Garrett Corp., 813 F.2d 543, 560 (2d Cir. 1987).  In another case, Hollie v. Korean
Air Lines Co., 834 F.Supp. 65 (S.D.N.Y. 1993), in holding that the yield on a 52-week T-bill was
an appropriate rate for prejudgment interest, the District Court  found the rate to be "an
appropriate approximation of the interest rate plaintiffs could have earned on their funds. In
addition, as a highly liquid, short-term, and risk-free investment, the 52–week T-bill embodies,
in part, the financial communities [sic] estimate of future inflation and, over time, has moved
closely with the actual inflation rate." 834 F.Supp. at 71.  In reaching this conclusion, the Court

23

relied on the factors that the Second Circuit had indicated needed to be considered in determining an interest rate. Id. at 69. The factors included: "1) the interest rate a plaintiff could likely receive on relatively risk-free investments; and 2) of particular importance, the inflation that occurred between the date of the accident and the date of trial." In re Connecticut Nat. Bank, 928 F.2d 39, 43 (2d Cir. 1991). See Tucson Medical Center v. Sullivan, 947 F.2d 971, 981 n.13 (D. C. Cir. 1991) ("Congress'[s] main intent was to compensate the party entitled to the amount in controversy for the time value of money wrongfully withheld.… 'Interest compensates for [delay in payment] and for the loss in purchasing power caused by inflation, which is a component of interest.' [citation omitted]"); U.S. For Use And Benefit of Evergreen Pipeline v. Merrit-Meridian Const. Corp., 890 F.Supp. 1213, 1225 (S.D.N.Y. 1995) ("The Supreme Court has recognized the time value of money, and noted that money received today for services provided previously is not equivalent to the same dollar amount had it been received at the time the services were provided.… For this reason, the Supreme Court has held that prejudgment interest is an element of complete compensation…. Thus, Evergreen is entitled to an award of prejudgment interest on the damages it suffered…), aff'd, in part, and vacated, in part, 95 F.3d 153 (2d Cir. 1996); In re CNB Intern., Inc., 440 B.R. 31, 46 (W.D.N.Y. 2010) (sustaining bankruptcy court in its choice of interest rate and as to which the bankruptcy court had opined that "the plaintiffs need some accommodation for the time value of money. Prejudgment interest fulfills this purpose.").

Instead of supporting a contrary conclusion, authorities relied upon by the SEC confirm that inflation is an element of prejudgment interest in order to achieve complete compensation

for the wronged party.[7]  For example, the SEC cites to a report of a Special Master in <u>Kansas v. Colorado</u>, 533 U.S. 1 (2001), for the proposition that prejudgment interest is separate from inflation.  The Court in the case considered each objection to the Special Master report, but did not discuss the inflation component or the rate of prejudgment interest <u>per se</u>.  Rather, the Court considered the appropriateness of the starting date for the application of prejudgment interest.  In doing so, significantly, the Court noted that an award of prejudgment interest is in an effort to achieve full compensation, 533 U.S. at 10, <u>citing</u> <u>City of Milwaukee v. Cement Div., Nat. Gypsum Co.</u>, 515 U.S. 189, 195 (1995), and that an inflation adjustment is "a type of interest."  533 U.S. at 9 n.2.  The report of the Special Master made clear that inflation is not separate from prejudgment interest, but is a form of interest that is a component of it.  As stated in the report:

> There is, however, another consideration in the award of prejudgment interest during these early years.  Three elements can be involved in any such award: an interest rate to reflect the loss of use of money owed; a rate to reflect inflation; and a risk factor, although that is not applicable here.

<u>Kansas v. Colorado.</u>, No. 105, ORIGINAL, 2000 WL 34508307, at *46 (Aug. 31, 2000).  The report also noted that the rates applied "properly include inflation and the loss of use of money due as damages."  <u>Id</u>.  Likewise, in another decision relied upon by the Commission, SEC Br. at 14-15, the Court noted that pre-judgment interest is designed to make a plaintiff whole and that

---

[7] Typically, interest is paid by someone who has held another's funds.  Here, application of interest to benefit any "wronged party" comes not at the expense of the wrongdoer who held and converted customer assets, but rather at the direct expense of other "wronged parties."  As discussed herein, giving damage awards, under the rubric of interest, grants a greater portion of "customer property" to one group while directly diminishing the funds available to other customers.

the "purpose of awarding prejudgment interest under Title VII, … is to compensate victims both for the time value of the lost money as well as for the effects of inflation." <u>U. S. v. City of Warren, Mich.</u>, 138 F.3d 1083, 1096 (6th Cir. 1998). The Court concluded that <u>prejudgment interest based on the consumer price index alone</u> would not be sufficient to provide the victims with full compensation     and remanded the case for reconsideration of the appropriate rate of prejudgment interest. Other cases relied upon by the Commission highlight that the purpose of prejudgment interest is complete compensation.

## B. <u>Prejudgment Interest Without the Judgment</u>

Before prejudgment interest can be awarded, there must first be a judgment. This principle applies with equal force to the arguments of the claimants in this case who seek an inflation adjustment, as well as of those who assert that they are entitled to interest on their net equities.

 Various sections of the Bankruptcy Code ("Code") apply to the SIPA proceeding to the extent consistent with SIPA. <u>See</u> SIPA §78fff(b). Under section 502(a) of the Code, a claim is deemed allowed, unless there is an objection. Under section 101(5) of the Code, a "claim" is a right to payment. If there is a right to payment to prejudgment interest under applicable nonbankruptcy law, then the prejudgment interest is part of the claim which is deemed allowed in the absence of an objection. <u>See</u> <u>In re Milham</u>, 141 F.3d 420, 423 (2d Cir.) (interest accruing prior to the filing of the bankruptcy petition generally allowable to the extent and at the rate provided for under applicable nonbankruptcy law), <u>cert</u>. <u>den.</u>, 525 U.S. 872 (1998); <u>In re 785 Partners LLC</u>, 470 B.R. 126, 131 (Bankr. S.D.N.Y. 2012). Because they are consistent with

26

SIPA, sections 502(a) and 101(5) of the Bankruptcy Code apply to the SIPA proceeding but only to the extent they relate to general creditor, and not "customer," claims.[8]

Applicable law in the case at hand is New York law.  Under N.Y. CPLR §5001(a) and (c), interest is available from the date that damage is incurred but only "upon a sum awarded" in "the verdict, report or decision."  The decision of this Bankruptcy Court in In re Arcade Publ'g., Inc., 455 B.R. 373, 383 (Bankr. S.D.N.Y. 2011) ("Arcade"), provides useful guidance in this regard.

In Arcade, an author filed a claim against the debtor, a publishing company, seeking past due royalties and prepetition interest on those royalties.  Before the petition was filed, the author had sued the publishing company in New York state court for breach of contract, but upon the filing of the petition, the suit was stayed.  In the bankruptcy proceeding, after noting that prepetition interest is generally allowable as a claim, the court stated that first the author would have to prove that he was entitled to prepetition interest under the applicable nonbankruptcy law, in that case N.Y. CPLR 5001.  Because CPLR 5001(a) only allows prejudgment interest on a "sum awarded," and because the author's state court claim for royalties was never reduced to a judgment, the author was not entitled to prepetition interest.  The Court considered the author's assertions that the Bankruptcy Code's definition of "claim" includes payments "whether or not

---

[8]    Because "customers" are preferred creditors in the distribution of customer property and in their eligibility for SIPC advances, their claims are not presumptively valid.  Instead, the burden is on the claimant to establish the validity of his claim and his status as a "customer."  See SIPC v. Stratton Oakmont, Inc., 229 B.R. 273, 278 (Bankr. S.D.N.Y.) ("Just as all creditors in a bankruptcy case who claim priority status have the burden of showing that they are entitled to the asserted priority under the Bankruptcy Code, the claimants bear the burden of proving that they are the type of priority creditors known as "customers" and that the equity in their accounts is "customer property" under SIPA.), aff'd sub nom., Arford v. Miller, 239 B.R. 698 (S.D.N.Y. 1999), aff'd, 210 F.3d 420 (2d Cir. 2000).

such right is reduced to judgment," 11 U.S.C. § 101(5)(a), and that given the equities of the case,

namely, that the author's suit had been stayed by the filing of the petition and the debtor in

Arcade effectively had conceded its liability, a judgment should be "deemed" to have been

entered.   The Court concluded that allowance of a claim was "not the same as a verdict or

judgment in a plenary action in state court or bankruptcy court," and that the Court was not

authorized to "'create substantive rights that are otherwise unavailable under applicable law, or

constitute a roving commission to do equity.'"   Arcade, 455 B.R. at 382-383 (citation omitted).

The Court also observed:

> [A]dopting [the author's] arguments would result in prepetition
> prejudgment interest being added to many allowed unsecured
> claims arising from a breach of contract (*e.g.*, unpaid contract
> arrears common to most bankruptcies) in New York, in the
> absence of any judgment in favor of the claimant, with perhaps the
> same effect with claims arising in other states having prejudgment
> interest statutes similar to New York's.  Such a result would distort
> equality of treatment of otherwise similarly situated creditors;
> equity certainly does not counsel that result.

Id. at 383.

Thus, under SIPA, incorporating, as it does, under section 78fff(b), principles of

bankruptcy law with respect to the treatment of unsecured general creditor claims, the claimants

would not be entitled to the relief that they seek here.  On a related point, the claimants in this

proceeding who assert an entitlement to interest on their net equities contend that the rate should

be at 9% per annum.  In the first instance, claims for prejudgment interest are at best unsecured

general creditor damage claims and not customer claims.  In the second, for prejudgment interest

to be available, there must be a judgment.  And in the third, although under N.Y. CPLR 5001, the

nature of the claim may dictate the rate to be applied, where the award under CPLR 5001 is in

28

the discretion of the court, 9% has been held to be "an absurd judgment rate in this day and age

for any claim."  Sriraman v. Patel, 761 F.Supp.2d 23, 26 (E.D.N.Y. 2011).  In the latter case, the

court also has commented that an award at 9% "effectively creates a windfall for plaintiffs, who

likely will recover far more in interest received from a defendant than had they made a short-

term investment of a like amount of money."  761 F.Supp.2d at 27.

### III.    AN INFLATION ADJUSTMENT IS INAPPROPRIATE

Ultimately, the SEC takes no position on whether an inflation adjustment is appropriate

in this case, contending that in deciding the question, the Court must weigh the costs and burden

of an adjustment versus the benefits.  SEC Br. at 16-17.  Even assuming arguendo that the

requested adjustments could legally be made, the harm that would result plainly outweighs any

perceived benefit.

An extraordinary amount of time and effort at an exorbitant cost already has been

expended to bring the liquidation to this point.  The Trustee has collected more than $9.3 billion,

but, to date, has distributed only roughly half of that amount.  More than $4.5 billion continues to

be withheld from distribution to customers because of an endless stream of meritless objections

interposed for self-serving, and possibly, in some cases, for delaying, purposes.  Thus, more than

4-1/2 years since the start of the liquidation, if adopted, the position of the claimants would

require the Trustee to calculate anew, in thousands of customer accounts, every deposit, every

withdrawal, every transfer of funds between and among accounts; to re-determine thousands of

claims; to issue new determinations and afford claimants a fresh opportunity for objection;  to re-

start the period for objections and the review process; to re-consider causes of action that the

Trustee has brought that either can or can no longer be pursued, such causes of action now

29

compromised by the running of statutes of limitations; to un-do settlements that have contributed to the $9.3 billion collected and yielded substantial benefit for customers.   Whether any benefit would result from this "re-do" process is uncertain.   What is certain to result is the fundamental distortion of the liquidation process, the statutory framework, and the objectives of a SIPA proceeding.  The below are just a few ways in which inconsistency with SIPA is achieved.

First, in deciding that customers with claims for fictitious securities have "securities" instead of  "cash" claims, the Court in the New Times case held that net equity properly is calculated as "the amount of money that the claimants initially placed with the Debtors to purchase" the fictitious security.  371 F.3d at 88.  This view by the Court is consistent with the protection under SIPA of the custodial function of the broker.   In contrast, by failing to acknowledge the reality of price fluctuation in the marketplace and the fact that SIPA does not protect against market loss, the claimants' positions seek to expand the SIPA protection beyond its intended limits and unfairly, and with no authority, place the defrauded securities customer in a better position than the cash customer.

A customer who deposits $100 with his broker for the purpose of investing in securities but who has placed no trades before the firm fails is entitled to the return of his $100.  As previously discussed, he receives his $100 even if, due to inflation, the value of the $100 is $110 on the filing date.  The SEC concurs in this position.  See SEC Br. at 9 ("If the [cash customer's] account was not interest bearing, the customer would have no expectation of protection against inflation.").   On the other hand, the assertion that the securities customer whose claim is to be satisfied in cash is entitled to an adjustment in the value or amount of his claim fails to recognize the realities of investing and improves the position of that investor in a way not contemplated

30

under SIPA.  Thus, in the ordinary course of investing, depending upon price movement, an

investor may achieve a windfall or he may lose his entire investment.  Adjusting the value or

amount of the claim in the ways proposed by the claimants, is inconsistent with this reality.  The

securities investor has no reasonable basis to believe that the amount or value of cash that he has

invested will remain constant throughout its investment or achieve a consistent 9% annual return.

Moreover, the claimants' proposed adjustments for inflation or interest may place the defrauded

customer with a claim for securities in a <u>better</u> position than he would have been had investments

actually been made for his account.  Thus, a comparison of the performances of the Consumer

Price Index ("CPI") and the Standard & Poor's 500 index ("S&P500") shows the CPI

outperforming the S&P in a number of months between 1996 and 2008.[9]   In that situation, the

customer not only does better with an inflation adjustment than he would in the marketplace, but

is afforded this unheralded protection even though there is no protection under SIPA for market

loss.  <u>See</u>, <u>e.g.</u>, <u>Madoff</u>, 654 F.3d at 239, <u>citing</u> <u>SIPC v. Associated Underwriters, Inc.</u>, 423

F.Supp. 168, 171 (D. Utah 1975) ("SIPC is not an insurer, nor does it guarantee that customers

will recover their investments which may have diminished as a result of, among other things,

market fluctuations or broker-dealer fraud"); <u>SEC v. Albert & Maguire Sec. Co.</u>, 560 F.2d 569,

572 (3d Cir.1977) (SIPA provides no protection "against the vagaries of the market").  Surely an

---

[9]  For example, according to Exhibit C to the Expert Report of Timothy H. Hart, CPA, CFE, J.,
the value of Account "I" would have grown from $1 million in the year 2000, to a CPI-adjusted
value of $1,227,264 by December 11, 2008, the filing date of the liquidation proceeding.  <u>See</u>
Ex. C to Declaration of Richard A. Kirby (Doc. No. 5330).  It appears that Account "I" was an
account that was opened on March 3, 2000.  Assuming this to be correct, the S&P dropped from
a closing price of 1,409.17 on March 3, 2000, to 873.59 on December 11, 2008   (<u>see</u>
<u>http://finance.yahoo.com/q/hp?s=^GSPC&a=02&b=3&c=2000&d=02&e=3&f=2000&g=d</u>   and
<u>http://finance.yahoo.com/q/hp?s=^GSPC&a=11&b=11&c=2008&d=11&e=11&f=2008&g=d</u>).
This which would have resulted in a decline in the value of the account from $1 million to
approximately $620,000 (873.59÷1,409.17=.62 multiplied by $1 million).

adjustment of his cash deposit for inflation would not be within the investor's contemplation if the re-calculation caused a downward, instead of an upward, adjustment to the deposited amount.

Second, the Bankruptcy Code and SIPA aim to maximize assets for ratable distribution to similarly situated creditors. See Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 463 (S.D.N.Y. 2001) (underlying philosophy of the Bankruptcy Code and SIPA is "to maximize assets available for ratable distribution to all creditors similarly situated"). But application of a factor to increase the value or amount of a claim accomplishes the opposite. Unlike the value of claims enhanced for inflation, the value of customer property available for distribution cannot change. Customer property must be the actual amount of property held by the broker for customers and recovered by the Trustee. The sharing of a fixed amount of customer property by investors whose claims are now larger due to inflation necessarily means a smaller percentage of customer property per customer which, for some customers, results in a smaller number of dollars. If a customer receives a smaller amount of customer property, it is because his real dollars are being used to pay the inflated claim of another customer. If he already has received the $500,000 maximum amount of SIPC protection, this net loser's only hope for a further distribution is if the Trustee is able to recover more property for customers.

Yet, the reality is that all of the BLMIS customers with valid customer claims are similarly situated, and it is unfair to them to single out a particular segment for greater satisfaction. But even among the customers with inflated claims, the proposed treatment is uneven and arbitrary. The application of the inflation or interest adjustment purports to benefit customers, but among those who are similarly situated, it is unclear which ones.

Finally, as noted, certain "net losers" will do worse with the application of time-based damages, and their only recourse is if the Trustee is able to recover more customer property.  But the application of time-based damages impinges upon that possibility.   Inevitably, if the claimants prevail in their positions, some "net winners" will become net losers.  Hiding behind their inflated claims, these claimants may try to rely on defenses that previously would have been unavailable to them in avoidance suits brought against them by the Trustee.  Time-based damages becomes a shield that enables them to keep the fictitious profits that they received and that, in reality, are real dollars that were stolen from, and therefore belong to, others.

To date, as a result of recoveries by the Trustee and SIPC advances, every claimant with an allowed customer claim of $875,000 or less in this liquidation proceeding has been fully satisfied.[10]  Substantial progress has been achieved, but there is more work to be done, more distributions to come, and more recoveries to be had.   A merciful end is needed to the obstructionist tactics in this proceeding that do no more than delay the satisfaction of legitimate claims and the Trustee's efforts at recovery.   While some of the claimants no doubt wish otherwise, the fact is that "'SIPC protects customers against those losses occasioned by a broker's liquidation,' and in so doing, does not pretend to offer full compensation to all those injured by the brokerage's failure." Stratton Oakmont, Inc., 229 B.R. at 279.  In the absence of any authority and the harm that is certain to result, as is the case here, there is no room to modify the calculation of net equity by time-based damages.

---

[10]   See http://www.madofftrustee.com/distributions-16.html (total distributions through the third pro rata distribution equal 42.879% of the allowed claim amount).

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in SIPC's main brief, the Trustee's

motion to affirm his calculations of net equity and deny time-based damages should be granted.

Respectfully submitted,


<u>/s/ Josephine Wang</u>
JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior Associate General Counsel
  For Dispute Resolution

CHRISTOPHER H. LAROSA
Senior Associate General Counsel –
  Litigation

LAUREN T. ATTARD
Assistant General Counsel

SECURITIES INVESTOR
  PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, D.C.  20005
Telephone: (202) 371-8300
Facsimile: (202) 371-6728
E-mail: jwang@sipc.org
E-mail: kbell@sipc.org
E-mail: clarosa@sipc.org
E-mail: lattard@sipc.org

Date:  July 18, 2013
Washington, D. C.