Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - x

4    SECURITIES INVESTOR PROTECTION

5    CORPORATION

6    v.                              Case No. 08-01789-brl

7    BERNARD L. MADOFF INVESTMENT

8    SECURITIES, LLC, et al,

9          Debtors.

10   - - - - - - - - - - - - - - - x

11   IRVING H. PICARD, TRUSTEE FOR

12   THE SUBSTANTIVELY CO              Adversary Proceeding:

13   v.                              Case No. 12-01701-brl

14   RD TRUST, ET AL

15   - - - - - - - - - - - - - - - x

16                 U.S. Bankruptcy Court

17                 One Bowling Green

18                 New York, New York

19                 May 29, 2013

20                 10:11 AM

21   B E F O R E :

22   HON. BURTON R. LIFLAND

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

Page 2

1    HEARING Re (cc-5334) Windels Marx Lane & Mittendorf, LLP's

2    Tenth Application for Allowance of Interim Compensation for

3    Services Rendered and Reimbursement of Actual and Necessary

4    Expenses Incurred from July 1, 2012 through November 30,

5    2012 for Windels Marx Lane & Mittendorf, LLP, Special

6    Counsel, period:  7/1/2012 to 11/30/2012, fee $1,723,997.00;

7    expenses $25,804.05

8

9    HEARING Re (cc-5343) Taylor Wessing as Special Counsel to

10   the Trustee's Application for Allowance of Interim

11   Compensation for Services Rendered and Reimbursement of

12   Actual and Necessary Expenses Incurred from July 1, 2012

13   through November 30, 2012 for Taylor Wessing, Special

14   Counsel, period: 7/1/2012 to 11/30/2012, fee $3,573,113.31;

15   expenses $2,056,150.34

16

17   HEARING Re (cc-5342) Soroker - Agmon as Special Counsel to

18   the Trustee's Application for Allowance of Interim

19   Compensation for Services Rendered and Reimbursement of

20   Actual and Necessary Expenses Incurred from July 1, 2012

21   through November 30, 2012 for Sorokor - Agmon, Special

22   Counsel, period 7/1/2012 to 11/30/2012, fee $449,693.55;

23   expenses $5,530.58

24

25

Page 3

1    HEARING Re (cc-5337) Greenfield Stein & Senior, LLP as

2    Special Counsel to the Trustee's Application for Allowance

3    of Interim Compensation for Services Rendered and

4    Reimbursement of Actual and Necessary Expenses Incurred from

5    July 1, 2012 through November 30, 2012 for Greenfield Stein

6    & Senior, LLP, Special Counsel, period 7/1/2012 to

7    11/30/2012, fee $369.00, expenses $0.00

8

9    HEARING Re (cc-5341) Schlitz & Schlitz as Special Counsel to

10   the Trustee's Application for Allowance of Interim

11   Compensation for Services Rendered and Reimbursement of

12   Actual and Necessary Expenses Incurred from July 1, 2012

13   through November 30, 2012 for Schlitz & Schlitz, Special

14   Counsel, period 7/1/2012 to 11/30/2012, fee $34,700.82,

15   expenses $2,255.55

16

17   HEARING Re (cc-5335) Browne Jacobson, LLP as Special Counsel

18   to the Trustee's Application for Allowance of Interim

19   Compensation for Services Rendered and Reimbursement of

20   Actual and Necessary Expenses Incurred from July 1, 2012

21   through November 30, 2012 for Browne Jacobson, LLP, Special

22   Counsel, period: 7/1/2012 to 11/30/2012, fee $105,139.36,

23   expenses $26,141.07

24

25

```
1    HEARING Re (cc-5336) Graf & Pitkowitz Rechtsanwalte GmbH as

2    Special Counsel to the Trustee's Application for Allowance

3    of Interim Compensation for Services Rendered and

4    Reimbursement of Actual and Necessary Expenses Incurred from

5    July 1, 2012 through November 30, 2012 for Graf & Pitkowitz

6    Rechtsanwalte GmbH, Special Counsel, period: 7/1/2012 to

7    11/30/2012, fee $568,557.29, expenses $17,031.80

8

9    HEARING Re (cc-5344) Triay Stagnetto Neish as Special

10   Counsel to the Trustee's Application for Allowance of

11   Interim Compensation for Services Rendered and Reimbursement

12   of Actual and Necessary Expenses Incurred from September 11,

13   2012 through November 30, 2012 for Triay Stagnetto Neish as

14   Special Counsel, period: 9/11/2012 to 11/30/2012, fee

15   $60,964.10, expenses $383.80

16

17

18   HEARING Re (cc-5340) SCA Creque as Special Counsel to the

19   Trustee's Application for Allowance of Interim Compensation

20   for Services Rendered and Reimbursement of Actual and

21   Necessary Expenses Incurred from July 1, 2012 through

22   November 30, 2012 for SCA Creque, Special Counsel, period:

23   7/1/2012 to 11/30/2012, fee $6,977.56, expenses $150.00

24

25
```

Page 5

1    HEARING Re (cc-5399) La Tanzi, Spaulding & Landreth, P.C.

2    as Special Counsel to the Trustee's Application for

3    Allowance of Interim Compensation for Services Rendered and

4    Reimbursement of Actual and Necessary Expenses Incurred from

5    June 7, 2012 through November 30, 2012 for La Tanzi,

6    Spaulding & Landreth, P.C., Special Counsel, period:

7    6/7/2012 to 11/30/2012, fee $7,128.00, expenses $349.40

8

9    HEARING Re (cc-5333) Trustee and Baker & Hostetler LLP's

10   Eleventh Application for Allowance of Interim Compensation

11   for  Services Rendered and Reimbursement of Actual and

12   Necessary Expenses Incurred from July 1, 2012 through

13   November 30, 2012 for Baker & Hostetler, LLP, Trustee's

14   Attorney,  period: 7/1/2012 to 11/30/2012, fee

15   $49,126,984.20, expenses $1,158,883.26

16

17   HEARING Re (cc-5338) Higgs & Johnson (formerly Higgs Johnson

18   Truman Bodden & Co.,) as Special Counsel to the Trustee's

19   Application for Allowance of Interim Compensation for

20   Services Rendered and Reimbursement of Actual and Necessary

21   Expenses Incurred from July 1, 2012 through November 30,

22   2012 for Higgs & Johnson (formerly Higgs Johnson Truman

23   Bodden & Co.), Special Counsel, period: 7/1/2012 to

24   11/30/2012, fee $56,936.25, expenses $1,578.21

25

Page 6

1    HEARING Re (cc-5348) Young Conaway Stargatt & Taylor LLP, as

2    Special Counsel to the Trustee's Application for Allowance

3    of Interim Compensation for Services Rendered and

4    Reimbursement of Actual and Necessary Expenses Incurred from

5    July 1, 2012 through November 30, 2012 for Young Conaway

6    Stargatt & Taylor LLP, Special Counsel, period: 7/1/2012 to

7    11/30/2012, fee $42,709.50, expenses $7,374.19

8

9    HEARING Re (cc-5346) Werder Vigano as Special Counsel to the

10   Trustee's Application for Allowance of Interim Compensation

11   for Services Rendered and Reimbursement of Actual and

12   Necessary Expenses Incurred from July 1, 2012 November 30,

13   2012 for Werder Vigano, Special Counsel, period: 7/1/2012 to

14   11/30/2012, fee $14,848.36, expenses $0.00

15

16   HEARING Re (cc-5347) Williams, Barristers & Attorneys as

17   Special Counsel to the Trustee's Application for Allowance

18   of Interim Compensation for Services Rendered and

19   Reimbursement of Actual and Necessary Expenses Incurred from

20   July 1, 2012 through November 30, 2012 for Williams,

21   Barristers & Attorneys, Special Counsel, period: 7/1/2012 to

22   11/30/2012, fee $252,813.56, expenses $0.00

23

24

25

Page 7

1     HEARING Re (cc-5345) UGGC & Associates as Special Counsel to

2     the Trustee's Application for Allowance of Interim

3     Compensation for Services Rendered and Reimbursement of

4     Actual and Necessary Expenses Incurred from July 1, 2012

5     through November 30, 2012 for UGGC & Associates, Special

6     Counsel, period: 7/1/2012 to 11/30/2012, fee $91,231.12,

7     expenses $647.19

8

9     HEARING Re Adversary Proceeding: 12-01701-brl Irving H.

10    Picard, Trustee for the Substantively Co v RD Trust et al;

11    (cc-8) Motion for Entry of Order Pursuant to Rule 15 of the

12    Federal Rules of Civil Procedure as Incorporated by Rule

13    7015 of the Federal Rules of Bankruptcy Procedure Granting

14    Motion for Leave to File a First Amended Complaint Adding PF

15    Trustees Limited In Its Capacity As Trustee of RD Trust as a

16    Defendant

17

18

19

20

21

22

23

24

25    Transcribed by:  Sheila Orms

Page 8

1    A P P E A R A N C E S :

2    BAKER HOSTETLER

3          Attorneys for SIPA Trustee

4          45 Rockefeller Plaza

5          New York, NY  10111

6

7    BY:  IRVING H. PICARD, ESQ.

8          DAVID J. SHEEHAN, ESQ.

9          MARC E. HIRSCHFIELD, ESQ.

10

11   BAKER HOSTETLER

12         Attorneys for SIPA Trustee

13         Capital Square, Suite 2100

14         65 East State Street

15         Columbus, OH  43215

16

17   BY:  CATHERINE E. WOLTERING, ESQ.

18

19   SiPC

20         Attorneys for SIPC

21         805 15th St., N.W.

22         Suite 800

23         Washington, DC  20005

24

25   BY:  KEVIN H. BELL, ESQ.

1   WINDELS, MARX, LANE & MITTENDORF, LLP

2        Attorney for Windels Marx

3        156 W. 56TH

4        New York, NY   10019

5

6   BY:  ALAN NISSELSON, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 10

```
 1                    P R O C E E D I N G S
 2             THE CLERK:  SIPC v BLMIS.
 3             MR. SHEEHAN:  Your Honor, there's actually several
 4    matters here this morning.  The RD Trust is up first and --
 5             THE COURT:  Okay.
 6             MR. SHEEHAN:  -- Your Honor, my colleague,
 7    Catherine Woltering will handle that, and then we'll do the
 8    fee application.
 9             THE COURT:  Sounds like a plan.
10             MR. SHEEHAN:  Thank you very much, Your Honor.
11             MS. WOLTERING:  Good morning, Your Honor.  We're
12    here this morning on the trustee's motion for leave to file
13    a first amended complaint, adding PF Trustee's Limited as a
14    defendant in Picard v RD Trust, Adversary Proceeding No. 12-
15    01701.  No objections have been filed in this matter.
16             In June of 2012, the trustee filed the adversary
17    proceeding against the defendant seeking $172 million in
18    subsequent transfers of customer property that originated
19    with BLMIS and was initially transferred to three Fairfield
20    Greenwich Group feeder funds.  One of which was the largest
21    BLMIS feeder fund in Fairfield century.
22             At the request of Andres Peter Hedra (ph) which is
23    one of the Fairfield Greenwich Group co-founders, this
24    customer of property was subsequently transferred from those
25    funds to two entities in a trust, including the defendant
```

Page 11

1    Safe Hand Investments and Strongback Holding Corporation.

2    Both are corporations that were formed in the Cayman Islands

3    by Andres Peter Hedra.

4            Based on the trustee's limited records available

5    at this point of litigation, it appears that Andres Peter

6    Hedra set up these two entities, these two corporations, for

7    the purpose of indirectly receiving compensation and

8    partnership distributions associated with ownership

9    interests that he had in various Fairfield Greenwich Group

10   funds and entities.

11           The trustee's records to date indicate that

12   Safehand Investment and Strongback Holding Corporation were

13   both wholly owned by defendant, RD Trust, which was a trust

14   established in 2002 by Andres Peter Hedra in the Cayman

15   Islands, where he and his family were the beneficiaries.

16           It's -- the trustee has just learned who the

17   trustee is for RD Trust.  So now having learned that, the

18   trustee seeks to -- seeks leave to file a first amended

19   complaint adding PF Trustee's Limited in its capacity as

20   trustee for RD Trust to the complaint.

21           Rule 15 of the Federal Rules of Civil Procedure

22   made applicable by the Federal Rules of Bankruptcy

23   Procedure, allows a party to amend upon leave of Court.  In

24   deciding whether to grant the trustee's motion for leave to

25   amend, the standard is whether or not there's been undue

Page 12

1    delay by the parties seeking the amendment, whether the

2    parties seeking the amendment is acting in good faith,

3    whether the opposing party will be prejudiced, and whether

4    the amendment will be futile.

5              In this action, each favor weighs in favor of --

6    each factor weighs in favor of the trustee, the trustee's

7    motion for leave.  First, the trustee has acted in good

8    faith without undue delay.

9              In 2012, we are facing the statute of limitations

10   for actions seeking to recover subsequent transfers of

11   customer property received from Fairfield Greenwich Group

12   feeder funds, so the trustee filed this complaint in June of

13   2012 up against that statute.

14             At the time of filing, the trustee was uncertain

15   who -- as to the identity of RD Trust current trustee.  The

16   trustee had reason to believe that First Island Trustees

17   Gurnsey Limited (ph) was the original trustee, but was no

18   longer the current trustee, or it was unclear what role they

19   served at best.

20             Despite his best efforts, even after an extensive

21   investigation, the trustee was unable to verify who RD Trust

22   current trustee was.  As such, the trustee began the process

23   of effectuating international service of process pursuant to

24   the Hague On First Island Trustee's Gurnsey Limited.

25             In December of 2012, the trustee received a

Page 13

1    certificate of service for that -- for indicating First

2    Island was served on behalf of RD Trust.  However, we also

3    received a letter from First Island's counsel indicating

4    that by a deed of removal and appointment of new trustee

5    dated November 25th, 2003, First Island was removed as the

6    trustee of the RD Trust in favor of the Cayman Island

7    trustee.  But the letter -- but First Island would not

8    disclose who was the current trustee.

9            After we received this letter, the trustee

10   consulted with local counsel in the United Kingdom, as well

11   as retained local counsel in Gurnsey, for the purpose of

12   determining what judicial options he had available to compel

13   disclosure of RD Trust's current trustee.

14           Based on local counsel's advice, in April of 2013,

15   local counsel in Gurnsey sent First Island's counsel a

16   letter indicating that unless they disclosed who RD Trust

17   current trustee was, or the successor trustee to them, that

18   we would be compelled to file a motion -- to initiate

19   proceedings requesting a Norwich Firm of Call (ph), which is

20   an order over there that requires disclosure pre-litigation.

21           Shortly thereafter, trustee's counsel received a

22   call from counsel for Strongback Holding and -- for Safehand

23   Investment and Strongback Holdings, indicating that they

24   also represented the third defendant RD Trust, and that the

25   current trustee was actually PF Trustee's Limited in the

Page 14

1    Cayman Islands.

2              While they originally indicated that they could

3    accept service on behalf of RD Trust and PF Trustee's

4    Limited in its capacity as trustee, they subsequently

5    learned from their client, that they were not authorized.

6              So facing the need to effectuate formal service of

7    process again internationally, the trustee filed the instant

8    motion for leave to amend the complaint, naming PF Trustee's

9    Limited in its capacity as trustee for RD Trust.

10             From these facts, it's clear that the trustee has

11   acted in good faith and without undue delay.

12             Second, it's equally clear that in its capacity as

13   trustee for RD Trust, PF Trustee's Limited will not suffer

14   any prejudice if the Court grants the trustee's motion for

15   leave to amend.

16             The complaint has not been answered, and to date,

17   there's been no discovery.  Thus, in its capacity as trustee

18   for RD Trust, PF Trustee's Limited will be in the same

19   position as the two existing previously served defendants,

20   and will have a full and fair opportunity to conduct

21   discovery and challenge any and all claims asserted in the

22   first amended complaint.

23             Additionally, because RD Trust wholly owns both of

24   the other defendants, Safehand and Strongback, both of whom

25   were previously served, they've been on notice of this

Page 15

1    action since we first filed the complaint.

2              Lastly, because PF Trustee's Limited is

3    represented by the same counsel as the two existing

4    defendants, who have previously been served, it's

5    subsidiaries, Strongback and Safehand, it will have the

6    benefit of any work and research done to date by counsel.

7              Third, and I promise last, the first amended

8    complaint is not futile.  The statute of limitations for the

9    purposes of filing --

10             THE COURT:  Who is the second counsel?

11             MS. WOLTERING:  It's Morrison & Forester in New

12   York.

13             THE COURT:  And they found it inappropriate on

14   behalf of their client in the view of transparency to

15   disclose who the actual current owner was?

16             MS. WOLTERING:  They ended up disclosing who the

17   current trustee --

18             THE COURT:  I know they ended up doing it, but I'm

19   a little concerned over everything that's had to go on, it

20   was almost like dealing with Three Card Monte and Morrison &

21   Forester, I don't think should be engaged in that kind of

22   gamesmanship.  You can report back to them, the Court's

23   comment in this regard.  Your application is granted.

24             MS. WOLTERING:  Thank you.  I have a copy of the

25   order here.  May I approach?

Page 16

1          THE COURT:  I'll entertain it.

2          MS. WOLTERING:  Thank you.

3      (Pause)

4          THE COURT:  I've approved the order.

5          MS. WOLTERING:  Thank you.

6          MR. SHEEHAN:  Thank you, Your Honor.

7          Good morning, Your Honor.

8          THE COURT:  Morning.

9          MR. SHEEHAN:  David Sheehan for the trustee from

10   Baker & Hostetler.

11          This is the eleventh application for fee --

12   interim fees and allowances by the trustee and its counsel,

13   as well as an application for conflicts counsel for the

14   trustee, and in addition, application of foreign fee

15   applications by counsel retained by the trustee in aid of

16   his efforts to recover assets for the estate.

17          As I've done in the past, and with the Court's

18   permission, what I would like to do is very briefly go

19   through each of the foreign fee applications first and

20   submit them to Your Honor for your consideration.  There is

21   no opposition to these, but I wish to at least try to inform

22   the Court as to the basis for the retention of each of these

23   counsel.

24          If I may, I'll start with Schlitz & Schlitz, which

25   is located in Luxemburg.  They have been with us for out --

Page 17

1    practically all of these proceedings.  They represent us in

2    a number of capacities, as Your Honor may recall.  The

3    trustee was actually sued in Luxemburg, and they represented

4    it in connection with that litigation.  They're trying to

5    enjoin that, and this matter is currently pending here.

6            And then we also have various funds, such as Lux

7    Alpha and others that were originated there.  So we monitor

8    their proceedings, and we haven't participated as yet in any

9    of the proceedings in Luxemburg, we're contemplating that,

10   but what we do, is we engage in watchful waiting, nothing

11   has actually occurred.

12           Other than we have tracked down some funds of a

13   colleague of Sonya Coyens (ph) and we have managed to freeze

14   that, it's about $2 million.  And all that work was taking

15   place working with Schlitz & Schlitz.  There, ultimately

16   hopefully that money will be returned to the -- there's a

17   fight over its origin as to whether it is not associated

18   with the Coyen endeavors.  We believe we have a very strong

19   case for that, and we believe preliminarily, the Court has

20   indicated that by entering the freeze.  And therefore, a

21   likelihood of success on that is good.

22           So all that work was deemed done with us with

23   Schlitz & Schlitz.

24           Higgs and Johnson is in the Cayman Islands.  As

25   Your Honor will recall, many of the feeder funds were

Page 18

1    incorporated outside the United States, principally in the

2    Cayman Islands, BVI and Bermuda.  As a result, we have

3    retained counsel in each of those jurisdictions to assist us

4    with regard to the investigation associated with each of

5    those funds, as well as in each instance, to institute

6    litigation there.

7            And an example of that would be in Kinggate (ph),

8    Kinggate created a -- the fund managers there, Serretti &

9    Grosso (ph) who are defendants in a lawsuit here before Your

10   Honor created Kinggate Management Limited, which was a

11   management company, supposedly engaging in the efforts of

12   examining assets under management, doing due diligence, et

13   cetera.  Of course, it did none of that, and we have sued

14   them in Bermuda, because there is substantial funds

15   available in Bermuda.  There's over $300 million in a trust

16   that we are pursuing at this point.  And therefore, we need

17   local counsel obviously to represent us there in connection

18   with that liquidation.

19           The liquidators, who we actively negotiate with,

20   I'll talk about that in a minute, are located actually in

21   BVI, that's where the Kinggate funds themselves were

22   incorporated, and we have counsel there, and I'll talk about

23   them in a minute.

24           So what we have is a very active litigation taking

25   place in Bermuda with regard to Kinggate Management, as well

1   the liquidators of instituted suit as well against Kinggate

2   Management.

3           As Your Honor will recall, we've written

4   application to enjoin that action from going forward.

5   That's been because of negotiations which I'll report on in

6   a moment, has been deferred, and we are hopefully going to

7   resolve all of those issues, even with the receiver, who's

8   been appointed for Kinggate Management in the near term.

9           There's been some witches there, which I'll also

10  talk about in a minute, but in any event, our local counsel

11  there, Higgs & Johnson has been very active in representing

12  us in connection with a number of proceedings that have

13  taken place there.

14          And perhaps most importantly, and something I

15  think Your Honor will find interesting is, is that in the

16  Premial Fund (ph) matter, which is pending there, we had an

17  application made by our adversaries representing the Premial

18  case dismissed.  And as Your Honor will recall, there was a

19  Ruben decision when it was pending, and it was to the

20  question of whether or not that would be affirmed, and of

21  course, it was not.

22          And the question became, what is the vitality of

23  ours going forward in foreign jurisdictions, and

24  interestingly enough a judge down there found that we do

25  have, the trustee, Mr. Picard, has the authority to proceed

Page 20

```
 1    under their insolvency laws, not under the United States

 2    solvency laws, so he sustained our cause of action going

 3    forward.  And he refused to engage in an offset, which was

 4    more or less a mimicking of 502(d).

 5            So it was a very interesting proceeding, a very

 6    good result for us.  As of now, no appeal has been taken by

 7    our adversary, but that may indeed happen, and I'll share a

 8    copy of that opinion with Your Honor if you would like.  I

 9    think you'd find it, given your background on Chapter 15,

10    fairly interesting as to how the judge reached his --

11            THE COURT:  Who was the author?

12            MR. SHEEHAN:  Pardon?

13            THE COURT:  Who was the author?

14            MR. SHEEHAN:  I knew you'd ask me that.  Judge --

15    it's a simple name, it's like Judge Vall (ph) or something.

16            UNIDENTIFIED:  Bannister?

17            MR. SHEEHAN:  No, it's not that.  I'll remember it

18    like a half an hour from now, but I'll remember it, and I'll

19    tell Your Honor, but.

20            In any event, so that's Higgs & Johnson, as you

21    can see, lots of activity by them.

22            Then the next is Soroker and Agmon in Tel Aviv.

23    This is the magnified case that is currently pending before

24    Your Honor.  What we have, the essential allegation there

25    is, is that over the course of the fraud, which goes back
```

Page 21

1    into the '80s involving Magnify, and a fellow named Albert

2    Engoyan (ph) who passed away in 1995, and invested in about

3    $3 million in the mid-'80s into BLMIS.  Over the course of

4    the next 20 some odd years, up through 2008, took out over

5    $130 million.

6            So we are chasing those assets, as it were, using

7    Soroker & Agmon.  What they did is, is Engoyan created a --

8    what they call over there, like a charitable organization

9    although really didn't engage in charity, I'll explain that

10   in a minute, called the Yoshia Horowitz (ph) and Horowitz

11   became the vehicle into which the money went and then got

12   distributed.  And what they did is, they gave it to a number

13   of organizations in Israel, engaging not in donations, but

14   which would be essentially funding technology transfer

15   engagements.  In other words, underwriting research and

16   development of medical techniques and other things, so that

17   they would be investing, and the money would come back.  A

18   very complex array of relationships among all those

19   different organizations there.

20           Yoshia Horowitz when we started our suit in front

21   of Your Honor, moved to dissolve, we challenged that,

22   they've since withdrawn that.  They are now engaged in

23   active discovery of the Yoshia Horowitz, and ultimately, we

24   will have to make decisions as to where we go down the road,

25   with regard to suing them directly, as well as perhaps

1   potentially, although not -- and something we're

2   particularly fond of doing, which would be suing the other

3   organizations.  But in order to get discovery, which is very

4   different in Israel than it is here, we may very well have

5   to do that.

6          Soroker & Agmon are very active in that on a daily

7   basis, quite frankly.  So that is what they are working on.

8          Graf & Pitkowitz is our Austrian counsel.  As Your

9   Honor knows, that's where Bank of Medeche and Bank Austria

10  are located.  They were, we allege, part and parcel of Sonya

11  Coyen's enterprise that took $9 billion into BLMIS as a

12  feeder fund.  All of her organizations relate and orbit

13  around those two banking activities, and ultimately as you

14  know, in 2006, UniCredit, a major bank in Italy, actually

15  purchased Bank Austria.  In fact, most of the money that we

16  are seeking to recover went into Bank Austria during that

17  two year period from '06 to '08.

18          Now, Graf Pitkowitz assists us, because as I've

19  showed Your Honor before, there is an active investigation

20  by the prosecutor in Austria, and unlike the United States,

21  we are able to participate.  Mr. Picard, as the trustee,

22  represents all the victims.  They recognize him as a victim,

23  and he can participate in those proceedings.

24          We've actually attended hearings where we can work

25  with the prosecutors, submit questions to be asked, obtain

Page 23

1    copies of documents.  It has been an invaluable assistance

2    to us in terms of our investigation, not only on Ms. Coyen,

3    but the organizations that she created as feeder funds, in

4    order to draw the money into to BLMIS.

5           Next, is SCA Creque, that's in BBI.  As you know,

6    when we got into this case, all of the lawyer -- all those

7    funds already had retained counsel down there.  We have, as

8    a result, had to retain counsel there as well.  BBI, as I

9    mentioned earlier when I was talking about Bermuda, is the

10   home of Kinggate, and a number of other funds.  They have

11   assisted us there in terms of the protective actions that

12   we've filed in BBI, to protect the trustee's interests.

13   Obviously, we've also sued all these entities here before

14   Your Honor, but we have those protective actions recognizing

15   that that there may be any number of hurdles for us to cross

16   before we get to the ultimate judgment against these

17   entities.

18          They've been working very hard with us in

19   connection with litigation that's down there, service of the

20   various defendants that we've sued, and they give us advice

21   in relation to our claims against the BBI funds that are

22   domiciled there.

23          Williams Barristers are located in Bermuda.  I

24   talked about them in connection with the Cayman law firm.

25   This is where KML is located.  This is where we have

Page 24

1    instituted litigation that is ultimately going to be, we

2    believe, the seat of all the litigation involving Kinggate.

3    They actively will be tried there, because of the presence

4    of the funds that are there, as well as the fact that

5    jurisdiction over Serette and Grosso (ph), which has not

6    been challenged yet here before Your Honor, but eventually

7    at some point we believe it will be, it has been in the past

8    by them, that we believe that ultimately we may end up

9    trying this case in Bermuda.  Therefore, our Bermuda counsel

10   has been of great assistance to us preparing for that.

11          We are also working with the liquidators counsel,

12   as I say, we're trying to be very collaborative with them.

13   And while I can't get into the exact details of -- because

14   it's not final or been worked out, some of them are

15   relatively well known because they're in the press between

16   us and the Kinggate liquidators.

17          As Your Honor will recall, some time ago actually,

18   we thought we had a deal and what happened is that the end

19   low (ph) excursion I guess we could call it into the

20   district court, that had something of an impact on the

21   claims trading that was taking place, so it went down in

22   value, and the banking institution was DBSI, also publicly

23   known, was ultimately sued by the Kinggate liquidators,

24   basically on a specific performance claim, trying to compel

25   them to close the deal.

Page 25

```
 1              Then afterwards we had a very good result in Katz

 2   Will (ph) on -- the claims went back up, all of a sudden now

 3   DBSI was trying to compel the deal and the liquidators were

 4   not.  That resulted in the three parties getting together

 5   over the last six months in trying to work out a deal.  We

 6   are very, very close to having that done.

 7              There is one wild card that is well known in the

 8   public, and which we've discussed with the representatives

 9   of the government, and that is the $2.35 billion in the

10   hands of the U.S. Attorney's office, and how that's going to

11   be distributed, and whether or not assignments of claims

12   agents will be recognized, and what capacity they'll be able

13   to take any of the money out of that forfeiture fund.

14              As a result, we've had ongoing negotiations with

15   the DOJ, the Special Master, as well with these parties.

16   It's an ongoing, as I say, negotiation.  It's been

17   fascinating in terms of how it may eventually turn out.

18              In the past, the DOJ, as in the Adelphia case, has

19   not honored any assignments.  We're suggesting that this is

20   a bit different here.  We already have $3.4 billion of

21   assigned claims in this case.  I think it would wreak havoc

22   upon the customers if all those were suddenly going to be

23   cast into litigation as a result of nothing in distribution

24   from the Special Master.  It also inhibits our ability to

25   obtain financing, because that's not an insignificant amount
```

Page 26

1    of money.  Not us get financing, obviously the trustee

2    doesn't purchase claims, but that the claims people

3    themselves will have some inability to get financing as a

4    result of the question mark associated with the forfeiture

5    fund.

6            What we have been doing is not only negotiating to

7    get that result, but we've also been negotiating with the

8    idea that there can be a self-funding mechanism.  As Your

9    Honor knows, we've already distributed over $5 billion in

10   this case, which is now raised the value of claims and

11   claims trading to 83 cents at the last quote, so that there

12   is a feeling among that community, that there will be a

13   continued distribution by the trustee.  And that as a result

14   of that, we believe that we can probably in effect, self-

15   finance this by virtue of their continued recoveries of the

16   trustee.

17           We've worked out with our colleagues at

18   AlixPartners, algorhythms that will give us the ability to

19   obviously enhance the fund, by taking in monies that will

20   essentially, not dissimilar as Your Honor will recall, from

21   what we did in Catts Will Fund (ph) where we basically took

22   an assignment of their claims, and therefore, we get paid

23   every time there is a distribution by the trustee from the

24   Catts Will Fund claims that were allowed.

25           So fairly complicated, and I gave that to Your

1    Honor in very much tree top fashion, but that's exactly

2    what's going on right now in Kinggate, why we have active

3    counsel with us in Bermuda, BBI, and the Caymans, assisting

4    us in this endeavor.  It's a very, as I say, complex

5    transaction.  Complicated, again Your Honor would appreciate

6    this, by virtue of the fact that we're told that the law, as

7    Your Honor well knows, and DBI isn't necessarily the same as

8    here, the liquidators use that all the time, so we need our

9    local counsel to interpret that, and give us assistance with

10   regard to it, in terms of what can be approved and what

11   cannot.

12           So it's a very active practice, just orbiting

13   around that one aspect of the case, which is only as I say,

14   one aspect of the case.  There's many, many others that take

15   place every day.

16           Then we have Taylor and Wessing.  This is probably

17   by far the largest fee app by foreign counsel.  Taylor

18   Wessing is our counsel in the United Kingdom.  There are

19   several things occurring right now.

20           One of them, and most importantly is, is that

21   there is a trial that's about to start on June 10th in the

22   United Kingdom.  The defendants in that case are the

23   directors and officers of MISL, which was Mr. Madoff's

24   London operation, which was essentially a proprietary

25   trading desk, and also was utilized by him to round trip

```
 1   monies back and forth between the various accounts at BLMIS.

 2   And at the same time, to pay, we allege, money to Ms. Coyen

 3   that -- to which she was not entitled in the form of fees

 4   for research she allegedly performed, which we believe was

 5   never really performed, and never utilized by them.

 6           And it's about an $80 million or 80 million pound

 7   lawsuit that we have.  Taylor Wessing is not trying it, they

 8   are our solicitors.  We have, as a barrister, Bushbender

 9   Sunny (ph) who is billed by Taylor Wessing as a

10   disbursement.  That's how they handle it in the UK.

11           THE COURT:  I was going to inquire about that.

12           MR. SHEEHAN:  Yeah.

13           THE COURT:  Because the disbursements are very,

14   very high.

15           MR. SHEEHAN:  Yeah, and that's exactly why they

16   are high.

17           THE COURT:  So these disbursements are really

18   legal fees?

19           MR. SHEEHAN:  That's right.  So -- but that's how

20   they do it there, and so that's how we pay it.  We do get

21   Mr. Sunny's bills, we do examine those, SIPC certainly

22   examines Mr. Sunny's bills, and we look at them very

23   carefully.

24           It's a very -- even though it's fairly expensive,

25   this has been a wide range in litigation actively defended.
```

1   The Madoff brothers were both directors.  Their survivor,

2   Andrew is actively litigating this case with us in London.

3   It's an important case for us because it is, in fact, the

4   first case that we're going to try.  So the, you know,

5   obviously looked upon very carefully by others as we try

6   this case.  So we've been working very hard, not just

7   through our counsel, Taylor Wessing, and Mr. Sunny, but also

8   our team has been working very closely with them as well.

9           So that's why you see the significant amount of

10  time there.  And as you see also, I've -- Kinggate

11  Management Limited was also part and parcel of this, because

12  what we needed was their assistance in connection with

13  discovery.

14          As I mentioned earlier, Serette & Grosso created

15  this architecture of Kinggate Management Limited, which

16  managed that fund, and then yet, the Kinggate funds, but

17  they also had someone who was supposed to be also doing the

18  work of evaluating assets and assisting Kinggate management.

19  It was also another sham.  All of these were decide -- put

20  together to earn fees.  That was called FIN, F-I-N, and FIN

21  is actually located in London, and we had the assistance of

22  Kinggate -- I'm sorry, of Taylor Wessing assisting us in

23  that endeavor.

24          So lots of activity going on, and of course, as

25  our solicitors in the UK, they've been of great assistance

Page 30

1    to us in advising us in connection with actions in BBI,

2    Bermuda, and Cayman, even though we also have counsel there,

3    because it is all part of the Commonwealth, and ultimately,

4    there is a continuity there we're getting assistance from

5    Taylor Wessing has been of great value to the trustee.

6         UGG Associates is located in Paris, France.  What

7    is happening there is not dissimilar to what is occurring in

8    the -- in Austria.  There is an ongoing criminal prosecution

9    taking place with regard to several of the banks that we've

10   sued, UBS and HSBC.  We've been called in by the prosecutor,

11   and we have again filed papers to be a participant in those

12   proceedings.  Again, Mr. Picard being recognized as a

13   victim.

14        And again, what we have achieved there is an

15   exchange of information that has been of great assistance to

16   the trustee in terms of discovery.

17        The Triay firm is located in Gibraltar.  That's a

18   new firm, but essentially the same counsel.  The counsel we

19   had before switched law firms since the last reporting

20   period.  They are engaged in what is probably the longest

21   running litigation we've had in this case, that's Weskia

22   (ph).

23        Very early in the case, as Your Honor will recall,

24   we discovered a transfer of about $150 million to Gibraltar.

25   Without repeating all the history associated with that, as

Page 31

1    Your Honor knows, approximately 70 million of that is now in

2    this courthouse, as a result of rulings by Your Honor, as a

3    result of the then pending Ruben decision, the entry of the

4    default by Your Honor against them.  All those things

5    assisted us in getting that money back here.

6         There is a continuing fight over the balance of

7    the funds taking place in Gibraltar.  We also have a fight

8    with regard to the effectiveness of the default there now

9    after Ruben.  So it's an ongoing litigation there over the

10   balance of the funds.  There have been hearings there

11   recently as several weeks ago.  Our counsel goes obviously

12   from our office, but obviously we do need the assistance of

13   local counsel in Gibraltar, and that's what that fight has

14   all been about.

15        Werder, the Werder firm in Switzerland, there's

16   not much actually going, you see it's a very small

17   application there.

18        What we do have though is that we do try to get

19   discovery in Switzerland, and as Your Honor probably well

20   knows, that's not an easy thing to accomplish.  The most

21   viable vehicle for us is the Hague Convention, which

22   routinely gets ignored by individuals there.  So we're doing

23   our very best to get that information, but we have had

24   admittedly not great success.

25        Then we also have the firm of Browne Jacobson,

Page 32

1    that's the West firm I'm going to talk about here this

2    morning.

3            Browne Jacobson is our conflict counsel in the

4    United Kingdom.  That has come up because we've run into

5    certain situations where Tara Wessen (ph) which is a global

6    law firm in connection with certain of the banks, where we

7    need conflict counsel to assist us.  They've done that work,

8    as well as in addition to that, they've acted as our

9    insolvency counsel in connection with the MSLIL litigation.

10   They have a particular expertise in that category, and

11   interestingly enough, to go back to the MSLIL litigation for

12   a minute, they're actually challenging or were trying to

13   challenge the insolvency of it.

14           Basically trying to assert that the MSIL

15   organization was an independent corporation, and as an

16   independent corporation, it was actually owed money.  If we

17   looked at the books, it looked as though it was owed money

18   by BMLIS.  Our argument that it was an instrumentality of

19   the fraud didn't seem to register with the defendants.

20   Ultimately, it did register with the Court, so we're doing

21   well there, but we did need the assistance of our counsel at

22   Browne Jacobson to have success in that effort, and to

23   strike that defense.

24           It's interesting operating in the United Kingdom.

25   I know we're separated by a common language, but I have to

Page 33

1    tell you, we may emanate both from the common law, but I am

2    always astounded every once in a while with what the rule of

3    law is in the United Kingdom, and what we are up against in

4    trying to win those litigations.

5              They've also helped us, currently there's a trial

6    going on in Ireland, which we're watching very carefully,

7    among one of the major funds created by Sonya Coyen, THEMA

8    (ph).  And THEMA has been sued by individual investors there

9    in Ireland, also HSBC.  That trial has been going on now for

10   about three, four weeks.  It will continue probably for

11   another three or four weeks.  Browne Jacobson is monitoring

12   that trial for us, and we are obtaining the transcript

13   because we believe that there will be significant evidence

14   there that will assist eventually in the cases that we have

15   against all of the banks.

16             So in sum, Your Honor, that is the work that's

17   been performed by the foreign counsel.  As I said, there's

18   no objection to it.  And I believe Mr. Bell can speak to

19   this, but that there is support for all these applications

20   from the Securities Investor Protection.

21             MR. BELL:  Your Honor, SIPC has submitted a

22   recommendation as to all international special counsel and

23   support -- after it's review and the appropriate adjustments

24   reflective of SIPC's comments, we support the amounts that

25   are in the applications that have been filed by the

Page 34

1   international special counsel, and ask the Court to enter an

2   order approving those payments.

3              THE COURT:  Does anyone else want to be heard?

4              (No response)

5              THE COURT:  The applications are granted.

6              MR. SHEEHAN:  Your Honor, I'll be very brief with

7   regard to the remaining applications.  There's, of course,

8   the application of Wedels Marx and of Young Conaway.  Let me

9   speak very briefly, Mr. Nisselson is here in court, he

10  appeared already before Your Honor in another matter, as is

11  Howard Signman (ph), and I want to mention also Amy Longvow

12  (ph), all three of those people have been just spectacular

13  in terms of their support for the trustee throughout the

14  course of this liquidation proceeding.  The work that

15  they've done is exemplary, first rate.  We've had nothing

16  but great results, as a result of the work that they've done

17  in the various litigations and the support they've given to

18  us.  Young Conaway is of the same quality.  Without

19  reservation, we support their application as I do -- as I

20  know the SIPC does as well.  And I'll turn again to Mr.

21  Bell.

22             MR. BELL:  Your Honor, we make the same comments.

23  SIPC has reviewed, we would note in the SIPC recommendation

24  on the Windels' application at paragraph 3 of the

25  recommendation, Windels has been very accommodating and

1    accepting SIPC suggestions or reductions, and they lay out

2    the numbers, which I think are of a significant nature that

3    they have taken in light of our comments.

4              And similarly with Young Conaway and SIPC supports

5    the payment of the amounts that are reflected in those two

6    applications, and we would ask the Court to enter an order.

7              THE COURT:  Does anyone else want to be heard?

8              (No response)

9              THE COURT:  The applications are granted.

10             MR. SHEEHAN:  The last, but certainly not least,

11   Your Honor, is the application of Mr. Picard as trustee, and

12   the firm is Baker Hostetler, as his counsel.

13             Your Honor is very familiar with the work of both

14   Mr. Picard and the trustee, we actively appeared before Your

15   Honor, and with some degree of notoriety in the district

16   court and in the Second Circuit, so I think Your Honor is

17   very familiar with a lot of the activity that took place

18   during the reporting period, which did involve many motions

19   to withdraw the reference before Judge Rakoff, as well as

20   activity here before Your Honor.

21             I would actually defer to the report that we filed

22   recently with Your Honor and our fee application,

23   highlighted with only one actually major event that took

24   place during the reporting period, and that is, is due to

25   the efforts of Mr. Picard, we were able to distribute two

1   and a half billion dollars in September to the victims in

2   this case.

3           I think it was an extremely significant milestone

4   in the case, culminating from a major effort by the trustee

5   and his counsel, with regard to a variety of the litigation,

6   much of which I talked about here today, but much, much more

7   of which we engage in every day which I did not talk about

8   here today, but which is adequately detailed in our

9   application to Your Honor.

10          That type of result, getting that type of

11  collection here, I think as I say, truly representative of

12  the quality of the work, I submit to Your Honor, that has

13  been done by the trustee and his counsel, and I would

14  respectfully request that our applications be granted.  Mr.

15  Bell.

16          MR. BELL:  Your Honor, SIPC has reviewed all the

17  invoices that Baker has submitted for this five month period

18  from July 1st, 2012 through November 30th, 2012, that

19  underlie Baker's application before the Court.

20          Baker has agreed, you know, as have all applicants

21  to this Court, to a basic ten percent reduction in their

22  normal billing rates.  Secondly, SIPC comments have been

23  taken under consideration by the applicants, and appropriate

24  adjustments have been made.

25          By will of this illustration, I call the Court's

Page 37

1   attention to the Baker application and the SIPC

2   recommendation thereon, particularly at paragraph 5, where

3   it lays out the significant reduction that Baker has made in

4   response to SIPC's recommendation, not only the ten percent

5   reduction, which is at a high number, but also the over $3.3

6   million adjustment that Baker has made, in response to

7   SIPC's suggestions.

8           SIPC Section 78(eee)(B)(5)(C) vests in SIPC a

9   great responsibility in reviewing these applications and all

10   the underlying invoices.  And, you know, in this case, as

11   noted in paragraph 277, page 84 of the Baker application,

12   the trustee has determined that no reasonable expectation

13   that the general estate will be sufficient to make a

14   distribution to general creditors and pay administrative

15   expenses.

16           And as we have had discussions over the last ten

17   applications, I know the Court is extremely aware of this

18   unique situation that Congress has vested in SIPC, and we

19   take that responsibility at the highest level, you know, it

20   has always been my fondest wish that when we get to a

21   hundred percent, we pass this responsibility back to the

22   Court, and we make our recommendations, which you take with

23   hopefully significant weight.  But until that moment in

24   time, in this case where the trustee has made that

25   determination, SIPC's recommendation is what's there in this

1    situation, and we recommend that Baker's application be

2    granted as submitted.  And there were two other

3    applications, one by Latanzi (ph) and one by Greenfield of

4    insignificant amounts, but we would -- we've reviewed them,

5    and we would support those too also, Your Honor, and ask

6    that you issue the appropriate order.

7              Do you have any questions, Your Honor?

8              THE COURT:  Well, no, it's very clear, as it has

9    been with respect to the prior applications, that until we

10   reach, and if we ever reach that point in time where the

11   word shall when linked to the recommendation of SIPC may

12   possibly be no longer operative.  But as it stands right

13   now, the Court so must require it, to grant the applications

14   based upon the SIPC recommendation.

15             I do have one question, and since Mr. Picard is

16   here, and I understand Mr. Picard's billings are, to some

17   extent, statutory, but he also has a relationship with Baker

18   & Hostetler, and Mr. Picard, I see the amount of your

19   expenses for this period of time are quite substantial, and

20   well over a million dollars, can you explain that?

21             MR. PICARD:  Your Honor, my expenses are not

22   anywhere near that, in fact, I didn't put in any expenses

23   during the --

24             THE COURT:  That's strange, then maybe I misread

25   the applications that were before me or the summaries, would

Page 39

```
 1    seem to indicate --

 2              MR. PICARD:  Those would be the firm's request,

 3    Your Honor, not mine.

 4              THE COURT:  Well, that's what I'm asking for the

 5    explanation.

 6              MR. BELL:  Your Honor, SIPC has reviewed all those

 7    requests and I know there have been, if you -- at paragraph

 8    5 of our recommendation, there have been reductions by

 9    Baker --

10              THE COURT:  The way these have been set up in the

11    columns, the 1.158 million seems to be ascribed to Mr.

12    Picard.

13              MR. SHEEHAN:  If you look at Exhibit D of the

14    application, Your Honor, that's the expense summary by Baker

15    Hostetler.

16              THE COURT:  I'm looking at a summary sheet, so

17    that's the application.

18              MR. PICARD:  Well, Your Honor, if I could, I could

19    submit you Exhibit D so you could see what we're talking

20    about.

21              THE COURT:  I accept the representations of Mr.

22    Picard and everyone else.

23              MR. PICARD:  Thank you, Your Honor.

24              THE COURT:  The applications are granted, as

25    requested.
```

Page 40

1            MR. SHEEHAN:  May I submit the order, Your Honor?

2            THE COURT:  Sure.

3            MR. SHEEHAN:  Inadvertently I did not bring a

4    disk, but I'll have the order submitted.

5            THE COURT:  I've approved the order.

6            MR. SHEEHAN:  Thank you, Your Honor.

7            MR. BELL:  Thank you, Your Honor.

8            MR. PICARD:  Thank you.

9    (Whereupon, the proceedings were concluded at 10:51 AM)

10                    * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 41

1                              I N D E X

2

3                              RULINGS

4    IDENTIFICATION                                    PAGE

5    Trustee's motion for leave to file a              15

6    first amended complaint

7

8    International applications                         34

9

10   Windels Marx Lane & Mittendorf LLP and            35

11   Young Conaway Stargatt & Taylor LLP applications

12

13   Trustee and Baker & Hostetler LLP application     39

14

15

16

17

18

19

20

21

22

23

24

25

Page 42

1

CERTIFICATION

2

3          I, Sheila G. Orms, certify that the foregoing is a

4     correct transcript from the official electronic sound

5     recording of the proceedings in the above-entitled matter.

6

      Dated:  May 30, 2013

7
          Sheila          Digitally signed by Sheila Orms
8                          DN: cn=Sheila Orms, o, ou,
                           email=digital1@veritext.com,
9          Orms            c=US
                           Date: 2013.07.18 14:32:19
                           -04'00'
10

11      Signature of Approved Transcriber

12

13

      Veritext

14
      200 Old Country Road

15
      Suite 580

16
      Mineola, NY 11501

17

18

19

20

21

22

23

24

25