Hearing Date: September 10, 2013

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

...................................................................... x
SECURITIES INVESTOR PROTECTION :
CORPORATION, :
  :
                Plaintiff, : Adv. Pro. No. 08-1789 (BRL)
  :
           v. : SIPA LIQUIDATION
  :
BERNARD L. MADOFF INVESTMENT : (substantively consolidated)
SECURITIES LLC, :
  :
              Defendant. :
...................................................................... x
In re: :
  :
BERNARD L. MADOFF, :
  :
              Debtor. :
...................................................................... x

**CUSTUMERS' OPPOSITION TO TRUSTEE'S REQUEST FOR
<u>EXCLUSION OF HART EXPERT TESTIMONY</u>**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................................1

II. RELEVANT FACTS .............................................................................................................2

    A. The Trustee's Inflation Adjustment Briefing Raised New Factual Assertions. ..................2

    B. The Court Orders Discovery on the Trustee's Assertions and Permits a Rebuttal Witness. ..................3

    C. Discovery Shows that the Trustee's Witnesses Do Not Support His Assertions. ..................3

    D. The Customers Offer Hart as a Rebuttal Witness. ..................4

III. DISCUSSION ......................................................................................................................5

    A. Hart Is Well Qualified to Provide Opinions on an Inflation Adjustment. ..................6

    B. Hart's Testimony Directly Responds to the Trustee's Factual Assertions. ..................8

        1. An Inflation Adjustment Is Equitable ..................8

        2. Impact of an Inflation Adjustment ..................8

        3. Feasibility of an Inflation Adjustment ..................9

    C. Hart's Analysis Is Reliable and Accurate. ..................9

        1. Methodology ..................11

        2. Legal Conclusions ..................12

        3. Opinions ..................13

        4. Accuracy ..................13

IV. CONCLUSION ..................................................................................................................14

## TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*,
--- F. Supp. 2d ---, 2012 WL 6634138 (S.D.N.Y. Dec. 20, 2012) ............................................. 5

*Crown Cork & Seal Co. v. Credit Suisse First Boston Corp.*,
2013 U.S. Dist. LEXIS 34368 (S.D.N.Y. Mar. 12, 2013) ......................................................... 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .................................................................................................. 1, 5, 9, 10, 11

*Emig v. Electrolux Home Pros.*,
2008 U.S. Dist. LEXIS 68811 (S.D.N.Y. Sept. 10, 2008) ........................................................ 10

*Frye v. United States*,
293 F. 1013 (D.C. Cir. 1923) ...................................................................................................... 5

*IBM v. BGC Partners, Inc.*,
No. 10-128, 2013 U.S. Dist LEXIS 59779 (S.D.N.Y. Apr. 25, 2013) ...................................... 10

*In re Bernard L. Madoff Inv. Sec. LLC*,
654 F.3d 229 (2d Cir. 2011) ...................................................................................................... 13

*Joseph S. v. Hogan*,
No. 06-1042, 2011 WL 2848330 (E.D.N.Y. July 15, 2011) ....................................................... 6

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) ................................................................................................................... 10

*Liriano v. Hobart Corp.*,
949 F. Supp. 171 (S.D.N.Y. 1996) ............................................................................................. 10

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) ................................................................................................ 6, 7, 8

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ........................................................................................................ 5

*Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010) ..................................................................................... 5, 6

*U.S. v. Brown*,
776 F.2d 397 (2d Cir. 1985) .................................................................................................. 6, 8

**FEDERAL RULES**

Fed. R. Evid. 702 ............................................................................................................... 1, 5, 8

## I. INTRODUCTION

This brief is submitted by a group of defrauded Madoff customers (collectively, the "Customers") in opposition to the Trustee's request[1] that the Court exclude the expert report and testimony of Timothy H. Hart. Under the Court's scheduling order, the Customers proffered Hart, a certified forensic accountant with 30 years of experience in complex claims administration and valuation analysis, to respond to the Trustee's assertions regarding the equity, impact, and feasibility of conducting an inflation adjustment. Utilizing data provided by the Trustee, Hart's expert report (the "Hart Report")[2] squarely addresses those assertions based on his extensive expertise in accounting and claims administration.

The Hart Report is focused on three issues: (1) the well-established and uncontested principle of the time-value of money (*i.e.*, that a dollar today is worth more than a dollar tomorrow due to inflation); (2) the application of that principle to the customer claims data (a project largely already completed by the Trustee's claims administrator); and (3) the purported burden of conducting that calculation (the Trustee's witness substantially completed the calculation in under two weeks). The Trustee declined to take Hart's deposition but now seeks, without foundation, to exclude all or portions of his Report and future testimony. That request should be rejected.

---

[1] Although not styled as a "*Daubert* motion," the Trustee's Reply Memorandum of Law in Support of Trustee's Motion for an Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based Damages, July 18, 2013 (ECF 5415) (the "Trustee's Reply") seeks *Daubert* relief -- asking the Court to "act as a gatekeeper" under Fed. R. Evid. 702 and exclude or give no weight to Hart's report. Accordingly, the Customers are entitled to respond to the Trustee's Reply as a *Daubert* motion.

[2] Expert Report of Timothy H. Hart, CPA, CFE, Apr. 26, 2013 (ECF 5331).

-1-

## II.     RELEVANT FACTS[3]

### A.     The Trustee's Inflation Adjustment Briefing Raised New Factual Assertions.

In October 2012, the Trustee requested that this Court authorize him to ignore the time value of money in calculating customer claims. *See* Mem. of Law in Support of Trustee's Motion for an Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based Damages (ECF 5039) (the "Trustee Motion"). The Trustee asserted that an inflation adjustment on net equity claims would "create inequities," add significant "delay and cost" to the administration of the estate, and principally benefit feeder funds. *Id.* at 24-29. In support, the Trustee offered the Declaration of Robert J. Rock (ECF 5041) ("Rock Declaration"), an accountant employed by Alix Partners, LLP, the Trustee's claims agent.

The Customers disputed the Trustee's assertions. *See* Customers' Brief, Dec. 3, 2012 (ECF 5133) ("Customer Br."). The SEC likewise submitted a brief supporting an inflation adjustment on both legal and equitable grounds. *See* Mem. of Law of the Securities and Exchange Commission Supporting a Constant Dollar Approach to Valuing Customers' Net Equity Claims for Fictitious Securities Positions, Dec. 10, 2012 (ECF 5142) ("SEC Br."). The SEC analyzed the issue and concluded that "an inflation adjustment should provide a more accurate calculation of the real-dollar value of the customer's net investment; however, whether such an adjustment should be made in a given case (or in this case) should be guided by a consideration of the relative costs and benefits of doing so . . . ." *Id.* at 1-2. The SEC stated that it did "not at this time have the data necessary to make an informed evaluation of the benefits or of the costs of making an inflation adjustment in this case." *Id.* at 17. "The Commission believes that the Court should determine the ultimate appropriateness of using constant dollars

---

[3] For a more complete recitation of the facts of this dispute, please refer to the Customers' Supplemental Brief Opposing Trustee's Motion for an Order Rejecting an Inflation Adjustment to the Calculation of "Net Equity,"

-2-

based on the Court's own evaluation of the benefits and costs of making an inflation adjustment." *Id*.

**B.    The Court Orders Discovery on the Trustee's Assertions and Permits a Rebuttal Witness.**

Faced with a factual dispute, the Trustee and the Customers agreed to limited discovery related to the implementation of an inflation adjustment. *See* Notice of Presentment of Amended Time-Based Damages Sch. Order, Jan. 15, 2013 (ECF 5196). The Court ordered the discovery. *See* Amended Time-Based Damages Sch. Order, Jan. 23, 2013 (ECF 5212) (the "Order"). The Order specifically required the Trustee to respond to document requests and to produce witnesses. It further allowed the Customers to "proffer a Rebuttal Witness or Affidavit (in any . . . form whatsoever)." *Id.* at 3-4.

**C.    Discovery Shows that the Trustee's Witnesses Do Not Support His Assertions.**

The Customers deposed Rock, whose testimony[4] contradicted the Trustee's claims on the supposed impact and burden of an inflation adjustment. Rock's task was to conduct an inflation adjustment calculation on all transactions for all active BLMIS accounts from 1981 to December 2008. Rock Decl. ¶ 4. He testified that he was able to complete this task in a matter of two weeks and for a total cost of less than $120,000. Rock Dep. 120:23-121:12. Rock's analysis of an inflation adjustment on various categories of accounts showed that, by using a hypothetical $10 billion distribution, the net distribution increase to non-feeder accounts would dwarf the net increase to feeder funds. *See* Hart Report ¶¶ 25-26 (reviewing summary illustrative tables provided by Rock showing $14.8 million increase to feeder funds with net increase to non-feeder funds of $111.5 million).

---

Apr. 26, 2013 (ECF 5329) (the "Customers' Supp. Br.") and accompanying declarations.

[4] All of the cited Rock deposition testimony may be found at Ex. B of the Declaration of Richard Kirby in support of the Customers' Supp. Br.

-3-

The Trustee next offered Vineet Sehgal, one of the principal forensic accountants responsible for claims administration of the Madoff estate, as a Rule 30(b)(6) witness. While Sehgal agreed that an inflation adjustment had largely been completed for the vast majority of accounts, he claimed that various legal and bureaucratic hurdles were the real source of cost and delay. Sehgal Dep. 61:8-63:19.

**D.    The Customers Offer Hart as a Rebuttal Witness.**

The Customers retained Timothy Hart, an expert forensic accountant with substantial experience in claims administration and valuation. Hart "review[ed] the Trustee's financial assertions related to implementing an inflation adjustment, including the evidence he provided to support these assertions" and provided his opinion on three issues: "[1] the financial theory and implications of an inflation adjustment on the claim amounts; [2] the impact of an inflation adjustment; and [3] the efforts and costs for calculating an inflation adjustment on all accounts." Hart Report ¶ 10. In brief, Hart concluded that, "[t]he failure to account for the time value of money in the calculation of a claim [] results in claim amounts that are inconsistent with even the most basic financial principles." *Id.* ¶ 17. In addition, he concluded that an inflation adjustment would have a substantial impact on the claims of early investors and would provide a significant net benefit to many non-feeder fund investors. *Id*. ¶¶ 18-26. Finally, Hart concluded that the costs of conducting an inflation adjustment were relatively modest because the Trustee's claims administrator had already constructed the model and conducted the calculations for almost every single account. *Id.* ¶¶ 27-32. The Trustee now asks the Court to exclude Hart's testimony.

-4-

### III.    DISCUSSION

Hart's expert report and testimony easily meet the admissibility requirements of FED. R. EVID. 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The rule has three main requirements: (1) the proffered witness must be an expert; (2) the expert's testimony must assist the trier of fact; and (3) the testimony must be based on a reliable foundation. *See Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 457-58 (S.D.N.Y. 2010). "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive, standard of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993)). "[T]he rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702, Advisory Committee's Notes (2000).

Where the judge is the trier of fact, "the Court has greater flexibility in satisfying its gatekeeping function vis a vis expert testimony given the absence of the need to protect juries from dubious expert evidence." *Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*, --- F. Supp. 2d ---, 2012 WL 6634138, at *7 (S.D.N.Y. Dec. 20, 2012). During bench trials, "expert testimony should be admitted so that the Court could have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions."

-5-

*Joseph S. v. Hogan*, No. 06-1042, 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011). Where the judge is dissatisfied with the examination of the expert, the court can ask additional questions to determine what weight to give the opinion -- without influencing a jury. *See id.* at *3.

### A.  Hart Is Well Qualified to Provide Opinions on an Inflation Adjustment.

Experts are permitted to testify regarding matters within their general expertise and experience. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042-43 (2d Cir. 1995) ; *U.S. v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985). "Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert." *Crown Cork & Seal Co. v. Credit Suisse First Boston Corp.*, 2013 U.S. Dist. LEXIS 34368, *29 (S.D.N.Y. Mar. 12, 2013) (internal citations and quotations omitted); *see also Pension Comm.*, 691 F. Supp. 2d at 457 (same).

Hart is an expert forensic accountant with 30 years of experience conducting claims administrations and investigations in insolvencies and legal disputes. *See* Hart Report, Att. A (C.V.). Hart started his career in 1984 with Arthur Andersen and became a partner there in 1996. *Id*. From 2002 he was a managing director at Navigant Consulting, where he was the co-leader of its Global Disputes and Investigations practice, comprising over 500 professionals. *Id*. In 2008, he joined Huron Consulting Group as a vice president and managing director where he was the leader of the accounting and financial consulting practice. *Id*. He subsequently founded Credibility Consulting. *Id*. Hart has worked on over 25 matters involving the assessment and application of accounting adjustments to large pools of claims in insolvent or near-insolvent estates. *Id*. As an internationally recognized damages expert, he has extensive experience performing valuations and accounting for the time value of money. Hart Report ¶¶ 2-5.

Faced with Hart's clear *bona fides*, the Trustee asserts that "the parties did not contemplate engaging in expert discovery at this juncture." Trustee Reply at 15. To the

-6-

contrary, the Court granted the Customers leave to "proffer a Rebuttal Witness or Affidavit (in any . . . form whatsoever)." Order at 3. Since the Customers have no regular access to the Trustee's vast database of claims data, they could not possibly produce a *fact witness* on the topic of conducting calculations and adjustments to that data. As such, an expert witness is the *only* witness the parties could have contemplated.

The Trustee further argues that the Court should not give weight to the Hart Report because it "has not been provided to counter an expert report submitted by the Trustee" and that Rock's Declaration "was provided only to demonstrate the calculations considered by the Trustee in reaching his decision regarding Time-Based Damages." Trustee Reply at 15. This is nonsensical. Rock's assignment was to "analyze" data and draw conclusions based on his 30 years of experience. Rock Decl. ¶¶ 2, 4. Whatever nomenclature the Trustee uses to describe Rock, he was engaged for and testified based upon his expertise.[5] Prior to performing this analysis, Rock had *no involvement* in the Madoff liquidation. That the Trustee chose not to retain an independent expert, perhaps one not affiliated with the Trustee's claims agent, does not bar the Customers from submitting an expert report, and the Trustee offers no authority to the contrary.

With 30 years of experience conducting claims administrations and investigations in insolvencies and legal disputes, Hart certainly has the "knowledge, skill, experience, training, or education" sufficient to satisfy the liberal Rule 702 standard for admission of expert testimony. *See McCullock*, 61 F.3d at 1042-43.

---

[5] Rock's Declaration notes that he has "testified in over 20 cases through the country during the past 5 years and has authored 5 publications including the *Financial Handbook for Bankruptcy Professionals*…." Rock Decl. ¶ 2.

-7-

**B.      Hart's Testimony Directly Responds to the Trustee's Factual Assertions.**

Hart's testimony will assist the trier of fact because it squarely addresses the central assertions the Trustee raises regarding the supposed burden and impact of an inflation adjustment. Such testimony is offered to assist the Court in determining the validity of the Trustee's claims. *See* FED. R. EVID. 702; *U.S. v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985); *McCullock*, 61 F.3d at 1042-43.

1.    *An Inflation Adjustment Is Equitable.*  The Hart Report directly responds to the Trustee's assertion that an inflation adjustment is "not in the interest of the customer class as a whole" and that "the Trustee believes the most equitable method is simply to repay customers their net principal invested before any adjustments for interest are made." Trustee Motion at 25. Hart highlights the central financial fallacy in the Trustee's argument -- that it ignores the time value of money, a fundamental and basic concept in finance. Hart Report ¶ 13. "The failure to account for the time value of money in the calculation of a claim [] results in claim amounts that are inconsistent with even the most basic financial principles." *Id.* ¶ 17. Therefore, Hart concluded that sound financial principles and basic equity require a time-value component be applied to customer claims. *Id*. Indeed, it is his opinion that "distributions from the estate made on a basis that fails to account for the time value of money will result in an inappropriate financial result." *Id*. ¶¶ 16-17. Thus, the Hart Report provides a direct counterpoint to the Trustee's unsupported assertions regarding the relative equity of an inflation adjustment, which will assist the Court in weighing those claims.

2.    *Impact of an Inflation Adjustment.*  The Trustee claims that an inflation adjustment would be inappropriate because it would principally benefit feeder funds. Trustee

-8-

Motion at 27-29. Putting aside the relevance of such a claim (after all, feeder funds are customers too),[6] Hart demonstrates that it is simply untrue:

> The result of Rock's analysis shows that feeder funds would have a net increase in distributions of $14.8 million, ***while non-feeder fund accounts would have a much larger net increase in distributions of $111.5 million***. In other words, according to Rock's analysis, ***individual account holders benefit more than feeder funds from an inflation adjustment***.

Hart Report ¶ 26 (emphasis added).

3.  *Feasibility of an Inflation Adjustment.* The Trustee asserts that conducting an inflation adjustment would create undue delay and cost because it would "require that the Trustee once again perform a transaction-by-transaction, account-by-account, review . . . expected to take as long as twelve months to perform." Trustee Motion at 26. Hart pointedly rejects this claim: "A model to calculate inflation adjusted claims has already been constructed. . . . The cost of constructing that model is a sunk cost as it has already been spent." Hart Report ¶ 28. Based on the fact that the Trustee has already applied on paper an inflation adjustment to almost every customer account in order to analyze the impact of such an adjustment, Hart concludes that "the process to calculate the claims and review these claims using an inflation adjusted calculation method should be straightforward and should not be time consuming." *Id.* ¶ 30. Hart then further outlines his views regarding the appropriate level of quality control and individual analysis necessary for certain settlement accounts. *Id.* ¶ 30.

C.  **Hart's Analysis Is Reliable and Accurate.**

The Trustee's conclusory attacks on the reliability, methodology, and accuracy of the Hart Report rely on the structure set out in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *See* Trustee Reply at 12. But the *Daubert* test does not apply to the kind of expert

---

[6] The Customers are aware of no legal standard that allows the Trustee to justify his decision based upon his

-9-

testimony offered here -- non-scientific expert testimony reasonably based upon years of accumulated experience in a particular industry (and upon basic principles of finance that the Trustee admits are not open to doubt). *See*, *e.g.*, *Liriano v. Hobart Corp.*, 949 F. Supp. 171, 177 (S.D.N.Y. 1996) ("It is not appropriate to invoke the *Daubert* test in cases where expert testimony is based solely on experience or training, as opposed to a methodology or technique. Indeed, it would be impossible to do so. Expert opinion based on personal experience cannot always be evaluated on the basis of 'rate of error', 'peer review' or 'general acceptance' in the relevant scientific community. Yet such opinions may be as valuable to the trier of fact as those opinions that can be readily gauged in such terms.") (internal citations and quotations omitted); *Emig v. Electrolux Home Pros.*, 2008 U.S. Dist. LEXIS 68811 *26-32 (S.D.N.Y. Sept. 10, 2008) (admitting expert testimony based on substantial industry experience but that did not otherwise fit the *Daubert* test).

Indeed, courts "have considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable," with the objective of "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "While a scientific or engineering expert's use or failure to use a particular methodology may provide reason to exclude their testimony, experts may also rely primarily, if not solely, on their experience or years of accumulated learning and insight." *IBM v. BGC Partners, Inc.*, No. 10-128, 2013 U.S. Dist LEXIS 59779, at *47-48 (S.D.N.Y. Apr. 25, 2013) (internal citations and quotations omitted).

---

favoritism of particular types of customers and prejudice toward others.

While the *Daubert* test for scientific evidence does not apply to expert opinions regarding non-controversial financial principles and the mechanical application of calculations into a spreadsheet, Hart's methods and logic were nevertheless sound and his report is demonstrably reliable.

1. *Methodology.* The Trustee's challenge to Hart's methodology does not withstand scrutiny. The Trustee claims that the Hart Report "does not demonstrate any semblance of a methodology, much less a reliable one" and simply "rehashes the Claimants' legal arguments and, without a meaningful review of the record or learned materials, presents counsels' theory of why the inflation-adjusted method is the more appropriate method for calculation of claims." Trustee Reply at 13. To the contrary, Hart is very specific about his methodology throughout his Report: he reviewed the data, conclusions, and testimony provided by the Trustee and Rock and applied his own substantial experience, knowledge of financial and accounting practice, and data analytic skills to test that data and the related conclusions. Hart Report ¶¶ 7, 10.

In order to analyze the equities of an inflation adjustment, Hart explains the common understanding of the time value of money and cites to a seminal text on the "Principles of Corporate Finance" to establish the fundamental concept that "a dollar today is worth more than a dollar tomorrow." Hart Report ¶¶ 11-13. Hart then shows how adjustments are applied across a variety of hypothetical examples and industries to account for the time value of money. *Id.* ¶¶ 14-15. Finally, Hart applies his personal expertise and experience in claims administration to the claims administration task faced by the Trustee here to conclude that "the failure to account for the time value of money in the valuation of a claim provides a windfall to the customers who invested in the latest years of the scheme at the expense of the earlier investors." *Id.* ¶¶ 16-17.

Notably, the Securities and Exchange Commission applied the same methodology as Hart in its finding that the "use of 'constant dollars' is well accepted when comparing the value of cash at different points in time" and concluding that "an inflation adjustment should be made to better calculate the value of the customer's claim . . . ." SEC Br. at 11. Indeed, these principles are so well established that the Trustee himself concedes that he "does not dispute Hart's statements regarding basic principles of finance and the operation of inflation . . . ." Trustee Reply at 16.

Hart's analysis of the impact of an inflation adjustment likewise followed a methodology. He "reviewed the inflation adjusted calculations performed by AlixPartners, including electronic copies of those calculations" and then sorted that data in Excel to test the Trustee's assertions and come up with his own illustrative points. Hart Report ¶¶ 18-26. That is the very same "methodology" that Rock used to analyze the impact of an inflation adjustment. *See* Rock Decl. ¶¶ 10-13.

And finally, Hart's review of the feasibility of conducting an inflation adjustment started with Rock's testimony that he had largely completed the analysis in a matter of two weeks and for a cost of under $120,000. *See* Rock Dep. 19:14-20:7; 9:19-25; 120:23-121:12. Hart then used his substantial experience conducting claims administration in complex cases to critique the quality control review process outlined by the Trustee's witnesses as "redundant, repetitive and not necessary to test the mechanical calculation that would be employed to adjust customer accounts for inflation. Hart Report ¶ 29. He then offered his own views, based on his substantial expertise, of what steps a reasonably quality review process would entail. *Id.* ¶ 30.

2.  *Legal Conclusions.* The Trustee's Reply suggests that the Hart Report offers "impermissible legal conclusions" but does not identify a single example. Instead, the Trustee

-12-

proclaims that "broad statements regarding inflation adjustments generally have no bearing on these proceedings where the Trustee is bound by the statutory strictures of SIPA." Trustee Reply at 14. In other words, the Trustee contends that SIPA prohibits an inflation adjustment to net equity claims such that analysis of the equities of such an adjustment -- an issue the Trustee himself first raised -- is unnecessary. The Trustee's own legal conclusion cannot be the basis for the exclusion of Hart's testimony on basic accounting and finance principles. Moreover, the Second Circuit has ruled that SIPA's definition of "net equity" allows for some flexibility to determine the "method, or combination of methods, will best measure 'net equity'" given that "[f]raud is endlessly resourceful" and may take many forms over varying durations of time. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 238 (2d Cir. 2011).

3. *Opinions*. The Trustee contends that Hart's opinions are "lacking in any expert foundation, and fall outside Hart's professed experience." Trustee Reply at 15-16. This argument, which is not explained, is demonstrably wrong. The foundation of Hart's opinions are his substantial experience in forensic accounting and valuation, his knowledge of fundamental principles of finance and accounting, his substantial experience with claims administration in insolvent estates, the raw data provided by the Trustee, and the analysis provided by the Trustee's witnesses. Hart Report ¶¶ 1-10.

4. *Accuracy*. Finally, the Trustee claims that the Hart Report "misstate[s] the impact of an adjustment for Time-Based Damages and the burden associated with implementing such a re-allocation of customer property." Trustee Reply at 16. In support of this argument, the Trustee compares how certain accounts would benefit by application of an inflation adjustment as compared to the performance of the S&P 500. Trustee Reply at 17. This comparison is

irrelevant.  Hart's analysis relied upon the inflation model constructed, and adjustments already conducted, by the Trustee's own agents.

The Trustee fails to demonstrate any proper grounds for the exclusion of Hart's testimony.

## IV.    CONCLUSION

For the reasons stated above, the Trustee's request for the exclusion of the testimony of Timothy Hart should be denied.

Dated:  August 12, 2013
        Washington, D.C.

Respectfully submitted,

K&L GATES LLP

By:    /s/ Richard A. Kirby  
    Richard A. Kirby
    Laura K. Clinton
    Scott P. Lindsay
    1601 K Street NW
    Washington, DC 20006-1600
    Tel:  (202) 778-9000
    Fax:  (202) 778-9100

*Attorneys for the Customers identified on Schedule A identified as being represented by K&L Gates LLP*

LOEB & LOEB LLP
P. Gregory Schwed
Walter H. Curchack
Daniel B. Besikof
345 Park Avenue
New York, NY  10154
Tel:  (212) 407-4000
Fax:  (212) 407-4990

*Attorneys for Alan and Norma Aufzien and family; the Evenstad family parties; Gorvis LLC; and The Koff Living Trust*

-14-

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Elise S. Frejka
Jason S. Rappaport
1177 Avenue of the Americas
New York, NY  10036
Tel:  (212) 715-9100
Fax:  (212) 715-8000

*Attorneys for the Customers identified on Schedule A identified as being represented by Kramer Levin Naftalis & Frankel LLP*

MILBERG LLP
Matthew Gluck
Matthew A. Kupillas
Jennifer L. Young
Joshua E. Keller
One Pennsylvania Plaza
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229

*Attorneys for the Customers identified on Schedule A identified as being represented by Milberg LLP*

SCHULTE ROTH & ZABEL LLP
Marcy Ressler Harris
Jennifer M. Opheim
Mark D. Richardson
919 Third Avenue
New York, New York 10022
Tel:  (212) 756-2000
Fax:  (212) 593-5955

*Attorneys for HHI Investment Trust #2*

SEEGER WEISS LLP
Parvin K. Aminolroaya
77 Water Street, 26th Floor
New York, NY 10005
Tel: (212) 584-0700
Fax: (212) 584-0799

*Attorneys for the Customers identified on Schedule A identified as being represented by Seeger Weiss LLP*

-15-