1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Adversary 08-01789-brl

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SECURITIES INVESTOR PROTECTION CORPORATION,

8                          Plaintiff

9                   v.

10

11   BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, et al

12                          Defendant

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15   In Re:

16

17   BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, et al

18                          Debtor

19

20   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21

22                   U.S. Bankruptcy Court

23                   One Bowling Green

24                   New York, New York

25

1                    September 10, 2013

2                        10:03 AM

3

4    B E F O R E :

5    HON BURTON R. LIFLAND

6    U.S. BANKRUPTCY JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1   Hearing re:  (cc-5038-5041) Trustees Motion for an Order

2   Affirming Trustees Calculations of Net Equity and Denying

3   Time-Based Damages

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Jamie Gallagher, Melissa Looney, Penny Skaw

Page 4

1   A P P E A R A N C E S :

2   BAKER HOSTETLER

3        Attorney for Irving Picard, Trustee

4        45 Rockefeller Plaza

5        New York, NY 10111

6

7   BY:  DAVID J. SHEEHAN, ESQ.

8

9   SECURITIES INVESTOR PROTECTION CORPORATION

10        Attorney for SIPC

11        805 15th Street N.W.

12        Suite 800

13        Washington, DC 20005-2215

14

15   BY:  JOSEPHINE WANG, ESQ.

16

17   K&L GATES, LLP

18        Attorneys for Various Customers

19        1601 K Street, NW

20        Washington, DC 20006

21

22   BY:  SCOTT P. LINDSAY, ESQ.

23        RICHARD A. KIRBY, ESQ.

24

25

```
 1   STIM & WARMUTH, PC

 2         2 Eighth Street

 3         Farmingville, NY 11738

 4

 5   BY:  GLENN P. WARMUTH, ESQ.

 6

 7   LOEB & LOEB, LLP

 8         Attorneys for Various Customers

 9         345 Park Avenue

10         New York, NY 10154

11

12   BY:  DANIEL BESIKOF, ESQ.

13         P. GREGORY SCHWED, ESQ.

14

15   U.S. SECURITIES AND EXCHANGE COMMISSION

16         Deputy Solicitor

17         Office of the General Counsel

18         100 F Street, NE

19         Washington, DC 20549

20

21   BY:  JOHN AVERY, ESQ.

22

23

24

25
```

1   MILBERG, LLP

2        Attorney for Various Customers

3        One Pennsylvania Plaza

4        New York, NY 10119

5

6   BY:  JENNIFER L. YOUNG, ESQ.

7

8   SCHULTE, ROTH & ZABEL, LLP

9        Attorneys for HHI Trust

10       919 Third Avenue

11       New York, NY 10022

12

13  BY:  MARCY RESSLER HARRIS, ESQ.

14       JENNIFER M. OPHEIM, ESQ.

15

16  LOWENSTEIN SANDLER, LLP

17       65 Livingston Avenue

18       Roseland, NJ 07068

19

20  BY:  NICOLE STEFANELLI, ESQ.

21

22

23

24

25

Page 7

1                    P R O C E E D I N G S

2              THE CLERK:  SIPC v. BLMIS.

3              THE COURT:  We have appearances for the

4    (indiscernible - 00:01:35)?

5              MR. SHEEHAN:  Yes, Your Honor.  David Sheehan with

6    Baker Hostetler, attorney for the trustee, Irving Picard.

7              MS. WANG:  Josephine Wang for the Securities

8    Investor Protection Corporation.

9              MR. SCHWED:  Greg Schwed of Loeb & Loeb for

10   various customers.

11             MR. KIRBY:  Richard Kirby, K&L Gates for various

12   customers.

13             MR. AVERY:  I'm John Avery, representing the

14   Securities and Exchange Commission.

15             MR. BESIKOF:  Dan Besikof with Loeb & Loeb for

16   various customers.

17             MS. HARRIS:  Marcy Harris with Schulte, Roth, and

18   Zabel, HHI (indiscernible - 00:02:07) trust.

19             MS. YOUNG:  Jennifer Young from Milberg LLP for

20   various customers.

21             MS. OPHEIM:  Jennifer Opheim, Schulte, Roth, and

22   Zabel for HHI Trust.

23             MR. LINDSAY:  Scott Lindsay from K&L Gates,

24   various customers.

25             MR. WARMUTH:  Glen Warmuth, Stim & Warmuth for

1   Michael (indiscernible - 00:02:23).

2            THE COURT:  It's your motion, Mr. Sheehan.

3            MR. SHEEHAN:  Yes, Your Honor.  I understand.

4            I think there's a couple of actually -- perhaps,

5   housekeeping items that I would suggest with Your Honor's

6   permission we could address.

7            One is, is that Judge Grasay (ph), as I'm sure

8   Your Honor is aware, ruled last week with regard to the

9   intervener's appeal.  That appeal was denied.  That leaves

10  the other half of that, which we already have argued before

11  Your Honor previously and have submitted briefs on.

12           I don't intend to argue that here this morning and

13  that is that those people who filed the claim, but did not

14  object to the determination should also not participate in

15  this proceeding for all of the reasons we stated earlier.  I

16  don't mean to go into that again today.  So, I just wanted

17  to put that to the side.

18           The other thing is, is that we have raised an

19  objection here with regard to Mr. Hart (ph) testifying.  And

20  what I thought we could do is perhaps deal with that issue,

21  at least our objection now, because if Your Honor is

22  inclined to hear his testimony, that would, I would think,

23  go before any argument by us.

24           Our position is well stated in our briefs, but I

25  think it's even better stated, if I may be so bold, as to

Page 9

```
1    refer to the brief filed by our adversaries who give us the

2    three reasons why they think Mr. Hart could be of assistance

3    to Your Honor here this morning.

4              The three things they say he's going to address

5    are, and I'm quoting from page 1 of their brief, one, that

6    well established and uncontested principle of the time value

7    of money.  Something I think Your Honor needs no assistance

8    whatsoever to understand, or to apply, or determine in this

9    case.

10             Number two, the application of that principle to

11   the customer claims.  Again, a rudimentary application of a

12   time honored principal.  Again, something I don't think Your

13   Honor needs any assistance on.

14             And last, but not least, the purported burden,

15   that is the burden of applying that principle to all of the

16   claims that the trustee has had filed with him.  Again, not

17   something that we've -- given all of Your Honor's experience

18   and background that you would need any assistance to reach

19   any of the determinations here.

20             But last, but not least, and perhaps most

21   importantly, that none of these factual issues that are

22   being raised here have anything to do with the ultimate

23   legal principal, whether or not interest or the time value

24   of money is something that is afforded to customers in their

25   customer claim.
```

1           And we believe, obviously, that should be decided

2    on the law based on the statute and the decisional law that

3    we've cited to Your Honor, and therefore, Mr. Hart should

4    not testify here this morning.

5           MR. KIRBY:  Your Honor, Richard Kirby on behalf of

6    customers.

7           I think to understand why it is appropriate to

8    have an expert witness, we go to the -- or a witness with

9    respect to this issue, we have to go to the position of the

10   SEC in this matter, which has stated that -- that, and you

11   will hear from Mr. Avery later today, that one of the

12   fundamental questions in deciding the issue of whether there

13   should be an inflation adjustment in the net equity

14   determination is that you must determine the question of the

15   administrative burden.

16          THE COURT:  A cost benefit analysis?

17          MR. KIRBY:  A cost benefit analysis, that is

18   fundamentally a fact issue.  The trustee has put in issue

19   that fact question by putting on a declaration -- filing a

20   declaration by their witness, Mr. Rock (ph).

21          Subsequently, Your Honor, we were issued a

22   scheduling order authorizing the customers to have a

23   rebuttal witness.  That witness is Mr. Hart.  Mr. Hart

24   testifies about what I think is a mixed question of law and

25   fact as to the effective inflation.

1           Mr. Hart would testify as a second issue as --

2     which will amplify on something that Mr. Rock stated, and we

3     put it forth in evidence through his deposition testimony

4     because Mr. Rock is not here, as to the impact.  And the

5     most important issue is Mr. Hart's experience and

6     specialized knowledge with respect to the question of

7     administrative cost in administering an estate like this.

8           He has substantial experience administering much

9     larger estates than this, and he is prepared to testify

10    about how having reviewed the database of the trustee and

11    reviewed the information that the trustee has provided about

12    the -- his claim calculations, how simple it would be to

13    implement an inflation adjustment should the Court determine

14    that.

15          And because that is a fundamental issue of fact

16    that the Court must decide, it's not a legal question, it's

17    a fact question, we think that the Court should have a --

18    the opportunity to hear the witness.

19          As far as the question of exclusion, he -- under

20    Rule 702, as we've stated in our papers, but the standard is

21    one of specialized knowledge.  He clearly has that.  Once

22    you hear his background and experience, you will be most

23    impressed about the large experience he's had administering

24    and being involved in the administration of large

25    insolvencies, much larger than this one.  And based upon

Page 12

1    that knowledge, he can provide testimony that will assist

2    you, as trier of fact, on several of the issues that you

3    need to decide.

4            One of the issues that you will have to decide is,

5    is the SEC -- is the ultimate question of what the SEC

6    attributable state, which is that the difference between --

7    which is -- the Court can certainly take judicial notice.

8    We ask the Court to take judicial notice of -- in the

9    papers, but it is a question of what is the impact of

10   inflation and the importance of that in determining -- in a

11   cash in, cash out method under the facts like this.

12           The second thing is the impact of the various

13   inflation adjustments and how it would impact the estate

14   overall, which is an important consideration in determining

15   administrative burden.

16           And the third issue that the Court will need to

17   address is the fundamental question of what is it going to

18   cost, and how much time would it take.  And Mr. Hart can

19   assist the Court on each of those.

20           We think that meets the criteria for Rule 702, and

21   therefore we ask --

22           THE COURT:  All of this is captured in this binder

23   you submitted to me?

24           MR. KIRBY:  That's -- those -- that is not all

25   captured in that, okay?  That is -- that is material that

Page 13

1     comes from Mr. Rock --

2            THE COURT:  But his declaration would capture

3     everything that you're telling me?

4            MR. KIRBY:  In his -- his -- his testimony and his

5     written report would -- would -- that he -- he submitted an

6     expert report that is permitted under the rules --

7            THE COURT:  Very well.

8            MR. KIRBY:  -- and he -- it will be within that.

9            But I think it would be helpful to the Court,

10    that's the reason we brought him here today -- it would be

11    helpful to the Court to understand the -- from somebody from

12    his experience the -- you know, how that -- how to

13    administer something of that -- which the trustee has stated

14    is tremendously burdensome.

15           THE COURT:  Thank you.  Anyone else want to be

16    heard?

17           Mr. Sheehan, any response?  Or should I take your

18    opening statement as your response?

19           MR. SHEEHAN:  Well, my response would be that I

20    think we're putting the cart before the horse here.  Even

21    the SEC's cost benefit analysis is a cart before the horse.

22    Your Honor refers to all --

23           THE COURT:  Well, the SEC takes the position that

24    it's a discretionary matter now for me and I should do a

25    cost benefit analysis before I exercise my discretion.

1          I thank you, Mr. Sheehan, and I thank the others.

2     And I also thank everybody for the enormous amount of work

3     that's gone in to get us to today.

4          The briefing has been excellent and it's come from

5     every quadrant of the bar, and all of the main interests

6     that are swept up in the Madoff affair.  But I have to agree

7     with Mr. Sheehan that this is essentially a matter of law,

8     and it is not going to turn on a question of fact.  I've

9     analyzed all the briefs.

10          However, in order to preserve a record for

11     everyone, and since both sides have submitted their version

12     of what would be involved in a cost benefit analysis, I have

13     all of the so-called tendered exhibits.  And notwithstanding

14     the fact that the Court has some serious concerns and

15     (indiscernible - 00:12:01) as to the ultimate admissibility

16     of some of the expert testimony, I'm certainly willing to

17     make as part of the record the submission that's essentially

18     the Hart, the Seagel (ph), and Rock, both depositions and

19     declarations that have been placed before the Court, and

20     those documents that are sought to be submitted in support

21     of them.  So, that will all be part of a record.

22          However, if -- to have a recorded testimony, it's

23     not necessary and again I'll reiterate, I certainly find

24     that this issue is resolvable as a matter of law.

25          Go ahead, Mr. Sheehan.

1          MR. SHEEHAN:  Thank you, Your Honor.

2          Your Honor, as I was preparing this here today, I

3    know Your Honor reads all the papers, and I know you're very

4    familiar with it.  So, I just want to try to offer you --

5          THE COURT:  I wore out a pair of glasses.

6          MR. SHEEHAN:  I can totally understand that.

7          THE COURT:  Actually, I lost my glasses yesterday

8    and I was afraid I'd have to adjourn the hearing.

9          MR. SHEEHAN:  Oh my goodness, wow.  Well, I'm glad

10   you found them.

11         The -- I'm trying to offer you a perspective,

12   then, that, you know, underscored by what's in the briefs,

13   but perhaps a little bit different.

14         And in doing so, I go all the way back to when I

15   was here a few years ago arguing at this very podium the net

16   equity decision.  And at the very end of that argument, I

17   got up and I said to Your Honor, there's only one thing

18   that's certain if in fact you rule in favor of my

19   adversaries with regard to the (indiscernible - 00:13:32)

20   method.  And that is, is that people who did not get all

21   their money back will get less.  And the people who got

22   other people's money will get more.  And the same principle

23   adheres today.

24         This is, after all, and I know people don't want

25   to hear this, it's a Ponzi scheme.  It's a zero sum gain.

Page 16

1    There's only one pot of money.  Until everyone who lost all

2    of their money is fully satisfied, there's nothing that

3    should provide for other people getting their money.  That

4    should not happen.

5            And so with that principle in mind, let's take a

6    hard look at what we're really talking about here because it

7    gets lost, I think, in all of the rhetoric of all of our

8    papers, and that's this.

9            What is SIPA really all about?  It's all about a

10   priority for customers so they get their cash and their

11   securities back.  It recognizes that when you have a

12   customer account, you are at risk.  You may very well lose

13   everything by your investment.  You could pick Float to

14   Relax, Inc. and it just doesn't take off.  Many, many things

15   can happen to that account.

16           So, SIPA never guarantees that you'll get a

17   return.  SIPA never suggests that if there's fraud, that you

18   somehow get damages.  None of that is the case.  It's simply

19   this.  If you have cash and stock there on the filing date,

20   you're entitled to get that cash and stock back, up to

21   limits of protection and whatever the customer fund,

22   assembled by the trustee, can distribute to you.  That's it.

23           There is nothing else in net equity, and that is

24   the fundamental principal upon which the net equity decision

25   that Your Honor rendered, and affirmed by the Second

Page 17

```
 1    Circuit, is predicated upon, that that's what they get.

 2    They don't get anything else.

 3              So, to suggest here that because, yes, it is a

 4    horrible situation, no one in this courtroom certainly

 5    starting with the trustee on down to his entire staff, does

 6    not recognize the pain that's been inflicted by Mr. Madoff

 7    on all of the net winners in this case.

 8              They are, in fact, people who suffered.  They

 9    looked at their statement and thought they had an investment

10    which they did not have.  They thought they were actually

11    getting profits which weren't real.  They had to return

12    them.  They're being sued for those.  We understand that,

13    but that is the nature of a bankruptcy proceeding.  That is

14    the nature of a SIPA proceeding, that a trustee assembles

15    that customer property and redistributes it.

16              There is nothing, absolutely nothing in the

17    statute that's been pointed to by either the SEC or any of

18    our adversaries that suggests that interest, or an inflation

19    adjustment, or whatever name you wish to call it is

20    available to a customer claimant.

21              Let's just pause on that.  Customer claimant.

22    That's what we're focusing on here.  It's not a question of

23    whether or not somewhere within the context of this overall

24    massive proceeding that at some point down the road -- let's

25    assume that Mr. Picard has the success that we're striving
```

Page 18

1    for and that we, indeed, attain all of the money back.  And

2    along with the statutory mandate of, you know, reimbursing

3    SIPA, and doing all of those other things, there's a general

4    estate.

5           If there is a general estate, what is interest?

6    It's damages.  It's clearly associated with the general

7    creditor claim.

8           So, we're not saying that someone can't come in

9    here and say, my goodness, I gave Mr. Madoff, that thief, my

10   money and look what he did with it.  I should get a judgment

11   against him as a tortfeasor.  And I should be able to prove

12   that claim as a general creditor claim, because the trustee

13   has now assembled a general estate.

14          That's not what we're talking about here.  They're

15   trying to take those principals and somehow infuse them into

16   a statutory mandate that Congress has created that has a

17   very limited, albeit a very salutary purpose, but a very

18   limited role and that is to give you back your stock and

19   your cash.  To try and infuse in that the concept that there

20   is a inflation adjustment that should be available is just

21   wrong.

22          With respect, the SEC has corrupted new times when

23   it suggests to Your Honor, now wait a minute, legitimate

24   expectations have a role here.  So, anyone who gave somebody

25   money and then left it there for a couple years has a

1    legitimate expectation that at the end of the day they

2    shouldn't just get that money back, they should get

3    something on top of that.

4              Where is that expectation emanate from?  It cannot

5    emanate from the fact that they gave money to the broker and

6    think that somehow they're going to get interest on it.

7              If Your Honor gave $1,000 to Merrill Lynch and did

8    nothing with it and ten years later went to Merrill Lynch

9    and said I want my $1,000 plus interest, they'd be

10   dumbfounded.  You would not be getting any interest because

11   you would not be entitled to it.

12             So, if that's the case, in the ordinary day of

13   commerce that we have in the brokerage industry, how can it

14   be true that in a filing, when you have a complete debacle

15   like we have here, that somehow we engraft upon it an

16   expectation that somehow the brokerage account became

17   something different.  It became an FDIC account?  It became

18   a note with interest?  It became some other legal vehicle

19   that gives you the ability to get time value of money?

20   That's just not true.

21             THE COURT:  Well, it could have contractually, but

22   I don't see that contractually that existed here.

23             MR. SHEEHAN:  Absolutely, Your Honor.  And there

24   are cases.  And they're cited by our adversaries.  And we

25   acknowledge the fact that in those cases where there's a

Page 20

1    contractual obligation to provide interest, Corolla Zella

2    (ph), and all those other cases, we agree.  But there is no

3    such contractual obligation here.  There's no statutory

4    requirement for it.  There is just simply nothing in the

5    record to support this.

6           So, at the end of the day, while we understand why

7    our adversary suggests, well look, it's fair.  It's just

8    fair.  Well, with all due respect, fair isn't what is in

9    play today.  What's in play here today is the statute itself

10   and the law, and what the law requires.

11          And while we may feel as though there's something

12   we want to do here, when the SEC suggests there should be

13   maybe something here, I think they're wrong.  And I think

14   the Second Circuit gave us really good insight into this in

15   the Walsh decision, which I know Your Honor's familiar with,

16   which the SEC and the CFTC participated in and submitted.

17          And it's quoted at length in the opinion by the

18   Circuit, submitted that when the trustee, in that case a

19   receiver, has assembled a rarely massive estate, what should

20   happen in that instance is there should be no interest

21   associated with the Ponzi scheme as there was in that case,

22   because it would be wrong.  That's what they said, wrong, to

23   take the money from those people who did not get their

24   principal back and give it to other people who already got

25   their principal and fictitious profits.  It would be wrong.

1        I submit to Your Honor it would be equally wrong

2    here.  The same principles that applied there, apply here

3    today.  And I would submit to Your Honor that based on the

4    record that we have before you, that interest inflation

5    adjustment, whatever it should be, should not be afforded to

6    the customer claimants here, and it should be denied.

7        Thank you, Your Honor.

8        MS. WANG:  Josephine Wang for the Securities

9    Investor Protection Corporation.  Good morning, Your Honor.

10        THE COURT:  Good morning, Ms. Wang.

11        MS. WANG:  SIPC supports the position of the

12    trustee in this matter.  We must respectfully disagree with

13    our colleagues from the SEC.

14        There is no statutory authority or any other basis

15    to impose an inflation, or any other time based damages in

16    this case, inflation factor.

17        Now, it's true that in SIPA there is an inflation

18    provision, at least since 2010, but that relates to the

19    adjustment of the amount of cash that SIPC can advance for

20    cash claims.  So, up until 2010, SIPC could advance up to

21    $100,000 to satisfy claim for cash.

22        Since 2010, that amount has become $250,000

23    subject to a possible adjustment for inflation.  But even

24    providing -- even in providing for that possible adjustment,

25    Congress imposed several conditions.  First of all, every

Page 22

1    five years, SIPC has to --

2            THE COURT:  Those conditions are rather daunting

3    as I read the statute.

4            MS. WANG:  Absolutely, Your Honor.  And I'll be

5    happy not to review them if they are simply repeating the

6    conditions for the Court.  But they are very onerous.

7            And so Congress did not intend that simply on a

8    whim, amounts be adjusted for inflation.  There were many

9    conditions that have to be met; notice of any adjustment for

10   inflation has to be published.  You give the public an

11   opportunity to comment.  SIPC reports to the Congress.  It's

12   not simply something that's done overnight.  It's a very

13   well considered action.

14           But that's not what's being done here.  What's

15   being done here is simply because the SEC has suggestion

16   that possibly -- just possibly there should be an adjustment

17   for inflation, that should be the case, but that's not the

18   rule of law.  That's not what Congress has provided.

19           And in fact, that would be changing the definition

20   of net equity, which is something that is specifically

21   prohibited under SIPA Section 78 CCC B4A.

22           There are other reasons why the adjustment is

23   inappropriate in this case.  One is that realistically

24   what's being looked for here are damages.  What you get in a

25   SIPA proceeding, is what you have deposited with the broker.

Page 23

1    If you give the broker $100, that's what you get back.  If

2    you're looking for something more, because you were damaged,

3    because the broker lied to you, that's a claim you may have,

4    but you have it as a -- you have it as a general creditor,

5    not as a customer.

6           And certainly the intent of SIPA was not for the

7    customer to do better in liquidation than he would have done

8    otherwise, but that's exactly what these customers are

9    looking for at this point, at this time.  When an investor

10   suggests that he should get 9 percent interest on the amount

11   that he deposited with the broker, that's not a SIPA

12   protected claim.  That's allowing the investor to do better

13   in bankruptcy than he would have done in the marketplace.

14          And so for these reasons, because there is no

15   statutory authority, because there is no basis to apply an

16   inflation or any other adjustment, such as interest, we

17   would ask that the Court grant the trustee's motions and

18   affirm his determinations of these claims.  Thank you, Your

19   Honor.

20          THE COURT:  Thank you.  Does the SEC want to be

21   heard from?

22          MR. AVERY:  You want to hear from us next?

23          THE COURT:  It seems we ought to lump the

24   Government together, even though they might be on opposite

25   ends of the argument today.

1              MR. AVERY:  Might as well.  My name is John Avery.

2      I represent the Securities and Exchange Commission.  SIPC

3      just said the way the statute works is if you give the

4      broker $100, that's what you get back.

5              That would certainly be true if you had a claim

6      for cash.  Here the customers have claims for securities and

7      it seems to me that those securities have to be valued,

8      which is a bit of a task, because they -- as we all know,

9      they are fictitious securities or at least fictitious

10     security positions.  Nevertheless, they are claims for

11     securities and the question is how best to value them.

12             Now, the trustee came up with the net investment

13     method, cash in, cash out.  And that's a method that the SEC

14     vigorously supported, but with the caveat that when you're

15     valuing the net investment, it may make sense to make an

16     adjustment to account for interest so as to best value the

17     money when it went in and value the money that came out when

18     it came out.

19             We think this will provide for a more accurate

20     valuation of the customer's net equity, the customer's

21     claims for securities.

22             THE COURT:  That's not the position you took in

23     Walsh (ph); is that correct?  And Walsh was also a long

24     standing Ponzi scheme lasting over 13 years or even longer.

25             MR. AVERY:  Different circumstances, Your Honor.

Page 25

1    I wasn't involved in the Walsh case, at least not that

2    aspect --

3                THE COURT:  But the SEC was.

4                MR. AVERY:  -- not that aspect of it.  The SEC

5    was.

6                THE COURT:  This is not a personal situation, this

7    is a position taken by a Government agency.  And, you know,

8    there's a deference standard that the Court has to look to.

9                MR. AVERY:  Well, let me address that just very

10   briefly.  We're actually not asking for deference here.  If

11   we were asking for deference --

12               THE COURT:  Not even --

13               MR. AVERY:  If we were asking -- it would be --

14               THE COURT:  Not even Skidmore deference?

15               MR. AVERY:  -- it would be Skidmore deference,

16   which means if what I'm saying makes sense to you --

17               THE COURT:  So you cross your fingers and hope I

18   give it to you?

19               MR. AVERY:  Pretty much.  Pretty much, Your Honor.

20               THE COURT:  Oh, I get it.

21               MR. AVERY:  But we -- we're not claiming Chevron

22   deference.  We acknowledge that this is a position that

23   we're taking in this litigation and as you pointed out, a

24   different position was taken in the Walsh case.

25               Let me just address a couple of the points that

Page 26

1    the trustee makes.  Because I do think that contrary to the

2    trustee's argument, that the statute is clear and that

3    you've got no discretion to make an adjustment, assuming you

4    want to, then that's nonsense.  The trustee says there's no

5    specific in SIPC that would allow for any sort of an

6    adjustment for inflation.  Well, there's nothing specific in

7    SIPC that requires cash in/cash out.  It's a method for

8    determining in this unusual circumstance what the value of

9    the claim for securities is.

10            In fact, the Second Circuit made it perfectly

11   clear.  It says, the statute does not say specifically how

12   net equity should be calculated.  If a just honest broker

13   failed to place a customer's funds into the securities

14   market, notwithstanding the customer deposited cash with the

15   debtor for the purpose of purchasing securities.

16            The Court went on to say, that differing fact

17   patterns will inevitably call for differing approaches to

18   ascertaining the fairest method for approximating net equity

19   as defined in SIPA.  Well, how are we going to do that as --

20   it's the Commission's position that given the length of the

21   fraud here, you'll get a better view of the customer's

22   investment -- customer's net investment by making an

23   adjustment for inflation.  This is completely different from

24   an adjustment for interest.

25            One of the things the trustee has done is tended

Page 27

1  to confuse an inflation adjustment, interest, a claim for

2  damages.  In fact, he lumps them all under the rubric of

3  time based damages.  Well, I would submit that an inflation

4  adjustment is neither interest nor damages.  It simply

5  recognizes the value of the money at the time it went in and

6  the value of the money at the time it came out.

7          Finally, I would just say perhaps I've already

8  said it, that the trustee's position would be entirely

9  appropriate if these were claims for cash.  If the customer

10  put cash in, didn't expect to receive securities back and

11  later the broker went belly up, the customer would expect to

12  get his cash back without interest, without an inflation

13  adjustment, without any damages.  But again, I submit that

14  here you've got to value the securities.

15          It is the Commission's position, as the trustee

16  points out, that the statute doesn't require you to make an

17  adjustment.  The Commission believes that it's a question of

18  whether it's -- whether it makes sense in this case, whether

19  the value of doing so outweighs the obvious burdens.

20          Any questions?

21          THE COURT:  Thank you.

22          MR. AVERY:  Thank you.

23          MR. SCHWED:  Good morning, Your Honor.  Greg

24  Schwed of Loeb and Loeb.

25          THE COURT:  Good morning, Mr. Schwed.

Page 28

1           MR. SCHWED:  Good morning.  We represent numerous

2    clients and we are also speaking on behalf of the seven law

3    firms that signed on to the consolidated brief.  In an

4    effort to spare Your Honor the burden of multiple and

5    duplicative filings, our goal was to try to pool our efforts

6    into one brief.

7           There have been other customers who have filed

8    papers and just to clear up one confusion, the consolidated

9    brief is not asking for 9 percent interest.  That's -- there

10   may be some others who are.  It is not our position.

11          We support the SEC's position in this case and we

12   think it really resolves to a very simple and fundamental

13   issue that was framed in the net equity decision that SIPC

14   and the trustee are so fond of citing.

15          In addition to the quotations that Mr. Avery made,

16   the Second Circuit left in our view absolutely no question

17   that the proper technique the proper procedure for assessing

18   competing views is to actually look at them as competing

19   views is to actually look at them as competing views.

20          And they even -- they even articulated a

21   standards, which we admit gives the trustee a modicum of

22   deference, but if the trustee's method as head to head

23   against a competing method is clearly inferior to the

24   competing method, then the competing method should prevail.

25          And we think it's really a red herring, just sort

Page 29

1    of a preliminary road block that the trustee and SIPC are

2    setting up and they do it skillfully as one would expect in

3    saying that the statute, the SIPA statute itself just flatly

4    bars anything other than their method.  It's their way or

5    the highway.  It's either net investment method with no

6    adjustment or as we're suggesting and the SEC is suggestion,

7    the same net investment method, but with an adjustment to

8    take account of economic reality and fairness.

9           And really that's what this case comes down to, we

10   believe.  And we actually agree with Your Honor.  We -- our

11   initial submission to the Court did not provide for a

12   factual hearing.  The SEC took the position that in

13   principle it was fair to adjust for constant dollars and

14   inflation, but said that they wanted a fuller record on it,

15   and so we -- we engaged in some discovery and we're prepared

16   to put Mr. Hart (ph) on if necessary.

17          But we do think that in fact, as a matter of law,

18   this case can be decided.  Hopefully when we think what your

19   honor is thinking, but that's obviously one of the mysteries

20   of the ages.  The -- we think it can be decided as a matter

21   of law, because the concept that a dollar today is not the

22   same as a dollar 20 years ago is so incandescently obvious

23   that it barely needs belaboring.

24          Your Honor made a very good -- had a good and

25   detailed example in your opinion in the net equity decision

Page 30

1    and we put an example in our brief as well, which we think

2    really focuses the issue.  It's not unrealistic.  It

3    subsumes the time frame we're talking about.  We mention it

4    in the first brief, which is ECF 5133.  And I'll just --

5    with Your Honor's forbearance, I'll just go through it one

6    more time, because it seems to us so clear that no one can

7    really deny the fairness.  And ultimately fairness goes back

8    to Bank of Maron v. England that old case from 1966.  The

9    Bankruptcy Court is a court of equity.  And it should be

10   doing the right thing, unless of course it's constrained by

11   a statutory command that goes the other direction.

12          And perhaps just to linger for a moment on whether

13   the statute does in fact constrain Your Honor and force Your

14   Honor to decide that only unadjusted net equity is the way

15   to go.  In addition to the quotations that Mr. Avery made,

16   the Second Circuit made no doubt about it.  I'm quoting now

17   from 654 F.3d at 235.  The statutory language does not

18   prescribe a single means for calculating net equity that

19   applies in the numerous circumstances that may arise in a

20   SIPA liquidation.

21          If that weren't enough, the Court goes on to say

22   at Footnote 5, the two competing methods of calculating net

23   equity proposed by the parties to this litigation are the

24   only two methods at issue here.

25          We do not hold that they are the only possible

1   approaches to calculation of net equity under SIPA, and yet

2   Mr. Sheehan and Ms. Wang say, that really is -- it's their

3   way or the highway.  It's net adjustment, it's net equity,

4   unadjusted or nothing.

5        Note 6, we express no view on whether the net

6   investment method should be adjusted to account for

7   inflation or interest.

8        So the Second Circuit was acknowledging what I

9   think is clear from the statute, which is the statute

10  itself, the SIPA statute doesn't deal with the Ponzi scheme.

11  It's just so clear.  They talk about yes, you're an

12  investor, if your broker goes under, you're entitled to get

13  your securities back.  And that makes complete sense and

14  you're entitled to have SIPA insurance to the extent that

15  you have Exxon stock that was there.  We'll give you the

16  Exxon stock.

17        What do you do if that doesn't happen?  If you've

18  got a Ponzi scheme where he's not buying anything?  And

19  courts have had to engage their resourcefulness and their

20  pragmatism to come up with a fair and appropriate result.

21  That's never more evidenced than in the New Times Decision,

22  another Second Circuit case that Your Honor is familiar with

23  from about ten years ago.

24        And again, this was a Ponzi scheme; the net equity

25  definition was in play.  The whole question there was what

Page 32

1     happens --is the investment made by the customer, is that a

2     cash deposit entitled to only $100,000 of SIPA protection or

3     is it an investment for securities.  And the SIPC in that

4     case said, perhaps understandably, because it's an industry

5     funded organization and they don't want to pay out any more

6     than they have to, they said it was cash.

7            The SEC disagreed and the Courts all the way up to

8     the Second Circuit also disagreed.  Said, no it's

9     investment, even though they are fictitious securities,

10    there was no such security at all, so it didn't fit into the

11    statute.  They said, no.  These customers expected to have

12    securities.  But it was a hybrid decision, because they also

13    said in foreshadowing the equity decision, you don't get the

14    value of your fictitious securities.

15           So we think that this -- it's jump ball and really

16    is the cost benefit analysis that Your Honor identified

17    earlier.  And again, just to return to the example, because

18    the -- neither SIPA nor the trustee -- they stay a million

19    miles away from this because they know there's no real

20    response to it.

21           Customer A invests a $1 million in 1988 well

22    within the time frame of this decade's long Ponzi scheme.

23    Customer A chugs along and then near the end in 2008 when

24    the scheme collapses, takes out $1,050,000.  So Customer A

25    is nominally in the trustee's nomenclature, a net winner to

Page 33

1    the tune of $50,000.

2            Customer B is a very late investor.  Customer B

3    invests $1 million way back in 1988, but sometime in 2008.

4    And then decides, gee, I need the money to buy a new mansion

5    and takes out $950,000.  Why we've just used these numbers

6    (indiscernible - 00:38:14).  No one would do that, but they

7    put in $1 million and the next day they take out $950,000.

8            So again, using the trustee's nomenclature,

9    Customer B is a net loser.  They put in a million, they took

10   out $950,000.  So in the trustee's world, these people -- I

11   have a net winner, you have a net loser.  If this were a

12   closed system, where these were the only two investors, the

13   trustee's view is, well, we're going to sue that -- that bad

14   net winner for $50,000 and we will give it to the net loser.

15   And then it will be even Steven.  They'll both have $1

16   million in and $1 million out.

17           But in the real world, that's not what happened.

18   If you apply to those numbers -- and we do it in the brief

19   and we're not using some fancy index.  We're using the CPI

20   all urban index that everyone agrees is a fair inflation

21   measure.  What really happens is that in 2008 dollars,

22   constant dollars is recommended by the SEC, customer A

23   really got back only $575,000.  In other words, Customer A's

24   real loss in the real world is 42 percent.  Not -- he's not

25   a net winner.  He's actually a net loser.  And Customer B --

1    compared to Customer B -- Customer B that's a simple

2    arithmetical computation.  That he or she is a 5 percent net

3    loser.

4           So in the real world where real people live where

5    government and businesses thrive and operate, Customer A is

6    vastly more injured, vastly more harmed.  And the fair thing

7    is not to just put on blinders and pretend --

8           THE COURT:  There are lots of customer Bs, Mr.

9    Schwed who left all of their money and even put their money

10   in in 2006, '07 --

11          MR. SCHWED:  I don't know --

12          THE COURT:  Your customer -- you don't know of

13   others?

14          MR. SCHWED:  I'm sorry, I'm not sure I understood

15   your --

16          THE COURT:  There are Customer Bs who never pulled

17   anything out.

18          MR. SCHWED:  Oh, there unquestionably are and no

19   one is saying that Customer Bs should not be compensated.

20   It's really a question of adjusting the numerator, the

21   number that is the appropriate plain number to take into

22   account unquestioned economic reality.  And it's -- to do

23   so, I think is just closing ones eye to the fairness.

24          THE COURT:  You can always pick and choose a

25   profile of a particular customer to almost validate any

1   mathematical argument that you might make in the whole

2   Madoff scheme of things.

3          It's gone on for so many years and there are so

4   many different kinds of fallout from whether you deal with

5   constant dollar or whether you deal with the cash in/cash

6   out.

7          MR. SCHWED:  Well, Your Honor is no doubt --

8          THE COURT:  Without any kind of adjustment.

9          MR. SCHWED:  Well I think the only one that's been

10  seriously proposed in the four and half years of this case

11  is the adjustment to net investment method to account for --

12  apart from the 9 percent, which once again that's not our

13  position.  The only one that we have seen surface is the --

14  is to adjust for CPI, which is not a wild or outré idea.

15  It's pretty standard concept that constant -- that inflation

16  -- the ravages of inflation as Alexander Hamilton put it 200

17  years ago, are real.  And that we shouldn't close our eyes

18  to that.  And in forging a judicially crafted remedy, that's

19  the appropriate thing to do.

20          Thank you, Your Honor.

21          THE COURT:  When you say it's the appropriate

22  thing to do, Congress certainly knows how to deal with these

23  kind of issues and maybe it's for Congress to determine.

24          MR. SCHWED:  Well, Your Honor, that may be -- that

25  often is the case, but I think in the absence of

Page 36

```
 1    Congressional action and again we don't think the SIPA

 2    statute, 78 LLL 11 the definition of net equity doesn't deal

 3    with this and given Congressional gridlock, they may never

 4    deal with it.  It's incumbent upon the courts to try to do

 5    the right thing.  And we are faced with real situation --

 6              THE COURT:  You want me to be a legislature.

 7              MR. SCHWED:  Pardon?

 8              THE COURT:  You want me to be a legislature.

 9              MR. SCHWED:  Well, I think in (indiscernible

10    00:42:36) legislature, I do think that that's what happens.

11              THE COURT:  Okay.  Thank you Mr. Schwed.

12              MR. SCHWED:  Sure.

13              MR. KIRBY:  Your Honor, I -- in response to the

14    question that you just posed the issue is -- and that's what

15    my colleague Mr. Schwed emphasized, this is not a case which

16    is governed by the statute in with -- that the statute gives

17    you the answer.  That is the point of that -- the Second

18    Circuit made in approving the net equity position saying

19    that in this -- in a circumstance where you're applying a

20    statute that says a customer claim for securities where

21    there were no securities.  There's a level of discretion

22    that is built into the statute to the trustee.

23              And the trustee's method, which takes a cash

24    amount in, but does not adjust that for inflation -- the

25    standard that the Second Circuit said is that you have to
```

Page 37

1    determine that's clearly inferior.  And it is undisputed and

2    the trustee does not dispute the basic fact that a 1985 or

3    1988 dollar is very different from a 2008 dollar.

4              And so that is the fundamental problem that is not

5    solved by the statute and is left for the Court to deal

6    with.  That is the point that the SEC has reinforced here

7    today.

8              MR. KIRBY:  I'd like to just make two points

9    because I don't want to belabor the comments of my

10   colleagues.  This is -- first, this is not an interest

11   claim.  That is a totally separate issue.  We are not

12   advocating for that.  That's not an issue before the Court.

13   There is -- other parties are here before the Court on that.

14   We are not here on that point.

15             We are saying that when you looked at cash, and

16   the cash in versus cash out, that cash determination, there

17   needs to be an adjustment for inflation.  The trustee abuses

18   his discretion is he does not do that under the

19   circumstances of this case.  That's -- the Court has to

20   address that issue.

21             I also would like to address the issue of Walsh

22   because Walsh was an equity receivership, very different

23   principles involved there.  The different principle is is

24   that you have a statute here that gives the customer in

25   ordinary course a claim for securities.  But the receiver

1    was not dealing with that.

2              The other significant difference between Walsh and

3    this case is that there was one customer who supported an

4    inflation adjustment.  That was the appellant in Walsh.

5    Here, you have an overwhelming number of customers who

6    believe that an inflation adjustment is appropriate and that

7    ought to be a significant difference.

8              The third thing is is that the level of discretion

9    given an equity receiver to make a determination is not

10   cabined by the situation that we have here where the Court

11   has said that the way weight that is whether one is clearly

12   inferior to the rest.

13             We think there's really no dispute that, and there

14   can be no dispute, that using 1980 -- pretending that 1985

15   dollars should be valued as current dollars is a clearly

16   inferior method.

17             Finally, I would like to address the issue of

18   deference to the SEC that the -- that's an issue that was

19   addressed both in the New Times case and the -- again, in

20   the net equity case.  They addressed the issue of deference

21   to the position of the SEC on this.

22             The Court emphasizes that the issue is the power

23   to persuade.  And the power to persuade is -- what the SEC

24   has said, and as I said reinforced here today, the same

25   thing that we are saying -- that you cannot take dollars

Page 39

1   that are 1985 or 88 dollars and measure those the same as if

2   they -- your -- as if they were current dollars.  That is

3   something that is fundamental to basic economics and that is

4   something that this Court should not ignore in determining

5   the decision in this case.

6          Finally, I would address the issue of

7   administrative burden because accepting that the record that

8   has been made on that issue, there really can be no dispute,

9   that implementing an inflation adjustment in today's world

10  of excel spreadsheets and pushing a button and implementing

11  across a database, it is a simple task.  Mr. Rock testified

12  in his deposition, and we put that into evidence before you,

13  that it took him less than a $120,000 to implement an

14  inflation adjustment that, using their method, across the

15  entire database of the trustee's claims.

16         So, to suggest that for a minute that there is

17  administratively burdensome to implement an inflation

18  adjustment should the Court direct one is just -- there's no

19  record support for it.  And that's the reason, you know, we

20  ask you to consider the testimony which you said you would

21  with respect to Mr. Hart as submitted in his report.

22         THE COURT:  I didn't say that I would.  I said I

23  would receive it into the record and I also stated, if I

24  recall correctly or incorrectly, that I have my doubts under

25  Daubert as to whether or not it would ultimately be accorded

Page 40

1    sufficient weight to sway the Court one way or the other.

2           I also stated that the reason I'm doing this is I

3    believe that this matter is determinable as a matter of law.

4    So for purposes of all of you that want to make a record,

5    I'm giving you your record.

6           But, again, I tell you it can be determined, and

7    will be determined, as a matter of law.

8           MR. KIRBY:  Thank you, Your Honor.

9           MR. SHEEHAN:  I'll be very brief, Your Honor.

10   Just two points --

11          THE COURT:  It's not necessary.  Everybody here is

12   on the billing clock so they --

13          MR. SHEEHAN:  Wow.  Anyway, the quick points are

14   these Your Honor.

15          With regard to the SEC, Mr. Avery was focusing on

16   and there was some colloquy with Your Honor, with regard to

17   this concerning the fact that the inflation adjustment

18   should apply because this is securities as opposed to cash.

19   Yet, if you look at the statute, when Congress looked at

20   that, the colloquy you were having with Ms. Wang about this,

21   and you look at the various provisions that are there, there

22   is no inflation adjustment for securities.  It's only for

23   cash.

24          So if Congress was speaking to this issue, and

25   wanted to do something about it, it had an opportunity to do

1   it.  Not only did it not do it, it made a choice not to.  So

2   do -- for Mr. Avery to suggest that you engage in a little

3   bit of legislative work here today, or Mr. Schwed actually

4   said it, more so than Mr. Avery, yeah, the guidance that you

5   would receive from Congress is is to not do that.  Not to

6   add an inflation adjustment to securities.

7           The other thing is Mr. Avery suggested that, you

8   know, I'm confusing the principles of interest and inflation

9   adjustment.  I don't confuse them.  I understand there are

10  economic difference in the principles under girding both of

11  those.

12          I tell you this; that to the net loser, the

13  distinction is meaningless.  To tell them that they got less

14  money because it was an inflation adjustment, doesn't make

15  it any fairer or easier for them to accept.

16          The other thing is --

17          THE COURT:  Any of these theories result in an

18  enhancement and to --

19          MR. SHEEHAN:  Yes, exactly.  And that's why,

20  getting right to that, is that the suggestion by Mr. Schwed

21  and Mr. Kirby that our position is inferior, that it should

22  -- that they have a better -- Your Honor, ours is so

23  consistent with net equity.  It exactly follows net equity.

24  I think the, quite frankly, even though the Second Circuit

25  didn't address it, on purpose, we said so.  It anticipated

1    where we are here today by suggesting that this is the only

2    way to go.  All right?

3             And while our -- my colleagues suggest that

4    fairness and equity should somehow have play here, there's

5    an old, time honored principle, that I think applies here.

6    Equity follows the law.  And the law here is is that there

7    is no interest.  And equity is also equality.  And equality

8    here means that everyone has to be treated the same.  And

9    the only way that happens is under the trustee's

10   determination with regard to net equity.

11            Thank you, Your Honor.

12            THE COURT:  Does anyone want to be heard?  Sir.

13            UNIDENTIFIED SPEAKER:  Please, go ahead.

14            MR. WARMUTH:  Good morning, Your Honor.

15   Glenn Warmuth for claimant, Michael Most.

16            Your Honor, Michael Most is not a trust or a

17   feeder fund.  He's just one man who invested and lost his

18   money and he put in a claim.  And we have two methods for --

19   competing methods for determining these claims; the net

20   equity method and the time-based damages method, which takes

21   into account the time value of money.

22            Now all that Mr. Most wants is to be treated

23   fairly.  And what I heard this morning from Mr. Sheehan is

24   fair is not what is in play.  Fair is not what is in play.

25   And I would submit to the Court that a method which does not

Page 43

1    take into account fairness is clearly inferior to a method

2    which does take into account fairness.  And that the time

3    value of money takes into account fairness because Mr. Most

4    invested his money early and his money is worth money.  And

5    that the claims should be adjusted so that that is accounted

6    for.

7            Wherefore, I would ask that you respectfully deny

8    the trustee's motion.

9            THE COURT:   Thank you, sir.

10           MR. WARMUTH:   Thank you.

11           MS. STEFANELLI:   Good morning, Your Honor.

12   Nicole Stefanelli of Lowenstein, Sandler on behalf of the

13   irrevocable charitable remainder trust of Yell Fishman and

14   the Glen Akeva (ph) Fishman charitable remainder uni-trust.

15           The trust filed an objection to this motion at

16   docket number 5118.

17           Your Honor, quite honestly, we're a little bit

18   puzzled as to why the trust's claims were listed on page 34

19   of Exhibit A to the declaration of Vic Cheema (ph).  We do

20   not believe that the trust's claims should be lumped in with

21   the time-based damages and other claims here.

22           Briefly, Your Honor, in accordance with the

23   procedures order that was entered back in December,

24   December 23rd, 2008, the trusts filed objections to the

25   trustee's determination letters, which were sent by the

Page 44

1    trustee on April 27, 2010.  Those objections were filed in

2    May of 2010.

3              To date, the trustee has not sought a date and

4    time for a hearing before this Court on the merits of those

5    controverted claims in accordance with the procedures order.

6    By this ---

7              THE COURT:    I'm not dealing with claims

8    objection.  If you want to get to the point that's before

9    the Court, the issue of time-value of damages as it applies

10   to your client, I'll hear you.  If not, everybody is

11   entitled to some respite.

12             MS. STEFANELLI:  Okay.  Apologies, Your Honor.

13   All we are asking is that the claim not be expunged as it's

14   listed on Exhibit A.  What we're really asking for is a

15   hearing on the merits of our objection.

16             THE COURT:  That's not the issue before me.  Thank

17   you.

18             MS. STEFANELLI:  Thank you, Your Honor.

19        (Pause.)

20             MR. SCHWED:  Just two very brief points.  I was

21   too hasty perhaps in --

22             THE COURT:  Before you speak, Mr. Schwed, you and

23   one of your colleagues, disassociated themselves from one of

24   the methodologies and that is interest.  I'm waiting to hear

25   from the parties who are espousing a nine percent interest

Page 45

1    rate.

2            I guess nobody really cares about that as a

3    methodology.  Go ahead, Mr. Schwed.

4            MR. SCHWED:  I was perhaps too hasty in consenting

5    to Your Honor's characterization of judicial legislation.  I

6    think, really, what we're talking about is a statute that

7    doesn't deal with a situation.  And that's really the task

8    that I think courts deal with.

9            THE COURT:  You should be reminded that today is a

10   form of election day and I'm not running for any office.

11       (Laughter.)

12           MR. SCHWED:  That's true indeed.  I just wanted to

13   address myself to one point made by Mr. Sheehan, again, in

14   an attempt to show that the statute, in fact, deals with

15   this issue, and he says that the statute provides for

16   inflation adjustment -- for no  inflation adjustment in the

17   case of securities.

18           Well, of course, it doesn't.  If you have

19   securities, why would anybody every think of adding an

20   inflation adjustment.  That's really the point.  If you get

21   -- if the statute is framed as saying you get your

22   securities back, why would Congress or a draft's person

23   every say, you get your securities back plus interest.  You

24   get the -- any appreciation is embedded in the value of the

25   security, plus or minus.

1            That was the only point I wanted to make.

2            THE COURT:  Thank you.  Does anyone else want to

3    be heard?  Very well.

4            I, again, want to express my appreciation for what

5    I regard as very insightful, very high quality briefing.

6    You've gotten together to pull resources before the Court

7    and the submissions have been very welcome and enable me to

8    come to the conclusion, as I expressed previously, that this

9    is really determinable as a matter of law.

10           Broadly speaking, the trustee has determined that

11   excluding time-based damages from the net equity calculus is

12   appropriate because it's not only correct as a legal matter,

13   but also assures that no customer is entitled to recover

14   profits before other customers recover their principal

15   investment.  In contrast, the objecting claimants contend

16   that the inclusion of time-based damages is more consistent

17   with SIPA's protective aims and takes the economic reality

18   of inflation into account by not arbitrarily penalizing

19   early customers.

20           This Court recognizes that choosing any method for

21   calculating net equity is particularly challenging in light

22   of the complex and unique facts of Madoff's ponzi scheme and

23   each suggested benefit method, I'm sorry, will benefit some

24   victims at the expense of others.  Indeed, in this zero-sum

25   game where funds are limited, hard choices must be made.

Page 47

1          The purpose, framework and distribution scheme of

2     SIPA, as well as Second Circuit precedent, all support a

3     method chosen by the trustee.  Moreover, permitting the

4     inclusion of time-based damages in the net equity calculus

5     will likely have significant unintended consequences,

6     including favoring certain investors who have already

7     recovered their principal investments at the expense of

8     other investors who have yet to recoup their principal and

9     potentially providing a windfall for claims traders who

10    never were victims of the Madoff fraud.

11         So, I'm granting the trustee's motion.  I will

12    issue a full opinion probably some time before the end of

13    the day and in that regard, I do make a suggestion, as I did

14    in connection with the net equity decision, that the parties

15    consider a request or a motion to certify a direct appeal to

16    the United States Court of Appeals for the Second Circuit.

17         I think in this particular case that's rather

18    important because, as I know from prior activities before

19    the Court, the trustee is holding in a security -- as

20    security for ongoing litigation, and other purposes, some $4

21    billion.  Mr. Sheehan, you can correct the amount --

22         MR. SHEEHAN:  No, that's correct, Your Honor.

23         THE COURT:  And out of that $4 billion, I think

24    earmarked is some $1.4 billion on a net equity issue.  So if

25    that matter can be determined rather quickly, that's $1.4

Page 48

1    billion that can go out rather quickly.  I think the parties

2    here should get together and determine whether or not they

3    want to take that particular route.

4             And as I indicated, I will render the decision,

5    probably some time before the end of the day.  And if you

6    want to hang out here for awhile, maybe I can do it within

7    the hour.

8         (Chorus of thank you)

9             THE COURT:  Thank you all.

10        (Proceedings concluded at 11:06 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              RULINGS

2                                                    Page      Line

3    Trustees Motion for an Order Affirming           47        11

4    Trustees Calculations of Net Equity and

5    Denying Time-Based Damages

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3    I, Jamie Gallagher, Melissa Looney and Pamela Skaw, certify

4    that the foregoing transcript is a true and accurate record

5    of the proceedings.

6    Pamela A   Digitally signed by Pamela A
          Skaw
7    Skaw   DN: cn=Pamela A Skaw, o, ou,
          email=digital1@veritext.com,
          c=US
          Date: 2013.09.10 17:38:56 -04'00'

8    Jamie   Digitally signed by Jamie
          Gallagher
9    Gallagher   DN: cn=Jamie Gallagher, o, ou,
          email=digital1@veritext.com,
          c=US
          Date: 2013.09.10 17:37:52 -04'00'

10

11   Melissa   Digitally signed by Melissa Looney
          DN: cn=Melissa Looney, o, ou,
     Looney   email=digital1@veritext.com, c=US
          Date: 2013.09.10 17:37:10 -04'00'
     _____

12

     MELISSA LOONEY

13

     AAERT Certified Electronic Transcriber CET**D - 607

14

15

16

17

18   Veritext

19   200 Old Country Road

20   Suite 580

21   Mineola, NY 11501

22

23   Date:  September 10, 2013

24

25