**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

SECURITIES INVESTOR PROTECTION
CORPORATION,

                                        Plaintiff,

            v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                        Defendant.

------------------------------------------------------------X

In re:

BERNARD L. MADOFF,

                        Debtor.

------------------------------------------------------------X

**FOR PUBLICATION**

Adv. Pro. No. 08-01789 (BRL)

SIPA LIQUIDATION

(Substantively Consolidated)

**ARGUING ON THE MOTION**[1]


<u>Before</u>: Hon. Burton R. Lifland
            United States Bankruptcy Judge

**MEMORANDUM DECISION AND ORDER GRANTING, TO THE EXTENT SET
FORTH HEREIN, THE TRUSTEE'S MOTION FOR AN ORDER AFFIRMING THE
TRUSTEE'S CALCULATIONS OF NET EQUITY AND DENYING TIME-BASED
<u>DAMAGES</u>**

          Before the Court is the motion (the "Motion") of Irving H. Picard, Esq. (the "Trustee"),

trustee for the substantively consolidated Securities Investor Protection Act[2] ("SIPA")

liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff

---

[1] Attached hereto as Exhibit A is a list of parties who have submitted briefs in connection with the instant Motion.

[2] 15 U.S.C. §§ 78aaa *et seq.*  Hereinafter, "SIPA"  shall replace "15 U.S.C." when referencing sections of SIPA.

("Madoff") seeking an order affirming the Trustee's determination that BLMIS customers' claims for "net equity," as defined in SIPA section 78*lll*(11), do not include interest, time value of money, or inflation adjustments such as constant dollar (collectively, "Time-Based Damages").

The Trustee's instant Motion raises an issue of first impression: whether to adjust customers' net equity claims to account for any form of Time-Based Damages under SIPA. At stake in the instant Motion is a distribution formula that impacts not only the extent of the entitlements of every single BLMIS claimholder to the limited customer property fund but also whether the approximately $1.4 billion cash reserve may be released.[3]

Broadly speaking, the Trustee has determined that excluding Time-Based Damages from the net equity calculus is appropriate because it is not only correct legally, but also assures that no customer is entitled to recover profits before other customers recover their principal investment. In contrast, the objecting claimants contend that the inclusion of Time-Based Damages is more consistent with SIPA's protective aims and takes the economic reality of inflation into account by not penalizing earlier customers in an arbitrary fashion.

This Court recognizes that choosing any method for calculating net equity is particularly challenging in light of the complex and unique facts of Madoff's Ponzi scheme, and each method will benefit some victims at the expense of others. Indeed, in this zero sum game "whe[re] funds are limited, hard choices must be made." *In re The Reserve Fund Secs. & Derivative Litig.*, 673 F. Supp. 2d 182, 195 (S.D.N.Y. 2009) (quotations omitted). However, the plain language,

---

[3] *See* Affidavit of Matthew Cohen in Support of the Trustee's Motion for an Order Approving the Third Allocation of Property to the Fund of Customer Property and Authorizing Third Interim Distribution to Customers (Dkt. No. 5231), ¶ 17 (stating that "the Trustee will hold the $1,357,903,492.06 in reserve pending the outcome of the Time-Based Damages Motion").

purpose, framework and distribution scheme of SIPA, as well as Second Circuit precedent,[4] all support the method chosen by the Trustee.  Moreover, permitting the inclusion of Time-Based Damages in the net equity calculus will likely have significant unintended consequences, including favoring certain investors who have already recovered their principal investments at the expense of other investors who have yet to recoup their principal, and potentially providing a windfall for claims traders who were never victims of Madoff's fraud.[5]

Accordingly, for the reasons set forth below, all of the objecting claimants' objections are hereby OVERRULED, and the Trustee's Motion is hereby GRANTED to the extent set forth herein.

## BACKGROUND[6]

SIPA aims to protect customers of an insolvent or financially unstable broker-dealer by expediting the return of customer property.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 239–40 (2d Cir. 2011).  In order to do so, SIPA grants customers prioritized claims which permit them to share *pro rata* in customer property to the extent of their net equity.  *See* SIPA § 78*lll*(2), (4), (11).  For each customer with a valid net equity claim, SIPC advances funds to the SIPA trustee up to the amount of the customer's net equity, not to exceed $500,000.  *See* SIPA § 78fff-3(a).

---

[4] Informatively, the Second Circuit recently considered the fairness of including adjustments for inflation in a Ponzi scheme distribution formula.  *See Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735 (2d Cir. 2013) [hereinafter "*Walsh*"].  As such, resort to the central query in the familiar Snow White fable may be helpful, in one key way, to frame the issue here: *Mirror, Mirror on the Walsh Wall, Which is the Fairest Distribution of Them All? See* SNOW WHITE AND THE SEVEN DWARFS (Disney 1937); *see also infra* at Section II, Part C.

[5] Claims traders, using current dollars, commenced investing in Madoff claims after the December 11, 2008 filing date.

[6] A comprehensive discussion of the facts underlying this SIPA liquidation and Madoff's notorious Ponzi scheme is set forth in this Court's decision of March 1, 2010.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 125–33 (Bankr. S.D.N.Y. 2010) [hereinafter "*Net Equity Decision*"].

In the instant SIPA liquidation proceedings of BLMIS, the Trustee is tasked with recovering and distributing customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. In 2009, the Trustee determined that the net equity claims of BLMIS customers should be calculated based upon the monies that customers deposited into their BLMIS accounts, less any amounts they withdrew from their BLMIS accounts (the "Net Investment Method"). On March 1, 2010, this Court upheld the Trustee's Net Investment Method, finding it was an interpretation of net equity consistent with the plain language of SIPA, its legislative history, controlling Second Circuit precedent, and considerations of equity and practicality. *See Net Equity Decision*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24 (June 25, 2012), 133 S. Ct. 25 (June 25, 2012).[7]

At such time, both this Court and the Second Circuit explicitly declined to address the issue of whether the Net Investment Method should be adjusted to account for Time-Based Damages. *See Net Equity Decision*, 424 B.R. at 125 n.8; *In re Bernard L. Madoff Inv. Sec.*, 654 F.3d at 235 n.6. Therefore, following the denial of certiorari, the Trustee moved this Court for a briefing schedule and hearing on the Time-Based Damages issue. *See* Notice of Motion for Order Scheduling Hearing on Trustee's Motion Affirming Denial of Time-Based Damages Adjustment to Customer Claims (Dkt. No. 4920). The Court approved the Trustee's motion and entered an order on September 5, 2012, narrowly defining the Time-Based Damages issue as, "whether the Objecting Claimants are entitled to time-based damages adjustments to their net

---

[7] Certiorari was also dismissed with respect to one petition. *See Sterling Equities Assocs. v. Picard*, 132 S. Ct. 2712 (June 4, 2012).

equity customer claims to be paid from the fund of customer property."[8]  Scheduling Order (Dkt. No. 5022), p. 4.

The Trustee subsequently filed the instant Time-Based Damages Motion [hereinafter "Tr. Motion"] (Dkt. No. 5038),[9] which returns the Court to this novel SIPA issue.  In his Motion, the Trustee seeks an order: (i) affirming the Trustee's determinations of the claims listed on Exhibit A to the Cheema Declaration, to the extent they relate to the recalculation of net equity customer claims based on Time-Based Damages; (ii) affirming the Trustee's denial of the claims to the extent these claims seek amounts in excess of net equity calculated using the Net Investment Method; (iii) affirming the Trustee's interpretation of net equity under SIPA as excluding Time-Based Damages; (iv) expunging the objections to the Trustee's determinations listed on Exhibit A to the Cheema Declaration, insofar as they relate to the recalculation of net equity customer claims based on Time-Based Damages; and (v) allowing the Trustee to release any funds previously reserved for the Time-Based Damages issue.[10]  *See* Tr. Motion, p. 1.  The Securities Investor Protection Corporation ("SIPC") submitted a brief in support of the Trustee's Time-Based Damages Motion [hereinafter "SIPC Br."] (Dkt. No. 5036).

Objecting to the Trustee's Motion, certain claimants (collectively, the "Objecting Claimants"), consisting of both individuals who withdrew more than they deposited with BLMIS

---

[8] Certain claimants have raised issues in their objections to this Motion that are beyond the scope of the Scheduling Order, such as (i) when Madoff's Ponzi scheme began, (ii) whether Madoff ever actually purchased securities, (iii) whether Time- Based Damages provide a "value" defense under section 548(c) of the Bankruptcy Code in avoidance actions commenced by the Trustee [currently pending before Judge Rakoff, *see* 12-MC-0015, Dkt. Nos. 107, 199] and (iv) factual issues regarding specific accounts.  *See, e.g.*, Dkt. Nos. 5118, 5122.  As the Court has limited its determination to the narrow issue of whether to include Time-Based Damages in calculating BLMIS customers' net equity claims, the Court will refrain from addressing these extraneous issues.

[9] Along with his Motion, the Trustee filed (i) a memorandum of law [hereinafter "Tr. Br."] (Dkt. No. 5039), (ii) the Declaration of Bik Cheema [hereinafter "Cheema Decl."] (Dkt. No. 5040), and (iii) the Declaration of Robert J. Rock (Dkt. No. 5041).

[10] The Trustee is holding a total of $4,686,277,486.33 on reserve pending, *inter alia*, resolution of ongoing litigation. Of this sum, $1,357,903,492.06 relates to the Time-Based Damages issue (the "Time-Based Damages Reserve"), which is arguably best put promptly into the hands of waiting distributees.

("Net Winners"), as well as ones who withdrew less ("Net Losers"), seek Time-Based Damages for the period of time during which their funds were deposited with BLMIS. Specifically, certain Objecting Claimants seek *interest*-based adjustments to their net equity claims based on, *inter alia*: (i) federal claims against BLMIS for securities fraud under the Securities Act of 1933 (the "1933 Act") and rule 10b-5 promulgated under section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), which entitle them to prejudgment interest, (ii) state law claims against BLMIS for conversion, which entitle them to prejudgment interest of 9% per annum under section 5001 of the New York Civil Practice Law and Rules ("CPLR"), and (iii) general claims for lost investment opportunities over time. Others seek *inflation*-based adjustments to their net equity claims in reliance on the basic economic precept that the value of the dollar changes over time.

On December 10, 2012, the Securities and Exchange Commission (the "SEC") submitted a brief [hereinafter "SEC Br."] (Dkt. No. 5142) supporting "the application of constant dollars[11] when determining the value of customers' net equity claims for nonexistent securities positions in a SIPA liquidation proceeding," but maintaining that this Court "should determine the ultimate appropriateness of using constant dollars based on the Court's own evaluation of the benefits and costs of making an inflation adjustment." *See* SEC Br., pp. 18, 2.

Thereafter, certain parties (collectively, the "Customer Group") requested discovery from the Trustee and his professionals to address whether the costs and burden of calculating and implementing an inflation adjustment to customers' net equity claims would be as significant as suggested by the Trustee. To accommodate such discovery, on January 23, 2013, this Court entered an amended scheduling order. *See* Dkt. No. 5212. Following the close of discovery, on

---

[11] The concept of "constant dollars" or "real dollars" refers to dollar values after adjustment for inflation. *See Current versus Constant (or Real) Dollars*, U.S. CENSUS BUREAU, http://www.census.gov (last visited Sept. 10, 2013).

April 29, 2013, the Customer Group submitted a supplemental opposition brief [hereinafter "Customer Supp. Br."] (Dkt. No. 5332), as well as the Declaration of Timothy H. Hart, CPA, CFE [hereinafter "Hart Decl."] (Dkt. No. 5331), to address "precisely the question the SEC left open: whether the costs outweigh the benefits of an inflation adjustment." Customer Supp. Br., p. 1.

On July 18, 2013, the Trustee filed his reply memorandum (Dkt. No. 5415), along with the Declaration of Vineet Sehgal [hereinafter "Sehgal Decl."] (Dkt. No. 5416). That same day, SIPC also filed its reply memorandum [hereinafter "SIPC Reply Br."] (Dkt. No. 5413). Finally, on August 12, 2013, the Customer Group filed the Customers' Opposition to Trustee's Request for Exclusion of Hart Expert Testimony (Dkt. No. 5444). A hearing was held on September 10, 2013.

## DISCUSSION

As a preliminary matter, there is no basis to extend deference to the SEC's "constant dollar" position. Further, under the present circumstances, this Court finds that the Trustee's Net Investment Method unadjusted for Time-Based Damages is legally sound in light of the plain language, purpose, framework and distribution scheme of SIPA, as well as Second Circuit precedent. Finally, if Time-Based Damages are to be included in the net equity calculus under SIPA, it is for Congress to enact such a law, not this Court.

## I.    THE SEC'S CONSTANT DOLLAR POSITION IS NOT ENTITLED TO DEFERENCE

The issue of whether to award Time-Based Damages under SIPA was first brought formally before this Court by the SEC in 2009 during briefing for the *Net Equity Decision*. At that time, the SEC asserted that the net equity calculus should include a constant dollar adjustment. *See* SEC Memorandum on Net Equity Issue, (Dkt. No. 1052), p. 1 ("The

Commission believes . . . that in determining customer claims under the cash-in/cash-out method, the amount of the payment should be calculated in constant dollars by adjusting for the effects of inflation (or deflation).").  With respect to the instant Motion, however, the SEC seems to have retreated from its earlier position, maintaining that the net equity calculus should include a constant dollar adjustment, but leaving resolution of whether to include constant dollars at the Court's discretion.[12]  *See* SEC Br., p. 2 ("The Commission believes that the Court should determine the ultimate appropriateness of using constant dollars based on the Court's own evaluation of the benefits and costs of making an inflation adjustment.").  If not completely deferring to this Court, the SEC's position seems to be that the SIPA statute permits, but does not require, an adjustment for constant dollars.  Specifically, the SEC advocates the use of constant dollars "under the narrow set of factual circumstances presented here, where customers have claims for fictitious securities or securities positions that cannot be valued except by reference to the customer's net investment" so long as such an adjustment makes sense in light of the "Court's consideration of the costs and benefits of doing so."  SEC Br., p. 4.  This position is not entitled to either *Chevron* or *Skidmore* deference.[13]

To determine whether an agency's interpretation of a statute is entitled to either *Chevron* or *Skidmore* deference, a court must first ascertain "whether Congress has directly spoken to the precise question at issue."  *New Times*, 371 F.3d at 80 (quotation omitted).  Where the statutory

---

[12] Pouncing on this open question left by the SEC, the Customer Group submitted their supplemental brief and the Hart Declaration, in an effort to demonstrate that the Trustee's costs are minimal in comparison to the potential benefits to customers of an inflation adjustment.  **As this Court is adjudicating the instant Motion as a matter of law, *see infra* Section II, there is no need to address the cost/benefit analysis raised by the Trustee, SEC or Customer Group, nor any briefing related to this cost/benefit issue.**

[13] *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) delineate two separate levels of deference to be accorded to agency statutory interpretations.  Agency interpretations formally promulgated through notice-and-comment rulemaking or formal adjudication are generally accorded the higher, near mandatory deference envisioned by *Chevron*.  *See In re New Times Secs. Servs., Inc.*, 371 F.3d 68, 80 (2d Cir. 2004); *see also U.S. v. Mead Corp.*, 533 U.S. 218, 230 (2001).  Even if not entitled to the higher level of *Chevron* deference, agency interpretations may still be granted a more limited, non-mandatory level of *Skidmore* deference in appropriate circumstances.  *See New Times*, 371 at 82–83.

text is clear or congressional intent can be discerned from the face of the statute, courts "must give effect to the unambiguously expressed intent of Congress," and the agency's interpretation is not entitled to deference.  *Chevron*, 467 U.S. at 842–43; *see also Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) (finding that there is "no need to choose between *Skidmore* and *Chevron*" where the statute is clear).  Conversely, where the statute at issue is silent or ambiguous, a court must then determine whether an agency's interpretation of a statute is entitled to either *Skidmore* or *Chevron* deference.  *See New Times*, 371 F.3d at 80, 83.  Here, no one disputes that SIPA is silent with respect to whether any form of Time-Based Damages should be included in the net equity calculus.  *See* SIPA § 78*lll*(11).

### A.  The SEC's Position is Not Entitled to *Chevron* Deference

As both the Supreme Court and the Second Circuit have recognized, the overwhelming majority of agency interpretations accorded *Chevron* deference are formally promulgated "regulations issued through notice and comment or adjudication, or in another format authorized by Congress for use in issuing 'legislative' rules."  *See Estate of Landers v. Leavitt*, 545 F.3d 98, 106 (2d Cir. 2008) (quotation omitted).  While an agency interpretation that is not formally promulgated in such a manner "does not alone determine the applicability of *Chevron*," such informality taken together with other factors may lead a court to determine that *Chevron* deference is inappropriate.  *New Times*, 371 F.3d at 81.

For example, in *New Times*, the Second Circuit looked at several factors in determining whether the SEC's interpretation of SIPA, as set forth in an amicus brief, was entitled to *Chevron* deference.  *See* 371 F.3d at 80–82.  Specifically, the court found that the SEC interpretation was not entitled to deference, as it (i) was not "expressed in the form of a rule or regulation," (ii) had not been previously "articulated in *any* form" and was inconsistent with the SEC's previous

interpretation, and (iii) disagreed with the interpretation of SIPC, which "arguably [has] greater familiarity with the provisions of SIPA." *Id.*

Here, similar factors weigh against according *Chevron* deference to the position of the SEC.  <u>First</u>, the SEC failed to introduce its position through notice and comment procedures, instead, setting it forth in a brief in litigation.  <u>Second</u>, the SEC's position is certainly novel.  As SIPC pointed out, "[o]ver the course of more than forty years and more than three hundred SIPA liquidations prior to this one, the Commission has not once suggested that the amount of any customer claim subject to satisfaction with cash should be expressed in 'constant dollars,' or, indeed, adjusted in any way to reflect inflation or any other measure of the time value of money."  *See* SIPC Reply Br., p. 7.  Moreover, the SEC seems to espouse a constant dollar adjustment here in light of the "unusually long duration of Madoff's Ponzi scheme" where "the effects of inflation may be more pronounced than in a scheme of shorter duration" and "the benefits of an adjustment here may be significant."  *See* SEC Br., pp. 16–17.  However, the SEC explicitly opposed such an adjustment in *Walsh*, a case which involved a Ponzi scheme that lasted for over 13 years, and supported a net investment distribution without even considering a constant dollar adjustment in *New Times*, a SIPA case which involved a Ponzi scheme that lasted for 17 years.  *See Walsh*, 712 F.3d at 744; *New Times*, 371 F.3d at 88.  <u>Finally</u>, the SEC's position is at odds with SIPC's interpretation of net equity under SIPA.  *See* SIPC Br., p. 4 ("SIPC submits that the customer's [net equity] claim is not subject to recalculation for time-based damages . . . .").

Accordingly, this Court will not accord *Chevron* deference to the position of the SEC.

### B.  <u>The SEC's Position is Not Entitled to *Skidmore* Deference</u>

Even if ineligible for *Chevron* deference, an agency's statutory interpretation may still be accorded some deference under the Supreme Court's decision in *Skidmore*.  *See Mead*, 533 U.S.

at 234–35.    When determining whether an agency interpretation is entitled to *Skidmore* deference, courts in the Second Circuit look at "the agency's expertise, the care it took in reaching its conclusions, the formality with which it promulgates its interpretations, the consistency of its views over time, and the ultimate persuasiveness of its arguments."    *New Times*, 371 F.3d at 83 (quotation omitted); *see also Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002).    A reviewing court may conclude that no deference under *Skidmore* is owed to an agency interpretation that is deficient in one or more of these characteristics.    *See, e.g.*, *English v. Ecolab, Inc.*, No. 06-CIV-5672, 2008 WL 878456, at *5 (S.D.N.Y. Mar. 31, 2008) ("Weight and deference need not be given to interpretations that are inconsistent, not contemporaneous to enactment of the statute, or stale.").

In the present case, the majority of these considerations weigh against according *Skidmore* deference to the SEC's position.    As discussed above, the SEC's novel position that SIPA permits but does not mandate the inclusion of Time-Based Damages in the definition of net equity is inconsistent with its prior interpretations, as the SEC has never espoused the "constant dollar" approach in any of its prior positions on this issue.    Rather, the SEC informally announced this position in briefing for this litigation, without formal promulgation.    Further, the SEC has not demonstrated the level of care in reaching its conclusion that would warrant even *Skidmore* deference, as "the thoroughness evident in [the interpretation's] consideration [and] the validity of its reasoning" are questionable.    *Skidmore*, 323 U.S. at 140.    Indeed, the SEC does not commit to constant dollar adjustments.    Instead, the SEC makes the vague observation that including such adjustments is limited to certain "circumstances such as [those that] exist in a Ponzi scheme," SEC Br., p. 16, but then never specifies which circumstances warrant including that inflation factor.    Instead, it leaves it to this Court to determine whether the circumstances are

present here.  Such a position is unprecedented, unsupported by the law, and creates confusion

for the administration of this and future liquidations under SIPA.  As such, the SEC's arguments

are ultimately unpersuasive.

Accordingly, the SEC's position does not warrant either *Chevron* or *Skidmore* deference.

## II.    THE TRUSTEE'S UNADJUSTED NET INVESTMENT METHOD FOR CALCULATING NET EQUITY IS SOUND AS A MATTER OF LAW UNDER SIPA

Turning to the merits of the instant Motion, this Court finds that the Trustee's unadjusted

Net Investment Method is legally sound in light of the plain language, purpose, statutory

framework and distribution scheme under SIPA, as well as Second Circuit precedent.

### A.    The Plain Language of SIPA Supports Upholding The Trustee's Unadjusted Net Investment Method

It is well established that "courts must presume that a legislature says in a statute what it

means and means in a statute what it says there."  *Connecticut Nat'l Bank v. Germain*, 503 U.S.

249, 253–54 (1992).  As such, typically, the absence of statutory language indicates lack of

intent.  *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003).

SIPA defines net equity as:

> The dollar amount of the account or accounts of a customer, to be determined by
> calculating the sum which would have been owed by the debtor to such customer if the
> debtor had liquidated, by sale or purchase on the filing date, all securities positions of
> such customer . . . minus any indebtedness of such customer to the debtor on the filing
> date . . . .

SIPA § 78*lll*(11). As seen above, the statutory definition of net equity does not contain any

language supporting the inclusion of interest, inflation or other Time-Based Damages.

This statutory silence in the definition of net equity supports the inference that Congress

did not intend to award Time-Based Damages for two reasons.  <u>First</u>, Congress knows how to

include interest or inflation adjustments when they are intended.  Specifically, Congress has

made such adjustments in (i) various non-SIPA statutes, *see, e.g.*, 11 U.S.C. § 104 (explicitly providing adjustment for inflation); 12 U.S.C. § 1712a (same), 10 U.S.C. § 2306a(7) (finding adjustment must be "equal to the fiscal year 1994 constant dollar value of the amount set forth"), (ii) certain provisions of SIPA, *see* SIPA § 78jjj(a) (interest provision for late payments by brokers to SIPC); SIPA § 78ddd(f)–(h) (interest provision on loans from the SEC to SIPC) and (iii) recent amendments to SIPA, *see* Dodd-Frank Act[14] (amending SIPA to increase certain statutory limits on account of inflation).  Yet, Congress has never included any allowances for the time value of money in the definition of net equity, despite amending SIPA multiple times.

Second, when Congress includes time-based adjustments in the SIPA context, it has done so with a high level of specificity.  For example, Congress recently increased the limit of protection for SIPA cash claims from $100,000 to $250,000.  *See* Dodd-Frank Act § 929H.  In so doing, Congress added highly specific statutory requirements concerning such increases going forward.  *See id.*  In particular, SIPC's Board of Directors must determine whether to adjust the cash claim limit for inflation no later than January 1, 2011, and every five years thereafter.  *See* SIPA § 78fff-3(e)(1).  In making such a determination, SIPC's Board must consider certain factors, including the economic conditions affecting SIPC member broker-dealers, the potential problems impacting SIPC members, and any other factors the Board deems appropriate.  *See* SIPA § 78fff-3(e)(5).  Should the Board find that such an adjustment is appropriate, the standard amount of the adjustment must be (i) calculated according to a formula, including certain consumer price index figures published by the Department of Commerce, *see* SIPA § 78fff-3(e)(1), (ii) rounded down to the nearest $10,000, *see* SIPA § 78fff-3(e)(2), (iii) published in the Federal Register by the SEC, *see* SIPA § 78fff-3(e)(3), and (iv) presented to Congress in a report

---

[14] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929H(A), 124 Stat. 1856, 1931 (2010) [hereinafter "Dodd-Frank Act"].

by SIPC's Board of Directors, *see* SIPA § 78fff-3(e)(3).  Furthermore, any finding by the SIPC

Board that an adjustment is warranted must be submitted to the SEC for approval, which itself is

a multi-step process.  *See* SIPA § 78ccc(e)(2).  The SEC must first publish SIPC's proposal to

provide interested persons with an opportunity to submit "written data, views, and arguments

with respect to such proposed rule change."  *See* SIPA § 78ccc(e)(2)(A).  Then, the SEC may

either approve SIPC's proposed changes based on a finding that it is in the public interest and

consistent with SIPA, or disapprove them following (i) public notice of the reasons for

disapproval, (ii) an opportunity for a hearing, and (iii) publication of those reasons.  *See* SIPA

§ 78ccc(e)(2)(A)–(D).  All of the foregoing procedures serve to show that in the SIPA context,

inflation adjustments are carefully and clearly delineated.

Accordingly, the omission of specific provisions for inflation and interest adjustments in

the net equity definition bolsters the Trustee's position that there should be no reallocation of net

equity based on Time-Based Damages.

### B.  SIPA's Purpose Supports Upholding The Trustee's Unadjusted Net Investment Method

One of SIPA's primary purposes is to promote investor confidence in the market.  *See*

*New Times*, 371 F.3d at 84.  In order to do so, SIPA, *inter alia*, strives to satisfy "customers'

legitimate expectations" by returning customer accounts "in the form they existed on the filing

date."  *In re New Times Secs. Servs., Inc.*, 463 F.3d 125, 128–129 (2d Cir. 2006) (quoting S. REP.

No. 95-763, at 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764, 765).  The Objecting Claimants

argue that awarding Time-Based Damages is necessary to satisfy their legitimate expectations

because "[n]o reasonable investor would expect cash held by a third party for decades to be

unadjusted, completely exposed to inflation."  *See* Customers' Brief Opposing Trustee's Motion

for an Order Rejecting an Inflation Adjustment to the Calculation of "Net Equity" [hereinafter

"Customer Br."] (Dkt. No. 5133), p. 17.  SIPA, however, satisfies customer expectations, only so long as the customer accounts "*necessarily have [a] relation to [market] reality*."  *New Times*, 371 F.3d at 88 (emphasis added); *see also* SIPA § 78fff-2(b) (stating that "all securities shall be valued as of the close of business on the filing date").  Indeed, SIPA will satisfy such expectations, even where no securities were ever purchased, provided that the customer accounts reflect "what would have happened [in the market] had the given transaction been executed," whether the value of the securities at issue increase or decrease.  *New Times*, 371 F.3d at 74; *see also SEC v. Albert & Maguire Sec. Co.*, 560 F.2d 569, 572 (3d Cir. 1977) (noting that SIPA does not provide protection "against the vagaries of the market").

Here, in the context of the Madoff Ponzi scheme, however, where the last account statements that Madoff sent to customers were complete fabrications, there is no way of having customer claims reflect market reality because it is impossible to determine the true securities positions of Madoff customers.  In other words, there is no way to know how much each customer's account balance would have been had securities actually been purchased in the market.  Consequently, even though the Objecting Claimants stress that an inflation adjustment "uses an objective, universally applicable methodology that is entirely independent of the fraudulent Madoff Securities account statements," Customer Br., p. 17, there is no way to know whether adding any Time-Based Damages adjustments to customers' net equity claims would result in their claim amounts more closely approximating what would have transpired in the market.  Indeed, adding such inflation adjustments could very well increase the difference between net equity claim amounts and market realities in contravention of SIPA's purpose. *See, e.g.*, Sehgal Decl., ¶ 7 (testifying that "[i]f the accounts used in the Hart Report had invested in the S&P 500 Index, the vast majority of those accounts would show a performance balance

that is lower than the [net equity claim amounts] adjusted for inflation"); *In re Stratton Oakmont, Inc.,* 01-CV-2812, 2003 WL 22698876, at **1, 8 (S.D.N.Y. Nov. 14, 2003) (net equity claimants granted only "worthless" securities that had declined dramatically in value between their unlawful conversion and the commencement of the SIPA liquidation).

Moreover, the Objecting Claimants cannot posit that their legitimate expectations will be defied if they don't receive Time-Based Damages because they never bargained for any such protection. **When they invested in Madoff, they bargained for a market-driven investment designed to fluctuate with the performance of the market; they did not bargain for a contractually guaranteed interest rate or an inflation-protected investment vehicle.** Indeed, SIPC "is not an insurer" and does not "guarantee that customers will recover their investments which may have diminished as a result of, among other things, market fluctuations or broker-dealer fraud." *See SIPC v. Associated Underwriters, Inc.,* 423 F. Supp. 168, 171 (D. Utah 1975). The inclusion of Time-Based Damages, however, would eliminate the market risks that are inherent in securities and other market-based investment vehicles. This would yield an outcome for which the Objecting Claimants never bargained and SIPA never intended to protect.

For these reasons, the exclusion of Time-Based Damages from the calculation of net equity is more consonant with the purposes of SIPA. Accordingly, the purpose of SIPA militates in favor of adopting the Trustee's unadjusted Net Investment Method.

## C. <u>The Holding in *Walsh* Supports Upholding The Trustee's Unadjusted Net Investment Method</u>

As a preliminary matter, none of the SIPA cases relied upon by the Trustee directly addresses the issue of whether the application of Time-Based Damages to the net equity calculus is appropriate under SIPA.[15] The Objecting Claimants have also failed to cite a single SIPA case

---

[15] Specifically, the cases the Trustee cites in support of the proposition that SIPA does not provide for payment of

in which Time-Based Damages were awarded.[16]

A very recent Second Circuit, non-SIPA, securities receivership case involving a long-running Ponzi scheme, however, provides direct guidance to this Court regarding whether the Trustee's determination that net equity excludes any form of Time-Based Damages is appropriate under the instant circumstances. *See Walsh*, 712 F.3d 735 (2d Cir. 2013).

In *Walsh*, defendants ran an investment business as a Ponzi scheme for over 13 years. *Id.* at 738–39. The defendants sent fabricated account statements to their investors, used investor funds to live lavishly and funded investor redemptions with money received from earlier investors when there were no earnings. *Id.* at 739. After the scheme collapsed, the Commodity Futures Trading Commission (the "CFTC") and the SEC initiated civil enforcement actions against the defendants and their related entities, alleging violations of various federal securities laws. *Id.* at 739–40. Thereafter, the district court appointed a receiver (the "Receiver") to collect the defendants' assets and propose a distribution plan, and approved a claims administration procedure specifying (i) parties in interest were permitted to submit proposals to the court for the distribution of money collected by the Receiver and (ii) the CFTC and the SEC could comment

---

*interest* to customers do not address the prejudgment interest sought by certain Objecting Claimants here. Instead, they address only whether net equity includes fictitious profits as a form of interest or whether claimants can obtain a *post-judgment* interest award directly from SIPC based on the delay between the filing date and SIPC's payment of claims. *See, e.g., In re Old Naples Sec., Inc.*, 311 B.R. 607, 617 (Bankr. M.D. Fla. 2002) (rejecting a claim for interest based on fictitious profits and holding that only the return of principal was appropriate); *In re C.J. Wright & Co.*, 162 B.R. 597, 610 (Bankr. M.D. Fla. 1993) (finding that "the most that claimants are entitled to receive is the return of the principal invested" and not any fictitious profits); *SEC v. Ambassador Church Fin./Dev. Grp., Inc.*, 788 F.2d 1208, 1210–13 (6th Cir. 1986) (finding claimants were not entitled to an interest award against SIPC "for the seven and one-half year period that SIPC withheld funds").

[16] Instead, the Objecting Claimants argue that two cases in the *non-SIPA* context support an inflation adjustment. *See* Customer Br., p. 22–23 (citing *In re Carrozzella & Richardson*, 286 B.R. 480, 484 n.7 (Bankr. D. Conn. 2002); *In re Unified Commercial Capital, Inc.*, 260 B.R. 343, 351 (Bankr. W.D.N.Y. 2001)). Neither of these cases, however, is on point because both courts relied exclusively on the fact that the relevant investment contracts specifically provided for the payment of interest. *See In re Carrozzella & Richardson*, 286 B.R. at 483–84; *In re Unified Commercial Capital, Inc.*, 260 B.R. at 345–47. In contrast, in the instant SIPA proceeding, no one argues that BLMIS customers were ever promised a guaranteed rate of interest or inflationary factor in connection with their investments.

on any distribution plan submitted.  *Id.* at 739–42.

In relevant part, the Kern County Employees' Retirement Association ("KCERA") proposed that the Receiver implement a "constant dollar" approach, "which would distribute larger shares to earlier investors than to more recent investors in order to account for inflation." *Id.* at 743.  The CFTC and the SEC submitted a joint recommendation to the district court in favor of a net investment, *pro rata* distribution plan without an adjustment for inflation, which they believed to be "*the most fair and equitable* method of distribution of the assets held by the Receiver."  *Id*. at 743, 745.  Consistent with this joint recommendation, the Receiver moved before the district court for approval of a *pro rata* distribution that would not "include any interest, earnings, or other compensation based on the time value of money."  *Id*. at 745.  The district court approved the Receiver's distribution plan, concluding that it was equitable because it "most closely mirrors what would be an equal and equitable distribution of the *principal contributions* of each of the investors."  *Id*. at 749 (emphasis added).

On cross-appeal to the Second Circuit, KCERA contended that the district court erred by not implementing a constant dollar adjustment to the Receiver's distribution plan, reasoning, like the Objecting Claimants here, "that the real value of a dollar invested long ago is greater than the value of a dollar invested more recently" and long-term investors should not be treated dissimilarly from the short-term investors simply "because they have been in longer."  *Id.* at 747.  Certain victims of the Ponzi scheme objected to KCERA's constant dollar proposal in favor of the Receiver's proposed *pro rata* distribution because, *inter alia*, such an adjustment would result in certain investors receiving millions of dollars above their principal at the expense of other investors who had not yet recovered their principal.  *Id*.

The Second Circuit found "no abuse of discretion in the district court's approval of the

Receiver's plan of distribution without requiring the requested inflation adjustment."[17]  *Id*. at

754–55.  The Second Circuit pointed out the importance of making victims "whole" by first

returning their principal.  *See id*. at 755 (highlighting the SEC and CFTC's joint position that

inflation should not be awarded because funds collected were "insufficient *to make all of the*

*victims whole*") (emphasis added); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at

238 (favoring Trustee's Net Investment Method because it prevents "[Madoff customers] who

had already withdrawn cash deriving from imaginary profits in excess of their initial investment

[from] deriv[ing] additional benefit at the expense of those customers who had not withdrawn

funds before the fraud was exposed.").  Indeed, the Second Circuit emphasized that KCERA

failed to cite even one case finding that awarding an inflation adjustment "was required as a

matter of law when there is to be a distribution of assets to a group of similarly situated victims

and those assets are insufficient *to make all of the victims whole*."  *Walsh*, 712 F.3d at 755

(emphasis added); *see also id*. (finding none of KCERA's cases on point because they did not

involve "numerous victims and insufficient assets to provide *complete compensation*") (emphasis

added).  Finally, the Second Circuit suggested that the district court would be "free to consider

whether to approve an inflation adjustment" if the Receiver ultimately recovers enough money to

provide all of the victims with their principal.  *Id*.

     At bottom, *Walsh* is highly persuasive, as the facts, issue and arguments before the *Walsh*

court tend to mirror those present here.  Indeed, like *Walsh*, (i) the instant Motion involves the

distribution of limited assets following a long-running Ponzi scheme, (ii) the Court must

determine whether the Trustee's unadjusted Net Investment Method for distribution is

---

[17] While many of the Objecting Claimants anticipated this ruling in their opening brief, *see* Customer Br., p. 23, in light of the Second Circuit's ruling thereafter, it is not surprising that these claimants merely attempted to distinguish *Walsh* in a footnote in their supplemental brief, *see* Customer Supp. Br., p. 3 n.2.

appropriate under the circumstances, and (iii) the Trustee has argued, *inter alia*, that any Time-Based Damages adjustment would come at the expense of victims who had yet to recover their principal.  In accord with the holdings of the District Court and the Second Circuit, this Court finds that the Trustee's unadjusted Net Investment Method is proper, as it is "equal and equitable" and "most closely mirrors" a distribution of the principal contributions of each investor.  *Walsh*, 712 F.3d at 749.[18]  By returning principal to Net Losers first, the Trustee attempts to make victims whole by bringing the greatest number of investors closest to their positions prior to the hatching of Madoff's nefarious scheme.  Accordingly, the *Walsh* case appears to this Court to weigh in favor of adopting the Trustee's Net Investment Method, unadjusted for any Time-Based Damages.

### D.  SIPA's Statutory Framework and Distribution Scheme Support Upholding the Trustee's Unadjusted Net Investment Method

While SIPA was designed to protect customers from the losses caused by the insolvency or financial instability of broker-dealers by expediting the return of customer property, *see In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 239–40, it was not meant to fully compensate customers for all losses, *id.* at 236 (stating "SIPA does not—and cannot—protect an investor against all losses").  Indeed, beyond including converted property as a customer claim, SIPA provides no protection for any other losses caused by "conversion, fraud, or other broker wrongdoing."  *In re Stratton Oakmont, Inc.*, 2003 WL 22698876, at *5 ("SIPA brings those whose property was unlawfully taken within the preferred status of 'customer,' and the property unlawfully taken within the definition of 'customer property,' but those are the only inclusion of conversion, fraud, or other broker wrongdoing in the legislation.").  Thus, it is well settled that

---

[18] Indeed, permitting Time-Based Damages may provide an unseemly benefit to certain groups, including current dollar claims traders.

claims are not protected under SIPA when they are for "damages resulting from a broker's misrepresentations, fraud or breach of contract." *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 421 (Bankr. S.D.N.Y. 2003); *see also In re Stratton Oakmont, Inc.*, 257 B.R. 644, 652 (Bankr. S.D.N.Y. 2001) ("Because of [SIPA's] statutory requirements, any demand by the Claimants for 'damages' for conversion based on state law damage theories must be rejected. Many cases have held SIPA permits only the satisfaction of net equities and not the payment of damages."), *rev'd on other grounds*, 2003 WL 22698876 (S.D.N.Y. Nov. 14, 2003); *In re MV Sec., Inc.*, 48 B.R. 156, 160 (Bankr. S.D.N.Y. 1985) (noting that SIPA's intent is to protect customers having cash or securities on deposit with the broker-dealer and not to act as a vehicle for the litigation of fraud claims and securities law violations). Instead, such claims must be satisfied by the general estate. *In re John Dawson & Assoc., Inc.*, 289 B.R. 654, 662 (Bankr. N.D. Ill. 2003) ("[C]laims based on fraud or breach of contract are not . . . part of a customer's net equity claim . . . . Such claim must be satisfied from the general estate, not SIPC funds.") (quotation omitted).

In the instant Motion, the time-based adjustments requested by the Objecting Claimants seek damages stemming from Madoff's wrongdoings, which are not protected by SIPA. No matter how these claimants couch their requests, they are actually seeking additional compensation for the losses arising from the period of time their money was tied up in Madoff's fraud. Specifically, their *interest*-based adjustment requests are, in fact, seeking compensation for the lost use of their funds while invested with Madoff. *See Carter v. Shop Rite Foods, Inc.*, 503 F. Supp. 680, 688 (N.D. Tex. 1980) (defining interest adjustments as "compensation for deprivation of the use of funds"); 44B Am. Jur.2d Interest & Usury § 39 (defining prejudgment interest as "compensation allowed by law as additional damages for lost use of money due as damages during the lapse of time between the accrual of the claim and the date of

21

judgment.").  And their *inflation*-based adjustment requests are, in, fact, seeking compensation for the diminished purchasing power of the money they invested with Madoff.  *See Carter*, 503 F. Supp. at 688 (defining an "inflation factor" as "compensation for the diminution over time in the purchasing power of the funds").

All of this additional compensation, however, must be excluded from customer net equity claims because it amounts to damages stemming from Madoff's wrongdoing, which are not covered by SIPA.  *See In re Klein, Maus & Shire*, 301 B.R. at 421 ("Because claims for damages do not involve the return of customer property entrusted to the broker they are not the claims of 'customers' under SIPA.").  Indeed, it was Madoff's continuous fraudulent activity, including the fabrication of BLMIS customer account statements, that misled customers into leaving their investments with BLMIS for extended periods of time.

Accordingly, in the event that the Objecting Claimants are entitled to any pre-judgment interest[19] or inflation-based payments, such claims arising therefrom do not constitute net equity claims to be paid out from the customer fund; at best, they may constitute general claims to be satisfied by payment from the general estate fund.

Taking all of the above in tandem, the Court finds that SIPA's plain language, purpose, framework and distribution scheme, as well as Second Circuit precedent, all favor the Trustee's distribution methodology.  Accordingly, this Court upholds the Trustee's Net Investment Method, unadjusted for Time-Based Damages.

---

[19] Some of the claimants have requested that their net equity claims be adjusted for the prejudgment interest provided under New York CPLR section 5001.  However, at the present juncture, such request is unfounded because CPLR section 5001: (i) at best, is relevant only to distributions from the general estate fund and not from the customer fund; and (ii) requires a verdict, judgment or decision to be rendered in the state court in favor of the plaintiff before the statutory prejudgment interest may be applied, *see In re Arcade Publ'g, Inc*., 455 B.R. 373, 379–80 (Bankr. S.D.N.Y. 2011), which has not been obtained here.

### III.    IF TIME-BASED DAMAGES ARE TO BE AWARDED AS PART OF THE NET EQUITY CALCULUS UNDER SIPA, IT IS FOR CONGRESS TO ENACT SUCH A LAW, NOT THIS COURT

It is clear that the plain language of SIPA does not address whether to include an adjustment for Time-Based Damages in the calculation of net equity. The Objecting Claimants attempt to explain this statutory silence, arguing that Congress has never had to accommodate a long-running Ponzi scheme, such as this one, where it is alleged that no securities were actually purchased.[20]  *See* Customer Br., p. 22.  Instead, the Objecting Claimants suggest that Congress has addressed the typical broker-dealer insolvency where the customer's net equity claim is based on the then-current value of the securities.  *See* SIPA § 78fff-2(b) (stating that "all securities shall be valued as of the close of business on the filing date").  In such a context, an inflation adjustment would be unnecessary because the customer receives the benefit of current stock pricing, which would reflect inflation or deflation.  Therefore, the Objecting Claimants essentially argue that the Court should fill this statutory gap by permitting Time-Based Damages under the present circumstances.

Regardless of the statute's silence or whether Congress has ever had occasion to consider this issue, it is not for this Court to amend SIPA to fill legislative lacunae.  *See In re Stratton Oakmont, Inc.*, 2003 WL 22698876, at *5 ("It is equally true that the change in value between the date the stocks were converted and the time when the claim is paid must be addressed by

---

[20] These Claimants also emphasize that SIPA was drafted in 1970, which was several decades prior to the emergence of Ponzi-type frauds of the scale and duration of that of Madoff.  *See* Customer Br., p. 13 n.5.  However, *New Times*, a case decided by the Second Circuit in 2004, addressed how to value net equity claims of victims of a 17-year Ponzi scheme that resulted in the loss of $32.7 million where closing statements could not be used.  *See New Times*, 371 F.3d at 71.  The court endorsed the Net Investment Method and made no mention of any form of time based damages.  *See id.*  Since the issuance of *New Times*, Congress has amended SIPA several times.  *See, e.g.*, Dodd–Frank Act; Financial Netting Improvements Act of 2006, Pub.L. No. 109–390, 120 Stat. 2692, (2006); Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 23 (2005).  Thus, it is difficult to accept the position that Congress never contemplated the contours of net equity claims based on the Net Investment Method in long-running Ponzi schemes.

Congress and not the courts."). This is especially so since there are too many unknowns, such as: (i) which index should be applied, (ii) which inflation factor should be applied, (iii) whether to apply the inflation factor to each and every deposit and withdrawal or to only final account balances, (iv) whether to apply the inflation factor daily, monthly, quarterly or yearly, and (v) whether amounts are to be rounded up or down. These unknowns can, and should be, clarified only by Congress. Indeed, were the Court to fill this gap, "[b]y forcing the square peg" of Time-Based Damages "into the round holes" of SIPA "in order to accomplish a further reallocation and redistribution to implement a policy of equality of distribution in the name of equity," this Court will have "done a substantial injustice" to SIPA and will "have made policy decisions that should be made by Congress." *In re Unified Commercial Capital, Inc.*, 260 B.R. at 350.

Accordingly, if Time-Based Damages are to be included in the calculation of net equity under SIPA, only Congress can enact such a law.

## CONCLUSION

For the reasons set forth above, the Court upholds the Trustee's determination that net equity should be calculated based on the Trustee's Net Investment Method, without any adjustments/enhancements for Time-Based Damages. Specifically, the Court affirms: (i) the Trustee's determinations of the claims listed on Exhibit A to the Cheema Declaration, to the extent they relate to the recalculation of net equity customer claims based on Time-Based Damages; (ii) the Trustee's denial of the claims to the extent these claims seek amounts in excess of net equity calculated using the Net Investment Method; (iii) the Trustee's interpretation of net equity under SIPA as excluding Time-Based Damages. In addition, the Court hereby expunges the objections to the Trustee's determinations listed on Exhibit A to the Cheema Declaration, insofar as they relate to the recalculation of net equity customer claims based on Time-Based Damages, and permits the Trustee to release any funds previously reserved for the Time-Based

Damages issue in accordance with the Court's direction below.

In view of the factors contained in 28 U.S.C. section 158(d)(2)(A)(i)–(iii), as well as the obvious need for a release of approximately $1.4 billion to parties entitled to a prompt return of their funds, *see supra* n.10, this Court will upon appropriate request or motion consider favorably a request to certify a direct appeal to the United States Court of Appeals for the Second Circuit. Accordingly, distribution of the approximately $1.4 billion Time-Based Damages Reserve by the Trustee shall be stayed for a period of 10 days from entry of this Memorandum Decision and Order to grant the parties time to consider whether to certify a direct appeal to the United States Court of Appeals for the Second Circuit.

Thus, the Trustee's Motion is hereby GRANTED to the extent set forth herein.

**IT IS SO ORDERED**.

Dated: New York, New York        /s/ Burton R. Lifland
       September 10, 2013        United States Bankruptcy Judge

## EXHIBIT A – ARGUING ON THE MOTION

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201
By:    David J. Sheehan
        Jorian L. Rose
        Seanna R. Brown
        Bik Cheema
        Brian A. Bash
        Thomas D. Warren
        Wendy J. Gibson

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*


SECURITIES INVESTOR PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, DC 20005
Telephone: (202) 371-8300
Facsimile:  (202) 371-6728
By:    Josephine Wang
        Kevin H. Bell
        Christopher H. LaRosa
        Lauren T. Attard

*Attorneys for the Securities Investor Protection Corporation*


SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, D.C. 20549
Telephone: (202) 551-5143
By:    John W. Avery
        Dominick V. Freda

New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281
Telephone: (212) 336-0163
By:    Alistaire Bambach
        Patricia Schrage

*Attorneys for the Securities and Exchange Commission*

BECKER & POLIAKOFF LLP
45 Broadway
New York, NY 10006
Telephone: (212) 599-3322
By:    Helen Davis Chaitman
       Julie Gorchkova

*Attorneys for Claimants listed at Amended Exhibit A to the Amended Declaration of Helen Davis Chaitman in Support of Customers' Objection to Trustee's Motion for an Order Denying Time-Based Damages, Dec. 7, 2012 (Dkt. No. 5140)*


DAVID GROSS, *pro se*
7248 Ballantrae Ct.
Boca Raton, FL 33496
Telephone: (561) 483-4543


LAW OFFICES OF JOEL L. HERZ
3573 E. Sunrise Drive, Suite 215
Tucson, AZ 85718
Telephone: (520) 529-8080
By:    Joel L. Herz

*Attorneys for Samdia Family, LP*


ROBERT J. KAPLAN
15 Maiden Lane, Suite 703
New York, NY 10038
Telephone: (212) 964-0600
By:    Robert J. Kaplan

*Attorney for MUUS Independence Fund LP and Michael W. Sonnenfeldt*


K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Telephone: (202) 778-9000
Facsimile:  (202) 778-9100
By:    Richard A. Kirby
       Laura K. Clinton
       Scott P. Lindsay

*Attorneys for individual customers listed at Schedule A to the Customers' Brief Opposing Trustee's Motion for an Order Rejecting an Inflation Adjustment to the Calculation of "Net Equity," Dec. 3, 2012 (Dkt. No. 5133) as being represented by K&L Gates LLP*

KRAMER LEVIN NAFTALIS & FRANKEL LLP

1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile:  (212) 715-8000
By:    Philip Bentley
       Elise S. Frejka
       Jason S. Rappaport

*Attorneys for individual customers listed at Schedule A to the Customers' Brief Opposing Trustee's Motion for an Order Rejecting an Inflation Adjustment to the Calculation of "Net Equity," Dec. 3, 2012 (Dkt. No. 5133) as being represented by Kramer Levin Naftalis & Frankel LLP*


LOEB & LOEB LLP

345 Park Avenue
New York, NY 10154
Telephone: (212) 407-4000
Facsimile:  (212) 407-4990
By:    P. Gregory Schwed
       Walter H. Curchack
       Daniel B. Besikof

*Attorneys for individual customers listed at Schedule A to the Customers' Brief Opposing Trustee's Motion for an Order Rejecting an Inflation Adjustment to the Calculation of "Net Equity," Dec. 3, 2012 (Dkt. No. 5133) as being represented by Loeb & Loeb LLP*


DENTONS

1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Facsimile:  (212) 768-6800
By:    Carole Neville

*Attorneys for individual customers listed at Schedule A to the Customers' Brief Opposing Trustee's Motion for an Order Rejecting an Inflation Adjustment to the Calculation of "Net Equity," Dec. 3, 2012 (Dkt. No. 5133) as being represented by SNR Denton*

MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229
By:    Matthew Gluck
        Matthew A. Kupillas
        Jennifer L. Young
        Joshua E. Keller

*Attorneys for individual customers listed at Schedule A to the Customers' Brief Opposing Trustee's Motion for an Order Rejecting an Inflation Adjustment to the Calculation of "Net Equity," Dec. 3, 2012 (Dkt. No. 5133) as being represented by Milberg LLP*


SEEGER WEISS LLP
77 Water Street, 26th Floor
New York, NY 10005
Telephone: (212) 584-0700
Facsimile:  (212) 584-0799
By:    Parvin K. Aminolroaya

*Attorneys for individual customers listed at Schedule A to the Customers' Brief Opposing Trustee's Motion for an Order Rejecting an Inflation Adjustment to the Calculation of "Net Equity," Dec. 3, 2012 (Dkt. No. 5133) as being represented by Seeger Weiss LLP*


LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile:  (973) 597-2400

1251 Avenue of the Americas, 18th Floor
New York, NY 10020
Telephone: (212) 262-6700
Facsimile:  (212) 262-7402
By:    Bruce Buechler
        Nicole Stefanelli

*Attorneys for the Irrevocable Charitable Remainder Trust of Yale Fishman and the Glenn Akiva Fishman Charitable Remainder Unitrust*

MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
<u>By</u>:     Bernard J. Garbutt III

*Attorneys for The Kostin Co.*


SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955
<u>By</u>:     Marcy Ressler Harris
          Jennifer M. Opheim
          Mark D. Richardson

*Attorneys for HHI Investment Trust #2*


SILLS CUMMIS & GROSS P.C.
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 643-7000
<u>By</u>:     Andrew H. Sherman

*Attorneys for Claimants listed at Exhibit 1 to the Joinder in Opposition to Trustee's Motion for
an Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based Damages,
Dec. 3, 2012 (Dkt. No.  5126)*


STIM & WARMUTH, P.C.
2 Eighth Street
Farmingville, NY 11738
Telephone: (631) 732-2000
Facsimile:  (631) 732-2662
By:     Paula J. Warmuth
          Glenn P. Warmuth

*Attorneys for Michael Most*