1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-01789(BRL)

4    Adv. Case No. 08-01789(BRL)

5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    SECURITIES INVESTOR PROTECTION

9    CORPORATION,

10

11            Debtor.

12   - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   SECURITIES INVESTOR PROTECTION

14   CORPORATION,

15                 Plaintiff,

16            v.

17   BERNARD L. MADOFF INVESTMENT

18   SECURITIES, LLC, et al.,

19                 Defendants.

20   - - - - - - - - - - - - - - - - - - - - - - - - - - x

21

22

23                 U.S. Bankruptcy Court

24                 One Bowling Green

25                 New York, New York

Page 2

1                        October 16, 2013

2                          10:08 AM

3

4    B E F O R E :

5    HON BURTON R. LIFLAND

6    U.S. BANKRUPTCY JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    Hearing re:  (cc-5491) Eleventh Application of Windels Marx

2    Lane & Mittendorf, LLP for Allowance of Interim Compensation

3    for Services Rendered and Reimbursement of Actual and

4    Necessary Expenses Incurred from December 1, 2012 through

5    April 30, 2012 for Windels Marx Lane & Mittendorf, LLP,

6    Special Counsel, period: 12/1/2012 to 4/30/2013, fees:

7    $1,629,622.00, expenses: $9,539.18

8

9    Hearing re:  (cc-5502) Application of Werder Vigano as

10   Special Counsel to the Trustee for Allowance of Interim

11   Compensation for Services Rendered and Reimbursement of

12   Actual and Necessary Expenses Incurred from December 1, 2012

13   through April 30, 2013 for Werder Vigano, Special Counsel,

14   period: 12/1/2012 to 4/30/2013, fee: $5,792.27, expenses: $0

15

16   Hearing re:  (cc-5503reenfield Stein & Senior, LLP as

17   Special Counsel to the Trustee for Allowance of Interim

18   Compensation for Services Rendered and Reimbursement of

19   Actual and Necessary Expenses Incurred from December 1, 2012

20   through April 30, 2013 for Greenfield Stein & Senior, LLP,

21   Special Counsel, period: 12/1/2012 to 4/30/2013, fee:

22   $2,270.25, expenses: $25.65

23

24   Hearing re:  (cc-5504) Application of Browne Jacobson, LLP

25   as Special Counsel to the Trustee for Allowance of Interim

Page 4

1   Compensation for Services Rendered and Reimbursement of

2   Actual and Necessary Expenses Incurred from December 1, 2012

3   through April 30, 2013 for Browne Jacobson, LLP, Special

4   Counsel, period: 12/1/2012 to 4/30/2013, fee: $214,820.72,

5   expenses: $35,148.00

6

7   Hearing re:  (cc-5505) Application of Eugene F. Collins as

8   Special Counsel to the Trustee for Allowance of Interim

9   Compensation for Services Rendered and Reimbursement of

10  Actual and Necessary Expenses Incurred from December 1, 2012

11  through April 30, 2013 for Eugene F. Collins, Special

12  Counsel, period: 12/1/2012 to 4/30/2013, fee: $1,397.62,

13  expenses: $0.00

14

15  Hearing re:  (cc-5506) Application of Kugler Kandestein, LLP

16  as Special Counsel to the Trustee for Allowance of Interim

17  Compensation for Services Rendered and Reimbursement of

18  Actual and Necessary Expenses Incurred from December 1, 2012

19  through April 30, 2013 for Kugler Kandestein, Special

20  Counsel, period: 12/1/2012 to 4/30/2013, fee: $982.24,

21  expenses: $4.98

22

23  Hearing re:  (cc-5490) Twelfth Application of Trustee and

24  Baker & Hostetler LLP for Allowance of Interim Compensation

25  for Services Rendered and Reimbursement of Actual and

Page 5

1   Necessary Expenses Incurred from December 1, 2012 through

2   April 30, 2013 for Baker & Hostetler, LLP, Trustee's

3   Attorney, period: 12/1/2012 to 4/30/2013, fee: $46775739.15,

4   expenses: $1,347,334.97

5

6   Hearing re:  (cc-5507) Application of Ritter & Ritter

7   Advokatur as Special Counsel to the Trustee for Allowance of

8   Interim Compensation for Services Rendered and Reimbursement

9   of Actual and Necessary Expenses Incurred from January 15,

10  2013 through April 30, 2013 for Ritter & Ritter Advokatur,

11  Special Counsel, period: 1/15/2013 to 4/30/2013, fee:

12  $70,665.70, expenses: $44.56

13

14  Hearing re:  (cc-5492) Application of Schiltz & Schiltz as

15  Special Counsel to the Trustee for Allowance of Interim

16  Compensation for Services Rendered and Reimbursement of

17  Actual and Necessary Expenses Incurred from December 1, 2012

18  through April 30, 2013 for Schiltz & Schiltz, Special

19  Counsel, period: 12/1/2012 to 4/30/2013, fee: $66,279.97,

20  expenses: $4,308.20

21

22  Hearing re:  (cc-5493) Application of Higgs & Johnson

23  (formerly Higgs Johnson Truman Bodden & Co.) as Special

24  Counsel to the Trustee for Allowance of Interim Compensation

25  for Services Rendered and Reimbursement of Actual and

Page 6

1    Necessary Expenses Incurred from December 1, 2012 through

2    April 30, 2013 for Higgs & Johnson (formerly Higgs Johnson

3    Truman Bodden & Co.), Special Counsel, period: 12/1/2012 to

4    4/30/2013, fee: $33,237.00, expenses: $900.65

5

6    Hearing re:  (cc-5494) Application of Soroker - Agmon as

7    Special Counsel to the Trustee for Allowance of Interim

8    Compensation for Services Rendered and Reimbursement of

9    Actual and Necessary Expenses Incurred from December 1, 2012

10   through April 30, 2013 for Soroker - Agmon, Special Counsel,

11   period: 12/1/2012 to 4/30/2013, fee: $398,386.25, expenses:

12   $9,883.93

13

14   Hearing re:  (cc-5495) Application of Graf & Pitkowitz

15   Rechtsanwalte GmbH as Special Counsel to the Trustee for

16   Allowance of Interim Compensation for Services Rendered and

17   Reimbursement of Actual and Necessary Expenses Incurred from

18   December 1, 2012 through April 30, 2013 for Graf & Pitkowitz

19   Rechtsanwalte GmbH, Special Counsel, period: 12/1/2012 to

20   4/30/2013, fee: $642,544.02, expenses: $76,918.91

21

22   Hearing re:  (cc-5496) Application of SCA Creque as Special

23   Counsel to the Trustee for Allowance of Interim Compensation

24   for Services Rendered and Reimbursement of Actual and

25   Necessary Expenses Incurred from December 1, 2012 through

Page 7

1   April 30, 2013 for SCA Creque, Special Counsel, period:

2   12/1/2012 to 4/30/2013, fee: $5,590.05, expenses: $174.50

3

4   Hearing re:  (cc-5497) Application of Young Conaway Stargatt

5   & Taylor, LLP as Special Counsel to the Trustee for

6   Allowance of Interim Compensation for Services Rendered and

7   Reimbursement of Actual and Necessary Expenses Incurred from

8   December 1, 2012 through April 30, 2013 for Young Conaway

9   Stargatt & Taylor, LLP, Special Counsel, period: 12/1/2012

10  to 4/30/2013, fee: $38,026.35, expenses: $1,401.38

11

12  Hearing re:  (cc-5498) Application of Williams, Barristers &

13  Attorneys as Special Counsel to the Trustee for Allowance of

14  Interim Compensation for Services Rendered and Reimbursement

15  of Actual and Necessary Expenses Incurred from December 1,

16  2012 through April 30, 2013 for Williams, Barristers &

17  Attorneys, Special Counsel, period: 12/1/2012 to 4/30/2013,

18  fee: $159,419.08, expenses: $0.00

19

20  Hearing re:  (cc-5499) Application of Taylor Wessing as

21  Special Counsel to the Trustee for Allowance of Interim

22  Compensation for Services Rendered and Reimbursement of

23  Actual and Necessary Expenses Incurred from December 1, 2012

24  through April 30, 2013 for Taylor Wessing, Special Counsel,

25  period: 12/1/2012 to 4/30/2013, fee: $5,825,888.90,

1    expenses: $3,250,037.23

2

3    Hearing re:  (cc-5508) Application of Bedell Cristin

4    Guernsey Partnership as Special Counsel to the Trustee for

5    Allowance of Interim Compensation for Services Rendered and

6    Reimbursement of Actual and Necessary Expenses Incurred from

7    April 5, 2013 through April 30, 2013 for Bedell Cristin

8    Guernsey Partnership, Special Counsel, period: 4/5/2013 to

9    4/30/2013, fee: $7,851.97, expenses: $27.56

10

11   Hearing re:  (cc-5500) Application of UGGC & Associes as

12   Special Counsel to the Trustee for Allowance of Interim

13   Compensation for Services Rendered and Reimbursement of

14   Actual and Necessary Expenses Incurred from December 1, 2012

15   through April 30, 2013 for UGGC & Associes, Special Counsel,

16   period: 12/1/2012 to 4/30/2013, fee: $175,812.50, expenses:

17   $717.59

18

19   Hearing re:  (cc-5509) Application of Munari Giudici

20   Maniglio Panfili E Associati as Special Counsel to the

21   Trustee for Allowance of Interim Compensation for Services

22   Rendered and Reimbursement of Actual and Necessary Expenses

23   Incurred from March 21, 2013 through April 30, 2013 for

24   Munari Giudici Maniglio Panfili E Associati, Special

25   Counsel, period: 3/21/2013 to 4/30/2013, fee: $2,651.72,

1   expenses: $0.00

2

3   Hearing re:  (cc-5501) Application of Triay Stagnetto Neish

4   as Special Counsel to the Trustee for Allowance of Interim

5   Compensation for Services Rendered and Reimbursement of

6   Actual and Necessary Expenses Incurred from December 1, 2012

7   through April 30, 2013 for Triay Stagnetto Neish, Special

8   Counsel, period: 12/1/2012 to 4/30/2013, fee: $99,982.03,

9   expenses: $4,035.89

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South

1    A P P E A R A N C E S :

2    BAKER & HOSTETLER LLP

3          Attorney for the Trustee

4          45 Rockefeller Plaza

5          New York, NY 10111-0100

6

7    BY:  DAVID J. SHEEHAN, ESQ.

8

9    WINDELS MARX LANE & MITTELDORF, LLP

10          156 West 56th Street

11          New York, NY 10019

12

13    BY:  ALAN NISSELSON, ESQ.

14

15    SPIC

16          805 15th Street, N.W.

17          Suite 800

18          Washington, D.C. 20005-2215

19

20    BY:  KEVIN H. BELL, ESQ.

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Second call.

3              THE COURT:  SIPC v. BLMIS.

4              MR. SHEEHAN:  Good morning, Your Honor.  How are

5      you today?

6              THE COURT:  Good morning, Mr. Sheehan.

7              MR. SHEEHAN:  The -- this is the twelfth interim

8      fee application of the trustee together with his other

9      counsel, conflict counsel, Windels Marx and Young Conaway,

10     as well as an assortment, as Your Honor knows, of foreign

11     counsel who are also seeking reimbursements this morning.

12             There is no objection to any of the applications

13     before Your Honor today, but as I have done in the past,

14     what I would like to do, if I may, and very briefly, is to

15     outline the work that has been done by the international

16     counsel in the reporting period before I actually submit the

17     order to Your Honor.

18             THE COURT:  Sure.

19             MR. SHEEHAN:  We actually have some new counsel

20     here this morning.  The first one is the Munari firm in

21     Italy.  We've retained that firm in connection with several

22     matters.  One is the action that we've instituted against

23     UniCredit, which of course is the largest bank in Italy, and

24     they're assisting us with regard to a variety of issues,

25     mainly related to discovery and in assistance to the freeze

1    order that we obtained against Sonja Cohen in the United

2    Kingdom.

3           The next firm is the Bedell firm, this is in

4    the Isle of Guernsey.  This is a new retention by us in

5    connection with work that we've begun there.  Certain of the

6    defendants actually are incorporated there.  We've begun

7    service of process and instituted proceedings there and

8    utilized our Guernsey counsel.

9           Ritter & Ritter is in Liechtenstein, they have

10   been working for us for some time.

11          As Your Honor knows there are a number of matters

12   in Liechtenstein, one of which involves an investor with

13   regard to the Sonja Cohen matter.  There have a freeze

14   with regard to about $2 million that we have found there,

15   and the Liechtenstein prosecutor has worked with us to

16   maintain that freeze.

17          We are pursuing avenues of discovery there, and

18   Ritter & Ritter assists us with both of those efforts.

19          Eugene Collins is in Ireland.  In Ireland we have

20   the Thema (ph) matter, which we did not participate in.  We

21   elected not to for a variety of reasons.

22          That case, as Your Honor probably recalls, settled

23   for about $250 million.  That was brought by the Thema

24   investors against HSBC.

25          We have worked out an arrangement, that money is

Page 13

1    currently sitting on hold until we resolve our differences

2    with HSBC or at least reach an accommodation as to the

3    disposition of those funds.

4              Collins has assisted us with regard to that

5    effort.

6              Schiltz & Schiltz is in Luxembourg.

7              Luxembourg is where we have an action actually

8    instituted, as Your Honor may recall, against the trustee

9    language with a number of other individuals.  We brought a

10   motion, as Your Honor will recall, to enjoin that action

11   here.  It was removed before Judge Raykoff and is currently

12   pending before him, and we have before Your Honor an issue

13   with regard to personal jurisdiction, which of course is

14   still being briefed and litigated in this court.

15             Schiltz & Schiltz works with us on all of those

16   matters, but in addition to that we are also again pursuing

17   this freeze order against Sonja Cohen in the Luxembourg

18   courts because there are assets that she has there as well.

19             Kugler & Kandestein is in Canada, that's a very

20   limited retention, it seeks only three hours.  That's only

21   in connection with some discovery.

22             THE COURT:  Isn't Sonja Cohen also Austria?

23             MR. SHEEHAN:  Yes, there is, and I'll get to that

24   in a minute, Your Honor.

25             THE COURT:  Oh, okay.

Page 14

1          MR. SHEEHAN:  Higgs & Johnson is the Cayman

2    Islands.

3          As Your Honor will recall many of the feeder funds

4    created to feed the Bernie Madoff fraud were in fact located

5    in the Cayman Islands, and later I'll speak about BDI.

6          In Cayman we've had an interesting array of

7    matters that have transpired there, principally orbiting

8    around whether or not the trustee has jurisdiction.  We

9    fought that in the Premio (ph) matter -- or Premaio (ph) --

10   and in Premaio we had success with the court there in

11   enforcing and going forward with our order.  That is now

12   currently on appeal.

13         Our adversaries are still taking the position that

14   we cannot appear there and actually prosecute the causes of

15   action.

16         As Your Honor knows we filed causes of action here

17   with Your Honor but we filed protective actions in Cayman,

18   the UK, BDI, Bermuda, and a number of other jurisdictions

19   just in case we ran into either personal jurisdiction or

20   other jurisdictional problems, but we are actively pursuing

21   this there and we've had, as I say, success to date, and

22   that is what Higgs & Johnson is principally assisting us

23   with, although there are other jurisdictional issues that

24   they've assisted on us as well.

25         Soroker & Agmon in Israel, that is the Magnify

Page 15

1   matter.  That is a matter where as Your Honor recalls from

2   the complaint that we filed here that approximately

3   $130 million of fictitious profits went to Magnify.  Magnify

4   then became the principal donor to an alleged charitable

5   organization known as Shasia Horowitz (ph) in Israel.  That

6   money then was subsequently transferred out to a number of

7   other institutions.

8           We have been participating there in the -- there

9   was an immediate after our filing of a complaint I should

10  say -- Shasia Horowitz immediately filed to liquidate

11  without disclosing the fact that they'd been sued as part of

12  the Magnify action.

13          We then went into the courts in Israel through

14  Soroker and notified the Court of what was transpiring, they

15  then withdrew their liquidation.

16          We are now in the process of having a receiver

17  appointed through the Israeli courts with the idea of

18  utilizing that vehicle to find the assets and trace them

19  through the Shasia Horowitz transfers.

20          There's been some discovery here.  Your Honor will

21  recall Soroker also assisted us with that, because that was

22  a deposition that we ended up actually taking in Switzerland

23  of the attorney who created the Magnify Shasia Horowitz

24  combination.

25          It's a very fascinating story that we've managed

1    to pull together, but what we still have not unraveled,

2    quite frankly, is the fact that there's $130 million in

3    fictitious profits and they went through Shasia Horowitz and

4    into the hands of a man named Israel Greene (ph), who we've

5    also sued, and a good deal of those monies then went

6    interest the Greene family.  We're also pursuing those.

7            So that one case alone has generated very

8    significant activity on behalf of the trustee.  But because

9    of the magnitude, as is always the case in Madoff, the

10   $130 million, we're actively pursuing that in Israel more so

11   than we are here because that's where we think all the

12   assets are.

13           Graf & Pitkowitz, that's Austria as Your Honor

14   mentioned a moment ago.

15           That is the place where Sonja Cohen created, as

16   Your Honor will recall, Bank Medichi (ph).  Bank Medichi was

17   the principal vehicle she created to create a feeder fund --

18   a number of feeder funds.  Bank Medichi then created

19   investment vehicles, four or five of them that were

20   supposedly, you know, diversified or fixed income, et

21   cetera.  None of them really existed.  They were just

22   fabrications created by her.  They then all fed all their

23   money into Mr. Madoff.  She over the course of time brought

24   in about $9 billion into the Madoff fraud.

25           We have sued her, Bank Medichi, and a number of

1    other individuals here in the United States.  We have not

2    started a lawsuit there.  What we have been doing is

3    cooperating with the prosecutor.

4           As Your Honor knows there's a little different

5    system in Europe.  We can actually participate.  The trustee

6    is viewed as the victim in those proceedings.  We can

7    participate and have participated and given them documents

8    and assistance, them being the prosecutor, it's a criminal

9    action, and that criminal action we can participate in by

10   being in the room with witnesses who are interviewed or

11   depositions take place, and we've actively participated in

12   those as well.

13          Graf & Pitkowitz is our firm that's worked with us

14   throughout that.  There has been an enormous amount of

15   information that's been forthcoming.  That prosecution is

16   nearing its head.  We believe that certainly, although not

17   in the reporting period, but more recently it has, so that

18   we believe by the end of this year, the beginning of next,

19   there will be an active prosecution of the principal

20   defendants, including Mrs. Cohen in that action.

21          THE COURT:  Isn't she also involved in the UK

22   proceedings?

23          MR. SHEEHAN:  She is.  I'm going to get to that

24   one in a minute as well.  But yes, she is.  She's a

25   principal defendant there and we had a trial this summer,

Page 18

1   which I'll talk about in a moment.

2           THE COURT:  And they were adverse to her findings?

3           MR. SHEEHAN:  Well, there were adverse findings

4   against Mrs. Cohen with regard to the freeze order, which

5   was about 18 months ago.

6           THE COURT:  I see.

7           MR. SHEEHAN:  But we're still waiting for the

8   decision of Judge Popplewell.  I used to think as an aside

9   that Thickens made those names up, but they actually just

10  exist in England.

11          But in any event, Judge Popplewell is sitting

12  there on that decision.  We should have it I think next

13  week.

14          SCA Creque is the Switzerland -- I'm sorry – BDI

15  counsel that we've had working for us.  Not much activity

16  during the reporting period.

17          BDI has gone somewhat quite in the sense that most

18  of the activity is taking place, as Your Honor as noted, in

19  the United kingdom, Austria, Cayman, and obviously in this

20  courthouse, but they do of course assist us, because there

21  are number of (indiscernible – 00:14:14) such as Kinggate

22  (ph), which is active principally in Bermuda though, which

23  is the next firm, that's the Williams Barrister firm.

24          In Bermuda what is occurring is this.  As you know

25  we've been negotiating at length with the liquidators in

Page 19

1    Kinggate to try to resolve that matter.  It broke out into

2    litigation with DBSI and Kinggate in the federal courts

3    here.  There's been a delay principally because there has to

4    be some resolution of the remission fund, which has not yet

5    taken place with the special master.  We're hoping that will

6    happen shortly, and that'll give us guidance as to how we

7    can deal with that distribution.

8           But in the meantime what's going on is KML,

9    Kinggate Management Limited, is operating in Bermuda and

10   they were one of the management funds created by the

11   ultimate architects of this fraud, the Kinggate fraud,

12   Suretti & Grosso (ph), who we've sued both here and in the

13   United Kingdom.  Those lawsuits are pending.

14          But we sued them also in Bermuda and there's an

15   action there also by the liquidators that had been on hold

16   while we were discussing things.  But since things aren't

17   moving they've started to move, therefore we've become much

18   more active there seeking to shut down the liquidator cause

19   of action in favor of the trustee's cause of action.  That's

20   being currently litigated in the courts.

21          We have an agreement with the receiver, there are

22   many parties here, the receiver for Kinggate Management

23   Limited was actually appointed in Bermuda, the liquidators

24   are from BDI, and we're here from the United States.  We're

25   all in the Bermuda court.

Page 20

1          We're cooperating with the receiver and we will

2    ultimately I think resolve all this once we have guidance

3    from special master on that aspect of it, because we've

4    virtually worked out all the details with the rest of the

5    settlement.

6          Taylor Wessing is our counsel in England.  You can

7    see they have significant time, over 17,000 hours.

8          What was happening during the reporting period was

9    essentially the discovery that took place with regard to the

10    cause of action Your Honor eluded to, the defendants in that

11    action are the directors of MSIL, which was the corporation

12    created by Mr. Madoff in furtherance of his fraud, there was

13    an instrumentality of the fraud.  He presented it as a

14    foreign body that was utilized by him to create trades in

15    the European market thereby justifying that he was operating

16    in dark pools of liquidity, as he called it, so that

17    therefore the volatility that otherwise would have

18    manifested itself on the exchange did not because he used

19    it.  Of course it was all a lie and MSIL was a fraud.

20          The activities that were limited to proprietary

21    trading on his behalf we have during the course of this

22    discovery we discovered not only a number of documents

23    supporting our case but actual phone conversations between

24    Mr. Madoff and the directors evidencing their discussions

25    with regard to the fact that the work that Ms. Cohen was

Page 21

1   doing was not really work but they were manufacturing

2   invoices to pay her.

3           All of this was presented to Judge Popplewell in

4   July when we actually tried this case.  I did not try it.

5   Our again Pushpinder Saini, our barrister, tried that case

6   on behalf of the trustee, assisted by Williams -- assisted

7   by I should say Taylor Wessing, as the solicitors.

8           So there's been a great deal of activity there

9   mostly in the form of discovery and trial preparation during

10  the reporting period which culminated, as I say, in a trial,

11  the judge reserved decision.

12          Judge Popplewell has indicated that we will next

13  week get a what they call a preliminary decision.  We get to

14  comment on it, not substantively, but whether he's got all

15  the facts right and the grammar looks right, and then we

16  give that back and we should have a decision within the next

17  ten days.

18          They've also assisted us as I say Kinggate we've

19  sued Suretti & Grosso, we're pursuing them in England as

20  well in Bermuda and BDI and the Caymans -- or BDI I should

21  say.

22          So there's a lot of activity in the United

23  Kingdom, which is why you have the amount of time there.

24          UGGC you'll see that the time has gone up, it's

25  over 400 hours.  This is in France.

1           What has happened there is, is that initially the

2    prosecutor in France, a number of -- let me just back up a

3    step.  A number of the investors that went through the

4    Luxsolfa (ph) and what we call the Luxembourg funds actually

5    are out in France, and it was initially an investigation by

6    the prosecutor, but he shut it down.

7           And quite frankly we've gone over there and we've

8    talked to the prosecutor and he's reopened the

9    investigation.

10          And Soretti & Grosso by the way have gone in

11   because there's also a part of this and tried to shut it

12   down.

13          So we have active litigation going on in French

14   courts with us pursuing discovery there through the French

15   prosecutor assisting them with discovery that we have,

16   again, a very unique system.

17          We're confident that the courts will allow us to

18   proceed and that they will deny Soretti & Grosso's

19   application to shut down our participation, which is what

20   they're trying to do.

21          The prosecutor is supporting it, wants us

22   involved, and I think it will continue.

23          Again, this is not in support of any particular

24   action in France so much as to develop evidence and

25   documents with regard to the activities of Sonja Cohen and

Page 23

1    other, you know, participants in the fraud like Soretti &

2    Grosso in Europe.

3              Then we have Gibraltar.

4              THE COURT:  Let me ask you this, Mr. Sheehan.  At

5    the end of the day with all the activity surrounding Sonja

6    Cohen is it possible that it's a dry well?

7              MR. SHEEHAN:  You know, well, we've actually

8    frozen about $25 million.  Now I realize in the scheme of

9    things in this case that's not a lot of money, but it is

10   still a lot of money and there is -- you know, we've traced

11   a good deal of the money - and you haven't seen this counsel

12   here yet -- but to Australia.  And most of the money is

13   there in the hands of her children and her mother, who's

14   still alive.

15             So we're pursuing that at this point trying to

16   work it out through her counsel, and they've been somewhat

17   cooperative, and we think that once we have the judgment,

18   which we anticipate we will get in England, we'll get much

19   more cooperation from them.

20             Right now we haven't had the cooperation that

21   we've expected, although we've had many conferences and

22   worked with them.

23             But I do believe that there is ultimately nine

24   figures that will be available to the trustee, which

25   justifies all this activity.

1          And in addition what we're finding is this.  Is

2     that just as a general observation.  While all of the

3     individuals that we sued would suggest to you in their

4     defenses that we didn't know anything, how were we supposed

5     to find out, the SEC couldn't figure it out, how were we,

6     and we were in isolation, we didn't know anything?  What

7     we're actually finding is we continue to develop everyone of

8     these individuals was talking to one another and they

9     actually knew one another and they actually cooperated with

10    one another.  They introduced each other to different funds.

11          So this is not really just one case against

12    Ms. Cohen, it's actually a case that manifested itself in

13    Soretti & Grosso, for example, in the Kinggate funds, we're

14    seeing evidence of them there.  We see them in other funds

15    that are offshore.  All of them were offshore, as Your Honor

16    knows.

17          So we're finding that as we continue this

18    discovery the closeness of all these individuals gets

19    tighter and tighter.

20          So it's not just a question of pursuing assets,

21    and we've obviously had some success in that and we'll

22    continue, but I believe also what we're doing is we're tying

23    together and ticking and tying so much information that just

24    makes the credibility of our case that much stronger.

25          Then Gibraltar what we have there is, Your Honor,

Page 25

1    this has been long running probably from the very beginning,

2    you'll recall that we found $150 million sitting in bank

3    accounts there for Biskia (ph) and related funds.

4         What we've done there is we've frozen those funds,

5    and then as Your Honor will recall, with your assistance, we

6    convinced our adversaries of the value of our default, so

7    they -- the money has actually been transferred to this

8    court and ultimately that trial will take place here.

9         In the meantime we have other defendants there and

10   other monies that we're pursuing and we're seeking to

11   enforce the default judgment, which Your Honor entered here.

12        Most recently the courts in Gibraltar agreed to

13   Enforce, that notwithstanding any recent Rubin decision

14   would seem to suggest otherwise, we were very successful.

15   That case is on appeal now, it was actually just argued this

16   week.  So we're hoping that we will ultimately be successful

17   with the appellate body.

18        The reports I have is that, although you can't

19   forecast a result, that our arguments went very well and

20   were well received by the panel, so we're very hopeful that

21   in Gibraltar we're actually get really good law for us, that

22   would be very helpful in other cases where we can take

23   defaults and pursue them throughout the commonwealth.

24        Then we have Switzerland, that's very small.  That

25   was the deposition that I eluded to earlier in connection

Page 26

1    with Magnify.  Took the deposition of an individual there

2    who was the lawyer who created the Shasia Horowitz and the

3    Magnify connection.

4            And then last that I'm going to report on here

5    this morning is Browne Jacobson with over 400 hours.

6            They're our conflict counsel, for wont of a better

7    term, in the United Kingdom.  Taylor Wessing is a major

8    international law firm.  Unfortunately we've run into

9    several conflicts with the wide reach of the Madoff case.

10           So Browne Jacobson has come in, they've worked

11   with us on a number of matters, not the -- obviously the

12   Sonja Cohen matter -- but we've had other causes of action

13   there that we're pursuing in connection with Soretti &

14   Grosso as I've said.

15           They've also been our principal bankruptcy counsel

16   there.  It's not one of the strong suits, to be blunt, of

17   Taylor Wessing, but the Browne Jacobson people have been

18   very, very good there and we've worked with Blackstone

19   Chambers as our barrister in connection with those efforts.

20           So that is a brief summary and overview, Your

21   Honor, of what we've been doing at least in the reporting

22   period and continuing to do today.

23           In addition to that of course we have, as I

24   mentioned earlier, our counsel here today --

25           THE COURT:  Before we get to that I just have

1    one --

2              MR. SHEEHAN:  Sure, Your Honor.

3              THE COURT:  -- inquiry based just on the numbers.

4              Taylor Wessing is approaching six million and

5    their expenses are half again the amount of their fees.

6              MR. SHEEHAN:  Yes, Your Honor.

7              THE COURT:  That seems to be somewhat

8    disproportionate.

9              MR. SHEEHAN:  Yes, and there is an explanation.

10             THE COURT:  Please.

11             MR. SHEEHAN:  And the explanation is that the

12   barristers there are treated as an expense, so when you see

13   the expenses that expense is for Pushpinder Saini, and they

14   charge it to us as an expense.

15             Barristers don't bill the way that we do here in

16   the States, they bill with -- to the solicitor, the

17   solicitor bills us, it's treated as an expense.

18             THE COURT:  So the fees essentially are really

19   closer to nine million than --

20             MR. SHEEHAN:  Correct, Your Honor.  That's

21   correct.

22             As I was about to say there's two other firms here

23   this morning that I want to speak about before I get to our

24   own firm, and that is Windels Marx and Young Conaway.

25             And as Your Honor knows the history very, very

Page 28

1   well about Windels' involvement in the case, they've been

2   actively involved in assisting us and have done, as I've

3   said in the past and continues to date, superb work in

4   supporting the efforts of the trustee in recovering assets

5   from many, many defendants.  It's an ongoing activity,

6   continuing even as we speak today, in a matter that will be

7   mediated this afternoon.

8           So this is a firm that has been in the forefront

9   with us throughout this process and has done exemplary work.

10          Along the way of course they themselves developed

11  conflicts, again given the wide reach of Madoff, and we

12  brought Young Conaway in who has been again very, very

13  helpful to us and assisted us in any number of matters which

14  are reported on in our interim report.

15          Then last but not least of course there is the

16  Baker Hostetler application, which is as I said at the

17  outset, our twelfth interim application.

18          We've submitted a very extensive application as

19  well as we've submitted an interim report to Your Honor in

20  the past over the course of this proceeding.  I'm not going

21  to get into detail.  We appear regularly in front of Your

22  Honor, you're aware of what has transpired over the last

23  four and a half years, and certainly specifically during

24  this reporting period.

25          So at this point, Your Honor, given the fact

Page 29

1   there's no opposition, I would ask and move that all of

2   these applications be approved by Your Honor.

3           THE COURT:  Does anyone want to be heard?

4           MR. BELL:  Yes, Your Honor.  Kevin Bell on behalf

5   of Securities Investor Protection Corporation.

6           I want to thank Your Honor for taking my first

7   point, that was Taylor Wessing, because the extraordinary

8   number of hours and the millions of dollars of expenses I

9   was going to address it but Your Honor raised the question

10  and Mr. Sheehan asked that we at SIPC had been very vigilant

11  in looking at international counsel and the extraordinary

12  number of hours and the expenses, and I want to thank

13  Mr. Sheehan for clarifying on the record that Blankstone

14  Chambers' charges as the barrister are included in those

15  expenses, and SIPC has been very vigilant in monitoring

16  those and reviewing them and commenting on them and getting

17  adjustments.

18          As to all the others, Young Conaway, Greenfield,

19  Wendels, and Baker, again, this is a no asset case.  SIPC

20  takes the responsibility of monitoring these very seriously,

21  and as you will see that monitoring continues even after the

22  applications are filed, and there was a further adjustment

23  with regard to Baker's application, which is noted in the

24  SIPC recommendation.  And I just wanted to make sure that I

25  note to the Court that there is an adjustment that was made

1    after Baker filed, which is noted in paragraphs 4 and 5 of

2    the SIPC recommendation on Baker -- Baker Hostetler's

3    application.

4              Again, it's a no asset case, the SIPA statutory

5    provision says that in a no asset case the Court is required

6    to accept SIPC's recommendation where the numbers agree.

7    Baker has agreed with our further adjustment, but I believe

8    that even if there were -- this was a no asset case and the

9    Court went through its normal processes that I feel

10   confident the Court would look at SIPC's recommendation and

11   instead of taking it as a mandatory acceptance would find

12   that the oversight that we've looked at and the results

13   where we've come to with Wendels, Taylor Wessing, and Baker

14   would be exactly where the Court would come.

15             This is a massive case, and as Mr. Sheehan's

16   explanation shows everything is connected.  And, you know,

17   when you get to Magnify and Israel you wind up with one of

18   the good faith actions in France.  Same person set up both

19   entities.

20             So you watch the connections, you watch Ms. Cohen

21   wandering through even a new jurisdiction, Australia, and

22   I'm sure we'll be recommending to the Court a retention of a

23   special counsel down under, and you know, there are more

24   aspects of this case coming forward.

25             THE COURT:  I predict you may end up possibly in

```
 1   New Zealand as well.

 2            MR. BELL:  Maybe Popular New Guinea, who knows.

 3   But somewhere down in that area of the world.  If she's in

 4   one country we have found Ms. Cohen winds up popping up

 5   other places.  It's like whack a mole.

 6            But to get back to the matter at hand, we, SIPC,

 7   recommends strongly that this Court approve these fees and

 8   we thank the Court for its time.

 9            MR. SHEEHAN:  Your Honor, if I may, just one thing

10   I did overlook that Mr. Bell reminded me of it.

11            There is a reduction that took place.  After we

12   Filed, had further discussions with SIPC, and we effectuated

13   further reductions to the specific month of April, and the

14   reduction is in the amount of $33,572.70 in fees, and in

15   disbursements, $1,112.91.  That has been reflected in the

16   order that I prepared and can submit to Your Honor this

17   morning.

18            THE COURT:  Does anyone else want to be heard?

19            Well, as in everything in this case the scale is

20   incredibly broad, both with respect to the worldwide

21   implications and jurisdictions, which bring a huge amount of

22   jurisdictional complexity, territorial push back on the part

23   of the -- I can't even say hundreds -- I presume we're even

24   getting into potentially thousands of parties who have an

25   incentive to push back, and we're on a scale of beyond
```

Page 32

1    billions that are involved here.

2          The efforts by the trustee and counsel here have

3    been -- I won't say happily -- have been substantially

4    productive.

5          I don't know how long it's going to take to wind

6    everything down, but certainly we're getting into a more

7    hardball of viewability of where some ultimate economic

8    resolution can take place on the part of all the parties

9    that are involved.

10          Somewhere along the line everybody is going to be

11    having to say enough is enough, we've spent enough, but

12    nevertheless, when we are dealing with such a high amount of

13    billions and we're also dealing in a situation where this is

14    not a traditional bankruptcy estate where the estate itself

15    suffers the expense of all the fees SIPC under 78(b)(5) and

16    so forth puts the Court in the position of almost being

17    required to approve the fees that are requested and provided

18    that its convinced it's been appropriate oversight by SIPC.

19          I am absolutely convinced that that is the case

20    here.

21          There does not appear to be any chance at this

22    point in time for recovery of the fees that have been laid

23    out so far.

24          So under the circumstances and as before the Court

25    will follow the statute which says must, but I agree with

Page 33

1    counsel for SIPC, that if you took an overall look at the

2    amount of work that's been put in, the recoveries that have

3    been had so far, and the potential for many more recoveries

4    coming forward that the fees that are requested are

5    definitely not out of line.

6          I'm also aware that the new period coming up is

7    probably going to be as heavy as the one we've just seen

8    because of all the very heavy activity both here in the

9    United States and in other jurisdictions where decisions

10   both pro and adverse are continuing to be litigated and

11   appealed with interesting kinds of reactions and success.

12          I'm also aware that based upon some of the

13   decisions that have come down recently that there's going to

14   be a new flurry of litigation here before me, and certainly

15   my opinion that is now on its way up to the circuit, I hope,

16   on the time value of money will generate even more activity

17   here.

18          So it's unfortunate that this case is really

19   becoming such a huge case for generation of fees, but

20   hopefully they, as opposed to many other situations, will

21   reflect on recoveries to victims and those entitled to a

22   recovery alike as opposed I understand to some of the other

23   Ponzi cases that are winding their way where many, many

24   millions of dollars of fees are generated with very little

25   results for that.

Page 34

1               The applications are approved.

2               MR. SHEEHAN:  Your Honor, may I approach with the

3     order?

4               THE COURT:  Sure.

5               THE COURT:  I've approved the order.

6               MR. SHEEHAN:  Thank you very much, Your Honor.

7               MR. BELL:  Your Honor, thank you.

8         (Whereupon these proceedings were concluded at 10:17

9     AM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 35

1                           I N D E X

2

3                           RULINGS

4                                              Page      Line

5     All Fee Applications                      31        19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3      I, Dawn South, certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5

6      Dawn           Digitally signed by Dawn South
                      DN: cn=Dawn South, o, ou,
                      email=digital1@veritext.com,
                      c=US
       South          Date: 2013.10.18 12:40:07
7                     -04'00'

8      AAERT Certified Electronic Transcriber CET**D-408

9

10     Veritext

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  October 17, 2013

16

17

18

19

20

21

22

23

24

25