Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-01789-brl

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   SECURITIES INVESTOR PROTECTION CORPORATION,

8                   Plaintiff,

9

10  v.

11

12  BERNARD L. MADOFF, INVESTMENT SECURITES, LLC.,

13                  Defendant.

14  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

15                  United States Bankruptcy Court

16                  One Bowling Green

17                  New York, New York

18

19                  December 17, 2013

20                  10:03 a.m.

21

22  B E F O R E :

23  HON BURTON R. LIFLAND

24  U.S. BANKRUPTCY JUDGE

25

Page 2

1    (cc-5584) Windels Marx Lane & Mittendorf, LLP Twelfth

2    Application for Allowance of Interim Compensation for

3    Services Rendered and Reimbursement of Actual and Necessary

4    Expenses Incurred from May 1, 2013 through July 31, 2013 and

5    Request for Partial Release of Holdback for Windels Marx

6    Lane & Mittendorf, LLP, Special Counsel, period: 5/1/2013 to

7    7/31/2014, fee: $1,590,346.00, expenses: $7,737.22

8

9    (cc-5567)  Schiltz & Schiltz as Special Counsel to the

10   Trustee Application for Allowance of Interim Compensation

11   for Services Rendered and Reimbursement of Actual and

12   Necessary Expenses Incurred from May 1, 2013 through July

13   31, 2013 for Schiltz & Schiltz, Special Counsel, period:

14   5/1/2013 to 7/31/2013, fee: $65,470.66, expenses: $4,255.59

15

16   (cc-5568) Higgs & Johnson (formerly Higgs Johnson Truman

17   Bodden & Co.) as Special Counsel to the Trustee's

18   Application for Allowance of Interim Compensation for

19   Services Rendered and Reimbursement of Actual and Necessary

20   Expenses Incurred from May 1, 2013 through July 31, 2013 for

21   Higgs, Johnson, Truman, Bodden & Co., Special Counsel,

22   period: 5/1/2013 to 7/31/2013, fee: $70,193.25, expenses:

23   $1,186.90

24

25

Page 3

1    (cc-5569) Soroker - Agmon as Special Counsel to the Trustee

2    Application for Allowance of Interim Compensation for

3    Services Rendered and Reimbursement of Actual and Necessary

4    Expenses Incurred from May 1, 2013 through July 31, 2013 for

5    Soroker-Agmon, Special Counsel, period: 5/1/2013 to

6    7/31/2013, fee: $187,952.44, expenses: $74.34

7

8    (cc-5570) Graf & Pitkowitz Rechtsanwalte GmbH as Special

9    Counsel to the Trustee's Application for Allowance of

10   Interim Compensation for Services Rendered and Reimbursement

11   of Actual and Necessary Expenses Incurred from May 1, 2013

12   through July 31, 2013 for Graf & Pitkowitz Rechtsanwalte

13   GmbH, Special Counsel, period: 5/1/2013 to 7/31/2013, fee:

14   $548,430.68, expenses: $5,068.65

15

16   (cc-5571) SCA Creque as Special Counsel to the Trustee

17   Application for Allowance of Interim Compensation for

18   Services Rendered and Reimbursement of Actual and Necessary

19   Expenses Incurred from May 1, 2013 through July 31, 2013 for

20   SCA Creque, Special Counsel, period: 5/1/2013 to 7/31/2013,

21   fee: $28,090.07, expenses: $20.00

22

23

24

25

1    (cc-5572) Young, Conaway, Stargatt & Taylor, LLP as Special

2    Counsel to the Trustee Application for Allowance of Interim

3    Compensation for Services Rendered and Reimbursement of

4    Actual and Necessary Expenses Incurred from May 1, 2013

5    through July 31, 2013 for Young, Conaway, Stargatt & Taylor,

6    LLP, Special Counsel, period: 5/1/2013 to 7/31/2013, fee:

7    $20,503.80, expenses: $1,555.39

8

9    (cc-5573) Williams, Barristers & Attorneys as Special

10   Counsel to the Trustee Application for Allowance of Interim

11   Compensation for Services Rendered and Reimbursement of

12   Actual and Necessary Expenses Incurred from May 1, 2013

13   through July 31, 2013 for Williams, Barristers & Attorneys,

14   Special Counsel, period: 5/1/2013 to 7/31/2013, fee:

15   $101,219.42, expenses: $0

16

17   (cc-5566) Trustee and Baker & Hostetler, LLP's Thirteenth

18   Application for Allowance of Interim Compensation for

19   Services Rendered and Reimbursement of Actual and Necessary

20   Expenses Incurred from May 1, 2013 through July 31, 2013 for

21   Baker & Hostetler, LLP, Trustee's Attorney, period: 5/1/2013

22   to 7/31/2013, fee: $31,487,024.25, expenses: $810,213.07

23

24

25

Page 5

1    (cc-5574) Taylor Wessing as Special Counsel to the Trustee

2    Application for Allowance of Interim Compensation for

3    Services Rendered and Reimbursement of Actual and Necessary

4    Expenses Incurred from May 1, 2013 through July 31, 2013 for

5    Taylor Wessing, Special Counsel, period: 5/1/2013 to

6    7/31/2013, fees: $3,609,012.69, expenses: $2,056,092.17

7

8    (cc-55834) Kelley, Wolter & Scott, P.A. as Special Counsel

9    to the Trustee Application for Allowance of Interim

10   Compensation for Services Rendered and Reimbursement of

11   Actual and Necessary Expenses Incurred from July 1, 2013

12   through July 31, 2013 for Kelley, Wolter & Scott, P.A.,

13   Special Counsel, period: 7/1/2013 to 7/31/2013, fees:

14   $3,733.20, expenses: $110.00

15

16   (cc-5575) UGGC & Associates as Special Counsel to the

17   Trustee Application for Allowance of Interim Compensation

18   for Services Rendered and Reimbursement of Actual and

19   Necessary Expenses Incurred from May 1, 2013 through July

20   31, 2013 for UGGC & Associates, Special Counsel, period:

21   5/1/2013 to 7/31/2013, fees: $170,393.77, expenses:

22   $4,896.64

23

24

25

Page 6

1    (cc-5576) Triay Stagnetto Neish as Special Counsel to the

2    Trustee Application for Allowance of Interim Compensation

3    for Services Rendered and Reimbursement of Actual and

4    Necessary Expenses Incurred from May 1, 2013 through July

5    31, 2013 for Triay Stagnetto Neish, Special Counsel, period:

6    5/1/2013 to 7/31/2013, fees: $31,993.53, expenses: $221.87

7

8    (cc-5577) Werder Vigano as Special Counsel to the Trustee

9    Application for Allowance of Interim Compensation for

10   Services Rendered and Reimbursement of Actual and Necessary

11   Expenses Incurred from May 1, 2013 through July 31, 2013 for

12   Werder Vigano, Special Counsel, period: 5/1/2013 to

13   7/31/2013, fees: $5,701.15, expenses: $0

14

15   (cc-5578) Greenfield Stein & Senior, LLP as Special Counsel

16   to the Trustee Application for Allowance of Interim

17   Compensation for Services Rendered and Reimbursement of

18   Actual and Necessary Expenses Incurred from May 1, 2013

19   through July 31, 2013 for Greenfield Stein & Senior, LLP,

20   Special Counsel, period: 5/1/2013 to 7/31/2013, fees:

21   $863.10, expenses: $0

22

23

24

25

Page 7

1    (cc-5579) Browne Jacobson, LLP as Special Counsel to the

2    Trustee Application for Allowance of Interim Compensation

3    for Services Rendered and Reimbursement of Actual and

4    Necessary Expenses Incurred from May 1, 2013 through July

5    31, 2013 for Browne Jacobson, Special Counsel, period:

6    5/1/2013 to 7/31/2013, fees: $408,874.01, expenses:

7    $14,836.89

8

9    (cc-5580) Eugene F. Collins as Special Counsel to the

10   Trustee Application for Allowance of Interim Compensation

11   for Services Rendered and Reimbursement of Actual and

12   Necessary Expenses Incurred from May 1, 2013 through July

13   31, 2013 for Eugene F. Collins, Special Counsel, period:

14   5/1/2013 to 7/31/2013, fees: $87,053.58, expenses: $240.10

15

16   (cc-5581) Ritter & Ritter Advokatur as Special Counsel to

17   the Trustee Application for Allowance of Interim

18   Compensation for Services Rendered and Reimbursement of

19   Actual and Necessary Expenses Incurred from May 1, 2013

20   through July 31, 2013 for Ritter & Ritter Advokatur, Special

21   Counsel, period: 5/1/2013 to 7/31/2013, fees: $38,150.06,

22   expenses: $1,851.92

23

24

25

Page 8

1   (cc-5582) Munari Giudici Maniglio Panfili E Associati as

2   Special Counsel to the Trustee Application for Allowance of

3   Interim Compensation for Services Rendered and Reimbursement

4   of Actual and Necessary Expenses Incurred from May 1, 2013

5   through July 31, 2013 for Munari Giudici Maniglio Panfili E

6   Associati, Special Counsel, period: 5/1/2013 to 7/31/2013,

7   fees: $56,337.36, expenses: $201.21

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach, CERT*D-397

1   A P P E A R A N C E S :

2   SECURITIES INVESTMENT PROTECTION CORPORATION (SiPC)

3        Attorneys for Plaintiff

4        805 15th Street, N.W.

5        Suite 800

6        Washington, D.C. 20005

7

8   BY:   KEVIN H. BELL, ESQ.

9

10   BAKER HOSTETLER

11        Attorneys for Irving Picard, Trustee

12        45 Rockefeller Plaza

13        New York, New York 10111

14

15   BY:   IRVING H. PICARD, ESQ.

16        DAVID J. SHEEHAN, ESQ.

17

18   ALSO APPEARING:

19   HOWARD SIMON

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Good morning, all.

 3         (A chorus of good morning)

 4              THE COURT:  Look what the snow can do.

 5    Unbelievable.

 6              THE CLERK:  SiPC v BMIS.

 7              THE COURT:  Where's my -- where's my off button

 8    here?  We got a new system.

 9              (Pause)

10              UNIDENTIFIED SPEAKER:  Turn it down.

11              MR. SHEEHAN:  It's quite all right, Your Honor.

12              Thank you for accommodating us today.

13              THE COURT:  It's not a problem.

14              MR. PICARD:  There are a few people, I think,

15    stuck in the line downstairs.

16              THE COURT:  Shall we give them time, then?

17              MR. SHEEHAN:  Well, the only person who I'm sure

18    would like to be heard is Mr. Bell who is here from SiPC and

19    I understand he's in the line.  So --

20              THE COURT:  All right.  We'll take --

21              MR. SHEEHAN:  I don't know how long it will be.

22              THE COURT:  We'll take second call.

23              MR. SHEEHAN:  Okay.

24              THE COURT:  Fifteen -- 15 minutes.

25              MR. SHEEHAN:  Okay.  Fine, Judge.  All right.
```

Page 11

1    Thanks.

2            THE COURT:  Is it possible to make an announcement

3    downstairs that anybody waiting for this hearing could be

4    brought forward?  Contact the guards.

5            UNIDENTIFIED SPEAKER:  I'll --

6            THE COURT:  Yeah.

7            (Recess taken at 10:05 a.m.; resume at 10:13)

8            THE CLERK:  SiPC v BMIS.

9            MR. SHEEHAN:  Good morning, Your Honor.  David --

10           THE COURT:  Good morning, Mr. Sheehan.

11           MR. SHEEHAN:  -- Sheehan on behalf of the trustee

12    from Baker & Hostetler.

13           THE COURT:  Can we have appearances?

14           MR. PICARD:  Irving Picard, the trustee.

15           MR. BELL:  Kevin Bell from the Securities Investor

16    Protection Corporation.

17           MR. SIMON:  Howard Simon from Windels Marx.

18           MR. SHEEHAN:  Thank you, Your Honor.

19           Your Honor, first of all, thank you very much for

20    this accommodation seeing us here to -- on special notice

21    here this morning.  I know that in the past what I've done

22    is, is gone through a recitation of the work done by a

23    number of the law firms internationally that have worked for

24    us and, aside from one significant event which took place

25    during the reporting period, I thought today I would forego

1    that and actually talk more about what the trustee's counsel

2    has been doing and what's been happening in the major cases

3    that it is handling together with Windels Marx who has been

4    working with us hand in hand in most of those cases, if

5    that's all right with Your Honor?

6              THE COURT:  Sure.

7              MR. SHEEHAN:  So starting first, of course, in the

8    international arena there was, as Your Honor is well aware,

9    an event that took us, quite honestly, somewhat by surprise,

10   and that is, is that we tried Sonja Kohn matter in the

11   United Kingdom, tried it for six weeks without a jury before

12   Judge Popplewell.  He then rendered a decision sometime in

13   early October in which he found for the defendants and did

14   find against in that case not the trustee, but Stephen Akers

15   who is the liquidator for MSIL in London and found that

16   Sonja Kohn was, indeed, a legitimate business woman who was

17   entitled to receive these payments, notwithstanding the

18   allegations and proofs of the -- of the liquidator, Mr.

19   Akers, to the effect that the company was insolvent, which

20   we thoroughly proved, we thought, through the auspices of

21   FTI.

22             Mr. Popplewell or Judge Popplewell did his own

23   analysis.  There was no contest of the solvency, no expert

24   presented in -- against it.  In fact, it was not challenged.

25   But he, on his own, found the company to be solvent by

Page 13

1    reviewing the records and found $38 million that was, in

2    fact, not proven to be stolen money among the hundreds and

3    hundreds of millions of dollars that we did prove to be

4    stolen, billions to be exact, and said, therefore, it was

5    solvent from his perspective.

6           Once he made that finding the rest that flowed

7    from that made it very difficult for us, as Your Honor can

8    surmise, in the sense that the ratification of what was an

9    order from the owner of the company, Mr. Madoff, who he

10   found to be someone who at that time they could rely upon as

11   having sound business judgment and, therefore, he could,

12   therefore, go ahead and pay these payments to Sonja Kohn if

13   he wished to because it was his company.

14          And I can tell you this, that the legal industry

15   in the United Kingdom is royaling with this judgment as to

16   what the responsibilities are for directors at this point

17   because this seems to give them a free reign to do anything

18   they damn well pleased want.

19          So we've looked at that very, very carefully.  We

20   actually had what I refer to euphemistically as a cold silk

21   (sic) look at it, meaning that we've had a member of the

22   Queen's bench who is a silk look at it, Robin Ditcher (ph)

23   who is a very, very talented foremost bankruptcy lawyer in

24   the United Kingdom, a barrister, and he looked at it and

25   gave us the opinion that while it was challengeable, it

Page 14

1    would be very, very difficult for us to succeed on appeal

2    given the findings of the Court, given the fact that the

3    Court was both the fact-finder as well as the arbiter of the

4    law.

5           That being the case and it being a very, very

6    narrow ruling, we were seeking there only the monies paid to

7    Sonja Kohn in return for what were supposed to be reports,

8    financial analysis and reports that she would develop for

9    them and then assist MISL as well as BLMIX (sic).

10          We had an expert testify that they were valueless

11   and that they were plagiarized and he said, well, that was

12   up to Mr. Madoff to decide.   If -- he didn't disagree they

13   were plagiarized.  He simply thought, the Court, that if Mr.

14   Madoff wanted to pay for plagiarized material that was his

15   business.

16          So it was a very, very interesting outcome for us.

17   It was kind of a bizarre ruling to say the least.  But that

18   being the case, I must admit to you that while it was

19   difficult for us to arrive at the conclusion not to take the

20   appeal, we did decide to do that.  We have preliminarily,

21   through Mr. Aker's has paid some of the counsel fees there.

22   I don't think it will have any impact on the estate here.

23   It will impact the monies that would have otherwise been

24   distributed to Mr. Picard by MSIL because they'll be

25   diminished as a result of these fees being paid.

Page 15

```
 1              But, overall, the impact on us; that is, the cases
 2      that we have here before Your Honor, the cases that we're
 3      prosecuting throughout Europe -- for example, we've already
 4      been in contact with the Liechtenstein, Luxembourg and
 5      Austrian officials, all of whom consider the decision, to
 6      put it mildly, an outlier.  They're not relying upon it at
 7      all.  They don't see it as persuasive and they don't
 8      understand how the Court reached the result it did.
 9              So having said all that, though, that that kind of
10      a bizarre detour as it were, and I use that term advisably,
11      in the middle of this five-year litigation has been
12      something of an interesting time for us.  But at the end of
13      the day, we've made, I think, the considered and correct
14      judgment that what we should do here is just move on.  We
15      will continue with our litigation.
16              We have already been and we have lawyers right now
17      in Vienna working with the Austrian authorities because the
18      target there ultimately, as Your Honor well knows from the
19      pleadings that we file, is not Sonja Kohn, but her as the go
20      between for Bank of Austria, Bank Medici, in which she was
21      the 75 percent owner and Bank of Austria was the 25 percent
22      owner, and then after that, of course, UniCredit who
23      ultimately, a bank in Italy, that ultimately owns Bank of
24      America and whose tenure most of the fraudulent transfers
25      took place.
```

1          So while it has something of an impact on the

2     estate generally, it's de minimis, but only in -- in that

3     legally we do not believe after analysis that we will have

4     any problems with it.  Although I do believe, as I think

5     Your Honor well understands, that you will hear about it.  I

6     don't doubt that some of our colleagues -- I've heard

7     already from some of the attorneys here -- that how could we

8     possibly move forward now in light of these issues with

9     regard to certain defendants.

10         Again, that's ultimately for Your Honor to decide.

11    It's the trustee's position that this should have no impact

12    whatsoever and ultimately, if those issues are raised, we'll

13    litigate them before Your Honor and Your Honor will decide

14    what impact there really is going to be had here.

15         So that was the major event in Europe.  The rest

16    of the events that took place over there were more or less

17    routine, if anything is routine in the Madoff matter,

18    meaning that there was continuing ongoing investigations

19    throughout those jurisdictions.  The trustee, other than the

20    setback in the United Kingdom, has been successful in every

21    other arena in terms of moving forward and working

22    cooperatively with the authorities.

23         There is no trial scheduled in Europe at this

24    point that will take place before any further trials will

25    take place here, which we fully anticipate will happen this

Page 17

1    year, which is this year being -- I'm sorry -- 2014, which

2    is probably a good segway into what the trustee is actually

3    and Baker & Hostetler have been doing during the reporting

4    period.  And I may step outside out that a little bit just

5    to complete a thought.

6          But what we've been doing since Judge Rakoff

7    issued his rulings earlier on in the case in Katz Wilpon and

8    some of its progeny and he decided that the standard of --

9    or proof of good faith would involve actual intent; that we

10   have to prove not a actual -- that they had actual intent --

11   actual intent meaning that they had knowledge of the fraud

12   where some have argued knowledge of a Ponzi scheme.

13         So he gave us guidelines, as Your Honor will

14   recall, because in that decision that he rendered he gave us

15   guidelines in the sense that he reviewed our Cohmad

16   complaint and he found a Cohmad complaint, thereby

17   implicitly without overtly stating, that it's a pleading

18   standard.  He found that the Cohmad complaint withstood the

19   analysis of what was required in order to allege actual

20   intent.

21         And if you read the Cohmad complaint it talks

22   about Cohmad complaint -- it talks about intent in terms of

23   knowledge of a fraud.  We never mentioned Ponzi scheme in

24   that complaint.  So if that withstood the challenge, we

25   believe that the standard is actual knowledge of the fraud.

Page 18

1              THE COURT:  Interestingly, in today's media

2      there's an essay by Judge Rakoff where he seems to extol the

3      concept of willful blindness.

4              MR. SHEEHAN:  I understand that.  Well, and we

5      found other decisions by Judge Rakoff that equates willful

6      blindness with actual intent.  So I think it's going to be

7      an interesting journey as we move forward because I -- as

8      Your Honor knows, and I don't want to step on that here, but

9      there is already a motion before Your Honor seeking to

10     dismiss one of our complaints based on that standard.  It's

11     -- it will be -- it's not already fully briefed, it -- I

12     think it is actually.

13             But, in any event, what we've been doing is this.

14     And a lot of the effort of the trustee and his counsel were,

15     in all of the cases that we have that allege bad faith, have

16     been amending the complaints.  Throughout the three or four

17     years leading up to that decision, we were doing a lot of

18     discovery.  We were discovering third parties.  We were

19     actually engaging in some 2004s with regard to even the

20     parties themselves with regard to issues that we could

21     proceed with.

22             As Your Honor will recall, Your Honor found that

23     very SiPC case in which 2004s can go forward even though

24     litigation has been instituted if you're going with regard

25     to a third party who has not been joined to the litigation

Page 19

1    as yet.

2            So we've been doing all of those things and

3    amending all of the complaints internally in full

4    anticipation that we will either have to do it by way of a

5    motion made to dismiss and, therefore, have to upgrade, if

6    you will, our complaints, or we will do them voluntarily.

7    You will start to see, as we did in Merca (sic), we had

8    filed the complaint and then the motion to dismiss was

9    filed.

10           We anticipate that there will be a good deal of

11   motion practice that will take place with regard to that and

12   we're fully prepared for it because we've been working very,

13   very hard to amend our complaints and get them ready.

14           In addition, we've re-crafted a lot of our

15   discovery.  As Your Honor might suspect, because of the

16   motion to withdraw the reference practice that took place

17   starting in 2011 and all through 2012 into 2013, we were

18   slowed down quite a bit with regard to obtaining discovery

19   in any number of matters.  But that didn't stop us from

20   pursuing discovery in many, many cases and we have been

21   doing that.

22           A good deal of it has been third party discovery

23   because, as Your Honor well knows, once it reached the

24   recipient or the defendant in any of these cases -- and this

25   is another area we've worked very hard on -- there are going

Page 20

1    to be a lot of subsequent transferees and there are a number

2    of subsequent transferee actions that we've already brought,

3    and there may even still be some that we are yet to bring

4    because we have not a -- made the initial avoidances yet.

5            But the difficulty there is is that in this

6    instance many of the people that are on the subsequent side

7    are nominees.  We're not looking at the actual recipitier

8    (sic) or the ultimate person who is going to get the money.

9    So we are penetrating through those nominees.  That's true

10   with Kingate, for example.  That's true in a number of other

11   areas.  It was true, for example, in Embest (ph) which we

12   settled with.

13           So the hurdles here aren't your normal hurdles of

14   just chasing the money and getting banks to give you all of

15   the transfers.  We do do that and we are not only going

16   through a number of Rule 45 subpoenas to banks to get all of

17   those records, we are also sending preservation letters out

18   because as time has progressed we've lost time due to the

19   motions to withdraw the reference.  We're concerned about

20   bank records.  And although there should be holds on all of

21   these records, we're not relying up on that.  We're reaching

22   out to all the banks, making sure that the banks preserve

23   records with regard to all of these transactions because in

24   order to prove them, having those bank records will be of

25   great assistance to us.

1          So you can see we're operating on many fronts here

2     with regard to all of these cases.  And when people look at

3     our efforts and they question, well, why are you spending

4     this much time and money, it's the multiples that are

5     involved here.  Every one of these cases involves hundreds

6     of millions if not billions of dollars.  They are adequately

7     defended, to put it mildly, by all of their, you know,

8     esteemed counsel and they are not going to just simply turn

9     over everything to us.  It's been quite the battle on each

10    of these fronts.

11         And we've been trying to resolve as many of them

12    because I know that's Your Honor preferences, as it is with

13    most courts, not to have to handle these discovery disputes.

14    And we've been pretty successful, by and large, in most of

15    them, including recently Your Honor's entry of the order

16    with regard to the data room, third party data room, which

17    is going to, I think, be a very innovative tool.  We'll save

18    a lot of time and money, and we spent a lot of time during

19    the reporting period putting that together and negotiating

20    with all the parties that were involved, a myriad

21    objections.  As Your Honor can imagine, just the creative

22    imagination of lawyers to find an objection to a discovery

23    procedure knows no bounds.

24         So they -- we dealt with all of those.  And then

25    we obviously filed the order.  The order has now been

Page 22

1   entered.  We're in the process of setting that up because

2   next year, as I said earlier, is going to be an incredible

3   year in terms of discovery, motion practice and in some

4   instances, as Your Honor knows, we've already schedule a

5   trial in the good faith cases with Your Honor, the MUUS

6   case.  We fully anticipate that that hopefully will become

7   the standard by which we can then craft mediations and

8   resolve the balance of those cases.

9           We have been engaging with a collective group, if

10  you will, of good faith defense counsel to try to craft and

11  we'll try to bring to Your Honor a coordinated calendar so

12  that we can operate in a way that everyone is aware of

13  what's transpiring.

14          That with regard to even the motion practice that

15  is currently before Your Honor through Ms. Chapeman (ph)

16  that what we try to do there -- and I've reached out to

17  defense counsel.  I would like not to have Your Honor or

18  ourselves have to deal with this on a repeated basis.  There

19  should be a way to bring everyone to this forum now so that

20  once this is decided we can move forward with these cases

21  and have all these issues behind us, save for whatever

22  appeal may take place.

23          All that is happening, but that is, as I said

24  earlier I'm stepping outside the reporting period, that's

25  more so happening today.  But, nonetheless, is a direct

Page 23

1    derivative of what we were doing during the reporting period

2    time and that is knowing that eventually the motions to

3    withdraw the reference in Judge Rakoff's decision would be

4    handed down based upon his Stern Marshall decision that they

5    would be coming to you, and that, therefore, we should be

6    prepared for trial.  And that's what we've been doing and

7    spending an enormous amount of time doing that and working,

8    you know, as I say, very cooperatively with most of the

9    defense counsel to get all of these things ready.

10           Throughout that process, Windels Marx has been our

11   right hand.  There is no question that they have done a

12   superb job here with regard to all the cases that they have.

13   We are in daily communication with them.  We share a great

14   deal of information, still abiding, of course, by whatever

15   conflict walls that we need to have engaged because of their

16   work for us in matters for which we have a conflict.  But

17   there are matters that they work on.

18           For example, we have all these leverage cases that

19   I know Your Honor's familiar with, but just quickly they are

20   the cases where banks, such as Nomura and brokerage houses

21   such as Merrill Lynch and Citi and others, and JPMorgan for

22   that matter, created structured products that they should to

23   their high net worth individuals and then took those

24   products and invested them in places like Fairfield on a

25   three for one basis, either as notes or derivatives or

Page 24

1    swaps.

2              And these are very complicated transactions

3    involving, again, hundreds of millions of dollars.  We've

4    sued all of those banks for those transactions to get those

5    redemptions back because, as Your Honor will recall, very

6    startlingly in the JPMorgan matter they redeemed in October,

7    all right, at the same time they filed their SARS report

8    that they were aware of illegal activity in the UK.  So

9    needless to say we think we have a strong case with regard

10   to that redemption.

11             But the point is is that that kind of activity was

12   not unique.  It's ripe throughout all of these structured

13   products, but they're difficult cases, difficult because of

14   the sophistication of the investment products that were

15   involved and because of the fact that they went through

16   several layers to go through all of that.

17             So, in particular, Mr. Simon, who is here in court

18   today, is heading up several of those leverage cases, even

19   though there's no conflict that we have with regard to it

20   because we need the skill and support of that firm to make

21   that happen.  And it's been invaluable to us and to the

22   estate and obviously to the trustee.  So that the combined

23   effort of both of these firms has been, you know, towards

24   bringing these cases to the floor.

25             Along the way, as Your Honor knows, we have,

Page 25

1    remarkably enough, notwithstanding, you know, the if you

2    will haze that may have been created by the motions to

3    withdraw the reference and the lack of clarity, we have

4    still managed a number of settlements.  Some of them smaller

5    like Beacon Andover or larger like Maxum.  But each of these

6    represents -- you know, I say smaller and yet, you know, it

7    was over $20 million in Beacon Andover.  There used to be a

8    day when you would say you had a $20 million settlement and

9    it was a very nice settlement.  You were very proud to bring

10   that, and we are proud to bring that to the Court.

11           But at the same time when you look at that

12   compared to the others that we've managed to achieve, it

13   does look smaller, but at the same time very significant

14   that it happens because what is also going on during the

15   reporting period is this, is that because of the relentless

16   work of the trustee and his counsel and those whose support

17   it like Windels Marx, I think we've been able to maintain

18   the credibility of the trustee and the viability of all of

19   his causes of action, notwithstanding the attacks that have

20   been taken upon him in the Federal District Court in a lot

21   of the motions to withdraw the reference.

22           I think the recent decisions by Judge Rakoff also

23   vindicate the narrative created by the trustee.  The trustee

24   has taken the narrative throughout that what has gone on

25   here is totally consistent with the Bankruptcy Code and the

Page 26

1    law before it.  I think the recently antecedent debt

2    decision and the five -- and the subsequent transferee

3    decision or 550 decision by Judge Rakoff proves that because

4    if you read both of those decisions they are very

5    traditional decisions of bankruptcy law, which is what we

6    always said ultimately would win out here.

7            And so that narrative has -- that has sustained us

8    throughout this process is recognized by our adversaries and

9    continues to be a very strong part of what we do every day

10   in terms of trying to advance the cases.  It's in our

11   interest to close these cases as quickly as possible.

12           I should report to Your Honor, for example, that

13   on time based damages, notwithstanding your efforts and

14   ours, the Second Circuit has not as yet acted on our ask for

15   -- our request for a direct appeal, even though I'm told we

16   have very good papers there.  Your Honor and counsel acted

17   promptly.  But we can't control those things.

18           But what we can do is do things as efficiently and

19   as quickly as possible, keep the pressure on, and which I

20   think we do across many, many fronts every day.  This is

21   what I call to my colleagues a five-year TRO.  It never

22   stops.  Every day there's something going on and something

23   happening, and we're expected to respond to it.  Even now,

24   even though it's outside the reporting period, there's a

25   very public ongoing criminal trial.  We work and assist the

Page 27

1    U.S. Attorney in that matter every day.

2            So we're there assisting and providing support

3    logistically, witnesses such as Bruce Dubinsky who we spent

4    many, many hours and many, many dollars preparing because

5    this is a very difficult analysis.  It may look simple at

6    the conclusion, but going through the process is very, very

7    significant.

8            So I wanted to this morning, Your Honor -- as I

9    said, a lot of this, as Your Honor well knows, is laid out

10   in our interim reports and obviously in the current fee

11   application.  But I thought in the past when I have dwelled

12   on the international aspects of this case it might look as

13   though I was overlooking what we do here in the United

14   States.  And it is a significant effort, as I say, every

15   day.

16           So I wanted to submit that to Your Honor together

17   with all of the international applications and those of

18   Windels Marx.

19           And now I would like to turn the podium over to

20   Mr. Bell for his comments with regard to the applications

21   before Your Honor.

22           Thank you, Your Honor.

23           THE COURT:  With respect to -- Mr. Sheehan --

24           MR. SHEEHAN:  Yes.

25           THE COURT:  Excuse me a minute.

1          MR. SHEEHAN:  Yes, Your Honor.

2          THE COURT:  -- to the time based damages

3     certification to the circuit, I assume you've been joined

4     with the parties on the other side with respect to --

5          MR. SHEEHAN:  Yes.  It's a collective effort.

6          THE COURT:  Yeah.  I wonder how or where in the

7     circuit is -- that there's $1.4 billion --

8          MR. SHEEHAN:  It was prominently mentioned in our

9     papers that this is a significant -- that, for example, it's

10    a ten-cent swing weaving up from 43 to a 53 cent

11    distribution if we did not have the reserve.  And we told

12    them that.

13         THE COURT:  Does the circuit procedure include a

14    meeting with the -- there used to be some meeting with a --

15         MR. SHEEHAN:  Well, Your Honor --

16         THE COURT:  -- a committee?

17         MR. SHEEHAN:  -- (indiscernible) because just

18    yesterday I talked to defense counsel about setting up a

19    call with our case manager to do just that, so that we can

20    bring it to their attention like -- as -- without being

21    disrespectful asked our case manager, can we have a

22    conference so that we can see where this is and that we can

23    keep it moving.

24         THE COURT:  Very well.  Thank you.

25         MR. SHEEHAN:  Thank you, Your Honor.

1          MR. BELL:  Good morning, Your Honor.  Kevin Bell

2    for SiPC.

3          THE COURT:  Sorry for the interruption, Mr. Bell.

4          MR. BELL:  We -- excuse me, Your Honor.

5          THE COURT:  I said sorry for the interruption.

6          MR. BELL:  Oh, no problem, Your Honor.

7          SiPC has filed its recommendations in support of

8    the international foreign special counsel, Windels, Marx;

9    Young, Conaway; the Kelley firm, and the Greenfield firm.

10   And I think they speak for themselves.

11         One point on Windels is that SiPC wholeheartedly

12   supports the reduction of the holdback that's been kept back

13   at our request in the Court's order by 50 percent at this

14   time because we do believe, as Windels said, it becomes

15   burdensome for a firm that size to have that large sum of

16   money withheld.  And SiPC supports an entry of an order

17   reducing that holdback at this time.

18         And we echo Mr. Sheehan's comments about the

19   excellence of the work by the Windels firm throughout and,

20   particularly, Mr. Simon.

21         As to the Baker Hostetler revised recommendation,

22   we filed -- some lawyer at SiPC, namely myself, forgot to

23   talk about the reduction of the holdback in the first

24   recommendation, so we filed one that afternoon after I

25   realized my error.  SiPC, as in paragraph 4 you will see

Page 30

1    that even after the applications were filed by Baker on or

2    about November 21st, we continued our review and we

3    requested additional adjustments which you will see in the

4    submission by Baker of the proposed order and the

5    attachment.

6           The ultimate reduction by Baker is approximately

7    14.73 percent from the standard fees they would charge.

8    This reduction includes the voluntary ten percent reduction

9    which all counsel for the trustee have agreed to throughout

10   this case, including all the applicants here.

11          SiPC supports the application and also with regard

12   to Baker the reduction of the holdback by 25 percent at this

13   time which equals a little more than $8.7 million in a

14   reduction of the holdback.

15          SiPC, as you know, on every one of these

16   applications -- and this is the thirteenth by Baker

17   Hostetler -- spends a good deal of time at many levels by

18   SiPC lawyers, myself included, in discussions with Mr.

19   Sheehan with regard to adjustments, comments, and monitoring

20   of what is going on, and we participate regularly in

21   discussions going forward.  And, in fact, I was talking to

22   my general counsel late yesterday evening about the issue

23   you just brought up about time based damages, and she says,

24   isn't it time enough for the circuit to set something.

25          So, you know, it's something that's there on our

Page 31

1    mind because it does -- it does keep a significant sum of

2    money out of the customers' hands.  And, you know, Your

3    Honor, when we started this case not many people thought we

4    would get more than two cents back to the customers and SiPC

5    would really appreciate getting that time based damages

6    decision that you issued affirmed by the circuit and, if

7    need be, a petition for cert denied by the Supreme Court so

8    that we can get that substantial sum of money into the hands

9    of the victims.

10            And so I will conclude by asking Your Honor to

11   enter the orders that have been submitted to you at this

12   time.  And any questions you would wish, Your Honor, I can

13   try and answer.

14            THE COURT:  Thank you, Mr. Bell.

15            MR. BELL:  Thank you, Your Honor.

16            THE COURT:  Anyone else want to be heard?

17            Well, as Mr. Bell pointed out, this is what, the

18   thirteenth --

19            MR. BELL:  Thirteenth.

20            THE COURT:  -- application.  The ruling is based

21   upon the law which in the case on the trustee's fees and the

22   fees that are also ancillary here, the Court has almost no

23   discretion.  There are a series of shalls (sic) in SIPA

24   78(eee)(b)(5)(a) and (c) which give the Court no discretion

25   when certain factors align themselves, and that is that the

Page 32

1  allowances to be paid by SiPC, without reasonable

2  expectation of recoupment, there is -- and there's no

3  difference between the amounts requested and the amounts

4  recommended by SiPC, the Court shall -- and shall in caps --

5  award the amounts recommended by SiPC.

6          All of those factors have lined up here.  The

7  Court, even if it had to go back beyond 1978 when the Court

8  did have discretion, probably under and I assume under every

9  factor that I've seen before me would not challenge the fees

10  that are requested here.  I recognize the enormous amount of

11  effort and I also recognize the very substantial recoveries

12  that have been the sequela (sic) from that effort.

13          Accordingly, and in accordance with the

14  recommendations of SiPC, the voluntary discounts and the

15  requests for partial release of the holdbacks, I do grant

16  those requests.

17          MR. SHEEHAN:  Thank you.  Thank you, Your Honor.

18          THE COURT:  Submit an appropriate order.

19          MR. SHEEHAN:  Yes, we will, Your Honor.

20      (A chorus of thank you)

21          MR. SHEEHAN:  And thank you again for

22  accommodating us today.

23          THE COURT:  The snow let us all get here today.  I

24  don't know if it will let us get out of here, but --

25      (Laughter)

Page 33

1          MR. SHEEHAN:  Yeah.  Well, we all should leave

2    shortly.

3          THE COURT:  Thank you, all.

4          MR. PICARD:  Thank you, Your Honor.

5       (Whereupon these proceedings were concluded at 10:43

6    a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 34

```
 1                         I N D E X

 2

 3                         RULINGS

 4    DESCRIPTION                           PAGE      LINE

 5    (cc-5584) Windels Marx Lane & Mittendorf,

 6    LLP Twelfth Application for Allowance of

 7    Interim Compensation for Services Rendered

 8    and Reimbursement of Actual and Necessary

 9    Expenses Incurred from May 1, 2013 through

10    July 31, 2013 and Request for Partial

11    Release of Holdback for Windels Marx Lane

12    & Mittendorf, LLP, Special Counsel, period:

13    5/1/2013 to 7/31/2014, fee: $1,590,346.00,

14    expenses: $7,737.22                      32        13

15

16    (cc-5567)  Schiltz & Schiltz as Special

17    Counsel to the Trustee Application for

18    Allowance of Interim Compensation for

19    Services Rendered and Reimbursement of

20    Actual and Necessary Expenses Incurred

21    from May 1, 2013 through July 31, 2013

22    for Schiltz & Schiltz, Special Counsel,

23    period: 5/1/2013 to 7/31/2013, fee:

24    $65,470.66, expenses: $4,255.59          32        13

25
```

```
 1                      I N D E X

 2

 3                        RULINGS

 4     DESCRIPTION                          PAGE      LINE

 5     (cc-5568) Higgs & Johnson (formerly Higgs

 6     Johnson Truman Bodden & Co.) as Special

 7     Counsel to the Trustee's Application for

 8     Allowance of Interim Compensation for

 9     Services Rendered and Reimbursement of

10     Actual and Necessary Expenses Incurred

11     from May 1, 2013 through July 31, 2013

12     for Higgs, Johnson, Truman, Bodden & Co.,

13     Special Counsel, period: 5/1/2013 to

14     7/31/2013, fee: $70,193.25, expenses:

15     $1,186.90                             32        13

16

17     (cc-5569) Soroker - Agmon as Special Counsel

18     to the Trustee Application for Allowance of

19     Interim Compensation for Services Rendered

20     and Reimbursement of Actual and Necessary

21     Expenses Incurred from May 1, 2013 through

22     July 31, 2013 for Soroker-Agmon, Special

23     Counsel, period: 5/1/2013 to 7/31/2013,

24     fee: $187,952.44, expenses: $74.34       32        13

25
```

Page 36

1                        I N D E X

2

3                           RULINGS

4     DESCRIPTION                              PAGE      LINE

5     (cc-5570) Graf & Pitkowitz Rechtsanwalte

6     GmbH as Special Counsel to the Trustee's

7     Application for Allowance of Interim

8     Compensation for Services Rendered and

9     Reimbursement of Actual and Necessary

10    Expenses Incurred from May 1, 2013 through

11    July 31, 2013 for Graf & Pitkowitz

12    Rechtsanwalte GmbH, Special Counsel,

13    period: 5/1/2013 to 7/31/2013, fee:

14    $548,430.68, expenses: $5,068.65            32        13

15

16    (cc-5571) SCA Creque as Special Counsel

17    to the Trustee Application for Allowance

18    of Interim Compensation for Services

19    Rendered and Reimbursement of Actual and

20    Necessary Expenses Incurred from May 1,

21    2013 through July 31, 2013 for SCA Creque,

22    Special Counsel, period: 5/1/2013 to

23    7/31/2013, fee: $28,090.07, expenses:

24    $20.00                                      32        13

25

```
 1                          I N D E X

 2

 3                           RULINGS

 4     DESCRIPTION                              PAGE      LINE

 5     (cc-5572) Young, Conaway, Stargatt & Taylor,

 6     LLP as Special Counsel to the Trustee

 7     Application for Allowance of Interim

 8     Compensation for Services Rendered and

 9     Reimbursement of Actual and Necessary

10     Expenses Incurred from May 1, 2013 through

11     July 31, 2013 for Young, Conaway, Stargatt

12     & Taylor, LLP, Special Counsel, period:

13     5/1/2013 to 7/31/2013, fee: $20,503.80,

14     expenses: $1,555.39                        32        13

15

16     (cc-5573) Williams, Barristers & Attorneys

17     as Special Counsel to the Trustee Application

18     for Allowance of Interim Compensation for

19     Services Rendered and Reimbursement of Actual

20     and Necessary Expenses Incurred from May 1,

21     2013 through July 31, 2013 for Williams,

22     Barristers & Attorneys, Special Counsel,

23     period: 5/1/2013 to 7/31/2013, fee:

24     $101,219.42, expenses: $0                  32        13

25
```

```
 1                        I N D E X

 2

 3                        RULINGS

 4   DESCRIPTION                             PAGE      LINE

 5   (cc-5566) Trustee and Baker & Hostetler,

 6   LLP's Thirteenth Application for Allowance

 7   of Interim Compensation for Services

 8   Rendered and Reimbursement of Actual and

 9   Necessary Expenses Incurred from May 1,

10   2013 through July 31, 2013 for Baker &

11   Hostetler, LLP, Trustee's Attorney, period:

12   5/1/2013 to 7/31/2013, fee: $31,487,024.25,

13   expenses: $810,213.07                      32        13

14

15   (cc-5574) Taylor Wessing as Special Counsel

16   to the Trustee Application for Allowance of

17   Interim Compensation for Services Rendered

18   and Reimbursement of Actual and Necessary

19   Expenses Incurred from May 1, 2013 through

20   July 31, 2013 for Taylor Wessing, Special

21   Counsel, period: 5/1/2013 to 7/31/2013, fees:

22   $3,609,012.69, expenses: $2,056,092.17      32        13

23

24

25
```

Page 39

```
 1                            I N D E X

 2

 3                             RULINGS

 4    DESCRIPTION                              PAGE      LINE

 5    (cc-55834) Kelley, Wolter & Scott, P.A. as

 6    Special Counsel to the Trustee Application

 7    for Allowance of Interim Compensation for

 8    Services Rendered and Reimbursement of Actual

 9    and Necessary Expenses Incurred from July 1,

10    2013 through July 31, 2013 for Kelley, Wolter

11    & Scott, P.A., Special Counsel, period:

12    7/1/2013 to 7/31/2013, fees: $3,733.20,

13    expenses: $110.00                          32        13

14

15    (cc-5575) UGGC & Associates as Special

16    Counsel to the Trustee Application for

17    Allowance of Interim Compensation for

18    Services Rendered and Reimbursement of Actual

19    and Necessary Expenses Incurred from May 1,

20    2013 through July 31, 2013 for UGGC &

21    Associates, Special Counsel, period: 5/1/2013

22    to 7/31/2013, fees: $170,393.77, expenses:

23    $4,896.64                                  32        13

24

25
```

```
 1                         I N D E X

 2

 3                         RULINGS

 4    DESCRIPTION                          PAGE      LINE

 5    (cc-5576) Triay Stagnetto Neish as Special

 6    Counsel to the Trustee Application for

 7    Allowance of Interim Compensation for

 8    Services Rendered and Reimbursement of

 9    Actual and Necessary Expenses Incurred

10    from May 1, 2013 through July 31, 2013 for

11    Triay Stagnetto Neish, Special Counsel,

12    period: 5/1/2013 to 7/31/2013, fees:

13    $31,993.53, expenses: $221.87              32        13

14

15    (cc-5577) Werder Vigano as Special Counsel

16    to the Trustee Application for Allowance

17    of Interim Compensation for Services

18    Rendered and Reimbursement of Actual and

19    Necessary Expenses Incurred from May 1,

20    2013 through July 31, 2013 for Werder

21    Vigano, Special Counsel, period: 5/1/2013

22    to 7/31/2013, fees: $5,701.15, expenses:

23    $0                                         32        13

24

25
```

Page 41

```
 1                        I N D E X

 2

 3                          RULINGS

 4   DESCRIPTION                            PAGE      LINE

 5   (cc-5578) Greenfield Stein & Senior, LLP as

 6   Special Counsel to the Trustee Application

 7   for Allowance of Interim Compensation for

 8   Services Rendered and Reimbursement of Actual

 9   and Necessary Expenses Incurred from May 1,

10   2013 through July 31, 2013 for Greenfield

11   Stein & Senior, LLP, Special Counsel,

12   period: 5/1/2013 to 7/31/2013, fees:

13   $863.10, expenses: $0                   32        13

14

15   (cc-5579) Browne Jacobson, LLP as Special

16   Counsel to the Trustee Application for

17   Allowance of Interim Compensation for

18   Services Rendered and Reimbursement of

19   Actual and Necessary Expenses Incurred

20   from May 1, 2013 through July 31, 2013 for

21   Browne Jacobson, Special Counsel, period:

22   5/1/2013 to 7/31/2013, fees: $408,874.01,

23   expenses: $14,836.89                    32        13

24

25
```

```
 1                           I N D E X

 2

 3                            RULINGS

 4     DESCRIPTION                           PAGE      LINE

 5     (cc-5580) Eugene F. Collins as Special

 6     Counsel to the Trustee Application for

 7     Allowance of Interim Compensation for

 8     Services Rendered and Reimbursement of

 9     Actual and Necessary Expenses Incurred from

10     May 1, 2013 through July 31, 2013 for

11     Eugene F. Collins, Special Counsel, period:

12     5/1/2013 to 7/31/2013, fees: $87,053.58,

13     expenses: $240.10                      32        13

14

15     (cc-5581) Ritter & Ritter Advokatur as

16     Special Counsel to the Trustee Application

17     for Allowance of Interim Compensation for

18     Services Rendered and Reimbursement of Actual

19     and Necessary Expenses Incurred from May 1,

20     2013 through July 31, 2013 for Ritter &

21     Ritter Advokatur, Special Counsel, period:

22     5/1/2013 to 7/31/2013, fees: $38,150.06,

23     expenses: $1,851.92                    32        13

24

25
```

Page 43

1                          I N D E X

2

3                          RULINGS

4   DESCRIPTION                              PAGE      LINE

5   (cc-5582) Munari Giudici Maniglio Panfili E

6   Associati as Special Counsel to the Trustee

7   Application for Allowance of Interim

8   Compensation for Services Rendered and

9   Reimbursement of Actual and Necessary

10  Expenses Incurred from May 1, 2013 through

11  July 31, 2013 for Munari Giudici Maniglio

12  Panfili E Associati, Special Counsel,

13  period: 5/1/2013 to 7/31/2013, fees:

14  $56,337.36, expenses: $201.21                32        13

15

16

17

18

19

20

21

22

23

24

25

Page 44

1                      C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6        Sherri L                Digitally signed by Sherri L Breach
                                  DN: cn=Sherri L Breach, o, ou,
7                                 email=digital1@veritext.com,
         Breach                   c=US
8                                 Date: 2013.12.19 16:47:46 -05'00'

9    SHERRI L. BREACH

10   AAERT Certified Electronic Reporter & Transcriber

11   CERT*D-397

12

13   Veritext

14   330 Old Country Road

15   Suite 300

16   Mineola, New York 11501

17

18   Date: December 19, 2013

19

20

21

22

23

24

25