Hearing Date: April 2, 2014 at 10:00 a.m. (Eastern Time)
Objection Deadline: March 5, 2014 at 4:00 p.m. (Eastern Time)
Reply Deadline: March 19, 2014 at 4:00 p.m. (Eastern Time)

**LOWENSTEIN SANDLER LLP**
Bruce Buechler, Esq.
Nicole Stefanelli, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
     -and-
1251 Avenue of the Americas, 18th Floor
New York, NY  10020
Tel: (212) 262-6700
Fax: (212) 262-7402

*Attorneys for the Irrevocable Charitable Remainder Trust of*
*Yale Fishman and the Glenn Akiva Fishman Charitable Remainder Unitrust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**MOTION OF THE IRREVOCABLE CHARITABLE REMAINDER TRUST OF YALE FISHMAN AND THE GLENN AKIVA FISHMAN CHARITABLE REMAINDER UNITRUST FOR (I) A HEARING TO DETERMINE ALLOWANCE OF CLAIMS AND (II)  ENTRY OF AN ORDER ALLOWING THE TRUST CLAIMANTS' CLAIMS AND GRANTING RELATED RELIEF**

The Irrevocable Charitable Remainder Trust of Yale Fishman (the "Yale Trust") and the Glenn Akiva Fishman Charitable Remainder Unitrust (the "Glenn Trust," and together with the Yale Trust, the "Trust Claimants"), by and through their undersigned attorneys, hereby submit this motion (the "Motion") for (i) a hearing to determine the allowance of the Claims (defined below) filed by the Trust Claimants and (ii) the entry of an order allowing the Claims and granting related relief.  In support of this Motion, the Trust Claimants state as follows:

## BACKGROUND

### A.    General Background

1.    On December 11, 2008, Bernard L. Madoff ("Madoff") was arrested and charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. 240.10b-5.  That same day, the Securities and Exchange Commission filed a civil action alleging that Madoff and Bernard L. Madoff Investment Securities LLC ("BLMIS") were operating a Ponzi scheme through BLMIS's investment advisor activities.  On December 15, 2008, the above-captioned liquidation was commenced pursuant to Securities Investor Protection Corporation Act, 15 U.S.C. § 78aaa, et seq. ("SIPA") and Irving H. Picard (the "Trustee") was appointed as the SIPA trustee for the substantively consolidated liquidation of BLMIS and Madoff.

2.    On December 23, 2008, the Court issued an order (the "Claims Procedure Order") [Dkt. No. 12] directing the Trustee to disseminate notice and claim forms to BLMIS customers and setting forth claim-filing deadlines.  The Claims Procedure Order provides that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, *and the reason therefor* . . . ."  Claims Procedure Order at 6 (emphasis added).

3.    Pursuant to the Claims Procedure Order, a claimant who desires to oppose the Trustee's determination was required to file "a written statement setting forth in detail the basis for the opposition, together with copies of any documents in support of such opposition, within

thirty (30) days of the date on which the Trustee mails his determination to the claimant." *Id.*

The Claims Procedure Order further provides that "[f]ollowing receipt by the Trustee of an

opposition by a claimant, the Trustee shall obtain a date and time for a hearing before this Court

on the controverted claim and shall notify the claimant in writing of the date, time, and place of

such hearing." *Id.*

**B.    The Claim of the Yale Trust**

4.      The Yale Trust was formed pursuant to a written agreement.

5.      On August 24, 1998, the Yale Trust opened an account with BLMIS, Account No.

1CM543 (the "Yale Account").

6.      In accordance with the Claims Procedure Order, on or about February 12, 2009,

the Yale Trust timely filed a claim, Claim No. 004568, in the amount of $1,502,029.40 (the

"Yale Claim").  A copy of the Yale Claim is annexed hereto as Exhibit A.

7.      On April 27, 2010, the Trustee sent a Notice of Trustee's Determination of Claim

to the Yale Trust stating that the Yale Claim is denied (the "Yale Determination Letter").  A

copy of the Yale Determination Letter is annexed hereto as Exhibit B.

8.      Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Yale

Determination Letter, between August 24, 1998 and December 11, 2000, $2,000,000.00 in cash

was deposited into the Yale Account.  *See* Exhibit B at 4.

9.      Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Yale

Determination Letter, between April 14, 1999 and July 21, 2004, the Yale Trust withdrew a total

of $515,778.87 in cash.  *See* Exhibit B at 4.

10.     No other cash withdrawals were made from the Yale Account.

11.     Assuming the Trustee's records are correct, the "net equity" in the Yale Account

based on the "cash in/cash out approach" embraced by the Trustee calculates to $1,484,221.13

($2,000,000.00- $515,778.87), ignoring all alleged fictitious gains.

12.    Between September 29, 2004 and January 31, 2005, the Yale Trust attempted to transfer the then balance in the Yale Account of $3,352,581.72 to the BLMIS account of an independent public charity called the Judaic Heritage Foundation, Inc. which owned BLMIS Account No. CM56830 (the "Transferee Account").  However, no actual funds or securities were actually transferred from the Yale Account to the Transferee Account.

13.    As set forth in Table 1 annexed to the Yale Determination Letter, the Trustee claims that, during the period from August 24, 1998 through January 31, 2005, a total of $2,000,000.00 in cash was deposited into the Yale Account and a total of $3,868,360.59 was withdrawn from the Yale Account.  However, the Trustee has inexplicably "adjusted" the amount of the withdrawals to $2,000,000.00.  *See* Exhibit B at 4.

14.    In accordance with the Claims Procedure Order, the Yale Trust timely filed an *Objection to the Trustee's Determination of Claim* on May 25, 2010 [Docket No. 2337].

15.    Despite requests of counsel to the Yale Trust, to date, the Trustee has not obtained a date and time for a hearing before this Court to determine the allowance of the Yale Claim.

**C.    The Claim of the Glenn Trust**

16.    The Glenn Trust was formed pursuant to a written agreement.

17.    On December 15, 1998, the Glenn Trust opened an account with BLMIS, Account No. 1CM552 (the "Glenn Account").

18.    In accordance with the Claims Procedure Order, on or about June 20, 2009, the Glenn Trust timely filed a claim, Claim No. 011058, in the amount of $1,488,494.00 (the "Glenn Claim" and together with the Yale Claim, the "Claims").  A copy of the Glenn Claim is annexed hereto as Exhibit C.

19.    On April 27, 2010, the Trustee sent a Notice of Trustee's Determination of Claim to the Glenn Trust stating that the Glenn Claim is denied (the "Glenn Determination Letter" and

-4-

together with the Yale Determination Letter, the "Determination Letters"). A copy of the Glenn Determination Letter is annexed hereto as Exhibit D.[1]

20.     Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Glenn Determination Letter, between December 15, 1998 and December 29, 2000, $2,000,000.00 in cash was deposited into the Glenn Account.  *See* Exhibit D at 4.

21.     Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Glenn Determination Letter, between April 14, 1999 and July 21, 2004, the Glenn Trust withdrew a total of $513,410.00 in cash.  *See* Exhibit D at 4.

22.     No other cash withdrawals were made from the Glenn Account.

23.     Assuming the Trustee's records are correct, the "net equity" in the Glenn Account based on the "cash in/cash out approach" embraced by the Trustee calculates to $1,486,590.00 ($2,000,000.00- $513,410.00), ignoring all alleged fictitious gains.

24.     Between September 29, 2004 and January 31, 2005, the Glenn Trust attempted to transfer the then balance in the Glenn Account of $3,200,746.41 to the Transferee Account at BLMIS.   However, no actual funds or securities were actually transferred from the Glenn Account to the Transferee Account.

25.     As set forth in Table 1 annexed to the Glenn Determination Letter, the Trustee claims that, during the period from December 15, 1998 through January 31, 2005, a total of $2,000,000.00 in cash was deposited into the Glenn Account and a total of $3,714,156.41 was withdrawn from the Glenn Account.   However, the Trustee has inexplicably "adjusted" the amount of the withdrawals to $2,000,000.00.  *See* Exhibit D at 4.

26.     In accordance with the Claims Procedure Order, the Glenn Trust timely filed an *Objection to the Trustee's Determination of Claim* on May 25, 2010 [Docket No. 2341].

---

[1] Both the Yale and Glenn Trusts agree with the dollar amounts for deposits and cash withdrawals (but not the treatment of transfers to other BLMIS accounts) set forth on the Determination Letters annexed hereto as Exhibits B and D.

27.     Despite requests of counsel to the Glenn Trust, to date, the Trustee has not obtained a date and time for a hearing before this Court to determine the allowance of the Glenn Claim.

## RELIEF REQUESTED

28.     As detailed in the Certification of Bruce Buechler annexed hereto as Exhibit E (the "Buechler Certification"), the Trust Claimants have requested that the Trustee schedule a hearing to determine the allowance of the Claims on numerous occasions.   Despite these requests, the Trustee has not obtained a date and time for a hearing before this Court to determine the allowance of the Claims.   Accordingly, by this Motion the Trust Claimants request (i) a hearing to determine the allowance of the Claims (defined below) filed by the Trust Claimants and (ii) the entry of an order allowing the Claims and granting related relief.

**A.     The Trust Claimants Are Entitled to  Hearing to Determine the Allowance of Their Claims**

29.     Pursuant to the Claims Procedure Order, a claimant who desires to oppose the Trustee's determination was required to file "a written statement setting forth in detail the basis for the opposition, together with copies of any documents in support of such opposition, within thirty (30) days of the date on which the Trustee mails his determination to the claimant."  *Id.* The Claims Procedure Order further provides that "[f]ollowing receipt by the Trustee of an opposition by a claimant, the Trustee shall obtain a date and time for a hearing before this Court on the controverted claim and shall notify the claimant in writing of the date, time, and place of such hearing."  *Id.*

30.     The Trust Claimants have complied with every aspect of the Claims Procedure Order and have been waiting for nearly four years for an adjudication of their Claims. According to the Trustee's official website (www.madofftrustee.com), as of January 15, 2014, of the 16,519 claims received and determined, only 155 remain pending.   Accordingly, while the Trust Claimants understand that the Claims Procedure Order was implemented to maintain an

orderly claims resolution process, the Trust Claimants submit that the procedures contained in the Claims Procedure Order have been overridden by the Trustee's unwillingness to schedule a hearing to determine the Claims and it is unjust to require the Trust Claimants to continue to wait for relief to which they are entitled. Furthermore, the Trustee's official website states that claimants "may object and request a hearing before the United States Bankruptcy Court for the Southern District of New York." *See* http://www.madofftrustee.com/claims-03.html (accessed Jan. 14, 2014), a copy of which is annexed hereto as Exhibit F.

31.    As detailed in the Buechler Certification, the Trust Claimants have requested that the Trustee schedule a hearing to determine the allowance of the Claims on numerous occasions. These requests have been denied. In addition, the Trust Claimants filed an objection [Docket No. 5118] to the *Trustee's Motion For An Order Affirming Trustee's Calculations Of Net Equity And Denying Time-Based Damages* [Docket Nos. 5038, 5039] (the "Trustee's Motion"). Although the hearing on the Trustee's Motion was originally scheduled for January 10, 2013, it was not heard until September 10, 2013. At the September 10, 2013, counsel to the Trust Claimants requested that a hearing to address the merits of the Claims be scheduled. This request was denied.

32.    As set forth below, the Trust Claimants submit that their Claims were wrongfully denied by the Trustee. Prior to filing this Motion, the Trust Claimants contacted the Court to request a hearing, which request was granted. Accordingly, the Trust Claimants submit that this Motion is procedurally proper and, notwithstanding the Claims Procedure Order, the Court may conduct a hearing to determine the allowance of their Claims and to allow the Claims.

**B.    The Trust Claimants' Claims Must Be Allowed**

**1.    *Fictitious Transfers Do Not Constitute Withdrawals for Purposes of Calculating "Net Equity"***

33.    In asserting that the Yale and Glenn Accounts have a zero balance, the Trustee takes the position that despite his admission in the Determination Letters that both the Yale and Glenn Accounts originally had a total of $2,000,000.00 in cash deposited into each Account, that

fictitious transfers to the Transferee Account should reduce their claims.  The Trustee alleges that the Trust Claimants are neither net winners or losers, but have an unexplained "zero balance." The Trustee's position is factually incorrect because in his calculations, the Trustee included fictitious transfers to the Transferee Account (adjusted downward to $2,000,000 by the Trustee for some unknown reason), which he characterized as "withdrawals."  Oddly, it appears that the Trustee is asserting that the Yale and Glenn Accounts have a zero balance based on the last statement issued to them by BLMIS, yet the Trustee has consistently argued (and won before this Court and the Second Circuit) that one cannot rely upon customer account statements issued by BLMIS.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 135 (Bankr. S.D.N.Y. 2010), *aff'd, In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011), *reh'g and reh'g en banc den.* (2d Cir. Nov. 8, 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *cert. den.*, 2012 WL 396489, 2012 WL 425188 (June 25, 2012).

34.    The alleged transfers to the Transferee Account never actually occurred and clearly are not "cash withdrawals" for the purposes of calculating "net equity."  The Trust Claimants are "net losers" because no actual funds were transferred from the Yale and Glenn Accounts with BLMIS to another account at BLMIS (the Transferee Account).  Because all Madoff/BLMIS transfers, statements and trading records were fictitious, the Trustee cannot be heard to argue that fictitious journal entries by the mastermind of Ponzi schemes equates to actual transfers of funds from the Yale and Glenn Accounts to another BLMIS account controlled by others.  *See In re Madoff*, 424 B.R. at 135.  The Trustee cannot argue both sides of the same coin.  Thus, the Trust Claimants are "net losers" based on the cash in/cash out methodology as set forth in paragraphs 11 and 23 above and their claims must be allowed.

35.    The Trustee has determined each customer's "net equity" by calculating the amount of cash deposited by the customer into their BLMIS account, minus any cash amounts withdrawn from their BLMIS customer account, otherwise known as the cash in/cash out approach.  The Court has upheld the "cash in/cash out approach."  *Id.*  In discussing the definition of "net equity" under SIPA, the Court noted that "the BLMIS books and records

expose a Ponzi scheme where no securities were ever ordered, paid for or acquired." *Id.* Thus, the Court held that "the Trustee cannot discharge claims upon the false premise that customers' securities positions are what the account statements purport them to be. Rather, the only verifiable amounts that are manifest from the books and records are the cash deposits and withdrawals." *Id.* The Court further held that "[e]quality is achieved in this case by employing the Trustee's method, which looks solely to deposits and withdrawals that in reality occurred." *Id.* at 141.

36.     While the Court did not specifically address transfers between customer accounts, the Court made it clear that net equity is to be calculated by crediting the amount of actual cash deposited by the customer into his BLMIS account, minus any actual cash withdrawn or transfers "that in reality occurred." *Id.* The purported transfers from both the Yale and Glenn Accounts to the Transferee Account transfers do not constitute "withdrawals" for the purposes of calculating net equity because those transfers never occurred. No real funds or securities were transferred. As the Second Circuit stated, "Madoff generated fictitious paper account statements and trading records in order to conceal the fact that he engaged in no trading activity whatsoever." *Madoff*, 654 F.3d at 231. The only withdrawals from the Yale and Glenn Accounts that actually occurred were the actual cash withdrawals. Again, the  Second Circuit held "the only accurate entries reflected the customers' cash deposits and withdrawals." *Id.* at 232. Based on the "cash in/cash out method," the Yale Account has "net equity" of $1,484,221.13 and the Glenn Account has "net equity" of $1,486,590.00.

37.     For the foregoing reasons, the Trust Claimants disputed the Trustee's Determination Letters. The Trustee's denial of both the Trust Claimants' Claims is not supported due to the simple incontrovertible fact that the only cash withdrawals from the Yale Account totaled $515,778.87 and from the Glenn Account totaled $513,410.00 (based on the Trustee's records as set forth in the Determination Letters). Because no other cash withdrawals were made from the Yale and Glenn Accounts and the transfers to the Transferee Account never actually occurred, the "net equity" in the Yale Account is at least $1,484,221.13 and the "net

-9-

equity" in the Glenn Account is at least $1,486,590.00. Thus, both are "net losers," not creditors with a zero balance and, therefore, the Trustee should be directed to allow and pay their respective claims.

### 2. The Trustee is Barred from Denying the Trust Claimants' Claims Under the Doctrine of Judicial Estoppel

38.    The fictitious journal entries of Madoff purporting to transfer non-existent funds to the Transferee Account are no different than the fictitious gains fabricated by Madoff that the Trustee has refused to recognize in determining customer claims as accepted by the Court in its Opinion which was affirmed by the Second Circuit Court of Appeals. The Trustee should be held to his own standard and criteria: if fictitious gains are not to be considered (as they never occurred), neither should fictitious transfers be considered (as they too never occurred). It is inconsistent for the Trustee to argue that "fictitious gains that were fabricated"[2] by Madoff should be ignored, yet, at the same, argue, in order to deny a customer claim, that fictitious transfers did occur. As this Court held, "the only verifiable transactions were the customers' cash deposits into, and cash withdrawals out of, their particular accounts." *Madoff*, 424 B.R. at 122. This does not include transfers to other BLMIS accounts. As such, the Trustee is barred from denying the Trust Claimants' Claims under the doctrine of judicial estoppel and the doctrine of equitable estoppel.

39.    The doctrine of judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding." *In re Venture Mortgage Fund, L.P.*, 245 B.R. 460, 471 (Bankr. S.D.N.Y. 2000), *aff'd*, 282 F.3d 185 (2d Cir. 2002). Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The purpose of judicial estoppel is to "protect the integrity of the judicial process . . . by prohibiting

---

[2] *See*, Determination Letters, Exhibits B and D at 2.

parties from deliberately changing positions according to the exigencies of the moment." *Id.  See also Rosenshein v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996) ("Judicial estoppel is invoked . . . to prevent the party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process.").

40.     In the Second Circuit, two factors must be satisfied for the doctrine of judicial estoppel to apply: (i) the party against whom estoppel is asserted took an inconsistent position in a prior proceeding, and (ii) the first tribunal adopted the inconsistent position in some manner, such as by rendering a favorable judgment. *In re Venture Mortgage Fund*, 245 B.R. at 472. The doctrine does not depend upon prejudice to the party invoking it. *Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., New York Branch (In re Galerie Des Monnaies of Geneva, Ltd.)*, 55 B.R. 253, 260 (Bankr. S.D.N.Y. 1985), *aff'd*, 62 B.R. 224 (S.D.N.Y. 1986).

41.     In this case, both factors are satisfied.  The Trustee took the position that because BLMIS created fictitious transactions in a fictitious market, customer claims should not include fictitious gains and should be calculated only on a "cash in/cash out" method. *See* Mem. of Law in Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying Customer Accounts at 40-43 [Docket No. 525]. *See also Madoff*, 424 B.R. at 125.  The Court granted the Trustee's prior motion and held that the Trustee's method of determining "net equity" was the appropriate way to calculate customer claims in this proceeding, *See id.* at 134-35, 142.  This ruling was affirmed by the Second Circuit.

42.     In the Determination Letters regarding the Yale Trust and the Glenn Trust, the Trustee reversed the legal and factual position he previously took in the prior motion that resulted in the Court's March 1, 2010 opinion, and affirmed by the Second Circuit, by claiming that fictitious transfers that never occurred should be considered in calculating "net equity" while fictitious gains should be ignored.  Under the doctrine of judicial estoppel (and equitable estoppel), such action is impermissible and the Trustee is barred from employing this inconsistent position in order to deny the Trust Claimants' Claims.

### 3. The Trustee is Barred from Denying the Trust Claimants' Claims Under the Law of the Case Doctrine

43.     The Trustee is likewise barred from denying the Trust Claimants' Claims under the law of the case doctrine.

44.     The law of the case doctrine is a rule of law that dictates that "a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent states of the same litigation." *Perreca v. Gluck*, 262 F. Supp. 2d 269, 272 (S.D.N.Y. 2003) (quoting *In re Korean Air Lines Disaster*, 798 F. Supp. 755, 759 (E.D.N.Y. 1992) (citation omitted)). The law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *DiLaura v. Power Auth.*, 982 F.2d 73, 76 (2d Cir. 1992) (quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)); *see also NLRB v. Coca-Cola Bottling Co.*, 55 F.3d 74, 77-78 (2d Cir. 1995).

45.     The purpose of the law of the case doctrine is to avoid reopening what has already been decided. *Manley v. Mazzuca*, Case No. 01-civ-5178, 2007 WL 4233013 at *3 (S.D.N.Y. Nov. 30, 2007). Thus, "'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Id.* (quoting *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*, LLP, 322 F.3d 147, 167 (2d Cir. 2003)). Courts generally depart from the law of the case only where there is a change in controlling law, when new evidence becomes available, to correct a clear error, or prevent manifest injustice. *DiLaura v. Power Auth.,* 982 F.2d at 76.

46.     Here, none of these "good reasons" to depart from the law of the case are present and the Court's prior ruling, as affirmed by the Second Circuit, that the Trustee's method of determining "net equity" was the appropriate way to calculate customer claims in this proceeding constitutes the "law of the case." Thus, the Trustee should not be permitted to argue, in order to deny the Trust Claimants' Claims, that fictitious transfers that never occurred when the "law of

the case" requires the Trustee to ignore "fictitious gains that were fabricated" by Madoff in determining "net equity." Accordingly, under the law of the case doctrine, the Trustee is barred from denying the Trust Claimants' Claims.

**4.    *The Trustee Has Failed To Set Forth Any Legal or Factual Basis for Disallowing the Trust Claimants' Claims in Full***

47.    The Trustee has set forth no legal or factual basis for disallowing the Trust Claimants' Claims in full. The Trust Claimants timely filed their proofs of claim and Objections to the Trustee's Determination Letters [Docket Nos. 2337 and 2341].

48.    The party objecting to the claim has the burden of going forward and introducing evidence sufficient to rebut the presumption of validity. *In re Campano*, 293 B.R. 281, 285 (D.N.H. 2003). In order to shift the burden to the Trust Claimants, the Trustee would need to provide the Court with "evidence equal in force to the prima facie case … which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) (citation omitted). *See also, In re Rockefeller Ctr. Props.*, 272 B.R. 525, 539 (Bankr. S.D.N.Y. 2000) ("Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to meet the usual burden of proof to establish the validity of the claim.").

49.    The Determination Letters themselves are inadequate to rebut the *prima facie* validity of the Trust Claimants' Claims as provided in section 502(a) of the Bankruptcy Code and Rule 3001(f) of the Federal Rules of Bankruptcy Procedure.

50.    Furthermore, the Determination Letters violate general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based. As this Court has stated,

> The best practice is to denominate an objection to a claim as just that. The body of the objection should identify the claim. It should also, at a minimum, allege those facts necessary to support the objection . . . and provide a description of the theories on which it is based. In short, proofs of claim have been held analogous to complaints initiating civil actions; an

> objection to a claim should therefore meet the standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses.

*In re Enron Corp.*, 2003 Bankr. LEXIS 2261, *25 (Bankr. S.D.N.Y. Jan. 13, 2003) (quoting 9 *Collier on Bankruptcy* ¶ 3007.01[3] (footnotes omitted)).

51.    Finally, the table attached to each of the Determination Letters, which purportedly calculates "net equity" in each Account, based on the "cash in/cash out approach" embraced by the Trustee, is unsubstantiated and does not reflect the fact that any transfer of actual funds or securities to the Transferee Account occurred. Thus, the Determination Letters support the Trust Claimants' position. Accordingly, the Court must determine that the Yale Trust is entitled to a claim of at least $1,484,221.13 and that the Glenn Trust is entitled to a claim of at least $1,486,590.00.

**5.    The Trustee is Barred from Denying the Trust Claimants' Claims Because the Alleged Transfers Occurred Outside of the Applicable Two-Year Look-Back Period**

52.    Assuming, *arguendo*, that the fictitious transfers to the Transferee Account are considered withdrawals for purposes of calculating "net equity," such withdrawals were made outside of the applicable two-year look-back period and, therefore, are not avoidable by the Trustee.

53.    The only source of the Trustee's avoidance power is section 548(a)(1)(A) of the Bankruptcy Code, which limits avoidance to transfers that occurred within two years prior to the date of the filing of the petition. *See* 11 U.S.C. § 548(a)(1)(A). While section 544(b) of the Bankruptcy Code adopts "applicable [state] law" for avoidance actions, the Trustee is bound by section 548(a)(1)(A) by virtue of the "safe harbor" provisions contained in section 546(e) of the Bankruptcy Code and thus cannot avail himself of any longer state law look-back period.

54.    Section 546(e) of the Bankruptcy Code provides that "[n]otwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section . . . 741 of this title, made by or to (or for the benefit

of) a . . . stockbroker . . . or that is a transfer made by or to (or for the benefit of) a . . . stockbroker, in connection with a securities contract, as defined in section 741(7) . . . **except under section 548(a)(1)(A) of this title**." 11 U.S.C § 546(e) (emphasis supplied).

55.    As recognized by District Court Judge Rakoff in an opinion relating to one of the myriad of BLMIS clawback proceedings pending before him, because BLMIS was a registered stockbrokerage firm, the liabilities of customers are subject to the "safe harbor" provisions of section 546(e) of the Bankruptcy Code. *Picard v. Katz*, 462 B.R. 447, 451 (S.D.N.Y. 2011). "'By restricting a bankruptcy trustee's power to recover payments that are otherwise avoidable under the Bankruptcy Code, the safe harbor stands 'at the intersection of two important national legislative policies on a collision course - the policies of bankruptcy and securities law.'" *Id.* at 451 (quoting *In re Enron Creditors Recovery Corp.*, 651 F.3d 329, 334 (2d Cir. 2011)). As further recognized by Judge Rakoff, the kind of contract BLMIS had with its customers is a "securities contract" as defined in section 741(7) of the Bankruptcy Code and "all payments made by [BLMIS] to its customers" are "settlement payments" as defined in section 741(8) of the Bankruptcy Code. Judge Rakoff bolstered this ruling when he dismissed claims by the Trustee seeking to claw back six years or more of profits and held that the Trustee may only avoid transfers that BLMIS made during the two years prior to bankruptcy "with actual intent to hinder, delay, or defraud any" of its creditors. *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 (JSR), slip op. at 13 (S.D.N.Y. April 30, 2012).

56.    While this Court has taken a different view on the invocation of section 546(e) – holding that certain defendants' section 546(e) defense was "premature" and, even if the defense were timely, the Court could not find as a matter of law the section 546(e) applied to the transactions at issue, *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243, 267 (Bankr. S.D.N.Y. 2010), *leave to appeal denied*, 2011 U.S. Dist. LEXIS 97647 (S.D.N.Y. August 31, 2011), such ruling is inapposite to the purpose of the safe harbor provisions of section 546(e). As noted by Judge Rakoff, Congress enacted section 546(e) "to minimize the displacement caused in the commodities and securities markets in the event of a major

bankruptcy affecting those industries." *Picard v. Katz*, 462 B.R. at 452. In the case of Madoff's fraud involving over $60 billion and thousands of customers, it is clear that permitting the avoidance of transfers other than those permitted under the safe harbor provisions of section 546(e) of the Bankruptcy Code would have a substantial negative effect of the financial markets. *Id.*

57. Between September 29, 2004 and January 31, 2005, the Yale Trust attempted to transfer the then balance in the Account of $3,352,581.72 to the Transferee Account. Between September 29, 2004 and January 31, 2005, the Glenn Trust attempted to transfer the then balance in the Glenn Account of $3,200,746.41 the Transferee Account. However, as noted above, no actual funds or securities were actually transferred from the Yale or Glenn Accounts to the Transferee Account. These were fictitious transfers or journal entries. Should the Court determine that the fictitious journal entries to the Transferee Account are withdrawals for purposes of calculating "net equity," the Trustee may not deny the Trust Claimants' Claims because such transfers occurred more than two years prior to December 15, 2008 (the date on which the liquidation was commenced pursuant to SIPA). Thus, the alleged transfers to the Transferee Account cannot be avoided under section 548(a)(1)(A) of the Bankruptcy Code. Therefore, the Trustee should be precluded from arguing transfers to another Madoff account are effectively recoverable by the Trustee by offsetting them in the calculation of net equity.

58. Further, the Trustee is now time barred from commencing an avoidance action against the Trust Claimants or the owner of the Transferee Account to recover any alleged transfers. The statute of limitations to commence a clawback action has long expired. The import of section 546(e) in this case is that the Trustee would never have been permitted to avoid the alleged transfers as they occurred outside the two-year look-back period. Thus, the Trustee is barred from denying the Trust Claimants' Claims for alleged transfers that occurred more than two years before the commencement of these cases.

## NOTICE

59.    Notice of this Motion will be provided by email to (i) counsel to the Trustee and (ii) all parties who have filed a notice of appearance and request for service of pleadings in this case pursuant to Bankruptcy Rule 2002.  The Trust Claimants submit that no other or further notice is required.

WHEREFORE, the Trust Claimants respectfully request that the Court conduct a hearing to determine the allowance of the Claims and enter an order (i) granting the Yale Trust an allowed claim in the amount of $1,484,221.13, (ii) granting the Glenn Trust an allowed claim in the amount of $1,486,590.00, (iii) directing SIPC to pay each of the Trust Claimants a $500,000 advance pursuant to 15 U.S.C. § 78fff-3(a), and (iv) granting the Trust Claimants such other and further relief as this Court deems just and equitable.

Respectfully submitted,

Dated: February 7, 2014

**LOWENSTEIN SANDLER LLP**

By:    */s/ Bruce Buechler*
Bruce Buechler, Esq. (BB 0324)
Nicole Stefanelli (NS 4100)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
          -and-
1251 Avenue of the Americas, 18th Floor
New York, NY  10020
Tel: (212) 262-6700
Fax: (212) 262-7402

*Attorneys for the Irrevocable Charitable*
*Remainder Trust of Yale Fishman and the Glenn*
*Akiva Fishman Charitable Remainder Unitrust*

# Exhibit A

Yale M. Fishman

930 Broadway

Woodmere, NY 11598

Yale@FishmanAssociates.com

Work:: 516.374.0350 Cell: 516.313.0350

Re: Madoff Account # 1-CM543-3-0

Irving H. Picard, Esq.

Trustee for Bernard Madoff Investment Securities LLC

Claims Processing Center

2100 McKinney Ave., Suite 800

Dallas, TX 75201

Dear Mr. Picard.

Please find enclosed the Yale Fishman Charitable Trusts' claim for SIPIC relief against the Madoff estate as well as documentary evidence of contributions and losses.  Please find the documentary evidence which shows $2,000,000 in contributions into the account.  Only $497,970.65 in disbursements was taken out of the Madoff Account.  The last closing statement value received as 11/30/04 was $3,018,415.52.  Thus we have a principal loss of $1,502,029.40.

We do not have any statements past 2004 as we attempted to transfer the balance of $3,352,581.72 to a public charity (Madoff Account #1CM56830, see Ex. J1, K4, and L3).  As I was advised by you the trustee Irving Picard at the February 20th meeting in New York the Trustee views the statements and earnings of Madoff as fictional as the monies were stolen on arrival at Madoff.  Furthermore you stated that you will "only consider actual monies deposited in and monies taken out of accounts."  Accordingly the purported transfer to the charity never occurred and was a fictional entry.  Thus our principal loss remains $1,502,029.40.

I am attaching a copy of the Charitable Remainder Trust of Yale Fishman showing I have authority to act on behalf of the trust in Ex M1.

Accordingly, your effort in recovering the stolen monies and SIPIC relief is greatly appreciated.

Yale Fishman Charitable Trust

Yale Fishman, Trustee

Glenn Fishman, Trustee

Yale Fishman
930 Broadway
Woodmere, NY 11598
Work: 516.374.0350 Fax: 516.374.0309
Yale@FishmanAssociates.com

## Yale Fishman Charitable Trust
## Madoff Account 1-CM543-3-0

| Date | Amount | Contributions Type of Contribution | Exhibit/Page Description |
|---|---|---|---|
| 12/11/2000 | $ 500,000.00 | received by transfer from #1-CM433-3-0 | Ex. A1 – Madoff Statement<br>Ex. B1 – Madoff Ticket |
| 12/29/1999 | $ 500,000.00 | check | Ex. B2 – Madoff Statement<br>Ex. B6 – Madoff Ticket |
| 8/27/1998 | $ 330,000.00 | received by transfer from #1-CM433-3-0 | Ex. C1 – Madoff Statement |
| 8/24/1998 | $ 670,000.00 | check wire | Ex. C1 – Madoff Statement |
| | $ 2,000,000.00 | | |

| Date | Amount | Deductions Type of Deduction | Exhibit/Page Description |
|---|---|---|---|
| 7/21/2004 | $ 12,101.60 | check | Ex. D1 – Madoff Statement |
| 1/23/2004 | $ 90,550.40 | check | Ex. E3 – Madoff Statement<br>Ex. E8 – Madoff Statement |
| 12/11/2002 | $ 130,161.00 | check | Ex. F1 – Madoff Statement |
| 12/30/2001 | $ 87,351.00 | check | |
| 1/30/2001 | $ 124,305.00 | check | Ex. G1 – Madoff Ticket |
| 1/3/2000 | $ 53,501.65 | check | Ex. H1 – Madoff Ticket |
| | $ 497,970.65 | | |

| Date | Amount | Transfer Type of Transfer | Exhibit/Page Description |
|---|---|---|---|
| 1/3/2005 | $ 656.88 | Transfer to Account #1CM56830 | Ex. J1 – Madoff Statement |
| 12/31/2004 | $ 3,101,924.84 | Transfer to Account #1CM56830 | Ex. K4 – Madoff Statement |
| 9/30/2004 | $ 250,000.00 | Transfer to Account #1CM56830 | Ex. L3 – Madoff Statement |
| | $ 3,351,924.84 | | |

**Value of statement as of 11/30/04 was $3,018,415.52 (Exhibit I5)

CUSTOMER CLAIM

Claim Number_____

Date Received_____

BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

DECEMBER 11, 2008

Irving H. Picard, Esq.
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

Provide your office and home telephone no.

OFFICE: _516 374 0350_

HOME: _516 373 - 0350_

Taxpayer I.D. Number (Social Security No.)
_11-650 75 64_

Account Number:    1CM543
YALE FISHMAN CHARITABLE TRUST
C/O YALE FISHMAN
445 CENTRAL AVE SUITE 201
CEDARHURST, NY  11516

(If incorrect, please change)

NOTE:    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY THE
ACCOMPANYING INSTRUCTION SHEET.  A SEPARATE CLAIM FORM SHOULD
BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL PROTECTION
AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE RECEIVED BY THE
TRUSTEE ON OR BEFORE March 4, 2009.  CLAIMS RECEIVED AFTER THAT
DATE, BUT ON OR BEFORE July 2, 2009, WILL BE SUBJECT TO DELAYED
PROCESSING AND TO BEING SATISFIED ON TERMS LESS FAVORABLE TO THE
CLAIMANT.  PLEASE SEND YOUR CLAIM FORM BY CERTIFIED MAIL - RETURN
RECEIPT REQUESTED.

*************************************************************************

1.    Claim for money balances as of December 11, 2008 :
      a.    The Broker owes me a Credit (Cr.) Balance of        $_____
      b.    I owe the Broker a Debit (Dr.) Balance of           $_____

502180406                                    1

c.  If you wish to repay the Debit Balance,
please insert the amount you wish to repay and
attach a check payable to "Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC."
If you wish to make a payment, **it must be enclosed
with this claim form.**                                $ _____

d.  If balance is zero, insert "None."                 _NoN_

2.  Claim for securities as of December 11, 2008:

## PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.

|  | YES | NO |
|---|---|---|
| a.  The Broker owes me securities | ✓ |  |
| b.  I owe the Broker securities |  | ✓ |

c.  If yes to either, please list below:

| Date of Transaction (trade date) | Name of Security | Number of Shares or Face Amount of Bonds | |
|---|---|---|---|
| | | The Broker Owes Me (Long) | I Owe the Broker (Short) |
| _____ | _See exhibits J-1, K-4_ | $ 3,752,581.72 | |
| _____ | _and L-3 attached_ | | |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation.  You should also provide all documentation or

5021 80406                                        2

information regarding any withdrawals you have ever made or payments received from the Debtor.

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.

NOTE: IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

|  |  | YES | NO |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. | *money dies set medi in* | |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? | | ✓ |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? | | ✓ |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker?  If so, give name(s) | | ✓ |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank?  If so, provide documentation with respect to each public customer on whose behalf you are claiming. | | ✓ |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf?  Give names, addresses and phone numbers. | | ✓ |

502180406                                        3

9.  Have you or any member of your family
    ever filed a claim under the Securities
    Investor Protection Act of 1970?  if
    so, give name of that broker.

Please list the full name and address of anyone assisting you in the
preparation of this claim form: _____

If you cannot compute the amount of your claim, you may file an estimated claim.  In that
case, please indicate your claim is an estimated claim.

IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM.
CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR
IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.

THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY
INFORMATION AND BELIEF.

Date ___2/12/0Y___    Signature _____

Date _____    Signature _____

(If ownership of the account is shared, all must sign above.  Give each owner's name,
address, phone number, and extent of ownership on a signed separate sheet.  If other
than a personal account, e.g., corporate, trustee, custodian, etc., also state your capacity
and authority.  Please supply the trust agreement or other proof of authority.)

**This customer claim form must be completed and mailed promptly,
together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

502180406                    4

# **Exhibit B**



# BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

## DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

April 27, 2010

Irrevocable Charitable Remainder Trust of Yale Fishman
c/o Yale Fishman, Trustee
445 Central Avenue, Suite 201
Cedarhurst, New York 11516

Dear Irrevocable Charitable Remainder Trust of Yale Fishman:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1CM543 designated as Claim Number 004568:

Your claim for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $2,000,000.00), as more fully set forth in Table 1 annexed hereto and made a part

---

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

hereof, is the same as the amount that was deposited with BLMIS for the purchase of securities (total of $2,000,000.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since you have withdrawn all of the funds deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

**On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued a decision which affirmed the Trustee's Net Investment Method for determining customer claims. The final resolution of this issue is expected to be determined on appeal.**

**Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.**

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching

2

copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after April 27, 2010, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc:    Yale M. Fishman
       930 Broadway
       Woodmere, New York 11598

3

| Table 1 | | | |
|---|---|---|---|
| DEPOSITS | | | |
| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
| 8/24/1998 | CHECK WIRE | $670,000.00 | $670,000.00 |
| 8/27/1998 | TRANS FROM 1CM43330 | $330,000.00 | $330,000.00 |
| 12/29/1999 | CHECK | $500,000.00 | $500,000.00 |
| 12/11/2000 | TRANS FROM 1CM43330 | $500,000.00 | $500,000.00 |
| 12/31/2004 | TRANS FROM 1CM56830 | $0.01 | $0.00 |
| **Total Deposits:** | | $2,000,000.01 | $2,000,000.00 |
| | | | |
| WITHDRAWALS | | | |
| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
| 4/14/1999 | CHECK | ($17,808.22) | ($17,808.22) |
| 1/3/2000 | CHECK | ($53,501.65) | ($53,501.65) |
| 1/30/2001 | CHECK | ($124,305.00) | ($124,305.00) |
| 12/31/2001 | CHECK | ($87,351.00) | ($87,351.00) |
| 12/11/2002 | CHECK | ($130,161.00) | ($130,161.00) |
| 1/23/2004 | CHECK | ($90,550.40) | ($90,550.40) |
| 7/21/2004 | CHECK | ($12,101.60) | ($12,101.60) |
| 9/29/2004 | TRANS TO 1CM56830 | ($250,000.00) | ($250,000.00) |
| 12/31/2004 | TRANS TO 1CM56830 | ($3,101,924.84) | ($1,234,221.13) |
| 1/31/2005 | TRANS TO 1CM56830 | ($656.88) | $0.00 |
| **Total Withdrawals:** | | ($3,868,360.59) | ($2,000,000.00) |
| | | | |
| **Total deposits less withdrawals:** | | ($1,868,360.58) | $0.00 |

4

# Exhibit C

Glenn Akiva Fishman Charitable Remainder Trust
C/o Glenn Fishman
930 Broadway
Woodmere, NY 11598

June 20, 2009

RE: Madoff Account # 1-CM552-3 SIPC claim

To Whom It May Concern:

Please find enclosed a SIPC customer claim form with respect to the Madoff fraud for the
Glenna Akiva Fishman Charitable Remainder Unitrust.  Also enclosed is a summary
schedule and supporting documentation for the following:

- $2,000,000 of cash contributions into the account (Exhibits A1-A3);
- $511,506 in cash distributions from the account (Exhibits B1-B5); and
- Summary Schedule showing SIPC loss calculated as $1,488,494 ($2,000,000-
  $511,506), as explained below.
- Copy of Trust Agreement (Exhibit D1)

As was reported in the news (see Ex.D2), Irving Picard views the statements and earnings
of Madoff as fictional being that the monies were stolen upon transfer to Madoff.
Accordingly, although the Unitrust attempted to transfer its remaining account balance
with Madoff to a charity in December 2004 through a journal entry (to Madoff account
#1-CM568-3-0 – for that reason, there are no statements for the Unitrust after 2004), the
trustee's statements indicate that the transfer to the charity never actually occurred for
purposes of the Unitrust's filing of a SIPC claim.

Therefore, although the charity is filing a separate SIPC claim with respect to amounts
purportedly transferred to it from the Unitrust and other sources, the attached claim for
the Unitrust in the amount of the balance indicated above, $1,488,494, identifies a loss as
occurring at the time of the transfer to Madoff.

Please note that this filing is subject to amendment and that no rights are being waived in
making this claim.

Glenn Akiva Fishman Charitable Remainder Trust

By: _____
Glenn Fishman, Trustee

By: _____
Yale Fishman, Trustee

# CUSTOMER CLAIM

Claim Number_____

Date Received_____

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

### In Liquidation

### DECEMBER 11, 2008

Irving H. Picard, Esq.
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

Provide your office and home telephone no.

OFFICE: _(516)374-0350_

HOME: _(516)~~322~~ 633-1110_

Taxpayer I.D. Number (Social Security No.)
_11-6510747_

Account Number:   1CM552
GLENN AKIVA FISHMAN
CHARITABLE REMAINDER UNITRUST
C/O GLENN A FISHMAN TRUSTEE
445 CENTRAL AVE  SUITE 201
CEDARHURST, NY  11516

(If incorrect, please change)

**NOTE:**    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY THE ACCOMPANYING INSTRUCTION SHEET. A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009. CLAIMS RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.    Claim for money balances as of **December 11, 2008** :
    a.    The Broker owes me a Credit (Cr.) Balance of      $ _2,736,197.50_
    b.    I owe the Broker a Debit (Dr.) Balance of      $_____

information regarding any withdrawals you have ever made or payments received from the Debtor.

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.**

**NOTE:**   IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

|  |  | YES | NO |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. | ✓ _money stolen from Madoff_ | |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? | | ✓ |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? | | ✓ |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) | | ✓ |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. | | ✓ |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. | | ✓ |

Glenn Fishman
930 Broadway
Woodmere, NY 11598
Work: 516.374.0350 Fax: 516.374.0309
Glenn@Fishmanassociates.com

## Glenn Akiva Fishman Charitable Remainder Unitrust
## Madoff Account # 1-CM552-3

| Date | Contribution In | Support Enclosed |
|------|-----------------|------------------|
| 12/15/98 | $1,000,000.00 | See Ex. A1 |
| 12/29/99 | $500,000.00 | See Ex. A2 |
| 12/29/00 | $500,000.00 | See Ex. A3 |
| Totals : | $2,000,000.00 | |

| Date | Distribution Out | Support Enclosed |
|------|------------------|------------------|
| 01/03/00 | $50,095.00 | See Ex. B1 |
| 01/30/01 | $85,219.00 | See Ex. B2 |
| 12/28/01 | $119,210.00 | See Ex. B3 |
| 10/23/02 | $125,872.00 | See Ex. B4 |
| 07/21/04 | $131,110.00 | See Ex. B5 |
| Totals: | $511,506.00 | |

*The last closing statement value as of 12/31/02 is $2,736,197.50 See Ex. C1

# Exhibit D



## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

April 27, 2010

Glenn Akiva Fishman Charitable Remainder Unitrust
c/o Glenn A. Fishman, Trustee
445 Central Avenue, Suite 201
Cedarhurst, New York 11516

Dear Glenn Akiva Fishman Charitable Remainder Unitrust:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1CM552 designated as Claim Number 011058:

Your claim for securities is **DENIED**. No securities were ever purchased for your account.

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.



Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $2,000,000.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is the same as the amount that was deposited with BLMIS for the purchase of securities (total of $2,000,000.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since you have withdrawn all of the funds deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

**On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued a decision which affirmed the Trustee's Net Investment Method for determining customer claims. The final resolution of this issue is expected to be determined on appeal.**

**Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.**

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.



**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after April 27, 2010, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

_____
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc:    Glenn Akiva Fishman
930 Broadway
Woodmere, New York 11598

3

COPY

| Table 1 | | | |
|---|---|---|---|
| **DEPOSITS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 12/15/1998 | CHECK | $1,000,000.00 | $1,000,000.00 |
| 12/29/1999 | CHECK | $500,000.00 | $500,000.00 |
| 12/29/2000 | CHECK | $500,000.00 | $500,000.00 |
| **Total Deposits:** | | $2,000,000.00 | $2,000,000.00 |
| | | | |
| **WITHDRAWALS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 4/14/1999 | CHECK | ($1,904.00) | ($1,904.00) |
| 1/3/2000 | CHECK | ($50,095.00) | ($50,095.00) |
| 1/30/2001 | CHECK | ($85,219.00) | ($85,219.00) |
| 12/28/2001 | CHECK | ($119,210.00) | ($119,210.00) |
| 10/23/2002 | CHECK | ($125,872.00) | ($125,872.00) |
| 7/21/2004 | CHECK | ($131,110.00) | ($131,110.00) |
| 9/29/2004 | TRANS TO 1CM56830 | ($250,000.00) | ($250,000.00) |
| 12/31/2004 | TRANS TO 1CM56830 | ($2,950,112.99) | ($1,236,590.00) |
| 1/31/2005 | TRANS TO 1CM56830 | ($633.42) | $0.00 |
| **Total Withdrawals:** | | ($3,714,156.41) | ($2,000,000.00) |
| | | | |
| **Total deposits less withdrawals:** | | ($1,714,156.41) | $0.00 |

4

# **Exhibit E**

**LOWENSTEIN SANDLER LLP**
Bruce Buechler, Esq.
Nicole Stefanelli, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
    -and-
1251 Avenue of the Americas, 18th Floor
New York, NY  10020
Tel: (212) 262-6700
Fax: (212) 262-7402

*Attorneys for the Irrevocable Charitable Remainder Trust of*
*Yale Fishman and the Glenn Akiva Fishman Charitable Remainder Unitrust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**CERTIFICATION OF BRUCE BUECHLER IN SUPPORT OF**
**MOTION OF THE IRREVOCABLE CHARITABLE REMAINDER TRUST OF**
**YALE FISHMAN AND THE GLENN AKIVA FISHMAN CHARITABLE**
**REMAINDER UNITRUST FOR ENTRY OF AN ORDER (I) SCHEDULING A**
**HEARING TO DETERMINE ALLOWANCE OF CLAIMS, (II) ALLOWING**
**CLAIMS AND (III) GRANTING RELATED RELIEF**

Bruce Buechler, pursuant to 28 U.S.C. §1746, certifies as follows:

1.      I am a partner with the law firm of Lowenstein Sandler LLP, counsel to the Irrevocable Charitable Remainder Trust of Yale Fishman (the "Yale Trust") and the Glenn Akiva Fishman Charitable Remainder Unitrust (the "Glenn Trust," and together with the Yale Trust, the "Trust Claimants").

2.      I submit this Certification in support of the motion (the "Motion")[1] of the Trust Claimants for (i) a hearing to determine the allowance of the Claims (defined below) filed by the Trust Claimants and (ii) the entry of an order allowing the Claims and granting related relief.

3.      As set forth in the Motion, the Trust Claimants have requested that the Trustee schedule a hearing to determine the allowance of the Claims on numerous occasions.  Despite requests of counsel to the Glenn Trust, to date, the Trustee has not obtained a date and time for a hearing before this Court to determine the allowance of the Glenn Claim.

4.      Since the Trust Claimants filed their objections in May of 2010, I have had numerous conversations with counsel for the Trustee.  On several different occasions, I requested that the Trustee schedule a hearing to determine the Claims.  I have been repeatedly advised by counsel to the Trustee that the Claims would be dealt with at a later date.  However, nearly four years later, no hearing has been scheduled on the merits of the Claims.

5.      On December 3, 2012, the Trust Claimants filed an objection [Docket No. 5118] to the *Trustee's Motion For An Order Affirming Trustee's Calculations Of Net Equity And Denying Time-Based Damages* [Docket Nos. 5038, 5039] (the "Trustee's Motion").  Although the hearing on the Trustee's Motion was originally scheduled for January 10, 2013, it was not heard until September 10, 2013.  At the September 10, 2013, counsel to the Trust Claimants requested that a hearing to address the merits of the Claims be scheduled.  This request was denied.

---

[1]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

6.      On October 7, 2013, my office once again contacted counsel to the Trustee via e-mail to request a hearing date.  On October 14, 2013, counsel to the Trustee responded that a hearing could not be scheduled in the Bankruptcy Court regarding the Claims until after the antecedent debt issue has been resolved by District Court Judge Rakoff.  On November 4, 2013, my office sent an e-mail to the Trustee's counsel requesting that, because the October 15, 2013 decision of Judge Rakoff in the consolidated proceedings pending before the District Court (*In re Madoff Sec.,* No. 12-mc-0115 (S.D.N.Y. Oct. 15, 2013), ECF No. 489) did not address the issues raised by the Trust Claimants in their objections, the Trustee schedule a hearing on the Trust Claimants' Claims.

7.      On November 21, 2013, I spoke with counsel to the Trustee by telephone and was advised that the Trustee intended to file a motion in the Bankruptcy Court by the end of December 2013 to deal with all claimants asserting claims arising out of inter-account transfers, such as the Claims of the Trust Claimants.  On December 24, 2013, I once again spoke with counsel to the Trustee by telephone but was advised that such a motion would not be filed by the end of 2013.

8.      On or about January 30, 2014, my office contacted the Court to obtain a hearing date for the Motion.  The Court subsequently advised my office that the Motion could be filed, but that we should first reach out to the Trustee's counsel to work out a briefing schedule. Thereafter, my office engaged in discussions with the Trustee's counsel in an effort to agree on a briefing schedule for the Motion.  The Trustee's counsel would not consent to a briefing schedule for the Motion.  Instead, the Trustee proposed filing his own motion seeking the entry of a scheduling order regarding the appropriate methodology for calculating customer claims involving transfers between BLMIS accounts.  Having been unable to reach an agreement on a briefing schedule for the Motion, my office once again contacted the Court to request a hearing date, which request was granted.  This Motion is filed in accordance with the schedule provided to us by the Court.

I hereby certify under penalty of perjury that the foregoing statements made by me are true and correct.

Dated:  February 7, 2014            */s/ Bruce Buechler*
                                      Bruce Buechler

# Exhibit F

# The Madoff Recovery Initiative

SUBSTANTIVELY CONSOLIDATED SIPA LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC & BERNARD L. MADOFF

**CLAIMS STATUS**

**As of January 3, 2013:**

**TOTAL RECEIVED CLAIMS**
## 16,519

**DETERMINED CLAIMS**
## 16,519

**ALLOWED CLAIMS**
## 2,517

**DENIED CLAIMS**
## 2,705

**DENIED CLAIMS (THIRD PARTY)**
## 10,921

**WITHDRAWN CLAIMS**
## 209

**DETERMINED (NO CLAIM)**
## 12

**DEEMED DETERMINED PENDING LITIGATION**
## 155

**TOTAL VALUE OF ALLOWED CLAIMS**
## $11.402 Billion

**SIPC COMMITTED FUNDS SUBJECT TO SUBROGATION***
## $708.9 Million

*All amounts approximate*

**SIPA LIQUIDATION CLAIMS PROCESS**

The Securities Investor Protection Act (SIPA) Trustee and his counsel are governed by SIPA process, which includes:

- Establishing a fund of customer property: All customer-related assets are put into a co-mingled fund of customer property. Allocation of property to the fund of customer property is based on a motion made by the SIPA Trustee subject to approval by the United States Bankruptcy Court for the Southern District of New York.

- Completing determinations of claims, the value of customer property and total net equity prior to distributions: The SIPA Trustee must first determine the number of allowed claimants and the amount and value of the property under the SIPA Trustee's control. Distributions to pay allowed customer claims will be made when there is clarity for reasonable estimates that can be made of both the amount of customer property available for distribution and the total net equity of all allowed customer claims.

- Providing cash advances from the Securities Investor Protection Corporation (SIPC), a membership organization funded by the securities industry: Advances from SIPC are available to the court-appointed SIPA Trustee to distribute to customers with allowed claims, as a way to speed financial relief to these customers, up to the maximum amount of $500,000. As of December 6, 2013, SIPC has committed approximately $811.7 million to the Bernard L. Madoff Investment Securities LLC (BLMIS) liquidation for this purpose. SIPC committed advances will continue to increase as additional claims that have been deemed determined become allowed over time.

- According to the provisions of SIPA, under which SIPC was created, SIPC is entitled to be reimbursed for cash advanced to customers once respective customer claims have been fully satisfied. As of the third pro rata distribution in the BLMIS liquidation proceeding, SIPC received $102.81 million in reimbursement from the Customer Fund for advances paid on accounts now fully satisfied, leaving $708.9 million in SIPC advances outstanding.

- Making advances for administrative costs: The SIPA Trustee and SIPC have agreed that, at this time, they have no reasonable expectation that the General Estate will be sufficient to pay the administrative expenses of the BLMIS liquidation. Accordingly, any fees and expenses allowed by the United States Bankruptcy Court for the Southern District of New York will be paid from advances by SIPC, a membership organization funded by the securities industry.

- Distributing customer property pro rata based on net equity: Each verified allowed claimant is entitled to a pro rata share, or a percentage of the fund of customer property based on a calculation related to the customer's individual "net equity." Distributions may be in stages.

**BLMIS LIQUIDATION CLAIMS PROCEDURES AND CHRONOLOGY**

**Claims Procedures Order**
 - Claims Determinations
 - Objections
 - Claims Trading
 - General Creditor Claims
 - Net Equity Methodology
 - Time-Based Damages

**Claims Procedures Order**
On December 23, 2008, the United States Bankruptcy Court for the Southern District of New York entered the Claims Procedures Order that specified the procedures for the filing, determination and adjudication of customer claims in the Securities Investor Protection Act (SIPA) liquidation of Bernard L. Madoff Investment Securities LLC (BLMIS). This order specified that BLMIS customers would share pro rata in customer property, based on their net equity.

The last date for filing customer claims under SIPA and the Claims Procedure Order was July 2, 2009. The SIPA Trustee published notices to BLMIS customers in all major newspapers regarding the liquidation, mailed thousands of customer claim forms to those who requested them and made request forms available for download via this website.

**Claims Determinations**
Once a claim is determined, a letter of determination is sent to the claimant by the SIPA Trustee. Every six months, the SIPA Trustee files a detailed interim report on the status of claims. In addition, claims numbers are updated weekly on this website.

**Objections**
If a claimant disputes the SIPA Trustee's determination, the claimant may object and request a hearing before the United States Bankruptcy Court for the Southern District of New York. This must be done within 30 days of the date of the determination letter unless the time is extended. If the claimant fails to request a hearing within those 30 days or fails to appear at the scheduled hearing, the SIPA Trustee's determination is final.

**Claims Trading**
Customer claims may be transferred in full in the BLMIS liquidation proceeding. On November 10, 2010, the Court entered an order approving certain uniform procedures and forms with respect to the trading of claims. Notice of a claim transfer must be provided in accordance with those procedures.

The SIPA Trustee does not take a position with regard to claims trading.

**General Creditor Claims**

All "good faith" BLMIS customers were defrauded. Regardless of whether their claims for distributions from the Customer Fund are denied or approved, their claims are also deemed to be general creditor claims against the General Estate. Other creditors in the liquidation, such as service providers and vendors, also have claims against the BLMIS General Estate. Once the SIPA Trustee fully satisfies the net equity claims of BLMIS customers, the next step in the BLMIS liquidation is to distribute customer property in accordance with the other priorities in SIPA. After customer net equity claims, the next priority is to distribute customer property to SIPC as subrogee. Thereafter, any customer property remaining becomes part of the General Estate.

Once those priorities are satisfied, the next step is to allocate recoveries to the General Estate and to distribute those recoveries pro rata to general creditors in the order of priority established in the Bankruptcy Code.

**Net Equity Methodology**

The SIPA Trustee determined that he would calculate a customer's net equity based on the real assets that customers lost to Madoff's scheme: the cash deposited, less any amount withdrawn (the "net investment" or "cash in/cash out" method).

Certain claimants disagreed with the SIPA Trustee as to the definition of "net equity" in the Madoff fraud and how that term should be applied to determine the amount of the valid customer claim of each claimant. They argued that the SIPA Trustee should have calculated their net equity – which determines their percentage of recovered customer property – based on the amounts shown on the final customer statements issued by BLMIS in November 2008 (the "last statement method").

The SIPA Trustee rejected that method, as those statements were fiction.

United States Bankruptcy Court for the Southern District of New York

After the filing of a number of objections, the SIPA Trustee filed a motion with the United States Bankruptcy Court for the Southern District of New York seeking an order affirming his use of the Net Investment Method in calculating "net equity."

Both SIPC and the SEC submitted briefs supporting the SIPA Trustee's motion.

A hearing was held at the United States Bankruptcy Court for the Southern District of New York on February 2, 2010.

On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York granted the SIPA Trustee's motion for an order denying customer claims for amounts listed on the BLMIS last customer statement and affirming the SIPA Trustee's determination of net equity and entered a memorandum decision. On March 8, 2010, the United States Bankruptcy Court for the Southern District of New York entered an order implementing that decision.

The memorandum by the Honorable Judge Burton R. Lifland noted that "[a]ny dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested." Further, the order noted that those claimants who withdrew funds from their BLMIS accounts that exceeded their initial investments "would receive more favorable treatment by profiting from the principal investments of [those claimants who have withdrawn less money than they deposited], yielding an inequitable result."

Finally, the memorandum noted that the Net Investment Method, unlike the Last Statement Method, allowed The SIPA Trustee to "unwind, rather than legitimiz[e], the fraudulent scheme."

Appeal to the United States Court of Appeals Certified

Certain claimants elected to appeal the decision. The appeal was certified directly to the United States Court of Appeals.

On September 20, 2010, both the SIPA Trustee and the Securities Investor Protection Corporation (SIPC) filed briefs in support of the "cash-in, cash out" net equity methodology.

On September 21, 2010, the SEC filed an amicus brief that supported the SIPA Trustee's Net Investment Method, asserting that it is required by SIPA and is consistent with precedent.

Oral arguments were held on March 3, 2011 before a panel of three Justices of the United States Court of Appeals for the Second Circuit.

On August 16, 2011, the United States Court of Appeals for the Second Circuit issued an order affirming the decision of United States Bankruptcy Court for the Southern District of New York as "legally sound," noting that "Use of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations."

Petition for Panel Rehearing, or, in the Alternative, Rehearing en banc Filed

A petition was filed with the United States Court of Appeals for the Second Circuit for a panel rehearing, or, in the alternative, for rehearing en banc.

Panel Rehearing or Rehearing en banc Denied

On November 8, 2011, the petition was denied.

Petitions for Writs of Certiorari Filed with Supreme Court of the United States

Three petitions for writs of certiorari were filed with the Supreme Court of the United States seeking review of the United States Court of Appeals decision. The SIPA Trustee submitted briefs in opposition on March 9, 2012. SIPC

submitted briefs in opposition on March 9, 2012, and the SEC submitted a brief in opposition on May 24, 2012. On June 4, 2012, one of the writs of certiorari was withdrawn, a result of settlement with the SIPA Trustee.

Petitions for Writs of Certiorari Denied – Net Equity Upheld
On June 25, 2012, the Supreme Court entered an order that it refused to grant the petitions, thereby upholding the net equity methodology, ending the appeals process and resolving the matter.

**Time-Based Damages**
On August 22, 2012, the SIPA Trustee's July 26, 2012 motion for a second pro rata interim distribution was approved by the Honorable Burton R. Lifland of the United States Bankruptcy Court for the Southern District of New York. The second pro rata interim distribution, which totals approximately $3.746 billion to date, commenced on September 19, 2012 with a record date of September 12, 2012.

The amount of the distribution was dependent on several issues, including the issue of whether BLMIS claimants are entitled to "time-based damages" or payments based on the time elapsed while customer monies were deposited with BLMIS. More than 1,200 objections have been filed based on the issue of time-based damages, with some claimants seeking as much as 9 percent interest. In its order, the Court instructed the SIPA Trustee to reserve 3 percent for the time-based damages issue.

On September 10, 2013, the United States Bankruptcy Court for the Southern District of New York approved the SIPA Trustee's motion to deny time-based damages adjustments to customer claims. That decision was appealed by objecting parties on September 24, 2013 and on the same day an order was filed by the Bankruptcy Court certifying the order of September 10, 2013 for immediate appeal to the United States Court of Appeals.

Until a final, unappealable decision is reached, the SIPA Trustee must continue to hold money in reserve for this issue. To date, the reserve is approximately $1.375 billion.