# EXHIBIT A

**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Marc E. Hirschfield
Richard J. Bernard
Geraldine E. Ponto
Marc Skapof

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-_____ (BRL) |
| v. | |
| NTC & Co. LLP, as former custodian of an Individual Retirement Account for the benefit of David Ivan Lustig; and DAVID IVAN LUSTIG, | |
| Defendants. | |

# COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L.

Madoff individually ("Madoff"), by and through his undersigned counsel, for his complaint (the

"Complaint"), states as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Madoff.  Over the course of the scheme, there were more than 8,000 client accounts at BLMIS.

In early December 2008, BLMIS generated client account statements for its approximately 4,900

open client accounts.  When added together, these statements purport that clients of BLMIS had

approximately $65 billion invested with BLMIS.  In reality, BLMIS had assets on hand worth a

small fraction of that amount.  On March 12, 2009, Madoff admitted to the fraudulent scheme

and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison.

2.      Defendant NTC & Co. LLP, as former custodian of the Individual Retirement

Account for the benefit of David Ivan Lustig ("Defendant NTC") is either an initial transferee of

the avoidable Transfers (as defined below) or a conduit of such Transfers for the benefit of

Defendant David Ivan Lustig ("FBO Defendant").  If Defendant NTC is the initial transferee,

then FBO Defendant is the subsequent transferee of the Transfers for purposes of this Complaint.

To the extent Defendant NTC served as a conduit for the funds withdrawn for the benefit of FBO

Defendant, FBO Defendant is an initial transferee of the Transfers for whose benefit such

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

Transfers were made for purposes of this Complaint.  The within defendants, Defendant NTC
and/or FBO Defendant, received avoidable transfer(s) from BLMIS.

3.      Defendant NTC and/or FBO Defendant were beneficiaries of this Ponzi scheme.
Since December 11, 2002, Defendant NTC and/or FBO Defendant received the amount of
$2,000,000 from BLMIS.  The Trustee's investigation has revealed that $1,863,225 of this
amount represented fictitious profits from the Ponzi scheme, in that Defendant NTC and/or FBO
Defendant withdrew more than was invested in the BLMIS account of Defendant NTC and/or
FBO Defendant.  Accordingly, Defendant NTC and/or FBO Defendant have received $1,863,225
of other people's money.  This action is brought to recover the fictitious profit amount so that
this customer property can be equitably distributed among all of the victims of BLMIS.

4.      This adversary proceeding is brought pursuant to sections 78fff(b), 78fff-1(a) and
78fff-2(c)(3) of SIPA, sections 105(a), 544, 548(a), 550(a) and 551 of title 11 of the United
States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York
Debtor and Creditor Law § 270 *et seq*. (McKinney 2001) ("DCL")) and other applicable law, for
avoidance of fraudulent conveyances in connection with certain transfers of property by BLMIS
to or for the benefit of Defendant NTC and/or FBO Defendant.  The Trustee seeks to set aside
such transfers and preserve and recover the property for the benefit of BLMIS' defrauded
customers.

## JURISDICTION AND VENUE

5.      This is an adversary proceeding commenced before the same Court before whom
the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is
pending.  The SIPA Proceeding was originally brought in the United States District Court for the
Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff
Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has

been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28

U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

6.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), and (O).

7.      Venue in this district is proper under 28 U.S.C. § 1409.

## DEFENDANTS

8.      Defendant NTC is a limited liability partnership that was formed under the laws

of the state of Colorado. Its principal place of business is located at 717 17th Street, Suite 2100,

Denver, Colorado 80202.

9.      Upon information and belief, FBO Defendant maintains an address in Pescadero,

California. FBO Defendant holds a BLMIS account in the name, "NTC & Co. FBO David Ivan

Lustig (xxxxx)," with the account address reported in Pescadero, California.

## BACKGROUND, THE TRUSTEE AND STANDING

10.     On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal

agents for violation of the criminal securities laws, including, *inter alia*, securities fraud,

investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and

Exchange Commission ("SEC") filed a complaint in the District Court which commenced the

District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains

pending in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in

fraud through the investment advisor activities of BLMIS.

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is
filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court
"in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced
before the date on which such application was filed, the term 'filing date' means the date on which such proceeding
was commenced." 15 U.S.C. § 78*lll*(7)(B). Thus, even though the application for a protective decree was filed on
December 15, 2008, the Filing Date in this action is December 11, 2008.

11.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of BLMIS.

12.     On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging*, inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

13.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

    a.     appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

    b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

    c.     removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

14.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

15.     At a Plea Hearing on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information

filed against him by the United States Attorneys' Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

16. On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11, 2009 in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS since at least the 1980s. Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

17. As the Trustee appointed under SIPA, the Trustee is charged with recovering and paying out customer property to BLMIS' customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the

10-04554-smb  Doc 57  Filed 12/01/10  Entered 12/01/10 08:07  Main Document
Pg 8 of 30

Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

18. Pursuant to section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA section 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA.

19. Pursuant to sections 78fff(b) and 78*lll*(7)(B) of SIPA, the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

20. The Trustee has standing to bring these claims pursuant to section 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a. Defendant NTC and/or FBO Defendant received "Customer Property" as defined in 15 U.S.C. §78*lll*(4);

b. BLMIS incurred losses as a result of the claims set forth herein;

c. BLMIS' customers were injured as a result of the conduct detailed herein;

d. SIPC has not reimbursed, and statutorily cannot fully reimburse, all customers for all of their losses;

e. the Trustee will not be able to fully satisfy all claims;

f. the Trustee, as bailee of customer property, can sue on behalf of the customer bailors;

g.    The Trustee is the assignee of claims paid, and to be paid, to customers of
BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers,
collectively, "Accountholders").  As of the date hereof, the Trustee has received multiple express
unconditional assignments of the applicable Accountholders' causes of action, which actions
could have been asserted against Defendant NTC and/or FBO Defendant.  As assignee, the
Trustee stands in the shoes of persons who have suffered injury in fact and a distinct and
palpable loss for which the Trustee is entitled to reimbursement in the form of monetary
damages.  The Trustee brings this action on behalf of, among others, those defrauded customers
of BLMIS who invested more money in BLMIS than they withdrew; and

h.    SIPC is the subrogee of claims paid, and to be paid, to customers of
BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon
the Trustee enforcement of its rights of subrogation with respect to payments it has made and is
making to customers of BLMIS from SIPC funds.

## THE FRAUDULENT PONZI SCHEME

21.    Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and
later, effective January 2001, formed as a New York limited liability company wholly owned by
Madoff.  Since in or about 1986, BLMIS operated from its principal place of business at 885
Third Avenue, New York, New York.  Madoff, as founder, proprietor, chairman, and chief
executive officer, ran BLMIS together with several family members and a number of additional
employees.  BLMIS was registered with the SEC as a securities broker-dealer under section
15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78$o$(b).  By that registration, BLMIS
is a member of SIPC.  BLMIS had three business units: investment advisory (the "IA Business"),
market making and proprietary trading.

22.     For certain accounts in the IA Business, BLMIS purported to participate in a capital appreciation/depreciation strategy, depending on whether the customer sought to generate gains or losses.  For example, the strategy was executed by either purporting to purchase small groups of securities near lows and then purporting to sell those same securities at highs, or by purporting to short-sell securities near highs and then purporting to repurchase those securities near lows.

23.     For other accounts, Madoff described the IA Business' strategy as a "split-strike conversion" strategy.  Madoff promised these clients that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S. publicly traded companies.  The basket of stocks would be intended to mimic the movement of the S&P 100 Index.  Madoff asserted that he would carefully time purchases and sales to maximize value, but this meant that the clients' funds would intermittently be out of the market, at which times they would purportedly be invested in U.S. issued securities and money market funds.  The second part of the split-strike conversion strategy was the hedge of such purchases with option contracts.  Madoff purported to purchase and sell S&P 100 Index option contracts that closely corresponded with the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks.

24.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication.  The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious.  At his Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he

claimed to have purchased for customer accounts. *See* Plea Allocution of Bernard L. Madoff at 3, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients other than Defendant NTC and/or FBO Defendant, there is no record of BLMIS having cleared any purchase or sale of securities on behalf of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions.

25.     Prior to his arrest, Madoff assured clients and regulators that he conducted all trades on the over-the-counter market after hours.  To bolster that lie, Madoff periodically wired tens of millions of dollars to BLMIS' affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity substantially owned by Madoff and his family.  There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.

26.     Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased and sold.

27.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder, delay or defraud other current and prospective customers of BLMIS.  The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to – or payments on behalf of – other investors.  The money sent to BLMIS for investment, in short, was simply used to keep the scheme going and to enrich Madoff, his associates and others, including Defendant NTC and/or FBO Defendant, until such time as the

-10-

requests for redemptions in December 2008 overwhelmed the flow of new investments and
caused the inevitable collapse of the Ponzi scheme.

28.    The payments to investors constituted an intentional misrepresentation of fact
regarding the underlying accounts and were an integral and essential part of the fraud. The
payments were necessary to validate the false account statements, and were made to avoid
detection of the fraud, to retain existing investors and to lure other investors into the Ponzi
scheme.

29.    During the scheme, certain investors requested and received distributions of the
so-called "profits" listed for their accounts which were nothing more than fictitious profits.
Other investors, from time to time, redeemed or closed their accounts, or removed portions of
purportedly available funds, and were paid consistently with the statements they had been
receiving.  Some of those investors later re-invested part or all of those withdrawn payments with
BLMIS.

30.    When payments were made to or on behalf of these investors, including
Defendant NTC and/or FBO Defendant, the falsified monthly statements of accounts reported
that the accounts of such investors included substantial gains.  In reality, BLMIS had not
invested the investors' principal as reflected in customer statements.  In an attempt to conceal the
ongoing fraud and thereby hinder, delay or defraud other current and prospective investors,
BLMIS paid to or on behalf of certain investors the inflated amounts reflected in the falsified
financial statements, including principal and/or fictitious profits.

31.    BLMIS used the funds deposited from new investments to continue operations
and pay redemption proceeds to or on behalf of other investors and to make other transfers.  Due
to the siphoning and diversion of new investments to fund redemptions requested by other

investors, BLMIS did not have the funds to pay investors on account of their new investments.
BLMIS was able to stay afloat only by using the principal invested by some clients to pay other
investors or their designees.

32.     In an effort to hinder, delay or defraud authorities from detecting the fraud,
BLMIS did not register as an Investment Advisor until September 2006.

33.     In or about January 2008, BLMIS filed with the SEC a Uniform Application for
Investment Adviser Registration.  The application represented, *inter alia*, that BLMIS had 23
customer accounts and assets under management of approximately $17.1 billion.  In fact, in
January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of
approximately $65 billion under management.

34.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports
"prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New
York.  Of the two accountants at the firm, one was semi-retired and living in Florida for many
years prior to the Filing Date.

35.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars
greater than the assets of BLMIS.  At all relevant times, BLMIS was insolvent in that (i) its
assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they
came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**THE TRANSFERS**

36.     According to BLMIS' records, Defendant NTC and/or FBO Defendant
maintained an account (No. 1ZR297) with BLMIS, as set forth on Exhibit A (the "Account").
Upon information and belief, for the Account, FBO Defendant executed a Customer Agreement,
an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of
Securities and Options (collectively, the "Account Agreements"), and delivered such documents

-12-

to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.  At all times relevant hereto, Defendant NTC was the custodian of FBO Defendant's Account.

37.     The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Account was held in New York, New York, and Defendant NTC and/or FBO Defendant sent funds to BLMIS and/or to BLMIS' account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Account and the purported conducting of trading activities.  Between the date the Account was opened and the Filing Date, Defendant NTC and/or FBO Defendant made deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or received inter-account transfers from other BLMIS accounts.

38.     During the six years prior to the Filing Date, BLMIS made transfers (collectively, the "Transfers") to Defendant NTC and/or FBO Defendant totaling at least $1,863,225 in fictitious profits from the Ponzi scheme.  The Transfers received by Defendant NTC and/or FBO Defendant constitute non-existent profits supposedly earned in the Account, but, in reality, they were other people's money.  The Transfers were made to or for the benefit of Defendant NTC and/or FBO Defendant and are set forth in Columns 10 and 11 on Exhibit B annexed hereto.

39.     The Transfers that are avoidable and recoverable under sections 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3) total at least $1,863,225 and are referred to hereafter as the "Two Year Transfers." See Exhibit B, Column 10.  The Transfers that are avoidable and recoverable under sections 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of N.Y. CPLR 203(g) (McKinney 2001)

and DCL sections 273 – 279 (McKinney 2001) total at least $1,863,225 and are referred to

hereafter as the "Six Year Transfers." See Exhibit B, Column 11.

40.     On information and belief, all of the Transfers were subsequently transferred by

Defendant NTC to FBO Defendant (collectively, the "Subsequent Transfers").

41.     The Subsequent Transfers, or the value thereof, are recoverable from FBO

Defendant pursuant to §550(a) of the Bankruptcy Code.

42.     The Trustee's investigation is ongoing and the Trustee reserves the right to

(i) supplement the information regarding the Transfers, Subsequent Transfers, and any additional

transfers and (ii) seek recovery of such additional transfers.

43.     To the extent that any of the avoidance and/or recovery counts may be

inconsistent with each other, they are to be treated as being pled in the alternative.

## CUSTOMER CLAIMS

44.     On or about June 30, 2009, FBO Defendant filed a customer claim with the

Trustee which the Trustee has designated as Claim # 013425 (the "Customer Claim").

45.     On or about October 19, 2009, the Trustee issued a Notice of Trustee's

Determination of Claim to FBO Defendant (the "Determination") with respect to the Customer

Claim. A copy of the Determination is attached hereto as Exhibit C.

46.     On or about December 17, 2009, FBO Defendant filed an objection to the

Determination with the Court (the "Claims Objection").

47.     On December 23, 2008, this Court entered an Order on Application for Entry of

an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying

Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief

("Claims Procedures Order"; Docket No. 12). The Claims Procedures Order includes a process

for determination and allowance of claims under which the Trustee has been operating. The

Trustee intends to resolve the Customer Claim and the Claims Objection to the Trustee's determination of such claim through a separate hearing as contemplated by the Claims Procedures Order.

**COUNT ONE**
**FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a) AND 551**

48.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

49.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

50.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

51.    Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS' then existing and/or future creditors.

52.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Defendant NTC and/or FBO Defendant pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

53.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendant NTC and/or FBO Defendant: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS.

## COUNT TWO
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a) AND 551

54.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

55.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

56.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

57.    BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers.

58.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfers.

59.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with BLMIS was an unreasonably small capital.

60.    At the time BLMIS made each of the Two Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

61.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendant NTC and/or FBO Defendant pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

62.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of
the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment
against Defendant NTC and/or FBO Defendant: (a) avoiding and preserving the Two Year
Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two
Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit
of the estate of BLMIS.

**COUNT THREE**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 276,**
**278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551**

63.     To the extent applicable, the Trustee incorporates by reference the allegations
contained in the previous paragraphs of this Complaint as if fully rewritten herein.

64.     At all times relevant to the Six Year Transfers, there have been and are one or
more creditors who have held and still hold matured or unmatured unsecured claims against
BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and
are not allowable only under section 502(e) of the Bankruptcy Code.

65.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined
under DCL section 270.

66.     Each of the Six Year Transfers was made by BLMIS with the actual intent to
hinder, delay or defraud the creditors of BLMIS.  BLMIS made each of the Six Year Transfers to
or for the benefit of Defendant NTC and/or FBO Defendant in furtherance of a fraudulent
investment scheme.

67.     As a result of the foregoing, pursuant to DCL sections 276, 278 and/or 279,
sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the
Trustee is entitled to a judgment against Defendant NTC and/or FBO Defendant: (a) avoiding
and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and

(c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS.

## COUNT FOUR
### FRAUDULENT TRANSFER --NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

68.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

69.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

70.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

71.    BLMIS did not receive fair consideration for any of the Six Year Transfers.

72.    BLMIS was insolvent, or became insolvent as a result of the Six Year Transfers.

73.    As a result of the foregoing, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendant NTC and/or FBO Defendant: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS.

## COUNT FIVE
### FRAUDULENT TRANSFER—NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551

74.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

75.     At all times relevant to the Six Year Transfers, there have been and are one or
more creditors who have held and still hold matured or unmatured unsecured claims against
BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and
are not allowable only under section 502(e) of the Bankruptcy Code.

76.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined
under DCL section 270.

77.     BLMIS did not receive fair consideration for any of the Six Year Transfers.

78.     At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or
was about to engage in a business or transaction for which the property remaining in its hands
after each of the Six Year Transfers was an unreasonably small capital.

79.     As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279,
sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the
Trustee is entitled to a judgment against Defendant NTC and/or FBO Defendant: (a) avoiding
and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and
(c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO
Defendant for the benefit of the estate of BLMIS.

**COUNT SIX**
**FRAUDULENT TRANSFER-NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278**
**AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551**

80.     To the extent applicable, the Trustee incorporates by reference the allegations
contained in the previous paragraphs of the Complaint as if fully rewritten herein.

81.     At all times relevant to the Six Year Transfers, there have been and are one or
more creditors who have held and still hold matured or unmatured unsecured claims against
BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and
are not allowable only under section 502(e) of the Bankruptcy Code.

82.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

83.    BLMIS did not receive fair consideration for any of the Six Year Transfers.

84.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

85.    As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279 and sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendant NTC and/or FBO Defendant: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS.

**COUNT SEVEN**
**RECOVERY OF SUBSEQUENT TRANSFER - NEW YORK DEBTOR AND CREDITOR
LAW §§ 278 AND/OR 279 AND 11 U.S.C. §§ 544, 548, 550(a) AND 551**

86.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

87.    Each of the Transfers is avoidable under sections 544 and 548 of the Bankruptcy Code, DCL sections 273, 274, 275 and/or 276 and section 78fff-2(c)(3) of SIPA.

88.    On information and belief, the Subsequent Transfers were transferred by Defendant NTC to FBO Defendant.

89.    Each of the Subsequent Transfers was made directly or indirectly to FBO Defendant.

90.    FBO Defendant is an immediate or mediate transferee of the Subsequent Transfers from Defendant NTC.

91.     As a result of the foregoing and the avoidance of the within Transfers, pursuant to DCL sections 278 and/or 279, sections 544(b), 548(a), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against FBO Defendant: (a) avoiding and preserving the Subsequent Transfers, (b) directing that the Subsequent Transfers be set aside, and (c) recovering the Subsequent Transfers, or the value thereof, from FBO Defendant for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendant NTC and/or FBO Defendant as follows:

i.      On the First Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS;

ii.     On the Second Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS;

iii.    On the Third Claim for Relief, pursuant to DCL sections 276, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS;

iv.      On the Fourth Claim for Relief, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS;

v.       On the Fifth Claim for Relief, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS;

vi.      On the  Sixth Claim for Relief, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant NTC and/or FBO Defendant for the benefit of the estate of BLMIS;

vii.     On the Seventh Claim for Relief as a result of the avoidance of the within Transfers, pursuant to DCL section 278 and/or 279, sections 544(b), 548, 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Subsequent Transfers; (b) directing that the Subsequent Transfers be set aside; and (c) recovering the Subsequent Transfers, or the value thereof, from FBO Defendant for the benefit of the estate of BLMIS;

viii.    On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001
and 5004 awarding the Trustee prejudgment interest from the date on which the Transfers were
received;

ix.    On all Claims for Relief, establishment of a constructive trust over the proceeds of
the Transfers in favor of the Trustee for the benefit of BLMIS' estate;

x.    On all Claims for Relief, assignment of income tax refunds of Defendant NTC
and/or FBO Defendant from the United States, state and local governments paid on fictitious
profits during the course of the scheme;

xi.    On all Claims for Relief, awarding the Trustee all applicable interest, costs, and
disbursements of this action; and

xii.    On all Claims for Relief, granting Plaintiff such other, further, and different relief
as the Court deems just, proper and equitable.

Date:  November 12, 2010
       New York, New York

Of Counsel:                                    By: /s/ Marc E. Hirschfield
                                                   /s/ Richard J. Bernard
**BAKER & HOSTETLER LLP**                          /s/ Geraldine E. Ponto
1000 Louisiana, Suite 2000                         /s/ Marc Skapof
Houston, Texas 77002-5018                      **BAKER & HOSTETLER LLP**
Telephone: (713)751-1600                       45 Rockefeller Plaza
Facsimile: (713)751-1717                       New York, New York 10111
Dean D. Hunt                                   Telephone: (212) 589-4200
Email: dhunt@bakerlaw.com                      Facsimile: (212) 589-4201
Tonya A. Jacobs                                David J. Sheehan
Email: tjacobs@bakerlaw.com                    Email:  dsheehan@bakerlaw.com
Pamela G. Johnson                              Marc E. Hirschfield
Email: pjohnson@bakerlaw.com                   Email:  mhirschfield@bakerlaw.com
Robyn R. Goldstein                             Richard J. Bernard
Email: rgoldstein@bakerlaw.com                 Email: rbernard@bakerlaw.com
                                               Geraldine E. Ponto
                                               Email: gponto@bakerlaw.com
                                               Marc Skapof
                                               Email: mskapof@bakerlaw.com

                                               *Attorneys for Irving H. Picard, Trustee for the*
                                               *Substantively Consolidated SIPA Liquidation*
                                               *of Bernard L. Madoff Investment Securities*
                                               *LLC and Bernard L. Madoff*

10-04354-smg    Doc 1    Filed 12/07/10    Entered 12/07/10 13:33:07    Main Document
Pg 26 of 30

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| NTC & CO. FBO DAVID IVAN LUSTIG  REDACTED | 1ZR297 |

BLMIS ACCOUNT NO. 1ZR297 - NTC & CO. FBO DAVID IVAN LUSTIG      REDACTED

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |
| 5/30/2000 | CHECK | 56,265 | 56,265 | - | - | - | 56,265 | - | - | - |
| 5/31/2000 | TRANS FROM 1ZA31430 | 1,225,426 [1] | - | - | - | - | 56,265 | - | - | - |
| 8/16/2000 | TRANS FROM 1ZA31430 | 536 [1] | - | - | - | - | 56,265 | - | - | - |
| 12/18/2001 | CHECK | 28,638 | 28,638 | - | - | - | 84,903 | - | - | - |
| 5/12/2003 | CHECK | 51,872 | 51,872 | - | - | - | 136,775 | - | - | - |
| 7/25/2007 | CHECK WIRE | (2,000,000) | - | (2,000,000) | - | - | (1,863,225) | - | (1,863,225) | (1,863,225) |
| | Total: | | $ 136,775 | $ (2,000,000) | $ - | $ - | $ (1,863,225) | $ - | $ (1,863,225) | $ (1,863,225) |

[1] Although BLMIS statements reflect that funds were transferred into this account on this date, these funds consisted entirely of fictitious profits which were never achieved and thus no funds were actually transferred into the account on this date.  Accordingly, the account balance has remained unchanged.

MADC0624_00000002

# BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

## DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

October 19, 2009

NTC & Co. FBO David Ivan Lustig (IRA)
**REDACTED**
Pescadero CA 94060

Dear NTC & Co. FBO David Ivan Lustig (IRA):

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1ZR297 designated as Claim Number 013425:

Your claim for a credit balance of $3,985.00 and for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $2,000,000.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

300034804.1

of $136,774.75). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($1,863,225.25) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after October 19, 2009, the date on which the Trustee mailed this notice.

300034804.1

2

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc:    Austin G. Bosarge
Turning Point Law
REDACTED
San Rafael, California 94903

NTC & Co. FBO David Ivan Lustig
REDACTED
Denver, Colorado 80217

300034804.1                                3

| - Table 1 - | | | |
|---|---|---|---|
| **DEPOSITS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 5/30/2000 | CHECK | $56,264.79 | $56,264.79 |
| 5/31/2000 | TRANS FROM 1ZA31430 | $1,225,426.25 | $0.00 |
| 8/16/2000 | TRANS FROM 1ZA31430 | $536.03 | $0.00 |
| 12/18/2001 | CHECK | $28,638.31 | $28,638.31 |
| 5/12/2003 | CHECK | $51,871.65 | $51,871.65 |
| **Total Deposits:** | | $1,362,737.03 | $136,774.75 |
| **WITHDRAWALS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 7/25/2007 | CHECK WIRE | ($2,000,000.00) | ($2,000,000.00) |
| **Total Withdrawals:** | | ($2,000,000.00) | ($2,000,000.00) |
| **Total deposits less withdrawals:** | | ($637,262.97) | ($1,863,225.25) |

300034804.1

4

MADC0624_00000006

EXHIBIT B

| HOME | TRUSTEE | CLAIMS | RECOVERIES | AVOIDANCE ACTIONS | COURT FILINGS | NEWS | FACTS | CLASS ACTION | CONTACT |

# The Madoff Recovery Initiative

SUBSTANTIVELY CONSOLIDATED SIPA LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC & BERNARD L. MADOFF

FOLLOW US ON TWITTER
SUBSCRIBE TO RSS

## CLAIMS STATUS

**As of February 21, 2014:**

**TOTAL RECEIVED CLAIMS**
16,519

**DETERMINED CLAIMS**
16,519

**ALLOWED CLAIMS**
2,517

**DENIED CLAIMS**
2,705

**DENIED CLAIMS (THIRD PARTY)**
10,921

**WITHDRAWN CLAIMS**
209

**DETERMINED (NO CLAIM)**
12

**DEEMED DETERMINED PENDING LITIGATION**
155

**TOTAL VALUE OF ALLOWED CLAIMS**
$11.402 Billion

**SIPC COMMITTED FUNDS SUBJECT TO SUBROGATION***
$708.9 Million

MORE INFO

*All amounts approximate*

## SIPA LIQUIDATION CLAIMS PROCESS

The Securities Investor Protection Act (SIPA) Trustee and his counsel are governed by SIPA process, which includes:

- Establishing a fund of customer property: All customer-related assets are put into a co-mingled fund of customer property. Allocation of property to the fund of customer property is based on a motion made by the SIPA Trustee subject to approval by the United States Bankruptcy Court for the Southern District of New York.

- Completing determinations of claims, the value of customer property and total net equity prior to distributions: The SIPA Trustee must first determine the number of allowed claimants and the amount and value of the property under the SIPA Trustee's control. Distributions to pay allowed customer claims will be made when there is clarity for reasonable estimates that can be made of both the amount of customer property available for distribution and the total net equity of all allowed customer claims.

- Providing cash advances from the Securities Investor Protection Corporation (SIPC), a membership organization funded by the securities industry: Advances from SIPC are available to the court-appointed SIPA Trustee to distribute to customers with allowed claims, as a way to speed financial relief to these customers, up to the maximum amount of $500,000. As of February 7, 2014, SIPC has committed approximately $811.7 million to the Bernard L. Madoff Investment Securities LLC (BLMIS) liquidation for this purpose. SIPC committed advances will continue to increase as additional claims that have been deemed determined become allowed over time.

- According to the provisions of SIPA, under which SIPC was created, SIPC is entitled to be reimbursed for cash advanced to customers once respective customer claims have been fully satisfied. As of the third pro rata interim distribution in the BLMIS liquidation proceeding, SIPC received $102.81 million in reimbursement from the Customer Fund for advances paid on accounts now fully satisfied, leaving $708.9 million in SIPC advances outstanding.

- Making advances for administrative costs: The SIPA Trustee and SIPC have agreed that, at this time, they have no reasonable expectation that the General Estate will be sufficient to pay the administrative expenses of the BLMIS liquidation. Accordingly, any fees and expenses allowed by the United States Bankruptcy Court for the Southern District of New York will be paid from advances by SIPC, a membership organization funded by the securities industry.

- Distributing customer property pro rata based on net equity: Each verified allowed claimant is entitled to a pro rata share, or a percentage of the fund of customer property based on a calculation related to the customer's individual "net equity." Distributions may be in stages.

### BLMIS LIQUIDATION CLAIMS PROCEDURES AND CHRONOLOGY

- Claims Procedures Order
- Claims Determinations
- Objections
- Claims Trading
- General Creditor Claims
- Net Equity Methodology
- Time-Based Damages

#### Claims Procedures Order
On December 23, 2008, the United States Bankruptcy Court for the Southern District of New York entered the Claims Procedures Order that specified the procedures for the filing, determination and adjudication of customer claims in the Securities Investor Protection Act (SIPA) liquidation of Bernard L. Madoff Investment Securities LLC (BLMIS). This order specified that BLMIS customers would share pro rata in customer property, based on their net equity.

The last date for filing customer claims under SIPA and the Claims Procedure Order was July 2, 2009. The SIPA Trustee published notices to BLMIS customers in all major newspapers regarding the liquidation, mailed thousands of customer claim forms to those who requested them and made request forms available for download via this website.

#### Claims Determinations
Once a claim is determined, a letter of determination is sent to the claimant by the SIPA Trustee. Every six months, the SIPA Trustee files a detailed interim report on the status of claims. In addition, claims numbers are updated weekly on this website.

If a claimant disputes the SIPA Trustee's determination, the claimant may object and request a hearing before the United States Bankruptcy Court for the Southern District of New York. This must be done within 30 days of the date of the determination letter unless the time is extended. If the claimant fails to request a hearing within those 30 days or fails to appear at the scheduled hearing, the SIPA Trustee's determination is final.

### Claims Trading
Customer claims may be transferred in full in the BLMIS liquidation proceeding. On November 10, 2010, the Court entered an order approving certain uniform procedures and forms with respect to the trading of claims. Notice of a claim transfer must be provided in accordance with those procedures.

The SIPA Trustee does not take a position with regard to claims trading.

### General Creditor Claims
All "good faith" BLMIS customers were defrauded. Regardless of whether their claims for distributions from the Customer Fund are denied or approved, their claims are also deemed to be general creditor claims against the General Estate. Other creditors in the liquidation, such as service providers and vendors, also have claims against the BLMIS General Estate. Once the SIPA Trustee fully satisfies the net equity claims of BLMIS customers, the next step in the BLMIS liquidation is to distribute customer property in accordance with the other priorities in SIPA. After customer net equity claims, the next priority is to distribute customer property to SIPC as subrogee. Thereafter, any customer property remaining becomes part of the General Estate.

Once those priorities are satisfied, the next step is to allocate recoveries to the General Estate and to distribute those recoveries pro rata to general creditors in the order of priority established in the Bankruptcy Code.

### Net Equity Methodology
The SIPA Trustee determined that he would calculate a customer's net equity based on the real assets that customers lost to Madoff's scheme: the cash deposited, less any amount withdrawn (the "net investment" or "cash in/cash out" method).

Certain claimants disagreed with the SIPA Trustee as to the definition of "net equity" in the Madoff fraud and how that term should be applied to determine the amount of the valid customer claim of each claimant. They argued that the SIPA Trustee should have calculated their net equity – which determines their percentage of recovered customer property – based on the amounts shown on the final customer statements issued by BLMIS in November 2008 (the "last statement method").

The SIPA Trustee rejected that method, as those statements were fiction.

### United States Bankruptcy Court for the Southern District of New York
After the filing of a number of objections, the SIPA Trustee filed a motion with the United States Bankruptcy Court for the Southern District of New York seeking an order affirming his use of the Net Investment Method in calculating "net equity."

Both SIPC and the SEC submitted briefs supporting the SIPA Trustee's motion.

A hearing was held at the United States Bankruptcy Court for the Southern District of New York on February 2, 2010.

On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York granted the SIPA Trustee's motion for an order denying customer claims for amounts listed on the BLMIS last customer statement and affirming the SIPA Trustee's determination of net equity and entered a memorandum decision. On March 8, 2010, the United States Bankruptcy Court for the Southern District of New York entered an order implementing that decision.

The memorandum by the Honorable Judge Burton R. Lifland noted that "[a]ny dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested." Further, the order noted that those claimants who withdrew funds from their BLMIS accounts that exceeded their initial investments "would receive more favorable treatment by profiting from the principal investments of [those claimants who have withdrawn less money than they deposited], yielding an inequitable result."

Finally, the memorandum noted that the Net Investment Method, unlike the Last Statement Method, allowed The SIPA Trustee to "unwind, rather than legitimiz[e], the fraudulent scheme."

### Appeal to the United States Court of Appeals Certified
Certain claimants elected to appeal the decision. The appeal was certified directly to the United States Court of Appeals.

On September 20, 2010, both the SIPA Trustee and the Securities Investor Protection Corporation (SIPC) filed briefs in support of the "cash-in, cash out" net equity methodology.

On September 21, 2010, the SEC filed an amicus brief that supported the SIPA Trustee's Net Investment Method, asserting that it is required by SIPA and is consistent with precedent.

Oral arguments were held on March 3, 2011 before a panel of three Justices of the United States Court of Appeals for the Second Circuit.

On August 16, 2011, the United States Court of Appeals for the Second Circuit issued an order affirming the decision of United States Bankruptcy Court for the Southern District of New York as "legally sound," noting that "Use of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations."

**Petition for Panel Rehearing, or, in the Alternative, Rehearing en banc Filed**
A petition was filed with the United States Court of Appeals for the Second Circuit for a panel rehearing, or, in the alternative, for rehearing en banc.

**Panel Rehearing or Rehearing en banc Denied**
On November 8, 2011, the petition was denied.

**Petitions for Writs of Certiorari Filed with Supreme Court of the United States**
Three petitions for writs of certiorari were filed with the Supreme Court of the United States seeking review of the United States Court of Appeals decision. The SIPA Trustee submitted briefs in opposition on March 9, 2012. SIPC submitted briefs in opposition on March 9, 2012, and the SEC submitted a brief in opposition on May 24, 2012. On June 4, 2012, one of the writs of certiorari was withdrawn, a result of settlement with the SIPA Trustee.

**Petitions for Writs of Certiorari Denied – Net Equity Upheld**
On June 25, 2012, the Supreme Court entered an order that it refused to grant the petitions, thereby upholding the net equity methodology, ending the appeals process and resolving the matter.

**Time-Based Damages**
On August 22, 2012, the SIPA Trustee's July 26, 2012 motion for a second pro rata interim distribution was approved by the Honorable Burton R. Lifland of the United States Bankruptcy Court for the Southern District of New York. The second pro rata interim distribution, which totals approximately $3.746 billion to date, commenced on September 19, 2012 with a record date of September 12, 2012.

The amount of the distribution was dependent on several issues, including the issue of whether BLMIS claimants are entitled to "time-based damages" or payments based on the time elapsed while customer monies were deposited with BLMIS. More than 1,200 objections have been filed based on the issue of time-based damages, with some claimants seeking as much as 9 percent interest. In its order, the Court instructed the SIPA Trustee to reserve 3 percent for the time-based damages issue.

On September 10, 2013, the United States Bankruptcy Court for the Southern District of New York approved the SIPA Trustee's motion to deny time-based damages adjustments to customer claims. That decision was appealed by objecting parties on September 24, 2013 and on the same day an order was filed by the Bankruptcy Court certifying the order of September 10, 2013 for immediate appeal to the United States Court of Appeals.

Until a final, unappealable decision is reached, the SIPA Trustee must continue to hold money in reserve for this issue. To date, the reserve is approximately $1.375 billion.

---

EXHIBIT C

| HOME | TRUSTEE | CLAIMS | RECOVERIES | AVOIDANCE ACTIONS | COURT FILINGS | NEWS | FACTS | CLASS ACTION | CONTACT |

# The Madoff Recovery Initiative

SUBSTANTIVELY CONSOLIDATED SIPA LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC & BERNARD L. MADOFF

FOLLOW US ON TWITTER
SUBSCRIBE TO RSS 

# Building the Customer Fund

◀ ▶ Start Over

Recoveries & Settlement Agreements Reported as of *February 07, 2014*:

$9.790 Billion

Status of Customer Fund



| FEBRUARY 04, 2014 | JPMorgan Chase, et al. | **$275 Million** | ⓘ |
| DECEMBER 31, 2013 | Additional Recoveries | **$6.6 Million** | ⓘ |
| NOVEMBER 30, 2013 | Additional Recoveries | **$776 Thousand** | ⓘ |
| OCTOBER 31, 2013 | Additional Recoveries | **$4.8 Million** | ⓘ |
| SEPTEMBER 30, 2013 | Additional Recoveries | **$2 Million** | ⓘ |
| SEPTEMBER 17, 2013 | Maxam Absolute Return Fund L.P. | **$97.8 Million** | ⓘ |
| AUGUST 31, 2013 | Additional Recoveries | **$440 Thousand** | ⓘ |
| AUGUST 08, 2013 | Additional Union Bancaire Privée ("UBP") | **$49 Million** | ⓘ |
| JULY 31, 2013 | Additional Recoveries | **$4.7 Million** | ⓘ |
| JUNE 30, 2013 | Additional Recoveries | **$1.6 Million** | ⓘ |
| MAY 31, 2013 | Additional Recoveries | **$2.9 Million** | ⓘ |
| APRIL 30, 2013 | Additional Recoveries | **$10.8 Million** | ⓘ |
| APRIL 15, 2013 | Saul Katz, et al. | **$75.7 Million** | ⓘ |
| MARCH 31, 2013 | Additional Recoveries | **$5.7 Million** | ⓘ |
| FEBRUARY 28, 2013 | Additional Recoveries | **$2.4 Million** | ⓘ |
| DECEMBER 31, 2012 | Additional Recoveries | **$13.7 Million** | ⓘ |
| DECEMBER 04, 2012 | Beacon & Andover | **$24 Million** | ⓘ |
| NOVEMBER 28, 2012 | Additional Fairfield Fund | **$46 Million** | ⓘ |
| SEPTEMBER 30, 2012 | Additional Recoveries | **$19.2 Million** | ⓘ |
| JULY 31, 2012 | Additional Recoveries | **$2.9 Million** | ⓘ |
| JUNE 30, 2012 | Additional Recoveries | **$11.5 Million** | ⓘ |
| MAY 15, 2012 | Trotanoy Investment Company, Ltd. | **$28.96 Million** | ⓘ |
| MARCH 31, 2012 | Additional Recoveries | **$36 Million** | ⓘ |
| DECEMBER 21, 2011 | IRS | **$326 Million** | ⓘ |
| OCTOBER 04, 2011 | Mount Capital | **$43.5 Million** | ⓘ |
| SEPTEMBER 30, 2011 | Additional Recoveries | **$51.1 Million** | ⓘ |
| SEPTEMBER 22, 2011 | Tremont Group | **$1.025 Billion** | ⓘ |

| Date | Description | Amount | |
|---|---|---|---|
| JUNE 07, 2011 | Fairfield Funds | **$16 Million** | ⓘ |
| MARCH 31, 2011 | Additional Recoveries | **$390.8 Million** | ⓘ |
| MARCH 10, 2011 | Hadassah | **$45 Million** | ⓘ |
| JANUARY 13, 2011 | Estate of Jeffry Picower | **$5 Billion** | ⓘ |
| JANUARY 06, 2011 | Union Bancaire Privée ("UBP") | **$470 Million** | ⓘ |
| DECEMBER 21, 2010 | Carl J. Shapiro, et al. | **$550 Million** | ⓘ |
| SEPTEMBER 30, 2010 | Additional Recoveries | **$17.9 Million** | ⓘ |
| FEBRUARY 28, 2010 | Additional Recoveries | **$5.5 Million** | ⓘ |
| FEBRUARY 18, 2010 | Norman F. Levy, et al. | **$220 Million** | ⓘ |
| OCTOBER 31, 2009 | Additional Recoveries | **$23.9 Million** | ⓘ |
| JUNE 16, 2009 | Optimal | **$235.4 Million** | ⓘ |
| MAY 31, 2009 | Initial Recoveries | **$647.8 Million** | ⓘ |

Building the Customer Fund

HOME   TRUSTEE   CLAIMS   RECOVERIES   AVOIDANCE ACTIONS   COURT FILINGS   NEWS   FACTS   PEOPLE   CONTACT   PRIVACY   SEARCH

# EXHIBIT D

BAKER & HOSTETLER LLP                    Hearing Date: February 4, 2014, 10:00 a.m. (EST)
45 Rockefeller Plaza                      Objection Deadline: January 28, 2014, 4:00 p.m.
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Deborah R. Renner
Keith R. Murphy
Seanna R. Brown

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-4932 (BRL) |
| Plaintiff, | |
| v. | |
| JPMORGAN CHASE CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., | |
| Defendants. | |

10-04383-smb    Doc 20-6   Filed 01/17/14   Entered 01/17/14 13:40:05   Exhibit A -
Part 6    Pg 2 of 42

**TRUSTEE'S MOTION FOR ENTRY OF ORDER PURSUANT TO SECTION 105(a) OF
THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES
OF BANKRUPTCY PROCEDURE APPROVING SETTLEMENT OF COMMON LAW
CLAIMS BY AND BETWEEN THE TRUSTEE, THE CLASS REPRESENTATIVES,
AND JPMORGAN**

TO:    THE HONORABLE BURTON R. LIFLAND,
       UNITED STATES BANKRUPTCY JUDGE

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L.

Madoff ("Madoff," and together with BLMIS, the "Debtors"), by and through the Trustee's

undersigned counsel, submits this motion and memorandum (the "Motion") seeking entry of an

order, pursuant to section 105(a) of title 11, United States Code, 11 U.S.C. §§ 101 *et seq.* (the

"Bankruptcy Code") and Rules 2002(a)(3) and 9019(a) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), approving a settlement ("Settlement"), the terms and

conditions of which are set forth in the Settlement Agreement (the "Agreement")[1] dated January

6, 2014 by and among the Trustee; Paul Shapiro, and Stephen and Leyla Hill (the "Class

Representatives"); and JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan

Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMorgan" or "Defendants")

(each of the Trustee, the Class Representatives, and Defendants a "Party" and collectively, the

"Parties").  In support of the Motion, the Trustee respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.    This settlement resolves the substantial Common Law Claims (as defined below

in paragraph 10) asserted by the Trustee and the Class Representatives against JPMorgan.   It is

---

[1] The Agreement is annexed hereto as Exhibit A. To the extent there is any discrepancy between
this Motion and the Agreement, the Agreement controls. Capitalized terms not defined herein
shall have the meaning set forth in the Agreement.

by no means clear that the Trustee or the Class Representatives would prevail in litigation

against JPMorgan on these claims.  In fact, litigation is pending in the United States Supreme

Court that may determine the ability of either the Trustee or the Class Representatives to

successfully pursue the Common Law Claims.  But after the Parties' successful negotiations, and

after thorough and deliberate consideration of the uncertainty, costs, and risks inherent in this

litigation, the Parties determined it was appropriate to reach a business resolution on the

Common Law Claims in light of all the facts and circumstances.

2.      JPMorgan has agreed to settle the Common Law Claims brought by the Trustee

and the Class Representatives in the amount of $218 million, which will flow to "net loser"

BLMIS customers through a class settlement fund, as more fully described herein.

3.      In addition, contemporaneous settlements were entered into between the Trustee

and JPMorgan on the Trustee's Avoidance Claims (as defined below in paragraph 10) and

between JPMorgan and the Government relating to the Government's investigation.  When those

settlements are combined with the Settlement provided for herein, approximately $2.243 billion

will flow to "net loser" victims of Madoff's fraud.

4.      The Agreement represents the culmination of the Trustee's investigation of

JPMorgan's potential liability on the Common Law Claims and a partnership with the Class

Representatives to reach a consensual, cost-efficient resolution with JPMorgan for the benefit of

BLMIS customers.

5.      The Agreement represents a good faith, complete, and final Settlement among the

Trustee, the Class Representatives, and JPMorgan as to the Common Law Claims on the terms

and conditions as set forth in the Agreement.  Resolution of the Trustee's Avoidance Claims is

provided for in a separate agreement. For all of the reasons in this Motion, the Trustee believes

that the Agreement is fair and in the best interests of BLMIS customers and the Estate.

## BACKGROUND AND RELEVANT PROCEDURAL HISTORY

6.      On December 11, 2008 (the "Filing Date"), the Securities & Exchange

Commission ("SEC") filed a complaint in the United States District Court for the Southern

District of New York (the "District Court") against the Debtors (Case No. 08 CV 10791).  The

complaint alleged that the Debtors engaged in fraud through the investment advisor activities of

BLMIS.

7.      On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC

consented to a combination of its own action with an application of the Securities Investor

Protection Corporation ("SIPC").  Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC

filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its

obligations to securities customers as they came due and, accordingly, its customers needed the

protection afforded by SIPA.

8.      On that date, the District Court entered the Protective Decree, to which BLMIS

consented, which, in pertinent part:

    (i)     appointed the Trustee for the liquidation of the business of BLMIS
            pursuant to section 78eee(b)(3) of SIPA;

    (ii)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
            section 78eee(b)(3) of SIPA; and

    (iii)   removed the case to the United States Bankruptcy Court ("Bankruptcy
            Court") pursuant to section 78eee(b)(4) of SIPA.

9.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff.

On June 9, 2009, the Bankruptcy Court entered an order substantively consolidating the chapter

7 estate of Madoff into BLMIS's estate in the SIPA liquidation proceeding (the consolidated

Madoff and BLMIS estates collectively are referred to as the "Estate").

10.    On December 2, 2010, the Trustee filed a complaint (the "Complaint")

commencing an adversary proceeding captioned *Picard v. JPMorgan Chase & Co, et al.*, No.

10-4932 (BRL) (the "JPMorgan Adversary Proceeding") against JPMorgan seeking to avoid and

recover under 11 U.S.C. §§ 544(b), 547, 548 and 550 and the New York Uniform Fraudulent

Conveyance Act (New York Debtor and Creditor Law §§ 270-281) (collectively, the "Avoidance

Claims") approximately $425 million of transfers or other payments (the "Transfers") received

by JPMorgan prior to the collapse of BLMIS, along with interest.  The Trustee also asserted

common law claims (the "Common Law Claims") against JPMorgan, including aiding and

abetting fraud, aiding and abetting breach of fiduciary duty, conversion, unjust enrichment, and

contribution.

11.    On February 8, 2011, JPMorgan moved to withdraw the reference from the

Bankruptcy Court, which was granted by the District Court (McMahon, J.) on May 23, 2011.

12.    On June 3, 2011, JPMorgan moved to dismiss the Common Law Claims and

certain of the Avoidance Claims in the Complaint.  On June 24, 2011, the Trustee filed an

amended complaint (the "Amended Complaint").  On August 1, 2011, JPMorgan moved to

dismiss the Common Law Claims and certain of the Avoidance Claims in the Amended

Complaint.  The Trustee opposed.  On November 1, 2011, the District Court granted JPMorgan's

motion to dismiss the Trustee's Common Law Claims and returned all the Avoidance Claims to

the Bankruptcy Court for further proceedings.  *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84

(S.D.N.Y. 2011).

13.     The Trustee appealed to the United States Court of Appeals for the Second Circuit

(the "Second Circuit"), which affirmed the District Court's ruling on June 20, 2013.  *Picard* v.

*JPMorgan Chase & Co. (In re Bernard L. Madoff Investment Securities LLC)*, 721 F.3d 54 (2d

Cir. 2013).

14.     The Trustee sought review of the Second Circuit's decision by the United States

Supreme Court by filing a petition for a writ of certiorari on October 9, 2013.  The Trustee's

petition is pending.

15.     Shortly after the District Court dismissed the Trustee's Common Law Claims, two

class action complaints were filed in the District Court against JPMorgan in the names of the

customer representatives, Stephen and Leyla Hill, *Hill v. JPMorgan Chase & Co.*, 11 Civ.

7961(CM); and Paul Shapiro, *Shapiro v. JPMorgan Chase & Co.*, 11 Civ. 8331(CM) (together,

the "Customer Representatives").  These complaints asserted various claims against JPMorgan

on behalf of BLMIS customers who were "net losers" as of the Filing Date arising out of the

same facts and circumstances as those giving rise to the Common Law Claims previously

brought by the Trustee.

16.     On December 5, 2011, the District Court consolidated the matters into the

Consolidated Class Action.  On January 20, 2012, a consolidated class action complaint was

filed against JPMorgan (the "Consolidated Class Action Complaint"), again asserting on behalf

of the same proposed class (i.e., BLMIS customers who were "net losers" as of the Filing Date)

various claims against JPMorgan relating to Madoff (the claims set forth in the Consolidated

Class Action Complaint together with the dismissed Common Law Claims are collectively

referred to hereafter as the "Class Claims").

17.    On March 9, 2012, JPMorgan filed a motion to dismiss the Consolidated Class

Action Complaint, which was opposed by the Customer Representatives.  The Trustee filed a

motion seeking limited intervention pursuant to Fed. R. Civ. P. 24(a)(2) in the Consolidated

Class Action, which was granted by the District Court on October 16, 2012.  On September 26,

2013, the District Court placed the Consolidated Class Action on the suspense calendar pending

a decision from the United States Supreme Court in *Roland v. Green*, 675 F.3d 503 (5th Cir.

2012), *cert. granted sub nom. Chadbourne & Parke LLP v. Troice*, 133 S. Ct. 977 (U.S. Jan. 18,

2013) (No. 12-79).  The parties submitted various letter briefs regarding *Chadbourne* and related

issues with the result that the matter remains on the suspense calendar.

## THE COMMON LAW CLAIMS AGAINST JPMORGAN

18.    To fulfill his statutory obligations under 15 U.S.C. § 78fff -1(d), the Trustee,

assisted by his counsel and consultants, investigated the relationship between BLMIS and

JPMorgan.  That investigation included, without limitation, the review and analysis of the "703"

account and other banking accounts held by BLMIS at JPMorgan, correspondence and other

records and documents available to the Trustee, including third-party records and documents;

interviews with third-parties; and documents and testimony provided by JPMorgan under

Bankruptcy Rule 2004.

19.    Counsel for the Class Representatives also commenced an investigation into

BLMIS and Madoff.

20.    The Trustee and the Class Representatives assert that JPMorgan is liable for the

Class Claims, including aiding and abetting fraud, aiding and abetting breach of fiduciary duty,

conversion, unjust enrichment, and contribution.

21.    JPMorgan disputes any liability under all counts alleged in the Trustee's

Amended Complaint and the Consolidated Class Action Complaint.

22.    JPMorgan commenced negotiations to resolve all claims relating to Madoff, including those brought by the Trustee, the Customer Representatives, and the Government.  The Parties have met face-to-face on numerous occasions and conducted frequent settlement negotiations by telephone.

23.    After extensive negotiations, the Trustee, the Class Representatives, and JPMorgan reached a compromise of the Class Claims.  The Agreement, including all exhibits attached thereto and incorporated therein, is the definitive document that reflects all of the terms and conditions of the Settlement between the Trustee, the Class Representatives, and JPMorgan on the Class Claims.  *See* Exhibit A.

24.    As a result of the investigation by the Trustee and the Class Representatives, and the Parties' successful negotiations, and after thorough and deliberate consideration of the uncertainty, costs, and risks inherent in all litigation, the Trustee, in the exercise of his business judgment, determined that it was appropriate to reach a business resolution in light of all the facts and circumstances.

25.    A separate compromise was entered into to settle the Trustee's Avoidance Claims. That compromise was negotiated in tandem with the settlement of the Class Claims but is subject to a separate agreement.

## OVERVIEW OF THE AGREEMENT

26.    Certain salient terms and conditions of the Agreement are briefly summarized below.  The Agreement should be reviewed for a complete account of other important terms, including with respect to mutual releases and the representations and warranties of the Parties. *See* Exhibit A.

27.    The Agreement provides:

(a) On or around the same date as this Motion seeking an order approving the Agreement pursuant to Bankruptcy Rules 2002(a)(3) and 9019(a) (the "Common Law 9019 Order"), the Customer Representatives shall submit to the District Court a motion for preliminary approval of the Settlement, including entry of a preliminary approval order (the "Preliminary Approval Order"). If the Settlement is finally approved by the District Court following a settlement hearing, then the Customer Representatives shall request that the District Court enter a judgment (the "Judgment").

(b) The Settlement will become effective upon the occurrence of all of the following events (the "Effective Date"): (a) the entry of a final and non-appealable Common Law 9019 Order approving the Agreement (the "Final Common Law 9019 Order"); (b) the entry of a final and non-appealable Judgment (the "Final Judgment"); and (c) JPMorgan has not exercised its right to terminate the Settlement.

(c) After entry by this Court of the Common Law 9019 Order and entry by the District Court of the Preliminary Approval Order, JPMorgan shall within fourteen days deposit $218 million (the "Class Settlement Amount") into an escrow account (the "Escrow Account") maintained at Citi National Bank (the "Escrow Agent") pursuant to an escrow agreement (the "Escrow Agreement") executed by and among JPMorgan, the Customer Representatives, and the Trustee.

(d) The Class Settlement Amount, together with any interest earned thereon (less any applicable taxes paid or required to be paid), shall be referred to as the "Class Settlement Fund." Fees paid to Class Counsel are not paid out of the Class Settlement Fund.

(e) The Customer Representatives will move before the District Court for the: (a) appointment of the Customer Representatives as class representatives for the Settlement

9

Class; (b) appointment of Entwistle & Cappucci LLP and Hagens Berman Sobol Shapiro LLP as

Class Counsel for the Settlement Class; and (c) certification of the Settlement Class pursuant to

Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

        (f)      If approved by the District Court, the Settlement Class will consist of

BLMIS customers, including their successors, transferees, or assignees, who directly had capital

invested with BLMIS as of the Filing Date and thus, under the net investment method upheld by

the United States Court of Appeals for the Second Circuit, had net losses ("Net Losses") as of the

Filing Date ("Net Losers"), regardless of whether they filed a claim in the SIPA proceeding.

        (g)      The Settlement Class includes all Net Losers, including those that did not

file claims in the SIPA proceeding, and is intended to be coterminous with all BLMIS customers

who have a positive net equity claim in the SIPA proceeding or who would have had a positive

net equity claim in the SIPA proceeding had they filed a timely customer claim in that

proceeding.  The Settlement Class does not include:  (i) BLMIS insiders and their families; (ii)

defendants in any criminal Madoff-related proceeding; (iii) BLMIS accountholders whose claims

against the BLMIS estate were extinguished by virtue of three separate settlements with the

Trustee, namely the estate of Jeffry Picower, *Picard v. Picower*, 09-1197 (BRL) (Bankr.

S.D.N.Y.) (ECF No. 43), the Carl Shapiro Family, *SIPC v. BLMIS*, 08-1789 (Bankr. S.D.N.Y.)

(ECF No. 3551), and Jeanne Levy-Church and Francis N. Levy, *SIPC v. BLMIS*, 08-1789

(Bankr. S.D.N.Y.) (ECF No. 1964); or (iv) any persons or entities that exclude themselves from

the Settlement Class by filing a request for exclusion that is accepted by the District Court.

        (h)      If approved by the District Court, AlixPartners LLP will be appointed

distribution agent for the Class Settlement Fund.  AlixPartners LLP serves as the Trustee's

claims agent in the SIPA proceeding and, as such, has access to the Trustee's books and records,

which reflect the Net Losers and the amount of their losses as of December 11, 2008.

AlixPartners LLP maintains contact information for all former BLMIS customers such that direct

notice of the Settlement can be made to all potential members of the Settlement Class regardless

of whether they previously filed a claim in the SIPA proceeding.  AlixPartners LLP also

maintains lists of all transfers or assignments of customer claims in the SIPA proceeding and so

notice of the Settlement can also be made directly to all transferees or assignees of such claims.

AlixPartners LLP will process all claims relating to the Class Settlement Fund and make

distributions in consultation with the Trustee and Class Counsel.  The costs and expenses of

AlixPartners LLP incurred in fulfilling its duties as distribution agent in connection with this

Agreement shall be paid from the Class Settlement Fund.

       (i)       After the Effective Date, the Escrow Agent will, pursuant to the Escrow

Agreement, release to AlixPartners LLP the Class Settlement Fund following receipt of written

notice provided jointly by the Trustee, the Customer Representatives, and JPMorgan, with copies

of the Final Common Law 9019 Order and the Final Judgment attached, which notice shall be

provided only after the Trustee and Class Counsel have certified that AlixPartners LLP has

completed all relevant pre-distribution claims-related work.

       (j)       The Parties agree that, subject to any additional requirements of Federal

Rule of Civil Procedure 23 (or any requirements that may be imposed by either this Court or the

District Court in connection with the approval process), the Class Settlement Fund will be

distributed to the Settlement Class after the Effective Date.  For purposes of distributions from

the Class Settlement Fund, a claim filed with the Trustee in the SIPA proceeding will be deemed

a claim against the Class Settlement Fund.  If a Settlement Class member did not file a claim in

the SIPA proceeding, that class member will need to file a claim against the Class Settlement

Fund.  Members of the Settlement Class, including those Net Losers that are defendants in

avoidance actions by the Trustee, shall receive their *pro rata* shares of the Class Settlement Fund

based on their Net Losses as of the Filing Date.

(k)      It is anticipated that direct Notice will be given to the Settlement Class

through this SIPA proceeding as well as through the Trustee's and Class Counsel's websites and

publication of a short-form notice on Bloomberg.  Any costs related to noticing outside of the

SIPA proceeding will be paid from the Class Settlement Fund.  Settlement Class members that

have already submitted claims to the Trustee in the SIPA proceeding will not need to file a claim

against the Class Settlement Fund.  For those Settlement Class members that did not file claims

with the Trustee in the SIPA proceeding, there will be a new claims period during which they

may file a claim against the Class Settlement Fund.  For those claims filed with the Trustee in the

SIPA proceeding that have been transferred, direct notice will be provided to the transferor and

transferee.  The forms of notice will be presented to the District Court in connection with the

motion for preliminary approval of the Settlement.

(l)      Within six (6) business days of the Effective Date, the Trustee will file a

Notice of Dismissal dismissing the Common Law Claims asserted in the JPMorgan Adversary

Proceeding with prejudice and without costs to any of the Parties and will withdraw the petition

for certiorari with respect to such claims as it pertains to JPMorgan.  From the date of the

Agreement through the filing of a Notice of Dismissal, with exception of any proceeding in

connection with the petition for certiorari referenced in the preceding sentence, the Adversary

Proceeding shall be stayed and no further actions may be taken by any of the Parties thereto.

The Parties have agreed to refrain from making disparaging statements with respect to each other

or the Settlement.

(m)    The Parties are executing a supplemental confidential agreement which

gives JPMorgan the right, but not the obligation, to terminate the Settlement in the event that a

certain portion of the Settlement Class delivers timely and valid requests for exclusion from the

Settlement Class (the "Opt-Out Contingency Agreement").  The Opt-Out Contingency

Agreement will be identified to, but not filed with, this Court and the District Court, except that

the substantive contents of the Opt-Out Contingency Agreement may be disclosed to either

Court, in camera, if so requested or as otherwise ordered to do so.  The Parties will keep the

terms of the Opt-Out Contingency Agreement confidential, except if compelled by judicial

process to disclose them.

## RELIEF REQUESTED

28.    By this Motion, the Trustee respectfully requests that the Court enter an order,

substantially in the form of the proposed order annexed to this Motion as Exhibit B approving

the Settlement as memorialized in the Agreement.

## LEGAL DISCUSSION

29.    Bankruptcy Rule 9019(a) states, in pertinent part, that "[o]n motion by the trustee

and after notice and a hearing, the court may approve a compromise or settlement."  Courts have

held that in order to approve a settlement or compromise under Bankruptcy Rule 9019(a), the

court should find that the compromise proposed is fair and equitable, reasonable, and in the best

interests of a debtor's estate.  *Air Line Pilots Assoc., Int'l v. Am. Nat'l Bank & Trust Co. of

Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600

(2d Cir. 1994) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson,* 390 U.S. 414, 424 (1968)).

30.    The Second Circuit has stated that in determining whether to approve a

compromise, the court should not decide the numerous questions of law and fact raised by the

compromise, but rather should "canvass the issues and see whether the settlement 'fall[s] below

the lowest point in the range of reasonableness.'"  *Cosoff v. Rodman (In re W T. Grant Co.),* 699

F.2d 599, 608 (2d Cir.), *cert. denied Cosoff v. Romon,* 464 U.S. 822 (1983) (quoting *Newman v.*

*Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied* 409 U.S. 1039 (1972)); *see also In re Chemtura,*

439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010).   "[T]he court need not conduct a 'mini-trial' to

determine the merits of the underlying litigation."  *In re Purified Down Prods. Corp.,* 150 B.R.

519, 522 (S.D.N.Y. 1993).

   31. The factors that courts in the Second Circuit consider when approving bankruptcy

settlements are well established.  These interrelated factors are:

> (1) the balance between the litigation's possibility of success and
> the settlement's future benefits; (2) the likelihood of complex and
> protracted litigation, with its attendant expense, inconvenience, and
> delay, including the difficulty in collecting on the judgment; (3)
> the paramount interests of the creditors, including each affected
> class's relative benefits and the degree to which creditors either do
> not object to or affirmatively support the proposed settlement; (4)
> whether other parties in interest support the settlement; (5) the
> competency and experience of counsel supporting, and [t]he
> experience and knowledge of the bankruptcy court judge
> reviewing, the settlement; (6) the nature and breadth of releases to
> be obtained by officers and directors; and (7) the extent to which
> the settlement is the product of arm's length bargaining.

*Fox v. Picard (In re Madoff)*, No. 10 Civ. 4652 (JGK), 2012 WL 990829, at *15 (S.D.N.Y.

March 26, 2012) (quoting *Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re*

*Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal quotation marks and

citations omitted)).

   32. Even though the Court has discretion to approve settlements and must

independently evaluate the reasonableness of the settlement, *In re Rosenberg*, 419 B.R. 532, 536

(Bankr. E.D.N.Y. 2009), the business judgment of the trustee and his counsel should be

considered in determining whether a settlement is fair and equitable.  *In re Chemtura Corp.*, 439

B.R. at 594.  The competency and experience of counsel supporting the settlement may also be

considered.  *Nellis*, 165 B.R. at 122.  Finally, the Court should be mindful of the principle that

"the law favors compromise." *Vaughn v. Drexel Burnham Lambert Group, Inc. ( In re Drexel*

*Burnham Lambert Group, Inc.),* 134 B.R at 499, 505 (quoting *In re Blair,* 538 F.2d 849, 851 (9th

Cir. 1976)).

33.     The Settlement is fair and equitable and in the best interests of the BLMIS

customers and the Estate.  *See* Affidavit of Irving H. Picard in Support of the Motion (the

"Picard Aff.") ¶ 8, a true and accurate copy of which is annexed to this Motion as Exhibit C.

The Agreement resolves all issues regarding the Trustee's Common Law Claims against

JPMorgan without the need for protracted, costly, and uncertain litigation.  Overall, the terms of

the Agreement fall well above the lowest point in the range of reasonableness and all of the

following considerations influenced the Trustee's decision to settle:

(a)     Benefit to BLMIS Customers.  Although the Class Settlement Amount is

being distributed through the Class Settlement Fund, rather than through the SIPA proceeding,

BLMIS customers will benefit from distributions from the Class Settlement Fund.  The

Settlement Class includes only Net Losers, which is coterminous with those customers that

receive distributions from the fund of customer property – *i.e.*, BLMIS customers with allowed

claims.  *Id.* ¶ 5.  Moreover, when the Class Settlement Amount is combined with the related

Avoidance Settlement and the settlement of the Government investigation, over $2.243 billion

will flow to "net loser" victims of Madoff's fraud.  *Id.* ¶ 6.  Thus, the Settlement not only makes

good financial sense for the Estate and the victims of Madoff's fraud, it represents efforts to

work cooperatively with other parties to achieve unparalleled results for Madoff victims. For this

reason, the Settlement is in the best interest of BLMIS customers.  *Id.* ¶¶ 6, 8.

15

08-01789-cgm    Doc 5736-1    Filed 02/28/14    Entered 02/28/14 15:48:31    Exhibit
Part 1 Pg 17 of 42

(b)    <u>Nature of Claims</u>.  The Trustee's Common Law Claims have been
dismissed by the District Court, the dismissal of which was upheld by the Second Circuit.  Given
that the Trustee's ability to pursue these claims remains in doubt, and given JPMorgan's
potential defenses to the claims if litigated, the Trustee determined it is in the best interests of
BLMIS customers and the Estate to settle these claims now.  *Id.* ¶¶ 4, 8.

(c)    <u>Avoidance of the Cost and Delay of Further Litigation</u>.  The Agreement
eliminates the expense, delay and uncertainty of litigation with JPMorgan.  The Agreement also
eliminates the inevitable delay caused by future likely appeals in this proceeding, which benefits
BLMIS customers and the Estate.  *Id*. ¶ 4.

(d)    <u>Finality</u>.  The Agreement puts an end to the Trustee's litigation of the
Common Law Claims against JPMorgan.  *Id.*

(e)    <u>Experienced Counsel</u>.  The Parties are represented by sophisticated and
experienced professionals.  The Parties and their professionals understand the difficulties of a
SIPA liquidation of this size and complexity and are aware of the harm to customers and
creditors if the Agreement is not consummated.

(f)    <u>Product of Arms-Length Negotiation</u>.  The settlement is the product of
arm's length and good faith negotiations between the Trustee, the Class Representatives, and
JPMorgan.  *Id.* ¶ 7.

34.    For all of the reasons discussed above, the Agreement is well within the "range of
reasonableness," *In re W.T. Grant Co*., 699 F.2d at 608 (quoting *Newman v. Stein*, 464 F.2d at
693), and confers a substantial benefit on BLMIS customers and the Estate.  The Trustee
respectfully requests that the Court approve the Agreement.  *Id.* ¶¶ 4, 8.

## NOTICE

35.      In accordance with Bankruptcy Rules 2002 and 9019, and the Order Establishing

Notice Procedures and Limiting Notice entered on December 5, 2011 ("Order Limiting Notice"),

Bankr. ECF. No. 4560, notice of this Motion has been given to (i) SIPC; (ii) the SEC; (iii) the

Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York;

(v) Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York, 10019; and

(vi) Entwistle & Cappucci LLP, 280 Park Avenue, 26th Floor West, New York, New York

10017.  Also in accordance with the Order Limiting Notice, the Trustee has provided notice by e-

mail to interested parties in the SIPA liquidation proceeding of the following:  the Motion; the

date and time scheduled for the hearing at which this Court will consider the Motion; the date by

which objections, if any, must be filed with this Court, and the name and address of the persons

to be served with a copy of any objections.

WHEREFORE, the Trustee respectfully requests entry of an order substantially in the

form of Exhibit B granting the relief requested in the Motion.

Respectfully submitted,

Dated: January 7, 2014
      New York, New York

/s/ David J. Sheehan
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Deborah R. Renner
Email: drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and the Estate of Bernard L. Madoff*

# EXHIBIT A

## AGREEMENT TO SETTLE COMMON LAW CLAIMS

This AGREEMENT ("Agreement" or "Settlement"), dated as of January 6, 2014, is made by and among (i) PAUL SHAPIRO, and STEPHEN HILL and LEYLA HILL, acting at all times by and through their attorneys Entwistle & Cappucci LLP and Hagens Berman Sobol Shapiro LLP (the "Customer Representatives"), putative representatives of the proposed class of former customers of Bernard L. Madoff Investment Securities LLC ("BLMIS") (the "Settlement Class," as defined further below) in the consolidated class actions (the "Consolidated Class Action"), on behalf of themselves and the Settlement Class, (ii) IRVING H. PICARD, in his capacity as trustee ("Trustee") for the liquidation of the business of BLMIS under the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa et seq., as amended ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff ("Madoff") (together, the "Estate"), and (iii) JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD. (collectively, "JPMorgan") (collectively, with the Trustee and JPMorgan, the "Parties," or singularly, "Party").

## BACKGROUND

A.    BLMIS and its predecessor was a registered broker-dealer and a member of the Securities Investor Protection Corporation ("SIPC").

B.    On December 11, 2008, Madoff was arrested by federal agents for criminal securities laws violations including securities fraud, investment adviser fraud, and mail and wire fraud. On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission (the "Commission") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against, among others, BLMIS and Madoff, captioned SEC v. BLMIS, et al., No. 08-CV-10791(LLS).

C.    On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the Commission consented to a combination of its own action with an application of SIPC. Thereafter, SIPC filed an application in the District Court under section 78eee(a)(3) of SIPA alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA. On December 15, 2008, the District Court granted the SIPC application and entered an order under SIPA, which, in pertinent part, appointed the Trustee for the liquidation of the business of BLMIS under section 78eee(b)(3) of SIPA and removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under section 78eee(b)(4) of SIPA, where it is currently pending as SIPC v. BLMIS, No. 08-01789 (BRL) (the "SIPA proceeding"). The Trustee is duly qualified to serve and act on behalf of the Estate. Separate investigations by the Trustee and the Customer Representatives' counsel into BLMIS and Madoff commenced shortly thereafter.

D.    On December 2, 2010, the Trustee filed a complaint (the "Complaint") commencing an adversary proceeding captioned Picard v. JPMorgan Chase & Co, et al., No. 10-4932 (BRL) (the "JPMorgan Adversary Proceeding") against JPMorgan seeking to avoid and recover under 11 U.S.C. §§ 544(b), 547, 548 and 550 and the New York Uniform Fraudulent Conveyance Act (New York Debtor and Creditor Law §§ 270-281) (collectively, the "Avoidance

Claims") approximately $425 million of transfers or other payments (the "Transfers") received by JPMorgan prior to the collapse of BLMIS. The Trustee also asserted common law claims (the "Common Law Claims") against JPMorgan, including aiding and abetting fraud, aiding and abetting breach of fiduciary duty, conversion, unjust enrichment, and contribution. In addition to closely following these developments, the Customer Representatives continued to investigate BLMIS and Madoff during this period.

E.      On February 8, 2011, JPMorgan moved to withdraw the reference from the Bankruptcy Court, which was granted by the District Court (McMahon, J.) on May 23, 2011.

F.      On June 3, 2011, JPMorgan moved to dismiss the Common Law Claims and certain of the Avoidance Claims in the Complaint. On June 24, 2011, the Trustee filed an amended complaint (the "Amended Complaint"). On August 1, 2011, JPMorgan moved to dismiss the Common Law Claims and certain of the Avoidance Claims in the Amended Complaint. The Trustee opposed. On November 1, 2011, the District Court granted JPMorgan's motion to dismiss the Trustee's Common Law Claims and returned all the Avoidance Claims to the Bankruptcy Court for further proceedings. *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84 (S.D.N.Y. 2011).

G.      The Trustee appealed to the United States Court of Appeals for the Second Circuit (the "Second Circuit"), which affirmed the District Court's ruling on June 20, 2013. *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Investment Securities LLC)*, 721 F.3d 54 (2d Cir. 2013).

H.      The Trustee sought review of the Second Circuit's decision by the United States Supreme Court by filing a petition for a writ of certiorari on October 9, 2013. The Trustee's petition is pending.

I.      Shortly after the District Court dismissed the Trustee's Common Law Claims, two class action complaints were filed in the District Court against JPMorgan in the names of the Customer Representatives, Stephen and Leyla Hill, *Hill v. JPMorgan Chase & Co.*, 11 Civ. 7961(CM); and Paul Shapiro, *Shapiro v. JPMorgan Chase & Co.*, 11 Civ. 8331(CM), based upon their ongoing investigation and that of the Trustee. These complaints asserted various claims against JPMorgan on behalf of BLMIS customers who directly had capital invested with BLMIS as of the Filing Date, *i.e.*, BLMIS customers who were Net Losers (as defined below). On December 5, 2011, the District Court consolidated the matters into the Consolidated Class Action. On January 20, 2012, a consolidated class action complaint was filed against JPMorgan (the "Consolidated Class Action Complaint" or "CAC"), again asserting on behalf of the proposed class (*i.e.*, BLMIS customers who were "net losers" as of the Filing Date) various claims against JPMorgan arising out of its relationship to Madoff (the claims set forth in the CAC together with the dismissed Common Law Claims are collectively referred to hereafter as the "Class Claims").

J.      On March 9, 2012, JPMorgan filed a motion to dismiss the Consolidated Class Action Complaint. The motion to dismiss was opposed by the Customer Representatives. The Trustee filed a motion seeking limited intervention pursuant to Fed. R. Civ. P. 24(a)(2) in the Consolidated Class Action, which was granted by the District Court on October 16, 2012.

Throughout this period, counsel for the Customer Representatives continued their investigation of the claims asserted and continued to prosecute other Madoff-related litigations.

K.    On September 26, 2013, the District Court placed the Consolidated Class Action on the suspense calendar pending a decision from the United States Supreme Court in *Roland v. Green*, 675 F.3d 503 (5th Cir. 2012), *cert. granted sub nom. Chadbourne & Parke LLP v. Troice*, 133 S. Ct. 977 (U.S. Jan. 18, 2013) (No. 12-79).  The parties submitted various letter briefs regarding *Chadbourne* and related issues with the result that the matter remains on the suspense calendar.  Counsel for the Customer Representatives continued to investigate the claims here, including the review of JPMorgan documents and interviews in this and other proceedings, the review and analysis of trial testimony in Madoff-related proceedings, work with experts on damages and Madoff-related liability including but not limited to Madoff-related banking activity and defenses raised by JPMorgan in its various motions to dismiss the Consolidated Class Action Complaint.

L.    Counsel for the Customer Representatives initiated a series of meetings and conference calls, both individually and collectively, with counsel for JPMorgan and counsel for the Trustee that took place on a regular basis over several months to arrange for the production and review of documents and other materials previously produced to the Trustee pursuant to the Bankruptcy Rule 2004 discovery process and to the Government.  These discussions also considered the potential for a global resolution of the Class Claims and the related Avoidance Claims that would maximize the total recovery for the Class.  During the same period, JPMorgan was also in discussions to resolve an investigation by the United States Attorneys' Office for the Southern District of New York (the "Government") related to Madoff.  In seeking to achieve a global resolution of these matters, including the Government investigation, JPMorgan took into consideration the Class Claims and the Customer Representatives' position that the global resolution should result in an appropriate total recovery for the Class.

M.    As a result of complex and protracted discussions, contemporaneous proposed settlements were agreed to:  (i) among JPMorgan, the Customer Representatives, and the Trustee resolving the Class Claims; (ii) between JPMorgan and the Trustee resolving the Avoidance Claims;  and (iii) between JPMorgan and the Government resolving the Government's investigation. Resolution of the Class Claims is provided for in this Agreement.  Resolution of the Avoidance Claims and the Government's investigation are provided for in separate agreements with the Trustee (the "Avoidance Settlement") and the Government (the "Government Settlement"), respectively.  It is anticipated that the proceeds of all three settlements will flow to victims of Madoff's fraud, whether through the Class Settlement Fund (as defined below in paragraph 3), the Trustee's fund administered under SIPA, or the Madoff Victim Fund administered by the United States Department of Justice.

N.    The Customer Representatives and the Trustee believe that one or both of them will prevail in recovering damages from JPMorgan on the Class Claims.  JPMorgan denies any fault, liability, or wrongdoing whatsoever in connection with the Class Claims asserted by the Customer Representatives and the Trustee and does not believe it is liable for any damages. The Parties wish to settle their disputes regarding the Class Claims without the expense, delay, and uncertainty of litigation.

O.    The Parties reached agreement to settle the Class Claims for a total payment by JPMorgan of $218,000,000.00 to the Settlement Class (the "Class Settlement Amount"), following Class Counsel's review of the terms of the Avoidance Settlement and the Government Settlement to ensure that the total relief provided by JPMorgan is appropriate and sufficient.

P.    In order to preserve as much of the settlement payment as possible for the Settlement Class, after the Parties reached an agreement in principle on the Class Settlement Amount, the Parties entered into subsequent, arms-length negotiations as to the separate amount JPMorgan would pay to Class Counsel in lieu of attorneys' fees and expenses (which would otherwise be awardable out of the Class Settlement Fund, as defined below) (the "Attorneys' Fees Payment"). As a result of those subsequent negotiations, the Parties agreed that JPMorgan would make an Attorneys' Fees Payment to Class Counsel in the amount of $18 million, subject in all respects to Paragraph 11 below, in exchange for which counsel for the Customer Representatives agreed that they would not make an application to the District Court seeking fees and expenses in excess of that amount from JPMorgan or from the corpus of the Class Settlement Fund.

NOW, THEREFORE, in consideration of the foregoing, of the mutual covenants, promises and undertakings set forth herein, and for good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the Customer Representatives, the Trustee, and JPMorgan agree as follows:

## <u>AGREEMENT</u>

1.    <u>Bankruptcy Court Approval of Settlement</u>. Promptly after execution and delivery of this Agreement, and on or around the same date as the motion referenced in paragraph 2, the Trustee shall submit to the Bankruptcy Court a motion for approval of the Settlement pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure, including entry of an order substantially in the form attached hereto as Exhibit A (the "Common Law 9019 Order"), after consulting in good faith with JPMorgan and the Customer Representatives as to the language of the motion. The Customer Representatives will join in support of the approval motion.

2.    <u>District Court Approval of Consolidated Class Action Settlement</u>. Promptly after execution and delivery of this Agreement, and on or around the same date as the motion referenced in paragraph 1, the Customer Representatives shall submit to the District Court a motion for preliminary approval of the Settlement, including entry of a preliminary approval order substantially in the form attached hereto as Exhibit B (the "Preliminary Approval Order"), after consulting in good faith with JPMorgan and the Trustee as to the language of the motion. The Trustee will join in support of the approval motion. If the Settlement contemplated by this Agreement is finally approved by the District Court following a settlement hearing, then the Customer Representatives shall request that the court enter a judgment substantially in the form attached hereto as Exhibit C (the "Judgment").

3.    <u>Settlement Payments</u>. No later than fourteen (14) days after both the Bankruptcy Court has entered the Common Law 9019 Order and the District Court has entered the Preliminary Approval Order, JPMorgan shall deposit the Class Settlement Amount into an

4

escrow account (the "<u>Escrow Account</u>") maintained at Citi National Bank (the "<u>Escrow Agent</u>") pursuant to an escrow agreement (the "<u>Escrow Agreement</u>") executed by and among JPMorgan, counsel for the Customer Representatives, and the Trustee.  The Class Settlement Amount, together with any interest earned thereon (less any applicable taxes paid or required to be paid), shall be referred to as the "<u>Class Settlement Fund</u>."  Other than the Customer Representative Attorneys' Fees Payment set forth in paragraph 11, once JPMorgan has fulfilled its obligations under this Agreement to cause the Class Settlement Amount to be wired into the Escrow Account, JPMorgan shall have no further payment obligations under this Agreement.  For the avoidance of doubt, JPMorgan shall have no obligation to pay, or any responsibility or liability for, any taxes on any income earned by the Class Settlement Fund.  With regard to the Customer Representative Attorneys' Fees Payment, JPMorgan will, subject to paragraphs 4 and 11 below, be responsible for payment following entry of an order by the District Court awarding fees and expenses to Class Counsel.

4.    <u>Effective Date</u>.  The Settlement contemplated by this Agreement shall become effective upon the occurrence of all of the following events (the "<u>Effective Date</u>"):  (a) the entry of a final and non-appealable 9019 Order (the "<u>Final Common Law 9019 Order</u>"); (b) the entry of a final and non-appealable Judgment (the "<u>Final Judgment</u>"); and (c) JPMorgan has not exercised its right to terminate the Settlement pursuant to paragraph 18 below.  For purposes of this Agreement, an order shall be considered final and non-appealable when (i) the time to appeal the order has expired, or (ii) if any appeal has been taken, any and all such appeals have been fully and finally resolved without material modification of the order.  In the event that the Settlement is terminated or does not become effective:  (aa) the payments made by JPMorgan pursuant to this Agreement will be returned to JPMorgan; (bb) this Agreement will not take effect and will become null and void for all purposes, except for paragraphs 27 and 29, which will continue to be effective and binding on the Parties; (cc) the stay of the Consolidated Class Action provided for in paragraph 17 below will be lifted and the Customer Representatives and JPMorgan will continue to litigate their respective claims and defenses in the Consolidated Class Action; (dd) the stay of the JPMorgan Adversary Proceeding provided for in paragraph 16 will be lifted and the Trustee and JPMorgan will continue to litigate their respective claims and defenses in the JPMorgan Adversary Proceeding (provided, however, that the Trustee and JPMorgan shall work together in good faith to effectuate modifications to the Case Management Order applicable to the JPMorgan Adversary Proceeding to the extent a modification to the schedule is reasonably necessary); and (ee) the Parties shall not use or rely on any statement herein in the JPMorgan Adversary Proceeding, the Consolidated Class Action, or in any public statement or other litigation relating to BLMIS or Madoff.

5.    <u>Class Certification</u>.  The Customer Representatives will move before the District Court for the (a) appointment of the Customer Representatives as class representatives for the Settlement Class; (b) appointment of Entwistle & Cappucci LLP and Hagens Berman Sobol Shapiro LLP as Class Counsel for the Settlement Class; and (c) certification of the Settlement Class pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

6.    <u>Class Definition.</u>  If approved by the District Court, the Settlement Class will consist of all BLMIS customers, including their successors, transferees, or assignees, who directly had capital invested with BLMIS as of the Filing Date and thus, under the net investment method upheld by the United States Court of Appeals for the Second Circuit, had net losses

5

("Net Losses") as of the Filing Date ("Net Losers"), regardless of whether they filed a claim in
the SIPA proceeding. The net investment method credits the amount of cash deposited by a
BLMIS customer into his or her BLMIS account, less any amounts withdrawn from it. *See
generally In re Bernard L. Madoff Securities LLC*, 654 F.3d 229 (2d Cir. 2011). The Settlement
Class includes all Net Losers, including those that did not file claims in the SIPA proceeding,
and is intended to be coterminous with all BLMIS customers who have a positive net equity
claim in the SIPA proceeding or who would have had a positive net equity claim in the SIPA
proceeding had they filed a timely customer claim in that proceeding. The Settlement Class does
not include: (i) BLMIS insiders and their families; (ii) defendants in any criminal Madoff-
related proceeding; (iii) BLMIS accountholders whose claims against the BLMIS estate were
extinguished by virtue of three separate settlements with the Trustee, the estate of Jeffry Picower,
*Picard v. Picower*, 09-1197 (BRL) (Bankr. S.D.N.Y.) (ECF No. 43), the Carl Shapiro Family,
*SIPC v. BLMIS*, 08-1789 (Bankr. S.D.N.Y.) (ECF No. 3551), and Jeanne Levy-Church and
Francis N. Levy, *SIPC v. BLMIS*, 08-1789 (Bankr. S.D.N.Y.) (ECF No. 1964), or (iv) any
persons or entities that exclude themselves from the Settlement Class by filing a request for
exclusion that is accepted by the District Court.

       7.   <u>Appointment of Distribution Agent</u>. If approved by the District Court,
AlixPartners LLP will be appointed distribution agent for the Class Settlement Fund.
AlixPartners LLP serves as the Trustee's claims agent in the SIPA proceeding and, as such, has
access to the Trustee's books and records, which reflect the Net Losers and the amount of their
losses as of December 11, 2008. AlixPartners LLP maintains contact information for all former
BLMIS customers such that direct notice of the Settlement can be made to all potential members
of the Settlement Class regardless of whether they previously filed a claim in the SIPA
proceeding. AlixPartners LLP also maintains lists of all transfers or assignments of customer
claims in the SIPA proceeding and so notice of the Settlement can also be made directly to all
transferees or assignees of such claims. Counsel for the Customer Representatives has reviewed
various administration related materials, including information related to prior claims
determinations, met with representatives of AlixPartners LLP to review claims handling
procedures and notice requirements and to negotiate an appropriate budget for notice and claims
related services for the Class Settlement. AlixPartners LLP will process all claims relating to the
Class Settlement Fund and make distributions pursuant to paragraph 9 below in consultation with
the Trustee and Class Counsel who will review such determinations and report to the Court as
requested. To the extent there is a dispute as to the resolution of any claim against the Class
Settlement Fund, the determination of AlixPartners LLP, Class Counsel, and the Trustee —
subject to approval by the Court — will be dispositive and none of AlixPartners LLP, Class
Counsel, or the Trustee or its counsel will have any liability related to such determinations. The
costs and expenses of AlixPartners LLP incurred in fulfilling its duties as distribution agent in
connection with this Agreement shall be paid from the Class Settlement Fund.

       8.   <u>Release of Escrow Funds</u>. After the Effective Date, the Escrow Agent will,
pursuant to the Escrow Agreement, release to AlixPartners LLP the Class Settlement Fund
following receipt of written notice provided jointly by the Trustee, the Customer
Representatives, and JPMorgan, with copies of the Final Common Law 9019 Order and the Final
Judgment attached, which notice shall be provided only after the Trustee and Class Counsel have
certified that AlixPartners LLP has completed all relevant pre-distribution claims-related work.

9.    <u>Distributions</u>.  The Parties agree that, subject to any additional requirements of Federal Rule of Civil Procedure 23 (or any requirements that may be imposed by either the Bankruptcy Court or the District Court in connection with the approval process), the Class Settlement Fund will be distributed to the Settlement Class after the Effective Date, in accordance with and subject to the terms of this paragraph 9.  For purposes of distributions from the Class Settlement Fund, a claim filed with the Trustee in the SIPA proceeding will be deemed a claim against the Class Settlement Fund.  If a Settlement Class member did not file a claim in the SIPA proceeding, that class member will need to file a claim against the Class Settlement Fund.  Members of the Settlement Class, including those Net Losers that are defendants in avoidance actions by the Trustee, shall receive their *pro rata* shares of the Class Settlement Fund based on their Net Losses as of the Filing Date.  Notwithstanding anything to the contrary in this Agreement, no putative member of the Settlement Class that delivers a valid and timely request for exclusion from the Settlement Class shall receive any portion of the Class Settlement Fund.

10.    <u>Notice</u>.  It is anticipated that direct Notice will be given to the Settlement Class through the SIPA proceeding as well as through the Trustee's and Class Counsel's websites and publication of a short-form notice on Bloomberg.  Any costs related to noticing outside of the SIPA proceeding will be paid from the Class Settlement Fund.  Settlement Class members that have already submitted claims to the Trustee in the SIPA proceeding will not need to file a claim against the Class Settlement Fund.  For those Settlement Class members that did not file claims with the Trustee in the SIPA proceeding, there will be a new claims period during which they may file a claim against the Class Settlement Fund.  For those claims filed with the Trustee in the SIPA proceeding that have been transferred, direct notice will be provided to the transferor and transferee.  The forms of notice that will be presented to the District Court in connection with the motion for preliminary approval of the Settlement are attached hereto as Exhibits D (long-form Claim Notice) and E (short-form Summary Notice).

11.    <u>Customer Representatives Attorneys' Fees Payment</u>.  If the District Court approves the Attorneys' Fees Payment negotiated between counsel for the Customer Representatives, JPMorgan, and the Trustee, then JPMorgan will, not later than fourteen (14) days after such order, remit to Class Counsel that amount (in no event to exceed $18 million).  If any portion of the Attorneys' Fees Payment is not approved by the District Court, JPMorgan will have no obligation to pay the unapproved portion.  The application by Class Counsel for fees and expenses is not a condition of the Settlement and is to be considered by the District Court separately from the District Court's consideration of the fairness, reasonableness, and adequacy of the Settlement.  The fee and expense award shall be set forth in an order separate from the Judgment entered by the District Court such that any appeal of either order shall not constitute an appeal of the other.  Any proceedings relating to Class Counsel's fee and expense application will not provide any basis to modify, cancel, or terminate the Settlement, or affect or delay the finality of the Judgment.  In the event that the Settlement does not become effective, then Class Counsel shall refund the Attorneys' Fees Payment (if already paid) to JPMorgan together with any interest earned thereon.  In the event that the Settlement does become effective, but the Attorneys' Fees Payment is subsequently reversed or modified (either by the District Court or on appeal), then Class Counsel shall refund to JPMorgan the portion of the Attorneys' Fees Payment consistent with such reversal or modification, together with any interest thereon, within fourteen (14) days after such reversal or modification has become final.  For the avoidance of doubt, except as expressly set forth in this Agreement, JPMorgan shall have no obligation to pay

or reimburse separately any fees and expenses incurred by or on behalf of the Customer Representatives, any other member of the Settlement Class, the Trustee, any other party, or any of their respective counsel.

12.    <u>Release by the Trustee</u>.  In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, except with respect to any rights arising under this Agreement, upon the Effective Date and without any further action by the Parties, the Trustee, on behalf of himself, his professionals, and the Estate, shall release, remit and forever discharge JPMorgan, its affiliates, and their respective predecessors, successors, assigns, current and former employees, and agents (collectively, "JPMorgan Releasees") from any and all past, present and future claims or causes of action (including any suit, petition, demand, or other claim in law, equity or arbitration) and from any and all allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, in tort, contract, federal or state statutory liability, or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty, unjust enrichment, constructive trust, or otherwise (including attorneys' fees, costs or disbursements), that are, have been, could have been or might in the future be asserted by the Trustee, on behalf of himself, his professionals, and the Estate, against JPMorgan, its affiliates, and their respective predecessors, successors, assigns, current and former employees, and agents that arise out of, are based on, or relate in any way to BLMIS, Madoff, BLMIS or Madoff accounts at JPMorgan, or the JPMorgan Adversary Proceeding; provided, however, that the foregoing release shall not extend to the Avoidance Claims asserted by the Trustee in First through Twentieth Causes of Action in the Amended Complaint (it being understood that the terms and conditions of a release of the Avoidance Claims are provided for separately in the Avoidance Settlement).

13.    <u>Release by the Settlement Class</u>.  In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, except with respect to any rights arising under this Agreement, upon the Effective Date and without any further action by the Parties, the Customer Representatives, on behalf of themselves, each and every member of the Settlement Class, and each of their respective predecessors, successors, affiliates, assigns, purchasers or other transferees, attorneys, heirs, representatives, administrators, executors, devisees, legatees, and estates, hereby releases, remits and forever discharges JPMorgan, its affiliates, and their respective predecessors, successors (including any trustee in bankruptcy), successors-in-interest, assigns, current and former employees, and agents (collectively, "JPMorgan Releasees") from any and all past, present and future claims or causes of action (including any suit, petition, demand, or other claim in law, equity or arbitration) and from any and all allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect (including class, representative or derivative), asserted or unasserted, known or unknown, absolute or contingent, in tort, contract, federal or state statutory liability, or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty, unjust enrichment, constructive trust, or otherwise (including attorneys' fees, costs or disbursements), that are, have been, could have been or might in the future be asserted

8

against JPMorgan, its affiliates, and their respective predecessors, successors (including any trustee in bankruptcy), successors-in-interest, assigns, current and former employees, and agents that arise out of, are based on, or relate in any way to BLMIS, Madoff, BLMIS or Madoff accounts at JPMorgan, or the Consolidated Class Action (the releases by the Settlement Class contained in this paragraph 13 referred to as the "Released Customer Claims").

14.    <u>Release by JPMorgan</u>.  In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, except with respect to any rights arising under this Agreement, upon the Effective Date and without any further action by the Parties, JPMorgan, its affiliates, and their respective predecessors, successors (including any trustee in bankruptcy), successors-in-interest, assigns and agents, each on behalf of itself and any other person or entity claiming under or through it, including JPMorgan in its capacity as Agent, hereby releases, remits and forever discharges the Trustee, his professionals, and the Estate, and the Customer Representatives and their professionals, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or unknown, now existing or arising in the future, arising out of or in any way related to BLMIS; provided, however, that the foregoing release shall not extend to any counterclaims or defenses that JPMorgan has or in the future may have arising out of, related to, or in connection with the Trustee's assertion of the Avoidance Claims (it being understood that a release of such counterclaims and defenses is provided for separately in the Avoidance Settlement).

15.    <u>Unknown Claim Waiver</u>.  The Parties agree that, upon the Effective Date and without further action of the Parties, the Trustee, JPMorgan, and the Customer Representatives shall have expressly waived, and each of the other Settlement Class Members shall be deemed to have waived, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Trustee, JPMorgan, and the Customer Representatives, and JPMorgan acknowledge, and the other Settlement Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement of which this release is a part.

16.    <u>Dismissal Of JPMorgan Adversary Proceeding</u>.  Within six (6) business days of the Effective Date, the Trustee will file a Notice of Dismissal dismissing the Common Law Claims asserted in the JPMorgan Adversary Proceeding with prejudice and without costs to any of the Parties and will withdraw the petition for certiorari with respect to such claims as it pertains to JPMorgan.  From the date of this Agreement through the filing of a Notice of Dismissal pursuant to this paragraph, with exception of any proceeding in connection with the

petition for certiorari referenced in the preceding sentence, the Adversary Proceeding shall be stayed and no further actions may be taken by any of the Parties thereto.  For the avoidance of doubt, the Trustee's Avoidance Claims are not covered by this Agreement and the effectiveness of this Agreement is not conditioned on entry or approval of the separate agreement between the Trustee and JPMorgan resolving the Avoidance Claims.

17.    <u>Dismissal Of Consolidated Class Action</u>.  Within six (6) business days of the Effective Date, the Customer Representatives will file a Notice of Dismissal dismissing the Consolidated Class Action with prejudice and without costs to any of the Parties.  From the date of this Agreement through the filing of a Notice of Dismissal pursuant to this paragraph, the Consolidated Class Action shall be stayed and no further actions may be taken by any of the Parties thereto.

18.    <u>Opt-out Contingency Agreement</u>.  Simultaneously herewith, the Parties, by and through their respective counsel, are executing a supplemental confidential agreement, which gives JPMorgan the right, but not the obligation, to terminate the Settlement in the event that a certain portion of the Settlement Class delivers timely and valid requests for exclusion from the Settlement Class (the "Opt-Out Contingency Agreement").  The Opt-Out Contingency Agreement will be identified to, but not filed with, the Bankruptcy Court and the District Court, except that the substantive contents of the Opt-Out Contingency Agreement may be disclosed to either Court, in camera, if so requested or as otherwise ordered to do so.  The Parties will keep the terms of the Opt-Out Contingency Agreement confidential, except if compelled by judicial process to disclose them.

19.    <u>Further Assurances; Representations and Warranties</u>.  The Trustee, the Customer Representatives, and JPMorgan (a) agree to use their best efforts to consummate the Settlement in accordance with the terms of this Agreement, and (b) shall execute and deliver any document or instrument reasonably requested by any of them after the date of this Agreement to effectuate the intent of this Agreement.  The Customer Representatives and Class Counsel represent and warrant that the Customer Representatives are members of the Settlement Class and that neither the Customer Representatives' potential claims against JPMorgan nor any right of the Customer Representatives to receive further distributions in the SIPA proceeding has been assigned, encumbered or in any manner transferred in whole or in part.  The Trustee represents and warrants that the Trustee's release of any claims pursuant to this Agreement operates to release all such claims by either the Trustee or by SIPC, including without limitation any all claims of SIPC as a subrogee for customers.

20.    <u>Exhibits; Entire Agreement</u>.  All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein.  This Agreement, together with the exhibits attached hereto and the Opt-Out Contingency Agreement, constitutes the entire agreement and understanding between and among the Parties hereto and supersedes all prior agreements, representations and understandings concerning the subject matter hereof.

21.    <u>Amendments; Waiver</u>.  Except as otherwise provided herein, this Agreement may not be terminated, amended or modified in any way except in a writing signed by all the Parties. No waiver of any provision of this Agreement shall be deemed to constitute a waiver of any

other provision hereof, whether or not similar, nor shall such waiver constitute a continuing waiver.

22.    <u>Assignability</u>.    No Party hereto may assign its rights under this Agreement without the prior written consent of each of the other Parties hereto.

23.    <u>Successors Bound</u>.    This Agreement shall be binding upon and inure to the benefit of each of the Parties, and their respective successors and permitted assigns.

24.    <u>No Third Party Beneficiary</u>.    The Parties do not intend to confer any benefit by or under this Agreement upon any person or entity other than the Parties and their respective successors and permitted assigns.

25.    <u>No Admission of Liability or Wrongdoing</u>.    By entering into this Agreement, JPMorgan does not admit any liability to the Trustee or the Customer Representatives.

26.    <u>Applicable Law</u>.    This Settlement and Agreement shall be construed and enforced in accordance with the laws of the State of New York, including but not limited to New York General Obligation Law § 15-108.

27.    <u>Jurisdiction</u>.    The Bankruptcy Court and the District Court, as appropriate, shall retain jurisdiction with respect to the implementation and enforcement of the terms of their respective orders relating to this Agreement.

28.    <u>Captions and Rules of Construction</u>.    The captions in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.    Any reference in this Agreement to a paragraph is to a paragraph of this Agreement.    "Includes" and "including" are not limiting.    This Agreement shall not be construed more strictly against one Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Parties, it being recognized that it is the result of arm's-length negotiations between the Parties, and all Parties have contributed substantially and materially to the preparation of this Agreement and the exhibits incorporated herein.

29.    <u>Confidentiality</u>.    All agreements by, between or among the Parties, their counsel and their other advisors as to confidentiality, including the confidentiality of information exchanged between or among them, shall remain in full force and effect and shall survive the execution of and any termination of this Agreement and the final consummation of the Settlement, if finally consummated, without regard to any of the conditions of the Settlement. The Parties agree to give each other Party the opportunity to review and approve in advance any press release, statements to the media or other public communications regarding the Settlement to be made in connection with the filing of the Settlement Agreement or other pre-filing public disclosure, such approval not to be unreasonably withheld.    The Parties further agree to refrain from making disparaging statements about the other in any press release, statements to the media, or other public communications (including statements made in court filings or in court) relating to the Settlement, including the claims to be released pursuant to the Settlement, including prior to the Effective Date.

30. <u>Counterparts; Electronic Copy Of Signatures</u>. This Agreement and exhibits may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same document. The Parties may evidence their execution of this Agreement by delivery to the other Parties of scanned or faxed copies of their signatures, with the same effect as the delivery of an original signature.

31. <u>Notices</u>. Any notices under this Agreement shall be in writing, shall be effective when received and may be delivered only by hand, by overnight delivery service, by fax or by electronic transmission to:

| If to the Trustee: | If to JPMorgan: | If to the Customer Representatives: |
|---|---|---|
| David J. Sheehan<br>E: dsheehan@bakerlaw.com<br>Seanna R. Brown<br>E: sbrown@bakerlaw.com<br>Baker & Hostetler LLP<br>45 Rockefeller Plaza<br>New York, NY 10111<br>F: (212) 589-4201 | John F. Savarese<br>E: JFSavarese@wlrk.com<br>Stephen R. DiPrima<br>E: SRDiPrima@wlrk.com<br>Emil A. Kleinhaus<br>E: EAKleinhaus@wlrk.com<br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019<br>F: (212) 403-2000 | Andrew Entwistle<br>E: aentwistle@entwistle-law.com<br>Arthur Nealon<br>E: anealon@entwistle-law.com<br>Entwistle & Cappucci LLP<br>280 Park Avenue<br>26th Floor West<br>New York, NY 10017<br>F: (212) 894-7200<br><br>Reed Kathrein<br>E: reed@hbsslaw.com<br>Hagens Berman Sobol Shapiro LLP<br>715 Hearst Ave., Suite 202<br>Berkeley, CA 94710<br>F: 510-725-3030 |

*[Signature page follows]*

12

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed
as of the date first above written.

IRVING H. PICARD, Trustee

As Trustee for the Substantively
Consolidated SIPA Liquidation of
Bernard L. Madoff Investment
Securities and Bernard L. Madoff

ENTWISTLE & CAPPUCCI LLP

BY:

Andrew J. Entwistle
Arthur Nealon
280 Park Avenue, 26th Floor West
New York, NY 10017

Co-Lead Counsel for the Customer
Representatives and the Proposed Class

HAGENS BERMAN SOBOL SHAPIRO LLP

BY:

Reed Kathrein
715 Hearst Ave., Suite 202
Berkely, CA 94710

Co-Lead Counsel for the Customer
Representatives and the Proposed Class

WACHTELL, LIPTON, ROSEN & KATZ

BY:

John F. Savarese
Stephen R. DiPrima
Emil A. Kleinhaus
51 West 52nd Street
New York, NY 10019

Attorneys for JPMorgan Chase & Co.,
JPMorgan Chase Bank, N.A., J.P. Morgan
Securities LLC, and J.P. Morgan Securities
Ltd.

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-4932 (BRL) |
| Plaintiff, | |
| v. | |
| JPMORGAN CHASE CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., | |
| Defendants. | |

## [PROPOSED] ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING SETTLEMENT OF COMMON LAW CLAIMS BY AND BETWEEN THE TRUSTEE, THE CLASS REPRESENTATIVES, AND JPMORGAN

Upon the motion (the "Motion")[1] of Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, the "Debtors"), seeking entry of an order, pursuant to section 105(a) of title 11, United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002(a)(3) and 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement ("Settlement"), the terms and conditions of which are set forth in the Settlement Agreement (the "Agreement") by and among the Trustee; Paul Shapiro, and Stephen and Leyla Hill (the "Class Representatives"); and JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMorgan" or "Defendants"); and it appearing that due and sufficient notice has been given to all parties in interest as required by Rules 2002(a)(3) and 9019(a) of the Federal Rules of Bankruptcy Procedure; and the Court having considered the Affidavit of Irving H. Picard in support of the Motion; and it further appearing the relief sought in the Motion is appropriate based upon the record of the hearing held before this Court to consider the Motion; and it further appearing that this Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and after due deliberation; and sufficient cause appearing therefor; it is

ORDERED, that the Motion is granted in its entirety; and it is further

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

ORDERED, that the Agreement between the Trustee, the Class Representatives, and JPMorgan is hereby approved and authorized; and it is further

ORDERED, that the Trustee, the Class Representatives, and JPMorgan shall each comply with and carry out the terms of the Agreement; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated:  New York, New York
　　　_____, 2014

_____
HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE

09-01789-cgm    Doc 206-5    Filed 01/17/14    Entered 01/17/14 13:40:05    Exhibit F
Pg 30 of 42

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-4932 (BRL) |
| Plaintiff, | |
| v. | |
| JPMORGAN CHASE CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., | |
| Defendants. | |

**AFFIDAVIT IN SUPPORT OF MOTION FOR ENTRY OF ORDER PURSUANT TO
SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002
AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
APPROVING SETTLEMENT OF COMMON LAW CLAIMS BY AND BETWEEN
THE TRUSTEE, THE CLASS REPRESENTATIVES, AND JPMORGAN**

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) | ss: |
| COUNTY OF NEW YORK | ) | |

Irving H. Picard, being duly sworn, hereby attests as follows:

1.      I am the trustee for the liquidation of the business of Bernard L. Madoff
Investment Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L.
Madoff ("Madoff," and together with BLMIS, collectively, the "Debtors").  I am familiar with
the affairs of the Debtors.  I respectfully submit this Affidavit in support of the motion (the
"Motion") seeking entry of an order, pursuant to section 105(a) of title 11, United States Code,
11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002(a)(3) and 9019(a) of the
Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement
("Settlement") by and among the Trustee; Paul Shapiro, and Stephen and Leyla Hill (the "Class
Representatives"); and JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan
Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMorgan" or "Defendants")
(each of the Trustee, the Class Representatives, and Defendants a "Party" and collectively, the
"Parties")

2.      I make this Affidavit based upon my own personal knowledge or upon
information that I believe to be true.

3.      All capitalized terms not defined herein have the meaning ascribed to them in the
Motion.

4.      I believe that the terms of the Settlement Agreement fall well above the lowest
point in the range of reasonableness and, accordingly, should be approved by this Court.  The
Settlement Agreement resolves all of the Trustee's Common Law Claims against JPMorgan,
without the need for protracted and uncertain litigation.  I recognize that litigating the Common
Law Claims would undoubtedly require a significant commitment of time by the various
professionals involved and involves significant litigation risk.  Moreover, it is likely that to the

extent litigation on the Common Law Claims is permitted by the Supreme Court, such litigation would result in future appeals, only delaying further the benefits to the BLMIS customers.

5.     Although the Class Settlement Amount is being distributed through the Class Settlement Fund, rather than through the SIPA proceeding, BLMIS customers will benefit from distributions from the Class Settlement Fund.  The Settlement Class includes only Net Losers, which is coterminous with those customers that receive distributions from the fund of customer property – *i.e.*, BLMIS customers with allowed claims.  For this reason, I believe the Settlement is in the best interest of BLMIS customers.

6.     I believe that when the Class Settlement Amount is combined with the related Avoidance Settlement and the settlement of the Government investigation, over $2.243 billion will flow to "net loser" victims of Madoff's fraud.  Thus, I believe the Settlement not only makes good financial sense for the Estate and the victims of Madoff's fraud, it represents efforts to work cooperatively with other parties to achieve unparalleled results for Madoff victims.

7.     The settlement is the product of arm's length and good faith negotiations between the Trustee, the Class Representatives, and JPMorgan.

8.     For all of these reasons, I have determined in my business judgment that the Settlement, as memorialized in the Settlement Agreement, represents a fair, equitable and reasonable compromise of the Common Law Claims and is in the best interests of BLMIS customers and the BLMIS Estate.  I respectfully ask that the Court approve the Settlement as memorialized in the Agreement.

/s/ Irving H. Picard
IRVING H. PICARD

Sworn to before me this 7th
day of January, 2014

/s/ Sonya M. Graham
Notary Public, State of New York
No. 01GR6133214
Qualified in Westchester County
Commission Expires September 12/2017

EXHIBIT E

# PETITION FORM DIR
### Claim filed by Direct Investors

# MADOFF VICTIM FUND
### Distribution Vehicle for Forfeited Assets
on behalf of the



# UNITED STATES DEPARTMENT OF JUSTICE

*All submissions to the Madoff Victim Fund will be considered in support of a claim only
if they are verified under the penalty of perjury pursuant to 28 U.S.C. § 1746.*

# INSTRUCTIONS

This Petition Form DIR is for the use of an investor that is filing a claim with the Madoff Victim Fund ("MVF") who invested with Madoff Securities through an account held directly in its name.

Please review the Frequently Asked Questions section at www.madoffvictimfund.com for further information regarding claim eligibility and the claims process.

Generally, the claims of direct investors eligible to use this Form DIR had "allowed" claims in the Madoff bankruptcy proceedings. However, a victim in MVF must have lost its own money as a result of the fraud. A person or entity who managed money invested in Madoff Securities on behalf of other investors is not generally an eligible victim for purposes of the MVF. You should complete this Form DIR for investments of your own money through direct accounts with Madoff Securities. If you invested money for the benefit of others, you should file claims for the investors' benefit using Form PV.

A Direct Investor includes any individual or organization that maintained an account at Madoff Securities in its name and with its tax identification number that lost its own money as a result of the fraud. Claimants using this Form DIR must be able to show that they suffered a net loss of its own money based on a "cash in, cash out" analysis.

### The United States Department of Justice ("DOJ") will determine all questions
### of eligibility to make a claim on MVF in its sole discretion.

## Victim Status

To qualify for a recovery from the MVF a claimant must have been a "victim" of the crimes that took place involving Bernard Madoff or Madoff Securities. A victim must have suffered a monetary loss on an investment made with Madoff Securities on or before December 11, 2008. Such a qualifying investment can have been made as a direct account holder, or indirectly through another person or entity. However, no person or entity will be an eligible victim if it did not actually lose its own money in the fraud at Madoff Securities.

If you filed a claim with the trustee in the Madoff Securities bankruptcy as a direct account holder investor and have an unsatisfied loss, you will receive this form "pre-populated" with data taken from the bankruptcy claims record. If you use the "pre-populated" form, you must nonetheless review and verify such information for completeness and accuracy.

## Measurement of Losses

A victim's eligible loss for purposes of MVF will be measured as the total amount invested with Madoff Securities, less any amounts withdrawn or obtained from Madoff Securities. Any person or entity that withdrew or otherwise obtained more cash payments from Madoff Securities than its actual cash investments is NOT an eligible victim.

MVF will aggregate the deposits and withdrawals in multiple accounts of a single investor, and among multiple investors, wherever DOJ determines that there is a "unity of interest" between two or more investors or accounts. Where a unity of interest is determined to exist, these accounts will be consolidated for purposes of determining the combined "net loss." However unless such a "unity of interest" is determined to exist, the measurement of net investment losses or net cash withdrawals will be done on an individual basis, without netting against the deposits or withdrawals of others who invested through the same account.

**Full Disclosure.** A claim on this Form DIR must disclose fully and completely all of an investor's accounts with interests in Madoff Securities, and all investments and withdrawals from all accounts. Failure to provide complete and accurate information will be grounds for disqualifying a Petition.

**Collateral Recoveries.** In processing a claim, all "collateral recoveries" from any source must be deducted from the net investment amount. See the FAQs for a description of collateral recoveries.

## Sale or Transfer of Claims

Only victims can file claims in the MVF. A victim is the person or entity that suffered a pecuniary loss as a direct result of the criminality that gave rise to the forfeiture of assets in this case. If you believe you sold your right to participate in any distribution by DOJ, please consult the Frequently Asked Questions and the Transfer Ratification Process instructions at www.madoffvictimfund.com. In order to commence the ratification process, a claim must first be filed by the victim.

For additional information regarding MVF eligibility requirements,
please refer to our website at www.madoffvictimfund.com.

## Submission Requirements

- This Form DIR must be completed and signed by the **underlying investor** whose funds were invested in the Madoff Securities account. For accounts held jointly, all parties must sign the Petition.

- If submitted on behalf of an underlying investor by an attorney, the Petition must be accompanied by a signed and sworn statement of the underlying investor stating that:

  - the attorney has the authority to represent the underlying investor in connection with the submission of the Petition;

  - the underlying investor has fully reviewed the Petition; and

  - the Form is truthful, complete and accurate in every respect.

- If submitted on behalf of an estate, the Petition must be submitted by a court-appointed executor or administrator of the estate, accompanied by documentary proof of his/her authority to act on behalf of the estate.

- If submitted on behalf of an entity, the person signing the Petition must provide documentary proof of his/her authority to sign the Petition and authority to provide the certification and release contained herein.

- You must disclose all accounts that held investments on your behalf, whether directly or indirectly.

- This Form DIR must be received by MVF before the deadline for submission of claims or within such later period as the DOJ may determine to accept submissions on behalf of victims.

- Losses on investments in swaps or other derivatives whose value was measured by interests in Madoff Securities, but where funds were never actually invested with Madoff Securities, will NOT qualify for purposes of claims on MVF.

**Completion and submission of this Petition does not automatically entitle you to a distribution from MVF. Determination letters regarding the eligibility of claims will be mailed later in the claims process.**

## PETITION FORM DIR

### Submitted by Direct Investors

---

**I    Direct Investor Information**

*Please type or print using blue or black ink*

<table>
<tr>
<td>Account Information</td>
<td>

**Madoff Securities Account Number** *that your money was invested in*

SIPA Claim ID *(if known)*

Name on Madoff Securities Account

</td>
</tr>
<tr>
<td>Primary Claimant</td>
<td>

Claimant's (Investor's) Name

Tax ID          *(Check one)*          SSN          EIN          Foreign ID

*(If Foreign ID, provide country)* _____

</td>
</tr>
<tr>
<td>Joint Claimant</td>
<td>

Joint Claimant's Name *(if any)*

Tax ID          *(Check one)*          SSN          EIN          Foreign ID

*(If Foreign ID, provide country)* _____

</td>
</tr>
<tr>
<td>Investor's Mailing Address</td>
<td>

Attention

Street Address

City, State/Province, Postal Code

Country

</td>
</tr>
<tr>
<td>Investor's Contact Information</td>
<td>

Daytime Phone                              Alternate/Cell Phone

Contact Name *(if other than primary claimant)*

E-mail Address or Website

</td>
</tr>
</table>

## II    Tax-Deferred Accounts

If the investment in Madoff Securities was through an individual tax-deferred account, such as a 401(k), 403(b) or IRA account, please provide the name, phone number and account number for the institution in which the investor's tax-deferred account is currently held.

Financial Institution _____

Account Number _____    Phone Number _____


## III    Transactions

If you filed a claim in the Madoff Securities bankruptcy proceeding, we have a copy of all documentation you submitted with that claim and you do *NOT* need to resubmit that documentation. However, you will need to confirm under the penalty of perjury that the documentation you provided to the Trustee was correct, and complete as of the date it was submitted. In addition, you must provide any documentation requested below that has not already been submitted to the Trustee. In all cases of doubt, please provide the necessary documentation so we can review your claim.

Please verify or complete the below transaction table. Confirm (if pre-populated) or list every deposit, transfer-in, withdrawal and transfer-out of your own investments in the identified Madoff Securities account. If you filed a claim in the Madoff Securities bankruptcy proceeding, these transactions should match those detailed in the Determination Letter you received from the Trustee. You must attach documentary proof for any transaction that is not identified in, or is different than, those identified in the Determination Letter. Documentary proof of transactional information can include account statements, wire transfer confirmations, cancelled checks, receipts, etc. If you need additional space, please make copies of the table or download additional pages from our website.

If you invested money in your Madoff Securities account for other individuals or entities, list only your own transactions, not the deposits and withdrawals made on behalf of other investors. If the pre-populated transaction table includes the investments of other investors, please cross out those transactions.


*Please submit copies and keep the originals.*

10-04385-smb    Doc 26-7    Filed 01/17/14    Entered 01/17/14 13:40:05    Exhibit E
Part 1    Pg 6 of 12

*This is not a determination of the eligible amount of your claim.*
*It is merely a listing of the cash transactions relating to your Madoff Securities investment.*

| Date of Transaction | Transaction Type *Deposit or Withdrawal* | Transaction Description or Note *(if applicable)* | Amount (USD or local currency) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Total Deposits (Cash In):    $ _____

Total Withdrawals (Cash Out):    $ _____

| Did you invest money in more than one Madoff Securities account, either directly or indirectly? |
| --- |
| ☐   No<br><br>☐   Yes - All transactions for all accounts are listed on this claim form (preferred method).<br><br>☐   Yes - I am filing a separate claim form for every Madoff account I invested money in.<br><br>Please list on an attached sheet all Madoff accounts in which you had an investment if more than one. |

## IV   Recoveries

Please report any recoveries you have received for any or all of the losses incurred as a result of your investment in Madoff Securities (e.g., payments from SIPC, distributions from the Madoff Securities bankruptcy trustee, litigation recoveries, insurance recoveries or recoveries from any other source). Please include documentation to support any recovery you have received.

*(Any monies received for the sale or transfer of a claim in the Madoff Securities bankruptcy proceeding or for the purported sale or transfer of a claim against MVF should be recorded on a separate Form T-1, which is available from our website. Please call the Help Desk if you have questions.)*

| Amount | Date | Source |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

List any other recoveries you expect to receive **in the future** through litigation, arbitration, insurance or otherwise.

| Amount | Date | Source |
| --- | --- | --- |
|  |  |  |
|  |  |  |

## V  Settlement Agreements

Have you entered into a settlement agreement with the bankruptcy trustee in connection with your
Madoff Securities bankruptcy claim?

| | | |
|---|---|---|
| No | ☐ | |
| Yes | ☐ | If yes, please provide a copy of the settlement agreement and all related materials. |

## VI  Payments Made to the Madoff Securities Bankruptcy Trustee

Were you required to pay any funds to the Madoff Securities bankruptcy trustee (e.g.. for a preference
transfer or avoidance amount)?

| | | |
|---|---|---|
| No | ☐ | |
| Yes | ☐ | If yes, please provide documentation evidencing the payment details. |

## VII  Sale, Transfer or Assignment of Claim

Did you sell, transfer or assign your bankruptcy and/or remission claim?

| | | |
|---|---|---|
| No | ☐ | |
| Yes | ☐ | If yes, please complete Form T-1, which is available on our website. |

Only victims are eligible to receive a recovery. However, where the actual victim acknowledges that
they sold or otherwise transferred their claim for a payment of remission, and ratifies the terms of the
transaction in writing, the victim may request that MVF pay any monies that would otherwise go to
the victim directly to the purchaser or other transferee. The ratification process must also be completed
by all subsequent purchasers or transferees, if applicable. Please refer to our website at
www.madoffvictimfund.com or call for additional information regarding the ratification process and
related requirements.

## VIII   Disclosure of Fees, Commissions or Other Financial Compensation

Did you receive any fees, commissions or any financial compensation (from any source) for directing any person to make, or otherwise for handling, investments in Madoff Securities?

| | | |
|---|---|---|
| No | ☐ | |
| Yes | ☐ | If yes, you are required to complete Form A, which is available on our website. |

## IX   Certification and Release

**A.** CERTIFICATION.  The undersigned represents and certifies under penalty of perjury that:

**1.** All personal and transactional information, and all disclosures regarding any recovery for the loss resulting from the Madoff fraud, are complete and accurate to the best of the undersigned's knowledge. Information regarding all accounts, whether showing a net investment or net withdrawals, has been provided.

**2.** All accompanying documents in support of this Petition, and documents submitted to the Madoff Securities bankruptcy trustee in support of the bankruptcy claim, are true, correct and complete to the best of the undersigned's knowledge.

**3.** He/she/it is not and/or has not been any of the following.

    **a.** A person who knowingly participated in, benefitted from or acted in a willfully blind manner relating to the fraud, and has not earned fees, commissions or other payments from handling or directing investments in Madoff Securities, except as disclosed in Form A (available on our website).

    **b.** A person who was an officer, director or employee of Madoff Securities at any time during the Madoff fraud through and including December 11, 2008.

    **c.** A member of the Madoff family.

    **d.** A person who forfeited cash or property to the DOJ in connection with the Madoff fraud.

    **e.** A defendant in any state or federal criminal action relating to the Madoff fraud.

    **f.** A person who is otherwise prohibited from receiving payments in the United States, including all prohibited persons under regulations of the Office of Foreign Assets Control (see:  www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx).

    **g.** An affiliate, assign, heir, distributee, parent, spouse, child, or other relative of any of the foregoing, or an entity controlled by, or under common control of, any of such persons.

**B.** He/she/it consents to the use by the U.S. Department of Justice, the MVF and its staff, and any of the Department's agents of any of the information provided herein for any purpose relating to this claims and remission process, including verifying the Petition or the identity of the Petitioner. This information includes, but is not limited to, the Social Security Number (or taxpayer identification number or similar foreign identifying information), address, telephone number and brokerage account information of the persons involved in any claim.

**C.** **RELEASE.** Each Petitioner hereby recognizes that the distribution of funds that make up the Madoff Victim Fund is not required by law, but that any distribution made shall be in the sole discretion of the Attorney General. Petitioner, whether ultimately determined eligible or ineligible to receive a remission payment from the Madoff Victim Fund, hereby releases and fully discharges, and consents and agrees that it shall make no claim of any kind or nature whatsoever against any person in connection with the administration and distribution of the Madoff Victim Fund, including the U.S. Department of Justice, U.S. Attorney's Office, Special Master and their respective employees and agents.

Each of the undersigned declares under penalty of perjury under the laws of the United States of America (and the applicable laws of any other jurisdiction) on information and belief that the information contained herein, the statements made and the answers given in this Petition are true and correct and that any documents submitted herewith are true and genuine.

Executed on this the _____ day of _____, _____ in

(Month)                    (Year)

_____

(City, State, Country)

| Individuals | Corporations, Partnerships, Other Entities |
|---|---|
| _____ | _____ |
| Signature of Petitioner | Authorized Signature |
| _____ | _____ |
| Type or print name of Petitioner | Type/print name |
| _____ | _____ |
| Signature of Joint Petitioner (if any) | Title |
| _____ | _____ |
| Type/print name of Joint Petitioner (if any) | Name of Entity |
| _____ | _____ |
| Capacity of persons signing above *(i.e., Underlying Investor, Executor, POA, etc.)* | Capacity of persons signing above *(i.e., President, Managing Partner, Trustee, etc.)* |

# PETITION FORM CHECKLIST

*Before mailing your Petition Form please read these reminders.*

**1)** The signed Petition Form must be received by the Special Master **on or before** February 28, 2014, or such other date as the Department may later establish, in order to be eligible for consideration.

**2)** Please review, complete and return all pages of the Petition Form.

**3)** Remember to **sign the Certification and Release.** The Certification and Release must be signed by the primary claimant and all joint claimants. If you received any fees, commissions or other payments for handling or directing investments in Madoff Securities, you must disclose any such compensation on Form A, which is available on our website. You must file Form A with this Petition Form.

**4)** Remember to supply your Social Security Number or Tax Identification Number (or the foreign equivalents of such identifying information) and any joint Social Security Number if applicable.

*5)* Remember to attach all supporting documentation if applicable. Do not send originals of any supporting documentation; **send copies. *You do not need to resend the supporting documentation previously provided to the Madoff Securities bankruptcy trustee.***

**6)** Do not use a highlighter on the Petition Form or supporting documentation.

**7)** Keep copies of the Petition Form and supporting documentation for your records.

**8)** We will send a postcard confirming receipt of the Petition Form within 30 days after receiving it. If you do not receive a confirmation postcard within 35 days of mailing the Petition Form, please call us at (866) 624-3670. **Please note that the Petition Form is not deemed filed until you receive a confirmation postcard. This postcard only confirms receipt. Therefore, it does not mean that your Petition Form is complete or that you are eligible for a recovery.** Once the petition has been reviewed you may receive correspondence concerning any additional information or documentation needed to make the petition complete.

**9)** You are responsible for notifying us of any changes in the information you file, including changes of address or contact information, or new collateral recoveries received. Please call us at (866) 624-3670, email us at info@madoffvictimfund.com, or mail us your new contact information. Please include the MVF petition number on any correspondence. Our mailing address is:

Madoff Victim Fund
P.O. Box 6310
Syracuse, NY 13217-6310

# EXHIBIT F

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*And Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |

**TRUSTEE'S TENTH INTERIM REPORT**
**FOR THE PERIOD ENDING SEPTEMBER 30, 2013**

# TABLE OF CONTENTS

**Page**

I.     EXECUTIVE SUMMARY ................................................................ 5

II.    BACKGROUND ............................................................................ 7

III.   FINANCIAL CONDITION OF THE ESTATE ................................ 7

IV.   ADMINISTRATION OF THE ESTATE ........................................ 8

    A.    Marshaling And Liquidating The Estate Assets ................... 8

    B.    Retention Of Professionals ................................................ 9

V.    CLAIMS ADMINISTRATION ..................................................... 9

    A.    Claims Processing .............................................................. 9

         i.     Customer Claims ..................................................... 9

         ii.    General Creditor Claims ....................................... 10

         iii.   The Trustee Has Kept Customers Informed Of The Status Of The Claims Process ................ 10

         iv.   The Hardship Program ........................................... 11

    B.    Objections To Claims Determinations .............................. 13

    C.    Settlements Of Customer Claims Disputes ....................... 14

VI.   PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA ........................ 15

    A.    Net Equity Dispute ........................................................... 15

    B.    Time-Based Damages ...................................................... 17

    C.    "Customer" Definition .................................................... 20

VII.  RECOVERIES AND CONTINGENCIES ..................................... 24

    A.    Recoveries Accomplished During Prior Report Periods .................... 24

    B.    Recoveries Accomplished During This Report Period ....................... 24

    C.    Earlier Settlements ........................................................... 25

VIII. THE TRUSTEE'S ALLOCATION OF FUNDS AND DISTRIBUTIONS TO CUSTOMERS ................................ 29

    A.    The Customer Fund ......................................................... 29

    B.    The Trustee's Initial Allocation of Property to the Fund of Customer Property and Authorizing the First Interim Distribution to Customers .............. 30

    C.    The Trustee's Second Allocation of Property to the Fund of Customer Property and Authorizing the Second Interim Distribution to Customers .......... 31

    D.    The Trustee's Third Allocation of Property to the Fund of Customer Property and Authorizing the Third Interim Distribution to Customers ............. 33

    E.    The General Estate ........................................................... 34

# TABLE OF CONTENTS
(continued)

| | | | |
|---|---|---|---|
| IX. | LITIGATION | | 34 |
| | A. | The District Court—Motions to Withdraw the Reference, Motions to Dismiss and Related Appeals | 35 |
| | | i. The HSBC Action | 35 |
| | | ii. The JPMorgan Action | 37 |
| | | iii. The Luxalpha Action | 39 |
| | |    (a) Luxalpha, The Luxembourg Investment Fund and Access Injunction Actions | 39 |
| | |    (b) The Oreades Action | 41 |
| | |    (c) Banque Degroof Action | 41 |
| | | iv. The Kohn Action | 41 |
| | | v. Other Proceedings Relating to Motions To Withdraw | 44 |
| | |    (a) The Administrative Order | 44 |
| | |    (b) Consolidated Briefing Orders | 45 |
| | |    (c) The 546(e) Appeal | 48 |
| | B. | The Bankruptcy Court and Related Appeals | 50 |
| | | i. Avoidance Actions | 50 |
| | | ii. Subsequent Transferee Actions | 51 |
| | | iii. *Picard v. Avellino* | 52 |
| | | iv. *Picard v. BNP Paribas* | 54 |
| | | v. *Picard v. Citibank* | 55 |
| | | vi. *Picard v. Cohmad Sec. Corp.* | 57 |
| | | vii. *Picard v. Defender* | 58 |
| | | viii. *Picard v. Equity Trading* | 60 |
| | | ix. *Picard v. Friedman* | 61 |
| | | x. *Picard v. J. Ezra Merkin* | 62 |
| | | xi. *Picard v. Kingate* | 66 |
| | | xii. *Picard v. Legacy Capital Limited* | 68 |
| | | xiii. *Picard v. Magnify Inc.* | 69 |
| | | xiv. *Picard v. Maxam Absolute Return Fund, L.P.* | 71 |
| | | xv. *Picard v. Mendelow* | 72 |
| | | xvi. *Picard v. Merrill Lynch* | 73 |
| | | xvii. *Picard v. Michael Lieberbaum* | 74 |

## TABLE OF CONTENTS
(continued)

**Page**

xviii. *Picard v. Natixis* .................................................................. 75

xix. *Picard v. Peter B. Madoff* ................................................... 76

xx. *Picard v. PJ Administrators* ............................................... 81

xxi. *Picard v. Plaza* .................................................................. 81

xxii. *Picard v. Richard M. Glantz* ............................................. 83

xxiii. *Picard v. Stanley Chais* ..................................................... 84

xxiv. *Picard v. Stanley Shapiro* .................................................. 85

xxv. *Picard v. Thybo* .................................................................. 86

xxvi. *Picard v. Westport* .............................................................. 88

C. Injunction Proceedings ................................................................. 89

i. *Picard v. Fox*, Adv. No. 10-03114 (BRL), Case Nos. 10-04652, 10-cv-07101, and 10-cv-07219 (JGK); *Picard v. Picower*, Adv. No. 09-01197 (BRL), Case Nos. 11-cv-01328, 11-cv-01298 (JGK); *In re Bernard L. Madoff Inv. Sec., LLC*, 12-1645 and consolidated cases (2d Cir.) ............................................................. 90

ii. *Picard v. Stahl*, Adv. No. 10-03268 (BRL), Case Nos. 11-cv-02246, 11-cv-02135, 11-cv-02392 (AKH), Case Nos. 11-5421 and 11-5428 (2d Cir.) ........................................................... 91

iii. *Picard v. Hall*, Adv. No. 12-01001 (BRL) ............................ 93

iv. *Picard v. Maxam Absolute Return Fund*, Adv. No. 10-05342 (BRL) ...................................................................................... 94

v. *Picard v. Schneiderman*, Adv. No. 12-01778 (BRL) ............. 94

vi. *Goldman Lift-Stay Motions*, Adv. No. 08-01789 (BRL) ........ 96

vii. *Picard v. Access Mgmt. Luxembourg S.A.*, Adv. No. 12-01563 (BRL) ...................................................................................... 97

viii. *Picard v. Kingate Global Fund, Ltd.*, Adv. No. 12-01920 (Bankr. S.D.N.Y.) ............................................................................... 98

ix. *Picard v. Fairfield Greenwich Ltd.*, Adv. No. 12-2047 (Bankr. S.D.N.Y.), No. 12-9408 (S.D.N.Y.) ........................................ 98

X. INTERNATIONAL INVESTIGATION AND LITIGATION ...................... 99

A. Austria and Italy ............................................................................ 100

B. Bermuda ....................................................................................... 100

C. BVI and the Cayman Islands .......................................................... 100

D. England ........................................................................................ 101

E. Gibraltar ....................................................................................... 102

08-01420-smb   Doc 9526-6   Filed 00/16/14   Entered 00/16/14 16:52:20   Main Document
Part 11   Pg 98 of 207

**TABLE OF CONTENTS**

(continued)

**Page**

F.    Ireland ................................................................................................. 104

G.    Switzerland and Luxembourg .......................................................... 104

XI.   FEE APPLICATIONS AND RELATED APPEALS .................................... 104

A.    Objections to Prior Fee Applications ............................................... 104

B.    Eleventh Fee Application .................................................................. 105

C.    Twelfth Fee Application ................................................................... 105

XII.  CONCLUSION ............................................................................................ 106

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, Esq. (the "Trustee"), as Trustee for the substantively consolidated liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the "Debtors"), respectfully submits his Tenth Interim Report (this "Report") pursuant to SIPA § 78fff-1(c) and this Court's Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief entered on December 23, 2008 (the "Claims Procedures Order") (ECF No. 12).[2]  Pursuant to the Claims Procedures Order, the Trustee shall file additional interim reports every six (6) months.  This Report covers the period between April 1, 2013 and September 30, 2013 (the "Report Period").

## I.    EXECUTIVE SUMMARY

1.    The Trustee has worked relentlessly for almost five years to recover customer property and distribute it to BLMIS customers.  Through pre-litigation and other settlements, the Trustee has successfully recovered, or reached agreements to recover, more than $9.5 billion— more than 54% of the currently estimated principal lost in the Ponzi scheme by those who filed claims—for the benefit of all customers of BLMIS.  [3]

---

[1] For convenience, subsequent references to SIPA will omit "15 U.S.C."

[2] All ECF references refer to pleadings filed in the main adversary proceeding pending before this Court, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, Adv. No. 08-01789 (BRL) (Bankr. S.D.N.Y.), unless otherwise noted.

[3] Almost $20 billion of principal was lost in the Ponzi scheme in total.  Of the $20 billion, approximately $17.5 billion of principal was lost by those who filed claims.

2.      Beginning on March 29, 2013, the Trustee made his third interim distribution from the Customer Fund, distributing approximately $522.412 million to customers with allowed claims to date.   When combined with the approximately $515.594 million first interim distribution, the $3.741 billion second interim distribution, and $810.177 million of advances paid or committed to be paid by the Securities Investor Protection Corporation ("SIPC"),[4] the Trustee has distributed approximately $5.590 billion to BLMIS customers to date.   This represents a significant milestone in this litigation, with 1,106 BLMIS accounts fully satisfied. The 1,106 fully satisfied accounts represent approximately 51% of accounts with allowed claims.

3.      The Trustee and his counsel (including, but not limited to, Baker & Hostetler LLP ("B&H"), Windels Marx Lane & Mittendorf, LLP ("Windels Marx"), and various special counsel retained by the Trustee ("Special Counsel") (collectively, "Counsel"), continued to litigate hundreds of individual cases before this Court, the United States District Court for the Southern District of New York (the "District Court"), the United States Court of Appeals for the Second Circuit (the "Second Circuit"), the United States Supreme Court (the "Supreme Court"), and dozens of international courts.

4.      This Report is meant to provide an overview of the efforts of the Trustee and his team of professionals in unwinding the largest Ponzi scheme in history.   Billions of dollars and thousands of people and entities located across the world were involved in this fraud.   The Trustee continues to work diligently to coordinate the administration, investigation, and litigation to maximize efficiencies and reduce costs.

---

[4] SIPC has advanced over $800 million to date to the Trustee to pay allowed claims.  The difference between the amount committed to pay by SIPC and the amount actually advanced to customers depends on whether the Trustee has received an executed assignment and release from the customer. Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims is less than the amount of SIPC advances committed by the Trustee.

5.      All Interim Reports, along with a complete docket and substantial information about this liquidation proceeding, are located on the Trustee Website, www.madofftrustee.com.

## II.      BACKGROUND

6.      The Trustee's prior interim reports, each of which is fully incorporated herein,[5] have detailed the circumstances surrounding the filing of this case and the events that have taken place during prior phases of this proceeding.

## III.      FINANCIAL CONDITION OF THE ESTATE

7.      No administration costs, including the compensation of the Trustee and his counsel, are being paid out of recoveries obtained by the Trustee for the benefit of BLMIS customers.  Rather, the fees and expenses of the Trustee, his counsel and consultants, and administrative costs incurred by the Trustee are paid from administrative advances from SIPC.  These costs are chargeable to the general estate and have no impact on recoveries that the Trustee has or will obtain.  Thus, recoveries from litigation, settlements, and other means will be available in their entirety for the satisfaction of customer claims.

8.      A summary of the financial condition of the estate as of September 30, 2013 is provided in Exhibit A attached hereto.

9.      This summary reflects cash and cash equivalents in the amount of $204,576,103.00 and short-term United States Treasuries in the amount of $4,418,674,492.00.

10.      As detailed in Exhibit A, as of September 30, 2013, the Trustee requested and SIPC advanced $1,637,502,068.32, of which $805,103,978.44 was used to pay allowed customer

---

[5] Prior reports cover the periods from December 11, 2008 to June 30, 2009 (the "First Interim Report") (ECF No. 314); July 1, 2009 to October 31, 2009 (the "Second Interim Report") (ECF No. 1011); November 1, 2009 to March 31, 2010 (the "Amended Third Interim Report") (ECF No. 2207); April 1, 2010 to September 30, 2010 (the "Fourth Interim Report") (ECF No. 3038); October 1, 2010 to March 31, 2011 (the "Fifth Interim Report") (ECF No. 4072); April 1, 2011 to September 30, 2011 (the "Sixth Interim Report") (ECF No. 4529); October 1, 2011 to March 31, 2012 (the "Seventh Interim Report") (ECF No. 4793); April 1, 2012 to September 30, 2012 (the "Eighth Interim Report") (ECF No. 5066); and October 1, 2012 to March 31, 2013 (the "Ninth Interim Report") (ECF No. 5351).

claims up to the maximum SIPA statutory limit of $500,000 per account,[6] and approximately

$832,398,089.88 was used for administrative expenses.

## IV.    ADMINISTRATION OF THE ESTATE

### A.    Marshaling And Liquidating The Estate Assets

11.    The Trustee and his Counsel have worked diligently to investigate, examine, and evaluate the Debtor's activities, assets, rights, liabilities, customers, and other creditors.  Thus far, the Trustee has been successful in recovering or entering into agreements to recover a significant amount of assets for the benefit of customers, totaling more than $9.5 billion through September 30, 2013.  For a more detailed discussion of prior recoveries, *see* Section V.B. of the First Interim Report; Section IV of the Second, Amended Third, and Fourth Interim Reports; Section VII of the Fifth Interim Report; Section IV of the Sixth Interim Report; and Section VII of the Seventh, Eighth, and Ninth Interim Reports.

12.    The Trustee has identified claims in at least eight shareholder class action suits that BLMIS filed before the Trustee's appointment arising out of its proprietary and market making desk's ownership of securities.  As of the Ninth Interim Report, the Trustee had received distributions from seven of these class action settlements totaling over $91,000.  The Trustee has not and will not receive any distributions from the eighth class action settlement.  In addition, the Trustee has identified claims that BLMIS may have in 153 other class action suits also arising out of its proprietary and market making activities.  The Trustee has filed proofs of claim in 99 of these cases and, based on a review of relevant records, has declined to pursue claims in 33 additional cases.  Subject to the completion of a review of relevant records, the Trustee intends to

---

[6] The Trustee must receive an executed assignment and release from each customer before releasing an advance of funds from SIPC.  Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims that have been determined is less than the amount of SIPC advances committed by the Trustee. *See supra* note 3.

file claims in the remaining 21 cases. As of September 30, 2013, the Trustee has recovered $604,878.82 from settlements relating to 44 of the 99 claims filed directly by the Trustee, of which $75,474.06 was recovered during the Report Period.

**B.**   **Retention Of Professionals**

13.   In addition to the professionals already retained by the Trustee, during the Report Period and pursuant to orders of this Court, the Trustee retained Triay Stagnetto Neish, as special counsel to represent him in Gibraltar (ECF No. 5076), Ritter & Ritter as special counsel to represent him in Liechtenstein (ECF No. 5220), and Kelley, Wolter & Scott, P.A. as local co-counsel in Minnesota (ECF No. 5467).

## V.   CLAIMS ADMINISTRATION

**A.**   **Claims Processing**

**i.**   **Customer Claims**

14.   During the Report Period, the Trustee allowed $39,617,800.50 in customer claims. This brings the total amount of allowed claims as of September 30, 2013 to $11,111,641,497.74. The Trustee has paid or committed to pay $809,677,373.62 in cash advances from SIPC. This is the largest commitment of SIPC funds of any SIPA liquidation proceeding and greatly exceeds the total aggregate payments made in all SIPA liquidations to date.

15.   As of September 30, 2013, there were 160 claims relating to 117 accounts that were "deemed determined," meaning the Trustee has instituted litigation against those accountholders and related parties. The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under § 502(d) of the Bankruptcy Code. Accordingly, such claims will not be allowed until the avoidance actions are resolved by

settlement or otherwise and the judgments rendered against the claimants in the avoidance actions are satisfied.

### ii. General Creditor Claims

16.     As of September 30, 2013, the Trustee had received 427 timely and 21 untimely filed secured and unsecured priority and non-priority general creditor claims totaling approximately $1.7 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 427 claims and $1.7 billion, the Trustee has received 94 general creditor claims and 49 broker-dealer claims totaling approximately $264.9 million.  At this time, the BLMIS estate has no funds from which to make distributions to priority/non-priority general creditors and/or broker dealers.

### iii. The Trustee Has Kept Customers Informed Of The Status Of The Claims Process

17.     Throughout the liquidation proceeding, the Trustee has kept customers, interested parties, and the public informed of his efforts by maintaining the Trustee Website, a toll-free customer hotline, conducting a Bankruptcy Code § 341(a) meeting of creditors on February 20, 2009, and responding to the multitude of phone calls, e-mails, and letters received on a daily basis, from both claimants and their representatives.

18.     The Trustee Website allows the Trustee to share information with claimants, their representatives, and the general public regarding the ongoing recovery efforts and the overall liquidation.  In addition to court filings, media statements, and weekly information on claims determinations, the Trustee Website includes up-to-date information on the status of Customer Fund recoveries, an "Ask the Trustee" page where questions of interest are answered and updated, a letter from the Chief Counsel to the Trustee on litigation matters, a detailed

distribution page, an FAQs page, and a timeline of important events. The Trustee Website is monitored and updated on a daily basis.

19.    In addition, the Trustee Website allows claimants to e-mail their questions directly to the Trustee's professionals who follow up with a return e-mail or telephone call to the claimants. As of September 30, 2013, the Trustee and his professionals had received and responded to more than 7,000 e-mails via the Trustee Website from BLMIS customers and their representatives.

20.    The toll-free customer hotline provides status updates on claims and responses to claimants' questions and concerns. As of September 30, 2013, the Trustee, B&H, and the Trustee's professionals had fielded more than 8,000 calls from claimants and their representatives.

21.    In sum, the Trustee and his team have endeavored to respond in a timely manner to every customer inquiry and ensure that customers are as informed as possible about various aspects of the BLMIS proceeding.

### iv.    The Hardship Program

22.    At the commencement of claims administration, the Trustee established the Hardship Program to accelerate the determination of claims and the receipt of SIPC protection up to $500,000 for individual account holders who were dealing with hardship. An individual could qualify for the Hardship Program if he or she filed a claim and was: (i) unable to pay for necessary living or medical expenses, (ii) over 65 years old and forced to reenter the work force after retirement, (iii) declaring personal bankruptcy, (iv) unable to pay for the care of dependents, or (v) suffering from extreme financial hardship beyond the identified circumstances.

23.     As of December 11, 2010, the Trustee had received 394 Hardship Program applications.  The Trustee obtained advances from SIPC and issued 122 checks to hardship applicants with allowed claims.  The Trustee also worked in good faith with approved applicants to reconcile any disputed portions of their claims.  Of the 394 Hardship Program applications received prior to December 11, 2010, the Trustee assessed the information provided and, in the exercise of his discretion, decided not to commence avoidance actions against 249 hardship applicants.

24.     The Trustee expanded the Hardship Program into a second phase as he instituted avoidance actions.  While the law requires the Trustee to pursue avoidance actions to recover customer property, the Trustee has stated that he will not pursue avoidance actions against BLMIS accountholders suffering proven hardship.  In order to forego an avoidance action, the Trustee needed financial information about the accountholder.  Thus, the Trustee announced in November 2010 that the Hardship Program would focus on avoidance action defendants and requested that accountholders come forward to share information regarding their hardships.  Through this program, the Trustee has worked with a substantial number of hardship applicants who were subject to avoidance actions to confirm their hardship status and forego the pursuit of an avoidance action.

25.     In the second phase of the Hardship Program, as of September 30, 2013, the Trustee had received 495 applications from avoidance action defendants relating to 317 adversary proceedings.   After reviewing the facts and circumstances presented in each application and, in many cases, requesting additional verifying information, the Trustee has dismissed 199 Hardship Program applicants-defendants from avoidance actions.   As of September 30, 2013, there were 74 applications still under review and 226 that were otherwise

resolved because they were either (i) withdrawn by the applicant, (ii) deemed withdrawn for failure of the applicant to pursue the application, (iii) denied for lack of hardship, or (iv) referred for consideration of settlement.

26.    The Trustee established a Hardship Program Hotline with a telephone number and electronic mail address.  A large number of potential applicants have been assisted by the Trustee through the use of the Hotline, and the Trustee urges customers to continue using this resource and the Hardship Program if they believe they qualify.  Further information and applications are available on the Trustee Website.

**B.     Objections To Claims Determinations**

27.    As required by the Claims Procedures Order and described in each determination letter sent by the Trustee ("Determination Letter"), BLMIS claimants have thirty days from the date of a Determination Letter to object to the Trustee's determination of their claim.  Claimants who disagree with the Trustee's determination of their claim must file with the Court a written opposition setting forth the grounds of disagreement and provide the Trustee with the same.  A hearing date will be obtained by the Trustee, and claimants will be notified of that date.  As of September 30, 2013, 2,293 objections (which includes duplicates, amendments, and supplements) have been filed with the Court.  These objections relate to 4,218 unique claims and 1,146 accounts.

28.    The following objections, among others, have been asserted: (i) Congress intended a broad interpretation of the term "customer" and the statute does not limit the definition to those who had a direct account with BLMIS, (ii) the Trustee should determine claims based upon the BLMIS November 30, 2008 statement as opposed to the court-approved cash in-cash out or "Net Investment Method", (iii) claimants should receive interest on deposited amounts, (iv) the Trustee must commence an adversary proceeding against each claimant in

-13-

order to avoid paying gains on claimants' investments, (v) claimants paid income taxes on distributions and their claims should be adjusted by adding all amounts they paid as income taxes on fictitious profits, (vi) each person with an interest in an account should be entitled to the SIPC advance despite sharing a single BLMIS account, and (vii) there is no legal basis for requiring the execution of a Assignment and Release prior to prompt payment of a SIPC advance.

29.     The Trustee has departed from past practice in SIPA proceedings and paid or committed to pay the undisputed portion of any disputed claim in order to expedite payment of SIPC protection to customers, while preserving their right to dispute the total amount of their claim.

## C.     Settlements Of Customer Claims Disputes

30.     The Trustee has continued settlement negotiations with customers who withdrew funds from their BLMIS accounts within ninety days of the Filing Date.[7]  Such withdrawals are preferential transfers recoverable by the Trustee under Bankruptcy Code §§ 547(b) and 550(a), which are applicable in this proceeding pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3).  To settle potential preference actions against these customers, the Trustee has proposed that the customers agree to authorize the Trustee to deduct the preferential amount from the initial payment advanced by SIPC pursuant to § 78fff-3(a)(1) of SIPA.  The allowed claim is thus calculated based on the amount of money the customer deposited with BLMIS for the purchase of securities, less subsequent withdrawals, plus the preferential amount.  The customer will be entitled to receive an additional distribution from the Customer Fund based on the total amount of the allowed claim.

---

[7] In this case, the Filing Date is the date on which the SEC commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* § 78*lll*(7)(B) of SIPA, 15 U.S.C. § 78*lll*(7)(B).

31.     As of September 30, 2013, the Trustee had reached agreements relating to 554 accounts and with the IRS (which did not have a BLMIS account), recovering $8,416,825,027.97 in litigation, pre-litigation, and avoidance action settlements. These litigation, pre-litigation, and avoidance action settlements allowed the Trustee to avoid the litigation costs that would have been necessary to obtain and collect judgments from these customers.

## VI.     PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA

### A.     Net Equity Dispute

32.     For purposes of determining each customer's Net Equity, as that term is defined under SIPA, the Trustee credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn from that BLMIS customer account, also known as the Net Investment Method. Some claimants argued that the Trustee was required to allow customer claims in the amounts shown on the November 30, 2008 customer statements (the "Net Equity Dispute").

33.     This Court issued a decision on March 1, 2010 upholding the Trustee's Net Investment Method as the only interpretation consistent with the plain meaning and legislative history of the statute, controlling Second Circuit precedent, and considerations of equity and practicality. (ECF No. 2020); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010). This Court certified an immediate appeal to the Second Circuit (ECF No. 2467), which heard oral argument on March 3, 2011.

34.     On August 16, 2011, the Second Circuit affirmed this Court's decision and the Trustee's Net Investment Method, holding that it would have been "legal error" for the Trustee to discharge claims for securities under SIPA "upon the false premise that customers' securities positions are what the account statements purport them to be." *Sec. Investor Prot. Corp. v.*

-15-

*Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 654 F.3d 229, 241 (2d Cir. 2011). Any calculation other than the Net Investment Method would "aggravate the injuries caused by Madoff's fraud." *Id*. at 235. Instead, the Net Investment Method prevents the "whim of the defrauder" from controlling the process of unwinding the fraud. *Id*.

35.    Under the Second Circuit's decision, the relative position of each BLMIS customer account must be calculated based on "unmanipulated withdrawals and deposits" from its opening date through December 2008. *Id*. at 238. If an account has a positive cash balance, that accountholder is owed money from the estate. As a corollary, if an account has a negative cash balance, the accountholder owes money to the estate. Both the recovery and distribution of customer property in this case are centered on the principle that the Trustee cannot credit "impossible transactions." *Id.* at 241. If he did, then "those who had already withdrawn cash deriving from imaginary profits in excess of their initial investment would derive additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed." *Id*. at 238.

36.    First, the Second Circuit found, "in the context of this Ponzi scheme—the Net Investment Method is . . . more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud . . . and 'avoid[s] placing some claims unfairly ahead of others.'" *Id*. at 242 n.10 *(quoting Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 463 (S.D.N.Y. 2001)). Thus, the Trustee is obligated to use the avoidance powers granted by SIPA and the Bankruptcy Code to prevent one class of customers—the "net winners" or those with avoidance liability—from having the benefit of Madoff's fictitious trades at the expense of the other class of customers—the "net losers" or those who have yet to recover their initial investment.

37.     Next, the Second Circuit explained that "notwithstanding the BLMIS customer statements, there were no securities purchased and there were no proceeds from the money entrusted to Madoff for the purpose of making investments." *Id.* at 240.   Therefore any "[c]alculations based on made-up values of fictional securities would be 'unworkable' and would create 'potential absurdities.'" *Id.* at 241 (*quoting In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 88 (2d Cir. 2004)).   Thus, the Second Circuit rejected reliance upon the BLMIS account statements, finding that, to do otherwise, "would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations." *Id.* at 235.

38.     On September 6, 2011, certain claimants filed a petition for panel rehearing, or, in the alternative, for rehearing en banc. *Sterling Equities Assocs. v. Picard (In re Bernard L. Madoff Inv. Secs., LLC)*, No. 10-2378 (2d Cir.), ECF Nos. 505, 537.   The panel that determined the appeal considered the request for panel rehearing, the active members of the Court considered the request for rehearing en banc, and on November 8, 2011, both denied the petition. (ECF No. 551).

39.     Three petitions for certiorari were filed with the Supreme Court.   On June 25, 2012, the Supreme Court denied certiorari in two of the petitions. *Ryan v. Picard*, 133 S. Ct. 24 (2012); *Velvel v. Picard*, 133 S. Ct. 25 (2012).   Certiorari was also dismissed with respect to one appeal. *Sterling Equities Assocs. v. Picard*, 132 S. Ct. 2712 (2012).

**B.     Time-Based Damages**

40.     Following the Supreme Court decision denying certiorari regarding the Net Investment Method, the Trustee filed a motion on July 17, 2012 (the "Scheduling Motion") (ECF No. 4920) for an order (the "Scheduling Order") requesting a briefing schedule regarding the question of whether customer claims should be recalculated with an interest factor or a constant

dollar adjustment ("Time-Based Damages Issue"). Approximately 1,200 objections raised the Time-Based Damages Issue. Claimants raised numerous theories of law, all of which seek some increase in their customer claims based upon the amount of time they invested with BLMIS. Most commonly, they seek an increase in their claims based on the time they were invested with BLMIS using the New York prejudgment rate of 9% per annum, lost opportunity cost damages, or the consumer price index to take inflation into account. The Trustee is using "Time-Based Damages" as an umbrella term.

41.     Two objections were filed in response to the Trustee's Scheduling Motion by HHI Investment Trust #2 and Blue Star Investors, LLC, among others (collectively, the "HHI Parties") (ECF Nos. 4957, 5004). Martin, Richard, and Steven Surabian (the "Surabians") also filed an objection. (ECF No. 4952). Sidney and Ethel Chambers filed a letter. (ECF No. 4999). The Trustee filed responses asserting, among other things, a lack of standing by the HHI Parties and the Surabians. (ECF Nos. 5001, 5009).

42.     After a hearing on September 5, 2012, at which the Court heard argument on behalf of non-claimant avoidance defendants, the HHI Parties, it approved the Scheduling Order establishing the scope and schedule for briefing of Time-Based Damages, overruling the objections, and scheduling a hearing on the Trustee's motion (the "Time-Based Damages Motion") to be held on January 10, 2013. (ECF No. 5022). In its order, the Court stated that the sole purpose of the Time-Based Damages Motion would be to resolve the legal issues raised in the claims and objections relating to the Time-Based Damages Issue. *Id.*

43.     On October 12, 2012, the Trustee filed his Time-Based Damages Motion and Memorandum of Law for an Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based Damages. (ECF Nos. 5038, 5039). The Trustee's position that customer claims

under SIPA should not include Time-Based Damages was supported by SIPC in its Memorandum of Law filed the same day.  (ECF No. 5036).

44.     On or around December 3, 2012, ten briefs were filed on behalf of various BLMIS customers objecting to the Trustee's Time-Based Damages Motion.  On December 10, 2012, the Securities and Exchange Commission ("SEC") filed its brief on the Time-Based Damages Motion.  (ECF No. 5142).

45.     On or around December 7, 2012, a group of customers similarly situated to the HHI Parties in that they had not filed timely claims, sought to move to intervene in the Time-Based Damages Motion on the same bases that the HHI Parties had objected to the Scheduling Order.  (ECF No. 5141).  The Trustee objected (ECF No. 5184), and the Court denied the request to intervene.  (ECF No. 5185).  After the Court denied the request to intervene, the Trustee and a third group of similarly-situated customers in that they had not filed timely claims, stipulated that they were covered by the Court's previous order denying the request to intervene.  (ECF No. 5224).  Appeals were taken by these customers from the Court's denials to intervene.  *See In re Bernard L. Madoff Investment Securities LLC*, No. 13-cv-1300 (TPG) (S.D.N.Y.).   On September 10, 2013, the District Court affirmed this Court's denial of the requests to intervene. (ECF No. 43).

46.     On or around December 17, 2012, certain parties calling themselves the "Customer Group" requested discovery from the Trustee and his professionals in connection with the Time-Based Damages Motion.  (ECF No. 5133).  Thereafter, this Court entered an amended scheduling order that adjourned the remaining deadlines for the Time-Based Damages Motion.  (ECF No. 5212).

47.     On April 29, 2013, the Customer Group filed a supplemental opposition brief. (ECF No. 5332).  On July 18, 2013, the Trustee and SIPC filed their reply briefs.  (ECF Nos. 5415, 5413).  On August 12, 2013, the Customer Group filed an opposition to the Trustee's request to have the testimony of Timothy Hart excluded.  (ECF No. 5444).  The Court held a hearing on the matter on September 10, 2013.

48.     On the same day, this Court issued its Memorandum Decision and Order Granting, To The Extent Set Forth Herein, The Trustee's Motion For An Order Affirming the Trustee's Calculation of Net Equity And Denying Time-Based Damages (the "Time-Based Damages Decision").  (ECF No. 5463).  The Court granted the Trustee's motion, finding that claimants were not entitled to time-based damages as part of their net equity claims against the fund of customer property.

49.     Thereafter, the Trustee, SIPC, and the Customer Group submitted a letter to the Court requesting that the Court certify a direct appeal of the Time-Based Damages Decision to the Second Circuit under 28 U.S.C. § 158(d)(2).  (ECF No. 5488).  On September 24, 2013, the Court certified the Time-Based Damages Decision for a direct appeal to the Second Circuit. (ECF No. 5514).

C.     **"Customer" Definition**

50.     The Trustee's position is that only those claimants who maintained an account at BLMIS constitute "customers" of BLMIS, as defined in § 78*lll*(2) of SIPA.  Where it appears that claimants did not have an account in their names at BLMIS ("Claimant Without An Account"), they are not customers of BLMIS under SIPA, and the Trustee has denied their claims for securities and/or a credit balance.

51.     On June 11, 2010, the Trustee filed a Motion For An Order To Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names,

Namely, Investors in Feeder Funds. (ECF Nos. 2410–2413, 2416). The motion addressed only those claimants whose claims emanated from their direct or indirect investments in sixteen so-called feeder funds that, in turn, had accounts with and invested directly with BLMIS.

52. This Court held a hearing on October 19, 2010. On June 28, 2011, this Court issued a Memorandum Decision and Order affirming the Trustee's denial of these claims. (ECF Nos. 3018, 4193, 4209); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011).

53. This Court found that, in light of the plain language of SIPA and relevant case law, the investor-claimants did not qualify as "customers" under SIPA. This Court found that the objecting claimants invested in, not through, the feeder funds, and had no individual accounts at BLMIS. It was the feeder funds who entrusted their monies with BLMIS for the purpose of trading or investing in securities—the touchstone of "customer" status—whereas the objecting claimants purchased ownership interests in the feeder funds. This Court held that, absent a direct broker-dealer relationship with BLMIS, the objecting claimants sought a definition of "customer" that stretched the term beyond its limits.

54. This Court put it succinctly: the objecting-claimants who invested in sixteen feeder funds did not qualify as "customers" because they "had no securities accounts at BLMIS, were not known to BLMIS, lacked privity and any financial relationship with BLMIS, lacked property interests in any Feeder Fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment discretion over Feeder Fund assets invested with BLMIS, received no account statements or other communications from BLMIS and had no transactions reflected on the books and records of BLMIS . . . ." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 454 B.R. at 290.

09-01789-smb    Doc 5736-1    Filed 02/28/14    Entered 02/28/14 15:48:31    Exhibit A

08-01789-smb    Doc 5526-6    Filed 07/30/13    Entered 07/30/13 15:20:05    Main Document
F to Ha Declaration    Pg 116 of 207    Pg 23 of 110

55.     Twenty-seven notices of appeal were filed and assigned to United States District Judge Denise L. Cote.  *See Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, No. 11-cv-05683 (DLC) (S.D.N.Y.).  On January 4, 2012, Judge Cote affirmed the June 28, 2011 order of this Court.  *See Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, 480 B.R. 117 (S.D.N.Y. 2012).  In that decision, Judge Cote determined in light of SIPA, the "most natural reading of the 'customer' definition excludes persons like the appellants who invest in separate third-party corporate entities like their feeder funds, that in turn invest their assets with the debtor." *Id.* at 123.  Thus, the District Court held that the feeder funds were the BLMIS customers and the appellants were precluded from seeking separate recoveries as additional SIPA claimants. *Id.* at 129–30.

56.     On January 6, 2012, four appeals were taken from Judge Cote's decision to the Second Circuit. *See Bricklayers and Allied Craftsman Local 2 Annuity Fund v. Sec. Investor Prot. Corp., Irving H. Picard*, No. 12-410; *Rosamilia v. Sec. Investor Prot. Corp., Irving H. Picard*, No. 12-437; *Kruse v. Sec. Investor Prot. Corp., Irving H. Picard*, No. 12-483; *Upstate N.Y. Bakery Drivers and Indus. Pension Fund v. Sec. Investor Prot. Corp., Irving H. Picard*, No. 12-529.  On February 22, 2013, the Second Circuit affirmed the decisions of the District Court and the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  *See Kruse v. Sec. Investor Prot. Corp., Irving H. Picard*, 708 F.3d 422 (2d Cir. 2013).

57.     On another matter involving the interpretation of the "customer" definition, on October 5, 2011, the Trustee moved before this Court for an order establishing a briefing schedule and hearing to affirm his determination that ERISA did not alter his denial of "customer" status to certain claimants.  (ECF No. 4432).  This Court entered a scheduling order on November 8, 2011.  (ECF No. 4507).

58.    On November 14, 2011, the Trustee filed his Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections. (ECF No. 4521) (the "ERISA Motion").  On or around January 17, 2012, approximately eighteen opposition briefs to the ERISA Motion were filed on behalf of various ERISA claimants.  (ECF Nos. 4625–4628, 4631–4633, 4635, 4637–4643, 4652–4654).  On March 2, 2012, the Trustee filed his Memorandum in Support of the Trustee's Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections.  (ECF No. 4703).  On April 2, 2012, five replies to the ERISA Motion were filed on behalf of various ERISA claimants.  (ECF Nos. 4746, 4748, 4750, 4755, 4756).  The Trustee's sur-reply was filed on April 20, 2012.  (ECF No. 4781).

59.    During the pendency of the above briefing, certain ERISA claimants also filed motions to withdraw the reference on the ERISA Motion from this Court to the District Court. *See Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, No. 12-cv-01039-DLC (S.D.N.Y. Aug. 6, 2012) (filed on behalf of J. X. Reynolds & Co. Deferred Profit Sharing Plan, Jacqueline Green Rollover Account and Wayne D. Green Rollover Account); *Sec. Investor Prot. Corp. v. I.B.E.W. Local 241 Pension Fund*, No. 12-cv-01139-DLC (S.D.N.Y. Aug. 6, 2012) (filed on behalf of thirty-seven ERISA plan claimants).  On February 28, 2012 and March 1, 2012, these motions were accepted as related to the appeals decided by Judge Cote in *Aozora Bank*, 480 B.R. 117 (S.D.N.Y. 2012), discussed above, and were re-assigned to Her Honor. Judge Cote withdrew the reference on April 20, 2012.  *Jacqueline Green Rollover Account*, No. 12-cv-01039-DLC (S.D.N.Y.), ECF No. 7.

60.    On July 25, 2012, the District Court granted the Trustee's ERISA Motion.  *See Id.*, ECF No. 29.  The District Court found that the ERISA claimants were not "customers" under

SIPA because they did not deposit money with BLMIS for the purchase of securities and did not own the assets of the ERISA plans that were deposited with BLMIS. *Id.* No appeal was taken from this opinion and order.

## VII. RECOVERIES AND CONTINGENCIES

### A. Recoveries Accomplished During Prior Report Periods

61.     In the Sixth Interim Report, the Seventh Interim Report, the Eighth Interim Report and the Ninth Interim Report, the Trustee reviewed the significant settlements entered into during those and prior report periods. Prior to this Report Period, the Trustee had recovered or reached agreements to recover more than $9.33 billion for the benefit of BLMIS customers. *See* Trustee's Sixth Interim Report ¶¶ 52–63, ECF No. 4529; Trustee's Seventh Interim Report ¶¶ 56–62, ECF No. 4793; Trustee's Eighth Interim Report ¶¶ 57–61, ECF No. 5066; Trustee's Ninth Interim Report ¶¶ 59 - 61, ECF No. 5351.

### B. Recoveries Accomplished During This Report Period

62.     During this Report Period, the Trustee settled twenty-one cases for a total recovery of $67,707,733.29. Currently, the Trustee has successfully recovered or reached agreements to recover more than $9.5 billion.

63.     On September 17, 2013, this Court approved a settlement in the adversary proceeding entitled *Picard v. Maxam Absolute Return Fund, L.P.*, Adv. No. 10-05342 (BRL) (Bankr. S.D.N.Y. Sept. 17, 2013), ECF No. 118. Pursuant to that settlement, the *Maxam* defendants paid $97,800,000 to the Trustee for the benefit of the fund of customer property from (i) the advance from SIPC and (ii) catch-up payments from the first and second interim distributions of customer property which were owed to Maxam based on its customer claim allowed as part of the settlement.

## C.    Earlier Settlements

64.    On February 18, 2010, this Court approved a pre-litigation settlement between the Trustee and the Estate of Norman F. Levy.  (ECF No. 1964).  This settlement resulted in the return of $220 million (the "Levy Settlement").  One year later, on February 18, 2011, certain customers moved to set aside the Court's Order approving the Levy Settlement.  (ECF No. 3861).  This Court denied the motion (ECF No. 3984), and the claimants filed an appeal on April 11, 2011 (ECF No. 4005).

65.    On February 16, 2012, United States District Judge Deborah A. Batts issued a Memorandum and Order affirming this Court's order of March 30, 2011.  *See Levy-Church v. Picard*, No. 11 Civ. 03313 (DAB), 2012 U.S. Dist. LEXIS 21740 (S.D.N.Y. Feb. 16, 2012).  The District Court found that bankruptcy courts need not conduct a "mini-trial" of all the facts underlying settlement disputes and are entitled to rely upon the opinions of the trustee, the parties, and their attorneys.  *Id.* at *12.  Thus, the District Court held that this Court did not abuse its discretion in denying the motion to vacate the settlement.  *Id.* at *7.  The claimants subsequently appealed Judge Batts's decision to the Second Circuit.  *See Peshkin v. Levy-Church*, No. 12-816 (2d Cir. Feb. 29, 2012).  The Second Circuit affirmed the rulings of Judges Batts and Lifland.  *In re Bernard L. Madoff Inv. Sec., LLC*, 489 Fed. Appx. 519, 520 (2d Cir. 2012).

66.    On June 10, 2011, this Court approved a settlement between the Trustee and the Joint Liquidators for Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited (collectively, the "Fairfield Funds").  *Picard v. Fairfield Sentry*, Adv. No. 09-1239 (BRL) (Bankr. S.D.N.Y.), ECF No. 95.  On July 13, 2011, this Court entered consent judgments between the Trustee and Fairfield Lambda Limited in the amount of $52.9 million (ECF No. 108), Fairfield Sentry Limited in the amount of $3.054 billion (ECF No. 109), and Fairfield

Sigma Limited in the amount of $752.3 million (ECF No. 110). One objection was filed by plaintiffs in a derivative action allegedly on behalf of Fairfield Sentry Limited, which was overruled by this Court on June 7, 2011. (ECF No. 92).

67. Under the terms of this settlement, Fairfield Sentry Limited agreed to permanently reduce its net equity claim from approximately $1.19 billion to $230 million. Additionally, the Joint Liquidator for the Fairfield Funds agreed to make a $70 million payment to the Customer Fund. To date, the Fairfield Sentry Joint Liquidators have paid $70 million, of which $16 million was in cash, $8 million was an offset against funds owed by the Trustee to Fairfield Sentry, and $46 million was an offset from the Trustee's second interim distribution per the settlement agreement. The Joint Liquidator also agreed to assign to the Trustee all of the Fairfield Funds' claims against the Fairfield Greenwich Group management companies, officers, and partners; the Trustee retained his own claims against the management defendants. Further, the Trustee and the Liquidators agreed to share future recoveries in varying amounts, depending on the nature of the claims. On or about July 8, 2011, Fairfield Sentry transferred $16 million to the Trustee, and the Trustee allowed Fairfield Sentry's claim of $78 million. The remaining $46 million was paid on or about November 28, 2012. As a result of the $46 million payment, the Trustee increased the allowed claim by $152 million to $230 million.

68. On July 7, 2011, this Court approved a settlement between the Trustee, Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P. (collectively, the "Greenwich Funds"), wherein this Court entered judgment against Greenwich Sentry, L.P. in an amount over $206 million and against Greenwich Sentry Partners, L.P. in an amount over $5.9 million. *Picard v. Fairfield Sentry*, Adv. No. 09-01239 (BRL) (Bankr. S.D.N.Y.), ECF No. 107. Three objections were filed to the proposed settlement agreement, but were subsequently withdrawn

prior to this Court's July 7, 2011 order.  In this settlement, the Greenwich Funds agreed to permanently reduce their net equity claim from approximately $143 million to over $37 million, for a combined reduction of over $105.9 million.  Additionally, the Greenwich Funds assigned the Trustee all of their claims against Fairfield Greenwich Group management, as well as agreed to share with the Trustee any recoveries they accomplish against service providers.

69.     To implement this settlement agreement, the Court was required to confirm the plan in the jointly administered Chapter 11 proceeding of Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P.  *In re Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P.*, Adv. No. 10-16229 (BRL) (Bankr. S.D.N.Y.).  The plan confirmation hearing was held on December 22, 2011.  The plan was confirmed subject to the resolution of issues unrelated to the settlement with the Trustee.  Those matters have been resolved.  The effective date of the plan was February 24, 2012.  With the settlement becoming effective, claims against the Fairfield Greenwich Group management have been assigned to the Trustee, Greenwich Sentry, and Greenwich Sentry Partners, and the BLMIS customer claims have been allowed in the amount of $35,000,000.00 and $2,011,304.00, respectively.

70.     On June 6, 2012, the Trustee filed three additional adversary proceedings naming as defendants entities, trusts, or family members who received transfers of customer property paid to Fairfield Greenwich Group partners as part of the management and incentive fees paid by Fairfield Sentry, Ltd. The cases are *Picard v. RD Trust*, Adv. No. 12-01701 (BRL) (Bankr. S.D.N.Y.), *Picard v. Barrenche, Inc.*, Adv. No. 12-01702 (BRL) (Bankr. S.D.N.Y.) and *Picard v. Toub*, Adv. No. 12-01703 (BRL) (Bankr. S.D.N.Y.).  Those three cases, along with the claims against the Fairfield Greenwich Group management entities and partners in *Picard v. Fairfield Sentry, Ltd.*, Adv. No. 09-1239 (Bankr. S.D.N.Y.), remain pending before this Court.

-27-

71.     In addition, on December 21, 2011, this Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, "Tremont") in the amount of $1.025 billion.  *Picard v. Tremont Group Holdings, Inc.*, Adv. No. 10-05310 (BRL) (Bankr. S.D.N.Y.), ECF No. 38.

72.     On January 13, 2011, this Court entered an Order (the "Picower Settlement Order") approving the $5 billion settlement between the Trustee and the Estate of Jeffry M. Picower ("Picower Defendants").  *Picard v. Picower*, Adv. No. 09-01197 (BRL) (Bankr. S.D.N.Y.).  BLMIS claimants Adele Fox ("Fox") and Susanne Stone Marshall ("Marshall"), who brought actions against the Picower Defendants in Florida, appealed the Picower Settlement Order.  (ECF Nos. 45, 49).  On March 26, 2012, United States District Judge John G. Koeltl issued an Opinion and Order affirming this Court's Picower Settlement Order and permanently enjoining certain duplicative or derivative actions against the Picower Defendants.  *Fox v. Picard*, 848 F. Supp. 2d 469 (S.D.N.Y.).  An appeal of Judge Koeltl's decision is pending before the Second Circuit.  *See In re Bernard L. Madoff*, No. 12-1645 (2d Cir.), and consolidated cases.

73.     A forfeiture action against the estate of Jeffry M. Picower resulted in the additional recovery of more than $2.2 billion to the United States Government (the "Picower Forfeiture"), which is intertwined with the Trustee's Picower settlement.  *See United States v. $7,206,157,717 On Deposit at JPMorgan Chase, NA in the Account Numbers Set Forth on Schedule A*, No. 10 Civ. 09398 (TPG) (S.D.N.Y.).  On May 23 and 24, 2011, United States District Judge Thomas P. Griesa entered a final order of forfeiture in favor of the United States. (ECF No. 17).  The Second Circuit dismissed an appeal of Judge Griesa's order, and on June 8, 2012, a final order of forfeiture was issued.  *See United States v. $7,206,157,717 On Deposit at*

-28-

*JPMorgan Chase, NA in the Account Numbers Set Forth on Schedule A*, No. 11-2898 (2d Cir.),
ECF No. 85.

74.    Because the time to appeal the final order of forfeiture expired, the Trustee
received the Picower settlement funds.  The settlement amount of $5 billion was transferred to
the BLMIS estate and the Customer Fund.  Part of the proceeds from the Picower settlement has
been distributed to customers, and the balance will be distributed in due course.

75.    Through the end of the Report Period, the Trustee recovered $452,905,944.69 as a
result of preference and other settlements that were made pursuant to agreements subject to the
Net Equity Dispute.  Although the main Net Equity Dispute has been finally determined,
ancillary issues, such as Time-Based Damages, remain unresolved.  On September 10, 2013, the
Court entered an order denying the request to use Time-Based Damages in making the net equity
calculation. (ECF No. 5463).  The Court further certified the decision denying the use of Time-
Based Damages to the Second Circuit for review. As such, these amounts are held in reserve.

## VIII.    THE TRUSTEE'S ALLOCATION OF FUNDS AND DISTRIBUTIONS TO CUSTOMERS

### A.    The Customer Fund

76.    In order to protect customers of an insolvent broker-dealer such as BLMIS,
Congress established a statutory framework pursuant to which customers of a debtor in a SIPA
liquidation are entitled to preferential treatment in the distribution of assets from the debtor's
estate.  The mechanism by which customers receive preferred treatment is through the creation
of a Customer Fund, as defined in SIPA § 78*lll*(4), which is distinct from a debtor's general
estate.  Customers holding allowable claims are entitled to share in the Customer Fund based on
each customer's net equity as of the filing date, to the exclusion of general creditors.  SIPA
§ 78fff-2(c).

77.     In order to make interim distributions from the Customer Fund, the Trustee must determine or be able to sufficiently estimate: (a) the total value of customer property available for distribution (including reserves for disputed recoveries), and (b) the total net equity of all allowed claims (including reserves for disputed claims).  Each element of the equation—the customer property numerator and the net equity claims denominator—is inherently complex in a liquidation of this magnitude.

78.     There are many unresolved issues in this liquidation proceeding that require the maintenance of substantial reserves.  Nonetheless, the liquidation proceeding progressed to a stage at which it was possible for the Trustee, on an interim basis, to determine: (a) the allocation of property to the Customer Fund, or the "numerator" (taking reserves into account), (b) the amount of allowable net equity claims, or the "denominator" (also taking reserves into account), and (c) the calculation of each customer's minimum ratable share of the Customer Fund.

**B.      The Trustee's Initial Allocation of Property to the Fund of Customer Property and Authorizing the First Interim Distribution to Customers**

79.     On May 4, 2011, the Trustee moved for an initial allocation and pro rata interim distribution of the Customer Fund to customers whose claims had not been fully satisfied because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "First Allocation" and "First Interim Distribution").  (ECF No. 4048).  This motion was unopposed, and the Court entered the Order Approving the Trustee's Initial Allocation of Property to the Fund of Customer Property and Authorizing An Interim Distribution to Customers on July 12, 2011.  (ECF No. 4217).

80.     On October 5, 2011, the Trustee distributed $311.854 million, or 4.602% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Subsequent to October 5, 2011, an additional $190.533 million was distributed as catch-up payments, bringing

the total First Interim Distribution amount to $502.387[8] million through the end of the Report Period. The First Interim Distribution was made to 1,303 BLMIS accounts[9], and thirty-nine payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

81.    The First Allocation and First Interim Distribution were initial and interim in nature because the Trustee anticipated (i) recovering additional assets through litigation and settlements, and (ii) resolving the issues on appeal that require reserves.

**C.    The Trustee's Second Allocation of Property to the Fund of Customer Property and Authorizing the Second Interim Distribution to Customers**

82.    During the year after the Trustee made the First Interim Distribution, the Trustee recovered significant additional assets through litigation and settlements, as well as the resolution of issues on appeal that required reserves.

83.    In particular, the Supreme Court resolved the Net Equity Dispute on June 25, 2012, and the Trustee received the Picower settlement funds after the final order of forfeiture became final and nonappealable on July 16, 2012.

84.    Thus, the Trustee was prepared to make a second significant distribution to BLMIS customers in an amount as great as $3.019 billion, or 41.826% of each customer's allowed claim, unless the claim had been fully satisfied. However, in order to maintain adequate reserves for the Time-Based Damages Issue, the Trustee was unable to distribute the entire $3.019 billion.

---

[8] Subsequent to the Report Period ending on September 30, 2013, an additional $13.206 million was distributed as catch-up payments, bringing the total First Interim Distribution amount to $515.594 million through October 30, 2013.

[9] Subsequent to the Report Period ending on September 30, 2013, three additional BLMIS accounts were given distributions from the First Interim Distribution, bringing the total number of BLMIS accounts to 1,306.

85.    On July 26, 2012, the Trustee filed a motion seeking entry of an order approving the second allocation of property to the Customer Fund and authorizing the second interim distribution to customers whose claims have not been fully satisfied because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "Second Allocation" and "Second Interim Distribution"). (ECF No. 4930).

86.    In connection with the Second Interim Distribution, the Trustee proposed holding in reserve an amount sufficient for the Trustee to pay Time-Based Damages assuming an interest rate of three percent (the "3% Reserve") or, in the alternative, nine percent (the "9% Reserve"). Four objections were made to the Trustee's motion, seeking the imposition of the 9% Reserve. (ECF Nos. 4965, 4966, 4971, 4976).

87.    On August 22, 2012, this Court held a hearing and entered an Order Approving the Trustee's Second Allocation of Property to the Fund of Customer Property and Authorizing a Second Interim Distribution to Customers, with a 3% Reserve. (ECF No. 4997).

88.    Thus, on September 19, 2012, the Trustee distributed $2.479 billion, or 33.556% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied. Subsequent to September 19, 2012, an additional $1.166 billion was distributed as catch-up payments, bringing the total Second Interim Distribution amount to $3.645 billion[10] through the end of the Report Period. The Second Interim Distribution was made to 1,289 BLMIS accounts[11], and thirty-nine payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

---

[10] Subsequent to the Report Period ending on September 30, 2013, an additional $.096 billion was distributed as catch-up payments, bringing the total Second Interim Distribution amount to $3.741 billion through October 30, 2013.

[11] Subsequent to the Report Period ending on September 30, 2013, three additional BLMIS accounts were given distributions from the Second Interim Distribution, bringing the total number of BLMIS accounts to 1,292.

**D.    The Trustee's Third Allocation of Property to the Fund of Customer Property and Authorizing the Third Interim Distribution to Customers**

89.    During the months after the Second Interim Distribution, the Trustee recovered significant additional assets thorough litigation and settlements, particularly the Tremont settlement. *See* discussion *supra* Section VII(C).

90.    On February 13, 2013, the Trustee filed a motion seeking entry of an order approving the third allocation of property to the Customer Fund and authorizing the third interim distribution to customers whose claims have not been fully satisfied because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "Third Allocation" and "Third Interim Distribution").  (ECF No. 5230).

91.    In connection with the Third Interim Distribution, the Trustee proposed holding reserves in connection with the Levy settlement appeal, the Internal Revenue Service (the "IRS") settlement and net loser accounts currently in litigation. *Id.*

92.    On March 13, 2013, this Court held a hearing and entered an Order Approving the Trustee's Third Allocation of Property to the Fund of Customer Property and Authorizing a Third Interim Distribution to Customers.  (ECF No. 5271).

93.    Thus, on March 29, 2013, the Trustee distributed $506.227 million, or 4.721% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Subsequent to March 29, 2013, an additional $2.637 million was distributed as catch-up payments, bringing the total Third Interim Distribution amount to $508.864 million through the end of the Report Period[12].  Upon completion of the Third Interim Distribution, approximately 50% of the allowed customer claims were satisfied.  The Third Interim Distribution was made to 1,107 BLMIS

---

[12] Subsequent to the Report Period ending on September 30, 2013, an additional $13.548 million was distributed as catch-up payments, bringing the total Third Interim Distribution amount to $522.412 million through October 30, 2013.

accounts[13], and twenty-six payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

94.     Final resolution of the remaining appeals and disputes will permit the Trustee to further reduce the reserves he is required to maintain, which will allow for a greater distribution to customers in the future.  The Trustee expects to seek authorization for further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.

E.     **The General Estate**

95.     If the Trustee is able to fully satisfy the net equity claims of the BLMIS customers, any funds remaining will be allocated to the general estate and distributed in the order of priority established in Bankruptcy Code § 726 and SIPA § 78fff(e).

96.     All BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—are general creditors of the BLMIS estate.  The Trustee is working diligently on behalf of the entire BLMIS estate and seeks to satisfy all creditor claims in this proceeding.

## IX.    LITIGATION

97.     Other major developments have occurred during the Report Period in the Trustee's avoidance actions and bank/feeder fund litigations.  As the Trustee has more than 1,000 lawsuits pending, this Report does not discuss each of them in detail but instead summarizes those matters with the most activity during the Report Period.

---

[13] Subsequent to the Report Period ending on September 30, 2013, three additional BLMIS accounts were given distributions from the Third Interim Distribution, bringing the total number of BLMIS accounts to 1,110.

## A.    The District Court—Motions to Withdraw the Reference, Motions to Dismiss and Related Appeals

98.    Many of the defendants in the litigations brought by the Trustee moved to withdraw the reference from this Court to the District Court.  These motions commenced with the HSBC, JPMorgan, UBS, and Kohn Actions.  These complaints had common law and/or Racketeer Influenced and Corrupt Organizations Act ("RICO") claims in addition to avoidance counts under the Bankruptcy Code.  Then, the defendants in the Katz-Wilpon avoidance action moved to withdraw the reference, which was granted by the District Court.  Subsequently, hundreds of defendants began seeking similar relief.

99.    The District Court has withdrawn the reference in numerous cases and heard or has pending before it numerous motions to dismiss.  On March 5, 2012, this Court entered an administrative order directing all defendants in the Trustee's litigations to file motions to withdraw the reference by April 2, 2012 (the "Administrative Order").  *See* Administrative Order Establishing Deadline for Filing Motions to Withdraw the Reference, ECF No. 4707.  As of the end of the Report Period, defendants in approximately 791 avoidance actions commenced by the Trustee in this Court have filed approximately 463 motions to withdraw the reference and approximately 410 joinders to these motions.

### i.    The HSBC Action

100.    On July 15, 2009, the Trustee commenced an adversary proceeding against a handful of HSBC entities and international feeder funds in the financial services industry that transferred funds to and from BLMIS.  *Picard v. HSBC Bank plc*, Adv. No. 09-01364 (BRL) (Bankr. S.D.N.Y.) (the "HSBC Action").  After further investigation, the Trustee filed an amended complaint on December 5, 2010, expanding the pool of defendants to thirteen HSBC entities and forty-eight individuals and entities, and alleging that over 33% of all monies invested

-35-

in Madoff's Ponzi scheme were funneled by and through these defendants into BLMIS.  (ECF No. 35).

101.  The thirteen HSBC-related defendants and, separately, UniCredit S.p.A. and Pioneer Alternative Investment Management Limited, moved to withdraw the reference.  On April 14, 2011, United States District Judge Jed S. Rakoff ("Judge Rakoff") withdrew the reference to consider the Trustee's standing to assert common law claims.  *Picard v. HSBC Bank plc*, No. 11 Civ. 00836 (JSR) (S.D.N.Y.), ECF Nos. 20, 23.

102.  On May 3, 2011, the same defendants filed motions to dismiss.  *Picard v. HSBC Bank plc*, No. 11 Civ. 00836, ECF Nos. 24–27.  The Trustee and SIPC opposed the motions. (ECF Nos. 32–36).  On July 28, 2011, the District Court dismissed the Trustee's common law claims, holding that the Trustee lacked standing, under any theory, to assert them.  *Picard v. HSBC Bank plc*, 454 B.R. 25, 37–38 (S.D.N.Y. 2011).  The District Court returned the remainder of the HSBC Action to this Court for further proceedings.  *Id.* at 38.

103.  On December 15, 2011, the Trustee appealed the District Court's decision to the Second Circuit.  *See Picard v. HSBC Bank PLC*, No. 11-5175bk (2d Cir.); *Picard v. HSBC Bank PLC*, No. 11-5207bk (2d Cir.).  The Trustee filed his appellate briefs on February 16, 2012 (ECF Nos. 76–85), and SIPC intervened in the appeals (ECF No. 75).  On April 26, 2012, the Trustee and SIPC each filed reply briefs (ECF Nos. 165,166) to the oppositions that were filed to the Trustee's appellate briefs.  (ECF Nos. 135, 136).  Oral argument was held on November 21, 2012.  On June 20, 2013, the Second Circuit affirmed the decision of the District Court. (ECF No. 163).

104.  On October 9, 2013, the Trustee filed a petition for a writ of certiorari with the Supreme Court.  *See Picard v. J.P. Morgan Chase & Co.*, No. 13-448 (2013).

105.    The District Court returned several of the Trustee's bankruptcy claims to this Court.  However, various defendants in this action moved to withdraw the reference from this Court and those motions have been granted, at least in part, by the District Court.  These defendants are participating in a variety of motions which are before the District Court on Common Briefing, including the application of § 546(e) of the Bankruptcy Code to the Trustee's claims, the application of SIPA and the Bankruptcy Code to claims abroad, and the standard of good faith.  Judge Rakoff issued a "bottom line" order on the § 546(e) issue and a full decision on April 15, 2013.  *See* discussion *infra* Section IX(A)(v)(b); *see also* Order, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Madoff Sec., LLC)*, 12 MC 0115 (JSR) (S.D.N.Y. Feb. 12, 2013), ECF No. 439.  The other issues remain pending.

106.    The Trustee is engaged in certain foreign proceedings with some of these defendants as well.  This includes the Trustee's participation in proceedings against one of the feeder fund defendants, Primeo, in the Cayman Islands.  *See* discussion *infra* in Section X(C).

**ii.     The JPMorgan Action**

107.    On December 2, 2010, the Trustee commenced an action against JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd (the "JPMorgan Defendants").  *Picard v. JPMorgan Chase*, Adv. No. 10-04932 (BRL) (Bankr. S.D.N.Y.) (the "JPMorgan Action").  On February 8, 2011, the JPMorgan Defendants moved for withdrawal of the reference.  *Picard v. JPMorgan Chase*, No. 11-cv-00913 (CM) (S.D.N.Y.), ECF Nos. 1–3 (the "JPMorgan Withdrawn Action").  The District Court granted the motion on May 23, 2011.  *JPMorgan Withdrawn Action*, ECF No. 30.

108.    On June 3, 2011, the JPMorgan Defendants filed a motion to dismiss.  *JPMorgan Withdrawn Action*, ECF Nos. 32–34.  The Trustee filed an amended complaint against the JPMorgan Defendants on June 24, 2011.  *JPMorgan Withdrawn Action*, ECF No. 50.  On August

1, 2011, the JPMorgan Defendants renewed their motion to dismiss. *JPMorgan Withdrawn Action*, ECF Nos. 56–58. The Trustee and SIPC opposed the motion. *JPMorgan Withdrawn Action*, ECF Nos. 61–66.

109.     On November 1, 2011, the District Court dismissed the Trustee's common law and contribution claims in the JPMorgan Action (the "November 1 Order"). *Picard v. J.P. Morgan Chase & Co.*, 460 B.R. 84 (S.D.N.Y. 2011). The District Court returned the remainder of the JPMorgan Action to this Court for further proceedings. *Id.*

110.     On November 10, 2011, the Trustee filed a motion for entry of final judgment under Federal Rule of Civil Procedure 54(b) as to counts twenty-one through twenty-eight of the amended complaint. *JPMorgan Withdrawn Action*, ECF Nos. 71, 72. On November 30, 2011, the District Court held that there was no just reason for delay and certified its November 1 Order as final (the "JPMorgan Rule 54(b) Judgment"). *JPMorgan Withdrawn Action*, ECF No. 74. The JPMorgan Rule 54(b) Judgment was then entered on December 1, 2011. *JPMorgan Withdrawn Action*, ECF No. 75.

111.     On February 16, 2012, the Trustee filed his brief appealing the November 1 Order in the JPMorgan Action, and SIPC intervened in the appeal. *See Picard v. JPMorgan Chase & Co.*, No. 11-5044 (2d Cir.), ECF Nos. 79–87. On April 5, 2012, the JPMorgan Defendants opposed the appeal of the November 1 Order. *JPMorgan*, No. 11-5044, ECF No. 110. On April 26, 2012, the Trustee and SIPC filed their respective reply briefs. *JPMorgan*, No. 11-5044, ECF Nos. 130, 131. Oral argument before the Second Circuit took place on November 21, 2012.

112.     On June 20, 2013, the Second Circuit affirmed the District Court's November 1, 2011 Order. *JPMorgan*, No. 11-5044, ECF No. 166. On July 11, 2013, the Second Circuit issued its mandate, terminating the Second Circuit's jurisdiction over the JPMorgan Action and

transferring jurisdiction back to this Court. *JPMorgan*, No. 11-5044, ECF No. 173. On August

20, 2013, the Supreme Court granted the application for an extension of time within which to file

a petition for a writ of certiorari, extending the time to and including October 18, 2013.

*JPMorgan*, No. 11-5044, ECF No. 174. On October 9, 2013, the Trustee filed a petition for a

writ of certiorari with the Supreme Court. *See Picard v. J.P. Morgan Chase & Co.*, No. 13-448

(2013).

113.    The remaining claims against the JPMorgan Defendants, which were not

dismissed and are thus not subject to the appeal, are pending before this Court.

114.    On September 19, 2013, this Court entered a Case Management Plan in the

JPMorgan Action. *JPMorgan Action*, ECF. No. 26. The parties are currently engaged in active

discovery pursuant to the Case Management Plan.

    **iii.**    **The Luxalpha Action**

        **(a)**    **Luxalpha, The Luxembourg Investment Fund and Access Injunction Actions**

115.    During the Report Period, the Luxalpha, LIF, and Access Injunction actions

largely proceeded on parallel tracks due to the defendants' coordinated, pending motions to

dismiss for lack of personal jurisdiction and *forum non conveniens*. *Picard v. UBS AG*, No. 10-

4285 (BRL) (Bankr. S.D.N.Y.) ("Luxalpha"); *Picard v. UBS AG*, Adv. No. 10-05311 (BRL)

(Bankr. S.D.N.Y.) ("LIF"); and *Picard v. Access Mgmt. Luxembourg, S.A.*, Adv. No. 12-01563

(BRL) (Bankr. S.D.N.Y.) (the "Access Injunction").

116.    On December 19, 2012, the Court held a hearing on the motions to dismiss, but

rather than hearing oral argument, the Court converted the hearing into a Rule 16 conference and

ordered the parties to further meet and confer on the issues in dispute with the goal of narrowing

the issues that the Court would ultimately have to determine. That meet-and-confer process,

which began in December 2012 and has continued through October 2013, involves efforts by the Trustee to negotiate with counsel for numerous defendants across the three actions, as well as *Picard v. Defender*, which has defendants in common with the LIF action. Adv. No. 10-05229 (BRL) (Bankr. S.D.N.Y.); *see* discussion *infra* Section IX(B)(vii). The Trustee has made progress toward narrowing the number of defendants and parties in dispute; in particular, on June 18, 2013, the Trustee entered into stipulations in the Luxalpha and LIF actions whereby Defendant UBS (Luxembourg) S.A. withdrew its motions to dismiss for lack of personal jurisdiction in both actions, and certain of the defendants in the Luxalpha action were dismissed without prejudice. (*Luxalpha*, ECF No. 154; *LIF*, ECF No. 157). The Trustee's meet-and-confer process with respect to certain other defendants in the actions remains ongoing.

117. In addition, on November 1, 2011, the District Court dismissed the Trustee's common law and contribution claims in the Luxalpha action. *Picard v. UBS AG*, No. 11-cv-4212 (CM) (S.D.N.Y.), (ECF No. 36). The Trustee appealed the November 1, 2011 Order to the Second Circuit. Briefing was completed in April 2012, and oral argument took place in November 2012.

118. On June 20, 2013, the Second Circuit affirmed the District Court's November 1 order. *See Picard v. Egger*, No. 11-5051 (2d Cir.), (ECF No. 167). On July 11, 2013, the Second Circuit issued its mandate, terminating the Second Circuit's jurisdiction over the Luxalpha action. (ECF No. 177). On August 20, 2013, the Supreme Court granted the application for an extension of time within which to file a petition for a writ of certiorari, extending the time to and including October 18, 2013. (ECF No. 181). On October 9, 2013, the Trustee filed a petition for a writ of certiorari with the Supreme Court. *See Picard v. J.P. Morgan Chase & Co.*, No. 13-448 (2013).

08-01789-smb   Doc 5526-6   Filed 07/01/14   Entered 07/01/14 17:06:05   Main Document
Pg 135 of 170

### (b)   The Oreades Action

119.   The Trustee has entered into a series of stipulations with the defendants in *Picard v. Oreades Sicav*, Adv. No. 10-05120 (BRL) (Bankr. S.D.N.Y.) ("Oreades") pending determination of the Common Briefing issues (*see* discussion *infra* Section IX(A)(v)(b)) by Judge Rakoff that are relevant to the Oreades action.   The last stipulation was entered on August 19, 2013, which extended the defendants' time to respond to the complaint until November 22, 2013, with a February 26, 2014 pretrial conference date.   (ECF No. 30).

### (c)   Banque Degroof Action

120.   The Trustee and the defendants in the Banque Degroof action have entered into a series of stipulations extending the time by which defendants must respond to the complaint. *Picard v. Banque Degroof SA/NV*, Adv. No. 12-01691 (BRL) (Bankr. S.D.N.Y.) (the "Banque Degroof" action).   The most recent stipulation was entered into on August 12, 2013, which established the response deadline as November 22, 2013 and a pretrial conference date of February 26, 2014.   (ECF No. 36).

### iv.   The Kohn Action

121.   On December 10, 2010, the Trustee commenced an adversary proceeding (the "Kohn Action") against Sonja Kohn ("Kohn"), Bank Medici, UniCredit Bank Austria AG ("Bank Austria"), UniCredit S.p.A. ("UniCredit), Pioneer Asset Management ("Pioneer"), Alessandro Profumo ("Profumo"), and dozens of individuals, trusts, and nominee companies (collectively, the "Kohn Defendants").   *Picard v. Kohn*, Adv. No. 10-5411 (BRL) (Bankr. S.D.N.Y.).   The Trustee alleges that the Kohn Defendants participated in an illegal scheme and conspired to feed over $9.1 billion into Madoff's Ponzi scheme.

122.   On February 22, 2011, UniCredit, Bank Austria, Pioneer, and Profumo moved to withdraw the reference as to certain of the Trustee's claims against them.   *Picard v. Kohn*, No.

-41-

11 Civ. 01181 (JSR) (S.D.N.Y.).  The Trustee and SIPC opposed the motion.  (ECF Nos. 15–17).

On June 6, 2011, Judge Rakoff granted the motion to consider the Trustee's standing to assert his

RICO claims and to determine whether those claims are otherwise barred.  (ECF Nos. 34, 55,

56).

123.    On July 25, 2011, UniCredit, Bank Austria, Pioneer, and Profumo filed motions

to dismiss the Trustee's RICO and common law claims.  (ECF Nos. 38–41, 44–47, 49–50).  The

Trustee and SIPC opposed the motions to dismiss.  (ECF Nos. 51–54).  On February 22, 2012,

Judge Rakoff dismissed the RICO and common law claims as to those defendants and returned

the remainder of the claims to this Court.  (ECF No. 69).

124.    On March 21, 2012, the Trustee initiated an appeal within the 30-day time period

prescribed by Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure to preserve the

Trustee's right to appeal.  (ECF No. 70).

125.    Since entry of the Administrative Order, thirty-two of the Kohn Defendants have

moved to withdraw the reference, including UniCredit and Pioneer (*Kohn*, No. 11 Civ. 01181,

ECF Nos. 70–75), Bank Austria, Kohn and certain of her family members and related companies

(ECF Nos. 89, 94).  This is the first time that Kohn has appeared in the Kohn Action.

126.    On April 6, 2012, the Trustee filed the second amended complaint and amended

RICO case statement in this Court.  (ECF No. 97).

127.    On April 10, 2012, the Trustee dismissed Gianfranco Gutty as a defendant in the

Kohn Action.  (ECF No. 100).

128.    On May 10, 2012, the Trustee entered into a stipulation to formally dismiss

Hassans International Law Firm.  (ECF No. 104).

129.    On August 10, 2012, the Clerk of this Court (the "Clerk") entered a default against defendant Daniele Cosulich, on a request made by the Trustee on August 9, 2012.  (ECF Nos. 114, 112).

130.    On August 31, 2012, the Clerk entered a default against defendants Yakov Lantzitsky and Sharei Halacha Jerusalem, Inc., on a request made by the Trustee on August 30, 2012.  (ECF Nos. 122, 123, 116, 118).

131.    On November 16, 2012, the Trustee filed a motion for judicial assistance for service of process on defendants in Liechtenstein and Austria.  (ECF Nos. 145, 146).

132.    On December 17, 2012, the Court signed an order issuing requests for international judicial assistance for service of process on defendants in Liechtenstein and Austria.  (ECF Nos. 151, 152).

133.    On April 5, 2013, the Trustee filed a supplemental stipulation with the Second Circuit, which continues to stay the appeal initiated by the Trustee on March 21, 2012.  *Picard v. Kohn*, No. 12-1106 (2d Cir.), ECF No. 18.  This supplemental stipulation makes clear that the appeal was initially withdrawn on April 5, 2012 without prejudice and that the Trustee now has until April 4, 2014 to reinstate the appeal.  The Trustee agreed with the appellees that he would seek the entry of a final judgment under Rule 54(b) before reinstating the appeal.

134.    On April 15, 2013, the Clerk entered a default against defendants Brightlight Trading Ltd., Eastview Service Ltd., Fintechnology Ltd., IT Resources Ltd., Marketinc Strategies Ltd., and Systor S.A., on a request made by the Trustee on April 12, 2013.  (ECF Nos. 170, 171, 172, 173, 174, and 175).

135.    On April 25, 2013, the Clerk entered a default against defendants RTH AG,
Tonga International S.A., Lifetrust AG, and Starvest Anstalt, on requests made by the Trustee on
April 17 and 23, 2013.  (ECF Nos. 183, 184, 185, and 186).

136.    On June 13, 2013, Starvest Anstalt and Lifetrust AG filed a notice of joinder in
the motion to withdraw the reference from the Bankruptcy Court.  (ECF No. 198).

137.    On June 18, 2013, the Clerk entered a default against defendants Bank Medici AG
(Gibraltar), New Economy. Tech S.A., and Paul de Sury on a request made by the Trustee on
June 13, 2013.  (ECF Nos. 200, 201, and 203).

**v.      Other Proceedings Relating to Motions To Withdraw**

**(a)      The Administrative Order**

138.    On March 5, 2012, this Court entered the Administrative Order which stated: "[i]n
the interest of administrative efficiency, this Court has been informed by Judge Rakoff, and
hereby notifies all parties to the Adversary Proceedings, that the District Court will automatically
regard untimely any motion to withdraw . . . if such motion is not filed on or before April 2,
2012."  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, Adv. No. 08-01789, ECF
No. 4707.  Pursuant to the Administrative Order, 438 motions to withdraw and 409 joinders to
these motions were filed by the April 2, 2012 deadline, implicating a total of 768 adversary
proceedings (accounting for overlap in actions as some motions and joinders were filed in the
same matters).

139.    As of the end of the Report Period, a total of 484 motions to withdraw and 424
joinders have been filed, altogether implicating a total of 807 adversary proceedings.

### (b)    Consolidated Briefing Orders

140.    In April 2012, the District Court instituted a new briefing protocol for pending
motions to withdraw, facilitating consolidated briefing on common issues raised in the motions
to withdraw (the "Common Briefing").  The common issues included:

- whether the Supreme Court's decision in *Stern v. Marshall* (the "Stern Issue") precluded the Bankruptcy Court from entering final judgment on the Trustee's claims and therefore mandated withdrawal of the reference to Bankruptcy Court.  131 S. Ct. 2594 (2011); *see* Order, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, No. 12 MC 0115 (JSR) (S.D.N.Y. Apr. 13, 2012), ECF No. 4;

- whether the Trustee's claims against certain defendants should be dismissed in light of the defendants' affirmative defense of antecedent debt (the "Antecedent Debt Issue").  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. May 16, 2012), ECF No. 107;

- whether standing issues (the "Standing Issue") bar the Trustee's common law claims against certain defendants by virtue of the doctrine of *in pari delicto* and/or the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), as well as whether the Trustee is entitled to accept assignments or assert the "insider exception" to *in pari delicto*.  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. May 15, 2012), ECF No. 114;

- whether § 546(e) of the Bankruptcy Code precludes the Trustee's claims against certain defendants against whom the Trustee has alleged knew or should have known that Madoff was running a Ponzi scheme (the "Bad Faith § 546(e) Issue").  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. May 15, 2012), ECF No. 119;

- whether the Trustee is entitled to employ § 502(d) of the Bankruptcy Code against defendants accused of receiving avoidable transfers (the "§ 502(d) Issue").  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. June 1, 2012), ECF No. 155;

- whether the Supreme Court's ruling in *Morrison v. National Australia Bank Ltd.*, as applied to SIPA or the Bankruptcy Code, bars the Trustee's claims against certain defendants (the "Extraterritoriality Issue").  130 S. Ct. 2869 (2010); *see* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. June 6, 2012), ECF No. 167; and

- whether SIPA or the securities laws alter the standards for determining good faith under either §§ 548(c) or 550(b) of the Bankruptcy Code (the

"Good Faith Standard Issue"). *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. June 23, 2012), ECF No. 197.

141.    The Stern Issue was raised by hundreds of defendants. The defendants' moving papers were filed on May 4, 2012 (ECF No. 78), the Trustee's opposition papers were filed on May 25, 2012 (ECF No. 141), and the defendants' reply papers were filed on June 11, 2012 (ECF No. 176). Judge Rakoff heard oral argument on June 18, 2012 and issued a decision on January 4, 2013 (the "*Stern* Decision"), ruling that the Bankruptcy Court could not issue a final decision on the Trustee's fraudulent transfer claims. Opinion and Order, ECF No. 427. The *Stern* Decision indicates that the Bankruptcy Court may be able to render rulings where a defendant filed a claim. *Id.* at 19. In the *Stern* Decision, Judge Rakoff found that the Bankruptcy Court could issue a report and recommendation, and referred the Trustee's cases back to the Bankruptcy Court subject to the other pending rulings. *Id.*

142.    The Antecedent Debt Issue was also raised by hundreds of defendants, who filed their motion on June 25, 2012. (ECF No. 196). The Trustee's opposition papers were filed on July 25, 2012 (ECF No. 252), and the defendants' reply papers were filed on August 8, 2012 (ECF No. 273). Oral argument was held by Judge Rakoff on August 25, 2012. Judge Rakoff issued a decision on October 15, 2013 (the "Antecedent Debt Decision"), ruling that the Trustee's avoidance claims against certain defendants should not be dismissed and stating that "[the] pre-reach-back-period inter-account transfers of amounts exceeding principal in the account of the sender continue to be fictitious profits, not principal, in the account of the recipient, and therefore do not constitute antecedent debt for the recipient of the funds." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 (JSR), 2013 WL 5651285, at *11 (S.D.N.Y. Oct. 15, 2013).

143.    The Standing Issue was raised by various defendants.  The defendants filed two

sets of moving papers on August 3, 2012 (ECF Nos. 269, 270, 271), the Trustee's opposition

papers were filed on September 14, 2012 (ECF No. 342), and the defendants' reply papers were

filed on October 5, 2012 (ECF No. 383).  Judge Rakoff heard oral argument on October 15,

2012.  The Standing Issue remains *sub judice*.

144.    Various defendants raised the § 502(d) Issue and joined in the moving papers

filed on July 13, 2012.  (ECF Nos. 231–33).  The Trustee's opposition papers were filed on

September 12, 2012 (ECF No. 336), and the defendants' reply papers were filed on September

28, 2012 (ECF No. 369).  Oral argument was held by Judge Rakoff on October 9, 2012.  On

February 12, 2013, Judge Rakoff issued a "bottom line" ruling indicating that the Trustee may

invoke section 502(d) of the Bankruptcy Code.  (ECF No. 439).  Judge Rakoff indicated that an

opinion setting forth the basis for Judge Rakoff's ruling will issue in due course.

145.    The Bad Faith § 546(e) Issue was raised by various defendants who filed two sets

of moving papers on July 27, 2012.  (ECF Nos. 259–261).  The Trustee filed a consolidated

opposition on September 28, 2012 (ECF No. 370), the defendants submitted a reply on October

19, 2012 (ECF No. 400), and oral argument was held on November 26, 2012.  On February 12,

2013, Judge Rakoff issued a "bottom line" ruling indicating that under certain circumstances, the

Trustee's complaints should not be dismissed at the pleading stage solely on the basis of

defendants' invocation of § 546(e) of the Bankruptcy Code.  (ECF No. 439).  On April 15, 2013,

Judge Rakoff issued an opinion setting forth the basis for his ruling, and indicated that the

Trustee's claims are not precluded under § 546(e) of the Bankruptcy Code in cases where the

Trustee "sufficiently alleges that the transferee from whom [the Trustee] seeks to recover a

fraudulent transfer knew of [BLMIS's] fraud, that transferee cannot claim the protection of Section 546(e)'s safe harbor." (ECF No. 460).

146.   The Extraterritoriality Issue was joined by various defendants, who filed their moving papers on July 13, 2012. (ECF Nos. 234–36).   The Trustee filed opposition papers on August 17, 2012 (ECF No. 310), and the defendants filed reply papers on August 31, 2012 (ECF No. 322).  Judge Rakoff held oral argument on September 21, 2012.  The Extraterritoriality Issue remains *sub judice*.

147.   The Good Faith Standard Issue was raised by various defendants, who filed two main sets of moving papers on July 20, 2012. (ECF Nos. 242, 243).   The defendants were permitted to file six supplemental briefs on August 10, 2012. (ECF Nos. 276, 282–86, 292).   On August 31, 2012, the Trustee filed a consolidated opposition to the two main sets of moving papers. (ECF No. 324).   On September 14, 2012, the Trustee filed a consolidated opposition to the six supplemental briefs. (ECF No. 347).   On September 14, 2012, the defendants filed two replies in support of the main moving papers. (ECF No. 345, 346).   On September 28, 2012, the defendants filed six replies in support of the six supplemental memoranda. (ECF Nos. 361–64, 366, 367).   Oral argument on the Good Faith Standard Issue was conducted by Judge Rakoff on October 12, 2012.  The Good Faith Standard Issue remains *sub judice*.

### (c)        The 546(e) Appeal

148.   On April 27, 2012 the District Court entered an order dismissing certain claims in seventy-eight adversary proceedings in the *Picard v. Greiff*, Adv. No. 11-03775 (BRL) (Bankr. S.D.N.Y.), *Picard v. Blumenthal*, Adv. No. 11-04293 (BRL) (Bankr. S.D.N.Y.), *Picard v. Goldman*, Adv. No. 11-04959 (BRL) (Bankr. S.D.N.Y.), and *Picard v. Hein*, Adv. No. 11-04936 (BRL) (Bankr. S.D.N.Y.) actions.  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. April 30, 2012), ECF No. 57.  These claims included (1) preferences under § 547 of the Bankruptcy Code, (2)

constructive fraudulent transfers under § 548(a)(l)(B) of the Bankruptcy Code, and (3) actual and constructive fraudulent transfers or fraudulent conveyances under provisions of the New York Debtor & Creditor Law incorporated by § 544(b) of the Bankruptcy Code (the "Dismissed Claims"). The Dismissed Claims did not include those claims proceeding under § 548(a)(l)(A) and § 550(a) of the Bankruptcy Code.

149.    On April 30, 2012, the District Court entered an Opinion and Order explaining the reasons for its decision. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Picard v. Greiff)*, 476 B.R. 715 (S.D.N.Y. 2012). On May 15, 2012, the District Court entered a Supplemental Opinion and Order to make explicit that § 546(e) of the Bankruptcy Code applies to the Trustee's claims for avoidance and recovery of preferential transfers under § 547 of the Bankruptcy Code. Supplemental Opinion and Order, No. 12 MC 0115 (JSR), ECF No. 101. [14]

150.    On June 21, 2012, the Trustee and SIPC each filed notices of appeal in the Second Circuit from these orders. On or about June 21, 2012, the Second Circuit opened Case Nos. 12-2497 and 12-2557 in relation to the notices of appeal filed by the Trustee. On or about June 21, 2012, the Second Circuit opened Case Nos. 12-2500 and 12-2616 in relation to the notices of appeal filed by SIPC. The Second Circuit, *sua sponte*, consolidated Case Nos. 12-2497 and 12-2500 under Case No. 12-2497. The Second Circuit, *sua sponte*, also consolidated Case Nos. 12-2557 and 12-2616 under Case No. 12-2557.

151.    On August 13, 2012, the Trustee and SIPC filed notices of appeal to a subsequent judgment entered by the District Court relating to the 546(e) appeal. On or about September 10, 2012, the Second Circuit opened Case Nos. 12-3440 and 12-3585 in relation to the notices of appeal filed by the Trustee. On or about September 10, 2012, the Second Circuit opened Case

---

[14]

Nos. 12-3422 and 12-3582 in relation to the notices of appeal filed by SIPC. The Second Circuit, *sua sponte*, consolidated Case Nos. 12-3422, 12-3440, 12-3582, and 12-3585 under Case No. 12-3422.

152.    The appeal will specifically address whether § 546(e) of the Bankruptcy Code should be applied to the Trustee's avoidance actions and whether a defendant's invocation of a defense under § 546(e) of the Bankruptcy Code mandates withdrawal of the reference to the Bankruptcy Court under 28 U.S.C. § 157(d).

153.    The Trustee filed his appeal brief on May 15, 2013.

154.    By order of the Second Circuit dated August 2, 2013, the appellees' briefs were due to be filed on or before October 11, 2013, and the Trustee's reply brief was to be filed on or before November 22, 2013. (ECF No. 165).

155.    The appellees filed four separate briefs on October 11, 2013.

**B.    The Bankruptcy Court and Related Appeals**

156.    During this period of voluminous activity before the District Court on motions to withdraw the reference, motions to dismiss, and trial preparation, adversary proceedings that had not been withdrawn to the District Court proceeded before this Court. Certain decisions of this Court in the matters described herein were appealed to the District Court and decided by various judges of that Court. After entry of the Administrative Order, certain defendants in these actions moved to withdraw the reference from this Court.

**i.    Avoidance Actions**

157.    Prior to December 10, 2010, the Trustee filed approximately 1,000 avoidance actions seeking the return of fictitious profits received by the defendants in those actions (the "Fictitious Profits Litigation"). Since then, and during the Report Period, the Trustee has undertaken a multitude of tasks to prosecute the actions.

158.    As a preliminary matter, many of the defendants in the Fictitious Profits Litigation moved to withdraw the bankruptcy reference on a number of grounds.  The Trustee engaged in briefing with respect to whether the reference should be withdrawn, and where the District Court did withdraw the reference on certain issues, the Trustee briefed the motions to dismiss that followed.

159.    With respect to cases remaining in the Bankruptcy Court, because of the uncertainty surrounding the motions to withdraw the reference, the Trustee agreed to extend many defendants' time to respond to the Trustee's complaints and entered into numerous stipulations to extend same.  Additionally, the Trustee considered hardship applications and where appropriate, agreed to dismiss certain defendants from the actions.  In other cases, the parties engaged in settlement negotiations which led to the resolution of certain actions or a narrowing of the open issues.  Certain defendants requested an early mediation of their cases. Where the Trustee concurred in that request, the parties engaged in mediations, some of which resulted in a settlement of the actions.  In certain cases, the parties engaged in fact and expert discovery during the Report Period.

**ii.    Subsequent Transferee Actions**

160.    To date, the Trustee has brought a total of eighty-two adversary proceedings seeking recovery of just over $7.2 billion in subsequent transfers from 150 defendants who redeemed money from Fairfield Sentry Limited, Fairfield Sigma Limited, Fairfield Lambda Limited, Harley International (Cayman) Ltd., Kingate Global Fund Ltd., and Kingate Euro Fund Ltd.   The Trustee has completed service of process in all but two adversary proceedings, for which the Trustee is currently in the process of effectuating international service of process on the remaining three defendants.

161.    The subsequent transferee defendants filed motions to withdraw the reference, which were granted by Judge Rakoff and resulted in Common Briefing by the Trustee and the defendants.  Among the issues affecting the subsequent transfer cases are the Extraterritoriality Issue, the Bad Faith § 546(e) Issue, the avoidance of initial transfers through the settlement with Fairfield Sentry, Greenwich Sentry, Greenwich Sentry Partners, and various Tremont funds under Bankruptcy Code § 550, application of SLUSA, and the Trustee's standing to assert claims assigned to him.  To date, the District Court has issued a "bottom line" order regarding Bankruptcy Code § 550, has limited the application of the 546(g) safe harbor, and set out a new standard under Bankruptcy Code § 546(e) for those with actual knowledge of BLMIS' securities fraud.  *See* discussion *supra* in Section IX(A)(v)(b).

162.    Two subsequent transferee defendants filed motions to dismiss in the Bankruptcy Court.  Briefing on one motion has not yet been completed.  In the second motion, *Picard v. Bureau of Labor Insurance*, the defendant sought to dismiss based on the Foreign Sovereign Immunities Act, lack of personal jurisdiction, improper extraterritorial application of SIPA and the Bankruptcy Code, the failure to avoid the initial transfers to Fairfield Sentry through the Fairfield Sentry settlement, and the statute of limitations under Bankruptcy Code § 550.  Adv. No. 11-02732 (BRL) (Bankr. S.D.N.Y.), ECF No. 8–10.  On October 11, 2012, the Bankruptcy Court denied the motion to dismiss on all grounds.  (ECF No. 51).

163.    Currently, the response dates to the Trustee's subsequent transfer adversary proceedings have been extended while the parties await the District Court's rulings on the issues subject to Common Briefing which may affect the cases.

### iii.    *Picard v. Avellino*

164.    On December 10, 2010, the Trustee commenced an avoidance action against Avellino & Bienes, Frank J. Avellino, Michael S. Bienes, Nancy C. Avellino, Dianne K. Bienes,

Thomas G. Avellino, and numerous other trusts and entities (collectively, the "A&B Defendants") seeking the return of over $904 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of the A&B Defendants. *Picard v. Frank J. Avellino*, Adv. No. 10-05421 (BRL) (Bankr. S.D.N.Y.) (the "A&B Action").

165.    On June 6, 2011, certain A&B Defendants moved to dismiss the complaint in the Bankruptcy Court. *A&B Action*, ECF Nos. 23-27.  In addition, on June 7, 2011, certain A&B Defendants moved to withdraw the bankruptcy reference in the District Court. *Id.*, ECF Nos. 28–30; *see also Picard v. Avellino*, No. 11-cv-03882 (JSR) (S.D.N.Y.) (the "A&B Withdrawal Action").

166.    The motion to withdraw the reference was fully briefed in the District Court, and oral argument was held on October 18, 2011.  On February 29, 2012, the District Court issued a Memorandum Order withdrawing the reference on certain issues of law raised by the A&B Defendants and other defendants named in separate adversary proceedings commenced by the Trustee. *A&B Withdrawal Action*, ECF No. 20.  As a result of the District Court's order, during the period of May 2012 through October 2012, the Trustee and the A&B Defendants participated in consolidated briefing and oral arguments on the withdrawn issues of law.  *See A&B Withdrawal Action*, ECF Nos. 21–23.

167.    Specifically, the A&B Defendants participated in consolidated briefing on the merits of the Stern Issue, pursuant to the Order dated April 13, 2012, No. 12 MC 115 (S.D.N.Y. April 13, 2012) (ECF No. 4).  Oral arguments were held on June 18, 2012, and Judge Rakoff

issued his ruling on January 4, 2013. *See* Opinion and Order Regarding *Stern v. Marshall*, No. 12 MC 115 (JSR) (S.D.N.Y. Jan. 4, 2013), ECF No. 427.

168.    The A&B Defendants also participated in consolidated briefing on the merits of the Antecedent Debt Issue, pursuant to the Order dated May 16, 2012, No. 12 MC 0115 (S.D.N.Y. May 15, 2012) (ECF No. 107). Oral arguments were held on August 20, 2012, and Judge Rakoff issued his ruling on October 15, 2012. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 (JSR), 2013 WL 5651285 (S.D.N.Y. Oct. 15, 2013).

169.    The A&B Defendants further participated in consolidated briefing on the merits of the Bad Faith § 546(e) Issue, pursuant to the Order dated May 15, 2012, No. 12 MC 0115 (S.D.N.Y. May 16, 2012) (ECF No. 119). Oral arguments were held on November 26, 2012, and Judge Rakoff issued his ruling on April 15, 2013. *See* Opinion and Order Regarding Section 546(e), No. 12 MC 115 (S.D.N.Y. August 15, 2013), ECF No. 460.

170.    While the above-referenced motions have been pending, the motion to dismiss the A&B Defendants filed in Bankruptcy Court has continued to be held in abeyance. In the interim, during the applicable reporting period, B&H attorneys have continued to engage in document review, discovery preparation, case management and case assessment tasks so that the litigation may move forward once the withdrawal motions have been finally decided.

    **iv.    *Picard v. BNP Paribas***

171.    The Trustee has brought a total of five adversary proceedings seeking the return of approximately $1 billion under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act from BNP Paribas S.A. and its subsidiaries—BNP Paribas (Suisse) S.A., BNP Paribas Arbitrage SNC, BNP Paribas (Canada), BNP Paribas Bank & Trust Cayman Limited, BGL BNP Paribas Luxembourg S.A., BNP Paribas Investment Partners Luxembourg S.A., BNP Paribas Securities Services—Succursale de Luxembourg, BNP Paribas Securities Services S.A.,

and BNP Paribas Securities Corp. (collectively, "BNP Paribas")—who redeemed money from feeder funds that invested with BLMIS. *Picard v. BNP Paribas Arbitrage, SNC*, Adv. No. 11-02796 (BRL) (Bankr. S.D.N.Y. 2011); *Picard v. BNP Paribas S.A.*, Adv. No. 12-01576 (BRL) (Bankr. S.D.N.Y. 2011); *Picard v. Legacy Capital Ltd.*, Adv. No. 10-05286 (BRL) (Bankr. S.D.N.Y. 2010); *Picard v. Oreades SICAV*, Adv. No. 10-05120 (BRL) (Bank. S.D.N.Y. 2010); and *Picard v. Equity Trading Portfolio Ltd.*, Adv. No. 10-04457 (BRL) (Bank. S.D.N.Y. 2010) (collectively, the "BNP Paribas Proceedings"). The Trustee has completed service of process in each of the BNP Paribas Proceedings.

172. BNP Paribas filed motions to withdraw the reference which were granted by Judge Rakoff and resulted in consolidated subject matter briefing pending in the District Court. Among the issues affecting the BNP Paribas Proceedings are the Extraterritoriality Issue, the Bad Faith § 546(e) Issue, the avoidance of initial transfers through settlements with feeder funds that invested with BLMIS, and the Good Faith Standard Issue. To date, the District Court has issued a "bottom line" order regarding the avoidance of initial transfers through settlements and has set out a new standard for the safe harbor under Bankruptcy Code section 546(e).

173. Currently, the response dates in the BNP Paribas Proceedings have been extended while the parties await the District Court's rulings on the issues subject to Common Briefing which may affect the cases.

**v.    *Picard v. Citibank***

174. On December 8, 2010, the Trustee commenced an action against Citibank, N.A., Citibank North America, Inc., and Citigroup Global Markets Limited (collectively, "Citibank") seeking the return of approximately $425 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent transfers in connection with certain transfers of property by BLMIS to or for the benefit of

09-01789-smb Doc 5736-1 Filed 02/28/14 Entered 02/28/14 15:48:34 Exhibit A
08-01789-smb Doc 5536 F e Filed 07/01/13 Entered 07/01/13 16:20:05 Main Document
F to Ha Declaration Pg 150 of 207
Page 170 of 176

Citibank.  *Picard v. Citibank*, Adv. No. 10-05345 (BRL) (Bankr. S.D.N.Y.) (the "Citibank Action").

175.     On November 2, 2011, Citibank moved for withdrawal of the reference.  *Picard v. Citibank*, No. 11 Civ. 7825 (JSR) (S.D.N.Y.) (ECF Nos. 1–3).  On March 2, 2012, the Trustee opposed the motion to withdraw the reference, and oral argument was held on May 1, 2012. (ECF Nos. 13–15).  On July 2, 2012, the District Court granted Citibank's motion, allowing Citibank to move to dismiss as to the issues of 550(a) and 546(g), and directing Citibank to participate in Common Briefing as to the Bad Faith § 546(e) Issue and the Good Faith Standard Issue.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Madoff Sec., LLC)*, 12 MC 0115 (JSR) (S.D.N.Y. July 3, 2012), ECF No. 214.  The District Court's disposition of these Common Briefing issues is discussed *supra* in Section IX(A)(v)(b).

176.     On August 15, 2012, Citibank filed a motion to dismiss, claiming that the safe harbor of 546(g) bars Trustee's subsequent transferee claims.  *Picard v. Citibank*, No. 11 Civ. 7825 (JSR) (S.D.N.Y.) (ECF Nos. 25–28).  The Trustee and SIPC opposed Citibank's motion, (ECF Nos. 30–31), and Citibank filed reply papers. (ECF No. 32).  On November 29, 2012 the District Court held oral argument on Citibank's motion to dismiss jointly with two other motions raising the 546(g) motions.  On February 15, 2013, the District Court issued a bottom-line order partially granting and partially denying the 546(g) motions, with an opinion explaining the bottom-line order to follow.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Madoff Sec., LLC)*, 12 MC 0115 (JSR), ECF No. 451.

177.     On October 5, 2012, Citibank filed a motion to dismiss based on § 550 of the Bankruptcy Code, asserting that the Trustee must first obtain a judgment of avoidance as to the initial transferees before pursuing recovery of subsequent transfers from Citibank.  *Id.*, ECF No.

384. The Trustee and SIPC filed opposition papers on November 13, 2012, and the Court heard oral argument on December 3, 2012. (ECF Nos. 409, 410). On December 12, 2012, Judge Rakoff issued a bottom-line ruling denying defendants' motion to dismiss in its entirety. (ECF No. 422).

178. Currently, response dates in the Trustee's adversary proceeding against Citibank have been extended while the parties await the District Court's rulings on the issues subject to Common Briefing which may affect the cases.

### vi. *Picard v. Cohmad Sec. Corp.*

179. On June 22, 2009, the Trustee commenced an adversary proceeding against Madoff insiders Cohmad Securities Corporation ("Cohmad"), Maurice ("Sonny") J. Cohn ("Sonny Cohn"), Marcia B. Cohn, and several other defendants (collectively, the "Cohmad Defendants") seeking the return of over $245 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances, disallowance of any claims filed against the estate by the Cohmad Defendants, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Cohmad Defendants. *Picard v. Cohmad Sec. Corp.*, Adv. No. 09-01305 (BRL) (Bankr. S.D.N.Y.).

180. The complaint seeks to avoid and recover the fictitious profits withdrawn by the Cohmad Defendants and the return of commissions and fees transferred directly from BLMIS to Sonny Cohn and Cohmad. On October 8, 2009, the Trustee filed an amended complaint. (ECF No. 82). The Cohmad Defendants filed numerous motions to dismiss, which the Trustee opposed. (ECF No. 135).

181. On August 1, 2011, this Court issued its Memorandum Decision and Order Denying Defendants' Motions to Dismiss Trustee's Complaint. (ECF No. 209). This Court found that the Trustee had adequately pleaded that the transfers received by the Cohmad

Defendants in excess of their principal were not transferred for reasonably equivalent value, and

Cohmad and Sonny Cohn lacked good faith in receiving commissions from Madoff. *Picard v.*

*Cohmad Sec. Corp.*, 454 B.R. 317, 332–34 (Bankr. S.D.N.Y. 2011).

182.    Certain of the Cohmad Defendants filed a motion for leave to appeal. *See Picard*

*v. Cohmad Sec. Corp.*, No. 11 MC 00337 (TPG) (S.D.N.Y.), ECF Nos. 212–13.  The Cohmad

Defendants' appeal was denied by Judge Griesa on November 14, 2012.

183.    Meanwhile, the parties have engaged in discovery.  The Trustee has served

discovery on all parties, and discovery is ongoing.

184.    In March and April 2012, the Cohmad Defendants moved to withdraw the

reference from this Court. *Picard v. Cohmad*, 12-cv-02676 (JSR) (S.D.N.Y.), ECF No. 1.  The

Cohmad Defendants have also participated in Common Briefing as to the Bad Faith § 546(e)

Issue and the Good Faith Standard Issue.  *See* discussion *supra* Section (IX)(A)(v)(b).  The

District Court rendered a decision on the Bad Faith § 546(e) Issue, which indicated that the

Trutsee adequately pleaded a case against the Cohmad Defendants so that the Cohmad

Defendants are not entitled to dismiss the Trustee's complaint at the pleading stage on the basis

of Bankruptcy Code Section 546(e).

### vii.    *Picard v. Defender*

185.    On December 5, 2010, the Trustee commenced an adversary proceeding against

Defender Limited, Reliance Management (BVI) Limited, Reliance Management (Gibraltar)

Limited, and Tim Brockmann (collectively, the "Foreign Defendants"), and Reliance

International Research, LLC, and Justin Lowe (collectively, the "Domestic Defendants") seeking

the return of over $93 million under SIPA, the Bankruptcy Code, the New York Fraudulent

Conveyance Act, and other applicable law for preferences, fraudulent transfers, fraudulent

conveyances and damages in connection with certain transfers of property by BLMIS to or for

the benefit of the Domestic Defendants and the Foreign Defendants.  *Picard v. Defender Ltd.*,
Adv. No. 10-05229 (BRL) (Bankr. S.D.N.Y.) (the "Defender Action").

186.    On November 29, 2012, the Trustee filed a notice of voluntary dismissal without
prejudice of Justin Lowe.  (ECF No. 58).

187.    On April 2, 2012, the Foreign Defendants and the Domestic Defendants
separately moved to withdraw the reference.  (ECF Nos. 24, 28).  On May 15, 2012, Judge
Rakoff withdrew the reference in part for the Foreign Defendants and the Domestic Defendants
to consider the Trustee's standing to assert common law claims and issues related to SLUSA and
Bankruptcy Code Section 546(e).  No. 12-cv-02800 (JSR) (S.D.N.Y.), ECF Nos. 7, 8; No. 12-cv-
02871 (JSR) (S.D.N.Y), ECF Nos. 7, 9.  In those same orders, Judge Rakoff consolidated these
cases with others into Case No. 12 MC 0115 and issued consolidated briefing schedules.  The
Foreign Defendants and the Domestic Defendants participated in Common Briefing as to the
Standing Issue and the Bad Faith Section 546(e) Issue.  The District Court's disposition of these
Common Briefing issues is discussed *supra* in Section IX(A)(v)(b).

188.    On April 27, 2012, defendants Reliance Management (BVI) Limited, Reliance
Management (Gibraltar) Limited, and Tim Brockmann (the "Moving Defendants") filed a
motion to dismiss for lack of personal jurisdiction.  (ECF No. 36).  The Trustee opposed the
motion.  (ECF No. 49).  The Moving Defendants filed their reply brief on October 26, 2012.
(ECF No. 55).  This Court converted the hearing on this motion, scheduled for December 19,
2012, into a Rule 16 conference and directed the parties to meet and confer with respect to the
motion.  This motion to dismiss remains pending.

189.    On July 18, 2013 the parties filed a stipulation extending the Foreign Defendants' and Domestic Defendants' time to respond to the complaint to December 20, 2013.  (ECF No. 68).

### viii.    *Picard v. Equity Trading*

190.    On December 5, 2010, the Trustee commenced an adversary proceeding against Equity Trading Portfolio Limited, Equity Trading Fund Limited and BNP Paribas Arbitrage, SNC (collectively, the "Equity Trading Defendants"), seeking the return of over $16 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences, fraudulent transfers, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Equity Trading Defendants.  *Picard v. Equity Trading Portfolio Limited*, Adv. No. 10-04457 (BRL) (Bankr. S.D.N.Y.) (the "Equity Trading Action").

191.    On October 31, 2011, defendant BNP Paribas Arbitrage, SNC moved to withdraw the reference, and on November 7, 2011 defendants Equity Trading Portfolio Limited and Equity Trading Fund Limited joined that motion.  (ECF Nos. 16, 21).  On May 15, 2012, Judge Rakoff withdrew the reference in part for the Equity Trading Defendants to consider the Trustee's standing to assert common law claims and issues related to SLUSA and Bankruptcy Code Section 546(e).  *Picard v. Equity Trading*, No. 11-cv-07810 (JSR) (S.D.N.Y.) (ECF Nos. 13, 14). In those same orders, Judge Rakoff consolidated the cases with others into case number 12 MC 0115 and issued consolidated briefing schedules.  The Equity Trading Defendants participated in Common Briefing as to the Standing Issue and the Bad Faith § 546(e) Issue.  The District Court's disposition of these Common Briefing issues is discussed *supra* in Section IX(A)(v)(b).

192.    On November 19, 2013, this Court so ordered a stipulation authorizing the Trustee to file an amended complaint by November 22, 2013 and setting forth a schedule for

responses to the amended complaint and briefing on any motions the Equity Trading Defendants might file in lieu of an answer.  (ECF No. 42).

ix. *Picard v. Friedman*

193.    On December 9, 2010, the Trustee commenced an adversary proceeding seeking the return of more than $19 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent transfers, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of S. Donald Friedman, individually and as a beneficiary of an individual retirement account, Saundra Friedman, Ari Friedman, Broadway-Elmhurst Co. LLC and NTC & Co. LLP (the "Friedman Defendants").  *Picard v. Friedman*, Adv. No. 10-5395 (BRL) (Bankr. S.D.N.Y.).  NTC & Co. LLP was subsequently voluntarily dismissed as a defendant.

194.    The complaint alleges that the Friedman Defendants received fraudulent transfers from BLMIS in bad faith.  The complaint was amended on March 31, 2011 (ECF No. 13) to add allegations concerning newly-discovered transfers after the Friedman Defendants sought to dismiss the action on February 18, 2011.  (ECF Nos. 7, 8).  The Friedman Defendants answered the amended complaint on May 13, 2011.  (ECF No. 26).

195.    On March 30, 2012, the Friedman Dfendants moved to withdraw the reference to the District Court.  *See Picard v. Friedman*, No. 12-cv-02343 (JSR) (S.D.N.Y.).  The District Court granted the motion by orders entered on May 16, 2012 and June 25, 2012, allowing the Friedman Defendants to move to dismiss as to the Stern Issue, the Antecedent Debt Issue, the Bad Faith § 546(e) Issue, and the issue of whether the Trustee may avoid mandatory withdrawals from individual retirement accounts.  (ECF Nos. 7, 8).  The Friedman Defendants participated in Common Briefing on these issues.  *See id.*  The District Court's disposition of these Common Briefing issues is discussed *supra* in Section IX(A)(v)(b).

196.    Discovery in the Trustee's action has continued to proceed pending resolution of all the motions to dismiss concerning common issues.  During the Report Period, a second amended case management order was entered by this Court.  *Picard v. Friedman*, Adv. No. 10-05395 (BRL) (Bankr. S.D.N.Y.), ECF No. 75.  The Trustee issued non-party subpoenas for documents to the Friedman Defendants' banks and numerous third parties, including their former accounting firms.  After extensive discussions regarding the Friedman Defendants' deficient discovery responses, the Trustee obtained forensic copies of the Friedman Defendants' hard drives.

197.    The Trustee has reviewed thousands of documents produced by these third parties and the Friedman Defendants pursuant to these discovery efforts.  In particular, the Trustee has also engaged with his consultants to perform a comprehensive tracing analysis and analysis of tax records and related documents.  The Trustee has also produced numerous documents to the Friedman Defendants, served requests for admissions on Saundra Friedman and Donald Friedman, and responded to the Friedman Defendants' second set of requests for documents.

198.    On September 10, 2013, the Trustee took the deposition of Ari Friedman under Federal Rule of Civil Procedure 30(b)(1) and the deposition of Broadway-Elmhurst Co. LLC under Federal Rule of Civil Procedure 30(b)(6).   On September 24, 2013, the Trustee took the deposition of Saundra Friedman under Federal Rule of Civil Procedure 30(b)(1).  The Trustee is currently in the process of scheduling the deposition of Donald Friedman and negotiating an amended case management plan.

**x.    *Picard v. J. Ezra Merkin***

199.    On May 7, 2009, the Trustee commenced an adversary proceeding against sophisticated money manager and Madoff associate J. Ezra Merkin ("Merkin") and his funds, Gabriel Capital, L.P., Ariel Fund Ltd., Ascot Partners, L.P., and Gabriel Capital Corporation

(collectively, the "Merkin Defendants") alleging that Merkin knew or should have known that Madoff's investment advisory business ("IA Business") was predicated on fraud, and seeking the return of nearly $560 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of the Merkin Defendants. *Picard v. J. Ezra Merkin*, Adv. No. 09-01182 (BRL) (Bankr. S.D.N.Y.). On August 6, 2009, the Trustee filed an amended complaint. (ECF No. 10).

200.    On November 4, 2009, Bart M. Schwartz, as Receiver ("Receiver") of defendants Ariel Fund Limited and Gabriel Capital, L.P., filed a motion to dismiss the complaint, as did the remaining defendants in the proceeding. (ECF Nos. 16, 22). The Trustee opposed the motions. (ECF Nos. 29–30). The Trustee received leave to file a second amended complaint (ECF No. 46) and filed such complaint on December 23, 2009 (ECF No. 49). The Merkin Defendants renewed their motions to dismiss (ECF Nos. 53, 55), which the Trustee opposed (ECF Nos. 62–63).

201.    On November 17, 2010, this Court entered its Memorandum Decision and Order Granting in Part and Denying in Part Defendants' Motions to Dismiss Trustee's Complaint. (ECF No. 84); *see also Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010). Among other holdings, the Court held that the Trustee sufficiently pleaded his federal and state law claims seeking to avoid and to recover actual and constructive fraudulent transfers. The Court also held that the funds were not entitled at the pleading stage to dismissal of the Trustee's actual fraudulent transfer claims pursuant to the § 548(c) "good faith transferee" affirmative defense. *Picard v. Merkin*, 440 B.R. at 256–57. In addition, the Court held that the funds were not, at the pleading stage, entitled to dismissal of the Bankruptcy Code-

08-01789-smb   Doc 5736-1   Filed 02/28/14   Entered 02/28/14 15:48:34   Exhibit A F to Ha Declaration   Pg 158 of 207

based constructive fraudulent transfer claims pursuant to the § 546(e) "safe harbor" affirmative defense. *Id.* at 266 n.25.

202.    The Receiver filed a Motion for Leave to Appeal the Court's Memorandum Decision and Order.  (ECF No. 90); *see also Picard v. Merkin*, 11-MC-0012 (KMW) (S.D.N.Y. Jan. 1, 2011).  On August 31, 2011, United States District Judge Kimba M. Wood denied the motion.  *Picard v. Merkin*, No. 11-MC-0012(KMW), 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011).  Among other findings, Judge Wood determined that there were no "substantial grounds for difference of opinion as to the correctness of the standards relied on by the Bankruptcy Court in its refusal—at the pleading stage—to dismiss on the grounds of [the Merkin Defendants'] § 546(e) affirmative defense." *Id.* at *12.

203.    On April 2, 2012, the Receiver filed a motion to withdraw the reference and marked the Merkin case as related to the Katz-Wilpon Action.  *Id.*, ECF No. 119.  The District Court subsequently withdrew the reference only as to certain issues, including but not limited to, the Bad Faith § 546(e) Issue, the Good Faith Standard Issue, and the § 502(d) Issue.  The District Court has issued rulings on some of these issues.

204.    In connection with ongoing discovery before the Bankruptcy Court, the parties jointly agreed to appoint Melanie Cyganowski as binding arbitrator.  To date, Judge Cyganowski has heard several disputes between the parties regarding third-party documents and bank records. On March 15, 2013, Judge Cyganowski issued a ruling granting in substantial part, and denying in part, the Trustee's motion to compel.  Among other things, the order granted the Trustee's requested six-month extension of the third amended case management plan, compelled the Merkin Defendants to comply with Federal Rule of Civil Procedure 34(b) by identifying how their production corresponds with the Trustee's document requests, and required the Merkin

Defendants to produce their underlying financial records from their banks and other financial institutions.

205.    Following this favorable ruling, during the Report Period, the Trustee's counsel continued to press the Merkin Defendants to comply with all aspects of that order through multiple meet and confers, including in connection with the Trustee's Fourth Request for Production of Documents.  B&H attornyes further pursued Rule 2004 discovery from Lauren Merkin, who, individually and jointly with Merkin, received subsequent transfers of funds or was the beneficiary of subsequent transfers to Merkin and other third parties.

206.    During the Report Period, the Trustee continued preparing for fact witness depositions and expert discovery by conducting extensive and ongoing analysis of documents produced by the Merkin Defendants and from third parties.  The Trustee has taken depositions and has scheduled additional depositions of third-party and defendant witnesses.  In addition, the Trustee continued to issue additional document requests to the Merkin Defendants and subpoenas for documents from other third parties.

207.    On August 8, 2013, Judge Cyganowski heard oral arguments on the Trustee's motion to compel discovery from Lauren Merkin pursuant to Rule 2004 discovery.  A decision is pending.  The team also presented additional discovery disputes to Judge Cyganowski regarding deficient discovery pursuant to Arbitration Decision #3 and discovery deficiencies related to the Trustee's Fourth Request for Production of Documents.  These decisions are also pending.

208.    During the Report Period, B&H attorneys devoted significant time and effort to preparing and finalizing its third amended complaint, which alleges that Merkin had knowledge of, or was willfully blind to, the fraud at BLMIS consistent with the District Court's recent decisions.  The third amended complaint was filed on August 30, 2013.  The Merkin Defendants

and the Receivers filed motions to dismiss on October 11, 2013, which B&H attorneys are analyzing for response and further litigation.

209.   Subsequent to a press release on June 25, 2012 by the New York Attorney General ("NYAG") announcing a settlement with the Merkin Defendants, the Trustee prepared and filed with this Court comprehensive injunction pleadings and a complaint seeking to enjoin the NYAG and others from consummating the settlement, transferring, or otherwise dissipating any assets. *Picard v. Schneiderman*, Adv. No. 12-01778 (BRL) (Bankr. S.D.N.Y.), ECF Nos. 1, 3. The NYAG and other settling parties filed a joint motion to withdraw the reference (ECF No. 17), which the District Court granted. *Picard v. Schneiderman*, 12-cv-06733 (S.D.N.Y). Following oral argument on March 25, 2013, the District Court denied the Trustee's application on April 15, 2013.

210.   During the Report Period, the Trustee appealed the District Court's decision to the Second Circuit. The Trustee filed his opening appellate brief on June 6, 2013, the Merkin Defendants and the Receivers filed their responses on July 19, 2013, and the Trustee filed his reply brief on August 7, 2013. *Picard v. Schneiderman*, 13-1785 (2d Cir.), ECF Nos. 87, 131, 132, 150).

211.   Oral argument before the Second Circuit took place on October 10, 2013, and the matter is awaiting decision.

**xi.    *Picard v. Kingate***

212.   On April 17, 2009, the Trustee commenced an adversary proceeding against Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. (together, the "Kingate Funds"), and other defendants, seeking, among other relief, the avoidance and recovery under SIPA, the Bankruptcy Code, New York Debtor and Creditor Law and other applicable law of preferential and fraudulent transfers made by BLMIS to or for the benefit of the Kingate Funds in the

approximate total amount of $875 million.[15]   On June 8, 2011, the Trustee filed and served a

third amended complaint, which added a number of additional foreign defendants, significantly

expanding the case.  *Picard v. Federico Ceretti*, Adv. No. 09-01161 (BRL) (Bankr. S.D.N.Y.),

ECF No. 32.

213.    On January 4, 2013, the District Court issued an Opinion and Order ruling that, in

light of the Supreme Court's decision in *Stern v. Marshall*, the Bankruptcy Court has the power

to hear the Trustee's avoidance claims and to enter proposed findings of fact and conclusions of

law.  Opinion and Order, *In re Bernard L. Madoff, LLC*, No. 12 MC 0115 (JSR), ECF No. 427.

On April 13, 2013, the District Court issued an Order expanding that Court's earlier ruling.

(ECF No. 4766).  That Order sent back to the Bankruptcy Court the adversary proceedings that

had been withdrawn on the issue as to whether section 546(e) provides a safe harbor to protect

alleged transfers from avoidance, except for transfers made with actual fraudulent intent pursuant

to section 548(a)(1)(A) of the Bankruptcy Code.   Under the District Court's ruling, the

Bankruptcy Court is the proper court to determine whether the Trustee has sufficiently alleged

that initial and subsequent transferees had actual knowledge of BLMIS's fraud and, therefore,

were entitled to the protection afforded by section 546(e).

214.    In anticipation of a decision on other issues that are pending before the District

Court and the appellate courts, which would have a bearing on the resolution of the Trustee's

avoidance action returned to the Bankruptcy Court, the Trustee has consented to an extension of

time for all defendants to respond to the third amended complaint.  The Trustee and his counsel

also continue to prepare for trial.

---

[15] As a result of a settlement between the Trustee and the United States of America on behalf of the Internal
Revenue Service, approved by order of this Court dated December 21, 2011, the aggregate amount of the alleged
transfers has been adjusted to approximately $825 million.  *See* Order, Sec. Investor Prot. Corp. v. Bernard L.
Madoff Inv. Sec., LLC (In re Madoff Sec.), No. 08-01789 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2011), ECF No. 4602.

09-01789-smb Doc 5736-1 Filed 02/28/14 Entered 02/28/14 15:48:31 Exhibit A
08-01789-bram Doc 5526-6 filed 07/30/14 entered 07/30/14 13:20:05 Main Document
F to Ha Declaration Pg 1 Pg 162 of 207

215.     While the parties pursue a global settlement, the Trustee also has extended the Kingate Funds' time to answer the Trustee's injunction action filed in this Court to stay the Kingate Funds' action in Bermuda against Kingate Management Limited and other defendants named by the Trustee that would interfere with the Trustee's avoidance action.  As previously reported, the proceedings commenced by the Trustee in the United Kingdom are currently stayed.

### xii.     *Picard v. Legacy Capital Limited*

216.     On December 6, 2010, the Trustee commenced an action against Legacy Capital Ltd., Isaac Jimmy Mayer, Rafael Mayer, Khronos LLC, Khronos Capital Research LLC,  HCH Management Co., Montpellier Resources Ltd., BNP Paribas Securities Corp., Inversiones Coque S.A., Aurora Resources Ltd., and Olympus Assets LDC (collectively, the "Legacy Capital Defendants") seeking the return of over $218 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Legacy Capital Defendants.  *Picard v. Legacy Capital Ltd.*, Adv. No. 10-05286 (BRL) (Bankr. S.D.N.Y. 2010).

217.     During the Report Period, B&H attorneys commenced review of Rule 2004 discovery and third productions relevant to the claims against the Legacy Capital Defendants. B&H attorneys also worked with the Mintz Group to procure information regarding the Legacy Capital Defendants and on relevant third-party witnesses.  In addition, B&H attorneys are in the process of drafting an amended complaint in light of the relatively recent opinions on fraudulent transfers issued by the District Court.  The pre-discovery investigations and task of drafting the amended complaint will continue over several months.

xiii. *Picard v. Magnify Inc.*

218.   On December 6, 2010, the Trustee commenced an action against Magnify, Inc. and several related companies holding BLMIS accounts, individuals acting on behalf of these accounts, and several other recipients of transfers from these accounts (collectively, the "Magnify Defendants") seeking the return of more than $154 million under SIPA §§ 78fff(b) and 78fff-2(c)(3), §§ 105(a), 542, 544, 547, 548(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws for preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Magnify Defendants. *Picard v. Magnify Inc.*, Adv. No. 10-05279 (BRL) (Bankr. S.D.N.Y.). On September 21, 2011, the Trustee filed an amended complaint in the action.  (ECF No. 39).

219.   On April 2, 2012, defendants Robert H. Book and R.H. Book LLC moved to withdraw the reference to the District Court on several grounds. *See Picard v. Magnify, Inc.*, No. 12-cv-02482 (JSR) (S.D.N.Y.).   The motion has been granted, in part, respecting certain Common Briefing issues. These defendants, acting collectively with other defendants in such adversary proceedings at the direction of the District Court, have filed briefs in connection with certain of those Common Briefing issues.  Briefing has been completed respecting these common issues.

220.   Defendant Kurt Brunner moved to dismiss the Trustee's complaint for lack of personal jurisdiction on September 1, 2011, and supplemented this motion with regard to allegations in the amended complaint on November 3, 2011. *Picard v. Magnify*, Adv. No. 10-05279 (BRL), ECF Nos. 32, 48.  On June 14, 2012, this Court held a hearing on Mr. Brunner's motion to dismiss for lack of personal jurisdiction.  This Court denied the motion and ordered jurisdictional discovery over Mr. Brunner related to "the degree to which Brunner controlled and

profited from [defendants] Magnify, Premero and Strand" and entered an order to this effect on
June 15, 2012. (ECF No. 97).

221.    Following this order, the Trustee reviewed responses to written discovery served
on Mr. Brunner and conducted a deposition of Mr. Brunner on November 7 and 8, 2012. By
stipulation of the parties so ordered by this Court, the parties extended the deadline for the close
of jurisdictional discovery to October 18, 2013 (ECF No. 109), and a further extension is
contemplated. The Trustee has also extended the deadline for the close of jurisdictional
discovery to December 20, 2013 in *Picard v. Estate (Succession) of Doris Igoin*, Adv. No. 10-
04336 (BRL) (Bankr. S.D.N.Y.), ECF No. 65, a pending avoidance action against defendants
who have ties to the late founder of several of the Magnify Defendants. Ongoing discovery in
each action may result in information relevant to both actions.

222.    The Trustee's counsel in Israel filed an application to halt the voluntary
liquidation of the defendant Yeshaya Horowitz Association ("YHA") and transfer the liquidation
to a court-supervised liquidation before the Jerusalem District Court. At a February 7, 2013
hearing before the Jerusalem District Court, YHA's liquidator represented to the court that the
liquidation had been terminated by resolution of YHA's board; the Jerusalem District Court
ordered YHA to serve the Trustee with a copy of the resolution terminating the voluntary
liquidation within 30 days and to provide at least 21 days' notice to the court and the Trustee
before commencing any future liquidation. YHA failed to serve the Trustee with a copy of the
resolution terminating the voluntary liquidation within the allotted time.

223.    On April 3, 2013, the Trustee's counsel in Israel filed a motion for contempt
based on YHA's failure to comply with the court's order; later that same day, YHA's liquidator
submitted to the Trustee a copy of a resolution dated March 7, 2013 terminating YHA's

voluntary liquidation.    After briefing on the Trustee's motion for contempt and both sides'
request for costs in connection with that motion, in April the Jerusalem District Court declined to
find YHA in contempt and no costs were awarded to either party.

224.    In addition to this activity, and pursuant to the parties' case management plan, the
Trustee has received and reviewed documents served in response to written discovery requests to
several of the defendants, prepared documents for production to the defendants as part of
ongoing discovery, and prepared subpoenas pursuant to Federal Rules of Civil Procedure 45 and
motions for the issuance of letters of request pursuant to the Hague convention to certain third-
parties who may possess relevant information.

### xiv.    *Picard v. Maxam Absolute Return Fund, L.P.*

225.    On December 8, 2010, the Trustee commenced an avoidance action against
Maxam Absolute Return Fund, L.P., Maxam Absolute Return Fund, Ltd., Maxam Capital
Management, LLC, Maxam Capital GP LLC, Sandra L. Manzke Revocable Trust, Sandra L.
Manzke, as trustee and individually, Suzanne Hammond, Walker Manzke, and April Bukofser
Manzke (collectively, the "Maxam Defendants") seeking the return of $97.8 million under SIPA,
the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for
fraudulent conveyances and damages in connection with certain transfers of property by BLMIS
to or for the benefit of the Maxam Defendants.    *Picard v. Maxam Absolute Return Fund, L.P.*,
Adv. No. 10-05342 (BRL) (Bankr. S.D.N.Y.).

226.    During the Report Period, discovery continued in the Maxam case while the
parties negotiated a settlement.    With respect to discovery, the Trustee's counsel prepared for
depositions, including the review and organization of documents pertaining to key witnesses to
be deposed.    The Trustee's counsel also worked to identify non-party witnesses.    In addition, the
Trustee's counsel had a dispute with the Maxam Defendants regarding documents claimed as

privileged.  The parties ultimately entered into a stipulation regarding the Maxam Defendants'
privileged documents and the use of many documents in the litigation.

227.    The Trustee's counsel also spent considerable time working to negotiate a
settlement.  The parties entered into a settlement agreement dated August 14, 2013.  The Trustee
then prepared a motion seeking the Court's approval for the settlement, which was filed on
August 26, 2013.  (ECF No. 111).  The Trustee's counsel then addressed a limited objection to
the motion.  (ECF Nos. 114–15).  On September 17, 2013, the Court entered an order approving
the settlement agreement.  (ECF No. 118).  The order was not appealed, and the settlement
closed on October 2, 2013.  The case has since been dismissed.

228.    Pursuant to the terms of the settlement agreement, as authorized and approved by
the Court on September 17, 2013, the Maxam Defendants agreed to return the entirety of the
$97.8 million sought by the Trustee in the adversary proceeding.  In exchange, the Trustee
allowed a customer claim for Maxam Absolute Return Fund, L.P. in the amount of
$276,687,000—comprised of a net equity claim of $215,287,000, plus an increase of $61.4
million under Section 502(h) of the Bankruptcy Code.  In addition, the Sandra L. Manzke
Revocable Trust waived 50% of its right to any distribution made as a result of the allowed
claim.  The parties also agreed on full releases and to stipulate to a dismissal of the adversary
proceeding.  The entirety of the settlement agreement is attached as Exhibit "A" to the Trustee's
August 26, 2013 motion.  (ECF No. 111).

**xv.    *Picard v. Mendelow***

229.    On November 23, 2010, the Trustee commenced an action against Steven B.
Mendelow ("Mendelow"), Nancy Mendelow, Cara Mendelow, Pamela (Mendelow) Christian,
C&P Associates, Ltd., and C&P Associates, Inc. (collectively, the "Mendelow Defendants")
seeking the return of just over $20 million under SIPA, the Bankruptcy Code, the New York

Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Mendelow Defendants. *Picard v. Steven B. Mendelow*, Adv. No. 10-04283 (BRL) (Bankr. S.D.N.Y.).

230.    The Mendelow Defendants moved to withdraw the reference, which was granted. Previously, Mendelow moved in the Bankruptcy Court to enforce the automatic stay against a third-party action filed against him in the New York State Supreme Court ("NYS Supreme Court"). B&H attorneys prepared and filed a response to Mendelow's motion. The hearing was adjourned several times. B&H attorneys have granted the Mendelow Defendants several extensions of time to respond to the complaint pending the outcome of the motion and have continued to monitor the developments in the third-party NYS Supreme Court action.

231.    During the Report Period, B&H attorneys reviewed documents in preparation for amending the complaint.

### xvi.    *Picard v. Merrill Lynch*

232.    On December 8, 2010, the Trustee commenced an action against Merrill Lynch International ("MLI") seeking the return of approximately $16 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent transfers in connection with certain transfers of property by BLMIS to or for the benefit of MLI. *Picard v. Merrill Lynch International*, Adv. No. 10-05346 (BRL) (Bankr. S.D.N.Y.).

233.    On November 22, 2011, the Trustee commenced an action against Merrill Lynch Bank (Suisse), S.A. ("MLBS") seeking the return of approximately $46 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent transfers in connection with certain transfers of property by BLMIS

to or for the benefit of MLBS.  *Picard v. Merrill Lynch Bank (Suisse), S.A.*, Adv. No. 11-02910 (BRL) (Bankr. S.D.N.Y.).

234.    On May 2, 2012, both MLI and MLBS moved for withdrawal of the reference. *Picard v. Merrill Lynch Int'l*, No. 12-cv-03486 (JSR) (S.D.N.Y.), ECF Nos. 1–2; *Picard v. Merrill Lynch Bank (Suisse) S.A.*, No. 12-cv-03487 (JSR) (S.D.N.Y.), ECF Nos. 1-2.  In May, June, and August 2012, the District Court directed both MLI and MLBS to participate in Common Briefing as to the following issues: the Bad Faith § 546(e) Issue, the Extraterritoriality Issue, § 550(a), the Stern Issue, and the Good Faith Standard Issue.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Madoff Sec., LLC)*, No. 12 MC 0115 (JSR) (S.D.N.Y. July 3, 2012), ECF No. 214.  The District Court's disposition of these Common Briefing issues is discussed *supra* in Section IX(A)(v)(b).

235.    Currently, response dates in the Trustee's adversary proceedings against MLI and MLBS have been extended while the parties await the District Court's rulings on the issues subject to Common Briefing which may affect the cases.

### xvii.   *Picard v. Michael Lieberbaum*

236.    On December 10, 2010, the Trustee commenced an avoidance action against husband and wife Michael and Cynthia Lieberbaum (collectively, the "Lieberbaums"), seeking the return of approximately $2.36 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent transfers, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Lieberbaums.  *Picard v. Michael Lieberbaum*, Adv. No. 10-05406 (BRL) (Bankr. S.D.N.Y.).

237.    The Trustee alleges that the Lieberbaums profited from the Ponzi scheme and from a personal relationship with Madoff through the annual receipt of side, off-the-books

payments of thousands of dollars of cash, which spanned approximately thirty years.  In addition to the cash, in or around 1989, Mr. Lieberbaum, who was a broker at Morgan Stanley, also orchestrated an arrangement with Madoff, whereby Madoff allegedly allowed Mr. Lieberbaum to use BLMIS's name and BLMIS's trading account to trade options for himself.  (ECF Nos. 1, 2).  Because the Lieberbaums received hundreds of thousands of dollars in cash from BLMIS and because Mr. Lieberbaum acted with Madoff to violate several FINRA, NASD, and other regulations, the complaint alleges that the Lieberbaums knew or should have known that BLMIS was involved in fraudulent activity.  *Id.*

238.    The Lieberbaums filed an answer to the Trustee's complaint, counterclaims, and a demand for a jury trial on April 18, 2011.  (ECF No. 5).  On August 25, 2011, this Court entered a case management plan.  (ECF No. 21).  On September 13, 2013, this Court entered the sixth amended case management plan.  (ECF No. 48).

239.    During the course of discovery, the Trustee has continued to work with various third parties to obtain documents relevant to the Trustee's case against the Lieberbaums and responsive to subpoenas served on those parties, obtained handwriting exemplars from former BLMIS employees, taken the depositions of several third-party witnesses, produced documents responsive to the Lieberbaums' document requests, reviewed documents produced by the Lieberbaums, and began the process of identifying experts needed to prove the Trustee's case.

240.    The Trustee and the Lieberbaums also have engaged in substantive settlement conversations, which are ongoing.  Discovery ends December 2, 2013, and all dispositive motions must be filed by October 3, 2014.

### xviii.   *Picard v. Natixis*

241.    On December 8, 2010, the Trustee commenced an action against Natixis, Natixis Corporate & Investment Bank (f/k/a Ixis Corporate & Investment Bank), Natixis Financial

Products, Inc., Bloom Asset Holdings Fund, and Tensyr Ltd. (collectively, the "Natixis Defendants") seeking the return of approximately $430 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent transfers in connection with certain transfers of property by BLMIS to or for the benefit of the Natixis Defendants (the "Natixis Action"). *Picard v. Natixis*, Adv. No. 10-05353 (BRL) (Bankr. S.D.N.Y.).

242. On December 20, 2011 and January 10, 2012, the Natixis Defendants moved for withdrawal of the reference. *Picard v. Natixis*, No. 11 Civ. 9501 (JSR) (S.D.N.Y.), ECF Nos. 1–3, 5–7. In May and June 2012, the District Court directed the Natixis Defendants to participate in Common Briefing as to the Bad Faith § 546(e) Issue, the Stern Isssue, the Good Faith Standard Issue, and deferring briefing on remaining issues in pending motions to withdraw the reference. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Madoff Sec., LLC)*, 12 MC 0115 (JSR) (S.D.N.Y.), ECF Nos. 109, 131, 166, 197. The District Court's disposition of these Common Briefing issues is discussed *supra* in Section IX(A)(v)(b)**.**

243. Currently, response dates in the Trustee's adversary proceeding against the Natixis Defendants have been extended while the parties await the District Court's rulings on the issues subject to Common Briefing which may affect the cases.

**xix.**    *Picard v. Peter B. Madoff*

244. On October 2, 2009, the Trustee commenced an adversary proceeding against Peter Madoff, Andrew Madoff, Shana Madoff, and the late Mark Madoff (the "Family Defendants") seeking the return of approximately $198 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent transfers, fraudulent conveyances and damages for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting in connection with certain transfers of property by

BLMIS to or for the benefit of the Family Defendants. *Picard v. Peter B. Madoff*, Adv. No. 09-01503 (BRL) (Bankr. S.D.N.Y.). On March 15, 2010, the Family Defendants filed a motion to dismiss the complaint. (ECF Nos. 13–19). The Trustee opposed the motion. (ECF No. 25).

245.    On September 22, 2011, this Court filed its Memorandum Decision And Order Denying In Part And Granting In Part Defendants' Motion To Dismiss Trustee's Complaint. (ECF No. 55); *Picard v. Peter B. Madoff (In re Bernard L. Madoff Inv. Sec., LLC)*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011). This Court upheld the Trustee's common law claims for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting. In so doing, the Court determined that the Trustee's common law claims (i) were not barred by the doctrine of *in pari delicto* or the related *Wagoner* Rule because the Family Defendants were alleged to be insiders and fiduciaries of BLMIS, and (ii) were not preempted by the Martin Act because those claims were unrelated to the fraudulent investment advice given by Madoff to customers of the IA Business. (ECF Nos. 123, 124). This Court also ruled that because the NYAG has no enforcement power under the Martin Act to bring the types of claims asserted in the Trustee's complaint, which do not require proof of scienter, the common law claims would not interfere with the Martin Act's statutory enforcement mechanism. (ECF No. 127).

246.    This Court dismissed certain of the Trustee's claims for a failure to identify the transfers with the requisite particularity, noting that "[r]ectifying the majority of these pleading deficiencies upon amendment should not prove to be a Herculean task." *Id.* 107. This Court granted leave to the Trustee to amend his complaint. *Id.*

247.    On October 6, 2011, Andrew Madoff and the Estate of Mark Madoff filed a Motion for Leave to Appeal the Bankruptcy Court's decision (ECF Nos. 56–57), which was assigned to United States District Judge William H. Pauley, III. *See Picard v. Estate of Mark D.*

*Madoff*, No. 11 MC 00379 (WJP) (S.D.N.Y.). On December 22, 2011, Judge Pauley issued a
decision denying the Motion for Leave to Appeal. (ECF No. 12).

248. On November 7, 2011, the Trustee filed an amended complaint that identified the
date and amount of each transfer alleged in the action. *Picard v. Peter B. Madoff*, Adv. No. 09-
01503 (BRL) (Bankr. S.D.N.Y.), ECF No. 64. The amended complaint also increased the
amount sought from the Family Defendants from over $198 million to over $226 million. This
increase was due, in part, to the ongoing nature of the Trustee's investigation, which uncovered
additional fraudulent transfers to the Family Defendants in various forms.

249. On December 23, 2011, the Trustee filed a Motion for Leave to File a Second
Amended Complaint. (ECF No. 71). In his proposed second amended complaint, the Trustee
sought to name as defendants Mark Madoff's widow, Stephanie Mack, Mark Madoff's ex-
spouse, Susan Elkin, and Andrew Madoff's wife, Deborah Madoff (collectively, the "Spouse
Defendants"). *Id.* The Trustee also sought to add additional fraudulent transfer claims against
the Family Defendants, as well as subsequent transferee claims against both the Family
Defendants and the Spouse Defendants. *Id.* Lastly, the Trustee sought to make certain
clarifications with regard to previously asserted fraudulent transfer claims. *Id.* The Spouse
Defendants and Andrew Madoff, individually and as Executor of the Estate of Mark Madoff,
opposed the motion. (ECF Nos. 89, 91, 94, 96).

250. This Court heard oral arguments on the Trustee's motion on April 3, 2012. On
April 4, 2012, this Court issued a Memorandum Decision and Order Denying in Part and
Granting in Part the Trustee's Motion for Leave to File a Second Amended Complaint. (ECF
No. 106). The Court granted the Trustee leave to name Stephanie Mack and Deborah Madoff as
defendants with respect to certain common law causes of action as to which the statute of

limitation had not yet run. *Id.* The Court denied leave to name the Spouse Defendants as defendants with respect to the bankruptcy causes of action and certain common law causes of action for which the statute of limitation had expired. *Id.* The Court granted the Trustee leave to pursue additional fraudulent transfer claims against the Family Defendants, as well as subsequent transferee claims against both the Family Defendants and the Spouse Defendants. Finally, the Court granted the Trustee leave to make the necessary clarifications with regard to previously asserted claims. *Id.*

251.     On April 2, 2012, putative defendants Stephanie Mack and Deborah Madoff moved to withdraw the reference in this case, notwithstanding that they were not yet named as defendants. (ECF Nos. 100, 104). In their moving papers (ECF Nos. 101, 105), Ms. Mack and Ms. Madoff noted that while they had not yet been named as defendants, they were nevertheless filing the motion to withdraw the reference by the Court-instituted April 2, 2012 deadline out of an abundance of caution. *Id.* They both argued, in part, that the cases against them ought to be precluded by the rule of *in pari delicto*, specifically, because they were not insiders of BLMIS, as to whom Courts have recognized a narrow exception to this rule. *Id.* While Ms. Mack's motion sought withdrawal of the reference only with respect to the claims against her (ECF No. 101), Ms. Madoff's motion sought to withdraw the reference with respect to the entire case (ECF No. 105). Ms. Madoff also filed a separate motion to withdraw the reference in the related action filed against her by the Trustee. *Picard v. Deborah Madoff*, Adv. No. 10-05332 (BRL) (Bankr. S.D.N.Y.), ECF Nos. 22, 23.

252.     The Trustee consented to allow Ms. Mack and Ms. Madoff to submit their briefs to the District Court as part of the consolidated briefing to determine issues related to the Trustee's standing in adversarial proceedings. Their brief was separately opposed by the Trustee

in a memorandum of law filed with the District Court on September 14, 2012.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Madoff Sec., LLC)*, 12 MC 0115 (JSR) (S.D.N.Y. Sept. 14, 2012), ECF No. 344.  Ms. Mack and Ms. Madoff filed a reply memorandum on October 5, 2012.  (ECF No. 378).  Oral argument on the consolidated briefing, including the arguments set forth by Ms. Mack and Ms. Madoff, was heard by Judge Rakoff on October 16, 2012.

253.    On June 29, 2012, Peter Madoff pleaded guilty to a two-count indictment and consented to the entry of a forfeiture order for $143.1 billion.  Specifically, Peter Madoff pleaded guilty to one count of conspiracy to (a) commit securities fraud, (b) falsify records of an investment adviser, (c) falsify records of a broker-dealer, (d) make false filings with the SEC, (e) commit mail fraud, (f) falsify statements in relation to documents required by ERISA, and (g) obstruct and impede the lawful governmental function of the IRS.  He also pleaded guilty to one count of falsifying records of an investment advisor.  *See United States v. O'Hara*, 10 Cr. 228 (LTS) (S.D.N.Y.), ECF No. 246 (the "Preliminary Forfeiture Order").  Under the Preliminary Forfeiture Order, Peter Madoff and his wife, Marion Madoff, forfeited substantially all of their assets to the United States Government.  In addition, the Preliminary Forfeiture Order covered certain significant property owned by Shana Madoff that was forfeited under the same plea agreement.

254.    On February 6, 2013, Peter Madoff consented to the entry of judgment against him in the amount of $90,390,500, the full amount of the Trustee's claims against him.  (ECF No. 145).  Under the consent judgment, the Trustee will forbear from seeking to enforce the judgment as long as Peter Madoff makes reasonable efforts to cooperate with the Trustee in the Trustee's efforts to recover funds for the BLMIS estate.  *Id.*

255.    As part of the consent judgment, the Trustee agreed to forbear from seeking recovery against Shana Madoff and to dismiss the Trustee's action against Marion Madoff. *Id.* On February 7, 2013, the Trustee voluntarily dismissed, with prejudice, the adversary proceeding against Marion Madoff. *Picard v. Marion Madoff*, Adv. No. 10-04310 (BRL) (Bankr. S.D.N.Y. Feb. 7, 2013), ECF No. 16. On March 19, 2013, the Court so-ordered a stipulation dismissing with prejudice the adversary proceeding against Shana Madoff. *Picard v. Peter Madoff*, Adv. No. 09-01503 (BRL), ECF No. 148.

### xx.    *Picard v. PJ Administrators*

256.    On December 10, 2010, the Trustee commenced an action against American Securities Management, L.P., PJ Associates Group, L.P., and numerous other individuals and entities (collectively, the "PJ Defendants") seeking the return of approximately $91 million, including approximately $10 million in fictitious profits under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the PJ Defendants. *Picard v. American Sec. Mgmt., L.P.*, Adv. No. 10-05415 (BRL) (Bankr. S.D.N.Y.).

257.    During the Report Period, B&H attorneys reviewed documents and prepared to interview additional individuals who may have information regarding the PJ Defendants' knowledge.

258.    In addition, B&H attorneys granted the PJ Defendants extensions of time to respond to the complaint.

### xxi.    *Picard v. Plaza*

259.    On November 23, 2010, the Trustee commenced an avoidance action against Plaza Investments International Limited and Notz, Stucki Management (Bermuda) Limited (collectively, the "Plaza Defendants") seeking the return of approximately $235 million under

SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Plaza Defendants (the "Plaza Action").  *Picard v. Plaza Invs. Int'l Ltd.*, Adv. No. 10-04284 (BRL) (Bankr. S.D.N.Y.).

260.    On July 21, 2011, the Plaza Defendants filed a motion to withdraw the reference on the limited issue of the Trustee's stated common law claims (the "Plaza Defendants' First Withdrawn Action").  (ECF No. 11).

261.    The parties resolved by agreement the issues raised in the Plaza Defendants' First Withdrawn Action.  On September 26, 2011, the parties filed a so-ordered stipulation dismissing the Trustee's common law claims and the Plaza Defendants' motion to withdraw.  (ECF No. 16).

262.    On December 15, 2011, the Plaza Defendants filed a motion to dismiss the Plaza Action.  (ECF No. 19).

263.    On January 31, 2012, the parties filed a stipulation adjourning the remaining briefing schedule for the Plaza Defendants' motion to dismiss, in light of the common legal issues that were being addressed in the motion to withdraw the reference proceedings.  (ECF No. 21).

264.    On April 2, 2012, the Plaza Defendants filed a second motion to withdraw the reference.  (ECF No. 24).

265.    On July 12, 2012, Judge Rakoff issued an order as to the Plaza Defendants' fully briefed motion to withdraw the reference, stating that the Plaza Defendants raised the same issues that the District Court previously arranged for consolidated briefing, and directed the Plaza Defendants to continue to proceed according to the procedures arranged for consolidated briefing.  *See* Order, *Picard v. Plaza Inv. Int'l Ltd.*, No. 12-cv-02646 (JSR) (S.D.N.Y. July 12,

2012), ECF No. 15. As of September 30, 2013, a number of those issues remained under consideration by the District Court.

      **xxii.**    *Picard v. Richard M. Glantz*

     266.    On December 9, 2010, the Trustee commenced an adversary proceeding against Richard Glantz and several related individuals and entities (collectively, the "Glantz Defendants"), seeking the return of more than $113 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent transfers, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Glantz Defendants.

     267.    The Trustee alleges that Richard Glantz and his deceased father, Edward Glantz, created and managed entities that pooled many millions of dollars of investor funds to be funneled into BLMIS. *See Picard v. Richard M. Glantz*, Adv. No. 10-05394 (BRL) (Bankr. S.D.N.Y.). The Trustee further alleges that, after Richard Glantz, Edward Glantz and entities they created and managed were sued by the SEC for violations of the federal securities laws and were permanently enjoined from future securities laws violations, Richard Glantz and Edward Glantz arrived at a new arrangement with Madoff, which resulted in Richard Glantz and Edward Glantz receiving fraudulent side payments. (ECF No. 1). In addition, Richard Glantz continued to funnel his own money, his family's money, and other people's money into BLMIS though new entities. *Id.*

     268.    To date, the Trustee has dismissed or settled with twenty Glantz Defendants. Nineteen Glantz Defendants remain in this adversary proceeding. (ECF Nos. 11, 13, 14, 20, 25, 31, 43, 44, 46, 49, 50, 51).

     269.    On February 1, 2012, the remaining Glantz Defendants moved in this Court to dismiss the complaint. The Trustee and counsel for the Glantz Defendants subsequently entered

into a scheduling stipulation, which was so ordered by the Court on April 2, 2012, providing new dates for the Trustee to amend the complaint and for the Glantz Defendants to supplement their motion to dismiss or file a new one.

270. Prior to entry of that scheduling stipulation, on March 31, 2012, the remaining Glantz Defendants filed a motion to withdraw the reference. (ECF No. 34). On April 11, 2012, the motion to withdraw the reference was referred to Judge Rakoff. *See Picard v. Glantz*, No. 12-cv-02778 (JSR) (S.D.N.Y.), ECF Nos. 1–3. On May 15, May 16, June 1 and June 25, 2012, the District Court entered orders withdrawing the reference, in part, for the limited purpose of hearing and determining certain Common Briefing issues. (ECF Nos. 7, 9, 10, 11). Certain of those issues remain subject to decisions to be rendered by the Court.

271. The Trustee and the remaining Glantz Defendants entered into a recent stipulation, which was so ordered by this Court on August 20, 2013, pursuant to which the Trustee has until December 12, 2013 to amend the complaint. *Picard v. Glantz*, Adv. No. 10-05394 (BRL), ECF No. 48. The Glantz Defendants may either supplement their motion to dismiss or file a new motion to dismiss by January 30, 2014.

272. The Trustee continues to consider resolving the complaint as to certain Glantz Defendants via dismissal or settlement.

### xxiii. *Picard v. Stanley Chais*

273. On May 1, 2009, the Trustee commenced an action against Stanley Chais and Pamela Chais, certain members of their family, and a number of related trusts and entities (collectively, the "Chais Defendants") seeking the return of more than $1.3 billion under SIPA §§ 78fff(b) and 78fff-2(c)(3), §§ 105(a), 542, 544, 547, 548(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws for turnover, accounting, preferences, fraudulent conveyances, and damages in connection with certain transfers of

-84-

property by BLMIS to or for the benefit of the Chais Defendants (the "Chais Action"). *Picard v. Chais*, Adv. No. 09-1172 (BRL) (Bankr. S.D.N.Y.).

274.   On April 2, 2012, certain of the Chais Defendants moved to withdraw the reference to the District Court on several grounds. *See Picard v. Chais*, No. 12-cv-02371 (S.D.N.Y) (JSR); *Picard v. Chais*, No. 12-cv-02658 (JSR) (S.D.N.Y.). Both motions have been granted, in part, respecting certain Common Briefing issues. The moving defendants, acting collectively with other defendants in such adversary proceedings at the direction of the District Court, have filed briefs in connection with certain of those discrete issues. Briefing has been completed respecting these Common Briefing issues.

275.   On July 18, 2012, by order of this Court, the parties in the Chais Action and the Hall Action (as defined *infra,* Section IX(C)(iii)) were ordered to participate in a joint mediation of both actions. *Picard v. Chais*, Adv. No. 09-1172 (Bankr. S.D.N.Y.), ECF No.128. The mediation took place on February 12, 13 and 14, 2013. The parties are still engaged in follow-up discussions in furtherance of the mediation.

276.   In addition to this activity, the Trustee drafted a proposed case management plan regarding discovery in the Chais Action and readied an amended complaint for filing with additional factual allegations regarding defendant Michael Chasalow. Per a stipulation with Mr. Chasalow, the Trustee has until October 31, 2013 to file the amended complaint in the Chais Action. (ECF No. 134).

### xxiv.   *Picard v. Stanley Shapiro*

277.   On December 9, 2010, the Trustee commenced an action against Stanley Shapiro, Renee Shapiro, David Shapiro, Rachel Shapiro, Leslie Shapiro Citron, Kenneth Citron, and numerous trusts (collectively, the "Shapiro Defendants") seeking the return of over $61.7 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other

applicable law for fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Shapiro Defendants. *Picard v. Stanley Shapiro*, Adv. No. 10-05383 (BRL) (Bankr. S.D.N.Y.).

278.  Prior to the Report Period, the Shapiro Defendants successfully moved to withdraw the bankruptcy reference to the District Court and joined in an omnibus motion to dismiss. No. 11-cv-05835 (JSR) (S.D.N.Y.). Prior to and during the Report Period, the District Court decided several issues that were raised in the omnibus motion to dismiss.

279.  During the Report Period, B&H attorneys consented to several extensions of time for the Shapiro Defendants to respond to the amended complaint filed in the avoidance action, and continued to develop the Trustee's case against the Shapiro Defendants.

### xxv.  *Picard v. Thybo*

280.  On July 15, 2009, the Trustee commenced an avoidance action against Thybo Asset Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited, and Thybo Stable Fund Ltd. seeking the return of approximately $62 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent conveyances (the "Thybo Action"). *Picard v. Thybo Asset Mgmt. Ltd.*, Adv. No. 09-01365 (BRL) (Bankr. S.D.N.Y.).

281.  On August 25, 2009, the Trustee filed an amended complaint against all the defendants to add a claim seeking disallowance of the SIPA customer claim filed by Thybo Stable Fund Limited.

282.  On February 10, 2011, the Trustee filed a second amended complaint against Thybo Asset Management Limited and Thybo Stable Fund Ltd. (collectively, the "Thybo Defendants") seeking the return of approximately $63.5 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and

fraudulent conveyances, and seeking disallowance and equitable subordination of any and all claims of the Thybo Defendants.  (ECF No. 20).

283.    On June 10, 2011, the Thybo Defendants filed a motion to dismiss the Thybo Action.  (ECF No. 24).

284.    On October 25, 2011, the Thybo Defendants filed a motion to withdraw the reference on the issues of the safe harbor provision of 11 U.S.C. § 546(e) and the standard for establishing "good faith" receipt of transfers.  (ECF No. 36).

285.    On November 15, 2011, the parties filed a stipulation adjourning the hearing on the Thybo Defendants' motion to dismiss and permitting the Trustee to file a supplemental memorandum addressing the safe harbor provision of 11 U.S.C. § 546(e) and reliance upon *Picard v. Katz.*  No. 11 Civ. 3605 (JSR), 2011 WL 4448638 (S.D.N.Y. Sept. 27, 2011) (ECF 40).

286.    On December 2, 2011, the Trustee filed a supplemental memorandum in opposition to the Thybo Defendants' motion to dismiss the Thybo Action.  (ECF No. 43).

287.    On December 20, 2011, the Thybo Defendants filed a supplemental memorandum in further support of the motion to dismiss the Thybo Action.  (ECF No. 45).

288.    On January 17, 2012, the parties filed a stipulation adjourning the hearing on the Thybo Defendants' motion to dismiss.  (ECF No. 47).

289.    On July 5, 2012, Judge Rakoff issued an order as to the Thybo Defendants' fully briefed motion to withdraw the reference, stating that the Thybo Defendants raised the same issues that the District Court previously arranged for consolidated briefing, and directing the Thybo Defendants to continue to proceed according to the procedures arranged for consolidated briefing.  *See* Order, *Picard v. Thybo Asset Mgmt. Ltd.*, No. 11-cv-027576 (JSR) (S.D.N.Y. July

5, 2012), ECF No. 17. As of September 30, 2013, a number of those issues remained under consideration by the District Court.

290. On September 6, 2013, the parties filed a stipulation further adjourning the hearing on the Thybo Defendants' motion to dismiss, in light of the Common Briefing issues being addressed in the motion to withdraw the reference proceedings. (ECF 59).

**xxvi.** *Picard v. Westport*

291. On December 10, 2010, the Trustee commenced an action against Robert L. Silverman ("Silverman"), his business, PSCC Services, Inc., and Westport National Bank, a division of Connecticut Community Bank, N.A., in an adversary proceeding titled *Picard v. Silverman*, Adv. No. 10-05418 (BRL) (Bankr. S.D.N.Y.) (the "Silverman Action").

292. On March 18, 2011, Silverman filed a chapter 11 petition for bankruptcy in the United States Bankruptcy Court for the District of Connecticut. *In re Silverman*, Adv. No. 11-50504 (Bankr. D. Conn.). As a result of the automatic stay entered in *In re Silverman*, the Trustee was stayed from pursuing his litigation against Silverman through the Silverman Action. The Trustee did, however, actively pursue his right to recover through Silverman's bankruptcy case, and on June 7, 2011, the Trustee filed a proof of claim in *In re Silverman* in the amount of $11,671,323.33.

293. The Trustee and Silverman subsequently reached an agreement and prepared a stipulation allowing the Trustee's claim in its full amount of $11,671,323.33. On May 21, 2013, the United States Bankruptcy Court for the District of Connecticut entered an order granting Silverman's motion to approve his stipulation with the Trustee. *In re Silverman*, ECF No. 209. Silverman has proposed a plan of reorganization providing for treatment of the Trustee's allowed claim based on his remaining assets. The hearing on the disclosure statement is scheduled for October 29, 2013.

294.    The Trustee also has been pursuing his claims against Westport National Bank. Currently, the Trustee and Westport National Bank have stipulated that the bank must move, answer or otherwise respond to the complaint by December 11, 2013.  The pre-trial conference in the matter is scheduled for December 18, 2013 in the Bankruptcy Court.

## C.    <u>Injunction Proceedings</u>

295.    The Trustee has commenced numerous injunction actions seeking to enjoin third-party lawsuits brought against defendants who also have been named as defendants in the Trustee's avoidance actions.  During the Report Period, there were significant developments in the Bankruptcy Court, the District Court, and the Second Circuit with respect to the Trustee's injunction proceedings, including with respect to the Picower Defendants, the Family Defendants, the Chais Defendants, the Maxam Defendants, the Merkin Defendants, Access Management Luxembourg S.A. and related entities (the "Luxembourg Defendants"), Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (the "Kingate Funds"), and a class of investors in feeder funds operated by the Fairfield Greenwich Group (the "Fairfield Class Plaintiffs"). Through these proceedings, the Trustee has sought to enforce the automatic stay established by § 362 of the Bankruptcy Code and related District Court stays, and to enjoin third-party actions under § 105 of the Bankruptcy Code in order to facilitate the orderly administration of the BLMIS liquidation, and to preserve assets from which the Trustee may recover for the benefit of all BLMIS customers.  As a result of these efforts, very significant rulings favoring the estate have been obtained.

 

**i.** ***Picard v. Fox*, Adv. No. 10-03114 (BRL), Case Nos. 10-04652, 10-cv-07101, and 10-cv-07219 (JGK); *Picard v. Picower*, Adv. No. 09-01197 (BRL), Case Nos. 11-cv-01328, 11-cv-01298 (JGK); *In re Bernard L. Madoff Inv. Sec., LLC*, 12-1645 and consolidated cases (2d Cir.)**

296.    On March 31, 2010, the Trustee commenced an adversary proceeding in this Court, *Picard v. Fox*, Adv. No. 10-03114 (BRL) (Bankr. S.D.N.Y.), seeking to enjoin third-party actions that were commenced against the Picower Defendants by Adele Fox, Susanne Marshall, and classes they purport to represent (the "Fox Plaintiffs").

297.    Following significant briefing and argument, this Court held that the automatic stay and the December 15, 2008 stay order of the District Court apply, and hence, the third-party actions are void *ab initio*. *Picard v. Fox*, 429 B.R. 423 (Bankr. S.D.N.Y. 2010). Additionally, this Court preliminarily enjoined the actions pending the Trustee's settlement with the Picower Defendants or completion of the Trustee's Picower litigation. *Id.* The Fox Plaintiffs appealed the decision to the District Court. (ECF No. 51, 52).

298.    In connection with the Trustee's avoidance action in *Picard v. Picower,* Adv. No. 09-01197 (BRL) (Bankr. S.D.N.Y.), the Trustee subsequently reached a settlement with the Picower Defendants. The Trustee then moved for approval of his settlement with the Picower Defendants and for the issuance of a permanent injunction in connection therewith. (ECF No. 25). On January 13, 2011, this Court issued an order approving the settlement and granting the requested injunction. (ECF No. 43). The Fox Plaintiffs appealed this decision as well. (ECF Nos. 44, 45, 49).

299.    The appeals were consolidated, and the propriety of this Court's rulings as to the injunctions and the settlement was argued by the Trustee and the Fox Plaintiffs on December 19, 2011. On March 26, 2012, United States District Judge John G. Koeltl issued a written opinion affirming this Court's opinion in *Fox* and the order approving the settlement between the Trustee

-90-

and the Picower Defendants, as well as the related injunction. *See Picard v. Fox*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012). Judge Koeltl held that the Trustee's settlement with the Picower Defendants was "extraordinarily beneficial" to the BLMIS estate, and the third-party actions were "substantively duplicative" of the Trustee's Picower litigation. *Id.* at 473, 481. Judge Koeltl also held that the third-party actions commenced by the Fox Plaintiffs were properly enjoined because they "plainly [. . .] jeopardize[d] the estate's ability to recover fraudulently transferred assets from the Picower Defendants . . . ." *Id.* at 486.

300. The Fox Plaintiffs filed notices of appeal of Judge Koeltl's order to the Second Circuit on April 24, 2012. The appeal is pending as Case No. 12-1645, together with consolidated cases. A hearing took place on November 19, 2012, and the parties are awaiting a decision.

## ii. *Picard v. Stahl*, Adv. No. 10-03268 (BRL), Case Nos. 11-cv-02246, 11-cv-02135, 11-cv-02392 (AKH), Case Nos. 11-5421 and 11-5428 (2d Cir.)

301. On May 27, 2010, the Trustee commenced an adversary proceeding in this Court, *Picard v. Stahl*, Adv. No. 10-03268 (BRL) (Bankr. S.D.N.Y.), seeking to enjoin third-party actions commenced against Andrew Madoff, Mark Madoff, Peter Madoff, Ruth Madoff and Shana Madoff (collectively, the "Madoff Defendants") by Richard Stahl, Reed Abend, and a number of other unrelated plaintiffs (collectively, the "Stahl Plaintiffs"). The Trustee has brought an avoidance action against the Madoff Defendants in this Court. *See Picard v. Peter B. Madoff*, Adv. No. 10-01503 (BRL) (Bankr. S.D.N.Y.); *see* discussion *supra* Section IX(B)(xix).

302. This Court found that the automatic stay and the December 15, 2008 stay order of the District Court applied, and held that the third-party actions are void *ab initio* as against the Madoff Defendants. *Picard v. Stahl*, 443 B.R. 295 (Bankr. S.D.N.Y. 2011). As an alternative part of the ruling, this Court also preliminarily enjoined the actions pending the completion of

the Trustee's litigation against the Madoff Defendants.  *Id.*  Several of the Stahl Plaintiffs appealed this decision.  *Picard v. Stahl*, Adv. No. 10-03268, ECF Nos. 51–53.

303.    Following briefing and argument, on November 17, 2011, United States District Judge Alvin K. Hellerstein issued a bench ruling and summary order affirming this Court's opinion.  *In re Bernard L. Madoff Inv. Sec., LLC*, No. 11-cv-2392 (AKH), 2011 WL 7975167 (S.D.N.Y. Dec. 15, 2011).  Judge Hellerstein found that the third-party actions created "a waste of personal assets that the trustee seeks to recover" and that "the profusion of [the third-party] lawsuits makes it extremely difficult for the trustee to run his lawsuit expeditiously and economically in the interests of the creditors of the estate."  *Id.* at *15.  Judge Hellerstein recognized that "it's the rationale behind § 362 and § 105 to favor the trustee . . . ," and held that a preliminary injunction was proper "to allow the trustee the ability to pursue his actions and obtain rulings and finality on those rulings because the trustee is acting for the benefit of all creditors and not just a few."  *Id.* at *13.

304.    The Stahl Plaintiffs filed joint appeals of Judge Hellerstein's ruling with the Second Circuit, which were pending as *Picard v. Lautenberg*, Nos. 11-5421 and 11-5428 (2d Cir.).  On February 20, 2013, the Second Circuit issued a decision in favor of the Trustee, affirming the issuance of the preliminary injunction.  *See Picard v. Lautenberg*, No. 11-5421, 2013 WL 616269 (2d Cir. Feb. 20, 2013).  The Second Circuit found that § 105(a) applied in a SIPA liquidation, and that the injunction issued by the Bankruptcy Court "serves the legitimate purpose of 'preserving the debtor's estate for the creditors and funneling claims to one proceeding in the bankruptcy court . . . .'"  *Id.* at *1–2 (citation omitted).  The Second Circuit further found that "[w]ere it not for the Preliminary Injunction, there would ensue a chaotic rush to the courthouse—or rather, multiple courthouses—of those seeking assets that the trustee

claims are properly part of the BLMIS estate . . .", which would "run counter to SIPA's objective of furthering 'the prompt and orderly liquidation of SIPC members.'"  *Id.* at *2 (citation omitted).  The Second Circuit likewise found that the Stahl Plaintiffs' actions would have an "'immediate adverse economic consequence for the debtor's estate' if allowed to proceed . . . in as much as, if successful, they would draw down assets almost all of which could otherwise be expected to return to the BLMIS estate as a consequence of the Trustee's fraudulent transfer action." *Id.*

305.    The Second Circuit also denied a subsequent motion to reinstate the appeal filed by certain of the Stahl Plaintiffs.  The period for the Stahl Plaintiffs to file a petition for certiorari has expired.

### iii.    *Picard v. Hall*, Adv. No. 12-01001 (BRL)

306.    On January 4, 2012, the Trustee commenced an adversary proceeding in this Court captioned *Picard v. Hall*, Adv. No. 12-01001 (BRL) (Bankr. S.D.N.Y.) (the "Hall Action") seeking to enjoin several third-party actions against the Chais Defendants commenced by Douglas Hall, Steven Heimoff, and certain other plaintiffs, including the Office of the California Attorney General (collectively, the "Hall Plaintiffs").  The Trustee has brought an avoidance action against the Chais Defendants in this Court.  *Picard v. Chais*, Adv. No. 10-01172 (BRL) (Bankr. S.D.N.Y.).

307.    The actions brought by the Hall Plaintiffs, among other things, threaten assets of the estate and the administration of the estate; therefore, the Trustee sought to enjoin the actions while his case against the Chais Defendants proceeds.

308.    This Court ordered mediation of the *Hall* proceeding, together with the Trustee's underlying avoidance action against the Chais Defendants and the Hall Plaintiffs' actions.  The mediation remains ongoing.

**iv.    *Picard v. Maxam Absolute Return Fund* , Adv. No. 10-05342 (BRL)**

309.    In his avoidance action against the Maxam Defendants, *Picard v. Maxam Absolute Return Fund*, Adv. No. 10-05342 (BRL) (Bankr. S.D.N.Y.), the Trustee moved to enjoin an action commenced by the Maxam Defendants against the Trustee in the Cayman Islands (the "Cayman Action") in violation of the automatic stay and the *Barton* doctrine. Through that action, the Maxam Defendants sought relief in a foreign court, claiming they were not liable on the claims brought by the Trustee in the United States.

310.    Following briefing and argument, on October 12, 2011, this Court issued a bench memorandum decision and order agreeing with the Trustee and granting his application on the grounds that the Cayman Action violated the automatic stay, the District Court Stay Orders, SIPA, and the *Barton* doctrine.  *See Picard v. Maxam Absolute Return Fund L.P.*, 460 B.R. 106 (Bankr. S.D.N.Y. 2011).  In the decision, this Court recognized that the bankruptcy automatic stay has worldwide reach. *See id.* at 115.

311.    On appeal, the District Court affirmed this Court in full.  *See In re Bernard L. Madoff Inv. Sec., LLC*, 474 B.R. 76 (S.D.N.Y. 2012).  The District Court held that the automatic stay had extraterritorial reach, the Cayman Action violated the stay, this Court properly exercised its injunctive authority, and the interests of comity did not bar the injunction. *Id.* at 82–85.

312.    The Maxam Defendants appealed the District Court's decision to the Second Circuit. *Maxam v. Picard*, No. 12-2194-bk (2d Cir. Dec. 11, 2012).  The case was settled by the parties, and thus, the appeal has been voluntarily dismissed without prejudice to reinstatement.

**v.    *Picard v. Schneiderman*, Adv. No. 12-01778 (BRL)**

313.    On August 1, 2012, the Trustee commenced an adversary proceeding in this Court captioned *Picard v. Schneiderman*, Adv. No. 12-01778 (BRL) (Bankr. S.D.N.Y.), seeking to enjoin a settlement (the "Settlement") by the NYAG and others (the "Settling Plaintiffs") with

the Merkin Defendants purporting to resolve third-party actions by the Settling Plaintiffs with the Merkin Defendants. The Trustee sued the Merkin Defendants to recover fraudulent transfers in a separate proceeding. *Picard v. Merkin*, Adv. No. 09-01182 (BRL) (Bankr. S.D.N.Y.).

314. Upon requests by the Settling Plaintiffs and Merkin Defendants, and after oral argument, the District Court withdrew the reference of the Trustee's injunction action.

315. Following the withdrawal, the Trustee continued with briefing in connection with his application for a preliminary injunction of the NYAG's and the state court receivers' settlement with the Merkin Defendants. On January 25, 2013, the NYAG, Bart M. Schwartz, as liquidator of Ariel Fund Limited and Gabriel Capital, L.P., David Pitofsky, as receiver of Ascot Partners, L.P., J. Ezra Merkin and Gabriel Capital Corporation (the "Injunction Defendants") filed their opposition briefs, and in February, B&H attorneys prepared for and drafted a comprehensive reply brief, which was filed on February 21, 2013. They also worked on sealing issues in light of the confidential nature of several documents critical to the reply, and addressed these issues with opposing counsel and the District Court. The Injunction Defendants filed their sur-replies on March 5, 2013.

316. On April 15, 2013, following a hearing, the District Court issued a decision denying the Trustee's injunction request and dismissing the action. (ECF No. 53). The District Court held that the Injunction Defendants' claims did not violate the automatic stay, a section 105(a) preliminary injunction was not warranted, and the Trustee's action was barred by the doctrine of laches.

317. The Trustee appealed the District Court's decision to the Second Circuit. *Picard v. Schneiderman*, 13-1785 (2d Cir. filed May , 2013). An oral argument took place on October 10, 2013 before the Honorable Judges Chin, Sack and Droney. The appeal was heard in tandem

with the appeal of the District Court's decision denying the Trustee's request for injunctive relief respecting defendants related to the Fairfield Greenwich Group, described further below.

###### vi. *Goldman Lift-Stay Motions*, Adv. No. 08-01789 (BRL)

318.    In December 2011, A.G. Goldman and Pamela Goldman (the "Goldman Plaintiffs") moved before this Court to lift the automatic stay so that they could file putative securities class actions against the Picower estate and related entities. (ECF No. 4581). Some of the counsel for the named plaintiffs are also representing the Fox Plaintiffs. The Trustee opposed the lift-stay motions on the grounds articulated, among others, by Judge Koeltl in his decision and order affirming the Picower settlement and enforcing the automatic stay and injunction with respect to the Fox Plaintiffs. (ECF No. 4797).

319.    On June 20, 2012, this Court issued an order denying the Goldman Plaintiffs' motion. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff)*, 477 B.R. 351, 352–53 (Bankr. S.D.N.Y. 2012). The Court reasoned that the Goldman Plaintiffs were using "inventive pleading" to circumvent the automatic stay because their pleadings were identical to the Fox Plaintiffs' enjoined actions. *Id*. at 354–55. The Court further held that the Goldman Plaintiffs failed to assert any particularized injury suffered by them, and that the plaintiffs were seeking to re-litigate the net equity decision. *Id*. at 357

320.    The Goldman Plaintiffs appealed to the District Court. *See A & G Goldman P'ship v. Picard*, No. 12-cv-06109 (RJS) (S.D.N.Y. Aug. 10, 2012). On September 30, 2013, after oral argument, the District Court issued a decision affirming the Bankruptcy Court's decision and dismissing the appeal. *A & G Goldman P'ship v. Picard*, No. 12 Civ. 6109 (RJS), 2013 WL 5511027 *11 (S.D.N.Y. Sept. 30, 2013). The District Court examined the substance of the Goldman Plaintiffs' claims and found that they were "simply deceptively labeled fraudulent conveyance claims" that were derivative of the Trustee's fraudulent transfer claims. *Id.* at *10.

The Court found that the claims hence "c[a]me within the plain scope of the Picower Injunction" and that the Bankruptcy Court had jurisdiction to enjoin them. *Id.* at *10.

### vii. *Picard v. Access Mgmt. Luxembourg S.A.*, Adv. No. 12-01563 (BRL)

321.    On April 19, 2012, the Trustee commenced an adversary proceeding in this Court captioned *Picard v. Access Mgmt. Luxembourg S.A.*, Adv. No. 12-01563 (BRL) (Bankr. S.D.N.Y.), seeking to enjoin the Luxembourg Defendants -- third-party plaintiffs who are also defendants in an adversary proceeding commenced by the Trustee -- from proceeding with a third-party writ in a civil action in Luxembourg impleading the Trustee as representative of the consolidated estates of BLMIS and Madoff, and seeking an indemnity from the BLMIS estate. The Trustee previously brought an avoidance action against the Luxembourg Defendants in this Court, which remains pending. *Picard v. UBS AG*, Adv. No. 10-04285 (BRL) (Bankr. S.D.N.Y.).

322.    The Luxembourg Defendants moved to dismiss the application, in part based on personal jurisdiction grounds, and moved before the District Court to withdraw the reference. *See Picard v. Access Mgmt. Luxembourg S.A.*, 12-CV-05597 (JSR) (S.D.N.Y.), ECF No. 1. The District Court granted the motion to withdraw the reference in part and denied the motion in part. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, No. 12 MC 0115 (JSR) (S.D.N.Y.), ECF No. 373. Briefing before the District Court is on hold pending resolution of the personal jurisdiction issues before this Court, concerning which the parties are currently undertaking meet and confer conferences. The hearing on the Trustee's application and Luxembourg Defendants' motions to dismiss has been scheduled for December 12, 2013.

      **viii.**   *Picard v. Kingate Global Fund, Ltd.*, **Adv. No. 12-01920 (Bankr. S.D.N.Y.)**

323.    On October 22, 2012, the Trustee moved to enjoin an action in Bermuda (the "Bermuda Action") filed by the Kingate Funds against certain management defendants (the "Management Defendants") that the Trustee also named as defendants in the Trustee's action against the Kingate Funds.  (ECF No. 1).

324.    Negotiations between the parties are ongoing.  This Court entered a so-ordered stipulation extending the response deadline to November 1, 2013, extending the Trustee's and SIPC's reply deadline to December 2, 2013, and adjourning the hearing to January 29, 2014 at 10:00 a.m.  (ECF No. 12).

      **ix.**    *Picard v. Fairfield Greenwich Ltd.*, **Adv. No. 12-2047 (Bankr. S.D.N.Y.), No. 12-9408 (S.D.N.Y.)**

325.    On November 29, 2012, the Trustee moved to enjoin a proposed class-action settlement in the District Court between the Fairfield Class Plaintiffs and managing entities and principals of feeder funds operated by the Fairfield Greenwich Group.  If effectuated, the settlement would recover the same funds sought by the Trustee as subsequent transfers in his underlying avoidance action, and would greatly decrease the value of the claims against the managing entities and principals assigned to the Trustee by the feeder funds in connection with the Trustee's settlement with the funds.

326.    The Honorable Victor Marrero, who is overseeing the class action and settlement, granted defendants' motion to withdraw the reference, and the parties completed briefing of the injunction application.  *Picard v. Fairfield Greenwich Ltd.*, Adv. No. 12-09408, ECF Nos. 30, 37–39, 49.  Thereafter, on March 20, 2013, without oral argument, Judge Marrero issued a decision denying the Trustee's injunction application.  *Picard v. Fairfield Greenwich, Ltd.*, No. 12 CIV 9408, 2013 WL 1149933 (S.D.N.Y. Mar. 20, 2013).  The Trustee has advised the parties

and the District Court of his intention to appeal the decision and is seeking to obtain a consensual stay while that appeal takes place.

327.    In addition, Judge Marrero denied a separate motion by the Trustee to intervene in the underlying class action suit that was proceeding before the District Court.  The Trustee is incorporating this denial into his pursuit of the appeal.

328.    The Trustee appealed the District Court's decisions to the Second Circuit.  An oral argument took place on October 10, 2013 before the Honorable Judges Chin, Sack and Droney.  *Picard v. Sec. & Inv. Co. Bahrain*, 13-1289 (2d Cir.).  The appeal was heard in tandem with the appeal of the District Court's decision denying the Trustee's request for injunctive relief respecting Ezra Merkin and related defendants, described further above.

## X.    INTERNATIONAL INVESTIGATION AND LITIGATION

329.    The Trustee's international investigation and recovery of BLMIS estate assets involves, among other things: (i) identifying the location and movement of estate assets abroad, (ii) becoming involved in litigation brought by third parties in foreign courts, by appearance or otherwise, to prevent the dissipation of funds properly belonging to the estate, (iii) bringing actions before United States and foreign courts and government agencies to recover customer property for the benefit of the customers and creditors of the BLMIS estate, and (iv) retaining international counsel to assist the Trustee in these efforts, when necessary.  More than seventy of the actions filed in this Court involve international defendants, and the Trustee also has actions pending in the United Kingdom, Bermuda, the British Virgin Islands (BVI), Gibraltar, and the Cayman Islands, among other countries.

330.    The following summarizes key litigation involving foreign defendants in the Bankruptcy Court and in foreign courts.

## A.    <u>Austria and Italy</u>

331.    The Trustee has actively investigated certain banks, institutions, and individuals located in these jurisdictions. The Kohn and HSBC Actions, both discussed *supra*, name several Austrian and Italian defendants, including Sonja Kohn, Bank Austria, and UniCredit S.p.A.

## B.    <u>Bermuda</u>

332.    The Trustee is actively investigating various BLMIS-related entities, their officers and directors, and transfers of funds to and through Bermuda. In addition, in December 2010, the Trustee filed protective actions in Bermuda against several HSBC-related entities in order to preserve the Trustee's ability to bring causes of action in that jurisdiction, as well as an action in the Bankruptcy Court against Bermuda-based Whitechapel Management Limited. *Picard v. Whitechapel Mgmt. Ltd.*, Adv. No. 10-05402 (BRL) (Bankr. S.D.N.Y.). The Trustee is also continuing to actively monitor legal proceedings taking place in Bermuda that involve several BLMIS-related entities, including, in particular, the winding-up of Kingate Management Limited, a defendant in *Picard v. Kingate*, Adv. No. 09-01161 (BRL) (Bankr. S.D.N.Y.).

## C.    <u>BVI and the Cayman Islands</u>

333.    The Trustee has discovered and is actively investigating the involvement of no fewer than twenty BVI-based feeder funds that funneled money into the Ponzi scheme. In particular, the Trustee has investigated and filed complaints in the Bankruptcy Court against BVI-based Kingate Global Fund Ltd., Kingate Euro Fund Ltd., the Bank of Bermuda, Thybo Asset Management Ltd., Thybo Global Fund Ltd., Thybo Return Fund Ltd., Thybo Stable Fund Ltd., Hermes International Fund Limited, Lagoon Investment Limited, Thema Fund Ltd, Thema Wise Investments Ltd., Lagoon Investment Trust, Defender Limited, Equity Trading Portfolio, and Granadilla Holdings Limited. *See, e.g.*, *Picard v. Kingate*, Adv. No. 09-01161 (BRL) (Bankr. S.D.N.Y.); *Picard v. Thybo*, Adv. No. 09-01365 (BRL) (Bankr. S.D.N.Y.); *Picard v.*

*Defender Ltd.*, Adv. No. 10-05229 (BRL) (Bankr. S.D.N.Y.). In addition, the Trustee has filed numerous claims against several feeder funds in BVI that preserve the Trustee's right to pursue claims in that jurisdiction.

334. The Trustee has investigated and filed complaints in the Bankruptcy Court against Cayman Islands-based Harley International (Cayman) Ltd. ("Harley"), *Picard v. Harley*, Adv. No. 09-01187 (BRL) (Bankr. S.D.N.Y.) (the "Harley Adversary Proceeding"), Herald Fund SPC, and the Primeo Fund, the latter two of which are defendants in the HSBC Action. The Trustee has also filed a complaint in the Cayman Islands against Harley and the Primeo Fund. The Trustee's substantive claims against Harley in the Cayman courts were dismissed by mutual consent last year. Nevertheless, the Trustee retains the right to enforce the default judgment entered against Harley in the Harley Adversary Proceeding in certain instances.

335. A hearing was held in October 2012 for the determination of preliminary issues in the Cayman action against the Primeo Fund. The hearing sought to determine, *inter alia*, whether the Trustee could, as a matter of Cayman law, bring avoidance actions in the Cayman Islands under both Cayman and United States law. The court held that the Trustee could bring those actions under Cayman law, but not United States law. That ruling was subsequently appealed by both parties, whereby the Trustee argues that he should be able to bring avoidance claims based in United States bankruptcy law in addition to claims under Cayman law. The hearing of the appeal is scheduled for November 7 and 8, 2013.

**D.    England**

336. The Trustee, who was granted recognition as a foreign representative for the purpose of gathering evidence, has continued to investigate Madoff Securities International Limited ("MSIL") and work with MSIL's joint liquidators ("MSIL Liquidators").

337.     In December 2010, the Trustee filed suit in England, together with MSIL (in

liquidation) against MSIL's former directors and Sonja Kohn (the "MSIL Action").  While the

Trustee is no longer a party to the MSIL Action for jurisdictional reasons, the Trustee assisted

the MSIL Liquidators in their procurement of freezing orders and document disclosure from

Sonja Kohn, and BLMIS received access to the results of this disclosure order in March 2012.  In

spring 2013, the MSIL Liquidators successfully filed an application to cross-examine Sonja

Kohn in relation to her non-disclosure with the freezing order.  The cross-examination occurred

on March 18, 2013 and yielded valuable information for use in the MSIL Action and the New

York RICO litigation, pending further approval from the Commercial Court in England.

338.     A trial in the MSIL Action took place from June 12 through July 18, 2013.  On

October 18, 2013, the English court ruled against the MSIL Liquidators.

339.     In addition, the Trustee filed protective claims in England against Kingate-related

individuals and entities and against HSBC and related entities.

**E.     Gibraltar**

340.     After extensive investigation, the Trustee brought both domestic and Gibraltar-

based actions against Vizcaya Partners Ltd. ("Vizcaya"), Banque Jacob Safra (Gibraltar) Ltd.

("Bank Safra"), Asphalia Fund Ltd. ("Asphalia"), Zeus Partners Ltd. ("Zeus"), and Siam Capital

Management ("Siam").  *Picard v. Vizcaya*, Adv. No. 09-01154 (BRL) (Bankr. S.D.N.Y.).

341.     Vizcaya, Siam, Asphalia, and Zeus failed to appear or answer the Trustee's

amended complaint in this Court.  Accordingly, this Court granted the Trustee's motion for

default judgment on August 3, 2010.  (ECF No. 49).  Thereafter, Zeus and the Trustee entered

into a stipulation pursuant to which the Trustee agreed to vacate the default judgment against

Zeus; Zeus agreed not to oppose the Trustee's application to the Supreme Court of Gibraltar for

the transfer of over $60 million that had been held in Zeus's account at Bank Safra and was

placed in the custody of the Supreme Court of Gibraltar. This Court approved the stipulation on November 23, 2010. (ECF No. 56). The Trustee and Siam reached a settlement, and Siam was dismissed from the domestic and Gibraltar actions.

342.    The Trustee filed an application in the Supreme Court of Gibraltar for the repatriation of those funds to the United States, which was granted. Those funds were deposited in the Court's registry on August 8, 2011.

343.    The parties to the domestic action are presently engaged in discovery.

344.    The Trustee has also served a protective action in Gibraltar to preserve his right to sue Vizcaya, Bank Safra, Asphalia, Zeus, Siam, Banque J. Safra (Suisse) SA, and Pictet et Cie for $180 million in transfers received from BLMIS. Presently, the Trustee is preparing the Particulars of Claim that will be served in that action. A case management conference was recently rescheduled by the Court for January 2014.

345.    Following the UK Supreme Court's judgment in *Rubin v. Eurofinance,* defendants Vizcaya and Asphalia moved to dismiss the Trustee's actions in Gibraltar that seek to enforce the default judgment entered against them in the United States, and to release assets that have been frozen by the Gibraltar action. The Gibraltar court held a hearing in March 2013, which was continued in May 2013. Following the hearing, the Court issued an order denying Vizcaya's motion and denying Asphalia's motion in part, finding that the Trustee's action involved issues of fact that required a trial. Vizcaya and Asphalia filed an appeal of this order. Both parties prepared and filed their skeleton arguments, and the hearing on the appeal took place on October 7-8, 2013. A case management conference is also scheduled for October 31, 2013.

346.    In addition, in September 2012, the Trustee filed an action in the Gibraltar courts opposing and seeking to join to the Trustee's existing proceedings in Gibraltar a petition filed by

Mr. Robert Faissal against Vizcaya (the "Faissal Action"). The Faissal Action seeks to adjourn the enforcement of a default judgment entered in the BVI against Vizcaya. A hearing is scheduled for December 9, 2013 for Faissal's application to enforce his judgment and the Trustee's application to stay such enforcement.

**F.**     **Ireland**

347.    The Trustee investigated Ireland-based Thema International Fund plc and included the feeder fund as a defendant in the HSBC Action. The Trustee has continued to investigate this fund, related litigation and related entities.

**G.**     **Switzerland and Luxembourg**

348.    In 2010, the Trustee filed two lawsuits in this Court against Switzerland-based UBS AG and other UBS-related entities and various feeder funds, management companies, and individuals, discussed above. In addition, the Trustee has moved to enjoin a third-party proceeding in Luxembourg relating to a dispute involving Luxalpha, its investors, and its service providers, which names the Trustee as a third-party defendant.

## XI.    FEE APPLICATIONS AND RELATED APPEALS

**A.**     **Objections to Prior Fee Applications**

349.    Objections were filed to six of the twelve fee applications submitted by the Trustee and B&H. Discussions of the objections to the first through sixth fee applications, and related motions for leave to appeal the Court's orders granting the Trustee's and B&H's fee applications and overruling those objections, are discussed more fully in the Trustee's Amended Third Interim Report ¶¶ 186–90, ECF No. 2207, the Trustee's Fourth Interim Report ¶¶ 163–66, ECF No. 3038, the Trustee's Fifth Interim Report ¶¶ 134–43, ECF No. 4072, and the Trustee's Sixth Interim Report ¶¶ 131–42, ECF No. 4529. No decisions have been entered on motions for

leave to appeal the Second Interim Fee Order, No. M47-b (DAB) (S.D.N.Y.), or the Sixth Interim Fee Order, No. 11 MC 00265 (S.D.N.Y.).

**B.**     <u>Eleventh Fee Application</u>

350.   On April 29, 2013, the Trustee and his counsel filed the Eleventh Application for Interim Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred from July 1, 2012 through and including November 30, 2012 with the Bankruptcy Court. (ECF No. 5333). Counsel and international special counsel also filed applications for Interim Professional Compensation. (ECF Nos. 533–5348).

351.   At the hearing on May 29, 2013, the Trustee, his counsel, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Eleventh Interim Fee Application was reasonable. This Court subsequently entered the Eleventh Interim Fee Order approving the Eleventh Interim Fee Applications. (ECF No. 5383). No motion for leave to appeal the Eleventh Interim Fee Order was filed.

**C.**     <u>Twelfth Fee Application</u>

352.   On September 23, 2013, the Trustee and his counsel filed the Twelfth Application for Interim Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred from December 1, 2012 through and including April 30, 2013 with the Bankruptcy Court. (ECF No. 5490). Counsel and international special counsel also filed applications for Interim Professional Compensation. (ECF Nos. 5491–5509).

353.   At the hearing on October 16, 2013, the Trustee, his counsel, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Twelfth Interim Fee Application was reasonable. This Court subsequently entered the Twelfth Interim Fee Order approving the Twelfth Interim Fee

Applications. (ECF No. 5547). No motion for leave to appeal the Twelfth Interim Fee Order

was filed.

## XII. CONCLUSION

354. The foregoing report represents a summary of the status of this proceeding and

the material events that have occurred through September 30, 2013, unless otherwise indicated.

This Report will be supplemented and updated with further interim reports.


Dated:  New York, New York                              Respectfully submitted,
              October 30, 2013

**Baker & Hostetler LLP**                               /s/ Irving H. Picard
45 Rockefeller Plaza                                    _____
New York, New York 10111                                Irving H. Picard
Telephone: (212) 589-4200                               **Baker & Hostetler LLP**
Facsimile: (212) 589-4201                               45 Rockefeller Plaza
David J. Sheehan                                        New York, New York 10111
Email: dsheehan@bakerlaw.com                            Telephone: (212) 589-4200
Seanna R. Brown                                         Facsimile: (212) 589-4201
Email: sbrown@bakerlaw.com                              Email: ipicard@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com                             *Trustee for the Substantively Consolidated*
                                                        *SIPA Liquidation of Bernard L. Madoff*
*Attorneys for Irving H. Picard, Trustee for the*       *Investment Securities LLC and*
*Substantively Consolidated SIPA Liquidation*           *Bernard L. Madoff*
*of Bernard L. Madoff Investment Securities*
*LLC And Bernard L. Madoff*

06-04389-smb    Doc 5524-1    Filed 01/17/14    Entered 01/17/14 18:46:23    Exhibit A
page 99 of 115

# EXHIBIT A

Period Ended September 30, 2013

CASH RECEIPTS:

Report No. 58

| General Cash Receipts | Net Change for Period | Prior Period Cumulative | Total Received | Customer Fund | General Estate | SIPC | Code |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | $35,288,406.64 | | | | | | |
| Transfer from Debtor's Estate - Securities | 246.51 | 289,841,661.49 | 289,841,908.00 | 289,841,908.00 | | | 4011 |
| Transfers from Debtor's Estate - BNY Account | 0.00 | 336,660,934.06 | 336,660,934.06 | 336,660,934.06 | | | 4014 |
| Transfers from Debtor's Estate - Chase Account | 0.00 | 235,156,309.36 | 235,156,309.36 | 235,156,309.36 | | | 4016 |
| Transfers from Debtor's Estate - Other | 0.00 | 4,036,145.08 | 4,036,145.08 | 4,036,145.08 | | | 4018 |
| Interest and Dividends | 0.00 | 1,843,166.84 | 1,843,166.84 | 1,843,166.84 | | | 4040 |
| Closeout Proceeds - Broker Dealers | 0.00 | 37,316,297.78 | 37,316,297.78 | 37,316,297.78 | | | 4030 |
| Closeout Proceeds - NSCC | 0.00 | 21,783,082.40 | 21,783,082.40 | 21,783,082.40 | | | 4031 |
| Closeout Proceeds - DTCC | 0.00 | 17,304,329.91 | 17,304,329.91 | 17,304,329.91 | | | 4032 |
| Sale of Debtor's Assets | 0.00 | | | | | | |
| - Sports Tickets | 0.00 | 47.26 | 47.26 | 47.26 | | | 4070 |
| - Bank Debt Participations | 0.00 | 89,690.80 | 89,690.80 | 89,690.80 | | | 4071 |
| - DTCC Shares | 0.00 | 7,871,653.96 | 7,871,653.96 | 7,871,653.96 | | | 4072 |
| - Market Making Business | 0.00 | 204,170.51 | 204,170.51 | 204,170.51 | | | 4073 |
| - Abtech | 0.00 | 1,416,279.52 | 1,416,279.52 | 1,416,279.52 | | | 4075 |
| - NSX Shares | 0.00 | 795,000.00 | 795,000.00 | 795,000.00 | | | 4076 |
| - BLM Air Charter | 0.00 | 97,865.49 | 97,865.49 | 97,865.49 | | | 4077 |
| Administrative Subtenant Rent Revenue | 0.00 | 6,494,631.95 | 6,494,631.95 | 6,494,631.95 | | | 4074 |
| Administrative Subtenant Rent Revenue | 0.00 | 531,078.49 | 531,078.49 | 531,078.49 | | | 4111 |
| *Adjusting Administrative Subtenant Rent Revenue* | 0.00 | (531,078.49) | (531,078.49) | (531,078.49) | | | 4111a |
| Refunds - Deposits | 0.00 | 9,841.45 | 9,841.45 | 9,841.45 | | | 4091 |
| - Dues/Subscriptions | 0.00 | 177,247.15 | 177,247.15 | 177,247.15 | | | 4092 |
| - Car Registrations | 0.00 | 157.00 | 157.00 | 157.00 | | | 4093 |
| - Vendors | 0.00 | 61,567.20 | 61,567.20 | 61,567.20 | | | 4094 |
| - Transit Cards | 0.00 | 833.61 | 833.61 | 833.61 | | | 4095 |
| - Insurance/Workers Comp | 0.00 | 402,859.56 | 402,859.56 | 402,859.56 | | | 4096 |
| - Ref. - Political Contributions | 0.00 | 144,500.00 | 144,500.00 | 144,500.00 | | | 4097 |
| - Refunds Other | 0.00 | 50.84 | 50.84 | 50.84 | | | 4099 |
| Recoveries - Litigation Related | 0.00 | 0.00 | 0.00 | | | | 4101 |
| - Customer Avoidances | 0.00 | 117,298,582.68 | 117,298,582.68 | 117,298,582.68 | | | 4020 |
| - Pre-Litigation Settlements | 0.00 | 1,905,143,597.98 | 1,905,143,597.98 | 1,905,143,597.98 | | | 4021 |
| - Litigation Settlements | 1,745,000.00 | 6,392,637,847.31 | 6,394,382,847.31 | 6,394,382,847.31 | | | 4022 |
| - Donation Settlements | 0.00 | 500,000.00 | 500,000.00 | 500,000.00 | | | 4023 |
| - Vendor Preferences | 0.00 | 809,850.39 | 809,850.39 | 809,850.39 | | | 4024 |
| - Employees | 0.00 | 10,674.74 | 10,674.74 | 10,674.74 | | | 4102 |
| - Taxing Authorities | 0.00 | 12,777.56 | 12,777.56 | 12,777.56 | | | 4103 |
| - Class Actions | 61,736.02 | 635,085.49 | 696,821.51 | 696,821.51 | | | 4104 |
| - NASDAQ | 0.00 | 308,948.49 | 308,948.49 | 308,948.49 | | | 4105 |
| - NYSE | 0.00 | 183,683.79 | 183,683.79 | 183,683.79 | | | 4106 |
| - Transaction Fees | 0.00 | 96,816.23 | 96,816.23 | 96,816.23 | | | 4107 |
| - Other | 0.00 | 296,298.73 | 296,298.73 | 296,298.73 | | | 4109 |
| Miscellaneous | 0.00 | 0.36 | 0.36 | 0.36 | | | 4110 |
| Earnings on Trustee's Investments | 178,209.44 | 22,667,963.06 | 22,846,172.50 | 22,846,172.50 | | | 4120 |
| Interest on Trustee's Savings Accounts | 25,659.73 | 1,084,260.65 | 1,109,920.38 | 1,109,920.38 | | | 4140 |
| **Sub-total General Cash Receipts** | $2,010,851.70 | $9,403,394,710.68 | $9,405,405,562.38 | $9,405,405,562.38 | | | |
| **Advances from SIPC** | | | | | | | |
| Administration - Advances | 24,256,901.32 | 808,141,188.56 | 832,398,089.88 | | | 832,398,089.88 | 2901 |
| Securities - Paid Bank Loans | 0.00 | 0.00 | 0.00 | | | 0.00 | 2921 |
| - Cash in Lieu | 0.00 | 805,103,978.44 | 805,103,978.44 | | | 805,103,978.44 | 2922 |
| **Sub-total SIPC Advances** | $24,256,901.32 | $1,613,245,167.00 | $1,637,502,068.32 | | | $1,637,502,068.32 | |
| Funds Transferred from Investment Accounts *See Note (3) on Page 3 | 0.00 | 5,759,766,491.53 | 5,759,766,491.53 | | | | 1901 |
| **Total Cash Receipts** | $26,267,753.02 | $16,776,406,369.21 | $16,802,674,122.23 | $9,405,405,562.38 | $0.00 | $1,637,502,068.32 | |

*Cumulative Detail columns: Customer Fund | General Estate | SIPC*

**Period Ended September 30, 2013**          Report No. 58

*CASH DISBURSEMENTS:*

*Administrative Disbursements*

| General Administrative Disbursements | Net Change for Period | Prior Period Cumulative | Cumulative Total Paid | Code |
|---|---|---|---|---|
| Computer - Rental | 0.00 | 11,121.59 | 11,121.59 | 5011 |
| - Software Support | 0.00 | 55,159.20 | 55,159.20 | 5012 |
| - Equipment Leases | 0.00 | 204,159.01 | 204,159.01 | 5013 |
| Employee Related - Salaries-Net | 0.00 | 4,361,844.80 | 4,361,844.80 | 5020 |
| - FICA-Employer | 0.00 | 318,550.60 | 318,550.60 | 5021 |
| - Fed. & St. Unemploy. | 0.00 | 4,296.08 | 4,296.08 | 5023 |
| - Temporary Help | 0.00 | 29,612.50 | 29,612.50 | 5024 |
| - Employee Medical Plan | 0.00 | 830,103.99 | 830,103.99 | 5025 |
| - Employee LTD | 0.00 | 6,887.03 | 6,887.03 | 5026 |
| - Employee Expense Reimbursement | 0.00 | 1,125.87 | 1,125.87 | 5027 |
| - Employee Life/AD&D | 0.00 | 9,006.83 | 9,006.83 | 5028 |
| - Other | 0.00 | 1,622.90 | 1,622.90 | 5029 |
| Insurance - Trustee Bond | 0.00 | 2,400.00 | 2,400.00 | 5030 |
| Insurance - Surety & Fidelity Bonds | 0.00 | 37,400.00 | 37,400.00 | 5031 |
| Insurance Workers Comp | 0.00 | 12,578.00 | 12,578.00 | 5032 |
| - Other | (3,652.00) | 24,751.00 | 21,099.00 | 5039 |
| Fees - Payroll Processing | 0.00 | 8,195.96 | 8,195.96 | 5045 |
| Fees - Escrow | 0.00 | 1,218,198.85 | 1,218,198.85 | 5046 |
| - Other | 0.00 | 12,337.22 | 12,337.22 | 5047 |
| Expenses for Asset Sales | 0.00 | 19,205.73 | 19,205.73 | 5048 |
| Rent - Office | 0.00 | 3,987,347.17 | 3,987,347.17 | 5050 |
| - *Adjustment for Administrative Subtenant Rent Revenue* | 0.00 | (531,078.49) | (531,078.49) | 5050a |
| - Equipment | 0.00 | 1,695.89 | 1,695.89 | 5051 |
| - Warehouse | 12,577.08 | 680,076.94 | 692,654.02 | 5052 |
| - Bulova | 0.00 | 310,130.75 | 310,130.75 | 5053 |
| - Other | 936.00 | 57,569.27 | 58,505.27 | 5059 |
| Costs - Vacating 885 Third Avenue | 0.00 | 20,179.46 | 20,179.46 | 5111 |
| Telephone and Telegraph | 0.00 | 360,456.68 | 360,456.68 | 5060 |
| Communication Fees | 0.00 | 644,177.76 | 644,177.76 | 5070 |
| Utilities - Electricity | 332.79 | 19,236.79 | 19,569.58 | 5080 |
| Office Supplies & Expense - Maint. & Repairs | 0.00 | 79,338.86 | 79,338.86 | 5080 |
| - Moving & Storage | 0.00 | 253,607.94 | 253,607.94 | 5081 |
| - Postage/Handling/Preparation | 0.00 | 40,961.12 | 40,961.12 | 5082 |
| - Reproduction | 0.00 | 183,889.65 | 183,889.65 | 5083 |
| - Locksmith | 0.00 | 5,811.39 | 5,811.39 | 5084 |
| - Security | 0.00 | 249,897.70 | 249,897.70 | 5085 |
| - Supplies | 0.00 | 3,342.03 | 3,342.03 | 5086 |
| - Temporary Help | 0.00 | 4,588,642.69 | 4,588,642.69 | 5087 |
| - Process Server - Complaint | 0.00 | 241,451.52 | 241,451.52 | 5088 |
| - Other | 0.00 | 33,818.62 | 33,818.62 | 5089 |
| Taxes | 0.00 | 555.51 | 555.51 | 5090 |
| NYC Commercial Rent Tax | 0.00 | 154,269.47 | 154,269.47 | 5091 |
| Claims Related Costs - Mailing Costs | 0.00 | 23,053.28 | 23,053.28 | 5101 |
| - Publication | 0.00 | 163,961.13 | 163,961.13 | 5102 |
| - Supplies | 0.00 | 16,244.58 | 16,244.58 | 5103 |
| - Printing | 0.00 | 2,207.42 | 2,207.42 | 5104 |
| Court Related Noticing - Postage/Handling/Preparation  *See Note (1) Below | 0.00 | 0.00 | 0.00 | 5106 |
| - Reproduction | 0.00 | 0.00 | 0.00 | 5107 |
| - Supplies | 0.00 | 0.00 | 0.00 | 5108 |
| Scanning - Investigation | 0.00 | 5,158,625.31 | 5,158,625.31 | 5110 |
| Foreign Research | 0.00 | 38,975.00 | 38,975.00 | 5112 |
| Miscellaneous | 0.00 | 0.05 | 0.05 | 5115 |
| Hosting Expense *See Note (2) Below | 1,640,186.62 | 15,134,017.87 | 16,774,204.49 | 5244 |
| Sub-total General Admin. Disbursements | $1,650,380.49 | $39,091,020.52 | $40,741,401.01 | |

*Professional Fees and Expenses*

| | Net Change for Period | Prior Period Cumulative | Cumulative Total Paid | Code |
|---|---|---|---|---|
| Trustee Fees | 0.00 | 4,377,662.10 | 4,377,662.10 | 5200 |
| Trustee Expenses | 0.00 | 2,549.25 | 2,549.25 | 5201 |
| Trustee Counsel Fees (Baker) | 9,280,029.15 | 454,474,021.84 | 463,754,050.99 | 5210 |
| Trustee Counsel Expenses (Baker) | 427,298.86 | 10,385,067.06 | 10,812,365.92 | 5211 |
| Trustee Counsel Fees (Windels) | 0.00 | 20,050,084.11 | 20,050,084.11 | 5212 |
| Trustee Counsel Expenses (Windels) | 0.00 | 861,591.16 | 861,591.16 | 5213 |
| Special Counsel Fees | 0.00 | 23,939,188.28 | 23,939,188.28 | 5220 |
| Special Counsel Expenses | 0.00 | 5,304,617.34 | 5,304,617.34 | 5221 |
| Consultant Fees *See Note (2) Below | 4,251,612.71 | 273,576,039.48 | 277,827,652.19 | 5240 |
| Consultant Expenses  *See Note (1)  Below | 286,591.36 | 12,502,777.68 | 12,789,369.04 | 5241 |
| Investment Banker Fees | 0.00 | 1,050,000.00 | 1,050,000.00 | 5242 |
| Sales Tax | 519.00 | 1,223,761.03 | 1,224,280.03 | 5243 |
| Mediator Fees | 0.00 | 1,039,502.57 | 1,039,502.57 | 5245 |
| Mediator Expenses | 0.00 | 9,498.85 | 9,498.85 | 5246 |
| Receiver Counsel Fees | 0.00 | 300,000.00 | 300,000.00 | 5260 |
| Receiver Counsel Expenses | 0.00 | 6,449.08 | 6,449.08 | 5261 |
| Receiver's Consultants Fees | 0.00 | 316,000.00 | 316,000.00 | 5262 |
| Receiver's Consultants Expenses | 0.00 | 15,000.00 | 15,000.00 | 5263 |
| Sub-total Professional Fees and Expenses | $14,246,051.08 | $809,433,809.83 | $823,679,860.91 | |
| Total Administrative Disbursements | $15,896,431.57 | $848,524,830.35 | $864,421,261.92 | |

Page 2

* Note (1) See Supporting Schedule on Page 6

* Note (2) The current month's activity includes a reclassification from consulting fees to hosting expense in the amount of $974,050.47.

**Period Ended September 30, 2013**                                        Report No. 58

| CASH DISBURSEMENTS: | Net Change | Prior Period | Total | Cumulative Totals | | | |
|---|---|---|---|---|---|---|---|
| Claim Related Disbursements | for Period | Cumulative | Paid | Customer Fund | General Estate | SIPC | Code |
| | | $ | $ | $ | | $ | |
| Customer - Paid Bank Loan | | | | | | | 6021 |
| - Securities - Cash in Lieu | 0.00 | 5,453,357,385.59 | 5,453,357,385.59 | 4,648,253,407.15 | | 805,103,978.44 | 6022 |
| - Securities - Purchases | | | | | | | 6023 |
| - Indemnification | | | | | | | 6031 |
| - Cash Balance | | | | | | | 6041 |
| Customer - | | | | | | | 6050 |
| Customer - | | | | | | | 6060 |
| Customer - Trustee Journal Entry | | | | | | | |
| per Allocation | | | | | | | 6000 |
| Other - Contractual Commitments | | | | | | | 6111 |
| - Pd. Bank Loan | | | | | | | 6121 |
| - Indemnification | | | | | | | 6131 |
| Other - | | | | | | | 6140 |
| Other - | | | | | | | 6150 |
| Other - | | | | | | | 6160 |
| Other - Trustee Journal Entry | | | | | | | |
| per Allocation | | | | | | | 6100 |
| General Creditor | | | | | | | 6200 |
| | | | | | | | |
| Sub-total Claim Disbursements | $0.00 | $5,453,357,385.59 | $5,453,357,385.59 | $4,648,253,407.15 | $0.00 | $805,103,978.44 | |
| | | | | | | | |
| Other Disbursements (except investments) | | | | | | | |
| SIPC - Refunds - Recoupment | | | | | | | 6301 |
| - Indemnification | | | | | | | 6310 |
| - Contr. Commitments | | | | | | | 6311 |
| - Paid Bank Loan | | | | | | | 6321 |
| - Subrogation | 0.00 | 102,805,012.23 | 102,805,012.23 | 102,805,012.23 | | | 6322 |
| Other - | | | | | | | 6400 |
| Other - | | | | | | | 6401 |
| Other - | | | | | | | 6402 |
| Other - | | | | | | | 6403 |
| Other - | | | | | | | 6404 |
| | | | | | | | |
| Sub-total Other Disbursements | $0.00 | $102,805,012.23 | $102,805,012.23 | $102,805,012.23 | $0.00 | $0.00 | |
| | | | | | | | |
| Investments by Trustee - Purchases *See Note (3) Below | $203,869.17 | $10,336,430,734.40 | $10,336,634,603.57 | | | | 1900 |
| | | | | | | | |
| Sub-total Administrative Disb. - page 2 | $15,896,431.57 | $848,524,830.35 | $864,421,261.92 | $0.00 | $0.00 | $864,421,261.92 | |
| | | | | | | | |
| Total Disbursements | $16,100,300.74 | $16,741,117,962.57 | $16,757,218,263.31 | $4,751,058,419.38 | $0.00 | $1,669,525,240.36 | |
| | | | | | | | |
| Total Receipts less Disbursements | $10,167,452.28 | $35,288,406.64 | $45,455,858.92 | $4,654,347,143.00 | $0.00 | ($32,023,172.04) | |
| | | | | | | | |
| Ending Cash Balance *See Note (4) Below | $45,455,858.92 | | | | | | |

Page 3

\* Note (3) Two preferred custody accounts and an insured money market account have been established at Citibank for investment purposes and an additional investment account is maintained at JP Morgan Chase. A Broker's account, which was previously established at Morgan Joseph, was closed in January 2012. Since January 20, 2009, $10,336,634,603.57 of recovered funds have been transferred into these investment accounts and $5,759,766,491.53 of these funds have subsequently been used for interim distributions to customers with allowed claims and for operations. (See Page 5 for more details).

\* Note (4) The ending cash balance includes a $20,580,577.67 balance in the Citibank Business Checking Account and $24,875,281.25 in the Citibank Distribution Account.

Report No. 58

## SUMMARY INFORMATION ON STATUS OF LIQUIDATION

| | Customer Claimants | Broker/Dealer Claimants | General Estate Claimants |
|---|---|---|---|
| Claims received | 16,519 | 49 | 94 |
| Claims satisfied by distribution of cash and/or securities: | | | |
| a. As part of the transfer in bulk | | | |
| b. On an account by account basis-Fully Satisfied | 1,245 | | |
| c. On an account by account basis-Partially Satisfied | 1,249 | | |
| | 2,494 | - | - |
| Claims Determined - no claims | 12 | | |
| Claims Deemed Determined - pending litigation | 160 | | |
| Claims Determined - withdrawn | 209 | | |
| Claims Determined but not yet satisfied | 18 | | |
| Claims under review | - | 49 | 94 |
| Claims Denied: | | | |
| a. No Claims | | | |
| c. Assets at Another Broker | | | |
| c. Other Denials for which no objections were filed | 9,536 | | |
| d. Denials for which objections were filed: | | | |
| - Hearing not yet set | 3,446 | | |
| - Set for Hearing | 644 | | |
| - Adjudicated | | | |
| | 14,025 | 49 | 94 |

Accounts with cash and/or securities which were transferred in bulk

Filing Date Value

| | |
|---|---|
| Customer name securities distributed | |
| Customer fund securities distributed | |
| | $ |

_(Trustee's Signature)_                                          10/11/2013
                                                                                    (Date)

_(Accountant's Signature)_                                    10/10/2013
                                                                                    (Date)

Page 4

<u>Period Ended September 30, 2013</u>                                                                                                                    Report No. 58

### IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BLMIS LLC
### Investment Accounts

| | Citibank Preferred Custody Account-Original Account | | | | | Citibank Preferred Custody Account-#2 | Citibusiness IMMA Account | |
|---|---|---|---|---|---|---|---|---|
| | Cash Assets/Mutual Funds | U.S. Treasury Bills | US Treasury Notes | Accrued Interest | Account Balance | Cash Assets/Mutual Funds | Account Balance | Total Citibank |
| **Balance August 31, 2013** | 2,962,457 | 644,751,506 | 103,171,599 | 22,124 | 750,907,686 | 763,594,173 | 156,084,261 | 1,670,586,120 |
| Maturity of U.S. Treasury Bills | 225,373,199 | (225,373,199) | | | - | | | - |
| Purchase of Securities | (225,375,624) | 225,375,624 | | | - | | | - |
| Unrealized Gain or (Loss) | | 95,457 | | | 95,457 | | | 95,457 |
| Realized Gain on Sale of Securities | 3,984 | | | | 3,984 | | | 3,984 |
| Interest and Dividends Earned | | | | | | | | |
| Interest | | | | 10,511 | 10,511 | 75,321 | 25,660 | 111,492 |
| Dividends | 50 | | | (1) | 49 | | | 49 |
| **Balance September 30, 2013** | 2,964,066 | 644,849,388 | 103,171,599 | 32,634 | 751,017,687 | 763,669,494 | 156,109,921 | 1,670,797,102 |

| | JP Morgan Chase | | |
|---|---|---|---|
| | Cash | U.S. Treasury Bills | Account Balance |
| **Balance August 31, 2013** | 46,257 | 2,906,783,659 | 2,906,829,916 |
| Maturity of U.S. Treasury Bills | | | - |
| Purchase of U.S. Treasury Bills | | 167,718 | 167,718 |
| Unrealized Gain or (Loss) | | | - |
| Interest and Dividends Earned | | | |
| Interest | | | - |
| Dividends | | | - |
| **Balance September 30, 2013** | 46,257 | 2,906,951,377 | 2,906,997,634 |

Page 5

Period Ended September 30, 2013                                              Report No. 58

### IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BLMIS LLC
#### Consultant Expenses for Court Related Noticing

|  | Net Change for Period | Prior Period Cumulative | Cumulative Total Paid |
|---|---|---|---|
| Postage / Handling / Preparation | 0.00 | 490,385.30 | 490,385.30 |
| Printing | 0.00 | 44,945.40 | 44,945.40 |
| Reproduction Costs | 0.00 | 682,797.70 | 682,797.70 |
| Supplies | 0.00 | 91,503.64 | 91,503.64 |
| **Total  *See Note Below** | **$0.00** | **$1,309,632.04** | **$1,309,632.04** |

**Page 6**

*Note: All of the expenses above were incurred by consultants in connection with court related noticing procedures, and are included in the Consultant Expenses line (Account #5241) on Page 2 of the SIPC Form 17.