**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>SUSANNE STONE MARSHALL; ADELE FOX; MARSHA PESHKIN; RUSSELL OASIS; A & G GOLDMAN PARTNERSHIP; and PAMELA GOLDMAN,<br><br>    Defendants. | Adv. Pro. No. _____ (SMB)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S APPLICATION FOR ENFORCEMENT OF PERMANENT INJUNCTION AND AUTOMATIC STAY** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 2

FACTS ................................................................................................................ 6

I.     THE NET EQUITY DECISION ............................................................ 6

II.    THE CLASS ACTION PLAINTIFFS' PARTICIPATION IN THE
       BANKRUPTCY PROCEEDING ........................................................... 7

III.   THE TRUSTEE'S AVOIDANCE ACTION ........................................... 10

IV.    ROUND ONE:  THE FIRST FLORIDA PUTATIVE CLASS ACTIONS ........ 10

       A.    The Fox and Marshall Complaints ........................................... 10

       B.    The Bankruptcy Court's Enforcement of the Automatic Stay and
             Issuance of a Preliminary Injunction ...................................... 12

       C.    The Picower Settlement .......................................................... 13

       D.    The Bankruptcy Court's Approval of the Settlement and Issuance
             of a Permanent Injunction ..................................................... 13

       E.    The District Court's Decision and Order Affirming the Bankruptcy
             Court's Order ........................................................................ 15

       F.    The Civil Forfeiture Action and the Trustee's Distribution .......... 16

       G.    The Second Circuit's Decision Affirming the Permanent Injunction
             As Against Fox and Marshall ................................................. 17

V.     ROUND TWO:  THE SAME LAW FIRMS ATTEMPT TO BRING THE
       GOLDMAN CLASS ACTIONS ......................................................... 20

       A.    The Goldman Class Action Complaints .................................... 20

       B.    The Bankruptcy Court's Enforcement of the Automatic Stay and
             Permanent Injunction ............................................................ 22

       C.    The District Court's Affirmance of the Bankruptcy Court's
             Decision and Order ................................................................ 23

VI.    ROUND THREE:  THE GOLDMAN AND FOX PLAINTIFFS AGAIN
       TAKE ACTION IN FLORIDA ........................................................... 24

       A.    The Goldman Plaintiffs Seek a Declaration That Their Amended
             Complaint Does Not Violate the Permanent Injunction .............. 24

       B.    Fox and Marshall Move to Re-Open the Florida Class Action ...... 27

       C.    The Class Action Plaintiffs' Efforts to File Amended Complaints
             are Disputed Even in the Florida District Court by the Class Action
             Plaintiffs .............................................................................. 30

ARGUMENT  THE PERMANENT INJUNCTION AND AUTOMATIC STAY BAR
       THE CLASS ACTION PLAINTIFFS FROM PROCEEDING ...................... 32

I.     THE CLASS ACTION PLAINTIFFS SHOULD SEEK PERMISSION
       FROM THIS COURT TO PROCEED .................................................. 32

# TABLE OF CONTENTS

(continued)

**Page**

| | | |
|---|---|---|
| II. | THE BANKRUPTCY COURT HAS PERSONAL JURISDICTION OVER THE CLASS ACTION PLAINTIFFS | 35 |
| III. | THE CLASS ACTIONS VIOLATE THE PERMANENT INJUNCTION | 35 |
| | A. Like Their Predecessor Actions, the New Florida Class Actions Remain Duplicative and Derivative of the Trustee's Action | 35 |
| | B. The Class Action Plaintiffs' Legal Arguments Have Previously Been Rejected and Find No Support in Case Law | 40 |
| | C. The Goldman Plaintiffs Fail to Plead Any New Evidence | 43 |
| IV. | THE CLASS ACTIONS ALSO VIOLATE THE AUTOMATIC STAY | 44 |
| V. | THE CLASS ACTION PLAINTIFFS AND THEIR COUNSEL SHOULD BE PRELIMINARILY ENJOINED | 46 |
| CONCLUSION | | 49 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*,
835 F.2d 427 (2d Cir. 1987)..................................................................45

*A&G Goldman P'ship v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*,
No. 12-6109, 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013) .......................... *passim*

*In re Adelphia Commc'ns Corp.*,
298 B.R. 49 (S.D.N.Y. 2003)................................................................48

*Adelphia Commc'ns Corp. v. Am. Channel, LLC (In re Adelphia Commc'ns Corp.)*,
No. 06-01528, 2006 WL 1529357 (Bankr. S.D.N.Y. June 5, 2006) ......................48

*AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.)*,
117 B.R. 789 (Bankr. S.D.N.Y. 1990).................................................47, 48

*In re Bernard L. Madoff Inv. Sec. LLC*,
No. 11 Civ. 2135 (AKH), 2011 WL 7981599 (S.D.N.Y. Dec. 5, 2011), *aff'd*,
512 F. App'x 19 (2d Cir. 2013) ..........................................................41

*C&J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*,
92 B.R. 87 (Bankr. S.D.N.Y. 1988)......................................................48

*Calpine Corp. v. Nev. Power Co. (In re Calpine Corp.)*,
354 B.R. 45 (Bankr. S.D.N.Y. 2006) *aff'd*, 365 B.R. 401 (S.D.N.Y. 2007) ...........48

*In re Charter Commc'ns*,
No. 09-11435, 2010 WL 502764 (Bankr. S.D.N.Y. Feb. 8, 2010)...................33, 34

*Chartschlaa v. Nationwide Mut. Ins. Co.*,
538 F.3d 116 (2d Cir. 2008)..............................................................45

*Cruisephone, Inc. v. Cruise Ships Catering & Servs. N.V. (In re Cruisephone, Inc.)*,
278 B.R. 325 (Bankr. E.D.N.Y. 2002)....................................................35

*In re Dreier LLP*,
429 B.R. 112 (Bankr. S.D.N.Y. 2010)................................................16, 44

*E. Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*,
111 B.R. 423 (Bankr. S.D.N.Y. 1990), *aff'd in part*, 124 B.R. 635 (S.D.N.Y. 1991) ................................................................................48

*E. Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs Inc.)*,
124 B.R. 635 (S.D.N.Y. 1991)............................................................47

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*FDIC v. Hirsch (In re Colonial Realty Co.)*,
    980 F.2d 125 (2d Cir. 1992)....................................................................46

*Fid. Mortg. Investors v. Camelia Builders, Inc.*,
    550 F.2d 47 (2d Cir. 1976).....................................................................32

*Fisher v. Apostolou*,
    155 F.3d 876 (7th Cir. 1998) ...........................................................46, 48

*Fox v. Picard (In re Madoff)*,
    848 F. Supp. 2d 469 (S.D.N.Y. 2012).......................................... *passim*

*Garrity v. Leffler (In re Neuman)*,
    71 B.R. 567 (S.D.N.Y. 1987)................................................................48

*Jackson v. Novak (In re Jackson)*,
    593 F.3d 171 (2d Cir. 2010).................................................................45

*In re Johns–Manville Corp.*,
    33 B.R. 254 (Bankr. S.D.N.Y. 1983)...................................................47

*Kagan v. Saint Vincents Catholic Med. Ctrs. (In re Saint Vincents)*,
    449 B.R. 209 (S.D.N.Y. 2011)..............................................................45

*Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*,
    162 B.R. 935 (Bankr. S.D.N.Y. 1994)..................................................48

*Keene Corp. v. Coleman (In re Keene Corp.)*,
    164 B.R. 844 (Bankr. S.D.N.Y. 1994).............................................45, 46

*Koch Refining v. Farmers Union Cent. Exch., Inc.*,
    831 F.2d 1339 (7th Cir. 1987) .............................................................39

*LaMonica v. N. of Eng. Protecting & Indem. Ass'n (In re Probulk Inc.)*,
    407 B.R. 56 (Bankr. S.D.N.Y. 2009)....................................................48

*Lautenberg Found. v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
    512 F. App'x 18 (2d Cir. 2013) ...........................................................48

*LTV Steel Co. v. Bd. of Educ. (In re Chateaugay Corp.)*,
    93 B.R. 26 (S.D.N.Y. 1988)......................................................32, 47, 48

*Luan Inv., S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*,
    No. 95B44528 (AJG), 2001 WL 826122 (S.D.N.Y. July 19, 2001) ......35

*Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*,
    304 F.3d 223 (2d Cir. 2002).................................................................33

# TABLE OF AUTHORITIES

### (continued)

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem.
    Co.)*,
    402 B.R. 571 (Bankr. S.D.N.Y. 2009)..................................................................48

*Malcolm v. Board of Educ.*,
    506 F. App'x 65 (2d Cir. 2012) ...........................................................................47

*Marshall v. Picard*,
    740 F.3d 81 (2d Cir. 2014)............................................................ *passim*

*In re Martin-Trigona*,
    9 F.3d 226 (2d Cir.1993)......................................................................................47

*McHale v. Alvarez (In re 1031 Tax Grp.)*,
    397 B.R. 670 (Bankr. S.D.N.Y. 2008)............................................................41, 46

*Medsker v. Feingold*,
    307 F. App'x 262 (11th Cir. 2008) ......................................................................40

*Moelis & Co. LLC v. Wilmington Trust FSB (In re Gen. Growth Props., Inc.)*,
    460 B.R. 592 (Bankr. S.D.N.Y. 2011)..................................................................33

*Mother African Union Methodist Church v. Conference of AUFCMP Church (In
    re Conference of African Union First Colored Methodist Protestant Church)*,
    184 B.R. 207 (Bankr. D. Del. 1995) ....................................................................32

*In re Mrs. Weinberg's Kosher Foods, Inc.*,
    278 B.R. 358 (Bankr. S.D.N.Y. 2002)..................................................................44

*In re Old Carco LLC*,
    No. 09–50002 (SMB), --- B.R. ----, 2014 WL 641545 (Bankr. S.D.N.Y.
    Feb. 19, 2014) ......................................................................................................33

*Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    418 B.R. 75 (Bankr. S.D.N.Y. 2009)....................................................................35

*Picard v. Fox*,
    429 B.R. 423 (Bankr. S.D.N.Y. 2010).......................................................... *passim*

*Picard v. Fox*,
    Adv. Pro. No 10-03114 (BRL), 2010 WL 8815208 (Bankr. S.D.N.Y. Aug. 3, 2010)............33

*Picard v. JPMorgan Chase & Co.*,
    721 F.3d 54 (2d Cir. 2013)...................................................................................18

## TABLE OF AUTHORITIES
### (continued)

*Picard v. Stahl*,
443 B.R. 295 (Bankr. S.D.N.Y. 2011), *aff'd*, 2011 WL 7975167 (S.D.N.Y. 2011), *aff'd*, 512 F. App'x 18 (2d Cir. 2013) ............................................................35, 41, 48

*Quigley Co. v. Law Offices of Peter G. Angelos (In re Quigley Co.)*,
676 F.3d 45 (2d Cir. 2012)..............................................................................17, 45

*Rios v. Altamount Farms*,
64 N.Y.2d 792 (1985) ............................................................................................35

*Ryan v. Picard*,
133 S. Ct. 24 (2012)..................................................................................................7

*S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*,
817 F.2d 1142 (5th Cir. 1987) ...............................................................................39

*In re Sayeh R.*,
91 N.Y.2d 306 (1997) ............................................................................................35

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*,
424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd,* 654 F.3d 229 (2d Cir. 2011),
*cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (June 25, 2012)...............................5, 6, 7

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*,
477 B.R. 351 (Bankr. S.D.N.Y. 2012)........................................................... *passim*

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
884 F.2d 688 (2d Cir.1989)........................................................................... *passim*

*Stern v. Marshall*,
131 S. Ct. 2594 (2011)......................................................................................16, 19

*In re Swallen's, Inc.*,
205 B.R. 879 (Bankr. S.D. Ohio 1997)..................................................................46

*Time Warner Cable v. M.D. Elecs., Inc.*,
101 F.3d 278 (2d Cir. 1996)...................................................................................34

*Travelers Indem. Co. v. Bailey*,
557 U.S. 137 (2009)................................................................................................33

*United States v. $7,206,157,717 on Deposit at JP Morgan Chase Bank, N.A.*,
274 F.R.D. 125 (S.D.N.Y. 2011) .....................................................................16, 17

*Velvel v. Picard*,
133 S. Ct. 25 (2012)..................................................................................................7

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Statutes**

11 U.S.C. § 105 ..........................................................................................................47

11 U.S.C. § 105(a) ................................................................................................ *passim*

11 U.S.C. § 362(a) ....................................................................................................44

11 U.S.C. § 362(a)(1) ...........................................................................................45, 46

11 U.S.C. § 362(a)(3) ......................................................................................39, 44, 46

11 U.S.C. § 541(a) ....................................................................................................45

11 U.S.C. § 541(a)(1) .................................................................................................44

15 U.S.C. § 78fff-2(c)(1) ..............................................................................................9

15 U.S.C. § 78*lll*(11) ..................................................................................................6

28 U.S.C. § 1334 .......................................................................................................33

Securities Exchange Act of 1934 § 20(a) ........................................................... *passim*

**Rules**

Fed. R. Bankr. P. 2002 ..............................................................................................14

Fed. R. Bankr. P. 7065 .........................................................................................47, 48

Fed. R. Bankr. P. 9019 ..............................................................................................14

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.,* and the estate of Bernard L. Madoff ("Madoff"), by his undersigned counsel, respectfully submits this memorandum of law in support of his application seeking to: (i) enforce the permanent injunction order entered by this Court on January 13, 2011 (the "Permanent Injunction") and the automatic stay in these proceedings; and (ii) otherwise enjoin plaintiffs Susanne Stone Marshall ("Marshall"), Adele Fox ("Fox"), Marsha Peshkin ("Peshkin") and Russell Oasis ("Oasis") (collectively, the "Fox Plaintiffs"), and plaintiffs Pamela Goldman and A&G Goldman Partnership (the "Goldman Plaintiffs," and collectively with the Fox Plaintiffs, the "Class Action Plaintiffs"), and anyone acting on behalf of the Class Action Plaintiffs, from proceeding with their putative class actions (the "Fox Class Action," the "Goldman Class Action," and collectively, the "Class Actions") against the estate of Jeffry M. Picower ("Picower") and related defendants (collectively, the "Picower Defendants"),[1] recently brought before two different judges in the United States District Court for the Southern District of Florida (the "Florida District Court"), or any other action related to BLMIS against any of the Picower Defendants, without leave of this Court.

---

[1] The "Picower Defendants" are: Capital Growth Company; Decisions, Inc.; Favorite Funds; JA Primary Limited Partnership; JA Special Limited Partnership; JAB Partnership; JEMW Partnership; JF Partnership; JFM Investment Companies; JLN Partnership; JMP Limited Partnership; Jeffry M. Picower Special Company; Jeffry M. Picower, P.C.; the Picower Foundation; John Doe Trustees of the Picower Foundation; the Picower Institute of Medical Research; the Trust F/B/O Gabrielle H. Picower; Barbara Picower, individually, and as executor of the estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust F/B/O Gabriel H. Picower.

## PRELIMINARY STATEMENT

As the late Judge Lifland commented the last time these plaintiffs' counsel sought yet again to sue the Picower Defendants based on the same facts, "'it's *déjà vu* all over again.'" *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 477 B.R. 351, 354 (Bankr. S.D.N.Y. 2012). This effectively is the third round of efforts by the same class action plaintiffs' counsel to bring claims against the Picower Defendants for withdrawing fraudulent transfers from BLMIS—the same conduct underlying the Picower Defendants' $7.2 billion settlement with the Trustee and the Department of Justice. Their first two efforts were held merely to replead the Trustee's fraudulent transfer claims in the guise of differently-named causes of action and were enjoined. In their current attempt, the Fox Plaintiffs seek to re-open their class action in Florida District Court against the Picower Defendants with a newly amended complaint, while the Goldman Plaintiffs ask the Florida District Court to declare whether the newly amended Goldman Class Action violates this Court's Permanent Injunction and the automatic stay in these proceedings. But despite the Class Action Plaintiffs' relabeling of their claims, and their attempt to side-step this forum in the hopes of getting a better ruling in Florida, their new complaints remain duplicative and derivative of the Trustee's avoidance action against the Picower Defendants (the "Trustee's Action"). They thus are barred both by the Permanent Injunction and the automatic stay.

Picower was a BLMIS customer who took $7.2 billion of improper withdrawals from the Picower Defendants' BLMIS accounts. After his estate returned this money and settled with the Trustee and the Department of Justice, Judge Lifland entered the Permanent Injunction barring claims that are duplicative and derivative of the Trustee's claims. (*See* Declaration of Keith R. Murphy in Support of Trustee's Application ("Murphy Dec.") Ex. A.) The Class Action Plaintiffs again seek to represent putative classes of BLMIS customers —the same customers on

whose behalf the Trustee acted in the settlement—whom they allege were injured by Picower's

conduct in connection with his withdrawals.  While the Class Action Plaintiffs refine their legal

theories with each iteration of their complaints, they fail to allege any new or additional facts that

could support any causes of action that would fall outside the scope of the Permanent Injunction.

Fox and Marshall styled their original claims against the Picower Defendants as

violations of the Florida Racketeer Influenced and Corrupt Organizations Act ("RICO") and as

unjust enrichment.  Looking beyond the labels, the Second Circuit held that their claims were

merely derivative of the Trustee's fraudulent transfer claims:  "[Fox's and Marshall's] alleged

injuries are inseparable from, and predicated upon, a legal injury to the estate—namely, the

Picower defendants' fraudulent withdrawals from their BLMIS accounts of what turned out [to]

be other BLMIS customers' funds."  *See Marshall v. Picard*, 740 F.3d 81, 92 (2d Cir. 2014).

The Goldman Plaintiffs styled their original claims against the Picower Defendants as

Section 20(a) "control person" securities law claims.  Judge Richard J. Sullivan of the District

Court for the Southern District of New York ("District Court"), affirming the Bankruptcy Court,

ruled that these claims, too, were duplicative and derivative of the Trustee's fraudulent transfer

claims:  "[r]egardless of what Appellants call their claims, the Goldman complaints plead

fraudulent conveyance claims."  *A&G Goldman P'ship v. Picard (In re Bernard L. Madoff Inv.*

*Sec., LLC)*, No. 12-6109, 2013 WL 5511027, at *9 (S.D.N.Y. Sept. 30, 2013).

There is nothing new here.  Beyond repeating their prior complaints, the Fox Plaintiffs

have now borrowed from the previous Goldman securities complaints and attempt to allege a

securities claim, asserting that Picower was a "control person" of BLMIS.  (*See* Murphy Dec.

Ex. B ¶¶ 85, 112–22; *see also* Murphy Dec. Ex. C ¶¶ 12–13, 59–77.)  Both the Bankruptcy Court

and the District Court previously rejected this theory:  "the Plaintiffs attempt to distinguish the

actions of the Picower Defendants as against the Plaintiffs by creating a security and concocting

that Picower was a control person . . . ." *In re Madoff*, 477 B.R. at 356.  As before, the "control"

alleged by the amended complaints "consist[s] solely of the Picower Defendants directing

fictitious trades in, and withdrawing proceeds from, their own BLMIS accounts." *Goldman*,

2013 WL 5511027, at *6.  Such allegations do not constitute "bona fide securities claims," but

rather allege misrepresentations and misconduct that were "incident to the [Picower Defendants']

fraudulent withdrawals." *Id.* at *9–10.  They are thus wholly derived from the Trustee's claims

for fraudulent transfers, which have been resolved with a huge benefit for the estate, and are

barred by the Permanent Injunction.  *See id.* at *11.  So long as the gravamen of the Fox and

Goldman Complaints are predicated on activity solely within the Picower Defendants' own

accounts, they cannot escape the reach of the Permanent Injunction.

The amended Goldman and Fox Complaints seek to buttress the rejected "control person"

theory simply by adding more conclusions.  The basis for their claim continues to be only that

when Jeffry Picower took funds from *his own* accounts at BLMIS, he knew that it would lead

BLMIS to generate false account information for *other* customers' accounts.  (*See, e.g.,* Murphy

Dec. Ex. B ¶ 51, Ex. C ¶ 2.)  Under this logic, every time any customer allegedly lacked good

faith when he or she withdrew fictitious profits, that customer could be sued by every other

customer.  The orderly administration of the bankruptcy process was designed precisely to avoid

such chaos.  *See Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d 469, 485–86 (S.D.N.Y. 2012).

In papers filed in the Florida District Court, the Fox Plaintiffs have represented that the

Second Circuit affirmatively gave them leave to amend their claims.  (*See* Murphy Dec. Ex. Q at

2.)  In fact, the Second Circuit stated that it "intimate[s] no view on an appropriate disposition of

any such motion for leave to amend." *Marshall*, 740 F.3d at 96.  Nor did the Second Circuit

state that this Court lacked jurisdiction to enforce its own Permanent Injunction, as the Class

Action Plaintiffs have suggested.  *See id.* at 94.  The Second Circuit's acknowledgment of the

Florida District Court's ability to determine whether Fox and Marshall could state a claim that

was not derivative of the Trustee's does not deprive this Court of jurisdiction.  To the contrary,

the Bankruptcy Court remains the best forum to interpret the Permanent Injunction as well as the

scope of the automatic stay in the BLMIS liquidation proceeding.  The underlying administration

of the estate requires that this Court uniformly interpret the scope of the Permanent Injunction.

The Class Action Plaintiffs and their counsel have remained resolute in their efforts to

supplement their BLMIS recovery by suing the Picower Defendants.  Under the Bankruptcy

Court's "Net Equity Decision," as affirmed by the Second Circuit, BLMIS customers are not

entitled to their false profits.  *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re*

*Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd,* 654 F.3d 229 (2d

Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (June 25, 2012).  As Judge Lifland

recognized in enjoining Fox and Marshall from proceeding initially, "any judgment awarded to

the Florida Plaintiffs would exceed their entitlement to BLMIS distribution under SIPA and this

Court's Net Equity Decision."  *Picard v. Fox*, 429 B.R. 423, 437 (Bankr. S.D.N.Y. 2010).

Significantly, the Second Circuit, two District Court judges and Judge Lifland have found the

Class Action Plaintiffs' efforts to circumvent the Net Equity Decision unavailing.  The Class

Action Plaintiffs' regurgitation of their previous complaints forebodes the same result now.

Given their multiple attempts to circumvent the Permanent Injunction and automatic stay,

and the border-line vexatious quality of their litigation at this point—rife with conclusory

allegations that contain no meaningful distinctions from prior complaints—the Trustee

respectfully requests that the Court not only enforce the Permanent Injunction and automatic stay

to bar the pending Class Actions, but also enjoin the Class Action Plaintiffs and their counsel

from proceeding with the Class Actions, or any other action related to BLMIS against any of the

Picower Defendants, without first seeking leave of this Court.

## FACTS

The details of Madoff's Ponzi scheme and the background of the bankruptcy proceedings

have been set forth numerous times and will not be repeated here.[2]

The Class Action Plaintiffs' latest complaints rehash four prior putative class actions,

each of which was brought against the Picower Defendants by the same class action counsel

here, and each of which was held to be duplicative and derivative of the Trustee's claims against

the Picower Defendants.  The Bankruptcy Court concluded that all of those actions violated the

automatic stay and enjoined all the litigants from proceeding.  In each instance, the District Court

affirmed the Bankruptcy Court's decision—Judge John G. Koeltl affirmed this Court's order in

the Fox and Marshall cases, and Judge Richard J. Sullivan affirmed this Court's order in the

Goldman cases—and also found that their claims violated the Permanent Injunction.  Fox and

Marshall appealed Judge Koeltl's order to the Second Circuit, which affirmed that those class

actions were duplicative and derivative of the Trustee's Action against the Picower Defendants

and could not proceed.  The proposed new complaints are no different.  No matter what color the

Class Action Plaintiffs paint their square peg, they cannot fit it into a round hole.

## I.    THE NET EQUITY DECISION

In liquidation proceedings, SIPA provides that customers with allowed claims share *pro

rata* in customer property to the extent of their net equity, as defined in section 78*lll*(11) of

SIPA.  *See Sec. Inv. Prot. Corp.*, 424 B.R. at 124–25.  Consistent with SIPA, the Trustee

---

[2] *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 125–32.

determined that each customer's net equity should be calculated by crediting the amount of cash

the customer deposited into its BLMIS account, less any amounts withdrawn from the

customer's BLMIS account, referred to as the "net investment method." *Id.* at 125.  Many

customers, including Fox, argued that their net equity should have been calculated based on the

last customer statement they received from BLMIS, including whatever fictitious profits were

reflected on that statement. *See id.*; (Affidavit of Matthew Cohen in Support of Trustee's

Application ("Cohen Aff.") Ex. C.)

The Bankruptcy Court approved the Trustee's use of the net investment method and

affirmed the Trustee's calculation of net equity.  (*See* Order dated March 8, 2010, *Sec. Inv. Prot.*

*Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro No. 08-1789 (Bankr. S.D.N.Y. Mar. 8,

2010), ECF No. 2020.)  The Second Circuit affirmed the Net Equity Decision, holding that the

Trustee's methodology is "more consistent with the statutory definition of 'net equity' than any

other method advocated by the parties or perceived by this Court."  654 F.3d 229, 235 (2d Cir.

2011).  It found that other methods would "aggravate the injuries caused by Madoff's fraud," and

that reliance on the fictitious profits shown on customer statements "would have the absurd

effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal

effect to Madoff's machinations." *Id.*  On June 25, 2012, the United States Supreme Court

denied *certiorari*. *Velvel v. Picard*, 133 S. Ct. 25 (2012); *Ryan v. Picard*, 133 S. Ct. 24 (2012).

## II.     THE CLASS ACTION PLAINTIFFS' PARTICIPATION IN THE BANKRUPTCY PROCEEDING

On December 23, 2008, this Court entered a Claims Procedure Order, which

implemented a customer claims process in accordance with SIPA.  (*See Sec. Inv. Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec.  LLC*, Adv. Pro. No. 08-1789 (Bankr. S.D.N.Y.), ECF No. 12.)  By

July 2, 2009, the bar date for filing claims under SIPA, the Trustee had received more than

16,000 customer claims.  (*See Sec. Inv. Prot. Corp.*, Adv. Pro. No. 08-1789, ECF No. 2207 at 25.)  The Class Action Plaintiffs participated in the claims procedure process.

Marshall filed a customer claim regarding her BLMIS account.  (Cohen Aff. Ex. J.)  It was allowed by the Trustee in the amount of $30,000, which represented the net cash position of her account.  (*Id.* Ex. K.)  After she executed an assignment and release, Marshall received a payment from the Trustee in the full amount of her allowed claim with funds advanced by SIPC. (*Id.* ¶ 5.)  Marshall did not file an objection to the Trustee's determination of her claim within the 30-day period prescribed by the Claims Procedure Order.  (*Id.*)

Fox filed claims for two of the seven BLMIS accounts with which she is associated, both of which were denied because she was a "net winner" (meaning she withdrew more than she invested).  (Cohen Aff. Exs. A, B, D, E.)  She also filed a claim on behalf of the Fox Family Partnership, which was denied on the ground that the Fox Family Partnership did not have a BLMIS account.  (*Id.* Exs. G, H).  Fox filed objections to these determinations.  (*Id.* Exs. C, F, I.)

Peshkin filed two customer claims and one general creditor claim.  (*Id.* Exs. L, O, Q.) One claim was allowed by the Trustee in the amount of $176,354.66, which represented the net cash position of her account.  (*Id.* Ex. M.)  After she executed an assignment and release, Peshkin's allowed claim was fully satisfied by payment from the Trustee with funds advanced by SIPC.  (*Id.* ¶ 3.)  Peshkin's other claims were denied, and Peshkin filed objections to the determinations.  (*Id.* Ex. N, P, R)  Peshkin has been active in litigation related to the BLMIS bankruptcy case.  Peshkin appeared in the Trustee's adversary proceedings against various banks, was a party to the appeal of the Net Equity Decision, and has appealed from the Trustee's settlement with another avoidance action defendant.  (Murphy Dec. ¶ 3.)

Oasis did not file a customer claim. However, Oasis was a limited partner in BLMIS Account number 1R0172 held by the RAR Entrepreneurial Fund. (Complaint ¶ 9, *Picard v. RAR Entrepreneurial Fund, Ltd. et al.*, Adv. Pro. No. 10-4352 (Bankr. S.D.N.Y. Nov. 30, 2010), ECF No. 1.) Oasis and the RAR Entrepreneurial Fund are net winners and are defendants in an avoidance action brought by the Trustee. (*See id.*) The defendants have moved in that action to dismiss the Trustee's complaint. (*See id.*, ECF Nos. 48, 49.) Oasis also recently filed a letter in the main BLMIS case requesting a stay of briefing on omnibus motions to dismiss. (*See Sec. Inv. Prot. Corp.*, Adv. Pro. No. 08-1789, ECF No. 5648 (Feb. 10, 2014).)

A&G Goldman Partnership submitted a customer claim for its BLMIS account, which was denied by the Trustee because it had withdrawn more funds than it deposited. (*See* Cohen Aff. Exs. W–Y.) Pamela Goldman submitted two customer claims for BLMIS accounts for which she was associated, which the Trustee allowed. (Cohen Aff. Exs. S–V.) Through SIPC advances and an interim distribution from the fund of customer property, Pamela Goldman's allowed claims have been fully satisfied. (Cohen Aff. ¶ 4.)

As creditors and customers, the Class Action Plaintiffs are represented by the Trustee. The customer claims of Marshall, Peshkin, and Pamela Goldman were satisfied. And although Fox's and A&G Goldman Partnership's net equity claims were denied because they were "net winners," like all other net winners, they may still participate in the estate as general creditors (as could Marshall, Peshkin, and Pamela Goldman, for amounts above their net equity claims) if the Trustee is able to recover more customer property than is required to satisfy net equity claims. *See* SIPA § 78fff-2(c)(1) ("Any customer property remaining after allocation in accordance with this paragraph shall become part of the general estate of the debtor . . .").

## III.    THE TRUSTEE'S AVOIDANCE ACTION

The Trustee filed a complaint against Jeffry M. Picower (now deceased) and the other

Picower Defendants on May 12, 2009.  (Murphy Dec. Ex. D.)  The complaint identified more

than $6.7 billion in net withdrawals that the Trustee alleged the Picower Defendants had received

from BLMIS.  (*Id.* ¶¶ 63(b), 67.)  The complaint alleged that the Picower Defendants knew or

should have known that BLMIS was engaged in fraud and sought recovery of the entire amount

known at the time of filing to have been transferred from BLMIS to the Picower Defendants

throughout the history of the Picower Defendants' BLMIS accounts.  (*Id.* ¶¶ 3, 4, 28, 57, 65–67.)

After filing the complaint, the Trustee identified additional transfers from BLMIS to the

Picower Defendants, bringing the total amount of net withdrawals sought by the Trustee to $7.2

billion.  (*See* Memorandum of Law in Opposition to Motion to Dismiss, *Picard v. Picower*, Adv.

Pro. No. 09-1197 (Bankr. S.D.N.Y. Sept. 30, 2009), ECF No. 11.)

## IV.    ROUND ONE:  THE FIRST FLORIDA PUTATIVE CLASS ACTIONS

### A.    The Fox and Marshall Complaints

On February 16 and 17, 2010, just two weeks after oral argument in the Bankruptcy

Court on the net equity issue, Fox and Marshall each filed a putative class action ("Initial Florida

Complaints") against the Picower Defendants in Florida District Court ("Initial Florida Actions")

seeking to circumvent the anticipated net equity decision. [3]  (Murphy Dec. Exs. E ("Initial Fox

Complaint"), Murphy Dec. Ex. F ("Initial Marshall Complaint.")

Between them, Fox and Marshall sought to represent a "class" of all BLMIS customers

whose claims would not be fully satisfied by the Trustee using his net equity calculation.  Fox

---

[3] Fox and Marshall amended their complaints on March 15, 2010, making only clerical changes
to the original versions.  (*See* Murphy Dec. Exs. E–F.)

sought to certify a class of net winners. (Murphy Dec. Ex. E ¶ 74.) Marshall sought to certify a

class on behalf of "all SIPA Payees, but only with respect to claims, or portions thereof, not

assigned to the Trustee." (Murphy Dec. Ex. F ¶ 74.) Neither putative class was ever certified.

Fox and Marshall conceded that "the factual allegations in [their] respective Florida

complaints are virtually identical to those made" by the Trustee in his complaint. (Murphy Dec.

Ex. J at 5.) Both complaints copied the factual allegations contained in the Trustee's Action,

added a new caption, and relabeled the causes of action. Both of the Initial Florida Complaints

against the Picower Defendants alleged, in substance: that the Picower Defendants withdrew

billions of dollars from Madoff's Ponzi scheme under the circumstances alleged in the Trustee's

complaint; that those circumstances suggested that the Picower Defendants were not only aware

of but were complicit in the Ponzi scheme; and that the Picower Defendants' conduct in making

these withdrawals under the circumstances alleged constituted conversion through the theft of

funds from the accounts of Fox, Marshall and other BLMIS customers. (*See e.g.,* Murphy Dec.

Ex. E ¶¶ 67, 39–41; Murphy Dec. Ex. F ¶¶ 67, 39–41.)

These allegations parroted the Trustee's fraudulent transfer allegations against the

Picower Defendants. Fox and Marshall alleged that they and other BLMIS customers were

damaged as a result of the fraudulent transfers that the Picower Defendants received from

BLMIS. (Murphy Dec. Ex. E ¶¶ 5–9; Murphy Dec. Ex. F ¶¶ 5–9; *see In re Madoff*, 477 B.R. 351

at Ex. A (chart comparing allegations in Trustee's complaint with those in the Initial Florida

Actions).) Similar to the proposed "new" complaints by the Class Action Plaintiffs, the prior

Fox and Marshall complaints alleged that BLMIS and the Picower Defendants engaged in a

conspiracy to "steal the funds" of other customers—specifically, that "Picower and Defendants

converted the cash in other innocent BLMIS customers' accounts for their own personal benefit

11

with the acquiescence and assistance of Madoff and BLMIS."  (Murphy Dec. Ex. E ¶ 9; Murphy

Dec. Ex. F ¶ 9.)  The complaints sought, among other things, disgorgement of the profits that the

Picower Defendants received from BLMIS and a constructive trust over the Picower Defendants'

assets.  (Murphy Dec. Ex. E ¶ 92; Murphy Dec. Ex. F ¶ 92.)

      **B.**      **The Bankruptcy Court's Enforcement of the Automatic Stay and Issuance of a Preliminary Injunction**

At the time Fox and Marshall filed their complaints, the Trustee was in settlement

negotiations with the Picower Defendants.  Because the Initial Florida Actions would interfere

with the Trustee's claims, upend the SIPA priority distribution scheme, and hinder settlement

discussions with the Picower Defendants, on March 31, 2010, the Trustee filed an application in

the Bankruptcy Court seeking, among other things, to enforce the automatic stay and

preliminarily enjoin Fox and Marshall and their counsel from litigating against the Picower

Defendants, pending the completion of the Trustee's settlement with the Picower Defendants.[4]

(*See* Murphy Dec. Ex. I.)

On May 3, 2010, this Court held that the Initial Florida Actions violated the automatic

stay and at least one stay order of the District Court.  *Fox*, 429 B.R. 423.  The Court declared the

Initial Florida Actions void *ab initio* and issued a preliminary injunction under section 105(a) of

the Bankruptcy Code.  *Id.*  The Court further found an imminent threat to the BLMIS estate from

the Florida Actions and held that an extension of the stay was appropriate and necessary to,

among other things, "preserve the integrity of the SIPA proceedings and the Trustee's settlement

negotiations . . . ."  *Id.* at 436.  Fox and Marshall appealed that order.

---

[4] After the Trustee moved for his injunction, Fox and Marshall moved *ex-parte* in the Florida District Court for a preliminary injunction against the Trustee.  The Florida District Court denied that request (the same day the motions were filed) and deferred to the Bankruptcy Court, ultimately closing the Initial Florida Actions.  (*See* Murphy Dec. Exs. E, F (docket sheets).)

### C.    The Picower Settlement

While the Trustee was pursuing his action against and potential settlement with the

Picower Defendants, the government also was in discussions with the Picower Defendants'

counsel.  (Murphy Dec. Ex. G (Trustee's Mot. to Approve Compromise) at 3.)

After months of extensive negotiations, the Trustee and the Picower Defendants reached

an agreement under which the Picower estate agreed to return $5 billion to the BLMIS estate.

(*Id.*)  Simultaneously, the Picower estate agreed to forfeit the $5 billion and an additional amount

of approximately $2.2 billion to the government.  (*Id.*)  When these amounts were combined in

this global settlement, 100 percent of the net withdrawals received by the Picower Defendants

over the lifetime of their investments with BLMIS became available for eventual distribution to

BLMIS victims, without the need for litigation.  (*Id.*)

In exchange for the benefits to the BLMIS estate, the settlement agreement contains a

release of all claims that the Trustee brought or could have brought against the Picower

Defendants in connection with BLMIS.  (*Id.* at 15.)  Because of the importance to the Picower

Defendants of precluding suits on claims they were settling, the Trustee agreed to use his

reasonable best efforts to seek a narrowly tailored permanent injunction from the Bankruptcy

Court.  (*Id.*)  The permanent injunction would exclude from its scope actions where there is an

independent basis on which to bring suit against the Picower Defendants.  (*Id.*)  The permanent

injunction was identified by the Picower Defendants as an essential part of the settlement.  (*Id.* at

25–28.)

### D.    The Bankruptcy Court's Approval of the Settlement and Issuance of a Permanent Injunction

On December 17, 2010, the Trustee moved for an order approving the settlement

agreement and entering a permanent injunction under section 105(a) of the Bankruptcy Code and

Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure.  (Murphy Dec. Ex. G.)  Fox

and Marshall filed objections.  (*See Picard v. Picower*, Adv. Pro. No. 09-1197, ECF Nos. 32,

34.)  Out of the approximately 16,000 creditors of the BLMIS estate, (*see* Murphy Dec. H at 6),

only one other objection was filed to this landmark settlement.

In opposing the settlement, Fox and Marshall argued, among other things, that the

Trustee was obtaining an unfair "priority" over the $7.2 billion which should have remained

available to Fox and Marshall and others who disagreed with the Net Equity Decision, for

satisfaction of their own claims.  (*See Picard v. Picower*, Adv. Pro. No. 09-1197, ECF Nos. 32,

34.)  The Bankruptcy Court overruled Fox's and Marshall's objections and approved the

settlement on January 13, 2011.  (Murphy Dec. Ex. A.)

Judge Lifland found that the Permanent Injunction was necessary and appropriate to carry

out the provisions of the Bankruptcy Code, to prevent any entity from exercising control or

possession over property of the estate, to preclude actions that would have a conceivable effect

or adverse impact upon the BLMIS estate or on the administration of the liquidation proceeding,

and to avoid relitigation or litigation of claims that were or could have been asserted by the

Trustee on behalf of all customers and creditors.  (*Id.* at 6–7.)  Judge Lifland stated at the hearing

that: "[t]he injunction is narrow.  It deals with duplicative and parallel claims of the trustee. . . .

And you cannot expect any settlor to make a settlement with a potential possibility of being sued

twice over the same causes of action and claims."  (Murphy Dec. H at 40–41.)  Accordingly,

Judge Lifland approved the settlement and issued the following Permanent Injunction:

> [A]ny BLMIS customer or creditor of the BLMIS estate . . . is hereby
> permanently enjoined from asserting any claim against the Picower BLMIS
> Accounts or the Picower Releasees that is duplicative or derivative of the claims
> brought by the Trustee, or which could have been brought by the Trustee against
> the Picower BLMIS Accounts or the Picower Releasees . . . .

(Murphy Dec. Ex. A at 7.)  The Court stated on the record that the Permanent Injunction applied

to Fox's and Marshall's putative class actions, and that their cases were barred.  (Murphy Dec.

Ex. H at 41.)

### E.    The District Court's Decision and Order Affirming the Bankruptcy Court's Order

Fox and Marshall appealed the orders declaring the Initial Florida Actions void *ab initio*,

the approval of Picower settlement, and the preliminary and permanent injunctions.  These

appeals were consolidated and heard by the Judge Koeltl.  Judge Koeltl rejected each of Fox's

and Marshall's arguments, holding that the Bankruptcy Court was "plainly correct in finding that

the Florida Actions violated the automatic stay," because they were a "transparent effort" to

pursue claims that "were duplicative of claims brought by the Trustee and that belonged to the

Trustee on behalf of all creditors of BLMIS."  *Fox*, 848 F. Supp. 2d at 473.

Judge Koeltl examined the complaints in the Initial Florida Actions and determined that,

"[p]ut bluntly, the wrongs pleaded in the Florida Actions and in the Trustee's action are the

same."  *Id.* at 479.  The factual allegations, which were "virtually identical" to those in the

Trustee's complaint (and which are repeated, though re-worded, in the new complaints recently

brought by the Fox Plaintiffs), alleged no act directed specifically toward Fox and Marshall or

duty owed specifically to them.  *Id.*  Instead, the District Court held that the wrongful acts

alleged in their complaints "harmed every BLMIS investor (and BLMIS itself) in the same way:

by withdrawing billions of dollars in customer funds from BLMIS and thus substantially

diminishing the assets available to BLMIS . . . ."  *Id.* at 480.  Accordingly, the District Court

concluded that the claims asserted by Fox and Marshall could have been asserted by any creditor

of BLMIS.  The District Court further rejected Fox's and Marshall's attempt to "circumvent this

obvious proposition by arguing that they are seeking different damages" such as the time-value

of their money and taxes paid, because "these are all the same types of damages that could be claimed by other BLMIS customers in general." *Id.* at 480–81. Under the Second Circuit's *St. Paul* decision, the District Court held, such generalized claims belong to the Trustee. *Id.*

The District Court further upheld the validity of the Permanent Injunction, finding that the Bankruptcy Court has jurisdiction to permanently enjoin actions "that are derivative or duplicative of claims brought by the trustee, or that could have been brought by the trustee in the first instance," and concluded that the Fox and Marshall actions violated the Permanent Injunction as well as the automatic stay. *Id.* at 488 (citing *In re Dreier LLP*, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010) (Bernstein, J.)). The District Court enforced the injunction, finding that the extraordinary sum of $7.2 billion was recovered for the estate after arm's-length bargaining, "the injunction of derivative claims like the Florida Actions was part of that bargain," and that the "integrity of the SIPA liquidation itself" is protected by preventing customers from circumventing the Net Equity Decision and undermining the liquidation plan.[5] *Id.* at 490.

### F.  **The Civil Forfeiture Action and the Trustee's Distribution**

Fox separately sought to intervene in the civil forfeiture action commenced by the government. On May 23, 2011, the Honorable Thomas P. Griesa denied Fox's attempt to intervene and amend, modify, or rescind the order of settlement. *See United States v. $7,206,157,717 on Deposit at JP Morgan Chase Bank, N.A.*, 274 F.R.D. 125 (S.D.N.Y. 2011). The District Court found that "the proper avenue for Fox to challenge Picard's method of compensating Madoff's victims is not with this case, but with the appeal by other net winners of the Bankruptcy Court's decision approving of Picard's method." *Id.* at 127.

---

[5] The District Court also rejected Fox's and Marshall's argument that *Stern v. Marshall*, 131 S. Ct. 2594 (2011), deprived the Bankruptcy Court of jurisdiction to approve the settlement. *Fox*, 848 F. Supp. 2d at 483 n.5.

On May 24, 2011, Judge Griesa issued a final judgment of forfeiture. *See United States v. $7,206,157,717 on Deposit at JP Morgan Chase Bank, N.A.*, Final Judgment of Forfeiture, 10-CV-9398 (TPG), ECF No. 17 (S.D.N.Y. Dec. 17, 2010). Fox appealed the forfeiture order, and the government moved to dismiss the appeal as frivolous. *See U.S. v. Fox*, Case No. 11-2898-CV (2d Cir. 2011), ECF Nos. 1, 44. The Second Circuit dismissed the appeal as lacking a legal or factual basis. (*See U.S. v. Fox*, Case No. 11-2898-CV, ECF No. 85.) Fox did not seek a writ of *certiorari*, making the forfeiture order final and allowing for the release of funds to the Trustee, who obtained approval to make a distribution to customers. (*See U.S. v. Fox*, Case No. 11-2898-CV (docket sheet); Order Approving Second Allocation, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. 08-01789 (Bankr. S.D.N.Y. Aug. 22, 2012), ECF No. 4997.)

## G.     The Second Circuit's Decision Affirming the Permanent Injunction As Against Fox and Marshall

On January 13, 2014, the Second Circuit affirmed the District Court and upheld the Permanent Injunction as against Fox and Marshall. *Marshall*, 740 F.3d 81. The Second Circuit held that the Initial Florida Actions "impermissibly attempt to 'plead around'" the Permanent Injunction because they "allege nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS, instead of 'particularized' conduct directed at BLMIS customers." *Id.* at 84. It further held that the Bankruptcy Court had jurisdiction to enjoin duplicative or derivative claims, like those in the Florida Actions, because they "undoubtedly have an effect on the bankruptcy estate . . . ." *Id.* at 89 (citing *Quigley Co. v. Law Offices of Peter G. Angelos (In re Quigley Co.)*, 676 F.3d 45, 57 (2d Cir. 2012). The Second Circuit defined derivative claims as those claims that "arise from harm done to the

estate" and "seek relief against third parties that pushed the debtor into bankruptcy." *Id.* (quoting *Picard v. JPMorgan Chase & Co.*, 721 F.3d 54, 70 (2d Cir. 2013)).

The Second Circuit held that the Florida Actions were derivative of the Trustee's Action because the allegations in the Florida complaints "echo" those made by the Trustee. *Id.* at 91 (referring to the chart comparing allegations in the Trustee's complaint with those of the Florida complaints, appended as Exhibit A to *In re Madoff*, 477 B.R. 351). Importantly, it found that "[t]he only allegations of the Picower [D]efendants' direct involvement in the Ponzi scheme are that they prepared false documentation, recorded and withdrew fictional profits, and filed false statements in connection with their tax returns." *Id.* at 92. Citing the District Court's decision in *Goldman*, 2013 WL 5511027, the Second Circuit held that:

> [t]he . . . Complaints plead nothing more than that the Picower Defendants traded on their *own* BLMIS accounts, knowing that such "trades" were fraudulent, and then withdrew the "proceeds" of such falsified transactions from BLMIS. All the "book entries" and "fraudulent trading records" that the Complaints allege refer to nothing more than the fictitious records BLMIS made, *for the Picower Defendants*, to document these fictitious transactions. In other words, the Complaints plead nothing more than that the Picower Defendants fraudulently withdrew money from BLMIS.

*Id.* at 92 (citing *Goldman*, 2013 WL 5511027, at *7) (emphasis in original). The Second Circuit ruled that the Initial Florida Actions did not contain particularized claims because they "do not allege that the Picower [D]efendants made . . . misrepresentations to BLMIS customers," and found rather that the "alleged injuries are inseparable from, and predicated upon, a legal injury to the estate—namely, the Picower defendants' fraudulent withdrawals from their BLMIS accounts of what turned out to be other BLMIS customers' funds." *Id.* The Second Circuit further held that Fox's and Marshall's complaints "have not alleged that the Picower defendants took any . . . 'particularized' actions aimed at BLMIS customers," such as making misrepresentations to Fox and Marshall. *Id.* at 93.

18

Notably, Fox and Marshall argued to the Second Circuit that the allegations in their complaint, at their "core," amounted to a claim that Picower has "ensured the fraud's success by inducing [them] and other customers to invest (and remain invested) in BLMIS." (*See* Fox Appellate Brief, No. 12-1645 (2d Cir.), ECF No. 71 (Aug. 10, 2012) at 25, Marshall Appellate Brief, No. 12-1645 (2d Cir.), ECF No. 87 (Aug. 13, 2012) at 31.) The Second Circuit specifically rejected this argument: "[a]llegations that the Picower [D]efendants knowingly reaped the benefits of Madoff's scheme through fraudulent withdrawals, and effected such withdrawals through backdating trades and recording fictional profits, *does not amount to a particularized claim that they directly participated in defrauding BLMIS customers by inducing them to invest*." *Id.* at 92 (emphasis added). The Second Circuit also rejected Fox's and Marshall's argument that their claims were non-derivative because they sought damages not available in an avoidance action, finding that the "claimed damages, also suffered by all BLMIS customers, still remain mere secondary harms flowing from the Picower defendants' fraudulent withdrawals and the resulting depletion of BLMIS funds."[6] *Id.* at 93.

Contrary to Fox's and Marshall's statements to the Florida District Court, the Second Circuit did *not* grant the Fox Plaintiffs leave to amend their complaints. Rather, the Second Circuit affirmed the injunction "without prejudice to Fox and Marshall seeking leave to amend their complaints." The Court noted that while "[t]here is conceivably some particularized conspiracy claim appellants could assert that would not be derivative of those asserted by the Trustee," that question was not properly before the Court but rather "is a question in the first instance for the United States District Court for the Southern District of Florida." *Id.* at 94.

---

[6] The Second Circuit also held that the Bankruptcy Court had constitutional authority to issue the Permanent Injunction under the U.S. Supreme Court's holding in *Stern v. Marshall*, 131 S. Ct. 2594 (2011). *Id.* at 94–96.

19

Accordingly, the Second Circuit stated that "we intimate no view on an appropriate disposition of any such motion for leave to amend." *See id.* at 96.  Notably, nowhere did the Second Circuit instruct that *only* the Florida District Court could consider whether any new filings violated the Permanent Injunction, as the Class Action Plaintiffs now argue.  (*See* Murphy Dec. Ex. U at 3; Murphy Dec. Ex. N at 2.)

## V.    ROUND TWO:  THE SAME LAW FIRMS ATTEMPT TO BRING THE GOLDMAN CLASS ACTIONS

### A.    <u>The Goldman Class Action Complaints</u>

While the Fox and Marshall appeal was pending, the Goldman Plaintiffs sought permission from this Court to file two putative class actions in Florida District Court in 2011 (the "Initial Goldman Actions" and "Initial Goldman Complaints").  (Murphy Dec. Ex. K.)  While Pamela Goldman sought to represent so-called "net losers," A&G Goldman sought to represent "net winners."  (*See id.*)  Together, they sought to represent customers and creditors already before the Bankruptcy Court, and for whom the Bankruptcy Court had already determined equitable distributions in accordance with the net equity method approved by the Second Circuit.

The Initial Goldman Actions alleged that the Picower Defendants received billions of dollars of transfers from BLMIS under circumstances that suggest Picower knew that BLMIS was engaged in fraud.  (*See e.g.,* Murphy Dec. Ex. K, Ex. A thereto ¶ 2.)[7]  As demonstrated in Exhibit A annexed to the Bankruptcy Court's order in *In re Madoff*, 477 B.R. 351, the Fox/Marshall and Goldman complaints were virtual carbon copies of each other.

The only thing new in the Initial Goldman Actions was the labeling of the claims as securities fraud claims instead of fraudulent transfers or conspiracy to defraud.  The Goldman

---

[7] The A&G Goldman Partnership and Pamela Goldman draft complaints are identical except for paragraphs identifying the classes represented.

Plaintiffs claimed that Picower was a "control person" under section 20(a) of the Exchange Act with respect to BLMIS and participated with BLMIS in violations of Rule 10b-5 of the Exchange Act. (*See, e.g.*, Murphy Dec. Ex. K, Ex. A thereto ¶¶ 4, 41.) The purported federal securities laws violations were based on the Picower Defendants' withdrawals from BLMIS: "The volume, pattern and practice of the Defendants' fraudulent withdrawals from BLMIS and their control over fraudulent documentation of underlying transactions at BLMIS establishes the Defendants' 'control person' liability under the federal securities laws." (*Id.* ¶ 41.)

The alleged wrongdoing by Picower consisted of his fraudulent transfers from BLMIS, which mirrored allegations in the Trustee's complaint. (*See, e.g.*, *id.* ¶ 44 ("Jeffry Picower knew of the existence of [Madoff's] scheme and . . . Jeffry Picower was taking fraudulent profits from the BLMIS customer accounts"); *id.* ¶ 45 ("Picower was able to control BLMIS and use BLMIS as 'a personal piggy bank' by withdrawing funds for various entities he controlled, even if there was no legitimate underlying profitable transaction warranting a distribution of such funds."); *id.* ¶ 51 ("The pattern of transactions in the Defendants' accounts reveals their fraudulent nature. Each quarter, Picower, directly and through the other Defendants and other agents, directed the withdrawal of large sums of money divided into odd numbers spread over many of the Defendant accounts."); *see also* Murphy Dec. Ex. D (Trustee's Picower Complaint) ¶ 66 ("The Transfers were, in part, false and fraudulent payments of nonexistent profits supposedly earned in the Accounts . . . "). They also mirrored the allegations in the Initial Florida Complaints by Fox and Marshall, which were already held to be nothing but a rehash of the Trustee's allegations. *See In re Madoff*, 477 B.R. 351, 355–57 and at Ex. A.

**B.      The Bankruptcy Court's Enforcement of the Automatic Stay and Permanent Injunction**

On June 20, 2012, the Bankruptcy Court held that the Initial Goldman Actions violate the Permanent Injunction and the automatic stay.  *See In re Madoff*, 477 B.R. 351.  The Bankruptcy Court expressed frustration at the tactics of the Goldman Plaintiffs and their counsel, and the proliferation of actions seeking to circumvent the Net Equity Decision and disrupt the *pro rata* distribution provided by SIPA.  "*It's déjà vu all over again*.  The Class Action Plaintiffs are attempting to use inventive pleading to sidestep the automatic stay and the [Permanent] Injunction."  *Id.* at 354 (internal quotations omitted).)  The Bankruptcy Court emphasized that the Goldman Plaintiffs "have simply repeated, repackaged, and relabeled the wrongs alleged by the Trustee [against the Picower Defendants] in an attempt to create independent claims where none exist."  *Id.*  The Court found that the Goldman Plaintiffs "re-iterate" the Trustee's allegations "almost verbatim."  *Id.*

The Bankruptcy Court held that the Goldman Actions violated the Permanent Injunction and the automatic stay for three main reasons.  First, the Court found that despite the "nominal title" of their causes of action, the Initial Goldman Actions raised issues substantially "identical" to the Trustee's Picower complaint.  *Id.* at 355.  Specifically, the Court found that "the Plaintiffs' action is based on pleadings that are nearly identical to those of the Trustee," that they "substantially parroted the Trustee's Complaint," and also "mimic those set out in the Fox and Marshall complaints, which this Court found to be duplicative of the Trustee's, a finding the District Court affirmed."  *Id.*  The Court recounted numerous examples of overlap between the Goldman Plaintiffs' allegations and those of the Trustee, as well as those of Fox and Marshall, and cited an exhibit, originally submitted by the Trustee, which "substantially reflects and links the cloning of the pleadings."  (*Id.* at 356 n.12, Ex. A.)

22

Second, the Bankruptcy Court found the Goldman Plaintiffs' claims to be "derivative of the Trustee's." *Id.* at 356. Indeed, the Court found that the alleged harms are "limited to 'general direction and control and action to the detriment of all [BLMIS's] creditors.'" *Id.* at 357. Thus, the Court found that the Goldman Plaintiffs did not state a particularized injury against the Picower Defendants.

Third, the Bankruptcy Court found that the Initial Goldman Complaints, like the Fox and Marshall complaints, were simply "yet another attempt by the same counsel to re-litigate [the] Net Equity Decision." *Id.*

### C.   The District Court's Affirmance of the Bankruptcy Court's Decision and Order

On September 30, 2013, Judge Sullivan affirmed the Bankruptcy Court and upheld the Permanent Injunction as applied to the Initial Goldman Complaints. *A&G Goldman P'ship*, 2013 WL 5511027. The District Court held that the Goldman Plaintiffs' claims were derivative of the Trustee's fraudulent transfer claims. *Id.* at *6–11. Rejecting "a purely formalistic approach" that looks only at the nominal title of a cause of action, the District Court determined that the Goldman Plaintiffs' claims "are not bona fide securities fraud claims," and found instead that, aside from allegations listing the elements of a securities fraud claim, "all of the allegations in the Complaint refer exclusively to the Picower Defendants' fraudulent withdrawals." *Id.* at *6–7. The District Court recognized that the Goldman Complaints pled "nothing more than that the Picower Defendants traded on their *own* BLMIS accounts," allege fraudulently trading activity that BLMIS conducted "*for the Picower Defendants*," and that, "[i]n other words, the Complaints plead nothing more than that the Picower Defendants fraudulently withdrew money from BLMIS." *Id.* at *7 (emphasis in original).

23

The District Court further held that "the parts of the Complaints that do discuss aspects of the BLMIS fraud unconnected to the Picower Defendants' accounts noticeably *lack* any allegation that the Picower Defendants were involved in such fraud . . ." and that "with respect to the clearest examples of BLMIS's fraud to other customers, the Goldman Complaints are completely silent about the Picower Defendants' involvement." *Id.* at *8 (emphasis in original). Hence, the District Court found that:

> [t]his examination of the Goldman Complaints makes clear that *Class Action Plaintiffs do not in fact claim that the Picower Defendants directed BLMIS to make misrepresentations above and beyond what was necessary to document the Picower Defendants' false withdrawals.* The fraudulent representations Class Action Plaintiffs point to were incident to the fraudulent withdrawals. *Regardless of what Class Action Plaintiffs call their claims, the Goldman Complaints plead fraudulent conveyance claims.* Accordingly, they are clearly derivative of the Trustee's already-settled claims."

*Id.* at *9 (emphasis added). As a result, the District Court found that the Goldman Plaintiffs had brought "simply deceptively labeled fraudulent conveyance claims." *Id.* at *10. Accordingly, the District Court held the claims came "within the plain scope of the [Permanent] Injunction" and that the Bankruptcy Court had jurisdiction to enjoin them. *Id.* at *10–11. The Goldman Plaintiffs did not appeal the District Court's decision.

## VI.   ROUND THREE:  THE GOLDMAN AND FOX PLAINTIFFS AGAIN TAKE ACTION IN FLORIDA

### A.   The Goldman Plaintiffs Seek a Declaration That Their Amended Complaint Does Not Violate the Permanent Injunction

On January 6, 2014, the Goldman Plaintiffs commenced a new action in the Florida District Court seeking a declaration that neither the Permanent Injunction nor the automatic stay bars the Goldman Plaintiffs from filing a "new" class action complaint against the Picower Defendants. (Murphy Dec. Ex. M (the "New Goldman Action").) The action was assigned to District Judge Kenneth Marra. (*See id.*) The Goldman Plaintiffs are represented by the Beasley

Hauser and Blackner Stone law firms.[8]  (*Id.*)  The declaratory judgment action attaches a class

action complaint (the "New Goldman Complaint") that the Goldman Plaintiffs seek to have

declared not in violation of the automatic stay or the Permanent Injunction.  (*See* Murphy Dec.

Ex. C.)

Despite rehashing the same arguments rejected by the District Court, the Goldman

Plaintiffs assert that their claims rest on different legal theories, have different elements, seek

different damages, are subject to different proof, and are subject to a different statute of

limitations than the Trustee's claims against the Picower Defendants.  The Goldman Plaintiffs

have added a general allegation that the Picower Defendants "directly or indirectly induced"

BLMIS to make misrepresentations to BLMIS customers.  (Murphy Dec. Ex. C ¶¶ 24–29.)

In substance, however, the New Goldman Complaint is identical to the former Goldman

complaint that was held to be barred under the Permanent Injunction.  It again attempts to assert

a claim under section 20(a) of the Exchange Act against the Picower Defendants for loss in the

value of their investment in the "BLMIS Discretionary Trading Program" (their new name for

BLMIS's Investment Advisory business).  (*Id.* ¶ 62, 89–97.)  But again, it does not contain any

factual allegations that Picower took any specific action with respect to other customers'

accounts, or indeed took any action at BLMIS outside of his own accounts.

Instead, trying to get around the deficiencies in their prior pleading, the Goldman

Plaintiffs more clearly spell out their theory that Picower knew that the false trading in his own

BLMIS accounts would result in false asset values in other BLMIS customers' accounts because

those other accounts did not reflect cash transfers from their accounts to Picower.  (*See id.* ¶¶ 65–

---

[8] Beasley Hauser and Blackner Stone also represented Fox in her appeal of the injunction before
the Second Circuit.  (*See Fox v. Picard*, No. 12-1645 (2d Cir. filed Apr. 24, 2012), ECF Nos. 1,
71, 118.)

66.)  As a result of Picower's activity within his own accounts, the Goldman Plaintiffs allege, "the account records of other BLMIS customers falsely overstated the assets therein and their investment performance.  BLMIS customers consequently unknowingly overpaid for BLMIS securities."  (*Id.* ¶ 66; *see also id.* ¶ 2 (Picower's own transactions in his own accounts "(1) directly resulted in additional material misrepresentations to other BLMIS investors as to their account values and profits and (2) required defalcation of funds from other BLMIS investors to pay Picower and his affiliates."); ¶ 3 (Picower's knowledge that his transactions would cause other BLMIS customers to be defrauded and Picower's control over BLMIS together "*amount to Picower making direct misrepresentations to those customers.*") (emphasis added); ¶ 65 ("Picower caused BLMIS to book phony transactions with phony profits *in his accounts*.  From time to time, Picower withdrew these phony profits *from his BLMIS account*.") (emphasis added); ¶¶ 69–70, 72–73 (providing specific examples of Picower directing false trading in his own accounts).  These allegations are entirely conclusory and do not cure the deficiencies in the prior Goldman complaint.

        The omission of any allegation that Picower undertook any conduct outside of his own accounts is particularly telling given the Goldman Plaintiffs' prior representations to Judge Sullivan during oral argument that they had email evidence that the Picower Defendants also controlled BLMIS with respect to the dissemination of account statements to other customers and audit reports, and hence directly harmed investors: "Mr. Stone:  . . . There are email documents . . . which showed that Picower directed through email false trades [to] be recorded on the bank records of Madoff which showed substantial profits that were not occurring. . . .  It is our intention, when we have the ability to do so, to file an amended complaint including all of that."  (Murphy Dec. Ex. L at 12–13); *see A&G Goldman P'ship*, 2013 WL 5511027, at *8.  The

26

New Goldman Complaint's lack of any reference to or quotation from such alleged evidence speaks volumes as to the lack of anything new here.

The Goldman Plaintiffs have moved for summary judgment on their request for declaratory relief in the New Goldman Action.  (Murphy Dec. Ex. N.)  The Goldman Plaintiffs have also filed a notice of pendency of Fox's and Marshall's recent motion to re-open their own action.  (Murphy Dec. Ex. P.)

### B.    Fox and Marshall Move to Re-Open the Florida Class Action

Following the New Goldman Complaint activity, on February 18, 2014, Fox and Marshall, together with Peshkin and Oasis, and purportedly representing a putative class of plaintiffs, moved in the Florida District Court before Senior District Judge Kenneth Ryskamp to re-open the Fox Class Action, Case No. 10-80252, and for leave to file a second amended complaint ("Motion to Re-open").  (Murphy Dec. Ex. Q.)  The Fox Plaintiffs are represented by the law firm of Becker Poliakoff and Becker Poliakoff attorney Helen Chaitman ("Chaitman").

The Fox Plaintiffs appended to the Motion to Re-open a draft Second Amended Complaint (the "Fox Second Amended Complaint" or "Fox SAC").  (*See* Murphy Dec. Ex. B.) The Fox Second Amended Complaint does little more than re-label the same allegations made in the Initial Florida Complaints.  The Fox SAC makes two innovations.  First, it manufactures a claim under Section 20(a) of the Exchange Act against the Picower Defendants on allegations that are virtually identical to those in the New Goldman Complaint.[9]  As a result, the Fox SAC is substantively no different from either the complaints in the Initial Florida Action or the New Goldman Complaint, relying on the same conclusory allegations: that the Picower Defendants

---

[9] For the Court's convenience, attended hereto as Appendix A is a chart comparing key allegations among the various iterations of the Fox/Marshall and Goldman Complaints.

knew that their actions in their own accounts would affect other BLMIS accounts, and that such conduct is tantamount to a misrepresentation to other BLMIS customers. (*See, e.g.,* Murphy Dec. Ex. C (New Goldman Complaint) ¶¶ 2, 3, 65–66; Murphy Dec. Ex. B (Fox SAC) ¶ 117, 119, 120.)

Second, the Fox SAC now states affirmatively what it previously urged to the Second Circuit, specifically that Picower's conduct with respect to his accounts generally "induced" other customers to invest with BLMIS. Notably, the allegations are framed as a general statement that Picower "induced" Madoff to make misrepresentations and omissions to BLMIS customers, rather than alleging any conduct by Picower toward any other customer. (*See* Murphy Dec. Ex. B (Fox SAC) ¶ 117 ("Picower directly or indirectly induced BLMIS' misleading statements to others so that he could continue to enrich the Picower Parties at the expense of the Plaintiffs . . ."); ¶ 118 ("Picower induced Madoff to solicit additional customers for the BLMIS Discretionary Trading Program so that he could continue to enjoy astronomical returns"); ¶ 119 ("Picower directly or indirectly induced the material misrepresentations and omissions giving rise to the securities violations alleged herein"); ¶ 120 ("Picower directly or indirectly induced BLMIS to conceal the fraud from BLMIS customers and from federal and state regulators"); ¶¶ 174, 185; *cf.* Initial Florida Complaint (Murphy Dec. Ex. E) ¶¶ 80, 81.)

Like the New Goldman Complaint, the Fox Second Amended Complaint alleges that Picower knew that the false trading in his accounts resulted directly in false trading in other BLMIS customers' accounts. (*See e.g., id.* ¶ 52 ("Picower knew and intended that each phony recording of a fictitious profitable transaction in his accounts resulted directly in the recording of false transactions and false asset values in the accounts of customers whose funds were invested pursuant to the BLMIS Discretionary Trading Program because BLMIS concealed the theft of

customers' money in order to enrich Picower and the Picower Parties"), ¶ 53 ("As a result of
Picower's control over Madoff, he caused BLMIS to send to all of the customers of the BLMIS
Discretionary Trading Program false and misleading information (*i.e.*, fictitious trade and
inflated account values), in order to induce customers to maintain their accounts with BLMIS
and to continue to attract new customers for BLMIS' Discretionary Trading Program"), ¶ 55; *cf.*
New Goldman Complaint ¶¶ 2, 3, 65–66.)  Thus, like the New Goldman Complaint, the Fox
Second Amended Complaint does not allege any specific conduct by Picower outside of
directing trades and related misconduct concerning his own accounts.

The Fox SAC contains several allegations made "according to Madoff."  (*See, e.g.*, Fox
SAC at 1; *id.* ¶¶ 46 ("According to Madoff, Picower fully and knowingly participated in the
fraud that BLMIS perpetrated on customers of the BLMIS Discretionary Trading Program and
actively encouraged people to enter into investment advisory agreements with BLMIS."), 43,
49–51.)  As a convicted fraudster, Madoff is entirely unreliable.  Even if this Court were to give
weight to alleged statements by Madoff, which it should not, the allegations are conclusory.  The
Fox SAC's failure to allege any specific new conduct by the Picower Defendants or
communications by the Picower Defendants to any BLMIS customer shows that these allegations
are merely a gloss on the same allegations rejected by the District Court and Second Circuit.

The Fox Second Amended Complaint drops all the claims from the Initial Florida
Complaints except for a claim under Florida's RICO statute (*id.* ¶¶ 140–64), and replaces them
with claims under Section 20(a) of the Exchange Act, the federal RICO statute (*id.* ¶¶ 123–39),
and state-law tort claims for aiding and abetting breach of fiduciary duty, aiding and abetting
fraud, and non-normative tort for intentional and unprivileged infliction of temporal harm.  (*Id.*
at 101–93.)  The Fox Second Amended Complaint also differs from the Initial Florida Complaint

in that two new named plaintiffs have been added, Marsha Peshkin and Russell Oasis, and the class definition no longer distinguishes between net winners and net losers.

Both the Fox Second Amended Complaint and the New Goldman Complaint, unlike their predecessors, remove any references to the Trustee's Picower allegations, and re-word their previous allegations as necessary to try to avoid the word-for-word parroting of the previous versions of their complaints.  That said, the new complaints still do little more than mimic the Trustee's complaint.

> **C.**    **The Class Action Plaintiffs' Efforts to File Amended Complaints are Disputed Even in the Florida District Court by the Class Action Plaintiffs**

In the Fox Plaintiffs' motion to re-open the case, the Fox Plaintiffs represent to the Florida District Court that they "have leave from the Second Circuit Court of Appeals to proceed with this matter."  (Murphy Dec. Ex. Q at 2; *see also* Murphy Dec. Ex. S at 5.)  In view of this misrepresentation, among other things, the Picower Defendants sought an immediate stay in Florida District Court of the Fox Class Action.  (Murphy Dec. Ex. R.)  The Picower Defendants' motion included as an exhibit a letter from the Trustee's counsel to the Picower Defendants' counsel that the Trustee would be filing this Application.  (*See id.*, Declaration of Marcy R. Harris in Support of Defendants' Motion, Ex. C.)  On February 21, 2014, Florida District Judge Ryskamp issued an order to show cause why the Florida District Court should not stay the action "to allow the New York Bankruptcy Court to decide the applicability of the permanent injunction and automatic stay."  (Murphy Dec. Ex. V.)

The Fox Plaintiffs have responded and cross-moved for a preliminary injunction allowing them to proceed in Florida.  (Murphy Dec. Ex. U.)  Anticipating the Trustee's injunction request, they have argued to the Florida District Court that the Trustee's request to have this Court enforce its own injunction would be "defying" the Second Circuit, and they seek to enjoin the

Picower Defendants and "any person in active concert or participation with them," including

specifically the BLMIS Trustee, from litigating the Fox Class Action in any jurisdiction *other*

than the Florida District Court.  (*Id.*)[10]  Their cross-motion also seeks an order permitting them to

take the depositions of Bernard Madoff and April Freilich (who is affiliated with the Picower

Defendants and is a releasee under the Permanent Injunction).  (*Id.*; *see* Murphy Dec. Ex. A

(listing Picower Releasees).)

Concurrently, Beasley Hauser and Blackner Stone, representing the Goldman Plaintiffs,

have sought to transfer the Fox Class Action to Florida District Judge Marra and consolidate it

with the New Goldman Action, or alternatively, to consolidate the New Goldman Action with

the Fox Class Action before Judge Ryskamp.  (*See* Murphy Dec. Ex. S.)  They also have moved

to disqualify Becker Poliakoff and Chaitman as counsel for the Fox Plaintiffs due to a conflict of

interest in her representation.  (*See* Murphy Dec. Ex. T.)  Beasley Hauser and Blackner Stone

assert that *they* represent Fox and Marshall, not Becker Poliakoff and Chaitman.  (*See id.* at 7–8.)

The Fox Plaintiffs' action is currently stayed before Judge Ryskamp pending his

resolution of the Picower Defendants' emergency motion to stay.  (*See* Murphy Dec. Ex. V.)

Briefing on the disqualification motion is nevertheless going forward.  (*See* Endorsed Order

issued Feb. 26, 2014, Murphy Dec. Ex. E (docket sheet).)

---

[10] The Fox Plaintiffs did not name the Trustee in any action in the Florida District Court, nor did
they serve the Trustee with their injunction papers.  (Murphy Dec. ¶ 4.)

31

**ARGUMENT**

**THE PERMANENT INJUNCTION AND AUTOMATIC STAY BAR THE CLASS ACTION PLAINTIFFS FROM PROCEEDING**

**I.    THE CLASS ACTION PLAINTIFFS SHOULD SEEK PERMISSION FROM THIS COURT TO PROCEED**

The Class Action Plaintiffs contend that the Florida District Court has *exclusive* jurisdiction to interpret this Court's Permanent Injunction and decide whether their claims are barred by it.  (Murphy Dec. Ex. N ¶ 2; Ex. U at 3 ¶ 5.)  They are incorrect.  The Second Circuit, upon which the Fox Plaintiffs rely, held no such thing.  Rather, the court merely stated in *dicta* that the Florida District Court would be empowered to determine the applicability of the Permanent Injunction—not that it is the only court that could do so.  *Marshall*, 740 F.3d at 94. Indeed, it is not.

As an initial matter, this Court is overseeing the administration of the BLMIS estate and has jurisdiction to enforce the automatic stay.  It is proper procedure for a litigant who believes that he or she might be prosecuting an action in violation of the automatic stay to move the bankruptcy court for relief from the stay.  *See LTV Steel Co. v. Bd. of Educ. (In re Chateaugay Corp.)*, 93 B.R. 26, 30 (S.D.N.Y. 1988) ("a motion to *modify* or *lift* the provisions of the automatic stay with respect to a particular action must be made to the bankruptcy court which is supervising the reorganization . . . .") (emphasis in original) (citing *Fid. Mortg. Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 57 (2d Cir. 1976)); *Mother African Union Methodist Church v. Conference of AUFCMP Church (In re Conference of African Union First Colored Methodist Protestant Church)*, 184 B.R. 207, 215–16 (Bankr. D. Del. 1995) (motion to modify or lift the automatic stay must be made to the bankruptcy court).  The Goldman Plaintiffs and counsel for both the Fox and Goldman Plaintiffs well know they should have moved before this Court given that the automatic stay pertains here, because the Goldman Plaintiffs moved before

this Court previously to lift the stay, and Judge Lifland admonished counsel for the Fox Plaintiffs

previously for failing to do so.  *Picard v. Fox*, Adv. Pro. No 10-03114 (BRL), 2010 WL

8815208, at *3 (Bankr. S.D.N.Y. Aug. 3, 2010) ("The Appellants violated the stay when they

pursued these actions without seeking relief in this Court."); *Fox*, 429 B.R. at 430.

Moreover, the Bankruptcy Court expressly retained jurisdiction in the Permanent

Injunction "over any and all disputes arising under or otherwise relating to this Order."  (*See*

Murphy Dec. Ex. A at 8.)  It is well-settled that bankruptcy courts, like Article III courts, have

jurisdiction to interpret and enforce their own orders, including injunction orders. *See Travelers*

*Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (the "Bankruptcy Court plainly had jurisdiction

to interpret and enforce" its order confirming debtor's reorganization plan and permanently

enjoining third-party litigation); *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*,

304 F.3d 223, 230 (2d Cir. 2002) (bankruptcy court had jurisdiction to enforce pre-existing

injunction in sale order); *In re Old Carco LLC*, No. 09–50002 (SMB), --- B.R. ----, 2014 WL

641545, at 6 n.17 (Bankr. S.D.N.Y. Feb. 19, 2014) (Bernstein, J.) ("the Court retains bankruptcy

jurisdiction under 28 U.S.C. § 1334 to interpret its prior sale order even when the dispute

involves non-debtor third parties"); *Moelis & Co. LLC v. Wilmington Trust FSB (In re Gen.*

*Growth Props., Inc.)*, 460 B.R. 592, 598 (Bankr. S.D.N.Y. 2011) ("A bankruptcy court always

has jurisdiction to interpret its own orders . . . .").

Accordingly, while both courts may have the ability to interpret and apply the Permanent

Injunction, this Court is the most appropriate forum to determine whether the Class Action

Plaintiffs' proposed amended complaints run afoul of the Permanent Injunction and the

automatic stay.  *See In re Charter Commc'ns*, No. 09-11435, 2010 WL 502764, at *1 (Bankr.

S.D.N.Y. Feb. 8, 2010) (bankruptcy court held that it was best situated to interpret injunction that

was part of its own confirmation order). *Charter* is instructive, as it concerned an effort to bring a securities class action against third parties in a distant district court in the face of a release in the bankruptcy court in the Southern District of New York. The *Charter* Court found that "although both this Court and the [Arkansas] District Court are clearly competent to rule on the Plan releases as they relate to the action pending in the District Court, the bankruptcy court is more closely connected to the current dispute and is the proper forum to rule with respect to the [debtor's motion to enforce the releases]." *Id.* at *3. The court also reasoned that there was a risk that the release could be eroded if interpreted by the Arkansas district court, particularly with respect to one of the officers who had "deep pockets" and who bargained for an effective settlement. *Id.* The court further held that preventing the prosecution of third-party actions barred by the Permanent Injunction was "critical to the orderly functioning of the bankruptcy process [and] closely tethered to core bankruptcy jurisdiction." *Id.* at *4.

As in *Charter*, while the Florida District Court may be competent to interpret the scope of the Permanent Injunction, this Court is best suited to do so. This Court is more closely connected to the dispute and the entire SIPA liquidation proceeding before it. The courts in this Circuit are also more familiar with these plaintiffs and the previous actions. Moreover, resolution here avoids the potential erosion of the Permanent Injunction and protects the Court's jurisdiction over the estate, including estate settlements.[11]

---

[11] The Fox Plaintiffs' expressed intent to seek leave to depose Bernard Madoff and April Freilich (*see* Murphy Dec. Ex. U at 3; Murphy Dec. Ex. B (Fox SAC) ¶ 63) underscores that the New York Bankruptcy Court is the proper forum. In this jurisdiction, a party should seek relief from the automatic stay before proceeding to depose a debtor. *See Time Warner Cable v. M.D. Elecs., Inc.*, 101 F.3d 278, 282–83 (2d Cir. 1996) (it was the "prudent course" for a third-party plaintiff to request relief from the automatic stay from the bankruptcy court before seeking discovery against a debtor). Likewise, Freilich is a releasee under the Settlement Agreement, and the plaintiffs' request to depose her falls within the scope of the Permanent Injunction and requires

*(continued on next page)*

## II.    THE BANKRUPTCY COURT HAS PERSONAL JURISDICTION OVER THE CLASS ACTION PLAINTIFFS

This Court has personal jurisdiction over the Class Action Plaintiffs and can enjoin those litigants and their counsel.  Each of the Class Action Plaintiffs, except Oasis, filed claims with the Trustee.  It is black-letter law that in a bankruptcy case, personal jurisdiction over a defendant exists when a defendant "consent[s] to jurisdiction by filing a proof of claim." *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 418 B.R. 75, 79 (Bankr. S.D.N.Y. 2009)); *see also Luan Inv., S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, No. 95B44528 (AJG), 2001 WL 826122, at *7 (S.D.N.Y. July 19, 2001); *Cruisephone, Inc. v. Cruise Ships Catering & Servs. N.V. (In re Cruisephone, Inc.)*, 278 B.R. 325, 330 (Bankr. E.D.N.Y. 2002).  "A customer claim filed in a SIPA action is equivalent to a proof of claim filed in a typical bankruptcy proceeding for purposes of submission to jurisdiction." *Picard v. Stahl*, 443 B.R. 295, 310 (Bankr. S.D.N.Y. 2011), *aff'd*, 2011 WL 7975167 (S.D.N.Y. 2011), *aff'd*, 512 F. App'x 18 (2d Cir. 2013).  Likewise, Oasis has actively litigated in both the adversary proceeding against him and the main BLMIS case, and has hence submitted to the Bankruptcy Court's jurisdiction.  *See In re Sayeh R.*, 91 N.Y.2d 306, 315 (1997); *Rios v. Altamount Farms*, 64 N.Y.2d 792 (1985)).

## III.    THE CLASS ACTIONS VIOLATE THE PERMANENT INJUNCTION

### A.    Like Their Predecessor Actions, the New Florida Class Actions Remain Duplicative and Derivative of the Trustee's Action

Pursuant to the Permanent Injunction contained in the Picower Settlement: "any BLMIS customer or creditor of the BLMIS estate . . . is hereby permanently enjoined from asserting any

---

an interpretation of the Settlement Agreement.  (*See* Murphy Dec. Ex. A at Attachment B (Settlement Ag.) ¶ 9(a)(i); Murphy Dec. Ex. A at 8.)

claim against the Picower [Defendants] that is duplicative or derivative of the claims brought by

the Trustee, or which could have been brought by the Trustee against the Picower [Defendants]."

(Murphy Dec. Ex. A at 7.)  The claims in the Florida Class Actions fall squarely within this

category of enjoined claims.  Counsel in the Florida Class Actions have twice before attempted

to create a "shadow" estate of all customers of BLMIS in order to circumvent the Net Equity

Decision as they seek their false profits.  Those efforts were found violative of the Permanent

Injunction.  Their current attempts still seek to circumvent the Net Equity Decision and must also

fail.  (*See, e.g.,* Murphy Dec. Ex. B (Fox SAC) ¶ 110 (seeking damages in the approximate

amount of $64.8 billion, which mirrors the total set forth on BLMIS fictitious statements at the

time of the collapse)).

As in their original complaints, the sole basis for the Class Action Plaintiffs' claim is

their allegation that Picower knowingly and improperly withdrew money from the Picower

Defendants' own BLMIS accounts.  (*Compare* Murphy Dec. Ex. E (Initial Fox Complaint) ¶ 39,

Murphy Dec. Ex. F (Initial Marshall Complaint) ¶ 39, with Fox SAC ¶ 46; *compare* Murphy

Dec. Ex. K Ex. A (Initial Goldman Complaints) ¶ 10, with Murphy Dec. Ex. B (New Goldman

Complaint) ¶ 64.)  The "conspiracy" the Fox Plaintiffs allege is one between BLMIS and the

Picower Defendants to allow the Picower Defendants to "steal the funds" of other investors

through these withdrawals.  (*Compare* Initial Fox Complaint ¶ 54, Initial Marshall Complaint

¶ 54, with Fox SAC ¶¶ 137, 161.)  There are no allegations that the Picower Defendants had any

contact with the Class Action Plaintiffs, and the only conduct alleged on the part of the Picower

Defendants is in connection with their withdrawals *from their own accounts*.  (*Compare* Initial

Fox Complaint ¶¶ 49–50, Initial Marshall Complaint ¶¶ 49–50, with Fox SAC ¶¶ 44–46, 48, 52;

36

Initial Goldman Complaints ¶¶ 2, 48–51, 56, 58–61, with New Goldman Complaint ¶¶ 65, 69–70, 72–73.)

As the Bankruptcy Court, the District Court and the Second Circuit all held with respect to the original Fox and Marshall complaints, such claims are duplicative and derivative of the Trustee's fraudulent transfer claims. *Fox*, 429 B.R. at 43–32; *Fox*, 848 F. Supp. 2d at 479–80; *Marshall*, 740 F.3d at 91–92. As the District Court stated:

> The Florida complaints contain no additional allegations of acts by the Picower defendants that were directed toward the Class Action Plaintiffs specifically, or any duty owed specifically to the Class Action Plaintiffs by the Picower defendants. Put bluntly, the wrongs pleaded in in the Florida Actions and in the Trustee's action are the same.

*Fox*, 848 F. Supp. 2d at 479; *see also Goldman*, 2013 WL 5511027, at *6–7; *Marshall*, 740 F.3d at 92.

Like the original complaints, the new Class Action Complaints do not and cannot allege any relationship between the Class Action Plaintiffs and the Picower Defendants that could form the basis for an independent claim. They allege that Picower, in his position as a "control person" at BLMIS, harmed them. (*See* Fox SAC ¶ 85, 112; New Goldman Complaint ¶ 13, 64.) But as before, the only "harm" or "bad acts" alleged stem from the Picower Defendants' "involvement in the Madoff Ponzi scheme, and the transfer of billions of dollars in BLMIS-held customer funds to the Picower defendants." *Fox*, 848 F. Supp. 2d at 479; *see also Goldman,* 2013 WL 5511027, at *7; *Marshall*, 740 F.3d at 92–93. The harm alleged by the Class Action Plaintiffs here was suffered by every other customer who is already within the purview of the SIPA proceeding. *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir.1989); *Fox*, 848 F. Supp. 2d at 480. It is also the same harm as that redressed by the Picower settlement, namely that Picower received fraudulent transfers from BLMIS.

Likewise, the Class Action Plaintiffs allege no direct misrepresentations by the Picower

Defendants to the Class Action Plaintiffs.  The Fox SAC now contains, repeatedly, the general

statement that Picower "induced" the misrepresentations BLMIS made to the Class Action

Plaintiffs in their customer statements.  (*Compare* Fox SAC ¶¶ 117, 119, 120, 174, 185 *with*

Initial Florida Complaints ¶¶ 80, 81; *compare* New Goldman Complaint ¶¶ 2–4, 12, 60, 64, 68,

91, 92 *with* Initial Goldman Complaints ¶¶ 49, 50, 60).  But this is merely a regurgitation of the

same legal theory that was rejected before.  Fox and Marshall sought to persuade the Second

Circuit that the allegations in their prior complaints in "essence" and at their "core" constituted a

claim that "the Picowers' wrongful conduct ensured the fraud's success by inducing [Fox and

Marshall] and other customers to invest (and remain invested) in BLMIS."  (*See Fox v. Picard*,

No. 12-1645, ECF No. 71 at 24–25; ECF No. 87 at 31.)  The Second Circuit responded that it did

"not think the complaints can reasonably be read in this way" because allegations of Picower's

conduct with respect to his own fraudulent withdrawals did not "amount to a particularized claim

that they directly participated in defrauding BLMIS customers by inducing them to invest."

*Marshall*, 740 F.3d. at 92.

Apparently taking the Second Circuit's "reasonably read" language literally, the Fox

Plaintiffs have responded by adding the legal conclusion that "Picower induced customers to

invest" to the same factual allegations they made before.  But they miss the point:  their

complaints failed because they did not allege any *facts* suggesting that the Picower Defendants

induced other customers to invest in BLMIS.  Adding their characterization of those same

allegations to the pleading does not remedy the defect.

The Class Action Plaintiffs further make the attenuated allegation that Picower's control

of BLMIS and knowledge of BLMIS's fraud "amounted to Picower making direct

misrepresentations" to the plaintiffs.  (New Goldman Complaint ¶ 3; *see* Fox SAC ¶ 117, 119–120, 174, 185.)  Again, this merely repackages the same facts previously held to be insufficient in an attempt to allege a non-duplicative, or non-derivative claim by plugging in the words "Picower Defendants" to general allegations regarding the Ponzi scheme where Judge Sullivan noted their deficiency.  For example, Judge Sullivan observed that paragraphs 69 through 71 of the former Goldman complaint discussed the false monthly statements BLMIS sent to each BLMIS customer, and noted that while the paragraphs alleged that such statements were fraudulent, there was no allegation that the Picower Defendants directed or were at all involved with the creation or dissemination of these statements to other BLMIS customers.  *See Goldman,* 2013 WL 5511027, at *8.  The New Goldman Complaint responds by wordsmithing its previous allegations:  it alleges that Picower caused BLMIS to book phony transactions in his own accounts from which he withdrew phony profits, that as a result Picower knew that BLMIS could not truthfully report to customers the unauthorized transfers of customer assets, and that as a result of Picower's control, the account records of other BLMIS customers falsely overstated the assets therein and their investment performance.  As a consequence, "BLMIS customers consequently unknowingly overpaid for BLMIS securities."[12]  (New Goldman Complaint ¶¶ 65–66.)  But this new verbiage does not remedy the defect that Picower is not alleged to have

_____

[12] There were no "BLMIS securities," as BLMIS was not a stock.  Plaintiffs also did not "overpay" for any securities, as no securities were purchased.  Alternatively, even if the Class Action Plaintiffs had brought *bona fide* securities claims, those claims still belong to the Trustee to the extent the Class Action Complaints allege that the Picower Defendants are alter egos of BLMIS.  (*See* Fox SAC ¶¶ 44–45, 47–48, 58, 62; *compare* Initial Goldman Complaints ¶¶ 49, 52–62, with New Goldman Complaint ¶¶ 68–77.)  Significantly, courts have widely held that an alter ego claim belongs to the Trustee and not creditors.  *See St. Paul*, 884 F.2d at 701; *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1153 (5th Cir. 1987) (alter ego action is property of the estate and attempt by party other than trustee or debtor in possession to bring action is stayed by section 362(a)(3)); *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1346 (7th Cir. 1987).

directed or been involved with the creation or dissemination of any statement to any other

BLMIS customer, or indeed to have taken any action at BLMIS other than with respect to his

own accounts.

Similarly, Judge Sullivan specifically commented that paragraph 75 of the former

Goldman complaint alleged that the BLMIS Ponzi scheme involved the preparation and

publication to investors and brokerage customers of false BLMIS audit reports provided to

regulators and investors, but failed to allege that the Picower Defendants were at all involved.

*Goldman,* 2013 WL 5511027, at *8.  The Goldman Plaintiffs attempt to remedy this flaw by

alleging that the fraudulent transactions directed by Picower also directly resulted in the

falsification of BLMIS's financial statements provided to regulators.  (*See* New Goldman

Complaint ¶ 71.)  Again, this allegation is merely a reiteration of the legal conclusion that the

Goldman Plaintiffs asked Judge Sullivan to draw from the prior complaint.  And again that

conclusion must be rejected for the same reasons.

**B.** **The Class Action Plaintiffs' Legal Arguments Have Previously Been Rejected and Find No Support in Case Law**

The Goldman Plaintiffs' reliance on *Medsker v. Feingold*, 307 F. App'x 262, 265 (11th

Cir. 2008), for the proposition that they have independent "securities claims," *see* Murphy Dec.

Ex. N ¶ 25–26, is misplaced, as Judge Sullivan recognized.  *See Goldman*, 2013 WL 5511027, at

*6.  The complaint in *Medsker* made numerous concrete allegations of specific

misrepresentations by the defendants (principals and sales representatives of hedge funds) to the

plaintiffs-investors.  The plaintiffs alleged that the defendants misrepresented the funds' growth,

rate of return, safety, and their own investment experience to the plaintiffs in subscription

documents, account statements, and other written material.  (*See* Murphy Dec. Ex. BB (*Medsker*

Compl.) ¶¶ 13–14, 16, 20.)  They alleged particular instances of direct communications between

the defendants and plaintiffs, including defendants' inviting plaintiffs to the funds' headquarters in Florida, *see id.* ¶ 25, and they quote the defendants' specific statements to investors, *see id.* ¶¶ 20, 25–28, 33, 35, 42, 44.  The Class Action Plaintiffs assert no such individualized allegations. *See Fox,* 848 F. Supp. 2d at 480–81 (finding the claims brought by the Class Action Plaintiffs "are claims that could be brought by any creditor of the debtor" because their "alleged losses were suffered by every BLMIS customer . . . in the same way and for the same reason. . . .")

As before, the superficial re-characterization of the Class Action Plaintiffs' claims by spelling out their legal theory does not change the fact that they are duplicative and derivative of the Trustee's claims.  In another action in the SIPA proceeding, *Picard v. Stahl*, the Trustee moved to enjoin the Lautenberg Foundation and related parties from continuing their lawsuit against Peter Madoff which alleged securities law violations.  The Bankruptcy Court granted the injunction, holding that the claims were duplicative and derivative of claims asserted by the Trustee against Peter Madoff because they sought to redress harms common to all victims of the BLMIS fraud.  *Stahl*, 443 B.R. at 314.  The District Court upheld the Bankruptcy Court's decision, and the Second Circuit affirmed.  *In re Bernard L. Madoff Inv. Sec. LLC*, No. 11 Civ. 2135 (AKH), 2011 WL 7981599 (S.D.N.Y. Dec. 5, 2011), *aff'd*, 512 F. App'x 19 (2d Cir. 2013).

It is not the label affixed to the claims, but rather the harm that is alleged, that determines whether a claim is independent.  *See Marshall*, 740 F.3d at 91–92; *St. Paul*, 884 F.2d at 701 ("These claims, although pleaded as claims personal to [plaintiff], if they are property of the corporation *or are claims available to all creditors*, are claims regarding the transfer of property to the estate" and therefore properly brought by the bankruptcy trustee) (emphasis added); *McHale v. Alvarez (In re 1031 Tax Grp.)*, 397 B.R. 670, 680–84 (Bankr. S.D.N.Y. 2008).  As the Second Circuit held in *Marshall*, "[w]e are . . . wary of placing too much significance on the

41

labels appellants attach to their complaints, lest they circumvent the Net Equity Decision by 'pleading around' the automatic stay and permanent injunction." 740 F.3d at 91–92. The Bankruptcy Court should likewise reject the Class Action Plaintiffs' attempts to create independent liability through artful pleading.

That the Class Action Plaintiffs purport to seek "different damages" from the fraudulently transferred customer property sought by the Trustee is not relevant to the determination of whether their claims are derivative or independent, as the Second Circuit held when affirming that the original Fox and Marshall complaints violated the Permanent Injunction: "[a]lthough appellants seek damages that are not recoverable in an avoidance action, their complaints allege nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS, instead of 'particularized' conduct directed at BLMIS customers."); *Marshall*, 740 F.3d at 84; *see Goldman*, 2013 WL 5511027, at *10 (that the Goldman Plaintiffs sought different remedies does not make their claims non-derivative).[13] Regardless of how the harm is characterized, the Class Action Plaintiffs' claims emanate from the Picower Defendants' fraudulent transfers, and could have been asserted by any customer of BLMIS. *See Fox*, 848 F. Supp. 2d at 480–81; *Marshall*, 740 F.3d at 84; *Goldman*, 2013 WL 5511027, at *10. The Class Action Plaintiffs failed to and cannot allege that the Picower Defendants had any direct relationship with any customer. Under these circumstances it readily apparent that there can be

---

[13] The Class Action Plaintiffs argue that they are not seeking any of the $7.2 billion in fraudulent transfers already recovered by the Trustee, but are instead seeking "damages" resulting from their "new" claims. (*See* Murphy Dec. Ex. C ¶ 60.) However, they have failed to assert any new theory of liability against the Picower Defendants that would enable them to obtain these other assets.

no class claim brought against the Picower Defendants that could be conceivably based upon an independent predicate.[14]

Notwithstanding the Class Action Plaintiffs' continued efforts to transform their claims into something else, their claims are premised on the Picower Defendants' receipt of fraudulent transfers, which have been returned in connection with the settlements with the Trustee and the government. The claims are duplicative and derivative of those of the Trustee, and are simply a repackaging of claims already found to violate the Permanent Injunction.

### C.    The Goldman Plaintiffs Fail to Plead Any New Evidence

Despite stating to Judge Sullivan at oral argument that the Goldman Plaintiffs had clear email and other evidence that Picower controlled BLMIS's dissemination of account statements to other customers and audit reports (*see* Murphy Dec. Ex. L at 10–13), the new proposed Goldman Class Action Complaint is completely devoid of any reference to, or quotations from, emails or other such evidence. Instead, the Goldman Plaintiffs set forth more of the conclusory legal allegations that Judge Sullivan rejected the first time they sought to bring their section 20(a) "control person" securities claims and simply add "the Picower Defendants" where Judge Sullivan noted their absence. *See Goldman*, 2013 WL 5511027, at *6. The Goldman Plaintiffs' inability to deliver on the promised evidence of something other than Picower's own fraudulent transfers dooms their latest effort as well.

---

[14] Likewise, Judge Sullivan rejected as formalistic the Goldman Plaintiffs' attempt to distinguish the Trustee's claims on the ground their claims accrued at different times, rest on different duties, and their assertion that the gravamen of their claim is not that the Picower Defendants withdrew money. *See Goldman*, 2013 WL 5511027, at *9–10; (*see* Murphy Dec. Ex. N ¶¶ 26–27.)

## IV.    THE CLASS ACTIONS ALSO VIOLATE THE AUTOMATIC STAY

Because the claims alleged in the Class Action Complaints are generalized claims that are

duplicative of those of the Trustee, they also violate the automatic stay, 11 U.S.C. § 362(a).  *See*

*Fox*, 848 F. Supp. 2d at 480–81; Murphy Dec. Ex A ¶ 8 (injunction was issued under section

105(a) and section 362(a) of the Bankruptcy Code).[15]  The Bankruptcy Court's issuance of the

Permanent Injunction in connection with the Trustee's settlement with the Picower Defendants

effectively made the automatic stay permanent as to derivative and duplicative claims brought

against the Picower Defendants.  *See In re Dreier*, 429 B.R. at 133 (Bankr. S.D.N.Y. 2010)

(ruling that the Bankruptcy Court has jurisdiction to "make the automatic stay permanent

following the settlement of a fraudulent transfer claim . . ."); *In re Mrs. Weinberg's Kosher*

*Foods, Inc.*, 278 B.R. 358, 365 (Bankr. S.D.N.Y. 2002) (Bernstein, J.) (holding that a bankruptcy

court in approving a settlement "may enjoin creditors from prosecuting the settled claims

derivatively in another court").

Section 362(a)(3) bars "any act to obtain possession of property of the estate or property

from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

"Property of the estate" includes "all legal or equitable interests of the debtor in property as of

the commencement of the case," 11 U.S.C. § 541(a)(1), "wherever located and by whomever

---

[15] The Class Action Complaints also violate certain stay orders entered by the District Court.
The District Court issued stay orders on December 15, 2008, December 18, 2008, and February
9, 2009 (the "Stay Orders") to facilitate the administration of the BLMIS estate.  Specifically, on
December 15, 2008, the District Court entered a stay order declaring that "all persons and
entities are stayed, enjoined and restrained from directly or indirectly . . . interfering with any
assets or property owned, controlled or in the possession of [BLMIS]."  (*See* December 15 Stay
Order ¶ IV (reinforcing the automatic stay); *see also* December 18 Stay Order ¶ IX ("no creditor
or claimant against [BLMIS], or any person acting on behalf of such creditor or claimant, shall
take any action to interfere with the control, possession, or management of the assets subject to
the receivership"); February 9 Stay Order ¶ IV (incorporating and making permanent the
December 18 Stay Order).)

held," 11 U.S.C. § 541(a), including causes of action possessed by the debtor at the time of

filing. *Jackson v. Novak (In re Jackson)*, 593 F.3d 171, 176 (2d Cir. 2010). These provisions are

sweeping in scope. "Every conceivable interest of the debtor, future, nonpossessory, contingent,

speculative, and derivative, is within reach of § 541." *Kagan v. Saint Vincents Catholic Med.

Ctrs. (In re Saint Vincents)*, 449 B.R. 209, 217 (S.D.N.Y. 2011) (quoting *Chartschlaa v.

Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008)); *see also In re Quigley Co.*, 676

F.3d at 57 (central purpose of extending bankruptcy jurisdiction to third party actions is to

protect the assets of the estate). Critically, courts look to the substance and not the form of the

purported action to determine whether it would have an adverse impact on the estate and be

barred by the automatic stay. *See 48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th

St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987).

The Second Circuit has held that the automatic stay "extends to common claims against

the debtor's alter ego or others who have misused the debtor's property in some fashion." *St.

Paul*, 884 F.2d at 701; *see Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 854

(Bankr. S.D.N.Y. 1994) (Bernstein, J.) ("The Court cannot sanction a practice which permits

creditors to assert general, indirect claims in order to achieve a greater distribution on a first

come, first serve basis from assets which the trustee has standing to recover, and which, if

recovered, will be available to satisfy the claims of all creditors."); *Goldman*, 2013 WL 5511027,

at *5 n.7.

Similarly, section 362(a)(1) bars "the commencement or continuation . . . of a judicial . . .

or other action or proceeding against the debtor . . . or to recover a claim against the debtor . . ."

11 U.S.C. § 362(a)(1). A "claim against the debtor" encompasses claims against third parties

that, as with those at issue here, are tantamount to claims against the debtor, including fraudulent

transfer actions.  *See, e.g.*, *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 132 (2d Cir. 1992).  As this Court found in *Keene*, "[e]ven if [such] claims are not, themselves, property of the estate, they represent attempts by creditors to collect claims against the debtor from third parties which the trustee is authorized to recover under his or her 'strong arm' or avoiding powers" and are stayed by section 362(a)(1).  164 B.R. at 855.

Given that the claims the Class Action Plaintiffs seek to bring are property of the estate, they would violate the automatic stay under section 362(a)(3).  *See, e.g.*, *Fox*, 848 F. Supp. 2d at 479 (Fox Plaintiffs' claims violate section 362(a)(3)); *1031 Tax Grp.*, 397 B.R. at 679; *Keene*, 164 B.R. at 850–55; *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998); *In re Swallen's, Inc.*, 205 B.R. 879, 884 (Bankr. S.D. Ohio 1997); *In re Madoff*, 477 B.R. at 357.  Likewise, the proposed Class Action claims are nothing more than disguised fraudulent transfer claims, and hence would violate the automatic stay under section 362(a)(1).  *See Goldman*, 2013 WL 5511027, at *11 (the Goldman Plaintiffs' claims are "deceptively labeled fraudulent conveyance claims that the Trustee already brought and settled.").

## V.    THE CLASS ACTION PLAINTIFFS AND THEIR COUNSEL SHOULD BE PRELIMINARILY ENJOINED

Jeffry Picower was a BLMIS customer, and he had no special relationship with any member of the putative class.  As Judge Lifland ruled long ago, there is no privity here, and that basic fact will not change no matter how the facts are phrased and the causes of action are articulated.  Accordingly, it is difficult to conceive of any cause of action that would not be based on Picower's own fraudulent transfers.  Not surprisingly, the Class Action Plaintiffs have not asserted any such independent causes of action to date, and the Trustee submits they cannot do so.

At some point, continual meritless litigation becomes vexatious. The Trustee submits that the Fox and Goldman Plaintiffs are close to that point. They should not be permitted to forum shop to find a court that will potentially misconstrue the Permanent Injunction. Accordingly, for consistency of ruling and to protect the administration of the estate, the Trustee requests that the Class Action Plaintiffs and their counsel be enjoined from filing any new actions against any of the Picower Defendants related to BLMIS, or modifying their existing litigation, without leave of this Court. *See, e.g., In re Martin-Trigona*, 9 F.3d 226, 227–28 (2d Cir.1993) ("courts may resort to restrictive measures" with respect to "litigants who have abused their litigation opportunities," including "subjecting a vexatious litigant to a 'leave of court' requirement with respect to future filings"); *Malcolm v. Board of Educ.*, 506 F. App'x 65, 70 (2d Cir. 2012) (affirming district court's injunction preventing vexatious filing of further complaints arising from the same facts as his previous efforts without obtaining leave from the court.)[16]

This Court is fully empowered under section 105(a) of the Bankruptcy Code to enjoin parties from commencing actions in violation of its orders. *See e.g., E. Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs Inc.)*, 124 B.R. 635, 641–42 (S.D.N.Y. 1991); *In re Chateaugay Corp.*, 93 B.R. at 30–31; *AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.)*, 117 B.R. 789, 805 (Bankr. S.D.N.Y. 1990); *In re Johns–Manville Corp.*, 33 B.R. 254, 263 (Bankr. S.D.N.Y. 1983). Further, courts in this Circuit have held that the standard for Federal Rule of Bankruptcy Procedure 7065 injunctions is inapplicable for injunctions predicated on section 105. *Fox*, 429 B.R. at 436 ("Because injunctions under section 105(a) are authorized by

---

[16] Moreover, in the event the Class Action Plaintiffs' counsel would seek to circumvent such a ruling by bringing such an action with a different named plaintiff without leave of this Court, the Trustee would request sanctions.

statute, they need not comply with traditional requirements of Rule 65"); *LaMonica v. N. of Eng.*

*Protecting & Indem. Ass'n (In re Probulk Inc.)*, 407 B.R. 56, 63 (Bankr. S.D.N.Y. 2009).[17]

Under section 105(a), courts may enjoin suits if: (i) a third-party suit would impair the

court's jurisdiction with respect to a case before it, or (ii) the third-party suits threaten to thwart

or frustrate the debtor's reorganization efforts and the stay is necessary to preserve or protect the

debtor's estate.[18] *See Fox*, 429 B.R. at 436; *Stahl*, 443 B.R. at 318; *Calpine Corp. v. Nev. Power*

*Co. (In re Calpine Corp.)*, 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006) *aff'd*, 365 B.R. 401

(S.D.N.Y. 2007); *Apostolou*, 155 F.3d at 882.[19]  Further prosecution of the Class Action

Complaints would violate the Permanent Injunction, and hence section 105(a) authorizes this

Court to enjoin the Class Action Plaintiffs and their counsel from proceeding.  Litigants who

---

[17] Notwithstanding that the Rule 7065 standard need not be satisfied here, it easily is. Infringement of this Court's jurisdiction to administer the estate constitutes "irreparable harm." *Adelphia Commc'ns Corp. v. Am. Channel, LLC (In re Adelphia Commc'ns Corp.)*, No. 06-01528, 2006 WL 1529357, at *5 (Bankr. S.D.N.Y. June 5, 2006).  Moreover, the Trustee is likely to succeed on the merits of his Application and demonstrate that the filing of the Class Actions violate the Permanent Injunction and automatic stay, as demonstrated herein.  *See id.* at *4–5; *see Fox*, 429 B.R. at 436 n.14; *Stahl*, 443 B.R. at 318 n.24.

[18] The Court's authority to enjoin third-party actions applies in liquidation cases.  *See Lautenberg Found. v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 512 F. App'x 18, at 20 (2d Cir. 2013) ("We apply § 105(a) in SIPA liquidations."); *In re AP Indus., Inc.*, 117 B.R. at 801 ("The court will have ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process whether in a liquidation or in a reorganization case.") (internal citations omitted).

[19] *See also In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003); *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 588 n.37 (Bankr. S.D.N.Y. 2009); *Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*, 162 B.R. 935, 944 (Bankr. S.D.N.Y. 1994); *E. Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990), *aff'd in part*, 124 B.R. 635 (S.D.N.Y. 1991); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571–72 (S.D.N.Y. 1987); *C&J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 92 (Bankr. S.D.N.Y. 1988); *In re Chateaugay Corp.*, 93 B.R. at 29.

settled with the Trustee are entitled to finality and freedom from vexatious litigation, and the

Trustee is entitled to administer the estate free from such litigation.

## <u>CONCLUSION</u>

For the foregoing reasons, the Trustee respectfully requests that the Court: (i) specifically

enforce the Permanent Injunction and automatic stay in these proceedings; and (ii) otherwise

enjoin the Class Action Plaintiffs and anyone acting on behalf of the Class Action Plaintiffs from

proceeding with the Class Actions or any other action related to BLMIS against any of the

Picower Defendants without leave of this Court.

Dated: March 11, 2014       Respectfully submitted,
   New York, New York

            /s/ David J. Sheehan
           David J. Sheehan
           Email: dsheehan@bakerlaw.com
           Deborah H. Renner
           Email: drenner@bakerlaw.com
           Tracy L. Cole
           Email: tcole@bakerlaw.com
           Keith R. Murphy
           Email: kmurphy@bakerlaw.com
           Amy Vanderwal
           Email: avanderwal@bakerlaw.com
           Ferve Ozturk
           Email: fozturk@bakerlaw.com
           Matt Moody
           Email: mmoody@bakerlaw.com

           Baker & Hostetler LLP
           45 Rockefeller Plaza
           New York, New York 10111
           Telephone: (212) 589-4200
           Facsimile: (212) 589-4201

           *Attorneys for Irving H. Picard, Trustee for the*
           *Substantively Consolidated SIPA Liquidation*
           *of Bernard L. Madoff Investment Securities*
           *LLC and the Estate of Bernard L. Madoff*