# Appendix A

**Key Substantive Allegations Across Complaints**

**Allegations Regarding Fabricated and Backdated Transactions in the Picower Defendants' Own Accounts**

| Trustee's Complaint | Initial Florida Complaints | Fox Second Amended Complaint | Initial Goldman Complaints | New Goldman Complaint |
|---|---|---|---|---|
| Among other things, **Picower . . . directed purported purchases and sales of securities within Defendants' accounts, including direction that sales or purchases be made for purposes of achieving gains or losses; directed that funds be transferred among Defendants' accounts; directed and received withdrawals of funds from Defendants' accounts; . . . ; executed . . . tax related documentation for the Accounts**, and otherwise communicated with and provided direction to BLMIS regarding Defendants' accounts.  Tr.'s Compl. ¶ 60. | **Defendants engaged in overt acts in furtherance of the conspiracy as set forth in above, which included: (a) participating in and directing the preparation of false documentation; (b) recording fictional profits in their respective BLMIS accounts; and (c) withdrawing such fictional profits** knowing that they were the funds of other BLMIS account holders.<br><br>**Defendants committed additional overt acts in pursuance of the conspiracy by concealing the true state of affairs from the IRS, securities regulators and other customers of BLMIS, by, inter alia, filing false statements in connection with their tax returns** that purported to show trading in Defendants' accounts which in fact did not occur.  Initial Fox Compl. ¶¶ 80-81; Initial Marshall Compl. ¶¶ 80-81.<br><br>*The Trustee notes that these are the allegations Fox and Marshall cited in their Second Circuit briefs to argue that the "essence" of their complaints was that Picower induced BLMIS customers to invest in BLMIS.  (See Fox. Br. at 25; Marshall Br. at 31.)* | The Picower Parties committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy . . . .<br><br>For instance, the Picower Parties **knowingly and purposely conspired to violate [the federal RICO statute[ by, among other things, (i) directing and orchestrating preparation of fictitious account statements to be distributed to customers of the BLMIS Discretionary Trading Program;** . . . **(iii) causing BLMIS to recognize certain fictitious gains and losses in the Picower Parties' accounts so that Picower and the rest of the Picower Parties could be enriched by the RICO scheme; (iv) causing BLMIS to steal money from customers in the BLMIS Discretionary Trading Program to generate enormous paper profits in the Picower Parties' accounts, thereby allowing Picower and the rest of the Picower Parties to enrich themselves by substantially more than $7.2 billion; and (v) causing BLMIS to falsify BLMIS' financial statements provided to regulators.**  Fox Sec. Am. Compl. ¶¶ 160-61. | In order to realize and withdraw their false profits, **Picower, through the Defendants and other agents, directed and effected false trading documentation at BLMIS with respect to the Defendants' BLMIS accounts**.<br><br>The Defendants directed BLMIS to prepare fraudulent trading records and fraudulent trading results, which effected returns in their accounts based upon transactions which in fact never took place. **Picower directly and through the other Defendants initiated, directed, coordinated and cause to be effected false records and back dated records at BLMIS, which resulted in the appearance of trading profits in these accounts. Picower then withdrew these false profits from the Defendant accounts.**  Initial Goldman Compls. ¶¶ 48-49. | **Picower caused BLMIS to book phony transactions with phony profits in his accounts.  From time to time, Picower withdrew these phony profits from his BLMIS account.**  These withdrawals were actually funded with cash from other BLMIS customers.<br><br>Picower knew and intended that material misrepresentations and omissions would be communicated to other investors, including Plaintiffs. **Picower directly or indirectly induced BLMIS to conceal the fraud from BLMIS customers and regulators**.  New Goldman Compl. ¶¶ 65, 92. |

| Trustee's Complaint | Initial Florida Complaints | Fox Second Amended Complaint | Initial Goldman Complaints | New Goldman Complaint |
|---|---|---|---|---|
| **On or around December 29, 2005, April Freilich, acting on behalf of Picower,** faxed to BLMIS a letter signed by Picower that **directed BLMIS to "pick up long term capital gains in the accounts listed below before December 31, 2005"** across five Decisions accounts. The letter further directed BLMIS to realize **$50,000,000 in gains**, and attached the relevant "portfolio appraisal" statements for the five Decisions accounts listed in the letter. *See* Tr.'s Compl. ¶ 63(i).<br><br>**Upon Picower's instruction, BLMIS "sold" Agilent Technologies ("Agilent") and Intel Corporation ("Intel") across these accounts, realizing a long-term gain of approximately $46.3 million, a significant majority of the requested gain.** According to the account statements generated by BLMIS for December 2005 – and forwarded to Picower and his agents – **these trades purportedly settled around December 8 and 9, 2005, approximately 3 weeks before the relevant instruction was sent to BLMIS.** Picower's failure to question BLMIS' apparent clairvoyance suggests that Picower knew that BLMIS was backdating trades.  Tr.'s Compl. ¶ 63(i)*(i)*. | **On or around December 29, 2005, Freilich, acting on Picower's behalf, faxed BLMIS a letter signed by Picower, that directed BLMIS to realize a gain of $50 million.** Upon instruction from Picower and/or Freilich, BLMIS "sold" large amounts of Agilent Technologies and Intel Corporation stock in various Defendant accounts on a backdated basis. **Freilich directed the sale of large amounts of these purported securities on or about December 29, 2005, requesting that the sales be booked to take place on an earlier date,** *i.e.*, **December 8th or 9th. These trades were backdated by Picower and BLMIS for the purpose of generating phony "paper" profits of approximately $46.3 million, making up most of Picower's requested $50 million gain.** Initial Fox Compl. ¶ 62; Initial Marshall Compl. ¶ 62. | For example, **on or about December 29, 2005, Picower's assistant April Friehlich, acting on behalf of the Picower Parties, faxed BLMIS a letter signed by Picower that directed BLMIS to "realize" a gain of $50 million in the Picower accounts.** Upon direction from Picower and Friehlich, BLMIS falsified records so that **it would appear that BLMIS sold large amounts of stock in Agilent Technologies and Intel Corporation in various Picower Parties' accounts on a back-dated basis.** Friehlich directed the fictitious sale of large amounts of these purported securities on or about December 29, 2005, **requesting that the** sales be "booked" to take place on an earlier date, *i.e.*, December 8 or 9. BLMIS back-dated the trades at Picower's direction and on Picower's behalf for the purpose of generating phony paper profits of approximately $46.3 million, which made up most of Picower's requested $50 million distribution.   Fox Sec. Am. Compl. ¶ 44. | By way of further example, **on or about December 29, 2005, Picower's assistant April Friehlich, acting on behalf of the Defendants, faxed BLMIS a letter signed by Picower that directed BLMIS to "realize" a gain of $50 million in the Picower accounts**.  Upon direction from Picower and Friehlich, BLMIS sold large amounts of stock in Agilent Technologies and Intel Corporation in various Defendant accounts on a back dated basis.  **Friehlich directed the sales of large amounts of these purported securities on or about December 29, 2005, requesting that the sales be booked to take place on an earlier date, i.e., December 8 or 9. BLMIS backdated the trades at Picower's direction and on Picower's behalf for the purpose of generating phony paper profits of approximately $46.3 million, which made up most of Picower's requested $50 million distribution**.  Inital Goldman Compls. ¶ 59. | By way of example, **on or about December 29, 2005, Picower's assistant April Friehlich, acting on behalf of the Defendants, faxed BLMIS a letter signed by Picower that directed BLMIS to "realize" a gain of $50 million in the Picower accounts.** Upon direction from Picower and Friehlich, BLMIS falsified records so that it would appear that BLMIS sold large amounts of stock in Agilent Technologies and Intel Corporation in various Defendant accounts on a back dated basis. **Friehlich directed the fictitious sale of large amounts of these purported securities on or about December 29, 2005, requesting that the sales be "booked" to take place on an earlier date, i.e., December 8 or 9. BLMIS backdated the trades at Picower's direction and on Picower's behalf for the purpose of generating phony paper profits of approximately $46.3 million, which made up most of Picower's requested $50 million distribution.** Picower knew that in order to maintain the Ponzi scheme, Picower's phony $46.3 million paper profit necessitated the creation of corresponding phony account records in other BLMIS customer accounts.  New Goldman Compl. ¶ 69. |

| Trustee's Complaint | Initial Florida Complaints | Fox Second Amended Complaint | Initial Goldman Complaints | New Goldman Complaint |
|---|---|---|---|---|
| Picower and the other Defendants knew or should have known **that fictitious and backdated trading activity was being reported in their accounts, and that their accounts reflected fictitious holdings**. For example, Decisions maintained several accounts with BLMIS. One of those accounts, "Decisions Inc.," was used by Picower and the other Defendants as the primary source of cash withdrawals from BLMIS. **The account reflected little trading activity and relatively few holdings** . . . . Indeed, as of the date of Madoff's arrest, **the account had a reported negative net cash balance of more than $6 billion**. Tr. Compl. ¶ 63(d). | The several BLMIS accounts of Defendant Decisions Incorporated, which was controlled by Picower, **provide concrete examples of the obviously fictitious profits Defendants received as a result of their participation in the Ponzi scheme.** These accounts were a primary source of Defendants' cash withdrawals from BLMIS during the relevant time period, yet **the accounts reflected virtually no trading activity and very few purported securities positions**. Initial Fox Compl. ¶¶ 49-50; Initial Marshall Compl. ¶¶ 49-50. | In addition to Picower's conspiracy with Madoff for BLMIS to provide Picower with astronomical returns and fictitious losses, **Picower directed BLMIS to make a margin "loan" of approximately $6 billion to Defendant Decisions Inc.** This $6 billion represented money stolen from customers of the BLMIS Discretionary Trading Program. . . . **The Decisions Inc. account reflected virtually no trading activity and virtually no securities positions or other collateral for loans.** Fox Sec. Am. Compl. ¶¶ 58-59. | Several BLMIS accounts controlled by Picower and operated under the name of Decisions, Inc. **provide concrete examples of Picower's control over BLMIS. Picower, directly and through the other Defendants, was able to withdraw "funds" from the Decisions, Inc. account in the form of a "loan" of approximately $6 billion, even though the account had no trading activity or cash or related assets to support such borrowing.** Initial Goldman Compls. ¶ 52. | Picower's control of BLMIS was not limited to the false documentation and concealment of phony trades and the direction of misreporting in customer accounts. Picower directly or indirectly exerted control over the benefits of the BLMIS Ponzi scheme and the cash assets held in customer accounts by BLMIS. For example, **Picower directed BLMIS to make a margin "loan" of approximately *$6 billion* to Defendant Decisions Incorporated, even though the account had no trading activity or cash or securities to support such borrowing.** New Goldman Compl. ¶¶ 72-73. |

| Trustee's Complaint | Initial Florida Complaints | Fox Second Amended Complaint | Initial Goldman Complaints | New Goldman Complaint |
|---|---|---|---|---|
| On or about April 24, 2006, Decisions opened a sixth account with BLMIS ("Decisions 6") by wire transfer on April 18 of $125 million. BLMIS promptly began "purchasing" securities in the account, but it backdated the vast majority of these purported transactions to January 2006. By the end of April, a scant 12 days later, the purported net equity value of the account was over $164 million, a gain of $39 million, or a return of more than 30% in less than two weeks of purported trading. Tr.'s Compl. ¶ 63(e). | For example, as stated in the Trustee's Complaint, on or about April 24, 2006, Decisions Incorporated opened a new account with BLMIS known as the "Decisions Incorporated 6" ("Decisions 6") account by a wire transfer on April 18, 2006 of $125 million.<br><br>Picower instructed BLMIS to backdate trades in this account to January 2006, which was before the Decisions 6 account was even opened. As a result of the fabrication/backdating of trades, the purported net value of securities in the Decisions 6 account by the end of April 2006 had increased by almost $40 million, for a return of 30% in less than two weeks of "purported trading." Initial Fox Compl. ¶ 55-57; Initial Marshall Compl. ¶ 55-57. | Similarly, on or about April 24, 2006, Defendant Decisions Inc. opened a new account with BLMIS known as the "Decisions, Inc. 6" account with a wire transfer of $125 million. Picower and Friehlich directed Madoff to back-date trades in this account to January 2006, which was four months prior to the date the account was actually opened. BLMIS employees carried out the Picower Parties' instructions and fabricated and back-dated trades in the "Decisions, Inc. 6" account. This resulted in the net value of the account increasing by almost $40 million, or 30%, in less than two weeks after it opened. Fox Sec. Am. Compl. ¶ 45. | By way of example, as stated in the Trustee's complaint, on or about April 24, 2006, Defendant Decisions, Inc. opened a new account with BLMIS known as the Decisions, Inc. 6 account. This account was opened with a wire transfer of $125 million. The Defendants instructed BLMIS to back date trades in this account to January 2006, which was four months prior to the time the account was actually opened. BLMIS employees carried out the Defendants' direct instructions and fabricated and back dated trades in the Decision 6 account. This resulted in the net value of the account increasing by almost $40 million, or 30%, in less than two weeks after it "actually opened." See Initial Goldman Compls. ¶ 58. | Similarly, on or about April 24, 2006, Defendant Decisions Incorporated opened a new account with BLMIS known as the "Decisions, Inc. 6" account. This account was opened with a wire transfer of $125 million. Defendants instructed BLMIS to back date trades in this account to January 2006, which was four months prior to the date the account was actually opened. BLMIS employees carried out Defendants' direct instructions and fabricated and back dated trades in the "Decisions, Inc. 6" account. This resulted in the net value of the account increasing by almost $40 million, or 30%, in less than two weeks after it opened. New Goldman Compl. ¶ 70. |

| Trustee's Complaint | Initial Florida Complaints | Fox Second Amended Complaint | Initial Goldman Complaints | New Goldman Complaint |
|---|---|---|---|---|
| **On May 18, 2007, Freilich indicated the Foundation needed "$20 mil in gains" for January and February and "want[ed] 18% for year[] 07 appreciation," but that she had to check the numbers "with Jeff." On information and belief, "Jeff" is Defendant Jeffry Picower. Five days later, on May 23, Freilich told BLMIS that the numbers she had provided earlier were wrong, and the Foundation "needs only $12.3 mil [in gains] for" January and February 2007.** <br><br> **Accordingly, the Picower Foundation's May 2007 statement reflected millions of dollars in securities transactions for the months of January and February 2007** that . . . had not appeared on the January or February 2007 statements, nor on any prior monthly customer statements that had been generated before May 2007, nor were the corresponding equity positions or values reflected on those earlier statements.  Tr.'s Compl. ¶¶ 63(f)(i)-(ii). | For example, according to the Trustee's Complaint, **on May 18, 2007, Freilich indicated that the Foundation needed "$20 mil in gains" for January and February and "want[ed] 18% for year[] 07 appreciation," but that she had to check the numbers "with Jeff."** Upon information and belief, "Jeff" is Picower. **Five days later on May 23, 2007, and presumably after consulting with Picower, Freilich told BLMIS that the numbers she provided earlier were wrong, and the Foundation "needs only $12.3 mil [in gains] for" January and February 2007.**  Initial Fox Compl. ¶ 60; Initial Marshall Compl. ¶ 60. | **The Picower Parties also directed and orchestrated the preparation of false statements in May 2007, which reflected millions of dollars in securities transactions which reportedly took place in earlier in 2007, but which in fact did not take place at all.** <br><br> According to Madoff, Picower knew that, in order to generate enormous paper profits in the Picower Parties' accounts, BLMIS would have to steal money from customers in the BLMIS Discretionary Trading Program. According to Madoff, Picower fully and knowingly participated in the fraud that BLMIS perpetrated on customers of the BLMIS Discretionary Trading Program and actively encouraged people to enter into investment advisory agreements with BLMIS.  Fox Sec. Am. Compl. ¶¶ 45-46. | **The Defendants also directed and orchestrated the preparation of false statements in May 2007, which reflected millions of dollars in securities transactions which reportedly took place in earlier in 2007, but which in fact did not take place at all**.  Inital Goldman Compls. ¶ 61. | **Defendants also directed and orchestrated the preparation of false statements in May 2007, which reflected millions of dollars in securities transactions which reportedly took place in earlier in 2007, but which in fact did not take place at all.**  New Goldman Compl. ¶ 70. |

| Allegations that Picower's Knew or Should Have Known That Profits Came From Other People's Money | | | | |
|---|---|---|---|---|
| **Trustee's Complaint** | **Initial Florida Complaints** | **Fox Second Amended Complaint** | **Initial Goldman Complaints** | **New Goldman Complaint** |
| **The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to—or payments on behalf of—other investors.** **Picower and the other Defendants were among the primary beneficiaries of this scheme,** reaping billions of dollars of other people's money. Tr.'s Compl. ¶¶ 24, 28. | Madoff also admitted that, during the relevant time period, he never actually invested any of the funds he received from BLMIS customers, instead depositing the funds into a bank account. Madoff never actually purchased and sold securities in BLMIS customer accounts, instead **using client funds simply to pay other, different, clients' purported returns and redemption of principal.** Initial Fox Compl. ¶ 36; Initial Marshall Compl. ¶ 36. | As Picower's demands for more and more money from Madoff increased, he encouraged Madoff to expand the customer base of the BLMIS Discretionary Trading Program so that **funds belonging to new customers could be stolen and given to the Picower Parties.** According to Madoff, Picower knew that BLMIS would have to conceal the fact that money belonging to customers in the BLMIS Discretionary Trading Program had been stolen by Picower. Fox Sec. Am. Compl. ¶¶ 49, 50. | **The money that customers paid to BLMIS in connection with their investment contracts with BLMIS was not used to purchase securities as described, but instead was used to make distributions to other investors, primarily to the Defendants**. Initial Goldman Compls. ¶ 34. | The net amount of investor cash that was defalcated in the Ponzi scheme was approximately $18 billion. Of that amount, approximately 40%, or $7.2 billion, went into and remained in the pockets of Picower and his affiliates. . . . Given Picower's knowledge of BLMIS's underlying fraud, **the fact that Picower reaped most of the benefits of the Ponzi scheme** is evidence that he was able to directly and indirectly exert control over BLMIS. New Goldman Compl. ¶ 6. |

| Trustee's Complaint | Initial Florida Complaints | Fox Second Amended Complaint | Initial Goldman Complaints | New Goldman Complaint |
|---|---|---|---|---|
| **Picower and the other Defendants also knew or should have known that they were reaping the benefits of manipulated purported returns, false documents and fictitious profit.** Due to the siphoning and diversion of new investments to pay requests for payments or redemptions from other investors, particularly longer-term account holders like the Defendants, BLMIS did not have the funds to pay investors on account of their new investments. **BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.** Tr.'s Compl. ¶¶ 4, 27. | | **Picower knew and intended that each phony recording of a fictitious profitable transaction in his accounts resulted directly in the recording of false transactions and false asset values in the accounts of customers whose funds were invested pursuant to the BLMIS Discretionary Trading Program** because BLMIS concealed the theft of customers' money in order to enrich Picower and the Picower Parties. Fox Sec. Am. Compl. ¶ 52. | In order to realize and withdraw their false profits, Picower, through the Defendants and other agents, directed and effected false trading documentation at BLMIS with respect to the Defendants' BLMIS accounts. The Defendants directed BLMIS to prepare fraudulent trading records and fraudulent trading results, which effected returns in their accounts based upon transactions which in fact never took place. **Picower directly and through the other Defendants initiated, directed, coordinated and cause to be effected false records and back dated records at BLMIS, which resulted in the appearance of trading profits in these accounts. Picower then withdrew these false profits from the Defendant accounts.** Initial Goldman Compl. ¶¶ 48-49. | **Picower caused BLMIS to book phony transactions with phony profits in his accounts. From time to time, Picower withdrew these phony profits from his BLMIS account.** These withdrawals were actually funded with cash from other BLMIS customers. Picower knew that BLMIS did not, and could not, truthfully report to customers the unauthorized transfer of customer assets to Picower and maintain the Ponzi scheme. **Picower knew and intended that each phony recording of a fictitious profitable transaction in his accounts resulted directly in the recording of false transactions and false asset values in the accounts of other BLMIS customers because these customer accounts did not reflect the resulting cash transfer from their accounts to Picower.** New Goldman Compl. ¶ 65. |

**Allegations Regarding Picower's Domination of the Picower Defendants**

| Trustee's Complaint | Initial Florida Complaints | Fox Second Amended Complaint | Initial Goldman Complaints | New Goldman Complaint |
|---|---|---|---|---|
| On information and belief, the . . . [Picower Entities] in dealing with BLMIS have been **dominated by and used merely as the instrument of Picower** to advance his personal interests rather than corporate ends.  As set forth herein, **Picower exercised complete dominion over the Picower Entities** in dealing with BLMIS, which he knew or should have known was predicated on fraud.  As a result, **the Picower Entities functioned as alter egos of Picower** and no corporate veil can be maintained between them.  *See* Tr.'s Compl. ¶ 53. | On information and belief the . . . [Picower Entity Defendants] were **dominated, controlled and used as a mere instrumentality of Picower** to advance his interests in, and to participate in, the Madoff Ponzi scheme.  Thus, **the Picower Entity Defendants are the alter egos of Picower** and of each other.  Initial Fox Compl. ¶ 32; Initial Marshall Compl. ¶ 32. | The Picower Entity Defendants were **dominated, controlled and used as a mere instrumentality of Picower** to advance his interests in, and to control BLMIS and the fraudulent BLMIS Discretionary Trading Program. Thus, **the Picower Entity Defendants are the alter egos of Picower** and of each other, and are jointly and severally liable for wrongful conduct committed by one or more of them, as detailed herein.  Fox Sec. Am. Compl. ¶ 31. | On information and belief, the . . . [Picower Entity Defendants] were **dominated, controlled and used as a mere instrumentality of Picower** to advance his interests in, and to participate in and control, the Madoff Ponzi scheme.  Thus, **the Picower Entity Defendants are the alter egos of Jeffry Picower** and of each other.  Inital Goldman Compls. ¶ 29. | On information and belief, the Picower Entity Defendants were **dominated, controlled and used as a mere instrumentality of Picower** to advance his interests in, and to control BLMIS and the Madoff Ponzi scheme. Thus, **the Picower Entity Defendants are the alter egos of Jeffry Picower** and of each other, and are jointly and severally liable for wrongful conduct committed by one or more of them, as detailed herein.  New Goldman Compl. ¶ 41. |

| Allegations Regarding the BLMIS Ponzi scheme | | | | |
|---|---|---|---|---|
| **Trustee's Complaint** | **Initial Florida Complaints** | **Fox Second Amended Complaint** | **Initial Goldman Complaints** | **New Goldman Complaint** |
| Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in—or had been traded through—their accounts, as well as the growth of and profit from those accounts over time, **the trades reported on these statements were a complete fabrication**. . . . At the Plea Hearing, **Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts.** Indeed, based on the Trustee's investigation to date and **with the exception of isolated individual trades for certain clients other than the Defendants, there is no record of BLMIS having cleared any purchase or sale of securities** at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities. Tr.'s Compl. ¶ 21. | The Defendants' account records reflect, and Defendants were aware of, or should have been of, the fact that **Madoff and BLMIS booked in their accounts fictional profits from fictional trading.** Upon information and belief, **no purchases or sales of securities in the Defendants' BLMIS accounts ever actually occurred. Upon information and belief, no purchases or sales of securities in the class members' BLMIS accounts ever actually occurred.** Initial Fox Compl. ¶ 8; Initial Marshall Compl. ¶ 8. | In fact, however, starting in 1992, **BLMIS generally did not purchase the securities shown on the customers' trade confirmations** and did not and allocate the securities to the accounts of the customers who participated in the BLMIS Discretionary Trading Program. Madoff has admitted that from 1992 on, the trade confirmations and monthly statements sent to customers in the BLMIS Discretionary Trading Program were fabricated and that **he had never purchased any securities for these customers that were allocated to their accounts. Except for certain isolated individual transactions, there is no record of BLMIS having purchased or sold any securities** for the customers of the BLMIS Discretionary Trading Program. Fox Sec. Am. Compl. ¶¶ 34, 39. | BLMIS customers received monthly statements showing the purchase and sales of securities in their accounts along with the profits purportedly realized from these securities transactions. **But the transactions reported on these statements were a fabrication.** The securities transactions described in the monthly statements either never occurred or rarely occurred, and the profits reported were entirely fictitious. **Madoff admitted at his plea hearing that he had never purchased any of the securities in BLMIS customer accounts.** Following an extensive and lengthy investigation, the Trustee for BLMIS has stated that**, except for isolated individual transactions, there is no record of BLMIS having purchased or sold any securities in BLMIS customer accounts.** Inital Goldman Compls. ¶ 33. | **The transactions reported on these statements were a fabrication.** The securities transactions described in the monthly statements never occurred, and the profits and securities positions reported were entirely fictitious. **Madoff admitted at his plea hearing that he had never purchased any of the securities in BLMIS customer accounts. Except for isolated individual transactions, there is no record of BLMIS having purchased or sold any securities in BLMIS customer accounts.** New Goldman Compl. ¶ 46. |

| Trustee's Complaint | Initial Florida Complaints | Fox Second Amended Complaint | Initial Goldman Complaints | New Goldman Complaint |
|---|---|---|---|---|
| Not only did Madoff seek to evade regulators, **Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New York.** Of the three employees at the firm, one employee was an assistant and one was a semiretired accountant living in Florida. Tr.'s Compl. ¶ 31. | | **BLMIS was assisted in perpetuating the fraudulent BLMIS Discretionary Trading Program by BLMIS' accounting firm, Friehlich and Horowitz, a three person accounting firm in Rockland County, New York, which prepared false BLMIS audited financial statements.** These statements, which showed that BLMIS operated profitably, were provided to regulators and customers in the BLMIS Discretionary Trading Program. Fox Sec. Am. Compl. ¶ 40. | **The BLMIS Ponzi scheme also involved the preparation and publication to investors and brokerage customers of false BLMIS audit reports prepared by Frielich and Horowitz as members of a three person accounting firm in Rockland County, New York.** BLMIS provided the financial reports to regulators and investors in the BLMIS Discretionary Trading Program for the purpose of their reliance thereon. Inital Goldman Compls. ¶ 75. | **The BLMIS Ponzi scheme also involved the preparation and publication of false BLMIS audit reports prepared by Friehlich and Horowitz, a three person accounting firm in Rockland County, New York.** BLMIS provided these financial reports to regulators and investors in the BLMIS Discretionary Trading Program for the purpose of their reliance thereon. The accounting reports falsely reported that Madoff was effecting customer transactions and that BLMIS was profitable and was generating profits in customer accounts. New Goldman Compl. ¶ 41. |