# EXHIBIT B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

Case No.:10-80252-CV-KLR

SUZANNE STONE MARSHALL, ADELE FOX, MARSHA PESHKIN, and RUSSELL OASIS, individually and on behalf of a class of similarly situated Plaintiffs,

vs.

CAPITAL GROWTH COMPANY;
DECISIONS, INCORPORATED.;
FAVORITE FUNDS;
JA PRIMARY LIMITED PARTNERSHIP;
JA SPECIAL LIMITED PARTNERSHIP;
JAB PARTNERSHIP;
JEMW PARTNERSHIP;
JF PARTNERSHIP;
JFM INVESTMENT COMPANIES;
JLN PARTNERSHIP;
JMP LIMITED PARTNERSHIP;
JEFFRY M. PICOWER SPECIAL COMPANY;
JEFFRY M. PICOWER, P.C.;
THE PICOWER FOUNDATION;
THE PICOWER INSTITUTE OF MEDICAL RESEARCH;
THE TRUST F/B/O GABRIELLE H. PICOWER;
BARBARA PICOWER, individually, and as Executor of the Estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust f/b/o Gabriel H. Picower.

_____/

**SECOND AMENDED COMPLAINT CLASS ACTION**

**Jury Trial Demanded**

Plaintiffs Suzanne Stone Marshall, Adele Fox, Marsha Peshkin, and Russell Oasis, through their undersigned attorneys, on their own behalf and on behalf of a similarly situated class of plaintiffs (collectively, "Plaintiffs"), hereby sue Defendants (the "Picower Parties") and allege the following based upon the investigation by Plaintiffs' counsel, including a review of documents filed in the bankruptcy proceeding concerning Bernard L.

Ex. 2

Madoff Investment Securities, LLC ("BLMIS"); documents made available to the public in the proceedings brought by the Securities Exchange Commission ("SEC") involving Bernard L. Madoff ("Madoff"); documents made available to the public in the civil forfeiture action (the "Civil Forfeiture Action") brought by the United States of America (the "Government") against Jeffry M. Picower ("Picower"); and communications with Madoff.

## NATURE OF ACTION

1.      This is an action on behalf of all BLMIS investors who entrusted their money to BLMIS to be invested in the BLMIS Discretionary Trading Program, in the expectation that it would be invested honestly and that it would appreciate over time.  The claims asserted against the Picower Parties arise out of Picower's criminal conspiracy with Madoff to perpetrate a massive investment fraud on the Plaintiffs in order to perpetuate a scheme whereby Picower and the Picower Parties were able to realize unprecedented returns on their money.  Plaintiffs assert claims under the federal securities laws, Florida and federal Racketeer Influenced and Corrupt Organization ("RICO") statutes, and Florida common law.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under (i) §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and under Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, (the "Section 20(a) Claim"); (ii) the Federal Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961-1968 (the "Federal RICO Claim"); (iii) Florida Civil Remedies for Criminal Practices Act, Chapter 772 of the Fla. Stat. (the "State RICO Claim"); and (iv) Florida common law.

3.      This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction when, as in

this case, "any member of a class of Plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds $5,000,000 exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2) and (6).

4.      Jurisdiction is also based on § 27 of the Exchange Act, 15 U.S.C. § 78aa, upon the Federal RICO Act, 18 U.S.C. § 1964, and upon principles of supplemental jurisdiction.

5.      At all relevant times the principal place of business and/or the residence of the Picower Parties was Palm Beach, Florida, where Madoff also had a residence.  Substantial acts, if not all of the acts, committed in furtherance of the control relationship and the Picower Parties' participation in the fraudulent scheme occurred in the State of Florida. Therefore, the Court has personal jurisdiction over the Picower Parties.

6.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because the Picower Parties reside or are headquartered in this district and the acts and transactions alleged occurred in substantial part in this district.

7.      In connection with the wrongs alleged herein, the Picower Parties used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of national securities markets.

## **THE PARTIES**

8.      Plaintiff Adele Fox ("Fox") is a resident of the State of Florida.  Under the Second Circuit's "net equity" decision, Fox is a "net winner" because she withdrew more money than she deposited with BLMIS over the life of her participation in the BLMIS Discretionary Trading Program. Accordingly, Irving H. Picard, Esq., as trustee ("Trustee") for the substantively consolidated liquidation of Madoff's estate and of BLMIS, disallowed her SIPC claim in the BLMIS liquidation.  Fox brings this class action on behalf of herself and a

putative class of persons similarly situated for damages and other relief arising from the Picower Parties' wrongful conduct described herein.

9.   Plaintiff Suzanne Stone Marshall ("Marshall") is a resident of the State of Florida. Under the Second Circuit's "net equity" decision, Marshall is a "net loser" because she withdrew less money than she deposited with BLMIS over the life of her participation in the BLMIS Discretionary Trading Program.  Marshall brings this class action on behalf of herself and a putative class of persons similarly situated for damages and other relief arising from the Picower Parties' wrongful conduct described herein.

10.   Plaintiff Marsha Peshkin ("Peshkin") is a resident of the State of Florida.  Under the Second Circuit's "net equity" decision, Peshkin is a "net loser" with respect to one of her accounts with BLMIS because she withdrew less money than she deposited with BLMIS over the life of her participation in the BLMIS Discretionary Trading Program.  Peshkin brings this class action on behalf of herself and a putative class of persons similarly situated for damages and other relief arising from the Picower Parties' wrongful conduct described herein.

11.   Plaintiff Russell Oasis ("Oasis") is a resident of the State of Florida.  Oasis was an indirect customer of BLMIS through an account which, under the Second Circuit's "net equity" decision, is a "net winner" because it withdrew more money than it deposited with BLMIS over the life of its participation in the BLMIS Discretionary Trading Program.  Accordingly, the Trustee sued him in the BLMIS liquidation.  Oasis brings this class action on behalf of himself and a putative class of persons similarly situated for damages and other relief arising from the Picower Parties' wrongful conduct described herein.

12.   Picower was a resident of Palm Beach, Florida, and Fairfield, Connecticut, prior to and at the time of his death on October 25, 2009.  Picower held an individual BLMIS account

in the name of "Jeffry M. Picower," with an account address of 1410 South Ocean Boulevard, Palm Beach, Florida. Picower was Chairman of the Board of Defendant Decisions Incorporated ("Decisions Inc."). Picower transacted business through all of the Defendant entities (the "Picower Entity Defendants").

13.     Defendant Barbara Picower is Picower's widow and the Executrix of his Estate, which is being probated in the State of New York. She resides at 1410 South Ocean Boulevard, Palm Beach, Florida 33480. Barbara Picower held an individual account at BLMIS in her name. She is the trustee for Defendant Trust f/b/o Gabrielle H. Picower. She is an officer and/or director of Defendant Decisions Inc. and she is a trustee and the Executive Director of the Defendant Picower Foundation.

14.     Defendant Decisions Inc. is a corporation organized under the laws of Delaware with a principal place of business at 950 Third Avenue, New York, New York 10022 and an alternate mailing address on its BLMIS account at 22 Saw Mill River Road, Hawthorne, New York, 10532. The Decisions Inc. office in Hawthorne was merely a store-front office through which little or no business was conducted. Decisions Inc. is a general partner of Defendants Capital Growth Company, JA Primary Limited Partnership, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JLN Partnership, JMP Limited Partnership and Jeffry M. Picower Special Co.

15.     Defendant Capital Growth Company purports to be a limited partnership with a mailing address for its BLMIS account at 22 Saw Mill River Road, Hawthorne, New York, 10532, care of Decisions Inc. During his lifetime, Picower served as General Partner or Director of Capital Growth Company. Since Picower's death, Decisions Inc. has assumed those roles.

16.     Defendant JA Primary Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594.  During his lifetime, Picower served as General Partner or Director of JA Primary Partnership.  Since Picower's death, Decisions Inc. has assumed those roles.

17.     Defendant JA Special Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York, New York 10594.  During his lifetime, Picower served as General Partner or Director of JA Special Limited Partnership.  Since his death, Decisions Inc. has assumed those roles.

18.     Defendant JAB Partnership purports to be a limited partnership with a mailing address care of Decisions Inc. at 22 Saw Mill River Road, Hawthorne, New York, 10532.  During his lifetime, Picower served as General Partner or Director of JAB Partnership.  Since his death, Decisions Inc. has assumed those roles.

19.     Defendant JEMW Partnership purports to be a limited partnership with a mailing address care of Decisions Inc. at 22 Saw Mill River Road, Hawthorne, New York, 10532.  During his lifetime, Picower served as General Partner or Director of JEMW Partnership.  Since his death, Decisions Inc. has assumed those roles.

20.     Defendant JF Partnership purports to be a limited partnership with a mailing address care of Decisions Inc. at 22 Saw Mill River Road, Hawthorne, New York, 10532.  During his lifetime, Picower served as General Partner or Director of JF Partnership.  Since his death, Decisions Inc. has assumed those roles.

21.     Defendant JFM Investment Company is an entity through which Picower and, after his death, Decisions Inc., have done business, with a listed mailing address care of

Decisions Inc. at 22 Saw Mill River Road, Hawthorne, New York, 10532. JFM Investment Company is a Limited Partner of Capital Growth Company. During his lifetime, Picower served as General Partner or Director of JFM Investment Company. Since his death, Decisions Inc. has assumed those roles.

22. Defendant JLN Partnership is a limited partnership with a mailing address care of Decisions Inc. at 22 Saw Mill River Road, Hawthorne, New York, 10532. During his lifetime, Picower served as General Partner or Director of JLN Partnership. Since his death, Decisions Inc. has assumed those roles

23. Defendant JMP Limited Partnership is a limited partnership organized under the laws of Delaware, with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594. During his lifetime, Picower served as General Partner or Director of JMP Partnership. Since his death, Decisions Inc. has assumed those roles.

24. Defendant Jeffry M. Picower Special Co. is an entity with a mailing address care of Decisions Inc. at 22 Saw Mill River Road, Hawthorne, New York 10532. During his lifetime, Picower served as General Partner or Director of Jeffry M. Picower Special Co. Since his death, Decisions Inc. has assumed those roles.

25. Defendant Favorite Funds is an entity with a mailing address care of Decisions Inc. at 22 Saw Mill River Road, Hawthorne, New York, 10532. During his lifetime, Picower served as General Partner or Director of Favorite Funds. Since his death, Decisions Inc. has assumed those roles,

26. Defendant Jeffry M. Picower P.C. purports to be a limited partnership with a mailing address at 25 Virginia Lane, Thornwood, New York, New York 10594. During his

lifetime, Picower served as General Partner or Director of Jeffry M. Picower P.C. Since his death, Decisions Inc. has assumed those roles.

27. Defendant the Picower Foundation purports to be a trust organized for charitable purposes with Picower listed as donor and Picower and Barbara Picower, among others, listed as Trustees during the relevant time period. The Picower Foundation's addresses are reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480 and 9 West 57th Street, Suite 3800, New York, New York 10019.

28. Defendants John Doe Trustees of the Picower Foundation were the Trustees of the Picower Foundation during the relevant time period.

29. Defendant Picower Institute for Medical Research is a nonprofit entity organized under the laws of New York, with a principal place of business at 350 Community Drive, Manhasset, New York 11030.

30. Defendant Trust f/b/o Gabrielle H. Picower is a trust established for beneficiary Gabrielle H. Picower, who is the daughter of Picower and Barbara Picower, with Defendant Barbara Picower listed as trustee, and the trust's BLMIS account address reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480.

31. The Picower Entity Defendants were dominated, controlled and used as a mere instrumentality of Picower to advance his interests in, and to control BLMIS and the fraudulent BLMIS Discretionary Trading Program. Thus, the Picower Entity Defendants are the alter egos of Picower and of each other, and are jointly and severally liable for wrongful conduct committed by one or more of them, as detailed herein.

## ALLEGATIONS COMMON TO ALL CLAIMS

### Madoff's Criminal Enterprise

32.     BLMIS is a New York limited liability company that was founded in 1959 and wholly owned by Madoff.  BLMIS operated from its principle place of business at 885 Third Avenue, New York, NY.  Madoff was Founder, Chairman, Chief Executive Officer, and sole equity holder.  BLMIS was registered with the SEC as a Securities Broker Dealer under § 15 of the Exchange Act.  BLMIS purportedly engaged in three different operations: investment advisory services, market making services, and proprietary trading.  In its market making and proprietary trading activities, BLMIS, at various times, employed approximately 188 people and conducted trades equal to 10% of the daily volume on the New York Stock Exchange.  BLMIS' customers included major financial firms like Bear Stearns and Charles Schwab.

33.     BLMIS' investment advisory business was operated by approximately 12 people and, according to Madoff, began operating fraudulently in the early 1990's.

34.     Starting in 1992 and continuing until December 11, 2008, BLMIS entered into investment advisory agreements with customers pursuant to which the customers authorized BLMIS to buy and sell securities in BLMIS' sole discretion pursuant to the BLMIS Discretionary Trading Program.  Madoff explained to customers that he had a proprietary trading strategy pursuant to which he would purchase a basket of Fortune 100 company stocks, hedge his positions through option contracts, hold the positions for a period of weeks, sell the stocks and put the money into Treasury Notes.  He would repeat that process approximately six times per year.  In fact, however, starting in 1992, BLMIS generally did not purchase the securities shown on the customers' trade confirmations and did not and allocate the securities to the accounts of the customers who participated in the BLMIS Discretionary Trading Program.

35.     BLMIS required customers of the BLMIS Discretionary Trading Program to execute a power of attorney and sign documents giving BLMIS complete discretion to trade in

their accounts. Customers of the BLMIS Discretionary Trading Program had no power to instruct BLMIS as to how their funds should be invested.

36.    From 1992 on, BLMIS provided customers of the BLMIS Discretionary Trading Program with a steady return of at least 10% per year, taxable as short term capital gains.

37.    BLMIS falsely represented to all Class members that it purchased securities and options contracts for their accounts under the BLMIS Discretionary Trading Program. Customer "participation" therein involved the purchase and sale of securities, which were securities and investment contracts under the Exchange Act.

38.    BLMIS purported to keep meticulous records of its customers' fictional trading transactions. The customers received written confirmations of every purchase and sale for their accounts and, each month, they received from BLMIS a detailed account statement showing the entire month's transactions and the month end securities positions in the account.

39.    Madoff has admitted that from 1992 on, the trade confirmations and monthly statements sent to customers in the BLMIS Discretionary Trading Program were fabricated and that he had never purchased any securities for these customers that were allocated to their accounts. Except for certain isolated individual transactions, there is no record of BLMIS having purchased or sold any securities for the customers of the BLMIS Discretionary Trading Program.

40.    BLMIS was assisted in perpetuating the fraudulent BLMIS Discretionary Trading Program by BLMIS' accounting firm, Friehlich and Horowitz, a three person accounting firm in Rockland County, New York, which prepared false BLMIS audited financial statements. These statements, which showed that BLMIS operated profitably, were provided to regulators and customers in the BLMIS Discretionary Trading Program.

**Picower's Relationship With Madoff**

41.     Picower was a highly sophisticated investor, accountant, and attorney.  He lived close to Madoff in Palm Beach and  was closely associated with Madoff, both in business and socially, for over 30 years.  Madoff served as a trustee for The Picower Institute of Medical Research.

42.      Picower "invested" approximately $650 million of his personal funds, Barbara Picower's funds, and the funds of the various Picower Entities Defendants, with BLMIS during a period beginning in the 1980's.  At times, Picower demanded returns of 700%-800% on his money entrusted to BLMIS and, for reasons that are presently unknown, Madoff acceded to those demands.

43.     According to Madoff, the amount the Picower Parties withdrew from BLMIS, over a 20-year period, far exceeded $7.8 billion.  Thus, the profit the Picower Parties realized on their BLMIS "investment" far exceeded $7.2 billion and Picower and the Picower Parties used those profits to invest in various businesses which, over decades, significantly appreciated in value.  Thus, the total profits that the Picower Parties realized from their criminal conspiracy with Madoff exceeds $20 billion.

44.     Picower directed Madoff, on numerous occasions, to document fictitious gains in the accounts of the Picower Parties and to deposit into those accounts cash purportedly representing the profits on those transactions.  For example, on or about December 29, 2005, Picower's assistant April Friehlich, acting on behalf of the Picower Parties, faxed BLMIS a letter signed by Picower that directed BLMIS to "realize" a gain of $50 million in the Picower accounts.  Upon direction from Picower and Friehlich, BLMIS falsified records so that it would appear that BLMIS sold large amounts of stock in Agilent Technologies and Intel Corporation in various Picower Parties' accounts on a back-dated basis.  Friehlich

directed the fictitious sale of large amounts of these purported securities on or about December 29, 2005, requesting that the sales be "booked" to take place on an earlier date, *i.e.,* December 8 or 9. BLMIS back-dated the trades at Picower's direction and on Picower's behalf for the purpose of generating phony paper profits of approximately $46.3 million, which made up most of Picower's requested $50 million distribution.

45. Similarly, on or about April 24, 2006, Defendant Decisions Inc. opened a new account with BLMIS known as the "Decisions, Inc. 6" account with a wire transfer of $125 million. Picower and Friehlich directed Madoff to back-date trades in this account to January 2006, which was four months prior to the date the account was actually opened. BLMIS employees carried out the Picower Parties' instructions and fabricated and back-dated trades in the "Decisions, Inc. 6" account. This resulted in the net value of the account increasing by almost $40 million, or 30%, in less than two weeks after it opened. The Picower Parties also directed and orchestrated the preparation of false statements in May 2007, which reflected millions of dollars in securities transactions which reportedly took place in earlier in 2007, but which in fact did not take place at all.

46. According to Madoff, Picower knew that, in order to generate enormous paper profits in the Picower Parties' accounts, BLMIS would have to steal money from customers in the BLMIS Discretionary Trading Program. According to Madoff, Picower fully and knowingly participated in the fraud that BLMIS perpetrated on customers of the BLMIS Discretionary Trading Program and actively encouraged people to enter into investment advisory agreements with BLMIS.

47. In addition to demanding astronomical fictitious gains, Picower and Freilich demanded that BLMIS manufacture fictitious losses for the Picower Parties, including The

Picower Foundation, in order to reduce their state and federal tax liabilities. April C. Freilich routinely demanded that BLMIS generate retroactive fraudulent statements showing trading losses so that the taxes payable by the various Picower Entity Defendants, including The Picower Foundation, would be reduced.

48.     At Picower's demand and Madoff's direction, BLMIS employees regularly fabricated and back-dated trades in Picower's accounts to generate phony losses. For reasons that are presently unknown, Madoff acceded to these demands and provided the fraudulent statements.

49.     As Picower's demands for more and more money from Madoff increased, he encouraged Madoff to expand the customer base of the BLMIS Discretionary Trading Program so that funds belonging to new customers could be stolen and given to the Picower Parties.

50.     According to Madoff, Picower knew that BLMIS would have to conceal the fact that money belonging to customers in the BLMIS Discretionary Trading Program had been stolen by Picower.

51.     According to Madoff, Picower also knew that BLMIS would have to generate false account information for each of the customers in the BLMIS Discretionary Trading Program, just as Picower demanded that Madoff generate false trades in order to justify the astronomical returns and fictitious losses that Picower demanded.

52.     Picower knew and intended that each phony recording of a fictitious profitable transaction in his accounts resulted directly in the recording of false transactions and false asset values in the accounts of customers whose funds were invested pursuant to the BLMIS Discretionary Trading Program because BLMIS concealed the theft of customers' money in order to enrich Picower and the Picower Parties.

53.     As a result of Picower's control over Madoff, he caused BLMIS to send to all of the customers of the BLMIS Discretionary Trading Program false and misleading information (*i.e.*, fictitious trade and inflated account values), in order to induce customers to maintain their accounts with BLMIS and to continue to attract new customers for BLMIS' Discretionary Trading Program.  If Plaintiffs had been provided with accurate information, they would have immediately closed their accounts.

54.     As a result of Picower's control, he caused BLMIS to solicit new customers for the BLMIS Discretionary Trading Program, such as the Plaintiffs.

55.     The fraudulent transactions directed by Picower also directly resulted in the falsification of BLMIS' financial statements provided to regulators.  Each month, BLMIS prepared and filed a Financial and Operational Combined Uniform Single ("FOCUS") report with the Financial Industry Regulatory Authority, Inc. ("FINRA"), the self-regulatory organization that regulates broker-dealers.  BLMIS' FOCUS reports materially misstated its financial condition by failing to account properly for Picower's phony trades and for the overstated value of other customers' accounts.

56.     Picower's ability to direct the creation and dissemination of false and misleading trading documentation which he knew would be incorporated in financial disclosures made by BLMIS, a regulated broker and investment advisor, shows that Picower exercised direct and indirect control over the day-to-day operations of BLMIS and over the illegal trading activity of the BLMIS Discretionary Trading Program.

57.     Picower's conduct constituted a violation of the securities laws.

58.     In addition to Picower's conspiracy with Madoff for BLMIS to provide Picower with astronomical returns and fictitious losses, Picower directed BLMIS to make a margin "loan"

of approximately $6 billion to Defendant Decisions Inc.  This $6 billion represented money stolen from customers of the BLMIS Discretionary Trading Program.

59.     Borrowing in a brokerage account is regulated by margin rules established by the Federal Reserve System and by the New York Stock Exchange.  These rules limit the amount that an account holder can borrow based upon the value of securities that can be used as collateral for the loan.  The Decisions Inc. account reflected virtually no trading activity and virtually no securities positions or other collateral for loans.

60.     Picower was able to direct BLMIS to violate the margin loan rules and "loan" almost $6 billion to the Decisions Inc. account without any collateral.

61.     Picower knew at all times that this $6 billion "loan" was actually a theft of funds from the accounts of other BLMIS Discretionary Trading Program customers that was never recorded in those accounts and never repaid.

62.     As further evidence of Picower's control over Madoff, in or about 1992, Madoff covered large loss positions incurred by Picower.  Madoff had a hold harmless agreement with Picower which Picower refused to honor.  Madoff could have enforced the agreement but, instead, he expanded the customer base for the BLMIS Discretionary Trading Program, stealing money from new customers to cove Picower's losses.

63.     In addition to the aforementioned illustrations of control exercised by Picower over BLMIS, Plaintiffs believe, based upon their investigation to date, that additional factual information concerning Picower's control over BLMIS and participation in the fraudulent scheme will be provided by Madoff, whose deposition Plaintiffs will seek to take promptly upon the reopening of this action.

**Madoff's Confession**

64.     On December 11, 2008, Madoff was arrested by federal agents and charged with criminal violation of the federal securities laws, including securities fraud, investment advisor fraud, and mail and wire fraud.  On the same day, the SEC filed a complaint in the United States District Court for the Southern District of New York against Madoff and BLMIS, also alleging that Madoff and BLMIS had engaged in securities fraud.

65.     On December 15, 2008, the district court appointed the Trustee under the Securities and Investor Protection Action ("SIPA").

66.     On March 10, 2009, the Government filed an 11-count criminal information against Madoff in the case styled *United States v. Madoff,* 09-CR-213 (S.D.N.Y.).

67.     According to the Information, by 2008, Madoff had 4,800 customer accounts in the BLMIS Discretionary Trading Program and, by November 30, 2008, BLMIS' customer monthly statements showed an aggregate of $64 billion under management. However, according to the Information, Madoff never traded a single security on behalf of any customer. He merely stole money from customers of the BLMIS Discretionary Trading Program for other purposes, such as funding the Picower Parties' astronomical returns.

68.     On March 12, 2009, Madoff pled guilty to all 11 counts, including Count I for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  In his plea allocution, Madoff stated that he began the investment advisory business in 1992 and never executed a single trade on behalf of any client. He admitted that he deposited all victim cash in an account at Chase Bank and used the funds to pay "returns" to earlier "investors."

## CLASS ACTION ALLEGATIONS

85.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).  The definition of the Class in this action is: (1) all customers of BLMIS who entrusted securities or cash to BLMIS, either directly or indirectly, pursuant to the BLMIS Discretionary Trading Program between December 1, 1992, the approximate date that Picower first became a control person of BLMIS, and December 11, 2008, the date that Madoff confessed (the "Class Period").  The Class excludes the Picower Parties, BLMIS employees, and any of their affiliates or controlled entities, as well as all co-conspirators.

86.     The Class meets the requirements for class certification under Rule 23(a) of the Federal Rules of Civil Procedure.

a.     *Numerosity.*  The members of the Class are so numerous that joinder of all members is impractical.  Based on disclosures made by the Trustee, the Class has thousands of members.  Class members may be identified from records maintained by BLMIS and the Trustee.  The members of the Class may be notified of the pendency of this action by mail or otherwise using a form of notice similar to that customarily used in securities class actions.

b.     *Commonality.*  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are: (i) whether § 20(a) of the Exchange Act was violated by the Picower Parties as alleged herein; (ii) whether the Federal RICO Statutes were violated by the Picower Parties as alleged herein; (iii) whether the Florida RICO Statute was violated by the Picower Parties as alleged herein; (iv) whether the Picower Parties violated Florida common law as alleged herein; (iv) whether members of the Class have sustained damages as a result of the foregoing violations and, if so, the proper measure of such damages.

    c.     *Typicality.* Plaintiffs' claims are typical of the claims of members of the Class because they originate from the same misconduct of the Picower Parties and all members of the Class were similarly affected by Picower's wrongful conduct in violation of federal and state law as alleged herein.

    d.     *Adequacy.* Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class and securities litigation, and have no interests antagonistic to or in conflict with those of the Class. As such, Plaintiffs are adequate representatives of the Class.

    87.     This class action also meets the requirements of Federal Rule of Civil Procedure 23(b)(3). The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the Class. The common issues outlined herein predominate over any individual issues in the case. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable and because of the many questions of law and fact that are common to Plaintiffs' claims and those of the Class. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually address the wrongs done to them. There will be no difficulty in the management of this action as a class action.

    88.     Class treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously, efficiently, and, without

unnecessarily duplicating evidence, effort, and expense that numerous individual actions would engender.

## STATUTE OF LIMITATIONS ALLEGATIONS

89.     On or about February 16, 2010, Fox and Marshall filed class actions complaints against the Picower Parties in the United States District Court for the Southern District of Florida.  *See Susanne Stone Marshall, Individually and On Behalf of a Class of Similarly Situated v. Barbara Picower, Individually, and as Executor of the Estate Of Jeffry M. Picower, et al.,* Case No.: 10-CV-80254 (S.D. Fla.) and *Adele Fox, Individually and On Behalf of a Class of Similarly Situated v. Barbara Picower, Individually, and as Executor of the Estate Of Jeffry M. Picower, et al.,* Case No.: 10-CV-80252 (S.D. Fla.)  Fox commenced the putative class action on behalf of BLMIS customers who were deemed "net winners" by the Trustee and thus entitled to no compensation in BLMIS' SIPA liquidation.  Marshall filed a similar lawsuit on behalf of "net losers" who will not receive full compensation of their lost principal and interest.

90.     The predominant theme of the complaints was that the Picower Parties directly participated in the fraudulent scheme and actively conspired with Madoff and BLMIS to injure Marshall, Fox, and similarly situated customers of the BLMIS Discretionary Trading Program. The complaints asserted claims for civil conspiracy, conversion, unjust enrichment, and conspiracy to violate the Florida RICO statute.

91.     On March 31, 2010, the Trustee filed complaints in the Bankruptcy Court for the Southern District of New York to enjoin the *Fox* and *Marshall* actions.  He also sought a preliminary injunction pursuant to 11 .S.C. § 105(a).

92.     On May 3, 2010, the bankruptcy court enjoined the actions on the theory that they violated the automatic stay and were, therefore, void *ab initio* (the "Automatic Stay Decision").

93.     On December 17, 2010, the United States Attorney's Office for the Southern District of New York filed a complaint against the Picower Parties for forfeiture in the amount of $7,206,157,717 (the "Forfeited Funds"), representing the net amount (according to the Government) that the Picower Parties received from their BLMIS accounts.  That same day, the Government and the Picower Parties signed a forfeiture settlement stipulation, whereby the Picower Parties agreed to irrevocably and unconditionally turn over to the Government all of the Forfeited Funds.

94.     Also on December 17, 2010, the Picower Parties entered into a settlement agreement with the Trustee for $5 billion of the $7.2 billion forfeited.  That settlement resolved the Trustee's adversary proceeding against the Picower Parties in which he alleged that the Defendants received at least $7.2 billion from BLMIS, net of their investments.  As part of the settlement, the Trustee agreed to use his reasonable best efforts to obtain a permanent injunction that would enjoin any BLMIS customer or creditor from asserting any claim against the Picower Parties that is duplicative or derivative of any claim brought by the Trustee, or which could have been brought by the Trustee.

95.     On January 13, 2011, the Bankruptcy Court for the Southern District of New York entered an order approving the settlement and granting a permanent injunction (the "Permanent Injunction Order").

96.     Fox and Marshall timely appealed the Permanent Injunction Order to the District Court for the Southern District of New York (the "District Court").

97.     On March 26, 2012, the District Court issued an order affirming the Automatic Stay Decision and the Permanent Injunction Order (the "First Appeal Order").

98.     Fox and Marshall appealed the First Appeal Order.  On January 13, 2014, the Court of Appeals for the Second Circuit affirmed the District Court's decision without prejudice to Fox and Marshall seeking leave to amend their complaints in this Court.  Although the court concluded that the Fox and Marshall complaints fell within the scope of the permanent injunction because they lacked particularized facts illustrating the Defendants' participation in the fraud aimed at other BLMIS investors, the court explicitly acknowledged that "[t]here is conceivably some particularized conspiracy claim appellants could assert that would not be derivative of those asserted by the Trustee."

99.     Any applicable statute of limitations with respect to Plaintiffs' claims has been tolled since no later than February 16, 2010, by the filing of the class action complaints.  *See American Pipe and Construction Company v. Utah,* 414 U.S. 538, 552 (1974).

100.    The claims asserted in this complaint are timely because they relate back to the filing of the class action complaints.  *See* Fed. R. Civ. P. 15(c).

## COUNT I

## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

**BLMIS' Primary Violation of** § **10(b)**
**of the Exchange Act and Rule 10b-5**

101.    Plaintiffs repeat the allegations heretofore stated.

102.    BLMIS violated § 10(b) of the Exchange Act and Rule 10b-5.  Madoff pled guilty to criminal securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Madoff admitted that his fraud involved billions of dollars.

103. BLMIS carried out a plan, scheme, and course of conduct that was intended to and, did: (i) cause customers of BLMIS' Discretionary Trading Program to entrust to BLMIS securities and cash; and (ii) misappropriate the assets of BLMIS customers who entered into agreements for their funds to be invested pursuant to the BLMIS Discretionary Trading Program. In furtherance of this unlawful scheme, plan, and course of conduct, BLMIS and its agents, including Madoff, took the actions set forth herein. Plaintiffs and the other members of the Class suffered damages in the amount of $64.8 billion as a result of the undisclosed and unauthorized theft of their securities and cash, the misappropriation of the proceeds thereof, and the deprivation of any appreciation in their investments, in many instances, over decades.

104. BLMIS (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon customers who entrusted their money to BLMIS to be invested pursuant to the BLMIS Discretionary Trading Program. Thus, BLMIS violated § 10(b) of the Exchange Act and Rule 10b-5.

105. As part of and in furtherance of this conduct, BLMIS engaged in an ongoing scheme to misappropriate funds that constituted the property of customers of the BLMIS Discretionary Trading Program.

106. BLMIS directly and indirectly, by the use, means and instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to misappropriate funds that constituted the property of BLMIS customers such as the Plaintiffs and the Class members.

107. BLMIS made untrue statements of material fact and/or omitted to state material facts necessary to make its statements not misleading and employed devices, schemes and artifices to defraud, and engaged in acts, practices, and a course of conduct in an effort to mislead and misappropriate the assets of customers of the BLMIS Discretionary Trading Program. Such misconduct included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the BLMIS Discretionary Trading Program, its financial performance and its business operations not misleading in light of the circumstances under which they were made. The misconduct included engaging in manipulative and deceptive transactions, practices and courses of business which operated as a fraud and deceit upon the customers of the BLMIS Discretionary Trading Program, including the surreptitious and unauthorized theft of customer assets and securities.

108. BLMIS had actual knowledge of the misrepresentations and omissions of material facts set forth herein. BLMIS' material misrepresentations and/or omissions were done knowingly for the purpose and effect of inducing customers to enter into and maintain their assets in the BLMIS Discretionary Trading Program. At all relevant times, BLMIS was aware of the dissemination of artificially inflated financial information to its customers which it knew was materially false and misleading.

109. At the time of the misrepresentations, omissions and manipulative and deceptive conduct, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true, and they were ignorant of the manipulative and deceptive conduct complained of herein. If Plaintiffs and the other members of the Class had known the truth regarding BLMIS' materially false statements and deceptive and manipulative conduct, Plaintiffs and other

members of the Class would never have entered into agreements with BLMIS to have their funds invested through the BLMIS Discretionary Trading Program.

110.   As a direct and proximate result of BLMIS' wrongful, manipulative, and deceptive conduct, including the dissemination of the materially false and misleading information set forth above, Plaintiffs and the other members of the Class suffered damages through the loss of their investment assets and the deprivation of any appreciation on their investment assets, in many instances, over decades.   As a result of the manipulative and deceptive conduct set forth above, Plaintiffs and the Class members suffered damages of approximately $64.8 billion.

111.   By virtue of the foregoing, BLMIS violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**The Picower Parties are Control Persons under Section 20(a)**

112.   Each Picower Party is an entity or individual operating as part of a control group of BLMIS.  The Picower Parties were commonly controlled by Picower and used by him as a mere instrumentality for his criminal conduct.

113.   Pursuant to § 20(a), Picower is jointly and severally liable to the same extent as BLMIS itself for BLMIS' violations of § 10(b) of the Exchange Act and Rule 10b-5.

114.   Picower acted collectively and in concert with the Picower Parties as a control group of BLMIS within the meaning of § 20(a) of the Exchange Act as alleged herein.

115.   Picower had the power to directly or indirectly control, and did in fact control, the overall decision-making at BLMIS, solicitation of customers, the record keeping for the Picower Parties' accounts and other BLMIS Discretionary Trading Program customers, and the false recording of securities transactions and cash transfers in and from all customer accounts at

BLMIS for customers of the BLMIS Discretionary Trading Program, including those of the Class members.

116.   Picower had the power to directly or indirectly control, and did in fact control, the flow of funds and securities in and out of the accounts of the BLMIS Discretionary Trading Program and Picower knew that the activity in these accounts was fraudulently mis-stated to customers.

117.   Picower regularly communicated and agreed with Madoff and other BLMIS personnel to perpetuate the fraud.  Picower had a close relationship with Madoff and BLMIS, and directly and indirectly ensured that Madoff and BLMIS concealed the scheme from other customers in the BLMIS Discretionary Trading Program.  Picower directly or indirectly induced BLMIS' misleading statements to others so that he could continue to enrich the Picower Parties at the expense of the Plaintiffs and the Class they seek to represent.  These misrepresentations induced customers to entrust their funds to BLMIS for investment in the BLMIS Discretionary Trading Program.

118.   Picower induced Madoff to solicit additional customers for the BLMIS Discretionary Trading Program so that he could continue to enjoy astronomical returns.

119.   Picower had intimate knowledge of and involvement in the operations, record keeping, and financial management of BLMIS.  Picower directly or indirectly induced the material misrepresentations and omissions giving rise to the securities violations alleged herein.

120.   Picower knew and intended that material misrepresentations and omissions would be communicated to other customers of the BLMIS Discretionary Trading Program, including Plaintiffs.  Picower directly or indirectly induced BLMIS to conceal the fraud from BLMIS customers and from federal and state regulators.  Picower and the rest of the Picower Parties

profited from the BLMIS scheme and materially benefitted from Picower's direct or indirect control of BLMIS' violations of § 10(b) and SEC Rule 10b-5.

121.   Pursuant to § 20(a), because of Picower's control of BLMIS and Picower's domination and control of Picower Parties, the Picower Parties are jointly and severally liable as a control group to the same extent as BLMIS itself for Plaintiffs' damages, which are sought to be recovered from other assets of the Picower Parties, and not from the funds recovered by the Trustee through his fraudulent conveyance claims.

122.   As a direct and proximate result of BLMIS' securities violations, Plaintiffs and other members of the Class have suffered damages for which the Picower Parties are liable.

## COUNT 2

## VIOLATIONS OF FEDERAL RICO (18 U.S.C. § 1962(d))

123.   Plaintiffs repeat the allegations stated in paragraphs 1 through 100 above as if fully set forth herein.

124.   In the alternative, Plaintiffs sue pursuant to § 1964(c) of the Federal RICO Act, 18 U.S.C. §§ 1961-1968, which confers a private right of action on any person injured in his business or property by reason of a violation of § 1962.

125.   Madoff and BLMIS, with criminal intent and through a pattern of racketeering activity, operated a criminal enterprise, which functioned from the offices of BLMIS at 885 Third Avenue, New York, New York and which affected interstate commerce.

126.   The enterprise had an ascertainable structure and hierarchy that set it apart from the mere commission of the predicate acts set forth herein, and that form a pattern of racketeering activity in which Madoff and BLMIS actively engaged.

127.  Madoff controlled   and operated the criminal enterprise in violation of 18 U.S.C. §1962(c) by inducing customers to retain his investment advisory services and agreeing to entrust their money to him for investment  through  the BLMIS Discretionary Trading Program, utilizing false and fraudulent materials, and disseminating fraudulent trade confirmations and account statements.

128.  None of the predicate acts on which the Plaintiffs rely involves "any conduct that would have been actionable as fraud in the purchase or sale of securities" as prohibited by 18 U.S.C. § 1964(c).

129.  Madoff conducted the affairs of a criminal enterprise  through a pattern of racketeering that ran from approximately 1992  until December 11, 2008 in violation of 18 U.S.C. § 1962 for the unlawful purpose of intentionally defrauding the Plaintiffs and the Class they represent.

130.  Madoff and BLMIS conducted the enterprise's affairs through a pattern of racketeering acts that consisted, among other things, of sending through the United States mail to thousands of customers of the BLMIS Discretionary Trading Program every month, between 1992  and December 11, 2008, periodic trade confirmations reflecting trades in their accounts that, in fact, did not occur, and monthly account statements that stated falsely that the customers' money was invested in various securities and that BLMIS has transacted various stock and bond transactions on their behalves.

131.  The BLMIS trade confirmations and account statements were intended to cause, and did in fact cause, customers in the BLMIS Discretionary Trading Program to believe that their money was earning a positive return which caused them to give more money to BLMIS for investment pursuant to the BLMIS Discretionary Trading Program.

132.  The RICO violation is the conduct of an enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), namely the use of the mails and wires in furtherance of a scheme to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, in violation of 18 U.S.C. §§ 1341 and 1343.

133.  Each predicate act was related and had as its purpose the criminal diversion of funds from the accounts of customers of the BLMIS Discretionary Trading Program.

134.  The conduct underlying the fraudulent scheme alleged in the complaint establishes a "pattern of racketeering activity" within 18 U.S.C. § 1961(5).  This conduct does not consist of isolated incidents.

135.  The Picower Parties knowingly and purposefully agreed and conspired with Madoff and BLMIS to violate 18 U.S.C. § 1962(c) by knowingly participating in Madoff's racketeering enterprise.

136.  The Picower Parties knowingly and purposely conspired to violate 18 U.S.C. § 1962(c) by, among other things, (i) directing and orchestrating preparation of fictitious account statements to be distributed to customers of the BLMIS Discretionary Trading Program; (ii) encouraging Madoff to increase the customer base of the BLMIS Discretionary Trading Program in order to maintain the criminal enterprise; (iii) causing BLMIS to recognize certain fictitious gains and losses in the Picower Parties' accounts so that Picower and the rest of the Picower Parties could be enriched by the RICO scheme; (iv) causing BLMIS to steal money from customers in the BLMIS Discretionary Trading Program to generate enormous paper profits in the Picower Parties' accounts, thereby allowing Picower and the rest of the Picower Parties to enrich themselves by substantially more than $7.2 billion; and (v) causing BLMIS to falsify BLMIS' financial statements provided to regulators.

137.   By directing Madoff and BLMIS employees to book various phony transactions that generated phony profits, the Picower Parties controlled and actively participated in the criminal conduct of Madoff and BLMIS in stealing the funds of customers of the BLMIS Discretionary Trading Program, including the funds of the Plaintiffs and the Class.

138.   The Picower Parties' knowing participation in the fraudulent scheme was an integral part of the racketeering enterprise.

139.   Plaintiffs and the Class are victims of Madoff's criminal enterprise.  By virtue of the fraudulent scheme of Madoff and the Picower Parties in violation of 18 U.S.C. § 1962, the Plaintiffs and the Class have been caused damages of $64.8 billion.

## COUNT 3

### CONSPIRACY TO VIOLATE THE FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT (FLORIDA RICO)

140.   Plaintiffs repeat the allegations stated in paragraphs 1-100 and 124-139 above as if fully set forth herein.

141.   This is an action for violations of the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et seq*., also known as the Florida RICO Act.

142.   Florida Stat. § 772.104 provides that any person who has been injured by reason of the provisions of § 772.103 shall have a civil cause of action for threefold actual damages and also for reasonable attorneys' fees and court costs through the trial and appellate courts.

143.   Section 772.103 provides that:

[i]t is unlawful for any person:

(1) Who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of criminal activity or through the collection of an unlawful debt to use or invest,

whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

(2) Through a pattern of criminal activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property.

(3) Employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt.

(4) To conspire or endeavor to violate any of the provisions of subsection (1), subsection (2), or subsection (3).

144.   Under Fla. Stat. § 772.102(3), an "enterprise" is defined as "any individual, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and the term includes illicit as well as licit enterprises. . . ."

145.   The enterprise was comprised of an association in fact of Madoff, individually, and through the association with BLMIS, with the Picower Parties, and others, that engaged in a scheme to fraud customers of the BLMIS Discretionary Trading Program.

146.   Madoff, with criminal intent, received proceeds from the operation of the criminal enterprise in violation of Fla. Stat. § 772.103(1).

147.   Additionally, Madoff, with criminal intent, through the pattern of criminal activity of the enterprise, participated in the conduct of, was otherwise in control of, and operated the enterprise by inducing new customers to enroll in the BLMIS Discretionary Trading Program, utilizing false and fraudulent materials, disseminating fraudulent trade confirmations and account

statements to customers of the BLMIS Discretionary Trading Program, and submitting falsified BLMIS financial statements to regulators.

148. The enterprise had an ascertainable structure and hierarchy that set it apart from the mere commission of the predicate acts set forth herein, and that form a pattern of racketeering activity in which Madoff and BLMIS actively engaged.

149. Under Fla. Stat. § 772.102(1)(a)(22), "criminal activity" includes any act indictable under Chapter 817 of the Florida Criminal Code relating to fraudulent practices, false pretenses, and fraud generally.

150. "Criminal activity" also encompasses any conduct that is subject to indictment or information as a criminal offense and listed in 18 U.S.C. § 1961(1), which includes § § 1341 and 1343 of Title 18 relating to mail fraud and wire fraud, respectively. *See* Fla. Stat. § 772.102(1)(b).

151. As set forth in detail above, Madoff engaged in a systematic ongoing course of criminal conduct with the intent to defraud customers of the BLMIS Discretionary Trading Program, including Plaintiffs and the Class, based on the following predicate acts: (a) a scheme to defraud with the intent to obtain property by false or fraudulent pretenses, representations, or promises as well as by unlawful misrepresentations in violation of Fla. Stat. § 817.034(4); (b) federal mail fraud; and (c) federal wire fraud.

152. Under Fla. Stat. § 772.102(4), a "pattern of criminal activity" is defined as "engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents; provided that the last of such incidents occurred within 5 years after a prior incident of criminal activity."

153.   Madoff and BLMIS engaged in a "pattern of criminal activity" that consisted, among other things, of sending through the United States mail to thousands of customers of the BLMIS Discretionary Trading Program every month, between 1992  and December 11, 2008, trade confirmations and monthly account statements that stated falsely that the customers' money was invested in various securities and that BLMIS had transacted various stock and bond transactions on their behalves.

154.   Each predicate act alleged herein was related and had as its purpose the criminal diversion of funds from customers of the BLMIS Discretionary Trading Program in connection with the conspiracy conducted by BLMIS, Madoff, and the Picower Parties.

155.   This conduct did not arise out of a single contract or transaction, but was a pervasive scheme that injured the Class over many years.  Each predicate act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted the Class in a similar fashion.

156.   The predicate acts specified above which Madoff committed, and which the Picower Parties conspired with Madoff to commit, were related to each other in furtherance of the scheme implemented by the enterprise.

157.   Under Fla. Stat. § 772.102(1), "criminal activity" also includes the conspiracy to commit the predicate acts under that section.

158.   At all relevant times, the Picower Parties knew of, agreed and conspired to participate in the scheme set forth herein through a pattern of criminal activity in violation of Fla. Stat. §772.103(4).

159. The Picower Parties knowingly and purposefully agreed and conspired with Madoff and BLMIS to violate Fla. Stat. § 772.103 by knowingly participating in Madoff's criminal enterprise.

160. The Picower Parties committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein to effect the objective of the fraudulent scheme, including the acts alleged in paragraphs 42 through 62.

161. For instance, the Picower Parties knowingly and purposely conspired to violate Fla. Stat. § 772.103 by, among other things, (i) directing and orchestrating preparation of fictitious account statements to be distributed to customers of the BLMIS Discretionary Trading Program; (ii) encouraging Madoff to increase the customer base of the BLMIS Discretionary Trading Program in order for BLMIS to obtain additional funds that the Picower Parties could steal in furtherance of the criminal enterprise; (iii) causing BLMIS to recognize astronomical fictitious gains and losses in the Picower Parties' accounts; (iv) causing BLMIS to steal money from customers in the BLMIS Discretionary Trading Program to generate enormous paper profits in the Picower Parties' accounts; and (v) causing BLMIS to falsify BLMIS' financial statements provided to regulators.

162. By directing Madoff and BLMIS employees to book various phony transactions that generated phony profits, the Picower Parties controlled and enabled BLMIS to wrongfully convert the funds of customers of the BLMIS Discretionary Trading Program, including the funds belonging to the Plaintiffs and the Class.

163. The Picower Parties' knowing participation in the fraudulent scheme was an integral part of the criminal enterprise.

164. Plaintiffs and the Class are victims of Madoff's criminal enterprise. By virtue of the fraudulent scheme of Madoff and the Picower Parties in violation of Fla. Stat. § 772.103, the Plaintiffs and the Class have suffered damages in excess of $64.8 billion.

## COUNT 4

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

165. Plaintiffs repeat the allegations stated in paragraphs 1 through 100 above as if fully set forth herein.

166. Madoff and BLMIS owed a fiduciary duty to customers of the BLMIS Discretionary Trading Program, including Plaintiffs and the Class.

167. The Picower Parties knew that Madoff, as the sole owner of BLMIS and an investment advisor, owed a fiduciary duty to the customers of the BLMIS Discretionary Trading Program. Moreover, Picower undoubtedly had reviewed account agreements in which BLMIS agreed to invest customers' money pursuant to specific terms.

168. Madoff and BLMIS breached that fiduciary duty by, among other things, failing to use the funds that customers of the BLMIS Discretionary Trading Program entrusted to BLMIS for investment purposes and instead misappropriating the funds for the enrichment of Madoff and the Picower Parties.

169. The Picower Parties knowingly participated in the theft of the money belonging to the customers of the BLMIS Discretionary Trading Program.

170. Madoff was able to perpetrate this scheme by sending customers of the BLMIS Discretionary Trading Program, including the Plaintiffs and the Class, trade confirmations and monthly account statements that falsely stated that securities were being purchased and sold on their behalves.

171.   The Picower Parties provided substantial assistance to Madoff in stealing the money belonging to the customers in the BLMIS Discretionary Trading Program.

172.   For instance, Picower directly or indirectly caused BLMIS employees to book profitable fabricated securities transactions in accounts which he directly or indirectly owned that, in fact, never occurred.

173.   Picower knew that by demanding and receiving astronomical returns on his and the other Picower Parties' money, Madoff and BLMIS were forced to steal the money belonging to the customers of the BLMIS Discretionary Trading Program.  This theft was carried out through  material misrepresentations to other BLMIS investors as to their account values and profits.

174.   The misrepresentations that Picower knowingly and intentionally caused to be made were calculated to give the appearance that BLMIS was a legitimate and profitable business and that BLMIS customers were making steady profits in their accounts. The misrepresentations ensured that the fraudulent scheme would continue, and that Picower would continue to reap the benefits from the scheme.

175.   The Picower Parties' participation was a proximate cause of the breach.  For reasons presently unknown, Picower controlled Madoff and caused Madoff to accede to all of his demands for astronomical returns and for falsified losses.

176.   The aforesaid conduct by the Picower Parties was purposeful.  With knowledge that they were aiding and abetting BLMIS' and Madoff's breach of fiduciary duty, Picower caused BLMIS to send to all of the customers of the BLMIS Discretionary Trading Program false and misleading information  in order to induce customers to maintain their accounts with BLMIS and to continue to attract new customers for BLMIS' Discretionary Trading Program.

177.   Picower's aiding and abetting of this breach of fiduciary duty caused customers of the BLMIS Discretionary Trading Program to lose billions of dollars.

178.   As a result of Picower's aiding and abetting Madoff's fraud, Plaintiffs have suffered damages of $64.8 billion.

## COUNT 5

## AIDING AND ABETTING FRAUD

179.   Plaintiffs repeat the allegations stated in paragraphs 1 through 100 above as if fully set forth herein.

180.   Madoff and BLMIS committed a massive fraud.

181.   The Picower Parties had actual knowledge of the fraud that BLMIS perpetrated on customers of the BLMIS Discretionary Trading Program and fully and knowingly lent substantial assistance to Madoff and BLMIS in committing the fraud.

182.   Picower knew that, in order to generate enormous paper profits in the Picower Parties' accounts, BLMIS would have to steal money from customers in the BLMIS Discretionary Trading Program.

183.   Picower also knew that BLMIS would have to generate false account information for each of the customers in the BLMIS Discretionary Trading Program, just as Picower demanded that Madoff generate false trades in order to justify the astronomical returns and fictitious losses that Picower demanded.

185.   Picower substantially assisted Madoff and BLMIS in committing the fraud by causing BLMIS employees to book profitable fabricated securities transactions in accounts which he directly or indirectly owned; causing additional material misrepresentations to other BLMIS investors as to their account values and profits; actively encouraging and causing

BLMIS to solicit new customers for the BLMIS Discretionary Trading Program, which Picower knew to be a fraudulent scheme; causing BLMIS to submit fraudulent financial statements to the regulators; directing recording of fictitious transactions in the Picower Parties' accounts; and directing BLMIS to violate rules pertaining to margin loans.

186.    Picower's assistance was a proximate cause of the fraud because, for reasons presently unknown, Picower controlled Madoff and caused Madoff to accede to all of his demands for astronomical returns and for falsified losses.

187.    Madoff's scheme has resulted in billions of dollars in losses to customers of the BLMIS Discretionary Trading Program, including the Plaintiffs and the Class.

188.    As a result of Picower's aiding and abetting Madoff's fraud, Plaintiffs have suffered damages in excess of $64.8 billion.

189.    Plaintiffs are entitled to punitive damages in an amount equal to ten times their actual damages.

**COUNT 6**

**NON-NOMINATIVE TORT FOR INTENTIONAL
AND UNPRIVILEGED INFLICTION OF TEMPORAL HARM**

**190.**    Plaintiffs repeat the allegations stated in paragraphs 1 through 100 above as if fully set forth herein.

191.    By knowingly and intentionally participating in BLMIS' fraudulent scheme on the customers of the BLMIS Discretionary Trading Program, the Picower Parties caused customers of the BLMIS Discretionary Trading Program, including the Plaintiffs and the Class, to incur billions of dollars in losses.

192.     The Picower Parties' conduct was undertaken without excuse or justification, was motivated by greed, and was intended to keep the fraudulent scheme from collapsing so that the Picower Parties could reap the benefits of the fraudulent scheme.

193.     As a result of the Picower Parties' conduct, Plaintiffs and the Class have suffered damages in excess of $64.8 billion.

**WHEREFORE**, Plaintiffs demand judgment against the Picower Parties as follows:

(i)     On Count One, awarding Plaintiffs and the Class compensatory damages against the Picower Parties jointly and severally in an amount to be determined at trial, together with interest, counsel fees, litigation expenses, and cost of suit;

(ii)     On Count Two, awarding Plaintiffs and the Class compensatory damages against the Picower Parties jointly and severally, treble damages under RICO, plus attorneys' fees, litigation expenses, and cost of suit;

(iii)     On Count Three, awarding Plaintiffs and the Class compensatory damages against the Picower Parties jointly and severally, treble damages  pursuant to Fla. Stat. § 772.104(1), as well as attorneys' fees and costs authorized under Fla. Stat. § 772.104(1);

(iv)     On Count Four, awarding Plaintiffs and the Class compensatory and punitive damages against the Picower Parties jointly and severally in an amount to be determined at trial, together with interest, counsel fees, litigation expenses, and cost of suit;

(v)     On Count Five, awarding Plaintiffs and the Class compensatory and punitive damages against the Picower Parties jointly and severally in an amount to be determined at trial, together with interest, counsel fees, litigation expenses, and cost of suit;

(vi)    On Count Six, awarding Plaintiffs and the Class compensatory and punitive damages against the Picower Parties jointly and severally in an amount to be determined at trial, together with interest, counsel fees, litigation expenses, and cost of suit;

(vii)    Determining that this action is a proper class action;

(viii)    Designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as class counsel; and

(ix)    Granting Plaintiffs such other and further relief as the Court deems appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

February 5, 2014

**BECKER & POLIAKOFF, P.A.**

*/s/ Allen M. Levine*_____
Florida Bar No. 315419
Becker and Poliakoff, P.A.
1 East Broward Blvd.
Suite 1800
Ft. Lauderdale, FL 33301
Telephone: (954) 987-7550
Facsimile: (954) 985-4176
ALevine@bplegal.com

and

**BECKER & POLIAKOFF LLP**

By:    *s/s Helen Davis Chaitman*___
_____

45 Broadway
New York, New York 10006
Telephone: (212) 599-3322
Facsimile: (212) 557-0295

Email: hchaitman@bplegal.com
Email: jgorchkova@bplegal.com

*Attorneys for Plaintiffs and the Class*

ACTIVE: 5443125_1
DRAFT 2/5/14