# EXHIBIT J

1CJFMADA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3
     In re: BERNARD L. MADOFF     10 CV 4652 (JGK)
 4                                10 CV 7101 (JGK)
                                  10 CV 7210 (JGK)
 5                                10 CV 1298 (JGK)
                                  10 CV 1328 (JGK)
 6   ------------------------------x
                                      New York, N.Y.
 7                                    December 19, 2011
                                      11:00 a.m.
 8
     Before:
 9
                         HON. JOHN G. KOELTL,
10
                                         District Judge
11
                            APPEARANCES
12
     BEASLEY HAUSER KRAMER & GALARDI
13        Attorneys for Adele Fox
     JAMES W. BEASLEY
14   JOSEPH G. GALARDI
15   COLE, SCHOTZ, MEISEL, FORMAN & LEONARD
          Attorneys for Adele Fox
16   LAWRENCE MAY
17
     BLACKNER, STONE & ASSOCIATES
18       Attorneys for Adele Fox
     RICHARD STONE
19
     BECKER & POLIAKOFF
20       Attorneys for Susanne Stone Marshall
     HELEN DAVIS CHAITMAN
21
     BAKER & HOSTETLER
22        Attorneys for Irving H. Picard
     DAVID SHEEHAN
23
     HEMANT SHARMA
24       Securities Investor Protection Corporation
25
```

```
 1              (Case called)

 2              (In open court)

 3              THE DEPUTY CLERK:  This is the case of In Re: Bernard

 4    L. Madoff.  All parties please state your appearance for the

 5    record.

 6              MS. CHAITMAN:  Helen Chaitman, Becker & Poliakoff, on

 7    behalf of Susanne Story Marshall.

 8              MR. BEASLEY:  Good morning, your Honor.  I'm Jim

 9    Beasley here on behalf of the Fox class.  With me is my partner

10    Joe Galardi and my colleague, Rick Stone.

11              THE COURT:  Thank you.

12              MR. MAY:  Good morning, your Honor.  Lawrence May,

13    Cole, Schotz, also on behalf of the Fox class.

14              MR. SHEEHAN:  Good morning, your Honor.  David Sheehan

15    on behalf of the trustee Picard.

16              MR. SHARMA:  Hemant Sharma on behalf of the Securities

17    Investor Protection Corporation.

18              THE COURT:  Good morning.  All right.  How much time

19    do you parties want?  I've read the papers.  I'm familiar with

20    the argument.

21              MR. BEASLEY:  If your Honor please, I would suggest

22    approximately 40 minutes per side.

23              THE COURT:  No.

24              MR. BEASLEY:  30 minutes per side.  Whatever your

25    honor please.
```

1CJFMADA

1          THE COURT:  About 25 minutes a side.  It's about twice

2     as long as the Court of Appeals.

3          MR. BEASLEY:  Thank you.  I understand.

4          THE COURT:  Okay.  I'll listen to the appellants

5     first.

6          MS. CHAITMAN:  Excuse me, your Honor, just when you

7     say 25 minutes, are you saying for both appellants?

8          THE COURT:  Yes.  25 minutes for the appellants, 25

9     minutes for the appellees.

10          MR. BEASLEY:  May it please the Court.  I'd like to

11     reserve ten minutes for rebuttal, your Honor.

12          THE COURT:  Sure.

13          MR. BEASLEY:  There are basically two issues before

14     the Court today.  First of all, should the Fox class be

15     permanently barred from pursuing their claims against Picower.

16     Second, should the trustee be allowed to retain a $5 billion

17     settlement with Picower, even though he only has a proper claim

18     for $250 million where there was no jurisdiction to approve the

19     settlement.  We submit, your Honor, the answer to both of those

20     questions is no, and that the order of the Bankruptcy Court

21     should be reversed.

22          A brief statement about the facts.  The trustees sued

23     Picower in May, 2009 after extensive investigation.  The

24     trustee only sued for fraudulent transfer claims under the

25     bankruptcy code.  In February, 2010, the Fox class brought an

1    action in Florida in the Southern District, all the claims were

2    under state law.  These are the claims that the Bankruptcy

3    Court held belonged to the trustee.  The Fox class made no

4    claim against the estate.

5            The Fox class consists of approximately --

6            THE COURT:  Let me stop you -- go ahead.

7            MR. BEASLEY:  The Fox class consists of about 3,000

8    victims of the ponzi scheme who were held to have no net equity

9    and therefore they have no claim against the estate.  The

10   trustee has determined --

11           THE COURT:  Let me stop you.  With respect to the

12   claims that you brought in Florida, the claims were the same,

13   based on the same facts that the trustee had alleged in the

14   fraudulent transfer claims, right?

15           MR. BEASLEY:  That is correct, your Honor.  Basically

16   the same basic facts, that there was a Madoff ponzi scheme.

17           THE COURT:  But it was a cut and paste of the

18   trustee's complaint, except for the names of the causes of

19   action and the damages sought.

20           MR. BEASLEY:  We relied substantially on the trustee's

21   complaint against Picower and the subsequent material that was

22   filed in court.

23           THE COURT:  Same facts?

24           MR. BEASLEY:  Essentially.  Essentially.

25           THE COURT:  You keep hedging.

```
1              MR. BEASLEY:  Well, because they're not identical,

2     your Honor.  I don't mean to quibble at all.  Let's assume they

3     are substantially the same facts, I suggest.

4              THE COURT:  Putting aside the issue of the Wagoner

5     Rule, could the trustee have brought -- could Madoff Securities

6     have brought the claims that you brought in Florida?

7              MR. BEASLEY:  Absolutely not, your Honor.  That's the

8     crux of our position.

9              THE COURT:  Why not?

10             MR. BEASLEY:  Why not?  Because the trustee has no

11    standing to assert those common law --

12             THE COURT:  No, I said could Madoff Securities have

13    done that, putting aside the Wagoner Rule.  The trustee

14    succeeds to any claims by Madoff Securities, and my question

15    is, could Madoff Securities have brought those claims?

16             MR. BEASLEY:  Absolutely not, your Honor.

17             THE COURT:  Why is that?

18             MR. BEASLEY:  That's because of the in pari delicto

19    rule.

20             THE COURT:  That's the Wagoner rule?

21             MR. BEASLEY:  The Wagoner rule doesn't really say in

22    pari delicto.  In pari delicto is a state law defense.  But

23    because two people who commit a fraud, one cannot sue the

24    other.  It's as simple as that.

25             THE COURT:  Has the Wagoner rule ever been applied to
```

```
 1    foreclose a trustee from bringing a claim based on the defense

 2    to a lawsuit that it had not brought?  In other words, usually

 3    the in pari delicto defense comes up with the trustee, on

 4    behalf of the debtor sues a person who is in pari delicto.  And

 5    the person who is in pari delicto says can't sue me, in pari

 6    delicto.  Has it ever been applied, as you seek to apply it in

 7    this case, to prevent the effectuation of an injunction based

 8    on a lawsuit that the trustee itself has not brought?

 9           MR. BEASLEY:  The trustee is claiming that all the

10    claims asserted by Fox belong to him.  Our response to that is

11    the position that you have articulated, and I do not believe

12    that there is any case that supports the trustee's position.

13    The Wagoner --

14           THE COURT:  But unlike the usual in pari delicto or

15    Wagoner situation, there's no one here like Picower to say,

16    hey, you can't sue me because you're in pari delicto.  So my

17    only question is, is there any case that's applied either in

18    pari delicto or Wagoner as you seek to apply it here?

19           MR. BEASLEY:  I am more familiar with the converse,

20    that there's no position to support the trustee's estate.  It's

21    not really --

22           THE COURT:  Okay, okay, so --

23           MR. BEASLEY:  It really doesn't matter --

24           THE COURT:  Okay.

25           MR. BEASLEY:  Because it's an issue of standing and
```

1    subject matter jurisdiction.  It's not a matter of who can

2    assert the affirmative defense.

3         THE COURT:  Okay.  There's a real question of whether

4    it's subject matter jurisdiction or not, but put that aside.

5    You don't think that there's any case going either way on this

6    subject.  There's no case that supports you and there's no case

7    that supports the trustee.  I'm writing on a clean slate.  Yes?

8         MR. BEASLEY:  I think the slate isn't quite clean

9    because I think the cases that do exist all support our

10   proposition.  Is there a case precisely on these facts, I

11   cannot tell you that today, this morning.

12        THE COURT:  And the only reason that Madoff Securities

13   could not have brought the Florida claims is because of in pari

14   delicto or the Wagoner rule.

15        MR. BEASLEY:  Well, it's two issues.  Number one, it's

16   the Wagoner rule and number two, it's the Johns Mansville rule,

17   so there's two independent bases for asserting that the trustee

18   can't possibly own the claims that were asserted by Fox.

19        THE COURT:  The Johns Mansville rule is different.

20   The claims were plainly independent claims in Johns Mansville

21   and one of the issues here is whether the claims are in fact

22   independent claims.  So it sort of begs the question to say

23   that these claims would have been precluded based on Johns

24   Mansville.  But the two reasons you say that the trustee could

25   not have brought these claims is Wagoner or in pari delicto and

1    Johns Mansville.

2             MR. BEASLEY:  That is correct, your Honor.  Those two

3    basic -- those are the two basic bedrock principles, and I will

4    add that there's been no one in this case that has denied that

5    the Fox class has suffered an independent injury.  The Fox

6    class claims are for things like improper income taxes paid

7    that could not possibly have been sustained by the debtor.

8             THE COURT:  And lost profits, right?

9             MR. BEASLEY:  No, not any claim for lost profit

10   whatsoever.

11            THE COURT:  The income it would have made had they had

12   the money?

13            MR. BEASLEY:  No, your Honor.  It's essentially, what

14   we're saying is we're entitled to prejudgment interest.  We're

15   entitled to compensation for the time value of money.

16   Prejudgment interest is our damage model.

17            THE COURT:  Okay.  If you had been successful in your

18   claims as to what your recovery should have been in the

19   bankruptcy, had the bankruptcy trustee come out the other way

20   and the Second Circuit come out the other way on the net equity

21   issue, would you have had any claims in Florida?

22            MR. BEASLEY:  The claims in Florida are for damages

23   that they suffered apart from -- well, go back -- just rewind,

24   if you want to rewind entirely, the claim initially was that

25   people wanted the amount of money that was shown their last

1  statement from the Madoff firm and they sought that amount of

2  money, that was the bedrock claim and that has been rejected.

3           THE COURT:  Right, but my --

4           MR. BEASLEY:  Under the net equity rule, which we do

5  not quarrel with --

6           THE COURT:  My question is, the claims that you

7  brought in Florida under state law, would those claims exist if

8  you had succeeded in your argument on the net equity rule?

9           MR. BEASLEY:  Yes, your Honor.  I think they would,

10  because the issue of whether or not, which I think is

11  hypothetical at this point, whether or not every investor in

12  Madoff was entitled to collect the total of the 64 to

13  $68 million that was shown on the last statements to the

14  investors in the Madoff ponzi scheme would still not go to the

15  issue of our claims for payment of income taxes on fraudulent

16  or phony investment income.

17           THE COURT:  How do your -- okay.  How do your claims

18  differ in Florida from the claims of all other customers or

19  shareholders of Madoff Securities, all of whom could make the

20  argument that they had to pay taxes on the profits as they came

21  in over the years?

22           MR. BEASLEY:  Well, the distinction today, your Honor,

23  is that the trustee has declared that the so-called net losers

24  are entitled to recover from the estate, whereas the Fox class

25  has no such entitlement.  So that's the real world answer I

1   think to your Honor's question.

2          THE COURT:  So the real world answer as to why you

3   have a claim or claim to have a claim in Florida is because you

4   lost the net equity decision.

5          MR. BEASLEY:  We never ourselves asserted that, others

6   did, we did not.

7          THE COURT:  Because --

8          MR. BEASLEY:  But yes, this decision is now etched in

9   stone as far as we're concerned.

10          THE COURT:  And the only reason you claim that you

11   have a claim in Florida is that you were the -- you came out on

12   the wrong end of the net equity decision.

13          MR. BEASLEY:   Well, having been declared not to have

14   any claim against the estate and knowing that the Fox class did

15   suffer real damages and no one has disputed that, we look to

16   others against whom the Fox class might recover, and Picower

17   was certainly one of those, and so we brought our claims

18   against Picower to recover damages that were suffered by the

19   Fox class for injuries for which there would be no compensation

20   whatsoever in the bankruptcy proceeding.

21          THE COURT:  Why isn't the trustee right, then, that

22   the lawsuits in Florida are an end run around the net equity

23   decision, because the only distinction that you claim and the

24   only distinctive damages that you're claiming in Florida are

25   based on being on the short end of the net equity decision by

1    the Bankruptcy Court in the Second Circuit?

2                MR. BEASLEY:  That decision simply means we have no

3    claim against the estate.  Whether we have a claim against

4    Picower is the issue of the day as far as we are concerned,

5    your Honor, most respectfully.  The question is whether we have

6    a claim against Picower for damages that we clearly suffered.

7    We are not doing an end run around the net equity rule because

8    we're not seeking the investment losses that were sustained

9    when someone got a statement from Madoff for $3 million and it

10   turns out not to exist.  We're not seeking that 3 million.

11               THE COURT:  But you're claiming taxes that you had to

12   pay on the profits.  It was a lawsuit which you say, if I

13   understand you right, could have been brought by any of the

14   investors or customers in Madoff Securities except the

15   customers you say who have been paid and not fully paid, but

16   don't have the same claim, so it's the losers in the net equity

17   who you say have this claim, right?

18               MR. BEASLEY:  It's because we have no claim against

19   the estate that we brought our claims against Picower.  We

20   didn't sue the estate, we didn't make a net equity claim.  We

21   made claims for common law causes of action that could not

22   possibly have been brought by the trustee, and therefore, there

23   was no subject matter jurisdiction in the Bankruptcy Court.

24               THE COURT:  Let me just, one last time to be sure that

25   I understand.  Could all of the customers of Madoff Securities

 1   have brought the same claims that you brought in Florida

 2   against the Picower Defendants?

 3            MR. BEASLEY:  I don't think so, your Honor, because

 4   they're going to be made whole.  If there are sufficient assets

 5   in the estate, they're going to be made whole.  They have a

 6   priority under SIPA to the bankruptcy estate.  If they're going

 7   to be made whole, I assume it's going to be made whole for

 8   whatever losses they suffer; investment losses, tax losses,

 9   whatever.

10            THE COURT:  So the cases that say if there is a claim

11   which is common to all of the creditors, that is a claim to be

12   brought by the trustee, those cases you say don't apply because

13   as a result of the net equity rule all of the creditors are not

14   in the same situation.  Some have been favored by the net

15   equity rule.

16            MR. BEASLEY:  That is precisely correct, your Honor,

17   and that's exactly the way Judge McMahon analyzed it.

18            THE COURT:  And that would then lead to the question

19   of whether this isn't an end run around the net equity rule.

20            MR. BEASLEY:  Well, it isn't an end run around the net

21   equity rule.  The net equity rule creates the problem, but we

22   don't question it, we don't question the net equity rule, and

23   the net equity rule means there are, the class of victims,

24   investors we'll call them, is now divided into at least two

25   parts.

1        THE COURT:  The haves and the have-nots.

2        MR. BEASLEY:  Ones that will recover against the

3    estate and ones that will not, and if our class is not allowed

4    to pursue these claims against Picower, they will actually

5    recover absolutely nothing.  And so we have 3,000 people with

6    claims of several billion dollars, we calculate, who will

7    receive absolutely nothing.  The trustee has taken upon himself

8    to, having denied the Fox class any recovery in the estate,

9    which we don't quarrel with, it's a proper decision, he's taken

10   upon himself for two years to prevent the Fox class from

11   seeking recovery for their damages against the Picowers.  We

12   haven't been litigating against Picower, we've been litigating

13   against the trustee.  I don't think Picower has filed a single

14   paper in any of these cases ever.  It's simply the trustee

15   trying to protect Picower and extinguish our claims as a

16   bargaining chip in the settlement that he has reached with

17   Picower.

18       THE COURT:  There's no question that the Picower

19   defendants were not in privity with the Florida plaintiffs.  Is

20   there any claim that the Picower defendants had any independent

21   duty to the Florida plaintiffs?

22       MR. BEASLEY:  Your Honor, there is no requirement for

23   privity or a duty based on the very claims that we have

24   asserted.  We did not assert any kind of fraud claims, we

25   asserted claims for conversion, unjust enrichment --

1        THE COURT:  And Florida civil RICO.

2        MR. BEASLEY:  And none of those require privity or

3   reliance or a relationship.

4        THE COURT:  And you don't allege any independent duty

5   by the Picower defendants.

6        MR. BEASLEY:  We do not allege any because there

7   weren't any.  It's not a requirement of the elements of our

8   causes of action.

9        THE COURT:  Doesn't that distinguish this case from

10  Travelers where the very essence of the claims were independent

11  claims by people who allegedly had direct actions against

12  Travelers for what Travelers did to them?

13       MR. BEASLEY:  Your Honor, I submit that there is no

14  case that requires privity or a duty under Johns Mansville.

15  Johns Mansville happened to be a case involving a fraudulent

16  misrepresentation which obviously had to be made directly to

17  one of the claimants, but it does not say that Johns Mansville,

18  does not say that privity is a requirement and it would be odd

19  to do that when the very claims that we are asserting do not

20  have privity or any of these other relationships as an element

21  of the causes of action.

22       THE COURT:  Okay.  Do you want to finish up?

23       MR. BEASLEY:  I guess I should, your Honor.  We submit

24  that under the Wagoner rule and under Johns Mansville the Fox

25  claims do not belong to the trustee.  These injuries were not

1   suffered by the estate or by Madoff prior to the bankruptcy.

2   Therefore, the trustee does not own these claims and therefore

3   the Bankruptcy Court had no jurisdiction whatsoever to enter

4   into the settlement that they entered into with the Picowers.

5   There was no jurisdiction to approval the settlement because of

6   the first injunction.  The notice of appeal divested the lower

7   Court of jurisdiction to address the aspects of the case that

8   are involved in this appeal.

9        The settlement agreement and the injunction in the

10  settlement are completely intertwined.  For example, the

11  trustee's motion before the bankruptcy said an injunction was

12  part of the settlement, and in their reply brief in this appeal

13  they said the permanent injunction was material and necessary.

14  It would have prevented settlement from going forward.  And so

15  in the trustee's motion to the Bankruptcy Court they cited the

16  first injunction at least seven times and argued extensively

17  that the second injunction, which is the one on appeal from

18  the, we'll call it the second appeal, should be approved on the

19  authority of the first.

20       So we believe that the Bankruptcy Court has no

21  jurisdiction to enter into the settlement and the second

22  injunction.  It had no subject matter jurisdiction as we've

23  already discussed under Wagoner and Johns Mansville and

24  finally, the release of a non-debtor is improper.  A permanent

25  injunction against a non-creditor is simply improper.  When a

1    third party gets sued by a trustee and a third party wants to

2    settle, the third party often asks that the settlement include

3    an injunction, a full release of all claims.  Courts uniformly

4    reject those settlements.  The clearest case is Johns Mansville

5    itself.  Secondly, the Zale case in the Fifth Circuit in 1995

6    which is cited in Johns Mansville.  The trustee has cited no

7    case where such a settlement containing such an injunction was

8    upheld.  Thank you.

9              MS. CHAITMAN:  Your Honor, I think you can hear me

10   from here, can't you?

11             THE COURT:  I think it might be helpful, if you don't

12   mind.

13             MS. CHAITMAN:  I'll be brief, your Honor.

14             THE COURT:  Thank you Ms. Chaitman.

15             MS. CHAITMAN:  I want to save some time for rebuttal.

16   I would answer differently the questions that you asked my

17   colleague.  If you look at the decision of Judge Rakoff in the

18   HSBC case or the decision of Judge McMahon in the JPMorgan

19   Chase case, you will see that Mr. Picard sought to see those

20   financial institutions on behalf of all of the investors, and

21   both judges held that he lacked standing to do so.  He lacked

22   it under SIPA, not only under the Wagoner rule but also he had

23   no standing to assert claims that belonged to the investors.

24   And here I would say, your Honor, that every single Madoff

25   investor --

1          THE COURT:  But weren't those based on in pari

2     delicto?

3          MS. CHAITMAN:  No.  There were several bases in the

4     decision, your Honor.  They said Picard was barred under the

5     Wagoner rule, he was barred under SIPA.  SIPA did not give him

6     the standing to assert claims that belonged to the investors

7     and SIPA did not give him the standing to assert common law

8     state law claims.  That's spelled out in the decisions, in both

9     of them.

10         THE COURT:  All right.

11         MS. CHAITMAN:  And it's based on existing authority,

12    your Honor.  Neither Court did anything that was unpredictable.

13         I would answer differently from Mr. Beasley your

14    question as to which of the Madoff victims have a claim against

15    the Picower parties.  I would say that every single one of them

16    has a claim.  I think you have to distinguish between whether

17    someone has a claim and whether they can prove damages.  Now,

18    it may be --

19         THE COURT:  So could I just stop you?  Unlike

20    Mr. Beasley, you would say that the Florida claims are shared

21    by all of the customers of Madoff Securities?

22         MS. CHAITMAN:  Yes, absolutely.  Because every single

23    customer -- if two people steal my wallet, I have a claim

24    against each of them for conversion.

25         THE COURT:  Okay.

1          MS. CHAITMAN:  And if one of them pays me back, then I

2     can't prove damages against the other one.

3          THE COURT:  But if that's right, then, the question is

4     there are cases that stand for the proposition that if a claim

5     is shared by all of the creditors of the debtor, then the

6     trustee is the proper party to bring that claim.

7          MS. CHAITMAN:  Those cases are contradicted by the

8     decisions of Judge Rakoff and Judge McMahon, and I think that

9     they are not good law, your Honor, because --

10          THE COURT:  There is a -- some of them are Second

11     Circuit law, which is more --

12          MS. CHAITMAN:  More controlling?

13          THE COURT:  More persuasive than our decisions.

14          MS. CHAITMAN:  I understand that, your Honor.  But the

15     point is that it may be that there are people who have claims

16     against BLMIS who will be paid in full.  Those people do not --

17          THE COURT:  But as you say, that's a difference that

18     goes to damages and not to whether the claim exists.  It goes

19     to the amount of the claim rather than the claim.

20          MS. CHAITMAN:  Yes.  Because I think all of this has

21     to be viewed in the context of what the jurisdiction, what

22     standing the trustee has and what jurisdiction the Bankruptcy

23     Court has, and I think one of the things that makes an enormous

24     difference for your Honor is that we now are dealing with the

25     law as announced by the United States Supreme Court in Stern v.

1   Marshall, which essentially divests the Bankruptcy Court of

2   jurisdiction over this adversary proceeding in the first

3   instance.  So here we have a situation where the Bankruptcy

4   Court entered an order approving a settlement in a case in

5   which it didn't have jurisdiction, and then in that settlement,

6   even though the settlement was not contingent upon an

7   injunction, the Court entered an injunction enjoining third

8   parties over whom the Court did not have jurisdiction.

9          THE COURT:  It plainly, it plainly had the

10  jurisdiction over the fraudulent conveyance claims that it

11  brought, and it plainly had jurisdiction to settle those

12  claims.  It plainly had jurisdiction to issue certain

13  injunctions.  It's not like Stern v. Marshall.  The question

14  then becomes what the appropriate scope of the injunction was,

15  and whether the injunction in furtherance of the settlement

16  went too far.  But it plainly is not a Stern v. Marshall case.

17         MS. CHAITMAN:  I would respectfully disagree, your

18  Honor, because Stern v. Marshall cited the Granfinanciera case

19  and Granfinanciera was a fraudulent transfer action.  I think

20  Stern v. Marshall reaches fraudulent transfer action.

21         THE COURT:  You think Stern v. Marshall held that a

22  Bankruptcy Court is without jurisdiction over a fraudulent

23  conveyance action?

24         MS. CHAITMAN:  Yes, I do, your Honor.  If you look at

25  the decision and look a t the citation in Granfinanciera, I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    think that's true.  I think the Court did not have jurisdiction

2    over this case.  Now, clearly, the Picower parties didn't raise

3    that, but you can't confer subject matter jurisdiction by

4    consent.

5              THE COURT:  I understand.

6              MS. CHAITMAN:  So I think we're in a situation where

7    the Bankruptcy Court did not have jurisdiction over the lawsuit

8    to begin with, we know that in retrospect, and the Court

9    certainly didn't have jurisdiction to enter an injunction

10   depriving the investors of claims they had against the Picower

11   defendants.  Because in essence what the Court has done is

12   given the Picowers the bankruptcy discharge when they didn't go

13   through the whole bankruptcy process.  They never disclosed

14   their assets.  There's just no authority for what was done

15   here, your Honor.

16             THE COURT:  Okay.

17             MS. CHAITMAN:  Thank you.

18             THE COURT:  Thank you, Ms. Chaitman.

19             MR. SHEEHAN:  Good morning, your Honor.  David Sheehan

20   for the trustee.  If I may, your Honor, just in light of the

21   colloquy that just transpired, I'd like to if I could just

22   return to first principles.  I think what's got lost here in

23   this colloquy is the fact, and I think your Honor focused on

24   it, is the fact of what we're doing with a fraudulent

25   conveyance action brought by the trustee under the bankruptcy

1    code for returned property to the estate and as such it falls

2    under cases like your Honor alluded to like St. Paul's from the

3    Second Circuit, been the law in this jurisdiction for over

4    twenty years, which says that if you have a generalized claim,

5    which is clearly what we have here, the fraudulent conveyance

6    action, seeking the return of property to the estate, a claim

7    that is not particularized but denies all the creditors, which

8    my colleague Ms. Chaitman has conceded is the case here.

9              Clearly, as your Honor has stated, this Court, Judge

10   Lifland, had jurisdiction, considered under Rule 9019

11   appropriately all the factors in connection with the approval

12   of a settlement, did so, and then not seeking a directed

13   discharge to the Picowers, but did exactly what you should do

14   as Judge Rakoff pointed out in the St. Vincent case and that is

15   what?  Protect the orderly administration of the estate, and to

16   protect those creditors, all of them that that trustee

17   represents, to make sure they all get a pro rata distribution,

18   as a benefit of that injunction to shut down all of those other

19   causes of action so that we don't have individualized causes of

20   action by creditors seeking generalized claims.  What happens

21   is, yes, the Picowers did indeed receive the benefit of that

22   injunction, there's no question of that.

23             THE COURT:  Are you referring to the first injunction?

24             MR. SHEEHAN:  I think yes, your Honor.  Because the

25   first injunction deals with the suit at hand.  The second

```
 1    injunction deals with suits yet to be had, and there are those

 2    that have been filed.

 3               THE COURT:  How do you respond to Mr. Beasley's

 4    argument that there was a lack of jurisdiction to approve the

 5    settlement because the first injunction was still on appeal to

 6    me?

 7               MR. SHEEHAN:  I disagree, your Honor.  I don't think

 8    one has any relationship to the other.  I believe that when the

 9    injunction was entered, what it did was enjoin those actions in

10    Florida, did not in any way affect the ongoing litigation in

11    front of Judge Lifland which then culminated in the settlement.

12    As part and parcel of that settlement the Court definitely had

13    to assess the jurisdiction to consider the entry of a permanent

14    injunction at that time as part of the overall settlement

15    process and approving that order to protect the integrity of

16    the settlement and the estate which was going to benefit from

17    that settlement.  So I think he definitely had jurisdiction at

18    that point to enter that order.

19               THE COURT:  Okay.  I interrupted you from your

20    argument.

21               MR. SHEEHAN:  Your Honor, I don't need to take a lot

22    of time.  I think our papers set forth most of the answers to

23    this.  One other thing I would bring up is this:  There are

24    many references to HSBC and JPMorgan Chase.  I don't think they

25    have anything to do with this case for a couple of reasons.
```

1    First of all, we're talking about settlement here.  This isn't

2    being raised by the Picowers, it's being raised by third

3    parties.  This case is settled, it's done, they've agreed to

4    it, approved by the Bankruptcy Court.  Whether or not the

5    trustee could or could not have brought these causes of action

6    I don't think matters one whit to the approval of the

7    settlement.  Those are defenses that could have been raised

8    there and they're certainly not binding --

9            THE COURT:  No, my same question that I raised to

10   Mr. Beasley.

11           MR. SHEEHAN:  Sure.

12           THE COURT:  Is there any case where the Wagoner rule

13   or in pari delicto has been used the way in which Mr. Beasley

14   seeks to bring it here and he says there's no case on either

15   side.  I said it usually comes up in the context of someone

16   sued by the trustee who says you can't do that.

17           MR. SHEEHAN:  Correct.

18           THE COURT:  In other words, Wagoner in pari delicto,

19   you can't sue me because you're in pari delicto, therefore,

20   throw the case out.  Here, the Picower defendants have not said

21   you can't sue us because of Wagoner or in pari delicto, and

22   Mr. Beasley said there's no case that deals with a situation

23   like this.

24           MR. SHEEHAN:  My comment on that, your Honor, would be

25   this, this is again going back to my first principle.  We're

1   dealing with a fraudulent conveyance.  In fraudulent conveyance

2   in pari delicto is not a defense.  As simple as that.

3   Relatively straightforward, but when you think about it, when

4   you're suing --

5        THE COURT:  Yes, but what Mr. Beasley would say is

6   that the Florida actions are not fraudulent conveyance actions

7   because they're named as state law claims, unjust enrichment,

8   conversion, Florida, civil RICO, they're not styled as

9   fraudulent conveyance claims, and he says the trustee could not

10  have brought those claims because of the Wagoner rule.

11       MR. SHEEHAN:  Independence, your Honor, but as Judge

12  Lifland pointed out, whatever label you put on the cause of

13  action, whether you call it a 10b-5 cause of action or whether

14  you call it the causes of action that are alleged here is of no

15  moment.  They are indeed the same causes of action disguised.

16  They are disguised, as it were, as Judge Lifland said as

17  fraudulent conveyance actions.  That's what they are.  They are

18  seeking to get property of the estate.  There can be no other

19  purpose served by this.  As St. Paul told us, when you're doing

20  that, that belongs to the trustee and creditors must abide by

21  that.  Creditors must empower those monies to be brought into

22  the estate.

23       Otherwise, think of it, your Honor.  Think of how

24  Judge Lifland alluded to think of what would ensue if that were

25  not the case.  We would have multiple litigations all across

1    the country with brilliant counsel coming up with different

2    ways to label what is essentially a fraudulent conveyance

3    action, and at the end of the day start parsing the estate

4    through multiple jurisdictions in federal and state courts, and

5    the trustee is in the middle of that trying to sort that all

6    out.  Congress saw that, so did the Second Circuit, shut it

7    down.  That's exactly what Judge Lifland did here.

8              Thank you, your Honor.

9              THE COURT:  Oh, before you go.

10             MR. SHEEHAN:  Oh, sure.

11             THE COURT:  Why was the injunction necessary in the

12   final settlement?  And what would the status of the settlement

13   be if the injunction against any claims against the Picower

14   defendants were not affirmed?  It's a multi part question.  In

15   your papers --

16             MR. SHEEHAN:  I'll answer both of those, your Honor,

17   if I may.

18             THE COURT:  All right.

19             MR. SHEEHAN:  The first is, is that it was settled.

20             THE COURT:  I'm sorry?

21             MR. SHEEHAN:  It was a settlement, it was bargained

22   for.  I think as Judge Lifland pointed out, I think someone who

23   pays this amount of money and divests themselves of every

24   single penny of what they took out of this estate is entitled

25   at that point to at least bargain for and ask for and that the

08-01789-smb   Doc 5810-12   Filed 03/11/14   Entered 03/11/14 15:01:48   Exhibit J
Case 1:10-cv-04652-JGK   Document 47   Filed 12/30/11   Page 26 of 47

Pg 27 of 48

1CJFMADA

```
 1    Court if it deems appropriate, the issuance of an injunction to

 2    accomplish not only the salutary purposes of the bankruptcy

 3    statute, but also to give those who are settling the benefit of

 4    that.  So it's part of the bargain.

 5         THE COURT:  No, but be clear with me, please, on what

 6    the nature of the bargain was, because it's not clear to me --

 7         MR. SHEEHAN:  Well --

 8         THE COURT:  Hold on -- that the papers are crystal

 9    clear.  It's one thing to say that as part of the bargain, we,

10    the trustee, will ask for an injunction against any claims

11    against you, the Picower defendants, arising from these

12    matters.  It would be another thing to say the settlement is

13    conditioned on an injunction against third party claims.  You,

14    the Picower defendants, can walk away from this having given

15    your $7 billion if in fact Judge Lifland doesn't enter the

16    injunction.  Those are two different things, right?

17         MR. SHEEHAN:  That's the second half of the question

18    which I didn't get to, your Honor, and I will in a moment.  Can

19    I add one thing to your description?

20         THE COURT:  Sure.

21         MR. SHEEHAN:  We're not settling any claims.  I think

22    we have a good, detailed injunction derivative in duplicate a

23    la Dreier.  I think we've written it pretty well and I think

24    any Court where this sought to be enjoined, sought to enjoin

25    the other parties, it's clear what we're enjoining here is not
```

1    any claim, but derivative claims of the trustee.

2                THE COURT:  And independent claims are excepted.

3                MR. SHEEHAN:  That's right.  Getting to the second

4    half of your question -- I'm sorry.

5                THE COURT:  I'll get to the second half.  In essence

6    you're asking me on the first appeal to find these are not

7    independent claims.

8                MR. SHEEHAN:  That's right, your Honor.  That's still

9    in play, I agree with that, absolutely.

10               THE COURT:  Okay.

11               MR. SHEEHAN:  The second half of the question is

12   complicated by the fact of the United States Attorney's

13   involvement in the proceeding, because, quite frankly, without

14   divulging any 408 discussions that took place, and there were

15   dozens of them, it became apparent to us that the, as we were

16   negotiating, if your Honor has read the history you know it was

17   somewhat tortured over a period of about 15 months, at one

18   point the United States Attorney's Office wanted to indeed,

19   even though we had a separate settlement for $5 billion and

20   they were forfeiting two, they wanted to forfeit it all.  That

21   made a lot of sense I think for a whole host of reasons that we

22   don't need to get into here this morning.

23               Once that happened, the answer to the second question

24   became moot.  The money is no longer there.  It's forfeited by

25   the government.  Once the government has that money it can't be

1  returned to the Picowers, it's gone.  The only thing that can

2  happen then is by virtue of the agreement we entered into with

3  the government we get the $5 billion.

4      Now, there's been an appeal from that as well.  As you

5  know, Judge Griesa saw, as I think your Honor has indicated

6  here this morning by your questioning, this was an end run

7  around the net equity and denied the opportunity to intervene

8  in the forfeiture proceeding.  That's also on appeal.  But,

9  your Honor, in the normal course, I agree with your Honor that

10  probably if we -- without the government's involvement the

11  Picowers indeed would have indeed suggested it should be

12  contingent we shouldn't pay $7 billion unless we had this

13  guarantee, as it were.  But here once the trustee became

14  involved that changed the whole landscape.

15      THE COURT:  So what do you do with the argument that

16  the injunction is then unnecessary because the money is gone?

17      MR. SHEEHAN:  It's not just an injunction in this

18  case, your Honor.  That's why we sent you Judge Hellerstein's

19  opinion.  I think Judge Hellerstein picked up on that in

20  Apostolou and the cases he cites, what we're talking about here

21  is an injunction and as I said at the outset, your Honor, this

22  is an injunction that preserves the orderly liquidation and the

23  pro rata distribution of the property of the estate.  That's

24  what we're talking about here.  So it's not just this

25  injunction.  It's the Stahl injunction, it's the Maxim

1  injunction.  We have multiple injunctions here that are all

2  directed at efforts by third parties such as those in the

3  courtroom here today to try to attack the estate.  So it's yes,

4  very important to us to maintain the integrity of the

5  injunction here irrespective of what the outcome may be with

6  respect to the money.

7       THE COURT:  Why?  Why with respect to the cases that

8  are before me you say the Picower $7 billion is gone, it won't

9  be returned, it can't be returned, and so the appellants say

10  the injunction is unnecessary.  The money is there, the trustee

11  has the money, the trustee is going to distribute the

12  5 billion, has authority over the 2 billion.  Our claims don't

13  have to be enjoined, even if they were duplicative.  Even if

14  they were derivative.  The injunction is unnecessary and

15  therefore shouldn't be affirmed?

16       MR. SHEEHAN:  Well, I respectfully, your Honor,

17  disagree with that.  I think that whether the money is there or

18  not is irrelevant.  I think what is important is the fact that

19  they are derivative claims and that with the trustees in this

20  estate and all the creditors should not be concerned about is

21  the ability of someone to go around the country instituting

22  litigation all over the place and interfering with the proper

23  administration of this estate.  I can't tell you how difficult

24  it is, your Honor, with the multiple litigations that we

25  already have that we brought in behalf of the trustee to deal

1    effectively with all these other parties.

2        THE COURT:  But you would no longer be involved in

3    this, right?  It's a suit by the losers of the net equity

4    decision suing a third party, the Picower defendants, who have

5    already given up money to the estate, but you wouldn't --

6    you're not -- you wouldn't be a party to the cases in Florida.

7        MR. SHEEHAN:  In essence, we would.  Let's assume your

8    Honor finds these are derivative, right?  Which I respectfully

9    suggest you should.  All right?  Well, then how do they then go

10   about it.  They can't just file a case.  There's something

11   called an automatic stay already enforced preliminarily by the

12   judge here.  Let's say they recraft their action, they say it's

13   a 10b-5 cause of action and they file it.  How can they file it

14   without going before Judge Lifland and suggesting to him it's

15   not derivative?  So no matter what, we have to have that bar.

16   And as a matter of fact, your Honor, when you really think

17   about the preliminary injunction, it's just actually the

18   judicial enforcement of a statutory directive, and that is, is

19   that you cannot have these causes of action proliferating and

20   we need your Honor and Judge Lifland's strong arm to make that

21   happen.

22       THE COURT:  But I'm talking now only about the part of

23   the final settlement agreement that includes the permanent bar

24   on the claims in Florida to the extent that they are

25   derivative.

1          MR. SHEEHAN:  Right.

2          THE COURT:  And the question is --

3          MR. SHEEHAN:  Yes, but I think if in fact they are

4     derivative they should be enjoined irrespective of what happens

5     to the money, I guess is my answer.

6          THE COURT:  All right.

7          MR. SHEEHAN:  Thank you, your Honor.

8          MR. SHARMA:  Good morning, your Honor, Hemant Sharma

9     on behalf of SiPC.  I'm going to keep this very brief.  I think

10    our briefs are very thorough and hit on most of these issues.

11    I want to make a couple of points.  There are two issues before

12    the Court.  One is the order approving the settlement and

13    requesting the issuing of the permanent injunction be appealed

14    and the second is whether or not the claims of the appellants

15    are derivative or duplicative.  SiPC only filed a brief with

16    respect to the order approving settlement.  We didn't file a

17    claim with respect to whether or not the claims are

18    duplicative.

19          Your Honor asked a couple of questions regarding the

20    necessity of the permanent injunction with respect to

21    duplicative and derivative claims and I just want to reiterate

22    the point which Mr. Sheehan made, which is that Congress set

23    forth under SIPA an orderly distribution mechanism that favors

24    customers of a broker dealer and if you have -- in this case

25    Judge Lifland issued a permanent injunction in order to

1    exercise his jurisdiction to make sure that that mechanism is

2    followed so you don't have, as Mr. Sheehan pointed out, a bunch

3    of different creditors that may not have that preferred status

4    trying to get what in this case would be customer property.

5    Because what the puck Picowers had received, the 7.2 billion,

6    was all customer property that were deposits made by other

7    customers.  That's the only thing I have to say, your Honor.

8              THE COURT:  But the issue is the Picowers having given

9    up that money, what's the necessity for the permanent

10   injunction?

11             MR. SHARMA:  Your Honor, I believe what the settlement

12   agreement said was that the trustee would make best efforts to

13   obtain a permanent injunction, but it was the Bankruptcy Court

14   on its own volition that has the authority and the discretion

15   to issue the permanent injunction in order to exercise their

16   jurisdiction over in this case customer property.  It was

17   customer property that was turned over by the Picowers and I

18   think what the Court found was that a permanent injunction was

19   necessary to stop other parties trying to seek property that

20   should have gone to the trustee for distribution.

21             THE COURT:  What does that mean?

22             MR. SHARMA:  The Picowers have $7.2 billion in

23   fraudulent conveyance.

24             THE COURT:  They've given it over, and it's gone.

25             MR. SHARMA:  It's gone, but, again, it's --

1          THE COURT:  It's gone from the Picowers.

2          MR. SHARMA:  It's gone from the Picowers.  Again, the

3     injunction is limited to claims of the trustee.  To the extent

4     there's other independent claims, other parties, those are not

5     property of the estate.  The Court doesn't have jurisdiction

6     over those.  The Court does have jurisdiction over claims that

7     belong to the trustee and it would be, the Court is just

8     enforcing its jurisdiction over property that belongs to the

9     trustee.

10          THE COURT:  But it has that already and it doesn't

11     need yet a further injunction except, I mean, it could

12     determine that if it didn't issue an injunction it would be the

13     last settlement it ever saw.  If in fact the money is a

14     settlement of a claim by the trustee and the trustee, and the

15     Court couldn't enjoin derivative claims that otherwise belong

16     to the trustee, what other person would ever give over money

17     even to settle claims of the trustee knowing that the next day

18     people would turn around and sue the person who had just turned

19     the money over to the trustee?

20          MR. SHARMA:  Certainly, absolutely right, especially

21     in this case where you have literally over a thousand lawsuits

22     seeking the recovery of fraudulent transfers of which many if

23     not most will end up settling.

24          THE COURT:  Fraudulent transfer actions brought by the

25     trustee.

 1          MR. SHARMA:  Correct, your Honor.

 2          THE COURT:  All right, thank you.  Mr. Beasley.

 3          MR. BEASLEY:  Your Honor, let me respond to several of

 4     the points that were made.  First, the argument that we've

 5     heard time and time again, these are really fraudulent transfer

 6     claims, fraudulent conveyance claims.  That's not correct.

 7     That's not what they say.  I respectfully submit, please read

 8     the complaint.  And Cumberland Oil teaches that you cannot

 9     relabel these claims the way the trustee wants to do.

10          Secondly, the Court asked about the first injunction,

11     and whether or not the first appeal divested the Court of

12     jurisdiction below.  I submit you received no answer to that

13     question from Mr. Sheehan.

14          Third, this complete red herring as to multiple

15     actions.  Here we have the opposite.  We have one class action

16     on behalf of 3,000 people instead of 3,000 independent claims.

17     This is precisely the opposite of this red herring of multiple

18     actions.

19          Next, the injunction.  The injunction really was part

20     of the final settlement, and there's no question about it,

21     there's no way to get around it, and you've heard both

22     Mr. Sheehan and SiPC argue that it's essential.

23          On the question of whether or not --

24          THE COURT:  That seems to cut against your argument

25     rather than for it, because in your original papers you argued

1    that the injunction should be vacated because it was

2    unnecessary, and then after SiPC and the trustee came back and

3    said that the negotiations for asking for the injunction was an

4    important part of the settlement.  You gave up that argument

5    and you said you now realize that it is part of the settlement.

6    But if it's part of the settlement, that's a pretty strong

7    argument in favor of Judge Lifland's decision to impose the

8    injunction in order to get $7.2 billion for the Madoff estate.

9            MR. BEASLEY:  Your Honor, I respectfully submit it's

10   exactly the opposite.  The fact that the injunction is

11   intertwined with the settlement is a strong reason to void the

12   entire settlement, not just the injunctions which we submit are

13   the minimum outcome that should result from this proceeding.

14           THE COURT:  It's a question of whether, isn't it,

15   Judge Lifland had the power to do it, whether he had the

16   jurisdiction to do it or whether he was acting beyond his

17   jurisdiction in a way simply to effectuate getting more money

18   for the estate, right?

19           MR. BEASLEY:  We have argued that repeatedly, and

20   we've said that in effect the trustee from the very beginning

21   of this proceeding was very clear, going all the way back two

22   years, that the reason he was attempting to block our pursuit

23   of the Picower claims was so he could use those claims in order

24   to settle with the Picowers.  They basically misappropriated

25   our claims and use them as a bargaining chip.  No Court has

1     ever sustained that.  Courts have considered that, have

2     rejected it.

3              THE COURT:  But Mr. Beasley, to frame the issue, there

4     are parts of your papers that argue that the injunction was an

5     abuse of Judge Lifland's discretion because it was unnecessary.

6     The $7.2 was recovered from the estate, it won't go back.  And

7     you argument now, not that it was an abuse of discretion, that

8     it was unnecessary, you argue that you simply had no power to

9     do it.  You argue under Johns Mansville much as the bankruptcy

10    judge might have liked to have gotten money for the estate he

11    went too far in getting this money.  You don't question based

12    on your current argument that he did it in order to get that

13    money for the estate and it was a necessary part of the

14    settlement.

15             MR. BEASLEY:  Well, what we're saying is that the fact

16    that the injunction is improper ties in with all the arguments,

17    the other arguments that we have said and we have always argued

18    that Judge Lifland had no jurisdiction to enter the settlement

19    or the injunction.

20             THE COURT:  But it's an argument of lack of

21    jurisdiction.  It's not an argument that it was unnecessary or

22    abuse of discretion as a necessary part to getting $7.2

23    billion.

24             MR. BEASLEY:  Essentially we've alleged that it's

25    illegal, your Honor, that it contravenes Johns Mansville and

1    Zale and all of other cases.

2              THE COURT:  Lack of jurisdiction.

3              MR. BEASLEY:  Another point your Honor focused on in

4    our original discussion was about whether the claims are common

5    to all the creditors.  The test is not whether all the

6    creditors have the same claim, the test is whether the

7    creditors and the estate all have the same claim, and here the

8    estate clearly hasn't suffered the harm, same harm as Fox.

9    Judge McMahon made that very clear in her discussion.  I

10   referred to it earlier, and I refer the Court to page --

11   because I know time is short -- page 15 of Judge McMahon's

12   opinion, which talks about the fact that it is not sufficient

13   merely, the test isn't simply whether the claim is common

14   through all the creditors, it has to be common to the

15   corporation, that is BLMIS, and the creditors, citing Coke.

16   And since these were not claims that BLMIS could have asserted

17   against the defendants they are not common to the corporation

18   and its creditors.  So merely focusing on whether a claim is

19   common to the creditors is not the complete test.  It has to be

20   common to the creditors and to the entity.  And the estate's

21   injury is not the same as that of the Fox class.

22             All the cases, we've cited a myriad of them, Higgins,

23   7 Seas, Cumberland Oil, Grant Partners, Johns Mansville itself,

24   all talk about looking to the injury of Fox versus the injury

25   to the estate, and as I've said, no has claimed that the estate

1   before or after the bankruptcy suffered the injuries that we

2   are claiming for the Fox class.

3           THE COURT:  Didn't the Court of Appeals say in St.

4   Paul, that if it's a claim that is common to all of the

5   creditors then it is a claim that should be brought by the

6   trustee?

7           MR. BEASLEY:  No, your Honor.  It's not just common to

8   the creditors.  It has to be common to the creditors and the

9   corporation.  And I don't have St. Paul directly in front of

10  me, but I do have Judge McMahon's opinion quoting from Coke,

11  which is the parallel case.  As I said that's at page 15 of her

12  decision.  All of the cases that I just reviewed, including

13  Granite Partners, state that the estate has to suffer the same

14  harm in order for that to apply.  So we believe that Judge

15  McMahon was correct in rejecting the argument in the JPMorgan

16  case.

17          Now, the final, I guess almost the final point, I

18  always hate to say the final point.

19          THE COURT:  The penultimate.

20          MR. BEASLEY:  I'm sorry?

21          THE COURT:  Penultimate.

22          MR. BEASLEY:  One of the last points.  The government

23  did not get involved in this matter until after the trustee

24  reached an approximate $5 billion settlement with the Picowers.

25  I think the trustee's papers in the Bankruptcy Court say that

39

1    happened around March or April, and the government did not get

2    involved in later in the fall.  So this settlement that we're

3    talking about did not occur because of the government, it was,

4    the original settlement, having no government involvement at

5    all.  We believe that the whole forfeiture business, which has

6    now been raised was based on two mistakes.  Number one, a

7    mistaken view of the trustee's claims thinking that the trustee

8    has a claim to $7 billion in fraudulent conveyances, where as

9    Judge Rakoff pointed out the real claim is $250 million.  The

10   second mistaken assumption was that Fox did not have any valid

11   claims based on the Bankruptcy Court's initial injunctions, and

12   when the forfeiture thing came up I had a meeting with the

13   government.  I had several conversations with the government,

14   and I understand from my discussions --

15             THE COURT:  They were popular parties.

16             MR. BEASLEY:  They were.  And they, from those

17   discussions it was clear that they believed that the Fox claims

18   had been extinguished by the first decision of the Bankruptcy

19   Court, and if this Court held that those claims were not

20   property of the estate and the Fox claims could go forward,

21   then the forfeiture will be revisited.  The amount and the

22   allocation of the forfeiture will be revisited and I

23   respectfully submit that this is the occasion for this Court

24   to --

25             THE COURT:  That's really not part of the record,

1CJFMADA

1    right?  There's a --

2              MR. BEASLEY:  No, sir, and neither was Mr. Sheehan's

3    comments about his discussions with the government, which is

4    what I'm really responding to.

5              THE COURT:  Okay.

6              MR. BEASLEY:  But the broader point, which doesn't

7    depend on these discussions is that if in fact the Fox claims

8    do not belong to the estate, it will have a major impact on

9    other parts of this process.

10             Now --

11             THE COURT:  Well, doesn't that support the trustee's

12   argument?  That seems to be an argument that reversal would be

13   disruptive of the bankruptcy proceeding.

14             MR. BEASLEY:  Well, it will be a different thing in

15   the bankruptcy proceeding because the $7 billion that is now

16   allocated to the trustee would not be there.  Now, let me

17   hasten to point out, if the Court rules as we request --

18             THE COURT:  That would be substantially disruptive.

19             MR. BEASLEY:  The trustees can go to the Picowers

20   tomorrow and settle with them.  There's no provision, we can't

21   prevent the trustee from settling with the Picowers.  What

22   we're complaining about is the two-year stay that they have

23   gotten against us which allowed this settlement, even though

24   the appeal from the first order of the Bankruptcy Court was

25   pending, which is harmful error, and we are complaining about

1   the fact that since they have made it clear that the injunction

2   is an integral part of the settlement, that if you reverse the

3   injunction the settlement should be reversed as well.  But that

4   doesn't mean that they can't settle tomorrow as long as they

5   don't use a misappropriation of Fox's claim as a bargaining

6   chip to obtain a settlement to which they are not otherwise

7   entitled.  And I think that argument that was made by the SiPC

8   counsel made that extremely clear.

9         And the last thing, your Honor, and this really is the

10  last thing, there's a quote from Zale, which was cited

11  approvingly in Johns Mansville.  When creditors have been

12  improperly enjoined by a settlement, it is appropriate to

13  reverse the approval order and vacate the entire settlement.

14  That's Zale at 65, 765, 766, and your Honor, we submit that

15  that is what should happen here.  We respectfully request the

16  Court to reverse the order.

17        THE COURT:  Thank you.  Ms. Chaitman.

18        MS. CHAITMAN:  Your Honor, I would advocate what I

19  think is a middle ground, which is simply that the injunction

20  be vacated without touching the settlement itself, and I think

21  that we have to be very clear about what the facts are.  The

22  facts are that $7.2 billion was irrevocably forfeited to the

23  United States government.  The facts are that the settlement

24  agreement that the trustee entered into with the Picower

25  defendants does not condition the settlement upon entry of the

1CJFMADA

1    injunction by the Bankruptcy Court.  That was a totally

2    gratuitous injunction.

3             THE COURT:  Well, not totally gratuitous.  I mean, a

4    settlement agreement at the very least required that the

5    trustee ask the Bankruptcy Court to enter the injunction,

6    right?

7             MS. CHAITMAN:  That's correct.  I'm speaking from the

8    Bankruptcy Court's perspective.  From the Court's perspective,

9    it was totally gratuitous.  It was not necessary for the

10   benefit of the estate, it was not necessary for the recovery of

11   the --

12            THE COURT:  But what do you do with the colloquy that

13   I had with Mr. Sharma?  You say it's gratuitous.  There's the

14   issue of jurisdiction, power to issue the injunction against

15   third party claims.  But in terms of a proper exercise of

16   discretion, what defendant in a suit by a trustee would ever

17   settle, given a substantial amount of money under circumstances

18   where that defendant would continue to be open?  There's the

19   issue, there's the Johns Mansville issue about whether the

20   Court had the power to do it, but in terms of exercise of

21   discretion in the course of administering the estate, how do

22   you respond it's not an abuse of discretion?

23            The issue has to be did the Bankruptcy Court have the

24   power, not could the Bankruptcy Court take the $7.2 billion and

25   say thank you very much and I don't think the injunction is

 1    really necessary.  The Bankruptcy Court has to sit over

 2    continuing settlements.

 3            MS. CHAITMAN:  And you know, your Honor, most often

 4    the settlements do not include an injunction, so that the

 5    settling parties have to face the liability that they have to

 6    other parties.

 7            THE COURT:  In Dreier there was such an injunction on

 8    appeal, right?

 9            MS. CHAITMAN:  Well, in the second Dreier decision the

10    Court recognized that it couldn't enjoin third party claimants.

11            THE COURT:  It can't enjoin independent claims, but

12    there is an injunction in Dreier that's up on appeal now, isn't

13    there?

14            MS. CHAITMAN:  Right, but they didn't enjoin what you

15    are calling independent claims and what I would consider our

16    claims to be.

17            THE COURT:  That comes back to the issue of whether

18    they are independent or not.

19            MS. CHAITMAN:  But again, if you want to --

20            THE COURT:  The injunction plainly excepts independent

21    claims.

22            MS. CHAITMAN:  But if you define independent as not

23    derived from the same facts.  But I think that both on a

24    jurisdictional basis and on a discretionary basis --

25            THE COURT:  Your claims are plainly derived from the

 1     same facts, right?

 2              MS. CHAITMAN:  They're derived from Mr. Picower's

 3     theft of the investors' money.

 4              THE COURT:  They're derived from the same facts as the

 5     trustee's claim.  They're both derived from the same facts?

 6              MS. CHAITMAN:  I wouldn't say so, your Honor.  I

 7     wouldn't say so at all.  Because what the trustee recovered

 8     from Mr. Picower was, and what they say in their papers they

 9     recovered was the amount of money Mr. Picower took out in

10     excess of what he put in.  That's totally different from the

11     claims that have been asserted by Mr. Beasley's client and by

12     my client.  We are not seeking the excess of what Mr. Picower

13     took out over what he put in.  We're seeking damages for his

14     criminal conduct.

15              THE COURT:  The damages differ, but the facts are the

16     same as alleged by the trustee.

17              MS. CHAITMAN:  Your Honor, you have to --

18              THE COURT:  But that's right, isn't it?  Yes?

19              MS. CHAITMAN:  I think we have to distinguish

20     something --

21              THE COURT:  It's yes?  Yes, but; but it's yes?

22              MS. CHAITMAN:  Yes.

23              THE COURT:  Okay.

24              MS. CHAITMAN:  Because we had no access to

25     Mr. Picower's documents.  The trustee did, and those were the

1    trustee's allegations.

2            But let's be very clear about something.  The trustee

3    recovered not based on theft because he didn't -- the trustee

4    has filed 988 fraudulent transfer actions against totally

5    innocent investors who had no knowledge of the fraud, they

6    received ordinary returns, nothing extraordinary.  The

7    allegations made against Picower were truly extraordinary, that

8    that Picower was a co-conspirator of Mr. Madoff.  The recovery

9    that the trustee got is nothing more than the same recovery he

10   sought against all the independent investors.  So even though

11   he alleged in his complaint that Picower was a mastermind and

12   co-conspirator of the fraud, he didn't get a recovery based on

13   that.  He got a recovery based on his plain vanilla theory that

14   anyone who took out more than they put in has to put it back,

15   the same allegations he made against 988 groups of defendants

16   in separate clawback actions.

17           So I think we can't get tied down on the allegations.

18   The cause of action was totally different.  We are seeking

19   damages against the Picower entities for Jeffrey Picower's

20   criminal conspiracy with Mr. Madoff.  We're not seeking the

21   amount of money he took out in excess of what he put in.  So I

22   think that the discretion and the jurisdiction go together and

23   I think you have to look at them both, because there was no

24   basis for the Bankruptcy Court to enjoin prosecution of

25   litigation against non-debtors against the Picower entities

1    when the trustee has given them a complete release.  It makes

2    absolutely no difference to the trustee whether the Picower

3    defendants have to cough up more of their ill-gotten gains.  It

4    wasn't in the trustee's claim.

5              THE COURT:  All right.

6              MS. CHAITMAN:  Thank you, your Honor.

7              THE COURT:  Thank you, Ms. Chaitman.

8              MR. SHEEHAN:  Your Honor, could I have 30 seconds?

9              THE COURT:  If you have 30 seconds, I will give the

10   appellants 30 seconds to respond to your 30 seconds.

11             MR. SHEEHAN:  Thank you, your Honor.  Not responding

12   at all.  It's just a continuation of what I always say about

13   this case.  Nothing in this case is easy.  As I was going to

14   sidebar, counsel for the Picowers are here, and they disagree

15   with the fact that the $5 billion will come back and therefore

16   if your Honor were to find, we'd probably have litigation over

17   what that settlement agreement means.  In other words, my view

18   of it, Ms. Chaitman's, may not be the same as the Picowers, so

19   nothing is easy, your Honor.  That's all I wanted to add.

20             THE COURT:  Anyone wants to respond to that?

21             MR. BEASLEY:  May I have my 30 seconds, your Honor?

22             THE COURT:  Sure.

23             MR. BEASLEY:  Common facts are not the proper test.

24   Johns Mansville says that, 7C says that.  The issue is what

25   damages were suffered.  The damages suffered by the Fox class

1CJFMADA

 1    are not in any way, shape, form or fashion the damages suffered

 2    by BLMIS or the trustee.  Thank you.

 3             THE COURT:  Thank you.  Ms. Chaitman?

 4             MS. CHAITMAN:  I'll cede my 30 seconds.

 5             THE COURT:  I very much appreciate the arguments, I

 6    very much appreciate the briefs and I'll take the appeals under

 7    advisement.

 8             COUNSEL:  Thank you, your Honor.

 9             (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25