# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

PAMELA GOLDMAN and A & G
GOLDMAN PARTNERSHIP,

    Plaintiffs,

    vs.

CAPITAL GROWTH COMPANY;
DECISIONS, INC.;
FAVORITE FUNDS;
JA PRIMARY LIMITED PARTNERSHIP;
JA SPECIAL LIMITED PARTNERSHIP;
JAB PARTNERSHIP;
JEMW PARTNERSHIP;
JF PARTNERSHIP;
JFM INVESTMENT COMPANIES;
JLN PARTNERSHIP;
JMP LIMITED PARTNERSHIP;
JEFFRY M. PICOWER SPECIAL COMPANY;
JEFFRY M. PICOWER, P.C.;
THE PICOWER FOUNDATION; JOHN DOE TRUSTEES
OF THE PICOWER FOUNDATION;
THE PICOWER INSTITUTE OF MEDICAL RESEARCH;
THE TRUST F/B/O GABRIELLE H. PICOWER;
BARBARA PICOWER, individually, and as
Executor of the Estate of Jeffry M. Picower,
and as Trustee for the Picower Foundation
and for the Trust f/b/o Gabriel H. Picower.
                                                      /

**COMPLAINT FOR DECLARATORY JUDGMENT**

    Plaintiffs Pamela Goldman and A & G Goldman Partnership, by and through their undersigned counsel, sue for a declaration that neither the injunction issued by the United States Bankruptcy Court for the Southern District of New York as part of its order, dated January 13, 2011, nor the automatic stay provisions (the "Automatic Stay") of Section 362 of Title 11 of the United States Code (the "Bankruptcy Code"), bar, prohibit, restrict or prevent the Plaintiffs from filing and prosecuting a proposed securities law class action (the "Class Action") against certain

1

non-debtor defendants (collectively, the "Picower Defendants") in the United States District Court for the Southern District of Florida:

1. The draft Class Action Complaint (attached as **Exhibit A** hereto) is intended to be consistent with the *Memorandum and Order* [Doc. 37] of September 30, 2013 issued by the Honorable Richard J. Sullivan, United States District Judge, in *A&G Goldman Partnership and Pamela Goldman v. Irving H. Picard*, No. 1:12-cv-06109-RJS (S.D.N.Y. September 30, 2013), which is attached as **Exhibit B**.

2. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and under § 27 of the Exchange Act, 15 U.S.C. §78aa. Under 28 U.S.C. § 2201(a), this Court may "declare the rights and other legal relations of any interested person" relating to this action.

3. *In personam* jurisdiction exists over all defendants as substantial acts, if not all of the acts, committed in the furtherance of the control relationship alleged in the underlying complaint occurred in the state of Florida.

4. Venue in this district is proper pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), because the acts and transactions alleged in the underlying complaint occurred in substantial part in this judicial district.

### The Madoff/BLMIS Bankruptcy Court Cases

5. On December 11, 2008, the Securities and Exchange Commission ("SEC") filed a Securities Violation Complaint in the United States District Court for the Southern District of New York against the estate of Bernard L. Madoff ("Madoff") and Bernard L. Madoff Investment Securities LLC ("BLMIS", and together with Madoff, the "Debtors"). The SEC alleged, *inter alia*, that the Debtors engaged in fraud through investment advisor activities of BLMIS.

6. On December 15, 2008, the District Court entered an order pursuant to Section 78eee(a)(4)(A) of the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA") which, in pertinent part, appointed Irving H. Picard (the "Trustee") as trustee for the liquidation of the business of BLMIS, pursuant to Section 78eee(b)(3) of SIPA.

### The Picower Settlement

7. On May 12, 2009, the Trustee filed a complaint (the "Picower Complaint") commencing an adversary proceeding against certain of the Picower Defendants, captioned *Picard v. Picower*, Adv. Pro. No. 09-1197 (BRL), in which the Trustee alleged that prior to the Filing Date, BLMIS made payments or other transfers totaling more than $6.7 billion to one or more of the Picower Defendants, an allegation that was subsequently increased to approximately $7.2 billion. The Picower Complaint asserted claims under the Bankruptcy Code for avoidance and recovery of alleged preferential transfers, and avoidance and recovery of alleged fraudulent conveyances.

8. The Trustee thereafter entered into a settlement agreement (the "Picower Settlement Agreement").

9. On January 13, 2011, the Bankruptcy Court entered an order (the "Picower Settlement Order") approving the Picower Settlement Agreement.

10. The Picower Settlement Order contained the following permanent injunction provision:

> ORDERED, that any BLMIS customer or creditor of the BLMIS estate who filed or could have filed a claim in the liquidation, anyone acting on their behalf or in concert or participation with them, or anyone whose claim in any way arises from or is related to BLMIS or the Madoff Ponzi scheme, is hereby permanently enjoined from asserting any claim against the Picower BLMIS Accounts or the Picower Releasees that is *duplicative or derivative of the claims brought by the*

3

*Trustee*, or which *could have been brought by the Trustee* against the Picower BLMIS Accounts or the Picower Releasees. (emphasis added).

### Judge Sullivan's Memorandum and Order of September 30, 2013

11. On December 13, 2011, the Plaintiffs filed a motion in the BLMIS Bankruptcy, Case No. 08-1789-brl, for leave to file two draft class action complaints under Section 20(a) of the Securities Exchange Act of 1934 (as amended, the "Exchange Act") against the Picower Defendants, based on the Picower Defendants' control over BLMIS.

12. The Bankruptcy Court denied leave to file the proposed complaints on June 20, 2012.

13. On appeal to the United States District Court, the Honorable Richard J. Sullivan considered whether the claims under Section 20(a) of the Exchange Act set forth in the draft complaints were barred by the Picower Settlement Order and the Automatic Stay. Judge Sullivan held that, by their very nature, claims against Picower under Section 20(a) could not be owned or asserted by the Trustee, barred by the Picower Settlement Order, or prohibited under the Automatic Stay. *See* **Exh. B.**

14. Nevertheless, Judge Sullivan held that the two draft class action complaints before him were barred, because the claims asserted were not Section 20(a) claims but fraudulent transfer claims.

### The Class Action Complaint

15. In compliance with Judge Sullivan's opinion, the Plaintiffs have prepared a draft Class Action complaint, which is attached as **Exhibit A** hereto (the "Class Action Complaint").

16. The Class Action Complaint states a Section 20(a) claim. Plaintiffs have alleged that Picower and his affiliates were in fact control persons who directly or indirectly controlled BLMIS and directly or indirectly induced BLMIS's securities fraud. The damages sought are

4

Case 08-01789-cgm12 Doc 5810-16 Filed 03/11/14 on Entered 03/11/14 15:01:48 Exhibit N 14
Pg 6 of 15

only securities based damages to be obtained from assets currently held by Defendants, not assets recovered by the Trustee from Defendants in the fraudulent conveyance settlement.

17. The sole issue in controversy for the purposes of this Complaint is whether the draft Class Action Complaint (**Exh. A**) is "duplicative" or "derivative" of the Trustee's fraudulent conveyance claims. As Judge Sullivan acknowledged in his September 30, 2013 Order, whether or not the Class Action Complaint properly states a claim under federal securities law is not now before the Court.

18. Because a Section 20(a) claim is sufficiently and clearly stated in Exhibit A, the Class Action claims are neither "duplicative" nor "derivative" of any claims made by or assertable by the Trustee against the Picower Defendants. As shown in Judge Sullivan's decision, neither the Trustee nor the pre-petition Debtor could have asserted the Plaintiffs' valid securities law claims against the Picower Defendants. Thus, Plaintiffs are not barred under the Picower Settlement Order from pursuing the Class Action claims.

19. In order to be liable under Section 20(a), the Picower Defendants must have directly or indirectly controlled BLMIS. As alleged in **Exhibit A**, the Picower Defendants had the practical ability to control BLMIS in order to operate and conceal the Ponzi scheme.

### Defendants' Position

20. Defendants have taken the position that the Plaintiffs' claims in the prior draft class action complaints against the Picower Defendants under Section 20(a) are barred by the Picower Settlement Order, and Defendants are expected to take the same position as to the attached Class Action Complaint.

## Declaratory Relief is Warranted

21. Accordingly, a controversy exists between the Plaintiffs and Defendants that should be judicially resolved pursuant to the United States Declaratory Judgment Act, 28 U.S.C. § 2201.

22. This Adversary Complaint seeks no relief other than a judicial determination that the claims in the draft Class Action Complaint are not duplicative or derivative of any claims that were made or that could be made by the Trustee against the Picower Defendants.

## Section 20(a) claims differ materially from fraudulent transfer claims

23. The Class Action Complaint does not plead "fraudulent transfer" claims, disguised or otherwise.

24. Fraudulent transfer and Section 20(a) control person claims are premised on different legal theories, have distinct elements, and seek different damages. They are therefore distinct in both "name and substance." *See Sher v. SAF Financial, Inc.*, 2010 WL 4034272, at *14 (D. Md. Oct. 14, 2010) (legal malpractice claims were not redundant of fraudulent transfer claims); *In re Friedman's Inc.*, 394 B.R. 623, 628–29 (S.D. Ga. 2008) (same).

25. The Eleventh Circuit has expressly held that, under similar circumstances, a Section 20(a) claim is a direct action which does not belong to a bankruptcy trustee and which may be asserted by securities holders against defendants. *See Medkser v. Feingold*, 307 Fed. App'x 262, 265 (11th Cir. 2008). In *Medkser*, a group of investors brought Section 20(a) claims against the principals of a bankrupt hedge fund, accusing them of, *inter alia*, controlling the hedge fund and violating securities laws by funneling the investors' funds into the defendants' own offshore accounts. The defendants argued that the investors' control person claims had to be raised as part of the bankruptcy estate. The trial court incorrectly found that the claims were

6

derivative, and granted judgment on the pleadings in favor of defendants. *See Report and Recommendation, Medsker v. Feingold*, No. 04-81025, D.E. 119 (S.D. Fla. Jan. 24, 2008), *adopted by district judge*, D.E. 124 (S.D Fla. Feb. 12, 2008) (attached as **Exhibit C** hereto). The Eleventh Circuit vacated the judgment, and held that:

> The claims involve direct injuries sustained by these plaintiffs based their own reliance on fraudulent statements and misrepresentations made to them. The fact that some other investors may also have been similarly injured does not transform these direct claims into derivative ones. **The corporate entity could not bring suit to recover the investment that these plaintiffs made relying on the fraudulent actions of the defendants; thus, these claims may be maintained in this direct action.**

*Medkser v. Feingold*, 307 Fed. App'x at 265 (emphasis supplied). The Eleventh Circuit's holding in *Medkser* definitively establishes that a Section 20(a) claim is not "duplicative" or "derivative" of any claims that belong to a bankruptcy estate.

26. There are numerous fundamental differences between the claims asserted in the Class Action Complaint and the Trustee's fraudulent conveyance action. Under New York's implementation of the Uniform Fraudulent Conveyance Act and the United States Bankruptcy Code, a fraudulent transfer is one in which the debtor transfers property for less than reasonably equivalent value at a time when the debtor is insolvent (or is left insolvent by the transfer), or one in which the debtor transfers the property to hinder, delay, or defraud creditors. *See* N.Y. DCD § 270 *et seq.*; 11 U.S.C. § 548. No intent or wrongdoing by the recipient is required for a fraudulent transfer claim because the "fraud" can be constructive – *any* transfer made for less than reasonably equivalent value may be set aside. N.Y. DCD § 273 ("Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent"); 11 U.S.C. § 548(a)(1)(b). The statute of limitations for a fraudulent transfer claim begins running from the date of the transfer

7

of the funds from the debtor to the recipient. *See* N.Y. Civ. Prac. L. & R. § 213(8) (limitations period for fraud is the greater of six years from accrual of the cause of action or two years after the claimant discovered or reasonably could have discovered the fraud). A fraudulent transfer action only seeks to set aside the conveyance; it does not seek damages against the transferee.

27. In contrast, the intent of Section 20(a) is to prevent defendants from escaping liability for securities fraud by using intermediaries to carry out actions that would be prohibited under the Securities Exchange Act if performed directly. *See* H.R. Rep. No. 73-1383, at 26 (1934). The statute of limitations for Section 20(a) is based upon the underlying securities violation itself, not the date that the debtor improperly transferred funds to a recipient. *See In re Heritage*, 289 F. Supp. 2d 1132, 1147-48 (C.D. Cal. 2003). Moreover, unlike the recipient of a fraudulent conveyance, a Section 20(a) control person is jointly and severally liable with the primary violator for all damages caused by the underlying securities fraud, which is the actual loss sustained by the plaintiff. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154-55 (1972).

28. Here Plaintiffs allege that Defendants directed and controlled the publication of false and misleading account documents to BLMIS investors, causing them to believe that BLMIS was profitable and that they were making profits in their BLMIS accounts. These misrepresentations and omissions caused BLMIS investors to overpay for BLMIS securities.

29. Judge Sullivan noted that the only relevant inquiry at this stage is whether a putative Section 20(a) claim is "duplicative" or "derivative" of the Trustee's fraudulent conveyance claims, not whether the Section 20(a) claim would survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). As a matter of law, the legal theory, elements, required proof, and damages stemming from a Section 20(a) securities law claim are completely different from a

fraudulent conveyance claim. The Class Action Complaint alleges a Section 20(a) claim, not a fraudulent conveyance claim.

### Picower was a control person of BLMIS

A.  **Legal Standard**

30. A defendant must "control" the primary violator in order to be liable under Section 20(a). Control requires "the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and having] the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *See Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996). Control may be established by showing that the defendant possessed, directly or indirectly, "'the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.'" *Laperriere v. Vesta Ins. Group, Inc.*, 526 F. 3d 715, 722-23 (11th Cir. 2008) (quoting 17 C.F.R. § 240.12b-2, emphasis supplied). There can be more than one control person. *See, e.g., In re PSS World Medical Inc.*, 250 F. Supp. 2d 1335, 1351 (M.D. Fla. 2002) (plaintiffs successfully alleged control person claims against multiple executive officers and directors; those defendants "both individually and [as] part of the group making up the [primary violator's] control structure — were directly responsible for the allegedly fraudulent statements at issue").

31. In the Eleventh Circuit, there is no requirement that a Section 20(a) control person defendant "culpably participate" in the underlying securities violation. *See Brown v. Enstar Group, Inc.*, 84 F.3d at 396 n.5. However, while culpable participation is unnecessary for Plaintiffs to prevail on their Class Action claims, the allegations in the Class Action Complaint in any case show that the Picower Defendants were direct participants in the fraud and the material

9

misrepresentations made to BLMIS investors. The Class Action Complaint also alleges (1) Picower's knowledge of BLMIS's fraud and (2) the disproportionate profits that Picower obtained ($7.2 billion). *See generally Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 407 (S.D.N.Y. 2010) (plaintiffs pleaded scienter of fund managers who "benefited in a concrete and personal way" from perpetuating BLMIS's fraud and who "knew facts or had access to information" suggesting that BLMIS's public statements were not accurate).

### B. The Picower Defendants were control persons

32. Whether a defendant such as Picower "controlled" BLMIS depends "on the particular factual circumstances of each case."[1] *Laperriere v. Vesta Ins. Group, Inc.*, 526 F. 3d at 723. The issue of "control" requires close examination of the relationships of the various alleged "controlling persons" to the person or entity which is alleged to have violated the Securities Exchange Act. *In re Bausch & Lomb, Inc.*, 941 F. Supp. 1352, 1368 (W.D.N.Y. 1996) (issue of control status could not be resolved on motion to dismiss).

33. District courts have allowed control person claims against defendants who participated in fraudulent activity, even though they were not officers, directors, or shareholders of the controlled company. For instance, in *In re Global Crossing, Ltd.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004), the district court approved a Section 20(a) claim against a "Professional Standards Group" ("PSG") within Arthur Andersen. The PSG allegedly "gave advice on complex questions for [the primary violator's] audit teams," "was consulted by Andersen's [primary violator] audit team," "was actually aware of the fraudulent accounting schemes," "was responsible for ensuring that they were applied consistently," and "actively 'quashed' the dissent

---

[1] Allegations of control are not subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See In re Hamilton Bankcorp., Inc.*, 194 F. Supp. 2d 1353, 1360 (S.D. Fla. 2002) ("allegations that individuals, because of their management and/or director positions, could control a company's general affairs . . . are sufficient to state a cause of action for controlling person liability").

10

of a junior auditor who questioned their propriety in the context of related frauds perpetrated at another company." *Id.* at 351. These allegations were sufficient to show "actual control and culpable participation by the Andersen PSG." *Id.* (denying motion to dismiss); *see also In re Sunbeam*, 89 F. Supp. 2d 1326, 1346 (S.D. Fla. 1999) (approving Rule 10b-5 and Section 20(a) claims against Arthur Andersen based, in part, on the firm's allegedly reckless behavior in permitting primary violator to misrepresent audited financial statements).

34. A court must consider "the total effect of the various indicia of control in combination." *In re Leslie Fay Companies, Inc.*, 918 F. Supp. 749, 762-63 (S.D.N.Y. 1996). A person who has the power to make strategic decisions relating to the underlying securities fraud is generally in control. *See, e.g., In re Pfizer Inc.*, 584 F. Supp. 2d 621, 641 (S.D.N.Y. 2008) (control persons "had access to internal Company documents, reports and other information, including adverse nonpublic information regarding Pfizer's business, operations, products and future prospects"). Even a person who is not an executive officer at the time of the alleged misconduct may be held liable as a control person, if it is sufficiently alleged that the person "had the power to at least indirectly control corporate policy." *Fuechtman v. Mastec, Inc.*, 390 F. Supp. 2d 1264, 1268 (S.D. Fla. 2005).

35. The Picower Defendants' control is squarely alleged in the Class Action Complaint. For example, (1) Picower was aware of the misrepresentations and omissions BLMIS made to its investors under the control of Picower in order to conceal and thereby perpetuate the Ponzi scheme; (2) Picower materially and knowingly benefited from the Ponzi scheme; (3) the Picower Defendants and their agents communicated directly with BLMIS employees with regard to booking phony trades in their accounts, concealing those trades from other BLMIS customers, and misrepresenting the cash and securities positions in BLMIS

11

customer accounts; and (4) Picower and BLMIS agreed that Picower would receive large cash distributions based on phony profitable stock trades, and that BLMIS would make misrepresentations to the Plaintiffs (and all other BLMIS customers) necessary for Picower to obtain those distributions and maintain the secrecy of the fraud.

36.  Picower obtained approximately $7.2 billion (approximately 40% of the net cash placed with BLMIS) from a scheme which he knew was fraudulent. The benefit obtained by a defendant from a fraudulent misrepresentation is evidence of control. *See In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1303-1304 (N.D. Okla. 2010). *SemGroup* involved a securities class action in connection with two public offerings; the complaint alleged Section 20(a) claims against persons who did not own or manage the primary violator. *Id.* at 1303. However, the defendants owned minority interests in the primary violator's parent, approved the drop down of assets in connection with one of the offerings, and "reaped [millions of dollars in] distributions." *Id.* The district court held that "[t]hese facts, taken as a whole, create a sufficient inference of indirect control." *Id.* (denying 12(b)(6) motion to dismiss).

37.  Picower routinely communicated directly with BLMIS employees with regard to booking phony trades in his account and concealing those trades from other BLMIS customers by misrepresenting their account values. Communications between the primary violator and the control person relating to the primary violation show control. *See In re Tronox, Inc.*, 769 F. Supp. 2d 202, 212 (S.D.N.Y. 2011) (quarterly meetings between primary violator and control person relating to misrepresentations in a public offering supported the inference that the control person "ensured" that the primary violator acted as intended by the control person).

38.  Picower and BLMIS agreed that Picower would receive certain cash distributions based upon phony transactions. Picower's fraudulent gain of $7 billion necessarily meant a loss

12

of that same amount in the accounts of other investors. BLMIS and Picower agreed to make the misrepresentations to BLMIS investors necessary for Picower to obtain those distributions and to conceal them. Picower's ability to cause BLMIS to routinely make misrepresentations to others is proof of control.

### The Class Action is not derivative of the Trustee's claims

39. As set forth above and in more detail in the Class Action Complaint, the Picower Defendants controlled BLMIS under Section 20(a), and are jointly and severally liable with BLMIS for securities fraud.

40. The damages sought are exclusive of the $7.2 billion forfeited as a fraudulent conveyance to the Trustee. The damages sought equal the total amount overpaid by BLMIS investors for the BLMIS securities together with interest thereon. This amount, exclusive of the $7.2 billion, exceeds $10 billion.

41. The Picower Defendants did not and cannot immunize themselves from securities fraud liability merely by returning a portion of what they stole to the BLMIS estate. Plaintiffs' Section 20(a) claims do not belong to the Trustee, and are not derivative of the Trustee's claims. *See Medkser v. Feingold*, 307 Fed. App'x 262, 265 (11th Cir. 2008). Consequently, Plaintiffs' Section 20(a) claims are not subject to the injunction in the Picower Settlement Order or the Automatic Stay.

WHEREFORE, Plaintiffs respectfully request that the Court enter a Final Declaratory Judgment determining that neither the permanent injunction contained in the Picower Settlement Order nor the Automatic Stay prohibits the Plaintiffs from commencing and fully prosecuting the Class Action Complaint in the Southern District of Florida.

Dated: January 6, 2014

Respectfully submitted,

/s/ Joseph G. Galardi
James W. Beasley, Jr.
beasley@beasleylaw.net
Florida Bar No. 145750
Joseph G. Galardi
galardi@beasleylaw.net
Florida Bar No. 180572
BEASLEY HAUSER KRAMER
& GALARDI, P.A.
505 South Flagler Drive, Suite 1500
West Palm Beach, Florida 33401
Tel: (561) 835-0900
Fax: (561) 835-0939

and

/s/ Lesley Blackner
Lesley Blackner, Esq.
lblackner@aol.com
Florida Bar No. 654043
BLACKNER, STONE & ASSOCIATES
123 Australian Avenue
Palm Beach, Florida 33480
Tel: (561) 659-5754
Fax: (561) 659-3184

*Attorneys for Pamela Goldman and A & G Goldman Partnership*