**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Geraldine E. Ponto
Gonzalo S. Zeballos
Michelle R. Usitalo

*Attorneys for Irving H. Picard, Trustee for the
substantively consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC and the
estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　　　Plaintiff-Applicant,<br><br>　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　　　Defendant. | No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>FEDERICO CERETTI, CARLO GROSSO, KINGATE GLOBAL FUND, LTD., KINGATE EURO FUND, LTD., KINGATE MANAGEMENT | Adv. Pro. No. 09-1161 (SMB)<br><br>**FOURTH AMENDED COMPLAINT** |

1

LIMITED, FIM ADVISERS LLP, FIM LIMITED,
CITI HEDGE FUND SERVICES LIMITED, FIRST
PENINSULA TRUSTEES LIMITED,
INDIVIDUALLY AND AS TRUSTEE OF THE
ASHBY TRUST, THE ASHBY TRUST, ASHBY
INVESTMENT SERVICES LIMITED, ALPINE
TRUSTEES LIMITED, INDIVIDUALLY AND AS
TRUSTEE OF EL PRELA TRUST, PORT OF
HERCULES TRUSTEES LIMITED,
INDIVIDUALLY, AND AS TRUSTEE OF EL
PRELA TRUST, EL PRELA TRUST, EL PRELA
GROUP HOLDING SERVICES, ASHBY HOLDINGS
SERVICES LIMITED, EL PRELA TRADING
INVESTMENTS LIMITED, and HSBC BANK
BERMUDA LIMITED,

Defendants.

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"),[1] and the substantively consolidated estate

of Bernard L. Madoff ("Madoff," and with BLMIS, "Debtors"), by the Trustee's undersigned

counsel, for his Fourth Amended Complaint ("Complaint") states:

## I.    NATURE OF PROCEEDING

1.    As is now well known, Madoff conducted a Ponzi scheme previously unparalleled

in scale, scope, and duration.  Madoff did not accomplish this alone.  Madoff sustained his Ponzi

scheme for decades with capital infusions from around the globe.  Included among the complex

web of interconnected people and financial institutions that ensured capital infusions to BLMIS

were Federico Ceretti ("Ceretti") and Carlo Grosso ("Grosso") and their Madoff feeder funds,

---

[1] Hereinafter, applicable sections of SIPA shall be cited as SIPA § ____, and omit reference to title 15, United States Code.

Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro Fund, Ltd. ("Kingate Euro," and with Kingate Global, the "Kingate Funds").

2.      In 1994, Ceretti and Grosso established Kingate Global.  Ceretti and Grosso first sold shares in Kingate Global in March 1995, investing the subscription moneys exclusively with BLMIS.  In 2000, Ceretti and Grosso established Kingate Euro, which sold subscriptions in Euros for investment with BLMIS.

3.      Since their inception, the Kingate Funds deposited a combined total of approximately $1.7 billion with BLMIS and over time withdrew nearly $1 billion from BLMIS. The withdrawn funds were customer property and are avoidable transfers that the Trustee seeks to recover for equitable distribution.

4.      In 1994, contemporaneously with the formation of Kingate Global, Ceretti and Grosso established Kingate Management Limited ("Kingate Management"), which the Kingate Funds appointed as manager of the Kingate Funds.  Kingate Management collected over $300 million in management fees as manager of the Kingate Funds.

5.      The Kingate Funds and Kingate Management then appointed FIM Limited and later FIM Advisers LLP ("FIM Advisers," and with FIM Limited, "FIM"), among other things, to advise and consult with Kingate Management concerning the Kingate Funds.  FIM and Kingate Management, collectively referred to as the "Management Defendants," are directly or beneficially owned and controlled by Ceretti and Grosso.

6.      The Kingate Funds, Ceretti, Grosso, the Management Defendants, and Citi Hedge Fund Services Limited ("Citi Hedge"), as administrator of the Kingate Funds, received account statements, trade confirmations, and other sources of information clearly demonstrating that BLMIS's performance resulted from impossible, highly suspect, and illegitimate "trades."

3

7.      Although the defendants are separate entities, they operated in unison to collectively profit from Madoff's Ponzi scheme knowing that the "returns" reported by BLMIS could not have resulted from legitimate securities trading.  The interests of all defendants were aligned, with each defendant benefitting by increasing the Kingate Funds' assets under management solely for investment with BLMIS.

8.      BLMIS made initial transfers to, or for the benefit of, the Kingate Funds of at least $926,351,905, of which the Kingate Funds subsequently transferred hundreds of millions of dollars to the other defendants.  The Trustee brings this action to avoid and recover the initial transfers from BLMIS to the Kingate Funds and the subsequent transfers received by the other defendants.  Every dollar the defendants received directly or indirectly from BLMIS is customer property that must be returned to the estate for equitable distribution under SIPA.

## II.      JURISDICTION AND VENUE

9.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"), and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

10.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgments consistent with Article III of the U.S. Constitution.

11.      Venue in this district is proper under 28 U.S.C. §§ 1391(b) and 1409.

12.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), 502(a) and (b), 544(b), 547, 548(a), 550(a), and 551,[2] the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. Law ("NYDCL") §§ 270 *et seq.* (McKinney 2012)), and other applicable law.

## III.     BACKGROUND, THE TRUSTEE AND STANDING

13.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding, which is pending in the District Court.  The SEC's complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

14.     On December 12, 2008, the Honorable Louis L. Stanton of the District Court entered an order that appointed Lee S. Richards as receiver for the assets of BLMIS.

15.     On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

16.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order, that:

---

[2] Hereinafter, applicable sections of title 11, United States Code (the "Bankruptcy Code"), shall omit reference to title 11.

    a.     removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

    b.     appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

    c.     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

17.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.

18.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

19.     At a plea hearing on March 12, 2009 (the "Plea Hearing"), in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the Plea Hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23: 14-17.)

20.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

21.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the

records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

22. At a plea hearing on December 20, 2012, in the case captioned *United States v. Peter Madoff*, Case No. 10-CR-228 (LTS), Peter Madoff, Madoff's brother and BLMIS's chief compliance officer, pleaded guilty to a two-count criminal information charging him with falsifying records and conspiracy to commit securities fraud.

23. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent that and other recovery actions, the Trustee cannot satisfy the customer claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

## IV.   THE PONZI SCHEME

24. Madoff founded BLMIS in or about 1960 as a sole proprietorship, and on January 1, 2001, he formed it as a limited liability company under the laws of the State of New York. For most of its existence, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, sole owner, chairman, and chief executive officer, operated BLMIS with several family members and other employees, some of whom have pleaded guilty to helping Madoff carry out the fraudulent scheme. BLMIS had three business units: investment advisory (the "IA Business"), market making, and proprietary trading.

25. Beginning in the 1990s, Madoff outwardly ascribed the IA Business's consistent investment success to his "split-strike conversion" ("SSC") investment strategy. Madoff generally promised investors that their funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100 Index"), which is a collection of the 100 largest publicly traded companies, as determined by Standard & Poor's Index Committee. The

7

basket of stocks was designed to mimic the movement of the S&P 100 Index.  Because Madoff

claimed that he would carefully time purchases and sales to maximize value, customer funds

would intermittently be out of the market.  During those times, Madoff claimed that the funds

were invested, directly or indirectly, in U.S. Treasury securities ("Treasury Bills").  There is no

record of BLMIS clearing a single purchase or sale of securities in connection with the SSC

strategy at the Depository Trust & Clearing Corporation, the clearing house for such

transactions, or any other trading platform on which BLMIS could have traded securities.  There

are no other BLMIS records that demonstrate that BLMIS traded securities in connection with

the SSC strategy.

26.    The second part of the SSC strategy involved selling call options and buying put

options on the S&P 100 Index; this is commonly referred to as a "collar."  Madoff purported to

purchase and sell option contracts to control the downside risk of price changes in the basket of

stocks correlated to the performance of the S&P 100 Index.  All options relating to the

companies within the S&P 100 Index, including options based upon the S&P 100 Index itself,

clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that

BLMIS's IA Business cleared any trades in any exchange-listed options.

27.    At the Plea Hearing, Madoff admitted that BLMIS purchased none of the

securities it claimed to have purchased for IA Business customers.

28.    Madoff operated the IA Business as a Ponzi scheme.  The money received from

IA Business customers was not set aside to buy securities or options, as Madoff claimed, but

instead was used primarily to make distributions to, or payments for, other customers.  The

falsified monthly account statements made it appear that the IA Business accounts included

substantial gains on customers' principal investments.  In reality, BLMIS had not invested its

customers' funds but paid customers based upon the inflated amounts reflected in their fake

account statements as if those amounts were genuine. The money sent to BLMIS for investment

was used to keep the fraudulent scheme operating and to enrich Madoff, his associates, and

others, until December 2008, when requests for redemptions overwhelmed the flow of new

investments and caused the inevitable collapse of the Ponzi scheme.

29.    BLMIS did not register as an investment adviser with the SEC until August 2006.

At that time, BLMIS filed with the SEC Form ADV (Uniform Application for Investment

Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts

and assets under management of $11.7 billion. Thereafter, BLMIS filed Form ADV annually

with the SEC, the latest of which was filed in January 2008. It represented that BLMIS had 23

customer accounts with assets under management of $17.1 billion. In fact, at that time BLMIS

had over 4,900 active customer accounts with a purported value of approximately $68 billion

under management.

30.    BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling &

Horowitz"), a three-person accounting firm in Rockland County, New York. Of the three

employees at the firm, one employee was an administrative assistant and one was a semi-retired

accountant living in Florida. On or about November 3, 2009, David Friehling, the sole

proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and

filing false tax returns for Madoff and others.

31.    At all relevant times, BLMIS's liabilities were a minimum of millions, and at

times billions, of dollars greater than its assets. BLMIS was insolvent because (i) its assets were

worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due;

and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

### V.    DEFENDANTS

#### A.    Ceretti and Grosso

32.    Ceretti is an Italian national residing in the United Kingdom and maintains an address at 37 Queens Gate Gardens, London, SW7 5RR, United Kingdom.

33.    Grosso is an Italian national residing in the United Kingdom and maintains an address at 22 Cathcart Road, London SW10 9NN, United Kingdom.

34.    Between them, Ceretti and Grosso have over 60 years of experience in the securities industry.

35.    In 1981, Grosso founded FIM Limited in London, and he remains its executive chairman.

36.    In 2004, Ceretti and Grosso co-founded FIM Advisers.  Grosso is FIM Advisers' executive chairman and chief investment officer.  Ceretti is FIM Advisers' chief executive officer.

37.    In 2005, at the direction of Ceretti and Grosso, FIM (USA) Inc. ("FIM (USA)") was incorporated under the laws of the State of Delaware, with a principal place of business in New York, New York.

#### B.    The Kingate Funds

38.    Kingate Global is registered as an international business company organized under the laws of the British Virgin Islands with a registered address at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

39.    According to BLMIS's records, on or about March 2, 1994, Kingate Global opened an account with BLMIS designated 1FN061 (the "Kingate Global Account"), and signed and delivered to BLMIS in New York a Customer Agreement, Option Agreement, and Trading

Authorization Limited to Purchases and Sales of Securities and Options on or about July 4, 1994. The Kingate Global Account was open when Madoff was arrested on December 11, 2008.

40.     Kingate Euro is registered as an international business company organized under the laws of the British Virgin Islands with a registered address at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

41.     According to BLMIS's records, on or about January 1, 1996, BLMIS opened an account designated 1FN086 as a sub-fund of Kingate Global to handle investments made in Deutsche Marks.  In April 2000, Ceretti and Grosso created Kingate Euro, which assumed the rights to the sub-fund's account at BLMIS, to handle investments denominated in Euros.  On or about April 27, 2000, Kingate Euro signed and delivered to BLMIS in New York, a Customer Agreement, Option Agreement, and Trading Authorization Limited to Purchases and Sales of Securities and Options.

42.     Although the Kingate Funds were separate companies with separate boards of directors, they were part of an enterprise created by Ceretti and Grosso to invest with BLMIS. Shareholders of the Kingate Funds did not participate in the Kingate Funds' business affairs.

43.     The Kingate Funds are in liquidation proceedings in the British Virgin Islands and Bermuda.  By separate Orders, both dated June 4, 2009, the Eastern Caribbean Supreme Court in the High Court of Justice of the Virgin Islands ("BVI Court") appointed William R. Tacon and Richard F. Fogerty as joint liquidators of the Kingate Funds.  On October 5, 2009, the Supreme Court of Bermuda ("Bermuda Court") appointed Mr. Tacon, Mr. Fogerty, and John McKenna as joint liquidators.  Upon the resignation of Mr. Fogerty, on March 15, 2012, the BVI Court appointed Stuart C.E. Mackellar to act as a liquidator in Mr. Fogerty's place.  On July 25, 2012,

the Bermuda Court appointed Mr. Mackellar to act as a liquidator of the Kingate Funds in place

of Mr. Fogerty.

### C.    The Management Defendants

44.    Kingate Management is a corporation organized on February 24, 1994, under the

laws of Bermuda, with a registered address at 2 Reid Street, Hamilton HM11, Bermuda.

45.    Ceretti and Grosso beneficially owned and controlled Kingate Management.

46.    By an agreement dated in or around November 1994, Kingate Global appointed

Kingate Management as its manager.  By an agreement dated May 1, 2000, Kingate Euro

appointed Kingate Management as its manager.

47.    Each year the Kingate Funds prepared a report for shareholders titled

"Information Memorandum," containing information regarding the corporate structure, policies,

and investment strategy of each of the Kingate Funds.   The May 1, 2000 Information

Memorandum described Kingate Management's duties to include selecting the Kingate Funds'

sole investment adviser, *i.e.*, BLMIS, and arranging accounting and administrative services for

the Kingate Funds.

48.    Kingate Management is in a liquidation proceeding in Bermuda.  On March 2,

2012, the Bermuda Court ordered that Kingate Management be wound up and appointed The

Official Receiver of Bermuda Stephen Lowe, as liquidator.

49.    FIM Limited is an asset management company incorporated by Grosso under the

laws of the United Kingdom.  It has a registered address at 62 Wilson Street, London EC2A

2BU, United Kingdom.

50.    FIM Advisers is a limited liability partnership formed, controlled, and owned by

Ceretti and Grosso.  It was formed under the laws of the United Kingdom with a registered

address at 62 Wilson Street, London EC2A 2BU, United Kingdom.

51.    FIM Limited provided consultancy services to Kingate Management from 1994 until 2005.  On August 1, 2005, Kingate Management entered into a contract with FIM Advisers to provide consultancy services to Kingate Management for the Kingate Funds.

52.    FIM Limited provided distribution services to Kingate Management from 2001 until 2005.  On August 1, 2005, Kingate Management entered into a contract with FIM Advisers to provide distribution services to Kingate Management for the Kingate Funds.

53.    Of the 18 investment funds that FIM managed, 14 were invested in the Kingate Funds on the recommendation of FIM.

### D.    Ceretti Companies

54.    **El Prela Trust**:  El Prela Trust is a trust formed in or about April 1994, under the laws of the Island of Jersey.  On August 17, 2006, the laws of the British Virgin Islands was designated as the governing law for El Prela Trust.  Ceretti and his family members are beneficiaries of El Prela Trust.

55.    **El Prela Group**:  El Prela Group Holding Services Limited ("El Prela Group") is a limited liability company incorporated under the laws of the British Virgin Islands, with a registered address at Palm Grove House, P.O. Box 3186, Road Town, Tortola, British Virgin Islands.  Its registered agent is Moore Stephens International Services (BVI) Limited.  El Prela Group also has an administrative office c/o Moore Stephens Services SAM, L'Estoril, Bloc C, 31 Avenue Princess Grace, MC 38000, Monaco.

56.    **El Prela Trading**:  El Prela Trading Investments Ltd. ("El Prela Trading") is a limited liability company incorporated under the laws of the British Virgin Islands with a registered address at Palm Grove House, P.O. Box 3186, Road Town, Tortola, British Virgin Islands.  Its registered agent is Moore Stephens International Services (BVI) Limited.  El Prela

13

Trading also has an administrative office c/o Moore Stephens Services SAM, L'Estoril, Bloc C, 31 Avenue Princess Grace, MC 38000, Monaco.

57.    **Alpine Trustees**:  Alpine Trustees Ltd. ("Alpine Trustees") is a limited liability company incorporated under the laws of Liberia with a registered address at 80 Broad Street, Monrovia, Liberia.  Alpine Trustees acted as trustee to the El Prela Trust from 1994 to 2006.

58.    **Port of Hercules**:  Port of Hercules Trustees Limited ("Port of Hercules") is a limited liability company incorporated under the laws of the British Virgin Islands with a registered address at Palm Grove House, P.O. Box 3186, Road Town, Tortola, British Virgin Islands.  Its registered agent is Moore Stephens International Services (BVI) Limited.  Port of Hercules has acted as trustee to El Prela Trust since 2006.

59.    El Prela Trust was a 50% owner of Kingate Management.  In or about January 2008, Ceretti created El Prela Trading and El Prela Group, both of which were wholly owned by El Prela Trust.  On March 31, 2008, Ceretti transferred to El Prela Group all of the shares of Kingate Management held by El Prela Trust.

60.    Since 2001, Kingate Management transferred at least $147 million into one or more bank accounts held by each of El Prela Trust, El Prela Group, Alpine Trustees, Port of Hercules, and El Prela Trading (collectively, the "Ceretti Companies").

61.    Ceretti created El Prela Trust, El Prela Group, and El Prela Trading to hold title to assets for the benefit of Ceretti and his family members.  The Ceretti Companies have no interests adverse to the interests of Ceretti, and their interests are aligned.

62.    Certain of the Ceretti Companies invested, directly or indirectly, at least $19 million, in the Kingate Funds.

E.    **Grosso's Companies**

63.    **Ashby Trust**: Ashby Trust is a trust formed in March 1994 under the laws of the Island of Jersey.  On May 17, 2011, the laws of the British Virgin Islands were designated as the governing law for Ashby Trust.  Grosso and his family members are the beneficiaries of Ashby Trust.

64.    **Ashby Holdings**: Ashby Holdings Services Ltd. ("Ashby Holdings") is a limited liability company incorporated under the laws of the British Virgin Islands with a registered address at Palm Grove House, P.O. Box 3186, Road Town, Tortola, British Virgin Islands.  Its registered agent is Moore Stephens International Services (BVI) Limited.  Ashby Holdings also has an administrative office c/o Moore Stephens Services SAM, L'Estoril, Bloc C, 31 Avenue Princess Grace, MC 38000, Monaco.

65.    **Ashby Investment**: Ashby Investment Services Limited ("Ashby Investment") is a limited liability company incorporated under the laws of the British Virgin Islands with a registered address at Palm Grove House, P.O. Box 3186, Road Town, Tortola, British Virgin Islands.   Its registered agent is Moore Stephens International Services (BVI) Limited.  Ashby Investment also has an administrative office c/o Moore Stephens Services SAM, L'Estoril, Bloc C, 31 Avenue Princess Grace, MC 38000, Monaco.

66.    **First Peninsula**: First Peninsula Trustees Ltd. ("First Peninsula") is a limited liability company incorporated under the laws of Liberia with a registered address of 80 Broad Street, Monrovia, Liberia.  First Peninsula acts as trustee to Ashby Trust.

67.    Ashby Trust was a 50% owner of Kingate Management.  In or about November 2007, Grosso created Ashby Holdings and Ashby Investment, both of which were wholly owned by Ashby Trust.  On March 31, 2008, Grosso transferred to Ashby Holdings all of the shares of Kingate Management held by the Ashby Trust.  Upon written instructions from Grosso on

August 29, 1996, and March 24, 2000, to First Peninsula, it transferred certain shares of Kingate Management to Alpine Trustees.

68.    Since 2001, Kingate Management transferred at least $149 million into one or more bank accounts held by Ashby Trust, Ashby Holdings, Ashby Investment, and First Peninsula (collectively, the "Grosso Companies," and with the Ceretti Companies, the "Ceretti and Grosso Companies").

69.    Grosso controls the business and investment decisions for the Grosso Companies. Certain of the Grosso Companies invested at least $22 million, directly and indirectly, in the Kingate Funds.  In October 2007, upon instructions from Grosso to Ashby Trust, it redeemed its entire holdings of Kingate Global.

70.    The Grosso Companies have no interests adverse to the interests of Grosso, and their interests are aligned.  Ceretti and Grosso authorized the flow of funds into and out of bank accounts opened in Monaco, Bermuda, Guernsey, Island of Jersey, and Switzerland by Port of Hercules, Alpine Trustees, and First Peninsula for Ashby Trust and El Prela Trust.

71.    Ceretti and Grosso are beneficial owners of El Prela Trust, El Prela Group, El Prela Trading, Ashby Trust, Ashby Holdings, and Ashby Investment.

**F.    The Administrator**

72.    **Citi Hedge**:  Citi Hedge, formerly known as BISYS Hedge Fund Services Limited ("BISYS") and Hemisphere Management Limited ("Hemisphere"), is incorporated under the laws of Bermuda with a registered address at 9 Church Street, P.O. Box HM 951, Hamilton HM11, Bermuda.

73.    In 1994, Kingate Global, Kingate Management, and Hemisphere entered into an agreement appointing Hemisphere the administrator of Kingate Global.  On May 1, 2000,

Kingate Euro, Kingate Management, and Hemisphere entered into an agreement appointing

Hemisphere the administrator of Kingate Euro.

74.     Christopher Wetherhill ("Wetherhill") founded Hemisphere and was its chief

executive officer and president from 1981 to 2000.  Wetherhill was a director of the Kingate

Funds from their formation until 2008.  Wetherhill was an officer of Hemisphere at the same

time he was a director of the Kingate Funds.

75.     On March 22, 2002, BISYS Group, Inc., BISYS's parent, acquired Hemisphere

and renamed it BISYS.

76.     On June 1, 2007, the Kingate Funds and BISYS entered into agreements

appointing BISYS as administrator for the Kingate Funds.   In or around August 2007, Citi

Hedge acquired BISYS and became administrator to the Kingate Funds.

77.     The agreements among the Kingate Funds, Kingate Management, Hemisphere,

BISYS, and Citi Hedge with respect to administration of the Kingate Funds are collectively

referred to as the "Administration Agreements."

78.     Hemisphere and BISYS acted as registrar to each of the Kingate Funds pursuant

to agreements effective May 1, 2000 and January 1, 2002.  When Citi Hedge acquired BISYS in

2007, Citi Hedge became registrar of the Kingate Funds.

### G.     The Custodian

79.     **Bank Bermuda:**  HSBC Bank Bermuda Limited, f/k/a Bank Bermuda Limited

("Bank Bermuda"), is a banking institution with a registered address at 6 Front Street, Hamilton,

Bermuda.

80.     Kingate Global and Kingate Euro entered into custodian agreements with Bank

Bermuda's predecessor, the Bank of Bermuda Limited, on March 1, 1994 and May 1, 2000,

respectively, under which Bank Bermuda agreed to serve as custodian of the Kingate Funds'

cash assets.

### H.    This Court Has Personal Jurisdiction Over All Defendants

81.    This Court has personal jurisdiction over all defendants under Rule 302 of the

New York Civil Practice Law and Rules (Mckinney 2003) ("N.Y. C.P.L.R."), and Rule 7004 of

the Federal Rules of Bankruptcy Procedure because the defendants: (i) have intentionally taken

full advantage of the rights, benefits, and privileges of conducting business and/or transactions in

the State of New York; (ii) purposely availed themselves of the laws of the State of New York by

undertaking significant commercial activities in New York and by receiving customer property

to their benefit; (iii) derived significant revenue from New York; and (iv) maintained minimum

contacts with New York in connection with the Trustee's claims.  Defendants derived substantial

revenue from direct or indirect investments with BLMIS in New York, and they expected or

should have reasonably expected their activities would have consequences in New York.

82.    Defendants knew and intended that investments in the Kingate Funds would be

transferred to BLMIS in New York to be handled at Madoff's discretion through BLMIS.  All

defendants intended to, and did, profit from U.S.-based and N.Y.-based activities.

83.    All defendants and/or their agents communicated directly with BLMIS in New

York or with FIM (USA) in New York.  Kingate Management acted as agent for the Kingate

Funds.  FIM acted as agent for Kingate Management in connection with Kingate Management's

duties on behalf of the Kingate Funds.  According to the Administration Agreements, Citi Hedge

acted as agent for the Kingate Funds.  Ceretti and Grosso, as beneficial owners and/or creators of

the Management Defendants, the Kingate Funds, and certain of the Ceretti and Grosso

Companies, acted as agents for all of those defendants.

18

84.    FIM Advisers and FIM (USA) actively marketed FIM Advisers' services from the United States.  FIM (USA) also performed research functions in New York on behalf and under the direction of FIM Advisers, FIM Limited, Kingate Management, and Ceretti and Grosso.

85.    Employees of FIM (USA) promoted FIM in the United States by referring several of the Kingate Funds' shareholders to FIM.  Certain employees of FIM Advisers were also employees of FIM (USA).  According to the New York Department of State, FIM (USA) was terminated on June 17, 2009.

86.    Ceretti and Grosso transacted business in New York as the agents for the Ceretti and Grosso Companies.  Ceretti and Grosso authorized the transfer of funds to and from New York bank accounts for their personal benefit.  For example, on or about March 31, 2008, Grosso authorized Ashby Holdings to transfer $5 million to a bank account in New York.  The Ceretti and Grosso Companies routinely received funds originating from New York and derived substantial revenue from such funds.

87.    Acting on behalf of all defendants, Ceretti and Grosso met with Madoff in New York, including at BLMIS, on multiple dates.

88.    The Kingate Funds used New York banks to deposit funds with BLMIS, transferring investor funds to, and obtaining moneys from, the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703 (the "703 Account").

89.    The Kingate Funds transacted and conducted business in New York by, among other things, investing all of the assets of the Kingate Funds with BLMIS in New York.  Kingate Management paid fees to FIM Limited at FIM Limited's account with Brown Brothers Harriman & Co. in New York, New York.

19

90.    On or about July 2, 2009, Kingate Global filed Customer Claim No. 15359 and

Kingate Euro filed Customer Claim No. 15358 (collectively, the "Customer Claims") with the

Trustee.

91.    Citi Hedge is an affiliate of Citigroup, Inc., and Citi Hedge Fund Services, Inc., a

Delaware corporation registered to do business in New York with a registered address at 3435

Stelzer Road, Columbus, Ohio  43219.

92.    Bank Bermuda used New York banks to transfer funds into BLMIS, transferring

investor moneys into, and receiving moneys from, the 703 Account.

## VI.    CERETTI'S, GROSSO'S AND THE KINGATE FUNDS' ROLE IN MADOFF'S FRAUD

### A.    The Kingate Funds Enabled Madoff's Expansion Into New Parts Of Europe

93.    The Kingate Funds were part of BLMIS's expansion to European investors.

94.    In the early 1990s, Sandra Manzke ("Manzke"), a hedge fund manager then

affiliated with Tremont (Bermuda) Limited ("Tremont"), introduced Ceretti and Grosso to

Madoff.

95.    In 1993, Madoff informed fund managers, including Manzke, that going forward

BLMIS would only accept institutional investors as customers for its IA Business.  Manzke

formed the Tremont Broad Market Fund Limited as a domestic investment fund, and Ceretti and

Grosso joined with Manzke to create Kingate Global as a foreign investment fund.

96.    The Kingate Funds were single-purpose funds created by Ceretti and Grosso to

solicit investors for BLMIS primarily from continental Europe, principally in Italy and

Switzerland.  Ceretti and Grosso prepared, authorized, or otherwise participated in the

presentation of the Kingate Funds' public materials, such as solicitation materials, fact sheets and

other materials sent to shareholders to encourage investments in the Kingate Funds. Major

international financial institutions such as HSBC, Grupo BBVA, Banque Privee Edmond de

Rothschild, and Anglo Irish Bank invested with BLMIS through the Kingate Funds.

97.    The Kingate Funds also offered other fund managers without access to BLMIS an

opportunity to invest with BLMIS. For example, Reliance Management (BVI) Limited, the

manager of Defender Limited,[3] a separate BLMIS feeder fund, first gained access to BLMIS for

its flagship fund, Reliance Multi-Adviser Fund Limited, through Kingate Global.

**B.    Ceretti's And Grosso's Close Personal And Business Relationships With Madoff Provided Insights Into Madoff's Fraudulent IA Business**

98.    Ceretti and Grosso were part of Madoff's inner circle and had direct access to

him. Madoff publicly acknowledged as much, telling one potential investor that he did not meet

with investors, and the investor should meet with Grosso to learn about investment with BLMIS.

99.    Grosso met with Madoff in New York or London at least two times a year.

During those meetings, and the frequent telephone conversations that occurred in between,

Grosso and Madoff discussed various matters, including the performance of BLMIS and the

Kingate Funds.

100.    In 2001, at Madoff's invitation, Grosso met with Madoff and DiPascali at

BLMIS's office. The meeting included time spent on the 17th floor. The 17th floor was off limits

to all but a few BLMIS employees, select third parties, and Madoff family members. The

computers on the 17th floor were antiquated IBM AS 400 computers not connected to the internet

or even BLMIS's internal network. Yet a handful of employees were purportedly executing

---

[3] The Trustee filed a separate action in the Bankruptcy Court against Defender Limited in Adversary Proceeding No. 10-05229 (Bankr. S.D.N.Y. 2010).

billions of dollars of trades on a monthly, and sometimes daily, basis with such technology. Grosso saw that Madoff's IA Business operated from this space.

101.    Besides in-person meetings, Ceretti, Grosso, and/or FIM employees participated in no fewer than 286 telephone calls to BLMIS from 2004 to 2008.  Grosso was in close contact with Madoff until the last days before Madoff confessed, speaking with Madoff at length on December 2, 2008.

102.    Ceretti's and Grosso's relationship with Madoff also included various social engagements, such as dinners in London accompanied by their spouses.

103.    Ceretti and Grosso had close relationships not only with Madoff, but with other members of Madoff's inner circle.  For example, in addition to the 286 phone calls to BLMIS, between 2005 and 2008, Grosso exchanged 225 phone calls with Jonathan Greenberg of Cohmad Securities Corp., an entity co-owned by Madoff that referred investors to BLMIS.  Ceretti also communicated with key feeder fund managers in Madoff's circle.  For example, in January 2005, Ceretti communicated with Andrés Piedrahita of Fairfield Sentry Limited, a separate BLMIS feeder fund, concerning Credit Suisse's counseling its clients away from Madoff funds because of risk concerns.

## VII.    THE KINGATE FUNDS' MULTI-LAYER MANAGEMENT STRUCTURE

104.    When Ceretti and Grosso established the Kingate Funds, FIM Limited already owned and managed several well-established investment funds.  Instead of using one of FIM Limited's existing investment funds to invest with BLMIS, Ceretti and Grosso created the Kingate Funds.  Instead of FIM Limited directly managing the Kingate Funds, Ceretti and Grosso created a new management company, Kingate Management.

105.    Kingate Management never had over five employees.

106.    On or about March 1, 1995, Kingate Management and Tremont executed a co-manager agreement with Kingate Global.  Under that agreement, Kingate Management and Tremont were obligated to evaluate and monitor BLMIS, arrange accounting and administrative services, and provide all other necessary management services to Kingate Global.

107.    The Kingate Funds did not charge performance fees.  Shareholders in the Kingate Funds were charged a management fee of 1.5% of the Kingate Funds' net asset value, and that fee was then split between co-managers, Kingate Management and Tremont.  The Kingate Funds paid Kingate Management a fee of 1% of the assets Kingate Management introduced to the Kingate Funds, and Tremont a 0.5% fee on those same assets.  If Tremont introduced the assets to the Kingate Funds, it received the 1% fee and Kingate Management received the 0.5% fee.

108.    Figure 1 below shows aggregate management fees in the amount of $323,767,406 paid by the Kingate Funds from 1997 to 2007:

**Figure 1**

| Year | Paid by Kingate Global (USD) | Paid by Kingate Euro (USD) |
|---|---|---|
| 1997 | 3,187,062 | 276,643 |
| 1998 | 7,905,281 | 1,249,205 |
| 1999 | 13,114,676 | 2,646,787 |
| 2000 | 17,180,724 | 2,531,431 |
| 2001 | 22,646,088 | 4,614,543 |
| 2002 | 25,656,645 | 5,787,576 |
| 2003 | 28,495,194 | 7,698,704 |
| 2004 | 31,665,162 | 9,123,483 |
| 2005 | 34,017,453 | 10,463,664 |
| 2006 | 34,408,746 | 9,903,986 |
| 2007 | 38,783,479 | 12,410,873 |
| **Total** | **257,060,510** | **66,706,896** |

109.    Figure 2 below reflects additional management fees amounting to $52,284,724, paid by the Kingate Funds:

**Figure 2**

| Year | Paid by Kingate Global (USD) |
|---|---|
| 1996 | 930,826 |
| Jan - Nov 2008 | 37,270,793 |
| **Total** | **38,201,619** |

| Year | Paid by Kingate Euro (USD) |
|---|---|
| 1996 | 61,008 |
| Jan - Apr 2001 | 1,174,125 |
| Jan - Nov 2008 | 12,847,971 |
| **Total** | **14,083,105** |

110.     On December 1, 1995, Kingate Management and the Kingate Funds appointed FIM Limited to provide consulting services concerning financial and operational decisions related to the Kingate Funds.  FIM Limited received a monthly fee from the fees the Kingate Funds paid to Kingate Management.  FIM Advisers replaced FIM Limited as consultant in 2005.

111.     Kingate Euro operated in the same manner as Kingate Global, but without Tremont's involvement.

112.     On April 23, 2001, the Kingate Funds and Kingate Management appointed FIM Limited as a non-exclusive distributor for the Kingate Funds.  In that capacity, FIM Limited identified and solicited potential shareholders, introduced shareholders to Kingate Management, maintained regular contact with shareholders, prepared marketing materials, and supervised communications with prospective and existing shareholders.  FIM Advisers replaced FIM Limited as distributor in 2005.

113.     In or around 2005, Ceretti and Grosso caused Manzke to resign as director of Kingate Global and terminated the co-manager relationship with Tremont.

24

114.    On or around January 1, 2006, Kingate Management executed another management agreement with Kingate Global designating Kingate Management as the sole manager.  All co-manager agreements and management agreements between Kingate Management and the Kingate Funds are collectively referred to as the "Management Agreements."

115.    Kingate Management represented that it would review "the activity of the investment adviser to ensure that it complies with the Funds' investment guidelines and also [is] undertaking all actions that might be necessary in the furtherance of the investment objectives of the funds."

116.    The Information Memorandum provided to potential shareholders for each of the Kingate Funds stated that Kingate Management "evaluates and monitors the Investment Advisor [BLMIS] and, in general, provides all necessary management services to the Fund."

117.    According to the 2006 Kingate Global Information Memorandum, FIM Advisers "render[ed] consulting advice to [Kingate Management] with respect to certain aspects of the Fund's operational, administrative, marketing, accounting and legal matters."

118.    The Management Agreements between Kingate Management and the Kingate Funds allowed Kingate Management to delegate its duties to FIM, except for Kingate Management's continuing obligation to verify the competence of FIM, as the delegate performing Kingate Management's duties.

## VIII.    CERETTI, GROSSO, THE KINGATE FUNDS, THE MANAGEMENT DEFENDANTS, AND CITI HEDGE KNOWINGLY FACILITATED MADOFF'S FRAUDULENT IA BUSINESS

### A.    Efforts To Shield Madoff From Outside Scrutiny

119.    Even though many of the Kingate Funds' shareholders may have known the Kingate Funds were exclusively invested with BLMIS, neither of the Kingate Funds disclosed BLMIS or Madoff by name in the annual Information Memoranda sent to potential shareholders.

120.    When asked by an investor if arrangements could be made for an introduction to Madoff, Ceretti responded that was a "sticky issue."  In an email dated November 21, 2008, to FIM Advisers' employee Alessandro Albrighi, with a copy to Ceretti, Grosso responded to concerns raised by an analyst regarding Madoff's lack of transparency by explaining one of the Kingate Funds' roles: "[i]t is true that investors do not have direct access to Madoff, who tolerates structures like Kingate to act as buffers between Madoff and investors."  FIM's investment committee considered a fund manager's persistent refusal to meet investors as a sign of a high probability of fraud.  On at least one occasion, this circumstance prompted FIM to recommend liquidating the holdings with the fund manager.

121.    In July 2006, BISYS noted a discrepancy in the net asset valuations of the Kingate Funds.  Shazieh Salahuddin at Kingate Management telephoned DiPascali for an explanation.  Salahuddin found DiPascali's explanation unsatisfactory and expressed her concern to Ceretti and Grosso.  Rather than address Salahuddin's concern, Ceretti instructed her that all concerns should be raised with Kingate Management.  Wetherhill did not resolve the discrepancy but reassured Ceretti and Grosso by indicating Wetherhill had spoken with DiPascali.

### B.    FIM's High Due Diligence Standards

122.    FIM promoted itself as having a high standard of due diligence.  FIM Advisers' website described it as "a leading alternative investment company . . . [with] more than twenty

26

five years of experience in asset management, with almost fifteen years of advising and

managing portfolios of hedge funds." The website further stated that "FIM's investment model

is based upon a disciplined and structured approach to research, portfolio management, and risk

management. The model gives FIM a clear edge in the sourcing of new managers, in conducting

in-depth due-diligence, and in structuring portfolios."

123.    FIM undertook extensive due diligence by regular reviews of markets, strategies,

managers, and peer groups. FIM required its research specialists to conduct in-depth analysis

into every aspect of every potential investment. FIM subjected each portfolio to continuous

analysis to ensure that all risk factors were identified and controlled, and that all internal and

external management portfolio policies were followed. Risk management was integral to all of

FIM's procedures to ensure "that the manager remains within his own investment limits, and that

the fund is being managed according to its stated objective, without developing unexpected risk

exposures or strategy drift."

124.    FIM employed what it referred to as "four limbs" of due diligence: qualitative,

legal, quantitative, and operational, with each limb having a dedicated team. Its operational and

legal due diligence abilities included monitoring "the effectiveness of the systems and

procedures used to value the investment portfolio, the independence of the pricing of the

portfolio, the effectiveness of the reconciliations performed" and the prime broker arrangement

with the fund. Its qualitative and quantitative analysis group monitored the risk of both the

portfolio and the individual funds within the portfolio. FIM's portfolio management group

monitored financial information on a weekly basis and compiled it in a database.

125.    Under FIM's standard procedures and using a FIM-created template, each due

diligence team had to create a report for every fund in its respective areas of expertise. Those

27

four reports would then be combined to create a single report, usually 45-50 pages long that

would ultimately be presented to the investment committee.  FIM spreadsheets applied a scoring

system for each of the various "limbs" of due diligence to assist the FIM analysts in evaluating

each fund.  FIM would not invest in a fund until it completed those due diligence procedures.

126.    If a FIM analyst had a concern with an investment, the issue was discussed and

more closely monitored, typically with weekly or bi-weekly contact with the fund manager.  If a

concern persisted for three months, the investment committee's policy was to redeem the

investment.

127.    In an August 2007 report, FIM recommended liquidating an investment that its

analysts described as "too good to be true" and had "a limited downside" that made them feel

"uneasy."  FIM records show that an investment adviser with lack of transparency, lack of

independent oversight, and operational issues, and an investment result with low correlation with

peer funds were causes for concern. Those characteristics also were present in BLMIS.

**C.    The Defendants Knew That FIM's High Due Diligence Standards Were Not
        Applied To BLMIS And The Kingate Funds**

128.    FIM never created a "four limb" due diligence report for the Kingate Funds.

129.    There were no substantive discussions of the Kingate Funds or BLMIS at FIM's

investment committee meetings or monthly strategy meetings.

130.    FIM's due diligence included reporting on fund style, performance, operations,

returns, and relevant research for each active position held by its investment funds.  A March

2008 FIM Long-Invest report on 31 holdings, including Kingate Global, had detailed information

on only 30 holdings; Kingate Global's page is blank.

131.    In March 2008, an investor emailed Kingate Management requesting a due

diligence questionnaire, presentation material, and monthly performance and exposure data.

28

Ceretti and Grosso were the point of contact for questions relating to the business of the Kingate Funds and/or BLMIS's portfolio activity.  Salahuddin forwarded the email to Grosso, Ceretti, and Wetherhill, noting that Kingate Management does not have "half the things" requested, such as a standard due diligence questionnaire.

132.    In an email to an investor, Grosso acknowledged that "the Kingate Fund . . . has a somewhat unusual structure, and that as a consequence, there are a number of operational D[ue] D[iligence] points that may not be answered to your total satisfaction."  An email sent by Grosso in November 2008 to FIM's Head of Operational Due Diligence, Eric Lazear ("Lazear"), acknowledged "[w]e have never done much [due diligence on Kingate], as it will be impossible to go inside Madoff to do a proper D[ue] D[iligence]."

133.    After breaking news of Madoff's fraud, Lazear wrote to Grosso:

> I know we have to do what is right for FIM, but we need to be cognizant of how this portrays our (FIM) process.  [Kingate] is not a fund that went through our normal diligence process and I think it should not be depicted as if it had.  We all worked hard to build our process to be the best in the industry, which I think it is, and I do not want it to get out there that one slipped past us when it did not.

134.    In a December 12, 2008 email, Lazear stated that he believed BLMIS was a "scam" and that he had emailed Grosso "all the details" to support his beliefs *before* Madoff confessed.  He recounted telling Grosso that if Grosso did not own FIM and the Kingate Funds, Lazear would have vetoed any investment with BLMIS.

**D.    Ceretti, Grosso, The Kingate Funds, And The Management Defendants Knew That A Proper Audit Of The Kingate Funds By PricewaterhouseCoopers Would Expose Major Badges Of Fraud At BLMIS**

135.    Ceretti, Grosso, the Kingate Funds, and the Management Defendants knew as early as 2000 that PricewaterhouseCoopers ("PwC"), the Kingate Funds' auditor, relied solely on reports from Madoff's auditor and did not independently verify any information.  Grosso knew

that PwC only checked "the testing at Madoff" against the Kingate Funds' records (also provided

by BLMIS).

136.    In a February 2008 email, Grosso conceded to Wetherhill that it "does look as

though the auditors have not looked at all into the matter of cash and cash movements [sic]

controls.  Several questions have not been addressed . . . ."  In a separate February 2008 email to

Wetherhill, Grosso expressed his concern that PwC might actually "start to ask all sort [sic] of

questions next time they visit Madoff."

> ### E.    Ceretti, Grosso, And FIM Attributed BLMIS's Remarkably Consistent
> ### Returns To Illegal "Front Running"

137.    In 2001, an investment industry analyst published a newsletter that called into

question the legitimacy of BLMIS's SSC strategy.  The May 2001 MAR/Hedge newsletter titled

"Madoff Tops Charts; Skeptics Ask How" stated that experts were bewildered by Madoff's

unsurpassed ability to achieve consistent returns.  The article observed that "others who use or

used the strategy are known to have had nowhere near the same degree of success."

138.    Defendants' response was a "question and answer" document prepared by Grosso

for FIM employees marked "INTERNAL NOTE – NOT FOR DISTRIBUTION."  The

document scripted answers to potential questions from shareholders about the "red flags" of

fraud at BLMIS, including:

> (i) "How can there be such a relative complete lack of volatility in reported
> monthly returns?"

> (ii) "How can Madoff have the ability to time the market and to turn to cash
> before market conditions become negative?"

> (iii) "How can Madoff have the ability to buy and sell stocks without noticeably
> affecting the market?"

> (iv) "Why has no-one been able to duplicate similar results?"

(v) "How come other Wall Street firms have not become aware of the strategy and traded against it?"

(vi) "Why is Madoff willing to earn commissions on trades, but not set up a separate asset management division to offer hedge funds directly to investors?" and

(vii) "Why doesn't Madoff borrow money and manage funds on a proprietary basis?"

139.    In response to the question "[h]ow can Madoff have the ability to time the market and turn to cash before market conditions become negative," Grosso responded by referring to illegal front running: "Madoff benefits from unique market intelligence derived from the massive amount of order flow it handles daily."

140.    Similarly, Grosso answered the question "[w]hy has no one been able to duplicate similar results," by alluding to illegal front running: "[B]eing such a large market maker (Madoff currently accounts for about 15% of all equity transactions in the United States), he sees the flows."

141.    Ceretti, Grosso, the Management Defendants and the Kingate Funds knew the SSC strategy could not achieve the results reported in the Kingate Funds' account statements.

### F.    Citi Hedge's Calculation Of The Kingate Funds' Net Asset Value Could Not Be Substantiated

142.    As administrator for the Kingate Funds, Citi Hedge:

[D]etermines the net asset value of the Fund's Portfolio assets attributable to the USD Shares as of the close of business on the last Business Day of each calendar month. . .[and] verifies the prices attributed to the securities held by the USD Shares of the [Kingate Funds] by reference to pricing sources independent of . . .[BLMIS].

143.    In addition to calculating the net asset value ("NAV"), Citi Hedge also performed day-to-day administrative services for the Kingate Funds, including preparing and distributing monthly reports to shareholders, processing new shareholder subscriptions, maintaining the

31

Kingate Funds' corporate records, disbursing dividends, and paying legal fees, accounting fees, and salaries.

144.    In 2000, Grosso asked Tom Healy of Hemisphere, Citi Hedge's predecessor, to amend the Kingate Funds' offering memorandum to state that "Net asset valuations . . . are determined by the Administrator based on independent verification regarding the value of the Fund's portfolio assets . . . as of the close of business on the last Business Day of each calendar month."  Healy confirmed that "[s]o far this year we have been checking all the trade tickets received from Madoff to the monthly statement and doing a 100% verification of the pricing. Therefore, the proposed statement in the prospectus properly reflects what is actually happening."

145.    Citi Hedge and its predecessors received at least $5,902,037 in fees, based on the Kingate Funds' NAV, as shown in Figure 3 below:

**Figure 3**

| Year | Paid by Kingate Global (USD) | Paid by Kingate Euro (USD) |
|---|---|---|
| 1997 | 116,800 | 22,326 |
| 1998 | 154,382 | 53,600 |
| 1999 | 231,573 | 72,322 |
| 2000 | 232,478 | 55,556 |
| 2001 | 445,988 | 80,693 |
| 2002 | 502,056 | 106,135 |
| 2003 | 536,752 | 135,887 |
| 2004 | 576,603 | 155,387 |
| 2005 | 605,005 | 174,290 |
| 2006 | 611,802 | 165,317 |
| 2007 | 666,795 | 200,290 |
| **Total** | **4,680,234** | **1,221,803** |

IX.   **CERETTI, GROSSO, THE KINGATE FUNDS, THE MANAGEMENT DEFENDANTS, AND CITI HEDGE KNEW OF IMPOSSIBLE TRADING ACTIVITY AT BLMIS**

A.   **The Kingate Funds' Account Statements And Trade Confirmations Reflected Myriad Trading Impossibilities And Other Badges Of Fraud**

146.   For over a decade, the Kingate Funds and the Management Defendants received purported trade confirmations and account statements from BLMIS.  Those statements and confirmations revealed purported account activity that included trades executed under the SSC strategy that were both impossible and inconsistent with the strategy.

1.   **Impossibility:  The Kingate Funds' Returns Were Impossibly Consistent Over Many Years**

147.   Ceretti, Grosso, the Kingate Funds, and the Management Defendants touted the Kingate Funds' steady performance notwithstanding the volatility in the markets—including the S&P 100 Index, the very market the SSC strategy purportedly mimicked.

148.   In monitoring the Kingate Funds, FIM compared the Kingate Funds' performance against Standard & Poor's 500 Index ("S&P 500 Index"), which is highly correlated to the performance of the S&P 100 Index.  FIM also tracked the Kingate Funds' results against the results of other Madoff feeder funds, such as Fairfield Sentry and Tremont—which Ceretti and Grosso knew were mostly invested with BLMIS.

149.   The Kingate Funds' implausibly consistent, positive rates of return during events that caused financial markets—including the S&P 100 Index—to plunge, such as:  (1) the burst of the "dot com" bubble in 2000; (2) the 2000-2002 bear market, including the disastrous market impact of the attacks of September 11, 2001; and (3) the recession and housing crisis of 2008.

150.   From April1999 until November 2008, the Kingate Funds averaged annual returns of approximately 12.4%.  During that same 116-month period, the S&P 100 Index experienced

33

55 months of negative returns.  The Kingate Funds, which were supposed to have returns mimicking the S&P 100 Index, had negative returns in only five months of the same period.

151.    The Kingate Funds continued to generate positive returns during the last 14 months of BLMIS's existence, when the S&P 100 Index fell 39.4%.  The SSC strategy was designed to moderate any violent swings in the market—this was the purported purpose of the options "collar."  Instead, the Kingate Funds profited from a strategy based on short-term trades, an inherently high-risk strategy, where the risk paid off month after month.

152.    Figure 4 below compares the annual rates of return for the Kingate Funds for the period 1999 to 2008, with the rate of return for the S&P 100 Index, which the Kingate Funds were supposed to mimic:

**Figure 4**

**Kingate Funds Rates of Return v. S&P 100 Index Rates of Return
1999-2008**

| Year | Kingate Euro Rate of Return | Kingate Global Rate of Return | S&P 100 Index Rate of Return |
|------|------|------|------|
| 1999 | 17.9% | 18.2% | 31.3% |
| 2000 | 14.8% | 14.6% | (13.4%) |
| 2001 | 13.7% | 13.7% | (14.9%) |
| 2002 | 12.1% | 12.2% | (23.9%) |
| 2003 | 10.9% | 10.8% | 23.8% |
| 2004 | 9.9% | 10.0% | 4.5% |
| 2005 | 10.3% | 10.5% | (0.9%) |
| 2006 | 13.3% | 13.1% | 15.9% |
| 2007 | 10.9% | 11.0% | 3.8% |
| 2008 | 9.3% | 9.4% | (36.9%) |

153.    The May 2008 fact sheet that the Kingate Funds sent monthly to shareholders compared their returns to that of other indices, including the S&P 500, and reported their findings in a chart replicated below:

**Figure 5**



154.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew that if the SSC strategy were based on the S&P 100 Index, it could not produce these results.

### 2.    Impossibility: The Kingate Funds' BLMIS Account Statements Reflected Impossible Options Volume Trading

155.    According to the BLMIS account statements and trade confirmations reviewed by Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge, BLMIS was transacting millions of put and call options contracts in the S&P 100 Index ("OEX options"). Based on available information, from 1998 through November 2008, the options trading volume that BLMIS reported for the Kingate Funds' accounts alone exceeded the total number of OEX options traded on the Chicago Board Options Exchange ("CBOE"), for that contract on that day,

91.1% of the time.  The chart below illustrates the purported trades for the Kingate Funds in

2007 and 2008, and the real activity in the CBOE at the same time:

**Figure 6**



Blue line indicates Kingate Global - Option Volume (Account 1FN061 & 1FN086)
Black line indicates CBOE Option Volume

156.    Since 2001, the call options purportedly purchased for the Kingate Funds

exceeded the CBOE market volume for the same securities, as illustrated below:

**Figure 7**



Blue line indicates Kingate Global - Option Volume (Account 1FN061 & 1FN086)
Black line indicates CBOE Option Volume

157.    On June 15, 2001, for OEX call options with a July expiration and a strike price of 630, the entire market volume for the CBOE was 490.  On behalf of Kingate Global alone, BLMIS purportedly sold 6,271 OEX call options, which was nearly 13 times the volume traded for the entire market.  On the same day, for OEX put options with a July expiration and a strike price of 624, the entire market volume for the CBOE was 1,149.  On behalf of Kingate Global alone, BLMIS purportedly purchased 6,271 OEX put options.

158.    Similar impossibilities are evidenced by looking at the put option volume purportedly traded for the Kingate Funds compared to the CBOE.  The graph below illustrates the put options purportedly traded for the Kingate Funds in 2007 and 2008, compared to the volume traded of the CBOE:

**Figure 8**



Red line indicates Kingate Global - Option Volume (Account 1FN061 & 1FN086)
Black line indicates CBOE Option Volume

159.    The following chart shows the Kingate Funds' impossible purported trading volume of OEX put options from 2001 to 2008, contrasted with the actual trading of the same put options executed on the CBOE:

**Figure 9**



160.    On January 16, 2004, BLMIS purportedly purchased 9,088 OEX put options (with a February expiration and a strike price of 560) for Kingate Euro, when the total volume traded on the CBOE for those OEX put options for that day was 2,324.  Also on that day, BLMIS purportedly sold 9,088 OEX call options (with a February expiration and a strike price of 570) for Kingate Euro, when the total volume traded on the CBOE for those OEX call options for that day was 1,515.

161.    The occurrence of an OEX option trading at more than 50% of the total volume traded on the CBOE would be an aberration.  Yet, from 1998 to 2008, there were at least 1,162 options trades exceeding the entire volume for comparable options traded on the CBOE in the Kingate Funds' accounts alone.  When verifying the Kingate Funds' purported trading activity, Ceretti, Grosso, the Management Defendants, the Kingate Funds and Citi Hedge could not believe that it was possible to trade above the market volume for any security even once.

162.    Exchange-traded securities, including options traded on the CBOE, have a unique identifier known as a "CUSIP" number, which allows traders to quickly access electronic information regarding a transaction.  Options traded over the counter ("OTC") are not assigned a CUSIP number.  Despite that fundamental difference, and notwithstanding Madoff's claim that the trades were private OTC transactions, the BLMIS trade confirmations reviewed and verified by Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge all included a CUSIP number indicating that the options were traded on the CBOE.  Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew that BLMIS was not trading in the OTC market.

### 3.    Impossibility: The Volume Of BLMIS's Reported Equity Trades

163.    In January 2000, Ceretti had information that BLMIS's assets under management were estimated at $10 billion.  Ceretti, Grosso, the Kingate Funds, and the Management

42

Defendants knew, therefore, that the Kingate Funds' investments with BLMIS would comprise at least 12.7% of Madoff's total assets.

164.    In August 2006, when BLMIS registered as an investment adviser, it represented that it had approximately $11.7 billion of assets under management as of the end of July 2006. BLMIS stated that it managed $13.2 billion as of the end of 2006. The Kingate Funds' account statements from BLMIS reported balances of approximately $2.8 billion as of July 2006, and $3.0 billion as of December 2006. Based on the reported $13.2 billion in assets under management, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew that as of July 2006 and year-end 2006, the Kingate Funds comprised no more than 24.4% and 22.7%, respectively, of BLMIS's assets under management.

165.    Because BLMIS purported to execute the SSC strategy in block trades and then allocate the shares or options across all of its accounts, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew that the aggregate volume of trades purportedly executed by BLMIS was over four times the volume BLMIS claimed to have traded for the Kingate Funds.

166.    The Kingate Funds' account statements, reviewed and verified by Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge, indicated that from 1998 through 2008, at least 237 times, BLMIS's purported individual stock trades for the Kingate Funds purportedly exceeded 10% of a stock's trading on the entire composite tape, which includes all listed and unlisted market volumes. That trading result is highly improbable, if not impossible.

167.    On September 22, 2006, BLMIS purportedly traded for the Kingate Funds 618,792 shares of Wells Fargo & Company (WFC), comprising 17.4% of the total shares traded

on the composite tape. With the Kingate Funds accounting for approximately 24% of the reported assets that BLMIS purportedly was trading, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge thus knew that BLMIS was purportedly trading over 70% of the shares of WFC traded that day. That trading result is highly improbable, if not impossible.

168.    Any trade comprising 50% of the market of any one S&P 100 Index equity in one day is highly improbable, if not impossible. Ceretti, Grosso, the Kingate Funds, the Management Defendants and Citi Hedge reviewed and verified at least five separate transactions between 2006 and 2008 where BLMIS traded over 50% of the shares for an equity on the S&P 100 Index.

169.    Trading volumes at the levels reported by BLMIS would have moved the price of that stock significantly. No such movement was apparent, because no trades were ever made. The opening price for WFC on September 22, 2006, was $36.28. BLMIS purportedly sold over 2.5 million shares of WFC that day for a weighted average price of $36.22. The closing price for those shares was $36.01. The price of that stock was unaffected by BLMIS's purported trades. Despite purportedly trading over 70% of the shares throughout the day, BLMIS was still able to sell at a price above the midpoint.

### 4.    Impossibility: BLMIS Purported To Sell Equities and Options Outside The Daily Reported Price Ranges

170.    In an April 2010 meeting with the Kingate Funds' liquidators, Grosso explained that FIM would conduct an extensive analysis of the Kingate portfolio on a monthly basis, which included comparing the prices of the trades with the range of prices of the day on which the trades took place. Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi

44

Hedge also reviewed the BLMIS trade confirmations monthly.  The trade confirmations showed the prices for every purchase and sale of stocks and options.

171.     At the end of each month, Kingate Management received the BLMIS account statements.  Kingate Management then prepared spreadsheets detailing the month's trading activity and identifying equities, options, Treasury Bills, and dividends.  Kingate Management forwarded those spreadsheets to FIM.

172.     Those spreadsheets identified whether BLMIS trades were "within range," *i.e.*, whether each trade fell within the daily low and high prices for the stock on that day.

173.     BLMIS purported to make at least 281 "out of range" equity and options trades for the Kingate Funds from 1998 to 2008.  In at least 281 instances, the pricing "verified" by Citi Hedge and the Management Defendants for a particular security was outside the range of prices at which that security traded on that particular day.

174.     Account statements for October 2003 reported purchases of 984,137 shares of Intel Corporation (INTC) for Kingate Global and 240,240 shares for Kingate Euro, with a settlement date of October 7, 2003.  BLMIS trade confirmations indicated that those shares were purchased on October 2, 2003 for $27.59 per share.  However, the price for INTC on October 2, 2003 ranged from a low of $28.41 to a high of $28.95.  Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew from the Kingate Funds' own statements, therefore, that Madoff was lying—he could not have purchased shares at a lower price than the lowest price for the day.  If the Kingate Funds had purchased over 1.2 million shares of INTC on that date, the range between the high and low would have been significantly greater than the $0.54 difference between $28.41 and $28.95, because $27.59 is $0.82 lower than the low for that day.

45

175.    The Kingate Funds' account statements for December 2006 reported sales of 233,281 shares of Merck (MRK) for Kingate Global, and 60,449 shares of MRK for Kingate Euro, with a settlement date of December 28, 2006.  The Kingate Funds' trade confirmations indicated that those shares were sold on December 22, 2006 for $44.61.  On December 22, 2006, shares of MRK traded at a high of $43.42 and a low of $42.78.

176.    BLMIS reported at least 836 trades of Treasury Bills outside the daily price range by at least 1 basis point, and at least 144 trades outside the daily price range by at least 10 basis points.

177.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge reviewed and verified thousands of trades outside of the daily range, none of which could be the result of legitimate trading activity.

### 5.    Impossibility: Madoff's Statistically Impossible Execution When Allegedly Buying And Selling Stocks

178.    The Kingate Funds' trade confirmations and account statements revealed that Madoff consistently purchased equities at or near monthly lows and sold equities at or near monthly highs.

179.    Madoff claimed that he was time slicing, *i.e.*, entering the market at different times throughout a trading day, and that the equity price reported on an account statement reflected the average price.  When Madoff claimed to be purchasing equities, the reported average price was almost always in the lower half of the daily trade range, and when he claimed to be selling equities, the sale price was almost always in the upper half of the daily trade range.

180.    The Kingate Funds' account statements and trade confirmations indicate that from 1998 to 2008, approximately 81% of equity buys occurred in the lower half of the daily price range, and approximately 74% of equity sales occurred in the upper half of the daily price range.

46

This consistent execution was statistically impossible, because if Madoff were purchasing or selling a stock several times throughout the trading day, the reported prices would have gravitated toward the daily midpoint.

181.    On October 7, 2003, BLMIS purported to purchase 719,516 shares of Wal-Mart Stores Inc. (WMT) for the Kingate Funds at a price of $57.76.  The low for WMT that day was $57.71, and the high was $58.90.  The volume weighted average price was $58.46.  The Kingate Funds' purported purchase would have been roughly 10% of the traded volume for WMT on that day.  It was statistically impossible for BLMIS to have purchased that many shares of WMT for that price on that day.

182.    Ceretti, Grosso, the Management Defendants, the Kingate Funds, and Citi Hedge knew that Madoff claimed to be time slicing, and that reported stock prices from multiple purchases or sales of a stock throughout a trading day would gravitate toward the daily midpoint.

**6.    Badge Of Fraud: BLMIS Avoided SEC Reporting Requirements By Consistently Claiming To Be Out Of The Market At Quarter-End And Year-End Even Though Such Investment Behavior Was Inconsistent With The SSC Strategy**

183.    Various SEC reporting requirements are triggered when securities are invested in the market at either the end of the quarter or the end of the year.  To evade those reporting requirements, Madoff purported to liquidate all investments at those times and invest the proceeds in Treasury Bills.

184.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge reviewed and verified BLMIS statements, and thus knew that the Kingate Funds purportedly were invested in Treasury Bills at every quarter-end and year-end.

185.    Madoff's practice of exiting the market according to the calendar, rather than market or economic indicators, was a badge of fraud.  Ceretti, Grosso, the Kingate Funds, the

Management Defendants, and Citi Hedge knew Madoff touted "market-timing" as a cornerstone

of the SSC strategy and that Madoff's practice of liquidating all stocks and options at quarter-end

and year-end contravened that strategy.

### 7.    Badge Of Fraud: Madoff's Purported Options Trades Were Inconsistent With The SSC Strategy

186.    As part of the SSC strategy, Madoff claimed to buy put options and sell call

options to hedge losses on the underlying basket of equities.  On 126 occasions, the Kingate

Funds' account statements purported to show gains resulting from transactions inconsistent with

the SSC strategy.  Certain of those transactions involved short-term speculative options trading

that resulted in substantial gains for the Kingate Funds.

187.    In 2008, Kingate Global and Kingate Euro each participated in two such "trades"

that generated gains of approximately $25.5 million and $8.8 million, respectively.  Those

transactions represented approximately 11% of the total returns for the Kingate Funds in 2008.

One of those trades reflected on each of the Kingate Funds' account statements showed an option

trade in the middle of the month that accounted for 50% of the returns for that month.  Those

gains purportedly were achieved through speculation in the options market.

188.    Between 1996 and 2008, Kingate Global and Kingate Euro purportedly achieved

gains over $136 million and $32 million, respectively, from such trades, which were inconsistent

with the SSC strategy.  Ceretti, Grosso, the Kingate Funds, the Management Defendants, and

Citi Hedge knew that speculative options trading, and the substantial gains such trading

purportedly achieved, contradicted the SSC strategy.

189.    Additionally, the SSC strategy required that the put and call "collar" be adjusted

to reflect changes in the basket of equities if some of the underlying equities were sold before

liquidation of the entire basket.  BLMIS's falsified account statements indicated that BLMIS

often sold out of an equity position prior to liquidating the entire basket and did not adjust the

collar for that sale.  Between January 2000 and November 2008, the composition of underlying

equities for the Kingate Funds changed without a corresponding adjustment to the collar

approximately 64 times.

190.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge

knew that many of BLMIS's options trades contravened Madoff's SSC strategy.

### 8.    Badge Of Fraud: The Kingate Funds' Trade Confirmations Frequently Contained Settlement Anomalies In Purported Options Transactions

191.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge

ignored reported options transactions made for the Kingate Funds that settled in a time range

outside of industry norms.  According to industry standards, the settlement date for listed options

is the business day following the trade date, referred to as T+1.  Even if the trades were made in

the OTC market, Madoff claimed the terms were identical to exchange-traded options requiring

the same settlement terms.

192.    At least 555 of the 2,149 total options contracts reportedly executed for the

Kingate Funds between 1998 and 2008 settled outside the normal period of T+1, thereby failing

to comply with standard trading practices.

193.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge

reviewed and verified the trades with these irregularities that departed from the industry norm.

### 9.    Badge Of Fraud: The Dividend Activity Shown On Customer Statements Was Inconsistent With The Dividend Activity Sophisticated Investors Would Expect

194.    Certain equities that BLMIS purportedly purchased paid dividends.  At various

times when not in the market, customer funds were purportedly invested in a money market fund

that also paid dividends. On 432 occasions, the Kingate Funds' account statements reflected payments of dividends on dates and/or in frequencies inconsistent with industry practice.

195.    Kingate Global's account statements showed purported dividends from money market funds being paid on 217 occasions from December 1995 to November 2008. On 212 of those occasions, *i.e.*, 97.7%, the statement showed a payment date for those dividends that differed from the date on which the money market fund actually paid dividends.

196.    Kingate Euro's account statements showed dividends from money market funds being paid on 226 occasions from February 1996 to November 2008. On 220 of those occasions, *i.e.*, 97.3% of the time, the customer statements showed a payment date for those dividends that differed from the date on which the money market fund paid dividends.

197.    Typically, money market funds declare dividends daily and pay such dividends monthly. If an entity transacts in a money market fund multiple times in one month, that activity is tracked, the proper dividend is accrued for the days invested, and the dividend is paid at one time. BLMIS's account statements issued to the Kingate Funds, however, showed a dividend being paid upon each sale transaction of the money market fund. The Kingate Global account statements showed multiple dividends from the same money market fund in 40 of 156 months, *i.e.*, 25.6%. Similarly, the Kingate Euro account statements showed multiple dividends from the same money market fund in 43 out of 155 months, *i.e.*, 27.7%.

198.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge reviewed and verified statements showing highly improbable, if not impossible, dividend payments.

10.    **Badge Of Fraud: The Kingate Funds' Account Statements Reflected Illegal Margin Trades**

199.    When a customer purchases assets, that purchase must be made with the customer's available funds.  When a customer purchases securities, the value of which exceeds the cash value of that customer's account, the customer is said to be buying on "margin."  The Kingate Funds did not have a margin account with BLMIS.

200.    Between 1998 and 2008, the Kingate Funds' cash accounts with BLMIS showed a negative balance on 220 separate occasions over approximately 609 days.  These negative balances were the result of illegal margin trades Madoff purported to make on behalf of the Kingate Funds.

201.    For two days in July 1999, the Kingate Global account had a negative balance of $28,421,606.  The average negative balance was $13,815,039 for six days in June of 2004.  During those same respective time periods, the Kingate Euro account had an average negative balance of $5,272,252 and $3,742,508.

202.    The negative balances resulted from: (i) the purported purchase of equities that exceeded the value of the Treasury Bills purportedly sold to fund the purchase of a stock or put option; (ii) the purported purchase of put options before the purported sale of call options necessary to fund the purchase of the put options; or (iii) cash being withdrawn prior to the purported sale of equities to fund the withdrawal.

203.    For example, on January 29, 1998, BLMIS purported to purchase equities for Kingate Global's account but did not sell Treasury Bills necessary to fund the purchase until the next day, which resulted in a negative cash balance of $2,369,373.46.  Trading confirmations likewise showed a move into equities before the Kingate Funds obtained cash from the sale of Treasury Bills to fund that purchase.

51

204.    On January 20, 2006, Kingate Global withdrew $35 million from its BLMIS account, resulting in an average negative balance in the account of $25,403,644 for 11 days.

205.    BLMIS never charged the Kingate Funds margin interest.  As sophisticated and experienced investors and financial institutions, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew BLMIS's apparent interest-free "loans" of tens, if not hundreds, of millions of dollars, when their accounts had insufficient balances to cover the purchase price of the securities and/or cash withdrawals, evidenced fraudulent activity at BLMIS, or at a minimum suggested a high probability of fraud.

### B.    Defendants Acquired Knowledge Of Fraudulent Activity At BLMIS From Various Sources In Addition To The BLMIS Account Statements

#### 1.    Lack Of Scalability

206.    Based upon their experience and sophistication in investment management, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew that in the financial markets, scalability is the ability of an investment strategy to handle higher trading volumes or growing assets under management.  As assets under management increase and a fund grows, it becomes more difficult for the fund to find opportunities of a scale proportional to the fund's size.

207.    In a meeting in 1999, Grosso informed Island Storm Limited, a potential investor, that BLMIS had about $6 billion to $8 billion in assets under management.

208.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew that Madoff's SSC strategy, which purportedly capitalized on inefficiencies in the S&P 100 Index, was inherently limited, as the equities on which the strategy was based were among the most efficiently traded and carefully tracked stocks on the market.

209.    The SSC strategy was not scalable for the amount of BLMIS's purported assets

under management.  To execute the SSC strategy with at least $8 billion of assets under

management, BLMIS would have needed approximately $8 billion in notional value in call

options.  Between 2000 and 2008, there were not enough options on the entire market to

implement Madoff's purported SSC strategy at any point in time.

210.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge

knew that the SSC strategy could not sustain a fund the size of BLMIS's scale, and continue to

deliver such consistent returns.

## 2.    Purported Options Contracts Entered Into By The Kingate Funds Did Not Identify Counterparties

211.    Options trades that are made in the OTC market are pursuant to private contracts

between a party and a counterparty.  At times, Madoff claimed to be trading options in the OTC

market, which would have required BLMIS to enter into private, individually negotiated, arm's-

length contracts with willing counterparties.  If the counterparty failed to perform, the Kingate

Funds, not BLMIS, would be exposed to the risk.

212.    BLMIS identified no counterparties to the Kingate Funds.  No experienced

investor or financial institution, such as Ceretti, Grosso, the Kingate Funds, the Management

Defendants, or Citi Hedge, would knowingly accept the excessive risk of unidentified

counterparties to options contracts.

213.    Madoff claimed that counterparties entered into agreements identical to those

executed by BLMIS's investors, and he also declared that counterparties were obligated to

deposit Treasury Bills as collateral for performance.  But Ceretti, Grosso, the Kingate Funds, the

Management Defendants, and Citi Hedge saw no such agreement, and they never requested or

received any confirmation of where and how those Treasury Bills were posted.

214.    Grosso represented to shareholders that Madoff used 20 to 30 counterparties and that they "comprise the usual suspects." Grosso, Ceretti, the Kingate Funds, the Management Defendants, and Citi Hedge did not and could not identify the options counterparties.

215.    Madoff also claimed that counterparties took an investor's equity positions as collateral for performance, in direct contradiction to Madoff's representation that a counterparty could not seize a BLMIS investor's equity positions. Madoff's representation was false, because there was no restriction on an investor's right to withdraw funds from, or close out, its account, thus eradicating any rights in collateral that a counterparty could have had.

216.    Because BLMIS allegedly traded options in large blocks and then divided the contracts proportionally among its investors, a counterparty would not know upon which party it was relying for performance. Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew this was a badge of fraud.

### 3.    BLMIS Lacked Independent Oversight And Customary Internal Controls

217.    Grosso claimed in a 2007 investment publication that FIM Advisers is "risk conscious to the point of being obsessive," and that FIM Advisers considers "operational risk to be as much of a threat as market or strategy risk." Ceretti noted the high percentage of single-manager failures that were related to operational risk. According to that publication, FIM Advisers had terminated managers for growing beyond their operational support structure.

218.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew that BLMIS performed multiple roles in the fund process—it was the investment adviser, custodian, and broker-dealer that initiated and executed the purported trades. There was neither an independent custodian to hold and assure the proper segregation of assets nor an independent third-party to verify the existence of assets, transactions and their value.

219.    When a Hemisphere employee told Ceretti in May 2000 that a potential investor was concerned with Madoff's role as both broker and manager, Ceretti responded "keep them away from now on and let me know if they contact you again."

220.    In an operational due diligence report created in or about 2004, FIM acknowledged the lack of internal controls by listing Kingate Global as "[b]elow expectations" for fund legal set-up and corporate governance.  In 2007, FIM expanded its conclusion, stating "[t]here is a lack of independent oversight of the fund as there is no prime broker and the co-managers have delegated substantially all of the trading authority to the advisor."  FIM noted further that the Kingate Funds' administrator relies "on information provided by the advisor and as such this compromises the independent nature of the service.  The same applies to FIM's analysis of the performance."

221.    According to its regulatory filings with the SEC, BLMIS lacked the staff necessary to perform its purported investment adviser functions, including monitoring and researching the markets, executing the equities and options trades in accordance with the SSC strategy, and taking and verifying custody of securities.

222.    In light of their own experience and knowledge of the industry, the knowledge acquired through frequent contacts with Madoff, people in his inner circle and representatives of other funds investing with BLMIS, and visits to the IA Business premises, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew or willfully blinded themselves to the fact that BLMIS lacked the personnel necessary to conduct research on the investment opportunities, execute the purported trades in the IA Business, and manage the billions in assets it purportedly had under management.

4.    **Ceretti, Grosso, The Kingate Funds And The Management Defendants Knowingly Ignored The Warnings Of Fraudulent Activity At BLMIS Raised By Third Parties**

223.    In January 2005, Ceretti knew that Credit Suisse had advised its clients to sell funds invested with BLMIS because the investment strategy was too risky.

224.    In 2007, Merrill Lynch informed FIM directly that it would not invest with the Kingate Funds because of concerns with Madoff.

225.    In June 2008, HSBC issued a warning about the Kingate Funds due to the lack of communication and information coming from Madoff regarding his strategy and the IA Business.  Grosso dismissed the HSBC analyst as a "junior guy" and a "joker" for "rehashing old arguments" against Madoff.  Grosso admitted that such concerns about Madoff were "not new" and that "[t]his has been going on for 20 years."  Ceretti communicated directly with an HSBC Monaco representative, "remind[ing] them that they [HSBC] are [] administrator of Kinagate [sic] and sevral [sic] other funds and that also several clients are banking with them . . . ."  The HSBC Monaco representative reassured Ceretti that people would be fired for issuing the warning.

226.    In November 2008, Grosso was informed by another analyst of his concerns about BLMIS's lack of transparency and Madoff's possible conflict of interest.  Grosso attacked that analyst's professionalism and experience and dismissed the analyst's concerns, stating that it was "quite evident that [the analyst] has only a very limited knowledge of options strategies, as well as a very imperfect understanding of the Kingate structure, and possibly a poor understanding of the U.S. broker-dealer industry, its structure, functioning, and regulation."

227.    Each one of these warnings required due diligence into BLMIS.

### 5.    BLMIS, Known As A High-Technology Firm, Provided Only Time-Delayed Paper Statements

228.    Investment managers typically have technology and systems in place that allow clients to obtain account statements, balances, and other details electronically.  By at least June 2000, granting clients electronic access to their accounts was industry practice, particularly because of the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001, which permits using electronic records to comply with federal law.  Throughout the 2000s, consumers were also conducting transactions and accessing their checking and savings accounts online.

229.    Although it was customary in the industry, and although Madoff held himself out as a pioneer of electronic trading technology, he did not provide his customers with electronic access to their accounts.  BLMIS instead used outmoded technology and provided only printed account statements and paper trade confirmations sent by U.S. mail, three to four days after the trades purportedly occurred.  That practice enabled Madoff to pick trades, prices, and securities for customer statements using historical trading data.

230.    As early as 1997, a Hemisphere employee informed Grosso that Hemisphere ordinarily received Madoff's pricing information six working days after the trade occurred.

231.    Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew Madoff was technologically savvy, and BLMIS's failure to provide electronic access to the Kingate Funds' accounts was inexplicable.  Grosso proclaimed BLMIS's technology to be the reason "why someone like Madoff has an advantage over most other traders, due to the fact that it has state-of-the-art trading technology that enables it to take advantage immediately of such [trading] opportunities."

57

232.    BLMIS's paper statements, reviewed and verified by Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge, did not furnish standard information, such as opening account balances, trade dates, commissions charged, or ticker symbols for the equities.  As sophisticated and experienced investors and financial institutions, Ceretti, Grosso, the Kingate Funds, the Management Defendants, and Citi Hedge knew that the paper statements were deficient and contrary to industry practice.

233.    The use of paper statements that omitted standard information allowed BLMIS to purport to trade a security after Madoff could see actual market activity, and indicated a high probability of fraud at BLMIS.

> **6.    Madoff's "Strip Mall" Auditor Was Not Qualified Or Capable Of Auditing A Global Investment Management Company With Billions Of Dollars Under Management**

234.    An auditor reviews the financial statements of the audited firm and determines whether they are fairly stated under generally accepted accounting principles.  The Kingate Funds employed a well-known and reputable auditor, PwC.

235.    Ceretti, Grosso, the Kingate Funds, and the Management Defendants knew that BLMIS, with tens of billions of dollars under management, was audited by Friehling & Horowitz, a "small [firm] in Rockland [C]ounty."

236.    Ceretti, Grosso, the Kingate Funds and the Management Defendants did not independently confirm whether Friehling & Horowitz was adequately staffed, technically equipped, professionally qualified, or otherwise capable of providing large-scale domestic and international auditing services to BLMIS and the billions it had under management.

237.    All accounting firms that perform audit work must enroll in the peer review program of the American Institute of Certified Public Accountants ("AICPA"), and those that do are listed on the public area of the AICPA website.  Although it held itself out as a member of

AICPA, Friehling & Horowitz had avoided peer review since 1993 by representing that it did not perform any audit work and, therefore, was not listed on the AICPA website.

238.    With billions of dollars in assets under management, BLMIS's use of a small, ill-equipped auditor like Friehling & Horowitz was a clear badge of fraud.

### 7.    Contrary To Standard Industry Practice, Madoff Charged No Management Fees

239.    BLMIS charged commissions on purportedly executed trades rather than management and performance fees based on assets under management and his performance in executing the SSC strategy.  By using a commission-based structure, Madoff inexplicably walked away from hundreds of millions of dollars in fees that every other fund manager would have charged and collected.

240.    Fund managers typically charge two types of fees for managing a client's assets: a management fee and a performance fee.  The management fee is usually a fixed percentage of the assets under management.  The performance fee is based on the realized profits.  Any other fees incurred by a manager in trading securities on a customer's account are typically charged separately or are included within the management fee.

241.    Instead of charging a 1 to 2% management fee and a 10 to 20% performance fee, which is typical for fund managers, BLMIS charged only a commission for trades:  $0.04 per share on equity transactions, and $1.00 per contract on options transactions.  By not applying a 1% management and 10% performance fee structure, Madoff lost over $250 million in fees from the Kingate Funds alone from 1995 to 2008.

## X.    KINGATE FUNDS' ACCOUNTS IN BANK BERMUDA'S CUSTODY

242.    The Kingate Funds maintained at least four accounts at Bank Bermuda, including

Account # XXX-XXXXXX-511, Account # XXX-XXXXXXX-512,  Account # XXX-

XXXXXX-561, and Account # XXXX353 (collectively, the "Bank Bermuda Accounts").

243.    Bank Bermuda served as the custodian for the Kingate Funds from 1994 through

2008.  During that time, BLMIS fraudulently transferred at least $916 million into the Bank

Bermuda Accounts.

244.    As of December 2008, the Bank Bermuda Accounts held on behalf of the Kingate

Funds approximately $133 million, of which approximately $108 million originated from

BLMIS.

245.    Bank Bermuda received at least $328,798 in fees from the Kingate Funds as

shown in Figure 10 below:


**Figure 10**

| Year | Paid by Kingate Global (USD) |
|------|------------------------------|
| 1997 | 25,000 |
| 1998 | 25,000 |
| 1999 | 25,000 |
| 2000 | 25,000 |
| 2001 | 25,000 |
| 2002 | 23,735 |
| 2003 | 25,000 |
| 2004 | 25,000 |
| 2005 | 25,000 |
| 2006 | 25,000 |
| 2007 | 25,000 |
| **Total** | **273,735** |

| Year | Paid by Kingate Euro (USD) |
|---|---|
| 1997 | 15,585 |
| 1998 | 15,434 |
| 1999 | 14,509 |
| 2000 | 9,534 |
| **Total** | **55,063** |

246.    Upon information and belief, Bank Bermuda received an additional $137,566 in

fees from the Kingate Funds as shown in Figure 11 below:

**Figure 11**

| Year | Paid by Kingate Global (USD) |
|---|---|
| 1996 | 25,000 |
| **Total** | **25,000** |

| Year | Paid by Kingate Euro (USD) |
|---|---|
| 1996 | 7,566 |
| 2001 | 15,000 |
| 2002 | 15,000 |
| 2003 | 15,000 |
| 2004 | 15,000 |
| 2005 | 15,000 |
| 2006 | 15,000 |
| 2007 | 15,000 |
| **Total** | **112,566** |

## XI.    THE TRANSFERS

### A.    The Initial Transfers

247.    From the inception of the Kingate Funds' accounts with BLMIS to the Filing

Date, BLMIS made transfers to, or for the benefit of, Kingate Global of approximately

$398,797,047 (the "Kingate Global Transfers"), and to, or for the benefit of, Kingate Euro of

approximately $527,554,858 (the "Kingate Euro Transfers," and with the Kingate Global

Transfers, the "Transfers").  All of the Transfers were made in furtherance of the Ponzi scheme.

61

248. The Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, NYDCL §§ 273–279, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and N.Y. C.P.L.R. 203(g) and 213(8).

249. Of the Transfers, during the six years preceding the Filing Date, BLMIS made transfers to, or for the benefit of, Kingate Global of approximately $360,000,000 (the "Kingate Global Six Year Transfers") and to, or for the benefit of, Kingate Euro of approximately $465,000,000 (the "Kingate Euro Six Year Transfers," and with the Kingate Global Transfers, the "Kingate Funds Six Year Transfers").  The Kingate Funds Six Year Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable  under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

250. Of the Kingate Global Six Year Transfers, BLMIS transferred to or for the benefit of Kingate Global approximately $150,000,000, during the two years preceding the Filing Date (the "Kingate Global Two Year Transfers").  Of the Kingate Euro Six Year Transfers, BLMIS transferred to or for the benefit of Kingate Euro approximately $245,000,000 during the two years preceding the Filing Date (the "Kingate Euro Two Year Transfers," and with the Kingate Global Two Year Transfers, the "Kingate Funds Two Year Transfers").  The Kingate Funds Two Year Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

251.    Of the Kingate Global Two Year Transfers, BLMIS transferred to or for the

benefit of Kingate Global approximately $100,000,000 during the 90 days preceding the Filing

Date (the "Kingate Global Preference Transfers").  Of the Kingate Euro Two Year Transfers,

BLMIS transferred to or for the benefit of Kingate Euro approximately $155,000,000 during the

90 days preceding the Filing Date (the "Kingate Euro Preference Transfers," and with the

Kingate Global Preference Transfers, the "Kingate Funds Preference Transfers").  The Kingate

Funds Preference Transfers were and continue to be customer property within the meaning of

SIPA § 78*lll*(4) and are avoidable and recoverable under sections 547, 550, and 551 of the

Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

252.    The Kingate Funds Six Year Transfers are cumulative of the Kingate Funds Two

Year Transfers and the Kingate Funds Preference Transfers.  The Kingate Funds Two Year

Transfers are cumulative of the Kingate Funds Preference Transfers.  The Transfers, including a

breakdown of the Kingate Funds Six Year Transfers, the Kingate Funds Two Year Transfers, and

the Kingate Funds Preference Transfers, are set forth in the attached Exhibit B.

**B.    The Subsequent Transfers**

253.    Prior to the Filing Date, the Management Defendants, the Ceretti and Grosso

Companies, Ceretti, Grosso, Citi Hedge, and Bank Bermuda (collectively, the "Subsequent

Transferee Defendants") were immediate or mediate transferees of some or all of the Transfers to

the Kingate Funds.

254.    The Management Defendants received at least $300 million in subsequent

transfers in the form of fees (the "Management Defendants Subsequent Transfers").

255.    Ceretti and Grosso received subsequent transfers in the form of distributions from

the Ceretti and Grosso Companies, the Kingate Funds, and/or the Management Defendants (the

"Ceretti and Grosso Subsequent Transfers").

256.    The Ceretti and Grosso Companies received at least $296 million in subsequent transfers (the "Ceretti and Grosso Companies Subsequent Transfers"), including but not limited to:

    a.    From 2006 through 2008, Port of Hercules' HSBC account and Alpine Trustees received at least $63 million in subsequent transfers from Kingate Management, El Prela Group, and El Prela Trading.  Using some of those funds, Port of Hercules subsequently transferred at least $62 million to Ceretti's personal bank account, El Prela Trading, and other accounts held by Port of Hercules at Fortis Bank in Guernsey and in Switzerland.

    b.    In 2006, Alpine Trustees received approximately $16 million in subsequent transfers from Kingate Management.  Using those funds, Alpine Trustees subsequently transferred at least $2 million to Ceretti's personal bank account and at least $14 million to Port of Hercules.

    c.    From April through December 2008, El Prela Group received at least $18 million transferred initially from BLMIS to the Kingate Funds.  In turn, El Prela Group subsequently transferred at least $16 million to Port of Hercules.

    d.    In 2008, El Prela Trading received at least $2 million from Port of Hercules.

    e.    Between April and November 2008, Ashby Holdings received at least $16.3 million in subsequent transfers from Kingate Management.  Ashby Holdings subsequently transferred at least $16.3 million to First Peninsula.

    f.    From 2005 through 2008, First Peninsula received at least $68 million in subsequent transfers from Kingate Management, First Peninsula's HSBC account, Ashby Investment, and Ashby Holdings.

    g.    In October 2008, Ashby Investment transferred at least $7 million among its own bank accounts and subsequently transferred at least $7 million to First Peninsula.

257.    Citi Hedge received at least $5.9 million in subsequent transfers in the form of fees (the "Citi Hedge Subsequent Transfers").

258.    Bank Bermuda profited from the Kingate Funds' investments with BLMIS to the extent of at least $466,364 in subsequent transfers in the form of fees received from the Kingate Funds (the "Bank Bermuda Subsequent Transfers").

259.    The Management Defendants Subsequent Transfers, the Ceretti and Grosso Companies Subsequent Transfers, the Ceretti and Grosso Subsequent Transfers, the Citi Hedge Subsequent Transfers, and the Bank Bermuda Subsequent Transfers are collectively referred to as the "Subsequent Transfers."

260.    The Trustee's investigation is ongoing, and the Trustee reserves the right to:  (i) supplement the information regarding the Transfers, the Subsequent Transfers, and any other additional transfers; and (ii) seek recovery of such additional transfers.

261.    To the extent that any of the recovery Counts set forth below may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

## FIRST COUNT

## PREFERENTIAL TRANSFERS
## 11 U.S.C. §§ 502(d), 547(b), 550(a), AND 551

### *(Against the Kingate Funds)*

262.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

263.    At the time of the Kingate Funds Preference Transfers, the Kingate Funds were "creditors" of BLMIS under section 101(10) of the Bankruptcy Code and under SIPA § 78fff-2(c)(3).

264.    The  Kingate Funds Preference Transfers constitute a transfer of an interest of BLMIS in property under section 101(54) of the Bankruptcy Code and under SIPA § 78fff-2(c)(3).

265.    BLMIS made the Kingate Funds Preference Transfers to or for the benefit of the Kingate Funds.

266.     The Kingate Funds Preference Transfers were made for or on account of an antecedent debt owed by BLMIS before such transfers were made.

267.     The Kingate Funds Preference Transfers were made while BLMIS was insolvent.

268.     The Kingate Funds Preference Transfers were made during the 90-day preference period under section 547(b)(4) of the Bankruptcy Code.

269.     The Kingate Funds Preference Transfers enabled the Kingate Funds to receive more than they would have received if: (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the transferees received payment to the extent provided by the Bankruptcy Code.

270.     The Kingate Funds Preference Transfers constitute preferential transfers avoidable by the Trustee under section 547(b) of the Bankruptcy Code and recoverable from the Kingate Funds, as initial transferees or the entities for whose benefit such transfers were made under section 550(a) of the Bankruptcy Code.

271.     As a result of the foregoing, under sections 502(d), 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against each of the Kingate Funds: (a) avoiding and preserving the Kingate Funds Preference Transfers; (b) directing that the Kingate Funds Preference Transfers be set aside; (c) recovering the Kingate Funds Preference Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; (d) disallowing any claim that either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds Preference Transfers are repaid to the Trustee; and (e) awarding any other relief the Court deems appropriate.

## SECOND COUNT

## ACTUAL FRAUDULENT TRANSFER
## 11 U.S.C. §§ 502(d), 548(a)(1)(A), 550(a), AND 551

### *(Against the Kingate Funds)*

272.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

273.    BLMIS made the Kingate Funds Two Year Transfers on or within two years

before the Filing Date.

274.    The Kingate Funds Two Year Transfers constitute a transfer of an interest of

BLMIS in property under sections 101(54) and 548(a) of the Bankruptcy Code and SIPA § 78fff-

2(c)(3).

275.    BLMIS made the Kingate Funds Two Year Initial Transfers with actual intent to

hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made

the Kingate Funds Two Year Transfers to or for the benefit of the Kingate Funds in furtherance

of a fraudulent investment scheme.

276.    The Kingate Funds Two Year Transfers constitute fraudulent transfers avoidable

by the Trustee under section 548(a)(1)(A) of the Bankruptcy Code and recoverable from each of

the Kingate Funds under section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

277.    As a result of the foregoing, under sections 502(d), 548(a)(1)(A), 550(a), and 551

of the Bankruptcy Code,  and SIPA § 78fff-2(c)(3),  the Trustee is entitled to a judgment against

each of the Kingate Funds: (a) avoiding and preserving the Kingate Funds Two Year Transfers;

(b) directing that the Kingate Funds Two Year Transfers be set aside; (c) recovering the Kingate

Funds Two Year Transfers, or the value thereof, from Kingate Global and Kingate Euro,

respectively, as set forth in Exhibit B, for the benefit of the estate; (d) disallowing any claim that

67

either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds

Two Year Transfers are repaid to the Trustee; and (e) awarding any other relief the Court deems

appropriate.

## THIRD COUNT

## CONSTRUCTIVE FRAUDULENT TRANSFER
## 11 U.S.C. §§ 502(d), 548(a)(1)(B), 550(a), AND 551

### *(Against the Kingate Funds)*

278.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

279.    The Kingate Funds Two Year Transfers were made on or within two years before

the Filing Date.

280.    The Kingate Funds Two Year Transfers constitute a transfer of an interest of

BLMIS in property under sections 101(54) and 548(a) of the Bankruptcy Code and under SIPA

§ 78fff-2(c)(3).

281.    BLMIS received less than a reasonably equivalent value in exchange for the

Kingate Funds Two Year Transfers.

282.    At the time of the Kingate Funds Two Year Transfers, BLMIS was insolvent, or

became insolvent as a result of the Kingate Funds Two Year Transfers.

283.    At the time of the Kingate Funds Two Year Transfers, BLMIS was engaged in a

business or a transaction, or was about to engage in a business or a transaction, for which any

property remaining with BLMIS was an unreasonably small capital.

284.    At the time of the Kingate Funds Two Year Transfers, BLMIS intended to incur,

or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts

matured.

285.    The Kingate Funds Two Year Transfers constitute fraudulent transfers avoidable by the Trustee under section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Kingate Funds under section 550(a) of the Bankruptcy Code, and SIPA § 78fff-(2)(c)(3).

286.    As a result of the foregoing, under sections 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against each of the Kingate Funds: (a) avoiding and preserving the Kingate Funds Two Year Transfers; (b) directing that the Kingate Funds Two Year Transfers be set aside; (c) recovering the Kingate Funds Two Year Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; (d) disallowing any claim that either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds Two Year Transfers are repaid to the Trustee; and (e) awarding any other relief the Court deems appropriate.

### FOURTH COUNT

### ACTUAL FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 502(d), 544, 550(a), AND 551

*(Against the Kingate Funds)*

287.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

288.    At all times relevant to the Kingate Funds Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

289.    The Kingate Funds Six Year Transfers constitute a conveyance by BLMIS as defined under NYDCL § 270.

290.    BLMIS made the Kingate Funds Six Year Transfers with actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Kingate Funds Six Year Transfers to or for the benefit of the Kingate Funds in furtherance of a fraudulent investment scheme.

291.    At the time each of the Kingate Funds Six Year Transfers was made, the Kingate Funds received the Kingate Funds Six Year Transfers with actual intent to hinder, delay, or defraud present or future creditors of BLMIS.

292.    As a result of the foregoing, under NYDCL §§ 276, 276-a, 278, and/or 279, sections 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against each of the Kingate Funds: (a) avoiding and preserving the Kingate Funds Six Year Transfers; (b) directing that the Kingate Funds Six Year Transfers be set aside; (c) recovering the Kingate Funds Six Year Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; (d) disallowing any claim that either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds Six Year Transfers are repaid to the Trustee; (e) recovering attorneys' fees; and (f) awarding any other relief the Court deems appropriate.

## FIFTH COUNT

### CONSTRUCTIVE FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 273, 278, AND/OR 279, AND 11 U.S.C. §§ 502(d), 544, 550(a), AND 551

*(Against the Kingate Funds)*

293.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

294.    At all relevant times, there was at least one creditor that held a matured or unmatured unsecured claim against BLMIS that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

70

295.     The Kingate Funds Six Year Transfers constitute a conveyance by BLMIS as defined under NYDCL § 270.

296.     BLMIS did not receive fair consideration for the Kingate Funds Six Year Transfers.

297.     BLMIS was insolvent at the time it made each of the Kingate Funds Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Kingate Funds Six Year Transfers.

298.     As a result of the foregoing, under NYDCL §§ 273, 278, and/or 279, sections 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against each of the Kingate Funds: (a) avoiding and preserving the Kingate Funds Six Year Transfers; (b) directing that the Kingate Funds Six Year Transfers be set aside; (c) recovering the Kingate Funds Six Year Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; (d) disallowing any claim that either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds Six Year Transfers are repaid to the Trustee; and (e) awarding any other relief the Court deems appropriate.

### SIXTH COUNT

### CONSTRUCTIVE FRAUDULENT TRANSFER –
### NEW YORK DEBTOR AND CREDITOR LAW
### §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 502(d), 544, 550(a), AND 551

*(Against the Kingate Funds)*

299.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

300.    At all relevant times, there was at least one creditor that held a matured or unmatured unsecured claim against BLMIS that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

301.    The Kingate Funds Six Year Transfers constitute a conveyance by BLMIS as defined under NYDCL § 270.

302.    BLMIS did not receive fair consideration for the Kingate Funds Six Year Transfers.

303.    At the time BLMIS made the Kingate Funds Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Kingate Funds Six Year Transfers was an unreasonably small capital.

304.    As a result of the foregoing, under NYDCL §§ 274, 278, and/or 279, sections 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against each of the Kingate Funds: (a) avoiding and preserving the Kingate Funds Six Year Transfers; (b) directing that the Kingate Funds Six Year Transfers be set aside; (c) recovering the Kingate Funds Six Year Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; (d) disallowing any claim that either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds Six Year Transfers are repaid to the Trustee; and (e) awarding any other relief the Court deems appropriate.

## SEVENTH COUNT

### CONSTRUCTIVE FRAUDULENT TRANSFER –
### NEW YORK DEBTOR AND CREDITOR LAW
### §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 502(d), 544, 550(a), AND 551

*(Against the Kingate Funds)*

305.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

306.    At all relevant times there was at least one creditor that held a matured or unmatured unsecured claim against BLMIS that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

307.    Each of the Kingate Funds Six Year Transfers constitutes a conveyance by BLMIS as defined under NYDCL § 270.

308.    BLMIS did not receive fair consideration for the Kingate Funds Six Year Transfers.

309.    At the time BLMIS made the Kingate Funds Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay as the debts matured.

310.    As a result of the foregoing, under NYDCL §§ 275, 278, and/or 279, sections 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against each of the Kingate Funds: (a) avoiding and preserving the Kingate Funds Six Year Transfers; (b) directing that the Kingate Funds Six Year Transfers be set aside; (c) recovering the Kingate Funds Six Year Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; (d) disallowing any claim that either of the Kingate Funds may have against the Debtors until such

time as the Kingate Funds Six Year Transfers are repaid to the Trustee; and (e) awarding any

other relief the Court deems appropriate.

## EIGHTH COUNT

### UNDISCOVERED FRAUDULENT TRANSFERS – NEW YORK CIVIL PRACTICE LAW AND RULES 203(g) AND 213(8), AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, 11 U.S.C. §§ 502(d), 544, 550(a), AND 551

*(Against the Kingate Funds)*

311.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

312.    At all times relevant to the Transfers, the fraudulent scheme perpetrated by

BLMIS was not reasonably discoverable by at least one creditor of BLMIS that held a matured

or unmatured unsecured claim against BLMIS that is allowable under section 502 of the

Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

313.    The Transfers constitute a conveyance by BLMIS as defined under NYDCL

§ 270.

314.    BLMIS made the Transfers to or for the benefit of the Kingate Funds with actual

intent to hinder, delay, or defraud the creditors of BLMIS.

315.    At the time the Transfers were made, the Kingate Funds received the Transfers

with actual intent to hinder, delay or defraud present or future creditors of BLMIS.

316.    As a result of the foregoing, under N.Y. C.P.L.R. 203(g) and 213(8), NYDCL §§

276, 276-a, 278, and/or 279, sections 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code,

and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against each of the Kingate Funds:

(a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside;

(c) recovering the Transfers, or the value thereof, from Kingate Global and Kingate Euro,

74

respectively, as set forth in Exhibit B, for the benefit of the estate; (d) disallowing any claim that

either of the Kingate Funds may have against the Debtors until such time as the Transfers are

repaid to the Trustee; (e) recovering attorneys' fees from the Kingate Funds; and (f) awarding

any other relief the Court deems appropriate.

**NINTH COUNT**

**RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR AND
CREDITOR LAW § 278 AND 11 U.S.C. §§ 550(a) AND 551**

*(Against the Subsequent Transferee Defendants)*

317.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

318.    Each of the Subsequent Transfers is avoidable under applicable provisions of the

Bankruptcy Code, the NYDCL, and/or the N.Y. C.P.L.R., as alleged in this Complaint.

319.    The Subsequent Transferee Defendants were immediate or mediate transferees of

some or all of the Transfers.

320.    The Subsequent Transferee Defendants received the Subsequent Transfers at the

time they were made with actual knowledge and/or willful blindness of Madoff's and BLMIS's

fraudulent activity.

321.    As a result of the foregoing, pursuant to sections 105(a), 550(a), and 551 of the

Bankruptcy Code, NYDCL §§ 276-a and 278, and SIPA § 78fff-2(c)(3), the Trustee is entitled to

a judgment against the Subsequent Transferee Defendants: (a) recovering the Subsequent

Transfers, or the value thereof, from the Subsequent Transferee Defendants, for the benefit of the

estate; (b) directing the Subsequent Transferee Defendants to disgorge all profits, including any

and all management fees, incentive fees or other compensation and/or remuneration, received by

the Subsequent Transferee Defendants related to, arising out of, or concerning the Subsequent

Transfers; (c) recovering attorneys' fees; and (d) awarding any other relief the Court deems appropriate.

## TENTH COUNT

## OBJECTION TO AND DISALLOWANCE OF CUSTOMER CLAIMS

### *(Against the Kingate Funds)*

322.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

323.    The Kingate Funds were not innocent investors at the time they invested with BLMIS.  As a result of the Kingate Funds' inequitable conduct, they are not entitled to restitution of their principal investment.

324.    The Kingate Funds acted with actual knowledge of fraudulent activity at BLMIS at the time the Kingate Funds invested with BLMIS.  The Kingate Funds' conduct, at the time they invested with BLMIS, enabled Madoff to perpetuate the fraud at BLMIS.

325.    Alternatively, the Kingate Funds acted with explicit awareness of numerous and serious indications of fraudulent activity at BLMIS, as described in this Complaint.

326.    By their conduct, the Kingate Funds could not justifiably rely upon the fact that BLMIS was a legitimate business.  Thus, the Kingate Funds do not have a claim for restitution or any other valid claim against the BLMIS estate.

327.    As a result of the Kingate Funds' conduct, as described above, pursuant to section 502(a) of the Bankruptcy Code, the Trustee objects to any and all claims of the Kingate Funds against the BLMIS estate, including the Customer Claims, which claims should be disallowed, and the Trustee asserts that the Kingate Funds are not entitled to equitable distribution from the estate pursuant to section 502(b)(1) of the Bankruptcy Code, and SIPA §§ 78fff(b) and 78fff-1(a).

76

**ELEVENTH COUNT**

**EQUITABLE SUBORDINATION OF CLAIMS**

*(Against the Kingate Funds)*

328.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

329.    The Kingate Funds engaged in inequitable conduct, including the conduct described in this Complaint, and benefited by the withdrawal of approximately $925,351,905, during the lifetime of the Kingate Funds' accounts at BLMIS.

330.    Based on the Kingate Funds' inequitable conduct, BLMIS's customers have been misled as to the true financial condition of BLMIS and have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them.

331.    The Kingate Funds' conduct enabled Madoff to prolong the Ponzi scheme, resulted in injury to all customers and creditors of the BLMIS estate, and conferred an unfair advantage on the Kingate Funds.

332.    The Court should exercise the full extent of its equitable powers to ensure that the Customer Claims, and any other claims, payments, or benefits, of whatever kind or nature, that are asserted or sought by the Kingate Funds, directly or indirectly against the estate, and only to the extent such claims are allowed, are subordinated for distribution purposes pursuant to sections 105(a) and 510(c) of the Bankruptcy Code to the allowed claims of all other customers and creditors of BLMIS.

333.    Equitable subordination, as requested herein, is consistent with the provisions and purposes of the Bankruptcy Code.

## TWELFTH COUNT

## EQUITABLE DISALLOWANCE OF CLAIMS

### *(Against the Kingate Funds)*

334.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

335.    With the knowledge of fraudulent activity at BLMIS, including the conduct described in this Complaint, the Kingate Funds engaged in and benefited from inequitable conduct.  By the Kingate Funds' conduct, they have taken unconscionable advantage of, resulting in injury to, innocent customers and other creditors of the estate.

336.    Based upon the Kingate Funds' failure to deal fairly and in good faith, as described above, all customers and other creditors of BLMIS have been injured, including by being (a) misled as to the true financial condition of BLMIS; (b) induced to invest with BLMIS without knowledge of BLMIS's financial condition; and (c) hindered and delayed in recovering the full amounts due to them.  The Kingate Funds' conduct further enabled Madoff to continue the Ponzi scheme.

337.    The Kingate Funds' conduct was so egregious that they should not be allowed to share in any equitable distribution made by the Trustee to innocent customers holding allowed claims against BLMIS and/or Madoff.

338.    The Court should exercise the full extent of its equitable powers to ensure that the Customer Claims, and any other claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the Kingate Funds against the estate, are disallowed.

339.    Equitable disallowance is consistent with the provisions and purposes of the Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against defendants as follows:

i.      On the First Count, under sections 502(d), 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Kingate Funds: (i) avoiding and preserving the Kingate Funds Preference Transfers; (ii) directing that the Kingate Funds Preference Transfers be set aside; (iii) recovering the Kingate Funds Preference Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; and (iv) disallowing any claim that either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds Preference Transfers are repaid to the Trustee;

ii.      On the Second Count, under sections 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Kingate Funds: (i) avoiding and preserving the Kingate Funds Two Year Transfers; (ii) directing that the Kingate Funds Two Year Transfers be set aside; (iii) recovering the Kingate Funds Two Year Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; and (iv) disallowing any claim that either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds Two Year Transfers are repaid to the Trustee;

iii.      On the Third Count, under sections 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Kingate Funds: (i) avoiding and preserving the Kingate Funds Two Year Transfers; (ii) directing that the Kingate Funds Two Year Transfers be set aside; and (iii) recovering the Kingate Funds Two Year Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for

79

the benefit of the estate; and (iv) disallowing any claim that either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds Two Year Transfers are repaid to the Trustee;

      iv.      On the Fourth Count, under NYDCL §§ 276, 276-a, 278 and/or 279; sections 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code; and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Kingate Funds: (i) avoiding and preserving the Kingate Funds Six Year Transfers; (ii) directing that the Kingate Funds Six Year Transfers be set aside; (iii) recovering the Kingate Funds Six Year Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; (iv) disallowing any claim that either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds Six Year Transfers are repaid to the Trustee; and (vi) recovering attorneys' fees from the Kingate Funds;

      v.      On the Fifth Count, under NYDCL §§ 273, 278 and/or 279; sections 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code; and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Kingate Funds: (i) avoiding and preserving the Kingate Funds Six Year Transfers; (ii) directing that the Kingate Funds Six Year Transfers be set aside; (iii) recovering the Kingate Funds Six Year Transfers, or the value thereof, from Kingate Global and Kingate Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; and (iv) disallowing any claim that either of the Kingate Funds may have against the Debtors until such time as the Kingate Funds Six Year Transfers are repaid to the Trustee;

      vi.      On the Sixth Count, under NYDCL §§ 274, 278 and/or 279; sections 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code; and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Kingate Funds: (i) avoiding and preserving the Kingate Funds Six Year

Transfers; (ii) directing that the Kingate Funds Six Year Transfers be set aside; (iii) recovering

the Kingate Funds Six Year Transfers, or the value thereof, from Kingate Global and Kingate

Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; and (iv) disallowing any

claim that either of the Kingate Funds may have against the Debtors until such time as the

Kingate Funds Six Year Transfers are repaid to the Trustee;

   vii.  On the Seventh Count, under NYDCL §§ 275, 278 and/or 279; sections 502(d),

544(b), 550(a), and 551 of the Bankruptcy Code; and SIPA § 78fff-2(c)(3), the Trustee is entitled

to a judgment against the Kingate Funds: (i) avoiding and preserving the Kingate Funds Six Year

Transfers; (ii) directing that the Kingate Funds Six Year Transfers be set aside; (iii) recovering

the Kingate Funds Six Year Transfers, or the value thereof, from Kingate Global and Kingate

Euro, respectively, as set forth in Exhibit B, for the benefit of the estate; and (iv) disallowing any

claim that either of the Kingate Funds may have against the Debtors until such time as the

Kingate Funds Six Year Transfers are repaid to the Trustee;

   viii.  On the Eighth Count, under N.Y. C.P.L.R. 203(g) and 213(8); NYDCL §§ 276,

276-a, 278, and/or 279; sections 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code; and

SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Kingate Funds: (i)

avoiding and preserving the Transfers; (ii) directing that the Transfers be set aside; (iii)

recovering the Transfers, or the value thereof, from Kingate Global and Kingate Euro,

respectively, as set forth in Exhibit B, for the benefit of the estate; (iv) disallowing any claim that

either of the Kingate Funds may have against the Debtors until such time as the Transfers are

repaid to the Trustee; and (v) recovering attorneys' fees from the Kingate Funds;

   ix.  On the Ninth Count, under NYDCL § 278; sections 550(a) and 551 of the

Bankruptcy Code; and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the

Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the estate;

x.       On the Tenth Count, under section 502(b)(1) of the Bankruptcy Code, disallowing the Kingate Funds' claims, including the Customer Claims;

xi.       On the Eleventh Count, under sections 105(a) and 510(c) of the Bankruptcy Code, subordinating the Kingate Funds' claims, including the Customer Claims, for purposes of distribution to all allowed claims of BLMIS's customers and creditors, such that no claim of the Kingate Funds is paid ahead of the allowed claim of any customer or creditor of BLMIS;

xii.       On the Twelfth Count, under this Court's equitable powers, disallowing the Kingate Funds' claims, including the Customer Claims;

xiii.       On the First through Eighth Counts, directing the Kingate Funds to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by defendants related to, arising from, or concerning the Transfers from BLMIS to the Kingate Funds;

xiv.       On the Ninth Count, disgorgement of profits and fees received by the Subsequent Transferee Defendants in connection with the conduct alleged in this Complaint in favor of the Trustee for the benefit of the estate;

xv.       On the First through Ninth Counts, pursuant to N.Y. C.P.L.R. 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Transfers or Subsequent Transfers were received by defendants;

xvi.       On the First through Ninth Counts, establishing a constructive trust over all Transfers and Subsequent Transfers and their proceeds, product and offspring, in favor of the Trustee for the benefit of the estate;

82

xvii.    On the First through Ninth Counts, assigning defendants' right to seek refunds

from the government for federal, state, and local taxes paid on fictitious profits during the course

of the Ponzi scheme;

xviii.    Awarding the Trustee attorneys' fees and all applicable interest, costs, and

disbursements of this proceeding; and

xix.    Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.

Dated:  New York, New York
         March 17, 2014

                                      s/ David J. Sheehan
                                      David J. Sheehan
                                      Geraldine E. Ponto
                                      Gonzalo S. Zeballos
                                      Michelle R. Usitalo

                                      Baker & Hostetler LLP
                                      45 Rockefeller Plaza
                                      New York, NY 10111
                                      Telephone: (212) 589-4200
                                      Facsimile: (212) 589-4201

                                      *Attorneys for Irving H. Picard, Trustee for the
                                      substantively consolidated SIPA Liquidation
                                      of Bernard L. Madoff Investment Securities
                                      LLC and the estate of Bernard L. Madoff*

Of Counsel:
Oren J. Warshavsky
Frederick W. Chockley, III
John J. Burke
Nina Liao
William Hellmuth