# EXHIBIT D

IN THE SUPREME COURT OF BERMUDA

CIVIL JURISDICTION

COMMERICAL LIST

2010: 454

BETWEEN:

(1)  KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)

(2)  KINGATE EURO FUND LIMITED (IN LIQUIDATION)

Plaintiffs

and

(1)  KINGATE MANAGEMENT LIMITED

(2)  FIM LIMITED

(3)  FIM ADVISERS LLP

(4)  FIRST PENINSULA TRUSTEES LIMITED (AS TRUSTEE OF THE ASHBY TRUST)

(5)  PORT OF HERCULES TRUSTEES LIMITED (AS TRUSTEE OF THE EL PRELA TRUST)

(6)  ASHBY HOLDINGS SERVICES LIMITED

(7)  EL PRELA GROUP HOLDING SERIVCES LIMITED

(8)  MR CARLO GROSSO

(9)  MR FEDERICO CERETTI

(10)   ASHBY INVESTMENT SERVICES LIMITED

(12) EL PRELA TRADING INVESTMENTS LIMITED

(13)  ALPINE TRUSTEES LIMITED

Defendants

AMENDED STATEMENT OF CLAIM

## PARTIES

1    The Plaintiffs ("**Kingate Global**" and "**Kingate Euro**", together, "**the Funds**") were companies
incorporated in the British Virgin Islands which at all material times carried on business as open-
ended investment companies.

2      The First Defendant ("**Kingate Management**") is a company incorporated in Bermuda which at all
       material times acted as manager or co-manager of the Funds.

3      The Second Defendant ("**FIM Ltd**") is a company incorporated in England and Wales which at all
       material times until July 2005 acted as consultant to Kingate Management and the Funds.

4      The Third Defendant ("**FIM Advisers**") is a limited liability partnership incorporated in England and
       Wales which at all material times since July 2005 acted as consultant to Kingate Management and the
       Funds. In this amended statement of claim, FIM Ltd and FIM Advisers are referred to collectively as
       "**FIM**".

5      The Fourth Defendant ("**Ashby**") was at all material times before 1 April 2008 a direct 50%
       shareholder of Kingate Management, and is and was at all material times ~~after~~ from 1 April 2008,
       through its 100% subsidiary, the Sixth Defendant, an indirect shareholder of Kingate Management.
       Ashby is and was at all material times the trustee of the Ashby Trust, holding those shares on trust for
       the Eighth Defendant (and members of his family).

6      The Fifth Defendant ("**El Prela**") was at all material times ~~before~~ between 17 August 2006 and 1
       April 2008 a direct 50% shareholder of Kingate Management, and is and was at all material times
       ~~after~~ from 1 April 2008, through its 100% subsidiary, the Seventh Defendant, an indirect 50%
       shareholder of Kingate Management. El Prela is and was at all material times after 17 August 2006
       the trustee of the El Prela Trust, holding those shares on trust for the Ninth Defendant (and members
       of his family). In this amended statement of claim, Ashby and El Prela and Alpine Trustees (as
       defined in paragraph 10C below) are referred to collectively as "**the Trustees**".

7      The Sixth Defendant ("**Ashby Holding Services**") is and was at all material times ~~after~~ from 1 April
       2008 a direct 50% shareholder of Kingate Management. Ashby Holding Services in and was at all
       material times 100% owned by Ashby.

8      The Seventh Defendant ("**El Prela Holdings Services**") is and was at all material times after April
       2008 a direct 50% shareholder of Kingate Management. El Prela Holding Services is and was at all
       material times 100% onwed by El Prela. In this amended statement of claim, Ashby Holdings
       Services and El Prela, ~~and Ashby~~ Holding Services ~~and El Prela Holding Services~~ are referred to
       collectively as "**the Holding Companies**" and the Trustees and the Holding Companies are referred
       to collectively as "**the Shareholders**".

9      The Eighth Defendant ("**Mr Gross**") is and was at all material times a director and controlling
       shareholder of FIM Ltd and a principal of FIM Advisers, and, through the Ashby Trust, ultimate
       beneficial owner of 50% of the shares in Kingate Management.

10      The Ninth Defendant ("**Mr Ceretti**") is and was at all material times a director and controlling
        shareholder of FIM Ltd and a principal of FIM Advisers, and, through the El Prela Trust, ultimate
        beneficial owner of 50% of the shares in Kingate Management.

10A.    The Tenth Defendant ("**Ashby Investment Services**") is and was at all material times from 1 April
        2008 an investment company 100% owned by Ashby.

10B.    The Eleventh Defendant ("**El Prela Trading Investments**") is and was at all material times from 1
        April 2008 an investment company 100% owned by El Prela. In this amended statement of claim,
        Ashby Investment Services and El Prela Investments are referred to collectively as "**the Investment
        Companies**".

10C.    The Twelfth Defendant ("**Alpine Trustees**") was the trustee of the El Prela Trust from the settlement
        of that trust until 17 August 2006. Alpine Trustees was at all material times before 17 August 2006 a
        direct 50% shareholder of Kingate Management. As the trustee of the El Prela Trust, Alpine Trustees
        held those shares on trust for the Ninth Defendant (and members of his family).

11      Other relevant parties are as follows:

11.1    Tremon Bermuda Limited ("Tremont Bermuda") is a company incorporated in Bermuda which at all
        material times until 31 December 2005 acted as co-manager of Kingate Global.

11.2    Tremont Partners Inc ("Tremont Partners") is a company incorporated in Connecticut, USA which at
        all material times was the parent company of Tremont Bermuda.

11.3    Bernard L. Madoff Investment Securities LLC ("BLMIS") was a limited liability company
        incorporated in New York which at all material times acted as investment adviser to the Funds.

11.4    Bernard Madoff ("Mr Madoff") was at all material times the founder, chairman, chief executive
        officer and the sole shareholder of BLMIS.

## SUMMARY OF THE CLAIM

12      The Funds were established for the purpose of investing with BLMIS monies raised from investors.
        The same individuals, Mr Groso and Mr Ceretti, were behind the establishment of the Funds and its
        key service providers, Kingate Management and FIM.

13      From their establishment until November 2008, the Funds transferred billions of US dollars to BLMIS
        for investment.  Some of these monies were returned by BLMIS, for the payment of redemptions to
        investors.

14   In December 2008, it emerged that Mr. Madoff had for many years been operating a fraudulent 'Ponzi' scheme on a massive scale. In fact, BLMIS had invested none of the Funds' monies in assets. Instead, they had been used to pay redemptions to other investors and for the benefit of Mr Madoff and his associates.

15   At no stage before December 2008 did either Kingate Management or FIM alert the Funds to the possibility of this fraud. As a result, the Funds have lost many hundreds of millions of US dollars.

16   In addition, from their establishment until November 2008, the Funds paid Kingate Management hundreds of millions of US dollars in fees. The fees were calculated by reference to the Funds' net asset values. Because of Mr Madoff's fraud, at all material times, the Funds' only significant asset was their money at the bank. Accordingly, the Funds' net asset values were massively overstated, and the fees mistakenly overpaid.

17   The Funds's claim is:

17.1   in unjust enrichment on the ground of mistake, for the recovery of the overpaid fees from Kingate Management and/or the Shareholders and/or the Investment Companies, as ultimate recipients of the fees, and/or Mr Grosso and Mr Ceretti, as ultimate recipients of the fees and/or ultimate beneficial owners of the shares in Kingate Management;

17.2   alternatively, for orders based on the Funds' retention of legal title to the overpaid fees and/or their traceable proceeds;

17.3   alternatively, for declarations that Kingate Management and/or the Shareholders and/or the Investment Companies and/or Mr Grosso and Mr Ceretti hold the overpaid fees, together with their traceable proceeds, on trust for the Funds;

17.4   for damages for breach of contractual and tortious duties of care and/or negligent misstatement, against Kingate Management;

17.5   for damages for breach of tortious duties of care and/or negligent misstatement, against FIM ; and/or

17.6   for damages for breach of tortious duties of care and/or negligent misstatement against Mr Grosso and Mr Ceretti.

**FACTUAL BACKGROUND**

**Establishment of Kingate Global**

18    In the early 1990s, Mr Grosso and Mr Ceretti, as a development of the business of FIM, decided to set up a fund of hedge funds.

19    They took advice from Tremont Partners and, in particular, its president, Sandra Manzke ("Ms Manzke") who introduced them to various service providers in the United States and Bermuda.

20    On 11 February 1994, Kingate Global was incorporated in the British Virgin Islands as a fund of hedge funds having one class of shares denominated in US dollars. The directors of the company included Christopher Wetherhill ("Mr Wetherhill") and Mrs Manzke.

21    Soon afterwards, on 24 February 1994, Kingate Management was incorporated in Bermuda.  Its directors also included Mr Wetherhill.

22    By an agreement dated on or around 1 November 1994, Kingate Management was appointed as manager of Kingate Global.

23    By further agreement dated 1 November 1994, FIM Ltd was appointed as consultant to Kingate Management.  Tremon Bermuda had already been retained as a consultant by an agreement dated 24 February 1994.

24    In February or March 1995, a second class of shares in Kingate Global, also denominated in US dollars, was created and named 'Class B' shares.  The original class of shares was re-named 'Class A'.

25    By an agreement dated 1 March 1995, each of Kingate Management and Tremont Bermuda was appointed as co-manager of the Class B shares.  This agreement was amended and restated effective 1 May 2000.  In respect of the Class A shares, Kingate Management continued as manager and FIM Ltd and Tremont Bermuda continued as consultants.

26    In January 1996, a third class of shares in Kingate Global, denominated in Deutsche Marks, was created and named 'DM Class' shares.

27    By an agreement dated 1 December 1995, each of Kingate Management and Tremont Bermuda was appointed as co-manager of DM Class shares.

28    By further agreement dated 1 December 1995, FIM Ltd was appointed as consultant to Kingate Management in respect of all three classes of shares in Kingate Global.  This agreement was amended in late 1998 and further amended effective 1 May 2000.

29    By late 1999 or early 1997, the Class A shares in Kingate Global had been wound down, leaving only
the Class B shares and the DM Class shares.

**Establishment of Kingate Euro**

30    In late 1999, Mr Grosso and Mr Ceretti, as a further development of the business of FIM, decided to
spin-off the DM Class shares in Kingate Global into a separate entity.

31    Accordingly, on 19 April 2000 Kingate Euro was incorporated in the British Virgin Islands.  Its
directors were the same as the directors of Kingate Global (save the Ms Manzke was not a director of
Kingate Euro).

32    By an agreement dated 1 May 2000 ("the Kingate Euro Manager Agreement"), Kingate Management
was appointed as manager of Kingate Euro.

33    FIM was again retained as a consultant.

**Further agreements**

34    By an agreement dated 23 April 2001 ("the Kingate Global Consulting Services Agreement"), the
appoint of FIM Ltd as consultant to Kingate Management in respect of the remaining class of shares
in Kingate Global was restated and amended.

35    By a further agreement of the same date ("the Kingate Euro Consulting Services Agreement"), FIM
Ltd was formally appointed as consultant to Kingate Management in respect of Kingate Euro.

36    In addition, by distribution agreements dated 23 April 2001, FIM Ltd was appointed as non-exclusive
distributor for the sale of shares in both Funds.

37    The Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services
Agreement were amended by a further agreement dated 7 June 2001.

38    In late 2004 or early 2005, Kingate Global entered into further, separate Co-Manager Agreements
with Mingate Management and Tremont Bermuda, which agreements restated the earlier Manager and
Co-Manager Agreements to more precisely reflect each co-manager's activities based on actual
experience.

39    By a notice dated 16 January 2006, which took effect as of 31 December 2005, Tremont Bermuda
resigned as co-manager of the Class B shares in Kingate Global.

40    Accordingly, by an agreement dated 1 January 2006 ("the Kingate Global Manager Agreement"), the
appointment of Kingate Management as manager of Kingate Global was restated and amended.

**Relevant provisions of the agreements**

*Kingate Global Manage Agreement*

41      By the Kingate Global Manager Agreement, Kingate Management agreed to provide various services to Kingate Global and, in return, Kingate Global agreed to pay Kingate Management a monthly management fee.  In particular:

41.1    By clause 1.1, Kingate Management agreed to perform, or obtain the performance of:

    41.1.1   the investment management services described in Part II of the agreement;

    41.1.2   the administrative services described in Part III; and

    41.1.3   the services, relating to the sale of shares Kingate Global, described in Part IV.

41.2    By clauses 2.1 and 2.2, the investment management services included:

    41.2.1   effecting the investment strategy for the investment of the assets of Kingate Global;

    41.2.2   evaluating and selecting potential investments which were consistent with that strategy, including managing the investments and reinvestments of Kingate Global, in such manner as Kingate Management considered appropriate based on its past practices.

41.3    By clause 3.1, the administrative services included assisting Kingate Global, in a manner consistent with existing practice, in the performance of those administrative duties which were agreed by the parties from time to time.

41.4    By clauses 4.1, 4.2, 4.3 and 4.4, the services in respect of the sale of shares in Kingate Global included:

    41.4.1   all duties and functions in connection with the sale of any shares in Kingate Global;

    41.4.2   advising Kingate Global on general matters affecting the marketing of the shares, including advising the directors as to:

        41.4.2.1           soliciting and introducing prospective investors; and

        41.4.2.2           maintaining regular contact and updating existing and prospective investors to keep them informed of investment results and other information with regard to Kingate Global;

    41.4.3   seeking to procure applications to purchase shares by eligible investors;

41.4.4   appointing consultants, agents, securities dealers and other financial institutions as authorised
dealers to solicit application to purchase shares in Kingate Global and entering into
compensation agreements with such authorised dealers; and

41.4.5   arranging for the delivery to each person to whom shares in Kingate Global were offered a
copy of the fund's most recently published information memorandum and annual report.

41.5   By clause 5.9(a), Kingate Management was authorised was authorised to delegate as appropriate, or
its discretion, any of the duties or obligations under the agreement to one or more other persons or
entities, whether affiliated with or independent of Kingate Management.

41.6   By clause 5.2, Kingate Global agreed to pay Kingate Management a monthly management fee at an
annual rate of 1.5% of the net asset value ("NAV") of the funds determined as at each valuation date
of each calendar month. 'NAV' and 'valuation date' were to have the meanings respectively assigned
to them in Kingate Global's information memorandum.

41.7   Further:

41.7.1   Clause 5.4 purported to exclude any liability of Kingate Management to Kingate Global for
loss etc occasioned by Kingate Management in the performance of its services under the
agreement, other than as a result of gross negligence, bad faith, wilful or reckless malfeasance
or disregard of any obligations under the agreement; and

41.7.2   Clause 5.5 purported to oblige Kingate Global to indemnify Kingate Management and hold it
harmless against loss etc arising out of any claim asserted in connection with Kingate
Management's services under the agreement, save where the loss etc was caused by Kingate
Management's gross negligence, bad faith, wilful or reckless malfeasance or disregard of its
obligations under the agreement.

*Kingate Euro Manager Agreement*

42   Similarly, by the Kingate Euro Manager Agreement, Kingate Management agreed to provide various
services to Kingate Euro and, in return, Kingate Euro agreed to pay Kingate Management a monthly
management fee and a monthly administration fee. In particular:

42.1   By clause 2.1, Kingate Management agreed to develop, update and affect an overall investment
strategy for the investment of the assets of Kingate Euro, as well as evaluate and select potential
investments which were consistent with that strategy.

42.2   By clause 3.1, Kingate Management agreed to be responsible for performing, or procuring the
performance of, all duties and functions necessary or appropriate in connection with the placement of

shares in Kingate Euro outside of the United States, and for advising Kingate Euro on general matters affecting its structure and operations, including advising the directors as to:

42.2.1 the suitability of Kingate Euro's structure and operating procedures in light of the expectations of prospective investors;

42.2.2 steps which could be taken to enhance the marketability of Kingate Euro's shares and to improve investor relations;

42.2.3 the identification and evaluation of candidates to serve as directors of Kingate Eurol

42.2.4 general economic and financial developments in international securities and capital markets affecting Kingate Euro's investment program; and

42.2.5 in general, all aspects relating to Kingate Euro's administrative, accounting, legal and operational matters.

42.3 By clause 3.3, Kingate Management agreed to act as the placement agent for Kingate Euro's shares outside the United States, including using its best efforts to procure applications to purchase shares from eligible investors.

42.4 By clause 3.5, Kingate Management agreed to arrange for the delivery to each person to whom shares in Kingate Euro were offered a copy of the fund's most recently published information memorandum.

42.5 By clause 4.8, Kingate Management was authorised to delegate as appropriate, in its discretion, any of the duties or obligations imposed upon it under the agreement to one or more persons or entities, whether affiliated with or independent of Kingate Management.

42.6 By clause 4.1(a) and (b) Kingate Management was entitled to

42.6.1 a fixed monthly asset based fee, as defined in Kingate Euro's information memorandum; and

42.6.2 a fixed monthly asset based administration fee, also so defined.

42.7 Further:

42.7.1 clause 4.3 purported to exclude the liability of Kingate Management to Kingate Euro for loss etc suffered in connection with Kingate Management's services in the absence of gross negligence wilful default, fraud or dishonesty in the performance or non-performance of Kingate Management's obligations or duties; and

42.7.2 clause 4.4 purported to oblige Kingate Euro to indemnify Kingate Management and hold it harmless against loss etc arising out of any claim asserted in connection with Kingate

Management servicing or having served in good faith pursuant to the agreement, save where the loss etc was caused by Kingate Management's gross negligence, bad faith, breach of fiduciary duty, wilful or reckless malfeasance or disregard of any of its obligations under the agreement.

*Kingate Global Consulting Services Agreement and Kingate Euro Consulting Services Agreement*

43 The Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement are in materially identical terms. By both agreements, FIM Ltd agreed to provide various services to Kingate Management and, in return, FIM Ltd was entitled to be paid a consultancy fee. In particular:

43.1 By clause 2.2 of both agreements, FIM Ltd agreed to act as consultant to Kingate Management to provide such advice and recommendations as Kingate Management required from time to time, in connection with its management of the assets of the Funds and in the implementation of the investment objectives and policies of the Funds.

43.2 By clause 3 of both agreements, the services to be provided by FIM Ltd to Kingate Management included:

43.2.1 reviewing the structure and operating procedures of the Funds;

43.2.2 preparing such analyses and reports as Kingate Management and the Funds required;

43.2.3 providing Kingate Management with assistance and support on such matters relating to investor relations as Kingate Management and the Funds required;

43.2.4 liaising directly with Kingate Management on such matters relating to the investment programs of the Funds as might be required to enable FIM Ltd to properly perform its duties under the agreements; and

43.2.5 in general, providing advice to and assisting Kingate Management on such aspects of the operational, administrative and legal matters of the Funds as Kingate Management and the Funds required.

43.3 By clause 3 of the Kingate Euro Consulting Services Agreement, FIM Ltd also agree to provide Kingate Management with advice regarding Kingate Euro's hedging activities, in order to reduce the currency risk between the Euro and the US dollar, and to oversee the execution of its recommendations.

43.4 By clause 8 of both agreements, FIM Ltd agreed to:

43.4.1    provide such assistance, information and reports as Kingate Management and the auditors of the Funds required from time to time, in connection with:

    43.4.1.1    the preparation of valuations in respect of the Funds and periodic reports by Kingate Management to the Funds; and

    43.4.1.2    the provision of annual, semi-annual and other reports for the benefit of investors;

43.4.2    provide such representatives as Kingate Management requested from time to time to attend board meetings of the Funds with Kingate Management; and

43.4.3    report to and discuss with the directors of the Funds their performance and other matters related to the management of their assets.

43.5    By Schedule 1 to both agreements, Kingate Management agreed to pay FIM Ltd a fixed monthly fee equal to US$30,000. Schedule 1 also provided that, for administrative convenience, Kingate Management could arrange to have the Funds pay this fee directly to FIM Ltd.

43.6    Further, clause 13.1 of both agreements purported to exclude the liability of FIM Ltd to Kingate Management and the Funds for any loss etc, in the absence of gross negligence, fraud or wilful default on the part of FIM Ltd, or failure to comply with Kingate Management's instructions.

44    On 1 August 2005, FIM Advisers took over the business of FIM Ltd. Accordingly, by deeds of novation dated 29 July 2005, FIM Advisers was substituted for FIM Ltd under both the Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement.

44A    At trial, the Funds will rely on each of the above agreements for their full terms and effect.

**The business of the Funds**

45    As open-ended investment companies, the Funds raised monies from investors through private offerings of their shares. Investors would subscribe for redeemable shares in the Funds in accordance with each fund's information memorandum and subscription agreement. In particular:

45.1    Redeemable shares could only be purchased on the first business day of a month.

45.2    Investors would make an offer for subscription by submitting completed subscription forms to the Funds' administrator.

45.3    The minimum initial investment in redeemable shares was US$250,000 and the minimum subsequent investment was US$100,000.

45.4    The purchase price of the redeemable shares varied from time to time and was equal to the fund's NAV per share as at the last business day of the previous calendar month.

45.5    If an investor's offer to subscribe was accepted, redeemable shares were allocated to the investor which thereby became a shareholder of the fund in question.

46      An investor could recover its investment in the Funds by redeeming its shares in accordance with each fund's information memorandum and articles of association.  In particular:

46.1    Shares could only be redeemed on the last business day of a month.

46.2    The redemption price was the fund's NAV per share as at the redemption date.

**BLMIS**

47      Subject to amounts retained for the payment of redemptions, professional fees and operating costs, all the monies raised by Kingate Global from such share allotments, since at least late 1996 or early 1997 when the Class A shares were wound down, were transferred to BLMIS.  Further, all such monies raised by Kingate Euro since its establishment were also transferred to BLMIS.

48      From the outset, Kingate Management delegated responsibility for all investment advisory activities in respect of both Kingate Global and Kingate Euro to BLMIS.  Kingate Management also delegated responsibility for custody services in respect of the Funds to BLMIS.  In particular:

48.1    BLMIS opened brokerage accounts for both Funds.

48.2    By a customer agreement, an option agreement, a trading authorization limited to purchases and sales of securities and options, and a trading authorization directive, each fund authorized BLMIS to manage its portfolio on a discretionary basis.

48.3    The trading authorization directive gave BLMIS investment guidelines, restricting BLMIS to so-called 'split-strike conversion' investments.

49      Accordingly, at all material times:

49.1    All the monies raised by the Funds were invested and managed by BLMIS.

49.2    The Funds did not carry out their own investment activity.

49.3    BLMIS acted as the Funds' investment adviser.

49.4    The Funds had no investment adviser other than BLMIS.

49.5    The Funds' business was to invest with BLMIS.

50      BLMIS purportedly employed the split-strike conversion investment strategy and reported excellent
        returns year after year.  In particular:

50.1    In respect of both Funds, Kingate Management received (inter alia) monthly statements from BLMIS
        which purported to show the portfolio of assets in which BLMIS had invested the Funds' monies, and
        their values ("**Monthly Statements**").

50.2    Kingate Management passed these statements to FIM.  On the basis of the statements, FIM produced
        regular reports on the Funds' investment performance.

**Monies transferred to BLMIS**

51      When an investor subscribed for redeemable shares in either of the Funds, the purchase price for the
        shares would be paid into the fund's account at the Bank of Bermuda Limited ("**the Bank**"), before
        being transferred to BLMIS.

52      Similarly, when an investor requested to redeem its shares in either of the Funds, BLMIS would
        transfer to the fund's account at the Bank sufficient monies to meet the redemption request.  However,
        the Funds would often meet redemption requests from subscription monies then standing to the credit
        of their accounts at the Bank.

53      By the end of November 2008:

53.1    Kingate Global had transferred to BLMIS subscription monies in the amount of US$987,860,000 and
        BLMIS had transferred to Kingate Global redemption monies in the amount of US$400,254,792.

53.2    Kingate Euro had transferred to BLMIS subscription monies in the amount of US$767,440,000 and
        BLMIS had transferred to Kingate Euro redemption monies in the amount of US$545,000,000.

        See the tables attached to this amended statement of claim as Annex A, which set out, in respect of
        each fund, the payments made to and received from BLMIS and the dates of payment.

**Mr Madoff's fraud**

54      In December 2008, it emerged that Mr Madoff, through BLMIS, had for many years been operating a
        fraudulent 'Ponzi' scheme on a massive scale.  Media reports suggest that investors who transferred
        monies to BLMIS collectively stand to lose tens of billions of dollars.  In particular:

54.1    BLMIS did not in fact invest any of the monies transferred by investors, including the Funds.  BLMIS
        did not purchase or sell a single security or option with these monies.

54.2   The trades, assets and returns reported in the monthly statements which BLMIS provided to investors, including the Funds, were entirely fictitious.

54.3   Instead, BLMIS used the monies transferred from new investors to pay existing investors who requested withdrawals or redemptions.

54.4   In short, the monies transferred to BLMIS by investors, including the Funds, were used to keep the fraudulent scheme going, and for the benefit of Mr Madoff and his associates, until such time as the requests for withdrawals and redemptions overwhelmed the new investments, causing the collapse of the scheme.

55   Mr Madoff's fraudulent scheme remained undetected until its collapse despite the existence of numerous 'red flags' surrounding the operation of BLMIS.  These included the following:

55.1   Mr Madoff and his family controlled key positions at BLMIS, limiting third party involvement.

55.2   Rather than trading through an independent broker, or using a third party custodian, BLMIS acted as its own broker and custodian.

55.3   BLMIS' auditor was a very small, unknown auditing firm which had represented to its regulatory body that it did not conduct audits.

55.4   BLMIS' fee structure was highly unusual, potentially depriving it of tens of millions of dollars each year.

55.5   BLMIS did not provide investors with electronic real-time access to their accounts.  Instead, BLMIS reported trades using only paper confirmations, created after the fact, which stated average and not exact times and prices of trades.

55.6   BLMIS reported securities trades at non-existent prices and options trades at unrealistic volumes.

55.7   BLMIS refused to identify the counterparties with whom it purportedly traded securities and options.

55.8   Mr Madoff was consistently vague when responding to questions about BLMIS' operations and strategy.

55.9   At the end of each quarter and/or year, BLMIS reported to investors that it had converted all their assets into Treasury Bills or cash.

55.10   BLMIS' purported returns were too good to be true, with extremely rare losses and an incredible absence of volatility, which could not be replicated by others using the same split-strike conversion

investment strategy. Further, although in theory that strategy could reduce volatility, it could not produce gains in a declining market, yet BLMIS' returns purported to do so.

55.11   Several private financial institutions, having conducted routine due diligence, refused to invest with BLMIS.

55.12   Several articles were published in the financial press raising concerns about BLMIS.

55.13   Several regulatory actions were commenced against BLMIS.

56   On 11 December 2008, Mr Madoff was arrested and charged with various violations of United States criminal securities law.

57   On 15 December 2008, BLMIS was placed in bankruptcy. Mr Irving Picard (**"the Trustee"**) was appointed as trustee to oversee the liquidation.

58   Prior to this, neither Kingate Global nor Kingate Euro had any knowledge or information that Mr Madoff was operating a fraudulent scheme.

**Aftermath of the discovery of Mr Madoff's fraud**

59   Because almost all of the Funds' assets (other than monies held in their accounts at the Bank) were invested with BLMIS, Mr Madoff's arrest and the bankruptcy of BLMIS had a devastating effect on the Funds.

60   On 12 December 2008, the Funds suspended determination of their NAV, as well as the redemption and issue of shares.

61   In January 2009, the Bank froze both Funds' accounts. The position remains that the Funds have access to the monies in those accounts only for the purpose of paying their ordinary and necessary expenses of the liquidation.

62   On 17 April 2009, the Trustee commenced proceedings in the Bankruptcy Court for the Southern District of New York, claiming the return of $100 million which BLMIS paid to Kingate Global in the 90 days preceding 11 December 2008.

63   Accordingly:

63.1   On 8 May 2009, both Funds applied to the High Court of the Virgin Islands for the appointment of liquidators. By orders dated 4 June 2009, the court appointed liquidators and wound up both Funds.

63.2   On 7 August 2009, both Funds presented petitions for winding up to the Supreme Court of Bermuda. By orders dated 4 September 2009, the court wound up both Funds.

**CLAIMS IN UNJUST ENRICHMENT**

**Payment of fees to Kingate Management**

64     As set out in paragraphs 41.6 and 42.6 above, under the Kingate Global Manager Agreement (and its predecessors) and the Kingate Euro Manager Agreement (together, "**the Manager Agreements**"), the Funds were obliged to pay monthly fees to Kingate Management.

65     The fees payable by each of the Funds were calculated by reference to their NAVs. In particular, as set out in paragraphs 41.6 and 42.6 above:

65.1   Under the Kingate Global Manager Agreement, read with Kingate Global's information memorandum (as amended and restated from time to time), the monthly management fee payable by Kingate Global to Kingate Management was 1.5% of Kingate Global's NAV at each month end.

65.2   Under the Kingate Euro Manager Agreement, read with Kingate Euro's information memorandum (as amended and restated from time to time):

65.2.1   the monthly management fee payable by Kingate Euro to Kingate Management was 1.5% of Kingate Euro's NAV at each month end; and

65.2.2   the monthly administration fee payable by Kingate Euro to Kingate Management was 0.1% of Kingate Euro's NAV at each month end.

66     The Manager Agreements provided that the meaning of NAV and its method of calculation were as described in the Funds' respective information memoranda.

67     The information memoranda of both Funds (as amended and restated from time to time) made materially identical provision in respect of NAV. In particular, each information memorandum (as most recently amended and restated as at 6 October 2008) provided that:

67.1   The NAV of the fund was the market value of the fund's total assets less all accrued debts and liabilities.

67.2   The fund's administrator was to determine the fund's NAV as at the close of business on the last business day of each calendar month.

67.3   The fund's assets included:

67.3.1   all cash and cash equivalent, including bank deposits and interest bearing obligations;

67.3.2   all securities positions; and

67.3.3   all options positions.

67.4    Cash and cash equivalent was to be valued at cost plus accrued interest and discount.

67.5    Securities and options were to be valued at the last sale price reported on the principal securities exchange or market on which they were traded.  In the absence of reported sale prices on the valuation date, securities and options were generally to be valued at the last reported bid quotation.

67.6    In the absence of current quotations, or if the administrator concluded that such quotations were not indicative of value, the valuation of the assets was to be their fair value as determined in good faith by the administrator.

67.7    Further, if the administrator determined that market prices or quotations did not fairly represent the value of particular assets, the administrator was authorised to assign a value to those assets which differed from the market prices or quotations.

67.8    The administrator was to verify the prices attributed to the securities held by the fund by reference to pricing sources independent of BLMIS whenever reasonably possible.

67.9    In the absence of bad faith or manifest error, the NAV calculation made by the administrator was binding on investors in the fund.

68    In so providing, the information memorandum of each fund replicated provisions in the Funds' articles of association, in particular, in respect of Kingate Global, articles 55 to 57 and, in respect of Kingate Euro, articles 55, 56 and 58.

69    In accordance with these provisions, each of the Funds paid fees to Kingate Management, at the end of each month from their establishment until November 2008.  In particular:

69.1    from 1 January 1995 to November 2008, Kingate Global paid to Kingate Management fees in the amount of US$294,312,278; and

69.2    from 1 January 2000 to November 2008, Kingate Euro paid to Kingate Management fees in the amount of US$76,125,017.

See the table attached to this amended statement of claim as Annex B, which sets out the payments made by each fund in each year and the total paid.

70    It is understood that after receipt of these payments, Kingate Management paid on a significant percentage of the fees to the Shareholders in the form of dividends. In particular, by the end of November 2008, Kingate Management had paid to the Shareholders dividends totalling US$293,902,730. See the table attached to this amended statement of claim as Annex B, which sets out the dividends paid in each year from 1995 to 2008 (inclusive).

71    It is also understood that: after receipt of these dividends, the Shareholders paid on a percentage of them to Mr Grosso and Mr Ceretti in the form of distributions of trust property.

71.1    on or around 31 March 2008, the Trustees sold to the Investment Companies investments they had made with the dividends paid to them by Kingate Management.

71.2    from time to time from 1 April 2008, the Holding Companies loaned monies (constituted by dividends received from Kingate Management) to the Investment Companies, for the purposes of investment by the Investment Companies; and

71.3    from time to time, the Trustees made to Mr Grosso and Mr Ceretti distributions of trust property (constituted by dividends received from Kingate Management and income from investment of those dividends by the Trustees and/or the Investment Companies).

**Mistaken overpayment of fees to Kingate Management**

72    By mistake, at the end of each month from their establishment until November 2008, each of the Funds overpaid fees to Kingate Management. In particular:

72.1    As set out in paragraph 54 above, as a result of Mr Madoff's fraud:

72.1.1    none of the monies transferred by the Funds to BLMIS were invested in assets;

72.1.2    none of the assets reported in BLMIS' Monthly Statements ever existed;

72.1.3    instead, all of the monies transferred by the Funds to BLMIS were used to keep the fraudulent scheme going, and for the benefit of Mr Madoff and his associates; and

72.1.4    at all material times, BLMIS was hopelessly balance sheet insolvent.

72.2    Accordingly:

72.2.1    all of the monies transferred by the Funds to BLMIS must be treated as having been lost by the Funds at the date of transfer, and as having nil value; and

72.2.2    at the date of each payment of fees by the Funds to Kingate Management, the Funds' only significant assets were the monies held in their accounts at the Bank.

72.3   However, in calculating the Funds' NAVs at each month end, the Funds' administrator relied on BLMIS' Monthly Statements and assumed that the assets reported there existed.

72.4   As a result, as at the date of each payment of fees by the Funds to Kingate Management, the Funds' NAVs were vastly overstated and incorrect.

72.5   As at those dates, and at all times until the discovery of Mr Madoff's fraud in December 2008, the Funds believed that the NAVs were correct.

72.6   As set out in paragraph 69 above, the Funds overpaid fees to Kingate Management on the basis of this mistaken belief and as a result of it.

See the table attached to this amended statement of claim as Annex C, which sets out in respect of each fund, at the date of each payment of fees by the fund to Kingate Management, the fund's correct NAV, accordingly, the fees which should have been paid, the fees actually paid and the amount overpaid.

73   For the avoidance of doubt, and if necessary, the Funds aver that the overpaid fees were not due to Kingate Management under the Manager Agreements (or otherwise).

**Claim in unjust enrichment against Kingate Management**

74   Kingate Management was enriched, on receipt, in the amount of the overpaid fees.

75   The enrichment was at the expense of the Funds, Kingate Management having received the overpaid fees directly from the Funds.

76   Accordingly, given the Funds' mistake, Kingate Management has been unjustly enriched at the expense of the Funds and is liable to make restitution to the Funds in the amount of the overpaid fees. In particular, as set out in the table attached as Annex C to this amended statement of claim, Kingate Management is liable to make restitution:

76.1   to Kingate Global, in the amount of US$254,478,999.69; and

76.2   to Kingate Euro, in the amount of 56,226,531.48 Euros.

**Remedy against Kingate Management**

77   By reason of the claim set out in paragraphs 74-76 above, the Funds are entitled to an order that Kingate Management pay:

77.1   to Kingate Global, the amount of US$254,478,999.69; and

77.2   to Kingate Euro, the amount of 56,226,531.48 Euros.

**Further or alternative claim in unjust enrichment against the Shareholders**

78      The relevant factual background to the claims against the Shareholders is as follows:

78.1    Kingate Management and the Shareholders are not and were never independent or arms' length parties.

78.2    The Shareholders are the sole owners and controllers of Kingate Management.

78.3    As set out in paragraphs 20-21 above, Kingate Management and Kingate Global were established at the same time so as to create a structure for a hedge fund business which consisted of raising monies from investors for investment exclusively with BLMIS and earning fees from the investments.

78.4    In particular, Kingate Management was established and used as a corporate vehicle to receives fees from Kingate Global and, later, Kingate Euro, for payment on to the Shareholders.

79      The Shareholders were unjustly enriched on receipt of the overpaid fees by Kingate Management, and in that amount. This enrichment was at the expense of the Funds, which made the payments, and arose in the following alternative circumstances.

80      First, as sole owners of the entirety of the shares of Kingate Management, alternatively as the alter ego of Kingate Management, the Shareholders were automatically enriched by the receipt by Kingate Management of all overpaid fees.

81      Second, on receipt of the overpaid fees by Kingate Management, Kingate Management's assets were increased and the Shareholders were enriched by the corresponding increase in the value of their shareholdings in Kingate Management:

81.1    The value of the increase must be treated as equal to the amount of the overpaid fees received by Kingate Management.

81.2    The increase was a realised and/or realisable financial benefit and, accordingly, an incontrovertible benefit. Alternatively, the Shareholders freely accepted the increase.

82      Third, the Shareholders were enriched upon the receipt of overpaid fees by Kingate Management, as Kingate Management did not receive for its own benefit but merely as a channel or conduit pipe to the Shareholders, alternatively as nominee on behalf of the Shareholders.

83      Fourth, the role of Kingate Management in the circumstances was or was analogous to that of agent on behalf of the Shareholders. Accordingly, on the basis of, or by analogy with the principle that the receipt of a gain by an agent is to be treated as a receipt by his principal, the Shareholders must be treated as having been enriched upon the receipt by Kingate Management of the overpaid fees.

84    Fifth, by reason of the matters pleaded above, the corporate veil of Kingate Management falls to be pierced, so as to reflect the reality that the Shareholders were enriched upon the receipt of overpaid fees by Kingate Management.

85    In the alternative to the foregoing, the Shareholders were unjustly enriched on receipt by them of dividends paid by Kingate Management out of the overpaid fees and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof). Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection and nexus between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividends to the Shareholders. Each declaration of dividends formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

85A.    In the further alternative:

85A.1    Kingate Management made distributions to the Shareholders utilising the fees paid to it by the Funds, as pleaded above.

85A.2    Those fees were not (in the hands of Kingate Management) distributable profits, but liable to be repaid to the Funds for the reasons pleaded herein. Further, Kingate Management declared and paid the dividends to the Shareholders under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to it based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

85A.3    Accordingly, Kingate Management is entitled to recover from the Shareholders by way of restitution the sums paid to them by it as dividends. If (contrary to the Funds' primary case) Kingate Management has a defence to the Funds' claims in restitution against it, the Funds are entitled to be subrogated to such restitutionary claims of Kingate Management against the Shareholders.

86    Further or alternatively, when the overpaid fees were received from the Funds by Kingate Management, they constituted the Funds' property and/or its traceable proceeds. In particular:

86.1    The Funds' mistake, as set out in paragraph 72 above, was a fundamental mistake as to the quantity of fees paid and/or as to the obligation to pay fees. That fundamental mistake so vitiated the Funds' intention to transfer the overpaid fees to Kingate Management as to prevent legal title to the overpaid fees passing from the Funds to Kingate Management. Instead, legal title to the overpaid fees remained with the Funds.

86.2  Alternatively, even if legal title to the overpaid fees did pass from the Funds to Kingate Management, because of the Funds' mistake, Kingate Management held the overpaid fees on constructive trusts for the Funds, from the moment of receipt.

86.3  Alternatively, even if legal title to the overpaid fees did pass from the Funds to Kingate Management, the Funds' mistake was sufficiently serious to vitiate their intention to benefit Kingate Management by the transfer of the overpaid fees. Accordingly, the presumption of resulting trust, namely, that, in the circumstances, the transferor did not intend to benefit the transferee, could not be rebutted and Kingate Management held the overpaid fees on resulting trusts for the Funds, from the moment of receipt.

87  As a result, when Kingate Management paid on the overpaid fees and/or their traceable proceeds to the Shareholders, the Shareholders also received the Funds' property and/or its traceable proceeds. The Shareholders must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

88  In all the premises pleaded above, given the Funds' mistake, the Shareholders have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees, alternatively, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders.

89  The Funds repeat paragraphs 76.1 and 76.2 above.

**Remedy against the Shareholders**

90  By reason of the claim set out in paragraphs 78-89 above, the Funds are entitled to an order that the Shareholders pay:

90.1  to Kingate Global, the amount of US$254,478,999.69, alternatively, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds, which were paid on by Kingate Management to the Shareholders; and

90.2  to Kingate Euro, the amount of 56,226,531.48 Euros, alternatively, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds, which were paid on by Kingate Management to the Shareholders.

**Further or alternative claim in unjust enrichment against the Investment Companies**

90A.  Further or in the alternative to the above, the Investment Companies were enriched on receipt by them of:

90A.1   investments, made by the Trustees with dividends paid to the Trustees by Kingate Management out of the overpaid fees and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof) and then transferred to the Investment Companies by the Trustees; and

90A.2   such dividends, paid to the Holding Companies by Kingate Management and then transferred to the Investment Companies by the Holding Companies for the purposes of investment.

90B.   Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividend to the Shareholders, and the subsequent transfer of those dividends, and investments made with those dividends, to the Investment Companies for the purposes of investment. Each transfer formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

90C.   In the further alternative:

90C.1   The Trustees and the Holding Companies paid the sums referred to in paragraphs 90A.1 and 90A.2 above to the Investment Companies, which sums were derived from the fees paid to Kingate Management by the Funds, as pleaded above.

90C.2   Those sums were (in the hands of the Trustees and the Holding Companies) liable to be repaid to the Funds or Kingate Management for the reasons pleaded herein. Further, the Trustees and the Holding Companies made the transfers to the Investment Companies under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to Kingate Management, and by Kingate Management to them, based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

90C.3   Accordingly, the Trustees and the Holding Companies are entitled to recover from the Investment Companies by way of restitution the sums paid to them. If (contrary to the Funds' primary case) the Trustees and/or the Holding Companies have a defence to the Funds' claims in restitution against them, the Funds are entitled to be subrogated or sub-subrogated (via Kingate Management's restitutionary claim against the Trustees and the Holding Companies pleaded in paragraph 85A above) to such restitutionary claims of the Trustees and/or the Holding Companies against the Investment Companies.

90D.   Further or alternatively, for the reasons pleaded above, all such transfers to the Investment Companies constituted the Funds' property and/or the traceable proceeds thereof. The Investment Companies

must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

90E.    In all the premises pleaded above, given the Funds' mistake, the Investment Companies have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders and then by the Shareholders to the Investment Companies.

**Remedy against the Investment Companies**

90E.    By reason of the claim set out in paragraphs 90A – 90D above, the Funds are entitled to an order that the Investment Companies pay:

90E.1    to Kingate Global, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies; and

90E.2    to Kingate Euro, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies.

**Further or alternative claim in unjust enrichment against Mr Grosso and Mr Ceretti**

91      Further or in the alternative to the above, and on the basis that Mr Grosso and Mr Ceretti were in substance and reality the ultimate beneficial owners of the Shareholders, and hence KML, then Mr Grosso and Mr Ceretti were unjustly enriched at the expense of the Funds to the same extent and in the same circumstances as were the Shareholders, as pleaded above.

92      Further or in the alternative, Mr Grosso and Mr Ceretti were unjustly enriched on receipt by them of distributions by the Shareholders of trust property out of dividends paid by Kingate Management and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof). Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection and nexus between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividends to the Shareholders, and the subsequent distribution of trust property to Mr Grosso and Mr Ceretti. Each distribution of trust property formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

92A.    In the further alternative:

92A.1    The Shareholders paid the sums referred to in paragraphs 92 above to Mr Grosso and Mr Ceretti, which sums were derived from the fees paid to Kingate Management by the Funds, as pleaded above.

92A.2    Those sums were (in the hands of the Shareholders) liable to be repaid to the Funds or Kingate Management for the reasons pleaded herein. Further, the Shareholders made the transfers to Mr Grosso and Mr Ceretti under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to Kingate Management, and by Kingate Management to them, based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

92A.3    Accordingly, the Shareholders are entitled to recover from Mr Grosso and Mr Ceretti by way of restitution the sums paid to them. If (contrary to the Funds' primary case) the Shareholders have a defence to the Funds' claims in restitution against them, the Funds are entitled to be subrogated or sub-subrogated (via Kingate Management's restitutionary claim against the Shareholders pleaded above) to such restitutionary claims of the Shareholders against Mr Grosso and Mr Ceretti.

93    Further or alternatively, for the reasons pleaded above, all such distributions to Mr Grosso and Mr Ceretti constituted the Fund's property and/or the traceable proceeds thereof. Mr Grosso and Mr Ceretti must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

94    In all the premises pleaded above, given the Funds' mistake, Mr Grosso and Mr Ceretti have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees, alternatively, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders and then paid by the Shareholders to Mr Grosso and Mr Ceretti by way of distributions of trust property.

95    The Funds repeat paragraphs 76.1 and 76.2 above.

**Remedy against Mr Grosso and Mr Ceretti**

96    By reason of the claim set out in paragraphs 91-95 above, the Funds are entitled to an order that Mr Grosso and Mr Ceretti pay:

96.1    to Kingate Global, the amount of US$254,478,999.69, alternatively, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti; and

96.2  to Kingate Euro, the amount of 56,226,531.48 Euros, alternatively, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti.

**CLAIMS BASED ON RETENTION OF LEGAL TITLE**

97  As set out in paragraph 86.1, the Funds' mistake was a fundamental mistake as to the quantity of the fees paid and/or as to the obligation to pay fees, which so vitiated the Funds' intention to transfer the overpaid fees to Kingate Management as to prevent legal title to those fees from passing from the Funds to Kingate Management.

98  As a result:

98.1.1  when the overpaid fees were received from the Funds by Kingate Management, they constituted property to which the Funds retained legal title and/or its traceable proceeds;

98.1.2  when Kingate Management paid on the overpaid fees and/or their traceable proceeds to the Shareholders, in the form of dividends, the Shareholders also received property to which the Funds retained legal title and/or its traceable proceeds; and

98.1.2A  when the Shareholders paid on the overpaid fees and/or their traceable proceeds to the Investment Companies, for the purposes of investment, the Investment Companies also received property to which the Funds retained legal title and/or its traceable proceeds; and/or

98.1.3  when the Shareholders paid on the overpaid fees and/or their traceable proceeds to Mr Grosso and Mr Ceretti, in the form of distributions of trust property, Mr Grosso and Mr Ceretti also received property to which the Funds retained legal title and/or its traceable proceeds.

99  Accordingly, the Funds are entitled:

99.1  against Kingate Management, to:

99.1.1  an order that Kingate Management pay:

99.1.1.1  Kingate Global the amount of US$254,478,999.69; and

99.1.1.2  Kingate Euro the amount of 56,226,531.48 Euros;

99.1.2  alternatively:

99.1.2.1  a declaration that overpaid fees in the amount of US$254,478,999.69 and/or their traceable proceeds constituted property to which Kingate Global retained legal title