# EXHIBIT E

[2012] SC (Bda) 52 Com (3 October 2012)



# In The Supreme Court of Bermuda

## COMMERCIAL COURT

## COMPANIES (WINDING-UP)

### 2011: No. 301

**IN THE MATTER OF KINGATE MANAGEMENT LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 1981**

## RULING

(in Chambers)

Date of hearing: September 19-20, 2012
Date of Reasons: October 3, 2012

Mr. Alex Potts, Sedgwick Chudleigh, for the Joint Liquidators of Kingate Global Fund Limited (in liquidation) and Kingate Euro Fund Limited (in liquidation), the Plaintiffs in the Civil Action ("the Funds")

Mr. Saul Froomkin QC, Isis Law, and Ms. Venous Memari, Liberty Law Chambers for the Official Receiver and Provisional Liquidator of Kingate Management Limited (the "OR")

Mr. Tim Marshall and Ms. Katie Tornari, Marshall Diel & Myers Ltd, for First Peninsula Trustees Limited, Port of Hercules Trustees Limited, Ashby Holding Services Limited, El Prela

Group Holdings Services Limited, Ashby Investment Services Limited, El Prela Trading Investments Limited, and Alpine Trustees Limited, the Fourth to Seventh and Tenth to Twelfth Defendants in the Civil Action ("the Trust Defendants").

## Introductory

1. On March 2, 2012, I made a winding-up order in respect of the Company on the Court's own motion in the unusual circumstances explained in my Judgment dated March 6, 2012: *Re Kingate Management Ltd.* [2012] Bda LR 14. For present purposes it suffices to explain that the shareholders of the Company decided to petition for its own winding-up on September 7, 2011. A winding-up order was not sought at the first return date of the Petition when joint provisional liquidators ("JPLs") were appointed. When funding arrangements could not be worked out with the members who had caused the winding-up proceedings to be commenced (who were also defendants in the Civil Action), only the Court appeared competent to seek a winding-up order.

2. The Company's principal business function was managing the Funds, British Virgin Islands companies which were placed into liquidation there in 2009. Ancillary liquidation proceedings were subsequently commenced in Bermuda in 2010. The Funds were feeder funds through which non-US investors were able to invest with Bernard L. Madoff Investment Securities ("BLMIS") in New York.

3. Following the arrest of Bernard Madoff in December 2008 and the discovery that investors such as those who invested through the Funds had suffered grave financial losses due to his Ponzi scheme, litigation was commenced by or on behalf of investors in various jurisdictions seeking to mitigate these losses. On December 22, 2010, the Funds issued proceedings in Supreme Court of Bermuda Civil Jurisdiction 2010: 454 ("the Civil Action") against, *inter alia*, the trustees which held the shares in the corporate shareholders of the Company and the corporate shareholders themselves. The Funds seek to recover under various claims what now seem in cumulative terms to be generous management fees which were paid to the Company and distributed to its shareholders before the business structure collapsed as a result of the implosion at BLMIS consequent upon Bernard Madoff's arrest.

4. The underlying commercial background to the Funds' claims valued by them at in excess of $300 million is that the Company has virtually no liquid assets and the Defendants are seeking to retain substantial distributions received at a time when the Company was flush with money. Although two of the Trust Defendants claim to be creditors in the amount of some $900,000, this pales into insignificance when one considers that their legal

entitlement to retain the far larger distributions they allegedly received (in excess of $300 million) is in question in the Civil Action.

5. For the purposes of the present applications, I have assumed (despite Mr. Potts' impassioned protestations that their status is in doubt) that the Trust Defendants include amongst their number two actual or contingent creditors of the Company (Ashby Holding Services Limited and El Prela Group Holding Services Limited).

6. Accordingly, it seemed obvious from the outset that the predominant commercial interest of the Trust Defendants (Defendants 4-7 and 10-12 in the Civil Action) in relation to the present cross-applications (by the Funds for leave to continue the Civil Action against the Company and by the Shareholder Defendants to be joined to the aforesaid application) derives from their status as Defendants in the Civil Action. While it is also obvious that the Funds' investor creditors are the ultimate victims of the Madoff fraud, there is no suggestion that the Trust Defendants were themselves implicated in the fraud. These Defendants' desire to vigorously defend their right to retain what they view as a legitimate return on their own investment in the structure that provided international investors with access to a highly popular product is entirely understandable - and could ultimately be vindicated.[1] Who should bear the risk of the losses sustained by the Funds in the present scenario (and similar scenarios elsewhere in the Madoff-infected commercial world) remains to be decided.

7.  The Funds' liquidators appear to have formulated arguable claims for the return of some (if not all) of the management fees their investments generated for the Company as the monies passed through the offshore structure on the way to New York. And the main question raised by the present application is whether the claims asserted against the Company ought to be continued in the Civil Action or advanced instead through the proof of debt process in the Company's liquidation.

8. The Funds' primary application was made by Summons dated March 7, 2012; the Trust Defendants' joinder application was made by Summons dated July 9, 2012. On August 29, 2012, the Funds also issued a discovery Summons seeking disclosure by the OR of the current status of insurance cover in relation to the Company by the OR ("the Discovery Summons").

---

[1] In commenting on a draft of this Judgment, the Trust Defendants' counsel pointed out that they are professional trustees answerable to third parties acting pursuant to "Beddoe" orders made by the British Virgin Islands Court.

9. The so-called FIM Defendants (Defendants 2-3, 8-9) on July 9, 2012 issued a joinder Summons of their own. However, this Summons was discontinued by consent on September 19, 2012.

**The Civil Action**

10. Essentially two sets of claims are asserted by the Funds against the Company, the unjust enrichment claims and the contractual/tort claims. These claims correspond to claims pleaded against other Defendants and are based on the same core factual matrix.

11. The unjust enrichment claims are based on the simple premise that the Company's fee entitlements were based on the Funds' net asset value ("NAV"). The NAV of each Fund was calculated by reference to the value of assets believed to have been held by BLMIS but which in fact did not exist. The fees received by the Company based on a mistake of fact unjustly enriched the Company to the extent of the overpayment. A corresponding claim is pleaded in the alternative against the Trust Defendants and Defendants 8-9, as the alleged ultimate beneficial owners of the Company's shareholders. The right to trace the proceeds of the relevant receipts in equity is also asserted.

12. The fault-based claims against the Company are for "*breach of contractual and/or tortious duties of care and/or negligent misstatement*".   Corresponding claims are asserted against the FIM Defendants (Defendants 2-3).

13. Liquidated amounts are claimed in respect of the unjust enrichment claims; unliquidated damages to be assessed are sought in respect of the fault-based claims.

**Findings: governing legal principles**

**The Funds section 167(4) application**

14. Section 167(4) of the Companies Act 1981 provides as follows:

> "*When a winding-up order has been made or a provisional liquidator has been appointed, no action or proceeding shall be proceeded with or commenced against the company except by leave of the Court and subject to such terms as the Court may impose.*"

15. This provision is based on section 231 of the Companies Act 1948 (UK), and even earlier similar provisions, which were re-enacted in section 130(2) of the Insolvency Act 1986 (UK). Mr. Potts accurately submitted in the Funds' Skeleton Argument:

> "*8. Section 167(4) obviously confers a discretion upon the Court to lift the automatic stay of proceedings either unconditionally or subject to conditions as may be appropriate in the circumstances of the case.*
>
> *9. The application of section 167(4) has been considered occasionally by the Bermuda courts in various first instance judgments, and similar statutory provisions have been considered more regularly by the Courts in jurisdictions such as England and Wales, Australia, Canada, Singapore and Hong Kong, which cases are discussed, to some extent, in the textbooks. Although the case law is informative and illustrative of the various circumstances in which the discretion has been exercised one way or another, much depends on the facts and circumstances of each particular case. As the English Court of Appeal has stated on more than one occasion, the discretion is 'broad and unfettered' and gives the court 'freedom to do what is right and fair in all the circumstances'.*"

16. From the helpful review of cases set out in section 11.9 of French, '*Applications to Wind Up Companies*', 2nd edition, upon which the Funds relied, it is clear that:

   (a) the Company is ordinarily the only other party to an application to lift the stay;

   (b) the purpose of the stay is both

      (i)   to ensure that the proof of debt process is the predominant means of adjudicating creditors' debts rather than more expensive litigation, and

      (ii)  to prevent individual creditors gaining an unfair advantage which subverts the fundamental principle of a *pari passu* distribution of an insolvent company's assets;

   (c) the stay will normally be lifted to pursue proceedings involving questions which cannot be determined in the liquidation or where the company is a necessary party to proceedings against others, provided the claims are not obviously unsustainable;

(d) where leave is granted, the applicant is often asked to undertake not to enforce any judgment against the company without leave and regard is had to the ability of the company to fund its defence of the proceedings.

17. In the Respondent's Skeleton Argument, Mr. Froomkin and Ms. Memari also correctly submitted:

> "1. The rationale underlying the statutory liquidation stay is to prevent a creditor from gaining an advantage over other creditors and to prevent a company in liquidation being subjected to actions that are expensive and carried on at the expense of the creditors of the company...
>
> 4. The applicant must advance grounds which on balance justify the pursuit of its claim by litigation against the company, (with the attendant risk of diminution of the company's assets, potential prejudice to other creditors and interference with the orderly course of winding-up), rather than by the usual course of lodging a proof of debt on winding-up.".

18. Mr. Froomkin also relied upon the observations I made in the course of refusing to lift the liquidation stay in *Xena Investments Ltd -v- New Stream Capital Fund Limited (in liquidation)* [2011] Bda LR 4:

> "5.It is clear from all the authorities that there is a strong presumption against allowing unsecured creditors to establish their debts by ordinary writ action. This presumption even extends to equitable claims. In the present case the essence of the complaint is that 'Tensor' is possibly in a position to gain a priority. The rationale underlying the statutory liquidation stay is that some creditors may gain a variety of advantages if, by happenstance, they obtain a judgment or levy execution before a winding-up commences. The effect of lifting the stay would be to give the Plaintiff priority over other account owners of the same class, contrary to the rationale underlying section167(4)."

19. In the Trust Defendants' Skeleton Argument, Mr. Marshall and Ms. Tornari relied (at paragraph 45) on the following passage from my Judgment in *Ace Bermuda Insurance Ltd –v- Pedersen et al* [2005] Bda LR 44 at page 23 as stating the principles applicable to granting leave to sue a company in liquidation:

> "The principles for the grant of leave to proceed against a company in liquidation have been defined in Australia as follows:

'1. An application for leave nunc pro tunc to commence any action or to continue any action which was commenced without obtaining leave may be given if good cause is shown on the merits: *Australian Company Law and Practices* (Wallace and Young) p. 654.

2. Section 230(3) ensures that assets of the company in liquidation will be administered in accordance with the Act and that no person obtains an advantage to which, under the Act, he is not properly entitled. It enables the Court effectively to supervise all claims brought against the company: *Re Sydney Formworks Pty. Ltd. (in liq.) (supra).*

3. There must be no prejudice to the creditors or to the orderly winding-up of the company if the action is allowed to proceed: *Re Sydney Formworks Pty. Ltd. (supra); Re A.J. Benjamin Ltd. (in liq.)* and *The Companies Act (supra).*

4. The applicant's claim must be of a type which should proceed by action to judgment, rather than one which is capable of being dealt with in an ordinary way by proof of winding-up: *Century Mercantile Co. v. Auckland Provincial Fruitgrowers Society* (1929) N.Z.L.R. 272: *Batterson v. Miella Constructions Pty. Ltd. (sic)* (1967) V.R. 349.

5. Leave is more likely to be granted where there is an insurance company standing behind the company to pay any judgment which the plaintiff might obtain against it. If successful, such an action is unlikely to prejudice the creditors or the company: *Re Sydney Formworks Pty. Ltd. (in liq.) (supra); Re A.J. Benjamin (in liq.) (supra);* the section is not designed to protect an insurer.

6. A condition is often imposed that the plaintiff will not enforce any judgment against the company without leave of the Court. This ensures that the Court retains ultimate control: *Re Sydney Formworks Pty. Ltd. (in liq.) (supra); Re A.J. Benjamin (in liq.) (supra).*

7. Mere delay itself in applying for leave will not prevent leave being granted. Leave is not to be withheld simply and solely as a punishment: *Re A.J. Benjamin (in liq.) (supra).*

8. Leave may be granted after the expiry of the relevant period of limitation, to continue an action commenced within the limitation period without the leave of the Court.[2]"

---

[2] *BHG Nominees Pty Ltd v Ellis Young Investments Pty Ltd & Ors* [1998] 1019 FCA (14 August 1998), transcript, pages 5-6.

20. There was broad agreement as to the principles applicable to deciding whether or not to lift the stay combined with a consensus that the Funds' application turned on an evaluation of the specific factors relevant to the present case. It was also common ground that, in line with the statutory wording, the Court possesses a broad discretion in terms of imposing conditions on the grant of leave.

**Joinder of parties other than the Company to section 167(4) applications**

21. It is self-evident that the company to which the application to lift the stay relates will ordinarily be the only respondent to the application which must be made in the liquidation proceedings. The Trust Defendants' counsel were unable to identify a single case where a creditor or shareholder appeared on such an application although liquidation stay cases go back to the nineteenth century. McPherson (at paragraph 7.041) describes the procedure in the following way which is consistent with the established Bermudian approach:

> "*Application for leave to proceed should be filed in the court which made the winding-up order as the object of the rule is that all litigation affecting the assets of the company shall be brought before the judge having winding-up jurisdiction. The application cannot be dealt with on a without notice basis; it is to be served on the liquidator…*"

22. I am not so rash as to rule out the possibility that circumstances might exist in which a creditor would be entitled to be joined as a party to an application under section 167(4). However, the apparent absence of any cases illustrating instances where this has occurred serves to highlight how unusual such an eventuality is likely to be. The liquidator represents a company in liquidation, and creditors only typically become involved with liquidation applications dealing with their own claims or in applications seeking to challenge the validity of a liquidator's acts. The Trust Defendants appeared to invoke the following provisions of the Companies Act 1981 as an alternative basis for their joinder to the section 167(4) application:

> "***Powers of liquidator***
> *175    (1)    The liquidator in a winding-up by the Court shall have power, with the sanction either of the Court or of the committee of in-spection —*

(a)    *to bring or defend any action or other legal proceeding in the name and on behalf of the company;*

(b)    *to carry on the business of the company so far as may be necessary for the beneficial winding up thereof;*

(c)    *to appoint an attorney to assist him in the performance of his duties;*

(d)    *to pay any classes of creditors in full;*

(e)    *to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim, present or future, certain or contingent ascertained or sounding only in damages against the company, or whereby the company may be rendered liable;*

(f)    *to compromise all calls and liabilities to calls, debts and liabilities capable of resulting in debts, and all claims, present or future, certain or contingent, ascertained or sounding only in damages, subsisting or supposed to subsist between the company and a contributory or alleged contributory or other debtor or person apprehending liability to the company, and all questions in any way relating to or affecting the assets or the winding up of the company, on such terms as may be agreed, and take any security for the discharge of any such call, debt, liability or claim and give a complete discharge in respect thereof.*

(2)    *The liquidator in a winding up by the Court shall have power—*

(a)    *to sell the real and personal property and things in action of the company by public auction or private contract, with power to transfer the whole thereof to any person or to sell the same in parcels;*

(b)    *to do all acts and to execute, in the name and on behalf of the company, all deeds, receipts and other documents, and for that purpose to use, when necessary, the company's seal;*

(c)    *to prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against his estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent, and rateably with the other separate creditors;*

(d)    *to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the company, with the same effect with respect to the liability of the company as if the bill or note had been drawn, accepted,*

> *made or indorsed by or on behalf of the company in the course of its business;*
>
> (e) *to raise on the security of the assets of the company any money required;*
>
> (f) *to take out in his official name letters of administration to any deceased contributory and to do in his official name any other act necessary for obtaining payment of any money due from a contributory or his estate which cannot be conveniently done in the name of the company, and in all such cases the money due shall, for the purpose of enabling the liquidator to take out the letters of administration or recover the money, be deemed to be due to the liquidator himself;*
>
> (g) *to appoint an agent to do any business which the liquidator is unable to do himself;*
>
> (h) *to do all such other things as may be necessary for winding up the affairs of the company and distributing its assets.*
>
> **(3)    The exercise by the liquidator in a winding up by the Court of the powers conferred by this section shall be subject to the control of the Court, and any creditor or contributory may apply to the Court with respect to any exercise or proposed exercise of any of those powers."**
> [emphasis added]

23. Section 175(3), unlike the broader section 231 applicable to voluntary liquidations, only confers a right on creditors to apply to court to challenge the exercise or proposed exercise of the powers listed in section 175(1)-(2): *In re Mentor Insurance Limited* [1987] Bda LR 76, at page 8. The only obvious power which might be engaged by an application under section 167(4) is that under section 175(1) (a): "*to bring or defend any action or other legal proceeding in the name and on behalf of the company*".

24. If a creditor became aware that a liquidator did not propose to defend an action which had been commenced or continued against the company with or without leave under section 167(4), then an application could be brought by a creditor under section 175(3) with a view to challenging the validity of the contentious litigation position adopted by the liquidator. Equally, the possibility foreshadowed by the Trust Defendants in the present case, of a liquidator starting to defend proceedings but then deciding to allow a default judgment to be obtained could potentially be challenged under section 175(3).

25. It also seems at least arguable (albeit somewhat fanciful) that if a creditor was dissatisfied with a liquidator's proposed decision not to oppose an application made

under section 167(4), such creditor could seek to persuade the Court in advance of the hearing of the stay-lifting application that the liquidator's proposed stance was inconsistent with the best interests of the creditors.

26.  In the real world, however, professional liquidators rarely adopt litigation strategies that are capable of being credibly challenged by non-conflicted creditors who have an undisputed stake in the liquidation estate. If an estate lacks funds to prosecute or defend litigation and the creditors are unable or unwilling to finance their chosen litigation course, it will not lie in their mouths to complain if the liquidator fails to pursue their chosen litigation course. Section 175(3) of the Companies Act 1981 in my judgment provides no jurisdictional basis for joining a creditor as a respondent to an application made against a company in liquidation under section 167(4).

27.  As noted above, it is nevertheless impossible to rule out exceptional scenarios where a creditor might have standing to participate in an application to lift the liquidation stay. What can be excluded altogether is the legal standing of a co-defendant of the company in the litigation to which the stay-lifting application relates to participate in a section 167(4) application in order to advance its own litigation interests as opposed to the interests of unsecured creditors as a whole. Although no authority is required to support this proposition, the commentary on section 231 of the Companies Act 1948 (UK) in '*Buckley on the Companies Act*', 14th edition (not referred to in argument) states:

> "*A stranger to the company who is co-defendant with the company in a suit is not entitled, on the ground that no order for leave has been obtained, to have further proceedings in the suit stayed.*[3]"

28. The quoted commentary only directly supports the proposition that the existence of a liquidation stay against a company being sued cannot be invoked by a co-defendant of the company in liquidation as a ground for staying litigation taking place outside of the winding-up proceedings. However, in my judgment the passage illustrates the wider proposition that the continuance or lifting of the liquidation stay is a matter between the party suing the company and the company itself and is of no legally cognisable concern to co-defendants of the company in ordinary civil proceedings.

29. More generally still, in a case where alleged debtors of a company in liquidation sought to challenge an application by the joint liquidators in relation to a civil action against them, *In re Mentor Insurance Limited* [1987] Bda LR 76, Collett J held that the

---

[3] The commentary cites *Wells-v- Estates Investment Co.* (1867) 15 W.R. 762. The co-defendant apparently sought to stay the litigation and did not have the temerity to seek to enforce the liquidation stay in the winding-up proceedings.

requirements for joinder were not made out merely because the application in the liquidation would indirectly affect the civil litigation defendants' rights. In a passage upon which Mr. Potts relied, Collett J (at pages 7-8) declined to grant the joinder application under the Court's inherent jurisdiction (as an alternative to Order 15) on the following grounds:

> " …*in my judgment delivered on 1st May, 1987, I said, ' inherent jurisdiction although multi-faceted is not to be relied upon when the effect of invoking it would be to evade restrictions which Parliament has attached to a statutory jurisdiction in furtherance of a deliberate statutory scheme'. I reiterate these words and add that I am satisfied that to allow a joinder outside the ambit of the relevant rule would be mischievous and work only delay and inconvenience in the proper conduct of liquidations generally under Part XIII of the Companies Act 1981.*"

30. It is within this statutory context that the general principles relating to joinder and Order 15 rule 2(b) in particular, upon which the Trust Defendants relied, fall to be considered. I accept the test set out at paragraph 18 of their Skeleton taken from *Supreme Court Practice 1999* paragraph 15/6/9, namely that the intervener "*should have some interest which is directly related or connected with the subject matter of the action.*" I also have regard to the fact that "*the Court has an inherent jurisdiction to enable it to do justice in particular cases to allow a person not a party to intervene in proceedings if the effect of such proceedings has been, or is likely to be, to cause such person serious hardship, difficulty or damage*": *Supreme Court Practice 1999*, paragraph 15/6/10.

31. Taking these flexible principles into account in light of the legal parameters of the Funds' stay-lifting application, the legal position may be summarised as follows. The only potential parties to a section 167(4) of the Companies Act application will ordinarily be the applicant, the company acting by its liquidator and creditors seeking to advance the interests the liquidator is supposed to represent in his conduct of the liquidation.

**Discovery obligations of an insolvent company in relation to insurance policies relevant to a potential creditor's litigation claim**

32. Section 2 of the Third Parties (Rights Against Insurers) Act 1963 provides in salient part as follows:

> "***Rights of third parties on bankruptcy of insured person***

> *2 (1)* **Where under any contract of insurance a person is insured against liabilities to third parties which he may incur,** *then—*
>
>> *(a) in the event of the insured becoming bankrupt or making a composition or arrangement with his creditors; or*
>>
>> *(b)* **in the case of the insured being a company, in the event of a winding-up order being made**, *or a resolution for a voluntary winding-up being passed, with respect to the company, or of a receiver* **or liquidator of the company's business or undertaking being duly appointed**, *or of possession being taken, by or on behalf of the holders of any debentures secured by a floating charge, of any property comprised in or subject to the charge,*
>
> **if, either before or after that event, any such liability as aforesaid is incurred by the insured, his rights against the insurer under the contract in respect of the liability shall, notwithstanding anything in any Act or rule of law to the contrary, be transferred to and vest in the third party to whom the liability was so incurred.**
>
> *(2) Where any of the events specified in subsection (1) (a) or (b) occur, the rights of any of the creditors of the insured to or in respect of moneys paid or owing by the insurer to the insured under a contract of insurance shall, notwithstanding anything in any Act or rule of law to the contrary, be transferred to and vest in the third party to whom the liability was so incurred….*" [emphasis added]

33. These provisions have the effect that the benefit of any insurance policies an insolvent company (or individual) has taken out in respect of liabilities to a third party are transferred to a third party to whom the company is liable by operation of law. The transfer of rights is stated as taking place "*in the event*" that (i.e. when) a winding-up order is made or a liquidator is appointed. Supplementary to these primary provisions, section 3 of the Act imposes the following discovery obligations on the insolvent insured:

> "**Duty to give necessary information to third parties**
>
> *3 (1) In the event of any person becoming bankrupt or making a composition or arrangement with his creditors, or* **in the event of a winding-up order being made**, *or a resolution for a voluntary winding-up being passed, with respect to any company or of a receiver* **or liquidator of the company's business or undertaking being duly appointed** *or of possession being taken by or on behalf of the holders of any debentures secured by a floating charge of any property comprised in or subject to the charge* **it shall be the duty of the** *bankrupt, debtor, personal representative of the deceased debtor or company, and, as the case may be, of the trustee in bankruptcy, trustee,* **liquidator**, *receiver, or person in possession of the property* **to give at the request of any person claiming that the** *bankrupt, debtor, deceased debtor, or* **company is under a liability to him such**

*information as may reasonably be required by him for the purpose of ascertaining whether any rights have been transferred to and vested in him by this Act and for the purpose of enforcing such rights, if any,* and any contract of insurance, in so far as it purports, whether directly or indirectly, to avoid the contract or to alter the rights of the parties thereunder upon the giving of any such information in the events aforesaid or otherwise to prohibit or prevent the giving thereof in the said events shall be of no effect.

*(2) If the information given to any person in pursuance of subsection (1) discloses reasonable ground for supposing that there have or may have been transferred to him under this Act rights against any particular insurer, that insurer shall be subject to the same duty as is imposed by subsection (1) on the persons therein mentioned.*

*(3) The duty to give information imposed by this section shall include a duty to allow all contracts of insurance, receipts for premiums, and other relevant documents in the possession or power of the person on whom the duty is so imposed to be inspected and copies thereof to be taken.*" [emphasis added]

34. On a plain reading of section 3, a third party who asserts a disputed claim against an insolvent company which is insured against the relevant liability, is entitled to seek from the insured "*such information as may reasonably be required….for the purpose of enforcing such rights, if any*". The discovery rights are both broad and flexible designed to enable the third party seeking to recover under the policy to take practical steps to do so, by litigation or otherwise. Our 1963 Act is based on the Third Parties (Rights Against Insurers) Act 1930 (UK). The English Court of Appeal case of *In re OT Computers Ltd (in administration)* [2004] 3 WLR 886 supports this analysis clarifying a position which was, for a few years at least, in doubt under English law. Mr Potts relied in particular on the following passage from the leading judgment delivered by Longmore LJ:

"*33… What a third party claimant needs to know is whether the person against whom he is making a claim is insured and, if so, in what terms. If the proposed defendant has no insurance or only limited insurance or insurance to which it is a condition precedent that the insured shall have obtained an arbitration award (to take 3 examples), the third party claimant may well think that it is not sensible or worthwhile to issue (or continue) legal proceedings. In this sense he needs to have information about the proposed defendant's insurance position if any and that information is "such information as may be reasonably required" within section 2. The fact that in the event the third party claimant may not establish that the proposed defendant is liable in fact so that his action fails or the fact that he cannot be certain that his rights against the insurer will be effective because he may not, in the result, have established the liability of the defendant have, in my judgment, nothing to do with the reasonable requirement of being given*

*information about the defendant's insurance for the purpose of ascertaining whether rights against the insurer have been transferred.*

34. *This is all the more so once it is accepted, as Lindsay J did accept, that the transfer occurs on the event of insolvency. If there are rights against an insurer they are transferred to the third party at that time but what the third party reasonably needs to know is whether there are any rights which, in the statutory words, "have been transferred to and vested in him by this Act". If there is insurance, then there are rights which will have been transferred but he is not in a position to know whether those rights have, in fact, been transferred until he discovers the identity of the insurers and obtains information about the terms of the insurance. Only then will he know if there are rights which "have been transferred to and vested in him by the Act" and such information is reasonably required for the purpose of ascertaining whether those rights have been transferred and, also, for the purpose of enforcing such rights "if any".*

35. *The words "if any" are significant. They contemplate that there may in fact be no rights to be transferred. But the third party is entitled to discover that no rights have been transferred just as much as to discover that rights have been transferred. What he needs to know is whether there are rights against the insurers which have been transferred or whether there are not."*

35. The Official Receiver did not challenge the broad construction of the 1963 Act relied upon by the Funds.

**Findings: the Trustee Defendants' joinder application**

36. Having regard to the essential character of the Funds' application under section 167(4) of the Companies Act 1981 and the fact that the Trust Defendants' predominant commercial interest is clearly derived from their status as Defendants in the Civil Action, the joinder application must be refused. The stay-lift application is opposed by the Official Receiver on behalf of the Company. The statutory scheme for winding-up affords the two Defendants whom I assume to be creditors alternative remedies for any legitimate concerns they may have about the consequences for them of the liquidation stay being granted.

37. One justification for intervening was the Trust Defendants' greater familiarity with the Civil Action through their involvement with it over two years contrasted with the Official Receiver's recent entry onto the scene. It was suggested their participation could assist the Court. This ignored the simple point that any information which they had could

simply be shared with the Official Receiver, as ordinarily occurs when liquidators appear before the Court on applications within the liquidation proceeding itself.

38. The primary argument the Trust Defendants were keen to advance was the risk that the Official Receiver might be unable to defend the proceedings and thereby permit a default judgment to be entered against the Company in respect of the liquidated claims. This was the basis of both their opposition to the lifting of the stay and the alternative argument that a condition should be imposed on any leave requiring the Funds to obtain leave of the Court before seeking a default judgment against the Company. This plausible risk did not justify granting the joinder application for two main reasons.

39. Firstly, as Mr. Potts forcefully pointed out, the rules relating to default judgments in the context of a writ action containing mixed claims (Order 19 rule 7, which clearly applies to the Civil Action) has built in protections for co-defendants of a defaulting defendant. Order 19 rule 7 provides as follows:

> "*19/7 Default of defence: other claims*
>
> *7 (1) Where the plaintiff makes against a defendant or defendants a claim of a description not mentioned in rules 2 to 5, then, if the defendant or all the defendants (where there is more than one) fails or fail to serve a defence on the plaintiff, the plaintiff may, after the expiration of the period fixed by or under these rules for service of the defence, apply to the Court for judgment, and on the hearing of the application the Court shall give such judgment as the plaintiff appears entitled to on his statement of claim.*
>
> *(2) Where the plaintiff makes such a claim as is mentioned in paragraph (1) against more than one defendant, then, if one of the defendants makes default as mentioned in that paragraph, the plaintiff may—*
>
>> *(a) if his claim against the defendant in default is severable from his claim against the other defendants, apply under that paragraph for judgment against that defendant, and proceed with the action against the other defendants; or*
>>
>> *(b) set down the action on motion for judgment against the defendant in default at the time when the action is set down for trial, or is set down on motion for judgment, against the other defendants.*

*(3) An application under paragraph (1) must be by summons.*"

40.  It is simply not plausible that, having regard to the nature of the overlapping claims asserted in the Civil Action by the Funds against the Company and the Trust Defendants, a default judgment will be obtained against the Company before the claims against the other Defendants are tried. However, this rule disposes of any suggestion that the Trust Defendants, *qua* Defendants in the Civil Action, have vital interests impacted by the stay-lifting application.

41.  However, having regard to the nature of the winding-up regime, the two Trust Defendants who claim to be creditors have various other ways of  ensuring that any prejudice to their interests as creditors does not flow from the stance the Official Receiver adopts in the Civil Action. For instance:

> (a) it is always open to creditors to fund litigation which a liquidator has insufficient assets to pursue;

> (b) if the Official Receiver makes any litigation decisions which are inconsistent with the interests of unsecured creditors generally, the legality of the relevant decision can be challenged under section 175(3) of the Act.

42.  This should not be taken to suggest that the Court would ever give much or any weight to the views of partisan creditors, conflicted by countervailing debtor interests, as to how a liquidator should manage an insolvent estate. The point is that any legitimate creditor interests can be protected in various ways without the need for the Trust Defendants to be made a party to an application which concerns the applicant Funds and the Company.

43.  For the above reasons, the joinder application is refused.

**Findings: the Funds' section 167(4) application**

44.  The Company has no or no significant liquid assets but does have insurance cover which, depending on information the Official Receiver has yet to disclose to the Funds, will possibly fund at least some defence costs and will potentially meet at least some of the liability to which the Company is exposed in relation to the Funds' claims. The policy on its face appears only to cover the fault-based claims.

45. As the Company has no liquid assets, the suggestion that the Funds should prove in the liquidation instead of continuing their action against the Company and its co-Defendants

in the Civil Action seems highly artificial. Unless the Company itself were to seek to recover the distributions made to its shareholders or file claims against its directors and officers (there is no suggestion that any such claims could properly be formulated), it would have no assets to distribute making the proof of debt process a barren exercise.

46.  The reality appears to me to be that the Funds' claims as against the Company if successful will have no impact on the assets of the Company available for general distribution at all. Such assets do not presently exist. The claims (especially the contractual/tortious claims) will merely attach to the insurance proceeds which by operation of law will belong to the Funds in the event of their claims succeeding. On the face of the relevant policy, as Mr. Froomkin pointed out, the unjust enrichment claims may not be covered because no fault is alleged.

47.  To the extent that the restitutionary and the fault-based claims against the Company overlap with claims against its co-Defendants in the Civil Action, there is a risk of inconsistent findings if the same claims are determined in separate proceedings. This factor is more significant in pointing to lifting the stay than the mere character of the claims as it is always possible for liquidators to apply for directions in the form of a declaration on important points of law arising in the liquidation. If the Funds' claims require the Court to determine contested factual issues based on oral evidence and cross-examination (it was not suggested that they did not), this fact alone would make them inappropriate for determination through the proof of debt process.

48.  Obviously the Official Receiver, who is apparently being funded at this juncture by the public purse, would like to close down the Company's liquidation as soon as possible and this goal would be thwarted until the Civil Action is concluded.  In the interim, however, there would be no need for any significant liquidation expenses to be incurred if there are no assets to distribute and no useful purpose would be served in adjudicating claims. The inconvenience of delaying the closure of the liquidation cannot outweigh all of the other discretionary considerations which point strongly in favour of lifting the stay. This is not a case where the continuance of the Civil Action will interfere with the efficient administration of an active liquidation.

49.  Moreover, the defence of the Civil Action would largely (or to some extent at least) be informed by the views of the Company's liability insurer as the effect of the 1963 Act is that the benefits of the policy inure for the benefit of any successful third party claimants, not the insolvent estate. It presently seems to be the case that the Funds will make no recovery out of the assets of the Company at all so the notion of the Funds gaining some advantage over other creditors does not exist on the present facts. At present it seems most likely that no distribution will ever be made by the OR, based on his own

characterisation of the financial condition of the insolvent estate. Further and in any event, overseas proceedings are pending against the Company which have not, seemingly, been stayed, so the Funds cannot be said to be the only potential creditors pursuing claims outside the liquidation.

50.  The superficially appealing argument that the estate should not be burdened with the costs of defending the Funds' claims does not withstand closer scrutiny for similar reasons. If there are insufficient liquid assets in the estate to fund the OR's opposition to the section 167(4) application, it follows that the estate's resources will not meet the defence costs likely to be entailed in the Civil Action. It will be a matter for the commercial judgment of the OR to determine what public funds (if any) to expend on defending the relevant claims. As Jonathan Parker LJ observed in *New Cap Reinsurance Corporation Ltd -v- HIH & General Insurance Ltd et al* [2002] EWCA Civ 300, in a passage upon which the Funds' counsel relied:

> "54…. *the provisional liquidators had a choice as to the extent of the part (if any) which HIH should play in the Charman litigation, and, as is common ground, they have full powers of compromise. Essentially the choice is a commercial one which the provisional liquidators are well placed to make. It is open to them to decide that HIH should take no part in the litigation and simply be bound by the findings which the Commercial Court makes (assuming a trial takes place), just as it is open to them at the other extreme to decide that HIH should play a full part in defending the claims…*"

51. Mr. Froomkin, in the alternative, invited the Court, if leave was granted, to :

(a) extend the time for filing the Company's Defence in the Civil Action by six months, effectively giving the Company that time to file its pleading;

(b)  order security for costs.

52.   The time for filing the Company's Defence and the issue of security for costs should be dealt with by way of applications made in the Civil Action. The merits of such applications turn on judgments which the trial judge would be best placed to make and properly should be made in the Civil Action in any event. As I indicated to counsel in the course of the hearing, the Civil Action will be assigned to another judge to enable me to

deal with applications for directions in relation to the conduct of those proceedings which the Funds and/or the Company may make.

53.  I am minded to grant leave to continue the Civil Action upon the usual condition that any judgment obtained against the Company may not be enforced without leave of the Court. This condition presently seems somewhat academic in that there appear to be no assets of the Company against which any judgment could be enforced but the fact that this condition is routinely imposed and will impose no undue hardship on the Funds is sufficient to justify its imposition. The stay should be lifted for the following principal reasons:

(a) the Funds' claims against the Company are unlikely to interfere in any material way with the Company's liquidation because by the Official Receiver's own account there are no assets against which any judgment could be enforced. Accordingly, the pursuit of the Civil Action claims will not prevent the adjudication and payment of claims to the Company's other creditors, a process which at present seems unlikely to ever take place;

(b) the Funds' claims are only likely to be pursued on commercially rational grounds with a view to either (1) obtaining the benefits of the Company's liability insurance, or (2) obtaining findings which will support their claims against the Company's co-Defendants in the Civil Action.  As regards (1), the Company's insurer will be likely obliged to fund the Company's defence costs. As regards (2), the Official Receiver may be under no duty to defend the claims, so any costs burden is unlikely to be great; and

(c) the Funds' restitutionary and fault-based claims against the Company overlap with corresponding claims asserted against other Defendants in the Civil Action and are inappropriate to be resolved through the proof of debt process because of the risk of inconsistent findings. The Funds' fault-based claims against the Company appear unsuited for resolution through the proof of debt process, independently of the unjust enrichment claims, in any event.

**Findings: the Funds' discovery application**

54. Mr. Froomkin submitted that the Official Receiver's discovery obligations under the 1963 Act had been fully complied with because the Funds had a copy of the relevant policy. Mr. Potts argued that what was crucial was to know how much the policy was now worth in commercial terms and that the information sought under the Funds' Summons met the statutory test by constituting "*such information as may reasonably be*

20

*required by him for the purpose of ascertaining whether any rights have been transferred to and vested in him by this Act and for the purpose of enforcing such rights, if any"* (Third Parties (Rights Against Insurers) Act 1963, section 3(1). I agree. The Funds are entitled to an Order in terms of their Discovery Summons.

**Conclusion**

55. The Funds' application for leave to pursue the Civil Action against the Company (on the usual condition only) and their related discovery application are each granted. The Trust Defendants' joinder application is refused. Unless any application is made within 21 days by letter to the Registrar to be heard as to costs, I would make the following Order:

> (a) the Funds are awarded the costs of the stay-lifting application, which shall be borne 50% by the Company and 50% by the Trust Defendants;

> (b) the Funds are awarded the costs of the Discovery Summons as against the Company;

> (c) the Funds are awarded the costs of the joinder application as against the Trust Defendants.

Dated this 3rd day of October, 2012 _____
                                            KAWALEY CJ