of, and then seizing, the customer property included among those proceeds—violates this Court's

jurisdictional mandate to ensure the equitable distribution of all customer property under SIPA.[62]

A § 105(a) injunction that prohibits the Joint Liquidators from disposing of any recovery

obtained in the Bermuda Action is limited relief designed and necessary to preserve customer

property and maintain the status quo while the precise amounts of customer property possessed

by the Avoidance Defendants are litigated and determined in this Court.

C.      The Estate Will Suffer an "Immediate Adverse Economic Consequence" if the
        Joint Liquidators Are Allowed to Dissipate Tens, if not Hundreds, of Millions of
        Dollars of Customer Property Through the Bermuda Action

The subsequent transfers that the Trustee seeks to recover in the Avoidance Action

consist primarily of the management fee transfers made by the Kingate Funds to Kingate

Management, which Kingate Management then transferred to the Trust Defendants as

"dividends." The predominant relief sought by the Joint Liquidators in the Bermuda Action is

restitution of those very same management fees and "dividends."[63] The Kingate Funds claim to

have lost approximately $800 million through investment with BLMIS. Kingate Management is

in liquidation in Bermuda after almost all of its assets were drained through the distributions

made to the Trust Defendants. (Compl. ¶ 42.) There is unquestionably a limited pool of assets

available to satisfy the Trustee's claims.

That pool includes assets held by the Trust Defendants. According to the Trust

Defendants, as of December 31, 2011, Ashby Trust held net assets with a value of $136,652,602,

---

[62] 15 U.S.C. § 78eee(b)(2)(A)(i) (providing that upon the filing of a protective decree, the court obtains "exclusive
jurisdiction of such debtor and its property, wherever located"); 15 U.S.C. § 78fff-4(e) (declaring that "[t]he courts
of the United States having jurisdiction over cases under title 11 shall have original and exclusive jurisdiction of any
civil action for the adjudication of … [a customer] claim"); 15 U.S.C. § 78fff(g) (providing that only the district
court presiding over a SIPA liquidation can authorize the trustee to pay allowed customer claims).

[63] (Ex. A, Amended Claim ¶¶ 53.1–53.2.)

and El Prela Trust held net assets with a value of $117,822,836.[64] As stated, the Trust
Defendants acknowledge that *no less than $94,174,033 and as much as $199,410,710 in
dividend transfers were made with funds that originated from BLMIS.* The Joint Liquidators
similarly acknowledge that *no less than $12,105,660 and as much as $61,201,590 in dividend
transfers were made with funds that originated with BLMIS.*

  The Trustee has not yet had the opportunity to conduct party discovery of the Kingate
Funds, Kingate Management, or the Trust Defendants concerning their bank accounts and the
flow of funds in, out, and between them. During discovery, the Trustee will pursue evidence that
every dollar of the $370,437,295 transferred from the Kingate Funds to Kingate Management—
and every dollar of the $297,013,938 transferred from Kingate Management to the Trust
Defendants—is a dollar traceable to BLMIS. For purposes of the Trustee's motion, however, all
that is relevant is that the Joint Liquidators and the Trust Defendants acknowledge that tens of
millions, if not hundreds of millions, of dollars of customer property were transferred to the
Trust Defendants and, therefore, are at issue in the Bermuda Action.

  The threatened economic damage to the Debtors' estate is substantial and self-evident. If
the Joint Liquidators were to collect upon a judgment obtained in the Bermuda Action and
recover hundreds of millions of dollars in assets *and customer property* held by the Trust
Defendants, the Joint Liquidators could elect to distribute the recovery to creditors,[65] wind up,
and leave the Trustee unable to recover. Such a distribution by the Joint Liquidators would
violate SIPA, and the distributed customer property could be placed beyond the Trustee's reach.
The Kingate Funds, Kingate Management, and the Trust Defendants would have few to no assets

---

[64] (Ex. E, Andrews Aff. ¶ 59.)

[65] To date, the Trustee has not filed a claim in either of the Kingate Funds' respective liquidations. (*See* Zeballos
Decl. ¶ 4.)

22

remaining for the Trustee to recover for the Customer Fund through his Avoidance Action. To
prevent that "adverse economic consequence" and preserve the proper operation of SIPA and the
Bankruptcy Code, the Court should issue the § 105(a) injunctive relief sought by the Trustee.

### D.    *This Court and the District Court Have Previously Issued Section 105(a) Injunctions Under Similar Circumstances*

Sitting as an appellate court, the United States District Court for the Southern District of
New York (the "District Court") affirmed this Court's § 105(a) orders to protect this Court's
jurisdiction and the administration of this SIPA liquidation in at least two similar instances.[66] In
each case, third parties commenced actions naming as defendants the same parties being sued by
the Trustee in avoidance actions, and those third-party actions sought to recover the same funds
that the Trustee sought to avoid and recover.

*Fox* held that a § 105(a) injunction is proper even if the claims asserted in the third-party
action are not property of the estate but are "'so closely related'" to those asserted by the Trustee
that allowing the third party to prosecute such claims would "'convert the bankruptcy
proceedings into a race to the courthouse [that] would derail the bankruptcy proceedings.'"[67] In
*Stahl*, the District Court observed that § 105 favors the Trustee because he acts on behalf of all
creditors.[68] *Stahl* thus concluded that this Court properly enjoined third-party actions that sought
to recover the same funds being pursued by the Trustee and recovery of which by such third
parties would therefore "have [had] an adverse impact on property of the bankrupt estate."[69]

---

[66] *Fox*, 848 F. Supp. 2d 469; *In re Bernard L. Madoff Investment Securities LLC* (*"Stahl"*), 2011 WL 7975167, No.
11-02392 (AKH) (S.D.N.Y. Dec. 15, 2011), *aff'd*, 512 Fed. Appx. 18 (2d Cir. 2013).

[67] *Fox*, 848 F. Supp. 2d at 487 (quoting *Fisher*, 155 F.3d at 883).

[68] *Stahl*, 2011 WL 7975167 at *13.

[69] *Id.* at *13.

23

Both *Fox* and *Stahl* rely upon *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998),[70] in
which the third-party's claims and the trustee's claims constituted "claims to the same limited
pool of money, in the possession of the same defendants, as a result of the same acts, performed
by the same individuals, as part of the same conspiracy."[71] Enjoining the third-party suit under §
105 because it "may affect the amount of property in the bankrupt estate" was, per the *Fisher*
court, necessary to protect the bankruptcy court's jurisdiction.[72]

Moreover, as this Court has ruled in this SIPA liquidation, and as affirmed by the District
Court, the bankruptcy court's injunctive powers have worldwide effect. In *Picard v. Maxam
Absolute Return Fund, L.P. (In re Bernard L Madoff Inv. Sec. LLC)*, 460 B.R. 106, 116 (Bankr.
S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012), this Court enjoined a foreign action,
recognizing that "[c]ourts have the power to enjoin litigants subject to their jurisdiction from
proceeding with an action in a foreign jurisdiction." The Kingate Funds, as claimants in this
SIPA liquidation, are litigants subject to this Court's jurisdiction.

Akin to the claims in *Fox*, *Stahl*, and *Fisher*, the Joint Liquidators and the Trustee seek to
recover the same funds (*i.e.*, the more than $370 million transferred by the Kingate Funds to
Kingate Management as management fees and the more than $290 million transferred by
Kingate Management to the Trust Defendants as dividends) from the same parties (*i.e.*, the
Avoidance Defendants and the Bermuda Defendants) based on the same universe of acts and
omissions (*i.e.*, the Kingate Funds' and the Avoidance Defendants' involvement in BLMIS's
Ponzi scheme). As in *Maxam*, litigants subject to this Court's jurisdiction are seeking to
dismantle the BLMIS estate piecemeal through foreign actions seeking the same limited assets as

---

[70]*Fox*, 848 F. Supp. 2d at 487; *Stahl*, 2011 WL 7975167, at *14.

[71]*Fisher*, 155 F.3d at 882.

[72]*Id.* at 882-83.

24

the Trustee.[73] The Trustee here does not seek to enjoin the Bermuda Action from going forward;

he merely seeks to prevent any assets recovered in that action from being dissipated before this

Court can determine to what extent they consist of fraudulently transferred BLMIS customer

property. The precedent squarely supports the limited injunction sought here.[74]

## CONCLUSION

The judicial admissions made by the Joint Liquidators and the Trust Defendants here and

in the foreign proceedings establish that the Joint Liquidators seek to recover customer property

in the hands of the Bermuda Defendants. Freezing and preserving any recovery obtained by the

Joint Liquidators in the Bermuda Action shields the Trustee's claims and this Court's jurisdiction

from circumvention through parallel foreign proceedings until the amount of customer property

in any such recovery is determined in the Avoidance Action and delivered to the Trustee for

distribution. When the Joint Liquidators state that "most payments to Kingate Management did

not involve monies withdrawn from BLMIS" and that "the substantial majority of money used to

pay Kingate Management's fees was never held by BLMIS,"[75] they try to obscure their pursuit of

customer property. But, with those same statements, the Joint Liquidators reveal a desire to

distribute customer property when they obtain it. That the Joint Liquidators desire such an

---

[73]*See Maxam*, 460 B.R. at 121.

[74]The limited injunctive relief sought by the Trustee is also appropriately granted under this Court's equity jurisdiction, which permits an interlocutory injunction freezing a defendant's assets. *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 250 (S.D.N.Y. 2002); *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, 2000 WL1610790, No. 00 Civ. 8051 (JSM), *1 (S.D.N.Y. Oct. 27, 2000); *see also Republic of the Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) ("'A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally.'") (quoting *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)). A freezing injunction is particularly appropriate to preserve assets that are the subject of fraudulent transfer claims. *Rubin v. Pringle* (*In re Focus Media Inc.*), 387 F.3d 1077, 1084-85 (9th Cir. 2004); *United States ex rel. Rahman v. Oncology Associates*, 198 F.3d 489, 496-97 (4th Cir. 1999) (upholding preliminary injunction freezing assets when plaintiff sought to void certain fraudulent transfers and impose constructive trust over property obtained by fraud).

[75](Kingate Funds Opp'n Mem. at 8.)

25

outcome is reflected further in their flat, unexplained refusal to agree to the terms of injunctive relief that threatens no injury to their right to prosecute the Bermuda Action.

If the Joint Liquidators are permitted to distribute any recovery obtained in the Bermuda Action, they would dissipate customer property while side-stepping the claims-administration protocol and this Court's oversight of it. An injunction under § 105(a) is, therefore, necessary to protect from impairment this Court's jurisdiction over the Debtors' estate, to uphold the Trustee's duty to marshal assets on behalf of all customers and creditors, and to ensure the fair and equitable distribution of estate property under SIPA to those with allowed claims. The Trustee respectfully submits that this Court should enter an order under § 105 of the Bankruptcy Code enjoining the Joint Liquidators from taking any action in connection with, or to accomplish, the actual or attempted dissipation, transfer, disposition, disbursement, or distribution of any or all assets that the Joint Liquidators may recover from, or collect upon, any judgment entered or settlement reached in favor of either of the Kingate Funds in the Bermuda Action until this Court determines the amount of customer property transferred to the Bermuda Defendants, the Trustee's right to recover it, and the allowance or disallowance of the Kingate Funds' Customer Claims.

Dated: April __, 2014
     New York, NY

/s/ *David J. Sheehan*

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Geraldine E. Ponto
Email: gponto@bakerlaw.com

Of Counsel:
Anthony M. Gruppuso
Email:agruppuso@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*substantively consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff, | |
| v. | SIPA LIQUIDATION (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01920 |
| Plaintiff, | |
| v. | |
| KINGATE GLOBAL FUND, LTD., by its Liquidators; and KINGATE EURO FUND, LTD., by its Liquidators, | |
| Defendants. | |

**ORDER GRANTING MOTION FOR**
**PRELIMINARY INJUNCTIVE RELIEF**

**THIS MATTER**, having come before the Court on the Trustee's Motion for Preliminary Injunctive Relief, and the Court having considered the submissions in support of and in opposition to (if any) the Motion, and the Court having found good cause for the relief sought in the Motion, it is hereby **ORDERED** that the Motion is **GRANTED**.

Accordingly, **IT IS HEREBY ORDERED** that the Joint Liquidators acting on behalf of defendants Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (the "Kingate Funds"), and all those acting on the Joint Liquidators' behalf or in concert with them, from taking any action

in connection with, or to accomplish, the actual or attempted dissipation, transfer, disposition, disbursement, or distribution of any or all assets that the Joint Liquidators may recover from, or collect upon, any settlement reached or judgment entered in favor of either of the Kingate Funds in the civil action commenced in the Supreme Court of Bermuda, Commercial Court against Federico Ceretti, Carlo Grosso, Kingate Management Limited, FIM Advisers LLP, FIM Limited, Ashby Trust, First Peninsula Trustees Limited (as trustee of Ashby Trust), El Prela Trust, Port of Hercules Trustees Limited (as trustee of El Prela Trust), Alpine Trustees Limited (as former trustee of El Prela Trust), El Prela Group Holding Services Limited, Ashby Holding Services Limited, Ashby Investment Services Limited, and El Prela Trading Investments Limited.

This Order shall become effective immediately and shall continue in effect until this Court enters a final judgment in this adversary proceeding or otherwise lifts the preliminary injunction issued herein.

SO ORDERED.

Dated: _____, 2014
New York, New York

_____
HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

300315786.1

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                                        Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                                        Defendant. | No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                                        Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                                        Plaintiff,<br><br>v.<br><br>KINGATE GLOBAL FUND, LTD., by its Liquidators and KINGATE EURO FUND, LTD., by its Liquidators,<br><br>                                        Defendants. | Adv. Pro. No. 12-01920 |

**DECLARATION OF GONZALO S. ZEBALLOS, ESQ.**
**IN SUPPORT OF TRUSTEE'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

GONZALO SALINAS ZEBALLOS hereby declares as follows:

1.      I am a member of the New York Bar and a partner at Baker & Hostetler LLP, counsel for plaintiff Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.*, and the estate of Bernard L. Madoff.

2.      As an attorney of record in these proceedings, I am fully familiar with the facts set forth herein based either upon my own personal knowledge or upon information conveyed to me that I believe to be true.  I make this Declaration to transmit to this Court true and correct copies of documents and provide information in connection with the Trustee's motion for interlocutory injunctive relief in aid of the final relief sought in the Amended Complaint filed in this proceeding (the "Motion").[1]

3.      Customer Claim Nos. 15358 and 15359 submitted respectively by Kingate Euro Fund, Ltd. (in liquidation) ("Kingate Euro") and Kingate Global Fund, Ltd. (in liquidation) ("Kingate Global" and collectively with Kingate Euro, the "Kingate Funds"), and attached respectively hereto as *Exhibits G* and *H*, are currently unresolved because of the ongoing Avoidance Action.

4.      To date, the Trustee has not filed a claim in either of the Kingate Funds' respective liquidations.

5.      On March 7, 2012, the Joint Liquidators filed a motion to lift the stay in the liquidation proceeding captioned *In the Matter of Kingate Management Limited*, 2011:  No. 301 (Sup. Ct. of Bermuda Oct. 3, 2012).  Though the fact of the filing of the Joint Liquidators' motion to lift the stay is publicly available, the related pleadings are not.  As a non-party to

---

[1]  All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

Kingate Management Limited's liquidation proceeding (and the Bermuda Action as well), the

Trustee has not received a copy of the Joint Liquidators' motion to lift the stay.

6.     True and correct copies of the following documents are attached:[2]

| | |
|---|---|
| *Exhibit A*: | Amended Statement of Claim, *Kingate Global Fund Limited (In Liquidation, et al. v. Kingate Management Limited, et al.*, No. 2010: 454 (Sup. Ct. of Bermuda Feb. 13, 2012). |
| *Exhibit B*: | Affidavit of Frank Oliver Walters dated November 16, 2011, *First Peninsula Trustees Limited (as Trustee of the Ashby Trust) v. Picard, et al.*, No. BVIHCV 2011/0154 (Eastern Caribbean Sup. Ct. British Virgin Islands). |
| *Exhibit C*: | Affidavit of Frank Oliver Walters dated November 16, 2011, *Port of Hercules Trustees Limited (as Trustee of the El Prela Trust) v. Picard, et al.*, No. BVIHCV 2011/0155 (Eastern Carribean Sup. Ct. British Virgin Islands). |
| *Exhibit D*: | Affidavit of David Peter Alexander dated January 31, 2012, *First Peninsula Trustees Limited (as Trustee of the Ashby Trust) v. Picard, et al.*, No. BVIHCV 2011/0154 and BVIHCV 2011/0155 (Eastern Carribean Sup. Ct. British Virgin Islands). |
| *Exhibit E*: | Affidavit of Jeremy Edward Needham Andrews dated January 31, 2012, *First Peninsula Trustees Limited (as Trustee of the Ashby Trust) v. Picard, et al.*, No. BVIHCV 2011/0154 and BVIHCV 2011/0155 (Eastern Carribean Sup. Ct. British Virgin Islands). |
| *Exhibit F*: | Witness Statement of Andrew Witts dated March 2, 2009, *First Peninsula Trustees Limited as Trustees of the Ashby Trust, et al. v. Public Prosecutor of the Principality of Monaco* (Princ. of Monaco). |
| *Exhibit G*: | Customer Claim No. 015358, submitted by Kingate Euro Fund, Ltd. – In Liquidation, received by the Trustee on July 2, 2009. |
| *Exhibit H*: | Customer Claim No. 015359, submitted Kingate Global Fund, Ltd. – In Liquidation, received by the Trustee on July 2, 2009. |
| *Exhibit I*: | Fourth Amended Complaint, *Picard v. Ceretti, et al.*, Adv. Pro. No. 09-1161 (SMB) (Bankr. S.D.N.Y.), filed on March 17, 2014. |

---

[2] The Customer Claims attached as *Exhibits G* and *H* do not include the supporting materials originally filed with the claims.

*Exhibit J*:    Ruling, *In the Matter of Kingate Management Limited*, 2011:  No. 301 (Sup. Ct. of Bermuda Oct. 3, 2012).

*Exhibit K*:    Letter dated January 21, 2014, from David J. Sheehan to Robert S. Loigman.

*Exhibit L*:    Letter dated January 24, 2014, from Robert S. Loigman to David J. Sheehan.

7.    Also attached as *Exhibit M*, for the Court's convenience and ease of reference, are true and correct copies of the Memorandum of Law in Support of Opposition of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. to Trustee's Application for Enforcement of Automatic Stay and Injunction [ECF No. 24], the Declaration of Robert S. Loigman in Support of Opposition of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. to Trustee's Application for Enforcement of Automatic Stay and Injunction [ECF No. 25], and the Affidavit of Mark Guy Chudleigh [ECF No. 26], all filed in this adversary proceeding on February 18, 2014 by counsel for the Joint Liquidators.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing statements made by me are true and correct.

Dated: March __, 2014
New York, New York

_____
Gonzalo S. Zeballos

300314615.1

# EXHIBIT A

IN THE SUPREME COURT OF BERMUDA

CIVIL JURISDICTION

COMMERICAL LIST

2010: 454

BETWEEN:

(1) KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)

(2) KINGATE EURO FUND LIMITED (IN LIQUIDATION)

<u>Plaintiffs</u>

and

(1) KINGATE MANAGEMENT LIMITED

(2) FIM LIMITED

(3) FIM ADVISERS LLP

(4) FIRST PENINSULA TRUSTEES LIMITED (AS TRUSTEE OF THE ASHBY TRUST)

(5) PORT OF HERCULES TRUSTEES LIMITED (AS TRUSTEE OF THE EL PRELA TRUST)

(6) ASHBY HOLDINGS SERVICES LIMITED

(7) EL PRELA GROUP HOLDING SERVICES LIMITED

(8) MR CARLO GROSSO

(9) MR FEDERICO CERETTI

(10)   ASHBY INVESTMENT SERVICES LIMITED

(12) EL PRELA TRADING INVESTMENTS LIMITED

(13) ALPINE TRUSTEES LIMITED

<u>Defendants</u>

<u>AMENDED</u> STATEMENT OF CLAIM

PARTIES

1    The Plaintiffs ("**Kingate Global**" and "**Kingate Euro**", together, "**the Funds**") were companies incorporated in the British Virgin Islands which at all material times carried on business as open-ended investment companies.

LN/31289Sv1

2    The First Defendant ("**Kingate Management**") is a company incorporated in Bermuda which at all material times acted as manager or co-manager of the Funds.

3    The Second Defendant ("**FIM Ltd**") is a company incorporated in England and Wales which at all material times until July 2005 acted as consultant to Kingate Management and the Funds.

4    The Third Defendant ("**FIM Advisers**") is a limited liability partnership incorporated in England and Wales which at all material times since July 2005 acted as consultant to Kingate Management and the Funds. In this amended statement of claim, FIM Ltd and FIM Advisers are referred to collectively as "**FIM**".

5    The Fourth Defendant ("**Ashby**") was at all material times before 1 April 2008 a direct 50% shareholder of Kingate Management, and is and was at all material times ~~after~~ from 1 April 2008, through its 100% subsidiary, the Sixth Defendant, an indirect 50% shareholder of Kingate Management. Ashby is and was at all material times the trustee of the Ashby Trust, holding those shares on trust for the Eighth Defendant (and members of his family).

6    The Fifth Defendant ("**El Prela**") was at all material times ~~before~~ between 17 August 2006 and 1 April 2008 a direct 50% shareholder of Kingate Management, and is and was at all material times ~~after~~ from 1 April 2008, through its 100% subsidiary, the Seventh Defendant, an indirect 50% shareholder of Kingate Management. El Prela is and was at all material times after 17 August 2006 the trustee of the El Prela Trust, holding those shares on trust for the Ninth Defendant (and members of his family). In this amended statement of claim, Ashby and El Prela and Alpine Trustees (as defined in paragraph 10C below) are referred to collectively as "**the Trustees**".

7    The Sixth Defendant ("**Ashby Holding Services**") is and was at all material times ~~after~~ from 1 April 2008 a direct 50% shareholder of Kingate Management. Ashby Holding Services in and was at all material times 100% owned by Ashby.

8    The Seventh Defendant ("**El Prela Holdings Services**") is and was at all material times after April 2008 a direct 50% shareholder of Kingate Management. El Prela Holding Services is and was at all material times 100% onwed by El Prela. In this amended statement of claim, Ashby Holdings Services and El Prela. ~~and Ashby~~ Holding Services ~~and El Prela Holding Services are referred to collectively as "the Holding Companies"~~ and the Trustees and the Holding Companies are referred to collectively as "**the Shareholders**".

9    The Eighth Defendant ("**Mr Gross**") is and was at all material times a director and controlling shareholder of FIM Ltd and a principal of FIM Advisers, and, through the Ashby Trust, ultimate beneficial owner of 50% of the shares in Kingate Management.

10    The Ninth Defendant ("Mr Ceretti") is and was at all material times a director and controlling shareholder of FIM Ltd and a principal of FIM Advisers, and, through the El Prela Trust, ultimate beneficial owner of 50% of the shares in Kingate Management.

10A.    The Tenth Defendant ("Ashby Investment Services") is and was at all material times from 1 April 2008 an investment company 100% owned by Ashby.

10B.    The Eleventh Defendant ("El Prela Trading Investments") is and was at all material times from 1 April 2008 an investment company 100% owned by El Prela. In this amended statement of claim, Ashby Investment Services and El Prela Investments are referred to collectively as "the Investment Companies".

10C.    The Twelfth Defendant ("Alpine Trustees") was the trustee of the El Prela Trust from the settlement of that trust until 17 August 2006. Alpine Trustees was at all material times before 17 August 2006 a direct 50% shareholder of Kingate Management. As the trustee of the El Prela Trust, Alpine Trustees held those shares on trust for the Ninth Defendant (and members of his family).

11    Other relevant parties are as follows:

11.1    Tremon Bermuda Limited ("Tremont Bermuda") is a company incorporated in Bermuda which at all material times until 31 December 2005 acted as co-manager of Kingate Global.

11.2    Tremont Partners Inc ("Tremont Partners") is a company incorporated in Connecticut, USA which at all material times was the parent company of Tremont Bermuda.

11.3    Bernard L. Madoff Investment Securities LLC ("BLMIS") was a limited liability company incorporated in New York which at all material times acted as investment adviser to the Funds.

11.4    Bernard Madoff ("Mr Madoff") was at all material times the founder, chairman, chief executive officer and the sole shareholder of BLMIS.

## SUMMARY OF THE CLAIM

12    The Funds were established for the purpose of investing with BLMIS monies raised from investors. The same individuals, Mr Groso and Mr Ceretti, were behind the establishment of the Funds and its key service providers, Kingate Management and FIM.

13    From their establishment until November 2008, the Funds transferred billions of US dollars to BLMIS for investment. Some of these monies were returned by BLMIS, for the payment of redemptions to investors.

14    In December 2008, it emerged that Mr. Madoff had for many years been operating a fraudulent 'Ponzi' scheme on a massive scale. In fact, BLMIS had invested none of the Funds' monies in assets. Instead, they had been used to pay redemptions to other investors and for the benefit of Mr Madoff and his associates.

15    At no stage before December 2008 did either Kingate Management or FIM alert the Funds to the possibility of this fraud. As a result, the Funds have lost many hundreds of millions of US dollars.

16    In addition, from their establishment until November 2008, the Funds paid Kingate Management hundreds of millions of US dollars in fees. The fees were calculated by reference to the Funds' net asset values. Because of Mr Madoff's fraud, at all material times, the Funds' only significant asset was their money at the bank. Accordingly, the Funds' net asset values were massively overstated, and the fees mistakenly overpaid.

17    The Funds's claim is:

17.1    in unjust enrichment on the ground of mistake, for the recovery of the overpaid fees from Kingate Management and/or the Shareholders and/or the Investment Companies, as ultimate recipients of the fees, and/or Mr Grosso and Mr Ceretti, as ultimate recipients of the fees and/or ultimate beneficial owners of the shares in Kingate Management;

17.2    alternatively, for orders based on the Funds' retention of legal title to the overpaid fees and/or their traceable proceeds;

17.3    alternatively, for declarations that Kingate Management and/or the Shareholders and/or the Investment Companies and/or Mr Grosso and Mr Ceretti hold the overpaid fees, together with their traceable proceeds, on trust for the Funds;

17.4    for damages for breach of contractual and tortious duties of care and/or negligent misstatement, against Kingate Management;

17.5    for damages for breach of tortious duties of care and/or negligent misstatement, against FIM ; and/or

17.6    for damages for breach of tortious duties of care and/or negligent misstatement against Mr Grosso and Mr Ceretti.

**FACTUAL BACKGROUND**

**Establishment of Kingate Global**

18    In the early 1990s, Mr Grosso and Mr Ceretti, as a development of the business of FIM, decided to set up a fund of hedge funds.

19    They took advice from Tremont Partners and, in particular, its president, Sandra Manzke ("Ms Manzke") who introduced them to various service providers in the United States and Bermuda.

20    On 11 February 1994, Kingate Global was incorporated in the British Virgin Islands as a fund of hedge funds having one class of shares denominated in US dollars. The directors of the company included Christopher Wetherhill ("Mr Wetherhill") and Mrs Manzke.

21    Soon afterwards, on 24 February 1994, Kingate Management was incorporated in Bermuda. Its directors also included Mr Wetherhill.

22    By an agreement dated on or around 1 November 1994, Kingate Management was appointed as manager of Kingate Global.

23    By further agreement dated 1 November 1994, FIM Ltd was appointed as consultant to Kingate Management. Tremon Bermuda had already been retained as a consultant by an agreement dated 24 February 1994.

24    In February or March 1995, a second class of shares in Kingate Global, also denominated in US dollars, was created and named 'Class B' shares. The original class of shares was re-named 'Class A'.

25    By an agreement dated 1 March 1995, each of Kingate Management and Tremont Bermuda was appointed as co-manager of the Class B shares. This agreement was amended and restated effective 1 May 2000. In respect of the Class A shares, Kingate Management continued as manager and FIM Ltd and Tremont Bermuda continued as consultants.

26    In January 1996, a third class of shares in Kingate Global, denominated in Deutsche Marks, was created and named 'DM Class' shares.

27    By an agreement dated 1 December 1995, each of Kingate Management and Tremont Bermuda was appointed as co-manager of DM Class shares.

28    By further agreement dated 1 December 1995, FIM Ltd was appointed as consultant to Kingate Management in respect of all three classes of shares in Kingate Global. This agreement was amended in late 1998 and further amended effective 1 May 2000.

29    By late 1999 or early 1997, the Class A shares in Kingate Global had been wound down, leaving only the Class B shares and the DM Class shares.

**Establishment of Kingate Euro**

30    In late 1999, Mr Grosso and Mr Ceretti, as a further development of the business of FIM, decided to spin-off the DM Class shares in Kingate Global into a separate entity.

31    Accordingly, on 19 April 2000 Kingate Euro was incorporated in the British Virgin Islands. Its directors were the same as the directors of Kingate Global (save the Ms Manzke was not a director of Kingate Euro).

32    By an agreement dated 1 May 2000 ("the Kingate Euro Manager Agreement"), Kingate Management was appointed as manager of Kingate Euro.

33    FIM was again retained as a consultant.

**Further agreements**

34    By an agreement dated 23 April 2001 ("the Kingate Global Consulting Services Agreement"), the appoint of FIM Ltd as consultant to Kingate Management in respect of the remaining class of shares in Kingate Global was restated and amended.

35    By a further agreement of the same date ("the Kingate Euro Consulting Services Agreement"), FIM Ltd was formally appointed as consultant to Kingate Management in respect of Kingate Euro.

36    In addition, by distribution agreements dated 23 April 2001, FIM Ltd was appointed as non-exclusive distributor for the sale of shares in both Funds.

37    The Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement were amended by a further agreement dated 7 June 2001.

38    In late 2004 or early 2005, Kingate Global entered into further, separate Co-Manager Agreements with Mingate Management and Tremont Bermuda, which agreements restated the earlier Manager and Co-Manager Agreements to more precisely reflect each co-manager's activities based on actual experience.

39    By a notice dated 16 January 2006, which took effect as of 31 December 2005, Tremont Bermuda resigned as co-manager of the Class B shares in Kingate Global.

40    Accordingly, by an agreement dated 1 January 2006 ("the Kingate Global Manager Agreement"), the appointment of Kingate Management as manager of Kingate Global was restated and amended.

**Relevant provisions of the agreements**

*Kingate Global Manage Agreement*

41      By the Kingate Global Manager Agreement, Kingate Management agreed to provide various services to Kingate Global and, in return, Kingate Global agreed to pay Kingate Management a monthly management fee. In particular:

41.1    By clause 1.1, Kingate Management agreed to perform, or obtain the performance of:

41.1.1  the investment management services described in Part II of the agreement;

41.1.2  the administrative services described in Part III; and

41.1.3  the services, relating to the sale of shares Kingate Global, described in Part IV.

41.2    By clauses 2.1 and 2.2, the investment management services included:

41.2.1  effecting the investment strategy for the investment of the assets of Kingate Global;

41.2.2  evaluating and selecting potential investments which were consistent with that strategy, including managing the investments and reinvestments of Kingate Global, in such manner as Kingate Management considered appropriate based on its past practices.

41.3    By clause 3.1, the administrative services included assisting Kingate Global, in a manner consistent with existing practice, in the performance of those administrative duties which were agreed by the parties from time to time.

41.4    By clauses 4.1, 4.2, 4.3 and 4.4, the services in respect of the sale of shares in Kingate Global included:

41.4.1  all duties and functions in connection with the sale of any shares in Kingate Global;

41.4.2  advising Kingate Global on general matters affecting the marketing of the shares, including advising the directors as to:

41.4.2.1        soliciting and introducing prospective investors; and

41.4.2.2        maintaining regular contact and updating existing and prospective investors to keep them informed of investment results and other information with regard to Kingate Global;

41.4.3  seeking to procure applications to purchase shares by eligible investors;

41.4.4    appointing consultants, agents, securities dealers and other financial institutions as authorised dealers to solicit application to purchase shares in Kingate Global and entering into compensation agreements with such authorised dealers; and

41.4.5    arranging for the delivery to each person to whom shares in Kingate Global were offered a copy of the fund's most recently published information memorandum and annual report.

41.5    By clause 5.9(a), Kingate Management was authorised was authorised to delegate as appropriate, or its discretion, any of the duties or obligations under the agreement to one or more other persons or entities, whether affiliated with or independent of Kingate Management.

41.6    By clause 5.2, Kingate Global agreed to pay Kingate Management a monthly management fee at an annual rate of 1.5% of the net asset value ("NAV") of the funds determined as at each valuation date of each calendar month. 'NAV' and 'valuation date' were to have the meanings respectively assigned to them in Kingate Global's information memorandum.

41.7    Further:

41.7.1    Clause 5.4 purported to exclude any liability of Kingate Management to Kingate Global for loss etc occasioned by Kingate Management in the performance of its services under the agreement, other than as a result of gross negligence, bad faith, wilful or reckless malfeasance or disregard of any obligations under the agreement; and

41.7.2    Clause 5.5 purported to oblige Kingate Global to indemnify Kingate Management and hold it harmless against loss etc arising out of any claim asserted in connection with Kingate Management's services under the agreement, save where the loss etc was caused by Kingate Management's gross negligence, bad faith, wilful or reckless malfeasance or disregard of its obligations under the agreement.

*Kingate Euro Manager Agreement*

42    Similarly, by the Kingate Euro Manager Agreement, Kingate Management agreed to provide various services to Kingate Euro and, in return, Kingate Euro agreed to pay Kingate Management a monthly management fee and a monthly administration fee. In particular:

42.1    By clause 2.1, Kingate Management agreed to develop, update and affect an overall investment strategy for the investment of the assets of Kingate Euro, as well as evaluate and select potential investments which were consistent with that strategy.

42.2    By clause 3.1, Kingate Management agreed to be responsible for performing, or procuring the performance of, all duties and functions necessary or appropriate in connection with the placement of

LN/312895v1

shares in Kingate Euro outside of the United States, and for advising Kingate Euro on general matters affecting its structure and operations, including advising the directors as to:

42.2.1    the suitability of Kingate Euro's structure and operating procedures in light of the expectations of prospective investors;

42.2.2    steps which could be taken to enhance the marketability of Kingate Euro's shares and to improve investor relations;

42.2.3    the identification and evaluation of candidates to serve as directors of Kingate Eurol

42.2.4    general economic and financial developments in international securities and capital markets affecting Kingate Euro's investment program; and

42.2.5    in general, all aspects relating to Kingate Euro's administrative, accounting, legal and operational matters.

42.3    By clause 3.3, Kingate Management agreed to act as the placement agent for Kingate Euro's shares outside the United States, including using its best efforts to procure applications to purchase shares from eligible investors.

42.4    By clause 3.5, Kingate Management agreed to arrange for the delivery to each person to whom shares in Kingate Euro were offered a copy of the fund's most recently published information memorandum.

42.5    By clause 4.8, Kingate Management was authorised to delegate as appropriate, in its discretion, any of the duties or obligations imposed upon it under the agreement to one or more persons or entities, whether affiliated with or independent of Kingate Management.

42.6    By clause 4.1(a) and (b) Kingate Management was entitled to

42.6.1    a fixed monthly asset based fee, as defined in Kingate Euro's information memorandum; and

42.6.2    a fixed monthly asset based administration fee, also so defined.

42.7    Further:

42.7.1    clause 4.3 purported to exclude the liability of Kingate Management to Kingate Euro for loss etc suffered in connection with Kingate Management's services in the absence of gross negligence wilful default, fraud or dishonesty in the performance or non-performance of Kingate Management's obligations or duties; and

42.7.2    clause 4.4 purported to oblige Kingate Euro to indemnify Kingate Management and hold it harmless against loss etc arising out of any claim asserted in connection with Kingate

Management servicing or having served in good faith pursuant to the agreement, save where the loss etc was caused by Kingate Management's gross negligence, bad faith, breach of fiduciary duty, wilful or reckless malfeasance or disregard of any of its obligations under the agreement.

*Kingate Global Consulting Services Agreement and Kingate Euro Consulting Services Agreement*

43     The Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement are in materially identical terms. By both agreements, FIM Ltd agreed to provide various services to Kingate Management and, in return, FIM Ltd was entitled to be paid a consultancy fee. In particular:

43.1     By clause 2.2 of both agreements, FIM Ltd agreed to act as consultant to Kingate Management to provide such advice and recommendations as Kingate Management required from time to time, in connection with its management of the assets of the Funds and in the implementation of the investment objectives and policies of the Funds.

43.2     By clause 3 of both agreements, the services to be provided by FIM Ltd to Kingate Management included:

43.2.1     reviewing the structure and operating procedures of the Funds;

43.2.2     preparing such analyses and reports as Kingate Management and the Funds required;

43.2.3     providing Kingate Management with assistance and support on such matters relating to investor relations as Kingate Management and the Funds required;

43.2.4     liaising directly with Kingate Management on such matters relating to the investment programs of the Funds as might be required to enable FIM Ltd to properly perform its duties under the agreements; and

43.2.5     in general, providing advice to and assisting Kingate Management on such aspects of the operational, administrative and legal matters of the Funds as Kingate Management and the Funds required.

43.3     By clause 3 of the Kingate Euro Consulting Services Agreement, FIM Ltd also agree to provide Kingate Management with advice regarding Kingate Euro's hedging activities, in order to reduce the currency risk between the Euro and the US dollar, and to oversee the execution of its recommendations.

43.4     By clause 8 of both agreements, FIM Ltd agreed to:

43.4.1    provide such assistance, information and reports as Kingate Management and the auditors of the Funds required from time to time, in connection with:

43.4.1.1    the preparation of valuations in respect of the Funds and periodic reports by Kingate Management to the Funds; and

43.4.1.2    the provision of annual, semi-annual and other reports for the benefit of investors;

43.4.2    provide such representatives as Kingate Management requested from time to time to attend board meetings of the Funds with Kingate Management; and

43.4.3    report to and discuss with the directors of the Funds their performance and other matters related to the management of their assets.

43.5    By Schedule 1 to both agreements, Kingate Management agreed to pay FIM Ltd a fixed monthly fee equal to US$30,000. Schedule 1 also provided that, for administrative convenience, Kingate Management could arrange to have the Funds pay this fee directly to FIM Ltd.

43.6    Further, clause 13.1 of both agreements purported to exclude the liability of FIM Ltd to Kingate Management and the Funds for any loss etc, in the absence of gross negligence, fraud or wilful default on the part of FIM Ltd, or failure to comply with Kingate Management's instructions.

44    On 1 August 2005, FIM Advisers took over the business of FIM Ltd. Accordingly, by deeds of novation dated 29 July 2005, FIM Advisers was substituted for FIM Ltd under both the Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement.

44A    At trial, the Funds will rely on each of the above agreements for their full terms and effect.

**The business of the Funds**

45    As open-ended investment companies, the Funds raised monies from investors through private offerings of their shares. Investors would subscribe for redeemable shares in the Funds in accordance with each fund's information memorandum and subscription agreement. In particular:

45.1    Redeemable shares could only be purchased on the first business day of a month.

45.2    Investors would make an offer for subscription by submitting completed subscription forms to the Funds' administrator.

45.3    The minimum initial investment in redeemable shares was US$250,000 and the minimum subsequent investment was US$100,000.

LN/31289541

45.4    The purchase price of the redeemable shares varied from time to time and was equal to the fund's NAV per share as at the last business day of the previous calendar month.

45.5    If an investor's offer to subscribe was accepted, redeemable shares were allocated to the investor which thereby became a shareholder of the fund in question.

46    An investor could recover its investment in the Funds by redeeming its shares in accordance with each fund's information memorandum and articles of association. In particular:

46.1    Shares could only be redeemed on the last business day of a month.

46.2    The redemption price was the fund's NAV per share as at the redemption date.

**BLMIS**

47    Subject to amounts retained for the payment of redemptions, professional fees and operating costs, all the monies raised by Kingate Global from such share allotments, since at least late 1996 or early 1997 when the Class A shares were wound down, were transferred to BLMIS. Further, all such monies raised by Kingate Euro since its establishment were also transferred to BLMIS.

48    From the outset, Kingate Management delegated responsibility for all investment advisory activities in respect of both Kingate Global and Kingate Euro to BLMIS. Kingate Management also delegated responsibility for custody services in respect of the Funds to BLMIS. In particular:

48.1    BLMIS opened brokerage accounts for both Funds.

48.2    By a customer agreement, an option agreement, a trading authorization limited to purchases and sales of securities and options, and a trading authorization directive, each fund authorized BLMIS to manage its portfolio on a discretionary basis.

48.3    The trading authorization directive gave BLMIS investment guidelines, restricting BLMIS to so-called 'split-strike conversion' investments.

49    Accordingly, at all material times:

49.1    All the monies raised by the Funds were invested and managed by BLMIS.

49.2    The Funds did not carry out their own investment activity.

49.3    BLMIS acted as the Funds' investment adviser.

49.4    The Funds had no investment adviser other than BLMIS.

49.5    The Funds' business was to invest with BLMIS.

50    BLMIS purportedly employed the split-strike conversion investment strategy and reported excellent returns year after year. In particular:

50.1    In respect of both Funds, Kingate Management received (inter alia) monthly statements from BLMIS which purported to show the portfolio of assets in which BLMIS had invested the Funds' monies, and their values ("**Monthly Statements**").

50.2    Kingate Management passed these statements to FIM. On the basis of the statements, FIM produced regular reports on the Funds' investment performance.

**Monies transferred to BLMIS**

51    When an investor subscribed for redeemable shares in either of the Funds, the purchase price for the shares would be paid into the fund's account at the Bank of Bermuda Limited ("**the Bank**"), before being transferred to BLMIS.

52    Similarly, when an investor requested to redeem its shares in either of the Funds, BLMIS would transfer to the fund's account at the Bank sufficient monies to meet the redemption request. However, the Funds would often meet redemption requests from subscription monies then standing to the credit of their accounts at the Bank.

53    By the end of November 2008:

53.1    Kingate Global had transferred to BLMIS subscription monies in the amount of US$987,860,000 and BLMIS had transferred to Kingate Global redemption monies in the amount of US$400,254,792.

53.2    Kingate Euro had transferred to BLMIS subscription monies in the amount of US$767,440,000 and BLMIS had transferred to Kingate Euro redemption monies in the amount of US$45,000,000.

See the tables attached to this amended statement of claim as Annex A, which set out, in respect of each fund, the payments made to and received from BLMIS and the dates of payment.

**Mr Madoff's fraud**

54    In December 2008, it emerged that Mr Madoff, through BLMIS, had for many years been operating a fraudulent 'Ponzi' scheme on a massive scale. Media reports suggest that investors who transferred monies to BLMIS collectively stand to lose tens of billions of dollars. In particular:

54.1    BLMIS did not in fact invest any of the monies transferred by investors, including the Funds. BLMIS did not purchase or sell a single security or option with these monies.

54.2    The trades, assets and returns reported in the monthly statements which BLMIS provided to investors, including the Funds, were entirely fictitious.

54.3    Instead, BLMIS used the monies transferred from new investors to pay existing investors who requested withdrawals or redemptions.

54.4    In short, the monies transferred to BLMIS by investors, including the Funds, were used to keep the fraudulent scheme going, and for the benefit of Mr Madoff and his associates, until such time as the requests for withdrawals and redemptions overwhelmed the new investments, causing the collapse of the scheme.

55    Mr Madoff's fraudulent scheme remained undetected until its collapse despite the existence of numerous 'red flags' surrounding the operation of BLMIS. These included the following:

55.1    Mr Madoff and his family controlled key positions at BLMIS, limiting third party involvement.

55.2    Rather than trading through an independent broker, or using a third party custodian, BLMIS acted as its own broker and custodian.

55.3    BLMIS' auditor was a very small, unknown auditing firm which had represented to its regulatory body that it did not conduct audits.

55.4    BLMIS' fee structure was highly unusual, potentially depriving it of tens of millions of dollars each year.

55.5    BLMIS did not provide investors with electronic real-time access to their accounts. Instead, BLMIS reported trades using only paper confirmations, created after the fact, which stated average and not exact times and prices of trades.

55.6    BLMIS reported securities trades at non-existent prices and options trades at unrealistic volumes.

55.7    BLMIS refused to identify the counterparties with whom it purportedly traded securities and options.

55.8    Mr Madoff was consistently vague when responding to questions about BLMIS' operations and strategy.

55.9    At the end of each quarter and/or year, BLMIS reported to investors that it had converted all their assets into Treasury Bills or cash.

55.10    BLMIS' purported returns were too good to be true, with extremely rare losses and an incredible absence of volatility, which could not be replicated by others using the same split-strike conversion

investment strategy. Further, although in theory that strategy could reduce volatility, it could not produce gains in a declining market, yet BLMIS' returns purported to do so.

55.11 Several private financial institutions, having conducted routine due diligence, refused to invest with BLMIS.

55.12 Several articles were published in the financial press raising concerns about BLMIS.

55.13 Several regulatory actions were commenced against BLMIS.

56 On 11 December 2008, Mr Madoff was arrested and charged with various violations of United States criminal securities law.

57 On 15 December 2008, BLMIS was placed in bankruptcy. Mr Irving Picard ("the Trustee") was appointed as trustee to oversee the liquidation.

58 Prior to this, neither Kingate Global nor Kingate Euro had any knowledge or information that Mr Madoff was operating a fraudulent scheme.

**Aftermath of the discovery of Mr Madoff's fraud**

59 Because almost all of the Funds' assets (other than monies held in their accounts at the Bank) were invested with BLMIS, Mr Madoff's arrest and the bankruptcy of BLMIS had a devastating effect on the Funds.

60 On 12 December 2008, the Funds suspended determination of their NAV, as well as the redemption and issue of shares.

61 In January 2009, the Bank froze both Funds' accounts. The position remains that the Funds have access to the monies in those accounts only for the purpose of paying their ordinary and necessary expenses of the liquidation.

62 On 17 April 2009, the Trustee commenced proceedings in the Bankruptcy Court for the Southern District of New York, claiming the return of $100 million which BLMIS paid to Kingate Global in the 90 days preceding 11 December 2008.

63 Accordingly:

63.1 On 8 May 2009, both Funds applied to the High Court of the Virgin Islands for the appointment of liquidators. By orders dated 4 June 2009, the court appointed liquidators and wound up both Funds.

63.2 On 7 August 2009, both Funds presented petitions for winding up to the Supreme Court of Bermuda. By orders dated 4 September 2009, the court wound up both Funds.

**CLAIMS IN UNJUST ENRICHMENT**

**Payment of fees to Kingate Management**

64      As set out in paragraphs 41.6 and 42.6 above, under the Kingate Global Manager Agreement (and its predecessors) and the Kingate Euro Manager Agreement (together, **"the Manager Agreements"**), the Funds were obliged to pay monthly fees to Kingate Management.

65      The fees payable by each of the Funds were calculated by reference to their NAVs.  In particular, as set out in paragraphs 41.6 and 42.6 above: .

65.1    Under the Kingate Global Manager Agreement, read with Kingate Global's information memorandum (as amended and restated from time to time), the monthly management fee payable by Kingate Global to Kingate Management was 1.5% of Kingate Global's NAV at each month end.

65.2    Under the Kingate Euro Manager Agreement, read with Kingate Euro's information memorandum (as amended and restated from time to time):

65.2.1    the monthly management fee payable by Kingate Euro to Kingate Management was 1.5% of Kingate Euro's NAV at each month end; and

65.2.2    the monthly administration fee payable by Kingate Euro to Kingate Management was 0.1% of Kingate Euro's NAV at each month end.

66      The Manager Agreements provided that the meaning of NAV and its method of calculation were as described in the Funds' respective information memoranda.

67      The information memoranda of both Funds (as amended and restated from time to time) made materially identical provision in respect of NAV.  In particular, each information memorandum (as most recently amended and restated as at 6 October 2008) provided that:

67.1    The NAV of the fund was the market value of the fund's total assets less all accrued debts and liabilities.

67.2    The fund's administrator was to determine the fund's NAV as at the close of business on the last business day of each calendar month.

67.3    The fund's assets included:

67.3.1    all cash and cash equivalent, including bank deposits and interest bearing obligations;

67.3.2    all securities positions; and

LN/3128950.1

67.3.3   all options positions.

67.4   Cash and cash equivalent was to be valued at cost plus accrued interest and discount.

67.5   Securities and options were to be valued at the last sale price reported on the principal securities exchange or market on which they were traded.  In the absence of reported sale prices on the valuation date, securities and options were generally to be valued at the last reported bid quotation.

67.6   In the absence of current quotations, or if the administrator concluded that such quotations were not indicative of value, the valuation of the assets was to be their fair value as determined in good faith by the administrator.

67.7   Further, if the administrator determined that market prices or quotations did not fairly represent the value of particular assets, the administrator was authorised to assign a value to those assets which differed from the market prices or quotations.

67.8   The administrator was to verify the prices attributed to the securities held by the fund by reference to pricing sources independent of BLMIS whenever reasonably possible.

67.9   In the absence of bad faith or manifest error, the NAV calculation made by the administrator was binding on investors in the fund.

68   In so providing, the information memorandum of each fund replicated provisions in the Funds' articles of association, in particular, in respect of Kingate Global, articles 55 to 57 and, in respect of Kingate Euro, articles 55, 56 and 58.

69   In accordance with these provisions, each of the Funds paid fees to Kingate Management, at the end of each month from their establishment until November 2008.  In particular:

69.1   from 1 January 1995 to November 2008, Kingate Global paid to Kingate Management fees in the amount of US$294,312,278; and

69.2   from 1 January 2000 to November 2008, Kingate Euro paid to Kingate Management fees in the amount of US$76,125,017.

See the table attached to this amended statement of claim as Annex B, which sets out the payments made by each fund in each year and the total paid.

70    It is understood that after receipt of these payments, Kingate Management paid on a significant percentage of the fees to the Shareholders in the form of dividends.  In particular, by the end of November 2008, Kingate Management had paid to the Shareholders dividends totalling US$293,902,730.  See the table attached to this amended statement of claim as Annex B, which sets out the dividends paid in each year from 1995 to 2008 (inclusive).

71    It is also understood that, after receipt of these dividends, the Shareholders paid on a percentage of them to Mr Grosso and Mr Ceretti in the form of distributions of trust property.

71.1    on or around 31 March 2008, the Trustees sold to the Investment Companies investments they had made with the dividends paid to them by Kingate Management;

71.2    from time to time from 1 April 2008, the Holding Companies loaned monies (constituted by dividends received from Kingate Management) to the Investment Companies, for the purposes of investment by the Investment Companies; and

71.3    from time to time, the Trustees made to Mr Grosso and Mr Ceretti distributions of trust property (constituted by dividends received from Kingate Management and income from investment of those dividends by the Trustees and/or the Investment Companies).

**Mistaken overpayment of fees to Kingate Management**

72    By mistake, at the end of each month from their establishment until November 2008, each of the Funds overpaid fees to Kingate Management.  In particular:

72.1    As set out in paragraph 54 above, as a result of Mr Madoff's fraud:

72.1.1    none of the monies transferred by the Funds to BLMIS were invested in assets;

72.1.2    none of the assets reported in BLMIS' Monthly Statements ever existed;

72.1.3    instead, all of the monies transferred by the Funds to BLMIS were used to keep the fraudulent scheme going, and for the benefit of Mr Madoff and his associates; and

72.1.4    at all material times, BLMIS was hopelessly balance sheet insolvent.

72.2    Accordingly:

72.2.1    all of the monies transferred by the Funds to BLMIS must be treated as having been lost by the Funds at the date of transfer, and as having nil value; and

72.2.2    at the date of each payment of fees by the Funds to Kingate Management, the Funds' only significant assets were the monies held in their accounts at the Bank.

72.3    However, in calculating the Funds' NAVs at each month end, the Funds' administrator relied on
BLMIS' Monthly Statements and assumed that the assets reported there existed.

72.4    As a result, as at the date of each payment of fees by the Funds to Kingate Management, the Funds'
NAVs were vastly overstated and incorrect.

72.5    As at those dates, and at all times until the discovery of Mr Madoff's fraud in December 2008, the
Funds believed that the NAVs were correct.

72.6    As set out in paragraph 69 above, the Funds overpaid fees to Kingate Management on the basis of this
mistaken belief and as a result of it.

See the table attached to this amended statement of claim as Annex C, which sets out in respect of
each fund, at the date of each payment of fees by the fund to Kingate Management, the fund's correct
NAV, accordingly, the fees which should have been paid, the fees actually paid and the amount
overpaid.

73    For the avoidance of doubt, and if necessary, the Funds aver that the overpaid fees were not due to
Kingate Management under the Manager Agreements (or otherwise).

**Claim in unjust enrichment against Kingate Management**

74    Kingate Management was enriched, on receipt, in the amount of the overpaid fees.

75    The enrichment was at the expense of the Funds, Kingate Management having received the overpaid
fees directly from the Funds.

76    Accordingly, given the Funds' mistake, Kingate Management has been unjustly enriched at the
expense of the Funds and is liable to make restitution to the Funds in the amount of the overpaid fees.
In particular, as set out in the table attached as Annex C to this amended statement of claim, Kingate
Management is liable to make restitution:

76.1    to Kingate Global, in the amount of US$254,478,999.69; and

76.2    to Kingate Euro, in the amount of 56,226,531.48 Euros.

**Remedy against Kingate Management**

77    By reason of the claim set out in paragraphs 74-76 above, the Funds are entitled to an order that
Kingate Management pay:

77.1    to Kingate Global, the amount of US$254,478,999.69; and

77.2    to Kingate Euro, the amount of 56,226,531.48 Euros.

LN/31289Sv1

**Further or alternative claim in unjust enrichment against the Shareholders**

78     The relevant factual background to the claims against the Shareholders is as follows:

78.1   Kingate Management and the Shareholders are not and were never independent or arms' length parties.

78.2   The Shareholders are the sole owners and controllers of Kingate Management.

78.3   As set out in paragraphs 20-21 above, Kingate Management and Kingate Global were established at the same time so as to create a structure for a hedge fund business which consisted of raising monies from investors for investment exclusively with BLMIS and earning fees from the investments.

78.4   In particular, Kingate Management was established and used as a corporate vehicle to receives fees from Kingate Global and, later, Kingate Euro, for payment on to the Shareholders.

79     The Shareholders were unjustly enriched on receipt of the overpaid fees by Kingate Management, and in that amount. This enrichment was at the expense of the Funds, which made the payments, and arose in the following alternative circumstances.

80     First, as sole owners of the entirety of the shares of Kingate Management, alternatively as the alter ego of Kingate Management, the Shareholders were automatically enriched by the receipt by Kingate Management of all overpaid fees.

81     Second, on receipt of the overpaid fees by Kingate Management, Kingate Management's assets were increased and the Shareholders were enriched by the corresponding increase in the value of their shareholdings in Kingate Management:

81.1   The value of the increase must be treated as equal to the amount of the overpaid fees received by Kingate Management.

81.2   The increase was a realised and/or realisable financial benefit and, accordingly, an incontrovertible benefit. Alternatively, the Shareholders freely accepted the increase.

82     Third, the Shareholders were enriched upon the receipt of overpaid fees by Kingate Management, as Kingate Management did not receive for its own benefit but merely as a channel or conduit pipe to the Shareholders, alternatively as nominee on behalf of the Shareholders.

83     Fourth, the role of Kingate Management in the circumstances was or was analogous to that of agent on behalf of the Shareholders. Accordingly, on the basis of, or by analogy with the principle that the receipt of a gain by an agent is to be treated as a receipt by his principal, the Shareholders must be treated as having been enriched upon the receipt by Kingate Management of the overpaid fees.

84    Fifth, by reason of the matters pleaded above, the corporate veil of Kingate Management falls to be pierced, so as to reflect the reality that the Shareholders were enriched upon the receipt of overpaid fees by Kingate Management.

85    In the alternative to the foregoing, the Shareholders were unjustly enriched on receipt by them of dividends paid by Kingate Management out of the overpaid fees and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof). Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection and nexus between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividends to the Shareholders. Each declaration of dividends formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

85A.    In the further alternative:

85A.1    Kingate Management made distributions to the Shareholders utilising the fees paid to it by the Funds, as pleaded above.

85A.2    Those fees were not (in the hands of Kingate Management) distributable profits, but liable to be repaid to the Funds for the reasons pleaded herein. Further, Kingate Management declared and paid the dividends to the Shareholders under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to it based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

85A.3    Accordingly, Kingate Management is entitled to recover from the Shareholders by way of restitution the sums paid to them by it as dividends. If (contrary to the Funds' primary case) Kingate Management has a defence to the Funds' claims in restitution against it, the Funds are entitled to be subrogated to such restitutionary claims of Kingate Management against the Shareholders.

86    Further or alternatively, when the overpaid fees were received from the Funds by Kingate Management, they constituted the Funds' property and/or its traceable proceeds. In particular:

86.1    The Funds' mistake, as set out in paragraph 72 above, was a fundamental mistake as to the quantity of fees paid and/or as to the obligation to pay fees. That fundamental mistake so vitiated the Funds' intention to transfer the overpaid fees to Kingate Management as to prevent legal title to the overpaid fees passing from the Funds to Kingate Management. Instead, legal title to the overpaid fees remained with the Funds.

86.2   Alternatively, even if legal title to the overpaid fees did pass from the Funds to Kingate Management, because of the Funds' mistake, Kingate Management held the overpaid fees on constructive trusts for the Funds, from the moment of receipt.

86.3   Alternatively, even if legal title to the overpaid fees did pass from the Funds to Kingate Management, the Funds' mistake was sufficiently serious to vitiate their intention to benefit Kingate Management by the transfer of the overpaid fees.  Accordingly, the presumption of resulting trust, namely, that, in the circumstances, the transferor did not intend to benefit the transferee, could not be rebutted and Kingate Management held the overpaid fees on resulting trusts for the Funds, from the moment of receipt.

87   As a result, when Kingate Management paid on the overpaid fees and/or their traceable proceeds to the Shareholders, the Shareholders also received the Funds' property and/or its traceable proceeds. The Shareholders must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

88   In all the premises pleaded above, given the Funds' mistake, the Shareholders have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees, alternatively, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders.

89   The Funds repeat paragraphs 76.1 and 76.2 above.

**Remedy against the Shareholders**

90   By reason of the claim set out in paragraphs 78-89 above, the Funds are entitled to an order that the Shareholders pay:

90.1   to Kingate Global, the amount of US$254,478,999.69, alternatively, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds, which were paid on by Kingate Management to the Shareholders; and

90.2   to Kingate Euro, the amount of 56,226,531.48 Euros, alternatively, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds, which were paid on by Kingate Management to the Shareholders.

**Further or alternative claim in unjust enrichment against the Investment Companies**

90A.   Further or in the alternative to the above, the Investment Companies were enriched on receipt by them of:

90A.1  investments, made by the Trustees with dividends paid to the Trustees by Kingate Management out of the overpaid fees and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof) and then transferred to the Investment Companies by the Trustees; and

90A.2  such dividends, paid to the Holding Companies by Kingate Management and then transferred to the Investment Companies by the Holding Companies for the purposes of investment.

90B.  Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividend to the Shareholders, and the subsequent transfer of those dividends, and investments made with those dividends, to the Investment Companies for the purposes of investment.  Each transfer formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

90C.  In the further alternative:

90C.1  The Trustees and the Holding Companies paid the sums referred to in paragraphs 90A.1 and 90A.2 above to the Investment Companies, which sums were derived from the fees paid to Kingate Management by the Funds, as pleaded above.

90C.2  Those sums were (in the hands of the Trustees and the Holding Companies) liable to be repaid to the Funds or Kingate Management for the reasons pleaded herein. Further, the Trustees and the Holding Companies made the transfers to the Investment Companies under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to Kingate Management, and by Kingate Management to them, based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

90C.3  Accordingly, the Trustees and the Holding Companies are entitled to recover from the Investment Companies by way of restitution the sums paid to them. If (contrary to the Funds' primary case) the Trustees and/or the Holding Companies have a defence to the Funds' claims in restitution against them, the Funds are entitled to be subrogated or sub-subrogated (via Kingate Management's restitutionary claim against the Trustees and the Holding Companies pleaded in paragraph 85A above) to such restitutionary claims of the Trustees and/or the Holding Companies against the Investment Companies.

90D.  Further or alternatively, for the reasons pleaded above, all such transfers to the Investment Companies constituted the Funds' property and/or the traceable proceeds thereof.  The Investment Companies

must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

90E.    In all the premises pleaded above, given the Funds' mistake, the Investment Companies have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders and then by the Shareholders to the Investment Companies.

**Remedy against the Investment Companies**

90E.    By reason of the claim set out in paragraphs 90A – 90D above, the Funds are entitled to an order that the Investment Companies pay:

90E.1    to Kingate Global, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies; and

90E.2    to Kingate Euro, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies.

**Further or alternative claim in unjust enrichment against Mr Grosso and Mr Ceretti**

91    Further or in the alternative to the above, and on the basis that Mr Grosso and Mr Ceretti were in substance and reality the ultimate beneficial owners of the Shareholders, and hence KML, then Mr Grosso and Mr Ceretti were unjustly enriched at the expense of the Funds to the same extent and in the same circumstances as were the Shareholders, as pleaded above.

92    Further or in the alternative, Mr Grosso and Mr Ceretti were unjustly enriched on receipt by them of distributions by the Shareholders of trust property out of dividends paid by Kingate Management and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof). Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection and nexus between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividends to the Shareholders, and the subsequent distribution of trust property to Mr Grosso and Mr Ceretti. Each distribution of trust property formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

92A.    In the further alternative: