the Ashby Trust from that of Jersey to that of the BVI, see paragraph 67 below);

30.5 Paragraph B1, which states that: "*any monies requiring investment hereunder may be invested in or upon any such investments of whatsoever nature and wheresoever situate and whether producing income or not....as the Trustees shall in their absolute discretion think fit*" (page 142);

30.6 Paragraph C2 (pages 150 to 151), which provides that the express beneficiaries of the Ashby Trust are Mr Grosso and his wife, Diana Maria Grosso ("**Mrs Grosso**") and other members of Mr Grosso's family.[1] It also names as a beneficiary "*Any trust association body or other organisation in any part of the world the objects of which are charitable*", and includes "*Any person who is the subject of an addition under clause A3.02*" (page 151);

30.7 Paragraph A7.05.01, which states: "*the Trustees may at any time during the Trust Period pay or apply the Trust Fund and the income thereof or any part thereof to or for the benefit of all or such one or more exclusive of the others of the Beneficiaries and in such shares if more than one and in such manner generally as the Trustees shall in their discretion think fit*" (page 137);

30.8 Paragraph A12.01, which provides that the Ashby Trustee has "*the right to remuneration and the incidence thereof*" (page 139);

30.9 Paragraph B12, by which the Ashby Trustee has the power to employ agents "*whether a solicitor advocate attorney banker accountant stockbroker or other agent to transact any business or do any act required to be transacted or done in the execution of the trusts hereof*" (page 144) and pay them out of the Ashby Trust fund;

30.10 Paragraph B28, which provides that the Ashby Trustee: "*may appoint or employ investment advisers and managers and may delegate to any such*

---

[1] The six further express beneficiaries named in the Trust Deed are Federica Wezel and Gioia Wezel (who reside in Italy); and Gerardo Rivera Forquet, Mauricio Rivera Forquet, Carlos Jose Rivera Forquet, and Ricardo Jose Rivera Forquet (who reside in Puerto Rico). These further individual beneficiaries are the nephews and nieces of Mr and Mrs Grosso.

10

11698152.1

advisers or managers (for such periods to such extent and generally on such terms and in such manner as the Trustees may from time to time think fit) all or any of the Trustees' powers and discretions with regard to making retaining varying or transposing investments" (page 147);

30.11   Paragraph B36, which provides that: "*the expenses in connection with the preparation establishment and administration of this trust including without prejudice to the generality of the foregoing the remuneration and charge of the Trustees herein provided for and of the investment and re-investment of any part of the Trust Fund and the collection of income and other sums derivable therefrom may be paid out of the Trust Fund and may be charged against capital or income or partly out of one and partly out of the other at the discretion of the Trustees*" (page 149);

30.12   Paragraph A12.02, which provides that: "*any Trustee or person connected with [the Ashby Trustee] who shall be a solicitor advocate attorney or accountant or engaged in any other profession business or trade shall be entitled to charge be reimbursed and be paid out of the Trust Fund his usual professional or other charges for work or business done or transacted from time to time expended by him or his firm or any employee or partner of his in the execution of or otherwise in relation to [the Ashby Trust] including acts to which a Trustee not being in that or any profession business or trade could have done*" (page 139);

30.13   Paragraph B37, by which the Ashby Trustee is entitled to "*receive reimbursement from the Trust Fund of any expenses costs and other liabilities...incurred by him purely by reason of his duties relating to this Trust*" (page 150); and

30.14   Paragraph B40, which provides that the Ashby Trustee "*may institute and defend proceedings at law and may proceed to the final end and determination thereof or compromise the same as the [Ashby Trustee] shall consider advisable*" (page 150).

**Mr Grosso's letters of wishes and the Ashby Trust's shareholding in KML**

31.   In his capacity as settlor of the Ashby Trust, Mr Grosso has written a number of letters of wishes to the Ashby Trustee, as follows:

11

31.1   A letter dated 24 March 1994 (page 153) by which Mr Grosso asked the Ashby Trustee to consider Mr Grosso and Mrs Grosso to be the joint principal beneficiaries of the Ashby Trust during their lifetimes. In that letter of wishes, Mr Grosso also confirmed his intention to add to the settled fund the shares of a company in which he was to be involved with Mr Federico Ceretti ("**Mr Ceretti**") who is settlor of the El Prela Trust referred to above. That company was KML, as to which see further paragraph 79 below;

31.2   A letter dated 5 October 1998 (page 155) by which Mr Grosso requested that his mother, Mrs Adele Grosso, née Bonino, be added as a beneficiary of the Ashby Trust. This request was not carried out and Mrs Adele Grosso was never added as a beneficiary of the Ashby Trust;

31.3   A letter of wishes dated 29 August 1996 (page 157), in which Mr Grosso expressed his wish that the Ashby Trustee transfer 1,800 shares in KML for nil consideration to Alpine Trustees, which was at that time the trustee of the El Prela Trust (prior to the appointment of the El Prela Trustee); and

31.4   A letter of wishes dated 24 March 2000 (page 158), by which Mr Grosso noted his wish to transfer a further 120 shares in KML to Alpine Trustees as trustee of the El Prela Trust for nil consideration.

32.   On 24 February 1994, 9,000 shares (6,000 from Mr Grosso and 3,000 from Mr Ceretti) in KML, being 75% of the issued share capital of that company, were transferred to a nominee to hold on trust for the Ashby Trustee to form part of the property of the Ashby Trust following its settlement on 24 March 1994. The Ashby Trustee paid US$9,000 to KML in consideration for these shares.

33.   Also on 24 February 1994, 3,000 shares in KML were transferred by Mr Ceretti to a nominee to hold on trust for Alpine Trustees to form part of the property of the El Prela Trust following its settlement on 7 April 1994.

34.   Following these initial transfers, certain shares in KML (the legal ownership of which, from 24 February 1994 onwards, lay with a nominee) were transferred by the Ashby Trustee to Mr Ceretti, who subsequently added them to the property of the El Prela Trust as follows:

12

11698152.1

34.1    On 14 January 1997, 1,800 shares in KML were transferred from the Ashby Trustee to Mr Ceretti.

34.2    On 16 March 1998, 1,080 shares in KML were transferred from the Ashby Trustee to Mr Ceretti.

34.3    On 2 May 2000, a further 120 shares in KML were transferred from the Ashby Trustee to Mr Ceretti.

35.    Following the above transfers and allotments, the entire issued share capital of KML was held, via a nominee, by the Ashby Trustee on behalf of the Ashby Trust and Alpine Trustees (since 2006, the El Prela Trustee) on behalf of the El Prela Trust in equal shares.

**The restructuring of the Ashby Trust in 2008**

36.    The structure of the Ashby Trust and its subsidiary companies is designed to allow those beneficiaries of the Ashby Trust who are subject to taxation in the United Kingdom ("**UK**") to benefit from a special tax regime in the UK by which they, while UK taxpayers, are designated "resident non-domiciled" in the UK.

37.    Until 31 March 2008, the Ashby Trustee held its shares in KML via a nominee and the other investments of the Ashby Trust directly.

38.    In late 2007/early 2008, the first drafts of the new UK Finance Bill were published. This introduced the possibility of several changes to the legislation governing the taxation of UK resident non-domiciliaries. It appeared possible that capital gains made by the Ashby Trust after 5 April 2008 might attract a less favourable tax treatment from the perspective of those beneficiaries of the Ashby Trust (including Mr Grosso) who were subject to taxation in the UK as UK resident non-domiciliaries. It appeared at the time that a line might be drawn as at 5 April 2008 distinguishing trust gains that had been *"accrued or realised"* before that date and those *"accrued or realised"* after that date, with the old gains being taxed under the old rules (and so not giving rise to a charge to tax for UK resident non-domiciliaries) and the new gains being taxed under the new regime (where there would be a charge to tax). There was no certainty at that stage as to whether revaluing provisions might be introduced in the new legislation (which provisions might mitigate the impact of the changes in the law).

13

11698152.1

39. Given the uncertainty prevailing at the time, Leading English tax Counsel was instructed by the Ashby Trustee to consider the best action for the Ashby Trust. Leading tax Counsel considered it advisable to trigger gains in the Ashby Trust before 5 April 2008, so as to constitute actual disposals, rather than relying on the possibility that revaluation provisions might be introduced in the forthcoming legislation. This would have the effect of establishing a new higher base cost of these assets against which any future capital gains might be assessed. Accordingly it was deemed prudent by the Ashby Trustee to revalue the Ashby Trust's assets in this manner.

40. It was concluded that the most efficient way of effecting this revaluation was to transfer the Ashby Trust's shares in KML (held via a nominee) to one wholly-owned subsidiary of the Ashby Trust, and to transfer all of the Ashby Trust's other investments from the Ashby Trust to another wholly-owned subsidiary of the Ashby Trust.

41. Accordingly, in early 2008, the Ashby Trust underwent a tax restructuring. This involved, on 26 February 2008, the transfer to the Ashby Trustee of 100% of the shares of two shelf companies (the original subscriber being Moore Stephens International Services (BVI) Limited and the original holder of the single issued share being the El Prela Trustee). Those companies were:

    41.1 Ashby Holding Services Limited, a company incorporated on 23 November 2007 under the name Thornton Bay Holdings Limited, whose registered office is at Palm Grove House, Wickhams Cay 1, Road Town, Tortola, BVI (the "**Ashby Holding Company**"); and

    41.2 Ashby Investment Services Limited, a company incorporated on 12 October 2007 under the name Pestona Investments Inc, whose registered office is at Palm Grove House, Wickhams Cay 1, Road Town, Tortola, BVI (the "**Ashby Investment Company**").

42. On 31 March 2008, the Ashby Trustee sold its shareholding in KML to the Ashby Holding Company. The shares remained registered in the name of a nominee, which, following the sale, held the shares on trust for the Ashby Holding Company. This sale was deemed to occur at market value for UK tax purposes (i.e. at a price that was greater than the original cost of the KML shares). The shares in KML were therefore re-valued to apparent market value for UK tax

14

11698152.1

purposes (that revaluation taking place before Madoff's fraud was revealed). The sale proceeds were left outstanding on a loan account and dividend income from KML was used by the Ashby Holding Company towards repayment of the loan.

43. At the same time, the Ashby Trustee sold its other investments to the Ashby Investment Company for market value, therefore revaluing those investments to market value for UK tax purposes. Again, the sale proceeds of this transaction were left outstanding on a loan account.

44. As at 31 October 2011 the current outstanding balance of the loan accounts to the Ashby Trustee is :

   44.1 US$112,188,869.63 in relation to the Ashby Holding Company; and

   44.2 US$87,382,827.35 in relation to the Ashby Investment Company.

45. The structure created by these arrangements is set out in the structure chart at page 159.

**Dividends received from KML**

46. From time to time during the period 1995 to 2008 the directors of KML declared and paid dividends to its ultimate shareholders. In the case of the Ashby Trust, between 29 May 1995 and 31 March 2008 (i.e. prior to the restructuring referred to at paragraph 36 above) such dividends were paid directly to the Ashby Trustee. Following the restructuring, such dividends were paid to the Ashby Holding Company.

47. In total, between 29 May 1995 (when the first KML dividend was declared) and 26 November 2008 (when the last KML dividend was declared) the Ashby Trust received dividends from KML totalling US$149,082,329.01. The table below summarises the amount of KML dividends paid to the Ashby Trustee each year. A schedule setting out full details of those dividends is at page 160.

| Year | Total dividends received (US$) |
|------|-------------------------------|
| 1995 | 8,969.01 |
| 1997 | 1,564,200 |
| 1998 | 3,458,520 |

15

11698152.1

| Year | Total dividends received (US$) |
|---|---|
| 1999 | 5,355,000 |
| 2000 | 7,625,640 |
| 2001 | 10,050,000 |
| 2002 | 12,025,000 |
| 2003 | 13,925,000 |
| 2004 | 14,555,000 |
| 2005 | 19,640,000 |
| 2006 | 17,650,000 |
| 2007 | 21,150,000 |
| 2008 | 22,075,000[2] |

48. The moneys deriving from these dividend payments were initially invested by the Ashby Trustee pursuant to its powers of investment under the Trust Deed. Following the restructuring of the Ashby Trust in 2008, dividends received by the Ashby Holding Company were transferred to the Ashby Trustee towards repayment of the loan account relating to the transfer of KML shares from the Ashby Trustee to the Ashby Holding Company on 31 March 2008 as described above. These repayment moneys were retained on deposit by the Ashby Trustee.

49. Other than the return on capital generated from investments made by the Ashby Trustee (and latterly the Ashby Investment Company) (see below), the dividends paid by KML to the Ashby Trustee (and latterly the Ashby Holding Company) represented the sole source of revenues of the Ashby Trust.

50. The Ashby Trust's report and financial statements as at 31 December 2007 (page 169), showed that the Ashby Trust had net assets of US$159,426,222. The net assets of the Ashby Trust as at 30 April 2011 were US$142,298,627 according to the (unaudited) balance sheet at page 174.

**The Ashby Trust's investments into the Kingate Funds**

51. The Ashby Trustee (and latterly the Ashby Investment Company) invested a significant proportion of the dividends received from KML directly and indirectly in

---

[2] Of which, US$5,750,000 was paid to the Ashby Trustee, with the remaining US$16,325,000 being paid to the Ashby Holding Company following the restructuring referred to at paragraph 41 above.

the Kingate Funds. Taken together, the Ashby Trust's holdings in the Kingate Funds represented an at cost investment totalling in excess of US$19 million. Such investments were made in three ways:

51.1  Direct subscription for shares in the Kingate Funds;

51.2  Investment in structured products; and

51.3  Investment in funds of funds.

Each method of investment is described further below.

52.  Following Madoff's arrest in December 2008 and subsequent unveiling of the fraud committed by BLMIS, the value of the Ashby Trust's direct and indirect investments in the Kingate Funds was written down to zero[3].

Direct subscription

53.  The Ashby Trust and Ashby Investment Company invested directly in Kingate Global. The loss attributable to these investments is as follows:

| | |
|---|---|
| Investment at cost of: | US$2,096,404.23 |
| Stated value as at latest NAV date (31 December 2008): | US$3,568,386.86 |
| Value today: | US$0.00 |

Investment in structured products

54.  The Ashby Trust and the Ashby Investment Company invested indirectly in the Kingate Funds by way of structured notes issued by Boiro Finance BV, being a wholly owned subsidiary of Banco Bilbao Vizcaya Argentaria, SA. The loss attributable to these investments is as follows:

| | |
|---|---|
| Investment at cost of: | US$13,222,928.50 |
| Stated value as at latest NAV date (31 December 2008): | US$15,783,250.00 |
| Value today: | US$0.00 |

---

[3] This is subject to any recovery claim made by the Ashby Trustee in the liquidation of the Kingate Funds.

17

11698152.1

Investment in funds of funds

55.  The Ashby Trustee and the Ashby Investment Company also invested in certain funds of funds managed by FIM Limited and FIM Advisers LLP (together, "**FIM**"), which funds themselves had exposure to the Kingate Funds. FIM is a London-based alternative investment management company that at all relevant times was active in the creation, management and servicing of portfolios of hedge funds for institutional and private clients on a global basis. Established in 1981 by Mr Grosso, at all relevant times FIM was authorised and regulated by the UK Financial Services Authority (or its predecessors) and by the spring of 2008, had assets under management of US$4.33 billion. Its principals are Mr Grosso and Mr Ceretti. The value of the Ashby Trust's holdings in the FIM funds of funds concerned (the "**FIM Funds**") declined as a consequence of their exposure to the Kingate Funds and as a direct result of the activities of Madoff and/or BLMIS.

56.  The global economic crisis combined with the reputational damage suffered by FIM as a consequence of the scandal following Madoff's arrest led to FIM's business operations being wound down. As a consequence, the Ashby Trust's investments in the FIM Funds have gradually been liquidated.

57.  In summary terms, the losses suffered by the Ashby Trust attributable to the FIM Funds' exposure to BLMIS through the Kingate Funds are estimated at US$3,834,898.00.

**Payments to third parties from the assets of the Ashby Trust**

58.  During the life of the Ashby Trust, and in accordance with the powers afforded to it under the Trust Deed, the Ashby Trustee has incurred a variety of costs and expenses which have been met from the assets of the Ashby Trust. A spreadsheet detailing all such costs and expenses is at page 175. In summary, they can be broken down as follows:

    58.1    Administration fees;

    58.2    Trustee fees;

    58.3    Directors' fees;

    58.4    Registered agent's fees;

18

11698152.1

    58.5    Consultancy fees; and

    58.6    Fees paid to legal advisers.

### Administration, trustee, director and registered agent fees

59.    As set out above, paragraphs A12.01 and B36 of the Trust Deed provide that the Ashby Trustee is entitled to remuneration and/or repayment of its expenses incurred in the proper administration of the Ashby Trust from the assets of the Ashby Trust.

60.    The Ashby Trustee has delegated the administration of the Ashby Trust to Moore Stephens & Company Bermuda (which in turn has delegated the day-to-day administration of the Ashby Trust to Moore Stephens Monaco), which charges administration fees arising out of the time spent on the day-to-day administration of the Ashby Trust and its assets, for instance, arranging bank transfers, book keeping, preparing the Ashby Trust accounts and liaising with legal and other advisers. In addition to such administration fees, there are fixed annual trustee fees, directors' and registered agent's fees, which are also paid to Moore Stephens & Company Bermuda.

61.    The total amount of such fees paid to Moore Stephens & Company Bermuda on behalf of the Ashby Trustee to 31 October 2011 pursuant to the provisions in the Trust Deed are US$816,727.39.

### Consultancy fees

62.    From time to time and in accordance with paragraph A12.02 of the Trust Deed, the Ashby Trustee has sought the professional services of certain other companies within the Moore Stephens International member firms, namely Moore Stephens LLP and Moore Stephens Trust Company Limited, Isle of Man. Moore Stephens LLP provided consultancy advice in relation to trust matters. Moore Stephens Trust Company Limited, Isle of Man, provided services in connection with the execution of specialty debt.

63.    The total amount of such consultancy fees paid by the Ashby Trustee to 31 October 2011 pursuant to the provisions in the Trust Deed are US$180,381.45.

19

11698152.1

Fees paid to legal advisers

64. Paragraphs A12.02 and B37 of the Trust Deed entitle the Ashby Trustee to pay the fees of professional advisers in respect of advice obtained by the Ashby Trustee in the discharge of its duties under the Trust Deed from the assets of the Ashby Trust.

65. The majority of legal fees incurred by the Ashby Trustee in its capacity as trustee of the Ashby Trust relate to advice obtained in connection with the claims and potential claims articulated against it, the Ashby Holding Company and Ashby Investment Company arising from the fall-out following the discovery of the Madoff fraud. These claims are described in more detail at paragraph 105 below. This has entailed obtaining legal advice in a number of jurisdictions, including England, Bermuda, the BVI, New York, Monaco and Jersey. As at 31 October 2011, the total legal fees paid to legal advisers pursuant to these provisions are US$3,008,181.35.

66. Further details of these payments and the firms to which they have been paid are set out in the table at page 175.

**Change of the proper law of the Ashby Trust**

67. By paragraph A1 of the Trust Deed (page 133), the proper law of the Ashby Trust at the date of its settlement was the law of the Island of Jersey.

68. By paragraph A15 of the Trust Deed (page 141), the Ashby Trustee has the power to change the proper law of the Ashby Trust. Pursuant to that power, and having first sought the advice of Leading Counsel, by an instrument supplemental to the Trust Deed dated 17 May 2011 (page 176), the Ashby Trustee changed the proper law of the Ashby Trust to that of the BVI. Mr Grosso consented to that change and the joint liquidator of the Kingate Funds (see below) confirmed that he had no observation on it.

**THE KINGATE FUNDS AND KINGATE MANAGEMENT LIMITED**

69. Given the nature of the claims made in the Picard Claims and the fact that the assets of the Ashby Trust comprise shares in KML and investments made having received dividends from that company, it is relevant that I set out in this Affidavit certain details concerning KML and the Kingate Funds. The source of my knowledge in this regard is the series of affidavits and the witness statement

20

11698152.1

made in connection with the Ashby Trustee's successful application in 2009 to lift a freezing order over certain accounts of the Ashby Trust and its 100% subsidiaries held in Monaco, explained further at paragraph 108 below.

**The Kingate Funds**

70. Kingate Global was incorporated on 11 February 1994 under the laws of the BVI as a fund of hedge funds. Its registered office is at Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI.

71. On or about 19 April 2000, a separate self-standing entity, Kingate Euro, was incorporated under the laws of the BVI, its registered address being Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI.

72. The Kingate Funds are both open-ended investment companies and are recognised as professional mutual funds under the Territory of the British Virgin Islands Mutual Funds Act 1996.

73. During 1994, and having been introduced to various investment advisers, Kingate Global opened a discretionary managed account with BLMIS whose principal was Madoff.

74. Initially, Kingate Global had just one class of shares, denominated in US$. At the end of February 1995, Kingate Global created a new class of US$ shares called Kingate Global Fund – Class B Shares ("**Kingate B**"). The managed account with BLMIS was transferred into Kingate B, which shares were launched on 1 March 1995. At the same time, the original fund of funds shares were renamed Kingate Global Fund – Class A Shares but were wound down around the end of 1996. On 1 January 1996, a further class of shares was launched, called Kingate Global Fund – Class DM Shares ("**Kingate DM**"), denominated in Deutsche Marks, and then Euros.

75. Kingate DM was transferred from Kingate Global to Kingate Euro. Following this step, Kingate Global and Kingate Euro operated as separate funds, albeit using the same fund manager, as explained further below.

76. Investor funds deriving from subscriptions for participating common shares in the Kingate Funds (the "**Shares**") were passed to BLMIS as investment adviser to the Kingate Funds, on the understanding that they would be invested using BLMIS's so-called "split-strike conversion" strategy which was claimed by BLMIS

21

to limit losses when a stock price declined while still affording a capped upside potential.

77. As the extent of the fraud committed at BLMIS unfolded, this had a dramatic effect on the assets of the Kingate Funds, the value of which plummeted, and, on 8 May 2009 Mr William R Tacon and Mr Richard E L Fogerty of Zolfo Cooper were appointed as Joint Provisional Liquidators of the Kingate Funds by an order of the BVI Court. On 4 June 2009, the BVI Court duly appointed Messrs Tacon and Fogerty as Joint Liquidators of the Kingate Funds. For the purposes of this Affidavit, these Joint Liquidators are collectively referred to as "**Mr Tacon**".

**Current status of the liquidations of the Kingate Funds**

78. The most recent information of which I am aware as to the present position of the liquidation of the Kingate Funds is contained in Mr Tacon's Fifth Report to Creditors and Investors dated 27 January 2011 for each of Kingate Global (page 178) and Kingate Euro (page 199) (the "**Fifth Creditors' Reports**"). In brief summary:

   78.1 The Kingate Funds have made a provisional claim in the liquidation of the BLMIS estate. By an update to creditors and investors of Kingate Global dated 17 June 2011 (page 220), Mr Tacon confirmed that this claim is Kingate Global's most significant asset and that despite the potential risk in maintaining it (which I understand from Lawrence Graham LLP ("**LG**") to be submitting to the jurisdiction of the New York Court for the purposes of the Third Amended Complaint) Mr Tacon would not withdraw it;

   78.2 Mr Picard filed an avoidance claim against the Kingate Funds in the Bankruptcy Court on 17 April 2009 (the "**Picard US Complaint**"). The Picard US Complaint was subsequently amended on three occasions, and on 20 May 2011 Mr Picard filed the Third Amended Complaint. Mr Tacon has not made any appearance in connection with the Picard US Complaint, having agreed a number of extensions of time in which to do so with Mr Picard. The latest such extension of which I am aware (to 16 November 2011) was agreed by way of a Stipulation and Order dated 13 October 2011 (page 221).

   78.3 Mr Tacon has permission from the BVI Court to enter into a settlement agreement with Mr Picard in relation to the Picard US Complaint. Further

22

11698152.1

information about that draft settlement agreement and the negotiations between Mr Tacon and Mr Picard is at paragraphs 138 to 142 below.

78.4 Mr Picard has obtained permission to issue a claim in the BVI in respect of the Picard US Complaint on the basis that it will not be pursued until settlement negotiations with Mr Tacon are completed;

78.5 Bank of Bermuda has frozen the Kingate Funds' accounts held with that bank in Bermuda. The Kingate Funds have access to those accounts for the purpose of meeting their ordinary legal and business expenses and a hearing date for the hearing of the Kingate Funds' application to release the funds is yet to be set;

78.6 Mr Picard has intervened in those proceedings between the Kingate Funds and Bank of Bermuda, but has confirmed he has no intention of pursuing his claim in that action until the settlement negotiations with Mr Tacon are completed;

78.7 Mr Tacon has obtained copies of the Kingate Funds' books and records held by KML and access to the Kingate Funds' records held by Citi Hedge Fund Services Ltd ("**Citi**"), the administrator of the Kingate Funds;

78.8 Mr Tacon has issued a protective writ against PricewaterhouseCoopers Bermuda in relation to their 2003 audits of the Kingate Funds, with the intention of issuing further writs in relation to their 2004 audits;

78.9 On 2 December 2010, Mr Tacon was granted recognition by the English High Court as Joint Liquidator of the Kingate Funds pursuant to the UK Cross Border Insolvency Regulations 2006;

78.10 Mr Tacon has issued the Bermuda Proceedings, as described further below.

**Kingate Management Limited**

79. KML was incorporated on 24 February 1994 under the laws of Bermuda. Its registered office is 2 Reid Street, Hamilton HM11 Bermuda. Its issued shares are wholly-owned by a nominee company, holding in equal shares for the Ashby Holding Company and El Prela Group Holding Services Limited (the "**El Prela Holding Company**"), (together the "**Holding Companies**").

23

11698152.1

80. As at the date of Madoff's arrest on 11 December 2008, KML's board of directors comprised the following individuals: Michael Tannenbaum; Phillip Evans; Shazieh Salahuddin; and Christopher Wetherhill. Michael Tannenbaum retired as a director in early 2009, while Phillip Evans retired on 31 May 2010. Shazieh Salahuddin and Christopher Wetherhill resigned in May 2011.

81. KML acted as investment manager to the Kingate Funds in accordance with the terms of certain management agreements. The most recent management agreement between Kingate Global and KML is dated 1 January 2006 (the "**Global Management Agreement**") which superseded and replaced previous management agreements between those parties dating back to 1994. Kingate Euro entered into a management agreement with KML on 1 May 2000 (the "**Euro Management Agreement**"). Both management agreements are governed by the laws of Bermuda. The Global Management Agreement is subject to the non-exclusive jurisdiction of the Courts of Bermuda, whilst the Euro Management Agreement is silent as to jurisdiction. Copies of the Global Management Agreement and the Euro Management Agreement (together, the "**Management Agreements**") are at pages 224 and 237 respectively.

Fees received by KML under the Management Agreements

82. In return for the performance of its duties under the Management Agreements, KML received:

    82.1 Under the Global Management Agreement, a monthly management fee at an annual rate equal to 1.5% of the month-end net asset value of the Shares of Kingate Global; and

    82.2 Under the Euro Management Agreement: (a) a monthly management fee at an annual rate equal to 1.5% of the month-end net asset value of the Shares of Kingate Euro; and (b) an administration fee at an annual rate of 0.10% of the month-end net asset value of Kingate Euro in respect of the foreign exchange hedging activity undertaken by Kingate Euro.

83. From time to time and as described at paragraph 46 above, the directors of KML declared dividends which were paid to its ultimate shareholders (the Trustees or, after 31 March 2008, the Holding Companies) in proportion to their shareholdings in KML.

24

11698152.1

Delegation of KML's duties under the Management Agreements

84. Under the terms of the Management Agreements, KML was authorised to delegate any of its duties or obligations arising under those agreements to third parties, whether independent of or affiliated with KML. KML did exercise its authority to delegate the performance of certain of its duties under the Management Agreements, including to:

84.1 BLMIS as investment adviser to the Kingate Funds.

84.2 FIM as consultant to and distributor for the Kingate Funds, in return for certain fees. Those fees represented around 2.5% of FIM's annual revenues.

84.3 Citi, which was appointed to provide administrative services to the Kingate Funds.

84.4 Bank of Bermuda Limited (an indirect 100% subsidiary of HSBC Holdings plc), which was retained as banker and custodian to the Kingate Funds ("**Bank of Bermuda**").

Loan to KML

*Loan Agreement dated 16 July 2009*

85. From 26 November 2008, KML received no further management fees under the Management Agreements, meaning that KML's only source of income came to an end. Equally, as the true extent of the BLMIS fraud unfolded in 2009, KML continued to be heavily involved in dealing with redemptions and other related issues concerning the Kingate Funds, in accordance with its duties under the Management Agreements. It also agreed to provide voluntary disclosure to Mr Tacon of records held by it pertaining to the Kingate Funds. KML therefore continued to incur operating expenses.

86. In early 2009, the Holding Companies, which between them are beneficial owners of the shares in KML (held by a nominee) considered whether it would be appropriate to advance loan funding to KML that would enable it to continue operations and avoid entering insolvent litigation.

25

11698152.1