87.  On 16 July 2009 the Holding Companies (as lenders) and KML (as borrower) entered into a loan agreement in respect of a term loan facility of up to US$1,200,000 (the "**Loan Agreement**"). A copy of the Loan Agreement is at page 249.

88.  By clause 3 of the Loan Agreement (page 256), each Advance (as defined) made under that agreement was to be made for the sole and exclusive purpose of:

    88.1  Permitting KML to pay all relevant expenses relating to its position in respect of the Kingate Funds, to pay KML's officers to continue to run it, and to enable KML to take legal advice strictly in relation to its own position in respect of any issues that may have properly concerned it; and/or

    88.2  Such other purpose as the Holding Companies may have (in their absolute discretion) agreed in writing in advance.

89.  The facility granted under the Loan Agreement was specifically not to be used for KML's direct litigation defence costs and was made subject to strict conditions. Prior to the Loan Agreement being agreed, the Trustees reconfirmed to KML the purpose of the Loan Facility (as defined) by way of a side letter from LG dated 7 July 2009 (page 271).

90.  The Loan Agreement set out in clause 4.2 (pages 256 to 257) a number of conditions precedent which needed to be fulfilled before the Holding Companies were obliged to make an Advance (as defined). By clause 4.4 of the Loan Agreement (page 257), the Holding Companies had the ability to cancel unilaterally any undrawn part of the Loan Facility at any time on giving prior written notice to KML.

*Supplemental Loan Agreement dated 28 September 2010*

91.  In or around June 2010, KML made a request to the Holding Companies for a further loan of up to US$1,200,000 so as to extend the Loan Facility from US$1,200,000 to US$2,400,000 (the "**Extension Request**").

92.  On 28 September 2010 the Holding Companies (as lenders) and KML (as borrower) entered into a supplemental agreement to the Loan Agreement, extending the facility granted by way of the Loan Agreement by up to

26

11698152.1

US$1,200,000 (the "**Supplemental Loan Agreement**"). A copy of the Supplemental Loan Agreement is at page 272. Taken together, the Loan Agreement and the Supplemental Loan Agreement are referred to in this Affidavit as the "**Loan Agreements**".

*Advances made to KML under the Loan Agreements*

93. From July 2009, the Ashby Holding Company made Advances to KML under the Loan Agreements. The total Advances made by the Ashby Holding Company pursuant to the Loan Agreements were US$900,000.

*Suspension of Advances under the Supplemental Loan Agreement*

94. On 22 December 2010, Mr Tacon issued the Bermuda Proceedings and on 7 January 2011, the Ashby Trustee and the Ashby Holding Company received the Writ and draft Statement of Claim in respect of those proceedings. In light of the claims articulated in the draft Statement of Claim, the Ashby Trustee and Ashby Holding Company gave consideration to whether it was appropriate for the Ashby Holding Company to make any further advance to KML pursuant to the Supplemental Loan Agreement.

95. On 7 February 2011, LG wrote to KML (page 302) confirming that the Holding Companies would not make any further Advance to KML under the Supplemental Loan Agreement until further notice. No further funding has been advanced, and a petition has since been issued for KML's winding up, as explained further below.

Resignation of KML's directors and Petition to wind up KML

96. In May 2011, KML's remaining directors, Chris Wetherhill and Shazieh Salahuddin, gave notice of their resignation from KML.

97. The Trustees understand from their lawyers in Bermuda that under the Bermuda Companies Act, members of a company are under a positive obligation to appoint replacement directors in the event that the number of directors falls below the statutory minimum of two. As beneficial owners of the shares in KML, the Holding Companies have explored the possibility of appointing replacement directors, but concluded that, in the absence of third party funding, it would be difficult if not impossible to find prospective directors willing to accept an appointment.

27

11698152.1

98. By the time that KML's remaining directors resigned in May 2011, KML had ceased to carry on the business for which it was incorporated. Thereafter, the Holding Companies considered whether KML should be wound up, since it was unable to pay its debts as they fell due. At that time, those acting for the Holding Companies were not aware of the fact that the legal ownership of the shares in KML lay with a nominee company, Hamilton Nominees Limited ("**HNL**").

99. On 3 August 2011, the Ashby Holding Company issued a notice of statutory demand on KML via its registered agents (page 303, the "**Statutory Demand**"). An equivalent demand was served on behalf of the El Prela Holding Company. The Statutory Demand gave notice that, the Repayment Date (as defined in the Supplemental Loan Agreement) having passed, unless the US$900,000 advanced to KML pursuant to the Loan Agreements, plus interest, was repaid in full within 21 days, the Ashby Holding Company could petition to wind up KML pursuant to the Bermuda Companies Act.

100. The Ashby Holding Company did not follow up on the Statutory Demand. Instead, on 10 August 2011 the Holding Companies each resolved to enter into a unanimous written resolution, purportedly as the members of KML, that KML should be wound up and that Trott & Duncan Limited ("**Trott & Duncan**") should be instructed to prepare and file the appropriate petition for the winding up of KML, swear an affidavit verifying its contents and take all necessary steps to seek an order appointing a liquidator and/or joint provisional liquidators and/or the Official Receiver. Consequentially, a unanimous shareholders' resolution to that effect was purportedly passed on 10 August 2011 (the "**Unanimous Written Resolution**") (page 306).

101. On 7 September 2011, a winding up petition was issued (the "**Petition**") (page 308) which was advertised on 14 September 2011. The return date in respect of the Petition was 14 October 2011. In the event, representatives of both Mr Tacon and Mr Picard notified an intention to appear at the hearing. Correspondence was exchanged in advance of it (see pages 315 to 324) culminating in service on behalf of Mr Picard of affidavit evidence on the eve of the hearing itself. (The affidavit and exhibit are not exhibited to this Affidavit but can be made available to the Court upon request). During the course of this correspondence it became clear that the Holding Companies had overlooked the fact that legal ownership of the KML shares lay with HNL. As a consequence, the Unanimous Written Resolution was confirmed and adopted by a written resolution of HNL dated 14

October 2011 (page 325) which ratified the steps taken by Trott & Duncan in relation to the Unanimous Written Resolution.

102. In the event, the hearing of the Petition was adjourned on 14 October 2011. A copy of the order is at page 326. Further correspondence has since been exchanged between Trott & Duncan and Mr Picard's advisers (see pages 328 to 335), with the result that Mr Picard and Mr Tacon have confirmed that they do not intend to oppose the Petition.

103. While KML has been without directors, it has nevertheless had to continue to address various issues, including the proceedings to which it is a party (namely the Bermuda Proceedings and the Picard Claims) until such time as replacement directors or joint provisional liquidators of KML are appointed. This has been done by the sole member, HNL, resolving for KML to issue relevant instructions in relation to those proceedings.

104. At the same time, the Trustees are aware from copy invoices sent to KML's registered agent, that KML continues to incur certain expenses in the form of costs incurred for storage of KML's documents and IT equipment. The most recent such invoices from Island Self Storage, each for US$175, have been due for payment on 1 June 2011, 1 July 2011, 1 August 2011, 1 September 2011 and 1 October 2011. In light of the fact that KML was unable to pay these invoices, and given that non-payment might have placed disclosable documents at risk of destruction, the Holding Companies made arrangements to pay them.

**LEGAL ACTION AGAINST THE ASHBY TRUSTEE**

105. In addition to the Picard claims, which are explained in more detail at paragraphs 125 and 143 below, the Ashby Trustee has been or is a party to two other legal proceedings. These are:

   105.1 A temporary freezing order granted by the Court of First Instance of the Principality of Monaco (the "**Monaco Court**") over certain accounts of the Ashby Trust and its 100% subsidiaries held in Monaco; and

   105.2 The Bermuda Proceedings.

106. In addition, there is a consolidated class action complaint that is of potential relevance to the Ashby Trustee but to which it is not a party, filed in the United States District Court, Southern District of New York on 18 May 2010 and entitled

29

11698152.1

In re Kingate Management Limited Litigation, with Master File No. 09 Civ.5386 (BAB) (the "**Class Action**").

107. Further detail of these legal proceedings is given below.

**The Monaco Freezing Order and the creation of the Monaco Affidavits**

108. In late 2008, the Ashby Trustee and the Ashby Investment Company held significant cash balances, totalling some US$102,844,048.70 with HSBC Private Bank (Monaco) SA ("**HSBC Monaco**"). In early December 2008, concerns began to be raised about the stability of HSBC, as a result of the global crisis in the financial sector. From mid-December 2008 onwards, there was a sharp fall in HSBC's share price. As a result, following consideration of the issue by telephone with Mr Grosso, the Ashby Trustee decided to reduce the Ashby Trust's exposure to HSBC by transferring some of the cash balances held with HSBC Monaco to Fortis Bank (C.I.) Limited in Guernsey, Channel Islands ("**Fortis Guernsey**"), which had, at that point, recently been nationalised by the Dutch Government and was therefore considered unlikely to fail. Accordingly, the Ashby Trustee made the following payment instructions:

108.1 On 12 December 2008 the Ashby Trustee sent a payment instruction to HSBC Monaco requesting the transfer of the sum of US$36,300,000 from that Ashby Trust account to an Ashby Trust account held with Fortis Guernsey (page 336).

108.2 On 15 December 2008, the Ashby Trustee sent a payment instruction to HSBC Monaco requesting the transfer of the sum of US$24,000,000 from the Ashby Trust account with HSBC Monaco to an Ashby Trust account held with Fortis Guernsey (page 337) (this payment instruction together with that referred to in paragraph 108.1 above, the "**Payment Instructions**").

109. To the best of my knowledge, derived from written representations dated 17 December 2008 made by the Service d'Information et de Contrôle Sur les Circuits Financiers of the Principality of Monaco ("**SICCFIN**") to the Public Prosecutor of the Principality of Monaco (the "**Monaco Prosecutor**") at page 338 (English translation) and page 352 (original) (the "**SICCFIN Report**"), the Payment Instructions led HSBC Monaco to make a suspicious transaction report to SICCFIN, following which SICCFIN prepared the SICCFIN Report.

30

11698152.1

110. The immediate consequence of the SICCFIN Report having been transmitted to the Monaco Prosecutor was that, on 19 December 2008, the Monaco Court ordered the immediate attachment of assets held in a number of HSBC Monaco accounts in the name of the Ashby Trustee, the Ashby Holding Company and the Ashby Investment Company, as well as certain HSBC Monaco accounts connected to the El Prela Trust and Mr Ceretti (the "**Freezing Order**"). This rendered the relevant account of the Ashby Trust at HSBC Monaco and those of its direct 100% subsidiaries inoperable until such time as the Freezing Order was lifted.

111. On 19 June 2009 the Ashby Trustee and others interested in the Freezing Order issued an application before the Monaco Court for an order that it be lifted, supported by a number of affidavits and a witness statement (taken together, the "**Monaco Affidavits**"), copies of which are at pages 368 to 436. A copy of the accompanying exhibit, which runs to two lever arch files, can be made available to the Court upon request.

112. Following issue of the application, on 8 July 2009 the Monaco Court ordered the lifting of the Freezing Order (a copy of the resulting order of the Monaco Court is at page 437. An English translation has not been provided, but can be obtained on request). Subsequently, on 9 July 2009 the Payment Instructions which had been the cause of the suspicious transaction report were re-issued, and the transfers effected. No assets were removed from the Ashby Trust, the Ashby Holding Company or the Ashby Investment Company as a consequence of these transfers.

**The Bermuda Proceedings**

113. On 22 December 2010 by way of a Writ of Summons (page 443), the Kingate Funds commenced the Bermuda Proceedings against the Ashby Trustee and eight other Defendants, being KML, FIM Advisers LLP, FIM Limited, the El Prela Trustee, the Holding Companies, Mr Grosso and Mr Ceretti. The Writ and accompanying Statement of Claim (page 449) were served on the Ashby Trustee via its lawyers in Bermuda on 7 April 2011, following the Ashby Trustee's agreement to facilitate service, subject to first agreeing a timetable that took into account the steps the Ashby Trustee needed to take in light of those proceedings, namely the making of the previous applications for directions referred to at paragraph 20 above (the "**Bermuda Directions Applications**").

31

114.  The Ashby Trustee entered a memorandum of appearance before the Bermuda Court on 13 April 2011.

115.  The claims made in the Bermuda Proceedings divide into two broad categories:

   115.1  Non-fault based claims against KML, the Trustees, the Holding Companies, Mr Grosso and Mr Ceretti (the "**Non-Fault Based Claims**"); and

   115.2  Fault based claims against KML, FIM, Mr Grosso and Mr Ceretti (the "**Fault Based Claims**").

116.  The Non-Fault Based Claims, which are the only claims advanced against the Trustees are, in summary, as follows:

   116.1  Claims for the recovery from KML, the Trustees, the Ashby Holding Company, and/or the El Prela Holding Company of management fees alleged to have been paid by the Kingate Funds to KML on the basis of a mistake. The claims are brought on the basis of unjust enrichment. It is alleged that the Trustees are liable as ultimate recipients of the fees, and/or that Mr Grosso and Mr Ceretti are liable as ultimate recipients of the fees, and/or ultimate beneficial owners of shares in KML. These claims are for US$254,478,999.69 and 56,226,531.48 Euros or alternatively, the amount of fees paid by the Kingate Funds (and/or their traceable proceeds) which were paid on by KML to the Trustees.

   116.2  Alternatively, claims for an order that the Trustees pay the Kingate Funds the amount of the fees and/or their traceable proceeds which were paid on by KML to the Trustees, or alternatively, a declaration that the Kingate Funds retain legal title in the allegedly overpaid fees and/or their traceable proceeds.

   116.3  Alternatively, claims for a declaration that KML, the Trustees, the Ashby Holding Company, the El Prela Holding Company, Mr Grosso and/or Mr Ceretti hold the allegedly overpaid fees, together with their traceable proceedings, on trust for the Kingate Funds, and an order that they account to the Kingate Funds for them.

117.  The Fault Based Claims, which do not directly concern the Trustees, are based on allegations of breach of tortious duties of care and/or negligent misstatement

32

11698152.1

against KML, FIM, Mr Grosso and Mr Ceretti, and damages for breach of contractual duties of care against KML.

**The Class Action**

118. A copy of the Amended Consolidated Class Action Complaint is at page 547. The Plaintiffs to the Class Action are Silvana Worldwide Corp., Criterium Capital Fund, B.V., BBF Trust, BG Valores, S.A., Banca Arner S.A., Alvaro Castillo, Lucien Geldzahler, Jaques Lamac, Nitkey Holdings Corporation and all others similarly situated. Paragraph 14 of the Class Action complaint identifies the Plaintiffs as having *"lost their investments in the [Kingate] Funds as of December 10, 2008, and also [having] paid substantial fees that were wrongfully charged based on fictitious investment returns"* (page 563).

119. The Ashby Trustee is not named as a Defendant to the Class Action, those Defendants being KML, Tremont (Bermuda) Limited, Tremont Group Holdings, Inc., FIM Limited, FIM Advisers LLP, FIM (USA) Incorporated, Mr Grosso, Mr Ceretti, Graham H Cook, John E Epps, Sandra Manzke, Charles D Sebah, Keith R Bish, Christopher Wetherhill and Michael G Tannenbaum. However, the Ashby Trustee recognises that the Class Action plaintiffs may well seek to join it as a Defendant to the Class Action at some point in the future, given that it holds assets deriving from dividends declared payable by KML and calculated by reference to KML's profits, which in turn were derived from management fees calculated by reference to the NAV of the Kingate Funds.

120. Given that it is not a party to these proceedings, the Ashby Trustee has not sought substantive legal advice in connection with the complaint.

121. However, the Ashby Trustee is aware from information passed to it from its US lawyers that the Class Action complaint was dismissed in its entirety by an order of Judge Batts dated 30 March 2011 (page 706). That order also denied the Plaintiffs leave to re-plead the complaint.

122. On 11 April 2011 the Plaintiffs issued a notice of appeal (page 736) stating their intention to appeal the judgment and order of Judge Batts to the United States Court of Appeals for the Second Circuit.

33

11698152.1

123.  On one view, the complaint made by the Class Action is one more properly within the province of Mr Tacon as joint liquidator of the Kingate Funds, who could also take steps to have the complaint struck out.

124.  However, until such time as Mr Tacon moves to strike out the Class Action complaint, or the appeal against the judgment and order of Judge Batts is finally determined in favour of the Defendants to the Class Action, there remains the possibility that the Ashby Trustee will be joined as a party to it. Naturally, if that occurs, the Ashby Trustee will of necessity have to make a further application to the BVI Court for directions as to how it should proceed with respect to that proceeding.

## CLAIMS BY MR PICARD AGAINST THE ASHBY TRUSTEE

### The Third Amended Complaint

125.  On 20 May 2011, Mr Picard filed the Third Amended Complaint (page 1) against the Ashby Trustee and 17 other Defendants, being Mr Ceretti, Mr Grosso, the Kingate Funds, KML, FIM Advisers LLP, FIM Limited, Citi, the Ashby Trust[4], Alpine Trustees, the El Prela Trustee, the El Prela Trust[5], the Holding Companies, the Ashby Investment Company, El Prela Trading Investments Limited (the "**El Prela Investment Company**", together with the Ashby Investment Company, the "**Investment Companies**") and Bank of Bermuda. The Holding Companies and the Investment Companies are purportedly joined *"individually and as trustees of"* the Trusts. I can confirm that neither the Holding Companies nor the Investment Companies have ever acted as trustees of the Trusts.

126.  The Third Amended Complaint was the first time the Ashby Trustee had been named as a Defendant to the Picard US Proceedings, Mr Picard having initially filed those proceedings against the Kingate Funds and Bank of Bermuda on 17 April 2009, as set out above.

---

[4] The Ashby Trust has no legal personality.

[5] The El Prela Trust has no legal personality.

34

11698152.1

**Service of the Third Amended Complaint**

127.  As noted above, the Ashby Trustee is a company incorporated and registered in the Republic of Liberia. On 22 June 2011, the Third Amended Complaint was purportedly served on the Ashby Trust by SCA Creque (special counsel to Mr Picard in the BVI) via Moore Stephens BVI. However, Moore Stephens BVI is not the registered agent for the Ashby Trustee. The accompanying summons and notice of pre-trial conference (page 738) required the "Ashby Trust" to submit a motion or answer within 30 days from the date of issue, being 14 July 2011. The Ashby Trustee was not served, or purportedly served.

128.  On 14 July 2011, those Defendants who had been served in the BVI, namely the El Prela Trustee, the Holding Companies and the Investment Companies (acting by Freshfields Bruckhaus Deringer US LLP ("**Freshfields**")) agreed with Mr Picard (acting by Baker & Hostetler LLP) an extension of time (until 18 August 2011) to respond to the Third Amended Complaint, by way of a stipulation dated 14 July 2011 (page 740). Further extensions, to which the Ashby Trustee was also a party, were agreed on 10 August 2011 and 14 October 2011, the latest of which extended the time to move, answer or otherwise respond until 16 November 2011 (page 743)[6]. By joining in those stipulations, the Ashby Trustee agreed to facilitate service of the Third Amended Complaint and waive any defence based on insufficiency of service of process, although the Ashby Trustee reserved the right to challenge the jurisdiction of the New York Court.

**The Claims made against the Ashby Trustee in the Third Amended Complaint**

129.  As I have explained above, there are 17 Defendants to the Third Amended Complaint in addition to the Ashby Trustee, which alleges 15 counts upon which Mr Picard seeks judgment, as set out more fully at paragraphs 276 to 359 of the Third Amended Complaint (pages 65 to 83). The claims made divide into three broad categories:

129.1 The return of alleged avoidable and recoverable initial transfers from the Kingate Funds of approximately US$976 million (US$438 million in respect of Kingate Global and US$538 million in respect of Kingate Euro)

---

[6] At the time of finalising this Affidavit, Baker & Hostetler LLP and Freshfields were in discussions regarding a further such extension until 16 February 2012.

alleged to have been transferred to those entities by BLMIS (the "**Initial Transfer Claims**");

    129.2 The return of alleged subsequent transfers against the Trustees, KML, FIM Limited, FIM Advisers LLP, the Holding Companies, the Investment Companies, the Trusts[7], Alpine Trustees, Mr Grosso, Mr Ceretti and Citi (the "**Subsequent Transferee Claims**"); and

    129.3 Common law claims in unjust enrichment, conversion and money had and received (the "**Common Law Claims**").

130. The Third Amended Complaint also seeks the disallowance of the Kingate Funds' customer claims in the BLMIS bankruptcy, the equitable subordination of those customer claims (as to the status of which, see paragraph 78.1 above), and, against Bank of Bermuda, a declaratory judgment that funds currently frozen in the Kingate Funds' accounts held with that bank are to be returned to the BLMIS estate.

131. The Subsequent Transferee Claims and the Common Law Claims, which are the only claims advanced against the Trustees are, in summary, articulated in the Third Amended Complaint as follows:

    131.1 Claims for the recovery of alleged "subsequent transfers" (or the value thereof) alleged to have emanated from BLMIS. Similar claims are made under state law (the New York Debtor and Creditor Law) and under federal law (Title 11 of the United States Bankruptcy Code), as summarised at paragraphs 331 and 337 of the Third Amended Complaint (pages 74 to 75);

    131.2 Unjust enrichment claims against the Trustees, KML, FIM Limited, FIM Advisers LLP, the Holding Companies, the Investment Companies, the Trusts[8], Alpine Trustees, Mr Grosso, Mr Ceretti and Citi on the basis that they "*have wrongfully and unconscionably benefited from the receipt of [fees] from BLMIS, for which they did not, in good faith, provide fair value*", as summarised at paragraphs 347 to 350 of the Third Amended Complaint (pages 77 to 78);

---

[7] As stated above, the Trusts have no legal personality.

[8] Ibid.

36

11698152.1

131.3 Conversion claims against those same Defendants on the basis that they have "*intentionally exercised dominion and control over [BLMIS property] in a matter inconsistent with and in wilful disregard of the solvency of the BLMIS estate*", as summarised at paragraphs 351 to 353 of the Third Amended Complaint (page 78); and

131.4 Money had and received against all Defendants, on the basis that they "*are currently in possession of, or have control over, [BLIMS property, to which they] have no lawful or equitable right..., having obtained the monies through fraud, deceit or mistake*", as summarised at paragraphs 354 to 356 of the Third Amended Complaint (pages 78 to 79).

132. The Ashby Trustee has sought advice from US Counsel on the appropriate response to the Third Amended Complaint, in order that it can determine the motions it should make with respect to it. The Court is referred to the Confidential Affidavit for details of the resulting advice. The directions sought by the Ashby Trustee as a consequence of that advice are at paragraph 167 below.

133. In summary, and as set out in more detail below, the Ashby Trustee has filed a motion to withdraw the reference and proposes to file a motion or motions to dismiss the Third Amended Complaint.

**Motion to withdraw the reference**

134. On 7 and 14 October 2011, certain of the Defendants to the Third Amended Complaint made motions to the United States District Court for the Southern District of New York (the "**District Court**") to have certain legal issues heard by the District Court rather than the Bankruptcy Court on the basis that those issues will involve consideration of federal non-bankruptcy law. On 17 October 2011 the Ashby Trustee joined those motions. It is anticipated that the motions will be heard and determined in the coming months. Further information regarding the Ashby Trustee's motion to withdraw the reference is set out in the Confidential Affidavit.

**Motion to dismiss**

135. The Ashby Trustee proposes to make a motion or motions to dismiss the Third Amended Complaint on a number of grounds, further details and a legal opinion on the merits of which are set out in the Confidential Affidavit.

11698152.1

136.   The form of the motion to dismiss will depend on the outcome of the motion to remove the reference. It may be that the District Court agrees to hear the entire motion to dismiss. However, if the District Court removes the reference only to issues not typically handled by the Bankruptcy Court, the Ashby Trustee may need to make two motions to dismiss: one in the District Court on non-bankruptcy issues, and one in the Bankruptcy Court with regard to all other issues. Further information regarding the Ashby Trustee's motion or motions to dismiss is set out in the Confidential Affidavit.

137.   The Ashby Trustee understands from US Counsel that the motion to withdraw the reference could be decided relatively quickly. If so, it is possible that the motion or motions to dismiss will be filed prior to the hearing of this application. It is anticipated that a supplemental affidavit will be sworn in advance of the hearing of this application in order to update the Court as to the current position.

**Settlement discussions between Mr Picard and Mr Tacon**

138.   Given the nature of the claims articulated in both the Picard Claims and the Bermuda Proceedings, the Ashby Trustee is currently facing claims to the same funds held on the trusts of the Ashby Trust from competing claimants (the Kingate Funds and Mr Picard) arising out of the same facts. It is therefore relevant to set out my understanding of the discussions between those competing claimants.

139.   As set out above, according to the Fifth Creditors' Reports, Mr Tacon has permission from the BVI Court to enter into a settlement agreement with Mr Picard provided that settlement is consistent with the substance of the draft agreement considered by the BVI Court on 16 December 2009 (the "**Draft Agreement**").

140.   The Draft Agreement is contained at appendix B to Mr Tacon's Third Report to Creditors and Investors dated 31 July 2009 for each of the Kingate Funds (at pages 765 and 793 respectively).

141.   The principal terms of the Draft Agreement are that:

141.1 Each of the Kingate Funds will settle with Mr Picard on identical terms;

38

11698152.1

141.2 The Kingate Funds will pay to BLMIS 50% of their assets (as at the date of settlement), after providing for all the costs of the respective liquidations that remain accrued but unpaid;

141.3 The Kingate Funds will pay BLMIS 50% of any additional recoveries, including any successful claims against third parties;

141.4 The Kingate Funds will agree with Mr Picard a mechanism for determining who is in the best position to prosecute each potential third-party claim (including, presumably, the Bermuda Proceedings and the Picard Claims);

141.5 The Kingate Funds will be entitled to a fully allowed claim in the liquidation of BLMIS, with any dividends payable to the Kingate Funds from the liquidation of BLMIS being retained by Mr Picard until he has recovered 85% of his preference claim against the Kingate Funds;

141.6 Thereafter, 50% of any dividend payable to the Kingate Funds will be retained until Mr Picard has recovered 35% of his fraudulent preference claim;

141.7 Any payments from the Kingate Funds to Mr Picard will be added to the Kingate Funds' claims against BLMIS for the purpose of calculating their dividends from the BLMIS estate; and

141.8 Mr Picard will not prove as a creditor in the liquidations of the Kingate Funds.

142. I understand from an update to creditors and investors of Kingate Global dated 16 September 2011 (page 803) that, at that time, settlement discussions between Mr Tacon and Mr Picard had advanced "significantly", although a negotiated settlement had not yet been agreed. I understand from LG that recent decisions against Mr Picard in the US Courts may have had an impact on those settlement discussions.

**The English Claim**

143. A copy of the Claim Form issued by Mr Picard is at page 804. Besides the Ashby Trustee, the other Defendants reflect the Defendants to the Third Amended Complaint, save that the Kingate Funds, Citi and Bank of Bermuda are

39

11698152.1

not Defendants to the English Claim, and the Third Amended Complaint names the Ashby Trust and El Prela Trust, which are not legal entities.

**Service of the English Claim**

144.   On 11 March 2011, the English Court granted Mr Picard an extension until 7 October 2011 in which to serve the Claim Form and Particulars of Claim on the Ashby Trustee (page 808).

145.   On 22 August 2011, Mr Picard issued an application to serve the English Claim out of the jurisdiction. That application was granted by order of Mr Justice Blair dated 1 September 2011 (page 809).

146.   On 13 September 2011, the English Claim was served in the BVI on the Ashby Holding Company and the Ashby Investment Company.

147.   On 16 September 2011, the English Claim was served in Liberia on the Ashby Trustee.

**Claims made against the Ashby Trustee in the English Claim**

148.   The claims articulated in the Particulars of Claim are as follows:

   148.1   A declaration pursuant to English and US law that the US$975,541,729 alleged to have been received by the Kingate Funds from BLMIS in the period before Madoff's arrest (the "**Transfers**") (or part thereof) and/or their traceable proceeds (or part of the proceeds) were held on constructive trust for Mr Picard;

   148.2   An account and/or enquiry as to the whereabouts of the Transfers (or part thereof) and/or their traceable proceeds (or part of the proceeds);

   148.3   An order that the Transfers be voided and the Transfers (or part thereof) and/or their traceable proceeds (or part of the proceeds) be returned to BLMIS;

   148.4   Further or alternatively, damages or equitable compensation for knowing receipt in breach of trust;

   148.5   Further or alternatively, a contribution and/or indemnity at common law or under the Civil Liability (Contribution) Act 1978;

40

11698152.1

148.6 An order for a contribution under section 213 of the Insolvency Act 1986, pursuant to the Cross-Border Insolvency Regulations 2006, or at common law;

148.7 Such further or other relief as the Court thinks fit;

148.8 Interest; and

148.9 Costs.

149. The Ashby Trustee has sought advice from English Leading and Junior Counsel with respect to the English Claim. The Court is referred to the Confidential Affidavit for further details.

**The "stay" of the English Claim**

150. On 22 August 2011, Mr Picard issued an application to stay the whole of the English Claim (see the application notice, draft order and witness statement of Laurence Lieberman at pages 811 to 824). The exhibit to Mr Lieberman's witness statement is not exhibited to this Affidavit, but can be made available to the Court upon request). So far as the Ashby Trustee is aware, that application has not yet been listed for hearing.

151. On 7 October 2011 LG wrote to Taylor Wessing LLP seeking an extension of time for the Ashby Trustee to file its acknowledgment of service until the later of 14 November 2011 or the date falling seven days prior to the hearing of Mr Picard's stay application (the "**Acknowledgment Date**") (page 825).

152. On 10 October 2011, the latest date by which it could do so, the Ashby Trustee filed an acknowledgment of service indicating an intention to contest the jurisdiction of the English Court.

153. On 11 October 2011, Taylor Wessing LLP wrote to LG agreeing the proposals with respect to the Acknowledgment Date (page 827). That same day, LG wrote to Taylor Wessing LLP confirming that the Ashby Trustee had filed an acknowledgment of service (page 828) and seeking agreement that the 28 day period in which to make any application to contest jurisdiction should not begin until the Acknowledgment Date. Taylor Wessing LLP confirmed their client's agreement to that proposal by a letter dated 21 October 2011 (page 830).

41

11698152.1