*think fit) all or any of the Trustees' powers and discretions with regard to making retaining varying or transposing investments"* (page 146);

30.11   Paragraph B36, which provides that: *"the expenses in connection with the preparation establishment and administration of this trust including without prejudice to the generality of the foregoing the remuneration and charge of the Trustees herein provided for and of the investment and re-investment of any part of the Trust Fund and the collection of income and other sums derivable therefrom may be paid out of the Trust Fund and may be charged against capital or income or partly out of one and partly out of the other at the discretion of the Trustees"* (page 148);

30.12   Paragraph A12.02, which provides that: *"any Trustee or person connected with [the El Prela Trustee] who shall be a solicitor advocate attorney or accountant or engaged in any other profession business or trade shall be entitled to charge be reimbursed and be paid out of the Trust Fund his usual professional or other charges for work or business done or transacted from time to time expended by him or his firm or any employee or partner of his in the execution of or otherwise in relation to [the El Prela Trust] including acts to which a Trustee not being in that or any profession business or trade could have done"* (page 138);

30.13   Paragraph B37, by which the El Prela Trustee is entitled to *"receive reimbursement from the Trust Fund of any expenses costs and other liabilities...incurred by him purely by reason of his duties relating to this Trust"* (page 149); and

30.14   Paragraph B40, which provides that the El Prela Trustee *"may institute and defend proceedings at law and may proceed to the final end and determination thereof or compromise the same as the [El Prela Trustee] shall consider advisable"* (page 149).

**Mr Ceretti's letter of wishes and the El Prela Trust's shareholding in KML**

31.     In his capacity as settlor of the El Prela Trust, Mr Ceretti wrote a letter of wishes to Alpine Trustees (as the former trustee of the El Prela Trust) dated 23 August 1994 (page 156) by which Mr Ceretti asked the El Prela Trustee to consider him and Mrs Ceretti to be the joint principal beneficiaries of the El Prela Trust during their lifetimes. In that letter of wishes, Mr Ceretti also confirmed his intention to

add to the settled fund the shares of a company in which he was to be involved with Mr Carlo Grosso ("**Mr Grosso**") who is settlor of the Ashby Trust referred to above. That company was KML, as to which see further paragraph 79 below.

32. On 24 February 1994, 3,000 shares in KML, being 25% of the issued share capital of that company, were transferred from Mr Ceretti to a nominee to hold on trust for Alpine Trustees to form part of the property of the El Prela Trust following its settlement on 7 April 1994. Alpine Trustees paid US$3,000 to KML in consideration for these shares.

33. Also on 24 February 1994, 3,000 shares in KML were transferred by Mr Ceretti to a nominee to hold on trust for the Ashby Trustee. At the same time, 6,000 shares in KML were transferred by Mr Grosso to a nominee to hold on trust for the Ashby Trustee. These 9,000 shares in KML were added to form part of the property of the Ashby Trust following its settlement on 24 March 1994.

34. Following these initial transfers, certain shares in KML (the legal ownership of which, from 24 February 1994 onwards, lay with a nominee) were transferred by the Ashby Trustee to Mr Ceretti, who subsequently added them to the property of the El Prela Trust as follows:

    34.1 On 14 January 1997, 1,800 shares in KML were transferred from the Ashby Trustee to Mr Ceretti.

    34.2 On 16 March 1998, 1,080 shares in KML were transferred from the Ashby Trustee to Mr Ceretti.

    34.3 On 2 May 2000, a further 120 shares in KML were transferred from the Ashby Trustee to Mr Ceretti.

35. Following the above transfers and allotments, the entire issued share capital of KML was held, via a nominee, by Alpine Trustees on behalf of the El Prela Trust (since 2006, the El Prela Trustee) and the Ashby Trustee on behalf of the Ashby Trust in equal shares.

**The restructuring of the El Prela Trust in 2008**

36. The structure of the El Prela Trust and its subsidiary companies is designed to allow those beneficiaries of the El Prela Trust who are subject to taxation in the

12

United Kingdom ("**UK**") to benefit from a special tax regime in the UK by which
they, while UK taxpayers, are designated "resident non-domiciled" in the UK.

37.    Until 31 March 2008, the El Prela Trustee held its shares in KML via a nominee
and the other investments of the El Prela Trust directly.

38.    In late 2007/early 2008, the first drafts of the new UK Finance Bill were
published.  This introduced the possibility of several changes to the legislation
governing the taxation of UK resident non-domiciliaries.  It appeared possible
that capital gains made by the El Prela Trust after 5 April 2008 might attract a
less favourable tax treatment from the perspective of those beneficiaries of the El
Prela Trust (including Mr Ceretti) who were subject to taxation in the UK as UK
resident non-domiciliaries.  It appeared at the time that a line might be drawn as
at 5 April 2008 distinguishing trust gains that had been *"accrued or realised"*
before that date and those *"accrued or realised"* after that date, with the old gains
being taxed under the old rules (and so not giving rise to a charge to tax for UK
resident non-domiciliaries) and the new gains being taxed under the new regime
(where there would be a charge to tax).  There was no certainty at that stage as
to whether revaluing provisions might be introduced in the new legislation (which
provisions might mitigate the impact of the changes in the law).

39.    Given the uncertainty prevailing at the time, Leading English tax Counsel was
instructed by the El Prela Trustee to consider the best action for the El Prela
Trust.  Leading tax Counsel considered it advisable to trigger gains in the El
Prela Trust before 5 April 2008, so as to constitute actual disposals, rather than
relying on the possibility that revaluation provisions might be introduced in the
forthcoming legislation.  This would have the effect of establishing a new higher
base cost of these assets against which any future capital gains might be
assessed.  Accordingly it was deemed prudent by the El Prela Trustee to revalue
the El Prela Trust's assets in this manner.

40.    It was concluded that the most efficient way of effecting this revaluation was to
transfer the El Prela Trust's shares in KML (held via a nominee) to one wholly-
owned subsidiary of the El Prela Trust, and to transfer all of the El Prela Trust's
other investments from the El Prela Trust to another wholly-owned subsidiary of
the El Prela Trust.

13

41.    Accordingly, in early 2008, the El Prela Trust underwent a tax restructuring. This
involved, on 26 February 2008, the transfer to the El Prela Trustee of 100% of
the shares of two shelf companies (the original subscriber being Moore Stephens
International Services (BVI) Limited and the original holder of the single issued
share being the El Prela Trustee). Those companies were:

41.1    El Prela Group Holding Services Limited, a company incorporated on 9
January 2008 under the name New Opportunity Limited, whose
registered office is at Palm Grove House, Wickhams Cay 1, Road Town,
Tortola, BVI (the "**El Prela Holding Company**"); and

41.2    El Prela Trading Investments Limited, a company also incorporated on 9
January 2008 under the name Stoneybridge Limited, whose registered
office is at Palm Grove House, Wickhams Cay 1, Road Town, Tortola,
BVI (the "**El Prela Investment Company**").

42.    On 31 March 2008, the El Prela Trustee sold its shareholding in KML to the El
Prela Holding Company. The shares remained registered in the name of a
nominee, which, following the sale, held the shares on trust for the El Prela
Holding Company. This sale was deemed to occur at market value for UK tax
purposes (i.e. at a price that was greater than the original cost of the KML
shares). The shares in KML were therefore re-valued to apparent market value
for UK tax purposes (that revaluation taking place before Madoff's fraud was
revealed). The sale proceeds were left outstanding on a loan account and
dividend income from KML was used by the El Prela Holding Company towards
repayment of the loan.

43.    At the same time, the El Prela Trustee sold its other investments to the El Prela
Investment Company for market value, therefore revaluing those investments to
market value for UK tax purposes. Again, the sale proceeds of this transaction
were left outstanding on a loan account.

44.    As at 31 October 2011 the current outstanding balance of the loan accounts to
the El Prela Trustee is :

44.1    US$112,181,023.46 in relation to the El Prela Holding Company; and

44.2    US$80,035,101.65 in relation to the El Prela Investment Company.

14

11698343.1



45.     The structure created by these arrangements is set out in the structure chart at page 157.

**Dividends received from KML**

46.     From time to time during the period 1995 to 2008 the directors of KML declared and paid dividends to its ultimate shareholders.  In the case of the El Prela Trust, between 29 May 1995 and 17 August 2006 (i.e. prior to the appointment of the El Prela Trustee) such dividends were paid to Alpine Trustees. Between 17 August 2006 and 31 March 2008 (i.e. prior to the restructuring referred to at paragraph 36 above) such dividends were paid directly to the El Prela Trustee. Following the restructuring, such dividends were paid to the El Prela Holding Company.

47.     In total, between 29 May 1995 (when the first KML dividend was declared) and 26 November 2008 (when the last KML dividend was declared) the El Prela Trust received dividends from KML totalling US$147,931,609.01.  The table below summarises the amount of KML dividends paid to the El Prela Trustee each year. A schedule setting out full details of those dividends is at page 158.

| Year | Total dividends received (US$) |
|------|--------------------------------|
| 1995 | 2,969.01 |
| 1997 | 967,800 |
| 1998 | 3,207,480 |
| 1999 | 5,145,000 |
| 2000 | 7,538,360 |
| 2001 | 10,050,000 |
| 2002 | 12,025,000 |
| 2003 | 13,925,000 |
| 2004 | 14,555,000 |
| 2005 | 19,640,000 |
| 2006 | 17,650,000 |
| 2007 | 21,150,000 |
| 2008 | 22,075,000[1] |

---

[1]     Of which, US$5,750,000 was paid to the El Prela Trustee, with the remaining US$16,325,000 being paid to the El Prela Holding Company following the restructuring referred to at paragraph 41 above.

11698343.1

48.     The moneys deriving from these dividend payments were initially invested by the El Prela Trustee pursuant to its powers of investment under the Trust Deed. Following the restructuring of the El Prela Trust in 2008, dividends received by the El Prela Holding Company were transferred to the El Prela Trustee towards repayment of the loan account relating to the transfer of KML shares from the El Prela Trustee to the El Prela Holding Company on 31 March 2008 as described above. These repayment moneys were retained on deposit by the El Prela Trustee.

49.     Other than the return on capital generated from investments made by the El Prela Trustee (and latterly the El Prela Investment Company) (see below), the dividends paid by KML to the El Prela Trustee (and latterly the El Prela Holding Company) represented the sole source of revenues of the El Prela Trust.

50.     The El Prela Trust's report and financial statements as at 31 December 2007 (page 167), showed that the El Prela Trust had net assets of US$138,206,802. The net assets of the El Prela Trust as at 30 April 2011 were US$127,269,802 according to the (unaudited) balance sheet at page 172.

**The El Prela Trust's investments into the Kingate Funds**

51.     The El Prela Trustee (and latterly the El Prela Investment Company) invested a significant proportion of the dividends received from KML directly and indirectly in the Kingate Funds. Taken together, the El Prela Trust's holdings in the Kingate Funds represented an at cost investment totalling in excess of US$19 million. Such investments were made in three ways:

   51.1    Direct subscription for shares in the Kingate Funds;

   51.2    Investment in structured products; and

   51.3    Investment in funds of funds.

   Each method of investment is described further below.

52.     Following Madoff's arrest in December 2008 and subsequent unveiling of the fraud committed by BLMIS, the value of the El Prela Trust's direct and indirect investments in the Kingate Funds was written down to zero[2].

---

[2] This is subject to any recovery claim made by the El Prela Trustee in the liquidation of the Kingate Funds.

11698343.1

Direct subscription

53.     The El Prela Trust and El Prela Investment Company invested directly in Kingate Global.  The loss attributable to these investments is as follows:

| | |
|---|---|
| Investment at cost of: | US$3,078,700.03 |
| Stated value as at latest NAV date (31 December 2008): | US$3,272,187.80 |
| Value today: | US$0.00 |

Investment in structured products

54.     The El Prela Trust and the El Prela Investment Company invested indirectly in the Kingate Funds by way of structured notes issued by Boiro Finance BV, being a wholly owned subsidiary of Banco Bilbao Vizcaya Argentaria, SA.  The loss attributable to these investments is as follows:

| | |
|---|---|
| Investment at cost of: | US$13,828,298.00 |
| Stated value as at latest NAV date (31 December 2008): | US$16,438,550.00 |
| Value today: | US$0.00 |

Investment in funds of funds

55.     The El Prela Trustee and the El Prela Investment Company also invested in certain funds of funds managed by FIM Limited and FIM Advisers LLP (together, "**FIM**"), which funds themselves had exposure to the Kingate Funds.  FIM is a London-based alternative investment management company that at all relevant times was active in the creation, management and servicing of portfolios of hedge funds for institutional and private clients on a global basis.  Established in 1981 by Mr Grosso, at all relevant times FIM was authorised and regulated by the United Kingdom Financial Services Authority (or its predecessors) and by the spring of 2008, had assets under management of US$4.33 billion.  Its principals are Mr Grosso and Mr Ceretti. The value of the El Prela Trust's holdings in the FIM funds of funds concerned (the "**FIM Funds**") declined as a consequence of their exposure to the Kingate Funds and as a direct result of the activities of Madoff and/or BLMIS.

11698343.1

56.    The global economic crisis combined with the reputational damage suffered by FIM as a consequence of the scandal following Madoff's arrest led to FIM's business operations being wound down. As a consequence, the El Prela Trust's investments in the FIM Funds have gradually been liquidated.

57.    In summary terms, the losses suffered by the El Prela Trust attributable to the FIM Funds' exposure to BLMIS through the Kingate Funds are estimated at US$4,263,479.00.

**Payments to third parties from the assets of the El Prela Trust**

58.    During the life of the El Prela Trust, and in accordance with the powers afforded to it under the Trust Deed, the El Prela Trustee has incurred a variety of costs and expenses which have been met from the assets of the El Prela Trust. A spreadsheet detailing all such costs and expenses is at page 173. In summary, they can be broken down as follows:

58.1    Administration fees;

58.2    Trustee fees;

58.3    Directors' fees;

58.4    Registered agent's fees;

58.5    Consultancy fees; and

58.6    Fees paid to legal advisers.

Administration, trustee, director and registered agent fees

59.    As set out above, paragraphs A12.01 and B36 of the Trust Deed provide that the El Prela Trustee is entitled to remuneration and/or repayment of its expenses incurred in the proper administration of the El Prela Trust from the assets of the El Prela Trust.

60.    The El Prela Trustee has delegated the administration of the El Prela Trust to Moore Stephens & Company Bermuda (which in turn has delegated the day-to-day administration of the El Prela Trust to Moore Stephens Monaco), which charges administration fees arising out of the time spent on the day-to-day administration of the El Prela Trust and its assets, for instance, arranging bank

11698343.1

transfers, book keeping, preparing the El Prela Trust accounts and liaising with legal and other advisers. In addition to such administration fees, there are fixed annual trustee fees, directors' and registered agent's fees, which are also paid to Moore Stephens & Company Bermuda.

61.     The total amount of such fees paid to Moore Stephens & Company Bermuda on behalf of the El Prela Trustee to 31 October 2011 pursuant to the provisions in the Trust Deed are US$852,238.05.

Consultancy fees

62.     From time to time and in accordance with paragraph A12.02 of the Trust Deed, the El Prela Trustee has sought the professional services of certain other companies within the Moore Stephens International member firms, namely Moore Stephens LLP, which provided consultancy advice in relation to trust matters.

63.     The total amount of such consultancy fees paid by the El Prela Trustee to 31 October 2011 pursuant to the provisions in the Trust Deed are US$90,785.54.

Fees paid to legal advisers

64.     Paragraphs A12.02 and B37 of the Trust Deed entitle the El Prela Trustee to pay the fees of professional advisers in respect of advice obtained by the El Prela Trustee in the discharge of its duties under the Trust Deed from the assets of the El Prela Trust.

65.     The majority of legal fees incurred by the El Prela Trustee in its capacity as trustee of the El Prela Trust relate to advice obtained in connection with the claims and potential claims articulated against it, the El Prela Holding Company and El Prela Investment Company arising from the fall-out following the discovery of the Madoff fraud. These claims are described in more detail at paragraph 105 below. This has entailed obtaining legal advice in a number of jurisdictions, including England, Bermuda, the BVI, New York, Monaco and Jersey. As at 31 October 2011, the total legal fees paid to legal advisers pursuant to these provisions are US$2,874,173.67.

66.     Further details of these payments and the firms to which they have been paid are set out in the table at page 173.

**Change of the proper law of the El Prela Trust**

67.  By paragraph A1 of the Trust Deed (page 132), the proper law of the El Prela Trust at the date of its settlement was the law of the Island of Jersey.

68.  By paragraph A15 of the Trust Deed (page 140), the El Prela Trustee has the power to change the proper law of the El Prela Trust. Pursuant to that power, and for reasons of administrative convenience, the proper law of the El Prela Trust was changed from that of Jersey to that of the BVI by a Deed of Retirement and Appointment dated 17 August 2006 (page 151) referred to above, at the same time as the El Prela Trustee (a BVI company) was appointed in place of Alpine Trustees.

**THE KINGATE FUNDS AND KINGATE MANAGEMENT LIMITED**

69.  Given the nature of the claims made in the Picard Claims and the fact that the assets of the El Prela Trust comprise shares in KML and investments made having received dividends from that company, it is relevant that I set out in this Affidavit certain details concerning KML and the Kingate Funds. The source of my knowledge in this regard is the series of affidavits and the witness statement made in connection with the El Prela Trustee's successful application in 2009 to lift a freezing order over certain accounts of the El Prela Trust and its 100% subsidiaries held in Monaco, explained further at paragraph 108 below.

**The Kingate Funds**

70.  Kingate Global was incorporated on 11 February 1994 under the laws of the BVI as a fund of hedge funds. Its registered office is at Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI.

71.  On or about 19 April 2000, a separate self-standing entity, Kingate Euro, was incorporated under the laws of the BVI, its registered address being Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI.

72.  The Kingate Funds are both open-ended investment companies and are recognised as professional mutual funds under the Territory of the British Virgin Islands Mutual Funds Act 1996.

20

11698343.1

73.     During 1994, and having been introduced to various investment advisers, Kingate Global opened a discretionary managed account with BLMIS whose principal was Madoff.

74.     Initially, Kingate Global had just one class of shares, denominated in US$. At the end of February 1995, Kingate Global created a new class of US$ shares called Kingate Global Fund -- Class B Shares ("**Kingate B**"). The managed account with BLMIS was transferred into Kingate B, which shares were launched on 1 March 1995. At the same time, the original fund of funds shares were renamed Kingate Global Fund – Class A Shares but were wound down around the end of 1996. On 1 January 1996, a further class of shares was launched, called Kingate Global Fund – Class DM Shares ("**Kingate DM**"), denominated in Deutsche Marks, and then Euros.

75.     Kingate DM was transferred from Kingate Global to Kingate Euro. Following this step, Kingate Global and Kingate Euro operated as separate funds, albeit using the same fund manager, as explained further below.

76.     Investor funds deriving from subscriptions for participating common shares in the Kingate Funds (the "**Shares**") were passed to BLMIS as investment adviser to the Kingate Funds, on the understanding that they would be invested using BLMIS's so-called "split-strike conversion" strategy which was claimed by BLMIS to limit losses when a stock price declined while still affording a capped upside potential.

77.     As the extent of the fraud committed at BLMIS unfolded, this had a dramatic effect on the assets of the Kingate Funds, the value of which plummeted, and, on 8 May 2009 Mr William R Tacon and Mr Richard E L Fogerty of Zolfo Cooper were appointed as Joint Provisional Liquidators of the Kingate Funds by an order of the BVI Court. On 4 June 2009, the BVI Court duly appointed Messrs Tacon and Fogerty as Joint Liquidators of the Kingate Funds. For the purposes of this Affidavit, these Joint Liquidators are collectively referred to as "**Mr Tacon**".

**Current status of the liquidations of the Kingate Funds**

78.     The most recent information of which I am aware as to the present position of the liquidation of the Kingate Funds is contained in Mr Tacon's Fifth Report to Creditors and Investors dated 27 January 2011 for each of Kingate Global (page

11698343.1

174) and Kingate Euro (page 195) (the **"Fifth Creditors' Reports"**).  In brief summary:

78.1    The Kingate Funds have made a provisional claim in the liquidation of the BLMIS estate.  By an update to creditors and investors of Kingate Global dated 17 June 2011 (page 216), Mr Tacon confirmed that this claim is Kingate Global's most significant asset and that despite the potential risk in maintaining it (which I understand from Lawrence Graham LLP ("**LG**") to be submitting to the jurisdiction of the New York Court for the purposes of the Third Amended Complaint) Mr Tacon would not withdraw it;

78.2    Mr Picard filed an avoidance claim against the Kingate Funds in the Bankruptcy Court on 17 April 2009 (the **"Picard US Complaint"**).  The Picard US Complaint was subsequently amended on three occasions, and on 20 May 2011 Mr Picard filed the Third Amended Complaint.  Mr Tacon has not made any appearance in connection with the Picard US Complaint, having agreed a number of extensions of time in which to do so with Mr Picard.  The latest such extension of which I am aware (to 16 November 2011]) was agreed by way of a Stipulation and Order dated 13 October 2011 (page 217).

78.3    Mr Tacon has permission from the BVI Court to enter into a settlement agreement with Mr Picard in relation to the Picard US Complaint.  Further information about that draft settlement agreement and the negotiations between Mr Tacon and Mr Picard is at paragraphs 138 to 142 below.

78.4    Mr Picard has obtained permission to issue a claim in the BVI in respect of the Picard US Complaint on the basis that it will not be pursued until settlement negotiations with Mr Tacon are completed;

78.5    Bank of Bermuda has frozen the Kingate Funds' accounts held with that bank in Bermuda.  The Kingate Funds have access to those accounts for the purpose of meeting their ordinary legal and business expenses and a hearing date for the hearing of the Kingate Funds' application to release the funds is yet to be set;

78.6    Mr Picard has intervened in those proceedings between the Kingate Funds and Bank of Bermuda, but has confirmed he has no intention of

11698343.1

pursuing his claim in that action until the settlement negotiations with Mr Tacon are completed;

78.7   Mr Tacon has obtained copies of the Kingate Funds' books and records held by KML and access to the Kingate Funds' records held by Citi Hedge Fund Services Ltd ("**Citi**"), the administrator of the Kingate Funds;

78.8   Mr Tacon has issued a protective writ against PricewaterhouseCoopers Bermuda in relation to their 2003 audits of the Kingate Funds, with the intention of issuing further writs in relation to their 2004 audits;

78.9   On 2 December 2010, Mr Tacon was granted recognition by the English High Court as Joint Liquidator of the Kingate Funds pursuant to the UK Cross Border Insolvency Regulations 2006;

78.10  Mr Tacon has issued the Bermuda Proceedings, as described further below.

**Kingate Management Limited**

79.   KML was incorporated on 24 February 1994 under the laws of Bermuda. Its registered office is 2 Reid Street, Hamilton HM11 Bermuda. Its issued shares are wholly-owned by a nominee company, holding in equal shares for the El Prela Holding Company and Ashby Holding Services Limited (the "**Ashby Holding Company**"), (together the "**Holding Companies**").

80.   As at the date of Madoff's arrest on 11 December 2008, KML's board of directors comprised the following individuals: Michael Tannenbaum; Phillip Evans; Shazieh Salahuddin; and Christopher Wetherhill. Michael Tannenbaum retired as a director in early 2009, while Phillip Evans retired on 31 May 2010. Shazieh Salahuddin and Christopher Wetherhill resigned in May 2011.

81.   KML acted as investment manager to the Kingate Funds in accordance with the terms of certain management agreements. The most recent management agreement between Kingate Global and KML is dated 1 January 2006 (the "**Global Management Agreement**") which superseded and replaced previous management agreements between those parties dating back to 1994. Kingate Euro entered into a management agreement with KML on 1 May 2000 (the "**Euro Management Agreement**"). Both management agreements are governed by the laws of Bermuda. The Global Management Agreement is subject to the

23

11698343.1

non-exclusive jurisdiction of the Courts of Bermuda, whilst the Euro Management Agreement is silent as to jurisdiction. Copies of the Global Management Agreement and the Euro Management Agreement (together, the "**Management Agreements**") are at pages 220 and 233 respectively.

Fees received by KML under the Management Agreements

82.    In return for the performance of its duties under the Management Agreements, KML received:

    82.1    Under the Global Management Agreement, a monthly management fee at an annual rate equal to 1.5% of the month-end net asset value of the Shares of Kingate Global; and

    82.2    Under the Euro Management Agreement: (a) a monthly management fee at an annual rate equal to 1.5% of the month-end net asset value of the Shares of Kingate Euro; and (b) an administration fee at an annual rate of 0.10% of the month-end net asset value of Kingate Euro in respect of the foreign exchange hedging activity undertaken by Kingate Euro.

83.    From time to time and as described at paragraph 46 above, the directors of KML declared dividends which were paid to its ultimate shareholders (the Trustees or, after 31 March 2008, the Holding Companies) in proportion to their shareholdings in KML.

Delegation of KML's duties under the Management Agreements

84.    Under the terms of the Management Agreements, KML was authorised to delegate any of its duties or obligations arising under those agreements to third parties, whether independent of or affiliated with KML. KML did exercise its authority to delegate the performance of certain of its duties under the Management Agreements, including to:

    84.1    BLMIS as investment adviser to the Kingate Funds.

    84.2    FIM as consultant to and distributor for the Kingate Funds, in return for certain fees. Those fees represented around 2.5% of FIM's annual revenues.

11698343.1

84.3    Citi, which was appointed to provide administrative services to the Kingate Funds.

84.4    Bank of Bermuda Limited (an indirect 100% subsidiary of HSBC Holdings plc), which was retained as banker and custodian to the Kingate Funds ("**Bank of Bermuda**").

<u>Loan to KML</u>

*Loan Agreement dated 16 July 2009*

85.    From 26 November 2008, KML received no further management fees under the Management Agreements, meaning that KML's only source of income came to an end.  Equally, as the true extent of the BLMIS fraud unfolded in 2009, KML continued to be heavily involved in dealing with redemptions and other related issues concerning the Kingate Funds, in accordance with its duties under the Management Agreements.  It also agreed to provide voluntary disclosure to Mr Tacon of records held by it pertaining to the Kingate Funds.  KML therefore continued to incur operating expenses.

86.    In early 2009, the Holding Companies, which between them are beneficial owners of the shares in KML (held by a nominee) considered whether it would be appropriate to advance loan funding to KML that would enable it to continue operations and avoid entering insolvent litigation.

87.    On 16 July 2009 the Holding Companies (as lenders) and KML (as borrower) entered into a loan agreement in respect of a term loan facility of up to US$1,200,000 (the "**Loan Agreement**").  A copy of the Loan Agreement is at page 245.

88.    By clause 3 of the Loan Agreement (page 252), each Advance (as defined) made under that agreement was to be made for the sole and exclusive purpose of:

88.1    Permitting KML to pay all relevant expenses relating to its position in respect of the Kingate Funds, to pay KML's officers to continue to run it, and to enable KML to take legal advice strictly in relation to its own position in respect of any issues that may have properly concerned it; and/or

11698343.1

88.2    Such other purpose as the Holding Companies may have (in their absolute discretion) agreed in writing in advance.

89.    The facility granted under the Loan Agreement was specifically not to be used for KML's direct litigation defence costs and was made subject to strict conditions. Prior to the Loan Agreement being agreed, the Trustees reconfirmed to KML the purpose of the Loan Facility (as defined) by way of a side letter from LG dated 7 July 2009 (page 267).

90.    The Loan Agreement set out in clause 4.2 (pages 252 to 253) a number of conditions precedent which needed to be fulfilled before the Holding Companies were obliged to make an Advance (as defined).    By clause 4.4 of the Loan Agreement (page 253), the Holding Companies had the ability to cancel unilaterally any undrawn part of the Loan Facility at any time on giving prior written notice to KML.

*Supplemental Loan Agreement dated 28 September 2010*

91.    In or around June 2010, KML made a request to the Holding Companies for a further loan of up to US$1,200,000 so as to extend the Loan Facility from US$1,200,000 to US$2,400,000 (the "**Extension Request**").

92.    On 28 September 2010 the Holding Companies (as lenders) and KML (as borrower) entered into a supplemental agreement to the Loan Agreement, extending the facility granted by way of the Loan Agreement by up to US$1,200,000 (the "**Supplemental Loan Agreement**").    A copy of the Supplemental Loan Agreement is at page 268.    Taken together, the Loan Agreement and the Supplemental Loan Agreement are referred to in this Affidavit as the "**Loan Agreements**".

*Advances made to KML under the Loan Agreements*

93.    From July 2009, the El Prela Holding Company made Advances to KML under the Loan Agreements.    The total Advances made by the El Prela Holding Company pursuant to the Loan Agreements were US$900,000.

*Suspension of Advances under the Supplemental Loan Agreement*

94.    On 22 December 2010, Mr Tacon issued the Bermuda Proceedings and on 7 January 2011, the El Prela Trustee and the El Prela Holding Company received

26

11698343.1

the Writ and draft Statement of Claim in respect of those proceedings. In light of the claims articulated in the draft Statement of Claim, the El Prela Trustee and El Prela Holding Company gave consideration to whether it was appropriate for the El Prela Holding Company to make any further advance to KML pursuant to the Supplemental Loan Agreement.

95.    On 7 February 2011, LG wrote to KML (page 298) confirming that the Holding Companies would not make any further Advance to KML under the Supplemental Loan Agreement until further notice. No further funding has been advanced, and a petition has since been issued for KML's winding up, as explained further below.

Resignation of KML's directors and Petition to wind up KML

96.    In May 2011, KML's remaining directors, Chris Wetherhill and Shazieh Salahuddin, gave notice of their resignation from KML.

97.    The Trustees understand from their lawyers in Bermuda that under the Bermuda Companies Act, members of a company are under a positive obligation to appoint replacement directors in the event that the number of directors falls below the statutory minimum of two. As beneficial owners of the shares in KML, the Holding Companies have explored the possibility of appointing replacement directors, but concluded that, in the absence of third party funding, it would be difficult if not impossible to find prospective directors willing to accept an appointment.

98.    By the time that KML's remaining directors resigned in May 2011, KML had ceased to carry on the business for which it was incorporated. Thereafter, the Holding Companies considered whether KML should be wound up, since it was unable to pay its debts as they fell due. At that time, those acting for the Holding Companies were not aware of the fact that the legal ownership of the shares in KML lay with a nominee company, Hamilton Nominees Limited ("HNL").

99.    On 3 August 2011, the El Prela Holding Company issued a notice of statutory demand on KML via its registered agents (page 299, the "Statutory Demand"). An equivalent demand was served on behalf of the Ashby Holding Company. The Statutory Demand gave notice that, the Repayment Date (as defined in the Supplemental Loan Agreement) having passed, unless the US$900,000 advanced to KML pursuant to the Loan Agreements, plus interest, was repaid in

27

full within 21 days, the El Prela Holding Company could petition to wind up KML pursuant to the Bermuda Companies Act.

100.  The El Prela Holding Company did not follow up on the Statutory Demand. Instead, on 10 August 2011 the Holding Companies each resolved to enter into a unanimous written resolution, purportedly as the members of KML, that KML should be wound up and that Trott & Duncan Limited ("**Trott & Duncan**") should be instructed to prepare and file the appropriate petition for the winding up of KML, swear an affidavit verifying its contents and take all necessary steps to seek an order appointing a liquidator and/or joint provisional liquidators and/or the Official Receiver.  Consequentially, a unanimous shareholders' resolution to that effect was purportedly passed on 10 August 2011 (the "**Unanimous Written Resolution**") (page 302).

101.  On 7 September 2011, a winding up petition was issued (the "**Petition**") (page 304) which was advertised on 14 September 2011. The return date in respect of the Petition was 14 October 2011. In the event, representatives of both Mr Tacon and Mr Picard notified an intention to appear at the hearing. Correspondence was exchanged in advance of it (see pages 311 to 320) culminating in service on behalf of Mr Picard of affidavit evidence on the eve of the hearing itself.  (The affidavit and exhibit are not exhibited to this Affidavit but can be made available to the Court upon request).  During the course of this correspondence it became clear that the Holding Companies had overlooked the fact that legal ownership of the KML shares lay with HNL.  As a consequence, the Unanimous Written Resolution was confirmed and adopted by a written resolution of HNL dated 14 October 2011 (page 321) which ratified the steps taken by Trott & Duncan in relation to the Unanimous Written Resolution.

102.  In the event, the hearing of the Petition was adjourned on 14 October 2011.  A copy of the order is at page 322.  Further correspondence has since been exchanged between Trott & Duncan and Mr Picard's advisers (see pages 324 to 331), with the result that Mr Picard and Mr Tacon have confirmed that they do not intend to oppose the Petition.

103.  While KML has been without directors, it has nevertheless had to continue to address various issues, including the proceedings to which it is a party (namely the Bermuda Proceedings and the Picard Claims) until such time as replacement directors or joint provisional liquidators of KML are appointed.  This has been

11698343.1

done by the sole member, HNL, resolving for KML to issue relevant instructions
in relation to those proceedings.

104.    At the same time, the Trustees are aware from copy invoices sent to KML's
registered agent, that KML continues to incur certain expenses in the form of
costs incurred for storage of KML's documents and IT equipment.  The most
recent such invoices from Island Self Storage, each for US$175, have been due
for payment on 1 June 2011, 1 July 2011, 1 August 2011, 1 September 2011 and
1 October 2011.  In light of the fact that KML was unable to pay these invoices,
and given that non-payment might have placed disclosable documents at risk of
destruction, the Holding Companies made arrangements to pay them.


## LEGAL ACTION AGAINST THE EL PRELA TRUSTEE

105.    In addition to the Picard claims, which are explained in more detail at paragraphs
125 and 143 below, the El Prela Trustee has been or is a party to two other legal
proceedings.  These are:

105.1    A temporary freezing order granted by the Court of First Instance of the
Principality of Monaco (the "**Monaco Court**") over certain accounts of the
El Prela Trust and its 100% subsidiaries held in Monaco; and

105.2    The Bermuda Proceedings.

106.    In addition, there is a consolidated class action complaint that is of potential
relevance to the El Prela Trustee but to which it is not a party, filed in the United
States District Court, Southern District of New York on 18 May 2010 and entitled
In re Kingate Management Limited Litigation, with Master File No. 09 Civ.5386
(BAB) (the "**Class Action**").

107.    Further detail of these legal proceedings is given below.

### The Monaco Freezing Order and the creation of the Monaco Affidavits

108.    In late 2008, the El Prela Trustee and the El Prela Investment Company held
significant cash balances, totalling some US$55,017,846.34 with HSBC Private
Bank (Monaco) SA ("**HSBC Monaco**"). In early December 2008, concerns began
to be raised about the stability of HSBC, as a result of the global crisis in the

11698343.1

financial sector. From mid-December 2008 onwards, there was a sharp fall in HSBC's share price.   As a result, following consideration of the issue by telephone with Mr Ceretti, the El Prela Trustee decided to reduce the El Prela Trust's exposure to HSBC by transferring some of the cash balances held with HSBC Monaco to Lombard Odier Darier Hentsch & Cie in Geneva, Switzerland ("**Lombard Odier**").   Accordingly, on 12 December 2008, the El Prela Trustee sent a payment instruction to HSBC Monaco requesting the transfer of the sum of US$15,000,000 from that El Prela Trust account to an El Prela Trust account held with Lombard Odier (page 332) (the "**Payment Instruction**").

109.   To the best of my knowledge, derived from written representations dated 17 December 2008 made by the Service d'Information et de Contrôle Sur les Circuits Financiers of the Principality of Monaco ("**SICCFIN**") to the Public Prosecutor of the Principality of Monaco (the "**Monaco Prosecutor**") at page 333 (English translation) and page 347 (original) (the "**SICCFIN Report**"), the Payment Instruction led HSBC Monaco to make a suspicious transaction report to SICCFIN, following which SICCFIN prepared the SICCFIN Report.

110.   The immediate consequence of the SICCFIN Report having been transmitted to the Monaco Prosecutor was that, on 19 December 2008, the Monaco Court ordered the immediate attachment of assets held in a number of HSBC Monaco accounts in the name of the El Prela Trustee, the El Prela Holding Company and the El Prela Investment Company, as well as certain HSBC Monaco accounts connected to the Ashby Trust and Mr Ceretti (the "**Freezing Order**").   This rendered the relevant account of the El Prela Trust at HSBC Monaco and those of its direct 100% subsidiaries inoperable until such time as the Freezing Order was lifted.

111.   On 19 June 2009 the El Prela Trustee and others interested in the Freezing Order issued an application before the Monaco Court for an order that it be lifted, supported by a number of affidavits and a witness statement (taken together, the "**Monaco Affidavits**"), copies of which are at pages 363 to 431.  A copy of the accompanying exhibit, which runs to two lever arch files, can be made available to the Court upon request.

112.   Following issue of the application, on 8 July 2009 the Monaco Court ordered the lifting of the Freezing Order (a copy of the resulting order of the Monaco Court is at page 432. An English translation has not been provided, but can be obtained

on request).  Subsequently, on 9 July 2009 the Payment Instruction which had been the cause of the suspicious transaction report was re-issued, and the transfer effected.  No assets were removed from the El Prela Trust, the El Prela Holding Company or the El Prela Investment Company as a consequence of that transfer.

**The Bermuda Proceedings**

113.  On 22 December 2010 by way of a Writ of Summons (page 438), the Kingate Funds commenced the Bermuda Proceedings against the El Prela Trustee and eight other Defendants, being KML, FIM Advisers LLP, FIM Limited, the Ashby Trustee, the Holding Companies, Mr Grosso and Mr Ceretti.  The Writ and accompanying Statement of Claim (page 444) were served on the El Prela Trustee via its lawyers in Bermuda on 7 April 2011, following the El Prela Trustee's agreement to facilitate service, subject to first agreeing a timetable that took into account the steps the El Prela Trustee needed to take in light of those proceedings, namely the making of the previous applications for directions referred to at paragraph 20 above (the "**Bermuda Directions Applications**").

114.  The El Prela Trustee entered a memorandum of appearance before the Bermuda Court on 13 April 2011.

115.  The claims made in the Bermuda Proceedings divide into two broad categories:

115.1  Non-fault based claims against KML, the Trustees, the Holding Companies, Mr Grosso and Mr Ceretti (the "**Non-Fault Based Claims**"); and

115.2  Fault based claims against KML, FIM, Mr Grosso and Mr Ceretti (the "**Fault Based Claims**").

116.  The Non-Fault Based Claims, which are the only claims advanced against the Trustees are, in summary, as follows:

116.1  Claims for the recovery from KML, the Trustees, the El Prela Holding Company, and/or the Ashby Holding Company of management fees alleged to have been paid by the Kingate Funds to KML on the basis of a mistake. The claims are brought on the basis of unjust enrichment. It is alleged that the Trustees are liable as ultimate recipients of the fees, and/or that Mr Grosso and Mr Ceretti are liable as ultimate recipients of

31

the fees, and/or ultimate beneficial owners of shares in KML. These claims are for US$254,478,999.69 and 56,226,531.48 Euros or alternatively, the amount of fees paid by the Kingate Funds (and/or their traceable proceeds) which were paid on by KML to the Trustees.

116.2  Alternatively, claims for an order that the Trustees pay the Kingate Funds the amount of the fees and/or their traceable proceeds which were paid on by KML to the Trustees, or alternatively, a declaration that the Kingate Funds retain legal title in the allegedly overpaid fees and/or their traceable proceeds.

116.3  Alternatively, claims for a declaration that KML, the Trustees, the El Prela Holding Company, the Ashby Holding Company, Mr Grosso and/or Mr Ceretti hold the allegedly overpaid fees, together with their traceable proceedings, on trust for the Kingate Funds, and an order that they account to the Kingate Funds for them.

117.  The Fault Based Claims, which do not directly concern the Trustees, are based on allegations of breach of tortious duties of care and/or negligent misstatement against KML, FIM, Mr Grosso and Mr Ceretti, and damages for breach of contractual duties of care against KML.

**The Class Action**

118.  A copy of the Amended Consolidated Class Action Complaint is at page 542. The Plaintiffs to the Class Action are Silvana Worldwide Corp., Criterium Capital Fund, B.V., BBF Trust, BG Valores, S.A., Banca Arner S.A., Alvaro Castillo, Lucien Geldzahler, Jaques Lamac, Nitkey Holdings Corporation and all others similarly situated. Paragraph 14 of the Class Action complaint identifies the Plaintiffs as having *"lost their investments in the [Kingate] Funds as of December 10, 2008, and also [having] paid substantial fees that were wrongfully charged based on fictitious investment returns"* (page 558).

119.  The El Prela Trustee is not named as a Defendant to the Class Action, those Defendants being KML, Tremont (Bermuda) Limited, Tremont Group Holdings, Inc., FIM Limited, FIM Advisers LLP, FIM (USA) Incorporated, Mr Grosso, Mr Ceretti, Graham H Cook, John E Epps, Sandra Manzke, Charles D Sebah, Keith R Bish, Christopher Wetherhill and Michael G Tannenbaum. However, the El Prela Trustee recognises that the Class Action plaintiffs may well seek to join it

as a Defendant to the Class Action at some point in the future, given that it holds assets deriving from dividends declared payable by KML and calculated by reference to KML's profits, which in turn were derived from management fees calculated by reference to the NAV of the Kingate Funds.

120.    Given that it is not a party to these proceedings, the El Prela Trustee has not sought substantive legal advice in connection with the complaint.

121.    However, the El Prela Trustee is aware from information passed to it from its US lawyers that the Class Action complaint was dismissed in its entirety by an order of Judge Batts dated 30 March 2011 (page 701). That order also denied the Plaintiffs leave to re-plead the complaint.

122.    On 11 April 2011 the Plaintiffs issued a notice of appeal (page 731) stating their intention to appeal the judgment and order of Judge Batts to the United States Court of Appeals for the Second Circuit.

123.    On one view, the complaint made by the Class Action is one more properly within the province of Mr Tacon as joint liquidator of the Kingate Funds, who could also take steps to have the complaint struck out.

124.    However, until such time as Mr Tacon moves to strike out the Class Action complaint, or the appeal against the judgment and order of Judge Batts is finally determined in favour of the Defendants to the Class Action, there remains the possibility that the El Prela Trustee will be joined as a party to it. Naturally, if that occurs, the El Prela Trustee will of necessity have to make a further application to the BVI Court for directions as to how it should proceed with respect to that proceeding.


## CLAIMS BY MR PICARD AGAINST THE EL PRELA TRUSTEE

### The Third Amended Complaint

125.    On 20 May 2011, Mr Picard filed the Third Amended Complaint (page 1) against the El Prela Trustee and 17 other Defendants, being Mr Ceretti, Mr Grosso, the Kingate Funds, KML, FIM Advisers LLP, FIM Limited, Citi, the Ashby Trust[3],

---

[3] The Ashby Trust has no legal personality.

11698343.1

Alpine Trustees, the Ashby Trustee, the El Prela Trust[4], the Holding Companies, the El Prela Investment Company, Ashby Investment Services Limited (the "**Ashby Investment Company**", together with the El Prela Investment Company, the "**Investment Companies**") and Bank of Bermuda. The Holding Companies and the Investment Companies are purportedly joined *"individually and as trustees of"* the Trusts. I can confirm that neither the Holding Companies nor the Investment Companies have ever acted as trustees of the Trusts.

126.    The Third Amended Complaint was the first time the El Prela Trustee had been named as a Defendant to the Picard US Proceedings, Mr Picard having initially filed those proceedings against the Kingate Funds and Bank of Bermuda on 17 April 2009, as set out above.

### Service of the Third Amended Complaint

127.    As noted above, the El Prela Trustee is a company incorporated and registered in the BVI. On 22 June 2011, the Third Amended Complaint was served on the El Prela Trustee by SCA Creque (special counsel to Mr Picard in the BVI) via Moore Stephens BVI. The accompanying summons and notice of pre-trial conference (page 733) required the El Prela Trustee to submit a motion or answer within 30 days from the date of issue, being 14 July 2011.

128.    On 14 July 2011, the El Prela Trustee and the other Defendants who had been served in the BVI, namely, the Holding Companies and the Investment Companies (acting by Freshfields Bruckhaus Deringer US LLP ("**Freshfields**")) agreed with Mr Picard (acting by Baker & Hostetler LLP) an extension of time (until 18 August 2011) to respond to the Third Amended Complaint, by way of a stipulation dated 14 July 2011. Further extensions, to which the El Prela Trustee was also a party, were agreed on 10 August 2011 and 14 October 2011 the latest of which extended the time to move, answer or otherwise respond until 16 November 2011 (page 735)[5]. By joining in those stipulations, the El Prela Trustee agreed to waive any defence based on insufficiency of service of process, although the El Prela Trustee reserved the right to challenge the jurisdiction of the New York Court.

---

[4] The El Prela Trust has no legal personality.

[5] At the time of finalising this Affidavit, Baker & Hostetler LLP and Freshfields were in discussions regarding a further such extension until 16 February 2012.

11698343.1

**The Claims made against the El Prela Trustee in the Third Amended Complaint**

129.     As I have explained above, there are 17 Defendants to the Third Amended
Complaint in addition to the El Prela Trustee, which alleges 15 counts upon
which Mr Picard seeks judgment, as set out more fully at paragraphs 276 to 359
of the Third Amended Complaint (pages 65 to 83).  The claims made divide into
three broad categories:

129.1   The return of alleged avoidable and recoverable initial transfers from the
Kingate Funds of approximately US$976 million (US$438 million in
respect of Kingate Global and US$538 million in respect of Kingate Euro)
alleged to have been transferred to those entities by BLMIS (the "**Initial
Transfer Claims**");

129.2   The return of alleged subsequent transfers against the Trustees, KML,
FIM Limited, FIM Advisers LLP, the Holding Companies, the Investment
Companies, the Trusts[6], Alpine Trustees, Mr Grosso, Mr Ceretti and Citi
(the "**Subsequent Transferee Claims**"); and

129.3   Common law claims in unjust enrichment, conversion and money had
and received (the "**Common Law Claims**").

130.     The Third Amended Complaint also seeks the disallowance of the Kingate
Funds' customer claims in the BLMIS bankruptcy, the equitable subordination of
those customer claims (as to the status of which, see paragraph 78.1 above),
and, against Bank of Bermuda, a declaratory judgment that funds currently
frozen in the Kingate Funds' accounts held with that bank are to be returned to
the BLMIS estate.

131.     The Subsequent Transferee Claims and the Common Law Claims, which are the
only claims advanced against the Trustees are, in summary, articulated in the
Third Amended Complaint as follows:

131.1   Claims for the recovery of alleged "subsequent transfers" (or the value
thereof) alleged to have emanated from BLMIS. Similar claims are made
under state law (the New York Debtor and Creditor Law) and under
federal law (Title 11 of the United States Bankruptcy Code), as

---

[6] As stated above, the Trusts have no legal personality.

11698343.1

summarised at paragraphs 331 and 337 of the Third Amended Complaint
(pages 74 to 75);

131.2  Unjust enrichment claims against the Trustees, KML, FIM Limited, FIM
Advisers LLP, the Holding Companies, the Investment Companies, the
Trusts[7], Alpine Trustees, Mr Grosso, Mr Ceretti and Citi on the basis that
they "*have wrongfully and unconscionably benefited from the receipt of
[fees] from BLMIS, for which they did not, in good faith, provide fair
value*", as summarised at paragraphs 347 to 350 of the Third Amended
Complaint (pages 77 to 78);

131.3  Conversion claims against those same Defendants on the basis that they
have "*intentionally exercised dominion and control over [BLMIS property]
in a matter inconsistent with and in wilful disregard of the solvency of the
BLMIS estate*", as summarised at paragraphs 351 to 353 of the Third
Amended Complaint (page 78); and

131.4  Money had and received against all Defendants, on the basis that they
"*are currently in possession of, or have control over, [BLMIS property, to
which they] have no lawful or equitable right..., having obtained the
monies through fraud, deceit or mistake*", as summarised at paragraphs
354 to 356 of the Third Amended Complaint (pages 78 to 79).

132.    The El Prela Trustee has sought advice from US Counsel on the appropriate
response to the Third Amended Complaint, in order that it can determine the
motions it should make with respect to it.   The Court is referred to the
Confidential Affidavit for details of the resulting advice. The directions sought by
the El Prela Trustee as a consequence of that advice are at paragraph 166
below.

133.    In summary, and as set out in more detail below, the El Prela Trustee has filed a
motion to withdraw the reference and proposes to file a motion or motions to
dismiss the Third Amended Complaint.

---

[7] Ibid.

11698343.1

**Motion to withdraw the reference**

134.    On 7 and 14 October 2011, certain of the Defendants to the Third Amended
Complaint made motions to the United States District Court for the Southern
District of New York (the "**District Court**") to have certain legal issues heard by
the District Court rather than the Bankruptcy Court on the basis that those issues
will involve consideration of federal non-bankruptcy law. On 17 October 2011 the
El Prela Trustee joined those motions. It is anticipated that the motions will be
heard and determined in the coming months. Further information regarding the
El Prela Trustee's motion to withdraw the reference is set out in the Confidential
Affidavit.

**Motion to dismiss**

135.    The El Prela Trustee proposes to make a motion or motions to dismiss the Third
Amended Complaint on a number of grounds, further details and a legal opinion
on the merits of which are set out in the Confidential Affidavit.

136.    The form of the motion to dismiss will depend on the outcome of the motion to
remove the reference. It may be that the District Court agrees to hear the entire
motion to dismiss. However, if the District Court removes the reference only to
issues not typically handled by the Bankruptcy Court, the El Prela Trustee may
need to make two motions to dismiss: one in the District Court on non-
bankruptcy issues, and one in the Bankruptcy Court with regard to all other
issues. Further information regarding the El Prela Trustee's motion or motions to
dismiss is set out in the Confidential Affidavit.

137.    The El Prela Trustee understands from US Counsel that the motion to withdraw
the reference could be decided relatively quickly. If so, it is possible that the
motion or motions to dismiss will be filed prior to the hearing of this application. It
is anticipated that a supplemental affidavit will be sworn in advance of the
hearing of this application in order to update the Court as to the current position.

**Settlement discussions between Mr Picard and Mr Tacon**

138.    Given the nature of the claims articulated in both the Picard Claims and the
Bermuda Proceedings, the El Prela Trustee is currently facing claims to the
same funds held on the trusts of the El Prela Trust from competing claimants
(the Kingate Funds and Mr Picard) arising out of the same facts. It is therefore

11698343.1

relevant to set out my understanding of the discussions between those competing claimants.

139.   As set out above, according to the Fifth Creditors' Reports, Mr Tacon has permission from the BVI Court to enter into a settlement agreement with Mr Picard provided that settlement is consistent with the substance of the draft agreement considered by the BVI Court on 16 December 2009 (the "**Draft Agreement**").

140.   The Draft Agreement is contained at appendix B to Mr Tacon's Third Report to Creditors and Investors dated 31 July 2009 for each of the Kingate Funds (at pages 757 and 785 respectively).

141.   The principal terms of the Draft Agreement are that:

141.1   Each of the Kingate Funds will settle with Mr Picard on identical terms;

141.2   The Kingate Funds will pay to BLMIS 50% of their assets (as at the date of settlement), after providing for all the costs of the respective liquidations that remain accrued but unpaid;

141.3   The Kingate Funds will pay BLMIS 50% of any additional recoveries, including any successful claims against third parties;

141.4   The Kingate Funds will agree with Mr Picard a mechanism for determining who is in the best position to prosecute each potential third-party claim (including, presumably, the Bermuda Proceedings and the Picard Claims);

141.5   The Kingate Funds will be entitled to a fully allowed claim in the liquidation of BLMIS, with any dividends payable to the Kingate Funds from the liquidation of BLMIS being retained by Mr Picard until he has recovered 85% of his preference claim against the Kingate Funds;

141.6   Thereafter, 50% of any dividend payable to the Kingate Funds will be retained until Mr Picard has recovered 35% of his fraudulent preference claim;

11698343.1

141.7 Any payments from the Kingate Funds to Mr Picard will be added to the Kingate Funds' claims against BLMIS for the purpose of calculating their dividends from the BLMIS estate; and

141.8 Mr Picard will not prove as a creditor in the liquidations of the Kingate Funds.

142.     I understand from an update to creditors and investors of Kingate Global dated 16 September 2011 (page 795) that, at that time, settlement discussions between Mr Tacon and Mr Picard had advanced "significantly", although a negotiated settlement had not yet been agreed. I understand from LG that recent decisions against Mr Picard in the US Courts may have had an impact on those settlement discussions.

**The English Claim**

143.     A copy of the Claim Form issued by Mr Picard is at page 796.  Besides the El Prela Trustee, the other Defendants reflect the Defendants to the Third Amended Complaint, save that the Kingate Funds, Citi and Bank of Bermuda are not Defendants to the English Claim, and the Third Amended Complaint names the Ashby Trust and El Prela Trust, which are not legal entities.

**Service of the English Claim**

144.     On 11 March 2011, the English Court granted Mr Picard an extension until 7 October 2011 in which to serve the Claim Form and Particulars of Claim on the El Prela Trustee (page 800).

145.     On 22 August 2011, Mr Picard issued an application to serve the English Claim out of the jurisdiction. That application was granted by order of Mr Justice Blair dated 1 September 2011 (page 801).

146.     On 13 September 2011, the English Claim was served in the BVI on the El Prela Trustee, the El Prela Holding Company and the El Prela Investment Company.

**Claims made against the El Prela Trustee in the English Claim**

147.     The claims articulated in the Particulars of Claim are as follows:

147.1 A declaration pursuant to English and US law that the US$975,541,729 alleged to have been received by the Kingate Funds from BLMIS in the

11698343.1

period before Madoff's arrest (the "Transfers") (or part thereof) and/or their traceable proceeds (or part of the proceeds) were held on constructive trust for Mr Picard;

147.2  An account and/or enquiry as to the whereabouts of the Transfers (or part thereof) and/or their traceable proceeds (or part of the proceeds);

147.3  An order that the Transfers be voided and the Transfers (or part thereof) and/or their traceable proceeds (or part of the proceeds) be returned to BLMIS;

147.4  Further or alternatively, damages or equitable compensation for knowing receipt in breach of trust;

147.5  Further or alternatively, a contribution and/or indemnity at common law or under the Civil Liability (Contribution) Act 1978;

147.6  An order for a contribution under section 213 of the Insolvency Act 1986, pursuant to the Cross-Border Insolvency Regulations 2006, or at common law;

147.7  Such further or other relief as the Court thinks fit;

147.8  Interest; and

147.9  Costs.

148.    The El Prela Trustee has sought advice from English Leading and Junior Counsel with respect to the English Claim. The Court is referred to the Confidential Affidavit for further details.

**The "stay" of the English Claim**

149.    On 22 August 2011, Mr Picard issued an application to stay the whole of the English Claim (see the application notice, draft order and witness statement of Laurence Lieberman at pages 803 to 816). The exhibit to Mr Lieberman's witness statement is not exhibited to this Affidavit, but can be made available to the Court upon request). So far as the El Prela Trustee is aware, that application has not yet been listed for hearing.

11698343.1

150.    On 7 October 2011 LG wrote to Taylor Wessing LLP seeking an extension of
time for the El Prela Trustee to file its acknowledgment of service until the later of
14 November 2011 or the date falling seven days prior to the hearing of Mr
Picard's stay application (the "**Acknowledgment Date**") (page 817).

151.    On 11 October 2011, Taylor Wessing LLP wrote to LG agreeing the proposals
with respect to the Acknowledgment Date subject to receiving certain
confirmations (page 819), which LG provided by letter the same day (page 820).

## THE EL PRELA TRUSTEE'S APPROACH TO SEEKING REPRESENTATIONS IN CONNECTION WITH THE PRESENT APPLICATION

152.    The El Prela Trustee has consulted with Mr Picard and Mr Ceretti and others in
connection with this application.  Its approach to consultation is explained below.

### Mr Picard

153.    On 12 August 2011 LG wrote to Baker & Hostetler LLP (Mr Picard's lawyers in
New York) to explain the El Prela Trustee's intention to make this application
(page 822).  While it was too early precisely to define the directions which the El
Prela Trustee proposed to seek, the letter confirmed it was likely that the El Prela
Trustee would ask the BVI Court to issue directions that it should file a motion to
dismiss the Third Amended Complaint and, in the alternative, to stay litigation
concerning it until such time as the Bermuda Proceedings have been resolved as
against the El Prela Trustee.  The letter sought confirmation of Mr Picard's
position, in particular whether Mr Picard would oppose an order that the El Prela
Trustee be entitled to be indemnified for its costs of defending the Third
Amended Complaint out of the assets currently held on the trusts of the El Prela
Trust. It also raised the prospect of the El Prela Trustee applying for directions
with respect to the English Claim, which had not at that time been served on it.

154.    On 23 August 2011 Baker & Hostetler LLP wrote to LG confirming that Mr Picard
would need to have sight of the application and take advice from local counsel in
order to respond substantively.  If necessary, a supplemental affidavit will be
sworn in advance of the hearing of the application in order to update the BVI
Court as to the current position with regard to Mr Picard.

11698343.1

**The adult beneficiaries under the Trust Deed**

155.    Before making an application of the kind sought now before the Court, the El
Prela Trustee would normally be expected to have consulted with each of the
adult beneficiaries of the El Prela Trust to ascertain their views on the directions
sought.  Besides Mr Ceretti and his wife, the only other adult beneficiary named
in the Trust Deed is Alessandro Ceretti, who the El Prela Trustee understands to
have reached the age of majority in October 2011.  The El Prela Trustee has had
no previous contact with Mrs Ceretti or Alessandro Ceretti, despite the fact that
the letter of wishes from Mr Ceretti dated 23 August 1994 (page 156) asked the
El Prela Trustee to consider Mr Ceretti and Mrs Ceretti as joint principal
beneficiaries during their lifetimes.

156.    Accordingly, in the context of the Bermuda Directions Applications, LG wrote to
Mrs Ceretti on 20 May 2011 seeking her representations, to which she
responded that she had had no involvement with the matters that were the
subject of LG's letter and expressing the wish that her husband should deal with
such matters on her behalf (page 824).

157.    Both the Third Amended Complaint and the English Claim include competing
claims to the assets of the El Prela Trust (in respect of the former, by virtue of
the avoidance and the Common Law Claims and in respect of the latter, by virtue
of the constructive trust claims contained therein).  If Mr Picard is successful in
these claims, it will follow that the entire assets currently held on the trusts of the
El Prela Trust would be held on trust for him (for distribution in the BLMIS
estate).  In those circumstances, the express beneficiaries of the El Prela Trust
would have no further interest of any value in the El Prela Trust itself.  This fact
has led the El Prela Trustee to conclude that the interests of Mrs Ceretti and
Alessandro Ceretti are absolutely aligned with those of Mr Ceretti.

158.    By a letter dated 6 September 2011, Stephenson Harwood confirmed that Mr
Ceretti is willing to consent to an application that he be appointed to represent
the interests of Mrs Ceretti and Alessandro Ceretti for the purpose of this
application (page 825).

159.    Accordingly, as was the case in the Bermuda Directions Applications, the El
Prela Trustee considers it appropriate for Mr Ceretti to represent the interests of
Mrs Ceretti in connection with the present application.  It also considers it

42

11698343.1

appropriate for Mr Ceretti to represent the interests of Alessandro Ceretti. The El Prela Trustee intends to serve a copy of its application on Mr Ceretti once issued in order that he can respond substantively if he wishes to do so.

**Minor, unborn and unascertained beneficiaries**

160.    Given the significance to the beneficiaries of the El Prela Trust of both of the Picard Claims and the present application, the El Prela Trustee has concluded that it is appropriate that the interests of the minor, unborn and/or unascertained beneficiaries should be separately represented. The El Prela Trustee has previously identified Mr Imrie, a partner in the Cayman Islands office of Maples and Calder, who is admitted as a solicitor advocate in the BVI, as an appropriate person to represent the interests of those parties, he having previously been appointed to this role in connection with the Bermuda Directions Applications.

161.    Accordingly, on 5 September 2011, LG wrote to Mr Imrie on behalf of the El Prela Trustee, asking for confirmation whether or not he would consent to act in that capacity for the purpose of this application (page 826) (the enclosures to that letter are not exhibited to this Affidavit, since they consisted of documents which are already exhibited hereto).

162.    Mr Imrie responded by letter dated 11 October 2011 confirming his willingness to act as representative. The El Prela Trustee considers it appropriate for Mr Imrie to be appointed as representative of the interests of the minor, unborn and unascertained beneficiaries of the El Prela Trust and seeks an order that he be appointed as such for the purposes of the present application. The El Prela Trustee intends to serve a copy of its application on Mr Imrie once issued in order that he can respond substantively if he wishes to do so.

**The charitable class**

163.    The Trust Deed also provides for a further class of discretionary beneficiary, being "*any trust association body or other organisation in any part of the world the objects of which are charitable*" (the **"Charitable Class"**) For the reasons explained above, the El Prela Trustee has concluded that the interests of this Charitable Class are also aligned with those of Mr Ceretti, Mrs Ceretti and Alessandro Ceretti.

43

11698343.1

164.   In the circumstances, the El Prela Trustee considers it appropriate for the
Attorney General of the BVI (the "**Attorney General**") to be appointed as
representative of the Charitable Class and seeks an order that he be appointed
as such for the purposes of the present application. The El Prela Trustee intends
to serve a copy of its application on the Attorney General once issued in order
that he can respond substantively if he wishes to do so.

**Mr Tacon**

165.   Given the existence of the Bermuda Proceedings and the directions previously
obtained from the BVI Court in relation to them, in addition to canvassing the
views of the express beneficiaries of the El Prela Trust and Mr Picard, the El
Prela Trustee considers it appropriate that Mr Tacon be joined to the present
application. It intends to serve a copy of its application on Mr Tacon once issued
in order that he can respond substantively if he wishes to do so.

## THE DIRECTIONS SOUGHT

166.   Taking account of the facts and matters explained above and in the Confidential
Affidavit, the El Prela Trustee seeks the following directions:

166.1   That Mr Ceretti is appointed and shall act in these proceedings as
representative of the adult beneficiaries of the El Prela Trust and that his
reasonable costs incurred in connection with this application be paid from
the assets currently held on the trusts of the El Prela Trust;

166.2   That Mr Imrie is appointed and shall act in these proceedings as
representative of the interests of the minor, unborn and/or unascertained
beneficiaries of the El Prela Trust and that his reasonable costs incurred
in connection with this application be paid from the assets currently held
on the trusts of the El Prela Trust;

166.3   That the El Prela Trustee shall be indemnified from the assets currently
held on the trusts of the El Prela Trust for its costs of making this
application;

166.4   In respect of the Third Amended Complaint, that the El Prela Trustee
shall be indemnified from the assets currently held on the trusts of the El

44

Prela Trust for its costs of making the motions to withdraw the reference and motions to dismiss articulated in the Confidential Affidavit, including costs arising from any adverse costs orders made against it in pursuance of those motions; and

166.5 In respect of the English Claim, that the El Prela Trustee shall be indemnified from the assets currently held on the trusts of the El Prela Trust for its costs of obtaining advice in relation to the English Claim, considering that advice and taking such steps as appropriate in light of that advice, including costs arising from any adverse costs orders made against it in pursuance of those steps.

## COSTS

### Costs of steps already taken by the El Prela Trustee

#### The Third Amended Complaint

167.    Since 8 June 2011 (being the date on which the El Prela Trustee first had sight of the Third Amended Complaint) the El Prela Trustee has incurred legal fees and disbursements in connection with those proceedings, including in analysing and preparing to respond to the claims advanced, taking appropriate advice, and preparing for this application. Those fees and disbursements to the period ending 28 October 2011, at the exchange rate prevailing at 15 November 2011, equate to US$571,008.04. They are made up as follows:

167.1  LG's fees: £131,389.50;

167.2  US Counsel's fees: US$318,063.91;

167.3  English Counsel's fees: £14,275.00;

167.4  Other disbursements: £13,994.23.

#### The English Claim

168.    Since 9 August 2011 (being the date on which the El Prela Trustee first had sight of the English Claim) the El Prela Trustee has incurred legal fees and disbursements in connection with those proceedings, including in analysing the

11698343.1

claims advanced, taking appropriate advice, and preparing for this application. Those fees and disbursements to the period ending 28 October 2011 total £39,955.20, which at the exchange rate prevailing at 15 November 2011 equates to US$63,300.22. They are made up as follows:

168.1  LG's fees: £25,395.74;

168.2  English Counsel's fees: £14,137.50;

168.3  Other disbursements: £421.96.

169.    In addition to the legal fees and disbursements referred to above, during the period 8 June 2011 to 28 October 2011, the El Prela Trustee has also incurred other legal fees and disbursements, relating neither to this application nor the Picard Claims. Those unrelated costs are not relevant to this application and the El Prela Trustee does not seek an indemnity in respect of them in this application.

170.    Further information as to the costs of steps already taken by the El Prela Trustee is provided in the Confidential Affidavit. It is anticipated that a supplemental affidavit will be sworn in advance of the hearing of this application in order to update the Court as to the current costs position.

**Estimate of costs of future steps to be taken by the El Prela Trustee**

171.    LG and Freshfields have prepared estimates of the likely future costs of complying with the directions sought in this application. Those estimates are based on a number of assumptions, which are set out in the estimates themselves, including the assumption that the costs will be borne equally by the El Prela Trustee and the Ashby Trustee.

172.    A copy of those estimates of costs with respect to the Third Amended Complaint are at pages 829 to 831. The grand total at the exchange rate prevailing at 15 November 2011, including both estimated fees and disbursements, is:

172.1  US$452,463.46 to US$677,563.46 assuming a full scale fact review will not need to be undertaken prior to making the motions to withdraw the reference and motions to dismiss articulated in the Confidential Affidavit; and

46

172.2. US$816,741.64 to US$2,344,216.64 assuming that that exercise will be necessary.

173.  In relation to the English Claim, an estimate of costs has not yet been prepared for the purposes of this application. However, it is anticipated that a supplemental affidavit will be sworn in advance of the hearing of this application to provide relevant information to the Court.

## CONCLUSION

174.  In all the circumstances, the El Prela Trustee respectfully applies for an order in the form of the draft accompanying its application papers.

SWORN by the above-named FRANK OLIVER WALTERS        )
                                                     )
at Monaco                                            )
                                                     )
this 16th day of November 2011                       )
                                                     )

Before me

Solicitor/Commissioner for Oaths

**MARK LUSHER**
24, Boulevard Princesse Charlotte
MC 98000 MONACO
SOLICITOR

47

**Schedule 1 – Definitions**

| | |
|---|---|
| "Acknowledgment Date" | The date for which the time for the El Prela Trustee to file an acknowledgment of service in respect of the English Claim has been extended, by agreement (being the later of 14 November 2011 or the date falling seven days prior to the hearing of Mr Picard's stay application in respect of the English Claim) |
| "Alpine Trustees" | Alpine Trustees Limited |
| "Ashby Holding Company" | Ashby Holding Services Limited |
| "Ashby Investment Company" | Ashby Investment Services Limited |
| "Ashby Trustee" | First Peninsula Trustees Limited as trustee of the Ashby Trust |
| "Attorney General" | The The Attorney General of the BVI |
| "Bank of Bermuda" | Bank of Bermuda Limited (an indirect 100% subsidiary of HSBC Holdings Plc) |
| "Bankruptcy Court" | United States Bankruptcy Court for the Southern District of New York |
| "Bermuda Directions Applications" | The Trustees' application for directions to the BVI Court in respect of the Bermuda Proceedings |
| "Bermuda Proceedings" | Proceedings issued in the Supreme Court of Bermuda by Mr Tacon in his capacity as the Joint Liquidator of the Kingate Funds on 22 December 2010 against (1) KML (2) FIM Limited (3) FIM Advisers LLP (4) the Ashby Trustee (5) the El Prela Trustee (6) the Ashby Holding Company (7) the El Prela Holding Company (8) Mr Grosso (9) Mr Ceretti |
| "BLMIS" | Bernard L Madoff Investment Securities LLC |
| "BVI Court" | Eastern Caribbean Supreme High Court of Justice British Virgin Islands |
| "BVI" | British Virgin Islands |
| "Charitable Class" | A class of discretionary beneficiary named in the Trust Deed being any trust association body or other organisation in any part of the world the objects of which are charitable |
| "Citi" | Citi Hedge Fund Services Ltd (formerly Hemisphere Management Limited and BISYS Hedge Fund Services Ltd), the administrator of the Kingate Funds |
| "Class Action" | Consolidated class action complaint filed in the United States District Court, Southern District of New York on 18 May 2010 and entitled In re Kingate Management Limited Litigation, with Master File No.09 Civ 5386 (BAB) |
| "Common Law Claims" | Claims in unjust enrichment, conversion and money had and received asserted in the Third Amended Complaint |
| "Confidential Affidavit" | Second affidavit of Frank Oliver Walters in support of the present application concerning facts and matters which are privileged and/or confidential |
| "District Court" | United States District Court for the Southern District of New York |
| "Draft Agreement" | Draft settlement agreement between Mr Tacon and Mr Picard considered by the BVI Court on 16 December 2009 and contained at Appendix B to Mr Tacon's Third Report to Creditors and Investors dated 31 July 2009 for each of the Kingate Funds |
| "El Prela Holding Company" | El Prela Group Holding Services Limited |
| "El Prela Investment Company" | El Prela Trading Investments Limited |
| "El Prela Trustee" | Port of Hercules Trustees Limited |
| "English Claim" | Claim issued by Mr Picard in the High Court of Justice of |

| | |
|---|---|
| | England and Wales, Queens Bench Division, Commercial Court on 10 December 2010 with Claim Number 2010 Folio 1478 against the Ashby Trustee and eleven others |
| "Euro Management Agreement" | Agreement made between Kingate Euro and KML dated 1 May 2000 |
| "Extension Request" | The request by KML to the Holding Companies in or around June 2010 for a further loan in the sum of US$1,200,000 |
| "Fault Based Claims" | Fault based claims made in the Bermuda Proceedings against KML, FIM, Mr Grosso and Mr Ceretti |
| "Fifth Creditors' Reports" | Mr Tacon's Fifth Report to Creditors and Investors dated 27 January 2011 for each of the Kingate Funds |
| "FIM" | FIM Advisers LLP and FIM Limited taken together |
| "FIM Funds" | FIM funds of funds |
| "Freezing Order" | Order of the Monaco Court for the immediate attachment of assets held in a number of accounts in the name of the Ashby Trustee, the Ashby Holding Company, the Ashby Investment Company and certain HSBC Monaco Accounts connected to the El Prela Trust and Mr Ceretti |
| "Freshfields" | Freshfields Bruckhaus Deringer US LLP |
| "Global Management Agreement" | Agreement made between Kingate Global and KML dated 1 January 2006 (superseding and replacing previous management agreements between those parties dating back to 1994) |
| "Holding Companies" | The Ashby Holding Company and the El Prela Holding Company taken together |
| "HNL" | Hamilton Nominees Limited |
| "HSBC Monaco" | HSBC Private Bank (Monaco) SA |
| "Initial Transfer Claims" | Alleged avoidable and recoverable transfers made from BLMIS to the Kingate Funds asserted in the Third Amended Complaint |
| "Investment Companies" | The Ashby Investment Company and the El Prela Investment Company taken together |
| "Investment Objectives" | The investment objectives defined by the Ashby Trustee for the investment of the assets of the Ashby Trust |
| "Kingate B" | The class of shares called Kingate Global Fund – Class B Shares, created by Kingate Global at the end of February 1995 |
| "Kingate DM" | The class of shares called Kingate Global Fund – Class DM Shares, created by Kingate Global on 1 January 1996 |
| "Kingate Euro" | Kingate Euro Fund Limited (in liquidation) |
| "Kingate Funds" | Kingate Global and Kingate Euro taken together |
| "Kingate Global" | Kingate Global Fund Limited (in liquidation) |
| "KML" | Kingate Management Limited |
| "LG" | Lawrence Graham LLP, the Trustees' English Solicitors |
| "Loan Agreement" | The agreement dated 16 July 2009 between the Holding Companies (as lenders) and KML (as borrower) in respect of a term loan facility of up to US$1,200,000 |
| "Loan Agreements" | The Loan Agreement and the Supplemental Loan Agreement taken together |
| "Lombard Odier" | Lombard Odier Darier Hentsch & Cie in Geneva, Switzerland |
| "Madoff" | Mr Bernard Madoff, principal of BLMIS |
| "Management Agreements" | The Global Management Agreement and the Euro Management Agreement taken together |
| "Monaco Affidavits" | Taken together, the Witness Statement of Andrew Witts dated 2 March 2009 and Exhibit "AW1"; the Affidavit of Mr Grosso dated 27 February 2009; the Affidavit of Peter |

| | |
|---|---|
| | Brigham (as Company Secretary of the Ashby Trustee) dated 19 March 2009; the Affidavit of Mr Ceretti dated 27 February 2009; and the Affidavit of Peter Brigham (as Director of the El Prela Trustee) dated 19 March 2009, served in connection with the Monaco Freezing Order |
| "Monaco Court" | The Court of First Instance of the Principality of Monaco |
| "Monaco Prosecutor" | Public Prosecutor of the Principality of Monaco |
| "Moore Stephens International" | International accounting and consulting association. Moore Stephens & Company Bermuda is a member of Moore Stephens International. The Ashby Trustee and Moore Stephens Monaco are 100% subsidiaries of Moore Stephens & Company Bermuda |
| "Moore Stephens Monaco" | Moore Stephens Services SAM, whose offices are at L'Estoril, 31 Avenue Princesse Grace, Monte Carlo, MC 98000, Monaco. It is a company authorised by the government of the Principality of Monaco and acts as administrator to the Ashby Trustee and El Prela Trustee |
| "Mr Ceretti" | Mr Federico Ceretti, settlor and named beneficiary of the El Prela Trust |
| "Mr Grosso" | Mr Carlo Grosso, settlor of the Ashby Trust |
| "Mr Imrie" | Mr Mac Imrie, a partner in the Cayman Islands office of Maples and Calder, who is admitted as a solicitor advocate in the BVI |
| "Mr Picard" | Irving H Picard, trustee for the liquidation of BLMIS |
| "Mr Tacon" | Mr William R Tacon and Mr Richard E L Fogerty of Zolfo Cooper, Joint Liquidators of the Kingate Funds |
| "Non-Fault Based Claims" | Non-fault based claims made in the Bermuda Proceedings against KML, the Trustees, the Ashby Holding Company, the El Prela Holding Company, Mr Grosso and Mr Ceretti |
| "Payment Instruction" | The transfer instruction sent by the El Prela Trustee to Lombard Odier on 12 December 2008 |
| "Petition" | A petition for the winding up of KML issued on 7 September 2011 |
| "Picard Claims" | The Third Amended Complaint and the English Claim taken together |
| "Picard US Complaint" | Complaint filed by Mr Picard in the United States Bankruptcy Court, Southern District of New York on 17 April 2009 against the Kingate Funds and Bank of Bermuda, with reference ADV.Pro.No.08-01789 (BRL) |
| "Port of Hercules Directors" | Port of Hercules Directors Limited |
| "SEC" | United States Securities and Exchange Commission |
| "Shares" | Participating common shares in the Kingate Funds |
| "SICCFIN Report" | Written report of SICCFIN to the Monaco Prosecutor dated 17 December 2008 |
| "SICCFIN" | The Service d'Information et de Contrôle Sur les Circuits Financiers of the Principality of Monaco |
| "SIPA" | United States Securities Investor Protection Act |
| "SIPC" | United States Securities Investor Protection Corporation |
| "Statutory Demand" | The notice of statutory demand dated 8 August 2011 issued by the Ashby Holding Company on KML |
| "Subsequent Transferee Claims" | Alleged subsequent transfers asserted in the Third Amended Complaint arising from the Initial Transfer Claims |
| "Supplemental Loan Agreement" | The agreement dated 28 September 2010 supplemental to the Loan Agreement between the Holding Companies (as lenders) and KML (as borrower) extending the facility granted by way of the Loan Agreement by up to US$1,200,000 |

11698343.1

| "Third Amended Complaint" | A claim brought against the Ashby Trustee and others in the Bankruptcy Court by Mr Picard with case reference Adv. Pro. No. 09-1161 (BRL) |
|---|---|
| "Transfers" | The total sum of US$975,541,729 received by the Kingate Funds from BLMIS in the period before Madoff's arrest |
| "Trott & Duncan" | Trott & Duncan Limited |
| "Trust Deed" | Instrument of trust relating to the El Prela Trust dated 7 April 1994 |
| "Trustees" | The Ashby Trustee and the El Prela Trustee taken together |
| "Trusts" | The Ashby Trust or the El Prela Trust taken together |
| "Unanimous Written Resolution" | A unanimous shareholders' resolution in respect of the winding up of KML purportedly passed on 10 August 2011 |
| "UK" | United Kingdom |

51

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

BRITISH VIRGIN ISLANDS

BVIHCV 2011/

BETWEEN:

PORT OF HERCULES TRUSTEES LIMITED
(AS TRUSTEE OF THE EL PRELA TRUST)

<u>Claimant</u>

-and-

(1) IRVING H PICARD
(as trustee for the substantively consolidated
SIPA liquidation of Bernard L Madoff Investment
Securities LLC and the estate of Bernard L
Madoff)

(2) KINGATE GLOBAL FUND LIMITED (IN
LIQUIDATION)
(acting by William R Tacon and Richard E Fogerty
as joint liquidators)

(3) KINGATE EURO FUND LIMITED (IN
LIQUIDATION)
(acting by William R Tacon and Richard E Fogerty
as joint liquidators)

(4) FEDERICO CERETTI
(as representative of the adult beneficiaries of
the El Prela Trust)

(5) MAC IMRIE
(as representative of the minor, unborn and
unascertained beneficiaries of the El Prela
Trust)

(6) HER MAJESTY'S ATTORNEY GENERAL OF
THE BRITISH VIRGIN ISLANDS

<u>Defendants</u>

---

AFFIDAVIT OF
FRANK OLIVER WALTERS

---

**Maples & Calder**
Sea Meadow House, PO Box 173
Road Town
Tortola VG1110
British Virgin Islands

Ref: ADI/660226

52

11698343.1

# EXHIBIT D





Made on behalf of: Claimant
D P Alexander
1st Affidavit
Exhibits: DPA1 to DPA6
31 January 2012

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
BRITISH VIRGIN ISLANDS
BVIHCV 2011/0154 and BVIHCV 2011/0155

**B E T W E E N:**

### FIRST PENINSULA TRUSTEES LIMITED
### (AS TRUSTEE OF THE ASHBY TRUST)

**Claimant**

-and-

### (1) IRVING H PICARD
### (as trustee for the substantively consolidated SIPA liquidation of Bernard L Madoff Investment Securities LLC and the estate of Bernard L Madoff)

### (2) KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)
### (acting by William R Tacon and Richard E Fogerty as joint liquidators)

### (3) KINGATE EURO FUND LIMITED (IN LIQUIDATION)
### (acting by William R Tacon and Richard E Fogerty as joint liquidators)

### (4) CARLO GROSSO
### (as representative of the adult beneficiaries of the Ashby Trust)

### (5) MAC IMRIE
### (as representative of the minor, unborn and unascertained beneficiaries of the Ashby Trust)

### (6) HER MAJESTY'S ATTORNEY GENERAL OF THE BRITISH VIRGIN ISLANDS

**Defendants**

### AFFIDAVIT OF
### DAVID PETER ALEXANDER

I, **DAVID PETER ALEXANDER**, director, of Smith & Williamson Limited of 25 Moorgate, London EC2R 6AY, **MAKE OATH** and **SAY** as follows:

1.      I am a director in the accountancy firm Smith & Williamson Limited. Between October 2005 and September 2008, I was a Partner in Alexander Forensic Accounting LLP. Prior to that I was employed by KPMG for twelve years, becoming a Partner in October 2000. Prior to that, I was employed by Ernst and Young for eight years from October 1985.

2.      I am a Fellow of the Institute of Chartered Accountants in England and Wales. I have a BA Honours Degree in Accounting and Financial Management from Sheffield University. I qualified as a Certified Fraud Examiner in August 1992. Since 1985 I have been involved in audit and accountancy work and have specialised in forensic accounting matters since October 1991.

3.      Save as otherwise appears, I make this Affidavit from facts and matters that are within my own knowledge. Insofar as such matters are within my own knowledge, they are true. Where I refer to information supplied by others, that information is from the sources stated and is true to the best of my knowledge, information and belief.

4.      There is now produced and shown to me bundles of true copy documents marked "Exhibit DPA1" to "Exhibit DPA6" to which I shall refer. In summary:

   (1) DPA1 is a summary of the results of my analysis as described in this Affidavit;

   (2) DPA2 sets out my detailed working with respect to the "First in, First out" method, described below;

   (3) DPA3 sets out my detailed working with respect to the "Rolling Charge" method, described below;

   (4) DPA4 sets out my detailed working with respect to the "Extreme Picard" method, as described below;

   (5) DPA5 sets out conveniently in one place the data from which my analysis is drawn;

   (6) DPA6 contains copies of the Kingate Fund's bank statements to which I refer below.

2

5.      I make this Affidavit in support of applications for directions (the "**Applications**") made by First Peninsula Trustees Limited and Port of Hercules Trustees Limited (the "**Trustees**"). Since these matters are relevant to the Applications made by each of the Trustees, this Affidavit is made in support of both of them.

6.      The purpose of this Affidavit is to describe the analysis that I have performed of various payments made to and by Kingate Global Fund Limited ("**Kingate Global**") and Kingate Euro Fund Limited ("**Kingate Euro**") (together the "**Kingate Funds**") in accordance with the instructions I received from Lawrence Graham, the English solicitors acting for the Claimants in the Applications (details of which are set out below) and to summarise the results of that analysis.   My instructions do not require me to provide opinion evidence and I do not do so.

7.      I have been assisted in carrying out my analysis by Anne-Marie Hitchin, Forensic Senior at Smith & Williamson, but the evidence contained in this Affidavit is mine alone.

**Instructions**

8.      My instructions arise in the context of the claims made against, variously, First Peninsula Trustees Limited, Ashby Investment Services Limited, Ashby Holding Services Limited, Alpine Trustees Limited, Port of Hercules Trustees Limited, El Prela Group Holding Services Limited and El Prela Trading Investments Limited (which for convenience I refer to collectively below as the "**Trustee Defendants**") by Irving Picard (as trustee in the liquidation of Bernard L Madoff Investment Securities LLC ("**BLMIS**")) ("**Mr Picard**") in the New York Proceedings and the English Proceedings brought by him.

9.      The particular transactions which form the subject of the analysis which I have conducted arise out of the operation of the Kingate Funds and, in particular, their relationship with BLMIS and Kingate Management Limited ("**KML**").

10.     The Kingate Funds paid management fees over time to KML. Over the same time, the Kingate Funds received monies from different sources, including BLMIS. KML in turn paid sums to the Trusts by

3

way of dividends. The essential issue which I have been asked to analyse is whether it can be shown that the monies paid by BLMIS to the Kingate Funds can be traced into the sums held in the Trusts, and if so to what extent.

11.     To answer this question, it is necessary to analyse the position of each of the Kingate Funds separately, in order to calculate what if any sums paid by the Kingate Funds to KML by way of management fees represented the traceable proceeds of monies paid by BLMIS to the Kingate Funds. It is further necessary to analyse the position of KML, in order to determine what if any sums paid by KML to the respective Trusts by way of dividends represented the traceable proceeds of the BLMIS monies.

12.     In each of those sets of proceedings, Mr Picard claims to have a proprietary claim to the entirety of funds in the hands of the Trustee Defendants on the basis that those funds represent the traceable proceeds of transfers originally made from BLMIS to the Kingate Funds (the "**BLMIS Transfers**").

13.     The case advanced by Mr Picard is that between 1994 and 2008 the Kingate Funds paid management fees totalling some US$371m to KML and that KML paid dividends to the Trustee Defendants totalling some US$297m.     Mr Picard claims that all of that US$297m comprised the traceable proceeds of the BLMIS Transfers, on the basis that BLMIS paid over more than US$371m to the Kingate Funds over the course of their relationship.  The total of the BLMIS Transfers made to Kingate Global was approximately US$390m, and the total of such Transfers made to Kingate Euro was approximately US$526m. However, I understand from Lawrence Graham that Mr Picard has either conducted no tracing exercise to justify that claim or, at least, has not advanced it in his evidence.

14.     For present purposes, I assume that the assets presently in the hands of the Trustee Defendants derive from dividend payments made by KML and that the management fees paid by the Kingate Funds were the only income for KML.

4

**The Approaches to Tracing**

15.     I have been asked to do the necessary calculations and analysis
        using three different approaches to tracing. These are now briefly
        explained.

        **(A) The "Rolling Charge" model**

16.     We are here concerned with what is often called a "mixed fund". For
        example, the bank account of Kingate Global would at various times
        include a mix of monies not only from BLMIS but also from other
        people, in particular the investors in Kingate Global, who paid for their
        shares in the Fund by paying subscription monies into its bank
        account. The question arises as to how a withdrawal, whether to KML
        or anyone else, from that mixed bank account should be treated.

17.     The "Rolling Charge" model of tracing proceeds on the basis that
        each such withdrawal is borne proportionately by the then
        contributors to the mixed fund according to the amount each
        contributed to the mixed account at the point immediately prior to the
        relevant withdrawal.

18.     I understand from reading the Affidavit of Timothy Harkness in draft
        that this (known in the USA as the "pro rata rule") is the usual
        approach to issues of tracing before US courts.

19.     Over time the proportion of the mixed fund belonging to each
        contributor will vary as new contributions are made to the fund.
        Withdrawals made after such new contributions have been made will,
        therefore, be attributed to the contributors in accordance with the new
        proportions of the mixed fund attributed to each of them.

        **(B) The "First in, First out" model**

20.     This is an alternative model of tracing funds through a mixed bank
        account. It requires specific withdrawals to be matched against
        specific credits, based on the presumption that any withdrawal is
        presumed to be made using the earliest deposited funds remaining in
        the account. Once the earliest credit in each account is exhausted, it

5

is presumed that the next withdrawal is made from the next earliest credit in the account, and so on.

21.     I understand that this is the usual approach to issues of tracing before English courts.

## (C) The "Extreme Picard" model

22.     I am asked also to conduct an analysis on the following basis, although I understand that it is not in fact a recognised model for tracing either in the USA or in England & Wales.   This model assumes in Mr Picard's favour that he is entitled to allocate funds which have originated from BLMIS entirely at his option to any subsequent debit from the recipient account, without having to apply either the First in, First out or Rolling Charge models.   Accordingly, I have assumed for this purpose that Mr Picard can trace any BLMIS Transfer through the Kingate Funds and KML and into the dividends paid by KML to the Trusts until the value of all the BLMIS Transfers made up to that point has been completely exhausted.   Only once that point has been reached are payments from the Kingate Funds to KML and then on from KML to the Trusts deemed to have been made using non-BLMIS funds.

## The Questions asked of me and my answers in brief

23.     In considering each of the tracing models and their application to the flow of monies through the two Kingate Funds to KML and then to the Trusts, I have been asked to address the following questions, to which I also set out very briefly below my answers:

        (1) Can it be shown that all the dividend payments made by KML to the Trusts represent the traceable proceeds of BLMIS Transfers? The answer to this is that Mr Picard cannot show this on any of the three models I have analysed, not even the Extreme Picard model.

        (2) If the answer to the preceding question is "no", is it possible to calculate with certainty the aggregate value of all those payments which do not represent the traceable proceeds of BLMIS Transfers?  If so, what is that value?  The answer to this is that it

6

is not possible for me to conduct a complete analysis under either
the First in, First out or the Rolling Charge models because of a
lack of bank statements, as I discuss below. However, it is
possible to do so on the Extreme Picard model, which results are
set out below.

(3) If the answer to the question at sub-paragraph (2) above is "no",
is it possible to show that any of the payments from KML to the
Trustee Defendants do not represent the traceable proceeds of
BLMIS Transfers? If so, what is the aggregate value of those
payments which cannot be the traceable proceeds of BLMIS
Transfers? My answer is that it is possible to show that monies
received by the Trusts are not the traceable proceeds of BLMIS
Transfers. This is for the reasons set out below, which involve
making assumptions in Mr Picard's favour, by applying the
Extreme Picard model, wherever I cannot complete an analysis
under the First in, First out or Rolling Charge models. Even
making such assumptions, it is clear that under both models, very
large sums remain in each Trust, which cannot on any view be
sums which represent the traceable proceeds of BLMIS
Transfers.

(4) Are there any limitations on my analysis which the court should be
made aware of which might have an impact on the results of that
analysis? If so, what are those limitations and how might they
impact on the results of the analysis? I set out my assumptions
on which I have proceeded at Annex 2 hereto. I do not believe
that any of these are likely materially to affect the results to which
I have come.

#### The materials available to me

24.     In undertaking my analyses under each of the three tracing models
        described above, I have been provided with the following materials
        from which to perform them:

        (1) In the case of both the Kingate Funds, Mr Picard's New York
        Proceedings include a schedule of all payments made by BLMIS
        to the Funds (in Exhibit B of the Third Amended Complaint).

7

(2) In the case of both Kingate Funds, in addition Mr Tacon's Bermuda Proceedings include, at Annex C, an account of all management fees paid by each of the Kingate Funds to KML.

(3) Moreover, in the case of Kingate Global, I have complete bank statements for its relevant bank accounts the periods 12 May 2000 to 18 July 2000 and 28 November 2005 to 31 August 2006.

(4) Subject to what is said at paragraph 24(8) below, I have not had access to complete bank statements for Kingate Global for other periods. This does not, however, affect my ability comprehensively to identify sums paid by Kingate Global to KML which cannot be the traceable proceeds of payments from BLMIS. This is because, as I set out below, in the periods where I do not have bank statements, either (i) there are no BLMIS Transfers and it is clear that on either the Rolling Charge tracing model or the First in, First out model, absolutely no or only negligible sums remained in Kingate Global's bank account from BLMIS at the start of those periods or (ii) I have adopted the Extreme Picard model where BLMIS Transfers have taken place. Moreover, for the analysis of the Extreme Picard model, the lack of statements does not matter, given that all assumptions are made in Mr Picard's favour.

(5) Whilst I have been provided with some bank statements relating to Kingate Euro, these are insufficient for me to conduct an analysis on either the Rolling Charge or the First in, First out models. Hence, in relation to that Fund, I have simply proceeded on the basis of the Extreme Picard model, as I discuss further below.

(6) In addition, when it comes to transfers by way of dividend from KML to the Trusts themselves, I lack bank account or other information to conduct a full tracing exercise on either the Rolling Charge or the First in, First out models. I have again, therefore, assumed all relevant matters in Mr Picard's favour on the Extreme Picard model.

8

(7) The full set of documents with which I have been provided are set out at Annex 1 hereto.

(8) I should add that after close of business on 30 January 2012, I was provided with several paper files containing copies of further bank statements for each of Kingate Global and Kingate Euro, which were disclosed by Mr Tacon. In the time available, I have not had an opportunity to analyse those additional statements, and I do not take them into account in this Affidavit nor in the spreadsheets showing my calculations. For the reasons set out above, this does not impact upon the analysis I have been able to carry out.

**Kingate Global: analysis**

25. As I have noted above, the results I have come to for both Kingate Funds and applying all three models, and which I summarise hereunder, have been arrived at using various assumptions. I set out these assumptions in Annex 2 hereto.

26. I first set out the results of the analysis I have carried out of funds that reached the two Trusts from Kingate Global. As noted above, for this Fund I have had sufficient information from bank account statements to be able to conduct a full tracing analysis using each of the three models outlined above.

*Results on the First in, First Out ("FIFO") model*

27. In order to undertake a FIFO analysis, I took the opening account balance of the Kingate Global account immediately prior to the receipt of each payment of BLMIS monies. Upon receipt of those funds I identified each specific debit from the relevant account and treated that debit as reducing the opening account balance by the amount of the debit, until the amount of the opening account balance was exhausted. I then did likewise with the credit received from BLMIS, identifying specific debits, and treating the BLMIS credit as reducing by the amount of each debit.

28. The results of this analysis are set out in the spreadsheet at Exhibit DPA1, page 1. I have specifically highlighted debits of management

9

and/or administration fees paid by the Kingate Funds to KML where
those debits were made out of funds representing the traceable
proceeds of BLMIS Transfers when analysed on a FIFO basis.

29.     I have analysed the transfers from BLMIS to Kingate Global in six
        periods based on the dates of the transactions and the completeness
        of the supporting documents.   I have been provided with bank
        statements for the periods 12 May 2000 to 18 July 2000; and 28
        November 2005 to 31 August 2006 during which Kingate Global
        received US$240m in transfers from BLMIS. This has allowed me to
        carry out a full FIFO analysis during these periods.

30.     For the periods prior to 12 May 2000; 19 July 2000 to 27 November
        2006; and 1 September 2006 to 17 July 2008, due to the lack of bank
        statements, I cannot identify transfers from non-BLMIS sources.
        However, this does not matter since I know there were no BLMIS
        Transfers to Kingate Global in those periods.

31.     I have, therefore been able to analyse all payments of management
        fees during these periods to KML as sourced from non-BLMIS funds.

32.     For the period 18 July 2008 to 31 December 2008, due to the lack of
        bank statements, I cannot identify transfers from non-BLMIS sources.
        However, there were transfers totalling US$150m from BLMIS in that
        period.  For the purposes of my analysis and to give Mr Picard the
        best result, I have, therefore, simply assumed that during this period
        the total management fees paid during this period (of US$15m) can
        be traced from these BLMIS Transfers. I should add that as and when
        the relevant bank statements become available, I would expect the
        value of management fees attributable to BLMIS Transfers during this
        period to be significantly lower when analysed using the FIFO model.

33.     In summary, as can be seen from the spreadsheet at DPA1, page 1
        the total management fees and therefore the maximum dividends
        paid to the Trusts which can be traced from transfers from BLMIS to
        Kingate Global based on a FIFO analysis are:

| DATE | From BLMIS to Kingate Global | From KML to Trusts |
|---|---|---|
| | US$ | US$ |
| Pre 12 May 2000 | Nil | nil |
| 12 May 2000 to 6 June 2000 | 30,000,000 | 1,376,920 |
| 9 June 2000 to 27 November 2005 | nil | Nil |
| 28 November 2005 to 31 August 2006 | 210,000,000 | 9,136,003 |
| 1 September 2006 to 17 July 2008 | nil | nil |
| Post 17 July 2008 | 150,000,000 | 15,183,563 |
| Total | 390,000,000 | 25,696,486 |

34.  Hence it can be seen that, of the US$390m paid by BLMIS to Kingate
     Global, a maximum of US$25,696,486 arrived, on the FIFO tracing
     model with the Trusts. That is because, while I have not been able to
     carry out an analysis of this second step on a FIFO basis (i.e. from
     KML to the Trusts), I have simply assumed (as set out at paragraph
     24(6) above) for the benefit of Mr Picard, that 100% of the dividend
     payments made by KML to the Trusts derive from BLMIS Transfers
     and, hence, I can state with certainty the maximum amounts received
     into the Trusts.

### Results on the Rolling Charge Model

35.  In order to undertake a Rolling Charge analysis of the funds passing
     through Kingate Global's bank account, I have again, as with the
     FIFO model analysis, taken the opening account balance of the
     relevant bank account immediately prior to the receipt of any BLMIS
     monies, which opening balance I designated as "non-BLMIS" monies.

36.  Following each BLMIS Transfer, I calculated the respective proportion
     of BLMIS and non-BLMIS monies present in the account. Thereafter,
     I identified each specific withdrawal from the account, and, in
     accordance with the methodology I have described above, calculated
     the proportion of the withdrawal which derives from BLMIS Transfers,

11

and the proportion which derives from non-BLMIS monies, in line with
the respective proportion attributable to each source.

37.     The results of this analysis are set out in the spreadsheet at DPA1,
        page 2. I have specifically highlighted the (proportionate) amount of
        each debit of management fees paid by Kingate Global to KML.

38.     I have analysed the transfers from BLMIS to Kingate Global in six
        periods based on the dates of the transactions and the completeness
        of the supporting documents. What I say at paragraphs 29 to 32
        above about the information I have had and how that has permitted
        me, notwithstanding the incomplete run of bank statements, to make
        an accurate FIFO analysis, also applies to this Rolling Charge
        analysis.

39.     The only caveat to this is that, at the end of the period 12 May to 18
        July 2000, a small balance of US$128,403 is left over attributable to
        funds received into Kingate Global's account from BLMIS. I have not
        been able to show the exhaustion of this small sum by the time the
        second period in which BLMIS made payments into the account
        opened. But this was over 5 years later, in November 2005, and I
        believe that the small residue of US$128,403 as at 18 July 2000
        would inevitably have been reduced to a nil or almost nil balance over
        that 5-year period. Moreover, and in any event, it is so small an
        amount as to be wholly negligible in terms of any effect it could have
        on the calculations I have made in the later period. The same is true
        in respect of the period 28 November 2005 to 31 August 2006 but for
        this period the balance left over is US$25,399. Again, I believe that
        this small residue would have been reduced to a nil or almost nil
        balance over the 22 month period between 31 August 2006 and the
        next BLMIS Transfer in July 2008.

40.     In summary, as shown by the spreadsheet at DPA1, page 2, on the
        Rolling Charge model, the total management fees and therefore the
        maximum dividends paid to the Trusts which can be traced from
        BLMIS Transfers made to Kingate Global into payments made by
        KML to the Trusts are: