| | From BLMIS | | From KML |
|---|---|---|---|
| DATE | to Kingate Global | | to Trusts |
| | US$ | | US$ |
| Pre 12 May 2000 | nil | | nil |
| 12 May 2000 to 6 June 2000 | 30,000,000.00 | | 1,114,904 |
| 9 June 2000 to 27 November 2005 | nil | | nil |
| 28 November 2005 to 31 August 2006 | 210,000,000.00 | | 4,762,914 |
| 1 September 2006 to 17 July 2008 | nil | | nil |
| Post 17 July 2008 | 150,000,000.00 | | 15,183,563 |
| Total | 390,000,000.00 | | 21,061,381 |

41.     Hence it can be seen that, of the US$390m paid by BLMIS to Kingate Global, a maximum of US$21,061,381 arrived, on the Rolling Charge tracing model, with the Trusts, making the same assumption in Mr Picard's favour as set out at paragraph 34 above.

**Results on the Extreme Picard model**

42.     In this case, for each transfer of funds from BLMIS to both Kingate Global and Kingate Euro I have simply assumed that all the subsequent management or administration fees (in the case of Kingate Euro only), which were paid to KML, were made out of BLMIS funds until the total of all prior BLMIS Transfers were exhausted. I have ignored the fact that these monies may actually have been paid to other parties who have been paid earlier than the relevant payment of management or administration fees.

43.     I have further assumed that, with respect to the monies received by KML on this basis, any subsequent payment of dividends by KML to the Trustes is made with BLMIS funds until the total of all BLMIS funds traced into KML has been exhausted. Again, I have ignored the fact that these monies may have been paid to other parties who have been paid earlier than the relevant dividend payment.

44.     The results of this analysis are set out in the spreadsheet at DPA1, page 3. I have specifically highlighted the (proportionate) amount of

13

each debit of management and/or administration fees paid by the Kingate Funds to KML.

In summary, the total dividends paid to the Trusts which can be traced from transfers from BLMIS to each of the Kingate Funds based on the Extreme Picard method for the period April 1995 to 31 December 2008 are:

| | Source of funds transferred to KML as management fees | | |
|---|---|---|---|
| | Non-BLMIS Funds | BLMIS Funds | Total management fees paid |
| Transferred via Kingate Global | 146,520,703 | 144,299,827 | 290,820,531 |
| Transferred via Kingate Euro | 1,903,044 | 78,054,372 | 79,957,415 |
| | 148,423,747 | 222,354,199 | 370,777,946 |
| | | | |
| Dividend payments | Non-BLMIS Funds | BLMIS Funds | Total management fees paid |
| Dividends paid by KML to the Ashby Trust | 49,376,974 | 99,705,355 | 149,082,329 |
| Dividends paid by KML to the El Prela Trust | 48,226,254 | 99,705,355 | 147,931,609 |
| | | | |
| Total dividends paid to the Trusts | 97,603,228 | 199,410,710 | 297,013,938 |

45.     Hence, it can be seen that even on this model, extremely favourable to Mr Picard, of the total dividends paid by KML to the Trusts of US$297m, only US$199m can have come from BLMIS, and the remainder of US$97.6m did not.

**The Kingate Euro Fund**

46.     As I have discussed above, in the case of Kingate Euro, I have been unable to undertake either a FIFO analysis or a Rolling Charge analysis.

47.     I have therefore simply applied the most favourable approach to Mr Picard, the Extreme Picard approach. On this basis, as set out in the spreadsheet at DPA1, page 3 of the US$79,957,415 paid in management fees by Kingate Euro to KML, US$78,054,372 is attributable to BLMIS and just US$1,903,044 to other sources. As and when the relevant bank statements become available so as to permit further analysis, I would expect the value of management and

14

administration fees attributable to BLMIS Transfers during this period
to be significantly lower when analysed using either the FIFO or
Rolling Charge models.

**The overall results: the monies held by the Trusts**

48. Finally, for the Court's ease of reference, I refer to the spreadsheet at
DPA1, page 7 which shows:

(1) In the top half of the spreadsheet are shown the totals attributable
to BLMIS funds and to non-BLMIS funds that were paid to KML by
both Kingate Funds as management fees, applying each of the
three tracing models to the Kingate Global payments (and, as set
out above, just the Extreme Picard model to the Kingate Euro
payments). In respect of each method, the bottom line figures
here are that of the total management fees paid to KML by both
Kingate Funds are:

(a) On the FIFO model, US$267,013,992 came from non-BLMIS
sources and only US$103,750,858 from BLMIS.

(b) On the Rolling Charge model, US$271,649,096 came from
non-BLMIS sources and only US$99,115,753 from BLMIS.

(c) On the Extreme Picard model, US$148,423,747 came from
non-BLMIS sources and only US$222,354,199 from BLMIS.

(2) In the bottom half of the spreadsheet are shown the totals
attributable to BLMIS funds and to non-BLMIS funds that were
then received by the two Trusts as dividends. As noted at
paragraph 24(5), due to a lack of information, again this part of
the analysis has also been conducted simply on the basis most
favourable to Mr Picard, the Extreme Picard model. The bottom
line figures here are that, of the US$297,013,938 received by the
Trusts from KML by way of dividends:

(a) On the FIFO model, US$198,204,801 came from non-BLMIS
sources and only US$98,809,137 from BLMIS.

(b) On the Rolling Charge model, US$202,839,905 came from
non-BLMIS sources and only US$94,174,033 from BLMIS.

15

(c) On the Extreme Picard model, US$97,603,228 came from non-BLMIS sources and only US$199,410,710 from BLMIS.

**Expert's declaration**

49.     I have been provided with a copy of, have read and have understood Part 32 of the BVI Civil Procedure Rules ("CPR"), dealing with evidence given by experts and assessors.

50.     In particular, I understand that it is the duty of an expert to help the court impartially on the matters relevant to his or her expertise and that this duty overrides any obligation owed to the person instructing or paying the expert. I confirm that I have complied with that duty in preparing this Affidavit. I also confirm that I have complied with the requirements set out in CPR r.32.4.

51.     Finally, I confirm that I have included in my Affidavit all matters within my expertise relevant to the issue on which my evidence is given and that I have identified any matters which, to my knowledge, might affect the validity of my evidence.

52.     I attach to this Affidavit at Annex 3 a copy of my written instructions dated **17 January 2012**. Those instructions were subsequently supplemented by oral instructions, the content of which I have summarised above under the heading "Instructions".

SWORN by the above-named DAVID PETER ALEXANDER          )

at    One Bunhill Row, London EC1Y 8YY                         )

this 31 day of January 2012                                    )

Before me                                                      )

MICHAEL SHOLEM

Solicitor/Commissioner for Oaths

16

## Annex 1

### Documents

For the purpose carrying out my analysis, I have been supplied with the following documents:

(i) Kingate structure chart;

(ii) Statement of Claim and Annexes issued in the Supreme Court of Bermuda by Kingate Global Fund Limited (in liquidation) and Kingate Euro Fund (in liquidation) against the Trustees and 7 others (the "**Bermuda Proceedings**");

(iii) Particulars of Claim and Annex issued in the High Court of Justice Queen's Bench Division Commercial Court by Irving H Picard (as trustee for the substantively consolidated SIPA liquidation of BLMIS and the estate of Bernard L Madoff) against the Trustees and 10 others (the "**English Proceedings**");

(iv) Third Amended Complaint, which was filed in the United States Bankruptcy Court of the Southern District of New York by Irving H Picard (as Trustee for the Liquidation of BLMIS) with case reference Adv. Pro. No. 09-1161 (BRL) against the Trustees and 16 others (the "**New York Proceedings**");

(v) Bank statements for accounts in the name of (i) Kingate Global Fund Limited and (ii) Kingate Euro Fund Limited held with the Bank of Bermuda Limited. A full list of the bank statements and the periods to which they relate is attached at DPA6, page 1; and

(vi) Frank Walters' two Affidavits sworn on 16 November 2011 in support of the Applications.

## Annex 2

**Assumptions made in carrying out the tracing analyses under each tracing model**

(i)     I have not been able to determine at what point during each month management fees were paid to KML by the Kingate Funds and have therefore assumed these have been paid one month in arrears. Management fees were already being paid to KML prior to the transfer of funds from BLMIS to the Kingate Funds. This treatment therefore favours Mr Picard's position as it ensures that more management fees are potentially traceable from proprietary funds;

(ii)    I have used monthly average FX rates to translate Kingate Euro administration and management fees due to having insufficient information to determine payment dates. I do not consider that any variance between the daily exchange rate and the monthly average exchange rate will have a material impact on the translation value of the administration and management fees. My analysis covers almost 13 years of data increasing the likelihood that positive and negative exchange variances will compensate for each other over time;

(iii)   When money was paid in and paid out of the Kingate Funds' accounts on the same day, I have treated the credits and debits as occurring in the order in which they appear in the bank statements, subject to (iv) below;

(iv)   Where two payments were made on the same day, I have assumed the order of payments which would most benefit Mr Picard i.e. to ensure BLMIS monies pay the maximum management fee;

(v)    I have assumed that all management fees payable by Kingate Global between 18 July 2008 and 31 December 2008 were paid and that they represent the traceable proceeds of BLMIS Transfers;

18

(vi)    I have assumed that the dividends paid by KML to the Trusts
        were paid and were funded entirely by the management fees
        paid by the Kingate Funds to KML;

(vii)   In addition to dividends paid to the Trusts, KML also paid
        various other liabilities to third parties. For the purposes of my
        analysis I have assumed that any liabilities paid to third parties
        were paid from non-BLMIS funds, which is the best case for
        Mr Picard; and

(viii)  I have assumed that the details of the BLMIS Transfers set
        out in Exhibit B to the New York Proceedings and relied upon
        by Mr Picard are accurate.

**EXHIBIT E**

On behalf of: Claimant
J E N Andrews
1st Affidavit
Exhibit "JENA1"
31 January 2012

**THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**CLAIM NUMBER BVIHCV 2011/0154 and BVIHCV 2011/0155**

**BETWEEN:**

**FIRST PENINSULA TRUSTEES LIMITED**
**(AS TRUSTEE OF THE ASHBY TRUST)**

<u>**Claimant**</u>

**-and-**

**(1) IRVING H PICARD**
**(as trustee for the substantively consolidated SIPA liquidation of Bernard L Madoff Investment Securities LLC and the estate of Bernard L Madoff)**

**(2) KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)**
**(acting by William R Tacon and Richard E Fogerty as joint liquidators)**

**(3) KINGATE EURO FUND LIMITED (IN LIQUIDATION)**
**(acting by William R Tacon and Richard E Fogerty as joint liquidators)**

**(4) CARLO GROSSO**
**(as representative of the adult beneficiaries of the Ashby Trust)**

**(5) MAC IMRIE**
**(as representative of the minor, unborn and unascertained beneficiaries of the Ashby Trust)**

**(6) HER MAJESTY'S ATTORNEY GENERAL OF THE BRITISH VIRGIN ISLANDS**

<u>**Defendants**</u>

---

**AFFIDAVIT OF**
**JEREMY EDWARD NEEDHAM ANDREWS**

---

**I, JEREMY EDWARD NEEDHAM ANDREWS** of Lawrence Graham LLP, 4 More London Riverside, London SE1 2AU, United Kingdom **MAKE OATH** and **SAY** as follows:

1.      I am a partner in the Dispute Resolution Department of Lawrence Graham LLP, the English solicitors for First Peninsula Trustees Limited (as Trustee

of the Ashby Trust) and Port of Hercules Trustees Limited (as Trustee of the El Prela Trust) (the **"Trustees"**).  The Trustees' BVI solicitors are Maples and Calder, to whom my firm provides assistance where appropriate.

2.    I make this Affidavit in support of an application for directions in respect of the Picard Claims.  As explained below, it is also in support of an equivalent application for directions made by the El Prela Trustee.

3.    The purpose of this Affidavit is:

(1)    to update the Court as to events occurring on or after 16 November 2011, when Mr Walters swore his Affidavits in support of the two applications; and

(2)    to respond, as appropriate, to the Affidavits of Mr Gonzalo Zeballos sworn on 23 January 2012 and Mr William Tacon sworn on 20 January 2012 served in connection with these proceedings.

Since my evidence is relevant both to the Ashby Trustee's application and an equivalent application by the El Prela Trustee (also issued on 7 December 2011 and currently listed to be heard by the BVI Court on 8 and 9 February 2012), this Affidavit is sworn in support of both such applications (together, the "**Applications**").

4.    Save where the contrary appears, definitions in this Affidavit shall have the same meaning as in the Affidavits of Frank Oliver Walters sworn on 16 November 2011 in support of the Applications (together the "**Walters Affidavits**").

5.    The facts and matters set out in this Affidavit are within my own knowledge, save where the contrary appears, and are true.  Where such facts and matters are not within my own personal knowledge, they are true to the best of my information and belief and derive from the sources stated.

6.    Exhibited to this Affidavit are a bundle of documents marked "Exhibit JENA1". References in this Affidavit to page numbers are to page numbers in Exhibit JENA1.

7.        The structure of this Affidavit is as follows:

A. **Service of the Applications**: I address very briefly the service of both
Applications on the various Defendants.

B. **Mr Picard's evidence and the nature of the Applications**: in this
section, I address erroneous contentions advanced by Mr Picard in his
evidence as to the nature of the Applications and of the relief sought by
the Trustees and briefly summarise, to avoid confusion and so the
Court is properly informed, what the Trustees are seeking to do by the
Applications and why, on the facts of this case, that is an appropriate
approach by them.

C. **The weakness of Mr Picard's claims in New York against the
Trustees**: this section explains the basis upon which the Trustees
contend that Mr Picard's claims are misconceived and wrong and why
motions to dismiss those claims in New York are warranted and proper
ones for the Trustees to bring.

D. **Mr Picard's failure to conduct a tracing exercise to justify his claim**:
quite extraordinarily, the evidence filed on behalf of Mr Picard in the
Applications contains no more than a bald, unsubstantiated assertion
that he has a good proprietary claim to all of the assets in the Trustees'
hands.  On analysis, however, he plainly has no such claim. On the
usual and legally accepted basis of tracing applicable in New York, his
claim (even if valid, which is denied) is to a fraction of those assets.
Further analysis shows that, even applying a legally unacceptable basis
of tracing most favourable to him, he has no possible claim to many
millions of dollars in the Trustees' hands.

E. **Mr Picard's insolvency application to bar the Applications under
Part XIX of the BVI Insolvency Act 2003**: at the last minute, quite
improperly, Mr Picard seeks to hijack the hearing of the Applications by
mounting an argument unmentioned by him before, despite
correspondence on the subject from the Trustees' lawyers, concerning
his status as an insolvency office holder.  He seeks to claim that, under
BVI statute law, the effect of his office is that the Trustees should be
barred from seeking *Beddoe* directions – indeed, from convening a

*Beddoe* Court at all.  I set out why this claim is as misconceived as it is improperly sprung on the Trustees and the Court.

F. **The existing *Beddoe* order and the history of Mr Picard's US Complaint**: I then address the reasons why the previous *Beddoe* applications considered by the BVI Court concerned only Mr Tacon's Bermuda Proceedings, why Mr Picard was not convened to them and why the Orders granted then should remain in place.  This involves a consideration of the extraordinary approach to the New York litigation of Mr Picard and how the Trustees were left out of that litigation until a late stage.

G. **Mr Tacon's evidence and his change of position**: having consented to the previous *Beddoe* relief in relation to his Bermuda Proceedings, Mr Tacon does not, quite properly, seek to overturn that Order.  He does, however, now seek to oppose the *Beddoe* relief sought by the Trustees in relation to Mr Picard's New York proceedings.  I set out briefly the Trustees' position in relation to his opposition.

H. **The representation orders sought by the Trustees**: Mr Picard opposes the appointments sought by the Trustees in relation to the representation of adult beneficiaries and of minor and unborn beneficiaries.  I therefore set out briefly the Trustees' position in these regards.

I. **Update to the Court in relation to the Petition to wind up KML**

J. **Update to the Court on the costs of steps taken by the Trustees since Mr Walters' Affidavits**

K. **Updated estimates of costs of future steps for which the Trustees seek directions by the Applications**

8.      Nothing in this Affidavit is intended to be or should be read as a waiver of privilege on the part of the Trustees or their subsidiaries.

### A.  Service of the Applications

9.      The Ashby Trustee's application was served on the Defendants as follows:

(1)     On Mr Picard (the First Defendant) via SCA Creque on 12 December 2011;

(2)     On the Kingate Funds (the Second and Third Defendants) via Withers BVI on 9 December 2011;

(3)     On Mr Imrie (the Fifth Defendant) on 12 December 2011;

(4)     On the Attorney General of the BVI (the Sixth Defendant) on 5 January 2012; and

(5)     On Mr Grosso (the Fourth Defendant) on 14 December 2011 via Farara Kerins in the BVI.

10.     The El Prela Trustee's application was served on the Defendants as follows:

(1)     On Mr Picard (the First Defendant) via SCA Creque on 12 December 2011;

(2)     On the Kingate Funds (the Second and Third Defendants) via Withers BVI on 9 December 2011;

(3)     On Mr Imrie (the Fifth Defendant) on 12 December 2011;

(4)     On the Attorney General of the BVI (the Sixth Defendant) on 5 January 2012; and

(5)     On Mr Ceretti (the Fourth Defendant) on 14 December 2011 via Farara Kerins in the BVI.

## B.  Mr Picard's evidence and the nature of the Applications

11.     The evidence filed on behalf of Mr Picard is contained in the two Affidavits of Mr Zeballos dated 23 January 2012, one filed in each of the Applications, which are in materially the same terms.

12.     At paragraph 16 of each of his Affidavits, Mr Zeballos attacks the Applications and the use of the Confidential Affidavits filed by Mr Walters for the Trustees. He asserts that the Applications are not "true *Beddoe*"

5

applications and that his client, Mr Picard, should have access to the information within the Confidential Affidavits.

13.     He then goes on in addition at paragraph 17(a) to (c) to make further allegations that, in summary:

> (1)     It is wrong in principle for the Trustees to "side with" the principal beneficiaries of the Trusts over Mr Picard;

> (2)     The Applications do not seek directions as a *Beddoe* application would do but merely pre-emptive costs relief which the BVI Court ought not properly to make;

> (3)     Moreover, such pre-emptive costs relief would be wrong in principle as risking "severe injustice" to Mr Picard if his claims succeed in New York.

14.     Mr Zeballos then speaks further to these points at paragraphs 89 to 102 of his Affidavits, referring to advice he has apparently received on them.

15.     The Trustees, of course, considered the Applications very carefully with their legal team before issuing them.  In that context they considered the nature of the *Beddoe* jurisdiction.  They remain satisfied that the simplistic analysis advanced by Mr Zeballos is incorrect and inadequate to deal with the factual situation with which they are faced.  In the circumstances, they remain satisfied that it is proper and correct for them to advance the Applications and seek the directions and relief they intend to ask of the BVI Court at the hearing in February.

16.     In this context I should refer to a letter dated 20 January 2012 from SCA Creque (page 1), for Mr Picard, to Maples & Calder and Maples & Calder's response dated 30 January 2012 (page 4).   The SCA Creque letter articulates in essence the same points as Mr Zeballos makes.  Maples & Calder's letter in response sets out briefly why they are incorrect.  It also, however, makes clear that the Trustees will seek to amend the Amended Claim Forms to make it expressly clear that the Applications seek directions from the BVI Court that the Trustees be authorised:

(1)    In relation to the Third Amended Complaint of Mr Picard in New York, to file motions to withdraw the reference from the United States Bankruptcy Court and motions to dismiss his claims against them; and

(2)    In relation to the English Claim, to seek to agree with Mr Picard a stay of the proceedings until such time as the motions to dismiss referred to at sub-paragraph (1) above have been finally determined. In effect, all the Trustees seek is that they be permitted to continue the informal stay that they have already agreed with Mr Picard in relation to the English Claim.

17.    The Trustees therefore seek the leave of the Court to amend the Amended Claim Forms in the manner set out in the draft Re-Amended forms which appear at pages 14 (Ashby) and 25 (El Prela). As set out in the Maples & Calder letter, no prejudice will be caused by that amendment to Mr Picard or Mr Tacon (or any other party) since those who are actively participating in the Applications have prepared and served evidence in opposition on the basis of the Trustees' contention that they are seeking *Beddoe* directions to apply to have Mr Picard's Third Amended Complaint dismissed. To that contention, Mr Picard and Mr Tacon, in particular, have filed the evidence they wish to in order to oppose the grant of such relief.

18.    Moreover, it is important for the BVI Court to note how limited the relief sought by the Trustees is: they seek a direction to do nothing in the English Claim commenced by Mr Picard and effectively currently stayed; and in relation to the New York proceedings, they do not seek a general direction to defend Mr Picard's claims there, still less to do so at the expense of the Trusts.

19.    On the contrary, they seek very limited directions which, in consequence, would give rise to equally limited legal costs and hence an equally limited costs indemnity from the Trusts' funds. This is because they seek directions only:

(1)    To apply to have certain aspects of the Third Amended Complaint determined by the United States District Court for the Southern

District of New York, as opposed to the United States Bankruptcy
Court;

(2)   To apply, in essence (in BVI legal language) to strike out the claims
made in the Third Amended Complaint on the ground they are
misconceived in law and bound to fail;

(3)   To seek the dismissal of the Third Amended Complaint on
jurisdictional grounds.

The Trustees' estimate of the costs of the course of action for which they
seek directions is set out in Section K below.

20.   That it is proper and right for the Trustees to seek directions for such limited
involvement in the New York proceedings and such limited costs
indemnification in consequence flows from the following factors.

21.   In the first place, whilst it is recognised that if a trustee is faced with a claim
to the whole of the trust fund by another person who seeks to set the trust
aside, it is generally appropriate for the trustee to remain neutral, leaving
the beneficiaries and the claimant to fight the substantive dispute, there are
a number of factors specific to this case which mean that that general rule
is not applicable.

22.   First, such neutrality is only the ordinarily appropriate response where the
claim, properly analysed, is indeed to the whole of the trust fund.  On any
view, Mr Picard's claim is not such a claim. He does not seek to set aside
the Trusts, but to claim that the assets in the Trusts are his assets.
However, his claim, on proper analysis, is and cannot be a claim to the
whole of the assets in the Trusts. At most, it is a claim to some only of the
trust assets, and on any view of the matter there remains a very substantial
sum in each Trust which will always be untouched by his claims: see
Section D below.

23.   Secondly, it is submitted that it is obvious that, before a trustee can be
expected to adopt a neutral stance in the face of the third party's claim to
the trust assets, he needs to examine the nature and extent of the claim
and to examine whether it can be said to have a realistic prospect of
success.  The claim must have some material degree of merit to it before

the trustee can be expected to allow it to proceed without argument from the trustee. The Trustees have taken advice from New York lawyers about Mr Picard's claims.  On the basis of that advice, the Trustees have reasonably formed the view that Mr Picard's claims have no realistic prospect of success and no material merit, and that they should be dismissed. It cannot be correct that a trustee ought to remain neutral and his office be immobilised to the prejudice of his beneficiaries in the face of what he considers on advice to be a hopeless claim to the trust fund.

24.     This is not therefore a case in which Mr Picard is advancing claims with a realistic prospect of success, and the principle of neutrality does not require the Trustees to accept that he is when they reasonably form the view, after taking advice, that the claims are without merit. The reasons why the Trustees have formed this view appear clearly from the Affidavit of Mr Timothy Harkness of Freshfields Bruckhaus Deringer US LLP, which is to be filed together with this one, and which I have read in draft.

25.     As noted at paragraph 13(2) above, Mr Zeballos also contends that the Applications are more akin to what is called a pre-emptive or prospective costs award than a *Beddoe* application.  A useful general discussion of the distinction between the two is set out at 21-120 of *Lewin on Trusts* 18th ed. (2008).

26.     I believe that, as that passage illustrates, Mr Zeballos is simply incorrect. The Applications seek no order binding on the New York courts or determinative of the costs to be awarded at trial.  They seek orders which will bind only as between the Trustees on the one hand and all the persons who claim to be beneficially entitled to the Trusts' funds on the other hand.

27.     It is this which means, contrary to what Mr Zeballos suggests at paragraph 16 of his Affidavits, that it is both proper and correct for Mr Picard (and Mr Tacon) to be made parties to the *Beddoe* application and for certain confidential material to be kept from them.   This was made clear by Lightman J in *Alsop Wilkinson v Neary* [1996] 1220 at 1226B where he stated:

"*The justification for the protection afforded to trustees by* [a] *Beddoe order is that the beneficiaries are given the opportunity to make representations*

9

*to the court before the order is made. (In the case where there are unresolved disputes as to the identity of the beneficiaries, e.g. because of a trust dispute* [as here]*, then all possible claimants should be joined).*"

The need to maintain and the propriety of maintaining confidentiality in the materials within the Confidential Affidavits is also clear and perfectly normal where one of the persons claiming to be beneficially entitled and so properly party to the *Beddoe* application is also a hostile party in the main proceedings (as Mr Picard and Mr Tacon are in the main proceedings each has brought): I refer generally to *Lewin* at 21-126.

28.     It is appropriate to join Mr Picard to the *Beddoe* application because he is a party who is potentially affected by the relief to be sought on the application. In the unlikely event that Mr Picard succeeded in his claims, and the New York courts held that he was entitled to the whole of the assets in the Trusts, and in the meantime the trust assets have been deployed in the payment of the Trustees' legal costs, the amount recovered by Mr Picard will have been depleted. It is this factor which leads *Lewin* to comment that a *Beddoe* application such as the present one has similarities to a pre-emptive costs order (see *Lewin* at 21-115).

29.     That, however, is no bar on a trustee making such a *Beddoe* application or on the Court granting it.  The task of the *Beddoe* court faced with such an application is to consider the interests of all those who claim to be beneficially interested in the trust fund, hence here, of course, not just Mr Picard, but the express beneficiaries of the Trusts and, indeed, Mr Tacon. In doing so, it must consider the relative strengths of their various claims to the fund and the degree of prejudice which a *Beddoe* direction, or its lack, might cause to each of them. The existence of Mr Picard's claim to be entitled to the trust assets is a factor justifying him to be heard on the application, but it is not a factor which automatically determines its outcome.

30.     In the present case, on the advice received by the Trustee and made available to the Court:

(1)     Mr Picard has a very poor claim which merits being struck out;

(2)  Moreover and in any event, on analysis, his proprietary claims are not
properly to anything like all of the Trusts' funds such that he has no
such claim to millions of dollars of assets in the Trusts' funds;

(3)  Mr Tacon has a very poor claim, predicated on first instance English
authority disapproved of expressly by the House of Lords;

(4)  The amount of costs the Trustees would take from the Trusts' funds
were their motions to dismiss in New York to fail, are modest in
comparison to the scale of the assets in the Trusts' funds, so any
prejudice to Mr Picard or indeed Mr Tacon would be equally modest.

(5)  Otherwise, the beneficiaries of the Trusts have an incontrovertible
claim to the benefit of the Trusts.

## C.  The weakness of Mr Picard's claims in New York against the Trustees

31.  I have referred above, in summarising the Trustees' position and why Mr
Zeballos' objections to the formulation of the Applications are incorrect, to
the weakness of Mr Picard's claims and to the fact that, on analysis, any
claim he does have cannot extend to a large portion of the Trusts' assets.

32.  I shall now address each of these issues.  In relation to the first, the
weakness of Mr Picard's claims, I refer the court to the Affidavit of Mr
Harkness, which I have read in draft.  As Mr Harkness explains:

(1)  Mr Picard makes claims against, amongst others, the Trustees on
three different bases.  He makes Federal statutory claims, New York
statutory claims and New York common law claims (see paragraph
33 of Mr Harkness' Affidavit).

(2)  In relation to the Federal statutory claims, they can only affect and
undo transactions made within two years of the bankruptcy petition in
question being presented (here 11 December 2008) (paragraph 35)
and can only succeed against subsequent transferees to an initial
transferee of the bankrupt if Mr Picard can prove they did not take the
transfers for value, in good faith and without knowledge of the
voidability of the transfers (paragraphs 38 to 41).  Moreover, Mr
Zeballos' evidence fails to point out that it is likely that these claims

cannot in any event be advanced against a foreign defendant similarly placed to the Trustees (paragraphs 49 to 50; 62 to 67).

(3)    In relation to the New York statutory claims, these follow the same principles as the Federal statutory claims and give rise to the same defences, the only material difference being that the court can look back six years instead of just two (paragraph 42).   However, Mr Zeballos fails to mention the fact that it has been held that the same claims brought by Mr Picard against other defendants have already been dismissed by the New York courts on the basis that they are barred by the "safe harbour" provision of the US Bankruptcy Code. By those safe harbour provisions, transfers made by a stock broker, such as BLMIS, to a client, such as the Kingate Funds, may not be avoidable at all (paragraphs 51 to 53).   Moreover, Mr Zeballos fails additionally to refer to the New York court's finding that such a claim can only proceed if Mr Picard is able to plead and prove "wilful blindness" to the relevant fraud, which he does not allege against the Trustees (paragraphs 56 to 61).

(4)    As I set out at paragraphs 71 to 72 below, the effect of this bar on the New York statutory claims is that Mr Picard's statutory claims are limited to the Federal claims with their two year time limit. The effect of this is that the claim against the Trustees is limited to one for at most US$16,600,000.

(5)    In relation to the New York common law claims, Mr Picard lacks any standing to bring these claims, as has been found repeatedly in other claims he has tried to bring (paragraph 42).   Again, extraordinarily, Mr Zeballos fails to mention this at all (paragraphs 55 to 60).

(6)    Finally, Mr Harkness also discusses the US principles of equitable tracing which are relevant to Mr Picard's claims in New York and which I address further below.   These make clear that the "Rolling Charge" model of tracing is the one which it is most likely will be applied by the New York claims to Mr Picard's claims against the Trustees if they ever get far enough for such issues to arise (paragraphs 68 and following).

(7)    Hence, in the result, it is clear that all the claims advanced by Mr
Picard against the Trustees are very weak.  Indeed, it is clear that the
New York statutory claims and common law claims are wholly
unsustainable and ought never to have been advanced by Mr Picard,
whilst the Federal statutory claim is highly likely to be barred by basic
legal principles as well, which the Trustees ought also to bring before
the New York courts by their proposed motions to dismiss.

**D.  Mr Picard's failure to conduct a tracing exercise to justify his claim and
the true extent of his claim on analysis**

33.    In addition to the overall weakness of Mr Picard's claims against the
Trustees referred above, he also has, on proper analysis, no sustainable
claim at all to much of the Trusts' funds held by the Trustees.

34.    Mr Picard has, it seems and quite extraordinarily, failed in fact to conduct
any proper analysis by which to support his bald contention that he is
entitled to recover all the assets of the Trusts.

35.    This is notwithstanding the fact that, as is apparent from Mr Zeballos'
Affidavits, Mr Picard's opposition to the relief sought by the Trustees is
based squarely on the assertion that Mr Picard, as trustee of the
bankruptcy of BLMIS, has a proprietary claim to the entirety of the assets
held on the Trusts.  By way of example:

(1)    The foundation for Mr Picard's proprietary claim is set out at
paragraph 37 of Mr Zeballos' Affidavit, where he asserts as a fact
that,    having    received    transfers    totalling    approximately
US$975,000,000 from BLMIS *"the Kingate Funds in turn transferred
part of the proceeds of the Transfers to KML, payments totalling at
least U.S.$315,771,784"*.    The central allegation is therefore that
payments totalling over US$315 million from the Kingate Funds to
KML represent the traceable proceeds of BLMIS Transfers.

(2)    At paragraph 91, Mr Zeballos states that the Trustees' applications
are inappropriate *"due to the fact that* [Mr Picard] *has proprietary
claims over what he believes to be the entirety of the assets of* [the
Trusts]...*"*.

(3)    At paragraph 113.1 Mr Zeballos states that *"[Mr Picard] makes a proprietary claim to all the assets of* [the Trusts]*"*.

(4)    The heading above paragraph 99 of his Affidavit reads: *"The orders sought are wrong in principle because they will result in injustice if* **[Mr Picard]** *succeeds in establishing his proprietary claim to the trust funds."* [Emphasis added].

36.    In other words, Mr Picard's opposition to the Applications only has force to the extent that it can be demonstrated that all the assets held on the Trusts represent the traceable proceeds of transfers made out of BLMIS (which for convenience I refer to below as "**BLMIS Transfers**").  Put another way, to the extent that it can be shown that assets held on the Trusts **do not** represent the traceable proceeds of BLMIS Transfers, it follows that Mr Picard cannot have a proprietary claim to those assets and his opposition to the Applications will, on his own case, have no foundation to the extent of those assets.

37.    It is, therefore, very striking that Mr Picard adduces no evidence at all to make good his alleged proprietary claim.

38.    This is all the more so, since Mr Picard has clearly been aware of his difficulty in establishing what proportion of monies received by KML from the Kingate Funds derived from BLMIS for some time.  Indeed, as early as 9 March 2011, in a witness statement made in support of Mr Picard's application for an extension of time in which to serve the Claim Form by which the English Claim was commenced, Mr Laurence Lieberman of Taylor Wessing (Mr Picard's English solicitors) stated:

*"The Trustee* [i.e. Mr Picard] *acknowledges that he is unable, at present, to quantify the likely claim in England against the Defendants* [i.e. the defendants to the English Claim, including the Trustees of the Ashby and El Prela Trusts] *as he does not yet have sufficient information to demonstrate what proportion of the monies received by the First Defendant* [i.e. KML] *derived from monies sent to the Kingate Funds by BLMIS and what proportion was from Investors' monies which had not yet been sent to BLMIS, nor does he have sufficient evidence of what sums were onward paid from the First Defendant* [i.e. KML] *to the other Defendants* [i.e. the

defendants to the English Claim]. *However, it appears that many tens of millions of dollars received by KML and subsequently the other Defendants derived from BLMIS monies. How much is an issue of quantum which will become clearer as the parties provide disclosure in the usual course of the proceedings, and does not go to the question of liability."*

(See paragraph 38 at page 46).

39.    This passage was an express acknowledgement that some of the monies which went to KML by way of management fees derived from investors' monies which had not been sent to BLMIS and foreshadowed the need for an analysis to be carried out of what sums paid to KML by the Funds derived from those monies, and what sums derived from the transfers by BLMIS to the Funds.

40.    Given the bare assertion in Mr Zeballos' Affidavits, it would appear that, despite being aware of this crucial issue for almost a year, and despite the fact that (as I understand from Withers, solicitors to the Kingate Funds) Mr Picard has had access to the underlying bank statements sufficient to enable him to undertake the same analysis which the Trustees have conducted to establish what sums deriving from the Kingate Funds were received by the Trustees and when, Mr Picard has apparently chosen not to do so – or at any rate, if he has made such an assessment, he has not shared it with this Court or the Trustees or chosen to put it in evidence.

41.    This is a matter of considerable concern to the Trustees and, I anticipate, will also be of concern to the Court.

42.    It is all the more of concern, given the analysis undertaken by the Trustees of the same bank statements as are available to Mr Picard.  Given that the basis for Mr Picard's objection to the directions sought by the Applications is the bare assertion that he has a proprietary claim to the entire Trusts' funds, and in view of his failure to carry out the analysis necessary to make good that assertion, the Trustees have carried out their own analysis.  As I explain further below, that analysis shows that Mr Picard's claim cannot be correct and that, in fact, a very significant proportion of the assets held on the Trusts are in fact assets to which Mr Picard cannot have a proprietary claim.

**Equitable tracing analysis**

43.     The Trustees have carried out an analysis using three different methods for the tracing of assets through mixed bank accounts (which is obviously that relevant here):

(1)     The "first in, first out" ("**FIFO**") approach, which is the classical approach most commonly adopted under English law (see *Claytons case* (1816) 1 Mer. 572). This approach is adopted where there is a mixed fund comprising contributions from parties other than the wrongdoer. This would be relevant if the proceedings brought by Mr Picard in England were to proceed to trial, and it became necessary to determine whether any if so how much of the BLMIS Transfers found their way into the Trusts.

(2)     The North American rolling charge method ("**the Rolling Charge Method**"). This is the method which the Trustees are advised is that likely to be adopted by the New York court hearing the Third Amended Complaint.

(3)     A third method, which I refer to as the "**Extreme Picard model**", under which *all* assumptions are made in Mr Picard's favour *and* it is assumed (contrary to the tracing rules which would apply either in England or in New York) that to the extent that the respective bank accounts of Kingate Global and the Kingate Euro contained any sums which were the traceable proceeds of the BLMIS Transfers, *any* payments out to KML and/or the Trusts are made with those sums (i.e. sums to which Mr Picard can lay claim). For the avoidance of doubt, it is not contended that this methodology could possibly be appropriate in any circumstances, nor that it will have any bearing on the approach to be followed by the New York Court; indeed I note that in his Affidavit Mr Harkness states that this methodology is not supported by any American case law or statutes of which he is aware, and nor I am aware of it having any legal basis under English law. However, it simply serves to demonstrate the problems faced by Mr Picard in this regard, and that even on this extreme basis his

assertion through Mr Zeballos that he has a claim to the whole of assets in the Trusts is false.

44.    For convenience, the Trustees have engaged Mr David Alexander of the accountancy firm of Smith & Williamson Limited to carry out the numerical calculations necessary to apply each of the three methods to the transfers that are at issue in the Third Amended Complaint.  I have seen in draft a copy of an Affidavit of Mr Alexander in which he sets out for the Court's benefit the instructions he was given, the sources of the information on which he has based his calculations and the results of those calculations.

45.    I understand from reading Mr Alexander's Affidavit that as respects Kingate Global:

    (1)    Of the US$390 million transferred by BLMIS to the Kingate Global (being the sum which forms the foundation of Mr Picard's claim in respect of Kingate Global), the amount which can be traced into the hands of the Trustees on a FIFO basis is only US$25.7 million.

    (2)    Of that US$390 million, the amount which can be traced into the hands of the Trustees on the Rolling Charge method is only US$21.1 million.

    These amounts are to be compared with the sum of US$297 million which the Trustees received in total from KML over the whole period of their existence.

46.    I further understand from Mr Alexander's Affidavit that because of a lack of relevant bank statements for Kingate Euro, it has not been possible to do either a FIFO analysis or a Rolling Charge analysis for Kingate Euro and that Mr Alexander has therefore simply applied the Extreme Picard approach to the Kingate Euro.

47.    Mr Alexander's overall conclusions, taking both Kingate Global and Kingate Euro together are that:

    (1)    On the FIFO method (for Kingate Global) and the Extreme Picard approach (for Kingate Euro), of the US$297 million received by the

Trusts from KML in the form of dividends, only US$98.8 million came from BLMIS, and US$198.2 million came from non-BLMIS sources.

(2)    On the Rolling Charge method (for Kingate Global) and the Extreme Picard approach (for Kingate Euro), of that same US$297 million received by the Trusts from KML, only $94.2 million came from BLMIS, and US$202.8 million came from non-BLMIS sources.

(3)    Even applying the Extreme Picard approach to both Kingate Global and Kingate Euro (rather than just to Kingate Euro), of that same US$297 million received by the Trusts from KML, even though US$199.4 million came from BLMIS sources, there was still US$97.6 million which came from non-BLMIS sources.

48.    It is therefore possible to say with certainty that on any view of the matter there are very substantial funds held in the Trusts which cannot be claimed by Mr Picard however successful he may be in his claims.

49.    I respectfully suggest that these results demonstrate clearly that Mr Picard's claims to have a proprietary interest in the entirety of the Trusts' funds cannot be correct and that this provides a complete answer to his opposition to the Applications. It also provides a complete answer to his attempt to set aside the Orders made by this Court on 7 July 2011.

**At least US$48 million in the hands of the Trustees cannot be the traceable proceeds of BLMIS Transfers**

50.    There is, however, an even more straightforward way of demonstrating the fallacy of Mr Picard's claims to a proprietary interest in the entirety of the Trusts' assets, which does not rely on the application of equitable tracing principles, and by which it can be shown that at least US$48 million of the assets currently in the hands of the Trustees cannot on any view be the proceeds of BLMIS Transfers.

51.    At the outset, it is convenient to remind the Court of the stages in the process by which funds are alleged by Mr Picard to have passed from BLMIS to the Trusts, which is conveniently summarised at paragraphs 35 to 39 of Mr Zeballos' Affidavits.  In summary, it is alleged that:

(1)   Funds were transferred from BLMIS to each of Kingate Global and Kingate Euro (i.e. the BLMIS Transfers).

(2)   Out of the sums received by the BLMIS Transfers, Kingate Global and Kingate Euro paid management fees to KML.

(3)   KML then paid dividends to the Trusts from the sums paid to it in management fees by the Kingate Funds.

52.   Mr Zeballos says that it is reasonable to assume that the source of the dividend payments made to the Trusts by KML was the management fees received by KML from the Kingate Funds.  This is consistent with what is said by Mr Walters in his Affidavits and I believe it to be correct.  I understand that dividends were paid by KML to its ultimate shareholders (the Trustees, or, after 1 March 2008, the Holding Companies) in proportion to their respective shareholdings in KML (Walters Affidavits paragraph 46). A schedule setting out the amounts and dates of the dividend payments from KML to each of the Trusts are at pages 160 (Ashby) and 158 (El Prela) of Exhibit FOW1 to the Walters Affidavits.

53.   In the period up to and including 22 November 2005, the total of the dividends paid by KML to (i) the Ashby Trustee was US$86,757,329.01 and (ii) the El Prela Trustee was US$85,606,609.01 (see pages 160 (Ashby) and 158 (El Prela) of Exhibit FOW1 to the Walters Affidavits), i.e. a total between both Trusts of approximately **US$172 million**.

54.   As I have said above, the source of those dividends was the management fees paid by the Kingate Funds to KML.

55.   In that same period (i.e. up to and including November 2005), the total of management fees paid to KML by Kingate Euro was US$44,170,776, i.e. approximately **US$44 million** (page 47, which figures are taken from Annex C to the Statement of Claim in the Bermuda Proceedings (pages 514 (Ashby) and 509 (El Prela) of Exhibit FOW1 to the Walters Affidavits)).

56.   I assume, to the benefit of Mr Picard and for the purposes of this present analysis only, that 100% of the management fees paid to KML by Kingate Euro represents traceable proceeds of BLMIS Transfers, and that 100% of those management fees found its way into dividends paid by KML to each of

the Trustees (although the Trustees do not believe that either of these assumptions is in fact correct). On these assumptions, the balance of the dividends paid by KML to the Trustees, being approximately **US$128 million** (i.e. US$172 million less US$44 million) derived from management fees paid to KML by Kingate Global.

57.    However, during the same period (i.e. up to and including 22 November 2005), the total of the BLMIS Transfers to Kingate Global amounted to just **US$30 million** (a single transfer on 12 May 2000). That figure is taken from Mr Picard's own pleading, as contained in Exhibit B to the Third Amended Complaint (pages 85 (Ashby) and 84 (El Prela) of Exhibit FOW1 to the Walters Affidavits). Therefore, on any view, only US$30 million of the approximately US$128 million paid in management fees by Kingate Global to KML during the period could conceivably have originated from BLMIS Transfers.

58.    It follows that, even on the highly favourable (to Mr Picard) assumptions in paragraph 56 above, US$98 million paid as dividends by KML to the Trustees **cannot** have come from BLMIS and **cannot** represent the traceable proceeds of BLMIS Transfers.   It therefore follows that at least US$98 million of the sums transferred to the Trusts **cannot** be subject to a proprietary claim by Mr Picard.

**The position of the Trusts**

59.    When it comes to the position of the Trusts, as at 31 December 2011, the Ashby Trust had assets of US$136,652,602 and the El Prela Trust had assets of US$117,822,836 (see draft unaudited balance sheet at page 50A (Ashby) and 50B (El Prela)).

60.    Up to 31 December 2011, the total amount paid out of each of the Trusts by way of distributions to beneficiaries, the loans to KML, professional fees and expenses is US$18,561,496.15 in respect of the Ashby Trust and US$31,439,757.37 in respect of the El Prela Trust, i.e. a total of US$50,001,253.52.

61.    Bearing in mind that approximately US$98 million paid in dividends to the Trustees during the period to 22 November 2005 cannot represent the traceable proceeds of BLMIS, if one assumes, again to the benefit of Mr

Picard and solely for present purposes, that none of the US$50 million paid out of the Trusts by the Trustees over their entire life represented the traceable proceeds of BLMIS, it follows that **at least** US$48 million worth of assets as on their settlement into the hands of the Trustees cannot, on any view, be money from BLMIS.

62.    Put another way, taking each of the Trusts separately, since the US$98 million (referred to above) which cannot represent the proceeds of BLMIS Transfers was paid to each of the Trusts in proportion to their respective shareholdings in KML, the position is as follows.

63.    As regards the Ashby Trust:

   (1)    Ashby received 50.33% of the US$98 million referred to above, i.e. it received approximately US$49 million to which Mr Picard cannot conceivably have a proprietary claim;

   (2)    There have been total payments out of the Ashby Trust of US$18,561,496.15 (see paragraph 60 above);

   (3)    Accordingly, at least US$30 million worth of assets as on their settlement into the Ashby Trust is free of any proprietary claim by Mr Picard.

64.    As regards the El Prela Trust:

   (1)    El Prela received 49.67% of the US$98 million referred to above, i.e. it received approximately US$49 million to which Mr Picard cannot conceivably have a proprietary claim;

   (2)    There have been total payments out of the El Prela Trust of US$31,439,757.37 (see paragraph 60 above);

   (3)    Accordingly, at least US$18 million worth of assets as on their settlement into the El Prela Trust is free of any proprietary claim by Mr Picard.

65.    These sums are many times more than the Trustees' estimates of costs to be incurred in complying with the directions sought in connection with the Applications: see Section K below.

66.     Moreover, it must be remembered that the figures set out above represent the absolute best case from Mr Picard's point of view, based simply on the total amount of BLMIS Transfers up to and including 22 November 2005.  As is demonstrated by the results of the more comprehensive equitable tracing analyses set out above, the figures for assets that are on any proper view free and clear of a proprietary claim by Mr Picard are very significantly higher.

67.     In reality, therefore, the bare assertion in Mr Zeballos' evidence (on which Mr Picard's opposition to the Applications is based) to the effect that Mr Picard has a proprietary claim to the entirety of the Trusts' assets is simply and demonstrably wrong (as Mr Picard himself would have known had he carried out the analysis, as he should – indeed may – have done).

68.     This analysis also renders his objections to the expenditure of Trust monies on the dismissal motions in New York for which the Applications seek directions both misconceived and irrelevant.  As noted by *Lewin* at 21-114:

> *"In cases where the claimant seeks to establish some adverse equitable proprietary claim against the trust property, there could be no conceivable objection on the part of the claimant to the trustee defending the claim otherwise than by recourse to the disputed trust property".*

69.     There is one further important matter to which I wish to draw the Court's attention  in relation to Mr Picard's proprietary claim based on the Third Amended Complaint.  All of the foregoing material in this Section assumes that Mr Picard can make all the claims he asserts in the Third Amended Complaint.  However, in his Affidavit, Mr Harkness explains at paragraph 61 that as a result of the decisions of Judge Rakoff and Judge McMahon (which Mr Harkness describes at paragraphs 57 to 60) the only claim open to Mr Picard in the Third Amended Complaint is that under the United States Bankruptcy Code based on transfers with actual fraudulent intent made within the "*two-year look back period*", and that:

> *"subsequent transfers made to the Trust Defendants are only recoverable, therefore, if such transfers were originally from Two-Year Transfers (i.e. made on or after December 11, 2006) to the Kingate Funds".*

70.     That this is the case follows from existing decisions in the New York courts in
        Madoff related cases of which Mr Zeballos must be aware, but to which he
        makes no reference in his Affidavits.

71.     As appears from Exhibit B to Mr Picard's proceedings in New York, the first
        transfer made by BLMIS to the Kingate Funds within the two year period was
        that made to Kingate Global on 18 July 2008.  It follows that only transfers to
        the Trusts made after that date could possibly be recoverable by Mr Picard as
        avoidable subsequent transfers.

72.     Exhibited to the Walters Affidavits are lists of the dividends paid to the Ashby
        Holding Company (at page 160 of Exhibit FOW1 to the relevant Walters
        Affidavit) and the El Prela Holding Company (at page 158 of Exhibit FOW1 to
        the relevant Walters Affidavit).  The dividends paid after 18 July 2008 totalled
        US$8,300,000 in each case.  As matters stand, therefore, even if Mr Picard
        can avoid all the "Two-Year Transfers" to the Kingate Funds, his maximum
        possible claim to avoid subsequent transfers to the Trusts amounts to only
        US$16,600,000 out of the US$297 million paid to the Trustees and their
        subsidiaries.

**E.  Mr Picard's insolvency application to bar the Applications under Part XIX
     of the BVI Insolvency Act 2003**

73.     Paragraphs 110 and 111 of Mr Zeballos' Affidavits stated, for the very first
        time, that Mr Picard intended "*imminently*" to apply for an application
        restraining the Trustees from (amongst other things) commencing or
        continuing proceedings against him.

74.     Those applications, one in respect of each Trust, were finally issued, with
        evidence in support, on 26 January 2012.  Had Mr Picard wished to take this
        point against the Applications he could and should have done so very much
        earlier in the day – before, indeed, agreeing the directions to the hearing and
        the two day duration of the hearing as he did.  The Claimants and the BVI
        Court appear, unfortunately, to be faced with a cynical attempt to derail the
        hearing sprung by Mr Picard at the last moment.

75.     In the circumstances, it is relevant to draw the BVI Court's attention to
        correspondence passing between my firm and Mr Picard's US attorneys Baker

& Hostetler and English solicitors Taylor Wessing, prior to the Applications
having been served on Mr Picard.

76.    Lawrence Graham first placed Mr Picard on notice of the Trustees' intentions
to make the Applications by letter dated 12 August 2011 (page 831 (Ashby)
and 822 (El Prela) of Exhibit FOW1 to the Walters Affidavits).  The Trustees'
Applications were provided to Mr Picard in final draft form on 21 November
2011, before being eventually issued on 7 December 2011.  They were then
served on Mr Picard on 12 December 2011, and the Kingate Funds on 9
December 2011.

77.    Prior to issuing the Applications, the Trustees gave consideration as to
whether it was appropriate to join Mr Picard and the Kingate Funds to them,
given the insolvency of BLMIS and the Kingate Funds. Further details in
respect of correspondence with Mr Picard's representatives on this subject are
set out at paragraphs 79 to 82 below.

78.    Given that the Kingate Funds are in liquidation in the BVI, the Trustees each
issued applications to the BVI Court for permission to commence proceedings
(namely, the Applications) against each of them, in accordance with the BVI
Insolvency Act 2003, having first obtained confirmation from Mr Tacon's
representatives that he did not object to that course. Those applications were
issued by way of an Ordinary Application dated 23 November 2011, and the
Orders were granted on 5 December 2011.

79.    On 22 November 2011, Lawrence Graham wrote to Taylor Wessing
confirming our understanding that, pursuant to specific US statutory provisions
(namely 11 U.S.C. § 362 and SIPA § 78fff(b)) and as a consequence of its
bankruptcy, an automatic stay exists as to BLMIS in respect of certain
proceedings (page 51). The letter explained the Trustees' intention to join Mr
Picard as a defendant to the Applications (albeit one against whom no relief
would be sought), and explained their view that such a step does not in any
way offend against the vice which the automatic stay under US bankruptcy
legislation is intended to address.  The letter then sought confirmation as a
matter of urgency that Mr Picard did not object to being made a party to the
Applications.

80.    Having received no response to that letter, on 28 November 2011, Lawrence
Graham sent a further letter to Taylor Wessing, which was copied to Mr
Zeballos (page 52).

81.    On 30 November 2011, Taylor Wessing replied that they were "*currently in the
process of taking instructions*" and expected to provide a response in "*the first
half of next week*".

82.    On 7 December 2011, Taylor Wessing wrote to Lawrence Graham confirming
that Mr Picard intended to oppose the orders sought and that he would serve
evidence in response within 28 days of being served with the Applications
(page 53).  (In the event, although Mr Picard was served with the Applications
on 12 December 2011, that responsive evidence was not served until 23
January 2012.)  The letter was silent on the subject of Mr Picard being joined
as a Defendant to the Applications.  Accordingly, the Applications were issued
that same day.

83.    The first suggestion which the Trustees received that Mr Picard somehow
objected to these proceedings being continued, and indeed commenced,
against him was when they received Mr Zeballos' Affidavits in draft on 20
January 2012. This was almost two months after Lawrence Graham had
specifically raised the question with Mr Picard's lawyers.

84.    In these circumstances, the Trustees' position is as follows:

(1)    The BVI Court should not entertain the new applications issued by Mr
Picard at the hearing.   They are quite unnecessary as well as
improper:   Mr Zeballos' Affidavits set out the points Mr Picard
apparently wishes to make relating to the Insolvency Act 2003.  They
are points which can properly be made at the hearing and considered
by the BVI Court in the context of the Beddoe applications before it.

(2)    The BVI Court should also deal with them to the extent it considers
appropriate at the hearing: there is no justification and it would be
contrary to the just case management of the Applications to allow Mr
Picard to derail the two day hearing by introducing this argument so
late in the day.

(3)   This is especially so since, as the Trustees will submit at the hearing,
the argument that the BVI Court should bar a trustee from making a
*Beddoe* application merely because one of the parties properly to be
convened to it is a foreign insolvency office holder is palpably
misconceived and wrong.

(4)   Rather, in brief, the jurisdiction invoked by Mr Picard under Part XIX
of the Insolvency Act 2003 is one whereby the Court has a discretion
to make orders on the application of a foreign insolvency office holder
from a relevant country (of which, the USA is one).

(5)   The Court is to be guided, in considering whether to apply the
jurisdiction by what will "best ensure the economic and expeditious
administration of the foreign proceeding" (s. 468(1)).

(6)   Preventing a trustee against whom a foreign office holder asserts a
proprietary claim from applying to the court which supervises the
administration of its trust for directions as to whether and if so how to
defend proceedings against it brought by that office holder is
inconsistent with the economic and expeditious administration of
those proceedings.

(7)   Further, the grant of an injunction under Part XIX to restrain the
Trustees from funding applications to dismiss the New York
proceedings from the Trusts' funds can only be justified and
permissible if, were the Trustees ordinary persons prima facie owning
assets both legally and beneficially, such an injunction would be
granted at the suit of the foreign office holder.

(8)   The BVI Court ought only to grant such an order if satisfied that the
office holder is entitled to a proprietary freezing injunction against
those persons, who are still prima facie the legal and beneficial
owners of the assets in question.  In circumstances where the foreign
court from which the office holder comes requires him to bring
proceedings to establish his title to those assets, and has before it
such proceedings, but has made no determination against the
present holder and owner of the assets, the foreign office holder

ought to have to establish his entitlement to a proprietary freezing injunction on ordinary principles.

(9)   In the present case, the key issues in the Applications are whether Mr Picard has a good arguable case in the New York proceedings and a good arguable case there to all of the Trusts' funds. For the reasons explained in the earlier sections of this affidavit, the Trustees' case is that he does not have such a good arguable case; alternatively, even if he did, it clearly does not extend to all of the Trusts' assets.

(10)  These are the same questions, therefore, that arise in relation to the injunctive relief Mr Picard seeks by the Pt XIX applications. The Trustees' evidence is that (a) on advice received by them, Mr Picard has no such good arguable case and so the motions to dismiss the Third Amended Complaint should be made and (b) on analysis, Mr Picard has no claim at all to a significant amount in the Trustees' hands and so, again, the Trustees should be directed to make the motions in New York and fund them from such free funds.  Both those things being so, it is right for the Beddoe court to grant the relief sought in the Applications and Pt XIX cannot assist Mr Picard in avoiding that result.

### F.  The existing *Beddoe* order and the history of Mr Picard's US Complaint

85.   In addition to the insolvency application referred to in the Section above, Mr Zeballos' Affidavits also indicate (at paragraph 10) an intention to apply to be added as a party to the Bermuda Directions Applications heard by the BVI Court on 7 July 2011 and for all but one paragraph of the Orders of 7 July 2011 made in those proceedings by Charles J to be set aside.

86.   In doing so, he expressly alleges, at paragraph 13, that the Trustees "*wrongfully failed to make* [Mr Picard] *party*" to those previous applications.

87.   This is an unwarranted allegation.  Mr Picard's absence from those previous applications rests at his own door, given his dilatory formulation of the New York proceedings, to which he failed to join the Trustees for an extensive period, right up to the hearing of the previous applications.

88. To understand the position properly, it is necessary therefore to make clear some of the history of the proceedings in New York.

89. Mr Picard initially filed an avoidance claim against the Kingate Funds and Bank of Bermuda on 17 April 2009 in the United States Bankruptcy Court for the Southern District of New York (with reference Adv. Pro. No. 08-01789 (BRL)).   The Trustees were not parties to that complaint, which was subsequently amended on three occasions:

  (1) On 8 May 2009, Mr Picard filed an amended complaint. No new defendants were added. The amended complaint sought the return from the Kingate Funds of approximately US$395 million (US$150 million in respect of Kingate Global and US$245 million in respect of Kingate Euro) alleged to have been transferred to those entities by BLMIS.  Paragraph 2 of the amended complaint states:

    *"this adversary proceeding is brought ... for turnover, accounting, preferences and damages in connection with transfers of property by BLMIS to or for the benefit of* [the Kingate Funds].  [Mr Picard] *seeks to set aside such transfers and preserve the property for the benefit of BLMIS' defrauded customers".*

  (2) On 13 July 2010, Mr Picard filed a second amended complaint. Again, no new defendants were added. That complaint sought the return from the Kingate Funds of approximately US$874 million (US$399 million in respect of Kingate Global and US$475 million in respect of Kingate Euro) alleged to have been transferred to those entities by BLMIS.  Paragraph 2 of the amended complaint states:

    *"this adversary proceeding is brought ... for turnover, accounting, preferences, objection to claim, and damages in connection with transfers of property by BLMIS to or for the benefit of* [the Kingate Funds].  [Mr Picard] *seeks to set aside such transfers and preserve the property for the benefit of BLMIS' defrauded customers".*

  (3) On 20 May 2011, Mr Picard filed the Third Amended Complaint. In addition to the Kingate Funds and Bank of Bermuda, the Third Amended Complaint named 15 additional defendants, including the

Trustees. This was the first time that the Trustees had been named as defendants to these proceedings. Even then, the Third Amended Complaint was not initially made public, and the Trustees did not have sight of it until 8 June 2011.

90.     On 22 June 2011, the Third Amended Complaint was purportedly served in the BVI on the Ashby Trust by SCA Creque (special counsel to Mr Picard in the BVI) via Moore Stephens BVI.  However, the Ashby Trust (as opposed to the Ashby Trustee) is not of itself a legal entity. In any event, Moore Stephens BVI is not the registered agent for the Ashby Trustee. It follows that the Ashby Trustee was not served on this date.

91.     Also on 22 June 2011, the Third Amended Complaint was served in the BVI on the El Prela Trustee by SCA Creque.

92.     The hearing before Charles J in this Court on 7 July 2011 was held in private. However, I was present at the hearing and can confirm that the Judge was made aware of the fact that the Third Amended Complaint had been filed and the broad nature of the claims made against the Trustees in that complaint. At the time, the Trustees had not had an opportunity of taking detailed advice on those claims, but it was made clear to the Judge that applications of a similar nature to those which were before her at the time might be necessary in the context of the Third Amended Complaint once such advice had been received.

93.     By way of a stipulation dated 14 July 2011, those Defendants which had by then been served with the Third Amended Complaint in the BVI, namely the El Prela Trustee, the Holding Companies and the Investment Companies (acting by Freshfields Bruckhaus Deringer US LLP) agreed with Mr Picard (acting by Baker & Hostetler LLP) an extension of time (until 18 August 2011) to move, answer or otherwise respond to the Third Amended Complaint, while expressly reserving the right to challenge the jurisdiction of the New York Court.  Further extensions of time, to which the Ashby Trustee was also a party, were agreed on 10 August 2011, 14 October 2011 and 15 November 2011, the latest of which extended the time to move, answer or otherwise respond until 16 February 2012 (page 55).

94.     By joining in the stipulation of 10 August 2011, the Ashby Trustee agreed to facilitate service of the Third Amended Complaint and waive any defence

based on insufficiency of service of process, while expressly reserving the right to challenge the jurisdiction of the New York Court.

95.    The Kingate Funds and Bank of Bermuda have entered into similar extensions of time. The twenty-first such extension was entered into on 15 November 2011, which extended the time for the Kingate Funds and Bank of Bermuda to move, answer or otherwise respond to the Third Amended Complaint to 16 February 2012 (page 59).

96.    On 7 and 14 October 2011, certain of the defendants to the Third Amended Complaint made motions to the United States Court for the Southern District of New York to have certain of the legal issues raised in the Third Amended Complaint removed from the jurisdiction of the United States Bankruptcy Court and determined instead by the District Court (so-called "motions to withdraw the reference"). On 17 October 2011, each of the Trustees joined those motions, which are currently awaiting determination. My understanding from the Trustees' US Counsel (Freshfields Bruckhaus Deringer US LLP) is that the motions to withdraw the reference are likely to be determined by the District Court in the coming months. This is one of the matters on which the Trustees now seek directions from the BVI Court.

97.    In addition to the Trustees' motions to withdraw the reference from the United States Bankruptcy Court, the Trustees also seek directions by the Applications as to whether they should make a motion or motions to dismiss the Third Amended Complaint. This, as I have noted above, is because the Trustees consider in the light of the advice they have received that the claims are misconceived and ought to be dismissed by the New York court. I refer in this regard to the Affidavit of Timothy Harkness.

98.    For present purposes, however, I note simply that Mr Zeballos' attack on the Trustees, posited on a supposedly improper failure by them to join Mr Picard to the previous *Beddoe* application is unwarranted. Mr Picard was not joined because he was dilatory in joining the Trustees to his New York claim and in serving them with it. Charles J as the *Beddoe* judge was on that occasion, nonetheless, properly made aware of the existence of his claims and the fact that they would require further recourse to the BVI Court in due course.

99.    Turning then to Mr Picard's wish now to be joined to the previous *Beddoe*
applications, the Trustees' position is as follows:

    (1)    They have no objection to his being so joined.

    (2)    He can, however, have no proper objection to the directions sought
and obtained by the Trustees from Charles J, because , as set out at
Section D above, that, even if his claims have a realistic prospect of
success, they cannot on any basis, when analysed, extend to a very
sizeable proportion of the Trusts' funds which can quite properly,
therefore, be used to fund the defence to Mr Tacon's Bermuda
Proceedings as Charles J's order provides for.  (I refer again to the
passage from Lewin cited at paragraph 68 above.)

    (3)    Moreover, and in any event, Mr Picard's claims do not have a realistic
prospect of success (see Section C above), and accordingly there is
no proper basis for disturbing the order properly made by Charles J in
relation to the Bermuda Proceedings.

### G.  Mr Tacon's evidence and his change of position

100.    Mr Tacon's position appears, from his Affidavits, which are materially in the
same form in both Applications, to be as follows:

    (1)    He does not resile from the Order of Charles J in the previous
*Beddoe* applications in relation to the Bermuda Proceedings. Having
consented to that Order, he could not properly take any different
position.

    (2)    However, he now seeks to oppose the Trustees' proposed directions
in relation to Mr Picard's New York proceedings.

101.    He does not explain this change of position (paragraph 8 of his Affidavits).
Moreover, it is a surprising one since, one might think, were the Trustees at
modest cost successfully to bring about the dismissal of Mr Picard's claims
against them in New York, Mr Tacon would benefit in that a potentially
competing claimant to the Trust funds to which he himself lays claim would be
eliminated.

102.    Be that as it may, if on reflection and at the hearing he maintains his opposition to the present Applications, the Trustees' position is as follows:

(1)    The issue before the Court is whether the Trustees should be directed to make motions to withdraw the reference and seek the dismissal of the Third Amended Complaint and to seek to agree with Mr Picard a stay of the English Claim until such time as those dismissal proceedings are finally determined.

(2)    In considering those issues, the BVI Court will properly take account of the views and interests of all those who are or claim credibly to be beneficially interested in the trust assets.

(3)    So far as Mr Tacon is concerned, however, in relation to the issue of whether the Trustees should act and expend monies in relation to the Third Amended Complaint, the position is, self-evidently, not that the Trustees should be neutral simply because he, Mr Tacon, makes a claim to the Trusts' funds and he wishes that to happen. It is not his claim to the fund to which the Trustees' proposed directions relate at all.

(4)    On the contrary, the correct position, it is submitted, is that the BVI Court must have regard to the views of all those other beneficial claimants, other than Mr Picard, to the Trusts' funds, the express beneficiaries as well as Mr Tacon, and to the relative merits of their claims, in formulating its overall view as to whether to direct the Trustees to act as they request or not, as Mr Picard argues.

(5)    Hence Mr Tacon's views are potentially relevant, but cannot be determinative.

(6)    Moreover, in the present case, his views should properly be regarded as of little weight, compared to those of the principal beneficiaries, who do wish the motions in New York to proceed.

(7)    In the first place, Mr Tacon's own equitable proprietary claim to the Trusts' funds is a very weak one, resting in essence as it does on the reasoning in Chase Manhattan Bank v Israeli-British Bank [1981] Ch 105, a case the reasoning in which has been fundamentally

undermined by the House of Lords' decision in Westdeutsche Landesbank v Islington LBC [1996] AC 669.

(8)    Secondly, he appears to overestimate the costs of the course of action for which the Trustees seek directions at the same time as ignoring the benefits to the true beneficial owners of the Trusts' assets of that course of action: he describes the costs estimate of the New York application as estimated by in Mr Walters' Affidavits as "by no means negligible" (paragraph 8 of his Affidavits), which is of course correct.  However, (a) those costs are very modest indeed compared to the benefit that will accrue to the beneficial owners of the Trusts' funds if the applications in New York which give rise to them succeed, and (b) in any event, those costs are likely to be still more modest than was anticipated when Mr Walters swore the Walters Affidavits.  I address at Section K below the Trustees' current best estimates of the costs of the New York motions.

## H.  The representation orders sought by the Trustees

103.    A yet further issue raised by Mr Zeballos' Affidavits is the representation orders sought by the Applications, whereby the Trustees seek:

(1)    the appointment of Mr Grosso and Mr Ceretti to represent the adult beneficiaries of the Ashby and El Prela Trusts respectively; and

(2)    the appointment of Mr Imrie to represent minor, unborn and unascertained beneficiaries of each of the Trusts.

104.    Mr Picard opposes both these sets of appointments (see paragraphs 17(d) and (e) of Mr Zeballos' Affidavits).

105.    In the first place, he contends in relation to both sets of appointments that "no purpose" would be served by them.  In this, he is simply wrong.  It is inherent in and fundamental to the *Beddoe* jurisdiction that the Court has before it the beneficiaries of the relevant trust or, where more convenient, a representative of the relevant classes of beneficiaries so that, if they have views on the proper directions to be given to their trustees, the Court is able to hear, canvass and discuss those views with them and with the trustees.  Given that they are to be bound by the Court's decision to grant an indemnity to the

trustees in respect of the proceedings they propose, there will very rarely if ever be a case where some form of beneficiary representation is not called for: see generally *Alsop Wilkinson v Neary* [1996] 1 WLR 1220 at 1224E; *Lewin* op cit at 21-124.  This is not such an exceptional case, given the relatively wide range of the beneficial classes of both Trusts.

106.    Where, as here, a representation order is appropriate for adult beneficiaries of the trusts in question, it is again both usual and right that the representative be one of the current principal adult beneficiaries, since he or she has the best knowledge of the relevant trust and its affairs from amongst the beneficiaries. Hence he or she is best placed to ensure that the beneficiaries' interests are served by the directions sought and are duly considered at the application's hearing.

107.    Moreover, it is standard and appropriate to ensure that minor, unborn and unascertained beneficiaries have separate representation: their interests may not coincide with those of the existing principal adult beneficiaries, whose views are those which naturally the trustees will have had most exposure to and have been most influenced by.  Mr Imrie will be able to assess the position from the standpoint of those whose interests he is appointed to consider and represent.

108.    The Trustees do not expect him to do other than approve the directions they seek (otherwise, indeed, it would be unlikely that the Trustees would seek such directions).  But it would be inappropriate for them and the Court, or indeed for Mr Picard, simply to assume he will do so.

109.    Finally, objection is taken to the appointment of Mr Grosso and Mr Ceretti on the basis of *ad hominen* attacks on them by Mr Zeballos.  Even were they true, however, these are nothing to the point.  They do not give rise to a conflict of interest between Mr Grosso and Mr Ceretti on the one hand and the other members of the beneficial classes of the Ashby and the El Prela Trusts respectively on the other.

110.    On the contrary, all adult members of the beneficial classes retain a community of interest in relation to the directions sought by the Trustees and Mr Zeballos fails to suggest anything to the contrary.

111.    Since Mr Grosso and Mr Ceretti are, respectively, principal members of the beneficial classes of the two Trusts, and since they have the most knowledge and understanding of the Trusts, their affairs, and the issues raised by the Applications amongst the adult members of each Trust's beneficial classes, it remains the case that they are the most appropriate persons to be appointed as representative beneficiaries.

### I.    Update to the Court in relation to the Petition to wind up KML

112.    In the remainder of this Affidavit, I seek simply to update the Court as to relevant developments since the Walters Affidavits, including as to the Trustees' costs to date and the new estimate of the costs of the New York applications they seek a direction to make.

113.    The first such update matter is as to the winding up of KML.

114.    Since 16 November 2011 (the date on which Mr Walters swore the Walters Affidavits) Mr Roy Bailey and Ms Wanda Mello of Ernst & Young Limited ("**Ernst & Young**") have been appointed Joint Provisional Liquidators of KML. A copy of the Order made in the Supreme Court of Bermuda dated 18 November 2011 is at page 62.

115.    In order to facilitate such appointment, the Holding Companies considered whether it was appropriate for limited funding to be provided to the Joint Provisional Liquidators, to facilitate their appointment and to enable them to comply with their statutory functions.

116.    As set out at paragraphs 103 and 104 of the Walters Affidavits, KML had been without directors for some time, with the consequence that the Holding Companies, as beneficial owners of KML (holding shares via a nominee), were passing resolutions in order to allow KML to address various issues until Joint Provisional Liquidators (or replacement directors) could be appointed. In the circumstances, the Holding Companies considered it entirely appropriate to agree to provide limited funding to enable the Joint Provisional Liquidators to take over the running of KML in the absence of replacement directors.

117.    Accordingly, on 1 December 2011, the Holding Companies entered into a funding arrangement with Ernst & Young (page 67), whereby they agreed to advance US$200,000 for the limited purposes described therein. That funding

has been advanced to Ernst & Young by the Holding Companies, to be held on trust for each of them.

118. I note that at paragraph 9 of Mr Tacon's Affidavits sworn on 20 January 2012, he questions how the Holding Companies intend to meet the funding obligation. I can confirm that each of the Holding Companies has entered into a loan agreement with its 100% shareholder (the respective Trustees) for the sum of US$100,000, and that these sums have in turn been advanced to Ernst & Young as described above.

119. In this context I would note that on 15 February 2011 the Trustees gave an undertaking to Mr Tacon by way of a letter from Lawrence Graham to Withers BVI (page 71) in the following terms:

*"...without in any way being prevented from dealing with the assets of the Trusts in the ordinary course of business, including but not being limited to managing the Trusts' assets and/or settling reasonably incurred legal and other professional fees and expenses, that they will not move any of the Trusts' assets between jurisdictions or distribute any of them without giving your clients at least 14 days advance written notice (or such shorter period as shall be agreed with your clients in the circumstances) providing them with details of (a) where they propose to move them to; or (b) the amount of the proposed distribution and identity of the beneficiary concerned."*

120. An undertaking in similar terms was given to Mr Picard by way of Lawrence Graham's letter to Baker & Hostetler LLP (Mr Picard's US counsel) of 12 August 2011 (page 831 (Ashby) and 822 (El Prela) of Exhibit FOW1 to the Walters Affidavits. At the time of making the loans to the Holding Companies, the Trustees considered that such loans constituted the ordinary course of business of the Trusts. I would note that Mr Tacon has been aware of the funding of Ernst & Young by the Holding Companies since 12 October 2011 (and a copy of the draft funding agreement was provided to him and to Mr Picard's Bermuda representatives by email on 19 October 2011), but at no time has he sought to restrain it.

121. In accordance with notices to creditors and notices to contributories dated 30 November 2011, each of the Holding Companies submitted proofs of debt to Ernst & Young in the amount of US$900,000 plus interest, which debts arise

out of the loans made by each of the Holding Companies to KML, referred to
at paragraphs 85 to 93 of the Walters Affidavits.

122.    In paragraph 9 of his Affidavits sworn on 20 January 2012, Mr Tacon also
expresses concern regarding the loans to KML and asserts that they were not
referred to in the Trustees' evidence in support of the Bermuda Directions
Applications heard by this Court on 7 July 2011. In fact, details of the loans,
together with the legally privileged advice received by the Trustees in respect
of them, was put before the BVI Court in connection with that hearing. Given
that such advice is confidential and legally privileged, it was not appropriate for
details to be disclosed in open evidence. However, I can confirm that Charles
J was made aware of the fact of the loans, the circumstances in which they
were made and their terms.

123.    Meetings of creditors and contributories of KML were held on 9 December
2011, at which the Holding Companies were represented by Delroy Duncan of
Trott & Duncan (the Trustees' Bermudian lawyers) as their proxy. At those
meetings, Ernst & Young tabled the following resolutions:

    (1)    Whether an application should be made to the Bermuda Court for
           KML to be wound up;

    (2)    If so, who should act as the liquidator(s);

    (3)    Whether an application should be made to the Bermuda Court for a
           committee of inspection to be formed; and

    (4)    If so, who should be its members.

124.    I understand from Delroy Duncan and Amanda Mochrie of Trott & Duncan that
the admitted creditors (which did not include the Kingate Funds or Mr Picard,
whose proofs of debt were rejected by Ernst & Young) voted in favour of the
resolutions that an application be made for KML to be wound up and that
Ernst & Young be appointed liquidators. They also voted in favour of no
committee of inspection being formed at the present time. The Holding
Companies, as contributories, (by Mr Duncan as their proxy) voted in the
same way.

125.    I am aware from information received from Trott & Duncan that Ernst & Young have recently made an application to the Bermuda Court for Mr Bailey and Ms Mello to be appointed Liquidators of KML. However, I have had sight of recent correspondence passing between Mr Tacon and Mr Picard's Bermuda representatives and Ernst & Young's solicitors, Wakefield Quin (pages 73 to 82), in which both Mr Tacon and Mr Picard have expressed an intention to oppose that appointment. Accordingly, no return date for Ernst & Young's application has been set.

J.    **Update to the Court on the costs of steps taken by the Trustees since Mr Walters' Affidavits**

**The Ashby Trustee**

126.    In the Walters Affidavits (paragraphs 168 and 169) Mr Walters set out the total fees and disbursements incurred on behalf of the Ashby Trustee in connection with the Picard Claims.

Third Amended Complaint

127.    Between 30 October 2011 and 29 December 2011, the Ashby Trustee incurred further fees and disbursements in connection with the Third Amended Complaint, which at the exchange rate prevailing at 30 January 2012 equate to US$219,008.43.  This sum (which excludes other fees and disbursements incurred by the Ashby Trustee not connected to the Picard Claims and this application) is made up as follows:

(1)    LG's fees:  £27,992.99;

(2)    US Counsel's fees:  US$123,399.54;

(3)    English Counsel's fees: £2,537.50;

(4)    Other disbursements: £30,461.48.

128.    Certain of the above legal costs and disbursements incurred by the Ashby Trustee to date have arisen in connection with the preservation and collection of potentially relevant documents. The costs of this exercise have, for convenience, been designated as costs incurred solely in connection with the Third Amended Complaint.  However, it could be said that those costs should

more properly to be shared equally between the Third Amended Complaint, the English Claim and the Bermuda Proceedings.

129. For the period beginning 8 June 2011 (being the date on which the Ashby Trustee first had sight of the Third Amended Complaint) and 29 December 2011, the total fees and disbursements attributable to document preservation and collection were approximately £55,727.77, which at the exchange rate prevailing at 30 January 2012 equates to US$87,432.48.

<u>English Claim</u>

130. Between 30 October 2011 and 29 December 2011, the Ashby Trustee incurred further fees and disbursements in connection with the English Claim which at the exchange rate prevailing at 30 January 2012 equate to US$50,851.68.   This sum (which excludes other fees and disbursements incurred by the Ashby Trustee not connected to the Picard Claims and this application) is made up as follows:

(1)    LG's fees:  £5,911.50;

(2)    US Counsel's fees:  US$21,103.08;

(3)    English Counsel's fees: £12,862.60;

(4)    Other disbursements: £204.96.

**The El Prela Trustee**

131.    In the Walters Affidavits (paragraphs 167 and 168) Mr Walters set out the total fees and disbursements incurred on behalf of the El Prela Trustee in connection with the Picard Claims.

<u>Third Amended Complaint</u>

132. Between 30 October 2011 and 29 December 2011, the El Prela Trustee incurred further fees and disbursements in connection with the Third Amended Complaint, which at the exchange rate prevailing at 30 January 2012 equate to US$218,763.45.  This sum (which excludes other fees and disbursements incurred by the El Prela Trustee not connected to the Picard Claims and this application) is made up as follows:

    (1)    LG's fees:  £27,845.99;

    (2)    US Counsel's fees:  US$123,399.54;

    (3)    English Counsel's fees: £2,537.50;

    (4)    Other disbursements: £30,456.61.

133.    Certain of the above legal costs and disbursements incurred by the El Prela Trustee to date have arisen in connection with the preservation and collection of potentially relevant documents. The costs of this exercise have, for convenience, been designated as costs incurred solely in connection with the Third Amended Complaint.  However, it could be said that those costs should more properly to be shared equally between the Third Amended Complaint, the English Claim and the Bermuda Proceedings.

134.    For the period beginning 8 June 2011 (being the date on which the El Prela Trustee first had sight of the Third Amended Complaint) and 29 December 2011, the total fees and disbursements attributable to document preservation and collection were approximately £55,727.77, which at the exchange rate prevailing at 30 January 2012 equates to US$87,432.48.

<u>English Claim</u>

135.    Between 30 October 2011 and 29 December 2011, the El Prela Trustee incurred further fees and disbursements in connection with the English Claim which at the exchange rate prevailing at 30 January 2012 equate to US$50,852.17.  This sum (which excludes other fees and disbursements incurred by the El Prela Trustee not connected to the Picard Claims and this application) is made up as follows:

    (1)    LG's fees:  £5,911.50;

    (2)    US Counsel's fees:  US$21,103.08;

    (3)    English Counsel's fees: £12,862.50;

    (4)    Other disbursements: £205.27.

**K. Updated estimate of costs of future steps for which the Trustees seeks directions by the Applications**

136.    Both Mr Zeballos and Mr Tacon refer to the estimates of costs of future steps to be taken by the Trustees, as set out at paragraphs 172ff and 171ff of the Walters Affidavits (see paragraph 101 of Mr Zeballos' Affidavit and paragraph 8 of Mr Tacon's Affidavit).

The English Claim

137.    At paragraph 101 of his Affidavit, Mr Zeballos suggests that the future costs of complying with the directions sought in this application in connection with the English Claim may be "substantially more" than US$3,000,000.

138.    With respect to him, this entirely misunderstands the nature of the present Applications.   As I have set out above, the Trustees do not seek any substantive directions in relation to the English Claim, save for the BVI Court's approval of the current informal "stay" of those proceedings, details of which are set out in paragraphs 150ff and 149ff of the Walters Affidavits. That is why no such costs estimate was included in relation to the English Claim.

139.    Naturally, if and when Mr Picard elects actively to pursue the English Claim against the Trustees, they will of necessity have to make further applications to the BVI Court for directions as to how they should proceed with respect to that proceeding.   At that time, the Trustees will provide to the Court an estimate of the likely future costs of complying with the directions sought in any such application. In the interests of being entirely transparent, the Trustees have, however, provided details of the costs incurred to date in connection with the English Claim above.

The Third Amended Complaint

140.    At the date of swearing the Walters Affidavits, the scope of the various motions to be made in connection with the Third Amended Complaint, in respect of which the Trustees seek directions, had not yet been fully determined.

141.    I understand from reading the Affidavit of Timothy Harkness that the nature of certain recent decisions in New York has provided greater clarity on the scope

of those motions. Accordingly, it has been possible to refine the estimates of future costs, with the effect that the total amount has been significantly reduced.

142.    Copies of those revised costs estimates are at pages 83 and 84. The grand total payable by each Trustee (assuming the costs are borne equally by the Ashby Trustee and the El Prela Trustee) at the exchange rate prevailing at 30 January 2012, including both estimated fees and disbursements, is US$390,754 to US$615,854.

SWORN by the above-named **JEREMY EDWARD NEEDHAM ANDREWS**)

at  4, MORE LONDON RIVERSIDE, LONDON. SE1 2AU

this 31 day of January 2012

Before me

Solicitor/~~Commissioner for Oaths~~

SVATAVA SPRAGUE
NORTON ROSE LLP
3, MORE LONDON RIVERSIDE
LONDON, SE1 2AQ

42

On behalf of: Claimant
J E N Andrews
1st Affidavit
Exhibit "JENA1"
31 January 2012

**THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**CLAIM NUMBER BVIHCV 2011/0154 and BVIHCV 2011/0155**

**BETWEEN:**

**FIRST PENINSULA TRUSTEES LIMITED (AS TRUSTEE OF THE ASHBY TRUST)**
**Claimant**

**-and-**

**(1) IRVING H PICARD (as trustee for the substantively consolidated SIPA liquidation of Bernard L Madoff Investment Securities LLC and the estate of Bernard L Madoff)**

**(2) KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)**
**(acting by William R Tacon and Richard E Fogerty as joint liquidators)**

**(3) KINGATE EURO FUND LIMITED (IN LIQUIDATION)**
**(acting by William R Tacon and Richard E Fogerty as joint liquidators)**

**(4) CARLO GROSSO**
**(as representative of the adult beneficiaries of the Ashby Trust)**

**(5) MAC IMRIE**
**(as representative of the minor and unborn beneficiaries of the Ashby Trust)**

**(6) HER MAJESTY'S ATTORNEY GENERAL OF THE BRITISH VIRGIN ISLANDS**
**Defendants**

_____

**AFFIDAVIT OF**
**JEREMY EDWARD NEEDHAM ANDREWS**
_____

**Maples & Calder**
Sea Meadow House, PO Box 173
Road Town
Tortola VG1110
British Virgin Islands

Ref:  ADI/660226

# EXHIBIT F

THE MATTER OF:

**FIRST PENINSULA TRUSTEES LIMITED AS TRUSTEES OF THE ASHBY TRUST**

**PORT OF HERCULES TRUSTEES LIMITED AS TRUSTEES OF THE EL PRELA TRUST**

**MR FEDERICO CERETTI**

**MR CARLO GROSSO**

-and-

**THE PUBLIC PROSECUTOR OF THE PRINCIPALITY OF MONACO**

---

**WITNESS STATEMENT OF ANDREW
WITTS**

---

I, ANDREW WITTS, solicitor of 4 More London Riverside, London SE1 2AU, WILL SAY as
follows:

**Introduction**

1.   I am a partner at the firm of Lawrence Graham LLP in London. Lawrence Graham
     LLP is an international, full-service law firm and the only English law firm licensed to
     practice in the Principality of Monaco. The firm's registered address in London is 4
     More London Riverside, London SE1 2AU. Its registered address in Monaco is Est
     Ouest, 24 Boulevard Princesse Charlotte, MC98000, Monaco.

2.   Save where otherwise stated, the facts and matters referred to in this witness
     statement are within my own knowledge and are true. Where they are not within my
     own knowledge, I have stated the source of my information and I believe them to be
     true.

3.   Exhibited to this witness statement are a bundle of documents marked "Exhibit
     AW1". References in this witness statement to tab numbers are to tab numbers in
     Exhibit AW1.

4.   This witness statement is structured as follows:

| Section heading | Page |
|---|---|
| Introduction | 1 |
| Overview | 4 |
| Background to the Madoff affair | 4 |
| Dramatis Personae | 6 |
| The Kingate Funds | 8 |

7447031.3

370

| | |
|---|---|
| Kingate Management Limited – management of the Kingate Funds | 9 |
| BMIS's role as investment advisor to the Kingate Funds | 14 |
| Other entities' role in the Kingate Funds | 15 |
| FIM's role as consultant and distributor to Kingate Management Limited | 18 |
| Explanation of the Trusts' structure | 25 |
| Trusts' investment in the Kingate Funds | 28 |
| No payments to or from Madoff or BMIS | 29 |
| Instructions for transfer of the Trusts' funds | 31 |
| Federico 61 | 33 |
| No sequestration/freezing orders in other jurisdictions | 34 |
| Conclusion | 35 |

5.    I make this witness statement in support of the application by First Peninsula Trustees Limited as Trustees of The Ashby Trust, Port of Hercules Trustees Limited as Trustees of The El Prela Trust, Mr Federico Ceretti and Mr Carlo Grosso (together, the **"Applicants"**) to discharge the sequestration order made by the President of the Court of First Instance of the Principality of Monaco on 19 December 2008 (the **"Freezing Order"**), which ordered the immediate attachment of assets held in the following accounts held with HSBC Private Bank (Monaco) S.A. (**"HSBC Monaco"**):

- Account number 53062, entitled "FIRST PENINSULA TRUSTEES LTD AS TRUSTEE OF THE ASHBY TRUST";

- Account number 53063, entitled "PORT OF HERCULES TRUSTEES LTD AS TRUSTEE OF THE EL PRELA TRUST";

- Account number 61961, entitled "ASHBY HOLDING SERVICES LTD";

- Account number 61962, entitled "ASHBY INVESTMENT SERVICES LIMITED";

- Account number 61978, entitled "EL PRELA TRADING INVESTMENTS LTD";

- Account number 61979, entitled "EL PRELA GROUP HOLDING SERVICES LTD"; and

- Account number 60543, being the personal account of Mr Federico Ceretti, entitled "Federico 61".

6.    I understand that the accounts referred to above (together the **"Accounts"**) were made subject to the Freezing Order following representations made in writing by SICCFIN to the Public Prosecutor of the Principality of Monaco and dated 17

7447031.3

December 2008 regarding two individuals, namely Mr Federico Ceretti and Mr Carlo Grosso (the "**SICCFIN Report**"). A copy of the SICCFIN Report is at tab 1.

7.     Mr. Carlo Grosso is not the holder of an account with HSBC Monaco, and therefore is not directly concerned by the Freezing Order. However, his name appears prominently in the SICCFIN Report, and he has a clear indirect interest in these proceedings as a beneficiary of The Ashby Trust.

8.     I have seen a translated copy of the SICCFIN Report. From my review of that document, I understand that the SICCFIN Report may have followed receipt by SICCFIN of an anti money laundering notification issued by HSBC Monaco on or about 15 December 2008. I understand that this notification followed receipt by HSBC Monaco of the following payment instructions (together, the "**Payment Instructions**"), copies of which are at tab 2:

*     On 12 December 2008, First Peninsula Trustees Limited sent a payment instruction to HSBC Monaco relating to account number 53062 (referenced above), requesting transfer of the sum of US$36,300,000 from that account to an account held with Fortis Bank (C.I.) Limited in Guernsey, Channel Islands, which account is also held in the name of First Peninsula Trustees Limited as Trustees of The Ashby Trust;

*     Also on 12 December 2008, Port of Hercules Trustees Limited sent a payment instruction to HSBC Monaco relating to account number 53063 (referenced above), requesting the transfer of the sum of US$15,000,000 to an account held with Lombard Odier Darier Hentsch & Cie in Geneva, Switzerland, which account is also held in the name of Port of Hercules Trustees Limited as Trustees of The El Prela Trust; and

*     On 15 December 2008, First Peninsula Trustees Limited sent a payment instruction to HSBC Monaco relating to account number 53062 (referenced above), requesting the transfer of the sum of US$24,000,000 to an account held with Fortis Bank (C.I.) Limited in Guernsey, Channel Islands, which account is also held in the name of First Peninsula Trustees Limited as Trustees of the Ashby Trust.

9.     From the translated copy of the SICCFIN Report I have seen, it is apparent to me that SICCFIN understands some or all of the monies in the Accounts to have derived from certain funds named "Kingate". The SICCFIN Report inaccurately characterises these funds as being "*managed by [Bernard] Madoff*", who is currently at the centre of investigations for securities fraud by the US authorities. The SICCFIN Report wrongly casts doubt over the legitimacy of the funds held in the Accounts, suggesting that they "*could have come from the proceeds of a large scale fraud*".

10.    The SICCFIN Report reports that, according to information received from HSBC Monaco, "*Carlo Grosso and Federico Ceretti both have businesses as Financial Consultants through .....Ashby Holding Services Ltd and El Prela Group Holding Services Ltd*". This statement is untrue.

11.    It is also apparent to me from the SICCFIN Report that SICCFIN considers that trust structures such as those referred to therein might be intended to superimpose "*screens likely to cut all links with the origin of the funds*" held in the Accounts. There was and is no such intention in this case.

7447031.3

## Overview

12.     In supporting the application of the Applicants, this witness statement will:

   •     Set out clearly and in full detail the relationship between the Applicants, the Kingate funds, Kingate Management Limited, FIM Advisers LLP, The Ashby Trust and The El Prela Trust;

   •     Explain the roles of all entities involved in providing services to the Kingate funds;

   •     Explain the source of assets held in the Accounts;

   •     Explain the legitimate reasons for the structure of The Ashby Trust and The El Prela Trust;

   •     Demonstrate that the entities and individuals referred to in the SICCFIN Report are innocent of any wrongdoing and have themselves fallen victim to the alleged unlawful activities of Bernard Madoff; and

   •     Explain the reasons for the Payment Instructions.

## Background to the Madoff affair

13.     The Freezing Order was made in the light of the ongoing scandal relating to Bernard Madoff ("**Madoff**"), which first came to light on 11 December 2008 when Madoff was arrested and charged with securities fraud in connection with the operations of Bernard L. Madoff Investment Securities LLC ("**BMIS**"). It is alleged that Mr Madoff has admitted that the operations of BMIS were *"all just one big lie"* and *"basically, a giant Ponzi scheme"*.

14.     At or about the time of his arrest, Mr Madoff is reputed to have estimated the losses suffered by investors as a consequence of his actions to be in the region of US$50 billion. It is public knowledge that investors invested in so-called "feeder funds", which funds in turn entrusted these assets to BMIS to provide investment advisory services to them. Assets were transferred into the custody of BMIS in accordance with these engagements.

15.     In addition to the substantial assets invested through funds, it is thought that as many as 8,000 institutional and private investors have invested their money directly with BMIS. These include some of the world's most sophisticated investors. A list of 13,567 known customers of BMIS (as filed in the ongoing New York bankruptcy proceedings) is at tab 3.

16.     As a consequence of BMIS's alleged fraudulent activity, both the funds and those investors who invested directly with BMIS are known to have suffered substantial losses. The following table sets out my current understanding of the funds (so-called "feeder funds") whose assets have been lost as a consequence of BMIS's alleged activities. I understand that these funds (and potentially others of which I am currently unaware) conducted activities similar to those conducted by the Kingate Funds:

7447031.3

373

| Fund name | Fund Manager | Assets under management (US$billion) | Estimated Loss (US$billion) |
|---|---|---|---|
| Ascot Partners | Ezra Merkin | 2.7 | 2.7 |
| Defender | Reliance Management | 0.5 | 0.5 |
| Fairfield Sentry | Fairfield Greenwich | 7.5 | 7.5 |
| Harley Fund | [Unknown] | 2.7 | 2.7 |
| Herald Fund | Bank Medici (Bank Austria) | 2.5 | 2.5 |
| Kingate Euro Fund | Kingate Management | 0.8 | 0.8 |
| Kingate Global Fund | Kingate Management | 2.7 | 2.7 |
| LIF – Landmark Investment Fund | M & B Capital | 0.2 | 0.2 |
| Luxalpha | Access Intl. Advisors | 1.4 | 1.4 |
| Maxam | Maxam | 0.28 | 0.28 |
| M-Invest | UBP | 0.8 | 0.8 |
| Mount Capital | Mount Capital | 0.5 | 0.5 |
| One Regent | Perinvest | 0.04 | 0.04 |
| Optimal | Banco Santander | 3.2 | 3.2 |
| Palmer | Hyposuisse | 0.5 | 0.5 |
| Plaza Fund | Notz Stucki | 0.8 | 0.8 |
| Primeo | Pioneer (Unicredit) | 0.7 | 0.7 |
| Rye Select etc. | Tremont (Mass Mutual) | 3.1 | 3.1 |
| Santa Barbara | Fix Asset Management | 0.4 | 0.4 |
| Thema | Genevalor Benbassat | 0.9 | 0.9 |
| Zeus Partners Ltd | Bank Safra | 0.3 | 0.3 |
| TOTAL | | | 32.52 |

[Source: Bloomberg, Reuters, Financial Times, Wall Street Journal]

17.    As can be seen from the table above, the Kingate Euro Fund Limited and Kingate Global Fund Limited are among the many funds who between them are currently thought to have suffered losses in excess of US$32 billion as a consequence of BMIS's activities. However, I would stress that the table above is conservative – it is considered likely that other funds which have lost assets as a consequence of the alleged fraud will become public in time.

PAGE 6

18.   In summary, Kingate Euro Fund Limited and Kingate Global Fund Limited have been decimated by the alleged unlawful activities of Madoff and BMIS. The Ashby Trust and The El Prela Trust, who between them made significant investments in the Kingate Funds, have therefore suffered losses exceeding US$40 million when calculated by reference to the cost of those investments (the losses calculated by reference to the latest net asset value of those investments prior to 11 December 2008 being even higher).

**Dramatis Personae**

19.   There follows brief summary details of the individuals and entities relevant to this matter. Their roles are explained further below.

| | |
|---|---|
| Kingate Global Fund Limited | A company incorporated on 11 February 1994 under the laws of the British Virgin Islands. Its registered office is at Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI. |
| Kingate Euro Fund Limited | A company incorporated on or about 19 April 2000 under the laws of the British Virgin Islands. Its registered address is Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI. |
| Kingate Management Limited | A company incorporated on 24 February 1994 under the laws of Bermuda. Its registered office is 99 Front Street, Hamilton HM11 Bermuda. It is wholly-owned in equal shares by Ashby Holding Services Limited and El Prela Group Holding Services Limited. |
| Citi Hedge Fund Services Limited | A company incorporated under the laws of Bermuda. Formerly Hemisphere Management Limited and BISYS Hedge Fund Services Limited. A 100% subsidiary of Citigroup Inc. Acted as administrator to Kingate Global Fund Limited and Kingate Euro Fund Limited since their inception (1994 and 2000 respectively). |
| The Bank of Bermuda Limited | A licensed bank incorporated under the laws of Bermuda under the Bank of Bermuda Act of 1890. An indirect 100% subsidiary of HSBC Holdings plc. Acted as bankers to Kingate Global Fund Limited and Kingate Euro Fund Limited since their inception (1994 and 2000 respectively). |
| Pricewaterhouse Coopers | Formerly Coopers & Lybrand. A firm of chartered accountants, being a member of the worldwide Pricewaterhouse Coopers organisation. Its registered office is at Dorchester House, 7 Church Street, Hamilton HM11, Bermuda. Acted as auditor to Kingate Global Fund Limited and Kingate Euro Fund Limited since inception (1994 and 2000 respectively). |
| Bernard L Madoff Investment Securities LLC | A limited liability company with registered office at 885, Third Avenue, New York, USA. A broker-dealer and investment advisor registered with the US Securities and Exchange Commission. |
| First Peninsula Trustees Limited | A company incorporated on 3 August 1984 under the laws of the Republic of Liberia. Its registered office is at 80 Broad Street, Monrovia, Republic of Liberia. Trustee of The Ashby Trust. A 100% subsidiary of Moore Stephens & Company, a Bermuda partnership. |
| The Ashby Trust | A trust formed under the laws of Jersey on 24 March 1994. The settlor of The Ashby Trust is Carlo Grosso. Its Trustee is First Peninsula Trustees Limited. Carlo Grosso is within the class of discretionary beneficiaries of the Trust. |

7447031.3

375

| | |
|---|---|
| Ashby Holding Services Limited | A company incorporated on 23 November 2007 under the laws of the British Virgin Islands. Its registered office is at Palm Grove House, Wickhams Cay 1, Road Town, Tortola, BVI. 50% shareholder in KML. A 100% subsidiary of The Ashby Trust. |
| Ashby Investment Services Limited | A company incorporated on 12 October 2007 under the laws of the British Virgin Islands. Its registered office is at Palm Grove House, Wickhams Cay 1, Road Town, Tortola, BVI. A 100% subsidiary of The Ashby Trust. |
| Port of Hercules Trustees Limited | A company incorporated on 6 February 1993 under the laws of the British Virgin Islands. Its registered office is at Palm Grove House, Wickhams Cay 1, Road Town, Tortola, BVI. Trustee of The El Prela Trust. A 100% subsidiary of Moore Stephens & Company, a Bermuda partnership. |
| The El Prela Trust | A trust formed under the laws of Jersey on 7 April 1994. The settlor of The El Prela Trust is Federico Ceretti. Its Trustee is Port of Hercules Trustees Limited. Federico Ceretti is within the class of discretionary beneficiaries of the Trust. |
| El Prela Group Holding Services Limited | A company incorporated on 9 January 2008 under the laws of the British Virgin Islands. Its registered office is at Palm Grove House, Wickhams Cay 1, Road Town, Tortola, BVI. 50% shareholder in KML. 100% subsidiary of The El Prela Trust. |
| El Prela Trading Investments Limited | A company incorporated on 9 January 2008 under the laws of the British Virgin Islands. Its registered office is at Palm Grove House, Wickhams Cay 1, Road Town, Tortola, BVI. A 100% subsidiary of The El Prela Trust. |
| FIM Limited | A company incorporated on 31 December 1980 under the laws of England and Wales. Its registered office is 20 St James's Street, London SW1A 1ES. It is 100% owned by Federico Ceretti and Carlo Grosso in equal shares. |
| FIM Advisers LLP | A limited liability partnership incorporated on 8 October 2004 under the laws of England and Wales. Its registered office is 20 St James's Street, London SW1A 1ES. FIM Advisers LLP's immediate and ultimate parent undertaking is FIM Limited. |
| FIM Management Limited | A company incorporated on 21 January 2005 under the laws of Bermuda. Its registered office is Canon's Court, 22 Victoria Street, Hamilton, HM12, Bermuda. A 100% subsidiary of FIM Advisers LLP. |
| Carlo Grosso | Founder and Executive Chairman of FIM Limited. Founder member and the Chief Investment Officer of FIM Advisers LLP. Settlor and one of a class of discretionary beneficiaries of The Ashby Trust. An Italian citizen, who has been resident in the United Kingdom for 30 years. Mr Grosso holds a degree in law from the University of Milano, Italy. Prior to founding FIM Limited, he was securities analyst and foreign department manager at Tucker, Anthony & R.L. Day, Inc (1969-1972), account executive at White, Weld & Co. Inc. (1972-1974), president and general manager of Tucker Anthony S.A. (1974-1979) and executive director of Euromobiliare Limited (1979-1980). |

7447031.3

376

| Federico Ceretti | Chief Executive Officer of FIM Limited. Founder member and Chief Executive Officer of FIM Advisers LLP. Settlor and one of a class of discretionary beneficiaries of The El Prela Trust. An Italian citizen, who has been resident in the United Kingdom for more than 24 years. Mr Ceretti holds a degree in Business Administration from the University of Pavia, Italy. Prior to joining FIM Limited, he worked in various positions at Merrill Lynch Pierce Fenner and Smith in London (1985-1986). |
|---|---|

### The Kingate Funds

20.     Kingate Global Fund Limited was incorporated on 11 February 1994. It was established as a fund of funds and originally had one class of shares denominated in US$ (class A). In February/March 1995, a further class of US$ shares (class B) was created. On 1 January 1996, a third class of shares, denominated in Deutsche Marks (class DM) was created. The class A shares were cancelled in late 1996/early 1997, leaving only classes B and DM. Class DM was later spun off into a separate legal entity, Kingate Euro Fund Limited, which was incorporated on or about 19 April 2000. Kingate Global Fund Limited ("**Global Fund**") and Kingate Euro Fund Limited ("**Euro Fund**") (together, the "**Kingate Funds**") are both open-ended investment companies established under the laws of the British Virgin Islands. The Kingate Funds are recognised as professional mutual funds under the Territory of the British Virgin Islands Mutual Funds Act, 1996.

21.     The Kingate Funds seek long-term capital growth by allocating share capital to an investment advisor selected to execute the Kingate Funds' investment objectives. Global Fund's most recent Information Memorandum dated 6 October 2008 (at tab 4) describes that Fund's investment objective as follows:

*"The Fund's investment objective is long-term capital appreciation. The Fund seeks to obtain capital appreciation of its assets to the utilisation of a non-traditional stock/options trading strategy. In attempting to achieve its objective, the Fund has established a discretionary account with the Investment Advisor (as defined herein) who is based in the United States and who invests or trades in a wide range of equity securities, and, to a lesser extent, other securities and derivatives. In certain instances and at certain times, the Manager (as defined herein) may directly invest certain of the Fund's assets, rather than allocating such assets to the Investment Advisor as may be consistent with, and in furtherance of, the Fund's investment objective. All investments involve investment risk and may result in losses instead of gains, as the achievement of the Fund's investment objective cannot be assured."*

22.     Euro Fund's most recent Information Memorandum dated 6 October 2008 (tab 5) contains the same investment objective description, save that it refers to establishing "a discretionary account with *an* Investment Advisor" (emphasis added).

23.     Prospective investors in the Kingate Funds subscribed for participating common shares (the "**Shares**") of the relevant Fund at a net price per share equal to the net asset value (as defined) of those Shares, plus any applicable subscription fee. As of 31 December 2007, the net asset value per Share of Global Fund was US$421.37. The net asset value per Share of Euro Fund as at the same date was €164.89. The majority of the investor funds deriving from subscriptions for Shares were passed to the investment advisor of the Kingate Funds, in this case BMIS. At all relevant times, it was understood by the Applicants (and is believed to have been understood by all except Madoff himself) that assets passing from the Kingate Funds to BMIS were invested using BMIS's so-called "split-strike conversion" strategy which was

understood to limit losses when a stock price declined while still affording a capped upside potential.

24.   The Kingate Funds engaged in very limited marketing activity and only dealt with professional (as opposed to private) investors. Early on in their existence and as a result of their success, the Kingate Funds became well known among professional hedge fund investors. This led to a situation where professional investors tended to approach the Kingate Funds' manager (Kingate Management Limited) without solicitation.  Prospective investors were provided with a copy of the relevant information memorandum relating to the Kingate Funds (see examples at tabs 4 and 5) and a basic fact sheet containing a summary of the relevant Fund's strategy and their returns (see examples at tab 6).

25.   During the course of its investment in a Fund, each investor was kept informed as to the Fund's performance by being sent the following communications:

●   a weekly email showing an estimated net asset value of the Fund's Shares for the previous week (example at tab 7);

●   a monthly email showing the estimated and final net asset value for the end of the month (example at tab 8);

●   beginning in June 2008, a monthly letter describing the Fund's activity in the previous month (examples at tab 9).

26.   In addition, following publication of the Kingate Funds' annual audited amounts, the weekly and monthly emails referred to above made reference to the fact that these financial statements were available upon request from the manager of the Kingate Funds, Kingate Management Limited (example at tab 10).

### Kingate Management Limited - Management of the Kingate Funds

27.   Global Fund entered into a management agreement with Kingate Management Limited ("KML") on 1 January 2006 (superseding and replacing previous management agreements between those parties dating back to 1994). Euro Fund entered into a management agreement with KML on 1 May 2000.  Both management agreements are governed by the laws of Bermuda.  Copies of these management agreements (respectively the "Global Management Agreement" and the "Euro Management Agreement", each a "Management Agreement" and together the "Management Agreements") are at tabs 11 and 12.

### Global Management Agreement

28.   Pursuant to clause 1.1 of the Global Management Agreement and under the ultimate supervision of the directors of Global Fund from time to time as provided in Global Fund's Articles of Association and Information Memorandum dated 1 January 2006, KML is:

"responsible for performing or obtaining the performance of, and is hereby authorised and empowered to perform, or obtain the performance of, all of the following duties and functions necessary or appropriate in connection with the management of the Fund:

(a)   Providing investment management services as described in Part II of this Agreement;

(b)   Providing administrative services as described in Part III of this Agreement; and

7447031.3

378

(c)      Providing [marketing and share sale services] as described in Part IV of
this Agreement."

29.    The "investment management services" described in Part II of the Global
Management Agreement comprise effecting "the investment strategy for the
investment of the assets of Global Fund as well as evaluating and selecting potential
investments which are consistent with that strategy".

30.    The "administrative services" described in Part III of the Global Management
Agreement comprise assisting Global Fund "in the performance of certain of its
administrative duties as may be agreed by the parties from time to time".

31.    The "marketing and share sale services" described in Part IV of the Global
Management Agreement include:

•    performing (or procuring the performance of) "all duties and functions in
connection with the sale of any Shares of the Fund and advising the Fund on
general matters effecting the marketing of the Shares";

•    acting "in respect of the sale of any of the Fund's Shares"; and

•    appointing "consultants, agents, securities dealers and other financial
institutions as authorized dealers to solicit applications to purchase Shares".

32.    Under the Global Management Agreement, KML has full power to delegate as
appropriate, or in its discretion, any of the duties or obligations arising under that
agreement "to one or more other persons or entities whether affiliated with or
independent of KML" (clause 5.9). KML is entitled to receive fees from Global Fund
for performance of its duties at an annual rate of 1.5% of the net asset value of the
Fund (clause 5.2(a)).

_Euro Management Agreement_

33.    Pursuant to clause 2.2 of the Euro Management Agreement, KML has:

"full discretion and authority, without obtaining the Fund's prior approval, to
implement the Investment Objective and investment program set forth in the
Information Memorandum or Operative Documents and to manage the investment
and reinvestment of the assets of the Fund in such manner as [KML] considers
appropriate, market the Securities and otherwise act in connection with the
directions of the Fund".

34.    Under the Euro Management Agreement, KML is authorised to delegate any of the
duties or obligations imposed on it pursuant to that agreement, to one or more
persons or entities, whether affiliated with or independent of KML (clause 4.8(a)).
KML is authorised to engage consultants and other advisors to assist it or its
delegates in connection with its or their duties (clause 4.9). KML is also entitled to
receive fees from Euro Fund for performance of its duties under that agreement
(clause 4). This fee amounted to an annual rate of 1.5% of the month-end net asset
value of the Euro Fund attributable to the Shares. In addition, KML received an
administration fee of 0.10% per annum of the month-end net asset value of the Euro
Fund in respect of the foreign exchange hedging activity undertaken by the Euro
Fund.

_Disclosure to third parties of KML's role as manager to the Kingate Funds_

35.    KML's role as manager of the Kingate Funds was fully disclosed, including to
potential investors.

7447031.3

379

*Information Memoranda*

36.   By way of example, the most recent Information Memorandum for Global Fund
dated 6 October 2008 (at tab 4) contained the following statement:

> "*Kingate Management Limited has been appointed as the Manager of the Fund's
> capital (the "Manager"). The Manager was duly incorporated under the laws of
> Bermuda. The Manager is not registered with the U.S. Securities and Exchange
> Commission as a registered investment adviser under the U.S. Investment Advisers
> Act of 1940, as amended, nor does it intend to do so in the near future.*
>
> ....
>
> *The Manager performs services pursuant to the Manager Agreement effective
> January 1, 2006. Pursuant to the terms of the Manager Agreement, the Manager
> has agreed (i) to manage all aspects of the investment advisory services to the
> Fund, including the selection and evaluation of the Investment Advisor and (ii) to
> arrange for the performance of all accounting and administrative services which may
> be required by the Fund's operations. The Manager Agreement authorizes the
> Manager to delegate responsibilities to others, subject to retaining certain
> responsibilities for evaluating and co-ordinating the services offered by others......."*

37.   The most recent Information Memorandum for Euro Fund dated 6 October 2008 (at
tab 5) contained the following statement:

> "*Kingate Management Limited has been appointed as the Manager of the Fund's
> capital (the "Manager"). The Manager was duly incorporated under the laws of
> Bermuda ...*
>
> ...
>
> *The Manager performs services pursuant to the Manager Agreement. Pursuant to
> the terms of the Manager Agreement, the Manager has agreed (i) to manage all
> aspects of the investment advisory services provided to the Fund, including the
> selection and evaluation of the Investment Advisor and (ii) to arrange for the
> performance of all accounting and administrative services which may be required by
> the Fund's operations and (iii) make the decisions with regard to the Hedging
> Transactions utilising the recommendation of the Consultant. The Manager
> Agreement authorises the Manager to delegate responsibilities to others, subject to
> retaining certain responsibilities for evaluating and co-ordinating the services offered
> by others. The Manager is also permitted to manage directly the investment of a
> portion of the investment portfolio of the Fund and may do so from time to time as
> conditions warrant.*
>
> ....*"*

*Financial Statements*

38.   The audited financial statements for Global Fund as at 31 December 2007 (at tab
13) were prepared by Global Fund's independent auditors, PricewaterhouseCoopers
("PwC"). They contain the following disclosure regarding KML:

> "*Investment manager*
>
> *The Company is managed by [KML], a company duly incorporated under the laws of
> Bermuda. [KML] is responsible for providing the investment advisory, accounting
> and administrative services required by the Company. For its services, [KML]
> receives a monthly fee calculated at an annual rate equal to 1.5% of the month end*

*net asset value attributable to the Company, paid in arrears at the close of each month. Management and administration fees incurred by the Company during the year were $38,783,479 (2006 - $34,408,746). As of December 31, 2007, management and administration fees of $3,390,709 (2006 - $3,081,584) were payable. There are no performance fees associated with the Company."*

39.     The audited financial statements for Euro Fund as at 31 December 2007 (at tab 14) were prepared by the Euro Fund's independent auditors, PwC. They contain the following disclosure regarding KML:

*"Investment manager*

*The Company is managed by [KML], a company duly incorporated under the laws of Bermuda. [KML] is responsible for providing the investment advisory, accounting and administrative services required by the Company. For its services, [KML] receives a monthly fee calculated at an annual rate equal to 1.5% of the month end net asset value attributable to the Company, paid in arrears at the close of each month. In addition, [KML] also receives a monthly administration fee at an annual rate of 0.10% of the month end net asset value attributable to the Company, paid in arrears at the close of each month. Management and administration fees incurred by the Company during the year were €9,054,137 (2006 - €7,883,958). As of December 31, 2007, management and administration fees of €840,783 (2006 - €700,573) were payable. There are no performance fees associated with the Company."*

<u>Key duties under Management Agreements</u>

40.     In essence, the key duties of KML pursuant to the Management Agreements can be summarised as follows:

- Investment management services - KML is responsible for all aspects of the investment advisory services provided to the Funds, including the selection of the investment advisor. KML is responsible for reviewing, from time to time, the activity of the investment advisor to ensure that it complies with the Funds' investment guidelines and also undertaking all actions that may be necessary in the furtherance of the investment objectives of the Kingate Funds;

- Marketing and placement services - KML is responsible for performing all necessary duties and functions in connection with the sales of the shares of the Kingate Funds and advising the Kingate Funds on general matters affecting the marketing of the shares, including:

  o Soliciting and introducing prospective investors to the Kingate Funds;

  o Maintaining regular contact and updating existing and prospective investors regarding investment results and other information regarding the Kingate Funds;

  o Preparing and distributing marketing material and offering documents to investors and prospective investors; and

  o Appointing authorised dealers and sales agents to assist with the sale of shares of the Kingate Funds; and

7447031.3

- General management and administration services - KML is responsible for ensuring the proper functioning of the Kingate Funds, and its duties in this regard include:

    o   Arranging for the retention of the fund administrators and supervising the fund administrators in all their functions;

    o   Ensuring that adequate procedures are undertaken by the fund administrators to comply with all applicable anti-money laundering laws;

    o   Advising with regard to all aspects of subscriptions, redemptions, and transfers of the Funds' shares;

    o   Advising with regard to all aspects of the Funds' finances, including advising as to the payment of invoices payable by the Funds, and advising the Funds with regard to instructions to the banks about receiving/paying out money to and from the Funds;

    o   Reviewing periodically the Funds' offering documents to ensure continued compliance with applicable laws and regulations;

    o   Overseeing the preparation of the Funds' interim and annual financial statements, including organizing, coordinating and facilitating the audit of the Funds;

    o   Maintaining contact with the Funds' legal advisors in any jurisdiction where the Funds may operate with a view to advising the Funds on new legal and regulatory developments that may affect the structure of the Funds, their marketability, and their compliance with laws in general;

    o   Maintaining contact with the regulatory authorities in any jurisdiction where the Funds may operate; and

    o   In general, undertaking all actions that may be necessary for the proper administration of the Funds, and advising the Funds on all aspects related to Funds' administration, accounting, legal and operational matters.

41.   In accordance with the authority provided to it pursuant to the Management Agreements, KML:

- delegated certain of its investment management duties to an investment advisor, BMIS;

- delegated certain of its administrative functions (including the calculation of net asset value, the procuring of subscriptions and redemptions, the maintenance of the Kingate Funds' shareholder registers and other administrative functions) to Citi Hedge Fund Services Limited (formerly Hemisphere Management Limited and BISYS Hedge Fund Services Limited which was acquired by Citi Hedge Fund Services Limited, a subsidiary of Citigroup Inc., in approximately 2007);

- delegated custody of the assets of the Kingate Funds to The Bank of Bermuda Limited (subsequently acquired by HSBC Holdings plc); and

- delegated certain of its marketing and placement, general operational and administration services to FIM Limited (latterly FIM Advisers LLP, "FIM").

7447031.3

**BMIS's role as investment advisor to the Kingate Funds**

42.    KML appointed BMIS as investment advisor of the assets of both Global Fund and Euro Fund. The Kingate Funds each opened brokerage accounts with BMIS and gave BMIS authority to manage their respective portfolios on a discretionary basis. The Kingate Funds also gave BMIS strict investment guidelines, restricting BMIS to so-called "split-strike conversion" investments (see copies of the Trading Authorization Directive for both Kingate Funds, at tab 15).

43.    BMIS did not receive a direct fee for its services to the Kingate Funds. Instead, it was understood that BMIS earned trading commissions guaranteed by being the counterparty to the Funds. Each transaction for the Funds involved four elements:

    (a)    A market participant sells stock;

    (b)    BMIS buys that stock;

    (c)    BMIS sells that stock; and

    (d)    The Fund buys that stock.

44.    (The opposite would happen for transactions involving sales out of the relevant Fund). Between element (b) and (c), BMIS would either (i) act as principal and charge a mark-up/mark-down; or (ii) act as agent to the Fund and charge a commission.

*Disclosure to third parties of BMIS's role as investment advisor to the Kingate Funds*

45.    BMIS's role as investment advisor to Euro and Global Kingate Funds was fully disclosed, including to potential investors.

46.    The audited financial statements for Global Fund as at 31 December 2007 (tab 13), as prepared by PwC, contain the following disclosure regarding BMIS's role (Materially the same disclosure appears on previous audited financial statements of Global Fund):

    *"Investment advisor, broker-dealer, custodian and banker*

    *The Company's investment advisor is Bernard L Madoff Investment Securities LLC ("Madoff"), a New York based financial institution. Madoff also acts as the Company's broker-dealer for all equity, US Treasury and option transactions, these transactions being executed in certain instances with Madoff as the principal. During the year, the Company executed transactions of approximately $58 billion (2006 $48 billion). Madoff's only form of remuneration is from any principal spread and/or commission on the transactions. Madoff also acts as custodian for investment assets of the Company.*

    *..."*

47.    The audited financial statements for Euro Fund as at 31 December 2007 (tab 14), again as prepared by PwC, contain the following disclosure regarding BMIS's role (materially the same disclosure appears on previous audited financial statements of Euro Fund):

    *"Investment advisor, broker-dealer, custodian and banker*

    *The Company's investment advisor is Madoff, a New York based financial institution. Madoff also acts as the Company's broker-dealer for all equity, US*

*treasury and options transactions, these transactions being executed in certain instances with Madoff as the principal. During the year, the Company executed transactions of approximately €12.5 billion (2006 - €10.1 billion). Madoff's only form of remuneration is from any principal spread and/or commission on the transactions. Madoff also acts as custodian for investment assets of the Company...,"*

## Other entities' role in the Kingate Funds' operation

48.     Pursuant to its duties and powers of delegation under the Management Agreements, KML and the Kingate Funds also contracted with other third parties regarding the operations of the Kingate Funds.

### Administrator

49.     Pursuant to agreements dated 1 June 2007 (replacing the previous administration agreements which had been in place between the parties), Citi Hedge Fund Services Ltd (formerly Hemisphere Management Limited and BISYS Hedge Fund Services Ltd, **"Citi"**) was retained by KML and the Kingate Funds to provide company secretarial, registrar and transfer agency, accounting and other administrative services to the Kingate Funds. In return for its performance of these services, the Kingate Funds paid Citi fees in accordance with the provisions of those agreements.

50.     Citi's role as administrator to the Kingate Funds was fully disclosed.

### Information memoranda

51.     The most recent Information Memorandum for Global Fund dated 6 October 2008 (at tab 4) contained the following statement:

*"The Administrator*

*Citi Hedge Fund Services, Ltd (formerly BISYS Hedge Fund Services Limited), a Bermuda registered company, has been appointed as the Fund's administrator (the "Administrator").*

*Pursuant to the Administration Agreement, as amended and restated effective June 1, 2007, and the Registrar Agreement, as amended and re-stated effective January 1, 2002, the Administrator is responsible for all matters pertaining to the administration of the Fund, including, without limitation:*

(i)      *communicating with the Fund's Shareholders;*

(ii)     *communication with the general public;*

(iii)    *soliciting sales of the Fund's stock;*

(iv)    *accepting the subscriptions of new Shareholders;*

(v)     *maintaining the Fund's principal corporate records and books of account;*

(vi)    *disbursing payments of dividends, legal fees, accounting fees, and officers' and directors' salaries;*

(vii)   *calculating, publishing or furnishing the subscription or redemption price of the [Shares]*

7447031.3

384

(viii)        *conducting meetings of the Fund's Shareholders and Directors; and*

(ix)         *making redemptions of the [Shares].*

*The Administrator will also provide the services of an individual to act as secretary of the Fund.*

..........

### Fees of the Administrator

*For its administrative duties relating to the [Shares], the Administrator receives customary fees paid out of the Fund assets based upon the nature and extent of the services performed by the Administrator for the Fund.  The compensation provisions of the Administration Agreement may be revised in the future."*

52.        The most recent Information Memorandum for Euro Fund dated 6 October 2008 (at tab 5) contained materially the same disclosure, save that it also confirmed that Citi would be reimbursed for all out-of-pocket expenses.

### Financial statements

53.        The audited financial statements for Global Fund as at 31 December 2007 (tab 13), as prepared by PwC, contain the following disclosure regarding Citi's role:

*"Citi Hedge Fund Services Ltd, (formerly BISYS Hedge Fund Services Ltd) serves as Administrator of the Company (the "Administrator").  On August 1, 2007, The BISYS Group Inc., was acquired by and became a wholly owned subsidiary of Citigroup Inc.*

*In addition, the Administrator acts as Secretary and Registrar for the Company.  For its services, the Administrator receives a fee paid out of the Company's assets based upon the monthly net assets of the Company.  Administration fees incurred by the Company during the year were $666,795 (2006 - $611,802).  As of December 31, 2007, administration fees of $57,463 (2006 - $53,617) were payable."*

54.        The audited financial statements for Euro Fund as at 31 December 2007 (tab 14), again as prepared by PwC, contain the following disclosure regarding Citi's role:

*"Administrator*

*Citi Hedge Fund Services Ltd, (formerly BISYS Hedge Fund Services Ltd) serves as administrator of the Fund (the "Administrator").  On August 1, 2007, the BISYS Group Inc., was acquired by and became a wholly owned subsidiary of Citigroup Inc.*

*The Administrator also act as Secretary and Registrar for the Company.  For its services, the Administrator receives a fee paid out of the Company's assets based upon the monthly net assets of the Company.  Administration fees incurred by the Company during the year were €146,118 (2006 - €131,559).  As of December 31, 2007, administration fees of €13,372 (2006 - €11,453) were payable."*

7447031.3

385

### Custodian

Pursuant to agreements dated 1994 (for Global Fund) and 1 May 2000 (for Euro Fund), The Bank of Bermuda Limited (an indirect 100% subsidiary of HSBC Holdings plc) was retained by the Kingate Funds to carry out the functions of banker and custodian to the Kingate Funds, for the purposes of receiving subscription funds, disbursing redemption payments and processing cash transactions not directly related to the Kingate Funds' portfolios. A copy of these agreements is at tab 16 and tab 17. In return for its performance of these services, the Kingate Funds paid The Bank of Bermuda fees in accordance with the provisions of those agreements.

56.    In addition to the fees received by The Bank of Bermuda in connection with its services to the Kingate Funds, it also made lucrative margins in providing foreign exchange contract execution services to the Euro Fund.

57.    The Bank of Bermuda's role as banker and custodian to the Kingate Funds was fully disclosed.

### Information memoranda

58.    The most recent Information Memorandum for Global Fund dated 6 October 2008 (at tab 4) contained the following statements:

"**Banking and Custody**

*The Bank of Bermuda Limited, located in Hamilton, Bermuda (the "Bank") has been appointed as the Fund's banker for purposes of receiving subscription funds, dispersing redemption payments and processing cash transactions not directly related to the Fund portfolio. Actual custody, however, is with [BMIS] ...*

*The Bank of Bermuda Limited is a licensed bank incorporated in Bermuda under the Bank of Bermuda Act 1890. The Bank of Bermuda Limited is engaged in a wide range of international banking and trust services with its main office in Bermuda and its subsidiaries worldwide. On February 18, 2004, the Bank of Bermuda Limited became an indirect wholly owned subsidiary of HSBC Holdings plc, a public company incorporated in England. As of December 31, 2005, HSBC Holdings plc had consolidated gross assets of approximately US$1.467 billion...".*

.....

*Fees of the Bank*

*Pursuant to the Custodian Agreement, the Bank receives a custodian services fee comprised of (i) an annual safekeeping charge equal to 10 basis points (.10%) of the gross asset value of the Fund with a maximum of U.S.$25,000 per annum and (ii) the right to recover all sub-custodian charges which will be charged directly to the Fund. The Bank is entitled to reimbursement of actual out-of-pocket expenses. The compensation provisions of the Custodian Agreement may be revised in the future."*

59.    The most recent Information Memorandum for Euro Fund dated 6 October 2008 (at tab 5) contained this following statement:

"**Banking and Custody**

*Banking. The Bank of Bermuda Limited, located in Hamilton, Bermuda (the "Bank"), has been appointed as the Fund's banker for purposes of receiving subscription*

*funds, disbursing redemption payments and processing cash transactions not directly related to the Fund's portfolio. ...*

*Custody. Neither the Bank nor the Manager has custody of any of the Fund's assets, nor do they presently propose to perform any such services for the Fund. Actual custody of the Funds' [sic] assets will be maintained by the Investment Advisor or its affiliated broker dealer ..."*

*Financial statements*

60. The audited financial statements for Global Fund as at 31 December 2007 (tab 13), as prepared by PWC, contain the following disclosure regarding The Bank of Bermuda's role:

"*The Bank of Bermuda Limited (the "Bank") has been appointed banker for the Company. For its services, the Bank receives 0.10% of the gross asset value of the Company with a maximum of $25,000 per annum.*"

61. The audited financial statements for Euro Fund as at 31 December 2007 (tab 14) also as prepared by PWC contain the following disclosure regarding Bank of Bermuda's role:

"*The Bank of Bermuda Limited (the "Bank") has been appointed banker for the Company.*"

<u>Consultant and distributor</u>

62. Pursuant to agreements described further below, FIM Advisers LLP (formerly FIM Limited, taken together "FIM") was retained by KML to provide certain consultancy and distribution services to the Kingate Funds. In return for performance of these services, KML paid FIM fees in accordance with the provisions of those agreements. FIM's role as consultant to the Kingate Funds was fully disclosed, as described further below.

**FIM's role as consultant and distributor to KML**

<u>Background to the FIM group of companies</u>

63. The FIM group of companies (the **"FIM Group"**) comprises the following entities (a structure chart of the FIM Group is at tab 18):

- FIM Limited;

- FIM Advisers LLP;

- FIM Holdings Limited;

- FIM Management Limited;

- FIM Investment Holdings (Ireland) Limited;

- FIM Management (Guernsey) Limited; and

- FIM (USA) Inc.

Before the impact of the current financial crisis, the FIM Group employed 50 people. It currently employs a total of 30 individuals, located in London (24), New York (4) and Bermuda (2).

### The business of FIM

65.    FIM is a London-based alternative investment management company active in the creation, management and servicing of portfolios of hedge funds for institutional and private clients on a global basis.

66.    FIM was established in 1981 by Carlo Grosso and members of a substantial family group to provide traditional asset management services to high net-worth individuals. Throughout the 1980s, FIM Limited managed portfolios for wealthy investors along traditional lines. By 1993/1994, all of FIM's managed portfolios had been converted into customized funds of hedge funds, following extensive research and due diligence. In 1997, the firm launched FIM Long-Invest, its first fund of hedge funds to be marketed outside the circle of its discretionary managed accounts. In 2005, FIM undertook a reorganisation of its business, creating a limited liability partnership in the UK (FIM Advisers LLP, to which it transferred all its management/advisory contracts), expanding its research function into the United States and streamlining its offshore operations by establishing offices in Bermuda and Guernsey.

67.    Key milestones in the history of FIM are as follows:

| Year | Event |
| --- | --- |
| 1981 | FIM Limited established |
| 1988 | FIM obtains first regulatory status with Financial Intermediaries, Managers and Brokers Regulatory Association (predecessor regulatory body to Investment Management Regulatory Organisation and the Financial Services Authority) |
| 1994 | Completes full conversion of discretionary managed portfolios into customised funds of funds, comprised exclusively of hedge funds |
| 1995 | Appointed consultant to Kingate Global Fund |
| 1997 | Launch of FIM Long-Invest Fund, FIM's flagship low volatility fund |
|  | Appointed fund advisor to Levco Alternative Fund |
| 2000 | FIM expands investment management activities into institutional marketplace |
| 2001 | Appointed consultant to Kingate Euro Fund |
|  | Wins mandate as investment advisor for an Italian bank's fund of hedge funds products |
|  | Appointed fund advisor to Levco Debt Opportunity Fund |
| 2005 | FIM Advisers LLP is approved by the Financial Services Authority and takes over the investment management/advisory contracts from FIM Limited |

| | Wins mandate as advisor for the funds of funds of Italy's largest bank |
|---|---|
| | FIM Management Limited established in Bermuda |
| | New York Research Office opened |
| 2006 | FIM breaks through US$2 billion in assets under management/advice |
| | Launch of FIM Relative Value Fund |
| | Launch of FIM Long-Invest Plus Fund |
| | FIM Long-Invest Fund assets break through $1 billion |
| 2007 | Installation & conversion of fully integrated portfolio management and client reporting system |
| | Launch of FIM Global Opportunity (Formerly FIM Event Driven) |
| | FIM breaks through US$2billiono in assets under management/advice |

68.    At tab 19 are copies of articles from industry publications dated June 2007 and
       March 2008 reporting on the business of FIM Advisors LLP.

69.    FIM has been authorised and regulated by the United Kingdom Financial Services
       Authority (or its predecessors) since early 1988 and has maintained a spotless
       regulatory record throughout this period.   It is of note that financial services
       businesses in the United Kingdom were not statutorily obliged to be regulated before
       29 April 1988.  Extracts from the Financial Services Authority's website showing the
       authorisation status of FIM Advisers LLP, Carlo Grosso and Federico Ceretti are at
       tab 20.

70.    As noted further below, the consultancy and distribution fees earned by FIM over the
       course of its agreements with KML represent a very small proportion of its overall
       turnover (and profit).   The vast majority of FIM's business and focus relates to its
       substantial investment management business.

71.    FIM has actively invested in hedge funds since the mid-1990s. At the current time,
       FIM manages a total of 5 separate funds of funds, which have attracted substantial
       investments.  As at September 2008, 95% of FIM's client base was institutional,
       such institutional investors included banks (56.11%), asset managers (33.77%),
       insurance companies (3.17%), pension funds and government agencies (0.31%).

72.    About two-thirds of the funds of hedge funds that FIM manages or advises have as
       their principal objective low volatility of returns.   FIM focuses its research on
       developing low-volatility strategies.  This focus stems from a conviction about the
       power of compounding and the need to preserve capital throughout different
       economic and market cycles.

73.    In the spring of 2008, FIM had total assets under management of US$4.33 billion.
       The subsequent global economic crisis caused significant losses in the hedge funds
       industry.  FIM lost assets in the same proportion as other market participants. As at
       31 October 2008, FIM had total assets under management of US$2.6 billion.   A
       chart showing the asset growth of FIM's funds of funds between December 1999
       and December 2008 is at tab 21.

As a result of its extensive and long-established fund management activities, FIM
has, historically, generated substantial profits. These profits for the last four years
are illustrated in the table below:

| Year | Turnover (£) | Operating Profit (£) |
|------|-------------|---------------------|
| 2008 | 11,176,709 | 5,290,096 |
| 2007 | 16,987,981 | 11,733,984 |
| 2006 | 9,975,119 | 5,355,457 |
| 2005 | 8,351,993 | 2,363,085 |

75.    FIM also acts as advisor to a series of third party funds of funds. In August 2008,
FIM was ranked second (by market share) in a list of external hedge fund advisors
providing advisory services to Italian hedge funds, behind Union Bancaire Privée
and ahead of entities such as HSBC Republic and Goldman Sachs Hedge Fund
Strategies (see industry publication at tab 22). As at 31 December 2008, FIM
provided such services to institutions including Aletti Gestielle Alternative Sgr,
Eurizon Alternative Investments Sgr and Gottardo A.M. Sgr Alternative.

76.    In connection with its managed/advised funds of funds, FIM has distribution
agreements with financial institutions such as Barclays Bank Plc, Banco Bilbao
Vizcaya Argentaria S.A., Credit Agricole Structured Asset Management, Credit
Suisse International, HSBC Bank Plc, UBI Banca International, and others.

77.    In addition to its main asset management activities, FIM provides consultancy and
distribution services to KML pursuant to contracts entered into between FIM and
KML.

78.    A copy of FIM's latest filed accounts is at tab 23. A copy of a recent FIM overview
document describing the activities of that company is at tab 24.

*Bermuda office*

79.    FIM Management Limited provides administrative support services to the FIM
Group. It occupies premises at 99 Front Street, Hamilton HM11 Bermuda subject to
a tenancy agreement dated 18 October 2006 (tab 25). KML is licensed to occupy
part of these premises pursuant to a commercial agreement dated 1 November
2006 (tab 26). The businesses of FIM Management Limited and KML are entirely
separate. The businesses occupy distinct parts of the Premises.

*Consultancy Agreements*

80.    On 23 April 2001, KML as manager of the Kingate Funds entered into consulting
services agreements with FIM Limited relating to both Euro Fund and Global Fund
(respectively the "Euro Consultancy Agreement" and "Global Consultancy
Agreement", together the "Consultancy Agreements"). Copies are at tabs 27 and
28.    The Global Consultancy Agreement amended and reinstated previous
arrangements entered into between KML and FIM relating to Global Fund dating
back to 1995. The Consultancy Agreements are consistent with the authorisation
provided to KML under the Management Agreements for KML to appoint delegates
to assist it in the discharge of its functions under those agreements, as detailed
above.

The Consultancy Agreements provide (clause 2.2):

*"FIM hereby agrees with [KML] to act as a consultant to [KML] to provide such advice and recommendations as [KML] may from time to time require in connection with its management of the Company's assets and in the implementation of the investment objectives and policies of the Company in accordance with the provisions of the Management Agreement."*

82.   The consulting and other services which FIM Limited was to provide to KML under the terms of the Consultancy Agreements include (clause 3):

- reviewing the relevant Fund's structure and operating procedures;

- preparing analysis and reports;

- providing KML with assistance and support on investor relations;

- liaising with KML on matters relating to the relevant Fund's investment programme;

- providing KML with advice regarding the relevant Fund's hedging activities and overseeing the execution of its recommendation; and

- providing advice to and assisting KML on aspects of the relevant Fund's operational, administrative, accounting and legal matters as may be required.

83.   As part of its compliance with the Consultancy Agreements, at the end of each month, FIM received from Kingate Management Limited a copy of the monthly statements of the Kingate Funds' accounts at BMIS. These statements of account were issued by BMIS (a regulated broker-dealer) and purported to contain the full detail of all transactions effected during the month for the Kingate Funds' portfolios, as well as the full details of month-end positions. The statements, and resulting analysis work, provided FIM with an exceptional level of transparency which was far and above the level of transparency typically afforded by an alternative investment fund to its investors, and enabled FIM to gain a strong understanding of the source of returns of the portfolios' "split-strike conversion" strategy.

84.   Every month, FIM conducted an extensive analysis of these statements (constituting a series of reports per month), which included:

- Confirmation that the portfolios' strategy ("split-strike conversion") was being executed in accordance with the trading guidelines between the Kingate Funds and BMIS, together with a confirmation that the portfolios were always properly hedged against market moves;

- Checking the price paid/received on the purchase/sale of stocks and options to ensure that such price was within the range of prices for such stocks and options on the day of the trade; and

- Calculating the portfolios' profit and loss attribution and the total gross profit and loss for the month.

85.   The Consultancy Agreements provide (clause 4.1) that FIM has no power or authority to enter into any transaction on behalf of, or in any way to bind KML.

86.   The Consultancy Agreements also provide that, in consideration for its services under the relevant agreement, FIM Limited shall be due a monthly consultancy fee

from KML (clause 11 and schedule 1).    In the case of both Consultancy
Agreements, the amount of these fees was subsequently amended by side letters
dated 7 June 2001 (at tab 29).

87.     FIM Limited's obligations and benefits pursuant to the Consultancy Agreements
were transferred to FIM Advisors LLP by deeds of novation dated 29 July 2005 (at
tabs 30 and 31).

### Disclosure to third parties of FIM's role as consultant

88.     FIM Limited's role as consultant to KML was fully disclosed, including to potential
investors.

### Information Memoranda

89.     The most recent Information Memorandum for Global Fund dated 6 October 2008
(at tab 4) contained the following statement:

> **"The Consultant**
>
> The Manager has appointed FIM Advisers LLP "FIM" as its consultant in relation to
> certain aspects of the Fund's operations (the "Consultant").
>
> The Consultant was incorporated on October 8, 2004 as a limited liability
> partnership under English Law.  On August 1, 2005, the Consultant took over the
> business of its affiliate, FIM Limited, an asset management company with over
> twenty years of experience.  The Consultant is a leading alternative investment
> management company, specialising in the creation and management of portfolios of
> hedge funds for institutions and private clients on a global basis.  The Consultant is
> authorised and regulated by the Financial Services Authority ("FSA") of the United
> Kingdom.  As at the date of this document, the Consultant acts as investment/fund
> advisor in respect of funds with assets totalling in excess of US$7.3 billion.
>
> In addition to its role as Consultant to the Fund, the Consultant acts as investment
> and/fund advisor to several other investment management companies that manage
> a variety of funds and single-manager funds.
>
> ... pursuant to the FIM Consulting Services Agreement, the Consultant renders
> consulting advice to the Manager with respect to certain aspects of the Fund's
> operational, administrative, marketing, accounting and legal matters."

90.     The most recent Information Memorandum for Euro Fund dated 6 October 2008 (tab
5) contains the same disclosure, save that it states:

> "...the Consultant acts as <u>discretionary investment manger, or as Investment/Fund
> Advisor,</u> in respect of funds totalling in excess of US$7.3 billion." <u>(emphasis added)</u>.

### Financial statements

91.     The audited financial statements for Global Fund as at 31 December 2007 (tab 13),
as prepared by PwC, contain the following disclosure regarding FIM Limited's role:

92.     "Pursuant to the Consulting Services Agreement dated December 1, 1995 , FIM
Limited (the "Consultant") has been appointed to provide consultancy services to
[KML].  The Consultant is compensated by [KML], at no additional cost to the
company."

7447031.3

93.    The audited financial statements for Euro Fund as at 31 December 2007 (at tab 14),
again as prepared by PwC, containing the following disclosure regarding FIM
Limited's role:

"*Pursuant to the Consulting Services Agreement dated May 1, 2000 FIM Limited
(the "Consultant"), has been appointed to provide consultancy service to [KML]. The
Consultant is compensated by [KML], at no additional cost to the Company.*"

### Distribution Agreements

94.    In addition, on 23 April 2001, KML as manager of the Kingate Funds entered into
distribution agreements with FIM Limited relating to both Kingate Funds
(respectively the "**Euro Distribution Agreement**" and "**Global Distribution
Agreement**", together the "**Distribution Agreements**"). Copies are at tabs 32 and
33.   The Distribution Agreements were also consistent with the authorisation
provided to KML under the Management Agreements for KML to appoint delegates
to assist it in the discharge of its functions under those agreements.

95.    Pursuant to the Distribution Agreements, FIM Limited was appointed as non-
exclusive distributor for the sale of Shares in the Kingate Funds.  The distribution
services to be provided by FIM Limited pursuant to the Distribution Agreements
include (clause 3):

* identification and solicitation of prospective investors to purchase Shares in the
  relevant Fund;

* introduction of such prospective investors to KML;

* maintenance of regular contact with investors introduced to KML;

* preparation of marketing and other material;

* supervision of distribution lists to keep prospective and existing investors
  informed of developments with regard to the relevant Fund; and

* generally, the provision of such services as might be required by KML to enable
  it to fulfil its duties with regard to the placement of Shares in the relevant Fund in
  accordance with the provisions of the relevant Management Agreement.

96.    The Distribution Agreements provide that, in consideration for its services under the
relevant agreement, FIM Limited shall be due a monthly distribution fee from KML
(clause 6 and schedule 1).

97.    FIM Limited's obligations and benefits pursuant to the Distribution Agreements were
transferred to FIM Advisers LLP by deeds of novation dated 29 July 2005 (at tabs 34
and 35).

7447031.3

*Fees earned by FIM in return for services rendered to KML*

98.　FIM provided both consultancy and distribution services to KML, in return for which it earned fees, as explained above. The amount of these fees is shown in the table below. As can be seen from that table, throughout the period 2005 – 2008 inclusive this fee income represented a very small proportion (2.6% or less) of FIM's annual turnover. During the period 2005 – 2008 inclusive, the total fee income earned by FIM from the Consultancy Agreements and Distribution Agreements was US$ 1,801,164. This represented just 2.1% of the total turnover of FIM over the same 4 year period.

| Year | Consultancy USD | Consultancy EUR | Distribution USD | Total USD | FIM Total Turnover USD | % FIM annual turnover |
|---|---|---|---|---|---|---|
| 2005 | 180,000 | 57,760 | 175,909 | 402,520 | 15,149,680 | 2.6% |
| 2006 | 180,000 | | 249,470 | 429,470 | 18,529,781 | 2.3% |
| 2007 | 180,000 | | 317,455 | 497,455 | 31,975,982 | 1.5% |
| 2008 | 180,000 | | 291,719 | 471,719 | 20,586,380 | 2.3% |
| Total | 720,000 | 57,760 | 1,034,553 | 1,801,164 | 86,241,803 | 2.1% |

*[Note: these figures are in Euro and US$. The figures in the table at paragraph 74 are the GBP equivalent.]*

99.　Besides the consultancy and distribution fees earned by FIM and referred to above, none of the entities or individuals involved with the FIM Group derived any fees or other income from the Kingate structure. Nor did any of the entities or individuals involved with the FIM Group ever receive any fee or other payment either from Madoff, BMIS, or from any individual or entity related to Madoff or BMIS.

**Explanation of the Trusts' structure**

100.　The Ashby Trust is a trust formed under the laws of Jersey on 24 March 1994. The Settlor is Carlo Grosso. The beneficiaries comprise exclusively Carlo Grosso and members of his family. The trustee is First Peninsula Trustees Limited.

101.　The El Prela Trust is a trust formed under the laws of Jersey on 7 April 1994. The settlor is Federico Ceretti. The beneficiaries comprise exclusively Federico Ceretti and members of his family. The trustee is Port of Hercules Trustees Limited.

102.　The Ashby Trust and the El Prela Trust (each a "Trust", together the "Trusts"), have only two functions:

- To hold shares in KML; and

- To manage their assets.

103.　Many common-law jurisdictions, including those in the United Kingdom and the Channel Islands, recognise the concept of trusts, which derive from the recognition of such common law jurisdictions that the ownership of property consists of both legal and equitable interests. The history of the trust dates back to the feudal system of land ownership operative in medieval England, at which time all land was technically owned by the king, while others enjoyed the right to use that land as his tenants.

7447031.3

under a modern trust, the legal and equitable ownership of the trust property are separated and held by different persons. The legal title is vested in the trustee of the trust who must apply the property for the benefit of someone else, commonly termed the "beneficiary" who the law regards as being the equitable owner of the property. As legal owner, the trustee controls the property. He is entitled to decide whether it should be retained or sold, and how it is to be invested. The trustee may have the right to determine how the property should be distributed amongst the beneficiaries. However, he must not exercise his rights to deal with the trust property for his own personal advantage, and the law will prevent him from applying the trust property inconsistently with terms of the trust, which terms define the entitlement of the beneficiaries. In turn, the beneficiaries cannot dictate to the trustee how he exercises control over the trust property.

105.    Article 2 of the Hague Convention on the Law Applicable to Trusts and on their Recognition dated 1 July 1985 (the "**Hague Convention**"), contains the following definition of a "trust":

*"For the purposes of this Convention, the term "trust" refers to the legal relationship created – inter vivos or on death – by a person, the settlor, when assets have been placed under the control of a trustee for the benefit of a beneficiary or for a specified purpose.*

*A Trust has the following characteristics –*

(a)    *The assets constitute a separate fund and are not part of the trustee's own estate;*

(b)    *Title to the trust assets stands in the name of the trustee or in the name of another person on behalf of the trustee;*

(c)    *The trustee has the power and the duty, in respect of which he is accountable, to manage, employ or dispose of the assets in accordance with the terms of the trust and the special duties imposed upon him by law.*

*The reservation by the settlor of certain rights and powers, and the fact that the trustee may himself have rights as a beneficiary, are not necessarily inconsistent with the existence of a trust".*

106.    The Principality of Monaco acceded to the Hague Convention on 1 June 2007.

107.    Until 31 March 2008, the Trusts owned the entire share capital of KML in equal shares. Following a restructuring of the Trusts on or shortly after that date, KML is now wholly-owned by Ashby Holding Services Limited and El Prela Group Holding Services Limited in equal shares. A structure chart is at tab 36.

108.    The restructuring of the Trusts and the transfer of the shares in KML from the Trusts to Ashby Holding Services Limited and El Prela Group Holding Services Limited that took place in 2008 was carried out for the reasons set out below.

108.1    KML earns management fees under the Management Agreements, as explained above. Under the original structure of the Trusts, earnings made by KML which derived from these management fees were paid as dividends to the relevant trustees of the Trusts (each a "**Trustee**", together the "**Trustees**") by KML in equal shares. The Trustees invested a significant portion of this income directly in hedge funds, including the Kingate Funds (see below).

Carlo Grosso and Federico Ceretti are designated "resident non-domiciled" in the United Kingdom. As such, while they are UK taxpayers, they enjoy a special tax regime in the UK. The structure of The Ashby Trust, the El Prela Trust and their subsidiary companies is designed to allow Carlo Grosso and Federico Ceretti – as beneficiaries of the two trusts – legitimately to benefit from this tax regime.

108.3    In late 2007/early 2008, the first drafts of the new United Kingdom Finance Bill were published. This introduced the possibility of several changes to the UK legislation governing the taxation of UK resident non-domiciliaries. It appeared possible that capital gains made by the Trusts after 5 April 2008 might attract a less favourable tax treatment from the perspectives of those beneficiaries of the Trusts (including Carlo Grosso and Federico Ceretti) who were subject to taxation in the United Kingdom as UK resident non-domiciliaries. It appeared at the time that a line might be drawn as at 5 April 2008 distinguishing Trust gains that had been *"accrued or realised"* before that date and those *"accrued or realised"* after that date, with the old gains being taxed under the old rules (and so not giving rise to a charge to tax for UK resident non-domiciliaries) and the new gains being taxed under the new regime (where there would be a charge to tax). There was no certainty at that stage as to whether revaluing provisions might be introduced in the new legislation (which provisions might mitigate the impact of the changes in the law).

108.4    Given the uncertainty prevailing at the time, Leading English tax Counsel was instructed to consider the best action for the Trusts. Leading Counsel considered that it would be advisable to trigger gains in the Trusts before 5 April 2008, so as to constitute actual disposals, rather than relying on the possibility that revaluation provisions might be introduced in the forthcoming litigation. This would have the effect of establishing a new higher base cost of these assets against which any future capital gains might be assessed. Accordingly it was deemed prudent by the Trustees to revalue the Trusts' assets in this manner.

109.    It was concluded that the most efficient way of effecting this revaluation was to transfer the Trusts' shares in KML to two newly incorporated holding companies owned by the Trusts (each a "**Holding Company**"), and to transfer all the Trusts' hedge fund investments from the Trusts to two newly incorporated investment companies also owned by the Trusts (each an "**Investment Company**"). The revaluation therefore took the following form:

109.1    The Trustees incorporated two new British Virgin Island companies for each Trust. For The Ashby Trust, the Holding Company was called Ashby Holding Services Limited and the Investment Company was called Ashby Investment Services Limited. For The El Prela Trust, the Holding Company was called El Prela Holding Services Limited and the Investment Company was called El Prela Trading Investments Limited.

109.2    The Trustees each sold their respective Trust's shareholdings in KML to the relevant Holding Company. This sale was deemed to occur at market value for UK tax purposes (i.e. at a price that was greater than the original cost of the KML shares). The shares in KML were therefore revalued to market value for UK tax purposes. The sale proceeds were left outstanding on loan account. It was envisaged that dividend income from KML would be used by both Holding Companies to repay those loans and that, when the loans were repaid, the respective Holding Companies might pass dividends on to the Trustees of the Trusts.

109.3    At the same time, the Trustees sold each Trust's hedge fund holdings to the relevant Investments Company for market value, therefore revaluing those holdings to market value for UK tax purposes. Again, the sale proceeds of this transaction were left outstanding on loan account.

7447031.3

110.    The SICCFIN Report suggests that the setting up of structures such as the Trust structures explained above *"superimposes screens likely to cut all links with the origin of the Funds"*. This suggests some element of bad faith in the motives of those responsible for the Trust structures. As explained above, the motives in this case were essentially dictated by UK tax and normal family estate planning considerations; the structure of the Trusts and their respective Holding and Investment Companies is perfectly legitimate from the perspective of English law (and, I understand, Jersey law, being the law applicable to the Trusts) and the restructuring methodology described above is by no means unusual.

111.    I understand from the Trustees that the effect of this restructuring was purely to maximise the tax-efficiency of the Trust structures in light of the anticipated changes to UK tax legislation for resident non-domiciliaries.

112.    Further evidence of the good faith and legitimate motives behind the restructuring of the Trusts is that the restructuring itself was carried out in advance of the beginning of the new UK tax year (running from 6 April 2008 to 5 April 2009).    It was necessary to have the restructuring in place before 6 April 2008 in order to ensure the minimum tax exposure for those UK-resident non-domiciled beneficiaries of the Trusts in the future. In the event, I understand that the revaluation referred to above was carried out on 31 March 2008.

113.    There is no opacity whatever in the existing structures of the Trusts. The Holding Companies receive dividends from KML and use the money to either (i) repay the loan from the Relevant Trust that enabled them to acquire the shares in KML in the first place; or (ii) lend money to the relevant Investment Company to make further investments (at all times these investments remained part of the assets of the Trusts). *Accordingly, the restructuring continues to enable both Trusts to perform their functions described at paragraph 102 above.*

**Trusts' investment in the Kingate Funds**

114.    At the heart of the Freezing Order is the suggestion that BMIS acted as manager of the Kingate Funds. This is not and never has been the case: as described above, KML is manager to both Kingate Funds. BMIS was simply the investment advisor to the Kingate Funds, responsible for implementing the Kingate Funds' investment policy.

115.    Both KML and the Kingate Funds are victims of the alleged fraudulent activities of Madoff and BMIS.    Both the Kingate Funds and KML have been deceived by the activities of BMIS acting as investment advisor to the Kingate Funds. In the same way, *the Trusts have been deceived.* As noted above, both Trust Investment Companies hold significant investments in hedge funds. These holdings include both direct and indirect holdings in the Kingate Funds, as described further below.

116.    Since 1 March 1998 (for The Ashby Trust) and 30 September 1999 (for The El Prela Trust), the Trusts (latterly through their respective Investment Companies) have invested (at cost) a total in excess of US$40 million in the Kingate Funds. Such investments were made in three ways:

7447031.3

*Direct subscription for shares in the Kingate Funds*

117.  Both Trusts have invested directly in Global Fund. The loss attributable to these investments is as follows:

* *The Ashby Trust:* investment at cost of:    US$2,096,404.23

  o  Value as at latest NAV date:    US$3,568,366.86

  o  Value today:    US$0.00

* *The El Prela Trust:* investment at cost of:    US$3,078,700.03

  o  Value as at latest NAV date:    US$3,272,187.80

  o  Value today:    US$0.00

*Investment in structured products*

118.  Both Trusts have invested indirectly in the Kingate Funds by way of the following investments in structured notes issued by Boiro Finance B.V. ("**Boiro**"), being a wholly owned subsidiary of Banco Bilbao Vizcaya Argentaria, S.A ("**BBVA**"). The loss attributable to these investments is as follows:

* *The Ashby Trust:* investment at cost of:    US$13,222,928.50

  o  Value as at latest NAV date:    US$15,783,250.00

  o  Value today:    US$0.00

* *The El Prela Trust:* investment at cost of:    US$13,828,298.50

  o  Value as at latest NAV date:    US$16,433,550.00

  o  Value today:    US$0.00

*Investment in funds of funds*

119.  Both Trusts also invested in certain funds of funds which themselves held investments in the Kingate Funds. The value of each Trust's holdings in the funds of funds concerned have, without exception, declined as a consequence of their exposure to the Kingate Funds and as a direct result of the activities of Mr Madoff and/or BMIS. The losses attributable to such exposure are as follows:

* *The Ashby Trust:*    US$3,834,898.00

* *The El Prela Trust:*    US$4,263,479.00

**No payments to or from Madoff or BMIS**

120.  Over the 14 years since the Trusts were settled in 1994, the Trustee of The Ashby Trust has made a number of distributions to Carlo Grosso in his capacity as a discretionary beneficiary of that Trust (the "**Grosso Distributions**"), while the Trustee of The El Prela Trust has made a number of distributions to Federico Ceretti in his capacity as a discretionary beneficiary of that Trust (the "**Ceretti Distributions**").

7447031.3

398

  
121.    Having spoken to the Trustees, I am informed and believe that, besides certain professional fees incurred by the Trusts during their lifetime, and as at the date of the Freezing Order:

- The only distributions made from The Ashby Trust were the Grosso Distributions; and

- The only distributions made from The El Prela Trust were the Ceretti Distributions.

122.    In an attempt to expedite and assist any ongoing investigations into this matter, Carlo Grosso and Federico Ceretti are providing sworn affidavits (at tab 37 and 38) confirming as appropriate that, to the best of their knowledge, information and belief:

- At no time have any of the assets comprising the Grosso Distributions or the Ceretti Distributions been transferred either directly or indirectly to Madoff, BMIS, or to any individual or entity related to Madoff or BMIS; and

- Neither Madoff, nor BMIS, nor any individual or entity related to Madoff or BMIS has benefitted in any way from the Grosso Distributions or the Ceretti Distributions.

123.    Furthermore, the affidavits referred to above will confirm that, to the best of Carlo Grosso's and Federico Ceretti's knowledge, information and belief:

- At no time throughout the relevant period were they or any person or entity related to them or anyone in office or employment with any of the Kingate Funds, KML, FIM, the FIM Group, the Trusts or the Trusts' subsidiary companies aware of the alleged fraudulent activities of Madoff and/or BMIS;

- Neither they nor any persons or entities related to them, nor any of the Kingate Funds, KML, FIM, the FIM Group, the Trusts or the Trusts' subsidiary companies ever received any fee or other payment either from Madoff, BMIS, or any individual or entity related to Madoff or BMIS; and

- Neither Madoff nor BMIS nor any individual or entity related to Madoff or BMIS ever received any fees or any other kind of payment whatsoever either from them or any person or entity related to them, or from the Kingate Funds, KML, FIM, the FIM Group, the Trusts or the Trusts' subsidiary companies (besides trading commissions referred to at paragraph 43 above).

124.    In English law, the making of an affidavit requires the deponent to swear on that deponent's holy book that the contents of the affidavit are true. I have advised both Carlo Grosso and Federico Ceretti that, under English law, a statement made by a person lawfully sworn in England for the purposes of a judicial proceeding in a tribunal of any foreign state (such as the Principality of Monaco) is treated as a *"statement made in a judicial proceeding"* for the purposes of the Perjury Act 1911, which is the Act of the United Kingdom Parliament that defines the law of perjury in England. According to section 1 of the Perjury Act 1911, if any person lawfully sworn as a witness in a judicial proceeding wilfully makes a statement material in that proceeding, which he knows to be false or does not believe to be true, *he shall be guilty of perjury, and shall, on conviction thereof be liable to be imprisoned.*

125.    I therefore believe that Carlo Grosso and Federico Ceretti understand the significance of swearing the affidavits referred to above, and the severe consequences that they might face were it proven they made the statements

contained in their respective affidavits knowing them to be false or without belief in their truth.

### Instructions for transfer of the Trusts' funds

126.    The Payment Instructions ordering the transfer of funds from the Trusts were sent to HSBC Monaco on 12 and 15 December 2008, as detailed further above.  Copies of the Payment Instructions are at tab 2.

127.    The Payment Instructions were I understand made by the Trustees of the Trusts as a reaction both to the Trusts' perceived over-exposure to HSBC given the emergence of the global banking crisis which began to unfold during the latter part of 2008 and the emerging Madoff affair.  At a time when banks across the globe were coming under pressure as a result of the "credit crunch", it was widely acknowledged that diversification of investment portfolios between banks was a prudent investment management practice.  This was strengthened as the scale of the Madoff affair began to be made clear.

128.    The Trusts' respective substantial holdings with HSBC as at 17 December 2008 (the date of the SICCFIN Report) were as follows:

*The Ashby Trust*

| Account number | Name | Value (US$) |
|---|---|---|
| 53062 | First Peninsula Trustees as Trustees of the Ashby Trust | 60,335,853.92 |
| 61962 | Ashby Investment Services Limited | 42,508,194.80 |
| TOTAL | | 102,844,048.70 |

*The El Prela Trust*

| Account number | Name | Value (US$) |
|---|---|---|
| 53063 | Port of Hercules Trustees Limited as Trustee of the El Prela Trust | 29,444,955.09 |
| 61978 | El Prela Trading Investments Limited | 25,572,891.25 |
| TOTAL | | 55,017,846.34 |

129.    Given the size of these holdings, I understand that the Trustees were motivated to make the Payment Instructions.

130.    The movement of substantial funds between Trust accounts was normal practice for the Trustees.  On 2 October 2008, at a time when there was a perception that Fortis Bank might collapse, the Trustee of The Ashby Trust transferred approximately $7.2 million from an account at Fortis Bank to HSBC Monaco (which, at the time, was considered more stable).  This had the effect of transferring The Ashby Trust's *entire* cash balance at Fortis Bank to HSBC Monaco.  Given the concern as to the stability

of Fortis Bank, it was instructed by the Trustee as a matter of urgency, and involved the sale of an investment at a loss in order to be effected.

131. Concerns as to the stability of HSBC emerged in early December 2008 and appeared to be justified by the subsequent sharp fall in HSBC's share price from mid-December 2008 onwards. A chart illustrating this fall is at tab 39.

132. Prior to the Payment Instructions being made, Fortis Bank (of which Fortis Bank (C.I.) Limited is a wholly-owned subsidiary) had been nationalised by the Dutch government. The Trustee of The Ashby Trust therefore decided to transfer sums from HSBC Monaco into accounts with Fortis Bank which, as a consequence of its state ownership, was considered unlikely to fail.

133. It was also the intention of the Trustee of The Ashby Trust further to spread its risk by placing assets with other financial institutions. Enquiries had been made with banks in Geneva, Switzerland including Lombard Odier Darier Hentsch & Cie, Pictet & Cie and Mirabaund. While no transfers had taken place in light of these enquiries, the Trustee of The Ashby Trust was holding substantial amounts of cash on account at HSBC Monaco preparatory to opening an account with one or more other banks once the necessary due diligence was completed.

Again prior to the Payment Instructions being made and in the emergence of the banking crisis, the Trustees of The El Prela Trust sought to open a bank account with Lombard Odier Darier Hentsch & Cie in Geneva, Switzerland in order to achieve further portfolio diversification. The account was activated on 29 October 2008.

134. The Trustee of The El Prela Trust had accumulated a sizeable cash holding in its account with HSBC Monaco (approximately US$25 million), part of which (US$15 million) was intended to be transferred to this new account.

135. The following additional points are of note:

135.1 The Payment Instructions were the latest in a series of such instructions made by the Trustees to HSBC Monaco since the Accounts were first opened; they therefore represented the continuation of a banking relationship relating to accounts with which HSBC Monaco was and is intimately familiar. Indeed the SICCFIN Report acknowledges that "the activities of these accounts, both open since 2001, have remained consistent with what was declared at the time of opening". In fact, over the years, several transfers have been made from the Trusts' accounts at HSBC Monaco to the Trusts' accounts with Fortis Bank, and from the Trusts' account at Fortis Bank to the Trusts' accounts with HSBC Monaco;

135.2 At no time were the Trustees' decisions to issue the Payment Instructions motivated by a concern to remove funds from the Principality of Monaco. I am informed by the Trustees that their concern was simply to rectify a perceived over-reliance of the Trusts on the fortunes of a single bank. However, since neither of the Trusts had other existing banking relationships in the Principality besides those with HSBC Monaco, instructions were given by the Trustees to transfer funds to other banking institutions in different jurisdictions where the Trusts did have existing banking relationships;

135.3 This perceived over-reliance of the Trusts on the fortunes of HSBC was due not only to the fact that the size of the Trusts' portfolios held at HSBC Monaco were substantially larger than the size of the Trusts' portfolios held at other banking institutions. The objective of portfolio diversification became even more urgent in light of the emergence of the Madoff affair. This was not only because of the already fragile state of the banking system, but also because it was understood that

many banks themselves had significant exposure to Madoff. This has since been illustrated by the number of civil actions which have been commenced against HSBC and other banks in relation to the Madoff affair. Additional factors included:

- The Bank of Bermuda (wholly-owned by HSBC) was the banker to the Kingate Funds and to KML;

- HSBC had subscribed to the Kingate Funds on behalf of its clients;

- There were numerous market rumours at the time that HSBC might be acting as banker or administrator to other funds which had provided assets to BMIS besides the Kingate Funds;

- HSBC Guernsey was the custodian, administrator and banker to a large fund of hedge funds managed by FIM;

- HSBC London was the banker to FIM and certain subsidiaries of the FIM Group; and

- HSBC London is a personal banker to both Carlo Grosso and Federico Ceretti.

135.4    The Payment Instructions were not the result of any intention on the part of the Trustees to remove assets from the Trusts. The Payment Instructions request transfers between accounts in the legal ownership of the Trusts and do not represent an attempt to distribute assets of either Trust. At all times, the Trustees' only concern was to preserve the assets of the Trusts. I am informed by the Trustees that at no time during the relevant period did the Trustees engage in any discussions regarding the possibility of making any distributions from the Trusts to the beneficiaries or otherwise.

135.5    The Payment Instructions related to transfers of funds to recognised banking jurisdictions (Guernsey and Switzerland).

**Federico 61**

136.    The account numbered 60543 with HSBC Monaco in the name Federico 61 ("**Federico 61**") is a personal account owned by Federico Ceretti. As at 31 December 2008 this account had a value of €5,525,285.

137.    The Freezing Order had the effect of freezing this account. The following points should be noted:

137.1    The assets of Federico 61 are legally owned by Mr Ceretti. I understand that those assets represent the assets of a trust structure wholly separate from The El Prela Trust and wholly unrelated to KML or the Kingate Funds, which was liquidated prior to September 2007;

137.2    Federico 61 is wholly unrelated to the Trusts and to the accounts with HSBC Monaco held by the Trusts or their subsidiary companies. Nor does the account or its assets have any connection (direct or indirect) with the activities (alleged or otherwise) of Madoff or BMIS; and

137.3    None of the assets in Federico 61 are derived from any distributions made or dividends paid by KML, or to the Ceretti Distributions or the Grosso Distributions, or to consultancy or distribution fees earned by FIM from KML.