# EXHIBIT B

## *FEE SCHEDULE*

In consideration for the services detailed under Clause 3 of this Agreement, FIM shall be entitled to receive such fees as may be agreed from time to time between Kingate, the Fund and FIM. Such fees shall not abate and may be supplemented by reference to any other remuneration of FIM.

2. Such fees (payable to the extent that Kingate receives its management fee under the terms of its Management or Co-Management Agreement with the Fund) shall be no less than:

- 0.50% (one-half of one percent) per annum of the Net Asset Value of the Fund (being the sum of the Net Asset value of each Class of Shares of the Fund calculated in accordance to the Information Memorandum of each Class of Shares of the Fund), and

- US$ 300,000 (three hundred thousand U.S. dollars)

3. Such fees shall be payable in twelve equal monthly instalments of the greater of 1/12th of 0.50% (one twelfth of one-half percent) of the Net Asset Value of the Fund calculated as of the close of business on the last Business Day of each calendar month (as defined in the Fund's Information Memorandum) and US$ 25,000 (twenty five thousand U.S. dollars). The first payment shall be due as of the last Business Day of the month of December 1995 and subsequent payments shall be due as of the last Business Day of each calendar month.

4. FIM shall at its own expense employ such staff as may be necessary for the proper performance of its duties under the terms of this Agreement, except that reasonable travel expenses as mutually agreed in advance by the parties may be reimbursed by Kingate to FIM upon presentation of statement by FIM.

Attorney Eyes Only

# Deed of Novation

between

## Kingate Management Limited
as the Continuing Party

## FIM Limited
as the Outgoing Party

and

## FIM Advisers LLP
as the Incoming Party

relating to

the assumption of obligations and benefits by FIM Advisers LLP of a consulting services agreement relating to Kingate Global Fund, Ltd – USD Shares

# CONTENTS

1.    Interpretation .................................................................................................................... 1

2.    Novation .............................................................................................................................. 1

3.    Confirmation of terms ...................................................................................................... 2

4.    Limitation Periods ............................................................................................................. 2

5.    Governing Law ................................................................................................................... 2

**THIS DEED OF NOVATION** is dated     29th July 2005 and made

**BETWEEN:**

(1)     **KINGATE MANAGEMENT LIMITED,** (the "Continuing Party"), a limited liability company incorporated in Bermuda and having its registered office at 99 Front Street, Hamilton HM 11, Bermuda; and

(2)     **FIM LIMITED,** (the "Outgoing Party"), a limited liability company registered in England and Wales and having its registered office at 20 St James's Street, London, SW1A 1ES, England; and

(3)     **FIM ADVISERS LLP,** (the "Incoming Party"), a limited liability partnership registered in England and Wales and having its registered office at 20 St James's Street, London, SW1A 1ES, England.

**Background:**

(A)     This Agreement is supplemental to the Original Agreement.

(B)     The parties hereto have agreed that with effect from the effective date the Outgoing Party shall cease to be a party to the Original Agreement and that the Incoming Party shall become a party thereto in place of the Outgoing Party and accordingly the Outgoing Party shall be released and discharged from the Original Agreement upon the terms and to the extent set out in this Agreement.

**THE PARTIES AGREE THAT:**

1.     **Interpretation**

    In this Agreement:

    "Original Agreement" means the Consulting Services Agreement dated 23rd April 2001 (as amended on June 7th 2001) made between the Continuing Party and the Outgoing Party.

    "Effective Date" means 1st August 2005.

2.     **Novation**

2.1     **Substitution of parties**

    (A)     The Incoming Party hereby undertakes to the Continuing Party to perform the Original Agreement and be bound by the terms thereof in every way as if the Incoming Party was, with effect from the Effective Date, a party to the Original Agreement in place of the Outgoing Party.

    (B)     The Continuing Party hereby releases and discharges the Outgoing Party from all obligations and liabilities of the Outgoing Party under the Original Agreement becoming due to be performed or satisfied on or after the Effective Date and all claims and demands whatsoever in respect thereof and accepts the performance thereof by the Incoming Party in place of performance by the Outgoing Party and hereby undertakes to the Incoming Party, with effect from the Effective Date, to

LN: 1CFD8C8

1

perform the Original Agreement and be bound by the terms thereof in every way as if the Incoming Party was a party to the Original Agreement in place of the Outgoing Party.

### 2.2    Surviving obligations

The Incoming Party shall be liable to the Continuing Party in respect of the respective obligations and liabilities of the Outgoing Party under the Original Agreement becoming due to be performed or satisfied prior to the Effective Date and all claims and demands in respect thereof in all respects as if this Agreement had not been made and the Incoming Party was a party to the Original Agreement in place of the Outgoing Party.

### 3.    Confirmation of terms

The Continuing Party and the Incoming Party hereby confirm the terms of the Original Agreement with the exception only of the substitution of parties hereby effected.

### 4.    Limitation Periods

Nothing in this Agreement shall have the effect of extending any limitation period set out in, or applicable to, the Original Agreement and nothing in this Agreement shall operate to enable any claims to be brought against the Incoming Party whether in tort, contract or otherwise which, but for this Agreement, would be statute barred if made against the Outgoing Party.

### 5.    Governing Law

This Agreement shall be governed by and construed in accordance with the laws of England and the parties hereto hereby submit to the non-exclusive jurisdiction of the English Courts.

IN WITNESS whereof this Deed of Novation has been executed as a deed by the parties hereto the day and year first above written.

LN: 1D5F403

2

EXECUTED AS A DEED by
KINGATE MANAGEMENT LIMITED acting by:

............................................
Director

EXECUTED AS A DEED by
FIM LIMITED acting by:

............................................
Director

EXECUTED AS A DEED by
FIM ADVISERS LLP
acting by:

............................................
Member

LN: 1D5F403

# MANAGER AGREEMENT

## KINGATE EURO FUND, LTD.

**MANAGER AGREEMENT** (the "Agreement"), as of May 1, 2000 by and among KINGATE MANAGEMENT LIMITED, a company organized under the laws of Bermuda (the "Manager"), and KINGATE EURO FUND, LTD., a company organized under the laws of the British Virgin Islands (the "Fund").

## W I T N E S S E T H:

WHEREAS, the Fund has been organized for the principal purpose of investing its assets pursuant to a strategy as more fully described in the Information Memorandum with respect to the Fund's Common Shares (the "Shares"), initially dated as of May 1, 2000, as the same may from time to time be amended and/or supplemented (the "Information Memorandum");

WHEREAS, the Fund may from time to time issue securities in addition to the Shares such as without limitation, common or preferred stock, interests, participations, rights, notes, derivative arrangements and property interests of all sorts (collectively, including the Shares, the "Securities" or individually a "Security"); and

WHEREAS, the Fund's Board of Directors (the "Directors") desires to continue to avail itself of the experience, advice and assistance of the Manager and others to whom the Manager may delegate all or part of its responsibilities hereunder, with respect to the investment of its assets and the performance of investment management, accounting, sales and marketing outside of the United States, administration, custodial, banking and other services on behalf of the Fund;

NOW, THEREFORE, in consideration of the mutual premises and covenants contained herein, the Manager and the Fund hereby agree as follows:

## PART 1. DEFINITIONS; SCOPE

All capitalized terms used herein and not otherwise defined herein shall have the meaning set forth in the Information Memorandum or if none, as set forth in the operative documents or subscription materials pursuant to which the particular Security was issued by the Fund (the "Operative Documents"). The parties intend that the scope of this

[615593-3]

Agreement be broad enough to cover all Securities issued by the Fund from time to time
and that this Agreement be construed broadly in that regard.

## PART 2. INVESTMENT MANAGEMENT SERVICES

2.1    *Investment Program.*  Subject to the ultimate supervision of the Directors,
and in accordance with the investment objectives, policies, guidelines and restrictions
which are set forth in each Information Memorandum or Operative Documents or which
are otherwise communicated to the Manager, the Manager shall develop, update and
effect an overall investment strategy for the investment of the assets of the Fund as well
as evaluate and select potential investments which are consistent with such strategy.

2.2    *Authority of the Manager.*  The Manager shall have full discretion and
authority, without obtaining the Fund's prior approval, to implement the Investment
Objective set forth in the Information Memorandum or
Operative Documents and to manage the investment and reinvestment of the assets of the
Fund in such manner as the Manager considers appropriate, market the Securities and
otherwise act in connection with the directions of the Fund.   In furtherance of the
foregoing, the Fund hereby designates and appoints the Manager with full power and
authority and without the need for further approval of the Fund (except as may be
required by applicable law) to carry out the following with respect to the assets of the
Fund:

(a)    subject to compliance with any applicable regulatory requirements,
to effect purchases and sales (including short sales) of securities and other transactions
relating to the management of the assets of the Fund, at all times consistent with the
investment strategy as set out in the Information Memorandum or any Operative
Documents;

(b)    to make loans, whether secured or unsecured, to any entity (other
than an affiliate of the Manager) of any kind and on such terms and conditions as the
Manager deems appropriate;

(c)    to make all decisions relating to the manner, method and timing of
investment transactions, and to select brokers and dealers (including affiliates of the
Manager) for the execution, clearance and settlement of any transactions;

(d)    to trade on margin, to borrow from banks, brokers or other
financial institutions and to pledge assets of the Fund in connection therewith;

---

•  In accordance with Information Memorandum, the Fund is authorized to invest following what is
commonly known as a "split strike conversion" strategy by employing the services of an NASD registered broker
dealer with expertise in such strategy.

(e)     to direct prime brokers and custodians to deliver funds or securities for the purpose of effecting transactions, and to instruct such entities to exercise or abstain from exercising any privilege or right attaching to such assets; and

(f)     to make and execute, in the name and on behalf of the Fund, or in nominee accounts, all such documents (including, without limitation, customer agreements and other documents in connection with the establishment and maintenance of brokerage accounts) and to take all such other actions which the Manager considers necessary or advisable to carry out its investment management duties hereunder;

(g)     to enter into one or more consulting arrangements with one or more consultants, who may be affiliated with the Manager (and upon whom the Manager shall be entitled to rely) in order to hedge the currency risk between the Euro and the U.S. Dollar, including without limitation, to cause the Fund to be a counterparty in one or more FX agreements intended to hedge such risk.; and

(h)     to retain auditors consultants, experts and attorneys including such firms with whom the Manager (or any director of the Manager) is or may be affiliated, and

(i)     all other actions as may be necessary or appropriate to further the offering and the Investment Objective and investment program as set forth in the Information Memorandum and administrative matters in connection therewith.

2.3     *Custody.* Portfolio securities and other financial assets of the Fund shall be maintained at all times in the custody of one or more banks, prime brokers, trust companies, brokerage firms, investment advisers, brokers, dealers or other financial institutions as shall have been approved for that purpose by the Manager.

2.4     *Investments for the Accounts of Others.* It is understood that the Manager and its affiliates hereof may effect investment transactions for their own account and for the accounts of other customers, and the Fund further understands and agrees that nothing herein shall restrict the ability of the Manager and its affiliates from engaging in any such transactions notwithstanding the fact that the Fund may have or may take a position of any kind; provided, however, that the Manager or its affiliates shall not without the consent of the Fund cause the Fund to purchase any asset from or sell any asset to the Manager or any of its affiliates or any other person or entity for which the Manager or its affiliates is acting, unless such transaction involves (i) the purchase or sale of a security listed on a recognized securities exchange and such transaction is effected at current market prices or (ii) the purchase or sale of an interest or share of a privately placed investment vehicle and such transaction is effected at a price determined by an independent third party or by the Administrator of such investment vehicle.

When the Manager deems the purchase or sale of securities to be in the best interests of the Fund and of other clients, the Manager may aggregate the securities to be

[615593-3]

purchased or sold. In such event, allocation of the securities purchased or sold, as well as expenses incurred in the transaction, shall be made in a manner which the Manager considers to be the most equitable, and if all such orders cannot be filled at the same price, the Manager may cause the Fund and the Manager's other clients to pay or receive the average of the prices at which such orders were filled. Similarly, if an order on behalf of more than one client cannot be fully executed under prevailing market conditions, the Manager may allocate the securities purchased or sold among the different clients on a basis which the Manager considers equitable.

2.5    *Access to Information.*  The Manager shall retain, for a period of at least five (5) years, copies of any documents generated or received by the Manager in the ordinary course of business pertaining to the financial condition of the Fund's assets or to the compensation payable to the Manager.  At the request of the Fund, the Manager shall afford to the Fund's independent auditors reasonable access to such documents during customary business hours and shall permit the Fund's auditors to make copies thereof or extracts therefrom at the expense of the Fund.

2.6    *Delegation.*   The provisions of this Part 2 relating to investment management may be delegated to one or more persons or entities (including an affiliate of the Manager) pursuant to Section 4.8 hereof.  It is expected that investment management functions described in subsections 2.2(a), 2.2(c) and 2.2(e) will be assigned and delegated to Bernard L. Madoff Investment Securities, a New York based NASD registered broker-dealer.  Upon a proper delegation, the Manager shall be relieved of any responsibility for the acts or omissions of such delegate.

## PART 3. PLACEMENT AND ADVISORY SERVICES

3.1    *Provision of Placement Duties and Advisory Services.*  In accordance with the provisions of the Memorandum and Articles of Association of the Fund, as they may exist from time to time, and the Information Memorandum or Operative Documents, as the case may be, and under the ultimate supervision of the Directors, the Manager shall be responsible for performing (or procuring the performance of), and is hereby authorized and empowered to perform (or procure the performance of), all duties and functions necessary or appropriate in connection with the placement of the Securities outside of the United States and advising the Fund on general matters affecting its structure and operations, including from time to time advising the Directors concerning:

(a)    the suitability of the Fund's structure and operating procedures in light of the expectations of prospective investors;

(b)    steps which may be taken to enhance the marketability of the Fund's Securities and to improve investor relations;

(c)    the identification and evaluation of candidates to serve as Directors;

[615593-3]

(e)      general economic and financial developments in international securities and capital markets affecting the Fund's investment program.

(f)      in general, all aspects relating to Fund's administration, accounting, legal and operational matters.

3.2      *Meetings of Directors.*  At the request of the Directors and subject to reasonable prior notice, the Manager, at its own expense, shall each endeavor to make one of its executive officers available to attend the meetings of the Directors to report on the Manager's activities and on other matters pertaining to its engagement.

3.3      *Placement of the Securities.*  The Manager shall act as the placement agent for the Securities outside of the United States.  The Manager shall use its best efforts to procure applications for the purchase of Securities by eligible investors, either directly or through securities dealers and other financial institutions selected by the Manager pursuant to Section 3.4 hereof (the "authorized dealers").  The Securities shall be offered at the subscription price and on the terms and conditions set forth herein and in the Information Memorandum or Operative Documents.  All applicants shall be subject to acceptance by the Fund (it being understood that the Fund shall have the right to reject applications or to receive or accept on behalf of the Fund any funds or other property tendered as payment for the Securities.)

3.4      *Authorized Dealers.*

(a)      The Manager may appoint securities dealers and other financial institutions as authorized dealers to solicit applications to purchase the Securities, one or more of whom may be affiliates of the Manager.  The Manager shall use reasonable efforts to ensure that any such authorized dealer shall conduct solicitation activities in accordance with all of the conditions, restrictions and limitations applicable to the Manager's direct placement activities as set forth in this Agreement.

(b)      Upon request, the Manager shall promptly furnish to the Fund a copy of any written agreement with any authorized dealer relating to the solicitation of applications for the Securities.

3.5      *Offering Materials.*

(a)      The Manager shall deliver, or arrange for the delivery by any authorized dealer selected by the Manager, to each person to whom the Securities are offered a copy of the Fund's most recently published Information Memorandum or Operative Documents for the respective Security.

(b)      If any form of offering materials (including any form of advertisement or other solicitation materials calculated to result in an expression of

[615593-3]

interest in subscribing for the Securities) concerning the Fund or the Securities other than the Information Memorandum or Operative Documents is required or permitted to be given to any prospective investor under the laws of any jurisdiction in which the Securities are offered by or through the Manager, the Manager agrees that any such document (i) shall not contain any information concerning the Fund or the Securities which is inconsistent with the Information Memorandum or Operative Documents, and (ii) shall comply in all respects with the laws of the jurisdiction in which it is furnished.

(c)     The Manager acknowledges and agrees that no person is authorized to make any representations, whether written or oral, concerning the Fund and the Securities which are inconsistent with the Information Memorandum and that all offers of the Securities shall be made in conformity with the terms and conditions set forth therein.

3.6     *Certain Legal Restrictions.*

(a)     None of the Securities shall be offered by the Manager or any authorized dealer to any person who is not reasonably believed by the Manager or the authorized dealer to be an Eligible Investor as set forth in each Information Memorandum or the Operative Documents. Furthermore, none of the Securities shall be offered or sold to any person to whom it would be illegal to offer or sell the Securities.

(b)     The Securities and the Fund have not been and will not be registered or qualified for offer and sale under the applicable laws of any jurisdiction governing the offer or sale of investment company Securities or other securities. Neither the Manager nor any authorized dealer shall (i) solicit any applications or otherwise extend any offers for the purchase of the Securities, or (ii) deliver (or have in their possession for the purpose of delivery) the Information Memorandum or Operative Documents or any other offering literature relating to the Fund or the Securities, to any person in any jurisdiction in which such solicitation or delivery would be unlawful. The Manager represents to the Fund that it has informed itself as to the applicable legal restrictions governing the offer and sale of the Securities under the laws of any jurisdiction in which it intends to place share applications and that based on the methods of placement contemplated by the Manager, the sale of the Securities by the Fund to any person in any such jurisdiction will not be in violation of any applicable laws by reason of the activities of the Manager. The Manager undertakes to comply with the foregoing representations in connection with its placement activities (including the appointment of any authorized dealers) during the term of this Agreement.

3.7     *Delegation.* The provisions of this Part 3 may be delegated to one or more persons or entities (including an affiliate of the Manager) pursuant to Section 4.8 hereof.

3.8     *Consultants.* The Manager is authorized to engage consultants and other advisors to assist them in connection with their duties hereunder. The Fund agrees to such an arrangement and will incur the reasonable expenses thereof.

[615593-3]

## PART 4. GENERAL PROVISIONS

The following general terms and conditions shall apply to the performance of the Manager's obligations as set forth in Parts 2 and 3 above:

4.1 *Compensation.*

(a)  Management Fee.  The Manager shall be entitled to a fixed monthly asset based fee (the "Management Fee") with respect to any Securities as such fee is defined and described in the Information Memorandum or the Operative Documents.

(b)  Administration Fee.  The Manager shall be entitled to a fixed monthly asset based fee (the "Administration Fee") with respect to any Securities as such fee is defined and described in the Information Memorandum or the Operative Documents.

(c)  Performance Fees.  The Share class presently outstanding as of the date of this Agreement is without a performance fee arrangement.  In the event that Securities are issued by the Fund with a performance fee or incentive fee attached, then the parties will deal with such fee by separate agreement.

(d)  Other Benefits.  The Manager shall be entitled to receive other benefits (including redemption fees) that may be derived in connection with the issuance of Securities. ("Other Benefits")

(e)  Agents.  The Fund may pay a fee to third parties that introduce investors to the Fund and enter into compensation arrangements with such third parties.

(f)  In the event that this Agreement is terminated, the Management Fee, the Administration Fee, any performance fee and Other Benefits will be computed as of such termination date.

(g)  The Fund acknowledges that if a performance fee is attached to a Security issued by the Fund, the performance fee may create an incentive for the Manager to make investments that are riskier or more or less speculative than would be the case in the absence of a fee based on the performance of such Security.  In addition, the performance fee shall be based on unrealized, as well as realized, appreciation and depreciation of the investments relating to such Security of the Fund.

4.2 *Expenses.*

(a)  Except as otherwise provided below, the Manager shall bear all of its own costs and expenses incurred in the performance of its services provided pursuant

[615593-3]

12-01920-smb Doc 255-1 Filed 02/28/14 Entered 02/28/14 10:51:85 Exhibit E Page 14 of 63

to this Agreement as well as those attributable to the fees payable to delegates of and consultants to the Manager appointed pursuant to Sections 4.8 and 4.9 respectively.

(b) The Manager shall be reimbursed for all fees, costs and expenses incurred in connection with the performance of any services required or permitted to be procured for the Fund by the Manager pursuant to this Agreement including, but not limited to, all expenses related to trading the assets of the Fund (i.e., interest on margin borrowing, custodial fees, brokerage commissions, bank service fees and interest on loan and debit balances).

(c) Except as set forth above, the Fund shall bear all expenses incident to its organization, operations and business, including (i) brokerage commissions and charges on portfolio transactions, (ii) fees and charges of custodians and clearing agencies, (iii) interest and commitment fees on loans and debit balances, (iv) withholding taxes, transfer taxes and other governmental charges and duties, (v) fees of the Fund's legal advisors and independent auditors, (vi) Directors' fees and expenses, (vii) the costs of maintaining the Fund's registered office in the British Virgin Islands and elsewhere, and (viii) the costs of printing and distributing any offering documents, reports and notices to shareholders or prospective investors.

4.3    *Scope of Liabilities.*    The Manager (and any officer or director of the Manager) shall not be liable to the Fund or its Security holders for any error of judgment or for any loss suffered by the Fund or its Security holders in connection with its services in the absence of gross negligence, willful default, fraud, or dishonesty in the performance or non-performance of their obligations or duties.

4.4    *Indemnification.*

(a) The Fund shall indemnify the Manager (which shall include solely for purposes of this Section 4.4, the Manager's directors, officers, employees, members and shareholders) and hold the Manager harmless from and against any expense (including without limitation legal fees and expenses), loss, liability or damage arising out of any claim asserted or threatened to be asserted in connection with the Manager serving or having served in good faith pursuant to this Agreement; provided, however, that the Manager shall not be entitled to any such indemnification with respect to any expense, loss, liability or damage which was caused by such Manager's own gross negligence, bad faith, breach of fiduciary duty, willful or reckless malfeasance or disregard of any of its obligations under this Agreement and such indemnification shall only be to the extent legally permissible under and by virtue of the laws of the jurisdiction in which Securities are offered or placed.

The indemnification provisions set forth in this Section shall not be construed as limiting in any way the provisions of Section 4.1(e).

[615593-3]

(b)     The Manager shall indemnify the Fund against, and hold it harmless from, any expense, loss, liability or damage arising out of any claim asserted or threatened to be asserted by any third party as a consequence of any misstatement of any material fact or any other material misrepresentation concerning the Fund or the Securities by the Manager (other than any misstatement or misrepresentation contained in any document approved by the Fund).

(c)     In the event that either party hereto is or becomes a party to any action or proceeding in respect of which it may be entitled to seek indemnification hereunder or under Section 4.1 (the "indemnitee") the indemnitee shall promptly notify the other party (the "indemnitor") thereof. The indemnitor shall be entitled to participate in any such suit or proceeding and, to the extent that it may wish, to assume the defense thereof with counsel reasonably satisfactory to the indemnitee. After notice of an election by the indemnitor so to assume the defense thereof, the indemnitor will not be liable to the indemnitee hereunder for any legal or other expenses subsequently incurred by the indemnitee in connection with the defense thereof other than reasonable costs of investigation or reasonable legal expenses incurred as a result of (i) potential conflicts of interest between the indemnitee and indemnitor or (ii) the protection of proprietary or privacy interests of other clients of the indemnitee. The indemnitor shall advance to the indemnitee the reasonable costs and expenses of investigating and/or defending such claim, subject to receiving a written undertaking from the indemnitee to repay such amounts if and to the extent of any subsequent determination by a court or other tribunal of competent jurisdiction that the indemnitee was not entitled to indemnification hereunder.

(d)     The indemnitor shall not be liable hereunder for any settlement of any action or claim effected without its prior written consent thereto.

4.5     *Independent Contractor.*  For all purposes of this Agreement, the Manager shall be an independent contractor and shall not be deemed an employee or agent of the Fund; nor shall anything herein (notwithstanding Section 2.2 hereof) be construed as making the Fund a partner or co-venturer with the Manager or any of its affiliates.

4.6     *Information Concerning Activities.*  The Manager shall provide to the Fund from time to time and on request, information regarding the activities (i) conducted by the Manager since the inception of this Agreement or since the most recent date on which the Manager provided information to the Fund regarding the activities of the Manager and (ii) proposed to be conducted by the Manager. The Manager shall furnish information concerning the Manager and any authorized dealers and concerning the activities undertaken by it for the Fund as the Fund may reasonably request.

4.7     *Term. Termination and Renewal.*  The initial term of this Agreement commenced as of May 1, 2000 and shall continue until December 31, 2002. Thereafter, this Agreement will be automatically renewed for successive one-year periods, subject to termination as of December 31, 2002 or the close of any calendar month thereafter by

[615593-3]

either party upon not less than one hundred twenty (120) days' prior written notice to the other party.  In the event of termination, the provisions of Section 2.5 and Part 4 shall survive.

4.8     *Delegation.*

(a)     The Manager shall be authorized to delegate as appropriate, in its discretion, any of the duties or obligations imposed upon it hereunder to one or more other persons or entities, whether affiliated with or independent of the Manager.

(b)     In the event of any such delegation of duties or obligations hereunder pursuant to any agreement consented to in writing by the Fund, the Manager shall be relieved and discharged of its obligations to perform the services so delegated other than the continuing obligation (subject at all times to the standard of care set forth in Section 4.3 hereof) to take reasonable measures to ascertain the competence of the delegate to perform the services so delegated.  Notwithstanding any other provision of this Agreement, following the Fund's consent to any such delegation agreement, the Manager shall not incur any liability hereunder to the Fund pursuant to Section 4.3 hereof for any acts or omissions of such delegate and shall remain entitled to indemnification as provided in Section 4.4 hereof.

(c)     Whenever the Fund's consent to delegation is requested by the Manager, such consent shall not be withheld without reasonable cause.

(d)     The Manager may arrange for compensation payable to any person or entity to which duties are delegated hereunder to be made directly from the Fund out of fees otherwise payable to the Manager.

4.9     *Consultants.* The Manager is authorized to engage, and are authorized to delegate the authority to engage, consultants and other advisors to assist it or its delegates in connection with its or their duties hereunder.  The Fund agrees to such arrangements and will, upon prior agreement in writing, incur, or provide reimbursement for, the reasonable expenses thereof.

4.10     *Modification; Waiver.* Except as otherwise expressly provided herein, this Agreement shall not be amended, nor shall any provision of this Agreement be considered modified or waived, unless evidenced in writing and signed by the party to be charged with such amendment, waiver or modification.

4.11     *Notice.* Notices by one party to the other shall be made by facsimile, certified mail return receipt requested, or by recognized private courier (e.g., Federal Express, Airborne Express, etc.) at the usual business location of such other party.

4.12     *Binding Effect; Assignment.* This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, and in the case of

[615593-3]

an individual, his heirs and estate, but the rights and obligations hereunder shall not be assignable, transferable or delegable without the written consent of the other party hereto except as provided in Section 4.8 hereof and any attempted assignment, transfer or delegation thereof without such consent except as provided in Sections 2.6, 3.7 and 4.8 hereof shall be void.

4.13    *Governing Law.*    This Agreement shall be governed by and construed in accordance with the substantive laws of Bermuda applicable to contracts made and entirely to be performed therein.

4.14    *Counterparts.*    This Agreement may be signed in any number of counter-parts. Any single counterpart or a set of counterparts signed in either case by the parties hereto, shall constitute a full and original Agreement for all purposes.

4.15    *No Third Party Beneficiaries.*    Except as otherwise expressly provided for herein, the provisions hereof are for the sole benefit of the parties hereto and their successors and assigns (heirs and estates, as the case may be) and shall not be construed as containing, and are not intended to confer, any rights remedies or other benefits on any other persons.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as a deed as of the day and year first above written.

[615593-3]

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as a deed as of the day and year first above written.

KINGATE MANAGEMENT LIMITED
(The Manager)

Acting By:  _____

Name:

Title:

In the Presence of: 

Witness

KINGATE EURO FUND LIMITED
(The Fund)

Acting By:  _____

Name:

Title:

In the Presence of: 

Witness

[615593-3]

Dated 23/4 2001

# KINGATE MANAGEMENT LIMITED

## -and-

# FIM LIMITED

---

**Consulting Services Agreement**

**-relating to-**

**Kingate Euro Fund, Ltd.**

---

**THIS CONSULTING SERVICES AGREEMENT** is made this 23 day of Apr 2001

**BETWEEN:**

1.  **KINGATE MANAGEMENT LIMITED,** a limited company registered in Bermuda (under number EC-19184) and whose registered office is at 99 Front Street, Hamilton HM11, Bermuda (the "Manager");

2.  **FIM LIMITED,** a limited company registered in England and Wales (under number 1536755) and whose registered office is at 62 Wilson Street, London EC2A 2BU ("FIM").

**WHEREAS:**

(A)  Kingate Euro Fund, Ltd. (the "Company") is open-end investment company organized as an international business company in the British Virgin Islands ("B.V.I.").

(B)  By a Management Agreement effective May 1, 2000 between the Company and the Manager (the "Management Agreement") the Company has appointed the Manager to provide it with investment management and other services in relation to the Company's assets and operations in accordance with the provisions of the Management Agreement.

(C)  Under the provisions of the Management Agreement the Manager is authorised to appoint delegates to assist it in the discharge of its function under the Management Agreement.

(D)  In connection therewith FIM has been providing consultancy and other services to the Manager since May 1, 2000.

(E)  The Manager now wishes to appoint FIM as a consultant to the Manager to provide it with consultancy and other services to assist in the day to day management of the Company's assets undertaken by the Manager under the Management Agreement.

(F)  FIM is regulated in the conduct of investment business in the United Kingdom by the Investment Management Regulatory Organisation Limited ("IMRO") or its successor(s) or replacement(s).

(G)   This Agreement is in a form which complies with the Rules of IMRO on the basis that the Manager and the Company (which is an unregulated collective investment scheme) are Non-Private Customers (as defined in the IMRO Rules).

**NOW IT IS HEREBY AGREED** as follows:

1.   **Definitions and Constructions**

(a)   Save where the context otherwise requires, terms and expressions defined for the purposes of the Information Memorandum ("Information Memorandum")and the rules of IMRO shall have the same meaning when used in this Agreement.

(b)   "Information Memorandum" means the Information Memorandum of the Company dated 1 May 2000 relating to the Shares of the Company as the same may from time to time be amended or replaced. The term "Group Company" when used in this agreement means any company within the group comprising the Manager and any subsidiaries, holding companies and associated companies.

(c)   "IMRO" means the Investment Management Regulatory Organisation Limited or its successor(s) or replacement(s).

(d)   "Operative Documents" means any and all documents which may be issued by the Company in relation to the issue of securities (other than Shares) of the Company.

(e)   "Shares" means the Participating Common Shares of the Company.

(f)   References to any statute, statutory enactment, rules and regulations shall be references to such statutes, statutory instruments, rules or regulations as from time to time amended, re-enacted, replaced or substituted.

2.   **Appointment of Consultant**

2.1   This Agreement shall be operative with effect on and from May 1, 2000 (the "Effective Date").

2.2   FIM hereby agrees with the Manager to act as a consultant to the Manager to provide such advice and recommendations as the Manager may from time to

time require in connection with its management of the Company's assets and in the implementation of the investment objectives and policies of the Company in accordance with the provisions of the Management Agreement. This Agreement waives FIM's formal duty of Best Execution as defined by the rules of IMRO.

2.3 In providing consulting services to the Manager pursuant to this Agreement, FIM shall at all times have due regard to the need to comply with the following requirements:-

    (a) the investment objective, policy and powers of the Company as outlined in the Information Memorandum and Operative Documents;

    (b) any investment or other restrictions for the time being contained in the Memorandum of Association of the Company or the Articles (each as amended from time to time) or in the Information Memorandum and Operative Documents;

    (c) the provisions of the Management Agreement to which the Manager is subject in its provision of management services to the Company; and

    (d) any other matter to which a prudent consultant should reasonably pay regard in the proper discharge of its duties.

2.4 The Manager undertakes to provide FIM with copies of the Information Memorandum, Memorandum of Association, Articles of Association, Operative Documents and the Management Agreement and all amendments from time to time made thereto, promptly upon any such amendments being made and to provide to FIM such information in the Manager's possession as FIM may reasonably request in relation to the Company or as the Manager may consider relevant to FIM in the discharge of its duties hereunder, including, without limitation:-

    (a) details of the sums available for investment and the money required to meet redemptions or pay fees, dividends of expenses of the Company;

    (b) any notices of meetings, reports, circulars and other communications received or made by the Manager in relation to the Company and the Company's investments;

(c) any proposed changes to the investment objectives, policies and restrictions of the Company; and

(d) details of any actions taken or not taken in relation to recommendations of FIM to the Company.

Without prejudice to its obligations under clause 2.3 above, FIM shall be entitled to rely on the authenticity and completeness of such documents.

2.5 FIM represents and warrants to the Manager that it is a limited company duly registered under the laws of England and Wales having all necessary regulatory and other consents including membership of IMRO or any successor organisation thereto, including the Financial Services Authority, and pursuant to the Investment Business Act 1998 of Bermuda to the extent FIM is carrying on investment business in or from within Bermuda by virtue of this Agreement or otherwise, and capacity to provide the services and discharge the duties of a consultant required of them under this Agreement.

3.    **Consulting and Other Services**

Without prejudice to the generality of the provisions of clause 2 above, the consulting services and other services to be provided by FIM to the Manager under the terms of this Agreement shall include, without limitation:-

(a) reviewing the Company's structure and operating procedures;

(b) preparing such analyses and reports as the Manager and the Company may require, including such analyses and reports as may be required for use by the Manager;

(c) providing the Manager with assistance and support on such matters relating to investors relations as may be required by the Manager and the Company;

(d) liaising directly with the Manager on such matters relating to the Company's investment program as may be required to enable FIM to properly perform its duties hereunder;

(e) providing the Manager with advice regarding the Company's hedging activities in order to reduce the currency risk between the Euro and the US Dollar and overseeing of the execution of its recommendation; and

(e) in general, providing advice to and assisting the Manager on such aspects of the Company's operational, administrative, accounting and legal matters as may be required by the Manager and the Company.

4.    **Limitation on Authority**

4.1  FIM, acting as a consultant, shall not have the power or authority to enter into any transaction on behalf of, or in any way to bind, the Manager or the Company.

4.2  In carrying out its duties hereunder, FIM shall comply with all instructions of the Manager in connection therewith.  Such instructions may be given by letter, by fax, by e-mail or by telephone (and the Manager undertakes to confirm telephone instructions by fax, e-mail or in writing) by any director of the Manager or by any other person authorised by a resolution of the directors of the Manager (of which a copy, certified by any two such directors, shall have been supplied to FIM).

4.3  For the purposes of clause 4.2 and unless and until FIM shall receive written notice that any such person's authority has been revoked FIM may rely or act upon any instructions or communications which FIM believes, on reasonable grounds and in good faith, to have been given by or on behalf of any persons notified by the Manager from time to time in accordance with clause 4(b) as being authorised to instruct FIM.

5.    **Delegation and Use of Agents**

FIM may not delegate or sub-contract any of its duties or services under this Agreement without the prior written consent of the Manager provided that, in the event such delegation or sub-contracting is so permitted, FIM shall be relieved of any responsibility for the acts or omissions of such delegates except in circumstances where FIM shall be shown to have assumed responsibility for such acts or omissions.

6.   **Client Money**

FIM will not hold cash on behalf of the Company.

7.   **Custodial Services**

FIM will not be responsible for the provision of any safe custody services in relation to the Company.

8.   **Valuations and Reports**

FIM will provide such assistance, information and reports as the Manager and the Company's auditors may from time to time require in connection with the preparation of valuations in respect of the Company, the preparation by the Manager of periodic reports for submission to the Company and the provision of annual, semi-annual and other reports for the benefit of Shareholders or prospective Shareholders of the Company whether these are published by the Company or the Manager. FIM shall in addition provide such representative or representatives as the Manager may from time to time request to attend board meetings of the Company with the Manager and report to, and discuss with, the Directors of the Company the performance of the Company and other matters related to the management of the assets of the Company.

9.   **Investments**

FIM may provide investment advice to the Manager with respect to investments in collective investment schemes within the meaning of Section 75 of the United Kingdom Financial Services Act 1986 ("FSA") which are or are not authorised or recognised under ss78, 86, 87, 88 FSA (whether or not FIM and/or its affiliates are concerned in the operation thereof) and Contingent Liability Transactions. Advice on Contingent Liability Transactions may extend to investments not traded on exchanges recognised under the FSA or designated by the United Kingdom Financial Services Authority. Advice may relate to transactions with counterparties or through intermediaries that do not owe a duty of Best Execution.

FIM may provide investment advice to the Manager subject to FIM having all necessary regulatory and other consents pursuant to the Investment Business Act 1998 of Bermuda to the extent FIM is carrying on investment business in or from within Bermuda by virtue of this Agreement or otherwise.

10.  **Potential Conflicts of Interest and Disclosures**

FIM may be involved in other financial, investment or professional activities which may be similar to, or in competition with, its activities for the Manager with respect to the Company. FIM may effect transactions in which FIM, or its partners, officers, employees and directors, has, directly or indirectly, a material interest, which may involve a potential conflict with FIM's duty to the Manager and the Company. FIM shall disclose such conflicts, but shall not be under any obligation to account to the Manager or the Company for any profit, commission or remuneration earned or received in connection therewith. However, FIM shall at all times:-

(a) Have due regard to its duties to the Manager and the Company and, where a conflict arises, use all reasonable endeavours to ensure it is resolved fairly; and

(b) Where FIM acts as consultant to other ventures similar in nature to the Manager's and the Company's business, act fairly with respect to the Manager and the Company.

11.  **Fees and Expenses**

Fees and expenses shall be as detailed in Schedule 1 to this Agreement, or as agreed from time to time between the parties.

12.  **Exclusivity**

12.1 The appointment of FIM by the Manager hereunder shall not be deemed to be an exclusive appointment. FIM shall be free to render similar services to others as if FIM were not acting as consultant to the Manager under the terms hereof for so long as its services hereunder shall not be impaired thereby.

12.2 While this Agreement is in force, and for as long as FIM acts as consultant to the Manager to advise it on the business of the Company, the Manager may not appoint another consultant to provide services similar to the services that FIM provides under the terms of this Agreement.

13. **Liability**

13.1 In the absence of gross negligence, fraud or wilful default on the part of FIM, or failure to comply with instructions of the Manager pursuant to clause 4.2, its directors, officers, employees or agents, FIM shall not be liable to the Manager or the Company for any act or omission in the course of, or in connection with, the services rendered by it hereunder or for any decline in the value of the assets of the Company or any loss whatsoever that may result to the Company or the Manager.

13.2 The Manager agrees to keep FIM, its partners, officers, employees and directors indemnified from and against all claims, costs, charges, liabilities and expenses incurred by them directly or indirectly from any act or omission in the course of or in connection with the services provided by FIM hereunder ("Claims and/or Liabilities") provided that such indemnity shall not apply to the extent that any such Claim and/or Liability is due to the failure to comply with instructions of the Manager pursuant to clause 4.2 or the fraud, wilful default or gross negligence of FIM, its partners, officers, employees, directors or agents.

14. **Termination**

14.1 This Agreement and the appointment of FIM hereunder shall continue until 31 December 2002. Thereafter, this Agreement shall be automatically renewed for successive one year periods, subject to termination as of the close of each calendar month by either the Manager or FIM giving to the other party not less than six months' written notice (or such shorter notice as the parties may agree to accept).

14.2 Without prejudice to the accrued rights and provisions intended to survive termination, this Agreement may be terminated forthwith by written notice given by the Manager or FIM to the other party if:-

(a) the other party shall commit any material breach of its obligations under this Agreement and shall fail to make good such breach within thirty days after receipt of notice from the other party requiring it so to do;

(b) the other party becomes insolvent or goes into liquidation (except a voluntary liquidation for the purposes of a reconstruction, amalgamation or merger upon terms previously approved in writing by the other party, such consent not to be unreasonably withheld or delayed) or if a receiver or administrator is appointed over all or any of its assets;

(c) the Manager shall cease to be the manager of the Company; and

(d) FIM shall cease to be authorised by IMRO to provide its services under the terms of this Agreement.

14.3 Upon termination of this Agreement, FIM shall deliver to the Manager or to such other person or corporation as the Manager shall in writing direct, all books of account, correspondence and records or other documents which are in its power and/or possession, belonging to or relating to the Company.

14.4 On termination of this Agreement FIM shall be entitled to payment of its fees and expenses as referred to in clause 11 pro rata to the date of the termination and any additional expenses necessarily realised in settling or concluding outstanding obligations.

14.5 Termination of this Agreement shall operate without prejudice to any rights which either party may have against the other in relation to any antecedent breach by the other of any provision of this Agreement.

14.6 In the event of termination of this Agreement, all pending trades and transactions shall be settled in the ordinary course and consistent with existing trade practices.

15.   **Confidentiality**

Each party shall at all times keep confidential, confidential information acquired in consequence of its services under this Agreement except information which it is bound to disclose under compulsion of law or compulsion of regulatory agencies to whose jurisdiction it is subject. This clause shall survive the termination of this Agreement.

16.   **Notices**

Any instructions, notices, demands, acknowledgements or requests to be given by either of the parties hereunder shall, subject to any express provision of this Agreement, be given in writing in the English language (and may be delivered in person or sent by fax, e-mail or recorded delivery post) to the other party at the following address or any address subsequently notified by the relevant party to the other:-

**To FIM:**              FIM Limited
                         25-28 Old Burlington Street
                         London W1X 1LB
                         Attention: Carlo Grosso
                         Fax: (+ 44 20) 7494 1981

**To the Manager:**      Kingate Management Limited
                         99 Front Street
                         Hamilton HM11
                         Bermuda
                         Attention: Christopher Wetherhill
                         Fax: (+ 1 441) 296 6775

Notice given in person shall be effective when delivered. Notice given by fax or e-mail shall be deemed to have been given contemporaneously unless delivered outside normal business hours in which case it shall be deemed to have been received at the next time after delivery when normal business hours commence. Notice given by recorded delivery shall be deemed to have been given seventy-two hours after posting. Evidence that the notice was properly addressed and sent by recorded delivery shall be conclusive evidence of posting.

# Deed of Novation

between

### Kingate Management Limited
as the Continuing Party

### FIM Limited
as the Outgoing Party

and

### FIM Advisers LLP
as the Incoming Party

relating to

the assumption of obligations and benefits by FIM
Advisers LLP of a consulting services agreement relating
to Kingate Euro, Ltd

# CONTENTS

1.   Interpretation ...................................................................................................... 1

2.   Novation............................................................................................................... 1

3.   Confirmation of terms ........................................................................................ 2

4.   Limitation Periods .............................................................................................. 2

5.   Governing Law ................................................................................................... 2

**THIS DEED OF NOVATION** is dated     29th July 2005 and made

**BETWEEN:**

(1)     **KINGATE MANAGEMENT LIMITED**, (the "Continuing Party"), a limited liability company incorporated in Bermuda and having its registered office at 99 Front Street, Hamilton HM 11, Bermuda; and

(2)     **FIM LIMITED**, (the "Outgoing Party"), a limited liability company registered in England and Wales and having its registered office at 20 St James's Street, London, SW1A 1ES, England; and

(3)     **FIM ADVISERS LLP**, (the "Incoming Party"), a limited liability partnership registered in England and Wales and having its registered office at 20 St James's Street, London, SW1A 1ES, England.

**Background:**

(A)     This Agreement is supplemental to the Original Agreement.

(B)     The parties hereto have agreed that with effect from the effective date the Outgoing Party shall cease to be a party to the Original Agreement and that the Incoming Party shall become a party thereto in place of the Outgoing Party and accordingly the Outgoing Party shall be released and discharged from the Original Agreement upon the terms and to the extent set out in this Agreement.

**THE PARTIES AGREE THAT:**

1.     **Interpretation**

In this Agreement:

"Original Agreement" means the Consulting Services Agreement dated 23rd April 2001 (as amended on June 7th 2001) made between the Continuing Party and the Outgoing Party.

"Effective Date" means 1st August 2005.

2.     **Novation**

2.1     **Substitution of parties**

(A)     The Incoming Party hereby undertakes to the Continuing Party to perform the Original Agreement and be bound by the terms thereof in every way as if the Incoming Party was, with effect from the Effective Date, a party to the Original Agreement in place of the Outgoing Party.

(B)     The Continuing Party hereby releases and discharges the Outgoing Party from all obligations and liabilities of the Outgoing Party under the Original Agreement becoming due to be performed or satisfied on or after the Effective Date and all claims and demands whatsoever in respect thereof and accepts the performance thereof by the Incoming Party in place of performance by the Outgoing Party and hereby undertakes to the Incoming Party, with effect from the Effective Date, to

LN: 1CFDBC8

1

perform the Original Agreement and be bound by the terms thereof in every way as if the Incoming Party was a party to the Original Agreement in place of the Outgoing Party.

### 2.2 Surviving obligations

The Incoming Party shall be liable to the Continuing Party in respect of the respective obligations and liabilities of the Outgoing Party under the Original Agreement becoming due to be performed or satisfied prior to the Effective Date and all claims and demands in respect thereof in all respects as if this Agreement had not been made and the Incoming Party was a party to the Original Agreement in place of the Outgoing Party.

### 3. <u>Confirmation of terms</u>

The Continuing Party and the Incoming Party hereby confirm the terms of the Original Agreement with the exception only of the substitution of parties hereby effected.

### 4. <u>Limitation Periods</u>

Nothing in this Agreement shall have the effect of extending any limitation period set out in, or applicable to, the Original Agreement and nothing in this Agreement shall operate to enable any claims to be brought against the Incoming Party whether in tort, contract or otherwise which, but for this Agreement, would be statute barred if made against the Outgoing Party.

### 5. <u>Governing Law</u>

This Agreement shall be governed by and construed in accordance with the laws of England and the parties hereto hereby submit to the non-exclusive jurisdiction of the English Courts.

IN WITNESS whereof this Deed of Novation has been executed as a deed by the parties hereto the day and year first above written.

LN: 1D5F403

2

EXECUTED AS A DEED by
KINGATE MANAGEMENT LIMITED acting by:

...................
Director

EXECUTED AS A DEED by
FIM LIMITED acting by:

...................
Director

EXECUTED AS A DEED by
FIM ADVISERS LLP
acting by:

...................
Member

LN: 1D5F403

3

| **From:** | Robert Loigman |
|---|---|
| **Sent:** | Thursday, February 25, 2010 1:56 PM |
| **To:** | 'Chockley, Frederick W.'; 'Hirschfield, Marc E.' |
| **Cc:** | Robert Dakis; Joseph Hammond; Sarah Rubin |
| **Subject:** | BLMIS -- Kingate |
| **Attachments:** | PWC.PDF; FIM.PDF; KML - ownership.pdf; KML - provision of information & imaging.pdf |

Fritz and Marc:  Further to our discussion of late last week, I attach a few of the recent letters that the Joint Liquidators of the Kingate Funds and their representatives have sent to PWC, KML, and FIM.  As we've discussed, the JLs are actively seeking information from all three of these parties.

Please let us know if you will be providing us with a copy of the trustee's application in the UK to obtain documents from FIM.

Regards,
Bob

**Robert S. Loigman** ▫ **Partner**
**Quinn Emanuel Urquhart Oliver & Hedges, LLP**
**51 Madison Avenue, 22nd Floor**
**New York, NY 10010**
**Direct: (212) 849-7444**
**Main Phone: (212) 849-7000**
**Main Fax:  (212) 849-7100**
E-mail:  robertloigman    quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.



INTERNATIONAL LAWYERS

MERCURY HOUSE, FOURTH FLOOR   101 FRONT STREET   HAMILTON HM12, BERMUDA
*www.sedgwick-chudleigh.com*   441.296.9276 *phone*   441.296.9277 *fax*

# Sedgwick
# Chudleigh
BARRISTERS AND ATTORNEYS

Friday, January 29, 2010

Appleby Global,
Canon's Court,
22 Victoria street,
Hamilton,
HM EX
Bermuda

Attn:  Ms K. Bell

<u>By E-Mail</u>

Dear Sirs ,

**Kingate Euro Fund Limited (in liquidation) and Kingate Global Fund Limited (in liquidation) (the 'Funds')**

We refer to your letter to Mr John McKenna dated 14 December 2009.  It will not surprise you to learn that we completely disagree with what you say about the winding up orders made by the Bermuda Court and the standing of the Liquidators appointed under them.

The position your clients take leads ours to conclude that yours will do everything they can to avoid having to make the disclosures to our clients that they have asked for. The Liquidators are in the course or preparing an application to the Court.  We write today to inform you that our clients have issued (but do not intend yet to serve) a writ against your clients in respect of their 2003 audits of the Funds. They have been constrained to do so largely because of your clients' failure to co-operate with them as noted above; they were put in the position of having to issue in order not to fall foul of a limitation bar.

Accordingly, this writ is entirely protective in nature, at this stage, and we emphasise that our clients have taken no decision to pursue any claims against your clients. Instead, they are engaged in a fact-gathering process in order to try to determine whether or not they or the Funds should pursue any causes of action against your clients and others, and in the meantime have issued this writ in order that the Funds, their creditors and members should not be prejudiced by the passing of a limitation deadline.

Yours faithfully,

*Sedgwick Chudleigh*

**SEDGWICK CHUDLEIGH**
**By:    Cameron Hill**

*Sedgwick Chudleigh is an independent law firm under the Bermuda Bar Act 1974*
*Associated with Sedgwick, Detert, Moran & Arnold LLP, www.sdma.com*



25 November 2009

P.O. Box 4571
2nd Floor, Palm Grove House
Wickhams Cay, Road Town
Tortola
British Virgin Islands VG1110
t: +1 284 494 9600
f: +1 284 494 9601
www.zolfocooper.com

Mr D Dwyer
Wakefield Quin
P.O. Box HM809
Hamilton, HMZX
Bermuda

Dear Dennis

**Kingate Global Fund Limited and Kingate Euro Fund Limited – both in Liquidation (the "Funds")**

Your client: Kingate Management Limited ("KML")

Thank you for your long letter of 23 November 2009. I have also received Katie Richard's email of 24 November 2009.

I do not propose to respond at similar length but merely to observe that it is common ground that the process of segregating documents we previously identified has failed for reasons associated with the volume and quantum of data not being as had been understood and expected by me on the basis of information I had received. I think it best to leave it there; there is no point in re-rehearsing the arguments.

It is now clear from your letter and the email in response to my letter of 17 November, that you have embarked upon a process of production and segregation over which I have no visibility. You have advised that a Mr. Garry Pate of Capsicum Group, LLC, of whom I know nothing, has undertaken the work but you have not explained the criteria provided for the segregation of data nor the methodology adopted. Nonetheless, you have advised me that data is available and I will, as requested, arrange for it to be collected by a representative of Sedgwick Chudleigh and I will review it. Meanwhile please explain precisely how this material has been created. Without pre-judging matters, I must inform you that, unless I am satisfied with the material and processes and methodology employed in extracting it, I will not hesitate to make an application to the Court.

I have now agreed the charges of Kroll Ontrack at a discount from sums requested by them three or four weeks ago. I should forward to KML an invoice in respect of its contribution to the cost as we had previously agreed.

Yours sincerely

W R Tacon
Joint Liquidator

Zolfo Cooper (BVI) Limited is a company incorporated in the British Virgin Islands



MERCURY HOUSE 101 FRONT STREET HAMILTON HM12, BERMUDA
www.sedgwick-chudleigh.com  441.296.9276 phone  441.296.9277 fax

16 February 2010

Hamilton Nominees Limited
2 Reid Street
Hamilton HM 11
Bermuda

mark.chudleigh@sedgwick-chudleigh.com

Dear Sirs,

**Re:    Kingate Management Limited ("KML")**

We act on behalf of the Joint Liquidators who have been appointed by order of the Bermuda Supreme Court in respect of Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. ("the Funds"). Throughout the period of their operations, the Funds engaged KML to provide various services, including, but not limited to, management services and acting as investment manager.

As part of their ongoing investigations the Joint Liquidators wish to ascertain the identity of the beneficial owners of KML. The Joint Liquidators have obtained a copy of the company's Register of Members from the Bermuda Registrar of Companies. The Register merely indicates that its shares were held from 24 February 1994 to 5 March 2001 through Hemisphere Holdings Limited and then from 5 March 2001 to present through Hamilton Nominees Limited. The Joint Liquidators need to establish the identity of KML's ultimate beneficial ownership as part of their enquiries into the activities of the Funds.

We have been instructed by the Joint Liquidators to request from you full details of KML's ownership, from the date of its incorporation to present. We would be grateful for any information that you are able to provide in this regard.

Although the Joint Liquidators hope that you will provide this information voluntarily and thereby save costs, we must point out that they are possessed of powers to compel the production of the same by virtue of the provisions available to them under s195 of the Bermuda Companies Act 1981. The Joint Liquidators will not hesitate to use those powers should your voluntary assistance not be forthcoming.

*Sedgwick Chudleigh is an independent law firm regulated under the Bermuda Bar Act 1974.*

Page 2

We look forward to hearing from you by no later than by the close of business on 24 February 2010,
failing which we are instructed to commence the procedure for making an application under s195.

Should you have any question, please contact the under-signed.

Yours faithfully,
**SEDGWICK CHUDLEIGH**

By:   Mark Chudleigh

*Global H/FIM*

**ZC** ZOLFO COOPER

15 December 2009

FIM Limited
Buchanan House
3 St James's Square
London
SW1Y 4JU

**By email pniel@fim-group.com**

P.O. Box 4571
2nd Floor, Palm Grove House
Wickhams Cay, Road Town
Tortola
British Virgin Islands VG1110
t: +1 284 494 9600
f: +1 284 494 9601
www.zolfocooper.com

*For the attention of Philip Niel*

Dear Sirs

**Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd – in Liquidation (the "Funds")**

Thank you for your letter of 4 December 2009. Please arrange for copies of the documents I have requested to be delivered to my office in London at 10 Fleet Place, London, EC4M 7RB for the attention of Nick Edwards. Mr. Edwards may be contacted on 020 7332 5141 or at NEdwards@zolfocooper.eu.

As I am sure you are well aware, I am attempting to construct a picture of the formation and activities of the Funds of which I am liquidator, conducted through its directors and its other agents and sub-agents, in order to carry out my statutory duties. I consider that I require the information requested from you for this purpose.

I consider that I am entitled to this information by virtue of s.282 of the BVI Insolvency Act 2003, which provides that a person who was involved in the promotion or formation of the company in question may be required by an office holder to provide him with such information concerning the company, including its business, dealings and affairs, as he may reasonably require.

FIM Advisers LLP confirmed in their letter of 19 October 2009 that FIM Limited established the Funds, and you would therefore appear to fall within the category of persons whom I may require to provide this information.

You will no doubt have been advised that the BVI is one of the territories designated for the purposes of s.426 of the UK Insolvency Act 1986 under which assistance may be sought from the English Court by courts exercising an insolvency jurisdiction, and that in granting such assistance the English Court may apply the insolvency law of either court.



I should also mention for the sake of completeness that I am also, of course, in a position to constitute myself a "foreign representative" under the UK Cross-Border Insolvency Regulations 2006 and thus ask the English Court to provide me the powers available under s.236 of the UK Insolvency Act, including that to apply to the Court to summon any person who the Court thinks capable of giving information concerning the promotion, formation, business, dealing, and affairs or property of the company. There can be little doubt that you fall within this category as well.

I trust that the above explanation is sufficient and that you will now address the questions raised in my letter of 23 November 2009. Should a satisfactory response not be forthcoming then I will take steps to invoke the assistance of whichever Court is most convenient.

Yours faithfully

W R Tacon
Joint Liquidator



FIM Advisers LLP
Buchanan House
3 St. James's Square
London SW1Y 4JU

T (+44 20) 7389 8900
F (+44 20) 7389 89 11
E main@fim-group.com
www.fim-group.com

Zolfo Cooper
10 Fleet Place
London EC4M 7RB

For the attention of: Nick Edwards

22 December 2009

**By courier**

Dear Sirs

**Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. – in liquidation**

We refer to our recent correspondence with Mr Tacon of your firm's office in the British Virgin Islands.

Further to Mr Tacon's letter to us dated 15 December 2009 confirming to which address certain documents should be sent, we enclose copies of the documents that Mr Tacon requested in his letter dated 24 November 2009.

Please confirm safe receipt to Philip Niel of this office (pniel@fim-group.com).

Yours faithfully,

FIM Advisers LLP

FIM Advisers LLP

---

| **From:** | Robert Dakis |
|---|---|
| **Sent:** | Friday, March 12, 2010 3:51 PM |
| **To:** | Chockley, Frederick W.; Hirschfield, Marc E. |
| **Cc:** | Robert Loigman; Joseph Hammond; Sarah Rubin |
| **Subject:** | BLMIS -- Kingate |
| **Attachments:** | 100226 Letter to WQ.PDF; 100226 Letter to FIM.PDF |

Fritz,

As discussed on today's call, attached hereto is recent correspondence between the Joint Liquidators and counsel to KML and FIM regarding the Joint Liquidators' document requests.

Best,

Robert

**Robert K. Dakis**
**Quinn Emanuel Urquhart &Sullivan, LLP**
**51 Madison Avenue, 22nd Floor**
**New York, NY 10010**
**Direct: (212) 849-7447**
**Main Phone: (212) 849-7000**
**Main Fax:  (212) 849-7100**
E-mail:  robertdakis   quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**ZC** ZOLFO COOPER

26 February 2010

**By email: DDwyer@wq.bm**

Wakefield Quin
31 Victoria Street
Hamilton
HM10

P.O. Box 4571
2nd Floor, Palm Grove House
Wickhams Cay, Road Town
Tortola
British Virgin Islands VG1110
t: +1 284 494 9600
f: +1 284 494 9601
www.zolfocooper.com

Dear Dennis

**Kingate Global Fund, Limited and Kingate Euro Fund, Limited - in Liquidation (the "Companies")**

I refer to your letter of 25 January and our previous correspondence.

I will not in this letter rehearse my complaints about KML's desultory response to date to my requests for the handing over and production of documents, but I do wish to put you on notice of certain matters and also to revert to a suggestion made in your letter of 19 January 2010.

1.  As this point has not been made clear in your letters informing me how KML's document production (according to the program unilaterally undertaken by it, about which I will be writing separately) is progressing, I want to make it clear that I am expecting to receive documents in two broad categories, namely (i) those to which I am entitled as constituting part of the Companies' own books and records; and (ii) documents belonging to KML but relating to the Companies. KML undoubtedly has documents in the first category (for example, communications made and received in the name of one or other of the Companies, or by Chris Wetherhill as director of one or other of them, or by KML or Mr Wetherhill as their agent), and of course it has its own.

2.  The distinction is one of importance, since I consider the liquidators entitled as of right to receive documents in the first category, as property of the Companies. Documents of KML will be produced by KML in response to requests from the Liquidators otherwise compellable under s.195 of the Companies Act. The first category will include any privileged documents, since the privilege is that of the Companies; whereas of course KML may assert privilege to privileged documents in the second category.

3.  Please confirm that my expectation will be met.

4.  It is also important because I have now been waiting some 9 months for documents that form part of the books and records of the Companies, and the lack of them has been and continues to be a cause of serious possible prejudice to the conduct of these liquidations and the expectations and rights of the Companies' creditors and members. In your letter of 19 January, you wrote that completion of the review of the 100,000 emails "will probably not be until mid to late March". In light of the history, I am unable to allow this to continue beyond mid-March, and so I also write to let you know that I am treating 15 March 2010 as a deadline beyond which I am not prepared to see this go. It will not be a convincing reason for delay beyond that date to say that KML (or your firm for that matter) has insufficient resources to work any faster: As you know, KML received literally hundreds of millions of dollars in fees from the two Companies; if it does not have enough funds for this duty to be

**ZC** ZOLFO COOPER

performed at a more reasonable speed, no doubt its owners can put some of that money back so that it can. Beyond this deadline we will be in court.

5.    Turning to the suggestion in your letter of 19 January, this was to transmit material on an interval basis. I wish to accept that offer, so shall be grateful if you would kindly make arrangements to produce now to Mark Chudleigh what has been reviewed up to today's date, and between now and 15 March to produce the balance at weekly intervals as from today.

I look forward to hearing from you.

Yours sincerely

**W R Tacon**
Joint Liquidator

**ZC** ZOLFO COOPER

26 February 2010

FIM Advisors LLP
Buchanan House
3 St James's Square
London
SW1Y 4JU

**By email pniel@fim-group.com**

P.O. Box 4571
2nd Floor, Palm Grove House
Wickhams Cay, Road Town
Tortola
British Virgin Islands VG1110
t: +1 284 494 9600
f: +1 284 494 9601
www.zolfocooper.com

*For the attention of Philip Niel*

Dear Sirs

**Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd – in Liquidation (the "Funds")**

I refer to your letter of 4 January 2010.

1.  May I take it please that, just as on occasions (such as in your letter under reply) you answer letters addressed to FIM Limited, when I address questions to and make requests of you – FIM Advisers LLP – you will respond on behalf of yourselves and also FIM Limited?

2.  When I use the word 'FIM' in isolation in this letter I refer to you and/or FIM Limited.

3.  We take it that the reference in the second paragraph of your letter of 4 January to a bullet point question under the heading 'KML' is a reference to my letter to FIM Limited dated 24 November 2009. Assuming that is correct,

    3.1  Would you please answer the first bullet point question, viz., "In what way and by what steps did FIM establish Kingate Global? Were the founder shares issued to FIM Limited, or any other persons connected with FIM Limited? If not, how did FIM Limited establish Kingate Global, and what was its connection?" You acknowledge that this question relates to the Funds.

    3.2  It is true that other questions under that heading relate to KML and FIM, but they also relate to the Funds, as I believe you are well aware.

    3.3  As stated at the start of that heading, FIM 'established' Kingate Global. As the question in 3.1 above indicates, I do not know the answer to it, so nor do I know what (if any) FIM's role was in the subsequent establishment of Kingate Euro Fund Limited, (although I am generally aware of the commercial reasoning behind its establishment) and I would like to know that too.

    3.4  KML was the 'manager' of the Funds. The relationship between the Funds and KML was not merely contractual: there was a common director, Mr. Wetherhill and under BVI legislation, any fund must have a manager. But since almost everything the Fund did was delegated to KML almost all the questions I or any other outsider has about the Funds lead to KML. As I know that you are perfectly well aware of this, the implication in your letter that questions I have asked you about KML do not also

1

relate to the Funds is remarkable. To reinforce this I should mention that in June 2009 Mr. Wetherhill told me that the only business of KML was to manage the Funds. In these circumstances, every question I ask you about KML relates to the Funds.

3.5     KML, on behalf of the Funds, contracted with FIM. FIM was paid fees for the consultancy services it provided to the Funds. The Funds invested all their assets in BLMIS. FIM's principals were in regular personal contact with Mr. Madoff. Mr. Madoff perpetrated one of the largest and most serious frauds of recent times, one consequence of which is that the Funds lost all but a tiny fraction of their property. Enormous fees – hundreds of millions of dollars – were paid by the Funds to KML, for doing what amounted to very little. I have every reason to believe that KML distributed its vast profits to its owners. KML's registered shareholders are professed nominees. Mr. Wetherhill, albeit a director of KML, tells me that he does not know who its beneficial owners are. FIM was in regular close contact and communication with Mr. Wetherhill, even in relation to arranging visits by the Funds' auditors to BLMIS and Mr. Madoff in New York. I should add that KML has been particularly unco-operative with me in producing documents of and relating to the Funds, including the Funds own documents, held on KML's computer servers. I believe that FIM can elucidate the true relationships between the Funds, their manager, their manager's and the Funds' consultant, ownership of the Funds' manager (which received substantial fees from the Funds) and the ultimate destinations and recipients of those sums. Such information is of importance to me in carrying out my investigations into the businesses of the Funds. The questions under the heading you refer to do indeed relate to FIM, but they also relate to the Funds, which is why I have asked you to answer them.

3.6     I appreciate your concern that the answer to one question may lead to another. Unfortunately, that is frequently a feature of enquiries liquidators have to make; it is usually not possible to ask all relevant questions at once. Accordingly, I cannot give you the confirmation you request in your final paragraph. I have tried to limit questions and requests for documents to those I have considered to be most important and at the  same time minimising inconvenience to you, rather than, for example, asking you to produce all documents in your possession or power 'relating to' the Funds. I am disappointed you do not appear to recognise my approach to be constructive, targeted and pragmatic.

3.7     The enormity of the fraud carried out by Mr. Madoff will certainly not have been lost on you or your advisers. The Funds lost billions of dollars in purported investments analysed by FIM in its regular reports to KML for the benefit of the Funds. FIM's role in the Funds' structures currently leaves a great deal to be explained. I have little doubt that any court that I ask to assist me in getting to the bottom of these matters by examining FIM's officers and producing the documents I have so far asked for, and more, will readily do so.

I look forward to your co-operation. If you do not provide it by answering the questions I have asked you, by 5 March 2010, I will immediately move to apply for the assistance of the English Court.

If you have any questions with regard to this letter, kindly contact Mr. Richardson.

Yours faithfully

**W R Tacon**
Joint Liquidator

| From: | Robert Loigman |
|---|---|
| Sent: | Thursday, July 15, 2010 7:18 PM |
| To: | Hirschfield, Marc E.; Chockley, Frederick W. |
| Cc: | Robert Dakis; Joseph Hammond; Sarah Rubin |
| Subject: | BLMIS/Kingate -- Draft Tracing Summary (Confidential) |
| Attachments: | CONFIDENTIAL Draft Tracing Analysis.pdf |

WITHOUT PREJUDICE
CONFIDENTIAL MATERIALS

Marc and Fritz:  When we spoke on Wednesday, I explained that Zolfo Cooper had put together a draft
"tracing" summary of payments to KML.  The draft, as I explained, is incomplete because it does not account
for certain payments to KML.  Specifically, the summary addresses management fees that were paid to KML
between 2002 and 2008.  It does not include, however, (a) administration fees relating to FOREX (for Kingate
Euro), and (b) redemption fees or load fees (for Kingate Euro and Global).  While the management fees – i.e.,
those included in the summary – are the bulk of all fees paid by the Funds to KML, we will not know the
complete effect of adding the other fees until the analysis is redone.  We do not expect that these smaller
amounts will have a material effect on the results of the draft tracing.

The draft summary shows, for each year, the payments to KML, and how much of those payment came from
subscription monies (i.e., monies never paid into BLMIS), and how much came from funds withdrawn by the
Funds from their BLMIS accounts.

As you'll understand, this is a draft document that is subject to change, and which will necessarily be revised as
the JLs undertake the tracing analysis with more information.  We are providing the document to you without
prejudice and subject to our agreed confidentiality provisions.

Please let us know if you have any questions.

Regards,
Bob


**Robert S. Loigman** ▫ **Partner**
**Quinn Emanuel Urquhart & Sullivan, LLP**
**51 Madison Avenue, 22nd Floor**
**New York, NY 10010**
**Direct: (212) 849-7444**
**Main Phone: (212) 849-7000**
**Main Fax:  (212) 849-7100**
E-mail:  robertloigman__quinnemanuel.com
Web:  www.quinnemanuel.com


The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s)
named above.  This message may be an attorney-client communication and/or work product and as such is privileged and
confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the
intended recipient, you are hereby notified that you have received this document in error and that any review,
dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in
error, please notify us immediately by e-mail, and delete the original message.

**Kingate Global Limited**

Analysis of source of payments to KML

| Year | Total paid to KML per BoB statements | Paid from BLMIS monies | Paid from Subscription monies | Amounts paid to KML per audited accounts | Note |
|------|------|------|------|------|------|
| 2002 | 2,251,060 | 0 | 2,251,060 | | 1 |
| 2003 | 28,259,375 | 0 | 28,259,375 | 28,495,194 | |
| 2004 | 31,371,662 | 0 | 31,371,662 | 31,665,162 | |
| 2005 | 33,999,239 | 2,827,903 | 31,171,336 | 34,017,453 | |
| 2006 | 34,118,556 | 9,636,800 | 24,481,756 | 34,408,746 | |
| 2007 | 38,474,353 | 0 | 38,474,353 | 38,783,479 | |
| 2008 | 38,048,952 | 6,859,089 | 31,189,864 | 34,658,202 | 2 |
| Total | 206,523,197 | 19,323,792 | 187,199,406 | 202,028,236 | |
| Percentage | | 9.36% | 90.64% | | |

1.  This is only December of 2002
2.  No audited accounts prepared, amount is therefore per KML ledgers

| | |
|---|---|
| **From:** | Robert Dakis |
| **Sent:** | Friday, November 12, 2010 4:12 PM |
| **To:** | Chockley, Frederick W.; Hirschfield, Marc E.; Burke, John |
| **Cc:** | Robert Loigman; Joseph Hammond; Sarah Rubin |
| **Subject:** | Kingate -- Tracing Analysis |
| **Attachments:** | 101110 Note to accompany Tracing Analysis.pdf; 101110 Tracing Analysis.xls |

Attached please find the tracing analysis and accompanying cover note.

Best,

Robert


**Robert K. Dakis**
**Quinn Emanuel Urquhart & Sullivan, LLP**
**51 Madison Avenue, 22nd Floor**
**New York, NY 10010**
**Direct: (212) 849-7447**
**Main Phone: (212) 849-7000**
**Main Fax:  (212) 849-7100**
E-mail:  robertdakis__quinnemanuel.com
Web:  www.quinnemanuel.com


The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s)
named above.  This message may be an attorney-client communication and/or work product and as such is privileged and
confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the
intended recipient, you are hereby notified that you have received this document in error and that any review,
dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in
error, please notify us immediately by e-mail, and delete the original message.

Confidential – Subject to Confidentiality Agreement
Privileged

# KGF & KEF - Notes on Tracing Exercise

1.1    The analysis was undertaken to identify the source of payments made by the Funds to
investors (redemptions), and KML (remuneration), to determine what amounts had
been paid to these parties from BLMIS sourced monies and what amount had been paid
using non-BLMIS sourced monies (receipts from investors).

1.2    The analysis was undertaken for the period 6 years prior to the bankruptcy of BLMIS,
from 11 December 2002 – 11 December 2008.

1.3    The analysis has been conducted on a first in – first out basis ("FIFO"). Payments made
by the Funds were allocated against the monies available in the Funds' accounts in the
order in which the monies were received.

1.4    There are no definitive results for the analysis. Instead, the assumptions that have had
to be made in order to complete the analysis, which are further detailed in this note,
have led to a range of possibilities. The lower ends and higher ends of each range of
possibilities is given below, the 'true' result will fall between these figures. An
explanation of these ranges and the 2 scenarios noted for KEF can be found in
paragraphs 1.20 to 1.24. Tables setting out the findings are below:

**Results**

**KGF**

|  | Payments made to KML | | | |
|---|---|---|---|---|
|  | From BLMIS sourced monies | | From non-BLMIS sourced monies | |
|  | Amount US$ | % | Amount US$ | % |
| Lower end | 9,443,419 | 4.53% | 199,069,884 | 95.47% |
| Upper end | 26,813,135 | 12.86% | 181,700,168 | 87.14% |

|  | Payments made to Redeemers | | | |
|---|---|---|---|---|
|  | From BLMIS sourced monies | | From non-BLMIS sourced monies | |
|  | Amount US$ | % | Amount US$ | % |
| Lower end | 201,735,327 | 7.19% | 2,604,110,632 | 92.18% |
| Upper end | 301,735,327 | 10.75% | 2,504,110,632 | 89.25% |

Confidential – Subject to Confidentiality Agreement
Privileged

**KEF**

| | Payments made to KML | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Scenario 1 | | | | Scenario 2 | | | |
| | From BLMIS sourced monies | | From non-BLMIS sourced monies | | From BLMIS sourced monies | | From non-BLMIS sourced monies | |
| | Amount € | % | Amount € | % | Amount € | % | Amount € | % |
| Lower end | 2,662,241 | 5.36% | 47,049,678 | 94.64% | 29,864,891 | 60.08% | 19,847,028 | 39.92% |
| Upper end | 7,185,805 | 14.45% | 42,526,114 | 85.55% | 34,388,455 | 69.18% | 15,323,464 | 30.82% |

| | Payments made to Redeemers | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Scenario 1 | | | | Scenario 2 | | | |
| | From BLMIS sourced monies | | From non-BLMIS sourced monies | | From BLMIS sourced monies | | From non-BLMIS sourced monies | |
| | Amount € | % | Amount € | % | Amount € | % | Amount € | % |
| Lower end | 79,936,883 | 13.44% | 515,007,028 | 86.56% | 107,139,533 | 18.01% | 487,804,378 | 81.99% |
| Upper end | 156,036,166 | 26.23% | 438,907,745 | 73.77% | 183,238,816 | 30.80% | 411,705,095 | 69.20% |

**Methodology**

1.5    The analysis was undertaken on all the Funds' bank accounts that were used to receive monies from or pay monies to investors and BLMIS, all of which were held at the Bank of Bermuda, (as further detailed in paragraphs 1.13 to 1.14 below) and involved tracing the source of receipts into these accounts to determine what amounts had been paid to these parties from BLMIS sourced monies and what amounts had been paid using non-BLMIS sourced monies, i.e. receipts from investors.

1.6    Payments made by the Funds were allocated against the monies available in the Funds' accounts in the order in which the monies were received. This has been a manual exercise, it could not be undertaken using formulae in a spreadsheet in view of the complexity of the analysis and the anomalies encountered.

1.7    The anomalies that were encountered during the analysis are explained in paragraphs 1.8 to 1.28 below.

**Format change in Bank Statements**

1.8    On 1 July 2008 the format of all the bank statements changed to one which no longer listed transactions in the order they occurred, but instead by size of the transaction on any particular day.

Confidential – Subject to Confidentiality Agreement
Privileged

1.9    After enquiries, the Bank of Bermuda were unable to provide the timings of the transactions, therefore it was not possible to continue the FIFO tracing after 1 July 2008.

1.10   Substantial transactions occurred after 30 June 2008 and in view of the impossibility of continuing with the FIFO basis as before, certain assumptions have been made which have given rise to a range of possible answers referred to in the tables above. The lower end results represent the outcome if all payments were made from non-BLMIS sourced monies.  The upper end results represent the outcome if all payments, subject to the qualification noted in paragraph 1.12 below for KGF only, were made from BLMIS sourced monies.

1.11   The results at each end of the range of possibilities include all payments made during the period. Therefore, as stated in paragraph 1.4, the results set out in the summary represent the range of possibilities and the 'true' result will fall within the ranges given.

1.12   At 30 June 2008 the FIFO tracing indicated that the balance in KGF's account only comprised non-BLMIS sourced monies.  Payments of approximately US$290m were made during the period 1 July 2008 to 11 December 2008 to KML and redeeming investors, but KGF only received US$100m from BLMIS during this period.  Therefore, it is not appropriate to assume that all payments could have been made from BLMIS sourced monies. The realistic assumption adopted is that the maximum amount paid from BLMIS sourced monies at the upper end of the range of results is US$100m, representing approximately 35% of the payments in that period.

### Relevant Bank Accounts

1.13   KGF held a number of bank accounts at Bank of Bermuda ("BoB").  After reviewing each of them, it was apparent that all transactions involving BLMIS sourced monies occurred in its US$ account, therefore this was the only account considered in the tracing analysis for KGF.

1.14   KEF also held a number of bank accounts at BoB.  After reviewing them, it was apparent that all transactions involving BLMIS sourced monies occurred only in its US$ account.  KEF, however, also operated a Euro account which was used to receive and pay monies from and to investors and to pay fees to KML.  Both the Euro and US$ accounts were considered in the tracing analysis.

### Determining the Correct Starting Point

1.15   Although the analysis began at 11 December 2002 (6 years prior to commencement of BLMIS bankruptcy), it was necessary to determine the composition of the cash balance held by each of the Funds in their bank accounts at that date in order to determine what proportions were BLMIS and non-BLMIS sourced.

1.16   This was determined by working backward through the receipts from 11 December 2002 until such point as these receipts totalled the cash balance in the account as at 11 December 2002.  The source of these receipts leading up to 11 December 2002 was then examined and it was determined that none came from BLMIS. Therefore the cash balance in the accounts at 11 December 2002 only comprised non-BLMIS sourced monies.

Confidential – Subject to Confidentiality Agreement
Privileged

**Transfers made between bank accounts**

**Fund to Fund**

1.17    Transfers occurred between KGF and KEF in instances where an investor wished to change the fund in which they were invested.

1.18    Due to the Funds each using a different currency to handle monies from investors, the transfers between KGF and KEF included a foreign exchange from US$ to Euro, or vice versa.   The rates at which the exchanges took place are disclosed in the bank statements for each account.

1.19    Because any transfer between the Funds could consist of BLMIS sourced monies, the tracing analysis had to be undertaken for both Funds, on all three relevant bank accounts, simultaneously to be sure that BLMIS sourced monies could be tracked through the accounts correctly.  In each transfer, the proportion of BLMIS sourced and non-BLMIS sourced monies was maintained when the monies were received in the transferee account, notwithstanding the currency conversion.

**Foreign exchange in Kingate Euro**

1.20    KEF received subscriptions and paid redemptions and fees to KML from its Euro account, however it paid subscriptions to and received redemptions from BLMIS using its US$ account.   KEF, in anticipation of its future currency needs, entered into a number of foreign exchange futures contracts with BoB.  The contracts were conducted via the bank accounts reviewed in this exercise (not via a separate foreign exchange futures account).   The bank required that KEF always maintained a certain, but unknown, cash balance to support the contracts, however the source of this balance (BLMIS or non-BLMIS) was constantly changing.

1.21    There are therefore a number of credits and debits in KEF's accounts which reflect foreign exchange gains and losses. Some of these arise as a result of transactions based on monies identifiable as having been introduced by either subscribers or BLMIS and in such cases, gains or losses  have been allocated between these sources accordingly.

1.22    We have allocated the €27,202,649.78 in profits arising on currency transactions to non-BLMIS sourced monies.  The profits are cash profits and not accounting profits and should have been allocated between BLMIS and non-BLMIS sourced monies proportionate to the source of the monies that comprised the principal of the currency transaction in question.  It would be overly burdensome, however, to calculate how these profits should have been allocated as it would require us to re-do the entire analysis from scratch.

1.23    The need to re-allocate these profits only affects KEF; so the tracing exercise has not been re-calculated.  As with the format change in the bank statements already noted above, it is possible to analyse the effect of this error on the final results of the analysis on 2 different assumptions. As in paragraph 1.4 above, these different assumptions represent the extreme range of possible results:

        Scenario 1 - all €27,202,649.78 is attributable to non-BLMIS monies and therefore all resulting payments were made from non-BLMIS sourced monies

Confidential – Subject to Confidentiality Agreement
Privileged

Scenario 2 - all €27,202,649.78 is attributable to BLMIS monies and therefore all
resulting payments were made from BLMIS sourced monies.

1.24    Scenario 1 is the basis on which the tracing exercise has been conducted so no
amendment is needed to the results reported in the tables above to show the outcome
of this scenario.  However, Scenario 2 requires an amendment to the results in the
tables above.


**Overdrawn Position**

1.25    There are instances in each account where payments were made which led the account
to become overdrawn.  In these cases, any payments or portion of a payment that
caused an account to become overdrawn must have been paid from a facility in effect
provided by BoB and therefore could not be considered to have originated from BLMIS
monies.

1.26    When the next receipt or portion of a receipt entered the account, from whatever
source, to cover the amount overdrawn, this was treated as having been paid to BoB to
clear the overdraft.

1.27    The transactions that either lead to, or reduce or eliminate, an overdrawn balance
been highlighted in the analysis with red text.


**No Need for Detailed Payment Allocation at Certain Points**

1.28    At points in the analysis, all BLMIS sourced monies had been spent and only non-BLMIS
sourced monies remained in the accounts.  We have not provided a detailed payment
allocation analysis during these periods, as all payments to KML and to investors during
these periods could only have been made from non-BLMIS sourced monies.  The periods
of time where no detailed allocation is provided have been marked clearly on the
analysis – during these periods we have only shown the totals for redemptions paid and
the various fees paid to KML.

# User Guide

Confidential - Subject to Confidentiality Agreement
Privileged

## Column A

This column denotes the 1st date of each month included in the analysis.

## Column B

This column categorises the nature of the transaction.  When several transactions falling into the same category take place consecutively they have been summed on one row.

## Columns C to E

These columns were used to perform the analysis of the sources of cash available in KGF's US$ account.  Column C shows all non-BLMIS sourced monies received and all subsequent payments made from these receipts.  Column D shows all BLMIS sourced monies received and all subsequent payments made from these receipts.  Receipts are shown with positive figures and payments are shown with negative figures.  Column E was used to keep a running 'tally' through the analysis of which amounts of cash were available for use against payments.  As each amount was used against a payment it was deleted from the tally, this is why this column is now blank.

## Columns F to H

These columns were used to perform the analysis of the sources of cash available in KEF's Euro account.  Column F shows all non-BLMIS sourced monies received and all subsequent payments made from these receipts.  Column G shows all BLMIS sourced monies received and all subsequent payments made from these receipts.  Receipts are shown with positive figures and payments are shown with negative figures.  Column H was used to keep a running 'tally' through the analysis of which amounts of cash were available for use against payments.  As each amount was used against a payment it was deleted from the tally, this is why this column is now blank.

## Columns I to K

These columns were used to perform the analysis of the sources of cash available in KEF's US$ account.  Column I shows all non-BLMIS sourced monies received and all subsequent payments made from these receipts.  Column J shows all BLMIS sourced monies received and all subsequent payments made from these receipts.  Receipts are shown with positive figures and payments are shown with negative figures.  Column K was used to keep a running 'tally' through the analysis of which amounts of cash were available for use against payments.  As each amount was used against a payment it was deleted from the tally, this is why this column is now blank.

## Columns L to AC

These columns simply contain a summary of the information contained in columns C to H detailing the sources of the various payment types.

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
Confidential - Subject to Confidentiality Agreement
Privileged

Analysis of source of all payments to KML (Management fees, Load fees, Redemption fees and Admin fees - Euro ONLY)

**Kingate Global**

*11 December 2002 to 30 June 2008*

| Year | Total fees paid to KML per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| 2002 | 2,292,660 | 0 | 2,292,660 |
| 2003 | 28,593,600 | 0 | 28,593,600 |
| 2004 | 31,762,073 | 0 | 31,762,073 |
| 2005 | 34,074,056 | 2,827,903 | 31,246,153 |
| 2006 | 34,622,539 | 6,615,516 | 28,007,022 |
| 2007 | 38,952,848 | 0 | 38,952,848 |
| 2008 | 20,845,812 | 0 | 20,845,812 |
| Total KML Fee Payments $ | 191,143,587 | 9,443,419 | 181,700,168 |
| Percentage | | 4.94% | 95.06% |

*1 July 2008 to 11 December 2008 (refer to paragraphs 1.08 to 1.12 of the Tracing Note)*

KML Fee Payments $   17,369,716

*11 December 2002 to 11 December 2008*

Lower end
| Total KML Fee Payments $ | 208,513,303 | 9,443,419 | 199,069,884 |
|---|---|---|---|
| Percentage | | 4.53% | 95.47% |

Upper end
| Total KML Fee Payments $ | 208,513,303 | 26,813,135 | 181,700,168 |
|---|---|---|---|
| Percentage | | 12.86% | 87.14% |

**Kingate Euro**

*11 December 2002 to 30 June 2008*

| Year | Total fees paid to KML per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| 2002 | 548,329 | 0 | 548,329 |
| 2003 | 6,834,483 | 1,543 | 6,832,940 |
| 2004 | 7,652,215 | 614,012 | 7,038,203 |
| 2005 | 8,506,056 | 1,403,261 | 7,102,795 |
| 2006 | 7,508,134 | 643,424 | 6,864,710 |
| 2007 | 9,001,649 | 0 | 9,001,649 |
| 2008 | 5,137,488 | 0 | 5,137,488 |
| Total KML Fee Payments € | 45,188,355 | 2,662,241 | 42,526,114 |
| Percentage | | 5.89% | 94.11% |

*1 July 2008 to 11 December 2008 (refer to paragraphs 1.08 to 1.12 of the Tracing Note)*

KML Fee Payments €   4,523,564

*11 December 2002 to 11 December 2008*

Lower end
| Total KML Fee Payments € | 49,711,919 | 2,662,241 | 47,049,678 |
|---|---|---|---|
| Percentage | | 5.36% | 94.64% |

Upper end
| Total KML Fee Payments € | 49,711,919 | 7,185,805 | 42,526,114 |
|---|---|---|---|
| Percentage | | 14.45% | 85.55% |

*11 December 2002 to 11 December 2008 (refer to paragraphs 1.20 to 1.24 of the Tracing Note)*

Profits €   27,202,650

*11 December 2002 to 11 December 2008*

Scenario 1)
| Total KML Fee Payments € | 49,711,919 | 29,864,891 | 19,847,028 |
|---|---|---|---|
| Percentage | | 60.08% | 39.92% |

Scenario 2)
| Total KML Fee Payments € | 49,711,919 | 34,388,455 | 15,323,464 |
|---|---|---|---|
| Percentage | | 69.18% | 30.82% |

# Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.

Confidential - Subject to Confidentiality Agreement
Privileged

Analysis of source of all redemption payments to investors

**Kingate Global**

*11 December 2002 to 30 June 2008*

| Year | Total redemptions paid per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| 2002 | 42,501,305 | 0 | 42,501,305 |
| 2003 | 383,431,070 | 0 | 383,431,070 |
| 2004 | 371,433,824 | 408,137 | 371,025,687 |
| 2005 | 455,039,957 | 78,242,837 | 376,797,120 |
| 2006 | 435,357,267 | 123,084,354 | 312,272,913 |
| 2007 | 543,589,093 | 0 | 543,589,093 |
| 2008 | 301,518,917 | 0 | 301,518,917 |
| Total Redemption Payments $ | 2,532,871,432 | 201,735,327 | 2,331,136,105 |
| Percentage | | 7.96% | 92.04% |

*1 July 2008 to 11 December 2008 (refer to paragraphs 1.08 to 1.12 of the Tracing Note)*

Redemption Payments $    272,974,527

*11 December 2002 to 11 December 2008*

Lower end

| Total Redemption Payments $ | 2,805,845,959 | 201,735,327 | 2,604,110,632 |
|---|---|---|---|
| Percentage | | 7.19% | 92.81% |

Upper end

| Total Redemption Payments $ | 2,805,845,959 | 301,735,327 | 2,504,110,632 |
|---|---|---|---|
| Percentage | | 10.75% | 89.25% |

**Kingate Euro**

*11 December 2002 to 30 June 2008*

| Year | Total redemptions paid per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| 2002 | 7,707,374 | 0 | 7,707,374 |
| 2003 | 61,771,745 | 7,792,678 | 53,979,067 |
| 2004 | 84,144,489 | 3,923,550 | 80,220,940 |
| 2005 | 126,614,339 | 63,813,017 | 62,801,322 |
| 2006 | 75,963,174 | 4,407,638 | 71,555,536 |
| 2007 | 120,227,854 | 0 | 120,227,854 |
| 2008 | 42,415,653 | 0 | 42,415,653 |
| Total Redemption Payments € | 518,844,628 | 79,936,883 | 438,907,745 |
| Percentage | | 15.41% | 84.59% |

*1 July 2008 to 11 December 2008 (refer to paragraphs 1.08 to 1.12 of the Tracing Note)*

Redemption Payments €    76,099,283

*11 December 2002 to 11 December 2008*

Lower end

| Total Redemption Payments € | 594,943,910 | 79,936,883 | 515,007,027 |
|---|---|---|---|
| Percentage | | 13.44% | 86.56% |

Upper end

| Total Redemption Payments € | 594,943,910 | 156,036,166 | 438,907,745 |
|---|---|---|---|
| Percentage | | 26.23% | 73.77% |

*11 December 2002 to 11 December 2008 (refer to paragraphs 1.20 to 1.24 of the Tracing Note)*

Profits €    27,202,650

*11 December 2002 to 11 December 2008*

Scenario 1)

| Total Redemption Payments € | 594,943,910 | 107,139,533 | 487,804,377 |
|---|---|---|---|
| Percentage | | 18.01% | 81.99% |

Scenario 2)

| Total Redemption Payments € | 594,943,910 | 183,238,816 | 411,705,095 |
|---|---|---|---|
| Percentage | | 30.80% | 69.20% |

08-01789-smb    Doc 6015-21    Filed 02/18/14    Entered 02/18/14 10:47:49    Exhibit H -
Part 11    Pg 59 of 63

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> PLAINTIFF-APPLICANT, <br><br> V. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> DEFENDANT. | NO. 08-01789 (SMB) <br><br> SIPA LIQUIDATION <br><br> (SUBSTANTIVELY CONSOLIDATED) |
| IN RE: <br><br> BERNARD L. MADOFF, <br><br> DEBTOR. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC <br><br> PLAINTIFF <br><br> V. <br><br> KINGATE GLOBAL FUND, LTD., by its Liquidators, and KINGATE EURO FUND, LTD., by its Liquidators. <br><br> DEFENDANTS. | Adv. Pro. No. 12-01920 (SMB) |

## AFFIDAVIT OF MARK GUY CHUDLEIGH

I, MARK GUY CHUDLEIGH, of Sedgwick Chudleigh Ltd., E.W. Pearman Building, 20 Brunswick Street, Hamilton HM10, Bermuda, under penalty of perjury, state as follows:

**Introduction**

1. I make this Affidavit in support of the *Opposition of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. to Trustee's Application for Enforcement of Automatic Stay and Injunction* against Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (together, "the Kingate Funds").

2. I am a barrister and attorney and the managing director of Sedgwick Chudleigh Ltd., a Bermuda law firm ("Sedgwick Chudleigh"). Sedgwick Chudleigh act for the Kingate Funds and their Joint Liquidators ('the JLs') in litigation and liquidation matters in Bermuda, and I personally have conduct, along with a number of colleagues working under my supervision, of the Kingate Funds' litigation against Kingate Management Limited ("KML") and various other defendants in proceedings being brought in the Supreme Court of Bermuda, in Civil Jurisdiction 2010: No. 454 ("the Bermuda Proceedings").

3. The facts and matters set out in this Affidavit are within my own knowledge, save where the contrary appears, and are true. Where facts and matters are not within my own knowledge, I state the sources of my information and belief, and believe such matters to be true.

4. I have been asked to describe the procedural history, and current status, of the Bermuda Proceedings and to express an opinion on the potential consequences if the Kingate Funds are restrained from pursuing or progressing the Bermuda Proceedings.

**History and Current Status of the Kingate Funds' Liquidation Processes and Bermuda Proceedings**

5. The Kingate Funds were incorporated in the British Virgin Islands ("BVI") in 1994 and 2000, respectively, under the International Business Companies Act (Cap 291) (BVI), and were authorised by the BVI Financial Services Commission to carry on business as Professional Funds under the Mutual Funds Act 1996 (as amended) (BVI).

6. The Kingate Funds carried on business as open-ended investment funds in Bermuda, as exempt companies under the Companies Act 1981 (Bermuda), where their manager, KML, was incorporated, where their administrators (Citi Hedge Fund Services) were situated, and where their bankers (Bank of Bermuda, now HSBC Bank of Bermuda) and their auditors (PricewaterhouseCoopers) were also situated.

7. After sustaining losses in the hundreds of millions of dollars as a result of the fraud perpetrated by, and subsequent collapse of, Bernard L. Madoff Investment Securities

LLC, the Kingate Funds were placed first into provisional liquidation by Orders of the High Court of the British Virgin Islands on 8 May 2009, and then into permanent liquidation by Orders of that Court on 4 June 2009. The two funds thus became the subject of permanent liquidation processes under the supervision of the Court of the BVI. The JLs are officers of that Court.

8.   The Kingate Funds are also in liquidation in Bermuda, having been so placed by Orders of the Supreme Court of Bermuda made on 4 September 2009. The same joint liquidators were appointed by that Court, together with an additional liquidator being a Bermuda resident, as officers of that Court acting also under its supervision.

9.   Statutory stays prohibiting the commencement or continuation of any proceedings against the Kingate Funds (without the permission of the Court) came into force in the BVI on 8 May 2009 pursuant to section 175(1)(c) of the Insolvency Act 2003( BVI), and in Bermuda on 4 September 2009 pursuant to section 167(4) of the Companies Act 1981 (Bermuda).

10.  The JLs required, applied for and obtained Orders ("sanction") from both the BVI and Bermuda Courts dated 1 November 2010 and 8 December 2010 respectively to cause the Kingate Funds to commence proceedings in the Supreme Court of Bermuda against KML and others ("the Bermuda Defendants"). On 22 December 2010 the Kingate Funds duly commenced the Bermuda Proceedings, asserting claims against the Bermuda Defendants for unjust enrichment arising from the Bermuda Defendants' receipt of unearned management fees, and for damages for breach of contract and negligence flowing from duties owed directly to the Kingate Funds.

11.  The Kingate Funds have taken a variety of steps to advance the Bermuda Action. After the initial writ was issued, the Kingate Funds (a) framed and drafted detailed particulars to support their claims based on extensive documentary records, (b) negotiated service with multiple defendants outside of the Bermuda jurisdiction, (c) addressed extensive applications before the BVI Court filed by the various trustee defendants to the Bermuda Proceedings for permission to defend against the Kingate Funds' claims and to fund the defense from the trusts, (d) successfully participated —in conjunction with the Trustee— in the hearing of an application before the Bermuda Court to wind-up KML and to

3

appoint the Official Receiver of Bermuda as its provisional liquidator in place of its previous provisional liquidators, (e) sought and obtained relief from the Bermuda Court, which ordered the lifting of the KML stay to enable the action to proceed against KML, (f) engaged in extensive exchanges of pleadings and amended pleadings with KML and the other defendants, including a Court hearing of an application to re-amend the Kingate Funds' pleadings (which was initially resisted by the Bermuda Defendants but then resolved by agreement), (g) engaged in negotiations with KML and the other Bermuda Defendants regarding case management directions, and (h) commenced extensive document management and review. Through a portion of this time in 2012, the Trustee and the JLs were operating pursuant to a common interest agreement, which expired pursuant to its terms.

**Potential consequences if the Kingate Funds are restrained from pursuing or progressing the Bermuda Proceedings**

12. In my opinion, if the Kingate Funds are prevented from progressing the Bermuda Proceedings actively, or if they are prevented from complying with any procedural directions which the Supreme Court of Bermuda might make by Court order, or if they are prevented from responding to any interlocutory application which another party might make, they run the risk of (a) not being able to progress the Bermuda Proceedings to their advantage; (b) breaching a procedural Order of the Supreme Court of Bermuda; and (c) 'losing' important interlocutory applications by default.

13. The Kingate Funds also run the risk of having the Bermuda Proceedings struck out by the Court, if it can be established by another party that:

      6.1 the Bermuda Proceedings constitute an abuse of process, of which one recognized category is delay; or

      6.2 the Kingate Funds have acted in breach of Court orders or the procedural Rules of the Supreme Court of Bermuda.

14. The ordinary rule in civil litigation in the Supreme Court of Bermuda is that (subject to the precise circumstances of the case and the discretion of the judge) the 'loser' is

4

ordered to pay the 'winner's' legal costs and expenses. The amount of recoverable costs payable is then 'taxed' by the Registrar on the application of the receiving party if it is not otherwise capable of agreement.

15. The Kingate Funds therefore run the risk that, if the Bermuda Proceedings are struck out or dismissed, or if the Kingate Funds lose or are obliged to concede an interlocutory application, the Kingate Funds may be obliged to pay the other parties' costs of and occasioned by the Bermuda Proceedings, or the costs of the relevant stage of the proceedings.

16. In those circumstances, the Kingate Funds would also be obliged to bear their own legal costs and expenses, since as the unsuccessful party they would be unlikely to have any basis for making an application for a costs order against the other parties. Given the nature and duration of the Bermuda Proceedings, the legal costs to date (both of the Kingate Funds and the twelve defendants to the Bermuda Proceedings, individually and in the aggregate) are very substantial indeed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 17th day of February 2014 in Hamilton, Bermuda.

BY the said                          )

MARK GUY CHUDLEIGH          )

in the City of Hamilton             )

DATED this    17th    day of February 2014

_____
**A COMMISSIONER OF OATHS**

Keren V. P. Lomas
Lomas & Co.
Commissioner for Oaths
Notary Public
20 Brunswick Street
Hamilton, Bermuda HM 10