**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

Hearing Date: April 17, 2014
Hearing Time: 10:30 A.M. (EST)
Objection Deadline: April 10, 2014

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>       Plaintiff-Applicant,<br><br>       v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>       Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>       Debtor. | |

## MOTION FOR AN ORDER APPROVING FOURTH ALLOCATION OF PROPERTY TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING FOURTH INTERIM DISTRIBUTION TO CUSTOMERS

# TABLE OF CONTENTS

**Page**

I.    EXECUTIVE SUMMARY ................................................................................................1

II.   THE LIQUIDATION PROCEEDING ..........................................................................6

III.  ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA ............8

    A.    Allocation of Property.........................................................................................8

    B.    Distributions Under SIPA ...................................................................................9

    C.    Allocation Of Assets To The Customer Fund And Related Reserves..................11

        i.      Assets In Trustee's Possession As Of February 28, 2014 .........................13

        ii.     JPMorgan Funds.....................................................................................14

        iii.    Levy Funds...............................................................................................14

        iv.     IRS Settlement Funds ...............................................................................15

        v.      Other Recoveries To The BLMIS Estate Since The Third
             Allocation and Third Interim Distribution.................................................16

        vi.     Disputed Recoveries .................................................................................16

        vii.    Summary Of Requested Allocation ...........................................................17

    D.    Determination Of Allowable Net Equity Claims & Related Reserves.................18

IV.   CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR
      FOURTH ALLOCATION AND FOURTH INTERIM DISTRIBUTION ......................20

    A.    No Interim Distribution Of General Estate...........................................................23

V.    MISCELLANEOUS ...................................................................................................24

    A.    Notice..................................................................................................................24

    B.    Record Date ........................................................................................................24

VI.   CONCLUSION............................................................................................................25

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L.

Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this motion (the "Motion")

pursuant to SIPA §§ 78*lll*(4), 78fff(a)(1)(B), 78fff-2(b), and 78fff-2(c)(1), and Rule 9013 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking entry of an order (1)

approving the fourth allocation of property ("Fourth Allocation") to the fund of customer

property ("Customer Fund"); and (2) authorizing a fourth pro rata interim distribution ("Fourth

Interim Distribution") to customers whose claims for customer protection under SIPA have been

allowed for amounts exceeding the SIPA statutory advance limits and which have not already

been satisfied by the first, second, and third pro rata interim distributions.  This Court has

jurisdiction over this Motion pursuant to SIPA §§ 78eee(b)(2), 78eee(b)(4), 28 U.S.C. §§ 157

and 1334, and Bankruptcy Rule 5005.  This Motion is based upon the law set forth below as well

as the facts set forth in the affidavit of Vineet Sehgal ("Sehgal Aff."), filed herewith.  In support

of this Motion, the Trustee alleges and represents as follows:

## I.    <u>EXECUTIVE SUMMARY</u>

1.    In order to protect customers of an insolvent broker-dealer such as BLMIS,

Congress established a statutory framework pursuant to which customers of a debtor in a SIPA

liquidation are entitled to preferential treatment in the distribution of assets from a debtor's

estate.  The mechanism by which customers receive preferred treatment is through the creation

of a fund of "customer property" as defined in SIPA § 78*lll*(4), which is distinct from a debtor's

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

general estate.  Customers holding allowable claims are entitled to share pro rata in the Customer

Fund based on each customer's "net equity" as of the filing date, to the exclusion of general

creditors.  SIPA § 78fff-2(c).

2.      In order to make distributions from the Customer Fund, the Trustee must

determine or be able to sufficiently estimate: (a) the total value of customer property available

for distribution, or the "numerator" (including reserves for disputed recoveries), and (b) the total

net equity of all allowed claims, or the "denominator" (including reserves for disputed claims).

The Trustee calculates reserve amounts on a "worst-case" basis, such that the ultimate resolution

of disputed amounts will not adversely affect any customers' allowed or disputed net equity

distributions.

3.      In this case, for purposes of determining each customer's "net equity," the Trustee

credited the amount of cash deposited by the customer into his BLMIS account, less any amounts

already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the

"Trustee's Net Investment Method").  Some claimants argued that the Trustee was required to

allow customer claims in the amounts shown on the November 30, 2008 customer statements

(the "Last Statement Method," creating the "Net Equity Dispute").  Litigation over the Net

Equity Dispute has now proceeded through this Court,[2] the Second Circuit,[3] and the Supreme

Court of the United States.[4]  The Trustee's Net Investment Method was upheld.

---

[2] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

[3] *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision").

[4] Two petitions for writ of certiorari were denied by the Supreme Court of the United States on June 25, 2012.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC) (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Ryan v. Picard*, 133 S.Ct. 24 (2012); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (In re Bernard L. Madoff Inv. Sec., LLC), 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Velvel v. Picard*, 133 S.Ct. 25 (2012).  A third petition

4.    On May 4, 2011, the Trustee moved for an initial allocation and pro rata interim distribution of the Customer Fund ("First Allocation" and "First Interim Distribution").  (ECF No. 4048).  On July 12, 2011, this Court ordered the First Allocation and First Interim Distribution, in which the Trustee allocated approximately $2.618 billion to the Customer Fund and distributed approximately $516.190 million on allowed claims relating to 1,308 accounts, or 4.602% of each customer's allowed claim, unless the claim was fully satisfied.  Because the Net Equity Dispute was outstanding at the time of the First Allocation Motion, the Trustee, with the Court's approval, set a reserve for that issue.

5.    On July 26, 2012, the Trustee moved for a second allocation and pro rata interim distribution of the Customer Fund ("Second Allocation" and "Second Interim Distribution"). (ECF No. 4930).  On August 22, 2012, this Court ordered the Second Allocation and Second Interim Distribution, in which the Trustee allocated approximately $5.501 billion to the Customer Fund and distributed approximately $3.746 billion on allowed claims relating to 1,294 accounts, or 33.556% of each customer's allowed claim, unless the claim was fully satisfied.

6.    At the time of the Second Allocation Motion, a final, nonappealable order had been entered on the Net Equity Dispute, upholding the Trustee's Net Investment Method.  As a result of that ruling, a separate but related question of whether claimants are entitled to an increase of their claims based on the time that elapsed while their monies were deposited with BLMIS ("Time-Based Damages") was relevant to the Second Allocation Motion.  In its order approving the Second Allocation Motion (ECF No. 4997), the Court required the Trustee to maintain a reserve for the Time-Based Damages Dispute at not less than 3% ("the 3% Reserve").

---

for writ of certiorari was dismissed.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. dismissed sub nom. Sterling Equities Assocs. v. Picard*, 132 S.Ct. 2712 (2012).

On September 10, 2013, Judge Lifland held a hearing on the Time-Based Damages Dispute and granted the Trustee's motion, finding that claimants were not entitled to time-based damages as part of their net equity claims against the fund of customer property. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 496 B.R. 744 (Bankr. S.D.N.Y. 2013) (the "Time-Based Damages Decision"). The appeals from the Time-Based Damages Decision were accepted as direct appeals to the Second Circuit on January 22, 2014, where they are currently pending. *See In re Bernard L. Madoff Inv. Sec. LLC*, 14-97(L) (2d Cir.).

7.      On February 13, 2013, the Trustee moved for a third allocation and pro rata interim distribution of the Customer Fund ("Third Allocation" and "Third Interim Distribution"). (ECF No. 5230). On March 13, 2013, this Court ordered the Third Allocation and Third Interim Distribution, in which the Trustee allocated approximately $1.198 billion to the Customer Fund and distributed approximately $523.024 million on allowed claims relating to 1,112 accounts, or 4.721% of each customer's allowed claim, unless the claim was fully satisfied.

8.      On February 5, 2014, this Court approved a $325 million settlement between the Trustee and JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMorgan"). (Adv. Pro. No. 10-04932, ECF No. 51). Under the settlement, JPMorgan paid $325 million to the Trustee.

9.      On June 10, 2011, this Court approved a settlement agreement between the Trustee and the Joint Liquidators for Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited (collectively, the "Fairfield Funds"). *Picard v. Fairfield Sentry et al.*, Adv. Pro. No. 09-1239 (Bankr. S.D.N.Y.) (BRL) (ECF No. 95). Under that agreement, the Fairfield Funds are entitled to share in certain avoidance settlement payments received by the Trustee, including JPMorgan Chase. Accordingly, the Trustee paid $50 million of the $325

million to the Fairfield Funds.  Thus, the Trustee seeks approval to allocate a net amount of $275 million to the Customer Fund from the JPMorgan settlement.

10.    With these and other additional funds, the Trustee now stands ready to make a fourth significant distribution to customers with allowed claims.  The practical effect of this determination is to permit a fourth interim distribution to customers whose claims have not been fully satisfied because the net equity of their respective accounts as of the Filing Date[5] exceeded the statutory SIPA protection limit of $500,000 and were not satisfied by the First, Second, or Third Interim Distributions.

11.    Thus, by way of this Motion, the Trustee seeks to distribute, after maintaining the 3% Reserve, approximately $348.998 million (with an additional $196.443 million available for distribution to certain "net loser" accounts in litigation, if the claims relating to their accounts become allowed prior to the time the distribution is made, or reserved, if not allowed).[6]  The Fourth Interim Distribution, when combined with the First, Second, and Third Interim Distributions, will provide all claimants that have an allowed claim 46.036% of the customer's allowed claim amount, plus the SIPC advance of up to as much as $500,000.  These distributions will be paid on claims relating to 1,080 BLMIS accounts.  The average payment amount to those 1,080 BLMIS accounts will be approximately $323,000.  Twenty-five payments will go to claimants who qualified for hardship status under the Trustee's claims hardship program.  If approved, and when combined with the SIPC payment, the amounts from the First Interim

---

[5] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* SIPA § 78*lll*(7)(B).

[6] If all of these "net loser" accounts were allowed prior to the distribution, the total distribution to claimants would be approximately $544.973 million ($544,973,327.36), based on the net equity amount for deemed determined accounts.

Distribution, the Second Interim Distribution, and the Third Interim Distribution, claims relating to 1,129 accounts will be fully satisfied.

12.     The proposed Fourth Allocation and Fourth Interim Distribution are interim in nature.  The Trustee anticipates recovering additional assets through litigation and settlements. Final resolution of certain disputes will permit the Trustee to reduce the reserves he is required to maintain, which will allow him to make additional distributions to customers in the future.  The Trustee will seek authorization for these further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.[7]

## II.     THE LIQUIDATION PROCEEDING

13.     Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11" to the extent these provisions are consistent with SIPA.

14.     SIPA affords special protection to "customers," as defined in SIPA § 78*lll*(2), who receive preferential treatment by having their claims satisfied ahead of general creditors. *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (recognizing that a "person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment").  The amounts owed to each customer are determined by valuing his or her "net equity," defined in SIPA § 78*lll*(11), as of the Filing Date.

---

[7] The Trustee seeks permission to include in the Fourth Interim Distribution those claims that are allowed between the time an order is entered on this Motion and the date of the Fourth Interim Distribution.

15.    To date, the Trustee has received 16,519 customer claims.  (Sehgal Aff. ¶ 4).  To

date, the Trustee has determined 16,364 of those claims.  (*Id*. ¶ 4).  The Trustee allowed 2,517

claims and committed to pay approximately $811.747 million in funds advanced to him by SIPC.

(*Id*.).  To date, the allowed claims total approximately $11.402 billion.  (*Id*.).

16.    Of the remaining determined customer claims, 13,625 were denied, 12 were

determined as asserting no claim, and 210 were withdrawn.  (*Id*. ¶ 5).  One hundred fifty-five

claims are currently categorized as "deemed determined," meaning that the Trustee has instituted

litigation against those claimants.  (*Id*.).  The complaints filed by the Trustee in those litigations

set forth the express grounds for disallowance of customer claims under section 502(d) of the

Bankruptcy Code.  Accordingly, such claims will not be allowed until the avoidance action is

resolved by settlement or otherwise and any judgment rendered against the claimant in the

avoidance action is satisfied.

17.    As of March 25, 2014, the Trustee has received 427 timely and 21 untimely filed

secured priority and unsecured non-priority general creditor claims totaling approximately

$1.741 billion.  The claimants include vendors, taxing authorities, employees, and customers

filing claims on non-customer proof of claim forms.  Of these 448 claims, 94 are general creditor

claims and 49 are broker-dealer claims, which together total approximately $264.975 million of

the $1.741 billion.[8]  (*Id*. ¶ 6).

18.    2,290 docketed objections have been filed to the Trustee's claims determinations

relating to approximately 4,187 claims, which will be noticed for hearing as necessary.  (*Id*. ¶ 7).

---

[8] The 448 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor
and service claims.  (Sehgal Aff. ¶ 6).  They do not include "customer" claims, even though each "customer"
claim—both those allowed and denied—has a "general creditor" component.  All BLMIS creditors, including
customers whose claims were allowed, customers whose claims were denied, and general creditors, may have claims
as general creditors against BLMIS for misrepresentation, fraud, and breach of contract (assuming they filed
claims).  Customers who filed customer claims need not have specifically filed claims as general creditors to protect
such rights.

These 2,290 objections relate to approximately 1,149 BLMIS accounts.  (*Id.*).  The objections

raise various issues, including the proper interpretation of "net equity" (now resolved), the right

to interest or time value of money (now on appeal), and whether the Trustee's calculation of

allowed claims amounts are correct.

### III.    ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA

#### A.    Allocation of Property

19.    SIPA sets forth a bipartite statutory framework that gives customers priority over

general creditors of the broker-dealer.  Pursuant to SIPA § 78fff-2(c)(1)(B), all customers with

allowed claims share ratably in the fund of customer property.  Pursuant to SIPA § 78fff-2(c),

general creditors and customers, to the extent of their respective unsatisfied net equities, share in

any general estate.  Estate property not allocable to the fund of customer property is distributed

in the order of priority established in section 726 of the Bankruptcy Code.  SIPA § 78fff(e).  Any

property allocated to the fund of customer property that is not necessary to satisfy customer and

other priority claims will become part of the general estate.  SIPA § 78fff-2(c).

20.    According to SIPA § 78lll(4), "customer property" consists of "cash and

securities . . . at any time received, acquired, or held by or for the account of a debtor from or for

the securities accounts of a customer, and the proceeds of any such property transferred by the

debtor, including property unlawfully converted."

21.    Among the assets that comprise "customer property" are "any other property of

the debtor which, upon compliance with applicable laws, rules and regulations, would have been

set aside or held for the benefit of customers . . ."  SIPA § 78*lll*(4)(D).  Under SIPA §

78*lll*(4)(D), a trustee is permitted to look to the property of the debtor to rectify the actions taken

by the debtor that resulted in a shortfall in customer property.  *See Ferris, Baker, Watts v.*

*Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 132 (Bankr. D. Minn. 2002) ("Application

of the plain meaning of 15 U.S.C. § 78lll(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall. . . . Thus, if the debtor failed to set aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78lll(4)(D) would require the trustee to correct the debtor's error.").

22.     Thus, if the trustee determines that there is a shortfall in assets such that customer property is insufficient to satisfy net equity claims, then he may look to other assets of the debtor and allocate property to the fund of customer property.

23.     SIPA liquidations generally take a broad and inclusive customer-related approach to the allocation of property.  For example, in *In re Park South Securities, LLC*, 99% of the debtor's estate was allocated to customer property.  See Order, No. 03-08024A (Bankr. S.D.N.Y. Oct. 30, 2008) (ECF No. 201).[9]  Consistent with prior liquidations, the Trustee expects to allocate the vast majority of the BLMIS estate to the Customer Fund, inasmuch as here, recovered property either belonged to customers or was derived from the misuse of customer property.

**B.     Distributions Under SIPA**

24.     The SIPA distribution scheme, while complex, can be distilled to a simple equation.  Each customer is entitled to his or her pro rata share of customer property.  To

---

[9] *Accord SIPC v. Lehman Brothers, Inc.*, Adv. Pro. No. 08-01420, Motion for Order Approving Allocation of Property of the Estate at 27-28, n.33 (Bankr. S.D.N.Y. Oct. 5, 2009) (ECF No. 1866) (allocating "most" of debtor's assets to customer property); *In re Vision Inv. Grp., Inc.*, Adv. Pro. No. 97-1035B, Order Approving Third and Final Report and Final Accounting of the Securities Investor Protection Corporation (Bankr. W.D.N.Y. Dec. 13, 2005) (allocating 95% of debtor's estate to customer property); *In re Klein Maus & Shire, Inc.*, Adv. Pro. No. 00-8193A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property); *In re MJK Clearing*, 286 B.R. at 132 (allocating 100% the debtor's assets as customer property); *In re A.R. Baron & Co., Inc.*, Order Approving Final Report and Account and Related Relief, Adv. Pro. No. 96-8831A (Bankr. S.D.N.Y. Feb. 10, 2004) (allocating 99% of the debtor's assets to customer property); *In re Hanover, Sterling & Co.*, Adv. Pro. No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002) (allocating 75% of debtor's estate to customer property).

determine the percentage that each allowed customer will receive from the fund of customer property in an interim distribution, the aggregate amount collected to date by the Trustee and allocated to customer property is divided by the aggregate amount of net equity claims allowed by the Trustee. The percentage result is then to be applied to each net equity claim to determine a customer's pro rata share. The equation is as follows:

$$\frac{\text{Fund of Customer Property (“Numerator”)}}{\text{Allowable Customer Net Equity Claims (“Denominator”)}} = \text{Customer Pro Rata Share}$$

25.    SIPA § 78fff-2(c)(1) establishes the order of distribution of customer property. The second and third priorities of distribution are relevant here. The second priority is to distribute customer property among customers based on their filing date net equities. SIPA § 78fff-2(c)(1)(B). The third priority is to distribute customer property to SIPC as subrogee. SIPA § 78fff-2(c)(1)(C). Thereafter, any customer property remaining becomes part of the general estate.

26.    The amount advanced by SIPC to the Trustee in full or partial satisfaction of a customer claim is based on the difference between the customer's net equity and his share of customer property, subject to the $500,000 limit of SIPA's statutory protection. The SIPC advance does not reduce the customer's net equity or his claim against customer property. If the sum of the amount of a customer's SIPC advance and any subsequent distribution of customer property exceeds the customer's net equity, SIPC has the right to recoup its advance from the excess. In effect, SIPC becomes subrogated to the claims of customers to the extent it has made advances but cannot seek recovery from customer property as to any individual customer until the customer has been fully satisfied. SIPA §§ 78fff-3(a), 78fff-2(c)(1).

C.    **Allocation Of Assets To The Customer Fund And Related Reserves**

27.    As this Court previously found in its Net Equity Decision, and as numerous courts in civil and criminal proceedings have also found, Madoff did not engage in securities trading on behalf of BLMIS customers. Madoff used customer funds to support operations and fulfill requests for redemptions to perpetuate a Ponzi scheme. Thus, payment of "profits" to any one customer in fact came from another customer's deposit of funds. In essence, all of the funds withdrawn by BLMIS customers were simply other people's money.

28.    BLMIS had an obligation to set aside sufficient assets to cover its statutory obligations to customers. *See* Securities Exchange Act Rule 15c3-3; 17 C.F.R. § 240.15c3-3.[10] The assets of BLMIS and Madoff are insufficient to cover those obligations.

29.    For these reasons, and because it is not uncommon for almost all property available to a broker-dealer to be deemed "customer property," the Trustee seeks the Court's approval to allocate to the Customer Fund virtually all cash and cash equivalents currently in his possession that was not previously allocated -- $477,503,824.33 -- which includes the JPMorgan funds. (Sehgal Aff. ¶ 8). *See First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 362-66 (D.N.J. 1986) (describing and approving SIPA allocation and distribution scheme similar to that proposed by Trustee).

---

[10] SIPA's definitional paragraphs were amended in 1978 to incorporate in the "customer property" definition any other property of the debtor's estate which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers. Thus, to the extent that prior to the Filing Date BLMIS failed to maintain cash and securities in compliance with the Net Capital Rule issued by the SEC (Rule 15c3-1), as affected by the Customer Protection Rule (Rule 15c3-3) (both issued pursuant to the Exchange Act, 15 U.S.C. § 78*o*(c)(3)(A)), the Trustee is required to allocate property as necessary to remedy such non-compliance. The Customer Protection Rule effectively requires that a broker-dealer maintain control of all property that would have to be delivered to customers in the event of a liquidation: either the securities themselves or their value in the form of cash (or equivalents), and cash sufficient to pay net cash obligations to customers.

30.     When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the $5,501,375,994.66 that was allocated to the Customer Fund in connection with the Second Allocation, and the $1,198,067,071.04 that was allocated to the Customer Fund in connection with the Third Allocation, the total amount allocated will be $9,794,921,320.29.   Of this amount, $516,190,213.43 was distributed to customers with allowed claims as part of the First Interim Distribution, $3,745,822,500.31 was distributed to customers with allowed claims as part of the Second Interim Distribution, and $523,024,223.30 was distributed to customers with allowed claims as part of the Third Interim Distribution.  In connection with the First Interim Distribution, an additional $286,358,011.92 was reserved for accounts in litigation, and $8,544,437.00 of SIPC subrogation was deferred. In connection with the Second Interim Distribution, an additional $2,088,011,614.07 was reserved for accounts in litigation, and $80,165,922.91 of SIPC subrogation was deferred. In connection with the Third Interim Distribution, an additional $293,762,749.70 was reserved for accounts in litigation, and $15,257,752.68 of SIPC subrogation was deferred.[11]  Therefore, the total amount available for the Fourth Interim Distribution will be $2,237,783,894.97.   Of this amount, $236,653,320.42 must be held in reserve for the non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements, leaving a total of $2,001,130,574.55 available for distribution.  Further, the reserve for the Time-Based Damages issue for the First, Second and Third Interim Distributions is $1,347,657,799.47, resulting in the numerator of $653,472,775.08.

---

[11] The total SIPC subrogation from the First, Second, and Third Interim Distributions is $103,968,112.59.  On March 29, 2013, a SIPC subrogation payment was made in the amount of $102,805,012.23.   The remaining $1,163,100.36 is associated with accounts that have not returned the necessary paperwork required to receive their SIPC advance and accounts where the SIPC advance was provided after the payment to SIPC.  The $1,163,100.36 is currently held in reserve.

31.     Of the $653,472,775.08 numerator, $348,998,302.42 will be distributed as part of the Fourth Interim Distribution to allowed accounts, and SIPC subrogation for allowed accounts in the amount of $10,896,564.76[12] will be released to SIPC.  For deemed determined accounts, $196,443,338.49 will be reserved.  In addition to the deemed determined reserve, the Trustee will also reserve $97,072,605.77 for Time-Based Damages related to the Fourth Interim Distribution, bringing the total Time-Based Damages reserve through the Fourth Interim Distribution to $1,444,730,405.24.

### i.     Assets In Trustee's Possession As Of February 28, 2014

32.     The Form SIPC 17 completed by the Trustee each month lists all of the recoveries and assets in the Trustee's possession.  In the Trustee's Form SIPC 17 for the period ending on February 28, 2014 ("February 28 SIPC 17 Form"), attached hereto as Exhibit A, the Trustee reports that he has recovered approximately $9.795 billion.[13]  These funds were primarily derived from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS estate; (b) pre-litigation and litigation settlements; (c) customer preference recoveries; (d) the sale of assets; (e) refunds; and (f) earnings on the Trustee's investment and money market accounts.

33.     To the extent additional settlements are reached and/or become final prior to the entry of an order on this Motion, the Trustee will allocate and distribute those recoveries in accordance with the formula set forth herein.

---

[12] An additional $61,963.64 of SIPC subrogation associated with the Fourth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

[13] In addition, the Trustee has in his possession a *de minimis* amount of unliquidated assets.

### ii.    JPMorgan Funds

34.    On February 5, 2014, this Court approved a $325 million settlement between the Trustee and JPMorgan.  Under the settlement, JPMorgan paid $325 million to the Trustee in settlement of the Trustee's avoidance claims against JPMorgan.

35.    On June 10, 2011, this Court approved a settlement agreement between the Trustee and the Joint Liquidators for Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited (collectively, the "Fairfield Funds").  *Picard v. Fairfield Sentry et al.*, Adv. Pro. No. 09-1239 (Bankr. S.D.N.Y.) (BRL) (ECF No. 95).  Under that agreement, the Fairfield Funds are entitled to share in certain avoidance settlement payments received by the Trustee, including JPMorgan Chase.  Upon approval by this Court of the Trustee's Motion to approve the JPMorgan settlement, which indicated that approximately $50 million was due and owing to the Fairfield Funds from the JPMorgan settlement monies, the Trustee paid $50 million of the $325 million to the Fairfield Funds.  *See* Trustee's Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement of Avoidance Claims By and Between the Trustee and JPMorgan, *Picard v. JPMorgan Chase Bank & Co.*, Adv. Pro. No. 10-04932, ECF No. 29; Order, ECF No. 51.  Thus, the Trustee seeks approval to allocate a net amount of $275 million to the Customer Fund.

### iii.    Levy Funds

36.    One of the more significant pre-litigation settlements approved by this Court was entered into by the Trustee and the estate of Norman F. Levy.  Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement By and Among the Trustee and Jeanne Levy-Church and Francis N.

Levy (ECF No. 1964).  This settlement resulted in the return of $220 million to the BLMIS

estate.  (Sehgal Aff. ¶ 12).

37.     Certain claimants moved to vacate this settlement ("Levy Appeal").  This Court

denied the motion to vacate, and on appeal, the District Court affirmed.  (ECF No. 3984; *Sec.

Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 11 Civ. 03313, 2012 U.S. Dist. LEXIS

21740 (S.D.N.Y. Feb. 16, 2012) (DAB)).  The Second Circuit issued a summary order affirming

the judgment of the District Court.  *See Peshkin v. Levy-Church, et al.*, No. 12-816-cv, 2012 U.S.

App. LEXIS 26101 (2d Cir. Dec. 21, 2012) (ECF No. 98).  The time period to further challenge

these rulings in the Supreme Court of the United States expired on March 21, 2013.

38.     The $220 million previously was allocated to the Customer Fund on July 12, 2011

in connection with the First Allocation, and the Trustee held $220 million in reserve.  The $220

million of funds is now available for distribution by the Trustee

#### iv.     IRS Settlement Funds

39.     On December 21, 2011, this Court approved a $326 million settlement between

the Trustee and the United States of America, on behalf of the Internal Revenue Service ("IRS").

(ECF No. 4602).  In the settlement, the Trustee agreed to set aside almost $103 million as a

reserve to satisfy any judgments, settlements, or administrative decisions against the IRS, the

United States, or the Trustee that might have been entered with respect to certain payments.  The

settlement authorized the Trustee to release the reserve two years and sixty days after the order

approving the settlement agreement became final, which date has occurred.

40.     The $326 million previously was allocated to the Customer Fund on August 22,

2012 in connection with the Second Allocation, and the Trustee held $103 million in reserve

until March 4, 2014.  The $103 million of funds is now available for distribution by the Trustee.

**v.    Other Recoveries To The BLMIS Estate Since The Third Allocation and Third Interim Distribution**

41.    In the Motion on the Third Allocation and Third Interim Distribution submitted to the Court on February 13, 2013, the Trustee reported total recoveries of $1,198,067,071.04 that were not previously allocated.  When combined with recoveries of $5,501,375,994.66 reported in the Second Allocation and Second Interim Distribution submitted on August 22, 2012, and recoveries of $2,617,974,430.26 reported in the First Allocation and First Interim Distribution submitted on July 12, 2011, the total recoveries as of the Third Allocation and Third Interim Distribution were $9,317,417,495.96.  The Trustee has recovered additional funds for the estate from multiple parties and sources since that time.

42.    The Trustee has recovered approximately $477,503,824.33 since the Third Allocation and Third Interim Distribution as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries.  (Sehgal Aff. ¶ 14).  Therefore, the Trustee seeks approval to allocate the full amount of these recoveries to the Customer Fund.

**vi.    Disputed Recoveries**

43.    As of February 28, 2014, the Trustee had recovered approximately $9.794 billion as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries.  Of the total amount recovered, $236,653,320.42 must be held in reserve for the non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements.  Part of the funds held in reserve remain subject to a final ruling as to how net equity claims are to be determined.  Although the Second Circuit's Net Equity Decision on the Net Investment Method is now final, the Objecting Claimants argue that any time-based damages should be part of their net equity claims.  Thus, the Trustee will hold

such funds in reserve pending the outcome of the appeal of the Time-Based Damages Motion to the Second Circuit (the "Time-Based Damages Motion"). Therefore, the Trustee seeks approval to allocate the full amount of these preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries that were not previously allocated to the Customer Fund; however, $236,653,320.42 will not be available for distribution at this time. (Sehgal Aff. ¶ 17).

### vii.    Summary Of Requested Allocation

44.    The Trustee, in this Motion, seeks to allocate an additional $477,503,824.33 to the Customer Fund. When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the $5,501,375,994.66 that was allocated to the Customer Fund in connection with the Second Allocation, and the $1,198,067,071.04 that was allocated to the Customer Fund in connection with the Third Allocation, the total amount allocated will be $9,794,921,320.29. Of this amount, $516,190,213.43 was distributed to customers with allowed claims as part of the First Interim Distribution, $3,745,822,500.31 was distributed to customers with allowed claims as part of the Second Interim Distribution, and $523,024,223.30 was distributed to customers with allowed claims as part of the Third Interim Distribution. In connection with the First Interim Distribution, an additional $286,358,011.92 was reserved for accounts in litigation, and $8,544,437.00 of SIPC subrogation was deferred. In connection with the Second Interim Distribution, an additional $2,088,011,614.07 was reserved for accounts in litigation, and $80,165,922.91 of SIPC subrogation was deferred. In connection with the Third Interim Distribution, an additional $293,762,749.70 was reserved for accounts in litigation, and $15,257,752.68 of SIPC subrogation was deferred.[14] Therefore, the total amount

---

[14] The total SIPC subrogation from the First, Second, and Third Interim Distributions is $103,968,112.59. On March 29, 2013, a SIPC subrogation payment was made in the amount of $102,805,012.23. The remaining

available for the Fourth Interim Distribution will be $2,237,783,894.97. Of this amount, $236,653,320.42 must be held in reserve for non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements, leaving a total of $2,001,130,574.55 available for distribution. Further, the reserve for the Time-Based Damages issue for the First, Second, and Third Interim Distributions is $1,347,657,799.47, resulting in the numerator of $653,472,775.08.

45.    Of the $653,472,775.08 numerator, $348,998,302.42 will be distributed as part of the Fourth Interim Distribution to allowed accounts and SIPC subrogation for allowed accounts in the amount of $10,896,564.76[15] will be released to SIPC. For deemed determined accounts, $196,443,338.49 will be reserved. In addition to the deemed determined reserve, the Trustee will also reserve $97,072,605.77 for Time-Based Damages related to the Fourth Interim Distribution, bringing the total Time-Based Damages reserve through the Fourth Interim Distribution to $1,444,730,405.24.

46.    The Trustee does not seek to allocate any funds to the General Estate at this time.

**D.    Determination Of Allowable Net Equity Claims & Related Reserves**

47.    For distribution purposes, the Customer Fund numerator is only one half of the equation. In order to calculate each customer's pro rata share of customer property, the Trustee also needs to establish the denominator, or the amount of allowable net equity claims.

48.    If the Trustee had determined all customer claims and his determinations were final either through the passage of time or judicial determination, the denominator would simply

---

$1,163,100.36 is associated with accounts that have not returned the necessary paperwork required to receive their SIPC advance and accounts where the SIPC advance was provided after the payment to SIPC. The $1,163,100.36 is currently held in reserve.

[15] An additional $61,963.64 of SIPC subrogation associated with the Fourth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

equal the amount of allowed claims. Because the Trustee seeks to make a Fourth Interim Distribution prior to a final determination of all customer claims and certain disputes are pending, the Trustee cannot use as the denominator the amount of allowed claims as of this date. Doing so could result in an uneven distribution to customers, in violation of SIPA and the Bankruptcy Code, because there could be insufficient funds to distribute to claimants whose claims are allowed in the future. Instead, the Trustee must project as to the amount of all allowable net equity claims and establish sufficient reserves to ensure that all possibly-eligible claimants receive a pro rata distribution, should their claims be allowed. In order to do so, he must maintain sufficient reserves.

49.    As discussed above, Time-Based Damages is a contingency for which the Trustee must reserve. Per the Court's order (ECF No. 4997), the Trustee has calculated this reserve by applying a 3% interest rate to positive account balances. Thus, for purposes of this Motion, the Trustee seeks to set the denominator at $20,698,518,012.19[16] (the "3% Time-Based Damages Reserve Denominator"). (Sehgal Aff. ¶ 24).

50.    Certain accountholders decided against filing a claim in this proceeding, even though they may have had allowable net equity claims. The statutory bar date to file claims was July 2, 2009. SIPA § 78fff-2(a)(3). Thus, a failure to file a claim by that date means that there is no distribution that can be made to these accounts. No reserves are maintained for these accounts.

51.    Further, certain accountholders have entered into final settlements not contingent on the Net Equity Dispute. No reserves are maintained for these accounts.

---

[16]  The 3% Time-Based Damages Reserve Denominator has increased from $20,683,128,614.97 to $20,698,518,012.19 since the Third Allocation due to settlements that occurred after the Third Allocation.

52.    There are no additional reserves required for any future avoidance recoveries by the Trustee because such recoveries will be added to both the numerator and the denominator by operation of section 502(h) of the Bankruptcy Code.  Any subsequent recovery coupled with a corresponding claim for the same amount cannot adversely affect the distribution because the addition of any amount to both the numerator and denominator can only result in an increase, not a decrease, of the pro rata distribution to any customer.

## IV.    CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR FOURTH ALLOCATION AND FOURTH INTERIM DISTRIBUTION

53.    SIPA § 78fff-2(c)(1) establishes, in pertinent part, that a customer is to receive his ratable share from the fund of customer property.  To the extent the customer's share has been fully satisfied through an advance of funds by SIPC, SIPC steps into the shoes of the customer as subrogee and receives that customer's share of customer property.  In that manner, a customer does not receive a double recovery on his claim that was already fully satisfied by the SIPC advance.

54.    As set forth above and in the Sehgal Affidavit, the Trustee proposes to allocate $477,503,824.33 to the Customer Fund at this time.  When combined with the $2,617,974,430.26 that was allocated to the Customer Fund in connection with the First Allocation, the $5,501,375,994.66 that was allocated to the Customer Fund in connection with the Second Allocation, and the $1,198,067,071.04 that was allocated to the Customer Fund in connection with the Third Allocation, the total amount allocated will be $9,794,921,320.29.  Of this amount, $516,190,213.43 was distributed to customers with allowed claims as part of the First Interim Distribution, $3,745,822,500.31 was distributed to customers with allowed claims as part of the Second Interim Distribution, and $523,024,223.30 was distributed to customers with allowed claims as part of the Third Interim Distribution.  In connection with the First Interim

Distribution, an additional $286,358,011.92 was reserved for accounts in litigation, and $8,544,437.00 of SIPC subrogation was deferred. In connection with the Second Interim Distribution, an additional $2,088,011,614.07 was reserved for accounts in litigation, and $80,165,922.91 of SIPC subrogation was deferred. In connection with the Third Interim Distribution, an additional $293,762,749.70 was reserved for accounts in litigation, and $15,257,752.68 of SIPC subrogation was deferred.[17] Therefore, the total amount available for the Fourth Interim Distribution will be $2,237,783,894.97. (Sehgal Aff. ¶ 23). Of that amount, $653,472,775.08 is available for distribution (the "Net Customer Fund"). (Id.). The difference between those amounts—$1,584,311,119.89—represents the reserve relating to certain other settlements, and the outcome of the Time-Based Damages Motion. (Id.).

55.     Of the $653,472,775.08 numerator, $348,998,302.42 will be distributed as part of the Fourth Interim Distribution to allowed accounts and SIPC subrogation for allowed accounts in the amount of $10,896,564.76[18] will be released to SIPC. For deemed determined accounts, $196,443,338.49 will be reserved. In addition to the deemed determined reserve, the Trustee will also reserve $97,072,605.77 for Time-Based Damages related to the Fourth Interim Distribution, bringing the total Time-Based Damages reserve through the Fourth Interim Distribution to $1,444,730,405.24.

56.     The 3% Time-Based Damages Reserve Denominator is $20,698,518,012.19 (Id. ¶ 24). To determine the percentage of each allowed customer net equity claim that can be satisfied

---

[17] The total SIPC subrogation from the First, Second, and Third Interim Distributions is $103,968,112.59. On March 29, 2013, a SIPC subrogation payment was made in the amount of $102,805,012.23. The remaining $1,163,100.36 is associated with accounts that have not returned the necessary paperwork required to receive their SIPC advance and accounts where the SIPC advance was provided after the payment to SIPC. The $1,163,100.36 is currently held in reserve.

[18] An additional $61,963.64 of SIPC subrogation associated with the Fourth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

from the Customer Fund, the Net Customer Fund is divided by the 3% Time-Based Damages

Reserve Denominator, resulting in the following percentage (the "3% Scenario"):

$$\frac{\$653,472,775.08 \text{ (Net Customer Fund)}}{\$20,698,518,012.19 \text{ (3\% Time-Based Damages Reserve Denominator)}} = 3.157\%$$

57.    Under this scenario, a total of 1,080 accounts will receive a distribution of

approximately 3.157% of their net equity claims.  (Sehgal Aff. ¶ 25).  Of these 1,080 accounts,

20 will become fully satisfied, bringing the total of fully satisfied account holders to 1,129 (1,060

accounts will remain partially satisfied and will be entitled to participate in future distributions).

(*Id.*).

58.    An additional 108 accounts that are currently "deemed determined" could receive

a distribution if and when the status of their claims moves from "deemed determined" to

allowed.  (*Id.* ¶ 26).  Forty-one of the 108 accounts would be fully satisfied by the SIPC advance.

The remaining 67 accounts would receive both a SIPC advance and a distribution in accordance

with the Trustee's Motion and his Fourth Allocation and Fourth Interim Distribution.  (*Id.*).  Ten

of the remaining 67 accounts would be fully satisfied by the First, Second, Third, and Fourth

Interim Distributions.  (*Id.*).

59.    SIPC is entitled to receive repayment as to any given customer to the extent the

customer's claim was fully repaid by a combination of the SIPC advance and the Trustee's

distributions.  *See In re Bell & Beckwith*, 104 B.R. 842, 852-55 (Bankr. N. D. Ohio 1989), *aff'd*,

937 F.2d 1104 (6th Cir. 1991).  SIPC, as subrogee, is entitled to receive partial repayment of its

cash advances to the Trustee pursuant to SIPA § 78fff-3(a)(1).  If all of the "net loser" accounts

were allowed prior to the distribution, the total SIPC subrogation would be $119,891,043.49.  A

SIPC subrogation payment was made on April 1, 2013 in the amount of $102,805,012.33,

leaving a total SIPC subrogation claim through this Fourth Allocation of approximately $17.086 million ($17,086,031.26). Based on the "net loser" accounts that have been allowed and have returned a signed Partial Assignment and Release (PAR) through this Fourth Interim Distribution, SIPC's subrogation claim is approximately $11.218 million ($11,218,062.63). The $11.218 million is comprised of $10.897 million of SIPC subrogation from the Fourth Interim Distribution and $321,000.00 of SIPC subrogation associated with the First, Second, and Third Interim Distributions. This amount will be released to SIPC.

60.    As noted above, the Trustee is making an interim distribution of the undisputed property allocated to the Customer Fund. The numbers contained herein are based on recoveries and claims allowed as of February 28, 2014. To the extent additional claims are allowed or additional recoveries are made, the Trustee will distribute funds consistent with the formulas set forth in this Motion.

### A.    No Interim Distribution Of General Estate

61.    Under SIPA § 78fff(e), funds from the general estate satisfy the administrative costs and expenses of a Debtor's estate and a liquidation proceeding. To the extent the general estate is insufficient, SIPC makes advances to the Trustee for the payment of such costs and expenses. SIPA § 78fff-3(b)(2). All administrative advances made by SIPC are recoverable from the general estate under section 507(a)(2) of the Bankruptcy Code. SIPA §§ 78eee(b)(5)(E), 78fff(e). The general estate is distributed in accordance with section 726 of the Bankruptcy Code, with section 507(a)(2) expenses receiving second priority.[19] SIPA § 78fff(e).

---

[19] There are no § 507(a)(1) expenses in this liquidation proceeding.

62.     As noted previously, the Trustee has received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.741 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 448, 94 are general creditor claims and 49 are broker-dealer claims which together total approximately $264.975 million of the $1.741 billion.  Inasmuch as the Trustee proposes to allocate no assets to the General Estate, there are no funds in the General Estate from which to make a distribution to general creditors at this time.  Accordingly, "[no] purpose would be served" by the examination of or the institution of actions seeking to disallow such claims.  See 11 U.S.C. § 704(5).

## V.    **MISCELLANEOUS**

### A.    **Notice**

63.     Pursuant to Bankruptcy Rules 2002(a)(6), 2002(f)(8), and 2002(h), the Trustee has given notice of the hearing on the Trustee's Motion by first class mail, postage prepaid, to all claimants that filed a claim.  Pursuant to the Order Establishing Notice Procedures (ECF No. 4650), the Trustee has given notice of the hearing on the Trustee's Motion via email and/or U.S. Mail to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) all persons who have filed notices of appearance in the BLMIS proceeding. The Trustee believes that no further notice need be given of this or any further matter in the proceeding.

### B.    **Record Date**

64.     The Fourth Interim Distribution will be made to all record holders as of April 17, 2014.

## VI.    **CONCLUSION**

65.    This Motion and the relief requested by the Trustee are consistent with the policy and purposes underlying SIPA and are in the best interests of the customers of BLMIS, the Estate, and its creditors.

66.    No prior application for the relief sought herein has been made to this or any other Court.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a) approving: (i) the proposed Fourth Allocation of Property to the Customer Fund and to the General Estate; (ii) the proposed Fourth Interim Distribution of the Customer Fund; and (b) granting such other and further relief as may be deemed just and proper.

Dated: March 25, 2014                              Respectfully submitted,

*/s/ David J. Sheehan*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Bernard L. Madoff*