**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>    BERNARD L. MADOFF,<br><br>Debtor. | |

**MEMORANDUM OF LAW OF THE**
**SECURITIES INVESTOR PROTECTION CORPORATION**
**IN SUPPORT OF THE TRUSTEE'S DETERMINATIONS**
**<u>REGARDING INTER-ACCOUNT TRANSFERS</u>**

SECURITIES INVESTOR PROTECTION CORPORATION
805 15th Street, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 371-8300
JOSEPHINE WANG
General Counsel
KEVIN H. BELL
Senior Associate General Counsel for Dispute Resolution
LAUREN T. ATTARD
Assistant General Counsel

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .......................................................................................................... 2

    A.    The Placement of BLMIS in Liquidation ................................................................ 2

    B.    The Fraud ................................................................................................................. 3

        i.    The Claimant-Investors ............................................................................... 3

        ii.    The BLMIS Structure .................................................................................. 4

        iii.    The Account Statements ............................................................................. 4

        iv.    The "Trades" ................................................................................................ 5

ARGUMENT ................................................................................................................................ 5

    I.    AN OVERVIEW OF SIPA PROTECTION ...................................................................... 5

        A.    Burden of Proof........................................................................................................ 5

        B.    The Distribution of Funds Under SIPA .................................................................. 7

        C.    The Distribution of Customer Property .................................................................. 8

    II.  THE TRUSTEE'S DETERMINATIONS COMPORT WITH THE DEFINITION OF NET EQUITY .............................................................................................................................. 8

        A.    The Second Circuit's Net Equity Decision ............................................................. 8

        B.    Under the Net Equity Decision, the Inter-Account Transfers Deserve No Special Treatment ................................................................................................................. 9

    III.  THE TRUSTEE'S NET EQUITY CALCULUS FURTHERS THE SIPA OBJECTIVE OF NOT ENDORSING VIOLATIONS OF THE SECURITIES LAWS ................................. 11

CONCLUSION ........................................................................................................................... 14

# **TABLE OF AUTHORITIES**

**CASES:**                                                                                                                              **PAGE**

*In re Adler Coleman Clearing Corp.*, 198 B.R. 70 (Bankr. S.D.N.Y. 1996) .................................6

*In re Adler Coleman Clearing Corp.*, 204 B.R. 11 (Bankr. S.D.N.Y. 1997) ..................................6

*Arford v. Miller* (*In re Stratton Oakmont*), 239 B.R. 698 (S.D.N.Y. 1999), *aff'd*,
    210 F.3d 420 (2d Cir. 2000)....................................................................................................11

*In re Bayou Group, LLC*, 439 B.R. 284 (S.D.N.Y. 2010) ..............................................................11

*In re Bernard L. Madoff Investment Securities LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010),
    654 F.3d 229 (2d Cir. 2011), *cert. dismissed*, 132 S.Ct. 2712 (2012),
    *and cert. denied*, 133 S. Ct. 24 and 133 S. Ct. 25 (2012) .......................................... *passim*

*In re Hanover Square Sec.*, 55 B.R. 235 (Bankr. S.D.N.Y. 1985) ..................................................6

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
    263 B.R. 406 (S.D.N.Y. 2001).........................................................................................11, 12

*In re Madoff Securities*, 499 B.R. 416 (S.D.N.Y. 2013) *certification den.*,
    2013 WL 6301085 (S.D.N.Y. Dec. 5, 2013) .................................................................. 10-11

*In re New Times Securities Services, Inc.,* 371 F.3d 68 (2d Cir. 2004)................................... 11-12

*Schultz v. Omni Mutual, Inc.,* [1993-94] Fed. Sec. L. Rep. (CCH) ¶98,095 (S.D.N.Y. 1993).......6

*SEC v. Aberdeen Securities Co.*, 480 F.2d 1121 (3d Cir.), *cert. den. sub nom.,*
    *Seligsohn v. SEC*, 414 U.S. 1111 (1973) ................................................................................7

*SEC v. F. O. Baroff Co.*, 497 F.2d 280 (2d Cir. 1974) ...................................................................7

*SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir. 1974) ........................................................12

*SEC v. S.J. Salmon & Co.,* 375 F. Supp. 867 (S.D.N.Y. 1974) ......................................................11

*SIPC v. I.E.S. Mgmt. Group*, 612 F.Supp. 1172 (D.N.J. 1985), *aff'd w/o opinion,*
    791 F.2d 921 (3d Cir. 1986)......................................................................................................6

*SIPC v. Pepperdine Univ. (In re Brentwood Sec., Inc.)*, 925 F.2d 325 (9th Cir. 1991) ..................6

*SIPC v. Wise (In re Stalvey & Associates, Inc.)*, 750 F.2d 464 (5th Cir. 1985) .............................7

*Stafford v. Giddens (In re New Times Securities Services, Inc.)*,
    463 F.3d 125 (2d Cir. 2006).....................................................................................................11

# TABLE OF AUTHORITIES
### (cont.)

**STATUTES:** **PAGE**

Securities Investor Protection Act (2008), 15 U.S.C.

78bbb..................................................................................................................................12
78fff-2(b).................................................................................................................6, 8, 9, 10
78fff-2(c)(1) ....................................................................................................................6, 8
78fff-3(a)..........................................................................................................................3, 8
78kkk(g)..............................................................................................................................12
78*lll*(2).................................................................................................................................5
78*lll*(4).............................................................................................................................7, 9
78*lll*(7)(B) ..........................................................................................................................7
78*lll*(11)..............................................................................................................3, 6, 7, 8, 9

Securities Exchange Act of 1934, 15 U.S.C.

§ 78q....................................................................................................................................7

**RULES:**

SEC Rule 17a-3, 17 C.F.R. § 240.17a-3 (2013) .................................................................6

SIPC Series 500 Rules, 17 C.F.R. §300.500-300.503 .................................................. 12-13

The Securities Investor Protection Corporation ("SIPC") submits this memorandum of law in support of a motion (the "Motion") filed by Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Debtor") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and Bernard L. Madoff ("Madoff"). In the Motion, the Trustee asks this Court to uphold the Trustee's determinations (the "Determinations"), and to overrule the objections by the claimants (the "Claimants") who challenge the Trustee's treatment of the transfers of fictitious profit between accounts in the calculation of the Claimants' "net equity."

## PRELIMINARY STATEMENT

Claimants challenge the Determinations as related to the calculation of how much the Claimants are owed – their "net equity" – and the appropriate credit they received for inter-account transfers of fictitious profits. The Trustee determined, this Court agreed, and the Second Circuit affirmed, that customers' net equity is calculated by determining the amount deposited by them with BLMIS less their withdrawals (the "Net Investment Method"). *In re Bernard L. Madoff Inv. Sec. LLC,* 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd,* 654 F.3d 229 (2d Cir. 2011), *cert. dismissed,* 132 S. Ct. 2712 (2012), and *cert. den.,* 133 S. Ct. 24 and 133 S. Ct. 25 (2012) ("Net Equity Decision"). The Trustee did not, as sought by certain customers, base their net equity on amounts shown on the last account statement because the account statements were fictitious and reflected backdated prices and fake securities positions "paid for" out of fake profits in amounts that were fabricated by Madoff. The Second Circuit, in affirming the Trustee's use of the Net Investment Method, stated that the last statement method "would have

---

[1] For convenience, references to provisions of SIPA shall omit "15 U.S.C."

the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations." 654 F.3d at 235.

Despite the ruling from the Second Circuit, this is exactly what Claimants seek: once again, they argue that the Net Investment Method should be rejected and that the Trustee should give them credit for fictitious profits transferred to their accounts from other BLMIS accounts. Essentially, Claimants retrofit the "last statement method" to a type of "first statement method," asking this Court to give legal effect to the deposits of fictitious profits and the machinations of Madoff. The inter-account transfer issue as it applies to this case is whether the transfers of fictitious profits from one BLMIS account to another BLMIS account should be treated as transfers of principal, allowing the transferee to reap the benefit of fictitious profits. In short, should the Trustee treat the "fictitious and arbitrarily assigned paper profits as real"? Consistent with the Second Circuit's ruling, SIPC submits that the answer is "no."

## STATEMENT OF FACTS

### A. The Placement of BLMIS in Liquidation

On December 15, 2008, upon an application by SIPC, BLMIS, a securities broker-dealer and member of SIPC, was placed in SIPA liquidation by Order of the United States District Court for the Southern District of New York ("District Court"). The District Court appointed Mr. Picard as trustee for the firm and consistent with SIPA section 78eee(b)(4), removed the liquidation proceeding to the Bankruptcy Court for this District ("Bankruptcy Court"). *See* "Protective Order," Order filed on December 15, 2008, in *SIPC v. Bernard L. Madoff Investment Securities LLC*, No. 08-CV-10791 (LLS) (S.D.N.Y.).

Procedures for the filing of claims with the Trustee were approved by the Bankruptcy Court. *See* "Claims Procedure Order," Bankruptcy Court Order dated December 23, 2008, in

2

*SIPC v. BLMIS*, No. 08-01789 (Bankr. S.D.N.Y.), Doc. No. 12. Consistent with SIPA, the procedures provided, among other things, for the submission of claims to the Trustee, a determination by the Trustee of the claims, satisfaction by the Trustee of allowed claims, and an opportunity by any claimant who disagreed with the determination of his claim to seek Bankruptcy Court review. The Trustee processed all claims on the basis that what customer claimants were owed, that is, their "net equity" as defined under SIPA, was the net amount deposited by them with the brokerage.[2] The Trustee determined the claims to be ones for "securities" instead of "cash," making each customer eligible for up to $500,000 of SIPC protection, instead of $100,000 which is the limit of protection for cash claims. *See* SIPA § 78fff-3(a) (2008). Thus, in addition to having his claim satisfied out of "customer property," the customer could receive up to $500,000 from funds advanced to the Trustee by SIPC.

The Claimants filed claims which the Trustee determined. The Claimants disagreed with the Trustee's determinations, arguing that, *inter alia*, the Trustee should have treated the fictitious profits transferred into Claimants' BLMIS accounts from other BLMIS accounts as if they were principal, or *real* cash. However, the *account statements were fictitious*, as were the securities positions and profits appearing on them, having been invented by Madoff to yield "returns" that were pre-determined by him.

## B. The Fraud

### i. The Claimant-Investors

Having opened accounts with BLMIS, the Claimants typically received periodic account statements issued on BLMIS letterhead, as well as a "Year-End Summary Report" issued by an

---

[2] "Net equity" is defined at SIPA section 78*lll*(11) (2008) and essentially is the difference between what the broker owes the customer and what the customer owes the broker.

accounting firm. The statements and reports reflected numerous "securities positions" purportedly bought and sold by BLMIS for the Claimants and the dates and prices of the "trades." *See*, *e.g.*, Net Equity Decision, 424 B.R., at 128.

The Claimants made deposits to, and withdrawals from, their accounts. In certain cases, because of the sizeable "appreciation" of the accounts, the total amounts withdrawn by the Claimants exceeded many times over the total amounts they had deposited. In actuality, no real trading took place in the accounts. Instead, Madoff used new investors' money to pay previous investors "profits" in order to perpetuate a scam. Any "profits" in the account were phantom profits – the product of Madoff's imagination and the transfer of other people's money stolen by BLMIS and Madoff.

### ii. The BLMIS Structure

The Madoff fraud was carried out mainly through BLMIS's Investment Advisory ("IA") business which acted both as an investment advisor to its clients and a custodian of their "securities." *See* Net Equity Decision, 424 B.R., at 127. For these customers, their funds reportedly were placed into simulated baskets of stocks that were hedged by fake options positions under a "split strike conversion strategy" ("split strike"). *Id.* at 129-30. No securities actually were purchased by BLMIS for the split strike customers and virtually none were purchased for the non-split strike investors. *Id.* According to the fictitious account statements, fake investments reportedly amounted to a net sum of approximately $64.8 billion by early December 2008. *Id.* at 124.

### iii. The Account Statements

The fictitious account statements issued by BLMIS to customers were generated by means of a computer system that made possible the mass production of fictitious account

4

statements. *Id*. at 131-132. The system contained software that could be used to enter fictitious "trades" at any desired price or on any desired date that could then be allocated to the various customer accounts residing within the database. Inputting the data did not cause a trade to be made, and the trades made in this system were not reconciled with the Depository Trust & Clearing Corporation (DTCC). It merely created a record that could be printed onto a fictitious account statement or trade confirmation. *Id.*

BLMIS did not provide customers with electronic real-time online access to their accounts which by the year 2000 would have been customary in the industry. *Id.* For obvious reasons, it continued to rely on outmoded technology that produced paper trade confirmations, transmitted by mail.

### iv.    The "Trades"

Despite Madoff's claims to the contrary, customer funds were never invested "in the market" or "out of the market." 424 B.R. at 130. In order to maintain this illusion, Madoff and a group of employees would gather historical price and volume data for stocks and then place "strategically selected stocks after the fact at favorable prices" into customer accounts. *Id.* These backdated trades provided consistent annual returns of between 10-17%. *Id.*

## ARGUMENT

### I.    AN OVERVIEW OF SIPA PROTECTION

#### A.    Burden of Proof

In order to be protected under SIPA, a claimant must be a "customer," as defined in SIPA section 78*lll*(2). Because "customer" status is a preferred status that gives customers priority over other creditors in the distribution of certain assets, a claimant seeking "customer" protection under SIPA has the burden of proving both his status as a "customer" and what he is owed. *See*

5

*SIPC v. I.E.S. Mgmt. Group*, 612 F.Supp. 1172, 1177 (D.N.J. 1985), *aff'd w/o opinion*, 791 F.2d 921 (3d Cir. 1986) ("customers" under SIPA receive preferential treatment by being satisfied ahead of general creditors). *See also In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) ("person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment").

A customer's claim is determined by calculating the customer's "net equity." *See* SIPA § 78fff-2(c)(1)(B). SIPA section 78*lll*(11) (2008) states, in relevant part:

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by-
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date all securities positions of such customer (other than customer name securities reclaimed by such customer; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

Provisions of SIPA make clear the claimant's burden by requiring that a debtor's obligations to its customers be "ascertainable from the books and records of the debtor" or "otherwise established to *the satisfaction of the trustee*." SIPA § 78fff-2(b) (emphasis added). *See SIPC v. Pepperdine Univ. (In re Brentwood Sec., Inc.)*, 925 F.2d 325, 328 (9th Cir. 1991) (claimants have burden of proving that they are customers by establishing that they entrusted cash or securities to the broker); *In re Adler Coleman Clearing Corp.*, 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997); *Schultz v. Omni Mutual, Inc.,* [1993-94] Fed. Sec. L. Rep. (CCH) ¶98,095 at p. 98,763 (S.D.N.Y. 1993). "Books and records" of a debtor are more than just account statements. *See*, *e.g.*, SEC Rule 17a-3, 17 C.F.R. § 240.17a-3 (2013) (specifying no fewer than twenty-three categories of "books and records" to be made and kept current by the broker or dealer). *See also*

15 U.S.C. § 78q. Furthermore, if the books and records are unreliable, the claimant still must prove the obligation "to the satisfaction of the trustee."

Moreover, that an investor is a "customer" as to one transaction does not make him a "customer" for all time as to all transactions or amounts claimed. Customer status "in the air" is insufficient to confer such status as to all amounts sought by a claimant against a broker if outside the ambit of SIPA. *See SEC v. F. O. Baroff Co.*, 497 F.2d 280, 282 n.2 (2d Cir. 1974); *SIPC v. Wise (In re Stalvey & Associates, Inc.)*, 750 F.2d 464, 471 (5th Cir. 1985).

### B. The Distribution of Funds Under SIPA

In a SIPA case, those who can demonstrate that they are "customers" are favored over non-customers in two ways:

One, they share in "customer property" to the exclusion of all others up to the amount of their net equity. "Customer property" generally includes all cash and securities held by or for a broker's account from or for its customers' securities accounts. SIPA § 78*lll*(4). It is the securities and cash held by the broker for customers on the "filing date" and such customer property as a trustee is able to recover for the benefit of customers.[3]

Two, to the extent of a shortfall in customer property, customer claims may be satisfied out of funds advanced to the SIPA trustee by SIPC.

---

[3] A customer's net equity is measured as of the "filing date." SIPA §78*lll*(11). *See SEC v. Aberdeen Securities Co.*, 480 F.2d 1121, 1123-1124 (3d Cir.), *cert. den. sub nom., Seligsohn v. SEC*, 414 U.S. 1111 (1973) (customer account must be valued as of filing date in order to determine net amount owed to customer or customer's "net equity"). If, as with respect to BLMIS, a proceeding was pending against the debtor in which a receiver was appointed, the filing date relates back to the date on which that proceeding began. *See* SIPA §78*lll*(7)(B), and Order Appointing Receiver, *SEC v. Bernard L. Madoff Investment Securities LLC*, No. 1:08-cv-10791-LLS (S.D.N.Y. Dec. 12, 2008).

7

### C. The Distribution of Customer Property

SIPA section 78fff-2(c)(1) establishes the order of distribution of customer property. If a customer has been fully satisfied, SIPC is subrogated to the customer's share of customer property to the extent of its advance for that customer. § 78fff-3(a). The amount of any SIPC advance is based on the difference between the customer's net equity and his share of customer property, subject to the limits of protection.

## II. THE TRUSTEE'S DETERMINATIONS COMPORT WITH THE DEFINITION OF NET EQUITY

### A. The Second Circuit's Net Equity Decision

In the Net Equity Decision, the Second Circuit was asked whether the proper method for calculating the amount owed to a customer in this case is the Net Investment Method, which looks only to a customer's deposits and withdrawals, or the last statement method, which looks only to the fictitious account statements issued by BLMIS reflecting fictitious profits. The Court determined that the Net Investment Method was the method most consistent with the definition of "net equity" and with SIPA. 654 F.3d at 235. In reaching that conclusion, the Court based its decision on the language of SIPA, the equal treatment of customers under SIPA, and the consequences of viewing the fictitious statements as real. *Id.* at 235.

In its analysis, the Court first looked to two provisions of SIPA: the definition of net equity in SIPA section 78*lll*(11), and SIPA section 78fff-2(b), which states that net equity is to be determined in accordance with the books and records of the debtor. *Id.* at 236-37. The Court reasoned that because the statements were rigged "after-the-fact constructs," and because the recovery of fictitious profits would result in inequitable treatment of customers, some of whom had not withdrawn any funds before the fraud was exposed, the Net Investment Method was a better measure of net equity. *Id.* at 238. The Court also noted that "the Net Investment Method

8

allows the Trustee to make payments based on withdrawals and deposits, which can be confirmed by the debtor's books and records." *Id.* at 238-39.

Second, the Court looked to the purpose and design of SIPA. The Court explained that SIPC is not an "insurance provider," and SIPC does not protect against all forms of fraud. *Id.* at 239. Rather, the purpose of "net equity" is to "achieve a fair allocation of the available resources among the customers," and the Net Investment Method was the proper way to achieve that result. *Id.* at 240.

### B. Under the Net Equity Decision, the Inter-Account Transfers Deserve No Special Treatment

The Trustee's treatment in the Determinations of fictitious profits regardless of an inter-account transfer comports with the language of SIPA, the purposes of SIPA, and the interpretation of the Second Circuit. Indeed, the rationale of the Net Equity Decision applies with equal force here.

The essential question presented by the Objections is how to calculate a customer's net equity when fictitious profits have been transferred from one BLMIS account to another. The first step is to examine the statute, as the Second Circuit did in its analysis. *See* Net Equity Decision, 654 F.3d at 236-37 ("We begin where all such inquiries must begin: with the language of the statute itself" (internal quotations omitted)). The same two provisions considered in the Net Equity Decision are directly relevant to determining how much Claimants are owed here. First, the definition of "net equity" under SIPA section 78*lll*(11) requires the trustee to determine the amount owed to the customers, and second, section 78fff-2(b) requires that such information either be ascertainable from the books and records of the debtor or otherwise established to the satisfaction of the trustee. *See* 654 F.3d at 237 (reading the two provisions in concert). As the Second Circuit explained, in the BLMIS case, the books and records and other

9

information showed that the trades were backdated and fake, that the profits were fake, that certain claimants withdrew more than they deposited into their accounts, and that "securities" "purchased" with fake sales proceeds in fact were never paid for by the customer. *Id.* at 231-33. For the Trustee to ignore what the books and records show and to satisfy net equity claims based *solely* upon fictitious account statements or transfers of fictitious profits violates SIPA § 78fff-2(b). Thus, a customer's net equity cannot include transfers of fictitious profits. *See id.* at 238-39 (holding that "the Net Investment Method allows the Trustee to make payments based on withdrawals and deposits, which can be confirmed by the debtor's books and records.").

The inclusion of fictitious profits in the calculation of net equity, as Claimants request, is also in violation of the purpose and design of SIPA. As the Second Circuit stated, SIPC does not provide insurance, and SIPA does not protect against all forms of fraud. *Id.* at 239. Like the situation presented by the Net Equity Decision, Claimants' receipt of advances based on fictitious profits "will necessarily diminish the amount of customer property available to other investors." *See id.* at 240. Because Claimants' theory would render a "fair allocation" impossible, it is inconsistent with the objective of SIPA. *See id.*

The Determinations also comport with other case law in this Circuit. In addition to the Second Circuit's Net Equity Decision, the District Court has explicitly recognized in the context of a fraudulent transfer suit that "the true substance of transfers of fictitious profits from one account to another remains the same: The funds at issue are still other people's money, and shifting them among accounts, whether those accounts are owned by the same person or entity or, for example, transfers among family members, does not morph those funds into actual new principal." *In re Madoff Securities*, 499 B.R. 416, 428-29 (S.D.N.Y. 2013) *certification den.*,

10

2013 WL 6301085 (S.D.N.Y. Dec. 5, 2013). "[I]t is irrelevant that certain . . . transfers established new accounts and therefore new customer-broker relationships." *Id.*

Finally, the same argument made by the Claimants was rejected in *In re Bayou Group, LLC*, 439 B.R. 284, 338-39 (S.D.N.Y. 2010). In that case, the court held that because the profits were fraudulent, the transfers of principal and fictitious profits could not be "worth what Bayou reported them to be worth at the time." *Id.* at 339. "Instead, Bayou inflated their value in furtherance of the larger fraud scheme." *Id.* The situation is virtually identical here, where the fictitious profits reportedly transferred, if treated as real, would only perpetuate the fraud perpetrated by Madoff.

### III. THE TRUSTEE'S NET EQUITY CALCULUS FURTHERS THE SIPA OBJECTIVE OF NOT ENDORSING VIOLATIONS OF THE SECURITIES LAWS

If the Court were to give effect to fictitious account statements, as Claimants request, it would rubber-stamp fraud and other bad acts of a broker. In that vein, courts consistently have recognized that SIPA and rules promulgated thereunder "manifest a design to deny protection to transactions tainted by fraud." *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 435 (S.D.N.Y. 2001). *See Arford v. Miller (In re Stratton Oakmont, Inc.)*, 239 B.R. 698, 701 (S.D.N.Y. 1999), *aff'd,* 210 F.3d 420 (2d Cir. 2000); *SEC v. S.J. Salmon & Co.,* 375 F. Supp. 867, 870-71 (S.D.N.Y. 1974); *In re Adler, Coleman Clearing Corp.*, 198 B.R. 70, 75 (Bankr. S.D.N.Y. 1996). Where a claimant undertakes no actual market risk, and can claim entitlement to cash or securities only because of a broker's fraud, no "customer" relief under SIPA is available. *See, e.g., Stafford v. Giddens (In re New Times Securities Services, Inc.)*, 463 F.3d 125, 130 (2d Cir. 2006); *In re New Times Securities Services, Inc.,* 371 F.3d 68 (2d Cir.

11

2004); *Mishkin*, 263 B.R. at 435. One reason for this outcome is that SIPC's goal of customer protection must be carried out consistent with the securities laws of which SIPA itself is a part.

Except as otherwise provided in SIPA, the provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("the 1934 Act"), apply as if SIPA were an amendment to, and a section of the 1934 Act. SIPA § 78bbb. Moreover, as explicitly provided in SIPA, while a primary function of the statute is to provide some protection to investors, another central feature is to reinforce the broker-dealer's financial responsibility requirements so that the securities laws are strengthened and not weakened.[4] *Cf., SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 985 (2d Cir. 1974) (purpose of SIPA is to strengthen market. Goal is not served by reimbursing from public funds one whose fraudulent activities have weakened it). The fact that SIPA has more than one purpose and that those purposes supply the reason for a rule enacted by SIPC, see 17 C.F.R. §300.503,[5] was summed up by the District Court in *Mishkin, supra,* 263 B.R. at 434-435, as follows:

> [The broker's] extensive fraud has overarching significance and implications for the transactions that culminated in the Challenged Trades.... Contrary to Appellants' perceptions of these events, [the broker's] deeds cannot be ignored in assessing whether Appellants are entitled to enforce the Challenged Trades. While it is true that one of SIPA's primary objectives is to protect individual customers from financial hardship, the legislation also embodies parallel and complementary aims....

---

[4] As one example, under SIPA §78kkk(g), Congress charged the SEC with compiling a list of unsafe and unsound industry practices and required it to report upon the steps being taken under existing law to eliminate such practices and to provide recommendations for additional legislation needed to eliminate them.

[5] SIPC's Series 500 Rules, 17 C.F.R. §300.500-300.503, define when a customer has a claim for cash versus securities. Under Rule 503, nothing in the Rules can be construed as limiting a trustee's right to avoid securities transactions that are fraudulent, preferential, or otherwise voidable.

12

\* \* \* \*

> The SIPC 500 Rules, promulgated in 1988, ... reflect these ends. They safeguard securities customers' legitimate claims to cash and securities held by the debtor in their accounts prior to filing date, and also manifest a design to deny protection to transactions tainted by fraud.

The Trustee's reliance upon the fictitious account statements would give credence to the backdated trades and fake profits that were invented by Madoff and carried out by Madoff and BLMIS in flagrant violation of the securities laws. While a central goal of SIPA is protection of the individual customer, the protection cannot be administered at the expense of undermining the securities laws. As a result, the Trustee cannot treat the transfers of fictitious profits – clear violations of the securities laws – as "new principal" worthy of protection from SIPC and a distribution from the fund of customer property.

## **CONCLUSION**

For all of the aforementioned reasons, the Trustee's Determinations should be affirmed and the Claimants' Objections should be denied.

Dated: Washington, D.C.
March 31, 2014

Respectfully submitted,

JOSEPHINE WANG
General Counsel

 */s/ Kevin H. Bell*
KEVIN H. BELL
Senior Associate General Counsel for
 Dispute Resolution

LAUREN T. ATTARD
Assistant General Counsel

SECURITIES INVESTOR
  PROTECTION CORPORATION
805 15th Street, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 371-8300
E-mail: jwang@sipc.org
E-mail: kbell@sipc.org
E-mail: lattard@sipc.org

14