**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>      Plaintiff,<br><br>      v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>      Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>   BERNARD L. MADOFF,<br><br>      Debtor. | |

**MEMORANDUM OF LAW OF THE**
**SECURITIES INVESTOR PROTECTION CORPORATION**
**IN OPPOSITION TO THE FISHMAN CLAIMANTS' MOTION**
**<u>REGARDING INTER-ACCOUNT TRANSFERS</u>**

       SECURITIES INVESTOR PROTECTION CORPORATION
       805 15th Street, N.W., Suite 800
       Washington, D.C. 20005
       Telephone: (202) 371-8300
       JOSEPHINE WANG
       General Counsel
       KEVIN H. BELL
       Senior Associate General Counsel for Dispute Resolution
       LAUREN T. ATTARD
       Assistant General Counsel

## **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ........................................................................................................... 2

ARGUMENT ................................................................................................................................ 4

    I.   AN OVERVIEW OF SIPA PROTECTION.................................................................. 4

        A.   Burden of Proof.................................................................................................... 4

        B.   The Distribution of Funds Under SIPA ............................................................... 6

        C.   The Distribution of Customer Property ............................................................... 6

        D.   The Second Circuit's Net Equity Decision.......................................................... 7

    II.  TRANSFERS TO THE TRANSFEREE ACCOUNT
        CANNOT BE RECOVERED TWICE ........................................................................ 8

    III. JUDICIAL ESTOPPEL AND LAW OF THE CASE
         FURTHER THE TRUSTEE'S POSITION ................................................................ 10

    IV. THE TRUSTEE HAS NOT SUED CLAIMANTS IN AVOIDANCE............................... 10

CONCLUSION........................................................................................................................... 12

# **TABLE OF AUTHORITIES**

**CASES:**                                                                                                                  **PAGE**

*In re Adler Coleman Clearing Corp.*, 198 B.R. 70 (Bankr. S.D.N.Y. 1996) ..................4

*In re Adler Coleman Clearing Corp.*, 204 B.R. 111 (Bankr. S.D.N.Y. 1997) ...............5

*In re Bernard L. Madoff Investment Securities LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010),
    654 F.3d 229 (2d Cir. 2011), *cert. dismissed*, 132 S.Ct. 2712 (2012),
    *and cert. denied*, 133 S. Ct. 24 and 133 S. Ct. 25 (2012) .......................................... *passim*

*In re Hanover Square Sec.*, 55 B.R. 235 (Bankr. S.D.N.Y. 1985) ..................................4

*In re Madoff Securities*, 499 B.R. 416 (S.D.N.Y. 2013), *certification den.*,
    2013 WL 6301085 (S.D.N.Y. Dec. 5, 2013) ............................................................2, 10, 11

*Manley v. Mazzuca*, Case No. 01-civ-5178, 2007 WL 4233013 (S.D.N.Y. Nov. 30, 2007).........10

*McKenny v. McGraw (In re Bell & Beckwith)*, 104 B.R. 852 (Bankr. N. D. Ohio 1989), *aff'd*,
    937 F.2d 1104 (6th Cir. 1991) ......................................................................................7

*Schultz v. Omni Mutual, Inc.,* [1993-94] Fed. Sec. L. Rep. (CCH) ¶98,095 (S.D.N.Y. 1993).......5

*SEC v. Aberdeen Securities Co.*, 480 F.2d 1121 (3d Cir.), *cert. den. sub nom.,*
    *Seligsohn v. SEC*, 414 U.S. 1111 (1973) ......................................................................3

*SEC v. F. O. Baroff Co.*, 497 F.2d 280 (2d Cir. 1974) ..................................................5

*SIPC v. I.E.S. Mgmt. Group*, 612 F.Supp. 1172 (D.N.J. 1985), *aff'd w/o opinion*,
    791 F.2d 921 (3d Cir. 1986).........................................................................................4

*SIPC v. Pepperdine Univ. (In re Brentwood Sec., Inc.)*, 925 F.2d 325 (9th Cir. 1991) ..................5

*SIPC v. Wise (In re Stalvey & Associates, Inc.)*, 750 F.2d 464 (5th Cir. 1985) ..............5

# TABLE OF AUTHORITIES
### (cont.)

**STATUTES:**                                                                                                              **PAGE**

Securities Investor Protection Act (2008), 15 U.S.C.

78fff-2(b) ............................................................................................................................. 5, 8
78fff-2(c)(1) ..................................................................................................................... 4, 5, 6, 7
78fff-3(a) ................................................................................................................................ 6, 9
78jjj(c)(1)(C) ................................................................................................................................ 9
78*lll*(2) ........................................................................................................................................ 4
78*lll*(4) ........................................................................................................................................ 6
78*lll*(7)(B) .................................................................................................................................. 4
78*lll*(11) ........................................................................................................................... 3, 4-5, 8

Securities Exchange Act of 1934, 15 U.S.C.

§ 78q ............................................................................................................................................ 5

**RULES:**

SEC Rule 17a-3, 17 C.F.R. § 240.17a-3 ..................................................................................... 5

SIPC Series 100 Rules, 17 C.F.R. §§ 300.100–300.105 ............................................................. 9

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 95-746 (1977) ....................................................................................................... 7

*Securities Investor Protection Act Amendments: Hearings on H.R. 8331 Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing, and Urban Affairs*, 95th Cong. (1978) ............................................................................................................. 7

S. Rep. No. 95-763 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764 .............................................. 7

The Securities Investor Protection Corporation ("SIPC") submits this memorandum of law in opposition to the motion (the "Motion") filed by Claimants the Irrevocable Charitable Remainder Trust of Yale Fishman (the "Yale Trust") and the Glenn Akiva Fishman Charitable Remainder Unitrust (the "Glenn Trust," and together with the Yale Trust, "Claimants"), which seek the resolution of their objections (the "Objections") to the claim determinations ("Determinations") issued by Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Debtor") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and Bernard L. Madoff ("Madoff").

## PRELIMINARY STATEMENT

Claimants' Motion presents another collateral attack on the decision rendered by the United States Court of Appeals for the Second Circuit on net equity, in which the Court held that a customer's net equity is calculated by looking to the amount actually deposited with BLMIS, minus any withdrawals (the "Net Investment Method"). *In re Bernard L. Madoff Inv. Sec. LLC,* 654 F.3d 229 (2d Cir. 2011), *cert. dismissed,* 132 S. Ct. 2712 (2012), and *cert. den.,* 133 S. Ct. 24 and 133 S. Ct. 25 (2012) (the "Net Equity Decision").

Claimants each had account balances reflecting both principal and fictitious profits, and transferred the full amount of those balances to the Transferee Account (as defined below). Principal and significant fictitious profits were subsequently withdrawn from the Transferee Account. Essentially, Claimants each seek a protected customer claim for principal that was transferred *at Claimants' trustees' express direction* to the Transferee Account. The transferred principal was later withdrawn from the Transferee Account. Claimants evidently had full

---

[1] For convenience, references to provisions of SIPA shall omit "15 U.S.C."

knowledge of the deposits into and withdrawals from the Transferee Account, since all three accounts (the "Cedarhurst Accounts") share the same Cedarhurst address to which account statements were sent, and Glenn Fishman, and in one instance, with Yale Fishman, the trustees for the Yale and Glenn Trusts, initiated the transfers of the funds into the Transferee Account. In effect, Claimants look for a "double-dip."

As Judge Rakoff held in the decision on antecedent debt, transfers "among accounts, whether those accounts are owned by the same person or entity or, for example, transfers among family members, does not morph those funds into actual new principal." *In re Madoff Securities*, 499 B.R. 416, 428-29 (S.D.N.Y. 2013), *certification den.,* 2013 WL 6301085 (S.D.N.Y. Dec. 5, 2013). Claimants' arguments are devoid of merit.

## STATEMENT OF FACTS

A full presentation of the facts is available in the Trustee's Memorandum of Law in Opposition to Motion of the Irrevocable Charitable Remainder Trust of Yale Fishman and The Glenn Akiva Fishman Charitable Remainder Unitrust for Entry of an Order Allowing the Trust Claimants' Claims, dated March 31, 2014. The facts below are presented for convenience of the reader.

The Yale Trust's BLMIS account was opened on August 18, 1998 by Yale and Glenn Fishman who both signed the BLMIS customer agreement as trustees of the Yale Fishman Trust, located at Suite 201, 445 Central Avenue, Cedarhurst, New York, 11518 (the "Fishmans' Cedarhurst Address"). The Glenn Trust's BLMIS account was opened on December 8, 1998 by Yale and Glenn Fishman, who both signed the BLMIS customer agreement as trustees of the Glenn Fishman Trust, located at the Fishmans' Cedarhurst Address.

2

The trust agreements establishing the Yale and Glenn Trusts provided that upon termination of the trusts, the assets of the trusts were to be distributed to the Judaic Heritage Foundation Inc. (the "Judaic Heritage Foundation").

On December 11, 1998, the Judaic Heritage Foundation opened a BLMIS account (the "Transferee Account"). Eileen Fishman signed the BLMIS customer agreement on behalf of the Judaic Heritage Foundation, located at the Fishmans' Cedarhurst Address. Submitted to BLMIS with the customer agreement was a corporate resolution that identified Eileen Fishman as Treasurer and Secretary for the Judaic Heritage Foundation and Glenn Fishman as its Vice President, and authorized them to act on behalf of the Judaic Heritage Foundation with respect to the Foundation's BLMIS account.

The books and records of BLMIS show that in 2004, the full contents of each of the Yale Trust and the Glenn Trust accounts – both principal and fictitious profits – were transferred to the Transferee Account ("2004 Transfer") *at the request of their respective trustees, Yale and Glenn Fishman*. In total, the Yale Trust transferred over $3 million, $1,867,703.71 of which was of fictitious profits. Similarly, in total, the Glenn Trust transferred over $3 million, $1,713,522.99 of which was fictitious profits. Thus, as of 2005, the Yale Trust account and the Glenn Trust account both showed a $0.00 balance. Those balances thereafter remained at $0.00 through the "filing date."[2]

---

[2] A customer's net equity is measured as of the "filing date." SIPA §78*lll*(11) (2008). *See SEC v. Aberdeen Securities Co.*, 480 F.2d 1121, 1123-1124 (3d Cir.), *cert. den. sub nom., Seligsohn v. SEC*, 414 U.S. 1111 (1973) (customer account must be valued as of filing date in order to determine net amount owed to customer or customer's "net equity"). If, as with respect to BLMIS, a proceeding was pending against the debtor in which a receiver was appointed, the filing date relates back to the date on which that proceeding began. *See* SIPA §78*lll*(7)(B), and Order Appointing Receiver, *SEC v. Bernard L. Madoff Investment Securities LLC*, No. 1:08-cv-10791-LLS (S.D.N.Y. Dec. 12, 2008).

3

Subsequent to the 2004 Transfer and over the next three years, various withdrawals were made from the Transferee Account, at the direction of Glenn Fishman individually and in one instance, together with Yale Fishman. The books and records of BLMIS show that as of the filing date, the Transferee Account was overdrawn by more than $1.3 million in excess of principal, namely, it had received transfers of other people's money – "fictitious profits" – in that amount.

## ARGUMENT

### I. AN OVERVIEW OF SIPA PROTECTION

**A. Burden of Proof**

In order to be protected under SIPA, a claimant must be a "customer," as defined in SIPA section 78*lll*(2). Because "customer" status is a preferred status that gives customers priority over other creditors in the distribution of certain assets, a claimant seeking "customer" protection under SIPA has the burden of proving both his status as a "customer" and what he is owed. *See SIPC v. I.E.S. Mgmt. Group*, 612 F.Supp. 1172, 1177 (D.N.J. 1985), *aff'd w/o opinion*, 791 F.2d 921 (3d Cir. 1986) ("customers" under SIPA receive preferential treatment by being satisfied ahead of general creditors). *See also In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) ("person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment"). A customer's claim is determined by calculating a customer's "net equity." *See* SIPA § 78fff-2(c)(1)(B). SIPA section 78*lll*(11) (2008) states, in relevant part:

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by-

4

    (A)  calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date all securities positions of such customer (other than customer name securities reclaimed by such customer; minus

    (B)  any indebtedness of such customer to the debtor on the filing date . . .

Provisions of SIPA make clear the claimant's burden by requiring that a debtor's obligations to its customers be "ascertainable from the books and records of the debtor" or "otherwise established to *the satisfaction of the trustee*." SIPA § 78fff-2(b) (emphasis added). *See SIPC v. Pepperdine Univ. (In re Brentwood Sec., Inc.)*, 925 F.2d 325, 328 (9th Cir. 1991) (claimants have burden of proving that they are customers by establishing that they entrusted cash or securities to the broker); *In re Adler Coleman Clearing Corp.*, 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997); *Schultz v. Omni Mutual, Inc.,* [1993-94] Fed. Sec. L. Rep. (CCH) ¶98,095 at p. 98,763 (S.D.N.Y. 1993). "Books and records" of a debtor are more than just account statements. *See*, *e.g.*, SEC Rule 17a-3, 17 C.F.R. § 240.17a-3 (2013) (specifying no fewer than twenty-two categories of "books and records" to be made and kept current by the broker or dealer). *See also* 15 U.S.C. § 78q. Furthermore, if the books and records are unreliable, the claimant still must prove the obligation "to the satisfaction of the trustee."

Moreover, that an investor is a "customer" as to one transaction does not make him a "customer" for all time as to all transactions or amounts claimed. Customer status "in the air" is insufficient to confer such status as to all amounts sought by a claimant against a broker if outside the ambit of SIPA. *See SEC v. F. O. Baroff Co.*, 497 F.2d 280, 282 n.2 (2d Cir. 1974); *SIPC v. Wise (In re Stalvey & Associates, Inc.)*, 750 F.2d 464, 471 (5th Cir. 1985).

5

B. **The Distribution of Funds Under SIPA**

In a SIPA case, those who can demonstrate that they are "customers" are favored over non-customers in two ways:

<u>One</u>, they share in "customer property" to the exclusion of all others up to the amount of their net equity. "Customer property" generally includes all cash and securities held by or for a broker's account from or for its customers' securities accounts. SIPA § 78*lll*(4). It is the securities and cash held by the broker for customers on the "filing date" and such customer property as a trustee is able to recover for the benefit of customers.

<u>Two</u>, to the extent of a shortfall in customer property, customer claims may be satisfied out of funds advanced to the SIPA trustee by SIPC.

C. **The Distribution of Customer Property**

SIPA section 78fff-2(c)(1) establishes the order of distribution of customer property. Only the second and third priorities of distribution under section 78fff-2(c)(1) are relevant here. They are:

- As a second priority, customer property is distributed ratably among customers based on their filing date net equities. § 78fff-2(c)(1)(B).
- As a third priority, customer property is distributed to SIPC as subrogee. § 78fff-2(c)(1)(C).

If a customer has been fully satisfied, SIPC is subrogated to the customer's share of customer property to the extent of its advance for that customer. § 78fff-3(a). The amount of any SIPC advance is based on the difference between the customer's net equity and his share of customer property, subject to the limits of protection.

The distribution process is summarized in the legislative history of SIPA as follows:

6

> [Section § 78fff-2(c)(1)], the operative provision with respect to customer property, provides that each customer will be allocated a ratable share of customer property based upon his net equity. This allocation is fundamental to the process of determining the extent to which SIPC protection will be available to a customer, *because SIPC advances are applied to the difference between a customer's ratable share of customer property and his net equity claim....* [Emphasis added].

*Securities Investor Protection Act Amendments: Hearings on H.R. 8331 Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing, and Urban Affairs*, 95th Cong. 32 (1978). The SIPC advance does not reduce the customer's net equity or, therefore, his claim against customer property. As stated in H.R. Rep. No. 95-746, at 29 (1977):

> ...customer property would be allocated ratably among customers in satisfaction of their respective net equity claims. To the extent that a customer's net equity claim is unsatisfied by customer property, the customer is entitled to an advance of funds from SIPC up to the amount permitted by the bill.

*See* S. Rep. No. 95-763, at 13 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764, 776. *See also McKenny v. McGraw (In re Bell & Beckwith)*, 104 B.R. 852 (Bankr. N. D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991).

### D. The Second Circuit's Net Equity Decision

In the Net Equity Decision, the Second Circuit was asked whether the proper method for calculating the amount owed to a customer in this case is the Net Investment Method, which looks only to a customer's deposits and withdrawals, or the last statement method, which looks only to the fictitious account statements issued by BLMIS reflecting fictitious prices and fictitious profits. The Court determined that the Net Investment Method was the method consistent with the definition of "net equity" and with SIPA. 654 F.3d at 235. The Court based its decision on the language of SIPA, the intent of SIPA to treat customers equally, and the potential results if the fictitious statements were treated as real. *Id.* at 235 (stating that use of the

7

last statement method would yield inequitable treatment among customers and "have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real.").

In its analysis, the Court first looked to two relevant provisions of SIPA: the definition of net equity in SIPA section 78*lll*(11) (2008), and SIPA section 78fff-2(b), which states that net equity is to be determined in accordance with the books and records of the debtor. *Id.* at 236-37. The Court reasoned that because the statements are rigged "after-the-fact constructs," and because the recovery of fictitious profits would result in an inequitable treatment among customers, some of which had not withdrawn any funds before the fraud was exposed, the Net Investment Method is a better measure of net equity in this case. *Id.* at 238. The Court also noted that "the Net Investment Method allows the Trustee to make payments based on withdrawals and deposits, which can be confirmed by the debtor's books and records." *Id.* at 238-39.

Second, the Court looked to the purpose and design of SIPA. The Court explained that SIPC is not an "insurance provider," and SIPC does not protect against all forms of fraud. *Id*. at 239. Rather, the Court held that the purpose of "net equity" is to "achieve a fair allocation of the available resources among the customers," and the Net Investment Method was the proper way to achieve that result. *Id.* at 240.

## II. TRANSFERS TO THE TRANSFEREE ACCOUNT CANNOT BE RECOVERED TWICE

Curiously, Claimants argue that the transfers of principal from each of their BLMIS accounts to the Transferee Account "never actually occurred" and thus are not "cash withdrawals." *See* Motion at 8, ¶ 34. Claimants fail to point out, however, that the Transferee Account at BLMIS was established by the Judaic Heritage Foundation, with Glenn Fishman and Eileen Fishman as its authorized signatories, and that, on the filing date, the account had a

8

negative net equity – meaning the deposits of principal from each of the Claimants' accounts into the Transferee Account were withdrawn from the Transferee Account. Claimants characterize these transfers of principal as "fictitious" even though the principal was withdrawn from the Transferee Account with the Claimants' knowledge since all of the Cedarhurst Accounts shared the same Cedarhurst address to which account statements would have been sent, and Glenn Fishman, with in one instance Yale Fishman, initiated the withdrawals from the Transferee Account. In this regard, not only are Claimants' arguments specious, but they necessarily call into question the Claimants' good faith in asserting a claim to principal that the two Trusts not only knew was withdrawn but as to which the trustees of the Trusts bore responsibility for withdrawal. *Cf.*, SIPA section 78jjj(c)(1)(C) (prohibiting and imposing sanctions for false claims).

SIPA section 78fff-3, which provides for SIPC advances for the benefit of customers up to statutory limits, states that "a customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity." SIPA § 78fff-3(a)(2). The SIPC Series 100 Rules, 17 C.F.R. §§ 300.100–300.105, specify how accounts of separate customers are identified. Under SIPC Rule 104, 17 C.F.R. §300.104, trusts created under valid written trust instruments, are deemed to be held in separate capacities. Thus, each trust account at issue is held by a separate "customer," and each would be separately eligible for the maximum amount of SIPC protection.

In making the Determinations, the SIPA Trustee treated each account separately in accordance with the SIPC Series 100 Rules. Thus, transfers of principal away from each of Claimants' accounts were deposited into the account of a separate customer, that is, the Transferee Account. It bears mention that the nature of fictitious profit did not change, and such

9

funds were not laundered or washed into principal, by the transfer of the profit into a different account. *See In re Madoff Securities*, 499 B.R. at 428-429. At any rate, even if the Cedarhurst Accounts were treated as one account, that one account would still be considered a "net winner" account in which more money was withdrawn than deposited.

To the extent that Claimants request credit for fictitious profits, such a request is impermissible under the Net Investment Method.

### III. JUDICIAL ESTOPPEL AND LAW OF THE CASE FURTHER THE TRUSTEE'S POSITION

Contrary to Claimants' assertion, neither law of the case nor judicial estoppel undermines the Trustee's position, as his claim determinations have been entirely consistent with his previous positions and with the Net Equity Decision. The Net Equity Decision requires that the Trustee use the Net Investment Method to determine a claimant's net equity. The Trustee applied the Net Investment Method and concluded that each of the Claimants had transferred its principal (and fictitious profits) to the Transferee Account and thus each Claimant had a net equity balance of $0.00 as of the Filing Date. The law of the case presented by the Net Investment Method is binding on each of the Claimants. *See, e.g.*, *Manley v. Mazzuca*, Case No. 01-civ-5178, 2007 WL 4233013, at *3 (S.D.N.Y. Nov. 30, 2007) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." (internal quotations omitted)).

### IV. THE TRUSTEE HAS NOT SUED CLAIMANTS IN AVOIDANCE

Fraudulent transfer law is not applicable to Claimants, and, in any event, is not helpful to them here. Claimants argue that the Trustee effectively avoids transfers of fictitious profits when those transfers factor into the calculation of net equity. Yet, the Trustee has not asserted a claim against Claimants for a fraudulent or preferential transfer, and defenses to avoidance actions are

10

irrelevant to the calculation of net equity. This exact argument has been examined and rejected by this Court in the Net Equity Decision. *See In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 136-37 (Bankr. S.D.N.Y. 2010) ("The fact that the Trustee may be unable to avoid a transfer in particular circumstances, however, is irrelevant to the Court's finding that the power itself is inconsistent with a distribution scheme that credits the reported products of a fraud."), *aff'd*, 654 F.3d 229 (2d Cir. 2011). In fact, the argument that the two-year look back period should apply to the calculation of a defendant's net investment has been rejected outright by the District Court in its opinion on antecedent debt. *In re Madoff Securities*, 499 B.R. at 428-29. Thus, Claimants' arguments around avoidance are misplaced.

Claimants do not seek just an advisory opinion that transfers of fictitious profits do not constitute a fraudulent transfer. Claimants actually go one step further – they seek protected "customer" status for principal – the same principal that the Claimants' trustees, on multiple occasions, authorized and directed be transferred to the Transferee Account and the Claimants' trustees knew had been withdrawn – and were responsible for having withdrawn – before the Filing Date. This brazen request must be denied.

11

## **CONCLUSION**

For all of the aforementioned reasons, the Trustee's Determinations should be affirmed and the Claimants' Objections should be denied.

Dated: Washington, D.C.
March 31, 2014

Respectfully submitted,

JOSEPHINE WANG
General Counsel

 */s/ Kevin H. Bell*
KEVIN H. BELL
Senior Associate General Counsel for
 Dispute Resolution

LAUREN T. ATTARD
Assistant General Counsel

SECURITIES INVESTOR
  PROTECTION CORPORATION
805 15th Street, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 371-8300
E-mail: jwang@sipc.org
E-mail: kbell@sipc.org
E-mail: lattard@sipc.org