Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF THE IRREVOCABLE CHARITABLE REMAINDER TRUST OF YALE FISHMAN AND THE GLENN AKIVA FISHMAN CHARITABLE REMAINDER UNITRUST FOR ENTRY OF AN ORDER ALLOWING THE TRUST CLAIMANTS' CLAIMS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.    Procedural Background - SIPA Proceeding and Appointment of Trustee ........... 2

    B.    The Claims Process and the Fishman Trust Claims............................................. 4

    C.    The "Books and Records" Requirement ............................................................... 5

    D.    Net Equity Under SIPA ....................................................................................... 6

    E.    The Bankruptcy Court and The Second Circuit Affirmed Trustee's
        Method For Calculating Net Equity...................................................................... 6

        1.    Trustee's Net Investment Method............................................................ 6

        2.    Bankruptcy Court Affirmed Net Investment Method............................... 7

        3.    Second Circuit Affirmed Net Investment Method.................................... 8

    F.    The District Court Decision Applying Net Equity to Account Transfers.............. 9

    G.    The Transfers From the Fishman Trusts to JHF and JHF's Subsequent
        Withdrawals ....................................................................................................... 12

        1.    The Fishman Trust and JHF BLMIS Accounts ...................................... 12

        2.    The Fishman Trust Transfers ................................................................. 13

                (a)    Transfers from Yale Fishman Trust to JHF ................................ 14

                (b)    Transfers from Glenn Fishman Trust to JHF.............................. 14

                (c)    Withdrawals from the JHF Account ........................................... 15

    H.    Objections to Claims Determinations Filed by the Fishman Trusts and JHF...... 16

ARGUMENT ..................................................................................................................... 18

    A.    The Fishman Trust Transfers Were Not Fictitious ............................................. 18

    B.    The Trustee Has Properly Valued Account Transfers in Accordance with
        the Law of the Case........................................................................................... 20

    C.    The Trustee's Methodology Comports with Applicable Statutes of
        Limitation.......................................................................................................... 22

    D.    The Burden is on the Fishman Trusts to Establish They Have Claims
        Against the BLMIS Estate .................................................................................. 24

CONCLUSION................................................................................................................... 25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**C**ASES

*In re Bayou Grp., LLC*,
    396 B.R. 810 (Bankr. S.D.N.Y. 2008), *aff'd in part, rev'd in part*, 439 B.R. 284
    (S.D.N.Y. 2010)........................................................................................................22

*In re Bayou Grp., LLC*,
    439 B.R. 284 (S.D.N.Y. 2010).................................................................................22

*In re Bernard L. Madoff Inv. Sec. LLC*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011)..............8

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (2012)......9

*In re Brentwood Securities, Inc.*,
    925 F.2d 325 (9th Cir. 1991) ..................................................................................24

*Butner v. United States*,
    440 U.S. 48 (1979)..................................................................................................19

*Chicago Title Ins. Co. v. Eynard*,
    84 Misc. 2d 605, 377 N.Y.S.2d 895 (App. Term 1975) ........................................21

*Doucet v. Massachusetts Bonding & Ins. Co.*,
    180 A.D. 599, 167 N.Y.S. 892 (N.Y. App. Div. 1917) ..........................................19

*In re Korean Airlines Disaster of Sept. 1, 1983*,
    798 F. Supp. 755 (E.D.N.Y. 1992) .........................................................................20

*In re Lorie Dehimer Irrevocable Trust*,
    37 Misc.3d 1228(A), 964 N.Y.S.2d 60 (N.Y. Sur. 2012) ......................................20

*Neshewat v. Salem*,
    365 F. Supp. 2d 508 (S.D.N.Y. 2005), *aff'd*, 194 F. App'x 24 (2d Cir. 2006)........21

*Ryan v. Picard*,
    133 S. Ct. 24, 183 L. Ed. 2d 675 (2012) .................................................................9

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    499 B.R. 416 (S.D.N.Y. 2013).......................................................................... *passim*

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*,
    229 B.R. 273 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. Arford v. Miller*, 239 B.R. 698
    (S.D.N.Y. 1999), *aff'd sub nom. In re Stratton Oakmont*, 210 F.3d 420 (2d Cir. 2000).........24

## TABLE OF AUTHORITIES

**Page(s)**

*In re Venture Mortgage Fund, L.P.*,
   245 B.R. 460 (Bankr. S.D.N.Y. 2000), *aff'd*, 282 F.3d 185 (2d Cir. 2002) ...........................20

**STATUTES**

11 U.S.C. § 502(a) ...........................................................................................................24

11 U.S.C. § 546(c) ...........................................................................................................23

11 U.S.C. § 548(a)(1) .......................................................................................................23

11 U.S.C. § 548(a)(1)(A) ..........................................................................................10, 11

11 U.S.C. § 548(c) .................................................................................................. *passim*

15 U.S.C. § 78aaa *et seq.* ...................................................................................................1

15 U.S.C. § 78eee(a)(4)(A) .................................................................................................3

15 U.S.C. § 78eee(a)(4)(B) .................................................................................................3

15 U.S.C. § 78eee(b)(3) ......................................................................................................3

15 U.S.C. § 78eee(b)(4) ......................................................................................................3

15 U.S.C. § 78fff-1(a) .........................................................................................................3

15 U.S.C. § 78fff-2(a)(3) .................................................................................................4, 5

15 U.S.C. § 78fff-2(b) .....................................................................................................5, 24

15 U.S.C. § 78fff-2(c)(1)(B) ...........................................................................................6, 7

15 U.S.C. § 78fff(b) ............................................................................................................3

15 U.S.C § 78fff–2(b) .........................................................................................................8

15 U.S.C. § 78*lll*(11) .....................................................................................................6, 8

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*,[1] and the estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this memorandum of law in opposition to the Motion (the "Motion") of the Irrevocable Charitable Remainder Trust of Yale Fishman (the "Yale Fishman Trust") and the Glenn Akiva Fishman Charitable Remainder Trust (the "Glenn Fishman Trust," and together with the Yale Fishman Trust, the "Fishman Trusts" or "Movants") seeking entry of an order allowing the customer claims filed by the Fishman Trusts.

## PRELIMINARY STATEMENT

In an effort to obtain a double-recovery of amounts transferred between accounts of related parties and keep fictitious profits, Movants argue here that no transfers ever occurred between their accounts. Movants conveniently omit, however, the factual background of these accounts that show Movants have already acknowledged receipt of the funds transferred in a previously-filed objection, and that funds were in fact withdrawn from the related account.

The transferee account is in the name of Judaic Heritage Foundation, Inc. ("JHF"). The JHF account is controlled by the same individuals that control the Fishman Trusts. All three entities share the same counsel.

After those individuals requested that the balance of the Fishman Trust accounts be transferred to JHF and received BLMIS statements reflecting those transfers, they then sent requests to BLMIS asking for those funds to be withdrawn for the benefit of JHF. Pursuant to those requests, BLMIS sent checks to JHF and those checks were duly cashed.

Because, as a result of these transfers, the Fishman Trusts were left with no principal in

---

[1] For convenience, subsequent references to sections of the act shall be denoted as "SIPA § __."

1

their accounts, the Trustee denied the claims filed on the Fishman Trusts' behalf.  Movants objected to this determination and subsequently brought this Motion arguing that the Trustee should treat the transfers as fictitious.  In support of this argument, Movants assert that because the Trustee disregarded the fictitious security transactions listed on BLMIS customer statements, he should also disregard the bona fide transfers listed thereon and treat them differently than other account withdrawals.  However, contrary to Movants' assertion that "[n]o real funds or securities were transferred" (Motion at 9), JHF received the funds, withdrew them and acknowledged as much in the objection it filed with the Trustee.  Indeed, the claim determination objection filed by JHF not only acknowledges that it received these transfers, it seeks to have the value of the transfers adjusted upward to include fictitious profit.

When the objections are read together, it becomes apparent that the same individuals are (i) asking that the Fishman Trust Transfers (defined below), which collectively total almost $3 million in principal, be ignored to allow the Fishman Trusts to assert claims as net losers, and (ii) seeking to recover the full amount (including fictitious profit) of the Fishman Trust Transfers. This Court should not award Movants a double recovery by undoing the requested transfers and crediting them with money that was already withdrawn from BLMIS at their request.  The Trustee's treatment and valuation of inter-account transfers in this and every other relevant case is mandated by the Second Circuit's net equity decision and the District Court's recent decision regarding antecedent debt.  Movants' argument is inconsistent with this approach and has no factual or legal basis.  The Motion should be denied.

## STATEMENT OF FACTS

### A.   Procedural Background - SIPA Proceeding and Appointment of Trustee

On December 11, 2008, Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire

2

fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced a proceeding against Madoff and BLMIS in the District Court. The SEC's complaint alleges that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS could not meet its obligations to securities customers as they came due, and its customers needed the protections afforded by SIPA. Also on December 15, 2008, the District Court granted SIPC's application and entered an order pursuant to SIPA, which, *inter alia*: (i) appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3); (ii) appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and (iii) removed the case to the Bankruptcy Court pursuant to SIPA § 78eee(b)(4).

Under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers that hold allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee, in addition to the powers granted by SIPA. Pursuant to section 78fff(b) of SIPA, chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case, to the extent they are consistent with SIPA.

Madoff purported to be trading on behalf of his investment advisory clients using split-strike conversion and other strategies. But Madoff did not engage in trading activity on behalf of his clients. At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*,

Case No. 09-CR-213(DC), Madoff pleaded guilty to an eleven-count criminal information filed against him by the United States Attorney for the Southern District of New York.  On June 29, 2009, Madoff was sentenced to 150 years in prison for his crimes.

**B.**  **The Claims Process and the Fishman Trust Claims**

The Trustee sought and obtained a court order to implement a customer claims process in accordance with SIPA.  Following an application by the Trustee dated December 21, 2008, the Bankruptcy Court entered the Claims Procedures Order.  ECF No. 12.[2]  By the mandatory statutory bar date for filing claims under § 78fff-2(a)(3) of SIPA, the Trustee received more than 16,500 customer claims.

The Trustee began reviewing and determining claims.  As required by the Claims Procedures Order and described in each determination letter sent by the Trustee, BLMIS claimants had thirty days from the date of a determination letter to object to the Trustee's determination of their claim.  Claimants who disagreed with the Trustee's determination of their claim were required to file with the Court a written opposition setting forth the grounds of disagreement and provide the Trustee with the same.

Claims were timely filed by the Fishman Trusts (collectively, the "Fishman Trust Claims") and by JHF.  *See* Declaration of Vineet Sehgal In Support of Trustee's Opposition dated March 31, 2014 (the "Sehgal Decl."), Exs. 30, 31, 32.  The Trustee denied the Fishman Trust Claims on April 27, 2010 because the Fishman Trusts' accounts both had a zero balance, each having transferred the respective balance to JHF (collectively, the "Determination Letters").

---

[2] This and all following ECF No. references refer to pleadings filed in the main bankruptcy proceeding pending before the Bankruptcy Court, captioned *Sec. Investor Prot. Corp.  v. Bernard L. Madoff Inv. Sec. LLC*, Adv. No. 08-01789 (SMB) (Bankr. S.D.N.Y.), unless otherwise noted.  The full name of the Net Equity Motion is the Trustee's Motion for an Order Upholding Trustee's Determination Denying Customer Claims' for Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections with Respect to the Determination Relating to Net Equity.

*Id.*, Exs. 34, 35.  The Trustee denied the JHF claim, by determination letter dated October 12, 2010, because JHF withdrew more from its accounts than was deposited, making it a "net winner." *Id.*, ¶ 33, Ex. 36.  On May 25 and 26, 2010, the Fishman Trusts filed objections to the Trustee's claim determinations (collectively, the "Fishman Trust Objections").  *Id.*, Exs. 37, 38. On November 11, 2010, JHF filed an objection to the Trustee's claim determination (the "JHF Objection").  *Id.*, Ex. 39.  The Fishman Trust Objections and the JHF Objection are discussed in Section H below.

**C.    The "Books and Records" Requirement**

In order to have claims satisfied by a SIPA trustee, obligations to customers must be "ascertainable from the books and records of the debtor or . . . otherwise established to the satisfaction of the trustee." SIPA § 78fff-2(b).  Numerous customers have pointed to the last BLMIS customer statement reflecting fictitious equity as the only "books and records" relevant to their claims.  While the BLMIS customer statements and confirmations received by customers are part of the Debtor's "books and records," the books and records of BLMIS are comprised of many more sources of information that reflect the cash transactions that occurred between BLMIS and its customers, and that demonstrate that the securities transactions on the BLMIS customer statements did not occur.  Relevant books and records of BLMIS include bank records, annual reports, DTCC account information, other corporate documents, cash receipts records, cash disbursement records, and customer-related files such as account maintenance folders, portfolio management reports and portfolio management transaction reports.  The Trustee and his advisors have also reviewed account debits and credits as entered in the computer system that Madoff used to conduct the investment advisory side of BLMIS known as the "AS/400" and compared these debits and credits with requests from customers for withdrawals or inter-account transfers.

5

**D.    Net Equity Under SIPA**

Under section 78*lll*(11) of SIPA, "net equity" is defined in relevant part as "the dollar amount of the account or accounts of a customer, to be determined by . . . (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); … minus (B) any indebtedness of such customer to the debtor on the filing date[.]" SIPA § 78*lll*(11).  Distributions of customer property are by statute to be made to the customers "ratably . . . on the basis or to the extent of their respective net equities.  SIPA § 78fff-2(c)(1)(B).

**E.    The Bankruptcy Court and The Second Circuit Affirmed Trustee's Method For Calculating Net Equity**

After significant consideration and evaluation, the Trustee determined that each customer's net equity would be calculated on a "cash-in/cash-out" basis – crediting the total amount of cash deposited by the customer into their BLMIS account, and subtracting any amounts withdrawn from or otherwise transferred out of the account (the "Net Investment Method").  Certain customers disagreed with the Trustee's Net Investment Method, with some arguing that net equity should be determined on the basis of each customer's fictitious balance as shown on the last account statement generated by BLMIS (the "Last Statement Method").  The Last Statement Method would allow customers to recoup not only principal they invested with BLMIS, but also the fictitious profits Madoff credited them when he fabricated securities transactions on customer statements.

**1.    Trustee's Net Investment Method**

On October 16, 2009, the Trustee filed a motion (the "Net Equity Motion") seeking entry of an order, *inter alia*, affirming the Trustee's Net Investment Method for calculating net equity

and customers' claims.  ECF Nos. 524, 525.  In the Net Equity Motion, the Trustee argued that calculating customers' net equity using the Last Statement Method would legitimize and perpetuate Madoff's fraud.  ECF No. 525, p. 3.  Because there may not be sufficient funds to reimburse all customers' principal invested with BLMIS, every dollar paid to reimburse fictitious profits fabricated by Madoff would be one less dollar available to return to customers the principal they actually invested with BLMIS.  *Id*.  In sum, the Trustee reasoned, utilizing the Net Investment Method is the only way to return to customers their real dollars they invested and put all customers on an equal footing.  *Id.*

Under the Net Investment Method, customers fall within two categories:

> **(i)      Net Winners**:  Customers who withdrew more funds from BLMIS than they deposited.  These customers received a full return of their principal, as well as some "profit" fabricated by Madoff which was, in fact, other customers' principal.  The Trustee has filed adversary proceedings against certain Net Winners to avoid and recover transfers of these fictitious profits.

> **(ii)     Net Losers**:  Customers who withdrew less funds from BLMIS than they deposited.  These customers did not receive a full return of their principal invested with BLMIS, and were eligible to receive funds advanced from SIPC in the amount of their net equity up to SIPC's $500,000 maximum.  Those Net Losers whose net equity exceed $500,000 are eligible to receive additional pro rata distributions of customer property recovered by the Trustee.[3]

### 2.     The Bankruptcy Court Affirmed Net Investment Method

---

[3] There are also a number of customers that withdraw the same amount as they deposited.  The Trustee refers to these customers as "Net Zero Customers."  The Net Zero Customers would be included as Net Winners for these purposes because they have no principal left to recover and are not entitled to a distribution of customer property from the BLMIS estate.

On March 1, 2010, the late Judge Burton R. Lifland entered an order granting the Net

Equity Motion (the "Bankruptcy Court Net Equity Decision"). *In re Bernard L. Madoff Inv. Sec.*

*LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011). In the

Bankruptcy Court Net Equity Decision, this Court concluded that the Net Investment Method

complies with SIPA's statutory framework. The Court reasoned that "the definition of Net

Equity under SIPA section 78*lll*(11) must be read in tandem with SIPA section 78fff–2(b), which

requires the Trustee to discharge Net Equity claims only 'insofar as such obligations are [1]

ascertainable from the books and records of the debtor or [2] are otherwise established to the

satisfaction of the trustee.'" *Id.* at 135 (citing 15 U.S.C § 78fff–2(b)). BLMIS's books and

records show no equities were ever purchased; the only amounts shown in the books and records

are cash deposits and withdrawals. *Id.* Accordingly, netting out transfers based on these books

and records satisfy SIPA. *Id.* The Bankruptcy Court held:

> Equality is achieved in this case by employing the Trustee's method, which looks
> solely to deposits and withdrawals that in reality occurred. To the extent possible,
> principal will be rightly returned to Net Losers rather than unjustly rewarded to
> Net Winners under the guise of profits. In this way, the Net Investment Method
> brings the greatest number of investors closest to their positions prior to Madoff's
> scheme in an effort to make them whole.

*Id.* at 142.

Multiple parties filed notices of appeal, and the Bankruptcy Court Net Equity Decision

was certified for direct appeal to the Second Circuit on June 16, 2010. ECF No. 2467.

### 3.    The Second Circuit Affirmed Net Investment Method

On August 16, 2011, the Second Circuit affirmed the Bankruptcy Court Net Equity

Decision (the "Second Circuit Net Equity Decision"). *In re Bernard L. Madoff Inv. Sec. LLC*,

654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (2012). In the Second

Circuit Net Equity Decision, the Second Circuit agreed that the Net Investment Method is more

consistent with the statutory definition of "net equity" than any other method advocated by any of the parties or perceived by the Second Circuit. *Id.* at 235. Recognizing that Madoff fabricated customer statements using after-the-fact information based on stock movements that had already taken place, the Second Circuit observed that relying on the Last Statement Method would permit those who had already withdrawn cash exceeding their principal to unfairly benefit at the expense of those who had not withdrawn all their principal before Madoff's scheme collapsed. *Id.* at 238.

Certain parties filed petitions for *certiorari* to the United States Supreme Court, which denied *certiorari* on June 25, 2012 (*Ryan v. Picard*, 133 S. Ct. 24, 183 L. Ed. 2d 675 (2012), *Velvel v. Picard*, 133 S. Ct. 25, 183 L. Ed. 2d 675 (2012)), establishing the Trustee's Net Investment Method as the proper means for calculating customers' net equity claims.

**F.    The District Court Decision Applying Net Equity to Account Transfers**

After the Supreme Court denied *certiorari* for the Second Circuit Net Equity Decision, a number of customers sought another bite at the apple, but called the argument by a different name. In proceedings before District Court Judge Jed S. Rakoff, these customers (the "Antecedent Debt Defendants") argued that the Trustee could not seek to avoid and recover transfers they received from BLMIS in excess of their principal because those fictitious profits were payments on behalf of the debts BLMIS owed to those claimants pursuant to 11 U.S.C. § 548(c).

Particularly relevant to this Motion, the Antecedent Debt Defendants also disputed the Trustee's method for calculating inter-account transfers. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Civ. No. 12-mc-115, ECF No. 199 (S.D.N.Y.). An inter-account transfer is a transaction between BLMIS customer accounts at the request of the transferor account-holder in which no new funds entered or left BLMIS, but rather a book entry occurred at BLMIS

to internally adjust the balances of those accounts after a customer directed the transfer be made. *Id.*, ECF No. 252, p. 34. Inter-account transfers from one BLMIS account to another consisted of: (a) all principal, (b) all fictitious profits, or (c) a combination of principal and fictitious profits. The Trustee calculated transfers by crediting the transferee up to the amount of principal available in the transferor's account on the date the transfer. If the transferor attempted to transfer more than the principal available, those fictitious profits would not be credited to the transferee. *Id.* If, however, sufficient principal existed in the transferor's account to cover the amount of the transfer in question, the full amount was treated as "withdrawn" from the transferor's account and "deposited" into the transferee's account.

For example, if Customer A had a BLMIS-generated statement balance of $10 million, consisting of $6 million in principal and $4 million in fictitious profits, and attempted to make an inter-account transfer of $8 million to Customer B, Customer B's account would reflect a deposit of only $6 million – the total principal in Customer A's account. The additional $2 million in fictitious profits would not be credited to Customer B, nor would it reduce the calculation of Customer A's net equity.

The Antecedent Debt Defendants argued that the entirety of the transfer (including fictitious profits) should be credited as Customer B's principal and constitute value under section 548(c) because, to the extent the transfer that included fictitious profits was made outside section 548(a)(1)(A)'s two-year look-back period, the Trustee would not be able to avoid and recover those fictitious profits. *Id.*, ECF No. 199, p. 36. The Antecedent Debt Defendants theorized that the result of an inter-account transfer should not be treated differently than if Customer A had withdrawn from her BLMIS account $8 million of cash and given that cash to Customer B who deposited the cash in her BLMIS account; in that case, Customer B's account would receive the

10

full amount of the transfer (including the fictitious profits) and would have $8 million of

principal. *Id.* They argued that the Trustee's method for accounting for inter-account transfers

"is nothing more than an attempt to ignore the Reach-Back Period." *Id.* at 38.

The Trustee argued that crediting Customer B the full $8 million (thereby crediting

Customer B $2 million of fictitious profits) would violate the Net Investment Method. *Id.*, ECF

No. 252, p. 35-36. Using the Antecedent Debt Defendants' theory would result in there being

"absolutely no way to differentiate principal from fictitious profits." *Id.*, p. 36. Employing this

method would be akin to "money laundering—washing dirty (in this case fake) money and

turning it into real dollars through inter-account transfers accomplished by means of a fraudster's

book entries." *Id.*, p. 34. Therefore, only actual principal could be transferred between BLMIS

accounts. *Id.*

The District Court rejected the theory that inter-account transfers of fictitious profits,

including those that occurred before the two-year look-back period, should be treated as

principal. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 499 B.R. 416, 428

(S.D.N.Y. 2013) (the "Antecedent Debt Decision"). The Court reasoned that the funds being

shifted among accounts were ultimately other people's money because those "profits" were, in

fact, principal invested with BLMIS by other customers. *Id.* at 428-29. "In other words, no new

value was created by moving these funds between different accounts," and thus cannot constitute

principal or "value" under section 548(c). *Id.* at 429.

Further, the District Court noted that there is no time limit on what constitutes "value,"

accordingly an inter-account transfer of fictitious profits does not become principal and/or a

prepayment of an antecedent debt owed by BLMIS simply because it occurred before the two-

year look back period. *Id.* For these reasons, the District Court affirmed the Trustee's method

for accounting for inter-account transfers.  *Id.* at 428-29.

Once the Antecedent Debt Decision was entered, the Trustee began reviewing objections to claims determinations raising inter-account transfer issues, which include the Fishman Trust Objections and the JHF Objection.  Sehgal Decl., Exs. 37, 38, 39.

**G.    The Transfers From the Fishman Trusts to JHF and JHF's Subsequent Withdrawals**

**1.    The Fishman Trust and JHF BLMIS Accounts**

While it may be true, as Movants state in the Motion, that transferee JHF is an "independent public charity" (Motion at 4), what Movants fail to disclose to the Court is that the Fishman Trusts and JHF accounts are closely related and subject to common control.  The Yale Fishman Trust BLMIS account was opened on August 18, 1998 by Yale and Glenn Fishman, both of whom signed the BLMIS account opening documents which identified Yale Fishman as trustee of the Yale Fishman Trust.  Sehgal Decl., Ex. 2.  The Glenn Fishman Trust BLMIS account was opened on December 8, 1998 by Yale and Glenn Fishman both of whom signed the BLMIS account opening documents as trustees on behalf of the Glenn Fishman Trust.  *Id.*, Ex. 3.  The JHF BLMIS account was opened on December 11, 1998 by Glenn Fishman and Eileen Fishman.  *Id.*, Ex. 4.  A corporate resolution provided to BLMIS with the account operating documents identified Glenn Fishman as the vice president of JHF and Eileen Fishman as treasurer and secretary.[4]  *Id.*

The address provided in the account opening documents for the Fishman Trusts and JHF is the same.  *Id.*, Exs. 2, 3, 4.  Further, a review of their respective objections reveals that the Fishman Trusts and JHF are represented by the same counsel.  *Id.*, Exs. 37, 38, 39.

The formation agreements for the Fishman Trusts were submitted to the Trustee with the

---

[4] There is an additional account related to JHF held in the name of YMF Partners II LLC "(YMF)".  YMF filed a claim with the Trustee and that claim was allowed.  Sehgal Decl., Ex. 33.

Fishman Trust Claims (the "Trust Agreements").  *Id.*, Exs. 40, 41.  Each Trust Agreement provides that the relevant Fishman Trust was to terminate five years from the date of execution of the agreement.  *Id.*  The Yale Fishman Trust Agreement was dated August 18, 1998, resulting in a dissolution date of August 18, 2003.  *Id.*, Ex. 40.  The Glenn Fishman Trust Agreement was dated September 16, 1998, resulting in a dissolution date of September 16, 2003.  *Id.*, Ex. 41. The Trust Agreements further provide that upon termination of the relevant Fishman Trust, the assets should be distributed to JHF.  *Id.*, Exs. 40, 41.

### 2.    The Fishman Trust Transfers

The Motion argues that certain transfers from the Fishman Trusts to JHF (the "Fishman Trust Transfers") did not occur.  But the Fishman Trusts directed each of the transfers at the relevant times, as reflected on their contemporaneous account statements.  The Fishman Trusts received these account statements at the time and did not object to the transfers listed thereon. And not only did the transfers occur, but the funds were withdrawn from the transferee account at the direction of the same individuals who initiated the transfers.  *See, e.g., Id.*, Exs. 8, 15, 21.

A review of the Trustee's books and records reveals the details regarding the Fishman Trust Transfers and the relevant net equity for each account.  In summary, the trustees of the Fishman Trusts, Glenn and Yale Fishman, after the date on which the Fishman Trusts were to be dissolved, requested in writing that BLMIS transfer the balance in each account to the related JHF account.  The transfers were reflected on the Fishman Trusts' customer statements and the Fishman Trusts did not object to their inclusion thereon at the time of receipt of the statements. Shortly thereafter, Glenn and Yale Fishman began requesting withdrawals of these transfers from the JHF account for the benefit of JHF.

(a)    Transfers from Yale Fishman Trust to JHF

- On September 28, 2004, there was $1,484,221.13 of principal in the Yale Fishman Trust account. *Id.*, ¶ 12.

- On September 28, 2004, Yale Fishman requested that BLMIS transfer $250,000.00 to the JHF account. *Id.*, Ex. 5.

- On September 29, 2004, BLMIS recorded a transfer of $250,000.00 from the Yale Fishman Trust account to the JHF account. *Id.*, Ex. 6.

- The Yale Fishman Trust received a customer statement describing this transfer (*Id.*, Ex. 7) and did not object thereto.

- On December 30, 2004, Yale Fishman requested that BLMIS transfer the "full balance" of the Yale Fishman Trust account to the JHF account and requested that the Yale Fishman Trust account be closed once the account balance was $0. *Id.*, Ex. 8.

- On December 31, 2004, BLMIS recorded a transfer in the amount of $3,101,924.84 from the Yale Fishman Trust account to the JHF account. *Id.*, ¶ 15.

- The Yale Fishman Trust received a customer statement describing this transfer (*Id.*, Ex. 9) and did not object thereto.

- This amount included $1,234,221.13 of principal and $1,867,703.71 of fictitious profits. *Id.*, ¶ 15.

- There was no net equity in the Yale Fishman Trust BLMIS account on January 31, 2005. *Id.*, ¶ 16.

(b)    Transfers from Glenn Fishman Trust to JHF

- On September 28, 2004, there was $1,486,590.00 of principal in the Glenn Fishman Trust account. *Id.*, ¶ 17.

- On September 28, 2004, Glenn Fishman requested that BLMIS transfer $250,000.00 from the Glenn Fishman Trust account to the JHF account. *Id.*, Ex. 12.

- On September 29, 2004, BLMIS recorded a transfer of $250,000.00 from the Glenn Fishman Trust account to the JHF account. *Id.*, ¶ 18, Ex. 14.

- The Glenn Fishman Trust received a customer statement describing this transfer (*Id.*, Ex. 13) and did not object thereto.

- On December 30, 2004, Glenn Fishman requested that BLMIS transfer "the full

balance" of the Glenn Fishman Trust account to the JHF account and requested that BLMIS close the Glenn Fishman account once the account balance was $0. *Id.*, Ex. 15.

- On December 31, 2004, BLMIS recorded a transfer in the amount of $2,950,112.99 from the Glenn Fishman Trust account to the JHF account. *Id.*, ¶ 20.

- The Glenn Fishman Trust received a customer statement describing this transfer (*Id.*, Ex. 16) and did not object thereto.

- This amount included $1,236,590.00 of principal and $1,713,522.99 of fictitious profits. *Id.*, ¶ 20.

- There was no net equity left in the Glenn Fishman Trust BLMIS account on January 31, 2005. *Id.*, ¶ 21.

(c)    <u>Withdrawals from the JHF Account</u>

- Prior to the first transfer from the Fishman Trusts to JHF, JHF had a negative account balance of $870,000, having invested $1,000,000.00 of principal and having withdrawn $1,870,000.00. *Id.,* ¶ 11.

- The only deposits into the JHF account, other than the initial $1 million deposit were transfers from the Fishman Trusts. *Id.*, Ex. 39, ¶ 9.

- On February 4, 2005, after the transfers from the Fishman Trusts, there was $2,100,811.13 of principal in the JHF account. *Id.*, ¶ 22.

- On February 4, 2005, Glenn Fishman requested a withdrawal from the JHF account in the amount of $151,000.00 in the form of a check made payable to JHF. *Id.*, 19. A check for that amount was sent to JHF and deposited into a JPMorgan Chase account. *Id.*

- On April 18, 2005, Glenn Fishman requested a withdrawal from the JHF account in the amount of $100,000.00 in the form of a check made payable to JHF. *Id.*, Ex. 20. A check for that amount was sent to JHF and deposited into a JPMorgan Chase account. *Id.*

- On December 19, 2005, Glenn and Yale Fishman requested a withdrawal from the JHF account in the amount of $500,000.00 in the form of a check made payable to JHF. *Id.*, Ex. 21. A check for that amount was sent to JHF and deposited into a JPMorgan Chase account. *Id.*

- On March 20, 2007, Glenn Fishman requested a withdrawal from the JHF account in the amount of $100,000.00 in the form of a check made payable to JHF. *Id.*, Ex. 22. A check for that amount was sent to JHF and deposited into a JPMorgan

Chase account. *Id.*

- On August 28, 2007, Glenn Fishman requested a withdrawal from the JHF account in the amount of $600,000.00 in the form of a check made payable to JHF. *Id.*, Ex. 23. A check for that amount was sent to JHF and deposited into a JPMorgan Chase account. *Id.*

- On October 26, 2007, Glenn Fishman requested a withdrawal from the JHF account in the amount of $400,000.00 in the form of a check made payable to JHF. *Id.*, Ex. 24. A check for that amount was sent to JHF and deposited into a JPMorgan Chase account. *Id.*

- On January 14, 2008, Glenn Fishman requested a withdrawal from the JHF account in the amount of $400,000.00 in the form of a check made payable to JHF. *Id.*, Ex. 25. A check for that amount was sent to JHF and deposited into a JPMorgan Chase account. *Id.*

- On May 20, 2008, Glenn Fishman requested a withdrawal from the JHF account in the amount of $100,000.00 in the form of a check made payable to JHF. *Id.*, Ex. 26. A check for that amount was sent to JHF and deposited into a JPMorgan Chase account. *Id.*

- On July 1, 2008, Glenn Fishman requested a withdrawal from the JHF account in the amount of $200,000.00 in the form of a check made payable to JHF. *Id.*, Ex. 27. A check for that amount was sent to JHF and deposited into a JPMorgan Chase account. *Id.*

- On July 21, 2008, Glenn Fishman requested a withdrawal from the JHF account in the amount of $500,000.00 in the form of a check made payable to JHF. *Id.*, Ex. 28. A check wire for that amount was sent to JHF. *Id.*

- On October 2, 2008, Glenn Fishman requested a withdrawal from the JHF account in the amount of $400,000.00 in the form of a check made payable to JHF. *Id.*, Ex. 29. A check for that amount was sent to JHF and deposited into a JPMorgan Chase account. *Id.*

- As of the commencement of the BLMIS liquidation, the JHF account was overdrawn by $1,350,188.87 of principal. *Id.*, ¶ 33.

**H.**    **Objections to Claims Determinations Filed by the Fishman Trusts and JHF**

As stated above, the Fishman Trusts and JHF each filed objections to the Trustee's determination of their customer claims. The Fishman Trust Objections were substantially identical and addressed several issues, including the argument that the Fishman Trust Transfers

16

should be considered fictitious and disregarded. The JHF Objection, however, acknowledges

that the Fishman Trust Transfers were made.

The JHF Objection states as follows:

[o]ther than that initial $1,000,000.00 deposit made on February 16, 1999, all of
the deposits into the JHF Account were made via transfers from two other BLMIS
accounts: (i) the Glenn Akiva Fishman Charitable Remainder Unitrust …
transferred a total of $3,200,746.41 to the JHF Account between September 29,
2004 and January 31, 2005; and (ii) the Irrevocable Charitable Remainder Trust
of Yale Fishman … transferred a total of $3,352,581.72 to the JHF Account
between September 29, 2004 and January 31, 2005.

*Id.*, Ex. 39, p. 3.

The JHF Objection then notes that the amounts of the transfers were reduced by the

Trustee in accordance with his cash-in/cash-out methodology. *Id.* JHF agrees with the Trustee

that the "transfers made from the Fishman Trusts to the JHF Account 'constitute cash-in,'" (*Id.*,

p. 4) and argues that JHF should receive the benefit of that part of the transfers that were made

up of fictitious profit: "the Trustee should not be permitted to back out the fictitious profits to the

detriment of JHF." *Id.* The JHF Objection states that because JHF is a non-profit organization

created to do charitable works, it would be unfair to reduce the transfers to only principal. *Id.*, p.

4-5.

The JHF Objection admits that the transfers occurred and demands that the Trustee credit

JHF with the full amount of the transfers, making it a Net Loser instead of a Net Winner of more

than $1.3 million. When the Fishman Trust and JHF Objections are read together, it is clear that

they are seeking both to undo the Fishman Trust Transfers to create Net Loser claims for the

Fishman Trusts, and also to credit JHF with the full amount of the Fishman Trust Transfers,

including fictitious profits. Such a result would contravene the Second Circuit Net Equity

Decision.

**ARGUMENT**

**A.     The Fishman Trust Transfers Were Not Fictitious**

Movants' assertion that transfers did not actually occur between the Fishman Trusts and JHF is false and is belied by the JHF Objection.  The Fishman Trusts argue that because the Trustee has taken the position that the net equity in a customer account cannot accurately be determined from the last customer account statements because those statements include fictitious profits, any inter-account transfers must also be considered fictitious.  That is not the case.  The Trustee's methodology treats inter-account transfers like the account withdrawals that they essentially are.  Movants fail to articulate any legitimate basis for treating inter-account transfers in a different manner.

As an initial matter, the Fishman Transfers were made, and reflected on the customer statements, following requests made to BLMIS by the Fishman Trusts in writing with authorized signatures.  These requests are clear evidence of the Fishman Trusts' intent to transfer the funds.  The Fishman Trusts did not object to the transfer details as described on the customer statements at the time that they were received, which they presumably would have done if it were not their intent to transfer the funds to JHF.  The fact that, pursuant to the Trust Agreements, any remaining funds in the Fishman Trusts were to be transferred to JHF after the Fishman Trusts were dissolved – a date that has long since passed – only serves to reinforce the clear intent of the Fishman Trusts at the time of the Fishman Trust Transfers.

The customer statements received by the Fishman Trusts show the outgoing transfers to JHF, and the balances of the Fishman Trust accounts were adjusted accordingly.  The fact that the securities transactions listed on customer statements did not occur does not mean that the Trustee is not able, by reviewing the books and records of BLMIS, to determine when inter-account transfers occurred and how they should be valued.  Contrary to Movants' argument, the

18

Trustee is not relying solely on the last customer statements to calculate the amount of the inter-account transfers.  The Trustee is relying on customer requests for transfers, withdrawals and deposits contained in the books and records of BLMIS, and those verified transactions as reflected on customer statements.  By combining an analysis of the cash flowing into and out of each account with a review of the debits and credits as entered in the AS/400, the computer system used to conduct the investment advisory business, and the specific instructions provided by the holders of the transferor accounts, the Trustee is able to accurately determine the amount of the Fishman Trust Transfers.  Treating the transfers as withdrawals is thus consistent with the Net Investment Method.

Setting aside the fact that ignoring inter-account transfers would completely skew the calculation of the amount of principal lost to Madoff's Ponzi scheme, this particular argument is stretched beyond the breaking point with respect to the Fishman Trusts, where the individuals behind the transferor and transferee accounts are the same and where the transferee has acknowledged receipt of the funds and withdrawn them.  Even if there were some basis for the argument that the transfers could theoretically be considered fictitious, which there is not, the facts related to the Fishman Trust Transfers completely belie any such assertion in this case.

The Fishman Trust Transfers were not fictitious transactions to be disregarded, and thus, the ownership of the transferred funds is determined by New York law.  *See Butner v. United States*, 440 U.S. 48 (1979) (rights created by state law will be honored unless a specific bankruptcy provision or policy requires differently).  It is a well-settled rule that a voluntary transfer or delivery of personal property is a gift thereof and cannot be rescinded thereafter.  *See, e.g., Doucet v. Massachusetts Bonding & Ins. Co.*, 180 A.D. 599, 603, 167 N.Y.S. 892  (N.Y. App. Div. 1917) (plaintiff cannot rescind a voluntary transfer of securities).  Indeed, even in

19

situations where the transferor disputes the existence of an intention to transfer, New York courts will not allow parties to undo transfers where the relevant documents suggest the transferors intended to voluntarily transfer funds. *In re Lorie Dehimer Irrevocable Trust*, 37 Misc.3d 1228(A), 964 N.Y.S.2d 60 (N.Y. Sur. 2012). Here, the written requests to transfer the remaining balances of the Fishman Trust accounts to JHF make the parties' intentions indisputably clear, and they should be given effect pursuant to state law.

## B.   The Trustee Has Properly Valued Account Transfers in Accordance with the Law of the Case

Contrary to Movants' arguments, the Trustee's treatment of inter-account transfers is entirely consistent with the Second Circuit Net Equity Decision and was specifically affirmed by the District Court in the avoidance action context. Accordingly, there is no basis for Movants' assertions that judicial estoppel or the law of case precludes the Trustee's methodology.

Specifically, Movants argue that, in the Determination Letters, the Trustee reversed his position on calculating net equity on a cash-in/cash-out basis and such action is barred. However, the opposite is true. Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to one taken earlier. *In re Venture Mortgage Fund, L.P.*, 245 B.R. 460, 471 (Bankr. S.D.N.Y. 2000), *aff'd*, 282 F.3d 185 (2d Cir. 2002). To state the obvious, the Trustee has never taken the position that inter-account transfers were fictitious. Instead, the Trustee has given credit to the JHF account for the Fishman Transfers up to the amount of principal (*i.e.*, cash) available in the relevant Fishman Trust account on the day of the transfer. Use of the cash-in/cash-out method for inter-account transfers is entirely consistent with the Second Circuit Net Equity Decision.[5]

---

[5] Movants' assertions regarding the law of the case also fail. This doctrine provides that a decision on a legal issue in a case becomes binding precedent in that case. *In re Korean Airlines Disaster of Sept. 1, 1983*, 798 F. Supp. 755, 759 (E.D.N.Y. 1992). The doctrine is intended to avoid the re-litigation of decided matters. It has no application

Application of the Net Investment Method to inter-account transfers is also consistent with New York law which generally provides that a transferee can only receive funds to the extent of the transferor's interest in those funds.   *See, e.g., Neshewat v. Salem*, 365 F. Supp. 2d 508, 524 (S.D.N.Y. 2005), *aff'd*, 194 F. App'x 24 (2d Cir. 2006) (citing *Chicago Title Ins. Co. v. Eynard*, 84 Misc. 2d 605, 606, 377 N.Y.S.2d 895 (App. Term 1975) (noting that the grantee received only such title as the grantor had in the property)).   Therefore, accounts cannot be credited with fictitious profit.

Moreover, the District Court has already held that inter-account transfers should be treated in a manner consistent with the Second Circuit Net Equity Decision.   The District Court explained that it was appropriate to look through form to substance to determine the true nature of a transaction:

> the true substance of transfers of fictitious profits from one account to another remains the same: The funds at issue are still other people's money, and shifting them among accounts, whether those accounts are owned by the same person or entity or, for example, transfers among family members, does not morph those funds into actual new principal.

*Antecedent Debt Decision*, 499 B.R. at 428-29.   "In other words, no new value was created by moving these funds between different accounts." *Id.* at 429.

As the District Court noted, the same result was reached in an analogous Ponzi scheme case, *In re Bayou Grp., LLC*, 439 B.R. 284 (S.D.N.Y. 2010), in which the defendants had sought to have their "fraudulent-conveyance liability calculated not on the basis of their original principal investments but rather the amount they rolled over into new accounts when the original Bayou Fund split into four successor funds." *Antecedent Debt Decision*, 499 B.R. at 429. An earlier decision from the bankruptcy court evaluating *Bayou* dismissed that suggestion, stating

---

here where the Trustee's actions are required by, or at the very least the logical extension of, the Second Circuit Net Equity Decision and the Antecedent Debt Decision.  Indeed, it is Movants' arguments that ignore the decision of the District Court addressing inter-account transfers as discussed more fully below.

that "in no event is it appropriate to pile fiction on fiction by deeming these investors' final Bayou Fund account statements, including fictitious profits, to be the value of their investments contributed to the Bayou hedge funds." *In re Bayou Grp., LLC*, 396 B.R. 810, 885 (Bankr. S.D.N.Y. 2008), *aff'd in part, rev'd in part*, 439 B.R. 284 (S.D.N.Y. 2010).

In the Antecedent Debt Decision, the District Court recognized that the inter-account transfers were legitimate transactions but only to the extent there was principal in the transferor's account. The District Court also held that the Trustee's approach – treating each pre-reach-back period inter-account transfer of fictitious profit as what it was, "a transfer of funds that never belonged to the sender or the recipient" – reflected the reality of the transfers and treated investors "as equitably as possible." *Antecedent Debt Decision,* 499 B.R. at 429. Movants' inter-account arguments are inconsistent with the Antecedent Debt Decision. The holding of the District Court therein should apply with equal force in the claims context because calculating claims and avoidance liability are opposite sides of the same coin. *Id.* at 420.

In short, what the Trustee has done is to give effect to the unambiguous intention of the Fishman Trusts to transfer all funds in their accounts to JHF and calculated those transfers by using the amount of principal available immediately pre-transfer in the Fishman Trust accounts. The Trustee's actions would be inconsistent with the Second Circuit Net Equity Decision if he had either ignored the Fishman Trust Transfers altogether or credited JHF with the full amount of the transfers coming out of the Fishman Trust accounts, which included fictitious profits. The Trustee's treatment and calculation of inter-account transfers comply with the law of this case and constitute the only possible proper application of the Second Circuit Net Equity Decision and the Antecedent Debt Decision to such transfers.

## C.    The Trustee's Methodology Comports with Applicable Statutes of Limitation

Movants' argument that the Trustee cannot include transfers that occurred more than two

years prior to the filing date in his net equity calculations has been specifically rejected by the District Court.

In the Antecedent Debt Decision, the District Court held that the defendants mischaracterized the impact of the Net Investment Method by arguing that the Trustee's approach improperly circumvented the statutory reach-back period to recover time-barred withdrawals by applying deposits made during the reach back period against withdrawals made beyond the reach back period. Instead, the District Court found that while section 548(a)(1) allows the Trustee to avoid only those transfers made in the two years before the filing date, there is no similar limitation in section 548(c) with respect to whether a transfer is given for value. *Id.* at 427. The District Court noted the distinction between the concept of harm to the estate and the concept of reach-back periods. *Id.* The District Court also observed that when calculating net equity claims, defendants were given credit for principal invested before the reach-back period and not withdrawn.

The District Court applied this holding to the account transfer context holding that:

> because there is no time limit on what becomes "value" for purposes of section 546(c) [sic], an inter-account transfer of fictitious profits does not become principal just because it occurred prior to the reach-back period. To the extent no actual principal was transferred, the inter-account transfer could provide no value to Madoff Securities.

*Id*. at 429.

The same holds true with respect to the Fishman Transfers. It would be inconsistent with the Second Circuit Net Equity Decision and the Antecedent Debt Decision to fail to take into account all transfers in and out of a BLMIS account – regardless of when they occurred – because, as the District Court stated, there is no statute of limitation on the determination of value.

23

**D.**    **The Burden is on the Fishman Trusts to Establish They Have Claims Against the BLMIS Estate**

In a SIPA proceeding, unlike in a traditional bankruptcy case, the customer has the burden of demonstrating, to the satisfaction of the Trustee, that it has a claim against the estate. Thus, Movants' argument that the Determination Letters do not "rebut the prima facie validity of the Trust Claimants' Claims as provided in section 502(a) of the Bankruptcy Code and Rule 3001(f)" fails because Movants are applying the wrong standard.

SIPA § 78fff-2(b) provides that obligations to customers must be "ascertainable from the books and records of the debtor or [] otherwise established to the satisfaction of the trustee." *See also In re Brentwood Securities, Inc.*, 925 F.2d 325, 328 (9th Cir. 1991) (claimants have burden of proving that they are claimants by establishing that they entrusted cash or securities to the broker); *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. Arford v. Miller*, 239 B.R. 698 (S.D.N.Y. 1999), *aff'd sub nom. In re Stratton Oakmont*, 210 F.3d 420 (2d Cir. 2000).

Accordingly, there is no presumption of validity for the Trustee to overcome.  To the contrary, it is Movants who must satisfy the Trustee of the existence of a viable claim against the estate, something they are unable to do because their assertions are inconsistent both with other documentation provided to the Trustee by an apparently related party, JHF, and the established method for calculating claims against the estate.

Movants' argument that the table attached to each Determination Letter does not reflect the fact that a transfer occurred fails for all the reasons set out above.  The Trustee has applied a cash-in/cash-out analysis to each of the Fishman Trust accounts, and the table, which identifies deposits, withdrawals and transfers in and out of each account, provides ample information to Movants regarding the treatment of their claims.

24

Thus, the Determination Letters fulfill their function and Movants' Motion in this regard should be denied.

## CONCLUSION

For all of the foregoing reasons, the Trustee respectfully requests the Court deny the Motion.

Dated:  New York, New York
March 31, 2014

Respectfully submitted,

*/s/ David J. Sheehan*
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jorian L. Rose
Email: jrose@bakerlaw.com
Nicolas J. Cremona
Email: ncremona@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the estate of Bernard L.
Madoff*

25