Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email:dsheehan@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION AFFIRMING
APPLICATION OF NET INVESTMENT METHOD TO DETERMINATION OF
CUSTOMER TRANSFERS BETWEEN BLMIS ACCOUNTS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 3

    A.    Procedural Background - SIPA Proceeding and Appointment of Trustee ........... 3

    B.    The Claims Procedure Order and the Claims Process ........................................... 4

    C.    The "Books and Records" Requirement .................................................................. 5

    D.    Net Equity Under SIPA .......................................................................................... 5

    E.    The Bankruptcy Court and The Second Circuit Affirmed Trustee's
        Method For Calculating Net Equity ........................................................................ 6

        1.    Procedural History ...................................................................................... 6

        2.    Trustee's Net Investment Method ............................................................... 7

        3.    The Bankruptcy Court Affirmed The Net Investment Method ................. 8

        4.    The Second Circuit Affirmed The Net Investment Method ..................... 9

    F.    The District Court Decision Applying Net Equity to Inter-Account
        Transfers ............................................................................................................... 10

        1.    Procedural History .................................................................................... 11

        2.    The Antecedent Debt Theory and The Trustee's Rejection Thereof ....... 11

        3.    The District Court Rejected The Antecedent Debt Defendants'
            Arguments ................................................................................................. 14

            (a)    Claims Against BLMIS Do Not Constitute Antecedent
                Debt .............................................................................................. 14

            (b)    Trustee's Method for Calculating Inter-Account Transfers
                Was Affirmed ............................................................................... 15

    G.    The Inter-Account Transfers and the Trustee's Treatment Thereof ................... 15

    H.    Inter-Account Transfer Objections ...................................................................... 16

ARGUMENT ......................................................................................................... 17

    A.    The Trustee Has Properly Valued Inter-Account Transfers in Accordance
        with the Net Equity Decision and the Antecedent Debt Decision ....................... 17

    B.    The Trustee's Methodology Comports with Applicable Statutes of
        Limitation ............................................................................................................. 20

    C.    The Burden is on the Customers  to Establish They Have Claims Against
        the BLMIS Estate ................................................................................................ 22

    CONCLUSION ...................................................................................................... 244

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Bayou Grp., LLC*,
  396 B.R. 810 (Bankr. S.D.N.Y. 2008), *aff'd in part, rev'd in part*, 439 B.R. at 284
  (S.D.N.Y. 2010). ................................................................................................................. 18

*In re Bayou Grp., LLC*,
  439 B.R. 284 (S.D.N.Y. 2010) .......................................................................................... 18

*In re Bernard L. Madoff Inv. Sec. LLC*,
  424 B.R. 120 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011) .......................... 8, 9

*In re Brentwood Securities, Inc.*,
  925 F.2d 325 (9th Cir. 1991) ............................................................................................ 22

*Butner v. U.S.*,
  440 U.S. 48 (1979) ............................................................................................................ 19

*Chicago Title Ins. Co. v. Eynard*,
  84 Misc. 2d 605, 377 N.Y.S.2d 895 (1st Dep't 1975) .......................................................... 19

*In re Klein, Maus & Shire, Inc.*,
  301 B.R. 408 (Bankr. S.D.N.Y. 2003) ................................................................................ 22

*Neshewat v. Salem*,
  365 F.Supp (S.D.N.Y. 2005) .............................................................................................. 19

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff
  Inv. Sec. LLC)*,
  132 S. Ct. 2712 (2012), 654 F.3d 229 (2d Cir. 2011), *reh'g and reh'g en banc den.*
  (2d Cir. Nov. 08, 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *cert. den.*, 133 S. Ct.
  25, 133 S. Ct. 24 (2012) ............................................................................... 1, 9, 10, 17

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff
  Inv. Sec. LLC)*,
  424 B.R. 122 (Bankr. S.D.N.Y. 2010) ................................................................................. 3

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  476 B.R. 715 (S.D.N.Y. 2012) ........................................................................................... 14

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  499 B.R. 416 (S.D.N.Y. 2013) ............................................................................... 2, 11, 17

*SIPC v. I.E.S. Mgmt. Grp.*,
  612 F. Supp. 1172 (D.N.J. 1985), *aff'd without opinion*, 791 F.2d 921 (3d Cir. 1986) .......... 22

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*SIPC v. Stratton Oakmont,*
229 B.R. 273 (Bankr. S.D.N.Y. 1999), *aff'd* sub nom., *Arford v. Miller*, 239 B.R. 698
(S.D.N.Y. 1999), *aff'd*, 210 F.3d 420 (2d Cir. 2000) ............................................22

*Stern v. Marshall,*
(564 U.S. __, 131 S.Ct. 2594 (2011)) ........................................................11

## STATUTES

11 U.S.C. § 546(c) ....................................................................21

11 U.S.C. § 548(a)(1) ................................................................20

11 U.S.C. § 548(a)(1)(A) .......................................................11, 13

11 U.S.C. § 548(a)(1)(A) .......................................................11, 17

11 U.S.C. § 548(c) ...........................................................*passim*

11 U.S.C. § 548(d)(2)(A) ..............................................................12

15 U.S.C. § 78aaa *et seq.* ...............................................................1

15 U.S.C. § 78eee(a)(4)(A) .............................................................3

15 U.S.C. § 78eee(a)(4)(B) .............................................................3

15 U.S.C. § 78eee(b)(3) .................................................................3

15 U.S.C. § 78eee(b)(4) .................................................................3

15 U.S.C. § 78fff-1(a) ..................................................................3

15 U.S.C. § 78fff-2(a)(3) ...............................................................4

15 U.S.C. § 78fff-2(b) ..................................................................5

15 U.S.C. § 78fff-2(c)(1)(B) ............................................................6

15 U.S.C. § 78fff(b) ....................................................................3

15 U.S.C. § 78fff–2(b) .................................................................8, 9

15 U.S.C. § 78fff–2(c)(1) ...............................................................6

15 U.S.C. § 78fff–2(c)(1)(B) ............................................................6

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

15 U.S.C. § 78*lll*(4) ....................................................................................................................6

15 U.S.C. § 78*lll*(11) ...........................................................................................................5, 6, 8

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*,[1] and the estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this memorandum of law in support of the Trustee's motion (the "Motion") seeking entry of an order affirming the application of the Net Investment Method, as defined herein, to transfers between BLMIS customer accounts.

## PRELIMINARY STATEMENT

As is now well-known, the Trustee determined net equity of customer claims under SIPA using the Net Investment Method, which was approved by this Court and affirmed by the Second Circuit. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 132 S. Ct. 2712 (2012), 654 F.3d 229 (2d Cir. 2011), *reh'g and reh'g en banc den.* (2d Cir. Nov. 08, 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *cert. den.*, 133 S. Ct. 25, 133 S. Ct. 24 (2012). Pursuant to the Net Investment Method, the Trustee credited customers for the total amount of cash deposited into a BLMIS account and subtracted any amounts withdrawn from that account.

While reviewing customer claims, the Trustee encountered thousands of instances in which BLMIS customers made inter-account transfers, meaning a transfer between BLMIS customer accounts in which no new funds entered or left BLMIS. In determining such customer claims, the Trustee allowed for each transfer to be effected to the extent there was sufficient principal in the account based on the Net Investment Method. In other words, the Trustee credited the transfer in an amount up to the available net balance in the transferor account at the time of the transfer, to the extent there was such a balance in the transferor's account. If the

---

[1] For convenience, subsequent references to sections of the act shall be denoted as " SIPA § __."

BLMIS transferor account did not have any principal at the time of the desired transfer, no credit was given to the transferee account because no real dollars existed to transfer.

The Trustee's approach has been affirmed by the District Court in the avoidance context in its decision regarding antecedent debt. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 499 B.R. 416, 428 (S.D.N.Y. 2013) (the "Antecedent Debt Decision"). As the District Court determined, this method is the only approach that is consistent with the Net Investment Method and treats customers equitably by not giving credit to transfers of fictitious profit which, in this Ponzi scheme, is someone else's money. There is no reason to apply a different standard in the claims context.

Over 400 objections were filed to the Trustee's claims determinations, arguing that the Trustee improperly adjusted amounts transferred between BLMIS accounts to reflect the amount of principal in the transferor account at the time of the transfer (the "Inter-Account Transfer Objections"). The Inter-Account Objections are comprised of both those BLMIS customers subject to an avoidance action as well as those that are not.

The Trustee filed a motion requesting that the Court set a briefing schedule and hearing date regarding the Inter-Account Transfer Objections. ECF No. 5728.[2] On March 27, 2014, the Court granted the motion and ordered that the Trustee file a motion to affirm these claims determinations, and an accompanying memorandum of law and supporting papers setting forth the factual and legal bases for the Trustee's denial of the Objecting Claimants' claims on or before March 31, 2014. ECF No. 6049. The Motion and this supporting memorandum follows, addressing the objections identified on Exhibit 1 to the Declaration of Bik Cheema dated March 31, 2014 (the "Cheema Decl.").

---

[2] This and all following ECF No. references refer to pleadings filed in the main bankruptcy proceeding pending before this Court, captioned *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, Adv. No. 08-01789 (SMB) (Bankr. S.D.N.Y.), unless otherwise noted.

## STATEMENT OF FACTS

**A.     Procedural Background - SIPA Proceeding and Appointment of Trustee[3]**

On December 11, 2008, Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced a proceeding against Madoff and BLMIS in the District Court for the Southern District of New York (the "District Court").  The SEC's complaint alleges that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by SIPC.  Thereafter, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS could not meet its obligations to securities customers as they came due, and its customers needed the protections afforded by SIPA.  Also on December 15, 2008, the District Court granted SIPC's application and entered an order pursuant to SIPA, which, *inter alia*:  (i) appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3); (ii) appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and (iii) removed the case to the Bankruptcy Court pursuant to SIPA § 78eee(b)(4).

Under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers that hold allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  Pursuant to SIPA §78fff-1(a), the Trustee has the general powers of a bankruptcy trustee, in addition to the powers granted by SIPA.  Pursuant to SIPA § 78fff(b), chapters 1, 3, 5 and subchapters I and II of

---

[3] Detailed descriptions of the procedural history of the Madoff Ponzi scheme have been set forth numerous times. *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 125-33 (Bankr. S.D.N.Y. 2010).  Only those facts relevant to this Motion are included herein.

chapter 7 of the Bankruptcy Code are applicable to this case, to the extent they are consistent with SIPA.

Madoff purported to be trading on behalf of his investment advisory clients. But he did not. At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an eleven-count criminal information filed against him by the United States Attorney for the Southern District of New York. On June 29, 2009, Madoff was sentenced to 150 years in prison for his crimes.

**B.** **The Claims Procedure Order and the Claims Process**

The Trustee sought and obtained a court order to implement a customer claims process in accordance with SIPA. Following an application by the Trustee dated December 21, 2008, the Bankruptcy Court entered the Claims Procedures Order. ECF No. 12. By the mandatory statutory bar date for filing claims under SIPA § 78fff-2(a)(3), the Trustee received more than 16,500 customer claims.

The Trustee began reviewing and determining claims. As required by the Claims Procedures Order and described in each determination letter sent by the Trustee, BLMIS claimants had thirty days from the date of a determination letter to object to the Trustee's determination of their claim. Claimants who disagree with the Trustee's determination of their claim were required to file with the Court a written opposition setting forth the grounds of disagreement and provide the Trustee with the same.

As noted above, the Trustee received more than 400 objections to claims determinations that raised issues related to the Trustee's methodology in valuing inter-account transfers for purposes of calculating an account's net equity. *See* Exhibits 1 and 2 to the Cheema Declaration. The Inter-Account Transfer Objections are summarized in Section H below.

C.    **The "Books and Records" Requirement**

In order to have claims satisfied by a SIPA trustee, obligations to customers "must be ascertainable from the books and records of the debtor or . . . otherwise established to the satisfaction of the trustee."  SIPA § 78fff-2(b).  Numerous customers have pointed to the last BLMIS customer statement reflecting fictitious equity as the only "books and records" relevant to their claims. While the BLMIS customer statements and confirmations received by customers are part of the Debtor's "books and records," the books and records of BLMIS are comprised of many more sources of information that reflect the cash transactions that occurred between BLMIS and its customers and that demonstrate that the securities transactions on the BLMIS customer statements did not occur.  Relevant books and records of BLMIS include bank records, annual reports, DTCC account information, other corporate documents, cash receipts records, cash disbursement records, and customer-related files such as account maintenance folders, portfolio management reports and portfolio management transaction reports.  The Trustee and his advisors have also reviewed account debits and credits as entered in the computer system used by BLMIS for the investment advisory customers known as the "AS/400" and compared these debits and credits with requests from customers for withdrawals or inter-account transfers, third party bank records, and other available sources from the books and records.

D.    **Net Equity Under SIPA**

Under  SIPA § 78*lll*(11), "net equity" is defined in relevant part as "the dollar amount of the account or accounts of a customer, to be determined by . . . (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); . . . minus (B) any indebtedness of such customer to the debtor on the filing date[.]" SIPA § 78lll(11).  Distributions of customer property are by statute

to be made to the customers "ratably . . . on the basis or to the extent of their respective net equities." SIPA § 78fff-2(c)(1)(B).

### E.    The Bankruptcy Court and The Second Circuit Affirmed Trustee's Method For Calculating Net Equity

#### 1.    Procedural History

Pursuant to the Claims Procedure Order, the Trustee began evaluating BLMIS's books and records to calculate customers' net equity in accordance with SIPA ("Net Equity") to determine their claims to customer property. SIPA differentiates between the funds of "customer property" and the "general estate." Only customers share in the fund of customer property. If customer property remains after satisfying all customer claims, remaining customer property can be distributed to those holding general unsecured claims against the general estate. SIPA § 78fff–2(c)(1). SIPA defines customer property as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor." SIPA § 78*lll*(4). Accordingly, those who invested with BLMIS "share ratably in such customer property on the basis and to the extent of their respective net equities." SIPA § 78fff–2(c)(1)(B).

The Trustee recognized that the facts of Madoff's Ponzi scheme – taking customers' money but failing to purchase securities with those funds – posed a unique challenge in determining how to calculate Net Equity. After significant consideration and evaluation, the Trustee determined each customer's Net Equity would be calculated on a cash in/cash out basis – crediting the total amount of cash deposited by the customer into her BLMIS account, and subtracting any amounts withdrawn from or otherwise transferred out of her account (the "Net Investment Method"). ECF No. 395, ¶ 9.

Certain customers disagreed with the Trustee's Net Investment Method, with some

arguing that Net Equity should be determined on the basis of each customer's fictitious balance as shown on the last account statement generated by BLMIS (the "Last Statement Method"). *See, e.g.,* ECF No. 771. According to those customers, the Last Statement Method would fulfill SIPA's goal of satisfying customers' expectations by restoring them to the positions they believed they were in as of the Filing Date. *See, e.g.,* ECF No. 771, p. 7. The Last Statement Method would allow customers to recoup not only principal they invested with BLMIS, but also the fictitious profits Madoff credited them when he fabricated customer statements.

### 2.    Trustee's Net Investment Method

On October 16, 2009, the Trustee filed a motion and supporting memorandum (collectively, the "Net Equity Motion") seeking entry of an order affirming the Trustee's Net Investment Method for calculating Net Equity and customers' claims. ECF Nos. 524, 525.[4] In the Net Equity Motion, the Trustee argued that calculating customers' Net Equity using the Last Statement Method would legitimize and perpetuate Madoff's fraud. ECF No. 525, p. 3. Because there may not be sufficient funds to reimburse all customers, every dollar paid to reimburse fictitious profits fabricated by Madoff is one less dollar that can be returned to customers who lost principal. ECF No. 525, p. 3. In sum, the Trustee reasoned, calculating Net Equity based only on customers' principal deposits and withdrawals put all customers on an equal footing. ECF No. 525, p. 3.

Under the Net Investment Method, customers fall within two broad categories:

> **(i)    Net Winners**: Customers who withdrew more funds from BLMIS than they deposited. These customers received a full return of their principal, as well as some "profit" fabricated by Madoff which was, in fact, other customers'

---

[4]The full name of the Net Equity Motion is the Trustee's Motion for an Order Upholding Trustee's Determination Denying Customer Claims' for Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections with Respect to the Determination Relating to Net Equity.

principal.  The Trustee has filed adversary proceedings against certain Net

Winners to avoid and recover these transfers of fictitious profits.

(ii)    **Net Losers**: Customers who withdrew less funds from BLMIS than they

deposited.  These customers did not receive a full return of their principal invested

with BLMIS and have a claim against the fund of customer property for the

difference.  They were eligible to receive funds advanced from SIPC in the

amount of their Net Equity up to SIPC's $500,000 maximum and may be eligible

to receive additional pro rata distributions of customer property recovered by the

Trustee. [5]

### 3.    The Bankruptcy Court Affirmed The Net Investment Method

After extensive briefing, which included more than 30 briefs and in excess of 20 *pro se*

submissions and oral argument, on March 1, 2010, the Bankruptcy Court entered an order

granting the Net Equity Motion.  *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 120, 125

(Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011) (the "Bankruptcy Court Net Equity

Decision").  In the Bankruptcy Court Net Equity Decision, the Court concluded that the Net

Investment Method complies with SIPA's statutory framework.  The Court reasoned that "the

definition of Net Equity under SIPA section 78*lll*(11) must be read in tandem with SIPA section

78fff–2(b), which requires the Trustee to discharge Net Equity claims only 'insofar as such

obligations are [1] ascertainable from the books and records of the debtor or [2] are otherwise

established to the satisfaction of the trustee.'"  *Id.* at 135 (*citing* SIPA § 78fff–2(b)).  BLMIS's

books and records showed that no equities were ever purchased; the only amounts shown in the

---

[5]There are also a number of customers that withdrew the same amount as they deposited.  The Trustee refers to these customers as "Net Zero Customers."  The Net Zero Customers would be included as Net Winners for these purposes because they have no principal left to recover and are not entitled to a distribution of customer property from the BLMIS estate.

books and records are cash deposits and withdrawals. *Id.* at 135. Accordingly, netting out

transfers based on these books and records satisfied SIPA. *Id.*

Not only did the Net Investment Method comply with the governing statutory regime, the

Court further determined that it satisfies concerns about equity and practicality. The Net

Investment Method is appropriate "because it relies solely on unmanipulated withdrawals and

deposits" which were directed by the customers themselves. *Id.* at 140. Additionally, there is a

limited amount of customer property available and distributing customer property among

customers who were innocent victims of Madoff's fraud is a zero-sum game. Thus, any dollar

paid to reimburse a fictitious profit to one customer is a dollar no longer available to pay a

customer on their principal losses. *Id.* at 140-41. The Bankruptcy Court explained that:

> Equality is achieved in this case by employing the Trustee's method, which looks
> solely to deposits and withdrawals that in reality occurred. To the extent possible,
> principal will be rightly returned to Net Losers rather than unjustly rewarded to
> Net Winners under the guise of profits. In this way, the Net Investment Method
> brings the greatest number of investors closest to their positions prior to Madoff's
> scheme in an effort to make them whole.

*Id.* at 142.

Multiple parties filed notices of appeal, and the Bankruptcy Court Net Equity Decision

was certified for direct appeal to the Second Circuit on June 16, 2010. ECF No. 2467.

### 4.    The Second Circuit Affirmed The Net Investment Method

On August 16, 2011, after extensive briefing and oral argument, the Second Circuit

affirmed the Bankruptcy Court Net Equity Decision. *In re Bernard L. Madoff Inv. Sec. LLC*, 654

F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (2012) (the "Second Circuit

Net Equity Decision"). The Second Circuit agreed that the Net Investment Method is more

consistent with the statutory definition of "net equity" than any other method advocated by any

of the parties or perceived by the Second Circuit. *Id.* at 235. Recognizing that Madoff fabricated

customer statements using after-the-fact information based on stock movements that had already taken place, the Second Circuit observed that relying on the Last Statement Method would permit those who had already withdrawn cash exceeding their principal to unfairly benefit at the expense of those who had not withdrawn all their principal before Madoff's scheme collapsed. *Id*. at 238.

The Second Circuit also noted that SIPA is designed to return customer property to customers, and as the money invested with Madoff was not used to purchase securities, those principal sums are the only customer property available to distribute to victims. *Id.* at 240. "Because the main purpose of determining 'net equity' is to achieve a fair allocation of the available resources among the customers, the Trustee properly rejected the Last Statement Method as it would have undermined this objective." *Id.* For these reasons, the Second Circuit concluded, the circumstances of Madoff's fraud rendered the Net Investment Method the proper means to calculate customer claims. *Id*. at 238.

Certain parties filed petitions for *certiorari* to the United States Supreme Court, which denied *certiorari* on June 25, 2012, establishing the Trustee's Net Investment Method as the proper means for calculating customers' Net Equity claims. *In re Bernard L. Madoff Inv. Sec. LLC*, 132 S. Ct. 2712 (2012), 654 F.3d 229 (2d Cir. 2011), *reh'g and reh'g en banc den.* (2d Cir. Nov. 08, 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *cert. den.*, 133 S. Ct. 25, 133 S. Ct. 24 (2012).

## F.    The District Court Decision Applying Net Equity to Inter-Account Transfers

After the Supreme Court denied *certiorari*, a number of customers sought another bite at the apple, but called the argument by a different name. In proceedings before District Court Judge Jed S. Rakoff, these customers argued that the Trustee could not seek to avoid and recover transfers they received from BLMIS in excess of their principal because those fictitious profits

were payments on behalf of the debts BLMIS owed to those claimants pursuant to Section 548(c)

of the Bankruptcy Code (the "Antecedent Debt Theory"). The same group of customers also

disputed the Trustee's method for accounting for transfers between BLMIS accounts. The

District Court denied the customers' motion to dismiss their respective adversary proceedings

based on these two theories, recognizing that they conflicted with the Second Circuit Net Equity

Decision.

### 1.    Procedural History

As is well-known, the Trustee filed hundreds of adversary proceedings to avoid transfers

made by BLMIS to Net Winners on the theory that, *inter alia*, any transfer in excess of principal

(i.e. fictitious profits) constitutes an actually fraudulent transfer pursuant to section 548(a)(1)(A)

of the Bankruptcy Code. To determine whether a customer is a Net Winner, the Trustee

employed the Net Investment Method, comparing the amount of principal invested to the amount

of funds withdrawn from the account, and filed complaints to avoid and recover transfers in

excess of principal made during § 548(a)(1)(A)'s two-year look-back period. *Sec. Investor Prot.

Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 499 B.R. 416, 426 (S.D.N.Y. 2013). After the

Supreme Court handed down its *Stern v. Marshall,* (564 U.S. __, 131 S.Ct. 2594 (2011))

decision in June 2011, certain of these defendants (the "Antecedent Debt Defendants") moved to

withdraw the reference seeking, among other relief, that the District Court determine whether

they could retain transfers of fictitious profits they received from BLMIS that might otherwise be

avoidable as actually fraudulent transfers. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv.

Sec. LLC,* 12-mc-115 (S.D.N.Y.), ECF No. 199, p. 2.

### 2.    The Antecedent Debt Theory and The Trustee's Rejection Thereof

Along with their motions to withdraw the reference, the Antecedent Debt Defendants

filed motions to dismiss the complaints filed against them, arguing that the Trustee could not

avoid transfers made to them by BLMIS because they had viable defenses under section 548(c) of the Bankruptcy Code. *Id.* at 3. Under this theory, the Antecedent Debt Defendants could retain the fictitious profits they received because "a transferee … of such a transfer . . . that takes for value and in good faith … may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor . . . ." 11 U.S.C. § 548(c). Because satisfaction of an antecedent debt constitutes "value" under Section 548(d)(2)(A), they argued, the Antecedent Debt Defendants gave value to BLMIS because those transfers of fictitious profits satisfied antecedent debt BLMIS owed to those customers; the antecedent debt arose by virtue of the liability from claims customers had against BLMIS for, *inter alia*, damages stemming from the fraud Madoff committed. *Id.*

The Trustee argued that the means for calculating a customer's Net Equity had already been established and the Second Circuit Net Equity Decision governs whether customers received fictitious profits that could be pursued as fraudulent transfers. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 12-mc-115 (S.D.N.Y.), ECF No. 252, p. 1-2. The Trustee further argued that case law provides that a customer cannot provide value in excess of her principal investment, damages or other theoretical and unliquidated claims did not constitute support for the Antecedent Debt Defendants' theory. *Id.* Additionally, even if any of the Antecedent Debt Defendants had a valid claim for damages, those damages would not be paid out of the fund of customer property but would be recoverable only from the general estate. *Id.* at 2.

Particularly relevant to this Motion, the Antecedent Debt Defendants also disputed the Trustee's method for calculating inter-account transfers. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Civ. No. 12-mc-115 (S.D.N.Y.), ECF No. 199. An inter-account transfer

12

is a transaction between BLMIS customer accounts in which no new funds entered or left BLMIS, but rather a book entry occurred at BLMIS to internally adjust the balances of those accounts after a customer directed the transfer be made. In other words, a customer requested an alienation of some or all of the fund in their account. Inter-account transfers from one BLMIS account to another consisted of: (a) all principal, (b) all fictitious profits, or (c) a combination of principal and fictitious profits. The Trustee calculated transfers by crediting the transferee up to the amount of principal available in the transferor's account on the date of the transfer. If the transferor attempted to transfer more than the principal available, those fictitious profits would not be credited to the transferee. *Id.* If, however, sufficient principal existed in the transferor's account to cover the amount of the transfer in question, the full amount was treated as "withdrawn" from the transferor's account and "deposited" into the transferee's account.

The Antecedent Debt Defendants argued that the entirety of the transfer (including fictitious profits) should be credited as principal and constitute value under Section 548(c) because, to the extent the transfer that included fictitious profits was made outside § 548(a)(1)(A)'s two-year look-back period, the Trustee would not be able to avoid and recover those fictitious profits. *Id*. at 36. The Antecedent Debt Defendants theorized that the result of an inter-account transfer should not be treated differently than if the transferor had withdrawn funds from its BLMIS account and given that cash to the transferee who deposited the cash in her BLMIS account; in that case, the transferee's account would receive the full amount of the transfer (including the fictitious profits). *Id*. at 38-39. They argued that the Trustee's method for accounting for inter-account transfers "is nothing more than an attempt to ignore the Reach-Back Period." *Id.* at 38.

The Trustee argued that crediting the transferee with the full amount of the transfer would

13

violate the Net Investment Method.  *Id*. at 34.  Using the Antecedent Debt Defendants' theory would result in there being "absolutely no way to differentiate principal from fictitious profits." *Id*. at 36.  Employing this method would be akin to turning fictitious profits into real dollars "accomplished by means of a fraudster's book entries."  *Id*. at 34.  Therefore, only actual principal could be transferred between BLMIS accounts.  *Id*.

### 3.    The District Court Rejected The Antecedent Debt Defendants' Arguments

In an order entered October 15, 2013, the District Court denied the Antecedent Debt Defendants' motion, holding (1) any claims they may have had against BLMIS at the time of the transfers do not constitute antecedent debt for which they gave value by reducing the amount of those claims and (2) the Trustee's method for accounting for inter-account transfers was proper.

#### (a)    Claims Against BLMIS Do Not Constitute Antecedent Debt

In evaluating the Antecedent Debt Theory, the District Court rejected the proposition that claims for damages by the Antecedent Debt Defendants could constitute "value." *Antecedent Debt Decision*, 499 B.R. 416, 428 (S.D.N.Y. 2013).  Judge Rakoff noted that "even [in non-SIPA cases] where courts have recognized claims against the bankruptcy estate to the extent of principal invested, they have nonetheless rejected claims for interest in excess of principal." *Id*. at 422.  Judge Rakoff observed that the theory conflicts with an earlier District Court decision holding that "[t]o allow defendants, who have no net equity claims, to retain profits paid out of customer property on the ground that their withdrawals satisfied creditor claims under state law would conflict with the priority system established under SIPA by equating net equity and general creditor claims." *Id*. (*quoting Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 727-28 (S.D.N.Y. 2012), supplemented (May 15, 2012)).  Similarly, the Antecedent Debt Defendants' "damages claims are not net-equity claims (or any other payments that are committed to be made in SIPA's priority scheme), [and] allowing such claims to be

14

drawn out of the customer property estate would violate SIPA. It is for this reason that only a defendant's investment of principal may count as 'value' with respect to the customer property estate for purposes of section 548(c)." Id. at 424. Accordingly, the Antecedent Debt Theory was rejected. *Id*. at 424-25.

(b)    Trustee's Method for Calculating Inter-Account Transfers Was Affirmed

The District Court also rejected the theory that inter-account transfers, including those that included fictitious profits and occurred before the two-year look-back period, should be treated as principal. *Id*. at 428. The Court reasoned that the fact that transfers were made between accounts could not transform profits into principal. *Id*. at 428-29. "In other words, no new value was created by moving these funds between different accounts," and thus cannot constitute principal or "value" under section 548(c). *Id*. at 429.

Further, the District Court noted that there is no time limit on what constitutes "value," accordingly an inter-account transfer of fictitious profits does not become principal or a prepayment of an antecedent debt owed by BLMIS simply because it occurred before the two-year look back period. *Id*. For these reasons, the District Court affirmed the Trustee's method for accounting for inter-account transfers. *Id*. at 428-29.

Once the Antecedent Debt Decision was entered, the Trustee began reviewing objections to claims determinations and identifying those raising inter-account transfer issues and filed the instant Motion.

## G.    **The Inter-Account Transfers and the Trustee's Treatment Thereof**

The Trustee has identified transfers between accounts and applied a cash-in, cash-out analysis to the inter-account transfers. The Trustee and his professionals have examined the books and records of the Debtor with respect to each account. By combining an analysis of the cash flowing into and out of each account with a review of the debits and credits as entered in the

15

AS/400, the computer system used to conduct the investment advisory business, the Trustee is able to accurately determine the amount of the inter-account transfers.

By way of example of the Trustee's method, if Customer A had a BLMIS-generated statement balance of $10 million, consisting of $6 million in principal and $4 million in fictitious profits, and attempted to make an inter-account transfer of $8 million to Customer B, Customer B's account would reflect a deposit of only $6 million – the total principal in Customer A's account.  The additional $2 million in fictitious profits would not be credited to Customer B, nor would it reduce the calculation of Customer B's Net Equity.[6]

## H.    **Inter-Account Transfer Objections**

As stated above, the Trustee received in excess of 400 Inter-Account Transfer Objections filed by avoidance action defendants and other customers (the "Objectors") relating to almost 600 claims.  The claimants that filed Inter-Account Transfer Objections and had inter-account transfers adjusted by the Trustee in accordance with the Net Investment Method are identified on Exhibit 1 to the Cheema Declaration.  Exhibit 2 to the Cheema Declaration contains a list of claimants that filed an Inter-Account Transfer Objection but either (i) there were no inter-account transfers associated with the claimants' accounts, or (ii) the claimants inter-account transfers were not adjusted by the Trustee because sufficient principal existed in the transferor account to complete the transfer as requested.  Since those claimants are not impacted by these proceedings, regardless of how the Court rules on the issue, the Trustee submits that their Inter-Account Transfer Objections should be overruled.

---

[6]A small number of accounts relevant to this Motion received transfers from predecessor account wherein customer funds were commingled.  In those cases, the Trustee allocated the amount pro rata among the affected accounts.

The Inter-Account Transfer Objections raise the following legal issues:[7]

- Inter-account transfers should not be considered "withdrawals" from a BLMIS account.

- Customers should be credited with the amounts that they requested be transferred, i.e., inter-account transfers should include fictitious profits.

- The Trustee cannot include inter-account transfers occurring prior to the two-year look-back period prescribed by Section 548(a)(1)(A) of the Bankruptcy Code in the calculation of Net Equity.

- The Trustee's adjustments to the amounts purportedly transferred were made without sufficient explanation.

For all the reasons described below these arguments are inconsistent with the Second Circuit Net Equity Decision and the Antecedent Debt Decision. As such, this Court should affirm the Trustee's methodology with respect to inter-account transfers.

## ARGUMENT

### A. The Trustee Has Properly Valued Inter-Account Transfers in Accordance with the Second Circuit Net Equity Decision and the Antecedent Debt Decision

Subsequent to the filing of the Inter-Account Transfer Objections, the Bankruptcy Court and the Second Circuit determined that Net Investment Method was the correct methodology for calculating customer claims. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229. The District Court also upheld this methodology in connection with consideration of the amount of antecedent debt a defendant may use to offset potential avoidance liability, specifically addressing the Inter-Account Transfer Issue. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 499 B.R. 416. There is no reason to differentiate between the avoidance context and the claims context on this issue – the same account transfers are implicated.

---

[7]To the extent the Inter-Account Objections raised fact-specific issues, they will be addressed individually by the Trustee following resolution of the legal issue addressed herein. *See* Scheduling Order dated March 27, 2014, p.4. ECF No. 6049.

The Trustee's treatment of inter-account transfers is the only method consistent with the Second Circuit Net Equity Decision and the Antecedent Debt Decision.  The Trustee has credited the transfer to the relevant transferee up to the amount of principal available in the transferor's account on the day of the transfer.  In short, the Trustee has treated an account transfer as the equivalent of an account withdrawal.  Any other methodology would give transferees the benefit of fictitious profits.

The District Court has specifically approved this method of valuing inter-account transfers.  In the Antecedent Debt Decision, the District Court explained that it was appropriate to look through form to substance to determine the true nature of a transaction:

> the true substance of transfers of fictitious profits from one account to another remains the same: The funds at issue are still other people's money, and shifting them among accounts, whether those accounts are owned by the same person or entity or, for example, transfers among family members, does not morph those funds into actual new principal.

*Antecedent Debt Decision*, 499 B.R. at 428-29.  "In other words, no new value was created by moving these funds between different accounts." *Id.* at 429.

As the District Court noted, this was the same result reached in an analogous Ponzi scheme case, *In re Bayou Grp., LLC*, 439 B.R. 284 (S.D.N.Y. 2010), in which the defendants had sought to have their "fraudulent-conveyance liability calculated not on the basis of their original principal investments but rather the amount they rolled over into new accounts when the original Bayou Fund split into four successor funds."  *Antecedent Debt Decision*, 499 B.R. at 429.  An earlier decision from the bankruptcy court overseeing *Bayou* dismissed that suggestion, stating that "in no event is it appropriate to pile fiction on fiction by deeming these investors' final Bayou Fund account statements, including fictitious profits, to be the value of their investments contributed to the Bayou hedge funds." *In re Bayou Grp., LLC*, 396 B.R. 810, 885 (Bankr. S.D.N.Y. 2008), *aff'd in part, rev'd in part*, 439 B.R. at 284 (S.D.N.Y. 2010).

Certain Objectors also argued that inter-account transfers could conceivably be treated as a hypothetical withdrawal and re-investment. But the District Court held that the Trustee's approach, treating each pre-reach-back-period inter-account transfer of fictitious profit as what it was, "a transfer of funds that never belonged to the sender or the recipient," better reflected the reality of the transfers and treated investors "as equitably as possible. *Antecedent Debt Decision*, 499 B.R. at 429. The holding of the District Court should apply with equal force in the claims context because calculating claims and avoidance liability are opposite sides of the same coin. *Id.* at 420.

Application of the Net Investment Method is also the appropriate methodology to determine the amount of the transfer under New York law. *See Butner v. U.S.*, 440 U.S. 48 (1979) (rights created by state law will be honored unless a specific bankruptcy provision or policy requires differently). It is well-settled that a transferee can only receive funds to the extent of the transferor's interest in those funds. *See Neshewat v. Salem*, 365 F.Supp. 2d 508, 524 (S.D.N.Y. 2005), *aff'd*, 194 F. App'x 24 (2d Cir. 2006), *citing Chicago Title Ins. Co. v. Eynard*, 84 Misc. 2d 605, 606, 377 N.Y.S.2d 895 (App. Term 1975) (noting that the grantee received only such title as the grantor had in the property). Thus, transferee accounts cannot be credited with fictitious profits.

Certain Objectors also argued that the Trustee's treatment of inter-account transfers constituted an exercise of avoidance powers against non-parties to avoidance actions. That is not the case. The Trustee is simply using the Net Investment Method to calculate the net equity for the accounts of those individuals and entities that were BLMIS customers. Finally, the Trustee is not, as certain Objectors assert, treating them as subsequent transferees without providing them with related defenses available under the Bankruptcy Code. Because the funds at issue never left

19

BLMIS, the transferee is not a subsequent transferee under the relevant provisions of the Bankruptcy Code.

Providing credit for fictitious profits Objectors seek would have a significant impact on the estate because it would skew the principal balance calculation for all BLMIS accounts, thus reducing customer property available for distribution. Calculating claims in a Ponzi scheme case where there are insufficient recoveries to pay all of the defrauded creditors is a zero sum game. Allowing credit for fictitious profits – other people's money – on inter-account transfers simply reduces the principal that is available for customers who invested more than they withdrew. It is no different than allowing customers to retain fictitious profits that they withdrew from BLMIS.

In sum, the Trustee has merely adjusted the transfers out of the transferor account to reflect the amount of principal actually available in the account, in the same manner that account withdrawals are adjusted. The Trustee's valuation of account transfers complies with the law of this case and is the only possible application of the Second Circuit Net Equity Decision and the Antecedent Debt Decision to such transfers that does so.

**B.      The Trustee's Methodology Comports with Applicable Statutes of Limitation**

Contrary to the argument raised in certain of the Inter-Account Transfer Objections, it is entirely appropriate for the Trustee to include transfers which occurred more than two years prior to the filing date in his net equity calculations, and this approach has been specifically affirmed by the District Court.

In the Antecedent Debt Decision, the District Court held that the Antecedent Debt Defendants mischaracterized the impact of the Net Investment Method. The District Court rejected the Antecedent Debt Defendants' argument that the Trustee's approach improperly circumvented the statutory reach-back period to recover time-barred withdrawals by applying deposits made during the reach back period against withdrawals made beyond the reach back

period.  Instead, the District Court found that while section 548(a)(1) allows the Trustee to avoid

only those transfers made in the two years before the filing date, there is no similar limitation in

section 548(c) with respect to whether a transfer is given for value.  *Antecedent Debt Decision*,

499 B.R. at 427.  The District Court noted that the concept of harm to the estate is separate from

the concept of reach-back periods, which exist only to provide finality to transactions.  *Id.*  The

District Court also observed that when calculating net equity claims, defendants were given

credit for principal invested before the reach-back period and not withdrawn.

> The District Court applied this holding to the account transfer context holding that:
>
> because there is no time limit on what becomes "value" for purposes of section
> 546(c) [sic], an inter-account transfer of fictitious profits does not become
> principal just because it occurred prior to the reach-back period.  To the extent no
> actual principal was transferred, the inter-account transfer could provide no value
> to Madoff Securities.

*Id*. at 429.

The same holds true here.  It would be inconsistent with the Second Circuit Net Equity

Decision and the Antecedent Debt Decision to fail to take into account all transfers in and out of

a BLMIS account because as the District Court stated, there is no statute of limitation on the

determination of net equity.  Moreover, there is no way to distinguish between principal and

fictitious profits unless the entire account history is reviewed to determine when a particular

customer's withdrawals exceeded the amount of principal they invested.

Finally, while it is true that, instead of initiating a transfer, customers could have

withdrawn the money from their accounts, the fact is they did not.  Thus, the appropriate method

for calculating the amount of the transfer is the Net Investment Method.  Any other methodology

would legitimize Madoff's fraud and result in the transferee's receipt of other people's money.

Indeed, the Second Circuit stated in its Net Equity Decision that "As the Bankruptcy Court

observed, '[a]ny dollar paid to reimburse a fictitious profit is a dollar no longer available to pay

claims for money actually invested . . . [and] . . . those claimants who have withdrawn funds from their BLMIS account that exceed their initial investments would receive more favorable treatment by profiting from the principal investments of [those claimants who have withdrawn less money than they deposited], yielding an inequitable result." *Second Circuit Net Equity Decision*, 654 F.3d at 235. Indeed, were the Trustee to give credit to transferees for fictitious profit, the whim of the defrauder would control the process that is supposed to unwind the fraud. *Id.*

## C.    The Burden is on the Customers to Establish They Have Claims Against the BLMIS Estate

Certain Objectors argue that Trustee has failed to provide them with sufficient explanation for his treatment of inter-account transfers and that he has failed to meet his burden in overcoming the facial validity of their claim, citing to Bankruptcy Code provisions on claim allowance. But this is a SIPA proceeding. Because "customer" status is a preferred one that gives customers priority over other creditors in the distribution of customer property, a claimant seeking "customer" protection under SIPA has the burden of proving both her status as a "customer" and what she is owed. *See SIPC v. I.E.S. Mgmt. Grp.*, 612 F. Supp. 1172, 1177 (D.N.J. 1985), *aff'd without opinion*, 791 F.2d 921 (3d Cir. 1986).

"SIPA clearly places the burden of proof to establish customer status on the claimant by requiring that a debtor's obligations to its customers be "ascertainable from the books and records of the debtor" or "otherwise established to the satisfaction of the trustee." *See, e.g.*, *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003); *see also In re Brentwood Securities, Inc.*, 925 F.2d 325, 328 (9th Cir. 1991) (claimants have burden of proving that they are customers by establishing that they entrusted cash or securities to the broker); *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999), *aff'd sub nom.*

*Arford v. Miller*, 239 B.R. 698 (S.D.N.Y. 1999), *aff'd sub nom. In re Stratton Oakmont*, 210 F.3d 420 (2d Cir. 2000).   The Trustee has, as discussed above, reviewed the books and records of BLMIS and on that basis has determined customer claims in accordance with SIPA.   Should customers disagree with his determination, SIPA requires the customer satisfy the Trustee of the existence of a viable claim against the estate.

Objectors' argument that the table attached to each determination letter does not reflect the fact that transfers occurred fails for all the reasons set out above.   The Trustee has applied the Net Investment Method to each of the affected accounts, and the table, which identifies deposits, withdrawals and transfers in and out of each account, provide ample information to customers regarding the calculation of their particular claims regarding their particular accounts.

## CONCLUSION

For all of the foregoing reasons, the Trustee respectfully requests the Court affirm the Trustee's application of the Net Investment Method to inter-account transfers and overrule the Inter-Account Transfer Objections in this regard.

Dated:  New York, New York
March 31, 2014

Respectfully submitted,

*/s/ David J. Sheehan*
David J. Sheehan
Email:dsheehan@bakerlaw.com
Jorian L. Rose
Email:jrose@bakerlaw.com
Nicolas J. Cremona
Email: ncremona@bakerlaw.com
Amy E. Vanderwal
Email:avanderwal@bakerlaw.com
Seanna R. Brown
Email:sbrown@bakerlaw.com
Bik Cheema
Email:bcheema@bakerlaw.com

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and estate of Bernard L.
Madoff*