**Hearing Date: May 20, 2014 at 10:00 a.m. (ET)**

**LOWENSTEIN SANDLER LLP**
Bruce Buechler, Esq.
Nicole Stefanelli, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
        -and-
1251 Avenue of the Americas, 18th Floor
New York, NY  10020
Tel: (212) 262-6700
Fax: (212) 262-7402

*Attorneys for the Irrevocable Charitable Remainder Trust of*
*Yale Fishman and the Glenn Akiva Fishman Charitable Remainder Unitrust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>            Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>            Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>            Debtor. | |

**REPLY IN FURTHER SUPPORT OF THE MOTION OF
THE IRREVOCABLE CHARITABLE REMAINDER TRUST OF
YALE FISHMAN AND THE GLENN AKIVA FISHMAN CHARITABLE
REMAINDER UNITRUST FOR (I) A HEARING TO DETERMINE
ALLOWANCE OF CLAIMS AND (II)  ENTRY OF AN ORDER ALLOWING
THE TRUST CLAIMANTS' CLAIMS AND GRANTING RELATED RELIEF**

The Irrevocable Charitable Remainder Trust of Yale Fishman (the "Yale Trust") and the Glenn Akiva Fishman Charitable Remainder Unitrust (the "Glenn Trust," and together with the Yale Trust, the "Trust Claimants"), by and through their undersigned attorneys, hereby submit this reply (the "Reply") in further support of their motion [Docket No. 5645] (the "Motion")[1] for (i) a hearing to determine the allowance of the Claims (defined below) filed by the Trust Claimants and (ii) the entry of an order allowing the Claims and granting related relief and respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      As is now well known, Madoff bankrolled his lavish lifestyle with the investments of his victims.  Despite what was recorded on the paper statements provided by BLMIS to its customers, no cash deposited by any of the customers was ever invested.  Thus, none of the cash deposited by the Trust Claimants was ever deposited into the respective Trust Accounts at BLMIS.  Likewise, no securities were ever purchased by BLMIS for the Trust Claimants at any point in time.  Because no cash was deposited into either of the Trust Accounts at BLMIS at any time, and no securities were ever purchased for the Trust Claimants, no transfers from the Trust Accounts at BLMIS to the Transferee Account at BLMIS ever occurred or could have occurred.[2]  Like all entries on the BLMIS account statements, the alleged transfers to the Transferee Account were "fictitious."  Accordingly, regardless of whether the Trust Claimants intended to transfer the balances of their respective accounts to the Transferee Account, such transfers never occurred and cannot be considered "cash withdrawals" for the purposes of calculating "net equity."  There was never anything in the Trust Accounts to transfer. An intention to cause an act to happen cannot trump reality.

---

[1]      Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

[2]      As set forth in the Motion, the Transferee Account was owned by Judaic Heritage Foundation, Inc.  *See* Motion at ¶ 12.

2.      In asserting that these fictitious transfers to the Transferee Account should reduce the Trust Claimants' Claims, the Trustee is merely perpetuating Madoff's Ponzi scheme.  The Trustee's denial of both the Trust Claimants' Claims cannot be upheld due to the simple incontrovertible fact that the purported transfers from the Trust Accounts to the Transferee Account never occurred.  As set forth in more detail in the Motion and below, both of the Trust Claimants are "net losers," not creditors with a zero balance and, therefore, the Trustee should be directed to allow and pay their respective claims.

3.      Moreover, the Trustee's and SIPC's attempts to characterize the Trust Claimants' Claims as "double dipping" is baseless.  The Judaic Heritage Foundation, Inc. ("JHF") is a separate legal entity from the Trust Claimants and, as discussed further herein, the Trust Claimants had no obligation whatsoever to donate any funds to JHF.  The Trust Claimants could not possibly be "double dipping" as they withdrew far less than their respective initial $2 million deposits (approximately $515,000 each) and have received no recovery on account of those losses.  The Trustee is treating the Trust Claimants and JHF as if they are the same party, which is simply not the case.  Furthermore, the Trustee was asked by this Court whether JHF is a necessary party to the Motion and the Trustee responded that JHF is not necessary to this dispute.  *See* Transcript of Hearing re: Conference Re: Inter Account Transfer at 10:16-11:4 (Feb. 20, 2014), a copy of which is attached hereto as Exhibit A.

## STATEMENT OF FACTS

### A.      The Structure and Organization of BLMIS

4.      This Court has made the following findings regarding the structure and organization of BLMIS:

> Bernard L. Madoff Investment Securities LLC ("BLMIS") is a New York limited liability company founded by Bernard L. Madoff ("Madoff") as a sole proprietorship in 1960.  BLMIS was wholly-owned by Madoff, who was also its chairman and chief executive officer.  Together with family members and a number of additional employees, Madoff operated the company from its principal place of business at 885 Third Avenue, New York, New York.  On January 19, 1960, BLMIS registered with the

> SEC as a broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. section 78o(b), and, beginning in 2006, as an investment advisor.  By virtue of its registration as a broker-dealer, BLMIS is a member of the Securities Investor Protection Corporation (SIPC). . . .
>
> Outwardly, BLMIS functioned both as an investment advisor to its customers and a custodian of their securities.  Based on the Trustee's investigation, it appears that BLMIS began to offer investment advisory services as early as the 1960s, yet never truly acted as a legitimate investment advisor to its customers.

*In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 126-27 (Bankr. S.D.N.Y. 2010), *aff'd, In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011), *reh'g and reh'g en banc den.* (2d Cir. Nov. 8, 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *cert. den.*, 2012 WL 396489, 2012 WL 425188 (June 25, 2012).

## B.    The Mechanics of the Ponzi Scheme

5.    This Court has made the following findings regarding the mechanics of the Ponzi scheme perpetrated by Madoff:

> Rather than engage in legitimate trading activity, Madoff used customer funds to support operations and fulfill other investors' requests for distributions of profits to perpetuate his Ponzi scheme.  Thus, any payment of "profit" to a BLMIS customer came from another BLMIS customer's initial investment.  Even if a BLMIS customer could afford the initial fake purchase of securities reported on his customer statement, without additional customer deposits, any later "purchases" could be afforded only by virtue of recorded fictional profits.  Given that in Madoff's fictional world no trades were actually executed, customer funds were never exposed to the uncertainties of price fluctuation, and account statements bore no relation to the United States securities market at any time. . . .

*Id.* at 128 (footnote omitted).

> Although customer account statements reflected trading activity, [customer] funds were merely deposited into a bank account at J.P. Morgan Chase Manhattan Bank ("Chase Bank"), Account Number 140081703 (the "703 Account"), and never invested.

*Id.* at 129.  Thus, no funds were ever deposited into an account holder's account.

> As Madoff admitted at his plea hearing, none of the purported purchases of securities actually occurred, and the reported gains were entirely fictitious. This has been confirmed by the Trustee's investigation, which reveals that with the exception of isolated individual trades, there is no record of BLMIS having cleared any purchase or sale of securities in the Depository Trust & Clearing Corporation (the "DTCC"), a custodian for most stock and government debt securities issued in the United States. *See id.* Instead, investors' funds were principally deposited into the 703 Account, which was little more than a "slush fund." Money was misappropriated from the 703 Account solely to enrich Madoff and his inner circle.

*Id.* (footnote omitted).

> Business employees prepared daily reports for Madoff reflecting all 703 Account deposit and withdrawal activity. At the close of each business day, any net cash balances from this account were transferred to affiliated overnight investment accounts at Chase Bank to buy United States Treasuries or other short term paper until necessary to fund customers' withdrawal requests, BLMIS's capital obligations, or Madoff's personal wishes. At all relevant times, the fabricated amounts recorded on the monthly customer statements far exceeded the capital deposited in the 703 Account.

*Id.*

> Customer funds were never actually invested "in the market" or "out of the market" despite customer requests or statements. In reality, funds were maintained in the 703 Account at Chase Bank.

*Id.* at 130. Thus, no securities or cash were ever in the Trust Claimants' individual accounts at BLMIS.

## C.    The SIPA Proceeding

6.    On December 11, 2008, Madoff was arrested and charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. 240.10b-5. That same day, the Securities and Exchange Commission filed a civil action alleging that Madoff and BLMIS were operating a Ponzi scheme through BLMIS's investment advisor activities. 424 B.R. at 125-26. On December 15, 2008, the above-captioned liquidation was commenced pursuant to Securities Investor Protection Act, 15 U.S.C. § 78aaa, *et seq.* ("SIPA")

and the Trustee was appointed for the substantively consolidated liquidation of BLMIS and Madoff. *Id.* at 126.

**D.     The Claim of the Yale Trust**

7.      The Yale Trust was formed pursuant to a written agreement.

8.      On August 18, 1998, the Yale Trust opened an account with BLMIS, Account No. 1CM543 (the "Yale Account").

9.      In accordance with the Claims Procedure Order, on or about February 12, 2009, the Yale Trust timely filed a claim, Claim No. 004568, in the amount of $1,502,029.40 (the "Yale Claim").  A copy of the Yale Claim is attached to the Motion as Exhibit A.

10.     On April 27, 2010, the Trustee sent a Notice of Trustee's Determination of Claim to the Yale Trust stating that the Yale Claim is denied (the "Yale Determination Letter").  A copy of the Yale Determination Letter is attached to the Motion as Exhibit B.

11.     Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Yale Determination Letter, between August 24, 1998 and December 11, 2000, $2,000,000.00 in cash was deposited into the Yale Account.  *See* Yale Determination Letter at 4.

12.     Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Yale Determination Letter, between April 14, 1999 and July 21, 2004, the Yale Trust withdrew a total of $515,778.87 in cash by checks.  *See* Yale Determination Letter at 4.

13.     No other cash withdrawals were made from the Yale Account.

14.     No securities were ever purchased by BLMIS for the benefit of the Yale Account and no cash was ever deposited by BLMIS into the Yale Account.

15.     Between September 29, 2004 and January 31, 2005, the Yale Trust attempted to transfer the then balance in the Yale Account of $3,352,581.72 to the BLMIS account of JHF, an independent public charity, which owned BLMIS Account No. CM56830 (the "Transferee Account").

16.      No actual funds or securities were transferred from the Yale Account to the Transferee Account.

17.      In accordance with the Claims Procedure Order, the Yale Trust timely filed an *Objection to the Trustee's Determination of Claim* on May 25, 2010 [Docket No. 2337].

**E.      The Claim of the Glenn Trust**

18.      The Glenn Trust was formed pursuant to a written agreement.

19.      On December 8, 1998, the Glenn Trust opened an account with BLMIS, Account No. 1CM552 (the "Glenn Account" and together with the Yale Account, the "Trust Accounts").

20.      In accordance with the Claims Procedure Order, on or about June 20, 2009, the Glenn Trust timely filed a claim, Claim No. 011058, in the amount of $1,488,494.00 (the "Glenn Claim").  A copy of the Glenn Claim is attached to the Motion as Exhibit C.

21.      On April 27, 2010, the Trustee sent a Notice of Trustee's Determination of Claim to the Glenn Trust stating that the Glenn Claim is denied (the "Glenn Determination Letter").  A copy of the Glenn Determination Letter is attached to the Motion as Exhibit D.

22.      Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Glenn Determination Letter, between December 15, 1998 and December 29, 2000, $2,000,000.00 in cash was deposited into the Glenn Account.  *See* Glenn Determination Letter at 4.

23.      Pursuant to the Trustee's analysis, as set forth in Table 1 annexed to the Glenn Determination Letter, between April 14, 1999 and July 21, 2004, the Glenn Trust withdrew a total of $513,410.00 in cash by checks.  *See* Glenn Determination Letter at 4.

24.      No other cash withdrawals were made from the Glenn Account.

25.      No securities were ever purchased by BLMIS for the benefit of the Glenn Account and no cash was ever deposited by BLMIS into the Glenn Account.

26.      Between September 29, 2004 and January 31, 2005, the Glenn Trust attempted to transfer the then balance in the Glenn Account of $3,200,746.41 to the Transferee Account at BLMIS.

27.     No actual funds or securities were transferred from the Glenn Account to the Transferee Account.

28.     In accordance with the Claims Procedure Order, the Glenn Trust timely filed an *Objection to the Trustee's Determination of Claim* on May 25, 2010 [Docket No. 2341].

**F.    The Instant Motion**

29.     On February 7, 2014, the Trust Claimants filed the Motion.  A status conference on the Motion was held before the Court on February 20, 2014.

30.     On March 31, 2014, the Securities Investor Protection Corporation ("SIPC") filed a memorandum of law in opposition to the Motion [Docket No. 6080] (the "SIPC Objection") to the Motion.

31.     On March 31, 2014, the Trustee filed a memorandum of law in opposition to the Motion [Docket No. 6081] (the "Trustee's Objection" and together with the SIPC Objection, the "Objections"), along with the Declaration of Vineet Sehgal in support of the Trustee's Objection [Docket No. 6082] (the "Sehgal Declaration").

**REPLY**

32.     The mechanics of the Ponzi scheme perpetrated by Madoff are well documented. Madoff never engaged in any legitimate trading activity.  Rather, Madoff used the investments of his customers to support operations and fulfill other investors' requests for distributions of profits.  Although customer account statements reflected trading activity, customer funds were merely deposited into the 703 Account and never invested or deposited into a customer's individual account at BLMIS.  As with all of Madoff's victims, no cash deposited by the Trust Claimants was ever deposited into the respective Trust Accounts.  Likewise, no securities were purchased by BLMIS for the Trust Accounts.  Rather, the cash that was tendered by the Trust Claimants was actually deposited into the 703 Account, which was nothing more than a "slush fund" for Madoff and his inner circle.  424 B.R. at 129.

33.     The fact that no cash was ever deposited into the Trust Accounts is evident when looking at the account statements provided by BLMIS to the Trust Claimants.   As set forth in the account statements Yale Trust, copies of which are attached as Exhibit 30 to the Sehgal Declaration, the entire balance of the BLMIS account owned by the Yale Trust is comprised of securities, treasury bills and money market investments, including investments in the Fidelity Spartan U.S. Treasury Money Market Fund.[3]  Likewise, as set forth in the account statements for the Glenn Trust, copies of which are attached as Exhibit 31 to the Sehgal Declaration, the entire balance of the BLMIS account owned by the Glenn Trust is comprised of securities, treasury bills and money market investments, including investments in the Fidelity Spartan U.S. Treasury Money Market Fund.  Not a single line item in any of the account statement provided by BLMIS references cash in the account.  This Court has already found that "[a]s Madoff admitted at his plea hearing, none of the purported purchases of securities actually occurred," "there is no record of BLMIS having cleared any purchase or sale of securities in the [DTCC]" and "investors' funds were principally deposited into the 703 Account, which was little more than a 'slush fund.'"  424 B.R. at 129.  Not surprisingly, the account statements for JHF, copies of which are attached as Exhibit 32 to the Sehgal Declaration reflect that no cash ever existed in the Transferee Account.   At all times, the balance in the JHF Account was comprised entirely securities, treasury bills and money market investments, including investments in the Fidelity Spartan U.S. Treasury Money Market Fund.

34.     Because no cash was deposited into either of the Trust Accounts at any time, no transfers to the Transferee Account ever occurred or could have occurred.  Despite the myriad exhibits attached to the Sehgal Declaration, the Trustee has provided no evidence that any cash existed in the Trust Accounts that was actually transferred ("cash out") from the Trust Accounts to the Transferee Account on the dates set forth on the account statements for the Trust Claimants, which account statements this Court has previously determined "are entirely

---

[3]     Like securities, the money market accounts (in particular the Fidelity Spartan U.S. Treasury Money Market Fund) were illegitimate, as recognized by this Court.  424 B.R. at 130.

fictitious." 424 B.R. at 135.  Any transfers from the Trust Account to the Transferee Account noted on the account statements were nothing more than (fictitious) paper entries.  As discussed at length in the Motion, this Court (as affirmed by the Second Circuit Court of Appeals) has made it clear that net equity is to be calculated by crediting the amount of *actual cash deposited* by the customer into his BLMIS account, minus any *actual cash withdrawn or transferred* "that in reality occurred." *Id* at 141.  Thus, the alleged transfers to the Transferee Account cannot be considered "cash withdrawals" for the purposes of calculating "net equity."

35.    The Trustee argues that the Trust Claimants' intentions to transfer all of the funds in the Trust Accounts were "indisputably clear."  Trustee's Objection at 20.  The Trust Claimants do not dispute that they ***intended*** to transfer the funds in each of the Trust Accounts to JHF.  In fact, the Trust Claimants have stated in numerous pleadings filed with this Court that they attempted to transfer the balances in the respective Trust Accounts to JHF.  *See* Motion at ¶ 12, 24; *Objection to Trustee's Motion for an Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based Damages* [Docket No. 5118] at ¶ 12, 24; *Objection to Trustee's Determination of Claim* filed by the Irrevocable Charitable Remainder Trust of Yale Fishman [Docket No. 2337] at ¶ 12, 24; *Objection to Trustee's Determination of Claim of the Glenn Akiva Fishman Charitable Remainder Unitrust* [Docket 2341] at ¶ 12, 24.  However, those transfers ***never actually occurred***.    Moreover, the Trust Claimants attempted these transfers at a time when they did not know they were being defrauded by Madoff.  The Trustee's assertion that the Trust Claimants "did not object to the transfers listed [on the account statements]" (*see* Trustee's Objection at 13) has no bearing on this dispute.  Why would the Trust Claimants have objected to such transfers in 2004 and 2005 when they did not know or suspect they were being defrauded?

36.    It is well settled that the following elements must be proven for a gift to be valid: (i) intent on the part of the donor to make a present transfer; (ii) delivery of the gift, either actual or constructive to the donee; and (iii) acceptance by the donee.  *Gruen v. Gruen*, 68 N.Y.2d 48, 53 (1986).  Where a third party is an intermediary in the transfer of the gift, the failure of the

donor's agent to deliver the gift to the donee, "even if instructions had been given him to deliver to the donee, [is] fatal to the validity of the proposed gift." *In re Wallach's Estate*, 57 N.Y.S.2d 354, 356 (N.Y. Sur. Ct. 1945). Here, it was impossible for the delivery and acceptance of the alleged transfers to have occurred. As recognized by this Court, funds tendered by the Trust Claimants (as with all of BLMIS's customers) were merely deposited into the 703 Account, and never invested. *See* 424 B.R. at 129. Despite what was recorded on the paper statements provided by BLMIS to its customers, no cash deposited by any of the customers was ever invested, nor was any cash ever deposited into the Trust Claimants' respective accounts. Likewise, no securities were ever purchased for the Trust Claimants at any point in time. Because no cash was deposited into either of the Trust Accounts at any time, and no securities were ever purchased for the Trust Claimants, no transfers from the Trust Accounts to the Transferee Account ever occurred or could have occurred. Like all entries on the BLMIS account statements, the alleged transfers to the Transferee Account were "fictitious." Accordingly, regardless of whether the Trust Claimants intended to transfer the balances of their respective accounts to the Transferee Account, such transfers never occurred and cannot be considered "cash withdrawals" for the purposes of calculating "net equity." There was never anything in the Trust Accounts to transfer.

37.    The intentions of the Trust Claimants are therefore irrelevant. Intention cannot overcome reality. By way of example, suppose Person A writes an email to Person B directing Person B to deliver an object to Person C. Person B, however, never delivers the item. The fact that Person A intended to cause the transfer does not mean it actually happened and that Person C in fact received the item. An intention to cause an act to occur cannot trump reality.

38.    The Trustee further argues that the Net Investment Method, as applicable to inter-account transfers, is consistent with New York law which provides that a transferee can only receive funds to the extent of the transferor's interest in those funds. *See* Objection at 21 (citing *Neshewat v. Salem*, 365 F. Supp. 2d 508, 524 (S.D.N.Y. 2005) (internal citations omitted)). The Trust Claimants do not dispute this basic tenet of property law. What the Trust Claimants

-11-

dispute is the applicability of such proposition in this case, where there was never anything to be transferred because all of the funds deposited by the Trust Claimants were immediately deposited into the 703 Account solely for the benefit of Madoff and his inner circle and never deposited into the Trust Claimants' accounts at BLMIS.

39.     In asserting that these fictitious transfers to the Transferee Account should reduce the Trust Claimants' Claims, the Trustee is perpetuating the Madoff Ponzi scheme.  Despite that there is absolutely no evidence that the transfers ever occurred (because they could never have occurred), the Trustee has denoted the transfers as cash withdrawals on the Determination Letters.  In actuality, the Trust Claimants are "net losers" because no actual funds were transferred or withdrawn from the Trust Accounts to the Transferee Account.  It has been well settled in these proceedings that all statements and trading records were fictitious.  *See In re Madoff*, 424 B.R. at 135.  Accordingly, fictitious journal entries cannot translate into actual transfers of funds from the Trust Accounts to the Transferee Account (which is controlled by a third party).

40.     The Trustee also notes that the District Court held in the Antecedent Debt Decision (*SIPC v. BLMIS*, 499 B.R. 416 (S.D.N.Y. 2013)) that "inter-account transfers should be treated in a manner consistent with the Second Circuit Net Equity Decision [654 F.3d 229]." Trustee's Objection at 21.  The Antecedent Debt Decision has no relevance whatsoever to this dispute, which does not concern an allegedly avoidable transfer under section 548 of the Bankruptcy Code.  The Antecedent Debt Decision does not address in any manner whatsoever the core issue in the instant motion -- that the alleged transfers at issue here were fictitious and therefore the alleged transfers from the Trust Accounts to the Transferee Account cannot be withdrawals for purposes of calculating net equity.  On the other hand. the Second Circuit's ruling supports this position.  The Second Circuit stated that "Madoff generated fictitious paper account statements and trading records in order to conceal the fact that he engaged in no trading activity whatsoever" and "the only accurate entries reflected the customers' cash deposits and withdrawals."  654 F.3d at 231-32.  As this Court held, "[t]he only verifiable amounts that are

manifest from the books and records [of BLMIS] are the cash deposits and withdrawals." 424 B.R. at 135.

41.    Moreover, the Trustee's position would permit the Trustee to effectuate a claw-back outside of the two-year statute of limitations. Such a result is inequitable and not permissible. If the Trust Claimants had requested actual cash withdrawals (which would have been paid to them from the 703 Account under the Madoff Ponzi scheme between September 2004 and January 2005) instead of attempting to transfer the balance of their respective accounts to the Transferee Accounts, the Trust Claimants could have donated those funds to any charitable organization, such as JHF, in accordance with the purpose of their charitable trusts. JHF, in that scenario, would be a net loser and the Trust Claimants would not be subject to a clawback proceeding because it would have been outside of the two-year statute of limitations. Further, the funds subsequently withdrawn by JHF did not actually come from cash or securities in JHF's account at BLMIS, but rather from the 703 Account (which this Court has referred to as a "slush fund"). *Id.* at 129.

42.    The Trustee will likely argue that the Trust Claimants' intentions were fulfilled because JHF was able to withdraw more than was deposited into its account. The problem with this argument is that it belies the "cash in/cash out" approach approved by this Court and upheld by the Second Circuit. 424 B.R. at 129, *aff'd*, 654 F.3d at 242. Using the "cash in/cash out" approach, net equity is to be calculated by crediting the amount of ***actual cash deposited*** by the customer into his BLMIS account, minus any ***actual cash withdrawn or transferred*** "that in reality occurred." 424 B.R. at 141. Thus, the alleged transfers to the Transferee Account cannot be considered "cash withdrawals" for the purposes of calculating "net equity." The fact that Madoff perpetrated this massive Ponzi scheme does not impact the reality that the alleged transfers from the Trust Accounts to the Transferee Account never actually occurred. By relying on the fictitious account statements to support the opposite position, the Trustee is furthering the fraud.

43.     Finally, the Trust Claimants would be remiss if they did not address the baseless contentions of both the Trustee and SIPC concerning the Trust Claimants' relationship with JHF. According to the Trustee, the Trust Claimants "conveniently omit [] the factual background of these accounts that show [the Trust Claimants] have already acknowledged receipt of the funds transferred in a previously-filed objection, and that funds were in fact withdrawn from the related account."  Trustee's Objection at 1.  SIPC makes a similar baseless and inflammatory allegation: "Claimants fail to point out, however, that the Transferee Account at BLMIS was established by the Judaic Heritage Foundations, with Glenn Fishman and Eileen Fishman as its authorized signatories, and that, on the filing date, the account had a negative net equity."  SIPC Objection at 8-9.

44.     First, at no time did the Trust Claimants attempt to hide that the Transferee Account is owned by Judaic Heritage Foundation ("JHF").  In fact, the Trust Claimants disclosed JHF's identity as the Transferee Account at every stage of these proceedings.  *See* Motion at ¶ 12; Tr. of Status Conference, Exhibit A at 5:25-6:1; *Objection to Trustee's Motion for an Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based Damages* [Docket No. 5118] at ¶ 12; *Objection to Trustee's Determination of Claim* filed by the Irrevocable Charitable Remainder Trust of Yale Fishman [Docket No. 2337] at ¶ 12; *Objection to Trustee's Determination of Claim of the Glenn Akiva Fishman Charitable Remainder Unitrust* [Docket 2341] at ¶ 12.

45.     Second, while JHF is operated by Rabbi Eli Fishman and his wife Eileen, Yale and Glenn's parents, JHF is a non-profit corporation with the mission of promoting and teaching Judaic values and an understanding of the Jewish faith.  JHF is a separate legal entity from the Yale Trust and the Glenn Trust.  The trust documents governing the Yale and Glenn Trusts permitted distributions to any charitable organization as directed by Yale and Glenn Fishman, respectively, and provided for distributions to JHF only in the event the Yale and Glenn Trusts had terminated prior to such distributions having been made. *See* Irrevocable Charitable Remainder Unitrust of Yale Fishman, a copy of which is attached as Exhibit 40 to the Sehgal

Declaration at Item 1, § 3; Irrevocable Charitable Remainder Unitrust of Glenn Akiva Fishman, a copy of which is attached as Exhibit 41 to the Sehgal Declaration, Item 1, § 3. Thus, to argue that the attempted transfers were in bad faith is entirely without merit. The Objections effectively ask the Court to pierce the corporate veil or determine that these three distinct entities are one and the same without any factual or legal basis.

46.    The Trustee's attack on the relationship between the Trust Claimants and JHF is curious in light of the Trustee's failure to even mention the relevance of the identity of any of the transferees of the more than 400 other BLMIS customers who have argued that the Trustee "improperly adjusted amounts transferred between BLMIS accounts to reflect the amount of principal in the transferor account at the time of the transfer" that the Trustee is attempting to deal with in the *Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts* [Docket No. 6084 at ¶ 6] which is currently pending before the Court. The Trustee appears to be holding the Trust Claimants to a higher or different standard than the hundreds of other similarly situated customers who are no different that the Trust Claimants. The Trust Claimants, like thousands of other BLMIS customers, were defrauded by Madoff. The Trust Claimants have done nothing wrong – they are the victims.

47.    The Trustee's denial of both the Trust Claimants' Claims cannot be upheld due to the simple incontrovertible fact that the purported transfers from the Trust Accounts to the Transferee Account never occurred. The only actual cash withdrawals from the Yale Account totaled $515,778.87 and from the Glenn Account totaled $513,410.00 based on the Trustee's records as set forth in the Determination Letter). Because no other cash withdrawals were made from the Yale and Glenn Accounts and the transfers to the Transferee Account never actually occurred, the "net equity" in the Yale Account is at least $1,484,221.13 and the "net equity" in the Glenn Account is at least $1,486,590.00. Thus, both are "net losers," not creditors with a zero balance. Therefore, the Motion should be granted and the Trustee should be directed to allow and pay the Trust Claimants' respective claims.

-15-

**WHEREFORE**, the Trust Claimants respectfully request that the Court enter an order (i) granting the Yale Trust an allowed claim in the amount of $1,484,221.13, (ii) granting the Glenn Trust an allowed claim in the amount of $1,486,590.00, (iii) directing SIPC to pay each of the Trust Claimants a $500,000 advance pursuant to 15 U.S.C. § 78fff-3(a), (iv) directing the Trustee to pay the Yale Trust and the Glenn Trust their *pro rata* share of distributions previously made by the Trustee to date, and (v) granting the Trust Claimants such other and further relief as this Court deems just and equitable.

Respectfully submitted,

Dated: April 14, 2014

**LOWENSTEIN SANDLER LLP**

By: _/s/ Bruce Buechler_
Bruce Buechler, Esq. (BB 0324)
Nicole Stefanelli (NS 4100)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
            -and-
1251 Avenue of the Americas, 18th Floor
New York, NY 10020
Tel: (212) 262-6700
Fax: (212) 262-7402

*Attorneys for the Irrevocable Charitable*
*Remainder Trust of Yale Fishman and the Glenn*
*Akiva Fishman Charitable Remainder Unitrust*

# **Exhibit A**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In the Matter of:

5    SECURITIES INVESTOR PROTECTION

6    COMPANY,

7                    Plaintiff,

8           v.                    Case No. 08-01789(SMB)

9    BERNARD L. MADOFF INVESTMENT

10   SECURITIES, LLC, ET AL.,

11                   Defendants.

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                   U.S. Bankruptcy Court

15                   One Bowling Green

16                   New York, New York

17

18                   February 20, 2014

19                   10:01 AM

20

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

1     **Hearing re:  Conference Re:  Inter Account Transfer Issue**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     **Transcribed by:  Dawn South**

Page 3

```
 1   A P P E A R A N C E S :

 2   BAKER HOSTETLER

 3        Attorneys for the Trustee

 4        45 Rockefeller Plaza

 5        New York, NY 10111

 6

 7   BY:  DAVID J. SHEEHAN, ESQ.

 8        LOURA ALAVERDI, ESQ.

 9        BIK CHEEMA, ESQ.

10

11   LOWENSTEIN SANDLER LLP

12        65 Livingston Avenue

13        Roseland, NJ 07068

14

15   BY:  BRUCE BUECHLER, ESQ.

16

17   SECURITIES INVESTOR PROTECTION CORPORATION

18        Attorney for SIPC

19        805 15th St., N.W.

20        Suite 800

21        Washington, D.C. 20005-2215

22

23   BY:  KEVIN H. BELL, ESQ.

24

25
```

Page 4

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Please be seated.  Good morning.

 3      Madoff.  Good morning.

 4              MR. SHEEHAN:  Good morning, Your Honor.

 5              THE COURT:  I scheduled this conference because

 6      some issues have come up I guess in connection with what

 7      I'll call the Lowenstein motion or the trust motion just to

 8      make it simple.

 9              I guess, Mr. Sheehan, you had expressed a concern

10      that there was a common legal issue regarding whether or not

11      the net investment method applied to inter-account

12      transfers.

13              MR. SHEEHAN:  That's correct, Your Honor.

14              THE COURT:  Okay.  I don't understand them to be

15      challenging that.  They're accepting the net investment

16      method and they're arguing, for reasons we don't have to get

17      into today, that the transfer never occurred.

18              MR. SHEEHAN:  I understand that --

19              THE COURT:  Is that what you're -- am I right?

20              MR. BUECHLER:  Your Honor, Bruce Buechler of

21      Lowenstein Sandler.

22              That is correct, we're not challenging what I'll

23      call the cash in, cash out methodology that's been accepted

24      by the -- this Court and the Court of Appeals, we're

25      challenging how it's being applied to the facts of my
```

Page 5

1    client's claims.

2              We had been asking, as set forth in our papers,

3    the trustee and his counsel to deal with this issue for over

4    a year plus and they had told us they would file such a

5    motion on a group basis by the end of December.  When they

6    didn't we just --

7              THE COURT:  Let me just stop you for a minute.

8              MR. BUECHLER:  Right.  But we're not challenging

9    --

10             THE COURT:  But how can I grant the relief in your

11   motion without the presence of your transferee?  You're

12   asking me to invalidate a transfer and the transferee isn't

13   here.

14             MR. BUECHLER:  I'm not sure I understand Your

15   Honor's question.  The transferee --

16             THE COURT:  You're arguing that this transfer

17   never occurred, right?  That's the way I read your papers.

18             MR. BUECHLER:  Based on the methodology used --

19             THE COURT:  I understand, but you're --

20             MR. BUECHLER:  Yes.

21             THE COURT:  -- arguing that a transfer never

22   occurred and the transferee may disagree.

23             Do we know if this transferee has a claim or

24   pulled any money out of the account?

25             MR. BUECHLER:  Your Honor, we do know that, the

Page 6

1    transferee is an entity called Judaic Heritage --

2              THE COURT:  Right.

3              MR. BUECHLER:  -- they have no claim and there was

4    you no clawback proceeding ever commenced against that

5    party.

6              THE COURT:  No, that's -- I'm asking you a

7    different question.  Did they ever withdraw money?

8              MR. SHEEHAN:  Yes, Your Honor, they did.

9              THE COURT:  Yeah, so how can you get the money?

10   You're getting -- just answer my procedural question.

11             How can I make a determination that this transfer

12   never occurred and grant you the relief that you're

13   ultimately seeking, the allowance of your claim for what you

14   say was in the account, without the transferee as a party to

15   this proceeding?

16             MR. BUECHLER:  Your Honor, we have plenty of time

17   if you want us to notice the transferee.

18             THE COURT:  I don't know how you're going to bring

19   him into a claim objection.  Don't you have to start an

20   adversary proceeding, join the transferee, maybe join

21   Mr. Picard, maybe file it here, maybe file it in State

22   Court, you know, argue -- or seek a declaratory judgment

23   that a transfer never occurred?

24             MR. BUECHLER:  Your Honor, we --

25             THE COURT:  I'm just -- don't you have to have the

Page 7

1    transferee present?  Forget about the procedural mechanism

2    for a minute.

3            MR. BUECHLER:  We don't believe so, Your Honor.

4    We can provide the Court with the documentation as to what

5    happened with the --

6            THE COURT:  I know what happened --

7            MR. BUECHLER:  -- transferee's --

8            THE COURT:  -- but the transferee is going to say

9    it occurred.  Is the transferee going to give back the

10   money?

11           MR. BUECHLER:  There's no ability for the

12   transferee to do that, the transferee -- the time period for

13   the trustee to bring a clawback proceeding expired, and

14   based upon prior negotiations no -- no --

15           THE COURT:  So you think -- just as a matter of

16   law you think I can invalidate a transfer without the

17   transferee being a party to the suit.

18           MR. BUECHLER:  Your Honor, it's not an issue of

19   invalidating the transfer, it's whether the transfer

20   occurred as to whether my client is a net winner or loser

21   and has a claim against this bankruptcy estate.

22           THE COURT:  But don't you have to invalidate the

23   transfer in order to be a net winner?

24           MR. BUECHLER:  Your Honor --

25           THE COURT:  I'm sorry, net loser.

Page 8

1          MR. BUECHLER:  -- our view is the transfer, given

2     their calculation, never occurred.  And remember, the

3     transfer that they allege occurred include both principal

4     and --

5          THE COURT:  You keep saying that, but --

6          MR. BUECHLER:  -- the fictitious --

7          THE COURT:  -- how do I ever decide that without

8     the transferee being here?

9          MR. BUECHLER:  How does the transferee impact

10    that, Your Honor?

11         THE COURT:  Well the transferee may say it did

12    occur.

13         MR. BUECHLER:  But the transferee has no claim

14    against the estate at this point in time and the trustee has

15    no clawback right, so how does that impact?

16         THE COURT:  All right.  All right.  Let me hear

17    from the other side.

18         MR. SHEEHAN:  Your Honor, if I may just to -- and

19    I don't want to start arguing the motion, but I think --

20         THE COURT:  No, you don't have to argue the

21    merits, it's just --

22         MR. SHEEHAN:  No, but just --

23         THE COURT:  -- it struck me when I read the papers

24    that I cannot grant the relief, even if he's right, in the

25    absence of the transferee.

Page 9

1             MR. SHEEHAN:  But in responding to Your Honor's

2    question as to why we believe this falls into the category

3    of all the other 440 similar inter-account transfer matters,

4    what actually happened here, despite the characterization by

5    the Fishman trust here, there's two charitable remainder

6    trusts, the Fishman remainder trust.  Madoff was instructed,

7    and we have evidence of this, to make a transfer to the

8    Judaic charity.  That transfer was made --

9             THE COURT:  Uh-huh.

10            MR. SHEEHAN:  -- the Judaic charity then took the

11   money out.

12            When we do our inter-account transfer we give

13   credit when there is money, principal, in that account,

14   there was principal, it went out of both Fishman accounts

15   into the Judaic account.  By the way, the Judaic account is

16   also a Fishman charity, all right, so this is all family

17   connected.

18            So the two charitable remainder trusts transferred

19   to Judaic, Judaic then takes the money out.

20            We make the decision, on our discretion as

21   trustee, not to sue a charity.  Whether we should have or

22   not that's history at this point.  We did not sue them for

23   clawback, as we did not sue many charities, because there

24   were many charities that were impacted by Madoff.

25            But there is no uniqueness to this, this is indeed

Page 10

1   a transfer from an account where they transferred in

2   addition to principal fictitious profits.  When the money

3   came out the Judaic trust got not only the principal but

4   fictitious profits, which we -- for which we did not sue.

5          This is an inter-account transfer under the net

6   equity calculation, it's very traditional, it's not

7   different.  They can try to characterize it any way they

8   want but that's what it is.

9          THE COURT:  But he's not -- he's not challenging

10  the net -- the computation of the net equity, he's saying

11  that because of that computation where you only rely on cash

12  in, cash out that the transfer didn't occur.

13         Let's forget about the merits.  Do you believe

14  that I could grant relief without the presence of the

15  transferee?

16         MR. SHEEHAN:  I believe that because I look at it

17  as a traditional net equity calculation.  The transferee at

18  that point, all right, Your Honor, is not -- I don't

19  disagree with Mr. Buechler that the transferee is a part of

20  it from our perspective.  Our perspective is the calculation

21  was correct.

22         If they have a problem with the transferee ,who

23  didn't give them their money back, that's their problem.

24  All right?  That's not my problem.

25         THE COURT:  I understand that.

Page 11

```
 1              All right, look, if you both think that I don't
 2    need the presence of the transferee to decide this then I
 3    guess I'll decide it in the absence of the presence of the
 4    transferee, but I don't think that this is -- the claim
 5    that's being raised is -- is part of this larger issue
 6    regarding whether the net equity applies to or how it
 7    applies to the -- these intercompany transfers -- or these
 8    inter-account transfers.
 9              MR. SHEEHAN:  Your Honor, I'm not going to try to
10    convince Your Honor of that here this morning, I
11    respectfully disagree, and I think when we ultimately have
12    it before you Your Honor will see that what they've dressed
13    up here is essentially just an inter-account transfer that
14    they don't like happened, they don't like what happened with
15    the money, and they want to get it back, but that's --
16              THE COURT:  All right.
17              MR. SHEEHAN:  -- neither here nor there.
18              We're very happy to brief this motion separately,
19    and then Your Honor we would like to, you know --
20              THE COURT:  Are there any -- are there any factual
21    issues?
22              MR. BUECHLER:  Your Honor, I haven't seen the
23    reply, but I don't believe there are any factual issues
24    between us, we haven't discussed that, but I don't believe
25    that there are.
```

Page 12

```
 1              MR. SHEEHAN:  I don't believe so either, Your

 2    Honor, unless it becomes -- unless somehow the transferee

 3    does become part of this, but I don't see that here this

 4    morning.

 5              THE COURT:  All right.  So how do you propose we

 6    proceed?  It's your motion, you tell me.

 7              MR. BUECHLER:  Your Honor, we have filed the

 8    motion, it's returnable on right now for hearing dated

 9    April 2 with an objection deadline of March 5 and reply

10    deadline of March 19th, which are dates that my associate

11    worked out with, I'll be candid I don't recall -- I don't

12    know who in chambers they spoke to, they did speak to

13    Mr. (indiscernible - 00:08:06) Rose, my associate at --

14              THE COURT:  I see him sitting back there.

15              MR. BUECHLER:  Right.  About the dates, you know,

16    we had tried them, so arguably is we'd like to proceed on

17    that calendar.  If they need a little more time we're

18    willing to adjust that calendar if they need more time to do

19    a reply.

20              MR. SHEEHAN:  If anything we need another week,

21    Judge.

22              THE COURT:  That's fine.

23              I have to tell you this just strikes me as a

24    question of New York law whether they intended to transfer

25    their account.  If that's what you intended the fact that
```

Page 13

1      there was something less in there that you thought I don't

2      know how that makes a difference, but you can go ahead and

3      brief it and I'll decide the motion.

4                MR. SHEEHAN:  All right, fine, Your Honor, and we

5      would like to, if I may while we're here, Your Honor --

6                THE COURT:  Uh-huh.

7                MR. SHEEHAN:  -- respectfully there are now 439

8      other inter-account transfers, we are going to file with

9      Your Honor, and we'll work this out with your chambers, a

10     scheduling motion, we've done this in the past.

11               THE COURT:  Okay.

12               MR. SHEEHAN:  We did it with net equity, with

13     customer status, with time-based damages, all of those were

14     done on a scheduling order basis so that on that basis

15     everyone gets to participate.

16               THE COURT:  That's fine.

17               MR. SHEEHAN:  All right?

18               THE COURT:  I just -- this just sounds like a

19     different kind of --

20               MR. SHEEHAN:  If Your Honor sees it --

21               THE COURT:  -- one off dispute.

22               MR. SHEEHAN:  If Your Honor sees it that way

23     that's the way we're going to deal with it.

24               THE COURT:  Well are any other -- maybe I should

25     ask you, are there -- to your knowledge are there any other

Page 14

1    claimants who are contending that somehow a transfer didn't

2    occur?

3              MR. SHEEHAN:  I don't know that there's anyone

4    that's saying it exactly the way -- that's the -- I was

5    going to say the beauty of the Madoff case, I don't know if

6    that would be the right adjective -- but in any event is

7    that every case has its own factual story to it, Your Honor,

8    I would not doubt that there are other cases, I don't know

9    of any offhand, but I think this is somewhat unique --

10             THE COURT:  Okay.

11             MR. SHEEHAN:  -- from the standpoint of how

12   they're characterizing what transpired, not from what we

13   believe the underlying facts will prove.

14             THE COURT:  It doesn't sound like there's a

15   factual dispute.

16             MR. SHEEHAN:  I guess I don't either, Your Honor,

17   so I don't understand why the net equity calculation doesn't

18   apply and their claim gets denied.

19             So you know, if they authorize a transfer --

20             THE COURT:  Well, they have -- but they have a

21   different argument.  They're saying that the transfer never

22   occurred.

23             MR. SHEEHAN:  The transfer occurred.

24             THE COURT:  Well but they're saying it didn't,

25   and --

 1           MR. SHEEHAN:  Well how are they going prove that?

 2   We have the books and records.

 3           THE COURT:  I don't know.

 4           MR. SHEEHAN:  The transfer occurred to the Judaic,

 5   the Judaic gave the money, they took the money, they cashed

 6   the check --

 7           THE COURT:  Right.

 8           MR. SHEEHAN:  -- and it's their charity, the

 9   Judaic.

10           Maybe we do need a little discovery to show you,

11   Your Honor, what's going on here in terms of the fact that

12   the Fishmans don't like the outcome here, right?

13           THE COURT:  Well you have to books and records

14   which show that a transfer occurred on --

15           MR. SHEEHAN:  Absolutely.

16           THE COURT:  -- the books and records and then you

17   have books and records which show the cash in, cash out of

18   the -- of the transferee, right?

19           MR. SHEEHAN:  Correct.

20           THE COURT:  So I don't know if you need discovery.

21           MR. SHEEHAN:  I didn't think I did either, but I'm

22   starting to wonder if they can simply say if those are the

23   facts they didn't happen I don't know what the magic wand is

24   here but that doesn't change the fact that it did.

25           THE COURT:  Why don't you see if you can enter

Page 16

1    into a stipulation of facts in connection with this matter

2    in terms of --

3              MR. SHEEHAN:  Happy to do that, Your Honor.

4              THE COURT:  -- what happened with these accounts.

5              MR. SHEEHAN:  Whatever we can work out.

6              THE COURT:  It doesn't -- it doesn't sound like

7    there's a major dispute and it's mostly a legal issue.

8              In terms of your other motion you can tee it up --

9              MR. SHEEHAN:  All right.  We will, Your Honor.

10             THE COURT:  -- in the same way that you did the

11   other ones.  Just contact Ms. Vogel (ph).

12             MR. SHEEHAN:  We will, Your Honor.

13             THE COURT:  All right.

14             MR. SHEEHAN:  All right, thank you.

15             MR. BUECHLER:  Thank you, Judge.

16             THE COURT:  All right, thanks.

17             MR. BUECHLER:  Have a good morning.

18        (Whereupon these proceedings were concluded at 10:12

19   AM)

20

21

22

23

24

25

Page 17

1                    C E R T I F I C A T I O N

2

3      I, Dawn South, certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5

6      Dawn       Digitally signed by Dawn South
               DN: cn=Dawn South, o, ou,
               email=digital1@veritext.com,
               c=US
7      South      Date: 2014.02.21 12:47:46 -05'00'

8      AAERT Certified Electronic Transcriber CET**D-408

9

10     Veritext

11     330 Old Country

12     Suite 300

13     Mineola, NY 11501

14

15     Date:  February 21, 2014

16

17

18

19

20

21

22

23

24

25

**0**

00:08:06  12:13
07068  3:13
08-01789  1:8

**1**

10111  3:5
10:01  1:19
11501  17:13
15th  3:19
19th  12:10

**2**

2  12:9
20  1:18
20005-2215  3:21
2014  1:18 17:15
21  17:15

**3**

300  17:12
330  17:11

**4**

408  17:8
439  13:7
440  9:3
45  3:4

**5**

5  12:9

**6**

65  3:12

**8**

800  3:20
805  3:19

**a**

aaert  17:8
ability  7:11
absence  8:25 11:3
absolutely  15:15
accepted  4:23
accepting  4:15
account  2:1 4:11
  5:24 6:14 9:3,12,13
  9:15,15 10:1,5 11:8
  11:13 12:25 13:8

accounts  9:14 16:4
accurate  17:4
addition  10:2
adjective  14:6
adjust  12:18
adversary  6:20
ahead  13:2
al  1:10
alaverdi  3:8
allege  8:3
allowance  6:13
answer  6:10
appeals  4:24
applied  4:11,25
applies  11:6,7
apply  14:18
april  12:9
arguably  12:16
argue  6:22 8:20
arguing  4:16 5:16
  5:21 8:19
argument  14:21
asking  5:2,12 6:6
associate  12:10,13
attorney  3:18
attorneys  3:3
authorize  14:19
avenue  3:12

**b**

b  1:23
back  7:9 10:23
  11:15 12:14
baker  3:2
bankruptcy  1:1,14
  1:25 7:21
based  5:18 7:14
  13:13
basis  5:5 13:14,14
beauty  14:5
believe  7:3 9:2
  10:13,16 11:23,24
  12:1 14:13
bell  3:23
bernard  1:9
bernstein  1:24
bik  3:9

books  15:2,13,16,17
bowling  1:15
brief  11:18 13:3
bring  6:18 7:13
bruce  3:15 4:20
buechler  3:15 4:20
  4:20 5:8,14,18,20
  5:25 6:3,16,24 7:3,7
  7:11,18,24 8:1,6,9
  8:13 10:19 11:22
  12:7,15 16:15,17

**c**

c  3:1 4:1 17:1,1
calculation  8:2 10:6
  10:17,20 14:17
calendar  12:17,18
call  4:7,23
called  6:1
candid  12:11
case  1:8 14:5,7
cases  14:8
cash  4:23,23 10:11
  10:12 15:17,17
cashed  15:5
category  9:2
certified  17:8
certify  17:3
cet  17:8
challenging  4:15,22
  4:25 5:8 10:9
chambers  12:12
  13:9
change  15:24
characterization
  9:4
characterize  10:7
characterizing
  14:12
charitable  9:5,18
charities  9:23,24
charity  9:8,10,16,21
  15:8
check  15:6
cheema  3:9
claim  5:23 6:3,13
  6:19 7:21 8:13 11:4
  14:18

claimants  14:1
claims  5:1
clawback  6:4 7:13
  8:15 9:23
client  7:20
client's  5:1
come  4:6
commenced  6:4
common  4:10
company  1:6
computation  10:10
  10:11
concern  4:9
concluded  16:18
conference  2:1 4:5
connected  9:17
connection  4:6 16:1
contact  16:11
contending  14:1
convince  11:10
corporation  3:17
correct  4:13,22
  10:21 15:19
counsel  5:3
country  17:11
court  1:1,14 4:2,5
  4:14,19,24,24 5:7
  5:10,16,19,21 6:2,6
  6:9,18,22,25 7:4,6,8
  7:15,22,25 8:5,7,11
  8:16,20,23 9:9 10:9
  10:25 11:16,20 12:5
  12:14,22 13:6,11,16
  13:18,21,24 14:10
  14:14,20,24 15:3,7
  15:13,16,20,25 16:4
  16:6,10,13,16
credit  9:13
customer  13:13

**d**

d  4:1 17:8
d.c.  3:21
damages  13:13
date  17:15
dated  12:8
dates  12:10,15

[david - motion]                                                                 Page 2

**david** 3:7
**dawn** 2:25 17:3
**deadline** 12:9,10
**deal** 5:3 13:23
**december** 5:5
**decide** 8:7 11:2,3
  13:3
**decision** 9:20
**declaratory** 6:22
**defendants** 1:11
**denied** 14:18
**despite** 9:4
**determination** 6:11
**difference** 13:2
**different** 6:7 10:7
  13:19 14:21
**disagree** 5:22 10:19
  11:11
**discovery** 15:10,20
**discretion** 9:20
**discussed** 11:24
**dispute** 13:21 14:15
  16:7
**district** 1:2
**documentation** 7:4
**doubt** 14:8
**dressed** 11:12

**e**

**e** 1:23,23 3:1,1 4:1,1
  17:1
**either** 12:1 14:16
  15:21
**electronic** 17:8
**enter** 15:25
**entity** 6:1
**equity** 10:6,10,17
  11:6 13:12 14:17
**esq** 3:7,8,9,15,23
**essentially** 11:13
**estate** 7:21 8:14
**et** 1:10
**event** 14:6
**evidence** 9:7
**exactly** 14:4
**expired** 7:13
**expressed** 4:9

**f**

**f** 1:23 17:1
**fact** 12:25 15:11,24
**facts** 4:25 14:13
  15:23 16:1
**factual** 11:20,23
  14:7,15
**falls** 9:2
**family** 9:16
**february** 1:18 17:15
**fictitious** 8:6 10:2,4
**file** 5:4 6:21,21 13:8
**filed** 12:7
**fine** 12:22 13:4,16
**fishman** 9:5,6,14,16
**fishmans** 15:12
**foregoing** 17:3
**forget** 7:1 10:13
**forth** 5:2

**g**

**g** 4:1
**getting** 6:10
**give** 7:9 9:12 10:23
**given** 8:1
**go** 13:2
**going** 6:18 7:8,9
  11:9 13:8,23 14:5
  15:1,11
**good** 4:2,3,4 16:17
**grant** 5:10 6:12
  8:24 10:14
**green** 1:15
**group** 5:5
**guess** 4:6,9 11:3
  14:16

**h**

**h** 3:23
**happen** 15:23
**happened** 7:5,6 9:4
  11:14,14 16:4
**happy** 11:18 16:3
**hear** 8:16
**hearing** 2:1 12:8
**heritage** 6:1
**history** 9:22

**hon** 1:24
**honor** 4:4,13,20
  5:25 6:8,16,24 7:3
  7:18,24 8:10,18
  10:18 11:9,10,12,19
  11:22 12:2,7 13:4,5
  13:9,20,22 14:7,16
  15:11 16:3,9,12
**honor's** 5:15 9:1
**hostetler** 3:2
**huh** 9:9 13:6

**i**

**impact** 8:9,15
**impacted** 9:24
**include** 8:3
**indiscernible** 12:13
**instructed** 9:6
**intended** 12:24,25
**inter** 2:1 4:11 9:3
  9:12 10:5 11:8,13
  13:8
**intercompany** 11:7
**invalidate** 5:12 7:16
  7:22
**invalidating** 7:19
**investment** 1:9 4:11
  4:15
**investor** 1:5 3:17
**issue** 2:1 4:10 5:3
  7:18 11:5 16:7
**issues** 4:6 11:21,23

**j**

**j** 3:7
**join** 6:20,20
**judaic** 6:1 9:8,10,15
  9:15,19,19 10:3
  15:4,5,9
**judge** 1:25 12:21
  16:15
**judgment** 6:22

**k**

**keep** 8:5
**kevin** 3:23
**kind** 13:19
**know** 5:23,25 6:18
  6:22 7:6 11:19

  12:12,15 13:2 14:3
  14:5,8,19 15:3,20
  15:23
**knowledge** 13:25

**l**

**l** 1:9
**larger** 11:5
**law** 7:16 12:24
**legal** 4:10 16:7
**little** 12:17 15:10
**livingston** 3:12
**llc** 1:10
**llp** 3:11
**look** 10:16 11:1
**loser** 7:20,25
**loura** 3:8
**lowenstein** 3:11 4:7
  4:21

**m**

**m** 1:24
**madoff** 1:9 4:3 9:6
  9:24 14:5
**magic** 15:23
**major** 16:7
**march** 12:9,10
**matter** 1:4 7:15
  16:1
**matters** 9:3
**mechanism** 7:1
**merits** 8:21 10:13
**method** 4:11,16
**methodology** 4:23
  5:18
**mineola** 17:13
**minute** 5:7 7:2
**money** 5:24 6:7,9
  7:10 9:11,13,19
  10:2,23 11:15 15:5
  15:5
**morning** 4:2,3,4
  11:10 12:4 16:17
**motion** 4:7,7 5:5,11
  8:19 11:18 12:6,8
  13:3,10 16:8

**n**

n  3:1 4:1 17:1
n.w.  3:19
need  11:2 12:17,18
  12:20 15:10,20
negotiations  7:14
neither  11:17
net  4:11,15 7:20,23
  7:25 10:5,10,10,17
  11:6 13:12 14:17
never  4:17 5:17,21
  6:12,23 8:2 14:21
new  1:2,16,16 3:5
  12:24
nj  3:13
notice  6:17
ny  3:5 17:13

**o**

o  1:23 4:1 17:1
objection  6:19 12:9
occur  8:12 10:12
  14:2
occurred  4:17 5:17
  5:22 6:12,23 7:9,20
  8:2,3 14:22,23 15:4
  15:14
offhand  14:9
okay  4:14 13:11
  14:10
old  17:11
ones  16:11
order  7:23 13:14
outcome  15:12

**p**

p  3:1,1 4:1
papers  5:2,17 8:23
part  10:19 11:5
  12:3
participate  13:15
party  6:5,14 7:17
period  7:12
perspective  10:20
  10:20
ph  16:11
picard  6:21

**plaintiff**  1:7
plaza  3:4
please  4:2
plenty  6:16
plus  5:4
point  8:14 9:22
  10:18
presence  5:11 10:14
  11:2,3
present  7:1
principal  8:3 9:13
  9:14 10:2,3
prior  7:14
problem  10:22,23
  10:24
procedural  6:10 7:1
proceed  12:6,16
proceeding  6:4,15
  6:20 7:13
proceedings  16:18
  17:4
profits  10:2,4
propose  12:5
protection  1:5 3:17
prove  14:13 15:1
provide  7:4
pulled  5:24

**q**

question  5:15 6:7
  6:10 9:2 12:24

**r**

r  1:23 3:1 4:1 17:1
raised  11:5
read  5:17 8:23
reasons  4:16
recall  12:11
record  17:4
records  15:2,13,16
  15:17
regarding  4:10 11:6
relief  5:10 6:12 8:24
  10:14
rely  10:11
remainder  9:5,6,18
remember  8:2

**reply**  11:23 12:9,19
respectfully  11:11
  13:7
responding  9:1
returnable  12:8
right  4:19 5:8,17
  6:2 8:15,16,16,24
  9:16 10:18,24 11:1
  11:16 12:5,8,15
  13:4,17 14:6 15:7
  15:12,18 16:9,13,14
  16:16
rockefeller  3:4
rose  12:13
roseland  3:13

**s**

s  3:1 4:1
sandler  3:11 4:21
saying  8:5 10:10
  14:4,21,24
scheduled  4:5
scheduling  13:10,14
seated  4:2
securities  1:5,10
  3:17
see  11:12 12:3,14
  15:25
seek  6:22
seeking  6:13
seen  11:22
sees  13:20,22
separately  11:18
set  5:2
sheehan  3:7 4:4,9
  4:13,18 6:8 8:18,22
  9:1,10 10:16 11:9
  11:17 12:1,20 13:4
  13:7,12,17,20,22
  14:3,11,16,23 15:1
  15:4,8,15,19,21
  16:3,5,9,12,14
show  15:10,14,17
side  8:17
similar  9:3
simple  4:8
simply  15:22

**sipc**  3:18
sitting  12:14
smb  1:8
somewhat  14:9
sorry  7:25
sound  14:14 16:6
sounds  13:18
south  2:25 17:3
southern  1:2
speak  12:12
spoke  12:12
st  3:19
standpoint  14:11
start  6:19 8:19
starting  15:22
state  6:21
states  1:1
status  13:13
stipulation  16:1
stop  5:7
story  14:7
strikes  12:23
struck  8:23
stuart  1:24
sue  9:21,22,23 10:4
suit  7:17
suite  3:20 17:12
sure  5:14

**t**

t  17:1,1
takes  9:19
tee  16:8
tell  12:6,23
terms  15:11 16:2,8
thank  16:14,15
thanks  16:16
think  7:15,16 8:19
  11:1,4,11 14:9
  15:21
thought  13:1
time  6:16 7:12 8:14
  12:17,18 13:13
today  4:17
told  5:4
traditional  10:6,17
transcribed  2:25

**[transcriber - york]**

| | |
|---|---|
| transcriber  17:8 | **w** |
| transcript  17:3 | wand  15:23 |
| transfer  2:1 4:17 | want  6:17 8:19 10:8 |
| 5:12,16,21 6:11,23 | 11:15 |
| 7:16,19,19,23 8:1,3 | washington  3:21 |
| 9:3,7,8,12 10:1,5,12 | way  5:17 9:15 10:7 |
| 11:13 12:24 14:1,19 | 13:22,23 14:4 16:10 |
| 14:21,23 15:4,14 | we've  13:10 |
| transferee  5:11,12 | week  12:20 |
| 5:15,22,23 6:1,14 | went  9:14 |
| 6:17,20 7:1,8,9,12 | willing  12:18 |
| 7:12,17 8:8,9,11,13 | winner  7:20,23 |
| 8:25 10:15,17,19,22 | withdraw  6:7 |
| 11:2,4 12:2 15:18 | wonder  15:22 |
| transferee's  7:7 | work  13:9 16:5 |
| transferred  9:18 | worked  12:11 |
| 10:1 | **x** |
| transfers  4:12 11:7 | x  1:3,12 |
| 11:8 13:8 | **y** |
| transpired  14:12 | yeah  6:9 |
| tried  12:16 | year  5:4 |
| true  17:4 | york  1:2,16,16 3:5 |
| trust  4:7 9:5,6 10:3 | 12:24 |
| trustee  3:3 5:3 7:13 | |
| 8:14 9:21 | |
| trusts  9:6,18 | |
| try  10:7 11:9 | |
| two  9:5,18 | |
| **u** | |
| u.s.  1:14,25 | |
| uh  9:9 13:6 | |
| ultimately  6:13 | |
| 11:11 | |
| underlying  14:13 | |
| understand  4:14,18 | |
| 5:14,19 10:25 14:17 | |
| unique  14:9 | |
| uniqueness  9:25 | |
| united  1:1 | |
| **v** | |
| v  1:8 | |
| veritext  17:10 | |
| view  8:1 | |
| vogel  16:11 | |