**BECKER & POLIAKOFF LLP**

Helen Davis Chaitman
45 Broadway
New York, New York 10006
(212) 599-3322

*Attorneys for Defendants Susanne Stone
Marshall,  Adele Fox, Marsha Peshkin,
and Russell Oasis*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>      Plaintiff,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>      Defendant. | Adv. Pro. No. 08-01789 (BRL)<br>SIPA LIQUIDATION<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>      Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>      Plaintiff,<br><br>  v.<br><br>SUSANNE STONE MARSHALL, ADELE FOX, MARSHA PESHKIN, RUSSELL OASIS, A & G GOLDMAN PARTNERSHIP and PAMELA GOLDMAN,<br><br>      Defendants. | Adv. Pro. No. 14-01840 (SMB) |

**MEMORANDUM OF LAW (i) IN OPPOSITION TO TRUSTEE'S MOTION
FOR ENFORCEMENT OF PERMANENT INJUNCTION & AUTOMATIC STAY
AND (ii) IN SUPPORT OF CROSS-MOTION TO DISMISS COMPLAINT FOR
FAILURE TO STATE A CLAIM BY MARSHALL, FOX, PESHKIN & OASIS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .........................................................................1

FACTS AND PROCEDURAL HISTORY ............................................................ 3

ARGUMENT ....................................................................................................... 3

I.    THE CROSS-MOTION TO DISMISS SHOULD BE GRANTED ............................ 3

II.   THE COURT SHOULD DENY THE TRUSTEE'S ENFORCEMENT
      MOTION.............................................................................................. 5

      A.    *Filing a Motion to Amend Does Not Violate the Stay or the*
            *Permanent Injunction* ................................................................ 5

      B.    *The Claims in the PSAC Do Not Duplicate or Derive From*
            *the Trustee's Fraudulent Transfer Claims Against the*
            *Picowers*.................................................................................... 6

      C.    *The Marshall Plaintiffs' Control Person Claims Under Sec-*
            *tion 20(a) of the Securities Exchange Act of 1934 Do Not*
            *Fall Within the Scope of the Permanent Injunction or the*
            *Automatic Stay* .......................................................................... 9

            1.    The Trustee's fraudulent transfer claims against the
                  Picowers are distinct from the Marshall Plaintiffs' Sec-
                  tion 20(a) claims .......................................................... 10

            2.    The Marshall Plaintiffs' Section 20(a) claims are non-
                  derivative because they are not premised on harm to
                  the BLMIS estate ........................................................... 11

      D.    *The Other PSAC Claims Are Also Non-Derivative* .................17

CONCLUSION.....................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A & G Goldman Partnership v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*, 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013) ................ 9, 11-12, 18

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). ............................................................................................................ 11

*Board of Education of Farmingdale Union Free School District v. Farmingdale Classroom Teachers Association, Inc.,* 38 N.Y.2d 397 (1975). ................................................................................. 19

*Cuervo v. Airport Servs., Inc.*, 2013 WL 6170661 (S.D. Fla. Nov. 22, 2013) ........................................................................................................... 10

*Day v. Moscow*, 955 F.2d 807 (2d Cir. 1992) ...................................................... 4

*In re Friedman's Inc.*, 394 B.R. 623 (S.D. Ga. 2008) ........................................ 10

*General Universal Systems, Inc. v. HAL, Inc.*, 500 F.3d 444 (5th Cir. 2007) ................. 5

*Gulf Refining Co. v. United States*, 269 U.S. 125 (1925) ..................................... 2

*In re Global Crossing, Ltd.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004) .................................. 14

*Fuechtman v. Mastec, Inc.*, 390 F. Supp. 2d 1264 (S.D. Fla. 2005) ................................. 15

*Hirsch v. Arthur Anderson*, 72 F.3d 1085 (2d Cir. 1995) ...................................... 7

*JPMorgan Chase & Co. v. Picard*, 721 F.3d 54 (2d Cir. 2014) ........................................... 8

*Knipe v. Skinner*, 999 F.2d 708 (2d Cir. 1993) .................................................. 19

*Marshall v. Picard*, 740 F.3d 81 (2d Cir. 2014) ............................................ 1, 4, 6, 7, 12, 18

*Medkser v. Feingold*, 307 F. App'x 262 (11th Cir. 2008) ............................................. 15-17

*Michaelesco v. Estate of Richard*, 355 F. App'x 572 (2d Cir. 2009) .................................. 4

*Morrison v. National Broadcasting, Co.*, 24 A.D.2d 284 (1st Dep't 1965) (Breitel, J.), *rev'd on other grounds* 19 N.Y.2d 453 (NY 1967) ............................ 19

*Nixon v. Richey*, 513 F.2d 430 (D.C. Cir. 1975) .................................................. 5

*In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621 (S.D.N.Y. 2008) ....................................15

*Roger v. Hill*, 289 U.S. 582 (1933)............................................................................ 2

*In re Seven Seas*, 522 F.3d 575 (5th Cir. 2008) ..................................................... 7

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)................................12

*Sher v. SAF Fin., Inc.*, 2010 WL 4034272 (D. Md. Oct. 14, 2010) ................................... 10

*In re Sunbeam*, 89 F. Supp. 2d 1326 (S.D. Fla. 1999) ........................................15

*In re Tronox*, 769 F. Supp. 2d 202 (S.D.N.Y. 2011) ..........................................11

*United States v. Bell*, 5 F.3d 64 (4th Cir. 1993) .................................................. 3

*United States v. Quintieri*, 306 F.3d 1217 (2d Cir. 2002) ...........................................2, 3-4

*United States v. Zvi*, 242 F.3d 89 (2d Cir. 2001) ................................................ 3

## Statutes and Rules

11 U.S.C. § 548.................................................................................................. 10, 11

15 U.S.C. § 78t............................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6) .................................................................................... 4

N.Y. DEBT. & CRED. § 270 *et seq.*.................................................................. 10

## Other Authority

H.R. Rep. No. 73-1383, at 26 (1934) ................................................................ 14

Defendants Marshall, Fox, Peshkin, and Oasis (the "Marshall Plaintiffs"), through their counsel, Becker Poliakoff LLP, submit this memorandum of law (i) in opposition to the Trustee's motion for enforcement of permanent injunction and automatic stay (the "Enforcement Motion"); and (ii) in support of the Marshall Plaintiffs' cross-motion to dismiss the Trustee's complaint against them for failure to state a claim (the "Motion to Dismiss").

## PRELIMINARY STATEMENT

On January 13, 2014, in a decision to which the Trustee was a party, the Second Circuit mandated that the United States District Court for the Southern District of Florida (the "Florida Court") determine in the first instance whether the Marshall Plaintiffs' successfully amended their complaint to allege claims that are independent of the Trustee's.

> **We note that we affirm without prejudice to appellants seeking leave to amend their complaints.** There is conceivably some particularized conspiracy claim appellants could assert that would not be derivative of those asserted by the Trustee. **That question, however, is not properly before us, and is a question in the first instance for the United States District Court for the Southern District of Florida.**

*Marshall v. Picard*, 740 F.3d 81, 94 (2d Cir. 2014) (emphasis added)); Declaration of Helen Davis Chaitman (the "Chaitman Decl.") Ex. 1 at 23) (emphasis added).

On February 5, 2014, the Second Circuit issued a mandate explicitly incorporating its January 13, 2014 opinion: "IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED in accordance with the opinion of this court." (Chaitman Decl. ¶ 19 Ex 2 (the "Mandate").) The Mandate incorporates the January 13, 2014 opinion. *See Roger v. Hill*, 289 U.S. 582, 587 (1933) (cit-

ing *Gulf Refining Co. v. United States*, 269 U.S. 125, 136 (1925) ("A direction for pro-

ceedings in accordance with 'the opinion' makes it a part of the mandate.")); *United*

*States v. Quintieri*, 306 F.3d 1217, 1225, n. 5 (2d Cir. 2002) (same).

The Marshall Plaintiffs obeyed the Mandate by promptly filing a motion for leave

to amend so that the Florida Court could determine in the first instance whether their

proposed second amended complaint (the "PSAC") alleges independent claims.  Before

the Florida Court could make that decision, the Trustee, in flagrant contempt of the

Mandate, filed suit in this Court falsely accusing the Marshall Plaintiffs of alleging de-

rivative and duplicative claims.  Clearly, the Trustee is not above the law.  He is bound

by the Mandate issued in a case to which he was a party.  His complaint in this Court

should be dismissed and he should be ordered to pay all of the Marshall Plaintiffs' coun-

sel fees.  Thus, the Enforcement Motion should be moot.

If, nevertheless, the Court considers the Enforcement Motion, it should be de-

nied.  The Trustee's attacks against the PSAC are dishonest because he completely ig-

nores entire paragraphs of the proposed complaint that supply the precise kinds of alle-

gations that the Second Circuit found lacking in the Marshall Plaintiffs' prior complaints

(the "Original Florida Complaints").  Indeed, The Second Circuit, recognizing that the

Marshall Plaintiffs could conceivably plead claims against Jeffrey Picower and his affili-

ates (the "Picowers") that would not be derivative of the Trustee's claims, dismissed the

Original Florida Complaints without prejudice so that the Marshall Plaintiffs could add

the very allegations that the Trustee conveniently ignores.  Thus, if the Court considers

the Enforcement Motion, the Court should deny it in its entirety.

## FACTS AND PROCEDURAL HISTORY

The relevant facts and procedural history are set forth in the accompanying Declaration of Helen Davis Chaitman, to which the Court is respectfully referred.

## ARGUMENT

## I.    THE CROSS-MOTION TO DISMISS SHOULD BE GRANTED

The Trustee accuses innocent BLMIS customers, including the Marshall Plaintiffs, to whom by law he owes the highest fiduciary duty, of attempting an end run around the Second Circuit's net equity decision when they are simply acting pursuant to the Mandate issued long after the Circuit issued the net equity decision.  The Trustee's conduct in trying to protect Madoff's criminal co-conspirator is unseemly to say the least; it is also untenable as a matter of law.

The issue of which court should determine whether the Marshall Plaintiffs have stated cognizable claims that do not run afoul of the permanent injunction was decided by the Second Circuit.  It is inconceivable that the Trustee does not consider himself bound by that Mandate when he was the appellee in that case.  If this Court entertains the Enforcement Motion, this Court would also be acting in direct violation of the Mandate, which this Court has no power to do.  As the Second Circuit wrote in *United States v. Zvi*, 242 F.3d 89, 95 (2d Cir. 2001):

> The mandate rule 'compels compliance on remand with the dictates of the superior court and forecloses relegation of issues expressly or impliedly decided by the appellate court.'" (quoting *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993).

The mandate rule is a preclusion doctrine, like law-of-the-case, which requires parties and trial courts to follow an appellate court's ruling, not relitigate issues that the appellate court has already decided.  *See Quintieri*, 306 F. 3d at 1225 (mandate rule is

branch of law of the case doctrine requiring trial court to follow appellate court ruling). Thus, the Trustee is barred from arguing that this Court is the appropriate forum to challenge the PSAC.   He cannot avoid the preclusive bar of *res judicata* by commencing a new action here and asking this Court to decide that which must be determined in the first instance by the Florida Court according to the Mandate.  A complaint barred by *res judicata* fails to state a claim as a matter of law and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  *See Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) (recognizing that dismissal on *res judicata* defense is appropriate on motion to dismiss for failure to state a claim); *Michaelesco v. Estate of Richard*, 355 F. App'x 572 (2d Cir. 2009) (upholding dismissal based on *res judicata* on motion to dismiss).  Accordingly, the Trustee's complaint should be dismissed for failure to state a claim.

To avoid the consequence of the mandate rule, the Trustee argues that the language at issue is *dicta*, which he and this Court are free to ignore.  He further argues that the *dicta* merely indicates that the Florida Court **may** determine the applicability of the permanent injunction, but is not the only court empowered to do so.  (Tr. Br. at 32.) The Trustee's argument is outrageous.

The Second Circuit stated **twice** in its opinion that the Florida Court should determine the viability of the Marshall Plaintiffs' amended complaint.  *See Marshall*, 740 F.3d at 94; *id.* at 96.  The use of the term "dicta" has no place here.  The language is in the opinion twice and incorporated into the Mandate.  (Chaitman Decl. Ex. 2.)  One wonders how many times the Second Circuit would have had to repeat the same ruling for the Trustee to deem it binding on him.  To accept the Trustee's argument that the Mandate is mere *dicta* would be to presume that the Second Circuit did not intend for the parties to be bound by its ruling.

Surely, if the Second Circuit had intended for this Court to rule on the Marshall Plaintiffs' amended complaint, then it would have remanded back to this Court for further proceedings in the case that the Trustee commenced in 2010, instead of specifically stating, twice, that the Florida Court, where the Marshall Plaintiffs sued the Picowers, would determine "in the first instance" if the Marshall Plaintiffs had stated a viable amended complaint. But this Court need not, and indeed is not free to, speculate. It is bound by the mandate rule. As the Fifth Circuit held in *General Universal Systems, Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007), in implementing a court of appeals mandate, the district court must take into account the appellate court's opinion **and** the circumstances it embraces. Similarly, in *Nixon v. Richey*, 513 F.2d 430, 435-36 (D.C. Cir. 1975), the D.C. Circuit Court held that a district court judge "is without power to do anything which is contrary to either the letter or spirit of the mandate **construed in the light of the opinion of [the] court deciding the case** . . . **The opinion as well as the order comprised our mandate, and the opinion was to be consulted to ascertain what was required of [the district court].**" (emphasis added).

If the Court grants the Marshall Plaintiffs' Motion to Dismiss, then it need not reach the Trustee's Enforcement Motion. The Florida Court will do that when it rules on the Marshall Plaintiffs' motion to amend, as mandated by the Second Circuit.

## II.    THE COURT SHOULD DENY THE TRUSTEE'S ENFORCEMENT MOTION

### A.    *Filing a Motion to Amend Does Not Violate the Stay or the Permanent Injunction*

The Second Circuit affirmed dismissal of the Marshall Plaintiffs' complaint *without prejudice* and held that it is possible for the Marshall Plaintiffs to plead state law

claims that do not duplicate or derive from the Trustee's claims against the Picowers. *See Marshall*, 740 F.3d at 94; Chaitman Decl. Ex. 1 at 23 ("There is conceivably some particularized claim appellants could assert that would not be derivative of those asserted by the Trustee.").

Thus, the Marshall Plaintiffs' filing of a motion for leave to file the PSAC is not a violation of the automatic stay; it is precisely what the Second Circuit gave the Marshall Plaintiffs permission to do.  If the Florida Court determines that the complaint is not derivative or duplicative of the Trustee's former claims against the Picowers, then it cannot be a violation of the automatic stay or the permanent injunction for the Marshall Plaintiffs to proceed.  It is only if the Marshall Plaintiffs proceed to litigate claims that are determined by that court to be duplicative or derivative of the Trustee's former claims that the stay or the permanent injunction is violated and, obviously, the Marshall Plaintiffs will not do that.  Thus, the Trustee has no basis to accuse the Marshall Plaintiffs of violating the permanent injunction or the automatic stay and there is nothing for this Court to enjoin.

### B.    The Claims in the PSAC Do Not Duplicate or Derive From the Trustee's Fraudulent Transfer Claims Against the Picowers

The Second Circuit affirmed the dismissal of the Marshall Plaintiffs' Original Florida Complaint because (1) it did not allege that the Picowers directly participated in defrauding BLMIS customers by inducing them to invest; (2) it did not allege that the Picowers made misrepresentations to BLMIS customers; and (3) it did not allege that the Picowers took any particularized actions aimed at BLMIS customers.  *Marshall*, 740 F.3d at 92-93.  The PSAC includes new allegations that address and eliminate those deficiencies without duplicating the Trustee's claims.

The PSAC alleges that the Picowers "actively encouraged people to enter into investment advisory agreements with BLMIS." (Declaration of Keith R. Murphy ("Murphy Decl.")[1] Ex. B (PSAC) ¶ 46.)  That allegation clearly addresses the Second Circuit's concern that the Marshall Plaintiffs' claims duplicate and derive from the Trustee's because a particularized injury was not alleged.  *Marshall*, 740 F.3d at 92-93.  Particularized, direct injuries (and, thus, independent claims) are established where the  defendants allegedly (a) participated in the distribution of misleading private placement memoranda and (b) induced plaintiffs to invest with the debtor by knowingly using misleading financial information.  *Id.* (citing *Hirsch v. Arthur Anderson*, 72 F.3d 1085, 1087-89 (2d Cir. 1995); *In re Seven Seas*, 522 F.3d 575, 578-81 (5th Cir. 2008).)

As alleged in the PSAC, Picower knew that Madoff stole the money entrusted to him by customers and that Madoff would credit the Picowers with billions of dollars stolen from customers upon request or demand.  (Murphy Decl. Ex. B  ¶ 46.)  It is impossible for Picower to have "actively encouraged" anyone to entrust his money to BLMIS without lying to them because Picower knew the money was stolen by Madoff and Picower knew that he was the primary beneficiary of the criminal scheme.

Actively encouraging people to entrust their money to BLMIS by providing false and misleading information about BLMIS constitutes active participation in the fraud, resulting in direct injuries to the plaintiffs.  Such claims are easily distinguishable from the Trustee's claims.  Likewise, lying to customers to encourage them to entrust their money to BLMIS is systemically different from a fraudulent transfer claim and constitutes a particularized action by Picower against BLMIS customers which the Trustee

---

[1] The Murphy Declaration (with exhibits)  was previously submitted to this Court in connection with the Trustee's Enforcement Motion [ECF No. 4].

would lack standing to sue upon.  *See JPMorgan Chase & Co. v. Picard*, 721 F.3d 54 (2d Cir. 2014) (holding that Trustee lacked standing to assert aiding and abetting claims against those who aided and abetted BLMIS' fraud).  Therefore, the shortcomings in the Marshall Plaintiffs' Original Florida Complaint cited by the Second Circuit have been addressed.

The PSAC also alleges that "[a]s Picower's demands for more and more money from Madoff increased, he encouraged Madoff to expand the customer base of the BLMIS Discretionary Trading Program so that funds belonging to new customers could be stolen and given to the [Picowers]."  (Murphy Decl. Ex. B ¶ 49.)  That allegation shows that the Picowers took particular actions aimed at BLMIS customers.  Picower controlled Madoff and he directed him to cast a wider net to increase the number of victims whose money would be available for Madoff to steal and pass along to Picower. (Murphy Decl. Ex. B ¶¶ 31, 53, 54.)   Just as it would be impossible for Picower to encourage people to sign up for BLMIS' Discretionary Trading Program without lying to them, Madoff could not have expanded his customer base as directed by Picower without making misrepresentations to BLMIS customers.  Plaintiffs' injuries caused by that conduct are particularized and direct.  Therefore, the claims are not barred by the permanent injunction because they are independent from the Trustee's fraudulent transfer claims.

The Trustee argues that the PSAC "does not allege any specific conduct by Picower outside of directing trades and related misconduct concerning his own accounts." (Tr. Br. at 29.)  While this was true of the Original Florida Complaint before the Second Circuit, it is not true of the PSAC.  The allegations of specific conduct alleged above and

elsewhere in the PSAC have nothing to do with directing trades concerning Picower's accounts.  (Murphy Decl. Ex. B. ¶¶ 46, 49, 51, 55, 56, 115, 116 161.)

The Trustee claims that "[t]here are no allegations that the [Picowers] had any contact with the [Marshall] Plaintiffs."  (Tr. Br. at 36.)  That statement ignores paragraph 46 of the PSAC, which states that the Picowers "actively encouraged" people to invest in BLMIS.  (Murphy Decl. Ex. B ¶ 46.)  The Trustee also ignores ¶ 115 of the PSAC which alleges that the Picowers controlled overall decision-making at BLMIS; solicitation of customers; record keeping for the Picower accounts and the accounts of other customers; and the false recording of security transactions and cash transfers in and from **all** customer accounts, including the Marshall Plaintiffs.  (Murphy Decl. Ex. B ¶ 115.)

The Trustee's characterization of the PSAC completely and deliberately ignores these allegations, demonstrating that his motion was filed in bad faith and for an improper purpose.

### C.   *The Marshall Plaintiffs' Control Person Claims Under Section 20(a) of the Securities Exchange Act of 1934 Do Not Fall within the Scope of the Permanent Injunction or the Automatic Stay*

The permanent injunction enjoins only claims that are "duplicative or derivative of the claims" possessed by the Trustee.  Judge Sullivan in *A & G Goldman Partnership v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*, a decision cited with approval by the Second Circuit, has already ruled that true securities law claims would **not** be duplicative or derivative of the Trustee's claims.  *See* 2013 WL 5511027, *6 (S.D.N.Y. Sept. 30, 2013).  In fact, he recognized that the Trustee has no standing to assert securities law claims against the Picowers.  *Id.* at *10, n. 11 ("Federal securities claims may only be brought by individuals who purchased or sold the relevant securities.  The Trustee, who

stands in the shoes of BLMIS, does not fall into this category.")  Thus, the only remaining issue is whether the PSAC asserts true securities law claims as opposed to disguised fraudulent conveyance claims.  *See id.*  Since the PSAC pleads *bona fide* control person claims pursuant to Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), those claims are not be barred by the permanent injunction or the automatic stay.

**1.    The Trustee's fraudulent transfer claims against the Picowers are distinct from the Marshall Plaintiffs' Section 20(a) claims**

Fraudulent transfer claims and Section 20(a) control person claims are premised on different legal theories, have distinct elements, and seek different damages.  They are therefore fundamentally distinct in both "name and substance." *Cf. Sher v. SAF Fin., Inc.*, 2010 WL 4034272, *14 (D. Md. Oct. 14, 2010) (legal malpractice claims were not redundant of fraudulent transfer claims); *In re Friedman's Inc.*, 394 B.R. 623, 628–29 (S.D. Ga. 2008) (same); *see also Cuervo v. Airport Servs., Inc.*, 2013 WL 6170661, *6 (S.D. Fla. Nov. 22, 2013) (court refused to change an "amended complaint to allege a fraudulent transfer claim where none is there").

A transfer is fraudulent when the debtor transfers property for less than reasonably equivalent value at a time when the debtor is insolvent (or is left insolvent by the transfer), or one in which the debtor transfers the property to hinder, delay, or defraud creditors. *See* N.Y. DEBT. & CRED. § 270 *et seq.*; 11 U.S.C. § 548. No intent or wrongdoing by the recipient is required for a fraudulent transfer claim because the "fraud" can be constructive − *any* transfer made for less than reasonably equivalent value may be set aside. N.Y. DEBT. & CRED. § 273 ("Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent."); 11 U.S.C. § 548(a)(1)(b). A fraudulent

transfer action only seeks to set aside the conveyance; it does not seek damages against the transferee or his intermediaries.

By contrast, Section 20(a) securities claims prevent defendants from escaping liability for securities fraud by using intermediaries to carry out actions that would be prohibited under the Exchange Act, if performed directly. *See In re Tronox*, 769 F. Supp. 2d 202, 220 n.118 (S.D.N.Y. 2011) ("The control person provisions were included in the federal securities laws to prevent people and entities from using 'dummies' to do the things that they were forbidden to do by the securities laws"). Thus, to impose liability under Section 20(a), it must be proven first that there is a securities fraud, *i.e.*, that the plaintiff—unlike the Trustee—was a buyer or seller of securities. Next it must be proven not just that the primary violator acted with *scienter*, but that the alleged control person did not act "in good faith." Finally, unlike the recipient of a fraudulent conveyance, a Section 20(a) control person is jointly and severally liable with the primary violator for all damages caused by the underlying securities fraud, which is the actual loss sustained by the plaintiff. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154-55 (1972).

> **2.    Marshall Plaintiffs' Section 20(a) claims are non-derivative because they are not premised on harm to the BLMIS estate**

Under Section 20(a), persons who "directly or indirectly" control a primary securities violator are jointly and severally liable to securities purchasers for all damages caused by the underlying securities fraud. *See* 15 U.S.C. § 78t. Judge Sullivan correctly recognized in *A & G Goldman Partnership* that Section 20(a) creates a direct legal obligation from the control person to the defrauded investor:

> The elements of a section 20(a) claim are "a primary viola-
> tion by the controlled person and control of the primary vio-
> lator by the targeted defendant." *SEC v. First Jersey Sec.,
> Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996). Where the ele-
> ments are met, the control person is directly liable to harmed
> investors.
>
> Therefore, the premise of [a]ppellants' argument – that they
> could conceivably assert non-derivative securities claims
> based on control person liability – is correct. If the . . .
> [c]omplaints plead bona fide securities fraud claims resulting
> in injuries to investors like [a]ppellants, then those claims
> are not derivative and are not covered by the Picower Injunc-
> tion, even if they arise from similar facts as the Trustee's
> fraudulent conveyance claims. Indeed, the Trustee does not
> dispute this possibility.

2013 WL 5511027 at *6.

The Second Circuit cited *A & G Goldman Partnership* with approval and held
that independent claims against the Picowers might exist so long as they were not based
solely on the Picowers' "fraudulent withdrawals." *Marshall*, 740 F.3d at 94.

The PSAC alleges that the Picowers controlled BLMIS within the meaning of Sec-
tion 20(a) and knowingly used BLMIS as an intermediary to make misrepresentations
to BLMIS customers.  (Murphy Decl. Ex. B ¶¶ 112-121.)  The PSAC alleges direct reliance
by BLMIS customers upon false financial information created directly or indirectly by
the Picowers consistent with Section 20(a). (Murphy Decl. Ex. B ¶¶ 53, 109, 117.)  The
Picowers directed and controlled the publication of false and misleading account docu-
ments to BLMIS customers, causing them to believe that BLMIS was profitable and that
they were making profits in their BLMIS accounts. (Murphy Decl. Ex. B ¶¶ 46, 49, 115.)
Those misrepresentations and omissions caused BLMIS customers to entrust their
money to BLMIS.

Without identifying specific deficiencies in the PSAC, the Trustee claims the complaints contain no allegations that the Picowers were at all involved with the creation or dissemination of false statements to BLMIS customers. (Tr. Br. at 39-40.) That is false. The Marshall Plaintiffs allege that Picower controlled the record-keeping, including the false recording of securities transactions and cash transfers in connection with his *as well as all other customer* accounts. (Murphy Decl. Ex. B ¶ 115 ("Picower . . . did in fact control[] the overall decision-making at BLMIS, solicitation of customers, the record keeping for the Picower Parties' accounts and other BLMIS Discretionary Trading Program customers, and the false recording of securities transactions and cash transfers in and from customer accounts at BLMIS for customers of the BLMIS Discretionary Trading Program, including those of the Class members.")). The PSAC further alleges:

- "According to Madoff, Picower fully and knowingly participated in the fraud that BLMIS perpetrated on customers of the BLMIS Discretionary Trading Program and actively encouraged people to enter into investment advisory agreements with BLMIS." (Murphy Decl. Ex. B ¶ 46.)

- Picower "encouraged Madoff to expand the customer base of the BLMIS Discretionary Trading Program so that funds belonging to new customers could be stolen and given to the Picower[s]." (*Id.* ¶ 49.)

- "According to Madoff, Picower . . . knew that BLMIS would have to generate false account information for each of the customers in the BLMIS Discretionary Trading Program, just as Picower demanded Madoff generate false trades in order to justify the astronomical returns and fictitious losses that Picower demanded." (*Id.* ¶ 51.)

- Picower "control[ed] . . . the overall decision-making at BLMIS, solicitation of customers, the record keeping for the Picower[s]' . . . account and other BLMIS Discretionary Trading Program customers, and the false recording of securities transactions and cash transfers in and from all customer accounts at BLMIS for customers of the BLMIS discretionary Trading Program[.]" (*Id.* ¶ 115.)

- The "Picowers induced Madoff to solicit additional customers for the

BLMIS Discretionary Trading Program[.]"  (*Id.* ¶ 118.)

- "Picower directly or indirectly induced the material misrepresentations and omissions giving rise to securities violations. . . [.]  [He] knew and intended that material misrepresentations and omissions would be communicated to other customers of the BLMIS Discretionary Trading Program, including Plaintiffs.  Picower directly or indirectly induced BLMIS to conceal the fraud from BLMIS customers and from the federal and state regulators.  (*Id.* ¶¶ 119-120.)

- Picower caused BLMIS employees to book false fabricated securities transactions in his accounts, with the knowledge that these false transactions directly resulted in additional material misrepresentations to other BLMIS customers as to their account values and profits, and required defalcation of funds from other BLMIS customers to pay Picower and his affiliates.  (*Id.* ¶¶ 51-52.)

- Picower "caused BLMIS to send to all of the customers of the BLMIS Discretionary Trading Program false and misleading information (*i.e.*, fictitious trade and inflated account values), in order to induce customers to maintain their accounts with BLMIS and to continue to attract new customers for BLMIS' Discretionary Trading Program. If Plaintiffs had been provided with accurate information, they would have immediately closed their accounts.  (*Id.* ¶¶ 53.)

Picower's behavior is exactly the type of wrongful conduct that Section 20(a) was enacted to punish.  *See* H.R. Rep. No. 73-1383, at 26 (1934) (the intent of Section 20(a) is to prevent defendants from escaping liability for securities fraud by using intermediaries to carry out actions that would be prohibited under the Securities Exchange Act if performed directly).   The fact that he was not a shareholder, officer, or director of BLMIS does not shield him from liability for his role in the fraud against other BLMIS customers.  *See In re Global Crossing, Ltd.*, 322 F. Supp. 2d 319, 351 (S.D.N.Y. 2004) (upholding a Section 20(a) claim against a "Professional Standards Group" within Arthur Andersen that "was consulted by Andersen's [primary violator] audit team," "was actually aware of the fraudulent accounting schemes," and "was responsible for ensuring that they were applied consistently"); *In re Sunbeam*, 89 F. Supp. 2d 1326, 1346 (S.D.

Fla. 1999) (approving Rule 10b5 and Section 20(a) claims against Arthur Andersen based, in part, on the firm's allegedly reckless behavior in permitting primary violator to misrepresent audited financial statements).

In general, any person who has the power to make strategic decisions relating to the underlying securities fraud is in "control." *See, e.g., In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 641 (S.D.N.Y. 2008) (control persons "had access to internal Company documents, reports and other information, including adverse nonpublic information regarding Pfizer's business, operations, products and future prospects"). Thus, for example, a person who is not an executive at the time of the alleged misconduct may be held liable as a control person if it is sufficiently alleged that the person "**had the power to at least indirectly control corporate policy**." *Fuechtman v. Mastec, Inc.*, 390 F. Supp. 2d 1264, 1268 (S.D. Fla. 2005) (emphasis added).

The PSAC alleges a viable Section 20(a) claim. It plainly alleges a control relationship maintained by the Picowers, as well as misrepresentations – direct and indirect -- by the Picowers to innocent BLMIS customers, upon which they relied in making their investment decisions. The PSAC is a well-pled Section 20(a) claim alleging particularized injury to BLMIS customers directly traceable to the Picowers' conduct that is not duplicative or derivative.

Finally, even though the PSAC pleads "direct" misrepresentations, a defendant does not have to make direct misrepresentations himself to violate Section 20(a); it is only necessary that the defendant controlled others that did make direct misrepresentations. The Eleventh Circuit has expressly held that a Section 20(a) claim like the one asserted in the PSAC is a direct action, which does not belong to a bankruptcy trustee and which may be asserted by securities holders against defendants. *See Medkser v.*

*Feingold*, 307 F. App'x 262, 265 (11th Cir. 2008).   In *Medkser*, a group of investors brought Section 20(a) claims against the principals of a bankrupt hedge fund, accusing them of, *inter alia*, controlling the hedge fund and violating securities laws by funneling the investors' funds into the defendants' own offshore accounts.   The defendants argued, like the Trustee here, that the investors' control person claims had to be raised as part of the bankruptcy estate.   The trial court incorrectly found that the claims were derivative and granted defendants judgment on the pleadings. The Eleventh Circuit reversed, explaining:

> The claims involve direct injuries sustained by these plaintiffs based their own reliance on fraudulent statements and misrepresentations made to them. **The fact that some other investors may also have been similarly injured does not transform these direct claims into derivative ones.** The corporate entity could not bring suit to recover the investment that these plaintiffs made relying on the fraudulent actions of the defendants; thus, these claims may be maintained in this direct action.

*Id.* at 265 (emphasis added.)   Thus, *Medkser* definitively establishes that a Section 20(a) claim, brought by victimized investors against the control persons of an entity engaged in securities fraud, is not "derivative" of any claims owned by the entity's bankruptcy estate.

The Trustee has failed to distinguish the original *Medkser* complaint from the PSAC, which alleges a Section 20(a) claim based on similar facts.  The original *Medkser* complaint alleged Section 10b-5 claims based on direct fraudulent misrepresentations made to plaintiffs by two of the defendants, Darren Silverman and Paul Sloan. (Murphy Decl. Ex. CC ¶¶ 51-60). However, the *Medkser* plaintiffs also brought Section 20(a) claims against all defendants, including defendants Feingold and Baso.  (*Id.* ¶¶ 61-64).

Feingold and Baso's only alleged role in the fraud was their position as control persons who had "the power to direct or cause the direction of the management and policies of the [primary violators]" to make "numerous false statements and omissions of material fact." (*Id.*) While Feingold and Baso never themselves sent communications to the investor-plaintiffs, they used the company as a conduit for making particular misrepresentations to the victimized investors.

This misconduct in *Medkser* is clearly within the ambit of Section 20(a). It is also exactly akin to the misconduct alleged in the PSAC. The Picowers' securities law liability stems, not from the receipt or withdrawal of BLMIS funds, but from the Picowers' control of BLMIS and the misrepresentations that they made, both directly and indirectly, to BLMIS customers. As the Eleventh Circuit held in *Medkser*, control person claims, like those alleged in the PSAC, "involve direct injuries sustained by [investors] based on their own reliance on fraudulent statements and misrepresentations made to them" and are, therefore, not derivative or duplicative. *See* 307 F. App'x at 265.

### D.    *The Other PSAC Claims Are Also Non-Derivative*

The federal RICO claim and common law claims asserted in the PSAC are also not derivative which, perhaps, explains why the Trustee raises no specific deficiencies about those claims. The Second Circuit made plain that a secondary or derivative injury is one that arises from harm to the estate; conversely, the claim is non-derivative or "particularized" if it can be traced directly to the third party's conduct. *Marshall*, 740 F.3d at 89. Thus, factual allegations that the Picower defendants directly participated in defrauding BLMIS customers by inducing them to invest, as distinct from simply reaping the benefits of Madoff's scheme through fraudulent withdrawals would, whatever

their labels, state the requisite particularized, non-derivative claims.  *See id.* at *91; *see also A&G Goldman Partnership*, 2013 WL 5511027 at *7.

The PSAC alleges, based upon information provided by Madoff himself, that the Picowers actively encouraged people to enter into investment advisory agreements with BLMIS (Murphy Decl. Ex. B ¶ 46), encouraged Madoff to expand his customer base and solicit and include new customers by false pretenses (*id.* ¶¶ 49, 118), and induced Madoff to lie to customers (*id.* ¶¶ 53, 119-20).  Those allegations fall squarely within the Second Circuit's definition of non-derivative claims.

Count 2 of the PSAC asserts a federal RICO claim based upon the above and re-lated conduct of Picower and Madoff intended to mislead customers who signed up for BLMIS' Discretionary Trading Program.  (*Id.* ¶¶ 13, 136.)  The allegations speak of direct and particularized harm to the customers, not to the estate.  This is a claim the Trustee could never bring. It is therefore non-derivative. *See A&G Goldman Partnership, supra.* Count 3 is a claim under the Florida RICO statute that parallels Count 2.

Count 4 of the PSAC pleads that Picower, with knowledge of Madoff's and BLMIS' fiduciary duties to their customers, aided and abetted their breach of those du-ties, assisting Madoff in his theft of customer property by causing BLMIS employees to book fabricated transactions that never occurred in the Picower accounts and in the ac-counts of other customers.  (*Id.* ¶¶ 171-73.)  Again, the harm to the customers can be traced directly to Picower's conduct and is not a claim the Trustee could bring.  Count 4 thus states a particularized, non-derivative claim against the Picowers.  Count 5, which pleads a claim for aiding and abetting fraud, is to the same effect.  Again, the harm to the customers can be traced directly to Picower's conduct.

Finally, Count 6 states a non-nominative tort that permits a court to order relief whenever a defendant causes deliberate temporal harm without privilege or justification. *See Morrison v. National Broadcasting, Co.*, 24 A.D.2d 284 (1st Dep't 1965) (Breitel, J.), *rev'd on other grounds* 19 N.Y.2d 453 (NY 1967). The tort is designed to be a flexible, indeed, capacious tort, that can be molded by the court to meet the circumstances. *See id*; *see also Board of Education of Farmingdale Union Free School District v. Farmingdale Classroom Teachers Association, Inc.,* 38 N.Y.2d 397 (1975). Since the gravamen of the tort is the intentional infliction of harm on, and special damages inuring to, the plaintiff, it is by definition a particularized claim that flows directly from the defendant's misconduct. *See Morrison*, 24 A.D.2d 284. Accordingly, count 6 is non-derivative because it alleges a particularized injury caused by the Picowers.

This explains why the Trustee did not discuss any of these claims in the Enforcement Motion. And having failed to do so then, he is barred from doing so on reply. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) (holding that arguments cannot be made for first time in reply papers).

## **CONCLUSION**

For the foregoing reasons, the Marshall Plaintiffs' Motion to Dismiss should be granted and the Trustee's Enforcement Motion should be denied.  The Court should impose sanctions on the Trustee in the amount of all of the counsel fees and costs incurred by the Marshall Plaintiffs in responding to the Enforcement Motion.


**BECKER & POLIAKOFF LLP**

Dated:          April 20, 2014
                New York, New York          By:     */s/ Helen Davis Chaitman*
                                                    Helen Davis Chaitman
                                                    45 Broadway
                                                    New York, New York 10006
                                                    (212) 599-3322

                                                    *Attorneys for Defendants Susanne
                                                    Stone Marshall, Adele Fox, Marsha
                                                    Peshkin, and Russell Oasis*