# EXHIBIT 1

12-1645 (L)
In Re: Bernard L. Madoff Investment Securities LLC

# In the
# United States Court of Appeals
# For the Second Circuit

————————

AUGUST TERM 2012
Nos. 12-1645-bk(L), 12-1646-bk(CON), 12-1651-bk(CON),
12-1669-bk(CON), 12-1703-bk(CON)

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC,
*Debtor*.

SUSANNE STONE MARSHALL, individually and to the extent she
purports to represent a class of those similarly situated,
ADELE FOX, individually and to the extent she purports to represent
a class of those similarly situated,
*Claimants-Appellants*,

*v.*

IRVING H. PICARD, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,
*Appellee*,

SECURITIES INVESTOR PROTECTION CORPORATION,
*Intervenor*.*

————————

—————————————

* The Clerk of Court is directed to amend the official caption in this case to
conform to the listing of the parties above.

Appeal from the United States District Court
for the Southern District of New York.
No. 10 Civ. 7101 (JGK)—John G. Koeltl, *Judge.*

————

ARGUED: DECEMBER 6, 2012
DECIDED: JANUARY 13, 2014

————

Before: CABRANES, RAGGI, and CARNEY, *Circuit Judges.*

————

Once again, we are asked to review the liquidation proceedings involving Bernard L. Madoff Investment Securities LLC ("BLMIS")—the investment enterprise created by Bernard L. Madoff to effect his now-infamous Ponzi scheme. These consolidated appeals arise out of a permanent injunction entered by the United States Bankruptcy Court for the Southern District of New York (Burton R. Lifland, *Bankruptcy Judge*) and affirmed by the United States District Court for the Southern District of New York (John G. Koeltl, *Judge*), enjoining state law tort actions brought by appellants, two of Madoff's defrauded "investors," against the estate of Jeffry M. Picower, one of Madoff's alleged co-conspirators, and related defendants (collectively, "Picower defendants"). We consider two questions: (1) whether the Bankruptcy Court had the authority under the Bankruptcy Code to enjoin appellants' actions as "derivative" of adversary proceedings brought by the trustee for the BLMIS estate, Irving Picard ("Picard" or the "Trustee"), against the Picower defendants; and, if indeed authorized by the Bankruptcy Code, (2) whether the exercise of such authority transgressed the limitations imposed by Article III of the United States Constitution.

First, we conclude that appellants' complaints impermissibly attempt to "plead around" the Bankruptcy Court's injunction barring all claims "derivative" of those asserted by the Trustee. Although appellants seek damages that are not recoverable in an avoidance action, their complaints allege nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS, instead of "particularized" conduct directed at BLMIS customers. Second, we conclude that the Bankruptcy Court operated within the confines of Article III of the United States Constitution, as recently interpreted by the Supreme Court in *Stern v. Marshall*, 131 S. Ct. 2594 (2011). Accordingly, we hold that the Bankruptcy Court did not exceed the bounds of its authority under the Bankruptcy Code or run afoul of Article III.

Affirmed.

————

HELEN DAVIS CHAITMAN (Peter W. Smith, *on the brief*), Becker & Poliakoff, LLP, New York, NY, *for Claimant-Appellant Susanne Stone Marshall*.

LISA S. BLATT (Michael L. Bernstein, Charles A. Malloy, Isaac B. Rosenberg, *on the brief*), Arnold & Porter LLP, Washington, DC; (Richard L. Stone, *on the brief*), Palm Beach, FL; (James W. Beasley, Jr., Joseph G. Galardi, *on the brief*), Beasley Hauser Kramer & Galardi, P.A., West Palm Beach, FL, *for Claimant-Appellant Adele Fox*.

DAVID J. SHEEHAN (Deborah H. Renner, Tracy L. Cole, Keith R. Murphy, Thomas D. Warren, *on the brief*), Baker & Hostetler LLP, New York, NY, *for Appellee*.

Josephine Wang, General Counsel, Kevin H. Bell, Senior Associate General Counsel for Dispute Resolution, Lauren Attard, Assistant General Counsel, Securities Investor Protection Corporation, Washington, DC, *for Intervenor*.

————

JOSÉ A. CABRANES, *Circuit Judge*:

Once again, we are asked to review the liquidation proceedings involving Bernard L. Madoff Investment Securities LLC ("BLMIS")—the investment enterprise created by Bernard L. Madoff to effect his now-infamous Ponzi scheme. These consolidated appeals arise out of a permanent injunction entered by the United States Bankruptcy Court for the Southern District of New York (Burton R. Lifland, *Bankruptcy Judge*) and affirmed by the United States District Court for the Southern District of New York (John G. Koeltl, *Judge*), enjoining state law tort actions asserted by appellants, two of Madoff's defrauded "investors," against the estate of Jeffry M. Picower, one of Madoff's alleged co-conspirators, and related defendants (collectively, "Picower defendants"). We consider two questions: (1) whether the Bankruptcy Court had the authority under the Bankruptcy Code to enjoin appellants' actions as "derivative" of adversary proceedings brought by the trustee for the BLMIS estate, Irving Picard ("Picard" or the "Trustee"), against the Picower defendants; and, if indeed authorized by the Bankruptcy Code, (2) whether the Bankruptcy Court transgressed the limitations

on its authority imposed by Article III of the United States Constitution.

First, we conclude that appellants' complaints impermissibly attempt to "plead around" the Bankruptcy Court's injunction barring all claims "derivative" of those asserted by the Trustee. Although appellants seek damages that are not recoverable in an avoidance action, their complaints allege nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS, instead of "particularized" conduct directed at BLMIS customers. Second, we conclude that the Bankruptcy Court operated within the confines of Article III of the United States Constitution, as recently interpreted by the Supreme Court in *Stern v. Marshall*, 131 S. Ct. 2594 (2011). Accordingly, we hold that the Bankruptcy Court did not exceed the bounds of its authority under the Bankruptcy Code or run afoul of Article III.

## BACKGROUND

Following Madoff's arrest in December 2008, the Securities and Exchange Commission filed a civil complaint against Madoff and BLMIS in the United States District Court for the Southern District of New York, alleging that they had operated a Ponzi scheme through BLMIS's investment-advisor activities. On December 15, 2008, upon an application filed by the Securities Investment Protection Corporation ("SIPC"),[1] the District Court entered a protective order placing BLMIS in liquidation under the Securities Investor Protection Act ("SIPA"), appointing Picard as the

---

[1] The Securities Investor Protection Corporation is "a nonprofit corporation consisting of registered broker-dealers and members of national securities exchanges that supports a fund used to advance money to a SIPA trustee." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 232-33 (2d Cir. 2011).

Trustee, and referring the case to the United States Bankruptcy
Court for the Southern District of New York.[2]  *See* Order, *SEC v.
Bernard L. Madoff and Bernard L. Madoff Inv. Sec. LLC*, No. 08 Civ.
10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4.

## A

SIPA establishes procedures for the expeditious and orderly
liquidation of failed broker-dealers, and provides special protections
to their customers.  A trustee's primary duty under SIPA is to
liquidate the broker-dealer and, in so doing, satisfy claims made by
or on behalf of the broker-dealer's customers for cash balances.  *In re
Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011).  In a
SIPA liquidation, a fund of "customer property" is established—
consisting of cash and securities held by the broker-dealer for the
account of a customer, or proceeds therefrom, 15 U.S.C. § 78lll(4)—
for priority distribution exclusively among customers, *id.* § 78fff-
2(c)(1).  The Trustee allocates the customer property so that
customers "share ratably in such customer property . . . to the extent
of their respective net equities."  *Id.* § 78fff-2(c)(1)(B).

In order to calculate a customer's "net equity," Picard chose
the "net investment method," under which the amount owed to
each customer by BLMIS was "the amount of cash deposited by the
customer into his BLMIS customer account less any amounts already
withdrawn by him."  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv.
Sec. LLC* (*In re Bernard L. Madoff Inv. Sec. LLC*), 424 B.R. 122, 125
(Bankr. S.D.N.Y. 2010).  In other words, BLMIS customers had net
equity only to the extent that their total cash deposits exceeded their
total cash withdrawals.  *Id.* at 142.  On March 1, 2010, the

---

[2] In April 2009, Madoff was forced into an involuntary Chapter 7 bankruptcy
proceeding, which was later consolidated with BLMIS's SIPA liquidation.

Bankruptcy Court entered an order approving the "net investment method" (the "Net Equity Decision"), which we subsequently affirmed. *See id.* at 135, 140, *aff'd*, 654 F.3d 229 (2d Cir. 2011).

Following these proceedings, appellants each filed claims in the liquidation proceeding against the BLMIS estate. Picard allowed appellant Marshall's claim for $30,000, but he denied two claims filed by Fox on the grounds that she was a so-called "net winner," meaning that she had already withdrawn more than she deposited.

**B**

On May 12, 2009, Picard commenced an adversary proceeding against the Picower defendants in the United States Bankruptcy Court for the Southern District of New York (the "New York action"), alleging that they had made hundreds of improper withdrawals from BLMIS totaling $6.7 billion.[3] The complaint asserted claims for fraudulent transfers, avoidable preferences, and turnover under the Bankruptcy Code and New York's Uniform Fraudulent Conveyance Act, N.Y. Debt. & Cred. Law §§ 270-281.

While settlement talks were ongoing in the New York action, appellants filed complaints in the United States District Court for the Southern District of Florida on behalf of putative classes allegedly adversely affected by the Trustee's method for calculating net equity (the "Florida actions"). Marshall purported to represent the interests of BLMIS account holders who had not filed SIPA claims with the Trustee or whose SIPA claims were disallowed either in whole or in part. In her parallel suit, Fox allegedly represented the interests of BLMIS customers designated "net winners" and thus not

---

[3] This figure was later increased to $7.2 billion to reflect additional withdrawals.

entitled to any compensation in the SIPA litigation. Their complaints asserted claims for civil conspiracy, conversion, and conspiracy to violate the Florida Civil Remedies for Criminal Practices Act, *see* Fla. Stat. § 772.101 *et seq.*

On May 3, 2010, the Bankruptcy Court in New York granted the Trustee's application for a preliminary injunction, thereby enjoining the Florida actions. The Court held that the Florida actions violated the District Court's December 15, 2008 Protective Order, usurped causes of action belonging to the estate in violation of the Bankruptcy Code's automatic stay provision, *see* 11 U.S.C. § 362(a),[4] and undermined the Bankruptcy Court's jurisdiction over administration of the BLMIS estate, *see* 11 U.S.C. § 105(a).[5] *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC* (*In re Bernard L. Madoff Inv. Sec. LLC*), 429 B.R. 423, 430, 433-37 (Bankr. S.D.N.Y. 2010).

## C

On December 17, 2010, the Trustee and the Picower defendants entered into a settlement agreement (the "Settlement Agreement"), whereby the Picower defendants agreed to return $5 billion to the BLMIS estate, out of the proceeds of a $7.2 billion civil forfeiture they simultaneously agreed to make to the U.S. Attorney's

---

[4] The relevant provision of 11 U.S.C. § 362(a) states that "an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 [(SIPA)], operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *Id.* § 362(a)(3).

[5] Under 11 U.S.C. § 105(a), the Bankruptcy Court has authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

Office.[6]  In return, the Trustee agreed to release any other claims he might have had against the Picower defendants relating to BLMIS. The Trustee further agreed as part of the settlement to seek a narrowly-tailored permanent injunction from the Bankruptcy Court barring any BLMIS customer from suing the Picower defendants for certain claims arising from or related to Madoff's Ponzi scheme.

On December 17, 2010, the Trustee filed his motion for approval of the Settlement Agreement and for a permanent injunction pursuant to Rules 2002 and 9019 of the Bankruptcy Rules and section 105(a) of the Bankruptcy Code.  SIPC and the government filed a statement in support of the Trustee's motion.  On January 13, 2011, the Bankruptcy Court approved the Settlement Agreement, and issued the permanent injunction as follows:

> [A]ny BLMIS customer or creditor of the BLMIS estate who filed or could have filed a claim in the liquidation, anyone acting on their behalf or in concert or participation with them, or anyone whose claim in any way arises from or is related to BLMIS or the Madoff

---

[6] Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' . . . , or a conspiracy to commit such offense," is subject to forfeiture to the government.  "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) to include any offense listed under 18 U.S.C. § 1961(1), which in turn lists, among other offenses, violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and "fraud in the sale of securities."  In a complaint dated December 17, 2010, the government commenced a civil action pursuant to these statutes, seeking forfeiture of $7.2 million "traceable to the Ponzi scheme orchestrated by Bernard L. Madoff ('Madoff') that was paid to Jeffry M. Picower."  Joint App'x 3238.  In its complaint, the government stated its intention, upon the entry of a final order of forfeiture to the government, "to request that the funds be distributed to victims of the fraud," *id.* at 3239, pursuant to 21 U.S.C. § 853(i)(1), which provides that the "Attorney General is authorized to . . . restore forfeited property to victims."

Ponzi scheme, is hereby permanently enjoined from asserting any claim against the Picower BLMIS Accounts or the Picower Releasees *that is duplicative or derivative of the claims brought by the Trustee,* or which could have been brought by the Trustee against the Picower BLMIS Accounts or the Picower Releasees . . . .

Special App'x 31 (emphasis supplied).  At the January 13, 2011 motion hearing, the Bankruptcy Court made clear that, under its interpretation of the injunction, the claims in appellants' Florida actions were barred as duplicative and derivative of those asserted in the Trustee's complaint.  *See* Joint App'x 309 (Bankruptcy Court stating that, "[Fox and Marshall's claims] are subsumed in the prior injunctive paragraph").

On March 26, 2012, the District Court, on appeal, affirmed the January 13 Order, holding that the settlement was fair and reasonable, and that the issuance of the permanent injunction was a proper exercise of the Bankruptcy Court's authority under section 105(a).  *See Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d 469, 491 (S.D.N.Y. 2012).  The Court also agreed that the claims asserted in appellants' Florida actions were "duplicative or derivative" of those claims that could have been or were asserted by the Trustee in the New York action and, accordingly, were barred by the terms of the injunction.  *Id.* at 489.

This timely appeal followed.

## DISCUSSION

The relevant standards of review are familiar ones.  "On appeal from the district court's review of a bankruptcy court

decision, we review the bankruptcy court decision independently, accepting its factual findings unless clearly erroneous but reviewing its conclusions of law *de novo*." *Swimelar v. Baker (In re Baker)*, 604 F.3d 727, 729 (2d Cir. 2010) (internal quotations omitted). As relevant here, "[t]he standard of review for the grant of a permanent injunction, including an anti-suit injunction, is abuse of discretion." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 651 (2d Cir. 2004); *see also Sims v. Blot (In re Sims)*, 534 F.3d 117, 132 (2d Cir. 2008) (explaining the term of art "abuse of discretion" as a ruling based on "an erroneous view of the law or on a clearly erroneous assessment of the evidence, or . . . a decision that cannot be located within the range of permissible decisions." (internal quotations and citations omitted)).

At the January 13, 2011 hearing, the Bankruptcy Court stated explicitly that the Florida actions were among the claims enjoined by the permanent injunction.[7] Accordingly, the principal issue before us is whether the injunction, as applied to bar the Florida actions, was a proper exercise of the Bankruptcy Court's jurisdiction over non-debtor third-parties. Appellants contend that the injunction exceeded the Bankruptcy Court's powers under the Bankruptcy Code and under Article III of the United States Constitution. We consider these contentions in turn.

---

[7] We need not be detained by the fact that the injunction does not expressly refer to the Florida actions because it broadly enjoins "any claim . . . that is duplicative or derivative of the claims brought by the Trustee." Special App'x 31. The scope of an injunction "turns upon the intent and effect of the bankruptcy court's" order, and, thus, "[a] bankruptcy court's interpretation of its own order warrants customary appellate deference." *Casse v. Key Bank Nat'l Ass'n (In re Casse)*, 198 F.3d 327, 333 (2d Cir. 1999) (internal quotation omitted). At the January 13, 2011 hearing, the Court made clear that appellants' actions "are subsumed in the . . . injunctive paragraph." Joint App'x 309. Accordingly, the question presented is whether the injunction, *as applied by the Bankruptcy Court to bar appellants' claims*, was a proper exercise of its authority, or whether appellants' actions assert independent claims beyond the reach of the Bankruptcy Court.

### A.

Only recently we reaffirmed that "the touchstone for bankruptcy jurisdiction [over a non-debtor's claim] remains whether its outcome might have any 'conceivable effect' on the bankruptcy estate." *Quigley Co. v. Law Offices of Peter G. Angelos (In re Quigley Co.)*, 676 F.3d 45, 57 (2d Cir. 2012) (citation and internal quotation omitted). In a SIPA liquidation, the bankruptcy estate encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).[8] Such interests include "causes of action possessed by the debtor at the time of filing," *Jackson v. Novak (In re Jackson)*, 593 F.3d 171, 176 (2d Cir. 2010), and "[a]ny interest in property that the trustee recovers" under specified Bankruptcy Code provisions, 11 U.S.C. § 541(a)(3). "Every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of [the bankruptcy estate]." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (brackets and citation omitted).

A claim based on rights "derivative" of, or "derived" from, the debtor's typically involves property of the estate. *See In re Quigley*, 676 F.3d at 57 ("[W]e have treated whether a suit seeks to impose derivative liability as a helpful way to assess whether it has the potential to affect the bankruptcy *res* . . . ."). By contrast, a

---

[8] Although a SIPA liquidation is not a traditional bankruptcy, a SIPA trustee's authority to bring claims in administering a SIPA liquidation is coextensive with the powers of a Title 11 bankruptcy trustee. *See* 15 U.S.C. § 78fff-1(a) (SIPA trustee "vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11"); *id.* § 78fff(b) (SIPA liquidation proceedings "shall be conducted in accordance with, and as though it were being conducted under . . . Title 11"). Accordingly, we rely on statutes and case law relating to Title 11 bankruptcy actions.

bankruptcy court generally has limited authority to approve releases of a non-debtor's independent claims. *See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141-43 (2d Cir. 2005). As one federal appeals court has explained:

> The point is simply that the trustee is confined to enforcing entitlements of the [debtor]. He has no right to enforce entitlements of a creditor. He represents the unsecured creditors of the [debtor]; and in that sense when he is suing on behalf of the [debtor] he is really suing on behalf of the creditors of the [debtor]. But there is a difference between a creditor's interests in the claims of the [debtor] against a third party, which are enforced by the trustee, and the creditor's own direct—not derivative—claim against the third party, which only the creditor . . . can enforce.

*Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994). Put another way, "when creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995).

In light of these principles, we note that the parties have not objected, nor could they have objected, to the plain text of the injunction. The injunction, by its own terms, is limited to third-party claims based on derivative or duplicative liability or claims that could have been brought by the Trustee against the Picower releasees. *See* Special App'x 31. Insofar as such claims are truly duplicative or derivative, they undoubtedly have an effect on the

bankruptcy estate and, thus, are subject to the Bankruptcy Court's jurisdiction.  *See In re Quigley*, 676 F.3d at 57.

We have defined so-called "derivative claims" in the context of bankruptcy as ones that "arise[] from harm done to the estate" and that "seek[] relief against third parties that pushed the debtor into bankruptcy."  *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC) ("JPMorgan Chase")*, 721 F.3d 54, 70 (2d Cir. 2013).  In assessing whether a claim is derivative, we inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted.  *See Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.) ("Manville III")*, 517 F.3d 52, 67 (2d Cir. 2008).  While a derivative injury is based upon "a secondary effect from harm done to [the debtor]," an injury is said to be "particularized" when it can be "directly traced to [the third party's] conduct." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 704 (2d Cir. 1989).

Most of this Circuit's jurisprudence on a bankruptcy court's authority to enjoin derivative claims in liquidation proceedings stems from what has been aptly characterized as "the long saga of litigation arising from the bankruptcy of the Johns-Manville Corporation ('Manville'), a major national asbestos concern." *In re Quigley*, 676 F.3d at 55.  A brief comparison of two cases from that saga helps illustrate the principles just described.

In *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.) ("Manville I")*, 837 F.2d 89 (2d Cir. 1988), plaintiff, a distributor of Manville's asbestos products, alleged that it was coinsured under Manville's insurance policies.  *Id.* at 90.  As part of Manville's settlement with its insurers, the bankruptcy court entered an injunction relieving the insurers of all obligations related to the

disputed policies and channeling all insurance claims to the proceeds of the settlement. *Id.* Plaintiff challenged the court's authority to issue such an order, asserting that its contract-based claims against the insurers were independent from Manville's. We rejected this contention, asserting that

> [plaintiff's] rights as an insured vendor are completely derivative of Manville's rights as the primary insured. Such derivative rights are no different in this respect from those of the asbestos victims who have already been barred from asserting direct actions against the insurers.[9]   [Plaintiff] asserts contractual obligations whereas the direct action plaintiffs' claims sounded in tort; nevertheless, in both instances, third parties seek to collect out of the proceeds of Manville's insurance policies on the basis of Manville's conduct. In both cases, plaintiffs' claims are inseparable from Manville's own insurance coverage and are consequently well within the Bankruptcy Court's jurisdiction over Manville's assets.

*Id.* at 92-93 (citation omitted). In other words, the claims of both the plaintiff and the asbestos victims were "derivative" of Manville's— whether or not they sounded in tort or contract—because they all sought compensation for the same type of asbestos-related injuries caused by Manville's products. Accordingly, we held that the

---

[9] The "direct actions" referred to here concerned tort claims brought by asbestos workers against insurers under a Louisiana statute that afforded injured persons a cause of action against the insurers when the plaintiff has an independent cause of action against the insured. In *In re Davis*, 730 F.2d 176 (5th Cir. 1984), the Fifth Circuit held that the bankruptcy court had authority to stay such actions. *Id.* at 183-84.

bankruptcy court had the authority to funnel all claims against the policies to a single proceeding in the bankruptcy court. *Id.* at 93.

In *Manville III*, however, we held that plaintiffs' claims against Travelers Insurance were independent of Manville's.[10] Plaintiffs alleged in this instance that Travelers had acquired knowledge regarding the dangers of asbestos, but "influenced Manville's purported failure to disclose its knowledge of asbestos hazards." 517 F.3d at 58 (alteration omitted). In the course of the proceedings, the bankruptcy court entered a "Clarifying Order" specifying that these lawsuits were barred by the prior injunction. *Id.* at 59. We held, however, that such claims were non-derivative. Whereas the *Manville I* plaintiffs sought "indemnification or compensation for the tortious wrongs of Manville," the *Manville III* plaintiffs sought "to recover directly from Travelers . . . for [Travelers'] own alleged misconduct," namely, violations under state law of "an independent legal duty in its dealing with plaintiffs." *Id.* at 63; *see also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 143 & n.2 (2009).

We recently had occasion to apply the distinction drawn in *Manville III* in another case arising out of the SIPA-liquidation of BLMIS. In *JPMorgan Chase*, the Trustee sued various financial institutions, alleging that they had aided and abetted Madoff's fraud. 721 F.3d at 59. In holding that the Trustee lacked standing to bring such claims on behalf of BLMIS customers, we noted that the claims were not derivative: they were brought "on behalf of thousands of customers against third-party financial institutions for

---

[10] *Manville III* was reversed by the Supreme Court on narrow procedural grounds, *see Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); however, in *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.) ("Manville IV")*, 600 F.3d 135 (2d Cir. 2010), we reaffirmed the jurisdictional analysis, *see id.* at 152 (clarifying that the Supreme Court "did not contradict the conclusion of [*Manville III*'s] jurisdictional inquiry").

their handling of individual investments made on various dates in varying amounts." *Id.* at 71.

In the following section, we explain why the Florida actions are predicated upon secondary harms flowing from BLMIS—as in *Manville I*—rather than upon a particularized injury traceable to the Picower defendants' conduct—as in *Manville III* and *JPMorgan Chase*.

## B

### (1)

The Trustee's complaint in this case asserts fraudulent conveyance claims against the Picower defendants under the Bankruptcy Code and New York law.[11] It alleges that the Picower defendants withdrew billions of dollars from their BLMIS accounts—funds belonging to BLMIS's defrauded customers—and, because the Picower defendants knew or should have known that they were profiting from such fraud, the withdrawals were thus avoidable. Although state law typically provides creditors with the right to assert fraudulent conveyance claims,

---

[11] The Bankruptcy Code authorizes the Trustee to assert claims for the recovery of so-called "fraudulent transfers" against "the initial transferee of such transfer[s]." 11 U.S.C. § 550(a)(1). A transfer is deemed to be fraudulent—and therefore "avoidable" under the Bankruptcy Code—if the transfer was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted," *id.* § 548(a)(1)(A), or if the debtor "received less than a reasonably equivalent value in exchange for such transfer," *id.* § 548(a)(1)(B). A recipient of a transfer is entitled to a "good faith" defense upon a showing that it took the transfer "for value" and "in good faith." *Id.* § 548(c). The presence of "good faith" depends upon, *inter alia*, "whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose." *In re Bayou Grp., LLC*, 439 B.R. 284, 310 (S.D.N.Y. 2010).

> [a] typical fraudulent transfer claim is perhaps the
> paradigmatic example of a claim that is "general" to all
> creditors . . . . It is normally the debtor's creditors, and
> not the debtor itself, that have the right to assert a
> fraudulent transfer claim outside of bankruptcy, but in
> bankruptcy such a claim is usually brought by the
> trustee, for the benefit of all creditors.  This is because
> the claim is really seeking to recover property of the
> estate.

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas
Petroleum, Inc.)*, 522 F.3d 575, 589 n.9 (5th Cir. 2008).

Appellants Marshall and Fox argue that their complaints
assert non-derivative conspiracy-based claims predicated upon the
Picower defendants' direct participation in the theft of BLMIS
customers' funds.  However, the allegations in appellants' respective
Florida complaints echo those made by the Trustee.  With regard to
the Picower defendants' knowledge of the fraud, each complaint
alleges: (1) that the Picower defendants' account supposedly
achieved implausibly high rates of return, *see* Joint App'x 707, 1358,
2584; (2) that, unlike other investors, the Picower defendants were
sufficiently close to Madoff to be privy to BLMIS' trading records,
*see id.* at 722, 1349, 2584; and (3) that the Picower defendants knew of
fictitious and backdated trading activity in their accounts, *see id.* at
724, 1359, 2593.  *See also Sec. Investor Prot. Corp. v. Bernard L. Madoff
Inv. Sec. LLC*, 477 B.R. 351, 358-78 (Bankr. S.D.N.Y. 2012) (chart
comparing allegations in Trustee's complaint with those in the
Florida complaints, appended as Exhibit A to the opinion of the
Bankruptcy Court).  In fact, the Florida complaints cite the factual
allegations contained in the Trustee's complaint in New York's
bankruptcy court multiples times in support of their claims.

Appellants rightly note that overlapping allegations may give rise to a multiplicity of claims. As the Fifth Circuit has explained, "there is nothing illogical or contradictory about saying that [a third-party defendant] might have inflicted direct injuries on both the [estate's creditors] and [the debtor estate] during the course of dealings that form the backdrop of both sets of claims." *In re Seven Seas*, 522 F.3d at 587; *see, e.g., Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988) (finding that a creditor had "standing to bring a RICO claim, regardless of the fact that a bankrupt [debtor] might also have suffered an identical injury" because "[creditor] does not seek recovery for injuries suffered by [debtor] but for injuries it suffered directly").

We are nonetheless wary of placing too much significance on the labels appellants attach to their complaints, lest they circumvent the Net Equity Decision by "pleading around" the automatic stay and permanent injunction. *Cf., e.g., Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 200 (2d Cir. 1999) ("In an effort to plead around the proviso [preserving immunity for torts of misrepresentation] the complaint is cast in terms of the intentional infliction of emotional distress. However cast, the wrongful acts alleged to have caused the injury are misrepresentations . . . ."). The only allegations of the Picower defendants' direct involvement in the Ponzi scheme are that they prepared false documentation, recorded and withdrew fictional profits, and filed false statements in connection with their tax returns. *See* Joint App'x 1366 (Marshall Complaint); *id.* at 2600-01 (Fox Complaint). Appellants characterize these allegations as "the Picower Defendants work[ing] hand-in-glove with Madoff and BLMIS to perpetrate the Ponzi scheme." Fox Br. 24; *see also* Marshall Br. 31. But, as Judge Richard J. Sullivan recently explained in a case predicated upon the same alleged conspiratorial acts,

> [t]he . . . Complaints plead nothing more than that the
> Picower Defendants traded on their *own* BLMIS
> accounts, knowing that such "trades" were fraudulent,
> and then withdrew the "proceeds" of such falsified
> transactions from BLMIS.  All the "book entries" and
> "fraudulent trading records" that the Complaints allege
> refer to nothing more than the fictitious records BLMIS
> made, *for the Picower Defendants*, to document these
> fictitious transactions.  In other words, the Complaints
> plead nothing more than that the Picower Defendants
> fraudulently withdrew money from BLMIS.

*A & G Goldman Partnership v. Picard (In re Bernard L. Madoff Inv. Sec.,
LLC)*, No. 12 CIV. 6109 RJS, 2013 WL 5511027, at *7 (S.D.N.Y. Sept.
30, 2013) (citation omitted).

**(2)**

The case law upon which appellants rely to argue that they
have alleged "particularized" injuries directly traceable to the
Picower defendants is inapposite.  Appellant Marshall draws our
attention to *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037 (2d Cir.
1986), in which we held that a plaintiff's cause of action for
conspiracy to defraud "was not merely an artful repleading of
[fraudulent conveyance] claims."  *Id.* at 1043.  But in *Cumberland Oil*,
the plaintiff did not assert merely the "right . . . to recover
misappropriated assets," but "alleged with particularity that
misrepresentations of facts [about debtor's financial health] were
made by [defendant] in furtherance of a conspiracy to defraud."  *Id.*
at 1042-43.  The complaints here, however, do not allege that the
Picower defendants made any such misrepresentations to BLMIS

customers. Rather, as in *Manville I*, appellants' alleged injuries are inseparable from, and predicated upon, a legal injury to the estate—namely, the Picower defendants' fraudulent withdrawals from their BLMIS accounts of what turned out be other BLMIS customers' funds.

Appellant Fox relies on our decision in *Hirsch v. Arthur Anderson & Co.*, and the Fifth Circuit's in *In re Seven Seas*, to argue that her claims allege "particularized" injuries traceable to the Picower defendants. In *Hirsch*, the Trustee sought to sue Arthur Anderson & Co. for helping perpetuate the debtors' Ponzi scheme by distributing misleading private placement memoranda to investors. 72 F.3d at 1087-89. And in *In re Seven Seas*, bondholders alleged that a secured creditor had knowingly used misleading financial information to induce them to purchase unsecured notes issued by the debtor. 522 F.3d at 578-81. In both cases, the Courts held that the claims alleged an injury that was direct, and not merely derivative, of an injury to the debtor. *See Hirsch*, 72 F.3d at 1094 (holding that the claims "are the property of those investors, and may be asserted only by them and to the exclusion of [the Trustee]"); *In re Seven Seas*, 522 F.3d at 586 (holding that the claims alleged "a direct injury . . . that was independent of any injury to [the debtor]").

As just noted, however, appellants have not alleged that the Picower defendants took any such "particularized" actions aimed at BLMIS customers. They have not alleged, for instance, that the Picower defendants made any misrepresentations to appellants. Appellants respond that their respective complaints allege "that the Picower Defendants' wrongful conduct ensured the fraud's success *by inducing [them] and other customers to invest* (and remain invested) in BLMIS." Fox Br. 25 (emphasis supplied); *see also* Marshall Br. 31. We do not think that the complaints can reasonably be read in this

way.  Allegations that the Picower defendants knowingly reaped the
benefits of Madoff's scheme through fraudulent withdrawals, and
effected such withdrawals through backdating trades and recording
fictional profits, does not amount to a particularized claim that they
directly participated in defrauding BLMIS customers by inducing
them to invest.

### (3)

Appellants' final contention is that their complaints are
particularized and non-derivative because of the nature of the relief
sought.  Whereas the Trustee sought the recovery of assets BLMIS
transferred to the Picower defendants, appellants seek damages for
(1) the loss on the reasonable return on their investments, (2) taxes
paid on fictitious gains, and (3) monetary losses should they be sued
by the Trustee for the recovery of their own withdrawals from
BLMIS—none of which is recoverable in an avoidance action under
the Bankruptcy Code.  *See* 11 U.S.C. § 550(a) ("[T]he trustee may
recover, for the benefit of the estate, the property transferred, or . . .
the value of such property . . . ."). Yet appellants' claimed damages,
also suffered by all BLMIS customers, still remain mere secondary
harms flowing from the Picower defendants' fraudulent
withdrawals and the resulting depletion of BLMIS funds.  *Cf. Sec.
Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 491 B.R. 27, 36
(S.D.N.Y. 2013) ("[Investors'] actions relate to [investment
manager's] fraud on his own investors—not Madoff's fraud at the
expense of his customers—and therefore are independent claims
based on separate facts, theories, and duties than the Trustee's
fraudulent transfer claims against [investment manager].").

We conclude, therefore, that appellants purported conspiracy-
based claims against the Picower defendants are "derivative" of

those asserted by the Trustee in his fraudulent conveyance action, and, therefore, the Bankruptcy Court was authorized to enjoin those actions.[12]

We note that we affirm without prejudice to appellants seeking leave to amend their complaints. There is conceivably some particularized conspiracy claim appellants could assert that would not be derivative of those asserted by the Trustee. That question, however, is not properly before us, and is a question in the first instance for the United States District Court for the Southern District of Florida.

## C

We turn now to whether the Bankruptcy Court, an Article I court, exceeded the jurisdictional limits established by Article III of the United States Constitution. Both appellant Fox and Marshall's arguments in this regard are premised upon the Supreme Court's recent holding in *Stern v. Marshall*, 131 S. Ct. 2594 (2011). In *Stern*, a

---

[12] The Bankruptcy Court also articulated alternative bases for its injunction. In *In re Metromedia Fiber Network, Inc.*, we held that a bankruptcy court could permit the nonconsensual release of creditors' claims against third parties upon a finding of "truly unusual circumstances" that "render the release terms important to [the] success of the [underlying bankruptcy reorganization plan]." 416 F.3d at 143. The District Court found such circumstances present in the instant case on the basis of the size of the estate's recovery and on the importance of the injunction to prevent those who are not SIPA payees under the Net Equity Decision from circumventing that decision and undermining the liquidation plan. *See In re Madoff*, 848 F. Supp. 2d at 490. Because we hold that appellants' claims are property of the estate in that they are "derivative" of the Trustee's fraudulent conveyance action, we do not address whether this case satisfies the stringent standard laid out in *Metromedia* for injunctive relief.

In addition, because we find that appellants' claims are derivative of the Trustee's claims for fraudulent withdrawals, the fact that the Trustee lacks standing to bring *bona fide* conspiracy claims on behalf of BLMIS customers under *JPMorgan Chase* is irrelevant.

widow filed a state law counterclaim in her Chapter 11 bankruptcy case to recover for her stepson's alleged tortious interference with an inheritance gift she expected from her deceased husband.  *Id.* at 2601.  The Court observed that the Constitution generally reserves the power to adjudicate such common law claims to courts established under Article III.  *Id.* at 2608-09.  One exception to this principle is a category of cases involving "public rights."[13]  *Id.* at 2613.  The Court held, however, that the counterclaim at issue did not fall within any of the formulations of that exception because it neither derived from, nor was dependent upon, any agency regulatory regime, and was not limited to a particularized area of the law.  *Id.* at 2614-15.  Accordingly, the Court invalidated the portion of the Bankruptcy Code authorizing bankruptcy judges to enter final judgments on claims and counterclaims, such as the widow's, which are exclusively based upon some legal right guaranteed by state law.  *Id.* at 2620.

Appellant Fox argues that, in light of *Stern*, "the [bankruptcy] court improperly wielded powers reserved for Article III courts by permanently enjoining her claims."  Fox Br. 53.  According to Fox, her state law conspiracy claims are akin to the widow's tortious interference counterclaims in that they are "in no way derived from or dependent upon bankruptcy law," but instead "exist[ed] without regard to any bankruptcy proceeding."  *Stern*, 131 S. Ct. at 2618.  As noted above, however, appellants' purported tort claims are, in essence, disguised fraudulent transfer actions, which belong

---

[13] Although the contours of this exception have not been precisely delineated, the Supreme Court broadly defined cases involving a "public right" as those "in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority.  In other words, . . . what makes a right 'public' rather than private is that the right is integrally related to particular federal government action."  *Stern*, 131 S. Ct. at 2613 (2011).

exclusively to the Trustee. Accordingly, appellants' claims are distinct from those in *Stern* held to be beyond the powers of a bankruptcy court.

Appellant Marshall, in turn, argues that, in light of *Stern*, the Bankruptcy Court lacked jurisdiction to enter a final judgment on the *Trustee's* fraudulent transfer action against the Picower defendants. In *Stern*, the Supreme Court drew an analogy between the widow's tortious interference claim and a trustee's fraudulent conveyance action against a noncreditor, *id.* at 2614, which, under *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), does not fall within the "public rights" exception. *See Stern*, 131 S. Ct. at 2614 ("[The debtor's] counterclaim—like the fraudulent conveyance claim at issue in *Granfinanciera*—does not fall within any of the varied formulations of the public rights exception in this Court's cases."). As the Court explained in *Granfinanciera*:

> There can be little doubt that fraudulent conveyance actions by bankruptcy trustees . . . are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res. They therefore appear matters of private rather than public right.

*Granfinanciera*, 492 U.S. at 56 (citation omitted). Therefore, according to Marshall, the Bankruptcy Court did not have authority to enter final judgment on the Trustee's fraudulent transfer claims against the Picower defendants, much less to issue the accompanying order enjoining all duplicative and derivative actions.

Yet *Granfinanciera* held that a fraudulent conveyance claim is a matter of private right when asserted against *"a person who has not submitted a claim against a bankruptcy estate." Id.* at 36 (emphasis supplied). The Court reaffirmed this limitation of *Granfinanciera*'s holding in *Stern*. *See Stern*, 131 S. Ct. at 2617 ("[A] preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because *then* the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship." (internal quotations omitted; brackets in original)). In this case, unlike in *Granfinanciera*, the Picower defendants filed a proof of claim against the BLMIS estate. In order to rule on that claim, the Bankruptcy Court was required to first resolve the fraudulent transfer issue. *Cf. id.* at 2617 (noting that the "factual and legal determinations" the bankruptcy court was required to make "were not disposed of in passing on objections to [creditor's] proof of claim" (internal quotations omitted)).[14]

Accordingly, the Bankruptcy Court's authority under the Bankruptcy Code to approve the settlement between the Trustee and the Picower defendants and to permanently enjoin appellants' disguised fraudulent transfer claims does not run afoul of Article III of the United States Constitution.

---

[14] In addition, the Supreme Court has recently granted a petition for a writ of certiorari, in the wake of *Stern*, concerning the scope of a bankruptcy court's authority to adjudicate fraudulent conveyance claims upon a non-creditor's consent. *See Executive Benefits Ins. Agency v. Arkison*, 133 S. Ct. 2880 (2013); *see also* Petition for Writ of Certiorari at I, *Arkison*, 133 S. Ct. at 2880 (2013) (No. 12-1200), 2013 WL 1329527 (question presented is "[w]hether Article III permits the exercise of the judicial power of the United States by bankruptcy courts on the basis of litigant consent, and, if so, whether 'implied consent' based on a litigant's conduct, where the statutory scheme provides the litigant no notice that its consent is required, is sufficient to satisfy Article III"). Depending upon the Court's ruling in *Arkison*, the Picower defendants may have consented to the Bankruptcy Court's approval of the settlement and issuance of the injunction through their course of conduct in the proceedings.

27                                                      No. 12-1645-bk(L)

# CONCLUSION

To summarize:

(1) Allegations in the Florida actions of a conspiracy between
    Madoff and the Picower defendants echo those made by
    the Trustee in his New York action for the recovery of
    fraudulent transfers. Although common facts can give rise
    to multiple claims, the Florida actions impermissibly
    attempt to "plead around" the Bankruptcy Court's
    injunction barring all "derivative" claims in that they
    allege nothing more than steps necessary to effect the
    Picower defendants' fraudulent withdrawals of money
    from BLMIS.

(2) Appellants have not alleged "particularized" injuries
    directly traceable to the Picower defendants. The Picower
    defendants are alleged to have knowingly reaped the
    benefits of Madoff's scheme through fraudulent
    withdrawals, but they are not alleged to have made any
    misrepresentations to induce investments in BLMIS or to
    have taken any other actions that could reasonably be
    understood as aimed at BLMIS customers.

(3) Although the Florida actions assert claims for damages that
    are not recoverable in an avoidance action under the
    Bankruptcy Code, appellants' claims are still "derivative"
    of the Trustee's: they are predicated upon mere secondary
    harms flowing from the Picower defendants' fraudulent
    withdrawals and the resulting depletion of BLMIS funds.

(4) The Bankruptcy Court did not run afoul of Article III of the
    United States Constitution, as interpreted by the Supreme
    Court in *Stern v. Marshall*, in enjoining the Florida actions
    and approving the settlement of the Trustee's fraudulent
    transfer claims with the Picower defendants.

Accordingly, the judgment of the District Court is **AFFIRMED**
without prejudice to Fox and Marshall seeking leave to amend their
complaints in the United States District Court for the Southern
District of Florida.   Of course, we intimate no view on an
appropriate disposition of any such motion for leave to amend.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

ROBERT A. KATZMANN
CHIEF JUDGE

CATHERINE O'HAGAN WOLFE
CLERK OF COURT

Date: January 13, 2014
Docket #: 12-1645bk
Short Title: In Re: Bernard L. Madoff Inves

DC Docket #: 10-cv-7101
DC Court: SDNY (NEW YORK
CITY) DC Docket #: 11-cv-1328
DC Court: SDNY (NEW YORK
CITY) DC Docket #: 10-cv-4652
DC Court: SDNY (NEW YORK
CITY) DC Docket #: 11-cv-1298
DC Court: SDNY (NEW YORK CITY)
DC Judge: Koeltl

### BILL OF COSTS INSTRUCTIONS

The requirements for filing a bill of costs are set forth in FRAP 39. A form for filing a bill of costs is on the Court's website.

The bill of costs must:
* be filed within 14 days after the entry of judgment;
* be verified;
* be served on all adversaries;
* not include charges for postage, delivery, service, overtime and the filers edits;
* identify the number of copies which comprise the printer's unit;
* include the printer's bills, which must state the minimum charge per printer's unit for a page, a cover, foot lines by the line, and an index and table of cases by the page;
* state only the number of necessary copies inserted in enclosed form;
* state actual costs at rates not higher than those generally charged for printing services in New York, New York; excessive charges are subject to reduction;
* be filed via CM/ECF or if counsel is exempted with the original and two copies.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**ROBERT A. KATZMANN**                                    **CATHERINE O'HAGAN WOLFE**
**CHIEF JUDGE**                                                        **CLERK OF COURT**

Date: January 13, 2014                                    DC Docket #: 10-cv-7101
Docket #: 12-1645bk                                       DC Court: SDNY (NEW YORK
Short Title: In Re: Bernard L. Madoff Inves        CITY) DC Docket #: 11-cv-1328
                                                                          DC Court: SDNY (NEW YORK
                                                                          CITY) DC Docket #: 10-cv-4652
                                                                          DC Court: SDNY (NEW YORK
                                                                          CITY) DC Docket #: 11-cv-1298
                                                                          DC Court: SDNY (NEW YORK CITY)
                                                                          DC Judge: Koeltl

## VERIFIED ITEMIZED BILL OF COSTS

Counsel for

_____

respectfully submits, pursuant to FRAP 39 (c) the within bill of costs and requests the Clerk to
prepare an itemized statement of costs taxed against the

_____

and in favor of

_____

for insertion in the mandate.

Docketing Fee          _____

Costs of printing appendix (necessary copies _____ ) _____

Costs of printing brief (necessary copies _____ ____) _____

Costs of printing reply brief (necessary copies _____ ) _____

**(VERIFICATION HERE)**

 

_____

Signature