# EXHIBIT A

IN THE SUPREME COURT OF BERMUDA

CIVIL JURISDICTION

COMMERICAL LIST

2010: 454

BETWEEN:

(1) KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)

(2) KINGATE EURO FUND LIMITED (IN LIQUIDATION)

<u>Plaintiffs</u>

and

(1) KINGATE MANAGEMENT LIMITED

(2) FIM LIMITED

(3) FIM ADVISERS LLP

(4) FIRST PENINSULA TRUSTEES LIMITED (AS TRUSTEE OF THE ASHBY TRUST)

(5) PORT OF HERCULES TRUSTEES LIMITED (AS TRUSTEE OF THE EL PRELA TRUST)

(6) ASHBY HOLDINGS SERVICES LIMITED

(7) EL PRELA GROUP HOLDING SERIVCES LIMITED

(8) MR CARLO GROSSO

(9) MR FEDERICO CERETTI

(10) ASHBY INVESTMENT SERVICES LIMITED

(12) EL PRELA TRADING INVESTMENTS LIMITED

(13) ALPINE TRUSTEES LIMITED

<u>Defendants</u>

<u>AMENDED</u> STATEMENT OF CLAIM

PARTIES

1    The Plaintiffs ("**Kingate Global**" and "**Kingate Euro**", together, "**the Funds**") were companies incorporated in the British Virgin Islands which at all material times carried on business as open-ended investment companies.

LN/31289Sv1

2    The First Defendant ("**Kingate Management**") is a company incorporated in Bermuda which at all material times acted as manager or co-manager of the Funds.

3    The Second Defendant ("**FIM Ltd**") is a company incorporated in England and Wales which at all material times until July 2005 acted as consultant to Kingate Management and the Funds.

4    The Third Defendant ("**FIM Advisers**") is a limited liability partnership incorporated in England and Wales which at all material times since July 2005 acted as consultant to Kingate Management and the Funds. In this amended statement of claim, FIM Ltd and FIM Advisers are referred to collectively as "**FIM**".

5    The Fourth Defendant ("**Ashby**") was at all material times before 1 April 2008 a direct 50% shareholder of Kingate Management, and is and was at all material times after from 1 April 2008, through its 100% subsidiary, the Sixth Defendant, an indirect shareholder of Kingate Management. Ashby is and was at all material times the trustee of the Ashby Trust, holding those shares on trust for the Eighth Defendant (and members of his family).

6    The Fifth Defendant ("**El Prela**") was at all material times before between 17 August 2006 and 1 April 2008 a direct 50% shareholder of Kingate Management, and is and was at all material times after from 1 April 2008, through its 100% subsidiary, the Seventh Defendant, an indirect 50% shareholder of Kingate Management. El Prela is and was at all material times after 17 August 2006 the trustee of the El Prela Trust, holding those shares on trust for the Ninth Defendant (and members of his family). In this amended statement of claim, Ashby and El Prela and Alpine Trustees (as defined in paragraph 10C below) are referred to collectively as "**the Trustees**".

7    The Sixth Defendant ("**Ashby Holding Services**") is and was at all material times after from 1 April 2008 a direct 50% shareholder of Kingate Management. Ashby Holding Services in and was at all material times 100% owned by Ashby.

8    The Seventh Defendant ("**El Prela Holdings Services**") is and was at all material times after April 2008 a direct 50% shareholder of Kingate Management. El Prela Holding Services is and was at all material times 100% onwed by El Prela. In this amended statement of claim, Ashby Holdings Services and El Prela, and Ashby Holding Services and El Prela Holding Services are referred to collectively as "the Holding Companies" and the Trustees and the Holding Companies are referred to collectively as "**the Shareholders**".

9    The Eighth Defendant ("**Mr Gross**") is and was at all material times a director and controlling shareholder of FIM Ltd and a principal of FIM Advisers, and, through the Ashby Trust, ultimate beneficial owner of 50% of the shares in Kingate Management.

LN/3128950.1

10    The Ninth Defendant ("**Mr Ceretti**") is and was at all material times a director and controlling shareholder of FIM Ltd and a principal of FIM Advisers, and, through the El Prela Trust, ultimate beneficial owner of 50% of the shares in Kingate Management.

10A.    The Tenth Defendant ("**Ashby Investment Services**") is and was at all material times from 1 April 2008 an investment company 100% owned by Ashby.

10B.    The Eleventh Defendant ("**El Prela Trading Investments**") is and was at all material times from 1 April 2008 an investment company 100% owned by El Prela. In this amended statement of claim, Ashby Investment Services and El Prela Investments are referred to collectively as "**the Investment Companies**".

10C.    The Twelfth Defendant ("**Alpine Trustees**") was the trustee of the El Prela Trust from the settlement of that trust until 17 August 2006. Alpine Trustees was at all material times before 17 August 2006 a direct 50% shareholder of Kingate Management. As the trustee of the El Prela Trust, Alpine Trustees held those shares on trust for the Ninth Defendant (and members of his family).

11    Other relevant parties are as follows:

11.1    Tremont Bermuda Limited ("Tremont Bermuda") is a company incorporated in Bermuda which at all material times until 31 December 2005 acted as co-manager of Kingate Global.

11.2    Tremont Partners Inc ("Tremont Partners") is a company incorporated in Connecticut, USA which at all material times was the parent company of Tremont Bermuda.

11.3    Bernard L. Madoff Investment Securities LLC ("BLMIS") was a limited liability company incorporated in New York which at all material times acted as investment adviser to the Funds.

11.4    Bernard Madoff ("Mr Madoff") was at all material times the founder, chairman, chief executive officer and the sole shareholder of BLMIS.

## SUMMARY OF THE CLAIM

12    The Funds were established for the purpose of investing with BLMIS monies raised from investors. The same individuals, Mr Groso and Mr Ceretti, were behind the establishment of the Funds and its key service providers, Kingate Management and FIM.

13    From their establishment until November 2008, the Funds transferred billions of US dollars to BLMIS for investment. Some of these monies were returned by BLMIS, for the payment of redemptions to investors.

14    In December 2008, it emerged that Mr. Madoff had for many years been operating a fraudulent 'Ponzi' scheme on a massive scale. In fact, BLMIS had invested none of the Funds' monies in assets. Instead, they had been used to pay redemptions to other investors and for the benefit of Mr Madoff and his associates.

15    At no stage before December 2008 did either Kingate Management or FIM alert the Funds to the possibility of this fraud. As a result, the Funds have lost many hundreds of millions of US dollars.

16    In addition, from their establishment until November 2008, the Funds paid Kingate Management hundreds of millions of US dollars in fees. The fees were calculated by reference to the Funds' net asset values. Because of Mr Madoff's fraud, at all material times, the Funds' only significant asset was their money at the bank. Accordingly, the Funds' net asset values were massively overstated, and the fees mistakenly overpaid.

17    The Funds's claim is:

17.1    in unjust enrichment on the ground of mistake, for the recovery of the overpaid fees from Kingate Management and/or the Shareholders and/or the Investment Companies, as ultimate recipients of the fees, and/or Mr Grosso and Mr Ceretti, as ultimate recipients of the fees and/or ultimate beneficial owners of the shares in Kingate Management;

17.2    alternatively, for orders based on the Funds' retention of legal title to the overpaid fees and/or their traceable proceeds;

17.3    alternatively, for declarations that Kingate Management and/or the Shareholders and/or the Investment Companies and/or Mr Grosso and Mr Ceretti hold the overpaid fees, together with their traceable proceeds, on trust for the Funds;

17.4    for damages for breach of contractual and tortious duties of care and/or negligent misstatement, against Kingate Management;

17.5    for damages for breach of tortious duties of care and/or negligent misstatement, against FIM ; and/or

17.6    for damages for breach of tortious duties of care and/or negligent misstatement against Mr Grosso and Mr Ceretti.

## FACTUAL BACKGROUND

### Establishment of Kingate Global

18    In the early 1990s, Mr Grosso and Mr Ceretti, as a development of the business of FIM, decided to set up a fund of hedge funds.

19    They took advice from Tremont Partners and, in particular, its president, Sandra Manzke ("Ms Manzke") who introduced them to various service providers in the United States and Bermuda.

20    On 11 February 1994, Kingate Global was incorporated in the British Virgin Islands as a fund of hedge funds having one class of shares denominated in US dollars. The directors of the company included Christopher Wetherhill ("Mr Wetherhill") and Mrs Manzke.

21    Soon afterwards, on 24 February 1994, Kingate Management was incorporated in Bermuda. Its directors also included Mr Wetherhill.

22    By an agreement dated on or around 1 November 1994, Kingate Management was appointed as manager of Kingate Global.

23    By further agreement dated 1 November 1994, FIM Ltd was appointed as consultant to Kingate Management. Tremont Bermuda had already been retained as a consultant by an agreement dated 24 February 1994.

24    In February or March 1995, a second class of shares in Kingate Global, also denominated in US dollars, was created and named 'Class B' shares. The original class of shares was re-named 'Class A'.

25    By an agreement dated 1 March 1995, each of Kingate Management and Tremont Bermuda was appointed as co-manager of the Class B shares. This agreement was amended and restated effective 1 May 2000. In respect of the Class A shares, Kingate Management continued as manager and FIM Ltd and Tremont Bermuda continued as consultants.

26    In January 1996, a third class of shares in Kingate Global, denominated in Deutsche Marks, was created and named 'DM Class' shares.

27    By an agreement dated 1 December 1995, each of Kingate Management and Tremont Bermuda was appointed as co-manager of DM Class shares.

28    By further agreement dated 1 December 1995, FIM Ltd was appointed as consultant to Kingate Management in respect of all three classes of shares in Kingate Global. This agreement was amended in late 1998 and further amended effective 1 May 2000.

LN/31289541

29    By late 1999 or early 1997, the Class A shares in Kingate Global had been wound down, leaving only the Class B shares and the DM Class shares.

**Establishment of Kingate Euro**

30    In late 1999, Mr Grosso and Mr Ceretti, as a further development of the business of FIM, decided to spin-off the DM Class shares in Kingate Global into a separate entity.

31    Accordingly, on 19 April 2000 Kingate Euro was incorporated in the British Virgin Islands.  Its directors were the same as the directors of Kingate Global (save the Ms Manzke was not a director of Kingate Euro).

32    By an agreement dated 1 May 2000 ("the Kingate Euro Manager Agreement"), Kingate Management was appointed as manager of Kingate Euro.

33    FIM was again retained as a consultant.

**Further agreements**

34    By an agreement dated 23 April 2001 ("the Kingate Global Consulting Services Agreement"), the appoint of FIM Ltd as consultant to Kingate Management in respect of the remaining class of shares in Kingate Global was restated and amended.

35    By a further agreement of the same date ("the Kingate Euro Consulting Services Agreement"), FIM Ltd was formally appointed as consultant to Kingate Management in respect of Kingate Euro.

36    In addition, by distribution agreements dated 23 April 2001, FIM Ltd was appointed as non-exclusive distributor for the sale of shares in both Funds.

37    The Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement were amended by a further agreement dated 7 June 2001.

38    In late 2004 or early 2005, Kingate Global entered into further, separate Co-Manager Agreements with Mingate Management and Tremont Bermuda, which agreements restated the earlier Manager and Co-Manager Agreements to more precisely reflect each co-manager's activities based on actual experience.

39    By a notice dated 16 January 2006, which took effect as of 31 December 2005, Tremont Bermuda resigned as co-manager of the Class B shares in Kingate Global.

40    Accordingly, by an agreement dated 1 January 2006 ("the Kingate Global Manager Agreement"), the appointment of Kingate Management as manager of Kingate Global was restated and amended.

**Relevant provisions of the agreements**

*Kingate Global Manage Agreement*

41    By the Kingate Global Manager Agreement, Kingate Management agreed to provide various services to Kingate Global and, in return, Kingate Global agreed to pay Kingate Management a monthly management fee. In particular:

41.1    By clause 1.1, Kingate Management agreed to perform, or obtain the performance of:

41.1.1    the investment management services described in Part II of the agreement;

41.1.2    the administrative services described in Part III; and

41.1.3    the services, relating to the sale of shares Kingate Global, described in Part IV.

41.2    By clauses 2.1 and 2.2, the investment management services included:

41.2.1    effecting the investment strategy for the investment of the assets of Kingate Global;

41.2.2    evaluating and selecting potential investments which were consistent with that strategy, including managing the investments and reinvestments of Kingate Global, in such manner as Kingate Management considered appropriate based on its past practices.

41.3    By clause 3.1, the administrative services included assisting Kingate Global, in a manner consistent with existing practice, in the performance of those administrative duties which were agreed by the parties from time to time.

41.4    By clauses 4.1, 4.2, 4.3 and 4.4, the services in respect of the sale of shares in Kingate Global included:

41.4.1    all duties and functions in connection with the sale of any shares in Kingate Global;

41.4.2    advising Kingate Global on general matters affecting the marketing of the shares, including advising the directors as to:

41.4.2.1    soliciting and introducing prospective investors; and

41.4.2.2    maintaining regular contact and updating existing and prospective investors to keep them informed of investment results and other information with regard to Kingate Global;

41.4.3    seeking to procure applications to purchase shares by eligible investors;

41.4.4    appointing consultants, agents, securities dealers and other financial institutions as authorised dealers to solicit application to purchase shares in Kingate Global and entering into compensation agreements with such authorised dealers; and

41.4.5    arranging for the delivery to each person to whom shares in Kingate Global were offered a copy of the fund's most recently published information memorandum and annual report.

41.5    By clause 5.9(a), Kingate Management was authorised was authorised to delegate as appropriate, or its discretion, any of the duties or obligations under the agreement to one or more other persons or entities, whether affiliated with or independent of Kingate Management.

41.6    By clause 5.2, Kingate Global agreed to pay Kingate Management a monthly management fee at an annual rate of 1.5% of the net asset value ("NAV") of the funds determined as at each valuation date of each calendar month. 'NAV' and 'valuation date' were to have the meanings respectively assigned to them in Kingate Global's information memorandum.

41.7    Further:

41.7.1    Clause 5.4 purported to exclude any liability of Kingate Management to Kingate Global for loss etc occasioned by Kingate Management in the performance of its services under the agreement, other than as a result of gross negligence, bad faith, wilful or reckless malfeasance or disregard of any obligations under the agreement; and

41.7.2    Clause 5.5 purported to oblige Kingate Global to indemnify Kingate Management and hold it harmless against loss etc arising out of any claim asserted in connection with Kingate Management's services under the agreement, save where the loss etc was caused by Kingate Management's gross negligence, bad faith, wilful or reckless malfeasance or disregard of its obligations under the agreement.

*Kingate Euro Manager Agreement*

42    Similarly, by the Kingate Euro Manager Agreement, Kingate Management agreed to provide various services to Kingate Euro and, in return, Kingate Euro agreed to pay Kingate Management a monthly management fee and a monthly administration fee.  In particular:

42.1    By clause 2.1, Kingate Management agreed to develop, update and affect an overall investment strategy for the investment of the assets of Kingate Euro, as well as evaluate and select potential investments which were consistent with that strategy.

42.2    By clause 3.1, Kingate Management agreed to be responsible for performing, or procuring the performance of, all duties and functions necessary or appropriate in connection with the placement of

LN/31288Sv1

shares in Kingate Euro outside of the United States, and for advising Kingate Euro on general matters affecting its structure and operations, including advising the directors as to:

42.2.1    the suitability of Kingate Euro's structure and operating procedures in light of the expectations of prospective investors;

42.2.2    steps which could be taken to enhance the marketability of Kingate Euro's shares and to improve investor relations;

42.2.3    the identification and evaluation of candidates to serve as directors of Kingate Euro]

42.2.4    general economic and financial developments in international securities and capital markets affecting Kingate Euro's investment program; and

42.2.5    in general, all aspects relating to Kingate Euro's administrative, accounting, legal and operational matters.

42.3    By clause 3.3, Kingate Management agreed to act as the placement agent for Kingate Euro's shares outside the United States, including using its best efforts to procure applications to purchase shares from eligible investors.

42.4    By clause 3.5, Kingate Management agreed to arrange for the delivery to each person to whom shares in Kingate Euro were offered a copy of the fund's most recently published information memorandum.

42.5    By clause 4.8, Kingate Management was authorised to delegate as appropriate, in its discretion, any of the duties or obligations imposed upon it under the agreement to one or more persons or entities, whether affiliated with or independent of Kingate Management.

42.6    By clause 4.1(a) and (b) Kingate Management was entitled to

42.6.1    a fixed monthly asset based fee, as defined in Kingate Euro's information memorandum; and

42.6.2    a fixed monthly asset based administration fee, also so defined.

42.7    Further:

42.7.1    clause 4.3 purported to exclude the liability of Kingate Management to Kingate Euro for loss etc suffered in connection with Kingate Management's services in the absence of gross negligence wilful default, fraud or dishonesty in the performance or non-performance of Kingate Management's obligations or duties; and

42.7.2    clause 4.4 purported to oblige Kingate Euro to indemnify Kingate Management and hold it harmless against loss etc arising out of any claim asserted in connection with Kingate

Management servicing or having served in good faith pursuant to the agreement, save where the loss etc was caused by Kingate Management's gross negligence, bad faith, breach of fiduciary duty, wilful or reckless malfeasance or disregard of any of its obligations under the agreement.

*Kingate Global Consulting Services Agreement and Kingate Euro Consulting Services Agreement*

43      The Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement are in materially identical terms. By both agreements, FIM Ltd agreed to provide various services to Kingate Management and, in return, FIM Ltd was entitled to be paid a consultancy fee. In particular:

43.1    By clause 2.2 of both agreements, FIM Ltd agreed to act as consultant to Kingate Management to provide such advice and recommendations as Kingate Management required from time to time, in connection with its management of the assets of the Funds and in the implementation of the investment objectives and policies of the Funds.

43.2    By clause 3 of both agreements, the services to be provided by FIM Ltd to Kingate Management included:

43.2.1   reviewing the structure and operating procedures of the Funds;

43.2.2   preparing such analyses and reports as Kingate Management and the Funds required;

43.2.3   providing Kingate Management with assistance and support on such matters relating to investor relations as Kingate Management and the Funds required;

43.2.4   liaising directly with Kingate Management on such matters relating to the investment programs of the Funds as might be required to enable FIM Ltd to properly perform its duties under the agreements; and

43.2.5   in general, providing advice to and assisting Kingate Management on such aspects of the operational, administrative and legal matters of the Funds as Kingate Management and the Funds required.

43.3    By clause 3 of the Kingate Euro Consulting Services Agreement, FIM Ltd also agree to provide Kingate Management with advice regarding Kingate Euro's hedging activities, in order to reduce the currency risk between the Euro and the US dollar, and to oversee the execution of its recommendations.

43.4    By clause 8 of both agreements, FIM Ltd agreed to:

43.4.1    provide such assistance, information and reports as Kingate Management and the auditors of the Funds required from time to time, in connection with:

43.4.1.1    the preparation of valuations in respect of the Funds and periodic reports by Kingate Management to the Funds; and

43.4.1.2    the provision of annual, semi-annual and other reports for the benefit of investors;

43.4.2    provide such representatives as Kingate Management requested from time to time to attend board meetings of the Funds with Kingate Management; and

43.4.3    report to and discuss with the directors of the Funds their performance and other matters related to the management of their assets.

43.5    By Schedule 1 to both agreements, Kingate Management agreed to pay FIM Ltd a fixed monthly fee equal to US$30,000. Schedule 1 also provided that, for administrative convenience, Kingate Management could arrange to have the Funds pay this fee directly to FIM Ltd.

43.6    Further, clause 13.1 of both agreements purported to exclude the liability of FIM Ltd to Kingate Management and the Funds for any loss etc, in the absence of gross negligence, fraud or wilful default on the part of FIM Ltd, or failure to comply with Kingate Management's instructions.

44    On 1 August 2005, FIM Advisers took over the business of FIM Ltd. Accordingly, by deeds of novation dated 29 July 2005, FIM Advisers was substituted for FIM Ltd under both the Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement.

44A    At trial, the Funds will rely on each of the above agreements for their full terms and effect.

The business of the Funds

45    As open-ended investment companies, the Funds raised monies from investors through private offerings of their shares. Investors would subscribe for redeemable shares in the Funds in accordance with each fund's information memorandum and subscription agreement. In particular:

45.1    Redeemable shares could only be purchased on the first business day of a month.

45.2    Investors would make an offer for subscription by submitting completed subscription forms to the Funds' administrator.

45.3    The minimum initial investment in redeemable shares was US$250,000 and the minimum subsequent investment was US$100,000.

45.4    The purchase price of the redeemable shares varied from time to time and was equal to the fund's
NAV per share as at the last business day of the previous calendar month.

45.5    If an investor's offer to subscribe was accepted, redeemable shares were allocated to the investor
which thereby became a shareholder of the fund in question.

46      An investor could recover its investment in the Funds by redeeming its shares in accordance with each
fund's information memorandum and articles of association. In particular:

46.1    Shares could only be redeemed on the last business day of a month.

46.2    The redemption price was the fund's NAV per share as at the redemption date.

**BLMIS**

47      Subject to amounts retained for the payment of redemptions, professional fees and operating costs, all
the monies raised by Kingate Global from such share allotments, since at least late 1996 or early 1997
when the Class A shares were wound down, were transferred to BLMIS. Further, all such monies
raised by Kingate Euro since its establishment were also transferred to BLMIS.

48      From the outset, Kingate Management delegated responsibility for all investment advisory activities
in respect of both Kingate Global and Kingate Euro to BLMIS. Kingate Management also delegated
responsibility for custody services in respect of the Funds to BLMIS. In particular:

48.1    BLMIS opened brokerage accounts for both Funds.

48.2    By a customer agreement, an option agreement, a trading authorization limited to purchases and sales
of securities and options, and a trading authorization directive, each fund authorized BLMIS to
manage its portfolio on a discretionary basis.

48.3    The trading authorization directive gave BLMIS investment guidelines, restricting BLMIS to so-
called 'split-strike conversion' investments.

49      Accordingly, at all material times:

49.1    All the monies raised by the Funds were invested and managed by BLMIS.

49.2    The Funds did not carry out their own investment activity.

49.3    BLMIS acted as the Funds' investment adviser.

49.4    The Funds had no investment adviser other than BLMIS.

49.5    The Funds' business was to invest with BLMIS.

50    BLMIS purportedly employed the split-strike conversion investment strategy and reported excellent returns year after year. In particular:

50.1    In respect of both Funds, Kingate Management received (inter alia) monthly statements from BLMIS which purported to show the portfolio of assets in which BLMIS had invested the Funds' monies, and their values (**"Monthly Statements"**).

50.2    Kingate Management passed these statements to FIM. On the basis of the statements, FIM produced regular reports on the Funds' investment performance.

## Monies transferred to BLMIS

51    When an investor subscribed for redeemable shares in either of the Funds, the purchase price for the shares would be paid into the fund's account at the Bank of Bermuda Limited (**"the Bank"**), before being transferred to BLMIS.

52    Similarly, when an investor requested to redeem its shares in either of the Funds, BLMIS would transfer to the fund's account at the Bank sufficient monies to meet the redemption request. However, the Funds would often meet redemption requests from subscription monies then standing to the credit of their accounts at the Bank.

53    By the end of November 2008:

53.1    Kingate Global had transferred to BLMIS subscription monies in the amount of US$987,860,000 and BLMIS had transferred to Kingate Global redemption monies in the amount of US$400,254,792.

53.2    Kingate Euro had transferred to BLMIS subscription monies in the amount of US$767,440,000 and BLMIS had transferred to Kingate Euro redemption monies in the amount of US$545,000,000.

See the tables attached to this <u>amended</u> statement of claim as Annex A, which set out, in respect of each fund, the payments made to and received from BLMIS and the dates of payment.

## Mr Madoff's fraud

54    In December 2008, it emerged that Mr Madoff, through BLMIS, had for many years been operating a fraudulent 'Ponzi' scheme on a massive scale. Media reports suggest that investors who transferred monies to BLMIS collectively stand to lose tens of billions of dollars. In particular:

54.1    BLMIS did not in fact invest any of the monies transferred by investors, including the Funds. BLMIS did not purchase or sell a single security or option with these monies.