54.2 The trades, assets and returns reported in the monthly statements which BLMIS provided to investors, including the Funds, were entirely fictitious.

54.3 Instead, BLMIS used the monies transferred from new investors to pay existing investors who requested withdrawals or redemptions.

54.4 In short, the monies transferred to BLMIS by investors, including the Funds, were used to keep the fraudulent scheme going, and for the benefit of Mr Madoff and his associates, until such time as the requests for withdrawals and redemptions overwhelmed the new investments, causing the collapse of the scheme.

55 Mr Madoff's fraudulent scheme remained undetected until its collapse despite the existence of numerous 'red flags' surrounding the operation of BLMIS. These included the following:

55.1 Mr Madoff and his family controlled key positions at BLMIS, limiting third party involvement.

55.2 Rather than trading through an independent broker, or using a third party custodian, BLMIS acted as its own broker and custodian.

55.3 BLMIS' auditor was a very small, unknown auditing firm which had represented to its regulatory body that it did not conduct audits.

55.4 BLMIS' fee structure was highly unusual, potentially depriving it of tens of millions of dollars each year.

55.5 BLMIS did not provide investors with electronic real-time access to their accounts. Instead, BLMIS reported trades using only paper confirmations, created after the fact, which stated average and not exact times and prices of trades.

55.6 BLMIS reported securities trades at non-existent prices and options trades at unrealistic volumes.

55.7 BLMIS refused to identify the counterparties with whom it purportedly traded securities and options.

55.8 Mr Madoff was consistently vague when responding to questions about BLMIS' operations and strategy.

55.9 At the end of each quarter and/or year, BLMIS reported to investors that it had converted all their assets into Treasury Bills or cash.

55.10 BLMIS' purported returns were too good to be true, with extremely rare losses and an incredible absence of volatility, which could not be replicated by others using the same split-strike conversion

investment strategy. Further, although in theory that strategy could reduce volatility, it could not produce gains in a declining market, yet BLMIS' returns purported to do so.

55.11 Several private financial institutions, having conducted routine due diligence, refused to invest with BLMIS.

55.12 Several articles were published in the financial press raising concerns about BLMIS.

55.13 Several regulatory actions were commenced against BLMIS.

56 On 11 December 2008, Mr Madoff was arrested and charged with various violations of United States criminal securities law.

57 On 15 December 2008, BLMIS was placed in bankruptcy. Mr Irving Picard (**"the Trustee"**) was appointed as trustee to oversee the liquidation.

58 Prior to this, neither Kingate Global nor Kingate Euro had any knowledge or information that Mr Madoff was operating a fraudulent scheme.

**Aftermath of the discovery of Mr Madoff's fraud**

59 Because almost all of the Funds' assets (other than monies held in their accounts at the Bank) were invested with BLMIS, Mr Madoff's arrest and the bankruptcy of BLMIS had a devastating effect on the Funds.

60 On 12 December 2008, the Funds suspended determination of their NAV, as well as the redemption and issue of shares.

61 In January 2009, the Bank froze both Funds' accounts. The position remains that the Funds have access to the monies in those accounts only for the purpose of paying their ordinary and necessary expenses of the liquidation.

62 On 17 April 2009, the Trustee commenced proceedings in the Bankruptcy Court for the Southern District of New York, claiming the return of $100 million which BLMIS paid to Kingate Global in the 90 days preceding 11 December 2008.

63 Accordingly:

63.1 On 8 May 2009, both Funds applied to the High Court of the Virgin Islands for the appointment of liquidators. By orders dated 4 June 2009, the court appointed liquidators and wound up both Funds.

63.2 On 7 August 2009, both Funds presented petitions for winding up to the Supreme Court of Bermuda. By orders dated 4 September 2009, the court wound up both Funds.

**CLAIMS IN UNJUST ENRICHMENT**

**Payment of fees to Kingate Management**

64 As set out in paragraphs 41.6 and 42.6 above, under the Kingate Global Manager Agreement (and its predecessors) and the Kingate Euro Manager Agreement (together, "**the Manager Agreements**"), the Funds were obliged to pay monthly fees to Kingate Management.

65 The fees payable by each of the Funds were calculated by reference to their NAVs. In particular, as set out in paragraphs 41.6 and 42.6 above:

65.1 Under the Kingate Global Manager Agreement, read with Kingate Global's information memorandum (as amended and restated from time to time), the monthly management fee payable by Kingate Global to Kingate Management was 1.5% of Kingate Global's NAV at each month end.

65.2 Under the Kingate Euro Manager Agreement, read with Kingate Euro's information memorandum (as amended and restated from time to time):

65.2.1 the monthly management fee payable by Kingate Euro to Kingate Management was 1.5% of Kingate Euro's NAV at each month end; and

65.2.2 the monthly administration fee payable by Kingate Euro to Kingate Management was 0.1% of Kingate Euro's NAV at each month end.

66 The Manager Agreements provided that the meaning of NAV and its method of calculation were as described in the Funds' respective information memoranda.

67 The information memoranda of both Funds (as amended and restated from time to time) made materially identical provision in respect of NAV. In particular, each information memorandum (as most recently amended and restated as at 6 October 2008) provided that:

67.1 The NAV of the fund was the market value of the fund's total assets less all accrued debts and liabilities.

67.2 The fund's administrator was to determine the fund's NAV as at the close of business on the last business day of each calendar month.

67.3 The fund's assets included:

67.3.1 all cash and cash equivalent, including bank deposits and interest bearing obligations;

67.3.2 all securities positions; and

67.3.3 all options positions.

67.4 Cash and cash equivalent was to be valued at cost plus accrued interest and discount.

67.5 Securities and options were to be valued at the last sale price reported on the principal securities exchange or market on which they were traded. In the absence of reported sale prices on the valuation date, securities and options were generally to be valued at the last reported bid quotation.

67.6 In the absence of current quotations, or if the administrator concluded that such quotations were not indicative of value, the valuation of the assets was to be their fair value as determined in good faith by the administrator.

67.7 Further, if the administrator determined that market prices or quotations did not fairly represent the value of particular assets, the administrator was authorised to assign a value to those assets which differed from the market prices or quotations.

67.8 The administrator was to verify the prices attributed to the securities held by the fund by reference to pricing sources independent of BLMIS whenever reasonably possible.

67.9 In the absence of bad faith or manifest error, the NAV calculation made by the administrator was binding on investors in the fund.

68 In so providing, the information memorandum of each fund replicated provisions in the Funds' articles of association, in particular, in respect of Kingate Global, articles 55 to 57 and, in respect of Kingate Euro, articles 55, 56 and 58.

69 In accordance with these provisions, each of the Funds paid fees to Kingate Management, at the end of each month from their establishment until November 2008. In particular:

69.1 from 1 January 1995 to November 2008, Kingate Global paid to Kingate Management fees in the amount of US$294,312,278; and

69.2 from 1 January 2000 to November 2008, Kingate Euro paid to Kingate Management fees in the amount of US$76,125,017.

See the table attached to this amended statement of claim as Annex B, which sets out the payments made by each fund in each year and the total paid.

70 It is understood that after receipt of these payments, Kingate Management paid on a significant percentage of the fees to the Shareholders in the form of dividends. In particular, by the end of November 2008, Kingate Management had paid to the Shareholders dividends totalling US$293,902,730. See the table attached to this amended statement of claim as Annex B, which sets out the dividends paid in each year from 1995 to 2008 (inclusive).

71 It is also understood that: after receipt of these dividends, the Shareholders paid on a percentage of them to Mr Grosso and Mr Ceretti in the form of distributions of trust property.

71.1 on or around 31 March 2008, the Trustees sold to the Investment Companies investments they had made with the dividends paid to them by Kingate Management.

71.2 from time to time from 1 April 2008, the Holding Companies loaned monies (constituted by dividends received from Kingate Management) to the Investment Companies, for the purposes of investment by the Investment Companies; and

71.3 from time to time, the Trustees made to Mr Grosso and Mr Ceretti distributions of trust property (constituted by dividends received from Kingate Management and income from investment of those dividends by the Trustees and/or the Investment Companies).

**Mistaken overpayment of fees to Kingate Management**

72 By mistake, at the end of each month from their establishment until November 2008, each of the Funds overpaid fees to Kingate Management. In particular:

72.1 As set out in paragraph 54 above, as a result of Mr Madoff's fraud:

72.1.1 none of the monies transferred by the Funds to BLMIS were invested in assets;

72.1.2 none of the assets reported in BLMIS' Monthly Statements ever existed;

72.1.3 instead, all of the monies transferred by the Funds to BLMIS were used to keep the fraudulent scheme going, and for the benefit of Mr Madoff and his associates; and

72.1.4 at all material times, BLMIS was hopelessly balance sheet insolvent.

72.2 Accordingly:

72.2.1 all of the monies transferred by the Funds to BLMIS must be treated as having been lost by the Funds at the date of transfer, and as having nil value; and

72.2.2 at the date of each payment of fees by the Funds to Kingate Management, the Funds' only significant assets were the monies held in their accounts at the Bank.

72.3 However, in calculating the Funds' NAVs at each month end, the Funds' administrator relied on BLMIS' Monthly Statements and assumed that the assets reported there existed.

72.4 As a result, as at the date of each payment of fees by the Funds to Kingate Management, the Funds' NAVs were vastly overstated and incorrect.

72.5 As at those dates, and at all times until the discovery of Mr Madoff's fraud in December 2008, the Funds believed that the NAVs were correct.

72.6 As set out in paragraph 69 above, the Funds overpaid fees to Kingate Management on the basis of this mistaken belief and as a result of it.

See the table attached to this amended statement of claim as Annex C, which sets out in respect of each fund, at the date of each payment of fees by the fund to Kingate Management, the fund's correct NAV, accordingly, the fees which should have been paid, the fees actually paid and the amount overpaid.

73 For the avoidance of doubt, and if necessary, the Funds aver that the overpaid fees were not due to Kingate Management under the Manager Agreements (or otherwise).

**Claim in unjust enrichment against Kingate Management**

74 Kingate Management was enriched, on receipt, in the amount of the overpaid fees.

75 The enrichment was at the expense of the Funds, Kingate Management having received the overpaid fees directly from the Funds.

76 Accordingly, given the Funds' mistake, Kingate Management has been unjustly enriched at the expense of the Funds and is liable to make restitution to the Funds in the amount of the overpaid fees. In particular, as set out in the table attached as Annex C to this amended statement of claim, Kingate Management is liable to make restitution:

76.1 to Kingate Global, in the amount of US$254,478,999.69; and

76.2 to Kingate Euro, in the amount of 56,226,531.48 Euros.

**Remedy against Kingate Management**

77 By reason of the claim set out in paragraphs 74-76 above, the Funds are entitled to an order that Kingate Management pay:

77.1 to Kingate Global, the amount of US$254,478,999.69; and

77.2 to Kingate Euro, the amount of 56,226,531.48 Euros.

**Further or alternative claim in unjust enrichment against the Shareholders**

78 The relevant factual background to the claims against the Shareholders is as follows:

78.1 Kingate Management and the Shareholders are not and were never independent or arms' length parties.

78.2 The Shareholders are the sole owners and controllers of Kingate Management.

78.3 As set out in paragraphs 20-21 above, Kingate Management and Kingate Global were established at the same time so as to create a structure for a hedge fund business which consisted of raising monies from investors for investment exclusively with BLMIS and earning fees from the investments.

78.4 In particular, Kingate Management was established and used as a corporate vehicle to receives fees from Kingate Global and, later, Kingate Euro, for payment on to the Shareholders.

79 The Shareholders were unjustly enriched on receipt of the overpaid fees by Kingate Management, and in that amount. This enrichment was at the expense of the Funds, which made the payments, and arose in the following alternative circumstances.

80 First, as sole owners of the entirety of the shares of Kingate Management, alternatively as the alter ego of Kingate Management, the Shareholders were automatically enriched by the receipt by Kingate Management of all overpaid fees.

81 Second, on receipt of the overpaid fees by Kingate Management, Kingate Management's assets were increased and the Shareholders were enriched by the corresponding increase in the value of their shareholdings in Kingate Management:

81.1 The value of the increase must be treated as equal to the amount of the overpaid fees received by Kingate Management.

81.2 The increase was a realised and/or realisable financial benefit and, accordingly, an incontrovertible benefit. Alternatively, the Shareholders freely accepted the increase.

82 Third, the Shareholders were enriched upon the receipt of overpaid fees by Kingate Management, as Kingate Management did not receive for its own benefit but merely as a channel or conduit pipe to the Shareholders, alternatively as nominee on behalf of the Shareholders.

83 Fourth, the role of Kingate Management in the circumstances was or was analogous to that of agent on behalf of the Shareholders. Accordingly, on the basis of, or by analogy with the principle that the receipt of a gain by an agent is to be treated as a receipt by his principal, the Shareholders must be treated as having been enriched upon the receipt by Kingate Management of the overpaid fees.

84 Fifth, by reason of the matters pleaded above, the corporate veil of Kingate Management falls to be pierced, so as to reflect the reality that the Shareholders were enriched upon the receipt of overpaid fees by Kingate Management.

85 In the alternative to the foregoing, the Shareholders were unjustly enriched on receipt by them of dividends paid by Kingate Management out of the overpaid fees and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof). Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection and nexus between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividends to the Shareholders. Each declaration of dividends formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

85A. In the further alternative:

85A.1 Kingate Management made distributions to the Shareholders utilising the fees paid to it by the Funds, as pleaded above.

85A.2 Those fees were not (in the hands of Kingate Management) distributable profits, but liable to be repaid to the Funds for the reasons pleaded herein. Further, Kingate Management declared and paid the dividends to the Shareholders under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to it based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

85A.3 Accordingly, Kingate Management is entitled to recover from the Shareholders by way of restitution the sums paid to them by it as dividends. If (contrary to the Funds' primary case) Kingate Management has a defence to the Funds' claims in restitution against it, the Funds are entitled to be subrogated to such restitutionary claims of Kingate Management against the Shareholders.

86 Further or alternatively, when the overpaid fees were received from the Funds by Kingate Management, they constituted the Funds' property and/or its traceable proceeds. In particular:

86.1 The Funds' mistake, as set out in paragraph 72 above, was a fundamental mistake as to the quantity of fees paid and/or as to the obligation to pay fees. That fundamental mistake so vitiated the Funds' intention to transfer the overpaid fees to Kingate Management as to prevent legal title to the overpaid fees passing from the Funds to Kingate Management. Instead, legal title to the overpaid fees remained with the Funds.

86.2 Alternatively, even if legal title to the overpaid fees did pass from the Funds to Kingate Management, because of the Funds' mistake, Kingate Management held the overpaid fees on constructive trusts for the Funds, from the moment of receipt.

86.3 Alternatively, even if legal title to the overpaid fees did pass from the Funds to Kingate Management, the Funds' mistake was sufficiently serious to vitiate their intention to benefit Kingate Management by the transfer of the overpaid fees. Accordingly, the presumption of resulting trust, namely, that, in the circumstances, the transferor did not intend to benefit the transferee, could not be rebutted and Kingate Management held the overpaid fees on resulting trusts for the Funds, from the moment of receipt.

87 As a result, when Kingate Management paid on the overpaid fees and/or their traceable proceeds to the Shareholders, the Shareholders also received the Funds' property and/or its traceable proceeds. The Shareholders must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

88 In all the premises pleaded above, given the Funds' mistake, the Shareholders have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees, alternatively, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders.

89 The Funds repeat paragraphs 76.1 and 76.2 above.

**Remedy against the Shareholders**

90 By reason of the claim set out in paragraphs 78-89 above, the Funds are entitled to an order that the Shareholders pay:

90.1 to Kingate Global, the amount of US$254,478,999.69, alternatively, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds, which were paid on by Kingate Management to the Shareholders; and

90.2 to Kingate Euro, the amount of 56,226,531.48 Euros, alternatively, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds, which were paid on by Kingate Management to the Shareholders.

**Further or alternative claim in unjust enrichment against the Investment Companies**

90A. Further or in the alternative to the above, the Investment Companies were enriched on receipt by them of:

90A.1 investments, made by the Trustees with dividends paid to the Trustees by Kingate Management out of the overpaid fees and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof) and then transferred to the Investment Companies by the Trustees; and

90A.2 such dividends, paid to the Holding Companies by Kingate Management and then transferred to the Investment Companies by the Holding Companies for the purposes of investment.

90B. Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividend to the Shareholders, and the subsequent transfer of those dividends, and investments made with those dividends, to the Investment Companies for the purposes of investment. Each transfer formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

90C. In the further alternative:

90C.1 The Trustees and the Holding Companies paid the sums referred to in paragraphs 90A.1 and 90A.2 above to the Investment Companies, which sums were derived from the fees paid to Kingate Management by the Funds, as pleaded above.

90C.2 Those sums were (in the hands of the Trustees and the Holding Companies) liable to be repaid to the Funds or Kingate Management for the reasons pleaded herein. Further, the Trustees and the Holding Companies made the transfers to the Investment Companies under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to Kingate Management, and by Kingate Management to them, based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

90C.3 Accordingly, the Trustees and the Holding Companies are entitled to recover from the Investment Companies by way of restitution the sums paid to them. If (contrary to the Funds' primary case) the Trustees and/or the Holding Companies have a defence to the Funds' claims in restitution against them, the Funds are entitled to be subrogated or sub-subrogated (via Kingate Management's restitutionary claim against the Trustees and the Holding Companies pleaded in paragraph 85A above) to such restitutionary claims of the Trustees and/or the Holding Companies against the Investment Companies.

90D. Further or alternatively, for the reasons pleaded above, all such transfers to the Investment Companies constituted the Funds' property and/or the traceable proceeds thereof. The Investment Companies

must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

90E. In all the premises pleaded above, given the Funds' mistake, the Investment Companies have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders and then by the Shareholders to the Investment Companies.

**Remedy against the Investment Companies**

90E. By reason of the claim set out in paragraphs 90A – 90D above, the Funds are entitled to an order that the Investment Companies pay:

90E.1 to Kingate Global, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies; and

90E.2 to Kingate Euro, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies.

**Further or alternative claim in unjust enrichment against Mr Grosso and Mr Ceretti**

91 Further or in the alternative to the above, and on the basis that Mr Grosso and Mr Ceretti were in substance and reality the ultimate beneficial owners of the Shareholders, and hence KML, then Mr Grosso and Mr Ceretti were unjustly enriched at the expense of the Funds to the same extent and in the same circumstances as were the Shareholders, as pleaded above.

92 Further or in the alternative, Mr Grosso and Mr Ceretti were unjustly enriched on receipt by them of distributions by the Shareholders of trust property out of dividends paid by Kingate Management and/or which would not have been paid but for the overpaid fees (and which represent the traceable proceeds thereof). Such enrichment was at the expense of the Funds, in circumstances in which there was a clear causal connection and nexus between the payment of overpaid fees by the Funds to Kingate Management, acting as a conduit or nominee, and the regular and intended distribution of those monies by way of dividends to the Shareholders, and the subsequent distribution of trust property to Mr Grosso and Mr Ceretti. Each distribution of trust property formed part of a continuous transaction, originating with the payment of overpaid fees, at the expense of the Funds.

92A. In the further alternative:

92A.1 The Shareholders paid the sums referred to in paragraphs 92 above to Mr Grosso and Mr Ceretti, which sums were derived from the fees paid to Kingate Management by the Funds, as pleaded above.

92A.2 Those sums were (in the hands of the Shareholders) liable to be repaid to the Funds or Kingate Management for the reasons pleaded herein. Further, the Shareholders made the transfers to Mr Grosso and Mr Ceretti under and by reason of an operative mistake of fact, namely that the fees had been properly paid by the Funds to Kingate Management, and by Kingate Management to them, based on an accurate assessment of the net asset value of the Funds (which belief was mistaken for the reasons pleaded above).

92A.3 Accordingly, the Shareholders are entitled to recover from Mr Grosso and Mr Ceretti by way of restitution the sums paid to them. If (contrary to the Funds' primary case) the Shareholders have a defence to the Funds' claims in restitution against them, the Funds are entitled to be subrogated or sub-subrogated (via Kingate Management's restitutionary claim against the Shareholders pleaded above) to such restitutionary claims of the Shareholders against Mr Grosso and Mr Ceretti.

93 Further or alternatively, for the reasons pleaded above, all such distributions to Mr Grosso and Mr Ceretti constituted the Fund's property and/or the traceable proceeds thereof. Mr Grosso and Mr Ceretti must therefore be treated as having received directly from the Funds the overpaid fees and/or their traceable proceeds, and to have been enriched at the expense of the Funds accordingly.

94 In all the premises pleaded above, given the Funds' mistake, Mr Grosso and Mr Ceretti have been unjustly enriched at the expense of the Funds and are liable to make restitution to the Funds in the amount of the overpaid fees, alternatively, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders and then paid by the Shareholders to Mr Grosso and Mr Ceretti by way of distributions of trust property.

95 The Funds repeat paragraphs 76.1 and 76.2 above.

**Remedy against Mr Grosso and Mr Ceretti**

96 By reason of the claim set out in paragraphs 91-95 above, the Funds are entitled to an order that Mr Grosso and Mr Ceretti pay:

96.1 to Kingate Global, the amount of US$254,478,999.69, alternatively, the amount of the fees overpaid by Kingate Global and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti; and

96.2 to Kingate Euro, the amount of 56,226,531.48 Euros, alternatively, the amount of the fees overpaid by Kingate Euro and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti.

**CLAIMS BASED ON RETENTION OF LEGAL TITLE**

97 As set out in paragraph 86.1, the Funds' mistake was a fundamental mistake as to the quantity of the fees paid and/or as to the obligation to pay fees, which so vitiated the Funds' intention to transfer the overpaid fees to Kingate Management as to prevent legal title to those fees from passing from the Funds to Kingate Management.

98 As a result:

98.1.1 when the overpaid fees were received from the Funds by Kingate Management, they constituted property to which the Funds retained legal title and/or its traceable proceeds;

98.1.2 when Kingate Management paid on the overpaid fees and/or their traceable proceeds to the Shareholders, in the form of dividends, the Shareholders also received property to which the Funds retained legal title and/or its traceable proceeds; ~~and~~

98.1.2A when the Shareholders paid on the overpaid fees and/or their traceable proceeds to the Investment Companies, for the purposes of investment, the Investment Companies also received property to which the Funds retained legal title and/or its traceable proceeds; and/or

98.1.3 when the Shareholders paid on the overpaid fees and/or their traceable proceeds to Mr Grosso and Mr Ceretti, in the form of distributions of trust property, Mr Grosso and Mr Ceretti also received property to which the Funds retained legal title and/or its traceable proceeds.

99 Accordingly, the Funds are entitled:

99.1 against Kingate Management, to:

99.1.1 an order that Kingate Management pay:

99.1.1.1 Kingate Global the amount of US$254,478,999.69; and

99.1.1.2 Kingate Euro the amount of 56,226,531.48 Euros;

99.1.2 alternatively:

99.1.2.1 a declaration that overpaid fees in the amount of US$254,478,999.69 and/or their traceable proceeds constituted property to which Kingate Global retained legal title