and/or its traceable proceeds, together with an order that Kingate Management return those fees and/or their traceable proceeds to Kingate Global; and

99.1.2.2    a declaration that overpaid fees in the amount of 56,226,531.48 Euros and/or their traceable proceeds constituted property to which Kingate Euro retained legal title and/or its traceable proceeds, together with an order that Kingate Management return those fees and/or their traceable proceeds to Kingate Euro;

99.2    further or alternatively, against the Shareholders, to:

99.2.1    an order that the Shareholders pay the Funds the amount of the overpaid fees and/or traceable proceeds which were paid on by Kingate Management to the Shareholders;

99.2.2    alternatively, a declaration that the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders constituted property to which the Funds retained legal title and/or its traceable proceeds, together with an order that the Shareholders return those fees and/or their traceable proceeds to the Funds;

99.2A    Further or alternatively, against the Investment Companies, to:

99.2A.1    an order that the Investment Companies pay the Funds the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies;

99.2A.2    alternatively, a declaration that the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies constituted property to which the Funds retained legal title and/or its traceable proceeds, together with an order that the Investment Companies return those fees and/or their traceable proceeds to the Funds:

99.3    further or alternatively, against Mr Grosso and Mr Ceretti, to:

99.3.1    an order that Mr Grosso and Mr Ceretti pay the Funds the amount of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti;

99.3.2    alternatively, a declaration that the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti constituted property to which the Funds retained legal title and/or its traceable proceeds, together with an order that Mr Grosso and Mr Ceretti return those fees and/or their traceable proceeds to the Funds.

LN/31289v1

## EQUITABLE PROPRIETARY CLAIMS

100  As set out in paragraphs 86.2 and 86.3, even if legal title to the overpaid fees and/or their traceable proceeds did pass from the Funds to Kingate Management, they constituted property in which the Funds had an equitable proprietary interest and/or its traceable proceeds when:

100.1  received from the Funds by Kingate Management;

100.2  paid on by Kingate Management to the Shareholders in the form of dividends; ~~and~~

100.2A  paid on by the Shareholders to the Investment Companies for the purposes of investment; and/or

100.3  paid on by the Shareholders to Mr Grosso and Mr Ceretti in the form of distributions of trust property.

101  Further or alternatively:

101.1  The retention by the Shareholders of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders, after the date on which they learned of the Funds' mistake or the circumstances giving rise to it, being (at the latest) the date of Mr Madoff's arrest, constituted unconscionable conduct.

101.2  As a result, from that date, the Shareholders held those fees and/or their traceable proceeds on constructive trusts for the Funds.

101A.  Further or alternatively:

101A.1  The retention by the Investment Companies of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies, after the date on which they learned of the Funds' mistake or the circumstances giving rise to it, being (at the latest) the date of Mr Madoff's arrest, constituted unconscionable conduct.

101A.2  As a result, from that date, the Investment Companies held those fees and/or their traceable proceeds on constructive trusts for the Funds.

102  Further or alternatively:

102.1  The retention by Mr Grosso and Mr Ceretti of the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti, after the date on which they learned of the Funds' mistake or the circumstances giving rise to it, being (at the latest) the date of Mr Madoff's arrest, constituted unconscionable conduct.

102.2  As a result, from that date, Mr Grosso and Mr Ceretti held those fees and/or their traceable proceeds on constructive trusts for the Funds

103     Accordingly, the Funds are entitled:

103.1   against Kingate Management, to:

103.1.1 a declaration that Kingate Management held overpaid fees and/or their traceable proceeds in the amount of US$254,478,999.69 on resulting, alternatively constructive trusts for Kingate Global from the moment of receipt, together with an order that Kingate Management account to Kingate Global in respect of those fees and/or their proceeds; and

103.1.2 a declaration that Kingate Management held overpaid fees and/or their traceable proceeds in the amount of 56,226,531.48 Euros on resulting, alternatively constructive trusts for Kingate Euro from the moment of receipt, together with an order that Kingate Management account to Kingate Euro in respect of those fees and/or their proceeds;

103.2   further or alternatively, against the Shareholders, to a declaration that the Shareholders held on resulting, alternatively constructive trusts for the Funds, from the moment of receipt or subsequently, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management to the Shareholders, together with an order that the Shareholders account to the Funds in respect of those fees and/or their proceeds;

103.2A  further or alternatively, against the Investment Companies, to a declaration that the Investment Companies held on resulting, alternatively constructive trusts for the Funds, from the moment of receipt of subsequently, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to the Investment Companies, together with an order that the Investment Companies account to the Funds in respect of those fees and/or their proceeds;

103.3   further or alternatively, against Mr Grosso and Mr Ceretti, to a declaration that Mr Grosso and Mr Ceretti held on resulting, alternatively constructive trusts for the Funds, from the moment of receipt or subsequently, the overpaid fees and/or their traceable proceeds which were paid on by Kingate Management and then by the Shareholders to Mr Grosso and Mr Ceretti, together with an order that Mr Grosso and Mr Ceretti account to the Funds in respect of those fees and/or their proceeds.

**FAULT BASED CLAIMS**

**Claim against Kingate Management for breach of contractual and/or tortious duties of care and/or negligent misstatement**

104    It was an implied term of each of the Manager Agreements that, in the performance of its services under the agreement and/or in the delegation of the performance of any of those services to others, including the necessary monitoring of such delegation, Kingate Management would exercise reasonable skill and care, in particular, that degree of skill, care and diligence to be expected of a reasonably competent and prudent hedge fund manager.

105    Further or alternatively, by reason of the following facts and matters, Kingate Management owed to the Funds a duty of care in tort in like terms to the contractual duty set out in paragraph 104 above:

105.1    The Funds relied on Kingate Management to take care in the performance and/or delegation of the performance of its services under the agreements.

105.2    That reliance was reasonable, given:

105.2.1    the direct contractual relationship between the Funds and Kingate Management;

105.2.2    that, by contracting with the Funds and, in particular, agreeing to act as the Funds' manager, Kingate Management held itself out as having relevant skill and experience;

105.2.3    that Kingate Management (together with its delegates and/or FIM) had control over the Funds' investments; and

105.2.4    that, as Kingate Management was aware, the Funds' received no independent advice in respect of their investments from persons other than Kingate Management and/or its delegates and/or FIM.

105.3    Kingate Management knew, or ought to have known of this reliance.

105.4    Accordingly, Kingate Management assumed a responsibility to the Funds to take care in the performance and/or delegation of the performance of its services under the agreements.

105.5    Further or alternatively, given the direct contractual relationship between the Funds and Kingate Management, and in all the circumstances:

105.5.1    it was reasonably foreseeable that if Kingate Management did not take care in the performance and/or delegation of the performance of its services under the agreements, the Funds would suffer loss and damage;

LN/31295v1

105.5.2 there was a relationship of proximity between the Funds and Kingate Management; and

105.5.3 it is fair, just and reasonable that the law should impose such a duty on Kingate Management.

106 In performing and/or delegating the performance of its services under the agreements, Kingate Management breached these contractual and tortious duties. In particular:

106.1 On or around the establishment of each fund (and/or, in the case of Kingate Global, from the winding down of the Class A shares in late 1996 or early 1997 at the latest) Kingate Management decided on an investment strategy for both Funds of investing all monies raised from investors exclusively with BLMIS, alternatively, wholly delegated the performance of its investment advisory services to BLMIS, without first conducting any, or any adequate due diligence on BLMIS. In particular, before doing so:

106.1.1 Kingate Management failed to give any, or any adequate consideration to the numerous 'red flags' surrounding the operations of BLMIS which were matters of public information, and of which Kingate Management accordingly must have been aware. For example:

106.1.1.1 several regulatory actions had been commenced against BLMIS;

106.1.1.2 several articles had been published in the financial press raising concerns about BLMIS; and

106.1.1.3 several private financial institutions, having conducted routine due diligence, refused to invest with BLMIS.

106.1.2 Kingate Management also failed to give any, or any adequate consideration to the numerous 'red flags' surrounding the operations of BLMIS which, even if not matters of public information, could reasonably have been discovered, and of which Kingate Management accordingly should have been aware. For example:

106.1.2.1 Mr Madoff and his family controlled key positions at BLMIS;

106.1.2.2 BLMIS acted as its own broker and custodian;

106.1.2.3 BLMIS' auditor was very small and unknown;

106.1.2.4 BLMIS' fee structure was highly unusual;

106.1.2.5 BLMIS reported trades using only paper confirmations; and

106.1.2.6 BLMIS' purported returns were too good to be true.

LN/31289v1

106.1.3 Kingate Management unreasonably relied on due diligence of BLMIS conducted by third parties, including Tremont.

106.1.4 Kingate Management failed to conduct any, or any adequate due diligence on BLMIS of its own. In particular:

106.1.4.1 Kingate Management failed, adequately or at all, to visit BLMIS' premises, inspect BLMIS' operations (including BLMIS' information technology systems), interview Mr Madoff/his associates, review relevant documentation, communicate with BLMIS' auditors and/or review any audit reports prepared for BLMIS, so as to properly understand BLMIS' practices and procedures, and internal controls.

106.1.4.2 Kingate Management failed, adequately or at all, to investigate BLMIS' auditor, or to confirm that it was capable of such a large-scale audit – for example, by checking the public peer review list maintained by the American Institute of Certified Public Accountants.

106.1.4.3 Alternatively, Kingate Management failed, adequately or at all, to critically assess or independently verify anything which it was shown, told or learned.

106.2 Further or alternatively, Kingate Management failed to conduct any, or any adequate on-going due diligence on BLMIS and/or monitoring of BLMIS' performance of the investment advisory services which Kingate Management had delegated to BLMIS. In particular:

106.2.1 The Funds repeat paragraphs 106.1.1-106.1.2 above.

106.2.2 The Funds also repeat paragraphs 106.1.3-106.1.4 above.

106.2.3 Kingate Management failed, adequately or at all, to assess critically or independently or independently to verify the regular reports and other documentation produced by BLMIS in respect of the Funds, including trade confirmations and the Monthly Statements. In particular, Kingate Management failed, adequately or at all:

106.2.3.1 independently to verify the existence and value of the assets in which BLMIS had purportedly invested the Funds' monies, as described in those reports – for example, by requesting any certificate of title from an independent third party;

106.2.3.2 independently to verify that the trades by which BLMIS had purportedly invested the Funds' monies, as described in the reports, had actually taken place, at the reported prices – for example, by comparing the reported prices of the purported

LN/31289v1

trades with the range in prices actually traded in the market on the day/s in question;

106.2.3.3   critically to assess or independently verify the volumes of those trades, including how they could be accomplished without impacting the market; and/or

106.2.3.4   critically to assess or independently verify the existence of the counter-parties to those trades, or their ability to perform their obligations.

106.2.4   Kingate Management failed, adequately or at all to investigate the number of traders at BLMIS responsible for executing the split-strike conversion strategy, and/or their identity.

106.2.5   Kingate Management failed, adequately or at all, critically to assess the question why BLMIS' split-strike conversion strategy, which was based (in part) on market timing, involved pulling out of the market at the end of each quarter and/or year.

106.2.6   Kingate Management failed, adequately or at all, critically to assess the question how BLMIS' returns could be lawfully achieved, given that basic, industry standard, statistical analysis indicated that those returns (especially their lack of volatility) were highly improbable.

106.3   Further or alternatively, it is not accepted that Kingate Management delegated or properly delegated to FIM any responsibility for conducting on-going due diligence on BLMIS and/or monitoring of BLMIS' performance of its investment advisory services. However, if and to the extent that it did so, Kingate Management failed to take any, or any adequate steps to review and/or monitor FIM's discharge of that responsibility and/or to ensure that FIM did so with reasonable skill and care.

106.4   Further or alternatively, if and insofar as FIM made negligent misstatements to the Funds or otherwise acted in breach of its duty of care (see below), it was caused or permitted to do so by Kingate Management in the performance or purported performance by Kingate Management of its duties to the Funds. In such circumstances, Kingate Management is liable as accessory for such negligent misstatements and/or negligence. Alternatively, Kingate Management is liable as a joint tortfeasor for the negligent misstatements and/or negligence of FIM as its agent.

106.5   Further or alternatively, Kingate Management failed, adequately or at all, to disclose to the Funds, at the outset or subsequently:

106.5.1   the existence of any of the 'red flags' surrounding the operations of BLMIS of which it was, or should have been aware;

106.5.2 any particular on-going risks in relation to BLMIS, and the Funds' investment strategy of investing all monies raised from investors exclusively with BLMIS, of which it was, or should (if it had conducted adequate due diligence on BLMIS) have been aware.

107 For the avoidance of doubt, and if necessary, the Funds aver that these breaches of duty, individually or collectively, amounted to "gross negligence" by Kingate Management, within the terms of the purported exclusionary provisions in the Manager Agreements.

108 By reason of these breaches of duty, the Funds have suffered loss and damage. In particular:

108.1 But for these breaches of duty, the Funds would not have invested any, alternatively, any further monies with BLMIS. Accordingly:

108.1.1 The Funds would not have transferred any, alternatively, any further subscription monies to BLMIS for investment. As a result, the Funds have lost all, alternatively, part of those monies which, since their establishment, they have transferred to BLMIS. As to these losses, see Annex A to this amended statement of claim.

108.1.2 The Funds would not have paid any, alternatively, any further redemption monies to redeeming investors. As a result, the Funds have lost all, alternatively, part of those monies which, since their establishment, they have paid to redeeming investors. See the table attached to this amended statement of claim as Annex D, which sets out the payments made to redeeming investors by each fund in each year and the total paid.

108.1.3 The Funds would not have paid to Kingate Management any, alternatively, any further fees in respect of their investments with BLMIS. As a result, the Funds have lost all, alternatively, part of these fees which, since their establishment, they have paid to Kingate Management. As to these losses, see Annex B to this amended statement of claim.

108.1.4 The Funds would not have paid any, alternatively, any further fees to other parties which provided services to the Funds in respect of their investments with BLMIS, including:

108.1.4.1 Tremont Bermuda, as co-manager of Kingate Global, from its establishment until 31 December 2005;

108.1.4.2 each fund's administrator; or

108.1.4.3 the Bank, as each fund's custodian.

As a result, the Funds have lost all, alternatively, part of these fees which, since their establishment, they have paid to these parties. In particular:

LN/31289Sv1

108.1.4.4 between 1 January 1995 and 19 November 2008, Kingate Global paid:

108.1.4.4.1 Tremont Bermuda, as co-manager, fees in the amount of US$36,720,777.50;

108.1.4.4.2 its administrator fees in the amount of US$4,522,919.54;

108.1.4.4.3 the Bank, as custodian, fees in the amount of US$186,235; and

108.1.4.5 between 1 January 2000 and 19 November 2008, Kingate Euro paid its administrator fees in the amount of US$1,132,198.67.

108.1.5 The arrest of Mr Madoff and the bankruptcy of BLMIS would not have had any, alternatively, as devastating an effect on the Funds, and the Funds would not have been wound up. As a result, the Funds have lost all the costs and expenses of and associated with their liquidation.

108.2 In assessing the loss and damage suffered by the Funds:

108.2.1 The Funds accept that credit must be given for all redemption monies transferred by BLMIS to the Funds. As to these amounts, see Annex A to this amended statement of claim.

108.2.2 The Funds accept that credit must also be given for any subscription monies received from subscribing investors which were not transferred to BLMIS for investment or otherwise paid on by the Funds.

108.2.3 The Funds aver that any amount for which credit is given must be reduced by any amount/s which the Funds are subsequently found liable to pay to the Trustee in the proceedings commenced in the Bankruptcy Court for the Southern District of New York on 17 April 2009 (or any other proceedings), or which the Funds subsequently agree to pay to the Trustee.

**Remedy against Kingate Management for breach of contractual and/or tortious duties of care and/or negligent misstatement**

109 By reason of the claim set out in paragraphs 104-108 above, the Funds are entitled to damages against Kingate Management, to be assessed.

LN/312895v1

**Claim against FIM for breach of tortious duty of care**

110  By reason of the following facts and matters, FIM owed to the Funds a tortious duty to exercise reasonable skill and care, in particular, that degree of skill, care and diligence to be expected of a reasonably competent and prudent hedge fund consultant, in the performance of its services under the Kingate Global Consulting Services Agreement and the Kingate Euro Consulting Services Agreement (and their predecessors) ("**the Consulting Services Agreements**"):

110.1  The Funds were aware of the performance of the services set out in the Consulting Services Agreements by FIM. Accordingly, the Funds relied on FIM to take care in the performance of those services.

110.2  That reliance was reasonable, given that:

110.2.1  although there was (for most of the time) no direct contractual relationship between the Funds and FIM, there was at all material times direct and substantial contact between them. Notwithstanding that the Funds were not parties to the Consulting Services Agreements, their interests were directly and substantially affected by them, as:

110.2.1.1  the services which FIM agreed to provide to Kingate Management under the agreements were in respect of the Funds and for their benefit; and

110.2.1.2  the agreements purported to bind the Funds. As set out in paragraph 43.6 above, clause 13 of both agreements purports to exclude the liability of FIM for any loss etc, in the absence of (inter alia) gross negligence, to the Funds as well as Kingate Management. For the avoidance of doubt, the Funds make no admissions as to the efficacy of such clauses as against them;

110.2.2  FIM was not an arms' length party, independent of Kingate Management. As set out in paragraphs 9-10 above, at all material times, the controlling shareholders of FIM Ltd, and the principals of FIM Advisers, were Mr Grosso and Mr Ceretti. These same individuals were behind the establishment of Kingate Management (and both Funds). Accordingly, the corporate and contractual structure did not reflect reality but was merely a structure of convenience for the benefit of Mr Grosso and Mr Ceretti. In the circumstances, it cannot be treated as creating a relationship of liability between FIM and Kingate Management but excluding any such relationship between FIM and the Funds;

110.2.3  by entering into the Consulting Services Agreements, FIM held itself out as having the skills and experience to perform the services which it thereby agreed to provide;

110.2.4  to the extent of those services, FIM had control over the Funds' investments; and

LN/31289v1

110.2.5 in respect of those services, as FIM was aware, the Funds' received no independent advice.

110.3 FIM knew, or ought to have known of this reliance.

110.4 Accordingly, FIM assumed a responsibility to the Funds to take care in the performance of its services under the Consulting Services Agreements.

110.5 Further or alternatively, in all the circumstances:

110.5.1 it was reasonably foreseeable that if FIM did not take care in the performance of its services under the Consulting Services Agreements, the Funds would suffer loss and damage;

110.5.2 there was a relationship of proximity between the Funds and FIM; and

110.5.3 it is fair, just and reasonable that the law should impose such a duty on FIM.

111 In performing its services under the Consulting Services Agreements, FIM breached this tortious duty. In particular:

111.1 On or around the establishment of each fund (and/or, in the case of Kingate Global, from the winding down of the Class A shares in late 1996 or early 1997 at the latest) FIM decided on and/or recommended to Kingate Management an investment strategy for both Funds of investing all monies raised from investors exclusively with BLMIS, without first conducting any, or any adequate due diligence on BLMIS. In particular, before doing so:

111.1.1 FIM failed to give any, or any adequate consideration to the numerous 'red flags' surrounding the operations of BLMIS which were matters of public information, and of which FIM accordingly must have been aware. For example:

111.1.1.1 several regulatory actions had been commenced against BLMIS;

111.1.1.2 several articles had been published in the financial press raising concerns about BLMIS; and

111.1.1.3 several private financial institutions, having conducted routine due diligence, refused to invest with BLMIS.

111.1.2 FIM also failed to give any, or any adequate consideration to the numerous 'red flags' surrounding the operations of BLMIS which, even if not matters of public information, could reasonably have been discovered, and of which Kingate Management accordingly should have been aware. For example:

111.1.2.1 Mr Madoff and his family controlled key positions at BLMIS;

LN/31289v1

111.2.1.2   BLMIS acted as its own broker and custodian;

111.2.1.3   BLMIS' auditor was very small and unknown;

111.2.1.4   BLMIS' fee structure was highly unusual;

111.2.1.5   BLMIS reported trades using only paper confirmations; and

111.2.1.6   BLMIS' purported returns were too good to be true.

111.1.3 FIM unreasonably relied on due diligence of BLMIS conducted by third parties, including Tremont.

111.1.4 FIM failed to conduct any, or any adequate due diligence on BLMIS of its own. In particular:

111.1.4.1   FIM failed, adequately or at all, to visit BLMIS' premises, inspect BLMIS' operations (including BLMIS' information technology systems), interview Mr Madoff/his associates, review relevant documentation, communicate with BLMIS' auditors and/or review any audit reports prepared for BLMIS, so as to properly understand BLMIS' practices and procedures, and internal controls.

111.1.4.2   FIM failed, adequately or at all, to investigate BLMIS' auditor, or to confirm that it was capable of such a large-scale audit – for example, by checking the public peer review list maintained by the American Institute of Certified Public Accountants.

111.1.4.3 Alternatively, FIM failed, adequately or at all, to critically assess or independently verify anything which it was shown, told or learned.

111.2   Further or alternatively, FIM failed to conduct any, or any adequate on-going due diligence on BLMIS and/or monitoring of BLMIS' performance of the investment advisory services which Kingate Management had delegated to BLMIS. In particular:

111.2.1 The Funds repeat paragraphs 106.1.1-106.1.2 above.

111.2.2 The Funds also repeat paragraphs 106.1.3-106.1.4 above.

111.2.3 FIM failed, adequately or at all, to assess critically or independently or independently to verify the regular reports and other documentation produced by BLMIS in respect of the Funds, including trade confirmations and the Monthly Statements. In particular, FIM failed, adequately or at all:

111.2.3.1 independently to verify the existence and value of the assets in which BLMIS had purportedly invested the Funds' monies, as described in those reports – for example, by requesting any certificate of title from an independent third party;

111.2.3.2 independently to verify that the trades by which BLMIS had purportedly invested the Funds' monies, as described in the reports, had actually taken place, at the reported prices – for example, by comparing the reported prices of the purported trades with the range in prices actually traded in the market on the day/s in question;

111.2.3.3 critically to assess or independently to verify the volumes of those trades, including how they could be accomplished without impacting the market; and/or

111.2.3.4 critically to assess or independently to verify the existence of the counter-parties to those trades, or their ability to perform their obligations.

111.2.4 FIM failed, adequately or at all to investigate the number of traders at BLMIS responsible for executing the split-strike conversion strategy, and/or their identity.

111.2.5 FIM failed, adequately or at all, critically to assess the question why BLMIS' split-strike conversion strategy, which was based (in part) on market timing, involved pulling out of the market at the end of each quarter and/or year.

111.2.6 FIM failed, adequately or at all, to critically assess the question how BLMIS' returns could be lawfully achieved, given that basic, industry standard, statistical analysis indicated that those returns (especially their lack of volatility) were highly improbable.

111.3 Further or alternatively, FIM failed, adequately or at all, to disclose to Kingate Management or the Funds:

111.3.1 the existence of any of the 'red flags' surrounding the operations of BLMIS of which it was, or should have been aware;

111.3.2 any particular on-going risks in relation to BLMIS, and the Funds' investment strategy of investing all monies raised from investors exclusively with BLMIS, of which it was, or should (if it had conducted adequate due diligence on BLMIS) have been aware.

112 For the avoidance of doubt, and if necessary, the Funds aver that these breaches of duty, individually or collectively, amounted to "gross negligence" by FIM, within the terms of the purported exclusionary provisions in the Consulting Services Agreements.

LN/312895v1