# EXHIBIT B

On behalf of: Claimant
F O Walters
First Affidavit
Exhibit "FOW1"
16 November 2011

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

BRITISH VIRGIN ISLANDS

BVIHCV 2011/

BETWEEN:

### FIRST PENINSULA TRUSTEES LIMITED
### (AS TRUSTEE OF THE ASHBY TRUST)

Claimant

-and-

### (1) IRVING H PICARD
**(as trustee for the substantively consolidated SIPA liquidation of Bernard L
Madoff Investment Securities LLC and the estate of Bernard L Madoff)**

### (2) KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)
**(acting by William R Tacon and Richard E Fogerty as joint liquidators)**

### (3) KINGATE EURO FUND LIMITED (IN LIQUIDATION)
**(acting by William R Tacon and Richard E Fogerty as joint liquidators)**

### (4) CARLO GROSSO
**(as representative of the adult beneficiaries of the Ashby Trust)**

### (5) MAC IMRIE
**(as representative of the minor, unborn and unascertained beneficiaries of the
Ashby Trust)**

### (6) HER MAJESTY'S ATTORNEY GENERAL OF THE BRITISH VIRGIN ISLANDS

Defendants

---

### AFFIDAVIT OF
### FRANK OLIVER WALTERS

---

I, **FRANK OLIVER WALTERS** of L'Estoril, 31 Avenue Princesse Grace, Monte Carlo, MC
98000, Monaco **MAKE OATH** and **SAY** as follows:

## INTRODUCTION

1.      I am a Manager – Trust & Corporate Services at Moore Stephens Services SAM, whose offices are at L'Estoril, 31 Avenue Princesse Grace, Monte Carlo, MC 98000, Monaco ("**Moore Stephens Monaco**").

2.      Moore Stephens Monaco is a company authorised by the government of the Principality of Monaco.  It acts as administrator to First Peninsula Trustees Limited, being a company incorporated on 3 August 1984 under the laws of the Republic of Liberia, whose registered office is at 80 Broad Street, Monrovia, Republic of Liberia (the "**Ashby Trustee**").

3.      The facts and matters set out in this Affidavit are within my own knowledge, save where the contrary appears, and are true.  Where such facts and matters are not within my own personal knowledge, they are true to the best of my information and belief and derive from the sources stated.

4.      Exhibited to this Affidavit is a bundle of documents marked "Exhibit FOW1". References in this Affidavit to page numbers are to page numbers in Exhibit FOW1.

5.      Nothing in this Affidavit is intended to be or should be read as a waiver of privilege on the part of the Ashby Trustee or its 100% subsidiaries.

6.      This Affidavit is structured as follows:

| Section heading | Page |
|---|---|
| Introduction, purpose of the application and background | 2 |
| Overview | 7 |
| The Ashby Trust | 8 |
| The Kingate Funds and Kingate Management Limited | 20 |
| Legal action against the Ashby Trustee | 29 |
| Claims by Irving H Picard against the Ashby Trustee | 34 |
| The Ashby Trustee's approach to seeking representations in connection with the present application | 42 |

11698152.1

| Directions sought by the Ashby Trustee | 45 |
|---|---|
| Costs | 46 |
| Conclusion | 48 |

**Purpose of the Application**

7.      I make this Affidavit in support of an application by the Ashby Trustee for an order for the following directions in respect of (i) a claim brought against the Ashby Trustee and others in the United States Bankruptcy Court of the Southern District of New York (the "**Bankruptcy Court**") with case reference Adv. Pro. No. 09-1161 (BRL) (the "**Third Amended Complaint**") and (ii) a claim brought against the Ashby Trustee and others in the High Court of Justice of England and Wales, Queen's Bench Division, Commercial Court with claim number 2010 Folio 1478 (the "**English Claim**"), the subject matter of both of which is explained further below:

7.1      That Mr Carlo Grosso ("**Mr Grosso**") is appointed and shall act in these proceedings as representative of the adult beneficiaries of the Ashby Trust and that his reasonable costs incurred in connection with this application be paid from the assets currently held on the trusts of the Ashby Trust;

7.2      That Mr Mac Imrie is appointed and shall act in these proceedings as representative of the interests of the minor, unborn and/or unascertained beneficiaries of the Ashby Trust and that his reasonable costs incurred in connection with this application be paid from the assets currently held on the trusts of the Ashby Trust;

7.3      That the Ashby Trustee shall be indemnified from the assets currently held on the trusts of the Ashby Trust for its costs of making this application;

7.4      In respect of the Third Amended Complaint, that the Ashby Trustee shall be indemnified from the assets currently on the trusts of the Ashby Trust for its costs of making the motions to withdraw the reference and motions to dismiss articulated in the Confidential Affidavit, including costs arising

11698152.1

from any adverse costs orders made against it in pursuance of those motions; and

7.5     In respect of the English Claim, that the Ashby Trustee shall be indemnified from the assets currently held on the trusts of the Ashby Trust for its costs of obtaining advice in relation to the English Claim, considering that advice and taking such steps as appropriate in light of that advice, including costs arising from any adverse costs orders made against it in pursuance of those steps.

8.     The Ashby Trustee's application is also supported by my second Affidavit, of even date. That second Affidavit (the "**Confidential Affidavit**") concerns facts and matters which are privileged and/or confidential, including details of US Counsel's advice on the approach the Ashby Trustee should take with respect to the Third Amended Complaint.    The facts and matters in the Confidential Affidavit are relevant to the Court's consideration of the application, and for that reason, the Confidential Affidavit will be lodged with the Court together with this Affidavit. For reasons which will be obvious to the Court, the Ashby Trustee considers that it is not appropriate for the material in that Confidential Affidavit to be provided to the Defendants to the present application, a number of whom are themselves parties to the English claim and/or the Third Amended Complaint.

**Background**

9.     Schedule 1 to this Affidavit contains a list of defined terms used in this Affidavit.

10.     This application arises as a result of the following:

10.1    The Third Amended Complaint, which was filed in the Bankruptcy Court on 20 May 2011 naming the Ashby Trustee and 17 others (page 1), including the Ashby Trust and the El Prela Trust which have no legal personality. The Plaintiff is Irving H Picard ("**Mr Picard**"), the trustee for the liquidation of the business of Bernard L Madoff Investment Securities LLC ("**BLMIS**").    The Third Amended Complaint was deemed to be served on the Ashby Trustee on 10 August 2011, as is explained further below; and

10.2    The English Claim, which was issued by Mr Picard in the High Court of Justice of England and Wales, Queen's Bench Division, Commercial Court on 10 December 2010, against the Ashby Trustee and eleven

11698152.1

others.  The English Claim was served on the Ashby Trustee on 16 September 2011, as is explained further below.

The Third Amended Complaint and the English Claim are together, the "**Picard Claims**".

11.  As has been well publicised, on 12 March 2009, the principal of BLMIS, Mr Bernard Madoff ("**Madoff**") pleaded guilty before the New York court to the criminal charges laid against him, admitting to operating a "Ponzi scheme" through the investment advisory side of BLMIS.  He has since been sentenced to prison for 150 years.

12.  Shortly after his arrest, the United States Securities and Exchange Commission ("**SEC**") commenced proceedings against Madoff and BLMIS, and a receiver was appointed over the assets of BLMIS.  Shortly thereafter, the SEC consented to a combination of those proceedings with an application by the Securities Investor Protection Corporation ("**SIPC**"). SIPC filed an application alleging, among other things, that BLMIS was not able to meet its obligations as they came due and, accordingly, its customers needed the protection of the Securities Investor Protection Act ("**SIPA**").  On 15 December 2008, Mr Picard was appointed trustee for the liquidation of the business of BLMIS pursuant to SIPA.

13.  One of the Ashby Trustee's Co-Defendants to the Picard Claims is Port of Hercules Trustees Limited, a company incorporated on 6 February 1993 under the laws of the British Virgin Islands (the "**BVI**"), which is trustee of the El Prela Trust (the "**El Prela Trustee**"). The El Prela Trustee was appointed trustee of the El Prela Trust on 17 August 2006 in place of Alpine Trustees Limited ("**Alpine Trustees**"), also a Co-Defendant to the Picard Claims, which was trustee of the El Prela Trust from its settlement until that date. Moore Stephens Monaco also acts as administrator to the El Prela Trust, and I have sworn similar affidavits in support of an equivalent application by the El Prela Trustee, also seeking directions in relation to the Picard Claims. The Ashby Trust and the El Prela Trust are together, the "**Trusts**".

14.  Two of the other Co-Defendants to the Third Amended Complaint are Kingate Global Fund Limited ("**Kingate Global**") and Kingate Euro Fund Limited ("**Kingate Euro**") (together, the "**Kingate Funds**"), as to which, see further paragraphs 70 to 77 below.

15.     The claims made against the Ashby Trustee and the El Prela Trustee (together, the "**Trustees**") in the Third Amended Complaint are complex and the sums claimed are substantial, totalling approximately US$976 million. They fall into two broad categories:

   15.1   Claims under Title 11 of the United States Bankruptcy Code sections 544, 547, 548 and 550 and the New York Debtor and Creditor Law sections 273 to 279 to avoid and recover allegedly preferential and fraudulent transfers allegedly received by the Trustees (which claims are applicable to subsequent transferees by virtue of section 550 of that statute); and

   15.2   Common law claims asserted under New York law, the essence of which is that the Trustees possess BLMIS customer property and should be required to return those funds to Mr Picard for distribution among the claimants in the BLMIS liquidation.

16.     The claims made against the Trustees in the English Claim are also complex, and the amount claimed mirrors the amount claimed in the Third Amended Complaint, namely approximately US$976 million.   The relief sought and/or claims made can be summarised as follows:

   16.1   A declaration pursuant to English and US law that the Trustees hold on constructive trust for BLMIS subsequent transfers or the proceeds thereof allegedly received by the Trustees by reason of the initial transfers having been made in breach of the fiduciary duties owed to BLMIS by Madoff and/or the BLMIS management;

   16.2   An account and/or enquiry as to the whereabouts of the alleged subsequent transfers and/or their traceable proceeds;

   16.3   Claims that the Trustees make restitution of the alleged subsequent transfers or the proceeds thereof because, as a matter of New York law, the transfers from BLMIS to the Kingate Funds were void *ab initio*;

   16.4   Claims for damages and/or equitable compensation for alleged knowing receipt in breach of trust;

   16.5   A contribution and/or indemnity at common law or under the Civil Liability (Contribution) Act 1978; and

11698152.1

16.6    Claims under section 213 of the Insolvency Act 1986 and/or the common law and/or the Cross-Border Insolvency Regulations 2006 based on allegations that the Trustees were knowingly party to fraudulent trading at BLMIS.

17. The Kingate Funds (now in liquidation) are open-ended investment companies established under the laws of the BVI whose purpose was to seek long-term capital growth by allocating share capital to an investment adviser selected to execute their investment objectives.

18. As will be explained further below, the manager of the Kingate Funds was Kingate Management Limited ("**KML**"), which is the Third Defendant to the Third Amended Complaint and the First Defendant to the English Claim. At all material times, the shares in KML were held by a nominee appointed by the Trustees or their respective 100% subsidiaries.

19. While the applications made by the Trustees are distinct, they arise from the same facts and the Trustees' positions with respect to the Picard Claims are, materially, the same.

20. By way of further background, the Trustees have previously made similar applications for directions to the Eastern Caribbean Supreme Court, High Court of Justice of the BVI (the "**BVI Court**") as to how they should proceed in respect of other, related, proceedings commenced against them and seven others in the Supreme Court of Bermuda by the Kingate Funds (the "**Bermuda Proceedings**"). With the exception of Mr Picard, the Defendants to those applications were the same as the Defendants to this present application.

## OVERVIEW

21. In supporting this present application of the Ashby Trustee, this Affidavit will:

21.1    Explain the formation of the Ashby Trust and the source of its assets;

21.2    Summarise the relationship between the Ashby Trust and KML;

21.3    Summarise the relationship between KML, the Kingate Funds, Mr Picard and other parties;

11698152.1

21.4    Explain the various actual and prospective claims faced by the Ashby
Trustee, and its 100% subsidiaries, including the Picard Claims;

21.5    Explain the Ashby Trustee's approach to seeking representations in
connection with the present application;

21.6    Set out the directions sought; and

21.7    Summarise the costs of steps already taken by the Ashby Trustee and
the estimate of future steps to be taken by it.

22.     Certain other facts and matters are summarised in the Confidential Affidavit,
referred to above.

**THE ASHBY TRUST**

23.     On 24 March 1994, the Ashby Trust was formed under the laws of Jersey. Its
settlor is Mr Grosso and its trustee is the Ashby Trustee. The Ashby Trust is an
irrevocable discretionary trust. A copy of the instrument of trust relating to the
Ashby Trust dated 24 March 1994 (the "**Trust Deed**") is at page 130.

**The Ashby Trustee**

24.     The Ashby Trustee is a company incorporated on 3 August 1984 under the laws
of the Republic of Liberia, whose registered office is at 80 Broad Street,
Monrovia, Republic of Liberia. It has provided and continues to provide
professional trustee services to a number of trusts, in addition to the Ashby
Trust.

25.     Both the Ashby Trustee and Moore Stephens Monaco are 100% subsidiaries of
Moore Stephens & Company Bermuda, a partnership which is a member firm of
Moore Stephens International Limited ("**Moore Stephens International**"), an
international accounting and consulting association.

26.     The Ashby Trustee currently has a single corporate director, Port of Hercules
Directors Limited, being a company incorporated on 28 November 2000 under
the laws of the BVI, whose registered office is Palm Grove House, PO Box 3186,
Wickhams Cay 1, Road Town, Tortola, BVI ("**Port of Hercules Directors**"). Port
of Hercules Directors was appointed director of the Ashby Trustee on 6 February
2001.

8

11698152.1

27.     The current directors of Port of Hercules Directors, and the dates of their
        appointment, are as follows:

27.1    Frank O Walters (appointed 28 November 2000);

27.2    Phillip A Evans (appointed 28 November 2000); and

27.3    David R Brand (appointed 30 March 2006). Mr Brand replaced a previous
        director, Mary Magagli, who was appointed on 28 November 2000. Ms
        Magagli died on 20 March 2006.

28.     A table showing the dates of appointment and resignation of the directors of the
        Ashby Trustee prior to the appointment of Port of Hercules Directors is at page
        152.

29.     The shares of Port of Hercules Directors are held by the El Prela Trustee on trust
        for Moore Stephens & Company Bermuda. The company secretary of the Ashby
        Trustee and of Port of Hercules Directors is First Peninsula Secretaries Limited,
        which is also a 100% subsidiary of Moore Stephens & Company Bermuda.

**The Trust Deed**

30.     The Trust Deed contains the following provisions, relevant for the purposes of
        this application:

30.1    Paragraph C1, which provides that the property of the Ashby Trust as at
        the date of settlement was US$5,000 (page 150);

30.2    Recital (b) (page 133) and paragraph A6 (page 136), which provides that
        further "*money investments or other property*" may be "*paid or transferred
        to or otherwise placed under [the Ashby Trustee's] control*";

30.3    Paragraph A1, which provides that the proper law of the Ashby Trust at
        the date of its settlement was the law of the Island of Jersey (page 133);

30.4    Paragraph A15, which provides that the Ashby Trustee "*... may from time
        to time by instrument declare that the proper law of this trust shall be the
        law of some place in any part of the world under which the terms of
        this trust shall be capable of taking effect and such law shall thereupon
        become the proper law of this trust...*" (page141) (for an explanation of
        the Ashby Trustee's exercise of this power in changing the proper law of

the Ashby Trust from that of Jersey to that of the BVI, see paragraph 67 below);

30.5    Paragraph B1, which states that: "*any monies requiring investment hereunder may be invested in or upon any such investments of whatsoever nature and wheresoever situate and whether producing income or not....as the Trustees shall in their absolute discretion think fit*" (page 142);

30.6    Paragraph C2 (pages 150 to 151), which provides that the express beneficiaries of the Ashby Trust are Mr Grosso and his wife, Diana Maria Grosso ("**Mrs Grosso**") and other members of Mr Grosso's family.[1]    It also names as a beneficiary "*Any trust association body or other organisation in any part of the world the objects of which are charitable*", and includes "*Any person who is the subject of an addition under clause A3.02*" (page 151);

30.7    Paragraph A7.05.01, which states: "*the Trustees may at any time during the Trust Period pay or apply the Trust Fund and the income thereof or any part thereof to or for the benefit of all or such one or more exclusive of the others of the Beneficiaries and in such shares if more than one and in such manner generally as the Trustees shall in their discretion think fit*" (page 137);

30.8    Paragraph A12.01, which provides that the Ashby Trustee has "*the right to remuneration and the incidence thereof*" (page 139);

30.9    Paragraph B12, by which the Ashby Trustee has the power to employ agents "*whether a solicitor advocate attorney banker accountant stock-broker or other agent to transact any business or do any act required to be transacted or done in the execution of the trusts hereof*" (page 144) and pay them out of the Ashby Trust fund;

30.10   Paragraph B28, which provides that the Ashby Trustee: "*may appoint or employ investment advisers and managers and may delegate to any such*

---

[1]    The six further express beneficiaries named in the Trust Deed are Federica Wezel and Gioia Wezel (who reside in Italy); and Gerardo Rivera Forquet, Mauricio Rivera Forquet, Carlos Jose Rivera Forquet, and Ricardo Jose Rivera Forquet (who reside in Puerto Rico). These further individual beneficiaries are the nephews and nieces of Mr and Mrs Grosso.

11698152.1

*advisers or managers (for such periods to such extent and generally on such terms and in such manner as the Trustees may from time to time think fit) all or any of the Trustees' powers and discretions with regard to making retaining varying or transposing investments"* (page 147);

30.11   Paragraph B36, which provides that: *"the expenses in connection with the preparation establishment and administration of this trust including without prejudice to the generality of the foregoing the remuneration and charge of the Trustees herein provided for and of the investment and re-investment of any part of the Trust Fund and the collection of income and other sums derivable therefrom may be paid out of the Trust Fund and may be charged against capital or income or partly out of one and partly out of the other at the discretion of the Trustees"* (page 149);

30.12   Paragraph A12.02, which provides that: *"any Trustee or person connected with* [*the Ashby Trustee*] *who shall be a solicitor advocate attorney or accountant or engaged in any other profession business or trade shall be entitled to charge be reimbursed and be paid out of the Trust Fund his usual professional or other charges for work or business done or transacted from time to time expended by him or his firm or any employee or partner of his in the execution of or otherwise in relation to* [*the Ashby Trust*] *including acts to which a Trustee not being in that or any profession business or trade could have done"* (page 139);

30.13   Paragraph B37, by which the Ashby Trustee is entitled to *"receive reimbursement from the Trust Fund of any expenses costs and other liabilities...incurred by him purely by reason of his duties relating to this Trust"* (page 150); and

30.14   Paragraph B40, which provides that the Ashby Trustee *"may institute and defend proceedings at law and may proceed to the final end and determination thereof or compromise the same as the* [*Ashby Trustee*] *shall consider advisable"* (page 150).

**Mr Grosso's letters of wishes and the Ashby Trust's shareholding in KML**

31.      In his capacity as settlor of the Ashby Trust, Mr Grosso has written a number of letters of wishes to the Ashby Trustee, as follows:

31.1   A letter dated 24 March 1994 (page 153) by which Mr Grosso asked the
       Ashby Trustee to consider Mr Grosso and Mrs Grosso to be the joint
       principal beneficiaries of the Ashby Trust during their lifetimes. In that
       letter of wishes, Mr Grosso also confirmed his intention to add to the
       settled fund the shares of a company in which he was to be involved with
       Mr Federico Ceretti ("**Mr Ceretti**") who is settlor of the El Prela Trust
       referred to above.   That company was KML, as to which see further
       paragraph 79 below;

31.2   A letter dated 5 October 1998 (page 155) by which Mr Grosso requested
       that his mother, Mrs Adele Grosso, née Bonino, be added as a
       beneficiary of the Ashby Trust. This request was not carried out and Mrs
       Adele Grosso was never added as a beneficiary of the Ashby Trust;

31.3   A letter of wishes dated 29 August 1996 (page 157), in which Mr Grosso
       expressed his wish that the Ashby Trustee transfer 1,800 shares in KML
       for nil consideration to Alpine Trustees, which was at that time the trustee
       of the El Prela Trust (prior to the appointment of the El Prela Trustee);
       and

31.4   A letter of wishes dated 24 March 2000 (page 158), by which Mr Grosso
       noted his wish to transfer a further 120 shares in KML to Alpine Trustees
       as trustee of the El Prela Trust for nil consideration.

32.    On 24 February 1994, 9,000 shares (6,000 from Mr Grosso and 3,000 from Mr
       Ceretti) in KML, being 75% of the issued share capital of that company, were
       transferred to a nominee to hold on trust for the Ashby Trustee to form part of the
       property of the Ashby Trust following its settlement on 24 March 1994.   The
       Ashby Trustee paid US$9,000 to KML in consideration for these shares.

33.    Also on 24 February 1994, 3,000 shares in KML were transferred by Mr Ceretti
       to a nominee to hold on trust for Alpine Trustees to form part of the property of
       the El Prela Trust following its settlement on 7 April 1994.

34.    Following these initial transfers, certain shares in KML (the legal ownership of
       which, from 24 February 1994 onwards, lay with a nominee) were transferred by
       the Ashby Trustee to Mr Ceretti, who subsequently added them to the property of
       the El Prela Trust as follows:

11698152.1

34.1    On 14 January 1997, 1,800 shares in KML were transferred from the Ashby Trustee to Mr Ceretti.

34.2    On 16 March 1998, 1,080 shares in KML were transferred from the Ashby Trustee to Mr Ceretti.

34.3    On 2 May 2000, a further 120 shares in KML were transferred from the Ashby Trustee to Mr Ceretti.

35.    Following the above transfers and allotments, the entire issued share capital of KML was held, via a nominee, by the Ashby Trustee on behalf of the Ashby Trust and Alpine Trustees (since 2006, the El Prela Trustee) on behalf of the El Prela Trust in equal shares.

## The restructuring of the Ashby Trust in 2008

36.    The structure of the Ashby Trust and its subsidiary companies is designed to allow those beneficiaries of the Ashby Trust who are subject to taxation in the United Kingdom ("UK") to benefit from a special tax regime in the UK by which they, while UK taxpayers, are designated "resident non-domiciled" in the UK.

37.    Until 31 March 2008, the Ashby Trustee held its shares in KML via a nominee and the other investments of the Ashby Trust directly.

38.    In late 2007/early 2008, the first drafts of the new UK Finance Bill were published.  This introduced the possibility of several changes to the legislation governing the taxation of UK resident non-domiciliaries.  It appeared possible that capital gains made by the Ashby Trust after 5 April 2008 might attract a less favourable tax treatment from the perspective of those beneficiaries of the Ashby Trust (including Mr Grosso) who were subject to taxation in the UK as UK resident non-domiciliaries.  It appeared at the time that a line might be drawn as at 5 April 2008 distinguishing trust gains that had been *"accrued or realised"* before that date and those *"accrued or realised"* after that date, with the old gains being taxed under the old rules (and so not giving rise to a charge to tax for UK resident non-domiciliaries) and the new gains being taxed under the new regime (where there would be a charge to tax).  There was no certainty at that stage as to whether revaluing provisions might be introduced in the new legislation (which provisions might mitigate the impact of the changes in the law).

11698152.1

39.      Given the uncertainty prevailing at the time, Leading English tax Counsel was
         instructed by the Ashby Trustee to consider the best action for the Ashby Trust.
         Leading tax Counsel considered it advisable to trigger gains in the Ashby Trust
         before 5 April 2008, so as to constitute actual disposals, rather than relying on
         the possibility that revaluation provisions might be introduced in the forthcoming
         legislation.  This would have the effect of establishing a new higher base cost of
         these assets against which any future capital gains might be assessed.
         Accordingly it was deemed prudent by the Ashby Trustee to revalue the Ashby
         Trust's assets in this manner.

40.      It was concluded that the most efficient way of effecting this revaluation was to
         transfer the Ashby Trust's shares in KML (held via a nominee) to one wholly-
         owned subsidiary of the Ashby Trust, and to transfer all of the Ashby Trust's
         other investments from the Ashby Trust to another wholly-owned subsidiary of
         the Ashby Trust.

41.      Accordingly, in early 2008, the Ashby Trust underwent a tax restructuring. This
         involved, on 26 February 2008, the transfer to the Ashby Trustee of 100% of the
         shares of two shelf companies (the original subscriber being Moore Stephens
         International Services (BVI) Limited and the original holder of the single issued
         share being the El Prela Trustee). Those companies were:

    41.1   Ashby Holding Services Limited, a company incorporated on 23
           November 2007 under the name Thornton Bay Holdings Limited, whose
           registered office is at Palm Grove House, Wickhams Cay 1, Road Town,
           Tortola, BVI (the "**Ashby Holding Company**"); and

    41.2   Ashby Investment Services Limited, a company incorporated on 12
           October 2007 under the name Pestona Investments Inc, whose
           registered office is at Palm Grove House, Wickhams Cay 1, Road Town,
           Tortola, BVI (the "**Ashby Investment Company**").

42.      On 31 March 2008, the Ashby Trustee sold its shareholding in KML to the Ashby
         Holding Company. The shares remained registered in the name of a nominee,
         which, following the sale, held the shares on trust for the Ashby Holding
         Company. This sale was deemed to occur at market value for UK tax purposes
         (i.e. at a price that was greater than the original cost of the KML shares).  The
         shares in KML were therefore re-valued to apparent market value for UK tax

14

purposes (that revaluation taking place before Madoff's fraud was revealed). The sale proceeds were left outstanding on a loan account and dividend income from KML was used by the Ashby Holding Company towards repayment of the loan.

43.     At the same time, the Ashby Trustee sold its other investments to the Ashby Investment Company for market value, therefore revaluing those investments to market value for UK tax purposes.  Again, the sale proceeds of this transaction were left outstanding on a loan account.

44.     As at 31 October 2011 the current outstanding balance of the loan accounts to the Ashby Trustee is :

44.1    US$112,188,869.63 in relation to the Ashby Holding Company; and

44.2    US$87,382,827.35 in relation to the Ashby Investment Company.

45.     The structure created by these arrangements is set out in the structure chart at page 159.

**Dividends received from KML**

46.     From time to time during the period 1995 to 2008 the directors of KML declared and paid dividends to its ultimate shareholders.  In the case of the Ashby Trust, between 29 May 1995 and 31 March 2008 (i.e. prior to the restructuring referred to at paragraph 36 above) such dividends were paid directly to the Ashby Trustee. Following the restructuring, such dividends were paid to the Ashby Holding Company.

47.     In total, between 29 May 1995 (when the first KML dividend was declared) and 26 November 2008 (when the last KML dividend was declared) the Ashby Trust received dividends from KML totalling US$149,082,329.01.  The table below summarises the amount of KML dividends paid to the Ashby Trustee each year. A schedule setting out full details of those dividends is at page 160.

| Year | Total dividends received (US$) |
|------|-------------------------------|
| 1995 | 8,969.01 |
| 1997 | 1,564,200 |
| 1998 | 3,458,520 |

11698152.1

| Year | Total dividends received (US$) |
|------|-------------------------------|
| 1999 | 5,355,000 |
| 2000 | 7,625,640 |
| 2001 | 10,050,000 |
| 2002 | 12,025,000 |
| 2003 | 13,925,000 |
| 2004 | 14,555,000 |
| 2005 | 19,640,000 |
| 2006 | 17,650,000 |
| 2007 | 21,150,000 |
| 2008 | 22,075,000[2] |

48.     The moneys deriving from these dividend payments were initially invested by the Ashby Trustee pursuant to its powers of investment under the Trust Deed. Following the restructuring of the Ashby Trust in 2008, dividends received by the Ashby Holding Company were transferred to the Ashby Trustee towards repayment of the loan account relating to the transfer of KML shares from the Ashby Trustee to the Ashby Holding Company on 31 March 2008 as described above. These repayment moneys were retained on deposit by the Ashby Trustee.

49.     Other than the return on capital generated from investments made by the Ashby Trustee (and latterly the Ashby Investment Company) (see below), the dividends paid by KML to the Ashby Trustee (and latterly the Ashby Holding Company) represented the sole source of revenues of the Ashby Trust.

50.     The Ashby Trust's report and financial statements as at 31 December 2007 (page 169), showed that the Ashby Trust had net assets of US$159,426,222. The net assets of the Ashby Trust as at 30 April 2011 were US$142,298,627 according to the (unaudited) balance sheet at page 174.

**The Ashby Trust's investments into the Kingate Funds**

51.     The Ashby Trustee (and latterly the Ashby Investment Company) invested a significant proportion of the dividends received from KML directly and indirectly in

---

[2]     Of which, US$5,750,000 was paid to the Ashby Trustee, with the remaining US$16,325,000 being paid to the Ashby Holding Company following the restructuring referred to at paragraph 41 above.

11698152.1

the Kingate Funds. Taken together, the Ashby Trust's holdings in the Kingate Funds represented an at cost investment totalling in excess of US$19 million. Such investments were made in three ways:

51.1    Direct subscription for shares in the Kingate Funds;

51.2    Investment in structured products; and

51.3    Investment in funds of funds.

Each method of investment is described further below.

52.     Following Madoff's arrest in December 2008 and subsequent unveiling of the fraud committed by BLMIS, the value of the Ashby Trust's direct and indirect investments in the Kingate Funds was written down to zero[3].

## Direct subscription

53.     The Ashby Trust and Ashby Investment Company invested directly in Kingate Global. The loss attributable to these investments is as follows:

| | |
|---|---|
| Investment at cost of: | US$2,096,404.23 |
| Stated value as at latest NAV date (31 December 2008): | US$3,568,386.86 |
| Value today: | US$0.00 |

## Investment in structured products

54.     The Ashby Trust and the Ashby Investment Company invested indirectly in the Kingate Funds by way of structured notes issued by Boiro Finance BV, being a wholly owned subsidiary of Banco Bilbao Vizcaya Argentaria, SA. The loss attributable to these investments is as follows:

| | |
|---|---|
| Investment at cost of: | US$13,222,928.50 |
| Stated value as at latest NAV date (31 December 2008): | US$15,783,250.00 |
| Value today: | US$0.00 |

---

[3] This is subject to any recovery claim made by the Ashby Trustee in the liquidation of the Kingate Funds.

Investment in funds of funds

55.     The Ashby Trustee and the Ashby Investment Company also invested in certain
funds of funds managed by FIM Limited and FIM Advisers LLP (together, "**FIM**"),
which funds themselves had exposure to the Kingate Funds. FIM is a London-
based alternative investment management company that at all relevant times
was active in the creation, management and servicing of portfolios of hedge
funds for institutional and private clients on a global basis. Established in 1981
by Mr Grosso, at all relevant times FIM was authorised and regulated by the UK
Financial Services Authority (or its predecessors) and by the spring of 2008, had
assets under management of US$4.33 billion. Its principals are Mr Grosso and
Mr Ceretti. The value of the Ashby Trust's holdings in the FIM funds of funds
concerned (the "**FIM Funds**") declined as a consequence of their exposure to
the Kingate Funds and as a direct result of the activities of Madoff and/or BLMIS.

56.     The global economic crisis combined with the reputational damage suffered by
FIM as a consequence of the scandal following Madoff's arrest led to FIM's
business operations being wound down. As a consequence, the Ashby Trust's
investments in the FIM Funds have gradually been liquidated.

57.     In summary terms, the losses suffered by the Ashby Trust attributable to the FIM
Funds' exposure to BLMIS through the Kingate Funds are estimated at
US$3,834,898.00.

**Payments to third parties from the assets of the Ashby Trust**

58.     During the life of the Ashby Trust, and in accordance with the powers afforded to
it under the Trust Deed, the Ashby Trustee has incurred a variety of costs and
expenses which have been met from the assets of the Ashby Trust. A
spreadsheet detailing all such costs and expenses is at page 175. In summary,
they can be broken down as follows:

58.1    Administration fees;

58.2    Trustee fees;

58.3    Directors' fees;

58.4    Registered agent's fees;

11698152.1

58.5   Consultancy fees; and

58.6   Fees paid to legal advisers.

<u>Administration, trustee, director and registered agent fees</u>

59.     As set out above, paragraphs A12.01 and B36 of the Trust Deed provide that the
Ashby Trustee is entitled to remuneration and/or repayment of its expenses
incurred in the proper administration of the Ashby Trust from the assets of the
Ashby Trust.

60.     The Ashby Trustee has delegated the administration of the Ashby Trust to Moore
Stephens & Company Bermuda (which in turn has delegated the day-to-day
administration of the Ashby Trust to Moore Stephens Monaco), which charges
administration fees arising out of the time spent on the day-to-day administration
of the Ashby Trust and its assets, for instance, arranging bank transfers, book
keeping, preparing the Ashby Trust accounts and liaising with legal and other
advisers. In addition to such administration fees, there are fixed annual trustee
fees, directors' and registered agent's fees, which are also paid to Moore
Stephens & Company Bermuda.

61.     The total amount of such fees paid to Moore Stephens & Company Bermuda on
behalf of the Ashby Trustee to 31 October 2011 pursuant to the provisions in the
Trust Deed are US$816,727.39.

<u>Consultancy fees</u>

62.     From time to time and in accordance with paragraph A12.02 of the Trust Deed,
the Ashby Trustee has sought the professional services of certain other
companies within the Moore Stephens International member firms, namely
Moore Stephens LLP and Moore Stephens Trust Company Limited, Isle of Man.
Moore Stephens LLP provided consultancy advice in relation to trust matters.
Moore Stephens Trust Company Limited, Isle of Man, provided services in
connection with the execution of specialty debt.

63.     The total amount of such consultancy fees paid by the Ashby Trustee to 31
October 2011 pursuant to the provisions in the Trust Deed are US$180,381.45.

11698152.1