<u>Fees paid to legal advisers</u>

64. Paragraphs A12.02 and B37 of the Trust Deed entitle the Ashby Trustee to pay the fees of professional advisers in respect of advice obtained by the Ashby Trustee in the discharge of its duties under the Trust Deed from the assets of the Ashby Trust.

65. The majority of legal fees incurred by the Ashby Trustee in its capacity as trustee of the Ashby Trust relate to advice obtained in connection with the claims and potential claims articulated against it, the Ashby Holding Company and Ashby Investment Company arising from the fall-out following the discovery of the Madoff fraud. These claims are described in more detail at paragraph 105 below. This has entailed obtaining legal advice in a number of jurisdictions, including England, Bermuda, the BVI, New York, Monaco and Jersey. As at 31 October 2011, the total legal fees paid to legal advisers pursuant to these provisions are US$3,008,181.35.

66. Further details of these payments and the firms to which they have been paid are set out in the table at page 175.

**Change of the proper law of the Ashby Trust**

67. By paragraph A1 of the Trust Deed (page 133), the proper law of the Ashby Trust at the date of its settlement was the law of the Island of Jersey.

68. By paragraph A15 of the Trust Deed (page 141), the Ashby Trustee has the power to change the proper law of the Ashby Trust. Pursuant to that power, and having first sought the advice of Leading Counsel, by an instrument supplemental to the Trust Deed dated 17 May 2011 (page 176), the Ashby Trustee changed the proper law of the Ashby Trust to that of the BVI. Mr Grosso consented to that change and the joint liquidator of the Kingate Funds (see below) confirmed that he had no observation on it.

**THE KINGATE FUNDS AND KINGATE MANAGEMENT LIMITED**

69. Given the nature of the claims made in the Picard Claims and the fact that the assets of the Ashby Trust comprise shares in KML and investments made having received dividends from that company, it is relevant that I set out in this Affidavit certain details concerning KML and the Kingate Funds. The source of my knowledge in this regard is the series of affidavits and the witness statement

20

made in connection with the Ashby Trustee's successful application in 2009 to lift a freezing order over certain accounts of the Ashby Trust and its 100% subsidiaries held in Monaco, explained further at paragraph 108 below.

**The Kingate Funds**

70. Kingate Global was incorporated on 11 February 1994 under the laws of the BVI as a fund of hedge funds. Its registered office is at Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI.

71. On or about 19 April 2000, a separate self-standing entity, Kingate Euro, was incorporated under the laws of the BVI, its registered address being Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI.

72. The Kingate Funds are both open-ended investment companies and are recognised as professional mutual funds under the Territory of the British Virgin Islands Mutual Funds Act 1996.

73. During 1994, and having been introduced to various investment advisers, Kingate Global opened a discretionary managed account with BLMIS whose principal was Madoff.

74. Initially, Kingate Global had just one class of shares, denominated in US$. At the end of February 1995, Kingate Global created a new class of US$ shares called Kingate Global Fund – Class B Shares ("**Kingate B**"). The managed account with BLMIS was transferred into Kingate B, which shares were launched on 1 March 1995. At the same time, the original fund of funds shares were renamed Kingate Global Fund – Class A Shares but were wound down around the end of 1996. On 1 January 1996, a further class of shares was launched, called Kingate Global Fund – Class DM Shares ("**Kingate DM**"), denominated in Deutsche Marks, and then Euros.

75. Kingate DM was transferred from Kingate Global to Kingate Euro. Following this step, Kingate Global and Kingate Euro operated as separate funds, albeit using the same fund manager, as explained further below.

76. Investor funds deriving from subscriptions for participating common shares in the Kingate Funds (the "**Shares**") were passed to BLMIS as investment adviser to the Kingate Funds, on the understanding that they would be invested using BLMIS's so-called "split-strike conversion" strategy which was claimed by BLMIS

21

11698152.1

to limit losses when a stock price declined while still affording a capped upside potential.

77. As the extent of the fraud committed at BLMIS unfolded, this had a dramatic effect on the assets of the Kingate Funds, the value of which plummeted, and, on 8 May 2009 Mr William R Tacon and Mr Richard E L Fogerty of Zolfo Cooper were appointed as Joint Provisional Liquidators of the Kingate Funds by an order of the BVI Court. On 4 June 2009, the BVI Court duly appointed Messrs Tacon and Fogerty as Joint Liquidators of the Kingate Funds. For the purposes of this Affidavit, these Joint Liquidators are collectively referred to as "**Mr Tacon**".

**Current status of the liquidations of the Kingate Funds**

78. The most recent information of which I am aware as to the present position of the liquidation of the Kingate Funds is contained in Mr Tacon's Fifth Report to Creditors and Investors dated 27 January 2011 for each of Kingate Global (page 178) and Kingate Euro (page 199) (the "**Fifth Creditors' Reports**"). In brief summary:

   78.1 The Kingate Funds have made a provisional claim in the liquidation of the BLMIS estate. By an update to creditors and investors of Kingate Global dated 17 June 2011 (page 220), Mr Tacon confirmed that this claim is Kingate Global's most significant asset and that despite the potential risk in maintaining it (which I understand from Lawrence Graham LLP ("**LG**") to be submitting to the jurisdiction of the New York Court for the purposes of the Third Amended Complaint) Mr Tacon would not withdraw it;

   78.2 Mr Picard filed an avoidance claim against the Kingate Funds in the Bankruptcy Court on 17 April 2009 (the "**Picard US Complaint**"). The Picard US Complaint was subsequently amended on three occasions, and on 20 May 2011 Mr Picard filed the Third Amended Complaint. Mr Tacon has not made any appearance in connection with the Picard US Complaint, having agreed a number of extensions of time in which to do so with Mr Picard. The latest such extension of which I am aware (to 16 November 2011) was agreed by way of a Stipulation and Order dated 13 October 2011 (page 221).

   78.3 Mr Tacon has permission from the BVI Court to enter into a settlement agreement with Mr Picard in relation to the Picard US Complaint. Further

22

11698152.1

information about that draft settlement agreement and the negotiations between Mr Tacon and Mr Picard is at paragraphs 138 to 142 below.

78.4 Mr Picard has obtained permission to issue a claim in the BVI in respect of the Picard US Complaint on the basis that it will not be pursued until settlement negotiations with Mr Tacon are completed;

78.5 Bank of Bermuda has frozen the Kingate Funds' accounts held with that bank in Bermuda. The Kingate Funds have access to those accounts for the purpose of meeting their ordinary legal and business expenses and a hearing date for the hearing of the Kingate Funds' application to release the funds is yet to be set;

78.6 Mr Picard has intervened in those proceedings between the Kingate Funds and Bank of Bermuda, but has confirmed he has no intention of pursuing his claim in that action until the settlement negotiations with Mr Tacon are completed;

78.7 Mr Tacon has obtained copies of the Kingate Funds' books and records held by KML and access to the Kingate Funds' records held by Citi Hedge Fund Services Ltd ("**Citi**"), the administrator of the Kingate Funds;

78.8 Mr Tacon has issued a protective writ against PricewaterhouseCoopers Bermuda in relation to their 2003 audits of the Kingate Funds, with the intention of issuing further writs in relation to their 2004 audits;

78.9 On 2 December 2010, Mr Tacon was granted recognition by the English High Court as Joint Liquidator of the Kingate Funds pursuant to the UK Cross Border Insolvency Regulations 2006;

78.10 Mr Tacon has issued the Bermuda Proceedings, as described further below.

**Kingate Management Limited**

79. KML was incorporated on 24 February 1994 under the laws of Bermuda. Its registered office is 2 Reid Street, Hamilton HM11 Bermuda. Its issued shares are wholly-owned by a nominee company, holding in equal shares for the Ashby Holding Company and El Prela Group Holding Services Limited (the "**El Prela Holding Company**"), (together the "**Holding Companies**").

23

80. As at the date of Madoff's arrest on 11 December 2008, KML's board of directors comprised the following individuals: Michael Tannenbaum; Phillip Evans; Shazieh Salahuddin; and Christopher Wetherhill. Michael Tannenbaum retired as a director in early 2009, while Phillip Evans retired on 31 May 2010. Shazieh Salahuddin and Christopher Wetherhill resigned in May 2011.

81. KML acted as investment manager to the Kingate Funds in accordance with the terms of certain management agreements. The most recent management agreement between Kingate Global and KML is dated 1 January 2006 (the "**Global Management Agreement**") which superseded and replaced previous management agreements between those parties dating back to 1994. Kingate Euro entered into a management agreement with KML on 1 May 2000 (the "**Euro Management Agreement**"). Both management agreements are governed by the laws of Bermuda. The Global Management Agreement is subject to the non-exclusive jurisdiction of the Courts of Bermuda, whilst the Euro Management Agreement is silent as to jurisdiction. Copies of the Global Management Agreement and the Euro Management Agreement (together, the "**Management Agreements**") are at pages 224 and 237 respectively.

Fees received by KML under the Management Agreements

82. In return for the performance of its duties under the Management Agreements, KML received:

    82.1 Under the Global Management Agreement, a monthly management fee at an annual rate equal to 1.5% of the month-end net asset value of the Shares of Kingate Global; and

    82.2 Under the Euro Management Agreement: (a) a monthly management fee at an annual rate equal to 1.5% of the month-end net asset value of the Shares of Kingate Euro; and (b) an administration fee at an annual rate of 0.10% of the month-end net asset value of Kingate Euro in respect of the foreign exchange hedging activity undertaken by Kingate Euro.

83. From time to time and as described at paragraph 46 above, the directors of KML declared dividends which were paid to its ultimate shareholders (the Trustees or, after 31 March 2008, the Holding Companies) in proportion to their shareholdings in KML.

Delegation of KML's duties under the Management Agreements

84. Under the terms of the Management Agreements, KML was authorised to delegate any of its duties or obligations arising under those agreements to third parties, whether independent of or affiliated with KML. KML did exercise its authority to delegate the performance of certain of its duties under the Management Agreements, including to:

   84.1 BLMIS as investment adviser to the Kingate Funds.

   84.2 FIM as consultant to and distributor for the Kingate Funds, in return for certain fees. Those fees represented around 2.5% of FIM's annual revenues.

   84.3 Citi, which was appointed to provide administrative services to the Kingate Funds.

   84.4 Bank of Bermuda Limited (an indirect 100% subsidiary of HSBC Holdings plc), which was retained as banker and custodian to the Kingate Funds ("**Bank of Bermuda**").

Loan to KML

*Loan Agreement dated 16 July 2009*

85. From 26 November 2008, KML received no further management fees under the Management Agreements, meaning that KML's only source of income came to an end. Equally, as the true extent of the BLMIS fraud unfolded in 2009, KML continued to be heavily involved in dealing with redemptions and other related issues concerning the Kingate Funds, in accordance with its duties under the Management Agreements. It also agreed to provide voluntary disclosure to Mr Tacon of records held by it pertaining to the Kingate Funds. KML therefore continued to incur operating expenses.

86. In early 2009, the Holding Companies, which between them are beneficial owners of the shares in KML (held by a nominee) considered whether it would be appropriate to advance loan funding to KML that would enable it to continue operations and avoid entering insolvent litigation.

25

11698152.1

87. On 16 July 2009 the Holding Companies (as lenders) and KML (as borrower) entered into a loan agreement in respect of a term loan facility of up to US$1,200,000 (the "**Loan Agreement**"). A copy of the Loan Agreement is at page 249.

88. By clause 3 of the Loan Agreement (page 256), each Advance (as defined) made under that agreement was to be made for the sole and exclusive purpose of:

    88.1 Permitting KML to pay all relevant expenses relating to its position in respect of the Kingate Funds, to pay KML's officers to continue to run it, and to enable KML to take legal advice strictly in relation to its own position in respect of any issues that may have properly concerned it; and/or

    88.2 Such other purpose as the Holding Companies may have (in their absolute discretion) agreed in writing in advance.

89. The facility granted under the Loan Agreement was specifically not to be used for KML's direct litigation defence costs and was made subject to strict conditions. Prior to the Loan Agreement being agreed, the Trustees reconfirmed to KML the purpose of the Loan Facility (as defined) by way of a side letter from LG dated 7 July 2009 (page 271).

90. The Loan Agreement set out in clause 4.2 (pages 256 to 257) a number of conditions precedent which needed to be fulfilled before the Holding Companies were obliged to make an Advance (as defined). By clause 4.4 of the Loan Agreement (page 257), the Holding Companies had the ability to cancel unilaterally any undrawn part of the Loan Facility at any time on giving prior written notice to KML.

*Supplemental Loan Agreement dated 28 September 2010*

91. In or around June 2010, KML made a request to the Holding Companies for a further loan of up to US$1,200,000 so as to extend the Loan Facility from US$1,200,000 to US$2,400,000 (the "**Extension Request**").

92. On 28 September 2010 the Holding Companies (as lenders) and KML (as borrower) entered into a supplemental agreement to the Loan Agreement, extending the facility granted by way of the Loan Agreement by up to

US$1,200,000 (the "**Supplemental Loan Agreement**"). A copy of the Supplemental Loan Agreement is at page 272. Taken together, the Loan Agreement and the Supplemental Loan Agreement are referred to in this Affidavit as the "**Loan Agreements**".

*Advances made to KML under the Loan Agreements*

93. From July 2009, the Ashby Holding Company made Advances to KML under the Loan Agreements. The total Advances made by the Ashby Holding Company pursuant to the Loan Agreements were US$900,000.

*Suspension of Advances under the Supplemental Loan Agreement*

94. On 22 December 2010, Mr Tacon issued the Bermuda Proceedings and on 7 January 2011, the Ashby Trustee and the Ashby Holding Company received the Writ and draft Statement of Claim in respect of those proceedings. In light of the claims articulated in the draft Statement of Claim, the Ashby Trustee and Ashby Holding Company gave consideration to whether it was appropriate for the Ashby Holding Company to make any further advance to KML pursuant to the Supplemental Loan Agreement.

95. On 7 February 2011, LG wrote to KML (page 302) confirming that the Holding Companies would not make any further Advance to KML under the Supplemental Loan Agreement until further notice. No further funding has been advanced, and a petition has since been issued for KML's winding up, as explained further below.

Resignation of KML's directors and Petition to wind up KML

96. In May 2011, KML's remaining directors, Chris Wetherhill and Shazieh Salahuddin, gave notice of their resignation from KML.

97. The Trustees understand from their lawyers in Bermuda that under the Bermuda Companies Act, members of a company are under a positive obligation to appoint replacement directors in the event that the number of directors falls below the statutory minimum of two. As beneficial owners of the shares in KML, the Holding Companies have explored the possibility of appointing replacement directors, but concluded that, in the absence of third party funding, it would be difficult if not impossible to find prospective directors willing to accept an appointment.

27

11698152.1

98.  By the time that KML's remaining directors resigned in May 2011, KML had ceased to carry on the business for which it was incorporated. Thereafter, the Holding Companies considered whether KML should be wound up, since it was unable to pay its debts as they fell due. At that time, those acting for the Holding Companies were not aware of the fact that the legal ownership of the shares in KML lay with a nominee company, Hamilton Nominees Limited ("**HNL**").

99.  On 3 August 2011, the Ashby Holding Company issued a notice of statutory demand on KML via its registered agents (page 303, the "**Statutory Demand**"). An equivalent demand was served on behalf of the El Prela Holding Company. The Statutory Demand gave notice that, the Repayment Date (as defined in the Supplemental Loan Agreement) having passed, unless the US$900,000 advanced to KML pursuant to the Loan Agreements, plus interest, was repaid in full within 21 days, the Ashby Holding Company could petition to wind up KML pursuant to the Bermuda Companies Act.

100. The Ashby Holding Company did not follow up on the Statutory Demand. Instead, on 10 August 2011 the Holding Companies each resolved to enter into a unanimous written resolution, purportedly as the members of KML, that KML should be wound up and that Trott & Duncan Limited ("**Trott & Duncan**") should be instructed to prepare and file the appropriate petition for the winding up of KML, swear an affidavit verifying its contents and take all necessary steps to seek an order appointing a liquidator and/or joint provisional liquidators and/or the Official Receiver. Consequentially, a unanimous shareholders' resolution to that effect was purportedly passed on 10 August 2011 (the "**Unanimous Written Resolution**") (page 306).

101. On 7 September 2011, a winding up petition was issued (the "**Petition**") (page 308) which was advertised on 14 September 2011. The return date in respect of the Petition was 14 October 2011. In the event, representatives of both Mr Tacon and Mr Picard notified an intention to appear at the hearing. Correspondence was exchanged in advance of it (see pages 315 to 324) culminating in service on behalf of Mr Picard of affidavit evidence on the eve of the hearing itself. (The affidavit and exhibit are not exhibited to this Affidavit but can be made available to the Court upon request). During the course of this correspondence it became clear that the Holding Companies had overlooked the fact that legal ownership of the KML shares lay with HNL. As a consequence, the Unanimous Written Resolution was confirmed and adopted by a written resolution of HNL dated 14

28

11698152.1

October 2011 (page 325) which ratified the steps taken by Trott & Duncan in relation to the Unanimous Written Resolution.

102. In the event, the hearing of the Petition was adjourned on 14 October 2011. A copy of the order is at page 326. Further correspondence has since been exchanged between Trott & Duncan and Mr Picard's advisers (see pages 328 to 335), with the result that Mr Picard and Mr Tacon have confirmed that they do not intend to oppose the Petition.

103. While KML has been without directors, it has nevertheless had to continue to address various issues, including the proceedings to which it is a party (namely the Bermuda Proceedings and the Picard Claims) until such time as replacement directors or joint provisional liquidators of KML are appointed. This has been done by the sole member, HNL, resolving for KML to issue relevant instructions in relation to those proceedings.

104. At the same time, the Trustees are aware from copy invoices sent to KML's registered agent, that KML continues to incur certain expenses in the form of costs incurred for storage of KML's documents and IT equipment. The most recent such invoices from Island Self Storage, each for US$175, have been due for payment on 1 June 2011, 1 July 2011, 1 August 2011, 1 September 2011 and 1 October 2011. In light of the fact that KML was unable to pay these invoices, and given that non-payment might have placed disclosable documents at risk of destruction, the Holding Companies made arrangements to pay them.

**LEGAL ACTION AGAINST THE ASHBY TRUSTEE**

105. In addition to the Picard claims, which are explained in more detail at paragraphs 125 and 143 below, the Ashby Trustee has been or is a party to two other legal proceedings. These are:

105.1 A temporary freezing order granted by the Court of First Instance of the Principality of Monaco (the "**Monaco Court**") over certain accounts of the Ashby Trust and its 100% subsidiaries held in Monaco; and

105.2 The Bermuda Proceedings.

106. In addition, there is a consolidated class action complaint that is of potential relevance to the Ashby Trustee but to which it is not a party, filed in the United States District Court, Southern District of New York on 18 May 2010 and entitled

29

11698152.1

In re Kingate Management Limited Litigation, with Master File No. 09 Civ.5386 (BAB) (the "**Class Action**").

107. Further detail of these legal proceedings is given below.

**The Monaco Freezing Order and the creation of the Monaco Affidavits**

108. In late 2008, the Ashby Trustee and the Ashby Investment Company held significant cash balances, totalling some US$102,844,048.70 with HSBC Private Bank (Monaco) SA ("**HSBC Monaco**"). In early December 2008, concerns began to be raised about the stability of HSBC, as a result of the global crisis in the financial sector. From mid-December 2008 onwards, there was a sharp fall in HSBC's share price. As a result, following consideration of the issue by telephone with Mr Grosso, the Ashby Trustee decided to reduce the Ashby Trust's exposure to HSBC by transferring some of the cash balances held with HSBC Monaco to Fortis Bank (C.I.) Limited in Guernsey, Channel Islands ("**Fortis Guernsey**"), which had, at that point, recently been nationalised by the Dutch Government and was therefore considered unlikely to fail. Accordingly, the Ashby Trustee made the following payment instructions:

108.1 On 12 December 2008 the Ashby Trustee sent a payment instruction to HSBC Monaco requesting the transfer of the sum of US$36,300,000 from that Ashby Trust account to an Ashby Trust account held with Fortis Guernsey (page 336).

108.2 On 15 December 2008, the Ashby Trustee sent a payment instruction to HSBC Monaco requesting the transfer of the sum of US$24,000,000 from the Ashby Trust account with HSBC Monaco to an Ashby Trust account held with Fortis Guernsey (page 337) (this payment instruction together with that referred to in paragraph 108.1 above, the "**Payment Instructions**").

109. To the best of my knowledge, derived from written representations dated 17 December 2008 made by the Service d'Information et de Contrôle Sur les Circuits Financiers of the Principality of Monaco ("**SICCFIN**") to the Public Prosecutor of the Principality of Monaco (the "**Monaco Prosecutor**") at page 338 (English translation) and page 352 (original) (the "**SICCFIN Report**"), the Payment Instructions led HSBC Monaco to make a suspicious transaction report to SICCFIN, following which SICCFIN prepared the SICCFIN Report.

30

11698152.1

110. The immediate consequence of the SICCFIN Report having been transmitted to the Monaco Prosecutor was that, on 19 December 2008, the Monaco Court ordered the immediate attachment of assets held in a number of HSBC Monaco accounts in the name of the Ashby Trustee, the Ashby Holding Company and the Ashby Investment Company, as well as certain HSBC Monaco accounts connected to the El Prela Trust and Mr Ceretti (the "**Freezing Order**"). This rendered the relevant account of the Ashby Trust at HSBC Monaco and those of its direct 100% subsidiaries inoperable until such time as the Freezing Order was lifted.

111. On 19 June 2009 the Ashby Trustee and others interested in the Freezing Order issued an application before the Monaco Court for an order that it be lifted, supported by a number of affidavits and a witness statement (taken together, the "**Monaco Affidavits**"), copies of which are at pages 368 to 436. A copy of the accompanying exhibit, which runs to two lever arch files, can be made available to the Court upon request.

112. Following issue of the application, on 8 July 2009 the Monaco Court ordered the lifting of the Freezing Order (a copy of the resulting order of the Monaco Court is at page 437. An English translation has not been provided, but can be obtained on request). Subsequently, on 9 July 2009 the Payment Instructions which had been the cause of the suspicious transaction report were re-issued, and the transfers effected. No assets were removed from the Ashby Trust, the Ashby Holding Company or the Ashby Investment Company as a consequence of these transfers.

**The Bermuda Proceedings**

113. On 22 December 2010 by way of a Writ of Summons (page 443), the Kingate Funds commenced the Bermuda Proceedings against the Ashby Trustee and eight other Defendants, being KML, FIM Advisers LLP, FIM Limited, the El Prela Trustee, the Holding Companies, Mr Grosso and Mr Ceretti. The Writ and accompanying Statement of Claim (page 449) were served on the Ashby Trustee via its lawyers in Bermuda on 7 April 2011, following the Ashby Trustee's agreement to facilitate service, subject to first agreeing a timetable that took into account the steps the Ashby Trustee needed to take in light of those proceedings, namely the making of the previous applications for directions referred to at paragraph 20 above (the "**Bermuda Directions Applications**").

114. The Ashby Trustee entered a memorandum of appearance before the Bermuda Court on 13 April 2011.

115. The claims made in the Bermuda Proceedings divide into two broad categories:

   115.1 Non-fault based claims against KML, the Trustees, the Holding Companies, Mr Grosso and Mr Ceretti (the "**Non-Fault Based Claims**"); and

   115.2 Fault based claims against KML, FIM, Mr Grosso and Mr Ceretti (the "**Fault Based Claims**").

116. The Non-Fault Based Claims, which are the only claims advanced against the Trustees are, in summary, as follows:

   116.1 Claims for the recovery from KML, the Trustees, the Ashby Holding Company, and/or the El Prela Holding Company of management fees alleged to have been paid by the Kingate Funds to KML on the basis of a mistake. The claims are brought on the basis of unjust enrichment. It is alleged that the Trustees are liable as ultimate recipients of the fees, and/or that Mr Grosso and Mr Ceretti are liable as ultimate recipients of the fees, and/or ultimate beneficial owners of shares in KML. These claims are for US$254,478,999.69 and 56,226,531.48 Euros or alternatively, the amount of fees paid by the Kingate Funds (and/or their traceable proceeds) which were paid on by KML to the Trustees.

   116.2 Alternatively, claims for an order that the Trustees pay the Kingate Funds the amount of the fees and/or their traceable proceeds which were paid on by KML to the Trustees, or alternatively, a declaration that the Kingate Funds retain legal title in the allegedly overpaid fees and/or their traceable proceeds.

   116.3 Alternatively, claims for a declaration that KML, the Trustees, the Ashby Holding Company, the El Prela Holding Company, Mr Grosso and/or Mr Ceretti hold the allegedly overpaid fees, together with their traceable proceedings, on trust for the Kingate Funds, and an order that they account to the Kingate Funds for them.

117. The Fault Based Claims, which do not directly concern the Trustees, are based on allegations of breach of tortious duties of care and/or negligent misstatement

32

11698152.1

against KML, FIM, Mr Grosso and Mr Ceretti, and damages for breach of contractual duties of care against KML.

**The Class Action**

118. A copy of the Amended Consolidated Class Action Complaint is at page 547. The Plaintiffs to the Class Action are Silvana Worldwide Corp., Criterium Capital Fund, B.V., BBF Trust, BG Valores, S.A., Banca Arner S.A., Alvaro Castillo, Lucien Geldzahler, Jaques Lamac, Nitkey Holdings Corporation and all others similarly situated. Paragraph 14 of the Class Action complaint identifies the Plaintiffs as having *"lost their investments in the [Kingate] Funds as of December 10, 2008, and also [having] paid substantial fees that were wrongfully charged based on fictitious investment returns"* (page 563).

119. The Ashby Trustee is not named as a Defendant to the Class Action, those Defendants being KML, Tremont (Bermuda) Limited, Tremont Group Holdings, Inc., FIM Limited, FIM Advisers LLP, FIM (USA) Incorporated, Mr Grosso, Mr Ceretti, Graham H Cook, John E Epps, Sandra Manzke, Charles D Sebah, Keith R Bish, Christopher Wetherill and Michael G Tannenbaum. However, the Ashby Trustee recognises that the Class Action plaintiffs may well seek to join it as a Defendant to the Class Action at some point in the future, given that it holds assets deriving from dividends declared payable by KML and calculated by reference to KML's profits, which in turn were derived from management fees calculated by reference to the NAV of the Kingate Funds.

120. Given that it is not a party to these proceedings, the Ashby Trustee has not sought substantive legal advice in connection with the complaint.

121. However, the Ashby Trustee is aware from information passed to it from its US lawyers that the Class Action complaint was dismissed in its entirety by an order of Judge Batts dated 30 March 2011 (page 706). That order also denied the Plaintiffs leave to re-plead the complaint.

122. On 11 April 2011 the Plaintiffs issued a notice of appeal (page 736) stating their intention to appeal the judgment and order of Judge Batts to the United States Court of Appeals for the Second Circuit.

11698152.1

123. On one view, the complaint made by the Class Action is one more properly within the province of Mr Tacon as joint liquidator of the Kingate Funds, who could also take steps to have the complaint struck out.

124. However, until such time as Mr Tacon moves to strike out the Class Action complaint, or the appeal against the judgment and order of Judge Batts is finally determined in favour of the Defendants to the Class Action, there remains the possibility that the Ashby Trustee will be joined as a party to it. Naturally, if that occurs, the Ashby Trustee will of necessity have to make a further application to the BVI Court for directions as to how it should proceed with respect to that proceeding.

## CLAIMS BY MR PICARD AGAINST THE ASHBY TRUSTEE

### The Third Amended Complaint

125. On 20 May 2011, Mr Picard filed the Third Amended Complaint (page 1) against the Ashby Trustee and 17 other Defendants, being Mr Ceretti, Mr Grosso, the Kingate Funds, KML, FIM Advisers LLP, FIM Limited, Citi, the Ashby Trust[4], Alpine Trustees, the El Prela Trustee, the El Prela Trust[5], the Holding Companies, the Ashby Investment Company, El Prela Trading Investments Limited (the "**El Prela Investment Company**", together with the Ashby Investment Company, the "**Investment Companies**") and Bank of Bermuda. The Holding Companies and the Investment Companies are purportedly joined "*individually and as trustees of*" the Trusts. I can confirm that neither the Holding Companies nor the Investment Companies have ever acted as trustees of the Trusts.

126. The Third Amended Complaint was the first time the Ashby Trustee had been named as a Defendant to the Picard US Proceedings, Mr Picard having initially filed those proceedings against the Kingate Funds and Bank of Bermuda on 17 April 2009, as set out above.

---

[4] The Ashby Trust has no legal personality.

[5] The El Prela Trust has no legal personality.

11698152.1

**Service of the Third Amended Complaint**

127. As noted above, the Ashby Trustee is a company incorporated and registered in the Republic of Liberia. On 22 June 2011, the Third Amended Complaint was purportedly served on the Ashby Trust by SCA Creque (special counsel to Mr Picard in the BVI) via Moore Stephens BVI. However, Moore Stephens BVI is not the registered agent for the Ashby Trustee. The accompanying summons and notice of pre-trial conference (page 738) required the "Ashby Trust" to submit a motion or answer within 30 days from the date of issue, being 14 July 2011. The Ashby Trustee was not served, or purportedly served.

128. On 14 July 2011, those Defendants who had been served in the BVI, namely the El Prela Trustee, the Holding Companies and the Investment Companies (acting by Freshfields Bruckhaus Deringer US LLP ("**Freshfields**")) agreed with Mr Picard (acting by Baker & Hostetler LLP) an extension of time (until 18 August 2011) to respond to the Third Amended Complaint, by way of a stipulation dated 14 July 2011 (page 740). Further extensions, to which the Ashby Trustee was also a party, were agreed on 10 August 2011 and 14 October 2011, the latest of which extended the time to move, answer or otherwise respond until 16 November 2011 (page 743)[6]. By joining in those stipulations, the Ashby Trustee agreed to facilitate service of the Third Amended Complaint and waive any defence based on insufficiency of service of process, although the Ashby Trustee reserved the right to challenge the jurisdiction of the New York Court.

**The Claims made against the Ashby Trustee in the Third Amended Complaint**

129. As I have explained above, there are 17 Defendants to the Third Amended Complaint in addition to the Ashby Trustee, which alleges 15 counts upon which Mr Picard seeks judgment, as set out more fully at paragraphs 276 to 359 of the Third Amended Complaint (pages 65 to 83). The claims made divide into three broad categories:

   129.1 The return of alleged avoidable and recoverable initial transfers from the Kingate Funds of approximately US$976 million (US$438 million in respect of Kingate Global and US$538 million in respect of Kingate Euro)

---

[6] At the time of finalising this Affidavit, Baker & Hostetler LLP and Freshfields were in discussions regarding a further such extension until 16 February 2012.

alleged to have been transferred to those entities by BLMIS (the "**Initial Transfer Claims**");

129.2 The return of alleged subsequent transfers against the Trustees, KML, FIM Limited, FIM Advisers LLP, the Holding Companies, the Investment Companies, the Trusts[7], Alpine Trustees, Mr Grosso, Mr Ceretti and Citi (the "**Subsequent Transferee Claims**"); and

129.3 Common law claims in unjust enrichment, conversion and money had and received (the "**Common Law Claims**").

130. The Third Amended Complaint also seeks the disallowance of the Kingate Funds' customer claims in the BLMIS bankruptcy, the equitable subordination of those customer claims (as to the status of which, see paragraph 78.1 above), and, against Bank of Bermuda, a declaratory judgment that funds currently frozen in the Kingate Funds' accounts held with that bank are to be returned to the BLMIS estate.

131. The Subsequent Transferee Claims and the Common Law Claims, which are the only claims advanced against the Trustees are, in summary, articulated in the Third Amended Complaint as follows:

131.1 Claims for the recovery of alleged "subsequent transfers" (or the value thereof) alleged to have emanated from BLMIS. Similar claims are made under state law (the New York Debtor and Creditor Law) and under federal law (Title 11 of the United States Bankruptcy Code), as summarised at paragraphs 331 and 337 of the Third Amended Complaint (pages 74 to 75);

131.2 Unjust enrichment claims against the Trustees, KML, FIM Limited, FIM Advisers LLP, the Holding Companies, the Investment Companies, the Trusts[8], Alpine Trustees, Mr Grosso, Mr Ceretti and Citi on the basis that they "*have wrongfully and unconscionably benefited from the receipt of [fees] from BLMIS, for which they did not, in good faith, provide fair value*", as summarised at paragraphs 347 to 350 of the Third Amended Complaint (pages 77 to 78);

---

[7] As stated above, the Trusts have no legal personality.

[8] Ibid.

131.3   Conversion claims against those same Defendants on the basis that they have "*intentionally exercised dominion and control over [BLMIS property] in a matter inconsistent with and in wilful disregard of the solvency of the BLMIS estate*", as summarised at paragraphs 351 to 353 of the Third Amended Complaint (page 78); and

131.4   Money had and received against all Defendants, on the basis that they "*are currently in possession of, or have control over, [BLIMS property, to which they] have no lawful or equitable right..., having obtained the monies through fraud, deceit or mistake*", as summarised at paragraphs 354 to 356 of the Third Amended Complaint (pages 78 to 79).

132.   The Ashby Trustee has sought advice from US Counsel on the appropriate response to the Third Amended Complaint, in order that it can determine the motions it should make with respect to it. The Court is referred to the Confidential Affidavit for details of the resulting advice. The directions sought by the Ashby Trustee as a consequence of that advice are at paragraph 167 below.

133.   In summary, and as set out in more detail below, the Ashby Trustee has filed a motion to withdraw the reference and proposes to file a motion or motions to dismiss the Third Amended Complaint.

**Motion to withdraw the reference**

134.   On 7 and 14 October 2011, certain of the Defendants to the Third Amended Complaint made motions to the United States District Court for the Southern District of New York (the "**District Court**") to have certain legal issues heard by the District Court rather than the Bankruptcy Court on the basis that those issues will involve consideration of federal non-bankruptcy law. On 17 October 2011 the Ashby Trustee joined those motions. It is anticipated that the motions will be heard and determined in the coming months. Further information regarding the Ashby Trustee's motion to withdraw the reference is set out in the Confidential Affidavit.

**Motion to dismiss**

135.   The Ashby Trustee proposes to make a motion or motions to dismiss the Third Amended Complaint on a number of grounds, further details and a legal opinion on the merits of which are set out in the Confidential Affidavit.

37

11698152.1