Prela Trust for its costs of making the motions to withdraw the reference
and motions to dismiss articulated in the Confidential Affidavit, including
costs arising from any adverse costs orders made against it in pursuance
of those motions; and

7.5   In respect of the English Claim, that the El Prela Trustee shall be
indemnified from the assets currently held on the trusts of the El Prela
Trust for its costs of obtaining advice in relation to the English Claim,
considering that advice and taking such steps as appropriate in light of
that advice, including costs arising from any adverse costs orders made
against it in pursuance of those steps.

8.   The El Prela Trustee's application is also supported by my second Affidavit, of
even date. That second Affidavit (the "**Confidential Affidavit**") concerns facts
and matters which are privileged and/or confidential, including details of US
Counsel's advice on the approach the El Prela Trustee should take with respect
to the Third Amended Complaint.  The facts and matters in the Confidential
Affidavit are relevant to the Court's consideration of the application, and for that
reason, the Confidential Affidavit will be lodged with the Court together with this
Affidavit. For reasons which will be obvious to the Court, the El Prela Trustee
considers that it is not appropriate for the material in that Confidential Affidavit to
be provided to the Defendants to the present application, a number of whom are
themselves parties to the English claim and/or the Third Amended Complaint.

### Background

9.   Schedule 1 to this Affidavit contains a list of defined terms used in this Affidavit.

10.   This application arises as a result of the following:

10.1   The Third Amended Complaint, which was filed in the Bankruptcy Court
on 20 May 2011 naming the El Prela Trustee and 17 others (page 1),
including the El Prela Trust and the Ashby Trust which have no legal
personality. The Plaintiff is Irving H Picard ("**Mr Picard**"), the trustee for
the liquidation of the business of Bernard L Madoff Investment Securities
LLC ("**BLMIS**").  The Third Amended Complaint was served on the El
Prela Trustee on 22 June 2011, as is explained further below; and

10.2   The English Claim, which was issued by Mr Picard in the High Court of
Justice of England and Wales, Queen's Bench Division, Commercial

Court on 10 December 2010, against the El Prela Trustee and eleven others. The English Claim was served on the El Prela Trustee on 13 September 2011, as is explained further below.

The Third Amended Complaint and the English Claim are together, the "**Picard Claims**".

11.     As has been well publicised, on 12 March 2009, the principal of BLMIS, Mr Bernard Madoff ("**Madoff**") pleaded guilty before the New York court to the criminal charges laid against him, admitting to operating a "Ponzi scheme" through the investment advisory side of BLMIS. He has since been sentenced to prison for 150 years.

12.     Shortly after his arrest, the United States Securities and Exchange Commission ("**SEC**") commenced proceedings against Madoff and BLMIS, and a receiver was appointed over the assets of BLMIS. Shortly thereafter, the SEC consented to a combination of those proceedings with an application by the Securities Investor Protection Corporation ("**SIPC**"). SIPC filed an application alleging, among other things, that BLMIS was not able to meet its obligations as they came due and, accordingly, its customers needed the protection of the Securities Investor Protection Act ("**SIPA**"). On 15 December 2008, Mr Picard was appointed trustee for the liquidation of the business of BLMIS pursuant to SIPA.

13.     One of the El Prela Trustee's Co-Defendants to the Picard Claims is First Peninsula Trustees Limited, a company incorporated on 3 August 1984 under the laws of the Republic of Liberia, which is trustee of the Ashby Trust (the "**Ashby Trustee**"). Moore Stephens Monaco also acts as administrator to the Ashby Trust, and I have sworn similar affidavits in support of an equivalent application by the Ashby Trustee, also seeking directions in relation to the Picard Claims. The El Prela Trust and the Ashby Trust are together, the "**Trusts**".

14.     Two of the other Co-Defendants to the Third Amended Complaint are Kingate Global Fund Limited ("**Kingate Global**") and Kingate Euro Fund Limited ("**Kingate Euro**") (together, the "**Kingate Funds**"), as to which, see further paragraphs 70 to 77 below.

15.     The claims made against the El Prela Trustee and the Ashby Trustee (together, the "**Trustees**") in the Third Amended Complaint are complex and the sums

11698343.1

claimed are substantial, totalling approximately US$976 million. They fall into two
broad categories:

15.1   Claims under Title 11 of the United States Bankruptcy Code sections 544,
547, 548 and 550 and the New York Debtor and Creditor Law sections
273 to 279 to avoid and recover allegedly preferential and fraudulent
transfers allegedly received by the Trustees (which claims are applicable
to subsequent transferees by virtue of section 550 of that statute); and

15.2   Common law claims asserted under New York law, the essence of which
is that the Trustees possess BLMIS customer property and should be
required to return those funds to Mr Picard for distribution among the
claimants in the BLMIS liquidation.

16.   The claims made against the Trustees in the English Claim are also complex,
and the amount claimed mirrors the amount claimed in the Third Amended
Complaint, namely approximately US$976 million.   The relief sought and/or
claims made can be summarised as follows:

16.1   A declaration pursuant to English and US law that the Trustees hold
on constructive trust for BLMIS subsequent transfers or the
proceeds thereof allegedly received by the Trustees by reason of
the initial transfers having been made in breach of the fiduciary
duties owed to BLMIS by Madoff and/or the BLMIS management;

16.2   An account and/or enquiry as to the whereabouts of the alleged
subsequent transfers and/or their traceable proceeds;

16.3   Claims that the Trustees make restitution of the alleged subsequent
transfers or the proceeds thereof because, as a matter of New York
law, the transfers from BLMIS to the Kingate Funds were void *ab
initio*;

16.4   Claims for damages and/or equitable compensation for alleged
knowing receipt in breach of trust;

16.5   A contribution and/or indemnity at common law or under the Civil
Liability (Contribution) Act 1978; and

6

16.6     Claims under section 213 of the Insolvency Act 1986 and/or the common law and/or the Cross-Border Insolvency Regulations 2006 based on allegations that the Trustees were knowingly party to fraudulent trading at BLMIS.

17.     The Kingate Funds (now in liquidation) are open-ended investment companies established under the laws of the BVI whose purpose was to seek long-term capital growth by allocating share capital to an investment adviser selected to execute their investment objectives.

18.     As will be explained further below, the manager of the Kingate Funds was Kingate Management Limited ("**KML**"), which is the Third Defendant to the Third Amended Complaint and the First Defendant to the English Claim. At all material times, the shares in KML were held by a nominee appointed by the Trustees or their respective 100% subsidiaries.

19.     While the applications made by the Trustees are distinct, they arise from the same facts and the Trustees' positions with respect to the Picard Claims are, materially, the same.

20.     By way of further background, the Trustees have previously made similar applications for directions to the Eastern Caribbean Supreme Court, High Court of Justice of the BVI (the "**BVI Court**") as to how they should proceed in respect of other, related, proceedings commenced against them and seven others in the Supreme Court of Bermuda by the Kingate Funds (the "**Bermuda Proceedings**"). With the exception of Mr Picard, the Defendants to those applications were the same as the Defendants to this present application.

## OVERVIEW

21.     In supporting this present application of the El Prela Trustee, this Affidavit will:

21.1     Explain the formation of the El Prela Trust and the source of its assets;

21.2     Summarise the relationship between the El Prela Trust and KML;

21.3     Summarise the relationship between KML, the Kingate Funds, Mr Picard and other parties;

11698343.1

21.4   Explain the various actual and prospective claims faced by the El Prela Trustee, and its 100% subsidiaries, including the Picard Claims;

21.5   Explain the El Prela Trustee's approach to seeking representations in connection with the present application;

21.6   Set out the directions sought; and

21.7   Summarise the costs of steps already taken by the El Prela Trustee and the estimate of future steps to be taken by it.

22.   Certain other facts and matters are summarised in the Confidential Affidavit, referred to above.

## THE EL PRELA TRUST

23.   On 7 April 1994, the El Prela Trust was formed under the laws of Jersey. Its settlor is Mr Ceretti and its trustee is the El Prela Trustee. The El Prela Trust is an irrevocable discretionary trust. A copy of the instrument of trust relating to the El Prela Trust dated 7 April 1994 (the "**Trust Deed**") is at page 129.

### The El Prela Trustee

24.   The El Prela Trustee is a company incorporated on 6 February 1993 under the laws of the BVI, whose registered office is at Palm Grove House, Wickhams Cay 1, Road Town, Tortola, BVI. It holds a Class 1 trust licence in the BVI, and has provided and continues to provide professional trustee services to a number of trusts, in addition to the El Prela Trust.

25.   The El Prela Trustee was appointed trustee of the El Prela Trust on 17 August 2006 in place of Alpine Trustees Limited ("**Alpine Trustees**"), also a Co-Defendant to the Picard Claims, which was trustee of the El Prela Trust from its settlement until that date. A copy of the Deed of Retirement and Appointment by which this change was effected is at page 151.

26.   Both the El Prela Trustee and Moore Stephens Monaco are 100% subsidiaries of Moore Stephens & Company Bermuda, a partnership which is a member firm of Moore Stephens International Limited ("**Moore Stephens International**"), an international accounting and consulting association.

8

27.     The current directors of the El Prela Trustee, and the dates of their appointment, are as follows:

    27.1    Frank O Walters (appointed 21 January 1993);

    27.2    Phillip A Evans (appointed 14 April 1993); and

    27.3    Nicolas L R Lane (appointed 1 August 2009).

28.     A table showing the dates of appointment and resignation of all past and present directors of the El Prela Trustee is at page 155.

29.     The El Prela Trustee holds on trust for Moore Stephens & Company Bermuda the shares of Port of Hercules Directors Limited ("**Port of Hercules Directors**"), which is the sole corporate director of the Ashby Trustee. The company secretary of the El Prela Trustee and of Port of Hercules Directors is First Peninsula Secretaries Limited, which is also a 100% subsidiary of Moore Stephens & Company Bermuda.

**The Trust Deed**

30.     The Trust Deed contains the following provisions, relevant for the purposes of this application:

    30.1    Paragraph C1, which provides that the property of the El Prela Trust as at the date of settlement was US$5,000 (page 149);

    30.2    Recital (b) (page 132) and paragraph A6 (page 135), which provides that further "*money investments or other property*" may be "*paid or transferred to or otherwise placed under* [*the El Prela Trustee's*] *control*";

    30.3    Paragraph A1, which provides that the proper law of the El Prela Trust at the date of its settlement was the law of the Island of Jersey (page 132);

    30.4    Paragraph A15, which provides that the El Prela Trustee "*... may from time to time by instrument declare that the proper law of this trust shall be the law of some other place in any part of the world under which the terms of this trust shall be capable of taking effect and such law shall thereupon become the proper law of this trust...*" (page 140) (for an explanation of the El Prela Trustee's exercise of this power in changing

9

the proper law of the El Prela Trust from that of Jersey to that of the BVI, see paragraph 67 below);

30.5   Paragraph B1, which states that: "*any monies requiring investment hereunder may be invested in or upon any such investments of whatsoever nature and wheresoever situate and whether producing income or not....as the Trustees shall in their absolute discretion think fit*" (page 141);

30.6   Paragraph C2 (pages 149 to 150), which provides that the express beneficiaries of the El Prela Trust are Mr Ceretti, his wife, Laura Ceretti and his son, Alessandro Ceretti and any further issue of Mr and Mrs Ceretti. I understand from Mr Ceretti that he has a further son, who was born after the date of settlement of the El Prela Trust. The Trust Deed also names as a beneficiary "*Any trust association body or other organisation in any part of the world the objects of which are charitable*", and includes "*Any person who is the subject of an addition under clause A3.02*" (page 150);

30.7   Paragraph A7.05.01, which states: "*the Trustees may at any time during the Trust Period pay or apply the Trust Fund and the income thereof or any part thereof to or for the benefit of all or such one or more exclusive of the others of the Beneficiaries and in such shares if more than one and in such manner generally as the Trustees shall in their discretion think fit*" (page 136);

30.8   Paragraph A12.01, which provides that the El Prela Trustee has "*the right to remuneration and the incidence thereof*" (page 138);

30.9   Paragraph B12, by which the El Prela Trustee has the power to employ agents "*whether a solicitor advocate attorney banker accountant stockbroker or other agent to transact any business or do any act required to be transacted or done in the execution of the trusts hereof*" (page 143) and pay them out of the El Prela Trust fund;

30.10   Paragraph B28, which provides that the El Prela Trustee: "*may appoint or employ investment advisers and managers and may delegate to any such advisers or managers (for such periods to such extent and generally on such terms and in such manner as the Trustees may from time to time*

10

*think fit) all or any of the Trustees' powers and discretions with regard to making retaining varying or transposing investments"* (page 146);

30.11    Paragraph B36, which provides that: *"the expenses in connection with the preparation establishment and administration of this trust including without prejudice to the generality of the foregoing the remuneration and charge of the Trustees herein provided for and of the investment and re-investment of any part of the Trust Fund and the collection of income and other sums derivable therefrom may be paid out of the Trust Fund and may be charged against capital or income or partly out of one and partly out of the other at the discretion of the Trustees"* (page 148);

30.12    Paragraph A12.02, which provides that: *"any Trustee or person connected with [the El Prela Trustee] who shall be a solicitor advocate attorney or accountant or engaged in any other profession business or trade shall be entitled to charge be reimbursed and be paid out of the Trust Fund his usual professional or other charges for work or business done or transacted from time to time expended by him or his firm or any employee or partner of his in the execution of or otherwise in relation to [the El Prela Trust] including acts to which a Trustee not being in that or any profession business or trade could have done"* (page 138);

30.13    Paragraph B37, by which the El Prela Trustee is entitled to *"receive reimbursement from the Trust Fund of any expenses costs and other liabilities...incurred by him purely by reason of his duties relating to this Trust"* (page 149); and

30.14    Paragraph B40, which provides that the El Prela Trustee *"may institute and defend proceedings at law and may proceed to the final end and determination thereof or compromise the same as the [El Prela Trustee] shall consider advisable"* (page 149).

**Mr Ceretti's letter of wishes and the El Prela Trust's shareholding in KML**

31.    In his capacity as settlor of the El Prela Trust, Mr Ceretti wrote a letter of wishes to Alpine Trustees (as the former trustee of the El Prela Trust) dated 23 August 1994 (page 156) by which Mr Ceretti asked the El Prela Trustee to consider him and Mrs Ceretti to be the joint principal beneficiaries of the El Prela Trust during their lifetimes. In that letter of wishes, Mr Ceretti also confirmed his intention to

11

11698343.1

add to the settled fund the shares of a company in which he was to be involved
with Mr Carlo Grosso ("**Mr Grosso**") who is settlor of the Ashby Trust referred to
above. That company was KML, as to which see further paragraph 79 below.

32.     On 24 February 1994, 3,000 shares in KML, being 25% of the issued share
        capital of that company, were transferred from Mr Ceretti to a nominee to hold on
        trust for Alpine Trustees to form part of the property of the El Prela Trust
        following its settlement on 7 April 1994. Alpine Trustees paid US$3,000 to KML
        in consideration for these shares.

33.     Also on 24 February 1994, 3,000 shares in KML were transferred by Mr Ceretti
        to a nominee to hold on trust for the Ashby Trustee. At the same time, 6,000
        shares in KML were transferred by Mr Grosso to a nominee to hold on trust for
        the Ashby Trustee. These 9,000 shares in KML were added to form part of the
        property of the Ashby Trust following its settlement on 24 March 1994.

34.     Following these initial transfers, certain shares in KML (the legal ownership of
        which, from 24 February 1994 onwards, lay with a nominee) were transferred by
        the Ashby Trustee to Mr Ceretti, who subsequently added them to the property of
        the El Prela Trust as follows:

        34.1    On 14 January 1997, 1,800 shares in KML were transferred from the
                Ashby Trustee to Mr Ceretti.

        34.2    On 16 March 1998, 1,080 shares in KML were transferred from the Ashby
                Trustee to Mr Ceretti.

        34.3    On 2 May 2000, a further 120 shares in KML were transferred from the
                Ashby Trustee to Mr Ceretti.

35.     Following the above transfers and allotments, the entire issued share capital of
        KML was held, via a nominee, by Alpine Trustees on behalf of the El Prela Trust
        (since 2006, the El Prela Trustee) and the Ashby Trustee on behalf of the Ashby
        Trust in equal shares.

## The restructuring of the El Prela Trust in 2008

36.     The structure of the El Prela Trust and its subsidiary companies is designed to
        allow those beneficiaries of the El Prela Trust who are subject to taxation in the

12

United Kingdom ("**UK**") to benefit from a special tax regime in the UK by which they, while UK taxpayers, are designated "resident non-domiciled" in the UK.

37.     Until 31 March 2008, the El Prela Trustee held its shares in KML via a nominee and the other investments of the El Prela Trust directly.

38.     In late 2007/early 2008, the first drafts of the new UK Finance Bill were published. This introduced the possibility of several changes to the legislation governing the taxation of UK resident non-domiciliaries. It appeared possible that capital gains made by the El Prela Trust after 5 April 2008 might attract a less favourable tax treatment from the perspective of those beneficiaries of the El Prela Trust (including Mr Ceretti) who were subject to taxation in the UK as UK resident non-domiciliaries. It appeared at the time that a line might be drawn as at 5 April 2008 distinguishing trust gains that had been *"accrued or realised"* before that date and those *"accrued or realised"* after that date, with the old gains being taxed under the old rules (and so not giving rise to a charge to tax for UK resident non-domiciliaries) and the new gains being taxed under the new regime (where there would be a charge to tax). There was no certainty at that stage as to whether revaluing provisions might be introduced in the new legislation (which provisions might mitigate the impact of the changes in the law).

39.     Given the uncertainty prevailing at the time, Leading English tax Counsel was instructed by the El Prela Trustee to consider the best action for the El Prela Trust. Leading tax Counsel considered it advisable to trigger gains in the El Prela Trust before 5 April 2008, so as to constitute actual disposals, rather than relying on the possibility that revaluation provisions might be introduced in the forthcoming legislation. This would have the effect of establishing a new higher base cost of these assets against which any future capital gains might be assessed. Accordingly it was deemed prudent by the El Prela Trustee to revalue the El Prela Trust's assets in this manner.

40.     It was concluded that the most efficient way of effecting this revaluation was to transfer the El Prela Trust's shares in KML (held via a nominee) to one wholly-owned subsidiary of the El Prela Trust, and to transfer all of the El Prela Trust's other investments from the El Prela Trust to another wholly-owned subsidiary of the El Prela Trust.

11698343.1

41.   Accordingly, in early 2008, the El Prela Trust underwent a tax restructuring. This
involved, on 26 February 2008, the transfer to the El Prela Trustee of 100% of
the shares of two shelf companies (the original subscriber being Moore Stephens
International Services (BVI) Limited and the original holder of the single issued
share being the El Prela Trustee). Those companies were:

41.1   El Prela Group Holding Services Limited, a company incorporated on 9
January 2008 under the name New Opportunity Limited, whose
registered office is at Palm Grove House, Wickhams Cay 1, Road Town,
Tortola, BVI (the "**El Prela Holding Company**"); and

41.2   El Prela Trading Investments Limited, a company also incorporated on 9
January 2008 under the name Stoneybridge Limited, whose registered
office is at Palm Grove House, Wickhams Cay 1, Road Town, Tortola,
BVI (the "**El Prela Investment Company**").

42.   On 31 March 2008, the El Prela Trustee sold its shareholding in KML to the El
Prela Holding Company. The shares remained registered in the name of a
nominee, which, following the sale, held the shares on trust for the El Prela
Holding Company. This sale was deemed to occur at market value for UK tax
purposes (i.e. at a price that was greater than the original cost of the KML
shares). The shares in KML were therefore re-valued to apparent market value
for UK tax purposes (that revaluation taking place before Madoff's fraud was
revealed). The sale proceeds were left outstanding on a loan account and
dividend income from KML was used by the El Prela Holding Company towards
repayment of the loan.

43.   At the same time, the El Prela Trustee sold its other investments to the El Prela
Investment Company for market value, therefore revaluing those investments to
market value for UK tax purposes. Again, the sale proceeds of this transaction
were left outstanding on a loan account.

44.   As at 31 October 2011 the current outstanding balance of the loan accounts to
the El Prela Trustee is :

44.1   US$112,181,023.46 in relation to the El Prela Holding Company; and

44.2   US$80,035,101.65 in relation to the El Prela Investment Company.

14



45.    The structure created by these arrangements is set out in the structure chart at page 157.

**Dividends received from KML**

46.    From time to time during the period 1995 to 2008 the directors of KML declared and paid dividends to its ultimate shareholders.  In the case of the El Prela Trust, between 29 May 1995 and 17 August 2006 (i.e. prior to the appointment of the El Prela Trustee) such dividends were paid to Alpine Trustees. Between 17 August 2006 and 31 March 2008 (i.e. prior to the restructuring referred to at paragraph 36 above) such dividends were paid directly to the El Prela Trustee. Following the restructuring, such dividends were paid to the El Prela Holding Company.

47.    In total, between 29 May 1995 (when the first KML dividend was declared) and 26 November 2008 (when the last KML dividend was declared) the El Prela Trust received dividends from KML totalling US$147,931,609.01.   The table below summarises the amount of KML dividends paid to the El Prela Trustee each year. A schedule setting out full details of those dividends is at page 158.

| Year | Total dividends received (US$) |
|---|---|
| 1995 | 2,969.01 |
| 1997 | 967,800 |
| 1998 | 3,207,480 |
| 1999 | 5,145,000 |
| 2000 | 7,538,360 |
| 2001 | 10,050,000 |
| 2002 | 12,025,000 |
| 2003 | 13,925,000 |
| 2004 | 14,555,000 |
| 2005 | 19,640,000 |
| 2006 | 17,650,000 |
| 2007 | 21,150,000 |
| 2008 | 22,075,000[1] |

---

[1]    Of which, US$5,750,000 was paid to the El Prela Trustee, with the remaining US$16,325,000 being paid to the El Prela Holding Company following the restructuring referred to at paragraph 41 above.

15

11698343.1

48.     The moneys deriving from these dividend payments were initially invested by the El Prela Trustee pursuant to its powers of investment under the Trust Deed. Following the restructuring of the El Prela Trust in 2008, dividends received by the El Prela Holding Company were transferred to the El Prela Trustee towards repayment of the loan account relating to the transfer of KML shares from the El Prela Trustee to the El Prela Holding Company on 31 March 2008 as described above. These repayment moneys were retained on deposit by the El Prela Trustee.

49.     Other than the return on capital generated from investments made by the El Prela Trustee (and latterly the El Prela Investment Company) (see below), the dividends paid by KML to the El Prela Trustee (and latterly the El Prela Holding Company) represented the sole source of revenues of the El Prela Trust.

50.     The El Prela Trust's report and financial statements as at 31 December 2007 (page 167), showed that the El Prela Trust had net assets of US$138,206,802. The net assets of the El Prela Trust as at 30 April 2011 were US$127,269,802 according to the (unaudited) balance sheet at page 172.

**The El Prela Trust's investments into the Kingate Funds**

51.     The El Prela Trustee (and latterly the El Prela Investment Company) invested a significant proportion of the dividends received from KML directly and indirectly in the Kingate Funds. Taken together, the El Prela Trust's holdings in the Kingate Funds represented an at cost investment totalling in excess of US$19 million. Such investments were made in three ways:

    51.1    Direct subscription for shares in the Kingate Funds;

    51.2    Investment in structured products; and

    51.3    Investment in funds of funds.

    Each method of investment is described further below.

52.     Following Madoff's arrest in December 2008 and subsequent unveiling of the fraud committed by BLMIS, the value of the El Prela Trust's direct and indirect investments in the Kingate Funds was written down to zero[2].

---

[2] This is subject to any recovery claim made by the El Prela Trustee in the liquidation of the Kingate Funds.

11698343.1

Direct subscription

53.     The El Prela Trust and El Prela Investment Company invested directly in Kingate
        Global. The loss attributable to these investments is as follows:

        Investment at cost of:                                US$3,078,700.03

        Stated value as at latest NAV date (31 December       US$3,272,187.80
        2008):

        Value today:                                          US$0.00

Investment in structured products

54.     The El Prela Trust and the El Prela Investment Company invested indirectly in
        the Kingate Funds by way of structured notes issued by Boiro Finance BV, being
        a wholly owned subsidiary of Banco Bilbao Vizcaya Argentaria, SA. The loss
        attributable to these investments is as follows:

        Investment at cost of:                                US$13,828,298.00

        Stated value as at latest NAV date (31 December       US$16,438,550.00
        2008):

        Value today:                                          US$0.00

Investment in funds of funds

55.     The El Prela Trustee and the El Prela Investment Company also invested in
        certain funds of funds managed by FIM Limited and FIM Advisers LLP (together,
        "**FIM**"), which funds themselves had exposure to the Kingate Funds. FIM is a
        London-based alternative investment management company that at all relevant
        times was active in the creation, management and servicing of portfolios of
        hedge funds for institutional and private clients on a global basis. Established in
        1981 by Mr Grosso, at all relevant times FIM was authorised and regulated by
        the United Kingdom Financial Services Authority (or its predecessors) and by the
        spring of 2008, had assets under management of US$4.33 billion. Its principals
        are Mr Grosso and Mr Ceretti. The value of the El Prela Trust's holdings in the
        FIM funds of funds concerned (the "**FIM Funds**") declined as a consequence of
        their exposure to the Kingate Funds and as a direct result of the activities of
        Madoff and/or BLMIS.

11698343.1

56.    The global economic crisis combined with the reputational damage suffered by FIM as a consequence of the scandal following Madoff's arrest led to FIM's business operations being wound down. As a consequence, the El Prela Trust's investments in the FIM Funds have gradually been liquidated.

57.    In summary terms, the losses suffered by the El Prela Trust attributable to the FIM Funds' exposure to BLMIS through the Kingate Funds are estimated at US$4,263,479.00.

**Payments to third parties from the assets of the El Prela Trust**

58.    During the life of the El Prela Trust, and in accordance with the powers afforded to it under the Trust Deed, the El Prela Trustee has incurred a variety of costs and expenses which have been met from the assets of the El Prela Trust. A spreadsheet detailing all such costs and expenses is at page 173. In summary, they can be broken down as follows:

    58.1    Administration fees;

    58.2    Trustee fees;

    58.3    Directors' fees;

    58.4    Registered agent's fees;

    58.5    Consultancy fees; and

    58.6    Fees paid to legal advisers.

Administration, trustee, director and registered agent fees

59.    As set out above, paragraphs A12.01 and B36 of the Trust Deed provide that the El Prela Trustee is entitled to remuneration and/or repayment of its expenses incurred in the proper administration of the El Prela Trust from the assets of the El Prela Trust.

60.    The El Prela Trustee has delegated the administration of the El Prela Trust to Moore Stephens & Company Bermuda (which in turn has delegated the day-to-day administration of the El Prela Trust to Moore Stephens Monaco), which charges administration fees arising out of the time spent on the day-to-day administration of the El Prela Trust and its assets, for instance, arranging bank

18

transfers, book keeping, preparing the El Prela Trust accounts and liaising with legal and other advisers. In addition to such administration fees, there are fixed annual trustee fees, directors' and registered agent's fees, which are also paid to Moore Stephens & Company Bermuda.

61.    The total amount of such fees paid to Moore Stephens & Company Bermuda on behalf of the El Prela Trustee to 31 October 2011 pursuant to the provisions in the Trust Deed are US$852,238.05.

Consultancy fees

62.    From time to time and in accordance with paragraph A12.02 of the Trust Deed, the El Prela Trustee has sought the professional services of certain other companies within the Moore Stephens International member firms, namely Moore Stephens LLP, which provided consultancy advice in relation to trust matters.

63.    The total amount of such consultancy fees paid by the El Prela Trustee to 31 October 2011 pursuant to the provisions in the Trust Deed are US$90,785.54.

Fees paid to legal advisers

64.    Paragraphs A12.02 and B37 of the Trust Deed entitle the El Prela Trustee to pay the fees of professional advisers in respect of advice obtained by the El Prela Trustee in the discharge of its duties under the Trust Deed from the assets of the El Prela Trust.

65.    The majority of legal fees incurred by the El Prela Trustee in its capacity as trustee of the El Prela Trust relate to advice obtained in connection with the claims and potential claims articulated against it, the El Prela Holding Company and El Prela Investment Company arising from the fall-out following the discovery of the Madoff fraud. These claims are described in more detail at paragraph 105 below. This has entailed obtaining legal advice in a number of jurisdictions, including England, Bermuda, the BVI, New York, Monaco and Jersey. As at 31 October 2011, the total legal fees paid to legal advisers pursuant to these provisions are US$2,874,173.67.

66.    Further details of these payments and the firms to which they have been paid are set out in the table at page 173.

11698343.1

**Change of the proper law of the El Prela Trust**

67.    By paragraph A1 of the Trust Deed (page 132), the proper law of the El Prela Trust at the date of its settlement was the law of the Island of Jersey.

68.    By paragraph A15 of the Trust Deed (page 140), the El Prela Trustee has the power to change the proper law of the El Prela Trust. Pursuant to that power, and for reasons of administrative convenience, the proper law of the El Prela Trust was changed from that of Jersey to that of the BVI by a Deed of Retirement and Appointment dated 17 August 2006 (page 151) referred to above, at the same time as the El Prela Trustee (a BVI company) was appointed in place of Alpine Trustees.

## THE KINGATE FUNDS AND KINGATE MANAGEMENT LIMITED

69.    Given the nature of the claims made in the Picard Claims and the fact that the assets of the El Prela Trust comprise shares in KML and investments made having received dividends from that company, it is relevant that I set out in this Affidavit certain details concerning KML and the Kingate Funds. The source of my knowledge in this regard is the series of affidavits and the witness statement made in connection with the El Prela Trustee's successful application in 2009 to lift a freezing order over certain accounts of the El Prela Trust and its 100% subsidiaries held in Monaco, explained further at paragraph 108 below.

**The Kingate Funds**

70.    Kingate Global was incorporated on 11 February 1994 under the laws of the BVI as a fund of hedge funds. Its registered office is at Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI.

71.    On or about 19 April 2000, a separate self-standing entity, Kingate Euro, was incorporated under the laws of the BVI, its registered address being Craigmuir Chambers, PO Box 71, Road Town, Tortola, BVI.

72.    The Kingate Funds are both open-ended investment companies and are recognised as professional mutual funds under the Territory of the British Virgin Islands Mutual Funds Act 1996.

11698343.1

73.     During 1994, and having been introduced to various investment advisers,
        Kingate Global opened a discretionary managed account with BLMIS whose
        principal was Madoff.

74.     Initially, Kingate Global had just one class of shares, denominated in US$. At
        the end of February 1995, Kingate Global created a new class of US$ shares
        called Kingate Global Fund -- Class B Shares ("**Kingate B**"). The managed
        account with BLMIS was transferred into Kingate B, which shares were launched
        on 1 March 1995. At the same time, the original fund of funds shares were
        renamed Kingate Global Fund -- Class A Shares but were wound down around
        the end of 1996. On 1 January 1996, a further class of shares was launched,
        called Kingate Global Fund -- Class DM Shares ("**Kingate DM**"), denominated in
        Deutsche Marks, and then Euros.

75.     Kingate DM was transferred from Kingate Global to Kingate Euro. Following this
        step, Kingate Global and Kingate Euro operated as separate funds, albeit using
        the same fund manager, as explained further below.

76.     Investor funds deriving from subscriptions for participating common shares in the
        Kingate Funds (the "**Shares**") were passed to BLMIS as investment adviser to
        the Kingate Funds, on the understanding that they would be invested using
        BLMIS's so-called "split-strike conversion" strategy which was claimed by BLMIS
        to limit losses when a stock price declined while still affording a capped upside
        potential.

77.     As the extent of the fraud committed at BLMIS unfolded, this had a dramatic
        effect on the assets of the Kingate Funds, the value of which plummeted, and, on
        8 May 2009 Mr William R Tacon and Mr Richard E L Fogerty of Zolfo Cooper
        were appointed as Joint Provisional Liquidators of the Kingate Funds by an order
        of the BVI Court. On 4 June 2009, the BVI Court duly appointed Messrs Tacon
        and Fogerty as Joint Liquidators of the Kingate Funds. For the purposes of this
        Affidavit, these Joint Liquidators are collectively referred to as "**Mr Tacon**".

**Current status of the liquidations of the Kingate Funds**

78.     The most recent information of which I am aware as to the present position of the
        liquidation of the Kingate Funds is contained in Mr Tacon's Fifth Report to
        Creditors and Investors dated 27 January 2011 for each of Kingate Global (page

11698343.1

174) and Kingate Euro (page 195) (the "**Fifth Creditors' Reports**"). In brief summary:

78.1   The Kingate Funds have made a provisional claim in the liquidation of the BLMIS estate. By an update to creditors and investors of Kingate Global dated 17 June 2011 (page 216), Mr Tacon confirmed that this claim is Kingate Global's most significant asset and that despite the potential risk in maintaining it (which I understand from Lawrence Graham LLP ("**LG**") to be submitting to the jurisdiction of the New York Court for the purposes of the Third Amended Complaint) Mr Tacon would not withdraw it;

78.2   Mr Picard filed an avoidance claim against the Kingate Funds in the Bankruptcy Court on 17 April 2009 (the "**Picard US Complaint**"). The Picard US Complaint was subsequently amended on three occasions, and on 20 May 2011 Mr Picard filed the Third Amended Complaint. Mr Tacon has not made any appearance in connection with the Picard US Complaint, having agreed a number of extensions of time in which to do so with Mr Picard. The latest such extension of which I am aware (to 16 November 2011]) was agreed by way of a Stipulation and Order dated 13 October 2011 (page 217).

78.3   Mr Tacon has permission from the BVI Court to enter into a settlement agreement with Mr Picard in relation to the Picard US Complaint. Further information about that draft settlement agreement and the negotiations between Mr Tacon and Mr Picard is at paragraphs 138 to 142 below.

78.4   Mr Picard has obtained permission to issue a claim in the BVI in respect of the Picard US Complaint on the basis that it will not be pursued until settlement negotiations with Mr Tacon are completed;

78.5   Bank of Bermuda has frozen the Kingate Funds' accounts held with that bank in Bermuda. The Kingate Funds have access to those accounts for the purpose of meeting their ordinary legal and business expenses and a hearing date for the hearing of the Kingate Funds' application to release the funds is yet to be set;

78.6   Mr Picard has intervened in those proceedings between the Kingate Funds and Bank of Bermuda, but has confirmed he has no intention of

11698343.1

pursuing his claim in that action until the settlement negotiations with Mr
Tacon are completed;

78.7    Mr Tacon has obtained copies of the Kingate Funds' books and records
held by KML and access to the Kingate Funds' records held by Citi
Hedge Fund Services Ltd ("**Citi**"), the administrator of the Kingate Funds;

78.8    Mr Tacon has issued a protective writ against PricewaterhouseCoopers
Bermuda in relation to their 2003 audits of the Kingate Funds, with the
intention of issuing further writs in relation to their 2004 audits;

78.9    On 2 December 2010, Mr Tacon was granted recognition by the English
High Court as Joint Liquidator of the Kingate Funds pursuant to the UK
Cross Border Insolvency Regulations 2006;

78.10    Mr Tacon has issued the Bermuda Proceedings, as described further
below.

**Kingate Management Limited**

79.    KML was incorporated on 24 February 1994 under the laws of Bermuda.  Its
registered office is 2 Reid Street, Hamilton HM11 Bermuda.  Its issued shares
are wholly-owned by a nominee company, holding in equal shares for the El
Prela Holding Company and Ashby Holding Services Limited (the "**Ashby
Holding Company**"), (together the "**Holding Companies**").

80.    As at the date of Madoff's arrest on 11 December 2008, KML's board of directors
comprised the following individuals: Michael Tannenbaum; Phillip Evans;
Shazieh Salahuddin; and Christopher Wetherhill. Michael Tannenbaum retired
as a director in early 2009, while Phillip Evans retired on 31 May 2010.  Shazieh
Salahuddin and Christopher Wetherhill resigned in May 2011.

81.    KML acted as investment manager to the Kingate Funds in accordance with the
terms of certain management agreements.   The most recent management
agreement between Kingate Global and KML is dated 1 January 2006 (the
"**Global Management Agreement**") which superseded and replaced previous
management agreements between those parties dating back to 1994.  Kingate
Euro entered into a management agreement with KML on 1 May 2000 (the
"**Euro Management Agreement**"). Both management agreements are governed
by the laws of Bermuda.  The Global Management Agreement is subject to the

23

non-exclusive jurisdiction of the Courts of Bermuda, whilst the Euro Management Agreement is silent as to jurisdiction. Copies of the Global Management Agreement and the Euro Management Agreement (together, the "**Management Agreements**") are at pages 220 and 233 respectively.

Fees received by KML under the Management Agreements

82.     In return for the performance of its duties under the Management Agreements, KML received:

   82.1    Under the Global Management Agreement, a monthly management fee at an annual rate equal to 1.5% of the month-end net asset value of the Shares of Kingate Global; and

   82.2    Under the Euro Management Agreement: (a) a monthly management fee at an annual rate equal to 1.5% of the month-end net asset value of the Shares of Kingate Euro; and (b) an administration fee at an annual rate of 0.10% of the month-end net asset value of Kingate Euro in respect of the foreign exchange hedging activity undertaken by Kingate Euro.

83.     From time to time and as described at paragraph 46 above, the directors of KML declared dividends which were paid to its ultimate shareholders (the Trustees or, after 31 March 2008, the Holding Companies) in proportion to their shareholdings in KML.

Delegation of KML's duties under the Management Agreements

84.     Under the terms of the Management Agreements, KML was authorised to delegate any of its duties or obligations arising under those agreements to third parties, whether independent of or affiliated with KML. KML did exercise its authority to delegate the performance of certain of its duties under the Management Agreements, including to:

   84.1    BLMIS as investment adviser to the Kingate Funds.

   84.2    FIM as consultant to and distributor for the Kingate Funds, in return for certain fees. Those fees represented around 2.5% of FIM's annual revenues.

24

11698343.1

84.3   Citi, which was appointed to provide administrative services to the Kingate Funds.

84.4   Bank of Bermuda Limited (an indirect 100% subsidiary of HSBC Holdings plc), which was retained as banker and custodian to the Kingate Funds (**"Bank of Bermuda"**).

Loan to KML

*Loan Agreement dated 16 July 2009*

85.   From 26 November 2008, KML received no further management fees under the Management Agreements, meaning that KML's only source of income came to an end.  Equally, as the true extent of the BLMIS fraud unfolded in 2009, KML continued to be heavily involved in dealing with redemptions and other related issues concerning the Kingate Funds, in accordance with its duties under the Management Agreements.  It also agreed to provide voluntary disclosure to Mr Tacon of records held by it pertaining to the Kingate Funds.  KML therefore continued to incur operating expenses.

86.   In early 2009, the Holding Companies, which between them are beneficial owners of the shares in KML (held by a nominee) considered whether it would be appropriate to advance loan funding to KML that would enable it to continue operations and avoid entering insolvent litigation.

87.   On 16 July 2009 the Holding Companies (as lenders) and KML (as borrower) entered into a loan agreement in respect of a term loan facility of up to US$1,200,000 (the "**Loan Agreement**").  A copy of the Loan Agreement is at page 245.

88.   By clause 3 of the Loan Agreement (page 252), each Advance (as defined) made under that agreement was to be made for the sole and exclusive purpose of:

88.1   Permitting KML to pay all relevant expenses relating to its position in respect of the Kingate Funds, to pay KML's officers to continue to run it, and to enable KML to take legal advice strictly in relation to its own position in respect of any issues that may have properly concerned it; and/or

11698343.1

88.2    Such other purpose as the Holding Companies may have (in their absolute discretion) agreed in writing in advance.

89.    The facility granted under the Loan Agreement was specifically not to be used for KML's direct litigation defence costs and was made subject to strict conditions. Prior to the Loan Agreement being agreed, the Trustees reconfirmed to KML the purpose of the Loan Facility (as defined) by way of a side letter from LG dated 7 July 2009 (page 267).

90.    The Loan Agreement set out in clause 4.2 (pages 252 to 253) a number of conditions precedent which needed to be fulfilled before the Holding Companies were obliged to make an Advance (as defined).  By clause 4.4 of the Loan Agreement (page 253), the Holding Companies had the ability to cancel unilaterally any undrawn part of the Loan Facility at any time on giving prior written notice to KML.

*Supplemental Loan Agreement dated 28 September 2010*

91.    In or around June 2010, KML made a request to the Holding Companies for a further loan of up to US$1,200,000 so as to extend the Loan Facility from US$1,200,000 to US$2,400,000 (the "**Extension Request**").

92.    On 28 September 2010 the Holding Companies (as lenders) and KML (as borrower) entered into a supplemental agreement to the Loan Agreement, extending the facility granted by way of the Loan Agreement by up to US$1,200,000 (the "**Supplemental Loan Agreement**").  A copy of the Supplemental Loan Agreement is at page 268.  Taken together, the Loan Agreement and the Supplemental Loan Agreement are referred to in this Affidavit as the "**Loan Agreements**".

*Advances made to KML under the Loan Agreements*

93.    From July 2009, the El Prela Holding Company made Advances to KML under the Loan Agreements.  The total Advances made by the El Prela Holding Company pursuant to the Loan Agreements were US$900,000.

*Suspension of Advances under the Supplemental Loan Agreement*

94.    On 22 December 2010, Mr Tacon issued the Bermuda Proceedings and on 7 January 2011, the El Prela Trustee and the El Prela Holding Company received

26

11698343.1

the Writ and draft Statement of Claim in respect of those proceedings. In light of
the claims articulated in the draft Statement of Claim, the El Prela Trustee and El
Prela Holding Company gave consideration to whether it was appropriate for the
El Prela Holding Company to make any further advance to KML pursuant to the
Supplemental Loan Agreement.

95.      On 7 February 2011, LG wrote to KML (page 298) confirming that the Holding
Companies would not make any further Advance to KML under the
Supplemental Loan Agreement until further notice. No further funding has been
advanced, and a petition has since been issued for KML's winding up, as
explained further below.

Resignation of KML's directors and Petition to wind up KML

96.      In May 2011, KML's remaining directors, Chris Wetherhill and Shazieh
Salahuddin, gave notice of their resignation from KML.

97.      The Trustees understand from their lawyers in Bermuda that under the Bermuda
Companies Act, members of a company are under a positive obligation to
appoint replacement directors in the event that the number of directors falls
below the statutory minimum of two. As beneficial owners of the shares in KML,
the Holding Companies have explored the possibility of appointing replacement
directors, but concluded that, in the absence of third party funding, it would be
difficult if not impossible to find prospective directors willing to accept an
appointment.

98.      By the time that KML's remaining directors resigned in May 2011, KML had
ceased to carry on the business for which it was incorporated. Thereafter, the
Holding Companies considered whether KML should be wound up, since it was
unable to pay its debts as they fell due. At that time, those acting for the Holding
Companies were not aware of the fact that the legal ownership of the shares in
KML lay with a nominee company, Hamilton Nominees Limited ("**HNL**").

99.      On 3 August 2011, the El Prela Holding Company issued a notice of statutory
demand on KML via its registered agents (page 299, the "**Statutory Demand**").
An equivalent demand was served on behalf of the Ashby Holding Company.
The Statutory Demand gave notice that, the Repayment Date (as defined in the
Supplemental Loan Agreement) having passed, unless the US$900,000
advanced to KML pursuant to the Loan Agreements, plus interest, was repaid in

27