# EXHIBIT D



Made on behalf of: Claimant
D P Alexander
1st Affidavit
Exhibits: DPA1 to DPA6
31 January 2012

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
BRITISH VIRGIN ISLANDS
BVIHCV 2011/0154 and BVIHCV 2011/0155



BETWEEN:

**FIRST PENINSULA TRUSTEES LIMITED
(AS TRUSTEE OF THE ASHBY TRUST)**

**Claimant**

-and-

**(1) IRVING H PICARD**
(as trustee for the substantively consolidated SIPA liquidation of
Bernard L Madoff Investment Securities LLC and the estate of
Bernard L Madoff)

**(2) KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)**
(acting by William R Tacon and Richard E Fogerty as joint
liquidators)

**(3) KINGATE EURO FUND LIMITED (IN LIQUIDATION)**
(acting by William R Tacon and Richard E Fogerty as joint
liquidators)

**(4) CARLO GROSSO**
(as representative of the adult beneficiaries of the Ashby Trust)

**(5) MAC IMRIE**
(as representative of the minor, unborn and unascertained
beneficiaries of the Ashby Trust)

**(6) HER MAJESTY'S ATTORNEY GENERAL OF THE BRITISH VIRGIN
ISLANDS**

**Defendants**

---

**AFFIDAVIT OF
DAVID PETER ALEXANDER**

---

I, **DAVID PETER ALEXANDER**, director, of Smith & Williamson Limited of 25 Moorgate, London EC2R 6AY, **MAKE OATH** and **SAY** as follows:

1. I am a director in the accountancy firm Smith & Williamson Limited. Between October 2005 and September 2008, I was a Partner in Alexander Forensic Accounting LLP. Prior to that I was employed by KPMG for twelve years, becoming a Partner in October 2000. Prior to that, I was employed by Ernst and Young for eight years from October 1985.

2. I am a Fellow of the Institute of Chartered Accountants in England and Wales. I have a BA Honours Degree in Accounting and Financial Management from Sheffield University. I qualified as a Certified Fraud Examiner in August 1992. Since 1985 I have been involved in audit and accountancy work and have specialised in forensic accounting matters since October 1991.

3. Save as otherwise appears, I make this Affidavit from facts and matters that are within my own knowledge. Insofar as such matters are within my own knowledge, they are true. Where I refer to information supplied by others, that information is from the sources stated and is true to the best of my knowledge, information and belief.

4. There is now produced and shown to me bundles of true copy documents marked **"Exhibit DPA1"** to **"Exhibit DPA6"** to which I shall refer. In summary:

    (1) DPA1 is a summary of the results of my analysis as described in this Affidavit;

    (2) DPA2 sets out my detailed working with respect to the "First in, First out" method, described below;

    (3) DPA3 sets out my detailed working with respect to the "Rolling Charge" method, described below;

    (4) DPA4 sets out my detailed working with respect to the "Extreme Picard" method, as described below;

    (5) DPA5 sets out conveniently in one place the data from which my analysis is drawn;

    (6) DPA6 contains copies of the Kingate Fund's bank statements to which I refer below.

2

5. I make this Affidavit in support of applications for directions (the "**Applications**") made by First Peninsula Trustees Limited and Port of Hercules Trustees Limited (the "**Trustees**"). Since these matters are relevant to the Applications made by each of the Trustees, this Affidavit is made in support of both of them.

6. The purpose of this Affidavit is to describe the analysis that I have performed of various payments made to and by Kingate Global Fund Limited ("**Kingate Global**") and Kingate Euro Fund Limited ("**Kingate Euro**") (together the "**Kingate Funds**") in accordance with the instructions I received from Lawrence Graham, the English solicitors acting for the Claimants in the Applications (details of which are set out below) and to summarise the results of that analysis. My instructions do not require me to provide opinion evidence and I do not do so.

7. I have been assisted in carrying out my analysis by Anne-Marie Hitchin, Forensic Senior at Smith & Williamson, but the evidence contained in this Affidavit is mine alone.

**Instructions**

8. My instructions arise in the context of the claims made against, variously, First Peninsula Trustees Limited, Ashby Investment Services Limited, Ashby Holding Services Limited, Alpine Trustees Limited, Port of Hercules Trustees Limited, El Prela Group Holding Services Limited and El Prela Trading Investments Limited (which for convenience I refer to collectively below as the "**Trustee Defendants**") by Irving Picard (as trustee in the liquidation of Bernard L Madoff Investment Securities LLC ("**BLMIS**")) ("**Mr Picard**") in the New York Proceedings and the English Proceedings brought by him.

9. The particular transactions which form the subject of the analysis which I have conducted arise out of the operation of the Kingate Funds and, in particular, their relationship with BLMIS and Kingate Management Limited ("**KML**").

10. The Kingate Funds paid management fees over time to KML. Over the same time, the Kingate Funds received monies from different sources, including BLMIS. KML in turn paid sums to the Trusts by

3

way of dividends. The essential issue which I have been asked to analyse is whether it can be shown that the monies paid by BLMIS to the Kingate Funds can be traced into the sums held in the Trusts, and if so to what extent.

11. To answer this question, it is necessary to analyse the position of each of the Kingate Funds separately, in order to calculate what if any sums paid by the Kingate Funds to KML by way of management fees represented the traceable proceeds of monies paid by BLMIS to the Kingate Funds. It is further necessary to analyse the position of KML, in order to determine what if any sums paid by KML to the respective Trusts by way of dividends represented the traceable proceeds of the BLMIS monies.

12. In each of those sets of proceedings, Mr Picard claims to have a proprietary claim to the entirety of funds in the hands of the Trustee Defendants on the basis that those funds represent the traceable proceeds of transfers originally made from BLMIS to the Kingate Funds (the "**BLMIS Transfers**").

13. The case advanced by Mr Picard is that between 1994 and 2008 the Kingate Funds paid management fees totalling some US$371m to KML and that KML paid dividends to the Trustee Defendants totalling some US$297m. Mr Picard claims that all of that US$297m comprised the traceable proceeds of the BLMIS Transfers, on the basis that BLMIS paid over more than US$371m to the Kingate Funds over the course of their relationship. The total of the BLMIS Transfers made to Kingate Global was approximately US$390m, and the total of such Transfers made to Kingate Euro was approximately US$526m. However, I understand from Lawrence Graham that Mr Picard has either conducted no tracing exercise to justify that claim or, at least, has not advanced it in his evidence.

14. For present purposes, I assume that the assets presently in the hands of the Trustee Defendants derive from dividend payments made by KML and that the management fees paid by the Kingate Funds were the only income for KML.

4

### The Approaches to Tracing

15. I have been asked to do the necessary calculations and analysis using three different approaches to tracing. These are now briefly explained.

#### (A) The "Rolling Charge" model

16. We are here concerned with what is often called a "mixed fund". For example, the bank account of Kingate Global would at various times include a mix of monies not only from BLMIS but also from other people, in particular the investors in Kingate Global, who paid for their shares in the Fund by paying subscription monies into its bank account. The question arises as to how a withdrawal, whether to KML or anyone else, from that mixed bank account should be treated.

17. The "Rolling Charge" model of tracing proceeds on the basis that each such withdrawal is borne proportionately by the then contributors to the mixed fund according to the amount each contributed to the mixed account at the point immediately prior to the relevant withdrawal.

18. I understand from reading the Affidavit of Timothy Harkness in draft that this (known in the USA as the "pro rata rule") is the usual approach to issues of tracing before US courts.

19. Over time the proportion of the mixed fund belonging to each contributor will vary as new contributions are made to the fund. Withdrawals made after such new contributions have been made will, therefore, be attributed to the contributors in accordance with the new proportions of the mixed fund attributed to each of them.

#### (B) The "First in, First out" model

20. This is an alternative model of tracing funds through a mixed bank account. It requires specific withdrawals to be matched against specific credits, based on the presumption that any withdrawal is presumed to be made using the earliest deposited funds remaining in the account. Once the earliest credit in each account is exhausted, it

is presumed that the next withdrawal is made from the next earliest credit in the account, and so on.

21. I understand that this is the usual approach to issues of tracing before English courts.

**(C) The "Extreme Picard" model**

22. I am asked also to conduct an analysis on the following basis, although I understand that it is not in fact a recognised model for tracing either in the USA or in England & Wales. This model assumes in Mr Picard's favour that he is entitled to allocate funds which have originated from BLMIS entirely at his option to any subsequent debit from the recipient account, without having to apply either the First in, First out or Rolling Charge models. Accordingly, I have assumed for this purpose that Mr Picard can trace any BLMIS Transfer through the Kingate Funds and KML and into the dividends paid by KML to the Trusts until the value of all the BLMIS Transfers made up to that point has been completely exhausted. Only once that point has been reached are payments from the Kingate Funds to KML and then on from KML to the Trusts deemed to have been made using non-BLMIS funds.

**The Questions asked of me and my answers in brief**

23. In considering each of the tracing models and their application to the flow of monies through the two Kingate Funds to KML and then to the Trusts, I have been asked to address the following questions, to which I also set out very briefly below my answers:

    (1) Can it be shown that all the dividend payments made by KML to the Trusts represent the traceable proceeds of BLMIS Transfers? The answer to this is that Mr Picard cannot show this on any of the three models I have analysed, not even the Extreme Picard model.

    (2) If the answer to the preceding question is "no", is it possible to calculate with certainty the aggregate value of all those payments which do not represent the traceable proceeds of BLMIS Transfers? If so, what is that value? The answer to this is that it

6

is not possible for me to conduct a complete analysis under either the First in, First out or the Rolling Charge models because of a lack of bank statements, as I discuss below. However, it is possible to do so on the Extreme Picard model, which results are set out below.

(3) If the answer to the question at sub-paragraph (2) above is "no", is it possible to show that any of the payments from KML to the Trustee Defendants do not represent the traceable proceeds of BLMIS Transfers? If so, what is the aggregate value of those payments which cannot be the traceable proceeds of BLMIS Transfers? My answer is that it is possible to show that monies received by the Trusts are not the traceable proceeds of BLMIS Transfers. This is for the reasons set out below, which involve making assumptions in Mr Picard's favour, by applying the Extreme Picard model, wherever I cannot complete an analysis under the First in, First out or Rolling Charge models. Even making such assumptions, it is clear that under both models, very large sums remain in each Trust, which cannot on any view be sums which represent the traceable proceeds of BLMIS Transfers.

(4) Are there any limitations on my analysis which the court should be made aware of which might have an impact on the results of that analysis? If so, what are those limitations and how might they impact on the results of the analysis? I set out my assumptions on which I have proceeded at Annex 2 hereto. I do not believe that any of these are likely materially to affect the results to which I have come.

### The materials available to me

24.  In undertaking my analyses under each of the three tracing models described above, I have been provided with the following materials from which to perform them:

(1) In the case of both the Kingate Funds, Mr Picard's New York Proceedings include a schedule of all payments made by BLMIS to the Funds (in Exhibit B of the Third Amended Complaint).

7

(2) In the case of both Kingate Funds, in addition Mr Tacon's Bermuda Proceedings include, at Annex C, an account of all management fees paid by each of the Kingate Funds to KML.

(3) Moreover, in the case of Kingate Global, I have complete bank statements for its relevant bank accounts the periods 12 May 2000 to 18 July 2000 and 28 November 2005 to 31 August 2006.

(4) Subject to what is said at paragraph 24(8) below, I have not had access to complete bank statements for Kingate Global for other periods. This does not, however, affect my ability comprehensively to identify sums paid by Kingate Global to KML which cannot be the traceable proceeds of payments from BLMIS. This is because, as I set out below, in the periods where I do not have bank statements, either (i) there are no BLMIS Transfers and it is clear that on either the Rolling Charge tracing model or the First in, First out model, absolutely no or only negligible sums remained in Kingate Global's bank account from BLMIS at the start of those periods or (ii) I have adopted the Extreme Picard model where BLMIS Transfers have taken place. Moreover, for the analysis of the Extreme Picard model, the lack of statements does not matter, given that all assumptions are made in Mr Picard's favour.

(5) Whilst I have been provided with some bank statements relating to Kingate Euro, these are insufficient for me to conduct an analysis on either the Rolling Charge or the First in, First out models. Hence, in relation to that Fund, I have simply proceeded on the basis of the Extreme Picard model, as I discuss further below.

(6) In addition, when it comes to transfers by way of dividend from KML to the Trusts themselves, I lack bank account or other information to conduct a full tracing exercise on either the Rolling Charge or the First in, First out models. I have again, therefore, assumed all relevant matters in Mr Picard's favour on the Extreme Picard model.

8

(7) The full set of documents with which I have been provided are set out at Annex 1 hereto.

(8) I should add that after close of business on 30 January 2012, I was provided with several paper files containing copies of further bank statements for each of Kingate Global and Kingate Euro, which were disclosed by Mr Tacon. In the time available, I have not had an opportunity to analyse those additional statements, and I do not take them into account in this Affidavit nor in the spreadsheets showing my calculations. For the reasons set out above, this does not impact upon the analysis I have been able to carry out.

**Kingate Global: analysis**

25. As I have noted above, the results I have come to for both Kingate Funds and applying all three models, and which I summarise hereunder, have been arrived at using various assumptions. I set out these assumptions in Annex 2 hereto.

26. I first set out the results of the analysis I have carried out of funds that reached the two Trusts from Kingate Global. As noted above, for this Fund I have had sufficient information from bank account statements to be able to conduct a full tracing analysis using each of the three models outlined above.

*Results on the First in, First Out ("FIFO") model*

27. In order to undertake a FIFO analysis, I took the opening account balance of the Kingate Global account immediately prior to the receipt of each payment of BLMIS monies. Upon receipt of those funds I identified each specific debit from the relevant account and treated that debit as reducing the opening account balance by the amount of the debit, until the amount of the opening account balance was exhausted. I then did likewise with the credit received from BLMIS, identifying specific debits, and treating the BLMIS credit as reducing by the amount of each debit.

28. The results of this analysis are set out in the spreadsheet at Exhibit DPA1, page 1. I have specifically highlighted debits of management

9

and/or administration fees paid by the Kingate Funds to KML where those debits were made out of funds representing the traceable proceeds of BLMIS Transfers when analysed on a FIFO basis.

29. I have analysed the transfers from BLMIS to Kingate Global in six periods based on the dates of the transactions and the completeness of the supporting documents. I have been provided with bank statements for the periods 12 May 2000 to 18 July 2000; and 28 November 2005 to 31 August 2006 during which Kingate Global received US$240m in transfers from BLMIS. This has allowed me to carry out a full FIFO analysis during these periods.

30. For the periods prior to 12 May 2000; 19 July 2000 to 27 November 2006; and 1 September 2006 to 17 July 2008, due to the lack of bank statements, I cannot identify transfers from non-BLMIS sources. However, this does not matter since I know there were no BLMIS Transfers to Kingate Global in those periods.

31. I have, therefore been able to analyse all payments of management fees during these periods to KML as sourced from non-BLMIS funds.

32. For the period 18 July 2008 to 31 December 2008, due to the lack of bank statements, I cannot identify transfers from non-BLMIS sources. However, there were transfers totalling US$150m from BLMIS in that period. For the purposes of my analysis and to give Mr Picard the best result, I have, therefore, simply assumed that during this period the total management fees paid during this period (of US$15m) can be traced from these BLMIS Transfers. I should add that as and when the relevant bank statements become available, I would expect the value of management fees attributable to BLMIS Transfers during this period to be significantly lower when analysed using the FIFO model.

33. In summary, as can be seen from the spreadsheet at DPA1, page 1 the total management fees and therefore the maximum dividends paid to the Trusts which can be traced from transfers from BLMIS to Kingate Global based on a FIFO analysis are:

| DATE | From BLMIS to Kingate Global US$ | From KML to Trusts US$ |
|---|---|---|
| Pre 12 May 2000 | Nil | nil |
| 12 May 2000 to 6 June 2000 | 30,000,000 | 1,376,920 |
| 9 June 2000 to 27 November 2005 | nil | Nil |
| 28 November 2005 to 31 August 2006 | 210,000,000 | 9,136,003 |
| 1 September 2006 to 17 July 2008 | nil | nil |
| Post 17 July 2008 | 150,000,000 | 15,183,563 |
| Total | 390,000,000 | 25,696,486 |

34. Hence it can be seen that, of the US$390m paid by BLMIS to Kingate Global, a maximum of US$25,696,486 arrived, on the FIFO tracing model with the Trusts. That is because, while I have not been able to carry out an analysis of this second step on a FIFO basis (i.e. from KML to the Trusts), I have simply assumed (as set out at paragraph 24(6) above) for the benefit of Mr Picard, that 100% of the dividend payments made by KML to the Trusts derive from BLMIS Transfers and, hence, I can state with certainty the maximum amounts received into the Trusts.

*Results on the Rolling Charge Model*

35. In order to undertake a Rolling Charge analysis of the funds passing through Kingate Global's bank account, I have again, as with the FIFO model analysis, taken the opening account balance of the relevant bank account immediately prior to the receipt of any BLMIS monies, which opening balance I designated as "non-BLMIS" monies.

36. Following each BLMIS Transfer, I calculated the respective proportion of BLMIS and non-BLMIS monies present in the account. Thereafter, I identified each specific withdrawal from the account, and, in accordance with the methodology I have described above, calculated the proportion of the withdrawal which derives from BLMIS Transfers,

11

and the proportion which derives from non-BLMIS monies, in line with the respective proportion attributable to each source.

37. The results of this analysis are set out in the spreadsheet at DPA1, page 2. I have specifically highlighted the (proportionate) amount of each debit of management fees paid by Kingate Global to KML.

38. I have analysed the transfers from BLMIS to Kingate Global in six periods based on the dates of the transactions and the completeness of the supporting documents. What I say at paragraphs 29 to 32 above about the information I have had and how that has permitted me, notwithstanding the incomplete run of bank statements, to make an accurate FIFO analysis, also applies to this Rolling Charge analysis.

39. The only caveat to this is that, at the end of the period 12 May to 18 July 2000, a small balance of US$128,403 is left over attributable to funds received into Kingate Global's account from BLMIS. I have not been able to show the exhaustion of this small sum by the time the second period in which BLMIS made payments into the account opened. But this was over 5 years later, in November 2005, and I believe that the small residue of US$128,403 as at 18 July 2000 would inevitably have been reduced to a nil or almost nil balance over that 5-year period. Moreover, and in any event, it is so small an amount as to be wholly negligible in terms of any effect it could have on the calculations I have made in the later period. The same is true in respect of the period 28 November 2005 to 31 August 2006 but for this period the balance left over is US$25,399. Again, I believe that this small residue would have been reduced to a nil or almost nil balance over the 22 month period between 31 August 2006 and the next BLMIS Transfer in July 2008.

40. In summary, as shown by the spreadsheet at DPA1, page 2, on the Rolling Charge model, the total management fees and therefore the maximum dividends paid to the Trusts which can be traced from BLMIS Transfers made to Kingate Global into payments made by KML to the Trusts are:

| DATE | From BLMIS to Kingate Global US$ | From KML to Trusts US$ |
|---|---|---|
| Pre 12 May 2000 | nil | nil |
| 12 May 2000 to 6 June 2000 | 30,000,000.00 | 1,114,904 |
| 9 June 2000 to 27 November 2005 | nil | nil |
| 28 November 2005 to 31 August 2006 | 210,000,000.00 | 4,762,914 |
| 1 September 2006 to 17 July 2008 | nil | nil |
| Post 17 July 2008 | 150,000,000.00 | 15,183,563 |
| Total | 390,000,000.00 | 21,061,381 |

41. Hence it can be seen that, of the US$390m paid by BLMIS to Kingate Global, a maximum of US$21,061,381 arrived, on the Rolling Charge tracing model, with the Trusts, making the same assumption in Mr Picard's favour as set out at paragraph 34 above.

*Results on the Extreme Picard model*

42. In this case, for each transfer of funds from BLMIS to both Kingate Global and Kingate Euro I have simply assumed that all the subsequent management or administration fees (in the case of Kingate Euro only), which were paid to KML, were made out of BLMIS funds until the total of all prior BLMIS Transfers were exhausted. I have ignored the fact that these monies may actually have been paid to other parties who have been paid earlier than the relevant payment of management or administration fees.

43. I have further assumed that, with respect to the monies received by KML on this basis, any subsequent payment of dividends by KML to the Trustes is made with BLMIS funds until the total of all BLMIS funds traced into KML has been exhausted. Again, I have ignored the fact that these monies may have been paid to other parties who have been paid earlier than the relevant dividend payment.

44. The results of this analysis are set out in the spreadsheet at DPA1, page 3. I have specifically highlighted the (proportionate) amount of

13

each debit of management and/or administration fees paid by the Kingate Funds to KML.

In summary, the total dividends paid to the Trusts which can be traced from transfers from BLMIS to each of the Kingate Funds based on the Extreme Picard method for the period April 1995 to 31 December 2008 are:

|  | Source of funds transferred to KML as management fees | | |
|---|---|---|---|
|  | Non-BLMIS Funds | BLMIS Funds | Total management fees paid |
| Transferred via Kingate Global | 146,520,703 | 144,299,827 | 290,820,531 |
| Transferred via Kingate Euro | 1,903,044 | 78,054,372 | 79,957,415 |
|  | 148,423,747 | 222,354,199 | 370,777,946 |

| Dividend payments | Non-BLMIS Funds | BLMIS Funds | Total management fees paid |
|---|---|---|---|
| Dividends paid by KML to the Ashby Trust | 49,376,974 | 99,705,355 | 149,082,329 |
| Dividends paid by KML to the El Prela Trust | 48,226,254 | 99,705,355 | 147,931,609 |
| Total dividends paid to the Trusts | 97,603,228 | 199,410,710 | 297,013,938 |

45. Hence, it can be seen that even on this model, extremely favourable to Mr Picard, of the total dividends paid by KML to the Trusts of US$297m, only US$199m can have come from BLMIS, and the remainder of US$97.6m did not.

**The Kingate Euro Fund**

46. As I have discussed above, in the case of Kingate Euro, I have been unable to undertake either a FIFO analysis or a Rolling Charge analysis.

47. I have therefore simply applied the most favourable approach to Mr Picard, the Extreme Picard approach. On this basis, as set out in the spreadsheet at DPA1, page 3 of the US$79,957,415 paid in management fees by Kingate Euro to KML, US$78,054,372 is attributable to BLMIS and just US$1,903,044 to other sources. As and when the relevant bank statements become available so as to permit further analysis, I would expect the value of management and

14

administration fees attributable to BLMIS Transfers during this period to be significantly lower when analysed using either the FIFO or Rolling Charge models.

**The overall results: the monies held by the Trusts**

48.  Finally, for the Court's ease of reference, I refer to the spreadsheet at DPA1, page 7 which shows:

   (1) In the top half of the spreadsheet are shown the totals attributable to BLMIS funds and to non-BLMIS funds that were paid to KML by both Kingate Funds as management fees, applying each of the three tracing models to the Kingate Global payments (and, as set out above, just the Extreme Picard model to the Kingate Euro payments). In respect of each method, the bottom line figures here are that of the total management fees paid to KML by both Kingate Funds are:

   (a) On the FIFO model, US$267,013,992 came from non-BLMIS sources and only US$103,750,858 from BLMIS.

   (b) On the Rolling Charge model, US$271,649,096 came from non-BLMIS sources and only US$99,115,753 from BLMIS.

   (c) On the Extreme Picard model, US$148,423,747 came from non-BLMIS sources and only US$222,354,199 from BLMIS.

   (2) In the bottom half of the spreadsheet are shown the totals attributable to BLMIS funds and to non-BLMIS funds that were then received by the two Trusts as dividends. As noted at paragraph 24(5), due to a lack of information, again this part of the analysis has also been conducted simply on the basis most favourable to Mr Picard, the Extreme Picard model. The bottom line figures here are that, of the US$297,013,938 received by the Trusts from KML by way of dividends:

   (a) On the FIFO model, US$198,204,801 came from non-BLMIS sources and only US$98,809,137 from BLMIS.

   (b) On the Rolling Charge model, US$202,839,905 came from non-BLMIS sources and only US$94,174,033 from BLMIS.

15

(c) On the Extreme Picard model, US$97,603,228 came from non-BLMIS sources and only US$199,410,710 from BLMIS.

**Expert's declaration**

49. I have been provided with a copy of, have read and have understood Part 32 of the BVI Civil Procedure Rules ("CPR"), dealing with evidence given by experts and assessors.

50. In particular, I understand that it is the duty of an expert to help the court impartially on the matters relevant to his or her expertise and that this duty overrides any obligation owed to the person instructing or paying the expert. I confirm that I have complied with that duty in preparing this Affidavit. I also confirm that I have complied with the requirements set out in CPR r.32.4.

51. Finally, I confirm that I have included in my Affidavit all matters within my expertise relevant to the issue on which my evidence is given and that I have identified any matters which, to my knowledge, might affect the validity of my evidence.

52. I attach to this Affidavit at Annex 3 a copy of my written instructions dated **17 January 2012**. Those instructions were subsequently supplemented by oral instructions, the content of which I have summarised above under the heading "Instructions".

SWORN by the above-named DAVID PETER ALEXANDER

at One Bunhill Row, London EC1Y 8YY

this 31 day of January 2012

Before me

MICHAEL SHOLEM

Solicitor/Commissioner for Oaths

16

### Annex 1

### Documents

For the purpose carrying out my analysis, I have been supplied with the following documents:

(i) Kingate structure chart;

(ii) Statement of Claim and Annexes issued in the Supreme Court of Bermuda by Kingate Global Fund Limited (in liquidation) and Kingate Euro Fund (in liquidation) against the Trustees and 7 others (the "**Bermuda Proceedings**");

(iii) Particulars of Claim and Annex issued in the High Court of Justice Queen's Bench Division Commercial Court by Irving H Picard (as trustee for the substantively consolidated SIPA liquidation of BLMIS and the estate of Bernard L Madoff) against the Trustees and 10 others (the "**English Proceedings**");

(iv) Third Amended Complaint, which was filed in the United States Bankruptcy Court of the Southern District of New York by Irving H Picard (as Trustee for the Liquidation of BLMIS) with case reference Adv. Pro. No. 09-1161 (BRL) against the Trustees and 16 others (the "**New York Proceedings**");

(v) Bank statements for accounts in the name of (i) Kingate Global Fund Limited and (ii) Kingate Euro Fund Limited held with the Bank of Bermuda Limited. A full list of the bank statements and the periods to which they relate is attached at DPA6, page 1; and

(vi) Frank Walters' two Affidavits sworn on 16 November 2011 in support of the Applications.

## Annex 2

**Assumptions made in carrying out the tracing analyses under each tracing model**

(i) I have not been able to determine at what point during each month management fees were paid to KML by the Kingate Funds and have therefore assumed these have been paid one month in arrears. Management fees were already being paid to KML prior to the transfer of funds from BLMIS to the Kingate Funds. This treatment therefore favours Mr Picard's position as it ensures that more management fees are potentially traceable from proprietary funds;

(ii) I have used monthly average FX rates to translate Kingate Euro administration and management fees due to having insufficient information to determine payment dates. I do not consider that any variance between the daily exchange rate and the monthly average exchange rate will have a material impact on the translation value of the administration and management fees. My analysis covers almost 13 years of data increasing the likelihood that positive and negative exchange variances will compensate for each other over time;

(iii) When money was paid in and paid out of the Kingate Funds' accounts on the same day, I have treated the credits and debits as occurring in the order in which they appear in the bank statements, subject to (iv) below;

(iv) Where two payments were made on the same day, I have assumed the order of payments which would most benefit Mr Picard i.e. to ensure BLMIS monies pay the maximum management fee;

(v) I have assumed that all management fees payable by Kingate Global between 18 July 2008 and 31 December 2008 were paid and that they represent the traceable proceeds of BLMIS Transfers;

(vi)   I have assumed that the dividends paid by KML to the Trusts were paid and were funded entirely by the management fees paid by the Kingate Funds to KML;

(vii)  In addition to dividends paid to the Trusts, KML also paid various other liabilities to third parties. For the purposes of my analysis I have assumed that any liabilities paid to third parties were paid from non-BLMIS funds, which is the best case for Mr Picard; and

(viii) I have assumed that the details of the BLMIS Transfers set out in Exhibit B to the New York Proceedings and relied upon by Mr Picard are accurate.