# EXHIBIT E

On behalf of: Claimant
J E N Andrews
1st Affidavit
Exhibit "JENA1"
31 January 2012

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

BRITISH VIRGIN ISLANDS

CLAIM NUMBER BVIHCV 2011/0154 and BVIHCV 2011/0155

BETWEEN:

**FIRST PENINSULA TRUSTEES LIMITED
(AS TRUSTEE OF THE ASHBY TRUST)**

<u>**Claimant**</u>

**-and-**

**(1) IRVING H PICARD
(as trustee for the substantively consolidated SIPA liquidation of Bernard
L Madoff Investment Securities LLC and the estate of Bernard L Madoff)**

**(2) KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION)
(acting by William R Tacon and Richard E Fogerty as joint liquidators)**

**(3) KINGATE EURO FUND LIMITED (IN LIQUIDATION)
(acting by William R Tacon and Richard E Fogerty as joint liquidators)**

**(4) CARLO GROSSO
(as representative of the adult beneficiaries of the Ashby Trust)**

**(5) MAC IMRIE
(as representative of the minor, unborn and unascertained beneficiaries
of the Ashby Trust)**

**(6) HER MAJESTY'S ATTORNEY GENERAL OF THE BRITISH VIRGIN
ISLANDS**

<u>**Defendants**</u>

---

**AFFIDAVIT OF**

**JEREMY EDWARD NEEDHAM ANDREWS**

---

**I, JEREMY EDWARD NEEDHAM ANDREWS** of Lawrence Graham LLP, 4 More
London Riverside, London SE1 2AU, United Kingdom **MAKE OATH** and **SAY** as
follows:

1.        I am a partner in the Dispute Resolution Department of Lawrence Graham
          LLP, the English solicitors for First Peninsula Trustees Limited (as Trustee

of the Ashby Trust) and Port of Hercules Trustees Limited (as Trustee of the El Prela Trust) (the **"Trustees"**).  The Trustees' BVI solicitors are Maples and Calder, to whom my firm provides assistance where appropriate.

2.      I make this Affidavit in support of an application for directions in respect of the Picard Claims.  As explained below, it is also in support of an equivalent application for directions made by the El Prela Trustee.

3.      The purpose of this Affidavit is:

   (1)   to update the Court as to events occurring on or after 16 November 2011, when Mr Walters swore his Affidavits in support of the two applications; and

   (2)   to respond, as appropriate, to the Affidavits of Mr Gonzalo Zeballos sworn on 23 January 2012 and Mr William Tacon sworn on 20 January 2012 served in connection with these proceedings.

   Since my evidence is relevant both to the Ashby Trustee's application and an equivalent application by the El Prela Trustee (also issued on 7 December 2011 and currently listed to be heard by the BVI Court on 8 and 9 February 2012), this Affidavit is sworn in support of both such applications (together, the "**Applications**").

4.      Save where the contrary appears, definitions in this Affidavit shall have the same meaning as in the Affidavits of Frank Oliver Walters sworn on 16 November 2011 in support of the Applications (together the "**Walters Affidavits**").

5.      The facts and matters set out in this Affidavit are within my own knowledge, save where the contrary appears, and are true.  Where such facts and matters are not within my own personal knowledge, they are true to the best of my information and belief and derive from the sources stated.

6.      Exhibited to this Affidavit are a bundle of documents marked "Exhibit JENA1". References in this Affidavit to page numbers are to page numbers in Exhibit JENA1.

7.     The structure of this Affidavit is as follows:

A. **Service of the Applications**: I address very briefly the service of both Applications on the various Defendants.

B. **Mr Picard's evidence and the nature of the Applications**: in this section, I address erroneous contentions advanced by Mr Picard in his evidence as to the nature of the Applications and of the relief sought by the Trustees and briefly summarise, to avoid confusion and so the Court is properly informed, what the Trustees are seeking to do by the Applications and why, on the facts of this case, that is an appropriate approach by them.

C. **The weakness of Mr Picard's claims in New York against the Trustees**: this section explains the basis upon which the Trustees contend that Mr Picard's claims are misconceived and wrong and why motions to dismiss those claims in New York are warranted and proper ones for the Trustees to bring.

D. **Mr Picard's failure to conduct a tracing exercise to justify his claim**: quite extraordinarily, the evidence filed on behalf of Mr Picard in the Applications contains no more than a bald, unsubstantiated assertion that he has a good proprietary claim to all of the assets in the Trustees' hands.  On analysis, however, he plainly has no such claim. On the usual and legally accepted basis of tracing applicable in New York, his claim (even if valid, which is denied) is to a fraction of those assets. Further analysis shows that, even applying a legally unacceptable basis of tracing most favourable to him, he has no possible claim to many millions of dollars in the Trustees' hands.

E. **Mr Picard's insolvency application to bar the Applications under Part XIX of the BVI Insolvency Act 2003**: at the last minute, quite improperly, Mr Picard seeks to hijack the hearing of the Applications by mounting an argument unmentioned by him before, despite correspondence on the subject from the Trustees' lawyers, concerning his status as an insolvency office holder.  He seeks to claim that, under BVI statute law, the effect of his office is that the Trustees should be barred from seeking *Beddoe* directions – indeed, from convening a

*Beddoe* Court at all.  I set out why this claim is as misconceived as it is improperly sprung on the Trustees and the Court.

F. **The existing *Beddoe* order and the history of Mr Picard's US Complaint**: I then address the reasons why the previous *Beddoe* applications considered by the BVI Court concerned only Mr Tacon's Bermuda Proceedings, why Mr Picard was not convened to them and why the Orders granted then should remain in place.  This involves a consideration of the extraordinary approach to the New York litigation of Mr Picard and how the Trustees were left out of that litigation until a late stage.

G. **Mr Tacon's evidence and his change of position**: having consented to the previous *Beddoe* relief in relation to his Bermuda  Proceedings, Mr Tacon does not, quite properly, seek to overturn that Order.  He does, however, now seek to oppose the *Beddoe* relief sought by the Trustees in relation to Mr Picard's New York proceedings.  I set out briefly the Trustees' position in relation to his opposition.

H. **The representation orders sought by the Trustees**: Mr Picard opposes the appointments sought by the Trustees in relation to the representation of adult beneficiaries and of minor and unborn beneficiaries.  I therefore set out briefly the Trustees' position in these regards.

I. **Update to the Court in relation to the Petition to wind up KML**

J. **Update to the Court on the costs of steps taken by the Trustees since Mr Walters' Affidavits**

K. **Updated estimates of costs of future steps for which the Trustees seek directions by the Applications**

8.      Nothing in this Affidavit is intended to be or should be read as a waiver of privilege on the part of the Trustees or their subsidiaries.

## A.  Service of the Applications

9.      The Ashby Trustee's application was served on the Defendants as follows:

(1)    On Mr Picard (the First Defendant) via SCA Creque on 12 December 2011;

(2)    On the Kingate Funds (the Second and Third Defendants) via Withers BVI on 9 December 2011;

(3)    On Mr Imrie (the Fifth Defendant) on 12 December 2011;

(4)    On the Attorney General of the BVI (the Sixth Defendant) on 5 January 2012; and

(5)    On Mr Grosso (the Fourth Defendant) on 14 December 2011 via Farara Kerins in the BVI.

10.    The El Prela Trustee's application was served on the Defendants as follows:

(1)    On Mr Picard (the First Defendant) via SCA Creque on 12 December 2011;

(2)    On the Kingate Funds (the Second and Third Defendants) via Withers BVI on 9 December 2011;

(3)    On Mr Imrie (the Fifth Defendant) on 12 December 2011;

(4)    On the Attorney General of the BVI (the Sixth Defendant) on 5 January 2012; and

(5)    On Mr Ceretti (the Fourth Defendant) on 14 December 2011 via Farara Kerins in the BVI.

## B.  Mr Picard's evidence and the nature of the Applications

11.    The evidence filed on behalf of Mr Picard is contained in the two Affidavits of Mr Zeballos dated 23 January 2012, one filed in each of the Applications, which are in materially the same terms.

12.    At paragraph 16 of each of his Affidavits, Mr Zeballos attacks the Applications and the use of the Confidential Affidavits filed by Mr Walters for the Trustees. He asserts that the Applications are not "true *Beddoe*"

applications and that his client, Mr Picard, should have access to the information within the Confidential Affidavits.

13.     He then goes on in addition at paragraph 17(a) to (c) to make further allegations that, in summary:

(1)     It is wrong in principle for the Trustees to "side with" the principal beneficiaries of the Trusts over Mr Picard;

(2)     The Applications do not seek directions as a *Beddoe* application would do but merely pre-emptive costs relief which the BVI Court ought not properly to make;

(3)     Moreover, such pre-emptive costs relief would be wrong in principle as risking "severe injustice" to Mr Picard if his claims succeed in New York.

14.     Mr Zeballos then speaks further to these points at paragraphs 89 to 102 of his Affidavits, referring to advice he has apparently received on them.

15.     The Trustees, of course, considered the Applications very carefully with their legal team before issuing them.  In that context they considered the nature of the *Beddoe* jurisdiction.  They remain satisfied that the simplistic analysis advanced by Mr Zeballos is incorrect and inadequate to deal with the factual situation with which they are faced.  In the circumstances, they remain satisfied that it is proper and correct for them to advance the Applications and seek the directions and relief they intend to ask of the BVI Court at the hearing in February.

16.     In this context I should refer to a letter dated 20 January 2012 from SCA Creque (page 1), for Mr Picard, to Maples & Calder and Maples & Calder's response dated 30 January 2012 (page 4).  The SCA Creque letter articulates in essence the same points as Mr Zeballos makes.  Maples & Calder's letter in response sets out briefly why they are incorrect.  It also, however, makes clear that the Trustees will seek to amend the Amended Claim Forms to make it expressly clear that the Applications seek directions from the BVI Court that the Trustees be authorised:

(1)   In relation to the Third Amended Complaint of Mr Picard in New York, to file motions to withdraw the reference from the United States Bankruptcy Court and motions to dismiss his claims against them; and

(2)   In relation to the English Claim, to seek to agree with Mr Picard a stay of the proceedings until such time as the motions to dismiss referred to at sub-paragraph (1) above have been finally determined.   In effect, all the Trustees seek is that they be permitted to continue the informal stay that they have already agreed with Mr Picard in relation to the English Claim.

17.    The Trustees therefore seek the leave of the Court to amend the Amended Claim Forms in the manner set out in the draft Re-Amended forms which appear at pages 14 (Ashby) and 25 (El Prela).  As set out in the Maples & Calder letter, no prejudice will be caused by that amendment to Mr Picard or Mr Tacon (or any other party) since those who are actively participating in the Applications have prepared and served evidence in opposition on the basis of the Trustees' contention that they are seeking *Beddoe* directions to apply to have Mr Picard's Third Amended Complaint dismissed. To that contention, Mr Picard and Mr Tacon, in particular, have filed the evidence they wish to in order to oppose the grant of such relief.

18.    Moreover, it is important for the BVI Court to note how limited the relief sought by the Trustees is: they seek a direction to do nothing in the English Claim commenced by Mr Picard and effectively currently stayed;  and in relation to the New York proceedings, they do not seek a general direction to defend Mr Picard's claims there, still less to do so at the expense of the Trusts.

19.    On the contrary, they seek very limited directions which, in consequence, would give rise to equally limited legal costs and hence an equally limited costs indemnity from the Trusts' funds.   This is because they seek directions only:

(1)   To apply to have certain aspects of the Third Amended Complaint determined by the United States District Court for the Southern

District of New York, as opposed to the United States Bankruptcy Court;

(2)   To apply, in essence (in BVI legal language) to strike out the claims made in the Third Amended Complaint on the ground they are misconceived in law and bound to fail;

(3)   To seek the dismissal of the Third Amended Complaint on jurisdictional grounds.

The Trustees' estimate of the costs of the course of action for which they seek directions is set out in Section K below.

20.   That it is proper and right for the Trustees to seek directions for such limited involvement in the New York proceedings and such limited costs indemnification in consequence flows from the following factors.

21.   In the first place, whilst it is recognised that if a trustee is faced with a claim to the whole of the trust fund by another person who seeks to set the trust aside, it is generally appropriate for the trustee to remain neutral, leaving the beneficiaries and the claimant to fight the substantive dispute, there are a number of factors specific to this case which mean that that general rule is not applicable.

22.   First, such neutrality is only the ordinarily appropriate response where the claim, properly analysed, is indeed to the whole of the trust fund.  On any view, Mr Picard's claim is not such a claim. He does not seek to set aside the Trusts, but to claim that the assets in the Trusts are his assets. However, his claim, on proper analysis, is and cannot be a claim to the whole of the assets in the Trusts. At most, it is a claim to some only of the trust assets, and on any view of the matter there remains a very substantial sum in each Trust which will always be untouched by his claims: see Section D below.

23.   Secondly, it is submitted that it is obvious that, before a trustee can be expected to adopt a neutral stance in the face of the third party's claim to the trust assets, he needs to examine the nature and extent of the claim and to examine whether it can be said to have a realistic prospect of success.  The claim must have some material degree of merit to it before

the trustee can be expected to allow it to proceed without argument from the trustee. The Trustees have taken advice from New York lawyers about Mr Picard's claims.   On the basis of that advice, the Trustees have reasonably formed the view that Mr Picard's claims have no realistic prospect of success and no material merit, and that they should be dismissed. It cannot be correct that a trustee ought to remain neutral and his office be immobilised to the prejudice of his beneficiaries in the face of what he considers on advice to be a hopeless claim to the trust fund.

24.     This is not therefore a case in which Mr Picard is advancing claims with a realistic prospect of success, and the principle of neutrality does not require the Trustees to accept that he is when they reasonably form the view, after taking advice, that the claims are without merit. The reasons why the Trustees have formed this view appear clearly from the Affidavit of Mr Timothy Harkness of Freshfields Bruckhaus Deringer US LLP, which is to be filed together with this one, and which I have read in draft.

25.     As noted at paragraph 13(2) above, Mr Zeballos also contends that the Applications are more akin to what is called a pre-emptive or prospective costs award than a *Beddoe* application.  A useful general discussion of the distinction between the two is set out at 21-120 of *Lewin on Trusts* 18th ed. (2008).

26.     I believe that, as that passage illustrates, Mr Zeballos is simply incorrect. The Applications seek no order binding on the New York courts or determinative of the costs to be awarded at trial.  They seek orders which will bind only as between the Trustees on the one hand and all the persons who claim to be beneficially entitled to the Trusts' funds on the other hand.

27.     It is this which means, contrary to what Mr Zeballos suggests at paragraph 16 of his Affidavits, that it is both proper and correct for Mr Picard (and Mr Tacon) to be made parties to the *Beddoe* application and for certain confidential material to be kept from them.   This was made clear by Lightman J in *Alsop Wilkinson v Neary* [1996] 1220 at 1226B where he stated:

"*The justification for the protection afforded to trustees by* [a] *Beddoe order is that the beneficiaries are given the opportunity to make representations*

*to the court before the order is made. (In the case where there are*
*unresolved disputes as to the identity of the beneficiaries, e.g. because of a*
*trust dispute* [as here]*, then all possible claimants should be joined).*"

The need to maintain and the propriety of maintaining confidentiality in the
materials within the Confidential Affidavits is also clear and perfectly normal
where one of the persons claiming to be beneficially entitled and so
properly party to the *Beddoe* application is also a hostile party in the main
proceedings (as Mr Picard and Mr Tacon are in the main proceedings each
has brought): I refer generally to *Lewin* at 21-126.

28.     It is appropriate to join Mr Picard to the *Beddoe* application because he is a
party who is potentially affected by the relief to be sought on the
application. In the unlikely event that Mr Picard succeeded in his claims,
and the New York courts held that he was entitled to the whole of the
assets in the Trusts, and in the meantime the trust assets have been
deployed in the payment of the Trustees' legal costs, the amount recovered
by Mr Picard will have been depleted. It is this factor which leads *Lewin* to
comment that a *Beddoe* application such as the present one has similarities
to a pre-emptive costs order (see *Lewin* at 21-115).

29.     That, however, is no bar on a trustee making such a *Beddoe* application or
on the Court granting it.  The task of the *Beddoe* court faced with such an
application is to consider the interests of all those who claim to be
beneficially interested in the trust fund, hence here, of course, not just Mr
Picard, but the express beneficiaries of the Trusts and, indeed, Mr Tacon.
In doing so, it must consider the relative strengths of their various claims to
the fund and the degree of prejudice which a *Beddoe* direction, or its lack,
might cause to each of them. The existence of Mr Picard's claim to be
entitled to the trust assets is a factor justifying him to be heard on the
application, but it is not a factor which automatically determines its
outcome.

30.     In the present case, on the advice received by the Trustee and made
available to the Court:

(1)     Mr Picard has a very poor claim which merits being struck out;

(2)    Moreover and in any event, on analysis, his proprietary claims are not properly to anything like all of the Trusts' funds such that he has no such claim to millions of dollars of assets in the Trusts' funds;

(3)    Mr Tacon has a very poor claim, predicated on first instance English authority disapproved of expressly by the House of Lords;

(4)    The amount of costs the Trustees would take from the Trusts' funds were their motions to dismiss in New York to fail, are modest in comparison to the scale of the assets in the Trusts' funds, so any prejudice to Mr Picard or indeed Mr Tacon would be equally modest.

(5)    Otherwise, the beneficiaries of the Trusts have an incontrovertible claim to the benefit of the Trusts.

### C.  The weakness of Mr Picard's claims in New York against the Trustees

31.    I have referred above, in summarising the Trustees' position and why Mr Zeballos' objections to the formulation of the Applications are incorrect, to the weakness of Mr Picard's claims and to the fact that, on analysis, any claim he does have cannot extend to a large portion of the Trusts' assets.

32.    I shall now address each of these issues. In relation to the first, the weakness of Mr Picard's claims, I refer the court to the Affidavit of Mr Harkness, which I have read in draft.  As Mr Harkness explains:

(1)    Mr Picard makes claims against, amongst others, the Trustees on three different bases.  He makes Federal statutory claims, New York statutory claims and New York common law claims (see paragraph 33 of Mr Harkness' Affidavit).

(2)    In relation to the Federal statutory claims, they can only affect and undo transactions made within two years of the bankruptcy petition in question being presented (here 11 December 2008) (paragraph 35) and can only succeed against subsequent transferees to an initial transferee of the bankrupt if Mr Picard can prove they did not take the transfers for value, in good faith and without knowledge of the voidability of the transfers (paragraphs 38 to 41).  Moreover, Mr Zeballos' evidence fails to point out that it is likely that these claims

cannot in any event be advanced against a foreign defendant similarly placed to the Trustees (paragraphs 49 to 50; 62 to 67).

(3)     In relation to the New York statutory claims, these follow the same principles as the Federal statutory claims and give rise to the same defences, the only material difference being that the court can look back six years instead of just two (paragraph 42).   However, Mr Zeballos fails to mention the fact that it has been held that the same claims brought by Mr Picard against other defendants have already been dismissed by the New York courts on the basis that they are barred by the "safe harbour" provision of the US Bankruptcy Code. By those safe harbour provisions, transfers made by a stock broker, such as BLMIS, to a client, such as the Kingate Funds, may not be avoidable at all (paragraphs 51 to 53).   Moreover, Mr Zeballos fails additionally to refer to the New York court's finding that such a claim can only proceed if Mr Picard is able to plead and prove "wilful blindness" to the relevant fraud, which he does not allege against the Trustees (paragraphs 56 to 61).

(4)     As I set out at paragraphs 71 to 72 below, the effect of this bar on the New York statutory claims is that Mr Picard's statutory claims are limited to the Federal claims with their two year time limit. The effect of this is that the claim against the Trustees is limited to one for at most US$16,600,000.

(5)     In relation to the New York common law claims, Mr Picard lacks any standing to bring these claims, as has been found repeatedly in other claims he has tried to bring (paragraph 42).   Again, extraordinarily, Mr Zeballos fails to mention this at all (paragraphs 55 to 60).

(6)     Finally, Mr Harkness also discusses the US principles of equitable tracing which are relevant to Mr Picard's claims in New York and which I address further below.   These make clear that the "Rolling Charge" model of tracing is the one which it is most likely will be applied by the New York claims to Mr Picard's claims against the Trustees if they ever get far enough for such issues to arise (paragraphs 68 and following).

(7)    Hence, in the result, it is clear that all the claims advanced by Mr Picard against the Trustees are very weak. Indeed, it is clear that the New York statutory claims and common law claims are wholly unsustainable and ought never to have been advanced by Mr Picard, whilst the Federal statutory claim is highly likely to be barred by basic legal principles as well, which the Trustees ought also to bring before the New York courts by their proposed motions to dismiss.

**D. Mr Picard's failure to conduct a tracing exercise to justify his claim and the true extent of his claim on analysis**

33.    In addition to the overall weakness of Mr Picard's claims against the Trustees referred above, he also has, on proper analysis, no sustainable claim at all to much of the Trusts' funds held by the Trustees.

34.    Mr Picard has, it seems and quite extraordinarily, failed in fact to conduct any proper analysis by which to support his bald contention that he is entitled to recover all the assets of the Trusts.

35.    This is notwithstanding the fact that, as is apparent from Mr Zeballos' Affidavits, Mr Picard's opposition to the relief sought by the Trustees is based squarely on the assertion that Mr Picard, as trustee of the bankruptcy of BLMIS, has a proprietary claim to the entirety of the assets held on the Trusts. By way of example:

(1)    The foundation for Mr Picard's proprietary claim is set out at paragraph 37 of Mr Zeballos' Affidavit, where he asserts as a fact that, having received transfers totalling approximately US$975,000,000 from BLMIS *"the Kingate Funds in turn transferred part of the proceeds of the Transfers to KML, payments totalling at least U.S.$315,771,784"*. The central allegation is therefore that payments totalling over US$315 million from the Kingate Funds to KML represent the traceable proceeds of BLMIS Transfers.

(2)    At paragraph 91, Mr Zeballos states that the Trustees' applications are inappropriate *"due to the fact that* [Mr Picard] *has proprietary claims over what he believes to be the entirety of the assets of* [the Trusts]...*"*.

(3)    At paragraph 113.1 Mr Zeballos states that *"[Mr Picard] makes a proprietary claim to all the assets of* [the Trusts]*"*.

(4)    The heading above paragraph 99 of his Affidavit reads: *"The orders sought are wrong in principle because they will result in injustice* **if [Mr Picard]** *succeeds in establishing his proprietary claim to the trust funds."* [Emphasis added].

36.    In other words, Mr Picard's opposition to the Applications only has force to the extent that it can be demonstrated that all the assets held on the Trusts represent the traceable proceeds of transfers made out of BLMIS (which for convenience I refer to below as "**BLMIS Transfers**").  Put another way, to the extent that it can be shown that assets held on the Trusts **do not** represent the traceable proceeds of BLMIS Transfers, it follows that Mr Picard cannot have a proprietary claim to those assets and his opposition to the Applications will, on his own case, have no foundation to the extent of those assets.

37.    It is, therefore, very striking that Mr Picard adduces no evidence at all to make good his alleged proprietary claim.

38.    This is all the more so, since Mr Picard has clearly been aware of his difficulty in establishing what proportion of monies received by KML from the Kingate Funds derived from BLMIS for some time.  Indeed, as early as 9 March 2011, in a witness statement made in support of Mr Picard's application for an extension of time in which to serve the Claim Form by which the English Claim was commenced, Mr Laurence Lieberman of Taylor Wessing (Mr Picard's English solicitors) stated:

*"The Trustee* [i.e. Mr Picard] *acknowledges that he is unable, at present, to quantify the likely claim in England against the Defendants* [i.e. the defendants to the English Claim, including the Trustees of the Ashby and El Prela Trusts] *as he does not yet have sufficient information to demonstrate what proportion of the monies received by the First Defendant* [i.e. KML] *derived from monies sent to the Kingate Funds by BLMIS and what proportion was from Investors' monies which had not yet been sent to BLMIS, nor does he have sufficient evidence of what sums were onward paid from the First Defendant* [i.e. KML] *to the other Defendants* [i.e. the

defendants to the English Claim]. *However, it appears that many tens of millions of dollars received by KML and subsequently the other Defendants derived from BLMIS monies. How much is an issue of quantum which will become clearer as the parties provide disclosure in the usual course of the proceedings, and does not go to the question of liability."*

(See paragraph 38 at page 46).

39.     This passage was an express acknowledgement that some of the monies which went to KML by way of management fees derived from investors' monies which had not been sent to BLMIS and foreshadowed the need for an analysis to be carried out of what sums paid to KML by the Funds derived from those monies, and what sums derived from the transfers by BLMIS to the Funds.

40.     Given the bare assertion in Mr Zeballos' Affidavits, it would appear that, despite being aware of this crucial issue for almost a year, and despite the fact that (as I understand from Withers, solicitors to the Kingate Funds) Mr Picard has had access to the underlying bank statements sufficient to enable him to undertake the same analysis which the Trustees have conducted to establish what sums deriving from the Kingate Funds were received by the Trustees and when, Mr Picard has apparently chosen not to do so – or at any rate, if he has made such an assessment, he has not shared it with this Court or the Trustees or chosen to put it in evidence.

41.     This is a matter of considerable concern to the Trustees and, I anticipate, will also be of concern to the Court.

42.     It is all the more of concern, given the analysis undertaken by the Trustees of the same bank statements as are available to Mr Picard.  Given that the basis for Mr Picard's objection to the directions sought by the Applications is the bare assertion that he has a proprietary claim to the entire Trusts' funds, and in view of his failure to carry out the analysis necessary to make good that assertion, the Trustees have carried out their own analysis.  As I explain further below, that analysis shows that Mr Picard's claim cannot be correct and that, in fact, a very significant proportion of the assets held on the Trusts are in fact assets to which Mr Picard cannot have a proprietary claim.

**Equitable tracing analysis**

43.     The Trustees have carried out an analysis using three different methods for the tracing of assets through mixed bank accounts (which is obviously that relevant here):

(1)     The "first in, first out" ("**FIFO**") approach, which is the classical approach most commonly adopted under English law (see *Claytons case* (1816) 1 Mer. 572). This approach is adopted where there is a mixed fund comprising contributions from parties other than the wrongdoer. This would be relevant if the proceedings brought by Mr Picard in England were to proceed to trial, and it became necessary to determine whether any if so how much of the BLMIS Transfers found their way into the Trusts.

(2)     The North American rolling charge method ("**the Rolling Charge Method**"). This is the method which the Trustees are advised is that likely to be adopted by the New York court hearing the Third Amended Complaint.

(3)     A third method, which I refer to as the "**Extreme Picard model**", under which *all* assumptions are made in Mr Picard's favour *and* it is assumed (contrary to the tracing rules which would apply either in England or in New York) that to the extent that the respective bank accounts of Kingate Global and the Kingate Euro contained any sums which were the traceable proceeds of the BLMIS Transfers, *any* payments out to KML and/or the Trusts are made with those sums (i.e. sums to which Mr Picard can lay claim). For the avoidance of doubt, it is not contended that this methodology could possibly be appropriate in any circumstances, nor that it will have any bearing on the approach to be followed by the New York Court; indeed I note that in his Affidavit Mr Harkness states that this methodology is not supported by any American case law or statutes of which he is aware, and nor I am aware of it having any legal basis under English law. However, it simply serves to demonstrate the problems faced by Mr Picard in this regard, and that even on this extreme basis his

assertion through Mr Zeballos that he has a claim to the whole of assets in the Trusts is false.

44.    For convenience, the Trustees have engaged Mr David Alexander of the accountancy firm of Smith & Williamson Limited to carry out the numerical calculations necessary to apply each of the three methods to the transfers that are at issue in the Third Amended Complaint.  I have seen in draft a copy of an Affidavit of Mr Alexander in which he sets out for the Court's benefit the instructions he was given, the sources of the information on which he has based his calculations and the results of those calculations.

45.    I understand from reading Mr Alexander's Affidavit that as respects Kingate Global:

(1)    Of the US$390 million transferred by BLMIS to the Kingate Global (being the sum which forms the foundation of Mr Picard's claim in respect of Kingate Global), the amount which can be traced into the hands of the Trustees on a FIFO basis is only US$25.7 million.

(2)    Of that US$390 million, the amount which can be traced into the hands of the Trustees on the Rolling Charge method is only US$21.1 million.

These amounts are to be compared with the sum of US$297 million which the Trustees received in total from KML over the whole period of their existence.

46.    I further understand from Mr Alexander's Affidavit that because of a lack of relevant bank statements for Kingate Euro, it has not been possible to do either a FIFO analysis or a Rolling Charge analysis for Kingate Euro and that Mr Alexander has therefore simply applied the Extreme Picard approach to the Kingate Euro.

47.    Mr Alexander's overall conclusions, taking both Kingate Global and Kingate Euro together are that:

(1)    On the FIFO method (for Kingate Global) and the Extreme Picard approach (for Kingate Euro), of the US$297 million received by the

Trusts from KML in the form of dividends, only US$98.8 million came from BLMIS, and US$198.2 million came from non-BLMIS sources.

(2) On the Rolling Charge method (for Kingate Global) and the Extreme Picard approach (for Kingate Euro), of that same US$297 million received by the Trusts from KML, only $94.2 million came from BLMIS, and US$202.8 million came from non-BLMIS sources.

(3) Even applying the Extreme Picard approach to both Kingate Global and Kingate Euro (rather than just to Kingate Euro), of that same US$297 million received by the Trusts from KML, even though US$199.4 million came from BLMIS sources, there was still US$97.6 million which came from non-BLMIS sources.

48.    It is therefore possible to say with certainty that on any view of the matter there are very substantial funds held in the Trusts which cannot be claimed by Mr Picard however successful he may be in his claims.

49.    I respectfully suggest that these results demonstrate clearly that Mr Picard's claims to have a proprietary interest in the entirety of the Trusts' funds cannot be correct and that this provides a complete answer to his opposition to the Applications. It also provides a complete answer to his attempt to set aside the Orders made by this Court on 7 July 2011.

**At least US$48 million in the hands of the Trustees cannot be the traceable proceeds of BLMIS Transfers**

50.    There is, however, an even more straightforward way of demonstrating the fallacy of Mr Picard's claims to a proprietary interest in the entirety of the Trusts' assets, which does not rely on the application of equitable tracing principles, and by which it can be shown that at least US$48 million of the assets currently in the hands of the Trustees cannot on any view be the proceeds of BLMIS Transfers.

51.    At the outset, it is convenient to remind the Court of the stages in the process by which funds are alleged by Mr Picard to have passed from BLMIS to the Trusts, which is conveniently summarised at paragraphs 35 to 39 of Mr Zeballos' Affidavits.  In summary, it is alleged that:

(1)    Funds were transferred from BLMIS to each of Kingate Global and Kingate Euro (i.e. the BLMIS Transfers).

(2)    Out of the sums received by the BLMIS Transfers, Kingate Global and Kingate Euro paid management fees to KML.

(3)    KML then paid dividends to the Trusts from the sums paid to it in management fees by the Kingate Funds.

52.    Mr Zeballos says that it is reasonable to assume that the source of the dividend payments made to the Trusts by KML was the management fees received by KML from the Kingate Funds.  This is consistent with what is said by Mr Walters in his Affidavits and I believe it to be correct.  I understand that dividends were paid by KML to its ultimate shareholders (the Trustees, or, after 1 March 2008, the Holding Companies) in proportion to their respective shareholdings in KML (Walters Affidavits paragraph 46). A schedule setting out the amounts and dates of the dividend payments from KML to each of the Trusts are at pages 160 (Ashby) and 158 (El Prela) of Exhibit FOW1 to the Walters Affidavits.

53.    In the period up to and including 22 November 2005, the total of the dividends paid by KML to (i) the Ashby Trustee was US$86,757,329.01 and (ii) the El Prela Trustee was US$85,606,609.01 (see pages 160 (Ashby) and 158 (El Prela) of Exhibit FOW1 to the Walters Affidavits), i.e. a total between both Trusts of approximately **US$172 million**.

54.    As I have said above, the source of those dividends was the management fees paid by the Kingate Funds to KML.

55.    In that same period (i.e. up to and including November 2005), the total of management fees paid to KML by Kingate Euro was US$44,170,776, i.e. approximately **US$44 million** (page 47, which figures are taken from Annex C to the Statement of Claim in the Bermuda Proceedings (pages 514 (Ashby) and 509 (El Prela) of Exhibit FOW1 to the Walters Affidavits)).

56.    I assume, to the benefit of Mr Picard and for the purposes of this present analysis only, that 100% of the management fees paid to KML by Kingate Euro represents traceable proceeds of BLMIS Transfers, and that 100% of those management fees found its way into dividends paid by KML to each of

the Trustees (although the Trustees do not believe that either of these assumptions is in fact correct). On these assumptions, the balance of the dividends paid by KML to the Trustees, being approximately **US$128 million** (i.e. US$172 million less US$44 million) derived from management fees paid to KML by Kingate Global.

57.     However, during the same period (i.e. up to and including 22 November 2005), the total of the BLMIS Transfers to Kingate Global amounted to just **US$30 million** (a single transfer on 12 May 2000). That figure is taken from Mr Picard's own pleading, as contained in Exhibit B to the Third Amended Complaint (pages 85 (Ashby) and 84 (El Prela) of Exhibit FOW1 to the Walters Affidavits). Therefore, on any view, only US$30 million of the approximately US$128 million paid in management fees by Kingate Global to KML during the period could conceivably have originated from BLMIS Transfers.

58.     It follows that, even on the highly favourable (to Mr Picard) assumptions in paragraph 56 above, US$98 million paid as dividends by KML to the Trustees **cannot** have come from BLMIS and **cannot** represent the traceable proceeds of BLMIS Transfers.   It therefore follows that at least US$98 million of the sums transferred to the Trusts **cannot** be subject to a proprietary claim by Mr Picard.

**The position of the Trusts**

59.     When it comes to the position of the Trusts, as at 31 December 2011, the Ashby Trust had assets of US$136,652,602 and the El Prela Trust had assets of US$117,822,836 (see draft unaudited balance sheet at page 50A (Ashby) and 50B (El Prela)).

60.     Up to 31 December 2011, the total amount paid out of each of the Trusts by way of distributions to beneficiaries, the loans to KML, professional fees and expenses is US$18,561,496.15 in respect of the Ashby Trust and US$31,439,757.37 in respect of the El Prela Trust, i.e. a total of US$50,001,253.52.

61.     Bearing in mind that approximately US$98 million paid in dividends to the Trustees during the period to 22 November 2005 cannot represent the traceable proceeds of BLMIS, if one assumes, again to the benefit of Mr

Picard and solely for present purposes, that none of the US$50 million paid out of the Trusts by the Trustees over their entire life represented the traceable proceeds of BLMIS, it follows that **at least** US$48 million worth of assets as on their settlement into the hands of the Trustees cannot, on any view, be money from BLMIS.

62.    Put another way, taking each of the Trusts separately, since the US$98 million (referred to above) which cannot represent the proceeds of BLMIS Transfers was paid to each of the Trusts in proportion to their respective shareholdings in KML, the position is as follows.

63.    As regards the Ashby Trust:

   (1)    Ashby received 50.33% of the US$98 million referred to above, i.e. it received approximately US$49 million to which Mr Picard cannot conceivably have a proprietary claim;

   (2)    There have been total payments out of the Ashby Trust of US$18,561,496.15 (see paragraph 60 above);

   (3)    Accordingly, at least US$30 million worth of assets as on their settlement into the Ashby Trust is free of any proprietary claim by Mr Picard.

64.    As regards the El Prela Trust:

   (1)    El Prela received 49.67% of the US$98 million referred to above, i.e. it received approximately US$49 million to which Mr Picard cannot conceivably have a proprietary claim;

   (2)    There have been total payments out of the El Prela Trust of US$31,439,757.37 (see paragraph 60 above);

   (3)    Accordingly, at least US$18 million worth of assets as on their settlement into the El Prela Trust is free of any proprietary claim by Mr Picard.

65.    These sums are many times more than the Trustees' estimates of costs to be incurred in complying with the directions sought in connection with the Applications: see Section K below.

66.     Moreover, it must be remembered that the figures set out above represent the
absolute best case from Mr Picard's point of view, based simply on the total
amount of BLMIS Transfers up to and including 22 November 2005.  As is
demonstrated by the results of the more comprehensive equitable tracing
analyses set out above, the figures for assets that are on any proper view free
and clear of a proprietary claim by Mr Picard are very significantly higher.

67.     In reality, therefore, the bare assertion in Mr Zeballos' evidence (on which Mr
Picard's opposition to the Applications is based) to the effect that Mr Picard
has a proprietary claim to the entirety of the Trusts' assets is simply and
demonstrably wrong (as Mr Picard himself would have known had he carried
out the analysis, as he should – indeed may – have done).

68.     This analysis also renders his objections to the expenditure of Trust monies on
the dismissal motions in New York for which the Applications seek directions
both misconceived and irrelevant.  As noted by *Lewin* at 21-114:

> *"In cases where the claimant seeks to establish some adverse equitable
> proprietary claim against the trust property, there could be no
> conceivable objection on the part of the claimant to the trustee
> defending the claim otherwise than by recourse to the disputed trust
> property".*

69.     There is one further important matter to which I wish to draw the Court's
attention  in relation to Mr Picard's proprietary claim based on the Third
Amended Complaint.  All of the foregoing material in this Section assumes
that Mr Picard can make all the claims he asserts in the Third Amended
Complaint.  However, in his Affidavit, Mr Harkness explains at paragraph 61
that as a result of the decisions of Judge Rakoff and Judge McMahon (which
Mr Harkness describes at paragraphs 57 to 60) the only claim open to Mr
Picard in the Third Amended Complaint is that under the United States
Bankruptcy Code based on transfers with actual fraudulent intent made within
the "*two-year look back period*", and that:

> *"subsequent transfers made to the Trust Defendants are only
> recoverable, therefore, if such transfers were originally from Two-Year
> Transfers (i.e. made on or after December 11, 2006) to the Kingate
> Funds".*

70.     That this is the case follows from existing decisions in the New York courts in Madoff related cases of which Mr Zeballos must be aware, but to which he makes no reference in his Affidavits.

71.     As appears from Exhibit B to Mr Picard's proceedings in New York, the first transfer made by BLMIS to the Kingate Funds within the two year period was that made to Kingate Global on 18 July 2008.  It follows that only transfers to the Trusts made after that date could possibly be recoverable by Mr Picard as avoidable subsequent transfers.

72.     Exhibited to the Walters Affidavits are lists of the dividends paid to the Ashby Holding Company (at page 160 of Exhibit FOW1 to the relevant Walters Affidavit) and the El Prela Holding Company (at page 158 of Exhibit FOW1 to the relevant Walters Affidavit).  The dividends paid after 18 July 2008 totalled US$8,300,000 in each case.  As matters stand, therefore, even if Mr Picard can avoid all the "Two-Year Transfers" to the Kingate Funds, his maximum possible claim to avoid subsequent transfers to the Trusts amounts to only US$16,600,000 out of the US$297 million paid to the Trustees and their subsidiaries.

### E.  Mr Picard's insolvency application to bar the Applications under Part XIX of the BVI Insolvency Act 2003

73.     Paragraphs 110 and 111 of Mr Zeballos' Affidavits stated, for the very first time, that Mr Picard intended "*imminently*" to apply for an application restraining the Trustees from (amongst other things) commencing or continuing proceedings against him.

74.     Those applications, one in respect of each Trust, were finally issued, with evidence in support, on 26 January 2012.  Had Mr Picard wished to take this point against the Applications he could and should have done so very much earlier in the day – before, indeed, agreeing the directions to the hearing and the two day duration of the hearing as he did.  The Claimants and the BVI Court appear, unfortunately, to be faced with a cynical attempt to derail the hearing sprung by Mr Picard at the last moment.

75.     In the circumstances, it is relevant to draw the BVI Court's attention to correspondence passing between my firm and Mr Picard's US attorneys Baker

& Hostetler and English solicitors Taylor Wessing, prior to the Applications having been served on Mr Picard.

76.     Lawrence Graham first placed Mr Picard on notice of the Trustees' intentions to make the Applications by letter dated 12 August 2011 (page 831 (Ashby) and 822 (El Prela) of Exhibit FOW1 to the Walters Affidavits). The Trustees' Applications were provided to Mr Picard in final draft form on 21 November 2011, before being eventually issued on 7 December 2011. They were then served on Mr Picard on 12 December 2011, and the Kingate Funds on 9 December 2011.

77.     Prior to issuing the Applications, the Trustees gave consideration as to whether it was appropriate to join Mr Picard and the Kingate Funds to them, given the insolvency of BLMIS and the Kingate Funds. Further details in respect of correspondence with Mr Picard's representatives on this subject are set out at paragraphs 79 to 82 below.

78.     Given that the Kingate Funds are in liquidation in the BVI, the Trustees each issued applications to the BVI Court for permission to commence proceedings (namely, the Applications) against each of them, in accordance with the BVI Insolvency Act 2003, having first obtained confirmation from Mr Tacon's representatives that he did not object to that course. Those applications were issued by way of an Ordinary Application dated 23 November 2011, and the Orders were granted on 5 December 2011.

79.     On 22 November 2011, Lawrence Graham wrote to Taylor Wessing confirming our understanding that, pursuant to specific US statutory provisions (namely 11 U.S.C. § 362 and SIPA § 78fff(b)) and as a consequence of its bankruptcy, an automatic stay exists as to BLMIS in respect of certain proceedings (page 51). The letter explained the Trustees' intention to join Mr Picard as a defendant to the Applications (albeit one against whom no relief would be sought), and explained their view that such a step does not in any way offend against the vice which the automatic stay under US bankruptcy legislation is intended to address. The letter then sought confirmation as a matter of urgency that Mr Picard did not object to being made a party to the Applications.

80.     Having received no response to that letter, on 28 November 2011, Lawrence Graham sent a further letter to Taylor Wessing, which was copied to Mr Zeballos (page 52).

81.     On 30 November 2011, Taylor Wessing replied that they were "*currently in the process of taking instructions*" and expected to provide a response in "*the first half of next week*".

82.     On 7 December 2011, Taylor Wessing wrote to Lawrence Graham confirming that Mr Picard intended to oppose the orders sought and that he would serve evidence in response within 28 days of being served with the Applications (page 53).  (In the event, although Mr Picard was served with the Applications on 12 December 2011, that responsive evidence was not served until 23 January 2012.)  The letter was silent on the subject of Mr Picard being joined as a Defendant to the Applications.  Accordingly, the Applications were issued that same day.

83.     The first suggestion which the Trustees received that Mr Picard somehow objected to these proceedings being continued, and indeed commenced, against him was when they received Mr Zeballos' Affidavits in draft on 20 January 2012. This was almost two months after Lawrence Graham had specifically raised the question with Mr Picard's lawyers.

84.     In these circumstances, the Trustees' position is as follows:

    (1)     The BVI Court should not entertain the new applications issued by Mr Picard at the hearing.  They are quite unnecessary as well as improper:  Mr Zeballos' Affidavits set out the points Mr Picard apparently wishes to make relating to the Insolvency Act 2003.  They are points which can properly be made at the hearing and considered by the BVI Court in the context of the Beddoe applications before it.

    (2)     The BVI Court should also deal with them to the extent it considers appropriate at the hearing: there is no justification and it would be contrary to the just case management of the Applications to allow Mr Picard to derail the two day hearing by introducing this argument so late in the day.

(3)    This is especially so since, as the Trustees will submit at the hearing, the argument that the BVI Court should bar a trustee from making a *Beddoe* application merely because one of the parties properly to be convened to it is a foreign insolvency office holder is palpably misconceived and wrong.

(4)    Rather, in brief, the jurisdiction invoked by Mr Picard under Part XIX of the Insolvency Act 2003 is one whereby the Court has a discretion to make orders on the application of a foreign insolvency office holder from a relevant country (of which, the USA is one).

(5)    The Court is to be guided, in considering whether to apply the jurisdiction by what will "best ensure the economic and expeditious administration of the foreign proceeding" (s. 468(1)).

(6)    Preventing a trustee against whom a foreign office holder asserts a proprietary claim from applying to the court which supervises the administration of its trust for directions as to whether and if so how to defend proceedings against it brought by that office holder is inconsistent with the economic and expeditious administration of those proceedings.

(7)    Further, the grant of an injunction under Part XIX to restrain the Trustees from funding applications to dismiss the New York proceedings from the Trusts' funds can only be justified and permissible if, were the Trustees ordinary persons prima facie owning assets both legally and beneficially, such an injunction would be granted at the suit of the foreign office holder.

(8)    The BVI Court ought only to grant such an order if satisfied that the office holder is entitled to a proprietary freezing injunction against those persons, who are still prima facie the legal and beneficial owners of the assets in question.  In circumstances where the foreign court from which the office holder comes requires him to bring proceedings to establish his title to those assets, and has before it such proceedings, but has made no determination against the present holder and owner of the assets, the foreign office holder

ought to have to establish his entitlement to a proprietary freezing injunction on ordinary principles.

(9)    In the present case, the key issues in the Applications are whether Mr Picard has a good arguable case in the New York proceedings and a good arguable case there to all of the Trusts' funds. For the reasons explained in the earlier sections of this affidavit, the Trustees' case is that he does not have such a good arguable case; alternatively, even if he did, it clearly does not extend to all of the Trusts' assets.

(10)    These are the same questions, therefore, that arise in relation to the injunctive relief Mr Picard seeks by the Pt XIX applications. The Trustees' evidence is that (a) on advice received by them, Mr Picard has no such good arguable case and so the motions to dismiss the Third Amended Complaint should be made and (b) on analysis, Mr Picard has no claim at all to a significant amount in the Trustees' hands and so, again, the Trustees should be directed to make the motions in New York and fund them from such free funds.  Both those things being so, it is right for the Beddoe court to grant the relief sought in the Applications and Pt XIX cannot assist Mr Picard in avoiding that result.

## F.  The existing *Beddoe* order and the history of Mr Picard's US Complaint

85.    In addition to the insolvency application referred to in the Section above, Mr Zeballos' Affidavits also indicate (at paragraph 10) an intention to apply to be added as a party to the Bermuda Directions Applications heard by the BVI Court on 7 July 2011 and for all but one paragraph of the Orders of 7 July 2011 made in those proceedings by Charles J to be set aside.

86.    In doing so, he expressly alleges, at paragraph 13, that the Trustees "*wrongfully failed to make* [Mr Picard] *party*" to those previous applications.

87.    This is an unwarranted allegation.  Mr Picard's absence from those previous applications rests at his own door, given his dilatory formulation of the New York proceedings, to which he failed to join the Trustees for an extensive period, right up to the hearing of the previous applications.

88.    To understand the position properly, it is necessary therefore to make clear some of the history of the proceedings in New York.

89.    Mr Picard initially filed an avoidance claim against the Kingate Funds and Bank of Bermuda on 17 April 2009 in the United States Bankruptcy Court for the Southern District of New York (with reference Adv. Pro. No. 08-01789 (BRL)).    The Trustees were not parties to that complaint, which was subsequently amended on three occasions:

(1)    On 8 May 2009, Mr Picard filed an amended complaint. No new defendants were added. The amended complaint sought the return from the Kingate Funds of approximately US$395 million (US$150 million in respect of Kingate Global and US$245 million in respect of Kingate Euro) alleged to have been transferred to those entities by BLMIS.  Paragraph 2 of the amended complaint states:

*"this adversary proceeding is brought ... for turnover, accounting, preferences and damages in connection with transfers of property by BLMIS to or for the benefit of* [the Kingate Funds].  [Mr Picard] *seeks to set aside such transfers and preserve the property for the benefit of BLMIS' defrauded customers"*.

(2)    On 13 July 2010, Mr Picard filed a second amended complaint. Again, no new defendants were added. That complaint sought the return from the Kingate Funds of approximately US$874 million (US$399 million in respect of Kingate Global and US$475 million in respect of Kingate Euro) alleged to have been transferred to those entities by BLMIS.  Paragraph 2 of the amended complaint states:

*"this adversary proceeding is brought ... for turnover, accounting, preferences, objection to claim, and damages in connection with transfers of property by BLMIS to or for the benefit of* [the Kingate Funds].  [Mr Picard] *seeks to set aside such transfers and preserve the property for the benefit of BLMIS' defrauded customers"*.

(3)    On 20 May 2011, Mr Picard filed the Third Amended Complaint. In addition to the Kingate Funds and Bank of Bermuda, the Third Amended Complaint named 15 additional defendants, including the

Trustees. This was the first time that the Trustees had been named as defendants to these proceedings. Even then, the Third Amended Complaint was not initially made public, and the Trustees did not have sight of it until 8 June 2011.

90.    On 22 June 2011, the Third Amended Complaint was purportedly served in the BVI on the Ashby Trust by SCA Creque (special counsel to Mr Picard in the BVI) via Moore Stephens BVI.  However, the Ashby Trust (as opposed to the Ashby Trustee) is not of itself a legal entity. In any event, Moore Stephens BVI is not the registered agent for the Ashby Trustee. It follows that the Ashby Trustee was not served on this date.

91.    Also on 22 June 2011, the Third Amended Complaint was served in the BVI on the El Prela Trustee by SCA Creque.

92.    The hearing before Charles J in this Court on 7 July 2011 was held in private. However, I was present at the hearing and can confirm that the Judge was made aware of the fact that the Third Amended Complaint had been filed and the broad nature of the claims made against the Trustees in that complaint. At the time, the Trustees had not had an opportunity of taking detailed advice on those claims, but it was made clear to the Judge that applications of a similar nature to those which were before her at the time might be necessary in the context of the Third Amended Complaint once such advice had been received.

93.    By way of a stipulation dated 14 July 2011, those Defendants which had by then been served with the Third Amended Complaint in the BVI, namely the El Prela Trustee, the Holding Companies and the Investment Companies (acting by Freshfields Bruckhaus Deringer US LLP) agreed with Mr Picard (acting by Baker & Hostetler LLP) an extension of time (until 18 August 2011) to move, answer or otherwise respond to the Third Amended Complaint, while expressly reserving the right to challenge the jurisdiction of the New York Court.  Further extensions of time, to which the Ashby Trustee was also a party, were agreed on 10 August 2011, 14 October 2011 and 15 November 2011, the latest of which extended the time to move, answer or otherwise respond until 16 February 2012 (page 55).

94.    By joining in the stipulation of 10 August 2011, the Ashby Trustee agreed to facilitate service of the Third Amended Complaint and waive any defence

based on insufficiency of service of process, while expressly reserving the right to challenge the jurisdiction of the New York Court.

95.    The Kingate Funds and Bank of Bermuda have entered into similar extensions of time. The twenty-first such extension was entered into on 15 November 2011, which extended the time for the Kingate Funds and Bank of Bermuda to move, answer or otherwise respond to the Third Amended Complaint to 16 February 2012 (page 59).

96.    On 7 and 14 October 2011, certain of the defendants to the Third Amended Complaint made motions to the United States Court for the Southern District of New York to have certain of the legal issues raised in the Third Amended Complaint removed from the jurisdiction of the United States Bankruptcy Court and determined instead by the District Court (so-called "motions to withdraw the reference"). On 17 October 2011, each of the Trustees joined those motions, which are currently awaiting determination. My understanding from the Trustees' US Counsel (Freshfields Bruckhaus Deringer US LLP) is that the motions to withdraw the reference are likely to be determined by the District Court in the coming months. This is one of the matters on which the Trustees now seek directions from the BVI Court.

97.    In addition to the Trustees' motions to withdraw the reference from the United States Bankruptcy Court, the Trustees also seek directions by the Applications as to whether they should make a motion or motions to dismiss the Third Amended Complaint. This, as I have noted above, is because the Trustees consider in the light of the advice they have received that the claims are misconceived and ought to be dismissed by the New York court. I refer in this regard to the Affidavit of Timothy Harkness.

98.    For present purposes, however, I note simply that Mr Zeballos' attack on the Trustees, posited on a supposedly improper failure by them to join Mr Picard to the previous *Beddoe* application is unwarranted. Mr Picard was not joined because he was dilatory in joining the Trustees to his New York claim and in serving them with it. Charles J as the *Beddoe* judge was on that occasion, nonetheless, properly made aware of the existence of his claims and the fact that they would require further recourse to the BVI Court in due course.

99.   Turning then to Mr Picard's wish now to be joined to the previous *Beddoe* applications, the Trustees' position is as follows:

(1)   They have no objection to his being so joined.

(2)   He can, however, have no proper objection to the directions sought and obtained by the Trustees from Charles J, because , as set out at Section D above, that, even if his claims have a realistic prospect of success, they cannot on any basis, when analysed, extend to a very sizeable proportion of the Trusts' funds which can quite properly, therefore, be used to fund the defence to Mr Tacon's Bermuda Proceedings as Charles J's order provides for.  (I refer again to the passage from Lewin cited at paragraph 68 above.)

(3)   Moreover, and in any event, Mr Picard's claims do not have a realistic prospect of success (see Section C above), and accordingly there is no proper basis for disturbing the order properly made by Charles J in relation to the Bermuda Proceedings.

**G.  Mr Tacon's evidence and his change of position**

100.   Mr Tacon's position appears, from his Affidavits, which are materially in the same form in both Applications, to be as follows:

(1)   He does not resile from the Order of Charles J in the previous *Beddoe* applications in relation to the Bermuda Proceedings. Having consented to that Order, he could not properly take any different position.

(2)   However, he now seeks to oppose the Trustees' proposed directions in relation to Mr Picard's New York proceedings.

101.   He does not explain this change of position (paragraph 8 of his Affidavits). Moreover, it is a surprising one since, one might think, were the Trustees at modest cost successfully to bring about the dismissal of Mr Picard's claims against them in New York, Mr Tacon would benefit in that a potentially competing claimant to the Trust funds to which he himself lays claim would be eliminated.

102.    Be that as it may, if on reflection and at the hearing he maintains his opposition to the present Applications, the Trustees' position is as follows:

(1)    The issue before the Court is whether the Trustees should be directed to make motions to withdraw the reference and seek the dismissal of the Third Amended Complaint and to seek to agree with Mr Picard a stay of the English Claim until such time as those dismissal proceedings are finally determined.

(2)    In considering those issues, the BVI Court will properly take account of the views and interests of all those who are or claim credibly to be beneficially interested in the trust assets.

(3)    So far as Mr Tacon is concerned, however, in relation to the issue of whether the Trustees should act and expend monies in relation to the Third Amended Complaint, the position is, self-evidently, not that the Trustees should be neutral simply because he, Mr Tacon, makes a claim to the Trusts' funds and he wishes that to happen.  It is not his claim to the fund to which the Trustees' proposed directions relate at all.

(4)    On the contrary, the correct position, it is submitted, is that the BVI Court must have regard to the views of all those other beneficial claimants, other than Mr Picard, to the Trusts' funds, the express beneficiaries as well as Mr Tacon, and to the relative merits of their claims, in formulating its overall view as to whether to direct the Trustees to act as they request or not, as Mr Picard argues.

(5)    Hence Mr Tacon's views are potentially relevant, but cannot be determinative.

(6)    Moreover, in the present case, his views should properly be regarded as of little weight, compared to those of the principal beneficiaries, who do wish the motions in New York to proceed.

(7)    In the first place, Mr Tacon's own equitable proprietary claim to the Trusts' funds is a very weak one, resting in essence as it does on the reasoning in Chase Manhattan Bank v Israeli-British Bank [1981] Ch 105, a case the reasoning in which has been fundamentally

undermined by the House of Lords' decision in Westdeutsche
Landesbank v Islington LBC [1996] AC 669.

(8)   Secondly, he appears to overestimate the costs of the course of
action for which the Trustees seek directions at the same time as
ignoring the benefits to the true beneficial owners of the Trusts'
assets of that course of action: he describes the costs estimate of the
New York application as estimated by in Mr Walters' Affidavits as "by
no means negligible" (paragraph 8 of his Affidavits), which is of
course correct.  However, (a) those costs are very modest indeed
compared to the benefit that will accrue to the beneficial owners of
the Trusts' funds if the applications in New York which give rise to
them succeed, and (b) in any event, those costs are likely to be still
more modest than was anticipated when Mr Walters swore the
Walters Affidavits.  I address at Section K below the Trustees' current
best estimates of the costs of the New York motions.

## H.  The representation orders sought by the Trustees

103.   A yet further issue raised by Mr Zeballos' Affidavits is the representation
orders sought by the Applications, whereby the Trustees seek:

(1)   the appointment of Mr Grosso and Mr Ceretti to represent the adult
beneficiaries of the Ashby and El Prela Trusts respectively; and

(2)   the appointment of Mr Imrie to represent minor, unborn and
unascertained beneficiaries of each of the Trusts.

104.   Mr Picard opposes both these sets of appointments (see paragraphs 17(d)
and (e) of Mr Zeballos' Affidavits).

105.   In the first place, he contends in relation to both sets of appointments that "no
purpose" would be served by them.  In this, he is simply wrong.  It is inherent
in and fundamental to the *Beddoe* jurisdiction that the Court has before it the
beneficiaries of the relevant trust or, where more convenient, a representative
of the relevant classes of beneficiaries so that, if they have views on the
proper directions to be given to their trustees, the Court is able to hear,
canvass and discuss those views with them and with the trustees.  Given that
they are to be bound by the Court's decision to grant an indemnity to the

trustees in respect of the proceedings they propose, there will very rarely if ever be a case where some form of beneficiary representation is not called for: see generally *Alsop Wilkinson v Neary* [1996] 1 WLR 1220 at 1224E; *Lewin* op cit at 21-124.  This is not such an exceptional case, given the relatively wide range of the beneficial classes of both Trusts.

106.    Where, as here, a representation order is appropriate for adult beneficiaries of the trusts in question, it is again both usual and right that the representative be one of the current principal adult beneficiaries, since he or she has the best knowledge of the relevant trust and its affairs from amongst the beneficiaries. Hence he or she is best placed to ensure that the beneficiaries' interests are served by the directions sought and are duly considered at the application's hearing.

107.    Moreover, it is standard and appropriate to ensure that minor, unborn and unascertained beneficiaries have separate representation: their interests may not coincide with those of the existing principal adult beneficiaries, whose views are those which naturally the trustees will have had most exposure to and have been most influenced by.  Mr Imrie will be able to assess the position from the standpoint of those whose interests he is appointed to consider and represent.

108.    The Trustees do not expect him to do other than approve the directions they seek (otherwise, indeed, it would be unlikely that the Trustees would seek such directions).  But it would be inappropriate for them and the Court, or indeed for Mr Picard, simply to assume he will do so.

109.    Finally, objection is taken to the appointment of Mr Grosso and Mr Ceretti on the basis of *ad hominen* attacks on them by Mr Zeballos.  Even were they true, however, these are nothing to the point.  They do not give rise to a conflict of interest between Mr Grosso and Mr Ceretti on the one hand and the other members of the beneficial classes of the Ashby and the El Prela Trusts respectively on the other.

110.    On the contrary, all adult members of the beneficial classes retain a community of interest in relation to the directions sought by the Trustees and Mr Zeballos fails to suggest anything to the contrary.

111.    Since Mr Grosso and Mr Ceretti are, respectively, principal members of the beneficial classes of the two Trusts, and since they have the most knowledge and understanding of the Trusts, their affairs, and the issues raised by the Applications amongst the adult members of each Trust's beneficial classes, it remains the case that they are the most appropriate persons to be appointed as representative beneficiaries.

### I.    Update to the Court in relation to the Petition to wind up KML

112.    In the remainder of this Affidavit, I seek simply to update the Court as to relevant developments since the Walters Affidavits, including as to the Trustees' costs to date and the new estimate of the costs of the New York applications they seek a direction to make.

113.    The first such update matter is as to the winding up of KML.

114.    Since 16 November 2011 (the date on which Mr Walters swore the Walters Affidavits) Mr Roy Bailey and Ms Wanda Mello of Ernst & Young Limited ("**Ernst & Young**") have been appointed Joint Provisional Liquidators of KML. A copy of the Order made in the Supreme Court of Bermuda dated 18 November 2011 is at page 62.

115.    In order to facilitate such appointment, the Holding Companies considered whether it was appropriate for limited funding to be provided to the Joint Provisional Liquidators, to facilitate their appointment and to enable them to comply with their statutory functions.

116.    As set out at paragraphs 103 and 104 of the Walters Affidavits, KML had been without directors for some time, with the consequence that the Holding Companies, as beneficial owners of KML (holding shares via a nominee), were passing resolutions in order to allow KML to address various issues until Joint Provisional Liquidators (or replacement directors) could be appointed. In the circumstances, the Holding Companies considered it entirely appropriate to agree to provide limited funding to enable the Joint Provisional Liquidators to take over the running of KML in the absence of replacement directors.

117.    Accordingly, on 1 December 2011, the Holding Companies entered into a funding arrangement with Ernst & Young (page 67), whereby they agreed to advance US$200,000 for the limited purposes described therein. That funding

has been advanced to Ernst & Young by the Holding Companies, to be held on trust for each of them.

118. I note that at paragraph 9 of Mr Tacon's Affidavits sworn on 20 January 2012, he questions how the Holding Companies intend to meet the funding obligation. I can confirm that each of the Holding Companies has entered into a loan agreement with its 100% shareholder (the respective Trustees) for the sum of US$100,000, and that these sums have in turn been advanced to Ernst & Young as described above.

119. In this context I would note that on 15 February 2011 the Trustees gave an undertaking to Mr Tacon by way of a letter from Lawrence Graham to Withers BVI (page 71) in the following terms:

*"...without in any way being prevented from dealing with the assets of the Trusts in the ordinary course of business, including but not being limited to managing the Trusts' assets and/or settling reasonably incurred legal and other professional fees and expenses, that they will not move any of the Trusts' assets between jurisdictions or distribute any of them without giving your clients at least 14 days advance written notice (or such shorter period as shall be agreed with your clients in the circumstances) providing them with details of (a) where they propose to move them to; or (b) the amount of the proposed distribution and identity of the beneficiary concerned."*

120. An undertaking in similar terms was given to Mr Picard by way of Lawrence Graham's letter to Baker & Hostetler LLP (Mr Picard's US counsel) of 12 August 2011 (page 831 (Ashby) and 822 (El Prela) of Exhibit FOW1 to the Walters Affidavits). At the time of making the loans to the Holding Companies, the Trustees considered that such loans constituted the ordinary course of business of the Trusts. I would note that Mr Tacon has been aware of the funding of Ernst & Young by the Holding Companies since 12 October 2011 (and a copy of the draft funding agreement was provided to him and to Mr Picard's Bermuda representatives by email on 19 October 2011), but at no time has he sought to restrain it.

121. In accordance with notices to creditors and notices to contributories dated 30 November 2011, each of the Holding Companies submitted proofs of debt to Ernst & Young in the amount of US$900,000 plus interest, which debts arise

out of the loans made by each of the Holding Companies to KML, referred to at paragraphs 85 to 93 of the Walters Affidavits.

122.    In paragraph 9 of his Affidavits sworn on 20 January 2012, Mr Tacon also expresses concern regarding the loans to KML and asserts that they were not referred to in the Trustees' evidence in support of the Bermuda Directions Applications heard by this Court on 7 July 2011. In fact, details of the loans, together with the legally privileged advice received by the Trustees in respect of them, was put before the BVI Court in connection with that hearing. Given that such advice is confidential and legally privileged, it was not appropriate for details to be disclosed in open evidence. However, I can confirm that Charles J was made aware of the fact of the loans, the circumstances in which they were made and their terms.

123.    Meetings of creditors and contributories of KML were held on 9 December 2011, at which the Holding Companies were represented by Delroy Duncan of Trott & Duncan (the Trustees' Bermudian lawyers) as their proxy. At those meetings, Ernst & Young tabled the following resolutions:

(1)    Whether an application should be made to the Bermuda Court for KML to be wound up;

(2)    If so, who should act as the liquidator(s);

(3)    Whether an application should be made to the Bermuda Court for a committee of inspection to be formed; and

(4)    If so, who should be its members.

124.    I understand from Delroy Duncan and Amanda Mochrie of Trott & Duncan that the admitted creditors (which did not include the Kingate Funds or Mr Picard, whose proofs of debt were rejected by Ernst & Young) voted in favour of the resolutions that an application be made for KML to be wound up and that Ernst & Young be appointed liquidators. They also voted in favour of no committee of inspection being formed at the present time. The Holding Companies, as contributories, (by Mr Duncan as their proxy) voted in the same way.

125.    I am aware from information received from Trott & Duncan that Ernst & Young have recently made an application to the Bermuda Court for Mr Bailey and Ms Mello to be appointed Liquidators of KML. However, I have had sight of recent correspondence passing between Mr Tacon and Mr Picard's Bermuda representatives and Ernst & Young's solicitors, Wakefield Quin (pages 73 to 82), in which both Mr Tacon and Mr Picard have expressed an intention to oppose that appointment. Accordingly, no return date for Ernst & Young's application has been set.

### J.  Update to the Court on the costs of steps taken by the Trustees since Mr Walters' Affidavits

#### The Ashby Trustee

126.    In the Walters Affidavits (paragraphs 168 and 169) Mr Walters set out the total fees and disbursements incurred on behalf of the Ashby Trustee in connection with the Picard Claims.

<u>Third Amended Complaint</u>

127.    Between 30 October 2011 and 29 December 2011, the Ashby Trustee incurred further fees and disbursements in connection with the Third Amended Complaint, which at the exchange rate prevailing at 30 January 2012 equate to US$219,008.43.  This sum (which excludes other fees and disbursements incurred by the Ashby Trustee not connected to the Picard Claims and this application) is made up as follows:

    (1)    LG's fees:  £27,992.99;

    (2)    US Counsel's fees:  US$123,399.54;

    (3)    English Counsel's fees: £2,537.50;

    (4)    Other disbursements: £30,461.48.

128.    Certain of the above legal costs and disbursements incurred by the Ashby Trustee to date have arisen in connection with the preservation and collection of potentially relevant documents. The costs of this exercise have, for convenience, been designated as costs incurred solely in connection with the Third Amended Complaint.  However, it could be said that those costs should

more properly to be shared equally between the Third Amended Complaint, the English Claim and the Bermuda Proceedings.

129.    For the period beginning 8 June 2011 (being the date on which the Ashby Trustee first had sight of the Third Amended Complaint) and 29 December 2011, the total fees and disbursements attributable to document preservation and collection were approximately £55,727.77, which at the exchange rate prevailing at 30 January 2012 equates to US$87,432.48.

<u>English Claim</u>

130.    Between 30 October 2011 and 29 December 2011, the Ashby Trustee incurred further fees and disbursements in connection with the English Claim which at the exchange rate prevailing at 30 January 2012 equate to US$50,851.68.   This sum (which excludes other fees and disbursements incurred by the Ashby Trustee not connected to the Picard Claims and this application) is made up as follows:

(1)    LG's fees:  £5,911.50;

(2)    US Counsel's fees:  US$21,103.08;

(3)    English Counsel's fees: £12,862.60;

(4)    Other disbursements: £204.96.

**The El Prela Trustee**

131.    In the Walters Affidavits (paragraphs 167 and 168) Mr Walters set out the total fees and disbursements incurred on behalf of the El Prela Trustee in connection with the Picard Claims.

<u>Third Amended Complaint</u>

132.    Between 30 October 2011 and 29 December 2011, the El Prela Trustee incurred further fees and disbursements in connection with the Third Amended Complaint, which at the exchange rate prevailing at 30 January 2012 equate to US$218,763.45.   This sum (which excludes other fees and disbursements incurred by the El Prela Trustee not connected to the Picard Claims and this application) is made up as follows:

    (1)    LG's fees:  £27,845.99;

    (2)    US Counsel's fees:  US$123,399.54;

    (3)    English Counsel's fees: £2,537.50;

    (4)    Other disbursements: £30,456.61.

133.    Certain of the above legal costs and disbursements incurred by the El Prela Trustee to date have arisen in connection with the preservation and collection of potentially relevant documents. The costs of this exercise have, for convenience, been designated as costs incurred solely in connection with the Third Amended Complaint.  However, it could be said that those costs should more properly to be shared equally between the Third Amended Complaint, the English Claim and the Bermuda Proceedings.

134.    For the period beginning 8 June 2011 (being the date on which the El Prela Trustee first had sight of the Third Amended Complaint) and 29 December 2011, the total fees and disbursements attributable to document preservation and collection were approximately £55,727.77, which at the exchange rate prevailing at 30 January 2012 equates to US$87,432.48.

English Claim

135.    Between 30 October 2011 and 29 December 2011, the El Prela Trustee incurred further fees and disbursements in connection with the English Claim which at the exchange rate prevailing at 30 January 2012 equate to US$50,852.17.   This sum (which excludes other fees and disbursements incurred by the El Prela Trustee not connected to the Picard Claims and this application) is made up as follows:

    (1)    LG's fees:  £5,911.50;

    (2)    US Counsel's fees:  US$21,103.08;

    (3)    English Counsel's fees: £12,862.50;

    (4)    Other disbursements: £205.27.

### K.  Updated estimate of costs of future steps for which the Trustees seeks directions by the Applications

136.    Both Mr Zeballos and Mr Tacon refer to the estimates of costs of future steps to be taken by the Trustees, as set out at paragraphs 172ff and 171ff of the Walters Affidavits (see paragraph 101 of Mr Zeballos' Affidavit and paragraph 8 of Mr Tacon's Affidavit).

The English Claim

137.    At paragraph 101 of his Affidavit, Mr Zeballos suggests that the future costs of complying with the directions sought in this application in connection with the English Claim may be "substantially more" than US$3,000,000.

138.    With respect to him, this entirely misunderstands the nature of the present Applications.   As I have set out above, the Trustees do not seek any substantive directions in relation to the English Claim, save for the BVI Court's approval of the current informal "stay" of those proceedings, details of which are set out in paragraphs 150ff and 149ff of the Walters Affidavits. That is why no such costs estimate was included in relation to the English Claim.

139.    Naturally, if and when Mr Picard elects actively to pursue the English Claim against the Trustees, they will of necessity have to make further applications to the BVI Court for directions as to how they should proceed with respect to that proceeding.   At that time, the Trustees will provide to the Court an estimate of the likely future costs of complying with the directions sought in any such application. In the interests of being entirely transparent, the Trustees have, however, provided details of the costs incurred to date in connection with the English Claim above.

The Third Amended Complaint

140.    At the date of swearing the Walters Affidavits, the scope of the various motions to be made in connection with the Third Amended Complaint, in respect of which the Trustees seek directions, had not yet been fully determined.

141.    I understand from reading the Affidavit of Timothy Harkness that the nature of certain recent decisions in New York has provided greater clarity on the scope

of those motions. Accordingly, it has been possible to refine the estimates of future costs, with the effect that the total amount has been significantly reduced.

142.    Copies of those revised costs estimates are at pages 83 and 84. The grand total payable by each Trustee (assuming the costs are borne equally by the Ashby Trustee and the El Prela Trustee) at the exchange rate prevailing at 30 January 2012, including both estimated fees and disbursements, is US$390,754 to US$615,854.

SWORN by the above-named **JEREMY EDWARD NEEDHAM ANDREWS**)

at  4, MORE LONDON RIVERSIDE, LONDON, SE1 2AU

this  31  day of January 2012

Before me

Solicitor~~Commissioner for Oaths~~

SVATAVA  SPRAGUE
NORTON ROSE LLP
3, MORE LONDON RIVERSIDE
LONDON, SE1 2AQ

42

On behalf of: Claimant
J E N Andrews
1st Affidavit
Exhibit "JENA1"
31 January 2012

**THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**CLAIM NUMBER BVIHCV 2011/0154 and BVIHCV 2011/0155**

**BETWEEN:**

**FIRST PENINSULA TRUSTEES LIMITED (AS TRUSTEE OF THE ASHBY TRUST)**
<u>Claimant</u>

**-and-**

**(1) IRVING H PICARD (as trustee for the substantively consolidated SIPA liquidation of Bernard L Madoff Investment Securities LLC and the estate of Bernard L Madoff)**

**(2) KINGATE GLOBAL FUND LIMITED (IN LIQUIDATION) (acting by William R Tacon and Richard E Fogerty as joint liquidators)**

**(3) KINGATE EURO FUND LIMITED (IN LIQUIDATION) (acting by William R Tacon and Richard E Fogerty as joint liquidators)**

**(4) CARLO GROSSO (as representative of the adult beneficiaries of the Ashby Trust)**

**(5) MAC IMRIE (as representative of the minor and unborn beneficiaries of the Ashby Trust)**

**(6) HER MAJESTY'S ATTORNEY GENERAL OF THE BRITISH VIRGIN ISLANDS**
<u>Defendants</u>

_____

**AFFIDAVIT OF
JEREMY EDWARD NEEDHAM ANDREWS**
_____

**Maples & Calder**
Sea Meadow House, PO Box 173
Road Town
Tortola VG1110
British Virgin Islands

Ref:  ADI/660226