The Consultancy Agreements provide (clause 2.2):

*"FIM hereby agrees with [KML] to act as a consultant to [KML] to provide such advice and recommendations as [KML] may from time to time require in connection with its management of the Company's assets and in the implementation of the investment objectives and policies of the Company in accordance with the provisions of the Management Agreement."*

82. The consulting and other services which FIM Limited was to provide to KML under the terms of the Consultancy Agreements include (clause 3):

- reviewing the relevant Fund's structure and operating procedures;
- preparing analysis and reports;
- providing KML with assistance and support on investor relations;
- liaising with KML on matters relating to the relevant Fund's investment programme;
- providing KML with advice regarding the relevant Fund's hedging activities and overseeing the execution of its recommendation; and
- providing advice to and assisting KML on aspects of the relevant Fund's operational, administrative, accounting and legal matters as may be required.

83. As part of its compliance with the Consultancy Agreements, at the end of each month, FIM received from Kingate Management Limited a copy of the monthly statements of the Kingate Funds' accounts at BMIS. These statements of account were issued by BMIS (a regulated broker-dealer) and purported to contain the full detail of all transactions effected during the month for the Kingate Funds' portfolios, as well as the full details of month-end positions. The statements, and resulting analysis work, provided FIM with an exceptional level of transparency which was far and above the level of transparency typically afforded by an alternative investment fund to its investors, and enabled FIM to gain a strong understanding of the source of returns of the portfolios' "split-strike conversion" strategy.

84. Every month, FIM conducted an extensive analysis of these statements (constituting a series of reports per month), which included:

- Confirmation that the portfolios' strategy ("split-strike conversion") was being executed in accordance with the trading guidelines between the Kingate Funds and BMIS, together with a confirmation that the portfolios were always properly hedged against market moves;
- Checking the price paid/received on the purchase/sale of stocks and options to ensure that such price was within the range of prices for such stocks and options on the day of the trade; and
- Calculating the portfolios' profit and loss attribution and the total gross profit and loss for the month.

85. The Consultancy Agreements provide (clause 4.1) that FIM has no power or authority to enter into any transaction on behalf of, or in any way to bind KML.

86. The Consultancy Agreements also provide that, in consideration for its services under the relevant agreement, FIM Limited shall be due a monthly consultancy fee

7447031.3

391

from KML (clause 11 and schedule 1). In the case of both Consultancy Agreements, the amount of these fees was subsequently amended by side letters dated 7 June 2001 (at tab 29).

87. FIM Limited's obligations and benefits pursuant to the Consultancy Agreements were transferred to FIM Advisors LLP by deeds of novation dated 29 July 2005 (at tabs 30 and 31).

*Disclosure to third parties of FIM's role as consultant*

88. FIM Limited's role as consultant to KML was fully disclosed, including to potential investors.

*Information Memoranda*

89. The most recent Information Memorandum for Global Fund dated 6 October 2008 (at tab 4) contained the following statement:

"*The Consultant*

*The Manager has appointed FIM Advisers LLP "FIM" as its consultant in relation to certain aspects of the Fund's operations (the "Consultant").*

*The Consultant was incorporated on October 8, 2004 as a limited liability partnership under English Law. On August 1, 2005, the Consultant took over the business of its affiliate, FIM Limited, an asset management company with over twenty years of experience. The Consultant is a leading alternative investment management company, specialising in the creation and management of portfolios of hedge funds for institutions and private clients on a global basis. The Consultant is authorised and regulated by the Financial Services Authority ("FSA") of the United Kingdom. As at the date of this document, the Consultant acts as investment/fund advisor in respect of funds with assets totalling in excess of US$7.3 billion.*

*In addition to its role as Consultant to the Fund, the Consultant acts as investment and/fund advisor to several other investment management companies that manage a variety of funds and single-manager funds.*

*... pursuant to the FIM Consulting Services Agreement, the Consultant renders consulting advice to the Manager with respect to certain aspects of the Fund's operational, administrative, marketing, accounting and legal matters.*"

90. The most recent Information Memorandum for Euro Fund dated 6 October 2008 (tab 5) contains the same disclosure, save that it states:

"*...the Consultant acts as <u>discretionary investment manger, or as Investment/Fund Advisor</u>, in respect of funds totalling in excess of US$7.3 billion.*" (emphasis added).

*Financial statements*

91. The audited financial statements for Global Fund as at 31 December 2007 (tab 13), as prepared by PwC, contain the following disclosure regarding FIM Limited's role:

92. "*Pursuant to the Consulting Services Agreement dated December 1, 1995 , FIM Limited (the "Consultant") has been appointed to provide consultancy services to [KML]. The Consultant is compensated by [KML], at no additional cost to the company.*"

93.  The audited financial statements for Euro Fund as at 31 December 2007 (at tab 14), again as prepared by PwC, containing the following disclosure regarding FIM Limited's role:

*"Pursuant to the Consulting Services Agreement dated May 1, 2000 FIM Limited (the "Consultant"), has been appointed to provide consultancy service to [KML]. The Consultant is compensated by [KML], at no additional cost to the Company."*

### Distribution Agreements

94.  In addition, on 23 April 2001, KML as manager of the Kingate Funds entered into distribution agreements with FIM Limited relating to both Kingate Funds (respectively the "**Euro Distribution Agreement**" and "**Global Distribution Agreement**", together the "**Distribution Agreements**"). Copies are at tabs 32 and 33. The Distribution Agreements were also consistent with the authorisation provided to KML under the Management Agreements for KML to appoint delegates to assist it in the discharge of its functions under those agreements.

95.  Pursuant to the Distribution Agreements, FIM Limited was appointed as non-exclusive distributor for the sale of Shares in the Kingate Funds. The distribution services to be provided by FIM Limited pursuant to the Distribution Agreements include (clause 3):

- identification and solicitation of prospective investors to purchase Shares in the relevant Fund;

- introduction of such prospective investors to KML;

- maintenance of regular contact with investors introduced to KML;

- preparation of marketing and other material;

- supervision of distribution lists to keep prospective and existing investors informed of developments with regard to the relevant Fund; and

- generally, the provision of such services as might be required by KML to enable it to fulfil its duties with regard to the placement of Shares in the relevant Fund in accordance with the provisions of the relevant Management Agreement.

96.  The Distribution Agreements provide that, in consideration for its services under the relevant agreement, FIM Limited shall be due a monthly distribution fee from KML (clause 6 and schedule 1).

97.  FIM Limited's obligations and benefits pursuant to the Distribution Agreements were transferred to FIM Advisers LLP by deeds of novation dated 29 July 2005 (at tabs 34 and 35).

7447031.3

393

*Fees earned by FIM in return for services rendered to KML*

98. FIM provided both consultancy and distribution services to KML, in return for which it earned fees, as explained above. The amount of these fees is shown in the table below. As can be seen from that table, throughout the period 2005 – 2008 inclusive this fee income represented a very small proportion (2.6% or less) of FIM's annual turnover. During the period 2005 – 2008 inclusive, the total fee income earned by FIM from the Consultancy Agreements and Distribution Agreements was US$ 1,801,164. This represented just 2.1% of the total turnover of FIM over the same 4 year period.

| Year | Consultancy USD | Consultancy EUR | Distribution USD | Total USD | FIM Total Turnover USD | % FIM annual turnover |
|---|---|---|---|---|---|---|
| 2005 | 180,000 | 57,760 | 175,909 | 402,520 | 15,149,680 | 2.6% |
| 2006 | 180,000 | | 249,470 | 429,470 | 18,529,781 | 2.3% |
| 2007 | 180,000 | | 317,455 | 497,455 | 31,975,962 | 1.5% |
| 2008 | 180,000 | | 291,719 | 471,719 | 20,586,380 | 2.3% |
| Total | 720,000 | 57,760 | 1,034,553 | 1,801,164 | 86,241,803 | 2.1% |

*[Note: these figures are in Euro and US$. The figures in the table at paragraph 74 are the GBP equivalent.]*

99. Besides the consultancy and distribution fees earned by FIM and referred to above, none of the entities or individuals involved with the FIM Group derived any fees or other income from the Kingate structure. Nor did any of the entities or individuals involved with the FIM Group ever receive any fee or other payment either from Madoff, BMIS, or from any individual or entity related to Madoff or BMIS.

**Explanation of the Trusts' structure**

100. The Ashby Trust is a trust formed under the laws of Jersey on 24 March 1994. The Settlor is Carlo Grosso. The beneficiaries comprise exclusively Carlo Grosso and members of his family. The trustee is First Peninsula Trustees Limited.

101. The El Prela Trust is a trust formed under the laws of Jersey on 7 April 1994. The settlor is Federico Ceretti. The beneficiaries comprise exclusively Federico Ceretti and members of his family. The trustee is Port of Hercules Trustees Limited.

102. The Ashby Trust and the El Prela Trust (each a "Trust", together the "Trusts"), have only two functions:

- To hold shares in KML; and
- To manage their assets.

103. Many common-law jurisdictions, including those in the United Kingdom and the Channel Islands recognise the concept of trusts, which derive from the recognition of such common law jurisdictions that the ownership of property consists of both legal and equitable interests. The history of the trust dates back to the feudal system of land ownership operative in medieval England, at which time all land was technically owned by the king, while others enjoyed the right to use that land as his tenants.

7447031.3

394

Under a modern trust, the legal and equitable ownership of the trust property are separated and held by different persons. The legal title is vested in the trustee of the trust who must apply the property for the benefit of someone else, commonly termed the "beneficiary" who the law regards as being the equitable owner of the property. As legal owner, the trustee controls the property. He is entitled to decide whether it should be retained or sold, and how it is to be invested. The trustee may have the right to determine how the property should be distributed amongst the beneficiaries. However, he must not exercise his rights to deal with the trust property for his own personal advantage, and the law will prevent him from applying the trust property inconsistently with terms of the trust, which terms define the entitlement of the beneficiaries. In turn, the beneficiaries cannot dictate to the trustee how he exercises control over the trust property.

105. Article 2 of the Hague Convention on the Law Applicable to Trusts and on their Recognition dated 1 July 1985 (the "**Hague Convention**"), contains the following definition of a "trust":

*"For the purposes of this Convention, the term "trust" refers to the legal relationship created – inter vivos or on death – by a person, the settlor, when assets have been placed under the control of a trustee for the benefit of a beneficiary or for a specified purpose.*

*A Trust has the following characteristics –*

(a) *The assets constitute a separate fund and are not part of the trustee's own estate;*

(b) *Title to the trust assets stands in the name of the trustee or in the name of another person on behalf of the trustee;*

(c) *The trustee has the power and the duty, in respect of which he is accountable, to manage, employ or dispose of the assets in accordance with the terms of the trust and the special duties imposed upon him by law.*

*The reservation by the settlor of certain rights and powers, and the fact that the trustee may himself have rights as a beneficiary, are not necessarily inconsistent with the existence of a trust".*

106. The Principality of Monaco acceded to the Hague Convention on 1 June 2007.

107. Until 31 March 2008, the Trusts owned the entire share capital of KML in equal shares. Following a restructuring of the Trusts on or shortly after that date, KML is now wholly-owned by Ashby Holding Services Limited and El Prela Group Holding Services Limited in equal shares. A structure chart is at tab 36.

108. The restructuring of the Trusts and the transfer of the shares in KML from the Trusts to Ashby Holding Services Limited and El Prela Group Holding Services Limited that took place in 2008 was carried out for the reasons set out below.

108.1 KML earns management fees under the Management Agreements, as explained above. Under the original structure of the Trusts, earnings made by KML which derived from these management fees were paid as dividends to the relevant trustees of the Trusts (each a "**Trustee**", together the "**Trustees**") by KML in equal shares. The Trustees invested a significant portion of this income directly in hedge funds, including the Kingate Funds (see below).

7447031.3

395

Carlo Grosso and Federico Ceretti are designated "resident non-domiciled" in the United Kingdom. As such, while they are UK taxpayers, they enjoy a special tax regime in the UK. The structure of The Ashby Trust, the El Prela Trust and their subsidiary companies is designed to allow Carlo Grosso and Federico Ceretti – as beneficiaries of the two trusts – legitimately to benefit from this tax regime.

108.3 In late 2007/early 2008, the first drafts of the new United Kingdom Finance Bill were published. This introduced the possibility of several changes to the UK legislation governing the taxation of UK resident non-domiciliaries. It appeared possible that capital gains made by the Trusts after 5 April 2008 might attract a less favourable tax treatment from the perspectives of those beneficiaries of the Trusts (including Carlo Grosso and Federico Ceretti) who were subject to taxation in the United Kingdom as UK resident non-domiciliaries. It appeared at the time that a line might be drawn as at 5 April 2008 distinguishing Trust gains that had been *"accrued or realised"* before that date and those *"accrued or realised"* after that date, with the old gains being taxed under the old rules (and so not giving rise to a charge to tax for UK resident non-domiciliaries) and the new gains being taxed under the new regime (where there would be a charge to tax). There was no certainty at that stage as to whether revaluing provisions might be introduced in the new legislation (which provisions might mitigate the impact of the changes in the law).

108.4 Given the uncertainty prevailing at the time, Leading English tax Counsel was instructed to consider the best action for the Trusts. Leading Counsel considered that it would be advisable to trigger gains in the Trusts before 5 April 2008, so as to constitute actual disposals, rather than relying on the possibility that revaluation provisions might be introduced in the forthcoming litigation. This would have the effect of establishing a new higher base cost of these assets against which any future capital gains might be assessed. Accordingly it was deemed prudent by the Trustees to revalue the Trusts' assets in this manner.

109. It was concluded that the most efficient way of effecting this revaluation was to transfer the Trusts' shares in KML to two newly incorporated holding companies owned by the Trusts (each a "**Holding Company**"), and to transfer all the Trusts' hedge fund investments from the Trusts to two newly incorporated investment companies also owned by the Trusts (each an "**Investment Company**"). The revaluation therefore took the following form:

109.1 The Trustees incorporated two new British Virgin Island companies for each Trust. For The Ashby Trust, the Holding Company was called Ashby Holding Services Limited and the Investment Company was called Ashby Investment Services Limited. For The El Prela Trust, the Holding Company was called El Prela Holding Services Limited and the Investment Company was called El Prela Trading Investments Limited.

109.2 The Trustees each sold their respective Trust's shareholdings in KML to the relevant Holding Company. This sale was deemed to occur at market value for UK tax purposes (i.e. at a price that was greater than the original cost of the KML shares). The shares in KML were therefore revalued to market value for UK tax purposes. The sale proceeds were left outstanding on loan account. It was envisaged that dividend income from KML would be used by both Holding Companies to repay those loans and that, when the loans were repaid, the respective Holding Companies might pass dividends on to the Trustees of the Trusts.

109.3 At the same time, the Trustees sold each Trust's hedge fund holdings to the relevant Investments Company for market value, therefore revaluing those holdings to market value for UK tax purposes. Again, the sale proceeds of this transaction were left outstanding on loan account.

7447031.3

396

110. The SICCFIN Report suggests that the setting up of structures such as the Trust structures explained above *"superimposes screens likely to cut all links with the origin of the Funds"*. This suggests some element of bad faith in the motives of those responsible for the Trust structures. As explained above, the motives in this case were essentially dictated by UK tax and normal family estate planning considerations; the structure of the Trusts and their respective Holding and Investment Companies is perfectly legitimate from the perspective of English law (and, I understand, Jersey law, being the law applicable to the Trusts ) and the restructuring methodology described above is by no means unusual.

111. I understand from the Trustees that the effect of this restructuring was purely to maximise the tax-efficiency of the Trust structures in light of the anticipated changes to UK tax legislation for resident non-domiciliaries.

112. Further evidence of the good faith and legitimate motives behind the restructuring of the Trusts is that the restructuring itself was carried out in advance of the beginning of the new UK tax year (running from 6 April 2008 to 5 April 2009). It was necessary to have the restructuring in place before 6 April 2008 in order to ensure the minimum tax exposure for those UK-resident non-domiciled beneficiaries of the Trusts in the future. In the event, I understand that the revaluation referred to above was carried out on 31 March 2008.

113. There is no opacity whatever in the existing structures of the Trusts. The Holding Companies receive dividends from KML and use the money to either (i) repay the loan from the Relevant Trust that enabled them to acquire the shares in KML in the first place; or (ii) lend money to the relevant Investment Company to make further investments (at all times these investments remained part of the assets of the Trusts). Accordingly, the restructuring continues to enable both Trusts to perform their functions described at paragraph 102 above.

**Trusts' investment in the Kingate Funds**

114. At the heart of the Freezing Order is the suggestion that BMIS acted as manager of the Kingate Funds. This is not and never has been the case: as described above, KML is manager to both Kingate Funds. BMIS was simply the investment advisor to the Kingate Funds, responsible for implementing the Kingate Funds' investment policy.

115. Both KML and the Kingate Funds are victims of the alleged fraudulent activities of Madoff and BMIS. Both the Kingate Funds and KML have been deceived by the activities of BMIS acting as investment advisor to the Kingate Funds. In the same way, the Trusts have been deceived. As noted above, both Trust Investment Companies hold significant investments in hedge funds. These holdings include both direct and indirect holdings in the Kingate Funds, as described further below.

116. Since 1 March 1998 (for The Ashby Trust) and 30 September 1999 (for The El Prela Trust), the Trusts (latterly through their respective Investment Companies) have invested (at cost) a total in excess of US$40 million in the Kingate Funds. Such investments were made in three ways:

7447031.3

397