*Direct subscription for shares in the Kingate Funds*

117. Both Trusts have invested directly in Global Fund. The loss attributable to these investments is as follows:

- *The Ashby Trust*: investment at cost of: US$2,096,404.23
  - Value as at latest NAV date: US$3,568,386.86
  - Value today: US$0.00
- *The El Prela Trust*: investment at cost of: US$3,078,700.03
  - Value as at latest NAV date: US$3,272,187.80
  - Value today: US$0.00

*Investment in structured products*

118. Both Trusts have invested indirectly in the Kingate Funds by way of the following investments in structured notes issued by Boiro Finance B.V. ("Boiro"), being a wholly owned subsidiary of Banco Bilbao Vizcaya Argentaria, S.A ("BBVA"). The loss attributable to these investments is as follows:

- *The Ashby Trust*: investment at cost of: US$13,222,928.50
  - Value as at latest NAV date: US$15,783,250.00
  - Value today: US$0.00
- *The El Prela Trust*: investment at cost of: US$13,828,298.50
  - Value as at latest NAV date: US$16,433,550.00
  - Value today: US$0.00

*Investment in funds of funds*

119. Both Trusts also invested in certain funds of funds which themselves held investments in the Kingate Funds. The value of each Trust's holdings in the funds of funds concerned have, without exception, declined as a consequence of their exposure to the Kingate Funds and as a direct result of the activities of Mr Madoff and/or BMIS. The losses attributable to such exposure are as follows:

- *The Ashby Trust*: US$3,834,898.00
- *The El Prela Trust*: US$4,263,479.00

**No payments to or from Madoff or BMIS**

120. Over the 14 years since the Trusts were settled in 1994, the Trustee of The Ashby Trust has made a number of distributions to Carlo Grosso in his capacity as a discretionary beneficiary of that Trust (the "**Grosso Distributions**"), while the Trustee of The El Prela Trust has made a number of distributions to Federico Ceretti in his capacity as a discretionary beneficiary of that Trust (the "**Ceretti Distributions**").

7447031.3

398

121. Having spoken to the Trustees, I am informed and believe that, besides certain professional fees incurred by the Trusts during their lifetime, and as at the date of the Freezing Order:

- The only distributions made from The Ashby Trust were the Grosso Distributions; and

- The only distributions made from The El Prela Trust were the Ceretti Distributions.

122. In an attempt to expedite and assist any ongoing investigations into this matter, Carlo Grosso and Federico Ceretti are providing sworn affidavits (at tab 37 and 38) confirming as appropriate that, to the best of their knowledge, information and belief:

- At no time have any of the assets comprising the Grosso Distributions or the Ceretti Distributions been transferred either directly or indirectly to Madoff, BMIS, or to any individual or entity related to Madoff or BMIS; and

- Neither Madoff, nor BMIS, nor any individual or entity related to Madoff or BMIS has benefitted in any way from the Grosso Distributions or the Ceretti Distributions.

123. Furthermore, the affidavits referred to above will confirm that, to the best of Carlo Grosso's and Federico Ceretti's knowledge, information and belief:

- At no time throughout the relevant period were they or any person or entity related to them or anyone in office or employment with any of the Kingate Funds, KML, FIM, the FIM Group, the Trusts or the Trusts' subsidiary companies aware of the alleged fraudulent activities of Madoff and/or BMIS;

- Neither they nor any persons or entities related to them, nor any of the Kingate Funds, KML, FIM, the FIM Group, the Trusts or the Trusts' subsidiary companies ever received any fee or other payment either from Madoff, BMIS, or any individual or entity related to Madoff or BMIS; and

- Neither Madoff nor BMIS nor any individual or entity related to Madoff or BMIS ever received any fees or any other kind of payment whatsoever either from them or any person or entity related to them, or from the Kingate Funds, KML, FIM, the FIM Group, the Trusts or the Trusts' subsidiary companies (besides trading commissions referred to at paragraph 43 above).

124. In English law, the making of an affidavit requires the deponent to swear on that deponent's holy book that the contents of the affidavit are true. I have advised both Carlo Grosso and Federico Ceretti that, under English law, a statement made by a person lawfully sworn in England for the purposes of a judicial proceeding in a tribunal of any foreign state (such as the Principality of Monaco) is treated as a "*statement made in a judicial proceeding*" for the purposes of the Perjury Act 1911, which is the Act of the United Kingdom Parliament that defines the law of perjury in England. According to section 1 of the Perjury Act 1911, if any person lawfully sworn as a witness in a judicial proceeding wilfully makes a statement material in that proceeding, which he knows to be false or does not believe to be true, he shall be guilty of perjury, and shall, on conviction thereof be liable to be imprisoned.

125. I therefore believe that Carlo Grosso and Federico Ceretti understand the significance of swearing the affidavits referred to above, and the severe consequences that they might face were it proven they made the statements

7447031.3

399

contained in their respective affidavits knowing them to be false or without belief in their truth.

**Instructions for transfer of the Trusts' funds**

126. The Payment Instructions ordering the transfer of funds from the Trusts were sent to HSBC Monaco on 12 and 15 December 2008, as detailed further above. Copies of the Payment Instructions are at tab 2.

127. The Payment Instructions were I understand made by the Trustees of the Trusts as a reaction both to the Trusts' perceived over-exposure to HSBC given the emergence of the global banking crisis which began to unfold during the latter part of 2008 and the emerging Madoff affair. At a time when banks across the globe were coming under pressure as a result of the "credit crunch", it was widely acknowledged that diversification of investment portfolios between banks was a prudent investment management practice. This was strengthened as the scale of the Madoff affair began to be made clear.

128. The Trusts' respective substantial holdings with HSBC as at 17 December 2008 (the date of the SICCFIN Report) were as follows:

*The Ashby Trust*

| Account number | Name | Value (US$) |
| --- | --- | --- |
| 53062 | First Peninsula Trustees as Trustees of the Ashby Trust | 60,335,853.92 |
| 61962 | Ashby Investment Services Limited | 42,508,194.80 |
| TOTAL | | 102,844,048.70 |

*The El Prela Trust*

| Account number | Name | Value (US$) |
| --- | --- | --- |
| 53063 | Port of Hercules Trustees Limited as Trustee of the El Prela Trust | 29,444,955.09 |
| 61978 | El Prela Trading Investments Limited | 25,572,891.25 |
| TOTAL | | 55,017,846.34 |

129. Given the size of these holdings, I understand that the Trustees were motivated to make the Payment Instructions.

130. The movement of substantial funds between Trust accounts was normal practice for the Trustees. On 2 October 2008, at a time when there was a perception that Fortis Bank might collapse, the Trustee of The Ashby Trust transferred approximately $7.2 million from an account at Fortis Bank to HSBC Monaco (which, at the time, was considered more stable). This had the effect of transferring The Ashby Trust's entire cash balance at Fortis Bank to HSBC Monaco. Given the concern as to the stability

7447031.3

400

of Fortis Bank, it was instructed by the Trustee as a matter of urgency, and involved the sale of an investment at a loss in order to be effected.

131. Concerns as to the stability of HSBC emerged in early December 2008 and appeared to be justified by the subsequent sharp fall in HSBC's share price from mid-December 2008 onwards. A chart illustrating this fall is at tab 39.

132. Prior to the Payment Instructions being made, Fortis Bank (of which Fortis Bank (C.I.) Limited is a wholly-owned subsidiary) had been nationalised by the Dutch government. The Trustee of The Ashby Trust therefore decided to transfer sums from HSBC Monaco into accounts with Fortis Bank which, as a consequence of its state ownership, was considered unlikely to fail.

133. It was also the intention of the Trustee of The Ashby Trust further to spread its risk by placing assets with other financial institutions. Enquiries had been made with banks in Geneva, Switzerland including Lombard Odier Darier Hentsch & Cie, Pictet & Cie and Mirabaund. While no transfers had taken place in light of these enquiries, the Trustee of The Ashby Trust was holding substantial amounts of cash on account at HSBC Monaco preparatory to opening an account with one or more other banks once the necessary due diligence was completed.

Again prior to the Payment Instructions being made and in the emergence of the banking crisis, the Trustees of The El Prela Trust sought to open a bank account with Lombard Odier Darier Hentsch & Cie in Geneva, Switzerland in order to achieve further portfolio diversification. The account was activated on 29 October 2008.

134. The Trustee of The El Prela Trust had accumulated a sizeable cash holding in its account with HSBC Monaco (approximately US$25 million), part of which (US$15 million) was intended to be transferred to this new account.

135. The following additional points are of note:

135.1 The Payment Instructions were the latest in a series of such instructions made by the Trustees to HSBC Monaco since the Accounts were first opened; they therefore represented the continuation of a banking relationship relating to accounts with which HSBC Monaco was and is intimately familiar. Indeed the SICCFIN Report acknowledges that *"the activities of these accounts, both open since 2001, have remained consistent with what was declared at the time of opening"*. In fact, over the years, several transfers have been made from the Trusts' accounts at HSBC Monaco to the Trusts' accounts with Fortis Bank, and from the Trusts' account at Fortis Bank to the Trusts' accounts with HSBC Monaco;

135.2 At no time were the Trustees' decisions to issue the Payment Instructions motivated by a concern to remove funds from the Principality of Monaco. I am informed by the Trustees that their concern was simply to rectify a perceived over-reliance of the Trusts on the fortunes of a single bank. However, since neither of the Trusts had other existing banking relationships in the Principality besides those with HSBC Monaco, instructions were given by the Trustees to transfer funds to other banking institutions in different jurisdictions where the Trusts did have existing banking relationships;

135.3 This perceived over-reliance of the Trusts on the fortunes of HSBC was due not only to the fact that the size of the Trusts' portfolios held at HSBC Monaco were substantially larger than the size of the Trusts' portfolios held at other banking institutions. The objective of portfolio diversification became even more urgent in light of the emergence of the Madoff affair. This was not only because of the already fragile state of the banking system, but also because it was understood that

7447031.3

401

many banks themselves had significant exposure to Madoff. This has since been illustrated by the number of civil actions which have been commenced against HSBC and other banks in relation to the Madoff affair. Additional factors included:

- The Bank of Bermuda (wholly-owned by HSBC) was the banker to the Kingate Funds and to KML;

- HSBC had subscribed to the Kingate Funds on behalf of its clients;

- There were numerous market rumours at the time that HSBC might be acting as banker or administrator to other funds which had provided assets to BMIS besides the Kingate Funds;

- HSBC Guernsey was the custodian, administrator and banker to a large fund of hedge funds managed by FIM;

- HSBC London was the banker to FIM and certain subsidiaries of the FIM Group; and

- HSBC London is a personal banker to both Carlo Grosso and Federico Ceretti.

135.4   The Payment Instructions were not the result of any intention on the part of the Trustees to remove assets from the Trusts. The Payment Instructions request transfers between accounts in the legal ownership of the Trusts and do not represent an attempt to distribute assets of either Trust. At all times, the Trustees' only concern was to preserve the assets of the Trusts. I am informed by the Trustees that at no time during the relevant period did the Trustees engage in any discussions regarding the possibility of making any distributions from the Trusts to the beneficiaries or otherwise.

135.5   The Payment Instructions related to transfers of funds to recognised banking jurisdictions (Guernsey and Switzerland).

Federico 61

136.    The account numbered 60543 with HSBC Monaco in the name Federico 61 ("Federico 61") is a personal account owned by Federico Ceretti. As at 31 December 2008 this account had a value of €5,525,285.

137.    The Freezing Order had the effect of freezing this account. The following points should be noted:

137.1   The assets of Federico 61 are legally owned by Mr Ceretti. I understand that those assets represent the assets of a trust structure wholly separate from The El Prela Trust and wholly unrelated to KML or the Kingate Funds, which was liquidated prior to September 2007;

137.2   Federico 61 is wholly unrelated to the Trusts and to the accounts with HSBC Monaco held by the Trusts or their subsidiary companies. Nor does the account or its assets have any connection (direct or indirect) with the activities (alleged or otherwise) of Madoff or BMIS; and

137.3   None of the assets in Federico 61 are derived from any distributions made or dividends paid by KML, or to the Ceretti Distributions or the Grosso Distributions, or to consultancy or distribution fees earned by FIM from KML.

### No sequestration/freezing orders in other jurisdictions

138. I understand that HSBC has been involved in seeking to freeze assets which it considers to be related to the Madoff affair in at least one other jurisdiction. On or after 9 January 2009, The Bank of Bermuda (a subsidiary of HSBC) took steps to freeze certain accounts held with that bank in the name of KML and the Kingate Funds. This was a unilateral act taken without sanction of any court. The relevant accounts of KML have since been unfrozen. I also understand that the Supreme Court of Bermuda has recently allowed an application that certain business expenses of the Kingate Funds be allowed to be paid from the relevant frozen accounts pending the expedited hearing of an application by the Kingate Funds that those accounts be unfrozen permanently. A copy of the order of the Supreme Court of Bermuda is at tab 40.

139. To the best of my knowledge, information and belief, no claims of any kind have been made (still less proven) by any party against the Kingate Funds, KML, FIM, the FIM Group the Trusts, the Holding Companies, the Investment Companies, Federico Ceretti or Carlo Grosso whether in connection with the Madoff affair or otherwise. Nor has any other national authority or court taken any step to grant attachments of assets owned by these entities or individuals.

140. To the best of my knowledge, information and belief, the Freezing Order is the only order freezing assets which has been granted by a court in the light of the Madoff affair, including in the United States (which the exception of the order of the United States District Court freezing the assets of Mr Madoff and BMIS themselves, granted on 12 December 2008). This is despite the fact that a large number of civil claims have been commenced as a consequence of the affair, which claims have been commenced in a number of jurisdictions and against a variety of defendants.

141. As at the date of this witness statement, I am aware of the existence of just one application having been made for an injunction freezing the assets of a party to proceedings relating to the Madoff affair. That application was made on 9 January 2009 in the United States case of *Pacific West Health Medical Centre Inc. Employees Retirement Trust and Others –v- Fairfield Greenwich Group and Others* (Civil Action No. 09CV00134 (UA) in the United States District Court, Southern District of New York). A copy of the Plaintiff's memorandum in support of that application is at tab 41. The Defendant's memorandum in opposition to the Plaintiff's application is at tab 42.

142. The Plaintiff's application in *Pacific West* was made in an attempt to freeze the proceeds from management, performance and placement fees paid to the defendants to that case, which fees were derived from investments made in another so-called "feeder fund", whose assets were invested by BMIS (The Fairfield Sentry Fund). The application was denied by the Court, having considered the arguments made by both sides. The Court order dated 16 January 2009 is at tab 43.

143. In my respectful opinion, given the information set out above and the complete absence of any allegations whatsoever of wrongdoing on the part of the Applicants (far less any allegations of any merit) there are no grounds for maintaining the Freezing Order.

Conclusion

144.  Further to the information provided above, and in conclusion, I would note the following (adopting the order set out at paragraph 12 above):

145.  *Set out clearly and in full detail the relationship between the Applicants, the Kingate Funds, Kingate Management Limited, FIM Advisers LLP, The Ashby Trust and The El Prela Trust:*

- KML is and has always been the duly appointed and authorised manager of the Kingate Funds. Neither Madoff nor BMIS are or have ever been manager of the Kingate Funds.

- KML is owned jointly and in equal shares by Ashby Holding Services Limited and El Prela Group Holding Services Limited.

- Ashby Holding Services Limited is wholly-owned by The Ashby Trust, whose trustee is First Peninsula Trustees Limited. El Prela Group Holding Services Limited is wholly-owned by The El Prela Trust, whose trustee is Port of Hercules Trustees Limited.

- Carlo Grosso is the settlor of The Ashby Trust and is among the class of beneficiaries of that Trust. Federico Ceretti is the settlor of The El Prela Trust and is among the class of beneficiaries of that Trust.

- Neither Carlo Grosso nor Federico Ceretti have any legal ownership of Ashby Holding Services Limited, Ashby Investment Services Limited, El Prela Group Holding Services Limited or El Prela Trading Investments Limited, contrary to the implication contained in the SICCFIN Report.

- Neither Carlo Grosso nor Federico Ceretti have ever been employed, acted as directors or agents, or held any contract for services as investment advisors or otherwise with Ashby Holding Services Limited, Ashby Investment Services Limited, El Prela Group Holding Services Limited or El Prela Trading Investments Limited. None of these companies have ever conducted any marketing of the Kingate Funds, whether directly or indirectly.

- Carlo Grosso and Federico Ceretti's business activity consists in managing FIM, a UK-regulated alternative asset management business established in London since 1981, of which Carlo Grosso is the Executive Chairman and Chief Investment Officer, and Federico Ceretti is the Chief Executive Officer. Neither one of them has ever been engaged as a director, officer or employee of KML.

- FIM has a consulting services and distribution agreements with KML. In accordance with the terms of the distribution agreement, FIM has introduced to KML potential investors in the Kingate Funds.

- The Kingate Funds, KML, the Trusts, Federico Ceretti, Carlo Grosso and FIM are and have always been entirely independent of BMIS. None of those entities or individuals have any current or past shareholdings in BMIS and nor have any of them ever held any employment or management position within BMIS or held any contract for services with BMIS.

146.  *Explain the roles of all entities involved in providing services to the Kingate Funds:*

- KML provides management services to the Kingate Funds, in return for which it receives certain fees.

7447031.3

404

- Pursuant to the authority provided to it by the Kingate Funds and since its appointment as manager to those funds in 1994 (Global Fund) and 2000 (Euro Fund) respectively, KML has delegated certain of its management functions to third parties. These third parties include BMIS, The Bank of Bermuda Limited (a subsidiary of HSBC Holdings plc), Citi (a subsidiary of Citigroup Inc), and FIM. In return for exercising these functions, The Bank of Bermuda, Citi and FIM earned fees. BMIS's compensation was understood to derive from trading commissions.

- FIM earned fees exclusively from KML in its performance of legitimate consultancy and distribution functions. Such fees represented a very small proportion of FIM's annual turnover.

- The roles of KML, BMIS, The Bank of Bermuda, Citi and FIM were fully disclosed, including to potential investors in the Kingate Funds.

147.    *Explain the source of assets held in the Accounts:*

*Federico 61*

- The assets held in Federico 61, the personal account of Federico Ceretti, represent the proceeds of the liquidation of a trust structure totally unrelated to the Trusts. These assets are wholly separate from The El Prela Trust structure and wholly unrelated to KML and the Kingate Funds.

- The assets held in Federico 61 have no connection whatsoever with Madoff or BMIS or to any individual or entity related to Madoff and/or BMIS. They are also wholly unconnected to the assets held in the other Accounts.

*The other Accounts*

- The Kingate Funds paid management fees to KML as manager to the Kingate Funds. KML had no other source of revenue besides these management fees. KML never derived – either directly or indirectly - any fees or any other kind of payment/remuneration from BMIS.

- KML distributed its earnings as dividends to KML's shareholders (formerly the Trusts, latterly the Holding Companies). A significant proportion of these distributions were then invested in the Kingate Funds and other hedge fund investments by the Investment Companies.

- With the exception of Federico 61, the exclusive source of assets in the Accounts therefore has always been (i) the dividends received from KML; and (ii) proceeds from the sale of hedge fund investments.

- None of the Kingate Funds, KML, FIM, the FIM Group, Carlo Grosso, Federico Ceretti, any persons or entities related to Carlo Grosso or Federico Ceretti, the Trusts or the Trusts' subsidiary companies ever received any fee or other payment either from Madoff, BMIS, or any individual or entity related to Madoff or BMIS.

- Neither Madoff nor BMIS nor any individual or entity related to Madoff or BMIS ever received any fees or any other kind of payment whatsoever from the Kingate Funds, KML, FIM, the FIM Group, Carlo Grosso, Federico Ceretti, any persons or entities related to Carlo Grosso or Federico Ceretti, the Trusts or the Trusts' subsidiary companies (besides trading commissions referred to at paragraph 43 above).

7447031.3