(e)     general economic and financial developments in international securities and capital markets affecting the Fund's investment program.

(f)     in general, all aspects relating to Fund's administration, accounting, legal and operational matters.

3.2     *Meetings of Directors.*  At the request of the Directors and subject to reasonable prior notice, the Manager, at its own expense, shall each endeavor to make one of its executive officers available to attend the meetings of the Directors to report on the Manager's activities and on other matters pertaining to its engagement.

3.3     *Placement of the Securities.*  The Manager shall act as the placement agent for the Securities outside of the United States.  The Manager shall use its best efforts to procure applications for the purchase of Securities by eligible investors, either directly or through securities dealers and other financial institutions selected by the Manager pursuant to Section 3.4 hereof (the "authorized dealers").  The Securities shall be offered at the subscription price and on the terms and conditions set forth herein and in the Information Memorandum or Operative Documents.  All applicants shall be subject to acceptance by the Fund (it being understood that the Fund shall have the right to reject applications or to receive or accept on behalf of the Fund any funds or other property tendered as payment for the Securities.)

3.4     *Authorized Dealers.*

(a)     The Manager may appoint securities dealers and other financial institutions as authorized dealers to solicit applications to purchase the Securities, one or more of whom may be affiliates of the Manager.  The Manager shall use reasonable efforts to ensure that any such authorized dealer shall conduct solicitation activities in accordance with all of the conditions, restrictions and limitations applicable to the Manager's direct placement activities as set forth in this Agreement.

(b)     Upon request, the Manager shall promptly furnish to the Fund a copy of any written agreement with any authorized dealer relating to the solicitation of applications for the Securities.

3.5     *Offering Materials.*

(a)     The Manager shall deliver, or arrange for the delivery by any authorized dealer selected by the Manager, to each person to whom the Securities are offered a copy of the Fund's most recently published Information Memorandum or Operative Documents for the respective Security.

(b)     If any form of offering materials (including any form of advertisement or other solicitation materials calculated to result in an expression of

[615593-3]

interest in subscribing for the Securities) concerning the Fund or the Securities other than the Information Memorandum or Operative Documents is required or permitted to be given to any prospective investor under the laws of any jurisdiction in which the Securities are offered by or through the Manager, the Manager agrees that any such document (i) shall not contain any information concerning the Fund or the Securities which is inconsistent with the Information Memorandum or Operative Documents, and (ii) shall comply in all respects with the laws of the jurisdiction in which it is furnished.

(c)  The Manager acknowledges and agrees that no person is authorized to make any representations, whether written or oral, concerning the Fund and the Securities which are inconsistent with the Information Memorandum and that all offers of the Securities shall be made in conformity with the terms and conditions set forth therein.

3.6  *Certain Legal Restrictions.*

(a)  None of the Securities shall be offered by the Manager or any authorized dealer to any person who is not reasonably believed by the Manager or the authorized dealer to be an Eligible Investor as set forth in each Information Memorandum or the Operative Documents.  Furthermore, none of the Securities shall be offered or sold to any person to whom it would be illegal to offer or sell the Securities.

(b)  The Securities and the Fund have not been and will not be registered or qualified for offer and sale under the applicable laws of any jurisdiction governing the offer or sale of investment company Securities or other securities.  Neither the Manager nor any authorized dealer shall (i) solicit any applications or otherwise extend any offers for the purchase of the Securities, or (ii) deliver (or have in their possession for the purpose of delivery) the Information Memorandum or Operative Documents or any other offering literature relating to the Fund or the Securities, to any person in any jurisdiction in which such solicitation or delivery would be unlawful.  The Manager represents to the Fund that it has informed itself as to the applicable legal restrictions governing the offer and sale of the Securities under the laws of any jurisdiction in which it intends to place share applications and that based on the methods of placement contemplated by the Manager, the sale of the Securities by the Fund to any person in any such jurisdiction will not be in violation of any applicable laws by reason of the activities of the Manager.  The Manager undertakes to comply with the foregoing representations in connection with its placement activities (including the appointment of any authorized dealers) during the term of this Agreement.

3.7  *Delegation.*  The provisions of this Part 3 may be delegated to one or more persons or entities (including an affiliate of the Manager) pursuant to Section 4.8 hereof.

3.8  *Consultants.*  The Manager is authorized to engage consultants and other advisors to assist them in connection with their duties hereunder.  The Fund agrees to such an arrangement and will incur the reasonable expenses thereof.

## PART 4. GENERAL PROVISIONS

The following general terms and conditions shall apply to the performance of the Manager's obligations as set forth in Parts 2 and 3 above:

4.1   *Compensation.*

(a)   Management Fee.   The Manager shall be entitled to a fixed monthly asset based fee (the "Management Fee") with respect to any Securities as such fee is defined and described in the Information Memorandum or the Operative Documents.

(b)   Administration Fee.   The Manager shall be entitled to a fixed monthly asset based fee (the "Administration Fee") with respect to any Securities as such fee is defined and described in the Information Memorandum or the Operative Documents.

(c)   Performance Fees.   The Share class presently outstanding as of the date of this Agreement is without a performance fee arrangement.   In the event that Securities are issued by the Fund with a performance fee or incentive fee attached, then the parties will deal with such fee by separate agreement.

(d)   Other Benefits.   The Manager shall be entitled to receive other benefits (including redemption fees) that may be derived in connection with the issuance of Securities. ("Other Benefits")

(e)   Agents.   The Fund may pay a fee to third parties that introduce investors to the Fund and enter into compensation arrangements with such third parties.

(f)   In the event that this Agreement is terminated, the Management Fee, the Administration Fee, any performance fee and Other Benefits will be computed as of such termination date.

(g)   The Fund acknowledges that if a performance fee is attached to a Security issued by the Fund, the performance fee may create an incentive for the Manager to make investments that are riskier or more or less speculative than would be the case in the absence of a fee based on the performance of such Security.   In addition, the performance fee shall be based on unrealized, as well as realized, appreciation and depreciation of the investments relating to such Security of the Fund.

4.2   *Expenses.*

(a)   Except as otherwise provided below, the Manager shall bear all of its own costs and expenses incurred in the performance of its services provided pursuant

to this Agreement as well as those attributable to the fees payable to delegates of and consultants to the Manager appointed pursuant to Sections 4.8 and 4.9 respectively.

(b)     The Manager shall be reimbursed for all fees, costs and expenses incurred in connection with the performance of any services required or permitted to be procured for the Fund by the Manager pursuant to this Agreement including, but not limited to, all expenses related to trading the assets of the Fund (i.e., interest on margin borrowing, custodial fees, brokerage commissions, bank service fees and interest on loan and debit balances).

(c)     Except as set forth above, the Fund shall bear all expenses incident to its organization, operations and business, including (i) brokerage commissions and charges on portfolio transactions, (ii) fees and charges of custodians and clearing agencies, (iii) interest and commitment fees on loans and debit balances, (iv) withholding taxes, transfer taxes and other governmental charges and duties, (v) fees of the Fund's legal advisors and independent auditors, (vi) Directors' fees and expenses, (vii) the costs of maintaining the Fund's registered office in the British Virgin Islands and elsewhere, and (viii) the costs of printing and distributing any offering documents, reports and notices to shareholders or prospective investors.

4.3     *Scope of Liabilities.*  The Manager (and any officer or director of the Manager) shall not be liable to the Fund or its Security holders for any error of judgment or for any loss suffered by the Fund or its Security holders in connection with its services in the absence of gross negligence, willful default, fraud, or dishonesty in the performance or non-performance of their obligations or duties.

4.4     *Indemnification.*

(a)     The Fund shall indemnify the Manager (which shall include solely for purposes of this Section 4.4, the Manager's directors, officers, employees, members and shareholders) and hold the Manager harmless from and against any expense (including without limitation legal fees and expenses), loss, liability or damage arising out of any claim asserted or threatened to be asserted in connection with the Manager serving or having served in good faith pursuant to this Agreement; provided, however, that the Manager shall not be entitled to any such indemnification with respect to any expense, loss, liability or damage which was caused by such Manager's own gross negligence, bad faith, breach of fiduciary duty, willful or reckless malfeasance or disregard of any of its obligations under this Agreement and such indemnification shall only be to the extent legally permissible under and by virtue of the laws of the jurisdiction in which Securities are offered or placed.

The indemnification provisions set forth in this Section shall not be construed as limiting in any way the provisions of Section 4.1(e).

(b)     The Manager shall indemnify the Fund against, and hold it harmless from, any expense, loss, liability or damage arising out of any claim asserted or threatened to be asserted by any third party as a consequence of any misstatement of any material fact or any other material misrepresentation concerning the Fund or the Securities by the Manager (other than any misstatement or misrepresentation contained in any document approved by the Fund).

(c)     In the event that either party hereto is or becomes a party to any action or proceeding in respect of which it may be entitled to seek indemnification hereunder or under Section 4.1 (the "indemnitee") the indemnitee shall promptly notify the other party (the "indemnitor") thereof. The indemnitor shall be entitled to participate in any such suit or proceeding and, to the extent that it may wish, to assume the defense thereof with counsel reasonably satisfactory to the indemnitee. After notice of an election by the indemnitor so to assume the defense thereof, the indemnitor will not be liable to the indemnitee hereunder for any legal or other expenses subsequently incurred by the indemnitee in connection with the defense thereof other than reasonable costs of investigation or reasonable legal expenses incurred as a result of (i) potential conflicts of interest between the indemnitee and indemnitor or (ii) the protection of proprietary or privacy interests of other clients of the indemnitee. The indemnitor shall advance to the indemnitee the reasonable costs and expenses of investigating and/or defending such claim, subject to receiving a written undertaking from the indemnitee to repay such amounts if and to the extent of any subsequent determination by a court or other tribunal of competent jurisdiction that the indemnitee was not entitled to indemnification hereunder.

(d)     The indemnitor shall not be liable hereunder for any settlement of any action or claim effected without its prior written consent thereto.

4.5     *Independent Contractor.* For all purposes of this Agreement, the Manager shall be an independent contractor and shall not be deemed an employee or agent of the Fund; nor shall anything herein (notwithstanding Section 2.2 hereof) be construed as making the Fund a partner or co-venturer with the Manager or any of its affiliates.

4.6     *Information Concerning Activities.* The Manager shall provide to the Fund from time to time and on request, information regarding the activities (i) conducted by the Manager since the inception of this Agreement or since the most recent date on which the Manager provided information to the Fund regarding the activities of the Manager and (ii) proposed to be conducted by the Manager. The Manager shall furnish information concerning the Manager and any authorized dealers and concerning the activities undertaken by it for the Fund as the Fund may reasonably request.

4.7     *Term. Termination and Renewal.* The initial term of this Agreement commenced as of May 1, 2000 and shall continue until December 31, 2002. Thereafter, this Agreement will be automatically renewed for successive one-year periods, subject to termination as of December 31, 2002 or the close of any calendar month thereafter by

[615593-3]

either party upon not less than one hundred twenty (120) days' prior written notice to the other party. In the event of termination, the provisions of Section 2.5 and Part 4 shall survive.

    4.8    *Delegation.*

        (a)    The Manager shall be authorized to delegate as appropriate, in its discretion, any of the duties or obligations imposed upon it hereunder to one or more other persons or entities, whether affiliated with or independent of the Manager.

        (b)    In the event of any such delegation of duties or obligations hereunder pursuant to any agreement consented to in writing by the Fund, the Manager shall be relieved and discharged of its obligations to perform the services so delegated other than the continuing obligation (subject at all times to the standard of care set forth in Section 4.3 hereof) to take reasonable measures to ascertain the competence of the delegate to perform the services so delegated. Notwithstanding any other provision of this Agreement, following the Fund's consent to any such delegation agreement, the Manager shall not incur any liability hereunder to the Fund pursuant to Section 4.3 hereof for any acts or omissions of such delegate and shall remain entitled to indemnification as provided in Section 4.4 hereof.

        (c)    Whenever the Fund's consent to delegation is requested by the Manager, such consent shall not be withheld without reasonable cause.

        (d)    The Manager may arrange for compensation payable to any person or entity to which duties are delegated hereunder to be made directly from the Fund out of fees otherwise payable to the Manager.

    4.9    *Consultants.* The Manager is authorized to engage, and are authorized to delegate the authority to engage, consultants and other advisors to assist it or its delegates in connection with its or their duties hereunder. The Fund agrees to such arrangements and will, upon prior agreement in writing, incur, or provide reimbursement for, the reasonable expenses thereof.

    4.10    *Modification; Waiver.* Except as otherwise expressly provided herein, this Agreement shall not be amended, nor shall any provision of this Agreement be considered modified or waived, unless evidenced in writing and signed by the party to be charged with such amendment, waiver or modification.

    4.11    *Notice.* Notices by one party to the other shall be made by facsimile, certified mail return receipt requested, or by recognized private courier (e.g., Federal Express, Airborne Express, etc.) at the usual business location of such other party.

    4.12    *Binding Effect; Assignment.* This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, and in the case of

[615593-3]

an individual, his heirs and estate, but the rights and obligations hereunder shall not be assignable, transferable or delegable without the written consent of the other party hereto except as provided in Section 4.8 hereof and any attempted assignment, transfer or delegation thereof without such consent except as provided in Sections 2.6, 3.7 and 4.8 hereof shall be void.

4.13 *Governing Law.*  This Agreement shall be governed by and construed in accordance with the substantive laws of Bermuda applicable to contracts made and entirely to be performed therein.

4.14 *Counterparts.*  This Agreement may be signed in any number of counter-parts. Any single counterpart or a set of counterparts signed in either case by the parties hereto, shall constitute a full and original Agreement for all purposes.

4.15 *No Third Party Beneficiaries.*  Except as otherwise expressly provided for herein, the provisions hereof are for the sole benefit of the parties hereto and their successors and assigns (heirs and estates, as the case may be) and shall not be construed as containing, and are not intended to confer, any rights remedies or other benefits on any other persons.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as a deed as of the day and year first above written.

IN WITNESS WHEREOF, the parties have executed and delivered this
Agreement as a deed as of the day and year first above written.

KINGATE MANAGEMENT LIMITED
(The Manager)

Acting By: _____

Name: _____

Title: _____

In the Presence of: _____

Witness

KINGATE EURO FUND LIMITED
(The Fund)

Acting By: _____

Name: _____

Title: _____

In the Presence of: _____

Witness

[615593-3]

Dated  23 / 4   **2001**

# KINGATE MANAGEMENT LIMITED

-and-

# FIM LIMITED

---

**Consulting Services Agreement**

**-relating to-**

**Kingate Euro Fund, Ltd.**

---

**THIS CONSULTING SERVICES AGREEMENT** is made this *23* day of *April* 2001

**BETWEEN:**

1.   **KINGATE MANAGEMENT LIMITED,** a limited company registered in Bermuda (under number EC-19184) and whose registered office is at 99 Front Street, Hamilton HM11, Bermuda (the "Manager");

2.   **FIM LIMITED,** a limited company registered in England and Wales (under number 1536755) and whose registered office is at 62 Wilson Street, London EC2A 2BU ("FIM").

**WHEREAS:**

(A)   Kingate Euro Fund, Ltd. (the "Company") is open-end investment company organized as an international business company in the British Virgin Islands ("B.V.I.").

(B)   By a Management Agreement effective May 1, 2000 between the Company and the Manager (the "Management Agreement") the Company has appointed the Manager to provide it with investment management and other services in relation to the Company's assets and operations in accordance with the provisions of the Management Agreement.

(C)   Under the provisions of the Management Agreement the Manager is authorised to appoint delegates to assist it in the discharge of its function under the Management Agreement.

(D)   In connection therewith FIM has been providing consultancy and other services to the Manager since May 1, 2000.

(E)   The Manager now wishes to appoint FIM as a consultant to the Manager to provide it with consultancy and other services to assist in the day to day management of the Company's assets undertaken by the Manager under the Management Agreement.

(F)   FIM is regulated in the conduct of investment business in the United Kingdom by the Investment Management Regulatory Organisation Limited ("IMRO") or its successor(s) or replacement(s).

(G)     This Agreement is in a form which complies with the Rules of IMRO on the basis that the Manager and the Company (which is an unregulated collective investment scheme) are Non-Private Customers (as defined in the IMRO Rules).

**NOW IT IS HEREBY AGREED** as follows:

1.      **Definitions and Constructions**

(a)     Save where the context otherwise requires, terms and expressions defined for the purposes of the Information Memorandum ("Information Memorandum")and the rules of IMRO shall have the same meaning when used in this Agreement.

(b)     "Information Memorandum" means the Information Memorandum of the Company dated 1 May 2000 relating to the Shares of the Company as the same may from time to time be amended or replaced. The term "Group Company" when used in this agreement means any company within the group comprising the Manager and any subsidiaries, holding companies and associated companies.

(c)     "IMRO" means the Investment Management Regulatory Organisation Limited or its successor(s) or replacement(s).

(d)     "Operative Documents" means any and all documents which may be issued by the Company in relation to the issue of securities (other than Shares) of the Company.

(e)     "Shares" means the Participating Common Shares of the Company.

(f)     References to any statute, statutory enactment, rules and regulations shall be references to such statutes, statutory instruments, rules or regulations as from time to time amended, re-enacted, replaced or substituted.

2.      **Appointment of Consultant**

2.1     This Agreement shall be operative with effect on and from May 1, 2000 (the "Effective Date").

2.2     FIM hereby agrees with the Manager to act as a consultant to the Manager to provide such advice and recommendations as the Manager may from time to

time require in connection with its management of the Company's assets and in the implementation of the investment objectives and policies of the Company in accordance with the provisions of the Management Agreement. This Agreement waives FIM's formal duty of Best Execution as defined by the rules of IMRO.

2.3   In providing consulting services to the Manager pursuant to this Agreement, FIM shall at all times have due regard to the need to comply with the following requirements:-

(a)   the investment objective, policy and powers of the Company as outlined in the Information Memorandum and Operative Documents;

(b)   any investment or other restrictions for the time being contained in the Memorandum of Association of the Company or the Articles (each as amended from time to time) or in the Information Memorandum and Operative Documents;

(c)   the provisions of the Management Agreement to which the Manager is subject in its provision of management services to the Company; and

(d)   any other matter to which a prudent consultant should reasonably pay regard in the proper discharge of its duties.

2.4   The Manager undertakes to provide FIM with copies of the Information Memorandum, Memorandum of Association, Articles of Association, Operative Documents and the Management Agreement and all amendments from time to time made thereto, promptly upon any such amendments being made and to provide to FIM such information in the Manager's possession as FIM may reasonably request in relation to the Company or as the Manager may consider relevant to FIM in the discharge of its duties hereunder, including, without limitation:-

(a)   details of the sums available for investment and the money required to meet redemptions or pay fees, dividends of expenses of the Company;

(b)   any notices of meetings, reports, circulars and other communications received or made by the Manager in relation to the Company and the Company's investments;

        (c) any proposed changes to the investment objectives, policies and
        restrictions of the Company; and

        (d) details of any actions taken or not taken in relation to recommendations
        of FIM to the Company.

Without prejudice to its obligations under clause 2.3 above, FIM shall be entitled
to rely on the authenticity and completeness of such documents.

2.5 FIM represents and warrants to the Manager that it is a limited company duly
registered under the laws of England and Wales having all necessary
regulatory and other consents including membership of IMRO or any
successor organisation thereto, including the Financial Services Authority,
and pursuant to the Investment Business Act 1998 of Bermuda to the extent
FIM is carrying on investment business in or from within Bermuda by virtue
of this Agreement or otherwise, and capacity to provide the services and
discharge the duties of a consultant required of them under this Agreement.

3.    **Consulting and Other Services**

Without prejudice to the generality of the provisions of clause 2 above, the
consulting services and other services to be provided by FIM to the Manager
under the terms of this Agreement shall include, without limitation:-

(a) reviewing the Company's structure and operating procedures;

(b) preparing such analyses and reports as the Manager and the Company may
require, including such analyses and reports as may be required for use by the
Manager;

(c) providing the Manager with assistance and support on such matters relating to
investors relations as may be required by the Manager and the Company;

(d) liaising directly with the Manager on such matters relating to the Company's
investment program as may be required to enable FIM to properly perform its
duties hereunder;

(e) providing the Manager with advice regarding the Company's hedging activities in order to reduce the currency risk between the Euro and the US Dollar and overseeing of the execution of its recommendation; and

(e) in general, providing advice to and assisting the Manager on such aspects of the Company's operational, administrative, accounting and legal matters as may be required by the Manager and the Company.

4.  **Limitation on Authority**

4.1 FIM, acting as a consultant, shall not have the power or authority to enter into any transaction on behalf of, or in any way to bind, the Manager or the Company.

4.2 In carrying out its duties hereunder, FIM shall comply with all instructions of the Manager in connection therewith. Such instructions may be given by letter, by fax, by e-mail or by telephone (and the Manager undertakes to confirm telephone instructions by fax, e-mail or in writing) by any director of the Manager or by any other person authorised by a resolution of the directors of the Manager (of which a copy, certified by any two such directors, shall have been supplied to FIM).

4.3 For the purposes of clause 4.2 and unless and until FIM shall receive written notice that any such person's authority has been revoked FIM may rely or act upon any instructions or communications which FIM believes, on reasonable grounds and in good faith, to have been given by or on behalf of any persons notified by the Manager from time to time in accordance with clause 4(b) as being authorised to instruct FIM.

5.  **Delegation and Use of Agents**

FIM may not delegate or sub-contract any of its duties or services under this Agreement without the prior written consent of the Manager provided that, in the event such delegation or sub-contracting is so permitted, FIM shall be relieved of any responsibility for the acts or omissions of such delegates except in circumstances where FIM shall be shown to have assumed responsibility for such acts or omissions.

6.  **Client Money**

    FIM will not hold cash on behalf of the Company.

7.  **Custodial Services**

    FIM will not be responsible for the provision of any safe custody services in relation to the Company.

8.  **Valuations and Reports**

    FIM will provide such assistance, information and reports as the Manager and the Company's auditors may from time to time require in connection with the preparation of valuations in respect of the Company, the preparation by the Manager of periodic reports for submission to the Company and the provision of annual, semi-annual and other reports for the benefit of Shareholders or prospective Shareholders of the Company whether these are published by the Company or the Manager. FIM shall in addition provide such representative or representatives as the Manager may from time to time request to attend board meetings of the Company with the Manager and report to, and discuss with, the Directors of the Company the performance of the Company and other matters related to the management of the assets of the Company.

9.  **Investments**

    FIM may provide investment advice to the Manager with respect to investments in collective investment schemes within the meaning of Section 75 of the United Kingdom Financial Services Act 1986 ("FSA") which are or are not authorised or recognised under ss78, 86, 87, 88 FSA (whether or not FIM and/or its affiliates are concerned in the operation thereof) and Contingent Liability Transactions. Advice on Contingent Liability Transactions may extend to investments not traded on exchanges recognised under the FSA or designated by the United Kingdom Financial Services Authority. Advice may relate to transactions with counterparties or through intermediaries that do not owe a duty of Best Execution.

    FIM may provide investment advice to the Manager subject to FIM having all necessary regulatory and other consents pursuant to the Investment Business Act 1998 of Bermuda to the extent FIM is carrying on investment business in or from within Bermuda by virtue of this Agreement or otherwise.

10. **Potential Conflicts of Interest and Disclosures**

FIM may be involved in other financial, investment or professional activities which may be similar to, or in competition with, its activities for the Manager with respect to the Company. FIM may effect transactions in which FIM, or its partners, officers, employees and directors, has, directly or indirectly, a material interest, which may involve a potential conflict with FIM's duty to the Manager and the Company. FIM shall disclose such conflicts, but shall not be under any obligation to account to the Manager or the Company for any profit, commission or remuneration earned or received in connection therewith. However, FIM shall at all times:-

(a) Have due regard to its duties to the Manager and the Company and, where a conflict arises, use all reasonable endeavours to ensure it is resolved fairly; and.

(b) Where FIM acts as consultant to other ventures similar in nature to the Manager's and the Company's business, act fairly with respect to the Manager and the Company.

11. **Fees and Expenses**

Fees and expenses shall be as detailed in Schedule 1 to this Agreement, or as agreed from time to time between the parties.

12. **Exclusivity**

12.1 The appointment of FIM by the Manager hereunder shall not be deemed to be an exclusive appointment. FIM shall be free to render similar services to others as if FIM were not acting as consultant to the Manager under the terms hereof for so long as its services hereunder shall not be impaired thereby.

12.2 While this Agreement is in force, and for as long as FIM acts as consultant to the Manager to advise it on the business of the Company, the Manager may not appoint another consultant to provide services similar to the services that FIM provides under the terms of this Agreement.

13.   **Liability**

13.1 In the absence of gross negligence, fraud or wilful default on the part of FIM,
      or failure to comply with instructions of the Manager pursuant to clause 4.2,
      its directors, officers, employees or agents, FIM shall not be liable to the
      Manager or the Company for any act or omission in the course of, or in
      connection with, the services rendered by it hereunder or for any decline in
      the value of the assets of the Company or any loss whatsoever that may result
      to the Company or the Manager.

13.2 The Manager agrees to keep FIM, its partners, officers, employees and
      directors indemnified from and against all claims, costs, charges, liabilities
      and expenses incurred by them directly or indirectly from any act or omission
      in the course of or in connection with the services provided by FIM
      hereunder ("Claims and/or Liabilities") provided that such indemnity shall
      not apply to the extent that any such Claim and/or Liability is due to the
      failure to comply with instructions of the Manager pursuant to clause 4.2 or
      the fraud, wilful default or gross negligence of FIM, its partners, officers,
      employees, directors or agents.

14.   **Termination**

14.1 This Agreement and the appointment of FIM hereunder shall continue until
      31 December 2002. Thereafter, this Agreement shall be automatically
      renewed for successive one year periods, subject to termination as of the
      close of each calendar month by either the Manager or FIM giving to the
      other party not less than six months' written notice (or such shorter notice as
      the parties may agree to accept).

14.2 Without prejudice to the accrued rights and provisions intended to survive
      termination, this Agreement may be terminated forthwith by written notice
      given by the Manager or FIM to the other party if:-

      (a)  the other party shall commit any material breach of its obligations under
           this Agreement and shall fail to make good such breach within thirty
           days after receipt of notice from the other party requiring it so to do;

(b) the other party becomes insolvent or goes into liquidation (except a voluntary liquidation for the purposes of a reconstruction, amalgamation or merger upon terms previously approved in writing by the other party, such consent not to be unreasonably withheld or delayed) or if a receiver or administrator is appointed over all or any of its assets;

(c) the Manager shall cease to be the manager of the Company; and

(d) FIM shall cease to be authorised by IMRO to provide its services under the terms of this Agreement.

14.3 Upon termination of this Agreement, FIM shall deliver to the Manager or to such other person or corporation as the Manager shall in writing direct, all books of account, correspondence and records or other documents which are in its power and/or possession, belonging to or relating to the Company.

14.4 On termination of this Agreement FIM shall be entitled to payment of its fees and expenses as referred to in clause 11 pro rata to the date of the termination and any additional expenses necessarily realised in settling or concluding outstanding obligations.

14.5 Termination of this Agreement shall operate without prejudice to any rights which either party may have against the other in relation to any antecedent breach by the other of any provision of this Agreement.

14.6 In the event of termination of this Agreement, all pending trades and transactions shall be settled in the ordinary course and consistent with existing trade practices.

15. **Confidentiality**

Each party shall at all times keep confidential, confidential information acquired in consequence of its services under this Agreement except information which it is bound to disclose under compulsion of law or compulsion of regulatory agencies to whose jurisdiction it is subject. This clause shall survive the termination of this Agreement.

16. **Notices**

Any instructions, notices, demands, acknowledgements or requests to be given by either of the parties hereunder shall, subject to any express provision of this Agreement, be given in writing in the English language (and may be delivered in person or sent by fax, e-mail or recorded delivery post) to the other party at the following address or any address subsequently notified by the relevant party to the other:-

**To FIM:**                    FIM Limited
                               25-28 Old Burlington Street
                               London W1X 1LB
                               Attention: Carlo Grosso
                               Fax: (+ 44 20) 7494 1981

**To the Manager:**            Kingate Management Limited
                               99 Front Street
                               Hamilton HM11
                               Bermuda
                               Attention: Christopher Wetherhill
                               Fax: (+ 1 441) 296 6775

Notice given in person shall be effective when delivered. Notice given by fax or e-mail shall be deemed to have been given contemporaneously unless delivered outside normal business hours in which case it shall be deemed to have been received at the next time after delivery when normal business hours commence. Notice given by recorded delivery shall be deemed to have been given seventy-two hours after posting. Evidence that the notice was properly addressed and sent by recorded delivery shall be conclusive evidence of posting.

# Deed of Novation

between

## Kingate Management Limited
as the Continuing Party

## FIM Limited
as the Outgoing Party

and

## FIM Advisers LLP
as the Incoming Party

relating to

the assumption of obligations and benefits by FIM
Advisers LLP of a consulting services agreement relating
to Kingate Euro, Ltd

12-01920-smb    Doc 453-7    Filed 02/16/14    Entered 02/16/14 10:45:23    Exhibit M -
Pg 20 of 5 of 26

# CONTENTS

| | | |
|---|---|---|
| 1. | Interpretation | 1 |
| 2. | Novation | 1 |
| 3. | Confirmation of terms | 2 |
| 4. | Limitation Periods | 2 |
| 5. | Governing Law | 2 |

**THIS DEED OF NOVATION** is dated      29th July 2005 and made

**BETWEEN:**

(1)     **KINGATE MANAGEMENT LIMITED**, (the "Continuing Party"), a limited liability company incorporated in Bermuda and having its registered office at 99 Front Street, Hamilton HM 11, Bermuda; and

(2)     **FIM LIMITED**, (the "Outgoing Party"), a limited liability company registered in England and Wales and having its registered office at 20 St James's Street, London, SW1A 1ES, England; and

(3)     **FIM ADVISERS LLP**, (the "Incoming Party"), a limited liability partnership registered in England and Wales and having its registered office at 20 St James's Street, London, SW1A 1ES, England.

**Background:**

(A)     This Agreement is supplemental to the Original Agreement.

(B)     The parties hereto have agreed that with effect from the effective date the Outgoing Party shall cease to be a party to the Original Agreement and that the Incoming Party shall become a party thereto in place of the Outgoing Party and accordingly the Outgoing Party shall be released and discharged from the Original Agreement upon the terms and to the extent set out in this Agreement.

**THE PARTIES AGREE THAT:**

1.     **Interpretation**

In this Agreement:

"Original Agreement" means the Consulting Services Agreement dated 23rd April 2001 (as amended on June 7th 2001) made between the Continuing Party and the Outgoing Party.

"Effective Date" means 1st August 2005.

2.     **Novation**

2.1     **Substitution of parties**

(A)     The Incoming Party hereby undertakes to the Continuing Party to perform the Original Agreement and be bound by the terms thereof in every way as if the Incoming Party was, with effect from the Effective Date, a party to the Original Agreement in place of the Outgoing Party.

(B)     The Continuing Party hereby releases and discharges the Outgoing Party from all obligations and liabilities of the Outgoing Party under the Original Agreement becoming due to be performed or satisfied on or after the Effective Date and all claims and demands whatsoever in respect thereof and accepts the performance thereof by the Incoming Party in place of performance by the Outgoing Party and hereby undertakes to the Incoming Party, with effect from the Effective Date, to

LN: 1CFDBC8

1

perform the Original Agreement and be bound by the terms thereof in every way as if the Incoming Party was a party to the Original Agreement in place of the Outgoing Party.

### 2.2    Surviving obligations

The Incoming Party shall be liable to the Continuing Party in respect of the respective obligations and liabilities of the Outgoing Party under the Original Agreement becoming due to be performed or satisfied prior to the Effective Date and all claims and demands in respect thereof in all respects as if this Agreement had not been made and the Incoming Party was a party to the Original Agreement in place of the Outgoing Party.

### 3.    Confirmation of terms

The Continuing Party and the Incoming Party hereby confirm the terms of the Original Agreement with the exception only of the substitution of parties hereby effected.

### 4.    Limitation Periods

Nothing in this Agreement shall have the effect of extending any limitation period set out in, or applicable to, the Original Agreement and nothing in this Agreement shall operate to enable any claims to be brought against the Incoming Party whether in tort, contract or otherwise which, but for this Agreement, would be statute barred if made against the Outgoing Party.

### 5.    Governing Law

This Agreement shall be governed by and construed in accordance with the laws of England and the parties hereto hereby submit to the non-exclusive jurisdiction of the English Courts.

IN WITNESS whereof this Deed of Novation has been executed as a deed by the parties hereto the day and year first above written.

LN: 1D5F403

EXECUTED AS A DEED by
KINGATE MANAGEMENT LIMITED acting by:

...............................
Director

EXECUTED AS A DEED by
FIM LIMITED acting by:

...............................
Director

EXECUTED AS A DEED by
FIM ADVISERS LLP
acting by:

...............................
Member

LN: 1D5F403

3

| From: | Robert Loigman |
|---|---|
| Sent: | Thursday, February 25, 2010 1:56 PM |
| To: | 'Chockley, Frederick W.'; 'Hirschfield, Marc E.' |
| Cc: | Robert Dakis; Joseph Hammond; Sarah Rubin |
| Subject: | BLMIS -- Kingate |
| Attachments: | PWC.PDF; FIM.PDF; KML - ownership.pdf; KML - provision of information    imaging.pdf |

Fritz and Marc:  Further to our discussion of late last week, I attach a few of the recent letters that the Joint Liquidators of the Kingate Funds and their representatives have sent to PWC, KML, and FIM.  As we've discussed, the JLs are actively seeking information from all three of these parties.

Please let us know if you will be providing us with a copy of the trustee's application in the UK to obtain documents from FIM.

Regards,
Bob

**Robert S. Loigman** ▫ **Partner**
**Quinn Emanuel Urquhart Oliver & Hedges, LLP**
**51 Madison Avenue, 22nd Floor**
**New York, NY 10010**
**Direct: (212) 849-7444**
**Main Phone: (212) 849-7000**
**Main Fax:  (212) 849-7100**
E-mail:  robertloigman   quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.



**Sedgwick Chudleigh**

BARRISTERS AND ATTORNEYS

MERCURY HOUSE, FOURTH FLOOR  101 FRONT STREET  HAMILTON HM12, BERMUDA
*www.sedgwick-chudleigh.com*  **441.296.9276** *phone*  **441.296.9277** *fax*

Friday, January 29, 2010

Appleby Global,
Canon's Court,
22 Victoria street,
Hamilton,
HM EX
Bermuda

Attn:  Ms K. Bell

<u>By E-Mail</u>

Dear Sirs ,

**Kingate Euro Fund Limited (in liquidation) and Kingate Global Fund Limited (in liquidation) (the 'Funds')**

We refer to your letter to Mr John McKenna dated 14 December 2009.  It will not surprise you to learn that we completely disagree with what you say about the winding up orders made by the Bermuda Court and the standing of the Liquidators appointed under them.

The position your clients take leads ours to conclude that yours will do everything they can to avoid having to make the disclosures to our clients that they have asked for. The Liquidators are in the course or preparing an application to the Court.  We write today to inform you that our clients have issued (but do not intend yet to serve) a writ against your clients in respect of their 2003 audits of the Funds. They have been constrained to do so largely because of your clients' failure to co-operate with them as noted above; they were put in the position of having to issue in order not to fall foul of a limitation bar.

Accordingly, this writ is entirely protective in nature, at this stage, and we emphasise that our clients have taken no decision to pursue any claims against your clients. Instead, they are engaged in a fact-gathering process in order to try to determine whether or not they or the Funds should pursue any causes of action against your clients and others, and in the meantime have issued this writ in order that the Funds, their creditors and members should not be prejudiced by the passing of a limitation deadline.

Yours faithfully,

*Sedgwick Chudleigh*

**SEDGWICK CHUDLEIGH**
**By:    Cameron Hill**

*Sedgwick Chudleigh is an independent law firm under the Bermuda Bar Act 1974*
*Associated with Sedgwick, Detert, Moran & Arnold LLP, www.sdma.com*