

25 November 2009

P.O. Box 4571
2nd Floor, Palm Grove House
Wickhams Cay, Road Town
Tortola
British Virgin Islands VG1110
t: +1 284 494 9600
f: +1 284 494 9601
www.zolfocooper.com

Mr D Dwyer
Wakefield Quin
P.O. Box HM809
Hamilton, HMZX
Bermuda

Dear Dennis

**Kingate Global Fund Limited and Kingate Euro Fund Limited - both in Liquidation (the "Funds")**

Your client: Kingate Management Limited ("KML")

Thank you for your long letter of 23 November 2009. I have also received Katie Richard's email of 24 November 2009.

I do not propose to respond at similar length but merely to observe that it is common ground that the process of segregating documents we previously identified has failed for reasons associated with the volume and quantum of data not being as had been understood and expected by me on the basis of information I had received. I think it best to leave it there; there is no point in re-rehearsing the arguments.

It is now clear from your letter and the email in response to my letter of 17 November, that you have embarked upon a process of production and segregation over which I have no visibility. You have advised that a Mr. Garry Pate of Capsicum Group, LLC, of whom I know nothing, has undertaken the work but you have not explained the criteria provided for the segregation of data nor the methodology adopted. Nonetheless, you have advised me that data is available and I will, as requested, arrange for it to be collected by a representative of Sedgwick Chudleigh and I will review it. Meanwhile please explain precisely how this material has been created. Without pre-judging matters, I must inform you that, unless I am satisfied with the material and processes and methodology employed in extracting it, I will not hesitate to make an application to the Court.

I have now agreed the charges of Kroll Ontrack at a discount from sums requested by them three or four weeks ago. I should forward to KML an invoice in respect of its contribution to the cost as we had previously agreed.

Yours sincerely

**W R Tacon**
Joint Liquidator

F:\Case Files\K\Kingate\1. Kingate Global Fund Limited\4 Appointment and statutory documents\4.2 Letters\Letters to Investment Manager\091125 Letter to D Dwyer.doc

Zolfo Cooper (BVI) Limited is a company incorporated in the British Virgin Islands

MERCURY ... 101 FRONT STREET   HAMILTON HM12, BERMUDA

*www.sedgwick-chudleigh.com*   441.296.9276 *phone*   441.296.9277 *fax*



# Sedgwick Chudleigh

BARRISTERS AND ATTORNEYS

16 February 2010

Hamilton Nominees Limited
2 Reid Street
Hamilton HM 11
Bermuda

mark.chudleigh@sedgwick-chudleigh.com

Dear Sirs,

**Re:   Kingate Management Limited ("KML")**

We act on behalf of the Joint Liquidators who have been appointed by order of the Bermuda Supreme Court in respect of Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. ("the Funds"). Throughout the period of their operations, the Funds engaged KML to provide various services, including, but not limited to, management services and acting as investment manager.

As part of their ongoing investigations the Joint Liquidators wish to ascertain the identity of the beneficial owners of KML. The Joint Liquidators have obtained a copy of the company's Register of Members from the Bermuda Registrar of Companies. The Register merely indicates that its shares were held from 24 February 1994 to 5 March 2001 through Hemisphere Holdings Limited and then from 5 March 2001 to present through Hamilton Nominees Limited. The Joint Liquidators need to establish the identity of KML's ultimate beneficial ownership as part of their enquiries into the activities of the Funds.

We have been instructed by the Joint Liquidators to request from you full details of KML's ownership, from the date of its incorporation to present. We would be grateful for any information that you are able to provide in this regard.

Although the Joint Liquidators hope that you will provide this information voluntarily and thereby save costs, we must point out that they are possessed of powers to compel the production of the same by virtue of the provisions available to them under s195 of the Bermuda Companies Act 1981. The Joint Liquidators will not hesitate to use those powers should your voluntary assistance not be forthcoming.

*Sedgwick Chudleigh is an independent law firm regulated under the Bermuda Bar Act 1974.*

Page 2

We look forward to hearing from you by no later than by the close of business on 24 February 2010, failing which we are instructed to commence the procedure for making an application under s195.

Should you have any question, please contact the under-signed.

Yours faithfully,
SEDGWICK CHUDLEIGH

By:    Mark Chudleigh

*Global 4/ F IM*



**ZC** ZOLFO COOPER

15 December 2009

FIM Limited
Buchanan House
3 St James's Square
London
SW1Y 4JU

**By email pniel@fim-group.com**

P.O. Box 4571
2nd Floor, Palm Grove House
Wickhams Cay, Road Town
Tortola
British Virgin Islands VG1110
t: +1 284 494 9600
f: +1 284 494 9601
www.zolfocooper.com

*For the attention of Philip Niel*

Dear Sirs

### Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd – in Liquidation (the "Funds")

Thank you for your letter of 4 December 2009. Please arrange for copies of the documents I have
requested to be delivered to my office in London at 10 Fleet Place, London, EC4M 7RB for the
attention of Nick Edwards. Mr. Edwards may be contacted on 020 7332 5141 or at
NEdwards@zolfocooper.eu.

As I am sure you are well aware, I am attempting to construct a picture of the formation and
activities of the Funds of which I am liquidator, conducted through its directors and its other agents
and sub-agents, in order to carry out my statutory duties. I consider that I require the information
requested from you for this purpose.

I consider that I am entitled to this information by virtue of s.282 of the BVI Insolvency Act 2003,
which provides that a person who was involved in the promotion or formation of the company in
question may be required by an office holder to provide him with such information concerning the
company, including its business, dealings and affairs, as he may reasonably require.

FIM Advisers LLP confirmed in their letter of 19 October 2009 that FIM Limited established the Funds,
and you would therefore appear to fall within the category of persons whom I may require to provide
this information.

You will no doubt have been advised that the BVI is one of the territories designated for the purposes
of s.426 of the UK Insolvency Act 1986 under which assistance may be sought from the English Court
by courts exercising an insolvency jurisdiction, and that in granting such assistance the English Court
may apply the insolvency law of either court.



I should also mention for the sake of completeness that I am also, of course, in a position to constitute myself a "foreign representative" under the UK Cross-Border Insolvency Regulations 2006 and thus ask the English Court to provide me the powers available under s.236 of the UK Insolvency Act, including that to apply to the Court to summon any person who the Court thinks capable of giving information concerning the promotion, formation, business, dealing, and affairs or property of the company. There can be little doubt that you fall within this category as well.

I trust that the above explanation is sufficient and that you will now address the questions raised in my letter of 23 November 2009. Should a satisfactory response not be forthcoming then I will take steps to invoke the assistance of whichever Court is most convenient.

Yours faithfully

**W R Tacon**
Joint Liquidator



FIM

**FIM Advisers LLP**
Buchanan House
3 St. James's Square
London SW1Y 4JU

T (+44 20) 7389 8900
F (+44 20) 7389 8911
E main@fim-group.com
www.fim-group.com

Zolfo Cooper
10 Fleet Place
London EC4M 7RB

For the attention of: Nick Edwards

22 December 2009

**By courier**

Dear Sirs

**Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. – in liquidation**

We refer to our recent correspondence with Mr Tacon of your firm's office in the British Virgin Islands.

Further to Mr Tacon's letter to us dated 15 December 2009 confirming to which address certain documents should be sent, we enclose copies of the documents that Mr Tacon requested in his letter dated 24 November 2009.

Please confirm safe receipt to Philip Niel of this office (pniel@fim-group.com).

Yours faithfully,

FIM   Advisers LLP

FIM Advisers LLP

---

| **From:** | Robert Dakis |
|---|---|
| **Sent:** | Friday, March 12, 2010 3:51 PM |
| **To:** | Chockley, Frederick W.; Hirschfield, Marc E. |
| **Cc:** | Robert Loigman; Joseph Hammond; Sarah Rubin |
| **Subject:** | BLMIS -- Kingate |
| **Attachments:** | 100226 Letter to WQ.PDF; 100226 Letter to FIM.PDF |

Fritz,

As discussed on today's call, attached hereto is recent correspondence between the Joint Liquidators and counsel to KML and FIM regarding the Joint Liquidators' document requests.

Best,

Robert

**Robert K. Dakis**
**Quinn Emanuel Urquhart   Sullivan, LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010
Direct: (212) 849-7447
Main Phone: (212) 849-7000
Main Fax:  (212) 849-7100
E-mail:  robertdakis   quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

26 February 2010

**By email: DDwyer@wq.bm**

P.O. Box 4571
2nd Floor, Palm Grove House
Wickhams Cay, Road Town
Tortola
British Virgin Islands VG1110
t: +1 284 494 9600
f: +1 284 494 9601
www.zolfocooper.com

Wakefield Quin
31 Victoria Street
Hamilton
HM10

Dear Dennis

**Kingate Global Fund, Limited and Kingate Euro Fund, Limited - in Liquidation (the "Companies")**

I refer to your letter of 25 January and our previous correspondence.

I will not in this letter rehearse my complaints about KML's desultory response to date to my requests for the handing over and production of documents, but I do wish to put you on notice of certain matters and also to revert to a suggestion made in your letter of 19 January 2010.

1.  As this point has not been made clear in your letters informing me how KML's document production (according to the program unilaterally undertaken by it, about which I will be writing separately) is progressing, I want to make it clear that I am expecting to receive documents in two broad categories, namely (i) those to which I am entitled as constituting part of the Companies' own books and records; and (ii) documents belonging to KML but relating to the Companies. KML undoubtedly has documents in the first category (for example, communications made and received in the name of one or other of the Companies, or by Chris Wetherhill as director of one or other of them, or by KML or Mr Wetherhill as their agent), and of course it has its own.

2.  The distinction is one of importance, since I consider the liquidators entitled as of right to receive documents in the first category, as property of the Companies. Documents of KML will be produced by KML in response to requests from the Liquidators otherwise compellable under s.195 of the Companies Act. The first category will include any privileged documents, since the privilege is that of the Companies; whereas of course KML may assert privilege to privileged documents in the second category.

3.  Please confirm that my expectation will be met.

4.  It is also important because I have now been waiting some 9 months for documents that form part of the books and records of the Companies, and the lack of them has been and continues to be a cause of serious possible prejudice to the conduct of these liquidations and the expectations and rights of the Companies' creditors and members. In your letter of 19 January, you wrote that completion of the review of the 100,000 emails "will probably not be until mid to late March". In light of the history, I am unable to allow this to continue beyond mid-March, and so I also write to let you know that I am treating 15 March 2010 as a deadline beyond which I am not prepared to see this go. It will not be a convincing reason for delay beyond that date to say that KML (or your firm for that matter) has insufficient resources to work any faster: As you know, KML received literally hundreds of millions of dollars in fees from the two Companies; if it does not have enough funds for this duty to be

performed at a more reasonable speed, no doubt its owners can put some of that money back so that it can. Beyond this deadline we will be in court.

5.   Turning to the suggestion in your letter of 19 January, this was to transmit material on an interval basis. I wish to accept that offer, so shall be grateful if you would kindly make arrangements to produce now to Mark Chudleigh what has been reviewed up to today's date, and between now and 15 March to produce the balance at weekly intervals as from today.

I look forward to hearing from you.

Yours sincerely

**W R Tacon**
Joint Liquidator

**ZC** ZOLFO COOPER

26 February 2010

FIM Advisors LLP
Buchanan House
3 St James's Square
London
SW1Y 4JU

**By email pniel@fim-group.com**

*For the attention of Philip Niel*

P.O. Box 4571
2nd Floor, Palm Grove House
Wickhams Cay, Road Town
Tortola
British Virgin Islands VG1110
t: +1 284 494 9600
f: +1 284 494 9601
www.zolfocooper.com

Dear Sirs

### Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd – in Liquidation (the "Funds")

I refer to your letter of 4 January 2010.

1.  May I take it please that, just as on occasions (such as in your letter under reply) you answer letters addressed to FIM Limited, when I address questions to and make requests of you – FIM Advisers LLP – you will respond on behalf of yourselves and also FIM Limited?

2.  When I use the word 'FIM' in isolation in this letter I refer to you and/or FIM Limited.

3.  We take it that the reference in the second paragraph of your letter of 4 January to a bullet point question under the heading 'KML' is a reference to my letter to FIM Limited dated 24 November 2009. Assuming that is correct,

    3.1  Would you please answer the first bullet point question, viz., "In what way and by what steps did FIM establish Kingate Global? Were the founder shares issued to FIM Limited, or any other persons connected with FIM Limited? If not, how did FIM Limited establish Kingate Global, and what was its connection?" You acknowledge that this question relates to the Funds.

    3.2  It is true that other questions under that heading relate to KML and FIM, but they also relate to the Funds, as I believe you are well aware.

    3.3  As stated at the start of that heading, FIM 'established' Kingate Global. As the question in 3.1 above indicates, I do not know the answer to it, so nor do I know what (if any) FIM's role was in the subsequent establishment of Kingate Euro Fund Limited, (although I am generally aware of the commercial reasoning behind its establishment) and I would like to know that too.

    3.4  KML was the 'manager' of the Funds. The relationship between the Funds and KML was not merely contractual: there was a common director, Mr. Wetherhill and under BVI legislation, any fund must have a manager. But since almost everything the Fund did was delegated to KML almost all the questions I or any other outsider has about the Funds lead to KML. As I know that you are perfectly well aware of this, the implication in your letter that questions I have asked you about KML do not also

1

**ZC** ZOLFO COOPER

relate to the Funds is remarkable. To reinforce this I should mention that in June 2009 Mr. Wetherhill told me that the only business of KML was to manage the Funds. In these circumstances, every question I ask you about KML relates to the Funds.

3.5    KML, on behalf of the Funds, contracted with FIM. FIM was paid fees for the consultancy services it provided to the Funds. The Funds invested all their assets in BLMIS. FIM's principals were in regular personal contact with Mr. Madoff. Mr. Madoff perpetrated one of the largest and most serious frauds of recent times, one consequence of which is that the Funds lost all but a tiny fraction of their property. Enormous fees – hundreds of millions of dollars – were paid by the Funds to KML, for doing what amounted to very little. I have every reason to believe that KML distributed its vast profits to its owners. KML's registered shareholders are professed nominees. Mr. Wetherhill, albeit a director of KML, tells me that he does not know who its beneficial owners are. FIM was in regular close contact and communication with Mr. Wetherhill, even in relation to arranging visits by the Funds' auditors to BLMIS and Mr. Madoff in New York. I should add that KML has been particularly unco-operative with me in producing documents of and relating to the Funds, including the Funds own documents, held on KML's computer servers. I believe that FIM can elucidate the true relationships between the Funds, their manager, their manager's and the Funds' consultant, ownership of the Funds' manager (which received substantial fees from the Funds) and the ultimate destinations and recipients of those sums. Such information is of importance to me in carrying out my investigations into the businesses of the Funds. The questions under the heading you refer to do indeed relate to FIM, but they also relate to the Funds, which is why I have asked you to answer them.

3.6    I appreciate your concern that the answer to one question may lead to another. Unfortunately, that is frequently a feature of enquiries liquidators have to make; it is usually not possible to ask all relevant questions at once. Accordingly, I cannot give you the confirmation you request in your final paragraph. I have tried to limit questions and requests for documents to those I have considered to be most important and at the same time minimising inconvenience to you, rather than, for example, asking you to produce all documents in your possession or power 'relating to' the Funds. I am disappointed you do not appear to recognise my approach to be constructive, targeted and pragmatic.

3.7    The enormity of the fraud carried out by Mr. Madoff will certainly not have been lost on you or your advisers. The Funds lost billions of dollars in purported investments analysed by FIM in its regular reports to KML for the benefit of the Funds. FIM's role in the Funds' structures currently leaves a great deal to be explained. I have little doubt that any court that I ask to assist me in getting to the bottom of these matters by examining FIM's officers and producing the documents I have so far asked for, and more, will readily do so.

I look forward to your co-operation. If you do not provide it by answering the questions I have asked you, by 5 March 2010, I will immediately move to apply for the assistance of the English Court.

If you have any questions with regard to this letter, kindly contact Mr. Richardson.

Yours faithfully

**W R Tacon**
Joint Liquidator

2

| From: | Robert Loigman |
|---|---|
| Sent: | Thursday, July 15, 2010 7:18 PM |
| To: | Hirschfield, Marc E.; Chockley, Frederick W. |
| Cc: | Robert Dakis; Joseph Hammond; Sarah Rubin |
| Subject: | BLMIS Kingate -- Draft Tracing Summary (Confidential) |
| Attachments: | CONFIDENTIAL Draft Tracing Analysis.pdf |

WITHOUT PREJUDICE
CONFIDENTIAL MATERIALS

Marc and Fritz:  When we spoke on Wednesday, I explained that Zolfo Cooper had put together a draft "tracing" summary of payments to KML.  The draft, as I explained, is incomplete because it does not account for certain payments to KML.  Specifically, the summary addresses management fees that were paid to KML between 2002 and 2008.  It does not include, however, (a) administration fees relating to FOREX (for Kingate Euro), and (b) redemption fees or load fees (for Kingate Euro and Global).  While the management fees – i.e., those included in the summary – are the bulk of all fees paid by the Funds to KML, we will not know the complete effect of adding the other fees until the analysis is redone.  We do not expect that these smaller amounts will have a material effect on the results of the draft tracing.

The draft summary shows, for each year, the payments to KML, and how much of those payment came from subscription monies (i.e., monies never paid into BLMIS), and how much came from funds withdrawn by the Funds from their BLMIS accounts.

As you'll understand, this is a draft document that is subject to change, and which will necessarily be revised as the JLs undertake the tracing analysis with more information.  We are providing the document to you without prejudice and subject to our agreed confidentiality provisions.

Please let us know if you have any questions.

Regards,
Bob


**Robert S. Loigman** ▫ **Partner**
**Quinn Emanuel Urquhart & Sullivan, LLP**
**51 Madison Avenue, 22nd Floor**
**New York, NY 10010**
**Direct: (212) 849-7444**
**Main Phone: (212) 849-7000**
**Main Fax:  (212) 849-7100**
E-mail:  robertloigman   quinnemanuel.com
Web:  www.quinnemanuel.com


The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**Kingate Global Limited**

Analysis of source of payments to KML

| Year | Total paid to KML per BoB statements | Paid from BLMIS monies | Paid from Subscription monies | Amounts paid to KML per audited accounts | Note |
|---|---|---|---|---|---|
| 2002 | 2,251,060 | 0 | 2,251,060 | | 1 |
| 2003 | 28,259,375 | 0 | 28,259,375 | 28,495,194 | |
| 2004 | 31,371,662 | 0 | 31,371,662 | 31,665,162 | |
| 2005 | 33,999,239 | 2,827,903 | 31,171,336 | 34,017,453 | |
| 2006 | 34,118,556 | 9,636,800 | 24,481,756 | 34,408,746 | |
| 2007 | 38,474,353 | 0 | 38,474,353 | 38,783,479 | |
| 2008 | 38,048,952 | 6,859,089 | 31,189,864 | 34,658,202 | 2 |
| Total | 206,523,197 | 19,323,792 | 187,199,406 | 202,028,236 | |
| Percentage | | 9.36 | 90.64 | | |

1. This is only December of 2002
2. No audited accounts prepared, amount is therefore per KML ledgers

| **From:** | Robert Dakis |
|---|---|
| **Sent:** | Friday, November 12, 2010 4:12 PM |
| **To:** | Chockley, Frederick W.; Hirschfield, Marc E.; Burke, John |
| **Cc:** | Robert Loigman; Joseph Hammond; Sarah Rubin |
| **Subject:** | Kingate -- Tracing Analysis |
| **Attachments:** | 101110 Note to accompany Tracing Analysis.pdf; 101110 Tracing Analysis.xls |

Attached please find the tracing analysis and accompanying cover note.

Best,

Robert

**Robert K. Dakis**
**Quinn Emanuel Urquhart    Sullivan, LLP**
**51 Madison Avenue, 22nd Floor**
**New York, NY 10010**
**Direct: (212) 849-7447**
**Main Phone: (212) 849-7000**
**Main Fax:  (212) 849-7100**
E-mail:  robertdakis   quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

Confidential - Subject to Confidentiality Agreement
Privileged

# KGF & KEF - Notes on Tracing Exercise

1.1   The analysis was undertaken to identify the source of payments made by the Funds to investors (redemptions), and KML (remuneration), to determine what amounts had been paid to these parties from BLMIS sourced monies and what amount had been paid using non-BLMIS sourced monies (receipts from investors).

1.2   The analysis was undertaken for the period 6 years prior to the bankruptcy of BLMIS, from 11 December 2002 - 11 December 2008.

1.3   The analysis has been conducted on a first in - first out basis ("FIFO"). Payments made by the Funds were allocated against the monies available in the Funds' accounts in the order in which the monies were received.

1.4   There are no definitive results for the analysis. Instead, the assumptions that have had to be made in order to complete the analysis, which are further detailed in this note, have led to a range of possibilities. The lower ends and higher ends of each range of possibilities is given below, the 'true' result will fall between these figures. An explanation of these ranges and the 2 scenarios noted for KEF can be found in paragraphs 1.20 to 1.24. Tables setting out the findings are below:

**Results**

**KGF**

| | Payments made to KML | | | |
|---|---|---|---|---|
| | From BLMIS sourced monies | | From non-BLMIS sourced monies | |
| | Amount US$ | % | Amount US$ | % |
| Lower end | 9,443,419 | 4.53% | 199,069,884 | 95.47% |
| Upper end | 26,813,135 | 12.86% | 181,700,168 | 87.14% |

| | Payments made to Redeemers | | | |
|---|---|---|---|---|
| | From BLMIS sourced monies | | From non-BLMIS sourced monies | |
| | Amount US$ | % | Amount US$ | % |
| Lower end | 201,735,327 | 7.19% | 2,604,110,632 | 92.18% |
| Upper end | 301,735,327 | 10.75% | 2,504,110,632 | 89.25% |

Confidential - Subject to Confidentiality Agreement
Privileged

**KEF**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Payments made to KML | | | | | | | |
| | Scenario 1 | | | | Scenario 2 | | | |
| | From BLMIS sourced monies | | From non-BLMIS sourced monies | | From BLMIS sourced monies | | From non-BLMIS sourced monies | |
| | Amount € | % | Amount € | % | Amount € | % | Amount € | % |
| Lower end | 2,662,241 | 5.36% | 47,049,678 | 94.64% | 29,864,891 | 60.08% | 19,847,028 | 39.92% |
| Upper end | 7,185,805 | 14.45% | 42,526,114 | 85.55% | 34,388,455 | 69.18% | 15,323,464 | 30.82% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Payments made to Redeemers | | | | | | | |
| | Scenario 1 | | | | Scenario 2 | | | |
| | From BLMIS sourced monies | | From non-BLMIS sourced monies | | From BLMIS sourced monies | | From non-BLMIS sourced monies | |
| | Amount € | % | Amount € | % | Amount € | % | Amount € | % |
| Lower end | 79,936,883 | 13.44% | 515,007,028 | 86.56% | 107,139,533 | 18.01% | 487,804,378 | 81.99% |
| Upper end | 156,036,166 | 26.23% | 438,907,745 | 73.77% | 183,238,816 | 30.80% | 411,705,095 | 69.20% |

**Methodology**

1.5     The analysis was undertaken on all the Funds' bank accounts that were used to receive monies from or pay monies to investors and BLMIS, all of which were held at the Bank of Bermuda, (as further detailed in paragraphs 1.13 to 1.14 below) and involved tracing the source of receipts into these accounts to determine what amounts had been paid to these parties from BLMIS sourced monies and what amounts had been paid using non-BLMIS sourced monies, i.e. receipts from investors.

1.6     Payments made by the Funds were allocated against the monies available in the Funds' accounts in the order in which the monies were received. This has been a manual exercise, it could not be undertaken using formulae in a spreadsheet in view of the complexity of the analysis and the anomalies encountered.

1.7     The anomalies that were encountered during the analysis are explained in paragraphs 1.8 to 1.28 below.

**Format change in Bank Statements**

1.8     On 1 July 2008 the format of all the bank statements changed to one which no longer listed transactions in the order they occurred, but instead by size of the transaction on any particular day.

Confidential - Subject to Confidentiality Agreement
Privileged

1.9     After enquiries, the Bank of Bermuda were unable to provide the timings of the transactions, therefore it was not possible to continue the FIFO tracing after 1 July 2008.

1.10    Substantial transactions occurred after 30 June 2008 and in view of the impossibility of continuing with the FIFO basis as before, certain assumptions have been made which have given rise to a range of possible answers referred to in the tables above. The lower end results represent the outcome if all payments were made from non-BLMIS sourced monies. The upper end results represent the outcome if all payments, subject to the qualification noted in paragraph 1.12 below for KGF only, were made from BLMIS sourced monies.

1.11    The results at each end of the range of possibilities include all payments made during the period. Therefore, as stated in paragraph 1.4, the results set out in the summary represent the range of possibilities and the 'true' result will fall within the ranges given.

1.12    At 30 June 2008 the FIFO tracing indicated that the balance in KGF's account only comprised non-BLMIS sourced monies. Payments of approximately US$290m were made during the period 1 July 2008 to 11 December 2008 to KML and redeeming investors, but KGF only received US$100m from BLMIS during this period. Therefore, it is not appropriate to assume that all payments could have been made from BLMIS sourced monies. The realistic assumption adopted is that the maximum amount paid from BLMIS sourced monies at the upper end of the range of results is US$100m, representing approximately 35% of the payments in that period.

**Relevant Bank Accounts**

1.13    KGF held a number of bank accounts at Bank of Bermuda ("BoB"). After reviewing each of them, it was apparent that all transactions involving BLMIS sourced monies occurred in its US$ account, therefore this was the only account considered in the tracing analysis for KGF.

1.14    KEF also held a number of bank accounts at BoB. After reviewing them, it was apparent that all transactions involving BLMIS sourced monies occurred only in its US$ account. KEF, however, also operated a Euro account which was used to receive and pay monies from and to investors and to pay fees to KML. Both the Euro and US$ accounts were considered in the tracing analysis.

**Determining the Correct Starting Point**

1.15    Although the analysis began at 11 December 2002 (6 years prior to commencement of BLMIS bankruptcy), it was necessary to determine the composition of the cash balance held by each of the Funds in their bank accounts at that date in order to determine what proportions were BLMIS and non-BLMIS sourced.

1.16    This was determined by working backward through the receipts from 11 December 2002 until such point as these receipts totalled the cash balance in the account as at 11 December 2002. The source of these receipts leading up to 11 December 2002 was then examined and it was determined that none came from BLMIS. Therefore the cash balance in the accounts at 11 December 2002 only comprised non-BLMIS sourced monies.

Confidential - Subject to Confidentiality Agreement
Privileged

**Transfers made between bank accounts**

**Fund to Fund**

1.17    Transfers occurred between KGF and KEF in instances where an investor wished to change the fund in which they were invested.

1.18    Due to the Funds each using a different currency to handle monies from investors, the transfers between KGF and KEF included a foreign exchange from US$ to Euro, or vice versa.   The rates at which the exchanges took place are disclosed in the bank statements for each account.

1.19    Because any transfer between the Funds could consist of BLMIS sourced monies, the tracing analysis had to be undertaken for both Funds, on all three relevant bank accounts, simultaneously to be sure that BLMIS sourced monies could be tracked through the accounts correctly.   In each transfer, the proportion of BLMIS sourced and non-BLMIS sourced monies was maintained when the monies were received in the transferee account, notwithstanding the currency conversion.


**Foreign exchange in Kingate Euro**

1.20    KEF received subscriptions and paid redemptions and fees to KML from its Euro account, however it paid subscriptions to and received redemptions from BLMIS using its US$ account.   KEF, in anticipation of its future currency needs, entered into a number of foreign exchange futures contracts with BoB.   The contracts were conducted via the bank accounts reviewed in this exercise (not via a separate foreign exchange futures account).   The bank required that KEF always maintained a certain, but unknown, cash balance to support the contracts, however the source of this balance (BLMIS or non-BLMIS) was constantly changing.

1.21    There are therefore a number of credits and debits in KEF's accounts which reflect foreign exchange gains and losses. Some of these arise as a result of transactions based on monies identifiable as having been introduced by either subscribers or BLMIS and in such cases, gains or losses  have been allocated between these sources accordingly.

1.22    We have allocated the €27,202,649.78 in profits arising on currency transactions to non-BLMIS sourced monies.  The profits are cash profits and not accounting profits and should have been allocated between BLMIS and non-BLMIS sourced monies proportionate to the source of the monies that comprised the principal of the currency transaction in question. It would be overly burdensome, however, to calculate how these profits should have been allocated as it would require us to re-do the entire analysis from scratch.

1.23    The need to re-allocate these profits only affects KEF; so the tracing exercise has not been re-calculated.  As with the format change in the bank statements already noted above, it is possible to analyse the effect of this error on the final results of the analysis on 2 different assumptions. As in paragraph 1.4 above, these different assumptions represent the extreme range of possible results:

> Scenario 1 - all €27,202,649.78 is attributable to non-BLMIS monies and therefore all resulting payments were made from non-BLMIS sourced monies

Confidential - Subject to Confidentiality Agreement
Privileged

Scenario 2 - all €27,202,649.78 is attributable to BLMIS monies and therefore all
resulting payments were made from BLMIS sourced monies.

1.24   Scenario 1 is the basis on which the tracing exercise has been conducted so no
amendment is needed to the results reported in the tables above to show the outcome
of this scenario.  However, Scenario 2 requires an amendment to the results in the
tables above.


**Overdrawn Position**

1.25   There are instances in each account where payments were made which led the account
to become overdrawn.  In these cases, any payments or portion of a payment that
caused an account to become overdrawn must have been paid from a facility in effect
provided by BoB and therefore could not be considered to have originated from BLMIS
monies.

1.26   When the next receipt or portion of a receipt entered the account, from whatever
source, to cover the amount overdrawn, this was treated as having been paid to BoB to
clear the overdraft.

1.27   The transactions that either lead to, or reduce or eliminate, an overdrawn balance
been highlighted in the analysis with red text.


**No Need for Detailed Payment Allocation at Certain Points**

1.28   At points in the analysis, all BLMIS sourced monies had been spent and only non-BLMIS
sourced monies remained in the accounts.  We have not provided a detailed payment
allocation analysis during these periods, as all payments to KML and to investors during
these periods could only have been made from non-BLMIS sourced monies.  The periods
of time where no detailed allocation is provided have been marked clearly on the
analysis - during these periods we have only shown the totals for redemptions paid and
the various fees paid to KML.

# User Guide

Confidential - Subject to Confidentiality Agreement

Privileged

### Column A

This column denotes the 1st date of each month included in the analysis.

### Column B

This column categorises the nature of the transaction. When several transactions falling into the same category take place consecutively they have been summed on one row.

### Columns C to E

These columns were used to perform the analysis of the sources of cash available in KGF's US$ account. Column C shows all non-BLMIS sourced monies received and all subsequent payments made from these receipts. Column D shows all BLMIS sourced monies received and all subsequent payments made from these receipts. Receipts are shown with positive figures and payments are shown with negative figures. Column E was used to keep a running 'tally' through the analysis of which amounts of cash were available for use against payments. As each amount was used against a payment it was deleted from the tally, this is why this column is now blank.

### Columns F to H

These columns were used to perform the analysis of the sources of cash available in KEF's Euro account. Column F shows all non-BLMIS sourced monies received and all subsequent payments made from these receipts. Column G shows all BLMIS sourced monies received and all subsequent payments made from these receipts. Receipts are shown with positive figures and payments are shown with negative figures. Column H was used to keep a running 'tally' through the analysis of which amounts of cash were available for use against payments. As each amount was used against a payment it was deleted from the tally, this is why this column is now blank.

### Columns I to K

These columns were used to perform the analysis of the sources of cash available in KEF's US$ account. Column I shows all non-BLMIS sourced monies received and all subsequent payments made from these receipts. Column J shows all BLMIS sourced monies received and all subsequent payments made from these receipts. Receipts are shown with positive figures and payments are shown with negative figures. Column K was used to keep a running 'tally' through the analysis of which amounts of cash were available for use against payments. As each amount was used against a payment it was deleted from the tally, this is why this column is now blank.

### Columns L to AC

These columns simply contain a summary of the information contained in columns C to H detailing the sources of the various payment types.

12-01920-smb    Doc 25-11    Filed 02/18/14    Entered 02/18/14 10:45:18    Exhibit K    Pg 8 of 9

## Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.

Confidential - Subject to Confidentiality Agreement
Privileged

Analysis of source of all payments to KML (Management fees, Load fees, Redemption fees and Admin fees - Euro ONLY)

### Kingate Global

11 December 2002 to 30 June 2008

| Year | Total fees paid to KML per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| 2002 | 2,292,660 | 0 | 2,292,660 |
| 2003 | 28,593,600 | 0 | 28,593,600 |
| 2004 | 31,762,073 | 0 | 31,762,073 |
| 2005 | 34,074,056 | 2,827,903 | 31,246,153 |
| 2006 | 34,622,539 | 6,615,516 | 28,007,022 |
| 2007 | 38,952,848 | 0 | 38,952,848 |
| 2008 | 20,845,812 | 0 | 20,845,812 |
| Total KML Fee Payments $ | 191,143,587 | 9,443,419 | 181,700,168 |
| Percentage | | 4.94% | 95.06% |

1 July 2008 to 11 December 2008 (refer to paragraphs 1.08 to 1.12 of the Tracing Note)

KML Fee Payments $    17,369,716

11 December 2002 to 11 December 2008

| | Total fees | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| Lower end | | | |
| Total KML Fee Payments $ | 208,513,303 | 9,443,419 | 199,069,884 |
| Percentage | | 4.53% | 95.47% |
| Upper end | | | |
| Total KML Fee Payments $ | 208,513,303 | 26,813,135 | 181,700,168 |
| Percentage | | 12.86% | 87.14% |

### Kingate Euro

11 December 2002 to 30 June 2008

| Year | Total fees paid to KML per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| 2002 | 548,329 | 0 | 548,329 |
| 2003 | 6,834,483 | 1,543 | 6,832,940 |
| 2004 | 7,652,215 | 614,012 | 7,038,203 |
| 2005 | 8,506,056 | 1,403,261 | 7,102,795 |
| 2006 | 7,508,134 | 643,424 | 6,864,710 |
| 2007 | 9,001,649 | 0 | 9,001,649 |
| 2008 | 5,137,488 | 0 | 5,137,488 |
| Total KML Fee Payments $ | 45,188,355 | 2,662,241 | 42,526,114 |
| Percentage | | 5.89% | 94.11% |

1 July 2008 to 11 December 2008 (refer to paragraphs 1.08 to 1.12 of the Tracing Note)

KML Fee Payments €    4,523,564

11 December 2002 to 11 December 2008

| | | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| Lower end | | | |
| Total KML Fee Payments € | 49,711,919 | 2,662,241 | 47,049,678 |
| Percentage | | 5.36% | 94.64% |
| Upper end | | | |
| Total KML Fee Payments € | 49,711,919 | 7,185,805 | 42,526,114 |
| Percentage | | 14.45% | 85.55% |

11 December 2002 to 11 December 2008 (refer to paragraphs 1.20 to 1.24 of the Tracing Note)

Profits €    27,202,650

11 December 2002 to 11 December 2008

| | | | |
|---|---|---|---|
| Scenario 1) | | | |
| Total KML Fee Payments € | 49,711,919 | 29,864,891 | 19,847,028 |
| Percentage | | 60.08% | 39.92% |
| Scenario 2) | | | |
| Total KML Fee Payments € | 49,711,919 | 34,388,455 | 15,323,464 |
| Percentage | | 69.18% | 30.82% |

## Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.

Confidential - Subject to Confidentiality Agreement
Privileged

Analysis of source of all redemption payments to investors

### Kingate Global

11 December 2002 to 30 June 2008

| Year | Total redemptions paid per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| 2002 | 42,501,305 | 0 | 42,501,305 |
| 2003 | 383,431,070 | 0 | 383,431,070 |
| 2004 | 371,433,824 | 408,137 | 371,025,687 |
| 2005 | 455,039,957 | 78,242,837 | 376,797,120 |
| 2006 | 435,357,267 | 123,084,354 | 312,272,913 |
| 2007 | 543,589,093 | 0 | 543,589,093 |
| 2008 | 301,518,917 | 0 | 301,518,917 |
| Total Redemption Payments $ | 2,532,871,432 | 201,735,327 | 2,331,136,105 |
| Percentage | | 7.96% | 92.04% |

1 July 2008 to 11 December 2008 (refer to paragraphs 1.08 to 1.12 of the Tracing Note)

Redemption Payments $    272,974,527

11 December 2002 to 11 December 2008

| | Total redemptions paid per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| Lower end | | | |
| Total Redemption Payments $ | 2,805,845,959 | 201,735,327 | 2,604,110,632 |
| Percentage | | 7.19% | 92.81% |
| Upper end | | | |
| Total Redemption Payments $ | 2,805,845,959 | 301,735,327 | 2,504,110,632 |
| Percentage | | 10.75% | 89.25% |

### Kingate Euro

11 December 2002 to 30 June 2008

| Year | Total redemptions paid per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| 2002 | 7,707,374 | 0 | 7,707,374 |
| 2003 | 61,771,745 | 7,792,678 | 53,979,067 |
| 2004 | 84,144,489 | 3,923,550 | 80,220,940 |
| 2005 | 126,614,339 | 63,813,017 | 62,801,322 |
| 2006 | 75,963,174 | 4,407,638 | 71,555,536 |
| 2007 | 120,227,854 | 0 | 120,227,854 |
| 2008 | 42,415,653 | 0 | 42,415,653 |
| Total Redemption Payments € | 518,844,628 | 79,936,883 | 438,907,745 |
| Percentage | | 15.41% | 84.59% |

1 July 2008 to 11 December 2008 (refer to paragraphs 1.08 to 1.12 of the Tracing Note)

Redemption Payments €    76,099,283

11 December 2002 to 11 December 2008

| | Total redemptions paid per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| Lower end | | | |
| Total Redemption Payments € | 594,943,910 | 79,936,883 | 515,007,027 |
| Percentage | | 13.44% | 86.56% |
| Upper end | | | |
| Total Redemption Payments € | 594,943,910 | 156,036,166 | 438,907,745 |
| Percentage | | 26.23% | 73.77% |

11 December 2002 to 11 December 2008 (refer to paragraphs 1.20 to 1.24 of the Tracing Note)

Profits €    27,202,650

11 December 2002 to 11 December 2008

| | Total redemptions paid per bank statements | Portion paid from BLMIS $ | Portion paid from subscription $ |
|---|---|---|---|
| Scenario 1) | | | |
| Total Redemption Payments € | 594,943,910 | 107,139,533 | 487,804,377 |
| Percentage | | 18.01% | 81.99% |
| Scenario 2) | | | |
| Total Redemption Payments € | 594,943,910 | 183,238,816 | 411,705,095 |
| Percentage | | 30.80% | 69.20% |

12-01920-smb    Doc 24-3    Filed 02/19/14    Entered 02/19/14 19:12:50    Main Document -
Pg 23 of 27

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>            PLAINTIFF-APPLICANT,<br><br>V.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>            DEFENDANT. | NO. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(SUBSTANTIVELY CONSOLIDATED) |
| IN RE:<br><br>BERNARD L. MADOFF,<br><br>            DEBTOR. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC<br><br>            PLAINTIFF<br><br>V.<br><br>KINGATE GLOBAL FUND, LTD., by its Liquidators, and KINGATE EURO FUND, LTD., by its Liquidators.<br><br>            DEFENDANTS. | Adv. Pro. No. 12-01920 (SMB) |

## AFFIDAVIT OF MARK GUY CHUDLEIGH

I, MARK GUY CHUDLEIGH, of Sedgwick Chudleigh Ltd., E.W. Pearman Building, 20 Brunswick Street, Hamilton HM10, Bermuda, under penalty of perjury, state as follows:

### Introduction

1. I make this Affidavit in support of the *Opposition of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. to Trustee's Application for Enforcement of Automatic Stay and Injunction* against Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (together, "the Kingate Funds").

2. I am a barrister and attorney and the managing director of Sedgwick Chudleigh Ltd., a Bermuda law firm ("Sedgwick Chudleigh"). Sedgwick Chudleigh act for the Kingate Funds and their Joint Liquidators ('the JLs') in litigation and liquidation matters in Bermuda, and I personally have conduct, along with a number of colleagues working under my supervision, of the Kingate Funds' litigation against Kingate Management Limited ("KML") and various other defendants in proceedings being brought in the Supreme Court of Bermuda, in Civil Jurisdiction 2010: No. 454 ("the Bermuda Proceedings").

3. The facts and matters set out in this Affidavit are within my own knowledge, save where the contrary appears, and are true. Where facts and matters are not within my own knowledge, I state the sources of my information and belief, and believe such matters to be true.

4. I have been asked to describe the procedural history, and current status, of the Bermuda Proceedings and to express an opinion on the potential consequences if the Kingate Funds are restrained from pursuing or progressing the Bermuda Proceedings.

**History and Current Status of the Kingate Funds' Liquidation Processes and Bermuda Proceedings**

5. The Kingate Funds were incorporated in the British Virgin Islands ("BVI") in 1994 and 2000, respectively, under the International Business Companies Act (Cap 291) (BVI), and were authorised by the BVI Financial Services Commission to carry on business as Professional Funds under the Mutual Funds Act 1996 (as amended) (BVI).

6. The Kingate Funds carried on business as open-ended investment funds in Bermuda, as exempt companies under the Companies Act 1981 (Bermuda), where their manager, KML, was incorporated, where their administrators (Citi Hedge Fund Services) were situated, and where their bankers (Bank of Bermuda, now HSBC Bank of Bermuda) and their auditors (PricewaterhouseCoopers) were also situated.

7. After sustaining losses in the hundreds of millions of dollars as a result of the fraud perpetrated by, and subsequent collapse of, Bernard L. Madoff Investment Securities

LLC, the Kingate Funds were placed first into provisional liquidation by Orders of the
High Court of the British Virgin Islands on 8 May 2009, and then into permanent
liquidation by Orders of that Court on 4 June 2009. The two funds thus became the
subject of permanent liquidation processes under the supervision of the Court of the BVI.
The JLs are officers of that Court.

8.   The Kingate Funds are also in liquidation in Bermuda, having been so placed by Orders
of the Supreme Court of Bermuda made on 4 September 2009. The same joint
liquidators were appointed by that Court, together with an additional liquidator being a
Bermuda resident, as officers of that Court acting also under its supervision.

9.   Statutory stays prohibiting the commencement or continuation of any proceedings against
the Kingate Funds (without the permission of the Court) came into force in the BVI on 8
May 2009 pursuant to section 175(1)(c) of the Insolvency Act 2003( BVI), and in
Bermuda on 4 September 2009 pursuant to section 167(4) of the Companies Act 1981
(Bermuda).

10.   The JLs required, applied for and obtained Orders ("sanction") from both the BVI and
Bermuda Courts dated 1 November 2010 and 8 December 2010 respectively to cause the
Kingate Funds to commence proceedings in the Supreme Court of Bermuda against KML
and others ("the Bermuda Defendants"). On 22 December 2010 the Kingate Funds duly
commenced the Bermuda Proceedings, asserting claims against the Bermuda Defendants
for unjust enrichment arising from the Bermuda Defendants' receipt of unearned
management fees, and for damages for breach of contract and negligence flowing from
duties owed directly to the Kingate Funds.

11.   The Kingate Funds have taken a variety of steps to advance the Bermuda Action. After
the initial writ was issued, the Kingate Funds (a) framed and drafted detailed particulars
to support their claims based on extensive documentary records, (b) negotiated service
with multiple defendants outside of the Bermuda jurisdiction, (c) addressed extensive
applications before the BVI Court filed by the various trustee defendants to the Bermuda
Proceedings for permission to defend against the Kingate Funds' claims and to fund the
defense from the trusts, (d) successfully participated —in conjunction with the Trustee—
in the hearing of an application before the Bermuda Court to wind-up KML and to

3

appoint the Official Receiver of Bermuda as its provisional liquidator in place of its
previous provisional liquidators, (e) sought and obtained relief from the Bermuda Court,
which ordered the lifting of the KML stay to enable the action to proceed against KML,
(f) engaged in extensive exchanges of pleadings and amended pleadings with KML and
the other defendants, including a Court hearing of an application to re-amend the Kingate
Funds' pleadings (which was initially resisted by the Bermuda Defendants but then
resolved by agreement), (g) engaged in negotiations with KML and the other Bermuda
Defendants regarding case management directions, and (h) commenced extensive
document management and review. Through a portion of this time in 2012, the Trustee
and the JLs were operating pursuant to a common interest agreement, which expired
pursuant to its terms.

**Potential consequences if the Kingate Funds are restrained from pursuing or progressing
the Bermuda Proceedings**

12. In my opinion, if the Kingate Funds are prevented from progressing the Bermuda
    Proceedings actively, or if they are prevented from complying with any procedural
    directions which the Supreme Court of Bermuda might make by Court order, or if they
    are prevented from responding to any interlocutory application which another party might
    make, they run the risk of (a) not being able to progress the Bermuda Proceedings to their
    advantage; (b) breaching a procedural Order of the Supreme Court of Bermuda; and (c)
    'losing' important interlocutory applications by default.

13. The Kingate Funds also run the risk of having the Bermuda Proceedings struck out by the
    Court, if it can be established by another party that:

    6.1  the Bermuda Proceedings constitute an abuse of process, of which one
         recognized category is delay; or

    6.2  the Kingate Funds have acted in breach of Court orders or the procedural
         Rules of the Supreme Court of Bermuda.

14. The ordinary rule in civil litigation in the Supreme Court of Bermuda is that (subject to
    the precise circumstances of the case and the discretion of the judge) the 'loser' is

ordered to pay the 'winner's' legal costs and expenses. The amount of recoverable costs payable is then 'taxed' by the Registrar on the application of the receiving party if it is not otherwise capable of agreement.

15. The Kingate Funds therefore run the risk that, if the Bermuda Proceedings are struck out or dismissed, or if the Kingate Funds lose or are obliged to concede an interlocutory application, the Kingate Funds may be obliged to pay the other parties' costs of and occasioned by the Bermuda Proceedings, or the costs of the relevant stage of the proceedings.

16. In those circumstances, the Kingate Funds would also be obliged to bear their own legal costs and expenses, since as the unsuccessful party they would be unlikely to have any basis for making an application for a costs order against the other parties. Given the nature and duration of the Bermuda Proceedings, the legal costs to date (both of the Kingate Funds and the twelve defendants to the Bermuda Proceedings, individually and in the aggregate) are very substantial indeed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 17th day of February 2014 in Hamilton, Bermuda.

BY the said                                    )

MARK GUY CHUDLEIGH          )

in the City of Hamilton                )

DATED this    17th    day of February 2014

_____
**A COMMISSIONER OF OATHS**

Keren V. P. Lomas
Lomas & Co.
Commissioner for Oaths
Notary Public
20 Brunswick Street
Hamilton, Bermuda HM 10

5