**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                Plaintiff,<br><br>     v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                Defendant. | Bankruptcy Case No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                Plaintiff,<br><br>     v.<br><br>SUSANNE STONE MARSHALL; ADELE FOX; MARSHA PESHKIN; RUSSELL OASIS; A & G GOLDMAN PARTNERSHIP; and PAMELA GOLDMAN,<br><br>                Defendants. | Adv. Pro. No. 14-01840 (SMB)<br><br>**TRUSTEE'S REPLY IN SUPPORT OF APPLICATION FOR ENFORCEMENT OF PERMANENT INJUNCTION AND AUTOMATIC STAY** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...........................................................................................................................4

THE CLASS ACTION PLAINTIFFS' CLAIMS ARE BARRED .................................................4

I. THIS COURT HAS JURISDICTION AND IS THE PROPER FORUM TO DETERMINE THE APPLICABILITY OF THE PERMANENT INJUNCTION AND THE AUTOMATIC STAY....................................................4

    A. The "Mandate Rule" Is Inapplicable.............................................................4

    B. The Class Actions Are Not Immune From the Permanent Injunction and the Automatic Stay ...............................................7

II. THE CLASS ACTION CLAIMS ARE DERIVATIVE AND DUPLICATIVE OF THE TRUSTEE'S CLAIMS ................................................12

III. THE FOX PLAINTIFFS' MOTION TO DISMISS AND REQUEST FOR FEES SHOULD BE DENIED. ...............................................................19

CONCLUSION.....................................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Charter Commc'ns*,
  No. 09-11435, 2010 WL 502764 (Bankr. S.D.N.Y. Feb. 8, 2010)..........................................11

*Day v. Moscow*,
  955 F.2d 807 (2d Cir. 1991)....................................................................................................6

*DiLaura v. Power Auth. of State of New York*,
  982 F.2d 73 (2d Cir. 1992)......................................................................................................5

*Fox v. Picard*,
  848 F. Supp. 2d 469 (S.D.N.Y. 2012)...................................................................................3, 9

*Gen. Universal Sys., Inc. v. HAL, Inc.*,
  500 F.3d 444 (5th Cir. 2007) ..................................................................................................9

*Goldman v. Picard*,
  No. 12-06109, 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013) ........................................3, 9, 15

*In re Keene Corp.*,
  164 B.R. 844 (Bankr. S.D.N.Y. 1994)...................................................................................11

*Marshall v. Picard*,
  740 F.3d 81 (2d Cir. 2014)............................................................................................ *passim*

*Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
  140 B.R. 969 (N.D. Ill. 1992) ...............................................................................................11

*Medsker v. Feingold*,
  307 F. App'x 262 (11th Cir. 2008) ...................................................................................18, 19

*Michaelesco v. Estate of Richard*,
  355 F. App'x 572 (2d Cir. 2009) .............................................................................................6

*Midatlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*,
  474 U.S. 494 (1986)..............................................................................................................11

*Nixon v. Richey*,
  513 F.2d 430 (D.C. Cir. 1975)................................................................................................9

*Patterson v. Newspaper and Mail Deliverers' Union of New York and Vicinity*,
  138 B.R. 149 (S.D.N.Y. 1992)............................................................................................9, 10

*Picard v. Fox*,
  429 B.R. 423 (Bankr. S.D.N.Y. 2010)..............................................................................3, 4, 19

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Quigley Co., Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.),*
676 F.3d 45 (2d Cir. 2012)...........................................................................................8

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,*
884 F.2d 688 (2d Cir. 1989).......................................................................................19

*Stern v. Marshall,*
131 S. Ct. 2594 (2011)..................................................................................................6

*U.S. v. Quintieri,*
306 F.3d 1217 (2d Cir. 2002)........................................................................................6

**Statutes**

11 U.S.C. § 105...........................................................................................................11

**Rules**

Fed. R. Civ. P. 12......................................................................................................2, 9

**Other Authorities**

David Gelles et al., *From Behind Bars, Madoff Spins his Story*, FINANCIAL TIMES
MAGAZINE (Apr. 8, 2011)..........................................................................................17

DIANA B. HENRIQUES, THE WIZARD OF LIES: BERNARD MADOFF AND THE DEATH
OF TRUST (2011)......................................................................................................17

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff, individually, by

and through his counsel, respectfully submits this reply in support of the Trustee's Application

for Enforcement of Permanent Injunction and Automatic Stay (the "Application") to enforce the

Permanent Injunction[1] and automatic stay against Susanne Stone Marshall ("Marshall"), Adele

Fox ("Fox"), Marsha Peshkin ("Peshkin"), Russell Oasis ("Oasis") (Marshall, Fox, Peshkin and

Oasis are collectively the "Fox Plaintiffs"), and A&G Goldman Partnership, and Pamela

Goldman (collectively, the "Goldman Plaintiffs") (the Fox Plaintiffs and Goldman Plaintiffs are

collectively, the "Class Action Plaintiffs").

## PRELIMINARY STATEMENT

The Trustee and the Class Action Plaintiffs agree that before the Class Action Plaintiffs

can proceed to litigate their new complaints, a court of competent jurisdiction must determine

whether their claims violate the Permanent Injunction and the automatic stay.  Although this

Court, which issued the Permanent Injunction, is vested with jurisdiction over the administration

of the estate and the enforcement of the automatic stay, the Class Action Plaintiffs would have

the Trustee run from jurisdiction to jurisdiction to ensure the integrity of this Court's orders and

the automatic stay.  Their view is anathema to the very essence of a bankruptcy proceeding as a

centralized, efficient proceeding designed to prevent creditors from racing to courthouses across

the country.  That this is a SIPA proceeding makes no difference in this respect.  The goals of

fairness and efficiency are best met through a centralized proceeding in which the applicability

---

[1] Unless otherwise defined, all initially capitalized terms will have the meaning given to them in the
Application.

of the Permanent Injunction and the automatic stay is uniformly interpreted.  And a consistent interpretation requires that the Class Action Plaintiffs be barred from proceeding with their new complaints, in any court, because they are, as they were before, nothing more than disguised fraudulent transfer claims that are duplicative and derivative of the Trustee's claims.

The Class Action Plaintiffs' arguments, both procedural and substantive, are built on three fallacies.  First, they argue that the Second Circuit divested this Court of jurisdiction to proceed.  As the Trustee observed in opposition to a stay motion recently brought by the Fox Plaintiffs, that argument makes no sense.  To the contrary, the Second Circuit held that this Court had jurisdiction to enforce the Permanent Injunction against Fox and Marshall.  The claim that it impliedly divested this Court of the same jurisdiction at the same time defies all reason.

Second, the Class Action Plaintiffs argue that because of the procedural posture of their Florida Actions—in which the Goldman Plaintiffs seek a declaration as to whether their new claims violate the Permanent Injunction and the automatic stay, and the Fox Plaintiffs seek permission to re-open their action to assert new claims—this Court cannot touch them.  Their claim is that their actions so far cannot in and of themselves violate the Permanent Injunction or the automatic stay.  They are incorrect:  there is no reason, much less a requirement, for this Court to allow a court foreign to these proceedings to decide whether to enforce the Permanent Injunction and automatic stay that are so central to these bankruptcy proceedings.  While the Florida courts may decide whether the Class Action Plaintiffs' actions can survive a Rule 12(b)(6) motion to dismiss, it is up to this Court to first determine whether the proposed new complaints disrupt these bankruptcy proceedings as the Class Action Plaintiffs attempt to create a shadow estate.

Third, and substantively, the Class Action Plaintiffs persist in arguing that their purported

securities and other claims are different from the Trustee's fraudulent transfer claims for two

reasons.  As an initial matter, they argue that these claims are different because the Trustee does

not have standing to bring them.  That argument has been rejected by this Court, the District

Court and the Second Circuit, and cannot carry the day here.  *See Picard v. Fox*, 429 B.R. 423

(Bankr. S.D.N.Y. 2010), *aff'd*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd,* 740 F.3d 81 (2d Cir.

2014).  Next, they argue that their claims are factually different from their previously pled claims

because, following the roadmap laid out by the District Court in *Goldman v. Picard*, No. 12-

06109, 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013), they have more clearly spelled out their

theory as to how Picower's purported "control" of BLMIS harmed customers like themselves.

But just as in the prior iterations of their complaints, the facts on which they rely to allege

"control" are Picower's withdrawals from his own accounts and the false documentation in

connection with those withdrawals.  Stripped of conclusory and consciously ambiguous

language, the proposed new complaints contain no factual allegations that Picower directed the

preparation of false documentation, made misrepresentations, or took any other action that was

not incidental to directing trades *in the Picower Defendants' own accounts*.  The Goldman

Plaintiffs contend that they need not come forth with "evidence" to back their allegations despite

their promise to provide such evidence.  But they are required to come forth with particularized

factual allegations to demonstrate that they are not merely restating the same claims they made

before, which already have been adjudicated to be duplicative of the Trustee's claims.  They

have failed to make any allegation that is not a rewording of their previously rejected claims.

At bottom, this is an attempt by some BLMIS customers to circumvent the net equity

decision and obtain additional recoveries for Madoff-related losses from another BLMIS

3

customer.  But the Trustee already has settled this claim.  Not only has the Trustee recovered on

this claim for the benefit of estate customers like the Class Action Plaintiffs and the classes they

purport to represent, but the Second Circuit has affirmed the Trustee's methodology for

determining net equity, which controls the ratable distribution of the settlement proceeds to

BLMIS customers.  The Class Action Plaintiffs want to enforce their own concept of equity

despite the Second Circuit's determination.  That cannot be allowed, as it would supplant this

Court's authority to do right by BLMIS customers:  "any judgment awarded to the Florida

Plaintiffs would exceed their entitlement to BLMIS distribution under SIPA and this Court's Net

Equity Decision."  *Fox*, 429 B.R. at 437.  The Class Action Plaintiffs' attempt to create a shadow

estate based on their own conception of equity, venued in what they hope will be a more

favorable jurisdiction for them, directly harms the BLMIS estate.  Moreover, if successful, it

could undercut the Trustee's ability to settle claims for the benefit of the estate by calling into

question his ability to provide finality to parties who satisfy their claims to the Trustee in

exchange for an end to litigation on those same claims.  The Trustee respectfully requests that his

Application be granted and that the Fox Plaintiffs' motion to dismiss be denied.

## ARGUMENT

## THE CLASS ACTION PLAINTIFFS' CLAIMS ARE BARRED

**I.    THIS COURT HAS JURISDICTION AND IS THE PROPER FORUM TO
DETERMINE THE APPLICABILITY OF THE PERMANENT INJUNCTION
AND THE AUTOMATIC STAY.**

### A.    The "Mandate Rule" Is Inapplicable

The Fox Plaintiffs filed an emergency motion to stay (the "Stay Motion") the Trustee's

Application on the day before their opposition to the Application was due, arguing that this Court

had been divested of jurisdiction to determine whether their claims are barred by the Permanent

Injunction and the automatic stay.  (*See* ECF No. 16 (Apr. 17, 2014).)  The Fox Plaintiffs make

those same arguments here, as do the Goldman Plaintiffs (who were not party to the Stay

Motion).  As argued in the Trustee's Response to the Stay Motion ("Trustee's Response to Stay

Motion"), which is fully incorporated herein, this Court has ample jurisdiction and is the proper

forum to determine if the Class Action Plaintiffs' claims violate the automatic stay and the

Permanent Injunction.[2]

The Goldman Plaintiffs concede that this Court would have jurisdiction to enforce the

automatic stay.  (*See* Opposition of Goldman Plaintiffs ("Goldman Br.") at 12 n.2.)  But, they

argue, as do the Fox Plaintiffs, that the Second Circuit impliedly divested this Court of

jurisdiction to determine the applicability of the Permanent Injunction when it stated:  "There is

conceivably some particularized conspiracy claim appellants could assert that would not be

derivative of those asserted by the Trustee.  That question, however, is not properly before us,

and is a question in the first instance for the United States District Court for the Southern District

of Florida."  *Marshall v. Picard*, 740 F.3d 81, 94 (2d Cir. 2014).  Thus, they contend, it would

have been improper to seek permission to proceed from this Court.  They are wrong.

As argued in the Trustee's Response to Stay Motion, this reference in the Second

Circuit's opinion pertains to an issue that was not before the Second Circuit and was never

argued.  It is not part of the Second Circuit's Mandate.  This *dictum* was neither law-of-the-case

nor some type of implicit binding divestiture of this Court's jurisdiction to enforce its own order.

*See DiLaura v. Power Auth. of State of New York*, 982 F.2d 73, 76 (2d Cir. 1992) (declining to

apply law-of-the-case doctrine where prior ruling may be *dictum*).[3]  To the contrary, the Second

---

[2] A hearing on the Stay Motion took place earlier today, and this Court reserved decision.  The Trustee's oral argument is incorporated herein.

[3] *See* Trustee's Response to Stay Motion at 16-17 and cases cited therein.  For the same reason, authority cited by the Fox Plaintiffs for the view that *res judicata* and the "mandate rule" bar the Trustee is

*(continued on next page)*

Circuit explicitly held, on two separate grounds, that this Court had jurisdiction to issue and

enforce the Permanent Injunction. *See Marshall*, 740 F.3d at 89 (this Court has jurisdiction to

enjoin duplicative or derivative claims, like those in the Initial Florida Actions, because they

"undoubtedly have an effect on the bankruptcy estate . . . ") and 94-96 (U.S. Supreme Court's

decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011) did not abrogate this Court's jurisdiction to

enjoin Fox and Marshall); *see also* Trustee's Response to Stay Motion at 13-14.  Similarly

without merit is the Class Action Plaintiffs' invocation of "*res judicata*."  What is *res judicata* is

that, as the parties litigated and the Second Circuit held, the Permanent Injunction is within this

Court's jurisdiction.  The question of whether this Court or the Florida District Court should hear

disputes about future violations of the injunction was not before the Second Circuit, and as the

Class Action Plaintiffs' cases confirm, issues not adjudicated are not *res judicata*.[4]

In any event, even if the Class Action Plaintiffs' purposeful misconstruction of the

Second Circuit's mandate had any basis (which it does not), Judge Kenneth Ryskamp of the

Florida District Court did in fact consider the Fox Plaintiffs' motion in the first instance, and,

after consideration, decided to defer to this Court:  "The Court declines to conduct an emergency

hearing on the question of whether to enjoin the New York action.  Rather, this Court defers to

---

inapposite.  *See Michaelesco v. Estate of Richard*, 355 F. App'x 572 (2d Cir. 2009) (ruling dismissing prior complaint was adjudication on merits and hence *res judicata* applied to bar subsequent action with same parties bringing same claims arising from same facts); *U.S. v. Quintieri*, 306 F.3d 1217, 1231 (2d Cir. 2002) (district court did not err in declining to reconsider the record at resentencing on remand where mandate did not allow *de novo* resentencing); *Day v. Moscow*, 955 F.2d 807 (2d Cir. 1991) (principles of *res judicata* barred defendant from re-litigating claims defendant could have asserted arising out of same series of events.)

[4] The Class Action Plaintiffs also contend that the Second Circuit intended to fully divest this Court of jurisdiction because it did not remand later proceedings to this Court.  (*See* Opposition of Fox Plaintiffs to Application ("Fox Br.") at 5, Goldman Br. at 10.)  Not only is that argument tautological, it makes no sense, as the Second Circuit affirmed the lower courts and recognized this Court's jurisdiction and hence, there was no outstanding issue for the lower courts to address on remand.

the Bankruptcy Court for the Southern District of New York for a ruling on Picard's motion to

enjoin the instant action." (*See* Trustee's Response to Stay Motion at 2-3; Declaration of Helen

Chaitman in Support of Stay Motion, ECF No. 17 (Apr. 17, 2014), Ex. 7.) This is the same

action Judge Ryskamp took in 2010 in deferring to this Court to determine whether Fox and

Marshall's earlier claims violated the automatic stay. (*See* Docket, *Fox v. Picower*, 10-CV-

80252 (S.D. Fla.), ECF No. 19 (Apr. 1, 2010) (order denying Fox's motion for temporary

restraining order).) Meanwhile, Judge Kenneth Marra of the Florida District Court has not ruled

on the effort by the Goldman Plaintiffs to move their case along without a ruling from this Court.

(*See* Docket, *Goldman v. Picower*, 14-CV-80012 (S.D. Fla. (filed Jan. 6, 2014)).)

### B.    The Class Actions Are Not Immune From the Permanent Injunction and the Automatic Stay

The Class Action Plaintiffs attempt to limit the reach of this Court by muddying the

waters in five ways: (1) by contending that the procedural postures of their cases immunize them

from the Permanent Injunction and the automatic stay; (2) by conflating the viability of the

claims *qua* securities claims on a motion to dismiss with whether the claims are duplicative and

derivative of the Trustee's fraudulent transfer claims; (3) by contending that their Florida actions

should proceed because they were filed before the Trustee's Application; (4) by arguing that

their Florida actions should proceed because they have progressed significantly; and (5) by

arguing that the "locus of activity" favors Florida over New York. Not one of these arguments

has any merit, and just as is true of their jurisdictional argument, these arguments border on the

frivolous.

First, it is not the Trustee's position that the Class Action Plaintiffs' act of filing the

declaratory judgment complaint and the motion to re-open violated the automatic stay or the

Permanent Injunction *per se*. Rather, it is the Class Action Plaintiffs' efforts to pursue

duplicative and derivative claims that contravene the automatic stay and Permanent Injunction. The practical outcome of their actions is that a court foreign to these proceedings, not this Court, would be interpreting and deciding whether to enforce the Permanent Injunction and automatic stay that are central to the BLMIS liquidation proceedings.  The Class Action Plaintiffs admit that they seek a ruling from the Florida courts as to whether their new complaints violate the Permanent Injunction and the automatic stay or can proceed.  (*See* Fox Br. at 5; Goldman Br. at 11-12.)  Thus, they are attempting by their motions to remove this Court from the equation.[5]

They next contend that whatever the Florida District Court's decision, it would not affect the BLMIS estate, and is therefore outside this Court's jurisdiction.  In other words, they argue that an injunction that was issued by this Court that is a part of a $7.2 billion settlement inuring to the benefit of the BLMIS estate does not impact the BLMIS estate in any way.  Merely stating the proposition proves its falsity—as does the caselaw.  This Court's power to enjoin parties in other actions that impact the bankruptcy estate is significant.  *See Quigley Co., Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*, 676 F.3d 45, 58 (2d Cir. 2012) (bankruptcy courts' jurisdiction to enforce the automatic stay and enjoin third-party suits is broad and extends to suits that merely "pose[] the specter of direct impact on the *res* of the bankrupt estate . . . .") As the New York District Court put it when confronted with this same argument by Fox and Marshall:  "[a]llowing the Florida Actions to go forward would carry real risks to the estate, implicating the viability of the current settlement and the possibility of future settlements, and providing an avenue for BLMIS customers who are displeased with the Net Equity Decision to

---

[5] The Class Action Plaintiffs argue that it is *too early* for the Trustee to move before this Court.  However, they also imply that it would be *too late* for the Trustee to move after the Florida District Court ruled because the issue of whether the Class Action Plaintiffs' claims violate the automatic stay and Permanent Injunction would be *res judicata*.  The Court should reject this no-win argument.

undermine that decision by directly pursuing claims that are wholly derivative of claims already

brought by the Trustee." *Fox v. Picard*, 848 F. Supp. 2d 469, 490-91 (S.D.N.Y. 2012). The

Second Circuit itself held that this Court had jurisdiction to issue and enforce the Permanent

Injunction as against Fox and Marshall in nearly identical circumstances. *See Marshall*, 740

F.3d at 94-96. Authority cited by the Class Action Plaintiffs for the view that this Court lacks

jurisdiction to enjoin their conduct is not on point.[6]

Second, the Class Action Plaintiffs mischaracterize the Trustee's Application, arguing

that the Trustee is asking this Court to decide a motion to dismiss. (*See* Goldman Br. at 20; *see*

Fox Br. at 15.) He is not. While the Trustee believes that the new Class Action Complaints do

not state securities claims under Federal Rule of Civil Procedure 12, just as they failed to when

presented in the Initial Goldman Actions, *see Goldman*, 2013 WL 5511027, at *6-7, the issue the

Trustee asks this Court to review is not whether the complaints are deficient as a matter of

federal securities law, but whether they are duplicative and derivative of the Trustee's claims so

as to violate the automatic stay and Permanent Injunction in the centralized BLMIS proceeding.

As Judge Sullivan stated when faced with the same argument: "Trying to figure out what

'derivative' means and how it applies sort of feels like assessing the merits of the pleading for a

securities claim under 12(b)(6). Feels like it. But they are distinct analyses." (*See* Hearing

Transcript, No. 12-CV-6109 (S.D.N.Y.), ECF No. 34 (Sept. 26, 2013) at 38:21-25.)[7]

---

[6] *See Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444 (5th Cir. 2007) (mandate rule did not apply to issue of liability of certain defendants, which was not briefed on appeal); *Nixon v. Richey*, 513 F.2d 430 (D.C. Cir. 1975) (district court's issuance of opinion in consolidated cases despite Circuit Court mandate requiring district court prioritize a separate constitutional challenge case was improper).

[7] The Goldman Plaintiffs cite *Patterson v. Newspaper and Mail Deliverers' Union of New York and Vicinity*, 138 B.R. 149 (S.D.N.Y. 1992), for the argument that this Court should defer to the Florida District Court on the issues in the Application. However, *Patterson* is not on point. In *Patterson,* a district court declined to defer to the bankruptcy court to determine whether the automatic stay applied to a consent decree entered by the district court requiring the debtor to contribute to the decree

*(continued on next page)*

9

Third, as argued in the Trustee's Response to Stay Motion, the first-filed rule has no

application here because this is not a case where two litigants are bringing the same claims in

different fora; rather, the Trustee is seeking to enjoin duplicative or derivative claims and enforce

the Permanent Injunction and automatic stay. (*See* Trustee's Response to Stay Motion at 15 n.8.)

Authority cited by the Goldman Plaintiffs therefore is not relevant.[8] (*See* Goldman Br. at 9.)

Fourth, the Florida Actions are not far along. As the dockets demonstrate, while there

has been motion practice over the jurisdictional issue and proper service of process, nothing else

has happened in any Florida court. There has been no discovery, no answers, and no decision on

any substantive motion, nor has there been any briefing on the issue of duplicative and derivative

claims. (*See* Docket, *Goldman v. Picower*, No. 14-CV-80012 (S.D. Fla. filed Jan. 6, 2014);

Docket, *Fox v. Picower*, No. 10-CV-800252 (S.D. Fla. filed Feb. 16, 2010).) The Goldman

Plaintiffs' contention that "this Court cannot preempt the resolution of issues which are already

being litigated in another court with concurrent jurisdiction," *see* Goldman Br. at 12, not only

mischaracterizes the procedural history of the Goldman Action, but also confuses the concept of

pre-emption with the application of the automatic stay and Permanent Injunction. Of course the

stay can pertain to ongoing litigation in any court, and of course this Court can enjoin parties

from proceeding under Section 105 of the Code. These are among the Bankruptcy Court's core

---

administrator's salary. The court found that (1) concerns of centralized interpretation of the automatic
stay in the bankruptcy court and inconsistent decisions were not implicated by requiring the debtor to pay
the administrator's salary and (2) the district court had "substantial experience and familiarity" with the
litigation. *Id.* at 152. Here, by contrast, the centralized interpretation of the automatic stay and the
Permanent Injunction issued by this Court is strongly implicated by the Trustee's Application.

[8] As argued in the Trustee's Response to the Stay Motion, the Trustee filed the Application in response to
the declaratory judgment complaint the Goldman Plaintiffs filed in Florida District Court to determine the
application of the automatic stay and Permanent Injunction to the new Goldman action, and so the Trustee
could not have "filed first." In any case, the "first-filed" action was the Trustee's action against the
Picower Defendants filed in this Court in May 2009, and this Court is enforcing its own Permanent
Injunction.

powers.[9]  *See Midatlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 503

(1986) ("The automatic stay provision . . .  has been described as one of the fundamental debtor

protections provided by the bankruptcy laws.") (quotation marks omitted); *In re Keene Corp.*,

164 B.R. 844, 849, 854 (Bankr. S.D.N.Y. 1994) (enjoining under section 362 and section 105

derivative third-party claims).

As argued in the Trustee's Application and his Response to Stay Motion, this Court's

decision in *In re Charter Commc'ns*, No. 09-11435, 2010 WL 502764 (Bankr. S.D.N.Y. Feb. 8,

2010), is instructive here.  The Goldman Plaintiffs' attempt to distinguish *Charter* by arguing

that the *Charter* third-party plaintiffs had an "about face" in running first to this Court and then a

foreign district court is puzzling, given that the Goldman Plaintiffs did precisely the same

turnabout.

Fifth, the Goldman Plaintiffs' argument that Florida is the locus of activity in their cases

disregards that they seek to bring putative class actions representing BLMIS customers located

across the country.  (*See* Goldman Br. at 18.)  In this case, New York, where BLMIS was

located, where the investor funds were sent, and where BLMIS held bank accounts through

which it committed the fraud, is the single venue that unites the putative Class Action Plaintiffs.

Moreover, it is the locale where the BLMIS estate is administered by this Court.  Added to this,

the Goldman Plaintiffs' own allegations in the New Goldman Complaint state that Pamela

Goldman resides in New York and A&G Goldman Partnership's principal place of business is

New York.  (*See* Murphy Dec. Ex. C ¶¶ 19-20.)  In any event, the proper venue for the actions

---

[9] Authority cited by the Goldman Plaintiffs for the view that bankruptcy courts cannot enjoin parties from seeking to determine the application of the automatic stay in district court is irrelevant.  (*See* Goldman Br. at 8-9; *see also Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969 (N.D. Ill. 1992) (bankruptcy court's order purportedly enjoining parties from arguing before district court at hearing on application of automatic stay was improper).)

only becomes an issue if they can proceed.  But they cannot, as the actions remain duplicative

and derivative of the BLMIS estate's fraudulent transfer action.

## II.    THE CLASS ACTION CLAIMS ARE DERIVATIVE AND DUPLICATIVE OF THE TRUSTEE'S CLAIMS

The original Fox and Goldman complaints were previously held to violate the Permanent

Injunction and they continue to do so in their new iterations.  No matter how the factual

allegations are dressed up, they still fail to allege any particularized direct or even indirect

dealings by the Picower Defendants with the named plaintiffs or the putative class.  Rather, the

proposed new complaints now make allegations in which they *infer* such misrepresentations, just

as they previously *inferred* (and continue to infer) control over BLMIS, from the Picower

Defendants' trades in their own BLMIS accounts.  Absent any alleged conduct by the Picower

Defendants unrelated to the receipt of fraudulent transfers, the Class Action Plaintiffs' new

claims continue to violate the Permanent Injunction (and the automatic stay) and the Class

Action Plaintiffs must be barred from proceeding.

The Initial Goldman Complaints (one of which was brought by Pamela Goldman and the

other of which was brought by A&G Goldman Partnership), which were rejected by Judge

Sullivan, alleged that the BLMIS Ponzi scheme was carried out "under the direction and control

of the [Picower] Defendants," as allegedly evidenced by the Picower Defendants' ability to

"steal billions of dollars of BLMIS customers' assets . . . ."  (*See* Declaration of Keith R. Murphy

in Support of Application, ECF No. 4 (Mar. 11, 2014) ("Murphy Dec.") Ex. K Ex. A ¶ 2.)  Based

on Picower's conduct within his accounts, the Goldman Initial Complaints alleged that Picower

"directly influence[d] and control[led] the decision making at BLMIS, the record keeping at

BLMIS, and the recording of securities at BLMIS," and "had direct involvement in the day to

day operations, record keeping and financial management of BLMIS."  (*See id.* ¶¶ 91, 94.)  They

also alleged, based in part on Madoff's hearsay to a journalist, that Picower knew of the scheme and was taking fraudulent profits from customer accounts. (*See id.* ¶ 44.) Based on this purported knowledge and control, the Goldman Initial Complaints alleged that Picower was liable as a "control person" for the entirety of BLMIS's fraud. Judge Sullivan found that all of these allegations were premised solely on Picower's conduct within his own BLMIS accounts—in other words, on the fraudulent transfers that the Picower Defendants received. Accordingly, he ruled that the Initial Goldman Complaints were duplicative and derivative of the Trustee's fraudulent transfer action. The Class Action Plaintiffs in fact *concede* that their original complaints stated duplicative and derivative claims. (*See* Fox Br. at 8, Goldman Br. at 22.)

The gravamen of the complaints has not changed, and thus the same outcome is warranted here. To the previous general allegations of Picower's knowledge, control, and theft, the New Goldman Complaint has added new general allegations that other customers relied on false documentation that was necessarily created by Picower's demands for withdrawals from his BLMIS accounts. For example, the Goldman Plaintiffs cite the New Goldman Complaint as alleging that investors were "intentionally deceived as to the true state of BLMIS's financial condition . . . as a result of, and in reliance upon, false financial information created directly or indirectly by Picower," and "Picower . . . was able to fraudulently induce Plaintiffs to invest . . . in BLMIS by the creation and dissemination of materially false information concerning Plaintiffs' accounts." (*See* Goldman Br. at 18, quoting paragraphs 3 and 4 of New Goldman Complaint, Murphy Dec. Ex. C.) But the complaint does not in fact allege that Picower made misrepresentations to the Class Action Plaintiffs, directed the creation or dissemination of false financial information outside of his BLMIS accounts, or took any action with respect to the Class Action Plaintiffs' BLMIS accounts. The full paragraphs state:

13

3.      *Picower's control of BLMIS, combined with Picower's knowledge that other BLMIS customers would be defrauded as a result of the transactions that he directed, amounted to Picower making direct representations as to these customers.*  Picower's control of BLMIS was to the detriment of Plaintiffs, who were intentionally deceived as to the true state of BLMIS's financial condition and the condition and value of Plaintiffs' accounts, as a result of, and in reliance upon, false financial information created directly or indirectly by Picower.

4.      The Ponzi scheme could only succeed if investors did not know it existed.  The misrepresentations that Picower knowingly and intentionally caused to be made were calculated to give the appearance that BLMIS was a legitimate and profitable business, and that BLMIS customers were making steady profits in their accounts.  The misrepresentations ensured that the Ponzi scheme would continue, and that Picower would continue to reap the benefits from the scheme. *In short, Picower, through his direct or indirect control of BLMIS,* was able to fraudulently induce Plaintiffs to invest and/or remain invested in BLMIS by the creation and dissemination of materially false information concerning Plaintiffs' accounts.

(*See* Murphy Dec. Ex. C ¶¶ 3, 4 (emphasis added); *see also id.* ¶ 91 ("Picower *directly or indirectly* induced the material misrepresentations and omissions giving rise to the securities violations alleged herein") (emphasis added); *id.* ¶ 71 ("Picower's ability to direct the creation and dissemination of false and misleading trading documentation which he knew would be incorporated in financial disclosures made by BLMIS . . . "); *id.* ¶ 90 ("Picower directly *or indirectly* induced *BLMIS's misleading statements to others* [which] induced BLMIS customers to pay . . . .") (emphasis added).)  As before, the only specific direction that Picower is alleged to have made to BLMIS concern his own accounts: *see, e.g., id.* ¶ 2 (alleging Picower directed "fabricated securities transactions in accounts which he directly or indirectly owned" knowing that these false transactions would result in other misrepresentations); *id.* ¶ 65 ("Picower caused BLMIS to book phony transactions with phony profits in his accounts"); *id.* ¶ 68 ("Picower's direction of fraudulent misrepresentations with respect to his own accounts, coupled with his knowledge and intent . . . "; *id.* ¶¶ 69-70 (alleging examples of Picower directing false trades within his accounts); *id.* ¶¶ 73-75 (alleging Picower's direction to BLMIS to make a margin loan

to a Picower account).  As before, the rest is to be inferred based on Picower's alleged

knowledge of the fraud and general control over BLMIS.  But adding to the chain of inferences

based on the same facts does not remedy the flaw identified by Judge Sullivan:  claims based on

Picower's conduct with respect to his own BLMIS accounts are duplicative of the Trustee's

fraudulent transfer claims.  *See Goldman*, 2013 WL 5511027, at *6-7.

The Fox Second Amended Complaint ("Fox SAC") is no different.  The Initial Fox and

Marshall Complaints merely parroted the Trustee's fraudulent transfer complaint.  Fox and

Marshall argued to the Second Circuit that their claims nonetheless were independent because

their respective complaints alleged "that the Picowers' wrongful conduct ensured the fraud's

success by inducing [them] and other customers to invest (and remain invested) in BLMIS."

(*See Fox v. Picard*, No. 12-1645, ECF No. 71 at 24–25; ECF No. 87 at 31.)  The Second Circuit

responded, "[w]e do not think that the complaints can reasonably be read in this way."  *Marshall*,

740 F.3d at 92.  Accordingly, the Fox SAC now makes explicit the argument that Fox and

Marshall made to the Second Circuit:  Picower's conduct within his own accounts caused the

creation of false documentation by BLMIS that induced the Fox Plaintiffs and other customers to

invest:

> 52.     Picower knew and intended that each phony recording of a
> fictitious transaction *in his accounts* resulted directly in the recording of false
> transactions and false asset values in the accounts of [other customers] because
> BLMIS concealed the theft of customers' money in order to enrich Picower and
> the Picower Parties.
>
> 53.     *As a result of Picower's control over Madoff*, he caused BLMIS to
> send to all of [BLMIS's customers] false and misleading information (*i.e.*,
> fictitious trade and inflated account values), in order to induce customers to
> maintain their accounts with BLMIS, and to continue to attract new
> customers . . . .
>
> 54.     *As a result of Picower's control*, he caused BLMIS to solicit new
> customers for the [BLMIS investment advisory business], such as the Plaintiffs.

(*See* Murphy Dec. Ex. B ¶¶ 52-54 (emphasis added); *see also id.* ¶ 51.)  Like the Initial Fox and

Marshall Complaints and the New Goldman Complaint, the Fox SAC merely infers Picower's

"control" over BLMIS's operations and decision-making, which resulted in BLMIS making false

statements upon which customers relied, based on Picower's conduct with respect to his own

BLMIS accounts.  (*See e.g.,* Murphy Dec. Ex. B ¶¶ 51, 115, 119-20.)

Two allegations are contained in the Fox SAC that are not seen in the New Goldman

Complaint.  First, Fox and Marshall allege that "[a]ccording to Madoff, Picower . . . actively

encouraged people to enter into investment advisory agreements with BLMIS."  (*See* Murphy

Dec. Ex. B ¶ 46.)  But the Fox SAC pleads no *facts* supporting an allegation that Picower

directly "encouraged" any particular investor to enter into any agreement, investor advisory or

otherwise, with BLMIS.  To the contrary, the complaint seems to suggest that Picower did not

have any contact with other BLMIS customers.  (*See, e.g.*, Murphy Dec. Ex. B ¶ 117 ("Picower

directly *or indirectly* induced BLMIS's misleading statements to others . . . ") (emphasis added);

*id.* ¶ 120 ("Picower knew and intended that material misrepresentations and omissions would be

communicated to other customers . . . "); *see also id.* ¶ 119 ("Picower directly *or indirectly*

induced the material misrepresentations and omissions giving rise to the securities violations

alleged herein.") (emphasis added).)   Thus, like the Initial Fox and Marshall Complaints, the

Fox SAC fails to allege "for instance, that the Picower defendants made any misrepresentations

to appellants" or to any other customers.  *Marshall*, 740 F.3d at 93.

Second, the Fox SAC alleges that Picower "encouraged Madoff to expand the customer

base of the BLMIS [investment advisory business] so that funds belonging to new customers

could be stolen and given to the Picower Parties."  (*See* Murphy Dec. Ex. B ¶ 49; *see also id.*

¶ 118 (Picower "induced Madoff to solicit additional customers" so that he "could continue to

enjoy astronomical returns").)  But again, no *facts* are alleged as to what Picower said or did to induce Madoff to expand the BLMIS customer base, other than to demand "astronomical returns" from his own accounts.  There are thus no factual allegations to distinguish the Fox SAC from the Initial Goldman Complaint, which similarly contained general allegations that the entire Ponzi scheme was run at Picower's "direction and control," based solely on the facts surrounding his receipt of fraudulent transfers.

The Fox Plaintiffs also argue that these allegations are based on information provided by Madoff.  (*See* Fox Br. at 18; Murphy Dec. Ex. B at 1, ¶¶ 43, 46, 50, 51; *see also* New Goldman complaint (Murphy Dec. Ex. C) ¶ 64.)  These allegations are apparently drawn from statements chiefly from the book *The Wizard of Lies: Bernard Madoff and the Death of Trust* (2011) by Diana Henriques, and also from public and media statements by Madoff.[10]  Most importantly, these allegations all stem solely from Picower's transactions in and withdrawals from his own BLMIS accounts.  There is no other detail alleged.  They are dressed-up versions of the same allegations rejected by Judge Sullivan.  (*See* Initial Goldman Complaint (Murphy Dec. Ex. K Ex. A) ¶ 44 ("In interviews with author Diana Henriquez, Madoff stated that Jeffry Picower knew of the existence of his scheme and that Jeffry Picower was taking fraudulent profits from the BLMIS customer accounts."); *compare* New Goldman Complaint (Murphy Dec. Ex. C) ¶ 64 ("In

---

[10] *See e.g.,* DIANA B. HENRIQUES, THE WIZARD OF LIES: BERNARD MADOFF AND THE DEATH OF TRUST (published Apr. 26, 2011) at 333 ("Picower was the only one that might have [known about the fraud]," Madoff said. "I mean how could he not?"); *id.* at 134 ("Was [Picower] now astute enough to realize what Madoff was doing and devious enough to exploit the leverage that knowledge gave him? Madoff often suspected that the answer was yes."); David Gelles et al., *From Behind Bars, Madoff Spins his Story*, FINANCIAL TIMES MAGAZINE (Apr. 8, 2011) ("Madoff says his four big clients were motivated to help him, and referred their friends to him. 'Picower brought in clients . . .', Madoff tells us. . . . And he says Picower [and others] – his big four clients – knew something was amiss. 'They were complicit, all of them,' he says.")  As these examples show, Madoff contradicted himself in public statements about Picower, telling one source that Picower "suspected" the fraud and other sources that Picower was "complicit."

interviews with author Diana Henriquez, Madoff admitted that Picower knew of the existence of

the BLMIS scheme and actively participated in it for over 20 years, knowing that he was

participating in a fraud."))  Such conclusory allegations, based on the word of a convicted

fraudster, do not take the Fox Plaintiffs' duplicative claims outside the scope of the Permanent

Injunction.[11]

The Class Action Plaintiffs rely heavily on the Eleventh Circuit's decision in *Medsker v.*

*Feingold*, 307 F. App'x 262 (11th Cir. 2008), to argue that the Picower Defendants can be held

liable for BLMIS's representations based on their conclusory allegations that Picower generally

"induced" the fraud, and their specific allegations that he profited from BLMIS's

misrepresentations.  *Medsker* does not stand for that proposition.  In *Medsker*, the defendants

were alleged to have made direct misrepresentations and to have taken specifically alleged action

directly addressed toward the plaintiffs.[12]  The case is vastly different from that at bar, where

there are no specific misrepresentations alleged to have been made, nor any particular action

directed toward any particular plaintiff or putative class member, and where the only specifically

---

[11] Although the Goldman Plaintiffs argue that their allegations are supported by testimony in the criminal trial of former Madoff employees, *United States v. O'Hara et al.*, No. 10-CR-00228 (S.D.N.Y.), their allegations do not contain any individualized facts.

[12] The complaint in *Medsker* alleged section 10(b) federal securities claims against two defendants, Darren Silverman ("Silverman") and Paul Sloan ("Sloan"), and section 20(a) claims against two additional defendants, David Feingold ("Feingold") and Kristian Baso ("Baso").  In addition to allegations of specific misrepresentations by Silverman and Sloan to the plaintiffs, the complaint alleges particularized conduct and "control" of the fraud far beyond merely profiting from the scheme.  For example, Feingold allegedly conceived of an aspect of the scheme, signed at least one of the offering materials and fictitious statements sent to the plaintiffs, and prepared fictitious subscription documents. And Baso was an officer and director, with the attendant duties and obligations, of the companies through which the alleged fraud was enacted, and also allegedly owned one of the highly risky, speculative day-trading companies in which plaintiffs' funds were invested.  (*See* Murphy Dec. Ex. CC ¶¶ 4, 5, 6, 13, 18, 36.)

alleged activity the Picower Defendants purportedly took was to have traded in their own BLMIS accounts.[13]

## III.    THE FOX PLAINTIFFS' MOTION TO DISMISS AND REQUEST FOR FEES SHOULD BE DENIED.

For the same reasons that the Trustee's Application should be granted, the Fox Plaintiffs' motion to dismiss should be denied.  The Court should also reject the Fox Plaintiffs' baseless accusation that the Trustee is acting in contempt of the Second Circuit and his duties to BLMIS customers and their unsupportable request for legal fees.  (*See* Fox Br. at 2-3.)  As discussed above, it is the Fox Plaintiffs who continue to misconstrue the scope of the Mandate, and their efforts to skirt this Court's jurisdiction should be rejected.[14]

## <u>CONCLUSION</u>

For the foregoing reasons and those set forth in the Trustee's opening papers, the Trustee respectfully requests that his Application be granted and that the Fox Plaintiffs' motion to dismiss also be denied.

---

[13] The Class Action Plaintiffs also point to the *Medsker* Court's statement that "[t]he fact that some other investors may also have been similarly injured does not transform these direct claims into derivative ones." (Goldman Br. at 21 (citing *Medsker*, 307 F. App'x at 265); Fox Br. at 16.)  However, that has nothing to do with whether the proposed new complaints contain claims that are duplicative or derivative of the Trustee's claims.  And, under the law of this Circuit, when generalized claims are made applicable to all creditors, those claims belong to the Trustee.  *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989); *Fox*, 429 B.R. at 431; *Marshall*, 740 F.3d at 89.

[14] It is worth noting that whether current counsel for Fox Plaintiffs properly represent them and could even collect fees is not at all clear.  The Goldman Plaintiffs' motion to disqualify Becker & Poliakoff P.A. and Helen Chaitman as counsel for the Fox Plaintiffs is currently before the Eleventh Circuit.  (*See* Declaration of Ferve E. Ozturk in Support of Trustee's Opposition to Stay Motion, ECF No. 29, Adv. Pro. No. 14-01840 (Bankr. S.D.N.Y. Apr. 24, 2014) Ex. C.)

Dated:  May 1, 2014
       New York, New York

Respectfully Submitted,

By: */s/ David J. Sheehan*
David J. Sheehan
dsheehan@bakerlaw.com
Deborah H. Renner
drenner@bakerlaw.com
Tracy L. Cole
tcole@bakerlaw.com
Keith R. Murphy
kmurphy@bakerlaw.com
Amy Vanderwal
avanderwal@bakerlaw.com
Ferve Ozturk
fozturk@bakerlaw.com

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the Estate of Bernard L. Madoff*