# EXHIBIT A

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Marc E. Hirschfield

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04947 (BRL) |
| Plaintiff, | |
| v. | |
| MARJORIE MOST, | |
| Defendant. | |

### AMENDED COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, et seq. ("SIPA"),[1] and the substantively consolidated estate of Bernard L.

Madoff individually ("Madoff"), by and through his undersigned counsel, for his amended

complaint (the "Amended Complaint"), states as follows:

### NATURE OF PROCEEDING

1.        This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Madoff. Over the course of the scheme, there were more than 8,000 client accounts at BLMIS.

In early December 2008, BLMIS generated client account statements for its approximately 4,900

open client accounts. When added together, these statements purport that clients of BLMIS had

approximately $65 billion invested with BLMIS. In reality, BLMIS had assets on hand worth a

small fraction of that amount. On March 12, 2009, Madoff admitted to the fraudulent scheme

and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison.

2.        Defendant Marjorie Most ("Defendant") was a beneficiary of Madoff's Ponzi

scheme. The Trustee's investigation has revealed that between December 11, 2002 and

December 11, 2008, Defendant received $2,185,000 in fictitious profits from the Ponzi scheme,

meaning that Defendant withdrew more than she invested in her BLMIS account. Accordingly,

Defendant has received $2,185,000 of other people's money. The transfers of fictitious profits to

or for the benefit of Defendant constitute avoidable transfers and are recoverable by the Trustee.

This action is brought to recover the transfers of fictitious profits so that this customer property

can be equitably distributed among the holders of allowed claims in this SIPA proceeding.

---

[1]    For convenience, future reference to SIPA will not include "15 U.S.C."

300192699

3.       This adversary proceeding is brought pursuant to sections 78fff(b), 78fff-1(a) and

78fff-2(c)(3) of SIPA, sections 105(a), 544, 548(a), 550(a) and 551 of title 11 of the United

States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York

Debtor and Creditor Law § 270 *et seq.* (McKinney 2001) ("DCL")) and other applicable law, for

avoidance of fraudulent obligations and conveyances in connection with certain transfers of

property by BLMIS to or for the benefit of Defendant.  The Trustee seeks to set aside such

obligations and transfers and preserve and recover the property for the benefit of the BLMIS

estate.

## JURISDICTION AND VENUE

4.       This is an adversary proceeding commenced before the same Court before which

the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is

pending.  The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has

been referred to the Bankruptcy Court.  This Court has jurisdiction over this adversary

proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

5.       This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O).

6.       Venue in this district is proper under 28 U.S.C. § 1409.

## DEFENDANT

7.       Upon information and belief, Defendant Marjorie Most maintains her residence in

West Palm Beach, Florida.  Defendant holds a BLMIS account in the name, "Marjorie Most,"

with the account address reported in West Palm Beach, Florida.

## BACKGROUND, THE TRUSTEE AND STANDING

8.      On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal

agents for violation of the criminal securities laws, including, *inter alia*, securities fraud,

investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and

Exchange Commission ("SEC") filed a complaint in the District Court which commenced the

District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains

pending in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in

fraud through the investment advisor activities of BLMIS.

9.      On December 12, 2008, The Honorable Louis L. Stanton of the District Court

entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of

BLMIS.

10.     On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC

consented to a combination of its own action with an application of the Securities Investor

Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC

filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its

obligations to securities customers as they came due and, accordingly, its customers needed the

protections afforded by SIPA.

11.     Also on December 15, 2008, Judge Stanton granted the SIPC application and

entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS

pursuant to section 78eee(b)(3) of SIPA;

---

[2]    Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." 15 U.S.C. § 78*lll*(7)(B). Thus, even though the application for a protective decree was filed on December 15, 2008, the Filing Date in this action is December 11, 2008.

(b)      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to

section 78eee(b)(3) of SIPA; and

(c)      removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

12.      By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of

BLMIS.

13.      At a Plea Hearing on March 12, 2009 in the case captioned *United States v.

Madoff*, Case No. 09-CR-213 (DC), Madoff pled guilty to an eleven-count criminal information

filed against him by the United States Attorneys' Office for the Southern District of New York.

At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment

advisory side of [BLMIS]."  Plea Allocution of Bernard L. Madoff at 23, *United States v.

Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50).  Additionally,

Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed

criminal."  *Id.*  Madoff was sentenced on June 29, 2009 to 150 years in prison.

14.      On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to

participating in and conspiring to perpetuate the Ponzi scheme.  At a Plea Hearing on August 11,

2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS), DiPascali pled

guilty to a ten-count criminal information.  Among other things, DiPascali admitted that the

fictitious scheme had begun at BLMIS since at least the 1980s.  Plea Allocution of Frank

DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009)

(Docket No. 11).

15.     As the Trustee appointed under SIPA, the Trustee is charged with recovering and paying out customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences, payouts of fictitious profits and/or other avoidable obligations and transfers, to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

16.     Pursuant to section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA section 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA.

17.     Pursuant to sections 78fff(b) and 78*lll*(7)(B) of SIPA, the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

18.     The Trustee has standing to bring these claims pursuant to section applicable provisions of SIPA, including sections 78fff-1(a), 78fff(b) and 78fff-2(c)(3), and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

(a)     BLMIS incurred losses as a result of the claims set forth herein;

(b)    the Trustee is a bailee of customer funds entrusted to BLMIS for

investment purposes;

(c)    the Defendant received "Customer Property" as defined in 15 U.S.C.

§78*lll*(4);;

(d)    SIPC has not reimbursed, and will not fully reimburse, the customers for

their losses;

(e)    the Trustee is the assignee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers,

collectively, the "Accountholders").  To the extent the Trustee has received express assignments

of certain BLMIS customer claims, which they could have asserted, the Trustee stands in the

shoes of persons who have suffered injury-in-fact and a distinct and palpable loss for which the

Trustee is entitled to seek monetary damages;

(f)    SIPC has expressly conferred upon the Trustee enforcement of its rights of

subrogation with respect to payments it has made and is making to customers of BLMIS from

SIPC funds; and

(g)    the Trustee has the power and authority to avoid obligations, and avoid

and recover transfers, pursuant to sections 544, 547, 548 ,550(a) and 551 of the Bankruptcy

Code, applicable state law including the DCL, and applicable provisions of SIPA, including §§

788fff(b) and 788fff-2(c)(3).

## THE FRAUDULENT PONZI SCHEME

19.    Founded in or around 1959, BLMIS began operations as a sole proprietorship of

Madoff and later, effective January 2001, formed as a New York limited liability company

wholly owned by Madoff.  Since in or about 1986, BLMIS operated from its principal place of

business at 885 Third Avenue, New York, New York.  Madoff, as founder, proprietor, chairman,

and chief executive officer, ran BLMIS together with several family members and a number of

additional employees. BLMIS was registered with the SEC as a securities broker-dealer under

section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By that registration,

BLMIS is a member of SIPC. BLMIS had three business units: investment advisory (the "IA

Business"), market making and proprietary trading.

20.    For certain accounts in the IA Business, BLMIS purported to participate in a

capital appreciation/depreciation strategy, depending on whether the customer sought to generate

gains or losses. For example, the strategy was executed by either purporting to purchase small

groups of securities near lows and then purporting to sell those same securities at highs, or by

purporting to short-sell securities near highs and then purporting to repurchase those securities

near lows.

21.    For other accounts, Madoff described the IA Business' strategy as a "split-strike

conversion" strategy. Madoff promised these clients that their funds would be invested in a

basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S.

publicly traded companies. The basket of stocks would be intended to mimic the movement of

the S&P 100 Index. Madoff asserted that he would carefully time purchases and sales to

maximize value, but this meant that the clients' funds would intermittently be out of the market,

at which times they would purportedly be invested in U.S. issued securities and money market

funds. The second part of the split-strike conversion strategy was the hedge of such purchases

with option contracts. Madoff purported to purchase and sell S&P 100 Index option contracts

that closely corresponded with the stocks in the basket, thereby controlling the downside risk of

price changes in the basket of stocks.

22.    Although clients of the IA Business received monthly or quarterly statements

purportedly showing the securities that were held in – or had been traded through – their

accounts, as well as the growth of and profit from those accounts over time, the trades reported

on these statements were a complete fabrication. The security purchases and sales depicted in

the account statements virtually never occurred and the profits reported were entirely fictitious.

At his Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he

claimed to have purchased for customer accounts. *See* Plea Allocution of Bernard L. Madoff at

3, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50).

Indeed, based on the Trustee's investigation to date and with the exception of isolated individual

trades for certain clients other than Defendant, there is no record of BLMIS having cleared any

purchase or sale of securities on behalf of the IA Business at the Depository Trust & Clearing

Corporation, the clearing house for such transactions.

23.     Prior to his arrest, Madoff assured clients and regulators that he conducted all

trades on the over-the-counter market after hours. To bolster that lie, Madoff periodically wired

tens of millions of dollars to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a

London based entity substantially owned by Madoff and his family. There are no records that

MSIL ever used the wired funds to purchase securities for the accounts of the IA Business

clients.

24.     Additionally, based on the Trustee's investigation to date, there is no evidence

that BLMIS ever purchased or sold any of the options that Madoff claimed on customer

statements to have purchased and sold.

25.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme

and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder, delay or

defraud other current and prospective customers of BLMIS. The money received from investors

was not set aside to buy securities as purported, but instead was primarily used to make the

distributions to – or payments on behalf of – other investors. The money sent to BLMIS for

investment, in short, was simply used to keep the scheme going and to enrich Madoff, his

associates and others, including Defendant, until such time as the requests for redemptions in

December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of

the Ponzi scheme.

26.     The payments to investors constituted an intentional misrepresentation of fact

regarding the underlying accounts and were an integral and essential part of the fraud.  The

payments were necessary to validate the false account statements, and were made to avoid

detection of the fraud, to retain existing investors and to lure other investors into the Ponzi

scheme.

27.     During the scheme, certain investors requested and received distributions of the

so-called "profits" listed for their accounts that were nothing more than fictitious profits.  Other

investors, from time to time, redeemed or closed their accounts, or removed portions of

purportedly available funds, and were paid consistently with the statements they had been

receiving.  Some of those investors later re-invested part or all of those withdrawn payments with

BLMIS.

28.     When payments were made to or on behalf of these investors, including

Defendant, the falsified monthly statements of accounts reported that the accounts of such

investors included substantial gains.  In reality, BLMIS had not invested the investors' principal

as reflected in customer statements.  In an attempt to conceal the ongoing fraud and thereby

hinder, delay or defraud other current and prospective investors, BLMIS paid to or on behalf of

certain investors the inflated amounts reflected in the falsified financial statements, including

principal and/or fictitious profits.

29.     BLMIS used the funds deposited from new investments to continue operations

and pay redemption proceeds to or on behalf of other investors and to make other transfers.  Due

to the siphoning and diversion of new investments to fund redemptions requested by other investors, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

30.    In an effort to hinder, delay or defraud authorities from detecting the fraud, BLMIS did not register as an investment advisor until September 2006.

31.    In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration. The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $65 billion under management.

32.    Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New York. Of the two accountants at the firm, one was semi-retired and living in Florida for many years prior to the Filing Date.

33.    At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS. At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

### THE ACCOUNT AGREEMENTS

34.    According to BLMIS's records, the Account (No. 1ZA780) (the "Account") was maintained with BLMIS as set forth on Exhibit A. Upon information and belief, for the Account, a "Customer Agreement", an "Option Agreement", and/or a "Trading Authorization Limited to Purchases and Sales of Securities and Options" (collectively, the "Account

Agreements") were executed and delivered to BLMIS its headquarters at 885 Third Avenue, New York, New York. Additionally, there were periodic customer statements, confirmations and other communications made by BLMIS or Madoff and sent to Defendant (together with the Account Agreements, the "Account Documents").

35.    The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Account was held in New York, New York, and Defendant sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Account and the purported conducting of trading activities. Between the date the Account was opened and the Filing Date, Defendant made deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or received inter-account transfers from other BLMIS accounts.

## THE OBLIGATIONS

36.    To the extent BLMIS or Madoff incurred obligations to the Defendant in connection with the Account Documents or any statements or representations made by BLMIS or Madoff, such obligations (collectively, the "Obligations") are avoidable under sections 105(a), 544(b) and 548(a) of the Bankruptcy Code, applicable provisions of DCL sections 273-279, and applicable provisions of SIPA, including §§ 788fff(b) and 78fff-1(b). BLMIS or Madoff incurred the Obligations as an integral part of and in furtherance of BLMIS's Ponzi scheme.

37.    To the extent BLMIS or Madoff incurred the Obligations to the Defendant, such Obligations were incurred with actual intent to hinder, delay, or defraud then existing and/or future creditors.

38.    To the extent BLMIS or Madoff incurred the Obligations, such Obligations were incurred when BLMIS was insolvent, had unreasonably small capital, and/or was unable to pay

its debts as they matured. BLMIS was a massive Ponzi scheme, which, as a matter of law, was

insolvent from its inception and, therefore, never capable of fulfilling its obligations to its

creditors.

## THE TRANSFERS

39.     During the six years prior to the Filing Date, BLMIS made transfers (collectively,

the "Transfers") to Defendant of $2,185,000. The Transfers were made to or for the benefit of

Defendant and are set forth in Columns 10 and 11 on Exhibit B annexed hereto.

40.     The Transfers constitute fictitious profits supposedly earned in the Account, but,

in reality, were other people's money.

41.     The Transfers that occurred between December 11, 2002 and December 11, 2008

are referred to hereafter as the "Six Year Transfers." The Six Year Transfers are avoidable and

recoverable under sections 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable

provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and DCL sections 273 – 279, and

total $2,185,000. See Exhibit B, Column 11. The Six Year Transfers are also avoidable to the

extent they were made on account of the avoidable Obligations.

42.     The Transfers that occurred between December 11, 2006 and December 11, 2008

are referred to hereafter as the "Two Year Transfers." The Two Year Transfers are avoidable

and recoverable under sections 548(a), 550(a) and 551 of the Bankruptcy Code and applicable

provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and  total $1,420,000. See Exhibit

B, Column 10. The Two Year Transfers are also recoverable to the extent they were made on

account of the avoidable Obligations.

43.     The Trustee's investigation is ongoing and the Trustee reserves the right to

(i) supplement the information regarding the Obligations and the Transfers and any additional or

subsequent transfers and (ii) seek recovery of such additional transfers.

44.     To the extent that any of the avoidance and/recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

### CUSTOMER CLAIM

45.     On or about February 20, 2009, Defendant filed a customer claim with the Trustee which the Trustee has designated as Claim # 002913 (the "Customer Claim").

46.     On or about August 28, 2009, the Trustee issued a Notice of Trustee's Determination of Claim to Defendant (the "Determination") with respect to the Customer Claim. A copy of the Determination is attached hereto as Exhibit C.[3]

47.     Defendant did not file an objection to the Determination with the Court.

48.     On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12). The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. The Trustee intends to resolve the Customer Claim and any related objection to the Trustee's determination of such claim through a separate hearing as contemplated by the Claims Procedures Order.

### COUNT ONE
### FRAUDULENT TRANSFERS AND OBLIGATIONS – 11 U.S.C. §§ 548(a)(1)(A), 550(a) AND 551

49.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

---

[3]   In October 2009, the Trustee adjusted the methodology used for analysis of certain account transactions, specifically deposits that were cancelled. As a result, there may be slight variations in the way certain transactions are displayed in Exhibit B as compared to Table 1 attached to Exhibit C. The net cash balance of the account is not affected by this adjustment.

50.     Each of the Two Year Transfers was made on or within two years before the

Filing Date.

51.     Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in

property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section

78fff-2(c)(3) of SIPA.

52.     Each of the Two Year Transfers and the Obligations was made or incurred by

BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing

and/or future creditors.

53.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the

Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from

Defendant pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

54.     The Obligations are avoidable by the Trustee pursuant to section 548(a)(1)(A) of

the Bankruptcy Code and applicable provisions of SIPA including sections 788fff(b) and 78fff-

1(b).

55.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a) and 551 of

the Bankruptcy Code and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA, as applicable,

the Trustee is entitled to a judgment against Defendant: (a) avoiding and preserving the Two

Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and

Obligations be set aside, and (d) recovering the Two Year Transfers, or the value thereof, from

Defendant for the benefit of the estate of BLMIS.

### COUNT TWO
### FRAUDULENT TRANSFERS AND OBLIGATIONS – 11 U.S.C. §§ 548(a)(1)(B), 550(a) AND 551

56.     To the extent applicable, the Trustee incorporates by reference the allegations

contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

57.     Each of the Two Year Transfers was made on or within two years before the

Filing Date.

58.     Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in

property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section

78fff-2(c)(3) of SIPA.

59.     BLMIS received less than reasonably equivalent value in exchange for each of the

Two Year Transfers and the Obligations.

60.     At the time of each of the Two Year Transfers, and at all times relevant to the

Obligations, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfers.

61.     At the time of each of the Two Year Transfers, and at all times relevant to the

Obligations, BLMIS was engaged in a business or a transaction, or was about to engage in a

business or transaction, for which any property remaining with BLMIS was an unreasonably

small capital.

62.     At the time BLMIS made each of the Two Year Transfers, and at all times

relevant to the Obligations, BLMIS had incurred, was intending to incur, or believed that it

would incur debts beyond its ability to pay them as the debts matured.

63.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the

Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from

Defendant pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

64.     The Obligations are avoidable by the Trustee pursuant to section 548(a)(1)(B) of

the Bankruptcy Code and applicable provisions of SIPA including sections 78fff(b) and 778fff-

1(b).

65.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a) and 551 of

the Bankruptcy Code and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA, as applicable,

the Trustee is entitled to a judgment against Defendant: (a) avoiding and preserving the Two

Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and

Obligations be set aside, and (d) recovering the Two Year Transfers, or the value thereof, from

Defendant for the benefit of the estate of BLMIS.

## COUNT THREE
## FRAUDULENT TRANSFERS AND OBLIGATIONS – NEW YORK DEBTOR AND
## CREDITOR LAW §§ 276, 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

66.    To the extent applicable, the Trustee incorporates by reference the allegations

contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

67.    At all times relevant to the Six Year Transfers and Obligations, there have been

and are one or more creditors who have held and still hold matured or unmatured unsecured

claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or

that were and are not allowable only under section 502(e) of the Bankruptcy Code.

68.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under DCL section 270.

69.    Each of the Six Year Transfers and Obligations was made by BLMIS with the

actual intent to hinder, delay, or defraud then existing and/or future creditors of BLMIS. BLMIS

made each of the Six Year Transfers and incurred the Obligations to or for the benefit of

Defendant in furtherance of a fraudulent investment scheme.

70.    As a result of the foregoing, pursuant to DCL sections 276, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendant: (a)

avoiding and preserving the Six Year Transfers, (b) avoiding the Obligations, (c) directing that

the Six Year Transfers and Obligations be set aside, and (d) recovering the Six Year Transfers, or

the value thereof, from Defendant for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFERS AND OBLIGATIONS – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

71.      To the extent applicable, the Trustee incorporates by reference the allegations

contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

72.      At all times relevant to the Six Year Transfers and Obligations, there have been

and are one or more creditors who have held and still hold matured or unmatured unsecured

claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or

that were and are not allowable only under section 502(e) of the Bankruptcy Code.

73.      Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under DCL section 270.

74.      BLMIS did not receive fair consideration for any of the Six Year Transfers or the

Obligations.

75.      BLMIS was insolvent, or became insolvent as a result of the Six Year Transfers

or the Obligations.

76.      As a result of the foregoing, pursuant to DCL sections 273, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendant: (a)

avoiding and preserving the Six Year Transfers, (b) avoiding the Obligations, (c) directing that

the Six Year Transfers and Obligations be set aside, and (d) recovering the Six Year Transfers, or

the value thereof, from Defendant for the benefit of the estate of BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

77.      To the extent applicable, the Trustee incorporates by reference the allegations

contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

78.     At all times relevant to the Six Year Transfers, there have been and are one or

more creditors who have held and still hold matured or unmatured unsecured claims against

BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and

are not allowable only under section 502(e) of the Bankruptcy Code.

79.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under DCL section 270.

80.     BLMIS did not receive fair consideration for any of the Six Year Transfers.

81.     At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or

was about to engage in a business or transaction for which the property remaining in its hands

after each of the Six Year Transfers was an unreasonably small capital.

82.     As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the

Trustee is entitled to a judgment against Defendant: (a) avoiding and preserving the Six Year

Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year

Transfers, or the value thereof, from Defendant for the benefit of the estate of BLMIS.

## COUNT SIX
## FRAUDULENT TRANSFERS AND OBLIGATIONS – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

83.     To the extent applicable, the Trustee incorporates by reference the allegations

contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

84.     At all times relevant to the Six Year Transfers and Obligations, there have been

and are one or more creditors who have held and still hold matured or unmatured unsecured

claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or

that were and are not allowable only under section 502(e) of the Bankruptcy Code.

85.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

86.    BLMIS did not receive fair consideration for any of the Six Year Transfers or Obligations.

87.    At the time BLMIS made each of the Six Year Transfers or incurred the Obligations, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

88.    As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279 and sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendant: (a) avoiding and preserving the Six Year Transfers, (b) avoid the Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and (d) recovering the Six Year Transfers, or the value thereof, from Defendant for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendant as follows:

i.    On the First Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and Obligations be set aside, and (d) recovering the Two Year Transfers, or the value thereof, from Defendant for the benefit of the estate of BLMIS;

ii.    On the Second Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and Obligations be set aside, and (d) recovering the Two Year Transfers,

or the value thereof, from Defendant for the benefit of the estate of BLMIS;

iii.    On the Third Claim for Relief, pursuant to DCL sections 276, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the

Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and (d)

recovering the Six Year Transfers, or the value thereof, from Defendant for the benefit of the

estate of BLMIS;

iv.    On the Fourth Claim for Relief, pursuant to DCL sections 273, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the

Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and (d)

recovering the Six Year Transfers, or the value thereof, from Defendant for the benefit of the

estate of BLMIS;

v.    On the Fifth Claim for Relief, pursuant to DCL sections 274, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA:

(a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set

aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendant for the

benefit of the estate of BLMIS;

vi.    On the Sixth Claim for Relief, pursuant to DCL sections 275, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the

Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and (d)

recovering the Six Year Transfers, or the value thereof, from Defendant for the benefit of the

estate of BLMIS;

vii.    On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

viii.    On all Claims for Relief, establishing a constructive trust over the proceeds of the Transfers in favor of the Trustee for the benefit of BLMIS's estate;

ix.    On all Claims for Relief, assigning Defendant's income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the scheme;

x.    On all Claims for Relief, awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xi.    On all Claims for Relief, granting the Trustee such other, further, and different relief as the Court deems just, proper and equitable.

Date:    January 3, 2012
New York, New York

Of Counsel:

**BAKER & HOSTETLER LLP**
12100 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025-7120
Telephone: (310) 820-8800
Facsimile: (310) 820-8859
Michael R. Matthias
Email: mmatthias@bakerlaw.com
Karen Law
Email: klaw@bakerlaw.com

By: /s/ Marc E. Hirschfield
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| MARJORIE MOST | 1ZA780 |

Exhibit B

BLMIS ACCOUNT NO. ... Pg 1 of 2

MARJORIE MOST

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Conveyances |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/23/1992 | CHECK | 1,125,000 | 1,125,000 | | | | 1,125,000 | | | |
| 7/1/1997 | CHECK | (50,000) | | (50,000) | | | 1,075,000 | | | |
| 10/1/1997 | CHECK | (50,000) | | (50,000) | | | 1,025,000 | | | |
| 7/1/1998 | CHECK | (50,000) | | (50,000) | | | 975,000 | | | |
| 4/1/1998 | CHECK | (50,000) | | (50,000) | | | 925,000 | | | |
| 4/22/1998 | CHECK | (250,000) | | (250,000) | | | 675,000 | | | |
| 7/1/1998 | CHECK | (75,000) | | (75,000) | | | 600,000 | | | |
| 10/1/1998 | CHECK | (75,000) | | (75,000) | | | 525,000 | | | |
| 1/4/1999 | CHECK | (75,000) | | (75,000) | | | 450,000 | | | |
| 3/18/1999 | CHECK | (250,000) | | (250,000) | | | 200,000 | | | |
| 4/1/1999 | CHECK | (75,000) | | (75,000) | | | 125,000 | | | |
| 5/26/1999 | CHECK | (75,000) | | (75,000) | | | 50,000 | | | |
| 7/1/1999 | CHECK | (100,000) | | (100,000) | | | (50,000) | | | |
| 9/27/1999 | CHECK | (100,000) | | (100,000) | | | (150,000) | | | |
| 10/1/1999 | CHECK | (75,000) | | (75,000) | | | (225,000) | | | |
| 1/3/2000 | CHECK | (75,000) | | (75,000) | | | (300,000) | | | |
| 4/3/2000 | CHECK | (75,000) | | (75,000) | | | (375,000) | | | |
| 7/3/2000 | CHECK | (75,000) | | (75,000) | | | (450,000) | | | |
| 10/2/2000 | CHECK | (75,000) | | (75,000) | | | (525,000) | | | |
| 1/22/2001 | CHECK | (75,000) | | (75,000) | | | (600,000) | | | |
| 4/2/2001 | CHECK | (75,000) | | (75,000) | | | (675,000) | | | |
| 7/2/2001 | CHECK | (75,000) | | (75,000) | | | (750,000) | | | |
| 10/1/2001 | CHECK | (75,000) | | (75,000) | | | (825,000) | | | |
| 1/2/2002 | CHECK | 15,000 | 15,000 | | | | (810,000) | | | |
| 4/8/2002 | CHECK | 55,000 | 55,000 | | | | (755,000) | | | |
| 7/1/2002 | CHECK | (75,000) | | (75,000) | | | (830,000) | | | |
| 10/1/2002 | CHECK | (75,000) | | (75,000) | | | (905,000) | | | |
| 1/2/2003 | CHECK | (75,000) | | (75,000) | | | (980,000) | | | |
| 4/1/2003 | CHECK | (75,000) | | (75,000) | | | (1,055,000) | | | |
| 7/1/2003 | CHECK | (75,000) | | (75,000) | | | (1,130,000) | | | |
| 7/8/2003 | CHECK | 25,000 | 25,000 | | | | (1,105,000) | | | |
| 10/1/2003 | CHECK | (75,000) | | (75,000) | | | (1,180,000) | | | |
| 1/2/2004 | CHECK | (75,000) | | (75,000) | | | (1,255,000) | | | |
| 1/16/2004 | STOP PAYMENT | 75,000 | | 75,000 | | | (1,180,000) | | | |
| 1/21/2004 | CHECK | 375,000 | 375,000 | | | | (805,000) | | | |
| 2/17/2004 | CHECK | (75,000) | | (75,000) | | | (880,000) | | | (75,000) |
| 4/1/2004 | CHECK | (75,000) | | (75,000) | | | (955,000) | | | (75,000) |
| 7/1/2004 | CHECK | (55,000) | | (55,000) | | | (1,010,000) | | | (55,000) |
| 10/1/2004 | CHECK | (55,000) | | (55,000) | | | (1,065,000) | | | (55,000) |
| 1/3/2005 | CHECK | (55,000) | | (55,000) | | | (1,120,000) | | | (55,000) |
| 4/1/2005 | CHECK | (55,000) | | (55,000) | | | (1,175,000) | | | (55,000) |
| 7/1/2005 | CHECK | (55,000) | | (55,000) | | | (1,230,000) | | | (55,000) |
| 10/3/2005 | CHECK | (55,000) | | (55,000) | | | (1,285,000) | | | (55,000) |
| 10/21/2005 | CHECK | 250,000 | 250,000 | | | | (1,035,000) | | | |
| 1/3/2006 | CHECK | (55,000) | | (55,000) | | | (1,090,000) | | | (55,000) |

Exhibit B

10-04947-brl    Doc 12-2    Filed 01/03/12    Entered 01/03/12 22:24:41    Exhibit B

BLMIS ACCOUNT NO. 1ZA780 - MARJORIE MOST

Page 2 of 2 - 1ZA780

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported In Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Conveyances |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/1/2006 | CHECK | 500,000 | 500,000 | | | | 740,000 | | | |
| 4/3/2006 | CHECK | (75,000) | | (75,000) | | | (815,000) | | | (75,000) |
| 4/13/2006 | CHECK | 200,000 | 200,000 | | | | (615,000) | | | |
| 7/3/2006 | CHECK | (75,000) | | (75,000) | | | (690,000) | | | (75,000) |
| 10/2/2006 | CHECK | (75,000) | | (75,000) | | | 765,000 | | | (75,000) |
| 1/2/2007 | CHECK | (75,000) | | (75,000) | | | (840,000) | | (75,000) | (75,000) |
| 4/2/2007 | CHECK | (75,000) | | (75,000) | | | 915,000 | | (75,000) | (75,000) |
| 7/2/2007 | CHECK | (75,000) | | (75,000) | | | (990,000) | | (75,000) | (75,000) |
| 7/3/2007 | CHECK | (500,000) | | (500,000) | | | (1,490,000) | | (500,000) | (500,000) |
| 10/1/2007 | CHECK | (75,000) | | (75,000) | | | (1,565,000) | | (75,000) | (75,000) |
| 10/31/2007 | CHECK | (20,000) | | (20,000) | | | (1,535,000) | | (20,000) | (20,000) |
| 1/2/2008 | CHECK | (75,000) | | (75,000) | | | (1,660,000) | | (75,000) | (75,000) |
| 1/17/2008 | CHECK | (300,000) | | (300,000) | | | (1,960,000) | | (300,000) | (300,000) |
| 4/1/2008 | CHECK | (75,000) | | (75,000) | | | (2,035,000) | | (75,000) | (75,000) |
| 7/2/2008 | CHECK | (75,000) | | (75,000) | | | (2,110,000) | | (75,000) | (75,000) |
| 10/1/2008 | CHECK | (75,000) | | (75,000) | | | (2,185,000) | | (75,000) | (75,000) |
| | Total: | | $ 2,545,000 | $ (4,730,000) | $ - | $ - | $ (2,185,000) | $ - | $ (1,420,000) | $ (2,185,000) |

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

August 28, 2009

Marjorie Most
8052 Cranes Pointe Way
West Palm Beach, Florida 33412

Dear Ms. Most:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1ZA780 designated as Claim Number 2913:

Your claim for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $4,805,000.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $2,620,000.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

---

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($2,185,000.00) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after August 28, 2009, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York  10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York  10011

_____
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

## Table 1

### DEPOSITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| 12/23/1992 | CHECK | $1,125,000.00 |
| 10/10/2001 | CHECK | $15,000.00 |
| 4/8/2002 | CHECK | $55,000.00 |
| 7/8/2003 | CHECK | $25,000.00 |
| 1/16/2004 | STOP PAYMENT | $75,000.00 |
| 2/24/2004 | CHECK | $375,000.00 |
| 10/21/2005 | CHECK | $250,000.00 |
| 3/17/2006 | CHECK | $500,000.00 |
| 4/13/2006 | CHECK | $200,000.00 |
| **Total Deposits:** | | $2,620,000.00 |

### WITHDRAWALS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| 7/1/1997 | CHECK | ($50,000.00) |
| 10/1/1997 | CHECK | ($50,000.00) |
| 1/2/1998 | CHECK | ($50,000.00) |
| 4/1/1998 | CHECK | ($50,000.00) |
| 4/22/1998 | CHECK | ($250,000.00) |
| 7/1/1998 | CHECK | ($75,000.00) |
| 10/1/1998 | CHECK | ($75,000.00) |
| 1/4/1999 | CHECK | ($75,000.00) |
| 3/18/1999 | CHECK | ($250,000.00) |
| 4/1/1999 | CHECK | ($75,000.00) |
| 5/26/1999 | CHECK | ($100,000.00) |
| 7/1/1999 | CHECK | ($75,000.00) |
| 8/27/1999 | CHECK | ($100,000.00) |
| 10/1/1999 | CHECK | ($75,000.00) |
| 1/3/2000 | CHECK | ($75,000.00) |
| 4/3/2000 | CHECK | ($75,000.00) |
| 7/3/2000 | CHECK | ($75,000.00) |
| 10/2/2000 | CHECK | ($75,000.00) |
| 1/2/2001 | CHECK | ($75,000.00) |
| 4/2/2001 | CHECK | ($75,000.00) |
| 7/2/2001 | CHECK | ($75,000.00) |
| 10/1/2001 | CHECK | ($75,000.00) |
| 1/2/2002 | CHECK | ($75,000.00) |
| 4/1/2002 | CHECK | ($75,000.00) |
| 7/1/2002 | CHECK | ($75,000.00) |
| 10/1/2002 | CHECK | ($75,000.00) |
| 1/2/2003 | CHECK | ($75,000.00) |

| | | |
|---|---|---|
| 4/1/2003 | CHECK | ($75,000.00) |
| 7/1/2003 | CHECK | ($75,000.00) |
| 10/1/2003 | CHECK | ($75,000.00) |
| 1/2/2004 | CHECK | ($75,000.00) |
| 1/21/2004 | CHECK | ($75,000.00) |
| 4/1/2004 | CHECK | ($75,000.00) |
| 7/1/2004 | CHECK | ($55,000.00) |
| 10/1/2004 | CHECK | ($55,000.00) |
| 1/3/2005 | CHECK | ($55,000.00) |
| 4/1/2005 | CHECK | ($55,000.00) |
| 7/1/2005 | CHECK | ($55,000.00) |
| 10/3/2005 | CHECK | ($55,000.00) |
| 1/3/2006 | CHECK | ($55,000.00) |
| 4/3/2006 | CHECK | ($75,000.00) |
| 7/3/2006 | CHECK | ($75,000.00) |
| 10/2/2006 | CHECK | ($75,000.00) |
| 1/2/2007 | CHECK | ($75,000.00) |
| 4/2/2007 | CHECK | ($75,000.00) |
| 7/2/2007 | CHECK | ($75,000.00) |
| 7/5/2007 | CHECK | ($500,000.00) |
| 10/1/2007 | CHECK | ($75,000.00) |
| 10/31/2007 | CHECK | ($20,000.00) |
| 1/2/2008 | CHECK | ($75,000.00) |
| 1/17/2008 | CHECK | ($300,000.00) |
| 4/1/2008 | CHECK | ($75,000.00) |
| 7/1/2008 | CHECK | ($75,000.00) |
| 10/1/2008 | CHECK | ($75,000.00) |
| **Total Withdrawals:** | | ($4,805,000.00) |
| | | |
| **Total deposits less withdrawals:** | | ($2,185,000.00) |