Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In the Matter of:

5    SECURITIES INVESTOR PROTECTION

6    CORPORATION,

7                   Plaintiff,

8           v.                      Case No. 08-01789(SMB)

9    BERNARD L. MADOFF INVESTMENT

10   SECURITIES, LLC,

11                  Defendant.

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   IRVING H. PICARD, TRUSTEE FOR

14   LIQUIDATION OF BERNARD L. MADOFF

15   INVESTMENT SECURITIES LLC,

16                  Plaintiff,

17          v.                      Case No. 12-01920(SMB)

18   KINGATE GLOBAL FUND, LTD.,

19   by its Liquidators,

20                  Defendant.

21   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

22

23

24

25

Page 2

1                          U.S. Bankruptcy Court

2                          One Bowling Green

3                          New York, New York

4

5

6                          April 17, 2014

7                          11:09 AM

8

9

10

11    B E F O R E :

12    HON STUART M. BERNSTEIN

13    U.S. BANKRUPTCY JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                      Page 3

 1    Hearing re:  Application for Interim Professional

 2    Compensation / Thirteenth Application of Windels Marx Lane &

 3    Mittendorf, LLP for Allowance of Interim Compensation for

 4    Services Rendered and Reimbursement of Actual and Necessary

 5    Expenses Incurred from August 1, 2013 through November 30,

 6    2013 for Windels Marx Lane & Mittendorf, LLP, Special

 7    Counsel, period: 8/1/2013 to 11/30/2013, fees:

 8    $1,933,182.50, expenses: $10,001.84.

 9

10    Hearing re:  Motion for Leave to File an Amended Complaint

11

12    Hearing re:  Motion for 14th Interim Fee Application

13

14    Hearing re:  Motion for 4th Interim Distribution

15

16    Hearing re:  Application for Interim Professional

17    Compensation / Fourteenth Application of Trustee and Baker &

18    Hostetler LLP for Allowance of Interim Compensation for

19    Services Rendered and Reimbursement of Actual and Necessary

20    Expenses Incurred from August 1, 2013 through November 30,

21    2013 for Baker & Hostetler, L.L.P., Trustee's Attorney,

22    period: 8/1/2013 to 11/30/2013, fee: $39237170.40, expenses:

23    $489,830.09.

24

25    Hearing re:  Application for Interim Professional
```

Page 4

1   Compensation / Application of Schiltz & Schiltz as Special

2   Counsel to the Trustee for Allowance of Interim Compensation

3   for Services Rendered and Reimbursement of Actual and

4   Necessary Expenses Incurred from August 1, 2013 through

5   November 30, 2013 for Schiltz & Schiltz, Special Counsel,

6   period: 8/1/2013 to 11/30/2013, fee: $31,100.40, expenses:

7   $2,021.51.

8

9   Hearing re:  Application for Interim Professional

10  Compensation / Application of Higgs & Johnson (formerly

11  Higgs Johnson Truman Bodden & co. as Special Counsel to the

12  Trustee for Allowance of Interim Compensation for Services

13  Rendered and Reimbursement of Actual and Necessary Expenses

14  Incurred from August 1, 2013 through November 30, 2013 for

15  Higgs & Johnson, Special Counsel, period: 8/1/2013 to

16  11/30/2013, fee: $58,369.50, expenses: $4,772.21.

17

18  Hearing re:  Application for Interim Professional

19  Compensation / Application of Soroker - Agmon as Special

20  Counsel to the Trustee for Allowance of Interim Compensation

21  for Services Rendered and Reimbursement of Actual and

22  Necessary Expenses Incurred from August 1, 2013 through

23  November 30, 2013 for Soroker - Agmon, Special Counsel,

24  period: 8/1/2013 to 11/30/2013, fee: $46,747,43, expenses:

25  $14.00.

Page 5

1    Hearing re:  Application for Interim Professional

2    Compensation / Application of Graf & Pitkowitz Rechtsanwalte

3    GmbH as Special Counsel to the Trustee for Allowance of

4    Interim Compensation for Services Rendered and Reimbursement

5    of Actual and Necessary Expenses Incurred from August 1,

6    2013 through November 30, 2013 for Graf & Pitkowitz

7    Rechtsanwalte GmbH, Special Counsel, period: 8/1/2013 to

8    11/30/2013, fee: $369,883.06, expenses: $4,169.66.

9

10   Hearing re:  Application for Interim Professional

11   Compensation / Application of SCA Creque as Special Counsel

12   to the Trustee for Allowance of Interim Compensation for

13   Services Rendered and Reimbursement of Actual and Necessary

14   Expenses Incurred from August 1, 2013 through November 30,

15   2013 for SCA Creque, Special Counsel, period: 8/1/2013 to

16   11/30/2013, fee: $18,342.97, expenses: $135.00.

17

18   Hearing re:  Application for Interim Professional

19   Compensation / Application of Young Conaway Stargatt &

20   Taylor, LLP as Special Counsel to the Trustee for Allowance

21   of Interim Compensation for Services Rendered and

22   Reimbursement of Actual and Necessary Expenses Incurred from

23   August 1, 2013 through November 30, 2013 for Young, Conaway,

24   Stargatt & Taylor, LLP, Special Counsel, period: 8/1/2013 to

25   11/30/2013, fee: $31,022.55, expenses: $742.93.

Page 6

1   Hearing re:  Application for Interim Professional

2   Compensation / Application of Williams, Barristers &

3   Attorneys as Special Counsel to the Trustee for Allowance of

4   Interim Compensation for Services Rendered and Reimbursement

5   of Actual and Necessary Expenses Incurred from August 1,

6   2013 through November 30, 2013 for Williams, Barristers &

7   Attorneys, Special Counsel, period: 8/1/2013 to 11/30/2013,

8   fee: $118,386.81, expenses: $9.

9

10   Hearing re:  Application for Interim Professional

11   Compensation / Application of Taylor Wessing as Special

12   Counsel to the Trustee for Allowance of Interim Compensation

13   for Services Rendered and Reimbursement of Actual and

14   Necessary Expenses Incurred from August 1, 2013 through

15   November 30, 2013 for Taylor Wessing, Special Counsel,

16   period: 8/1/2013 to 11/30/2013, fee: $1,406,764.55,

17   expenses: $60,747.30.

18

19   Hearing re:  Application for Interim Professional

20   Compensation / Application of UGGC & Associes as Special

21   Counsel to the Trustee for Allowance of Interim Compensation

22   for Services Rendered and Reimbursement of Actual and

23   Necessary Expenses Incurred from August 1, 2013 through

24   November 30, 2013 for UGGC & Associes, Special Counsel,

25   period: 8/1/2013 to 11/30/2013, fee: $93,987.94, expenses:

Page 7

1    $10,508.64.

2

3    Hearing re:  Application for Interim Professional

4    Compensation / Application of Triay Stagnetto Neish as

5    Special Counsel to the Trustee for Allowance of Interim

6    Compensation for Services Rendered and Reimbursement of

7    Actual and Necessary Expenses Incurred from October 1, 2013

8    through November 30, 2013 for Triay Stagnetto Neish, Special

9    Counsel, period: 10/1/2013 to 11/30/2013, fee: $87,185.27,

10   expenses: $939.51.

11

12   Hearing re:  Application for Interim Professional

13   Compensation / Application of Werder Vigano as Special

14   Counsel to the Trustee for Allowance of Interim Compensation

15   for Services Rendered and Reimbursement of Actual and

16   Necessary Expenses Incurred from August 1, 2013 through

17   November 30, 2013 for Werder Vigano, Special Counsel,

18   period: 8/1/2013 to 11/30/2013, fee: $3,412.67, expenses:

19   $0.

20

21   Hearing re:  Application for Interim Professional

22   Compensation / Application of Greenfield Stein & Senior, LLP

23   as Special Counsel to the Trustee for Allowance of Interim

24   Compensation for Services Rendered and Reimbursement of

25   Actual and Necessary Expenses Incurred from August 1, 2013

1   through November 30, 2013 for Greenfield Stein & Senior,

2   LLP, Special Counsel, period: 8/1/2013 to 11/30/2013, fee:

3   $2,817.45, expenses: $36.25.

4

5   Hearing re:  Application for Interim Professional

6   Compensation / Application of Browne Jacobson, LLP as

7   Special Counsel to the Trustee for Allowance of Interim

8   Compensation for Services Rendered and Reimbursement of

9   Actual and Necessary Expenses Incurred from August 1, 2013

10   through November 30, 2013 for Browne Jacobson, LLP, Special

11   Counsel, period: 8/1/2013 to 11/30/2013, fee: $624,090.66,

12   expenses: $32,822.16.

13

14   Hearing re:  Application for Interim Professional

15   Compensation / Application of Eugene F. Collins as Special

16   Counsel to the Trustee for Allowance of Interim Compensation

17   for Services Rendered and Reimbursement of Actual and

18   Necessary Expenses Incurred from August 1, 2013 through

19   November 30, 2013 for Eugene F. Collins, Special Counsel,

20   period: 8/1/2013 to 11/30/2013, fee: $3,075.55, expenses:

21   $20.

22

23   Hearing re:  Application for Interim Professional

24   Compensation / Application of Ritter & Ritter Advokatur as

25   Special Counsel to the Trustee for Allowance of Interim

1    Compensation for Services Rendered and Reimbursement of

2    Actual and Necessary Expenses Incurred from August 1, 2013

3    through November 30, 2013 for Ritter & Ritter Advokatur,

4    Special Counsel, period: 8/1/2013 to 11/30/2013, fee:

5    $11,013.71, expenses: $23.26.

6

7    Hearing re:  Application for Interim Professional

8    Compensation / Application of Munari Giudici Maniglio

9    Panfili E Associate as Special Counsel to the Trustee for

10   Allowance of Interim Compensation for Services Rendered and

11   Reimbursement of Actual and Necessary Expenses Incurred from

12   August 1, 2013 through November 30, 2013 for Munari Giudici

13   Maniglio Panfili E Associati, Special Counsel, period:

14   8/1/2013 to 11/30/2013, fee: $14,262.31, expenses: $0.

15

16   Hearing re:  Application for Interim Professional

17   Compensation / Application of Kelley, Wolter & Scott, P.A.

18   as Special Counsel to the Trustee for Allowance of Interim

19   Compensation for Services Rendered and Reimbursement of

20   Actual and Necessary Expenses Incurred from August 1, 2013

21   through November 30, 2013 for Kelley, Wolter & Scott, P.A.,

22   Special Counsel, period: 8/1/2013 to 11/30/2013, fee:

23   $9,540.00, expenses: $324.00.

24

25   Hearing re:  Application for Interim Professional

1    Compensation / Application of Kugler Kandestein, LLP as

2    Special Counsel to the Trustee for Allowance of Interim

3    Compensation for Services Rendered and Reimbursement of

4    Actual and Necessary Expenses Incurred from August 1, 2013

5    through November 30, 2013 for Kugler Kandestein, LLP,

6    Special Counsel, period: 8/1/2013 to 11/30/2013, fee:

7    $337.19, expenses: $0.

8

9    Hearing re:  Motion to Approve Fourth Allocation of Property

10   to the Fund of Customer Property and Authorize Fourth

11   Interim Distribution to Customers.

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South

Page 11

1    A P P E A R A N C E S :

2    BAKER HOSTETLER

3         Attorneys for the Trustee and BLMIS

4         45 Rockefeller Plaza

5         New York, NY 10111

6

7    BY:  DAVID J. SHEEHAN, ESQ.

8         IRVING H. PICARD, ESQ.

9         SEANNA R. BROWN, ESQ.

10

11   WINDELS MARX LANE & MITTENDORF, LLP

12        Counsel of Record for the Trustee and BLMIS

13        156 West 56th Street

14        New York, NY 10019

15

16   BY:  ALAN NISSELSON, ESQ.

17        KIM M. LONGO, ESQ.

18

19   SECURITIES INVESTOR PROTECTION CORPORATION

20        Attorney for SIPC

21        805 15th St., N.W.

22        Suite 800

23        Washington, D.C. 20005-2215

24

25   BY:  KEVIN H. BELL, ESQ.

Page 12

1    QUINN EMANUEL URQUHART & SULLIVAN, LLP

2         Attorney for Kingate Global Fund

3         51 Madison Avenue, 22nd Floor

4         New York, NY 10010

5

6    BY:  ROBERT S. LOIGMAN, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S
 2           THE CLERK:  All rise.
 3           THE COURT:  Please be seated.  Good morning.
 4           UNIDENTIFIED SPEAKER:  Good morning.
 5           THE COURT:  Madoff, the 10 o'clock calendar?  I
 6   think that's you Mr. Nisselson and we have a motion for
 7   leave to file an amended complaint.
 8           MR. SHEEHAN:  Yes, Your Honor.
 9           THE COURT:  Okay.  Step up, please.
10           MR. SHEEHAN:  Good morning, Your Honor.  David
11   Sheehan from Baker Hostetler for the trustee.
12           Your Honor has before you a motion for leave to
13   amend for the fourth time our complaint in the Kingate
14   matter for which no opposition has been filed.
15           We have filed our motion papers with Your Honor.
16   Unless you have any questions we'd move that an order be
17   entered.
18           THE COURT:  Is there any objection to the motion?
19           MR. LOIGMAN:  Your Honor, Robert Loigman of Quinn
20   Emanuel on behalf of the Kingate Funds.  We have no
21   objection.
22           I do however just want to correct one short thing
23   that Mr. Sheehan said, I think they'll agree with, it's
24   actually the first amendment.  I think the fourth amendment
25   referred to is the avoidance action.
```

```
 1              MR. SHEEHAN:  Oh.

 2              THE COURT:  This is the injunction complaint.

 3    You're losing track of your complaints.

 4              MR. SHEEHAN:  Those things start to happen when

 5    you're as old as I am, Your Honor.

 6              THE COURT:  Okay, I have no comment to that.

 7              MR. SHEEHAN:  Thank you, Your Honor.

 8              THE COURT:  Since there's no opposition and since

 9    amendments are freely granted the motion is granted.

10              MR. SHEEHAN:  Thank you, Your Honor.

11              THE COURT:  You can submit an order.

12              MR. SHEEHAN:  Thank you.

13              THE COURT:  The Windels Marx fee application is on

14    now also.

15              MR. NISSELSON:  As well as the other fee

16    applications.

17              THE COURT:  The other ones are on at 10:30, I

18    don't know how that happened, but if you want to wait around

19    till 10:30 --

20              MR. NISSELSON:  Yeah, I'll wait around --

21              THE COURT:  All right.

22              MR. NISSELSON:  -- unless Mr. Sheehan

23    (indiscernible - 00:02:37).

24         (Recess at 10:14 a.m.)

25              THE COURT:  All right, we're up to Madoff.  Good
```

Page 15

1    timing.

2         (Pause)

3              MR. SHEEHAN:  Good morning, Your Honor.

4              THE COURT:  Good morning.

5              MR. SHEEHAN:  David Sheehan again for the trustee

6    and BLMIS.

7              This is the -- and I checked -- the fourteenth

8    return application for interim fee allowances by the trustee

9    and by his counsel that he's retained.

10             THE COURT:  I had a case with 26, so you have a

11   long way to go.

12             MR. SHEEHAN:  In any event we do have a long way

13   to go, but what I have done in the prior 13, Your Honor is,

14   is that we have very rarely had opposition to these

15   applications -- early on we did, but not in the last

16   probably 6 or 7 -- is that I still provided the Court with

17   an overview with regard to the trustee's efforts, those of

18   its other counsel, and the foreign counsel as well.

19             So if I would be permitted to do that this morning

20   I'd go ahead and do that.

21             THE COURT:  Certainly.

22             MR. SHEEHAN:  All right.  First of all let me deal

23   with the application of the foreign counsel.  I like to

24   start with those because I think it supplies the Court with

25   an overview of what's actually going on case wide.

1          As you can see from the applications we have many

2     foreign applications by counsel that the trustee has

3     retained over the course of the last five and a half years.

4     The trustee operates in 30 foreign jurisdictions, he does

5     not have causes of actions in all of those, but he is

6     operative in all in terms of pursuing the assets that we

7     believe are customer property and should be returned to the

8     estate.

9          And if I could quickly go through each of these

10    and give Your Honor an insight.

11         I will go first with Munari, which is a recent

12    firm that we've hired, only 38.9 hours.  What they've been

13    assisting us is in regard to investigation and discovery

14    with regard to UniCredit.  UniCredit is the parent of Bank

15    Austria, which is a principal defendant in the RICO case

16    that we've instituted against Sonya Cohen and numerous other

17    defendants.  So they've been recently retained to assist us

18    with those endeavors, and as I said, their hours are not

19    significant.

20         Next one is Ritter & Ritter.  Ritter & Ritter is

21    in Liechtenstein.  Liechtenstein has been an active

22    participate in these litigations for some time.  Indeed

23    there is an action there with regard to certain colleagues

24    of Ms. Cohen where we've actually frozen about $2 million

25    worth of assets there.  That freeze has continued not

Page 17

1    withstanding the outcome of the lawsuit in London, which

2    I'll get to in a moment, but in any event we're active there

3    mostly with regard to discovery.

4           What we found as we uncovered the fraud of

5    Mr. Madoff and revealed it was that many, many of the

6    investors existed in Europe and in the Caribbean, that they

7    were principally brought to the exercise by way of these

8    feeder funds that we talk about quite often, and that that's

9    where we had to go to get the discovery.

10          Again, Ritter & Ritter's hours in this period are

11   only 22, again, principally engaged in assistance of

12   discovery efforts.

13          Mr. Collins is our counsel if Ireland.  In Ireland

14   there was a major litigation involving the Thema (ph) Fund

15   and HSBC sued by their individual investors there.  We

16   monitored that litigation having made a decision not to

17   participate based upon the advise of counsel, and so we did

18   not.  We monitored it.  It has settled for $250 million.

19   That money is still being held in escrow pending resolution

20   of the trustee's claims against it, and Mr. Collins assisted

21   us with that effort.

22          Schiltz & Schiltz is in Luxembourg.  Luxembourg is

23   also very active in terms of investigation, but also active

24   in the sense that there's active litigation there.  Several

25   of the funds are based there, Luxof (ph) and a few others.

Page 18

1    So as a result we have debtors that have sued there and

2    indeed Mr. Picard has also been sued there, and we've been

3    actively engaged in trying to resolve that litigation by way

4    of compromise if at all possible.  And Schiltz & Schiltz

5    worked with us on all of those efforts in Luxemborg.

6           Higgs & Johnson is in the Cayman Islands.  As I

7    indicated to Your Honor we have many feeder funds in this

8    case, all of them were developed offshore.  They're either

9    in Cayman, BVI, or Bermuda.  As a result at almost the

10   outset of the case we were compelled to go to each of those

11   jurisdictions, retain counsel.

12          As you might expect there weren't a lot of counsel

13   available to us because they'd already been retained, mostly

14   by the feeder funds who are prevalent in our case.

15          But nonetheless we have excellent counsel in Higgs

16   & Johnson who have been working with us in the Caymans and

17   principally in connection with the Kingate matter and others

18   that are related to the Cayman Islands, and we find -- not

19   Kingate, I apologize, Your Honor -- Fairfield, and as a

20   result we've been engaged in active participation with the

21   ongoing liquidations that have taken place there.

22          As Your Honor knows there's been a lot of activity

23   between the Fairfield liquidators and the people on the

24   other side.

25          THE COURT:  I saw something on Law Through 60

Page 19

1    today that --

2            MR. SHEEHAN:  Yes.

3            THE COURT:  -- the (indiscernible - 00:24:44)

4    counsel had --

5            MR. SHEEHAN:  Yeah, they've got the --

6            THE COURT:  -- ruled that they can't sue the

7    redeemers.

8            MR. SHEEHAN:  Well the liquidators have had a

9    tough time of it, and the judge in the Caymans decided they

10   were not permitted to go forward, and they've lost that

11   appeal, so they -- we had settled, as Your Honor knows, a

12   listening time ago with them with the idea that we'd be able

13   to work together.  It doesn't affect our cause of action,

14   but I think we'll be more or less on our own given what's

15   happened to the liquidators.

16           So that's what Higgs & Johnson has been assisting

17   in working with us on.

18           Sorkoer & Agmon is a firm in Tel Aviv.  We are in

19   Israel because there was a customer of BLMIS called Magnify.

20   Magnify took out $135 million in fictitious profits.  What

21   they then did with it, they gave -- they turned over through

22   a series of individuals, Yar Greene (ph) being one of them,

23   and a fellow named Mr. Angoian (ph) who's since passed away,

24   but they created an enterprise called Yashia Horowitz (ph)

25   Foundation, which would sound like a child organization but

Page 20

1    was not, it was more of a technology transfer company that

2    would then give those monies or vest them with various

3    universities and other endeavors to try to advance medical

4    and other scientific endeavors, and they would get in return

5    payments back from them.

6              It's been difficult, I must say, because what

7    happened was we were barely in the case when Yashia Horowitz

8    became aware of the fact that we were going pursue these

9    funds, and when they did they tried to liquidate Yashia

10   Horowitz and just destroy all the records.

11             We went to Israel, hired counsel, stopped that

12   from happening, the dissolution has been foregone, it's not

13   going to happen, and we're in the middle of getting a

14   receiver appointed with the assistance of the Israeli

15   courts, et cetera, so they will assist us in the discovery

16   there.

17             Discovery, as Your Honor knows, outside the United

18   States just does not follow the same routine that we have.

19   It's not as easy to just get discovery in Israel or quite

20   frankly most of our foreign jurisdictions, so we're working

21   through the receivership and the offices of the State of

22   Israel to assist us in that endeavor and Soroker-Agmon works

23   with us in those efforts.

24             Graf & Pitkowitz.  Graf Pitkowitz is in Austria.

25   Austria is a major forum for us in terms of discovery.

Page 21

1           There have been ongoing criminal investigations by

2    the Austrian authorities almost from the outset of this case

3    focusing principally on Sonya Cohen and other individuals as

4    well as Bank of Medici, which she created, as a vehicle to

5    bring monies to Madoff, and which was partially owned by

6    bank of Austria, which at the time was the state bank of

7    Austria.

8           Needless to say this has been an uphill battle.

9    What we have been able to do though is work cooperatively

10   with the Austrian prosecutors.

11          Unlike the United States we can become what they

12   call a participant in the proceedings because Mr. Picard

13   stands in the shoes, unlike how we approach it here, in

14   Kaplan (ph), he stands in the shoes of all those customers

15   and he can represent them as a victim.  So he's able to

16   participate.

17          What we've been doing is assisting the prosecutor

18   by giving them documents and they in turn allow us to get

19   their documents and in turn when they take the depositions

20   -- they don't call them that -- they call them

21   confrontations -- but when they do confrontations of

22   witnesses we are allowed to sit in, propose -- not question

23   -- but propose questions to the prosecutor.  It's been of

24   immense assistance to us in terms of going forward and

25   developing the facts in this case.

Page 22

1            And Graf & Pitkowitz, as you can see, has

2     substantial time, 744 hours, engaged in all those endeavors.

3            BVI, SCA Creque.  BVI is very important us because

4     it is where Kingate was incorporated.  I made the mistake

5     earlier of saying the Caymans.  But in any event Kingate as

6     you know is a very active defendant, we're actively

7     litigating with those.

8            There is $300 million sitting in an account in

9     Cayman, it's the subject as Your Honor knows of an

10    application before you.  There are additional assets that

11    we're aware of in Panama, Monaco, and Nigeria, none of those

12    are going to be easy forums within which to obtain those,

13    but it's why we're pursuing this as vigorously as we are, is

14    that there are substantial assets to be pursued and we think

15    we have a very strong case, obviously not going to argue it

16    here this morning.

17           What Graf & Pitkowitz have been doing -- or I'm

18    sorry -- what SCA Creque has been doing is assisting us when

19    there are court hearings in BVI.  We really can't

20    participate, it's a very interesting phenomenon that occurs.

21    The British system has much more of a closed access to their

22    records and discovery, whereas here we have more or less an

23    open book, so to go down there we have to have someone

24    monitor the proceedings and hopefully strike a relationship

25    with some of the people participating and then we get an

Page 23

1    inside into actually what is happening, but we can't

2    actually get the court records, they're just not available

3    to us.  So Creque assists us in those.

4           There's a good deal of activity, because when the

5    liquidators have to operate here in the United States as

6    they do they need to sanction, as they call it, sanction

7    meaning their authority, to go forward and to do that, so

8    they seek that authorities, for example, in connection with

9    what we're currently talking about with them on the

10   injunction.

11          In any event that's what SCA Creque does.

12          Then we have Williams, Barristers in Bermuda.

13   Bermuda is also interestingly enough both a Fairfield and a

14   Kingate jurisdiction.

15          The reason is, is that many of these enterprises,

16   Kingate in particular, created Kingate Management Ltd., it

17   was a separate entity, separate from the funds, with the

18   Sureti and Grosso (ph) who were the principals who owned

19   Kingate, created it so they should charge fees for

20   administering the two funds.

21          Our allegations are they did nothing, they never

22   did any evaluation of the assets, no evaluation of

23   Mr. Madoff or anything, but they just charged a substantial

24   fee to the tune of over $300 million.

25          So Kingate Management Ltd. as you might suspect,

Page 24

1    Your Honor, has an official receiver appointed by the courts

2    in Bermuda.  We have a protective action there because there

3    is indeed $100 million sitting in a bank account in Bermuda,

4    some of that has been diminished by the liquidator who's has

5    fees awarded, probably down to about 80 million now.  In any

6    event we obviously monitor that.

7           And also Kingate liquidators have sued Kingate

8    Management ltd. in Bermuda.  Again, our only way of keeping

9    track of that is having someone in the court observing and

10   working cooperatively with the people on hand, and that's

11   what Williams, Barristers does for us there.

12          Taylor Wessing.  Taylor Wessing is in England.  As

13   Your Honor will recall Mr. Madoff created an enterprise

14   called MSIL, Madoff Securities International Ltd.

15          MSIL was a fraudulent instrumentality as we have

16   alleged and which we believe to be the case.  It was

17   essentially engaged in proprietary trading for Mr. Madoff,

18   but he utilized it as a vehicle by which to round trip funds

19   back through and then utilize it.  I won't get into all the

20   gory details here this morning, but he was utilizing it to

21   round trip monies back into the Bank of New York account

22   which was the marketing platform and then they would get

23   charged for expenses from IA, and that's how he supported

24   the IA operation.  So that's only one limited use of that.

25          He also told many people that he utilized that to

Page 25

1    engage in after-marketing trading and that's how he was able

2    to avoid the exchange volatility because he was doing what

3    he called dark pools of liquidity, which actually do exist

4    of course, but not in the volume that he suggested in terms

5    of equities being traded between banks from private

6    reserves.

7            In any event at the end of the day MSIL we

8    instituted litigation against them in a very narrow sense.

9    We didn't want to and we've tried not to, and I should have

10   said this at the outset, we are not interested really in

11   trying any of our cases in foreign jurisdictions, we are

12   trying to try all of them here in the United States before

13   this Court, but what we did is we filed protective actions

14   recognizing that personal jurisdiction is going to be an

15   issue, we also have still pending before Judge Rakoff, it's

16   been there since October of 2012, the Morrison application

17   under a motion to withdraw the reference, so that also would

18   have a dramatic impact if it were adverse to the trustee.

19           So needless to say we want to be in a position

20   that we can move forward and we filed protective actions in

21   virtually all of these jurisdictions.

22           What we did in England though however was we did

23   not do that.  We filed a very limited and targeted action

24   directed at Sonya Cohen who had been paid we thought

25   unauthorized fees and that the directors had allowed that to

Page 26

1   happen because she was supposedly providing them with

2   research.  You know, what we established was that the

3   research was indeed plagiarized and the English court found

4   that it was plagiarized.  It somehow found that it was still

5   value, I'm still mystified by the opinion by Judge

6   Popplewell in that particular case, but the short version of

7   that is that we lost that case, it did not go well for us.

8         It has very limited impact, it's not been raised

9   by any of our adversaries in any of our litigations here

10  because it was such a narrow and targeted and focused piece

11  of litigation just on those very few transactions.  And in

12  any event without going into greater detail on that Taylor

13  Wessing worked very, very hard on the case.  It was a great

14  deal of effort to put it all together.

15        As Your Honor probably knows from the English

16  system you have to put together all of your evidence and put

17  it in, you have to have skeletal briefs, you basically

18  submit the case almost in advance, and it's more or less as

19  sometimes we conduct preliminary injunction hearings,

20  there's cross-examination, there isn't direct examination.

21  So it -- but the trial nonetheless still took six weeks.

22        Most of the reporting period that we're dealing

23  with here Taylor Wessing was actively engaged preparing for

24  and try thing case because it took place between June and

25  July.

Page 27

1          Notwithstanding the outcome we do believe Taylor

2     Wessing did a very, very fine job, worked very, very hard

3     for us, and we totally support their application here this

4     morning as does SIPC.

5          Next we have Browne Jacobson.  That's a second

6     firm that we have in the United Kingdom.  We have them for

7     several reasons.  First and foremost of course they're

8     conflict counsel.

9          Taylor Wessing is a major international law firm,

10    they have engaged in many, many, activities for a variety of

11    different clients, some of whom we've sued, so they can't

12    represent us in all the litigations that we have,

13    principally involving banks.

14         Browne Jacobson is a firm that we, meaning Baker,

15    has had a relationship for any number of years, a very

16    talented law firm principally located outside of London.  In

17    any event they have worked with us not only in assisting us

18    on some of the extraneous efforts with regard to the MSIL

19    litigation in terms of providing overview of certain

20    bankruptcy issues, et cetera, but principally what they're

21    working with us on is two things.  One is Pisquia (ph),

22    which I'll get to in a minute, which is litigation that's

23    very active in Gibraltar, has been around since almost the

24    inception of the case, and they act as our barristers there.

25         We do have solicitors as Your Honor knows with the

Page 28

```
1    English system, we have two law firms in effect.  So we have

2    the barristers at Browne Jacobson, the solicitors which I'll

3    get to in a moment, live in Gibraltar, and our solicitors

4    have been very active there, and I'll get in more detail

5    when I get to the Gibraltar application itself.

6              In addition to that, you know, there's also the

7    appellate process that we engaged in that they also assisted

8    us in.

9              Your Honor is probably familiar under, you know,

10   the rubric of Chapter 15 and universalism, there was this

11   Rubin decision that was decided by the courts in England

12   about two years ago, maybe longer, which we actively

13   participated in for some time and were permitted to file an

14   amicus.

15             What Rubin held was is that a default judgment

16   here in the United States could be -- I'm simplifying it --

17   both could be enforced in the United Kingdom, which would be

18   a tremendous boom obviously to us since many of the

19   defendants have chosen to ignore us.  Well -- and we do

20   already have default judgments in, for example, the Veskia

21   (ph) case itself.

22             In any event on appeal we lost, it didn't turn out

23   as well as we would have liked and it also, you know,

24   brought into question --

25             THE COURT:  Was that the Adelphia Lyondell
```

1    adversary proceeding?  It was the Judge Gerber --

2              MR. SHEEHAN:  Yes.

3              THE COURT:  -- judgment wasn't it?

4              MR. SHEEHAN:  Yes, it was.

5              There's -- but there's a case called Cambridge Gas

6    which was the predecessor to that which had been called into

7    question by the Rubin appellate decision, but thereafter --

8    and I'll drift into a little bit into Veskia -- needless to

9    say our adversaries of Veskia jumped on that opportunity in

10   Arpia (ph) that we could not bring this cause of action

11   because we had filed to enforce our default that we'd

12   achieved here against them, and we had, as I said filed a

13   protective action there as well.

14             So we not only filed to enforce our default, but

15   filed an action under the law of Gibraltar and their

16   insolvency statutes and the courts upheld our ability to do

17   that.  They weren't too thrilled with our default but they

18   were okay with our ability to proceed under their -- and

19   both of those are under appeal right now, we're trying to

20   still suggest that Cambridge Gas has vitality and there's

21   still reasons why it should go forward here and it's

22   different than Rubin, but you know, that's obviously

23   somewhat difficult.  But the other one we're pretty

24   comfortable with.

25             And needless to say Browne Jacobson was very

Page 30

1    instrumental in structuring all of our arguments there, they

2    handled the skeletal briefs, they're the ones that argued,

3    et cetera.

4          But on the ground there, and I'm going to just

5    jump to them, we have the firm which Keith Asaparti (ph)

6    represents, and Keith Asaparti is in Gibraltar, he has

7    represented us for -- since the very beginning of the case,

8    in fact he switched firms and we switched with him because

9    he's that good.  He was the former attorney general of

10   Gibraltar or what the equivalent of the attorney general

11   was.

12         He gives us access to the courts and represents us

13   there as a solicitor and is highly regarded and has been a

14   tremendous assistance in terms of advancing our causes of

15   action.  As I say, there are several of them there.

16         And one highlight that's not in the application

17   here today but which I always like to refer to exists, is

18   that it was a benefit of Rubin, we as I said have obtained

19   judgments.  One of the defendants was Zeus (ph) called --

20   one of the funds.  And Zeus we had a default against.  And

21   after Rubin they decided they'd really rather litigate, and

22   that case is going to be tried here in what's deposited with

23   this court is $61 million.  We're pursuing approximately

24   150-, but 61- is already here that we're fighting over with

25   them and at some point when we get a decision on Morrison

Page 31

1    and we can move on these other cases -- everyone has joined

2    in Morrison and it's got a foreign basis -- so until that

3    gets resolved we're kind of hamstrung on being able to move

4    a lot of the feeder funds cases themselves.

5           That constitutes my overview at this point this

6    morning, Your Honor.  And what I'd like to do now is to just

7    talk a little bit about what Baker has been doing and I

8    usually comment on Mr. Nisselson and the Young firm as well.

9           As Your Honor knows there's many elements to the

10   case, and let me just break them down into four things that

11   are principally the categories that we operate in.

12          One is the customer claims.  Something we don't

13   talk a lot about, it's in front of Your Honor in the form of

14   the time-base -- not time-based damages -- the interaccount

15   transfer motion.  But as I've always said from the very

16   beginning this being a Ponzi scheme it's two sides of the

17   same coin when you talk about customer claims.

18          When you're talking about claims you're also

19   talking about adversary proceedings, because on the other

20   side of it the denied claim is a net winner who we're trying

21   to retrieve money from.

22          So as we calculate those net, you know, equity

23   results we're also at the same time calculating the outcome.

24          Well that resulted in another MTWR in front of

25   Judge Rakoff involving antecedent debt, which Your Honor I

Page 32

1    know is also familiar with.

2            So when the motions to withdraw the reference

3    started about a year and a half ago basically virtually all

4    the litigation got put on hold until such time as we could

5    resolve fundamental bankruptcy issues.  The antecedent debt,

6    value, things of that nature, even from my perspective 546

7    should have been decided by the Bankruptcy Court, but I

8    didn't win that one.

9            In any event the point is, is that those are

10   almost all now resolved, and most of that started to happen

11   during the reporting period that we have before Your Honor,

12   and it influences what we were doing at the time.

13           So we at that point had over 800, as Your Honor

14   knows, what we call good faith causes of actions, meaning

15   that there's no intent at issue here, we're not suggesting

16   that, we're simply saying it's fictitious profits and at

17   least within the two-year period under current law from

18   Judge Rakoff we should at least be able to obtain that, not

19   that we're foregoing the six year until the circuit rules.

20           In any event we started getting all of those up.

21   Your Honor has actually been actively engaged in that, you

22   know, but all of that ground work that we put together to

23   triage those cases into two year and hybrids and six year

24   all was taking place during the reporting period.  At the

25   same time we were also looking at the over 2000 customer

Page 33

1     objections we had.

2              As Your Honor knows we've had a series of

3     objections.  The first and most important was our net equity

4     calculation which took some time to resolve.  It cut across

5     the entire spectrum of all of our customer claims, and what

6     we said in all of our customer claim determinations was if

7     in fact we lost we'd redetermine every claim.  So we

8     preserved the objection for everyone.  Until that was

9     resolved getting to the one offs or even the ones where

10    there's 2- or 300 didn't make much sense.

11             So we didn't move on any of those because it would

12    just -- if in fact we lost and it was the last day most of

13    those other objections would have been wiped away.

14             So in any event the next big one was customers and

15    who's a customer and who isn't and the -- you know, people

16    that invested as we call them indirect investors who

17    invested in the feeder funds and we treated the fund as the

18    customer.  Again the Second Circuit and this Court agreed

19    with us and that resolved many, many of the customer claim

20    objections itself.

21             We are now in the phase, as Your Honor knows, of

22    trying to deal with the rest of those objections.  The

23    largest ones first such as interaccount transfers, which

24    involves over 400, that's an ongoing effort involving many

25    of the attorneys at a firm, and they've worked

1    collaboratively obviously with the good faith side of that

2    because there's two sides to that at all time, because many

3    of the people that are good faith defendants are also people

4    who have objected to our determination, so we have to

5    cooperate -- collaborate on that.

6           Good faith I'm not going to spend a lot of time

7    on, Your Honor has intimate familiarity with it, you're

8    working with it every day, I think we will continue to work

9    with it for quite some time.

10          In addition to the good faith -- and there are a

11   lot of cases, there are a lot of people involved.

12          Just to give Your Honor a sense of the structure

13   when the case came to us, you can see it from the

14   application we have many, many people working on it and the

15   reason is not just the sheer volume of it but the

16   adversaries.  The adversaries are very good, very creative,

17   and they're very active, and we are constantly stretched and

18   tested by them all the time, even in the good faith cases

19   which seem relatively straight forward and Your Honor is

20   seeing when speaking about just in the motions that you're

21   receiving to date.

22          But the bottom line is, is that what we've done is

23   we've incorporated groups of people from our Orlando,

24   Houston, Denver, and LA offices, mostly associates, try to

25   work at a lower rate, SIPC is very careful to monitor our

1    rate structure, our average hourly rate is under $400 an

2    hour because of that.  So as a result we utilize those

3    people to really deal with the good faith.

4            Principally the next category would be the feeder

5    fund cases, again, pretty much on hold, but as Your Honor

6    also knows Judge Rakoff found that somehow the SIPA statute

7    created a different standard for us, that it wasn't inquiry

8    notice, it's actual knowledge, and he then -- and analyzed

9    the Komed (ph) case and came to the conclusion we'd met that

10   standard at least in that particular case.  So that's sort

11   of become a benchmark.

12           What we've done since then, even though that

13   decision is a decision on actual knowledge is still not

14   resolved, that's another one that we're waiting for from

15   judge Rakoff, we have assumed --

16           THE COURT:  What is he supposed to decide?

17           MR. SHEEHAN:  Well --

18           THE COURT:  I thought he had decided that issue.

19           MR. SHEEHAN:  -- what he hasn't decided is whether

20   the standard for approving good faith in a fraudulent

21   conveyance action.  It's been withdrawn.  What they've

22   argued is --

23           THE COURT:  In connection with a 548(c) defense?

24           MR. SHEEHAN:  Yes.  He still has that.

25           So in any event, again, I thought that was a

Page 36

1    bankruptcy issue, but you know what can I say.

2            So in any event at the end of the day we -- we are

3    waiting for those, and in the meantime we decided, which

4    happened during this reporting period, that you know, the

5    likelihood of him having a different standard than the one

6    he enunciated in deciding 546(e) in terms of actual

7    knowledge and utilizing the standard there, that's where

8    that emanates from, because we took the position that if you

9    actually knew there was no trading how could you get a safe

10   harbor, he agreed with that, but he agreed it was a very

11   high standard to prove that defense or prove that they

12   shouldn't have the defense.

13           In any event we have now been during the reporting

14   period and continuing through today amending the complaints.

15   One of the things I haven't mentioned is that we have an

16   enormous database.  We have 28 million documents that are

17   active that we search all the time.  In addition to that

18   that's out database that we've created from the records

19   preserved by Mr. Madoff over four decades, and we've

20   eliminated terabytes of data, we just don't even deal with

21   it because we can't possibly go through all of it.  It gets

22   duplicative, it's every Wall Street Journal known to man he

23   seems to have kept because he would use those to go back --

24   you know, three days later he'd create statements out of

25   those Wall Street Journals.

Page 37

1          In any event the bottom line the, is that we also

2    have five million documents that we've gotten and it keeps

3    growing from third parties.  We've served over almost 500

4    subpoenas on third parties to obtain documents in connection

5    with this case, that's another large database that we

6    manage.

7          What we've been doing is doing a deep dive into

8    that database in light of the findings by Judge Rakoff and

9    hopefully anticipating, and while you're seeing some

10   amendments to the complaint you actually have a challenge

11   which will go shortly in the Berkin (ph) case as to whether

12   or not we've met that standard, and obviously we're going to

13   argue that we did.

14          But the bottom line is that's what a lot of the

15   work has been doing over the last couple of months or at

16   least during the reporting period, as well as Your Honor

17   also knows there's active litigation.  We have motion

18   practice that occurs in these cases irrespective of whether

19   they've been withdrawn or not we still have those.  Judge

20   Rakoff never shut down discovery, what we find though is all

21   of our adversaries in those cases say, well, you know, if

22   judge -- if the judge decides Morrison against you why are

23   we wasting time with discovery?  So we're again sort of at a

24   stalemate there.

25          The last group of cases I combine them because

1   they're somewhat similar.  Our subsequent transferee cases,

2   which we have many of those and in addition what we call the

3   leverage cases.

4          As Your Honor saw in connection with the 9019 for

5   JPMorgan Chase they engaged in structured products.  What

6   they did is they went out to their high net worth

7   individuals and they had them invest in Madoff through

8   Fairfield in that particular case by packaging sort of a

9   three for one, you know, swap transaction and then investing

10  with Madoff because they saw it as a positive, you know,

11  virtually guaranteed return -- and I won't go into all the

12  details of why we say they should have known better -- but

13  the point is, is at the end of the day they weren't the only

14  ones that did that.  There's about ten banks, I won't

15  remember all their names (indiscernible - 00:48:56) City and

16  a whole bunch of others that did this, that actually had

17  structured products that were invested in Madoff.

18         It's like I've always said, Bernie Madoff became

19  part of the financial fabric of Wall Street.  People want to

20  say he's a one off but he's not, he's actually as much a

21  part of it as any other credit default swap, as much as AIG

22  was, Bernie Madoff was too because of all of these

23  transactions that took place.

24         These are very complicated transactions.  We have

25  -- you know, we're the adversaries, the major named firms in

1    the city are all representing those banks as Wachtel (ph)

2    represented JPMorgan Chase.  They are actively being pursued

3    right now but we're limited again in terms of where we can

4    go because we don't have the good faith standard and we're

5    somewhat slowed down.  But those cases are active, but

6    they're all subsequent cases because they involve money

7    going into Fairfield and then coming out and getting paid to

8    JPMorgan and then paying them over to their clients.

9           But we have any number of subsequence emanating

10   out of the funds, whether it be Fairfield or any of the

11   others because they weren't -- banks weren't the only ones

12   utilizing them as an investment vehicle, Mr. Madoff was seen

13   as a very fine vehicle by which to invest so they did that.

14   So again, all of those cases are active all at the same

15   time.

16          What I've given Your Honor is a broad overview of

17   the work that the firm does during each of these reporting

18   periods, all at various stages, our submission of course

19   gives it to you in detail.

20          (Indiscernible - 00:50:27) we were -- and it's

21   worth I think informing Your Honor as to how this occurred

22   -- but early on as you may recall there was an involuntary

23   filed against Mr. Madoff at which point Mr. Niesselson was

24   appointed as -- by the U.S. Trustee as the trustee.  The

25   very next day the U.S. Attorney forfeited $170 billion of

Page 40

1    Mr. Madoff and his wife thereby rendering the estate at

2    zero.  Right.  Nonetheless we thought and we still believe

3    that working with Mr. Niesselson as the Chapter 7 Trustee

4    and continuing that, and we did this certainly in

5    consultation at that time with Judge Lifland, and so he has

6    continued as that.

7              At the same time, given the fact that he has

8    knowledge that he has of the case, we have utilized the

9    Widels Marx firm as a conflicts firm, that's true, and there

10   are many instances where Baker has conflicts and we turn it

11   over to him.  But because of the quality of the work and the

12   close working relationship we have with them they handle

13   many cases because of the sheer volume that are not

14   conflicts but that are given -- are turned over to Alan and

15   to his team -- and Kim Longo is here today as well -- who do

16   a superb job on all of these cases, and we -- you know,

17   without reservation support their efforts.

18             Windels Marx however has conflicts, so that's why

19   you have Conaway as in the case in a much more limited

20   capacity, but when they have conflicts -- if we have a

21   conflict we look to Young, Conaway who in the work they have

22   done have done a really very fine job.

23             So that in summary, Your Honor, is the state of

24   affairs with regard to the fourteenth interim fee

25   applications for Baker, their retained counsel, and I would

1    at this point turn it over to Mr. Bell who I think wants to

2    be heard --

3              THE COURT:  Sure.

4              MR. SHEEHAN:  -- by the --

5              THE COURT:  Thank you.

6              MR. SHEEHAN:  -- for SIPC.

7              THE COURT:  Thank you very much.

8              MR. BELL:  Good morning, Your Honor.

9              THE COURT:  Good morning.

10             MR. BELL:  Kevin bell on behalf of the Securities

11   Investor Protection Corporation.

12             Today is day 1,952 in the Madoff liquidation

13   proceeding.

14             THE COURT:  Who's counting?

15             UNIDENTIFIED SPEAKER:  He is.

16             MR. BELL:  The fee period ending in November 30th

17   was the 1,854th day, the fourteenth fee application involves

18   122 days, and we are waiting for Judge Rakoff for 1,560 days

19   on the three matters he has under advisement.

20             THE COURT:  You'll have to take that up with him.

21        (Laughter)

22             MR. BELL:  We will.  The Securities Investor

23   Protection Act, particularly Section 15 United States Code

24   78EEE(b)(5) addresses compensation in a SIPC liquidation

25   proceeding, it governs that, that's part of the statute, was

Page 42

1    amended by the federal law enacted on May 25th, 1978, which

2    amended the Securities Investor Protection Act which had

3    been enacted on December 30th, 1970.

4         Of particular interest to the Court and to SIPC

5    and to the public is Section 78EEE(b)(5)(c), and the

6    criteria that are there.  And I know Your Honor has had

7    other SIPA liquidation proceedings, but I just want to do as

8    I have done in the previous 13 fee applications when we got

9    up here, because SIPC has a responsibility, has great

10   sensitivity to this unique congressional enactment that was

11   put in here in the amendment in 1978 to address what we do

12   in reviewing the fee applications so we have a clear record

13   and the public understands that SIPC takes this

14   responsibility very seriously.

15        Each and every fee application that is submitted

16   to this Court has been previously reviewed by SIPC.  And

17   when I say reviewed I mean each page and each entry, and if

18   there are matters that are questions Mr. Sheehan and

19   Mr. Nisselson and his team get what I call SIPC comments not

20   only from me who is the primary lawyer, but then when the

21   general counsel reviews my recommendations and she may have

22   other comments that we ask.

23        So you'll see reflected in paragraph 5 of the SIPC

24   recommendation on the fourteenth fee application in

25   paragraph 3 on the Windels' fee recommendation by SIPC

Page 43

1    certain substantial reductions by the firms in light of the

2    SIPC comments.

3            Overall all the counsel that are subject to these

4    fee applications have agreed to a voluntary ten percent

5    discount across the board.

6            In addition to that there is the SIPC factor where

7    we look at it, raise questions, and there are other

8    reductions that occur.

9            Two that I would like to highlight in those

10   particular paragraphs is in the recommendation on Baker's

11   fourteenth application, the trustee and Baker's, the total

12   reduction is 16.6 percent on their standard ordinary rate,

13   which includes the 10 percent discount.  On Windels it's at

14   paragraph 3 and there's a 17.27 percent, including the 10

15   percent voluntary discount.

16           As I noted because this is a case and if we look

17   at paragraph 231 of the fourteenth application the trustee

18   and Baker note that there's no reasonable expectation of

19   recoupment.  SIPC monitors that, as this Court can be aware,

20   because of our substantial advances we have made not only

21   for satisfying customers of over $812 million but the other

22   advances we have made pursuant to the directive of the

23   statute to provide for the payment of administrative

24   expenses which are approaching or exceeding three quarter of

25   a billion dollars.

Page 44

1           So there is an act of oversight that SIPC has with

2      regard to this, it's in our annual report that we give to

3      the Securities and Exchange Commission which has an

4      oversight factor on SIPC, as well as the United States

5      Congress because there are committees in the House and the

6      Senate that are actively monitoring this case because this

7      case has caught the attention of the legislative body of

8      this country, and particularly some members of Congress that

9      have constituents who think that this should be done

10     differently.

11          The -- as I noted the SIPC review is very thorough

12     and we, Mr. Sheehan and I, have dialogue sometimes daily

13     regarding the invoices and what's being done, and

14     Mr. Sheehan's presentation today is not -- is not new news

15     because we're active and involved in the oversight of the

16     case.

17          So the critical thing here, Your Honor, and I've

18     said this on all 13 prior occasions, is that because there's

19     no reasonable expectation the statute pretty much says plain

20     language the Court shall award; however, I would note that

21     if we get to that nirvana state where SIPC gets back all its

22     recoupments and we are in a regular bankruptcy the statute

23     also provides that the Court should give weight to the SIPC

24     recommendation.

25          And that's the way I approach it, that's the way

Page 45

1   my general counsel approaches it, it's the way the

2   corporation approaches it is that we are monitoring this so

3   if you had questions with regard to this and we were not in

4   that shall award state we would be prepared to answer

5   questions that the Court has, and you know, one of these

6   days when Mr. Sheehan and his team and Mr. Nisselson and his

7   teem are successful and we reach payment of 100 percent of

8   customer claims and we get SIPC back, it's almost a billion

9   dollars of administrative advances in addition to the

10  $812 million we advanced for customers and we start talking

11  about general estate back in the bankruptcy context, you

12  know, at that point in time I do believe, having lived this

13  statute for 40 years, that this Court is going to look on

14  this.

15          We have a reserve with Baker and the trustee of

16  something like $30 million.

17          MR. SHEEHAN:  Correct.

18          MR. BELL:  Mr. Sheehan and I were discussing that

19  yesterday and I know there is a reserve not as high for

20  Mr. Nisselson's firm, as well as all the other firms,

21  because it's something that is there that as we get to the

22  final stages way down the road this Court I think has an

23  obligation to look at it and say the holdback should be paid

24  or should not be paid depending on the outcome of these

25  cases.

Page 46

1          And so we monitor -- we monitor that, and you

2    know, while it is not here it was there on the thirteenth

3    after negotiation we recommended to the Court and the Court

4    approved a reduction of that holdback.  That's not before

5    the Court now but has been before the Court on three or four

6    prior occasions, and is governed somewhat by the order of

7    the Court that is -- is noted in the trustee's application.

8          So I just wanted to present that to the Court and

9    ask the Court if it had any questions with regard to SIPC's

10   recommendations or SIPC's oversight of the case or the

11   applications, I --

12          THE COURT:  I take it that SIPC recommends the

13   fees --

14          MR. BELL:  SIPC recommends each and every one.

15   SIPC has filed six fee recommendations on the ninth

16   application of young, the seventh application of Good Field,

17   the second application of Kelley, all the applications of

18   the fifteen international special counsels, the thirteenth

19   application of Windels, and the fourteenth application of

20   trustee and counsel, it recommends it completely.

21          THE COURT:  Thank you very much.

22          MR. BELL:  Thank you, Your Honor.

23          THE COURT:  Is there anyone else who wants to be

24   heard in connection with the fee applications?  The record

25   should reflect there's no response.

Page 47

1          I'll award the fees as requested subject to the

2     holdback and the expenses in full.  I guess all subject to

3     review at the end of the case depending on how the case

4     turns out.

5          The trustee and his counsel are entitled to

6     reasonable compensation, SIPC has reviewed the applications,

7     and since SIPC has recommended the applications and has also

8     stated that it has no reasonable expectation at this time of

9     being -- of being -- of seeking recoupment I'm basically

10    bound by SIPC's recommendations.

11         So you can submit an order on that.

12         And then the only remaining thing is the

13    allocation motion.

14         MS. BROWN:  Yes, Your Honor.  Seanna Brown also on

15    behalf of the trustee.

16         This is also the return date of the trustee's

17    motion for a fourth allocation of property and a fourth

18    interim distribution to customers.

19         I want to note at the outset that there are also

20    no objections to this application.

21         The trustee has made three prior interim

22    distributions and the history is laid out in our papers so I

23    won't recount them here unless Your Honor has any questions.

24         THE COURT:  No, I've reviewed the application.

25         MS. BROWN:  Okay, great.

1        If I may briefly though just run through what the

2   trustee proposes to do here in the fourth distribution.

3        THE COURT:  Go ahead.

4        MS. BROWN:  The trustee intends to distribute

5   $350 million which will go to approximately 1,000 accounts

6   with an average check of $323,000.  When you combine this

7   distribution with the prior distributions customers with

8   allowed claims will have received 46 percent of their losses

9   and the trustee will have fully satisfied over 1,100

10  accounts.

11       To date we have collected over $9.8 billion, and

12  through our -- this distribution, our prior distributions,

13  and the SIPC advances, we will have returned to customers

14  almost $6 billion.

15       As Your Honor knows from the papers and from the

16  statute however we can't distribute the full 9.8 billion at

17  this time because we must maintain reserves for disputed

18  amounts.

19       The two largest reserves that we have currently

20  are for the time-based damages appeal, which is currently

21  being briefed before the Second Circuit, and the reserves

22  that we maintain for those account holders that are in

23  litigation with the trustee.

24       Notwithstanding those reserves the trustee is

25  ready to make this fourth distribution which will return

Page 49

1    significant amounts to customers particularly when it's

2    combined with the prior distributions and the amounts

3    advanced by SIPC.

4              We would respectfully ask that Your Honor approve

5    the allocation and authorize the trustee to make that

6    payment.

7              THE COURT:  Is there anybody that wants to be

8    heard in connection with the application?

9              MR. BELL:  Your Honor, SIPC is here in support and

10   it finds that this is a very important moment in this case

11   because the trustee will have distributed, if the Court

12   issues the order, 46.06 cents on the dollar together with

13   the approximate 14 cents that's on reserve for the two

14   matters, TBD, time-based damages, and the litigation dealing

15   with the customer account -- customers who have accounts

16   that are in litigation with the trustee.

17             THE COURT:  Thank you.

18             All right, I'll grant the application.  Certainly

19   it's in everybody's interest to get money to the victims as

20   quickly as possible.  So you have submit an order on that.

21             MR. BELL:  Yes, Your Honor.

22             THE COURT:  Thank you.

23         (A chorus of thank you)

24         (Whereupon these proceedings were concluded at 11:18

25   AM)

1                          I N D E X

2

3                          RULINGS

4                                          Page        Line

5    Motion for Leave to File an Amended

6    Complaint                              14           9

7

8    All Fee Applications                   47           1

9

10   Motion to Approve Fourth Allocation of

11   Property to the Fund of Customer Property and

12   Authorize Fourth Interim Distribution to

13   Customers                              49          18

14

15

16

17

18

19

20

21

22

23

24

25

Page 51

1                    C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    AAERT Certified Electronic Transcriber CET**D-408

9

10   Veritext

11   330 Old Country Road

12   Suite 300

13   Mineola, NY 11501

14

15   Date:  February 18, 2014

16

17

18

19

20

21

22

23

24

25