Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 09-01182-smb

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   PICARD,

7            Plaintiff,

8   v.

9

10  MERKIN, ET AL.

11           Defendant,

12  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              April 30, 2014

19              10:01 a.m.

20

21

22  B E F O R E :

23  HON STUART M. BERNSTEIN

24  U.S. BANKRUPTCY JUDGE

25

1    Motion to Dismiss The Third Amended Complaint

2

3    (cc-1) Pre-Trial Conference for Defendant Ascot Partners, LP

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach, CERT*D-397

Page 3

```
 1    A P P E A R A N C E S :

 2    BAKER HOSTETLER

 3         Attorneys for Trustee

 4         45 Rockefeller Plaza

 5         New York, New York 10111

 6

 7    BY:  DAVID J. SHEEHAN, ESQ.

 8         LAN HOANG, ESQ.

 9         BRIAN SONG, ESQ.

10

11    DECHERT, LLP

12         Attorneys for Merkin Defendants

13         1095 Avenue of the Americas

14         New York, New York 10036

15

16    BY:  ANDREW J. LEVANDER, ESQ.

17         NEIL A. STEINER, ESQ.

18

19    REED SMITH, LLP

20         Attorneys for Defendants Bart Schwartz as Receiver

21         599 Lexington Avenue

22         New York, New York 10022

23

24    BY:  JORDAN W. SIEV, ESQ.

25         MICHAEL J. VENDITTO, ESQ.
```

Page 4

1   NORTON ROSE FULBRIGHT & JAWORSKI, LLP

2        Attorneys for Receivers of Ascot Partners, LP

3        666 Fifth Avenue

4        New York, New York 10103

5

6   BY:   JUDITH A. ARCHER, ESQ.

7        DAVID L. BARRACK, ESQ.

8        JAMI M. VIBBERT, ESQ.

9

10   SADIS GOLDBERG, LLP

11        Attorneys for Ascot Fund, LTD.

12        551 Fifth Avenue, 21st Floor

13        New York, New York 10176

14

15   BY:   JENNIFER ROSSAN, ESQ.

16        DOUGLAS R. HIRSCH, ESQ.

17

18

19

20

21

22

23

24

25

Page 5

```
 1                      P R O C E E D I N G S

 2               THE COURT:  Please be seated.

 3               Picard versus Merkin.

 4               MR. LEVANDER:  Good morning, Your Honor.

 5               THE COURT:  Good morning.

 6               MR. LEVANDER:  Andrew Levander for the Merkin

 7      defendants. Your Honor, with the Court's permission I would

 8      like to address the actual knowledge of fraud and the

 9      willful blindness issues as well as the equitable

10      subordination issues.

11               THE COURT:  Are there really any willful blindness

12      issues in the case because the plaintiff would have to plead

13      and prove that the funds, which of the transferees had

14      actual knowledge of fraud, right?

15               MR. LEVANDER:  The -- under Counts 1, 3 through 9,

16      and the druid of counts that follow 10, I believe that that

17      is correct.

18               With regard to Count 2, which is the count that

19      has to do with 548(a)(1)(A), they're -- that would be a

20      willful blindness standard.  As --

21               THE COURT:  So you don't --

22               MR. LEVANDER:  -- as to ultimately the Merkin

23      defendants, the trustees will address the issues of

24      imputation.

25               THE COURT:  Okay.  But you don't -- you don't read
```

Page 6

```
 1    the counts (indiscernible) to require the pleading and proof

 2    of actual knowledge, even for the actual fraudulent transfer

 3    count under the Bankruptcy Code.

 4              MR. LEVANDER:  What I'm -- what I read them as

 5    saying is that with regard to the good faith defense, which

 6    would be considered on a motion to dismiss after -- I assume

 7    the Court has seen --

 8              THE COURT:  Yeah.

 9              MR. LEVANDER:  -- the Sweets' (ph) opinion, that

10    -- that willful blindness for the purposes only of

11    548(a)(1)(A) would, in fact, satisfy the actual knowledge of

12    fraud.  With regard to every other -- so that -- so for that

13    two year period.

14              With regard to every other count in the case, it's

15    an actual knowledge of a fraud and there are, obviously,

16    major hurdles there which we believe the trustee cannot

17    overcome.

18              THE COURT:  Okay.  Go ahead.

19              MR. LEVANDER:  Thank you.

20              The Merkin defendants never received any funds

21    directly from Madoff or BLMIS.  But the Merkin funds were

22    among the largest victims of Madoff's fraud.  More than $2

23    billion in paper losses, approximately 900 million in next

24    losses, and as Judge Batts noted in her class action

25    decision as re: Merkin's Securities Litigation, 817 F.Supp.
```

Page 7

1    at 357, Note 8, and as the trustee who has spent more than

2    $30 million in fees investigating the Merkin defendants well

3    knows, Mr. Merkin lost more than $110 million personally in

4    the Madoff fraud.

5            And just so there's no confusion, Your Honor,

6    because the trustee likes to sew confusion, Mr. Merkin was

7    the 100 percent owner of Gabriel (ph) Capital Corporation,

8    his management company.  That company, which I will refer to

9    as GCC, is not to be confused with one of the three Merkin

10   funds which I will refer to as Gabriel, Ariel (ph) and

11   Ascot.

12           Now there's no dispute on this motion to dismiss

13   that each of the three funds, which are the only parties to

14   transfer money to or receive money from Madoff are all

15   substantial net losers.  Arial and Gabriel, about $160

16   million each and the trustee admits Ascot is a $226 million

17   loser.  We believe that the net loss is actually 560

18   million, but either way a big loser.

19           Moreover, there is no dispute that the only

20   withdrawals Arial and Gabriel made in the entire six-year

21   period -- and none were in the preference period -- were

22   about 16 million and $17 million, respectively.  The trustee

23   alleges that $280 million in withdrawals from Ascot were --

24   happened in the two-year period and a total of 461 over the

25   course of the six-year period.

Page 8

```
 1              In this suit, notwithstanding the funds

 2    substantial net losses, the trustee seeks to recover the

 3    transfers from Madoff to the three funds during the two and

 4    six-year periods prior to bankruptcy under federal and state

 5    law.

 6              So let's turn to the sufficiency of the pleadings

 7    with regard to the transfers that are the subject of Counts

 8    1 through 9, specifically whether, after years of discovery,

 9    the trustee's third amended complaint sufficiently and with

10    particularity alleges at least willful blindness as to Count

11    2 and actual knowledge of Madoff's fraud as to Counts 1 and

12    3 -- 1 and 3 through 9.  It does not.

13              The controlling legal analysis is found in a

14    series of Seminole readings in the Madoff cases by Judge

15    Rakoff, which obviously are binding on this Court and which

16    the trustee seeks to ignore.

17              The first of those rulings, Picard v Katz,

18    requires dismissals of Counts 1 and 3 through 9 under the

19    safe harbor provision of Section 546(e).  Here, as in Katz,

20    Picard filed claims under various state and federal

21    provisions alleging fraudulent conveyances and willful

22    blindness.  But Judge Rakoff dismissed all claims except

23    those arising under Section 541(8)(1)(a).  Thus, at most,

24    only Count 2 survives under Katz.

25              Indeed, just a couple of days ago, Judge Rakoff,
```

Page 9

1    in the consolidated Madoff ruling, call it good faith

2    standard, confirmed what he had previously ruled in Katz and

3    Abilino (ph) decisions.  And if the Court needs a copy of

4    that, I'm happy to hand it up.

5              THE COURT:  I have it.

6              MR. LEVANDER:  Thank you.

7              In this week's decision, Judge Rakoff made it

8    crystal clear to decide -- to survive a motion to dismiss

9    the trustee must allege particularized facts demonstrating

10   actual knowledge of a fraud or willful blindness with regard

11   to two-year transfers and that the trustee can only go after

12   two-year transfers beyond two years if he can demonstrate

13   that the transferee had actual knowledge that the entire

14   operation was a fraudulent scheme in which there were no

15   securities' transactions whatsoever.

16             Notwithstanding the trustee's most recent

17   pleadings, he has no conceivable claim regarding transfers

18   beyond six years.

19             The statutory underpinning of Judge Rakoff's

20   decisions begins with Section 546(e).  That statute provides

21   that notwithstanding all the various statutes on which the

22   trustee relies in Counts 1 through 9, specifically Sections

23   544, 547 and 548, he can only recover transfers under

24   Section 548(a)(1)(A), and -- the actual fraud provision, and

25   only up to two years, not six.

1          Relying on Supreme Court and other precedents,

2    Judge Rakoff further held that Section 548(a)(1)(A) must be

3    read in conjunction with 548(c), the good faith defense, and

4    under Iqbal and Bell Atlantic the trustee must affirmatively

5    allege specific facts actually establishing actual fraud or

6    willful blindness.  Hence, that issue is properly addressed

7    on this motion to dismiss notwithstanding the position of

8    the trustee.

9          In Judge Rakoff's words earlier this week,

10   "Without particularized allegations that the defendants here

11   either knew of Madoff's securities' fraud or willfully

12   blinded themselves to it, the trustee's complaints here

13   cannot make out a plausible claim that is entitled to

14   recover the monies defendants received from their

15   securities' accounts."  That's at Page 11.

16          THE COURT:  So what facts do you think the trustee

17   would have to allege in order to show that he had actual

18   knowledge?

19          MR. LEVANDER:  So he -- actual knowledge, he would

20   have to show strong allegations under Rule 9(b) incorporated

21   under the Bankruptcy Rules --

22          THE COURT:  I know what the rule says.

23          MR. LEVANDER:  Yeah.  Yeah.

24          THE COURT:  What -- I'm asking, what is -- what

25   does he have to allege?

1           MR. LEVANDER:  He has to --

2           THE COURT:  He obviously can't just say he knew.

3           MR. LEVANDER:  Right.

4           THE COURT:  That's conclusory.

5           MR. LEVANDER:  Correct.  And that's what he's

6    done.  He -- he would have to show that there were

7    conversations or actions that demonstrated beyond per

8    venture that there was knowledge that this was a fraud.  And

9    that he can't possibly do in this case.  You know, the Court

10   has already noted that (indiscernible) -- your Dreier

11   opinion in (indiscernible) credit and what you just said,

12   obviously you disregard the conclusory allegations, the

13   legal allegations dressed up in factual garb.  We should be

14   taking a very tough look at the third amended complaint.

15          THE COURT:  Okay.  So paragraph 95, this is the

16   conversation with research company A --

17          MR. LEVANDER:  Yes.  I'm going to address that,

18   Your Honor.

19          THE COURT:  -- and there is a quote attributed to

20   Merkin that Charles Ponzi would lose out because it would be

21   called a Madoff scheme.  Why can't I infer from that that he

22   knows it's a Ponzi scheme?

23          MR. LEVANDER:  Okay.

24          THE COURT:  For purposes of a motion to dismiss.

25          MR. LEVANDER:  Sure.

Page 12

1          So you've got to look at that in context.  And

2     we'll put aside for the moment what the trustee actually

3     knows about the people who testified about that -- that

4     conversation.

5          THE COURT:  Well, the context is in the complaint.

6     I know you gave me a lot of deposition transcripts, but I

7     don't think I can consider those on a motion to dismiss.

8          MR. LEVANDER:  Okay.  So -- but the context, even

9     from the complaint, is the following.  The context is that

10    the Merkin funds, unlike the allegations, for example, in

11    Chase and allegations in Comack where there's 125 percent

12    returns.  There's tax losses when they want them, huge gains

13    when they need them, and -- and billions of dollars removed

14    for -- from false profits, from fictitious profits.

15         Here we've got three funds, all net losers.  Mr.

16    Merkin's money in -- on the line.

17         THE COURT:  Well, that's not alleged in the

18    complaint, though.

19         MR. LEVANDER:  Judge Batts took judicial notice of

20    it, Your Honor, in Footnote 8.

21         That -- that there's nothing unusual about the

22    withdrawals.  There's nothing unusual about the returns.

23    There's no 125 percent returns.  There's nothing like it and

24    no fictitious --

25         THE COURT:  So you're arguing that if the returns

                                                                    Page 13

1    are large enough that without more satisfies the requirement

2    --

3              MR. LEVANDER:  I think it's a --

4              THE COURT:  -- under --

5              MR. LEVANDER:  -- fact that the Court could look

6    to.  And it certainly did -- the Court did look to it in the

7    Chase case, Stanley Chase.

8              And here, you know, Judge Rakoff in the Katz

9    decision said the trustee has the unenviable burden, almost

10   an absurdity, to allege that people purposely invested in a

11   Ponzi scheme.  He starts with a huge presumption against him

12   and then you have irregularity here.

13             So on that conversation, we know from the

14   complaint that research company's A's clients having heard

15   this report, the comment that's made, which is the nature of

16   the guy's been in business for 20 years.  He's -- he's

17   always met his redemptions.  He's got a great reputation,

18   great returns, withdrawals are given without problem.  If

19   this is a fraud, they're going to rename it -- they're going

20   to rename it, you know, the Madoff scheme as opposed to a

21   Ponzi scheme.

22             THE COURT:  But -- but that's not --

23             MR. LEVANDER:  And --

24             THE COURT:  But that -- wait.  Wait.  Wait.

25   That's not pled and you're asking me to infer that on a

Page 14

1    motion to dismiss about that comment.

2             MR. LEVANDER:  What I'm asking you to infer is the

3    fact that's not disputed and, in fact, it is -- it's made

4    clear in the complaint that after this meeting research

5    company A's clients invested tens of millions of dollars --

6             THE COURT:  But that's not in the complaint

7    either.

8             MR. LEVANDER:  It says -- it says that they are --

9    they were investors in the fund.  It says that in the

10   complaint.  So it is implausible that if Mr. Merkin's

11   alleged comments were to be construed as, gosh, I think this

12   is a Ponzi scheme, that they would have kept tens of

13   millions of dollars in the account; that they would have

14   continued to invest.  That is not plausible and it's not

15   plausible as Judge Rakoff found in Katz.

16            The fact is that most of the third amended

17   complaint is directed to this very kind of publicly

18   available information about Madoff that Court after Court

19   after Court in the Southern District -- Judge Batts, Judge

20   Leisure (ph), Judge Sand (ph), all the cases we cited on

21   Page 18 of our brief have found to be insufficient to

22   establish inquiry notice or bad faith.  And the same facts

23   were known to the SEC in FINRA and to thousands of

24   sophisticated investors.  And that doesn't cut it.

25            So on the specific facts I've already addressed

1    reserve company A.

2            THE COURT:  What about paragraph 105 where Teisher

3    (ph) tells Merkin that BLMIS could be a Ponzi scheme.

4            MR. LEVANDER:  Okay.  So could, might, those

5    things might satisfy the inquiry notice standard, but they

6    are not willful blindness.  Under Judge Rakoff's ruling and

7    your Court's ruling in the Dreier trilogy, you are not

8    required to investigate.

9            Moreover, Mr. Teisher has testified that he did

10   not know who Madoff was.  He made an offhand comment and he

11   had no idea what Madoff traded.  And the returns that we're

12   talking about are normal returns.  There are plenty of

13   managers out there.  This Court could take judicial notice

14   --

15           THE COURT:  I can't take judicial notice that

16   those are normal returns.

17           MR. LEVANDER:  Okay.  Well, I mean, there -- the

18   --

19           THE COURT:  Tell me how I can do that.

20           MR. LEVANDER:  The fact is that there are lots of

21   articles about people whose returns are in the 20, 30, 40

22   percent range month after month, year after year.  And I can

23   list a bunch of them.  But the Court --

24           THE COURT:  Madoff being at the top of the list.

25           MR. LEVANDER:  No, not.  There's a -- there's an

Page 16

1    article that they rely on in Baron's (ph) which said he's

2    number 12 out of the list of whatever managers are looking

3    at.

4          So the fact is that the SEC knew about his

5    returns.  The FINRA knew about his returns, and thousands of

6    investors knew about his returns and Judge Rakoff has said

7    that does not lead one to willful blindness.  The standard

8    is not inquiry notice and he decried in his opinion the

9    trustee's attempt to re-litigate this standard over and over

10   and over again.  It is actual knowledge of the fraud or

11   willful blindness, which the Supreme Court in Global Tech

12   Appliances said:

13         "We think these requirements give willful

14   blindness an appropriately limited scope that surpasses

15   recklessness and negligence.  Under this formulation a

16   willfully blind defendant is one who takes deliberate

17   actions to avoid confirming a high probability of wrongdoing

18   and who can almost be said to have actually known the

19   critical facts."

20         And by the way, Mr. Teisher denies having said it

21   was a Ponzi scheme.  But --

22         THE COURT:  But that's from a deposition

23   transcript that I'm not going to consider on a motion to

24   dismiss.

25         MR. LEVANDER:  Okay.  But you can consider the

Page 17

```
 1    fact that in the 80s some man made an offhand comment about

 2    might or could.  And, Judge, we know from before and we know

 3    now that anybody could be engaged in a fraud. That

 4    possibility is not subject to willful blindness.  It doesn't

 5    meet the high standard.

 6             To the contrary, the courts have repeatedly

 7    concluded, and particularly Judge Rakoff has particularly

 8    concluded that you don't have to investigate.  It's not the

 9    standard.  You have to have it right in front of you. It's

10    tantamount to actual knowledge of the fraud and you have to

11    say, I don't want to know.  And that's not what happened

12    here.

13             THE COURT:  Well, how about paragraph 151 of the

14    complaint that alleges a telephone conversation between

15    Madoff and Merkin where Merkin asks him, I guess, about his

16    performance and Madoff refuses to answer.

17             MR. LEVANDER:  Well, the actual transcript, Your

18    Honor --

19             THE COURT:  Is that --

20             MR. LEVANDER:  The actual transcript at 151 is

21    precisely what is not willful blindness.  What --

22             THE COURT:  Is that annex to -- is that an

23    exhibit?

24             MR. LEVANDER:  I don't know if the entire

25    transcript is or is not, Your Honor.  I don't think it is,
```

Page 18

1    but we can provide it to the Court.

2              THE COURT:  Well, is it -- is there any extract of

3    it in the defendant's papers?

4              MR. LEVANDER:  I don't -- is the entire transcript

5    --

6              THE COURT:  All or any portion of it?

7              MR. LEVANDER:  No, but we can certainly supply the

8    Court with it.  The fact is that what he is saying there is,

9    I'm not smart enough to know how you go in and out of the

10   market.  He talks to him all the time.  That's in the

11   complaint.  He asks him why he's not in the market or why he

12   went into the market.  And he says, you know, I'm not smart

13   enough to second guess your decisions about going in and out

14   of the market.  That is totally not willful blindness.

15             THE COURT:  In paragraph 156 there's another

16   report of a conversation between Merkin and Madoff which

17   Merkin questions Madoff about assets.  Madoff refuses to

18   answer.  And Madoff -- then Merkin basically says, I really

19   don't care.  I've made my peace with Bernie.

20             Why isn't that a conscious turning away?

21             MR. LEVANDER:  The actual transcript says that --

22   that he gets -- he gives him an approximation at some point

23   and he doesn't need to know Bernie's confidential

24   information.

25             THE COURT:  Is that attached to the defendant's

Page 19

1   papers?

2            MR. LEVANDER:  I don't believe so, Your Honor.

3   But the -- but even the quote and the -- you know, says,

4   "Merkin did not press Madoff for a response."  That's

5   precisely what willful blindness is not.  That's what Judge

6   Rakoff has said over and over again.  You do not have to

7   investigate.  You do not have to question.

8            The notion that someone --

9            THE COURT:  But he did question.

10            MR. LEVANDER:  He raised a question.

11            THE COURT:  And Madoff refused to answer.

12            MR. LEVANDER:  And -- and according to this that

13   -- Madoff wanted to keep some confidentiality as to the

14   number of investors or the amount of underinvestment is

15   hardly the kind of thing that says, okay, I now know there's

16   a fraud.  There are lots of people who have lots of run --

17   run hedge funds, run managed accounts and who do -- and who

18   have -- like renaissance, you know, has a black box.  They

19   won't tell you how much is under management.  They won't

20   tell you how they're doing it.  They're not going to share

21   their computer analytics.  It's totally secret.  You make

22   your decision.  You want to be involved in that investment,

23   you do it.  You don't want to be involved, you don't do it.

24            And what Mr. Merkin says, okay, Bernie, you want

25   to keep this private, I understand.  You don't have to tell

Page 20

1     me what's under management.  But, by the way, the SEC was in

2     Mr. Madoff's offices over and over and over again.

3               And they -- and they knew what was under

4     management, or supposedly under management.  They

5     investigated in 1992 that there was an allegation -- this is

6     all public record.  There were two accountants down in

7     Florida.  There was a $440 million rescission offer that the

8     SEC said you didn't go to your clients, you know, and

9     properly under Section 5 make disclosures. They ordered the

10    rescission of it.  Madoff had the money.  He gave them the

11    money and on the front page of the Wall Street Journal, and

12    this article is in Mr. Madoff's files, made the front page

13    of the Wall Street Journal and it's all in public record

14    that the head of enforcement of the SEC said, thank -- we

15    thought it was a scam, but thank God the money was all

16    there.  It was Madoff.  That's what he said.

17              So the notion that this thing about you can't

18    press the manager for what he considers confidential

19    information is not willful blindness of a fraud.  It is not

20    tantamount to knowing that there's a fraud going on.

21              Willful blindness is when someone comes up to you

22    on the street, Your Honor, and he says to you, I've got a

23    Picasso for sale, and if you give me cash right now you can

24    have it for $500.  Well, either it's a fake Picasso or

25    you're confronted with the fact that the genesis of

Page 21

1    ownership here has a problem.  And you pay the $500 and it

2    turns out it's stolen, that's willful blindness.  That can't

3    be.  If it's a real Picasso, we all know it's not $500.

4              So --

5              THE COURT:  You're at least on inquiry notice,

6    right?

7              MR. LEVANDER:  You're surely under inquiry notice.

8    Okay.

9              And that is not the standard and Judge Rakoff has

10   rejected that three times.  So all you have when you look at

11   his brief, you look at his complaint is could have/should

12   have, should have asked more questions, could have done more

13   due diligence.  That's simply not the standard.

14             Now that fact, the failure to allege actual

15   knowledge requires dismissal of Counts 1 and 3 through 9,

16   the failure to allege willful blindness requires, in our

17   view, the dismissal of Count 2.  Count 2 is the -- is only a

18   two-year count and it has to do with transfers under

19   548(a)(1)(A).

20             If you did -- if you dismiss Counts 1 through 9,

21   then 10, which is a derivative of those things, has to fall

22   as well.  So let me just spend a minute addressing Counts 11

23   through 13, which seek to subordinate or disallow Madoff

24   funds' claims, the Merkin fund claims.  I apologize.

25             For the same reasons that the allegations

1    regarding actual knowledge and willful blindness are

2    insufficient on the transfer counts, it's also insufficient

3    under the subordination count.

4              In Your Honor's Dreier trilogy, in particular the

5    one captioned Gower (ph) versus Wachovia Bank, 453 B.R. 499,

6    at pages 516 to 517, right on point.  There Your Honor

7    explains --

8              THE COURT:  Sometimes I get it right.

9         (Laughter)

10             MR. LEVANDER:  There Your Honor explained that the

11   equitable subordination is rarely justified in a few

12   extraordinary and extreme circumstances.  "The proponent

13   must plead and prove that the non-insider engaged in gross

14   and egregious conduct tantamount to fraud or other willful

15   misconduct."  And for the same reasons, as I said, that that

16   -- that standard is a high standard and requires dismissal.

17             You further ruled in that case, at page 517, that

18   you can't get it -- you can't get both.  You cannot disallow

19   the claim and get equitable subordination.  At page --

20             THE COURT:  Well, there's nothing to support, I

21   mean, if you disallow the claim.

22             MR. LEVANDER:  Well -- so what you said was

23   "Furthermore, Wachovia will not be entitled to any

24   distribution unless it returns the fraudulent transfer.  In

25   that event, the estate will have been made whole and will

Page 23

1    not be entitled, repeat not entitled to the additional

2    remedy of equitable subordination."

3            The trustee, none the less, argues he has

4    unfettered equitable powers to disallow and subordinate.

5    But as the Second Circuit ruled in Picard v. JPMorgan Chase

6    at 721 F.3d. 54 in 2013, he doesn't have those kind of

7    extraordinary powers.  He's not a super equitable trustee.

8    His role as a SIPA trustee like any other bankruptcy trustee

9    is limited by statute.  He is --

10            THE COURT:  Is this the equitable disallowance

11    argument?

12            MR. LEVANDER:  No.  That JPMorgan Chase is not --

13            THE COURT:  No, but is that what you're arguing --

14            MR. LEVANDER:  Yes.

15            THE COURT:  Okay.

16            MR. LEVANDER:  Disallowance and, you know, that

17    somehow there's a reserve of huge equitable powers beyond

18    what the statute provides.  He's not a roving commission of

19    equity to use the phrase that the courts repeatedly say.

20    Therefore, Counts 11 through 13 should be dismissed as well.

21            I would reserve the rest of my time for rebuttal

22    if that's okay, Your Honor.

23            THE COURT:  Thank you very much.

24            MR. LEVANDER:  Thank you.

25            MR. SIEV:  Good morning, Your Honor.  Jordan Siev

Page 24

1   from Reed Smith for Bart Schwartz who is the receiver for

2   the Arial and Gabriel funds as distinct from Gabriel Capital

3   that Mr. Levander mentioned.  I'm going to be arguing the

4   imputation point also on behalf of the Ascot funds.

5           As indicated, these funds were so-called feeder

6   funds into Madoff and it's undisputed for purposes of

7   imputation.  There's no allegation in the complaint that

8   these funds should be imputed with the knowledge of anyone

9   other than Mr. Merkin.  So we're going to focus on what

10  Merkin knew because they're relying on the imputation of

11  Merkin's knowledge as agent of the funds.

12          Now I agree with everything argued by Mr. Levander

13  --

14          THE COURT:  Let's assume for your argument that

15  Merkin knew.

16          MR. SIEV:  Okay.

17          THE COURT:  Because you're arguing the imputation

18  you're going to say that whatever he knew shouldn't be

19  imputed to the funds, right?

20          MR. SIEV:  Correct.  There are four reasons --

21  even if Merkin knew there are four reasons why you should

22  not impute Merkin's knowledge to the funds.  I'm just going

23  to tick them off and then address them in a little bit more

24  detail.

25          First is he was acting outside the scope of the

Page 25

1    agency relationship between him as agent and the funds as

2    principal to --

3            THE COURT:  Well, why do you say that?  I mean,

4    I've read the offering documents.  He -- for Arial and

5    Gabriel, your funds, he had at the end of the day unfettered

6    discretion in terms of to deviate from the investment

7    strategy, didn't he?

8            MR. SIEV:  Well, the investment advisory agreement

9    indicates that he had discretion consistent with the terms

10   of that agreement.  I think when you read that agreement in

11   connection with the offering documents, but more importantly

12   when you look at the trustee's own allegations it makes very

13   clear that these were essentially distressed investing funds

14   and the split strike conversion strategy did not line up.

15           THE COURT:  Yeah.  I know what -- I know what the

16   offering documents said, but at the end of the day they had

17   the statement that he could deviate from the investment

18   strategy and basically invest in anything.  Doesn't it say

19   that?

20           MR. SIEV:  That -- that is what the investment

21   advisory agreement says, but I don't think that you can read

22   out of that the funds offering documents and the stated

23   purpose --

24           THE COURT:  But it's the offering documents --

25           MR. SIEV:  -- of the funds.

1            THE COURT:  -- that say that because the offering

2    documents were attached to your papers.  They're referred to

3    in the complaint so I can consider them, and they -- and the

4    two -- the Arial and Gabriel documents need to say that he

5    can, at the end of the day, invest in anything that he deems

6    appropriate.

7            MR. SIEV:  Well, the documents are slightly

8    different. The investment advisory agreement in Arial --

9            THE COURT:  Yeah, but he doesn't rely on the

10   investment advisory agreement.  He relies on the offering

11   documents.  So I can consider them on the motion to dismiss.

12           MR. SIEV:  Correct.  And those documents and the

13   -- and the trustee's own allegations say that this strategy,

14   this split strike conversion strategy was not consistent

15   with the strategy of --

16           THE COURT:  Okay.

17           MR. SIEV:  -- the distressed investing fund.

18   That's paragraphs 113 to 115 of the complaint when it comes

19   to Arial and Gabriel, and 120 to 123 when it comes to Ascot.

20           But more importantly, that's -- the fact that it

21   was invested with Madoff and the fact that it was being

22   invested in this so-called split strike conversion strategy

23   was concealed from the investors and that's laid out very

24   clearly by the trustee's own allegations, paragraphs 109,

25   119, 126, 131, 135 to 7 and 140 to 143.  That, in and of

Page 27

1   itself, negates any finding that he was acting within the

2   scope of his authority.  If he --

3               THE COURT:  Well, but -- but the fund is different

4   from the investors.  For example, he could be bringing more

5   money into the fund through fraud to the detriment of new

6   investors, let's say, but that -- under the New York State

7   Court of Appeals decision in REFCO would be sufficient for

8   imputation.

9               MR. SIEV:  Well, I --

10              THE COURT:  At least to defeat the adverse

11   interest exception.

12              MR. SIEV:  Well, I don't agree and that was

13   getting to the second and third --

14              THE COURT:  Okay.

15              MR. SIEV:  -- of the four reasons.  The second

16   reason is under agency law he was not acting for the benefit

17   of the principal which dovetails with the adverse interest

18   exception laid out in Kershner under principals of in pari

19   delicto.  Basically, the theory is that you can't expect

20   that an agent is going to disclose that which would expose

21   and defeat the fraud that was laid out in the Maxwell

22   Newspaper's case by Judge Brosman (ph).

23              And what we have here, as alleged by the trustee,

24   is a situation where he did not disclose in any

25   communications to investors that he was engaged in this --

Page 28

1      in this split strike conversion strategy or that he was --

2      that he was investing with Madoff.

3              And now what Kershner says is where you have a

4      situation of "outright theft or lewding or embezzlement

5      where the insider's misconduct benefits only himself or a

6      third party," also known as fraud against the corporation,

7      then you find that the agent was acting adversely and you

8      don't impute the agent's conduct.

9              THE COURT:  But I'm being told by Mr. Levander

10     that Merkin had $100 million invested in the fund or lost

11     $100 million, I forget which it was.

12             MR. SIEV:  That's correct, which -- and when you

13     look at the allegations of the complaint, according to

14     paragraphs 249 to 253, Mr. Merkin is alleged to have earned

15     over $256 million in management and incentive fees from his

16     Madoff-related investments only, $500 million total from his

17     activities on behalf of these various funds.

18             So I'm certainly not stating that $110 million

19     loss is not a very significant loss.  But if you look at it

20     in the context where you're in this situation, where you're

21     hiding from the investors in communications that you're

22     investing with Madoff and engaged in this strategy, if

23     you're earning 500 million based on your activities in these

24     funds and even 256 million based on your activities with

25     Madoff, on balance you're in a better situation than you

Page 29

1    would be taking this out and exposing this.

2              And getting back to the Kershner standard of

3    outright theft or eluding or embezzlement, what you have

4    here is a situation where this is not like you see in some

5    of the in pari delicto cases where there's a benefit to a

6    corporation.  In other words, an insider defrauds a bank,

7    gets a loan.  The corporation uses that for its day to day

8    operations or to issue stock and uses the proceeds of that

9    stock for its day to day operations, and the Courts find

10   that is a situation where even though the insiders may have

11   profited -- they sucked out salaries, they took bonuses,

12   whatever, they kept their positions -- the corporation also

13   benefited.

14             This is not the corporation in the sense of an

15   ongoing business entity.  The money that flows in here is

16   subject to a claim, if you will, by investors.  This is not

17   money that comes in that the corporation, the funds then use

18   for other corporate purposes.  And what happens when more

19   money comes in, Mr. Merkin gets more in management fees.

20   What happens when the fund performs better because of the

21   investments in Madoff, he gets more money in incentive fees.

22             So I would submit that by analogy that is

23   absolutely what the Kershner court is talking about in terms

24   of outright theft or eluding or embezzlement because this

25   benefited him and not the company.

1          Now, further, again, the trustee's own

2    allegations, paragraph 207 it says that Mr. Merkin failed to

3    protect the funds from fraud.  Paragraphs 226, 232, 239 and

4    245, what the trustee alleges is that when Mr. Merkin knew

5    that Madoff was having liquidity problems, he changed

6    redemption terms from 30 or 45 days to a two-year lockup.

7    So that's not evidence that you're looking -- that you're

8    acting on behalf of the funds.  That's evidence that you're

9    acting on your own behalf and in furtherance of the fraud.

10          And, in fact, there were no trades made,

11    paragraphs 26 to 28, false profits that were generated here

12    on paper only, that's not a benefit to the company.  And, in

13    fact, that's exactly what the trustee argued successfully, I

14    might add, in getting the Second Circuit to ultimately sign

15    off on the net investment method.  These paper profits are

16    fictitious.  So they didn't benefit the funds in any way.

17          If I may just briefly address the sole actor

18    point, which is an exception to the adverse interest

19    exception.  So if the sole actor applies, if Merkin was the

20    sole actor, then you go back to imputing his conduct to the

21    funds.

22          As the case law makes very clear, and this is all

23    cited in our papers, the mediator's case, the CBI case, the

24    McCale (ph) case, that actual corporate power or authority

25    is required to overcome the sole actor.

1            So what do we have here?  With respect to the

2    Cayman funds, Arial and Ascot, they have a board of

3    directors that has full authority to do anything for those

4    funds including make investments and including redeeming

5    shares.  And this is contained in the articles of

6    association of Arial that are attached as -- I believe it's

7    reply affidavit Exhibit A, paragraphs 5, 40, 86 and 88.

8            THE COURT:  Can I consider those on a motion to

9    dismiss?

10           MR. SIEV:  Yes.  Well, I think --

11           THE COURT:  All right.

12           MR. SIEV:  -- they have -- I think what they are

13    arguing in terms of -- if they're arguing that sole actor

14    can be determined based on their allegations in the

15    complaint that he was the only person acting on behalf of

16    Gabriel Capital, that he had full authority over these

17    funds, then I think you can consider something that directly

18    refutes that and shows that not to be the case.

19           And with respect to Gabriel and Ascot Partners,

20    which are Delaware LPs, in addition to, of course, outside

21    auditors and outside counsel that could have taken action,

22    the Delaware Limited Partnership Act is very clear that any

23    limited partner can petition the Court for dissolution or

24    appointment of a trustee or receiver.  So this is not a

25    hypothetical as some of the cases talk about should have,

Page 32

1    would have, could have standard.  These are -- these are

2    funds that had actors, innocent actors that had the power

3    and the authority to take action had they known.  So there's

4    no sole actor here.

5           Lastly, I won't run through the cases, but in our

6    reply brief pages 4 to 5 we cite a litany of cases where

7    this determination on imputation can be made as a matter of

8    law in a -- on a motion to dismiss.

9           So I'll reserve any further thoughts for reply, if

10   necessary.

11          THE COURT:  Thank you very much.

12          MS. ARCHER:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MS. ARCHER:  I'm Judith Archer with Fulbright &

15   Jaworski representing the receiver for Ascot Partners, LP,

16   and I will address Count 9, which is the subsequent transfer

17   claim in the third amended complaint.

18          Now there had been a previous complaint in which

19   there had been a different subsequent transfer claim that

20   had been withdrawn by the trustee.  In this case, the third

21   amended complaint seeks to recover as alleged subsequent

22   transfers, virtually ever transfer made by any of the funds

23   to any of the other funds or to GCC or Merkin in the six

24   years before this proceeding.

25          The Court should dismiss the subsequent transfer

Page 33

1    claims on three separate grounds.  The first is that in

2    order for a subsequent transfer to be recovered, it has to

3    relate to an initial transfer that is avoidable.  And as Mr.

4    Levander has argued, the initial transfers alleged in the

5    third amended complaint to the funds are not avoidable

6    because they fall within 546(e) and 546(c), and the

7    complaint is deficient in addressing those.

8            Second, the third amended complaint does not

9    adequately plead the alleged subsequent transfers to the

10   funds.  The trustee suggests that he can recover transfers

11   for which one or more of the other defendants might be

12   liable simply because some of the funds' cash passed through

13   accounts that also may have received funds from BLMIS.

14           THE COURT:  So why can't I infer from that that

15   they at least received some subsequent transfers?

16           MS. ARCHER:  Well, I think, Your Honor, that the

17   pleading standard has to be higher than that they might have

18   received some subsequent transfers; that the trustee doesn't

19   address in his complaint any connection between the

20   subsequent transfers and the BLMIS funds specifically, and

21   he alleges over a billion dollars in subsequent transfers

22   with respect to less than a half of that in initial

23   transfers.

24           THE COURT:  But so what?  If there's a one-dollar

25   initial transfer and the money is then transferred 20 times,

Page 34

1    you can sue for $21, but he can only recover one.

2            MS. ARCHER:  He can only recover once and he

3    admits that.  But --

4            THE COURT:  Well, but that's what the statute

5    says.

6            MS. ARCHER:  But, ultimately, he hasn't pled

7    sufficiently to connect the subsequent transfers that he

8    seeks to recover which are set out in his Exhibit C to the

9    third amended complaint with the initial transfers.

10           THE COURT:  Why can't I look at the chart that had

11   -- with the initial transfers and the time of the initial

12   transfers and then look at the chart with the subsequent

13   transfers and just infer if there was enough money

14   transferred, then some of it was transferred to the

15   subsequent transferee.  It may be a tracing problem at the

16   end of the day, but why isn't it sufficient for pleading

17   purposes?

18           MS. ARCHER:  Well, it -- while there doesn't have

19   to be a dollar for dollar tracing, there has to be

20   sufficient facts alleged to show that the funds that he

21   seeks to recover from the funds -- from the funds and the

22   defendants as subsequent transfers are actually connected to

23   the initial transfers.

24           THE COURT:  But what about --

25           MS. ARCHER:  And just a --

1          THE COURT:  -- just a temporal relationship?

2          MS. ARCHER:  Well, Your Honor, we -- we've been

3     through and tried to figure out that temporal relationship

4     and there are numerous problems with the pleading that don't

5     permit that.

6          For example, I was going to address this later,

7     but I'll address it right now.  Just as one example the

8     trustee alleges that Ascot and GCC received transfers of

9     more than 370 million from Gabriel and Arial.

10          THE COURT:  Uh-huh.

11          MS. ARCHER:  But all except 325,000 of those

12     alleged subsequent transfers occurred before there were any

13     initial transfers to Gabriel and Arial from BLMIS.

14          THE COURT:  But they could have been --

15          MS. ARCHER:  So they --

16          THE COURT:  -- subsequent transferees who were

17     then transferring the money to Ascot.

18          MS. ARCHER:  And that's what the trustee alleged

19     when we pointed out that -- the significant problems with is

20     pleading.  He alleged that in his opposition.  He doesn't

21     allege it in his complaint.  He doesn't specify which are

22     the initial transfers, which are the subsequent transfers,

23     which are the subsequent, subsequent transfers, and, you

24     know, at the very least, Your Honor, the funds and the

25     defendants have a right to understand what exactly he is

Page 36

1    saying with respect to those transfers.  He's put together

2    two exhibits that list a lot of different transfers.  He

3    doesn't connect the two.  He doesn't -- he -- you know,

4    attempts to do that in his opposition brief, but that's for

5    the complaint.

6          The funds have the right to be able to determine

7    exactly what subsequent transfers he is now seeking to

8    recover and what initial transfers those relate to so that

9    they can determine if the initial transfers are avoidable,

10   if they're time-barred and if -- if they make any sense.  I

11   mean, there are a number of situations in the complaint

12   where when you go through Exhibit C it looks as if there is

13   no connection between certain of the alleged subsequent

14   transfers or even the subsequent, subsequent transfers that

15   the trustee asserts in his brief, but not in his complaint.

16         And the -- what appear to be the initial

17   transfers.  So there are significant pleading problems that

18   don't permit us to understand exactly what he's trying to

19   recover.  And to the extent that this court allows this

20   belated argument in the papers about the subsequent,

21   subsequent transfers, which isn't in the complaint, you

22   know, there are also issues with respect to that.

23         For example, the trustee seeks to recover more

24   than 20 million from Ascot in an alleged subsequent,

25   subsequent transfer from Gabriel in July of 2004.  Now

Page 37

```
 1   there's no allegation of a transfer to Gabriel from BLMIS

 2   and there are only 6.8 million in transfers to Gabriel from

 3   other -- any other defendants prior to that date.

 4           So that's at least -- almost 14 million, 13.8 to

 5   be exact, that is not an avoidable transfer.  So the trustee

 6   has thrown all of these allegations together and says that

 7   they're subsequent or subsequent, subsequent and that that

 8   should be sufficient.  But the funds ought to be able to

 9   figure out what he is claiming, what he is seeking, what

10   subsequent transfers would be duplicative of any recovery on

11   initial transfers and what subsequent transfers relate to

12   which initial transfers.

13           And to the extent that that -- that there is the

14   fact that there were some BLS funds that were transferred

15   into the accounts that the trustee lists in his exhibits,

16   there were also, as the trustee concedes in his complaint,

17   numerous other sources for those funds.

18           So the trustee alleges that the accounts also

19   included management fees from the funds, investor

20   contributions, fees from third party entities, monies from

21   Merkin's personal account, and other money from

22   unidentifiable sources.

23           Now the trustee alleges that the Merkin defendants

24   comingled business assets, but in doing so it doesn't

25   absolve him of the requirement that he sufficiently plead
```

Page 38

1   the connection between subsequent transfers and initial, and

2   that the initial transfers are avoidable.  It simply

3   concedes that there were funds from investors, Merkin's

4   assets and assets of GCC that did not come from BLMIS that

5   were also in these accounts.

6          So what we're left with is liftings of avoidable

7   initial transfer -- unavoidable initial transfers and well

8   more than that amount in alleged subsequent transfers and it

9   should not be left to the funds and the defendants to have

10  to figure out what the trustee is attempting to recover on

11  this complaint.

12         As I mentioned earlier, the -- Mr. Levander's

13  argument would really dismiss the entire subsequent transfer

14  claim because according to the trustee it relates to the

15  initial transfers that all have been established as

16  unavoidable under 546(c) and 548(c).

17         The trustee tries to rely upon a previous decision

18  of this Court to say that their pleading in the third

19  amended complaint is sufficient as to subsequent transfers.

20  What he's referring to is a decision with respect to

21  subsequent transfers in an earlier version of his complaint.

22  The amended complaint and the second amended complaint.  And

23  those claims were withdrawn.  They are not the same as the

24  claims here.  They are different allegations.  There really

25  is no relevance to the prior decision whatsoever with

Page 39

1   respect to the sufficiency of the trustee's allegations in

2   this third amended complaint.

3           As I said earlier, Your Honor, there are a number

4   of issues that we have uncovered in our attempt to sort

5   through the morass that is the exhibit to the third amended

6   complaint and there are a number of issues that show, for

7   example, that the trustee alleges that Arial received

8   subsequent transfers from Gabriel of $118 million.  All

9   except 7 million occurred prior to any transfer to Gabriel

10  from BLMIS.

11          So these create issues with respect to what

12  exactly the trustee is attempting to recover and the funds

13  ought to be given sufficient notice.  And this simply does

14  not meet the notice standard under the complaint.  The

15  allegations are not sufficient and the allegations, in fact,

16  contradict the allegations that the trustee separately made

17  on subsequent transfers because of the admissions of the

18  other funds that were contained in the accounts that were

19  the subject of the transfer.

20          THE COURT:  Thank you.

21          MS. ARCHER:  I'll reserve any other comments after

22  Mr. Sheehan's argument.  Thank you.

23          MS. ROSSEN:  Good morning, Your Honor.  I'm

24  Jennifer Rossen from Sadis & Goldberg and we represent Ascot

25  Fund, Ltd. which is often referred to as the former Ascot

Page 40

1    fund.

2            I'm just going to touch briefly upon -- on a few

3    issues that make us somewhat different from the other

4    defendants in this matter.

5            First, the former Ascot fund terminated its

6    relationship with Merkin by agreement on December 31st,

7    2002.  He had been an investment advisor to the fund from

8    1992 till December 2002, and at that time the agreement was

9    terminated and the former Ascot fund became a limited

10   partner, an investor in Ascot Partners.

11           So to the extent that any agency relationship did

12   exist, it ended in December of 2002 and, therefore, any

13   imputation arguments that the trustee tried to make with

14   respect to Mr. Merkin's knowledge cannot be applied to the

15   former Ascot fund after December 2002.

16           And that's important because the trustee -- the

17   only claim against the former Ascot fund is that it was a

18   subsequent transferee, and that's Count 9 of the third

19   amended complaint.

20           And all of the subsequent transfers that the

21   trustee takes issue with happened after 2003.  So in order

22   for the trustee to impute -- there are no allegations in the

23   third amended complaint whatsoever that the former Ascot

24   fund had actual knowledge or was willfully blind to Madoff's

25   fraud, none.  There are no allegations in the third amended

Page 41

1    complaint that the board of directors of the former Ascot

2    fund -- and the former Ascot fund had a board of directors

3    -- no allegation that they had any knowledge about Madoff's

4    fraud, and there were no allegations that Merkin ever told

5    them that -- assuming the allegations that Merkin knew are

6    true, there are no allegations that he ever communicated

7    analysis of his knowledge to the board of directors.

8            So once the former Ascot fund became a limited

9    partner in Ascot Partners, any agency relationship with

10   Merkin terminated and any imputation arguments fail.

11           THE COURT:  Did Judge Rakoff decide that the

12   trustee had to basically plead around 548(c) and 550 or just

13   548(c)?

14           MS. ROSSEN:  Judge Rakoff decided that he had to

15   -- that -- I believe that the trustee --

16           THE COURT:  Because everything you're telling me

17   is relevant to an affirmative defense since you acted in

18   good faith.

19           MS. ROSSEN:  Yes.

20           THE COURT:  But that -- but that's an affirmative

21   defense.

22           MS. ROSSEN:  But the -- an affirmative defense

23   that is evident on the face of the pleadings as it is here

24   because of the failure by the trustee to allege that the

25   former Ascot fund -- I'm sorry.

Page 42

1          (Pause)

2               MS. ROSSEN:  Rakoff did decide that the trustee

3     has to -- he has to -- he does have to plead around on

4     550(b) and 550(a).  He has to establish -- he has to allege

5     sufficiently that the former Ascot fund did not act in good

6     faith.

7               THE COURT:  Okay.

8               MS. ROSSEN:  With respect to the other points that

9     I wanted to make on the subsequent transfers, as set forth

10    in our papers the trustee's map does not add up.  He alleges

11    that we -- that the former Ascot fund received $82 million

12    total in alleged subsequent transfers, but -- and that all

13    of the initial transfers were from Ascot Partners.  But as

14    of July 8th, 2004 there were only -- there were 5 --

15    $54,750,000 in subsequent transfers to the former Ascot

16    fund, but only 17 million in initial transfers to Ascot

17    Partners.

18               So in response to that, the trustee alleged in his

19    opposition that there were 28,840,000 transfers from BLMIS

20    to Ascot Partners between 1995 and 1998, but those are

21    outside of the six -- even if you're using the six-year look

22    back and there were -- still that adds up to only 45 million

23    in initial transfers, not 54,750,000.

24               And those initial transfers from 1995 through 1998

25    which the trustee seeks to use are not avoidable because

Page 43

1     they're beyond the six-year look back period.

2             And then to the extent that -- in his opposition

3     the trustee claims transfers among Ascot, Arial and Gabriel

4     on July 8th, 2004 our initial transfers, but those are time-

5     barred because he did not bring it in an avoidance action

6     within two years of the filing date.  He didn't bring any

7     action based on those transfers until August 30, 2013.  And

8     even if they were avoidable, the third amended complaint

9     fails to allege that the transfers originated from BLMIS.

10            And the only other issue I wanted to touch upon

11    was the Ascot Fund, Ltd's motion to sever itself from this

12    complaint.  We were added two years after the litigation

13    began.  There were -- there have been multiple depositions.

14    There have been millions of pages of documents exchanged,

15    and we are in this case for six transactions, six alleged

16    subsequent transfers whereas there are allegations about

17    multiple complicated transactions among the other funds.

18    And to have the former Ascot fund even engage in a trial of

19    this matter for -- that would, you know, undoubtedly last

20    weeks or months over six subsequent transactions we think

21    would be very unfair and --

22            THE COURT:  Well, do you --

23            MS. ROSSEN:  -- extremely --

24            THE COURT:  -- do you -- would you agree to be

25    bound by the outcome of the main action so that if the

Page 44

1    initial transfers are avoided you can't argue that they

2    shouldn't be avoided, or do you want another bite at the

3    apple in a separate trial?

4              MS. ROSSEN:  We want another bite at the apple at

5    a second --

6              THE COURT:  All right.  That motion is denied.

7         (Laughter)

8              THE COURT:  I guess you're up.

9              MR. SHEEHAN:  Indeed.

10             David Sheehan for the trustee.

11             THE COURT:  Go ahead.

12             MR. SHEEHAN:  Your Honor, this morning -- I'm not

13   going to -- at least I'm going to try not to reargue

14   everything we have in our papers.  I think my team, quite

15   frankly, did a fabulous job.  I don't think I've heard

16   anything this morning that contradicts or overwhelms what we

17   argued.  I do, however, want to comment on some of the

18   responses to Your Honor's questions and also to give Your

19   Honor an insight into how we approach Judge Rakoff's most

20   recent decision.

21             There's probably nobody in this courtroom that has

22   a more intimate familiarity with Judge Rakoff's decisions

23   with regard to actual knowledge because I lived through the

24   entire Katz Wilpon (ph) case and lived through the arguments

25   that culminated in the decision this week.

1          THE COURT:  He seems to think you keep rearguing

2     them, though.

3          MR. SHEEHAN:  He does, indeed.  But what was

4     fascinating -- I'm glad you brought that up -- is the fact

5     that that went before him on a motion to withdraw the

6     reference that he granted and that which he directed the

7     briefing.  So I don't know how we can be accused of re-

8     litigating, but that's beside the point.

9          In any event, what we know here is, is that Judge

10     Rakoff has not only enunciated the standard three different

11     times, in Katz at the very beginning when he opposed 546.

12          Then again he discussed it with regard to bad

13     faith and what we would have to prove so that if somebody

14     actually had knowledge of the fraud could they get the

15     benefit of a safe harbor.

16          And then lastly under 548(a)(1)(A) he has now

17     decided what the standard should be on the affirmative

18     defense of good faith and, therefore, what the trustee has

19     to show to defeat that defense.

20          All of those orbit around the concept of actual

21     knowledge.  And what we do know from reading those opinions

22     is that that actual knowledge can be demonstrated -- because

23     actual knowledge, as Your Honor questioned, what does that

24     mean, what -- what is actual knowledge.

25          And actual knowledge, I think, as he has said, can

1    be demonstrated through two avenues:  One is willful

2    blindness and another conscious avoidance.  He's used those

3    terms.

4              THE COURT:  But didn't he distinguish between

5    willful blindness and actual knowledge?

6              MR. SHEEHAN:  He does that, but a careful reading

7    of the opinion -- and, also, we've cited to Your Honor

8    certain criminal decisions by Judge Rakoff in which he has

9    said that actual knowledge can be proved by willful

10   blindness.

11             The reason I say that is this, and I think it --

12   it's a -- there's certainly a blending that takes place

13   there for this reason.  Let's take his statement that an

14   unsophisticated investor -- and I want to say right up front

15   that the antiphysis of an unsophisticated investor is

16   (indiscernible) Merkin who is a brilliant man, purportedly,

17   highly educated, involved in this industry for years, knows

18   all of it in and out, the chairman of GMAC.  I could go on.

19   It's all in our papers.

20             So we're not talking about that, but that's what

21   he was talking about in Katz Wilpon because he was

22   suggesting that Mr. Wilpon and Mr. Katz were unsophisticated

23   and, therefore, they had no duty to -- but if it starts to

24   land in front of you like a rotten fish, can you ignore it?

25   No.  Can you remain willfully blind to what is in front of

Page 47

1    you?  No.  Even if you're an unsophisticated investor at

2    some point a trigger takes place.  And how do we then

3    measure that?

4            Now I want to correct something that Mr. Levander

5    said, or at least I may have misheard what he said, and that

6    is is that Mr. -- Judge Rakoff, however, in the Katz

7    decision found that we didn't somehow meet that standard.

8    It's categorically not true.  There's a motion to dismiss in

9    Katz.  Our allegations in Katz withstood that challenge.

10   There was a summary judgment motion in Katz and we withstood

11   the summary judgment motion under the standard of actual

12   knowledge that he imposed in Katz Wilpon.

13           THE COURT:  Are there decisions --

14           MR. SHEEHAN:  Yes, Your Honor.

15           THE COURT:  -- in those cases?

16           MR. SHEEHAN:  Yes.

17           Now we didn't cite to those because I -- until

18   today when Mr. Levander suggested otherwise, I didn't think

19   we necessarily had to go there, but obviously we'll supply

20   those to Your Honor.

21           Here is the point to be made there.  So how do we

22   now fill in the content, as Your Honor suggested, of willful

23   blindness because what Your Honor has been mandated by the

24   Court, Judge Rakoff and his decision of this week, is that

25   I've given you the standards, you apply them.  You take your

Page 48

1   experience as a bankruptcy judge for all the years of

2   watching what travels through this courtroom as bad conduct,

3   as fraud, and utilize that skill set to determine utilizing

4   the standards he's enunciated whether or not we've met them.

5            One of the things all judges do is they look back.

6   They look back and see what has transpired in the past.  We

7   have two clear guidelines here.  Your Honor can look at the

8   Katz decision and the facts of that decision.  They're all a

9   little different.  All of our cases are going to be.  There

10  are some common themes, three themes here with regard to

11  both COMAD (sic), which is another guideline for Your Honor

12  because he utilized COMAD, if you remember that, in the

13  546(e) opinion --

14            THE COURT:  But in Cohen the defendant was

15  actually in the office and participated in --

16            MR. SHEEHAN:  That's right.

17            THE COURT:  -- and participated in the fraudulent

18  entry.

19            MR. SHEEHAN:  Sonny Cohen was involved.  There's

20  no question.  And he was operating at a certain level.

21  There's no -- but here's the thing that's very interesting

22  as you go through --

23            THE COURT:  I'm not suggesting you have to operate

24  at that level to have a --

25            MR. SHEEHAN:  I'm not either, needless to say.

Page 49

1    But the point is is that what I am saying is this, is that

2    you can take the factors and you start looking at them.

3    What are the touch points?  If you have a close, intimate

4    familiarity, clearly that's one of them.  The Katz Wilpon

5    people did and that got us past the motion for summary

6    judgment, together with the other facts that we alleged.

7              The same is true with Sonny Cohen and he was a

8    close, intimate friend and confidant to Mr. Madoff and the

9    same is true here with regard to Mr. Merkin.  There is no

10   question that these two gentlemen were closely intertwined,

11   personally and professional and we've demonstrated that in

12   our papers.

13             You then start looking beyond that.  What other

14   things do we have here.  And I'm not going to go through

15   them.  As I said, my colleagues have done a much better job

16   than I could here this morning outlining exactly what was in

17   play and what he knew and didn't know.  And Your Honor's

18   actually referred to some of them here this morning.

19             Now what do we have to rebut that on a motion to

20   dismiss?  I submit to you, respectfully, what we have is Mr.

21   Levander's testimony.  He testified this morning.  By the

22   way, I want to adopt part of his testimony; that Picasso

23   example, I think that's exactly what Ezra (ph) Merkin did.

24   He had a phony Picasso put in front of him.  He ignored it.

25   He spent $5,000.  He had a phony stock deal --

1            THE COURT:  It was $500.

2            MR. SHEEHAN:  Or whatever it was.  I apologize to

3    Mr. Levander.  That's exactly what he did.

4            THE COURT:  It's inflation.

5        (Laughter)

6            MR. SHEEHAN:  Well, yeah, that's what happens with

7    subsequent transferees.

8            In any event, the bottom line is is at the end of

9    the day that's exactly what happened.  He had presented to

10   him what he knew was a phony stock transaction which we've

11   alleged he knew it couldn't be split stock conversion.  It

12   wasn't even scalable and he admitted that.  Anyone in the

13   industry knew that you couldn't have --

14           THE COURT:  So if --

15           MR. SHEEHAN:  -- those returns.

16           THE COURT:  -- he knew all this -- and this may be

17   getting to the imputation argument.  If he knew all this why

18   did he invest the funds in a Ponzi scheme?

19           MR. SHEEHAN:  Well, you know, that's always the

20   question.  Judge --

21           THE COURT:  Except to get large --

22           MR. SHEEHAN:  -- Rakoff asked that.

23           THE COURT:  -- investment -- advisory fees.

24           MR. SHEEHAN:  Well, first of all I don't think he

25   thought it was a Ponzi scheme.  I'm not suggesting that we

Page 51

1    have to prove that either.  That's another interesting --

2                 THE COURT:  So what is --

3                 MR. SHEEHAN:  -- little tell tale insight --

4                 THE COURT:  -- it he had actual knowledge of?

5                 MR. SHEEHAN:  He had actual knowledge of fraud.

6    He knew there was a fraud going on because --

7                 THE COURT:  But --

8                 MR. SHEEHAN:  -- he couldn't have gotten these

9    results without fraud.

10                THE COURT:  But what was the fraud?

11                MR. SHEEHAN:  The fraud could have been any one of

12   a number of things, but the fact is he knew it was a fraud.

13   He didn't know whether it was a Ponzi scheme.  He eluded --

14   amazingly enough eluded to the fact on several occasions it

15   could be.

16                THE COURT:  But I -- I read a couple of statements

17   from the complaint when Mr. Levander was arguing and it

18   seems to say that he knew it was a --

19                MR. SHEEHAN:  Sure.

20                THE COURT:  -- Ponzi scheme.

21                MR. SHEEHAN:  Well, I'm -- what I'm saying is I

22   don't know -- I don't -- maybe I misspoke there.  Let me

23   rephrase that.  I don't think I have to prove that he knew

24   it was a Ponzi scheme.  I think I have to prove that he knew

25   it was a fraud.

1          THE COURT:  But what kind of fraud if it wasn't a

2     Ponzi scheme?

3          MR. SHEEHAN:  Well, it could have been, you know,

4     he could have thought, as was ripe in the industry,

5     everybody thought he was front and running office market

6     making operations.  Front running is criminal activity.  You

7     can't do that, all right.  So that was out there.  There

8     were others who thought that he was manufacturing those

9     returns off of his ability to manipulate the market

10    utilizing the market making platform.  There were lots of

11    theories.

12         Let me just elude -- alert Your Honor to the fact

13    that we're accused all the time of doing this with the

14    benefit of hindsight.  The industry was ripe with this.

15    Merrill Lynch didn't let anybody invest in Madoff.  Credit

16    Suisse didn't let people invest in Madoff.  This --

17         THE COURT:  I think you're get --

18         MR. SHEEHAN:  -- was all --

19         THE COURT:  I think you're getting beyond your

20    complaint.

21         MR. SHEEHAN:  I am.  I am.  But, Your Honor, we

22    sort of drifted there when --

23         THE COURT:  Okay.

24         MR. SHEEHAN:  -- Your Honor asked that question.

25         But my point simply is --

Page 53

1           THE COURT:  Fair enough.

2           MR. SHEEHAN:  My point simply is is that at the

3    end of the day what we have here is very good guidelines

4    from both Judge Rakoff, you know, and quite frankly, there

5    was a prior motion to dismiss here.  And Your Honor is well

6    aware of it by -- before Judge Lifland and the appeal was

7    denied by Judge Lifland.

8           And I raise that for this reason, and I'm going to

9    get to it when I get to the business of imputation.

10   Realistically speaking, everything that they're arguing here

11   today, save for this intent standard that's now been changed

12   in the last two years, was already before Judge Lifland.

13   Imputation was before Judge Lifland.  The specificity of the

14   transfers, et cetera --

15          THE COURT:  You know, I looked through your brief.

16   I don't think I saw the phrase, law of the case.

17          MR. SHEEHAN:  No.  No.  And I hate that term.  I

18   hate that term.

19          THE COURT:  All right.

20          MR. SHEEHAN:  You know -- well, because I don't

21   know what that means because that would suggest that Your

22   Honor doesn't have authority here today to decide what you

23   want to decide and of course you do.

24          THE COURT:  It's a discretionary --

25          MR. SHEEHAN:  Well, I --

Page 54

1            THE COURT:  -- phrase.

2            MR. SHEEHAN:  -- I just don't think that term

3     means anything.

4            But in any event the bottom line is, is the end --

5     the reason I say that is this:  It's not for the reason that

6     it's law of the case.  But what we have here is what I think

7     would universally be agreed is a very sound (indiscernible)

8     taking a very hard look at what the allegations were in that

9     complaint and finding that it withstood the challenge, and

10    that the only thing that's changed between then and today is

11    what they are talking about in terms of intent.  And we have

12    very good guidelines for that as well, and those are the

13    decisions by Judge Rakoff himself.

14            And I suggest to Your Honor as you go through

15    COMAD, as you go through Katz and you stack them together

16    with the allegations which have to be admitted as true here,

17    notwithstanding Mr. Levander's artful attempt to suggest,

18    no, I can giggle these a little bit and let's talk about who

19    said what at a deposition.  Who's testifying?  Mr. Levander.

20    All right.

21            Now that's fine and in trial -- what does that

22    tell you?  When I start hearing things like that, and I'm

23    sure Your Honor does, too, what does that tell you?  You've

24    got factual issues.  You've got credibility issues,.  We're

25    going to put that witness on the stand.  We're going to say

Page 55

1    what -- we're going to ask him these questions.  We have him

2    under oath.  He may walk away from it.  That's fine.  Your

3    Honor will decide whether or not you find that credible, or

4    whether you find the deposition testimony credible, or

5    whether you find Mr. Levander's examination to be more

6    palatable to you.

7            But at the end of the day what Mr. Levander made

8    an argument for today was a trial.  Yes.  I want to put in

9    front of you all these different things that tell you that

10   Mr. Merkin's actually a good guy, put some money in, oh, my

11   goodness, why would he have done that.  Well, Your Honor,

12   that age-old question which Your Honor asked me a moment

13   ago.  If that -- the answer to that was no and we put money

14   into something, that's just not true.  It happens every day.

15   Every day people are told here's something -- guy walks up

16   on the street and says, hey, I -- give me a 1,000 next week,

17   I'll give you ten.  And the guy says, it's that's simple and

18   he says, yes, it is.  All right.

19           And that's exactly what Mr. Madoff did.   Everyone

20   knew -- everyone knew throughout that these were returns

21   that you couldn't get anywhere else.  The consistency of

22   those returns day in and day out were unachievable by any

23   other one including renaissance, eluded to by Mr. Levander,

24   who had -- went up and down just like the S&P.  Right.

25           What's Mr. -- split strike conversion strategy

Page 56

1    Madoff.  He's saying I'm following the S&P 100 and I'm

2    putting a call on it, very conservative, so you're going to

3    have some down, you're going to have some up, but you won't

4    lose much and you won't gain much.  And what did he do?  He

5    went like this right through the roof.  And Mr. Merkin

6    plotted that in doing.  All right.

7              So at the end of the day what do we have here.  We

8    have in our complaint, I think, very solid array of facts

9    leading one to the, I think, ineluctable conclusion that Mr.

10   Merkin knew there was a fraud being perpetrated here.  Not

11   only did he have individual things like looking at the

12   statement and seeing out of range trades, seeing things that

13   were options that were being purchased weren't available to

14   CBOE, yet Mr. Madoff was issuing statements that had on it

15   an occlusive number which only emanates from the CBOE.

16             So where did it -- how did he have a statement

17   that the CBOE when his answer is I do it over the counter.

18   Hello.  This is a sophisticated, highly intelligent man not

19   figuring that out, please.  On a motion to dismiss that fact

20   alone is enough to carry us a long way.  There are many,

21   many others in this complaint.

22             So I'll leave that for the moment, Your Honor, and

23   I want to move on very quickly to a couple of other items.

24             One I just have to touch on because it comes up in

25   every argument I go to.  The SEC, boy that SEC, they really

Page 57

1    messed up.  Is the SEC on trial here?  Is their state of

2    mind or is Mr. Merkin's?

3            THE COURT:  Well, he's asking me to infer from the

4    lack of SEC findings that nobody could know.

5            MR. SHEEHAN:  No.  I don't think Your Honor could

6    arrive that.

7            THE COURT:  Well, that's what he's asking me.

8            MR. SHEEHAN:  I understand that, but that's just

9    one fact; that -- you know, the fact that the SEC -- by the

10   way, there was only two published.  It turns out there were

11   -- turned out there were more than two, but only two were

12   published with regard to Mr. Merkin and -- or Mr. Madoff and

13   the SEC.

14           And the thing is is that if we want to get into

15   that -- and it's not in the record here.  But what will come

16   up is -- if we debate that is, at trial, is that we'll find

17   out what the SEC did or didn't do.  And then we'll find out

18   what Mr. Merkin did.  The SEC is there six times.  Mr.

19   Merkin's there dozens, dozens and dozens of times talking

20   incessantly to Mr. Madoff because he's showing up with a

21   couple of kids out of the SEC in Washington doing an audit

22   probably looking for a job.

23           So at the end of the day to compare the two makes

24   no sense.  But, more importantly, it's not their state of

25   mind that counts.  It's Mr. Merkin that's on trial here, not

Page 58

1     theirs.

2             Imputation.  Your Honor, I -- you know, we've -- I

3     think we've very well briefed that, but I said earlier that

4     I was going to refer back to Judge Lifton's (ph) decision

5     and my adversary here this morning quoted Kershner and, of

6     course, that issue was extant at that time of the earlier

7     decision by Judge Lifton.  And if I could I -- we certainly

8     adopt and advance this argument to Your Honor that Judge

9     Lifton had this correct.

10            When at page 260 with regard to Kershner he cites

11    it and says, "The often invoked adverse interest exception"

12    -- I'm reading now.  I'm sorry.  "The often invoked adverse

13    interest exception requires an agent to have totally

14    abandoned his principal's interest and be acting entirely

15    for his own or another's purposes," citing Kershner.

16            Continuing, "That Merkin had abandoned the fund's

17    interests when he continued to invest with BLMIS is

18    certainly not apparent.  As the funds were receiving the

19    benefit of substantial annual returns that were otherwise

20    unavailable."

21            THE COURT:  Yeah.  But, you know, I looked at the

22    second amended complaint, the allegations that he cites

23    aren't in the third amended complaint.

24            MR. SHEEHAN:  They're not there.  Wow.  With the

25    (indiscernible) I knew that.

1          Well, we have other allegations.  Our

2   (indiscernible) allegations are there, Your Honor.  But the

3   point I think irrespective of what --

4          THE COURT:  I would say the substance of the

5   allegations are there in different --

6          MR. SHEEHAN:  Well --

7          THE COURT:  -- form.

8          MR. SHEEHAN:  -- I should have realized you would

9   actually make that comparison.  But in any event --

10          THE COURT:  Somebody had to.

11          MR. SHEEHAN:  Yeah.  I agree.  I agree.

12          But in any event, I think the point being made by

13   Judge Lifland is still valid here, and that is is that if

14   you look at what was going on with the funds and which we've

15   demonstrated, I think, elsewhere in the complaint and

16   certainly in our argument in our briefs, is that the funds

17   benefited by his conduct.  He --

18          THE COURT:  How did they --

19          MR. SHEEHAN:  -- never --

20          THE COURT:  How did the funds benefit?

21          MR. SHEEHAN:  Well, they were all making money.

22   They were all getting --

23          THE COURT:  What does it mean to make money with

24   fictitious profits?

25          MR. SHEEHAN:  Well, that -- that's true.  Now

1    ultimately what we're looking to do is get it back, but they

2    didn't get any fictitious profits because they're losers.

3              THE COURT:  So how did --

4              MR. SHEEHAN:  So they didn't get any.

5              THE COURT:  -- how did they benefit from --

6              MR. SHEEHAN:  Well, they were getting the benefit

7    of these returns, all right, so that at the end of the day

8    --

9              THE COURT:  But it's not real money.

10             MR. SHEEHAN:  Well, I understand that.   I

11   understand that.  But from his purpose and from their point

12   of view he wasn't acting adverse to them.  He was advancing

13   their interest by --

14             THE COURT:  Well, sure he was.  He --

15             MR. SHEEHAN:  -- having --

16             THE COURT:  -- was collecting management fees

17   based on profitability and the amounts he thought were

18   invested.

19             MR. SHEEHAN:  Well, he benefited, too.  I'm not

20   saying --

21             THE COURT:  But that's adverse --

22             MR. SHEEHAN:  -- he didn't.

23             THE COURT:  -- that's adverse to the funds.

24             MR. SHEEHAN:  No.  He said he was entitled to it.

25   It was very consistent with him having total management

Page 61

1    discretion and being able to invest it.  So I invested it.

2    I made money.  I get paid.  That's consistent with what he

3    was mandated to do.  He had the authority to go out.  Your

4    Honor related to it.  He had unbridled discretion to invest

5    it.  He did and he got paid and he made them money.  I don't

6    know how that's an adverse interest.

7              On the other side of that --

8              THE COURT:  But -- but there were no profits.  He

9    was getting paid profits that were never earned.

10             THE COURT:

11             MR. SHEEHAN:  Correct, which is why we're suing

12   now to get them back because he was saying, I want my

13   commissions based on those profits when he never should have

14   been collecting this.

15             THE COURT:  Sounds like he was defrauding the

16   funds.

17             MR. SHEEHAN:  Well, it sounds like maybe he was

18   the sole actor, too.  Another fact intensive inquiry which

19   is --

20             THE COURT:  But I thought --

21             MR. SHEEHAN:  -- required.

22             THE COURT:  I know what Judge Lifland said, but I

23   thought that sole actor only applies where the decision

24   maker is the sole shareholder.

25             MR. SHEEHAN:  Well --

Page 62

1        THE COURT:  And there's an identity between the

2   principal and the agent.

3        MR. SHEEHAN:  Well --

4        THE COURT:  At least that's what CBI Holdings

5   Second Circuit --

6        MR. SHEEHAN:  -- I do think that there do -- does

7   have to be an identity and I think in this -- in two of them

8   he's the general partner.  All right.

9        THE COURT:  But there's no allegation in the

10  complaint that he has an interest, an economic interest in

11  the funds other than his contractual interests or fees.

12        MR. SHEEHAN:  Yes.  You mean in terms of his

13  ownership interest?

14        THE COURT:  Yes.

15        MR. SHEEHAN:  I did -- I don't know that we did

16  allege that.  Although we do allege --

17        THE COURT:  I didn't see it.

18        MR. SHEEHAN:  I thought we alleged that he was

19  indeed the sole shareholder of GCC --

20        THE COURT:  You did.  You did.

21        MR. SHEEHAN:  -- and we -- we alleged all that.

22  I'm not going to go through all that, Your Honor.  You're

23  familiar with it.

24        Okay.  But my point simply being is that at the

25  end of the day what we have is a -- I think a very factual

Page 63

1    intensive inquiry here as to whether or not his -- in his

2    capacity as the sole decider as it were in all these GCC and

3    all the funds, and the fact that he's earning money and

4    earning the funds' money, whether it was real money or not,

5    he was fulfilling his obligations there.  Whether or not

6    that constitutes -- because the adverse interest section, as

7    Your Honor suggests in Lackner, is a very, very limited

8    exception.  Somebody has to be really out of bounds.  You

9    could be committing fraud and still be within the bounds of

10   --

11             THE COURT:  As long as you benefit your principal.

12             MR. SHEEHAN:  That's right.

13             THE COURT:  But I -- that's why I come back to the

14   question, how did this fraud benefit the principal?

15             MR. SHEEHAN:  Right.  Well --

16             THE COURT:  With fictitious profits, basically.

17             MR. SHEEHAN:  Well, to them he was.  I mean, in

18   other words, they -- he's giving them statements showing

19   month in and month out that they're making money.

20             THE COURT:  I understand.  But how does that

21   benefit them?

22             MR. SHEEHAN:  Well, you know, to -- I don't know.

23   If someone commits a fraud -- I'm going back to the section

24   again.  If someone commits a fraud and that happens, he's --

25   I think you measure it by virtue of what he was -- they

Page 64

1      thought he was doing consistent with.  In other words, he

2      wasn't out there taking all the profits and putting them in

3      the Cayman Islands.  He was issuing statements to them that

4      they had earned those profits.  If they asked for a

5      redemption, as Mr. Levander's pointed out, they got it.

6             THE COURT:  Well, maybe some of the investors that

7      got redemptions so far back enough benefited from it.  But

8      how does the fund benefit from that?

9             MR. SHEEHAN:  Well, I don't know if we look at --

10     well, the fund benefited from that because what he's doing

11     is they're making money and he -- and they're making

12     redemptions.  They're continuing to fund and they can make

13     investments, assuming it was all hunky dory, which it

14     wasn't.

15            But the point is is that they're making money and

16     being able to redeem it. Others are investing in the hope of

17     doing the same thing, and that went on for years.  And he

18     did that consistently.  He didn't say to them, you can't

19     redeem because I'm stealing it.  You can't have your money

20     back because it's in my personal bank account.  He gave it

21     all back to them.  So they benefited.  It went -- operated

22     like a normal fund.  That's what it did.  Otherwise it would

23     have blown up a long time ago.

24            So to that extent, I think he's acting very

25     consistently with what he -- his duties were.  The fact is

Page 65

1    that he was engaging in a fraud with Mr. Madoff, doesn't

2    take him out of that.  I think we can still take all of his

3    knowledge and input it to all of the funds.

4            So -- and -- or at the bottom line on a motion to

5    dismiss we should have the opportunity to advance because I

6    think we have enough facts at this point mustard in the

7    complaint to be able to go forward.

8            So the -- a couple of other things very quickly,

9    Your Honor.  I'm not going to spend a lot of time on

10   disallowance or equitable subordination.  I think we have

11   the better of the argument there in the law.  I think that

12   --

13           THE COURT:  I thought Judge Chapman ruled that

14   there was no equitable disallowance.

15           MR. SHEEHAN:  Well, you know, I think she did.

16   Respectfully disagree.  I do think that there are situations

17   -- you know, I realize -- I think the same quote that Mr.

18   Levander quoted about a roving court of equity --

19           THE COURT:  Roving commission.

20           MR. SHEEHAN:  Yeah.  Right.  Hmm.  We quoted that,

21   too.  But that doesn't mean you ignore fraud when it's

22   palpable and right in front of you, and allow someone to

23   participate on an equal level in an equity proceeding as

24   though they committed no wrongdoing.

25           THE COURT:  But if they have a valid claim under

Page 66

1    non-bankruptcy law how can I disallow that claim?

2              MR. SHEEHAN:  Well, I think that because the

3    trustee --

4              THE COURT:  Other than as 502(b) says I could.

5              MR. SHEEHAN:  Yeah.  Exactly.  And I think that

6    you can disallow the claim.  You know, whether or not Your

7    Honor has to resort to the equitable powers of this court to

8    do so, but I think you can disallow the claim under the

9    statute itself and I think the trustee has anticipated that

10   he would do that because it gives him the ability that it

11   has to be to the satisfaction of the trustee.  How do we put

12   that into play if we don't have the ability to say, well, in

13   this instance you get paid and in these you don't.  The mere

14   fact that you're a customer -- and Packer Wilbur (ph)

15   teaches us this.  The mere fact that you're a customer

16   doesn't get you the ability to get paid. You still have to

17   be queen.  You can't be a wrongdoer and get paid and

18   participate in, essentially, what is a equitable scheme to

19   protect customers.

20              Subsequent transfers I -- we do rely upon Your

21   Honor's more recent decision in January in the pathways of

22   that, you know, we -- the relevant pathways analysis that

23   Your Honor eludes to there.  And you cited, I think,

24   favorably Judge Lifland's decision in the trust case.

25              What we have here is we clearly have the initial

Page 67

1    transfers.  That's not the issue.  The issue there that

2    they're arguing is that we legally can't get to them because

3    of 546.  But assuming we could open a 546 and we disagree

4    even with Judge Rakoff on that and hopefully it's pending in

5    the Second Circuit.  And while I've heard from many people

6    that they didn't like the way that went for me, I still

7    think I'm going to win.

8              In any event, the end of the day --

9              THE COURT:  I would expect you would.

10             MR. SHEEHAN:  I always think that.  But, anyway,

11   but in any event the bottom line is at the end of the day if

12   we win that there are initial transfers.  That's not the

13   issue.  The issue really becomes the subsequent transfers.

14   And there is really kind of a tawdry tale associated with

15   that and this all emanates out of Mr. Merkin and this

16   (indiscernible).

17             What he's doing is, and as we've demonstrated and

18   we have that in our Exhibit C, is that he's transferring

19   money between the Morgan Stanley -- Morgan Stanley is where

20   the funds accounts were kept.  He would -- he would have

21   transfers going back and forth between the three funds.  No

22   evidence of a loan, no evidence of why that transaction is

23   taking place.  He's just moving funds from one fund to the

24   next fund, over and back and forth again.  And then what

25   he's doing is he's -- in the BLMIS account level he's doing

Page 68

1    the same thing.

2             So as Your Honor pointed out to my colleague here,

3    you know, what if the money went in and then the funds start

4    transferring back.  That's exactly what happened.

5             Now I will admit because we haven't had complete

6    discovery and there's been some resistance on this -- and we

7    have those before Judge Siganowski (ph) to get bank records

8    and other things to further delve into this.  But I think

9    what we've demonstrated adequately for purposes of a motion

10   to dismiss that the relevant pathways are there.  We know

11   what they are.  We've done more than establish just

12   inferentially that they're there.  Your Honor can see all

13   those transfers.

14            And what we're asking for is the ability, as Your

15   Honor ruled in Dreier, it's a difficult task.  We know what

16   our obligation is.  We're going to do our very, very best to

17   prove it.  But we at least deserve the opportunity to do so

18   and to complete discovery so that we can get there.

19            And then the last thing I have is -- at least I

20   think it's the last thing.  Yes.  Oh, you already denied it,

21   sever.

22            So that's it, Your Honor.  Thank you very much.

23            THE COURT:  Thank you.

24            MR. SHEEHAN:  I appreciate your time.

25            MR. LEVANDER:  Briefly, Your Honor.

1                THE COURT:  Sure.

2                MR. LEVANDER:  Andrew Levander again for the

3       Merkin defendants.

4                First, Your Honor, very quickly on the issue of --

5       there was a reference made to the books and records and the

6       satisfaction of the trustee.  That's not what the statute

7       says.  It's or.  So if it's established by the books and

8       records you don't get to the satisfaction of the trustee.

9                Second, let me just spend my time quickly on the

10      issues that pertain to the good faith and actual knowledge.

11               Mr. Sheehan has misrepresented to the Court what

12      Judge Rakoff did in Katz.  I'm referring to the decision of

13      Judge Rakoff at 462 Bankr. 447, September 27th, 2011.

14               THE COURT:  This is the --

15               MR. LEVANDER:  Motion to dismiss.

16               THE COURT:  -- motion for summary judgment?

17               MR. LEVANDER:  No.  This is the motion to dismiss.

18      He got up here and he told you there -- that we survived the

19      motions to dismiss.  The point I made was that the only

20      thing that can survive after Judge Rakoff's decision on the

21      motion to dismiss in Katz is Count 2, the 548(a)(1)(A)

22      count.

23               And on page 453 of that decision, after --

24               THE COURT:  What's the citation?

25               MR. LEVANDER:  Excuse me.

1           THE COURT:  What's the citation?

2           MR. LEVANDER:  It's 462 Bankr. 447, September

3      27th, 2011.

4           And what Judge Rakoff decided was that all of the

5      similar claims to Counts 1 and 3 through 9 that are in this

6      case he dismissed because of 546(e).  And his language is,

7      "Accordingly, the Court grants the defendants' motion to

8      dismiss all claims predicated on principals of preference or

9      constructive fraud under the Bankruptcy Code as well as all

10     claims under New York Law" -- that's Counts 4 through 9 in

11     our case, collectively corresponding to Counts 2 through 9

12     to the amended complaint in that case.

13          And what he said was the only thing that survives

14     is Count -- our Count 2.  In that case it was Count 1, the

15     548(a)(1)(A) count.  And Mr. Sheehan has misspoken.

16          Second, Your Honor, on the issue of what is in the

17     complaint with regard to research company A, research

18     company A obviously by definition is a sophisticated

19     advisor.  And paragraph 92 and also page 9 of Mr. Sheehan's

20     brief admits that research company A was advising investor.

21          And in paragraph 92 it confirms what I said

22     earlier, that research company A reviewed the various

23     confirms and statements that Mr. Sheehan has now averted to.

24          And in paragraph 94 the quote is that if there was

25     -- if there were a fraud, but that's not the actual words,

Page 71

1    "Ponzi would lose out," would, subjunctive.  In other words,

2    what Mr. Merkin was saying, if this is a Ponzi scheme it

3    will be the all time greatest Ponzi scheme ever.  And after

4    this conversation it is admitted that research company A's

5    clients were investors.

6           Now the -- there's a reference to the confirms.

7    Again, research company A actually reviewed the Madoff

8    statements and there's no allegation in this complaint, nor

9    could there be, that Mr. Merkin reviewed the confirms.

10   There was a back office.  He never looked at them.  There is

11   no allegation that he knew about what Mr. Sheehan has gone

12   on about.  Thousands of investors received similar confirms.

13   They didn't notice.  They were available for the SEC.  They

14   didn't notice.  But, in any event, there's no allegation

15   that -- of such a review or knowledge on Mr. Merkin's part.

16          He conclusory gets up here and tells you there was

17   an incredible personal relationship.  Well, if you look

18   beyond the conclusory allegation into the facts, on

19   information and belief Mr. Madoff, along with hundreds of

20   other -- Mr. Madoff, along with hundreds of other people,

21   attended a Bar Mitzvah.  That's a close personal

22   relationship, Your Honor.  That doesn't equal knowledge of a

23   fraud or inference of willful blindness.

24          Most dramatically, Mr. Sheehan got up here and he

25   admitted to the Court he has not alleged and cannot allege

Page 72

1    that Mr. Merkin was aware of a Ponzi scheme. Therefore, all

2    the counts fall because it's not just actual knowledge of a

3    fraud.  The issue has to be a Ponzi scheme because if

4    supposedly Mr. Merkin was -- had knowledge of it -- and this

5    is not established by the complaint.

6          But if he had knowledge of a trading scheme

7    involving actual stock where you were front running

8    customers, which is what he suggested was in the public

9    realm and people gossiped about, there would be security

10   screen sections.  And so 546(e) would still bar all the

11   claims and you would still have to allege actual knowledge,

12   548(a)(1)(A), and that they cannot do.

13         The concession here today that Mr. Merkin was not

14   aware that it was a Ponzi scheme ends this complaint.  The

15   Court should dismiss Counts 1 through 9.  And, notably,

16   compared to Mr. Chase, Stanley Chase where the Court did

17   sustain the complaint in this case, Mr. Chase took out

18   billions of dollars in fictitious profits.  Mr. Chase had

19   125 percent returns.  He had special deals.  It is alleged

20   in the complaint that he could direct what percentage and

21   what returns he wanted in a particular year, whether he

22   wanted a tax loss or a huge gain.  None of that has been or

23   could be alleged here.  All three funds are substantial,

24   multi-hundred-million-dollar net losers.

25         Case over.

Page 73

```
 1                   Thank you.

 2                   THE COURT:  Thank you.

 3                   MR. SIEV:  Your Honor, one minute or less I

 4        promise.

 5                   THE COURT:  I had a question which I may --

 6                   MR. SIEV:  Sure.

 7                   THE COURT:  -- ask you.

 8                   MR. SIEV:  Okay.

 9                   THE COURT:  It was raised and I know Mr. Sheehan

10        doesn't like this phrase, but why isn't the -- Judge

11        Lifland's decision, prior decision in this case with respect

12        to the second amended complaint that the second amended

13        complaint actively pled imputation law of the case?

14                   MR. SIEV:  Well, I think that was obviously this -

15        - that November 2010 decision was based on the second

16        amended complaint.

17                   THE COURT:  Right.

18                   MR. SIEV:  They chose -- because of subsequent

19        discovery and subsequent decisions by Judge Rakoff they

20        chose to amend their complaint to change their allegations

21        for actual knowledge and willful blindness, but --

22                   THE COURT:  Well, we're just talking about

23        imputation.

24                   MR. SIEV:  Sure.

25                   THE COURT:  And I --
```

1          MR. SIEV:  I know.

2          THE COURT:  -- and nothing that -- what I'm aware

3     of that Judge Rakoff decided has anything to do with

4     imputation.

5          MR. SIEV:  That is correct.  In -- a couple of

6     things. First of all in that case, right in the portion that

7     Mr. Sheehan read from it indicated that none of the moving

8     defendants disputed the agency relationship.  So based on

9     the complaint, the second amended complaint, there wasn't a

10    dispute that --

11         THE COURT:  Are you disputing --

12         MR. SIEV:  We're not disputing that he was the

13    agent.  We're disputing that he acted within the scope of

14    his agency as we discussed earlier.  He did find, certainly

15    based on the second amended complaint, that the adverse

16    interest exception and sole actor exception to the exception

17    were either -- either didn't survive scrutiny or at a

18    minimum raised fact questions.  But that's a completely

19    different complaint.  I think we --

20         THE COURT:  But how is it different than the

21    material aspects that you relied on to determine the

22    imputation was sufficiently pled?

23         MR. SIEV:  Well, I think, you know, the point is

24    what Your Honor was focusing on.  He has alleged in great

25    detail in this complaint -- and I don't have a side by side

```
 1    comparison of the second versus the third.  But he's alleged

 2    in great detail in this complaint, and I cited it earlier.

 3    The amount earned by Mr. Merkin based on his management of

 4    the three funds at issue -- of the four funds at issue and

 5    the amount of fees taken out by him specifically related to

 6    investments with Madoff.

 7                So those are alleged.  He chose to allege those

 8    for whatever reason --

 9                THE COURT:  They weren't in the second amended

10    complaint?

11                MR. SIEV:  I don't have the second amended

12    complaint.  I don't -- as I said, I don't have a side by

13    side.  But we'll be happy to take a look --

14                THE COURT:  I can do it.

15                MR. SIEV:  -- and let you know.  But in response

16    to the point that I raised and that Your Honor raised, that

17    the funds were not benefited here.  This was adverse.  The

18    funds didn't get any fictitious profits.  The statement or

19    the rejoinder, which I found quite astonishing, was, well,

20    Mr. Merkin was entitled to those fees because of his

21    management agreement.  He's not entitled to fees that are

22    earned as a result of the fraud.

23                So just because you claim you're entitled to

24    something doesn't mean that it's not adverse when you're

25    only entitled to that because of the inflated returns and
```

Page 76

1    the fraud.

2              So barring any further questions, that's all I

3    wanted to add.

4              THE COURT:  Thank you.

5              MR. SIEV:  Thank you.

6              MS. ARCHER:  Your Honor, just briefly.  The -- I

7    actually do have a side by side comparison and it appears

8    that some of -- with respect to imputation that some of the

9    allegations with respect to Merkin's non-disclosure and

10   misleading of investors are new to this complaint.  So I

11   believe that the trustee has included allegations that are

12   quite significant that were not in the prior complaint with

13   respect to the relationship between Mr. Merkin and the

14   investors and with respect to what Mr. Merkin may have or

15   did either fail to disclose or omit or withhold from the

16   investors.  And I believe that that is significant to the

17   point that Mr. Siev was raising.

18             Simply with respect to the subsequent transfers,

19   Mr. Sheehan is fairly dismissive of the fact that the

20   initial transfers have to be avoidable.  And so even aside

21   from -- with respect to 546(c) and 548(c), they -- if they

22   are not avoidable for other reasons such as the fact that he

23   appears to be talking about initial transfers well before

24   the six-year period, that also would completely dismiss the

25   subsequent transfer claims.

Page 77

1           And with respect to Mr. Sheehan's request for a

2    desire to -- or for an opportunity to prove the subsequent

3    transfer claims, he's had four years of discovery with many,

4    many, many requests and receipt of bank account records.

5    The fact that he has included various accounting entries

6    that he says reflect transfers, but has not provided the

7    pathway from BLMIS to those subsequent transfers through the

8    intermediate ones is fatal to his complaint.

9           Thank you.

10          THE COURT:  You're going to argue for severance

11   again.

12          MS. ROSSEN:  I would like to re-argue my severance

13   motion.

14      (Laughter)

15          MS. ROSSEN:  Next time I would like to win.

16          I just want to --

17          THE COURT:  Hope springs eternal.

18      (Laughter)

19          MS. ROSSEN:  -- point out to the Court that

20   because the former Ascot fund was not a defendant at the

21   time of the second amended complaint, Judge Lifland never

22   considered any imputation arguments with respect to the

23   former Ascot fund.

24          We were added --

25          THE COURT:  Okay.

1    MS. ROSSEN:  -- for the first time in the third

2    amended complaint.

3    THE COURT:  No.  I understand your argument.

4    Merkin wasn't an agent of the fund.

5    MR. SHEEHAN:  Your Honor, I --

6    THE COURT:  What do you --

7    MR. SHEEHAN:  I intend to be very brief.

8    THE COURT:  Thirty seconds.

9    MR. SHEEHAN:  I don't make this (indiscernible).

10    THE COURT:  Go ahead.  Thirty seconds.

11    MR. SHEEHAN:  All right.  And that is is that if

12    there were as -- if the outcome were as Mr. Levander would

13    have it there wouldn't have been a summary judgment motion.

14    The case would be over.  Obviously --

15    THE COURT:  Well, he quoted from the motions --

16    the decisions on the motions.  That's right.

17    MR. SHEEHAN:  That's right.

18    THE COURT:  And as I read that motion -- the

19    decision those counts were dismissed under the 546(e) issue.

20    He wasn't determining that the rest of the complaint was

21    adequately pleaded.  So are there other decisions that he --

22    MR. SHEEHAN:  Thank you, Your Honor.

23    THE COURT:  You said there was a summary judgment

24    motion?

25    MR. SHEEHAN:  Your point -- that was my point.

1    And so I agree.  And lastly that one thing that you should

2    know is that I didn't point out in COMAD we never plead that

3    they knew about the Ponzi scheme.  We never plead that they

4    knew about actual --

5            THE COURT:  But you plead facts that he was

6    falsifying records.

7            MR. SHEEHAN:  Yeah.  I understand that.  But the

8    point is is that our friend suggested here this morning that

9    I made a big concession.  All I'm saying is that we don't

10   have to plead -- we don't have to plead that he knew it was

11   a Ponzi scheme or knew that there was no trading.

12           THE COURT:  Did you plead that?

13           MR. SHEEHAN:  I did not.

14           THE COURT:  Okay.

15           MR. SHEEHAN:  We don't -- we didn't talk about

16   either.  And Judge Rakoff found that to be an adequate

17   complaint even though we didn't plead either one of those.

18           THE COURT:  Okay.

19           MR. SHEEHAN:  Thank you.

20           THE COURT:  Thank you.

21           I'll reserve decision.

22       (A chorus of thank you).

23           THE COURT:  Except on the severance motion.

24       (Laughter)

25       (Whereupon these proceedings concluded at 11:35 AM)

1                        I N D E X

2                       RULINGS

3                                         Page        Line

4    Motion to Dismiss The Third Amended

5    Complaint                            --          --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 81

1                  C E R T I F I C A T I O N

2

3      I, Sherri L. Breach, CERT*D-397, certified that the

4      foregoing transcript is a true and accurate record of the

5      proceedings.

6
       Sherri L       Digitally signed by Sherri L Breach
7      Breach          DN: cn=Sherri L Breach, o, ou,
                        email=digital1@veritext.com, c=US
                        Date: 2014.05.01 16:26:20 -04'00'
8

9      SHERRI L. BREACH

10     AAERT Certified Electronic Reporter & Transcriber

11     CERT*D-397

12

13     Veritext

14     330 Old Country Road

15     Suite 300

16     Mineola, New York 11501

17

18     DATE:  May 1, 2014

19

20

21

22

23

24

25