Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - x

4   IRVING H. PICARD, TRUSTEE FOR        CASE NO. 14-01840-smb

5   THE LIQUIDATION OF B                 CHAPTER 11

6   v.                                   CASE NO. 08-99000-smb

7   SUSANNE STONE MARSHALL, ET AL

8   - - - - - - - - - - - - - - - x

9   SECURITIES INVESTOR PROTECTION       ADMINISTRATIVE CASE NO.

10  CORPORATION                          08-1789

11  - - - - - - - - - - - - - - - x

12

13                      U.S. Bankruptcy Court

14                      One Bowling Green

15                      New York, New York

16

17                      May 7, 2014

18                      10:03 AM

19

20  B E F O R E :

21  HON. STUART M. BERNSTEIN

22  U.S. BANKRUPTCY JUDGE

23

24

25  ECRO:  MATTHEW

1   HEARING Re Motion for Preliminary Injunction/Memorandum of

2   Law in Support of Trustees Application for Enforcement of

3   Permanent Injunction and Automatic Stay (Adv. Pro No. 14-

4   01840)(related document(s)5808)'

5

6   HEARING Re Motion to Dismiss Trustee's Complaint as to

7   Defendants Marshall, Fox, Peshkin and Oasis

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sheila Orms

Page 3

```
 1    A P P E A R A N C E S :

 2    BAKER HOSTETLER

 3         Attorneys for SIPA Trustee

 4         45 Rockefeller Plaza

 5         New York, NY  10111

 6

 7    BY:  KEITH R. MURPHY, ESQ.

 8

 9    BECKER & POLIAKOFF

10         Attorneys for Fox plaintiffs

11         45 Broadway

12         8th Floor

13         New York, NY  10006

14

15    BY:  PETER W. SMITH, ESQ.

16

17    SCHULTE ROTH & ZABEL, LLP

18         Attorneys for Picower Parties

19         919 Third Avenue

20         New York, NY  10022

21

22    BY:  MARCY RESSLER HARRIS, ESQ.

23         MICHAEL KWON, ESQ.

24

25
```

Page 4

1    ATTORNEY AT LAW

2        Attorneys for Goldman plaintiffs

3        123 Australian Avenue

4        Palm Beach, FL   33480

5

6    BY:   RICHAD LEE STONE, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2           THE COURT:  Be seated.  Madoff.

 3      (Pause)

 4           MR. MURPHY:  Good morning, Your Honor, Keith

 5   Murphy, Baker & Hostettler for the trustee, Your Honor.

 6           We're here on the trustee's application this

 7   morning --

 8           THE COURT:  Let me just get the other appearances.

 9           MR. SMITH:  Of course.

10           MR. STONE:  Richard Stone for the Goldman

11   plaintiffs.

12           MR. SMITH:  Peter Smith of Beckler & Poliakoff for

13   the Fox plaintiffs.

14           THE COURT:  Okay.  Thank you.  Go ahead.

15           MR. MURPHY:  Thank you, Your Honor.  This morning

16   we're here on the trustee's application to enforce the

17   permanent injunction entered by the bankruptcy court on

18   January 13th, 2011 and the automatic stay in these

19   proceedings, Your Honor, and to otherwise enjoin the Fox

20   plaintiffs and the Goldman plaintiffs and anyone acting on

21   their behalf from proceeding with their punitive class

22   actions against the Picard defendants or any other actions

23   against the counter defendants without further leave of this

24   Court.

25           Last week, Your Honor, we were before you in
```

Page 6

1    connection with the Fox plaintiffs' motion to stay.  And

2    during that hearing, the Court asked what interest does the

3    estate have in this matter, and why shouldn't this go

4    forward in Florida.  And I answered it at that time, I

5    answered it with respect to what the trustee's interests are

6    and the estate's interest, as well as we believe this

7    Court's interests are, but I'd like to just highlight some

8    of that again.

9            The injunction against duplicative and derivative

10   claims, Your Honor, was a bargained for element of the

11   immense settlement that we entered into with Picard.  And

12   that permanent injunction has to have a meaning that's

13   uniform in order to be -- to have a meaning.

14           The fraudulent transfer claims here that were

15   settled with the Picard defendants are the estate claims,

16   but the class action plaintiffs here are seeking to usurp

17   those claims and to utilize them for themselves.

18           The Court's power, Your Honor, to enjoin

19   duplicative and derivative claims has to have teeth.  The

20   challenge that's presented here by the class action

21   plaintiffs complaints effects the ability -- the trustee's

22   ability to promise finality when the defendants settles

23   claims with the trustee, and it affects this Court's power

24   to grant that finality.

25           And it has effects clearly obviously just beyond

Page 7

1    this case.  It has to do with other bankruptcy cases as

2    well, when a permanent injunction is entered.

3         The other issue is that what claims belong to the

4    trustee, and what claims belong to other people is clearly

5    an issue that continues to be a live and litigated issue in

6    this case, Your Honor.  And therefore addressing it here,

7    protects the integrity of the entire BLMIS liquidation

8    proceeding before the Court, from the net equity decision to

9    the claims process to the avoidance and settlement process

10   to the permanent injunction itself.

11        All of these are integral and essential to these

12   proceedings.  I know that Judge Codel (ph) also had found

13   that the injunction of derivative claims protects the

14   integrity of the SIPA proceeding.

15        We can't allow, the Trust can't allow others to

16   use the estate's claims to get more money from the Picowers

17   for the benefit of the same customers who are already before

18   this proceeding and addressed by the trustee's activities,

19   Your Honor.

20        The net equity decision that was entered here

21   provided the parameters, Your Honor, they are not entitled

22   to their fictitious profits.  But the class action

23   plaintiffs in multiple attempts have tried to circumvent or

24   supplement their recovers beyond the net equity decision by

25   trying to sue the Picowers.

Page 8

1             They're essentially trying to create a shadow

2    estate of all the customers that are represented by the

3    trustee.  For example, the Fox second amended complaint

4    seeks damages in the approximately amount of $64.8 billion,

5    which actually coincides with what the last statements were

6    in December of 2008.

7             Why do we care, Your Honor?  We care because the

8    customers are usurping the estate's claims here.  They're

9    helping themselves to a separate recovery of claims that

10   were settled.  And absent the estate abandoning those

11   claims, they remain claims of the estate to bring and to

12   resolve, and it's inappropriate for others to take those

13   claims.

14            The Shadow estate is clearly an affront to the

15   Court's jurisdiction and is appropriate for this Court to

16   address it.  And the other point I would add, Your Honor, is

17   that a defendant, once they settle with the trustee, should

18   take comfort in the fact that they're not going to be sued

19   on the same claims multiple times by the same parties.

20            And furthermore, Your Honor, the fact that these

21   claims as we see them are duplicative and derivative.  Based

22   on the analysis of the claims, they have not set -- the

23   class action plaintiffs have not set forth any non-

24   conclusory particularized and non-derivative claims.

25            THE COURT:  Let me ask you a question on that.  Am

Page 9

1    I supposed to decide, for example, whether the complaints

2    state a claim for control personal liability?  In other

3    words, should I look this as a 12(b)(6) motion?

4            MR. MURPHY:  No, Your Honor, you should not look

5    at it that way.

6            THE COURT:  So what am I supposed to decide?

7            MR. MURPHY:  We're not asking the Court to look at

8    this and make determinations as to whether they're

9    securities claims or not, or whether they've adequately

10   stated securities claims.  What we're asking the Court, is

11   to review these claims as we have, and determine that once

12   you look behind the façade, that they are actually

13   duplicative and derivative of the trustee's fraudulent

14   conveyance claims.

15           THE COURT:  But we know that the same actions can

16   give rise to direct and derivative claims.  So how do I

17   avoid looking at the complaints to determine whether or not

18   they've asserted direct claims?

19           MR. MURPHY:  I think --

20           THE COURT:  Let me give you a for instance, and

21   I'm not saying these are facts, this is a hypothetical.

22           But suppose the allegation is that Picower induced

23   Madoff to send Picower's account statements out to everybody

24   to induce them to either join the fund, or join BLMIS, or to

25   continue to keep their money there.  Those claims would be

Page 10

1    based upon the withdrawals by Picower.  But wouldn't those

2    also state a claim for securities fraud and maybe aiding and

3    abetting a securities fraud, maybe a controlled personal

4    claim?

5            MR. MURPHY:  I think, Your Honor, you have to look

6    at it from the perspective of what's alleged and what facts

7    are presented in this particular instance.

8            THE COURT:  Well, that brings me back to my

9    question.  Am I really looking at these complaints to see if

10   they allege facts sufficient enough to assert a direct

11   claim; i.e., a controlled personal claim?

12           MR. MURPHY:  No, actually I -- let me come back,

13   Your Honor.

14           THE COURT:  That seems to what be Judge

15   Sullivan --

16           MR. MURPHY:  I was going to say Judge Sullivan

17   actually addressed this particular issue, and I think he

18   looked at it from the perspective of saying while it may

19   look on its face that I'm being asked to decide a 12(b)(6)

20   issue here, it's actually not.  It feels the same, but it's

21   actually not.  There's a different analysis.

22           I'm going -- Judge Sullivan looked at the

23   statements that were made, even with respect to allegations

24   that Picower was aware of the fraud, and that he directed

25   transfers, and that he was involved in making the statements

Page 11

1    to -- you know, with respect to the accounts.

2           Judge Sullivan examined that and said, even

3    despite that, I can actually look at this, and I can

4    determine that these are actually fraudulent conveyance

5    claims, and they're duplicate and derivative.  So he looked

6    behind it.

7           So I think this Court can do the same thing, and I

8    think that this Court should do the same thing.  There's a

9    long history here of the bankruptcy court and Judge Sullivan

10   and Judge Codel and the Second Circuit doing the exact same

11   thing.

12          I think at first blush, Your Honor, to your point,

13   you know, we're asking the Court to look at these that

14   there's really nothing here that's not based on Picower's

15   withdrawals and the activities on the -- or things that flow

16   from that.

17          THE COURT:  Well, I think one of the complaints,

18   maybe the Fox complaint says he induced other people to

19   invest, and somehow he induced or participated with Madoff

20   in sending the (indiscernible) sell to other investors,

21   which sounds like a securities fraud claim.  Certainly

22   nobody's arguing that BLMIS committed securities fraud, and

23   the question is really whether Picower can be liable for

24   that.  And should I look beyond those allegations or --

25   because those allegations weren't in the complaint I think

Page 12

```
 1    before Judge Sullivan, were they?

 2              MR. MURPHY:  No, I think that a large number of

 3    them were, the basis for a lot of these claims were, Your

 4    Honor.  I think that there were three categories of claims

 5    that are before you now, most of them were before prior

 6    judges as well.  I think that the initial kind of category

 7    is that Picower directed false trades and false

 8    documentation in his own accounts, and they took out large

 9    amounts of money from those accounts.

10              And then if you step down to the next level, is

11    that as demonstrated by his conduct in his own accounts,

12    Picower had knowledge of the fraud, and influence and

13    control over BLMIS.

14              And then you get down to the next level, where we

15    are now, Your Honor, is that Picower's knowledge, influence

16    and control over BLMIS amounted to Picower making direct

17    misrepresentations to class action plaintiffs, and amounted

18    to an inducement by the Picowers for others to invest, and

19    to remain invested.

20              I think the first two of those categories, Your

21    Honor, was what Judge Sullivan saw, and what Judge Codel

22    saw, and the Second Circuit saw.  But there isn't anything

23    here that's new, that's not based on Picower's activity.

24    This is what the --

25              THE COURT:  Well, of course it's based on
```

1    Picower's activity, they're seeking to hold Picower liable.

2            MR. MURPHY:  Yes, Your Honor, but what the prior

3    courts have decided is that all of that activity was

4    relating to Picower's activity in his own accounts.  What he

5    did with his own accounts, how he got the money out, what he

6    was alleging in his own accounts.

7            The rest of it flowed from there, Your Honor, but

8    those are inferences that come from Picower's own activity.

9    And that is what the bankruptcy court, the district courts

10   in the Second Circuit all rejected, in terms of Picower's

11   liability.  They all said it came back to that.  And those

12   were harms to the estate.  And that harm to the estate was

13   satisfied by the trustee's settlement.

14           THE COURT:  Did any of the prior complaints allege

15   even in conclusory terms that Picower induced whatever

16   Madoff to send out phony confirmations to other customers?

17           MR. MURPHY:  Your Honor, prior complaints said

18   that -- yes, I believe that they did.  I believe that prior

19   complaints said that Picower had control.  Picower

20   participated fully in the fraud.  Picower made statements or

21   took activity relating to the fraud.  I think that is

22   absolutely in the prior complaints, Your Honor.  And I think

23   though some of those specific allegations are actually

24   addressed in Judge Codel's and Judge Sullivan's decisions.

25           I think though, Your Honor, if you look at it this

                                                            Page 14

1    way, if you take away the fraudulent transfers, if you take

2    away activity that Picower did in his own account, with

3    respect to his own account statements, everything else fits.

4    All the other allegations fail because there's nothing here

5    that specifically says that Picower or that establishes

6    beyond mere conclusory statement.

7                THE COURT:  It sounds like you're arguing a

8    12(b)(6) motion.  That's why I asked the question, and let

9    me give you an example of what's bothering me or confusing

10   me.

11               I'm looking, I guess, at the Fox complaint, I'm

12   looking at paragraphs 117 and 118, and they say generally

13   that Picower induced BLMIS to send misleading statements to

14   other investors.  Am I supposed to look at the sufficiency

15   of those allegations, or simply say if those allegations are

16   sufficient, they state a direct claim, I'm not ruling on the

17   sufficiency of the allegations, that's appropriate for a

18   12(b)(6) motion in Florida.  That's what I'm getting at.

19               MR. MURPHY:  Uh-huh.

20               THE COURT:  Because I don't know the answer to

21   that.

22               MR. MURPHY:  Okay.  Here's what I would say, Your

23   Honor.  I think that looking at this holistically from the

24   entire history of what's been done here, all the prior

25   complaints that have been pled, all of the statements and

1    allegations that have been made previously and rejected by

2    prior judges, what we have here now are mere conclusory

3    statements that flow, I say, directly from Picower's

4    activities on account.  That was not directed, or any

5    directed to other customers here.  Mr. Picower was a

6    customer.

7           THE COURT:  Well, but they -- but they do allege,

8    and I know you disagree with the sufficiency --

9           MR. MURPHY:  Uh-huh.

10          THE COURT:  -- and you may be right, they do

11   allege that Picower induced BLMIS to send misleading

12   statements to others, and clearly sending misleading

13   statements to others would be a direct claim, assuming the

14   person received the statement and all the other elements of

15   fraud were present.

16          MR. MURPHY:  Right.

17          THE COURT:  There's -- and again, it sounds to me

18   like you're asking me to judge whether or determine whether

19   that is sufficient to state a direct claim.  Since as they

20   started out saying, we know that a direct claim and a

21   derivative claim can arise from the same facts, or the same

22   general facts.

23          MR. MURPHY:  I think, Your Honor, after multiple

24   bites at the apple, the class action plaintiffs haven't come

25   forward with particularized facts in their new complaints.

Page 16

1    Your question is, we're not asking you to again judge this

2    from a 12(b)(6) standard, we're not going to use the posture

3    of the case, as Judge Sullivan said, to shield the

4    complaints from your scrutiny.

5             There aren't particularized facts that are alleged

6    with respect to Mr. Picower's activity vis a vis other

7    customers in this case.  They -- the class action plaintiffs

8    do utilize specific allegations in certain instances.  For

9    example, they will say, Mr. Picower made a trade on this

10   date in this amount from this account.

11            But then a follow-up paragraph will be a

12   conclusion that basically as a result of that, he must have

13   made some misrepresentation on a global basis to everybody,

14   and that he somehow intended that.

15            I think, Your Honor, what we're asking the Court

16   to do is not decide the 12(b)(6) issue, not look at this

17   from a securities claim issue, but to look at it, to see

18   what was alleged here, to see how close it is really, in

19   fact, when you tear away the overlay of what they're saying,

20   and look at it from the perspective of, this all flows from

21   Picower's accounts.

22            Again, take out the activity that he did in his

23   own accounts, there's nothing left.  They don't have any

24   particularized facts.

25            I think that even with respect to the statement

Page 17

1    that Picower was encouraging other people or inducing other

2    peoples, that's all based on his knowledge of the fraud and

3    the activity in his own account.  But they use terms like

4    this amounted to something.  But I'll suggest to the Court

5    that there's no facts that actually back up their

6    statements.

7            And I think the Court can look at it again,

8    because the Court is looking at this holistically, this is

9    not coming from a brand new view.  Seventy-five percent of

10   this was already before prior courts, all the way up to the

11   Second Circuit.  They looked at it, they tore it apart.

12   While on their face, some statements that Picower controlled

13   these accounts, that he was absolutely involved in the

14   fraud, they said that he was -- they allege that he was

15   involved in the fraud.  I'm not sure how much more you need.

16   But that was found to be insufficient.

17           Judge Sullivan, I'll note, Your Honor, also

18   questioned how do you figure what is derivative claims here,

19   and how it applies, it sort of feels like you're accessing

20   the merits, it feels like it.  But as he said, they're

21   distinct analyses, so that's how I would answer the Court's

22   point on that, Your Honor.

23           And the derivative claims here, according to the

24   Second Circuit, are those claims which arise from harm done

25   to the estate, and they seek relief against third parties

Page 18

1    that push the debtor into bankruptcy.

2         Again, these points were all examined by the prior

3    courts, and they found, the Second Circuit found that the

4    plaintiffs here are trying to plead around the permanent

5    injunction because they allege nothing more than steps

6    necessary to affect Picower defendants withdrawals of money

7    from their accounts, it's their particularized conflict

8    direct with the BLMIS customers.

9         And by the way, Your Honor, the Goldman plaintiffs

10   specifically in their prior complaints had identified these

11   as securities claims, and as controlled personal claims.  It

12   made all those allegations previously, and previously were

13   rejected.

14        And that when Judge Sullivan looked at them, he

15   said, when you strip these of their conclusory language, the

16   only activity alleged is Picower's activities on accounts.

17   The same is true here, Your Honor, with respect to those,

18   there's no new facts alleged.

19        We compare the allegations, Your Honor, with the

20   original complaints with the allegations in the new

21   complaints in our briefs.  And as I said before, the example

22   I gave you was comparing the specific allegations that they

23   have, that they have facts are, all relate to Picower's

24   activities on account versus the conclusory statements that

25   their activity amounted to something else, that all flows

Page 19

1   from.

2           But absent any -- there's no allegations here that

3   Picowers had any contact with any of these customers.  And

4   the only conduct alleged is with his own accounts.  And by

5   the way, Your Honor, there's no relationship here between

6   Mr. Picower and any of these customers.  There's not been

7   one alleged.

8           The harm that they allege here is the same that's

9   been suffered by every customer, they're all the same.  An

10  illustration, Your Honor, I'd just like to go through with

11  you, a comparison of paragraph 69 to 71 of the initial

12  Goldman complaint, which discusses the false monthly

13  statements BLMIS sent each other which Judge Sullivan

14  observed, contained no allegations to Picower's directed or

15  were at all involved with the creation or dissemination of

16  these statements to customers.

17          THE COURT:  Well, but now there are these

18  generalized allegations.  They're general allegations, which

19  you say are conclusory, and I may agree, and it sounds to me

20  like what you're saying is, that even though this isn't a

21  12(b)(6) motion, I should ignore conclusory allegations and

22  look at the particular facts that are alleged to determine

23  whether or not they are direct of derivative claims.

24          MR. MURPHY:  Exactly, Your Honor.  And even more

25  so --

1          THE COURT:  I'm not sure what the difference

2     between that and a 12(b)(6) motion is, but go ahead.

3          MR. MURPHY:  Even more so, though, Your Honor,

4     I'll go back to the fact that they've had several bites at

5     the apple to try to allege this, and as you parse through

6     what these allegations, you're going to see what the prior

7     judges have found.

8          Again, they're using, you know, as a consequence,

9     this happened or that happened, but the new verbiage doesn't

10    affect that Picower is not alleged to have been directly

11    involved with the dissemination to any specific customers,

12    that he did any of this.

13         The -- what they're doing here, Your Honor, is

14    essentially adding to the chain of inferences that were

15    there before, that they had asked previous courts also to

16    make the conclusion.  But they don't remedy that flaw, as

17    Judge Sullivan had found.

18         The Fox plaintiffs' second amended complaint that

19    they're attempting to file, you know, it doesn't do any

20    better here, Your Honor, in connection with their initial

21    complaint, which they effectively parroted the trustee's

22    complaint.

23         They argued to the Second Circuit that the claims

24    are independent because their complaints allege that the

25    Picower's wrongful conduct ensured the fraud success by

Page 21

1    inducing them and other customers to remain invested and to

2    invest with BLMIS.  The Second Circuit did not buy that,

3    Your Honor, but the Fox specifically argues it now.  They

4    say that his conduct created -- in his own accounts, caused

5    the creation of false documentation that induced the Fox

6    plaintiffs and others to invest.

7              But like the former complaints, Your Honor, and

8    even the Goldman's new complaint, it merely infers Picower's

9    control over BLMIS' operation and decision-making, which

10   resulted in BLMIS picking the false statements upon which

11   they relied, based on Picower's conduct in his own accounts.

12             Two other points, Your Honor, with respect to the

13   Fox second amended complaint.  I know that some of what they

14   allege, some of what's new here, I guess, is that they're

15   saying, according to Madoff.  And so according to Madoff,

16   Picower actively encouraged.  But again, if the Court looks

17   at this, there are no facts, which support an allegation

18   that Picower actively encouraged any of this.

19             THE COURT:  Except Madoff said it supposedly.

20             MR. MURPHY:  Except that he said it.

21             THE COURT:  Well.

22             MR. MURPHY:  And frankly, Your Honor, Mr. Madoff

23   has been lying for decades.

24             THE COURT:  But can I judge that on her motion,

25   that's a question of proving it.

Page 22

```
1            MR. MURPHY:  I don't think you have to judge it,

2      but I don't think you have to give it weight.

3            THE COURT:  Let me ask you a different question.

4      There is a motion pending in the Southern District of

5      Florida before Judge Marra which raises this same issue.

6      And putting Fox aside, we dealt with that last week, the

7      Judge in the Fox matter had his chance, and he decided, he

8      essentially abstained.

9            But in connection with the Goldman matter, there's

10     a pending motion which was made before I guess you made the

11     current or you filed the current complaint.  Isn't it

12     appropriate for Judge Marra in the first instance to

13     entertain that.  And then if he decides that he'll defer to

14     me to do so?

15           MR. MURPHY:  I don't -- for once, Your Honor, I'll

16     start off with, I don't think this Court needs to wait.  I

17     don't think that it should, I don't think its required to.

18           Judge Weiscamp, as you pointed out did defer.

19     Judge Marra has had these papers for quite a long time now.

20     He's aware of what's going on here.  He has not taken any

21     action with respect to it whatsoever.

22           I would -- as I mentioned in my argument last

23     week, I think that this Court is the first court that we

24     need to go for questions as to whether something is

25     duplicative and derivative, or if somebody's trying to usurp
```

Page 23

1        the estate's claims, whether settled or not.

2                That's a question for this Court, and I don't

3        think that that responsibility or that opportunity was

4        handed off to anybody whether through the Second Circuit

5        decision or by, you know, a potential activity down in the

6        Florida courts.

7                But again, Your Honor, I say that's -- at this

8        point, nothing's gone forward.  There's been nothing

9        substantive that has actually taken place.  It's all been

10       procedural, and the best insight we have is that Judge

11       Weiscamp deferred to Your Honor.

12               THE COURT:  Okay.

13               MR. MURPHY:  And I'll note, Your Honor, you know,

14       even as to that Eleventh Circuit appeal, we have no guidance

15       even today.

16               THE COURT:  Okay.

17               MR. MURPHY:  The -- I'll also add, Your Honor, the

18       sufficiency of what we have before you, what you have before

19       you is relevant only insofar as it affects whether the

20       claims are direct.  And I think that's what the Court has

21       the possibility and the option to look at.

22               The -- going back to the Fox second amended

23       complaint, Your Honor, as previously I guess observed by the

24       Second Circuit, Fox second amended complaint here now if you

25       look at it again, it fails to allege quote, for instance

Page 24

1    that the Picower defendants made any misrepresentations to

2    the appellants or any other customers.  The --

3               THE COURT:  I don't think they're accusing Picower

4    of a primary violation.  That's not their argument.  Their

5    argument is essentially that he aided and abetted Madoff.

6               MR. MURPHY:  Right.  The primary -- obviously the

7    person would be Madoff.  But again, you're going to have the

8    opportunity to look behind the curtain to look at these

9    claims and to see whether they allege direct claims or not,

10   or really whether they're duplicative or derivative.  I

11   think that's really the test, and that's really what Judge

12   Sullivan considered himself.  And I think this Court also

13   has that opportunity.

14               I -- with respect to the statements as to what Mr.

15   Madoff said, Your Honor, none of those have any

16   particularity at all.  There's no specificity really about

17   what was said, what was made, what backs up this statement.

18   But they appear, Your Honor, to be drawn from a book by

19   Diana Henriques and maybe some other public media

20   statements, but there's nothing in there that we see that

21   has any specific facts.

22               And I note, Your Honor, these plaintiffs are

23   before you.  And I think they collectively represent

24   hundreds of customers.  They've had years to come up with

25   what they're going to come up with.  They're still relying

1    on something that they've either taken from a newspaper or a

2    book, or according to Madoff, but I'll note not -- there's

3    no allegations in these complaints that any of their clients

4    were made misrepresentations to, or that any of their

5    clients got something from Mr. Picower or relied on

6    something Mr. Picower did.

7            I would just want to add in, Your Honor, that the

8    -- their reliance on Metzger v Feingold (ph) is unavailing.

9    Because in Metzger, at least in that case, the defendants

10   were alleged to have made direct misrepresentations, and

11   taking specifically alleged action directly addressed

12   towards the plaintiffs, there's no such specific allegations

13   here or misrepresentations have been made, nor any

14   particular action directed toward any particular plaintiff

15   or punitive class member.  And where the only alleged

16   specific alleged activity was that taken by Picower in his

17   own accounts.

18           I'll turn now, Your Honor, to the fact that we

19   also say that this -- these activities violate the automatic

20   stay.

21           The claims here are certainly generalized, all of

22   the customers.  They are generalized, they're duplicative,

23   and our position is that they violate the automatic stay.

24           Now, we believe that --

25           THE COURT:  Could they violate the automatic stay

Page 26

1    without violating the injunction?

2              MR. MURPHY:  Excuse me, Your Honor?  They violate

3    both.

4              THE COURT:  Well, but could they violate one

5    without violating the other?  Do I really --

6              MR. MURPHY:  No.

7              THE COURT:  -- I have to reach --

8              MR. MURPHY:  You don't have to reach both.  Yes,

9    you don't have to reach both, Your Honor.  To that point

10   then, Your Honor, I will move along.

11             Just --

12             THE COURT:  In other words, there's no difference

13   at this point?

14             MR. MURPHY:  No, I don't think that there is, Your

15   Honor.  I think --

16             THE COURT:  If it's a derivative claim, it

17   violates the automatic stay and it violates the injunction.

18             MR. MURPHY:  Exactly.  And we say that these

19   claims are the estate's claims, and they're trying to also

20   under 362(a)(1) satisfy a claim against the debtor by going

21   into Picower's.  So it's multiple violations.

22             Lastly, Your Honor, I'm going to turn back to the

23   mandate issue.  I argued extensively on Thursday concerning

24   that.  I'm not going to go through it again.  I'm going to

25   adopt that argument.

Page 27

1          THE COURT:  Okay.

2          MR. MURPHY:  I'll just highlight a few things from

3     that.  Again, Your Honor --

4          THE COURT:  And Mr. Smith will adopt his argument

5     and we can move on off of that one.

6          MR. MURPHY:  What's that?

7          THE COURT:  Mr. Smith will adopt his argument,

8     we'll incorporate it all by reference, and we'll move on.

9          MR. MURPHY:  Well, for the benefit of the Goldman

10    plaintiffs, Your Honor, I'll just very quickly highlight a

11    few points --

12         THE COURT:  Okay.

13         MR. MURPHY:  -- I think they're going to address

14    it.

15         It was a 28-paged decision, Your Honor, from

16    the --

17         THE COURT:  I don't think -- is Goldman making

18    that argument that this Court lacks jurisdiction?

19         MR. STONE:  Your Honor, it's not our position that

20    the mandate required the case to be filed --

21         THE COURT:  Okay.  All right.  So good, we've

22    dealt with this.

23         MR. MURPHY:  Okay.

24         THE COURT:  Thank you.

25         MR. MURPHY:  Okay, Your Honor.  I'll note lastly

Page 28

1    that the bankruptcy court expressly retained jurisdiction

2    over the permanent injunction in any disputes arising or

3    otherwise relating to it.  And as I mentioned, the fraud

4    actions have not progressed.

5              And by the way, also, they haven't actually

6    briefed anything like the duplicative derivative issue that

7    we are fully briefed here on before Your Honor today.

8              THE COURT:  Okay.

9              MR. MURPHY:  Thank you, Your Honor.

10             MR. STONE:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. STONE:  Richard Stone for the Goldman parties.

13             Your Honor, I think you've picked up on many of

14   the issues that we've addressed in our brief.  And before I

15   go into the substance of my argument, I wanted to make clear

16   that we have solely one claim in the Goldman case, that's

17   20(a).

18             20(a) is a provision of federal law that provides

19   for joint and several liability against the party who does

20   not make direct misrepresentations, but does not directly

21   participate in fraud, but who controls or who has the

22   ability to control the party who does.

23             So the trustee's continuous refrain that we

24   haven't alleged direct contact, direct misrepresentation

25   from Picower to underlying investors is irrelevant.  That's

```
 1    a 10(b) case.  We didn't plead a 10(b) case.  BLMIS

 2    committed a 10(b) violation, a series of them.  Mr. Madoff

 3    was criminally indicted for that, the SEC brought a case

 4    against BLMIS for that, there's no question.

 5              What we are alleging is that Picower, an

 6    individual who was able to control the books and records at

 7    will of a broker dealer --

 8              THE COURT:  Well, but only within his own account.

 9    There's no -- is there an allegation that he controlled the

10    books and records -- well, that's a two part question.

11              The first is, am I supposed to look at the

12    complaint as I asked Mr. Murphy essentially to determine if

13    there's a controlled --

14              MR. STONE:  Mr. Stone, I'm sorry.

15              THE COURT:  No, I asked Mr. Murphy --

16              MR. STONE:  Oh, yes, I'm sorry.

17              THE COURT:  -- am I supposed to look at the

18    complaint to determine if there's a sufficient control

19    person claim alleged or do I simply look at the complaint,

20    which is what Judge Sullivan did holistically to determine

21    whether it was based upon Picower's withdrawals of funds

22    from the -- from BLMIS and his manipulation of the accounts

23    I guess it was kind of a corollary to that.  What am I

24    supposed to be looking for?

25              MR. STONE:  Your Honor, as I'm going to address, I
```

1    don't think Your Honor should do anything.  I think Your

2    Honor is correct that Judge Marra has jurisdiction over this

3    matter.  The case was first --

4              THE COURT:  Well, we both do.

5              MR. STONE:  Right.

6              THE COURT:  The Second Circuit, you know, neither

7    of you settled it -- cited it --

8              MR. STONE:  Right.

9              THE COURT:  -- but there's a Baldwin United (ph)

10   case, we both have jurisdiction --

11             MR. STONE:  Right.

12             THE COURT:  -- to determine whether the automatic

13   stay applies and presumably whether the injunction applies.

14             MR. STONE:  Correct, Your Honor.  But I don't

15   think this Court has jurisdiction to prevent us, or in any

16   way enjoin us from proceeding in front of Judge Marra.

17             THE COURT:  Well, what if I determine -- Judge

18   Marra hasn't done anything yet.  What if I determine that

19   your claims violate the permanent injunction?  Can't I issue

20   an injunction to prevent you from prosecuting that?

21             MR. STONE:  We don't think so, Your Honor.  The

22   case is pending in front of a federal district court judge

23   who clearly has jurisdiction over that matter.  He has not

24   issued the stay that has been requested by the Picower

25   defendants, the parties in interest, who have appeared in

Page 31

1   Florida, litigated in front of Judge Marra, okay.  This is

2   the trustee appearing here today, not the party in interest

3   in our case.

4          THE COURT:  So you're saying I don't have

5   jurisdiction --

6          MR. STONE:  Correct.

7          THE COURT:  -- to issue an injunction to prevent

8   you from asserting a claim, even though I have jurisdiction

9   to determine that your activities violate the injunction?

10          MR. STONE:  In the same way that if two courts

11   have equal jurisdiction over a matter, two district courts,

12   and the first court that has that matter in front of it is

13   ruling on it.  The second court, under rules of comity and

14   federal jurisdiction defers to the first court.

15          You can't have two courts handling the same matter

16   at the same time.  In this case, the first instance of this

17   issue being raised vis a vis our proposed, not filed, our

18   draft amended complaint was to a declaratory action in

19   federal district court.

20          Federal district courts have exclusive

21   jurisdiction over federal securities claims.  They have

22   expertise in federal securities claims.

23          THE COURT:  But I have jurisdiction to interpret

24   the injunction.

25          MR. STONE:  You do, but so does that judge and

1    that judge took --

2              THE COURT:  I'm not arguing --

3              MR. STONE:  This is sub judice first.

4              THE COURT:  -- with you that -- I grant you, we

5    both have jurisdiction and the question is who should decide

6    it.

7              MR. STONE:  I don't think that's correct, Your

8    Honor.  I think Judge Esterbrook's (ph) decision that I

9    cited in 140 B.R. 969 and also In Re Tech Net, 2007 --

10             THE COURT:  What about the Second Circuit's

11   decision in Baldwin United?

12             MR. STONE:  I agree that Your Honor has

13   jurisdiction, okay, but the jurisdiction of the district

14   court is also pending now.  What you would be doing by

15   ruling is usurping the jurisdiction of the federal district

16   court which had this matter in front of it first.

17             THE COURT:  So you're essentially arguing that the

18   first in time, first in right principle.  The issue was

19   first presented to Judge Marra and he should decide it.

20             MR. STONE:  Right.  And also, that as Judge

21   Esterbrook clearly stated, a bankruptcy court cannot enter

22   an order even when it has equal jurisdiction to a federal

23   district court, when that federal district court has sub

24   judice the same matter, i.e., violation of the stay and the

25   permanent injunction.

1           They have not rebutted those cases at all, Your

2    Honor.  We think that's black letter law.

3           If I could start from the beginning now.  I just

4    wanted to make clear --

5           THE COURT:  Go ahead.

6           MR. STONE:  -- that a 20(a) case doesn't require

7    direct misrepresentations.  And I'm going to read from the

8    complaint the various allegations showing this control

9    relationship.

10          THE COURT:  Okay.

11          MR. STONE:  Remember, Your Honor, typical control

12   person case is where an individual who's a director, or an

13   outside accountant participates in a fraudulent

14   misrepresentation or a scheme of fraud, and is then held as

15   a control person because he had the ability to prevent that

16   misrepresentation or otherwise.

17          We have much more than that, Your Honor.  We have

18   an individual who day-to-day was dictating the books and

19   records of a broker dealer.  What is a broker dealer?

20          THE COURT:  Other than his account, what are the

21   allegations that he did with respect to --

22          MR. STONE:  I'm going to read those, Your Honor.

23          THE COURT:  Okay.

24          MR. STONE:  The allegations that he controlled the

25   direct misrepresentations to underlying investors --

1              THE COURT:  That sounds conclusory to me.

2              MR. STONE:  But, Your Honor, this --

3              THE COURT:  What are the facts --

4              MR. STONE:  Federal Rule of Civil Procedure 8

5     applies here, not 9(b).

6              THE COURT:  But you still have to allege facts,

7     don't you?

8              MR. STONE:  We have to allege a reasonable basis

9     for the Court to conclude that we have met the pleading

10    standard under Rule 8.

11             THE COURT:  Okay.  So if I have to decide that, it

12    sounds like I'm deciding whether you pleaded a control

13    person claim.

14             MR. STONE:  Well, we don't think that the Court

15    should do that.  We think the federal court that has

16    exclusive jurisdiction --

17             THE COURT:  So what you're telling me about Rule 8

18    --

19             MR. STONE:  Right.

20             THE COURT:  What you're telling me about Rule 8 is

21    I'm not supposed to review this as a 12(b)(6) motion.

22             MR. STONE:  Well, I'm trying to be clear that

23    that's the rule that would apply, Your Honor, because the

24    trustee is asking this Court to decide a motion that should

25    be decided by a district court in Florida.

1          First, Your Honor --

2          THE COURT:  Didn't Judge Sullivan refer to Rule 8

3    or Rule 9(b)?

4          MR. STONE:  He did not.

5          THE COURT:  All right.  So it sounds like those

6    rules don't apply, and I'm just supposed to make a

7    determination whether you're simply asserting a dressed-up

8    derivative claim.

9          MR. STONE:  Well, why would Your Honor elect to do

10   that when there's a federal district court judge -- and by

11   the way this Metzger case that they cite, that we disagree

12   about, we both spilled a lot of ink on that, that's fair to

13   say.

14         THE COURT:  Yeah, I read the complaint.

15         MR. STONE:  This is Eleventh Circuit case law,

16   we've got a district court in the Eleventh Circuit.  We

17   think Metzger stands for exactly what we're saying.  Two of

18   the individuals in that case had no direct relationship, and

19   were only control persons.

20         THE COURT:  Yeah, but I recall going through

21   allegations, Feingold participated in the creation of a

22   couple of documents that were sent to investors I guess.

23         MR. STONE:  It's clear from the decision, Your

24   Honor, that two of the defendants, and I can indicate who

25   they were, had no --

Page 36

1                 THE COURT:  Basso (ph) and Feingold.

2                 MR. STONE:  Feingold and Basso were only control

3      persons, Your Honor.

4                 THE COURT:  I understand, and there were -- but

5      there were allegations in the complaint, again I looked at

6      it with Feingold, not with Basso, that he actually created

7      certain specific documents that were sent to I guess the

8      plaintiffs.

9                 MR. STONE:  In any event, that was not the case

10     with respect to the Basso defendant, who was solely a

11     control person, where the Eleventh Circuit held that claim

12     applies to.  And that clearly is our case.

13                But my point is, Your Honor, there's a lot of law

14     on this, and it's in the Eleventh Circuit where we're

15     litigating.  Why not let that district court handle it?

16                I want to make an initial point, Your Honor, which

17     we've made I think extensively in our brief.  We don't

18     believe that what we have done violates the stay or could

19     violate the stay or the permanent injunction.  We haven't

20     sued anyone.

21                THE COURT:  I agree, you can ask, I mean, you

22     can't be violating something, if you're simply asking if

23     you're violating it.

24                MR. STONE:  Correct.  So the relief that they

25     seek, an order finding that we violated the stay in Georgia

Page 37

1    can't be granted.  We haven't violated the stay.  And the

2    case law is clear that we can go to a district court without

3    fear of violating the stay, without fear of sanctions

4    against counsel or client, and ask them for this relief, and

5    that's exactly what we've done.

6              So the relief they're asking for is inappropriate

7    and inconsistent with the case law that we cited, In Re the

8    Conference of African Union Church, 184 --

9              THE COURT:  Yeah, wasn't that procedurally what

10   happened though the first time you proceeded in the Southern

11   District of New York, didn't you ask for a declaration that

12   what you were doing was not violating the injunction?

13             MR. STONE:  We first proceeded in front of Judge

14   Lifland.

15             THE COURT:  Okay.  But that was what you asked,

16   right?  And he concluded --

17             MR. STONE:  Initially.

18             THE COURT:  -- that you were.

19             MR. STONE:  Correct.

20             THE COURT:  And he concluded you had violated the

21   stay by doing that, or just violated the injunction?

22             MR. STONE:  I believe he concluded we violated the

23   stay as well.

24             THE COURT:  Okay.  And Judge Sullivan affirmed

25   that.

1              MR. STONE:  Affirmed on --

2              THE COURT:  So obviously there was a live

3      controversy just by your seeking declaratory relief.

4              MR. STONE:  There was no live controversy.  We're

5      seeking new relief in a new case.  That case was gone.

6              THE COURT:  But my -- what I'm getting from your

7      argument is you can't be violating the stay or the

8      injunction by simply asking whether or not you're violating

9      the stay or the --

10             MR. STONE:  Correct.

11             THE COURT:  -- injunction.  And that sounds to me

12     exactly what you did before Judge Lifland.

13             MR. STONE:  Right.  That is what we did.

14             THE COURT:  And he --

15             MR. STONE:  And that didn't violate the stay by

16     asking him for that relief --

17             THE COURT:  Okay.  Now, let's forget about the --

18             MR. STONE:  -- we agree, and it doesn't now

19     either.

20             THE COURT:  -- stay.  I mean, the basic question

21     is, whether the action you proposed violates the injunction

22     and it seemed like that request was sufficient to trigger

23     the bankruptcy court's and the district court's jurisdiction

24     to determine that what you're doing violates the injunction.

25             MR. STONE:  And had we commenced this action the

Page 39

1    same way by coming in front of Your Honor first, I agree

2    with that.  But we elected to go to another court that has

3    jurisdiction and we're entitled to do that.  And once we had

4    done that, and jurisdiction vests there, that is not a

5    violation of the stay.

6              THE COURT:  I agree with you that the district

7    court has jurisdiction to determine whether the automatic

8    stay is violated.  It doesn't necessarily follow that you're

9    filing an action in another court that has that jurisdiction

10   doesn't violate the stay.

11             MR. STONE:  I don't -- Your Honor, with all due

12   respect, we're not asking for relief against the estate.

13   We're not asking for relief against the Picowers.  We're

14   asking for an order from a district court that we have a

15   draft complaint, and we're asking that court to determine

16   that if we were to file that draft complaint, if, would we

17   violate the stay.  I don't understand, and the trustee's

18   made no argument that that is --

19             THE COURT:  It sounds like an advisory opinion.

20             MR. STONE:  I mean --

21             THE COURT:  Why don't you just file a complaint?

22             MR. STONE:  Because we didn't want to violate the

23   stay or be sanctioned for that, Your Honor.

24             THE COURT:  All right.

25             MR. STONE:  That's why.  But the courts adhere to

Page 40

```
1    this process.  I mean, I've cited three or four cases where

2    this is exactly what's being done, and the courts have said

3    that that doesn't violate the stay.

4              THE COURT:  Uh-huh.

5              MR. STONE:  Just like it didn't violate the stay

6    when we came in front of Judge Lifland, which is correct.

7              THE COURT:  Yeah, he determined that what you

8    proposed violated the injunction and that was affirmed.

9              MR. STONE:  Right.  And Judge Marra may decide the

10   same, we don't think so, but he has the right to do that.

11   And if he does decide that it violates the stay, there will

12   be no case filed, and there will be no violation of the

13   stay.

14             THE COURT:  Has anybody requested a conference

15   before Judge Marra to determine whether he intends to

16   proceed or defer?

17             MR. STONE:  If I could --

18             THE COURT:  Because I have the matter in the Fox

19   -- the fax (ph) case anyway, so I'm going to decide it.

20             MR. STONE:  If I could address that, Your Honor.

21   We -- what's happened in that action is, initially the

22   Picowers, not the trustee, responded in Florida voluntarily

23   seeking to dismiss that action for improper service, and to

24   stay.  The improper service issue is over.  They've agreed

25   in their brief that we have properly served them.
```

Page 41

1           So we have a call into Judge Marra's chambers to

2     the clerk that's working this, asking him to schedule a date

3     for their answer.  Because at this point, they have nothing

4     pending except the stay, and that doesn't preclude or extend

5     their time for answering it.

6           THE COURT:  But it's a motion for a stay, I mean,

7     the similar thing occurred with Fox.  There's a motion for a

8     stay, either pending some determination of this court or

9     pending some -- at that point, some contemplated filing in

10    this court.

11          So there is some -- there is a live motion before

12    Judge Marra which raises this issue, right?

13          MR. STONE:  Correct, yes.

14          THE COURT:  And has that motion been fully

15    briefed?

16          MR. STONE:  We have filed a summary judgment

17    motion with respect to our claim that it doesn't violate the

18    automatic stay.

19          THE COURT:  So why don't you ask for a conference

20    on the stay motion before Judge Marra and say, look, this

21    issue is before the court here, you know, if he's going to

22    decide it, he's going to decide it.  But something good to

23    know.

24          MR. STONE:  We agree with that, Your Honor, and we

25    did call chambers on Friday and asked for that scheduling,

Page 42

1    and the clerk was away until this Thursday, and we will

2    immediately do that on -- by getting back to Florida.

3              So, Your Honor, my first two points, just to

4    summarize are that one, the Court lacks jurisdiction because

5    this is pending in the federal district court.  And that

6    there is no violation of the stay, or the permanent

7    injunction that can be found.  What we have done can't

8    violate the stay there for the relief they seek can't be

9    ordered by this Court.

10             THE COURT:  I disagree with you that I lack

11   jurisdiction, putting aside the mandate issue.  It may be

12   appropriate for me not to exercise it, just as the Second

13   Circuit determined in Baldwin United that it was

14   inappropriate for the district court to exercise its

15   jurisdiction to determine whether or not the stay was

16   violated.  But I don't think it's a jurisdictional issue.

17             MR. STONE:  But doesn't that run the risk of two

18   courts reaching a decision at approximately the same time

19   that are inconsistent.

20             THE COURT:  That's why the Second Circuit said the

21   bankruptcy court should decide it first.

22             MR. STONE:  Well, that isn't what's occurred here.

23   The case was first filed in --

24             THE COURT:  I understand.

25             MR. STONE:  And that was a matter of discretion

1    and the posture of that case.

2              THE COURT:  Okay.  I understand your argument.

3              MR. STONE:  Okay.

4              THE COURT:  I'm just disagreeing that it's an

5    issue of jurisdiction.  It's an issue more of deference or

6    whatever.

7              MR. STONE:  Thank you, I understand.

8              Apart from lacking -- apart from my first two

9    issues, I won't repeat them, I respectfully disagree.  We

10   think that Florida is the right place --

11             THE COURT:  People disagree with me all the time.

12             MR. STONE:  Okay.  We think --

13             THE COURT:  Starting before I leave the house, but

14   go ahead.

15             MR. STONE:  There's nothing unusual about this

16   case proceeding in Florida on this part of the case.  The

17   case was always intended to be in Florida.  It was always

18   venued in Florida.  The case that we sought to proceed with

19   in front of Judge Lifland was venued in Florida.  The

20   attorneys are located in Florida, and it's clear that the

21   Florida court has jurisdiction.

22             Second, as the case is going to be litigated in

23   Florida if it proceeds, it's going to be litigated under

24   Eleventh Circuit federal securities law.  Okay.  Why not let

25   the judge who's familiar with that -- there's exclusive

Page 44

1    federal jurisdiction, bankruptcy courts do not have

2    jurisdiction to securities matters.  Okay.

3              Even under 157 when there's a securities matter in

4    front of your court --

5              THE COURT:  But I know I had a case a long, long

6    time ago where somebody brought a class action, federal

7    securities class action, and I certainly had jurisdiction to

8    determine whether or not the claims were derivative or

9    direct.

10             MR. STONE:  We --

11             THE COURT:  And to apply the automatic stay --

12             MR. STONE:  We absolutely agree --

13             THE COURT:  -- and I think they were derivatives

14   so.

15             MR. STONE:  -- with that, Your Honor.

16             But in a case where we have a complex issue that's

17   been up to a federal district court once, where there's a

18   disagreement over whether Eleventh Circuit law applies, it

19   seems appropriate that a district court judge in that

20   circuit would apply that law.

21             THE COURT:  But on the same vein, we have two

22   district court decisions, and a Second Circuit decision

23   which tell us what is a derivative claim and what is a

24   direct claim in this very case.  Doesn't it make sense for

25   this to be litigated here?

```
 1              MR. STONE:  I don't think so, Your Honor, because
 2     Eleventh Circuit law is going to apply that if --
 3              THE COURT:  If it's a securities law claim.
 4              MR. STONE:  Right.
 5              THE COURT:  But I first have to determine whether
 6     it's a derivative claim or not, and isn't that governed by
 7     the Second Circuit's decision on Fox, and Judge Codel and
 8     Judge Sullivan's decisions and Judge Lifland's decisions?
 9              MR. STONE:  I think it is governed by -- Judge
10     Codel's decision doesn't deal with 20(a), Judge Sullivan's
11     decision deals with 20(a).
12              THE COURT:  Yeah, but they talk about what a --
13     okay.  They do talk about what is a derivative claim --
14              MR. STONE:  Correct.
15              THE COURT:  -- and what is a direct claim in this
16     very context.
17              MR. STONE:  Right, that's correct.  I agree with
18     that, Your Honor.
19              Okay.  I also want to make the point that here,
20     the Picowers themselves appeared in federal district court
21     in Florida.
22              THE COURT:  What are they supposed to do, you sued
23     them?
24              MR. STONE:  No, they could've come here and asked
25     for a TRO.  That's what happened last time.
```

1           THE COURT:  But that's essentially what the

2     trustee did because he's contractually obligated.

3           MR. STONE:  But the trustee isn't the party in

4     interest, the Picowers are.  This isn't an estate matter

5     anymore, we're suing the Picowers, who got a general release

6     from the estate.

7           THE COURT:  Well, it is an estate matter if you're

8     seeking to usurp a claim that belongs to the estate and the

9     estate settled.

10          MR. STONE:  Agreed, Your Honor.  But if it's not,

11    and we are to proceed, then it's not --

12          THE COURT:  Well, but that's --

13          MR. STONE:  -- and it will be litigated in --

14          THE COURT:  -- what has to be decided whether or

15    not --

16          MR. STONE:  I agree, okay.

17          THE COURT:  -- you -- I agree with you that if

18    you're not usurping an estate claim, then it will be

19    litigated in Florida.

20          MR. STONE:  Okay.  What I want to do now, Your

21    Honor, is walk through the complaint because if there's

22    substance on the issue, and address the points that were

23    raised by Judge Sullivan.

24          And again, this is a 20(a) case, not a 10(b) case.

25    So what Judge Sullivan said was, how he -- why he criticized

Page 47

1    our prior complaint was that he said, control consisted

2    solely of the Picower defendants, directing fictitious

3    trades in and withdrawing proceeds from their accounts.

4            So doing the trades and withdrawing proceeds.

5    That's what he said we alleged only.  Stated it differently,

6    all the book entries and fraudulent trading records refer to

7    nothing more than fictitious records BLMIS made for the

8    Picower defendants themselves.

9            Okay.  So let's look at the allegations and see if

10   we've gone beyond that.  What he's said we should have done

11   and could have done, or maybe could have done, was make an

12   allegation that the Picower defendants directed the creation

13   or dissemination of false statements to other BLMIS

14   customers.  That would've been sufficient in his mind.

15           As to fraud to other customers, the complaints are

16   completely silent about the Picower defendant's involvement.

17   Okay.

18           So let's go through the complaint and see what

19   we've done vis a vis that.

20           First, paragraph 71.

21           THE COURT:  Wait, I'm looking at your complaint, I

22   have it.  71?

23           MR. STONE:  This is in the Golden complaint draft.

24           THE COURT:  Just give me a minute.  Okay.

25           MR. STONE:  Picower's ability to direct the

Page 48

```
 1    creation and dissemination of false and misleading trade

 2    documents which he knew would be incorporated in financial

 3    disclosures made by BLMIS, a highly regulated broker and

 4    investment advisor shows that Picower exercised, directed,

 5    and direct control over the day-to-day operations of BLMIS

 6    and specifically over trading activity that constituted a

 7    violation of the securities laws.

 8             THE COURT:  Sounds pretty conclusory to me.

 9             MR. STONE:  Your Honor, again, you're -- what's

10    the pleading standard that Your Honor would like to apply

11    here?  We have to give a plain and simple statement, okay,

12    we haven't had any chance to take discovery.  Yes, the case

13    has gone on for years, but we haven't gotten one bit of

14    discovery.

15             THE COURT:  But you don't get to discovery unless

16    you plead facts sufficient, in essence, to survive a motion

17    to dismiss.

18             MR. STONE:  Okay.

19             THE COURT:  I realize this isn't a motion to

20    dismiss.

21             MR. STONE:  Right.  I'm going to continue here.

22    The volume, pattern, and practice of Picower's control of

23    the defendant's documentation of underlying transactions,

24    including the direction of false reporting of customer

25    assets and returns in monthly statements to plaintiffs, as
```

Page 49

1    well as Picower's direct or indirect control over the

2    benefits of the Ponzi scheme establish control.

3            We are alleging that he had control over the

4    reporting of customer assets in their monthly statements.

5            THE COURT:  Well, no, I understand that's what

6    you're alleging.  But the argument that's being made is

7    those are conclusory allegations, and I should ignore them,

8    and for the purposes of determining whether it's a

9    derivative claim or a direct claim.

10           MR. STONE:  Under what theory would the Court

11   ignore them?

12           THE COURT:  Well, they're conclusory allegations.

13           MR. STONE:  But what the pleading standard --

14   that's not the pleading standard that we think should apply.

15   We think rule -- Federal Rule of Civil -- what Your Honor is

16   doing I think is actually applying Federal Rule of Civil

17   Procedure to this complaint.

18           THE COURT:  Well but that's --

19           MR. STONE:  You're reviewing it as if it were a

20   motion to dismiss.

21           THE COURT:  That's the issue I raised with counsel

22   for Mr. --

23           MR. STONE:  And I don't think that's appropriate.

24   I don't -- again, I don't think the Court has the ability to

25   determine that, that's a motion to dismiss that should be

1    directed to the district court.

2         If I could continue.  Paragraph 90, Picower

3    actively communicated and agreed with Madoff and other BLMIS

4    personnel to perpetuate the fraud.  Picower had a close

5    relationship with Madoff and BLMIS, and directly, indirectly

6    ensured that Madoff and BLMIS concealed the fraud from other

7    customers.

8         Picower directly or indirectly induced BLMIS'

9    misleading statements to others.  These misrepresentations

10   induced BLMIS customers to pay BLMIS for non-existent

11   securities.  That's a classic statement of control personal

12   liability.  I controlled an entity that made misstatements

13   that I directed them to make.

14        Paragraph 91.  Picower intimate knowledge and

15   involvement in the operations, records, recordkeeping and

16   financial management of BLMIS.  That's pretty specific, Your

17   Honor.

18        Picower directly or indirectly induced the

19   material misrepresentations and omissions giving rise to the

20   securities violations alleged herein.  Those would be BLMIS'

21   misrepresentations to the underlying customers.

22        THE COURT:  You know I understand, Mr. Stone, what

23   you're arguing.  My question is not whether you're asserting

24   what purports to be direct claims.  My question is in

25   reviewing the complaint, what standard am I supposed to

1    apply.  And am I really bound by whether or not you've pled

2    a sufficient controlled person claim, or am I simply looking

3    at the complaint as Judge Sullivan did, without regard to

4    Rule 8(a), and looking at the well-pleaded facts, I guess,

5    and I know it sounds like a motion to dismiss when I use a

6    phrase like that, and deciding whether you're just trying to

7    circumvent the trustee's derivative claim.

8              MR. STONE:  But, Your Honor, we're not

9    circumventing it.  What Judge Sullivan was concerned about

10   was that the allegations simply related to documents

11   concerning Mr. Picower's fraudulent accounts, that there was

12   no connection between that and BLMIS' misrepresentations to

13   the customers.  Not that we made direct misrepresentations,

14   but we didn't connect how those false book entries amounted

15   to misrepresentations to customers and we have.

16             What we've said is, they are incorporated in the

17   monthly statements made to customers.  Picower had the

18   incentive to hide the fort or he would've gotten too, and

19   gone to jail just like Mr. Madoff.

20             And the way that he did that was by directing them

21   to make false misrepresentations in the monthly statements

22   of the assets that were in their account.  That's a massive

23   amount of control.

24             THE COURT:  So you're saying, your complaint

25   alleges that Picower directed Madoff to make false

Page 52

1    statements in the other customers' accounts?

2            MR. STONE:  Correct.

3            THE COURT:  Where do you allege that?

4            MR. STONE:  I read it to you, Your Honor.

5            THE COURT:  That's not what I heard.

6            MR. STONE:  Okay.  As a result of --

7            THE COURT:  I heard generalized language that he

8    directly or indirectly caused BLMIS.

9            MR. STONE:  Paragraph 67, as a result of Picower's

10   control, he caused BLMIS to present plaintiffs with false

11   and misleading information; i.e., inflated account values,

12   in order to induce those investors to remain invested in

13   BLMIS, and to continue to attract new investments in BLMIS.

14   If plaintiffs had been provided with accurate information,

15   they would've attempted to protect the value, and the Ponzi

16   scheme would have collapsed.

17           THE COURT:  Does your complaint allege or proposed

18   complaint allege what he did in order to cause BLMIS to

19   issue these false statements?

20           MR. STONE:  What it says is that he controlled the

21   process.

22           THE COURT:  I understand the word control, but

23   does it say what he did to control the process?

24           MR. STONE:  Yes.  He had phony account records

25   created that masked his theft of money.

1          THE COURT:  That sounds like what the Second

2     Circuit and Judge Sullivan were warning about in the last

3     complaint, that was based on the manipulation of his records

4     so that he could withdraw money from BLMIS.

5          MR. STONE:  But it is not.  It is based on the

6     manipulation of the records to the customers.  And, Your

7     Honor, there's a slippery slope here.  You agree I think,

8     Your Honor, that the same facts can lead to an estate claim

9     and a securities claim.  That's quite common.  Okay.

10         I think that's what Your Honor is saying.  Yes,

11    the fact that he stole money and had phony trades parked in

12    his account and had the records gerrymandered to reflect

13    that, okay.  Did lead to the fact that there was a necessity

14    to do that in customer accounts also to protect the fraud.

15    So what?  So what?  Every fraud has to be covered up, and

16    it's the cover-up that may lead to misrepresentations to

17    other parties.  That's the nature of securities fraud.

18         I commit a theft at a company and I lie about it.

19    That's the securities fraud.  So the two acts lead to two

20    things.  One, conversion or fraudulent conveyance; and two,

21    misrepresentations.  And that's what we're alleging here.  I

22    don't think it could be more direct.

23         He caused BLMIS to present plaintiffs with false

24    and misleading information; i.e., inflated account values.

25    I don't think we have to allege that he physically wrote

Page 54

1    them, or the exact process by which we do.  We know that he

2    had an assistant who made phone calls to the BLMIS trading

3    desk, and had them rearrange trading records at will.

4              THE COURT:  Go ahead.

5              MR. STONE:  A broker dealer consists of two

6    things, securities and cash.  There's a master ledger of all

7    the securities' positions, and there's a master ledger of

8    the cash.  The amount of securities' positions in customer

9    accounts has to add up to what you actually own at the

10   broker dealer.

11             A misrepresentation in account A that you own X

12   has to result in a misrepresentation of account B, telling

13   them that they own X when they don't own X.  It's a

14   necessity.  So by directing --

15             THE COURT:  Isn't that a secondary effect of his

16   withdrawing this money from the estate?

17             MR. STONE:  It's not a secondary effect.  It's an

18   effect that we allege he knew about and directed.  It's not

19   a natural effect, they could've told the truth.

20             THE COURT:  I guess we wouldn't be here today.

21             MR. STONE:  Correct.

22             THE COURT:  Okay.

23             MR. STONE:  They could have made a different

24   misrepresentation.  They could've gotten a loan from a third

25   party to make up for the losses and lied to that guy.  There

1    are lots of ways to hide a fraud.  They chose to hide the

2    fraud by lying to prospective investors and current

3    investors, and that's what Picower directed.

4              And there's no question he had the ability to

5    manipulate the records of the company.  I don't think we

6    can, and I litigated many control person case, but I've

7    never had one where we were so micro on the issue.  Control

8    is a general theory, do you have the ability to control

9    what's going on at the company.

10             Yes, he had the ability to control the cash flow

11   in and out at will.  He had the ability to control the books

12   and records.  He had the ability to hide his fraud by

13   directing Picower, by directing Madoff and the Madoff

14   employees to lie to customers about what was in their

15   accounts, to protect the fraud.  That's massive control.

16             More than I -- in all honesty, Your Honor, more

17   than I've ever seen in a control person case.  Again, a

18   typical control person case is where an accountant

19   participates in a single misrepresentation that's made by a

20   third party in his role in participating in that is

21   sufficient to impose control personal liability, Your Honor.

22             Picower was using Madoff to steal money at the

23   expense of the underlying customers.  There's no doubt about

24   it.  That was his scheme.

25             Can I tell you --

1           THE COURT:  Does that mean that anybody who got a

2    distribution in this case with knowledge of the Ponzi scheme

3    is a control person, because they would have to know that

4    Madoff would have to steal the money from somebody else?

5           MR. STONE:  No.  Because those people didn't

6    necessarily have the ability, I don't know.

7           THE COURT:  So the knowledge --

8           MR. STONE:  And to my knowledge, they didn't have

9    the ability to control the trading records.

10          THE COURT:  So the mere knowledge that you're

11   creating a situation where you know that somebody has to

12   steal money in order to pay you, steal money from others,

13   doesn't create control personal liability?

14          MR. STONE:  Not unless, I believe, Your Honor,

15   you're controlling the firm.  In this case, we have control

16   through the control of the records.

17          Again, this isn't a manufacturing company, we're

18   making a simple misrepresentation about what we produced or

19   our venue.  This is a broker dealer that has stock and

20   money.  He's lying about the money and he's lying about the

21   stock, and he's directing them to transmit those lies in

22   thousands of monthly statements to underlying customers.

23   That's our theory of the case.

24          How did that happen?  It happened through

25   communications.  Through e-mails, through phone calls, we

1    have some of those phone calls and some of those e-mails.

2    We don't have all of them, because we haven't gotten

3    discovery.

4              THE COURT:  All I'm looking at is the complaint at

5    this point.

6              MR. STONE:  I understand that.

7              THE COURT:  All right.

8              MR. STONE:  Okay.  So if I could just -- I think

9    I've read enough of the allegations from the complaint, Your

10   Honor.  I just wanted to read one more, which is paragraph

11   77 which I think is sort of the summary paragraph.

12             The volume pattern and practice of Picower's

13   control over fraudulent documentation of underlying of

14   transactions at BLMIS, including the direction of false

15   reporting of customer assets and returns in monthly

16   statements to plaintiffs, as well as his direct and control

17   over the benefits of the Ponzi scheme establish control.

18             So we have made the connection, and I believe

19   sufficient to survive a Federal Rules of Civil Procedure 8

20   motion, that he directed the misrepresentations that were

21   made to customers to hide his theft.

22             And we don't think that this Court should go

23   anywhere beyond that, doing any other analysis.  There's

24   been no briefing of the pleading standard as if this was a

25   motion to dismiss or case law on control person liability.

Page 58

 1   I think that's way beyond the scope of where we are here

 2   today, and should be handled by the district court.

 3            Again, Your Honor, we're not alleging a 10(b)

 4   case.  We're alleging a control person case.  That's my

 5   argument.  Do you have any other questions?

 6            THE COURT:  No, thank you very much.

 7            MR. STONE:  Thank you.

 8            MR. SMITH:  Good morning, Your Honor.

 9            THE COURT:  Good morning.

10            MR. SMITH:  Peter Smith for the Fox plaintiffs.

11   I'm going to try not to cover old ground, and surely not to

12   undo anything, any good work that Mr. Stone has done.  I

13   incorporate by reference the mandate arguments I made last

14   week.

15            THE COURT:  Thank you.

16            MR. SMITH:  But having said that, I just would

17   like to speak about the mandate briefly, which is only

18   lawyers could make such a mess of this.

19            You know --

20            THE COURT:  You're a lawyer, right?

21            MR. SMITH:  Yeah, but I didn't create this mess.

22   The Fox plaintiffs didn't have a 20(a) claim, so whatever

23   the Second Circuit said, it didn't apply to the claim that

24   they've brought now.

25            THE COURT:  But I'm supposed to disregard labels

Page 59

1     anyway, right?

2              MR. SMITH:  You sure should.

3              THE COURT:  Okay.

4              MR. SMITH:  They filed their complaint where they

5     were told to.  And why shouldn't we assume that the Second

6     Circuit included that language in the most important part of

7     its decision to avoid this very mess.

8              THE COURT:  Let me cut through this.  We've been

9     through this last week.

10             MR. SMITH:  Yeah.

11             THE COURT:  You went to the Florida court in the

12    first instance, which was the phrase from the Second

13    Circuit.

14             MR. SMITH:  Correct.

15             THE COURT:  And Judge Weiscamp essentially said he

16    was going to defer to this court.  So we're beyond that.  So

17    let's move on.

18             MR. SMITH:  And now it's your decision.

19             THE COURT:  Right.

20             MR. SMITH:  And our argument is, as you said, it's

21    not a matter of jurisdiction, it's discretion, and you

22    should do what the Second Circuit mandated and let them

23    actually decide it, not simply --

24             THE COURT:  He has decided it.  You made the

25    argument and he deferred.

1          MR. SMITH:  Okay.  I don't believe he's decided

2     anything.  He's --

3          THE COURT:  Well, all right, so we differ on that.

4     But we heard -- you know, we went through this last week.

5          MR. SMITH:  The trustee began by saying, that this

6     is not a 12(b)(6) motion, and we all agree it isn't.  But I

7     feel like we're dealing with a summary judgment motion at

8     times, because he's saying well, there's not enough facts,

9     and it's not enough that the allegation is based on

10    something Madoff said.  Well, that's neither -- that's not

11    where we're here to decide.  It wouldn't be relevant to --

12    even a 12(b)(6), maybe a trial, maybe a summary judgment, we

13    can't help the fact that the primary witnesses to what we've

14    alleged happened are Madoff and Mr. Picower who was found

15    dead shortly after Madoff confessed.

16         The last I checked, even convicted felons are

17    allowed to testify under oath.  Whether he's credible or not

18    is not to be decided today.  He -- the allegations in this

19    complaint are based on things he said.  We don't say

20    anywhere in our complaint that they're based on a book.

21         So I don't know where that comes from.  This is

22    litigation by guesswork I suppose.  It says according to

23    Madoff.  And the allegations cannot be discounted simply

24    because he's the source.

25         The trustee says he compared all the allegations

Page 61

1    from the prior complaints to his original complaint to the

2    ones that are before the Florida court on the motion to

3    amend, and wherever the Goldman one ends up being.

4          Notably, among that -- in that chart, ten pages,

5    at the back of his brief, he doesn't focus on the ones that

6    matter.  And when he filed his motion, he didn't focus on

7    the ones that matter.  And when we called him out on it, in

8    our opposition, he still hasn't directly addressed them.

9          And they're the allegations in paragraphs 46, 49,

10   and 115 of the Fox's complaint.  46 says that Picower

11   actively engaged in soliciting or encouraging I think is the

12   word customers to invest with Madoff.

13         Notwithstanding that allegation, clear a day in

14   the complaint, the trustee said in his papers, in his reply,

15   and again here today that we haven't alleged anything that

16   has to do with something other than Picower's account.  How

17   can you say that?  How can you stand here and say that?

18   It's so obvious he knows it's there, and he's been choosing

19   to ignore it.  It can't be ignored.  It's in there.  They

20   have to deal with it.

21         It also shows that there were misrepresentations.

22   You can't actively encourage someone to invest in Madoff

23   when you're Picower.  Because Picower knew what was going

24   on.  We know that.  The trustee's alleged that Picower knew

25   what was going on.

Page 62

1              So if I know what's going on, which is Madoff's

2     going to take your money and give it to me, or give it to

3     someone else, I'm encouraging you to invest in it, you're

4     lying to them.  That's a misrepresentation.  You can't have

5     it any other way.

6              THE COURT:  What's the misrepresentation?

7              MR. SMITH:  Presumably that this is a good idea.

8     You can't encourage someone --

9              THE COURT:  There's no allegation that he told

10    anybody that.

11             MR. SMITH:  If the allegation --

12             THE COURT:  If you're saying they inferred that,

13    assuming they knew, if they inferred it from the fact that

14    he was withdrawing a lot of funds.  How do they know what

15    Picower was doing?

16             MR. SMITH:  I mean, who know what Picower was

17    doing?

18             THE COURT:  The investors.

19             MR. SMITH:  I don't know that they did.  The

20    allegation is that he encouraged them.  You can't --

21    encourage means go ahead, give him your money.  He knew what

22    Madoff was going to do with the money, he was going to steal

23    it.  So that's a misrepresentation.  You can't -- he didn't

24    tell them the truth, that's for sure.  We talked about that

25    a second ago.

1           It also -- the point also allegation in paragraph

2    49 that he told Madoff to encourage more people to get -- to

3    expand his base, so there'd be more people to put money into

4    the BLMIS.  That has nothing to do with Picower's account.

5    Right?  And that's what the Second Circuit --

6           THE COURT:  Why would he tell Madoff --

7           MR. SMITH:  To find more --

8           THE COURT:  -- to get more customers unless it was

9    to make his withdrawals?

10           MR. SMITH:  Well, whether that was the reason does

11   not --

12           THE COURT:  Why else would it --

13           MR. SMITH:  Well, everything has to do with --

14           THE COURT:  Well, it's got to be plausible, isn't

15   it?

16           MR. SMITH:  It is plausible.

17           THE COURT:  I mean, that's a 12(b)(6) standard,

18   but it's got to be plausible.

19           MR. SMITH:  It is a 12(b)(6), and really all we

20   had to do to satisfy the Second Circuit was, make

21   allegations that are not duplicative or derivative of the

22   trustee's claims.

23           The trustee has no claims like that.  The trustee

24   can't recover any damages for things like that.

25           As to the control person allegations, I adopt the

Page 64

```
 1   arguments of Mr. Stone, and I would point to paragraph 115

 2   of our second amended complaint, which is very similar to

 3   the allegations that Mr. Stone highlighted in their

 4   complaint, which is that Madoff -- I'm sorry, that Picower

 5   not just had the ability to control, but did control aspects

 6   of Madoff's operations from account statements to

 7   everything.

 8           This is not -- I know you don't want to go there,

 9   but if you're going to look at this and notwithstanding the

10   mandate, then there's nothing for the Court to decide about

11   the legal sufficiency of these claims.  It's much more

12   narrower than that.

13           The corridor for the Court on this application is

14   simply to look at the complaint, and see whether these

15   allegations duplicate something that the trustee has already

16   brought.  And they're clearly different.

17           They are not the same thing we pled before.  Mr.

18   Murphy said, oh, they've had several chances to do this.

19   No, this is the Fox plaintiffs' second chance, not several.

20   They filed a complaint, it went all the way up to the Second

21   Circuit.  The Second Circuit said --

22           THE COURT:  Well, I don't have before me a motion

23   to leave to replead, so.

24           MR. SMITH:  I'm sorry?

25           THE COURT:  I don't have before me a motion to
```

Page 65

 1    leave to replead so --

 2              MR. SMITH:  Right.

 3              THE COURT:  -- it doesn't really matter how many

 4    times you've pled this.

 5              MR. SMITH:  Correct, okay.

 6              The motion would be premature in any event, an

 7    application for leave to --

 8              THE COURT:  When would it be timely?

 9              MR. SMITH:  I suppose if the --

10              THE COURT:  After the district court ruled in

11    Florida?

12              MR. SMITH:  Yeah, I suppose it would be then.

13              THE COURT:  Then it's timely?

14              MR. SMITH:  Well, I --

15              THE COURT:  After the district court has decided

16    this issue?

17              MR. SMITH:  I'm sorry?

18              THE COURT:  After the district court has decided

19    the issue?

20              MR. SMITH:  That's right.

21              THE COURT:  How could I -- how could they then

22    bring a motion here if the district court in Florida decided

23    the same issue?

24              MR. SMITH:  Well, they could certainly intervene

25    down there, and put in --

Page 66

1          THE COURT:  But after they've decided --

2          MR. SMITH:  No, they could put in their two cents

3    just as the Picowers came up here the other day and filed a

4    motion to --

5          THE COURT:  I agree with you they could intervene.

6          MR. SMITH:  Right.

7          THE COURT:  But why couldn't they also make a

8    motion here to file an adversary proceeding?

9          MR. SMITH:  We're back to the mandate.

10         THE COURT:  Okay.

11         MR. SMITH:  It's -- I also feel like we've lost

12   sight on whose burden this is.  You know, the Second Circuit

13   didn't say that we have a burden to go out and do thus and

14   such.  We filed a complaint, there it is.  It's the

15   trustee's burden to show how it is duplicative.

16         And so far all he has said, talk about conclusory

17   obligations, ah, it's the same old stuff all over again.  He

18   doesn't address in his oral argument or in his reply, the

19   very allegations that we say make it different.

20         We put those in there in direct response to what

21   the Second Circuit told us to do.  He hasn't met his burden.

22         I would add further that we don't just have a 28

23   claim.  We have RICO claims, we have other common law

24   claims.

25         THE COURT:  But they're all based on the same

Page 67

1   facts, aren't they?

2              MR. SMITH:  Well, he hasn't addressed them at all.

3   He has not said --

4              THE COURT:  Well, are they based on the same

5   facts?

6              MR. SMITH:  Absolutely not.  They're based on the

7   facts in 46, among other things, on the allegations --

8              THE COURT:  I'm saying, aren't your RICO claims

9   and your prima facie court claim based on the same facts as

10  your, essentially your control person claim?

11             MR. SMITH:  The -- not all of them.  I mean, you

12  don't have to show that he --

13             THE COURT:  I'm talking about the elements.

14             MR. SMITH:  Yeah, I know, but --

15             THE COURT:  Aren't they based on the same factual

16  matter?

17             MR. SMITH:  Sure.  The facts are the facts.

18             THE COURT:  That Picower induced --

19             MR. SMITH:  Right.

20             THE COURT:  -- Madoff to go out and get more

21  customers and also participated in the preparation of false

22  statements.

23             MR. SMITH:  I see what you mean, yes.  But whether

24  he --

25             THE COURT:  So if those claims are derivative,

Page 68

1    then all the other claims have to be derivative.

2              MR. SMITH:  Right.  But remember most of the time

3    that was spent so far, before I got up here, was talking

4    about whether Your Honor should be deciding whether the

5    control was sufficiently pled or not, right?

6              THE COURT:  Right.

7              MR. SMITH:  That has nothing to do whether -- with

8    whether we've alleged an aiding and abetting a fiduciary

9    duty claim.  We don't have to allege any control for that.

10   And the trustee hasn't even spoken to it.

11             THE COURT:  But you have to at least have the

12   Second Circuit law, you would have to allege -- knowledge

13   which you've alleged, but actual substantial assistance.

14             MR. SMITH:  Correct.  But my point is just this,

15   even if you find for whatever standard you apply --

16             THE COURT:  And I doubt under the Second Circuit's

17   recent case in Refco that you would survive a motion to

18   dismiss that claim.

19             MR. SMITH:  And if this were a motion to dismiss,

20   that might matter, but it doesn't.  The point -- the reason

21   I raise it is, even if Your Honor, no matter what standard

22   you decide to apply on that control person claim, you could

23   find that's no good, I don't think it's good enough, Justice

24   Sullivan would've said it's no good.  Guess what, we still

25   have the aiding and abetting claims.

```
 1              THE COURT:  I guess what you're saying, and this

 2     is not a rhetorical question, you're saying, all I do is I

 3     look at your complaint, if the underlying claim is a direct

 4     -- what looks like a direct claim, a control person claim

 5     let's say, that that's the end of the inquiry and then it

 6     goes back to Florida to decide whether or not it adequately

 7     states a claim.

 8              MR. SMITH:  That's what the injunction says.  It

 9     doesn't say anything --

10              THE COURT:  Well --

11              MR. SMITH:  The injunction doesn't say that the

12     trustee will use his best efforts to prevent former BLMIS

13     customers from filing lousy insufficient claims against the

14     Picowers.  It doesn't say that.  It says he's only to use

15     his best efforts to stop people from filing claims that are

16     derivative or duplicative of the trustee's claims.

17              He seems to be coming in here and you can tell by

18     the -- I mean, why is he talking about the sufficiency of

19     the claims?  It's only because he realizes that these things

20     are not duplicative.  If they were duplicative or

21     derivative, he wouldn't bother telling you for pages and

22     pages in his brief that they're no good, that they don't

23     allege enough evidence, as if that's what matters on this

24     motion.  That wouldn't even matter on a 12(b)(6).

25              THE COURT:  Well, the Second Circuit used the
```

1    phrase particularized allegations.  So that suggests it's

2    got to be something more than conclusory, doesn't it?

3              MR. SMITH:  And I would suggest yes, but

4    conclusory in this context would be something like if a

5    plaintiff came up and said, you know, to avoid the

6    derivative and duplicative injunction said, Picower has

7    injured me in ways that are totally different from the

8    claims that the trustee sued him for.  That would be

9    conclusory.

10             This -- you know, I don't know how long our

11   complaint is, it goes through all these elements, that's not

12   conclusory.  That's the best we can do now.  I mean, how

13   often do you -- what more facts do we need?  Do we actually

14   -- someone has actually communicated with the primary

15   fraudster, the other one is dead.

16             We've got a motion, a cross-motion pending in

17   Florida for expedited discovery to take Madoff's deposition,

18   and to take the deposition of a representative of the

19   Picower's.  Until we get that, at least a ruling on that,

20   how can we be criticized for not providing more details?

21             I mean, it's not as if the evidence of this

22   conspiracy and this fraud is out there for everyone to

23   allege with more particularity than we have.  We've done the

24   best we can.  This can't be conclusory.

25             Again, Your Honor has a narrow role here, more

Page 71

1    narrow I submit than a 12(b)(6), and that is, just take a

2    look at this complaint, and is it derivative, is it

3    duplicative.  It's not.

4            It's different from the first one that we filed,

5    and therefore, your inquiry is done.

6            THE COURT:  Thank you.  Yes?

7            MS. HARRIS:  Your Honor, may I be heard?

8            THE COURT:  On -- who are you and on what?

9            MS. HARRIS:  I'm Marcy Harris, Schulte Roth &

10    Zabel, counsel to the Picower parties.

11            THE COURT:  Well, you're not a party to this

12    action.

13            MS. HARRIS:  We've moved for intervention.

14            THE COURT:  But that's a motion a week off.

15            MS. HARRIS:  We are -- our interest is directly at

16    issue here.

17            THE COURT:  That's certainly relevant to your

18    intervention motion.

19            MS. HARRIS:  We are litigating in the Florida

20    courts, and there were statements made about the status of

21    the --

22            THE COURT:  All right.  I'm happy to hear about

23    the status of the Florida proceeding, because you're

24    involved in that, but in terms of the merits of the

25    trustee's motion, the trustee is the one who will make that

Page 72

1    argument.

2                MS. HARRIS:  Okay.  I want to be clear that's what

3    been litigated in Florida is not this issue, whether the

4    trustee's claims or whether the claims in the new complaints

5    are derivative or duplicative.

6                THE COURT:  No, I understand that.

7                MS. HARRIS:  There has been a motion before Judge

8    Marra that's fully briefed that he hasn't decided yet, it

9    addresses --

10               THE COURT:  Is that for the stay?  That's for the

11   stay?

12               MS. HARRIS:  For the stay and service issues.

13   That's it.  We've never briefed the issue.  Picowers have

14   never briefed the issue addressed to the duplicative or

15   derivative nature of the claims.

16               THE COURT:  Is there a date for the -- the

17   response to your motion?

18               MS. HARRIS:  The agreement that we had reached

19   with counsel was that we wouldn't have to respond and put in

20   an answer or move to dismiss until this ruling, this Court

21   had determined --

22               THE COURT:  It sounds like a chicken and egg

23   problem.

24               MS. HARRIS:  Well, the first I heard sitting here

25   that there was a conference call to the Court last Friday to

Page 73

1    set up a schedule.

2              THE COURT:  I got it.

3              MS. HARRIS:  I don't know.  Right now, I can tell

4    you we're not aware of any briefing schedule with respect to

5    Judge Marra, and on the Fox side, Weiscamp that the

6    threshold issues have been stayed, there's been no briefing

7    again in that court on the duplicate or derivative issue.

8              THE COURT:  Okay.  Thank you.

9              MS. HARRIS:  Thank you.

10             MR. MURPHY:  Your Honor, I'm just going to limit

11   my comments to addressing some of the statements that were

12   made by my colleagues, Mr. Stone and Mr. Smith.

13             Absolutely, you can indeed, Your Honor, issue an

14   injunction when it's duplicative of estate claims.  The

15   Second Circuit confirmed it can.  We're also not looking to

16   enjoin courts here, we're looking to enjoin parties.

17             With respect to Metzger versus Feingold, Basso,

18   the other party here was an officer and director, and an

19   owner of one of the accounts where all the money went.  So

20   again, that's substantively different than what we have

21   here.

22             With respect to our timing, whether it's too

23   early, too late, kind of in a whipsaw position, I think the

24   Court recognized it.  We're not going to wait until a

25   Florida district court enters something that's affecting us

Page 74

1    here.  We don't want to be too late.

2           We are not a party to anything down in Florida,

3    and that's why we are here.  We are here where we belong

4    before Your Honor.

5           With respect to whether this court or that court

6    should do it, it is this Court's permanent injunction order.

7    This Court should decide it.  The charter communication

8    decision is instructive with respect to that.

9           As to where this is better put, they said that

10   some of the people are down in Florida.  The main locust of

11   activity here is in New York.  If they're proposing to

12   appear in a class action with respect to all the customers,

13   the only that unites all the customers is New York.  All the

14   fraud took place here.

15          THE COURT:  Well, then you should make -- somebody

16   should make a change of venue motion in Florida.  I'm not

17   sure that that -- those factors really weigh into what court

18   is supposed to decide the issue.

19          MR. MURPHY:  True, that's fair, Your Honor.

20          THE COURT:  Because I'm going to sit here, and

21   Judge Marra is going to sit down there, right?

22          MR. MURPHY:  That's true, unless you're going to

23   go on vacation, Your Honor.

24          THE COURT:  It's getting too hot in Florida.

25          MR. MURPHY:  With respect to -- I feel that, you

Page 75

1    know, Judge Sullivan kind of created a road map as to why

2    they went wrong.  But what I feel is that the class action

3    plaintiffs here simply added the word Picower defendants to

4    where they fell down before.

5              THE COURT:  Well, I think I asked you this before,

6    and it's not clear to me.  In either of the cases, the Fox

7    case, which went to the Second Circuit, or the Goldman case,

8    were there allegations in the complaints and those times

9    that Picower controlled BLMIS?

10             MR. MURPHY:  Yes, yes, there are, Your Honor.  And

11   let me just address that specifically because I know that --

12             THE COURT:  Okay.

13             MR. MURPHY:  -- specific paragraphs were

14   identified by Mr. Stone in the complaint.

15             THE COURT:  Well, he's looking at the new

16   complaint, I'm asking about the old complaint.  In other

17   words, I'm asking, has the Second Circuit or Judge Sullivan

18   directly or indirectly passed on these allegations?

19             MR. MURPHY:  Yes, yes.  The answer is yes, Your

20   Honor.

21             I'm not going to reread what Mr. Stone read with

22   respect to paragraph 71, paragraphs 90, paragraph 91, for

23   example, in their own amended complaint.

24             THE COURT:  Actually, I'm more interested in the

25   older complaints --

Page 76

```
 1              MR. MURPHY:  Right.

 2              THE COURT:  -- that have already been before the

 3    Court.

 4              MR. MURPHY:  Let me direct the Court to the older

 5    complaint them.

 6              THE COURT:  All right.

 7              MR. MURPHY:  What I'm suggesting, this is the

 8    complaint that was filed in 2011, Your Honor.

 9              THE COURT:  Is that in -- which exhibit is that

10    in?  Is it in one of the exhibits?

11              MR. MURPHY:  Yes, it is, and I don't know what the

12    exhibit number is, but we'll -- I'll get that for Your

13    Honor.

14              THE COURT:  This is the Goldman complaint you're

15    talking about?

16              MR. MURPHY:  Yes.

17              THE COURT:  Let me see if I can find it, because

18    it would be helpful if I could.

19              MR. MURPHY:  Sure.

20              THE COURT:  Do we have the complaints and these

21    pleadings from the own --

22              MR. MURPHY:  Exhibit K to the Murphy declaration,

23    Your Honor.

24              THE COURT:  Okay.

25              MR. MURPHY:  And you can turn to --
```

1            THE COURT:  We're just trying to find the papers.

2       (Pause)

3            THE COURT:  Maybe if you have another copy of it.

4            MR. MURPHY:  We're going to get that for Your

5   Honor.

6            THE COURT:  Yeah.  I can't find it, if you have

7   another one.

8            MR. MURPHY:  That's okay, we're going to get it

9   for Your Honor.

10       (Pause)

11            THE COURT:  I have a Goldman -- I'm looking for

12   the Goldman complaints.

13            MR. MURPHY:  This is the original Goldman

14   complaint.

15            THE COURT:  Oh, all right, because I think I may

16   have found it, but thank you.

17            MR. MURPHY:  I'm going to start with paragraph --

18   this is the entered 12/13/11, Your Honor.

19            I'm going to start with paragraph number 91, if

20   you want to turn to that.

21            THE COURT:  Go ahead.

22            MR. MURPHY:  So I'm not going to reread what Mr.

23   Stone said, but with respect to his specific references to

24   paragraph number 71, 90 and 91, as purportedly alleging new

25   control and direction.

Page 78

1        THE COURT:  Uh-huh.

2        MR. MURPHY:  I would direct the Court to paragraph

3   91 of the former Goldman complaint, I will read it.  "The

4   defendants had the power to influence and control, and did,

5   in fact, directly influence and control the decision-making

6   at BLMIS, the recordkeeping at BLMIS, and the recording of

7   securities transactions at BLMIS."

8        I will go down to paragraph 94, "The defendants

9   either directly or through Picower had direct involvement in

10  the day-to-day operations, recordkeeping, and financial

11  management of BLMIS.  The defendants had and employed the

12  power to control and influence actual transactions giving

13  rise to the securities violations alleged herein."

14        Your Honor, I'm going to quote from Judge Sullivan

15  where he says whether -- aside from that, Your Honor, this

16  is -- let me just go back for a second.  Those are the same

17  allegations that they had made previously, which were

18  rejected by Judge Sullivan and Judge Lifland.  And they are

19  the same, I would submit to you, when you go back and read

20  paragraph 71, 90 and 91 that Mr. Stone referred to, it's all

21  the same thing.  There's nothing more here than more

22  inferences and unsupported statements.

23        And he mentioned one other paragraph, paragraph

24  67, it began -- paragraph 67 of the new complaint starts out

25  "as a result of Picower's control."  But again, I think if I

1    can take you back, Your Honor, to the earlier kind of levels

2    that I discussed with you, we're starting out with Picower's

3    control of his own accounts, and his withdrawals of his own

4    accounts.

5            And then when you get to the bottom, then we start

6    talking more, far more inferentially.  But again, as a

7    result of Picower's control, this is an inference.

8            I'll read to the Court as to why the Court has the

9    power.

10           THE COURT:  But didn't the earlier complaint plead

11   that he controlled or had the ability to control the account

12   statements sent to other investors?

13           MR. MURPHY:  I think what they have, Your Honor,

14   in paragraph number 2 --

15           THE COURT:  This is the old complaint?

16           MR. MURPHY:  This is the old complaint.  "While

17   Madoff and a few employees operated the Ponzi scheme on a

18   day-to-day basis, they did so under the direction and

19   control of the defendants who participated in the fraud for

20   their own benefit by directing the false -- by directing the

21   creation of false books and records at BLMIS."

22           THE COURT:  In their own accounts though?

23           MR. MURPHY:  This is in --

24           THE COURT:  In the defendant's BLMIS accounts, but

25   the allegation now is that they also indirectly or directly

Page 80

1    controlled the dissemination of false information to other

2    customers.

3            MR. MURPHY:  I would submit to you, Your Honor,

4    that that -- to the extent that there are anything beyond

5    what was here, if any, it's conclusory and is not backed up

6    by any particularized allegations.

7            THE COURT:  Okay.  So you're saying that I have to

8    determine -- I realize we're getting back to what we

9    started.  I have to look at the legal sufficiency of the

10   allegations, as opposed to just saying, well, you know, a

11   controlled person claim is a direct claim and the Florida

12   court should determine whether it's legally sufficient.

13           MR. MURPHY:  If we're going back, Your Honor, I'll

14   go back as well.  And that is just --

15           THE COURT:  Which is what I did on another case

16   about 20 years ago.

17           MR. MURPHY:  I will read you just a quote from

18   Judge Sullivan in his decision, he says, and this is on --

19   this is a West Law cite, Your Honor.

20           THE COURT:  What page?

21           MR. MURPHY:  *6, 2013 West Law 5511027 *6.

22   "Whether the complaints plead a bona fide control person

23   claim is relevant insofar as it affects whether appellants

24   have plead a non-derivative claim.  Appellants cannot invoke

25   the posture of this case to shield their complaints from all

1    scrutiny, since the question before this Court is whether

2    appellants' claims as pleaded in the complaints should be

3    allowed to proceed, despite the injunction and the automatic

4    stay."

5              I submit to Your Honor that Judge Sullivan faced

6    the same issue that you are asking to -- right now, and he

7    found that it was appropriate to go forward and look at

8    these from the perspective of determining whether what we

9    have here is a direct claim that they're alleging that they

10   have, or whether it's a duplicative claim.

11             And really, Your Honor, this Court has the power

12   certainly to determine whether something pleaded here is

13   duplicate and derivative of the trustee's claims.

14             THE COURT:  Yeah, but you see if you go to *9, he

15   says, "This examination of the Goldman complaints makes

16   clear that the appellants did not, in fact, claim that the

17   Picower defendants directed BLMIS to make misrepresentations

18   above and beyond what was necessary to document the Picower

19   defendants' false withdrawals."

20             Don't these complaints allege that?  I know you

21   say it's conclusory, but don't these complaints purport to

22   allege that?

23             MR. MURPHY:  Well, yes, Your Honor, I think that

24   they do purport to do that.  And I --

25             THE COURT:  So then the next question is, should I

Page 82

1    decide if they do it sufficiently or should the Florida

2    court decide if they do it sufficiently?

3              MR. MURPHY:  I think that you should decide, Your

4    Honor, as to whether they're duplicative and derivative.

5    And I think that you can.

6              I think that what they were presented with here,

7    what Judge Sullivan looked at was what he saw.  He said,

8    you've just alleged it as to Mr. Picower's transactions in

9    his own accounts, this is where you failed, you didn't

10   allege it as to all the other customers.

11             Well, that's what they then did on this complaint,

12   Your Honor.  They went ahead and they added Picower

13   defendants to everything where they fell short.  But you

14   need more than mere conclusory statements, and more than

15   assumptions to just make that.  You can't just plug in the

16   missing words to a complaint and make it stand scrutiny.

17             Again, especially in light of the fact that this

18   is not the first time that we're looking at this.  This is

19   not a brand new complaint here.  As I said before, 75

20   percent of this was already before the prior judges.

21             So we have to look at it in part from that

22   framework, and we need to benefit from those judges'

23   analyses and see to what extent you can apply it here.

24             As to -- there was a reference at some point to e-

25   mails and calls, maybe showing some kind of evidence.  I

1    agree with Your Honor, that's not before the Court, it's not

2    in the complaint.  But I will note that that kind of

3    evidence, if you will, was promised to Judge Sullivan at

4    oral argument, but that -- it hasn't appeared and it's not

5    in the complaint, and I will stick with what Your Honor

6    said, it's not before you.

7             Your Honor, as to paragraph 46 --

8             THE COURT:  Of which complaint?

9             MR. MURPHY:  Of the Fox Marshall complaint.  There

10   you go, thanks.

11            My colleague Mr. Smith eluded to paragraph 46 as

12   showing some strength that they've pleaded independent

13   claims.  I would direct the Court, though, to just as a

14   comparison, paragraph 45 directly above it, talks about very

15   specific activity.

16            THE COURT:  Well, there's no question they're very

17   specific in terms of --

18            MR. MURPHY:  What Picower did.

19            THE COURT:  -- what Picower did with his own

20   accounts.

21            MR. MURPHY:  Correct.

22            THE COURT:  I don't think anybody is arguing that,

23   and this is less specific.

24            MR. MURPHY:  Okay.  So I'm going to -- what

25   immediately follows then is the very generalized kind of

Page 84

1    comment.  But again, we start off in paragraph number 46 of

2    the Fox amended complaint with according to Madoff, Picower

3    knew that in order to generate the enormous paper profits in

4    their accounts, BLMIS would have to steal money from

5    customers.  According to Madoff, Picower fully and knowingly

6    participated in the fraud, that BLMIS perpetrated on

7    customers and actively encouraged people to enter into

8    investment advisory agreements.

9            Again, these allegations that Picower fully and

10   knowingly participated in the fraud had been made before

11   especially by the Goldman plaintiffs.  And not necessarily

12   -- that was rejected.

13           THE COURT:  Did Judge Sullivan deal with that?

14   Well, where were those allegations in the Goldman complaint?

15           MR. MURPHY:  They were in, Your Honor, let me just

16   see.  Your Honor, paragraph 55.  Paragraph 55 at the bottom,

17   at the very end, "at all relevant times, Picower and the

18   Picower defendants knew that the withdrawals could only be

19   property of other BLMIS customers, including plaintiff and

20   the other class members."

21           Paragraph 44, "in interviews with author, Diana

22   Henriques, Madoff stated that Jeffrey Picower knew the

23   existence of a scheme, and that Jeffrey Picower was taking

24   fraudulent profits from the BLMIS customer accounts."

25           Again, I would lead the Court back to paragraphs

Page 85

1      91 and 94 as an example.  Again, they were saying, "the

2      defendants had the power to influence and control and did,

3      in fact, influence and control the decision-making at BLMIS,

4      the recordkeeping at BLMIS, and the recording of securities

5      transactions at BLMIS."

6              With respect to paragraph 46 again, Your Honor, on

7      the Fox complaint at least, when we talk about according to

8      Madoff, that he fully participated.  Again, the other courts

9      have seen that allegation before, but specifically

10     addressing this one paragraph, Mr. Smith eluded to, if you

11     read the paragraph as a whole, it's merely an additional

12     inference based on the same allegations that were previously

13     made regarding Mr. Picower's activities in his own accounts.

14             I've already commented on what I think about Mr.

15     Madoff's statements.

16             THE COURT:  Well, I'm not going to judge -- you

17     know, I'm not going to judge Mr. Madoff's credibility.

18             MR. MURPHY:  Sure.

19             THE COURT:  The question is whether they have

20     alleged a claim.

21             MR. MURPHY:  Well, there's absolutely no

22     specificity here alleged, Your Honor.  I mean, there's no

23     facts provided.  Who did he encourage, when, how, there's no

24     allegation that any of the customers, the plaintiffs here

25     received any of that encouragement.  Nothing.

1              And they purport to represent that they're going

2       to represent all customers here, and they represent quite a

3       few, over a couple of hundred even now in other sides of

4       this case, or at least well over 150.

5              But, you know, if you contrast the two, the

6       specific and not specific, you see where they're falling

7       short, but they can't be more specific here, because they

8       don't have particularization.

9              We're not sure where that information comes from,

10      by the way, Mr. Smith alleged -- said not sure where it

11      comes from.

12             THE COURT:  I guess that will be the subject of

13      discovery.

14             MR. MURPHY:  Discovery, yeah, and I mean, they

15      haven't deposed Mr. Madoff yet, so you know.

16             THE COURT:  Has he given any depositions?

17             MR. MURPHY:  Not that I know of, Your Honor.  I

18      think that's it, Your Honor.  If I could just have a moment

19      with Picower's counsel for --

20             THE COURT:  Sure.

21         (Pause)

22             MR. MURPHY:  Your Honor, after consulting Mr.

23      Picower's counsel, I will note that as to the first filed

24      issue, the trustee was the first filed here.  We brought the

25      complaint.  We had alleged that Mr. Picower knew or should

Page 87

1    have known about the fraud and the activities going on in

2    those accounts.  In Goldman, one in 2011, and Goldman too in

3    2014.

4              THE COURT:  Yeah, but those are different cases.

5              MR. MURPHY:  Different cases, right, Your Honor,

6    those are --

7              THE COURT:  The issue you're raising now is

8    whether the Picower and Fox complaints violate the automatic

9    stay and the injunction, and that wasn't something that was

10   raised when you sued Mr. Picower.

11             MR. MURPHY:  Fair enough, Your Honor.

12             THE COURT:  All right.

13             MR. MURPHY:  Thank you.

14             THE COURT:  Thank you.  I'll reserve decision, no

15   surreplies.  Thank you.

16   (Proceedings concluded at 11:35 AM)

17                        * * * * *

18

19

20

21

22

23

24

25

Page 88

1

                          CERTIFICATION

2

3          I, Sheila G. Orms, certify that the foregoing is a

4     correct transcript from the official electronic sound

5     recording of the proceedings in the above-entitled matter.

6

       Dated:  May 7, 2014

7

8       Sheila        Digitally signed by Sheila Orms
                       DN: cn=Sheila Orms, o, ou,
                       email=digital1@veritext.com,
                       c=US
9       Orms           Date: 2014.05.08 16:23:56
                       -04'00'

10

11      Signature of Approved Transcriber

12

13

      Veritext

14

      330 Old Country Road

15

      Suite 300

16

      Mineola, NY 11501

17

18

19

20

21

22

23

24

25