BECKER & POLIAKOFF LLP
45 Broadway
New York, New York 10006
(212) 599-3322
Helen Davis Chaitman
hchaitman@bplegal.com
*Attorneys for the Customers listed*
*on Exhibit A hereto*

Hearing Date:  June 19, 2014
Hearing Time:  10:00 A.M.
Objection Date:  May 16, 2014

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br><br>                    Debtor. | |


**CUSTOMERS' MEMORANDUM OF LAW IN OPPOSITION TO THE TRUSTEE'S**
**METHOD FOR VALUING INTER-ACCOUNT TRANSFERS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF FACTS .................................................................................................. 1

ARGUMENT ...................................................................................................................... 7

THERE IS NO BASIS IN LAW TO DISALLOW TRANSFERS FROM
FORMER ACCOUNT HOLDERS .................................................................................... 7

    A.    The Due Process Clause of the United States  Constitution
        Prohibits the Trustee's Methodology .................................................... 10

    B.    New York Public Policy Compels Rejection of the Trustee's
        Methodology ......................................................................................... 12

    C.    ERISA Prohibits the Trustee's Methodology ....................................... 14

    D.    The Securities Laws Prohibit the Trustee's Methodology .................... 17

        1.   SIPA and the SIPC Regulations Prohibit the Trustee's
           Methodology .............................................................................. 18

        2.   The SIPA Definition of "Customer" Bars the Trustee's
           Treatment of Inter- Account Transfers ........................................ 20

        3.   The Securities Laws Prohibit the Trustee's Methodology ............ 21

CONCLUSION .................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 570 N.E.2d 189 (1991) ....................12, 13

*Banque Worms v. BankAmerica Int'l*, 928 F.2d 538 (2d Cir. 1991) .........................................12, 13

*In Re Bernard L. Madoff Inv. Secs. LLC,* 654 F. 3d 229 (2d Cir. 2011), 132 S. Ct. 2712 (2012), *reh'g and reh'g en banc den.* (2d Cir. Nov. 8, 2011), *cert. den.,* 133 S. Ct. 25 (2012) .........................................................................................................8

*Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ............................19

*Carmichael v. Osherow (In re Carmichael)*, 100 F.3d 375 (5th Cir. 1996) ..................................16

*Commodities Future Trading Commission v. Walsh,* 17 N.Y.3d 162, 951 N.E.2d 369 (2011) ........................................................................................................................13

*Gelles v. TDA Indus., Inc.*, 44 F.3d 102 (2d Cir. 1994) ..................................................................22

*Grippo v. Perazzo*, 357 F.3d 1218 (11th Cir. 2004) .......................................................................22

*Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975) ....................................................11

*Lauder v. Jacobs*, 10 Misc. 3d 1052(A), 809 N.Y.S.2d 482 (Sur. 2005) *aff'd,* 35 A.D.3d 822, 826 N.Y.S.2d 719 (2006) ......................................................................17

*Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585 (2d Cir. 1991) ..........................22

*Nachman Corp. v. Pension Benefit Guaranty Corporation,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980) .........................................................................15

*Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438 (S.D.N.Y. 1994) ........................................22

*Patterson, Trustee v. Shumate,* 504 U.S. 753 (1992) .....................................................................15

*Pauk v. Pauk*, 232 A.D.2d 392, 393, 648 N.Y.S.2d 134, 135 (1996) ............................................17

*Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) .............................................22

*Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011)..............................................................................11

*Rousey v. Jacoway,* 544 U.S. 320 (2005) .......................................................................................16

*Savino v. E.F. Hutton & Co., Inc.*, 507 F.Supp. 1225 (S.D.N.Y. 1981) ........................................21

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285
  (Bankr. S.D.N.Y. 2011) *aff'd sub nom. In re Aozora Bank Ltd. v. Sec. Investor
  Prot. Corp.*, 480 B.R. 117 (S.D.N.Y. 2012) *aff'd sub nom. In re Bernard L.
  Madoff Inv. Sec. LLC*, 708 F.3d 422 (2d Cir. 2013) ...............................................21

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 476 B.R. 715
  (S.D.N.Y. 2012) ...............................................................................................10, 11

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 499 B.R. 416
  (S.D.N.Y. 2013) ............................................................................................................23

*SEC v. Zandford*, 535 U.S. 813, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) .......................22

*Tcherepin v. Knight,* 389 U.S. 332 (1967) ......................................................................21

*United States v. All Funds Distributed to Weiss*, 345 F.3d 49 (2d Cir. 2003) ...............14

*United States v. Ron Pair Enterprises, Inc*., 489 U.S. 235, 109 S.Ct. 1026, 103
  L.Ed.2d 290 (1989) ......................................................................................................19

*Wright v. Union Central Life Ins*., 304 U.S. 502 (1938)................................................12

**Statutes & Rules**

17 CFR § 300.100 ............................................................................................................19

17 CFR § 300.103 ............................................................................................................20

26 CFR 1.401[a]-13[c][1][iii] .........................................................................................14

11 U.S.C. § 546(e) ......................................................................................................10, 11

15 U.S.C. § 77l(a)(2) .......................................................................................................17

15 U.S.C. § 78ccc(b)(4)(A) .............................................................................................19

15 U.S.C. § 78fff-2(a) ......................................................................................................18

15 U.S.C. § 78fff-3(a) ......................................................................................................20

15 U.S.C. § 78*lll* ...............................................................................................18, 19, 20

26 U.S.C. § 219 ................................................................................................................15

26 U.S.C. § 401(a)(13) .....................................................................................................14

26 U.S.C. § 408 ................................................................................................................15

29 U.S.C. § 1001 ..........................................................................................................8, 15

29 U.S.C. § 1002(34) ........................................................................................15

29 U.S.C. § 1056 ..............................................................................................14

29 U.S.C. § 1056(d)(1) .....................................................................................14

I.R.C. § 401(a)(9)(C) ........................................................................................15

I.R.C. § 408 ......................................................................................................15

I.R.C. § 4974(a) ...............................................................................................15

Chapters 5 and 7 of the Bankruptcy Code ........................................................9

CPLR § 5205 ....................................................................................................17

**Other Authorities**

H.R. 13308, 91st Cong. § 7(d) (Aug. 4, 1969) ...............................................21

http://www.jct.gov/jcs-10-87.pdf......................................................................16

IRS Pub. 590 (2010), available at http://www.irs.gov/pub/irs-pdf/p590.pdf...............15

IRS Pub. 590, at 3 (2010), *available at* http://www.irs.gov/pub/irs-pdf/p590.pdf ......16

S. 2348, 91st Cong. § 7(d) (June 9, 1969) .......................................................21

United States Constitution ...................................................................8, 10, 23

The Customers listed on Exhibit A hereto (the "Customers") respectfully submit this memorandum of law in opposition to the Trustee's method for valuing inter-account transfers.

## STATEMENT OF FACTS

In response to the Trustee's motion, the Customers served the Trustee with a document demand seeking all documents relating to their accounts and the accounts of transferors of funds into their accounts. The Trustee did not begin to produce any documents to the Customers until the week of May 12, 2014. Thus, the Customers are unable to put before the Court the documentary record in the Trustee's possession, which compels denial of his motion. However, the Customers have filed, in opposition to the motion, the declarations of five Customers in order to provide some factual context for the Court's consideration. These declarations are summarized below.

**1.    Denis Castelli**

As set forth in detail in the declaration of Athena Arvin, the widow of Denis Castelli, Mr. Castelli died on April 19, 2014 at the age of 68. He had worked for Daprex, Inc. ("Daprex") from 1978 to 2000. Daprex maintained a profit sharing plan (the "Daprex Plan") for its employees with Bernard L. Madoff ("Madoff"). Daprex continued this account when Madoff formed Bernard L. Madoff Investment Securities LLC ("BLMIS") on December 4, 2000, at which point he became a SIPC member.

In 1982, when Castelli was 36 years old, he deposited his entire IRA account into the Daprex Plan account. On July 31, 2001, Castelli retired from Daprex at the age of 55. As of that point in time, Daprex had been a BLMIS customer for only seven months and, throughout the entire period that Daprex had been a Madoff/BLMIS customer, Castelli had not withdrawn any funds from the Daprex Plan. The company's accountants calculated the amount in the Daprex

Plan that was owed to Castelli and authorized the transfer of that sum – $1,917,764.07 – from the Dayprex Plan's BLMIS account to a BLMIS account in Castelli's own name.

Under the Daprex Plan, and under the Internal Revenue Code ("IRC"), Castelli's interest in the Plan was based solely on his own contributions and the Plan was required to transfer out only Castelli's interest in the Daprex Plan.   Nevertheless, the Trustee credited Castelli's BLMIS account with $0 for the Daprex Plan's transfer into Castelli's BLMIS  account of $1,917,764.07. Thus, Castelli was deprived by the Trustee of $1,917,764.07 representing the 2001 value of his retirement funds, even though he had been contributing to his IRA, and then to the Daprex Plan, for his entire working career, even though he had never withdrawn any funds, and even though he could have simply taken the full $1,917,764.07 and opened an IRA account at Merrill Lynch.

Obviously, the Trustee has charged Castelli with pension distributions that were made to other Daprex employees who had retired and withdrawn monies from the Plan prior to July 31, 2001 when Castelli's funds in the Plan were transferred to his own BLMIS account.   The November 30, 2008 market value of the securities in the account was $3,694,611.72, the amount for which Castelli filed a SIPC claim.   Yet, according to the Trustee, once Castelli was deprived of his $1,917,764.07, he had no SIPC claim because he had withdrawn since 2001, $525,000 more than he had deposited.

## 2.    Marsha Peshkin

Marsha Peshkin is the widow of Roy Peshkin who died on February 12, 2001.   At the time of his death, Roy Peshkin was the Trustee and sole beneficiary of a defined benefit pension plan at BLMIS titled the Superweb Press, DEF Benefit Plan, R. Peshkin Trustee, and his interest in the account had a value of $736,454.43.

As permitted by law, Mrs. Peshkin opened her own IRA account and deposited the inherited IRA of Roy Peshkin into her own BLMIS account.   Of course, Mrs. Peshkin could

have, just as easily, opened up an IRA account at Merrill Lynch and deposited the full

$736,454.43 at Merrill Lynch.  In total, including the $736,454.13 she inherited, she contributed

to her BLMIS IRA account $1,162,488.53 and she withdrew $450,000.  Her contributions

included $250,000 sent to Madoff within one month of his confession on December 11, 2008.

Her net investment was $712,488.53.

Mrs. Peshkin filed a SIPC claim for $712,488.53 but the Trustee only allowed the claim

for $176,354.66 because he charged against her the pension withdrawals taken prior to 2002 by

beneficiaries of the Plan.  Thus, the Trustee reduced the value of the initial deposit from

$736,454.43 to $200,622.83.

### 3.     Barbara Gaba

Barbara Gaba was a partner of the Gaba Partnership (the "Partnership"), which was

formed pursuant to a written agreement on January 4, 1993 for the purpose of establishing an

account with Madoff.  During the period from January 6, 1993 through December 11, 2008, the

partners deposited a total of $1,664,051.63 into the account and withdrew a total of $1,357,500

from the account.

One of the deposits was made on October 1, 2003 from another Madoff account in the

amount of $785,551.63 (the "Inheritance").  The Trustee has credited the Partnership with $0 for

the Inheritance, which represented a distribution from a trust established in 1988 under the last

will and testament of Herman Gaba for the benefit of his widow.  All federal and state estate

taxes had been paid on Herman Gaba's estate.  Thereafter, all income taxes had been paid each

year, at short-term capital gains rates, on the alleged profits in the trust account established by his

will.  There was no possibility, under the IRC, to obtain a refund of the taxes paid.  Obviously,

the family could have opened an account for the trust established under Herman Gaba's will at

Merrill Lynch, in which event Mrs. Gaba would have received the full benefit of the Inheritance,

with appreciation.  Even if Mrs. Gaba had only opened up the Merrill Lynch account temporarily and then deposited the Inheritance into her BLMIS account, the Trustee would have given her full credit for the deposit.

### 4.    Aaron Blecker

Aaron Blecker was born on July 27, 1910, and will be 103 on July 27, 2014.  He opened an account with Madoff in 1986 with a $50,000 deposit.  Thereafter, he deposited another $50,000 in 1986 and in 1992 he deposited $100,000.   In 1997, Mr. Blecker opened another Madoff account in the name of Arthur and Sofie Blecker, which, in 2007, was consolidated into the Aaron Blecker Revocable Trust, No. 1B0156-3-0.

No funds were ever withdrawn from any of the Blecker accounts and the value of the account as of November 30, 2008, was $2,625,435.95.  Each year, from 1997 on, Blecker paid taxes based on short-term capital gains rates.  Thus, over the life of his Madoff investment, he paid the Internal Revenue Service (the "IRS") approximately $1 million based upon the reported profits in the accounts.  The only refund he was able to obtain from the IRS was for $$235,276.37 representing the taxes he had paid on his alleged profits in the last five years he had the BLMIS account.

Blecker filed a SIPC claim for $2,625,435.95, the balance on his last statement.  The Trustee claimed that Blecker had a negative net investment of $261,633.94 because he did not credit Blecker with the value of the account as of 1997 when the balance was transferred from one Madoff account to another.  The Trustee claims that Blecker withdrew money based on scores of alleged checks written to various Fortune 500 companies whose stocks were listed on his statements.  The amounts were odd amounts such as $4,248.04 on April 7, 1987.  For example, one page of such "withdrawals" listed by the Trustee in his Determination Letter is as follows:

| Date | Description | Amount |
|---|---|---|
| 9/13/1984 | CHECK HOUSEHOLD INTL | ($5,654.50) |
| 10/31/1984 | CHECK KATY INDUSTRIES | ($5,818.54) |
| 1/8/1985 | CHECK ETHYL | ($11,085.00) |
| 2/22/1985 | CHECK ATLANTIC RICHFIELD | ($8,839.87) |
| 4/25/1985 | CHECK AMR CORP | ($10,403.43) |
| 6/11/1985 | CHECK INTERCO | ($7,371.58) |
| 8/8/1985 | CHECK ASSOC DRY GOODS | ($11,095.17) |
| 9/26/1985 | CHECK TEXTRON | ($6,484.27) |
| 11/12/1985 | CHECK VIACOM | ($8,829.20) |
| 1/15/1986 | CHECK WOOLWORTH | ($11,096.11) |
| 3/17/1986 | CHECK WETTERAU | ($10,392.02) |
| 5/27/1986 | CHECK FMC | ($10,313.75) |
| 7/14/1986 | CHECK GTE CORP | ($7,773.88) |
| 8/21/1986 | CHECK INTERCO | ($6,929.43) |
| 10/15/1986 | CHECK SUN | ($8,842.64) |
| 11/24/1986 | CHECK TRW | ($7,805.00) |
| 2/5/1987 | CHECK HOLIDAY CORP | ($11,090.00) |
| 4/7/1987 | CHECK ANHEUSER BUSCH | ($11,786.82) |
| 6/10/1987 | CHECK TRANSCO CO | ($10,393.61) |
| 8/21/1987 | CHECK AGS COMPUTERS | ($11,037.61) |
| 10/26/1987 | CHECK GROLIER | ($11,717.22) |
| 1/26/1988 | CHECK | ($10,396.92) |
| 3/24/1988 | CHECK ADVANCED SYSTEMS | ($11,087.09) |
| 5/25/1988 | CHECK INTERCO | ($11,778.76) |
| 8/8/1988 | CHECK AMFAC | ($10,400.46) |
| 10/12/1988 | CHECK COMPAQ COMPUTERS | ($11,048.11) |
| 12/5/1988 | CHECK PNC FINL | ($8,832.87) |
| 2/3/1989 | CHECK GENERAL CINEMA | ($10,400.48) |
| 4/11/1989 | CHECK | ($11,090.99) |
| 6/20/1989 | CHECK DURR FILLAUER MED | ($11,739.06) |
| 8/15/1989 | CHECK INLAND | ($10,398.73) |
| 10/20/1989 | CHECK AMERICAN MAIZE | ($11,062.73) |
| 12/11/1989 | CHECK COLUMBIA PICTURES | ($8,840.00) |
| 2/16/1990 | CHECK WESTINGHOUSE | ($10,347.18) |
| 4/20/1990 | CHECK SEAGULL | ($11,089.81) |
| 6/25/1990 | CHECK SUN MICROSYSTEMS | ($11,759.92) |
| 8/28/1990 | CHECK IMMUNEX | ($10,393.02) |
| 11/5/1990 | CHECK AMERICAN FILM | ($11,094.75) |
| 12/27/1990 | CHECK PFIZER | ($11,960.08) |
| 3/7/1991 | CHECK MEDCO | ($14,130.22) |
| 5/13/1991 | CHECK XOMA | ($13,172.52) |
| 7/11/1991 | CHECK HEALTH SOUTH | ($12,364.06) |

After the Trustee rejected Blecker's claim, Blecker explained to the Trustee that, at the time he first saw these entries on his statements, in the 1980's, he understood these checks to be payments for securities that appeared on his monthly statements in the months following issuance of the checks.  The Trustee took the position that, unless Blecker could produce his bank records from the 1980's proving that the checks were not deposited into his account, the Trustee would not credit Blecker's statement that he never received these checks, despite the fact that the payees were Fortune 500 companies.  The Trustee also told Blecker that he had the burden of proving that he did not receive the checks made out to Fortune 500 companies in the 1980's and refused to produce Madoff's own cancelled checks which, of course, would prove into whose account these checks were deposited.  Blecker had not retained his bank records from the 1980's.

**5.     Ellen Mishkin**

Ellen Mishkin's parents, Grace Mishkin and William Mishkin, were long-term customers of Madoff, beginning in the 1980's through Avellino and Bienes and then, in 1992 with a direct account with Madoff.    In August 2006, Grace Mishkin asked Madoff if he would open accounts for Grace's two adult daughters and Madoff told her to form a family trust and have the daughters invest in the family trust's account.  Thereafter, the family formed the Mishkin Family Trust and Ellen and her sister invested their own money into the account by sending their own personal checks to Madoff.

Both sisters were "net losers" because they had put more money into the account than they had withdrawn.  Nevertheless, the Trustee rejected their SIPC claims because, in his view, the withdrawals of Ellen's parents are chargeable against Ellen and her sister.

6.      **Barbara Kotlikoff Harman**

Mrs. Harman opened a Madoff account on April 6, 1990.  Both of her husband's parents, Toby Harman and Harry J. Harman, had accounts with Madoff.  Toby Harman died in June 1998 with an account balance of approximately $702,978.61.  Her estate passed through probate and an estate tax return was filed.  The funds in her account were transferred in September and October 1998 to two other Madoff accounts.

Mrs. Harman's father-in-law, Harry J. Harman, died in March 2003.  His estate passed through probate and an estate tax return was filed.  On April 15, 2003, the entire balance in his account, $895,204.01, was transferred to the Madoff account in the name of "The Estate of Harry J. Harman."   As part of his inheritance from his father, Mrs. Harman's husband received $421,188.41 from the Toby Harman Trust account with BLMIS and $351,746.18 from the Harry J. Harman account with BLMIS.  Both of these amounts were transferred by Mr. Harman into Mrs. Harman's Madoff account on April 7, 2003, and December 31, 2003, respectively.

The balance in Mrs. Harman's account as of November 30, 2008, was $1,802,563.77.  However, the Trustee disallowed her claim because he did not give her full credit for transfers into her account from June 9, 1997, through December 31, 2003.  Obviously, if the inherited funds had been deposited into Merrill Lynch and then transferred back into BLMIS, the Trustee would have credited Mrs. Harman with the full value of the inheritance.

## ARGUMENT

### THERE IS NO BASIS IN LAW TO DISALLOW
### TRANSFERS FROM FORMER ACCOUNT HOLDERS

In support of his unprecedented treatment of inter-account transfers, the Trustee relies upon the Second Circuit's affirmance of his methodology for calculating a customer's "net equity" under the Securities Investor Protection Act ("SIPA").  But what the Second Circuit held

was simply that, where an SEC-regulated broker conducted a Ponzi scheme, a SIPA trustee has the discretion under SIPA to calculate each customer's "net equity" by deducting from a customer's deposits into their BLMIS accounts the amounts they withdrew from those accounts (the "Net Equity Decision"). *In Re Bernard L. Madoff Inv. Secs. LLC,* 654 F. 3d 229 (2d Cir. 2011), 132 S. Ct. 2712 (2012), *reh'g and reh'g en banc den*. (2d Cir. Nov. 8, 2011), *cert. den., 133 S. Ct. 25 (2012).*

There is nothing in the Second Circuit's analysis which indicates that the court had any idea that the Trustee would apply the Court's holding not only to customers but also to former customers. The Net Equity Decision was rendered in a factual vacuum based solely on the Trustee's allegations. Among the fundamental facts which were not before the Second Circuit when it rendered the Net Equity Decision are the facts that (a) BLMIS was not formed until December 4, 2000; and (b) from 1960 to December 4, 2000, Madoff operated his business as a sole proprietor and was not a member of the Securities Investor Protection Corporation ("SIPC") and, therefore, not subject to the provisions of SIPA.

There is no indication in the Second Circuit's decision that it considered at all the issue presented by the Trustee's motion, *i.e.,* whether the Trustee can reduce a customer's "net equity' by deducting withdrawals taken, not by the customer but, by a transferor of the customer and whether the Trustee can do so beyond any conceivable statute of limitations period. And that is because the Trustee did not disclose to the Second Circuit that he intended to apply the Court's decision not only to customers but to former customers, going back to 1960.

The Trustee's position is insupportable under various bodies of law, which we will deal with separately. His position is insupportable under the United States Constitution; it is insupportable under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

USC § 1001 et seq.; it is insupportable under the federal securities laws, including SIPA; and it is insupportable under the fraudulent transfer laws.

The Trustee's position is also insupportable because he lacks the power to void transfers made by Madoff. The Trustee is the Trustee for the liquidation of BLMIS. Alan Nisselson was appointed the Trustee for Madoff. The respective powers of the two Trustee's are set forth in the Substantive Consolidation Order that was entered by the Court **with the Trustee's consent and at his request**. The Substantive Consolidation Order was entered on June 9, 2009, *nunc pro tunc* to December 11, 2008. Docket No. 252. It specifically provides that the Trustee has no power to bring avoidance claims against Customers of Madoff:

> Notwithstanding the substantive consolidation of the Madoff estate into the BLMIS SIPA Proceeding, the Chapter 7 Trustee [Nisselson] **shall remain Chapter 7 trustee of the Madoff estate and shall continue to have all powers, rights, claims and interests of a Chapter 7 trustee to bring claims under Chapters 5 and 7 of the Bankruptcy Code** in consultation with the SIPA Trustee and SIPC. Further, all powers, rights, claims and interests of the Madoff estate are expressly preserved, including without limitation all Chapter 5 and Chapter 7 powers, rights, claims and/or interests.

*Id.*; emphasis added.

Thus, in cases where avoidance was sought of transfers made by Madoff – that is any transfer that predated the formation of BLMIS on December 4, 2000 – the Chapter 7 Madoff Trustee was a necessary plaintiff because only he has the power to avoid transfers under Chapter 5 of the Bankruptcy Code. *See, e.g.,* Adv. Pro. No. 10-05328-brl. Just as the Trustee lacks standing to avoid transfers that pre-date December 4, 2000, he lacks standing to disallow inter-account transfers that pre-date December 4, 2000 and this Court should hold that BLMIS acquired all of the customer accounts, at full-dollar value, on December 4, 2000.

The Trustee tries to deflect the Court's attention from this issue by conflating transfers by Madoff with transfers by BLMIS.  For example, on the first page of his Memorandum, he writes:

> While reviewing customer claims, the Trustee encountered thousands of instances in which BLMIS customers made inter-account transfers, meaning a transfer between BLMIS customer accounts in which no new funds entered or left BLMIS.

It is indisputable that, by order of the Court, the Trustee lacks standing to seek to avoid any transfers made by Madoff, that is, any transfers that pre-date December 4, 2000.  It follows that the Trustee lacks standing to disallow any inter-account transfers that pre-date December 4, 2000.

But that is hardly the only legal barrier to the Trustee's motion.

### A.  The Due Process Clause of the United States Constitution Prohibits the Trustee's Methodology

As Judge Rakoff held, the Trustee cannot avoid any transfers that predate December 11, 2006, because of the safe harbor of 11 U.S.C. § 546(e).  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 476 B.R. 715, 722 (S.D.N.Y. 2012) ("*Greiff*"), supplemented (May 15, 2012).  But for that provision, the Trustee would be limited to fraudulent transfer actions going back six years under New York's Debtor and Creditor Law.  Yet, ignoring these statutory constraints, the Trustee has disallowed SIPC claims by refusing to credit inter-account transfers that predate the applicable fraudulent transfer period, in some instances by decades.  In Aaron Blecker's case, for example, the Trustee is seeking to avoid transfers going back into the early 1980's and taking the position that it is Mr. Blecker's burden to prove from documentary records – which, of course, he no longer has – that he did not deposit checks issued by Madoff and payable to various Fortune 500 companies.  While Mr. Blecker's situation offers an extreme example, the vast majority of BLMIS customers have been adversely impacted by the Trustee's unilateral decision to charge them with generations of withdrawals made by family members or

withdrawals made by co-workers and co-beneficiaries of the same retirement or pension accounts.

The Trustee seems to have forgotten that the due process clause guarantees to each person the full protection of the laws, including statutes of limitations. These are statutes of repose enacted in recognition of the fact that it would be unfair and unreasonable to force a person to litigate a particular issue more than a certain number of years after the occurrence giving rise to the claim. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 473 (1975) (statute of limitations designed to prevent the unfairness caused by "lost evidence, faded memories, and disappearing witnesses, and to avoid unfair surprise.") Obviously, the Customers do not have documents evidencing withdrawals from transferor accounts during the period from 1960 on. These documents would have been in the possession of the transferors, most of whom no longer exist. Moreover, banks do not keep records more than seven years so that, unless the Trustee has documentary evidence to prove his alleged transferor withdrawals, there is no evidence to refute the amounts claim by Customers in their SIPC claims.

By not crediting the transferee for the full value of a transfer made before the two year limitations period in § 546(e), the Trustee is violating the Customers' rights. The District Court has twice held that, by operation of the safe-harbor in § 546(e), the Trustee is barred from avoiding transfers to customers other than "transfers that Madoff Securities made during the two years prior to bankruptcy 'with actual intent to hinder, delay, or defraud any' of its creditors." *Greiff*, 476 B.R. at 722 and n.7; *Picard v. Katz*, 462 B.R. 447, 452-53 (S.D.N.Y. 2011). If the Trustee cannot seek, through an adversary proceeding, to avoid transfers that pre-date December 11, 2006, how can he possibly be permitted to avoid inter-account transfers going back to 1960 simply by sending Determination Letters to Customers disallowing their claims?

The Trustee has ignored the fundamental precept articulated by the Supreme Court in *Wright v. Union Central Life Ins*., 304 U.S. 502, 518 (1938), that Congress "may authorize the bankruptcy court to affect . . . property rights, provided the limitations of the due process clause are observed." In the Trustee's view, Madoff customers are not entitled to due process of law.

### B. New York Public Policy Compels Rejection of the Trustee's Methodology

The economic impact of the Trustee's treatment of inter-account transfers is massive. Obviously, when people inherit money, they make adjustments to their life styles. They put their enhanced assets on their financial statements and they give those financial statements to banks to support loans they may seek to buy a house, to start a new business, or to fund some other activity. It is equally obvious that the banks rely upon the accuracy of the financial statements. Yet, the Trustee's methodology wipes out billions of dollars of assets despite the fact that, under the law, these assets are not recoverable by him under any possible statute of limitations or indeed under any conceivable legal theory.

The New York Court of Appeals has made clear, in a long line of cases, that the fraudulent transfer laws should not be applied to upset commercial transactions that were completed in good faith. Under this line of cases, it is inconsistent with New York law to deprive the Customers of the full dollar value of inter-account transfers. For example, in *Banque Worms v. BankAmerica Int'l*, 928 F.2d 538 (2d Cir. 1991), the Second Circuit, dealing with an issue that would have "a significant impact on banks and financial institutions operating in New York State and have serious repercussions for New York's banking community," certified to the New York Court of Appeals the issue of whether Banque Worms should be subject to a fraudulent transfer action to recover funds paid by mistake, albeit to someone entitled to payment. *Id*. at 541; *see also Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 570 N.E.2d 189 (1991).

The Court of Appeals rejected the argument the Trustee is making that a claw back should be allowed because Banque Worms was paid with other people's money.  The Court of Appeals held that, under New York law, even if the source of repayment is questionable, so long as there was no fraud on the part of the recipient of the tainted funds, those funds are not subject to a "claw back."  As the Court wrote in its answer to the Second Circuit's certified question:

> to permit in every case of the payment of a debt an inquiry as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear

*Id.* at 372.

The Court of Appeals made a similar response to a certified question from the Second Circuit in a case where the Court addressed the precise issue raised by the inter-account transfers, *i.e.,* whether, in a Ponzi scheme case, fraudulently acquired funds could be clawed back from an innocent recipient.  In *Commodities Future Trading Commission v. Walsh,* 17 N.Y.3d 162, 173, 951 N.E.2d 369, 375 (2011), the SEC and the Commodities Futures Trading Commission sought to claw back funds from Walsh's ex-wife which she had received as part of a divorce settlement from Walsh.  The funds had been misappropriated by Walsh as part of a Ponzi scheme in which he had engaged.  Just as with the Customers, there was no suggestion that Walsh's ex-wife had any knowledge of Walsh's Ponzi scheme. The Court of Appeals rejected the "claw back" claim against the innocent spouse, citing *Banque Worms*, and wrote:

> At its core, our rule favoring innocent transferees of stolen funds over defrauded owners is rooted in New York's "concern for finality in business transactions"

*Walsh*, 17 N.Y.3d at 173, citing *Banque Worms*, 77 N.Y.2d at 362.

The "concern for finality in business transactions" compels rejection of the Trustee's treatment of inter-account transfers, whether because Castelli and Peshkin made fundamental

decisions based upon the knowledge of the amount in their retirement accounts; or whether because Harman and Gaba made decisions about where they could afford to live and whether they could retire based upon the amounts they inherited from family members; or whether Blecker made decisions about whether he had enough money to support himself in his very long life.

### C. ERISA Prohibits the Trustee's Methodology

Since many of the Customers had pension accounts or IRA accounts, the impact of this Court's decision will have a pervasive impact on thousands of people. Here, we are dealing with several federal statutes, none of which permits the Trustee's methodology:  ERISA, SIPA, the securities laws, and the Bankruptcy Code.

ERISA was enacted to protect participants in pensions, Keogh and 401K plans. Section 1056(d)(1) of ERISA requires that pension plans include a provision that the plan may not be assigned or alienated.  29 U.S.C. § 1056(d)(1).  Regulations promulgated under the IRC define "assignment" and "alienation," in pertinent part, as "any direct or indirect arrangement…whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit which is, or may become, payable to the participant or beneficiary" 26 CFR 1.401[a]-13[c][1][iii]; *United States v. All Funds Distributed to Weiss*, 345 F.3d 49 (2d Cir. 2003).  Every qualifying plan must contain an anti-alienation provision *See* 26 U.S.C. § 401(a)(13).

The Trustee's treatment of ERISA plan beneficiaries constitutes a violation of the anti-alienation provision of ERISA, which categorized all employee retirement plans into two newly-established categories:  defined benefit plans and defined contribution plans.  A defined contribution plan was defined, in pertinent part, as follows:

> The term "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for **benefits based solely upon the amount contributed to the participant's account,** and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

29 U.S.C. § 1002(34); emphasis added.

The Supreme Court has recognized this fundamental purpose of ERISA.  In *Patterson, Trustee v. Shumate,* 504 U.S. 753 (1992), the Court wrote:

> Our holding also gives full and appropriate effect to ERISA's goal of protecting pension benefits. See 29 U.S.C. §§ 1001(b) and (c). This Court has described that goal as one of ensuring that "if a worker has been promised a defined pension benefit upon retirement-and if he has fulfilled whatever conditions are required to obtain a vested benefit-he actually will receive it."

*Patterson*, 504 U.S. at 764-65, quoting *Nachman Corp. v. Pension Benefit Guaranty Corporation,* 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980).

Section 408 of the I.R.C. entitled "Individual Retirement Accounts" sets forth the requirements for a plan to qualify as an IRA or other similar retirement account so that the beneficiary is allowed to deduct limited contributions to his/her IRA, see 26 U.S.C. §§ 219, 408, and defer recognition of gains accruing to the IRA until its distribution. 26 U.S.C. §§ 408(d), 408(e).  Upon turning age 70 1/2, a retiree *must* withdraw mandatory minimum distributions or be subject to a 50% tax penalty on any amounts that should have been withdrawn. *See* I.R.C. §§ 401(a)(9)(C); 4974(a). The amounts of the mandatory minimum distributions are calculated based on a formula, which takes into account the retiree's account balance and life expectancy. *See* Individual Retirement Arrangements, IRS Pub. 590 (2010), available at http://www.irs.gov/pub/irs-pdf/p590.pdf.[1]

---

[1] An IRA custodian is required to report to the retiree and the IRS the amount of the IRA balance upon which mandatory minimum distributions are based. *See* IRC § 408(i) ("The trustee of an individual retirement

As stated by the Supreme Court in *Rousey v. Jacoway,* 544 U.S. 320, 331-32 (2005):

> [T]he minimum distribution requirements . . . require distribution to begin at the latest in the calendar year after the year in which the accountholder turns 70 1/2. Thus, accountholders must begin to withdraw funds when they are likely to be retired and lack wage income . . . . [A]bsent the applicability of other exceptions . . . , withdrawals before age 59 1/2 are subject to a tax penalty, restricting pre-retirement access to the funds. [T]o **ensure that the beneficiary uses the IRA in his retirement years, an accountholder's failure to take the requisite minimum distributions results in a 50-percent tax penalty on funds improperly remaining in the account**. All of these features show that IRA income substitutes for wages lost upon retirement and distinguish IRAs from typical savings accounts.

Emphasis added; internal citations omitted; *see also Carmichael v. Osherow (In re Carmichael)*, 100 F.3d 375, 378 (5th Cir. 1996) ("IRAs . . . are substitutes for future earnings in that they are designed to provide retirement benefits to individuals.  The age limitation on withdrawal illustrates Congress' intent to provide income to an individual in his advanced years."); Individual Retirement Arrangements, IRS Pub. 590, at 3 (2010), *available at* http://www.irs.gov/pub/irs-pdf/p590.pdf ("An IRA is a personal savings plan that gives you tax advantages for setting aside money for retirement."); Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1986 at 710 (1987), *available at* http://www.jct.gov/jcs-10-87.pdf ("Uniform minimum distribution rules . . . ensure that [retirement] plans are used to fulfill the purpose that justifies their tax-favored status -- replacement of a participant's pre retirement income stream at retirement -- rather than for the indefinite deferral of tax on a participant's accumulation under the plan.").

---

account . . . shall make such reports regarding such account . . . to the Secretary and to the individuals for whom the account . . . is . . . maintained . . . ."); IRS Notice 2002-27 (providing "guidance on the reports that trustees, custodians, and issuers are required to make with respect to required minimum distributions from . . . [IRAs].").

New York law similarly protects retirement accounts by preventing judgment creditors from levying upon them in most situations.  CPLR 5205(d)(1); *see also Lauder v. Jacobs*, 10 Misc. 3d 1052(A), 809 N.Y.S.2d 482 (Sur. 2005) *aff'd*, 35 A.D.3d 822, 826 N.Y.S.2d 719 (2006) ("Pursuant to CPLR 5205(c), assets held in certain 'trusts' are exempt from the normal remedies available to creditors seeking either pre-judgment attachment and/or post-judgment enforcement of money judgments. Among the assets which are exempt in this regard are IRA's, whether the funds in such accounts were derived from a 'roll-over' of otherwise exempt pension plans or established with funds traceable directly to the 'judgment debtor' or 'defendant.'"); *Pauk v. Pauk*, 232 A.D.2d 392, 393, 648 N.Y.S.2d 134, 135 (1996) ("Effective September 1, 1994, CPLR 5205(c)(2) was amended to include IRAs as accounts that are 'conclusively presumed to be spendthrift trusts' under CPLR 5205(c)(3), and exempt from attachment to enforce a money judgment except in certain circumstances not relevant here.").

Despite this clear body of law, the Trustee has violated ERISA by charging Castelli and Peshkin with withdrawals taken by other ERISA plan beneficiaries.  It is inconceivable that the Supreme Court would sustain the Trustee's treatment of Castelli and Peshkin when the result is to deprive honest, law-abiding citizens of their ERISA-protected retirement funds.

### D.  The Securities Laws Prohibit the Trustee's Methodology

Under the Securities Act of 1933 ("1933 Act"), every customer of Madoff and of BLMIS is entitled to interest on his or her stolen funds or securities.  Section 12(a)(2) of the 1933 Act provides that the victim may recover from the person who stole a security the "consideration paid for such security with interest thereon, less the amount of any income received thereon. . . ." 15 U.S.C. § 77l(a)(2).  There is no exception in this statute for victims of Ponzi schemes and clearly, if Congress intended that victims of Ponzi schemes should not be entitled to appreciation on their stolen investments, Congress could easily have so provided.  We are 81 years after the

enacting of the 1933 Act and still Congress has not provided that victims of Ponzi schemes are not entitled to appreciation on their investments.

    1.  <u>SIPA and the SIPC Regulations Prohibit the Trustee's Methodology</u>

Despite the clear mandate of the 1933 Act, the Trustee has deprived all Madoff customers of their statutory right to interest on their stolen money and, on top of that, he has punished customers for the withdrawals of transferor account holders.   By doing so, the Trustee is violating one of the most fundamental provisions of SIPA.   Congress anticipated, and prohibited, the precise methodology the Trustee has employed.   In defining "net equity", Congress mandated that accounts held by a customer in separate capacities "shall be deemed to be accounts of separate customers."

> (11) Net equity
>
> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by—
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date; plus
>
> (C) any payment by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff-2(a) of this title).
>
> **In determining net equity under this paragraph, accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers.**

15 U.S.C. § 78*lll*(11); emphasis added.

By charging customers with the withdrawals made by transferor account holders, the Trustee is violating the plain language of SIPA, which he cannot do.  *See e.g. United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("[W]here, as here, the statute's language is plain, 'the sole function of the court is to enforce it according to its terms'"), quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).

Moreover, Congress has explicitly prohibited SIPC from changing the definition of "net equity."  SIPA provides:

> SIPC shall have the power. . . to adopt, amend and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to. . . the definition of terms in this chapter, **other than those terms for which a definition is provided in section 78*lll* of this title**. .

15 U.S.C. § 78ccc(b)(4)(A); emphasis added.  *See also*, 17 CFR § 300.100 which provides as follows:

> PART 300 - RULES OF THE SECURITIES INVESTOR PROTECTION CORPORATION 300.100-General.
>
> (a) For the purpose of sections 9(a)(2) and 16(12) of [SIPA] . . . these rules will be applied in determining what accounts held by a person with a member of SIPC . . . are to be deemed accounts held in a capacity other than his individual capacity.
>
> (b) **Accounts held by a customer in different capacities, as specified by these rules, shall be deemed to be accounts of separate customers.**
>
> (c) A person as used in these rules includes, but is not limited to, an individual, a corporation, a partnership, an association, a joint stock company, a trust, an unincorporated organization, or a government or political subdivision thereof.
>
> (d) The burden shall be upon the customer to establish each capacity in which he claims to hold accounts separate from his individual capacity.

{N0047392 2 }                                    19

Emphasis added.

The SEC regulations require that partnership accounts are deemed separate from the accounts of any of its partners:

> 300.103 - Accounts held by a corporation, partnership or unincorporated association. **A corporation, partnership or unincorporated association holding an account with a member shall be deemed to be a separate customer distinct from the person or persons owning such corporation or comprising such partnership or unincorporated association** if on the filing date it existed for a purpose other than primarily to obtain or increase protection under the Act.

17 CFR § 300.103; emphasis added.

The Trustee's methodology violates all of these regulations because he collapses the accounts of transferors with the accounts of transferees.

### 2. The SIPA Definition of "Customer" Bars the Trustee's Treatment of Inter- Account Transfers

Each co-owner of a group account with an SEC-regulated broker is a "customer" under the plain definition of "customer" in SIPA.  Thus, for example, Ellen Mishkin and her sister are "customers" even though they deposited their money into a Madoff account in the name of the Mishkin Family Trust.   See 15 U.S.C. § 78*lll*(2) ("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.").  If Congress had intended to limit customers to account holders the definition of customer could have been six words:  "A "customer" is an account holder."  Instead, Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the Trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity

claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor"). Thus, clearly, Congress contemplated that a broker's customers would include people whose identity he did not know.

Even if there were an ambiguity in the statute, which there is not, the Court would be required to construe the provisions of SIPA broadly to protect customers. In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. § 7(d) (June 9, 1969); H.R. 13308, 91st Cong. § 7(d) (Aug. 4, 1969). **The final bill dropped this restriction.** Thus, any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Customers because SIPA is a remedial statute and "[t]hus should be construed broadly to effectuate its purposes." *Tcherepin v. Knight,* 389 U.S. 332 (1967); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285, 305 (Bankr. S.D.N.Y. 2011) *aff'd sub nom. In re Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, 480 B.R. 117 (S.D.N.Y. 2012) *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422 (2d Cir. 2013) (noting importance of preserving "SIPA's remedial character.").

For all of these reasons, the SIPA statute and regulations compel the Trustee's allowance of inter-account transfers for the full dollar amount of the transfer in any situation where the transfer predates the applicable statute of limitations period.

### 3. The Securities Laws Prohibit the Trustee's Methodology

Under the federal securities laws, the establishment of a securities account constitutes a new investment. *See*, *e.g.*, *Savino v. E.F. Hutton & Co., Inc.*, 507 F.Supp. 1225, 1239-40 (S.D.N.Y. 1981) (noting the well-established rule that "[t]he opening of a new account

constitutes the 'purchase' of a security"). There is no requirement that a party "identify a specific security, or demonstrate that his money was actually invested in securities, to be a purchaser of securities within the meaning of section 10b and Rule 10b-5." *Grippo v. Perazzo*, 357 F.3d 1218, 1223 (11th Cir. 2004), citing *SEC v. Zandford*, 535 U.S. 813, 819-21, 122 S.Ct. 1899, 1903-04, 153 L.Ed.2d 1 (2002); *Gelles v. TDA Indus., Inc.*, 44 F.3d 102, 104 (2d Cir. 1994) (holding that a securities "transaction need not involve cash to constitute a purchase or sale under Rule 10b-5").

Thus, when the Customers funded their accounts, whether through cash deposits or inter-account transfers, federal securities law provides that such Customers were making new investments and purchasing securities. Indeed, in each instance of an inter-account transfer, the transferor could simply have withdrawn the funds in his account, deposited them in a bank, and then written a check to the transferee, which the transferee deposited with Madoff. In that event, of course, the Trustee could not possibly claim the right to net out the deposits and withdrawals in the transferor's account because the funds would have come from outside Madoff.

There is no reason why the result should be different because the transferor simply made an inter-account transfer. Public policy strongly favors not putting form over substance. *See*, *e.g.*, *Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939) (courts should take measures to insure that "substance will not give way to form" and " that technical considerations will not prevent substantial justice from being done"); *Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 597 (2d Cir. 1991) ("It is well established that a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a bankrupt's estate."); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 498 (S.D.N.Y. 1994) (same).

While the Trustee understandably relies upon Judge Rakoff's holding that "transfers among family members" do not "morph those funds into actual new principal," we respectfully suggest that Judge Rakoff's holding with respect to inter-account transfers is insupportable under the authorities cited herein. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 499 B.R. 416 (S.D.N.Y. 2013). Judge Rakoff did not have before him the facts set forth in the Customers' declarations; he did not have before him the fact that BLMIS was only formed in December 2000 and that, prior thereto, Madoff had not been a member of SIPC; he did not know that the Trustee has no authority, under the Substantive Consolidation Order, to void transfers by Madoff; did not consider that the Trustee's methodology violated ERISA, that it violated the due process clause of the United States Constitution, and that it violated New York's strong policy of favoring the finality of commercial transactions.

## CONCLUSION

We have seen from the Net Equity Decision that important legal issues decided in a factual vacuum can lead the law in an unsustainable direction. For the reasons set forth above, we respectfully ask the Court to deny the Trustee's motion and allow the Customers to review the documents produced by the Trustee during the week of May 12, 2014, so that they can put before the Court a full factual record on which the Court can base its decision. The inter-account

transfer issue has an impact upon thousands of people in this case alone.  There is no reason for the issue to be decided without consideration of all relevant facts.

May 16, 2014

                                   Respectfully submitted,

                                   *s/s Helen Davis Chaitman*
                                   BECKER & POLIAKOFF LLP
                                   45 Broadway
                                   New York, New York 10006
                                   (212) 599-3322
                                   hchaitman@bplegal.com

                                   *Attorneys for the Customers listed*
                                   *on Exhibit A hereto*