# EXHIBIT B

Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
Attorneys for the Gaba Partnership,
Barbara K. Gaba and Richard M. Gaba

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,                                            Adv. Pro. No. 08-01789 (BRL)

            Plaintiffs                                 SIPA Liquidation

vs.                                                     **OBJECTION TO TRUSTEE'S**
                                                       **DETERMINATION OF**
BERNARD L. MADOFF INVESTMENT                            **CLAIM**
SECURITIES LLC,

            Defendant.
-----------------------------------------------------------

       The Gaba Partnership (the "Partnership") and its partners, Barbara K. Gaba and Richard M. Gaba (the "Partners") hereby object to the Notice of Trustee's Determination of Claim dated October 19, 2009 and state as follows:

**Background facts**

       1.     The Partnership was formed on January 4, 1993 pursuant to a written agreement between the Partners. The purpose of the Partnership was to invest the funds of the Partners.

       2.     On January 6, 1993, a Partnership account was opened with Bernard L. Madoff Investment Securities LLC ("Madoff") bearing Account No. 1ZA901 (the "Account"). The Partnership opened the Account for the purpose of each of the Partners investing in Madoff and each of the Partners deposited funds with Madoff for the purpose of purchasing securities.

3. During the period from January 6, 1993 through December 11, 2008, the Partners deposited a total of $1,664,051.63 into the Account and withdrew a total of $1,357,500 from the Account. However, one of the deposits was a transfer on October 1, 2003 from Madoff Account No. 1ZA52430 in the amount of $785,551.63, of which the Trustee is crediting the Partnership with zero. See Exh. A hereto at 4-5. This transfer represented a distribution from a trust established for the benefit of Dora L. Gaba, under the last will and testament of her husband, Herman Gaba, on whose estate all required federal and state estate taxes were paid, based upon the account balance in Herman Gaba's account at the time of his death.

4. The Partners do not agree with the Trustee's calculations.

5. On February 13, 2009, the Partnership filed a SIPC claim in the amount of $1,214,016.79, representing the November 30, 2008 balance in the Account. See Exh. B.

6. By letter dated October 19, 2009, Picard sent a determination letter to the Partnership rejecting its claim and denying any SIPC insurance on the ground that the Partnership withdrew more than the Partners invested, ignoring all appreciation in the Account and disregarding the transfer into the Account of $785,551.63. See Exh. A.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

7. The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that the Partnership did not have a "legitimate expectation" that the balance on the Account statement represented its property. In

2

fact, in each year of the investment, the Partners paid short term capital gains tax on the appreciation in the Account. They would not have done so if the Partners had any belief whatsoever that the assets in the Account did not belong to them.

8.  Picard has failed to state a basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at * (B.S.D.N.Y. Jan. 13, 2003).

## B. Picard has violated the requirement that he honor a customer's "legitimate expectations"

9.  The legislative history of SIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.

> \*   \*   \*

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible], customers will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

1096112.1

10. SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

11. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

12. Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

4

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

13. As indicated infra, in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00) (emphasis added).

**C. Without legal authority, Picard has invented his own definition of "net equity"**

14. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –

5

> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

15. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

16. The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

17. In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who have depended upon their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

18. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

6

1096112.1

>Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme.  It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

19. Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

20. After ten months of his tenure, Picard has identified only two Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate.  Picard has sued two Madoff customers, Stanley Chais and Jeffrey Picower who, Picard has alleged, took out of Madoff $7.2 billion more than they invested.  Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts.  Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

21. However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

22. The Partners, like thousands of other investors, received monthly statements from Madoff indicating returns on their Madoff investment in the range of 9 – 11% per year, subject to short term capital gains tax rates.  The Partnership had entered into standard brokerage agreements with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Partnership had specified, numbered accounts for the purchase and sale of securities; it received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune

7

1096112.1

100 company stocks and the purchase of US Treasury securities. The Partners paid taxes on the annual growth of the investments with Madoff. There is no basis to claim that each of the Partners did not have a "legitimate expectation" that the assets reflected on the Partnership's statements sent by Madoff belonged to them.

23. Thus, the Partnership is entitled to a claim for the November 30, 2008 balance on the Account as reflected on the Madoff statement.

**D. The Partnership is entitled to prejudgment interest on its investment and profits.**

24. At a minimum, under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted the Partnership's funds, it is also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

25. Although it is not legally relevant, Picard cannot prove that Madoff earned no money on the Partnership' investments. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which the Partnership and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

26. In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme

8

1096112.1

is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

**E. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit**

27. In derogation of his fiduciary duty to the Partnership, Picard is, in effect, imposing upon the Partnership a fraudulent conveyance judgment for sums that the Partnership withdrew from the Account beyond the statute of limitations period applicable to fraudulent conveyances and is failing to credit the Partnership with the full value of funds transferred into the Account beyond the statute of limitations period. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not

9

possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Partners of SIPC insurance and the claim to which the Partnership is absolutely entitled.

28. Moreover, Picard has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for Picard to utilize the avoidance powers of a trustee to enrich SIPC at the Partnership's expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g.,* 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

29. Here, however, Picard is not acting to assure equal distribution among prepetition creditors. On the contrary, he is simply acting as SIPC's agent in depriving the Partnership of the $1,000,000 in SIPC insurance to which the Partners are statutorily entitled.

**F. Picard has violated SIPA by delaying the payment of SIPC insurance**

30. Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace the Partners' securities up to a

10

1096112.1

value of $500,000 each, for a total of $1,000,000, as valued on the November 30, 2008 statements.

**G. The Partners are "customers" under SIPA entitled to $500,000 each in SIPC insurance.**

31.     Each of the Partners is a "customer" under the plain definition of "customer" in SIPA. Thus, each is entitled to receive $500,000 in SIPC insurance. 15 U.S.C. § 78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities."). *Rosenman Family, LLC v. Picard,* 401 B.R. 629, 635 (B.S.D.N.Y. 2009)("the mere act of entrusting . . . cash to the debtor for the purpose of effecting securities transactions . . . triggers customer status. . ."); *SEC v. Ambassador Church Financial Devel. Group, Inc.,* 679 F. 2d 608, 614 (6th Cir. 1982); *In re Primeline Sec. Corp.,* 295 F. 3d 1100, 1107 (10th Cir. 2002)("SIPA does . . . protect claimants who try to attempt to invest through their brokerage firm but are defrauded by dishonest brokers . . . If a claimant intended to have the brokerage purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds"); *Miller v. DeQuine (In re Stratton Oakmont, Inc.),* 2003 WL 22698876 at *3 (S.D.N.Y. Nov. 14, 2003)("Stratton Oakmont's conversion of Claimants' property makes the customers within the meaning of SIPA.").

32.     Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder." Instead, Congress' definition of "customer" is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the

11

1096112.1

extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor")(emphasis added).

33.  Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Partnership because "SIPA is remedial legislation.  As such, it should be construed liberally to effect its purpose."  *Tcherepin v. Knight,* 389 U.S. 332 (1967).

34.  Moreover, it is clear that Congress intended for "customer" to be broadly interpreted.  In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer."  S. 2348, 91st Cong. Section 7(d)(June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (Aug.4, 1969).  The final bill dropped this restriction.

35.  The Trustee may erroneously rely upon SIPC Rule 103.  SIPA does not permit SIPC, by the promulgation of Rules, to change the definition of "customer" under the statute.  Hence, Rule 103 is invalid.  15 U.S.C. §78ccc(b)(4)(A).

**H.  The Trustee is bound by federal law to accept the October 1, 2003 transfer at face value**

36.  The Trustee's disregard of the October 1, 2003 transfer from a trust established for Dora L. Gaba pursuant to the last will and testament of Herman Gaba is a violation of federal law, given the fact that the estate paid income taxes on the value of the account as reflected in the Madoff statements.

**Conclusion**

The Partnership is entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of $1,000,000 as of November 30, 2008, $500,000 for each of the Partners.

The Partnership is entitled to have its claim recognized in the amount of $1,214,016.79, consistent with the November 30, 2008 statement.

The Partners are entitled to judgment against Picard and Baker & Hostetler LLP for the damages they have suffered as a result of the breach of fiduciary duty of Picard and his counsel.

November 6, 2009

                                        PHILLIPS NIZER LLP

                                        By  Helen Davis Chaitman

                                        666 Fifth Avenue
                                        New York, NY 10103-0084
                                        (212) 841-1320
                                        Attorneys for
                                        The Gaba Partnership,
                                        Barbara K. Gaba and
                                        Richard M. Gaba

1096112.1

# EXHIBIT A

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

### In Liquidation
### DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

October 19, 2009

The Gaba Partnership
c/o Richard M. Gaba and Barbara K. Gaba
PO Box 25
Ancramdale, New York 12503

Dear Mr. and Mrs. Gaba:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1ZA901 designated as Claim Number 2307:

Your claim for a credit balance of $1,214,016.79 and any claim for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $1,357,500.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

of $878,500.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($479,000.00) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after October 19, 2009, the date on which the Trustee mailed this notice.

2

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

> Clerk of the United States Bankruptcy Court for
> the Southern District of New York
> One Bowling Green
> New York, New York 10004

> and

> Irving H. Picard, Trustee
> c/o Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York 10111

_____
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

3

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 1/6/1993 | CHECK | $100,000.00 | $100,000.00 |
| 1/6/1993 | CHECK | $18,000.00 | $18,000.00 |
| 9/20/1999 | CHECK | $75,000.00 | $75,000.00 |
| 7/31/2003 | CHECK | $450,000.00 | $450,000.00 |
| 10/1/2003 | TRANS FROM 1ZA52430 | $785,551.63 | $0.00 |
| 6/8/2004 | CHECK | $235,500.00 | $235,500.00 |
| **Total Deposits:** | | $1,664,051.63 | $878,500.00 |

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 10/19/1994 | CHECK | ($15,000.00) | ($15,000.00) |
| 6/1/1995 | CHECK | ($20,000.00) | ($20,000.00) |
| 4/19/1996 | CHECK | ($25,000.00) | ($25,000.00) |
| 1/29/1997 | CHECK | ($40,000.00) | ($40,000.00) |
| 10/3/1997 | CHECK | ($10,000.00) | ($10,000.00) |
| 1/7/1998 | CHECK | ($12,000.00) | ($12,000.00) |
| 11/5/1998 | CHECK | ($15,000.00) | ($15,000.00) |
| 3/19/1999 | CHECK | ($40,000.00) | ($40,000.00) |
| 2/17/2000 | CHECK | ($25,000.00) | ($25,000.00) |
| 3/2/2000 | CHECK | ($10,000.00) | ($10,000.00) |
| 4/20/2001 | CHECK | ($10,000.00) | ($10,000.00) |
| 6/25/2002 | CHECK | ($7,500.00) | ($7,500.00) |
| 11/21/2002 | CHECK | ($10,000.00) | ($10,000.00) |
| 2/12/2003 | CHECK | ($10,000.00) | ($10,000.00) |
| 4/2/2003 | CHECK | ($50,000.00) | ($50,000.00) |
| 6/20/2003 | CHECK | ($10,000.00) | ($10,000.00) |
| 9/17/2003 | CHECK | ($20,000.00) | ($20,000.00) |
| 11/4/2003 | CHECK | ($25,000.00) | ($25,000.00) |
| 12/15/2003 | CHECK | ($20,000.00) | ($20,000.00) |
| 4/2/2004 | CHECK | ($25,000.00) | ($25,000.00) |
| 10/7/2004 | CHECK | ($25,000.00) | ($25,000.00) |
| 1/5/2005 | CHECK | ($50,000.00) | ($50,000.00) |
| 3/30/2005 | CHECK | ($75,000.00) | ($75,000.00) |
| 6/10/2005 | CHECK | ($35,000.00) | ($35,000.00) |
| 9/13/2005 | CHECK | ($50,000.00) | ($50,000.00) |
| 1/9/2006 | CHECK | ($35,000.00) | ($35,000.00) |
| 2/15/2006 | CHECK | ($153,000.00) | ($153,000.00) |
| 4/11/2006 | CHECK | ($40,000.00) | ($40,000.00) |
| 6/21/2006 | CHECK | ($30,000.00) | ($30,000.00) |

4

08-01789-cgm    Doc 6717-2    Filed 05/16/14    Entered 05/16/14 16:58:12    Exhibit B
Pg 20 of 20

| | | | |
|---|---|---|---|
| 9/12/2006 | CHECK | ($50,000.00) | ($50,000.00) |
| 11/8/2006 | CHECK | ($35,000.00) | ($35,000.00) |
| 1/16/2007 | CHECK | ($30,000.00) | ($30,000.00) |
| 4/4/2007 | CHECK | ($40,000.00) | ($40,000.00) |
| 5/24/2007 | CHECK | ($30,000.00) | ($30,000.00) |
| 6/26/2007 | CHECK | ($20,000.00) | ($20,000.00) |
| 9/6/2007 | CHECK | ($60,000.00) | ($60,000.00) |
| 1/16/2008 | CHECK | ($40,000.00) | ($40,000.00) |
| 3/6/2008 | CHECK | ($40,000.00) | ($40,000.00) |
| 5/19/2008 | CHECK | ($40,000.00) | ($40,000.00) |
| 7/2/2008 | CHECK | ($20,000.00) | ($20,000.00) |
| 9/8/2008 | CHECK | ($40,000.00) | ($40,000.00) |
| 10/28/2008 | CHECK | ($20,000.00) | ($20,000.00) |
| **Total Withdrawals:** | | ($1,357,500.00) | ($1,357,500.00) |
| **Total deposits less withdrawals:** | | $306,551.63 | ($479,000.00) |

5