# EXHIBIT E

Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
Attorneys for Mishkin Family Trust,
William Mishkin, Grace Mishkin,
Ellen Mishkin and Julia Mishkin

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

        Defendant.

---------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

        The Mishkin Family Trust (the "Trust") and its beneficiaries, William Mishkin, Grace Mishkin, Ellen Mishkin and Julia Mishkin (the "Beneficiaries") hereby object to the Notice of Trustee's Determination of Claim dated October 19, 2009 sent by Irving H. Picard and state as follows:

**Background facts**

        1.      On November 30, 1992, Grace and William Mishkin opened an account with Bernard L. Madoff Investment Securities LLC ("Madoff"): Account No. 1ZA030 (the "Account").

        2.      At the instruction of Bernard L. Madoff, in 2006 the Trust was formed pursuant to a written agreement dated September 1, 2006 and the holder of the Account was changed to the

1095964.1

Trust so that the Mishkins' children, Ellen and Julia, could also deposit funds into the Trust for the purpose of purchasing securities. Thereafter, Ellen and Julia directly deposited funds with Madoff for the purpose of purchasing securities.

3. Each of the Beneficiaries had deposited money into the Account for the purpose of purchasing securities and each of them had the power to direct the investments in the Account. Each of the Beneficiaries communicated with Madoff concerning the Account.

4. During the period from November 30, 1992 through December 11, 2008, according to the Trustee, the Beneficiaries deposited a total of $1,130,000 into the Account and withdrew a total of $1,305,189 from the Account. See Exh. A at 4 – 5. On July 2, 1998, $100,000 was transferred into the Account from Madoff Account No. 1ZA16030. The Trustee has credited the Account with only $32,817.03 of this amount. The Beneficiaries dispute the Trustee's calculations.

5. Throughout the period that the Beneficiaries withdrew funds from the Account, they paid taxes annually on the withdrawn funds.

6. The November 30, 2008 market value of securities in the Account was $1,117,648.

7. On February 10, 2009, the Trust and each of the Beneficiaries sent a SIPC claim to Picard for the Account asserting a claim for securities in the amounts set forth in paragraph 2 above, based upon the November 30, 2008 Madoff statement.

8. On October 19, 2009, Picard sent the Trust a determination letter (the "Determination Letter") with respect to the Account, rejecting the claim for securities based upon the November 30, 2008 balance and stating that the Trust was not entitled to a claim because it had withdrawn $242,372.25 in excess of the funds invested, ignoring all appreciation

2

in the Account and ignoring the fact that each of the Beneficiaries is a "customer" under the Securities Investor Protection Act ("SIPA"), entitled to up to $500,000 in SIPC insurance. See Exh. A at 1-2.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

9.      The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that the Beneficiaries did not have a "legitimate expectation" that the balance on the Account statements represented their property. In fact, in each year that they had the Accounts, the Beneficiaries paid ordinary income taxes on the withdrawals from the Account, which were duly accepted by the federal and state taxing authorities. The Beneficiaries would not have paid those sums if they did not believe that the assets in the Account belonged to them.

10.     Picard has failed to state a basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.*, No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

**B. Picard has violated the requirement that he honor a customer's "legitimate expectations"**

3

1095964.1

11.     The legislative history of the Securities Investor Protection Act ("SIPA") makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
>
> \*   \*   \*
>
> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

12.     SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

13.     Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be

4

1095964.1

the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

14. Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

15. As indicated *infra*, in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.

5

1095964.1

COURT: In other words, if the money was diverted, converted –

HARBECK: And the securities were never purchased.

COURT: Okay.

HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00) (emphasis added).

### C. Without legal authority, Picard has invented his own definition of "net equity"

16. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

17. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

18. The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is

6

1095964.1

calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

19. In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who, like the Beneficiaries, have depended upon their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

20. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

21. Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.*, to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

22. After ten months of his tenure, Picard has identified only two Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. For example, Picard has sued two Madoff customers, Stanley Chais and Jeffry Picower who, Picard has alleged, took out of Madoff $7 billion more than they invested. Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts.

1095964.1

Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

23.    However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

24.    The Beneficiaries, like thousands of other investors, received monthly statements from Madoff over the past 16 years indicating returns on their Madoff investment in the range of 9.58% to 20.05% per year. The Trust had entered into a standard brokerage agreement with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Account had specific numbers; they received on a monthly basis trade confirmations for every securities transaction in the Account which accurately set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis to claim that the Beneficiaries did not have a "legitimate expectation" that the assets reflected on the Account statements sent to them by Madoff belonged to them. Thus, the Beneficiaries are entitled to a claim for securities in the amount of $1,117,648, as reflected on the November 30, 2008 Madoff statement.

### D. The Beneficiaries are each a "customer" under SIPA and are each entitled to up to $500,000 in SIPC insurance.

25.    Each of the Beneficiaries is a "customer" under the plain definition of "customer" in SIPA. Thus, each is entitled to receive the amounts set forth in paragraph 2, up to $500,000 in SIPC insurance. 15 U.S.C. § 78lll(2) ("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.").

8

26. Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder." Instead, Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor").

27. Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Beneficiaries because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

**E. The Beneficiaries are entitled to prejudgment interest on their investment and profits.**

28. Under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted the Beneficiaries' funds, that fact also entitles them to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.*S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

9

29. Although it is not legally relevant, Picard cannot prove that Madoff earned no money on the Beneficiaries' investment. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which the Beneficiaries and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

30. In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers*, 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

10

### F. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit

31. In derogation of his fiduciary duty to the Beneficiaries, Picard has applied his net investment calculation to determine the amount of their claim. However, he has no right to reduce their claim in this manner and to reduce transfers into their Account from another Madoff account. Without any legal authority, Picard is, in effect, imposing upon the Beneficiaries a fraudulent conveyance judgment for sums the Beneficiaries and their transferor withdrew from the Accounts beyond the statute of limitations period applicable to fraudulent conveyances. He is also charging Ellen Mishkin and Julia Mishkin with alleged fraudulent conveyances made by their parents many years earlier. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Beneficiaries of the claim to which they are absolutely entitled.

### H. Picard has violated SIPA by delaying the payment of SIPC insurance

32. Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace the Beneficiaries' securities up to the values set forth in paragraph 2 for each of them as of November 30, 2008.

### Conclusion

The Beneficiaries are entitled to an order compelling Picard and SIPC to immediately replace the securities in their Account to the extent of a valuation of $500,000 for each of the Beneficiaries as of November 30, 2008. Thus, they should receive securities valued at $1,117,648 as of November 30, 2008.

The Beneficiaries are entitled to have their claim recognized in the amount of $1,117,648, consistent with the November 30, 2008 statements.

The Beneficiaries are entitled to judgment against Picard and Baker & Hostetler LLP for the damages they have suffered as a result of the breach of fiduciary duty of Picard and his counsel.

November 4, 2009

                                      PHILLIPS NIZER LLP

                                      By <u>s/s Helen Davis Chaitman</u>

                                      666 Fifth Avenue
                                      New York, NY 10103-0084
                                      (212) 841-1320
                                      Attorneys for
                                      The Mishkin Family Trust,
                                      William Mishkin, Grace Mishkin
                                      Ellen Mishkin and Julia Mishkin

1095964.1

# EXHIBIT A

# BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

## DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

October 19, 2009

Mishkin Family Trust
750 Kappock Street, Apt. 708
Riverdale, NY 10463

Dear Mishkin Family Trust:

## PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1ZA030 designated as Claim Number 004174:

Your claim for a credit balance of $1,117,648.00 and for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $1,305,189.28), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $1,062,817.03). As noted, no securities were ever purchased by BLMIS for your account. Any

---

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($242,372.25) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after October 19, 2009, the date on which the Trustee mailed this notice.

2

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

> Clerk of the United States Bankruptcy Court for
> the Southern District of New York
> One Bowling Green
> New York, New York 10004

> and

> Irving H. Picard, Trustee
> c/o Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York 10111

_____
Irving H. Picard
Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc: Robert N. Cappucci, Esq.
    Entwistle & Cappucci LLP
    280 Park Avenue, 26th Floor West
    New York, NY 10017

3

## Table A

### DEPOSITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 11/30/1992 | CHECK | $380,000.00 | $380,000.00 |
| 11/3/1995 | CHECK | $50,000.00 | $50,000.00 |
| 7/27/1998 | TRANS FROM 1ZA16030 | $100,000.00 | $32,817.03 |
| 1/11/1999 | CHECK | $100,000.00 | $100,000.00 |
| 6/21/2004 | CHECK | $200,000.00 | $200,000.00 |
| 9/6/2006 | CHECK WIRE | $200,000.00 | $200,000.00 |
| 9/26/2006 | CHECK WIRE | $100,000.00 | $100,000.00 |
| **Total Deposits:** | | $1,130,000.00 | $1,062,817.03 |

### WITHDRAWALS

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 4/8/1993 | CHECK | ($20,520.14) | ($20,520.14) |
| 7/8/1993 | CHECK | ($10,000.00) | ($10,000.00) |
| 7/8/1993 | CHECK | ($10,000.00) | ($10,000.00) |
| 7/12/1993 | STOP PAYMENT | $10,000.00 | $10,000.00 |
| 7/13/1993 | CHECK | ($14,146.13) | ($14,146.13) |
| 10/13/1993 | CHECK | ($7,679.62) | ($7,679.62) |
| 1/14/1994 | CHECK | ($16,789.01) | ($16,789.01) |
| 4/13/1994 | CHECK | ($15,615.91) | ($15,615.91) |
| 7/14/1994 | CHECK | ($13,451.81) | ($13,451.81) |
| 10/13/1994 | CHECK | ($14,917.77) | ($14,917.77) |
| 1/13/1995 | CHECK | ($10,734.11) | ($10,734.11) |
| 4/13/1995 | CHECK | ($14,741.86) | ($14,741.86) |
| 7/14/1995 | CHECK | ($18,757.07) | ($18,757.07) |
| 10/16/1995 | CHECK | ($11,868.04) | ($11,868.04) |
| 1/12/1996 | CHECK | ($15,427.74) | ($15,427.74) |
| 3/8/1996 | CHECK | ($20,000.00) | ($20,000.00) |
| 4/12/1996 | CHECK | ($17,136.53) | ($17,136.53) |
| 7/12/1996 | CHECK | ($14,820.99) | ($14,820.99) |
| 10/11/1996 | CHECK | ($16,664.84) | ($16,664.84) |
| 1/13/1997 | CHECK | ($18,568.79) | ($18,568.79) |
| 4/10/1997 | CHECK | ($20,579.65) | ($20,579.65) |
| 7/11/1997 | CHECK | ($24,623.55) | ($24,623.55) |
| 10/10/1997 | CHECK | ($13,155.23) | ($13,155.23) |
| 1/13/1998 | CHECK | ($14,008.93) | ($14,008.93) |
| 4/8/1998 | CHECK | ($21,008.01) | ($21,008.01) |
| 7/9/1998 | CHECK | ($19,978.09) | ($19,978.09) |
| 10/19/1998 | CHECK | ($12,630.55) | ($12,630.55) |
| 1/13/1999 | CHECK | ($27,064.40) | ($27,064.40) |