MILBERG LLP
Matthew Gluck
Matthew A. Kupillas
Jennifer L. Young
Joshua E. Keller
One Pennsylvania Plaza
New York, NY 10119
Tel:  (212) 594-5300
Fax:  (212) 868-1229

*Attorneys for the Customers Identified on*
*Attachment A Hereto*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>            Plaintiff-Applicant,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                Debtor | |

**CLAIMANTS' OMNIBUS OPPOSITION TO THE TRUSTEE'S MOTION
AFFIRMING APPLICATION OF NET INVESTMENT METHOD TO
DETERMINATION OF CUSTOMER TRANSFERS BETWEEN BLMIS ACCOUNTS**

# TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ........................................................................1

RELEVANT BACKGROUND ..............................................................................3

ARGUMENT.........................................................................................................6

1.  The Trustee's Proposed Method Ignores the Separate Nature of the Transferor and
    Transferee Accounts Involved in Inter-Account Transfers ...........................................6

2.  Crediting Unadjusted Amounts as Principal Deposits into Transferee Accounts Is
    Consistent with SIPA's Goal to Promote Fairness.........................................................8

3.  The Trustee's Proposed Method Conflicts with the Overriding Policy Concern of
    Federal and State Legislatures for Respecting the Finality of Transactions ................11

    a.  Legislatures Have Shown a Clear Policy Preference for Respecting the Finality of
        Transactions between Private Parties ......................................................................11

    b.  Inter-Account Transferees Have Legitimate Property Interests in the Full Amounts
        that Were Transferred to Their BLMIS Accounts...................................................13

4.  The Trustee's Proposed Methodology Improperly Circumvents the Limits of His
    Avoidance Powers ........................................................................................................16

5.  There is No Bankruptcy Provision, Policy or Controlling Rule of Law Requiring the
    Trustee to Reduce Customers' Net Equity by Failing to Give Full Credit to Inter-
    Account Transfers ........................................................................................................19

    a.  The *Net Equity Decision* Does Not Support the Trustee's Position Regarding Inter-
        Account Transfers....................................................................................................19

    b.  The *Antecedent Debt Decision* Is Not Controlling and Is Distinguishable ...............21

    c.  The Trustee Has Failed to Meet His Burden to Show Why the Customers' Claims
        for Inter-Account Transfers Should Be Disallowed .................................................24

CONCLUSION ...................................................................................................26

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Int'l Grp. v. Bank of Am. Corp.*,
   712 F.3d 775 (2d Cir. 2013) ...............................................................10, 23

*Appleton v. First Nat'l Bank of Ohio*,
   62 F.3d 791 (6th Cir. 1995) ......................................................................20

*Banque Worms v. BankAmerica Int'l*,
   77 N.Y.2d 362 (1991) ....................................................................10, 12, 16

*In re Bayou Grp., LLC*,
   396 B.R. 810 (Bankr. S.D.N.Y. 2008) ......................................................23

*In re Bernard L. Madoff Inv. Sec. LLC*,
   496 B.R. 744 (Bankr. S.D.N.Y. 2013) ........................................................5

*In re Bernard L. Madoff Inv. Sec. LLC*,
   654 F.3d 229 (2d Cir. 2011) .............................................................*passim*

*BFP v. Resolution Trust Corp.*,
   511 U.S. 531 (1994) .................................................................................16

*Butner v. United States*,
   440 U.S. 48 (1979) ...................................................................................14

*Carey v. IBEW Local 363 Pension Plan*,
   201 F.3d 44 (2d Cir. 1999) .......................................................................23

*Christy v. Alexander & Alexander of N.Y., Inc.*,
   130 F. 3d 52 (2d Cir. 1997) ......................................................................17

*In re Dreier LLP*,
   429 B.R. 112 (Bankr. S.D.N.Y. 2010) ................................................15, 16

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
   651 F.3d 329 (2d Cir. 2011) .....................................................................16

*Flanagan v Mount Eden Gen. Hosp.*,
   24 N.Y.2d 427 (1969) ...............................................................................12

*Hooker Atlanta Corp. v. Hocker*,
   155 B.R. 332 (Bankr. S.D.N.Y. 1993) ..........................................17, 18, 19

*In re M. Fabrikant & Sons, Inc.*,
    394 B.R. 721 (Bankr. S.D.N.Y. 2008)...................................................................18

*In re Manhattan Inv. Fund, Ltd.*,
    397 B.R. 1 (S.D.N.Y. 2007) ...................................................................................17

*In re Maui Indus. Loan & Fin. Co.*,
    454 B.R. 133 (Bankr. D. Haw. 2011) ...................................................................12

*Menichini v. Grant*,
    995 F.2d 1224 (3d Cir. 1993) ................................................................................12

*In re MF Global Holdings*,
    No. 11-15059, 2012 Bankr. LEXIS 5297 (Bankr. S.D.N.Y. Nov. 13, 2012)...................24, 25

*In re New Times Sec. Servs.*,
    371 F.3d 68 (2d Cir. 2004) ....................................................................................20

*In re New Times Sec. Servs.*,
    463 F.3d 125 (2d Cir. 2006) ....................................................................................7

*Ontario Hydro v. Zallea Sys., Inc.*,
    569 F. Supp. 1261 (D. Del. 1983) .........................................................................11

*Picard v. Greiff*,
    476 B.R. 715 (S.D.N.Y. 2012) ................................................................................3

*Raleigh v. Illinois Dep't of Revenue*,
    530 U.S. 15 (2000) ................................................................................................14

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
    No. 12 Misc 115, 2014 U.S. Dist. LEXIS 58709 (S.D.N.Y. Apr. 27, 2014) ...........21

*Sec. Investor Prot. Corp. v. I.E.S. Mgmt. Grp.*,
    612 F. Supp. 1172 (D.N.J. 1985)...........................................................................24

*Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*,
    533 F.2d 1314 (2d Cir. 1976) ..................................................................................7

*SEC v. Credit Bancorp, Ltd.*,
    290 F.3d 80 (2d Cir. 2002) ....................................................................................10

*SEC v. Universal Express, Inc.*,
    No. 04 Civ. 2322, 2008 U.S. Dist. LEXIS 35342 (S.D.N.Y. Apr. 30, 2008)...................15, 16

*Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    499 B.R. 416 (S.D.N.Y. 2013) ......................................................................*passim*

*Simkin v. Blank,*
 19 N.Y.3d 46 (2012) ...................................................................................... 14

*Solomon v. Nedlloyd, Inc.,*
 59 B.R. 873 (Bankr. S.D.N.Y. 1986) ...................................................... 17, 19

*In re Tax Refund Litig.,*
 698 F. Supp. 439 (E.D.N.Y. 1988) ................................................................ 10

*Travelers Cas. & Sur. Co. of Am. v. PG&E,*
 549 U.S. 443 (2007) ...................................................................................... 14

*United States v. Kubrick,*
 444 U.S. 111 (1979) ...................................................................................... 12

**Statutes**

11 U.S.C. § 502 .................................................................................................... 15

11 U.S.C. § 548 .................................................................................................... 22

15 U.S.C. § 78a et seq .......................................................................................... 3

15 U.S.C. § 78aaa et seq ............................................................................... *passim*

15 U.S.C. § 78fff-2 .................................................................................... 3, 10, 18

15 U.S.C. § 78fff-3(a)(2) ....................................................................................... 6

15 U.S.C. § 78lll ........................................................................................... *passim*

N.Y. U.C.C. § 2-403 (2014) ............................................................................... 14

N.Y. U.C.C § 3-302(1)(a)-(c) (2014) ................................................................. 14

N.Y. U.C.C. § 8-303 (2014) ............................................................................... 14

**Other Authorities**

17 C.F.R. § 300.100(b) ......................................................................................... 7

Charles F. Gibbs & Colleen F. Carew, *Absent Actual Notice, When Does the*
 *Clock Commence a Proceeding?; Surrogate's Practice Proceedings,* N.Y.
 L.J., Feb. 15, 2002 .......................................................................................... 13

iv

This memorandum of law is submitted by the customers of Bernard L. Madoff Investment Securities LLC ("BLMIS") identified on Attachments A-D appended hereto (collectively, the "Customers" or "Customer-transferees" or "Claimants") who submitted timely claims to Irving H. Picard, the trustee ("Trustee"), under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa, *et seq.* The Customers submit this memorandum of law in opposition to the Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers between BLMIS Accounts [Dkt. No. 6084].[1]

## SUMMARY OF THE ARGUMENT

The Trustee is constrained by federal and state law to determine the claims of BLMIS customers who received funds from another BLMIS customer through one or more inter-account transfers by crediting as principal deposits the full unadjusted amounts transferred to the transferee accounts. Yet, the Trustee proposes a method that seeks to undo hundreds, if not thousands, of transactions between private parties involving transfers of funds from one BLMIS account to another. For at least four independent reasons, this Court should reject the Trustee's proposed treatment of inter-account transfers.

*First*, the Trustee's proposed method treats the transferor and transferee accounts as if they constituted a single account, which improperly disregards SIPA's directive that different customers' accounts must be considered separately in the determination of each customer's "Net Equity". By aggregating the transferor's and transferee's accounts for the calculation of a

---

[1] The Trustee's Memorandum of Law in Support of Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts [Dkt. No. 6085] is referred to herein as the "Trustee's Brief" or "Tr. Br.", and the Memorandum of Law of the Securities Investor Protection Corporation ("SIPC") in Support of the Trustee's Determinations Regarding Inter-Account Transfers [Dkt. No. 6079] is referred to herein as "SIPC's Brief" or "SIPC Br."

transferee-claimant's net equity, the Trustee improperly disregards the duties owed to the transferee arising from this transaction between third parties. This is nothing more than a back-door attempt to extend the Trustee's avoidance powers to an area in which such powers do not apply.

*Second*, the Trustee's proposed method—based solely on the means that the transferor selected to convey funds to the transferee—will result in arbitrary and unequal treatment of different BLMIS customers who are similarly situated. SIPA should not be interpreted to reach such an unjust and harsh result.

*Third*, the Trustee's proposed method disregards important and overriding policy concerns expressed by state and federal legislatures: the strong preferences for respecting the finality of the types of transactions in which many inter-account transfers occurred.

*Fourth*, the Trustee cannot ignore the significance of the transferor's participation and consent to the transaction that results in the conveyance of amounts to the transferee. This transaction makes the transferor an initial transferee and the transferee a subsequent transferee. The Trustee must take steps to avoid the transfer and obligations created by this transaction. And where he is constrained from doing so by the limits on his avoidance powers, the Trustee cannot do an end-run around these limitations under the guise of calculating net equity.

The Trustee incorrectly treats prior decisions in this SIPA proceeding and in avoidance actions involving BLMIS as if they give him carte blanche to broadly interpret the so-called "Net Investment Method" to disregard the rights afforded to the recipients of inter-account transfers. However, those decisions do not and should not apply to the issue presently before the Court.

2

The Court should deny Trustee's motion in its entirety, and direct the Trustee to recalculate the Claimants' Net Equity claims by treating the full, unadjusted amounts of inter-account transfers as principal deposits to the Claimants' accounts.

## RELEVANT BACKGROUND

BLMIS was a securities broker-dealer registered with the Securities and Exchange Commission ("SEC") and regulated under the Securities Exchange Act of 1934, and it was a member of SIPC. According to the Trustee, the brokerage account statements and trade confirmations that BLMIS issued to its customers were fraudulent. Instead of investing customer deposits, BLMIS purportedly used this money to "prop up" its "legitimate" business lines and pay amounts owed to other customers. The BLMIS market making and propriety business units "'appear to have been largely involved in legitimate trading.'" *Picard v. Greiff*, 476 B.R. 715, 718 n.4 (S.D.N.Y. 2012) (citations omitted).[2]

On December 11, 2008, BLMIS was placed into liquidation pursuant to SIPA and, on December 15, 2008, Irving H. Picard was appointed as Trustee to administer the liquidation of BLMIS under SIPA. Under SIPA, the Trustee must allocate customer property "to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities." 15 U.S.C. § 78fff-2(c)(1)(B). "Net Equity" is defined in SIPA as the "dollar amount" of the customer's account, to be determined by "calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated . . . all securities positions of such customer . . . [less any loans taken by the customer]." 15 U.S.C. § 78lll(11)(A)(i).

---

[2] Solely for the purposes of this response to the Trustee's Motion, the Customers do not contest the Trustee's oft-repeated but unproven assertions about the length and scope of the BLMIS fraudulent scheme.

3

Each of the Customers was the recipient of at least one transfer of funds from another BLMIS account, and those transfers were reflected as principal deposits into the Customers' accounts on BLMIS account statements. In each inter-account transfer, the transferor instructed BLMIS to withdraw funds from the transferor's account and to deposit those funds into the Customer-transferee's account.

Each Customer submitted a timely claim to the Trustee. The Trustee disallowed the Customers' claims, in whole or in part, purportedly based on the Trustee's application of the Net Investment Method. Under the Net Investment Method, a customer's Net Equity is calculated by adding a customer's principal contributions to BLMIS and subtracting any withdrawals. *See* Tr. Br. at 7-8. When the Trustee calculated the Customers' Net Equity, the Trustee did not credit the full amount of the inter-account transfers as principal contributions into the Customers' accounts, despite the fact that the full amounts transferred from the transferor accounts to the Customer-transferee accounts are reflected in the Customers' records, the contemporaneous documents furnished to the Customers at the time of the transfers, and/or the books and records of BLMIS. Instead, the Trustee gave partial or no credit for many of those inter-account transfers based on the Trustee's assessment of whether, at the time of the transfer, the transferor's account contained sufficient principal to fund the transfer to the transferee's account. If sufficient principal allegedly did not exist in the transferor's account at the time of the transfer to cover the amount of that transfer, the Trustee only credited the Customer-transferee's account with an amount equal to the amount of principal available (if any) in the transferor's account at that time. *See* Tr. Br. at 12-13.

The Customers timely objected to the Trustee's claim determinations, arguing, *inter alia*, that their Net Equity should be determined on the basis of the market value for the securities

4

reflected on their last BLMIS statements (the "Last Statement Method"). On October 16, 2009, the Trustee filed a motion with the Bankruptcy Court seeking entry of an order affirming his Net Investment Method. On March 1, 2010, the Bankruptcy Court issued a Memorandum Decision affirming the Trustee's Net Investment Method. On August 16, 2011, the Second Circuit affirmed the Bankruptcy Court's decision. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "*Net Equity Decision*"), *cert. denied*, 133 S. Ct. 24 & 25 (2012). Although the Second Circuit, in the *Net Equity Decision*, endorsed the Trustee's selection of the Net Investment Method over the Last Statement Method for calculating Net Equity, it recognized that these "two competing methods of calculating 'Net Equity' . . . *are the only two methods at issue here. We do not hold that they are the only possible approaches to calculation of 'Net Equity' under SIPA*." *Id.* at 235 n.5 (emphasis added).

Accordingly, unresolved issues remain for determining the total Net Equity for customer claims. For example, the Trustee has refused to include an adjustment to his Net Equity calculation that would account for the effect of inflation on customers' deposits. Although the Bankruptcy Court agreed with the Trustee's approach to an inflation adjustment, *see In re Bernard L. Madoff Inv. Sec. LLC*, 496 B.R. 744 (Bankr. S.D.N.Y. 2013), this issue is currently on direct appeal to the circuit court (No. 14-97(L) (2d Cir.)). The unresolved issue now before this Court is the Trustee's and SIPC's request that the Court approve the Trustee's methodology for the treatment of inter-account transfers in the calculation of Customers' Net Equity claims. Neither the Second Circuit nor any other court has addressed whether the full amounts of inter-account transfers should be treated as principal deposited into the Customer-transferees'

accounts for purposes of calculating their Net Equity.[3]    Customers urge the Court to determine

that they should.

## ARGUMENT

**1.    The Trustee's Proposed Method Ignores the Separate Nature of the
Transferor and Transferee Accounts Involved in Inter-Account Transfers**

The Trustee's methodology is improper and unfair to Customer-transferees because it has

the effect of holding the *transferees* responsible for the purported lack of principal in the

*transferors'* BLMIS accounts.  This violates the command of SIPA that the Trustee must treat

the transferor and transferee accounts as separate accounts in the determination of Net Equity

claims.

The Trustee is obligated to conduct the proceeding consistent with SIPA and its Rules.

Separate treatment of accounts is a basic concept of SIPA.  The statute provides that "a customer

who holds accounts with the debtor in separate capacities shall be deemed to be a different

customer in each capacity" for purposes of distribution.  15 U.S.C. § 78fff-3(a)(2); *see also* 15

U.S.C. §§ 78lll(11)(A)(i), 11(B) (a customer's net equity is based on the amounts owed to "such

customer", the securities positions of "such customer", and any indebtedness of "such

customer").

The SIPC Rules implementing SIPA address the circumstances under which customer

accounts are treated separately or in a combined fashion, and speak to the persons associated

with customer accounts for that purpose.  Under the SIPC Rules, "[a]ccounts held by a customer

in different capacities, as specified by these rules, shall be deemed to be accounts of 'separate'

---

[3] Although, as discussed below, the District Court has addressed whether inter-account transfers
can constitute "value" for the purposes of defenses to avoidance actions, *see Securities Inv. Prot.
Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 499 B.R. 416 (S.D.N.Y. 2013) (the "*Antecedent Debt
Decision*"), that decision did not address the appropriate treatment of inter-account transfers in
the calculations of customers' Net Equity claims under SIPA.

6

customers." 17 C.F.R. § 300.100(b).    Accounts held by corporations, partnership or unincorporated associations are treated as separate from the partners or owners of the entity. *Id.* at § 300.103.  Trust accounts, similarly, qualify as separate customers distinct from the trustee, settlor or beneficiary of the trust. *Id.* at § 300.104(b).  "'Judicial interpretations of 'customer' status support a narrow interpretation of the SIPA's provisions.'"  *In re New Times Sec. Servs.*, 463 F.3d 125, 127 (2d Cir. 2006) (citation omitted).  *See also Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1318 (2d Cir. 1976) (definition of "customer" should not be applied in a manner that would stretch "wholly beyond [the] limits" of its understood meaning).  Accordingly, the plain language of SIPA and the SIPC's rules implementing the statute should be considered in this light in assessing the Trustee's proposed treatment of inter-account transfers.

However, the Trustee's proposed treatment of inter-account transfers disregards the plain language of SIPA, the SIPC Rules implementing the statute, and the policy underlying those provisions, because it improperly blurs the lines between the transferor and the transferee accounts in determining the transferee account's Net Equity.  Under the Trustee's proposed method, the transferor's purported lack of principal (at the time of the transfer) is imputed to the transferee, resulting in the reduction of the transferee's Net Equity claim.  But doing so necessarily destroys the separateness of the two accounts that is demanded by SIPA, because it causes the transferee's Net Equity claim to be computed based on transactions that took place in an entirely separate account.

There are valid reasons for the requirement in SIPA that different customers' accounts must be treated separately.  For example, in this proceeding, many Customers objected to the Trustee's proposed treatment of inter-account transfers on the ground that the Customers do not

7

have access to information about deposits and withdrawals in the transferors' accounts, and therefore, the Customers are deprived of their ability to effectively challenge the Trustee's denials of their claims. The Customers' inability to effectively challenge the Trustee's claim determinations is a direct result of the fact that the Trustee is basing his determinations on deposits and withdrawals that took place in other peoples' (i.e., the transferors') accounts. This unfair result would not occur if the Trustee did not impermissibly blur the lines between the transferor and transferee accounts in violation of SIPA.

To the extent that a transferor's account had no principal as computed by the Trustee, SIPA and the Bankruptcy Code provide the Trustee with the ability to reject the transferor's Net Equity claim. However, SIPA does not permit the Trustee to use the transferor account's status as a "net winner" (in the Trustee's parlance) in the determination of the Net Equity claim of an entirely different customer account.

SIPA expressly requires the Trustee to treat different customers' accounts separately. Because the Trustee's proposed method for determining customer claims violates that requirement of SIPA, it should be rejected by the Court.

### 2. Crediting Unadjusted Amounts as Principal Deposits into Transferee Accounts Is Consistent with SIPA's Goal to Promote Fairness

The Trustee's oft-repeated refrain is that any approach to calculating Net Equity that strays from his own narrow view of the Net Investment Method unjustly gives any customer a Net Equity claim for more than the customer's principal before all customers have been paid their full principal. Once again, the Trustee invokes that argument here to assert that giving full credit for inter-account transfers would be unjust. However, it is the Trustee's method that is unfair to customers, as it would result in wholly arbitrary and inappropriate differences in the calculation of BLMIS customers' Net Equity claims.

8

The Trustee's proposed treatment of inter-account transfers results in arbitrary and unjust disparities in his calculations of customers' Net Equity claims, based solely on the method that customers selected for conveying funds to other customers. The following scenarios – both of which involve the movement of funds from one customer to another – demonstrate the unequal treatment of BLMIS customers under the Trustee's proposed method:

- Scenario 1: Customer A's BLMIS account statements state that she has $1,000,000 in her account, but Customer A has no principal in her BLMIS account (as determined under the Net Investment Method). Customer A informs BLMIS that she wants to withdraw $100,000 from her account. BLMIS sends a check to Customer A for $100,000, and records in its books and records that $100,000 has been withdrawn from Customer A's account. Customer A deposits that check into her personal checking account, then writes a check to Customer B for $100,000. Customer B cashes that check in his personal bank account, then writes a new check for $100,000 and sends it to BLMIS to be deposited into his BLMIS account. BLMIS records in its books and records that $100,000 has been deposited into Customer B's account.

- Scenario 2: Customer X's BLMIS account statements state that she has $1,000,000 in her account, but Customer X has no principal in her BLMIS account (as determined under the Net Investment Method). Customer X instructs BLMIS to transfer $100,000 from her account to Customer Y's BLMIS account. BLMIS records in its books and records that $100,000 has been withdrawn from Customer X's account, and records that $100,000 has been deposited into Customer Y's account.

In both of these scenarios, funds move from one BLMIS customer to another, and the transferor lacked principal in her account at the time of the transaction. However, under the Trustee's proposed method for calculating customer claims, Customer B would be credited with the *full* amount of the transaction ($100,000), while Customer Y would not be credited with *any* portion of the transaction ($0). The only basis for the Trustee's disparate treatment of these two BLMIS customers is the method selected by the transferor (unaware of Madoff's fraudulent scheme) to convey the funds.

9

There is no sound policy reason for unequal treatment of customer claims based solely on the method by which funds were conveyed.[4] Instead, the disparate treatment of customer claims is entirely arbitrary and unfair, and SIPA should not be interpreted in manner that would result in arbitrary and disparate treatment of customers. *See American Int'l Grp. v. Bank of Am. Corp.*, 712 F.3d 775, 782 (2d Cir. 2013) ("where possible, any ambiguities in a statute should be interpreted so as to avoid arbitrary or absurd results") (citing *United States v. Wilson*, 503 U.S. 329, 334 (1992)); *In re Tax Refund Litig.*, 698 F. Supp. 439, 442 (E.D.N.Y. 1988) ("the principles of statutory construction . . . require courts to avoid harsh, unjust, oppressive or arbitrary results").

In contrast with the Trustee's method, the Customers' proposed treatment of inter-account transfers avoids arbitrary and unfair disparities between similarly situated claimants. Under the Customers' proposal, *all* conveyances of funds between BLMIS customers would be credited as principal deposits into the transferees' accounts, *regardless* of whether those funds were conveyed through internal transfers between BLMIS accounts or through physical transfers of cash or checks. The Customers' proposal makes the form of those conveyances irrelevant to the determination of customers' Net Equity claims, as it should be.

As stated above, a SIPC trustee must allocate customer property "to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities." 15 U.S.C. § 78fff-2(c)(1)(B). Implicit in the "ratable" sharing requirement is the concept of fair allocation. *See SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 89

---

[4] In fact, the law does not favor physical transfers of funds (i.e., transactions involving cash or checks) over electronically recorded transactions. To the contrary, electronic transfers of funds "have become the preferred method utilized by businesses and financial institutions to effect payments and transfers" of funds, due to their speed, efficiency and lower cost. *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 369-70 (1991).

10

(2d Cir. 2002) ("[T]he use of a pro rata distribution has been deemed especially appropriate for fraud victims of a 'Ponzi scheme.'"). The Trustee's position arbitrarily and inappropriately punishes customers such as Customer B, while rewarding similarly situated customers such as Customer Y. Accordingly, the Trustee's position conflicts with the SIPA's goal of promoting fairness and should be rejected.

### 3. The Trustee's Proposed Method Conflicts with the Overriding Policy Concern of Federal and State Legislatures for Respecting the Finality of Transactions

Federal and state laws embody a clear policy concern for respecting the finality of transactions – including transactions that are contractual in nature, involve electronic fund transfers, arise from the distribution of a decedent's estate, as well as gifts and other gratuitous transactions.[5] The Trustee's proposed treatment of inter-account transfers in the calculation of Customers' Net Equity claims conflicts with that overriding policy and has the effect of undoing or voiding transactions that took place long ago.

#### a. Legislatures Have Shown a Clear Policy Preference for Respecting the Finality of Transactions between Private Parties

In countless different areas of law, legislatures have shown their clear policy preferences to respect the finality of commercial and personal transactions. By way of example, statutes of limitation governing contract claims set a certain point in time after which the validity of a contract, or the adequacy of performance thereunder, cannot be challenged under the law (except in extraordinary circumstances). *See Ontario Hydro v. Zallea Sys., Inc.*, 569 F. Supp. 1261, 1266 (D. Del. 1983) ("the finality necessary to promote the flow of commerce is effectuated by the

---

[5] Although this memorandum does not address specific inter-account transfers, it is likely that many of the transfers at issue here involve such transactions.

11

limitation period [for breaches of sales contracts].").[6]  Likewise, "[n]ational uniformity in the

treatment of electronic funds transfers is an important goal, as . . . [is] finality.  Establishing

finality in electronic fund wire transactions was considered a singularly important policy goal [of

the New York State legislature and the American Law Institute drafters of N.Y. U.C.C. Article

4A]." *Banque Worms*, 77 N.Y.2d at 372(citation omitted)).

Legislators have also expressed their policy preference for respecting the finality of

transactions in laws governing negotiable instruments.  "The finality of transactions promoted by

an ascertainable definite period of liability is essential to the free negotiability of instruments on

which commercial welfare so heavily depends."  *Menichini v. Grant*, 995 F.2d 1224, 1231 (3d

Cir. 1993) (quoting *Fuscellaro v. Indus. Nat'l Corp.*, 117 R.I. 558, 368 A.2d 1227, 1231 (1977)).

Legislative respect for the finality of transactions is also demonstrated by the implementation of

"look-back" or "reach-back" periods in the Bankruptcy Code and in federal and state fraudulent

conveyance statutes.  Much like statutes of limitations, these "lookback" periods establish a

temporal limitation on the ability to challenge the finality of certain types of transactions.  *See,*

*e.g.*, *In re Maui Indus. Loan & Fin. Co.*, 454 B.R. 133, 136 (Bankr. D. Haw. 2011) ("Congress

wrote the two year [look-back] period [in Section 548(a)(1)] as a fixed period. The text does not

support an inference that Congress intended to permit discretionary extension of the time

period.").  Although Congress amended Section 548(a)(1) in 2005 to lengthen the look-back

period from one year to two years, that amendment nonetheless reflected Congress' decision to

---

[6] *Cf. United States v. Kubrick*, 444 U.S. 111, 117 (1979) ("Statutes of limitations, which are found and approved in all systems of enlightened jurisprudence, represent a pervasive legislative judgment that . . . the right to be free of stale claims in time comes to prevail over the right to prosecute them.") (internal citations and quotation marks omitted); *Flanagan v Mount Eden Gen. Hosp.*, 24 N.Y.2d 427, 429 (1969) (the enactment of statutes of limitations embodies "an important policy of giving repose to human affairs").

respect the finality of transactions that occurred more than two years prior to the bankruptcy filing.

The law also respects the finality of gratuitous transactions such as gifts and transfers from a decedent's estate. *See* Charles F. Gibbs & Colleen F. Carew, *Absent Actual Notice, When Does the Clock Commence a Proceeding?; Surrogate's Practice Proceedings*, N.Y. L.J., Feb. 15, 2002 at 9 ("The limitations period is essential to ensure the finality of the disposition of property whether it is by the settlement of an estate or trust or the transfer of property by gift.").

The Trustee's proposed treatment of inter-account transfers would negate legislators' intent to provide finality to these types of transactions. In effect, the Trustee could look far back in time, perhaps 20 or even 30 years, and void or negate transactions between BLMIS customers that took place long ago by simply disregarding them on the ground that there was no transaction. The Trustee should not be permitted to erase history and "wipe away" the protections afforded to the finality of the Customers' transactions under federal and state law in this manner. Instead, the Court should reject the Trustee's proposed treatment of inter-account transfers, and should instead instruct the Trustee to honor the finality of those transactions by treating all inter-account transfers as principal deposits into the Customer-transferees' accounts.

> **b.    Inter-Account Transferees Have Legitimate Property Interests in the Full Amounts that Were Transferred to Their BLMIS Accounts**

To the extent that the Customers received the inter-account transfers in good faith and for value,[7] the Customers have state law property rights, similar to holders in due course,[8] over the

---

[7] A determination of whether any particular Customer received the inter-account transfers in good faith and for value (to the transferor under the applicable state law) is outside the scope of this motion, which seeks approval of the Trustee's overall methodology, not its application to specific customers. Determinations about specific customer claims can be made through separate procedures established by the Court. However, there has been no allegation or suggestion that *any* of the Customers lacked good faith or was otherwise aware of the Madoff

13

contents of their BLMIS accounts. The Trustee's proposed treatment of inter-account transfers eviscerates such property rights. Moreover, the Trustee admits that "a transferee can only receive funds to the extent of the transferor's interest in those funds." Tr. Br. at 19. To that end, the Trustee's proposed treatment also violates the Customers' legitimate state law property rights that existed at the time the transfer took place.[9]

The "'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'" *Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 450-51 (2007) (citation omitted). Unless a specific bankruptcy provision or policy requires differently, the rights that are created by state law will be honored. *See Butner v. United States*, 440 U.S. 48, 57 (1979) (rights created by state law will be honored unless a specific bankruptcy provision or policy requires differently); *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000)

---

fraud. While the Trustee has rejected the Customers' claims (in whole or in part), he has not raised the Customers' lack of good faith as a ground for his rejection of any of the Customers' claims.

[8] Under New York law, a "holder in due course is a holder who takes the instrument" for value, in good faith, and "without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." N.Y. U.C.C. § 3-302(1)(a)-(c) (2014) (defining a holder in due course of commercial paper); *see also* N.Y. U.C.C. § 2-403 (2014) ("Power to Transfer; Good Faith Purchase of Goods; 'Entrusting'"). Similarly, a "protected purchaser" of an investment security is one who "gives value[;] . . . does not have notice of any adverse claim to the security; and . . . obtains control of the certificated or uncertificated security." N.Y. U.C.C. § 8-303 (2014). A protected purchaser "acquires its interest in the security free of any adverse claim." *Id.*

[9] For example, the value of the transferred property under New York law is to be based on the value of the property *at the time of the transfer*. In one instance, the New York Court of Appeals recognized that the value of BLMIS accounts may be based on *the amount that the BLMIS customer could have withdrawn from his account prior to the commencement of the liquidation proceeding* in December 2008; such valuation may be determinative under New York law. *See Simkin v. Blank*, 19 N.Y.3d 46, 54-55 (2012) (transfer of BLMIS account as part of property settlement upheld in response to assertion that the account had no value at the time of the transfer).

14

("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code."). This is consistent with Bankruptcy Code Section 502(b)(1), incorporated by SIPA in Section 78fff(b), which provides that a claim in bankruptcy shall be allowed "except to the extent that . . . such claim is unenforceable . . . under . . . *applicable law* . . . ." *See* 11 U.S.C. § 502(b)(1) (emphasis added). As discussed above, and as the Trustee implicitly concedes, there are no specific bankruptcy provisions, policies, or other controlling rules of law dictating that any amounts transferred as part of inter-account transfers should be reduced in a SIPA proceeding. Accordingly, the Court should look to state law for guidance on the issue.

The Trustee contends that crediting Customers' claims with the full unadjusted amount of the inter-account transfers is not appropriate under the Net Investment Method. However, for inter-account account transfers in which New York law applies, inter-account transferees are essentially bona fide holders of their individual BLMIS accounts and have property interests in that which was transferred, including the full amount of the inter-account transfers. *See SEC v. Universal Express, Inc.*, No. 04 Civ. 2322, 2008 U.S. Dist. LEXIS 35342, at *3 (S.D.N.Y. Apr. 30, 2008) (for "'money or negotiable securities transferable by delivery, which have been put into circulation and have come to the hands of bona fide holders, [t]he right of the owner to pursue and reclaim the money and securities there ends, and *the holder is protected in his title*'") (emphasis added and citations omitted); *In re Dreier LLP*, 429 B.R. 112, 136 (Bankr. S.D.N.Y. 2010) ("While ordinarily 'a thief cannot convey a good title to stolen property,' a transferee 'acting in good faith may obtain title to money from a thief.'") (citations omitted).

The Customers received the inter-account transfers in good faith, and (in many instances) for value. Even if the inter-account transfers received by the Customers might include some

15

component of "other people's money", New York law, for example, permits the transferees to

retain the full amounts that were transferred to them. *See id.* The Trustee should therefore credit

Customers for the full, unadjusted amounts transferred to them from other BLMIS customers and

deem those transfers to be principal deposits for purposes of calculating Net Equity. To permit

the Trustee to do otherwise would undermine the important policies under state and federal law

for finality in transactions like the inter-account transfers at issue here. *See Banque Worms*, 77

N.Y.2d at 372-73 ("This concern for finality in business transactions has long been a significant

policy consideration in this State. . . . [T]o permit in every case of the payment of a debt an

inquiry as to the source from which the debtor derived the money, and a recovery if shown to

have been dishonestly acquired, would disorganize all business operations and entail an amount

of risk and uncertainty which no enterprise could bear.") (citation omitted); *Enron Creditors*

*Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 336 (2d Cir. 2011) ("certainty and

predictability are at a premium" in the area of law governing securities transactions). *See also*

*BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994) (expressing concern that if the

commencement of a bankruptcy case caused the validity of a foreclosure sale to be questioned,

"[t]he title of every piece of realty purchased at foreclosure would be under a federally created

cloud.").

4.    **The Trustee's Proposed Methodology Improperly Circumvents the Limits of His Avoidance Powers**

The Trustee's position that transactions between separate accounts can be ignored in

computing Net Equity if the transferor's account allegedly lacked sufficient principal to support

the transfer is contrary to SIPA and the limitations on the Trustee's avoidance powers. The

Trustee's accounting for inter-account transfers fails to acknowledge the separate duties owed by

16

the Trustee to the transferor and transferee account holders; his treatment of particular transfers as nullities improperly circumvents the limits of his avoidance powers.

Where a customer directed BLMIS to transfer funds between two separate brokerage accounts, the action necessarily required the transferor customer to authorize the transfer to a different customer account. That authorization reflects the transferor's assertion of dominion and control over the monies transferred, which establishes it as an initial transferee. *See In re Manhattan Inv. Fund, Ltd.*, 397 B.R. 1, 32-34 (S.D.N.Y. 2007) (initial transferee "must exercise dominion over the funds at issue and be able to put them to 'his own purposes'") (citation omitted); *Christy v. Alexander & Alexander of N.Y., Inc.*, 130 F. 3d 52, 58 n.3 (2d Cir. 1997). Thus, the transaction should be treated the same as where a customer makes a cash withdrawal and conveys that sum directly to a third party. *See Hooker Atlanta Corp. v. Hocker*, 155 B.R. 332, 341 (Bankr. S.D.N.Y. 1993) (transfer from debtor escrow account to third party was authorized payment from person to whom debtor owed funds and was not a transfer by the debtor but rather a transfer by the person to whom debt was owed); *Solomon v. Nedlloyd, Inc.*, 59 B.R. 873, 875 n.2 (Bankr. S.D.N.Y. 1986) (where debtor made payment to transferee at direction of entity to whom debtor owed funds, transfer was between entity and transferee). On this basis, for most inter-account customer transfers,[10] the transferee is a subsequent transferee of the transferor account.

Because BLMIS has duties to each of the broker's customers, the broker's obligations arising from inter-account transactions cannot simply be disregarded. SIPA recognizes that each account holder is a separate customer. *See Section 1, supra.* The obligation of a broker to pay

---

[10] Circumstances where the transferor was complicit in the fraud, or where there is other evidence of malfeasance surrounding the transaction, present issues beyond the scope of this analysis.

each customer funds from his account is fixed by state law, which sets the parties' respective

contractual rights and obligations, and imposes fiduciary duties on the broker. *Cf. Hooker*, 155

B.R. at 338 ("The nature and extent of the debtor's interest in property are to be determined by

reference to applicable nonbankruptcy, usually state, law."). Where a subsequent transferee is

also a customer of the broker, that customer, too, is entitled to the same state law rights available

to every customer independent of the transferor customer. Where a broker fails, its customers

have SIPA claims for securities because the broker is estopped from denying that deposits made

into customer accounts were for the purpose of purchasing securities. *See Net Equity Decision*,

654 F.3d at 236 (concluding that BLMIS customers "are customers with claims for securities

within the meaning of SIPA").

     If the Trustee wishes to disregard the transactions and related obligations involved in an

inter-account transfer, SIPA requires him to first avoid them -- assuming he is able to do so

under the governing law.[11] *See* SIPA Section 6(b) (incorporating the provisions of Chapter 5 of

the Bankruptcy Code including Section 548). Subject to the limitations of SIPA Section 8(c)(3)

and other statutory provisions, the Bankruptcy Code empowers a trustee to bring avoidance

actions. Those avoidance provisions have specific limits, such as Section 546(e) and the general

time limitations for pursuing such actions under Section 546(a). Unless and until the Trustee

avoids a transaction or obligation, however, it is valid and may not be disregarded. *See In re M.

Fabrikant & Sons, Inc.*, 394 B.R. 721, 741 (Bankr. S.D.N.Y. 2008) ("In other words, a transfer

must be avoidable in order to be avoided, but until it is avoided, it is as valid as an unavoidable

transfer."). Thus, in order to disregard an inter-account transfer, the Trustee must either seek to

---

[11] Customers do not concede that a SIPA trustee has the authority under SIPA Section 8(c)(3) (15 U.S.C. § 78fff-2(c)(3)) to avoid a broker's obligations incurred, in addition to transfers made. Nor do they concede that any such action at this time would be timely.

avoid the initial transfer and pursue a claim against the subsequent transferee or seek to avoid the obligation incurred by BLMIS to the transferee customer (assuming a legal basis to do so). The Trustee otherwise has no power to disrupt the transaction between third parties, i.e., the initial transferee and the subsequent transferee in an inter-account transfer. *See Hooker*, 155 B.R. at 341; *Solomon*, 59 B.R. at 875 n.2.[12]

The Trustee is constrained by SIPA to abide by the avoidance powers and limitations conferred by the Bankruptcy Code. The Trustee cannot simply ignore the limitations on his powers. Nor can the Trustee ignore the transaction that underlay the transfer in the first place, i.e., the transaction by which the initial transferee initiated the transfer to the transferee account. Where the Trustee lacks the power to avoid the transfers and obligations created by an inter-account transfer, or has chosen not to do so, he cannot simply ignore it in the calculation of a customer's Net Equity. To the contrary, absent avoidance, that transfer and related obligations must be given full effect.

**5.    There is No Bankruptcy Provision, Policy or Controlling Rule of Law Requiring the Trustee to Reduce Customers' Net Equity by Failing to Give Full Credit to Inter-Account Transfers**

The Trustee liberally cites the *Net Equity Decision* and the *Antecedent Debt Decision* as though each unquestionably supports his argument that, under the Net Investment Method, a Customer-transferee's Net Equity cannot include the full unadjusted amount of an inter-account transfer. The Trustee is incorrect.

**a.    The *Net Equity Decision* Does Not Support the Trustee's Position Regarding Inter-Account Transfers**

---

[12] Because the Trustee is not a creditor of the initial transferee, absent his avoidance powers he has no standing to avoid the transfer. Instead, as successor to BLMIS, the Trustee is a debtor of the initial transferee, as the Trustee readily admits, i.e., the Trustee owes money to that customer because of Madoff's fraud.

Although the Second Circuit endorsed the Trustee's Net Investment Method for calculating Net Equity, the calculation is limited to credits for the "amount of cash deposited by the customer into his or her BLMIS account, less any amounts withdrawn." *Net Equity Decision*, 654 F.3d at 233. The *Net Equity Decision* is silent on the question of how inter-account transfers should be treated in determining customers' Net Equity. As the Second Circuit stated: "[t]he two competing methods of calculating 'Net Equity' proposed by the parties to this litigation *are the only two methods at issue here. We do not hold that they are the only possible approaches to calculation of 'Net Equity' under SIPA*." *Id.* at 235 n.5 (emphasis added).

The Second Circuit held that SIPA's "statutory language does not prescribe a single means of calculating 'Net Equity' that applies in the numerous circumstances that may arise in a SIPA liquidation." *Id.* at 235. Here, as elsewhere, SIPA should be applied flexibly, consistent with the fundamental notion that SIPA is a remedial statute that should be construed liberally to carry out its customer-protection purpose. *See In re New Times Sec. Servs.*, 371 F.3d 68, 84 (2d Cir. 2004) ("These statutory goals – promoting investor confidence and providing protection to investors – are better served by the SEC's broader reading of section 9(a)(1) [§ 78fff-3]."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995) (broadly construing SIPA to effectuate its remedial purpose).

The Second Circuit recognized that SIPA does not "say specifically how 'Net Equity' should be calculated if [as the Trustee alleges here] a dishonest broker failed to place a customer's funds into the securit[ies] market." *Net Equity Decision*, 654 F.3d at 235. A SIPA trustee's choice of method to measure Net Equity is entitled to "a degree of deference," but only "so long as the method chosen by the trustee allocates 'Net Equity' among the competing

20

claimants in *a manner that is not clearly inferior* to other methods under consideration." *Id.* at 238 n.7 (internal quotations omitted) (emphasis added).

The Trustee's approach to inter-account transfers is inferior to the Customers' proposed method. The Trustee's approach would establish authority to support arbitrarily disparate treatment of similarly situated customers while disregarding important state and federal policies regarding finality in financial transactions.[13] By contrast, the Customers offer a pragmatic approach to the "unique challenge" created by Madoff's fraudulent scheme that would promote "SIPA's twin goals of maintaining marketplace stability and encouraging investor confidence." *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, No. 12 Misc 115, 2014 U.S. Dist. LEXIS 58709, at *36 (S.D.N.Y. Apr. 27, 2014). The Customers' approach is balanced because it respects the validity of completed transactions between BLMIS customers without giving validity to Madoff's fraudulent scheme more generally. Although the Trustee recognizes that "the facts of Madoff's Ponzi scheme . . . posed a unique challenge in determining how to calculate Net Equity" (Tr. Br. at 6), his overly rigid approach to inter-account transfers conflicts with SIPA's concept of flexibility and fails to achieve SIPA's goals.

**b.    The *Antecedent Debt Decision* Is Not Controlling and Is Distinguishable**

In the *Antecedent Debt Decision*, the District Court reviewed whether inter-account transfers should be treated as principal, and therefore should constitute "value" for purposes of

---

[13] Although the Trustee complains that crediting Customers with the full amounts of inter-account transfers "would have a significant impact on the [BLMIS] estate" (Tr. Br. at 20), his brief does not establish that thesis. Instead, crediting Customers with the full amounts of inter-account transfers would have an impact on *other claimants* who did not receive inter-account transfers. *Id.* There is nothing unfair or unusual about that impact; changes in *pro rata* distribution amounts are a natural and expected consequence of changes to customers' relative Net Equity claims. But the size of the BLMIS estate itself would not be impacted by the rejection of the Trustee's proposed method.

determining amounts subject to avoidance under Section 548(c) of the Bankruptcy Code. *Antecedent Debt Decision,* 499 B.R. at 428. The District Court did not address whether customers' Net Equity claims under SIPA should include the full, unadjusted amount of inter-account transfers. Accordingly, the *Antecedent Debt Decision* is not controlling on the question presently before the Court.

In any event, the District Court's reasoning concerning inter-account transfers is flawed and should not guide the Court here. The District Court rejected, without citation to any authority, the notion that an inter-account transfer "may be viewed as a transfer of the right to receive an unavoidable payment from [BLMIS]" because "that right does not exist as long as the fictitious profits remained with [BLMIS], and so the sender had no such right to transfer." *Antecedent Debt Decision,* 499 B.R. at 429. The District Court recognized, however, that its treatment of inter-account transfers would result in arbitrarily disparate treatment of BLMIS customers. *Id.*

The District Court considered this arbitrarily, unequal treatment of BLMIS customers to be acceptable, by analogizing it to the seemingly arbitrary impact of the two-year reach-back period for fraudulent transfer claims under Bankruptcy Code Section 548(c):

> To the extent that this distinction appears arbitrary, that is unavoidable. In a long-running fraud such as this one, the two-year cut-off for the reach-back period 'arbitrarily' allows a Madoff Securities investor who withdrew all his funds in November 2006 to keep the entirety of his 'profits', while a similarly situated investor who withdrew those funds only a month later would not have the same right.

*Antecedent Debt Decision,* 499 B.R. at 429. However, Judge Rakoff's analogy is undermined by his own recognition that the disparate impact of statutes of limitation only "***appears*** arbitrary". *Id.* (emphasis added). While statutes of limitation may seem to lead to arbitrary results, statutes

of limitation actually reflect important policy decisions made by Congress and state legislatures,

as the Second Circuit recognizes:

> [T]he Supreme Court has noted [that] the length of a limitation
> period for instituting suit in federal court inevitably reflects a value
> judgment concerning the point at which the interests in favor of
> protecting valid claims are outweighed by the interests in
> prohibiting the prosecution of stale ones. Statutes of limitation
> serve several important policies, including rapid resolution of
> disputes, repose for those against whom a claim could be brought,
> and avoidance of litigation involving lost evidence or distorted
> testimony of witnesses.

*Carey v. IBEW Local 363 Pension Plan*, 201 F.3d 44, 47 (2d Cir. 1999) (citations and internal

quotation marks omitted).

There are *no* policy considerations that might justify the disparate effect of the Trustee's

proposed method for valuing inter-account transfers, arbitrarily based on the method the

customer-transferors selected for conveying the funds. Accordingly, the District Court erred to

the extent it interpreted the Bankruptcy Code to allow for arbitrarily unequal treatment of

similarly situated customers. *See American Int'l Grp.*, 712 F.3d at 782.

Additionally, the *Antecedent Debt Decision* did not consider whether, under New York

law, customers have property interests in the full adjusted amounts of inter-account transfers or

whether those transfers should be valued at the time of the transfer or at the time of the SIPA

liquidation.[14]

Finally, the Trustee contends that it is "entirely appropriate . . . to include transfers which

occurred more than two years prior to the filing date in his net equity calculations, and this

---

[14] *In re Bayou Grp., LLC*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008), on which the *Antecedent Debt Decision* and the Trustee rely, is also distinguishable because, like the *Antecedent Debt Decision*, it did not address the SIPA concept of customer net equity. Further, it did not consider customer interests under applicable New York law nor state and federal policies favoring finality in financial transactions. Finally, *Bayou*, like the *Antecedent Debt Decision*, was adjudicated in the context of an avoidance action and is thus inapplicable here.

approach has been specifically affirmed by the [*Antecedent Debt Decision*]." Tr. Br. at 20. But the *Antecedent Debt Decision* examined the "value" of inter-account transfers in the context of a defense to an avoidance action, not in the context of calculating customer Net Equity claims in a SIPA liquidation proceeding. The important issue here is whether the Trustee's determination of inter-account transfers undermines state and federal concerns for finality in securities transactions. As discussed above, the Trustee's approach does undermine those concerns.

### c.    The Trustee Has Failed to Meet His Burden to Show Why the Customers' Claims for Inter-Account Transfers Should Be Disallowed

The Trustee incorrectly asserts that customer claimants in a SIPA liquidation have the burden to demonstrate that the Trustee's proposed method for valuing inter-account transfers should not be approved. However, the Trustee bears this initial burden, which he has failed to meet.

The basic rule in bankruptcy cases is that it is the Trustee's burden, as the objecting party, to show, first, that a claim should not be allowed; only after the Trustee makes a prima facie showing that a proof of claim should not be allowed does the burden shift back to the claimant. *See In re MF Global Holdings*, No. 11-15059, 2012 Bankr. LEXIS 5297, at *10 (Bankr. S.D.N.Y. Nov. 13, 2012) ("The party objecting to a proof of claim bears the initial burden of providing evidence to show that the proof of claim should not be allowed. Once the presumption of prima facie validity is overcome—e.g., the objecting party establishes that the proof of claim lacks a sound legal basis—the burden shifts to the claimant to support its proof of claim unless the claimant would not bear that burden outside of bankruptcy.").

The Trustee argues that the ordinary rule in bankruptcy cases does not apply to SIPA proceedings. Tr. Br. at 22. However, the cases cited by the Trustee hold only that claimants in SIPA proceedings have the burden to establish their status as "customers" of the debtor in the

24

first place (i.e., that they entrusted funds to the broker for the purpose of purchasing securities); those cases do not hold that once claimants have established that they are "customers" (and are therefore entitled to file customer claims), that they have an additional burden to establish the amounts of their claims.[15]   The Customers here clearly fall within the SIPA's definition of "customer", and the Trustee does not dispute that fact.

Customers are unaware of any SIPA provision or case law that abrogates the general rule of bankruptcy and shifts the initial burden to the Customers to establish what they are owed. Instead, the burden remains on the Trustee – as the objecting party – to show that the claim should not be allowed.  *See In re MF Global Holdings*, 2012 Bankr. LEXIS 5297, at *10.  The Trustee has failed to meet that initial burden.  In any event, even if the burden shifts back to the Customers, the arguments above more than sufficiently demonstrate the validity of the Customers' claims with regard to the treatment of inter-account transfers.

---

[15] For example, the Trustee cites *Sec. Investor Prot. Corp. v. I.E.S. Mgmt. Grp.,* 612 F. Supp. 1172, 1177 (D.N.J. 1985), for the proposition that "a claimant seeking 'customer' protection under SIPA has the burden of proving both her status as a 'customer' and what she is owed." Tr. Br. at 22.  However, the *I.E.S. Mgmt. Corp.* case says nothing about who bears the burden to prove, or disprove, the amount of SIPA customer claims.

25

## CONCLUSION

As discussed herein, the Trustee's treatment of inter-account transfers in the determination of Customers' Net Equity claims is incorrect as a matter of law. The Customers respectfully request that the Court issue an order:

1  denying the Trustee's Motion in its entirety; and

2  directing the Trustee to credit to the Claimants the full unadjusted amount of inter-account transfers to the Claimants' BLMIS accounts as principal deposits and recalculate the Claimants' claims.

Dated: May 16, 2014

Respectfully submitted,

**MILBERG LLP**

s/Matthew A. Kupillas
Matthew Gluck
Matthew A. Kupillas
Jennifer L. Young
Joshua E. Keller
One Pennsylvania Plaza
New York, NY 10119
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229

**SEEGER WEISS LLP**
Stephen A. Weiss
Parvin K. Aminolroaya
77 Water Street, 26th Floor
New York, NY 10005
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799

*Attorneys for the Customers Identified on
Attachment A Hereto*

26

**SEEGER WEISS LLP**

s/Parvin K. Aminolroaya_____

Stephen A. Weiss
Parvin K. Aminolroaya
77 Water Street, 26th Floor
New York, NY 10005
Telephone:  (212) 584-0700
Facsimile:  (212) 584-07099

*Attorneys for the Customers Identified on*
*Attachment B Hereto*

**K&L GATES LLP**

s/Richard A. Kirby_____

Richard A. Kirby
Laura K. Clinton
1601 K Street NW
Washington DC  20006
Telephone:  (202) 661-3730
Facsimile:  (202) 778-9100

*Attorneys for the Customers Identified on*
*Attachment C Hereto*

**DENTONS US LLP**

s/Carol Neville_____

1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6889
Facsimile:  (212) 768-6800

*Attorneys for Customers Identified on*
*Attachment D Hereto*

27

## ATTACHMENT A

### In re Bernard L. Madoff Investment Securities LLC
Adv. Pro. No. 08-01789 (SMB)

## CERTAIN CUSTOMER-CLAIMANTS JOINTLY REPRESENTED BY
## MILBERG LLP AND SEEGER WEISS LLP

| Customer-Claimant | BLMIS Account Number | Claim Number(s) | Docket Number(s) of Objection to Claim Determination |
|---|---|---|---|
| Jan Marcus Capper | 1EM468 | 011109 | 680 |
| Gary Albert | 1CM015 | 009762 | 2192 |
| Jerry Guberman Trust Dated 12/23/93 | 1ZA407 | 009416 | 711 |
| Harold A. Thau (IRA) | 1ZR261 | 009523 | 451 |
| John Denver Concerts Inc. Pension Plan Trust | 1ZB085 | 009526 | 687 |
| Joseph Sloves (IRA) | 1SO403 | 007959 | 1949 |
| Laurence E. Leif | 1LO142 | 001204 | 2351 |
| Onesco International, Ltd. | 1FR121 | 009658 | 668 |
| Potamkin Family Foundation I, Inc. | 1PO107 | 005312 | 709 |
| June Pollack T/O/D to Keith L. Pollack and Cary G. Pollack | 1CM884 | 000530 | 1080 |
| Linda Berger Howard Berger J/T WROS | 1ZB547 | 005115 | 1998 |
| Judith Rock Goldman | 1ZA490 | 009795 / 011678 | 867 |
| Anita Karimian | 1ZA142 | 010932 | 870 |
| Gary L. Harnick (IRA) | 1H0121 | 1209/14626 | 893 |
| William M. Woessner Family Trust, /Sheila A. Woessner Family Trust TIC | 1CM191 | 450/6829 | 2766 |
| Jonathan Michaeli (IRA) | 1ZR304 | 7984 | 2277 |
| The Adina Michaeli Revocable Trust | 1ZR305 | 7983/9009 | 2214 |
| Trudy Schlachter | 1S0293 | 011044 | 915 |

1

| | | | |
|---|---|---|---|
| Gerald Blumenthal (IRA) | 1B0166 | 6832 | 2366 |
| Steven V. Marcus Separate Property Marcus Family Trust | 1EM469 | 002882 | 873 |
| Richard Roth (IRA) | 1R0103 | 711/9177 | 2271, 3526 |
| Richard Roth | 1R0060 | 710 | 2448, 3525 |
| Lynda Roth | 1R0054 | 000721 | 2374 |
| Michael Roth | 1R0057 | 000715 | 2373 |
| Michael Roth (IRA) | 1R0102 | 000722 | 2272, 3524 |
| Florence Roth | 1R0047 | 712 | 2449 |
| Lester Kolodny (IRA) | 1K0138 | 001066 | 672 |
| P. Charles Gabriele (IRA) | 1CM431 | 009180 | 886 |
| Delia Gail Rosenberg | 1R0250 | 11095 | 2509 |
| Aspen Fine Arts Co. | 1EM381 | 009406 | 707 |
| Elizabeth Harris Brown | 1B0140 | 001691, 015095 | 2146 |
| The Douglas G. Brown Revocable Trust | 1B0139 | 001690, 015094 | 2439 |
| Do Stay, Inc. | 1D0040 | 2266, 14255 | 2820 |
| Elbert R. Brown, Trustee | 1B0073 | 2263, 14263 | 2288, 3122 |
| Elbert R. Brown, Trustee | 1B0142 | Claim pending determination | No objection filed |
| Viola Brown, Trustee U/T/D 12/29/88 | 1B0078 | 002317, 014254 | 2343, 3121 |
| Viola Brown, Trustee U/T/D 12/29/88 | 1B0128 | Claim pending determination | No objection filed |
| Lawrence I Brown and Barbara Brown J/T WROS | 1B0154 | 2892 | 2845 |
| Lewis R. Franck | 1ZA440 | 001891, 015368 | 733 |
| Martin Gelman & Michael Dancer JT/WROS | 1ZB516 | 8502 | 705 |
| Barbara Harris | 1H0092 | 2704, 9602 | 2753 |
| Deborah Katz | 1KW202 | 001841, 015096 | 2013 |
| Jack Kaufman and Phyllis Kaufman J/T WROS | 1KW142 | 006571 | 2221 |
| Michael Mathias and Stacey Mathias J/T WROS | 1M0100 | 002619 | 2963 |

2

| | | | |
|---|---|---|---|
| Katharine Brown Trust | 1B0141 | 004020 | 1136 |
| Barbara Schlossberg | 1ZG022 | 328, 14258 | 706 |
| Bernard Seldon | 1ZR050 | 6615 | 453 |
| Jonathan Sobin | 1EM208 | 8501 | 2469 |
| Leila F. Sobin | 1S0457 | 6479 | 829 |
| Leila F. Sobin | 1EM210 | 008499 | 2408 |

**ATTACHMENT B**

**In re Bernard L. Madoff Investment Securities LLC**
Adv. Pro. No. 08-01789 (SMB)

**CERTAIN CUSTOMER-CLAIMANTS REPRESENTED BY SEEGER WEISS LLP**

| Customer-Claimant | BLMIS Account Number | Claim Number | Docket Number of Objection to Claim Determination |
|---|---|---|---|
| Melvyn Weiss and Barbara Weiss JTWROS | 1CM241 | 014261 | 3039 |

**ATTACHMENT C**

**In re Bernard L. Madoff Investment Securities LLC**
Adv. Pro. No. 08-01789 (SMB)

**CERTAIN CUSTOMER-CLAIMANTS REPRESENTED BY K&L GATES LLP**

| Customer-Claimant | BLMIS Account Number | Claim Number(s) | Docket Number of Objection to Claim Determination |
|---|---|---|---|
| Joel A. and Kerry E .Blum, Jt. Owners | 1B0251 | 001507 | Claim determination pending |
| Norman J. Blum Living Trust | 1-B0201 | 005863,  009178 | Claim determination pending |

ATTACHMENT D

## In re Bernard L. Madoff Investment Securities LLC
Adv. Pro. No. 08-01789 (SMB)

## CERTAIN CUSTOMER-CLAIMANTS REPRESENTED BY Dentons US LLP

| Customer-Claimant | BLMIS Account Number | Claim Number(s) | Docket Number of Objection to Claim Determination |
|---|---|---|---|
| Davina Greenspan & Lori Friedman | 1ZA194 | 008425, 001974 | 864 |
| Toby Hobish (IRA) | 1H0135 | 009322 | 1094 |
| Alvin Gindel Revocable Trust Agreement | 1G0396 | 010207 | 863 |
| Estate of Helen Shurman | 1S0509 | 8358 | 741 |
| Lapin Children LLC | 1CM624 | 00694 | 2119 |
| Laura Guggenheimer Cole | 1C1258 | 009721 | 2744 |
| Norma Shapiro (IRA) | 1S0467 | 009819 | 2082 |
| Norma Shapiro Trustee | 1S0337 | 9826 | 2253 |
| Norma Shapiro | 1S0337 | 9825 | 2253 |
| Barbara Berdon | 1B0145 | 10279 | 2379 |
| Epic Ventures LLC | N/A | 13369-13378, 13380-13387 | 3371 |
| David R. Markin 2003 Trust | 1C1324 | 009174, 2656 | 811 |
| David Markin | 1m0211 | 009174 | N/A |
| Cecile Rudnick | I1EM351 | 4486 | 777 |