BECKER & POLIAKOFF LLP  
45 Broadway  
New York, New York 10006  
(212) 599-3322  
Helen Davis Chaitman  
hchaitman@bplegal.com

Hearing Date: July 17, 2014  
Hearing Time: 10:00 A.M.  
Objection Date: May 30, 2014

*Attorneys for Elizabeth Cavanaugh and Laura Hallick*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br><br>Debtor. | |

**MEMORANDUM OF LAW IN OPPOSITION TO THE TRUSTEE'S MOTION TO AFFIRM DENIAL OF CLAIMS OF ERISA PLAN CUSTOMERS**

{N0048219 3 }

## **TABLE OF CONTENTS**

                                                            **Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

STATEMENT OF FACTS .......................................................................................................... 1

ARGUMENT ................................................................................................................................ 3

    THERE IS NO BASIS IN LAW TO DISALLOW THE CUSTOMERS'
    CLAIMS ................................................................................................................................ 3

        A.      The SIPA Definition of "Customer" Bars the Trustee's
                Disallowance of the Customers' Claims ................................................................ 3

        B.      The Existing Case Law Does not Support the Trustee's Treatment ...................... 5

        C.      ERISA Prohibits the Trustee's Methodology ........................................................ 8

CONCLUSION ........................................................................................................................... 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Carmichael v. Osherow (In re Carmichael)*, 100 F.3d 375 (5th Cir. 1996) ................................. 10

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ........................................................................ 8

*Lauder v. Jacobs*, 10 Misc. 3d 1052(A), 809 N.Y.S.2d 482 (Sur. 2005) *aff'd*, 35 A.D.3d 822 N.Y.S.2d 719 (2006) ............................................................................................. 11

*Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir. 1999) .................................................................. 8

*Nachman Corp. v. Pension Benefit Guaranty Corporation,* 446 U.S. 359, 100 S. Ct. 1723, 64 L.Ed.2d 354 (1980) ................................................................................................. 9

*In re New Times Securities Services Inc.,* 371 F. 3d 68 (2d Cir. 2004) ..................................... 3, 4

*Patterson, Trustee v. Shumate,* 504 U.S. 753 (1992) ...................................................................... 9

*Pauk v. Pauk*, 232 A.D.2d 392, 648 N.Y.S.2d 134 (1996) ............................................................ 11

*Rousey v. Jacoway,* 544 U.S. 320 (2005) ...................................................................................... 10

*Sec. Investor Prot. Corp.* v. *BDO Seidman, LLP*, 222 F. 3d 63 (2d Cir. 2000) .............................. 4

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011) *aff'd sub nom. In re Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, 480 B.R. 117 (S.D.N.Y. 2012) *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422 (2d Cir. 2013) ................................................................ 4

*Sec. Investor Prot. Corp. v Bernard L. Madoff Inv. Sec. LLC,* 708 F. 3d 422 (2d Cir. 2013) .................................................................................................................................. 6, 7

*Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account,* 2012 WL 3042986 (S.D.N.Y. July 25, 2012) .......................................................................................... 7, 8

*Securities Investor Protection Corporation* v. *Morgan-Kennedy & Co., Inc.,* 533 F.2d 1314 (2d Cir. 1976) ................................................................................................. 5

*Tcherepin v. Knight,* 389 U.S. 332 (1967) ...................................................................................... 4

*United States v. All Funds Distributed to Weiss*, 345 F.3d 49 (2d Cir. 2003) ................................ 8

**Statutes & Rules**

15 U.S.C. § 78fff-3(a)(5) ................................................................................................................. 3

15 U.S.C. § 78*lll*(2) .................................................................................................................. 3

26 U.S.C. § 219 ........................................................................................................................... 9

26 U.S.C. § 401(a)(13) ................................................................................................................ 8

26 U.S.C. § 408 ........................................................................................................................... 9

26 U.S.C. § 408(d) ...................................................................................................................... 9

26 U.S.C. § 408(e) ...................................................................................................................... 9

29 U.S.C. § 1001(b) .................................................................................................................... 9

29 U.S.C. § 1001(c) .................................................................................................................... 9

29 U.S.C. § 1002(34) .................................................................................................................. 9

29 U.S.C. § 1056(d)(1) ............................................................................................................... 8

I.R.C. § 401(a)(9)(C) ................................................................................................................... 9

I.R.C. § 408 ................................................................................................................................. 9

I.R.C. § 408(i) ............................................................................................................................ 10

I.R.C. § 4974(a) .......................................................................................................................... 9

CPLR 2505(d)(1) ....................................................................................................................... 11

CPLR 5205(c) ............................................................................................................................ 11

CPLR 5205(c)(2) ....................................................................................................................... 11

CPLR 5205(c)(3) ....................................................................................................................... 11

**Other Authorities**

26 CFR 1.401[a]-13[c][1][iii] ..................................................................................................... 8

H.R. 13308, 91st Cong. **§** 7(d) (Aug. 4, 1969) ......................................................................... 4

IRS Pub. 590 (2010), *available at* http://www.irs.gov/pub/irs-pdf/p590.pdf ............................. 10

S. 2348, 91st Cong. **§** 7(d) (June 9, 1969) ................................................................................ 4

Staff of the Joint Committee on Taxation, General Explanation of the Tax
    Reform Act of 1986 at 710 (1987), *available at* http://www.jct.gov/jcs-10-
    87.pdf ..................................................................................................................................... 10

Elizabeth (Lisa) Cavanaugh and Laura Hallick (the "Customers") respectfully submit this memorandum of law in opposition to the Trustee's motion to disallow their claims.

## STATEMENT OF FACTS

As set forth in the Customers' accompanying declarations, they were long-term employees of Daprex, Inc. ("Daprex") and Trustees of the Daprex Profit Sharing & 401k Plan (the "Plan"). Cavanaugh began working for Daprex in 1985; Hallick in 1991. Throughout the period of their employment through December 11, 2008, Daprex contributed funds to the Plan for their accounts and for their benefit. They were informed that the Plan invested the bulk of its money through Bernard L. Madoff ("Madoff") and that they had the choice to invest their money however they wanted. They both chose to deposit their money with Madoff and they both understood that their money was being deposited with Madoff for the purpose of purchasing securities.

In 1995, the Plan was expanded to include a 401k plan so that the Customers could contribute a portion of their own salaries. They did so and the deferred portion of their salaries was also contributed to the Plan and credited to them. Again, they chose to have their deferred salaries invested through Madoff. They understood that the payroll deferrals, like the Daprex contributions, were deposited with Madoff for the purpose of purchasing securities.

Daprex kept records of the exact contributions into the Plan that were made by them, through their deferred compensation, or for their benefit by Daprex. Each year, they received a statement from Daprex summarizing their interests in the Plan, the company contributions, the earnings on the contributions attributable to them, and the ending balance of such funds.

In 2001, the Customers became trustees of the Plan, coincident with their acquiring Daprex from its prior owner. They were responsible for the transmission of funds to and from BLMIS as employees made deferrals, took and repaid loans, and terminated their interests or

{N0048219 3}                                        1

retired and rolled over their funds out of the Plan account at BLMIS into IRAs of their own choosing. During the time period beginning in 2001 and ending on December 11, 2008, they regularly spoke with several people at BLMIS including Frank DiPascali, Eric Reardon, and Annette Buongiorno. Most of these conversations, particularly during the period from 2001 – 2004, involved the transfer of funds belonging to retiring employees. In the course of their conversations with BLMIS personnel, they told them how many participants there were in the Plan at various times and that they, themselves, were participants. The people at BLMIS recommended that retiring employees open individual IRA accounts through Retirement Accounts, Inc. which would maintain the BLMIS accounts for the retiring employees once the funds were rolled over into their separate IRA accounts.

After the bankruptcy filing of BLMIS, the Plan filed a SIPC claim in the amount of $1,452,917.99 representing the interests of the four remaining Daprex employees. The claim was filed with a letter dated June 29, 2009, from the Customers' attorney to the Trustee enclosing information to establish that the remaining funds in the Plan account belonged to the four specific Daprex employees who were "net losers" under the Trustee's terminology. Cavanaugh's interest in the Plan was valued at $846,117.73. Hallick's interest in the Plan was valued at $195,905.67. Neither had ever taken any money out of the Plan account. For both, their balances included both Daprex contributions and the Customers' own salary deferrals.

By letter dated July 30, 2010, the Trustee rejected the Plan's claim. The Customers filed an objection to the Trustee's determination letter.

# ARGUMENT

## THERE IS NO BASIS IN LAW TO DISALLOW THE CUSTOMERS' CLAIMS

### A. The SIPA Definition of "Customer" Bars the Trustee's Disallowance of the Customers' Claims

Each co-owner of a group account with an SEC-regulated broker is a "customer" under the plain definition of "customer" in SIPA. See 15 U.S.C. § 78*lll*(2) ("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities."). There is no requirement in SIPA that a "customer" be an account holder and, clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder."

Instead, Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a)(5) to make clear that customers of a bank or broker that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the Trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor"). Thus, clearly, Congress contemplated that SIPA's protection would be afforded to participants in an account in an entity's name and that a broker's customers would include people whose identity he had no knowledge of.

As the Second Circuit explained in *In re New Times Securities Services Inc.,* 371 F. 3d 68, 84 (2d Cir. 2004), SIPA is remedial legislation that must be broadly construed to effectuate its purposes to provide financial relief to aggrieved investors consistent with their reasonable expectations and to foster confidence in our capital markets:

{N0048219 3}                                                3

> Congress enacted SIPA in 1970, in response to 'a rash of failures among securities broker-dealers in the late 1960's' that had resulted in 'significant losses to customers whose assets either were unrecoverable or became tied up in the broker-dealers' bankruptcy proceedings' The statute 'was designed to effect two aims.' First, the legislation immediately established 'a substantial reserve fund... [to] provide protection to customers of broker-dealers... to reinforce the confidence that investors have in the U.S. securities markets.' Second, SIPA 'strengthened ... the financial responsibilities of broker-dealers.' Later amendments to the statute have reiterated this emphasis on investor protection.

*New Times Securities Services, Inc,* 371 F.3d 68 at 84, *quoting*, *Sec. Investor Prot. Corp.* v. *BDO Seidman, LLP*, 222 F. 3d 63, 66 (2d Cir. 2000) and citing legislative history.

Thus, even if there were an ambiguity in the statute, which there is not, the Court would be required to broadly construe the provisions of SIPA to protect customers. In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. § 7(d) (June 9, 1969); H.R. 13308, 91st Cong. § 7(d) (Aug. 4, 1969). **The final bill dropped this restriction.** Thus, any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Customers because SIPA is a remedial statute and "[t]hus should be construed broadly to effectuate its purposes." *Tcherepin v. Knight,* 389 U.S. 332 (1967); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285, 305 (Bankr. S.D.N.Y. 2011) *aff'd sub nom. In re Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, 480 B.R. 117 (S.D.N.Y. 2012) *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422 (2d Cir. 2013) (noting importance of preserving "SIPA's remedial character.").

In considering this issue, it is essential for the Court to appreciate the fact that SIPC insurance is funded by the brokerage firms and **it is not calculated based upon actuarial data**.

Under SIPA, each broker's required annual contribution is not based upon the number of customer accounts that broker has. Indeed, for the entire period from 1996 – 2008, SIPC charged every brokerage firm a flat fee for SIPC insurance, regardless of the number of customers that firm had. Thus, Merrill Lynch paid the same fee to insure all of its customers that a one-person brokerage firm paid. And the fee that SIPC charged, from 1996 – 2008 was $150 per year. Yes, that is correct. Merrill Lynch, Goldman Sachs, Charles Schwab: each firm made out one check to SIPC each year in the amount of $150 and for that $150 per year each brokerage firm – no matter how many customers it had – was able to assure those customers that their accounts were insured by SIPC up to $500,000 based upon the customer's last statement.

Thus, there can be no argument that brokers calculated the cost of SIPC insurance based upon the number of accounts they had and there can be no rational basis to limit SIPC insurance to people who had accounts in their own name.

**B.    The Existing Case Law Does not Support the Trustee's Treatment**

In *Securities Investor Protection Corporation* v. *Morgan-Kennedy & Co., Inc.,* 533 F.2d 1314 (2d Cir. 1976), the Court held that participants in a profit-sharing plan, where the plan trustees made investment decisions for a large number of plan participants who had no knowledge how their funds were invested, were not "customers" under SIPA. Here, on the other hand, the Customers made their own decision to deposit their money with Madoff and they did so with their own 401K contributions as well as with the Daprex contributions for them. In fact, the *Morgan* court, at 1318, listed the following factors, any one of which is indicative of customer status. Almost all of these factors are present here:

| *Morgan* court criteria | Customers' experiences |
|---|---|
| Being an investor or trader | Each of the Customers was an investor |

{N0048219 3}                                            5

| *Morgan* court criteria | Customers' experiences |
|---|---|
| Making "the decision to entrust [one's] funds" to the broker-dealer | Each of the Customers made the decision to deposit her money with Madoff |
| Having standing to give "buy or sell order[s] in the account" | Not applicable because the account agreements gave Madoff complete discretion to invest the funds |
| Having a "financial relationship" with the broker-dealer | Each of the Customers had such a relationship |
| Having "exclusive power to entrust the assets to the [broker-dealer], to invest and reinvest, and to purchase and trade securities in the account"; | Each of the Customers had the power to control where her funds were invested |
| Having "repeated business dealings" with the broker-dealer | Each of the Customers had contact with Madoff personnel concerning the Plan account |
| Making purchases with, transacting business with, and having dealings with by the broker-dealer | Each of the Customers had frequent dealings with Madoff personnel to arrange for withdrawals and transfers of participants' assets |
| Owning property held by the broker-dealer | Each of the Customers was the equitable owner of her share of the Plan assets |
| Being known by the broker-dealer (i.e., not being "complete[ly] anonym[ous]"); | Each of the Customers was known to Madoff personnel and had frequent communications with them |
| Having "a capacity to have dealings with" the broker-dealer | Each of the Customers had the capacity to deal with Madoff |

The Trustee relies upon the Second Circuit's decision in *Sec. Investor Prot. Corp. v Bernard L. Madoff Inv. Sec. LLC,* 708 F. 3d 422, 427 (2d Cir. 2013). However, there the Court was dealing with the issue of whether investors through feeder funds were "customers" under SIPA. These investors purchased limited partnership interests in the feeder funds, not in the

{N0048219 3}                                    6

Madoff account, and they had no control over where their funds were invested or any direct communication with Madoff. Thus, as the Second Circuit found, "they: (1) had no direct financial relationship with BLMIS, (2) had no property interest in the assets that the Feeder Funds invested with BLMIS, (3) had no securities accounts with BLMIS, (4) lacked control over the Feeder Funds' investments with BLMIS, and (5) were not identified or otherwise reflected in BLMIS's books and records." *Id*. at 426-27.

Here, on the other hand, as the Customers' Declarations demonstrate, the Customers had a direct financial relationship with BLMIS; they had a property interest in the Daprex Plan account because they chose to invest their 401k money into the Plan account, along with the Daprex contributions for their benefit; they had direct control over their investments with Madoff because they could, at any time, have taken their money out; and they had frequent communications with Madoff personnel about the account as the funds of specific employees were withdrawn or converted to individual IRA accounts with Madoff.

Finally, the Trustee relies upon *Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account,* 2012 WL 3042986 (S.D.N.Y. July 25, 2012)("*Jacqueline Green"*). However, that decision did not deal with the particular facts at issue here. Indeed, the court expressly noted that it was not dealing with any factual defenses unrelated to ERISA:

> . . . the supplemental briefings submitted by the Reynolds Plan and the Greens on May 25 and June 15, respectively, purport to present evidence that these claimants had contact with BLMIS, that BLMIS traded in securities for their accounts, or that they were known to BLMIS. They do not present any arguments based on ERISA, or cite to any ERISA provision or accompanying regulation. These arguments are therefore beyond the scope of the ERISA Motion and will not be addressed in this Opinion.

*Id.* at *3.

To the extent the district court held that "customer" means a person who had a BLMIS account, the court has violated the Supreme Court's mandate that courts accept the plain language of a statute. Surely, if Congress had intended to limit customers to account holders, Congress could easily have done so. It chose not to, and a district court lacks the power to re-write the legislation. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (internal citations omitted); *see also Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation . . . and that judicial review must end at the statute's unambiguous terms.").

C.   **ERISA Prohibits the Trustee's Methodology**

While *Jacqueline Green* rejected the argument that ERISA preserves "customer" status, and while we understand this Court may feel bound to follow that decision, we respectfully assert that the *Jacqueline Green* court's analysis was incorrect for the following reasons.

ERISA was enacted to protect participants in pensions, Keogh and 401K plans. Section 1056(d)(1) of ERISA requires that pension plans include a provision that the plan may not be assigned or alienated. 29 U.S.C. § 1056(d)(1). Regulations promulgated under the IRC define "assignment" and "alienation," in pertinent part, as "any direct or indirect arrangement…whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit which is, or may become, payable to the participant or beneficiary" 26 CFR 1.401[a]-13[c][1][iii]; *United States v. All Funds Distributed to Weiss*, 345 F.3d 49 (2d Cir. 2003). Every qualifying plan must contain an anti-alienation provision *See* 26 U.S.C. § 401(a)(13).

{N0048219 3 }                                  8

The Trustee's treatment of ERISA plan beneficiaries constitutes a violation of the anti-alienation provision of ERISA, which categorized all employee retirement plans into two newly-established categories: defined benefit plans and defined contribution plans. A defined contribution plan was defined, in pertinent part, as follows:

> The term "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for **benefits based solely upon the amount contributed to the participant's account,** and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

29 U.S.C. § 1002(34); emphasis added.

The Supreme Court has recognized this fundamental purpose of ERISA. In *Patterson, Trustee v. Shumate,* 504 U.S. 753 (1992), the Court wrote:

> Our holding also gives full and appropriate effect to ERISA's goal of protecting pension benefits. See 29 U.S.C. §§ 1001(b) and (c). This Court has described that goal as one of ensuring that "if a worker has been promised a defined pension benefit upon retirement-and if he has fulfilled whatever conditions are required to obtain a vested benefit-he actually will receive it."

*Patterson*, 504 U.S. at 764-65, quoting *Nachman Corp. v. Pension Benefit Guaranty Corporation,* 446 U.S. 359, 375, 100 S. Ct. 1723, 1733, 64 L.Ed.2d 354 (1980).

Section 408 of the I.R.C. entitled "Individual Retirement Accounts" sets forth the requirements for a plan to qualify as an IRA or other similar retirement account so that the beneficiary is allowed to deduct limited contributions to his/her IRA, see 26 U.S.C. §§ 219, 408, and defer recognition of gains accruing to the IRA until its distribution. 26 U.S.C. §§ 408(d), 408(e). Upon turning age 70 1/2, a retiree *must* withdraw mandatory minimum distributions or be subject to a 50% tax penalty on any amounts that should have been withdrawn. *See* I.R.C. §§ 401(a)(9)(C); 4974(a). The amounts of the mandatory minimum distributions are calculated based on a formula, which takes into account the retiree's account

balance and life expectancy. *See* Individual Retirement Arrangements, IRS Pub. 590 (2010), *available at* http://www.irs.gov/pub/irs-pdf/p590.pdf.[1]

As stated by the Supreme Court in *Rousey v. Jacoway,* 544 U.S. 320, 331-32 (2005):

> [T]he minimum distribution requirements . . . require distribution to begin at the latest in the calendar year after the year in which the accountholder turns 70 1/2. Thus, accountholders must begin to withdraw funds when they are likely to be retired and lack wage income . . . . [A]bsent the applicability of other exceptions . . . , withdrawals before age 59 1/2 are subject to a tax penalty, restricting pre-retirement access to the funds. [T]o **ensure that the beneficiary uses the IRA in his retirement years, an accountholder's failure to take the requisite minimum distributions results in a 50-percent tax penalty on funds improperly remaining in the account**. All of these features show that IRA income substitutes for wages lost upon retirement and distinguish IRAs from typical savings accounts.

Emphasis added; internal citations omitted; *see also Carmichael v. Osherow (In re Carmichael)*, 100 F.3d 375, 378 (5th Cir. 1996) ("IRAs . . . are substitutes for future earnings in that they are designed to provide retirement benefits to individuals. The age limitation on withdrawal illustrates Congress' intent to provide income to an individual in his advanced years."); Individual Retirement Arrangements, IRS Pub. 590, at 3 (2010), *available at* http://www.irs.gov/pub/irs-pdf/p590.pdf ("An IRA is a personal savings plan that gives you tax advantages for setting aside money for retirement."); Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1986 at 710 (1987), *available at* http://www.jct.gov/jcs-10-87.pdf ("Uniform minimum distribution rules . . . ensure that [retirement] plans are used to fulfill the purpose that justifies their tax-favored status --

---

[1] An IRA custodian is required to report to the retiree and the IRS the amount of the IRA balance upon which mandatory minimum distributions are based. *See* I.R.C. § 408(i) ("The trustee of an individual retirement account . . . shall make such reports regarding such account . . . to the Secretary and to the individuals for whom the account . . . is . . . maintained . . . ."); IRS Notice 2002-27 (providing "guidance on the reports that trustees, custodians, and issuers are required to make with respect to required minimum distributions from . . . [IRAs].").

{N0048219 3}                                     10

replacement of a participant's pre retirement income stream at retirement -- rather than for the indefinite deferral of tax on a participant's accumulation under the plan.").

New York law similarly protects retirement accounts by preventing judgment creditors from levying upon them in most situations. CPLR 2505(d)(1); *see also Lauder v. Jacobs*, 10 Misc. 3d 1052(A), 809 N.Y.S.2d 482 (Sur. 2005) *aff'd*, 35 A.D.3d 822, 826 N.Y.S.2d 719 (2006) ("Pursuant to CPLR 5205(c), assets held in certain 'trusts' are exempt from the normal remedies available to creditors seeking either pre-judgment attachment and/or post-judgment enforcement of money judgments. Among the assets which are exempt in this regard are IRA's, whether the funds in such accounts were derived from a 'roll-over' of otherwise exempt pension plans or established with funds traceable directly to the 'judgment debtor' or 'defendant.'"); *Pauk v. Pauk*, 232 A.D.2d 392, 393, 648 N.Y.S.2d 134, 135 (1996) ("Effective September 1, 1994, CPLR 5205(c)(2) was amended to include IRAs as accounts that are 'conclusively presumed to be spendthrift trusts' under CPLR 5205(c)(3), and exempt from attachment to enforce a money judgment except in certain circumstances not relevant here.").

Despite this clear body of law, the Trustee has violated ERISA by charging the Customers with withdrawals taken by other ERISA plan beneficiaries. It is inconceivable that the Supreme Court would sustain the Trustee's treatment of the Customers when the result is to deprive honest, law-abiding citizens of their ERISA-protected retirement funds.

## CONCLUSION

For the reasons set forth above, we respectfully ask the Court to deny the Trustee's motion and allow the Customers' claims.

May 30, 2014

        Respectfully submitted,

        */s/ Helen Davis Chaitman*
        BECKER & POLIAKOFF LLP
        45 Broadway
        New York, New York 10006
        (212) 599-3322
        hchaitman@bplegal.com

        *Attorneys for Elizabeth (Lisa) Cavanaugh and Laura Hallick*

{N0048219 3}        12

## CERTIFICATE OF SERVICE

I, Lourdes Blanco, hereby certify that I caused a true and correct copy of the foregoing document(s) to be served upon the parties in this action who receive electronic service through CM/ECF. I certify under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
May 30, 2014

*/s/ Lourdes Blanco*

{N0048219 3}                              13