Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-99000-smb

4   Adversary No. 10-04891-smb

5   Adversary No. 10-05083-smb

6   Adversary No. 10-05091-smb

7   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

8   In the Matter of:

9   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF B.,

10                      Plaintiff

11              v.

12  THE ROBERT AUERBACH REVOC.,

13                      Defendants

14  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15  In the Matter of:

16  IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF B.,

17                      Plaintiff

18              v.

19  THE S. JAMES COPPERSMITH.,

20                      Defendants

21  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

22

23

24

25

Page 2

1   In the Matter of:

2   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF B.,

3                        Plaintiff

4                   v.

5   GUTMACHER ENTERPRISES, LP.,

6                        Defendants

7   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

8

9

10                  U.S. Bankruptcy Court

11                  One Bowling Green

12                  New York, New York

13

14                  May 14, 2014

15                  10:07 AM

16

17

18   B E F O R E :

19   HON STUART M. BERNSTEIN

20   U.S. BANKRUPTCY JUDGE

21

22   ECR OPERATOR:  F. FERGUSON

23

24

25

1    Hearing re:   Administrative case no. 10-04981: Discovery

2    Conference.

3

4    Hearing re:   Administrative case no. 10-05083: Discovery

5    Conference.

6

7    Hearing re:   Administrative case no. 10-05091: Discovery

8    Conference.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Jamie Gallagher

Page 4

```
 1    A P P E A R A N C E S :

 2    BAKER HOSTETLER

 3         Attorneys for Irving Picard, Trustee

 4         45 Rockefeller Plaza

 5         New York, NY 10111

 6

 7    BY:  NICHOLAS J. CREMONA, ESQ.

 8         EDWARD J. JACOBS, ESQ.

 9         SARAH JANE T.C. TRUONG, ESQ.

10

11    FOLKENFLIK & MCGERITY, LLP

12         Attorney for the Defendants

13         1500 Broadway

14         New York, NY 10036

15

16    BY:  MAX FOLKENFLIK, ESQ.

17

18

19

20

21

22

23

24

25
```

Page 5

1                    P R O C E E D I N G S

2           THE COURT:  Okay, Madoff.  Why don't you give me

3      an update of status of where you are in relation to your

4      dispute because I'm getting letters, and one side seems to

5      think that you're narrowing the differences, and I just

6      don't -- this is my first conference in this case which

7      seems to have a long history.  So, just give me an idea of

8      where you are.

9           MS. TRUONG:  Good morning, Your Honor.  Sarah Jane

10     Truong on behalf of the trustee.

11           To give you some background on the case, we have,

12     as you've seen in the letters that have been submitted, we

13     have attempted to meet and confer in good faith and

14     negotiate with the defendants over various discovery

15     disputes in these three cases.  For over a year we're --

16     we've extended the case management plans.  We're now in

17     seventh amended case management plans for two of the cases.

18           At issue, we have tried to narrow the disputes.

19     During the course of the last year, the defendants have

20     again and again repeatedly represented to the trustee and to

21     the Court that they will provide us with discovery responses

22     and documents.  We have continued to extend dates to allow

23     them to provide the discovery to us.  We have followed up

24     with them diligently.  They have failed to provide anything

25     but tricklings of documents and non-responsive discovery

Page 6

1   responses to the responses that are in dispute.

2             Since last fall when we brought this issue before

3   the Court initially, we have continued to try to engage with

4   the defendants.  One of the types of documents that was in

5   dispute are defendants' bank records.  The trustee served --

6             THE COURT:  What records?

7             MS. TRUONG:  The defendant's bank records.

8             THE COURT:  Bank records.

9             MS. TRUONG:  Yes.  And so the trustee endeavored

10  to serve Rule 45 subpoenas on financial institutions where

11  the defendants held accounts and we are continuing to obtain

12  documents from those subpoenas for the accounts that we have

13  identified to date, that are relevant where transfers were

14  received by defendants.

15            THE COURT:  Are these subsequent transferees, the

16  defendants?

17            MS. TRUONG:  Initial and subsequent transferees.

18  So, there are both initial and subsequent transfers at issue

19  in the cases.

20            THE COURT:  Is there a dispute regarding the

21  initial transfers?

22            MS. TRUONG:  The defendants have agreed to admit

23  to most of the initial transfers, and most of the disputes

24  rely with the subsequent transfers.

25            THE COURT:  Okay.

1          MS. TRUONG:  And so we are currently trying to

2     work through and we're willing to continue to negotiate with

3     the defendants on stipulations.  Since we have obtained the

4     defendant's bank records and are continuing to obtain bank

5     records from the banks themselves, if we can get

6     stipulations from the defendants that confirm the relevant

7     account numbers where transfers were received, both initial

8     and subsequent transfers, if we can get stipulations as to

9     the admissibility of the records that the trustee has

10    obtained from the banks in response to the Rule 45

11    subpoenas, and we obtained stipulations of facts, that is

12    stipulations that -- as to each of the transfers, whether

13    initial or subsequent, that each of the defendants obtained,

14    than we do agree that all of this will obviate the need to

15    obtain the defendants' bank records directly from the

16    defendants.

17           However, going beyond that, still at issue and

18    still at dispute are documents that may potentially be

19    relevant to affirmative defenses that have been raised by

20    the defendants.  For example, as to subsequent transfers, in

21    each of the cases the defendants have raised affirmative

22    defenses that subsequent transfers were received for value,

23    and I'm quoting from their affirmative defenses, "in

24    accordance with contractual agreements or other

25    obligations."  In it --

1              THE COURT:  Have they produced the contracts or

2      evidence of the obligations?

3              MS. TRUONG:  I believe that they have provided one

4      trust agreement, a unitrust trust agreement in one of the

5      cases.  There's also another affirmative defense that is

6      raised by defendants in Gutmacher as to the Nicole trust

7      regarding payment of insurance proceeds.  In addition, some

8      of the defendants raised defenses that the initial transfers

9      that were received were used for living expenses and other

10     expenses.

11             So, we believe that any documents that would --

12     that underlie these affirmative defenses are relevant and

13     should be produced.  There are also discovery responses --

14     discovery requests, like interrogatories and requests for

15     admission that are still outstanding that defendants have

16     not responded to, or if they have provided responses, those

17     responses have been non-responsive largely.

18             THE COURT:  Well, requests for admissions, if they

19     haven't responded are self-executing, so that's not a

20     problem or shouldn't be a problem.

21             MS. TRUONG:  In addition, I wanted to raise the

22     documents from the -- one of the third parties, FMC, that we

23     referred to in our letters.  And currently, the state of

24     play is that the defendants identified 40 boxes that may

25     contain relevant documents.  They offered to provide those

Page 9

1    documents to us, and then they revoked that offer.  And then

2    in the May 9th letter submitted to Your Honor, they did

3    raise that they would make these 40 boxes available for the

4    trustee to go look at, and inspect, and make copies of

5    potentially relevant documents.

6              THE COURT:  Right.

7              MS. TRUONG:  However, we --

8              THE COURT:  That's not acceptable to you, because

9    that's what you were proposing yesterday.

10             MS. TRUONG:  We would ask that we be able to, at

11   our -- while it's not our obligation, at our own cost, we

12   are willing to have a vendor go in and scan those 40 boxes

13   of documents so that we can load them into a database and

14   make them text searchable so that we can review them in an

15   efficient manner.

16             To the extent the defendants want to preserve any

17   privilege arguments, we would agree to work out an agreement

18   with the defendants to preserve any privilege arguments as

19   to the 40 boxes of documents with FMC.

20             THE COURT:  All right.

21             MS. TRUONG:  Thank you, Your Honor.

22             THE COURT:  Yes, sir.

23             MR. FOLKENFLIK:  Your Honor, I feel I know more

24   about what they think the deficiencies are today than I've

25   known at any time up until today.

1          THE COURT:  I don't know, they wrote a pretty

2    detailed letter on January 28th.

3          MR. FOLKENFLIK:  Well, but the detailed letter has

4    details that are not really going to the crux of the issue.

5    Your Honor might recall some years ago Alan King had a movie

6    called "Just Tell Me What You Want."  Their arguments, their

7    detailed letters do not address the reality of the situation

8    or the reality of the claims.  And let me just give Your

9    Honor a little background.

10          THE COURT:  Okay.

11          MR. FOLKENFLIK:  There are three groups of

12    defendants in three different cases that are slightly

13    different from each other.  With respect to Coppersmith,

14    let's take that because that's the easiest.  With respect to

15    Coppersmith, the -- James Coppersmith and his wife donated

16    assets to a charitable remainder unitrust and the unitrust

17    document provides by its terms that in each year of their

18    lives, and they were not young at the time they did this,

19    Mr. Coppersmith is now about 82 years old, in each year of

20    their lives, the unitrust pays them 12 and a half percent of

21    the value of the trust.

22          When I talk about the defense of antecedent debt,

23    there are two types of defenses.  One's been ruled upon by

24    -- with respect to the initial transferee by Judge Rakoff,

25    although that ruling may or may not survive appeal.  And the

 1    other is with respect to the subsequent transferees.

 2              THE COURT:  Excuse me, is that issue on appeal?

 3              MR. FOLKENFLIK:  It is not currently on appeal,

 4    Your Honor.  I've understood --

 5              MR. JACOBS:  No, it --

 6              MR. FOLKENFLIK:  -- I understand that --

 7              THE COURT:  Which issue are you talking about?

 8              MR. FOLKENFLIK:  The issue of antecedent debt with

 9    respect to whether or not the initial transferee, who takes

10    a transfer in good faith based on the statement values shown

11    in his account, can claim that the defense of a good faith

12    transfer for an antecedent and --

13              THE COURT:  You're arguing that the fictitious

14    profits, or the obligation to restitution is the antecedent

15    debt that's being satisfied?

16              MR. FOLKENFLIK:  I would argue that in a --

17              THE COURT:  Okay.

18              MR. FOLKENFLIK:  -- suit against Mr. Madoff

19    directly, and when I attended the In re: Bernard L. Madoff

20    hearing at the Second Circuit, Judge Jacobs and Judge Raggi

21    seemed to agree, and I believe Judge Cabranes agreed also,

22    that the claims against Madoff would be for the full amount

23    of the statement value because as Your Honor may --

24              THE COURT:  Well, but that's a direct fraud claim,

25    this is a --

1          MR. FOLKENFLIK:  That's --

2          THE COURT:  -- SIPC --

3          MR. FOLKENFLIK:  That's correct.

4          THE COURT:  -- SIPA liquidation and a Ponzi

5    scheme.

6          MR. FOLKENFLIK:  And my argument, which Your Honor

7    may or may not accept, or any Court may or may not accept,

8    is that the antecedent debt concept under -- for a Ponzi

9    scheme under SIPC incorporates the antecedent debt concept

10   from the bankruptcy statute and doesn't incorporate it in a

11   way that has any overlying statutory or policy basis for

12   changing what an antecedent debt is.

13         THE COURT:  But -- but -- I'm not ruling --

14         MR. FOLKENFLIK:  But in any event.

15         THE COURT:  Stop, stop.  I'm not ruling on this

16   now, but there are a slew of cases in all contexts that say

17   that the investor in a Ponzi scheme doesn't -- is not

18   entitled to anything more than their principal.

19         MR. FOLKENFLIK:  In the SIPC proceeding, that's

20   correct.

21         THE COURT:  Not just SIPC proceedings.  I have

22   other Ponzi scheme cases and they're all over the country.

23         MR. FOLKENFLIK:  And that's true, Your Honor, and

24   that's an argument which I most likely will lose.  But the

25   other argument is different.  And the other argument is as

Page 13

1    to the subsequent transferee.  As to the initial

2    transferee --

3              THE COURT:  Right.

4              MR. FOLKENFLIK:  -- I don't expect that that

5    argument will prevail.  But there is an argument, and I

6    don't think it's been authoritatively disposed by higher

7    level courts.  And there are many cases in Bankruptcy Courts

8    and District Courts.

9              With respect to the subsequent transferee, I

10   believe that the unitrust document, which requires a payment

11   of 12 and a half percent of the assets of the unitrust to

12   the donor in each year, that that is an antecedent debt.

13             THE COURT:  Okay, but what does that have to do

14   with the discovery?

15             MR. FOLKENFLIK:  So, here's the answer.  Every --

16   despite the fact that Your Honor heard this morning that

17   they want admissions about every transfer to the initial

18   transferee and every transfer to the subsequent transferee,

19   we've admitted them all: with respect to Coppersmith, with

20   respect to Auerbach --

21             THE COURT:  Well, that's not what I'm -- that's

22   not what I'm hearing.

23             MR. FOLKENFLIK:  No, it isn't, and that's why I

24   have been struggling to get them to say, what is it that you

25   actually need and what do I need to do to show you.  Every

Page 14

1    transfer is the subject of one of -- or two things.  Number

2    one, we admitted all of the transfers -- all of the deposits

3    into Madoff and the withdrawals out.  That's admitted.  It's

4    not a problem.

5             THE COURT:  Of the initial transfers, they're

6    all --

7             MR. FOLKENFLIK:  Of the initial transfers.

8             THE COURT:  Okay.

9             MR. FOLKENFLIK:  And with respect to the

10   subsequent transfers, the -- all of these defendants were

11   advised by a financial advisor corp., Family Management

12   Corp.  So, we produced Family Management Corp.'s internal

13   record showing every single transfer from the funds that

14   were held under Family Management's purview, to the

15   subsequent -- every transfer out.

16            THE COURT:  Let me ask you, do you know who the

17   subsequent transferees are of all of these initial

18   transfers?

19            MR. FOLKENFLIK:  Yes.

20            THE COURT:  Let me -- I'm asking her.

21            MS. TRUONG:  We believe that we have identified

22   subsequent transferees to the extent we have sued them in

23   the case.  However, we have reserved the right to, upon

24   review of the documents as we receive them, identify any

25   other potential transferees.

```
1            MR. FOLKENFLIK:  Now, Your Honor, 100 percent,
2   let's take Coppersmith as the first example.  100 percent of
3   the transfers from the initial transferee of the unitrust
4   were made to James Coppersmith and his wife, Janice,
5   pursuant to those documents.
6            THE COURT:  The sense I get from them, from the
7   plaintiffs, is they want to look at the bank records to make
8   sure that that bank statement is correct.
9            MR. FOLKENFLIK:  Well, we've admitted it and
10  Mr. Coppersmith is solvent and can pay it.  If they want to
11  verify it through bank records, they've subpoenaed the
12  banks.  I don't know what else Family Management, if Family
13  Management delivered -- who went back to Pershing, which was
14  their custodial bank, and get the records that would be a
15  lot of burden and a lot of expense, but they've subpoenaed
16  Pershing Bank to get their records.
17            I think it's a big waste of time because I don't
18  know what it is that they think they can discover or why
19  they are looking for downstream transferees, or whether or
20  not those bank records will produce anything that will help
21  them in that regard because basically you will see that
22  people used their money, once it went into their bank
23  accounts.  And with respect to Coppersmith, for example, it
24  went directly from Pershing to their own bank accounts, they
25  used it for living expenses.  They used it, you know, they
```

Page 16

1    might have given some money to their children, or they

2    tertiary subsequent transferees, I don't know, but --

3              THE COURT:  Well, they could be liable, though,

4    under the statute.

5              MR. FOLKENFLIK:  I think that there is, if

6    Mr. Coppersmith were not solvent and able to pay the amount,

7    which now in the two year period that's still in play under

8    Judge Rakoff's rulings, maybe that will change, in the two

9    year period, it's $315,000.  They can write a check.  In

10   fact, they've gotten more money than that from the Madoff --

11   from the trustee or otherwise, with respect to another

12   account which was not in dispute.

13             So, there is no need to do that --

14             THE COURT:  All right, so let's deal with --

15             MR. FOLKENFLIK:  -- and I'm trying to talk sense

16   to them.

17             THE COURT:  Let's deal with the Coppersmith

18   situation.

19             MR. FOLKENFLIK:  Right.

20             THE COURT:  In terms of your burden, forgetting

21   about the affirmative defenses for the moment, do you need

22   any further information or has this all been resolved by

23   stipulation or a promised stipulation?

24             MS. TRUONG:  There are a couple of issues with

25   Coppersmith to the extent that Mr. Folkenflik has raised and

Page 17

1   made factual assertions today.  Based upon what we have

2   received, which is a trickle of documents, we do not believe

3   that he has provided evidence in support of these factual

4   assertions today.

5           THE COURT:  But if -- I understand, but if

6   everybody -- let me start with your affirmative case.

7           What -- at this point, your affirmative case is

8   they've agreed to the initial transfers.  So, in your

9   affirmative case against the initial transferees, it doesn't

10  sound like you need anything else.

11          MS. TRUONG:  We don't believe that we need

12  anything else for --

13          THE COURT:  Okay, I'm just dealing with --

14          MS. TRUONG:  -- to prove our case.

15          THE COURT:  -- your affirmative case.

16          MS. TRUONG:  Yes.

17          THE COURT:  With respect to the subsequent

18  transferees, I'm being told in the Coppersmith case, and I

19  guess they're prepared to stipulate that all of the money

20  went from the unitrust to Mr. and Mrs. Coppersmith, there

21  may be subsequent transfers admitted.  So, what --

22          MR. FOLKENFLIK:  And I believe I admitted that in

23  the answer to the complaint.

24          THE COURT:  So, what more do you need for that

25  one?

1          MS. TRUONG:  So, we do have stipulations that we

2     drafted.  Mr. Folkenflik has recently circulated some

3     revisions to the stipulations that we do not believe are

4     acceptable, but we are willing to continue to try to discuss

5     with him those stipulations.

6          MR. FOLKENFLIK:  And, Your Honor, in fairness, I

7     said in what respect is it not acceptable and what is it

8     that you need to prove that I haven't -- that I've altered

9     with my language, and I haven't gotten an answer.  So, I

10    don't know.

11         We should be able to work out the stipulations.

12    We should be able to if they failed to ask for a stipulation

13    on anything I've said today and the documents don't prove

14    what I've said today, I'll stipulate to what I've said

15    today.  So, that's not -- that case should be taken care of.

16         THE COURT:  You're more optimistic than they are.

17         MR. FOLKENFLIK:  I think that has been the case.

18         THE COURT:  So what about -- all right, let me

19    hear about the affirmative defenses in Coppersmith.

20         MS. TRUONG:  In Coppersmith, again, the

21    affirmative defenses that are raised go to the subsequent

22    transfers and that they were taken for value so that --

23         THE COURT:  And I'm being told, all he has is this

24    unitrust agreement.  That's all he's relying on.  Is that

25    all you're relying on?

1           MR. FOLKENFLIK:  That's correct, Judge.

2           THE COURT:  So, if he stipulates that's all he's

3    relying on, then all you need is the agreement.

4           MS. TRUONG:  Okay --

5           MR. FOLKENFLIK:  And they have it.

6           MS. TRUONG:  The other issue is that they also

7    have raised affirmative defenses as to the calculations, the

8    withdrawals, and the deposits.

9           THE COURT:  I thought they admitted it?

10          MR. FOLKENFLIK:  No, Your Honor, we admitted the

11   withdrawals and deposits.  We admitted them in the response

12   to the complaint.  There was --

13          THE COURT:  I'm hearing two different things

14   here --

15          MR. FOLKENFLIK:  There was one question --

16          THE COURT:  -- that's the problem.

17          MR. FOLKENFLIK:  There was one question where we

18   admitted the withdrawals and the deposits.  The -- we

19   admitted the ultimate number, the amount that was overdrawn,

20   if you will.  I think there was one number of a deposit

21   where there was a minor error between two dates and they

22   asked me to admit the dates were correct.

23          For example, there was another kind of admission

24   problem and something that's throughout the letter that Your

25   Honor received from Mr. Cremona dated January 18th.  We --

Page 20

1    and that's in -- they asked me to admit that we received in,

2    you know, withdrawals in excess of deposits, which we did.

3    And then they said, admit that you have none -- no documents

4    which refute the claim that you submitted withdrawals in

5    excess of deposits, and I wrote down not applicable because

6    I might have a document that might tend to refute the claim,

7    but I'm not refuting the claim.  And so -- and I don't know

8    whether there's a document that tends to contradict that

9    statement, but I'm not relying on that document.  So, it's

10   not applicable.  They objected to that.

11           The objected to the fact that we gave them lists

12   that showed every single withdrawal from the account that

13   received the Madoff initial transfers because those

14   documents, in some cases, in Gutmacher, didn't include each

15   of the deposits from Madoff as well, but I had admitted each

16   of the deposits from Madoff into the initial transferee's

17   account.  With -- now let me go a step further.

18           There were a couple of verifications we had

19   complexities about.  They asked Robert Auerbach to sign a

20   verification with respect to his interrogatories.  And I

21   said, well, the problem is Mr. Auerbach is under 24 hour

22   care.  He's severely diabetic, suffered many strokes, and is

23   basically non-communicative.  He does not speak and cannot

24   care for himself.  He's under full-time care.  He hasn't

25   been declared officially an incompetent.  I said I don't

Page 21

1    think I can give a verification for him.

2              There's a slightly different issue with respect to

3    Nicole Gerard, who is a subsequent -- alleged subsequent

4    transferee.  And I said that Nicole Gerard has been in

5    mental health facilities for much of her life, has severe

6    mental problems, has had drug abuse issues, is not declared

7    incompetent -- judicially declared incompetent, but she does

8    have a conservator for her assets, and her assets come from

9    a spendthrift trust.

10             So, I feel -- I'm comfortable.  I've questioned

11   her.  She's confirmed the statements in the interrogatories,

12   and I don't feel as an officer of the Court I can put forth

13   a verification from her that I can attest to a good faith

14   belief that she's saying the right thing.  She also has no

15   firsthand knowledge.  All of the information comes to her

16   through secondhand.  Her mother dealt primarily with Madoff

17   accounts with Family Management, and her mother is now

18   deceased.  Her grandmother is deceased.  Those are the three

19   subsequent transferees in the Gerard case: the Estate of

20   Rose Gutmacher; the Estate of Barbara Gerard; and Nicole

21   Gerard.

22             Nicole has assets in a trust, a spendthrift trust,

23   that's where all her assets are.  And they are the result of

24   insurance proceeds that she recovered on the death of her

25   mother.  So, those are exempt from attachment, and I keep

Page 22

1    saying let's sit down and work this out.

2            And part of the problem is for logistical reasons

3    that I sympathize with, with the trustee, the people working

4    directly on this case are not in the courtroom here.  These

5    are people I've spoken to, in the case of Mr. Cremona, a

6    couple times, and the other counsel, I think, not at all.  I

7    need to sit down and negotiate this.  I could do that at the

8    end of June because Ms. Kitaev is coming into town with

9    regard --

10           THE COURT:  Who's she?

11           MR. FOLKENFLIK:  She is one of the counsel for the

12   trustee and she's coming into town for a mediation before

13   Judge Conrad --

14           THE COURT:  But the end of June --

15           MR. FOLKENFLIK:  -- in a different case.

16           THE COURT:  The end of June is a month away.

17           MR. FOLKENFLIK:  That's correct.

18           THE COURT:  Why does it take so long?

19           MR. FOLKENFLIK:  Well, if she's coming -- if she

20   wants to come into town or, you know, but I guess I could

21   fly to Colorado where she is, but that seems to be an

22   unnecessary expense for my client --

23           THE COURT:  Why can't it be done by telephone?

24           MR. FOLKENFLIK:  If -- all I -- if Your Honor --

25           THE COURT:  Or a video conference if you want to

1    look face to face?

2            MR. FOLKENFLIK:  Your Honor, we could, but that's

3    what's happened.  We've had these conversations periodically

4    and often where I say you have to narrow and tell me exactly

5    what you want, what you need for your case that I'm not

6    giving you, and I'll give it to you.  We'll make sure we get

7    that.  But to, for example, scan 40 boxes of daily

8    communications --

9            THE COURT:  If they want to do that, what's the

10   problem?

11           MR. FOLKENFLIK:  I can discuss it with my client.

12   I find it very intrusive, and I also think it's wrong to

13   have me have to go through the expense of going through the

14   40 boxes.  If they go through and pick out documents to --

15   for production, I can look at them, see if they've requested

16   them, if they're relevant, if they're objectionable.  If

17   they scan 40 boxes, in order for me to know how to deal with

18   that, I have to go through the 40 boxes.

19           THE COURT:  Haven't you gone through them?  Do you

20   know what's in them?

21           MR. FOLKENFLIK:  I don't know what's in the 40

22   boxes -- I mean, I know what's in.  They're daily

23   communications.  The Gutmacher/Gerard family, their entire

24   financial life was run by Family Management.  Then I'm told

25   they have correspondence every single day of every year that

Page 24

1    they were working with Family Management, which is many

2    years.  And the 40 boxes go back long before any period

3    where they are able to allege a transfer or activity that

4    would be -- lead to a recovery in this case, which should

5    only go for two years, for example.

6              Now, if they're only talking about two years,

7    yeah, they can probably scan those and I'll go through

8    those, and that makes sense if they're two years prior to

9    December of 2008.  If they want subsequent to 2008, we can

10   talk about that as well, what the need for that is.

11             THE COURT:  Well, you've raised -- okay, but

12   you've raised issues regarding the use of the money also.

13   And -- that it's used for living expenses or the people --

14             MR. FOLKENFLIK:  I've raised those issues, I'm not

15   sure they're defenses, but yes.

16             THE COURT:  Well, that's what I was going to ask.

17   I don't -- you know, I had it in the case yesterday, I

18   think, and I don't know why they're defenses.

19             MR. FOLKENFLIK:  I don't think they are.  I

20   mean --

21             THE COURT:  People are seeking rachmones, but --

22             MR. FOLKENFLIK:  Yes, it's a Writ of Rachmones

23   might be applicable, but with -- and particularly with

24   regard to Auerbach's because many of the expenses were for

25   his healthcare and insurance, but that is more properly met

Page 25

1   by a hardship application, which we will be filing in that

2   case.  We did not object to them getting all of their bank

3   records.  You know, I think this is something we could work

4   out if Your Honor urges us to.

5               THE COURT:  It's been going on a long time,

6   that's --

7               MR. FOLKENFLIK:  It has.

8               THE COURT:  -- my one concern.

9               On the other hand, I was starting to get the sense

10  that the trustee is over-discovering in these cases.  If

11  somebody is willing to admit, for example, to the initial

12  transfers that the trustee alleges, it seems to me that's

13  the end of the, at least the direct case regarding the

14  initial transfers.  Then whatever legal arguments are left

15  in the case, I guess the parties can make.

16              MS. TRUONG:  One of the issues that -- sorry, Your

17  Honor.

18              THE COURT:  Go ahead.

19              MS. TRUONG:  One of the issues that we have come

20  across in Coppersmith are for the reasons that

21  Mr. Folkenflik enumerated, is that the defendants are not --

22  some of the defendants are not able to verify responses and

23  no documents have been produced that would verify any of the

24  responses.

25              For example, in response to four interrogatory

Page 26

1    requests and in response to all of the defendants -- the

2    document requests, the defendants said that they would

3    produce business records.  They've only produced 31 pages,

4    10 of which are duplicative and --

5              THE COURT:  But what's the issue?  You know --

6              MS. TRUONG:  And --

7              THE COURT:  -- part of the problem I'm having in

8    addition to not -- I'm hearing two different sides of the

9    stories is, as the issues get narrower, you need less

10   documents.  So, to tell me they produced 31 documents on an

11   issue that may not be an issue in the case anymore doesn't

12   mean that much.

13             MS. TRUONG:  Well, even as to the admissions and

14   the request for admissions that a trustee served -- request

15   for admissions on both the individual Coppersmith defendants

16   and the unitrust, and the defendants served responses on the

17   trustee for the unitrust on May 10th of 2013 and for the

18   individual defendants on August 16th of 2013, and the

19   responses received in each of those requests for admissions

20   are conflicting.

21             MR. FOLKENFLIK:  I am not aware of that, Your

22   Honor, that they are conflicting responses with respect to

23   the same question unless it is -- there is some reason for a

24   difference.

25             We -- with respect to the unitrust, we filled out

Page 27

1    -- we -- and the -- with respect to a request for admission,

2    if I don't admit, I don't admit and there's potential

3    penalty, and that's what it is.  That's --

4              THE COURT:  Did they not admit or provide

5    admissions that varied -- that were not true admissions.  In

6    other words, I'm not talking about the inconsistency, but

7    kind of I can't admit it, but here's what happened type of

8    thing?

9              MS. TRUONG:  My understanding is that there were

10   internal inconsistencies in the admissions.

11             MR. FOLKENFLIK:  And, Your Honor --

12             THE COURT:  But you could get testimony that could

13   have that, right?  Just pick the one you like best.

14             MR. FOLKENFLIK:  If they want to ask me to make a

15   representation and/or make it on behalf of my clients,

16   explaining whatever inconsistencies they've identified,

17   that's fine.  But it's been like punching at a cloud.  I

18   haven't been able to get it narrowed down to sort of precise

19   issues where I actually know what they want so I can give it

20   to them.

21             THE COURT:  I don't know, it almost sounds like

22   these cases can be tried on stipulated facts, but what do

23   you propose?

24             MS. TRUONG:  We --

25             THE COURT:  Because we're going around, and

1    around, and around.

2              MS. TRUONG:  Again, I'd like to reiterate as I

3    mentioned earlier that if we can get acceptable

4    stipulations, then yes, we agree that we can accept those

5    stipulations or the proof of our case.

6              THE COURT:  Okay, and you sent --

7              MS. TRUONG:  However --

8              THE COURT:  -- draft stipulations?

9              MS. TRUONG:  We sent draft stipulations in the

10   past.  Last year we sent them.  Finally, just in the last

11   week have we got -- received actually on Monday, we received

12   edits to those stipulations that we are reviewing.  And so

13   far, we do have some issues with those, which we are again

14   willing to continue to negotiate with the defendants on.

15   Our concern, as you've mentioned, is that this has been

16   going on for over a year.  And so, we are trying to narrow

17   this issue and come to agreement.

18              THE COURT:  But you don't think you're in a

19   position to try your case today?

20              MR. JACOBS:  Your Honor, if I may interject,

21   absolutely not.

22              And the problem is that while we agree with the

23   principle that you're articulating that if there are factual

24   stipulations, obviously that it -- that narrows the issues

25   and narrows or eliminates necessary discovery on those

Page 29

1    issues.

2           Gutmacher, for example, we haven't been

3    negotiating any stipulation because we've received

4    absolutely no discovery in response to our request on that

5    case.  We don't have a basic understanding even of who the

6    defendants are and what their legal and contractual

7    relationships are to each other.  We also believe that many

8    of some or all of those defendants are also the principals

9    behind Family Management Corporation, which is the entity

10   that managed the trust for all -- in all three cases.

11          They have not responded to our subpoenas.  We

12   don't have any document productions from them regarding --

13   giving us insight into the basic facts that we would need to

14   even contemplate what a stipulation might say.  These

15   defendants have been completely dilatory over a year of

16   discovery in refusing to answer even basic discovery

17   requests for information.  That is our frustration.

18          MR. FOLKENFLIK:  Your Honor, that --

19          THE COURT:  Okay, let's just start with Gutmacher.

20          MR. FOLKENFLIK:  Let me explain the Gutmacher

21   situation.

22          Family management corFirst of all, the trustee of

23   some of these trusts, and that's not the case in Gutmacher,

24   is Seymour Zises, who is a principal of Family Management.

25   Family Management has produced in the case of Gutmacher

1    hundreds and hundreds of pages of computer printout showing

2    every transfer of every dollar out of the accounts which

3    received any Madoff distributions.  Everyone.

4           The problem with Gutmacher is if they don't

5    understand the relationships of the parties, that's because

6    their discovery hasn't address that.  I'm happy to sit down

7    with them and discuss what it is in some detail, but they

8    just keep saying, just give me all the documents I asked

9    for.  Let me scan 40 boxes of documents, that kind of

10   approach, rather than saying, look, why don't we have a

11   discussion off the record.  Let's talk about who does what,

12   who is what to whom, what the situation is, and then we will

13   see whether we can sign a stipulation.  But instead, they

14   want to go through tens of thousands of pages of documents.

15          In Gutmacher, I believe they subpoenaed and

16   received discovery from three separate commercial banks, as

17   well -- Pershing, which received the Madoff money, and the

18   family's private bank accounts and I don't know what any of

19   that means.

20          THE COURT:  So, what do you need?

21          MR. JACOBS:  Well, Your Honor, over all three of

22   these cases, each of which has multiple defendants that have

23   complicated legal relationships to each other, we've

24   received in total about 100 documents.  And we -- we've

25   reviewed those documents --

1            THE COURT:  See, I'm hearing two different things

2     again.

3            MR. JACOBS:  What we -- what I would like to

4     represent is that the documents don't show what counsel here

5     purports that they show.  They are not complete records of

6     all of the subsequent transfers that occurred between and

7     amongst defendants.  There are very few documents, if any,

8     that go to the legal relationship between the defendants at

9     issue, with the exception of a few of the operative trust

10    agreements.  But those documents don't address where the

11    money went, why the money went there, instructions between

12    the parties, instructions from Family Management

13    Corporation.  It's simply not enough.

14            And I have a binder of correspondence that we have

15    exchanged over the course of the year that I'm happy to

16    submit to the Court --

17            THE COURT:  I don't want to read a binder of

18    correspondence.

19            MR. JACOBS:  I'm sure that you don't.

20            THE COURT:  I want to know where we are now.

21            MR. JACOBS:  We want some basic discovery on our

22    claims and the affirmative defenses that counsel has raised

23    so that we can meaningfully have a discussion about what a

24    stipulation would look like that would obviate the need for

25    additional discovery.

1          MR. FOLKENFLIK:  Your Honor, why don't we start,

2     if I may make a suggestion?

3          THE COURT:  Go ahead.

4          MR. FOLKENFLIK:  With having a meeting, seeing if

5     we can reconcile what it is that they're actually looking

6     for which --

7          THE COURT:  You don't need me for that.

8          MR. FOLKENFLIK:  No we don't.  So, we can start

9     and have that meeting and write a joint letter to the Court

10    within seven days describing where we are at that point.

11         We are hearing two different stories, yes, but the

12    -- I don't believe that I received discovery that requires

13    every financial transaction between every defendant, but

14    that would only apply to Gutmacher as an issue.

15         With respect to Coppersmith and Auerback, it's

16    irrelevant.  There aren't a lot of complicated transactions.

17    There are people who are defendants who are husbands and

18    wives who received transfers from the initial transferee,

19    and that's it.  And in the initial transferee in Auerback is

20    a revocable trust and I doubt that I'm going to prevail upon

21    Your Honor to uphold that revocable grantor trust as being a

22    separate entity and not a conduit.  But, you know, I don't

23    know that I'll even try it, but I may, depending on how the

24    facts evolve.

25         But the bottom line is, if they would rather than

1   saying, produce all the documents, I'll go through and try

2   and figure out what I need, why don't we start with what it

3   is they would be looking for in the documents.

4           THE COURT:  What you're saying is very reasonable,

5   but my point is, this has been going on and I don't know

6   whose fault it is, but it has to be resolved.

7           MR. FOLKENFLIK:  Your -- that's correct, Your

8   Honor, and I'm trying to figure out a way to resolve it and

9   I've been doing this in this way for a very long time and

10  haven't been able to get them to pinpoint what they're

11  trying to prove.  For example, in my conversations with

12  Mr. Cremona, he admitted that there's going to be no issue

13  in this case about good faith with respect to the subsequent

14  transferees.

15          THE COURT:  It doesn't sound like a bad faith case

16  from what I'm hearing.

17          MR. FOLKENFLIK:  It doesn't, but if you read the

18  pleading, it does.  If you read the discovery request, it

19  does.  So, I'm not sure -- I mean, we've answered

20  interrogatories about what people did to try and investigate

21  Madoff when they asked that, and gave them the names of

22  anybody who there were discussions with.

23          THE COURT:  Right.

24          MR. FOLKENFLIK:  But I'm trying to get them to

25  narrow the discovery to the issues they actually want and I

1    can't get them to help me focus with them on what those

2    issues are so we can resolve them.

3              MR. JACOBS:  Your Honor, if I may, that is

4    patently untrue.  We have exchanged numerous letters that in

5    painstaking detail --

6              THE COURT:  I saw them --

7              MR. JACOBS:  -- provide Mr. Folkenflik --

8              THE COURT:  -- I saw the January 28th letter.

9              MR. JACOBS:  -- exactly what the discovery that

10   we're seeking.

11             THE COURT:  But he -- what he's saying is, look,

12   yeah, I haven't produced everything you've asked for, but

13   it's burdensome and you don't need it because I'm willing to

14   admit certain things.  So, tell me what you really need to

15   prove your case.  And to simply say, I asked for discovery

16   and he didn't produce it, doesn't get us where we want to

17   get to and that's what I'm sensing is the problem here.

18             MR. JACOBS:  Well, that offer to admit to certain

19   facts has been -- we've taken him up on that offer in

20   numerous instances and those facts still haven't -- we

21   haven't received any admissions as to those facts.  We were

22   before the Court with Mr. Folkenflik on these same issues

23   last year, on August 19, 2013, he wrote a letter to the

24   Court with a Schedule A that lists a large number of items

25   that he represented to the Court that he would produce by

Page 35

1    September 6th of that year.

2            Most of those issues have not -- most of those

3    items that are specific, narrowly identified on that

4    Schedule still have not been produced.  And to the extent he

5    references interrogatory responses, he did serve

6    interrogatory responses, but most of them refer to documents

7    that have never been produced.  I mean, this is -- we

8    literally have nothing to go on here.  It's hard to even

9    have an intelligent discussion about what a stipulation

10   might look like when we have no idea of what the parameters

11   are --

12           MR. FOLKENFLIK:  And --

13           MR. JACOBS:  -- of --

14           THE COURT:  Is the Gutmacher case the one with the

15   most problems in discovery?

16           MR. JACOBS:  I think that they are all about

17   equal, but Gutmacher is probably the case where we have the

18   least understanding of basic facts.

19           THE COURT:  I mean, from what I'm hearing about

20   the Coppersmith case, it seems to be a very straightforward

21   case.  The unitrust got the transfers, which everybody

22   admits.  The money was then transferred to Mr. and Mrs.

23   Coppersmith.  I don't know if you could put an amount on who

24   got what, although it may not matter in the end, and maybe

25   there were subsequent transfers to kids, or grandchildren,

Page 36

1    or something like that, but what do you need?  You have the

2    unitrust document.  That's the basis of his affirmative

3    defense of paying for value.  What more do you need in a

4    case like that?

5              MR. FOLKENFLIK:  And, Your Honor --

6              THE COURT:  Just a minute.

7              MR. JACOBS:  I think that the rules provide us a

8    right to basic discovery concerning the claims and defenses

9    in the case.  And at a minimum, that would be documents that

10   Mr. Folkenflik intends to use and rely upon in connection

11   with his affirmative defenses, and documents that enable us

12   to see and confirm the factual allegations and the

13   underlying facts that underlie the claims that we made in

14   our case.  And I don't think that it's fair --

15             THE COURT:  Not if he admits it.  You don't have

16   to see any documents if he admits these were the transfers.

17             MR. JACOBS:  But he has not admitted to all of

18   those facts and in a way that complies with his discovery

19   obligations.

20             MR. FOLKENFLIK:  In fairness to counsel, those are

21   just words.

22             THE COURT:  Well, I keep hearing about his

23   discovery obligations.  Here's what I'm going to suggest.

24   If you can work it out, fine.  You can make motions to

25   compel, to strike answers, or whatever, because we're just

1    not getting anywhere with this.  And as much as I don't

2    invite sanctions motions under Rule 37 --

3              MR. JACOBS:  Right.

4              THE COURT:  -- I don't know how else to resolve

5    this.

6              MR. JACOBS:  Right.

7              THE COURT:  Then he can tell me what he has

8    produced and, you know, I'll decide who --

9              MR. JACOBS:  Right.

10             THE COURT:  -- should pay the attorney's fees in

11   the end.

12             MR. JACOBS:  Well, Your Honor, the reason -- when

13   we initially asked for our hearing most recently, there were

14   some developments after we submitted our letter that caused

15   us to represent to the Court that we believed we could work

16   out some of these issues.  And number --

17             THE COURT:  Okay, it doesn't like it to me.

18             MR. JACOBS:  Well, number one --

19             THE COURT:  Because you have a different approach

20   to what this case is --

21             MR. JACOBS:  Sure, well --

22             THE COURT:  -- what discovery's about.

23             MR. JACOBS:  Well, what we've represented today is

24   that there are -- if Mr. Folkenflik produces the 40

25   documents of information from FMC, we're allowed to copy and

Page 38

1    review that, and we can also make progress on the

2    stipulations that we've been discussing --

3              THE COURT:  Why do you need it beyond two years?

4    You're limited to two year recoveries at this point.

5              MR. JACOBS:  I didn't represent that we needed it

6    beyond two years.  We just -- FMC is --

7              THE COURT:  So, how many boxes are two years?

8              MR. FOLKENFLIK:  Probably two.

9              THE COURT:  All right.  Do you have any objection

10   to producing the two years?

11             MR. FOLKENFLIK:  Yes, but I won't press it.

12             THE COURT:  All right.  So, let him copy the two

13   years at their expense.

14             MR. FOLKENFLIK:  Okay.

15             THE COURT:  What else?

16             MR. FOLKENFLIK:  The -- Your Honor, with respect

17   to Coppersmith, we have admitted everything, but --

18             THE COURT:  It sounds like that case is ready to

19   be tried.

20             MR. FOLKENFLIK:  It's -- I think Coppersmith is

21   ready for summary judgment or a trial.

22             THE COURT:  I'll try it.

23             MR. FOLKENFLIK:  And --

24             THE COURT:  It sounds like a case that can be

25   tried in half a day.

```
 1            MR. FOLKENFLIK:  But I think under the existing
 2    order, of course, Your Honor has the power to change it, the
 3    parties could mediate first with respect to the Coppersmith
 4    case.
 5            THE COURT:  Look, if you both want to mediate,
 6    that's fine.  I'm happy to try the case if it's ready to go.
 7    It doesn't sound like it will take more than half a day.
 8    Sooner or later you're going to have to start trying some of
 9    these cases.  You tell me.  Do you want to try the
10    Coppersmith case?
11            MR. JACOBS:  I think that we would need to
12    finalize the stipulation with Mr. Folkenflik first before we
13    could -- I can stand here today and tell you that we're
14    ready.
15            THE COURT:  All right, fair enough.  For example,
16    I assume he wants to know that the only document you're
17    relying on for your antecedent debt claim for the subsequent
18    transferees is the trust agreement.
19            MR. JACOBS:  Correct.
20            THE COURT:  So that --
21            MR. FOLKENFLIK:  That's -- and that's it.  They
22    haven't asked that.  I'm happy to admit to that.
23            THE COURT:  What else do you need?
24            MR. JACOBS:  Well, there's also the question of --
25    that's the stipulation that we have exchanged also includes
```

Page 40

1   stipulations as to the facts concerning the subsequent

2   transferee defendants.

3            THE COURT:  Which he tells me he's willing to

4   stipulate.

5            MR. JACOBS:  Right, but it's been a year and he

6   hasn't.  So, I'm hopeful that we can and we would like to,

7   but it hasn't happened, Your Honor.  So, that's our concern.

8            THE COURT:  Why don't you send him a draft

9   stipulation of what you're prepared to admit to with the

10  subsequent defendants -- for the subsequent transferees --

11           MR. FOLKENFLIK:  I'll add --

12           THE COURT:  -- as to who they are and how much

13  they got.

14           MR. FOLKENFLIK:  I'll add that --

15           THE COURT:  When are you going to do that?  You

16  tell me you already -- have done it already, so --

17           MR. FOLKENFLIK:  Yeah, I could do it by -- one

18  week, Your Honor.  I'd like to say less, but one week just

19  in case.  I have to check with clients.

20           MR. JACOBS:  Your Honor, could we have that same

21  arrangement for Gutmacher and Auerbach?

22           THE COURT:  Any objection?

23           MR. FOLKENFLIK:  Any objection to the same

24  arrangement to say --

25           THE COURT:  So, in other words, you're going to --

Page 41

1            MR. FOLKENFLIK:  No, I understand --

2            THE COURT:  -- the stip, right.  It sounds like

3    the subsequent transferees are the problems in these cases.

4            MR. JACOBS:  That's correct.

5            MR. FOLKENFLIK:  I --

6            THE COURT:  Putting aside -- yeah, all right.

7            MR. JACOBS:  Yeah, that's --

8            MR. FOLKENFLIK:  The --

9            MR. JABOBS:  -- that's one of the main issues,

10   yes.

11            THE COURT:  So, would you be willing or are you

12   prepared to draft and send him a stipulation in each of the

13   adversary proceedings which stipulates to the subsequent

14   transfers as to date, amount, and identity of the

15   transferee, which is what you're looking for, right?

16            MR. JACOBS:  Correct.

17            MR. FOLKENFLIK:  With respect to Auerbach and

18   Coppersmith, I think I've provided that information and I

19   can provide that information within a week.

20            THE COURT:  So, do a narrative form of the

21   stipulation.

22            MR. FOLKENFLIK:  In the narrative form on the

23   stipulation.  With respect to Gutmacher, the -- here is the

24   problem, Your Honor, with respect to Gutmacher using the

25   formulation Your Honor just approved.  With respect to

Page 42

1   Gutmacher, the Gutmacher enterprises was an actual business

2   entity and then when it went out of business, it effectively

3   held the assets of the Gutmacher family, chiefly Rose,

4   Barbara, and Nicole.  The family received money from Madoff,

5   that they withdrew from Madoff, as well as from other

6   investments.

7           THE COURT:  Directly from Madoff or through

8   Gutmacher?

9           MR. FOLKENFLIK:  No, the -- Gutmacher Enterprises

10  was a direct investor and withdrew money from Madoff.  They

11  were also, in the case of Gutmacher, there's also a case

12  where, you know, I believe 2005, they put $2 million back

13  into Madoff, so that issue that Judge Rakoff had where it

14  was, you know, does the accounting restart on the new

15  deposit?  Is it life over (indiscernible) effectively for --

16          THE COURT:  You go back to the entire life of the

17  account.

18          MR. FOLKENFLIK:  At the present, that's the state

19  of the law.  We want to preserve the claim -- the defense

20  that that's not appropriate method of accounting because

21  that has not been ruled on by the Second Circuit as yet.

22          THE COURT:  Is that part of the 546(b) appeal?

23          MR. JACOBS:  No, Your Honor.  As I have discussed

24  with Mr. Folkenflik, he keeps raising the antecedent debt

25  decision that Judge Rakoff issued in October of last year

1    and I've explained to him that the defense group in that

2    very case had moved pursuant to 1292(b) to seek an

3    interlocutory appeal and that appeal was denied.  So,

4    although we're talking about a theoretical appeal that

5    may --

6              THE COURT:  Right.

7              MR. JACOBS:  -- come sometime in the future, I

8    don't know how that's relevant to the discovery today.

9              THE COURT:  I'm not going to decide that

10   differently from Judge Rakoff.

11             MR. FOLKENFLIK:  No, no I am -- I'm saying I'm not

12   expecting Your Honor to.  I'm just saying I would want to

13   preserve that defense in the event that the law evolves in a

14   different way.  But --

15             MR. JACOBS:  Our question is, what does that have

16   to do with --

17             THE COURT:  That will be established by the record

18   of transfers.

19             MR. FOLKENFLIK:  Exactly so.  The -- but with

20   respect to the Gutmachers, other than that issue that

21   addresses all of them, what happened was they paid vendors,

22   they used the Gutmacher Enterprise's account to manage their

23   lives and they paid bills and --

24             THE COURT:  They paid bills or Gutmacher paid its

25   operating bills?

1            MR. FOLKENFLIK:  Gutmacher wasn't operating.

2            THE COURT:  It wasn't, okay.

3            MR. FOLKENFLIK:  Gutmacher paid bills for family

4    members.

5            THE COURT:  Right.

6            MR. FOLKENFLIK:  How you allocate that to the

7    various individuals is a --

8            THE COURT:  Well, that's his problem.

9            MR. FOLKENFLIK:  It's his problem, that's correct.

10           MR. JACOBS:  We've received zero discovery on that

11   issue, this is --

12           MR. FOLKENFLIK:  That's not true.

13           MR. JACOBS:  -- this is news to us.  We don't know

14   this.  We have no basis to understand any of the factual

15   assertions that he's making here because we have no

16   discovery on this case.

17           MR. FOLKENFLIK:  When -- I think counsel --

18           THE COURT:  But he told me he produced some

19   document, a computer printout that showed every subsequent

20   transfer.

21           MR. JACOBS:  That is not true according to our

22   review.

23           MR. FOLKENFLIK:  Well, I don't know whether you've

24   reviewed the documents, but I will reproduce that document

25   to them today.

1            THE COURT:  If you have produced that document,

2    then what's the problem with stipulating as to who received

3    the subsequent transfers?

4            MR. FOLKENFLIK:  Because the person who received

5    the subsequent transfer could be Food Emporium, but not

6    necessarily for the benefit for Barbara or Rose.  It's not

7    showing whose benefit --

8            THE COURT:  All right, well, but -- but you show

9    that and maybe they -- if it's a sizeable transfer, I don't

10   think they're going after a grocery bill.  But if it's a

11   sizeable subsequent -- subsequent, subsequent transfer, they

12   may want to know who that person is.

13           MR. FOLKENFLIK:  That's fine with me, Your Honor.

14           THE COURT:  So, what --

15           MR. FOLKENFLIK:  And they have, as I said, they've

16   gone through their bank accounts.  We have produced that

17   document.  We've also produced an allocation table that was

18   prepared by accountants during the course of a tax audit and

19   did allocations among the various individuals.  And I said,

20   I'm not sure I'm bound by that tax allocation table, but we

21   have it and you should have it.

22           THE COURT:  But that doesn't mean they're the

23   subsequent transferees.  So, the purpose is a fraudulent

24   transfer litigation.

25           MR. FOLKENFLIK:  It may or may not, I agree.

1          THE COURT:  So, we come back to the question of

2    it.  Are you prepared to stipulate to the date, amount, and

3    identity of the subsequent transferees, whether it's Food

4    Emporium, the local locksmith, or one of the beneficiaries

5    in the Gutmacher case?

6          MR. FOLKENFLIK:  If by the subsequent transferee,

7    Your Honor, means to whom the check was written, not for

8    whose benefit it was written but to whom the check was

9    written --

10          THE COURT:  To whom the check was written, then

11    he --

12          MR. FOLKENFLIK:  -- then I should be able to

13    stipulate to that and hopefully let me have two weeks on

14    that because it's much more complicated.

15          MR. JACOBS:  What happens then, Your Honor, when

16    the identity of the person to whom the check was written is

17    alleged to not be the beneficial recipient of that value and

18    the trustee has no discovery from Mr. Folkenflik on the

19    identities of the persons that he may later interpose are

20    the actual beneficiaries.

21          THE COURT:  Well, I guess you could send him -- I

22    mean, this is a process, but then you can send him an

23    interrogatory which says to the extent you contend that the

24    transferee was not the beneficial recipient of that

25    transfer, like Food Emporium or something like that,

Page 47

1    identify who it was.

2              MR. JACOBS:  Well, Your Honor --

3              THE COURT:  And if he doesn't, then you'll get

4    more discovery.

5              MR. JACOBS:  Your Honor --

6              THE COURT:  But it may not be -- what I'm saying

7    is, unless it's a really, really big transfer and you're

8    talking to a -- about a second generation of subsequent

9    transferees, you may make the judgment that it's really not

10   worth pursuing, even though you might technically be

11   entitled to the information.

12             MR. JACOBS:  That's absolutely correct, and we did

13   serve that interrogatory.  I believe that Mr. Folkenflik, or

14   one that would encompass that information.  I believe

15   Mr. Folkenflik said that the answer would be provided in the

16   form of documents produced.  Those documents were never

17   produced.

18             THE COURT:  Documents -- let's start with the

19   stipulations.  Here's what I'll do.  We'll enter an order,

20   you can settle a proposed order or you can submit a consent

21   order if you can agree to it.  I'll give you two weeks to do

22   the following: to make available for copying at the

23   plaintiff's expense, the FMC boxes for the two year period

24   that we're talking about.

25             MR. FOLKENFLIK:  For the Gutmachers' family?

Page 48

```
 1              THE COURT:  For the Gutmachers, well --

 2              MR. FOLKENFLIK:  That's correct.

 3              THE COURT:  -- it doesn't sound like it's much of

 4    an issue with the other ones at this point.  In each of the

 5    three cases, you'll provide a stipulation identifying a

 6    subsequent transferee as to date, amount, and identity of

 7    the subsequent transferee within two weeks.

 8              MR. FOLKENFLIK:  The initial subsequent

 9    transferee.

10              THE COURT:  The initial subsequent transferee, and

11    that the failure to comply with the order may result in

12    sanctions, including the striking of affirmative defenses or

13    the entry of judgment in favor of the plaintiff.  Let's --

14              MR. FOLKENFLIK:  I can assure Your Honor --

15              THE COURT:  -- let's move this along.

16              MR. FOLKENFLIK:  I can assure Your Honor you won't

17    be faced with that issue.

18              THE COURT:  Well, I'm hearing that.

19              MR. FOLKENFLIK:  Now, I have to prove it.

20              THE COURT:  But don't ask for the sun, the moon,

21    and the stars when you don't need the sun, the moon, and the

22    stars.  And it is burdensome.  If you have enough to prove

23    your case, it seems to me that you're ready to go in these

24    cases and we have to start trying them.

25              All right, let me schedule another conference
```

Page 49

1    because I may not be as optimistic as everybody is here that

2    this is going to be resolved.  And we can deal with the, I

3    guess the verbiage in the stipulations if there are disputes

4    over what it says or what it should say.

5              So, let's say June 19th, okay?  By then, the

6    stipulations will have been produced.  Hopefully there will

7    be some discovery -- some discussion if they're not totally

8    satisfactory and we'll see where this goes.

9              MR. JACOBS:  Thank you, Your Honor.

10             MR. CREMONA:  Thank you, Your Honor.

11             THE COURT:  All right.

12             MR. FOLKENFLIK:  Thank you.

13             THE COURT:  Thank you.

14        (Proceedings concluded at 10:57 a.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 50

1                        C E R T I F I C A T I O N

2

3    I, Jamie Gallagher, certify that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6        Jamie Gallagher          Digitally signed by Jamie Gallagher
                                    DN: cn=Jamie Gallagher, o=Veritext,
7                                   ou, email=digital@veritext.com, c=US
                                    Date: 2014.05.15 16:06:19 -04'00'
8

     Veritext
9

     330 Old Country Road
10

     Suite 300
11

     Mineola, NY 11501
12

13

     Date:  May 15, 2014
14

15

16

17

18

19

20

21

22

23

24

25