Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-01789-smb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    SECURITIES INVESTOR PROTECTION CORPORATION,

7              Plaintiff,

8    v.

9

10   BERNARD L. MADOFF INVESTMENT SECURITIES,

11             Defendant,

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                   United States Bankruptcy Court

15                   One Bowling Green

16                   New York, New York

17

18                   May 20, 2014

19                   10:16 a.m.

20

21

22   B E F O R E :

23   HON STUART M. BERNSTEIN

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1    The Fishman Trusts' Motion for a Hearing (I) to Determine

2    Allowance of Claims and (II) Entry of an Order Allowing the

3    Trust Claimants' Claims and Granting Related Relief (ECF

4    5645)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sherri L. Breach, CERT*D-397

1    A P P E A R A N C E S :

2    BAKER HOSTETLER

3         Attorneys for Trustee

4         45 Rockefeller Plaza

5         New York, New York 10111

6

7    BY:  NICHOLAS J. CREMONA, ESQ.

8

9    LOWENSTEIN SANDLER, P.C.

10        Attorneys for The Fishman Trusts

11        65 Livingston Avenue

12        Roseland, New Jersey 07068

13

14   BY:  BRUCE BUECHLER, ESQ.

15        NICOLE STEFANELLI, ESQ.

16

17   SECURITIES INVESTOR PROTECTION CORPORATION

18        Attorneys for SIPC

19        805 15th Street NW, Suite 800

20        Washington, D.C. 20005

21

22   BY:  LAUREN T. ATTARD, ESQ.

23

24

25

Page 4

1                    P R O C E E D I N G S

2               THE COURT:  Are you ready to begin?

3               MR. BUECHLER:  Yes, Your Honor.

4               Bruce Buechler and Nicole Stefanelli from

5    Lowenstein Sandler on behalf of the Yale Fishman and Glenn

6    Fishman charitable trusts.

7               THE COURT:  Thank you.

8               MR. CREMONA:  Good morning, Your Honor.  Nicholas

9    Cremona of Baker Hostetler appearing on behalf of the

10   trustee.

11              MS. ATTARD:  Lauren Attard from Securities

12   Investor Protection Corporation.

13              THE COURT:  Thank you.

14              Go ahead.

15              MR. BUECHLER:  Well, Your Honor, this is the

16   motion for the Yale Fishman and Glenn Fishman charitable

17   trusts for allowance of their claims.  If I could just

18   briefly go through what we think are the key facts that are

19   relevant for determination in connection with this matter.

20              The Yale trust opened its account at BLMIS in

21   August of 1998.  The Glenn charitable trust opened its

22   account at BLMIS in December of 1998.  Between the date each

23   account was opened and December 31, 2004, both the Yale

24   trust and the Glenn trust deposited $2 million each

25   respectively in cash into their accounts.

Page 5

1        To be clear, as we said last time we were here on

2    the status conference, which was February 20, 2014, we are

3    not challenging this Court or the Second Circuit's

4    determination of how you calculate net equity, meaning cash

5    in, cash out, but rather the dispute is how that methodology

6    is applied to the alleged transfer from the Glenn and Yale

7    charitable trusts respectively to the BLMIS account of

8    another entity, the (indiscernible) Heritage Foundation.

9        THE COURT:  You know I didn't think you were

10   challenging that so much as saying the transfers never

11   occurred for reasons that really don't have anything to do

12   with the way you calculate net equity.

13       In other words, I thought your argument was that

14   the transfers were fictitious and never occurred.

15       MR. BUECHLER:  Correct.  So -- but in allegations

16   made by the trustee initially that we were challenging, the

17   cash in, cash out methodology --

18       THE COURT:  No.  I didn't -- I did --

19       MR. BUECHLER:  And I just want to be clear that --

20       THE COURT:  Yeah.

21       MR. BUECHLER:  -- we are not standing here --

22       THE COURT:  I didn't understand you to be

23   challenging that.

24       MR. BUECHLER:  The bottom line of our position,

25   Your Honor, is that both accounts, the Glenn and the Yale

1   charitable trusts are net losers.  They're not winners or

2   creditors with a zero balance.

3           THE COURT:  How can they be net losers?

4           MR. BUECHLER:  And -- let's go through the facts,

5   Your Honor, here.

6           THE COURT:  They transferred whatever they had in

7   the account. How can they be net losers?

8           MR. BUECHLER:  But, Your Honor, that's our

9   fundamental dispute here.  When they put their money into

10  BLIS, the $2 million each of the trust accounts went into

11  what -- what's generally known as the 703 account.

12          THE COURT:  Uh-huh.

13          MR. BUECHLER:  No cash or securities were ever

14  purchased or placed into their individual accounts.

15          THE COURT:  But what --

16          MR. BUECHLER:  When --

17          THE COURT:  -- what does that mean?  I don't

18  understand.  Accounts are just bookkeeping entries.

19          MR. BUECHLER:  They may be bookkeeping entries.

20          THE COURT:  I mean, it wasn't a little draw at

21  Madoff Securities with everybody's name on a separate draw

22  with their stocks and money in it.

23          MR. BUECHLER:  No, but if I have an account that

24  has securities in it attached to my account, then the realty

25  -- or in my account.  So if I call my broker today as Bruce

Page 7

1    Buechler and say, I want to liquidate whatever shares and

2    whatever mutual funds or shares in some corporation, there

3    are shares attached to that account.  In these accounts --

4              THE COURT:  On the books -- on the books and

5    records.

6              MR. BUECHLER:  Right.  And in realty.

7              THE COURT:  Well, but what does that mean?

8    They're uncertificated (sic) securities.  They're just

9    bookkeeping entries, aren't they?

10             MR. BUECHLER:  But the bookkeeping entries of

11   Madoff, there's no question, especially the account

12   statements (indiscernible) by this Court, the trust and the

13   Second Circuit --

14             THE COURT:  I understand.

15             MR. BUECHLER:  -- are fictitious.

16             THE COURT:  I'm talking more generally about

17   accounts.  What are accounts?

18             MR. BUECHLER:  Accounts are accounts that people

19   have that have either cash in them, which is connected to

20   that account, or they have securities that are there.  They

21   may be uncertificated.  That may be true.  But there's an

22   account to which I have as an individual or the Glenn and

23   Yale trust accounts thought they had at Madoff Securities

24   that in reality never existed.  There was never anything to

25   attached to that account.  And, therefore, when they

Page 8

1    (indiscernible) request to liquidate and transfer their

2    funds, no transfers actually occurred.  They say that there

3    were bookkeeping entries.  There weren't bookkeeping entries

4    because Madoff did whatever Madoff wanted to do.  And when

5    (indiscernible) Heritage ultimately authorized and gave

6    checks to (indiscernible) Heritage, there's only one reason

7    Madoff did that.  That was to keep his Ponzi scheme going

8    and alive.  There's no double-dipping because that's their

9    biggest argument here is --

10            THE COURT:  Well --

11            MR. BUECHLER:  -- to double dip.

12            THE COURT:  Well, let's get to that as long as

13   we're here.  You also represent the foundation and aren't

14   you arguing in connection with the foundation claim that a

15   transfer did occur?  You want credit for the transfers,

16   including the fictitious profits, right?

17            MR. BUECHLER:  There's no issue with the

18   foundation at this point in time, Your Honor.  We resolved

19   that many years ago when the foundation is not asserting any

20   claim whatsoever and is not the subject of a claw back.  The

21   foundation will not be receiving any distribution -- I mean,

22   (indiscernible) Heritage Foundation --

23            THE COURT:  Yeah.

24            MR. BUECHLER:  -- will not be receiving any

25   distribution.  That was a separate client of mine and my

1    firm.  As me -- as my and my firm have many other clients

2    who are involved as creditors in the Madoff proceedings.

3    We're here today just with regard to the Glenn and Yale

4    accounts.  The fact that we represent -- separately

5    represented (indiscernible) is irrelevant.

6            When we were here at the status conference counsel

7    for the trustee agreed (indiscernible) is not a party to

8    these proceedings.  At the time, yes, we took certain

9    positions four-plus years ago in connection with the

10   trustee's objection or determination letter with regard to

11   the (indiscernible) Heritage claim.  Separate client,

12   separate issues, resolved.

13           (Indiscernible) Heritage is not going to be

14   receiving any distributions and it's not the subject or

15   never was the subject of a claw back proceeding based upon

16   events that occurred and discussions with the trustee a

17   number of years ago.  The only claims we're talking about

18   today are the Yale account and the Glenn account.

19           And what they attempted to do was transfer a total

20   of approximately $6.6 million to (indiscernible) Heritage.

21   Their intention was never carried out. Their intention never

22   occurred, and had (indiscernible) Heritage known that it was

23   getting something less than it thought it was getting, it

24   may have acted, candidly, differently as well.

25           But the bottom line here is the theory that the

1    trustee calculates accounts as cash in and cash out, and our

2    simple position is an inter-book transfer in notation on the

3    books and records of Madoff.  And the trustee to prove his

4    position cites extensively in his opposition to all of the

5    Madoff account statements of Yale and Glenn Fishman which we

6    find shocking because --

7              THE COURT:  Well, but --

8              MR. BUECHLER:  -- the trustee --

9              THE COURT:   -- but -- wait a minute.  Those

10   account statements do show deposits.  They do show

11   withdrawals and they show the fact of transfers.

12             MR. BUECHLER:  And the question is, are those cash

13   withdrawals?  The theory that this case is operating on as

14   proved by this Court and the Second Circuit is cash in, cash

15   out, not transfers.

16             THE COURT:  Did the Court --

17             MR. BUECHLER:  Cash --

18             THE COURT:  Did the Court of Appeals ever rule on

19   transfers?

20             MR. BUECHLER:  It ruled it was cash in and cash

21   out.

22             THE COURT:  But that was the issue before the

23   Court, then, correct?

24             MR. BUECHLER:  Correct.

25             THE COURT:  Okay.

1             MR. BUECHLER:  And so the question is, is an

2    alleged transfer, which we submit never occurred, cash out

3    within the meaning of the Court's prior decision.

4             THE COURT:  What's the difference between a

5    transfer out and a withdrawal?

6             MR. BUECHLER:  The withdrawals that all the other

7    cases talk about is that I actually had a check written to

8    myself or some other account that went to -- whether it was

9    to Yale and Glenn themselves or to the American Cancer

10   Society.  They got a check in, whether it's 2005 or 2009 --

11            THE COURT:  All right.  I --

12            MR. BUECHLER:  -- and cashed it.

13            THE COURT:  -- I know what the difference between

14   a withdrawal and a transfer is.  But --

15            MR. BUECHLER:  It's not the same.

16            THE COURT:  -- what's the difference -- let me

17   finish.

18            What's the difference in terms of what you have in

19   your account?

20            MR. BUECHLER:  Because what they had in their

21   account wasn't effectuated.  At the time that --

22            THE COURT:  But that's what you said.

23            MR. BUECHLER:  Let me explain it.  At the time

24   they took these transfers it was before the two year statute

25   of limitations.  One of the transfers -- alleged transfers

Page 12

1    in question occurred between September of 2004 and the end

2    of January 2005.  If they took those as checks out, actual

3    cash out --

4              THE COURT:  Right.

5              MR. BUECHLER:  -- they would never be recoverable

6    because they're outside the two-year statute of limitations.

7    They're -- they would not have been subject to a fraudulent

8    conveyance or what everybody likes to call the claw back

9    action, and it would be a separate transaction.

10             THE COURT:  But that's -- that's the result of any

11   statute of limitations.

12             MR. BUECHLER:  Correct.  But if they would have

13   taken that out, they would have received $6.6 million

14   approximately in round numbers from those transfers out.

15   What the trustee wants to say is, no, I'm going to count as

16   cash out --

17             THE COURT:  But if they did that they would be

18   sued today as net winners.

19             MR. BUECHLER:  They wouldn't be subject to that

20   lawsuit because --

21             THE COURT:  Oh, okay.

22             MR. BUECHLER:  -- those transfers would have

23   occurred outside the statute of limitations and they would

24   be in a very different situation because the statute has

25   passed.

1          THE COURT:  But, you know, people have been taking

2     -- were taking money out of the accounts over 20 years or

3     whatever.

4          MR. BUECHLER:  But that's cash out.  So now when

5     you want to apply that to an inter-account transfer to an

6     unrelated account -- and there's no question.  The Yale

7     account, the (indiscernible) account and the Glenn account

8     are all separate trusts.  As SIPA says in its brief, each --

9     under the regulations, each trust is a separate customer.

10          What they want to argue is that they get the

11     benefit, arguably, of the full amount.  But that's not what

12     occurred because they didn't give (indiscernible) Heritage

13     the benefit of the full 6.6 --

14          THE COURT:  They're not arguing that.

15          MR. BUECHLER:  -- as attached.

16          THE COURT:  They're just saying you transferred

17     whatever you had net in the account under the net investment

18     --

19          MR. BUECHLER:  But then they didn't get -- then

20     they're -- then they didn't get what they intended to

21     happen.  They're relying upon --

22          THE COURT:  So who --

23          MR. BUECHLER:  -- the intention --

24          THE COURT:  -- who didn't get what they intended

25     to get?

Page 14

```
1              MR. BUECHLER:  Neither Glenn or Yale got what --

2    had -- what --

3              THE COURT:  Well --

4              MR. BUECHLER:  -- the Yale and Glenn trusts

5    occurred --

6              THE COURT:  Wait a minute.  Did the

7    (indiscernible) Heritage foundation have a suit or rescind

8    the transfer?

9              MR. BUECHLER:  I'm not sure I -- I didn't follow

10   your question.

11             THE COURT:  In other words, the (indiscernible) --

12   you're telling me the foundation didn't get what it thought

13   it was getting in connection with the transfer because of

14   the operation of the net investment --

15             MR. BUECHLER:  And that's why in addition -- in

16   this --

17             THE COURT:  So why -- all I'm saying is why didn't

18   it sue the Fishman trusts to rescind the transaction, make

19   restitution and just be done with it?

20             MR. BUECHLER:  That's something (indiscernible)

21   Heritage did.  At the outset it asserted a claim in the

22   Madoff bankruptcy cases and in resolving the alleged claw

23   back issue reached a resolution with the trustee.  And

24   that's something that occurred several years ago.

25             But as to the Yale account and the Glenn
```

Page 15

1    charitable trust account, their intentions were never

2    effectuated.  There wasn't an actuality transfer because

3    today, if I transfer monies from Bruce Buechler's account

4    and it's a valid account and I make a gift to, whether it's

5    my children or the American Cancer Society or something

6    else, there's an actual transaction that occurs and there's

7    money that goes there.

8              It turns out unbeknownst to the Glenn account, the

9    Yale account, (indiscernible) Heritage and everybody else,

10   there was a fraud going on.  Nobody knew that at the time.

11   Nobody knew that until after December 2008 when, excuse the

12   expression, everything hit the fan and the world knew what

13   was going on.

14             But the bottom line is there was no transfer.

15   They were all separate trusts.  Therefore, each one is

16   separately a customer.  There's no argument.  There's no

17   facts here that somehow this Court can pierce the corporate

18   veil, assume that they're all alter egos of one or the

19   other.

20             THE COURT:  I don't think --

21             MR. BUECHLER:  The question --

22             THE COURT:  -- the trustee's arguing that.

23             MR. BUECHLER:  Well, they spend a lot of time in

24   their papers arguing that they're factually, essentially one

25   in the same --

1                THE COURT:  Well --

2                MR. BUECHLER:  -- and, therefore, we should -- the

3      Court should simply view it that way.  But --

4                THE COURT:  You've --

5                MR. BUECHLER:  -- they're separate accounts.

6                THE COURT:  You've invoked equity so they invoked

7      equity.

8                MR. BUECHLER:  Well, I'm not so sure that we've

9      invoked equity as opposed to we've invoked the reality of

10     the transaction.  There was no actual transfer.  That's our

11     bottom line and this is different than cash out.  And that's

12     the point.  What is cash out?  Cash out in every other

13     context meant cash.  What the trustee wants to do here is

14     create a fiction with regard to the transfers, but doesn't

15     even want to give parties the full value which is what the

16     trustee argues is the fictitious profit.

17               Our point goes further back in time which is was

18     there actually a transfer.  The fact that there were

19     notations that says stocks or securities were liquidated.

20     There were no stocks or securities that were liquidated.

21     There was never ever placed into --

22               THE COURT:  Can -- let me ask --

23               MR. BUECHLER:  -- the Glenn and Yale accounts.

24               THE COURT:  If there was no transfer, how was the

25     Heritage foundation able to use the funds?

1          MR. BUECHLER:  Because Madoff wanted everybody to

2    believe transfers occurred, and then in time subsequent,

3    when (indiscernible) Heritage decided it wanted to make a

4    withdrawal -- and (indiscernible) Heritage had other money

5    in its account predating that.

6          THE COURT:  I thought it had a negative balance

7    when the first transfer was made.

8          MR. BUECHLER:  I don't -- to be honest, I don't

9    recall the specifics of --

10          THE COURT:  According to the trustee's --

11          MR. BUECHLER:  -- the account --

12          THE COURT:  -- proof they had a -- they had an

13   $870,000 negative balance in the account when the first

14   transfer was made.

15          MR. BUECHLER:  I would have to --

16          MR. CREMONA:  Your Honor, I can tell you that the

17   account -- (indiscernible) account was opened with a million

18   dollars and the (indiscernible) objection specifically

19   recognizes that the balance of that account was populated

20   with the transfer from the Fishman accounts and

21   (indiscernible) subsequently withdrew $5.3 million.  And

22   they only --

23          THE COURT:  My records --

24          Mr. CREMONA:  -- put in a million to start with.

25          THE COURT:  All right.  My recollection was that

1   at the time of the first transfer from the Fishman accounts,

2   which was in September, I think, of 2004 --

3            MR. BUECHLER:  Correct.

4            THE COURT:  -- the (indiscernible) Heritage

5   foundation had a negative balance of $870,000.  Now I don't

6   know if that was under the investment method or just

7   included fictitious profits or what.

8            MR. BUECHLER:  Looking at the trustee's

9   determination letter it's -- to be honest, Your Honor, it's

10  hard for me to determine that from here.

11           THE COURT:  I think it's in that declaration -- I

12  mean, it's summarized in the declaration backed up --

13           MR. BUECHLER:  But, Your Honor, our point is may

14  -- Madoff wanted everyone to believe that there were

15  transfers and everything was going on, and Madoff decided to

16  make funds available.  That doesn't mean that the intention

17  of the Yale and Glenn charitable trust accounts was

18  effectuated to what they expected to occur as opposed to

19  Madoff as an intervening factor deciding to make money

20  available when (indiscernible) Heritage made a request for

21  withdrawals.  That's not double-dipping.  That's not

22  inequitable.  That's unfortunately what happened as part of

23  a Ponzi scheme effectuated by Mr. Madoff and the people that

24  worked under him, not (indiscernible), not the Yale trust,

25  not the Glenn trust.

1          Your Honor, it may be negative simply because of

2     the downward adjustment of principal, but, again, just

3     looking at the statement attached to the determination

4     letter I can't figure out what was in the account in

5     September of 2009.

6          MR. CREMONA:  Again, based on the objection that

7     you filed, it admits that there was a -- the account was

8     opened with a million-dollar deposit by (indiscernible).

9     And that's what I understand to be reflected here on

10    2/16/1999 there's a check wire in the amount of one-million-

11    dollars.  The balance of the amounts in this account were

12    received from inner-account transfers from the Fishman

13    trust.

14          THE COURT:  Oh, here it is.  It's paragraph 11 of

15    Mr. Segal's (ph) affidavit:  "My review of the books and

16    records of BLMIS shows that prior to the first transfer from

17    BLMIS to the fish -- of the fish -- accounts for the Fishman

18    trusts to the Heritage foundation account, the transferee

19    account had a negative account balance of $870,000, having

20    invested a million of principal and having withdrawn

21    $1,870,000.

22          All right.

23          MR. BUECHLER:  I'm not sure how Madoff would have

24    allowed them prior to additional monies coming in to have

25    made withdrawals of an additional $870,000.

Page 20

1            THE COURT:  You just told me he wanted to

2     perpetuate the scam.

3            MR. BUECHLER:  That may be the answer, Your Honor.

4            But, Your Honor, the bottom line of our position

5     is that in keeping the cash in and cash out, there were no

6     transfers that occurred.  The intention may be relevant, but

7     there's no actual (indiscernible) transferred, which in this

8     case would have been the delivery.

9            And simply marking on Madoff's internal records

10    which were all fictitious and the account statements were

11    fictitious because no funds were ever purchased, it was one

12    slush fund (sic) in its entirety, to use the words of Judge

13    Lifland's decision concerning the cash in, cash out.

14    There's nothing inequitable being sought here because if the

15    trustee wanted to be honest to the equitable position, then

16    he would have credited the transferees for the full amounts

17    that occurred prior to the two-year look back periods, but

18    the trustee didn't.  (Indiscernible) Heritage --

19            THE COURT:  Why should the trustee credit anybody

20    with fictitious profits?

21            MR. BUECHLER:  Because if this is -- if he's

22    arguing that if you're making transfers between accounts and

23    you want to effectuate what the parties transferred, what

24    Glenn and Yale intended to do was transfer the full amount

25    of what they believed they had in the account at the time,

Page 21

1    in 2004 and 2005.

2              THE COURT:  But they didn't have that.

3              MR. BUECHLER:  Unbeknownst to them.  So, in

4    reality, it was anything actually transferred and the

5    reality is nothing was transferred.  There's nothing

6    inequitable being sought here because (indiscernible)

7    doesn't have a claim at the end of the day in this case.

8    It's going to receive no distribution.  Likewise, it is not

9    subject to a claw back because a claw back wasn't timely

10   asserted and, therefore, all of the arguments of what --

11   what all with (indiscernible) we submit are simply

12   irrelevant. It's what happened with regard to the Yale trust

13   account and the Glenn trust account, and there's nothing

14   inequitable.  They were all separate customers.  They each

15   have separate accounts.  They're entitled to assert their

16   claims.

17              And we believe they have valid claims for the

18   delta.  They've each deposited two million.  They took out

19   cash, roughly, of approximately a little over a million-

20   five, so each one has -- as we set forth in our papers they

21   should have allowed claims of a million-four to that extent

22   because nothing was actually transferred, either securities

23   --

24              THE COURT:  I got it.

25              MR. BUECHLER:  -- or cash.  Thank you.

Page 22

1            THE COURT:  Thank you.

2            MR. CREMONA:  Good morning, Your Honor.

3            THE COURT:  Good morning.

4            MR. CREMONA:  I would just like to address some of

5      the arguments made by my colleague, Mr. Buechler.  I think a

6      fundamental flaw in his argument is that he fails to

7      recognize Judge Rakoff's recent decision on antecedent debt,

8      which specifically rejected that whole argument that

9      transfers made prior to the two-year reach back period are

10     somehow not -- not credited.  Specifically, Judge Rakoff

11     said that to do so would pile fiction upon fiction and

12     result in claimant's receiving other people's money.

13            THE COURT:  I think that was Judge Harden (ph) who

14     said that in the --

15            MR. CREMONA:  In --

16            THE COURT:  -- in the Bayou (sic) case.

17            MR. CREMONA:  -- in Bayou.  That's correct.  Judge

18     Rakoff cited him on antecedent debt.  The result -- although

19     Mr. Buechler is maintaining that he's not challenging the

20     net investment method, the results that he's seeking would,

21     in effect, nullify the net investment method in the Second

22     Circuit net equity decision and fly in the face of what

23     Judge Rakoff recently decided.  And I think his argument is

24     belied by the facts here.  I think we've heard part of the

25     story, but not the entire story.

1           So I think as a threshold matter I would point out

2    that under SIPA 78FFF(2)(b) the claimants have the burden to

3    demonstrate that they have a viable claim based on the

4    debtors' books and records or to the satisfaction of the

5    trustee.  I don't believe anything has been put forth to

6    provide a credible basis to in any way call into question

7    the trustee's determination.  I would say that they simply

8    have not carried their burden whatsoever.

9           The crux of Mr. Buechler's argument is based upon

10   the fact that because the securities -- there were no

11   securities transactions and those references on the account

12   statements are fictitious that, therefore, the transfers are

13   fictitious.

14          But, again, he fails to recognize, as Your Honor

15   pointed out, that there are book entries.  I mean, these --

16   there -- where -- the trustee is not solely relying on the

17   account statements.  The trustee has professionals who

18   reviewed the books and records, reviewed the AS400 and

19   credits and debits on the computer system, reviewed that and

20   compared that, to the statements to the requests for

21   withdrawals and/or to the request for inner-account

22   transfers.  And doing all of that in the aggregate is how

23   the trustee can accurately track inner-account transfers

24   that occurred.

25          To sit here now today and say that the transfers

Page 24

1    never occurred and attempt to unilaterally rescind them

2    under New York law, which is not prohibited as we point out

3    in our papers, I think is a bit disingenuous especially when

4    we have a third party here who -- whose presence is not

5    required to resolve this dispute.  But, nonetheless, we have

6    to acknowledge the facts that are at issue.  And

7    (indiscernible) Heritage fund did, in fact, receive those

8    transfers, all of which is demonstrated by Mr. Segal's

9    declaration and the attachments thereto.

10           And I think it's important to just run through the

11   facts, as Mr. Buechler said the Fishman -- the Yale Fishman

12   trust was opened in 1998.  The Glenn Fishman trust was

13   opened also in 1998.  Both were opened by Yale and Glenn

14   Fishman.  The (indiscernible) Heritage fund account was also

15   opened in 1998 and it was opened by Glenn and Ilene (ph)

16   Fishman.  All of the accounts are related, held by family

17   members.  All of the account opening documents list the same

18   exact address, and all of them were represented by Mr.

19   Buechler.

20           And then I think you have to look through the

21   facts related to the transfers between these related

22   accounts.  The trustee made his determination first based on

23   the fact that we had clear and contemporaneous direction

24   from the customers here to transfer the balance of their

25   accounts in 2004 and 2005.  They directed certain transfers

Page 25

1   and then ultimately, in writing, directed that the transfers

2   of the entire balance of the account be transferred to JHF.

3            And then we take -- next, we can see that the

4   statements actually reflect those contemporaneous transfers.

5   The debits and credits in the AS400 reflect those transfers,

6   and the parties, as Your Honor indicated, Yale and Glenn

7   Fishman began requesting withdrawals on behalf of JHF

8   acknowledging that the funds were, in fact, transferred.

9            You have in -- then you have a objection filed by

10  Mr. Buechler filed on behalf of JHF which specifically

11  acknowledges that the transfers were made and actually

12  funded the account in the specific amounts.  And at the same

13  time filed objections on behalf of the Fishman trust saying,

14  no, they -- the transfers didn't occur.  They should be

15  nullified on the one hand so that JHF becomes a net loser

16  instead of being a net winner to the amount of $1.3 million.

17  As we just discussed, the account for JHF was opened

18  initially with a million-dollar deposit and $5.3 million

19  roughly was taken out of that account.

20            THE COURT:  Does JHF still have a claim in the

21  case?  I don't understand what you're --

22            MR. CREMONA:  I think that's a good question, Your

23  Honor.  I don't know why JHF was not party to this motion

24  given that --

25            THE COURT:  Well, I raised --

1          MR. CREMONA:  -- their argument was --

2          THE COURT:  I raised that issue at the conference

3     and I was told that they weren't a necessary party.

4          MR. CREMONA:  I understand that, Your Honor.  But

5     I think that's more a question for Mr. Buechler in terms of

6     why they weren't included in this motion given the fact that

7     they're similarly situated arguably.

8          THE COURT:  I got the sense from Mr. Buechler,

9     though, that their claim has been resolved.

10         MR. CREMONA:  I think the -- I don't think the

11    claim has been resolved.  I think that the issue that was

12    discussed is that the trustee in his judgment decided not to

13    sue the charity despite the fact that they were a net --

14         THE COURT:  Oh, for claw --

15         MR. CREMONA:  -- winner.

16         THE COURT:  -- for a claw back.

17         MR. CREMONA:  Right.

18         THE COURT:  Do they still have (indiscernible)?

19         MR. BUECHLER:  (Indiscernible).

20         THE COURT:  Sure.

21      (Pause)

22         MR. BUECHLER:  Your Honor, I don't have -- I can't

23    answer the question specifically because I don't -- I didn't

24    review anything that occurred seven years ago when we --

25    when we had discussions with the trustee, the

1   (indiscernible) Heritage foundation as to how we resolved it

2   because I thought we had.  We have not furthered anything

3   with regard to the objection to the claim since we filed

4   that objection --

5            THE COURT:  Well, there --

6            MR. BUECHLER:  -- in 2010.

7            THE COURT:  -- there hasn't been a lot of activity

8   with respect to any claims because of all the litigation

9   that's been going on over the years.

10            MR. BUECHLER:  True.  I can't specifically answer

11   the question because I didn't look back at that.  I know we

12   had conversations.  I know with regard to (indiscernible)

13   Heritage we provided information to the trustee in the area

14   of -- in the way of financial information to demonstrate a

15   financial hardship; that we would be unable to retain a claw

16   back as part of the trust's --

17            THE COURT:  No.  He -- this is not about a claw

18   back action.

19            MR. BUECHLER:  I understand.  With regard to the

20   claim.  I don't recall specifically if that was wrapped into

21   it or not as part of the resolution.  That's what I'm

22   saying.

23            THE COURT:  Oh, I -- I hear what you're saying.

24            MR. BUECHLER:  I don't recall specifically one way

25   or the other.  And I didn't go back in preparing for this to

```
1   look back.

2            THE COURT:  But -- okay.  But your objection --

3            MR. BUECHLER:  And --

4            THE COURT:  Let me just -- your objection to the

5   trustee's determination is dated November 2010 which was

6   very close to the two-year statute of limitations.

7            MR. BUECHLER:  It was a little bit after

8   (indiscernible) Heritage.  Correct.

9            THE COURT:  Right.

10            MR. BUECHLER:  The ones we filed for the Fishman

11   -- the two Yale and Glenn Fishman trusts were filed in May.

12            THE COURT:  I'm particularly interested if the

13   (indiscernible) Heritage foundation still has a live claim

14   in which it's taking a position that the transfers were

15   made.  So --

16            MR. BUECHLER:  I would have to go back and check

17   my records as to what we did at that time and I'm -- I don't

18   want to speculate because I don't specifically recall.  I

19   didn't look at it.

20            MR. CREMONA:  My understanding, Your Honor, is

21   that is still a live claim that has not been resolved.

22            MR. BUECHLER:  For the Court's record --

23            MR. CREMONA:  Which is why I think we think it's

24   very important to point out to Your Honor that there were

25   certain admissions made and certain arguments made that
```

1    completely contradict the statements in the motion.  And I

2    think -- and the reason I would surmise that the -- that

3    claim is not being prosecuted possibly because, as Your

4    Honor noted, they were a net winner that withdraw $1.3

5    million more than they put in.  So they -- and not only is

6    that claim filed based on fictitious profits, it actually

7    asks for an adjustment up to include fictitious profits --

8              THE COURT:  I understand that.  But -- okay.  You

9    don't know if it's still pending and you think it's still

10   pending.

11             MR. CREMONA:  I believe so, Your Honor.

12             THE COURT:  Okay.

13             MR. CREMONA:  Your Honor, I just would also like

14   to point out that I think, as I mentioned earlier and as we

15   say in our papers it would be inequitable certainly for the

16   claimants to be able to unilaterally rescind a transfer

17   and/or a gift that occurred.  Again, they specifically

18   acknowledge that there was an intent to donate funds to JHF

19   and the -- those transfers did, in fact, occur under New

20   York law.  And to now, four years after the fact, after the

21   ultimate transferee received those transfers to seek to

22   rescind that I think would work an extremely inequitable

23   result.

24             And I do think despite how Mr. Buechler

25   characterized his argument is specifically would fly in the

1    face of the net investment method and Judge Rakoff's

2    antecedent debt decision because we -- we've given credit

3    and -- we've given credit up to the amount of the principal

4    in the account as Your Honor noted.

5            And I think if we were to take his approach, you

6    would be giving credence to the whim of the fraudster, which

7    would be, as certainly the Second Circuit noted and Judge

8    Rakoff noted again, that would be completely inconsistent

9    with the net investment method and the objectives of this

10   proceedings.

11           THE COURT:  Thank you.

12           MR. CREMONA:  Thank you, Your Honor.

13           MS. ATTARD:  Good morning, Your Honor.

14           THE COURT:  Good morning.

15           MS. ATTARD:  If I may, I just would like to

16   address Mr. Buechler's argument about the 703 account at

17   JPMorgan.

18           The fact that the assets at Madoff were comingled

19   does not have any sort of bearing on the claimants'

20   ownership interests.  Virtually, every broker dealer in the

21   U.S. today comingles customer assets.  Assets are held in

22   street name, the name of the broker dealer.  There are book

23   entries made by the broker dealer as to what a customer is

24   owed.  That's what Madoff did here with regard to the

25   deposits, with regard to the withdrawals, and also with

Page 31

1    regard to the transfers.

2              THE COURT:  Thank you.

3              MS. ATTARD:  Thank you.

4              THE COURT:  I'll give you the last word.

5              MR. BUECHLER:  Briefly, Your Honor,

6    (indiscernible) two items.

7              First, with regard to the allegations as to what

8    we said in the November 11, 2010 objection by

9    (indiscernible) Heritage foundation to the trustee's

10   determination letter that was set in motion by the Court's

11   claims for procedure order dated December 23, 2008.  In that

12   objection, (indiscernible) Heritage foundation, we submit,

13   has the right like any other party in an initial pleading to

14   plead different theories as to why it may have a claim.

15             It said in addition in paragraph 18, "Most

16   importantly, no cash was transferred from the Fishman trusts

17   to the JHF account.  The trustee knows this.  As the Court

18   has held, only cash deposits or withdrawals can be

19   (indiscernible) that can be verified can be used."

20             So we also --

21             THE COURT:  Look at paragraph 16.  That's where

22   you say the transfers occurred.

23             MR. BUECHLER:  Paragraph 16 says:

24             "The trustee should not be permitted to take such

25   inconsistent positions.  The trustee cannot deny the claims

1    of the Fishman trusts on the grounds that the Fishman trusts

2    transferred all of their funds to the JHF account and at the

3    same time argue the transfers to JHF account did not occur

4    at their full value to deny JHF's claims.  Either the

5    transfers between the accounts reflected all customer

6    account statements should recognize this (indiscernible) or

7    the transfer should not be recognized because they are

8    fictitious.  The trustee cannot have it both ways.  The

9    trustee's inconsistent approach is arbitrary and works a

10   gross injustice when applied to a charitable foundation" --

11            THE COURT:  So you're telling me that the transfer

12   shouldn't be recognized as real for all purposes including

13   the foundation's position.

14            MR. BUECHLER:  It's an alternative argument, Your

15   Honor.  That's what we pled --

16            THE COURT:  Well, now's the day.  Which is the one

17   you're advocating?

18            MR. BUECHLER:  I'm not advocating today for

19   (indiscernible) Heritage foundation, Your Honor.  I'm for

20   different clients.  I have the right to advocate --

21            THE COURT:  Sure.

22            MR. BUECHLER:  -- different positions.  I'm here

23   today on behalf of the Yale and Glenn --

24            THE COURT:  Don't you have a conflict?

25            MR. BUECHLER:  -- Fishman trusts.

1          THE COURT:  Don't you have a conflict?

2          MR. BUECHLER:  No, Your Honor.  First of all, the

3    clients have waived any conflict that may have existed.

4          Second of all, I have to check into whether

5    (indiscernible) Heritage foundation (indiscernible) is

6    actually pursuing its claim in the Madoff case which, as I

7    said to be fair, I didn't think about that question.  I

8    haven't checked it.  I haven't looked at anything for

9    (indiscernible) Heritage --

10         THE COURT:  Well, they did -- they did raise it.

11         MR. BUECHLER:  -- in a number of years.

12         THE COURT:  They did raise it in their response.

13         MR. BUECHLER:  It may be fair, Your Honor, but I

14   can't (indiscernible) say because I didn't check.  I can

15   check and report back if you would like me to.

16         Point one on that.

17         The other point with regard to Judge Rakoff's

18   recent decision with regard to the antecedent debt decision,

19   we submit that that decision doesn't have any relevance to

20   this dispute.  This matter -- what Judge Rakoff was deciding

21   was an issue under 548 of the Code and, specifically, under

22   548(c) what constituted value in the context of the defenses

23   or potential defenses to fraudulent conveyance actions.  The

24   matter before Your Honor has nothing to do with a fraudulent

25   conveyance.  It has nothing to do with 548(c) of the code.

1           THE COURT:   So why are you relying on 546(e) and

2    saying that they can't net more than two years before the

3    filing date.  If this isn't an avoidance action those rules

4    have no relevance.

5           MR. BUECHLER:   There's a separate argument, Your

6    Honor.  We're saying that demonstrates the inequity of the

7    trustee's position.  Our bottom line argument is that there

8    were no transfers that actually occurred.  There was no cash

9    out of either the Glenn or Yale Fishman charitable trust to

10   the (indiscernible) trust and, therefore, those trusts

11   should not be zero balances asserted by the trustee in his

12   determination letter, but rather they should be net losers

13   because there are still funds in their account because

14   nothing was transferred out.

15          And the trustee can say what they want with regard

16   to the Madoff accounts, but at the end of the day they were

17   fictitious.  The fact that Madoff -- Mr. Madoff made account

18   notations to keep his Ponzi scheme alive should not be

19   utilized to the disadvantage of creditors such as my two

20   clients.

21          And let's be honest, Your Honor.  They're victims

22   of the Madoff fraud.  They're not here --

23          THE COURT:   No.  I -- they didn't lose any money.

24          MR. BUECHLER:   They put $2 million into these

25   accounts and expected that they would grow and make $2

1    million out.

2              THE COURT:  But that I -- that I understand.

3              MR. BUECHLER:  Okay.

4              THE COURT:  Everybody --

5              MR. BUECHLER:  Everybody's in that --

6              THE COURT:  -- is in that boat.  Right.

7              MR. BUECHLER:  -- boat.

8              THE COURT:  But some were more unfortunate than

9    others because at the end of the day they put in more than

10   they took out.

11             MR. BUECHLER:  And my clients took out in cash

12   roughly $515,000 --

13             THE COURT:  Correct.

14             MR. BUECHLER:  -- each in cash, a piece in cash

15   out.  They may have attempted to transfer, but the transfer

16   never occurred.

17             THE COURT:  But if the --

18             MR. BUECHLER:  And if --

19             THE COURT:  -- transfer did occur, then they

20   didn't lose anything.

21             MR. BUECHLER:  If the Court determines it

22   occurred.

23             THE COURT:  Right.

24             MR. BUECHLER:  And our view is that had it

25   occurred, if you want to look at what their intentions are

Page 36

1    under New York State law, what they intended was 6.6

2    million.  That never occurred.  And then to arbitrarily go

3    back after the fact --

4            THE COURT:  That's -- there's no evidence of that.

5    They wrote letters saying transfer the balance of my

6    account.  They didn't say any specific sum, and that's

7    exactly what happened here, isn't it?

8            MR. BUECHLER:  And they were relying upon what was

9    in their account statements and, therefore, arguably

10   (indiscernible) Heritage, when it got its account statement

11   the next month and two thereafter saw that it was credited,

12   if you want to take that argument to its fullest extent,

13   with 6.6 million, not a lesser sum.

14           THE COURT:  I understand that.

15           MR. BUECHLER:  And they may have acted different

16   --

17           THE COURT:  So that --

18           MR. BUECHLER:  They may have acted very

19   differently --

20           THE COURT:  That's why --

21           MR. BUECHLER:  -- had they known.

22           THE COURT:  Well, you know, that's why I say, and

23   I'm not being facetious, that, you know, under New York law

24   maybe (indiscernible) Heritage foundation had a rescission

25   claim against the Fishman trusts.  Obviously, it wasn't

1  going to pursue that claim and make restitution.  But that

2  -- that's an issue between the transferor and the

3  transferee, isn't it?

4          MR. BUECHLER:  But to have a transfer under New

5  York State law, as we cite in the pages 9 to 12 -- excuse me

6  -- 10 to 12, I believe, of our reply brief requires that

7  there be actual delivery --

8          THE COURT:  Or --

9          MR. BUECHLER:  -- of the gift.

10          THE COURT:  Or constructive.

11          MR. BUECHLER:  Or constructive.  There was no

12  delivery.

13          THE COURT:  All right.  I got it.

14          MR. BUECHLER:  That's our point.

15          Thank you.

16          MR. CREMONA:  Your Honor, if I may just -- because

17  I would like to correct something that was just stated and,

18  I think, contradicts what Mr. Buechler said.

19          The operative paragraph in his objection on behalf

20  of JHF is paragraph 13 which says:

21          "Likewise, the trustee's denial is not supported

22  by the uncontroverted facts in the case that $7.5 million

23  was deposited into the account and only 5.3 was withdrawn.

24  The transfers made from the Fishman trust to JHF constitute

25  'cash in.'  The trustee's attempt to reduce the amount of

1   the transfers from the Fishman trust to the JHF account is

2   contrary to what occurred in reality.  The Fishman trusts

3   made six separate transfers to the JHF account, all of which

4   constitute 'cash in.'  Had the Fishman trust taken the cash

5   out of their accounts and then deposited the cash into JHF

6   account rather than transferring the funds between the

7   accounts, then without a doubt there would be no issue as to

8   JHF."

9             THE COURT:  I had the wrong paragraph.

10            MR. BUECHLER:  I don't -- I just answered Your

11   Honor's question as to the specific paragraph.

12            THE COURT:  You're right.  You're right.  I

13   thought it was paragraph 16, but it's paragraph 13.

14            MR. BUECHLER:  I only read the paragraph Your

15   Honor asked me to.  I --

16            THE COURT:  Okay.  You're --

17            MR. BUECHLER:  We concede.

18            THE COURT:  You were right, Mr. Buechler.

19            We'll take a brief recess and then I'll rule.

20            MR. BUECHLER:  Thank you.

21            MR. CREMONA:  Thank you, Your Honor.

22        (Recess taken at 10:52 a.m.; resume at 11:07 a.m.)

23            THE CLERK:  All rise.

24            Be seated.

25            THE COURT:  The irrevocable charitable remainder

Page 39

1    trust of Yale Fishman (the "Yale Trust") and the Glenn Akiva

2    Fishman charitable remainder unitrust (the "Glenn" trust and

3    together with the Yale trust the "trusts") move for the

4    allowance of their claims which Irving Picard, the trustee

5    of the debtor, Bernard L. Madoff Investment Securities, LLC

6    ("Madoff Securities") has determined to disallow.  Each

7    trust held an account with Madoff Securities and directed

8    Madoff Securities to transfer the remaining balances in

9    their accounts to the (indiscernible) Heritage foundation

10   (the "foundation"), a charitable organization.

11          According to the trust, the foundation is operated

12   by a Rabbi Eli Fishman and Ilene Fishman, the parents of

13   Yale Fishman ("Yale") and Glenn Fishman ("Glenn").  However,

14   at the relevant time Glenn was an officer and, as discussed

15   below, he and Yale had authority to withdraw funds from the

16   foundation's account.

17          The trusts argue principally that the transfers

18   never took place for a variety of reasons and Picard is

19   precluded from arguing otherwise.

20          Accordingly, the transfers should be disregarded

21   and the trusts' claim should be valued under the net

22   investment method endorsed by the Second Circuit in In Re:

23   Bernard L. Madoff Investment Securities, LLC, 654 Fed. 3d.

24   229 (2nd Circuit 2011) ("net equity decision"), Circ. denied

25   133 U.S. 24 (2012).

Page 40

1            For the reasons that follow their motion is denied

2       and Picard's decision to disallow the claims is approved.

3            The facts are derived from the documents attached

4       to the declaration of Dineet Sehgal of Alex Partners, LLP.

5       The authenticity of these documents has not been disputed.

6            The Yale trust was established some time prior to

7       August 18, 1998 and Yale and Glenn are -- were co-trustees.

8       On August 18, 1998, they signed a trading authorization

9       limited to purchases and sales of securities and options on

10      behalf of the Yale trust and Madoff Securities assigned it

11      account number 1-CM543-4-0 (the "Yale trust account").

12           Between August 24, 1998 and December 31, 2004, $2

13      million was deposited into the Yale trust account.  Between

14      April 14, 1999 and July 21, 2004, the Yale trust withdrew a

15      total of $515,778.87 from its account.  Although the account

16      statements provided by Madoff Securities indicated a larger

17      balance inflated by fictitious profits, the parties agree

18      that following the last withdrawal the balance or net equity

19      in the account was $1,484,221.13 under the net investment

20      method.

21           On September 28, 2004 Yale wrote to Madoff

22      Securities asking it to transfer $250,000 from the Yale

23      trust account to account number 1-CM568-3-0 held in the name

24      of the foundation ("the foundation account").  The transfer

25      occurred on September 29, 2004 as reflected in the account

Page 41

1    statements provided to the Yale trust and the foundation.

2              On December 30, 2004 Yale issued instructions to

3    Madoff Securities on behalf of the Yale trust to "transfer

4    the whole balance in my account" to the foundation account.

5    The letter further directed Madoff Securities to close the

6    Yale trust account once the balance was zero.  At the time,

7    the Yale trust account reflected a positive balance of

8    $3,101,924.80 and the Madoff Securities' records show that

9    this amount was transferred to the foundation account in

10   accordance with the letter instruction the next day.  In

11   fact, the balance in the account computed under the net

12   investment method was only $1,234,221.13.

13             As a result, the Yale trust account purported to

14   transfer $1,868,360.50 more than was actually in the

15   account.  Following the transfer, the balance in the account

16   was zero.

17             The transactions in the Glenn trust account

18   followed a similar pattern.  The Glenn trust account -- the

19   Glenn trust opened account number 1-CM-552-4-0 ("The Glenn

20   trust account") with Madoff Securities on December 8, 1998

21   and Glenn and Yale signed the trading authorization

22   agreement.

23             Between December 15, 1998 and December 29, 2000,

24   $2 million was deposited into the Glenn trust account and

25   through July 21, 2004 the Glenn trust account withdraw

Page 42

1    $513,410.

2         The parties agree the balance in the Glenn trust

3    account following the last withdrawal was $1,486,590 as

4    computed under the net investment method, although the

5    account statements reflected more as a result of the

6    fictitious profits.

7         On September 28, 2004, the Glenn -- the Glenn

8    trust issued a written direction to Madoff Securities to

9    transfer $250,000 to the foundation account and the

10   statements for each account reflected the transfer.

11        On December 30, 2004, the Glenn -- Glenn

12   instructed Madoff Securities, on behalf of the Glenn trust,

13   to "transfer the full balance of my account" to the

14   foundation account and close the Glenn trust account once

15   the balance was zero.  At the time the Glenn trust account

16   reflected a positive balance of $2,950,112.99 and the Madoff

17   Securities' records show that the amount was transferred to

18   the foundation account in accordance with the letter

19   instruction the next day.

20        In fact, the balance in the account computed under

21   the net investment method was only $1,236,590.  As a result,

22   the Glenn trust account purported to transfer in excess of

23   $1.7 million more than was actually in the account.

24        Following this transfer, the Glenn trust account

25   reflected a balance of $633.42 which was transferred to the

Page 43

1  foundation account on January 31, 2005 zeroing out the Glenn

2  trust account.

3          As a result of the transactions just described,

4  the balances in both trusts' accounts were zero whether or

5  not fictitious profits are credited or ignored.  The trust

6  nevertheless filed claims with Picard that ignored the

7  transfers to the foundation accounts and sought to recover

8  the net equity in each account immediately prior to the

9  transfers.  Picard determined that neither claim was

10  allowable because in each case the balance in the account

11  was zero as a result of the transfers initiated by each

12  trust.

13          The trusts now seek to have these claims allowed.

14  They argue the transfers fictitious citing the net equity

15  decision and also contend that there was never anything in

16  the trust accounts to transfer.  In addition, they maintain

17  that principals of judicial estoppel and law of the case

18  prohibit Picard from contending that the fictitious

19  transfers actually occurred.  And even if the transfers

20  occurred, the trustee is barred from Bankruptcy Code Section

21  546(e) from netting transactions that occurred more than two

22  years before the filing date.

23          The analysis begins with the New York law of

24  gifts.  A valid (indiscernible) requires proof of three

25  elements:  One, the donor's intent to make a valid transfer;

Page 44

1    two, the actual or constructive delivery to the donee; and,

2    three, acceptance by the donee.  Gruen versus Gruen, 496 NE

3    2nd 869, 872 (New York 1986); In re: Szabo's Estate, 176 NE

4    2nd 395, 396 (New York 1961).

5            The trusts concede the first element.  They admit

6    they intended to transfer the remaining balances in their --

7    to the foundation account (trusts' reply at paragraph 35),

8    and their written directions to Madoff Securities confirm

9    their intent.

10           The trusts must also concede the third element, to

11   wit:  That the foundation accepted the transfers.  To begin

12   with, there is no evidence that the foundation rejected the

13   transfers when they were made.  The suggestion was made at

14   oral argument that the trusts thought they were giving more

15   and the foundation thought it was getting more.  But that is

16   a matter between the parties to the transfers and there has

17   been no effort to rescind the transfers.

18           In addition, prior to the first transfer from the

19   trusts, the foundation accounts had a negative balance of

20   $870,000.  The only additional deposits were the transfers

21   directed by the trusts.  By February 5th, 2005, after the

22   last trust transfer, the balance in the foundation account

23   was $2,100,811.13 although the fictitious profits made it

24   seem larger.  Either Glenn or Yale and Glenn requested

25   withdrawals on behalf of the foundation aggregating

1    $3,451,000 from Madoff Securities and received checks in

2    that amount drawn on the Madoff Securities' JPMorgan

3    account.

4           Under the net investment method the foundation

5    account was overdrawn by $1,350,188.87 meaning the

6    foundation was able to draw some of the fictitious profits

7    "transferred" by the trusts.  Thus, the foundation got the

8    benefit of the transfers and relied on the transfers,

9    including the fictitious profits in computing and submitting

10   its own claim in this case.  Instead, the trusts focus on

11   the second element arguing that the transfers were

12   fictitious and never occurred.

13          The argument is inconsistent with the obvious fact

14   that the foundation benefited from the transfers and,

15   moreover, is belied by the documentary evidence submitted by

16   Picard.  That evidence demonstrates that Madoff Securities

17   constructively delivered the transfers through a series of

18   bookkeeping entries that zeroed out the balances in the

19   trusts' accounts and increased the foundation's account by a

20   comparable sum.

21          In the case of Yale trust, Madoff Securities

22   transferred $3,101,924.84 of which $1,868,360.58 was

23   fictitious profits.  The fictitious profits must be

24   disregarded in calculating the value of what was

25   transferred, In re: Bernard L. Madoff Investment Securities,

Page 46

1    LLC, 499 B.R. 416, 428-29 (SDNY. 2013); In re: Bayou Group,

2    LLC, 396 B.R. 810, 885 (Bankr. Court SDNY 2008), affirmed in

3    part and reversed in part, 439 B.R. 284 (SDNY 2010), and

4    accordingly the actual transfer was $1,234,221.13.

5             Similarly, Madoff Securities transferred

6    $2,950,112.99 in connection with the Glenn trust transfer,

7    but this included $1,713,522.99 in fictitious profits.

8    Consequently, the actual transfer was $1,236,590.  As noted,

9    the trust did not challenge the use of t net investment

10   method to calculate the net equity in the accounts

11   immediately prior to the transfers.

12            The trusts' argument that the transfers never

13   occurred is belied by the facts just discussed and

14   unsupported by their principle legal authority.  The net

15   equity decision, which they cite, rejected the position that

16   net equity should be determined by the balance shown on the

17   final account statement observing that account statements

18   included fictitious information and that "the only accurate

19   entries reflected the customer's cash deposits and

20   withdrawals" 654 Fed. 3d. at 232.

21            From this the trust reasoned -- the trusts reason

22   that the transfers were not withdrawals, don't count and

23   consequently the transfers were fictitious.

24            The Court of Appeals did not address inter-account

25   transfers, although the effect of the withdrawal and the

1   transfer is the same when computing net equity under the net

2   investment method.  Following the transfers, the account

3   balances fell to zero just as they would have if the trusts

4   had withdrawn all of the funds instead of transferring them.

5           Furthermore, because the trusts transferred

6   everything they had, they did not lose any money in Madoff's

7   Ponzi scheme, nor did the Second Circuit consider or decide

8   whether the Madoff Securities' statements accurately

9   reflected enter account transfers.  In fact here, the

10  account statements accurately reflected the amount of the

11  $250,000 transfers.  And although the account statements

12  showed final transfers inflated by fictitious profits, they

13  nevertheless reflected the fact that the remaining balances

14  were transferred to the foundation account at Glenn's and

15  Yale's direction.

16          The trusts also have failed to explain how the

17  foundation was able to use the transferred funds if the

18  transfers were fictitious and never occurred.  As noted, the

19  foundation, through Yale and Glenn, withdrew $3,451,000 from

20  its account.  But for the transfers into the account by the

21  trusts, there would have been nothing to withdraw.

22          Furthermore, the trusts and the foundation have

23  taken inconsistent positions regarding the transfers.  The

24  trusts argue that the transfers do not constitute

25  withdrawals under the net equity decision, but the

1    foundation maintained that the transfers count as deposits.

2    As a result, the foundation's proof of claim sought credit

3    for the transfers in calculating its net equity, while the

4    trusts' proofs of claim essentially demand the same benefit

5    by ignoring them.

6         Although the foundation is a separate entity,

7    Glenn was an officer of the foundation during the relevant

8    period and Yale and Glenn withdrew $3,451,000 from its

9    account.

10        In addition, the trusts and the foundation are

11   represented by the same counsel who ironically accused

12   Picard of taking inconsistent positions (objection to

13   trustee's determination of claim of (indiscernible) Heritage

14   foundation, Inc. dated November 11, 2010 at paragraph 16

15   (ECF Document Number 3143).)

16        Picard, however, has taken the consistent position

17   that he must ignore fictitious profits when computing net

18   equity and has applied this rule in calculating the amount

19   of the transfers.

20        The trusts also argue that because Madoff never

21   deposited cash into or bought securities for either trust

22   account there was never anything in the trust accounts to

23   transfer and no transfers from the trust accounts to the

24   foundation ever occurred or could have occurred (Trusts'

25   reply at paragraphs 1 and 36.)

Page 49

1          Although Madoff defrauded the investors and

2     misused their investments, he did not steal the funds from

3     the accounts, at least as the trusts mean it, anymore than

4     Picard restored funds to the accounts.  The trusts' accounts

5     consisted of bookkeeping entries, some correct, but most

6     fictitious.

7          Notwithstanding the fictitious investments listed

8     on the account statements, the accounts have value.  The

9     trusts withdrew one million dollars for their personal

10    benefit before they transferred the remaining balances, and

11    now seek to recover the balance of their pre-transfer net

12    equity through their motion.  If there was never anything in

13    their accounts, there would have been nothing to withdraw

14    and nothing left to recover.  The accounts plainly had value

15    and the trusts transferred the remaining value net of their

16    withdrawals to the foundation.

17          The arguments regarding law of the case and

18    judicial estoppel deserve short thrift.  They are based on

19    the erroneous assumption that Picard argued and the Second

20    Circuit agreed that the recorded inter-account transfers

21    were fictitious and the only accurate records maintained by

22    Madoff Securities related to the cash in and cash out.

23    Picard never argued and the Court never decided that the

24    records of transfers should be ignored, and for the reasons

25    stated the records accurately reflected the fact of the

1    transfers even if they did not always reflect the correct

2    amount.

3             The arguments -- the trusts' argument that

4    Bankruptcy Code Section 546(e) limits Picard's look back

5    period to two years before the filing date has already been

6    rejected by Judge Rakoff.  Section 546(e) limits a

7    bankruptcy trustee's avoiding powers in a case involving

8    settlement payments made in connection with securities'

9    contracts.

10            With certain exceptions that are not relevant to

11   this case, Picard can only recover intentional fraudulent

12   transfers made within two years of the filing date.  Picard

13   versus Greiff, 476 B.R. 715, 718 (SDNY 2012); Picard versus

14   Katz, 462 B.R. 447, 452 (SDNY 2011).

15            Nevertheless, in computing net equity under the

16   net investment method Picard used net cash in and net cash

17   out over the entire life of the investment.  476 B.R. at

18   729.  Judge Rakoff subsequently rejected the argument that

19   the netting of deposits and withdrawals before the two-year

20   period violated the two-year period of limitations

21   applicable to avoidance actions.  In re: Bernard L. Madoff

22   Investment Securities, LLC, 499 B.R. at 427.

23            Although Judge Rakoff was considering the concept

24   of value under Bankruptcy Code Section 548(c), his reasoning

25   applies equally to this case and I reject the trusts'

Page 51

1    argument for the same reason.

2              Finally, the trusts argue that Picard has failed

3    to carry his burden of going forward with evidence to rebut

4    the presumption that the trusts' claims are valid.  The

5    claimant bears the ultimate burden of proving its claim to

6    customer property.  In re: Bernard L. Madoff Investment

7    Securities, LLC 2014 Westlaw 1302660, at page 6 (SDNY March

8    31, 2014).

9              A properly completed proof of claim is prima facie

10   evidence of the validity and the amount of the claim, In re:

11   MF Global, Ltd. 2012 Westlaw 5499847 at page 3 (Bankr. SDNY

12   November 13, 2012); Federal Rule of Bankruptcy Procedure

13   3001(f), but if the objecting party produces evidence to

14   rebut the presumption, the burden of going forward shifts

15   back to the claimant who must prove its claim by a

16   preponderance of the evidence.  MF Global, 2012 Westlaw

17   5499847, at page 3.

18             Picard produced ample evidence discussed

19   previously to demonstrate that the transfer to the

20   foundation occurred resulting in zero balances in the

21   trusts' accounts and an increased balance in the foundation

22   account.  The trusts have not come forward with any contrary

23   evidence to prove that the transfers did not occur and,

24   hence, have failed to sustain their burdens of proof.

25             Accordingly, the trusts' motion is denied.  I have

Page 52

1    considered the trusts' remaining arguments and conclude that

2    they lack merit.

3              Submit an order.

4              Thank you.

5              MR. CREMONA:  Thank you,  Your Honor.

6              MR. BUECHLER:  Thank you, Judge.

7              THE COURT:  Thank you.

8         (Whereupon these proceedings concluded at 11:30 AM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2                          RULINGS

3                                          Page        Line

4    The Fishman Trusts' Motion for a

5    Hearing (I) to Determine Allowance

6    of Claims and (II) Entry of an Order

7    Allowing the Trust Claimants' Claims

8    and Granting Related Relief (ECF 5645)    40          1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 54

1              C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7    Sherri L Breach    Digitally signed by Sherri L Breach
                         DN: cn=Sherri L Breach, o, ou,
                         email=digital1@veritext.com,
                         c=US
8                        Date: 2014.05.21 15:31:55 -04'00'

9    SHERRI L. BREACH

10   AAERT Certified Electronic Reporter & Transcriber

11   CERT*D-397

12

13   Veritext

14   330 Old Country Road

15   Suite 300

16   Mineola, New York 11501

17

18   DATE:  May 20, 2014

19

20

21

22

23

24

25