Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jorian L. Rose
Email: jrose@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION
AFFIRMING APPLICATION OF NET INVESTMENT METHOD TO
DETERMINATION OF CUSTOMER TRANSFERS BETWEEN BLMIS ACCOUNTS**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................... 1

FACTUAL BACKGROUND ...................................................................... 2

    A.    The Trustee Did Not Improperly Aggregate Accounts When He
Included Transfers In the Net Investment Method ................................. 2

    B.    The Trustee Properly Credited Transfers Between BLMIS
Accounts, Where Transfers Consisted of Distributions From
Pension Plans, Trusts, and Inheritances ................................................. 3

    C.    The Trustee's Calculation of an Account's Net Equity Is Not
Changed Because Multiple Claimants Invested in a Single Account .................... 4

    D.    BLMIS's Fraudulent Representations Regarding "Profits
Withdrawals" Represent Cash Withdrawals ........................................... 6

    E.    Issues Relating to Avoidance Actions Are Outside the Scope of
This Motion ........................................................................... 7

ARGUMENT ......................................................................................... 7

    A.    The Trustee's Methodology is the Only Approach Consistent With
the Net Equity Decision and the Antecedent Debt Decision ..................... 7

    B.    The Trustee's Treatment of Inter-Account Transfers is Consistent
with SIPA and Other Laws .......................................................... 12

        1.    The Trustee has not Altered the Definition of "Net Equity" ................... 12

        2.    The Trustee's Method is Consistent with the Series 100 Rules .............. 13

        3.    The "Customer" Definition and the Question of Whether
Claimants are Entitled to Interest are the Subject of Separate
Proceedings and are not Relevant to the Instant Motion ......................... 14

        4.    Claimants' Vague References to "Federal Securities Laws" Have
no Bearing on the Inter-Account Transfer Issue ................................... 15

        5.    Because They are Seeking a Priority, Claimants Have the Burden
of Proof to Establish That They are Part of the Preferred Class and
their Transactions are Protected .................................................... 16

    C.    BLMIS's Change in Corporate Form Has No Relevance ................................... 20

## TABLE OF CONTENTS
### (continued)

**Page**

D.     The Trustee's Method Does Not Conflict With Public Policy ........................... 21

    1.     The Policy Favoring Finality in Corporate Transactions is Not Implicated ............................................................................................... 21

    2.     Transferees do Not Have Property Interests in Fictitious Profits ........... 23

    3.     The Payment of Taxes Does not Transform Fictitious Profits Into Principal ................................................................................................. 24

E.     Inter-Account Transfers to IRA Accounts Are Not Entitled to Special Treatment ............................................................................................. 25

F.     No Stay is Required Pending Mediation................................................................ 27

G.     *Stern* Does Not Limit This Court's Jurisdiction To Affirm the Trustee's Methodology .......................................................................................... 28

H.     Claimants That Require Discovery Should Serve Proper Discovery Demands ................................................................................................................ 29

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adler Coleman Clearing Corp.*,
   204 B.R. 111 (Bankr. S.D.N.Y. 1997) ...................................................................................19

*Amer. Sur. Co. of N.Y. v. Sampsell*,
   327 U.S. 269 (1946) ...........................................................................................................22

*Banque Worms v. BankAmerica Int'l*,
   77 N.Y. 2d 362 (1991) ........................................................................................................22

*In re Bayou Group LLC*,
   396 B.R. 810 (Bankr. S.D.N.Y. 2008), *aff'd*, 439 B.R. 284 (S.D.N.Y. 2010) ...................9, 23

*Bayou Superfund, LLC v. WAM Long/Short Fund II, LLP* (*In re Bayou Group, LLC*),
   362 B.R. 624 (Bankr. S.D.N.Y. 2007) .................................................................................24

*In re Bernard L. Madoff Inv. Sec. LLC*,
    Adv. Pro. 496 B.R. 744 (Bankr. S.D.N.Y. 2013), appeal docketed, No. 14-0097, (2d Cir. Jan. 22, 2014) ..................................................................................................15

*In re Bernard L. Madoff Inv. Sec. LLC*,
   424 B.R. 122 (Bankr. S.D.N.Y. 2010) ...............................................................................8, 25

*In re Bernard L. Madoff Inv. Sec. LLC*,
   454 B.R. 285 (Bankr. S.D.N.Y. 2011), *aff'd, In re Aozora Bank Ltd.*, 480 B.R. 117 (S.D.N.Y.2012), *aff'd, In re Bernard L. Madoff Inv. Sec. LLC,* 708 F.3d 422 (2d Cir. 2013)................................................................................................15

*In re Bernard L. Madoff Inv. Sec. LLC*,
   654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (2012).............. *passim*

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,* No. 09-9783, 2013 WL 6484727 (S.D.N.Y. December 9, 2013)…………………………………………....................................................23

*Butner v. United States*,
   440 U.S. 48 (1979)..............................................................................................................21

*In re CBI Holding Co.*,
   529 F.3d 432 (2d Cir. 2008)................................................................................................28

*Chicago Title Ins. Co. v. Eynard*,
   84 Misc. 2d 605 (1st Dept. 1975) .......................................................................................23

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Commodity Futures Trading Commn.v. Walsh*,
   17 N.Y. 3d 162 (2011) ..................................................................................................23

*Donell v. Kowell*,
   533 F.3d 762 (9th Cir. 2008) ....................................................................................10, 24

*In re Dreier LLP*,
   429 B.R. 112 (Bankr. S.D.N.Y. 2010) ..........................................................................21

*First Fed. Sav. & Loan Ass'n of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re
   Bevill, Bresler & Schulman, Inc.)*,
   59 B.R. 353 (D.N.J. 1986), *appeal dismissed*, 802 F.2d 445 (3d Cir. 1986)...........................22

*Fisher v. Sellis (In re Lake States Commodities, Inc.)*,
   253 B.R. 866 (Bankr. N.D. Ill. 2000) ...........................................................................24

*In re Francisco*,
   204 B.R. 799 (Bankr. M.D. Fla. 1996) ..........................................................................25

*In re Goodchild*,
   160 Misc. 738 (N.Y. Sur. Ct. 1936)...............................................................................23

*Gowan v. Patriot Grp., LLC (In re Dreier LLP)*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011)............................................................................24

*Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville
   Forest Products Corp.)*,
   896 F.2d 1384 (2d Cir. 1990).........................................................................................28

*Keller v. Blinder (In re Blinder Robinson & Co., Inc.)*,
   135 B.R. 892 (D. Col. 1991)...........................................................................................28

*Levine v. Central States, Southeast and Southwest Pension Fund (In re Ottawa
   Cartage, Inc.)*,
   55 B.R. 371 (N.D. Ill. 1985) ..........................................................................................26

*In re MF Global, Ltd.*,
   Nos. 11–15059 (MG), 11–02790 (MG), 2012 WL 5499847 (Bankr. S.D.N.Y.
   Nov. 13, 2012) ................................................................................................................18

*Milgram v. Orthopedic Assoc. Defined Contribution Pension Plan*,
   666 F.3d 68 (2d Cir. 2011)..............................................................................................27

*Murray v. McGraw (In re Bell & Beckwith)*,
   821 F.2d 333 (6th Cir. 1987) ..........................................................................................22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re MV Securities, Inc.*,
 48 B.R. 156 (Bankr. S.D.N.Y. 1985) ....................................................................................16

*Neshewat v. Salem*,
 365 F.Supp (S.D.N.Y. 2005), *aff'd*, 194 F. App'x 24 (2d Cir. 2006) ...................................23

*In re New Times Sec. Servs.*,
 463 F.3d 125 (2d Cir. 2006) ................................................................................................16

*In re O.P.M. Leasing Servs., Inc.*,
 60 B.R. 679 (Bankr. S.D.N.Y. 1986) ...................................................................................19

*Patterson v. Shumate*,
 504 U.S. 753 (1992) .............................................................................................................27

*Picard v. Greiff*,
 476 B.R. 715 (S.D.N.Y. 2012) .................................................................................10, 21, 23

*Picard v. Stahl*,
 443 B.R. 295 (Bankr. S.D.N.Y. 2011) .................................................................................28

*Savino v. E.F. Hutton & Co., Inc.*,
 507 F. Supp. 1225 (S.D.N.Y. 1981) .....................................................................................16

*Scholes v. Lehmann*,
 56 F.3d 750 (7th Cir. 1995) .................................................................................................24

*Schultz v. Omni Mutual Inc.*,
 No. 93-3700 (KC) 1993 WL 546671 (S.D.N.Y. 1993) .........................................................18

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
 499 B.R. 416 (S.D.N.Y. 2013) ....................................................................................... *passim*

*Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*,
 12 Civ. 1139 (DLC), 2012 WL 3042986 (S.D.N.Y. July 25, 2012) .................................15, 26

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*,
 229 B.R. 273 (Bankr. S.D.N.Y. 1999) *aff'd sub nom., Arford v. Miller (In re Stratton Oakmont, Inc.)*, 239 B.R. 698 (S.D.N.Y. 1999), 210 F.3d 420 (2d Cir. 2000) .................................................................................................................18, 19

*SEC v. Albert & McGuire Sec. Co., Inc.*,
 378 F.Supp. 906 (E.D. Pa. 1974) .........................................................................................22

*SEC v. Packer, Wilbur & Co., Inc.*,
 498 F.2d 978 (2d Cir. 1974) .................................................................................................11

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Sender v. Buchanan (In re Hedged-Inv. Assoc., Inc.),*
  84 F.3d 1267 (10th Cir. 1996) ...............................................................24

*SIPC v. Morgan, Kennedy & Co., Inc.,*
  533 F.2d 1314 (2d Cir. 1976)................................................................25

*SIPC v. Wise (In re Stalvey & Associates, Inc.),*
  750 F.2d 464 (5th Cir. 1985) ................................................................19

*Soule v. Alliot (In re Tiger Petroleum Co.),*
  319 B.R. 225 (Bankr. N.D. Okla. 2004) ................................................24

*In re St. Vincent's Catholic Med. Ctrs. of N.Y.,*
  445 B.R. 264 (Bankr. S.D.N.Y. 2011)...................................................28

*Sterling Die Casting Co., Inc. v. Local 365 UAW Welfare and Pension Fund (In
  re Sterling Die Casting Co., Inc.),*
  118 B.R. 205 (E.D.N.Y. 1990) .............................................................26

*Stern v. Marshall,*
  131 S. Ct. 2594 (2011)..........................................................................28

*Terry v. June,*
  432 F. Supp. 2d 635 (W.D. Va. 2006) ..................................................24

*In re United Energy Corp.,*
  944 F.2d 589 (9th Cir. 1991) ................................................................24

*In re Vaughan Co., Realtors,*
  2014 WL 2198163 (Bankr. D.N.M. May 27, 2014) ..............................24

*Wing v. Dockstader,*
  482 Fed.Appx. 361................................................................................24

**Statutes**

11 U.S.C. § 502(a) ............................................................................17, 18

11 U.S.C. § 546(e) ................................................................................9, 10

11 U.S.C. § 547......................................................................................10

11 U.S.C. § 548......................................................................................10

11 U.S.C. § 548(c) ................................................................................9, 23

11 U.S.C. § 550......................................................................................10

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

15 U.S.C. § 78aaa *et seq.* .................................................................................................................1

15 U.S.C. § 78fff-2(a)(2) ................................................................................................................17

15 U.S.C. § 78fff-2(b) ...............................................................................................................17, 18

15 U.S.C. § 78fff(b) ........................................................................................................................16

15 U.S.C. § 78*lll*(2) .......................................................................................................................19

15 U.S.C. § 78*lll* (11)(A) ...............................................................................................................12

29 U.S.C. §§ 1001-1191(c) .............................................................................................................26

29 U.S.C. § 1144(d) ........................................................................................................................26

**Rules**

Bankruptcy Rule 3001 ....................................................................................................................18

Bankruptcy Rule 3001(a) ...............................................................................................................17

Rule 10b-5...................................................................................................................................15, 16

**Other Authorities**

17 C.F.R. § 300.100 ........................................................................................................................13

17 C.F.R. § 300.100(d) ...................................................................................................................18

29 C.F.R. § 2510.3-2(d) ..................................................................................................................25

U.S. Const., art. VI, cl. 2.................................................................................................................22

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*,[1] and the estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this reply memorandum of law in support of the Trustee's motion (the "Motion") seeking entry of an order affirming the application of the Net Investment Method, as defined herein, to transfers between BLMIS accounts, and overruling the objections by the claimants ("Claimants") who have challenged the Trustee's methodology.

## PRELIMINARY STATEMENT

Claimants have failed to provide any legal basis to challenge the Trustee's method for calculating inter-account transfers.  This is not surprising given that the Trustee's approach, pursuant to which transferee accounts are given credit for transfers up to the amount of principal in the transferor account at the time of the transfer (the "Net Investment Method"), is the only approach consistent with the Second Circuit's reasoning in the Net Equity Decision (as defined herein) and the District Court's Antecedent Debt Decision (as defined herein), the latter of which specifically addressed the Trustee's treatment of inter-account transfers.

Although the Second Circuit did not opine on inter-account transfers in the Net Equity Decision, it explicitly upheld the Net Investment Method as to deposits and withdrawals from BLMIS accounts.  And as this Court recently recognized, the effect of a transfer is the same as a withdrawal for purposes of calculating net equity.  Allowing accounts to be credited with fictitious profits by way of inter-account transfers would circumvent the most basic precept of the Net Equity Decision: customers cannot retain fictitious profits when other customers have not yet received their principal.

---

[1] For convenience, subsequent references to sections of the act shall be denoted as " SIPA § __."

This Court has also recently confirmed that the District Court's approval of the Trustee's treatment of inter-account transfers in the avoidance context applies equally to claims calculations. Claimants' attempts to be credited with transfers of fictitious profits fail as they educe no basis in law or equity for doing so at the expense of other customers of BLMIS. Accordingly, the Trustee's Motion should be granted.

## FACTUAL BACKGROUND

As set forth in the Trustee's opening papers, the issue presented by the Trustee's Motion is a legal one and does not require consideration of any factual issues. In the oppositions filed, various claimants argue that their account histories or particular circumstances present factual issues that purportedly show that the Trustee's treatment of inter-account transfers was wrong. Upon reviewing the oppositions, the Trustee has found that none of the "factual" issues raised change the correctness of the Trustee's approach and are, for the most part, irrelevant to the legal determination at hand. While the Trustee does not believe that the Court need resolve any of these issues to rule on the Motion, the Trustee has endeavored, for the convenience of the Court, to categorize the "factual" issues presented and provide a brief response. To the extent that the Court determines that a separate hearing on any of these issues is warranted, the Trustee will schedule those hearings at the direction of the Court.

**A.** **The Trustee Did Not Improperly Aggregate Accounts When He Included Transfers In the Net Investment Method**

Several claimants argue that the Trustee improperly aggregated separate accounts by including in each account's "net equity" calculation adjusted amounts for inter-account transfers. *See e.g.,* Samdia Family, LP's Memorandum of Law in Opposition to the Trustee's

Inter-Account Transfer Motion ("Samdia Family Br."), at 2-7 (ECF No. 6640);[2] Customers'

Memorandum of Law in Opposition to the Trustee's Inter-Account Transfer Motion ("B&P Br.")

at 18-20 (ECF No. 6708); Claimants' Omnibus Opposition to the Trustee's Motion Affirming

Application of Net Investment Method To Determination of Customer Transfers Between

BLMIS Accounts ("Milberg Br.") at 6-8 (ECF No. 6732); The Diana Melton Trust, Dated

12/05/05 Opposition to the Trustee's Motion Affirming Application of Net Investment Method

to Determination of Customer Transfers Between BLMIS Accounts ("Melton Br.") at 3-5 (ECF

No. 6792). The Trustee did not "combine" these accounts; he merely credited or debited the

appropriate account from which a transfer was made or received. For example, Samdia Family

had a tenant-in-common account at BLMIS, Account No. 1ZB137 (the "Transferor

Account"). In 2001, Samdia Family closed that account and opened a new account in the name

of a family partnership, BLMIS Account No. 1ZB412 (the "Transferee Account"). Samdia

Family sought to transfer to the Transferee Account an amount that exceeded the principal in the

Transferor account. The Trustee did not give the Transferee Account credit for the portion of the

transfer that was made up of fictitious profits. But that calculation performed by the Trustee in

no way "combined" the two separate accounts.

**B.**    **The Trustee Properly Credited Transfers Between BLMIS Accounts, Where**
        **Transfers Consisted of Distributions From Pension Plans, Trusts, and Inheritances**

Various Claimants received transfers into their own personal BLMIS accounts from other

BLMIS accounts, such as pension plans and trust accounts. *See* Memorandum of Law in

Opposition to Inter-Account Transfer Motion ("Most Br.") at 4-6 (ECF No. 6670); Elliot G.

Sagor Memorandum of Law in Opposition to the Trustee's One Size Fits All Method For

---

[2]This and all following ECF No. references refer to pleadings filed in the main bankruptcy proceeding pending before this Court, captioned *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. No. 08-01789 (SMB) (Bankr. S.D.N.Y.), unless otherwise noted.

Valuing Inter-Account Transfers Which Inequitably and Harshly Does Not Always Credit a Customer's Principal Investment or Cash In ("Sagor Br.") at 5-7 (ECF No. 6900); B&P Br. at 1, 3.  Other claimants received transfers from other BLMIS accounts pursuant to inheritances after the transferor accountholder was deceased.  *See* B&P Br. at 2-3, 7; Marion Apple's Memorandum of Law in Opposition to the Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts ("Apple Br.") at 2 (ECF No. 6713).  While these particular transfers were made for different reasons, they all share a common thread: in each case, the transferor attempted to transfer fictitious profits to another BLMIS account.  Thus, while the Claimants posit that the nature of the transferor account (e.g., pension plan) or nature of the transfer (e.g., inheritance) should change the Trustee's treatment of the transfer transactions, the Trustee's position is that no account can be credited with fictitious profits.

C.    **The Trustee's Calculation of an Account's Net Equity Is Not Changed Because Multiple Claimants Invested in a Single Account**

The Trustee determined each BLMIS account's net equity by looking at the deposits, withdrawals, and transfers to and from each account.  The Net Investment Method was applied at the account-level, meaning that this calculation was performed in the same manner regardless of whether an account was held by an individual or by an entity through which multiple claimants invested.  Various Claimants argue that the Trustee's treatment of inter-account transfers is incorrect because he failed to credit individual deposits and withdrawals within a shared account.  *See* B&P Br. at 6; Objection and Joinder of Brian Ross to Arguments Presented in Connection With the Trustee's Motion Affirming Application of Net Investment Method To Determination of Customer Transfers Between BLMIS Accounts ("Ross Br.") at 5, (ECF No. 6702); Sagor Br. at 5-6.  But this issue does not impact whether the Trustee's treatment of inter-account transfers

for the relevant accounts as a whole are correct.  Instead, this issue relates only to who should be accorded customer status under SIPA, as opposed to the calculation of an inter-account transfer.

For example, Brian Ross's objection acknowledges that, prior to 2004, he made deposits to and withdrawals from an account held in the name of his father, Allen Ross.  *See* Ross Br. at 4-5.  Subsequently, he opened his own BLMIS account with a transfer from his father's account.  His father's account did not contain sufficient principal at the time of the transfer, and the Trustee did not give credit to Ross's account for fictitious profits received from his father's account.  Specifically Ross sought to transfer $1 million but only $483,237 of principal was available and credited as a transfer.  Ross seeks to have the Trustee individually calculate Ross's investments into his father's account separate and apart from the overall balance of that account, and to give Ross credit for the transfer to his own account on that basis.  In essence, Ross is seeking his own individual net equity claim for his father's account, which is another way of arguing that both Ross and his father should be recognized as separate "customers" under SIPA as to his father's single account.  That question is not the same as how the Trustee should calculate an inter-account transfer.

Nevertheless, the net equity calculation for Ross's father's account shows that it was overdrawn, regardless of how many people invested in the single account.  Accordingly, the Trustee properly determined that Ross was not entitled to full credit for the first transfer from his father's account into Ross's own account because that transfer was partially made up of fictitious profits.  To the extent that claimants like Ross have claims for the return of the money they purportedly invested into an allegedly "shared" account, those claims are against the transferor accountholder and are not relevant to this Motion.

D.    **BLMIS's Fraudulent Representations Regarding "Profits Withdrawals" Represent Cash Withdrawals**

One Claimant has asserted that the Trustee improperly calculated net equity based upon certain bookkeeping entries made by Madoff.  *See* B&P Br. at 4-6.  There were four BLMIS accounts held by Mr. Blecker and his family members: one in his own name, two held by Arthur and Sofie Blecker as joint tenants, and one in the name of the Aaron Blecker Revocable Trust.  Two accounts were overdrawn at the time the accounts were closed or as of December 2008 and the other two had a net zero balance.  Mr. Blecker filed claims for three of the accounts, which the Trustee denied because the accounts did not have positive net equity.

As set forth in the Trustee's determination letter, Mr. Blecker's account statements listed transactions denoted as "PW," which stands for "profit withdrawals."  These transactions were withdrawals in that the amounts listed were contemporaneously deducted from his account balance.  On the customer statements, these transactions differed slightly from other check withdrawals by listing various company names after the word "CHECK," for example "CHECK VIACOM."  Through his investigation, the Trustee has determined that at various points during the fraud and particularly in the years preceding the 2000s, Madoff falsely represented that he was paying dividends to customers.  As part of his fraudulent scheme, Madoff made this representation by purporting to send monies to customers like Mr. Blecker in the form of "profit withdrawals."  There were no "profits," however, because there was no trading.  These withdrawals were merely funds sent from BLMIS to customers in furtherance of the scheme.  For the time period for which the Trustee has bank records and cancelled checks, he has confirmed that when "PW" appears on the customer statement and lists a company name following "CHECK" in the detail field, the checks were in fact made out to and cashed by customers.  As such, although they look different, these transactions were in reality no different

-6-

than any other withdrawals whereby funds were sent to customers by BLMIS.

In any event, if there is a factual issue, it is the Trustee's position that it should be determined pursuant to a separate proceeding. To the extent that Mr. Blecker is objecting to the Trustee's determination regarding whether the particular transactions in his accounts should be treated as withdrawals, this question does not affect whether the Trustee's transfer methodology is correct.

E.    **Issues Relating to Avoidance Actions Are Outside the Scope of This Motion**

Certain claimants raised issues relating to the avoidance actions pending against them. For example, Lawrence Elins ("Elins") objected on the basis that his claim as to his net loser account, BLMIS Account No. 1E0172, should have been allowed. *See* Objection of Lawrence Elins to Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between Accounts ("Elins Br.") at 3 (ECF No. 6707). Elins also had a net winner account that was overdrawn by approximately $6 million and an avoidance action has been filed against him. Thus, the question of whether Elins is liable to the estate and whether any claims will ultimately be allowed is a matter that will be resolved in the context of his avoidance action.

**ARGUMENT**

A.    **The Trustee's Methodology is the Only Approach Consistent With the Net Equity Decision and the Antecedent Debt Decision**

Contrary to arguments raised by Claimants, the application of the Net Investment Method to account transfers is the only methodology that is consistent with the Second Circuit's decision regarding net equity. *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (2012) (the "*Net Equity Decision*"). This approach was recently approved by the District Court in its antecedent debt decision and, notwithstanding the

Objecting Claimants' protestations otherwise, this decision is directly relevant here. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 499 B.R. 416, 428 (S.D.N.Y. 2013) (the "*Antecedent Debt Decision*"). *See also* Transcript of Hearing at 50-51, *In re Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 20, 2014) (the "Fishman Hearing Transcript").

The Trustee has applied a cash-in, cash-out analysis to calculate customer claims, which approach was approved by the Bankruptcy Court and affirmed by the Second Circuit. *Net Equity Decision*, 654 F.3d 220. In accordance with the Net Investment Method, customers have a claim against the estate when the cash deposits into an account over the entire life of the account exceed withdrawals. *Id.* The Second Circuit explained the correctness of this approach:

> Here, the profits recorded over time on the customer statements were after-the-fact constructs that were based on stock movements that had already taken place, were rigged to reflect a steady and upward trajectory in good times and bad, and were arbitrarily and unequally distributed among customers. These facts provide powerful reasons for the Trustee's rejection of the Last Statement Method for calculating "net equity." In addition, if the Trustee had permitted the objecting claimants to recover based on their final account statements, this would have "affect[ed] the limited amount available for distribution from the customer property fund."

*Id.* at at 238 citing *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 133 (Bankr. S.D.N.Y. 2010) (the "*Bankruptcy Court Net Equity Decision*").

The Trustee's treatment of inter-account transfers is the only one consistent with that decision. Though the Net Equity Decision addressed withdrawals as opposed to transfers, as this Court has recently stated, the effect of a withdrawal and a transfer is the same when computing net equity under the Net Investment Method. Fishman Hearing Transcript at 46-7. Indeed, providing full value for inter-account transfers would be akin to adopting the Last Statement Method for transfers while utilizing the Net Investment Method for deposits and withdrawals. While Claimants have latched onto the Second Circuit's statement in the Net Equity Decision

that there are other possible approaches to the calculation of net equity, it stretches logic to suggest that the Second Circuit was implying that customers who had inter-account transfers should receive fictitious profits when others could not.

In addition, Claimants' objections that the Antecedent Debt Decision is irrelevant are patently false. The District Court, in the context of determining "value" for purposes of section 548(c) of the Bankruptcy Code, held that inter-account transferees should only receive credit for that portion of the transfer that was made up of principal because, when fictitious profits are transferred, "[t]he funds at issue are still other people's money, and shifting them among accounts . . . does not morph them into actual new principal." *Antecedent Debt Decision*, 499 B.R. at 428-29; *see also In re Bayou Group LLC*, 396 B.R. 810, 885 (Bankr. S.D.N.Y. 2008), *aff'd*, 439 B.R. 284 (S.D.N.Y. 2010). Claimants argue that because the District Court's holding was made in the avoidance context, it has no persuasive value. To the contrary, calculating customer claims and calculating avoidance liability are flip sides of the same coin. The Trustee first calculates a customer's net equity, in accordance with the Net Investment Method. That calculation determines whether the customer has a claim or is liable to the estate. If the customer's cash deposits exceed withdrawals, the customer may have a claim against the estate. If the customer withdrew more than was deposited, the Trustee may have an avoidance claim. As the District Court stated, "the definition of net equity and the definition of claims that can provide 'value' to the customer property estate are inherently intertwined." *Antecedent Debt Decision*, 499 B.R. at 424.

Claimants' arguments that the Antecedent Debt Decision is irrelevant because it arose in the avoidance context is surprising given how they have embraced the District Court's decision regarding section 546(e) of the Bankruptcy Code—which by its terms—only arises in the

avoidance context.    While the Antecedent Debt Decision specifically opines that the Net Investment Method is proper, demonstrating its applicability to the question presented herein, section 546(e), on its face, has nothing to do with claims allowance.  Section 546(e) places limits on the Trustee's ability to avoid transfers from the BLMIS estate in avoidance actions beyond the two years preceding the Filing Date pursuant to sections 547, 548 and 550 of the Code. Section 546(e) says nothing about the proper manner to calculate either the claim against the estate or the avoidance claim against the customer; it merely provides a temporal limit similar to all statutes of limitation.

Thus, even though there are statutory limits on the Trustee's ability to avoid and recover fraudulent transfers in the avoidance context, numerous courts have recognized that, both as a general matter and in this specific case, trustees in Ponzi schemes calculate claims over the life of the account. *See Picard v. Greiff*, 476 B.R. 715, 729 (S.D.N.Y. 2012) (adopting approach in *Donell v. Kowell*, 533 F.3d 762, 771-72 (9th Cir. 2008)).  The District Court specifically rejected the argument that netting beyond the two years prior to the commencement of the BLMIS liquidation violated the statute of limitations applicable to avoidance actions.  *Antecedent Debt Decision*, 499 B.R. at 427.  Further, this Court recently observed that Judge Rakoff's reasoning was equally applicable in the claims context, removing any doubt about Claimants' section 546(e) argument.  Fishman Hearing Transcript, at 50-51.[3]

Ignoring this long line of authority, Claimants assert that a "simple" solution would be to credit the full amount of all inter-account transfers, regardless of the amount of principal in the transferor account.  They point to the fact that there would have been a different result if a claimant had withdrawn the funds from BLMIS and then re-deposited into the transferee

---

[3] In addition, because the funds at issue never left BLMIS, the transferee is not a subsequent transferee under the relevant provisions of the Bankruptcy Code and arguments suggesting the Trustee must pursue claims against a subsequent transferee are misplaced.

account, citing to this example to demonstrate that the Trustee has elevated form over substance.[4] But in fact, the opposite is true: in Claimants' view, the fact that they received an inter-account transfer trumps the nature of that transfer—fictitious profits.  Adopting Claimants' proposal is not only inconsistent with existing authority, it would create an untenable and arbitrary distinction.  Giving full credit for inter-account transfers would require a re-distribution of the limited assets of the estate in which certain customers would be able to transform fictitious profits into real BLMIS assets at the expense of other customers.  In this Ponzi scheme, where all customers have not fully recovered their principal, the only way to give Claimants more is to take it away from someone else.

The Opposition filed by Milberg LLP suggests that this result would be appropriate, stating that "there is nothing unfair or usual" about giving credit for fictitious profits.  Milberg Br. at 21, n. 13.  To the contrary, not only does giving credit for transfers of fictitious profits fly in the face of the Net Equity Decision, it also gives credence to arbitrary decisions made by Madoff, a convicted fraudster.  *See Net Equity Decision*, 654 F.3d at 235 ("Use of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations.").

Further, as the Second Circuit has held, arguments based solely on the equities are not persuasive.  *SEC v. Packer, Wilbur & Co., Inc.*, 498 F.2d 978, 983 (2d Cir. 1974) ("If equity were the criterion, most customers and creditors of Packer Wilbur, the bankrupt, would be entitled to reimbursement for their losses. Experience, on the other hand, counsels that they will have to settle for much less. SIPA was not designed to provide full protection to all victims of a brokerage collapse.").

---

[4] It should be noted that a customer may still have been liable to the Trustee in an avoidance action for the withdrawal of fictitious profits, even if they later re-deposited the funds.

In any event, should there be any doubt as to the appropriate manner to calculate inter-account transfers, which the Trustee submits there should not, the Second Circuit has held that the Trustee must be accorded deference in net equity determinations.  *See Net Equity Decision* 654 F.3d at 238, n. 7 ("We have no reason to doubt that a reviewing court could and should accord a degree of deference to such an exercise of discretion so long as the method chosen by the trustee allocates "net equity" among the competing claimants in a manner that is not clearly inferior to other methods under consideration.").  Here, the calculation of inter-account transfers is a key component of the net equity calculation and the Trustee's method should be accorded deference.  As it extends the logic of the Net Equity Decision to inter-account transfers, which has already been approved by the Second Circuit, the Trustee submits that his proposed treatment of inter-account transfers is "not clearly inferior" to the other methods proposed.

**B.**     **The Trustee's Treatment of Inter-Account Transfers is Consistent with SIPA and Other Laws**

Claimants make a variety of statutory arguments under SIPA and other securities laws in an effort to anchor their oppositions to the Trustee's treatment of inter-account transfers in something other than their perceived notions of the equities.  But an analysis of each of these arguments shows that SIPA and other securities laws in fact support the Trustee's approach.

**1.**     **The Trustee has not Altered the Definition of "Net Equity"**

Contrary to the position advanced by certain Claimants, B&P Br. at 19, the definition of "net equity" does not proscribe the Trustee's treatment of inter-account transfers, and the Trustee does not seek to re-define the term.  SIPA § 78*lll* (11)(A) provides that net equity be calculated based upon the sum owed to the customer if the debtor "had liquidated, by sale or purchase on the filing date, all securities positions of the customer."  It is undisputed that no securities positions existed to liquidate, and thus, the determination of net equity must be guided by other

provisions of SIPA. *Net Equity Decision*, 654 F.3d at 239. As the Trustee successfully argued to this Court and the Second Circuit in the net equity dispute, the "books and records" provision is relevant to the net equity determination here where no securities existed. And because those courts did not find that the Trustee was "redefining" net equity, he is certainly not doing so now. Claimants' arguments to the contrary should be rejected.

### 2.    The Trustee's Method is Consistent with the Series 100 Rules

The SIPC Series 100 Rules, 17 C.F.R. § 300.100, govern the amount of SIPC protection a customer may receive when it has multiple accounts with a debtor broker-dealer. Under those rules, accounts held in separate "capacities" are deemed to be accounts of separate customers, entitling each account to its own SIPC advance and net equity claim. Where accounts are held in the same capacity, the accounts are combined for purposes of SIPC protection and are given a single claim against the fund of customer property and a single SIPC advance.[5] Various claimants incorrectly argue that the Trustee's application of the Net Investment Method to inter-account transfers improperly combines accounts in violation of the SIPC Series 100 Rules.

In order to determine how much principal a customer is owed or how much fictitious profits any one customer has received, the Trustee tracked deposits, withdrawals and transfers between accounts. There was simply no other way to determine these amounts. But the fact that the Trustee followed transactions between accounts does not mean that he combined them in violation of SIPA or the Series 100 Rules. The running balances for each account were

---

[5] Examples of "separate" capacities are individual accounts, joint accounts, accounts for a trust under state law, an individual retirement account, an account held by an executor, and an account held by a guardian for a minor or ward. Thus, if a claimant has two individual accounts, those accounts will be combined, resulting in SIPC coverage of up to $500,000 and a single claim against the fund of customer property. If, however, a claimant has an individual account and an IRA account, those accounts are held in "separate" capacities and he will be entitled to SIPC protection of up to $500,000 for each account and to two claims against the fund of customer property. 17 C.F.R. § 300.100.

-13-

calculated separately.  Deposits and withdrawals that took place within a single account were only credited or debited from that account.  Those transactions did not affect the net equity calculation for any other account; only in those instances where an account had an inter-account transfer was the net equity calculation impacted at all.  Even then, however, this did not result in the accounts being combined under the Series 100 Rules because separate accounts were determined separately.  Accounts with a positive net equity claim were allowed, and those accounts with a negative net equity claim were denied.  The fact of the transfer does not "combine" them for purposes of the Series 100 Rules.

For example, assume that a customer had an individual account and an IRA account, with a single transfer between them.  Further assume that that the individual account was a "net winner," with a negative balance – fictitious profits – of $500,000 and the IRA account was a "net loser," with a positive balance of $600,000.  Under the rules, the Trustee is required to treat these accounts as separate, so he would have denied the claim for the individual account and allowed the claim for the IRA account for $600,000, entitling the claimant to a SIPC advance of $500,000 and payments from one or more of the four distributions.  He would not have given the accounts a single claim for the difference of $100,000.  Thus, while the accounts may have had an inter-account transfer, calculating that transfer as part of each account's net equity does not render the accounts combined.  The manner in which the Trustee calculated claims was consistent with the Net Investment Method and his treatment of inter-account transfers did not violate the Series 100 Rules.

### 3. The "Customer" Definition and the Question of Whether Claimants are Entitled to Interest are the Subject of Separate Proceedings and are not Relevant to the Instant Motion

Certain Claimants argue that the Trustee has deprived customers of their "statutory right to interest on their stolen money" and that the definition of "customer" under SIPA bars the

Trustee's treatment of inter-account transfers.  B&P Br. at 18-21.  But the question of whether claimants are entitled to interest on their funds during the time they were invested with BLMIS is currently being briefed on appeal before the Second Circuit.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 496 B.R. 744 (Bankr. S.D.N.Y. 2013), appeal docketed, No. 14-0097, (2d Cir. Jan. 22, 2014), ECF No. 1.  And the question of whether claimants who had interests in shared or pooled accounts—such as feeder fund accounts, partnerships, investment pools, and the like—are individual "customers" under SIPA is outside the scope of this Motion.  With respect to investors in BLMIS feeder funds, three courts have held that the feeder fund accountholder is the "customer" under SIPA, not the investors in the feeder fund.  *See e.g., In re Bernard L. Madoff Inv. Sec. LLC,* 454 B.R. 285 (Bankr. S.D.N.Y. 2011), *aff'd, In re Aozora Bank Ltd.*, 480 B.R. 117 (S.D.N.Y.2012), *aff'd, In re Bernard L. Madoff Inv. Sec. LLC,* 708 F.3d 422 (2d Cir. 2013).  *See also  Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, 12 Civ. 1139 (DLC), 2012 WL 3042986 (S.D.N.Y. July 25, 2012).   In any event, that issue does not impact the question presented here as to whether the Trustee's treatment of inter-account transfers is correct and is more properly addressed as the subject of separate proceedings.

4.    **Claimants' Vague References to "Federal Securities Laws" Have no Bearing on the Inter-Account Transfer Issue**

Certain Claimants argue that the Trustee's methodology is prohibited by the "federal securities laws," stating that there is no requirement that a party identify a particular security in order to be a "purchaser of securities" for Rule 10b-5.  *See* B&P Br. at 21-21.  Building on this non-sequitur, these Claimants vaguely argue that the federal securities laws deem cash deposits and inter-account transfers as new investments and the purchase of securities.  *Id.*  Even if these authorities were correctly cited, which they were not, they have no bearing on the issues presented here.

Claimants cite to *Savino v. E.F. Hutton & Co., Inc.*, 507 F. Supp. 1225, 1239-40 (S.D.N.Y. 1981), for the proposition that the opening of a new account constitutes the purchase of a security. *See* B&P Br. at 21. But the full quote from that decision is that a new account constitutes the purchase of a security "where the account is an investment contract . . ." *Savino,* 507 F. Supp. at 1240. Under SIPA, only investment contracts registered with the SEC are protected under SIPA as securities. The accounts at BLMIS were not registered with the SEC as investment contracts and would thus not be entitled to protection under SIPA if they were deemed to be investment contracts. Claimants are surely not seeking to argue that their accounts are precluded from SIPA protection altogether.

Similarly, the fact that claimants may be "purchasers of securities" under section 10b and Rule 10b-5 has no bearing on the Trustee's methodology for calculating net equity claims. SIPA and the Securities & Exchange Act of 1934 are separate statutory schemes with distinct purposes. Establishing an entitlement to bring a 10b-5 claim has no impact on a claimant's rights under SIPA. *See, e.g., In re New Times Sec. Servs.*, 463 F.3d 125, 129-30 (2d Cir. 2006) (investor with a securities fraud claim did not have a customer claim); *In re MV Securities, Inc.*, 48 B.R. 156, 157 (Bankr. S.D.N.Y. 1985) (same). Instead, those rights are defined within SIPA itself. Accordingly, the federal securities laws cited to by claimants are not relevant to the issue presented by the Motion.

**5.    Because They are Seeking a Priority, Claimants Have the Burden of Proof to Establish That They are Part of the Preferred Class and their Transactions are Protected**

A SIPA liquidation is conducted "as though it were being conducted" under the liquidation provisions of title 11. SIPA § 78fff(b). But where SIPA and the Bankruptcy Code conflict, SIPA controls. *Id.* SIPA has a unique claims process that differs from traditional bankruptcies, reflected by specific provisions of SIPA and the entry of the claims procedures

order at the inception of the liquidation.  In addition, because a "customer" with a "net equity" claim is a priority status, claimants bear the burden of showing that they are entitled to such a priority.  For these reasons, the traditional rules in bankruptcy regarding claims allowance and the relative burdens of proof are applicable here but only as to general creditors, not "cutomers."

On December 23, 2008, this Court entered the claims procedures, which specifies the manner in which claims are filed and subsequently addressed by the Trustee and the Court, if necessary.  *See* Order on the Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order") (ECF No. 12).  A claimant need not file a "formal proof of claim" in a SIPA proceeding as is required by Bankruptcy Rule 3001(a).  Nor does a claimant file its claim with the Court.  Instead, a claimant seeking SIPA protection files a "written statement of claim" with the Trustee.  SIPA § 78fff-2(a)(2).  Thereafter, the Trustee determines the claim in writing.  Claims Procedures Order at 6.  The claimant may file an objection to the Trustee's determination with the Court within 30 days of the determination by the Trustee.  *Id.* at 6-7.  Thereafter, the Trustee schedules a hearing with the Court on the claimant's objection.  *Id*. at 7.  If the claimant does not object to the Trustee's determination, it becomes final.  *Id.*

This process differs from a non-SIPA bankruptcy proceeding, in which the creditor's claim filed with the Court is *prima facie* valid and deemed allowed unless a party in interest objects.  11 U.S.C. § 502(a).  The customer claim filed with the Trustee in a SIPA proceeding is accorded no *prima facie* validity; rather, such claim must be "ascertainable from the books and records of the debtor" or "otherwise established *to the satisfaction of the trustee*."  SIPA § 78fff-2(b) (emphasis added).  The satisfaction of a claim may be further "conditioned upon the trustee

requiring claimants to execute, in a form to be determined by the trustee, appropriate receipts, supporting affidavits, releases and assignments." *Id.*; *see also* 17 C.F.R. § 300.100(d) ("The burden shall be upon the customer to establish each capacity in which he claims to hold accounts separate from his individual capacity.").

Likewise, the Bankruptcy Code provision that a customer claim is allowed unless "a party in interest objects" does not apply. 11 U.S.C. § 502(a). In a SIPA case, a customer claim is allowed by the Trustee after he has reviewed the debtor's books and records or is otherwise satisfied that the claim has been established. Because the Trustee allows the claim in the amounts that have been established to his satisfaction, it is the claimant's duty to object if he disagrees with the Trustee's determination, not the trustee's duty to object, as is the normal course in an ordinary bankruptcy case. Thus, because SIPA has its specific provisions regarding customer claims, section 502(a) of the Code and Bankruptcy Rule 3001 do not apply in SIPA proceedings with regard to customer claims.[6]

SIPA is consistent with the Bankruptcy Code, however, in that a claimant seeking a preferred status as a "customer" bears the burden of showing that he is within the class of eligible persons and that his transactions are protected by the SIPA. *See Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999), *aff'd sub nom., Arford v. Miller (In re Stratton Oakmont, Inc.)*, 239 B.R. 698 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 420 (2d Cir. 2000) ("Just as all creditors in a bankruptcy case who claim priority status have the burden of showing that they are entitled to the asserted priority under the Bankruptcy Code, the Claimants bear the burden of proving that they are the type of priority creditors known as 'customers'"); *see also Schultz v. Omni Mutual Inc.*, No. 93-3700 (KC) 1993 WL 546671

---

[6] For general creditor claims, courts do look to the traditional bankruptcy rules in SIPA cases. *See, e.g., In re MF Global, Ltd.*, Nos. 11–15059 (MG), 11–02790 (MG), 2012 WL 5499847, at *3 (Bankr. S.D.N.Y. Nov. 13, 2012).

(S.D.N.Y. 1993) ("Claimants in a SIPA proceeding, like any other claimants seeking preferred status in a bankruptcy case, bear the burden of [proof]"); *In re O.P.M. Leasing Servs., Inc.*, 60 B.R. 679, 680 (Bankr. S.D.N.Y. 1986) (observing claimant has burden to prove priority).  Thus, in a SIPA proceeding, a claimant must show that he is entitled to "customer" status and that their "net equity" is customer property.  *See Stratton Oakmont,* 229 B.R. at 278.

While the Trustee does not disagree that Claimants meet the definition of "customers" under SIPA to the extent they deposited cash with the Debtor for the purpose of purchasing securities, SIPA §78*lll*(2), that does not end the inquiry, as Claimants would suggest.  The Claimants are seeking, by way of their objection, to assert a larger claim against the fund of customer property than the Trustee has allowed.  Distributions from the fund of customer property are at the heart of the "priority" accorded to customers under SIPA and thus claimants accordingly carry the burden of showing that they are entitled to that priority with respect to each transaction.  *See e.g.*, *In re Adler Coleman Clearing Corp.*, 204 B.R. 111 (Bankr. S.D.N.Y. 1997) (claimants must show that they they are "customers" and that the amounts in their account are "customer property"); *Stratton Oakmont,* 229 B.R. at 277  ("[A]n investor can be a customer vis-à-vis certain transactions but not others"); *SIPC v. Wise, (In re Stalvey & Associates, Inc.)*, 750 F.2d 464, 471 (5th Cir. 1985) ("Customer status 'in the air' is insufficient to confer the SIPA's protection on a given transaction.").

Claimants have not met their burden of demonstrating that they are entitled to the amounts they seek from the customer property estate.  Nor could they, because such claim amounts are contradicted by the books and records of the debtor, which show the amounts of principal and fictitious profits in each account.  Claimants are essentially arguing that their claims for fictitious profits are presumptively valid, which is patently false.

Finally, certain Claimants are arguing that their objections should be dealt with separately because they do not have enough information to challenge the Trustee's claims determinations for their accounts that sent or received transfers.  However, this is not a basis to overrule the Trustee's methodology as a legal rule.  Moreover, the tables attached to each determination letter sent to each and every Claimant, which identify deposits, withdrawals and transfers in and out of each account, provides ample information to Claimants regarding the treatment of each and every one of their claims.

## C.    BLMIS's Change in Corporate Form Has No Relevance

Certain Claimants argue that the Trustee cannot "disallow" inter-account transfers that occurred "prior to the formation of BLMIS on December 4, 2000."  B&P Br. at 9.  As an initial matter, whether or not the Trustee would have standing to avoid transfers prior to 2000 is irrelevant here for the reasons discussed above – the Trustee is not seeking to avoid and recover fraudulent transfers, he is calculating customer claims.  And, even if these allegations had any relevance, Claimants misstate the facts regarding the operation of BLMIS.

Certain Claimants assert that BLMIS was created in 2000.  To the contrary, BLMIS has been continually registered with the Securities and Exchange Commission ("SEC") since early 1960, and a member of SIPC since SIPC's formation in late 1970.  *See* Declaration of Kevin H. Bell in Support of the Reply Memorandum of Law of the Securities Investor Protection Corporation in Support of the Trustee's Determinations Regarding Inter-Account Transfers, dated June 6, 2014 ("Bell Decl."), Exhibit A.  Claimants' arguments that BLMIS did not make transfers prior to 2000 is thus factually incorrect.  In addition, when BLMIS changed—in form only—from a sole proprietorship to a limited liability company in 2001, its "business" (including its assets and liabilities) remained the same, and the bank accounts into which customer property was deposited and to and from transfers were made remained the same.

Significantly, when the sole proprietorship was continued as a limited liability company, both entities filed forms with the Financial Industry Regulatory Authority affirming that BLMIS was succeeding to the prior business of a currently registered broker-dealer. *See* Bell Decl., Exhibit B.  In so doing, BLMIS stated that it was assuming all assets and liabilities related to the sole proprietorship's business and that the transfer would not result in any change of control. *Id.* Thus, there was no practical change in the operation or control of the broker-dealer.

Claimants cite no case law in support of their argument that somehow a change in corporate form some *seven years before* the BLMIS estate was even created and the Trustee was appointed could now operate to limit the extent of the Trustee's statutory authority to determine claims.  To the contrary, the precise corporate form of BLMIS at any given time in its history is irrelevant under SIPA since BLMIS was a registered broker-dealer with the SEC and a member of SIPC in either form for many decades before the Filing Date.

**D.**     **The Trustee's Method Does Not Conflict With Public Policy**

**1.**     **The Policy Favoring Finality in Corporate Transactions is Not Implicated**

Certain Claimants assert that the Trustee's treatment of inter-account transfers violates New York public policy by upsetting commercial transactions that were made in good faith. *See* B&P Br. at 12.  Similarly, other Claimants argue more generally that the Court should allow the transfer of fictitious profits out of respect for the finality of transactions between private parties. *See* Milberg Br. at 11-13.

As a preliminary matter, these arguments are disguised statutes of limitations arguments, which the District Court has already held not to apply to the calculation of inter-account transfers.  Further, state law need not apply if "some federal interest requires a different result." *Greiff,* 476 B.R. at 724 (citing *Butner v. United States,* 440 U.S. 48 at 55 (1979)); s*ee also In re Dreier LLP,* 429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010) (finding state law or other applicable

non-bankruptcy law normally determines the extent of the debtor's interest in property, absent an overriding federal policy; bankruptcy law determines whether that interest is property of the estate).  Any state law inconsistent with SIPA is of no effect in a SIPA proceeding.  *See* U.S. Const., art. VI, cl. 2; *First Fed. Sav. & Loan Ass'n of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 378 (D.N.J. 1986), *appeal dismissed*, 802 F.2d 445 (3d Cir. 1986) (holding that any state law that is inconsistent with SIPA is preempted under the Supremacy Clause); *see also Murray v. McGraw (In re Bell & Beckwith)*, 821 F.2d 333, 337-38 (6th Cir. 1987) (holding that Ohio's version of the U.C.C. was preempted by federal bankruptcy and securities laws); *Amer. Sur. Co. of N.Y. v. Sampsell*, 327 U.S. 269, 272 (1946) ("[F]ederal bankruptcy law, not state law, governs the distribution of a bankrupt's assets to his creditors."); *SEC v. Albert & McGuire Sec. Co., Inc.*, 378 F.Supp. 906, 912 (E.D. Pa. 1974) (noting in respect to a SIPA proceeding that "[I]t is much too late to argue that the provisions of the federal Bankruptcy Act are subordinate to state laws with which they are in conflict.").

Claimants rely heavily upon *Banque Worms v. BankAmerica Int'l*, 77 N.Y. 2d 362 (1991), which involved the application of New York's "discharge for value" rule allowing a recipient to retain funds paid by mistake.  *See* B&P Br. at 12-13; Milberg Br. at 12, 16.  Not only is the case neither a SIPA proceeding nor a bankruptcy case, it addresses a specific "mistake of fact doctrine" that has no relevance here.  Further, while the *Banque Worms* court observed that there is a general policy in favor of finality in business transactions, the Court of Appeals, noted that recovery turns on whether the third party recipient of mistakenly-transferred funds gave *valuable consideration* for those funds.  *Banque Worms*, 77 N.Y.2d at 372-73.  Well-settled law establishes that Claimants cannot and did not give valuable consideration for the fictitious profits

they received.[7]   In any event, a general policy in favor of finality cannot trump the Second

Circuit's specific determination of how net equity should be calculated under SIPA.

### 2.    Transferees do Not Have Property Interests in Fictitious Profits

Claimants next argue, relying on New York law, that inter-account transferees have

legitimate property interests in the "full amounts" transferred.  *See* Milberg Br. at 13-16.  They

are incorrect.

Assuming it is appropriate to consider state law (see *supra*), Claimants get ahead of

themselves by relying on cases discussing what the transferee has the right to without

considering what the transferor is able to convey.  It is well-settled that a transferee can only

receive funds to the extent of the transferor's interest in those funds.  *See Neshewat v. Salem*, 365

F.Supp. 2d 508, 524 (S.D.N.Y. 2005), *aff'd*, 194 F. App'x 24 (2d Cir. 2006), *citing Chicago Title*

*Ins. Co. v. Eynard*, 84 Misc. 2d 605, 606, (1st Dept. 1975) (noting that the grantee received only

such title as the grantor had in the property); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,

No. 09-9783, 2013 WL 6484727 (S.D.N.Y. December 9, 2013) (assignee cannot stand in better

position than assignor); *In re Goodchild,* 160 Misc. 738, 745 (N.Y. Sur. Ct. 1936) (an individual

may convey no better title to an item of property than that which he himself possesses).  Because

the Second Circuit has confirmed that customers should not receive credit for fictitious profits

when calculating net equity, a transferor does not have the right to transfer fictitious profits and

the transferee does not have the right to receive fictitious profits.  *See also Antecedent Debt*

*Decision*, 499 B.R. at 428-29; *In re Bayou Group LLC*, 396 B.R. at 885.

Any argument that "value" was provided for the transfers (*see e.g.,* Milberg Br. at 15-16),

---

[7] *Commodity Futures Trading Commn.v. Walsh*, 17 N.Y. 3d 162 (2011) also has no application because that case turned on the value provided for a transfer of marital property.  No value can be provided for fictitious profits. *Antecedent Debt Decision,* 499 B.R. at 421 citing *Greiff*, 476 B.R. at 725 (any "transfers from Madoff Securities to defendants that exceeded the return of defendants' principal. . .were not 'for value' for purposes of section 548(c)"). *See also infra* at 24.

is similarly misguided because it is well-settled that no value is given for fictitious profits. *See,*
*e.g., Donell,* 533 F.3d at 770; *Gowan v. Patriot Grp., LLC* (*In re Dreier LLP*), 452 B.R. 391, 440
n.44 (Bankr. S.D.N.Y. 2011); *Sender v. Buchanan (In re Hedged-Inv. Assoc., Inc.)*, 84 F.3d
1267, 1290 (10th Cir. 1996); *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir. 1995); *In re United*
*Energy Corp.*, 944 F.2d 589, 595 n.6 (9th Cir. 1991); *Terry v. June*, 432 F. Supp. 2d 635, 642
(W.D. Va. 2006); *Bayou Superfund, LLC v. WAM Long/Short Fund II, LLP* (*In re Bayou Group,*
*LLC*), 362 B.R. 624, 636 (Bankr. S.D.N.Y. 2007) ; *Soule v. Alliot* (*In re Tiger Petroleum Co.*),
319 B.R. 225, 239 (Bankr. N.D. Okla. 2004); *Fisher v. Sellis* (*In re Lake States Commodities,*
*Inc.*), 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000).  Accordingly, these assertions cannot succeed.

**3.**    **The Payment of Taxes Does not Transform Fictitious Profits Into Principal**

Some Claimants assert that they should receive credit for inter-account transfers of
fictitious profits because they paid income tax on the amounts withdrawn from their BLMIS
accounts. *See* Apple Br. at 4.  But the payment of taxes is not related to the appropriate
calculation of net equity and the fact that taxes were paid on certain funds does not transform
those funds into principal.

As courts have found in the avoidance context, the payment of taxes is irrelevant in
calculating liability in a Ponzi scheme. *In re Vaughan Co., Realtors*, Adv. Pro. No. 12-1139
(RHJ), 2014 WL 2198163 (Bankr. D.N.M. May 27, 2014); *Wing v. Dockstader*, 482 Fed.Appx.
361, 365 ((10th Cir. 2012); s*ee also Donell*, 533 F. 3d at 799 (good faith investors may not claim
offsets for taxes or other expenses in connection with the receipt of transfers in a Ponzi scheme).
Indeed, in that context, courts have consistently held that there can be no deduction from
fictitious profits received in a Ponzi scheme for the payment of taxes on those profits.  In short,
claimants "are not entitled to offset taxes paid on their gains from [a] . . . Ponzi scheme." *Id.*

The fact that the IRS required payments on withdrawals and that the statute of limitations

for amending returns has passed cannot alter the treatment of fictitious profits in a Ponzi scheme. As this Court recognized in its net equity decision, "IRS and SIPC are governed by disparate statutory schemes with different purposes." *Bankruptcy Court Net Equity Decision*, 424 B.R. at 137. *See also SIPC v. Morgan, Kennedy & Co., Inc.,* 533 F.2d 1314, 1318–19 (2d Cir. 1976) (declining to interpret SIPA by reference to the Federal Deposit Insurance Act, as "SIPA and FDIA are independent statutory schemes, enacted to serve the unique needs of the banking and securities industries, respectively). The payment of taxes does not impact on the calculation of inter-account trasnfers.

### E.   Inter-Account Transfers to IRA Accounts Are Not Entitled to Special Treatment

Contrary to the assertions made by certain Claimants, there is no reason to treat inter-account transfers to BLMIS IRA accounts any differently than a transfer to a different type of BLMIS account. *See* Most Br. at 4-5. Claimants argue once again that the inter-account transfers consisting of rollovers to IRA accounts could have been accomplished by a cash withdrawal and a subsequent re-deposit, but those are not the facts presented here. Instead, BLMIS made a mere bookkeeping entry shifting part of the fictitious value of one account to another. The fact that the accounts at issue are IRA accounts is of no moment.

Claimants next point to ERISA, claiming that ERISA precludes the Trustee's treatment of inter-account transfers. *See* Most Br. at 6-7; B&P Br. at 14-17. As a preliminary matter, ERISA generally does not apply to IRA accounts, even if they are IRA accounts that were "rolled over" from an ERISA-regulated plan. The sole exception is for a very limited class of IRAs funded or endorsed by employers or otherwise described in 29 C.F.R. § 2510.3-2(d). As the court held in *In re Francisco*, "[t]here is nothing in the Congressional Record or in the language of the legislation dealing with ERISA, to indicate that ERISA was designed to include IRAs within the definition of 'employee benefit program or a plan." 204 B.R. 799, 801 (Bankr.

M.D. Fla. 1996).

ERISA also cannot affect the proper method of calculating "net equity" for purposes of SIPA, including as to inter-account transfers, because ERISA itself provides that it shall have no effect on other federal statutes:

> (d) <u>Alteration, amendment, modification, invalidation, impairment, or supersedure of any law of the United States prohibited</u>. Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law. 29 U.S.C. § 1144(d).

29 U.S.C. § 1144(d). The ERISA subchapter in question (Subchapter I, "Protection of Employee Benefit Rights," 29 U.S.C. §§ 1001-1191(c)), covers all the provisions of ERISA at issue here. The two exceptions are not relevant.

Case law confirms ERISA's subordinate status vis-à-vis other federal statutes, including in these very proceedings. *Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, 12 Civ. 1139 (DLC), 2012 WL 3042986, at *8 (S.D.N.Y. July 25, 2012) (holding that ERISA does not confer customer status and stating that ERISA contains a subordination provision pursuant to which it cannot be applied in a manner that could impair the function of SIPA); *see also Sterling Die Casting Co., Inc. v. Local 365 UAW Welfare and Pension Fund (In re Sterling Die Casting Co., Inc.),* 118 B.R. 205, 208 (E.D.N.Y. 1990) (finding it "abundantly clear that Congress intended the [ERISA] statute to be subordinate to all federal laws unless otherwise provided. ERISA's specific provision precluding interferences with the operation of federal law, renders the Bankruptcy Code superior and therefore effective over any ERISA provision to the contrary"); *Levine v. Central States, Southeast and Southwest Pension Fund (In re Ottawa Cartage, Inc.),* 55 B.R. 371, 377-78 (N.D. Ill. 1985) ("ERISA § 1144(d) explicitly states the Act's provisions do not override other federal laws. . . . [T]he all-embracing language of ERISA

§ 1144(d) reflects Congress has already chosen to subordinate ERISA's policies to those of conflicting federal statutes.").

Finally, the Trustee is not, as alleged by certain Claimants (Most Br. at 6; B&P Br. at 14), improperly alienating pension fund assets in contravention of ERISA.[8]  The Second Circuit has specifically held that ERISA's anti-alienation rule will not prevent the pension accounts of participants from being diminished by prior transfers to others.  *Milgram v. Orthopedic Assoc. Defined Contribution Pension Plan*, 666 F.3d 68, 74-75 (2d Cir. 2011) (regulations did not prevent the accounts of other plan participants from being diminished by reason of the earlier incorrect transfer and the judgment that resulted). The Second Circuit emphasized that "[b]y design, participants in a defined contribution plan bear the risk that the value of their accounts will be reduced as a result of actions taken by the plan administrator . . ." *Id.* at 76.   The Court also rejected the concept that an action adversely affecting the plan as a whole is "the economic or legal equivalent" of an action taken directly against the plan participants, even if the participants are affected.  *Id* at 78.

Thus, even if ERISA did apply, nothing in that legislation or the case law cited by Claimants requires credit to be given for the fictitious portion of an IRA account.

**F.     No Stay is Required Pending Mediation**

Certain Claimants argue that the Trustee's Motion should be stayed pending resolution of an avoidance action mediation in which the Claimants are participating. *See e.g.,* Objection of Edward A. Zraick, et al to Trustee's Motion Affirming Application of Net Investment Method to Determination of Customer Transfers Between BLMIS Accounts (Claim Nos. 002107 And 002108 ("Zraick Br.") at 12-13 (ECF No. 6687).  Doing so would not be appropriate.  The issues

---

[8] Because the Trustee is not seeking to include the contents of an ERISA-qualified plan as property of the estate, the case relied upon by Claimants is not on point. *See Patterson v. Shumate*, 504 U.S. 753 (1992).

raised in this Motion have case-wide application and resolution should not be needlessly delayed.

Claims and avoidance actions can proceed on parallel tracks and one should not impede the

progress of the other.  Importantly, the outcome of this Motion will not affect the treatment of

inter-account transfers implicated in the meditation because the Antecedent Debt Decision fully

resolved this issue in the avoidance context.  *See Antecedent Debt Decision*, 499 B.R. at 428-29;

Fishman Hearing Transcript at 50.

### G. *Stern* **Does Not Limit This Court's Jurisdiction To Affirm the Trustee's Methodology**

One Claimant argues that this Court lacks the Constitutional authority to determine

disputes between the Trustee and any Madoff customer based on the Supreme Court's holding in

*Stern v. Marshall*, 131 S. Ct. 2594 (2011).  *See* Declaration of Jeffrey L. Bernfeld at 5-6 (ECF

No. 6714).  To the contrary, by filing claims with the Court, Claimants have consented to its

jurisdiction.  *See Gulf States Exploration Co. v. Manville Forest Prods. Corp.* (*In re Manville*

*Forest Products Corp.)*, 896 F.2d 1384, 1389 (2d Cir. 1990) (creditor's filed claim "submitted

itself to the equitable power of the bankruptcy court to disallow its claim"); *In re St. Vincent's*

*Catholic Med. Ctrs. of N.Y.*, 445 B.R. 264, 268 (Bankr. S.D.N.Y. 2011) (finding the bankruptcy

court had jurisdiction to determine both the allowance and the amount of the claim because

"[w]hen [the claimant] filed a proof of claim, it "'necessarily became a party under the court's

core jurisdiction.'") (citing *In re CBI Holding Co.*, 529 F.3d 432, 466-67 (2d Cir. 2008) (filing a

proof of claim submits a creditor to the bankruptcy court's equitable jurisdiction in proceedings

affecting that claim)).  For purposes of submission to jurisdiction, a customer claim filed in a

SIPA action is the equivalent of a proof of claim filed in a bankruptcy proceeding. *Picard v.*

*Stahl*, 443 B.R. 295 (Bankr. S.D.N.Y. 2011); *Keller v. Blinder (In re Blinder Robinson & Co.,*

*Inc.)*, 135 B.R. 892, 896-97 (D. Col. 1991).  Indeed, a claim determination is exactly the type of

core proceeding arising under Title 11 that this Court has the authority to resolve. *Stern v. Marshall*, 131 S. Ct at 2604.

**H.**    **Claimants That Require Discovery Should Serve Proper Discovery Demands**

Finally, one Claimant has asserted that the Trustee did not provide, in the context of the avoidance action against that Claimant, sufficient documentation to allow the inter-account transfer issue to be resolved. *See* Most Br. at 7-8. Because resolution of this Motion involves only a consideration of the legal issue, no fact discovery is necessary. Having said that, Mr. Most was free to request discovery as certain other Claimants did in these proceedings. To the extent Mr. Most requires discovery to assist with verifying the Trustee's claims determination, the Trustee is willing to work with Mr. Most to ensure he has the documentation he requires.

## **CONCLUSION**

For all of the foregoing reasons, the Trustee respectfully requests the Court affirm the

Trustee's application of the Net Investment Method to inter-account transfers and overrule the

Claimants' objections.

Dated:  New York, New York
            June 6, 2014

Respectfully submitted,

*/s/ David J. Sheehan*
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jorian L. Rose
Email: jrose@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Estate of Bernard L.*
*Madoff*