**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Tracy Cole
Ona T. Wang

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04336 (SMB) |
| Plaintiff, | |
| v. | |
| THE ESTATE (SUCCESSION) OF DORIS IGOIN; LAURENCE APFELBAUM, individually and in her capacities as executor and beneficiary of the Estate (Succession) of Doris Igoin; and EMILIE APFELBAUM, | |
| Defendants. | |

**TRUSTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL**
**JURISDICTION AND FORUM NON CONVENIENS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .............................................................................. 1

PROCEDURAL HISTORY.................................................................................... 3

SUPPLEMENTAL STATEMENT OF FACTS ........................................................ 5

      I.     DEFENDANTS' CONNECTION TO THE *MAGNIFY* PROCEEDING ............. 5

      II.    ADDITIONAL FACTS REGARDING DEFENDANTS' CONTACTS
           WITH THE UNITED STATES................................................................ 6

ARGUMENT .................................................................................................... 12

      I.     STANDARD OF REVIEW ................................................................... 12

      II.    DEFENDANTS' UNITED STATES CONTACTS ARE SUFFICIENT
           TO CONFER PERSONAL JURISDICTION...................................... 12

           A.     Jurisdictional Discovery Confirms Defendants' Ample United
                 States Contacts .......................................................................... 13

           B.     The New York Court of Appeals' Decision in *Licci* Supports the
                 Trustee's Position...................................................................... 16

           C.     Apfelbaum's Jurisdictional Contacts are Imputed to Emilie and the
                 Estate ......................................................................................... 17

      III.   IT IS BEYOND DISPUTE THAT FILING A SIPA CLAIM CONFERS
           PERSONAL JURISDICTION.......................................................... 18

      IV.   DEFENDANTS' PARTICIPATORY CONDUCT IN THIS
           PROCEEDING WARRANTS THE EXERCISE OF PERSONAL
           JURISDICTION ............................................................................ 20

CONCLUSION................................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.I. Trade Fin. Inc. v. Petra Bank*,
  989 F.2d 76 (2d Cir. 1993)......................................................................................12

*Aurora Mgmt. Partners, Inc. v. GC Fin. Servs., Inc. (In re Protected Vehicles,
  Inc.)*,
  429 B.R. 856 (Bankr. D.S.C. 2010) ........................................................................18

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
  902 F.2d 194 (2d Cir. 1990).....................................................................................12

*Chloé v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010).....................................................................................17

*DiStefano v. Carozzi N. Am., Inc.*,
  286 F.3d 81 (2d Cir. 2001).......................................................................................12

*ESI, Inc. v. Coastal Corp.*,
  61 F. Supp. 2d 35 (S.D.N.Y. 1999)..........................................................................12

*Hamilton v. Atlas Turner, Inc.*,
  197 F.3d 58 (2d Cir. 1999).......................................................................................20

*Kriegman v. Cooper (In re LLS America, LLC)*,
  No. 11–80093–PCW11, 2012 WL 2564722 (Bankr. E.D. Wash. July 2, 2012) ....................20

*Licci v. Leb. Can. Bank, SAL*,
  20 N.Y.3d 327 (N.Y. 2012) ......................................................................................16

*Licci ex rel. Licci v. Lebanese Canadian Bank*,
  SAL, Docket No. 10-1306-cv, 2012 WL 688809 (2d Cir. March 5, 2012)..............................16

*NationsBank, N.A. v. Macoil, Inc. (In re Med-Atlantic Petroleum Corp.)*,
  233 B.R. 644 (Bankr. S.D.N.Y. 1999)......................................................................13

*North v. Winterthur Assurances (In re North)*,
  279 B.R. 845 (Bankr. D. Ariz. 2002)........................................................................12

*Picard v. Bureau of Labor Insurance (In re Bernard L. Madoff Inv. Secs. LLC*,
  480 B.R. 501 (Bankr. S.D.N.Y. 2012)...............................................................15, 16

*Picard v. Chais (In re Bernard L. Madoff Inv. Secs. LLC)*,
  440 B.R. 274 (Bankr. S.D.N.Y. 2010).....................................................13, 15, 17

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Picard v. Cohmad Secs. Corp. (In re Bernard L. Madoff Inv. Secs. LLC),*
    418 B.R. 75 (Bankr. S.D.N.Y. 2009) ...............................................................14, 15

*Picard v. Maxam Absolute Return Fund, Ltd. (In re Bernard L. Madoff Inv. Secs.
LLC),*
    460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) ...........................................................15

*Picard v. Stahl (In re Bernard L. Madoff Inv. Secs. LLC),*
    443 B.R. 295 (Bankr. S.D.N.Y. 2011) .................................................................18

*Smith v. Matias (In re IFS Fin. Corp.),*
    Adv. Nos. 04–3789, 2007 WL 2692237 (Bankr. S.D.Tex. Sept. 11, 2007) ...........................17

*Zaremba v. Pheasant (In re Cont'l Capital Secs.),*
    No. 06 CV 02394, 2007 WL 5964307 (N.D. Ohio Sep. 19, 2007) ........................................18

## Statutes

11 U.S.C. § 546(e) .........................................................................................................3

Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ........................................1

SIPA ............................................................................................................ *passim*

## Rules

Federal Rule of Civil Procedure 12(b)(2) ......................................................................12

Federal Rule of Civil Procedure 34 ................................................................................5

Federal Rule of Civil Procedure 56 ..............................................................................12

## Other Authorities

Restatement (Second) of Conflict of Laws § 358 cmt. g (1971) ......................................17

Irving H. Picard, as trustee ("Trustee") under the Securities Investor Protection Act

("SIPA"), 15 U.S.C. §§ 78aaa, *et seq.*, for the substantively consolidated liquidation of the

business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff

("Madoff"), by and through his undersigned counsel, hereby submits this supplemental

memorandum of law in opposition to the motion to dismiss dated April 2, 2012 ("Motion" or

"Mot.") by Laurence Apfelbaum ("Apfelbaum"), Emilie Apfelbaum ("Emilie") and the Estate

(Succession) of Doris Igoin ("Estate," and collectively with Apfelbaum and Emilie, the

"Apfelbaums" or "Defendants").

## PRELIMINARY STATEMENT

Defendants are BLMIS accountholders who withdrew more than $350 million in

fictitious profits over the life of their accounts and who submitted to this Court's jurisdiction by

filing SIPA claims.  They are also the heirs of Albert Igoin, an associate of Madoff's since at

least the 1980s, who created several entities, including Magnify Inc. ("Magnify").  The Trustee

has sued those entities in *Picard v. Magnify, Inc. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv.

Pro. No. 10-05279 (SMB) (Bankr. S.D.N.Y. 2010), alleging they themselves withdrew hundreds

of millions of dollars in fictitious profits under circumstances suggesting actual knowledge of

Madoff's fraud.  In this proceeding, after questioning the Apfelbaums' link to the *Magnify*

defendants at a court conference, the Court ordered jurisdictional discovery.

Discovery from the Apfelbaums and *Magnify* defendants has resulted in conflicting

information regarding that link.  The defendants in the *Magnify* action have produced (in some

cases contradictory) documents suggesting that Albert Igoin created Magnify for Defendants'

benefit and that Doris and Apfelbaum were the entity's authorized signatories.  Yet Apfelbaum

has denied all knowledge of Magnify's existence, and has invoked the French "blocking statute"

to withhold financial information that could allow the Trustee to confirm or rebut her claims.

While the Trustee continues to seek discovery from both the Apfelbaums and the *Magnify*

defendants about the Apfelbaums' connection to the *Magnify* defendants, jurisdictional discovery

into their conduct regarding their own accounts amply confirms this Court's jurisdiction over the

Apfelbaums.  Beyond the Trustee's original allegations that Defendants held multiple BLMIS

accounts in New York, benefitted from hundreds of millions of dollars' worth of fictitious profit

transfers, communicated directly with BLMIS and filed SIPA claims, jurisdictional discovery

has yielded numerous facts further evidencing Defendants' deliberate and repeated availment of

the benefits of doing business in the United States.

As the magnitude of their withdrawals suggests, jurisdictional discovery has confirmed

that the Apfelbaums were anything but ordinary investors.  They received preferential treatment

from BLMIS, having a direct line to Madoff for urgent matters and regularly corresponding with

BLMIS employee Frank DiPascali to direct BLMIS to enter into transactions at specified times.

Contrary to their portrayal of themselves as passive beneficiaries of Albert Igoin's decision to

invest in Madoff, the Apfelbaums have conceded they faced at least three separate decision

points over more than a decade at which they affirmatively chose to continue investing with

BLMIS.  They have conceded their control over and active participation in their BLMIS

accounts since at least 1999.  Jurisdictional discovery also confirms that the Apfelbaums

prepared and filed their SIPA claims, and that they did so of their own accord and for the

purpose of seeking a distribution from the BLMIS estate.

Finally, nothing has changed that could help Defendants with their legal arguments.  The

law remains the same that filing a SIPA claim confers personal jurisdiction on the claimants, and

that participating in a U.S. judicial proceeding—as the Apfelbaums did by moving to withdraw

the reference and participating in briefing on a motion to dismiss—also confers jurisdiction.  The

only change in the law is that since Defendants filed the Motion, the New York Court of Appeals has ruled that even holding a correspondent bank account is sufficient to confer jurisdiction. Because there is no basis to challenge this Court's jurisdiction over Defendants, the Motion should be denied and the parties should proceed with merits discovery.

## PROCEDURAL HISTORY

The Trustee commenced this action on November 30, 2010 against Defendants, seeking to avoid and recover approximately $152,114,086 in fictitious profit transfers made by BLMIS during the six-year period prior to BLMIS's collapse. [Dkt. No. 1]. On April 2, 2012, Defendants jointly moved to dismiss based on lack of personal jurisdiction, among other arguments. [Dkt. Nos. 19-24].[1] The Trustee thereafter filed an amended complaint on April 23, 2012 ("Amended Complaint" or "Am. Compl."). [Dkt. No. 27]. By stipulation so ordered by this Court on June 18, 2012, the parties agreed that the Motion shall be treated as a motion to dismiss the Amended Complaint. [Dkt. No. 29].

On October 23, 2012, after full briefing on personal jurisdiction and *forum non conveniens*, Judge Lifland held a chambers conference at which he raised questions about Defendants' papers, particularly regarding Defendants' relationship to the entities in the *Magnify* proceeding. Judge Lifland invited Defendants to either supplement their papers or simply

---

[1] Defendants' Motion also seeks dismissal based on *forum non conviens* and 11 U.S.C. § 546(e). By stipulation so ordered by this Court on June 18, 2012, the parties agreed that a Final Judgment entered by Judge Rakoff on May 22, 2012 in Case No. 11-cv-7603 (JSR) (S.D.N.Y. 2011) [Dkt. No. 14] had disposed of the § 546(e) issue, and that briefing and argument shall proceed only with respect to Defendants' personal jurisdiction and *forum non conveniens* arguments. [Dkt. No. 29]. Further, on October 23, 2012, Judge Lifland entered an order adjourning the Motion to allow the parties to engage in jurisdictional discovery. [Dkt. No. 45]. Judge Lifland did not opine on Defendants' *forum non conveniens* argument, which remains outstanding for the Court's consideration. The Trustee hereby incorporates his Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens, dated August 3, 2012 [Dkt. No. 30] ("Memorandum" or "Trustee's Mem.") and Surreply in Further Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens, dated October 1, 2012 [Dkt. No. 43] ("Surreply") with respect to the *forum non conveniens* arguments made therein.

withdraw the Motion.  He subsequently entered an order adjourning the Motion to allow the

parties to engage in jurisdictional discovery ("Order").  [Dkt. No. 45].[2]

Following entry of the Order, the Trustee served Defendants with written discovery

requests including document demands, interrogatories and requests for admission.  In February

2013, Defendants produced approximately 1,500 pages of documents, largely consisting of

BLMIS statements for certain of their accounts and bank statements from the year 2000 with

virtually all numbers redacted.  (Supplemental Declaration of Ona T. Wang in Support of the

Trustee's Opposition to Defendants' Motion to Dismiss ("Supp. Wang. Decl.") Ex. A).  In

March 2013, the parties met and conferred to discuss the Trustee's issues with Defendants'

production and to begin making arrangements for Apfelbaum's deposition.  Over the ensuing

months, the parties conferred regarding a number of discovery issues, including the Trustee's

objections to the scope of Defendants' redactions, the appropriate scope of discovery, and

Defendants' refusal to produce certain documents requested by the Trustee.  Defendants made

supplemental productions on November 1 and December 20, 2013 of certain documents related

to Albert Igoin's estate.

On September 3, 2013, the Trustee, with Defendants' consent, filed a motion for issuance

of a commission appointing a commissioner to preside over Apfelbaum's deposition in Paris

under the Hague Evidence Convention, Article 17, which this Court granted on September 11,

2013.  [Dkt. Nos. 62, 64].  The Trustee took Apfelbaum's deposition in Paris on March 26-27,

2014 pursuant to this commission.  (Supp. Wang. Decl. Ex. B [hereinafter "Apfelbaum

---

[2] As previously noted, Judge Lifland did not opine on Defendants' *forum non conveniens* arguments, nor did he
invite supplemental briefing on that issue.

Deposition" or "Apf. Dep."]).  After the deposition, in response to a demand by the Trustee,

Defendants produced approximately fifty pages of additional documents on May 30, 2014.[3]

Because jurisdictional discovery amply confirms that personal jurisdiction exists over

Defendants based on their activities in connection with their own accounts, the Trustee requests

that the Motion be denied so that merits discovery may proceed.

## SUPPLEMENTAL STATEMENT OF FACTS

### I.    DEFENDANTS' CONNECTION TO THE *MAGNIFY* PROCEEDING

The Trustee has received conflicting discovery regarding Defendants' connection to

Magnify and the remaining *Magnify* defendants.  Certain defendants in the *Magnify* action have

produced handwritten documents purporting to show that Albert Igoin had established a trust in

Israel to hold Magnify's assets for the benefit of Doris, Apfelbaum, and Emilie, and that

Apfelbaum and Emilie were entitled to 50% of the returns from Magnify's BLMIS portfolio.

(*See* Apf. Dep. Exs. 31-33).  When shown these documents at her deposition, Apfelbaum

admitted that each of the handwritten notes appears to be in her father's handwriting or bears her

father's signature.  (Apf. Dep. 226:2-7; 226:15-20; 227:4-9).  Magnify itself has claimed that it is

owned by a trust of which its co-defendant Yeshaya Horowitz Association ("YHA") is the

Trustee.  *See* Rule 7007.1 Corporate Disclosure Statement ¶ 1, *Picard v. Magnify, Inc. (In re

Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 10-05279 (SMB) (Bankr. S.D.N.Y. Jan. 18,

2012) [Dkt. No. 65].  YHA, in an action brought by the Trustee against it in Israel, denied that it

---

[3] In addition to the procedural events described herein, the parties have engaged in numerous discovery disputes since March 2013, many of which have not been resolved.  These include, among others: a) whether the French "blocking statute" justifies withholding or redacting certain documents; b) whether Defendants have complied with their obligation under Federal Rule of Civil Procedure 34 to locate and produce all responsive documents within their possession, custody or control; and c) whether adherence to Article 17 of the Hague Evidence Convention removes the French "blocking statute" as an impediment to producing documents in connection with Apfelbaum's deposition.  The Trustee is not seeking Court intervention as to these issues at this time; however, the Trustee reserves all rights to seek an order compelling production or granting other appropriate relief during merits discovery.

is a "trustee" or that it owns Magnify, but did state that it held the assets of Magnify like a

"safety deposit box at a bank" for Defendants' benefit. (Supp. Wang. Decl. Ex. C, at 8).  Another

document contains handwritten notations indicating that Apfelbaum and Doris were authorized

to give instructions regarding Magnify.  (Apf. Dep. Ex. 30).  Apfelbaum confirmed that those

notations also appeared to be in her father's handwriting.  (Apf. Dep. 222:13-24).

Yet Apfelbaum continues to deny any knowledge of the existence of Magnify or its

assets, or that she and her daughter were Magnify's intended beneficiaries.  (Supp. Wang. Decl.

Ex A, General Objection No. 12).  At her deposition, Apfelbaum testified that she knew nothing

of Magnify, denied all knowledge of the other *Magnify* defendants (beyond a family relationship

with YHA's treasurer), and stated that Albert Igoin never discussed his business affairs with her.

(Supp. Wang Decl. Ex. A, Response to Interrogatory No. 14; Apf. Dep. 67:4-11; 223:6-225:12).

The Trustee reserves the right to seek additional merits discovery to resolve the conflicting

information regarding the Apfelbaums' links to the *Magnify* defendants.

## II.    ADDITIONAL FACTS REGARDING DEFENDANTS' CONTACTS WITH THE UNITED STATES

As indicated in the Trustee's prior briefing, Defendants, among other things, signed

customer agreements with BLMIS, knowingly invested in BLMIS, withdrew more than $350

million from BLMIS, and filed SIPA claims seeking nearly half a billion dollars from the

BLMIS estate.[4]  These facts alone subject them to this Court's jurisdiction.  Additional

information obtained in jurisdictional discovery emphasizes the Defendants' purposeful

availment of this forum.

---

[4] The Trustee hereby incorporates by reference the statement of facts included in his Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens, dated August 3, 2012 [Dkt. No. 30] (as previously defined, "Memorandum" or "Trustee's Mem.").

      1.       **1995: Defendants Choose to Invest Their Inherited Assets with BLMIS and Enlist Madoff's Cooperation in Structuring the Investment**

According to Apfelbaum, the Apfelbaums' investment advisory accounts ("Accounts") originated from BLMIS investments made by Apfelbaum's late father, Albert Igoin, during the early 1980s. (Apf. Dep. 67:25-68:12). Upon Albert Igoin's death in 1995, Apfelbaum affirmatively decided to keep both her and her daughter Emilie's inherited assets invested with BLMIS in New York. (Apf. Dep. 84:8-17). To do so, Apfelbaum asked Madoff to come to Paris to sign customer agreements on her and her daughter's behalf (the "Agreements"), which she executed with Madoff on June 12, 1995. (Apf. Dep. 174:7-21; 181:2-25; 185:3-21). The Agreements provided, among other things, that Apfelbaum will "deposit funds and/or securities with Madoff, so that these can be deposited into an account at Madoff for the client's benefit," and required Madoff to "invest these funds in securities listed on the United States stock market and to invest the returns therefrom on the client's behalf." (Apf. Dep. Exs. 24, 25).Madoff also agreed to charge Apfelbaum and Emilie reduced commissions compared to what he charged other customers. (Apf. Dep. 182:25-183:20). The Agreements were different from BLMIS's standard customer agreements, which Apfelbaum testified she has never seen before. (Apf. Dep. 193:19-194:8).

As Emilie was a minor at that time, a French guardianship judge required that only half of her inheritance could remain with BLMIS, and that the other half would have to be invested in French treasury bonds. (Apf. Dep. 80:2-24). In addition, the judge required that Madoff personally guarantee that losses in Emilie's BLMIS account would not exceed 5% per year. (Apf. Dep. 174:7-21; 192:2-12). Apfelbaum enlisted her notary to draft such a guarantee, and then asked Madoff to review and sign it. (Apf. Dep. 174:2-6; 189:7-21). Madoff purported to

7

set up a unique system of puts and calls for Emilie's account to ensure there was no risk.  (Apf.

Dep. 192:14-24).

        2.       1995-1999: Apfelbaum Administers Albert Igoin's Estate, of which the
                      BLMIS Accounts were the Primary Asset

Apfelbaum testified that under Albert Igoin's will, Doris inherited 50% of Albert Igoin's

estate (which consisted primarily of BLMIS assets), and also held a life estate over the other

50%, which passed to Laurence and Emilie.  (Apf. Dep. 167:7-24).  Apfelbaum then persuaded

Doris to forego her life estate so that Apfelbaum and Emilie would inherit—and Apfelbaum

would control—their inherited assets directly.  (Apf. Dep. 79:7-80:18; 167:20-169:5; 171:13-19).

Further, in or around 1997, the French tax authorities contested the portion of Albert Igoin's

estate that belonged to his widow Doris, after which the money in Doris's BLMIS account (No.

1FN006) also became property of Apfelbaum and Emilie in equal shares.  (Apf. Dep. 86:24-

87:7).  Thus, after 1997, it appears that Apfelbaum owned the majority of her family's inherited

assets.

According to Apfelbaum, from 1995 to 1999, the Accounts were administered by a

French bank called Banque Pour l'Industrie Francaise, which Apfelbaum testified later became

Banque Finama ("Finama").[5]  (Apf. Dep. 77:6-19; 105:20-23).  During this time, the French

bank administering the Accounts sent Apfelbaum faxes and other correspondence containing

information it received from BLMIS regarding trading activity in the Accounts.  (Apf. Dep.

84:25-85:8; 112:3-112:10).  Although the French bank administered the Accounts, withdrawals

from the Accounts were wired directly from BLMIS in New York to Apfelbaum's joint account

with her husband at Société Générale.  (Apf. Dep. 107:17-108:5).

---

[5] Defendants have referred to the French bank that administered their Accounts as "Banque Finama, formerly known as Banque pour l'Industrie Francaise."  (*See* Supp. Wang. Decl. Ex. A, Response to Interrogatory No. 7).

3.      1999: Defendants Assume Direct Management of the Accounts

In 1999, the French bank cut ties with BLMIS and informed Apfelbaum that if she

wished to continue investing with BLMIS she would have to do so directly.  (Apf. Dep. 112:19-

113:8).  Apfelbaum testified that she or Doris (or both) spoke with Madoff directly about this

decision.  (Apf. Dep. 117:24-118:17).  Apfelbaum also sought advice from Ms. Silvie

Dringenberg, the Finama employee in charge of the Accounts, who encouraged Apfelbaum to

continue directly with Madoff.  (Apf. Dep. 112:19-113:8).  After informing Madoff of her

decision, BLMIS made arrangements to carry the Accounts directly under Apfelbaum's,

Emilie's, and Doris's names.  (Apf. Dep. Ex. 20; 119:16-120:7).  After Apfelbaum began

directly managing the Accounts, she began receiving BLMIS account statements by mail and

faxes from BLMIS employee Frank DiPascali every time a transaction was made.  (Apf. Dep.

121:17-122:10).

4.      1999-2008: Defendants Regularly Communicate with BLMIS Regarding
        the Accounts

Apfelbaum's sworn testimony confirms she regularly communicated with DiPascali

regarding trading activity, strategy, and holdings in the Accounts.  For example, Apfelbaum

regularly monitored the purported status of the Treasury bills in the Accounts to ensure that the

Treasury bills were "sold" prior to their maturity date.  (Apf. Dep. 92:4-93:20).  According to

Apfelbaum, this was to avoid the tax increase (from 24% to 50%) that would purportedly occur

if the Treasury bills matured.  (Apf. Dep. 92:9-20).  If DiPascali failed to "sell" the Treasury bills

close to their maturity date, Apfelbaum became worried and "took action" by either calling him

or sending him a fax to remind him to sell the Treasury bills.  (Apf. Dep. 153:1-154:21).  In

general, Apfelbaum communicated with DiPascali for "fairly menial" things, but called Madoff

"[e]very time there was some landmark[,]" (Apf. Dep. 207:15-208:2; 125:6-126:8), such as, for

9

example, to inform him when Doris died and that Apfelbaum was trying to sort out the Estate. (Apf. Dep. 207:15-208:1). She also communicated with DiPascali at least twice a year to request redemptions from the Accounts, (Apf. Dep. 90:20-91:5; 154:9-11), including on at least one occasion to request a "huge" withdrawal. (Apf. Dep. 95:21-96:15).

In 1999, Apfelbaum wrote to DiPascali to suggest a "strategy for progressively evening out Emilie's option loss/taxable gain gap," enclosing three pages of charts and equations. (Apf. Dep. Ex. 28). According to Apfelbaum, this proposed "strategy" was the result of a conversation she had with her tax advisor exploring ways to utilize losses in Emilie's account to reduce her tax liability. (Apf. Dep. 215:11-21). Because of the system that had been set up in 1995 to protect Emilie's interests, Apfelbaum's tax advisor "could see what profits were made but he couldn't see the losses" and therefore could not deduct them on Emilie's tax returns. (Apf. Dep. 212:8-18). Because this issue was "out of the ordinary," Apfelbaum discussed it directly with Madoff, who told her to send the figures to DiPascali. (Apf. Dep. 216:3-8).

5.    2005: Upon Doris Igoin's Death, Defendants Reinvest with BLMIS

When Emilie turned 21 in 2005, she was faced with a decision whether to reinvest her French Treasury bills (which the French judge had required in 1995) with BLMIS. (Apf. Dep. 236:2-238:25). After consulting with Apfelbaum and her father, Emilie officially made the decision to liquidate the Treasury bills and reinvest the proceeds with BLMIS. (*Id.*) When Doris died shortly thereafter, Apfelbaum contacted Madoff to inform him of her mother's death and that Apfelbaum had decided to continue investing with BLMIS for herself and Emilie. (Apf. Dep. 206:4-11).

As Apfelbaum was Doris's only heir, (Apf. Dep. Ex. 11), the holdings in Doris's BLMIS account were transferred upon her death directly to Apfelbaum's BLMIS account (No. 1FN076). (Apf. Dep. 44:20-45:15). However, Apfelbaum realized that Doris, being a U.S. citizen, should

have been paying United States taxes during her lifetime on capital gains earned on Doris's

BLMIS portfolio.  (Apf. Dep. 44:23-45:15).  Apfelbaum retained an attorney in the United States

to negotiate a settlement with the IRS on her and the Estate's behalf.  (Apf. Dep. 61:2-63:10).

While those settlement negotiations were pending, Apfelbaum created a new BLMIS account

(No. 1FR122) in the name of the Estate (the "Succession Account") to segregate the funds at

issue from Doris's account (No. 1FN006) for the purpose of settling the anticipated tax liability.

(*Id.*; *see also* Supp. Wang. Decl. Ex. A, Response to Interrogatory No. 5).  Once Apfelbaum paid

the Estate's tax liabilities, Apfelbaum closed the Succession Account and transferred the

remaining funds into her own BLMIS account.  (Apf. Dep. Ex. 11).  At all times, Laurence had

exclusive control over the Succession Account.  (Apf. Dep. 46:14-17).

> 6.    2008: After BLMIS's Collapse, Defendants File SIPA Claims Seeking
> $458,250,000 from BLMIS's Estate

After BLMIS's collapse, Apfelbaum wrote a letter to the IRS seeking a refund of taxes

paid on Doris's income.  (Apf. Dep. 260:3-23).  She also filed SIPA claims with the Trustee

seeking a distribution from the BLMIS estate on behalf of her and Emilie's accounts.  (Apf. Dep.

Exs. 9-10).  In January 2009, the Trustee mailed to Defendants a "Notice to Customers and

Creditors of [BLMIS] and to All Other Parties In Interest" ("Notice") along with claims forms

and other materials.  (Apf. Dep. Ex. 15).  Apfelbaum admits receiving and reviewing the claim

forms and the accompanying instructions, (Apf. Dep. 48:22-49:13), and testified that she is "90

per cent sure" she received the Notice.  (Apf. Dep. 57:7-58:19).  She thereafter handwrote,

signed and filed a customer claim for her account (No. 1FN076) seeking a distribution of

$335,075,000 from the BLMIS estate (Apf. Dep. 38:24-40:19), and helped Emilie handwrite,

sign and file a claim for Emilie's account (No. 1FN075) seeking a distribution of $123,175,000

from the BLMIS estate.  (Apf. Dep. 40:20-42:9).

## ARGUMENT

### I.    STANDARD OF REVIEW

When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a plaintiff need only make a *prima facie* showing that the court possesses personal jurisdiction over the defendant.  *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).  After jurisdictional discovery, the plaintiff's *prima facie* showing must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant.  *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).  The Court must deem all the Trustee's factual allegations as true and construe all inferences in the Trustee's favor.  *See DiStefano*, 286 F.3d at 84.  Where the parties submit conflicting affidavits, "doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."  *A.I. Trade Fin. Inc. v. Petra Bank*, 989 F.2d 76, 80 (2d Cir. 1993).  On a 12(b)(2) motion, a "court may consider affidavits and documents submitted by the parties without converting the motion into one for summary judgment under Rule 56."  *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 50 n.54 (S.D.N.Y. 1999).

### II.    DEFENDANTS' UNITED STATES CONTACTS ARE SUFFICIENT TO CONFER PERSONAL JURISDICTION

The Trustee has already established that Defendants' numerous, purposeful contacts with the United States are sufficient to confer personal jurisdiction under the due process clause of the Fifth Amendment.  (Memorandum, at 12-18 (citing *North v. Winterthur Assurances (In re North)*, 279 B.R. 845, 852-53 (Bankr. D. Ariz. 2002) ("[T]he Bankruptcy Rules effectively provide for worldwide service of process, limited only by the due process clause of the Fifth Amendment rather than the Fourteenth Amendment, which 'requires only that the defendant have the requisite 'minimum contacts' with the United States,' rather than with the forum state.")

(quoting *NationsBank, N.A. v. Macoil, Inc. (In re Med-Atlantic Petroleum Corp.)*), 233 B.R. 644, 653 (Bankr. S.D.N.Y. 1999))).  Substantial jurisdictional discovery not only confirms the Trustee's allegations, but provides additional evidence reinforcing Defendants' intention to avail themselves of the benefits of doing business in the United States.

### A.    Jurisdictional Discovery Confirms Defendants' Ample United States Contacts

The Trustee will not burden the Court by restating arguments already made in his Memorandum.  Jurisdictional discovery has yielded countless facts further supporting the Trustee's *prima facie* case of jurisdiction.  The undisputed facts show that Defendants, among other things:

a)    actively managed direct accounts with BLMIS, from which they received and/or benefitted from millions of dollars' worth of transfers;

b)    regularly reviewed BLMIS monthly account statements and communicated with Madoff and BLMIS employees in New York to ensure that the Treasury bills were sold prior to maturity, and to deal with the estates of Albert and Doris Igoin;

c)    affirmatively chose to remain invested with BLMIS on at least three separate occasions;

d)    persuaded Madoff to come to Paris, guarantee profits and otherwise comply with particular requirements to enable them to maintain their BLMIS investments;

e)    executed unique and personalized account agreements with Madoff, under which they expressed their clear intention to invest in—and profit from—United States securities markets and were charged less-than-customary commissions;

f)    opened and funded separate BLMIS accounts;

g)    hired counsel in the United States to, among other things, assist with the creation and administration of the Succession Account; and

h)    knowingly and voluntarily filed customer claims in the SIPA proceeding.

These facts conclusively establish personal jurisdiction.  *See, e.g.*, *Picard v. Chais (In re Bernard L. Madoff Inv. Secs. LLC)*, 440 B.R. 274, 279 (Bankr. S.D.N.Y. 2010) ("*Chais*") (*prima facie*

case of personal jurisdiction shown where defendants held direct BLMIS accounts, even on a

"passive" basis); *Picard v. Cohmad Secs. Corp. (In re Bernard L. Madoff Inv. Secs. LLC)*, 418

B.R. 75, 81 (Bankr. S.D.N.Y. 2009) ("*Cohmad*") (*prima facie* case of personal jurisdiction

shown where defendants "personally and continuously sent correspondence to the United States

to direct transfers and withdrawals" from BLMIS).

Defendants did not merely receive transfers from BLMIS; they opened, structured, and

actively controlled their investments, communicating regularly with BLMIS to discuss trading

activity and holdings in the Accounts.  Apfelbaum testified, for example, that she spoke directly

with Bernie Madoff on several occasions to discuss urgent—or "landmark"—matters, including

to communicate her proposed strategy for phasing out the system of puts and calls for Emilie's

account and to discuss the administration of the Estate.  She acknowledged the authenticity of

several letters she wrote to DiPascali and Madoff requesting withdrawals and discussing trading

activity in the Accounts.  (*See, e.g.*, Apf. Dep. 90:20-91:5 (acknowledging she wrote a letter in

1999 notifying DiPascali that she would be withdrawing "huge" sums); 109:21-110:14

(acknowledging she wrote a letter in 1999 requesting confirmation that DiPascali had sold

Treasury bills); 205:2-206:21 (acknowledging she wrote a letter in 2005 informing DiPascali of a

conversation she had with Madoff and forwarding instructions for opening the Succession

Account)).  And she testified she regularly monitored Treasury bills in the Accounts and called

DiPascali directly if he failed to "sell" the Treasury bills before their maturity date.  (Apf. Dep.

92:4-93:20).  Hence, jurisdictional discovery confirms that Apfelbaum was acutely aware of the

purported activity in the Accounts and acted deliberately to ensure BLMIS ran them efficiently

and with maximum profit-making potential.[6]

---

[6] Even during 1995-1999, when Finama administered the Accounts, Finama continuously updated Apfelbaum regarding trades and net asset values for the Accounts, and Defendants received millions of dollars of wire transfers

The case for personal jurisdiction here surpasses numerous other cases upholding personal jurisdiction in the BLMIS context. In both *Chais* and *Cohmad*, the Court upheld jurisdiction where the defendants—like Defendants here—maintained BLMIS accounts directly, profiting from millions of dollars of withdrawals therefrom. Most recently, Judge Lifland held in *Picard v. Bureau of Labor Insurance (In re Bernard L. Madoff Inv. Secs. LLC)* that personal jurisdiction was proper even where the defendant invested with BLMIS only indirectly through a feeder fund. 480 B.R. 501 (Bankr. S.D.N.Y. 2012) ("*BLI*"); *see also Picard v. Maxam Absolute Return Fund, Ltd. (In re Bernard L. Madoff Inv. Secs. LLC)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (*prima facie* case of personal jurisdiction established over Cayman Islands entity that invested with BLMIS indirectly through a feeder fund). The Court held that by "knowing, intending and contemplating that the substantial majority of funds invested in [the feeder fund] would be transferred to BLMIS in New York to be invested in the New York securities market[,]" the defendant purposefully availed itself of the benefits and protections of New York laws. *BLI*, 408 B.R. at 517.

Here, Defendants signed the Agreements directly with Madoff, and explicitly expressed their desire to invest in the United States stock market by depositing millions of dollars into BLMIS accounts for their benefit. (Apf. Dep. Ex. 25). BLMIS established the Accounts for Defendants and transferred hundreds of millions of dollars to them over a period of decades. In 2005, Apfelbaum created the Succession Account, receiving additional transfers from that account once the Estate's tax liabilities were paid. Apfelbaum and Emilie also benefitted from the holdings in Doris's BLMIS account (No. FN006), which belonged to Apfelbaum and Emilie

---

directly from BLMIS. (Apf. Dep. 84:25-85:8; 112:3-112:10). Hence, Finama's presence as a purported intermediary does not alter the conclusion that Defendants "directed [their] investment towards the forum State[.]" *Picard v. Bureau of Labor Insurance (In re Bernard L. Madoff Inv. Secs. LLC)*, 480 B.R. 501, 517 n.14 (Bankr. S.D.N.Y. 2012).

in fact. (Apf. Dep. 86:24-87:7). And Emilie, when she turned 21, deliberately decided to

redeposit millions of dollars' of proceeds from the sale of French Treasury bills with BLMIS in

New York. These facts firmly establish Defendants' conscious choice to invest with BLMIS and

to seize the benefits of investing in the United States.

### B.    The New York Court of Appeals' Decision in *Licci* Supports the Trustee's Position

Defendants argued in the Motion that their conduct was analogous to that of a person

who maintains a "correspondent bank account," which they asserted is insufficient to confer

personal jurisdiction in New York. At the time, the question was an open one because the

Second Circuit had certified that question to the New York Court of Appeals. *See Licci ex rel.*

*Licci v. Lebanese Canadian Bank*, SAL, Docket No. 10-1306-cv, 2012 WL 688809, at *1 (2d

Cir. March 5, 2012). In 2012, after the parties had fully briefed the personal jurisdiction issue,

the New York Court of Appeals issued a decision clarifying that purposeful maintenance of a

"correspondent bank account" in New York indeed suffices to confer personal jurisdiction. *See*

*Licci v. Leb. Can. Bank, SAL*, 20 N.Y.3d 327 (N.Y. 2012). Defendants' argument therefore fails.

In any event, as noted in the Trustee's Memorandum, BLMIS investment advisory

accounts are not "correspondent bank accounts," but rather exist for the express purpose of

investing clients' money in the United States and require the client's purposeful and voluntary

action based on a desire to profit from U.S. markets. (Memorandum, at 15). Moreover, as Judge

Lifland recognized in *BLI*, the Trustee's claims are not predicated on Defendants merely

maintaining the Accounts, nor is personal jurisdiction over them "rooted in the mere existence"

of the Accounts. *BLI*, 480 B.R. at 517 n.14. Rather, Defendants "directed [their] investment

towards the forum State, thereby purposefully availing [themselves] of the benefits and

protections of New York laws." *Id.*

### C.    Apfelbaum's Jurisdictional Contacts are Imputed to Emilie and the Estate

In addition to Emilie's and the Estate's direct ownership of BLMIS accounts and

Emilie's filing of a SIPA claim, jurisdiction exists on the additional ground that Apfelbaum acted

on their behalf and as their agent in connection with BLMIS. *See Chais*, 440 B.R. at 279

(Trustee established a *prima facie* case of personal jurisdiction over an Israeli defendant based on

her father's activities as her agent in connection with BLMIS); *Smith v. Matias (In re IFS Fin.

Corp.)*, Adv. Nos. 04–3789, et al., 2007 WL 2692237, at *11 (Bankr. S.D.Tex. Sept. 11, 2007)

("[P]ersonal jurisdiction is present if [defendant] gave another authority to act on his behalf and

the agent's contacts in his agency capacity are sufficient to establish specific personal

jurisdiction."); *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169 (2d Cir. 2010)

(holding that an agent's New York activities may be imputed to an out-of-state principal in

analyzing whether the court may exercise personal jurisdiction over the principal).

With respect to the Estate, Apfelbaum has claimed—and jurisdictional discovery

confirms—that Apfelbaum was the Estate's executor, only heir, and sole individual with control

over the Estate and its BLMIS account. (Apf. Dep. 46:14-17). As a matter of black-letter law,

in-state acts by an executor in his or her official capacity are sufficient to confer jurisdiction over

the estate. *See, e.g.*, Restatement (Second) of Conflict of Laws § 358 cmt. g (1971). Here,

Apfelbaum's substantial and purposeful contacts with BLMIS in her official capacity as the

Estate's executor confer personal jurisdiction over the Estate as a matter of law.

Further, as the Estate's executor and sole heir by operation of law, Apfelbaum was

authorized to act on the Estate's behalf as its agent. For example, Apfelbaum admits that she

enlisted an attorney in the United States to negotiate a settlement on her and the Estate's behalf,

and created the Succession Account for the purpose of paying the Estate's anticipated tax

liability. (Apf. Dep. 44:20-45:15). Once those liabilities were paid, Apfelbaum closed the

Succession Account and transferred the remaining funds into her own BLMIS account.  (Apf. Dep. Ex. 11).  Apfelbaum's BLMIS contacts are therefore imputed to the Estate for jurisdictional purposes.

Similarly, this Court has personal jurisdiction over Emilie based on her own conduct with respect to her BLMIS account, including, among other things, her decisions to reinvest with BLMIS and to file a SIPA claim.  In addition, jurisdictional discovery also confirms that Apfelbaum interacted with BLMIS on behalf of and/or as agent for Emilie.  Apfelbaum was intimately involved in negotiating the Agreements, which included a personal guarantee from Madoff that losses in Emilie's account would not exceed 5% per year.  (Apf. Dep. 174:7-21; 189:7-21).  Apfelbaum, in concert with BLMIS, also helped set up a system for trading puts and calls in Emilie's account to ensure limited risk, and devised a strategy for ending that system once Emilie turned 18.  (Apf. Dep. 192:14-24; 214:13-25).  When Emilie turned 21, Apfelbaum helped Emilie decide not only to remain invested with BLMIS, but to increase that investment substantially by liquidating the French treasury bills she had purchased in 1995 at the French judge's direction and re-depositing the proceeds into Emilie's BLMIS account.  (Apf. Dep. 236:2-238:25).  Accordingly, Apfelbaum interacted with BLMIS on Emilie's behalf and for her benefit.

## III.    IT IS BEYOND DISPUTE THAT FILING A SIPA CLAIM CONFERS PERSONAL JURISDICTION

In his Memorandum, the Trustee established beyond any doubt that filing a claim in a SIPA proceeding amounts to a consent to personal jurisdiction.  (Trustee's Mem. at 8-12 (citing *Aurora Mgmt. Partners, Inc. v. GC Fin. Servs., Inc. (In re Protected Vehicles, Inc.)*, 429 B.R. 856, 861 (Bankr. D.S.C. 2010) ("[i]n a bankruptcy case, personal jurisdiction over a foreign defendant exists when a defendant consents to jurisdiction by filing a proof of claim[.]"); *Picard*

18

*v. Stahl (In re Bernard L. Madoff Inv. Secs. LLC)*, 443 B.R. 295, 310 (Bankr. S.D.N.Y. 2011) ("A customer claim filed in a SIPA action is equivalent to a proof of claim filed in a typical bankruptcy proceeding for purposes of submission to jurisdiction."); *Zaremba v. Pheasant (In re Cont'l Capital Secs.)*, No. 06 CV 02394, 2007 WL 5964307, at *2 (N.D. Ohio Sep. 19, 2007) ("in a SIPA proceeding, . . . as in a bankruptcy case, a creditor who files a proof of claim seeks a share of the pie: a portion of the debtor's estate.")).

During jurisdictional discovery, Apfelbaum conceded that she and Emilie both handwrote the claim forms and filed them of their own volition and with the express desire to seek a distribution of hundreds of millions of dollars from the estate. (*See, e.g.*, Apf. Dep. 38:24-42-9). By doing so, Defendants purposefully availed themselves of the protections of United States law and consented to this Court's personal jurisdiction.

There is no dispute that Apfelbaum received and reviewed the claim forms and accompanying instructions, (Apf. Dep. 48:22-49:13), which contained numerous indicia of the Bankruptcy Court's involvement in the SIPA proceeding. (Trustee's Mem. at 11-12). Specifically, the claim package sent to investors included a "Notice to Customers and Creditors of [BLMIS] and to All Other Parties In Interest" (as previously defined, "Notice"), which, among other things, contained the case caption for the main case with "UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK" along the top. (Trustee's Mem. at 11). At her deposition, Apfelbaum conceded she had no reason to believe she did not receive the Notice, and in fact was "90 per cent sure" she did. (Apf. Dep. 57:7-58:19). Defendants were well aware of the Bankruptcy Court's involvement when they filed their SIPA claims.

IV.    **DEFENDANTS' PARTICIPATORY CONDUCT IN THIS PROCEEDING WARRANTS THE EXERCISE OF PERSONAL JURISDICTION**

In the Trustee's Memorandum and Surreply, the Trustee argued that Defendants' participation in this proceeding—including entering into stipulations extending response deadlines and filing a motion to withdraw the reference to the District Court—constituted a waiver of Defendants' personal jurisdiction defense.  (Trustee's Mem. at 18; Trustee's Surreply at 6).  Notably, Defendants proffered no reason why their filing of a motion to withdraw the reference should not serve as a basis for conferring personal jurisdiction.  *See, e.g.*, *Kriegman v. Cooper (In re LLS America, LLC)* (holding that defendants, by filing a motion to withdraw the reference, "sought affirmative relief and purposely availed themselves of the jurisdiction of the federal courts in this judicial district").  No. 11–80093–PCW11, 2012 WL 2564722, at *7 (Bankr. E.D. Wash. July 2, 2012).

On March 17, 2014, Defendants yet again affirmatively participated in the BLMIS bankruptcy proceedings by filing a brief in the liquidation proceeding.  [Dkt. No. 79].  The Trustee's March 10, 2014 omnibus opposition to pending motions to dismiss certain adversary proceedings—filed in the liquidation proceeding pursuant to this Court's case management order, *see* Adv. Pro. No. 08-01789 (SMB) [Dkt. No. 5695]—had noted that Defendants filed a motion to dismiss for lack of personal jurisdiction.  Defendants subsequently filed an 8-page reply brief to "clarify the status of their pending motions," noting that Defendants' Motion also raised *forum non conveniens*.  [Dkt. No. 79 at 1].

Participation in various pretrial proceedings demonstrates an acquiescence to the Court's personal jurisdiction.  *See Hamilton v. Atlas Turner, Inc.,* 197 F.3d 58, 61 (2d Cir. 1999) (holding that participation in "considerable pretrial activity" can lead to the forfeiture of a lack of personal jurisdiction defense).  After entering into various stipulations extending response

deadlines, filing a motion to withdraw reference (a non-jurisdictional issue), and filing an

unnecessary reply to the Trustee's omnibus opposition, Defendants have exhibited a pattern of

pretrial participation warranting a waiver of their personal jurisdiction defense.

## CONCLUSION

      **WHEREFORE**, the Trustee respectfully requests that the Court deny Defendants'

Motion for lack of personal jurisdiction and *forum non conveniens*.

Date:  June 20, 2014
       New York, New York

                         By: */s/* Ona T. Wang
                         **BAKER & HOSTETLER LLP**
                         45 Rockefeller Plaza
                         New York, New York 10111
                         Telephone: (212) 589-4200
                         Facsimile: (212) 589-4201
                         David J. Sheehan
                         Email:  dsheehan@bakerlaw.com
                         Tracy Cole
                         Email: tcole@bakerlaw.com
                         Ona T. Wang
                         Email: owang@bakerlaw.com
                         M. Elizabeth Howe
                         Email: bhowe@bakerlaw.com
                         David M. McMillan
                         Email: dmcmillan@bakerlaw.com

                         *Attorneys for Irving H. Picard, Trustee for the*
                         *Substantively Consolidated SIPA Liquidation*
                         *of Bernard L. Madoff Investment Securities*
                         *LLC and Bernard L. Madoff*