## **EXHIBIT C**



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK        )
                         )
                         )    ss
COUNTY OF NEW YORK       )


## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Hebrew into English of the attached Response on Behalf of the

Yeshaya Horowitz Association.


Mirna Turina, Project Manager
Geotext Translations, Inc.


Sworn to and subscribed before me

this 16th day of February, 20 14.


MORGEN MYRDAL
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MY6274933
Qualified in Kings County
My Commission Expires January 14, 2017

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com | www.geotext.com

**In the Jerusalem District Court**                                    *Petition*
**Before the Honorable Judge David Mintz**                             **File 36370-07-12** [signature]
**In the matter between:**

**Irving H. Picard**
represented by Counsel, Adv. Jonathan Agmon and/or Adv. Eran Soroker
and/or Adv. Adi Nordman and/or Adv. Hagar Raved and/or Adv. Raanan Ben-Yishai
whose address for the purposes of service of process is as follows:
14 Shenkar Street, POB 12425, Herzliya 46725
Tel. 09-9507000 Fax 09-9505500
E-mail: mail@ip-law.co.il

– v. –

1.  **Yeshaya Horowitz Association (in Voluntary Liquidation)**
    through the liquidator, Adv. Daniel Azriel
    represented by Counsel, Adv. Shifra (Azriel) Gittelman and/or Adv. Meital Seri Azrieli
    and/or Adv. Moshe Azriel and/or Adv. Asaf Azriel
    whose address for the purposes of service of process is as follows:
    216 Jaffa Road, Shaare Ha-Ir Building, Jerusalem 94383
    Telephone: 02-5003366 Fax: 02-5383731
    E-mail: dani@aa-adv.co.il

    | Jerusalem |
    | District Court |
    | **October 9, 2012** |
    | Received/Examined |
    | Signature:_____ |

2.  **Registrar of Non-Profit Organizations**
    whose address for the purposes of service of process is as follows:
    15 Kanfei Nesharim Street, POB 34071, Jerusalem 91340
    Telephone: 1-700-706044 Fax: 02-6462548
    represented by Counsel, Adv. Shiri Fogel
    whose address for the purposes of service of process is as follows:
    2 Hashelosha Street, POB 9222, Tel Aviv 61091
    Telephone: 03-1-700-70-60-44 Fax: 03-6899795

3.  **The Official Receiver**
    whose address for the purposes of service of process is as follows:
    15 Kanfei Nesharim Street, Bet Hateomim Building, Jerusalem 95464
    Telephone: 02-6215760 Fax: 02-6467570

        **Response on Behalf of the Yeshaya Horowitz Association (in Voluntary Liquidation)**
             **to the Petition to Transfer the Liquidation of the Association from Voluntary**
                  **Liquidation to Liquidation under the Supervision of the Court**

Pursuant to the ruling which was handed down by the Honorable Court on July 23, 2012, a response by the Yeshaya
Horowitz Association (in Voluntary Liquidation), through the receiver of the Association, The Undersigned, to the
Petition to Transfer the Liquidation of the Association from Voluntary Liquidation to Liquidation under the Supervision of
the Court is filed herewith.

**It should immediately be stated that the Association is opposed to the Petition and vehemently disputes that which
has been argued therein, on scores of pages which contain an infinite number of baseless and pointless arguments,
which are not supported by a true affidavit; *inter alia* because it constitutes a vile attempt, albeit one with no
chance of success, at harming one of the most important non-profit organizations which have ever existed within
the State of Israel—one which, in all humility, has made a vast and extremely important contribution to scientific
and medical research in Israel.**

## Introduction

The Yeshaya Horowitz Association (hereinafter: the "**Association**") was established at the end of 1988 by a donor who wished to remain anonymous. The donor's identity has since been discovered; he was a French citizen by the name of Albert Igoin (hereinafter: "**Igoin**" or the "**Donor**").

Igoin's contributions to scientific and medical research in Israel, through the Association, have significantly promoted the objectives in question and have been recognized and appreciated by the recipients of the donations, including: Hadassah University Hospital, the Hebrew University of Jerusalem, the Weizmann Institute of Science, the Technion—Israel Institute of Technology, Tel Aviv University, Ben Gurion University of the Negev, Haifa University, Rambam Hospital, Schneider Children's Medical Center, and others.

The members of the Association today are very senior academicians of unparalleled rank in Israel, and are highly renowned among the scientific community worldwide. Their activity within the Association was performed as part of their academic activity in the broad sense and was carried out on a volunteer basis, inspired by the sacred mission of contributing to the advancement of academic research in Israel. They are Prof. Henri Atlan (Chair), Prof. Hanoch Guttfreund, Prof. Irun Cohen, Prof. Amnon Caspi, Prof. Shimon Ulman, Prof. Ilan Chet, Prof. Bracha Rager and Ms. Ayala Nahir.

Until the time of his death, early in 1995, Igoin was the sole manager, under Bernard Madoff (hereinafter: "**Madoff**"), of the funds and investments of a Panamanian company which he had founded in 1983, by the name of Magnify Inc. (hereinafter: "**Magnify**"). In addition, he managed his own private funds, in amounts in the hundreds of millions of dollars.

To the best of the Association's knowledge, at the time of the Donor's death or thereabouts, Magnify's investment portfolio with Madoff showed a value of some $430,000,000.

The Donor's commendable philanthropic activity in Israel, through the Association, for the advancement of scientific and medical research, including the universal implications thereof, was financed by means of the funds and investments of Magnify.

Since the founding of the Association and to this day, all of the members of the Association, without exception, and its consultants and/or anyone acting on its behalf, have acted in absolute good faith, in an honest and modest manner, in total transparency and inspired by the sacred mission of realizing the Association's important objectives.

The operations which were performed on the Association's investment portfolio with Madoff were recorded on the Association's books each month. They include scores of documents which were transferred to it by Madoff and/or by some of his employees, with respect to activity on the Stock Exchange in the United States, including records related to the payment of taxes, including withholding tax which was actually transferred to the United States tax authorities, so that none of the members and/or consultants of the Association and no one acting on its behalf could have imagined that Madoff had carried out illegal operations in the Association's account.

As shall be set forth in extensive detail below, the Association totally and categorically denies the Petitioner's argument to the effect that it was ostensibly a trustee for Magnify's assets. The Association further and most vehemently denies the Petitioner's argument to the effect that it ostensibly acted improperly. The Association conducted itself in a totally transparent manner; it submitted detailed reports to the Registrar of Non-Profit Organizations; and the fact that it refrained from disclosing the Donor's name resulted **solely and exclusively** from its wish to respect his wishes and obey his instructions.

In this context, it should be emphasized that the collapse of the Madoff investment house hit the members and consultants of the Association like lightning out of a clear sky—and, in fact, like a death blow, in the sense that, with a single sword thrust, all of its investments, which had been used to finance its philanthropic activity for the advancement of scientific and medical research in Israel, were utterly lost. The filing of the action against the Association by the Petitioner before the Bankruptcy Court in New York was an additional and unnecessary lightning bolt for them.

As shall be clarified below, as of today, no ruling has yet been handed down by a competent court with regard to the value of Magnify's investment portfolio on the date when Madoff launched his Ponzi scheme fraud, although such a ruling would have a significant impact on the proceedings which the Petitioner is conducting against the Association and others before the Bankruptcy Court in New York. As a direct result, no ruling has yet been handed down as to whether the Association is actually required to refund to the Petitioner, in whole or in part, the funds which he has claimed in his action against it. In this context, it is appropriate to emphasize that, as long as no judgment has been handed down against the Association—and, in our opinion, there is no basis for such a judgment—the Petitioner is not a "creditor" of the Association.

**It would be superfluous to state that, if and when it is ruled, by means of a peremptory judgment, that the Association is required to refund to the Petitioner even one dollar, the Association will consent to the transfer of the liquidation from voluntary liquidation to liquidation under the supervision of the Court, in light of the fact that the Association not only has nothing to hide, but rather, quite the opposite is true: the Association and all of its members and consultants, or anyone acting on its behalf, are proud of their work within the framework of the Association.**

In this last context, it should be pointed out that, as early as the response by the liquidator—The Undersigned—to Counsel for the Petitioner dated February 2, 2012 (Appendix 38 to the Petition), the liquidator informed them as follows: "**At the same time, as soon as I was informed that an action had been filed against the Association, I froze the liquidation proceedings.**"

**Freezing the liquidation of the Association leaves its legal situation unchanged, at this stage. Moreover, there is no need to change it—neither in general, nor under the circumstances of the case, in particular—since, as long as legal proceedings are under way in New York, in which, on one hand, the Association has filed an action against the Petitioner in the amount of some $51,000,000, and, on the other, the Petitioner has filed an action against the Association in the amount of some $124,000,000, it is not appropriate to grant his Petition.**

It is not and never was appropriate for the Petitioner to file his Petition, **as long as no ruling has yet been handed down as to whether the Association is entitled to recoup its investments or whether it owes the Petitioner even one dollar.** It was even less appropriate to file the Petition in the scathing, vitriolic and arrogant language in which it was filed and to waste the Court's precious time. However, now that the Petition has been filed, notwithstanding the freezing of the liquidation proceedings, there is no alternative but to respond to it in a pertinent and detailed manner.

**Threshold arguments**

    **I. The Petition is not supported by an affidavit as required by law**

1.   Both the law and justice require the Petition to be denied *in limine*, given that it is not supported by a real affidavit. Section 89 of the Petition states: "An affidavit by Ms. Tracy Cole is attached in support of this Petition." The trouble is that what purports to be attached in support of the Petition is an affidavit by Ms. Mary Elizabeth Howe and not by Ms. Tracy Cole.

2.   **With all due respect, when a Petition which is phrased in scathing, vitriolic and arrogant language, as was the case in the Petitioner's Petition, is filed, it would have been fitting and proper for the Petitioner, at the very least, to be accurate in naming the affiant on his behalf, especially when the affidavit which is filed in support of the Petition is vague and laconic, written by an attorney who represents the Petitioner in the proceedings in New York, and when, on the basis of the affidavit, it is blatantly clear that the affiant is incapable of verifying the facts which are argued therein, at least insofar as those facts refer to events which occurred, and to documents which were written, in the State of Israel.**

3.   This omission on the Petitioner's part is not the most important thing. The most important thing is that the affidavit by Ms. Mary Elizabeth Howe cannot support the Petition. There is a good reason why she does not affirm facts which are supposed to constitute an element of the Petition, as **it is obvious that these facts are not known to her**, at least insofar as these facts refer to events which occurred, and to documents which were written, in the State of Israel. Accordingly, she laconically affirms as follows:

    "I, Mary Elizabeth Howe……hereby declare under penalty of perjury that the foregoing statement in the application for the Transfer of the Voluntary Liquidation of the Yeshaya Horowitz Association (in voluntary liquidation) to Court Supervised Liquidation and for the appointment of Liquidator are true and correct."

4.   It takes a great deal of insolence and defiance to declare, under penalty of perjury, against a magnificent organization such as the Yeshaya Horowitz Association and its members—who, as set forth above, are very senior academicians of unparalleled rank in Israel, and are highly renowned among the scientific community worldwide— such an essentially untenable declaration as, merely for the sake of the example, that "royalties from research studies on technology transfer" were unlawfully diverted to any third party whatsoever.

    See Section 18 of the Petition.

    In support of this untenable argument, the Petitioner has attached Appendix 23, which is an article, the author of which is the Legal Advisor of the Association, Adv. Yair Green, with regard to technology transfer, which was published in the informational brochure of the National Biotechnology Institute in the Negev.

3

The affiant, who is supposed to know how to read that which has been set forth in the article—which is written in English—has ignored the fact that the Association undertook that the royalties earned from the commercialization of the academic knowledge would return to the university, the results of whose studies gave rise to the royalties in question, as stated in the article:

**"In return, the Association undertakes to re-contribute all the reimbursed funds to the university, in this way encouraging the development of a revolving fund"**

Moreover, the Hebrew translation which was appended to the Petition, also states as follows:

"In return, the Association undertakes to re-contribute the entire amount of the royalty to the university, and in this way, to encourage the development of the revolving fund."

**As we have seen, the argument that the royalties from research studies in technology transfer were unlawfully diverted to any third party whatsoever is immediately refuted by Appendix 23 to the Petition itself, which the affiant apparently did not take the trouble to study—a fact which is indicative of the credibility of her affidavit, or perhaps "lack of credibility" is the preferred wording.**

5.   Or, for example, the scandalous argument in Section 47 of the Petition, pursuant to which "it is to be feared that documents and data may have been concealed, and that assets may have been smuggled or that creditors may have been illicitly preferred, and that this is tantamount to an improper attempt to frustrate the efforts of creditors, such as the Madoff Trustee, to obtain satisfaction from the Association."

As set forth above, the Association's activity, since its establishment and to this day, has been carried out in total and absolute transparency, with the provision of complete and detailed reports on its activity to the Registrar of Non-Profit Organizations and the Income Tax Assessment Clerk.

Copies of the Association's financial statements for the years 2000 through 2009 were appended to the Petition—see Appendices 12 and 14 through 22.

Study of Appendices 12 and 22, and especially of the Notes to those financial statements, clearly indicates that anyone who argues that "it is to be feared that documents and data may have been concealed, and that assets may have been smuggled or that creditors may have been illicitly preferred, and that this is tantamount to an improper attempt to frustrate the efforts of creditors, such as the Madoff Trustee, to obtain satisfaction from the Association" is not speaking the truth, or, at the very least, does not know what he is affirming.

6.   In addition, established case law holds that an affidavit may not be drawn up in a manner which involves a reference to another document (and, in the case which is presently at hand, to the Petition) and a statement to the effect that "all of the facts which have been set forth in the Petition are correct."

In this regard, see:

a.   Dr. Joel Sussman, *Civil Procedure*, 7th edition, Section 556, page 717, in which he wrote the following statement:

> **"The affiant is required, in his affidavit, to set forth all of those facts which he wishes to prove; an affidavit may not be drawn up in a manner which involves a mention of, and a reference to, another document, such as "all of the facts which appear in the Statement of Claim are correct." Such an affidavit is deficient and will not be admitted…. Should the petitioner wish to file a document, he shall append it to his affidavit and shall verify it in the proper way."**

b.   Civil Appeal 16/89, **Vradim Rose Cultivation Company Ltd. v. Israel Foreign Trade Risk Insurance Co. Ltd.**, *PD* 45 (5), 729, at 736–737.

c.   Civil Appeal 166/90, **Mordechai (Moti) Azulai v. AB Eilat Tourism Enterprises Ltd.**, *PD* 46 (5), 344, at 348–349.

7.   **In any event, the affiant is required to report for cross-examination on what purports to be her affidavit.**

## II. The Petition for the appointment of Adv. Nitza Pozner as the liquidator of the Association contains an inherent and improper conflict of interests.

8.    As set forth in the Petition, the Association has submitted a claim for debt to the Trustee—the Petitioner—in the amount of some $51,000,000, and that claim was rejected by him. The Association, however, did not accept the rejection; rather, it lodged an appeal against the Petitioner's decision before the Bankruptcy Court of New York. That appeal has not yet been heard and, in any event, has not yet been decided.

See Section 30 of the Petition.

At the same time, the Petitioner has filed an action against the Association in the amount of approximately $124,000,000.

In the Petition, the Petitioner is seeking the appointment of Adv. Nitza Pozner as the liquidator of the Association **on his behalf**.

This involves a conflict of interests which cries to the heavens. After all, how can a liquidator who is appointed at the request and on behalf of the Petitioner also pursue an action against him in the name of the Association; how can she also represent the Association's interests against him???

In this regard, see:

a.    High Court of Justice 531/79, **Likud Faction of Petach Tikva Municipality v. Petach Tikva Municipal Council**, *PD* 32 (2) 566, at 569–570.

b.    High Court of Justice 595/89, **Moshe Shimon v. Shalom Danino, Region Director, Ministry of the Interior Southern Region**, *PD* 44 (1) 409, at 412–413.

c.    High Court of Justice 7767/07, **Avi Asraf v. Minister of the Interior**, Supreme Court Compendium 2008 (1), 5725 (2008).

## III. The Petition is premature and, in any event, the hearing thereof should be stayed on the basis of the rule of *lis alini* [sic] *pendens*

9.    **At this stage**, even before it has been determined that the Association owes the Petitioner even one dollar, there is no cause whatsoever for granting the Petitioner's Petition for Court-supervised liquidation of the Association and for the appointment of another liquidator instead of The Undersigned.

10.    As set forth in Sections 29 and 30 of the Petitioner's Petition, the Association and Magnify submitted proofs of debt to the Petitioner.

The Association submitted proof of debt in the amount of some $51,000,000, and Magnify submitted proof of debt in the amount of some $770,000,000. These proofs of debt were rejected by the Petitioner. The Association and Magnify, however, did not accept the rejection; rather, they appealed against the decisions before the Court. **The appeals in question have not yet been heard and, in any event, have not yet been decided.**

11.    As the Petitioner argues in Section 42 of the Petition, the legal proceedings before the Court in New York will go on for a long period of time. **Thus, on the date on which the Petitioner's Petition was filed, it had not yet been determined that the Association owes the Petitioner even one dollar.**

Quite the opposite is true: according to the information which was provided by the Petitioner himself, in interim reports which he filed before the Court in New York, there is more than a reasonable basis on which to assume that Madoff's Ponzi scheme fraud began only at the end of 1992.

In any event, to this day, no binding judiciary decision has been handed down with respect to the starting date of the Ponzi scheme fraud which was perpetrated by Madoff, nor with respect to the manner of calculation of the profits which were generated on the money in the investment fund which was invested with BLMIS, starting on a date which preceded the start of the fraud and up to the date on which the fraud by Madoff began.

5

According to an argument advanced by Magnify, through which, as set forth above, the Donor financed the Association's commendable philanthropic activity, all of the money which was in its accounts with Madoff prior to December 31, 1992 is legitimate money, consisting of principal and earnings; and in light of the fact that, on December 31, 1992, its accounts with Madoff contained amounts which came to a grand total of **$253,608,194** (see the document known as BLMIS Page 360 in Appendix 31 to the Petition, together with the documents known as BLMIS Page 367, 368 in Appendix 32 to the Petition), then, even if the action by the Petitioner is allowed in its entirety, and the defendants in that action are required to refund the amounts claimed from them, in the approximate amount of $154,000,000—**which is totally and categorically denied**—Magnify will still be owed a credit balance in the amount of some **$110,000,000**.

In such a case, should the Petitioner distribute a dividend at the rate of some 50% of Magnify's credit balance (as the Petitioner intends to do), Magnify will be owed an amount of some $55,000,000. This will enable the Association to continue operating, for the benefit of scientific and medical research in the State of Israel, as it did from the time of its inception and until the day when it was forced to decide on voluntary liquidation.

12.   In Section 75 (a) of the action which the Petitioner filed against Magnify, *et al.*, he argues as follows:

"75 a. Magnify's BLMIS account numbered 1FN025 was opened on or around September 30, 1990 without any initial deposit of principal. The account's first statement, however, indicates that a 'sale' of almost 3 million shares of MCI Communications stock took place on May 18, 1990, five months before the account was opened. The purported 'gain' from that sale—upwards of $100 million—was based on the fiction that those securities had been 'purchased' on October 21, 1986, when the price of MCI stock was roughly $1/7^{th}$ of the purported sales price."

The members of the Association and its legal advisor are convinced that the opening of Magnify's Account No. 1FN025 by the founder of Magnify, Albert Igoin, actually involved the money from the sale of shares in MCI Communications, which had apparently been purchased for him at an earlier time, through one of his private accounts and/or from accounts of banking institutions in which he was involved in his business with Madoff.

13.   Clarifications which were recently performed with the Association's Counsel in New York, Adv. Michael Wexelbaum, indicated that the value of a share in MCI Communications, on the date when the Petitioner claims that the shares in question were purchased—that is, on October 21, 1986—was $6.875 per share. On the date when, according to the Petitioner's argument, the shares in question were sold—that is, on May 18, 1990—the share value was $42.25. These amounts are commensurate with the statement by the Petitioner in the above-cited Section 75 a, to the effect that the value of those shares increased, between the date of purchase thereof and the date of sale thereof, by a factor of approximately 7.

In other words, the sale of 3,000,000 shares in MCI Communications on May 18, 1990 yielded a return of $126,750,000, which is apparently the amount with which Magnify's Account No. 1FN025 was opened in September 1990.

It should further be clarified that it is inconceivable that Madoff would have given Albert Igoin a "gift" in the amount of $126,750,000, and/or that Albert Igoin would have received a "gift" in that amount from Madoff.

There is accordingly no basis for the Petitioner's argument, which is repeated again and again throughout the entire Petition, pursuant to which Igoin's only investment with Madoff and/or with BLMIS in Magnify's accounts was in the amount of only $3,136,150.

14.   In August of last year, the Honorable Judge Lifland, who is hearing Madoff's bankruptcy case in New York, decided that the Petitioner must keep **at least** 3% with respect to each year in which funds were invested with Madoff, from the time of the investment and until the time of his bankruptcy—that is, the month of December 2008—for "damage caused by the drop in the value of the dollar over the years."

6

A return at the rate of 3% per year, from the time of the opening of Magnify's Account No. 1FN025 with Madoff, in September 1990, to the time of Madoff's bankruptcy, in December 2008, calculated on a compound basis, brings the total rate of return to 67.84%. If we calculate the above-cited return (67.84%) on the amount with which Magnify's Account No. 1FN025 was opened—the amount of $126,750,000—we obtain the amount of $85,987,200.

The cumulative amount of the principal and the annual return, at the rate of 3%, in Magnify's Account No. 1FN025, at the time of Madoff's bankruptcy, in December 2008, should accordingly be in the range of $212,737,200 ($126,750,000 + $85,987,200).

We said "in the range of $212,750,200," and not a more precise figure, because, on one hand, a precise calculation should also take into account the withdrawals which were made over the years from Magnify's account at Madoff and should reduce the above-cited aggregate amount—but, on the other hand, should the Honorable Judge Lifland determine a rate of return which is higher than 3% per year, the amount of the return will significantly increase, and, as a result, the amount which should have been in Magnify's account at the time of Madoff's bankruptcy will increase.

Accordingly, even if the action which the Petitioner has filed against the Association is allowed in its entirety, in the amount of approximately $124,000,000—**and this is totally and categorically denied**—the Association, through Magnify, will still be owed a considerable amount, which is far higher than the amount of the action which the Petitioner has filed against it.

15.    In any event, as set forth above, to this day, no Court judgment has yet been handed down against the Association, just as the appeal against the rejection of the proof of debt which it submitted to the Petitioner has not yet been decided.

In this context, see: Civil Appeal 877/07, **Sigal Gefen and 19 others v. Gyrotech Investments Ltd.**, Supreme Court Compendium 2010 (3) 3013, at 3018 (2010), in which the Honorable Justice Elyakim Rubinstein ruled as follows:

**"When a company does not accede to a demand for payment, because it disputes the very existence of the debt or the extent thereof, it is not appropriate to presume that the non-payment indicates insolvency (Z. Cohen, 106). As Han points out (page 234): '… When a person argues the existence of a debt owed to him by the company, but the company, sincerely and in good faith, disputes the very existence of that debt, the person in question is not considered as a creditor, who is entitled to seek its liquidation.'"**

**Under these circumstances, the Petitioner's Petition is premature and the law requires it to be denied *in limine*.**

16.    Alternatively, the hearing of the present Petition should be stayed, pending a decision in the proceedings which are under way between the Petitioner and the Association in the Bankruptcy Court in New York, on the basis of the rule of *lis alini* [sic] *pendens*.

17.    Study of the entire length of the Petition, and of Appendix 39 thereto, which concerns the "Details of the Powers of the Liquidator," indicates that what the Petitioner is seeking to accomplish is not the liquidation of the Association under the supervision of the Court; rather, his true intention is to file an action against the Association and the members of its Executive Committee (although Section 6 of the description of the powers has apparently been negligently copied from another Petition which is of no relevance to the present case).

Established case law, since earliest times, has held that, under such circumstances, the Court shall stay the hearing of the later Petition until the earlier action has been heard.

In this context, see:

a.    Civil Appeal 9/75, **Sheikh Suleiman Muhammad al-Uqbi v. Israel Lands Administration**, *PD* 29 (2) 477, at 479–480.

b.    Opening Motion (Jerusalem District Court) 8208/09, **Hana Issa Odeh Awadeh v. Lands Registrar**, District Court Compendium 2011 (1) 14693 (2011).

c.    Civil File (Jerusalem District Court) 2002/00, Civil File (Jerusalem) 2058/00, **Elias Jacob** (the Defendants in Civil File 2058/00) **v. Eli Jochanan Engineers—Engineering and Construction Ltd.** (the Plaintiffs in Civil File 2058/00), District Court Compendium 2000 (3) 775 (2000).

7

d.      Civil File (Haifa Magistrates' Court) 2399-11-11, **Ahmad Abd al-Qadr v. Israel Lands Administration**, Magistrates' Court Compendium 2012 (2) 75783 (2012).

**IV. Detailed comments on the arguments which have been set forth in the Petition (Sections 1–76)**

The comments on the Petition shall be made parallel to the sections of the Petition.

It should be clarified that refraining from comment on any section or sections of the Petition does not constitute an admission to the arguments which have been set forth in the sections in question, and that, should the Association not comment on any of the sections of the Petition, that which has been set forth in the sections in question is denied.

With regard to the Petitioner's argument in the heading of the Petition and in Section 87 thereof, pursuant to which his Petition was filed "with the knowledge of the Registrar of Non-Profit Organizations," the Association hereby refers to Section 4 of the response by the Registrar of Non-Profit Organizations, pursuant to which, "notwithstanding that which has been set forth in the Petition, and notwithstanding a meeting which took place between the Registrar of Non-Profit Organizations and the Petitioners, **it cannot be said that the Petition was filed with the knowledge of the Registrar of Non-Profit Organizations**."

That which has been set forth above indicates that, as early as the heading of the Petition, the Petitioner has not been precise, to put it mildly.

1.      The Association denies that the Petitioner—the Madoff Trustee—is its "creditor" at this stage, in light of the fact that, as set forth above, **the Association, sincerely and in good faith, disputes the very existence of the debt in question** and no judgment which determines the Association's liability vis-à-vis the Petitioner has yet been handed down.

        In this context, see the ruling which is mentioned in Section 15 of Chapter **III** above.

        In the context of the action which the Petitioner has filed against the Association before the Bankruptcy Court in New York, the Association shall state that there is more than a reasonable basis on which to assume that, in the end, the action will be denied—both because the action is founded on untenable hypotheses, through the repeated use (more than 40 times) of the expression "on information and belief"—hypotheses which are denied by all of the Defendants in that case—and because it is replete with [to quote Ecclesiastes 4:4] "vanity and vexation of spirit"; it is phrased in a conceited, arrogant and hurtful way; and it consists entirely of [to quote Isaiah 1:6] "wounds and bruises and putrefying sores."

        With regard to Appendix 2 to the action, the Association shall state that it cannot serve as a lawful power of attorney for the representation of the Petitioner before a court in Israel.

5.      The Association denies that it filed solvency affidavits, signed by Prof. Henri Atlan, the Chair of the Association, and Prof. Hanoch Guttfreund, before the Registrar of Non-Profit Organizations, "after Counsel for the Association learned of the filing of the action by the Madoff Trustee."

        In the context of that which has been argued in the section in question, the Association admits that, at the time of the filing of the solvency affidavits, the members of the executive management knew that the Petitioner had rejected the proof of debt which was filed by the Association, in the approximate amount of $51,000,000. The Association, however, did not accept the rejection; rather, it lodged an appeal against the Petitioner's decision before the Bankruptcy Court of New York. That appeal has not yet been heard and, in any event, has not yet been decided.

6.      The Association most vehemently denies all of that which has been set forth in Section 6 of the Petition, including all of the subsections thereof.

        With regard to footnote 1, which is set forth in Section 6.2 of the Petition, the Association shall state that it was never the beneficiary of the rights in Magnify, and that all of its trusteeship in this regard was restricted solely and exclusively to the **holding** of shares in Magnify for the heirs of Albert Igoin—his widow, Doris Igoin; after her, his daughter, Laurence Apfelbaum; and after her, his granddaughter, Emilie Apfelbaum (in that order), so that all of the arguments in the Petition with regard to the trusteeship are a mere fabrication, and it would have been better for them not to have been raised, than to have been raised when the one who raised them did not know the facts and the truth.

        See Appendix A to the affidavit by Ayala Nahir, the content of which speaks for itself.

        The holding of the shares in Magnify by the Association may be compared to the deposit of the shares in a safety deposit box at a bank.

8

9.    The Association disputes the Petitioner's attempt to describe Dr. Kurt Brunner as a person who "purported" to serve as the sole Director of Magnify.

The Association further disputes the statement that Adv. Yair Green "was and still is the CEO of Magnify."

In the context of Magnify's accounts at Madoff, the Association shall state that both Account No. 1FN024 and Account No. 1FN025 were opened by Albert Igoin during his lifetime, and that he was the one who deposited the funds therein for the purposes of investment with Madof. Only after his death was Adv. Yair Green appointed to manage and supervise Magnify's accounts with Madoff.

10.    The Association shall state that, even if there were technical flaws in its conduct during its first years, those flaws were remedied; evidence of this may be found in the fact that, on January 20, 2004, the Association was given a certificate of good management for the years 2003 and 2004, which remained in force until March 31, 2004—this certificate may be seen among the other documents which were marked in the Petition as Appendix 10.

In this context, it should be stated that the Association has undergone a number of comprehensive in-depth examinations, and, as set forth in a summary report which was filed by Boaz Gazit, Certified Public Accountant, on January 20, 2004, he wrote, in the chapter entitled "Conclusion and findings":

> **"7.1 The findings of the ongoing examination were found to be normal.**
> **7.2 On the basis of our examination, the Association operates in accordance**
> **with the objectives for the purpose of which it was established."**

**The only reason** for which the Association was not given a certificate of good management, starting in 2004 and thereafter, is its wish to fulfill the Donor's request, to honor his instructions, and to prevent the publication of his identity—in this regard, see the report set forth in Appendix 9; see also a letter from Adv. Yair Green, the Legal Advisor of the Association, to Boaz Gazit, Certified Public Accountant, dated February 1, 2004, which was attached as part of the documents which were marked in the Petition as Appendix 10.

11.    Ms. Ayala Nahir is not the granddaughter of the donor, Albert Igoin; rather, she is his niece. Ms. Ayala Nahir's mother raised Albert Igoin in France during his youth, and Ayala Nahir and the members of her family are his only relatives in Israel.

12.    It is true that the Association, its executive management and its Legal Advisor expressly attempted to prevent the exposure of Albert Igoin's identity as the person who financed the commendable activity of the Association, on the basis of its wish to honor the Donor's wishes. This was set forth in letters by Prof. Henri Atlan, the Chair of the Association, dated February 29, 2004, and by Prof. Hanoch Guttfreund, a member of the executive management of the Association, dated March 7, 2004—both of which were addressed to the Registrar of Non-Profit Organizations, and were attached as part of the documents in Appendix 9 to the Petition.

As for the description of Adv. Yair Green as "the Donor's trustee": it should be clarified that the reference is to the fact that Adv. Yair Green was the Donor's "trusted ally," because one cannot be the "trustee," in the formal sense of the term, of a person who has died, unless one has been appointed as such, within the framework of the appointment of an executor for that person's estate—and Adv. Yair Green was not appointed as such by the Donor, although their personal relationship was close and involved a great deal of trust.

13.    It is true that both the Association's original Articles of Association, in English, and the Hebrew version which was submitted to the Registrar of Non-Profit Organizations mention the name of Albert Igoin as a person who may donate to the Association. However, a general mention in the Articles of Association is not equivalent to an express confirmation that donations were actually made. As set forth above, it may be assumed that the Association, its executive management and its Legal Advisor wished to honor the Donor's wishes and his instructions to keep his donations anonymous.

In this context, it should be noted that, according to clarifications performed by the Association's Legal Advisor, at the time when the Association was seeking to avoid exposing the Donor's identity, it appears that, from time to time, the Registrar of Non-Profit Organizations grants requests of this type—for example, requests in which he is asked to avoid exposing the names of donors who donated to the Weizmann Institute of Science and sought to keep their donation anonymous.

15.    With regard to the affidavit for the disclosure of the details of a corporation, which was filed in the action filed by the Petitioner in the United States—Appendix 13 to the Petition, the Association shall state that the Petitioner was not quite precise in this regard; and, as set forth in Section 6 above, all of the Association's trusteeship in this regard was restricted solely and exclusively to the **holding** of shares in Magnify for the heirs of Albert Igoin—his widow, Doris Igoin; after her, his daughter, Laurence Apfelbaum; and after her, his granddaughter, Emilie Apfelbaum (in that order).

9

16.    It is true that Strand International Investments Ltd. is a subsidiary of Magnify. However, just as Magnify is not part of the Association's assets, Strand is also not part of the Association's assets.

17.    Under the circumstances which have been set forth in Sections 6, 15 and 16 above, the Association was not required to state, in its financial statements, that it holds assets belonging to others, and was not required to keep accounts in the context of the trust, just as it was not required to report on it to the tax authorities in Israel or to include the trust in its objectives.

18.    The Association vehemently denies that which has been set forth in this section, which reflects nothing other than a lack of enlightenment or basic understanding of the commendable philanthropic activity directed toward the advancement of scientific and medical research in Israel.

The Association decided to promote a subject of unparalleled national importance, which was known as "technology transfer," with a view to commercializing the vast amount of know-how which had accumulated in the academic institutions in Israel, as described briefly in an article, the author of which is the Legal Advisor of the Association, Adv. Yair Green, with regard to technology transfer, which was published in the informational brochure of the National Biotechnology Institute in the Negev.

This contribution by the Association to subsidiaries of Israel's universities, such as Yissum, a subsidiary of the Hebrew University of Jerusalem; BG Negev, a subsidiary of Ben Gurion University; Hadassit, a subsidiary of Hadassah University Hospital; and other university companies, promoted technology transfer significantly for the benefit of the universities in question. The Association, however, never intended for a situation to arise whereby, should the subsidiaries of the universities earn profits from the commercialization of the know-how, the profits in question would be used by the Association, and certainly not by third parties, as the Petitioner has had the audacity—and the lack of any basic understanding—to argue.

In all of the contracts which were signed between the Association and the universities to which funds were donated for the purpose of "technology transfer," it was expressly agreed that, should the universities in question earn profits derived from the contribution by the Association to the studies yielding those profits, the universities undertook to repay up to 10 times the amounts donated to research, as set forth above, to the Association. **In return, however, the Association undertook to re-invest all of the profits in the university whose research yielded the profits in question.**

In this context, see Appendix B to the affidavit by Ayala Nahir.

In the context of the arguments which have been set forth in this section, the Association reiterates that set forth in Section **4** of Chapter **I** above.

With regard to the untenable argument to the effect that, starting at the time of Madoff's collapse, "the transfers of royalties in favor of the Association ceased abruptly," the Association shall state that, on the date of Madoff's collapse, it remained owing universities and other institutions in Israel the amount of $53,763,754, as set forth in the Notes to the Association's financial statements for the year 2008—Appendix 22 to the Petition.

As we have seen, not only do (and did) the universities and the recipients of the donations from the Association not owe it any "debts"; quite the opposite, in fact, is true. The Association was the entity which undertook to donate to them; however, as a result of the collapse of the Madoff investment house, it became unable to continue to donate, as it had undertaken to do.

In this context, it should be stated that all of the recipients of donations from the Association understood the gravely disadvantageous situation into which the Association had become embroiled, and waived the continued receipt of donations from the Association, even if the donations in question had been promised to them within the framework of signed contracts between them and the Association.

19.    The Association vehemently disputes the argument which holds that the source of the funds which it donated consisted of the "transfers of fictitious funds and acts of fraud and deception which were known, or which, at the very least, should have given rise to suspicion and should have been known, to the members and officeholders of the Association."

**This is an untenable and surreal argument which is devoid of any foundation whatsoever—not on the basis of the facts, not on the basis of common sense, and not on the basis of reality.**

Until the collapse of the Madoff investment house, Bernard Madoff was considered to be a financial wizard, whereby the best investors in the world—including banks, investment companies and experts in the capital market—waited in line to invest with him.

10

All of the donations to the Association were received by it from the Donor, Albert Igoin, who was the one who invested Magnify's funds with Madoff, just as he invested his own private funds with him, in amounts in the hundreds of millions of dollars.

The Association, its members, its executive management, its Legal Advisor, and its accountants took as given the funds which financed the Association's commendable activity—which, shortly after the Donor's death, came to a total of some $430,000,000 in Magnify's accounts.

Over a period of 16 years prior to the collapse of the Madoff investment house, between 1992 and 2008, the capital market authorities in the United States—the Securities and Exchange Commission—performed a number of in-depth examinations of Madoff and his investment house, and their examinations did not reveal the fraud which was being perpetrated by him.

How is it possible to argue that, if the capital market authorities in the United States, their inspectors and the experts on their behalf did not discover the fraud which was being perpetrated by Madoff, precisely the members of the Association, its executive management, or anyone on its behalf, could have discovered it???

Moreover, had the least suspicion arisen that something was wrong at Madoff, would the Association have left **all of its investments** in Madoff's hands, rather than dispersing them among several finance managers, or at least in banks in Israel???

The argument to the effect that the returns generated by the Association's account with Madoff earned "unreasonable profits" is also an untenable and baseless argument, as the returns in the Association's account were definitely reasonable and did not deviate from the returns in the United States capital market.

In this context, it should be stated that, since the death of the Donor, Albert Igoin, early in 1995, Magnify's accounts never yielded a return in excess of 9.7% (in only one year), and that, in most of the years between the Donor's death and the collapse of the Madoff investment house, the returns on Magnify's accounts were in the range between 4% and 6%, which were actually lower than the returns in the United States capital market during those years.

Not only that: the Association received, on a monthly basis, reports on trading activity which was performed in its account at Madoff; the reports did not indicate that this was fictitious activity; and, at the end of each year, the Association received a certificate from the accountants in the United States, with regard to the activity which was performed in its account at Madoff.

In addition, the Association received certificates attesting to tax which was withheld at source from the profits in its investment portfolio at Madoff, and the withheld funds were actually transferred by Madoff to the United States tax authorities (the IRS).

On the basis of that which has been set forth above, it is obvious that the members of the Association, its executive management and those on its behalf did not know and could not have known what has been argued by the Petitioner, and it would have been better for the argument in question not to have been raised, and now that it has been raised, in any event, it must be totally and categorically rejected.

20.   It should be clarified and emphasized that all of the Association's donations were made after its members gave pertinent, profound and serious consideration to requests for donations which were addressed to the Association, or projects and ventures in Israel which were based on research studies of scientific or medical importance, including the universal implications thereof, which the members of the Association saw fit to initiate.

Study of the Association's Articles of Association indicates that its donations did not specify the institutions to which the Association was required to donate, but rather, the purposes for which the funds of its donations were intended.

This, in turn, means that that which has been argued in this section represents an inexplicable pretension, on the Petitioner's part, in purporting to replace the professional judgment of the members of the Association, who are very senior academicians of unparalleled rank in Israel, and are highly renowned among the scientific community worldwide, with his own judgment—which, with all due respect, cannot begin to compete with the capabilities, knowledge and integrity of the members of the Association.

Moreover, reliance on Appendix 25 to the Petition is inappropriate for three reasons:

First of all, the donation to the Peres Peace Center, to which the writer of Appendix 25 to the Petition refers, was given following an in-depth discussion, which took place among the members of the Association on July 30, 2002, of an application for support of an important national project concerning **research on the subject of water culture and agriculture in the desert**, based on a document entitled "The

11

Culture of Water," which was managed by the Peres Peace Center and implemented through Research Institutions of Ramat Hanegev Ltd., which is headed by Dr. Moshe Sagi and managed by Prof. Shmuel Pohoryles, and through other research institutions, with the cooperation of additional international entities.

Secondly, at the time when Appendix 25 to the Petition was written, an in-depth examination of the Association had already been performed by Boaz Gazit, Certified Public Accountant. As set forth in detail in Section 10 of this chapter above, at the end of his examination, he wrote, in the chapter entitled "Conclusion and findings":

> **"7.1 The findings of the ongoing examination were found to be normal.**
> **7.2 On the basis of our examination, the Association operates in accordance with the objectives for the purpose of which it was established."**

Thirdly, as a matter of fact, in real time when Appendix 25 to the Petition was written, in December 2006 or thereabouts, the Registrar of Non-Profit Organizations did not see fit to accede to the proposal which was set forth therein, apparently on the basis of a wish to "create" additional work for the writer, more than out of any real concern for the propriety of the Association's operations.

21.    The Association disputes that which has been argued in this section in general, and its arrogant phrasing in particular.

Quite the opposite of that which has been argued in this section is true. Specifically, **the circumstances which have been described up to this point do not justify granting the Petition by the Petitioner, especially as these "circumstances" are not supported by an affidavit as required by law.**

Moreover, the use of the expression "it is indisputable" cannot create a new situation out of thin air—because, as set forth in detail above and below, that which has been argued in the Petition is definitely disputable.

And furthermore, Adv. Daniel Azriel is not a crony of the Association, or of the officeholders thereof; he has both the legal know-how which is required in order to serve as the liquidator of the Association and the considerable public experience necessary for the position, having served as Director-General of the National Insurance Institute and as Head of the Mevasseret Zion Local Council.

Nor would it be superfluous to state that, in that which has been argued in this section, the Petitioner is "calling the kettle black"—since, in his Petition, he is seeking to appoint **a liquidator on his behalf,** and we have already discussed the inherent and improper conflict of interests which this entails—see Section 8 of Chapter **II** above.

With regard to the closing passage of this section, it should be clarified that there is no need to "locate" financial sources of the Association, because the sources in question are reflected, in an obvious and transparent manner, in the financial statements which are submitted and which are known to the Petitioner and in his possession. Furthermore, the argument with regard to debts owed to the Petitioner—which do not exist, up to this moment—is inappropriate.

23.    The Association does not see fit to comment on that which has been argued in this section, with the exception of the following:

It is true that no one can dispute that Madoff perpetrated a broad-scale Ponzi scheme fraud, which was discovered on December 10, 2008. However, that which has been argued in this section—specifically: "In fact, there was **never** any trading in securities in BLMIS's clients' accounts"—still needs to be proved by the Petitioner, because, to this day, **the starting date** of Madoff's Ponzi scheme fraud has not yet been established; and this fact has a significant impact on all of the proceedings which are being conducted by the Petitioner, in general, and against the defendants in the action which was filed by him against Magnify, *et al.*, in particular.

24.    The Association disputes that which has been argued in this section and refers to that which has been set forth in Chapter **III**, Sections 9–15 above.

26.    The closing passage of this section, starting with the words "The Association accordingly knew," is an absurd argument which is not based on any factual or evidentiary foundation whatsoever, which was set forth in writing only because "paper tolerates everything"—and the Association vehemently disputes this untenable and fanciful argument.

27.    With regard to this section, the Association refers to that which has been set forth in Section 30 of the Petition, in which the Petitioner confirms that the Association did not accept the rejection of the proof of debt which it submitted, and lodged an appeal before the Court in New York—an appeal which is still pending.

28.    The Association shall state that there would be no advantage in increasing its financial activity following the death of the Donor, as, according to his instructions, **half of the returns in Magnify's investment portfolio was intended to be used for philanthropic purposes, through the Association**; and because, notwithstanding the fact that, between 1995 and 2008, the cumulative return in both of

Magnify's accounts was single-digit, with the increase in the amounts which were reflected in these accounts, according to Madoff's semiannual reports to Adv. Green, it would have been possible to honor the Donor's wishes and instructions and to transfer increasingly large amounts from Magnify's accounts to the Association's account.

31.   It may be assumed that the details of the action which the Petitioner filed against the Association, *et al.*, before the Court in New York, in the present Petition, were not intended for any other purpose than to vilify the Association, its members, its executive management, its Legal Advisor and anyone on its behalf before this Honorable Court, and to ensure that it would be published and made widely known—as, in fact, was actually done.

This is not the place to comment on the details of this action, given that the Petitioner did not see fit to append the Statement of Defense which was filed against the action.

At the same time, we cannot just do nothing, and the Association shall state that "paper tolerates everything" and that, in the opinion of the members of the Association, its executive management and its Legal Advisor, the action is fundamentally untenable and is likely to be denied, for the reason that the Association received real donations from Igoin, for financing its activity, and that it acted in good faith, in a modest and totally transparent manner, toward the realization of its objectives, as set forth in the verbal report dated December 31, 2010, which the Association submitted to the Registrar of Non-Profit Organizations.

This is not the place to set forth all of the Association's arguments against the action; it will be sufficient for us to briefly point out the following facts:

Igoin was a unique businessman, wealthy, decent and principled, a self-taught intellectual who only donated to fields after he had learned the essence thereof, understood the principles thereof and become convinced of the importance thereof.

During his lifetime, Igoin funded the Association's activity; after his death, on January 31, 1995, all of the Association's activity was financed with funds that were transferred to its account at Madoff from Magnify, which had been established at Igoin's request in 1983 by an attorney, Dr. Kurt Brunner of Switzerland.

According to the information which was provided by the Petitioner himself in interim reports which he filed before the Court in New York, there is more than a reasonable basis on which to assume that Madoff's Ponzi scheme fraud began only at the end of 1992.

In any event, as set forth above, to this day, no binding judiciary decision has been handed down with respect to the starting date of the Ponzi scheme fraud which was perpetrated by Madoff, nor with respect to the manner of calculation of the profits which were generated on the money in the investment fund which was invested with BLMIS, starting on a date which preceded the start of the fraud and up to the date on which the fraud by Madoff began.

According to an argument advanced by Magnify, through which, as set forth above, the Donor financed the Association's commendable philanthropic activity, all of the money which was in its accounts with Madoff prior to December 31, 1992 is legitimate money, consisting of principal and earnings; and in light of the fact that, on December 31, 1992, its accounts with Madoff contained amounts which came to a grand total of **$253,608,194**, then, even if the action by the Petitioner is allowed in its entirety, and the defendants in that action are required to refund the amounts claimed from them, in the approximate amount of $154,000,000—**which is totally and categorically denied**—Magnify will still be owed a credit balance in the amount of some **$110,000,000**.

Moreover, according to the argument that was set forth by all of the Defendants, the action is based on false foundations; it is replete with [to quote Ecclesiastes 4:4] "vanity and vexation of spirit"; it is phrased in a conceited, arrogant and hurtful way; and it consists entirely of [to quote Isaiah 1:6] "wounds and bruises and putrefying sores."

**All of the Defendants acted with devotion and loyalty, in good faith and in perfect confidence** that they were fulfilling Igoin's wishes, to donate to the advancement of scientific and medical research in Israel, including the universal implications thereof. Those wishes continued to be fulfilled after his death by his widow, Doris Igoin.

The argument that any of the Defendants in the present action, and especially Adv. Green, knew, or should have known, of Madoff's Ponzi scheme fraud, as set forth in Section 19 of this Petition, is—as set forth in Section 19 of this chapter above—a mendacious, surreal and untenable argument. Not only is it devoid of any factual basis in the facts of the case; it is an argument which has been directed, as a matter of routine, against the great majority of the Defendants by the Petitioner, in an attempt to overcome such legal barriers as expiry under the statute of limitations.

32.   The Association disputes that which has been argued in this section, including all of the subsections thereof.

With regard to that which has been argued in Section 32.1, pursuant to which the accounts of the Defendants in the action yielded an alleged, fictitious profit of more than 150 times the amount of money which was deposited, it should be clarified that this untenable argument is based on the fact that the Petitioner canceled, with no reason and unlawfully, the amount which had been deposited by Igoin, in September 1990, in Magnify's account, in the amount of $126,750,000.

In this context, it should be stated that, on December 7, 2011, the Association's Legal Advisor, Adv. Green, met in New York with four attorneys from the law firm of Baker & Hostetler, who represent the Petitioner, and presented to them documents and conclusive, unequivocal evidence, according to which all of their arguments about any of the Defendants' having known of Madoff's Ponzi scheme fraud, or even about their ability to know of it, was a surreal argument and it would have been better for it not to have been raised; and that he presented them with details on the increase in the value of Magnify's investment portfolio from 1992 to mid-2008, as was known to him, according to the reports which had been given by Madoff to Igoin during his lifetime and to Green after Igoin's death, pursuant to which the increase in the value of Magnify's investment portfolio during those years was a reasonable and moderate increase, in utter contrast to that which had been claimed in the action which is mentioned here. The trouble is that the Petitioner chose to ignore that information.

With regard to that which has been argued in Section 32.3, the Association shall again state that, as far as it is concerned, the argument that the reports produced by BLMIS were "entirely different" from reports which were produced for other investors is an inaccurate argument, to put it mildly—because, as set forth in Section 19 above, the Association received, each month, reports on trading activity which was performed in its account at Madoff; the reports did not indicate that this was fictitious activity; and, at the end of each year, the Association received a certificate from accountants in the United States, with regard to the activity which was performed in its account at Madoff.

With regard to the argument in the closing passage of this section, pursuant to which these reports were produced and drawn up on separate computers of Madoff's employees, and not on the automatic computerization system, through the use of which the reports were produced for the other accounts at BLMIS: the Association asks the following question: Can the Petitioner possibly believe that the Association, or anyone on its behalf, had access to the computers at BLMIS, so that they could have known on which computers the reports were produced???

With regard to Appendix 33 to the Petition, the Association shall state that it saw the documents known as BLMIS Page 371 and BLMIS Page 372 **for the first time** upon receipt of the volume of appendices to the Petition.

The document known as BLMIS Page 370 was also not known to the Association; it was only known to Adv. Green, who did not bring it to the attention of the Association—and even he saw the other two documents **for the first time** upon receipt of the volume of appendices to the Petition.

More precisely: the document known as BLMIS Page 371 is addressed to Kurt Brunner, and the document known as BLMIS Page 372 is not legible enough to discern to whom it was addressed.

Accordingly, there is no foundation for the argument whereby it was possible to know from the documents about the inconsistencies and discrepancies in reporting that were committed by Madoff.

34.    The Association rejects the reference to the funds which were transferred to its account for the purpose of its commendable philanthropic activity as "donations."

As for the description of Adv. Yair Green as "the Donor's trustee"—it should again be clarified, as set forth in our comments in Section 12 of this chapter above, that the reference is to the fact that Adv. Yair Green was the Donor's "trusted ally," and their personal relationship was close and involved a great deal of trust, to the point that it could be metaphorically referred to as a father-and-son relationship.

With regard to the "trustee" of Magnify, the attention of the Honorable Court is hereby called to the arguments in Sections 6, 15, 16, and 17 of this chapter above.

35.    The argument in the closing passage of this section, pursuant to which the Association received, "*inter alia*," funds from accounts which were kept at BLMIS is outrageous and deceptive, given that the overwhelming majority of the funds, in the amount of some $124,000,000, were transferred to the Association, for the financing of its commendable philanthropic activity for the advancement of scientific and medical research in Israel, including the universal implications thereof, according to the wishes and the explicit instructions and guidelines of the Donor, Albert Igoin, and after his death, those of his widow, Doris Igoin.

14

**The entire balance of the transfers of funds which were made in the Defendants' accounts there were made with permission, according to authority, and lawfully, and they do not concern the Association** and do not concern the present Petition, and the very raising of that which has been argued in this section was inappropriate and merely intended as vilification.

It should be noted that Adv. Green has denied that he had a special relationship with Madoff, over and above the performance of the duties which were assigned to him by Magnify, as the Donor instructed him and as the Donor instructed the sole Director of Magnify, Dr. Kurt Brunner, and apparently Madoff as well.

36.    The Association disputes that which has been argued in this section, and shall state that the argument raised by the Petitioner in the closing passage of this section, to the effect "that voluntary liquidation proceedings were never intended for the location and collection of funds for the benefit of the creditors," indicates that the Petitioner is not petitioning for a proceeding involving the Court-supervised liquidation of the Association, but rather, for entirely different purposes which have nothing to do with the liquidation of the Association; and, for this reason, it is fitting and proper for the Honorable Court to allow the petition by the Association to strike the Petition *in limine* or, at the very least, to stay the hearing thereof, pending a final decision in the proceedings which are under way between the Petitioner and the Association before the Bankruptcy Court in New York, on the basis of the rule of *lis alini* [sic] *pendens*, as set forth in detail in Sections 9 through 17 of Chapter **III** above.

38.    The obscure arguments which have been raised in this section do not indicate when the conversation between the Petitioner's attorneys and the Association's former attorney took place; and, in any event, the latter acted lawfully and properly when she refused to waive a formal service of the action and even to receive a "courtesy copy" of the action, which was delivered to the offices of the Association on March 22, 2011.

39.    The Association denies that which has been argued in this section.

As may be seen as early as the Association's financial statements for the year 2008, which were signed by Prof. Henri Atlan, the Chair of the Association, and Prof. Hanoch Guttfreund, a member of its executive management, on April 20, 2009, Note 2 to the financial statements states as follows:

> "1. At a General Meeting of members of the Association, which took place on December 31, 2008, it was resolved to freeze all of the Association's activity until the matter had been clarified and confirmed."
>
> See Appendix 22 to the Petition.

Starting at that General Meeting, at the end of 2008, the Chair of the Association, Prof. Henri Atlan, wished to liquidate the Association. Its members, however, decided to delay the liquidation until after the Association had attempted to collect from the tax authorities in the United States (the IRS) the withholding tax money which Madoff had deducted from its profits and had transferred to the tax authorities, in the three years which preceded the collapse of his investment house.

The Association was in need of those funds, *inter alia*, in order to cover its undertakings to its employees and to pay its attorneys' legal fees for the action which had been filed by the Petitioner against it in New York.

After the Association succeeded in receiving the withholding tax funds, it acceded to Prof. Atlan's request to enter into voluntary liquidation proceedings.

It is true that, at the time of the submission of the solvency affidavits, the signers thereof knew that the Petitioner had denied the proof of debt which the Association had submitted to him, in the amount of some $51,000,000. They also knew, however, that the Association had lodged an appeal against that denial, and that the appeal in question had not yet been decided.

It is not true that, at the time of the signing of the solvency affidavits, the signers thereof knew about the action by the Petitioner.

In any event, any speculation by the Petitioner as to the Association's intentions in the filing of an application for voluntary liquidation is nothing but nonsense, with no factual or legal basis whatsoever.

40.    The Association disputes that which has been argued in this section, which, as set forth above, is not correct from the factual standpoint and is accordingly baseless from the legal standpoint.

41.    Again, the Petitioner has chosen to open this section with the expression "it is indisputable," when he knows that his argument is not true and that the Association disputes the argument in fact which underlies that expression.

Precisely that which has been set forth in this section with regard to the Association's former attorney indicates that the argument raised by the Petitioner, to the effect that the Association, or someone on its behalf, knew of the filing of the action before the Association entered into voluntary liquidation proceedings, is not true. Moreover, even if the Association's former attorney had some general knowledge of the filing of the action, this knowledge cannot be imputed to the Association or anyone on its behalf.

42. The Association denies that which has been argued in this section, and again calls the attention of the Honorable Court to the arguments advanced by the Association in Sections 10 through 15 of Chapter **III** above, and to Sections 1 and 31 of this chapter.

43. The Association shall state that, at the time when it resolved to enter into voluntary liquidation, it had no repayable debts, as all of the recipients of the donations, to which the Association had undertaken to donate, waived the balance of the donations which was due to them from the Association.

Moreover, at the time when it resolved to enter into voluntary liquidation, the Association did not yet owe the Petitioner even a single dollar, and accordingly, that which has been argued by him in this section is devoid of any validity whatsoever.

It should be clarified that the Petitioner's **alternative** argument in this section is not commensurate with what purports to be an affidavit in support of the Petition, as the truth cannot be alternative, and, in the case which is presently at hand, the affiant made **a vague and laconic affidavit, which refers in a generalized manner** to that which has been argued in the Petition, as if **everything** in it were true, including alternative arguments in fact—and this indicates that that which has been set forth therein cannot support the Petition, and that the law requires the Petition to be struck *in limine*.

44. Whereas the Petitioner, in the action, repeats the untenable argument, pursuant to which the Association "knew or should have known" of the fraud perpetrated by Madoff—and this is totally and categorically denied, *inter alia*, as set forth in detail in Section 19 of this chapter above—with regard to himself, the Petitioner argues that "the Madoff Trustee did not know and could not have known, at the time of the service of the action to the Association, of the voluntary liquidation proceedings."

This argument is inaccurate, given that the publication of the Association's voluntary liquidation appeared in two newspapers, *TheMarker* and *First Source*, on February 28, 2011, and the action was served to the Association some three weeks thereafter, on March 22, 2011.

The publication in the media gives rise to a presumption that the Petitioner knew of the Association's voluntary liquidation proceedings and that, accordingly, his argument to the effect that he did not know and could not have known of the voluntary liquidation proceedings at the time of the service of the action to the Association is not accurate, to put it mildly—and, in other words, this is a case of "the pot calling the kettle black."

45. The argument that the liquidator of the Association, Adv. Daniel Azriel, acted unlawfully, as argued in this section, is unfounded.

The minutes of the General Meeting of the Association on January 18, 2011, at which it was resolved to enter into voluntary liquidation, was delivered to his office on January 19, 2011, and after an attorney from his office, Adv. Meital Seri Azrieli, studied them, she asked Ms. Ayala Nahir to again convene the General Meeting of the Association, which was convened on February 15, 2011, at which time it again confirmed the Association's entry into voluntary liquidation. The date of the minutes, however, was not corrected and remained as it had originally been: January 18, 2011.

Nine days after the date of the additional convocation of the Association, on February 24, 2011, Adv. Azriel sent applications to publish the liquidation of the Association to two newspapers, *TheMarker* and *First Source*, and to *Reshumot* [the official Gazette of the State of Israel]. The publication appeared in the newspapers on February 28, 2011, and in *Reshumot* on April 6, 2011.

It would be superfluous to state that the liquidator of the Association has no control over the date of publication in *Reshumot*, and the argument against him in this regard is utterly baseless.

47. The Association vehemently disputes that which has been argued in this section, which is a scandalous and baseless argument from both the factual and the legal standpoints.

First of all, the Petitioner does not have any evidence whatsoever to the effect that, at the time when the Association resolved on its voluntary liquidation, it had "positive knowledge" of the action.

Secondly, there is no suspicion whatsoever of that which has been argued by the Petitioner in this section, which is nothing more than a suspicion from his own feverish imagination.

16

See Section 5 of Chapter **I** above.

48.  That which has been argued in this section is also untenable and baseless. As set forth in Section 45 above, the liquidator of the Association sent *Reshumot* an application for publication of the liquidation of the Association, and the fact that the publication took place when it did is beyond the liquidator's control.

Moreover, as part of Appendix 4 to the Petition, the Petitioner has appended the letter dated January 19, 2011, which was sent by Ms. Racheli Arad, Coordinator of Deletions and Liquidations at the Office of the Registrar of Non-Profit Organizations, to the liquidator of the Organization, pursuant to which, in order to complete the liquidation proceedings, the Association was required to file seven documents.

The publication in *Reshumot* concerning the voluntary liquidation of the Association and the appointment of a liquidator—Appendix 34 to the Petition—was not made in order "to attempt to create the finality of the voluntary liquidation proceedings," as argued by the Petitioner—an argument which it would have been better for it not to have been made.

49.  The Association totally and categorically disputes that which has been argued in this section—again, through the use of the expression "it is indisputable," when all of that which has been argued in this section is definitely disputable, and there is no need to reiterate the arguments in this context.

50.  The frivolous nature of the Petitioner's argumentation in this section may be learned from the fact that he writes that the time which the liquidator of the Association allocated to its creditors for the filing of their claims was "only two weeks." Study of the publication in *Reshumot*—Appendix 34 to the Petition—indicates, however, that the time which was allocated to the creditors by the liquidator was "within 21 days of the date of publication of this notice."

The time which the liquidator allocated to the Association's creditors is reasonable and generally accepted. On the other hand, the manner of the Petitioner's argumentation against him, in general, and in this matter, in particular, is improper, and the law requires that argumentation to be totally and categorically denied.

For the sake of comparison of the reasonable and generally accepted time during which creditors are invited to file their claims for debt, the attention of the Honorable Court is hereby called to the invitation which was published by Adv. Amir Levitzky, the liquidator of the organization known as the Broadband Wireless Communication Consortium, which was published in Appendix 34 to the Petition itself.

51.  That which has been argued in this section is utterly baseless and the Association totally and categorically disputes it. It would be superfluous to state that Adv. Green is not the Yeshaya Horowitz Association.

53.  That which has been argued in this section also indicates that the Petitioner's intention was not to obtain Court-supervised liquidation for the Association, but rather, to promote, through the liquidation of the Association, the untenable action which he filed against the Association, *et al.*, in New York.

Moreover, the Petitioner has also proposed to appoint "a liquidator who is not tainted with a conflict of interests," while ignoring the fact that the appointment of the liquidator who has been proposed by him, Adv. Nitza Pozner, is tainted with an inherent and improper conflict of interests, as described in Chapter II above.

54.  That which has been argued in this section puts the cart before the horse, as it cannot be said that the very filing of the action—which, as has been argued in this very section, is "pending"—gives rise to a liability for the Association vis-à-vis the Petitioner, not even in the amount of one single dollar.

Not only is there a good chance that the action will be denied; there is also a possibility that the Association's appeal against the rejection of the proof of debt which it submitted will be allowed by the Court, and that the Petitioner will end up in debt to the Association, and not the other way around.

There is accordingly no advantage to that which has been argued in the closing passage of this section—just as there is no need, **at this stage**, for the managers of the Association to provide other affidavits.

55.  With regard to that which has been argued in this section, the Association shall reiterate that which was argued in the Introduction to the Response: that as early as the response by the liquidator—The Undersigned—to Counsel for the Petitioner dated February 2, 2012 (Appendix 38 to the Petition), the liquidator informed them as follows: "**At the same time, as soon as I was informed that an action had been filed against the Association, I froze the liquidation proceedings**."

56.  The Association and its liquidator, The Undersigned, dispute that which has been argued in this section and shall state that all of the operations were conducted lawfully, with integrity and in total transparency, and that the Petitioner's arguments against them in this section are pointless and outrageous arguments, which the law requires to be totally and categorically rejected.

17

59.    The Association disputes that which has been argued in this section and shall state that that which has been set forth in the closing passage thereof is nothing more than a meaningless citation of sections of the Non-Profit Organizations Law, 5740-1980.

60.    The Association disputes the Petitioner's arguments in this section, which have been raised in a generalized, unfounded way and phrased in vitriolic language.

The Association again calls the attention of the Honorable Court to the arguments raised by it in Sections 10 through 14 of Chapter **III** above.

And if we are discussing representation that, it would not be superfluous to state that, to date, **the Petitioner and his various Counsel** have been paid more than four hundred million dollars (**$400,000,000**), out of the liquidation fund of the BLMIS investment house—*inter alia*, with respect to duplicate proceedings which the Petitioner has chosen to conduct, such as this duplicate proceeding.

61.    It is true that, pursuant to the resolution to freeze the Association's information proceedings, the Association adopted the resolutions which have been set forth in this section.

62.    The argument that Appendix 36 to the Petition "was drafted and signed by Green" is not accurate and is clearly refuted by study of the appendix in question, which was signed by Prof. Henri Atlan, the Chair of the Association, and Prof. Hanoch Guttfreund, a member of its executive management.

Adv. Green, the Association's Legal Advisor, confirmed that the resolutions which were adopted at the meeting in question were adopted in accordance with the Association's Articles of Association, as he confirmed all of the resolutions by the Association which complied with the test set forth in its Articles of Association.

65.    The letter by the liquidator of the Association, The Undersigned, Appendix 38 to the Petition, speaks for itself; it is obvious that the Association and The Undersigned rely on that which has been set forth therein, as an integral part of the Response by the Association.

66.    The Association and its liquidator, The Undersigned, **vehemently** dispute each and every one of the arguments which have been raised in unrestrained language in this section, with the exception of the argument in Section 66.7, which confirms the argument by the Association in Appendix 38 to the action, and which is concisely stated in Section 65.7 of the Petition.

At the same time, the Petitioner's argument in Section 66.7, which holds that Counsel for the Association in New York approached Counsel for the Petitioner with a petition for the receipt of evidence "prior to the filing of the action" is not true, and cannot be true.

The Association shall state that it takes a great deal of audacity and defiance to raise the argument which the Petitioner has raised in Section 66.2 of the Petition, especially when the Petitioner—not to mention the attorney whose vague, laconic and generalized affidavit purports to support the Petition—does not have a scrap of evidence in support of the insolent arguments in this section.

67.    The Association denies that which has been argued in this section, and shall again emphasize that, **to this day, it owes the Petitioner nothing at all**, and that the Petitioner's argument, to the effect that the Association intends, "**when the time comes**," to evade the payment of its debt to the Petitioner, in and of itself indicates that the Petition by the Petitioner, in the case which is presently at hand, is premature, and that the law requires it to be struck *in limine*, until "**the time comes**," **or perhaps forever!!!**

In this context, the Association reiterates its declaration in the Introduction to this Response:

**It would be superfluous to state that, if and when it is ruled, by means of a peremptory judgment, that the Association is required to refund to the Petitioner even one dollar, the Association will consent to the transfer of the liquidation from voluntary liquidation to liquidation under the supervision of the Court, in light of the fact that the Association not only has nothing to hide, but rather, quite the opposite is true: the Association and all of its members and consultants, or anyone acting on its behalf, are proud of their work within the framework of the Association.**

68.    The Association and its liquidator, The Undersigned, totally and categorically deny that which has been argued, with no basis whatsoever in fact or in law, in this section.

In this context, the Association calls the attention of the Honorable Court to a statement which the liquidator of the Association made to Counsel for the Petitioner in Appendix 38 to the Petition, in the following words:

"You have reached the height of audacity in your argument to the effect that the liquidation proceeding is merely being carried out for the sake of appearances and in bad faith. As the Association specified in the financial report which it submitted to the Registrar of Non-Profit Organizations on June 16, 2011, which you mention in Section 24 of your letter, the collapse of the Madoff investment house led the Association to a situation in which very little cash remained in its treasury, and certainly not the untenable amounts which have been claimed from it by Picard, on the order of some $124,000,000; and accordingly, even if his claim against the Association

18

were to be allowed—**and this is denied**—he would not be able to obtain satisfaction from the Association for even a small part of the amount claimed, even had the Association not entered into voluntary liquidation proceedings."

70–76. With regard to that which has been argued in the sections in question, the Association again refers to that which has been argued by it in Sections 12 and 34, and in Sections 6, 15 and 16, of this chapter above.

### V. Detailed comments on the arguments which have been set forth in the Petition (Sections 77–90)

It should again be clarified that refraining from comment on any section or sections of the Petition does not constitute an admission to the arguments which have been set forth in the sections in question, and that, should the Association not comment on any of the sections of the Petition, that which has been set forth in the sections in question is denied.

79.1    The Association disputes the Petitioner's argument to the effect that it is appropriate to order its dissolution by virtue of Section 49 (4) of the Non-Profit Organizations Law, 5740-1980.

In this context, the attention of the Honorable Court is hereby called, once again, to the case law which was handed down by the Supreme Court, and specifically by Honorable Justice Elyakim Rubinstein, in Civil Appeal 877/07, **Sigal Gefen and 19 others v. Gyrotech Investments Ltd.**, Supreme Court Compendium 2010 (3) 3103, at 3108 (2010):

"Insolvency

23. The question of when a company shall be deemed insolvent is governed by Section 258 of the Companies Ordinance:

'A company shall be deemed insolvent upon the occurrence of one of the following:

(1) Should a creditor who is owed by the company, according to a check or in any other manner, an amount which is greater than five shekels, the payment of which has come due, have given the company, at its registered offices, a demand, bearing his signature, for the payment of his debt, and should the company, for three weeks after the demand, not have paid the debt and not have provided a guarantee and not have come to an arrangement to the creditor's reasonable satisfaction;

(2) Should an execution order or another Court document issued pursuant to a Court judgment or a Court order in favor of a creditor of the company not have been honored, in whole or in part;

(3) Should it have been proved, to the satisfaction of the Court, after having taken into account the company's contingent and future liabilities, that the company is unable to pay its debts.'

Although the third alternative requires positive proof of insolvency, the first two alternatives—the first of which, according to the amount set forth therein and the phrasing thereof, comes from 'the books of previous generations'—impose presumptions, according to which the company is deemed insolvent, with no need for proof of the company's actual situation (Z. Cohen, *Liquidation of Companies* (5760-2000), 103 (hereinafter: '**Z. Cohen**')). According to the first alternative, which is relevant to the case which is presently at hand, it is required for the creditor to be owed an amount which is greater than five shekels, the payment of which has come due; for the creditor to have given the company, at its registered offices, a demand, bearing his signature, for the payment of his debt; and for the debt not to be in dispute. The underlying view with respect to the first alternative seeks to make it easier for the creditor to impose an insolvency proceeding upon the debtor. A single specific debt is sufficient to confer a right to petition for the opening of the proceeding, and the initiating creditor is not required to examine all of the debtor's economic circumstances before approaching the Court. The remaining elements of the cause concern procedural details, which were intended to ensure the exhaustion of the proceedings between the creditor and the debtor prior to the filing of the petition (Han, 215).

24. **When a company does not accede to a demand for payment, because it disputes the very existence of the debt or the extent thereof, it is not appropriate to presume that the non-payment indicates insolvency (Z. Cohen, 106). As Han points out (page 234): "… When a person argues the existence of a debt owed to him by the company, but the company, sincerely and in good faith, disputes the very existence of that debt, the person in question is not considered as a creditor, who is entitled to seek its liquidation."**
And subsequently:

"25. **Like the District Court, I believe that the proper forum for the clarification of the issue, as a rule, is within the framework of a civil action, and that it is difficult to justify the use of liquidation proceedings as a means of circumvention of a civil action and as an arena for**

19

**the settlement of disputes. In this regard as well, the parties are engaged in a complex dispute, which gives rise to questions in fact and in law, which require clarification and decision."** (Emphasis added by The Undersigned–D.A.)

79.2    In this context, the Association again refers to that which has been argued in the Introduction and in Sections 6, 12, 15, 16, 17 and 34 of Chapter **IV** above, and denies that it has committed a breach of any duty of trust whatsoever, as the Petitioner argues that it has, with no basis in fact.

79.3–79.10 The Association has already commented on these untenable arguments, which have been raised, again and again, by the Petitioner in these subsections, on the basis of an erroneous assumption that multiple repetition of something that is not true will make it true—**and it will not!**

Moreover, the Petitioner's attempt to rely on Sections 49 (1), 55, 27, 30, 36, 45 and 46 of the Non-Profit Organizations Law, 5740-1980 cannot succeed, as there is no factual infrastructure which could impose any of those sections of the Law upon the Association or upon its liquidator.

79.11 With regard to the cause which has been set forth in Section 49 (5) of the Non-Profit Organizations Law, 5740-1980, the attention of the Honorable Court is hereby called to a statement by the Honorable Justice Danziger in Civil Appeal 1775/10, **Kiryat Nadvorno Association—Bene Beraq v. Registrar of Non-Profit Organizations**, Supreme Court Compendium 2011 (2) 1099, at 1106 (2011):

"The cause of liquidation which has been set forth in Section 49 (5) of the Non-Profit Organizations Law, which concerns liquidation for reasons of justice and integrity, constitutes a 'basket cause' or a 'catch-all cause,' similarly to that set forth in Section 257 (5) of the Companies Ordinance (see: Leave for Civil Appeal 5596/00, **Stavi v. Nahusi**, *PD* 57 (1) 149 (2002); Civil Appeal 877/07, **Gefen v. Gyrotech Investments Ltd.** (unpublished, September 2, 2010) (hereinafter: the '**Gefen** Case'). **In the Gefen Case, Justice E. Rubinstein reviewed the use of the 'basket cause' which is set forth in Section 257 (5) of the Companies Ordinance, and pointed out that use of this cause should be made sparingly and that, within the framework of the considerations of justice and integrity, is given,** *inter alia*, **to the behavior of the parties, good faith and fairness, the company's needs, and its ability to accomplish its objectives, in accordance with the circumstances of the matter.** Among other things, Justice E. Rubinstein discussed the fact that the courts have made use of this 'basket cause' in situations where the company is not active, where it is not possible for the company to accomplish its objectives, where the company has abandoned its principal objectives, or where the company is a 'bubble' company.
24. I believe that the interpretation of the basket cause which has been set forth in Section 49 (5) of the Non-Profit Organizations Law is indicated by the manner in which the basket cause set forth in Section 257 (5) of the Companies Ordinance was interpreted, *mutatis mutandis* as a result of the special characteristics of non-profit organizations. **Thus, just as this cause should be used sparingly in the context of the liquidation of companies, restraint should be exercised in the use of this 'basket cause' in the context of the liquidation of a non-profit organization.** One of the cases which, as I see it, enable the exercise of this cause of liquidation is a situation in which the non-profit organization is no longer operating towards the promotion of its objectives, but is still continuing to exploit the tax benefits or other benefits to which it is entitled as a non-profit organization, or is still receiving funds from donors—similarly to the recognition of the cause for the liquidation of a company, on the basis of considerations of justice and integrity, in a situation where the company has become a 'bubble' company, an empty framework devoid of all content, the purpose of which is to get money out of its shareholders. As set forth above, in each individual case, the Court must remember that it must act with restraint in using this cause, and must carefully examine the circumstances of the case. Thus, for example, in cases involving the liquidation of a non-profit organization for failure to promote its objectives, it is necessary to consider the period of time during which the non-profit organization had failed to promote its objectives and the circumstances which surround this conduct. **Thus, for example, failure to promote its objectives due to economic difficulties or difficulty in raising funds is not legally equivalent to failure to promote the organization's objectives for no reason.**" (Emphasis added by The Undersigned–D.A.)

82.    With regard to the Petitioner's argument in this section, the Association shall state that the Petitioner is attempting to expropriate the powers of the Registrar of Non-Profit Organizations for himself, as the use of the powers pursuant to Section 48A of the Non-Profit Organizations Law, 5740-1980 is reserved for the Registrar of Non-Profit Organizations, and after the Petitioner.

In a ruling which was handed down on July 26, 2012, the Court asked to be given the position of the Registrar of Non-Profit Organizations—who, in the response provided by him, through Adv. Shiri Fogel, joined the Petition filed by the Petitioner.

**In this latter context, the Association shall state that the response by the Registrar of Non-Profit Organizations was issued without the Association having been given the opportunity to voice its arguments to the Registrar prior to the issuance of the response, and without the Association having been given any warning whatsoever by the Registrar, and, even if for this reason alone, the response by the Registrar is totally unsubstantiated, and the Honorable Court is hereby requested to ignore it.**

It should be noted that, on August 19, 2012, the liquidator of the Association wrote a letter to Adv. Shiri Fogel, the content of which speaks for itself.

A copy of the letter is attached to this Response and constitutes an integral part hereof.

In response to the letter from the liquidator, Adv. Fogel replied, on August 29, 2012, that the position of the Registrar has remained unchanged.

20

The reply by Adv. Fogel is attached hereto.

In any event, the Association and The Undersigned would like to hope that, after the Registrar of Non-Profit Organizations has studied this Response, he will change his previous position.

83–84. The Association vehemently disputes the comparison of its case to the cases discussed in the ruling which was cited by the Petitioner in this section.

The difference between the two organizations and their conduct is as great as the distance between East and West.

85–86. There are not enough words in the Hebrew language to express the disgust of the Association, its members, its executive management and anyone on its behalf at the mendacious and derisive arguments in these sections, which cannot be called anything other than pure evil and malice.

Not only does the Petitioner not have even a shred of evidence with regard to that which has been argued in these sections; the audacity of this mendacious argumentation has gone too far, and the Honorable Court is hereby requested to strike it *in limine*, by virtue of Regulation 91 (a) of the Civil Procedure Regulations, 5744-1984.

Solely and exclusively due to the provisions of Section 13 (5) of the Prohibition Against Defamation Law, 5721-1961, neither a private criminal complaint nor a civil action for defamation is being filed against Counsel for the Petitioner, who were so bold as to set forth in writing mendacious arguments devoid of any basis or foundation whatsoever, with respect to the defamations which were pronounced by them in their untenable arguments throughout the entire length of the Petition, and which reached the height of mendacity in these sections.

At the same time, the attention of the Honorable Court is hereby called to a statement by the Honorable Justice Elyakim Rubinstein (admittedly, in a minority opinion) in Leave for Civil Appeal 1104/07, **Adv. Fuad Kheir v. Adv. Oded Gil**, Supreme Court Compendium 2009 (3) 2464, at 2477 (2009), in the following words:

"The uncertainty of the courts and the learned scholars and the lack of consistency which we have seen are understandable. The language of the law and the history of legislation tend, to a certain extent, to favor the expansion of defense. Nonetheless, conscience and the human soul to not allow an interpreting judge, in my opinion, to ignore the fact that another human being has been defamed and insulted and his dignity has been trampled—in many cases, in a manner which can be considered tantamount to evil or malice—and to remain within the dimension of formal or formalistic interpretation. Can one who defames another be allowed to be 'a scoundrel with the permission of Torah' (Nachmanides in his interpretation of Leviticus 19:2)? This is the uncertainty, and the pendulum of interpretation, as I see it, must move in a direction which will not enable trampling of this type, and I believe that we must take up the cause of promoting—if not completing—an interpretation which will prevent any exploitation of the permission given, and that the legislators must do their part and must complete their work as soon as they see fit to do so. In my opinion, in so doing, we are not taking the place of the legislators—a place which is not our own; rather, we are donning the robes of the interpreters—robes which are ours. To preclude all doubt, I shall emphasize that we are not dealing with the principle of freedom of expression itself, which is an established element—and rightly so—of the case law handed down by this Court. I shall further emphasize that we are not dealing with the 'threat' of political and public freedom of expression, and it would not be appropriate to view the approach described here as bearing the odor of limitation of the freedom of expression as such. The learned scholar Hillel has already said 'That which is hateful to you, do not do to your fellow' (Babylonian Talmud, *Shabbat*, 31:1). In any event, however, freedom of expression is not an obscure and limitless concept. The prohibition against defamation is one of its significant limits, and the question is how protections and permits in the matter of defamation are to be interpreted, and I believe that Basic Law: Human Dignity and Liberty has its place in that question."

Affidavits by Prof. Henri Atlan and by Ms. Ayala Nahir are attached to this Response in support hereof.

In light of that which has been set forth above, the Honorable Court is hereby requested as follows:

1.   To deny the Petition *in limine*.
2.   Alternatively, to stay the hearing of the Petition, pending the receipt of a peremptory judgment in the action which the Petitioner has filed against the Association in New York.
3.   As an alternative to the alternative, to deny the Petition following the examination of all of the affiants on their affidavits and discussion of the Petition.
4.   To deny the petition for the appointment of Adv. Nitza Pozner as the liquidator of the Association.
5.   Alternatively, should the Honorable Court believe that it is appropriate to transfer the liquidation of the Association to the supervision of the Court, to leave the liquidator of the Association, The Undersigned, as a liquidator on behalf of the Court.
6.   To charge the Petitioner with the exemplary costs of the Petition.

[signature]
Adv. Daniel Azriel
Liquidator of the Yeshaya Horowitz Association (Registered Non-Profit Organization)
(in Voluntary Liquidation)

21

**בית המשפט המחוזי בירושלים**
בפני כבוד השופט דוד מינץ

תיק 12-07-36370

בעניין שבין:

**אירווינג ה. פיקרד**
ע"י ב"כ עוה"ד יונתן אגמון ו/או ערן סורוקר
ו/או עדי נורדמן ו/או הגר ראב"ד ו/או רענן בן-ישי
שמענם לצורך מסירת כתבי בי-דין הוא:
רחוב שנקר 14 ת.ד 12425 הרצליה 46725
טל: 09-9507000 פקס: 09-9505500
דואר אלקטרוני: mail@ip-law.co.il

נגד

1. **עמותת ישעיה הורוויץ (בפירוק מרצון)**
באמצעות המפרק עו"ד דניאל עזריאל
ע"י ב"כ עוה"ד שפרה (עזריאל) גיטלמן ו/או מיטל סרי עזריאלי
ו/או משה עזריאל ו/או אסף עזריאל
שמענם לצורך מסירת כתבי בי-דין הוא:
רחוב יפו 216 בניין שערי העיר ירושלים 94383
טלפון: 02-5003366 פקס: 02-5383731
דואר אלקטרוני: dani@aa-adv.co.il

2. **רשם העמותות**
שמענו לצורך מסירת כתבי בי-דין הוא:
רחוב כנפי נשרים 15 ת.ד 34071 ירושלים 91340
טלפון: 1-700-706044 פקס: 02-6462548
ע"י ב"כ עו"ד שירי פוגל
שמענה לצורך מסירת כתבי בי-דין הוא:
רחוב השלושה 2 ת.ד. 9222 תל אביב 61091
טלפון: 03-1-700-70-60-44 פקס: 03-6899795

3. **כונס הנכסים הרשמי**
שמענו לצורך מסירת כתבי בי-דין הוא:
רחוב כנפי נשרים 15 בית התאומים ירושלים 95464
טלפון: 02-6215760 פקס: 02-6467570

## תגובה מטעם עמותת ישעיה הורוויץ (בפירוק מרצון)
לבקשה להעברת פירוק העמותה מפירוק מרצון לפירוק בפיקוח בית המשפט

בהתאם להחלטות בית המשפט הנכבד מתאריך 23/7/2012, מוגשת בזאת על ידי עמותת ישעיה הורוויץ (בפירוק מרצון), באמצעות המפרק של העמותה, החי"מ, תגובה לבקשה להעברת פירוק העמותה מפירוק מרצון לפירוק בפיקוח בית המשפט.

**יאמר מיד, העמותה מתנגדת לבקשה וחולקת בתוקף על הנטען בה, בעשרות עמודים המגוללים אין ספור טענות סרק חסרות יסוד, שאינן נתמכות בתצהיר אמת; בין היתר משום שמדובר בניסיון נואל, בלתי צליח, לפגוע באחת מהעמותות החשובות שהיו אי פעם במדינת ישראל אשר, בכל הענווה, תרמה תרומה עצומה ורבת חשיבות לחקר המדע והרפואה בישראל.**

<u>מבוא</u>

עמותת ישעיה הורוויץ (להלן: "**העמותה**") הוקמה בשלהי שנת 1988 על ידי תורם אשר ביקש לשמור על עילום שמו, שזהותו תתגלתה ומדובר באזור צרפתי בשם Albert Igoin (להלן: "Igoin" או "התורם").

תרומותיו של Igoin למחקר המדעי והרפואי בישראל, באמצעות העמותה, קידמו באופן משמעותי את המטרות האמנורות וזכו לתכרה ולהוקרה מצד מקבלי התרומות ובהם: בית החולים האוניברסיטאי הדסה, האוניברסיטה העברית בירושלים, מכון ויצמן למדע, הטכניון, אוניברסיטת תל אביב, אוניברסיטת בן-גוריון בנגב, אוניברסיטת בר-אילן, אוניברסיטת חיפה, בית החולים רמב"ם, מרכז שניידר לרפואת ילדים, ועוד.

חברי העמותה הינם אנשי אקדמיה בכירים מאד, מהשורה הראשונה בארץ ובעלי מוניטין והכרה בקהילה המדעית בעולם, אשר פעילותם בעמותה נעשתה כחלק מפעילות אקדמית במובנה הרחב; והיותה פעילות התנדבותית, מתוך תחושת שליחות, כתרומה לקידום המחקר האקדמי בישראל, והם: פרופ׳ הנרי אטלן, יו"ר, פרופ׳ חנוך גוטפרוינד, פרופ׳ ירון כהן, פרופ׳ אמנון כספון, פרופ׳ שמעון אולמן, פרופ׳ אילן חת פרופ׳ ברכה רגר וגברת אילה נהיר.

עד מועד פטירתו, בתחילת שנת 1995, היה זה Igoin לבדו שניהל, אצל ברנרד מאדוף (להלן: "מאדוף"), את כספיו והשקעותיו של חברה פמגית שייסד בשנת 1983 בשם Magnify Inc. (להלן:Magnify), כפי שניהל את כספיו הפרטיים, בסכומים של מאות מיליוני דולרים.

ככל הידוע לעמותה, במועד פטירתו של התורם, או סמוך לו, הראה תיק ההשקעות של Magnify אצל מאדוף סכום של כ- $430,000,000.

את פעילותו הפילנתרופית המבורכת בישראל, באמצעות העמותה, לקידום המחקר המדעי והרפואי אשר יש לו השלכה אוניברסאלית, מימן התורם מכספיהם והשקעותיה של חברת Magnify.

כל חברי העמותה ללא יוצא מן הכלל, כמו גם מטעמה, פעלו מאז הקמת העמותה ועד היום בתום לב מוחלט, ביושר, בצניעות, בשקיפות מלאה ובתחושת שליחות למימוש מטרותיה החשובות של העמותה.

הפעולות שנעשו בתיק ההשקעות של העמותה אצל מאדוף נרשמו בספרי העמותה, מדי חודש בחודשו, והן כוללות עשרות מסמכים שהועברו אליה על ידי מאדוף ו/או מי מעובדיו, בגין פעילות בבורסה בארצות הברית, ובכללם רישומים של תשלומי מיסים, לרבות ניכוי מס במקור שהועבר בפועל לשלטונות המס בארצות הברית, כך שאין מחברי העמותה ו/או יועצה ו/או מי מטעמה לא יכול היה להעלות בדעתו שבוצעו על ידי מאדוף בחשבון העמותה פעולות בלתי חוקיות.

כפי שיפורט בהרחבה בהמשך העמותה מכחישה, מכל וכל, את טענות המבקש על היותה, כביכול, נאמן לנכסי Magnify. עוד מכחישה העמותה, בתוקף רב, את טענת המבקש על שפעלה, כביכול, באופן לא תקין. העמותה התנהלה בשקיפות מלאה, הגישה לרשם העמותות דו"חות מפורטים והימנעותה מגילוי מפורט של שמו של התורם נעשתה **אך ורק** מתוך רצון לכבד את רצונו והנחייתו.

בהקשר זה יודגש כי קריסת בית ההשקעות של מאדוף נפלה על חברי העמותה וויעצה כרעם ביום בהיר וכמכה אנושה לכל שבאבחת חנית אחת ירדו לטמיון כל השקעותיה, אשר שימשו למימון פעילותה הפילנתרופית לקידום המחקר המדעי והרפואי בישראל. הגשת תביעתה כנגד העמותה על ידי המבקש בבית המשפט לענייני פשיטת רגל בני-יורק הייתה בבחורם מכת ברק מפתיעה נוספת ומיותרת.

כפי שיובהר להלן, עד היום טרם נפסק, על ידי בית משפט מוסמך, שווי תיק ההשקעות של Magnify במועד שבו החל מאדוף את הונאת הפונזי שבוצעה על ידו, קביעה שיש לה השלכה משמעותית על התהליכים שמנהל המבקש כנגד העמותה ואח׳ בבית המשפט לענייני פשיטת רגל בני-יורק; וכפועל יוצא טרם נפסק האם אמנם חייבת העמותה להשיב למבקש את הכספים הנתבעים על ידו ממנה, כולם או חלקם. בהקשר זה מן הראוי להדגיש שכל עוד לא ניתן כנגד העמותה פסק דין, ולדעתנו אין בסיס למתן פסק דין כזה, המבקש איננו "נושה" של העמותה.

2

<u>אין צריך לומר שאם כאשר ייפסק דין חלוט שעל העמותה להשיב למבקש לו דולר אחד תספיק</u>
<u>העמותה להעברת הפירוק מרצון לפירוק בפיקוח בית המשפט, באשר לא זו בלבד שאין לעמותה דבר</u>
<u>וחצי דבר להסתיר, אלא להיפך העמותה וכל חבריה ויועציה או מי מטעמה גאים בפעולתם במסגרתה .</u>

בהקשר אחרון זה ראוי לציין כי כך כבר בתשובת המפרק, החי"מ, לבאי כוח המבקש מתאריך 2/2/2012 (נספח
38 לבקשה) הוא הודיע להם לאמור: "עם זאת, מעת שהובא לידיעתי שהוגשה נגד העמותה תביעה
הקפאתי את הליכי הפירוק".

<u>הקפאת פירוק העמותה מותירה, בשלב זה, את מצבת המשפטכי כמות שהוא ואין כל צורך לשנותו, בכלל;</u>
<u>ובנסיבות העניין בפרט, שכן עוד מתנהלים בניו-יורק הליכים משפטיים בהם תובעת העמותה את</u>
<u>המבקש בסכום של כ- 51,000,000$, מחד גיסא; ותובעת על ידו בסכום של כ-124,000,000 $ מאידך</u>
<u>גיסא,</u> אין מקום להיענות לבקשתו.

אין ולא היה מקום להגיש את בקשת המבקש, <b>עוד בטרם נפסק אם העמותה זכאית להחזיר השקעותיה או</b>
<b>שהיא חייבת למבקש לו דולר אחד.</b> על אחת כמה וכמה לא היה מקום להגשת הבקשה בסיגנון בוטה,
משתלח ויהיר, כפי שנעשה; ולבזבז את זמנו היקר של בית המשפט. אולם משהוגשה הבקשה, למרות
הקפאת הליכי הפירוק, אין מנוס אלא להשיב לה בצורה עניינית ומפורטת.

<u>טענות סף</u>

## I.   <u>הבקשה איננה נתמכת בתצהיר כדין:</u>

1.   מן הדין ומן הצדק לדחות את הבקשה על הסף הואיל והיא איננה נתמכת בתצהיר אמת.

בסעיף 89 של הבקשה נכתב: "תצהירה של הגב' טריייסי קול מצורף בתמיכה לבקשה זו". דא עקא למה
שמתיימר לתמוך בבקשה מצורף תצהיר של גברת Mary Elizabeth Howe ולא של גב' טריייסי קול.

2.   <b>בכל הכבוד הראוי, כאשר מוגשת בקשה המנוסחת באופן בוטה, משתלח ויהיר כפי שנעשה בבקשת</b>
<b>המבקש, מן הראוי היה שלמיצער ידייק בציון שמה של המצהירה מטעמו, בייחוד כאשר כתמיכה</b>
<b>בבקשה תצהיר סתמי ולאקוני, של עורכת דין המייצגת את המבקש בהליכים משפטיים בניו-יורק,</b>
<b>ממנו ברור בעליל שאין באפשרותה לאמת את העובדות הנטענות בה, למזער ככל שעובדות אלו</b>
<b>מתייחסות לאירועים שאירעו ולמסמכים שנכתבו במדינת ישראל.</b>

3.   מחדל זה של המבקש אינעו עיקר. העיקר הוא שאין בתצהירה של גברת Mary Elizabeth Howe כדי
לתמוך בבקשה, באשר לא בכדי אין היא מצהירה על העובדות האמורות לשמש יסוד לבקשה, שכן <u>פשיטא</u>
<u>שעובדות אלו אינן בידיעתה,</u> למזער ככל שעובדות אלו מתייחסות לאירועים שאירעו ולמסמכים שנכתבו
במדינת ישראל ולפיכך היא מצהירה באופן לאקוני:

"I, Mary Elizabeth Howe......hereby declare under penalty of perjury that the foregoing
statement in the application for the Transfer of the Voluntary Liquidation of the Yeshaya
Horowitz Association (in voluntary liquidation) to Court Supervised Liquidation and for the
appointment of Liquidator are true and correct"

4.   צריך הרבה עוז רוח ומצח נחושה להצהיר, תחת עונש של שבועת שקר, (under penalty of perjury) כנגד
עמותה מפוארת כמו עמותת ישעיה הורוויץ וחבריה, שכאמור לעיל, הינם אנשי אקדמיה בכירים מאד,
מחשובי הראשונים בארץ ובעלי מוניטין והכרה בקהילה המדעית בעולם, הצהרה מופרכת מן היסוד כמו,
לדוגמא בלבד, ש"תמלוגים ממחקרים בהעברת טכנולוגיה" הופנו שלא כדין לצד שלישי כלשהו.

ראה סעיף 18 לבקשה.

כתמיכה בטענה מופרכת זו מצרף המבקש את נספח 23 שהינו מאמר, פרי עטו של היועץ המשפטי של
העמותה, עו"ד יאיר גרין, בעניין Technology Transfer שפורסם בעלון המידע של המכון הלאומי של
ביוטכנולוגיה בנגב.

המצהירה, אשר אמורה לדעת לקרוא את האמור במאמר, הכתוב באנגלית, מתעלמת מכך שהעמותה התחייבה שהתמלוגים נשוא פירות המסחור של חידע האקדמי יחזרו לאוניברסיטה אשר פירות מחקרה הניבו תמלוגים אלו, כפי שנכתבה במאמר :

**"In return, the Association undertakes to re-contribute all the reimbursed funds to the university, in this way encouraging the development of a revolving fund"**

כפי שגם מופיע בתרגום העברי שצורף לבקשה לאמור :

"בתמורה, העמותה מתחייבת לתרום מחדש את כל סכום התגמול לאוניברסיטה, ובצורה זו לעודד את פיתוח הקרן המחזורית".

**הינה כי כן,  הטענה שהתתמלוגים ממחקרים בהעברת טכנולוגיה הופנו שלא כדין לצד שלישי כלשהו נסתרת מניה וביה מנספח 23 לבקשה שעצמו אשר המצהירה, ככל הנראה, לא טרחה לעיין בו, דבר המלמד על אמינות תצהירה, או שמא תמצי לומר על אי אמינותה.**

5.  או למשל הטענה השערורייתית שבסעיף 47 לבקשה לפיה "קיים חשש להתנקנות העלמת מסמכים ונתונים כמו גם להברחת נכסים או העדפת נושים אסורה וכי מדובר בניסיון לא ראוי לסכל את דרכם של נושים כמו נאמן מיידוף להיפרע מן העמותה".

כאמור לעיל, פעילות העמותה מאז הקמתה ועד היום נעשתה בשקיפות מלאה ומוחלטת תוך מתן דוחו"ת מלאים ומפורטים על פעילותה לרשם העמותות ולפקיד השומה.

לבקשה צורפו העתקים מדו"חות כספיים של העמותה לשנים 2000 עד 2009 – ראה נספחים 12 ו-14 עד 22.

עיון בנספחים 12 ו-22, ובייחוד בביאורים לדו"חות אלו, מלמד בעליל שמי שטוען כי "קיים חשש להתנקנות העלמת מסמכים ונתונים כמו גם להברחת נכסים או העדפת נושים אסורה וכי מדובר בניסיון לא ראוי לסכל את דרכם של נושים כמו נאמן מיידוף להיפרע מן העמותה" איננו דובר אמת, או למיצער איננו יודע על מה הוא מצהיר.

6.  ואף גם זאת, הלכה פסוקה היא כי אין לערוך תצהיר על דרך של הפנייה אל מסמך אחר (במקרה דנה אל הבקשה) ולומר "כל העובדות המפורטות בבקשה הן נכונות"

ראה בעניין זה :

ד"ר יואל זוסמן : סדרי הדין האזרחי, מהדורה שביעית סעיף 556 עמוד 717 שבו כתב לאמור :

**"המצהיר חייב בתצהירו להביא את כל אותן העובדות שהוא מבקש להוכיחן; אין לערוך תצהיר על ידי איזכור והפניה אל מסמך אחר, כגון 'כל העובדות המופיעות בכתב התביעה הן נכונות'. תצהיר כזה פסול ולא יתקבל... רצה המבקש להגיש מסמך, יצרף אותו לתצהירו ויאמת אותו כראוי".**

ב.  ע"א 16/89 "ורדים" חברה לגידול פרחים בע"מ נ' החברה הישראלית לביטוח סיכוני סחר חוץ בע"מ, פ"ד מה(5), 729 , 737-736

ג.  ע"א 166/90 מרדכי (מוטו) אזולאי נ' א"ב, מפעלי תיירות אילת בע"מ, פ"ד מו(5), 344 , 348-349

7.  **בכל מקרה נדרשת המצהירה להתייצב לחקירה נגדית על מה שמתיימר להיות תצהירה.**

4

## II. יש בבקשה למנות את עו"ד ניצה פוזנר כמפרקת העמותה ניגוד עניינים מובנה ופסול.

8. כמפורט בבקשת העמותה הגישה הנאמן – המבקש, תביעת חוב על סך כ – $51,000,000 ותביעה זו נדחתה על ידו, אולם העמותה לא השלימה עם הדחייה וערערה על החלטת המבקש בפני בית המשפט לעניני פשיטת רגל בניו-יורק, ערעור שטרם נידון וממילא טרם הוכרע.

   ראה סעיף 30 לבקשה.

   בה בעת תובע המבקש את העמותה בסכום של כ – $124,000,000.

   בבקשת עותר המבקש למנות את עו"ד ניצה פוזנר כמפרקת העמותה **מטעמו.**

   יש בכך ניגוד עניינים זועק לשמיים, שכן כיצד תוכל מפרקת אשר נתמנתה לבקשתו ומטעמו של המבקש גם לתבוע אותו בשם העמותה וגם לייצג את האינטרסים של העמותה כנגדו ???

   ראה בעניין זה :

   א. בג"צ 531/79 סיעת "הליכוד" בעיריית פתח-תקוה נ' מועצת עיריית פתח-תקוה, פ"ד לד(2), 566 , 569- .570

   ב. בג"צ 595/89 משה שמעון נ' שלום דנינו, הממונה על מחוזמשרד הפנים מחוז הדרום., פ"ד מד(1), 409 412-413

   ג. בג"ץ 7767/07 אבי אסרף נ' שר הפנים, תק-על 2008(1), 5275 (2008)

## III. הבקשה הינה מקדמית ומכל מקום יש לעכב את הדיון בה על בסיס הכלל של "עניין תלוי ועומד" (Lis Alini Pendens)

9. **בשלב זה**, עוד בטרם נקבע שהעמותה חייבת למבקש ולו דולר אחד, אין עילה כלשהיא להעתר לבקשת המבקש לפירוק העמותה בפיקוח בית המשפט ולמינוי מפרק אחר במקום הח"מ.

10. כמפורט בסעיפים 29 ו-30 של בקשת המבקש העמותה ו- Magnify הגישו למבקש הוכחות חוב.

   העמותה הגישה הוכחת חוב על סך של כ- $51,000,000 ו- Magnify הגישה הוכחת חוב על סך של כ- $770,000,000. הוכחות חוב אלו נדחו על ידי המבקש, אולם הן העמותה והן Magnify לא השלימו עם הדחיות וערערו על החלטות בית המשפט, **ערעורים שטרם נידונו וממילא טרם הוכרעו.**

11. כפי שטוען המבקש בסעיף 42 לבקשתה התהליכים המשפטיים בבית המשפט בניו-יורק ימשכו תקופה ארוכה **כך שבמועד הגשת בקשת המבקש עוד טרם נקבע שהעמותה חייבת למבקש ולו דולר אחד.**

   היפך הוא הנכון : בהתאם למידע שנמסר על ידי המבקש עצמו, בדו"חות ביניים שהוגשו על ידו לבית המשפט בניו-יורק, יש יותר מיסוד סביר להניח שהונאת הפונזי של מאדוף החלה רק בסוף שנת 1992.

   מכל מקום, עד היום טרם ניתנה החלטה שיפוטית מחייבת לגבי מועד תחילת הונאת הפונזי שבוצעה על ידי מאדוף, וכיצד יש לחשב את הרווחים שנוצרו על כספי קרן התשקעות שהושקעו אצל BLMIS ממועד שקדם לתחילת ההונאה ועד למועד שבו החלה ההונאה על ידי מאדוף.

5

לטענת Magnify, אשר כאמור לעיל באמצעותה מימן התורם את פעילותה הפילנתרופית המבורכת של העמותה, כל הכספים שהיו בחשבונותיה אצל מאדוף קודם לתאריך 31/12/1992 הינם כספי קרן ורווחים לגיטימיים; ומאחר ובתאריך 31/12/1992 היו בחשבונותיה אצל מאדוף סכומים בסך כולל של $253,608,194 (ראה ממסמך BLMIS Page 360 בנספח 31 לבקשה ביחד עם מסמכים BLMIS Page 367, 368 בנספח 32 לבקשה), הרי שגם אם תתקבל טביעתו של המבקש כנגד מלואה, ותנתבעים שם יחויבו להשיב את הסכומים הנתבעים מהם, בסך של כ- $154,000,000, **דבר המוכחש מכל וכל**, עדיין תגיע ל- Magnify יתרת זכות בסך של כ-$110,000,000.

במקרה כזה, אם יחלק המבקש דיבידנד בשיעור של כ- 50% מיתרת הזכות של Magnify, (כפי שהמבקש מתכוון לחלק) כי אז יגיע ל - Magnify סכום של כ – $55,000,000 דבר שיאפשר לעמותה להמשיך לפעול לתועלת המחקר המדעי והרפואי במדינת ישראל, כפי שעשתה מאז היוסדה ועד המועד שבו נאלצה לחלטי על פירוקה מרצון.

12. בסעיף (a) 75 של התביעה שהגיש המבקש נגד Magnify ואחי הוא טוען :

75 a. Magnify's BLMIS account numbered 1FN025 was opened on or around September 30, 1990 without any initial deposit of principal. The account's first statement, however, indicates that a "sale" of almost 3 million shares of MCI Communications stock took place on May 18, 1990, five months before the account was opened. The purported "gain" from that sale—upwards of $100 million—was based on the fiction that those securities had been "purchased" on October 21, 1986, when the price of MCI stock was roughly 1/7th of the purported sales price.

חברי העמותה ויועצה המשפטי משוכנעים כי פתיחת חשבונה של Magnify מספר 1FN025 על ידי מייסדתה של Magnify, Albert Igoin, אכן נעשתה מכספי מכירת המניות של MCI Communications, אשר נרכשו עבורו קודם לכן, וכל הנראה, באמצעות אחד מחשבונותיו הפרטיים ו/או מחשבונות של מוסדות בנקאיים עימם היה מעורב בעסקיו עם מאדוף.

13. מבירורים שערכנו לאחרונה על ידי בא כח העמותה עם משרד מיכאל וקסלבאום, הסתבר כי שווי מניית MCI Communications במועד שבו טוען המבקש שמניות אלו נרכשו, היינו בתאריך 21/10/1986 עמד על 6.875 $ למניה; ובמועד שבו לטענת המבקש מניות אלו נמכרו, היינו בתאריך 18/5/1990, עמד שווי המניה על 42.25 $. סכומים העולים בקנה אחד עם קביעתו של המבקש בסעיף 75a המצוטוט לעיל, לפיה עלה שוויין של מניות אלו, בין מועד רכישתן לבין מועד מכירתן, בערך פי שבעה.

הינה כי כן מכירת 3,000,000 מניות של MCI Communications בתאריך 18/5/1990 הניבה תמורה של $126,750,000 שזהו, ככל הנראה, הסכום שבו נפתח חשבון Magnify מספר 1FN025 בחודש ספטמבר 1990.

ויוברר שאין זה מתקובל על הדעת שמאדוף נתן ל - Albert Igoin "מתנה" בסכום של 126,750,000 $ ו/או ש - Albert Igoin קיבל ממאדוף "מתנה" בסכום זה.

אין אפוא כל יסוד לטענת המבקש, החוזרת ונשנית לאורך כל הבקשה, לפיה ההשקעה היחידה של Igoin אצל מאדוף ו/או אצל BLMIS בחשבונות Magnify עמדה על סך של 3,136,150 $ בלבד.

14. בחודש אוגוסט החולף החליט כבוד השופט ליפלנד, הדן בפשיטת הרגל של מאדוף בניו יורק, כי על המבקש לשמור לפחות (at least) 3% בגין כל שנה שבה חושקעו כספים אצל מאדוף, ממועד ההשקעה ועד מועד פשיטת הרגל שלו, דהיינו חודש דצמבר 2008, בגין "נזקים על ירידת ערך הדולר לאורך השנים".

6

תשואה בשיעור של 3% בשנה, ממועד פתיחת חשבון Magnify מספר 1FN025 אצל מאדוף, בחודש ספטמבר 1990 ועד מועד פשיטת הרגל של מאדוף, בחודש דצמבר 2008, בחישוב מצטבר (ריבית דריבית) מביא את שיעורה ל- 67.84%. אם מחשבים את התשואה הנ"ל (67.84%) על הסכום שבו נפתח חשבון Magnify מספר 1FN025 בסך של $126,750,000 מקבלים סכום של $85,987,200.

הסכום המצטבר של הקרן והתשואה השנתית בשיעור של 3% בחשבון Magnify מספר 1FN025 ,במועד פשיטת הרגל של מאדוף, בחודש דצמבר 2008, אמור להיות אפוא בגבולות של כ- 212,737,200 $. ( 85,987,200 + 126,750,000 )

אמרנו בגבולות הסכום של $212,750,200 ולא סכום מדויק יותר, שכן מחד גיסא, חישוב מדויק יותר אמור להביא את החשבון גם את המשכיות שנעשו במשך השנים מחשבונות Magnify אצל מאדוף ולהפחית את הסכום המצטבר הנ"ל, אך מאידך גיסא, אם כבוד השופט ליפולד יקבע שיעור תשואה גבוה יותר מ-3% בשנה כי אז יגדל סכום התשואה בצורה משמעותית וכפועל יוצא יגדל הסכום שאמור היה להיות בחשבון Magnify במועד פשיטת הרגל של מאדוף.

לפיכך, גם אם תתקבל תביעת המבקש נגד העמותות במלואה, בסכום של כ – $124,000,000, **דבר המוכחש מכל וכל**, עדיין יגיע לעמותה, באמצעות Magnify סכום נכבד, העולה עשרת מונים על תביעת המבקש נגדה.

15. בין כך ובין כך, כאמור לעיל, עד היום טרם ניתן פסק דין כנגד העמותות, כפי שטרם הוכרע בבית המשפט ערעורה על דחיית הוכחת החוב שהוגשה על ידה למבקש.

ראה בהקשר זה : ע"א 877/07 סיגל נגח ועוד 19 אח' נ' ג'ירוטק השקעות בע"מ, תק-על 2010(3), 3103 , 3108 (2010) שבו קבע כבוד השופט אליקים רובינשטיין לאמור :

**"כאשר חברה אינה נענית לדרישת התשלום, שכן היא חולקת על עצם קיומו של החוב או על שיעורו, אין מקום לחזקה שאי תשלום מצביע על חוסר יכולת פירעון (ג' כהן, 106). כפי שנכון הדבר (עמ' 234) "... כאשר אדם טוען לקיומו של חוב של החברה כלפיו, אולם החברה חולקת בכנות ובתום לב על עצם קיומו של חוב זה, אותו אדם אינו נחשב לנושה הזכאי לבקש את פירוקה"**

בנסיבות אלו, בקשת המבקש הינה מקדמית ודינה להדחות על הסף.

16. לחלופין, יש לעכב את הדיון בבקשה זו עד להכרעה בהליכים המתנהלים בין המבקש לבין העמותה בבית המשפט לפשיטת רגל בניו-יורק, על יסוד הכלל של "עניין תלוי ועומד" Lis Alini Pendens

17. עיון בבקשה לכל אורכה ובנספח 39 לה שעניינו "פירוט סמכויות המפקרת" מלמד כי לא אוכי את פירוק העמותות בפיקוח בית המשפט יותר המבקש לצבע, אלא כוונתו האמיתית היא לתבוע את העמותות ואת חברי הועד הממונה שלה, (הגם שסעיף 6 של תאור הסמכויות מועתק ברשלנות, ככל הנראה, מבקשה אחרת שאינה עניין לכאן).

הלכה פסוקה היא מקדמת דנא כי בנסיבות אלו, יעכב בית המשפט את הדיון בבקשה המאוחרת עד אשר תתברר חתביעה הראשונה .

ראה בהקשר זה :

א.    ע"א 9/75 שיך סולימאן מוחמד אל-עוקבי נ' מינהל מקרקעי ישראל, פ"ד כט(2), 477 , 480-479

ב.    ה"פ (מחוזי יר') 8208/09 חנה עיסא עודה עוודה נ' רשם המקרקעין, תק-מח 2011(1),14693 (2011)

ג.    ת"א (מחוזי יר') 2002/00תת"א (ירושלים) 2058/00 אליאס גייקוב (התנבעים בת"א 2058/00) נ' חברת אלי יוחנן מהנדסים - הנדסה ובניה בע"מ(התונבעים בת"א2058/00) תק- מח 2000 (3) 775 , (2000)

7

ד.    ת"א (שלום חי') 2399-11-11 אחמד עבד אל קאדר נ' מינהל מקרקעי ישראל, תק-של 2012(2),
75783 (2012)

## IV. התייחסות מפורטת לנטען בבקשה (סעיפים 1 - 76)

ההתייחסות לבקשה תעשה במקביל לסעיפי הבקשה.

יובהר כי אי התייחסות לאיזה מסעיפי הבקשה איננו מהווה הודאה בנטען באותם סעיפים וככל שהעמותה
איננה מתייחסת לסעיף כלשהו מסעיפי הבקשה האמור בהם מוכחש.

בהתייחס לטענת המבקש בכותרת לבקשה ובסעיף 87 שלה, לפיה בבקשתו הוגשה "בידיעת רשם העמותות"
מפנה העמותה לסעיף 4 בתגובת רשם העמותות לפיה "על אף האמור בבקשה ולמרות פגישה שנתקיימה
בין רשם העמותות למבקשים, לא ניתן לומר כי הבקשה הוגשה בידיעת רשם העמותות".

שמע מינה שכבר בכותרת הבקשה אין המבקש דק מדייק, אם לנקוט בלשון המעטה.

1.    העמותה מכחישה כי המבקש – נאמן מאדוף, הינו בשלב זה "נושה" שלה שכן, כמפורט לעיל,
העמותה חולקת בכנות ובתום לב על עצם קיומו של חוב זה וטרם זה ניתן פסק דין הקובע את חבות
העמותה כלפי המבקש.

וראה בהקשר זה את פסק הדין הנזכר בסעיף 15 של פרק III לעיל.

בהקשר לתובענה שהגיש המבקש נגד העמותה בבית המשפט לפשיטת רגל בניו-יורק תטען
העמותה שיש יותר מיסוד סביר להניח שבסופו של יום התובענה תידחה, הן משום שהתובענה
נסמכת על השערות מופרכות, תוך שימוש חוזר ונשנה (למעלה מארבעים פעמים) בביטוי "On
information and belief", השערות המוכחשות על ידי כל הנתבעים שם ; והן משום שהוגשה ללא רצופה
דברי הבל ורעות רוח, מנוסחת בצורה יהירה, מתנשאת ופוגעת וכולה פצע וחבורה ומכה טרייה.

בהתייחס לנספח 2 לתביעת העמותה אין כי אין בו כדי לשמש ייפוי כח  כדין לייצוג המבקש
בבית משפט בישראל.

5.    העמותה מכחישה כי הגישה לרשם העמותות תצהירי כושר פירעון חתומים בידי פרופ' הנרי אטלן
יו"ר העמותה ופרופ' חנוך גוטפרוינד חבר הנהלתה, "לאחר שנודע לבא כח העמותה על הגשת
תביעת נאמן מיידוף".

בהקשר לנטען בסעיף זה, מודה העמותה כי בעת הגשת הפירעון כושר הפירעון ידעו חברי הנהלתה
שהמבקש דחה את הוכחת החוב שהוגשה על ידי העמותה בסך של כ – 51,000,000 $ אולם,
העמותה לא השלימה עם דחיית הוכחת החוב ועררה ערעורה על כך בפני בית המשפט לפשיטת רגל בניו-
יורק, ערעור שטרם נידון ממילא טרם הוכרע.

6.    העמותה מכחישה בתוקף רב את כל הנטען בסעיף 6 לבקשה על כל סעיפי המשנה שבו.

בהתייחס להערת שוליים 1 המפורטת בסעיף 6.2 לבקשה טוען טענה העמותה כי היא מעולה לא הייתה
המוטבת של הזכויות בחברת Magnify וכל נאמנותה בעניין זה הצטמצמה אך ורק להחזקת
מניות Magnify עבור יורשיו של Albert Igoin - אלממתו דוריס איגואן, אחריה בתו לורנס
אפלבאום ולאחריה נכדתו אמילי אפלבאום (לפי סדר זה), כך שכל הטענות בבקשה בעניין
הנאמנות הינן עורבא פרח וטוב היה להן שלא נטענו משנטענו, מבלי שהטוען יודע את העובדות
ואת האמנת.

ראה נספח "אי" לתצהירה של אילה נהיר אשר תוכנו מדבר בעד עצמו

החזקת מניות Magnify בידי העמותה משולה להפקדתן של המניות בכספת של בנק.

8

9.     העמותה חולקת על ניסיון המבקש לתאר את ד"ר קורט ברונר כמי "שמתיימר" לשמש כדירקטור
       יחיד בחברת Magnify.

       עוד חולקת העמותה על כי עו"ד יאיר גרין "היה ועודנו המנכ"ל של Magnify".

       בתקשור לחשבונות Magnify אצל מאדוף תטען העמותה כי הן חשבון 1FN024 והן חשבון
       1FN025 נפתחו על ידי Albert Igoin בחייו והוא זה שהפקיד בהם את הכספים לצורכי השקעה
       אצל מאדוף. רק לאחר מותו, נתמנה עו"ד יאיר גרין לנהל ולפקח על חשבונות Magnify אצל
       מאדוף.

10     חמעמותה תטען כי גם היו פגמים טכניים בהתנהלותה בשנותיה הראשונות הרי שאלו נרפאו ; והא
       ראיה שבתאריך 20/1/2004 ניתן לעמותה אישור על ניהול תקין לשנים 2003 ו-2004 שתוקפו עד
       31/3/2004 – ראה אישור זה בין יתר המסמכים שסומנו בבקשה כנספח 10.

       בתקשור זה ראוי לציין כי העמותה עברה כמה בדיקות עומק מקיפות וכמפורט בדו"ח מסכם
       שהגיש רו"ח בועז גזית בתאריך 20/1/2004 הוא כתב, בפרק סיכום וממצאים :

       **7.1" ממצאי הבדיקה השוטפת נמצאו תקינים.**
       **7.2 מבדיקתנו, העמותה פועלת בהתאם למטרות שלשמן היא הוקמה".**

       <u>הסיבה היחידה</u> שבשלה לא ניתן לעמותה אישור על ניהול תקין, החל משנת 2004 ואילך, היא
       רצונה לקיים את בקשתו של התורם ; ולכבד את הנחיותיו, למנוע את פרסום זהותו – ראה בעניין
       זה את הדו"ח האמור בנספח 9 וכן את מכתב עו"ד יאיר גרין, היועץ המשפטי של העמותה אל
       רו"ח בועז גזית מתאריך 1/2/2004 שצורף כחלק מהמסמכים שסומנו בבקשה כנספח 10.

11.    הגברת אילה נהיר איננה נכדתו של התורם אלברט איגואן אלא הינה בת אחותו, אמה של הגברת
       אילה נהיר גידלה את אלברט איגואן בשנות נעוריו בצרפת ואילה נהיר ובני משפחתה הינם קרובי
       משפחתו היחידים בישראל

12.    אכן העמותה, הנהלתה ויועצה המשפטי, ביקשו להימנע באופן מפורש מחשיפת זהותו של אלברט
       איגואן כמי שממומן את פעילותה המבורכת של העמותה וזאת מתוך רצון לכבד את רצונו של
       התורם, כמפורט במכתביהם של פרופ' הנרי אטלן רו"י העמותה מתאריך 29/2/2004 ומכתבו של
       פרופ' חנוך גוטפרויינד חבר הנהלת העמותה מתאריך 7/3/2004 המופנים אל רשם העמותות, אשר
       צורפו כחלק מהמסמכים נספח 9 לבקשה.

       באשר לתיאורו של עו"ד יאיר גרין כ – "נאמן של התורם" יובהר כי הכוונה היא להיותו של עו"ד
       יאיר גרין "איש אמונו" של התורם, שכן לא ניתן לשמש ב"נאמן" במובן הפורמאלי של מושג זה,
       של אדם שנפטר אלא אם כן נעשה המינוי במסגרת של מינוי מנהל עיזבון, מינוי שלא ניתן לעו"ד
       יאיר גרין על ידי התורם, הגם שיחסיהם האישיים היו יחסי קרבה ואמון רב.

13.    אכן הן בתקנון המקורי של העמותה בשפה האנגלית והן בנוסח העברי שהוגש לרשם העמותות
       נוכר שמו של אלברט איגואן כמי שיכול לתרום לעמותה, אך אין זין דין אישור כללי בתקנון כדין
       אישור מפורש על ביצוע תרומות בפועל. כאמור לעיל חזקה היתה על העמותה, הנהלתה ויועצה
       המשפטי לכבד את רצונו של התורם ולהנחייתו לשמור את תרומותיו בעילום שם.

       בהקשר זה יצוין כי על פי ברורים שערך היועץ המשפטי של העמותה, במועד שבו ביקשה להימנע
       מחשיפת זהותו של התורם, הסתבר כי מפגט לפעם נתקר לרשם רשם עמותות לבקשות מזוג זה, למשל
       לבקשות שהוגשו אליו למנוע את חשיפת שמם של תורמים שתרמו למכון ויצמן למדע וביקשו
       לשמור את תרומתם בעילום שמם.

15.    בהתייחס לתצהיר גילוי פרטי תאגיד שהוגש שהוגש בתובענה שהגיש המבקש בארצות הברית – נספח 13
       לבקשה, תטען העמותה כי המבקש לא דק פורמא בעניין זה ; וכאמור בסעיף 6 לעיל, כל נאמנותה
       של העמותה הצטמצמה אך ורק <u>להחזקת</u> מניות Magnify עבור יורשיו של Albert Igoin-
       אלמנתו דורים איגואן, אחריה ביתו לורנס אפלבאום ולאחריה נכדתו אמילי אפלבאום (לפי סדר
       זה).

9

16.    אכן, Strand International Investments Ltd היתה חברת בת (Subsidiary) של Magnify
אולם כמו ש–Magnify אינה חלק מנכסי העמותה כך גם Strand אינה חלק מנכסי העמותה.

17.    בנסיבות המתוארות בסעיפים 6, 15 ו-16 לעיל לא היה על העמותה לציין בדוחותיה שהיא
מחזיקה בנכסים של אחרים ולא היה עליה לנהל חשבונות בעניייי האמנות כפי שלא היה עליה
לדווח על כך לרשויות המס בישראל או לכלול את האמנון במטרותיה.

18.    העמותה מכחישה בתוקף את הנטען בסעיף זה שאינו אלא ליקוי מאורות וחוסר הבנה בסיסי
בפעילות הפילנתרופית המבורכת לקידום המחקר המדעי והרפואי בישראל.

העמותה החליטה לקדם נושא נשא בעל חשיבות לאומית ממדרגה ראשונה תנקרא "העברת טכנולוגיה"
בטרח למסחר את הידע האדיר שנצבר במוסדות האקדמיים בישראל, כפי שתואר בקצרה
במאמר, פרי עטו של היועץ המשפטי של העמותה, עו"ד יאיר גרין, בעניין Technology Transfer
שפורסם בעלון המידע של המכון הלאומי של ביוטכנולוגיה בנגב.

תרומתה זו של העמותה לחברות בנות של האוניברסיטאות בישראל, כגון:  ייסום של
האוניברסיטה העברית בירושלים, נ.ג. נגב של אוניברסיטת בן-גוריון, חדשית של בית החולים
האוניברסיטאי תל השומר וחברות אוניברסיטאיות אחרות, קידמו את הענקת הטכנולוגיה לתועלת
אותן אוניברסיטאות בצורה משמעותית, אולם העמותה מעולם לא התכוונה לכך שכלל שהיו
לחברות הבנות של האוניברסיטאות רווחים ממסחור הידע ישמש רווחים אלו בידי העמותה,
שלא לומר בידי צדדים שלישיים, כפי שטוענן המבקש בעוות מצח ובחוסר הבנה בסיסי.

בכל החוזים שנחתמו בין העמותה לבין האוניברסיטאות להם נתרמו כספים למטרת "העברת
טכנולוגיה" הוסכם במפורש ש כל שיהיו לאוניברסיטאות אלו רווחים הנובעים מתרומות
העמותה למוחקרים שינגנו רווחים אלו, הרי שהאוניברסיטאות מתחייבות לחשיב לעמותה את פי
10 מהסכומים שנתרמו למוחקר כאמור **אולם בתמורה מתחייבת העמותה לשוב ולהשקיע את כל
כספי הרווחים לאותה אוניברסיטה שמהמחקר הניב את אותם רווחים.**

ראה בחקשר זה את נספח "יב" לתצהירה של אילה נהיר

בהחקשר לנטען בסעיף זה חוזרת העמותה על האמור בסעיף 4  שבפרק I לעיל.

בהתייחס לטענת העמותה המופרכת שממועד קריסתו של מאדוף "חדלו לפתע העברות תמלוגים לזכות
העמותהת" תטען העמותה כי במועד קריסתו של מאדוף היא נותרה חייבת לאוניברסיטאות
ולמוסדות אחרים בישראל סכום של 53,763,754 $ כמפורט בביאורים לדו"ח הכספי של העמותה
לשנת 2008 – נספח 22 לבקשה .

הינה כי כן, לא זו בלבד שאין לא היו לאוניברסיטאות ולמקביצי התרומות מהעמותה "חובות"
כלפיה אלא להיפך העמותה היא זו שהתחייבה לתרום להם, אולם בשל קריסת בית ההשקעות של
מאדוף נמנע ממנה להמשיך ולתרום כפי שהתחייבה.

בהחקשר זה מן הראוי לציין שכל מקבלי התרומות מהעמותה  הבינו את הסיטואציה הקשה אליה
נקלעה העמותה, שלא בטובתה, וויתרו על המשך קבלת התרומות מהעמותה גם אם תרומות אלו
הובטחו להם בחוזים שנחתמו בינם לבין העמותה.

19.    העמותה חולקת בתוקף רב על הטענה כי מקור הכספים שתרומה הוא "בהעברות כספים פיקטיביים
ובמעשה מרמה והונאה שהיו ידועים, או לפחות היו צריכים להעלות חשד ולהיות ידועים לחברי
העמותה ולנושאי תפקידים בה".

**זוהי טענה  מופרכת והזויה שאין לה כל בסיס, לא בעובדות, לא בשכל הישר ולא במציאות.**

עד קריסת בית ההשקעות של מאדוף נחשב ברנרד מאדוף לאשף פיננסי אשר טובי המשקיעים בעולם,
לרבות בנקים, חברות השקעות ומומחים לשוק ההון עמדו בתור כדי להשקיע אצלו.

כל כספי התרומות של העמותה נתקבלו על ידה מהמורם Albert Igoin אשר הוא זה שהשקיע את
כספי Magnify אצל מאדוף, כפי שהשקיע  אצלו את כספיו הפרטיים, בסכומים של מאות מיליוני
דולרים.

העמותה, חבריה, הנהלתה , יועצה המשפטי, וראשי החשבון שלה קיבלו הינה כנתון את הכספים אשר מימנו
את פעילותה המבורכת של העמותה, אשר בסמוך לאחר פטירתו של התורם עמדו בחשבונות
Magnify על סך של כ – 430,000,000 $.

במשך 16 שנים שלפני קריסת בית ההשקעות של מאדוף, בין השנים 1992 עד 2008,  ביצעו רשויות
שוק ההון בארצות הברית ה – SEC כמה וכמה בדיקות עומק אצל מאדוף ובית ההשקעות שלו
ובדיקותיהם לא גילו את התנומה שבוצעה על ידו.

כיצד ניתן לטעון שאם רשויות שוק ההון בארצות הברית, מפקחיהם וחוממחים מטעמם לא גילו את
התנומה שבוצעה על ידי מאדוף דווקא חברי העמותה, הנהלתה, או מי מטעמה, יכולים היו לגלות
זאת. ???

יתר על כן, לו היה עולה חשד הקל שבקלים שמשהו אינו כשורה אצל מאדוף האם הייתה העמותה
מותירה אצלו את כל השקעותיה ולא מפזרת אותם אצל כמה מנהלי כספים, או למוזע בבנקים
בישראל?!!

גם הטענה שהתשואות שהניב חשבון העמותה אצל מאדוף נשאו "רווחים בלתי סבירים" הינה טענה
מופרכת וחסרת יסוד שכן התשואות בחשבון העמותה היו סבירות בהחלט ולא חרגו מתשואות של
שוק ההון בארצות הברית.

בהקשר זה, מן הראוי לציין כי מאז מותו של התורם Albert Igoin, בתחילת שנת 1995 לא הניבו
חשבונותיה של Magnify  תשואה העולה על 9.7% (בשנה אחת בלבד) וברבה השנים, מאז פטירת
התורם ועד קריסת בית ההשקעות של מאדוף, גם תשואות בחשבונותיה של Magnify  בשיעור שבין
4% עד 6% שהינן תשואות שחיי אפילו נמוכות מתשואות שוק ההון בארצות הברית באותן שנים.

ואף גם זאת, העמותה קיבלה, מדי חודש בחודשו, דו"חות על פעילות בורסאית שהתנהלה בחשבונה
אצל מאדוף, מהן לא ניתן היה לדעת שמדובר בפעילות פיקטיבית, ובסוף כל שנה קיבלה העמותה
אישור מרואי חשבון בארצות הברית על הפעילות שבוצעה בחשבונה אצל מאדוף.

כמו כן קיבלה העמותה אישורים על ניכוי מס במקור שנוכה מרווחים שהיו בתיק ההשקעות שלה אצל
מאדוף וכספי ניכויים אלו הועברו בפועל על ידי מאדוף לרשויות המס בארצות הברית. (IRS)

מהאמור לעיל ברור שחברי העמותה, הנהלתה ומי מטעמה  לא ידעו ולא יכולים היו לדעת את שטוען
המבקש, וטוב היה לטענה זו שלא נטענה מלכתחילה ובכל מקרה יש לדחותה מכל וכל.

20.  יובהר ויודגש כי כל תרומות העמותה נעשו לאחר שחבריה שקלו בצורה עניינית, מעמיקה ורצינית
בקשות לתרומות שהופנו אל העמותה, או פרויקטים ומיזמים של מחקרים בישראל בעלי חשיבות
מדעית או רפואית שיש להם השלכה אוניברסאלית, שחברי העמותה ראו לנכון ליזום.

עיון בתקנון העמותה מלמד שתרומותיה לא נקבע כפוי לאיזה מוסדות על העמותה לתרום, אלא לאילו
מטרות מיועדות כספי תרומותיה.

מכאן שהנטען בסעיף זה הינו התיימרות בעלמא של המבקש להחליף את שיקול דעתם של חברי
העמותה, שהינם אנשי אקדמיה  בכירים מאד, מהשורה הראשונה בארץ ובעלי מוניטין והכרה
בקהילה המדעית בעולם, בשיקול דעתו שלו אשר, בכל הכבוד הראוי, איננו משתווה לאפס קצהו של
היכולת, הידיעות, והיושר של חברי העמותה.

גם החסמכות על נספח 25 לבקשה אינגה במקומה משלושה טעמים:

ראשית, התרומה למרכז פרס לשלום, אליה מתייחס כותב נספח 25 לבקשה, ניתנה לאחר דיון
מעמיק שקיימו חברי העמותה בתאריך 30/7/2002 בבקשה לתמויכה בפרוייקט לאומי חשוב של
מחקר בנושא תרבות המים  וחקלאות במדבר, בהתבסס על המסמך  The Culture of

11

Water☐אשר נוהל על ידי מרכז פרס לשלום באמצעות מוסדות המחקר של רמת הנגב בע"מ בראשותו של ד"יר משה שגיא ובהנהלתו של פרופ' שמואל פוהורליס ובאמצעות מוסדות מחקר אחרים, בשיתוף גורמים בינלאומיים נוספים.

שנית, בעת שנוספה 25 לבקשה נכתב כבר נעשתה בדיקת עומק בעמותה על ידי רו"ח בועז גזית, וכמפורט בסעיף 10 של פרק זה לעיל, בסיומה הוא כתב "סיכום וממצאים":

"7.1 ממצאי הבדיקה השוטפת נמצאו תקינים.
7.2 מבדיקתנו, העמותה פועלת בהתאם למטרות שלשמן היא הוקמה".

שלישית, כדבר שבעובדה, בזמן אמת בעת שנוספה 25 נכתב, בחודש דצמבר 2006 או בסמוך אליו, לא ראה רשם העמותות לנכון להתייחס לטיענות שפורטה בן, ככל הנראה מתוך רצון "לייצר" לכותב עבודה נוספת, יותר מאשר דאגה אמיתית לתקינות פעולותיה של העמותות.

21. העמותה חולקת על הנטען בסעיף זה, בכלל, ועל ניסוחו המתנשא, בפרט.

ההיפך מהנטען בסעיף זה הוא הנכון באשר **הנסיבות המתוארות עד הנה אינן מצדיקות היענות לבקשת המבקש, מה גם ש"נסיבות" אלו אינן נתמכות בתצהיר כדין.**

יתר על כן, השימוש בביטוי "אין עוררין" איננו יכול ליצור "יש מאין" שכן, כמפורט לעיל ולהלן, יש ויש עוררין על הנטען בבקשה.

ואף גם זאת, עו"ד דניאל עזריאל איננו מקורב לעמותה או לבעלי תפקידים בה; ויש אין הן את הידע המשפטי הדרוש כדי לשמש בתפקיד המפרק של העמותה והן ניסיון ציבורי עשויר לכך, שכן הוא שימש בתפקיד מנכ"ל המוסד לביטוח לאומי ובתפקיד ראש המועצה המקומית מבשרת ציון.

לא למותר לציין שבטיעון בסעיף זה פוסל המבקש במומו שלו, שהרי בבקשתו הוא מבקש למנות **מפרקת מטעמו** וכבר עמדנו על ניגוד העניינים המובנה והפסול שבכך – ראה סעיף 8 בפרק II לעיל.

בהתייחס לסיפא של סעיף זה יובהר שאין כל צורך ל"אתר"י מקורות כספיים של העמותה שכן אלו גלויים ושקופים מחדו"חות הכספיים שהניש מתמדיים בידיעת המבקש ובחזקתו, כפי שאין מקום לטענה בדבר חובות שאינם קיימים, עד לרגע זה, כלפי המבקש.

23. העמותה איננה רואה נכון להתייחס לנטען בסעיף זה למעט זאת:

אכן, אין מחלוקת שמאדוף ביצע הונאת פונזי רחבת היקף אשר התגלתה בתאריך 10/12/2008, אולם הנטען בסעיף זה, לאמור: "בפועל **מעולם** לא בוצע מסחר בניירות ערך בחשבונות הלקוחות של BLMIS" עדיין טעון הוכחה על ידי המבקש, שכן עד עצם היום הזה לא נקבע **המועד שבו תחלה** הונאת הפונזי של מאדוף; ולעניינו זה ישנה השלכה משמעותית על כל ההליכים המתנהלים על ידי המבקש בכלל; וכבנד הנתבעים בתביעה שהוגשה על ידו נגד Magnify ואח' בפרט.

24. העמותה חולקת על הנטען בסעיף זה ומפנה לאמור בפרק III סעיפים 9 – 15 לעיל.

26. הסיפא של סעיף זה, החל מהמילים "העמותה ידעה יפה או" ואילך, הינה טענה אבסורדית שאיננה נסמכת על בסיס עובדתי או ראייתי כלשהו והעולה על הכתב כי הנייר סובל הכול והעמותה חולקת, בתוקף רב, על טענה מוברעדת ודמיונית זו.

27. בהתייחס לסיפא של סעיף זה מפנה העמותה לאמור בסעיף 30 לבקשה, שבו מאשר המבקש שהעמותה לא השלימה עם דחיית הוכחת החוב שהגישה וערערה על כך לפני בית המשפט בניו יורק, ערעור שעדיין תלוי ועומד.

28. העמותה טען טענה שאין כל רבותא בגידול פעילותה הכספית לאחר מות התורם שכן, לפי חנחיותיו **מחצית** מהתשואות **בתיק ההשקעות** של Magnify אמורה הייתה לשמש למטרות פילנדרופיות, באמצעות **העמותה**; ומאחר שלמרות שבין השנים 1995 עד 2008 הייתה התשואה המצטברת בשני חשבונותיה של Magnify חד ספרתית, הרי שעם הגידול בסכומים שהשתתפו בחשבונות אלו, דיווחיה החצי

12

שנתיים של מאדוף לעו"ד גרין, ניתן היה לקיים את רצונו והנחיותיו של התורם ולהעביר מחשבונותיה של Magnify לחשבון העמותה סכומים גדולים והולכים.

31. יש להניח שפירורו התובעה שהגיש המבקש נגד העמותה ואח' לבית המשפט בניו יורק בבקשה דנא לא נועד אלא כדי להכפיש את העמותה, חבריה, הנהלתה, יועצה המשפטי ומי מטעמה בפני בית משפט נכבד זה, כמו גם לראות לכך שהיא תפורסם ברבים, כפי שאכן נעשה בפועל.

אין זה המקום להתייחס בפירוט לתובענה זו אשר המבקש לא ראה לנכון מלפניו לצרף את כתב ההגנה שהוגש כנגד התובענה.

עם זאת פטור בלא כלום אי אפשר והעמותה תטען שהנייר סובל הכל וכל ולדעת חברי העמותה, הנהלתה ויועצה המשפטי התובענה הינה מופרכת מיסודה ועתידה להיידחות בשל הסיבה שהעמותה קיבלה מ- Igoin תרומות אמיתיות למימון פעילותה ופעלה בתום לב, בצנעה ובשקיפות מלאה למימוש מטרותיה, כפי שפורט בדו"ח המילולי ליום 31/12/2010 שהגישה העמותה לרשם העמותות.

אין זה המקום לפרט את כל טענות העמותה כנגד התובענה, די אם נציין בתמצית את העובדות הבאות:

Igoin היה איש עסקים מיוחד במינו עתיר נכסים, הגון ובעל עקרונות, אינטלקטואל ואוטודידקט שתרם רק לנושאים אחרי שלמד את מהותם הבין את עקרונותיהם והשתכנע בחשיבותם.

בימי חייו מימן Igoin את פעילות העמותה ולאחר מותו, בתאריך 31/1/1995, מומנה כל פעילות העמותה מכספים שהועברו לחשבונה אצל מאדוף מחברת Magnify שהוקמה לבקשת Igoin בשנת 1983 על ידי עורך הדין Dr. Kurt Brunner משווייץ.

בהתאם למידע שנמסר על ידי המבקש עצמו בדו"חות הביניים שהוגשו על ידו לבית המשפט בניו יורק, יש יותר מיסוד סביר להניח שהוואת הפונזי של מאדוף החלה רק בסוף שנת 1992.

מכל מקום, כאמור לעיל, עד היום טרם ניתנה החלטה שיפוטית מחייבת לגבי מועד תחילת הוואת הפונזי שבוצעה על ידי מאדוף וכיצד יש לחשב את הרווחים שנוצרו על כספי קרן ההשקעות שהושקעו אצל BLMIS ממועד שקדם לתחילת ההוואה ועד למועד שבו החלה ההוואה על ידי מאדוף.

לטענת Magnify, אשר כאמור לעיל היא זו שמימנה את פעילותה הפילנתרופית המבורכת של העמותה, כל הכספים שהיו בחשבונותיה אצל מאדוף קודם לתאריך 31/12/1992 הינם כספי קרן ורווחים לגיטימיים; ומאחר ובתאריך 31/12/1992 היה בחשבונותיה אצל מאדוף סכום כולל של **$253,608,194** הרי שגם אם תתקבל תביעתו של המבקש במלואה, והנתבעים ובהם העמותה יחויבו להשיב את הסכומים הנתבעים, בסך כולל של כ- $154,000,000, **דבר המוכחש מכל וכל**, עדיין תגיע ל- Magnify יתרת זכות בסך של כ- **$110,000,000.**

ואף גם זאת, לטענת הנתבעים כולם התובענה מבוססת על אדני שווא, היא רצופה דברי הבל ורעות רוח, מנוסחת בצורה יהירה, מתנשאת ופוגעת וכולה פצע וחבורה ומכה טרייה ובסופו של יום תדחה.

**כל הנתבעים פעלו במסירות, בנאמנות, בתום לב ובאמונה שלמה** שהם עושים את רצונו של Igoin, לתרום לקידום המחקר המדעי והרפואי במדינת ישראל, אשר יש לו השלכה אוניברסאלית, רצון אשר נמשך לאחר מותו על ידי אלמנתו Doris Igoin.

הטענות כי מי מהנתבעים **בתובענה דנא**, ובייחוד עו"ד גרין, ידעו, או שהיה עליהם לדעת, על הוואת הפונזי של מאדוף הינה, כמפורט בסעיף 19 של פרק זה לעיל, טענה שקרית, הוזיה ומופרכת אשר לא זו בלבד שאין לה כל יסוד בעובדות שבעובדות המקרה, אלא שהיא טענה המופנית, כדבר שבשגרה, כלפי רוב רובם ומניינם של הנתבעים על ידי המבקש,  בניסיון להתגבר על מחסומים משפטיים כגון, התיישנות.

32. העמותה חולקת על הנטען בסעיף זה על כל סעיפי המשנה שלו.

13

באשר לנטען בסעיף 32.1 לפיו הניבו חשבונות הנתבעים בתובענה רווח נטען ופיקטיבי של למעלה מ-150 פעמים על הכסף שהופקד, יוברר כי טענה מופרכת זו נסמכת על כך שהמבקש בטל ללא כל סיבה ושלא כדין את הסכום שהופקד על ידי Igoin, בחודש ספטמבר 1990, בחשבון Magnify בסך של $ 126,750,000

בהקשר זה ראוי לציין שבתאריך 7/12/2011 נפטר היועץ המשפטי של העמותה, עו"ד גרין, בניו יורק עם ארבעה עורכי דין ממשרד Baker & Hostetler, המייצגים את המבקש והציג בפניהם מסמכים וראיות חותכות, שאינן משתמעות לשתי פנים, לפיהן כל טענותיהם בדבר ידיעה או מחותבעים שם על הונאת הפונזי של מאדוף, או אפילו על יכולתם לדעת זאת, הינה טענה הזויה שטוב היה לה שלא נטענה משנטענה; וכן הציג בפניהם פירוט של עליית שווי תיק השקעות של Magnify, מאז שנת 1992 ועד מחציתה של שנת 2008, כפי שהייתה בידיעתו, על פי הדיווחים שנמסרו על ידי מאדוף לאיגואן בחייו ולאחר פטירתו לגרין; ולפיהם עליית שווי תיק ההשקעות של Magnify בשנים אלו הייתה עליה סבירה ומתונה, בניגוד גמור לנטען בתובענה המאוזכרת כאן. דא עקא שהמבקש בחר להתעלם ממידע זה.

באשר לנטען בסעיף 32.3 תשוב העמותה ותטען כי ככל שהדברים נוגעים אליה הטענה שהדו"חות שניפקה BLMIS היו "שונים לחלוטין" מדו"חות שניפקו למשקיעים אחרים הינה טענה לא נכונה, אם לנקוט לשון המעטה, שכן כאמור בסעיף 19 לעיל העמותה קיבלה, מדי חודש בחודשו, דו"חות של פעולות בורסאיות שהתנהלה בחשבונה אצל מאדוף, מהן לא ניתן היה לדעת שמדובר בפעילות פיקטיבית, ובסופו של כל שנה קיבלה העמותה אישור מראוי חשבון בארצות הברית על הפעילות שבוצעה בחשבונה אצל מאדוף.

אשר לטענה בסיפא של סעיף זה לפיה דיווחים אלו הופקו ונערכו במחשבים נפרדים של עובדי מאדוף ולא במערכת המחשוב האוטומטית שבה הופקו הדו"חות עבור החשבונות האחרים ב- BLMIS מקשה העמותה ושואלת, האם עולה על דעתו של המבקש שלעמותה או מי מטעמה הייתה גישה למחשבים של BLMIS כך שיכלו לדעת מאיזה מחשבים מונפקים הדו"חות?!!

בהתייחס לנספח 33 לבקשה תטען העמותה שאת המסמכים המסומנים BLMIS Page 371 וכן BLMIS Page 372 היא ראתה **בפעם הראשונה** עם קבלת כרך הנספחים לבקשה.

גם המסמך המסומן BLMIS Page 370 לא היה בידיעת העמותה, אלא רק בידיעתו של עו"ד גרין, אשר לא הביא לידיעת העמותה וגם הוא ראה את שני המסמכים האחרים **בפעם הראשונה** עם קבלת כרך הנספחים לבקשה.

וזאת: מסמך BLMIS Page 371 מופנה בכלל ל- Kurt Brunner ומסמך BLMIS Page 372 לא קריא כדי לדעת למי הופנה.

לפיכך, אין כל יסוד לטענה שניתן היה לדעת ממסמכים אלו על אי אי התאמות וחריגות בדיווח שבוצעו על ידי מאדוף.

34. העמותה דוחה את כינוי הכספים שהועברו לחשבונה לצורך פעילותה הפילנתרופית המבורכת כ-"תרומות".

באשר לתיאורו של עו"ד יאיר גרין כ – "נאמן של התורם" יוברר שוב, כמפורט בהתייחס לסעיף 12 של פרק זה לעיל, שהכוונה היא לחיותו של עו"ד יאיר גרין "איש אמונו" של התורם שיחסיהם האישיים היו יחסי קרבה ואמון רב, עד שניתן להתייחס אליהם באופן מטאפורי כיחסי אב ובן.

באשר ל"נאמן" של Magnify מופנה בית המשפט הנכבד לנטען בהתייחס לסעיפים 6, 15, 16, 17 של פרק זה לעיל.

35. הטענה בסיפא של סעיף זה לפיה העמותה קיבלה "בין היתר" כספים מחשבונות שהתנהלו אצל BLMIS מקוממת ומטעה, באשר רוב רובם ומיניה של הכספים בסכום של כ-124,000,000 $ הועברו לעמותה, למימון פעילותה הפילנתרופית המבורכת לקידום המחקר המדעי והרפואי בישראל, שיש לו השלכה אוניברסאלית וזאת בהתאם לרצונו, הוראותיו והנחיותיו המפורשות של התורם, אלברט איגואן, ולאחר פטירתו של אלמנתו דוריס איגואן.

14

**כל יתרת העברות הכספים שבוצעו בחשבונות הנתבעים שם נעשו ברשות בסמכות וכדין, ואין הם מעניינה של העמותה** או מעניינה של הבקשה דנא ולא היה מקום לטעון את הנטען בסעיף זה, אלא כדי להכפיש.

יצוין שעו"ד גרין מכחיש שהיו לו יחסים מיוחדים עם מאדוף, מעבר למילוי התפקיד שהוטל עליו על ידי Magnify, כפי שהנחה אותו התורה וכפי שהנחה התורה את המנהל היחיד של Magnify ד"ר קורט ברונר, וכפל הנראה גם את מאדוף.

36. העמותה חולקת על הנטען בסעיף זה ותוסיף ותטען כי טענת המבקש בסיפא של סעיף זה "שהליכי פירוק מרצון לא נועדו כלל ועיקר לצבע איתwatiתן כספים וגביית ם לטובת ת תנושים" מלמדת על כי לא להליך של פירוק העמותה בפיקוח בית המשפט אשר המבקש כי אם למסטרות אחרות גלמרי שאין בין לבין פירוק העמותה ולא כלום, ומוטען זה מן הראוי שבית המשפט הנכבד יקבל את עתירת העמותה למחוק את הבקשה על הסף, או למצער לעכב את הדיון בה עד להכרעה סופית בהליכים המתנהלים בין המבקש לבין העמותה בבית המשפט לפשיטות רגל בני-יורק, על יסוד הכלל של "עניין תלוי ועומד" Lis Alini Pendens, כמפורט בסעיפים 9 עד 17 בפרק III לעיל.

38. מהנטען באופן מורחבל בסעיף זה לא ניתן לדעת מתי התקיימה השיחה בין עורכי דינו של המבקש לבין עורכת הדין הקודמת של העמותה, ומכל מקום כדין נהגה האחרונה בהברה לוותר על הליכי המצאה פורמאליים של התובענה ואפילו לקבל "עותק נימוסין" של התובענה, אשר נמסרה במשרד העמותה בתאריך 22/3/2011.

39. העמותה מכחישה את הנטען בסעיף זה.

צא וראה, כבר בדו"ח הכספי של העמותה לשנת 2008 שנחתם על ידי פרופ' הנרי אטלן יו"ר העמותה ופרופ' חנן גוטפרוינד חבר הנהלתה בתאריך 20/4/2009 נכתב בביאור 2 לאמור :

"1. באסיפה כללית של חברי העמותה שהתקיימה ביום 31 בדצמבר 2008 הוחלט להקפיא את פעילות העמותה עד להתבהרות הדברים לאשורם".

ראה נספח 22 לבקשה.

החל מאותה אסיפה כללית, בשלהי שנת 2008, ביקש יו"ר העמותה, פרופ' הנרי אטלן, לפרק את העמותה, אולם חבריה החליטו לעכב את הפירוק עד לאחר שהעמותה תוגה לגבות משלטונות המס בארצות הברית (IRS) את כספי הניכויים במקור שניכה מאדוף מרווחיה והעבירם לשלטונות המס, בשלוש השנים שקדמו לקריסתה בית הנשקעות שלו.

העמותה נזקקה לכספים אלו, בין היתר, כדי לכסות את התחייבויותיה לעובדיה וכדי לשלם את שכר טרחת עורכי דינה בתביעת המבקש כנגדה בני-יורק.

לאחר שהעמותה הצליחה לקבל את כספי הניכויים במקור היא נעתרה לבקשתו של פרופ' אטלן לנקוט בהליכי פירוק מרצון.

אכן במועד הגשת תצהירי כושר הפירעון ידעו חותמ ימ שהמבקש שהמבקש דחה את הוכחת החוב שהגישה לו העמותה בסך של כ- 51,000,000 $, אולם הם גם ידעו שהעמותה ערערה על כך וערעור זה טרם הוכרע.

אין זה נכון נוכון שבעת חתימת תצהירי כושר הפירעון ידעו חותמיהם על תביעת המבקש.

בין כך ובין כך, כל הספקולציה של המבקש על כוונות העמותה בהגשת בקשה לפירוק מרצון אינה אלא עורבא פרח חסרת בסיס עובדתי או משפטי.

40. העמותה חולקת על הנטען בסעיף זה שכאמור לעיל אינו נכון מבחינה עובדתית ולפיכך חסר יסוד מבחינה משפטית.

41. שוב בוחר המבקש לפתוח סעיף זה בביטוי "אין עוררין", כאשר הוא יודע שטענתו איננה אמת וכי העמותה מערערת על הטענה העובדתית שביסוד ביטוי זה.

15

דווקא האמור בסעיף זה לגבי עורכת הדין הקודמת של העמותה מצביע על כך שטענת המבקש על ידיעת העמותה, או מי מטעמה, על הגשת התובענה, בטרם כניסת העמותה להליך של פירוק מרצון, איננה אמת. יתר על כן, גם אם הייתה לעורכת הדין הקודמת של העמותה ידיעה כללית על דבר הגשת התובענה הרי שלא ניתן לייחס ידיעה זו לעמותה או למי מטעמה.

42. העמותה מכחישה את הנטען בסעיף זה והיא שבה ומפנה את בית המשפט הנכבד לנטען על ידה בסעיפים 10 עד 15 של פרק III לעיל; וכן לסעיפים 1 ו-31 של פרק זה.

43. העמותה טוענת כי במועד קבלת ההחלטה על פירוקה מרצון לא היו לה חובות ברי פירעון שכן כל מקבלי התרומות שכלפיהם התחייבה העמותה לתרום ויתרו על יתרת התרומות המגיעה להם מהעמותה.

במועד קבלת ההחלטה על פירוקה מרצון עוד טרם חבה העמותה למבקש ולו דולר אחד ולכן אין לנטוע על ידו בסעיף זה כל נפקות.

מן הראוי להבהיר שטיעונו **החילופי** של המבקש, בסעיף זה, איננו עולה בקנה אחד עם מה שמתיימר להיות תצהיר התומך בבקשה, שכן האמנם איננה יכולה להיות חילופית וכאן המצהירה עשתה **תצהיר סתמי ולקוני המפנה באופן גורף** לנטוע בבקשה, כאילו **הכל** בה אמת, גם טענות עובדתיות חילופיות, דבר המלמד כי הכל האמור בו איננו יכול לתמוך בבקשה ודינה להימחק או הסף.

44. בעד שבתובענה חוזר המבקש על טענה מופרכת לפיה העמותה "ידעה או שהיה עליה לדעת" על הנושאה של מאדוף, דבר המוכחש מכל וכל, בין היתר, כמפורט בסעיף 19 של פרק זה לעיל, הרי שכל הדברים נוגעים אליו טוען המבקש כי "נאמן מיידית לא ידע ולא היה יכול היה לדעת בעת המצאת התובענה לעמותה, על הליכי הפירוק מרצון".

טענה זו איננה נכונה שכן הפרסום בעיתונים TheMarker ומקור ראשון בדבר פירוקה מרצון של העמותה נעשה בתאריך 28/2/2011 ואילו התובענה הומצאה לעמותה כשלושה שבועות לאחר מכן, בתאריך 22/3/2011.

הפרסום בעיתונים יוצר חזקה חזקה שהמבקש ידע על הליך הפירוק מרצון של העמותה ולפיכך טענתו שלא ידע ולא יכול היה לדעת בעת המצאת התובענה על הליכי הפירוק מרצון איננה נכונה, אם לנקוט לשון המעטה, ובמילים אחרות: "כל הפוסל במומו פוסל".

45. אין כל יסוד לטענה שמפרק העמותה, עו"ד דניאל עזריאל, פעל שלא כדין כנטען בסעיף זה.

פרוטוקול האסיפה הכללית של העמותה מתאריך 18/1/2011 שבה הוחלט על פירוקה מרצון נמסר למשרדו בתאריך 19/1/2011 ולאחר שעורכת הדין מיסל סרי עזריאלי ממשרדו עיינה בו היא ביקשה מהגברת אילת נהיר לכנס שנית את האסיפה הכללית של העמותה וזו כונסה בתאריך 15/2/2011 ושבה ואישרה את פירוק העמותה מרצון, אולם תאריך הפרוטוקול לא שונה ונשאר כפי שהיה במקור, דהיינו 18/1/2011.

תשעה ימים לאחר מועד כינוסה הנוסף של העמותה, בתאריך 24/2/2011, שלח עו"ד עזריאל לשני עיתונים, TheMarker ומקור ראשון; וכן לרשומות, בקשות לפרסם את דבר פירוק העמותה והפרסומים בעיתונים בוצעו בתאריך 28/2/2011 וברשומות בתאריך 6/4/2011.

אין צריך לומר שלמפרק העמותה אין שליטה על מועד הפרסום ברשומות והטענה כלפיו בעניין זה משוללת כל יסוד.

47. העמותה חולקת, בתוקף רב, על הנטען בסעיף זה שהינה טענה שערורייתית וחסרת יסוד הן מבחינה עובדתית והן מבחינה משפטית.

ראשית, אין בידי המבקש ראיה כלשהי על שבעת שהעמותה קיבלה החלטה על פירוקה מרצון, הייתה לה "ידיעה פוזיטיבית" בדבר התובענה.

שנית, לא קיים חשש כלשהו כנטען על ידי המבקש בסעיף זה, שאינו אלא חשש מדמיונו הקודם.

16

ראה סעיף 5 בפרק I לעיל.

48. גם הנטען בסעיף זה הוא מופרך וחסר יסוד. כאמור בסעיף 45 לעיל, שלח מפרק העמותה לרשומות בקשה לפרסם את פירוק העמותה מרצונו והעובדה שהפרסום נעשה במועד שנעשה איננו בשליטתו של המפרק.

יתר על כן, כחלק מנספח 4 לבקשה מצורף המבקש את מכתבה מתאריך 19/01/2011 של גברת רחלי ארד, מרכזת מחוזית ופירוקים במשרד רשם העמותות, למפרק העמותה, לפיו על מנת לסיים את הליכי הפירוק על העמותה להמציא שבעה מסמכים.

אין בפרסום ברשומות בדבר פירוק העמותה מרצונו ומנוי מפרק – נספח 34 לבקשה – כדי "לנסות וליצור סופיות של הליך הפרוק מרצונו" כפי שטוען המבקש, טענה שטוב היה לה שלא נטענה משנטענה.

49. העמותה חולקת מכל וכל על הנטען בסעיף זה, שוב תוך תוך שימוש בביטוי "אין עוררין", כאשר יש ויש עוררין על כל הנטען שם ואין צורך לחזור על הטענות בהקשר זה.

50. עד כמה לא רציני טיעונו של המבקש בסעיף זה ניתן ללמוד מכך שהוא כותב כי הזמן שהקצביב מפרק העמותה לנושיה להגיש את תביעותיהם היה "שבועיים בלבד". והנה עיון בפרסום ברשומות - נספח 34 לבקשה, מלמד שהזמן שהוקצב על ידי המפרק לנושים הינו "בתוך 21 ימים מיום פרסום הודעה זו".

הזמן שהקצביב המפרק לנושיה של העמותה הינו סביר ומקובל ודרך הטענון של המבקש של חמבקש כנגדו, בכלל, ובעניין זה, בפרט אינגה ראויה ומן הדין לדחותה מכל וכל.

לשם חשוותא של הזמן הסביר והמקובל להזמנת נושים להגיש את תביעות החוב שלהם, מופנה בית המשפט הנכבד להזמנה שפרסם עו"ד אמיר לויצקי מפרק עמותת קונסורציום תקשורת אלחוטית רחבת פס שהתפרסמה בנספח 34 לבקשה של המבקש עצמו.

51. אין כל יסוד לנטען בסעיף זה והעמותה חולקת עליו מכל וכל. אין צריך לומר כי עו"ד גרין איננו עמותה ישעיה הורוויץ.

53. גם הנטען בסעיף זה מלמד שכוונת המבקש אינגה לפירוק העמותה בפיקוח בית המשפט אלא לקדם, באמצעות פירוק העמותה, את התובענה המופרכת שהגיש כנגד העמותה ואחרים בבני-יורק.

ואף גם זאת, חמבקש מצביע למנות "מפרק שאינו נוגע בנינוד עניינים" תוך התעלמות מכך שמנעות של המפרקים המוצעת על ידו, עו"ד ניצה פוזנר, נגוע בניגוד עניינים מובנה ופסול כמתואר בפרק II לעיל.

54. הנטען בסעיף זה מקדים את המאוחר למוקדם, שכן לא ניתן לומר שעצם הגשת התובענה, אשר כנטען בסעיף זה עצמו, עדיין "תלויה ועומדת", יוצרת לעמותה חבות כלפי המבקש ולו של דולר אחד.

לא זו בלבד שקיימים סיכויים טובים שהתובענה תדחה, אלא גם קיימת האפשרות שערעורה של העמותה על דחיית הוכחת החוב שהגישה תתקבל על ידי בית המשפט, והמבקש הוא זה שיהיה חייב לעמותה ולא להיפך.

אין אפוא כל רבותא בנטען בסיפא של סעיף זה, כפי שאין כל צורך, **בשלב זה**, שמנהלי העמותה יתנו תצהירים אחרים.

55. בהתייחס לנטען בסעיף זה תשוב העמותה ותציין את שנטען במבוא לתגובה, לאמור, שכבר בתשובת המפרק, חח"מ, לבאי כוח המבקש מתאריך 2/2/2012 (נספח 38 לבקשה) הוא חודיע להם לאמור : **"עם זאת, מעת שהובא לידיעתי שהוגשה כנגד העמותה תביעה הקפאתי את הליכי הפירוק".**

56. העמותה כמו גם המפרק שלה, חח"מ, חולקים על הנטען בסעיף זה וייטענו שכל פעולותיהם נעשו כדין, ביושר ובשקיפות מלאה וטענות המבקש כלפיהם בסעיף זה הינן טענות סרק מקוממות ודינן להדחות מכל וכל.

17

59. העמותה חולקת על הנטען בסעיף זה ותטען כי האמור בסיפא לו אינו אלא ציטוט סתמי של סעיפים מחוק העמותות התש"ם – 1980.

60. העמותה חולקת על טענות המבקש בסעיף זה, הנטענות בצורה כוללנית, בלתי מבוססת ובלשון משתלחת.

העמותה שבה ומפנה את בית המשפט הנכבד לנטען על ידה בסעיפים 10 עד 14 של פרק III לעיל.

ואם ביתצא עסקינן, לא למותר לציין כי **למבקש ובאי כוח** השונים שולמו עד היום מקופת פירוק בית ההשקעות BLMIS למעלה מארבע מאות מיליון דולר ( \$400,000,000), בין היתר, בגין הליכים כפולים שהמבקש **בוחר** לנהל, כמו הליך כפול זה.

61. אכן, בעקבות ההחלטה על הקפאת הליכי פירוק העמותה קיבלה העמותה את ההחלטות המפורטות בסעיף זה.

62. הטענה כי נספח 36 לבקשה "נערך ונחתם על ידי גרין" איננה נכונה ונסתרת בעליל מעיון בנספח זה, אשר נחתם בידי פרופ' הנרי אטלן יו"ר העמותה ועל ידי פרופ' חנוך גוטפרוינד, חבר הנהלתה.

עו"ד גרין, יועצה המשפטי של העמותה, אישר שההחלטות שנתקבלו באותה אסיפה נתקבלו בהתאם לתקנון העמותה, כפי שאישר את כל החלטותיה של העמותה, אשר עמדו במבחן התקינות שלה.

65. מכתבו של מפרק העמותה, החו"מ, נספח 38 לבקשה, מדבר בעד עצמו ופשיטא שהעמותה והחו"מ סומכים את ידיהם על הנאמר בו בכלל בלתי נפרד מתגובת העמותה.

66. העמותה והמפרק שלה, החו"מ, חולקים, **בתוקף רב**, על כל אחת ואחת מהטענות הנטענות בסעיף זה בלשון שלוחת רסן, למעט הטענה שבסעיף 66.7, שיש בה כדי לאשר את טענת העמותה שבנספח 38 לתביעה ומצוינת בתמצותיותה בסעיף 65.7 לבקשה.

עם זאת, אין זו אמת ; ואף לא יכולה להיות אמת, טענת המבקש בסעיף 66.7 שפניית בא כוח העמותה בני-יורק לבאי כוח המבקש, בבקשה לקבל ראיות נעשתה "קודם להגשת התובענה".

העמותה תטען שדרושה חוצפה רבה ומצח נחושה לטעון נגד שטוען המבקש בסעיף 66.2 של הבקשה, ביחוד כאשר אין למבקש, בכל הכבוד לערוך את הדין שתצהירת הסמכני, הלאקוני והגורף מתיימר לתמוך בבקשה, שמץ של ראיה לטענות עזות המצח שבסעיף זה.

67. העמותה מכחישה את הנטען בסעיף זה ותשוב ותדגיש כי **עד עצם היום הזה אין היא חייבת למבקש דבר וחצי דבר** וכי טענת המבקש שכוונת העמותה להתחמק **"בבוא היום"** מתשלום חובה למבקש מלמדה, כשלעצמה, שבקשת המבקש דנא היא מוקדמת ודינה להימחק על הסף עד אשר **"יבוא היום", אם בכלל !!!**

בהקשר זה שבה העמותה ומצהירה את שהצהירה במבוא לתגובה זו, דהיינו :

**אין צריך לומר שאם מצא אתם מגיעים בטענתכם שהליך הפירוק נעשה למראית עין בלבד ובחוסר תום לב. כפי שפורטה העמותה בדו"ח הכספי שהגישה לרשם העמותות בתאריך 16/6/2011, הנוכד על ידכם בסעיף 24 של מכתבכם, קריסת בית ההשקעות של מאדוף הביאה את העמותה למצב שבקופתה נותרו כספים מעטים מאד, ובודאי לא בסכומים המופרכים הנתבעים ממנה על ידי Picard, בסדר גודל של כ- \$124,000,000 ;**

68. העמותה והמפרק שלה, החו"מ, דוחים מכל וכל את הנטען בלא כל בסיס עובדתי או משפטי בסעיף זה.

בהקשר זה מפנה העמותה את בית המשפט הנכבד לדברים שכתב מפרק העמותה לבאי כוח המבקש בנספח 38 לבקשה, לאמור :

"לשיא של עזות מצח אתם מגיעים בטענתכם שהליך הפירוק נעשה למראית עין בלבד ובחוסר תום לב. כפי שפורטה העמותה בדו"ח הכספי שהגישה לרשם העמותות בתאריך 16/6/2011, הנוכד על ידכם בסעיף 24 של מכתבכם, קריסת בית ההשקעות של מאדוף הביאה את העמותה למצב שבקופתה נותרו כספים מעטים מאד, ובודאי לא בסכומים המופרכים הנתבעים ממנה על ידי Picard, בסדר גודל של כ- \$124,000,000 ;

18

ולפיכך גם אם תתקבל תביעתו כנגד העמותה, **דבר המוכחש**, לא יהיה בידו להיפרע מהעמותות ולו במקצת מהסכום הנתבע, גם אם העמותה לא הייתה מתחילה בהליכי פירוק מרצון."

70 – 76. בהתייחס לנטען בסעיפים אלו שבה העמותה ומפנה לנטען על ידה בסעיפים 12 ו- 34 וכן לסעיפים 6, 15 ו- 16 של פרק זה לעיל.

## V. התייחסות מפורטת לנטען בבקשה (סעיפים 77 - 90)

יובהר שנית כי אי התייחסות לאיזה מסעיפי הבקשה איננו מהווה הודאה בנטען באותם סעיפים וככל שהעמותה איננה מתייחסת לסעיף כלשהו מסעיפי הבקשה האמור בהם מוכחש.

79.1 העמותה חולקת על טענת המבקש כאילו יש מקום לצוות על פירוקה מכוח סעיף 49(4) לחוק העמותות התש"ם- 1980.

בהקשר זה מופנה בית המשפט הנכבד, שוב, להלכה שיצאה מלפני בית המשפט העליון, מפי כבוד השופט אליקים רובינשטיין, ב- ע"א 877/07 סיגל גפן ועד 19 אח' נ' ג'ירוטק השקעות בע"מ, תק-על 2010(3), 3103 , 3108 (2010), לאמור :

"חדלות פרעון

כג. השאלה מתי תיחשב חברה חדלת פירעון מוסדרת בסעיף 258 לפקודת החברות:

"רואים חברה כחדלת-פרעון בהתקיים אחת מאלה :

(1) נושה שמגיע לו מן החברה, על פי המחאה או באופן אחר, סכום העולה על חמישה שקלים שהגיע זמן פרעונו, מסר לחברה במשרדה הרשום דרישה חתומה בידו לשלם לו את חובו, ובמשך שלושה שבועות לאחר הדרישה לא שילמה החברה את החוב ולא נתנה ערובה ולא הגיעה לידי סידור להנחת דעתו הסבירה של הנושה ;

(2) צו הוצאה לפועל או כתב בי-דין אחר שניתן על פי פסק דין או צו של בית משפט לטובת נושה של החברה לא קוים כולו או מקצתו ;

(3) הוכח להנחת דעתו של בית המשפט, לאחר שהביא בחשבון את חבויותיה המותנות והעתידות, שאין ביכלתה של החברה לשלם את חובותיה".

בעוד החלופה השלישית דורשת הוכחת פוזיטיבית בדבר חדלות פירעון, מצויבות שתי החלופות הראשונות - שהראשונה בהן, על פי הסכום ונסוחה, היא מ"ספרי דברות קדומים" - חזקות, שבהן רואים את החברה כחדלת פירעון, ללא צורך בהוכחה בדבר מצבה בפועל של החברה (צ' כהן פירוק חברות (תש"ס) 103 (להלן צ' כהן)). על פי החלופה הראשונה, הרלבנטית לענייננו, נדרש כי לנושה יהא מגיע סכום העולה על חמישה שקלים, שהגיע זמן פרעונו ; כי הנושה מסר לחברה במשרדה הרשום דרישה חתומה בידו לשלם לו את חובו ; ולבסוף, כי מדובר בחוב שאינו שנוי במחלוקת. ההשקפה שביסוד חלופה זו מבקשת להקל על הנושה להניעים את החיים להליך של חדלות פרעון. די בחוב אחד מסוים כדי להצמיח זכות לבקש את פתיחת ההליך, והנושה היוום אינו נדרש לבחון את כלל נסיבותיה הכלכליות של החברה, טרם שיפנה לבית המשפט. יתר יסודות העילה עניינם פרטים דיוניים, שנוגעות להבטיח מיצוי הליכים בין הנושה לבין חייבה, טרם הגשת הבקשה (האן, 215).

כד. **כאשר חברה אינה נענית לדרישת התשלום, שכן היא חולקת על עצם קיומו של החוב או על שיעורו, אין מקום לחזקה שאי קיום הסכום נובע מחוסר יכולת פירעון** (צ' כהן, 106). כפי המציין האן (עמ' 234) "... כאשר אדם טוען לקיומו של חוב של החברה כלפי, אולם החברה חולקת בכנות ובתום לב על עצם קיומו של חוב זה, אותו אדם אינו נחשב לנושה הזכאי לבקש את פירוקה"

ובהמשך:

כה **כמותי כבית המשפט המחוזי חוזי סבורני, כי האכסניה הראויה לבירור הסוגיה היא כלל במסגרת תביעה אזרחית, וכי קשה להלום שימוש בהליכי הפירוק כעוקף הליך אזרחי וכדרי להכרעת סכסוכים.**

19

גם בנידון דידן ניטש בין הצדדים סכסוך סבוך, המעלה שאלות עובדתיות הנחוצות בירור והכרעה";
(ההדגשה של החי"מ ד.ע)

79.2.    העמותה שבה ומפנה בהקשר זה לנטען במבוא ובסעיפים 6, 12, 15, 16, 17, ו-34 של פרק IV לעיל,
ומכחישה שהפרה חובת נאמנות כלשהי, כפי שטוען המבקש, ללא כל ביסוס עובדתי.

79.3-79.10.    העמותה התייחסה לטענות המופרכות הנטענות, שוב ושוב, על ידי המבקש בסעיפי משנה אלו, מתוך
הנחה, שגויה, שחזרה פעמים רבות על דבר שאיננו אמת תהפוך אותו לאמת, ולא היא!

גם ניסיון המבקש להסתמך על סעיפים 49(1), 55, 27, 30, 36, 45 ו-46 בחוק העמותות תשי"ם-1980 לא
יצלח, שכן לא קמה תשתית העובדתית כדי להחיל על העמותה או על המפרק שלה איזה מסעיפי
חוק.

79.11    בהתייחס לעילה שבסעיף 49 (5) בחוק העמותות התשי"ם-1980 מופנה בית המשפט הנכבד לדברי כבוד
השופט דנציגר ב- ע"א 1775/10 עמותת קרית נדבורנה - בני ברק נ' רשם העמותות, תק-על(2)2011, 1099 ,
1106 (2011), לאמור :

עילת הפירוק הקבועה בסעיף 49(5) לחוק העמותות הנוגעת לפירוק מטעמים של צדק ושל יושר מהווה
"עילת סל" אל "עילת שמתוכן" בדומה לזו הקבועה בסעיף 257(5) לפקודת החברות (ראו : רע"א 5596/00
סתוו נ' נאחוסי, פ"ד נו(1) 149 (2002); ע"א 877/07 גפן נ' גירונטי חשקעות בע"מ (לא פורסם, 2.9.2010)
(להלן : עניין גפן); גרינברגר ובן-נוח, בעמ' 495). בענייננו גם סקר השופט א' רובינשטיין את השימוש
שנעשה במשורה וכי במסגרת שיקולי הצדד וחיושר בין בתי יותר ביטוי להתנהגות הצדדים, לתום לב
ולהגינות, לצרכיה של החברה וליכולתה להגשים את מטרותיה, בהתאם לנסיבות העניין. בין היתר, עמד
השופט א' רובינשטיין על כך כי בתי המשפט עשו שימוש ב"עילת סל" זו במצבים בהם החברה אינה
פעילה, שלא ניתן להשיג את מטרותיה או שהחברה הגיעה את מטרותיה העיקריות או כשמדובר בחברת
"בועה".

24.    אני סבור כי כל פרשנותה של עילת הסל הקבועה בסעיף 49(5) לחוק העמותות יש ללמוד מן האופן בו
פורשה עילת הסל הקבועה בסעיף 257(5) לפקודת החברות, בכפוף לשינויים המחויבים הנגזרים
ממאפייניה הייחודיים של העמותה. כך, כשם שהשימוש בעילה זו נעשה במשורה בכל שהדברים נוגעים
לפירוק חברות, יש לנקוט בריסון בשימוש ב"עילת סל" זו ככל שהדברים נוגעים לפירוק עמותה. אחד מן
המקרים אשר לדידי מאפשרים את הפעלת עילת פירוק זה הוא במצב בו העמותה אינה פועלת עוד לקידום
מטרותיה אף מוסיפה היא להחזיק את ההשבה חמס או הטבת אחרות לחץ היא וכאית העמותות או שהיא
מוסיפה לקבל כספים מתורמים, וזאת בדומה להחזרת בעילה לפירוק משיקולי צדק ויושר במצב בו
החברה הפכה לחיות חברת בועה המומזה מיטגרת רימה מתוכן שהכלשה הוצאת כספים מבעלי המניות.
כאמור, בכל מקרה ומקרה על בית המשפט לבחור כי עליו לפעול בריסון בעשותו שימוש בעילה זו, ולבחון
היטב את נסיבות המקרה. כך למשל, ככל שהדברים נוגעים לפירוק עמותה בשל אי קידום מטרותיה יש
לתת את הדעת למשך הזמן בו העמותה אינה פועלת לקידום מטרותיה כמו גם לנסיבות האופפות
התנהלות זו. כך למשל, אין דין או דין דף קידום המטרות מחמת קשיים כלכליים או קושי בגיוס תרומות כדין
אי קידום מטרות העמותה סתם". (ההדגשות של החי"מ, ד.ע)

82.    בהתייחס לטענת המבקש בסעיף זה טוען העמותה שהמבקש מנסה מנסה לנכס לעצמו את סמכויות רשם העמותות,
שכן השימוש בסמכות לפי סעיף 48 א לחוק העמותות תשי"ם-1980 מסורה לרשם העמותות ולא למבקש.

בהחלטה מיום 26/7/2012 ביקש בית המשפט לקבל את עמדתו של רשם העמותות אשר נמסרה על
ידי, באמצעות עו"ד שירי פוגל, הצטרף לבקשת המבקש.

בהקשר אחרון זה תטען העמותה כי תגובת רשם העמותות ניתנה מבלי שניתנה לעמותה הזדמנות להשמיע
בפניי את טעוניה בטרם מתן התגובה ומבלי שניתנה לעמותה על ידי הרשם התראה כלשהי ומטעם זה
בלבד אין תגובת הרשם מבוססת כל עיקר ובית המשפט הנכבד מתבקש להתעלם ממנה.

יצוין שבתאריך 19/8/2012 כתב מפרק העמותה לעו"ד שירי פוגל מכתב אשר תוכנו מדבר בעד עצמו.

העתק המכתב מצורף לתגובה זו כחלק בלתי נפרד הימנה.

ובמענה למכתב המפרק השיבה עו"ד פוגל בתאריך 29/8/2012 כי עמדת הרשם נותרה בעינה.

20

מצורפת תשובת עו"ד פוגל.

מכל מקום, העמותה והח"מ רוצים לקוות שלאחר שרשם העמותות יעיין בתגובה זו הוא ישנה את עמדתו הקודמת.

83-84 . העמותות חולקת בתוקף על השוראות עניינה לעניינים שנידונו בפסק הדין המצוטט על ידי המבקש בסעיף זה.

השוני בין שתי העמותות ובהתנהלותן הינו כמרחק מזרח ממערב.

85-86 . אין מספיק מילים בשפה העברית כדי להביע את שאט הנפש של העמותה, חבריה, הנהלתה, או מי מטעמה על הטענות השקריות והמלעיזות שבטיעונים אלו, שאין לכנותן אלא רשעות וזדון גרידא.

לא זו בלבד שאין למבקש אפילו שמץ של ראיה לנטען בסעיפים אלו, אלא שניות המצא שבטיעונים שקריים אלו עוברת כל גבול ובית המשפט הנכבד מתבקש למחוק אותם על הסף, כמצוות תקנה 91 (א) לתקנות סדר הדין האזרחי התשמ"ד – 1984.

אך ורק בשל הוראות סעיף 13(5) של חוק איסור לשון הרע תשכ"א – 1961 לא מוגשת כנגד באי כוח המבקש, שהתריבו עוז להתעלות על הכבד טענות שקריות חסרות יסוד או בסיס, הן קובלנה פלילית פרטית והן תביעה אזרחית בגין לשון הרע שהוציאו בטיעוניהם המופרסמים, לכל אורך הבקשה ואשר הגיעו לשיא שקרי בסעיפים אלו.

עם זאת מופנה בית המשפט הנכבד לדבריו של כבד השופט אליקים רובינשטיין (בדעת מיעוט אמנם) ב-רע"א 07/1104 עו"ד פואד חיר נ' עו"ד עודד גיל, תק-על 2009(3), 2464 , 2477 (2009), לאמור :

"מובנים התחבטותם של בתי המשפט והמלומדים והיעדר האחידות, כאשר ראינו. לשון החוק ותולדות החקיקה נוטות במידה מסויימת לצד הרחבת ההגנה - אך המצפון והמצפון המצפין אינם מניחים לשופט הפרשן, לדעתי, להתעלם מהלבנת פניו של הזולת, מעלבונו ורמיסת כבודו. לא אחת במה שנזקן לראותו כרשעות אם כזדון, ולהישאר בממד הפרשנות הפורמלית או הפורמליסטית. האם יתכן לו למלבין הפנים לחיות "נובל ברשות התורה" (רמב"ן בפירושו לויקרא י"ט, ב')? זו ההתחבטות, ועל המוטלה הפרשנית לידידי לנוע לכיוון שלא יאפשר רמיסה מעין זו, וסבורני כי עליון המלאכה לקדם, אם לא לגמור, פרשנות שתמטע ניצול לרעה של ההיתר, והמחוקק יעשה את שלו וישלים בשעה שימצא שימצא לנכון. לטעמי אין אני תופסים בכך את מקום המחוקק שאינו מקומנו, אלא עוטים גלימת הפרשן שהיא מלאכתנו. כדי להסיר ספק, אטעים כי אין אני עוסקים בעקרון חופש הביטוי כשלעצמו, אל נכון יסוד מוסד בפסיקתו של בית משפט זה. אטעים שוב כי אין אני עוסקים ב"איום" על חופש הביטוי הפוליטי והציבורי, ואין מקום לחשוש מפני הגשה המתוארת כאן כמדיפה ניחות של הגבלת חופש ביטוי כזה, וכבר אמר התנא הלל "דעלך סני, לחברך לא תעביד" "מה שעליך שנוא, לחברך לא תעשה" (בבלי שבת, לא,א) אך מכל מקום, חופש הביטוי אינו מושג ערטילאי נטול גבולות. איסור לשון הרע הוא אחד תנובלות המשמעותיים, והשאלה היא כיצד לפרש הגנות והיתרים לעניין לשון הרע, וסבורני כי לחוק יסוד : כבוד האדם וחרותו מקום בכך".

תצהירים של פרופ' הנרי אטלן ושל גברת אילה נהיר מצורפים לתגובה זו בתמיכה לה.

לאור כל האמור לעיל מתבקש בית המשפט הנכבד כדלקמן :

1. לדחות את הבקשה על הסף.
2. לחלופין, לעכב את הדיון בבקשה עד לקבלת פסק דין חלוט בתובענה שהגיש המבקש כנגד העמותה בניו-יורק.
3. לחלופין חלופי, לדחות את הבקשה לאחר חקירת כל המצהירים על תצהיריהם ודיון בבקשה.
4. לדחות את הבקשה למינויהו של עו"ד ניצה פוגל כמפרקת העמותה.
5. לחלופין, אם יסבור בית המשפט הנכבד שיש מקום להעביר את פירוק העמותה לפיקוח של בית המשפט, להשאיר את מפרק העמותה, הח"מ, כמפרק מטעם בית המשפט.
6. לחייב את המבקש בהוצאות הבקשה, לדוגמא.

דניאל עזריאל עמר
מפרק עמותת ישעיה הורוויץ (ע"ר) (בפירוק מרצון)

21