**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (SMB) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 10-04336 (SMB) |
| Plaintiff, | |
| v. | |
| THE ESTATE (SUCCESSION) OF DORIS IGOIN, LAURENCE APFELBAUM, individually and in her capacities as executor and beneficiary of the Estate (Succession) of Doris Igoin, and EMILIE APFELBAUM, | |
| Defendants. | |

**JURISDICTIONAL MEMORANDUM OF LAW IN FURTHER SUPPORT**
**OF DEFENDANTS THE ESTATE (SUCCESSION) OF DORIS IGOIN,**
**LAURENCE APFELBAUM, AND EMILIE APFELBAUM'S MOTION TO DISMISS**

# TABLE OF CONTENTS

                                                                                    **Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 4

ARGUMENT ........................................................................................................ 4

I.      THERE IS NO EVIDENCE THAT LAURENCE OR EMILIE
        APFELBAUM HAD ANY KNOWLEDGE OF, OR INVOLVEMENT
        WITH, THE EVENTS ALLEGED IN THE MAGNIFY ADVERSARY
        PROCEEDING ................................................................................................ 4

II.     DISCOVERY HAS CONFIRMED THE MERITS OF THE MOTION TO
        DISMISS FOR LACK OF PERSONAL JURISDICTION ................................. 9

        A.      Laurence and Emilie Apfelbaum's Filing Of A SIPA Customer
                Claim Is Not A Consent To Personal Jurisdiction ...................................... 9

        B.      Jurisdictional Discovery Has Confirmed That There Are
                Insufficient Minimum Contacts With This Forum To Establish
                Personal Jurisdiction Over Laurence Or Emilie Apfelbaum .................. 11

                1.      Defendants Are A French Psychoanalyst And Art Gallery
                        Worker Whose Only United States Contacts Were Their
                        BLMIS Accounts ....................................................................... 11

                2.      Laurence Apfelbaum's Father, Albert Igoin, Had An
                        Account Dating Back To The Early 1980s With A French
                        Bank That Invested In BLMIS; Laurence And Emilie
                        Apfelbaum Had No Knowledge Of, Or Involvement With,
                        That Investment Prior To His Death In 1995 ............................. 12

                3.      When Albert Igoin Died, Madoff Traveled To France To
                        Convince Laurence Apfelbaum And The French
                        Guardianship Judge Overseeing Emilie Apfelbaum's
                        Inheritance To Invest With BLMIS ........................................... 14

                4.      Discovery Undermines The Trustee's Assertion That
                        Laurence And Emilie Apfelbaum Were Sophisticated
                        Investors Who Closely Oversaw Their BLMIS Investments ...... 17

                5.      Discovery Has Confirmed That The Majority Of
                        Withdrawals From The BLMIS Accounts Were Used To
                        Pay Taxes .................................................................................. 22

i

III.    A FORUM NON CONVENIENS DISMISSAL IS APPROPRIATE.................22

      A.    The Trustee's Choice Of A New York Forum Should Not Be
Accorded Great Deference, Especially Given The Trustee's
Continued Active Use Of French Counsel...............................................23

      B.    Relevant Documents Are Located In France ...........................................24

      C.    The Relevant Witnesses Are Located In France......................................24

      D.    The Public Interest Factors Favor A French Forum ...............................25

CONCLUSION.......................................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Picard v. Magnify, Inc., et al.*,
  Adv. Pro. No. 10-05279(SMB).............................................................................................1, 4

*Carey v. Bayerische Hypo-Und Vereinsbank AG*,
  370 F.3d 234 (2d Cir. 2004)...................................................................................................23

*In re Petrucci*,
  256 B.R. 704 (Bankr. D.N.J. 2001) .......................................................................................10

*Picard v. Cohmad Secs. Corp. (In re Bernard L. Madoff Inv. Secs., LLC)*,
  418 B.R. 75 (Bankr. S.D.N.Y. 2009) ("*Cohmad*") ...............................................................17

*SEC v. Platforms Wireless International Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ...............................................................................................11

*Secs. Inv. Protection Corp. v. Bernard L. Madoff Investment Secs. LLC. (In re: Bernard
  L. Madoff)*,
  No. 08-1789 (Bankr. S.D.N.Y. Apr. 13 2011).......................................................................23

OTHER AUTHORITIES

Rule 10(b)(5)...............................................................................................................................11

## PRELIMINARY STATEMENT

Defendants The Estate (Succession) of Doris Igoin, Laurence Apfelbaum,

individually and in her capacities as executor and beneficiary of the Estate (Succession) of Doris

Igoin, and Emilie Apfelbaum ("Defendants") submit this memorandum of law in further support

of their motion to dismiss for lack of personal jurisdiction and motion to dismiss for *forum non*

*conveniens* in favor of a French forum.  The purpose of this memo is to inform the Court about

evidence obtained during jurisdictional discovery ordered by Judge Lifland.

At the October 23, 2012 oral argument of the motion to dismiss, Judge Lifland

ordered the parties to engage in jurisdictional discovery.  Judge Lifland's primary concern was

about the Trustee's allegations in *Picard v. Magnify, Inc., et al.*, Adv. Pro. No. 10-05279(SMB).

In that case, the Trustee has sought the recovery of monies from a charitable trust originally

established by Albert Igoin, the father of Laurence Apfelbaum, who died in 1995.

Justice Lifland did not articulate the reasons why he believed that the *Magnify*

case might impact Laurence and Emilie Apfelbaum's motion to dismiss for lack of personal

jurisdiction and *forum non conveniens*.  The Trustee has not named either Laurence or Emilie

Apfelbaum as defendants in the *Magnify* case or alleged that *Magnify*-related events have any

impact on the pending motions in this case.  With good reason, since jurisdictional discovery

confirms that the Apfelbaum Defendants had nothing at all to do with the events described in the

*Magnify* Complaint.

The Magnify trust was entirely unknown to Laurence and Emilie Apfelbaum.

They were only informed about its existence after the BLMIS bankruptcy filing.  From the

discovery in the *Magnify* case, it appears that when Albert Igoin originally set up a French-

language charitable trust in 1983 in Switzerland, Albert Igoin included a trust provision that

Laurence Apfelbaum was authorized to give instructions to the trust administrator on behalf of

himself, the shareholder.  However, Laurence Apfelbaum was totally unaware of the trust, and

when the trust was amended six years later, Albert Igoin ceased being a shareholder, and

Laurence Apfelbaum was no longer authorized to give instructions.  In short, the Trustee has not

alleged that the events in the *Magnify* Complaint have any bearing on this case and any such

allegations would be without basis in fact or law.

Moreover, jurisdictional discovery has strengthened the pending motions by

developing facts further demonstrating that this case largely involves events that occurred in

France with little connection to this forum.  Defendant Laurence Apfelbaum is a French

psychoanalyst who lives and works in Paris.  Her daughter Emilie Apfelbaum was a minor

student in France and now works in an art gallery.  They have no connections with New York or

with the United States.

When Albert Igoin passed away in 1995, his investment in BLMIS held through a

French bank comprised the majority of his estate.  Since Emilie Apfelbaum at that time was an

11-year-old minor, her inheritance was subject to a French Guardianship Judge who was

skeptical of equity investments and who preferred that Emilie Apfelbaum's inherited money be

placed in French Treasury Bills.  In order to convince the Apfelbaums and the French Judge that

the Apfelbaums' inherited monies should be invested with BLMIS, Madoff traveled to France

where he negotiated special contracts with a French Notaire that were subject to French law and

which governed the relationships of the Apfelbaums with BLMIS.  Emilie Apfelbaum's contract

was reviewed and approved by the French Judge with the condition that half of the inheritance

would be placed in French Treasury Bills.  But for these specifically negotiated French law

contracts, Emilie Apfelbaum would not have been able to invest with BLMIS and Laurence

Apfelbaum likely would not have done so as well.   They did not sign the type of BLMIS

2

standard customer agreements with a consent to New York jurisdiction that this Court has previously held gives rise to New York jurisdiction over foreign plaintiffs.

The Trustee's prior papers attempt to portray Laurence and Emilie Apfelbaum as sophisticated investors with regular and extensive contacts with New York.  The Trustee, for example, claimed that Laurence Apfelbaum "routinely participated in administering [their BLMIS] Accounts" and "implement[ed] a tax-cutting trading strategy."  (Trustee's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens [Dkt. No. 30] ("Trustee Opp'n") at 2.)  The only proof offered by the Trustee to support these claims were three largely handwritten faxes from 1999, years before the Bankruptcy filing and the alleged fraudulent conveyance period.  (Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss [Dkt. No. 34] ("Reply Mem.") at 10; *see* Declaration of Ona T. Wang in Support of the Trustee's Memorandum of Law in Opposition to Defendants' Motion to Dismiss [Dkt. No. 31] ("Wang Decl."), Exs. C, D, E.)  None supported the Trustee's claims, and Laurence Apfelbaum's deposition testimony demonstrates that the Trustee's allegations were completely off-base.  (*See id*.)

Nor are defendants "net winners" as a result of living an extravagant lifestyle. France taxes a person's overall wealth in addition to income.  Accordingly, the overwhelming majority of withdrawals that defendants made from these accounts were in order to pay taxes based upon the presumed value of their BLMIS accounts.  (Declaration of Laurence Apfelbaum [Dkt. No. 21] ("Apfelbaum Decl.") at ¶¶ 17-21.)

The jurisdictional discovery ordered by Judge Lifland further demonstrates the overwhelming French nature of this case and why a *forum non conveniens* dismissal is

3

appropriate.  The evidence relevant to the Apfelbaums' defense is in France, and their defense

will be materially prejudiced if they are required to proceed in this forum.  The same cannot be

said for the Trustee who long ago retained prominent French counsel for exactly this type of

French-centric case.

## STATEMENT OF FACTS

Defendants respectfully refer the Court to Defendants' prior submissions for a full

recitation of the facts: Defendants' Memorandum of Law in Support of Defendants' Motion to

Dismiss [Dkt. No. 23] ("Moving Mem."); Declaration of Laurence Apfelbaum [Dkt. No. 21]

("Apfelbaum Decl."); and Reply Declaration of Laurence Apfelbaum [Dkt. No. 35] ("Apfelbaum

Reply Decl.").  Following the filing of Defendants' motion to dismiss and the Trustee's

opposition papers, on October 23, 2012, Judge Burton R. Lifland entered an order adjourning the

Motion to Dismiss and ordering the parties to engage in jurisdictional discovery.  (Dkt. No. 45.)

This memorandum supplements Defendants' prior motion to dismiss and reply in further support

of Defendants' motion to dismiss based on the findings from jurisdictional discovery.

## ARGUMENT

**I.      THERE IS NO EVIDENCE THAT LAURENCE OR EMILIE APFELBAUM HAD
ANY KNOWLEDGE OF, OR INVOLVEMENT WITH, THE EVENTS ALLEGED
IN THE *MAGNIFY* ADVERSARY PROCEEDING**

Judge Lifland ordered jurisdictional discovery to determine if there was a

connection between Defendants' BLMIS accounts and the accounts at issue in the *Magnify*

Adversary Proceeding.  In that proceeding, the Trustee has alleged that approximately $150

million in fictitious profits were withdrawn from Magnify-related BLMIS accounts to be donated

to various charities in Israel under circumstances that the Trustee has alleged show a lack of

good faith.  (*See Picard v. Magnify, Inc., et al.*, Adv. Pro. No. 10-05279(SMB), Amended

Complaint [Dkt. No. 39] at ¶ 3.)

4

In 1983, Laurence Apfelbaum's father, Albert Igoin, apparently traveled from his home in France to visit a Swiss attorney, Kurt Brunner, to set up a French-language Panamanian trust with the intent of making charitable donations in Israel.  (*Id.* at ¶¶ 39, 53-57.)  There is no evidence that Laurence or Emilie Apfelbaum knew anything about any of the events involved in the *Magnify* case.

Ms. Apfelbaum testified that she had never heard of this trust.  (Cooperman Decl. Ex. 1 at 221:5-22.)[1]  Nor had Albert Igoin told Laurence Apfelbaum about any of the facts related in the *Magnify* Complaint, consistent with the fact that he did not discuss business or financial matters with her.  (*Id.* at 223:15-224:18.)

> Q:    It's fair to say that your father in his lifetime never told you
>       about a Panamanian Company named Magnify, Inc?
>
>             *       *       *
>
> A:    No, I didn't know anything about this account because my
>       father didn't discuss those matters with us at all….When
>       this came about it was a total and enormous surprise for
>       me.

(*Id.* at 223:6-21.)  During Laurence Apfelbaum's deposition, the Trustee's counsel mentioned approximately 20 names of individuals and investment funds associated with events raised in the *Magnify* Complaint and asked if she was familiar with any of them.  (*Id.* at 263:10-269:5.)  Ms. Apfelbaum had only heard of one of them, Henri Atlan, and only because she generally knew him as a professor of medicine and a philosopher, not because of anything to do with the *Magnify* events.  (*Id.* at 265:19-266:19.)

The testimony of Kurt Brunner, the Swiss attorney who established the trust in 1983, is consistent with Ms. Apfelbaum's testimony.  Dr. Brunner, who was deposed in the

---

[1]    "Cooperman Decl." refers to the Declaration of Jonathan K. Cooperman in Support of Defendants The Estate (Succession) of Doris Igoin, Laurence Apfelbaum, and Emilie Apfelbaum's Motion to Dismiss Based on Jurisdictional Discovery, dated June 20, 2014.

*Magnify* case on November 7-8, 2012 in London, testified that Doris Igoin (Laurence

Apfelbaum's mother) and Laurence Apfelbaum were originally listed in the trust document as

being able to give Dr. Brunner instructions regarding the Magnify accounts.  (Cooperman Decl.

Ex. 2 at 66:14-68:4.)[2]  However, that trust document was amended in 1989 to exclude Ms.

Apfelbaum and Ms. Igoin.  (*Id.* at 96:2-24.)  During the six-year period when Ms. Apfelbaum

hypothetically could have given instructions to Dr. Brunner, Dr. Brunner testified that he never

received instructions from them, had any contact with them, or even knew if they were aware of

Magnify.[3]

> Q:    So Mr Igoin's wife or his daughter could also have given
>       you instructions in the event of Mr Igoin's death, is that
>       right?
>
> A:    Right
>
>               *        *        *
>
> A:    May I add something in connection with Doris Igoin and
>       Laurence Igoin[4].  I have never talked to these two ladies,
>       have never received anything in writing and have never met
>       them.
>
> Q:    Do you have any understanding whether Mrs Doris Igoin or
>       Miss Laurence Igoin were even aware that their names
>       were mentioned in this agreement?
>
> A:    I do not know.
>
> Q:    Do you have any understanding or any knowledge whether
>       Doris Igoin or Laurence Igoin were even aware of the
>       existence of Magnify?
>
> A:    No.

---

[2]    Exhibit 2 to the Cooperman Declaration has been designated confidential and is the subject of a motion to file under seal.

[3]    Dr. Brunner was at no time authorized to take instructions from Emilie Apfelbaum. (Cooperman Decl. Ex. 2 at 260:15-19.)

[4]    Laurence Apfelbaum's maiden name was Laurence Igoin.

\*     \*     \*

> Q:     Aside from receiving this document, did you ever have any discussions with Mr Igoin about either Doris Deborah Igoin or Laurence Apfelbaum – Laurence Jeanne Igoin?

> A:     No, I didn't.

> Q:     So the only instructions you ever had is because you were handed this document written by somebody?

> A:     Yes.

> Q:     Now, did you have the address or contact information for either Doris Deborah Igoin or Laurence Jeanne Igoin?

> A:     No, I don't.

> Q:     Did you ever know what city, for example, Laurence Jeanne Igoin lived in?

> A:     No, but it was not the meaning of this instruction that I should go and get contact with them.  But, if they want to give instructions to me, they would have to come to me and give the instructions.

(*Id.* at 68:1-71:13; 262:2-21.)

In 1989, Albert Igoin instructed Kurt Brunner to transfer the Magnify shares to the Yeshaya Horowitz Foundation, a foundation located in Israel.  (*Id.* at 95:21-96:4.)  From that point on, Doris Igoin and Laurence Apfelbaum were no longer authorized to give Kurt Brunner instructions.  (*Id.* at 96:4-24; 262:23-264:8.)  According to Kurt Brunner, "on the day when Mr Igoin instructed me to transfer the shares to Yeshaya Horowitz Foundation[,] the agreement between Igoin and me ha[d] ended."  (*Id.* at 264:5-8.)

> Q:     So after the transfer of Magnify's shares to Yeshaya Horowitz, Mr Igoin no longer has authority to give you instruction regarding Magnify, Mrs Igoin no longer has instruction to give – no longer has authority to give you instruction regarding Magnify and Miss Laurence Igoin also does not have authority to give you instructions regarding Magnify; is that right?

7

> A:    I understand and I can respond to it.  This is correct.  I
>       would not have acted according to instructions of Mr Igoin,
>       his wife or daughter without asking or having a follow-up
>       question to Yeshaya Horowitz.

(*Id.* at 140:5-18.)

Unbeknownst to Ms. Apfelbaum, her father was involved with setting up the

Yeshaya Horowitz Foundation in Israel and Ms. Apfelbaum's cousin Ayala Nahir was named a

Director of that Foundation.  (Cooperman Decl. Ex. 1 at 247:17-248:14.)  Ms. Apfelbaum

testified that it was not until after the collapse of BLMIS that Ms. Nahir told her about the

Yeshaya Horowitz Foundation:

> Q:    At some point after you found out about the collapse of
>       BLMIS Ms Ayala Na[h]ir called you and told you about
>       her activities in the Yeshaya Hor[owitz] Association, is that
>       right?
>
> A:    Yes.
>
> Q:    Can you tell me about that conversation, since it has some –
>       obviously had a reaction to it?
>
> A:    It was a lot of surprises in a short time.  First, Madoff.  Of
>       course that was an enormous surprise.  Then a couple of
>       weeks later my cousin calls to tell me something I didn't
>       know at all, that my father had set up a foundation – I can't
>       remember the name exactly – in Israel . . . and she was the
>       manager.  And she had also lost everything because of
>       Madoff.  So it was a big surprise; I didn't even know he'd
>       done this.  Because I didn't know there was any other
>       money than what was in the estate.  And I don't know with
>       what money he'd done it.  So at first I didn't know that it
>       existed.  Then I realized that my cousin had never told me. .
>       . .  She'd never told me until December 2008, and she'd
>       had the chance when my father passed away, another
>       chance when my mother passed away, but she had never
>       told me.

(*Id.* at 247:17-249:3.)  Laurence Apfelbaum was never close with her cousin who lived in Israel

and infrequently saw her.  (*Id.* at 249:21-250:20; 253:19-21.)  Laurence Apfelbaum's parents had

also never discussed making any financial arrangements for Ms. Nahir.  In sum, she was unaware

of the Yeshaya Horowitz Foundation and Ms. Nahir's role in managing it.  (*Id.* at 254:18-255:7.)

Moreover, there is absolutely no evidence that money from any Magnify accounts

was ever co-mingled with Laurence and Emilie's BLMIS accounts.  The Trustee's counsel

marked a document during Kurt Brunner's deposition regarding a Magnify account that stated –

"Need to adjust December for extra P&L Doris, Emily & Laurence which resulted from large

$/Euro losses customer absorbed."  (Cooperman Decl. Ex. 2 at 251:15-252:2.)  Dr. Brunner had

no knowledge of this document.  (*Id.* at 259:24-260:2.)  More importantly, whatever BLMIS may

have been telling Magnify, the account statements of Laurence and Emilie Apfelbaum show no

money from a Magnify-related account being transferred to the BLMIS accounts of either

Laurence or Emilie Apfelbaum.

In short, there is no evidence of any relation between Defendants and the Magnify

events described in the *Magnify* complaint.  Any alleged connection that the Magnify defendants

may have had with New York is thus not a valid basis for jurisdiction over Defendants.

## II.    DISCOVERY HAS CONFIRMED THE MERITS OF THE MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### A.    Laurence and Emilie Apfelbaum's Filing Of A SIPA Customer Claim Is Not A Consent To Personal Jurisdiction

The Trustee previously asserted that the Apfelbaums consented to the jurisdiction

of this Court by mailing a SIPA claim form to the Texas claims facility.  (Trustee Opp'n at 8-10.)

In prior briefing, Defendants argued that a consent to jurisdiction requires a knowing submission

to the jurisdiction of the Court and that this SIPA form did not amount to such a knowing

consent.  (Moving Mem. at 7-8; Reply Mem. at 5.)  Unlike a Bankruptcy Court Proof of Claim,

the SIPA Notice sent to Defendants provided no information on the consequences of mailing a

customer claim to the claims facility in Texas, nor suggested that recipients seek legal counsel.

(Reply Mem. at 6-7.)  The SIPA Notice did not advise investors (especially unsophisticated foreign investors) that they would participate in New York Bankruptcy Court proceedings, but simply that they would be protected by SIPA.  (Moving Mem. at 10-11.)

      Jurisdictional discovery confirms that the Apfelbaums are not sophisticated investors and that they had no understanding or expectation that submitting a SIPA claim form could subject them to a New York lawsuit.  Laurence Apfelbaum prepared the claim form for herself and for her daughter Emilie in Paris, France.  She did not consult with an attorney or other professional, nor relied on any documents in preparing it.  (Cooperman Decl. Ex. 1 at 39:8-25.)  As an innocent, unsophisticated foreign investor for whom English was not a first language, Laurence Apfelbaum only believed that she was required to fill out the form.

> Q:    Did you – did you receive [the SIPA Notice] at any point in time in the past?
>
> A:    Certainly, but I don't remember.  What I remember, is that we were told that we had to answer quickly when we received the leaflet.  As far as execution is concerned, I'm saying I'm not quite sure because it didn't concern directly how to fill in the forms.

(*Id.* at 50:13-20.)[5]

      An informal SIPA proof of claim will only lead to jurisdiction where "its allowance is equitable based on the facts of the case."  (Reply Mem. at 6 (quoting *In re Petrucci*, 256 B.R. 704, 706 (Bankr. D.N.J. 2001).)  Jurisdictional discovery has confirmed that Laurence and Emilie Apfelbaum are not sophisticated investors and they had no experience with United States courts.  (*See, e.g.*, Cooperman Decl. Ex. 1 at 19:4-6; 39:8-25; 50:13-20.)  The SIPA Notice did not notify them that returning it would subject them to U.S. Bankruptcy Court proceeding.  (*See* Apfelbaum Decl. at ¶ 24; Moving Mem. at 10-12; Reply Mem. at 5-9.)

---

[5]    Laurence Apfelbaum's deposition was held in Paris, France.  She testified in French through an English translator.

In a prior sur-reply, the Trustee argued that the Apfelbaums' subjective intent in filling out SIPA forms is not material and that submitting a SIPA form automatically created jurisdiction.  (Trustee's Surreply in Further Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens [Dkt. No. 43] ("Trustee Sur-Reply") at 2-3.)  The only case that the Trustee cited for this proposition, *SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072 (9th Cir. 2010), (Trustee Sur-Reply at 2), did not at all involve a SIPA claim form.  Indeed, the case did not even concern consent to jurisdiction.  Rather, the case involved whether defendants were deliberately reckless under securities laws Section 10(b) and Rule 10(b)(5) in issuing a press release to potential investors when they omitted critical information that the product was not yet completed, even though they believed that the press release was not misleading.  617 F.3d at 1095-96.

**B.** **Jurisdictional Discovery Has Confirmed That There Are Insufficient Minimum Contacts With This Forum To Establish Personal Jurisdiction Over Laurence Or Emilie Apfelbaum**

The Trustee presents this lawsuit as a simple "net winner" case involving BLMIS accounts that date back to the 1980s.  Jurisdictional discovery confirms that this case is far different.  It is very much a French-centric matter, with the key events for Laurence and Emilie Apfelbaum all occurring in France and minimal New York contacts.

1.   Defendants Are A French Psychoanalyst And Art Gallery Worker Whose Only United States Contacts Were Their BLMIS Accounts

Jurisdictional discovery confirms that Laurence Apfelbaum is a French citizen born, raised, and educated in France.  (Cooperman Decl. Ex. 1 at 21:9-11; 25:2-27:21.)  She likewise has always been employed in France.  (*Id.* at 27:22-29:17.)  She has visited the United States infrequently, (*id.* at 125:6-17), and has never had any assets here aside from her connection with her BLMIS accounts, (*id.* at 262:2-12).

11

Emilie Apfelbaum is Laurence Apfelbaum's daughter and was a minor when her

grandfather, Albert Igoin, died in 1995.  At all relevant times, Emilie Apfelbaum has been either

a student or an employee in a French art gallery.  (*Id.* at 23:15-19; *see also* Apfelbaum Decl. at ¶

4.)  She still resides with her parents.  (Cooperman Decl. Ex. 1 at 23:2-9; 164:8-14.)  Like her

mother, aside from infrequent visits to the United States for pleasure, Emilie Apfelbaum has had

no other connection to, or assets in, this country.  (Apfelbaum Decl. at ¶ 22.)

      2.      Laurence Apfelbaum's Father, Albert Igoin, Had An Account Dating
              Back To The Early 1980s With A French Bank That Invested In
              BLMIS; Laurence And Emilie Apfelbaum Had No Knowledge Of, Or
              <u>Involvement With, That Investment Prior To His Death In 1995</u>

Jurisdictional discovery undermines the Trustee's argument that this is a simple

"net winner" case involving accounts that date back to the early 1980s, when Laurence

Apfelbaum's father, Albert Igoin, originally invested money with BLMIS.  Laurence Apfelbaum

has no knowledge of her father Albert Igoin's opening of accounts with French banks that

invested with BLMIS, except that a family accountant told her after her father's death in 1995

that the origin of the account was monies from the sale of his business.  (Cooperman Decl. Ex. 1

at 64:16-22; 66:11-67:2.)  Prior to his death, Laurence Apfelbaum was not at all involved with

her father's business.  (*Id.* at 67:4-11; 68:22-69:13.)  She believed that her father was a

successful businessman, but he did not share any details with her about his business.  (*Id.* at 31:3-

32:1.)

Prior to her father's death, Ms. Apfelbaum was also not aware of her father's

assets or the BLMIS investments.  The only time Ms. Apfelbaum had met Mr. Madoff was in

1981 when her father arranged for Mr. Madoff to give she and her husband a tour of the New

York Stock Exchange when they were passing through New York on their way to attend a

scientific conference for her husband, a French physician.  (*Id.* at 124:25-125:17.)  At that time,

she only knew Mr. Madoff as a business acquaintance of her father.  (*Id.* at 125:18-25.)

Ms. Apfelbaum was aware that her father was financially successful, but had no

understanding of the nature or extent of his wealth.  (*Id.* at 73:2-10; 81:13-18.)  Nor did she ever

know about his BLMIS investments through a French bank prior to his death.  (*Id.* at 81:13-18.)

Ms. Apfelbaum testified:

> Q:    I want to actually go back to the origin of the earliest
> account that you were aware of.  Those – that account or
> accounts were started by your father; is that right? . . . .
>
> A:    I found out about my mother's affairs, state of business,
> when she died.  And so my father was the same; it's when
> he died that I found out.  But for anything else, I don't
> know.  I don't know.
>
> Q:    Is it your understanding that the account or accounts at
> BLMIS were started in the 1980s by your father? . . . .
>
> A:    I don't know.  I don't have any direct knowledge; I don't
> have direct knowledge.
>
> *            *            *
>
> Q:    So before the year 2000, you did know that your family had
> investments in BLMIS; is that right?
>
> A:    I knew it since 1995.
>
> Q:    But before 1995, when your father was alive, you did not
> know?
>
> A:    No, I didn't know anything about my father's business.

(*Id.* at 64:5-67:11.)

That Albert Igoin was a secretive person was perhaps not surprising given his

experience as a Jewish French Resistance member during World War II.  As Kurt Bruner

testified:

> Mr. Igoin was a very careful person.  He went through World War II and I believe he's of Jewish origin, and because of that he's a very careful person. . . .  During my time when I worked for the law firm in Zurich I had contact with various people who had gone through World War II and those who had been persecuted.  All these people, those who I've met then, all of them have been very, very cautious or careful.  Because they learned that you could survive only if you were very careful or cautious.

(Cooperman Decl. Ex. 2 at 34:1-35:13.)  Ms. Apfelbaum confirmed that her father was secretive and not forthcoming about issues in his life.

> There were things going on underneath that we didn't know about.  But that's because my father had a whole history with clandestinity.  During the war he had to be a clandestine, and when I was a little girl I was made to change my name and I couldn't understand why.

(Cooperman Decl. Ex. 1 at 224:16-22.)

  3. When Albert Igoin Died, Madoff Traveled To France To Convince Laurence Apfelbaum And The French Guardianship Judge Overseeing Emilie Apfelbaum's Inheritance To Invest With BLMIS

The absence of New York contacts is also confirmed by the facts surrounding the opening of Laurence and Emilie Apfelbaum's BLMIS accounts after the 1995 death of Albert Igoin.  Mr. Igoin's will assumed that his fortune was jointly owned with his wife Doris Igoin who would be left with her 50-percent share.  (Cooperman Decl. Ex. 1 at 71:12-22.)  For the remaining 50 percent of his assets, Albert Igoin left half to his daughter Laurence Apfelbaum and the other half to his granddaughter Emilie Apfelbaum, with Doris Igoin having a life estate interest, called a "usufruct" in France.  (*Id.* at 78:6-9; 86:24-87:7.)

Emilie Apfelbaum was only 11 in 1995.  Laurence Apfelbaum was concerned that, under the life estate scenario, her elderly mother Doris Igoin ultimately controlled the money.  Her elderly mother might become infirm or would be susceptible to spoiling Emilie, her only granddaughter.  (*Id.* at 78:6-13; 80:2-10.)  Accordingly, Laurence Apfelbaum convinced her

mother to give up her life estate and to allow Emilie to inherit directly.  (*Id.* at 78:13-20; 80:10-18.)  That would allow Laurence and her husband, as the parents, more control over Emilie's money.  Doris Igoin eventually agreed to give up her life estate and to allow Laurence and Emilie Apfelbaum to each inherit directly.  (*Id.* at 78:13-20; 169:20-170:8.)

As a result, Laurence and Emilie Apfelbaum acquired full ownership of 50 percent of Albert Igoin's estate, the majority of which was comprised of his BLMIS account.  Because Emilie was 11 years old at the time, Laurence Apfelbaum and her husband became legal guardians of Emilie's wealth.  (*Id.* at 170:3-22.)  French law requires that a French Guardianship Judge oversee inheritances to minors.  (*Id.* at 173:15-22.)  Accordingly, Laurence Apfelbaum and her husband had to appear before a French Guardianship Judge, Judge C. Standish, to determine how to invest the inherited money.  (*Id.* at 173:15-174:21.)

The Guardianship Judge's role is to protect the investments and to make sure that they are invested safely and that capital is well preserved.  (*Id.* at 174:23-175:13.)  Judge Standish was skeptical about the money remaining at BLMIS, as French judges usually require a minor's money to be invested in ultra-safe French Treasury bills.  (*See id.* at 235:13-22.)   The French judge asked that half of Emilie's money be placed in French Treasury bills.  (*Id.* at 80:19-81:2.)  The other half of Emilie's money could be held by a French bank investing in BLMIS, but only if BLMIS agreed to certain conditions guaranteeing the security of the investment.  (*Id.* at 80:19-81:11.)  As Laurence Apfelbaum testified:

> Q:    Who was it who expressed concern about Emilie's investments and required that half of it be put into French Treasury Bills?
>
> A:    The judge, the guardianship judge, wanted to have written guarantees if we were going to maintain some investment in the US.  That's why we asked Madoff to come to Paris, so that he could be part of a discussion and provide some guarantees.  If Madoff hadn't consented to do that, provide

his guarantee, we would have had to invest somewhere
else.

(*Id.* at 174:7-21.)  The money at that time was not invested directly with BLMIS, but through an

account at a French bank.

A French "Notaire" became involved.  In France, Notaires draft all the paperwork

relating to succession accounts.  (*Id.* at 206:11-15.)  Bernard Madoff then traveled to Paris to

meet with the Notaire and negotiate a special contract to abide by Judge Standish's requirements.

(*Id.* at 177:11-19.)  As stated in the English translation of the French language contract drafted

by the Notaire, Madoff agreed to:

> [S]et up this account for [Emilie's] behalf and to invest these funds
> in securities listed on the United States stock market and to invest
> the returns therefrom on the client's behalf . . . [and] compensate
> the client for any losses exceeding 5 (five) percent of the capital
> market value as calculated according to the market value at any
> point in the first year, and if the client maintains the account with
> Madoff beyond this first year, to compensate the client for any
> losses above 5 (five) percent calculated on each subsequent annual
> evaluation.

(Wang Decl. Ex. A; *see also* Apfelbaum Decl. Ex. B.)  This contract was then presented to the

French Guardianship Judge for approval.  (Cooperman Decl. Ex. 1 at 178:21-22.)  As Madoff

agreed to the special contract for Emilie Apfelbaum required by the French Court, on June 12,

1995, Laurence Apfelbaum also signed a French language contract with Madoff for her inherited

money to be invested in an account held by a French bank investing in BLMIS.  (*See* Apfelbaum

Decl. Ex. A; Wang Decl. A.)

Both of these contracts were signed in Paris France.  (See Apfelbaum Decl. Exs.

A, B; Wang Decl. Ex. A.)  As a result, both contracts are governed by French law.  (Declaration

of Bruno Quint [Dkt. No. 22] ("Quint Decl.") at ¶ 6.)  Had Madoff not traveled to France and

negotiated these terms, Emilie Apfelbaum would not have been able to invest with BLMIS, and

16

Laurence Apfelbaum also likely would not have invested her inheritance with BLMIS. (Cooperman Decl. Ex. 1 at 174:7-21.)

Relevant to jurisdiction, all of these contacts occurred in France. Laurence and Emilie Apfelbaum's relationship with BLMIS are governed by special French language contracts negotiated and signed in France that are subject to French law. These contracts differ from the standard four-page BLMIS Customer Agreements containing New York choice of law clauses and designating a New York agent that BLMIS accountholders typically signed. *See, e.g.*, *Picard v. Cohmad Secs. Corp. (In re Bernard L. Madoff Inv. Secs., LLC)*, 418 B.R. 75 (Bankr. S.D.N.Y. 2009) ("*Cohmad*"). Additionally, the standard BLMIS Customer Agreements included several technical contractual provisions including a severability clause, a waiver clause, provisions on liquidations and covering positions, and an arbitration clause. (*See Cohmad*, Adv. Pro. No. 09-1305, Customer Agreement [Dkt. No. 71-8].) Laurence and Emilie Apfelbaum's French language contracts included no such information.

The French Guardianship Judge required that Defendants report to him annually until Emilie reached the age of 18. (Cooperman Decl. Ex. 1 at 175:10-19.) Each year, Laurence Apfelbaum would show the annual BLMIS account statements and French Treasury Bill documents to the Judge to ensure that capital in the accounts had not been lost. (*Id.* at 175:21-176:22.) Thus, until Emilie Apfelbaum ceased being a minor, her BLMIS investments were subject to cancellation by the French Court if the guarantee in her French language agreement with BLMIS was not met.

4.    Discovery Undermines The Trustee's Assertion That Laurence And Emilie Apfelbaum Were Sophisticated Investors Who Closely Oversaw Their BLMIS Investments

Laurence Apfelbaum previously submitted an affidavit demonstrating that she and her daughter Emilie took no active part in managing their BLMIS accounts and had no regular

connection with New York or elsewhere in the United States. (*See* Apfelbaum Decl. at ¶¶ 3-7, 23-25.)   In opposition, the Trustee asserted that jurisdiction was appropriate because Laurence Apfelbaum "actively manag[ed] multiple BLMIS accounts," (Trustee Opp'n at 13), and that Laurence Apfelbaum "routinely participated in administering the Accounts," (*id.* at 2). Jurisdictional discovery has undermined the Trustee's position and further demonstrates the lack of contacts the Apfelbaums have had with the United States.

　　　　Prior to her father's death in 1995, Laurence Apfelbaum had no knowledge about BLMIS.  She had met Mr. Madoff only once in 1981, when her father had arranged to have Madoff give her and her husband a tour of the New York Stock Exchange while they were on their way to a scientific conference.  (Cooperman Decl. Ex. 1 at 125:6-25.)  At that time, she did not know that her father had any money invested with BLMIS.  (*See id.* at 67:4-11.)

　　　　After her father died in 1995, Emilie and Laurence Apfelbaum's accounts were not held directly by BLMIS.  Instead, their accounts were with a French bank, Finama, formerly known as Banque Pour l'Industrie Francaise or BIF.  (*Id.* at 76:25-77:19.)  During this time, Defendants only received account statements from Finama and BIF, and Laurence Apfelbaum withdrew monies when needed directly from Finama or BIF.  (*Id.* at 83:19-84:7; 107:4-108:10.)

　　　　Finama shut down its foreign operations in 1999, and Defendants' accounts were then administered by BLMIS.  (*Id.* at 112:24-113:8; 121:17-22.)  At no time was Laurence Apfelbaum asked to sign any BLMIS account forms.  In fact, Laurence Apfelbaum testified that she did not believe she ever saw a BLMIS account form.  (*Id.* at 193:19-194:8.)  Relevant to jurisdiction, those types of BLMIS account forms contain a New York consent to jurisdiction clause.  Here, the only contracts signed were in France, subject to French law, with the contract

for Emilie specifically subject to approval by a French court.  (Quint Decl. at ¶ 6; *see* Apfelbaum Decl. Ex. B; Wang Decl. Ex. A.)

From 2000 until the BLMIS bankruptcy filing, aside from receiving monthly statements, Ms. Apfelbaum's only contacts with New York were that she occasionally spoke to or corresponded with Frank Di Pascali about her BLMIS accounts, although she never actually met him.  (Cooperman Decl. Ex. 1 at 91:25-92:3; 153:12-154:21.)  Rather than contacting him to "actively manage" her BLMIS accounts as the Trustee previously asserted, Ms. Apfelbaum testified that she only contacted him on those occasions that Treasury bills listed on her statements appeared to be nearing maturity.  (*Id.* at 153:12-154:21.)

When BIF managed the accounts, BIF informed Laurence Apfelbaum that French tax law considered Treasury bills held to maturity as dividends, taxed at a 50-percent rate, whereas Treasury bills sold before maturity, even the day before maturity, were considered as equity and taxed at 24 percent.  (*Id.* at 92:4-93:5.)  Ms. Apfelbaum would contact Mr. Di Pascali on those occasions when it appeared from her statements that BLMIS had "left it to the last week" to sell a Treasury bill prior to maturity.  (*Id.* at 154:19-21.)  Ms. Apfelbaum did not recall how many times she contacted Mr. Di Pascali about this issue.  She testified that "[m]aybe it happened twice in the given year and then it didn't happen for several years."  (*Id.* at 154:16-17.)

Ms. Apfelbaum preferred to contact Mr. Di Pascali by fax.  (*Id.* at 93:16-20.)  She did not retain copies of the faxes she sent.  The only faxes produced by the Trustee are the three faxes from 1999.  (*See* Wang Decl. Exs. C, D, E.)  Moreover, these three faxes were written in 1999, years before the fraudulent conveyance period.

Discovery confirms that those faxes do not support the claim that Laurence Apfelbaum was an active or sophisticated investor.  In the first fax, Ms. Apfelbaum wrote to Mr.

Di Pascali that she had not received a notice concerning Emilie, and that it was "too late to reach

the bank to check." (Wang Decl. Ex. C.) She asked Mr. Di Pascali to confirm that Emilie's

treasury bills had been sold and stated that "it has to be done by now, so as not to be dated for us

October 14." (*Id.*) At her deposition, Ms. Apfelbaum testified that she sent this fax to verify that

Mr. Di Pascali had sold the Treasury bill ahead of maturing – "[a] matter that only concerns

France." (Cooperman Ex. 1 at 109:21-110:9.) She remembered little about the communication,

but stated that she "believe[s] that the BIF would forward to me faxes that they would receive

from Madoff to let me know the transactions that were made . . . ." (*Id.* at 111:4-112:2.) She did

not recognize any of the handwriting at the bottom of the fax. (*Id.* at 112:11-17.) Laurence

Apfelbaum's testimony about this fax is consistent with her testimony that she primarily

contacted Mr. Di Pascali only on those occasions when he left it to the last minute to sell a

Treasury bill prior to maturity. (*See id.* at 153:12-154:21.)

> In the second fax, Laurence Apfelbaum stated:
>
> Just a word to tell you that on our coming sale of treasury bills I
> shall be drawing huge amounts because I have finally received the
> 1996 income tax which I had not paid then because they had
> miscalculated it (and it took them all this time to correct the
> figures!). I will also be paying the 1999 tax on fortune but will not
> have the exact figures before May 18 . . . .

(Wang Decl. Ex. D.) Ms. Apfelbaum testified that she wrote this because she was told that the

French tax authorities had mistakenly under-calculated her family's taxes because "[t]hey forgot

one zero, which made a huge difference in the amount we had to pay". She therefore anticipated

having to draw a large amount to pay additional tax for her family's 1996 tax liability.

(Cooperman Decl. Ex. A at 95:21-96:10.)

> In the third fax, Laurence Apfelbaum told Frank Di Pascali that "[a]fter wading

through the fiscal jargon, I have tried to summarize it as clearly as I could" and asked if her

attached summary is "an adequate document for working on our strategy for progressively evening out Emilie's option loss/taxable gain gap." (Wang Decl. Ex. E.) Ms. Apfelbaum testified that her "tax advisor [Philippe Colin] dictated these pages to me" because he "was trying to help me to understand this puts and call system" that BLMIS put in place to comply with the requirements of the French Guardianship Judge to protect the principal of Emilie Apfelbaum's account. (*Id.* at 214:8-10.)

The Trustee previously argued that Ms. Apfelbaum was involved with setting up BLMIS accounts directly with Madoff and "actively direct[ing] trading strategy." (Trustee Opp'n at 14.) Discovery has shown this was not at all the case. The French Guardianship Judge required that one-half of Emilie Apfelbaum's inherited money be placed in French treasury bonds. (Cooperman Decl. Ex. 1 at 174:7-21.) The remaining half could be placed with BLMIS, but only if BLMIS guaranteed that the account would not lose more than five percent in any year. (*Id.* at 188:7-189:5.) It was for that reason that Bernard Madoff traveled to Paris, France and consulted with a French Notaire handling the matter and prepared a system to protect the money. (*Id.* at 189:7-18.) Ms. Apfelbaum testified that she was not at all involved with BLMIS's trading strategy as she "wasn't involved in the[] technical aspects (which I don't always understand) so I'm not into the detail of it." (*Id.* at 189:13-15.) Ms. Apfelbaum further testified as follows:

> Q:   So as of 1999, was it your understanding that the investment strategy in yours and Emilie's BLMIS accounts consisted of investing in buying and selling US treasury bills? . . .
>
> A:   I've never known exactly what the strategy was. I've only noticed that on the monthly statements there were dividends or equity. . . . I don't know anything about [the] Stock Exchange. All I know is that I was told that they were either treasury bills or equities. Stocks. I've never seen anything else.

(*Id.* at 94:23-95:19.)

5.    Discovery Has Confirmed That The Majority Of Withdrawals From The BLMIS Accounts Were Used To Pay Taxes

Laurence Apfelbaum's mother, Doris Igoin, was a U.S. citizen who had been living in France since her marriage in 1948.  (Cooperman Decl. Ex. 1 at 25:20-26:6; 62:16-23.) When Laurence Apfelbaum went to the American Embassy to turn in her mother's U.S. passport after her death in 2005, Ms. Apfelbaum reviewed a leaflet and realized that her mother should have paid taxes on U.S. capital gains when she was alive.  (*Id.* at 62:24-63:10.)  For this reason, Laurence Apfelbaum set up the Doris Igoin Succession account to pay back taxes on behalf of her mother.  While the Trustee has asserted that the Doris Igoin Succession account is a net winner, all of the money withdrawn from that account was used to pay back taxes.  (*Id.* at 45:19-46:1; 61:2-22.)  When the taxes were paid, the account was closed.  (*Id.* at 44:9-46:17.)

Likewise, the facts are unrebutted that Emilie Apfelbaum only withdrew monies from her BLMIS account in order to pay French wealth taxes.  (*Id.* at 104:18-105:6; 228:8-12.) In 2005, when she turned 21, and her monies were no longer subject to the French guardianship judge, Emilie Apfelbaum withdrew the money she had in French treasury bonds and decided to invest it in her BLMIS account.  (*Id.* at 246:15-247:1.)  Similarly, the Trustee does not challenge that Laurence Apfelbaum withdrew the vast majority of money from her account to pay French taxes.

## III.    A *FORUM NON CONVENIENS* DISMISSAL IS APPROPRIATE

Jurisdictional discovery has also bolstered the showing by Laurence and Emilie Apfelbaum on the issue of *forum non conveniens*.  This is a case involving activities in France, and the Apfelbaums will be prejudiced by having to litigate this case in a New York forum.

22

A.    **The Trustee's Choice Of A New York Forum Should Not Be Accorded Great Deference, Especially Given The Trustee's Continued Active Use Of French Counsel**

In prior briefing, Defendants demonstrated that the Trustee's choice of a New York forum should not be accorded great deference since the Second Circuit has held that "diminished . . . weight [is] accorded a plaintiff's choice of forum where the plaintiff has actively sought international business." *Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234 (2d Cir. 2004). Here, Madoff actively pursued Laurence and Emilie Apfelbaum's business in Paris and signed French language contracts negotiated with a French Notaire, one of which was subject to the approval of the French Court Guardianship Judge. These contracts are subject to French law. (Quint Decl. at ¶ 6.)

The Trustee has also retained French counsel, UGCC & Associés, to "assist the Trustee in France . . . including bringing any litigation seeking recovery from third parties of assets of the estate." (Reply Mem. at 21-22 (quoting Declaration of Disinterestedness of Jean-Francois Canat of UGCC & Associés, As Proposed Special Counsel to Trustee at ¶ 4, *Secs. Inv. Protection Corp. v. Bernard L. Madoff Investment Secs. LLC. (In re: Bernard L. Madoff)*, No. 08-1789 (Bankr. S.D.N.Y. Apr. 13 2011) [Dkt. No. 4012-1]). There is no reason why UGCC & Associés cannot pursue this case in France. Indeed, UGCC & Associés remains active in BLMIS matters. Since October 23, 2012 when Judge Lifland ordered jurisdictional discovery, UGCC & Associés has submitted five applications for its legal fees totaling over $492,000. (*See* Application of UGCC & Associés as Special Counsel to the Trustee for Allowance of Interim Compensation for Services Rendered ("Fee Application") from February 1, 2012 through June 30, 2012 [Dkt. No. 5107]; Fee Application from July 1, 2012 through November 30, 2012 [Dkt. No. 5345]; Fee Application from December 1, 2012 through April 30, 2013 [Dkt No. 5500]; Fee

23

Application from May 1, 2013 through July 31, 2013 [Dkt. No. 5575]; Fee Application from

August 1, 2013 through November 30, 2013 [Dkt. No. 5993].)

With respect to this case, UGCC & Associés also had two of its attorneys, its

most senior partner Jean-Francois Canat and Of Counsel Delphine Eskenazi, attend Laurence

Apfelbaum's deposition.  They were active during the deposition with regard to French law

issues, specifically whether the French blocking statute, (*see* Quint Decl. at ¶ 7-8; Reply

Declaration of Bruno Quint [Dkt. No. 36] at 11-13), prohibited Ms. Apfelbaum from testifying

about certain personal information.

In sum, the Trustee continues to retain qualified French counsel, and pursuing this

type of case in France is one of the stated reasons that the Trustee gave this Court to retain

French counsel.

### B.    Relevant Documents Are Located In France

During jurisdictional discovery, the only documents produced with a New York

connection were BLMIS monthly account statements from March 2000 through November 2008

in the possession of Ms. Apfelbaum.  We assume that the Trustee has other documents, but the

Trustee objected to producing any documents during jurisdictional discovery [Dkt 89], so there is

no evidence that any are relevant to the issues of this case.  Any documents held by the Trustee

are no doubt in digital form and can be easily used in France.

As Defendants have demonstrated, this case involves events that occurred in

France.  Document discovery has not in any way strengthened the Trustee's position.

### C.    The Relevant Witnesses Are Located In France

Jurisdictional discovery has confirmed that there are important witnesses residing

in France relevant to this case.  Since the Apfelbaums invested in BLMIS in 1995 subject to

French-law contracts, they should be entitled to have their rights decided under French law.

24

Even if this case proceeded under the Trustee's net winner theory, the Apfelbaums need to show the value they created for the accounts. The Trustee will likely claim that the Apfelbaums' accounts were mere transfers of existing BLMIS accounts dating back to the early 1980s when Albert Igoin originally invested. The Apfelbaums will be materially prejudiced if they are not permitted to demonstrate the value that they provided through the rather unique circumstances of their investments beginning in 1995. The Apfelbaums can only do this through French witnesses who cannot be compelled to testify in this forum. (Quint Decl. at ¶ 8.)

Relevant witnesses were previously identified. Discovery has especially confirmed the role of Judge Standish would testify about the amounts she allowed Emilie Apfelbaum to invest in BLMIS, Emilie Apfelbaum's lack of ownership and interest in this money prior to 1995, and French law on guardianship proceedings and investments. In any case, the whole file of the Guardianship Judge could be produced before the French Court. In addition, Maitre Airault was the French Notaire who negotiated the French-law contracts in Paris with Madoff regarding these investments. Pierre Pradie, a French attorney and Defendants' tax adviser, would also be a potential witness regarding the taxes paid on the accounts. Likewise, Philippe Colin was identified during discovery as having assisted Ms. Apfelbaum with the Guardianship Judge's requirements for Emilie's investments. (Cooperman Decl. Ex. 1 at 214-15.) Until 1999, Defendants' BLMIS accounts were held at Finama, not directly through BLMIS. (Cooperman Decl. Ex. 1 at 77:6-19.) The testimony of Sylvie Dringenberg of Finama would also be relevant to the Apfelbaums' investments. (*See id.* at 105:20-106:4; 112:19-114:1.)

### D.    <u>The Public Interest Factors Favor A French Forum</u>

Discovery has also confirmed that France will have a much greater interest in this case. The investments at issue arise from French-language contracts negotiated in France that are subject to French law, one of which was reviewed and approved by a French Judge. France

will of course have a greater interest in deciding matters relating to French citizens who entered

into French law investment contracts negotiated in France.  Issues of French law important to

this case are as follows:

When Madoff came to France to meet with Laurence Apfelbaum in 1995, this was

a direct violation of Law no 72-6 of 3 January 1972, modified by Law no 85-1321 of 14

December 1985 and Law no 88-70 of 22 January 1988, as applicable at the relevant time, which

prohibits canvassing for financial services at a prospective customer's home by unregistered

financial advisers.  (Quint Decl. at ¶ 5.)  Any breach of the laws, regulations, or professional

obligations applicable to canvassing for banking or financial services committed by a natural

person is punishable by five-years imprisonment and a fine of 375,000 Euros (Article 313-1 to

313-3 of the French Criminal Code).  (*Id.*)  Because illicit canvasing is a breach of the rules of

public order, a French court would likely rule that the contract executed between Laurence

Apfelbaum and Madoff was invalid from the start.  (*Id.*)

With respect to the French language customer contracts, under French and

European conflict of laws rules applicable to consumer contracts, contracts signed in French by

French citizens will in all likelihood be interpreted under French law.  (*Id.* at ¶ 6 (citing

Regulation (EC) 593/2008 of June 17, 2008, Article 6).)  A French court would be better

disposed to interpret these contracts under French law.

Third, French law prohibits French nationals from communication through any

means or otherwise providing documents containing financial or economic matters to any non-

French public authority or in any non-French judicial proceeding, including matters in front of

courts in the United States (*i.e.*, French blocking statute).  (*Id.* at ¶ 7 (citing Law no. 68-678 of 26

July 1968, article 1 bis, modified by Law no. 80-538 of 16 July 1980).)  Pursuant to this law,

Defendants would be subject to French criminal prosecution if they go to the United States and present evidence before a U.S. court.  (*Id.*)  Defendants would most certainly testify if this case were to proceed, and it would be unjust for this Court to put them in the position of violating French criminal law in order to defend themselves in a proceeding they are unfairly part of to begin with.

In short, a French court will have a great interest in adjudicating these uniquely French issues.

## CONCLUSION

For all of the reasons set forth above, as well as those stated in Defendants Motion to Dismiss and Reply in Further Support of Defendants' Motion to Dismiss, the motion to dismiss Defendants The Estate (Succession) of Doris Igoin, Laurence Apfelbaum, individually and in her capacities as executor and beneficiary of the Estate (Succession) of Doris Igoin, and Emilie Apfelbaum should be granted in all respects.

Dated:  June 23, 2014

**KELLEY DRYE & WARREN LLP**

By:     s/ Jonathan K. Cooperman
        Jonathan K. Cooperman
        Jessica L. Klarfeld
        101 Park Avenue
        New York, New York  10178
        (212) 808-7800

        *Attorneys for Defendants The Estate
        (Succession) of Doris Igoin, Laurence
        Apfelbaum, and Emilie Apfelbaum*

27