**UNITED STATES BANKRUPTCY COURT**      **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION    :
CORPORATION,    :
          Plaintiff,    :
    :
    – against –    :
    :    Adv. Pro. No. 08-01789 (SMB)
BERNARD L. MADOFF INVESTMENT    :    SIPA LIQUIDATION
SECURITIES LLC,    :    (Substantively Consolidated)
          Defendant.    :
-----------------------------------------------------------------X
In re:    :
    :
BERNARD L. MADOFF,    :    Case No.  09-11893 (SMB)
    :
    :
          Debtor.    :
-----------------------------------------------------------------X
IRVING H. PICARD, Trustee for the    :
Liquidation of Bernard L. Madoff    :
Investment Securities LLC,    :
    :
          Plaintiff,    :
    :
CAPITAL GROWTH COMPANY; DECISIONS,  :
INC.; FAVORITE FUNDS; JA PRIMARY    :
LIMITED PARTNERSHIP; JA SPECIAL    :
LIMITED PARTNERSHIP; JAB    :
PARTNERSHIP; JEMW PARTNERSHIP; JF    :
PARTNERSHIP; JFM INVESTMENT    :
COMPANIES; JLN PARTNERSHIP; JMP    :
LIMITED PARTNERSHIP; JEFFRY M.    :
PICOWER SPECIAL COMPANY; JEFFRY M.  :
PICOWER, P.C.; THE PICOWER    :    Adv. Pro. No. 14-01840 (SMB)
FOUNDATION; THE PICOWER INSTITUTE  :
OF MEDICAL RESEARCH; THE TRUST F/B/O  :
GABRIELLE H. PICOWER; BARBARA    :
PICOWER, individually and as Executor of the  :
Estate of Jeffry M. Picower, and as Trustee for the  :
Picower Foundation and for the Trust f/b/o Gabriel  :
H. Picower,    :
    :
          Intervenors,    :

|  | : |
| --- | --- |
| – against – | : |
|  | : |
| SUSANNE STONE MARSHALL; ADELE FOX; | : |
| MARSHA PESHKIN; RUSSELL OASIS; A & G | : |
| GOLDMAN PARTNERSHIP; and PAMELA | : |
| GOLDMAN, | : |
|  | : |
| Defendants. | : |

----------------------------------------------------------------X

**MEMORANDUM DECISION GRANTING
PLAINTIFF'S MOTION FOR AN INJUNCTION
AND DENYING MOTION FOR A STAY
AND CROSS-MOTION TO DISMISS**

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

> David J. Sheehan, Esq.
> Deborah H. Renner, Esq.
> Tracy L. Cole, Esq.
> Keith R. Murphy, Esq.
> Amy Vanderwal, Esq.
> Ferve Ozturk, Esq.
> Matt Moody, Esq.
> Of Counsel

*Attorneys for Plaintiff*

SCHULTE ROTH ZABEL LLP
919 Third Avenue
New York, NY 10022

> William D. Zabel, Esq.
> Marcy Ressler Harris, Esq.
> Michael Kwon, Esq.
> Jennifer M. Opheim, Esq.
> Of Counsel

*Attorneys for Intervenors*

2

HERRICK, FEINSTEIN LLP
Two Park Avenue
New York, New York 10016

    Joshua J. Angel, Esq.
    Frederick E. Schmidt, Jr., Esq.
       Of Counsel

    - and-

BEASLEY HAUSER KRAMER & GALARDI, P.A.
505 South Flagler Drive, Suite 1500
West Palm Beach, Florida 33401

    - and-

BLACKNER, STONE & ASSOCIATES
123 Australian Avenue
Palm Beach, Florida 33480

    Richard Lee Stone, Esq.
       Of Counsel

*Attorneys for Defendants A & G Goldman Partnership and Pamela Goldman*

BECKER & POLIAKOFF LLP
45 Broadway
New York, New York 10006

    Helen Davis Chaitman, Esq.
    Peter W. Smith, Esq.

*Attorneys for Defendants Susanne Stone Marshall,*
*Adele Fox, Marsha Peshkin, and Russell Oasis*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

    This long-running saga has thus far involved this Court, four District Court judges in two

District Courts and two Circuit Courts of Appeal.  The matter presently before the Court

concerns the motion (the "Motion") by Irving H. Picard, Esq. ("Trustee"), trustee for the

Securities Investor Protection Act ("SIPA") liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS"), to enjoin the defendants from prosecuting two class action lawsuits

pending in the United States District Court for the Southern District of Florida.  (*See*

*Memorandum of Law in Support of Trustee's Application for Enforcement of Permanent Injunction and Automatic Stay*, dated Mar. 11, 2014 (ECF Doc. # 3).)[1]  The Trustee contends that the prosecution of these lawsuits violates a permanent injunction issued by this Court on January 13, 2011 as well as the automatic stay.

The defendants, the plaintiffs in the Florida lawsuits, oppose the Motion, and the Fox Plaintiffs, defined below, have moved to stay this adversary proceeding until the Eleventh Circuit Court of Appeals decides a related appeal.  The Fox Plaintiffs have also cross-moved to dismiss the complaint arguing that it violates the Second Circuit Mandate, also defined below.  For the reasons that follow, the Motion is granted and the motion for a stay and the cross-motion are denied.

## BACKGROUND

### A.    The Trustee's Settlement with the Picower Defendants[2]

The Court assumes familiarity with the notorious BLMIS Ponzi scheme RUN BY Bernard L. Madoff which has been detailed in numerous opinions of this Court, the District Court and the Second Circuit Court of Appeals.  The instant proceedings concern a settlement reached between the Trustee and the Picower Defendants, investors in BLMIS, and we begin there.  On May 12, 2009, the Trustee filed a complaint against the Picower Defendants alleging

---

[1]    "ECF Doc." refers to the electronic docket in this adversary proceeding.

[2]    The "Picower Defendants" include Capital Growth Company; Decisions, Inc.; Favorite Funds; JA Primary Limited Partnership; JA Special Limited Partnership; JAB Partnership; JEMW Partnership; JF Partnership; JFM Investment Companies; JLN Partnership; JMP Limited Partnership; Jeffry M. Picower Special Company; Jeffry M. Picower, P.C.; the Picower Foundation; John Doe Trustees of the Picower Foundation; the Picower Institute of Medical Research; the Trust F/B/O Gabrielle H. Picower; Barbara Picower, individually, and as executor of the estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust F/B/O Gabriel H. Picower. By order dated May 22, 2014 (ECF Doc. # 45), the Court granted the Picower Defendants' unopposed motion to intervene in this adversary proceeding.

that they had received more than $6.7 billion in fictitious profits from BLMIS.[3]  The Trustee

later identified additional transfers to the Picower Defendants, bringing the total amount of their

net withdrawals to $7.2 billion.  The Trustee entered into settlement discussions with the Picower

Defendants who were also discussing a settlement with the Government regarding a potential

civil forfeiture under 18 U.S.C. § 981(a)(1)(C).  The parties ultimately reached a settlement

under which the estate of Jeffry M. Picower agreed to pay $5 billion to the BLMIS estate and

forfeit $2.2 billion to the Government.  These combined amounts represented 100% of the net

withdrawals received by the Picower Defendants over the life of their investments with BLMIS.

On December 17, 2010, the Trustee moved for an order approving the settlement

agreement.  The settlement included the Permanent Injunction, detailed below, which was

designed to protect the Picower Defendants against certain future litigation.   Susanne Stone

Marshall and Adele Fox objected to the settlement.  The Bankruptcy Court overruled their

objections, approved the settlement and issued the following Permanent Injunction:

> [A]ny BLMIS customer or creditor of the BLMIS estate . . . or anyone whose
> claim in any way arises from or is related to BLMIS or the Madoff Ponzi scheme,
> is hereby permanently enjoined from asserting any claim against the Picower
> BLMIS Accounts or the Picower Releasees that is duplicative or derivative of the
> claims brought by the Trustee, or which could have been brought by the Trustee
> against the Picower BLMIS Accounts or the Picower Releasees . . . .

(*Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the*

*Federal Rules of Bankruptcy Procedure Approving an Agreement by and Among the Trustee and*

*the Picower BLMIS Account Holders and Issuing a Permanent Injunction*, dated Jan. 13, 2011

---

[3]    A copy of the Complaint filed against the Picower Defendants is annexed as Exhibit D to the *Declaration of Keith R. Murphy in Support of Trustee's Application for Enforcement of Permanent Injunction and Automatic Stay* ("*Murphy Dec.*"), dated Mar. 10, 2014 (ECF Doc. # 4).

("*Permanent Injunction*") at 7.)[4]   Under paragraph 7 of the settlement agreement, the Trustee

agreed to "use his reasonable best efforts to oppose challenges, if any, to the scope, applicability

or enforceability of the Permanent Injunction." (*Id.*, Ex. A thereto ¶ 7.)  Finally, the Court

retained jurisdiction "over any and all disputes arising under or otherwise relating to this Order."

(*Permanent Injunction* at 8.)

B.     **The Fox and Marshall Action**

1.     **The Initial Florida Actions**

On February 16 and 17, 2010, while the Trustee and the Government were discussing

settlement with the Picower Defendants, Fox and Marshall filed putative class actions against the

Picower Defendants in Florida District Court (the "Initial Florida Actions").  (*See Murphy Dec.*,

Ex. E ("*Initial Fox Complaint*"); Ex. F ("*Initial Marshall Complaint*").)[5]   Fox sought to certify a

class of net winners, and Marshall sought to certify a class of "all SIPA Payees, but only with

respect to claims, or portions thereof, not assigned to the Trustee."  (*Initial Marshall Complaint*

at ¶ 74.)  Neither putative class was ever certified.

Both complaints alleged that the Picower Defendants had withdrawn billions of dollars

from Madoff's Ponzi scheme under circumstances that suggested that the Picower Defendants

were aware of and complicit in the Ponzi scheme.  They alleged that BLMIS and the Picower

Defendants engaged in a conspiracy to "steal the funds" of other customers – specifically, that

"Picower and Defendants converted the cash in other innocent BLMIS customers' accounts for

their own personal benefit with the acquiescence and assistance of Madoff and BLMIS."  (*Initial*

---

[4]     A copy of the Court's Order, which attaches the settlement agreement, is annexed to the *Murphy Dec.* as
Ex. A.

[5]     The *Initial Marshall Complaint* and the *Initial Fox Complaint* are referred to collectively as the *Initial
Florida Complaints*.

*Fox Complaint* at ¶ 9; *Initial Marshall Complaint* at ¶ 9.)  The complaints asserted claims for conspiracy, unjust enrichment, conversion, and conspiracy to violate the Florida RICO statute. They sought, among other things, disgorgement of the profits that the Picower Defendants received from BLMIS and the imposition of a constructive trust over the Picower Defendants' assets.

On March 31, 2010 the Trustee filed a motion in this Court seeking to enforce the automatic stay and to preliminarily enjoin Fox and Marshall from litigating against the Picower Defendants, pending the completion of the Trustee's settlement with the Picower Defendants. (*See Murphy Dec.*, Ex. I.)  On May 3, 2010, the Court held that the Initial Florida Actions violated the automatic stay and at least one stay order of the District Court.  *See Picard v. Fox (In re Bernard L. Madoff Inv. Sec. LLC)*, 429 B.R. 423, 430-34 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. Fox v. Picard (In re Bernard L. Madoff)* ("*Fox*"), 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd sub nom. Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)* ("*Marshall*"), 740 F.3d 81 (2d Cir. 2014).  The Court declared the Initial Florida Actions *void ab initio* and issued a preliminary injunction under section 105(a) of the Bankruptcy Code.  *Id.* at 433-34.  The Court further found that the Initial Florida Actions posed an imminent threat to the BLMIS estate and held that an extension of the stay was appropriate and necessary to "preserve the integrity of the SIPA proceedings and the Trustee's settlement negotiations . . . ." *Id.* at 436.[6]

Fox and Marshall appealed the approval of the Picower settlement and preliminary injunction, and the District Court affirmed.  District Judge Koeltl explained that the question hinged on whether the *Initial Florida Complaints* alleged direct claims or claims that were

---

[6]      At the hearing on the motion to approve the Picower Settlement, the Bankruptcy Court stated on the record that the Permanent Injunction applied to Fox's and Marshall's putative class actions.  (*Murphy Dec.*, Ex. H at 41.)

derivative of the claims asserted against the Picower Defendants by the Trustee. *Fox*, 848 F.

Supp. 2d at 478. He observed that the *Initial Florida Complaints* explicitly relied on the

Trustee's complaint against Picower Defendants, were based on the same conduct, and did not

contain any allegations of acts by the Picower Defendants directed toward Fox and Marshall

specifically, or any duty owed specifically to Fox and Marshall by the Picower Defendants. *Id.*

at 479. Furthermore, the alleged wrongful acts harmed every BLMIS customer in the same way

by withdrawing customer funds from BLMIS, depleting the remaining funds available to other

customers and creditors and diminishing the value of BLMIS. *Id.* at 480. Hence, every customer

could bring the same claim and assert the same damages. *Id.* Accordingly, the District Court

concluded that the claims asserted by Fox and Marshall were generalized claims belonging to the

Trustee, *id.*, and also upheld the validity of the preliminary injunction:

> Allowing the Florida Actions to go forward would carry real risks to the estate,
> implicating the viability of the current settlement and the possibility of future
> settlements, and providing an avenue for BLMIS customers who are displeased
> with the Net Equity Decision to undermine that decision by directly pursuing
> claims that are wholly derivative of claims already brought by the Trustee.

*Id.* at 490-91.

Fox and Marshall again appealed, and on January 13, 2014, the Second Circuit affirmed

the District Court. The Court of Appeals observed that the same wrongful act could inflict both

direct and derivative injuries, but remained wary that the labels that Fox and Marshall attached to

their complaints might allow them to circumvent the Court's Net Equity Decision (*In re Bernard*

*L. Madoff Inv. Secs., LLC*, 654 F.3d 229 (2d. Cir. 2011), *cert. denied* 133 U.S. 24 (2012)). It

ruled that the Initial Florida Actions attempted to "plead around" the Permanent Injunction,

entered after the Bankruptcy Court's decision, and the automatic stay. *Marshall*, 740 F.3d at 91-

92. The Initial Florida Actions "allege nothing more than steps necessary to effect the Picower

8

defendants' fraudulent withdrawals of money from BLMIS, instead of 'particularized' conduct directed at BLMIS customers." *Id.* at 84.  They did not contain particularized claims because they "do not allege that the Picower defendants made any such misrepresentations to appellants," rather, the "alleged injuries are inseparable from, and predicated upon, a legal injury to the estate namely, the Picower defendants' fraudulent withdrawals from their BLMIS accounts of what turned out to be other BLMIS customers' funds."  *Id.* at 92.  Quoting from District Judge Richard J. Sullivan's decision in a case involving other investors and discussed below:

> The . . . Complaints plead nothing more than that the Picower Defendants traded on their *own* BLMIS accounts, knowing that such "trades" were fraudulent, and then withdrew the "proceeds" of such falsified transactions from BLMIS.  All the "book entries" and "fraudulent trading records" that the Complaints allege refer to nothing more than the fictitious records BLMIS made, *for the Picower Defendants,* to document these fictitious transactions.  In other words, the Complaints plead nothing more than that the Picower Defendants fraudulently withdrew money from BLMIS.

*Id.* (emphasis in original).

The Court stated that its affirmance was without prejudice to seeking leave to amend their complaints.  "There is conceivably some particularized conspiracy claim appellants could assert that would not be derivative of those asserted by the Trustee," and this "is a question in the first instance for the United States District Court for the Southern District of Florida."  *Id.* at 94.  The Court "intimate[d] no view on an appropriate disposition of any such motion for leave to amend."  *See id.* at 96.  On February 5, 2014, the Second Circuit issued its mandate (the "Second Circuit Mandate"), stating: "IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the District Court is AFFIRMED in accordance with the opinion of this court." [7]

---

[7]    A copy of the Second Circuit Mandate is annexed as Exhibit 2 to the *Declaration of Helen Davis Chaitman (i) in Opposition to Trustee's Motion for Enforcement of Permanent Injunction & Automatic Stay; and (ii) in Support of Cross-Motion to Dismiss Complaint for Failure to State a Claim by Marshall, Fox, Peshkin & Oasis*, dated Apr. 20, 2014 (*"Chaitman Dec."*) (ECF Doc. # 23).

## 2.    The New Fox Complaint

On February 5, 2014, Fox and Marshall, together with Marsha Peshkin and Russell Oasis (collectively, the "Fox Plaintiffs") moved in Florida District Court before Senior District Judge Kenneth L. Ryskamp to re-open the Fox action, Case No. 10-80252, and for leave to file a second amended complaint (the "*New Fox Complaint*").[8] The *New Fox Complaint* purports to assert claims under (i) section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78t(a) (the "Section 20(a) Claim"); (ii) the Federal Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961-1968 (the "Federal RICO Claim"); (iii) Florida Civil Remedies for Criminal Practices Act, Chapter 772 of the Fla. Stat. (the "Florida RICO Claim"); and (iv) Florida common law.

On February 18, 2014, the Picower Defendants sought an immediate stay of the action before Judge Ryskamp. (*Murphy Dec.*, Ex. R.) Their motion included a letter from the Trustee's counsel stating that the Trustee intended to file an injunction motion in this Court. (*See id.*) Two days later, Judge Ryskamp issued an order directing the Fox Plaintiffs to show cause why the Florida District Court should not stay the action "to allow the New York Bankruptcy Court to decide the applicability of the permanent injunction and automatic stay." (*Murphy Dec.*, Ex. V at 2-3.) The order also stayed all proceedings in the Fox action pending the Court's resolution of the Picower Defendants' motion for a stay. (*See id.* at 3.)

The Fox Plaintiffs responded and cross-moved for a preliminary injunction allowing them to proceed in Florida. (*See Murphy Dec.*, Ex. U, W.) They argued that any request directed to the Bankruptcy Court to enforce its own injunction defied the Second Circuit

---

[8]    The *New Fox Complaint* is annexed as Exhibit B to the *Murphy Dec.*

10

Mandate.  The Fox Plaintiffs therefore sought to enjoin the Picower Defendants and "any person in active concert or participation with them," including the non-party Trustee, from litigating the Fox Plaintiffs' action in any jurisdiction other than the Florida District Court.  (*Id.* at 2.)

After the Trustee filed the injunction motion in this Court, the Fox Plaintiffs moved before the Florida District Court requesting limited relief from that court's stay to request an emergency hearing on their motion for injunctive relief.  On March 14, 2014, Judge Ryskamp denied the Fox Plaintiffs' motion and deferred to this Court to rule on the Trustee's application for injunctive relief (the "March 14 Order"):

> The Court declines to conduct an emergency hearing on the question of whether to enjoin the New York action.  Rather, this Court defers to the Bankruptcy Court for the Southern District of New York for a ruling on Picard's motion to enjoin the instant action.

(*Chaitman Dec.*, Ex. 5 at 2.)

On March 24, 2014, the Fox Plaintiffs filed a notice of appeal from the March 14 Order. (*See Declaration of Ferve E. Ozturk in Support of Trustee's Opposition to Motion for Stay*, dated Apr. 24, 2014 ("*Ozturk Dec.*"), Ex. A (ECF Doc. # 29).)  More than two weeks later, on April 9, 2014, they moved before the Eleventh Circuit to expedite the appeal, (*see id.*, Ex. B), and simultaneously moved before the Eleventh Circuit for injunction pending appeal.  Like their motion before the District Court, the Fox Plaintiffs sought a preliminary injunction "preventing Appellees, and those in active concert and participation with them, from seeking to litigate the claims in this action other than in [the Florida District Court]."  (*See id* at 1.)  On May 7, the Eleventh Circuit issued an order denying the motion to expedite and the motion for an injunction pending appeal.  (*See Notice of Issuance of Order by Eleventh Circuit Court of Appeals*, dated

May 8, 2014, Ex. A. (ECF Doc. # 41).)  The appeal of the March 14 Order remains pending

before the Eleventh Circuit.  (*See id.*)

**B.    The Goldman Action**

**1.    The Initial Goldman Complaints**

In 2011, while the appeals of Fox and Marshall were pending in the District Court,

Pamela Goldman and A&G Goldman Partnership (collectively, the "Goldman Plaintiffs") sought

permission from this Court to file two putative class actions in the Florida District Court.  (*See*

*Murphy Dec.*, Ex. K (the "*Initial A&G Complaint*" and the "*Initial Pamela Complaint*," and

collectively, the "*Initial Goldman Complaints*").)  A&G Goldman sought to represent so-called

"net winners," (*see Initial A&G Complaint* at ¶ 62), and Pamela Goldman sought to represent so-

called "net losers."  (*See Initial Pamela Complaint* at ¶ 62.)

The *Initial Goldman Complaints* alleged that the Picower Defendants received billions of

dollars of transfers from BLMIS under circumstances that suggested Picower knew that BLMIS

was engaged in fraud.  The pleadings were virtually identical to the *Initial Florida Complaints*,

the main difference being they labelled their claims as securities fraud claims.  The Goldman

Plaintiffs claimed that Picower was a "control person" under section 20(a) of the Exchange Act

with respect to BLMIS and participated with BLMIS in violations of Rule 10b-5 of the Exchange

Act.  According to the *Initial Goldman Complaints*, "[t]he volume, pattern and practice of the

Defendants' fraudulent withdrawals from BLMIS and their control over fraudulent

documentation of underlying transactions at BLMIS establishes the Defendants' 'control person'

liability under the federal securities laws."  (*Initial Goldman Complaints* at ¶ 41.)

On June 20, 2012, the Bankruptcy Court held that the proposed *Initial Goldman Complaints* violated the Permanent Injunction and the automatic stay. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 477 B.R. 351, (Bankr. S.D.N.Y. 2012), *aff'd sub nom. A & G Goldman P'ship v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)* ("*Goldman*"), 12 Civ. 6109 (RJS), 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013). This Court emphasized that the Goldman Plaintiffs "have simply repeated, repackaged, and relabeled the wrongs alleged by the Trustee [against the Picower Defendants] in an attempt to create independent claims where none exist." *Id.* at 354. This Court highlighted the overlap between the Goldman Plaintiffs' allegations and those of the Trustee as well as those of Fox and Marshall in their *Initial Florida Complaints*, and cited an exhibit submitted by the Trustee that "substantially reflects and links the cloning of the pleadings." *Id.* at 356 n.12; Ex. A thereto. This Court also concluded that the Goldman Plaintiffs' claims were derivative of the Trustee's direct claims because they alleged harms "limited to general direction and control and action to the detriment of all [BLMIS's] creditors," and did not state a particularized claim against the Picower Defendants. *Id.* at 357 (alteration in original) (quoting *In re Cabrini Med. Ctr.*, 09-14398 (ALG), 2012 WL 2254386, at *8 (Bankr. S.D.N.Y. June 15, 2012)) (internal quotation marks omitted).

The Goldman Plaintiffs appealed the order to the District Court, and the District Court affirmed. *Goldman*, 2013 WL 5511027. District Judge Sullivan observed that the same act may give rise to derivative and direct claims, and claims under § 20(a) of the Exchange Act were direct. *Id.* at *5-6. However, a plaintiff does not plead a § 20(a) claim simply by labelling it as such, and the Court must, instead, look to the substance of what is alleged. *Id.* at *6. Thus, although the adequacy of the *Initial Goldman Complaints* was not before the District Court,

"whether the Complaints plead a bona fide control person claim *is* relevant insofar it affects

whether Appellants have pled a non-derivative claim." *Id.* (emphasis in original).

The District Court then proceeded to examine the *Initial Goldman Complaints* and

concluded that they were not bona fide securities fraud claims. *Id.* "Apart from a few

conclusory legal assertions that list the elements of a control person claim, all of the allegations

in the Complaint refer exclusively to the Picower Defendants' fraudulent withdrawals," and

"follow a consistent pattern, in which a broad statement alleging that the Picower Defendants

controlled BLMIS is followed by a specific qualification that this 'control' consisted solely of

the Picower Defendants directing fictitious trades in, and withdrawing proceeds from, their own

BLMIS accounts." *Id.* The Goldman Plaintiffs did not plead "any facts to support the allegation

that the Picower Defendants controlled BLMIS beyond what was necessarily incident to

directing trades in their own customer accounts," and each "conclusory legal statement about the

Picower Defendants control over BLMIS . . . simply parrots the elements required to make out a

control person claim." *Id.* at *8  Furthermore, the *Initial Goldman Complaints* did not claim that

the Picower Defendants directed BLMIS to make representations beyond what was necessary to

document the Picower withdrawals. *Id.* at *9. The District Court concluded:

> [I]t is not enough that securities fraud claims *would* be non-derivative of
> fraudulent conveyance claims and that Appellants *call* their claims securities
> fraud claims – the Goldman Complaints must *actually* plead securities fraud
> claims. Beyond a few bare legal conclusions, the Complaints plead no such
> claims. All the Goldman Complaints plead is that the Picower Defendants
> directed trades in their own BLMIS accounts and did so knowing that no such
> trades were in fact taking place – in other words, that the Picower Defendants
> fraudulently withdrew money from BLMIS.

*Id.* at *10 (emphasis in original). The Goldman Plaintiffs did not appeal the District Court's

decision.

14

2.      **The New Goldman Complaint**

On January 6, 2014, the Goldman Plaintiffs filed a new complaint, (*Murphy Dec.*, Ex. N),

in the Florida District Court seeking a declaration that neither the Permanent Injunction nor the

automatic stay barred the Goldman Plaintiffs from pursuing the control person claim alleged in

in the proposed class action complaint annexed thereto (the "*New Goldman Complaint*," and

together with the *New Fox Complaint*, the "*New Complaints*").  (*See Murphy Dec.*, Ex. C.)  The

action was assigned to District Judge Kenneth A. Marra.  On January 28, 2014, the Goldman

Plaintiffs filed a motion for summary judgment with respect to the declaratory relief sought in

the complaint.  (*See Murphy Dec.*, Ex. O.)  On March 14, 2014, the Picower Defendants filed a

motion seeking to (1) dismiss the action for insufficient service of process, and (2) stay the

action pending final resolution of the injunction motion filed by the Trustee in this Court.  (*See

Goldman v. Capital Growth Company*, 14-Cv-80012 (S.D. Fla.) ECF Doc. # 9.)  The Goldman

Plaintiffs opposed the motion but the docket does not reflect any further activity after the

Picower Defendants filed their reply on April 7, 2014.

C.      **Trustee's Injunction Motion**

On March 11, 2014, the Trustee filed the instant motion.  Arguing that the *New

Complaints* assert derivative claims, he seeks to enforce the Permanent Injunction and automatic

stay and enjoin the Fox Plaintiffs and Goldman Plaintiffs from continuing their respective

actions in Florida District Court or any other action related to BLMIS against any of the Picower

Defendants without leave of this Court.  The Goldman Plaintiffs and the Fox Plaintiffs filed

objections.  (*See Defendants A&G Partnership and Pamela Goldman's Objection to Application

for Enforcement of Permanent Injunction and Automatic Stay*, dated Apr. 18, 2014 ("*Goldman

Opp.*") (ECF Doc. # 20); *Memorandum of Law (i) in Opposition to Trustee's Motion for*

15

*Enforcement of Permanent Injunction & Automatic Stay and (ii) in Support of Cross-Motion to Dismiss Complaint for Failure to State a Claim by Marshall, Fox, Peshkin & Oasis*, dated Apr. 20, 2014 (ECF Doc. # 22).)  They argue that their claims are direct rather than derivative, and principally, that the Picower Defendants controlled BLMIS through their ability to fraudulently withdraw customer money from BLMIS and induce BLMIS to make false entries in the records of the Picower Defendants' accounts and caused BLMIS to send false financial information to the other customers regarding their own accounts.  The Fox Plaintiffs filed a motion in this Court to stay the proceedings pending a decision by the Eleventh Circuit.  (*Notice of Motion for a Stay of the Proceeding and an Extension of Time Pursuant to Fed. Bankr. R. 9006 and Local Rule 9006-2*, dated Apr. 17, 2014 (ECF Doc. # 15).)  They also cross-moved to dismiss the Trustee's complaint arguing that it violated the Second Circuit Mandate.

## DISCUSSION

### A.    This Court's Authority

We begin with two basic precepts: (1) a Court has the jurisdiction to interpret its own order, especially when the order expressly retains jurisdiction to do so, *Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 151 (2009), and (2) both this Court and the Florida District Court have jurisdiction to determine whether the automatic stay applies to the Florida actions.  *See Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.)*, 765 F.2d 343, 347 (2d Cir. 1985) ("Whether the [automatic] stay applies to litigation otherwise within the jurisdiction of a district court or court of appeals is an issue of law within the competence of both the court within which the litigation is pending and the bankruptcy court supervising the reorganization.") (internal citations omitted); *In Re Charter Commc'ns*, 09-11435 (JMP), 2010 WL 502764, at *3 (Bankr. S.D.N.Y. Feb. 8, 2010) (explaining that both the Bankruptcy Court and the District

16

Court had jurisdiction to determine whether an action pending in the District violated releases contained in a confirmed plan); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969, 973 (N.D. Ill. 1992) ("[I]t is settled that both the bankruptcy court and the court in which the other litigation exists may construe the automatic stay."). Here, the Permanent Injunction included an express reservation of jurisdiction to interpret it.

The Second Circuit Mandate did not alter these jurisdictional principles. The Court of Appeals could not have affirmed the Bankruptcy Court without implicitly upholding the Bankruptcy Court's jurisdiction to interpret the automatic stay and issue the Permanent Injunction. On a going forward basis, the *Marshall* Court's statement that leave to amend should be presented in the first instance to the Florida District Court reflects the recognition that a party seeking leave to amend a pleading should ordinarily present that motion to the court in which the action is pending. Furthermore, District Judge Ryskamp implicitly rejected the Fox Plaintiffs' jurisdictional argument because he stayed the action before him and deferred the question regarding the Permanent Injunction and the automatic stay to this Court.

In any event, the Second Circuit Mandate has been met because the Fox Plaintiffs made their motion in the first instance to the Florida District Court. The Fox Plaintiffs are now appealing Judge Ryskamp's stay order, but the Eleventh Circuit denied their motion to expedite that appeal or stay the Picower Defendants or the Trustee from proceeding in this Court. They offer no satisfactory reason why this Court should now grant what amounts to the same stay that the Eleventh Circuit refused, and accordingly, their motion for a stay as well as their cross-motion to dismiss based on the Second Circuit Mandate are denied.

17

As to the *New Goldman Complaint*, the inquiry begins with *Baldwin-United*, a case which none of the parties discussed.  There, the plaintiffs sued Paine Webber after Baldwin-United filed for bankruptcy alleging securities fraud in connection with the sale of Baldwin-United annuities they had purchased.  765 F.2d at 345.  Paine Webber filed a claim for contribution and indemnity in the bankruptcy court and also filed a third-party complaint for contribution and indemnity against Baldwin-United in the securities litigation.  *Id.*  After learning that Baldwin-United intended to seek relief against the third party complaint in the bankruptcy court, Paine Webber obtained a temporary restraining order from the district court barring the debtor "from applying to the Bankruptcy Court in Ohio [the court presiding over the debtor's bankruptcy case] 'for declaratory or injunctive relief which would purport to determine, affect or interfere, directly or indirectly with [the District] Court's jurisdiction over the third-party complaint against Baldwin . . . .'"  *Id.* at 346.  At a subsequent hearing, the District Court expressed the view that it, rather than the Bankruptcy Court, was the appropriate forum in which to determine the scope of the automatic stay, and issued a preliminary injunction prohibiting Baldwin-United or the trustee from applying for injunctive, declaratory or any other relief in any court other than the district court.  *Id.*

On appeal, the Second Circuit reversed.  After noting that both the District and Bankruptcy Courts had jurisdiction to decide the scope of the automatic stay as it applied to the District Court action, the Court of Appeals ruled that the equities did not warrant preventing the Bankruptcy Court from construing the stay.  *Id.* at 347-48.  It identified several reasons, including the possibility that the same issue could be raised in various district courts threatening the Bankruptcy Court's ability to assure equal treatment among creditors and the "paramount interest of assuring uniformity of decision concerning the reach of the automatic stay."  *Id.*  at

18

349; *accord In Re Charter Commc'ns*, 2010 WL 502764, at *3 (concluding that the Bankruptcy

Court should rule on whether a third-party release contained in the debtor's confirmed plan

barred a federal securities class action pending in Arkansas federal court because of the Court's

"natural familiarity with the full record of the confirmation hearing," and "the risk that the

release provisions and injunction may be eroded to some extent by means of potential

incremental exceptions to the Plan's comprehensive bar to claims against identified third

parties").  In addition, Paine Webber invoked the Bankruptcy Court's jurisdiction first by filing a

proof of claim and the Bankruptcy Court could have resolved the reach of the automatic stay

expeditiously if Paine Webber had not preempted that consideration by applying to the District

Court and obtaining an injunction.  *See Baldwin-United*, 765 F.2d at 349.

Most of these considerations militate in favor of this Court construing the scope of the

Permanent Injunction and the automatic stay on the Goldman action.  In light of Judge

Ryskamp's order, this Court must decide the issue anyway as it concerns the Fox Plaintiffs.

More important, centralization of the question in this Court will promote uniformity of

interpretation and equal treatment among creditors, not to mention judicial efficiency.  The

*Marshall* Court had only the one case before it.  However, over 16,500 customer claims have

been filed in the BLMIS case.  (*See Affidavit of Vineet Sehgal in Support of the Trustee's Motion

for an Order Approving Fourth Allocation of Property to the Fund of Customer Property and

Authorizing Fourth Interim Distribution to Customers*, sworn to Mar. 25, 2014 at ¶ 4 (Case No.

08-1789, ECF Doc. # 6025).)  Every customer could file the same lawsuit against the Picower

Defendants as the Fox Plaintiffs and the Goldman Plaintiffs did.[9]  Moreover, requiring the

---

[9]      The 16,500 number does not include "net winners" who may not have filed claims with the Trustee but
could still seek to recover from the Picower Defendants the difference between their "net winnings" and the balance
appearing on their final statements.

Trustee to defend the same Permanent Injunction and automatic stay in myriad courts at the risk

of inconsistent results will impact the Trustee's ability to settle similar disputes.  On balance, the

relevant factors weigh in favor of this Court construing the effect of its own Permanent

Injunction and the automatic stay on the Goldman action.

It is true that the Goldman Plaintiffs first presented the question to Judge Marra before

whom it is still pending.  However, the Picower Defendants' motion for a stay has not been

scheduled for a hearing, [10]  the lawsuit is at any early stage, the Florida District Court has not

invested substantial time in the case and this Court's determination of the question will not

interfere with ongoing proceedings in that Court.  In contrast, this Court, the District Court and

the Second Circuit have devoted significant time to the questions raised by the Permanent

Injunction and the automatic stay.  Moreover, all of the parties – the Goldman Plaintiffs, the

Picower Defendants and the Trustee – are parties to this adversary proceeding; the Trustee is not

a party to the Goldman action.  Consequently, the Court concludes that it is appropriate for it to

decide the scope of the Permanent Injunction and automatic stay on the Florida Actions.

*Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*, 138 B.R. 149

(S.D.N.Y. 1992) and *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation*,

140 B.R. 969 (N.D. Ill. 1992) do not support a different result.  In *Patterson*, the District Court

held that it should decide whether the automatic stay applied to payments required under a

consent decree entered by the District Court as part of settlement of a case against the debtor

almost twenty years prior to the bankruptcy.  The Court explained that it was most familiar with

---

[10]     During oral argument, the Court asked counsel for the Goldman Plaintiffs why he did not seek a conference
with Judge Marra on the pending stay motion to determine if he intended to decide the issue.  Counsel advised the
Court that they had called Judge Marra's chambers to schedule a conference, his clerk was away, and they intended
to follow up that week.  (May 7, 2014 Transcript at 41-42 (ECF Doc. # 44).)  The Court has not received word of
any further development on this point.

the underlying case and that the concerns in *Baldwin-United* of centralized interpretation of the automatic stay and inconsistent decisions were not implicated by requiring the debtor to continue to make payments required under the consent decree. *Patterson*, 138 B.R. at 150. As noted, this Court has the greatest familiarity with the issues presented, and moreover, any of the over 16,500 BLMIS customers that filed claims could file the same lawsuit as the Goldman Plaintiffs against the Picower Defendants raising the possibility of inconsistent decisions.

In *Mahurkar*, one of the defendants in a patent infringement suit in the Northern District of Illinois, Kendall Med–West ("Kendall"), filed for bankruptcy in Delaware less than three months before trial at a time when the case was in the "final stages of discovery, with depositions by the dozen." *In re Mahurkar*, 140 B.R. at 970. The plaintiff moved before the Illinois District Court for an order declaring that its patent infringement action against Kendell did not violate the automatic stay. After filing a response in the District Court, Kendall successfully moved before the Bankruptcy Court on minimal notice for an order restraining the plaintiff from continuing to prosecute the motion before the District Court. The District Court subsequently enjoined Kendall from enforcing the temporary restraining order issued by the Bankruptcy Court and made its own determination whether the automatic stay applied to the action before it. In declining to defer to the Bankruptcy Court, the District Court found that Kendall's motion to the Bankruptcy Court was "an abuse of the judicial process" because the issue "had been fully briefed" before the District Court. *Id.* at 974. The Court also noted that Kendall's action "throws the schedule in this court out of whack, awarding itself the extension that I have repeatedly refused to grant and raising questions about whether Kendall will be able to catch up in time to join the trial in August." *Id.* at 971.

Unlike *Patterson* and *Mahurkar*, the equities here, as discussed above, support this Court exercising its jurisdiction. Moreover, the Trustee is not a party to the Goldman action, and short of seeking intervention, has no standing to participate in those proceedings. Finally, this Court is not, as the Goldman Plaintiffs suggest, enjoining the Florida District Court from deciding any issue. (*See Goldman Opp.* at 7-9.) Instead, this Court is exercising its jurisdiction to decide the scope of the Permanent Injunction and the automatic stay, an issue that is properly before it.

Nor does the first-filed rule mandate deference to the Florida District Court in this instance. The Goldman Plaintiffs, citing a Fourth Circuit decision, argue that the Florida District Court's jurisdiction attached first in time and that Court is entitled to decide the issue. (*See Goldman Opp.* at 12 (citing *U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Virginia, Inc.*, 64 F.3d 920, 927 n.12 (4th Cir. 1995)).) But "despite the fact that an action was first filed in another district, courts have held that bankruptcy courts are in the best position to interpret and enforce their own orders." *In re Duplan Corp.*, 209 B.R. 324, 330 (Bankr. S.D.N.Y. 1997), *aff'd*, 229 B.R. 609 (S.D.N.Y. 1999), *aff'd in part, vacated in part*, 212 F.3d 144 (2d Cir. 2000). Indeed, in a later case, the Fourth Circuit recognized that the first-filed rule is not always applicable in the bankruptcy setting. *See Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 303 (4th Cir. 2001) ("[Some of the parties] argued for a 'first-filed' principle, urging that the court which first takes custody of assets for liquidation should be given priority. We cannot agree. Our examination of the Bankruptcy Code reveals that Congress intended that the bankruptcy process be favored in circumstances such as these."); *accord In re Tribune Co.*, 418 B.R. 116, 125 (Bankr. D. Del. 2009) ("In [*Gilchrist*], the Fourth Circuit Court of Appeals recognized that both statutory jurisdictional grants and equitable principles may require the first-filed rule to yield to the bankruptcy process.") (internal citation omitted).

22

**B.      The Merits of the Trustee's Application**

**1.      Introduction**

The question before the Court is whether the *New Complaints* assert derivative claims.  A claim is derivative when it "seeks relief against third parties that pushed the debtor into bankruptcy . . . [and asserts a] claim that arises from harm done to the estate." *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Secs., LLC)*, 721 F.3d 54, 70 (2d Cir. 2013); *accord Marshall*, 740 F.3d at 89.  Admittedly, a direct claim and a derivative claim can arise from the same wrongful act.  "A creditor's claim is non-derivative only if some direct legal obligation flowed from the defendants to the creditor," *Goldman*, 2013 WL 5511027, at *5, and the creditor's injury can be "directly traced to [the third party's] conduct." *Marshall*, 740 F.3d at 89 (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 704 (2d Cir.1989)) (alteration in original).  In the context of this case, the claims in the *New Complaints* will be considered derivative, regardless of their labelling, if they plead nothing more than the Picower Defendants fraudulently withdrew money from BLMIS.  *Marshall*, 740 F.3d at 92-93; *Goldman*, 2013 WL 5511027, at *10.

The answer to the question is informed by the long histories of these lawsuits.  All the Courts that have considered the issue have concluded that regardless of the label the plaintiffs choose to attach to their claims, a claim based on the Picower Defendants' fraudulent withdrawals and fraudulent entries in their accounts, without any particularized allegations that the Picower Defendants directly participated in any misrepresentation to the customers, is derivative of the Trustee's fraudulent conveyance claims against the Picower Defendants. *E.g., Goldman*, 2013 WL 5511027, at *8 ("Paragraphs 69 through 71 [of the *Initial Goldman Complaints*] discuss the false monthly statements that BLMIS sent to each BLMIS customer and

23

allege that such statements were fraudulent.  Yet, there is no allegation that the Picower

Defendants directed or were at all involved with the creation or dissemination of these statements

to other BLMIS customers.").  Furthermore, claims that the Picower Defendants' fraudulent

withdrawals were paid with assets belonging to other customers that diminished BLMIS's ability

to pay its customers were the type of claims that could be asserted by every customer.  *Fox*, 848

F. Supp. 2d at 480.

The *New Complaints* attempt to avoid these prior rulings by asserting that the Picower

Defendants controlled BLMIS through their ability to fraudulently withdraw funds and cause

BLMIS to make fraudulent entries in their own accounts.  They further assert that the Picower

Defendants directly or indirectly also caused BLMIS to make fictitious entries in the proposed

class members' own accounts and to send the proposed class members that false financial

information.  Thus, they purport to allege that they were victims of misrepresentations by

BLMIS, and the Picower Defendants controlled BLMIS and/or caused the dissemination of the

false information sent to the other customers.

### 2.    The New Goldman Complaint

The *New Goldman Complaint* pleads only one claim – control person liability under

section 20(a) of the Exchange Act.[11]  A control person claim consists of three elements: (1) a

primary violation by a controlled person; (2) control of the primary violator by the defendant;

and (3) that the control person "had the requisite power to directly or indirectly control or

---

[11]    Section 20(a) provides in pertinent part:

Every person who, directly or indirectly, controls any person liable under any provision
of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with
and to the same extent as such controlled person to any person to whom such controlled person is
liable. . . .

influence the specific corporate policy which resulted in primary liability." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (internal citation and quotation marks omitted). A plaintiff must "allege facts sufficient to satisfy . . . the three prongs" of the test stated by the Eleventh Circuit. *Theoharous v. Fong,* 256 F.3d 1219, 1227 (11th Cir. 2001), *abrogated on other grounds by Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010). "Allegations that restate the legal standard for control person liability but fail to provide facts to support these allegations does not adequately plead control person liability." *Bruhl v. PriceWaterhouse Coopers Int'l*, No. 03-23044-Civ., 2008 WL 899253, at *2 (S.D. Fla. Mar. 31, 2008) (Marra, J.); *accord Slayter v. DC 701, LLC*, No. 8:07-cv-1903-T-24-EAJ, 2008 WL 2695645, at *3 (M.D. Fla. July 3, 2008) ("Merely restating the legal standard for control person liability, or in this case, merely alleging that Defendant Clark orchestrated and directed the scheme—without more—is insufficient to plead control person liability.").

We may take as a given that Madoff and BLMIS committed federal securities fraud. The control person allegations are set forth in paragraphs 63 through 77. In substance, the *New Goldman Complaint* alleges that the Picower Defendants were aware of the Ponzi scheme, were able to cause BLMIS to make fraudulent entries in their own accounts that allowed them to steal the funds belonging to other customers, and knew and caused BLMIS to make misrepresentations to the other customers in the account statements and other financial information that BLMIS sent to them. The heart of the direct claim is alleged in paragraphs 65 through 67:

> 65.    Picower caused BLMIS to book phony transactions with phony profits in his accounts. From time to time, Picower withdrew these phony profits from his BLMIS account. These withdrawals were actually funded with cash from other BLMIS customers. Picower knew that BLMIS did not, and could not, truthfully report to customers the unauthorized transfer of customer assets to Picower and maintain the Ponzi scheme. Picower knew and intended that each phony

25

recording of a fictitious profitable transaction in his accounts resulted directly in the recording of false transactions and false asset values in the accounts of other BLMIS customers because these customer accounts did not reflect the resulting cash transfer from their accounts to Picower.

66.     As a result of Picower's control, the account records of other BLMIS customers falsely overstated the assets therein and their investment performance. BLMIS customers consequently unknowingly overpaid for BLMIS securities.

67.     As a result of Picower's control, he caused BLMIS to present Plaintiffs with false and misleading information (*i.e.*, inflated account values), in order to induce those investors to remain invested in BLMIS and to continue to attract new investments in BLMIS.  If Plaintiffs had been provided with accurate information, they would have attempted to protect the value of their investments, and the Ponzi scheme would have collapsed.

At oral argument, counsel for the Goldman Plaintiffs also drew my attention to the

following additional paragraphs:

71.     . . . Picower's ability to direct the creation and dissemination of false and misleading trading documentation which he knew would be incorporated in financial disclosures made by BLMIS, a highly regulated broker and investment advisor, shows that Picower exercised direct and indirect control over the day-to-day operations of BLMIS and specifically over the trading activity that constituted a violation of the securities laws.

90.     Picower actively communicated and agreed with Madoff and other BLMIS personnel to perpetuate the fraud.  Picower had a close relationship with Madoff and BLMIS, and directly or indirectly ensured that Madoff and BLMIS concealed the scheme from other BLMIS customers.  Picower directly or indirectly induced BLMIS's misleading statements to others.  These misrepresentations induced BLMIS customers to pay BLMIS for non-existent securities.

The *Initial Goldman Complaints* alleged that BLMIS sent false monthly statements to its

customers, but Judge Sullivan concluded that these allegations did not support a control person

claim against the Picower Defendants because they did not allege that the Picower Defendants

"directed or were at all involved in the creation or dissemination of these statements to other

BLMIS customers."  *Goldman*, 2013 WL 5511027, at *8.  The Initial Goldman Complaints also

alleged that the Picower Defendants had the power to influence the decision making at BLMIS

and the recordkeeping of securities transactions and had direct involvement in the day-to-day

26

operations, record keeping and financial management of BLMIS, but Judge Sullivan again

disregarded those allegations because the Goldman Plaintiffs

> do not in fact claim that the Picower Defendants directed BLMIS to make
> misrepresentations above and beyond what was necessary to document the
> Picower Defendants' false withdrawals. The fraudulent representations
> Appellants point to were incident to the fraudulent withdrawals.

*Id.* at *9. Judge Sullivan reemphasized this point later in the opinion:

> Beyond a few bare legal conclusions, the Complaints plead no such [securities
> fraud] claims. All the Goldman Complaints plead is that the Picower Defendants
> directed trades in their own BLMIS accounts and did so knowing that no such
> trades were in fact taking place – in other words, that the Picower Defendants
> fraudulently withdrew money from BLMIS.

*Id.* at *10.

The *New Goldman Complaint* attempts to supply the missing allegations by averring that

the Picower Defendants' fraudulent withdrawals and fictitious entries in their own accounts had

the effect of causing BLMIS to send false financial statements to other customers. The same

could be said of any withdrawal by any other BLMIS customer. Moreover, beyond conclusory

statements that the Picower Defendants' fraudulent transactions relating to their own accounts

caused BLMIS to send false statements to other customers, the *New Goldman Complaint* does

not allege that the Picower Defendants "directed or were at all involved in the creation or

dissemination of these statements to other BLMIS customers." *Goldman*, 2013 WL 5511027, at

*8. The *New Goldman Complaint*, like its predecessors, relies on the Picower Defendants'

fraudulent withdrawals and fictitious entries in their own accounts, and if these allegations are

ignored, there is nothing left. In the words of the *Marshall* Court, which rejected similar

allegations, the "alleged injuries are inseparable from, and predicated upon, a legal injury to the

estate namely, the Picower defendants' fraudulent withdrawals from their BLMIS accounts of

what turned out be other BLMIS customers' funds." *Marshall*, 740 F.3d at 92.

*Medsker v. Feingold*, 307 F. App'x 262 (11th Cir. 2008), cited by the Goldman Plaintiffs

in support of their control person claims is distinguishable.  There, the Eleventh Circuit found

that the complaint adequately alleged control person liability against David Feingold and

Kristian Baso. The *Medsker* complaint (attached as Exhibit CC to the *Murphy Dec.*) alleged that

Feingold conceived aspects of the scheme, signed at least one of the deceptive offering materials

and fictitious statements sent to the plaintiffs, prepared subscription agreements and set up

several of the shell companies to which the plaintiffs' funds were diverted.  (*See* Murphy Dec.

Ex. CC at ¶¶ 4, 5, 13.)  Baso was an officer and director of the companies which allegedly ran

the fraud.  (*Id.* at ¶ 6.)

The *Medsker* complaint included particularized allegations regarding Feingold's

participation in the preparation of false information and other documentation that advanced the

scheme and alleged that Baso was an officer.  In contrast, the *New Goldman Complaint* does not

allege that Picower was an officer of BLMIS or include particularized allegations that Picower

Defendants did anything besides fraudulently withdraw money from BLMIS and cause BLMIS

to make phony entries in the records of their accounts.  Accordingly, the *New Goldman

Complaint* states a derivative claim barred by the Permanent Injunction for the same reasons

articulated by Judge Sullivan.

### 3.    The New Fox Complaint

The *New Fox Complaint* alleges control person claims as well as federal and state RICO

claims, aiding and abetting claims and other common law claims.  The allegations are similar to

the *New Goldman Complaint.*  The Picower Defendants withdrew over $7.2 billion in fictitious

profits knowing that BLMIS would have to steal money from other customers, (*New Fox

Complaint* at ¶¶ 43, 46 ), Picower directed BLMIS to make a phony $6 billion margin loan to

Defendant Decisions Inc. with funds that were stolen from other customer accounts, (*id.* at ¶¶ 58-61), Picower caused BLMIS to falsify the records relating to their own accounts, (*id.* at ¶¶ 44, 45, 47, 48), this ability to cause BLMIS to falsify Picower records and direct fictitious withdrawals enabled the Picower Defendants to control BLMIS, (*id.* at ¶¶ 56, 115, 137, 162), and Picower knew that BLMIS would have to generate false financial information in other customer accounts to cover up the withdrawals, and this false information was sent to other customers. (*See id.* at ¶¶ 51, 52, 53, 117.)

As with the *New Goldman Complaint*, the allegations are conclusory and based on the Picower Defendants' ability to withdraw funds and cause BLMIS to doctor the records of their own accounts. The *New Fox Complaint* does not contain any particularized allegation that the Picower Defendants participated in the preparation of any financial information sent to the proposed class members or directed BLMIS to send false information to the customers. Like the Goldman Plaintiffs, they essentially argue that the Picower Defendants knew that their own fraud would force BLMIS to send false financial information to the other customers and, therefore, they controlled BLMIS, and specifically, its dissemination of false financial information to the other customers. Absent particularized allegations that the Picower Defendants directed BLMIS to send false financial information or participated in its dissemination, the Fox Plaintiffs' claims are based on the secondary effects of the fraudulent transfers to the Picower Defendants and are inseparable from the Trustee's claim.

The *New Fox Complaint* adds additional allegations that Picower induced others to invest in BLMIS and caused BLMIS to solicit additional investors to perpetuate the Ponzi scheme. These include the following:

46.    . . . According to Madoff, Picower fully and knowingly participated in the fraud that BLMIS perpetrated on customers of the BLMIS Discretionary Trading Program and actively encouraged people to enter into investment advisory agreements with BLMIS.

49.    As Picower's demands for more and more money from Madoff increased, he encouraged Madoff to expand the customer base of the BLMIS Discretionary Trading Program so that funds belonging to new customers could be stolen and given to the Picower Parties.

53.    As a result of Picower's control over Madoff, he caused BLMIS to send to all of the customers of the BLMIS Discretionary Trading Program false and misleading information (*i.e.*, fictitious trade and inflated account values), in order to induce customers to maintain their accounts with BLMIS and to continue to attract new customers for BLMIS' Discretionary Trading Program. . . .

54.    As a result of Picower's control, he caused BLMIS to solicit new customers for the BLMIS Discretionary Trading Program, such as the Plaintiffs.

115.    Picower had the power to directly or indirectly control, and did in fact control, the . . .  solicitation of customers . . . .

118.    Picower induced Madoff to solicit additional customers for the BLMIS Discretionary Trading Program so that he could continue to enjoy astronomical returns.

185.    Picower substantially assisted Madoff and BLMIS in committing the fraud by causing . . . BLMIS to solicit new customers for the BLMIS Discretionary Trading Program . . . .

The *New Fox Complaint* does not include any particularized allegation that Picower solicited any investor or induced Madoff to do so.  Indeed, the Fox Plaintiffs do not even allege that they were solicited directly or indirectly by Picower to invest in BLMIS.  Thus, the allegations in the *New Fox Complaint* are wholly conclusory. Therefore, whether labeled a control person claim, a RICO claim or a common law claim, the allegations "echo those made by the Trustee in [the Picower complaint]" and the New Fox Complaint "impermissibly attempt[s] to 'plead around' the Bankruptcy Court's injunction barring all 'derivative' claims in that [it] allege[s] nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS." *Marshall*, 740 F.3d at 96.

30

In conclusion, the Motion is granted to the extent of enforcing the Permanent Injunction enjoining the Goldman Plaintiffs and the Fox Plaintiffs from prosecuting the *New Complaints* in the Florida Actions.  In light of this conclusion, it is unnecessary to separately consider the reach of the automatic stay.  I also decline the Trustee's request to enjoin the plaintiffs from proceeding with any other action related to BLMIS against any Picower Defendants without leave of this Court.  Although this request is consistent with the Court's conclusion and makes sense given the history of these litigations, I am not prepared to state categorically that I must be the gatekeeper.  In this case, the Florida District Court also has the jurisdiction to decide the scope of the Permanent Injunction and the automatic stay, and it is possible that it may be more appropriate for that District Court rather than this Court to address the propriety of a future proposed action.  I leave this question for another day.  Finally, the Fox Plaintiffs' motion for a stay and their cross-motion to dismiss are denied.

Settle order on notice.

Dated:  New York, New York
        June, 23, 2014

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge

31