**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-4932 (SMB) |
| Plaintiff, | |
| v. | |
| JPMorgan CHASE CO., JPMorgan CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., | |
| Defendants. | |

**TRUSTEE'S MEMORANDUM OF LAW OPPOSING REFUND TO OPTIMAL UNDER "MOST FAVORED NATION" PROVISION OF OPTIMAL SETTLEMENT**

**TABLE OF CONTENTS**

Page

BACKGROUND ...................................................................................................................1

PROCEDURAL & FACTUAL HISTORY ..........................................................................3

    A.    The Optimal Settlement Negotiations......................................................3

    B.    The Status of the BLMIS Liquidation at the Time of the Optimal Settlement.......9

    C.    The JPMorgan Litigation & Settlement.................................................11

        1.    The Trustee's Suit Against JPMorgan ......................................11

        2.    Withdrawal of The Reference & Motions to Dismiss .............12

        3.    The Class Action Suit and Government's Claims Against JPMorgan ......15

        4.    Re-Starting Litigation on Avoidance Claims............................16

        5.    Settlement Discussions Resulting in Tri-Partite Settlement .....................16

ARGUMENT .......................................................................................................................17

    A.    Standards for Extrinsic Evidence Relating to Ambiguous Agreement.................18

    B.    The Extrinsic Evidence Confirms That, Consistent with its Terms, the MFN Provision Was Intended to Apply Only To Straightforward Avoidance Claims Brought Against BLMIS Customers .........................................19

        1.    The Most Favored Nation Clause Was Meant To Be Narrowly Applied To Similar Settlements and Avoidance Claims With Few Available Defenses ......................................................20

        2.    The Most Favored Nation Clause Was Intended to Apply to Customers ..............................................................25

    C.    Optimal's Current Position on "Negotiating Leverage" Is Inconsistent With The Language Of The Agreement And Was Not Addressed By The Parties........27

    D.    The Circumstances Underlying The JPMorgan Settlement And The Optimal Settlement Are Not Similar Under Any Measure ....................................28

        1.    The List Of Non-Exclusive Factors Set Forth In The MFN Permits The Court To Look At The Totality Of The Qualifying Settlement..........29

        2.    Under the MFN Factors, The JPMorgan Settlement Is Not Similar To The Optimal Settlement ......................................32

            a.    Avoiding Power Claims.................................................32

            b.    Complicity/Knowledge ................................................35

            c.    Stage of the Litigation..................................................36

    E.    The Drastic Changes In The Case Law Since The Time of the Optimal Settlement Demonstrate Why the Parties Agreed to a Flexible Standard for the MFN Clause. ..................................................................38

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of New York Trust, N.A. v. Franklin Advisers, Inc.*,
    726 F.3d 269 (2d Cir. 2013)................................................................................18

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011)................................................................................10

*British Int'l Ins. Co. v. Seguros La Republica, S.A.*,
    342 F.3d 78 (2d Cir. 2003)..................................................................................18

*Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*,
    957 F. Supp.2d 316 (S.D.N.Y. 2013)........................................................18, 19, 28

*Doe v. Nat'l Bd. Of Podiatric Medical Exam'rs*,
    03 CV 4034, 2004 WL 912599 (S.D.N.Y. Apr. 29, 2004).....................................18

*Gowan v. Wachovia Bank N.A. (In re Dreier LLP)*,
    453 B.R. 499 (Bankr. S.D.N.Y. 2011)..................................................................13

*Hill v. JPMorgan Chase & Co.*,
    11 CV 07961 (CM) (S.D.N.Y. Jan. 20, 2012).......................................................15

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
    309 F.3d 76 (2d Cir. 2002)........................................................................19, 26, 28

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010)................................................................................18

*Mazzaferro v. RLI Ins. Co.*,
    50 F.3d 137 (2d Cir. 1995)..................................................................................26

*Mercury Partners. LLC v. Pac. Med. Bldgs., LP*,
    No. 02 Civ. 2005 (HBP), 2007 WL 2197830 (S.D.N.Y. July 31, 2007)...............19

*Nycal Corp. v. Inoco PLC*,
    988 F. Supp. 296 (S.D.N.Y. 1997).......................................................................18

*Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*,
    472 F.3d 33 (2d Cir. 2006)..................................................................................18

*Picard v. Greiff*,
    476 B.R. 715 (S.D.N.Y. 2012).............................................................................10

*Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec.)*,
    460 B.R. 84 (S.D.N.Y. 2011)...............................................................................15

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Picard* v. *JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    721 F.3d 54 (2d Cir. 2013)..................................................................................15

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011)............................................................................10

*Scholastic, Inc. v. Harris*,
    259 F.3d 73 (2d Cir. 2001)..................................................................................19

*In re Sept. 11 Litig.*,
    906 F. Supp.2d 295 (S.D.N.Y. 2012)...................................................................26

*Shapiro v. JPMorgan Chase & Co.*,
    11 CV 08331 (CM), 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014).......................17

*Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005).........................................................................13, 14, 34

*SIPC v. Bernard L. Madoff Inv. Sec.*,
    --- F. Supp. 2d --- (JSR), 2014 WL 1651952 (S.D.N.Y. Apr. 27, 2014) ..........11, 37

*SIPC v. Bernard L. Madoff Inv. Sec.*,
    No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ........... *passim*

**Statutes**

11 U.S.C. § 105(a) ...............................................................................................17

11 U.S.C. § 326(a) ...............................................................................................37

11 U.S.C. § 542..............................................................................................26, 32

11 U.S.C. § 544........................................................................................... *passim*

11 U.S.C. § 544(b) .........................................................................................11, 32

11 U.S.C. § 546(e) ..................................................................................10, 37, 39

11 U.S.C. § 547........................................................................................... *passim*

11 U.S.C. § 548....................................................................................3, 5, 11, 21

11 U.S.C. § 548(a)(1)(A) ................................................................................10, 39

11 U.S.C. § 550........................................................................................... *passim*

11 U.S.C. § 551....................................................................................................33

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

15 U.S.C. § 78aaa *et seq* ..................................................................................1

15 U.S.C. § 78eee(b)(5)(C) ...............................................................................37

28 U.S.C. § 1292(b) ..........................................................................................11

N.Y. Debt. & Cred. Law § 270-281 ...........................................................3, 11, 32

**Rules**

Fed. R. Bankr. P. 2002 .......................................................................................1

Fed. R. Bankr. P. 2004 ................................................................................11, 37

Fed. R. Bankr. P. 7016 ......................................................................................16

Fed. R. Bankr. P. 7023 ......................................................................................16

Fed. R. Bankr. P. 9019 ...............................................................................1, 2, 17

Fed. R. Civ. P. 26 .............................................................................................16

Fed. R. Civ. P. 34 .............................................................................................16

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, the "Debtors"), by and through the Trustee's undersigned counsel, submits this memorandum of law in opposition to the request by SPV Optimal SUS Ltd. ("SPV"), as successor in interest to Optimal Strategic U.S. Equity Limited ("SUS"), and Solus Recovery Fund, LP ("Solus"), as successor in interest to Optimal Arbitrage Limited ("Arbitrage," and together with SUS, "Optimal"), for a refund under the "most favored nation" ("MFN") provision set forth in paragraph 13 of the settlement agreement between Trustee and Optimal dated May 22, 2009 (the "Optimal Settlement" or "Optimal Settlement Agreement")[1] to the Trustee's settlement with JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMorgan") dated January 6, 2014 ("JPMorgan Settlement").[2]

## BACKGROUND

The Trustee settled his claims against Optimal in June 2009. The settlement resulted in the return of 85% of the preferential transfers received by Optimal in the ninety days preceding December 11, 2008 (the "Filing Date"). The Optimal Settlement contained an MFN clause, which requires the Trustee to return a portion of the consideration paid by Optimal if the Trustee settles similar avoidance claims for less than 85% under circumstances that are similar to the

---

[1] *See* Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement By and Among the Trustee and Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited ("Optimal Settlement Order"), *SIPC v. Bernard L. Madoff Inv. Sec.*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 16, 2009), ECF No. 270.

[2] *See* Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement of Avoidance Claims by and Between the Trustee and JPMorgan, *Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 10-04932 (SMB) (Bankr. S.D.N.Y. Feb. 5, 2014), ECF No. 51; Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement of Common Law Claims by and Between the Trustee, the Customer Representatives, and JPMorgan, *Picard v. JPMorgan Chase & Co.*, 10-04932 (SMB) (Bankr. S.D.N.Y. Feb. 5, 2014), ECF No. 52.

circumstances underlying the Optimal Settlement. The MFN provision contains a list of non-exclusive factors to be taken into account when determining whether the avoidance claims and circumstances of a settlement are similar.

When the Trustee sought this Court's approval of the JPMorgan Settlement, SPV filed a limited objection ("SPV Limited Objection"), arguing that Optimal is entitled to a net refund of $7,439,482.40 from the BLMIS estate pursuant to the MFN clause.[3] After the Trustee filed his reply to the SPV Limited Objection,[4] Solus filed a joinder.[5] At the February 4, 2014 hearing, this Court determined that at least two factors in the MFN provision were "ambiguous:"

> (ii) the nature of the Avoiding Power Claims (such as whether they are for recovery of a preference or for recovery of principal or fictitious profits) . . .

> (iv) the knowledge of the defendant (or group of defendants, taken as a whole) or its or their complicity in the fraud that BLMIS perpetrated on its customers.[6]

The Court suggested that extrinsic evidence on these terms may be necessary.[7] The parties thereafter exchanged documents and deposed the two principal negotiators for the Trustee and Optimal during the settlement. This brief is submitted in anticipation of an evidentiary hearing to be held before this Court on July 30, 2014 to determine whether Optimal is entitled to a refund under the Optimal Settlement Agreement.

---

[3] Limited Response of SPV Optimal SUS Ltd. To the Proposed Settlement Agreement Between the Trustee and JPMorgan Chase & Co., et al. at 10, *Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 10-04932 (SMB) (Bankr. S.D.N.Y. Jan. 28, 2014), ECF No. 42.

[4] Reply to Limited Response to Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement of Avoidance Claims by and between the Trustee and JPMorgan, *Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 10-04932 (SMB) (Bankr. S.D.N.Y. Jan. 31, 2014), ECF No. 45.

[5] Joinder of Solus Recovery Fund LP to the Limited Response of SPV Optimal Sus Ltd. to the Proposed Settlement Agreement Between the Trustee and JPMorgan Chase & Co., et al., *Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 10-04932 (SMB) (Bankr. S.D.N.Y. Jan. 31, 2014), ECF No. 48.

[6] Hearing re: Trustee's 9019 Motion to Approve Settlement of Avoidance Claims with JPMorgan ("Hearing Tr.") 28:1-29:4, *Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 10-04932 (SMB) (Bankr. S.D.N.Y. Feb. 4, 2014); Optimal Settlement, ¶ 13(c).

[7] Hearing Tr. 30:10-21.

## PROCEDURAL & FACTUAL HISTORY

### A.    The Optimal Settlement Negotiations

Arbitrage and SUS were BLMIS customers, opening their BLMIS accounts in February 1996 and January 1997, respectively.[8]    In the ninety days before the Filing Date, Arbitrage withdrew $125,087,004.00 from its BLMIS account and SUS withdrew $151,831,876.00 from its BLMIS account (the "Preferential Transfers").[9]    The Trustee's investigation revealed that Arbitrage also received fictitious profits over the life of its account in the additional amount of $96.5 million, $35 million of which was withdrawn in the six-year period preceding the Filing Date (the "Fictitious Profits Transfers").[10]

The Trustee maintained that the Preferential Transfers were recoverable by the Trustee under sections 547 and 550 of the Bankruptcy Code, and that the Fictitious Profits Transfers were recoverable under section 544, 548, and 550 of the Bankruptcy Code and sections 270-281 of the New York Debtor & Creditor Law.    When Optimal approached the Trustee regarding a possible settlement in March 2009, Optimal had virtually no defenses to the Trustee's presumptive action to recover the Preferential Transfers or the Fictitious Profits Transfers under any applicable case law.    Moreover, if the Trustee was able to show that Optimal took the transfers in bad faith, the Trustee could seek to recover all transfers made to Optimal, including principal invested by Optimal.

In March 2009, Mr. Richard Levin of Cravath, Swain & Moore LLP, approached the Trustee's counsel on behalf of Optimal to discuss settlement of the Trustee's presumptive claims against Optimal.[11]    At the first meeting between the parties, Optimal proposed the MFN clause.[12]

---

[8] Declaration of Marc E. Hirschfield, dated April 9, 2014 ("Hirschfield Decl.") ¶ 5.
[9] *Id.*
[10] Hirschfield Decl. ¶ 6.
[11] Hirschfield Decl. ¶ 7; Deposition of Richard Levin, Esq., dated May 16, 2014 ("Levin Tr.") 40:10-41:14.
[12] Hirschfield Decl. ¶ 11, Exs. 3-4.

The Trustee's counsel was "highly skeptical" of an MFN clause and was clear that any such clause must be sufficiently narrow so as not to hinder the Trustee in future settlement negotiations. [13] This concern was amplified by the fact that the liquidation was in nascent stages. In a March 30, 2009 letter, the Trustee told Optimal that an MFN term may not be acceptable as part of the settlement.[14]    The Trustee continued to express these reservations to Optimal throughout the settlement negotiations.

Both parties understood Optimal's concern that it did not want to be penalized for settling early: it did not want to discover, after paying 85% of the Preferential Transfers, that later-settling parties against whom the Trustee had similar claims were paying a far smaller percentage.[15] Optimal also posed the concept as mutually beneficial to both parties, since it set a benchmark of an 85% recovery for future settlements.[16] Even so, the Trustee's counsel made clear throughout the negotiations he would not accept a broadly-applicable MFN provision but only one that applied to truly similar claims.[17]

Optimal circulated the initial draft of the MFN clause to the Trustee on April 6, 2009 ("April 6 Version").[18] The April 6 Version stated that the MFN clause would only apply under certain circumstances where the Trustee entered into a settlement with another BLMIS customer.[19] Specifically, Optimal would be entitled to a refund where the settling BLMIS customer: (a) had a BLMIS-provided account balance of over $100 million at any time; (b) received over $25 million in transfers from BLMIS within the 90 days before the Filing Date, in the form of either fictitious profits or Bankruptcy Code section 547 preferences; (c) had fewer

---

[13] Levin Tr. 41:15-42:6; *see* Hirschfield Decl. ¶¶ 13, 15-17.
[14] Hirschfield Decl. ¶ 13, Ex. 4, at 3; Levin Tr. 41:15-42:6.
[15] Hirschfield Decl. ¶¶ 12, 17; Levin Tr. 40:10-41:14.
[16] Hirschfield Decl. ¶¶ 12, 40; Levin Tr. 40:10-41:14.
[17] Hirschfield Decl. ¶¶ 13-18.
[18] Hirschfield Decl. Ex. 7.
[19] *Id.*

jurisdictional contacts with the United States than Optimal did; (d) faced claims by the Trustee as to which less than 50% were outside the 90-day period; (e) had sufficient assets to pay the Trustee; and (f) settled with the Trustee prior to commencement of either a trial or a contested hearing on summary judgment.[20] If all of the above conditions were met and the Trustee entered into a settlement for less than 80% of the total value of the BLMIS transfers, Optimal would receive a proportional refund based on the difference between what they paid on the Preferential Transfers and what the future BLMIS customer paid.[21]

Before the Trustee circulated any revisions, Optimal proffered a new version of the MFN clause reflecting their internal edits on April 13, 2009 entitled "Equal Treatment for SUS and Arbitrage with Other Similar Customers," ("April 13 Version").[22] The April 13 Version had two notable changes. First, the April 13 Version applied to a broader set of avoidance claims, including transfers of either "fictitious profits (calculated on a cash in-cash out basis) or after September 11, 2008 and that are recoverable under Bankruptcy Code section 544, 547, 548 or 550" as opposed to just 90-day transfers of fictitious profits and preference amounts in the April 6 Version.[23] Second, Optimal offered 85% of the Preferential Transfers, raised from 80% in the April 6 Version. As the title suggests, the April 13 Version was also limited to those settlements between the Trustee and BLMIS customers.[24]

The Trustee rejected the MFN clause proposed in the April 13 Version, and instead offered an alternative clause on May 4, 2009 ("Trustee's Version").[25] This version sought to clarify the Trustee's position that the MFN provision should apply only in circumstances similar

---

[20] *Id.*
[21] Hirschfield Decl. ¶ 20, Ex. 7.
[22] Hirschfield Decl. ¶ 23, Hirschfield Decl. Ex. 10.
[23] Hirschfield Decl. Ex. 10.
[24] *Id.*
[25] Hirschfield Decl. ¶¶ 29-30, Hirschfield Decl. Ex. 16.

to Optimal's by specifically defining what constituted a "Similarly Situated Person or Entity" and "Similar Claim" and allowing for an "MFN Opt Out" in the event that the Trustee found the circumstances of any new settlement insufficiently similar to Optimal's.[26] The Trustee's Version recited that Optimal agreed to pay to the Trustee an amount "equal to 85% of the amount of transfers received by each of SUS and Arbitrage within the 90 days before the Filing Date (the "Settlement Amount.") It is the intent and agreement of the parties that this 85% amount be established as a 'benchmark'…."[27]

The substantial changes in the Trustee's Version were: (a) limiting application of the provision to similar claims against similar BLMIS customers; (b) applying to claims of over $100 million as opposed to those of $25 million or more; (c) applying only to avoidable transfers made within 90 days before the Filing Date, as opposed to certain 90-day transfers and all fictitious profits; and (d) including an MFN Opt Out provision so that the Trustee had the opportunity to decline applying the MFN provision in the event that circumstances of any new BLMIS customer settlement are sufficiently different from the Optimal Settlement.[28] The Trustee's Version, like Optimal's versions, applied only to settlements with BLMIS customers.[29]

After the Trustee's Version was circulated, the parties met to address their concerns.[30] On May 9, Mr. Levin circulated a new draft,[31] again entitled "Equal Treatment for SUS and Arbitrage with Other Similar Customers," ("May 9 Version").[32] In his cover email, Mr. Levin stated that he "tried to be accommodating to the concerns that [BakerHostetler has] previously

---

[26] Hirschfield Decl. ¶¶ 31-39.
[27] Hirschfield Decl. Ex. 16,
[28] *Id.*; Hirschfield Decl. ¶¶ 31-39.
[29] *Id.* The Trustee's Version was consistent with Optimal's versions that also applied strictly to BLMIS customers.
[30] Hirschfield Decl. ¶ 43.
[31] Hirschfield Decl. Ex. 22.
[32] *Id.*; *see* Hirschfield Decl. ¶ 44.

expressed."[33]  Because the parties had been unable to agree on an exclusive list of factors to

define a "similar" action or claimant, Mr. Levin attempted to find a middle ground by

introducing a non-exclusive list of factors.[34]  The May 9 Version thus provided a more flexible

method for determining equal treatment with other similar customers:

> The following non-exclusive factors shall be taken into account in determining
> whether the circumstances of the Avoiding Power Claims and the Qualifying
> Settlement are "similar": (i) the ability of the defendant to pay, (ii) the nature of the
> Avoiding Power Claims (such as whether they are for recovery of a preference or for
> recovery of principal or fictitious profits), (iii) the jurisdictional connections of the
> defendant with the United States and the enforceability of a judgment of a court of the
> United States against the defendant in its domiciliary jurisdiction, (iv) the defendant's
> knowledge of or complicity in the fraud that BLMIS perpetrated on its customers, and
> (v) the stage of any litigation by the Trustee against the defendant.[35]

Four of the five factors addressed the same issues described in Optimal's earlier

versions—ability to pay, similarity of claims, jurisdictional contacts, and stage of litigation—but

defined them as non-exclusive factors to be taken into account, instead of specifying a bright-

line, up-or-down rule as to any particular factor or even all the factors.  For example, Optimal's

April 13 Version had specified that, if it met the other factors, a settlement of a fictitious profits

claim would be "similar," while the Trustee's Version had specified that only claims to avoid

transfers made within 90 days would be "similar."   The May 9 version splits the difference by

stating that the nature of the claims, such as whether it is a preference or for recovery of principal

or fictitious profits, is one factor to consider in determining whether a claim is "similar."

This approach was acceptable to the Trustee because it provided the necessary flexibility

to apply the MFN provision to only a limited number of settlements that were truly similar to

Optimal's: even if a settlement ticked off the boxes that could be foreseen by the parties in

March 2009, it would not be subject to the MFN if it were not truly "similar" to Optimal.

---

[33] Hirschfield Decl. Ex. 21; *see* Hirschfield Decl. ¶ 44.
[34] Levin Tr. 57:14-58:17.
[35] Hirschfield Decl. Ex. 22.

Accordingly, the omission of the "MFN Opt Out clause" that had been suggested by the Trustee was not unduly problematic.[36]

The fifth factor, regarding "knowledge of or complicity in" the BLMIS fraud, had not appeared in any earlier versions circulated by the parties. On May 7, 2009, two days before the May 9 Version was circulated, Optimal circulated a draft settlement agreement stating that the Trustee conducted a preliminary investigation of Optimal and concluded that Optimal was not complicit in the fraud and did not have actual knowledge of the fraud.[37] This factor was also acceptable to the Trustee, consistent with the flexible approach suggested by Optimal. Like the other factors, knowledge or complicity is not an element of a preference or fictitious profits claim, but it is a factor relevant to the Trustee's decision to settle with a defendant.

Additional changes in the May 9 Version included: (a) the "benchmark" language that the Trustee had added was revised to recite that the Optimal Defendants were paying the Trustee "an amount equal to 85% of the amounts received by [the defendants] either within the 90 days before the Filing Date *or as fictitious profits*;" (b) amount of Trustee's claims necessary for a "Qualifying Settlement" changed to $40 million or more, as opposed to $100 million in the Trustee's Version and $25 million in Optimal's April 13 Version; and (c) providing for a dispute resolution mechanism before the Bankruptcy Court for any disputes over the MFN provision.

Optimal now takes the position that the May 9 Version changed the MFN provision to include non-customers of BLMIS, pointing to the use of the word "defendants" in the list of non-exclusive factors to be taken into account in determining the "Equal Treatment for SUS and Arbitrage with Other Similar Customers." This is flatly inconsistent with the plain language of the document, which states that these factors are a guideline to help determine whether "other

---

[36] Hirschfeld Decl. ¶¶ 43, 60.
[37] Hirschfeld Decl. Ex. 18, at ¶ P.

similar customers" are being treated equally to Optimal in settlement of similar claims with the Trustee.  There is no evidence to suggest that either party had any intention of broadening the scope of the MFN as Optimal now asserts; to the contrary, the shared goal was to find a middle ground between the two competing views of which customers were "similar."  Indeed, the caption remained "Other Similar Customers" as it had in all prior drafts.[38]

Barring a few minor edits that are irrelevant to the issues at dispute in this proceeding, the May 9 Version became the final MFN clause between the parties.[39]  The settlement was finalized on May 22, 2009 and approved by the Bankruptcy Court on June 16, 2009.[40]  The Optimal Settlement provided that Optimal would return 85% of the Preferential Transfers; it did not provide for the return of any Fictitious Profits Transfers nor any transfers that hinged on proving that Optimal lacked good faith.[41]  The Optimal Settlement also provided that the Trustee would allow Optimal's customer claim for approximately $1.5 billion.[42]

**B.      The Status of the BLMIS Liquidation at the Time of the Optimal Settlement**

During Spring 2009 when the negotiations with Optimal commenced, the Trustee had just begun his investigation into the massive fraud perpetrated by BLMIS.[43]  The claims process under SIPA was underway but the statutory bar date to file customer claims under SIPA—July 2, 2009—had not yet passed.  The Trustee had not yet fully reconciled the 4,000 active BLMIS accounts nor had he completed applying the net investment method to those accounts.  Thus, the total amount of avoidance liability by BLMIS customers, and conversely, the amount owed by

---

[38] Optimal Settlement, ¶ 13.

[39] The three minor differences between the May 9 Version and the final MFN clause include: (a) language allowing the Trustee to notify Optimal regarding Qualifying Settlements, (b) including a single defendant or a group of defendants settling as a single unit, and (c) slight changes to the final settlement amount to reflect tax withholding payments.  Hirschfield Decl. ¶ 57,Exs. 27-28; Declaration of Richard Levin Regarding Application of the Equal Treatment Provision to the Settlement Agreement Between the Trustee and JPMorgan Chase & Co., et al., dated April 9, 2014 ("Levin Decl.") ¶ 11(b).

[40] *See* Optimal Settlement Order.

[41] Optimal Settlement ¶¶ H, I, 2, 4, 13.

[42] Optimal Settlement ¶ 3.

[43] Hirschfield Decl. ¶ 8.

9

the BLMIS estate to its customers, had not yet been fully determined.  In April 9, 2009, the Trustee filed his first avoidance action.  And by June 2009 when the Optimal Settlement was completed, the Trustee had filed only seven additional avoidance actions.[44]

At that time, whether and to what extent the Trustee could recover for BLMIS customers was hotly contested and unresolved (as it remains today).  The Trustee's did not file his motion on the proper calculation of net equity under SIPA until October 2009.  The Second Circuit's affirmance of the Bankruptcy Court's approval of the Trustee's net investment method over the "last statement method" was not rendered until August 2011.[45]  Indeed, many issues that were inchoate at that time are still unresolved today, the most prominent of which is whether section 546(e) of the Bankruptcy Code applies to transfers from BLMIS.  At the time of the Optimal Settlement, little dispute existed between the parties as to whether the Trustee could recover preferences like those received by Optimal.[46]  No court ever had ruled that the "safe harbor" of section 546(e) was applicable to a Ponzi scheme. On September 27, 2011, however, District Judge Jed S. Rakoff ruled contrary to all other judges to consider the matter previously and held that the Trustee was precluded from recovering any transfers other than actually fraudulent transfers (including preferences) under section 548(a)(1)(A) by virtue of the safe harbor.[47]  That issue is now on appeal to the Second Circuit.[48]

Further distinguishing the current state of the law from that existing at the time of the Optimal Settlement is Judge Rakoff's subsequent opinion holding that section 546(e) is not a bar to the Trustee's claims if he can show that the defendant had "actual knowledge" of a fraud.[49]

---

[44] Hirschfield Decl. ¶ 9.
[45] *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 242 (2d Cir. 2011).
[46] *See* Levin Tr. 17:2-9 (such claims would be "difficult to defend").
[47] *Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011); *see also Picard v. Greiff*, 476 B.R. 715 (S.D.N.Y. 2012).
[48] *In re Bernard L. Madoff Inv. Sec. LLC*, 12-2557(L) (2d Cir.).
[49] *SIPC v. Bernard L. Madoff Inv. Sec.*, No. 12 MC 115 (JSR), 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013).

And in a more recent opinion, Judge Rakoff held that contrary to long-established precedent in bankruptcy cases, the Trustee has both a pleading and a proof burden to show subjective knowledge rather than objective "inquiry notice" in order to recover fraudulent transfers under federal or state law.[50]    The Trustee has requested that this latter opinion be certified for immediate appeal pursuant to 28 U.S.C. § 1292(b).[51]

## C.    The JPMorgan Litigation & Settlement

### 1.    <u>The Trustee's Suit Against JPMorgan</u>

Very early in the Trustee's investigation, it became apparent that JPMorgan had a unique role in the BLMIS fraud.  The Trustee quickly discovered a BLMIS account at JPMorgan, the "703" Account.  Further review indicated that customer monies relating to the Ponzi scheme flowed through this account.  The Trustee issued Bankruptcy Rule 2004 subpoenas to JPMorgan for documents and testimony from five JPMorgan employees.  His investigation revealed that in addition to being BLMIS's banker and maintaining the critical 703 Account, JPMorgan made loans to BLMIS, charged interest on those loans, and invested indirectly in BLMIS through leveraged note programs.  On December 2, 2010, the Trustee filed a complaint against JPMorgan,[52] asserting traditional avoidance claims under federal and state law, seven common law damages claims, and a contribution claim under New York law.

The Trustee's avoidance claims were brought under 11 U.S.C. §§ 544(b), 547, 548 and 550 and the New York Uniform Fraudulent Conveyance Act (New York Debtor and Creditor Law §§ 270-281) ("NYDCL").  Totaling approximately $425 million, the Trustee sought to

---

[50] *SIPC v. Bernard L. Madoff Inv. Sec.*, --- F. Supp. 2d ---, 12 MC 115 (JSR), 2014 WL 1651952, at *5 (S.D.N.Y. Apr. 27, 2014).

[51] *See* Trustee's Memorandum of Law in Support of Motion for Certification of Interlocutory Appeal Under 28 U.S.C. § 1292(b), *SIPC v. Bernard L. Madoff Inv. Sec.*, No. 12 MC 115 (JSR) (S.D.N.Y. June 5, 2014), ECF No. 545.

[52] Complaint, *Picard v. JPMorgan Chase & Co, et al.*, Adv. Pro. No. 10-04932 (SMB) (Bankr. S.D.N.Y. Dec. 2, 2010), ECF No. 1; *see* Complaint (Redacted), *Picard v. JPMorgan Chase & Co, et al.*, Adv. Pro. No. 10-04932 (SMB) (Bankr. S.D.N.Y. Feb. 3, 2011), ECF No. 4.

avoid and recover, on the basis that JPMorgan was on notice of fraudulent activity and knew or should have known of fraudulent activity at BLMIS:

    i.    $145 million in loans made by JPMorgan to BLMIS in November 2005 and January 2006, and the related interest payments made by BLMIS to JPMorgan through May 2006;

    ii.    fees in the amount of at least $590,000 paid to JPMorgan by BLMIS relating to maintenance of the 703 Account during the six-year period preceding the Filing Date; and

    iii.    subsequent transfers received by JPMorgan through redemptions of their interests in Fairfield Sentry Limited and Fairfield Sigma Limited (together, the "Fairfield Funds"), and Herald Fund s.p.c. ("Herald"), three BLMIS feeder funds, for approximately $276 million.

The Trustee also pursued common law claims against JPMorgan. Specifically, the Trustee alleged aiding and abetting fraud, aiding and abetting breach of fiduciary duty, knowing participation in a breach of trust, conversion, aiding and abetting conversion, fraud on the regulator, and unjust enrichment. He asserted a claim for contribution under New York law. These claims were similarly premised on allegations that JPMorgan, Madoff's banker, knowingly facilitated and profited from Madoff's fraud. The unjust enrichment claim sought to recover JPMorgan's Madoff-related profits and revenues, including the revenue derived from having the use of billions of dollars in the 703 Account over the life of that account.

### 2.    <u>Withdrawal of The Reference & Motions to Dismiss</u>

On February 8, 2011, JPMorgan moved to withdraw the reference from this Court, which was granted by District Judge Colleen McMahon on May 23, 2011.[53] On June 3, 2011, JPMorgan moved to dismiss the common law claims and the avoidance claims relating to the loan and interest payments.

On June 24, 2011, the Trustee filed an amended complaint.[54] On August 1, 2011,

---

[53] Order, *Picard v. JPMorgan Chase & Co.*, 11 CV 00913 (CM) (S.D.N.Y. May 23, 2011), ECF No. 30.
[54] Amended Complaint, *Picard v. JPMorgan Chase*, 11 CV 00913 (CM) (S.D.N.Y. June 24, 2011). ECF No. 50.

JPMorgan again moved to dismiss the common law claims and the avoidance claims relating to the loan and interest payments. JPMorgan did not seek dismissal of the counts relating to the subsequent transfers, instead indicating that while it had complete defenses to those counts, it was not moving to dismiss them at that time.[55]

The defenses raised in JPMorgan's motion to dismiss emphasize that the Trustee's claims against it are not "similar" to his claims against Optimal, in that they have nothing to do with any claims or defenses that Optimal could have raised. In support of its motion to dismiss the claims for avoidance of loan and interest payments, JPMorgan argued: (i) the repayment of the loan constituted an act of setoff rather than a transfer; (ii) the repayment of a secured loan is not avoidable; and (iii) under the Second Circuit's decision in *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*,[56] the repayment of a loan is not avoidable absent participation by the loan creditor in the debtor's fraud.

The legal issues implicated by these arguments included whether the 703 Account was a "general account" such that debits were not transfers for purposes of the Bankruptcy Code, whether JPMorgan was a bona fide lender, and whether the Trustee was required to collapse the loan transactions in order to succeed on his claims. The latter of these claims required analysis of both the *Sharp* case as well as this Court's opinion in *Gowan v. Wachovia Bank N.A. (In re Dreier LLP)*, which concerned transfers to a bank issued in connection with a Ponzi scheme and addressed the appropriate standards for collapsing transactions and the bank's knowledge.[57] JPMorgan also asserted (successfully) that the Trustee did not have standing to bring his common law claims, claims that the Trustee did not raise with Optimal.

---

[55] Opening Brief in Support of JPMorgan's Motion to Dismiss the Trustee's Complaint at 67 n.15, No. 11 CV 00913 (CM) (S.D.N.Y. Aug. 1, 2011), ECF No. 57.
[56] 403 F.3d 43, 53-57 (2d Cir. 2005).
[57] 453 B.R. at 499, 508 (Bankr. S.D.N.Y. 2011).

The Trustee's claims against JPMorgan—whether avoidance or common law—hinged on showing JPMorgan's lack of good faith.  For example, the Trustee argued that *Sharp* was distinguishable because the trustee in that case conceded that State Street's transfers were on account of valid antecedent debt and for value as a loan repayment and Sharp incurred the loan obligation before engaging in fraudulent activity or becoming insolvent.[58]  The Trustee, on the other hand, alleged that JPMorgan knew or should have known that BLMIS was engaged in a fraud or was insolvent at the time it extended credit to BLMIS, and thus JPMorgan could not have created a *valid* antecedent debt rendering the obligations avoidable as both actually and constructively fraudulent.[59]

The Trustee's allegations regarding JPMorgan's lack of good faith centered on two broad areas: (1) allegedly suspicious activity in BLMIS's bank account; and (2) JPMorgan's due diligence in connection with issuance of Madoff-related structured products.  JPMorgan argued that the Trustee alleged what JPMorgan "should have done" with respect to the 703 Account, and what a review of Madoff's accounts "would have revealed," but that such allegations did not amount to "actual knowledge."  As to the diligence on the structured products, JPMorgan argued that the complaint did not allege that anyone at JPMorgan learned of fraud during the preliminary due diligence.  JPMorgan argued that the Trustee's particularized allegations and generic "red flags" allegations showed, at best, that while JPMorgan employees may have raised concerns in conducting due diligence, they missed or mis-analyzed "red flags" that might have alerted them to fraud.

On November 1, 2011, the District Court granted JPMorgan's motion to dismiss the common law claims and returned the avoidance claims to this Court for further proceedings

---

[58] *See Sharp*, 403 F.3d at 54.
[59] Trustee's Memorandum of Law in Opposition to Motion to Dismiss at 128, No. 11 CV 00913 (CM) (S.D.N.Y. Sept. 1, 2011), ECF No. 64.

14

without ruling on them.[60]  Judge McMahon held that: (i) the Trustee lacked standing to assert common law claims against JPMorgan as bailee of customer property or as enforcer of SIPC's subrogation rights; (2) the Trustee lacked standing to assert his common law claims because of the affirmative defense of *in pari delicto* and the Second Circuit's holding in *Wagoner*; and (3) the Trustee could not assert a claim for contribution under New York law.  The Trustee appealed to the Second Circuit, which affirmed the District Court's ruling on June 20, 2013.[61]  The Trustee filed a petition for certiorari with the Supreme Court on October 9, 2013.[62]

### 3.    The Class Action Suit and Government's Claims Against JPMorgan

Shortly after the District Court dismissed the Trustee's common law claims, two class action complaints were filed in the District Court by BLMIS customers (the "Customer Representatives").[63]  These complaints asserted various claims against JPMorgan, virtually identical to the Trustee's common law claims, on behalf of BLMIS customers who were "net losers" as of the Filing Date arising out of the same facts and circumstances as those giving rise to the common law claims previously brought by the Trustee.  On March 9, 2012, JPMorgan filed a motion to dismiss the Consolidated Class Action Complaint, which was opposed by the Customer Representatives.  The parties reached a settlement before any decision was issued on the motion to dismiss.

Announced in a deferred prosecution agreement filed in January 2014 as part of the simultaneous settlements described below,[64] the United States (the "Government") was also investigating JPMorgan for violations of the Bank Secrecy Act for activity in the 703 Account and its failure to maintain an effective anti-money laundering program.

---

[60] *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec.)*, 460 B.R. 84 (S.D.N.Y. 2011).

[61] *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013).

[62] The Trustee's petition is pending, although it is withdrawn as to JPMorgan as a term of the settlement.

[63] Complaint, *Hill v. JPMorgan Chase & Co.*, 11 CV 07961 (CM) (S.D.N.Y. Jan. 20, 2012); Complaint, *Shapiro v. JPMorgan Chase & Co.*, 11 CV 08331(CM) (MHD) (S.D.N.Y. Jan. 20, 2012), ECF No. 18.

[64] Deferred Prosecution Agreement, *United States v. JPMorgan Chase Bank,* 1:14-cr-7 (S.D.N.Y. Jan 8, 2014).

4.    **Re-Starting Litigation on Avoidance Claims**

The Trustee and JPMorgan entered into a stay of proceedings pending appeal.  But once the Second Circuit issued its mandate dismissing the Trustee's appeal from the District Court decision, the stay expired and the litigation on the avoidance claims resumed in the Bankruptcy Court.  Accordingly, on September 19, 2013, JPMorgan and the Trustee entered into a case management plan in accordance with Federal Rules of Bankruptcy Procedure 7016 and 7023.[65] JPMorgan filed an answer to the Trustee's amended complaint on October 11, 2013.[66]  The parties thereafter served initial disclosures as required on October 11, 2013 and the Trustee served his first set of document demands under Federal Rules of Civil Procedure 26 and 34.

5.    **Settlement Discussions Resulting in Tri-Partite Settlement**

In Fall 2013, the Trustee and JPMorgan commenced complex, multi-party settlement discussions along with the Customer Representatives.  JPMorgan indicated that it was seeking a settlement of all claims relating to Madoff, including those of the Government.  These settlement discussions between JPMorgan, the Trustee, and the Customer Representatives culminated in a resolution of all of the Trustee's claims against JPMorgan, including the avoidance claims and the common law claims that remained subject to appeal, as well as resolution of the Class Action.  The settlement provided that JPMorgan would pay the Trustee $325 million for the avoidance claims.  Because the Class Action and the Trustee's common law claims sought similar relief on behalf of the same class of investors (*i.e.*, "net losers"), a multi-party settlement was negotiated whereby JPMorgan paid $218 million into a class settlement fund to resolve the common law claims brought by both the Trustee and the Customer Representatives.

These settlements, along with the Government's settlement with JPMorgan, were

---

[65] Case Management Plan, *Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 10-04932 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2013), ECF No. 26.

[66] Answer to Amended Complaint, *Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 10-04932 (SMB) (Bankr. S.D.N.Y. Oct. 11, 2013), ECF No. 27.

announced on the same day. These three settlements resulted in a recovery of approximately

$2.2 billion for Madoff victims. While the settlement with the Government was reached

separately from that of the Trustee and Customer Representatives, they were reached

simultaneously and were intended to provide JPMorgan with a global resolution relating to the

Madoff fraud, requiring the cooperation and coordination of the numerous parties involved.[67]

The Trustee filed separate motions seeking this Court's approval of his settlement with

JPMorgan.[68] After notice and a hearing, this Court approved the Trustee's settlements with

JPMorgan, finding that the "settlements are fair, reasonable, and in the best interest of the

Madoff estate and fall well above the lowest point in the range of reasonableness."[69]

Subsequently, the class action settlement was also approved by the District Court.[70]

## ARGUMENT

The extrinsic evidence supports the Trustee's position that the MFN provision was

intended to have a narrow application to avoidance claims brought by the Trustee against BLMIS

customers that were similar to those brought against Optimal; specifically, preference claims and

claims for fictitious profits. Optimal's current position—-that any action brought by the Trustee

that includes any avoidance claims may be "similar" for purposes of the MFN—is not supported

by extrinsic evidence of the parties' intent at the time of drafting and should not be considered by

the Court in its determination of the parties' intent. This is particularly true given that all

---

[67] *See Shapiro v. JPMorgan Chase & Co.*, 11 CV 08331 (CM) (MHD), 2014 WL 1224666, at *7 (S.D.N.Y. Mar. 24, 2014) ("The hard-fought arm's-length settlement negotiations took place over the course of almost one year, amid a myriad of complicated issues, including the simultaneous settlements of the Trustee's avoidance claims and the civil forfeiture with the United States government . . .").

[68] Trustee's Motions for Entry of Orders Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019, *Picard v. JPMorgan Chase & Co.*, No. 10-04932 (Bankr. S.D.N.Y. Jan. 7, 2014), ECF Nos. 29 and 31.

[69] Hearing Tr. 21:17-19.

[70] *See Shapiro v. JPMorgan Chase & Co.*, 11 CV 08331 (CM) (MHD), 2014 WL 1224666, at *8 (noting that JPMorgan's three settlements will result in a payment of $2,243,000,000 to be distributed to Madoff victims).

ambiguities in the contract must be construed against Optimal as the drafter.[71]  In any event, a comparison of the JPMorgan and Optimal claims and settlements shows that under any metric, they are not similar.  The Trustee settled a (then) virtually uncontestable preference action against SUS and Arbitrage, as BLMIS customers.[72]  The settlement with JPMorgan resolved claims brought against BLMIS's bank by the Trustee and the Customer Representatives for, among other things, fees, loan repayments, and common law fraud.  Accordingly, Optimal is not entitled to a refund.

## A.    Standards for Extrinsic Evidence Relating to Ambiguous Agreement

In reviewing the Optimal Settlement, this Court found two provisions to be ambiguous[73] and determined that extrinsic evidence may be necessary to resolve that ambiguity.  The Court may accept "any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract."[74]  Courts "may and should" look to the parties' prior negotiations of the agreement to determine what was intended during the drafting of the agreement's language.[75]

To determine the meaning of an ambiguous contract term, courts may only consider evidence concerning the objective manifestations of the parties' intent at the time the agreement was drafted.[76]  Conversely, "when resolving disputes concerning the meaning of ambiguous contract language unexpressed subjective views have no proper bearing."[77]  Courts reject unexpressed subjective intent of one party in an effort to prevent a party from concealing its

---

[71] *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 43 (2d Cir. 2006) *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, 957 F. Supp. 2d 316, 332 (S.D.N.Y. 2013).d

[72] A potential defense of Optimal in 2009 to the Trustee's claims related to jurisdiction.

[73] A contract is deemed "ambiguous" if it is susceptible to conflicting reasonable interpretations. *Doe v. Nat'l Bd. Of Podiatric Medical Exam'rs*, 03 CV 4034 (RWS), 2004 WL 912599, at *5 (S.D.N.Y. Apr. 29, 2004).

[74] *Bank of New York Trust, N.A. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013) (quoting *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003)).

[75] *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co.*, 957 F. Supp. 2d 316, 341 (S.D.N.Y. 2013).

[76] *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301, 301 n. 32 (S.D.N.Y. 1997); *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (emphasis in original) (citation omitted)).

[77] *Nycal Corp.*, 988 F. Supp. at 302.

understanding of the contract from the counterparty "only to reveal that understanding later or to invent a *post hoc* rationalization in aid of a litigation position."[78]   The parties' intention at the time the contract was executed must control "rather than any subsequent intention tailored to complement an individual's posture once an agreement has gone sour."[79]   In determining the meaning of a contract, no contract language shall be deemed superfluous.  Instead, a court must look at "'the entire integrated agreement,' to 'safeguard against adopting an interpretation that would render any individual provision superfluous.'"[80]

**B.      The Extrinsic Evidence Confirms That, Consistent with its Terms, the MFN Provision Was Intended to Apply Only To Straightforward Avoidance Claims Brought Against BLMIS Customers**

The extrinsic evidence put forth by both parties confirms that the MFN provision was intended to provide a refund only for similar claims to Optimal's; that is, claims, like the Trustee's claims against Optimal in 2009, constituting straightforward avoidance claims for the recovery of preferences or transfers of fictitious profits to BLMIS customers.  Through all versions of the draft agreement until the Optimal-drafted May 9 Version (which became the final iteration), the extrinsic evidence shows that both parties intended the MFN provision to apply to transfers received by BLMIS customers either within the 90 days prior to the Filing Date, including preferential transfers, or transfers of fictitious profits; the dispute between them was as to which of (and to what extent) these subsets would be encompassed by the clause.  The extrinsic evidence offers no support for Optimal's current position that the MFN clause applies to non-BLMIS customers with complex avoidance (and other) claims, for which viable defenses exist.

---

[78] *Chesapeake Energy Corp.*, 957 F. Supp. 2d at 341, n.24.
[79] *Mercury Partners. LLC v. Pac. Med. Bldgs., LP*, No. 02 Civ. 2005 (HBP), 2007 WL 2197830, at *14 (S.D.N.Y. July 31, 2007) (internal quotations omitted)).
[80] *Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir. 2001) (internal quotation omitted); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002).

To the contrary, as characterized by Optimal itself, and consistent with the contemporaneous extrinsic evidence, the changes in the May 9 Version were intended to "bridge the gap" between the parties, who had been unable in prior drafts to agree on an exclusive list of factors.[81]  It is thus undisputed that the final version of the MFN provision was meant to establish a middle ground between Optimal's and the Trustee's prior positions, both of which limited the provision to straightforward avoidance claims against BLMIS customers as to which transferee intent was irrelevant.

### 1.    The Most Favored Nation Clause Was Meant To Be Narrowly Applied To Similar Settlements and Avoidance Claims With Few Available Defenses

The extrinsic evidence confirms that the Trustee's intention was clear that the MFN provision should be narrowly construed to encompass only similar claims with few available defenses.  As stated by Mr. Hirschfield:

> The overall intent of the Trustee in agreeing to the most favored nation provision was to limit its application to narrow circumstances—only those in which the claims settled were truly similar to Optimal.  This was consistent with the Optimal Parties' concern that they not look foolish by overpaying the Trustee on his preference claims against them and be penalized for settling early.[82]

The Trustee's view that the MFN provision should be narrowly applied was expressed to Optimal during the settlement negotiations[83] and is further evidenced in the contemporaneous

---

[81] Levin Decl. ¶ 18 ("The parties agreed on this approach because they could not agree on an exclusive list of conditions or factors"); Levin Tr. 57:14-58:17 (concerning Mr. Levin's considerations in drafting the May 9 Version "[a]ll I recall is the general concern that the Trustee wanted a narrower equal treatment provision and Optimal wanted a broader equal treatment provision, and as negotiator I was sensitive to trying to bridge that gap.").
[82] Hirschfield Decl. ¶ 64.
[83] Hirschfield Decl. ¶ 15 ("[T]he Trustee's view was expressed that any most favored nation provision should be drafted in such a way that it was rarely, if ever, triggered."); *see also* Optimal Settlement Hearing at 10:14-11:10, *SIPC v. Bernard L. Madoff Inv. Sec.*, Adv. Pro. No. 08-01789 (BRL) (Bankr. S.D.N.Y. June 16, 2009) (Mr. Hirschfield stating, "We negotiated very heavily on the most favored nations clause, and it only applies in very limited circumstances where the settlement is under similar circumstances and facts of the settlement. . . .There is a whole litany of factors that the Court would ultimately consider, and we feel comfortable, ultimately, if we settle other claims similar to the ones that are settled here that they should follow at 85 percent.")

emails exchanged by the Trustee and Optimal during the settlement negotiations.[84]    Mr. Hirschfield's recollection of the Trustee's insistence on a narrow provision is also echoed in Mr. Levin's testimony during his deposition, during which Mr. Levin recalled that "the Trustee wanted a narrower equal treatment provision."[85]

The Trustee's concern that the MFN provision was sufficiently narrow was furthered by the language of the Optimal Settlement and the parties' manifest intent to apply the provision only to "similar" avoidance claims to the Trustee's claims against Optimal; that is, claims for preference or fictitious profits.  SUS and Arbitrage were BLMIS customers with substantial customer claims against the estate, and the Trustee's claims against SUS and Arbitrage were straightforward preferences and fictitious profits claims.[86]  As Mr. Levin stated in his deposition testimony, the Trustee's preference claims against Optimal would be "difficult to defend" as would be the Trustee's fictitious profits claims against Optimal because of the well-established Ponzi scheme presumption.[87]

In its initial draft, Optimal limited the application of the MFN clause to BLMIS customers who received preferential transfers or transfers of fictitious profits within the 90-day period.[88]  In its April 13 Version, it broadened the definition to include BLMIS customers who received transfers within the 90-day period that were avoidable under sections 544, 547, 548 and 550 of the Bankruptcy Code or transfers of fictitious profits (without restriction to the 90-day period).  The Trustee's Version limited the MFN clause to BLMIS customers in receipt of avoidable transfers under Bankruptcy Code sections 544, 547, 548 or 550 within the 90-day

---

[84] Hirschfield Decl. Ex. 17.
[85] Levin Tr. 58:13-58:17.
[86] Hirschfield Decl. ¶¶ 5-6; Levin Tr. 14:20-15:4.
[87] Levin Tr. 17:2-22; *see* Levin Tr. 19:19-20:8, 31:8-15; Levin Decl. ¶ 21(b).
[88] Hirschfield Decl. Exs. 7, 10.

period.[89]   Similarly, the Trustee's original recitation of the "benchmark" language referred only to the 90-day period (suggesting an intent to have the MFN encompass only preferences); Optimal revised the language to refer to *either* transfers during the preference period *or* transfers "of fictitious profits."

As the extrinsic evidence shows, when the parties could not agree on an exclusive list of factors under which to apply the MFN provision, Optimal attempted to redraft the clause to, in Mr. Levin's words, "bridge the gap" between the parties' respective drafts.[90]   Thus, the clause provides that one factor in considering whether an avoidance claim or settlement is "similar"  is the "nature" of the claim, such as whether it is  "for recovery of a preference" or "for recovery of principal or fictitious profits."   This harmonizes the prior drafts by providing that claims for preferences and claims for fictitious profit may both be "similar" to the Optimal settlement but neither is necessarily or dispositively "similar."

Optimal's  current  position—that  this  language  was  intended  to  scrap  the  whole foundation of the parties' negotiations and provide that *any* avoidance claim may be "similar" to Optimal's—makes no sense.   The common thread between the avoidance of preferences (in 2009) and avoidance of fictitious profits to customers of a Ponzi scheme is that there are no facts to be proven beyond the facts of the transfers.   The primacy of the concept of "similar" is clear from the MFN clause itself, which repeatedly states that the Avoiding Power Claims between the Optimal Settlement and any future settlement—as well as the circumstances underlying both settlements—must be "similar."   This is facially inconsistent with the notion that any avoidance action by the Trustee, no matter how complex or distinguishable from the simple preference

---

[89] Hirschfield Decl. Ex. 16.
[90] Levin Decl. ¶ 18; Levin Tr. 57:14-58:17.

claim in Optimal, may be swept into the MFN to provide Optimal with a refund.[91]

Moreover, neither party ever suggested at any time that the MFN should apply to other kinds of actions, such as one in which transferee intent must be proven. To the contrary, Optimal agrees with the Trustee's position that the list of non-exclusive factors it introduced in its May 9 Version was intended, not to vastly expand the reach of the MFN clause, but to be a middle ground between the parties' prior drafts.[92] Indeed, Optimal concedes that the reason it sought (and obtained) the expanded definition of "Avoiding Power Claims," located in paragraph M of the Agreement, was to ensure that the Trustee could not unfairly allocate portions of a settlement payment to 90-day claims when the Trustee also received payment for two-year and six-year claims.[93] Thus, the definition of "Avoiding Power Claims," was not broadened by Optimal to expand the relevant set of claims brought by the Trustee beyond 90-day claims, but only to close a potential loophole that the Trustee could potentially use to avoid complying with the parties' agreement.

As to the non-exclusive factor of "the defendant's knowledge of or complicity in the fraud," the extrinsic evidence presented by both parties demonstrates that this term was considered hand-in-hand with the Avoiding Power Claims factor and should be evaluated accordingly.[94] The complicity factor was only included when corresponding language was added that Optimal lacked complicity in or knowledge of the BLMIS fraud.[95] The Trustee knew—and Optimal agreed—that proving a case in which knowledge or complicity is at issue is a more difficult case than cases where it is not.[96] It was the Trustee's understanding that only

---

[91] *See* Levin Tr. 28:4-25, 29:1-30:9, 33:23-35:3, 66:9-68:7.
[92] *Id.*
[93] Levin Decl. ¶ 21(b). (d).
[94] Hirschfield Decl. ¶ 48; *see* Levin Decl. ¶ 21(b), (d).
[95] Hirschfield Decl. Ex. 18, ¶ P.
[96] Deposition of Marc E. Hirschfield, Esq., dated May 6, 2014 ("Hirschfield Tr.") at 73:15-75:9; Hirschfield Decl. ¶ 48.

those settlements where complicity in BLMIS's fraud was not alleged would be "similar" under the MFN clause.[97]   Notably, this is confirmed by the language of the MFN provision itself, which provides that complicity is a different factor from the "nature of the Avoiding Power Claims:" like ability to pay or jurisdiction, the language was intended to ensure that only "similar" defendants were treated similarly.

Moreover, Optimal's suggested reading that this factor holds the Trustee to a higher settlement percentage than 85% on any avoidance claim if the defendant knew of the BLMIS fraud or was complicit in any way is neither reasonable nor supported by the evidence.[98]   Instead, this factor would weigh in favor of the Trustee settling for at least 85% on a preference or fictitious profits claim if the defendant was complicit in the fraud.   This would be appropriate— based on the statement in the Optimal Settlement that Optimal did not have knowledge of the BLMIS fraud, the Trustee would need good reason to accept less than 85% of transfers that he was virtually guaranteed to recover in litigation (i.e., preferences or fictitious profits) from defendants he alleged were complicit.   It does not, however, set a benchmark on other claims such as those for recovery of principal because such claims are not "similar" in any event.

Concerning the "stage of litigation" factor, the extrinsic evidence shows that the Trustee understood that this factor would provide flexibility to the Trustee.   In the event that a party settled under similar circumstances to Optimal's, this factor may counsel that the parties should reach the benchmark of 85% repayment to the Trustee.[99]   If, on the other hand, the Trustee engaged in prolonged litigation resulting in one or more unfavorable rulings to the Trustee, a lower settlement amount may be warranted.[100]

---

[97] *Id.; see also* Levin Tr. 70:22-71:10.
[98] Levin Decl. ¶ 21(d).
[99] Hirschfield Decl. ¶ 49.
[100] *Id.*

Little extrinsic evidence exists on the remaining factors of the non-exclusive list (ability to pay/jurisdictional contacts) that informs those factors that the Court found ambiguous. These factors were considered by the parties in earlier versions of the agreement, and their presence in the final agreement does not vary greatly from the prior drafts.

## 2.    The Most Favored Nation Clause Was Intended to Apply to Customers

An important factor bearing on the dissimilarities between Optimal and JPMorgan is SUS and Arbitrage's status as BLMIS customers. At the time the Optimal Settlement was executed, Optimal approached the Trustee in order to settle its claims not only as a potential defendant, but also as claimants with an aggregate $1.5 billion claim against BLMIS.[101] Their status as customers with a large claim certainly impacted Optimal's willingness to settle and should be considered in connection with evaluating its similarity to any other settling party. Recognizing the importance of Optimal's customer status, the MFN clause applied only to BLMIS customers in each iteration of the MFN clause until the May 9 Version. The May 9 Version, like all previous versions and the executed Optimal Settlement, entitled the MFN provision: "Equal Treatment for SUS and Arbitrage with Other Similar BLMIS Customers."[102] The consistent use of this heading throughout the parties' negotiations and the fact that this heading is included in the Optimal Settlement is indicative of the parties' intent to limit this provision to settlements with other BLMIS customers. While the Optimal Settlement states that captions "do not define, limit or describe the scope" of the parties' agreement,[103] that paragraph stands for the proposition that captions and headings cannot be considered when a court interprets a contract by its terms. This Court determined that the Optimal Settlement was ambiguous, however, and the extrinsic evidence considered by a court to establish the parties' intent for ambiguous contract

---

[101] Levin Tr. 40:10-41:1.
[102] Optimal Settlement ¶ 13.
[103] Optimal Settlement ¶ 24.

provisions includes the review of any captions or headings, particularly the heading for the single paragraph in dispute.[104]

Optimal's current position that it intended non-customers to be encompassed by the MFN, much less that the parties agreed to such a change by using the word "defendants" in the list of non-exclusive factors to consider, is unsupported by any extrinsic evidence.  In his declaration explaining his considerations in drafting these factors, Mr. Levin does not make any mention of a deliberate decision to use the word "defendant" instead of "customers" when listing the factors.  In his deposition, Mr. Levin professed a subjective intent to broaden the scope of the MFN beyond customers, explaining:

> I do recall, and the paper record shows this as well, that one of the big changes from the prior draft to this draft was to expand from simply preference actions to avoiding power claims.  And so it was a broader set of claims that we were covering and that may have been the reason for changing it to defendants.[105]

This explanation is, however, inconsistent with the record evidence because the Bankruptcy Code sections cited as the basis for avoidance claims in the final MFN and earlier versions of the provision are nearly identical.[106]  Mr. Levin's explanation for the changed term "defendants" does not support Optimal's view that the MFN was significantly expanded to non-BLMIS customers with dissimilar avoidance claims, nor is his explanation consistent with the extrinsic evidence of the parties' intent during settlement negotiations.

The Trustee always understood that the MFN applied only to BLMIS customers because the avoidance claims and circumstances of settlement with BLMIS customers differ significantly from defendants who are not BLMIS customers, including potential defenses non-customers are

---

[104] *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d at 85 (citing *Mazzaferro v. RLI Ins. Co.*, 50 F.3d 137, 140 (2d Cir. 1995)); *In re Sept. 11 Litig.*, 906 F. Supp. 2d 295, 303 (S.D.N.Y. 2012).
[105] Levin Tr. 53:10-54:19.
[106] *Compare* April 13 Version, ¶ 12(b) (stating that MFN concerns transfers "recoverable under Bankruptcy Code section 544, 547, 548 or 550") *with* Optimal Settlement, ¶ M ("any claims under 11 U.S.C. 542, 544, 547 or 550, 'Avoiding Power Claims'").  The only significant change made by Optimal to the final MFN concerning the "Avoiding Power Claims" was that the claims were no longer time-limited to the 90 days prior to the Filing Date.

entitled to raise that may not be available to customers.[107]  In his deposition, Mr. Levin testified

that Optimal understood the Trustee wanted to limit the MFN clause apply only to BLMIS

customers.[108]

### C.    Optimal's Current Position on "Negotiating Leverage" Is Inconsistent With The Language Of The Agreement And Was Not Addressed By The Parties

Optimal now states that its intent in introducing the non-exclusive five-factor test was to

ensure that it would receive a refund if the Trustee settled for less than 85% with any party as to

which he had comparable "negotiating leverage" as he had with Optimal.[109]  Because Optimal

had no viable defenses in 2009 (other than jurisdiction) to the Trustee's preference and fictitious

profits claims, this characterization does not assist Optimal here since virtually every defendant

has some defenses to the full scope of the Trustee's avoidance claims under current law.

In any event, Optimal's claim that a settlement may come under the MFN if, *in Optimal's*

*view*, the Trustee has comparable "negotiating leverage" is inconsistent with both the Optimal

Settlement and its history.  For example, in his declaration, Mr. Levin points out that the

agreement states that Optimal lacked knowledge and complicity of BLMIS's fraud, and states

that if the Trustee asserts knowledge and complicity against a defendant, the Trustee has

"negotiating leverage" that is "at least as strong" as the leverage he had when negotiating with

Optimal, "making the circumstances of any resulting settlement more similar."  But that is not

what the MFN says:  it lists factors that, separately and together, should be considered to

determine whether the "*circumstances* of the Avoiding Power Claims and the Qualifying

Settlement are 'similar.'"[110]  And as Mr. Levin conceded at his deposition, the allegation that a

settling party had knowledge and complicity when Optimal did not would make the

---

[107] Hirschfield Tr. 20:15-21:14; 22:20-23:20; 24:2-26:21.
[108] Levin Tr. 59:12-22.
[109] Levin Decl. ¶ 19, 21(b)-(d).
[110] Optimal Settlement ¶ 13(c).

circumstances *less* similar, not more so. Because the "negotiating leverage" interpretation advanced by Mr. Levin is inconsistent with the plain language of the MFN, it should not be considered.[111]

Moreover, Optimal did not express to the Trustee that the non-exclusive list of factors was meant to encompass the concept of negotiating leverage. Neither Mr. Levin nor Mr. Hirschfield recall discussing that concept during the settlement negotiations nor is it mentioned in any of the drafts of the MFN clause or any other contemporaneous extrinsic evidence put forth by either party.[112] Based on the term's absence from the parties' negotiations, written correspondence, and drafts of the MFN provision, Optimal's concept of "negotiating leverage" was, at best, an unexpressed consideration of Optimal.[113]

Because Optimal's post hoc explanation of "negotiating leverage" is inconsistent with the record evidence, as well as the express agreed-upon language to evaluate the similarity between the Avoiding Power Claims and the settlement circumstances, it should not be considered by this Court.[114] This is particularly true given that it was Optimal, not the Trustee, that drafted the language at issue, and therefore any ambiguities should be construed against it.

## D.    The Circumstances Underlying The JPMorgan Settlement And The Optimal Settlement Are Not Similar Under Any Measure

Regardless of the ambiguity in the Optimal Settlement as to the scope of a "similar" settlement, there can be no doubt that the circumstances underlying the JPMorgan and Optimal Settlements are not similar. Both parties agree that the factors this Court found to be ambiguous—the nature of the Avoiding Power Claims and complicity—show that the Optimal

---

[111] *Id.*

[112] *See* Hirschfield Tr. 63:1-65:10; Levin Tr. 64:2-65:5.

[113] *Chesapeake Energy Corp.,* 957 F. Supp. 2d at 341, n.24 ("where a contract is ambiguous and one or both parties to the contract seek to introduce their own unexpressed intentions, courts will not rely on such evidence to resolve that ambiguity").

[114] *See Chesapeake Energy Corp.*, 957 F. Supp. 2d at 341, n.24; *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d at 86.

Settlement and the JPMorgan settlement are not similar.  Indeed, even without resort to the MFN factors, the JPMorgan and Optimal settlements are dissimilar on their face.  The Trustee's settlement with JPMorgan was part of a global resolution of all Madoff-related exposure for JPMorgan, of which the Trustee's avoidance claims were only one part.  JPMorgan reached a comprehensive settlement with the Trustee, the Government, and the Customer Representatives on a variety of statutory, criminal, and common law claims, resulting in a total payment of over $2.2 billion to Madoff's victims.  Those settlements are a far cry from the straightforward bilateral deal struck between Optimal and the Trustee on simple preference claims resulting from withdrawals from BLMIS brokerage accounts.

### 1.    The List Of Non-Exclusive Factors Set Forth In The MFN Permits The Court To Look At The Totality Of The Qualifying Settlement

The list of factors set forth in the MFN provision is, explicitly, non-exclusive, thus permitting the Court to evaluate any circumstances relating to the settlements at issue.[115]   The totality of the circumstances surrounding the global settlements with JPMorgan and the complex nature of the Trustee's case against JPMorgan is in no way similar to the potential claims that the Trustee had against Optimal and the circumstances relating to the Optimal Settlement itself.

The Trustee's claims against Optimal could not be more straightforward: SUS and Arbitrage were BLMIS customers who received preferences and transfers of fictitious profits.  As the law stood at the time of the settlement, very few defenses, if any, existed that would defeat the Trustee's claims for the full amount of the Preferential Transfers and the Fictitious Profits Transfers within the six-year period, which is supported by Optimal's willingness to quickly settle such claims.[116]

Even a cursory review of the Trustee's case against JPMorgan, on the other hand, shows

---

[115] *See* Hirschfield Decl. ¶ 60; Levin Decl. ¶ 19; Levin Dep. Tr. 75:14 ("the factors are nonexclusive").
[116] Levin Tr. 17:2-22, 19:19-20:8, 31:8-15.

that the relationship between them was far more complex. JPMorgan was not a BLMIS customer, but was its primary banker, its lender, and an indirect investor. The Trustee asserted both common law and avoidance claims against JPMorgan as result of this multifaceted relationship. Many counts in the Trustee's complaint were predicated upon JPMorgan's maintenance of the 703 Account, where customer monies were washed back and forth. The 703 Account gave JPMorgan—and JPMorgan alone—visibility into every BLMIS transaction between its investment advisory customers. The allegations regarding the 703 Account formed the basis of not only the Trustee's complaint, but also the Government's criminal complaint and the class action complaint.

While Optimal prefers to look at the Trustee's avoidance claims against JPMorgan in a vacuum, the Trustee's claims were in fact alleged in a single complaint and resolved in one comprehensive settlement. While the consideration paid by JPMorgan for settlement of the common law claims did not flow into the BLMIS estate, the Trustee obtained unquestionable value for BLMIS customers by resolving his common law claims—the viability of which were in doubt—and ensuring that they would receive a payment on those claims. Certainly, whether BLMIS customers received monies from the BLMIS estate or the class settlement fund was irrelevant to them.[117] Indeed, this Court found that the Trustees' settlement of his common law claims had value even though the $218 million flowed through the class action because the Trustee's dismissal of his common law claims and release of JPMorgan facilitated the payment of $218 million to Madoff victims and the larger global settlement.[118] And a review of the factual statement that accompanied the deferred prosecution agreement between the Government and JPMorgan reveals that the Government relied on factual allegations similar to those that

---

[117] Hearing Tr. 26:1-5.
[118] Hearing Tr. 25:22-25.

were made in the Trustee's complaint.[119]  Thus, while the three settlements were entered into

separately and on different theories of liability, the basis for each was a comprehensive set of

facts stemming from JPMorgan's role as BLMIS's banker that were initially set forth in the

Trustee's complaint.

Timing is critical to resolutions of complex, multi-party matters such as those between

JPMorgan and the Trustee, the Customer Representatives, and the Government.  JPMorgan

indicated that it wanted to resolve all Madoff-related litigation in a coordinated fashion and that

the window to do so would be brief.  The Trustee was cognizant of the significant risk that any

future settlement would be far less than the one negotiated at this juncture if the Trustee was the

only party to fail to settle his claims with JPMorgan.  With the timing pressure and litigation

risks in mind, the Trustee negotiated a settlement that was fair and in the best interests of the

estate.[120]  None of these pressures existed in the Optimal Settlement.  There were no third parties

to consider, particularly not the Government and the Customer Representatives.  Instead, the

negotiations between the Trustee and Optimal were simple, bilateral negotiations between the

Trustee's counsel and Optimal's attorneys on the simplest of avoidance claims, preferences and

fictitious profits.

The JPMorgan settlement is not similar to the Optimal settlement in the types of claims

asserted, the nature of the factual allegations, the number of different parties representing

different interests, the over $2 billion recovered in these coordinated settlements for Madoff

victims, or in any other way other than that it encompassed avoidance claims.   If Optimal is

correct that this settlement is "similar" to the Trustee's settlement of his preference claims in

Optimal, then any settlement by the Trustee that includes an avoidance claim will be similar,

---

[119] Deferred Prosecution Agreement, *United States v. JPMorgan Chase Bank,* No-1:14-cr-7 (S.D.N.Y. Jan 8, 2014).
[120] Even under Mr. Levin's unexpressed notion of "negotiating leverage," the timing pressures that existed in the JPMorgan settlement meant that the Trustee had less, not more, "negotiating leverage."

regardless of any other claims he asserted and regardless of the backdrop against which he settled his claims. That is not what the MFN provides; it applies to settlements of similar claims under circumstances that are similar to those of Optimal.

**2.   Under the MFN Factors, The JPMorgan Settlement Is Not Similar To The Optimal Settlement**

The Trustee's participation in a global, comprehensive settlement with JPMorgan on all Madoff-related claims differentiates the JPMorgan Settlement from the Optimal Settlement on its face. Unsurprisingly, they are also dissimilar when compared under the relevant factors[121] identified in the MFN provision.

**a.   Avoiding Power Claims**

One of the non-exclusive factors that the Court may take into account when determining whether the circumstances of the settlements are similar is the "nature of the Avoiding Power Claims[122] (such as whether they are for recovery of a preference or for recovery of principal or fictitious profits)."[123] Optimal claims that the JPMorgan Settlement is a "Qualifying Settlement" because the proposed settlement amount for the avoidance claims was $325 million, which was approximately 76.32% of the total avoidance claims.[124] Optimal further argues that the circumstances underlying the claims against JPMorgan were similar to those underlying the Optimal Settlement.[125] But even a cursory review of the specific avoidance claims sought in each case shows that is not so.

As set forth in his complaint, the Trustee sought to avoid and recover from JPMorgan: (i) initial transfers over the six-year period preceding the Filing Date under sections 544, 547, 550,

---

[121] Because the Trustee concedes that JPMorgan had an ability to pay, just as Optimal did, and that both parties are similarly situated with respect to jurisdiction, the "ability to pay" and "jurisdiction" factors are not at issue here.
[122] The Optimal Settlement defines "Avoiding Power Claims" as claims arising under 11 U.S.C. §§ 542, 544(b), 547, or 550 or those arising under NYDCL §§ 270-281.
[123] Optimal Settlement, ¶ 13(c)(ii).
[124] *See* SPV Limited Objection at 5.
[125] *Id.* at 7-8.

551 of the Bankruptcy Code and the NYDCL for banking fees charged to BLMIS by JPMorgan

for the maintenance of the 703 Account; (ii) initial transfers that occurred outside the two-year

period under section 544 of the Code and the NYDCL for the loan and associated interest

payments; and (iii) subsequent transfers under sections 550 and 551 of the Bankruptcy  Code

consisting of transfers made by BLMIS to the Fairfield Funds and Herald and subsequently made

to JPMorgan.[126]

By contrast, the claims settled in the Optimal Settlement consisted of the Preferential

Transfers.[127]  The only other potential claims identified at that time were the Fictitious Profits

Transfers.[128]  Put simply, the "nature" of the Avoiding Power Claims against Optimal is different

because those were among the simplest claims that the Trustee has litigated in this proceeding:

straightforward avoidance claims consisting of preferences and fictitious profits with virtually no

legal defenses and no factual issues.[129]  The questions surrounding whether Optimal would pay

the Trustee on his claims were not "if" but "when" and "how much."

The nature of the Trustee's Avoiding Power Claims against JPMorgan was incredibly

complex.  None of the claims stemmed from a simple customer relationship and concomitant

account withdrawals like those present in Optimal.  Instead, most of the Avoiding Power Claims

against JPMorgan stemmed from its relationship as BLMIS's banker and lender. The banking

fees claim against JPMorgan is the only one of its kind in this entire liquidation simply because

there was only one 703 Account through which the Ponzi monies flowed.  The same is true for

the loan claim: it is the only one like it in any of the Trustee's 1,000-plus avoidance actions.  The

remaining Avoiding Power Claims of the Trustee against JPMorgan consisted of subsequent

---

[126] Complaint, *Picard v. JPMorgan Chase & Co,* No. 10-04932 (SMB) (Bankr. S.D.N.Y. Dec. 2, 2010), ECF No. 1;
*see also* SPV Limited Objection at 4 (with chart of various claims against JPMorgan).
[127] *See* Levin Tr. 17:2-22; Levin Tr. 66:9-68:7.
[128] Levin Tr. 18:22-19:6; *see* Levin Tr. 66:9-68:7.
[129] Levin Tr. 17:2-22, 19:19-20:8; 31:8-15.

transfer claims, which are fundamentally different in terms of pleading and proof than the preference claims the Trustee had against Optimal.

Similarly, the defenses held by JPMorgan to the claims were unique to the JPMorgan action since the Trustee has no other avoidance action with a similar loan claim.  Thus, no other defendant has raised the same defenses that JPMorgan raised, including that: "(i) the repayment of the loan constituted an act of setoff rather than a "transfer" subject to avoidance; (ii) the repayment of a secured loan is not avoidable; and (iii) under the Second Circuit's decision in *Sharp*, the repayment of any loan is not avoidable absent participation by the creditor in the debtor's fraud."[130]   Each of these arguments created doubt as to the ultimate viability of the Trustee's claims on the loan transfers, doubt that did not exist in Optimal.

Finally, there can be no dispute that avoidance and recovery of subsequent transfers are different in nature than recovery of preferences and fictitious profits generally, and specifically with respect to JPMorgan and Optimal.[131]   Optimal suggests that because the subsequent transfers were requested and received by JPMorgan within 90 days of the Filing Date, these subsequent transfer claims are similar to the preference claims in Optimal.[132]   But any studied analysis of the claims shows that is not so.

In order to recover the subsequent transfers from JPMorgan at trial, the Trustee would have to prove the avoidability of the transfers from BLMIS to both the Fairfield Funds and Herald, from whom JPMorgan subsequently received the transfers.  Even though the Trustee settled his claims on the initial transfers as to the Fairfield Funds, as a matter of due process, the Trustee would still be required to prove that the avoidability of the initial transfers in order to

---

[130] *See* Brief in Support of JPMorgan's Motion to Dismiss at 68, No. 11 CV 00913 (CM) (S.D.N.Y. Aug. 1, 2011), ECF No. 57.
[131] Levin Tr. 19:19-20:8; 28:4-25, 29:1-30:9, 33:23-35:3, 66:9-68:7; Hirschfield Decl. ¶ 63.
[132] *See* SPV Limited Objection at 8.

recover from JPMorgan, because the settlement with the Fairfield Funds did not involve a determination on the merits as to the initial transfers.  As for Herald, which litigation is still pending on the initial transfers, the Trustee would similarly have to show that the initial transfers to Herald were avoidable, requiring the Trustee to put on his case against Herald in the JPMorgan action, in advance of a trial with Herald itself.  JPMorgan, as subsequent transferee, would have all of the defenses available to the Fairfield Funds and Herald, in addition to its own defenses as subsequent transferee.  In essence, the Trustee would have to put on a "case within a case" regarding the avoidability of the initial transfers to the Fairfield Funds and Herald, as well as a trial on the recoverability of the transfers from JPMorgan. To suggest that there is no difference between a direct preference claim against BLMIS accountholders and a claim against an indirect, subsequent transferee ignores the significant evidentiary and other legal burdens presented by section 550 claims.

Optimal glosses over these differences in burdens of pleading and proof, simply stating because the subsequent transfers were received in the 90-day period, the circumstances surrounding the two settlements are the same.  But even Optimal recognizes that the "nature of the Trustee's Avoiding Power Claim for [the subsequent transfers] differs."[133]  Accordingly, the nature of the avoidance claims is not similar.

### b.    Complicity/Knowledge

A second non-exclusive factor in determining whether the circumstances of the settlements are similar is the "knowledge of the defendant (or group of defendants, taken as a whole) or its or their complicity in the fraud that BLMIS perpetrated on its customers . . ."[134] The Trustee and Optimal settled on the basis that Optimal was "not complicit in the fraud . . . and

---

[133] SPV Limited Objection at 8.
[134] Optimal Settlement, ¶ 13(c)(iv).

did not have actual knowledge of the fraud."[135]   The Trustee alleged that JPMorgan, as BLMIS's

bank, knew or was willfully blind to the fraud at BLMIS[136] and the Trustee would have had to

sustain these allegations in order to recover on his avoidance claims against JPMorgan.  Because

Optimal agrees with the Trustee that the circumstances of the Optimal Settlement and JPMorgan

Settlement differ on this factor,[137] there is no dispute that this factor militates in favor of the

Trustee.

### c.      Stage of the Litigation

Another non-exclusive factor is the stage of any litigation by the Trustee against the

defendant.  This factor was intended to encompass a wide variety of outcomes.  In some cases,

the Trustee may need to settle for less than 85% if some of his claims were dismissed or there

were other unfavorable rulings that could diminish his chance of success.[138]  Examples of this

include the ruling that the section 546(e) safe harbor applies to the BLMIS case[139] and the more

recent ruling that heightens the standard for proving lack of good faith from an objective inquiry

notice standard to a subjective actual knowledge standard.[140]  Likewise, if the parties are

approaching or are at trial and an unknown reason presents itself for the parties to settle before

going to trial or judgment, such an outcome is taken into account by this factor.  Unlike typical

bankruptcies, however, a SIPA trustee does not have the same incentives to settle claims before a

lengthy litigation because the litigation costs are not borne out of the recoveries but instead are

advanced by the Securities Investor Protection Corporation.[141]

---

[135] *Id.* at ¶ P.

[136] *See* Complaint at 1, *Picard v. JPMorgan Chase & Co,* No. 10-04932 (Bankr. S.D.N.Y. Feb. 3, 2011), ECF No. 4.

[137] Levin Tr. 39-40, 70-71.

[138] Hirschfield Decl. ¶ 49.

[139] *SIPC v. Bernard L. Madoff Inv. Sec.*, 12 MC 115 (JSR), 2013 WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013).

[140] *SIPC v. Bernard L. Madoff Inv. Sec.*, 12 MC 115 (JSR), 2014 WL 1651952, at *5 (S.D.N.Y. Apr. 27, 2014)

[141] The percentage commission schedule for trustees found in § 326(a) of the Bankruptcy Code is not applicable in a
SIPA liquidation.  *See* SIPA § 78eee(b)(5)(C); *see* Hirschfield Tr. 50:5-24 ("you asked earlier about trustees or
debtors settling cases early to avoid litigation costs.  For us that is not necessarily a factor, because we, as you noted

The stage of the proceedings against Optimal was quite simple: it was settled prior to discovery under either Rule 2004 or the Federal Rules, prior to any complaint, and prior to any dispositive rulings.[142]  Indeed, the Optimal Settlement was completed when there had been virtually no rulings at all in this liquidation.[143]  Very few matters have or will ever have a similar procedural posture to the Optimal matter due to the passage of time.

Optimal argues that because the Trustee litigated extensively with JPMorgan, he should not be willing to take less than 85%.  But this factor is not susceptible to such a bright-line rule.  If the stage of the proceedings has progressed but the Trustee's chances for success have been diminished by virtue of legal rulings issued late in the proceedings, certainly the Trustee must be able to adjust his settlement posture to reflect those realities.  If all that was considered was the length of the litigation without regard to the difficulty of the litigation, then almost by definition, the Trustee would never be able to accept less than 85% from any party given that the statutory deadline to file his avoidance actions against initial transferees has long since passed and he is five and a half years—and counting—into the various litigations.

In any event, a close look at the JPMorgan litigation shows that contrary to Optimal's suggestion, the Trustee was only at the beginning of his litigation on his avoidance claims.  No court issued any rulings relating to the Trustee's avoidance claims against JPMorgan and discovery on those claims had only just begun under the Federal Rules in Fall 2009.  Optimal cannot ignore the common law claims when evaluating whether the circumstances of the settlements are similar but then rely upon those claims to argue that the stage of the proceedings is different.  Particularly when the dismissal of the common law claims is factored in, the Trustee

---

earlier, get paid by SIPC and therefore we're not spending money out of the customer funds to get more customer money").
[142] *Id.*
[143] Hirschfield Decl. ¶¶ 8-10.

was more than justified in accepting the settlement percentage he did.  This factor weighs against providing a refund to Optimal in light of the JPMorgan settlement.

**E.      The Drastic Changes In The Case Law Since The Time of the Optimal Settlement Demonstrate Why the Parties Agreed to a Flexible Standard for the MFN Clause.**

Optimal's argument that the MFN applies to provide them with a refund is particularly disingenuous given that even avoidance claims that the parties did contemplate as coming within the MFN in 2009 can no longer be settled under circumstances "similar" to the Optimal Settlement.  At the time of that settlement, existing case law provided that the Trustee could avoid and recover 90-day preferential payments and fictitious profits for the six-year period without showing any evidence of transferee intent.  Accordingly, the language in the MFN provision contains language relating to preferences and transfers of fictitious profits.

But under the law as it currently stands (pending appeals), only fictitious profits received by the transferee within two years preceding the filing date could be comparable to the avoidance claims encompassed by the Optimal settlement.  Preferential transfers cannot be avoided and recovered unless the Trustee can plead and prove that a defendant had actual knowledge of a fraud.  Otherwise, under Judge Rakoff's ruling, the Trustee is precluded by the section 546(e) safe harbor from recovery of any transfers other than those recoverable under section 548(a)(1)(a).  Pleading and proving "actual knowledge" is a far different burden to carry than showing that a party received a transfer within the 90-day period on account of an antecedent debt, even though the claim remains a "preference" under section 547 of the Bankruptcy Code.  Similarly, the burden of pleading and proof for the Trustee's claims has been elevated since the Optimal Settlement in 2009 from an objective inquiry notice standard to a subjective "actual knowledge" standard.  Comparing a claim for recovery in 2009 to one under the current law in 2014 is essentially comparing apples to oranges.

It is precisely because the parties were in an early stage of the liquidation and could not foresee the future that they negotiated flexibility regarding when circumstances surrounding a settlement are "similar." The fact that the Trustee's claim arises under the Bankruptcy Code is not dispositive under the MFN; rather, similarity depends on the totality of the circumstances, including the five non-exclusive factors. The purpose of the MFN provision was to hedge against the risk of the unknown by providing a benchmark for settlements of similar claims under similar circumstances, not to ensure that Optimal gets a cut every time the Trustee settles any avoidance action regardless of the surrounding circumstances.

Indeed, it is worth noting that Optimal itself was not held to the 85% benchmark it now claims the parties intended. Optimal returned an amount equal to 85% of the Preferential Transfers it received, but did not return any additional funds in satisfaction of the Trustee's claim on the Fictitious Profits Transfers. Under the Optimal Parties' current reading of the MFN provision to include *all* avoidance claims that may have been asserted by the Trustee for purposes of calculating the 85% benchmark, Optimal would have had to return 85% of the Fictitious Profits Transfers in addition to the 85% of the Preferential Transfers in order to meet the 85% benchmark. Optimal's demand for a refund—particularly on a dissimilar settlement—should be denied when its own settlement would not satisfy that standard.

## CONCLUSION

The Trustee respectfully requests that the Court reject Optimal's request for a refund under the MFN provision of the Optimal Settlement because the circumstances of the JPMorgan Settlement and the Optimal Settlement not similar under the meaning of that provision.

Dated:  June 27, 2014  
      New York, New York

*/s/ David J. Sheehan*  
Baker & Hostetler LLP  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Email:dsheehan@bakerlaw.com  
Seanna R. Brown  
Email:sbrown@bakerlaw.com  
Amanda E. Fein  
Email:afein@bakerlaw.com  

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the Estate of Bernard L. Madoff*