## Exhibit A

**Declaration of Marc E. Hirschfield Esq.**
**Dated April 9, 2014, along with exhibits 1-32 thereto**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-4932 (SMB) |
| Plaintiff, | |
| v. | |
| JPMORGAN CHASE CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., | |
| Defendants. | |

## <u>DECLARATION OF MARC E. HIRSCHFIELD</u>

I, Marc E. Hirschfield, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a partner of Baker & Hostetler LLP, counsel to Irving H. Picard (the

"Trustee"), the trustee for the liquidation of the business of Bernard L. Madoff Investment

Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L. Madoff

("Madoff") (collectively, "Debtor").  In my role as counsel to the Trustee, I, along with my

colleagues, represented the Trustee in his settlement negotiations with Optimal Strategic U.S.

Equity Limited ("SUS") and Optimal Arbitrage Limited ("Arbitrage," SUS and Arbitrage are

collectively referred to as "Optimal").

     2.     The Trustee's settlement with Optimal in June 2009 was the first significant

settlement in the BLMIS liquidation.  The settlement resulted in the return of 85% of preferential

transfers received by Optimal in the 90-day period preceding the Filing Date.  Attached hereto as

Exhibit 1 is a true and correct copy of the Order Approving an Agreement By and Among the

Trustee and Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited, issued in

*SIPC v. BLMIS*, 08-1789 (Bankr. S.D.N.Y. June 16, 2009), ECF No. 270. The settlement

agreement also included a "most favored nation" provision, which is the subject of this affidavit.

Attached hereto as Exhibit 2 is a true and correct copy of the Motion for Entry of Order Pursuant

to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of

Bankruptcy Procedure Approving an Agreement by and among the Trustee and Optimal

Strategic U.S. Equity Limited and Optimal Arbitrage Limited, issued in *SIPC v. BLMIS*, 08-1789

(Bankr. S.D.N.Y. May 26, 2009), ECF No. 219 ("Optimal 9019 Motion"), at Exhibit A, Form of

Agreement Between Trustee and Optimal Companies (hereinafter "Optimal Settlement"), ¶ 13.

     3.     In pursuing litigation and/or settlement with parties such as Optimal, the Trustee

is using his authority under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*

("SIPA"), and the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code"), to avoid and recover preferences, payments of fictitious profits, and other transfers made

by the Debtor to the detriment of innocent customers whose money was lost to the Ponzi scheme.

Absent these recovery actions, the Trustee cannot satisfy the customer claims described in

subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

300317997.1

4.    Pursuant to sections 547 and 550 of the Bankruptcy Code, a trustee may avoid and recover, for the benefit of the estate, any transfer of an interest of the debtor in property: (i) to or for the benefit of a creditor; (ii) on account of an antecedent debt owed by the debtor before such transfer was made; (iii) made while the debtor was insolvent; (iv) made within 90 days of the filing of the petition; and (v) that enables the creditor to receive more than the creditor would have otherwise received.  11 U.S.C. §§ 547, 550.

5.    The Optimal parties were BLMIS customers.  SUS maintained a BLMIS customer account since January 1997.  Arbitrage maintained a BLMIS customer account since February 1996.  In the 90 days before December 11, 2008 (the "Filing Date"),[1] SUS withdrew $151,831,876.00 from its BLMIS account and Arbitrage withdrew $125,087,004.00 from its BLMIS account. *See* Exhibit 2, ¶¶ 8-9.

6.    Based on his investigation, the Trustee maintained that the withdrawals made on behalf of Optimal within the 90-day period prior to the Filing Date were preferences, recoverable by the Trustee under sections 547 and 550 of the Bankruptcy Code.  The Trustee also asserted that Arbitrage received fictitious profits over the life of its account in the amount of $96.5 million, $35 million of which was withdrawn in the six-year period preceding the Filing Date. *Id.* at Exhibit A, Optimal Settlement, ¶¶ I, M.

7.    In March 2009, Mr. Richard Levin of Cravath, Swain & Moore LLP, on behalf of Optimal, approached the Trustee's counsel regarding settlement between the Trustee and Optimal.  Attached hereto as Exhibit 3 is a true and correct copy of an email from Mr. Mark Cymrot to Mr. Levin entitled "Re: Confidentiality Agreement," dated March 20, 2009

---

[1] In this case, the Filing Date is the date on which the Securities & Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* SIPA § 78*lll*(7)(B).

3

(OPT000001).  The parties met in person to discuss a potential settlement of the Trustee's claims

against Optimal on March 24, 2009.  Attached hereto as Exhibit 4 is a true and correct copy of a

letter from Mr. Cymrot to Mr. Levin entitled "Settlement Discussions between Optimal

Multiadvisors LLP and Irving H. Picard, Esq., Trustee for Bernard L. Madoff Investment

Securities, LLC," dated March 31, 2009 (OPT000007).

8.       During Spring 2009 when the negotiations with Optimal commenced, the Trustee

was in the early stages of investigating the massive fraud perpetrated by BLMIS and

reconstructing the books and records of the Debtor.  The first several months of the Trustee's

engagement involved, among other things, investigating the operations of BLMIS, determining

the financial condition of BLMIS, marshaling and liquidating of the assets of the BLMIS estate,

undertaking account reconciliations for thousands of BLMIS accounts, and setting up a claims

process under SIPA for BLMIS customers and creditors.  Attached hereto as Exhibit 5 is a true

and correct copy of the Trustee's First Interim Report for the Period of December 11, 2008

Through June 30, 2009, issued in *SIPC v. BLMIS*, Adv. Pro. No. 08-1789 (Bankr. S.D.N.Y. July

9, 2009), ECF No. 314 ("First Interim Report").

9.       Due to the length and scope of the BLMIS fraud, the Trustee's investigation was

only in its nascent stages in Spring 2009.  The Trustee's account reconciliations for over 4,000

BLMIS accounts and the determinations regarding potential avoidance action litigation

stemming from that account activity were not yet complete.  The Trustee's first avoidance action

was not filed until April 9, 2009.  By the time that the settlement between Optimal and the

Trustee was approved at the June 28, 2009 hearing, the Trustee had filed only eight avoidance

actions to avoid and recover funds on behalf of investors. *See id.*

10.    In addition, certain legal issues impacting whether and to what extent the Trustee

could recover for BLMIS customers—whether avoidance actions or through settlements—were

hotly contested and unresolved.  For example, the Trustee's motion in the Bankruptcy Court on

the issue of how to calculate net equity under SIPA—whether to include the fictitious profits or

to use only cash in/cash out—was not filed until October 2009.  The Second Circuit's affirmance

of the Bankruptcy Court's approval of the Trustee's net investment method to calculate net

equity was not rendered until August 2011.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.2d

229 (2d Cir. 2011).  The legal framework governing the case was either not yet tested or

unresolved when these settlement negotiations took place in early 2009—as it still is today on

certain issues.[2]

11.    Optimal introduced the concept of a most favored nation provision at the

inception of settlement negotiations with the Trustee.  *See* Exhibit 4, at 2.  As expressed to the

Trustee, Optimal was concerned that by being the first BLMIS customers to settle with the

Trustee, Optimal may overpay the Trustee if other parties subsequently settled for less on similar

claims.

---

[2] The legal landscape governing this liquidation continues to be in flux.  For the first several years of this
liquidation, courts routinely held the safe harbor in section 546(e) of the Bankruptcy Code did not apply to the
transfers from BLMIS.  Indeed, at the time that the Optimal settlement was reached, both parties understood the law
as permitting the Trustee to recover preferences.  On September 27, 2011, District Judge Jed S. Rakoff ruled for the
first time that the Trustee was precluded from recovering any transfers other than actually fraudulent transfers
(including preferences) under section 548(a)(1)(A) by virtue of the safe harbor.  *Picard v. Katz*, 462 B.R. 447
(S.D.N.Y. 2011); *see also Picard v. Greiff*, 476 B.R. 715 (S.D.N.Y. 2012).  That issue is now on appeal to the
Second Circuit.  *In re Bernard L. Madoff Inv. Sec. LLC*, 12-2557(L) (2d Cir.).  Judge Rakoff issued a subsequent
ruling that held that section 546(e) defense does not bar the Trustee's claims if the Trustee can prove that the
defendant had "actual knowledge" of a fraud.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12
MC 115 (JSR), 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013).  Under the prior case law, and certainly under
the standards articulated by Judge Rakoff, pleading and proving fraudulent transfer claims is much more difficult
than pleading and proving the strict liability preference claims that were compromised with Optimal.  Optimal did
not compromise any fraudulent transfer claims or any other claims beyond the straightforward preference claims
which, at the time, had few defenses and none applicable to Optimal.

12.     Optimal presented the most favored nation concept as beneficial to all parties: it would assist the Trustee in future settlements by setting a benchmark and it would ensure that Optimal would not look foolish by being penalized for settling first.

13.     While Optimal's view that a most favored nation provision would set a favorable benchmark had some merit, my colleagues and I had reservations that agreement could be reached on sufficiently narrow terms.  From the Trustee's perspective, an overly broad provision—such as an 85% recovery rule on all of the Trustee's claims—could mean that most, if not every, subsequent settlement would trigger the provision, even where parties were not similarly situated and/or the claims differed from those included in the Optimal settlement.  This would unfairly hamper the Trustee's ability to reach favorable settlements for the benefit of the estate.  It would also provide a windfall to Optimal, which neither the Trustee nor Optimal intended.  As such, following the first meeting between the parties, the Trustee indicated that such a term may not be acceptable as part of the settlement.  *See* Exhibit 4, at 3.

14.     The most favored nation provision, however, was a key term for Optimal to move forward with the settlement.  Because there were significant dollars at stake—and because the Trustee had not reached any significant settlements as of that date—it was determined that the Trustee's counsel had an obligation to the estate to determine whether an agreement could be reached on a sufficiently narrow provision.  Particularly where the parties were discussing settlement of a straightforward preference claim with no applicable defenses, it was important to see if an accord could be reached to expeditiously bring money into the estate.  Accordingly, we continued settlement discussions with Optimal, including discussion concerning the most favored nation provision.

300317997.1

15.     In connection with those discussions, the Trustee's view was expressed that any most favored nation provision should be drafted in such a way that it was rarely, if ever, triggered.  It also had to be drafted in a way that provided flexibility to accommodate future, unknown events.  Given that the settlement was entered into so early in the liquidation, the Trustee knew that he could not anticipate every circumstance that he would encounter in the future.  Thus, he wanted to ensure that he had the freedom and flexibility to enter into beneficial settlements, even if those settlements fell below the 85% benchmark, if there were other countervailing considerations at play.

16.     Thus, at all times during the negotiations, the expressly stated intent of the Trustee with regard to this provision was to limit the provision's applicability to truly similar claims that are settled under similar circumstances.  The only claims present against Optimal were preferences and transfers of fictitious profits.  Ultimately, the settlement amount reflected 85% of the preference amounts alone, with no recovery on the fictitious profits amount.  These types of avoidable transfer claims are similar in that the intent of the transferee is not relevant to the Trustee's ability to recover.  The most favored nation clause was intended by the Trustee and Optimal to only capture cases in which there were few defenses to the Trustee's claims, such as preferences or transfers of fictitious profits.

17.     The Trustee's position at this time was consistent with Optimal's stated concern that subsequent parties would settle similar claims for less money, effectively penalizing Optimal for coming forward first.

18.     In light of those concerns, the parties tried to negotiate the limited circumstances in which the most favored nation provision would apply.

300317997.1

19.     On April 6, 2009, Mr. Levin circulated the first draft of the most favored nation provision to the Trustee's counsel.  Attached as Exhibit 6 is a true and correct copy of an email from Mr. Levin to Mr. Cymrot, Ms. Pamela Caraway and Mr. Ronald Rolfe, dated April 6, 2009 (OPT00022); attached as Exhibit 7 is a true and correct copy of a document entitled "'Most Favored Nation Provision' for Optimal Picard Settlement Draft of April 6, 2009," dated April 6, 2009 (OPT00026) (the "April 6 Proposal").  This draft provision, and those proposals that followed, generally provided that, under certain limited circumstances, the Trustee may have to refund to Optimal a portion of their settlement payment in the event that another BLMIS customer settled for an amount proportionally less than Optimal's settlement amount.  The proposals sought to define the various factors that would result in a settlement being sufficiently different from the Optimal Settlement such that the proposed most favored nation provision would not apply.

20.     The April 6 Proposal stated that the Optimal Parties could receive a partial refund of their settlement amount where the customer: (a) had a BLMIS-provided account balance of over $100 million at any time; (b) received over $25 million in transfers from BLMIS within the 90 days before the Filing Date, in the form of either fictitious profits or Bankruptcy Code section 547 preferences; (c) had less jurisdictional contacts with the United States than the Optimal Parties; (d) the Trustee's claims against that BLMIS customer outside the 90-day period constituted less than 50% of the Trustee's total claims; (e) had sufficient assets to pay the Trustee; and (f) settled with the Trustee prior to commencement of either a trial or a contested hearing on summary judgment.  If all of these conditions were met, and the Trustee settled for

300317997.1

less than 80%[3] of the total value of the BLMIS transfers received by a former BLMIS customer that constituted either § 547 preferences or fictitious profits within the 90-day period before the Filing Date, the Optimal Parties would receive from the Trustee the proportional difference between what they paid and what this BLMIS customer paid.  *See* Exhibit 7.

21.    On April 8, 2009, attorneys from Cravath and BakerHostetler met to discuss the proposed settlement.  Attached hereto as Exhibit 8 as a true and correct copy of an email from Mr. Levin to Mr. Thomas Lucchesi entitled "Re: Optimal," dated April 9, 2009 (OPT00027).

22.    On April 14, 2009, Mr. Levin circulated to Trustee's counsel another draft of the most favored nation provision dated April 13, 2009.  He stated that the new draft was not meant to reflect any changes suggested by BakerHostetler attorneys, but only changes proposed by his firm.  Attached hereto as Exhibit 9 is a true and correct copy of an email from Mr. Levin to myself and Messrs. Cymrot and Lucchesi entitled "Madoff-Optimal Draft Settlement Agreement," dated April 14, 2009 (OPT000029); attached hereto as Exhibit 10 is a true and correct copy of a document entitled "Settlement Agreement" dated April 13, 2009 (OPT00031) (the "April 13 Proposal").

23.    The April 13 Proposal altered the language in paragraph (b) of the April 6 Proposal with respect to which transfers were relevant to determining if another party would trigger the most favored nation provision.  In the April 13 Proposal, in order to fall under the provision, the BLMIS customer must have received transfers from BLMIS *either*: (a) as fictitious profits (with no temporal restrictions), or (b) as avoidable transfers under Bankruptcy Code sections 544, 547, 548 or 550 within the 90 days prior to the Filing Date.  This draft also changed the baseline settlement amount from 80% of the total transfers received by BLMIS customers to

---

[3] At the time, the settlement offer by Optimal was for payment of 80% of the preference amounts.

300317997.1

85% of the transfers received by BLMIS customers, consistent with the increase of the settlement offer to 85% of the preference claims.  *See* Exhibit 10, ¶ 12.

24.    Redacted.

25.    On April 17, 2009, after our review of Cravath's April 13 Proposal, I sent an email to Mr. Levin and Mr. Rolfe which included BakerHostetler's preliminary comments. Attached as Exhibit 11 is a true and correct copy of an email from myself to Messrs. Levin and Rolfe, entitled "Optimal," dated April 17, 2009 (OPT00054); attached as Exhibit 12 is a true and correct copy of a document entitled "Settlement Agreement," dated April 17, 2009 (OPT00055) (the "April 17 Proposal").   Concerning the most favored nation provision, I wrote "we are still working our way through the MFN provision so we have not commented on it in this draft." *See* Exhibit 11.    Redacted.

300317997.1

26.     On April 20, 2009, I spoke with Mr. Levin concerning the status of the proposed settlement. Attached hereto as Exhibit 13 is a true and correct copy of an email from Mr. Levin to myself and Messrs. Cymrot, Rolfe, and Lucchesi, entitled "Re: Optimal," dated April 22, 2009 (OPT00086).

27.     On April 22, 2009, Mr. Levin emailed a new draft agreement, stating "[w]e are also awaiting your further thinking on the Equal Treatment provision (paragraph 13)" and including  no changes to the most favored nation provision.  *See* Exhibit 13.  Attached hereto as Exhibit 14 is a true and correct copy of a document entitled "Settlement Agreement," dated April 21, 2009 (OPT00089) (the "April 21 Proposal").

28.     Redacted.



29.     On May 4, 2009, I circulated to Mr. Levin BakerHostetler's proposed settlement agreement, including a revised most favored nation provision, which differed from Mr. Levin's proposal in certain key ways.  Attached hereto as Exhibit 15 is a true and correct copy of an

300317997.1

email from myself to Messrs. Levin, Rolfe, Lucchesi and Cymrot entitled "Optimal," dated May 4, 2009 (OPT000110); attached hereto as Exhibit 16 is a true and correct copy of a document entitled "Settlement Agreement," dated May 4, 2009 (OPT000111) (the "May 4 Proposal").

30.     The May 4 Proposal made clear that the settlement amount of 85% of the transfers received by the Optimal Parties within the 90 days preceding the Filing Date was intended to establish a benchmark for future settlements on similar claims. *See* Exhibit 16, ¶ 13.

31.     Under the April 13 Proposal, a similar claim for the purposes of determining the application of the most favored nation provision included any BLMIS customer with transfers of fictitious profits or transfers under Bankruptcy Code sections 544, 547, 548, and 550 within the 90-day period of over $25 million.  *See* Exhibit 10, ¶ 13.  Consistent with the Trustee's stated position that the most favored nation provision should only apply in very limited circumstances that were truly similar to the Optimal settlement, the May 4 Proposal introduced the limited application of the most favored nation provision to a "Similar Claim"  against a "Similarly Situated Person or Entity" on "More Favorable Terms."  *See* Exhibit 16, ¶ 13.  This version also included the concept of an "opt-out," in which the Trustee could elect to have the most favored nation provision not apply to a certain number of settlements that otherwise met the criteria for its application.  *Id.*

32.     Thus, under the May 4 Proposal, the Trustee defined a "Similarly Situated Person or Entity" as: (a) a party with control of only one BLMIS account, or with no inter-account transfers between accounts; (b) with a BLMIS customer account statement of $1.0 billion or more as of the Filing Date; (c) that operated as a "feeder fund" to deposit funds of other persons or entities to BLMIS; (d) with remaining assets to pay the full claim for the avoidable transfers received within the 90 days before the Filing Date; (e) with minimum contacts with the United

300317997.1

States that are no less than those of the Optimal Parties; and (f) are citizens or residents of a

jurisdiction that allows for the enforcement of a United States-rendered judgment.  *Id.*

33.    In contrast to the description of applicable persons or entities in the April 13

Proposal (*i.e.*, BLMIS customers with BLMIS-provided account statements of $100 million or

more at any time), the May 4 Proposal limiting the provision to those BLMIS customers with

BLMIS-provided account statements of $1 billion or more.  *Compare* Exhibit 10, ¶ 13 *with*

Exhibit 16, ¶ 13.

34.    Another significant difference is that the May 4 Proposal mentions for the first

time that the Similarly Situated Person or Entity must have only a single BLMIS account or

multiple accounts with no inter-account transfers and provides conditions to ensure that a

judgment against the Similarly Situated Person or Entity could be enforced abroad.  *See* Exhibit

16, ¶ 13.

35.    The "More Favorable Terms" referred to a settlement by the Trustee for less than

85% of the amount of the avoidable transfers received within 90 days before the Filing Date.  *Id.*

36.    A "Similar Claim" was defined as a claim by the Trustee against a former BLMIS

customer for at least $100 million on account of avoidable transfers under Bankruptcy Code

sections 544, 547, 548, and 550 made within 90 days of the Filing Date.  *Id.*

37.    In the event that another settlement constituted an "MFN Trigger Event" the May

4 Proposal entitled the Trustee to exercise an "MFN Opt Out" – allowing the Trustee to decline

the application of the most favored nation provision up to six times in the event that "the Trustee

determines that the circumstances [of the new BLMIS customer settlement] are sufficiently

different than the situation giving rise to the settlement" with Optimal.  *Id.*  Because the

Trustee's investigation was in its early stages and the full panoply of litigation he would

ultimately bring was not yet defined or asserted, the Trustee wanted the ability to use an "opt-out" in the event that a future settlement presented itself and came within the most favored nation provision in a way that he or Optimal had not anticipated.

38.    Redacted.

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

39.    The May 4 Proposal also adds that the Trustee shall have no obligation to provide to the Optimal Parties any information or discovery with respect to another settlement that is or could give rise to triggering the most favored nation provision.  *See* Exhibit 16, ¶ 13.

40.    On May 8, 2009, Mr. Levin circulated another version of the draft settlement agreement which is dated May 7, 2009 and brackets the most favored nation provision in paragraph 13 for further discussion without making any changes.  Attached hereto as Exhibit 17 is a true and correct copy of an email from Mr. Levin to myself and Messrs. Cymrot, Rolfe, and Lucchesi entitled "Re: Optimal Settlement Draft," dated May 8, 2009 (OPT000144); attached hereto as Exhibit 18 is a true and correct copy of a document entitled "Settlement Agreement," dated May 7, 2009 (OPT000146) (the "May 7 Proposal").  Concerning the most favored nation provision, Mr. Levin states, "[a]lthough I know that the Trustee is concerned about the risk that he might have to return money, we believe that he would be well served by the opportunity to hold the line on future settlements, which would benefit both sides here.  In any event, we have

14

some new ideas to break the logjam, which would benefit from further conversation." *See*

Exhibit 17.  Mr. Levin understood the Trustee's concerns and was amenable to addressing them.

41.    The May 7 Proposal, circulated two days prior to the May 9 Proposal, also

Redacted.

                                                 states the Trustee concluded the following:

"The Optimal Companies and their affiliates were not complicit in the fraud that BLMIS and

Madoff perpetrated on BLMIS's customers and did not have actual knowledge of the fraud, and

based on the review, the Trustee does not believe that the conduct, acts and omissions of the

Optimal Companies and their affiliates provide any ground to assert any claim against the

Optimal Companies or any of their affiliates (other than Avoiding Power Claims), or to disallow

any claim that SUS or Arbitrage may have against BLMIS or its estate." *Id.*

42.    On May 8, 2009, Mr. Levin and I had a teleconference to discuss the most favored

nation provision and ways to come to an agreement.  Attached hereto as Exhibit 19 is a true and

correct copy of an email from myself to Mr. Levin entitled "RE: Optimal Settlement Draft,"

dated May 8, 2009 (OPT000178); attached hereto as Exhibit 20 is a true and correct copy of an

email from myself to Mr. Levin entitled "RE: Optimal Settlement Draft," dated May 8, 2009

(OPT000182). The specific form that the most favored nation provision would take was an

evolving concept, however, and the parties sought to settle on a form that addressed each of their

concerns.  Optimal did not agree to the concept of an "MFN Opt-Out," therefore requiring

consideration of alternative structures to the provision.

15

43.    The parties conferred regarding the possibility of a non-exclusive list of factors to be considered by future courts.  The non-exclusive nature of the list was key to the negotiations on the final form of agreement because it provided the necessary flexibility given the stage of the proceedings.  Thus, if a circumstance came up in a future settlement that could not be foreseen in Spring 2009, a court evaluating the applicability of the most favored nation clause could still consider such circumstance even though it was not expressly included in the factors.  A court could also determine to give more or less weight to one of the factors in determining whether a settlement was similar based upon the record before it.  Moreover, with the factors being non-exclusive, the concept of an "MFN Opt-Out" became less important to the Trustee because a future settlement could be considered as a whole to determine if it was truly similar to the Optimal Settlement.  The factors were merely considerations and not requirements to a finding that the most favored nation provision applied.

44.    On May 9, I received an email from Mr. Levin with a new draft of the most favored nation provision ("May 9 Proposal") that differed in form from the May 4 Proposal. Attached hereto as Exhibit 21 is a true and correct copy of an email from Mr. Levin to myself and Messrs. Lucchesi and Rolfe entitled "RE: Optimal Settlement Draft," dated May 9, 2009 (OPT000186); attached hereto as Exhibit 22 is a true and correct copy of a document entitled "Draft Equal Treatment Insert for the Picard – Optimal Settlement Agreement," dated May 9, 2009 (OPT000191).  In his email, Mr. Levin stated that he "tried to be accommodating to the concerns that [BakerHostetler has] previously expressed."  *See* Exhibit 21.  Thus, the May 9 Proposal was intended to address the Trustee's concerns that I had expressed to Mr. Levin, albeit through a different structure than the May 4 Proposal.

16

45.     One change in the May 9 Proposal is that it stipulates that any future BLMIS customer settlement amount must be $40 million or more to constitute a "Qualifying Settlement," as opposed to the May 4 Proposal stipulating that the most favored nation settlement should only apply to claims of $100 million or more. *Compare* Exhibit 22 *with* Exhibit 16, ¶ 13.

46.     Another change in the May 9 Proposal is how it determines under what circumstances the most favored nation provision applies.  The May 9 Proposal states that only those settlements with "similar circumstances" will trigger the most favored nation provision. *See* Exhibit 22.  This was the overarching concern of the Trustee and the language proposed attempted to accommodate that concern.

47.     To determine whether the Optimal Parties' settlement and the "Qualifying Settlement" are similar, the May 9 Proposal provides that several "non-exclusive factors shall be taken into account," including: (i) defendant's ability to pay; (ii) "the nature of the "Avoiding Power Claims" (such as whether they are for recovery of a preference or for recovery of principal or fictitious profits);" (iii) the jurisdictional connections and enforceability of a judgment in U.S. court; (iv) defendant's knowledge of or complicity in BLMIS's fraud; and (v) the stage of any litigation by the Trustee against the defendant. *Id.*

48.     Accordingly, the list includes one non-exclusive factor as "the nature of the Avoiding Power Claims (such as whether they are for recovery of a preference or for recovery of principal or fictitious profits)."  A second non-exclusive factor is whether the parties involved in the future  settlement and the Optimal Parties are "similar" concerning "knowledge of or complicity in" BLMIS's fraud. *Id.*  When taken together, these factors are consistent with my intention that the only cases that would be "similar" to Optimal are those that presented claims

17

for which no intent of the transferee need be shown—i.e., preferences or fictitious profits.  Cases

in which the Trustee asserted claims in which the intent or the bad acts of the defendant were at

issue—i.e., cases for recovery of principal—would not be "similar" claims.  The latter group of

cases requires higher standards of pleading and proof and thus the Trustee wanted the flexibility

to accept less than 85% without triggering the most favored nation provision.

49.    Another non-exclusive factor is the stage of any litigation by the Trustee against

the defendant.  This factor was intended to be flexible to encompass a wide variety of outcomes.

If a future defendant were to settle early and in a similar posture to Optimal—for example,

before a complaint was filed, discovery was taken, or before any rulings on dispositive

motions—the settlement should be in a similar range, assuming the claims and defenses did not

otherwise require a discount.  In some cases, the Trustee may need to settle for less than 85% if

some of his claims were dismissed or there were other unfavorable rulings that could diminish

his chances of success.  Likewise, if the parties are approaching or are at trial and an unknown

reason presents itself for the parties to settle before going to trial or judgment, such an outcome

is taken into account by this factor.

50.    The remaining non-exclusive factors are not at issue in the current dispute.

However, with regard to ability to pay, the understanding at the time was that the Trustee should

not accept less than 85% if a defendant has an ability to pay, determined from looking at, among

other things, a defendant's assets, the nature and future of its business (if applicable), and its

future obligations.

51.    With regard to the jurisdictional factor, the understanding at the time was that the

Trustee can accept less than 85% for certain foreign defendants because of the jurisdictional

defenses a defendant may raise and the difficulties associated with enforcing a United States

300317997.1

judgment in certain jurisdictions, assuming the Trustee was successful in defeating the jurisdictional challenges.

52.     The May 9 Proposal also provided that any disputes over the most favored nation provision shall be heard in a summary fashion by the Bankruptcy Court.  It states that the "Parties do not intend to generate collateral litigation over whether a particular settlement is under similar circumstances."  *See* Exhibit 22.

53.     The May 9 Proposal was incorporated into the next draft settlement agreement circulated by Mr. Levin on behalf of the Optimal Parties, dated May 13, 2009.  Attached hereto as Exhibit 23 is a true and correct copy of a document entitled "Settlement Agreement," dated May 13, 2009 (OPT000211).

54.     On May 11, 2009, my colleague, Mr. Lucchesi, emailed Mr. Levin stating, "I have reviewed your revisions to the Agreement, including the new MFN provision, and believe we are close to concluding our discussions."  Attached hereto as Exhibit 24 is a true and correct copy of an email from Mr. Lucchesi to Mr. Levin entitled "RE: FW: Optimal Settlement," dated May 11, 2009 (OPT000201).  Mr. Levin responded, "[W]e do not have client sign-off on this new form yet.  I would like to discuss with you any issues or revisions you have with it, and then I will send it to our clients for review."  Attached hereto as Exhibit 25 is a true and correct copy of an email from Mr. Levin to Mr. Lucchesi entitled "RE: FW: Optimal Settlement," dated May 11, 2009 (OPT000204).

55.     That same day, on the afternoon of May 11, 2009, Messrs. Levin and Rolfe met with Mr. Lucchesi and myself at BakerHostetler's office to discuss the proposed settlement agreement, including the most favored nation provision.  *See* Exhibit 25.

19

56.     Mr. Levin and Mr. Rolfe of Cravath and Mr. Lucchesi and myself also held a teleconference on May 13, 2009 to discuss the revised draft settlement agreement and draft press release prepared by Cravath on behalf of Optimal.  Attached hereto as Exhibit 26 is a true and correct copy of an email from Mr. Levin to myself and Messrs. Rolfe and Lucchesi entitled "Re: Optimal Settlement: Revised Draft, HSBC and Press Release," dated May 13, 2009 (OPT000247).

57.     The May 9 Proposal incorporated into Optimal's draft settlement agreement of May 13, 2009 is nearly identical to the most favored nation provision in the Parties' final settlement agreement, with only two changes.  On May 14, 2009, Mr. Levin added language to allow for the Trustee's notification of the Optimal Parties' should any settlement meet the requirements of the most favored nation provision.  Attached hereto as an Exhibit 27 is a true and correct copy of a document entitled "Settlement Agreement," dated May 14, 2009 (OPT000255). On May 18, 2009, Mr. Levin changed references in the most favored nation provision to a single defendant to include either a single defendant or a group of defendants, settling as a single unit. Attached hereto as an Exhibit 28 is a true and correct copy of a document entitled "Agreement," dated May 18, 2009 (OPT000322).

58.     The parties were under some pressure to finalize the settlement and obtain Bankruptcy Court approval prior to the July 2, 2009 bar date to file claims.  Optimal did not want to submit to jurisdiction by filing a claim unless it was certain that the settlement would be approved by the Bankruptcy Court and any order would become final before the bar date. Thus, at least in part, the speed with which the settlement negotiations took place was driven by this timing concern on the part of Optimal.

300317997.1

59.     The evolution of the provision during Spring 2009 shows the difficulty in drafting a provision that addressed the concerns of both parties without being overly broad.  A too-broad provision would preclude the Trustee from entering into settlements for less than 85%, even where the settlement would be beneficial to the estate and even in cases that presented different facts, claims, and defenses.  The Trustee also expressed to Optimal the concern that unforeseen circumstances would arise in the future that a rigid most favored nation provision would not accommodate, putting the Trustee at risk that an early settlement that would hamstring his future ability to settle and recover for the estate throughout the pendency of this liquidation.  Indeed, numerous developments in this liquidation, including the withdrawal of the reference and the application of section 546(e) to the Trustee's claims, were not anticipated at the time of the Optimal settlement in Spring 2009.  The Trustee balanced these concerns with his fiduciary duty to enter into favorable settlements for the benefit of the estate, particularly on the straightforward preference claims that were the subject of the Optimal settlement.  While the form of the provision was an evolving concept throughout the negotiations, the Trustee's concerns were expressed to Mr. Levin and captured in the agreed-upon provision.

60.     It was my understanding that the list of non-exclusive factors to be used in determining whether a future settlement was similar would permit for unforeseen circumstances. The non-exclusive factors also retained the intent and spirit of the parties that the provision apply only "similar" claims by listing the salient features of the Optimal Settlement—a settlement on preference claims against a defendant presenting plausible jurisdictional challenges with sufficient assets to satisfy a judgment.  To the extent that a future settlement presented these facts (or some limited variation on these facts within the factors listed), the intent was that the most favored nation provision should apply.  To the extent that a future settlement was not on all fours

300317997.1

with the Optimal settlement after reviewing the factors listed, the most favored nation provision
was not intended to apply.  Based on our discussions with Optimal and the final agreed-upon
language of the Optimal Settlement, the Trustee anticipated that the most favored nation
provision would only apply in extremely limited circumstances where the Trustee settled on
claims similar to strict liability claims, like the preference or fictitious profits claims in Optimal.

61.    The Trustee sued JPMorgan in December 2010, seeking to avoid and recover
approximately $425 million of transfers or other payments received by JPMorgan prior to the
collapse of BLMIS, along with interest.  The Trustee also asserted claims for aiding and abetting
fraud, aiding and abetting breach of fiduciary duty, conversion, unjust enrichment, and
contribution against JPMorgan.  After the reference was withdrawn to the District Court, the
District Court dismissed the Trustee's common law claims, which was affirmed by the Second
Circuit.  A petition for writ of *certiorari* is currently pending in the Supreme Court on the
Second Circuit decision.  A class action asserting similar common law claims against JPMorgan
was filed after the District Court's dismissal.  JPMorgan reached a global resolution of claims
relating to Madoff/BLMIS, including those with the Trustee on his avoidance and common law
claims, with the counsel for the class, and with the Government on forfeiture claims and criminal
penalties, for a total of over $2.2 billion flowing to Madoff victims.  The Trustee's settlements
were approved by this Court on February 5, 2014.  Attached hereto as Exhibit 29 is a true and
correct copy of the Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and
9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement of Avoidance Claims
by and Between the Trustee and JPMorgan, issued in *Picard v. JPMorgan Chase Co.*, Adv. Pro.
No. 10-4932 (SMB) (Bankr. S.D.N.Y. Feb. 5, 2014), ECF No. 51; attached hereto as Exhibit 30
is a true and correct copy of the Order Pursuant to Section 105(a) of the Bankruptcy Code and

300317997.1

Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement of

Common Law Claims by and Between the Trustee, the Class Representatives, and JPMorgan,

issued in *Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 10-4932 (SMB) (Bankr. S.D.N.Y.

Feb. 5, 2014), ECF No. 52.

62.     Optimal asserted that the most favored nation provision was triggered by the

Trustee's settlements with JPMorgan.  Attached as Exhibit 31 is a true and correct copy of the

Limited Response of SPV Optimal SUS Ltd. to the Proposed Settlement Agreement Between the

Trustee and JPMorgan Chase & Co., et al., *Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 10-

4932 (SMB) (Bankr. S.D.N.Y. Jan. 28, 2014), ECF No. 42.  The Trustee disputed that the

Trustee's settlement with JPMorgan was "similar" and asserted that the most favored nation

provision was not triggered.  Attached as Exhibit 32 is a true and correct copy of the Reply to

Limited Response to Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy

Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving

Settlement of Avoidance Claims By and Between the Trustee and JPMorgan, *Picard v.

JPMorgan Chase & Co.*, Adv. Pro. No. 10-4932 (SMB) (Bankr. S.D.N.Y. Jan. 31, 2014), ECF

No. 45.

63.     Based on my understanding at the time and the express intent of the Trustee in

entering into the Optimal settlement, the most favored nation provision would not apply to the

JPMorgan settlement because, among other things: (a) JPMorgan was not a BLMIS customer;

(2) the Trustee did not assert preference claims against JPMorgan similar to the preference

claims asserted against Optimal; (3) the Trustee asserted a variety of claims, both avoidance and

common law claims, against JPMorgan that he did not assert against Optimal, including for

JPMorgan's role as BLMIS's banker and lender, and as a subsequent transferee, all of which

23

require a higher standard of pleading and proof than preference claims like those settled in

Optimal; (4) the JPMorgan settlement with the Trustee was part of contemporaneous settlements

relating to its role in the Madoff fraud with the Department of Justice and other federal

authorities, as well as with class counsel representing a class of BLMIS customers, whereas the

Optimal settlement involved only the Trustee; (5) the Trustee asserted bad faith on the part of

JPMorgan, which he did not assert against Optimal; and (6) the stage of the proceedings in

JPMorgan were vastly different than with Optimal, as JPMorgan and the Trustee engaged in

discovery under Bankruptcy Rule 2004, a complaint (as amended) had been filed against

JPMorgan, the reference had been withdrawn, the District Court had issued dispositive rulings on

certain of the Trustee's claims, direct appeals and a petition for certiorari were filed relating to

the District Court ruling, and the case was proceeding to discovery before the Bankruptcy Court

at the time of the settlement, JPMorgan having answered the complaint.

64.    The overall intent of the Trustee in agreeing to the most favored nation provision

was to limit its application to narrow circumstances—only those in which the claims settled were

truly similar to Optimal.   This was consistent with the Optimal Parties' concern that they not

look foolish by overpaying the Trustee on his preference claims against them and be penalized

for settling early.  The most favored nation provision was not intended to be a blanket provision

that applied to any avoidance settlement by the Trustee relating to Madoff's fraud at any time

until the conclusion of the proceeding.  It was intended to provide *equal treatment* to Optimal

where the Trustee brought similar claims (those with few defenses) against similarly-situated

defendants.  Thus, it was intended to apply to settlements on straightforward claims involving no

intent on the part of the transferee and for which there are few defenses—i.e., preference or

fictitious profits claims—against defendants who had sufficient assets to satisfy a judgment.

24

Based on our express intent at the time of drafting, the Optimal Settlement was never intended to apply to complex claims like the ones presented in JPMorgan.

65.    Pursuant to 28 U.S.C. § 1746, I hereby declare that the foregoing statements made by me are true and correct.

Dated: April 9, 2014

MARC E. HIRSCHFIELD