# EXHIBIT 2

David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Amy Vanderwal
Email: avanderwal@bakerlaw.com
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone:     (212) 589-4200
Facsimile:       (212) 589-4201

**Hearing Date and Time:  June 16, 2009 at 10:00 a.m.**
**Objection Deadline: June 11, 2009**

Attorneys for Irving H. Picard, Esq.,
Trustee for the SIPA Liquidation of
Bernard L. Madoff Investment Securities
LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>                 Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>                 Defendant. | Adv. Pro. No. 08-1789 (BRL) <br><br> SIPA Liquidation |

**MOTION FOR ENTRY OF ORDER PURSUANT TO**
**SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF**
**THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AN**
**AGREEMENT BY AND AMONG THE TRUSTEE AND OPTIMAL STRATEGIC**
**U.S. EQUITY LIMITED AND OPTIMAL ARBITRAGE LIMITED**

TO:     THE HONORABLE BURTON R. LIFLAND
         UNITED STATES BANKRUPTCY JUDGE:

         Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the

business of Bernard L. Madoff Investment Securities LLC (the "Debtor" or "BLMIS"), by

and through his undersigned counsel, submits this motion (the "Motion") seeking entry of an order, pursuant to section 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking approval of an agreement (the "Agreement")[1] by and among the Trustee on the one hand and Optimal Strategic U.S. Equity Limited ("SUS") and Optimal Arbitrage Limited ("Arbitrage," SUS and Arbitrage are collectively referred to as the "Opimal Companies") on the other hand and, in support thereof, the Trustee respectfully represents as follows:

## BACKGROUND

1.  On December 11, 2008 (the "Filing Date"),[2] the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against defendants Bernard L. Madoff and the Debtor (together, the "Defendants") (Case No. 08 CV 10791). The complaint alleged that the Defendants engaged in fraud through investment advisor activities of the Debtor.

2.  On December 12, 2008, the Honorable Louis L. Stanton of the United States District Court for the Southern District of New York entered an order which appointed Lee S. Richards, Esq. as receiver (the "Receiver").

---

[1] The form of Agreement is annexed hereto as Exhibit "A."

[2] Section 78*lll*(7)(B) of the Securities investor Protection Act, 15 U.S.C. §§ 78aaa et seq. ("SIPA") states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

3.     On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

4.     On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA;

(b)     appointed Baker & Hostetler, LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

(c)     removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

5.     On December 18, 2008, the District Court entered the Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants (the "Preliminary Injunction Order").  Among other things, the Preliminary Injunction Order clarified that the Receiver is only appointed as to assets concerning the London entity, Madoff Securities International Ltd.

6.     At a plea hearing (the "Plea Hearing") on March 12, 2009 in the Criminal Action, Bernard Madoff pled guilty to an 11-count criminal information, which counts included securities fraud, money laundering and theft and embezzlement, filed against him by the United States Attorneys' Office for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (Plea Hr'g Tr. at 23:14-17.)

3

## THE CLAIMS AGAINST THE OPTIMAL COMPANIES

7.    Prior to the Filing Date, both of the Optimal Companies, either directly or through a customer agreement with Optimal Multiadvisors Limited or its predecessor and BLMIS, were customers of BLMIS.

8.    Specifically, SUS maintained a customer account commencing in January of 1997. Between then and the Filing Date, SUS deposited $1,411,084,183.00 in excess of the amount of withdrawals made from the account. Among other withdrawals, SUS withdrew $151,831,876.00, including BLMIS's withholding tax payments on SUS's behalf, from the account within the 90 day period prior to the Filing Date. The amount reflected on SUS's BLMIS account statement for the period ending November 30, 2008, which is the last available account statement, is $2,919,934,627.70, including option positions.

9.    Arbitrage maintained a customer account with BLMIS commencing in February of 1996. Between then and the Filing Date, Arbitrage withdrew a total of $96,516,185.00 in excess of the amount that Arbitrage deposited in the account. Among other withdrawals, Arbitrage withdrew $125,087,004.00, including BLMIS's withholding tax payments on Arbitrage's behalf, within the 90 day period before the Filing Date. Arbitrage also withdrew an additional $20,000,000.00 in October of 2007 and $15,000,000.00 in February of 2003. The amount reflected on Arbitrage's BLMIS account statement for the period ending November 30, 2008, which is the last available account statement, is $14,597,639.02, including option positions.

10.    The Trustee believes that the withdrawals made by or on behalf of the Optimal Companies in the 90 days prior to the Filing Date (the "90 Day Payments") are preferences, recoverable by the Trustee pursuant to sections 547 and 550 of the Bankruptcy

Code. Pursuant to these sections, a trustee may avoid and recover, for the benefit of the estate, any transfer of an interest of the debtor in property made (i) to or for the benefit of a creditor; (ii) on account of an antecedent debt owed by the debtor before such transfer was made; (iii) made while the debtor was insolvent; (iv) made within 90 days of the filing of the petition; (v) and which allowed the creditor to receive more than the creditor would have otherwise received. 11 U.S.C. §§ 547 and 550.

11.    Applying these sections of the Bankruptcy Code to the instant case, there is ample evidence to show that BLMIS was insolvent at all times relevant hereto. In fact, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS. In addition, there is no suggestion that the Optimal Companies provided new value after the withdrawals that could provide the Optimal Companies with a defense under section 547(c)(1)(A) to the recovery of the withdrawals. The Optimal Companies received transfers on behalf of antecedent debts, while BLMIS was insolvent and within 90 days of the Filing Date. Given the disparity between the value of the assets and the liabilities of BLMIS, the Optimal Companies certainly received more than they would have received if the transfers had not been made.

12.    The Trustee has also asserted that Arbitrage may be liable to the BLMIS estate under section 544(b) and 550 of the Bankruptcy Code and the New York Uniform Fraudulent Conveyance Law (New York Debtor and Creditor Law §§ 270 – 281) for the $35,000,000.00 which Arbitrage withdrew in 2003 and 2007. The Trustee issued a subpoena under Rule 2004 of the Federal Rule of Bankruptcy Procedure in this regard on February 27, 2009, seeking relevant documents (the "Subpoena"). Section 544(b) of the Bankruptcy Code allows a trustee to avoid a transfer that is voidable under state law. The

New York Uniform Fraudulent Conveyance Law provides a six year look-back period for fraudulent transfers.

13.    The Trustee believes that the 90 Day Payments made to each of the Optimal Companies are recoverable pursuant to Bankruptcy Code provisions and that the earlier payments made to Arbitrage may be recoverable under state law. However, in the interest of avoiding costly litigation and bringing the claims against the Optimal Companies to a speedy resolution, the Trustee has determined that the appropriate course of action is to seek to settle his claim against each of the Optimal Companies.

14.    In particular, the Trustee has reached an agreement with the Optimal Companies, subject to this Court's approval of the Agreement, whereby SUS will pay to the Trustee the sum of $129,057,094.60, which sum represents eighty-five percent of the amounts received by SUS in the 90 days prior to the Filing Date. Arbitrage will pay to the Trustee $106,323,953.40, which sum represents eighty-five percent of the amounts received by Arbitrage in the 90 days prior to the Filing Date. The terms of the Agreement are more fully described below.

## THE AGREEMENT

15.    The principal terms and conditions of the Agreement[3] are generally as follows (as stated, the form of Agreement is attached as Exhibit "A" and should be reviewed for a complete account of its terms):

- At Closing, SUS shall pay to the Trustee for the benefit of the BLMIS estate, the sum of $129,057,094.60, representing eighty-five percent of the amounts transferred to or for the benefit of SUS in the 90 days prior to

---

[3] Terms not otherwise defined in this section shall have the meaning ascribed in the Agreement. In the event of any inconsistency between the summary of terms provided in this section and the terms of the Agreement, the Agreement shall prevail.

the Filing Date. Upon the filing of a timely claim by SUS, the execution of a Partial Assignment and Release and the occurrence of the Closing, SUS shall have an allowable claim in the amount of $1,540,141,277.60. The Trustee shall make an initial distribution to SUS on account of its allowed claim in the amount of $500,000.00 in respect of the customer advance provided for by Section 9 of SIPA. The advance may be paid by setoff against the payment required to be made by SUS.

- At Closing, Arbitrage shall pay to the Trustee for the benefit of the BLMIS estate, the sum of $16,323,953.40 with five additional installments of $18,000,000.00 each to be paid every 30 days after the Closing, the total payment representing eighty-five percent of the amounts transferred to or for the benefit of Arbitrage in the 90 days prior to the Filing Date. Upon the filing of a timely claim by Arbitrage, the execution of a Partial Assignment and Release and the occurrence of the Closing, Arbitrage shall have an allowable claim in the amount of $9,807,768.40. The Trustee shall make an initial distribution to Arbitrage on account of its allowed claim in the amount of $500,000.00 in respect of the customer advance provided for by Section 9 of SIPA. The advance may be paid by setoff against the final installment payment required to be made by Arbitrage.

- The Trustee shall withdraw the Subpoena and shall not seek any other discovery from the Optimal Companies with respect to claims released by the Agreement.

- The Trustee will release the Optimal Companies from any and all claims and causes of action that are based on or arise out of the affairs of BLMIS, the SUS Account or the Arbitrage Account and that are based on or arise out of the Optimal Companies' actions, statements, conduct or omissions in connection with the Optimal Companies and certain related entities.

- The Optimal Companies will release the Trustee and all his agents and BLMIS and its estate from all actions or causes of action arising out of or in any way related to BLMIS, except with respect to the customer claims of the Optimal Companies described in the Agreement.

- As noted above, the payments by the Optimal Companies represent eighty-five percent of the amounts transferred to or for the benefit of each within the 90 days before the Filing Date. The parties intend that this amount be established as a minimum benchmark for future settlements of similar claims by the Trustee. In certain situations, if the Trustee settles a similar claim for less than eighty-five percent of the amount transferred to or for the benefit of the transferee in the relevant period, the Trustee may be required to return a portion of the consideration paid by the Optimal

Companies. Specifically, if the Trustee settles a similar claim for an amount of $40,000,000 or more, and the amount of the settlement is less than eighty-five percent of the total claim, the Trustee will return consideration to the Optimal Companies so that the Optimal Companies will have paid a percentage that is equal to that received in the subsequent settlement.

- If the Trustee obtains new information relating to the BLMIS accounts of the Optimal Companies that materially affects the Trustee's decision to enter into the Agreement, the Trustee shall provide such information to the Optimal Companies and permit them to respond within ten days. After reviewing the response, the Trustee may declare the Agreement and the settlement contained therein void and return the amounts paid by the Optimal Companies.

- The Optimal Companies will submit to the Bankruptcy Court's jurisdiction only with respect to the enforcement of the Agreement.

## RELIEF REQUESTED

16.     By this Motion, the Trustee respectfully requests that the Court enter an order substantially in the form of the proposed Order annexed hereto as Exhibit "B" approving the Agreement.

## LEGAL BASIS

I.     The Agreement is Fair, Equitable and in
       Best Interests Of The Debtor, its Estate and Customers

17.     Bankruptcy Rule 9019(a) provides, in pertinent part, that: "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Courts have held that in order to approve a settlement or compromise under Bankruptcy Rule 9019(a), a bankruptcy court should find that the compromise proposed is fair and equitable, reasonable and in the best interests of a debtor's estate. In re Ionosphere Clubs, Inc., 156 BR 414, 426 (S.D.N.Y. 1993), accord, 17 F.3d 600 (2d Cir. 1994) (citing Protective Comm. for Index. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).

18.     The Second Circuit has stated that a bankruptcy court, in determining whether to approve a compromise, should not decide the numerous questions of law and fact raised by the compromise, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir.), cert. denied sub nom. Cosoff v. Roman, 464 U.S. 822 (1983) (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir.), cert. denied sub nom. Benson v. Newman, 409 U.S. 1039 (1972)); accord Nellie v. Shugrue, 165 BR 115, 121-22 (S.D.N.Y. 1994); In re Ionosphere Clubs, 156 BR at 426; In re Purified Down Prods. Corp., 150 BR 519, 522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying litigation"); In re Drexel Burnham Lambert Group, Inc., 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

19.     In deciding whether a particular compromise falls within the "range of reasonableness," courts consider the following factors:

(i)     the probability of success in the litigation;

(ii)    the difficulties associated with collection;

(iii)   the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

(iv)    the paramount interests of the creditors.

Nellis v. Shugrue, 165 B.R. at 122 (citing In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir. 1992), cert. dismissed, 506 U.S. 1088 (1993)).

20.     The bankruptcy court may credit and consider the opinions of the trustee or debtor and their counsel in determining whether a settlement is fair and equitable. See In re Purofied Down Prods., 150 B.R. at 522; In re Drexel Burnham Lambert Group, Inc., 134

9

B.R. at 505. The competency and experience of counsel supporting the settlement may also be considered. Nellis v. Shugrue, 165 B.R. at 122. Finally, the court should be mindful of the principle that "the law favors compromise." In re Drexel Burnham Lambert Group, Inc., 134 B.R. at 505 (quoting In re Blair, 538 F.2d 849, 851 (9th Cir. 1976)).

21.     The Trustee believes that the terms of the Agreement fall well above the lowest point in the range of reasonableness and, accordingly, the Agreement should be approved by this Court.  The Agreement resolves all issues regarding the Trustee's claims against the Optimal Companies (the "Claims") without the need for protracted, costly, and uncertain litigation.  (Affidavit of the Trustee in Support of the Motion (the "Picard Affidavit") ¶ 4.  A true and accurate copy of the Picard Affidavit is attached hereto as Exhibit "C.")  Litigating the Claims would undoubtedly be expensive and would require a significant commitment of time by the various professionals involved in the matter and would increase the administrative burden on the estates.

22.     While it appears that the withdrawals by the Optimal Companies each represent a "textbook" preference, there are other issues that make proceeding against them for the full amount of their withdrawals less than certain.  Indeed, the Optimal Companies, both of which are located in the Bahamas, have each cited to the Trustee potential jurisdictional and other issues regarding the ability of the Trustee to collect on any judgment that he might obtain.  Given these issues, and the cost and complexities involved in proceeding with litigation, the Trustee has determined that the proposed settlement with the Optimal Companies represents a fair compromise of the Claims.  The Agreement also furthers the interests of the customers of BLMIS by bringing a substantial amount of money into the estate. Id. ¶ 5.

23.    The Trustee conducted a confirmatory investigation, including a review of documents made available to the Trustee by the Optimal Companies that related to, among other things, due diligence conducted by the Optimal Companies and their affiliates on BLMIS.  On the basis of the review, the Trustee concluded that the Optimal Companies and their affiliates were not complicit in the fraud perpetrated by BLMIS and Bernard Madoff on BLMIS's customers and did not have actual knowledge of the fraud, and based on the review, the Trustee does not believe that the conduct, acts and omissions of the Optimal Companies and their affiliates provide grounds to assert any claim against the Optimal Companies or any affiliates (other than avoiding power claims), or to disallow any claim that SUS or Arbitrage may have against BLMIS or its estate.  If the Trustee obtains new information relating to the BLMIS accounts of the Optimal Companies that materially affects the Trustee's decision to enter into the Agreement, the Trustee will provide such information to the Optimal Companies and permit them to respond within ten days.  After reviewing the response, the Trustee may declare the Agreement and the settlement contained therein void and return the amounts paid by the Optimal Companies. Id. ¶ 6.

24.    In sum, the Trustee submits that the Agreement should be approved (a) to avoid burdensome and expensive litigation and (b) and because the Agreement represents a reasonable compromise of the Claims that benefits the estate and the customers of BLMIS. Accordingly, since the Agreement is well within the "range of reasonableness" and confers a substantial benefit on the estate, the Trustee respectfully requests that the Court enter an Order approving the Agreement.

## NOTICE

25.     In accordance with Bankruptcy Rules 2002 and 9019, notice of this Motion has been given to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) all known creditors of BLMIS. The Trustee shall also serve, by way of the ECF filing that will be made, each person or entity that has filed a notice of appearance in this case. The Trustee submits that no other or further notice need be given. and respectfully requests that the Court find that such notice is proper and sufficient.

WHEREFORE, the Trustee respectfully requests entry of an Order substantially in the form of Exhibit "B" granting the relief requested in the Motion.

Dated: New York, New York          Respectfully submitted,
       May 26, 2009

                                   /s/ Marc Hirschfield
                                   Baker & Hostetler LLP
                                   45 Rockefeller Plaza
                                   New York, New York 10111
                                   Telephone: (212) 589-4200
                                   Facsimile: (212) 589-4201
                                   David J. Sheehan
                                   Email: dsheehan@bakerlaw.com
                                   Marc Hirschfield
                                   Email: mhirschfield@bakerlaw.com
                                   Amy Vanderwal
                                   Email: avanderwal@bakerlaw.com

                                   *Attorneys for Irving H. Picard, Esq.*
                                   *Trustee for the SIPA Liquidation of Bernard L.*
                                   *Madoff Investment Securities LLC*

David J. Sheehan                                        **Hearing Date and Time:  June 16, 2009 at 10:00 a.m.**
Email: dsheehan@bakerlaw.com                            **Objection Deadline:  June 11, 2009**
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Amy Vanderwal
Email: avanderwal@bakerlaw.com
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York  10111
Telephone:     (212) 589-4200
Facsimile:     (212) 589-4201

Attorneys for Irving H. Picard, Esq.,
Trustee for the SIPA Liquidation of
Bernard L. Madoff Investment Securities
LLC


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

---

## NOTICE OF MOTION FOR ENTRY OF ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AN AGREEMENT BY AND AMONG THE TRUSTEE AND OPTIMAL STRATEGIC U.S. EQUITY LIMITED AND OPTIMAL ARBITRAGE LIMITED

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business

of Bernard L. Madoff Investment Securities LLC (the "Debtor" or "BLMIS"), by and through his

undersigned counsel, will move before the Honorable Burton R. Lifland, United States

Bankruptcy Judge, at the United States Bankruptcy Court, the Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004-1408, on June 16, 2009 at 10:00 a.m., or as soon thereafter as counsel may be heard, seeking entry of an order, pursuant to section 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure approving that certain Agreement by and among the Trustee on the one hand and Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited, on the other hand, as more particularly set forth in the Motion.

PLEASE TAKE FURTHER NOTICE that written objections to the Motion must be filed with the Clerk of the United States Bankruptcy Court, One Bowling Green, New York, New York 10004 by no later than **5:00 p.m. on June 11, 2009** (with a courtesy copy delivered to the Chambers of the Honorable Burton R. Lifland) and must be served upon (a) Baker & Hostetler, LLP, counsel for the Trustee, 45 Rockefeller Plaza, New York, New York 10111, Attn: Marc Hirschfield and (b) Cravath, Swaine & Moore LLP, Worldwide Plaza, 825 Eighth Avenue, New York, New York 10019, Attn: Richard Levin. Any objections must specifically state the interest that the objecting party has in these proceedings and the specific basis of any objection to the Motion.

Dated: New York, New York
      May 26, 2009

Respectfully submitted,

`

/s/ Marc Hirschfield
_____
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Amy Vanderwal
Email: avanderwal@bakerlaw.com
*Attorneys for Irving H. Picard, Esq.*
*Trustee for the SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC*

# EXHIBIT A

## FORM OF AGREEMENT BETWEEN
## TRUSTEE AND OPTIMAL COMPANIES

300004132

[Execution Version]

## AGREEMENT

This AGREEMENT, dated as of May 22, 2009, is made by and among IRVING H. PICARD, in his capacity as Trustee for the liquidation under the Securities Investor Protection Act of 1970, as amended ("SIPA") of Bernard L. Madoff Investment Securities LLC (the "Trustee"), on the one hand, and OPTIMAL STRATEGIC U.S. EQUITY LIMITED, a Bahamas corporation ("SUS"), and OPTIMAL ARBITRAGE LIMITED, a Bahamas corporation ("Arbitrage"), on the other hand (each of the Trustee, SUS and Arbitrage, a "Party").

## BACKGROUND

A.    Bernard L. Madoff Investment Securities LLC ("BLMIS") was a registered broker-dealer and a member of the Securities Investor Protection Corporation ("SIPC").

B.    On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against BLMIS and Bernard L. Madoff ("Madoff").  On December 12, 2008, the District Court entered an order which among other things appointed a receiver (the "Receiver") for the assets of BLMIS (No. 08-CV-10791(LSS)).

C.    On December 15, 2008, pursuant to section 5(a)(4)(A) of SIPA, the Commission consented to a combination of its own action with the application of SIPC. Thereafter, SIPC filed an application in the District Court under section 5(a)(3) of SIPA alleging, _inter alia_, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On December 15, 2008, the District Court granted the SIPC application and entered an order under SIPA, which, in pertinent part, appointed the Trustee for the liquidation of the business of BLMIS under section 5(b)(3) of SIPA and removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under section 5(b)(4) of SIPA, where it is currently pending as Case No. 08-01789 (BRL) (the "SIPA Proceeding").  The Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

D.    On December 11, 2008, Madoff was arrested by federal agents for criminal securities laws violations including securities fraud, investment adviser fraud, and mail and wire fraud.  At a plea hearing on March 12, 2009 in the case captioned United States v. Madoff, Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]" and engaged in fraud in the operation of BLMIS.

E.    SUS and Arbitrage are trading companies that are owned by Optimal Multiadvisors Limited, which is a Bahamas multi-portfolio investment company and Standard Fund ("OML").  All of OML's ordinary voting shares are owned by Optimal Investment Services, S.A., a Swiss société anonyme ("OIS"), which is an indirect wholly-owned subsidiary of Banco Santander, S.A., a Spanish banking corporation ("Santander").  Optimal Multiadvisors (Ireland) plc is an Irish public limited company authorized by the Irish Financial Services Regulatory Authority and constituted as an umbrella fund comprised of a number of segregated

liability sub-funds ("OMI"). OIS owns 50% of the ordinary shares of OMI (the other 50% of which are owned by an indirect subsidiary of Santander). OIS acts as the investment manager and investment advisor of OMI and of OML. OIS, OMI, OML, SUS and Arbitrage are referred to collectively as the "Optimal Companies".

     F.    Investments in the funds operated by OMI and OML are represented by participating shares, which are held by numerous investors ("Investors"), many of whom may be customers of Santander or one or more of its affiliates.

     G.    HSBC Securities Services (Ireland) Limited, an Irish limited liability company ("HSSI"), serves as administrator for OMI, OML, SUS and Arbitrage; HSBC Institutional Trust Services (Ireland) Limited, an Irish limited liability company ("HITS"), serves as custodian for OMI, OML, SUS and Arbitrage.

     H.    SUS (either directly or through a customer agreement between OML or its predecessor and BLMIS) was a customer of BLMIS and maintained a customer account (the "SUS Account") with BLMIS, commencing in January 1997. Between then and the Filing Date, SUS had deposited into the SUS Account a total of $1,411,084,183 in excess of the amount of withdrawals, including BLMIS's withholding tax payments on SUS's behalf, that SUS had made from the account. Among other withdrawals, SUS withdrew $151,831,876, including BLMIS's withholding tax payments on SUS's behalf, from the SUS Account within 90 days before the Filing Date, but did not withdraw any other amount from the SUS Account after November 2002, other than by BLMIS's withholding tax payments on SUS's behalf. The amount of the SUS Account reflected on SUS's BLMIS account statement for the period ended November 30, 2008, which is the last available account statement, is $2,919,934,627.70, including option positions.

     I.    Arbitrage (either directly or through a customer agreement between OML or its predecessor and BLMIS) was a customer of BLMIS and maintained a customer account (the "Arbitrage Account") with BLMIS, commencing in February 1996. Between then and the Filing Date, Arbitrage had withdrawn from the Arbitrage Account a total of $96,516,185, including BLMIS's withholding tax payments on Arbitrage's behalf, in excess of the amount that Arbitrage had deposited into the Arbitrage Account. Among other withdrawals, Arbitrage withdrew $125,087,004, including BLMIS's withholding tax payments on Arbitrage's behalf, from the Arbitrage Account, within 90 days before the Filing Date, and an additional $20,000,000 in October 2007 and $15,000,000 in February 2003, but did not withdraw any other amount from the Arbitrage Account after November 2002, other than by BLMIS's withholding tax payments on Arbitrage's behalf. The amount of the Arbitrage Account reflected on Arbitrage's BLMIS account statement for the period ended November 30, 2008, which is the last available account statement, is $14,567,639.02, including options positions.

     J.    As a result of agreements between Santander or one or more of its affiliates and numerous former Investors in SUS who were private banking clients of Santander or its banking subsidiaries, Santander and some of its affiliates have succeeded to the interest of such former Investors in SUS.

2

K.    SUS and Arbitrage have asserted that they are each entitled to allowance of a customer claim in the BLMIS liquidation proceeding in an amount reflected on their respective BLMIS account statements for the period ended November 30, 2008. The Trustee has disputed that SUS and Arbitrage are entitled to allowance of customer claims in the amounts reflected on their respective BLMIS account statements.

L.    The Trustee has advised the Optimal Companies of his position that only SUS and Arbitrage, as the direct customer account holders at BLMIS, are entitled to the allowance of customer claims under the provisions of SIPA or to the benefit of SIPC advances under section 9 of SIPA in the SIPA Proceeding on account of the SUS Account and the Arbitrage Account, respectively, and only upon compliance with the applicable provisions of SIPA and the Bankruptcy Code.

M.    The Trustee has asserted that SUS and Arbitrage are liable to the BLMIS estate under 11 U.S.C. §§ 547 and 550 for the withdrawals that each of them received within the 90 days before the Filing Date. The Trustee has also asserted that Arbitrage also may be liable to the BLMIS estate under 11 U.S.C. §§ 544(b) and 550 and the New York Uniform Fraudulent Conveyance Act (New York Debtor and Creditor Law §§ 270 - 281) for $35,000,000, which Arbitrage withdrew in 2003 and 2007 (any claims under 11 U.S.C. §§ 542, 544, 547 or 550, "Avoiding Power Claims"). In connection therewith, the Trustee issued a subpoena to OML under Fed. R. Bankr. Proc. 2004 on February 27, 2009 (the "Subpoena"), seeking documents related to the SUS Account and the Arbitrage Account, among other things.

N.    SUS and Arbitrage have disputed any liability to the estate. SUS and Arbitrage also have disputed that either of them is subject to the jurisdiction of the Bankruptcy Court under principles of United States law and that any judgment that the Trustee might obtain against either of them in the Bankruptcy Court would not be enforced against either of them by a court in The Bahamas, based on lack of jurisdiction over them in the United States. SUS and Arbitrage also have disputed that OML is subject to the jurisdiction of the Bankruptcy Court for the purpose of enforcement of the Subpoena.

O.    The Trustee, on the one hand, and SUS and Arbitrage, on the other hand, wish to settle their disputes about the matters described above without the expense, delay and uncertainty of litigation.

P.    As a condition to settling the disputes, which involves releasing claims against the Optimal Companies and their affiliates and the allowance of customer claims in favor of SUS and Arbitrage in the SIPA Proceeding, the Trustee conducted a confirmatory investigation which included review of documents that were made available to the Trustee by the Optimal Companies on a confidential basis that relate to, among other things, due diligence conducted by the Optimal Companies and their affiliates on BLMIS. On the basis of such review, the Trustee concluded that the Optimal Companies and their affiliates were not complicit in the fraud that BLMIS and Madoff perpetrated on BLMIS's customers and did not have actual knowledge of the fraud, and based on the review, the Trustee does not believe that the conduct, acts and omissions of the Optimal Companies and their affiliates provide grounds to assert any claim against the Optimal Companies or any of their affiliates (other than Avoiding Power Claims), or to disallow any claim that SUS or Arbitrage may have against BLMIS or its estate.

3

NOW, THEREFORE, in consideration of the foregoing, of the mutual covenants, promises and undertakings set forth herein, and for good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the Trustee, SUS and Arbitrage agree:

## AGREEMENT

1.    **SUS and Arbitrage Agreement to Bankruptcy Court Jurisdiction.** For the purpose of this Agreement only (including with respect to paragraphs 7 and 23), SUS and Arbitrage agree that the agreements with BLMIS that they each signed in connection with the SUS Account and the Arbitrage Account and their respective communications and trading activities with respect to the Accounts, submit them to the jurisdiction of the Bankruptcy Court for the purpose of the SIPA Proceeding and any Avoiding Power Claims that the Trustee may bring against them under section 544, 547 and/or 550 of the Bankruptcy Code. SUS's and Arbitrage's agreement to Bankruptcy Court jurisdiction under this paragraph does not constitute consent by any other Optimal Company to the Bankruptcy Court's jurisdiction or an agreement that any of them is subject to the Bankruptcy Court's jurisdiction.

2.    **SUS Payment to Trustee.** SUS shall pay the Trustee the sum of $129,057,094.60 by wire transfer at the Closing (as defined in paragraph 11), in full and final settlement of all Avoiding Power Claims and other claims of the Trustee or the BLMIS estate against SUS.

3.    **Allowance of SUS Customer Claim.** Upon the filing of a timely claim by SUS, the execution of a Partial Assignment and Release in the form annexed hereto (the "Partial Assignment") and the occurrence of the Closing (as defined below), SUS shall have an allowed customer claim in the SIPA Proceeding in the amount of $1,540,141,277.60 and shall be entitled to the full benefit of SIPC customer advances under section 9 of SIPA. The Bankruptcy Court's order approving this Agreement shall provide for the allowance of SUS's customer claim as provided in this paragraph. The Trustee shall make a distribution to SUS on account of its allowed claim in the amount of $500,000 in respect of the customer advance to the Trustee under section 9 of SIPA, as provided in paragraph 11. Payment of the customer advance under Section 9 of SIPA and any other payments made to SUS on account of SUS's allowed customer claim made by the Trustee shall be governed by all of SUS's organizational and other fund documents relating to SUS's relations with its investors and with all applicable agreements with SUS's investors.

4.    **Arbitrage Payment to Trustee.** Arbitrage shall pay the Trustee the sum of $106,323,953.40 by wire transfer, in full and final settlement of all Avoiding Power Claims and other claims of the Trustee or the BLMIS estate against Arbitrage, in a single payment of $16,323,953.40 at the Closing and in five installments of $18,000,000 every 30 days after the Closing (each, an "Arbitrage Deferred Payment").

5.    **Allowance of Arbitrage Customer Claim.** Upon the filing of a timely claim by Arbitrage, the execution of a Partial Assignment, and the occurrence of the Closing, Arbitrage shall have an allowed customer claim in the SIPA Proceeding in the amount of $9,807,768.40 and shall be entitled to the full benefit of SIPC customer advances under section 9 of SIPA. The

Bankruptcy Court's order approving this Agreement shall provide for the allowance of Arbitrage's customer claim as provided in this paragraph. The Trustee shall make a distribution to Arbitrage on account of its allowed claim in the amount of $500,000 in respect of the customer advance to the Trustee under section 9 of SIPA, as provided in paragraph 11. Payment of the customer advance under Section 9 of SIPA and any other payments made to Arbitrage on account of Arbitrage's allowed customer claim made by the Trustee shall be governed by all of Arbitrage's organizational and other fund documents relating to Arbitrage's relations with its investors and with all applicable agreements with Arbitrage's investors.

6.    Filing of Customer Claims.  SUS and Arbitrage agree that only SUS and Arbitrage (as the only BLMIS customer account holders among the Optimal Companies and their affiliates and as investment funds not acting as agents for the Investors) may file customer claims in the SIPA Proceedings on account of the SUS Account and the Arbitrage Account.

7.    Withdrawal of Subpoena.  The Trustee shall withdraw the Subpoena and shall not seek any other discovery, by subpoena or otherwise, from any of the Optimal Companies or any of the Optimal Third-Party Releasees (as defined below) for anything relating to the SUS Account or the Arbitrage Account or the relationship between the Optimal Companies or their affiliates and BLMIS or Madoff; provided, however, that the provisions of this paragraph shall extend to the Optimal Third-Party Releasees only to the extent of their relationship with the Optimal Companies and not in any other context or capacity. Nothing in this paragraph shall prevent the Trustee from requesting that the Optimal Companies or any of the Optimal Third-Party Releasees produce documents relating specifically to individuals or entities (other than the individuals or entities released by this Agreement) with respect to claims or possible claims against any individual or entity not released by this Agreement. Each of SUS and Arbitrage, on behalf of themselves and to the extent they may bind each of the other Optimal Releasees (as defined below), agrees to cooperate and, to the extent permitted by the jurisdiction in which the documents are located, produce such documents. The Trustee reserves the right to issue a subpoena for any document so requested by the Trustee that has not been produced voluntarily, and nothing in this Agreement may be construed as a waiver by any of the Optimal Releasees of any rights to contest any such subpoena.

8.    Notification of No Interest in Custodial Accounts.  The Trustee shall advise HSSI and HITS promptly after the date on which this Agreement become effective that the Trustee and the BLMIS estate do not assert any interest in any of the funds or accounts that HSSI or HITS holds or controls for any of the Optimal Companies and shall not in the future assert any interest in any such funds. Upon HSSI's and HITS's making funds of SUS and Arbitrage, respectively, available to make the payments to the Trustee required under paragraphs 3 and 5, the Trustee releases HSSI and HITS from any claim or liability for any Avoiding Power Claim that the Trustee has or may have against SUS or Arbitrage.

9.    Release by Trustee.  In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to any rights arising under this Agreement, the Trustee does hereby release, remise and forever discharge SUS and Arbitrage from any and all past, present or future claims or causes of action (including any suit, petition, demand, or other claim in law, equity or arbitration) and from any and all allegations of liability or damages

(including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect, in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty or otherwise (including attorneys' fees, costs or disbursements), known or unknown, that are, have been, could have been or might in the future be asserted by the Trustee against any of the Optimal Releasees and that meet both of the following conditions: (a) they are based on, arise out of or relate in any way to the affairs of BLMIS, the SUS Account or the Arbitrage Account and (b) they are based on, arise out of or relate in any way the Optimal Releasee's actions, statements, conduct, or omissions in connection with, or investments in, one or more of the Optimal Companies and not in any other context or capacity. The foregoing release shall also apply, to the same extent, to each of the Optimal Companies (in addition to SUS and Arbitrage) and each of their respective past or present direct or indirect stockholders, affiliates, limited partners, investors or other equity holders and each of their successors, assigns and transferees and each of their respective past or present officers, directors, employees, agents, legal representatives, privies, representatives, accountants, attorneys (collectively, the "Optimal Third-Party Releasees" and with the Optimal Companies, the "Optimal Releasees") who subscribes to the release under paragraph 10 by executing and delivering to the Trustee the Release Subscription annexed to this Agreement at any time until 60 days after the Trustee gives written notice to the subscribing Optimal Releasee of a claim or a potential claim against the subscribing Optimal Releasee.

　　　　10.　　Release by SUS and Arbitrage.　　In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to the claims set forth in paragraphs 3 and 5 and any rights arising under this Agreement, each of SUS and Arbitrage hereby releases, acquits and absolutely discharges the Trustee and all his agents, BLMIS and its estate, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or unknown, now existing or arising in the future, arising out of or in any way related to BLMIS.

　　　　11.　　Closing.　　SUS and Arbitrage shall use its best efforts to determine, and shall notify the Trustee promptly of, the date on which HSSI and HITS make funds of SUS and Arbitrage, respectively, available to make the payments to the Trustee under this Agreement. There shall be a closing ("Closing") within 10 days after the later of the date of such notice or the date on which this Agreement becomes effective and binding on the Parties under paragraph 12, on a date agreed by the Parties, at the offices of Trustee's counsel in New York, N.Y. At the Closing, (a) SUS shall make the payment required under paragraph 2; (b) Arbitrage shall make the first payment required under paragraph 4, (c) SUS shall execute and deliver to the Trustee a Partial Assignment; (d) Arbitrage will execute and deliver to the Trustee a Partial Assignment; (e) SUS shall file a customer claim in the SIPA Proceeding by delivery of the claim to the Trustee in the amount specified in paragraph 3, (f) Arbitrage shall file a customer claim in the SIPA Proceeding by delivery of the claim to the Trustee in the amount specified in paragraph 4, (g) upon the delivery of such claims to the Trustee, the Trustee shall pay SUS and Arbitrage each $500,000 from SIPC advances under section 9 of SIPA, which amounts may be paid by setoff against the payments required under paragraph 2 with respect to SUS and with respect to

6

Arbitrage, the last of the Arbitrage Deferred Payments under paragraph 4, (h) the Trustee's withdrawal of the subpoena under paragraph 7 of this Agreement shall become effective, without any further action by any of the Parties, (i) the releases contained in paragraphs 9 and 10 shall become effective without any further action by any of the Parties, except as to Arbitrage, as to which the Trustee's release of Arbitrage shall become effective only upon Arbitrage's completion of payments required under paragraph 4.

     12.   Bankruptcy Court Approval; Effective Date; Termination. This Agreement is subject to, and shall become effective and binding on the Parties (except as provided in paragraph 11) upon and only upon, the Bankruptcy Court's approval of this Agreement in the SIPA Proceeding by an order that is no longer subject to appeal, review or rehearing. The form of the approval order shall be subject to SUS's and Arbitrage's reasonable approval. The Trustee shall use his best efforts to obtain such approval as promptly as practicable after the date of this Agreement. The Trustee shall provide SUS and Arbitrage a draft of any motion to the Bankruptcy Court for approval of this Agreement, which shall be subject to SUS's and Arbitrage's reasonable approval. If this Agreement has not become effective as provided in this paragraph within 45 days after the date of this Agreement (or within such additional time as SUS and Arbitrage permit), then (a) this Agreement (other than this paragraph and paragraphs 22 and 23) shall terminate and be void, (b) all of the statements, admissions, consents and agreements contained in the Agreement (other than this paragraph and paragraphs 22 and 23) shall be void and (c) neither the Trustee nor any of the Optimal Companies or its affiliates may use or rely on any such statement, admission, consent or agreement in any public statement or litigation involving the SIPA Proceedings, any case or proceeding relating to the SIPA Proceeding or any case or proceeding relating to BLMIS or Madoff. There shall be no other basis for termination of this Agreement by either Party.

     13.   Equal Treatment for SUS and Arbitrage with Other Similar Customers. (a) Under this Agreement, SUS and Arbitrage are paying the Trustee an amount equal to 85% of the amounts received by each of SUS and Arbitrage either within the 90 days before the Filing Date or as fictitious profits (the "Settlement Amount"). The parties intend and agree that this 85% percentage be established as a benchmark for future settlements by the Trustee in the SIPA Proceeding of Avoiding Powers Claims that are similar to the Avoiding Power Claims the Trustee asserted against SUS and Arbitrage.

     (b)(i) If the Trustee settles one or a related series of Avoiding Power Claims against a single defendant or group of defendants that are under common control for an aggregate settlement amount of $40,000,000 or more (a "Qualifying Settlement"), (ii) if the amount of the Qualifying Settlement is less than the benchmark 85% of the Avoiding Power Claims, and (iii) if the circumstances of the Avoiding Power Claims and the Qualifying Settlement are similar to the circumstances underlying this Agreement, then the Trustee shall return to SUS a portion of the consideration paid under paragraph 3 or reduce of a portion of the consideration to be paid by Arbitrage, or return to Arbitrage a portion of the consideration paid, as the case may be, under paragraph 5, so that the net amount that SUS and Arbitrage will have paid (net after all such returns) as a percentage of $151,831,876 and of $125,087,004, respectively, is equal to that contained in the Qualifying Settlement.

(c) The following non-exclusive factors shall be taken into account in determining whether the circumstances of the Avoiding Power Claims and the Qualifying Settlement are "similar": (i) the ability of the defendant (or group of defendants, taken as a whole) to pay, (ii) the nature of the Avoiding Power Claims (such as whether they are for recovery of a preference or for recovery of principal or fictitious profits), (iii) the jurisdictional connections of the defendant (or group of defendants, taken as a whole) with the United States and the enforceability of a judgment of a court of the United States against the defendant (or group of defendants, taken as a whole) in its domiciliary jurisdiction, (iv) the knowledge of the defendant (or group of defendants, taken as a whole) or its or their complicity in the fraud that BLMIS perpetrated on its customers, and (v) the stage of any litigation by the Trustee against the defendant (or group of defendants, taken as a whole).

(d) If the Parties do not agree whether circumstances are similar as described in this paragraph 13, the Bankruptcy Court shall resolve any such dispute. The Parties do not intend to generate collateral litigation over whether a particular settlement is under similar circumstances. To that end, (i) any proceeding before the Bankruptcy Court on such a dispute shall be heard in a summary fashion; (ii) the Trustee shall provide SUS and Arbitrage factual information about a Qualifying Settlement that in the Trustee's reasonable discretion is of the same kind and detail as would be appropriate in a motion for approval of a single settlement under Federal Rule of Bankruptcy Procedure 9019, including factual information about the total amount of the Avoiding Power Claim or Claims being settled and factual information relevant to the factors set forth in paragraph 13(c); and (iii) the Trustee shall not be subject to discovery in any such matter.

(e) The Trustee shall notify SUS and Arbitrage promptly of any settlement that meets the requirements of either paragraph 13(b)(i) or 13(b)(ii). The notice shall contain at least enough information to indicate that the settlement meets the requirements of either paragraph 13(b)(i) or 13(b)(ii). Notice may be given as provided in paragraph 27 or by a filing with the Bankruptcy Court. If the Trustee is under any confidentiality obligation with respect to any of the information that the Trustee is required to provide under this paragraph 13(e) or under paragraph 13(d)(ii), the Trustee shall provide the information to SUS and Arbitrage upon SUS and Arbitrage entering into a reasonable confidentiality agreement with the Trustee with respect to the information. The Trustee agrees not to enter into any confidentiality agreement that would prevent him from honoring his information sharing obligations under paragraph 13(d)(ii).

(f) This paragraph 13 may be applied more than once if there is more than one Qualifying Settlement.

14.   New Information. If the Trustee obtains new information specifically relating to the Optimal Companies with respect to the SUS Account or the Arbitrage Account after the date of this Agreement that is not merely cumulative and if the Trustee reasonably believes that the new information materially affects the Trustee's conclusions stated in paragraph P or the Trustee's decision to enter into this Agreement, the Trustee shall provide such information to SUS and Arbitrage and permit SUS and Arbitrage to respond to such new information within ten business days. After reviewing the SUS and Arbitrage response, the Trustee may, on written notice to SUS and Arbitrage, declare this Agreement and the settlement set forth herein, including the release given under paragraph 9, void, and the Trustee shall, within ten days of

8

providing such notice, return the amounts paid under paragraphs 2 and 4 to SUS and Arbitrage. Thereafter, each of the Parties shall have all rights and defenses as though this Agreement had never been executed.

15.    <u>SUS and Arbitrage Authority</u>.  SUS and Arbitrage represent and warrant to the Trustee as of the date hereof that each of them is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation and that each of them has the full power, authority and legal right to execute and deliver, and to perform its respective obligations under, this Agreement and has taken all necessary action to authorize the execution and delivery of, and the performance of its respective obligations under, this Agreement.

16.    <u>Further Assurances</u>.  The Trustee, SUS and Arbitrage shall execute and deliver any document or instrument reasonably requested by any of them after the date of this Agreement to effectuate the intent of this Agreement.

17.    <u>Entire Agreement</u>.  This Agreement and any confidentiality agreement between the Trustee and any of the Optimal Companies constitute the entire agreement and understanding between and among the Parties and supersede all prior agreements, representations and understandings concerning the subject matter hereof.

18.    <u>Amendments, Waiver</u>.  This Agreement may not be terminated, amended or modified in any way except in a writing signed by all the Parties.  No waiver of any provision of this Agreement shall be deemed to constitute a waiver of any other provision hereof, whether or not similar, nor shall such waiver constitute a continuing waiver.

19.    <u>Assignability</u>.  No Party hereto may assign its rights under this Agreement without the prior written consent of each of the other Parties hereto.

20.    <u>Successors Bound</u>.  This Agreement shall be binding upon and inure to the benefit of each of the Parties and their successors and permitted assigns.

21.    <u>No Third Party Beneficiary</u>.  Except as expressly provided in paragraphs 7, 8, 9 and 10, the Parties do not intend to confer any benefit by or under this Agreement upon any person or entity other than the Parties hereto and their respective successors and permitted assigns.

22.    <u>Applicable Law</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

23.    <u>Exclusive Jurisdiction</u>.  The Parties agree that any action for breach or enforcement of this Agreement may be brought only in the Bankruptcy Court.  No Party shall bring, institute, prosecute or maintain any action pertaining to the enforcement of any provision of this Agreement in any court other than the Bankruptcy Court.

24.    <u>Captions and Rules of Construction</u>.  The captions in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.  Any reference in this

Agreement to a paragraph is to a paragraph of this Agreement. "Includes" and "including" are not limiting.

25.    Counterparts; Electronic Copy of Signatures.  This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same document. The Parties may evidence their execution of this Agreement by delivery to the other Parties of scanned or faxed copies of their signatures, with the same effect as the delivery of an original signature.

26.    Termination of SUS and Arbitrage Agreements with BLMIS.  All agreements between SUS and BLMIS and between Arbitrage and BLMIS are terminated as of the Closing.

27.    Notices.  Any notices under this Agreement shall be in writing, shall be effective when received and may be delivered only by hand, by overnight delivery service, by fax or by electronic transmission to:

If to the Trustee, c/o:

Marc Hirschfield, Esq.
Baker & Hostetler LLP
45 Rockefeller Center, Suite 1100
New York, NY 10111
F: (212) 589-4201
E: mhirschfield@bakerlaw.com

If to SUS or Arbitrage, c/o:

Richard Levin and Ronald Rolfe
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Ave.
New York, NY 10019
F: (212) 474-3700
E: rlevin@cravath.com; rolfe@cravath.com

*[Signature page follows]*

10

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

IRVING H. PICARD, Trustee

_____


OPTIMAL STRATEGIC U.S. EQUITY LIMITED


By: _____
      Name:
      Title:

OPTIMAL ARBITRAGE LIMITED


By: _____
      Name:
      Title:

11

08-01789-smb    Doc 219-3    Filed 05/26/09    Entered 05/26/09 10:17:55    Exhibit B
Pg 1 of 3

# EXHIBIT B

# PROPOSED ORDER

300004132

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA Liquidation |

## ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AN AGREEMENT BY AND AMONG THE TRUSTEE AND OPTIMAL STRATEGIC U.S. EQUITY LIMITED AND OPTIMAL ARBITRAGE LIMITED

Upon the motion (the "Motion")[1] of Irving H. Picard, Esq. (the "Trustee") as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC (the "Debtor" or "BLMIS"), seeking entry of an order, pursuant to sections 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure, approving the agreement, by and among the Trustee on the one hand, and Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited on the other hand, in substantially the form annexed to the Motion (the "Agreement"); and it appearing that due and sufficient notice has been given to all parties in interest as required by Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure; and the Court having considered the Affidavit of Irving Picard in support of the Motion; and it further

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

appearing the relief sought in the Motion is appropriate based upon the record of the hearing

held before this Court to consider the Motion; and it further appearing that this Court has

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C.

§§ 157 and 1334; and after due deliberation; and sufficient cause appearing therefor; it is

      ORDERED, that the Motion is granted in all respects; and it is further

      ORDERED, that the Agreement between the Trustee on the one hand and

Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited on the other hand is

hereby approved and authorized; and it is further

      ORDERED, that the Trustee, Optimal Strategic U.S. Equity Limited and

Optimal Arbitrage Limited shall each comply with and carry out the terms of the

Agreement.

Dated: New York, New York
     June __, 2009


                    _____
                    HONORABLE BURTON R. LIFLAND
                    UNITED STATES BANKRUPTCY JUDGE

300004132

# EXHIBIT C

## AFFIDAVIT OF IRVING PICARD

300004132

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA Liquidation |

**AFFIDAVIT IN SUPPORT OF MOTION FOR ENTRY OF ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AN AGREEMENT BY AND AMONG THE TRUSTEE AND OPTIMAL STRATEGIC U.S. EQUITY LIMITED AND OPTIMAL ARBITRAGE LIMITED**

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF NEW YORK)

Irving H. Picard, being duly sworn, hereby attests as follows:

1.       I am the trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC (the "Debtor"). I am familiar with the affairs of the Debtor. I respectfully submit this Affidavit in support of the Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving a Settlement Agreement By and Among the Trustee and Optimal Strategies U.S. Equity Limited and Optimal Arbitrage Limited.

2.       I make this Affidavit based upon my own personal knowledge or upon information that I believe to be true.

3.     All capitalized terms not defined herein have the meaning ascribed to them in the Motion.

4.     I believe that the terms of the Settlement Agreement fall above the lowest point in the range of reasonableness and, accordingly, should be approved by this Court.  The Settlement Agreement resolves all issues regarding the Claims, without the need for protracted, costly and uncertain litigation.  I recognize that litigating the Claims would undoubtedly be complex and expensive for the Debtor's estate, involving significant time of various professionals and increasing the administrative burden on the Debtor's estate.  Moreover, the Optimal Companies, both of which are located in the Bahamas, have each cited potential jurisdictional and other issues regarding my ability to collect on any judgment that I might obtain in respect to the Claims.

5.     Given the potential impact of these issues, and the cost and complexities involved in proceeding with litigation, I have determined that the Settlement Agreement represents a fair compromise of the Debtor's claims against the Optimal Companies.  The Settlement Agreement also furthers the interests of the customers of BLMIS by bringing a substantial amount of money into the estate.

6.     I have, together with my counsel, conducted a confirmatory investigation, including a review of documents made available to me by the Optimal Companies that related to, among other things, due diligence conducted by the Optimal Companies and their affiliates on BLMIS.  On the basis of the review, I concluded that the Optimal Companies and their affiliates were not complicit in the fraud perpetrated by BLMIS and Bernard Madoff on BLMIS's customers and did not have actual knowledge of the fraud.  And based on the review, I do not believe that the conduct, acts and omissions of the Optimal Companies and their affiliates

provide grounds to assert any claim against the Optimal Companies or any affiliates (other than

avoiding power claims), or to disallow any claim that SUS or Arbitrage may have against

BLMIS or its estate.  If I obtain new information relating to the BLMIS accounts of the Optimal

Companies that materially affects my decision to enter into the Agreement, I will provide such

information to the Optimal Companies and permit them to respond within ten days.  After

reviewing the response, I may declare the Agreement and the settlement contained therein void

and return the amounts paid by the Optimal Companies.

7.    In sum, I respectfully submit that the Settlement Agreement should be approved

(a) to avoid lengthy, burdensome and expensive litigation and (b) because the Settlement

Agreement represents a reasonable compromise of the Claims.

IRVING H. PICARD

Subscribed and Sworn to before me
this 26th day of May, 2009

Notary Public

DAMIAN SMITH
Notary Public, State of New York
No. 01SM6169097
Qualified in New York County
Commission Expires June 18, 2011