# EXHIBIT 5

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com

*Attorneys for Irving H. Picard, Esq. Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*And Bernard L. Madoff*

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

### TRUSTEE'S FIRST INTERIM REPORT FOR THE PERIOD
### DECEMBER 11, 2008 THROUGH JUNE 30, 2009

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................1

II.     BACKGROUND .......................................................................................2

III.    PROCEDURAL HISTORY ........................................................................5

IV.     LIQUIDATION PROCEEDING ................................................................5

V.      ADMINISTRATION OF THE ESTATE....................................................7

        A.  RETENTION OF PROFESSIONALS .....................................7
        B.  MARSHALLING AND LIQUIDATION OF ESTATE ASSETS .................8
        C.  WIND-DOWN OF ESTATE OPERATIONS ...............................15

VI.     FINANCIAL CONDITION OF ESTATE ......................................17

VII.    CLAIMS ADMINISTRATION...........................................................18

        A.  CUSTOMER CLAIMS ........................................................18
        B.  CLAIMS OF GENERAL CREDITORS ...................................26

VIII.   TRUSTEE INVESTIGATION ................................................................26

        A.  INTERNATIONAL PROCEEDINGS ......................................27
        B.  FEEDER FUNDS.................................................................30
        C.  OTHER CORPORATE ASSETS ..........................................30
        D.  EVIDENCE GATHERING ..................................................31

IX.     BANKRUPTCY COURT PROCEEDINGS .....................................32

        A.  THIRD-PARTY ACTIONS AGAINST THE TRUSTEE ............32
        B.  THIRD PARTY ACTIONS BY THE TRUSTEE .......................34
        C.  SUBSTANTIVE CONSOLIDATION .....................................41
        D.  OBJECTIONS TO CLAIMS DETERMINATIONS ....................42
        E.  JOINT PROVISIONAL LIQUIDATORS...................................43
        F.  MOTIONS TO INTERVENE..................................................43

X.      CONCLUSION.................................................................................44

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, Esq. (the "Trustee"), as trustee for the substantively consolidated liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff" and together with BLMIS, each a "Debtor" and collectively, the "Debtors"), respectfully submits his First Interim Report (this "Report") pursuant to section 78fff-1(c) of the Securities Investor Protection Act of 1970, 15 U.S.C. 78aaa et seq. ("SIPA"),[1] and in accordance with the terms of the Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief entered on December 23, 2008 (the "Housekeeping Order" or "Claims Procedures Order") (Docket No. 12). Pursuant to the Housekeeping Order, the Trustee shall file additional interim reports at least every six (6) months hereafter. This Report covers the period from December 15, 2008 through June 30, 2009 (the "Report Period").

## I.   **INTRODUCTION**

1.      Almost seven months have passed since the Trustee was appointed to liquidate the estate of the largest Ponzi scheme ever conducted.  During this initial Report Period, the Trustee and his professionals have made significant headway into the investigation of Madoff's fraud. As of June 30, because of efforts made by Trustee and his professionals, over $1,088,507,818 has been recovered for the estate.  In addition, the Trustee has filed eight (8) avoidance actions seeking to recover over $13.7 billion in funds from various feeders funds and related parties.

2.      During the Report Period, the Trustee initiated a claims process for all customers and creditors of BLMIS.  As described in further detail below, within the Report Period the

---

[1] For convenience, subsequent references to SIPA will omit "15 U.S.C. ____."

Trustee received over 13,705 claims from potential customers and 212 claims from other creditors of the estate.[2]

3.      Given the task of liquidating BLMIS and coordinating efforts with federal and state authorities investigating the criminal matter, the Trustee has also dealt with issues spanning a broad spectrum of legal and administrative specialties and disciplines.  The Trustee's ability to call on the resources of his counsel in such areas as corporate, real estate, bankruptcy, employment, tax, banking, litigation (and others) has been of material assistance in achieving results, establishing protocols, and directing the efforts of the Trustee's financial professionals. Beyond issues that may be handled pursuant to work plans or protocols, many issues that could not have been anticipated were especially challenging during the initial investigative phase of this proceeding.

4.      This Report is meant to provide an overview of all the efforts engaged in by the Trustee and his team of professionals and to summarize all of the results achieved, as well as challenges faced by the Trustee during the Report Period.

## II.      **BACKGROUND**

5.      BLMIS was founded by Madoff in 1960 and engaged in three primary types of business: market making, proprietary trading and investment advisory services.  BLMIS was registered with the SEC as a broker-dealer and beginning in 2006 as an investment advisor. Pursuant to such registration as a broker-dealer, BLMIS was a member of the Securities Investor Protection Corporation ("SIPC").  BLMIS was also a member of the Financial Industry Regulatory Authority ("FINRA"), formerly known as the National Association of Securities Dealers, Inc. ("NASD").

---

[2] As of the date of the filing of this Report, the Trustee has received over 15,400 customer claims and over 400 claims from other creditors.

6.    On December 11, 2008, Madoff was arrested by the FBI in his Manhattan home and was criminally charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. 240.10b-5 in the United States District Court for the Southern District of New York ("District Court"), captioned United States v. Madoff (No. 08 CV 2735) (the "Criminal Case").

7.    Also on December 11, 2008 (the "Filing Date")[3], the Securities and Exchange Commission ("SEC") filed a complaint in the District Court against defendants Madoff and BLMIS (No. 08 CV 10791) (the "Civil Case"). The complaint alleged that the defendants engaged in fraud through investment advisor activities of BLMIS.

8.    Based on allegations brought by the SEC against Madoff and BLMIS in the Civil Case, on December 12, 2008, the Honorable Louis L. Stanton of the District Court entered an order which appointed Lee S. Richards, Esq. as receiver for BLMIS (the "Receiver").

9.    On December 18, 2008, the District Court entered the Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants (the "Preliminary Injunction Order"). Among other things, the Preliminary Injunction Order clarified that the Receiver's authority was limited to assets of the London entity, Madoff Securities International Ltd.

10.    On February 26, 2009, the Receiver submitted a report and application to Terminate the Receivership to the District Court. After receipt of submissions by the Trustee,

---

[3] [1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

the SEC, and the Department of Justice, and after a hearing on March 23, 2009, the District

Court issued an order discharging the Receiver and terminating the receivership.

11.     At a plea hearing (the "Plea Hearing") on March 12, 2009 in the Criminal Action,

Madoff pled guilty to an 11-count criminal information, which counts included securities fraud,

money laundering and theft and embezzlement, filed against him by the United States Attorney's

Office for the Southern District of New York.   At the Plea Hearing, Madoff admitted that he

"operated a Ponzi scheme through the investment advisory side of [BLMIS]."   (Plea Hr'g Tr. at

23:14-17.)   Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing

[was] wrong, indeed criminal."   (Id. at 23:20-21.)   Madoff filed a plea allocution describing

some of the details of his fraud (the "Allocution"), No. 09-213 [Dkt. No. 50].

12.     Madoff represented to clients and prospective clients that he would invest their

money in shares of common stock, options and other securities and would, at their request, return

profit and principal.   (See Allocution at pg. 1).   As the world is now aware, no such securities

were purchased by Madoff.

13.     In pleading guilty to the crimes he committed, Madoff admitted that since at least

the early 1990's the investment advisory business part of BLMIS (the "IA" business) was used to

operate a Ponzi scheme.   (See Allocution at p. 2).   Madoff solicited billions of dollars under false

pretenses and failed to invest investors' funds as promised.   Instead, he deposited investors funds

in a bank account at Chase Manhattan Bank.   (See Allocution at pg. 1).   In his Allocution,

Madoff also described how he moved funds between this account and other BLMIS accounts in

an attempt to conceal the fraud.   (See Allocution at pg. 4).

14.     On June 29, 2009, Madoff was sentenced by the District Court to serve, in

consecutive terms, the maximum term of incarceration recommended under the U.S. Federal

Sentencing Guidelines on each count to which Madoff pled guilty.  The sentence totals 150 years in prison.

### III.   **PROCEDURAL HISTORY**

15.    On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of the SEC Action with an application filed by SIPC.  Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that the Debtor was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

16.    On that date, the District Court entered the Protective Decree (District Court Docket No. 4), to which BLMIS consented, which, in pertinent part:

(a)    appointed the Trustee for the liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA, therefore, effectively replacing the Receiver as to BLMIS;

(b)    appointed Baker & Hostetler, LLP ("B&H") as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

(c)    removed the case to the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court" or "Court") pursuant to section 78eee(b)(4) of SIPA.[4]

### IV.   **LIQUIDATION PROCEEDING**

17.    On December 23, 2008, this Court approved the Trustee's Bond (Docket No. 11). Pursuant to an application of the Trustee dated December 21, 2008 (Docket No. 8), this Court entered the Housekeeping Order (Docket No. 12), which directed, among other things, that on or before January 9, 2009 (a) a notice of the commencement of this SIPA proceeding be published in all editions of The New York Times, The Wall Street Journal, The Financial Times, USA Today, Jerusalem Post and Ye'diot Achronot; (b) notice of the liquidation proceeding and claims

procedure be given to persons who appear to have been customers of BLMIS by mailing to each

such person, at the last known address appearing on the books of BLMIS, a copy of the notice,

proof of claim form and instructional materials approved by the Court; (c) notice of the

liquidation proceeding and a claim form be mailed to all known general creditors of the Debtor;

and (d) notice be given of the hearing on disinterestedness of the Trustee and his counsel (see

section 78eee(b)(6) of SIPA) scheduled for February 4, 2009 and the meeting of creditors,

scheduled for February 20, 2009.

18.     As discussed in further detail in ¶60 below, the required notice was published on

January 2, 2009, in all required publications (see Docket No. 57), and a mailing to customers and

general creditors of BLMIS was completed on January 9, 2009 (see Docket No. 76).[5]  Potential

claimants were advised of the court-approved and statutory time limits for filing claims.

19.     On February 4, 2009, this Court entered the Order Regarding Disinterestedness of

the Trustee and Counsel to the Trustee (Docket No. 69), finding that the Trustee and B&H are

disinterested pursuant to provisions section 78eee(b)(6) of SIPA, section 327(a) of 11 U.S.C. §§

101, et seq. (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure ("Bankruptcy

Rule") 2014(a) and are therefore in compliance with the disinterestedness requirement in section

78eee(b)(3) of SIPA, section 327(a) of the Bankruptcy Code, and Bankruptcy Rule 2014(a).

Accordingly, the Trustee is duly qualified to serve and act on behalf of the Debtor's estate.

20.     On February 20, 2009, a meeting of creditors under section 341(a) of the

Bankruptcy Code was held.  No representative of the Debtor appeared for examination at that

---

[4] Pursuant to section 78fff(b) of SIPA, "[t]o the extent consistent with [SIPA], [this] liquidation proceeding [is]
be[ing] conducted in accordance with, and as though it [is] being conducted under chapter 1, 3, 5 and subchapters I
and II of chapter 7 of [the Bankruptcy Code]."
[5] In addition, materials were mailed in response to requests from customers or general creditors.  Furthermore, all
claims packages were made available for download on the Trustee's website, www.madofftrustee.com and on
SIPC's website, www.sipc.org.

meeting. The Trustee and his counsel, as well as the SIPC staff, attended the meeting of creditors and reported on the then current state of affairs as well as the process for filing and determining customer claims. The Trustee and counsel then responded to inquiries made by over 150 customers and creditors who attended the meeting and to questions received via email prior to the meeting. In addition, the Trustee made over 1,000 phone lines available for those customers and creditors who could not attend the 341 meeting to listen in live, and also posted a video link to the 341 meeting on the Trustee website.

21.    As discussed in further detail in ¶¶129-134 below, the BLMIS Liquidation Proceeding was substantively consolidated with the Madoff chapter 7 case on June 9, 2009 by order of the Bankruptcy Court.

### V.    ADMINISTRATION OF THE ESTATE

22.    The Trustee has made every effort to keep customers and other interested parties informed of his ongoing efforts to administer the BLMIS estate, including responding to hundreds of phone calls, emails, and letters, establishing a telephone call center respond to inquiries from claimants and their representatives (see discussion on customer claims process infra at Section VII.A), creating a website to serve as a clearinghouse for information, and meeting with representatives of customers, creditors, regulatory authorities and other interested parties.

### A.    RETENTION OF PROFESSIONALS

23.    As of the filing of this Report, in addition to B&H, the Trustee has retained the following professionals: various foreign counsel (as further described in ¶94 below) to represent the Trustee in proceedings abroad, AlixPartners LLP ("AlixPartners") as claims agent and to assist the Trustee in the day-to-day management of the BLMIS office, FTI Consulting ("FTI") as forensic consultant, Lazard Frères & Co. LLC ("Lazard") as investment banker for the limited

purpose of marketing and selling the market making and/or proprietary trading business of BLMIS, Renaissance Associates Ltd., a private investigation firm, Helen D. Lally of Fine Arts, Ltd. as art appraiser, Morgan Joseph & Co., Inc. ("Morgan Joseph") as securities broker and investment advisor and certain other specialized professionals and experts to perform various functions and otherwise assist the Trustee in the orderly liquidation of the BLMIS Estate and the satisfaction of customer claims.[6]

## B.   **MARSHALLING AND LIQUIDATION OF ESTATE ASSETS**

24.    Following their appointment, the Trustee and his counsel have worked diligently to investigate, examine and evaluate the Debtor's activities, assets, rights, liabilities, customers and other creditors.   As a result of his investigation, the Trustee has thus far identified and succeeded in marshalling, and in some cases liquidating, the following estate assets:

Sale of the Market Making Business.

25.    The Trustee determined that the Debtor's market making operations (the "Market Maker") might be a potentially productive unit and concluded that it was in the best interests of the Debtor's estate, customers and creditors, and his duty pursuant to Section 78fff(a)(2) of SIPA, to sell the Market Maker.   Following approval of SIPC, on December 19, 2008, the Trustee retained Lazard as the investment banker to market and locate a buyer for the Market Maker.

26.    In late December 2008, B&H and Lazard began to send out packages with informational materials to potential bidders, along with non-disclosure agreements ("NDAs"). Forty-six (46) potential bidders executed and returned NDAs.   Upon receipt of the NDAs,

---

[6] A SIPA trustee has authority, subject to approval from the Securities Investor Protection Corporation ("SIPC") but without need for Court approval, to among other things "hire and fix the compensation of all personnel (including officers and directors of the debtor and of its examining authority) and other persons (including accountants) that are

potential bidders were given access to a data room which contained diligence information regarding the Market Maker. B&H and Lazard worked with the employees of the Market Maker business, whom the Trustee continued to employ, to prepare and give numerous management presentations to potential bidders.

27. The Trustee's efforts resulted in the receipt of four offers. The Trustee entered into extensive negotiations with the offerors to maximize these offers and the returns for the benefit of the Debtor's estate, customers and creditors. Ultimately, after a reasonable period of marketing under the circumstances and negotiations with other parties, the Trustee selected Surge Trading Inc. (f/k/a Castor Pollux Inc.) ("Surge") to serve as the "stalking horse" bidder in an auction and a stalking horse Asset Purchase Agreement by and between the Trustee and Surge (the "Stalking Horse Contract") was executed on March 27, 2009. This Stalking Horse Contract providing for a purchase price of up to $15,500,000, which included a closing payment of $500,000, accelerated earn-out payments totaling $3,000,000, and certain additional trading revenue-based earn-out payments totaling $12,000,000.

28. Following approval of the Stalking Horse Contract by the Bankruptcy Court on April 7, 2008, B&H and Lazard initiated an overbid process in which potential bidders were invited to outbid the terms of the Stalking Horse Contract. An auction took place at B&H's New York office on April 27, 2009 with Surge, Aleo Capital Markets LLC and Guzman & Company in attendance. Following an auction intended to maximize the returns for the benefit of the Debtor's estate, customers and creditors, Surge was deemed the winning bidder with a total purchase price of up to $25,500,000. This total purchase price includes a closing payment of $1,000,000 and a revenue-based earn-out which could total up to $24,500,000.

---

deemed necessary for all or any purposes of the liquidation proceeding." 15 U.S.C. §78fff-1(a)(1). Each of the Trustee's hiring decisions to date has been reviewed and approved by SIPC.

9

29.     The terms and conditions of the winning bid were memorialized in a Second Amended and Restated Asset Purchase Agreement by and between the Trustee and Surge dated April 29, 2009, and were approved by the Court on April 30, 2009 (Docket No. 184).   The transaction closed on June 17, 2009.

Settlement of Trades and Short Positions (of Non-IA Business of BLMIS).

30.     On December 12, 2008, the Depository Trust & Clearing Corporation ("DTCC") and National Securities Clearing Corporation ("NSCC") ceased acting for BLMIS, and all BLMIS trading activity stopped.   On December 16, 2008, the FBI secured the BLMIS premises.

31.     From December 12, 2008 through December 15, 2008, financial institutions which had lent securities to BLMIS executed buy-ins to cover the lent securities, sent confirmations to AlixPartners, and calculated excess collateral due to BLMIS.

32.     From December 15, 2008 through December 31, 2008, AlixPartners contacted all financial institutions where BLMIS had an account (including Options Clearing Corporation, CIBC, Interactive Brokers and UBS AG).   The financial institutions were instructed to close out all BLMIS positions expeditiously and in a manner which would not negatively impact the market price for less liquid positions.   The financial institutions closed out the positions, deducted commissions and fees, collected interest and dividends, sent confirmations and statements to AlixPartners, and notified AlixPartners of all final balances.

33.     From January 2, 2009 through February 13, 2009, the above-mentioned financial institutions received letters instructing them to wire the balances to a Trustee account.   The financial institutions wired the cash balances to the account, and AlixPartners confirmed that the incoming wire amounts matched the final statement balances.   Proceeds received were $37,272,105.

34.    From December 15, 2008 through January 30, 2009, DTCC and NSCC worked to settle BLMIS trades and cover BLMIS short positions.  On or about January 30, 2009, DTCC and NSCC transferred approximately 1,600 remaining securities positions with an estimated market value of $291,203,372 to an account at JPMorgan Clearing Corp., clearing for Morgan Joseph, for the benefit of the Trustee.  Separately, the Trustee received cash proceeds of $34,443,082 from DTCC and NSCC.  Over time, most of the securities positions have been sold.  As of June 30, 2009, the value of the Trustee's Morgan Joseph account was $297,478,126, consisting of money market account having a value of $135,495,990 and stock and bond positions valued at $161,982,136.

Cash Recoveries from Bank and Brokerage Accounts.

35.    The Trustee's consultant, AlixPartners, has performed the following steps to assist in the recovery of cash from the BLMIS bank accounts: review of BLMIS' general ledgers to identify bank accounts; interview of BLMIS accounting and treasury personnel to confirm completeness of general ledger, cash account listing and identify any bank accounts that may not have been maintained on the general ledger; review various files from specific offices to identify any additional account.  In addition, B&H sent inquiries to a variety of financial institutions to, among other matters, identify any additional BLMIS bank accounts.

36.    At least two institutions froze accounts, and funds have been received as described below.  In addition, the Trustee's counsel has been working with other institutions' legal and operations departments to release additional funds to the estate.  The Trustee established a separate general ledger that included all transactions after December 19, 2008, which has facilitated the process of monitoring for the full recovery of the bank account balances.

37.     As a result of these efforts, the Trustee has identified eleven (11) BLMIS accounts at three (3) banks.  As of June 30, 2009, the Trustee has received the following funds: Bank of New York - $336,654,397, JPMorgan Chase - $235,156,309, and M&T Securities - $4,030,939 (transferred directly to the Trustee's Morgan Joseph account), as well as other miscellaneous amounts.

Settlement with NETJETS.

38.     The Trustee has reached an agreement, which remains subject to Bankruptcy Court approval, with NETJETS Sales, Inc. ("NJS"), NETJETS Aviation, Inc. ("NJA") and NETJETS Services, Inc. ("Services" and together with NJS and NJA, the "NJ Companies") regarding the fractional ownership of a Citation X aircraft held by BLM Air Charter LLC ("BLM Air").

39.     BLM Air was organized with an effective date of January 12, 2001.  Initially, the sole member of BLM Air was Madoff.  On January 30, 2001, pursuant to an Assignment Agreement, Madoff transferred ownership of "all of the economic interest" in BLM Air to BLMIS and appears to have retained certain non-economic interest.  Accordingly, the Trustee has brought a motion, on behalf of the BLMIS and Madoff estates, as the owner of BLM Air.

40.     Pursuant to a Repurchase Agreement, the NJ Companies have agreed to buy back BLM Air's 12.5% ownership (the "Interest") in the aircraft for $752,963.  In consideration of this amount the Trustee and the NJ Companies agree to refrain from making any further claims against each other, including preference claims or claims for contribution, through the bankruptcy process or otherwise.

41.     The Trustee believes that the transaction should be approved because the NJ Companies have agreed to pay fair market value for the Interest.  Given that no other potential

purchaser would pay more than market value, there is no advantage to attempting to sell the Interest to a third party.  Accordingly, the Agreement allows the Trustee to avoid having to participate in what would likely be a futile sales process and further allows the Trustee to avoid what could be protracted, costly, and uncertain litigation.

42.    The motion for approval of the settlement with the NJ Companies is scheduled to be heard at a hearing before the Bankruptcy Court on July 28, 2009.

<u>Class Action Settlement Recoveries</u>.

43.    The Trustee has identified claims that BLMIS had in at least six class action suits. During the Report Period, the Trustee received awards from four of those class action settlements totaling approximately $54,760.

44.    In addition, the Trustee has identified claims that BLMIS had in four other class action suits that had not been completed by BLMIS.  Proofs of claim have been filed and accepted in each case.  The first award, which is estimated to be approximately $35,000 is expected to be received in July, and the remaining awards, which are estimated to total approximately $55,000, should be received by year end.  Further review is being done in this area.

<u>Sports Tickets</u>.

45.    In the course of his investigation, the Trustee identified New York Knicks and New York Rangers 2008-09 season ticket subscriptions, New York Mets 2009 season ticket subscription, single game Minnesota Wild tickets and single race NASCAR tickets, owned by or purchased for the benefit of BLMIS.  The Trustee generated a total recovery of $91,504 through the liquidation and/or public auction or sale of these subscriptions and tickets for the BLMIS estate.

Insurance Refunds.

46.     Due to the Civil Case and SIPA Liquidation, various insurance policies of BLMIS have been cancelled by the applicable carriers, resulting in the return of premium payments to the estate in the total amount of approximately $233,900 to date.

Political Refunds.

47.     The Trustee has received the voluntary return of certain political donations, previously made by BLMIS and/or Madoff from several committees for Senators and Congressmen, the Democratic Senatorial Campaign Committee, the Police Athletic League and one securities industry Political Action Committee in the total amount of $144,500.

Tax Recoveries.

48.     To date, the Trustee has recovered approximately $12,777 in tax refunds due to the estate.  The Trustee's counsel is looking into several substantial tax payments made by BLMIS over the years to determine whether they may be recoverable.

Sale of Loan Participations.

49.     During the Report Period, the Trustee divested BLMIS' position as a lien holder in certain loan participations which resulted in additional funds to the estate.  On April 13, 2009, the Trustee sold BLMIS' second lien position in Panavision Inc. to Credit Suisse for $1,040,000.  On May 11, 2009, NES Rentals Holdings, Inc. exchanged cash for BLMIS' first lien senior secured position in NES Rentals Holdings, Inc. for $543,599.

Sale of DTCC Shares.

50.     On or about April 9, 2009, the Trustee received a check from DTCC in the amount of $204,171, representing the proceeds of the sale of 37.39510 shares of DTCC common

stock. The sale was handled by DTCC in accordance with the provisions of its shareholders' agreement.

Miscellaneous Recoveries.

51.     In addition to the above, the Trustee has recovered an estimated $54,100 in miscellaneous recoveries from sources such as cancellation of various subscriptions and memberships and the return of leased vehicles.

## C.     **WIND-DOWN OF ESTATE OPERATIONS**

Termination of BLMIS Employees.

52.     In an effort to understand the business, the Trustee obtained an employee listing as well as a payroll register from its payroll administrator, Fidelity. The Trustee reviewed such listings with various BLMIS employees to obtain an understanding of each individual's role at BLMIS. As a result of these efforts as well as the then-pending sale of the Market Making business, employees were terminated in phases. As of December 12, 2008, 140 individuals were on the BLMIS payroll. The two largest termination stages took place at the end of January and March, which accounted for 80% of the individuals on payroll. The initial termination stage reduced payroll costs by approximately 42% and the March termination increased the reduction of payroll costs to approximately 95% of the total payroll costs at the beginning of January. The remaining three (3) employees on the Trustee's payroll to assist in winding down certain aspects of the business were terminated as of June 30, 2009.

Termination and Liquidation of BLMIS-Sponsored Benefit Plans.

53.     As part of the process of winding down the business operations of BLMIS and dismissing its many managers and employees in an orderly and equitable fashion, the Trustee (through counsel) reviewed the many employee benefit plans BLMIS sponsored and maintained for its employees and their dependents, incident to terminating those plans and providing for the

orderly resolution and liquidation of all affected individuals' and vendors' plan-related rights and claims. Initial efforts by the Trustee, counsel and AlixPartners consisted of identifying all such plans; investigating the extent to which those plans had been administered, funded, invested and maintained; identifying and rectifying any problems associated with the communication of terms, the payment or denial of benefits, and the arrangements made with plan fiduciaries and third party service providers; identifying any circumstances under which claims might be made, or actions could be taken by federal or state regulators, against the estate; and protecting the privacy rights of BLMIS' current and former employees and dependents.

54.    As a result of the initial efforts of B&H, BLMIS was found to have provided health, accident and sickness benefits, retirement-related benefits, and life insurance, disability income and accidental death and dismemberment benefits under as many as six (6) identifiable employee benefit plans; some of those benefits were provided through group insurance contracts and policies, while others were provided on a self-insured basis (including a group health plan which covered substantially all of BLMIS' current and former employees and their respective dependents) or were provided through a separately-established trust fund (such as the BLMIS-sponsored 401(k) plan). Substantially all of the benefit plans needed to be brought into compliance with relevant law, including the Employee Retirement Income Security Act ("ERISA") prior to termination, and several of the contractual arrangements made with third parties, including third party administrators, trustees and insurance companies, needed to be modified or replaced.

55.    On May 27, 2009, the Bankruptcy Court entered an order confirming the Trustee's authority to modify, then terminate effective May 31, 2009, and finally liquidate and wind down, all of the BLMIS-sponsored health and welfare plans by collecting and adjudicating

all plan-related claims made by employees, covered dependents and third parties; negotiating agreements with vendors to provide for the handling, storage and disposal of plan records (including medical records subject to federal and state privacy laws); notifying all affected individuals and third parties of their plan-held or plan-related rights; and providing for the payment of meritorious claims and the denial and discharge of  ineligible or untimely claims. The liquidation and wind-down process is expected to be completed by the close of the 2009 calendar year, ending with the submission in 2010 of final reports prepared by the Trustee and tax reports to the federal authorities responsible for plan oversight, including the Internal Revenue Service and the United States Department of Labor ("DOL").

56.     The Trustee will also seek a court order confirming the Trustee's authority under SIPA and the Bankruptcy Code to first modify, and then terminate effective July 31, 2009, the BLMIS-sponsored 401(k) plan, subject to any restrictions or requirements suggested by the DOL, which is currently reviewing the plan.  Winding down the 401(k) plan is expected to be completed by the close of the 2009 calendar year; however, the time required to compile and submit final reports and returns to the federal authorities responsible for plan oversight is not known at this time.

## VI.   **FINANCIAL CONDITION OF ESTATE**

57.     A summary of the financial condition of the estate as of May 31, 2009[7] is provided on Exhibit A attached hereto.   To date, the Trustee has incurred significant administrative expenses in maintaining the BLMIS office, especially prior to the agreement to sell the Market Maker, as Market Maker employees were kept on staff with benefits.  In addition, other significant expenses included rent, monthly payment of legal fees and consultant fees (all

---

[7] A report of the financial condition of the estate ending June 30, 2009, was not available in time for the filing of this Report.  As of June 30, 2009, the Trustee had $802,871,722 in his bank account at Citibank.

approved by SIPC), the digitizing of records and costs associated with determining customer claims. These costs have all been paid from SIPC administration advances. Since they are chargeable to the general estate, payment has no impact on recoveries that the Trustee has obtained and will obtain, and that will be allocated to the fund of customer property.

58.     SIPC has advanced funds to the Trustee to pay all administrative costs associated with the liquidation of the estate – as of June 30, 2009, the Trustee has requested and received from SIPC a total of $214,352,442, including $45,947,111 for administrative expenses. The balance of $168,405,331 in SIPC advances has been used to pay customer claims.[8]

## VII.     **CLAIMS ADMINISTRATION**

### A.     **CUSTOMER CLAIMS**

The Claims Processing Order and Notices of the Bar Date.

59.     The Trustee sought Court approval for and implemented a customer claims process in accordance with the Securities Investor Protection Act ("SIPA"). As discussed in ¶17 above, the Claims Procedures Order approved (i) the form and manner of publication of the notice of the commencement of the liquidation proceeding (the "Notice") and (ii) specified the procedures for filing, determining and adjudicating customer claims.

60.     On January 2, 2009, the Trustee mailed a copy of the Notice and claims filing information to (i) all persons and entities that are or appear from available records to have been a customer of BLMIS at any time, (ii) creditors other than customers or broker-dealers and (iii) broker-dealers who were identified as BLMIS customers based on a review of BLMIS' books and records. More than 16,000 potential customer, general creditor and broker-dealer claimants

---

[8] During the Report Period, the Trustee determined 543 claims, representing $231,017,981 in SIPC advances. However, as further described below in ¶70, the Trustee must receive an executed assignment and release form before he can advance funds, and in turn, request those funds from SIPC. Thus the amount of SIPC funds requested by the Trustee for advances to pay customer claims during the Report Period is different than the amount of SIPC advances committed to customer claims that have been determined during the Report Period.

were included in the mailing of the Notice.   The Trustee published the Notice in all editions of

The New York Times, The Wall Street Journal, The Financial Times, USA Today, Jerusalem

Post and Ye-diot Achronot by January, 2009.  The Trustee also posted claim forms and claims

filing information on the Trustee's website (www.madofftrustee.com) ("Trustee Website"), and

SIPC's website (www.sipc.org) ("SIPC Website").

61.    Under the Housekeeping Order, claimants were to mail their claims to the Trustee

at the following address: Irving H. Picard, Esq., Trustee for Bernard L. Madoff Investment

Securities LLC, Claims Processing Center, 2100 McKinney Avenue, Suite 800, Dallas, Texas

75201.  In the claims materials, the Trustee strongly urged claimants to "send your claim form by

certified mail – return receipt requested."  In the Notice, the Trustee further stated in boldface

that "[c]ustomer claims will be deemed filed only when received by the Trustee."   The

mandatory statutory bar date for filing of claims under section 78fff-2(a)(3) of SIPA was July 2,

2009.  Any claims that are received after July 2, 2009 will be deemed untimely and will not be

allowed.  Each claimant was specifically advised of the statutory bar date in the claims materials

mailed and posted on January 2, 2009 on the Trustee's and SIPC's websites.  The Notice

published in the newspapers, mailed to claimants and posted on the websites, stated in boldface

that "[n]o claim of any kind will be allowed unless received by the trustee within six (6) months

after the date of this Notice."  In the Instructions for completing the Customer Claim form, the

Trustee stated in boldface that "[t]he law governing this proceeding absolutely bars the

allowance of any claim, including a customer claim, not actually received by the trustee on or

before July 2, 2009.  Neither the trustee nor SIPC has authority to grant extensions of time for

filing of claims, regardless of the reason.  If your claim is received even one day late, it will be

disallowed." Broker-dealer claims must have been received by the Trustee on or before January 12, 2009.

62.     On May 21, 2009, the Trustee mailed a reminder notice to customers who had not yet filed a claim as a reminder that the statutory bar date was July 2, 2009.

63.     On June 22, 2009, the Trustee mailed a final bar date reminder notice (the "Final Reminder Notice") to 7,766 known past and present customers of BLMIS from whom a claim had not yet been received.  In addition, the Trustee posted the Final Reminder Notice on the Trustee Website.  The Trustee urged all customers to file claims by July 2, 2009.  In the Final Reminder Notice, the Trustee acknowledged that certain litigation had been filed regarding the Trustee's definition of "net equity" under SIPA and that this Court's decision on this issue may affect whether or not certain customers have an allowed claim in this proceeding (such litigation is discussed in ¶¶112-114, infra).  That being said, the Trustee urged all customers to file a claim by the July 2, 2009 in order to ensure that the Trustee considers their claim.  The Trustee was concerned that some claimants might mistakenly rely on the litigation and not file claims by July 2, 2009.  The mailing of the Final Reminder Notice was unprecedented in SIPA proceedings and represented an extraordinary effort by the Trustee.  The purpose of the Final Reminder Notice was to ensure that each and every customer of BLMIS has the opportunity to have his, her, or its claim considered for protections afforded under SIPA in this proceeding.

64.     As of June 30, 2009, the Trustee had received 13,705 customer claims.[9]  The books and records of BLMIS reflect that there were 8,095 non-administrative IA accounts.  As of December 11, 2008, 4,903 accounts were active, i.e, either a monthly customer statement was

---

[9] As of July 2, 2009, the statutory claims bar date, the Trustee had received at least 15,400 customer claims and had determined more than 543 customer claims.  The Trustee also received over 395 claims from general creditors and 16 claims from broker-dealers.

generated for the account for the period ending November 30, 2008 or the account was opened in December 2008. The Trustee has received multiple claims for many accounts.

Claims Processing.

65.     In compliance with the Claims Procedures Order, the Trustee has developed a comprehensive claims administration process for the intake, reconciliation, and resolution of customer claims. The Trustee's dedicated team of professionals including business consultants, forensic accountants, and attorneys work together through the various levels of review a claim must undergo before it can be determined and allowed.

66.     At the initial intake stage, AlixPartners, the Trustee's claims agent receives and reviews each filed claim to insure they are filled out properly and all relevant information is included. If any information is missing, the claims agent sends a request for supplemental information. As of June 30, 2009, AlixPartners had mailed over 425 requests for supplemental information.

67.     In the next stage – the research stage - FTI, the Trustee's forensic accountants, review each claim, information gathered from BLMIS' books and records regarding the account at issue and information submitted directly by the claimant. The results of this review are noted on each account and are ultimately used by the Trustee in assessing his determination of the claim.

68.     At the third review stage, the claims are moved to SIPC where a SIPC claims review specialist provides a recommendation to the Trustee regarding how each claim should be determined. Once a recommendation has been made by a SIPC reviewer, the Trustee and his counsel then review the recommendation and legal or other issues that have been raised in prior review stages. Once the Trustee has decided upon a resolution of a claim, the Trustee issues a determination letter to the claimant.

300016705

69.     The Trustee has or will mail a determination letter to every claimant when their claim is determined.  The determination letter explains how the customer's claim has been determined by the Trustee, states the amount of the allowed claim based on the net equity of the customer's account, and sets forth the amount of SIPC protection available to the customer. Pursuant to the Claims Procedures Order, if the claimant does not object to the Trustee's determination within 30 days of the date on which the Trustee mailed the determination letter, the Trustee's determination will be deemed confirmed by the Court and binding on the claimant.

70.     Together with the determination letter, the Trustee mails either a full or partial assignment and release.  This agreement states that the claimant agrees with the Trustee's determination and treatment of the claim as set forth in the determination letter.  This agreement must be executed and notarized by the claimant before the claimant receives a SIPC advance. Upon receipt of the executed and notarized agreement, the Trustee prepares and mails a check for the proposed SIPC protection to the application customer.

Interim Results of the Claims Process.

71.     Notwithstanding the monumental and unprecedented task faced by the Trustee, the Trustee has made substantial progress in reviewing and determining customer claims.  As of June 30, 2009, the Trustee had determined and allowed 543 claims and committed to pay $231,017,981 in cash advances made by SIPC.  Based on the committed amount of SIPC advances to date, this is already the largest commitment of SIPC funds in the history of SIPA liquidations.  As of June 30, 2009, the total amount of customer claims allowed was $2,971,725,899.  The total over-the-limit claim amount on these claims– the amount by which allowed customer claims exceed the $500,000 statutory limit of SIPC protection – was $2,740,707,918.

The Hardship Program.

72.     In an effort to speed relief to those BLMIS customers who have been hardest hit by the BLMIS Ponzi scheme, the Trustee implemented a Hardship Program in early May to expedite the determination of eligible customer claims and, therefore, payment of SIPC protection to those individuals facing severe hardship.  The type of hardship considered includes, among others, the inability to pay for necessary living expenses (food, housing, utilities and transportation); inability to pay for necessary medical expenses; necessity to return to work, at the age of 65 or older, after having previously retired from former employment; declaring personal bankruptcy; and inability to pay for the care of dependents.

73.     The Trustee's counsel has evaluated each hardship application to determine whether or not the application should be approved for inclusion in the Hardship Program and provided written notification of the decision within 20 days of receipt of the application.  In some instances, rather than deny the application, the Trustee has requested further information from the applicants in an effort to make sure the applicants receive full consideration of their hardship status.

74.     Once the Trustee accepts an applicant into the Hardship Program, the Trustee endeavors to determine the claim within 20 days of the customer's entry for the Hardship Program if the claimant's account was opened at BLMIS after January 1, 1996.  For claims on accounts that were opened at BLMIS prior to 1996, the Trustee is currently working to reconstruct the records for these years.  The Trustee is committed to determining these accounts as soon as the records are available.

75.     As of June 30, 2009, the Trustee had received 258 Hardship Program applications and approved 152 applications.  Most of the remaining 106 applications await the reconstruction of the pre-1996 records.  In a further effort to speed protection to Hardship Applicants, the

Trustee has departed from the practice in past SIPC proceedings and has committed to paying the

undisputed portion of approved Hardship Claims even if there is a dispute over the full amount

of the claim.  The purpose of this procedure is to expedite payment of SIPC protection to the

hardest hit claimants while preserving their rights to dispute the total amount of their claim.

The Trustee Has Worked to Keep Customers Informed of the Status of the Claims Process.

76.     Throughout the liquidation proceeding, the Trustee has kept customers, other

interested parties and the public informed of his efforts by maintaining a website, a customer

hotline, holding a Section 341(a) meeting of creditors on February 20, 2009, and having his

counsel respond to the multitude of phone calls, e-mails and letters he receives on a daily basis.

77.     The Trustee established the Trustee Website for centralized distribution of as

much information as possible, including (i) regular press releases and statements on the status

and progress of the proceedings; (ii) statistics on the number of claims determined, the dollar

amount of the proposed allowed claims, the dollar amount of SIPC protection provided on such

claims and the dollar amount by which the proposed allowed claims exceed the statutory limits

of SIPC protection (which statistics are typically updated twice a week); (iii) copies of

Bankruptcy Court filings; (iv) claims-related information and claim forms; and (v) details

regarding the Hardship Program, including Hardship Program application forms.

78.     The Trustee Website also allows claimants to e-mail their questions directly to the

Trustee's representatives, who follow up with a return e-mail or telephone call to the claimants.

As of June 30, 2009, the Trustee and his professionals have received and responded to more than

2,700 e-mails from BLMIS customers as well as their representatives.

79.     In addition, the Trustee established a toll-free hotline for BLMIS customers to call

for information.  As of June 30, 2009, the Trustee's professionals have fielded 6,557 hotline calls

from claimants as well as their representatives, and have provided status updates on claims,

addressed claimants' questions or concerns and offered confirmation to claimants that their claims were received.  In addition, the Trustee and his counsel have responded to over 150 phone calls.

80.    In sum, the Trustee and his team have endeavored to respond timely to every customer inquiry and to ensure that the customers are as informed as possible about various aspects of the BLMIS proceeding.

81.    As discussed above, the Trustee has made progress in determining 543 claims before the final date for filing claims had arrived as well as in recovering substantial funds and administering the BLMIS estate.   Nevertheless, substantial contingencies remain and have emerged during the Report Period, and the Trustee must reserve for these contingencies in determining what distributions can be made immediately to customers with allowed net equity claims.

Contingencies.

82.    As noted above, July 2, 2009 was the claims bar date.  The total universe of allowed net equity claims against customer property cannot be determined with precision until all claims, including ones filed in recent weeks and up until the deadline, have been fully analyzed, a process that will take time, given the complexity of many claims.

83.    In addition, as discussed below, as the analysis of the claims population has progressed, disputes have arisen with claimants over the Trustee's definition of "net equity" as being measured by money in put in, less money withdrawn.  This issue is the subject of pending litigation.  (See ¶¶ 112-114).

84.    It is the Trustee's intent, at the earliest practicable time, to seek, pursuant to §78fff-2(c)(1) and related provisions of SIPA, Bankruptcy Court approval for the allocation of all recoveries already obtained and to be obtained to the "fund of customer property."   To the

extent appropriate, there could be an allocation of some funds to the "general estate." The Trustee anticipates making applications seeking approval for interim allocations and pro rata distributions.

B.      **CLAIMS OF GENERAL CREDITORS**

85.     As of June 30, 2009, the Trustee had received 196 secured and priority and nonpriority general unsecured claims totaling approximately $282,060,833. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. As of June 30, 2009, the Trustee had received 16 general unsecured broker dealer claims totaling approximately $3,058,146.

86.     The Trustee does not currently believe that there will be sufficient funds in the Debtor's estate from which to make distributions to priority, non-priority general creditors and/or broker dealers. Accordingly, the Trustee believes that "[no] purpose would be served, [to] examine [such] proofs of claim and to object to the allowance of any [such] claim that is improper" (see Bankruptcy Code § 704(5)). Further, the Trustee does not expect that there will be sufficient funds in the general estate for SIPC to recoup its advances for administrative expenses.

VIII.   **TRUSTEE INVESTIGATION**

87.     As required by SIPA, the Trustee is obligated to, among other things, (i) investigate the acts, conduct, property, liabilities, and financial condition of the debtor, the operation of its business, and any other matter, to the extent relevant to the liquidation proceeding, and report thereon to the Court; and (ii) report to the court any facts ascertained by the trustee with respect to fraud, misconduct, mismanagement, and irregularities, and to any causes of action available to the estate. Section 78fff(1)(d) of SIPA.

88.     Pursuant to these obligations, during the Report Period the Trustee and his professionals have extensively investigated the Debtor's financial affairs inside and outside of the United States.  In so doing, the Trustee has unearthed a labyrinth of interrelated international funds, institutions, and entities of almost unparalleled complexity and breath.

89.     In addition, the Trustee, through B&H and certain foreign counsel, has been monitoring all domestic and international third-party actions filed outside of the Bankruptcy Court that may be related to Madoff, BLMIS, any insiders thereof, or any other related parties and/or assets of the estate.

90.     In furtherance of its investigation, the Trustee has sent more than 230 subpoenas pursuant to Bankruptcy Rule 2004 seeking documents from many of the funds and banks. Additionally, the Trustee has sent over 90 letters to these and similar entities, informing them that they may be in possession of customer property and demanding the return of such customer property.

91.     As a result of the Trustee's investigation, several funds and persons are in settlement discussions with the Trustee and several others are producing documents to the Trustee without the need to resort to formal process.

92.     The Trustee is also providing information to and coordinating efforts with the SEC, Federal Bureau of Investigation ("FBI"), United States Attorney's Office for the Southern District of New York ("USAO") and other regulators on an on-going basis.

A.     **INTERNATIONAL PROCEEDINGS**

93.     After months of investigation, the Trustee has discovered assets and corporate entities of interest for the purposes of liquidating the BLMIS estate in at least eleven different countries or territories: England, Gibraltar, Bermuda, the British Virgin Islands, the Cayman Islands, the Bahamas, Ireland, France, Luxembourg, Switzerland, and Spain.  The relationships

between the involved entities are tangled and frequently involve many nations, various funds, and complicated corporate structures and jurisdictional issues.

94.     Accordingly, the Trustee has retained the following international counsel to assist him in further investigations and to represent him and the BLMIS estate in any foreign proceedings that have or may arise in connection with BLMIS: (i) Lovells - England, France, Gibraltar, BVI; (ii) Higgs Johnson Truman Bodden - Cayman Islands; (iii) Williams Barristers & Attorneys – Bermuda; (iv) Attias & Levy – Gibraltar; (v) E.F. Collins – Ireland; (vi) Schiltz & Schiltz – Luxembourg; and (vii) Schifferli – Switzerland.   The Trustee will continue to seek court approval to retain professionals to investigate and represent him wherever estate assets may be found across the globe.

95.     The Trustee's international investigation and recovery of BLMIS estate assets takes place in three stages: (i) investigate the location and movement of estate assets and retain counsel where necessary; (ii) become involved where appropriate, whether by appearance in court or otherwise, to prevent dissipation of funds properly belonging to the estate; and (iii) bring actions before courts and government agencies to recover customer property for the benefit of the customers and creditors of the BLMIS estate.

England.

96.     In England, the Trustee is investigating a Madoff-affiliated company called Madoff Securities International Ltd. ("MSIL").   To advance his investigations, the Trustee has worked with the Joint Provisional Liquidators ("JPLs") of MSIL.   To investigate further the operation of BLMIS as it related to MSIL, the Trustee applied for and was granted recognition in England as a foreign representative and is authorized to serve disclosure orders to gather evidence.   His representatives met thereafter with personnel from the Serious Fraud Office, the

Financial Services Authority, and the Serious Organized Crime Agency to discuss the implications of the evidence being uncovered.

Gibraltar.

97.   The Trustee's investigations into the business and operation of BLMIS have shed light on numerous Gibraltar-related funds and banks with accounts and affiliations with BLMIS. Among them is Vizcaya Partners Limited ("Vizcaya"), a British Virgin Island ("BVI") fund located in Gibraltar.  On April 9, 2009, the Trustee filed a complaint in the Bankruptcy Court for the Southern District of New York against Vizcaya and Banque Jacob Safra (Gibraltar) Ltd. ("Safra"), seeking return of $150,000,000 under SIPA and the Bankruptcy Code as preferential transfer and also for turnover and accounting in connection with a transfer from BLMIS to Safra for the benefit of Vizcaya.  Of that $150 million, approximately $75 million is still held in various accounts at Bank Jacob Safra (Gibraltar) Limited ("Bank Safra") or in a Gibraltar Court, which money is currently frozen by the Gibraltar authorities and which the Trustee is claiming for the benefit of the estate.  The Trustee applied to be and was added as an interested party to a Gibraltar-based Judicial Review Action, which was filed by Vizcaya against the Gibraltar Attorney General and Bank Safra in order to regain control over frozen funds held in its account at Bank Safra.

98.   To date, $10.7 million of the approximately $75 million frozen at Safra by the Gibraltar authorities has been turned over to the Gibraltar Supreme Court.  The Judicial Action was filed by Vizcaya Partners, Limited on February 18, 2009.  It is Case No. 2009-Misc-13. Interested parties include Bank J. Safra (Gibraltar) Limited and Irving H. Picard.

99.   As discussed in further detail below (see ¶116 infra), the Trustee's international investigations have also led him to file suit in the Bankruptcy Court against BVI funds Kingate

Euro Fund Ltd. and Kingate Global Fund Ltd. (collectively "Kingate"), as well as the Bank of Bermuda to recover two preference payments totaling approximately $257 million. The litigation against Kingate and the Bank of Bermuda may ultimately involve related litigation in other jurisdictions as well.

100.    In addition, after extensive investigative efforts and due diligence, the Trustee settled preference claims involving the Optimal Funds, based in the Bahamas, for $235 million, which was an 85% recovery (see further discussion at ¶126 infra).

B.    **FEEDER FUNDS**

101.    During the Report Period, and as a result of international and domestic investigations, the Trustee has identified and commenced investigations of numerous hedge funds, entities and individuals that held IA accounts at BLMIS. The Trustee's investigation of these "feeder funds" and other account holders is continuing.

102.    As further described in ¶¶115-128, below, as a result of the Trustee's investigation to date, he has filed eight avoidance actions against hedge funds and individuals who withdrew funds from their IA accounts during the relevant time periods. Collectively, these eight actions seek to recover more than $13.7 billion in principal and fictitious profits.

C.    **OTHER CORPORATE ASSETS**

103.    During the Report Period, the Trustee and his professionals also focused on the investigation of corporate assets held by BLMIS and other related entities and individuals. As part of this ongoing investigation, the Trustee and his professionals have collected and reviewed thousands of pages of corporate documents from the BLMIS premises, and have issued subpoenas and consensual document requests to numerous entities. In addition, fact-finding interviews have been held with a number of former employees of BLMIS.

104.    The documents and information collected to date have assisted the Trustee in performing funds flow analyses that have identified both direct and indirect assets of BLMIS, such as those which are held nominally in the name of other entities.  The process is complicated by the fact that corporate documents often misrepresent which party contributed capital to an asset.  Examples of this include companies for which BLMIS provided capital, but for which corporate records indicate no apparent ownership interest by BLMIS.

105.    The Trustee's investigation is also ongoing with respect to the analysis of funds and other assets provided to related individuals originating from customer property which was formerly held in accounts of BLMIS.  The Trustee's counsel has been reviewing corporate records, as well as analyses provided by the Trustee's financial professionals in an attempt to trace the ultimate destination of such funds.  It is the Trustee's intention to recover any improperly transferred corporate assets from family members and any other third-party transferees to whom customer property has been improperly transferred.

106.    To date more than sixty potential corporate assets and interests have been identified, and efforts to further identify, collect and liquidate these assets are ongoing.

D.    **EVIDENCE GATHERING**

107.    Within hours of the appointment of the Receiver, AlixPartners began certain efforts to identify and preserve evidence at the three (3) physical locations used by BLMIS – the main office at 885 Third Avenue in Manhattan, the Disaster Recovery site at the Bulova Building in Astoria, Queens and a warehouse in Long Island City, Queens.  Starting on December 11, 2008, AlixPartners coordinated efforts with the FBI to identify and provide forensic images and server data for review and analysis  and conducted numerous forensic analysis of electronic data.

108.    In addition, AlixPartners engaged in the following activities to gather and preserve evidence: coordinated the recovery of data from hard drives and other media that were

physically damaged or had failed during the normal course of use; conducted a site survey of the 885 3rd Avenue and Bulova facilities to identify and preserve loose media (i.e. floppy disks, DVD/CDs, etc.); previewed each collected computer hard drive to document all user profiles; and extracted for analysis and review data identified for relevant custodians, including certain Madoff family members and employees.

109.    With the assistance of AlixPartners, the Trustee has identified and preserved various items of computer media.  The preserved data have been forensically imaged allowing analysis and future use as evidence.  AlixPartners has identified and collected server data, from both the 885 3rd Avenue and Bulova facilities, and has coordinated the backup of all relevant server data for preservation purposes.  This data has been loaded into a secure web-based document review program which B&H attorneys continue to review.

## IX.    BANKRUPTCY COURT PROCEEDINGS

### A.    THIRD-PARTY ACTIONS AGAINST THE TRUSTEE

Rosenman Family LLC v. Picard, et al., Adv. Pro. No. 09-1000 (BRL).

110.    On January 1, 2009, Rosenman Family LLC, a BLMIS customer, filed an adversary proceeding seeking the return of $10 million dollars it deposited mere days before BLMIS collapsed.  The Trustee moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that Rosenman Family LLC was a "customer," as that term is defined under SIPA, and thus could only recover through the customer claims process set forth in that statute.  After full briefing, oral argument was heard by this Court on February 24, 2009.  On that same date, this Court granted the Trustee's motion to dismiss the complaint.  Rosenman Family LLC filed a notice of appeal in the District Court, which has been assigned to District Court Judge Buchwald.  The appeal has been fully briefed, and the parties are waiting for the District Court to set a date for oral argument.

Hadleigh Holdings LLC v. Picard, et. al., Adv. Pro. No. 09-1005 (BRL).

111.    A similar complaint was filed on January 7, 2009 against the Trustee by Hadleigh

Holdings LLC ("Hadleigh"), a BLMIS customer who deposited $1 million dollars just a few

days before the collapse of BLMIS.  The Trustee filed a motion to dismiss the complaint under

Federal Rule of Civil Procedure 12(b)(6).  While the motion was pending, Hadleigh Holdings

LLC filed an amended complaint.  After the Trustee filed a motion to dismiss the amended

complaint, the case was voluntarily dismissed by Hadleigh.  The customer claim of Hadleigh has

been determined and partially satisfied by the Trustee.

Albanese, et al. v. Picard, Adv. Pro. No 09-1265 (BRL).

112.    As detailed more fully herein, the Trustee has begun satisfying customer claims.

The Trustee has issued its determinations using a "money in/money out approach."  Thus, the

customer is credited with the money deposited with BLMIS by him, less any amounts already

withdrawn from BLMIS.  On June 5, 2009, a class action complaint ("Class Action Complaint")

was filed by a group of BLMIS customers against the Trustee seeking a declaratory judgment

that the Trustee's approach of money in/money out was incorrect as a matter of law.  Instead, the

complaint alleges that the Trustee should allow claims based on the customer account statements

as of the Filing Date.  The Class Action seeks to certify a class of customers who "are adversely

affected by the Trustee's definition of 'net equity' under SIPA."

113.    On June 23, 2009, the Class Action Complaint was amended and a motion for

class certification and memorandum of law in support of an order to show cause for expedited

relief was filed in connection with the amended complaint.  On June 24, 2009, the Bankruptcy

Court denied the request for expedited relief.  The Trustee's answer to the original Class Action

Complaint is due on July 8, 2009.

Peskin, et al. v. Picard, Adv. Pro. No. 09-1272 (BRL).

114.    A complaint was filed on June 10, 2009 on behalf of three customers seeking

similar relief to that sought in the class action.  The customers seek a declaration that the Trustee

must determine their claims based on the amounts showing on their November 30, 2008

customer statement.  The complaint also seeks compensatory damages for the alleged breach of

fiduciary duty.  Plaintiffs allege that the Trustee breached his duties to them by failing to

promptly determine their customer claims and by "inventing" a new definition of "net equity."

The Trustee's answer is due on July 10, 2009.

## B.    **THIRD PARTY ACTIONS BY THE TRUSTEE**

## AVOIDANCE ACTIONS

Picard v. Vizcaya Partners Limited and Banque Jacob Safra (Gibraltar) Ltd. Adv. Pro. No 09-
1154 (BRL).

115.    As discussed above in ¶97 , the Trustee filed a complaint against Vizcaya Partners

Limited ("Vizcaya") and Banque Jacob Safra (Gibraltar) Ltd. ("Safra"), seeking return of

$150,000,000 under SIPA §§ 78lll(4) and 78fff-2(c)(3), and sections 542, 547, 550(a)(1), and

551 of the Bankruptcy Code as a preferential transfer and also for turnover and accounting in

connection with a transfer from BLMIS to Safra for the benefit of Vizcaya.

Picard v. Kingate Global Fund Ltd. and Kingate Euro Fund Ltd., Adv. Pro. No 09-1161 (BRL).

116.    On April 17, 2009, the Trustee filed a complaint against Kingate Global Fund Ltd.

("Kingate Global") and Kingate Euro Fund Ltd. ("Kingate Euro"), seeking return of $395

million under SIPA §§ 78lll(4) and 78fff-2(c)(3), and Bankruptcy Code sections 542, 547,

550(a)(1), and 551 and other applicable law for turnover, accounting, preferences, fraudulent

conveyances and damages in connection with certain transfers of property by BLMIS to or for

the benefit of the defendants.  The defendants' answer is currently due on July 13, 2009 and a

pretrial conference has been scheduled for July 28, 2009.

Picard v. Stanley Chais, et al., Adv. Pro. No 09-1172 (BRL).

117.    On May 1, 2009, the Trustee filed an adversary complaint against Stanley Chais,

Pamela Chais, Emily Chasalow, Mark Chais, William Chais, Michael Chasalow, Mirie Chais,

Wrenn Chais, Albert Angel, The Brighton Company, The Lambeth Company, The Popham

Company, Appleby Productions Ltd., The Appleby Productions Ltd. Defined Contribution Plan,

The Appleby Productions Ltd. Money Purchase Plan, The Appleby Productions Ltd. Profit

Sharing Plan, The Unicycle Trading Company, Unicycle Corp., individually and as the General

Partner of The Unicycle Trading Company, The Unicycle Corporation Money Purchase Plan,

Onondaga, Inc., individually and as General Partner of Chais Investments Ltd., a Nevada

Limited Partnership, The Onondaga, Inc. Money Purchase Plan, The Onondaga, Inc. Defined

Benefit Pension Plan, Chais Investments, Ltd., Chais Family Foundation, Chais Management,

Inc., individually and as General Partner of Chais Management Ltd., Chais Management Ltd.,

Chais Venture Holdings, The 1994 Trust For The Children Of Stanley And Pamela Chais, The

1996 Trust For The Children Of Pamela Chais And Stanley Chais, The 1999 Trust For The

Children Of Stanley And Pamela Chais, The 1999 Trust For The Grandchildren Of Stanley And

Pamela Chais, The Chais 1991 Family Trust, The Emily Chais 1983 Trust, The Emily Chais

Trust, The Emily Chais Issue Trust, The Mark Hugh Chais Trust, The Mark Hugh Chais Issue

Trust, The Mark Hugh Chais 1983 Trust, The William Frederick Chais Trust, The William F.

Chais Issue Trust, The William Frederick Chais 1983 Trust, The William And Wrenn Chais

1994 Family Trust, The Ari Chais 1999 Trust, The Ari Chais Transferee #1 Trust, The Benjamin

Paul Chasalow 1999 Trust, The Benjamin Paul Chasalow Transferee #1 Trust, The Chloe

Francis Chais 1994 Trust, The Chloe Francis Chais Transferee #1 Trust, The Jonathan Wolf

Chais Trust, The Jonathan Chais Transferee #1 Trust, The Justin Robert Chasalow 1999 Trust,

The Justin Robert Chasalow Transferee #1 Trust, The Madeline Celia Chais 1992 Trust, The

Madeline Chais Transferee #1 Trust, The Rachel Allison Chasalow 1999 Trust, The Rachel

Allison Chasalow Transferee #1 Trust, The Tali Chais 1997 Trust, The Tali Chais Transferee #1

Trust, Does 1-25 (collectively, the "Chais-related entities") seeking return of more then $1.1

billion under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551

of the Bankruptcy Code, N.Y. Debt & Cred. § 270 et seq. (the "New York Fraudulent

Conveyance Act"), and other applicable law, for turnover, accounting, preferences, fraudulent

conveyances and damages in connection with certain transfers of property by BLMIS to or for

the benefit of the defendants.  The defendants' answer is currently due on August 12, 2009 and a

pretrial conference has been scheduled for August 25, 2009.

<u>Picard v. Gabriel Capital, L.P., et al.</u>, Adv. Pro. No. 09-1182(BRL).

118.    On May 7, 2009, the Trustee filed an adversary complaint against Gabriel Capital,

L.P., Ariel Fund, Ltd., Ascot Partners, L.P., Gabriel Capital Corporation and J. Ezra Merkin

(collectively, the "Merkin Funds") seeking return of more then $557 million under SIPA §§

78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy

Code, the New York Fraudulent Conveyance Act, and other applicable law, for turnover,

accounting, preferences, fraudulent conveyances and damages in connection with certain

transfers of property by BLMIS to or for the benefit of the defendants.  The defendants' answer

is currently due on July 17, 2009.

Picard v. Harley International (Cayman) Limited, Adv. Pro. No. 09-1187 (BRL).

119. On May 12, 2009, the Trustee filed a complaint against Harley International (Cayman) Limited ("Harley"), seeking return of approximately $1.1 billion pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of Defendant Harley.

Picard v. Jeffry Picower, et al., Adv. Pro. No. 09-1179 (BRL).

120. On May 12, 2009, the Trustee filed an adversary complaint against Jeffry M. Picower, individually and as trustee for the Picower Foundation, Barbara Picower, individually and trustee for the Trust FBO Gabrielle H. Picower and the Picower Foundation, Capital Growth Company, Favorite Funds, JA Primary Limited Partnership, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JFM Investment Company, JLN Partnership, JMP Limited Partnership, Jeffry M. Picower Special Co., Jeffry M. Picower, P.C., Decisions Incorporated, The Picower Foundation, The Picower Institute For Medical Research, The Trust FBO Gabrielle H. Picower and Does 1-25 (collectively, the "Picower-related entities") seeking return of more then $6.7 billion under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the defendants. The defendants' answer is currently due on July 31, 2009.

Picard v. Fairfield Sentry Limited, et al., Adv. Pro. No 09-1239 (BRL).

121.    On May 18, 2009, the Trustee filed a complaint against Fairfield Sentry Limited, Greenwich Sentry Limited, L.P., and Greenwich Sentry Partners, L.P., (collectively, "the Fairfield Funds") seeking return of approximately $3.5 billion pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent conveyances, damages and objection to claim in connection with certain transfers of property by BLMIS to or for the benefit of the Fairfield Funds.

Picard v. Cohmad Securities Corporation, et al., Adv. Pro. No. 09-1305 (BRL).

122.    On June 22, 2009, the Trustee filed a complaint in the Bankruptcy Court against Cohmad Securities Corporation ("Cohmad"), Maurice "Sonny" J. Cohn, Marcia B. Cohn, Robert Jaffe, Alvin "Sonny" Delaire, Jr., Milton S. Cohn, Frank A. Christensen, Stanley Berman, Jonathan Greenberg, Cyril Jalon, Morton Kurzrok, Linda McCurdy, Richard Spring, Rosalie Buccellato, Marilyn Cohn, Jane M. Delaire a/k/a Jane Delaire Hackett, Carole Delaire, Gloria Kurzrok, Joyce Berman, S & J Partnership, Janet Jaffin Revocable Trust, The Spring Family Trust, Jeanne T. Spring Trust, The Estate of Elena Jalon, The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger, The Joint Tenancy of Robert Pinchou and Fabian Guenzburger and Elizabeth M. Moody.

123.    The complaint seeks to avoid, pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, decades worth of transactions through which BLMIS paid approximately $114 million to Cohmad, Sonny Cohn and other Cohmad related individuals in exchange for Sonny Cohn, Marcia Cohn, Robert Jaffe and other

Cohmad employees introducing victims to BLMIS and knowingly helping Madoff create, fund and maintain his massive Ponzi scheme. Over 90% or more of the income to Cohmad and others came from the referral of customers to Madoff.

124. The complaint portrays the unique relationships between Madoff, Cohmad, Cohn, Jaffe and other Cohmad individuals, who, though ostensibly at different companies, acted as a single enterprise. According to the complaint, while Madoff shrouded himself with an unapproachable, Wizard of Oz-like aura eschewing unknown investors, the reality is that Cohn, Jaffe and others were actively recruiting more than 1,000 customer accounts and infusing the Ponzi scheme with billions of dollars.

125. In addition, the complaint seeks to recover all of the fictitious profits that the Cohmad representatives, and their family members, received over the years from their investment advisory accounts at BLMIS, an amount greater than $100 million.

## SETTLEMENTS

Optimal Companies.

126. On May 22, 2009, the Trustee reached an agreement (the "Settlement Agreement") with Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited (collectively the "Optimal Companies") to settle the Trustee's claims against them in connection with the liquidation of BLMIS. The Optimal Companies are indirectly owned by Banco Santander, S.A., a Spanish banking corporation ("Santander" and together with the Optimal Companies, collectively "Optimal"). On May 26, 2009, the Trustee filed a motion seeking approval of the Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code and Fed. R. Bankr. P. 2002 and 9019. This Court approved the Settlement Agreement at a hearing held on June 16, 2009.

127. Pursuant to the Settlement Agreement, Optimal agreed to pay $235 million to settle potential litigation claims by the Trustee. This settlement is significant because it is the first instance where a "feeder fund" has agreed to settle with the Trustee. The Optimal Companies withdrew about $275 million within 90 days before the collapse of BLMIS. The $275 million in withdrawals were therefore considered preferences, recoverable by the Trustee pursuant to sections 547 and 550 of the Bankruptcy Code. Optimal agreed to return approximately $235 million, which is 85% of what the Trustee would have sought from Optimal as a 90-day preference claim. The settlement is considered to be a major success because it allows the Trustee to avoid (1) the anticipated legal battles over determining the judicial plausibility of a US court holding jurisdiction over a foreign bank in Spain and (2) the costly litigation that would be necessary to collect a judgment from the funds.

128. The Trustee conducted a confirmatory investigation, including a review of documents made available to the Trustee by the Optimal Companies that related to, among other things, due diligence conducted by the Optimal Companies and their affiliates on BLMIS. On the basis of that review, the Trustee concluded that the Optimal Companies and their affiliates were not complicit in the fraud perpetrated by BLMIS and Bernard Madoff on BLMIS's customers and did not have actual knowledge of the fraud, and based on the review, the Trustee did not believe that the conduct, acts and omissions of the Optimal Companies and their affiliates provide grounds to assert any claim against the Optimal Companies or any affiliates (other than avoiding preference claims), or to disallow any claim that the Optimal Companies may have against BLMIS or its estate. If the Trustee obtains new information relating to the BLMIS accounts of the Optimal Companies that materially affects the Trustee's decision to enter into the

Settlement Agreement, the Trustee may declare the Settlement Agreement void and return the

amounts paid by the Optimal Companies.

C.   **SUBSTANTIVE CONSOLIDATION**

129.   On April 10, 2009, the District Court entered an order modifying article V of the

Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief

Against Defendants dated December 18, 2008, to allow the Petitioners to file an involuntary

bankruptcy petition against Madoff.  The District Court in its Order noted that:

> A Bankruptcy Trustee has direct rights to Mr. Madoff's individual
> property, with the ability to maximize the size of the estate
> available to Mr. Madoff's creditors through his statutory authority
> to locate assets, avoid fraudulent transfers, and preserve or increase
> the value of assets through investment or sale, as well as provide
> notice to creditors, process claims, and make distributions in a
> transparent manner under the procedures and preferences
> established by Congress, all under the supervision of the
> Bankruptcy Court.

130.   On April 13, 2009, Blumenthal & Associates Florida General Partnership, Martin

Rappaport Charitable Remainder Unitrust, Martin Rappaport, Marc Cherno and Steven

Morganstern (collectively, the "Petitioning Creditors"), filed an involuntary petition for relief

against Madoff commencing a case under Chapter 7 of the Bankruptcy Code (the "Madoff

Chapter 7 Case").

131.   On April 21, 2009, pursuant to an Order of the Court signed on April 20, 2009

directing the appointment of an interim Chapter 7 trustee, the United States Trustee's Office for

the Southern District of New York appointed Alan Nisselson, Esq. as interim trustee for the

Madoff Chapter 7 Case (the "Madoff Trustee").

132.   On April 20, upon an ex parte application by the USAO, Judge Chin issued a

post-indictment restraining order in the Criminal Action (the "Restraining Order").  In pertinent

part, the Restraining Order restrained Madoff and Ruth Madoff from the transfer or dissipation

of assets subject to forfeiture. The Restraining Order exempts the USAO from the foregoing

provisions, and further states that the USAO may provide specific written authorization to third

parties to take actions otherwise prohibited by the Restraining Order.

133. The Trustee and the Madoff Trustee began discussions regarding the possible

substantive consolidation of the two estates. The Madoff Trustee reviewed documentation

related to the intertwined nature of the two estates and discussed same with representatives of

FTI and AlixPartners. Following this investigation, the Trustee and the Madoff Trustee agreed

to a form of consent order substantively consolidating the Madoff estate into the BLMIS SIPA

proceedings. This order was entered by the court on June 9, 2009.

134. Notwithstanding the substantive consolidation, the Madoff Trustee remains

Chapter 7 trustee of the Madoff estate solely to bring claims under Chapters 5 and 7 of the

Bankruptcy Code in consultation with the Trustee and SIPC.

D.    **OBJECTIONS TO CLAIMS DETERMINATIONS**

135. In connection with the determination of customer claims as of June 30, 2009 there

have been six (6) objections filed in the Bankruptcy Court to the Trustee's determination of such

claims. As required by the Claims Procedures Order, and as described in each Determination

Letter sent by the Trustee, customers of BLMIS have thirty (30) days from the receipt of the

Determination Letter to object to the Trustee's determination of their claim. Notice of and

reasons for such objection must be provided to the Trustee and to the Bankruptcy Court.

136. The six (6) objectors have cited, among others, the following reasons for

objecting to the Trustee's determination of their claims: (i) the use of the "cash in, cash out"

method for calculating the value of claims is inappropriate and claim should be valued based on

the BLMIS November 30, 2008 statement; (ii) claimants should receive interest on deposited

amounts; (iii) the Trustee is required to commence an adversary proceeding as the Trustee is attempting to avoid gains on claimants' investments; (iv) there is no legal basis for requiring execution of a Partial Assignment and Release prior to payment of SIPC advance; and (v) claimants are entitled to immediate payment of the $500,000 SIPC advance. In addition, one claimant objects on the basis that he has a joint account with another customer (although the account is solely in his name), and they should therefore be entitled to separate treatment as two (2) claimants with individual claims/

E.    **JOINT PROVISIONAL LIQUIDATORS**

137.    On June 9, 2009, the Bankruptcy Court approved two protocols between the Trustee and the Joint Provisional Liquidators ("JPLs") for Madoff Securities International Limited ("MSIL"), Madoff's U.K. operations. The protocols provide for cooperation between the Trustee and the JPLs. Specifically, the Trustee and the JPLs entered into the Cross-Border Insolvency Protocol for the Bernard Madoff Group of Companies (the "Cross Border Protocol") and an Information Sharing Protocol (the "Information Protocol").

138.    The Cross Border Protocol provides that the Trustee and the JPLs will keep each other updated with respect to their activities, including any court proceedings and will work together regarding any assets that the representatives locate. The Information Protocol  sharing of information regarding the affairs of BLMIS and MSIL, including by their respective agents.

139.    On the same date, the MSIL proceeding was recognized by the Bankruptcy Court as a foreign main proceeding pursuant to Chapter 15 of the Bankruptcy Code.

F.    **MOTIONS TO INTERVENE**

140.    Jonathan Lee Riches attempted to intervene in this proceeding in January 2008, however his motion was denied by the Bankruptcy Court (Docket #56). In addition to failing to meet the standards for intervention, the Bankruptcy Court observed that Mr. Riches is a self-

described inmate of the federal prison system who has filed over one thousand lawsuits in federal district courts. Mr. Riches has recently taken to assuming the name of the Trustee when filing various baseless pleadings and requests for preliminary injunctions in unrelated pending cases around the country, including in the Chrysler chapter 11 case. In these cases, Mr. Riches has been identifying himself as "a/k/a Irving Picard" and "d/b/a Irving Picard," referencing the Madoff fraud in his papers. The Trustee has been advising courts in various jurisdictions that (i) he is not in any way connected to Mr. Riches, a prisoner at the Federal Medical Center in Kentucky; and (ii) Mr. Riches is not authorized to represent the Trustee.

141. The Trustee and his counsel successfully opposed an attempt by Ade Ogunjobi, Toks, Inc. and its related companies (collectively, "Toks") to intervene in the BLMIS proceedings. Based on the papers filed by the Trustee, and after a hearing on the matter held on June 2, 2009, the Bankruptcy Court found that Toks was not a party in interest, and that Toks failed to demonstrate any ability to complete its proposed tender offer. The Bankruptcy Court ultimately found no basis for Toks to intervene and denied its motion. Toks has appealed the order, and the matter has been assigned to District Court Judge Chin. The Trustee believes that the decision of the Bankruptcy Court will be upheld on appeal.[10]

## X.   **CONCLUSION**

The foregoing report represents a summary of the status of this proceeding and the material events that have occurred from December 15, 2008 through June 30, 2009. It will be supplemented and updated with further interim reports.

---

[10] Mr. Ogunjobi's and Tok's emergency motion seeking a stay of the liquidation proceeding (Docket No. 304) was denied by the Bankruptcy Court on July 6, 2009 (Docket No. 306).

Dated: New York, New York
      July 9, 2009

Respectfully submitted,


 _/s/  Irving H. Picard _____
Irving H. Picard
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Trustee for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and
Bernard L. Madoff*


OF COUNSEL[11]

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Alissa M. Nann
Email: anann@bakerlaw.com

*Attorneys to Trustee for the Substantively
Consolidated SIPA Liquidation of Bernard L.
Madoff Investment Securities LLC And
Bernard L. Madoff*

---

[11] The Trustee would like to recognize the following B&H attorneys who contributed to this Report: John McGowan, Ona Wang, Thomas Wearsch, Keith Murphy, Henry Bodenheimer, Seanna Brown, Deborah Kaplan, Doug Nevin and Amy Vanderwal.  Denis O'Connor, Matthew Cohen, William Kingsford, Meaghan Schmidt and Vineet Sehgal of AlixPartners also contributed to this Report.

300016705                                    45

# <u>EXHIBIT A</u>

# SECURITIES INVESTOR PROTECTION CORPORATION
## Irving Picard, Trustee of Bernard L. Madoff Investment Securities, LLC

Report No. 6

Period Ended May 31, 2009

CASH RECEIPTS:

| General Cash Receipts | Net Change for Period | Prior Period Cumulative | Total Received | Cumulative Detail | | | Code |
|---|---|---|---|---|---|---|---|
| | | | | Customer Fund | General Estate | SIPC | |
| Beginning Cash Balance | $642,700,482.16 | | | | | | |
| Transfer from Debtor's Estate - Other | 1,016.50 | 4,157.93 | 5,174.43 | | $ | | 4010 |
| Transfers from Debtor's Estate - BNY account | 6,817,909.56 | 329,836,487.98 | 336,654,397.54 | | | | 4014 |
| Transfers from Debtor's Estate - Chase account | 0.00 | 235,156,309.36 | 235,156,309.36 | | | | 4016 |
| Customers | 0.00 | 25,000.00 | 25,000.00 | | | | 4020 |
| Interest and Dividends | 94,976.72 | 372,741.23 | 467,717.95 | | | | 4040 |
| Closeout Proceeds - Broker Dealers | -12,657.29 | 37,284,763.22 | 37,272,105.93 | | | | 4030 |
| Closeout Proceeds - NSCC | 0.00 | 21,783,082.40 | 21,783,082.40 | | | | 4031 |
| Closeout Proceeds - DTCC | 0.00 | 12,660,000.00 | 12,660,000.00 | | | | 4032 |
| Sale of Debtor's Assets | 0.00 | 535,000.00 | 535,000.00 | | | | 4070 |
| - Sports Tickets | 5,181.00 | 73,610.70 | 78,791.70 | | | | 4071 |
| - Bank Debt Participations | 543,599.32 | 1,040,000.00 | 1,583,599.32 | | | | 4072 |
| - DTCC Shares | 0.00 | 204,170.51 | 204,170.51 | | | | 4073 |
| Refunds - Subscriptions | 0.00 | 1,078.59 | 1,078.59 | | | | 4092 |
| - Car Registrations | 0.00 | 157.00 | 157.00 | | | | 4093 |
| - Vendors | 36,561.82 | 7,058.84 | 43,620.66 | | | | 4094 |
| - Transit Cards | 0.00 | 793.61 | 793.61 | | | | 4095 |
| - Insurance/Workers Comp | 0.00 | 233,904.29 | 233,904.29 | | | | 4096 |
| - Ref. - Political Contributions | 0.00 | 141,500.00 | 141,500.00 | | | | 4097 |
| - Refunds Other | 0.00 | 50.84 | 50.84 | | | | 4099 |
| Recoveries - Employees | 0.00 | 10,674.74 | 10,674.74 | | | | 4102 |
| - Taxing Authorities | 0.00 | 12,777.56 | 12,777.56 | | | | 4103 |
| - Class Actions | 0.00 | 51,028.97 | 51,028.97 | | | | 4104 |
| - NASDAQ | 0.00 | 308,948.49 | 308,948.49 | | | | 4105 |
| - NYSE | 0.00 | 183,683.79 | 183,683.79 | | | | 4106 |
| - Transaction Fees | 0.00 | 2,954.71 | 2,954.71 | | | | 4107 |
| - Other * (See Note) | 0.00 | 494.64 | 494.64 | | | | 4109 |
| Miscellaneous | 0.00 | 0.36 | 0.36 | | | | 4110 |
| Subtenant Rent | 15,252.36 | 335,424.30 | 350,676.66 | | | | 4111 |
| **Sub-total General Cash Receipts** | $7,501,839.99 | $640,265,845.06 | 647,767,694.05 | $0.00 | $0.00 | $0.00 | |
| **Advances from SIPC** | | | | | | | |
| Administration - Advances | 5,104,537.53 | 28,298,911.54 | 33,403,449.07 | | | | 2901 |
| Securities - Paid Bank Loans | 0.00 | 0.00 | 0.00 | | | | 2921 |
| - Cash in Lieu | 40,353,089.11 | 25,601,810.32 | 65,954,899.43 | | | | 2922 |
| **Sub-total SIPC Advances** | $45,457,626.64 | $53,900,721.86 | 99,358,348.50 | | | | |
| **Total Cash Receipts** | $52,959,466.63 | $694,166,575.92 | 747,126,042.55 | $0.00 | $0.00 | $0.00 | |

* (Note) In addition, on January 30, 2009, Depository Trust & Clearing Corp. transferred to the Trustee's brokerage account 1601 securities positions. The total net equity value at May 31, 2009 is $298,520,680.
(See Page 5 for more details)

**Period Ended May 31, 2009**                                    **Report No. 6**

*CASH DISBURSEMENTS:*

*Administrative Disbursements*

| | Net Change for Period | Prior Period Cumulative | Cumulative Total Paid | Code |
|---|---|---|---|---|
| **General Administrative Disbursements** | | | | |
| Computer - Rental | 0.00 | 11,121.59 | $11,121.59 | 5011 |
| - Software Support | 0.00 | 55,159.20 | $55,159.20 | 5012 |
| - Equipment Leases | 45,279.00 | 71,798.24 | $117,077.24 | 5013 |
| Employee related - Salaries-Net | 31,352.00 | 4,286,884.00 | $4,318,236.00 | 5020 |
| - FICA-Employer | 2,274.97 | 314,885.30 | $317,160.27 | 5021 |
| - Fed. & St. Unemploy. | 109.04 | 436.16 | $545.20 | 5023 |
| - Employee Medical Plan | 28,892.32 | 612,384.53 | $641,276.85 | 5025 |
| - Employee LTD | -386.57 | 7,180.19 | $6,793.62 | 5026 |
| - Employee Expense Reimbursement | 0.00 | 1,125.87 | $1,125.87 | 5027 |
| - Employee Life/AD&D | 0.00 | 9,006.83 | $9,006.83 | 5028 |
| - Other | 0.00 | 1,722.90 | $1,722.90 | 5029 |
| Insurance Workers Comp | 0.00 | 12,578.00 | $12,578.00 | 5032 |
| Fees - Payroll Processing | 51.33 | 7,848.54 | $7,899.87 | 5045 |
| - Other | 1,615.00 | 0.00 | $1,615.00 | 5049 |
| Rent - Office | 323,583.78 | 1,266,680.11 | $1,590,263.89 | 5050 |
| - Equipment | 287.19 | 1,408.70 | $1,695.89 | 5051 |
| - Warehouse | 10,144.30 | 50,785.98 | $60,930.28 | 5052 |
| - Bulova | 0.00 | 265,925.53 | $265,925.53 | 5053 |
| Telephone and Telegraph | 0.00 | 159,481.69 | $159,481.69 | 5060 |
| Communication Fees | 103,674.87 | 82,553.02 | $186,227.89 | 5061 |
| Utilities - Electricity | 121.10 | 954.35 | $1,075.45 | 5070 |
| Office Supplies & Expense - Maint. & Repairs | 19,989.81 | 41,001.03 | $60,990.84 | 5080 |
| - Postage | 91.00 | 0.00 | $91.00 | 5082 |
| - Reproduction | 2,853.12 | 7,522.47 | $10,375.59 | 5083 |
| - Locksmith | 0.00 | 2,770.83 | $2,770.83 | 5084 |
| - Security | 32,772.60 | 181,792.14 | $214,564.74 | 5085 |
| - Supplies | 580.88 | 552.71 | $1,133.59 | 5086 |
| - Temporary Help | 114,052.95 | 21,197.86 | $135,250.81 | 5087 |
| - Other | 259.94 | 33,274.82 | $33,534.76 | 5089 |
| Taxes | 8,198.74 | 36,647.51 | $44,846.25 | 5090 |
| Claims Related Costs | 0.00 | 0.00 | $0.00 | 5100 |
| - Mailing Costs | 0.00 | 15,157.38 | $15,157.38 | 5101 |
| - Publication | 0.00 | 163,961.13 | $163,961.13 | 5102 |
| - Supplies | 0.00 | 16,244.58 | $16,244.58 | 5103 |
| - Printing | 0.00 | 2,207.42 | $2,207.42 | 5104 |
| Scanning - Investigation | 827,699.99 | 1,455,081.27 | $2,282,781.26 | 5110 |
| Hosting Expense | 0.00 | 289,237.74 | $289,237.74 | 5111 |
| Foreign Research | 0.00 | 38,975.00 | $38,975.00 | 5112 |
| **Sub-total General Admin. Disbursements** | **$1,553,497.36** | **$9,525,544.62** | **$11,079,041.98** | |
| **Professional Fees and Expenses** | | | | |
| Ruth Hartman | 145,414.80 | 320,515.20 | $465,930.00 | 5200 |
| Trustee Expenses | 0.00 | 37.00 | $37.00 | 5201 |
| Trustee Counsel Fees | 2,983,207.60 | 5,515,651.00 | $8,498,858.60 | 5210 |
| Trustee Counsel Expenses | 72,658.64 | 140,539.28 | $213,197.92 | 5211 |
| Consultant Fees | 86,281.25 | 13,817,746.48 | $13,904,027.73 | 5240 |
| Consultant Expenses | 8,776.50 | 644,249.86 | $653,026.36 | 5241 |
| Investment Banker Fees | 0.00 | 400,000.00 | $400,000.00 | 5242 |
| **Sub-total Professional Fees and Expenses** | **$3,296,338.79** | **$20,838,738.82** | **$24,135,077.61** | |
| **Total Administrative Disbursements** | **$4,849,836.15** | **$30,364,283.44** | **$35,214,119.59** | |

Page 2

Period Ended May 31, 2009

Report No. 6

## CASH DISBURSEMENTS

| Claim Related Disbursements | Net Change for Period | Prior Period Cumulative | Total Paid | Customer Fund | General Estate | SIPC | Code |
|---|---|---|---|---|---|---|---|
| Customer - Paid Bank Loan | $ | $ | $ | | $ | $ | 6021 |
| - Securities - Cash in Lieu | 33,853,089.11 | 21,101,810.32 | 54,954,899.43 | | | | 6022 |
| - Securities - Purchases | | | | | | | 6023 |
| - Indemnification | | | | | | | 6031 |
| - Cash Balance | | | | | | | 6041 |
| Customer - | | | | | | | 6050 |
| Customer - | | | | | | | 6060 |
| Customer - Trustee Journal Entry per Allocation | | | | | | | 6000 |
| Other - Contractual Commitments | | | | | | | 6111 |
| - Pd. Bank Loan | | | | | | | 6121 |
| - Indemnification | | | | | | | 6131 |
| Other - | | | | | | | 6140 |
| Other - | | | | | | | 6150 |
| Other - | | | | | | | 6160 |
| Other - Trustee Journal Entry per Allocation | | | | | | | 6100 |
| General Creditor | | | | | | | 6200 |
| Sub-total Claim Disbursements | $33,853,089.11 | $21,101,810.32 | $54,954,899.43 | $0.00 | $0.00 | $0.00 | |
| **Other Disbursements (except investments)** | | | | | | | |
| SIPC - Refunds - Recoupment | | | | | | | 6301 |
| - Indemnification | | | | | | | 6310 |
| - Contr. Commitments | | | | | | | 6311 |
| - Paid Bank Loan | | | | | | | 6321 |
| - Subrogation | | | | | | | 6322 |
| Other - | | | | | | | 6400 |
| Other - | | | | | | | 6401 |
| Other - | | | | | | | 6402 |
| Other - | | | | | | | 6403 |
| Other - | | | | | | | 6404 |
| Sub-total Other Disbursements | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Investments by Trustee - Purchases | | | | | | | 1900 |
| Sub-total Administrative Disb. - page 2 | $4,849,836.15 | $30,364,283.44 | $35,214,119.59 | 0.00 | 0.00 | 0.00 | |
| Total Disbursements | $38,702,925.26 | $51,466,093.76 | $90,169,019.02 | $0.00 | $0.00 | $0.00 | |
| Total Receipts less Disbursements | $14,256,541.37 | $642,700,482.16 | $656,957,023.53 | $0.00 | $0.00 | $0.00 | |
| Ending Cash Balance | $656,957,023.53 | | | | | | |

Page 3

Period Ended <u>May 31, 2009</u>                                      Report No. 6

<u>SUMMARY INFORMATION ON STATUS OF LIQUIDATION</u>

| | Customer Claimants | Broker/Dealer Claimants | General Estate Claimants |
|---|---|---|---|
| Claims received | 9,134 | 16 | 167 |
| Claims satisfied by distribution of cash and/or securities: | | | |
| a. As part of the transfer in bulk | | | |
| b. On an account by account basis-Fully Satisfied (1) | 5 | | |
| c. On an account by account basis-Partially Satisfied (1) | 107 | | |
| | 112 | | |
| | | | |
| Claims Determined but not yet satisfied (1) | 140 | | |
| Claims under review | 8,881 | 16 | 167 |
| Claims Denied: | | | |
| a. No Claims | 1 | | |
| b. Assets at Another Broker | | | |
| c. Other Denials for which no objections were filed (1) | | | |
| d. Denials for which objections were filed: | | | |
|   - Hearing not yet set | | | |
|   - Set for Hearing | | | |
|   - Adjudicated | | | |
| | 9,022 | 16 | 167 |
| Accounts with cash and/or securities which were transferred in bulk | | | |
| Filing Date Value | | | |
| Customer name securities distributed | $ | | |
| Customer fund securities distributed | | | |
| | $ | | |

(1) To the extent satisfied, customer claims have been paid with up to
    the maximum SIPC advance of $500,000.


Comments:


_____
(Trustee's Signature)                         6/25/09
                                              (Date)

_____
(Accountant's Signature)                      6/24/09
                                              (Date)


Page 4

Period Ended May 31, 2009

Report No. 6

**IRVING H. PICARD, TRUSTEE FOR BMIS LLC**
**Morgan Joseph Account**

| | Fixed Income | Equities | Accrued Interest | Sweep Account (Proceeds from sale of securities and other investment transactions) | Account Balance |
|---|---|---|---|---|---|
| Balance on April 30, 2009 | 140,471,477 | 18,781,214 | 1,069,386 | 133,329,041 | 293,651,118 |
| Recovery of Funds from M&T Bank | | | | 4,030,939 | 4,030,939 |
| Sale of Securities — Fixed Income | (1,700,000) | | | 1,932,000 | 232,000 Note 1 |
| Sale of Securities — Equities | | (881,520) | | 885,950 | 4,430 Note 2 |
| Unrealized Gain or (Loss) | 14,040 | 130,985 | | | 145,025 |
| Interest and Dividends Earned | | | | 362,058 | 362,058 |
| Other changes in Account Balance | | | 95,117 | (7) | 95,110 |
| Balance on May 31, 2009 | 138,785,517 | 18,030,679 | 1,164,503 | 140,539,981 | 298,520,680 |

Note 1: Actual gain on sale of fixed income securities
Note 2: Actual gain on sales of Equity Securities

Page 5

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*And Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2009, I caused true copies of the **Trustee's First Interim Report For The Period December 11, 2008 Through June 30, 2009** to be served upon the interested parties who receive electronic service through ECF, by emailing the interested parties true and correct copies via electronic transmission to the email addresses designated for delivery and/or by placing true and correct copies thereof in sealed packages designated for regular U.S.

095879, 300023207

Mail to those parties as set forth on the attached Schedule A.

Dated: New York, New York
     July 9, 2009                       _s/Nikki M. Landrio_____
                                      NIKKI M. LANDRIO

## SCHEDULE A

Internal Revenue Service
District Director
290 Broadway, 5th Floor
New York, New York 10008

Internal Revenue Service
Centralized Insolvency Operation
Post Office Box 21126
Philadelphia, PA 19114

U.S. Department of Justice, Tax Division
Box 55
Ben Franklin Station
Washington, DC 20044

**Chapter 7 Trustee**
Alan Nisselson, Esq.
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, NY 10019


**Securities Investor Protection Corporation**
Kevin Bell – kbell@sipc.org
Josephine Wang – jwang@sipc.org

**Securities and Exchange Commission**
Alistaire Bambach – bambacha@sec.gov
Alexander Mircea Vasilescu – vasilescua@sec.gov
Terri Swanson – swansont@sec.gov
Israel E. Friedman – friedmani@sec.gov
Preethi Krishnamurthy – krishnamurthyp@sec.gov

**United States Attorney for SDNY**
Marc Litt – marc.litt@usdoj.gov
Lisa Baroni – lisa.baroni@usdoj.gov
Natalie Kuehler - natalie.kuehler@usdoj.gov

**Counsel to the JPL**
Eric L. Lewis – Eric.Lewis@baachrobinson.com

**Notices of Appearance**
Service via Electronic Notification through ECF Filing

095879, 300023207                                    - 3 -