# **EXHIBIT 28**

[CSM Revision of May 18, 2009]

## AGREEMENT

This AGREEMENT, dated as of May [●], 2009, is made by and among IRVING H. PICARD, in his capacity as Trustee for the liquidation under the Securities Investor Protection Act of 1970, as amended ("SIPA") of Bernard L. Madoff Investment Securities LLC (the "Trustee"), on the one hand, and OPTIMAL STRATEGIC U.S. EQUITY LIMITED, a Bahamas corporation ("SUS"), and OPTIMAL ARBITRAGE LIMITED, a Bahamas corporation ("Arbitrage"), on the other hand (each of the Trustee, SUS and Arbitrage, a "Party").

## BACKGROUND

A. Bernard L. Madoff Investment Securities LLC ("BLMIS") was a registered broker-dealer and a member of the Securities Investor Protection Corporation ("SIPC").

B. On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against BLMIS and Bernard L. Madoff ("Madoff"). On December 12, 2008, the District Court entered an order which among other things appointed a receiver (the "Receiver") for the assets of BLMIS (No. 08-CV-10791(LSS)).

C. On December 15, 2008, pursuant to section 5(a)(4)(A) of SIPA, the Commission consented to a combination of its own action with the application of SIPC. Thereafter, SIPC filed an application in the District Court under section 5(a)(3) of SIPA alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA. On December 15, 2008, the District Court granted the SIPC application and entered an order under SIPA, which, in pertinent part, appointed the Trustee for the liquidation of the business of BLMIS under section 5(b)(3) of SIPA and removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under section 5(b)(4) of SIPA, where it is currently pending as Case No. 08-01789 (BRL) (the "SIPA Proceeding"). The Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

D. On December 11, 2008, Madoff was arrested by federal agents for criminal securities laws violations including securities fraud, investment adviser fraud, and mail and wire fraud. At a plea hearing on March 12, 2009 in the case captioned United States v. Madoff, Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]" and engaged in fraud in the operation of BLMIS.

E. SUS and Arbitrage are trading companies that are owned by Optimal Multiadvisors Limited, which is a Bahamas multi-portfolio investment company and Standard Fund ("OML"). All of OML's ordinary voting shares are owned by Optimal Investment Services, S.A., a Swiss société anonyme ("OIS"), which is an indirect wholly-owned subsidiary of Banco Santander, S.A., a Spanish banking corporation ("Santander"). Optimal Multiadvisors (Ireland) plc is an Irish public limited company authorized by the Irish Financial Services Regulatory Authority and constituted as an umbrella fund comprised of a number of segregated liability sub-funds

("OMI"). OIS owns 50% of the ordinary shares of OMI (the other 50% of which are owned by an indirect subsidiary of Santander). OIS acts as the investment manager and investment advisor of OMI and of OML. OIS, OMI, OML, SUS and Arbitrage are referred to collectively as the "Optimal Companies".

F.   Investments in the funds operated by OMI and OML are represented by participating shares, which are held by numerous investors ("Investors"), many of whom may be customers of Santander or one or more of its affiliates.

G.   HSBC Securities Services (Ireland) Limited, an Irish limited liability company ("HSSI"), serves as administrator for OMI, OML, SUS and Arbitrage; HSBC Institutional Trust Services (Ireland) Limited, an Irish limited liability company ("HITS"), serves as custodian for OMI, OML, SUS and Arbitrage.

H.   SUS (either directly or through a customer agreement between OML or its predecessor and BLMIS) was a customer of BLMIS and maintained a customer account (the "SUS Account") with BLMIS, commencing in January 1997. Between then and the Filing Date, SUS had deposited into the SUS Account a total of $1,411,084,183 in excess of the amount of withdrawals, including BLMIS's withholding tax payments on SUS's behalf, that SUS had made from the account. Among other withdrawals, SUS withdrew $151,831,876, including BLMIS's withholding tax payments on SUS's behalf, from the SUS Account within 90 days before the Filing Date, but did not withdraw any other amount from the SUS Account after November 2002, other than by BLMIS's withholding tax payments on SUS's behalf. The amount of the SUS Account reflected on SUS's BLMIS account statement for the period ended November 30, 2008, which is the last available account statement, is $2,919,934,627.70, including option positions.

I.   Arbitrage (either directly or through a customer agreement between OML or its predecessor and BLMIS) was a customer of BLMIS and maintained a customer account (the "Arbitrage Account") with BLMIS, commencing in February 1996. Between then and the Filing Date, Arbitrage had withdrawn from the Arbitrage Account a total of $96,516,185, including BLMIS's withholding tax payments on Arbitrage's behalf, in excess of the amount that Arbitrage had deposited into the Arbitrage Account. Among other withdrawals, Arbitrage withdrew $125,087,004, including BLMIS's withholding tax payments on Arbitrage's behalf, from the Arbitrage Account, within 90 days before the Filing Date, and an additional $20,000,000 in October 2007 and $15,000,000 in February 2003, but did not withdraw any other amount from the Arbitrage Account after November 2002, other than by BLMIS's withholding tax payments on Arbitrage's behalf. The amount of the Arbitrage Account reflected on Arbitrage's BLMIS account statement for the period ended November 30, 2008, which is the last available account statement, is $14,567,639.02, including options positions.

J.   As a result of agreements between Santander or one or more of its affiliates and numerous former Investors in SUS who were private banking clients of Santander or its banking subsidiaries, Santander and some of its affiliates have succeeded to the interest of such former Investors in SUS.

K.   SUS and Arbitrage have asserted that they are each entitled to allowance of a customer claim in the BLMIS liquidation proceeding in an amount reflected on their respective

2

Confidential pursuant to June 6, 2011 Litigation Protective Order        OPT000323

BLMIS account statements for the period ended November 30, 2008.  The Trustee has disputed that SUS and Arbitrage are entitled to allowance of customer claims in the amounts reflected on their respective BLMIS account statements.

   L. The Trustee has advised the Optimal Companies of his position that only SUS and Arbitrage, as the direct customer account holders at BLMIS, are entitled to the allowance of customer claims or to the benefit of SIPC advances under section 9 of SIPA in the SIPA Proceeding on account of the SUS Account and the Arbitrage Account, respectively, and only upon compliance with the applicable provisions of SIPA and the Bankruptcy Code.

   M. The Trustee has asserted that SUS and Arbitrage are liable to the BLMIS estate under 11 U.S.C. §§ 547 and 550 for the withdrawals that each of them received within the 90 days before the Filing Date.  The Trustee has also asserted that Arbitrage also may be liable to the BLMIS estate under 11 U.S.C. §§ 544(b) and 550 and the New York Uniform Fraudulent Conveyance Act (New York Debtor and Creditor Law §§ 270 - 281) for $35,000,000, which Arbitrage withdrew in 2003 and 2007 (any claims under 11 U.S.C. §§ 542, 544, 547 or 550, "Avoiding Power Claims").  In connection therewith, the Trustee issued a subpoena to OML under Fed. R. Bankr. Proc. 2004 on February 27, 2009 (the "Subpoena"), seeking documents related to the SUS Account and the Arbitrage Account, among other things.

   N. SUS and Arbitrage have disputed any liability to the estate.  SUS and Arbitrage also have disputed that either of them is subject to the jurisdiction of the Bankruptcy Court under principles of United States law and that any judgment that the Trustee might obtain against either of them in the Bankruptcy Court would not be enforced against either of them by a court in The Bahamas, based on lack of jurisdiction over them in the United States.  SUS and Arbitrage also have disputed that OML is subject to the jurisdiction of the Bankruptcy Court for the purpose of enforcement of the Subpoena.

   O. The Trustee, on the one hand, and SUS and Arbitrage, on the other hand, wish to settle their disputes about the matters described above without the expense, delay and uncertainty of litigation.

   P. As a condition to settling the disputes, which involves releasing claims against the Optimal Companies and their affiliates and the allowance of customer claims in favor of SUS and Arbitrage in the SIPA Proceeding, the Trustee conducted a confirmatory investigation which included review of documents that were made available to the Trustee by the Optimal Companies on a confidential basis that relate to, among other things, due diligence conducted by the Optimal Companies and their affiliates on BLMIS.  On the basis of such review, the Trustee concluded that the Optimal Companies and their affiliates were not complicit in the fraud that BLMIS and Madoff perpetrated on BLMIS's customers and did not have actual knowledge of the fraud, and based on the review, the Trustee does not believe that the conduct, acts and omissions of the Optimal Companies and their affiliates provide grounds to assert any claim against the Optimal Companies or any of their affiliates (other than Avoiding Power Claims), or to disallow any claim that SUS or Arbitrage may have against BLMIS or its estate.

Confidential pursuant to June 6, 2011 Litigation Protective Order  OPT000324

NOW, THEREFORE, in consideration of the foregoing, of the mutual covenants, promises and undertakings set forth herein, and for good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the Trustee, SUS and Arbitrage agree:

## AGREEMENT

1. <u>SUS and Arbitrage Agreement to Bankruptcy Court Jurisdiction</u>.  For the purpose of this Agreement only (including with respect to paragraphs 7 and 23), SUS and Arbitrage agree that the agreements with BLMIS that they each signed in connection with the SUS Account and the Arbitrage Account and their respective communications and trading activities with respect to the Accounts, submit them to the jurisdiction of the Bankruptcy Court for the purpose of the SIPA Proceeding and any Avoiding Power Claims that the Trustee may bring against them under section 544, 547 and/or 550 of the Bankruptcy Code.  SUS's and Arbitrage's agreement to Bankruptcy Court jurisdiction under this paragraph does not constitute consent by any other Optimal Company to the Bankruptcy Court's jurisdiction or an agreement that any of them is subject to the Bankruptcy Court's jurisdiction.

2. <u>SUS Payment to Trustee</u>.  SUS shall pay the Trustee the sum of $129,057,094.60 by wire transfer at the Closing (as defined in paragraph 11), in full and final settlement of all Avoiding Power Claims and other claims of the Trustee or the BLMIS estate against SUS.

3. <u>Allowance of SUS Customer Claim</u>.  Upon the filing of a timely claim by SUS, the execution of a Partial Assignment and Release in the form annexed hereto (the "<u>Partial Assignment</u>") and the occurrence of the Closing (as defined below), SUS shall have an allowed customer claim in the SIPA Proceeding in the amount of $1,411,084,183 and shall be entitled to the full benefit of SIPC customer advances under section 9 of SIPA.  The Bankruptcy Court's order approving this Agreement shall provide for the allowance of SUS's customer claim as provided in this paragraph.  The Trustee shall make a distribution to SUS on account of its allowed claim in the amount of $500,000 in respect of the customer advance to the Trustee under section 9 of SIPA, as provided in paragraph 11.  Payment of the customer advance under Section 9 of SIPA and any other payments made to SUS on account of SUS's customer claim made by the Trustee shall be governed by all of SUS's organizational and other fund documents relating to SUS's relations with its investors and with all applicable agreements with SUS's investors.

4. <u>Arbitrage Payment to Trustee</u>.  Arbitrage shall pay the Trustee the sum of $106,323,953.40 by wire transfer, in full and final settlement of all Avoiding Power Claims and other claims of the Trustee or the BLMIS estate against Arbitrage, in a single payment of $16,323,953.40 at the Closing and in five installments of $18,000,000 every 30 days after the Closing (each, an "<u>Arbitrage Deferred Payment</u>").

5. <u>Allowance of Arbitrage Customer Claim</u>.  Upon the filing of a timely claim by Arbitrage, the execution of a Partial Assignment, and the occurrence of the Closing, Arbitrage shall have an allowed customer claim in the SIPA Proceeding in the amount of $9,807,768.40 and shall be entitled to the full benefit of SIPC customer advances under section 9 of SIPA.  The Bankruptcy Court's order approving this Agreement shall provide for the allowance of Arbitrage's customer claim as provided in this paragraph.  The Trustee shall make a distribution to Arbitrage on account

4

Confidential pursuant to June 6, 2011 Litigation Protective Order       OPT000325

of its allowed claim in the amount of $500,000 in respect of the customer advance to the Trustee under section 9 of SIPA, as provided in paragraph 11. Payment of the customer advance under Section 9 of SIPA and any other payments made to Arbitrage on account of Arbitrage's customer claim made by the Trustee shall be governed by all of Arbitrage's organizational and other fund documents relating to Arbitrage's relations with its investors and with all applicable agreements with Arbitrage's investors.

6. <u>Filing of Customer Claims</u>. SUS and Arbitrage agree that only SUS and Arbitrage (as the only BLMIS customer account holders among the Optimal Companies and their affiliates and as investment funds not acting as agents for the Investors) may file customer claims in the SIPA Proceedings on account of the SUS Account and the Arbitrage Account.

7. <u>Withdrawal of Subpoena</u>. The Trustee shall withdraw the Subpoena and shall not seek any other discovery, by subpoena or otherwise, from any of the Optimal Companies or any of the Optimal Third-Party Releasees (as defined below) for anything relating to the SUS Account or the Arbitrage Account or the relationship between the Optimal Companies or their affiliates and BLMIS or Madoff; provided, however, that the provisions of this paragraph shall extend to the Optimal Third-Party Releasees only to the extent of their relationship with the Optimal Companies and not in any other context or capacity. Nothing in this paragraph shall prevent the Trustee from requesting that the Optimal Companies or any of the Optimal Third-Party Releasees produce documents relating specifically to individuals or entities (other than the individuals or entities released by this Agreement) with respect to claims or possible claims against any individual or entity not released by this Agreement. Each of SUS and Arbitrage, on behalf of themselves and to the extent they may bind each of the other Optimal Releasees (as defined below), agrees to cooperate and, to the extent permitted by the jurisdiction in which the documents are located, produce such documents. The Trustee reserves the right to issue a subpoena for any document so requested by the Trustee that has not been produced voluntarily, and nothing in this Agreement may be construed as a waiver by any of the Optimal Releasees of any rights to contest any such subpoena.

8. <u>Notification of No Interest in Custodial Accounts</u>. The Trustee shall advise HSSI and HITS promptly after the date on which this Agreement become effective that the Trustee and the BLMIS estate do not assert any interest in any of the funds or accounts that HSSI or HITS holds or controls for any of the Optimal Companies and shall not in the future assert any interest in any such funds. Upon HSSI's and HITS's making funds of SUS and Arbitrage, respectively, available to make the payments to the Trustee required under paragraphs 3 and 5, the Trustee releases HSSI and HITS from any claim or liability for any Avoiding Power Claim that the Trustee has or may have against SUS or Arbitrage.

9. <u>Release by Trustee</u>. In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to any rights arising under this Agreement, the Trustee does hereby release, remise and forever discharge SUS and Arbitrage from any and all past, present or future claims or causes of action (including any suit, petition, demand, or other claim in law, equity or arbitration) and from any and all allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect,

5

Confidential pursuant to June 6, 2011 Litigation Protective Order                    OPT000326

in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty or otherwise (including attorneys' fees, costs or disbursements), known or unknown, that are, have been, could have been or might in the future be asserted by the Trustee against any of the Optimal Releasees and that meet both of the following conditions: (a) they are based on, arise out of or relate in any way to the affairs of BLMIS, the SUS Account or the Arbitrage Account and (b) they are based on, arise out of or relate in any way the Optimal Releasee's actions, statements, conduct, or omissions in connection with, or investments in, one or more of the Optimal Companies and not in any other context or capacity. The foregoing release shall also apply, to the same extent, to each of the Optimal Companies (in addition to SUS and Arbitrage) and each of their respective past or present direct or indirect stockholders, affiliates, limited partners, investors or other equity holders and each of their successors, assigns and transferees and each of their respective past or present officers, directors, employees, agents, legal representatives, privies, representatives, accountants, attorneys (collectively, the "Optimal Third-Party Releasees" and with the Optimal Companies, the "Optimal Releasees") who subscribes to the release under paragraph 10 by executing and delivering to the Trustee the Release Subscription annexed to this Agreement at any time until 60 days after the Trustee gives written notice to the subscribing Optimal Releasee of a claim or a potential claim against the subscribing Optimal Releasee.

   10. <u>Release by SUS and Arbitrage</u>. In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to the claims set forth in paragraphs 3 and 5 and any rights arising under this Agreement, each of SUS and Arbitrage hereby releases, acquits and absolutely discharges the Trustee and all his agents, BLMIS and its estate, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or unknown, now existing or arising in the future, arising out of or in any way related to BLMIS.

   11. <u>Closing</u>. SUS and Arbitrage shall use its best efforts to determine, and shall notify the Trustee promptly of, the date on which HSSI and HITS make funds of SUS and Arbitrage, respectively, available to make the payments to the Trustee under this Agreement. There shall be a closing ("<u>Closing</u>") within 10 days after the later of the date of such notice or the date on which this Agreement becomes effective and binding on the Parties under paragraph 12, on a date agreed by the Parties, at the offices of Trustee's counsel in New York, N.Y. At the Closing, (a) SUS shall make the payment required under paragraph 2; (b) Arbitrage shall make the first payment required under paragraph 4, (c) SUS shall execute and deliver to the Trustee a Partial Assignment; (d) Arbitrage will execute and deliver to the Trustee a Partial Assignment; (e) SUS shall file a customer claim in the SIPA Proceeding by delivery of the claim to the Trustee in the amount specified in paragraph 3, (f) Arbitrage shall file a customer claim in the SIPA Proceeding by delivery of the claim to the Trustee in the amount specified in paragraph 4, (g) upon the delivery of such claims to the Trustee, the Trustee shall pay SUS and Arbitrage each $500,000 from SIPC advances under section 9 of SIPA, which amounts may be paid by setoff against the payments required under paragraph 2 with respect to SUS and with respect to Arbitrage, the last of the Arbitrage Deferred Payments under paragraph 4, (h) the Trustee's withdrawal of the subpoena under paragraph 7 of this Agreement shall become effective, without any further action by any of the Parties, (i) the releases contained in paragraphs 9 and 10 shall become effective without any

6

further action by any of the Parties, except as to Arbitrage, as to which the Trustee's release of Arbitrage shall become effective only upon Arbitrage's completion of payments required under paragraph 4.

12. <u>Bankruptcy Court Approval; Effective Date; Termination</u>.  This Agreement is subject to, and shall become effective and binding on the Parties (except as provided in paragraph 11) upon and only upon, the Bankruptcy Court's approval of this Agreement in the SIPA Proceeding by an order that is no longer subject to appeal, review or rehearing.  The form of the approval order shall be subject to SUS's and Arbitrage's reasonable approval.  The Trustee shall use his best efforts to obtain such approval as promptly as practicable after the date of this Agreement.  The Trustee shall provide SUS and Arbitrage a draft of any motion to the Bankruptcy Court for approval of this Agreement, which shall be subject to SUS's and Arbitrage's reasonable approval.  If this Agreement has not become effective as provided in this paragraph within 45 days after the date of this Agreement (or within such additional time as SUS and Arbitrage permit), then (a) this Agreement (other than this paragraph and paragraphs 22 and 23) shall terminate and be void, (b) all of the statements, admissions, consents and agreements contained in the Agreement (other than this paragraph and paragraphs 22 and 23) shall be void and (c) neither the Trustee nor any of the Optimal Companies or its affiliates may use or rely on any such statement, admission, consent or agreement in any public statement or litigation involving the SIPA Proceedings, any case or proceeding relating to the SIPA Proceeding or any case or proceeding relating to BLMIS or Madoff.  There shall be no other basis for termination of this Agreement by either Party.

13. <u>Equal Treatment for SUS and Arbitrage with Other Similar Customers.</u> (a) Under this Agreement, SUS and Arbitrage are paying the Trustee an amount equal to 85% of the amounts received by each of SUS and Arbitrage either within the 90 days before the Filing Date or as fictitious profits (the "<u>Settlement Amount</u>").  The parties intend and agree that this 85% percentage be established as a benchmark for future settlements by the Trustee in the SIPA Proceeding of Avoiding Powers Claims that are similar to the Avoiding Power Claims the Trustee asserted against SUS and Arbitrage.

(b)(i)  If the Trustee settles one or a related series of Avoiding Power Claims against a single defendant or group of defendants that are under common control for an aggregate settlement amount of $40,000,000 or more (a "<u>Qualifying Settlement</u>"), (ii) if the amount of the Qualifying Settlement is less than the benchmark 85% of the Avoiding Power Claims, and (iii) if the circumstances of the Avoiding Power Claims and the Qualifying Settlement are similar to the circumstances underlying this Agreement, then the Trustee shall return to SUS a portion of the consideration paid under paragraph 3 or reduce of a portion of the consideration to be paid by Arbitrage, or return to Arbitrage a portion of the consideration paid, as the case may be, under paragraph 5, so that the net amount that SUS and Arbitrage will have paid (net after all such returns) as a percentage of  $151,831,876 and of $125,087,004, respectively, is equal to that contained in the Qualifying Settlement.

(c)  The following non-exclusive factors shall be taken into account in determining whether the circumstances of the Avoiding Power Claims and the Qualifying Settlement are "similar":  (i) the ability of the defendant (or group of defendants, taken as a whole) to pay, (ii) the nature of the Avoiding Power Claims (such as whether they are for recovery of a preference or for recovery of principal or fictitious profits), (iii) the jurisdictional connections of the defendant (or

7

Confidential pursuant to June 6, 2011 Litigation Protective Order        OPT000328

group of defendants, taken as a whole) with the United States and the enforceability of a judgment of a court of the United States against the defendant (or group of defendants, taken as a whole) in its domiciliary jurisdiction, (iv) the knowledge of the defendant (or group of defendants, taken as a whole) or its or their complicity in the fraud that BLMIS perpetrated on its customers, and (v) the stage of any litigation by the Trustee against the defendant (or group of defendants, taken as a whole).

(d)  If the Parties do not agree whether circumstances are similar as described in this paragraph 13, the Bankruptcy Court shall resolve any such dispute.  The Parties do not intend to generate collateral litigation over whether a particular settlement is under similar circumstances.  To that end, (i) any proceeding before the Bankruptcy Court on such a dispute shall be heard in a summary fashion; (ii) the Trustee shall provide SUS and Arbitrage factual information about a Qualifying Settlement that in the Trustee's reasonable discretion is of the same kind and detail as would be appropriate in a motion for approval of a single settlement under Federal Rule of Bankruptcy Procedure 9019, including factual information about the total amount of the Avoiding Power Claim or Claims being settled and factual information relevant to the factors set forth in paragraph 13(c); and (iii) the Trustee shall not be subject to discovery in any such matter.

(e)  The Trustee shall notify SUS and Arbitrage promptly of any settlement that meets the requirements of either paragraph 13(b)(i) or 13(b)(ii).  The notice shall contain at least enough information to indicate that the settlement meets the requirements of either paragraph 13(b)(i) or 13(b)(ii).  Notice may be given as provided in paragraph 27 or by a filing with the Bankruptcy Court.  If the Trustee is under any confidentiality obligation with respect to any of the information that the Trustee is required to provide under this paragraph 13(e) or under paragraph 13(d)(ii), the Trustee shall provide the information to SUS and Arbitrage upon SUS and Arbitrage entering into a reasonable confidentiality agreement with the Trustee with respect to the information.  The Trustee agrees not to enter into any confidentiality agreement that would prevent him from honoring his information sharing obligations under paragraph 13(d)(ii).

(f)  This paragraph 13 may be applied more than once if there is more than one Qualifying Settlement.

15.  <u>New Information</u>.  If the Trustee obtains new information specifically relating to the Optimal Companies with respect to the SUS Account or the Arbitrage Account after the date of this Agreement that is not merely cumulative and if the Trustee reasonably believes that the new information materially affects the Trustee's conclusions stated in paragraph P or the Trustee's decision to enter into this Agreement, the Trustee shall provide such information to SUS and Arbitrage and permit SUS and Arbitrage to respond to such new information within ten business days.  After reviewing the SUS and Arbitrage response, the Trustee may, on written notice to SUS and Arbitrage, declare this Agreement and the settlement set forth herein, including the release given under paragraph 9, void, and the Trustee shall, within ten days of providing such notice, return the amounts paid under paragraphs 2 and 4 to SUS and Arbitrage.  Thereafter, each of the Parties shall have all rights and defenses as though this Agreement had never been executed.

15.  <u>SUS and Arbitrage Authority</u>.  SUS and Arbitrage represent and warrant to the Trustee as of the date hereof that each of them is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation and that each of them has the full power,

8

Confidential pursuant to June 6, 2011 Litigation Protective Order    OPT000329

authority and legal right to execute and deliver, and to perform its respective obligations under, this Agreement and has taken all necessary action to authorize the execution and delivery of, and the performance of its respective obligations under, this Agreement.

16. <u>Further Assurances</u>.  The Trustee, SUS and Arbitrage shall execute and deliver any document or instrument reasonably requested by any of them after the date of this Agreement to effectuate the intent of this Agreement.

17. <u>Entire Agreement</u>.  This Agreement and any confidentiality agreement between the Trustee and any of the Optimal Companies constitute the entire agreement and understanding between and among the Parties and supersede all prior agreements, representations and understandings concerning the subject matter hereof.

18. <u>Amendments, Waiver</u>.  This Agreement may not be terminated, amended or modified in any way except in a writing signed by all the Parties.  No waiver of any provision of this Agreement shall be deemed to constitute a waiver of any other provision hereof, whether or not similar, nor shall such waiver constitute a continuing waiver.

19. <u>Assignability</u>.  No Party hereto may assign its rights under this Agreement without the prior written consent of each of the other Parties hereto.

20. <u>Successors Bound</u>.  This Agreement shall be binding upon and inure to the benefit of each of the Parties and their successors and permitted assigns.

21. <u>No Third Party Beneficiary</u>.  Except as expressly provided in paragraphs 7, 8, 9 and 10, the Parties do not intend to confer any benefit by or under this Agreement upon any person or entity other than the Parties hereto and their respective successors and permitted assigns.

22. <u>Applicable Law</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

23. <u>Exclusive Jurisdiction</u>.  The Parties agree that any action for breach or enforcement of this Agreement may be brought only in the Bankruptcy Court.  No Party shall bring, institute, prosecute or maintain any action pertaining to the enforcement of any provision of this Agreement in any court other than the Bankruptcy Court.

24. <u>Captions and Rules of Construction</u>.  The captions in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.  Any reference in this Agreement to a paragraph is to a paragraph of this Agreement.  "Includes" and "including" are not limiting.

25. <u>Counterparts; Electronic Copy of Signatures</u>.  This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same document.  The Parties may evidence their execution of this Agreement by delivery to the other Parties of scanned or faxed copies of their signatures, with the same effect as the delivery of an original signature.

9

[[NYCORP:3137863v15:3170B:05/18/09--03:41 p]]

Confidential pursuant to June 6, 2011 Litigation Protective Order                                     OPT000330

26.  <u>Termination of SUS and Arbitrage Agreements with BLMIS</u>.  All agreements between SUS and BLMIS and between Arbitrage and BLMIS are terminated as of the Closing.

27.  <u>Notices</u>.  Any notices under this Agreement shall be in writing, shall be effective when received and may be delivered only by hand, by overnight delivery service, by fax or by electronic transmission to:

|  |  |
|---|---|
| If to the Trustee, c/o: | If to SUS or Arbitrage, c/o: |
| Marc Hirschfield, Esq.<br>Baker & Hostetler LLP<br>45 Rockefeller Center, Suite 1100<br>New York, NY 10111<br>F:  (212) 589-4201<br>E:  mhirschfield@bakerlaw.com | Richard Levin and Ronald Rolfe<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Ave.<br>New York, NY 10019<br>F: (212) 474-3700<br>E: rlevin@cravath.com; rolfe@cravath.com |

[*Signature page follows*]

10

[[NYCORP:3137863v15:3170B:05/18/09--03:41 p]]

Confidential pursuant to June 6, 2011 Litigation Protective Order        OPT000331

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

IRVING H. PICARD, Trustee

_____

OPTIMAL STRATEGIC U.S. EQUITY LIMITED

By: _____
   Name:
   Title:

OPTIMAL ARBITRAGE LIMITED

By: _____
   Name:
   Title:

11

Confidential pursuant to June 6, 2011 Litigation Protective Order    OPT000332

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789-BRL<br><br>SIPA Liquidation |

## PARTIAL ASSIGNMENT AND RELEASE

**KNOW ALL MEN BY THESE PRESENTS,** that _____, located at _____ (hereinafter referred to as the "Assignor") in consideration of the payment of $500,000.00 to satisfy in part [his/her/its] claim for customer protection (the "Customer Claim", having been designated Claim #\_\_\_) filed in the liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §78aaa et seq. ("SIPA") (see §§78fff-2(b), 78fff-2(d), and §78fff-3(a)(1) of SIPA), does for [himself/herself/itself] hereby assign, transfer and set over to Irving H. Picard as SIPA Trustee (the "SIPA Trustee") for the liquidation of BLMIS (see §78fff-2(b) of SIPA), and the Securities Investor Protection Corporation ("SIPC"), as subrogee to the extent of its cash advances to the SIPA Trustee for the satisfaction of the aforementioned Customer Claim (see §78fff-3(a)(1) of SIPA), any and all rights, including causes of action or claims, that Assignor now may have against BLMIS and/or any third party arising out of or relating to any fraudulent or illegal activity with respect to Assignor's BLMIS account (Account No. _____, the "BLMIS Account"), which gave rise to the allowed Customer Claim for securities filed by Assignor

against BLMIS.  Such assignment is only to the extent that Claimant has received satisfaction of the Customer Claim as set forth above.

Further, Assignor has not previously compromised or assigned any claim, cause of action or other right against BLMIS, its principals or agents or any third party arising out of or related to any fraudulent or illegal activity giving rise to the Customer Claim.

Upon reasonable request of the SIPA Trustee or SIPC, Assignor agrees to cooperate with the SIPA Trustee or SIPC in connection with any efforts of either to recover from the principals or agents of BLMIS or anyone else for amounts advanced by SIPC or paid by the SIPA Trustee to satisfy in part Assignor's Customer Claim in this SIPA liquidation proceeding.  Such efforts to recover by the SIPA Trustee or SIPC, either to demand or pursue or to prosecute or settle any collection effort, action or proceeding therefore, shall be at the sole cost of the SIPA Trustee or SIPC.

Effective immediately and without further action, contingent only upon Assignor's receipt from the SIPA Trustee or his agent of a check in the amount of $500,000.00 as set forth in the SIPA Trustee's Notice of Determination of the Customer Claim dated _____, 2009, (the "Trustee's Determination"), and upon receipt by the SIPA Trustee of this executed and notarized Partial Assignment and Release, the Assignor does for Assignor's executors, administrators, heirs and assigns hereby remise, release and forever discharge the SIPA Trustee and SIPC, as subrogee to the extent of its cash advances for the satisfaction of the Customer Claim, and, as the case may be, its officers, directors, professionals, employees, agents, successors and assigns, of and from any and all claims arising out of or relating to the Assignor's BLMIS Account, the Customer Claim filed with the SIPA Trustee as protected by the provisions of SIPA, and any and all circumstances giving rise to said Customer Claim which the Assignor now has, or hereafter

[[NYCORP:3137863v15:3170B:05/18/09--03:41 p]]                                           Schedule 1 to Agreement

Confidential pursuant to June 6, 2011 Litigation Protective Order                                OPT000334

may have, for or by any reason, cause, matter or thing whatsoever from the beginning of the world to the date of the execution of this Partial Assignment and Release, only to the extent that the SIPA Trustee and/or SIPC has paid monies to the Assignor to satisfy Assignor's Customer Claim.

Assignor acknowledges the sufficiency of the consideration to be received in accordance with the SIPA Trustee's Determination and under this Partial Assignment and Release.

[The undersigned acknowledges that he or she is authorized to execute this Partial Assignment and Release on behalf of _____.]

**IN WITNESS WHEREOF,** the undersigned has on this day set forth below duly executed this Partial Assignment of Assignor's Customer Claim and Release, intending to be legally bound hereby.

By:_____
    [NAME]

Sworn and subscribed before me this
____ day of _____, 2009.

_____
    Notary Public

Confidential pursuant to June 6, 2011 Litigation Protective Order    OPT000335

# RELEASE SUBSCRIPTION

The undersigned is an "Optimal Releasee" as defined in the Agreement dated as of May [●], 2009, by and among Irving H. Picard, in his capacity as Trustee for the liquidation under the Securities Investor Protection Act of 1970, as amended, of Bernard L. Madoff Investment Securities LLC (the "Trustee"), on the one hand, and Optimal Strategic U.S. Equity Limited, a Bahamas corporation, and Optimal Arbitrage Limited, a Bahamas corporation, on the other hand.  For and in consideration of the Trustee's release of the undersigned under paragraph 9 of the Agreement, the undersigned subscribes to the release set forth in paragraph 10 of the Agreement (and only to such release) with the same force and effect as if the undersigned were a party to the Agreement.  By signing this Subscription, the undersigned does not become a Party to the Agreement and is not undertaking any rights or obligations under any other provisions of the Agreement, except that paragraphs 20, 21, 22 and 23 of the Agreement apply to this Subscription as though such paragraphs were a part of this Subscription.

Dated _____, 20__.

[_____]

By: _____
    Name:
    Title:

[[NYCORP:3137863v15:3170B:05/18/09--03:41 p]]

Confidential pursuant to June 6, 2011 Litigation Protective Order   OPT000336