**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-04932 (SMB) |
| Plaintiff, | |
| v. | |
| JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., | |
| Defendants. | |

**BRIEF OF SPV OPTIMAL SUS LTD. IN SUPPORT OF APPLICATION OF THE EQUAL TREATMENT PROVISION TO THE SETTLEMENT AGREEMENT BETWEEN THE TRUSTEE AND JPMORGAN CHASE & CO., et al.**

CRAVATH, SWAINE & MOORE LLP,
Attorneys for SPV Optimal SUS Ltd.
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

**Table of Contents**

**Page**

Table of Authorities ..................................................................................................................ii

Preliminary Statement ............................................................................................................. 1

Background ............................................................................................................................... 2

      I.      The OML Settlement.................................................................................................. 2

            A.      The Negotiation of the Settlement.................................................................. 3

            B.      The Equal Treatment Provision ...................................................................... 4

      II.     The Trustee's Settlement with JPM ....................................................................... 9

Argument ................................................................................................................................ 12

      I.      The Proper Application of the Equal Treatment Provision ................................. 12

      II.     Analysis and Application of the Factors................................................................ 14

            A.      Nature of the Avoiding Power Claims ......................................................... 14

            B.      Knowledge of the Defendant or Complicity in the Fraud ......................... 17

            C.      Stage of Litigation ......................................................................................... 18

            D.      Jurisdictional Connections and Enforceability of Judgment ..................... 20

            E.      Ability to Pay ................................................................................................ 21

      III.    The Balance Weighs in Favor of Application of the Equal Treatment
             Provision ..................................................................................................................... 21

Conclusion .............................................................................................................................. 22

# Table of Authorities

**Page(s)**

**Cases**

*Picard v. Katz,*
    462 B.R. 447 (S.D.N.Y. 2011) ...................................................................................... 15, 16

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
    501 B.R. 26 (S.D.N.Y. 2013) ............................................................................................ 15

**Statutes & Rules**

11 U.S.C. § 548(c) ..................................................................................................................... 16

**Other Authorities**

Chew, R., *Bernie Madoff's Victims: Why Some Have No Recourse,* Time, Jan. 12, 2009 ..................... 19

Farrell, G. & Mallet, V., *Santander to Pay Madoff Trustee $235m,* Financial Times,
    May 26, 2009 .................................................................................................................... 19

Frank, R. & Lauricella, T., *Madoff Feeder Is Charged In Fraud,* Wall St. J., Apr. 2,
    2009 ................................................................................................................................. 16

*Going Down Quietly: Bernard Madoff, History's Biggest Swindler, Faces Life Behind
    Bars,* The Economist, Mar. 12, 2009 ................................................................................ 19

Henriques, D., *It's Thankless, But He Decides Madoff Claims,* N.Y. Times, May 28,
    2009 ................................................................................................................................. 19

Kim, J. & Herman, T., *Madoff Victims Turn to IRS to Get Relief,* Wall St. J., Feb. 18,
    2009 ................................................................................................................................. 19

Rothfeld, M. & Bray, C., *Madoff Trustee Targets Fairfield,* Wall St. J., July 22, 2010 .......................... 16

Rothfeld, M., *Madoff Claims Lure Banks,* Wall St. J. (June 17, 2011) .................................................... 20

**Preliminary Statement**

In May 2009, two Bahamian investment funds, Optimal Strategic U.S. Equity Ltd. ("**SUS**") and Optimal Arbitrage Ltd. ("**Arbitrage**"), both trading subsidiaries of Optimal Multiadvisors Ltd. (Arbitrage, collectively with SUS, "**OML**"), reached a settlement of avoidance claims under which the funds agreed to return to the Bernard L. Madoff Investment Securities LLC ("**BLMIS**") SIPA Liquidation Estate, 85% of the amount of the claims. Through the settlement, the BLMIS SIPA Trustee (the "**Trustee**") recovered $235 million for the SIPA estate. These funds were the first the Trustee recovered, and through the settlement, OML became the first entity in the world (other than SIPC) to offer any Madoff victim the prospect of compensation in excess of BLMIS's remaining assets.

Because the settlement was the first of its kind, OML sought protection against the possibility that the Trustee might agree to a more favorable settlement in the future with another, similarly situated avoidable transfer recipient. The result was an "Equal Treatment Provision," under which the Trustee agreed to refund a portion of the amount OML had paid if in a later settlement exceeding $40 million, the "circumstances of the Avoiding Power Claims and the Qualifying Settlement [of the later settlement] are similar to the circumstances underlying" the 2009 OML settlement and the Trustee settled for a lower percentage of the amount of the avoiding power claims.

Over the ensuing five years, the Trustee has reached many resolutions with other avoidance action defendants, including 15 others that are above the Equal Treatment Provision's $40 million threshold. During that period, OML and its successor in interest, SPV Optimal SUS Ltd. ("**SPV**") have carefully reviewed each such significant settlement. But until recently, neither had identified any that, in their assessment, warranted a refund under the Equal Treatment Provision. That changed in January 2014, when the Trustee reached a settlement of avoiding power litigation against JPMorgan Chase & Co., et al. ("**JPM**") that he

had initiated at the end of 2010. It appeared that, as relates to the Equal Treatment Provision,

this settlement differed from all those preceding it. For in the JPM settlement, unlike most of the

preceding settlements, the Trustee had settled for less than 85% of the value of his avoidance

claims. And the circumstances surrounding the JPM settlement, unlike those surrounding the

few others in which the Trustee had accepted settlements below the 85% benchmark, indicated

that the JPM settlement was executed under "similar" relevant circumstances. Accordingly, for

the first time in the five years in which the Equal Treatment Provision has been in effect, SPV[1]

has requested a refund in accordance with its terms. For the reasons explained below, the JPM

settlement strongly engages the factors the parties agreed would govern the determination of

whether a partial refund is due.

## Background

### I.      The OML Settlement

SUS and Arbitrage are Bahamian investment funds, managed by Optimal

Investment Services, S.A., a Geneva-based investment manager. (May 22, 2009 Settlement

Agreement Between OML and the Trustee, attached as Exhibit 12 to the June 27, 2014

Declaration of Richard Levin ("OML Settlement") ¶ E.) Beginning in the late 1990s, both funds

maintained customer accounts with BLMIS. (Apr. 9, 2014 Declaration of Marc E. Hirschfield

("Hirschfield Decl.") ¶ 5.) As relevant to this proceeding, each fund made substantial

withdrawals from its BLMIS account during the 90-day period preceding the BLMIS liquidation

filing (the "**Preference Period**"). (*Id.*) During the Preference Period, SUS withdrew $150,000,000,

and Arbitrage withdrew $125,000,000 (not including withholding tax payments BLMIS made to

the IRS on OML's behalf). (*Id.*)

---

[1] Arbitrage sold its claim and any associated rights to recovery under the OML Settlement. This Memorandum is filed only on behalf of SPV, which acquired the SUS claim and rights under its Agreement with the Trustee, although Arbitrage is also seeking a refund under the Equal Treatment Provision.

A.      The Negotiation of the Settlement

Very early in this SIPA liquidation proceeding, the Trustee asserted in a letter

that OML was liable to the BLMIS estate under 11 U.S.C. §§ 547 and 550 for the withdrawals

that each of them had received within the Preference Period. (Hirschfield Decl. ¶¶ 5, 6.)

On February 27, 2009, the Trustee issued a subpoena under Federal Rule of

Bankruptcy Procedure 2004 (the "**Subpoena**") to Optimal Multiadvisors Ltd. seeking

documents related to the accounts OML maintained at BLMIS. (OML Settlement ¶ M;

Transcript of May 16, 2014 Deposition of Richard Levin ("Levin Tr.") 10:23-11:25.[2]) Soon after

the issuance of the Subpoena, counsel for OML, Mr. Richard Levin, contacted Trustee's counsel

to discuss a possible settlement of the Trustee's claims against OML as an alternative to

litigation. (Levin Tr. 10:23-11:25.)

Settlement negotiations began in late March 2009, and in conjunction with those

negotiations, OML made available to the Trustee documents related to the due diligence and

monitoring that OML had required its investment manager to conduct on BLMIS. (OML

Settlement ¶ P.) Based on his review of those documents, the Trustee concluded that "[SUS and

Arbitrage] and their affiliates were not complicit in the fraud that BLMIS and Madoff [had]

perpetrated on BLMIS's customers and did not have actual knowledge of the fraud." (*Id*.) The

Trustee further acknowledged that he did "not believe that the conduct, acts and omissions of

[SUS and Arbitrage] and their affiliates provide[d] grounds to assert any claim against [SUS or

Arbitrage] or any of their affiliates (other than Avoiding Power Claims)." (*Id*.)

On May 22, 2009, the parties executed the OML Settlement, under which SUS

paid the Trustee $127,500,000 and Arbitrage paid the Trustee $106,250,000, each figure

representing 85% of the Trustee's claims for the amounts that each entity withdrew from their

---

[2] This deposition transcript is included in the Trustee's June 27, 2014 submission in this proceeding.

BLMIS accounts within the Preference Period (not including withholding tax payments BLMIS

made to the IRS on their behalf). (*Id.* ¶¶ 2, 4.)

B.     The Equal Treatment Provision

Because the negotiation of the OML Settlement occurred before the Trustee had

reached settlements of avoidance actions against any other BLMIS customer, the negotiation

occurred without the benefit of any "benchmark percentage" for settlement of claims under 11

U.S.C. §§ 542, 544(b), 547 and 550 ("**Avoiding Power Claims")** under similar circumstances.

(Levin Tr. 40:15-23; Hirschfield Decl. ¶¶ 11, 12.) OML was therefore concerned that the Trustee

might execute future settlements with other similarly situated defendants that would suggest,

in hindsight, that it had disserved its investors by settling on terms less favorable than those

extended to other defendants who were not willing or able to settle their liabilities to the

Trustee as expeditiously as OML was. (Levin Tr. 40:15-41:1.) That would have effectively

"penalized" OML for having settled early and therefore operated as a disincentive for it to agree

to return the funds the Trustee was asking it to return under the OML Settlement. (Levin Tr.

40:15-41:1; Hirschfield Decl. ¶ 12.)

To address this concern and thereby facilitate consummation of the OML

Settlement, Mr. Levin proposed the concept of an Equal Treatment Provision early in the

settlement discussions. (Hirschfield Decl. ¶ 11.) Such provision would define a class of later

settlements that, if more favorable to the settling defendants than the OML Settlement, would

result in the refund to OML of a portion of the amounts it had paid under the OML Settlement.

(Limited Response of SPV Optimal SUS Ltd. to the Proposed Settlement Agreement Between

the Trustee and JPMorgan Chase & Co., et al., *Picard v. JPMorgan Chase & Co.*, No. 10-4932

(Bankr. S.D.N.Y. Jan. 28, 2014), ECF No. 42 ("SPV Limited Response") at 3.) Initially, Trustee's

counsel expressed reservations about including such a provision, because they thought it would

4

be difficult to define its parameters and because the Trustee wanted to avoid a broadly

applicable provision that would be easily triggered by later settlements. (Apr. 9, 2014

Declaration of Richard Levin ("Levin Decl.") ¶ 8.) However, Trustee's counsel agreed to

consider it, and a draft Equal Treatment Provision was included in the first draft of the OML

Settlement that Mr. Levin sent to Trustee's counsel on April 13, 2009. (*Id.* ¶¶ 7, 8.)

       The first version of the Equal Treatment Provision contained several qualifying

conditions, each of which had to be fully satisfied to trigger application of the Equal Treatment

Provision to a given settlement agreement. (Levin Decl. ¶ 18.) But as the parties' counsel

negotiated the scope of the provision, it became clear that any "qualifying condition" approach

would allow the Trustee to circumvent the application of the Equal Treatment Provision

through settlement structuring and timing and to avoid the faithful implementation of the

intent underlying the provision. (*Id.* ¶¶ 19, 21.)

       For example, one proposed condition would have permitted application of the

Equal Treatment Provision only if "the Customer received transfers from BLMIS that are in

excess of $25 million in the aggregate either as fictitious profits (calculated on a cash-in/cash-

out basis) or after September 11, 2008, and that are recoverable under Bankruptcy Code section

544, 547, 548 or 550 (the "Total Recoverable Amount" of the Customer)." (Levin Decl. ¶ 15.) Yet

clearly, the Trustee could relatively easily exempt from application of the Equal Treatment

Provision a settlement of claims for transfers both within and outside of the Preference Period,

where the settlement was executed under similar circumstances, by the simple expedient of

attributing a high settlement percentage to the 90-day transfers and a lower percentage to the

other transfers, even though the overall percentage would still be less than 85%. (*Id.* ¶ 21(b).)

Another proposed condition would have permitted application of the Equal Treatment

Provision only if "the Customer pays the Trustee an amount (the "Settlement Amount") in

settlement of the Trustee's claim for recovery of all or any portion of the Total Recoverable

Amount, under a settlement made before the commencement of a trial or a hearing on a

contested motion for summary judgment." (*Id.* ¶ 15.) Yet, again, if the Trustee and a particular

defendant had reached the stage of summary judgment briefing either prior to or during

settlement discussions, the Trustee could wait until the start of the summary judgment hearing

to formally reach an agreement and thus evade application of the Equal Treatment Provision.

For that reason, in version 12 of the OML Settlement, circulated on May 13, 2009,

OML's counsel introduced a non-exclusive, multifactorial approach that simply called for

qualitative, overall assessment of the similarity of the circumstances under which the

Agreement and subsequent settlement agreements were executed. (Levin Decl. ¶¶ 14, 18.) Both

parties understood similar circumstances to mean that the circumstances and challenges the

Trustee faced in pursuing Avoiding Power Claims against the later settling-defendant were

similar to, or less serious, than the corresponding challenges he had faced in pursuing Avoiding

Power Claims against OML.[3] The provision in the final Agreement is essentially the same as the

version circulated on May 13, 2009.

As it appears in the OML Settlement, the Equal Treatment Provision defines a

"Qualifying Settlement" as a settlement of Avoiding Power Claims against a single defendant

or a group of defendants for an aggregate settlement amount of $40 million or more and makes

eligible for application of the Equal Treatment Provision any Qualifying Settlement that is for

---

[3] Levin Decl. ¶ 19 (noting that the multifactorial approach allowed the parties to "assess similarity on a sliding scale by assessing the extent to which the Trustee's leverage to negotiate a settlement with another defendant compared with the Trustee's leverage in his Spring 2009 negotiations with SUS and Arbitrage"); Transcript of May 6, 2014 Deposition of Marc Hirschfield, attached as Exhibit A to the June 27, 2014 Declaration of David Greenwald ("Hirschfield Tr.") 63:23-64:12 (acknowledging that the intended guiding principle of the Equal Treatment Provision was that where it is more difficult for the Trustee to pursue avoidance claims against a defendant, he would be justified in agreeing to a settlement at a lower than the 85% benchmark, and where it is easier to pursue those claims, the less he would be justified in agreeing to a settlement lower than the benchmark).

less than 85% of the Avoiding Power Claims and that was reached under circumstances similar

to those underlying the OML Settlement. (OML Settlement ¶ 13(b)(1); SPV Limited Response at

2-3.) To guide the assessment of whether those circumstances are in fact "similar," the OML

Settlement identified five non-exclusive factors, each of which relates to a different circumstance

affecting the bargaining power the Trustee wields in negotiating settlements of avoidance

actions. (SPV Limited Response at 3.)

**"Ability to Pay":**  The parties recognized that if a defendant does not have the

ability to pay a judgment for the full amount of the Trustee's claims, then the Trustee might

reasonably be constrained to settle for a lower percentage than he would in settling with a

clearly solvent defendant. (Hirschfield Tr. 67:22-68:3 ("[I]f a particular defendant couldn't pay a

settlement, that would be a factor that would make it not similar.").) At the time of the OML

Settlement, there was no question that OML had the ability to pay. (SPV Limited Response at 6.)

**"Jurisdictional Connections"/"Enforceability of Judgment":**  The parties also

recognized that if the Trustee faces difficulty in establishing jurisdiction over a defendant or in

collecting a judgment (default or on-the-merits) in the defendant's domiciliary jurisdiction, the

Trustee has less settlement leverage and might, therefore, reasonably settle for less than he

would when litigating against a U.S. defendant based in the United States. (Hirschfield Tr. 58:3-

6 (acknowledging that Trustee has greater negotiating leverage where a defendant has a U.S.

presence).) SUS and Arbitrage were Bahamian entities that had no U.S. investors and no U.S.

connections other than their accounts at BLMIS. (SPV Limited Response at 8; Levin Decl. ¶

21(c).) In his motion for entry of an Order approving the OML Settlement, the Trustee cited

"jurisdictional and other issues regarding the ability of the Trustee to collect on any judgment"

as reasons why "proceeding against [OML] for the full amount of their withdrawals [was] less

than certain." (Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code

7

and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an

Agreement By and Among the Trustee and Optimal Strategic U.S. Equity Limited and Optimal

Arbitrage Limited, *In re Bernard L. Madoff Investment Securities LLC*, No. 08-1789 (Bankr. S.D.N.Y.

May 26, 2009), ECF No. 219 ("OML Motion") ¶ 22.)

> **"Nature of the Avoiding Power Claims":** The inclusion of this factor reflected

the parties' acknowledgment that if the Trustee faced steep legal hurdles or proof burdens in an

avoidance action, such as, for example, the obligation to prove "lack of good faith" to recover

fraudulently transferred principal, the existence of such challenges would reduce the leverage

he enjoyed in negotiations to settle an action. (SPV Limited Response at 6-7; Levin Decl. ¶

21(b).) The Avoiding Power Claims against OML involved preference claims, whose recovery

turns solely on the date of the challenged transfer, and, as such, did not present difficult issues

of proof for the Trustee. (*Id.*)

> **"Knowledge of the Defendant or Complicity in the Fraud":**  Even in a case,

however, in which the Trustee faces the challenge of proving a defendant's "lack of good faith,"

that challenge could be mitigated or eliminated if the Trustee possesses proof of the defendant's

knowledge of the Madoff fraud or, indeed, his complicity in it. (Hirschfield Tr. 76:21-77:6 ("[I]f

you're asking if we think we have a slam dunk, if someone acted in bad faith, that would make

it more similar.").) In recognition of this litigation reality, and to serve as a meaningful counter

in appropriate cases to the weight the "Nature of the Avoiding Power Claims" factor might

otherwise carry, the parties included  "the knowledge of the defendant . . . or its . . . complicity

in the fraud that BLMIS perpetrated on its customers" as a factor to be evaluated. (Levin Decl. ¶

21(b).) In this way, a case in which all or substantially all of the claims were subject to a "good

faith" defense could still trigger application of the Equal Treatment Provision if the Trustee

possessed evidence of knowledge/complicity rebutting that defense. (*Id.* ¶ 21(d).)

**"Stage of Litigation":**  The parties acknowledge that there is a "common

practice" in avoidance actions under which defendants who settle early receive more favorable

settlements than those who settle at a later stage in litigation. (Levin Decl. ¶ 21(e); Levin Tr.

15:7-24; Hirschfield Tr. 45:17-46:6, 52:3-21.) The reason for this practice is relatively clear and

salutary:  it is in the interest of a SIPA or bankruptcy estate for the trustee to recover assets for

the estate as quickly as possible and with the expenditure of fewer resources. (Hirschfield Tr.

45:25-46:3 ("[I]n many cases it makes sense for a trustee to settle or a debtor to settle things early

to avoid litigation costs."); *id.* 51:7-21 (agreeing that encouraging early settlements is useful

because "it's better to bring money in earlier, so we can distribute it).) By affording defendants

who settle early more favorable terms, the Trustee appropriately incentivizes such behavior and

thereby realizes immediate value for the estate more efficiently, as he did with the OML

Settlement. (*Id.* 54:11-14 (acknowledging that in at least some situations "early settlement might

deserve a little bit of discount versus later ones").) By including "stage of litigation," as a factor

bearing upon application of the Equal Treatment Provision, the parties recognized that, all other

things being equal, a settlement concluded after commencement of litigation (or, *a fortiori*, long

after litigation was filed) was a factor weighing in favor of application of the Equal Treatment

Provision in favor of OML, who was the first to settle with the Trustee and who had settled

before the Trustee had filed any action whatsoever. (Levin Decl. ¶ 21(e).)

**II.        The Trustee's Settlement with JPM**

In December 2010, the Trustee sued JPM seeking to avoid and recover

approximately $425 million of transfers that JPM received, directly or indirectly, from BLMIS

before its collapse. (Trustee's Motion for Entry of an Order Pursuant to Section 105(a) of the

Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure

Approving Settlement of Avoidance Claims By and Between the Trustee and JPMorgan, *Picard*

9

*v. JPMorgan Chase & Co.*, No. 10-4932 (Bankr. S.D.N.Y. Jan. 7, 2014), ECF No. 29 ("JPM

Avoidance Motion") ¶¶ 9, 18.) The suit challenged BLMIS's "initial" transfer of $149,507,062.53.

(Complaint, *Picard v. JPMorgan Chase & Co.*, No. 10-4932 (Bankr. S.D.N.Y. Dec. 2, 2010), ECF No.

1 ("JPM Compl.") ¶¶ 277-78; SPV Limited Response at 4.) The bulk of these transfers were

related to a 2006 loan repayment in the amount of about $149 million; the remainder were

payments to JPM of banking fees and interest. (JPM Avoidance Motion ¶ 18.) The suit also

challenged JPM's receipt of fraudulent "subsequent transfers" through redemptions of JPM's

interests in certain BLMIS "feeder funds," namely, Herald, Fairfield Sentry, and Fairfield Sigma

(which invested all of its assets in Fairfield Sentry). (JPM Compl. ¶¶ 279-90; SPV Limited

Response at 4.) All of these subsequent transfers occurred within 60 days before bankruptcy and

totaled $276,346,673.84. (SPV Limited Response at 4.)

The filing of the complaint against JPM occurred only after the Trustee had

conducted an examination under Federal Rule of Bankruptcy Procedure 2004. (Hirschfield Tr.

14:15-15:20, 16:9-22, 18:10-19:20.) As a result of this examination, the Trustee obtained what it

considered to be an evidentiary basis (*id.* 18:10-19:20) for alleging in the first paragraph of its

complaint that JPM "was at the very center of [Madoff's] fraud, and thoroughly complicit in it."

(JPM Compl. ¶ 1.) The Complaint included extensive details, based on the results of the Rule

2004 examination, of the Trustee's view of JPM's knowledge of and willful blindness to the

Madoff fraud. (*See, e.g.*, JPM Compl. ¶¶ 4, 141, 173-77, 274-76.)

On January 6, 2014, JPM entered into a settlement agreement with the Trustee

(the "**JPM Settlement**"), resolving all of the Trustee's Avoiding Power Claims against it.

Through the settlement, JPM agreed to pay the BLMIS estate $325 million, or 76.32% of the

$425,853,736 in the transfers the Trustee had sought to avoid. (JPM Avoidance Motion ¶ 25(b).)

The JPM Settlement also coincided with a Deferred Prosecution Agreement between JPM and the United States Department of Justice ("**DOJ**"), in which JPM stipulated to facts bearing upon JPM's knowledge of Madoff's fraud. (Jan. 6, 2014 Deferred Prosecution Agreement between JPMorgan Chase Bank, N.A. and the Office of the United States Attorney for the Southern District of New York, *available at* http://www.justice.gov/usao/nys/ pressreleases/January14/JPMCDPASupportingDocs/JPMC%20DPA%20Packet%20(Fully%20E xecuted%20w%20Exhibits).pdf ("DPA") ¶¶ 2, 17, Ex. C.) Those stipulated facts included that:

> [E]mployees of various divisions of JPMC and its predecessor entities raised questions about Madoff Securities, including questions about the validity of Madoff Securities's investment returns. At no time during this period did JPMC personnel communicate their concerns about Madoff Securities to [anti-money laundering] personnel in the United States responsible for JPMC's banking relationship with Madoff Securities. Nor did JPMC file any [Suspicious Activity Report] in the United States relating to Madoff Securities until after Madoff's arrest.

(DPA, Ex. C ¶ 12.) The stipulated facts include quotes from an internal, October 16, 2008 memorandum and associated internal JPM emails in which employees of JPM expressed concerns that Madoff's operations were fraudulent. (*See, e.g.*, DPA, Ex. C. ¶¶ 54-61.) Under Paragraph 17 of the DPA, JPM agreed that it would "not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement."

The JPM Settlement is a Qualifying Settlement eligible for application of the Equal Treatment Provision because it settled the Avoiding Power Claims against JPM for $325 million, well above the $40 million threshold. The Equal Treatment Provision potentially applies because the Qualifying Settlement amount is only approximately 76.32% of the $425,853,736.37 in Avoiding Power Claims that the Trustee asserted against JPM. Therefore, if

this Court determines that the circumstances of the JPM Settlement are similar to the

circumstances of the OML Settlement, then the Equal Treatment Provision requires a refund of

approximately 8.68% of the SUS Avoiding Power Claims of $150,000,000, or $13,024,075.91.

Upon the Trustee's payment of that amount, SPV's allowed customer claim in the amount of

$1,540,141,277.60 would be reduced by an equal amount, to $1,527,117,201.69. This reduction

would require SPV to refund to the Trustee the difference between the 46.036% dividend paid

to date on the current amount of SPV's allowed customer claim and 46.036% of the reduced

amount of SPV's allowed customer claim, or $5,995,763.59, resulting in a net refund of

$7,028,312.32.

## Argument

## I.        The Proper Application of the Equal Treatment Provision

As is true of most negotiations, the negotiation of the OML Settlement's Equal

Treatment Provision pitted two objectives against each other. The Trustee wanted to make the

Equal Treatment Provision apply rarely (Hirschfield Decl. ¶¶ 15-16), while OML wanted the

provision to apply in a wide set circumstances in which the Trustee might give a later settling

defendant a better deal than OML (Levin Decl. ¶¶ 4, 17-19). The latter possibility was a serious

concern for OML. (Levin Tr. 40:24-41:1; Hirschfield Decl. ¶¶ 12, 14.) OML needed a post hoc

mechanism for ensuring that its willingness as the first avoidance action defendant to settle

with the Trustee would not prove to be disadvantageous. (Levin Tr. 40:15-41:1.) Accordingly,

confidence that the selected mechanism, the Equal Treatment Provision, would be applied in

OML's favor, should circumstances so warrant, was an important inducement to OML to enter

into the settlement. (*Id.*; Hirschfield Decl. ¶¶ 13-14.)

As is also true of most settlements, the result of negotiation was a compromise.

The parties departed from the originally proposed checklist approach, under which the absence

of just one condition would disable the Equal Treatment Provision, and instead adopted a

multifactorial weighting approach to assess whether a settlement under consideration was

reached under "similar" circumstances. (Levin Decl. ¶¶ 18, 19.) Importantly, the parties

understood that "similarity" of circumstance did not mean "identity." (Hirschfield Decl. ¶ 16.)

As a practical matter, a settlement reached under identical circumstances would never occur.

(*Id.* (acknowledging that the Equal Treatment Provision would apply not to identical claims but

rather to "truly similar claims that are settled under similar circumstances").) Under the

approach the parties adopted, five factors, though non-exclusive, reflected the parties' best

contemporaneous forecast of the considerations that would guide application of the Equal

Treatment Provision in the future. (Levin Decl. ¶ 18.)

       The first step of that approach requires the Court to determine how each factor

individually "cuts."(Levin Decl. ¶ 19; Hirschfield Tr. 28:22-29:10, 54:15-23.) A factor cuts in

favor of application of the provision if its assessment leads to a conclusion that the later

settlement was one in which the Trustee had (i) equal or (ii) greater leverage than he did in

negotiating the OML Settlement. (*Id.*) *See supra* note 3. A factor cuts against application if its

assessment leads to a conclusion that, with respect to that factor, the Trustee had less leverage

in negotiating the later settlement than he did in negotiating the OML Settlement. (Hirschfield

Tr. 63:23-64:12.)

       Then the Court must "weigh" the factors that cut in favor against those that cut

against. (Levin Decl. ¶ 18.) No single factor is per se determinative, nor is equal weighting of the

factors necessarily appropriate. (*Id.* ¶¶ 18, 19.) As with a scale, on which heavy weights may

outweigh a greater number of lighter weights, so too only one or two "heavy" factors on SPV's

side of the scale in a later settlement could trigger the Equal Treatment Provision. Or the

provision could be defeated where only one or two factors weighed heavily in favor of the Trustee. (Levin Tr. 87:25-88:19.)

As shown below, only one of the five factors, "Nature of the Avoiding Power Claims," cuts in favor of the Trustee. Each of the other four favors SPV. Of those four, three ("Knowledge/Complicity," "Jurisdictional Connections," and "Stage of Litigation") favor SPV strongly, tilting the ultimate, overall balance in SPV's favor.

## II.    Analysis and Application of the Factors

### A.    Nature of the Avoiding Power Claims

Both parties appreciated that, as in all litigation, a major source of leverage the Trustee possessed in negotiating settlements of clawback actions was the strength of his case. (Levin Tr. 65:8-66:19; Hirschfield Tr. 67:22-68:11.) Further, both parties appreciated that although the Ponzi scheme presumption eliminated some issues of proof in a Ponzi scheme fraudulent transfer action, an action to recover principal transferred more than 90 days before bankruptcy presented issues the Trustee would not have faced in litigating his preference claims against OML. (Levin Decl. ¶ 21(b).) Similarly, subsequent transferee claims require the Trustee to prove the voidability of initial transfers and to rebut any showing of good faith made by the transferee. (Hirschfield Decl. ¶ 63.)

As noted above (*see supra* p. 8), the Trustee's Avoiding Power Claims against OML were primarily preference claims based on initial transfers by BLMIS, while the Trustee's Avoiding Power Claims against JPM include fraudulent transfer claims and subsequent transferee claims. Accordingly, with respect to this factor, the Trustee might have had less leverage against JPM than he did in negotiating a settlement with OML. (Levin Decl. ¶ 21(b).) For this reason, this factor cuts against application of the Equal Treatment Provision.

14

Still, it does not cut as heavily against application as it might in a more typical fraudulent/subsequent transfer avoidance action. Although JPM could have been expected to assert a "good faith" defense to the initial transfer claims, the Trustee included in court filings significant evidence he had acquired before he brought the action and more evidence acquired before he settled to rebut any defense based on good faith or lack of knowledge. *See infra* Section II.B. Although the Trustee might argue that Judge Rakoff's post-OML Settlement decision applying section 546(e)'s safe harbor to transfers that were withdrawals from BLMIS accounts complicated his avoiding power actions, that decision does not apply at all to the largest initial transfer to JPM, which was a loan repayment, not a settlement or securities contract payment. *Picard v. Katz*, 462 B.R. 447, 451-53 (S.D.N.Y. 2011). For the same reason, the decision does not apply to the remainder of the initial transfers to JPM, which were banking fees paid by BLMIS to JPM. Therefore, *Katz* did not alter the legal landscape in a way that reduced the similarity between the circumstances underlying the OML Settlement and those underlying the JPM Settlement by increasing the Trustee's burden of proof with respect to the claims against JPM.

Nor does *Katz* effectively apply to the Trustee's claims to recover subsequent transfers that occurred within 60 days before bankruptcy. *Katz* would apply only to the initial transfer to the feeder funds from which JPM received the subsequent transfers. The Trustee already had a judgment against the initial transferees Fairfield Sentry and Fairfield Sigma (together, the "**Fairfield Funds**") for over $3 billion. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 29-30 (S.D.N.Y. 2013). In that action, the Trustee sought to recover subsequent transfers paid by the Fairfield Funds to certain defendants. *Id.* at 28-29. The defendants countered that the Trustee had failed to obtain a judgment avoiding the initial transfers in its settlement agreement with the Fairfield Funds and that avoidance of the initial transfers was a necessary prerequisite to recovering the related subsequent transfers. *Id.* at 29.

15

Judge Rakoff rejected this argument, holding that a trustee is not legally required to avoid a transfer against an initial transferee prior to recovering a related subsequent transfer. *Id.* at 29-34. Rather, in an action against a subsequent transferee, a trustee need only demonstrate that the initial transfer is avoidable to recover the subsequent transfer. *Id.*

The transfers from the Fairfield Funds to JPM accounted for nearly half of the JPM subsequent transfers. (JPM Comp. ¶ 286 & Ex. E.) If the litigation against JPM had not settled, JPM could have tried to defend the subsequent transfer litigation by showing that the Fairfield Funds' initial transfers were not avoidable because of the Fairfield Funds' good faith. *See* 11 U.S.C. § 548(c) (providing good faith defense); *Picard v. Katz*, 462 B.R. at 453-56. But the Massachusetts Attorney General's settlement with the Fairfield funds' investment manager (*see* Consent Order among Fairfield Greenwich Advisors LLC and Fairfield Greenwich LTD, on the one hand, and the Massachusetts Securities Division, on the other hand, *Fairfield Greenwich Advisors LLC*, Case No. 2009-0028 (Office of the Secretary of the Commonwealth Securities Division Sept. 8, 2009), attached as Exhibit B to the June 27, 2014 Declaration of David Greenwald), and other reports of Fairfield's complicity,[4] as well as the Trustee's $3 billion judgment against the Fairfield Funds would have undercut this defense and any settlement negotiation leverage JPM would have had against the Trustee. Moreover, JPM would have had to show that it took the subsequent transfers in good faith. The timing of the subsequent transfers to JPM and the admissions in the DPA would have made such a showing more difficult for JPM (see immediately below), thereby increasing the Trustee's negotiating leverage against JPM.

---

[4] Michael Rothfeld & Chad Bray, *Madoff Trustee Targets Fairfield*, Wall St. J., July 22, 2010; Robert Frank & Tom Lauricella, *Madoff Feeder Is Charged In Fraud*, Wall St. J., Apr. 2, 2009.

B.        Knowledge of the Defendant or Complicity in the Fraud

This factor was specifically intended for a case such as this one, where the

Trustee must prove guilty knowledge but can readily do so. (Hirschfield Tr. 76:21-77:6 ("[I]f

you're asking if we think we have a slam dunk, if someone acted in bad faith, that would make

it more similar.").) In such a case, this factor acts as a counterweight to the "Nature of the

Avoiding Power Claims" factor, to prevent it from distorting the overall assessment of the

Trustee's negotiating leverage. (Levin Decl. ¶¶ 21(b), (d).)

Here, The Trustee conducted extensive discovery under Federal Rule of

Bankruptcy Procedure 2004. The Trustee prepared a complaint alleging facts he had obtained in

discovery that described the "evidentiary support"[5] for the Trustee's allegations concerning

JPM's knowledge of the fraud.[6] Additionally, in January 2014 JPM entered into a DPA with the

DOJ that contained a stipulated statement of facts that also attests to JPM's knowledge of the

BLMIS fraud.[7] Notably, JPM agreed in the DPA not to contest the facts stipulated in the DPA in

other civil litigation. (DPA ¶ 17.)

---

[5] Federal Rule of Bankruptcy Procedure 9011, like Federal Rule of Civil Procedure 11, requires the Trustee to assert in pleadings only factual contentions that have evidentiary support. Counsel for the Trustee confirmed during his deposition that the Trustee's complaint against JPM complied with Rule 9011. (Hirschfield Tr. 15:16-17:4.)

[6] See, e.g., JPM Compl. ¶ 274 ("Evidence of Madoff's fraud permeated every facet of JPMC. It ran from the Broker/Dealer Group, where BLMIS maintained a bank account that no one honestly could have believed was serving any legitimate purpose, to Equity Exotics, where JPMC learned of the red flags inherent in BLMIS's investment strategy, to JPMC's London office, which learned that individuals might be laundering money through BLMIS feeder funds…."); id. ¶ 276 ("JPMC is liable for Madoff's fraud because it was uniquely positioned to see the fraud and put a stop to it. Instead, it allowed the 'procession' to continue, and the fraud to continue unabated.").

[7] See, e.g., DPA ¶ 12 ("[E]mployees of various divisions of JPMC and its predecessor entities raised questions about Madoff Securities, including questions about the validity of Madoff Securities's investment returns. At no time during this period did JPMC personnel communicate their concerns about Madoff Securities to [anti-money laundering] personnel in the United States responsible for JPMC's banking relationship with Madoff Securities. Nor did JPMC file any [Suspicious Activity Report] in the United States relating to Madoff Securities until after Madoff's arrest.").

The interplay between the operation of the first and second factors here is not coincidental. As Mr. Levin has testified, the two factors were intended to operate in "tandem." (Levin Decl. ¶ 21(b).) Although there might be cases in which the two factors "cancel each other out"—such as a case in which the proof of the defendant's guilty knowledge is irrefutable (*e.g.*, a clawback action against Bernard Madoff himself)—SPV does not contend that this is such a case. Rather, it contends merely that in this case, the second factor cuts strongly in favor of SPV by substantially reducing the extent to which the first factor would otherwise tip the balance in the Trustee's favor.

C.     <u>Stage of Litigation</u>

This factor is based on the common practice in avoiding power actions of providing more favorable settlement terms to early-settling defendants than to later-settling defendants. (Levin Decl. ¶ 21(e).) In general, early settlements are more attractive to bankruptcy and SIPA trustees because they enable them to bring assets into the estate earlier and with less expenditure of resources. (Hirschfield Tr. 51:7-21.) Early settlements also allow trustees to dedicate resources to the pursuit of other claims. (*Id.* 45:25-46:3.) In this sense, an early settlement is "worth more" to a trustee than a later settlement. (*Id.* 54:11-14.) OML tried to ensure that in applying the Equal Treatment Provision, this factor would recognize this litigation reality that settlements at later stages of litigation need to be adjusted to allow an "apples to apples" comparison. (Levin Decl. ¶ 21(e).)

This factor merits particularly strong consideration in this case. OML reached a settlement with the Trustee before the Trustee filed suit. (*Id.*) In fact, OML was the first party to reach any settlement with the Trustee (Hirschfield Tr. 44:4-16), and thereby became the first entity in the world—other than SIPC—to offer Madoff victims the prospect of any recovery on

18

their Madoff-related losses.[8] For this reason, the OML Settlement gave the Trustee credibility

with Madoff victims that he sorely needed in early 2009. Many of those victims were, at that

time, understandably in despair.[9] The root of the public perception challenges the Trustee faced

in 2009 was the general pessimism about the amount of money the Trustee would eventually

recover.[10] The OML Settlement meaningfully helped the Trustee start to turn that tide.[11] The

OML Settlement also helped the Trustee in pressing other defendants to settle.[12]

In contrast, the Trustee and JPM reached their settlement agreement more than

five years after the commencement of this SIPA proceeding and more than three years after

commencement of the adversary proceeding against JPM. The JPM settlement occurred after

years of pre-complaint discovery and years of motion practice at every level of the federal

judiciary, including the Supreme Court. (Hirschfield Decl. ¶ 63.) It occurred after a string of

significant recoveries, most notably from Jeffry Picower's estate, but from other financial

institutions as well—e.g., UBP, Mount Capital Fund, the Fairfield Funds and the Tremont

---

[8] Greg Farrell & Victor Mallet, *Santander to Pay Madoff Trustee $235m*, Financial Times, May 26, 2009.

[9] *See, e.g.*, Robert Chew, *Bernie Madoff's Victims: Why Some Have No Recourse*, Time, Jan. 12, 2009; Jane J. Kim & Tom Herman, *Madoff Victims Turn to IRS to Get Relief*, Wall St. J., Feb. 18, 2009 ("The others devastated by Madoff's $50 billion global Ponzi – people like me, who collectively may have contributed 30% to 50% of Madoff's billions under management and never heard of Madoff until a month ago – are wondering what to do and whom to sue."); *see also* Transcript of 341 Hearing at 45:9-46:3, 47:7-23, 55:17-56:4, 68:4-69:9, 70:17-71:4, 91:10-23, 94:4-95:18, *In re Bernard L. Madoff Investment Securities LLC*, No. 08-1789 (Bankr. S.D.N.Y. Feb. 20, 2009). Some Madoff victims were even distrustful of the Trustee, even though their interests were clearly aligned. Diana B. Henriques, *It's Thankless, But He Decides Madoff Claims*, N.Y. Times, May 28, 2009 (discussing "ferocious criticism" of the Trustee by Madoff victims).

[10] *Going Down Quietly: Bernard Madoff, History's Biggest Swindler, Faces Life Behind Bars*, The Economist, Mar. 12, 2009 ("But there now appears to be little left for investors who stuck with [Madoff]: a court-appointed liquidator has so far recovered just $1 billion [of $65 billion in client accounts on paper]. Even Charles Ponzi's victims got a third of their money back.").

[11] Farrell & Mallet, *supra* note 8.

[12] *See* OML Settlement Press Release, May 26, 2009 (noting that the "settlement was reached without the need for the Trustee to commence litigation against" OML and that the Trustee "hope[d] that other entities against which [he had] claims [would] likewise come forward to settle those claims for the benefit of all of Madoff's victims").

Group, *see* The Madoff Recovery Initiative, *Significant Recoveries to Date*, *available at* http://www.madofftrustee.com/recoveries-25.html—and after Madoff victims had already been persuaded that the SIPA proceeding would go a long way toward restoring at least the funds that they had invested, so much so that an active market among hedge fund investors, to purchase Madoff claims for as much 75 cents on the dollar had arisen.[13]

This factor, therefore, cuts heavily in favor of application of the Equal Treatment Provision. Had OML settled with the Trustee after having put the Trustee through as much litigation as JPM did, and had settled only in 2014, rather than in 2009, one would have expected the Trustee to have agreed to settle only at a higher percentage. (Levin Decl. ¶ 21(e).) The mere nine percentage point differential between the OML and JPM benchmark percentages accordingly understates the extent to which the Trustee offered JPM a "sweeter" deal than he offered OML.

D.    Jurisdictional Connections and Enforceability of Judgment

This factor recognizes that whatever the strength of the Trustee's position on the merits of an action, the leverage he derives from that strength is worthless if he cannot enforce a judgment against a foreign defendant in a foreign jurisdiction where assets adequate to satisfy a judgment are located. (Levin Decl. ¶ 21(c).) OML was a purely foreign entity and had no assets or presence in the United States, other than its BLMIS accounts. (SPV Limited Response at 8.) Accordingly, the Trustee faced a litigating challenge against OML that it did not face in litigating against JPM in New York. (OML Motion ¶ 22.) Therefore, this factor cuts strongly in favor of application of the Equal Treatment Provision.

---

[13] Michael Rothfeld, *Madoff Claims Lure Banks*, Wall St. J. (June 17, 2011).

E.      Ability to Pay

Just as the prospect of an unenforceable judgment reduced the Trustee's

leverage, so too did the prospect of an enforceable judgment that could not be satisfied.

(Hirschfield Tr. 67:22-68:3.) OML and JPM each had a similar ability to pay. (SPV Limited

Response at 6.) Accordingly, this factor cuts in favor of application of the Equal Treatment

Provision, as ability to pay gave the Trustee no reason to reach a deal with JPM at a lower

percentage than with OML.[14]

## III.      The Balance Weighs in Favor of Application of the Equal Treatment Provision

Of the five non-exclusive factors listed in the Equal Treatment Provision, only

one cuts—and weakly at that—against application of the provision, while four cut in favor of

applying the provision.

The only factor favoring the Trustee is the "Nature of the Avoiding Power

Claims." However, that factor, standing alone, is not determinative of the applicability of the

Equal Treatment Provision. As Trustee's counsel has acknowledged, even where settled claims

in a later settlement agreement include claims that are more difficult to prove, analyzing all of

the factors together could still lead to the conclusion that the settlement circumstances were

similar and that the Equal Treatment Provision should apply. (Hirschfield Tr. 72:20-73:2.) This

acknowledgment is faithful to the intent underlying the adoption of the multifactorial approach.

(Levin Decl. ¶¶ 18-19.) It is also faithful to the language of the provision, which calls for analysis

of whether the "*circumstances* of the Avoiding Power Claims and the Qualifying Settlement are

---

[14] Before the JPM settlement, counsel for OML contacted the Trustee about the Equal Treatment Provision's potential application to another "Qualifying Settlement" that the Trustee had reached. However, the parties quickly agreed that the Equal Treatment Provision could not apply to that settlement agreement because the defendant lacked sufficient assets to pay the Trustee more. (Hirschfield Tr. 9:25-12:15.)

similar to the *circumstances* underlying" the OML Settlement, not just of whether the "claims" asserted are "similar."(OML Settlement ¶ 13(b)(iii).)

Each of the other factors favor SPV, and three—Stage of Litigation, Jurisdictional Connections and Enforceability of Judgment, and Knowledge of the Defendant or Complicity in the Fraud—present imbalances as substantial as the parties could have reasonably contemplated. Accordingly, the JPM Settlement was reached under similar circumstances as those underlying the OML Settlement, and the Equal Treatment Provision requires a refund to SPV.

## Conclusion

For the foregoing reasons, SPV respectfully requests that the Court order the Trustee to pay SPV under the Equal Treatment Provision a net refund of $7,028,312.32 from the OML Settlement amount and to reduce SPV's allowed customer claim in this case by $13,024,075.91.

June 27, 2014

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

by

/s/ David Greenwald
David Greenwald
Member of the Firm
Attorneys for SPV Optimal SUS Ltd.
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

22

## Certificate of Service

I hereby certify that on the 27th day of June, 2014, I caused true and correct copies of the foregoing Brief of SPV Optimal SUS Ltd. in Support of Application of the Equal Treatment Provision to the Settlement Agreement Between the Trustee and JPMorgan Chase & Co., et al. to be served upon the following counsel of record:

David J. Sheehan, Esq.
Seanna R. Brown, Esq.
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
*Counsel for Irving H. Picard, Trustee*

Gary Svirsky
Emily Chepiga
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
*Counsel for Solus Recovery Fund LP*

_____
Bryant Yu