# EXHIBIT B

# COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE SECRETARY OF THE COMMONWEALTH
### SECURITIES DIVISION
## ONE ASHBURTON PLACE, 17th FLOOR
## BOSTON, MASSACHUSETTS 02108

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| FAIRFIELD GREENWICH ADVISORS LLC and | ) | Docket No. 2009-0028 |
| FAIRFIELD GREENWICH (BERMUDA) LTD, | ) | |
| | ) | |
| RESPONDENTS. | ) | |

## I. CONSENT ORDER

This Consent Order ("Order") is entered into by the Massachusetts Securities Division ("Division") and Respondents, Fairfield Greenwich Advisors LLC ("FGA") and Fairfield Greenwich (Bermuda) LTD ("FG-Bermuda") (collectively "Fairfield") in connection with the Administrative Complaint alleging Fairfield's failure to conduct due diligence on its executing broker/sub adviser Bernard L. Madoff Investment Securities ("BLMIS") and subsequent misrepresentations to investors regarding the "rigorous" due diligence Fairfield conducted (*Docket No.* 2009-0028).

On September 8, 2009, Fairfield submitted an Offer of Settlement for the purposes of disposing the allegations set forth in the Offer of Settlement. Fairfield, without admitting or denying the Division's allegations of fact set out herein in Sections III, IV and V, and without any adjudication of any issue of law or fact, consents to the entry of this Order by the Division, consistent with the Offer of Settlement, settling the claims thereby with prejudice.

## II. JURISDICTION AND AUTHORITY

1.     The Massachusetts Securities Division is a Division of the Office of the Secretary
of the Commonwealth with jurisdiction over matters relating to securities as provided for
by the Act. The Act authorizes the Division to regulate: (a) the offers and/or sales of
securities; (b) those individuals offering and/or selling securities within the
Commonwealth; and (c) those individuals transacting business as broker-dealer agents
within the Commonwealth.

2.     The Division brings this action pursuant to the enforcement authority conferred
upon it by Section 407A of the Act and M.G.L. c 30A, wherein the Division has the
authority to conduct an adjudicatory proceeding to enforce the provisions of the Act and
all regulations and rules promulgated thereunder.

## III. RESPONDENTS

3.     Fairfield Greenwich Advisors ("FGA") is a SEC registered investment advisor
with a Central Registration Depository ("CRD") number of 129410. FGA has a principal
place of business at 919 Third Avenue, New York, NY 10022. FGA was paid by FGL for
providing certain administrative services and back-office support.

4.     Fairfield Greenwich (Bermuda) LTD. ("FG-Bermuda") is a SEC registered
investment advisor with a CRD number of 139882. FG-Bermuda has a principal place of
business at 131 Front Street, 1st Floor, Hamilton, HM 11 Bermuda.  FG-Bermuda is the
investment manager of Fairfield Lambda Ltd.  Until June 30, 2009, FG-Bermuda was the
investment manager of Fairfield Sentry Ltd. and Fairfield Sigma Ltd..  FG-Bermuda is
the General Partner of Greenwich Sentry L.P., and Greenwich Sentry Partners, L.P.

2

## IV.  OTHER INVOLVED AND RELATED PARTIES

5.      Fairfield Greenwich Group ("FGG") was founded in 1983 by Walter M. Noel, Jr.

for alternative asset investments. FGG is the marketing name for a group of employee

owned firms that have offices in New York, London, and Bermuda. FGG entities, such as

FGA and FG-Bermuda are registered with the United States Securities and Exchange

Commission. In one of the marketing pieces for the Sentry funds, Fairfield Greenwich

Group is described as "the marketing name for the securities and investment advisory

businesses of Fairfield Greenwich Limited and its subsidiaries worldwide."

6.      Fairfield Greenwich Limited ("FGL") is an exempted company organized under

the laws of the Cayman Islands and served as the general partner of the Greenwich Sentry

fund from its inception until March 1, 2006. FGL is an affiliate of FGG. FG-Bermuda is

an affiliated entity of FGL.

7.      Walter Miller Noel ("Noel") is a natural person, with a CRD number of 1247629.

Noel is a founding partner of Fairfield. Noel, according to the CRD, is an indirect owner

of FG-Bermuda. Noel, according to the CRD, is an indirect owner of FGA.

8.      Jeffrey Harvey Tucker ("Tucker") is a natural person, with a CRD number of

2272331. Tucker is a founding partner of Fairfield. Tucker, according to the CRD, is an

indirect owner of FG-Bermuda. Tucker, according to the CRD, is an indirect owner of

FGA.

9.      Daniel Eric Lipton ("Lipton") is a natural person, with a CRD number of

4725896. Lipton, according to the CRD, is a direct owner of FG-Bermuda and serves as

the Assistant Secretary and Chief Financial Officer. Lipton, according to the CRD, is a

direct owner of FGA and serves as its Vice President and Chief Financial Officer.

3

10.     Amit Vijayvergiya ("Vijayvergiya") is a natural person, with a CRD number of

5109282. Vijayvergiya, according to the CRD, is a direct owner of FG-Bermuda and

serves as its Director, Vice President, and Chief Risk Officer.

11.     Gordon McKenzie ("McKenzie") was the controller of FG-Bermuda. He is not

registered with the CRD.

12.     Mark Joseph McKeefrey ("McKeefrey") is a natural person, registered as an

agent of FG-Bermuda, with a CRD number of 4660502. McKeefrey, according to the

CRD, is a direct owner of FG-Bermuda and serves as the Director, Assistant Secretary

and Chief Legal Officer. McKeefrey, according to the CRD, is a direct owner of FGA

and serves as its President.

## V.  FACTUAL ALLEGATIONS

A.      Background and Structure of Relationship Between Fairfield and Madoff
        Investments

      1.      *Background of Sentry Funds' Relationship with Madoff
                *Investments*

13.     In 1989, Jeffrey Tucker's father-in-law introduced Walter Noel and Tucker to

Bernard Madoff.

14.     At that time, Noel testified that he thought that Madoff was doing business under

Cohmad Investments, a firm founded by Madoff and Maurice Cohn.

15.     Approximately, July 1, 1989, Noel and Tucker gave Madoff $1.5 million to

invest for an entity called the Fairfield International Fund.

16.     Tucker testified that about six months later, in January 1990 Fairfield added

another $1 million for Madoff to manage.

17.     At some point in the early 1990s, Madoff ceased managing a portion of the
Fairfield International's assets.

18.     The Fairfield Sentry Limited fund was first offered November 30, 1990.

19.     Initially that fund had about $4 million under management, all of which was
managed by Madoff.

20.     On January 1, 1993, Fairfield offered the Greenwich Sentry, L.P. a fund whose
objective sought to "obtain capital appreciation of its assets principally through the
utilization of a nontraditional options trading strategy described as 'split strike
conversion…'"

21.     On May 1, 2006, Fairfield began offering the Greenwich Sentry Partners, L.P.
which was also utilizing the "nontraditional options trading strategy described as `split
strike conversion…"

22.     As of December 11, 2008, there were three Sentry funds: Fairfield Sentry
Limited (which included share classes Fairfield Lambda Limited (valued in Swiss francs)
and Fairfield Sigma Limited (valued in Euros)), Greenwich Sentry L.P. and Greenwich
Sentry Partners L.P. The Fairfield Sentry Fund marketed primarily to international
investors and the Greenwich Sentry funds marketed primarily to domestic investors.
Those funds were managed the same way (and the same due diligence was conducted
with respect to each) and they will be referred to herein collectively as the "Sentry
funds".

23.     The Sentry funds have been offered and sold to investors in The Commonwealth
of Massachusetts.

5

24.     Sentry funds have been marketed by Noel, Tucker, and a worldwide staff of over 100 people that helped raise money for it.

25.     By the Fall of 2008, the Sentry funds had grown to in excess of $7 billion in assets under management.

        2.     *Structure of Relationship With Madoff Investments*

26.     Ninety-five percent or more of the Sentry funds' assets were (supposedly) held and managed by Bernard L. Madoff Investment Securities LLC ("Madoff Investments"). (Since October 2002, up to 5 percent of the Sentry funds were eligible to be invested in non-Madoff-related investments, but by October 2008 the percentage of non-SSC assets had been reduced to approximately 1 percent.)

27.     Madoff Investments was marketed as the executing broker who executed a split-strike conversion strategy on behalf of the Sentry funds.

28.     CITCO Fund Services was the custodian of assets for the Sentry funds.

29.     Madoff Investments was the sub-custodian that supposedly held the actual stock, options and U.S. Treasuries that comprised the bulk of the assets of the Sentry funds.

30.     Madoff Investments did not charge any fee for its sub-custodian services.

31.      Madoff Investments purportedly earned his fees off of commissions he charged while executing the split-strike conversion strategy, earning $.04 per share for equity trades and $1.00 per option contract. See Exhibit 53.

32.     Madoff Investments was supposed to be operating the split strike conversion strategy within guidelines furnished by Madoff Investments (see Exhibit 53) and approved by Fairfield.

6

33.     Fairfield was supposedly monitoring Madoff's trades and informing him if and

when he was operating outside of those guidelines.

34.     The contracts entered into included a Customer Agreement, a trading

authorization, options agreements and options hedging agreements. See Composite

Exhibit 53.

35.     The agreements setting forth the parameters under which Madoff Investments

was supposedly operating were created by Bernard L. Madoff ("Madoff") and supposedly

approved by Fairfield.

36.     However, Jeffrey Tucker testified that he was not aware of any time that Fairfield

told Madoff Investments that it was operating outside of those parameters. Specifically,

Tucker testified as follows:

> Q.     Did Fairfield ever inform Madoff Investments that – of any
> instances where the guidelines had not been complied with?
>
> A.     I don't recall. I don't – I did not.
>
> Q.     Are you aware of any instance where anyone at Fairfield
> communicated to Madoff that the guidelines had not been complied
> with?
>
> A.     I'm not aware.

37.     According to the testimony of Walter Noel, Madoff limited the total amount of

money Sentry could invest with him.[1]

38.     That limit appears to have increased slowly over the years.

39.     Upon information and belief, Sentry was frequently at that cap or near to it.

---

[1] The Division attempted to obtain additional information with respect to those limitations through
interrogatories and document requests. Even though the date for responding to those
interrogatories and document requests has passed, Fairfield has not provided the additional
information requested.

40.     Upon information and belief, when an investor redeemed, Sentry worked
diligently to replace the investment.

41.     Up until the Fall of 2008, when redemptions exceeded subscriptions, Fairfield
was typically able to immediately or promptly replace redemptions with new
subscriptions.

42.     The redemptions and subscriptions were typically netted out, so the bulk of the
outflows from redemptions never had to be transferred out of Madoff Investments. See
Exhibit 51.

43.     Gordon McKenzie testified that redemptions were paid out of subscriptions
received, before money would be withdrawn from Madoff Investments.[2]

        3.      *Madoff's Purported Split Strike Conversion Strategy*

44.     Madoff Investments purportedly[3] was conducting a split strike conversion
("SSC") strategy for the Sentry Funds.

45.     Under this strategy, Madoff would use proprietary algorithmic models to
determine when to enter and exit the market.

46.     When Madoff was in the market, he would buy a basket of stocks that was
intended to correlate with the S&P 100. He would also buy out-of-the-money puts on the
S&P 100 to protect the downside of the basket and would sell out-of-the-money calls on
the S&P 100 in order to fund the purchase of the protective puts.

---

[2] In his on the record testimony, Vijayvergiya stated that the fact that redemptions were always
received from Madoff without problem gave him comfort as to the legitimacy of Madoff's
operation. He did not mention that those redemptions typically came from new Sentry
subscriptions.
[3] Instead of adding "supposedly" or "purportedly" in every paragraph, it should be assumed that
any description of Madoff's activities with respect to his operation of the split-strike conversation
strategy are descriptions of what he was supposedly doing.

47.   When Madoff was out of the market he purchased U.S. Treasury Bills.

48.   Madoff conducted the strategy for a variety of clients and allocated equities, options and U.S. Treasuries pro rata to each client based on the amount of investments that client had with him.

49.   Tucker testified that it was a strategy that was supposed to take advantage of upward momentum in the markets.

4.   *Returns Boasted by Fairfield to Investors and Potential Investors*

50.   Marketing materials for the Sentry Funds offered uncannily consistent and positive returns.

51.   For example, in a marketing sheet dated October 2008, Fairfield indicated that it had posted positive returns 92.09 % percent of all months since 1993. See Exhibit 3.

52.   Many people outside of Fairfield questioned whether those returns were, in fact possible.

53.   For example, a Barron's article in 2001 titled "Don't Ask, Don't Tell" by Erin Arvelund questioned whether these returns were possible.

54.   Harry Markopolos, an independent fraud investigator, submitted a lengthy report to the SEC in 2005 providing a number of reasons why Madoff's returns were simply not possible. (Madoff, apparently with Fairfield's assistance, was subsequently able to dodge meaningful SEC scrutiny of his operation. See Section VI(F)(1) below).

55.   According to testimony of Noel, Ticker, Lipton and Vijayvergiya, it never crossed their mind that those returns were simply not possible.

56.     As of October 2008, the Sentry funds were (supposedly) up 4.5 %, for the year

despite the fact that the index the Sentry funds tracked, the S &P 100 DRI, was down

30.84 % for the year. See Exhibit 3.

57.     These favorable returns were reported by the Sentry funds despite the fact that,

according to the Division's review of account statements produced by Fairfield for the

Sentry funds against the daily closing price of the S&P 100, Madoff appears not to have

exited the SSC strategy in 2008 when the S&P 100 was higher, on average, then when he

entered it.

> 5.     *Fees Earned by Fairfield and its Principals in Connection with*
> *the Sentry Funds*

58.     Fairfield charged a fee of one percent of assets under management for the Sentry

funds, as well as a fee that was 20 percent of the increase of the net asset value of the

Sentry funds month-to-month, payable quarterly.

59.     Tucker testified that Fairfield earned approximately $100 million in fees from the

Sentry funds in each of 2008, 2007 and 2006.

60.     Gordon McKenzie, in his testimony, put the figure at over $100 million for each

of 2008, 2007, 2006 and 2005.[4]

61.     Tucker testified that he personally earned approximately $100 million from the

Sentry Funds over the last 10 years.

62.     However, documents produced to the Division indicate that the principals of

Fairfield made substantially more.

---

[4] The Division sent an interrogatory to Fairfield asking: "For each year from 1998 to the present,
provide the annual fees Fairfield generated from its Sentry Funds." Even though the date for
response has passed and no extension was granted, Fairfield has not provided this information.

63.     For example, a document titled Partner Comp Worksheets 2008 produced by
Fairfield appears to indicate that in 2007 alone Andres Piedrahita (Fairfield Partner and
Noel son-in-law) earned in excess of $45 million and Tucker and Noel earned in excess
of $30 million. See Exhibit 61, which is comprised of a cover email dated December 13,
2008 and certain attachments to the email.

64.     Upon information and belief, the Division believes that Noel earned fees on the
same order of magnitude from the Sentry Funds over the last ten years.

65.     Noel and Tucker, according to their testimony, each had less than $10 million
tied up with the Sentry funds and/or Emerald funds at the time Madoff was exposed as a
fraud.

          6.     *Madoff's Arrest*

66.     On December 11, 2008, Madoff turned himself in to federal authorities and
confessed that he had been conducting a Ponzi-scheme and that his firm's liabilities were
estimated at $50 billion.

67.     Subsequently, the Division received a number of calls from Madoff victims
located in The Commonwealth of Massachusetts.

68.     Many of those victims indicated that they had been exposed to Madoff through
feeder funds and affiliated brokers, including Fairfield.

69.     The court-appointed trustee charged with sorting out what Madoff assets remain
reported that Madoff never (or at least not over the last thirteen years), in fact, engaged in
any trades.

70.     In his confession at his sentencing, Madoff indicated that his fraud began in the
early 1990s.

11

71.     Rather, his whole money-management operation, including the money he

managed for Fairfield over their eighteen-year relationship, was nothing more than one

big Ponzi scheme.

72.     Fairfield claims to have had no idea whatsoever that Madoff was anything other

than the legitimate and broker and brilliant market-timer they promoted him as.

B.      Contrast Between The Due Diligence Fairfield Represented it Was Doing and
        The Due Diligence it Actually Undertook

        1.      *Fairfield's Representations with Respect to the Due Diligence it
                Undertook Generally and Specifically with Respect to the Sentry
                Funds*

73.     In marketing materials, Fairfield portrayed itself as an advisor that engages in

exceptionally rigorous due diligence.

74.     In a 2008 marketing piece titled" Fairfield Greenwich Group: Due Diligence and

Risk Monitoring: FGG's Value-Added Investment Process", Fairfield states that:

"Fairfield's business model enables the firm to have privileged access to all aspects of a

manager's operation and investment process, including security level transparency which

is employed on a confidential basis." See Exhibit 4.

75.     The same April 2008 marketing brochure went so far as to state:

        "Operational" risk refers to the risk of loss resulting from inadequate or
        failed internal processes, human resources, or systems, or from external
        events. Operational failures, including misrepresentation of valuations
        and outright fraud, constitute a majority of instances where massive
        investor losses occur. Other operational risks include staff processing
        errors, technology failure, and poor data. The inadequacy or lack of
        independence or transparency of valuation procedures, contingency

12

plans, and other trading and settlement procedures may cause FGG to
reject an otherwise appealing manager.[5]

76.    Another 2008 marketing brochure titled "Fairfield Greenwich Group: The Firm

and its Capabilities", which discussed the Sentry fund as Fairfield's "flagship single-

manager fund" and which was provided to a Massachusetts investor who invested in a

Sentry fund, states:

> Structural and operational risks exist to varying degrees in all hedge
> funds. "Operational risk" refers to the risk of loss resulting from
> inadequate or failed internal processes, human resources, or systems, or
> from external events. Operational failures, including misrepresentation of
> valuations and outright fraud, constitute a majority of instances where
> massive investor losses occur. Other operational risks include staff
> processing errors, contingency plans, and other trading and settlement
> procedures may cause FGG to reject an otherwise appealing manager.
>
> . . . FGG carefully assesses the controls and procedures that managers
> have in place and seeks to determine actual compliance with those
> procedures, often suggesting modifications, separation of
> responsibilities, and remedial service provider, technology, or staff
> additions.

See Exhibit 5.

77.    This piece also speaks of "FGG's deep, ongoing joint venture relationships with

its managers" and "greatly facilitated communication and a continuing dialogue with its

managers", as well as FGG's "ongoing activity is to ensure that the fund continues to . .

act[] in accordance with its operational and risk framework that was approved during the

due diligence phase". The piece states that "[a]ny divergences are discussed with the

manager and addressed or resolved". See Exhibit 5.

---

[5] In their testimony before the Division, certain Fairfield personnel stated that the representations
in the preceding exhibits were not meant to apply to the Sentry Funds, but could not point to
anywhere in the document where it stated or otherwise indicated that the document only applied to
the non-Sentry Funds. They were also unable to provide any coherent rationale why Madoff
Investments would be exempted from the promised ongoing due diligence.

78.    The implication is that the failures described in the excerpt could never happen at a Fairfield fund because Fairfield's hyper-vigilant due diligence would cause it to reject a manager that does not provide it with ongoing transparency with respect to its procedures such as its trading and settlement procedures.

79.    Fairfield published a plethora of marketing materials over the years geared towards giving investors comfort with the level of due diligence it performs on its managers (both its single-manager fund managers like Madoff and its multiple-manager-fund fund managers).

80.    In an April 2006 piece titled, "Fairfield Greenwich Group, Investment Process and Risk Management Overview April 2006)", Fairfield included a page titled: "Due Diligence: Headlines to Avoid". See Exhibit 6. Those headlines included the headline "Bayou[6] Duo Plead Guilty to Fraud". (Ironically, after the Bayou fraud was exposed, a client or potential client asked Fairfield to explain how Madoff's operation was different from the Bayou operation and Fairfield was quick to point out that they had nothing in common. See Exhibit 18.)

81.    Exhibit 6 also included a page titled: "Due Diligence – Review of Financials and Documents", which included the line item "Check for 'reputable' auditor".

82.    It also includes a page titled "Due Diligence – Onsite Backoffice Review", which states: "FGG must know: Who performs trade executions? . . ." See Exhibit 6.

---

[6] In 2005, Bayou Group founder, Samuel Israel III and the CFO, Daniel Marino, pled guilty to criminal fraud charges that they stole more than $450 million from investors in the Bayou hedge funds. The S.E.C. charged Israel and Marino with creating a sham accounting firm, Richmond-Fairfield Associates, that issued fake audits. See http://money.cnn.com/2005/09/29/markets/bayou/index.htm.

14

83.     One part of the document indicated that Fairfield would never have invested in
Bayou because "We would question Bayou's obscure auditing firm". See Exhibit 6. (The
irony of this statement can be seen when one examines Fairfield's due diligence with
respect to Madoff's auditors, see Section VI(C)(2)(b) below).

84.     Another part of the document indicated that Fairfield would never have invested
in Bayou because it would "Visit office, have several face-to-face meetings" and "Watch
for inconsistent answers, refusal to given information." (The irony of this statement can
be seen in Section VI(E)(3)(a) below.) See Exhibit 6.

85.     The document also stated that Fairfield: "Verif[ies] assets under management for
all funds directly with the prime broker/administrator" and "provides independent, third
party confirmation of assets". See Exhibit 6.

86.     Specifically, with respect to the Sentry Funds, Fairfield's marketing materials
promise "rigorous portfolio oversight" and indicated under the heading: "Value Added by
FGG", that it maintained "full transparency to BLM accounts" and "independent
verification of prices and account values". See Exhibit 7.

87.     A document titled "Fairfield Sentry Limited Standardized Responses (December
2008)", which included a compilation of standardized responses to customer questions
indicated that Fairfield conducted "detailed daily compliance monitoring of portfolio
activity against all risk limits" and that it "conducts daily positions-based risk
measurement, performance attribution and other quantitative analytics". See Exhibit 8.

88.     As an example of the types of representations Fairfield was making to its clients
regarding its due diligence into Madoff, on September 1, 2008, a Fairfield investor
indicated that it was going to switch its investments to another Madoff feeder fund which

15

charged lower fees. In response, Lauren Ross, a Fairfield employee, emailed the investor

and stated, among other things: "At a high level, [Fairfield's] value contribution centers

on: . . . "[d]aily compliance monitoring of all trade activity against compliance limits"

and "[o]perational DD of BLM using information gathered over almost two decades

working with that firm . . ." See Exhibit 9.

> 2.  *In Contrast to the Rigorous Due Diligence Promised to its*
>     *Investors, Fairfield Never Took Even Basic Steps to Make Sure*
>     *That Madoff Was Making the Trades he Said he was Making or*
>     *Holding the Assets that he Said he was Holding on Fairfield's*
>     *Behalf*
>
> > a.  Having Madoff Investments Serve as Both the
> >     Sub-Custodian and the Executing Broker Made
> >     it So Fairfield was Checking Information
> >     Received from Madoff Investments Against
> >     Other Information Received from Madoff
> >     Investments; Fairfield Sought no Independent
> >     Verification of Transactions

89.    Fairfield never engaged in any meaningful check to determine whether Madoff

was actually holding the assets he said he was holding on behalf of the Sentry funds.

90.    Fairfield never engaged in any meaningful check to determine whether Madoff

was actually making the trades he said he was making.

91.    Fairfield acquiesced to the unusual relationship whereby Madoff Investments

served as both the sub-custodian of the assets and the executing broker, which made it so

when Fairfield checked the custodian's records against the broker's records, it was

checking information received from Madoff Investments against other information

received from Madoff Investments.

92.    No other Fairfield fund had the same entity serving as the sub-custodian and the

executing broker.

16

93.      Both Vijayvergiya and Lipton acknowledged in their testimony to the Division

that this was a "risk" or a "risk factor", but that risk factor was not disclosed to investors.

94.      The only risk disclosed about Madoff Investments in the Greenwich Sentry

Partners offering memorandum provided to a Massachusetts investor was that "The

service of the General Partner's principals and key employees and BLM are essential to

the continued operations of the Partnership. If their services were no longer available,

their absence would have an adverse impact upon an investment in the Partnership." See

Exhibit 54.

95.      Investors were not aware of the risk of having the executing broker and sub-

custodian being one in the same. As an example, on December 15, 2008, after Madoff

was arrested, one investor in the Sentry funds emailed Vijayvergiya and asked the

following questions: "1. Does Fairfield approve every transaction and confirm the

transactions with the custodian directly? 2. How could the fund hire broker-dealer as an

advisor and as custodian?" See Exhibit 10.

96.      Fairfield never made certain basic checks such as insisting that Madoff provide

him with the names of at least one of his options counterparties and confirming with that

counterparty that Madoff was in fact buying and selling options from them.[7]

97.      Fairfield did not check with any counterparties to Madoff's equity trades to

discern that the trades he said he was making were actually being made.

    b. Fairfield Personnel in Charge of Madoff Due
      Diligence Never Saw the Part of Madoff's

---

[7] McKenzie testified: "To my knowledge, we've never received a list [of Madoff's options
counterparties], nor has any counterparty been named specifically." Vijayvergiya testified that
"[Madoff] did say he would not be able to provide [Fairfield] with a list of counterparties for the
reasons of confidentiality."

<u>Offices Where the SSC Strategy was
Supposedly Occurring and Did not Know the
Names of Any of the Traders who Were
Supposedly Executing the Strategy</u>

98.    Jeffrey Tucker, a Founding Partner of Fairfield, Dan Lipton, Fairfield's CFO or

Amit Vijayvergiya, Fairfield's Chief Risk Officer, were the three people at Fairfield most

directly responsible for conducting Madoff diligence, according to Dan Lipton's

testimony

99.    In their on the record testimony neither Tucker nor Vijayvergiya could name

anybody by first and last name at Madoff Investments involved in executing the split-

strike conversion ("SSC") strategy other than Madoff himself or Frank DiPascali. (Lipton

was not asked that question.)

100.    Tucker, Lipton and Vijayvergiya all received tours of Madoff's market-making

operation, yet none of them had actually seen the floor where Madoff supposedly ran the

SSC strategy or had met any of the individuals (other than Madoff and Frank DiPascali)

who were involved in implementing or executing the strategy.

101.    Specifically, on this point, Vijayvergiya testified as follows:

Q.    Who were some of the key personnel at Madoff Investments who
were involved in the split strike conversion strategy in 2008?

A.    Bernard L. Madoff and Frank Dipascali are the two names that I
know of who are the key people involved in the split strike conversion
strategy.

Q.    Who else? Do you know the names of any other people?

A.    I don't.

Q.    Did you guys push and try to get some names?

A.    Well we certainly asked the question.
. . .

18

Q.    So you asked and didn't get any names. Did you push the issue or just leave it at that?

A.    I don't recall.

Q.    How would you know that these people actually existed and were conducting the strategy?

A.    Well, in the first case Madoff had described that to us, Madoff after, you know, 18 years of a very lengthy and trusted relationship, an individual who had a stellar reputation and great credibility in the industry provided use with this information so we had every reason to believe it was true.

In the second case at some point in the last couple of years, I don't remember exactly when, I was present for an on-site, maybe the last two to three years, I was present for an on-site visit with Madoff where Madoff took use for a tour of his market making floor. I believe Jeffrey Tucker was at that meeting and I think also Mark McKeefry might have been at that meeting.

Q.    When did you go on that tour?

A.    It would have been either two or three years ago. It feels in that time frame. I'm not entirely sure.

Q.    Is that the same floor that did the Sentry trades?

A.    No, it was the market making floor and we saw in the market making business that there were dozens of traders.

Q.    But did you take an analogous tour of the floor that was trading the split strike conversion strategy for Sentry?

A.    I did not.

Q.    Did you ask to?

A.    I had not asked to that I can recall. I don't recall asking Madoff.

102.    Similarly, Tucker testified as follows:

Q.    Have you ever had a tour of the part of Madoff's offices where he engaged in the split strike conversion strategy?

A.    No.

19

Q.      Do you know of anyone else at Fairfield who has had a tour of
the portion of Madoff's offices where he engages in the split strike
conversion strategy?

A.      I don't know.

Q.      You don't know of anybody?

A.      I'm not aware of anybody that had access to it.

103.    In their on-the-record testimony, neither Tucker nor Vijayvergiya could describe

anything about the proprietary models and algorithms that Madoff supposedly used to run

the SSC strategy.

104.    On this point, Tucker testified as follows:

Q. With respect to the SSC strategy that Madoff had been executing for
the Sentry Fund, could you please describe those proprietary models and
algorithms?

A.      I don't --- I'm not familiar with them.

Q.      Do you know anything about them?

A.      No.

Q.      Who at Fairfield would know anything about them?

A.      Amit [Vijayvergiya] would – may have some knowledge of this,
but the models themselves, I don't think anybody at the firm [Fairfield]
had access to.

105.    On this point, Vijayvergiya testified:

Q.      So as far as you know you just don't know who anybody might
have been other than Frank DiPascali and Bernard Madoff? You have no
idea who these other people that were executing the split strike
conversation strategy were: is that correct?

A.      I'm saying I did not know, correct.

Q.      Who ran the algorithmic trading platform?

A. I know I heard from Madoff that he had a number of quants, MIT
PhDs, who—I think they were MIT PhDs, certainly PhDs and quants –

20

who as Madoff described built the algorithm systems and models to
produce the signals to activate the entry and exits.

Q.     Buy you don't know the names of any of these people; is that
correct?

A.     No, I did not.

. . .

Q.     So the split strike conversion side of it, there are algorithms, I'm
assuming there's computers, people presumably typing in inputs and
receiving outputs. Where was that all occurring?

A.     I have not seen those systems to your question. Where they were
occurring we understood, I understood from hearing Madoff say this and
from hearing Jeffrey and others describe this, that they were on the floor,
I think it was 17th floor of his offices.

Q.     But you never actually saw that portion of his offices?

A.     No, I did not.

Q.     Do you know if anyone else at Fairfield did?

A.     I don't know if anyone else at Fairfield did.

     c.     <u>Fairfield Completely Neglected to Monitor the
          Proxy Voting with Respect to the Equities
          Madoff Supposedly Held on Sentry's Behalf</u>

106.     According to Fairfield's promotional materials, Fairfield had limited-discretion

brokerage accounts with Madoff. <u>See</u> Exhibit 12.

107.     However, Fairfield never received any proxy materials from Madoff in

connection with the equities he was supposedly holding on their behalf.

108.     On or about October 23, 2003, Vijayvergiya, in response to questions from

Sentry funds' investors, called Madoff Investments to ask it if had a proxy voting policy.

109.     It is unclear why Fairfield never thought to inquire about proxy voting in

connection with the equities Madoff supposedly held on its behalf until 2003.

21

110.    On the call, Vijayvergiya posed the following question:

> [W]e've been asked, I guess, increasingly by some of our clients doing
> their due diligence, as well as, you know, for our own internal purposes
> about how the equities within the split strike within the split strike
> conversion strategy how we vote proxies on them and I was curious
> whether you had any sort of insight on that.

111.    Frank DiPascali assured Vijayvergiya that Madoff Investments did have a proxy

voting policy and promised to send it to him.

112.    Specifically, DiPascali told Vijayvergiya "as soon as I get a free moment to jot

down a letter to you, I will get that out, and this way you can have [proxy policy] for your

file and we've both done our jobs."

113.    The proxy voting policy that DiPascali actually sent on November 6, 2003 is

attached as Exhibit 11.

114.    Notably, it is not a cover letter enclosing a preexisting policy. Rather, it is a cover

letter dated approximately two weeks after the call stating what Madoff Investments will

do with respect to proxy voting.

115.    Vijayvergiya apparently never thought to question why he had not been sent

Madoff Investment's preexisting proxy voting policy or whether any such policy had

existed prior to his inquiry.

116.    The supposed proxy policy evidenced in Exhibit 11 stated that Madoff will

"maintain accurate records as to voting of such proxies that will enable the investment

advisor to periodically review voting procedures employed and actions taken on

individual voting situations."

117.    Fairfield never asked to look at or verify those records.

118.    Keeping track of proxies was a basic, normal-course-of-dealings due diligence

step that Fairfield did not engage in.

119.    Had it been asking for proxy statements, or records of the proxy votes that

Madoff made on its behalf, Fairfield would have discovered that Madoff was not, in fact,

buying and selling the securities he said he was.

> d.    Fairfield's "Daily" Monitoring of Madoff's
> Activities Was Subject to a Three to Five Day
> Time Lag

120.    Fairfield repeatedly included in its marketing materials the statement that it

conducted "detailed daily compliance monitoring of portfolio activity against all risk

limits" and "conducts daily positions-based risk measurement, performance attribution

and other quantitative analytics". See Exhibit 8.

121.    Fairfield also represented that "portfolio holdings are reconciled daily.

Proprietary software is used." See Exhibit 12.

122.    Fairfield also stated: "The Investment Manager monitors compliance of the SSC

strategy against these risk limits and guidelines each day." See Exhibit 8.

123.    These statements would give investors comfort that Madoff did not have time to

fabricate results, because results were being monitored by Fairfield on a daily basis.

124.    While it appears to be true that Fairfield conducted daily monitoring of the

information it received from Madoff, Fairfield did not tell its investors that the daily

monitoring had a three to five day time lag.

125.    According to Dan Lipton, Fairfield did not receive trade confirmations from

Madoff until three to five days after the trade had been entered.

23

126.    According to responses to interrogatories provided by Fairfield, the time lag was two to three business days.

127.    Fairfield did not inform its clients that its "daily" monitoring of positions and risk profiles had a three-to-five day time lag.

128.    In addition, the trade tickets received by Fairfield typically contained not the prices at which a security was bought or sold, but weighted average prices of a group of securities supposedly bought and sold during the day.

129.    Upon information and belief, this time lag, which Fairfield investors were not aware of, allowed Madoff time to concoct his fake results.

130.    The purported reason for the time lag was that Madoff apparently insisted on mailing the trade confirms to Sentry instead of faxing them.

131.    Fairfield did not have Internet access to its accounts at Madoff Investments.

132.    When asked about why Fairfield did not receive trade tickets by fax, Mr. Vijayvergiya initially testified that that would raise confidentiality issues (but could not explain why a fax posed greater confidentiality concerns than a letter) but was then reminded by his counsel of a conversation regarding front running.

133.    Mr. Vijayvergiya then went on to testify that because it often took three days for Madoff to enter or exit the SSC strategy, the three day time lag imposed by mailing the confirms was necessary to avoid front-running by Fairfield personnel.

134.    Vijayvergiya's testimony regarding the reasons for Madoff mailing the trade tickets is completely contradicted by the facts that (a) the records Madoff provided indicated that it typically did not take three days to enter or exit the strategy and (b) Frank

24

DiPascali routinely called Fairfield personnel to tell them that they were intending to

enter or exit the strategy.

135.    For example, in an email dated from Vijayvergiya to the Executive Committee,

Noel and Tucker, Vijayvergiya said:

> Gord and I spoke with Frank Di Pascali this morning and have another
> call with him later this morning once he gathers more details:
>
> --      we are still 19% invested in the SSC
> --      BLM/Frank do not want to sell into weakness today and are
> looking for an exit opportunity tomorrow morning or Wednesday
>                          …

See Exhibit 13.

136.    In a follow-up email, Vijayvergiya stated that DiPascali told him that "he is

looking to do an orderly exit [from the equities part of the SSC strategy] tomorrow." See

Exhibit 13.

137.    In a November 4, 2008 email from Gordon McKenzie to Vijayvergiya,

McKenzie titled "looks like we may be getting in the strategy this week" which states:

"Frank called to day about the redemptions and just said they have their buying hats on".

See Exhibit 14.

138.    When a client asked, via email on November 13, 2008, "Is it true that you don't

get daily madoff positions, via statements which are a few days old", Richard

Landsberger asked Andrew Smith, the Fairfield Executive Committee and Mr.

Vijayvergiya, "do we need to answer?" See Exhibit 15.

C.      Fairfield's Representations to its Clients with Respect to the Basis of its
        Confidence in the Validity of Madoff's Operation Were Extremely Misleading

25

1.   *Examples of Representations Made*

139.   Fairfield was quick to assure its clients that they had nothing to worry about

when it came to Madoff. Fairfield kept a database of responses to questions frequently

asked by its investors.

140.   On November 14, 2008, Disha Attavar, Vice President and Analyst, sent an email

to the Sentry team, containing a standard response for distribution to clients, setting forth

the basis on which Fairfield was satisfied that adequate controls existed to ensure that the

Madoff assets were properly supervised:

> …
> CITCO has not been charged with the responsibility to verify the
> existence of assets in the accounts of BLM.
> --Based on the following points, it is the opinion of the Investment
> Manager that adequate controls exist to ensure that the assets are
> properly supervised:
> a)   Federal regulatory authorities (SEC and NASD) conduct
> periodic inspections of BLM to monitor compliance with rules and
> regulations; BLM has a virtually spotless record;
> b)   Friehling and Horowitz, the independent auditors of BLM,
> conduct an annual report of the internal controls at BLM and have
> always provided a clean opinion;
> c)   PwC, the [Sentry] Fund's auditors, conduct a bi-annual internal
> review of the controls and systems at BLM, the front-office and trading
> practices, procedures in respect to supervision and monitoring,
> procedures in respect of stock reconciliation, procedures in respect to
> trade allocation of bunched orders, error handling and a number of other
> items;
> d)   Members of FGG's Finance, Operations, Risk and Investment
> teams periodically conduct on-site due diligence visits to BLM and
> independently assess the suitability of operational controls, systems and
> procedures.

See Composite Exhibit 16.

141.   In his on-the-record testimony, when asked what the purpose of the email was,

Vijayvergiya described that email as follows: "without being able to say with certainty it

seems that this would be consistent with the general kind of business answering questions clients would pose."

142.    When asked: "So you believe that this e-mail was probably generated in response to a question a client had?," Vijayvergiya responded that "it seems certainly consistent with our approach to doing business . . . "

143.    The text of this email was sent to Sentry clients and prospective clients. See Exhibit 16.

2.    *Why Those Representations were Baseless*

a.    Reliance on SEC Oversight

144.    Fairfield's reliance on SEC and FINRA (formerly NASD) oversight of Madoff Investments was unfounded.

145.    In December 2005, Mark McKeefrey, Fairfield's General Counsel and Chief Operating Officer, and Amit Vijayvergiya, Fairfield's Chief Risk Officer, had a telephone conversation with Madoff in preparation of an examination of Fairfield by SEC attorneys.

146.    Upon information and belief, the SEC was looking into Madoff Investments in response to concerns that had been brought to its attention by Harry Markopolos, and one of the ways the SEC was looking into Madoff was by interviewing Fairfield, his largest customer.

147.    In this conversation, Fairfield told Madoff of the upcoming meeting with the SEC and Madoff gave McKeefrey and Vijayvergiya precise instructions as to what to say in response to questions from SEC examiners. See Exhibit 1.

148.    From this conversation, Fairfield clearly knew that Madoff knew what to tell SEC and FINRA examiners to avoid deeper scrutiny of his operations. See Exhibit 1.

27

149.     Specifically, as discussed below, Madoff told Fairfield to provide answers to the
SEC that perpetuated the false impression that Madoff was not acting as an investment
adviser.[8] See Exhibit 1.

150.     Madoff needed to do that because he was not registered as an investment advisor
at the time.

151.     Fairfield was agreeable to tailoring its story to the SEC to his needs. See
Exhibit 1.

152.     In its closing memorandum on the Madoff matter in 2007 in which it found that
Madoff had committed no fraud, the SEC explicitly referred to information it received
from Fairfield. See Exhibit 17.

153.     Having received detailed instructions from Madoff as to what to tell SEC
examiners, Fairfield could not possibly in good faith have relied on the fact that Madoff
had a spotless record with the SEC as a basis for believing its assets were being properly
supervised at Madoff Investments.

                    b.     Reliance on Frehling and Horowitz

154.     Fairfield's reliance on the supposed audits by Friehling & Horowitz was
unfounded.

155.     Fairfield did not know a thing about this three-person auditing firm that was
operating out of a strip mall in New City, New York.

156.     When Fairfield inquired, it found out that Friehling & Horowitz only had one
employee and approximately $180,000 in annual sales.

---

[8] Yet, Lipton, Vijayvergiya and McKenzie all testified that they thought they were dealing with
Madoff Investments the investment adviser.

28

157.     No-one at Fairfield had ever spoken to Friehling & Horowitz other than a five to
ten-minute conversation Dan Lipton had with a partner at Friehling & Horowitz (whose
name Lipton cannot remember) in 2005.

158.     In a September 5, 2005 email from a Sentry client, the client asked the following
question about Madoff's auditor: "Bernard L. Madoff Securities LLC has employed a
small accounting firm. **Is that accounting firm checked and approved by Fairfield
Greenwich Group?"** See Exhibit 18.

159.     Dan Lipton, on September 12, 2005, sent the following statement for Jeffrey
Tucker to communicate to the client:

> Friehling & Horowitz, CPAs are a small to medium-sized financial
> services audit and tax firm specializing in broker/dealers and other
> financial services firms. They are located in Rockland County, New
> York. They have hundreds of clients and are well-respected in the local
> community.

See Exhibit 18.

160.     In his on the record testimony, Lipton testified as follows:

> Q.     How did you determine they had hundreds of clients?
>
> A.     That's what the partner said on the phone to me.
>
> Q.     Did you corroborate that in any other way?
>
> A.     No.

. . .

> Q. How did you determine that they were well-respected in the local
> community?"
>
> A.     That's what our conversation – my conversation with one of the
> partners at Friehling & Horowitz, that's what was told to me.
>
> Q.     So he told you they were well-respected in the local community?

29

A.    That's correct.

Q.    And that's what you based this statement on?

A. Plus I had looked up on the Internet to see if he was in good standing
with the CPA license, which he was and it listed that he - - or members
of the firm were members of the local chapters of the CPA.

161.    When Vijayvergiya was asked how he knew that Friehling & Horowitz were

independent auditors, he testified that "on the front of the report it said independent

auditor".

162.    Vijayvergiya represented to the Division that he made a note to himself to do

some research on Friehling & Horowitz, but never got around to it.

163.    On September 14, 2005, Gordon McKenzie emailed Tucker, Lipton, McKeefry

and others at Fairfield. In the email he stated: "It appears Friehling is the only employee"

of Friehling and Horowitz. See Exhibit 18.

164.    Jeffrey Tucker emailed back: "thank you". See Exhibit 18.

165.    Gordon McKenzie testified that the only information Fairfield had obtained with

respect to Friehling & Horowitz prior to 2005 was the information contained in Friehling

& Horowitz's filings with the SEC.

166.    Tellingly, in an August 20, 2008 email, in response to a client's question

regarding Friehling & Horowitz, Lipton asked Vijayvergiya: "Do we know any of the

other client of BLM's auditors? Or how big they are?" See Exhibit 19.

c.    Reliance on PriceWaterhouseCoopers

167.    Fairfield's supposed reliance on reviews by PwC was also unfounded.

30

168.   PwC[9] made two visits to Madoff Investments, in 2002 and 2004.

169.   While the 2002 visit was not memorialized in any document PwC provided to

Fairfield, Fairfield did receive a summary of the review PwC conducted in 2004.

170.   In 2005, PwC set forth the scope of its 2004 visit, which consisted of nothing

more than an interview with Madoff.

171.   In the report that PwC provided to Fairfield, it explicitly stated:

> The procedures performed by PwC Bermuda were only directed towards
> obtaining an understanding of certain procedures and organization
> aspects of BLM for the purpose of gaining comfort thereon for the audits
> by several PwC offices of a number of funds having moneys managed by
> BLM. One of these funds is Fairfield Sentry Ltd. Audited by PwC
> Rotterdam. Therefore, the procedures performed are not directed to the
> providing of assurance in respect of internal control, nor to the detection
> of fraud, errors or illegal acts. The procedures performed do not
> constitute an audit nor an investigation of the internal controls of/at
> BLM. The procedures consisted of gathering factual information through
> an interview with Mr. Madoff (hereafter 'BM'). No testing of controls
> and procedures was performed. [Emphasis added]

See Exhibit 20.

172.   PwC did not do even this limited review of Madoff Investments at anytime after

2004.

173.   Specifically, Dan Lipton, the CFO of Fairfield who was responsible, on behalf of

Fairfield, for planning the audits for the auditors, was asked by the Division: "After 2004,

. . . did any auditor or any entity on behalf – go in and look at Madoff's records on behalf

of Fairfield, any of the Fairfield entities to perform the same types of tests the Price

Waterhouse Coopers did in 2002 and 2004?" He responded: "Not to my knowledge".

---

[9] According to Lipton's and McKenzie's testimony, when PwC visited Madoff Investments, it was
conducting its review on behalf of both Fairfield and an apparently unaffiliated entity, Kingate,
which also had money invested with Madoff Investments.

174.    Nonetheless, in the Fairfield Sentry Due Diligence Questionnaire October 2007,

drafted for the benefit of investors and potential investors, poses the question: "Have

ongoing due diligence visits been conducted? If so, by whom and at what frequency?"

The answer was: "The CFO has accompanied PWC's auditors on a biannual basis to

review BLM's internal accounts for the Sentry Fund." See Exhibit 12.

175.    When asked about this statement Lipton testified as follows:

> Q.    Are you – you are the CFO; is that correct?

> A.    Of Fairfield, yes.

> Q.    Fairfield. So that would be you that it's referring to?

> A.    It appears so.

> Q.    Okay. Now, by BLM, would that be Madoff Investments?

> A.    I believe so, yes.

> Q.    Right. So when was the last time you accompanied Price Waterhouse Coopers auditors to review Madoff Investment's internal accounts for the Sentry Fund.

> A.    I recall going in December of 2002.

> Q.    Have you gone any more recently than that?

> A.    I have not accompanied them, no.

176.    When Lipton was asked if he had contacted PwC after April 2005 to inquire as to

whether PwC was going to check Madoff's internal controls, Lipton indicated that

McKenzie was the primary contact within PwC.

177.    McKenzie testified that Lipton was the primary contact with PwC on the

relationship level and that McKenzie was the contact for PwC's field work.

32

178.    Tellingly, in a November 2008 email Vijayvergiya emailed Lipton and told him

that he received a call from a consultant "whose client is invested in Sentry and want the

consultant to contact PwC to verify that PwC visits BLM's offices every couple of

years." Vijayvergiya added: "sounds like he wants to verify that PwC does what we told

them they do." See Exhibit 21.

179.    Both Vijayvergiya and Lipton admitted under oath that they were not aware of

PwC or any other auditor visiting Madoff Investments to review its controls at any time

after 2004.

180.    This testimony was corroborated by a September 18, 2008 email chain where

Lipton indicated to Vijayvergiya that PwC review of Madoff's controls "probably fell off

the map". See Exhibit 22.

181.    As late as December 5, 2008, Vijayvergiya was sending emails to clients

regarding PwC's "periodic on-site evaluation of BLM". See Exhibit 23.[10]

182.    According to Lipton and Vijayvergiya, PwC planned to visit Madoff Investments

in 2009, but Fairfield has not provided any corroboration of that statement.

            d.      Reliance on Examinations by Fairfield Personnel

183.    According to Lipton, Vijayvergiya and Lipton, the cornerstone of Fairfield's

purported due diligence into whether Madoff was actually doing what he was reporting

that he was doing came down to a 2001 visit Jeffrey Tucker made to Madoff's office.

184.    Tucker testified that the visit was made, at the invitation of Madoff, in response

to the 2001 article titled "Don't ask, Don't Tell" in Barron's which questioned the

---

[10] Ironically, Exhibit 23 reflects a client asking, on December 10, 2008, with respect to Madoff,
"[h]ow do you know the trade isn't a Ponzi scheme . . ?"

validity of Madoff's returns. He testified that the visit was made the same day that

Madoff invited him.

185.     In this meeting, Madoff and Frank DiPascali showed Tucker what, in Tucker's

words, Madoff "purported to be a P & S blotter which was a record of each trade."

186.     Madoff let Tucker thumb through the pages.

187.     Tucker testified that Madoff then opened up another journal "which was

purportedly the stock record for Madoff Securities" and let Tucker turn through it.

Madoff said "Pick any two stocks". Tucker picked AOL/Time Warner and turned to that

page which contained "a listing of each – purportedly of each client and their position in

shares."

188.     Tucker's testified as follows:

> He [Madoff] then activated – he or Frank activated a screen that he said
> would get us into their DTC account. And they continued to move pages
> of the screen until they got to the AOL page and with the stock record I
> could compare the total number of AOL according to the Madoff stock
> record with the Madoff account at DTC which had the --- which tied.
> And I knew of my own that the position I saw for us was roughly what
> we had because I was somewhat familiar with our size, you know, in
> shares. . . . That was basically the meeting.
>
> Q.     So how did you know that the screen you were looking at was a
> DTC screen?
>
> A.     It had a logo. It had a DTC logo. It was not a full-sized screen
> like this one here.
>
> Q.     For the record the witness is pointing to the screen from the
> transcriptionist.
>
> A.     Right, but it was – it had a logo and then he – I could see the
> pages being turned electronically until they got to the AOL page.
>
> Q.     Had you ever seen a DTC screen before?
>
> A.     No.

Q.      So this is the first time you'd seen a DTC screen?

A.      Yes.

Q.      And you believed it was a DTC screen because it had a – what
did the logo say, did it say DTC?

A.      Yes.

Q.      And because he was telling you that – because Madoff told you
that --

A.      Yeah, of course.

Q.      . . . have you ever seen a DTC screen since then?

A.      No.

. . .

Q       And did you get a printout of the DTC screen?

A.      No.

Q.      Did you repeat that review with any other equity or option or
was it just the AOL shares?

A.      I think just the AOL.

189.    Tucker testified that he never repeated that review and that he was not aware of

anyone else ever repeating that review.

190.    Tucker testified that he never asked to see counterparty confirmations of the

trades.

191.    Neither Tucker, nor Lipton nor Vijayvergiya had ever seen the portion of

Madoff's offices (or was aware of anyone at Fairfield who has seen the portion of

Madoff's offices) where he conducted the SSC strategy.

192.    Specifically, on this point, Tucker testified as follows:

Q.      Have you ever had a tour of the part of Madoff's offices where
he engaged in the split strike conversion strategy.

35

A.    No.

Q.    Do you know of anyone else at Fairfield who's had a tour of the portion of Madoff's offices where he engages in the split strike conversion strategy?

A.    I don't know.

Q.    You don't know of anybody?

A.    I'm not aware of anybody that had access to it.

193.    There are also serious questions over how rigorously Fairfield monitored the

trading parameters that Madoff was supposedly operating under.

194.    Tucker testified that he had no recollection of anyone at Fairfield ever telling

anyone at Madoff Investments that a violation had occurred.

195.    Specifically, Ttucker testified as follows:

Q.    Did Fairfield ever inform Madoff Investments that – of any instances where the guidelines had not been complied with?

A.    I don't recall. I don't – I did not.

Q.    Are you aware of any instance where anyone at Fairfield communicated to Madoff that the guidelines had not been complied with?

A.    I'm not aware.

196.    Internal emails show that at times when Madoff was apparently operating outside

of the parameters, Fairfield either ignored it or sought to re-write the parameters. See

Exhibit 24.

197.    In the December 2005 telephone conversation (a transcription of which is

attached hereto as Exhibit 1), Madoff indicated that he had changed the trading guidelines

he was operating under approximately two years earlier yet had never informed Fairfield.

36

D.    Fairfield Was Consistently Aware of Clients' "BLM Concerns" but Saw it Role
as to Comfort Clients and Defend Against Redemptions Instead of Sincerely
Investigating Those Concerns

198.    Fairfield was aware that a certain amount of its clients were redeeming because

of concerns with respect to Madoff.

199.    Clients for years had been asking about Madoff risk. See, e.g., Exhibit 18.

200.    Vijayvergiya was the Chief Risk Officer for the Sentry funds but was also in

charge of Sentry client communications—the person in charge of monitoring Madoff risk

also had a central role in marketing the Sentry funds.

201.    Fairfield's marketing team, directed by Vijayvergiya, worked very hard to dispel

concerns that Sentry investor has with respect to Madoff.

202.    For example, on June 10, 2008 Vijayvergiya sent an email to Gordon McKenzie,

Disha Attavar and Maria Teresa Pulido—Fairfield's head of Global Sales, indicating that

they were to began drafting a plan to work with agents to "defend redemptions each

month". Part of the plan was to determine: "reason for redemption (liquidity source,

performance concerns, rebate sensitivity, defection to a competitor, concerns about lack

of transparency, BLM concerns etc)". [Emphasis added] See Exhibit 25.

203.    The other part of the plan was to address "whether the Agent would like us to call

the client with them to see if we can stop the outflow (address their concerns, provide

outlook, further analysis)." See Exhibit 25.

204.    As one example, David Horn, a Chief Global Strategist at Fairfield, emailed

Vijayvergiya on June 2, 2008 about a prospective client. The email read in relevant part:

"appetite $50 to $100 million in bites. . . so worth our time. . . she has always heard about

37

Madoff, but hears things that scare her. . . so neutralize the scare with our transparency. . .
this will be a piece of cake." See Exhibit 26.

E.     Fairfield's Growing Awareness in the Fall of 2008 of its Inability to Answer
       Client's Madoff-Related Questions; Fairfield' Half-Hearted Attempt to Address
       its Lack of Knowledge With Respect to Key Aspects of Madoff's Operations;
       Fairfield's Continued Misrepresentations to Clients About Its Knowledge of and
       Comfort With Madoff's Operations

       1.     *When a Client in the Fall of 2008 Asked Certain Basic Due
              Diligence Questions, Fairfield was Unable to Answer Them*

205.     In May 2008, a client, Unigestion, asked certain basic questions of Fairfield
directly questioning whether Madoff was in fact making the trades and holding the assets
he said he was holding.

206.     Despite the fact that Fairfield had entrusted $7 billon of its clients' assets to
Madoff Investments at the time, Fairfield could not answer their questions, and the client
ultimately redeemed their shares.

207.     In an email dated July 29, 2008 to Fairfield, a principal at Unigestion explicitly
stated: "We think that we have a counterpart[y] risk as all the assets are held at Bernard
Madoff Securities and it is very difficult to find infos on it, audit report, etc." See Exhibit
29.

208.     In response to that email, Vijayvergiya stated: "I am confident that we can
address the majority of the counterparty risk concerns. We would be happy to spend as
much time with them as they'd like to answer their questions about BLM's systems,
controls, procedures etc – drawing from our knowledge of BLM accumulated over almost
two decades of dealing with that firm." See Exhibit 29.

38

209.    However, in an internal email chain occurring in August 2008 Fairfield personnel

conferred as to how to best answer Unigestion's questions Charles Murphy, a member of

Fairfield's Executive Committee, in an August 19, 2008 email, posed the following

question:

> Segregation: we confirm, but, not sure we answer directly their questions
> on how our account is segregated and how this can be confirmed? We
> talk about monitoring positions versus guidelines, and it is our
> understanding that implementation is identical for all accounts (though
> cannot confirm) – but is there more to say about how mechanically they
> actually segregate and whether and how this can be checked? One thing
> they cite in the 29Jul email is a lack of audit – do we have the audit of
> BLM? Does it address segregation? Do we get to talk with the auditors?

See Exhibit 27.

210.    Vijayvergiya responded:

> I believe that Jeffrey may have verified the existence and segregation of
> assets in the past by tracing stocks from the trade blotter to the stock
> record to DTCC and back to client accounts. We plan to repeat this check
> during our upcoming DD.[11] We also saw that that they commented on an
> audit of BLM in their July 29 email and we would like to show them the
> annual audited financials of BLM prepared by Freihling and Horowitz
> and submitted to the SEC.

See Exhibit 27.

211.    Mr. Vijayvergiya also stated in the same email that, with respect to Unigestion's

inquiry, "We attempted to provide written responses to their questions based on available,

verifiable information. Unfortunately, there are certain aspects of BLM's operations that

remain unclear and although we are attempting to obtain responses from Bernie Madoff

(via an operational DDQ), this process could take some time." See Exhibit 27.

---

[11] Vijayvergiya appears to be referring to the 2001 visit to Madoff's office by Jeffrey Tucker
discussed in Section VI(C)(2)(d) above. That "check" was never repeated by Fairfield.

212.    In that email chain, Murphy suggested that they enlist Madoff's help with

Unigestion. Specifically, he stated:

> Mark mentioned today that you had prepared a questionnaire to send to
> BLM to get more info to address some of these questions. If BLM
> complains of laundry lists, maybe worth sending BLM the Unigestion Q
> &A . . . and any enhancements you might write per the above and see if
> BLM can help draft a response – **after all, he too has an interest in
> saving AUM, particularly if these concerns are shared by others.**
> [Emphasis added]

See Exhibit 27.

213.    Similarly, in October 2008, JP Morgan redeemed a substantial amount of money

from its investment in the Sentry funds.

214.    Similar to the situation with Unigestion, the reason for JPMorgan's redemption

was because Fairfield could not make JP Morgan comfortable with respect to certain very

basic due diligence issues. Vijayvergiya explained it his colleagues in an internal email

titled "JP Morgan redemptions:

> [Contact person at] JP Morgan's derivatives desk called me this morning
> and asked several questions:
>
> --about the OTC options counterparties (who they are, how BLM decides
> which ones to use, detailed questions about how the traders interact with
> the c/p's, have we seen signed copies of the master options agreement
> with the c/p's),
>
> --the aggregate amount of assets in the SSC strategy executed by BLM,
>
> --technical details about how the algorithms interact with the order enter
> system,
>
> --have we seen BLM's trade break report to verify the small level of e&o
> at BLM
>
> --how do we verify the existence and segregation of assets at BLM
>
> ---the level of transparency we receive from BLM

--the Chinese walls between the market making and SSC execution
business

JPM has executed fund derivatives trades with several other SSC funds
as well and commented that we have the deepest knowledge of the
business, but I gathered from his questions that they were particularly
focused on c/p risk. I think their inability to get a firm answer on the c/p
names is a sticking point for them.

See Exhibit 30.[12]

2.   *Fairfield was Aware of the Enormous Gaps in its Knowledge
with Respect to Madoff Investments, But did not Disclose its
Lack of Knowledge to its Investors*

a.   Fairfield's Awareness of the Gaps in its
Knowledge

215.   Fairfield principals matter-of-factly discussed the risk that Madoff would "blow

up", but did not disclose that risk to investors. See Exhibit 32.

216.   However, after being unable to stem Unigestion's redemption, Fairfield prepared

a due diligence questionnaire for Madoff and sent it to him in September 2008.

217.   Part of the upcoming due diligence was to address, in the words of, Vijayvergiya,

"gaps in our knowledge". See Exhibit 31.

218.   In an email dated August 20, 2008 titled "BLM counterparty risk assessment",

Mr. Vijayvergiya stated:

. . . [W]e intend to expend our risk oversight to more formally include
non-market risks going forward—including
credit/counterparty/business/liquidity risks. The biggest single
counterparty risk exposure we have at FGG is BLM.

---

[12] JPMorgan Chase had issued notes that promised to pay investors up to three times the future
earnings of the Fairfield Sentry funds. In order to issue the notes, JPMorgan had invested up to
three times the face amount of the notes into the Fairfield Sentry funds. In October 2008, Fairfield
seemed stunned that JPMorgan was redeeming its holding in the Fairfield Sentry funds and spent
days communicating via email the possible reasons for redemption and indicating that they did not
think JP Morgan could redeem without informing its noteholders.

> Unfortunately, Unigestion submitted a $75 MM Sentry redemption
> ($27MM levered up) order this month over <u>Madoff</u> counterparty risk
> concerns—the details of which are only coming out in bits and pieces as
> Andres, [the point person between Unigestion and Fairfield] and others
> communicate with them. Some of their concerns are unfounded and can
> easily be addressed (D&B rating, BLM's audited financials) and we're
> working to address the rest (BLM DDQ), <u>but I think the larger question
> is if the Risk Group is comfortable with BLM counterparty risk</u>.
>
> I'd like to schedule some time during the first week of Sep (perhaps with
> GM, DA, BA, AV to start, and then the Risk Group as a whole after
> we've drafted a first pass report) to more formally study BLM risk and
> prepare a comprehensive Risk Group assessment of BLM counterparty
> risk. [Emphasis added]

<u>See</u> Exhibit 28.

219.    Among other things, it began to dawn on Fairfield how little they knew of the

options side of Madoff's trades.

220.    In September 2008, Dan Lipton expressed concern that the options markets were

experiencing a lack of liquidity and wondered how Madoff's options counterparties (who

were still unknown to Fairfield) could provide the requisite amount of options liquidity

for Madoff's SSC strategy to run.

221.    On September 22, 2008, Richard Landsberger, a member of Fairfield's Executive

Committee, emailed Vijayvergiya, the Executive Committee and Tucker stating:

> Amit – I have an additional question –
>
> It has come up more than once since the summer
>
> How do the counterparties at the banks provide enough liquidity to allow
> the options to be put on?
>
> My understanding is dealing desks are currently doing almost everything
> on an order or best efforts basis- and not providing risk capital to anyone,
>
> Can we get some clarity from BLM on how he sees the markets and
> liquidity from his counterparties on the options?

<u>See</u> Exhibit 33.

222.   As a follow-up, Landsberger, emailed the other members of the Executive

Committee (and Vijayvergiya and Lipton) on September 24 stating:

> I don't want to beat a dead horse, but this illiquidity exists in the bund,
> jgb and ust bond markets as well (the most liquid markets after fx).
>
> Does anyone in this e-mail not think we should speak to blm asap and get
> some color from him on how we are getting option liquidity in s + p 100
> from his counterparties? . . .

<u>See</u> Exhibit 31.

223.   Andrew Smith, a partner and member of FGG's Executive Committee,

responded:

> We were speaking about this last night and this morning amit mentioned
> you guys were seeing Bernie next week in times like there would be
> great if we could get some clarity on who the 20 non us options
> counterparties are and the liquidity in the mktplace just for our comfort
> not to tell the clients so we can tell them we know/monitor. I refuse to
> believe this illiquidity is permanent. Maybe he's in cash until dec 31?

<u>See</u> Exhibit 31.

224.   Vijayvergiya responded:

> We have a number of questions for BLM relating to the derivatives
> c/p's—including his views on the willingness of the options c/p's that
> have been historically used to continue trading with BLM, as Agent, in
> this environment. These are in addition to several other important
> questions we have for BLM relating to their operations and trading
> (Bernie as already been sent a fax of our questions).
>
> Frank di Pascali stated last week that they use 20 derivatives dealers and
> international banks, primarily European, for options, but we expect that
> some of these c/p's will either not trade or curtail their liquidity in the
> near term. The impact on SSC may be, as Andy suggests below, that we
> remain in cash for a period of time until the situation settles.
>
> The SSC strategy is entirely in cash now and I think it is very unlikely
> that BLM will activate again before the end of Sep.

43

> We are due to meet with Bernie during the next week or two . . . and my
> preference would be to approach Bernie with well though out, reasoned
> questions that focus on filling the gaps in our knowledge.
>
> If anyone feels we should urgently contact Bernie in advance of this
> meeting, we can do so.

See Exhibit 31.[13]

225.    On October 4, 2008 (two days after the supposed October 2, 2008 due diligence

meeting had occurred, as discussed below ), Richard Landsberger emailed Vijayvergiya:

"Cant wait to hear BLM comments on options liquidity--." See Exhibit 34.

226.    Another red flag was the fact that Citco submitted its due diligence questionnaire

to Fairfield in February 2008 to be forwarded to Madoff for completion and continuously

pestered Fairfield for a response at least through September 2008. See Exhibit 50.

227.    Upon information and belief, the questionnaire was never completed.

        b.      Fairfield did not Disclose the Gaps in its
                Knowledge to Investors

228.    Fairfield did not disclose the gaps in its knowledge with respect to Madoff

Investments to its investors.

---

[13] Interestingly, in a September 15 email to the Executive Committee, Tucker, Noel and others,
Vijayvergiya stated:

        As a follow up, Frank diPascali confirmed that no U.S. banks have been used in the
current options collar. The puts are deep ITM and bid at $26; the short calls are 35 points OTM
and are still asked at 85 cents (which is a remarkable example of the impact of vol on options
pricing – they should be worthless). Frank said that we're +5nps gross over the valuation of last
Thu night and that he is looking to do an orderly exit tomorrow." [Emphasis added] See Exhibit
13. Irregularities in the information Madoff provided to Fairfield popped up from time to time, but
Fairfield largely just tried to ignore them. For example, Vijayvergiya did not seem to be bothered
that DiPascali was telling him that options that should be worthless were still being asked (by
Madoff's mythical options counterparties) at 85 cents on the dollar. Vijayvergiya and Fairfield's
outside consultant had discussed other quirks in Madoff's options pricing but Fairfield did not
follow up. See Exhibit 52.

229.    There is a stark juxtaposition between Vijayvergiya's internal and external

communications regarding Madoff.

230.    For example, on August 20, 2008 Vijayvergiya emailed his colleagues to

describe a conversation he had with a Sentry investor who was concerned with Madoff

risk. He stated: "I described [to the investor] that we have a good knowledge of BLM's

business gathered over almost two decades of dealing with that firm, and that I hope we

could answer all his questions." See Exhibit 19.

231.    However, just the day before saying: "[u]nfortunately there are certain aspects of

BLM's operations that remain unclear and although we are attempting to obtain

responses from Bernie Madoff (via an operational DDQ), this process could take some

time." See Exhibit 27.

232.    On August 20, the same day he sought to reassure the client about operational

risk, he sent an internal email stating: "The biggest single counterparty exposure we have

at FGG is BLM. . . . I think the larger question is if the Risk Group is comfortable with

BLM counterparty risk." See Exhibit 28.

233.    Fairfield routinely provided deceptive or misleading responses to client inquiries.

234.    For example, in its document titled "Fairfield Sentry Limited Standardized

Responses (December 2008)" which contained a compilation of the standardized

responses Fairfield agents gave in response to client questions, it posed the question:

> Who are the counterparties of the OTC puts Madoff purchased from? Do
> not need to know that exact names, but can we get a sense on the types?

235.    The answer was:

> There is a master options agreement for the OTC options used in the
> strategy. Counterparty risk is diversified amongst approximately 15

45

> options counter-parties in order to reduce exposure to any one counter
> party. <u>We do not give out the names of the counterparties used but they
> are all well established financial institutions.</u> All counterparties are rated
> A or better and they are not affiliated with Madoff. [Emphasis added]

<u>See</u> Exhibit 8.

236.    Similarly, the document states: "The principal method applied to control [option]

counterparty credit risk is via an assessment of creditworthiness and strict credit

diversification limits." <u>See</u> Exhibit 8.

237.    At another point in the document, Fairfield states: "The options counterparties

that are used are well known, established options dealers" who "are rated A or better."

<u>See</u> Exhibit 8.

238.    Specifically, on October 20, 2008, Lourdes Barrenche emailed an investor who

had put in for a redemption from a Sentry fund in order to prevent the redemption. He

stated:

> On the counterparty side, Sentry has not had any exposure to Lehman
> Bros, Merrill Lynch or AIG. Sentry's executing broker uses derivatives
> dealers and international bans for the majority of the OTC options trades
> and counterparty risk is diversified amongst approximately 20 dealers in
> order to reduce exposure to any single counterparty. These counterparties
> are highly rated and maximum exposure to a single counterparty is
> currently 10 %.

<u>See</u> Exhibit 47.

239.    Receiving these responses, most investors would not glean that Fairfield (a) did

not have any idea who Madoff's supposed options counterparties were or (b) that

Fairfield knew absolutely nothing about those counterparties other than Madoff's

uncorroborated representations that they were large, non-U.S. financial derivatives

dealers and international banks.

240.    One Managing Director of Fairfield informed Vijayvergiya that a discerning

investor or prospective investor was not satisfied with Fairfield's standard responses:

"The question they posed was don't we need to see the counterparty names even if the

client does not get to . . . how can we be comfortable with Madoff just telling us they are

all A or better?" See Exhibit 48.

241.    Vijayvergiya's more elaborate spin is reflected in his response to this query,

contained in Exhibit 48.

242.    Similarly, as chronicled in Section VI(B)(2)(b) above, neither Tucker, nor Lipton

nor Vijayvergiya could name anyone involved in the SSC conversion strategy other than

Bernard Madoff and Frank DiPascali.

243.    However, in its standardized responses to clients, Fairfield, once again, glossed

this over by stating: "Although there are a number of people involved in the decision

making process, Bernard L. Madoff heads the team responsible for model maintenance

and trade execution and he is the ultimate decision maker." See Exhibit 8.

244.    When asked: " What is the key person risk at BLM? Please describe the

personnel contingency plan?," the client-facing response was

> Bernard L. Madoff heads BLM and oversees all activities of that
> organization. Although there are a number of people involved in
> executing the trades of the SSC strategy, Bernard Madoff (the individual)
> heads the team responsible for model maintenance and trade execution
> and he is the ultimate decision maker. We believe that a number of other
> people at that organization are capable of assuming his role including his
> sons and other long time employees.

See Exhibit 8.

245.    Again, as chronicled above, neither Tucker, nor Lipton nor Vijayvergiya could name anyone involved in the SSC strategy other than Bernard Madoff and Frank DiPascali.

246.    Similarly, neither Tucker nor Lipton nor Vijayvergiya had seen the part of Madoff's offices where the SSC strategy was being conducted.

247.    Nonetheless, Fairfield confidently stated in its standardized responses to investors: "The group at BLM responsible for executing the SSC strategy are both physically and operationally separate from the groups at BLM responsible for proprietary trading and market making. They work on different floors and cannot access the work space of the other groups; they have separate business managers and risk managers, separate P&L, use separate trading systems and independently enter trades into the order entry system." See Exhibit 8.

248.    Certain of Fairfield's statements to investors, geared towards making them comfortable with Madoff and his SSC, were patently false.

249.    For example, on September 16, 2008, in response to the market tumult associated with the Lehman bankruptcy, Vijayvergiya sent investors a letter stating: "Currently the SSC portfolio of Sentry is fully invested in short dated U.S. Treasury bills." See Exhibit 49.[14]

250.    The implication was that of course Madoff the brilliant market timer would not be caught in the market when it was experiencing extreme downside pressure.

---

[14] Those statements indicate that one of the holdings was the Fidelity Spartan U.S. Treasury Money Market fund, even though in 2005 Fidelity dropped the name "Spartan" from that fund.

251.    However, the account statements produced by Fairfield demonstrated that
Madoff was in the process of selling the equity portion of the SSC strategy on the 16th
and did not purchase the U.S. Treasury bills until September 19th. See Exhibit 49.

252.    Both Vijayvergiya and McKenzie testified that the September 16 letter's
representation about the portfolio being fully invested in U.S. Treasuries was not
accurate.

253.    Investors experienced a double falsehood: Madoff was sending fake records to
Fairfield that Fairfield claims it did not detect and Fairfield misrepresented what those
records said to customers.

> 3.    *Fairfield's Half-Hearted Attempt at Due Diligence in October
> 2008; Contrast Between Due Diligence Actually Undertaken and
> Representations to Clients*
>
> > a.    Fairfield Did not Require Madoff to Answer
> > Key Questions

254.    On October 2, 2008, senior personnel at Fairfield had a supposed due diligence
meeting in Madoff's offices.

255.    The questionnaire provided to Madoff in advance was drafted specifically for
him, to address gaps in Fairfield's knowledge with respect to Madoff's operations.

256.    Fairfield personnel agreed that because they had so many questions for Madoff,
they would only ask "priority" questions on October 2.

257.    However, during the meeting, Madoff simply refused to answer many of the
central questions asked. See Exhibit 35.

258.    For example, when asked: "Please provide a list of key personnel involved in the
split-strike conversion ("SSC") strategy. Provide a description of their roles." The answer

was: "The people involved in the SSC strategy are traders, systems, analysts,

programmers and operations people. No names given." See Exhibit 35.

259.    Similarly, when asked: "Who is responsible for actually placing the trade orders

of the SSC?, the answer was: "Traders, under the direction of supervisors." See

Exhibit 35.

260.    Fairfield personnel did not ascertain the names of those traders or supervisors.

When they were asked by the Division what the names of some of these traders or

supervisors were, neither Vijayvergiya nor Tucker knew the names of anybody involved

in the SSC strategy other than Madoff and Frank DiPascali.

261.    Again, when the Fairfield personnel in attendance at the due diligence meeting

asked Madoff about the names of the options counterparties, the answer recorded was:

"BLM will not disclose the names of the c/p's `for obvious reasons' (ie confidentiality).

See Exhibit 35.

262.    When asked: "Please describe the experience and tenure of the team responsible

for developing the models/algorithms used by the split strike conversion strategy," the

answer was: "Between 15 to 47 years. Frank has 32 years with BLM." See Exhibit 35.

263.    Fairfield, again, did not follow up with respect to this information. When asked

by the Division in his on-the-record interview who the people were who had between 15

to 47 years experience, Mr. Vijayvergiya did not know.

264.    The list of unanswered or dodged questions at the October 2 meeting goes on and

on. (See Exhibit 35). When asked, "Have there been any changes to [the SSC's] models

and algorithms in the past three years. If yes, please describe." The answer was: "Yes,

they are always looking at the models and fine tuning them." Nothing more specific was
provided.

265.    Exhibit 35 indicated that Fairfield was going to follow up and request certain
documents from Madoff, including the current form ADV Part II.

266.    Fairfield never followed up and obtained those documents.

267.    Even though the due diligence questionnaire had been specifically created for the
meeting and to address some of the enormous gaps in Fairfield's knowledge of Madoff's
operations, the Fairfield personnel in attendance did not push for answers.

268.    When asked in his on-the-record interview, with respect to each question that
was not answered, whether the Fairfield people pushed back and asked for answers,
Vijayvergiya repeatedly testified: "I don't recall if anyone at this meeting pushed back
and asked for a specific response".

269.    Tellingly, in addition to Tucker and Vijayvergiya not being able to name any
individuals at Madoff involved with the SSC strategy, Fairfield's interrogatory responses
indicate that the Fairfield personnel that spoke with personnel at Madoff Investments did
not even know the names at times or the last names of the people they spoke with.

270.    According to these interrogatory responses, on October 21 and 22, 2008 and
November 18, 2008, Vijayvergiya spoke with Bernard Madoff and "unidentified
additional participants". On October 31, 2003, Vijayvergiya spoke with "Eric (last name
unknown)" and "unidentified additional participants". On October 23, 2003, Vijayvergiya
spoke with Frank Diascali and "Robert (last name unknown)."

51

271.    In his testimony before the Division, when asked who he spoke with at Madoff

Investments other than Madoff himself and Frank DiPascali, Vijayvergiya stated: "The

first names come to mind, Erin, Eric and Rob. Last names I'm afraid I don't remember."

272.    Gordon McKenzie also testified that he did not know the last names of the

Madoff Investments' client service team members with whom he had spoken.

> b.    Despite the Lack of Information Obtained,
> Fairfield Used the Fact that it had Engaged in
> the October "Due Diligence" in its Sentry
> Marketing Efforts

273.    The lack of meaningful information obtained from Madoff at the October 2

meeting did not prevent Vijayvergiya from confidently stating to a prospective client on

October 6, 2008: "We spoke with BLM last week and had an extensive discussion about

their back office, operation, systems and internal controls." See Exhibit 36.

274.    Similarly, in an October 20, 2008 email from Vijayvergiya to the Sentry Team

titled "Marketing Support for Sentry", the Agenda included "what information do agents

need to defend redemptions" and included the subheading "operational risk—BLM

operational DD". See Exhibit 37.

275.    On October 21, 2008, Lourdes Barreneche of Fairfield emailed a prospective

client boasting that "Fairfield Greenwich (Bermuda) has been facilitating rigorous and

very thorough investment and operational due diligence on Fairfield Sentry Ltd." See

Exhibit 38.

276.    On November 7, 2008, Vijayvergiya received an email from Fairfield colleague

indicating that a client was "pleased with your recent due diligence with regard to BLM,

and the risk management steps taken. They recognize the unusual structure with regard to

Sentry. . so they found the info you provided very helpful in getting comfortable with
Sentry." See Exhibit 39.

277.   On December 11, 2008 (the day of Madoff's arrest), Vijayvergiya was still
marketing Sentry's superior due diligence into Madoff.

278.   In an email sent December 11, 2008 (the day Madoff was arrested), Vijayvergiya
stated: "I would also encourage setting up a meeting with [redacted] and/or Citi (the
leverage provider) to outline our case and explain why entry is superior to Kingate
(information edge, transparency, oversight, risk and compliance, shareholder
communications, BLM op DD knowledge etc.)." See Exhibit 40.

F.      Lack of an Arms Length Relationship Between Fairfield and Madoff Investments

279.   In a September 2005 email to a client attempting to distinguish Fairfield's
arrangement with the Madoff from the relationships that preceded the implosion of the
Bayou Management hedge fund, Carla Castillo of Fairfield highlights that Fairfield
"maintains an arm's length relationship with Bernard L. Madoff Securities LLC". See
Exhibit 41.

280.   Unbeknownst to investors, Fairfield and Madoff Investments had a deeply
interconnected, non-arms-length relationship.

        1.      "This Conversation Never took Place"

281.   As one striking example of the non-arms-length relationship between Fairfield
and Madoff Investments, on December 19, 2005, Fairfield's General Counsel and COO,
Mark McKeefrey and its Director of Risk Management, Amit Vijayverjiya, had a lengthy
conversation with Madoff in which Madoff gave them detailed instructions as to what to
say to SEC investigators in an upcoming examination. See Exhibit 1.

282.    The call began as follows:

BERNARD MADOFF: Obviously, first of all, this conversation never
took place, Mark, okay?

AMIT VIJAYGERGIYA: Yes, of course.

BERNARD MADOFF: All right ....

See Exhibit 1.

283.    Madoff gave them instructions to steer the SEC attorneys away from any

indication that he was actually acting as an investment advisor (because he was not

registered at the time as an investment advisor).

284.    At one point in the call, Madoff instructed: "I mean, the idea is that it's -- is that

we're not the one that's making the decision how much to --- I mean, you know -- you

know, we're not the one that's operating the fund. That's the issue that they always try to

determine as to what the role of the various parties are is the broker controlling the fund

[or] is the investment manager controlling the fund." Fairfield responded: "If they get

into the question of these trading authorizations and these operating guidelines, you

know, it's a model that you develop that we've reviewed and approved and that should be

the stance rather than – you know, than anything else." See Exhibit 1.

285.    After instructing them as to what to say with respect to the possibility of front

running his investments, Madoff cautioned: "And you don't have to actually go out say

so there's no front running possibility" See Exhibit 1.

286.    Vijayvergiya responded: "It will be understood, yeah." See Exhibit 1.

287.    At one point, Madoff stated: "So, you know, the secrecy as to information is a

key issue for everybody and from our standpoint yours should basically [be] I don't know

54

about – I don't know about these trades until after the trades are executed and my job is

then just to monitor and see what the performance of it is and to make sure that the

securities that we – that was – that as supposed to be in the model are in the model." See

Exhibit 1.

288.    Vijayvergiya responded: "Understood, that makes sense." See Exhibit 1.

289.    At one point during the call Madoff said, "the less you know about how we

execute, and so on and so forth, the better you are other than, yes, you could – you know,

you could, if they asked do you know that Madoff – do you know if Madoff has Chinese

walls, and you say, yes, look—you know, your position is say, listen, Madoff has been in

business for 45 years, you know, he executes, you know, a huge percentage of the

industry's orders, he's – you know, a well known broker. You know, we make the

assumption that he's doing everything properly." See Exhibit 1.

290.    The call continues at some length, with Madoff giving them detailed instructions

to act casual and that "with these guys anything you can't answer you basically just say I

– you know, don't answer. You know, you just say – you know, I'm not knowledgeable

in that aspect of it." See Exhibit 1.

291.    At one point Madoff instructed: "The best thing to do is not get involved with

what you said, written instructions, if possible because any time you say you have

something in writing they ask for it." See Exhibit 1.

292.    Vijayvergiya responded "Okay". See Exhibit 1.

293.    Madoff continued: "So the best thing to do is just say it's a phone call." See

Exhibit 1.

294.    At another point, Madoff said: "I'm giving you and basically what you should respond to them. Obviously, not that we had a – we didn't have a conversation on all of this stuff." See Exhibit 1.

295.    After Fairfield had its call with the SEC, it called Madoff and gave him a report.

296.    The fact that Fairfield and Madoff had this conversation must have evidenced to Fairfield personnel that Madoff was manipulating the flow of information he was providing to the SEC.

297.    Some of the answers that Madoff was telling Fairfield to tell to the SEC were not accurate and Fairfield thus helped Madoff evade regulatory oversight.

298.    For example, Madoff told the Fairfield personnel on the call to tell them "if they asked you do you know that Madoff do you know if Madoff has Chinese walls, and you say, yes . . . we know he has, you know, as part of our normal relationship, we know that he has Chinese walls between the various business lines of his firms".

299.    Fairfield did not have any reason to believe that Madoff had Chinese walls between his operations other than the fact that Madoff told them he did.

300.    In addition, Tucker testified that Madoff informed him that Madoff had spoken with Mark and Andrew in Madoff Investments market making operation, which was on the other side of the supposed Chinese wall.

301.    On this point, Tucker testified as follows:

    Q.    Again, who are the people, do you know the names of any of the people other than Bernard Madoff or Frank DiPascali –

    A.    No.

    Q.    -- who were involved in [the decision whether to exit the SSC strategy]?

56

A.      Going back some time, Bernie once or twice said, "you know, I
may consult with my kids who run the trading room because they get a
good feel for where the market is" . . .

Q.      So the two kids, was it Andrew Madoff was one of them and -

A.      Andrew and Mark.

302.    The SEC relied on information from Fairfield in determining that Madoff's

operation was not fraudulent. See Exhibit 17.

303.    Fairfield helped Madoff deceive the SEC and, in the process, deceives all of its

Sentry investors.

304.    The December 2005 telephone conversation "that never took place" is

particularly significant in light of the fact that when asked how Fairfield became

comfortable that Madoff was in fact making the trades he said he was making and

holding the assets he said he was holding, the Fairfield personnel interviewed pointed to

SEC oversight as one of the central bases upon which they obtained that comfort.

305.    In his on-the-record testimony, Tucker testified a follows:

Q.      And at this point in time in October of 2008 how did you know
that these people [Madoff's SSC team] actually existed and were
conducting the strategy?

A.      Well, again, we continued to get trade confirmations, monthly
statements, you know, an operating relationship.

Q.      Anything else that comes to mind?

A.      Frankly we – the SEC had done its investigation in '05/'06
which we drew comfort from that they had not taken any action;
probably all I can think of now.

2.      *"Shared Interest in Saving Assets Under Management"*

306.    As described above, in May 2008, a client, Unigestion, asked certain questions of

Fairfield directly questioning whether Madoff was in fact making the trades and holding

the assets he said he was.

307.    Fairfield could not answer their questions, as described above.

308.    At one point in Fairfield's internal discussions, Charles Murphy, a member of

Fairfield's Executive Committee, stated:

> Mark [McKeefrey] mentioned today that you had prepared a
> questionnaire to send to BLM to get more info to address some of these
> questions. If BLM complains of laundry lists, maybe worth sending
> BLM the Unigestion Q &A . . . and any enhancements you might write
> per the above and see if BLM can help draft a response – **after all, he
> too has an interest in saving AUM, particularly if these concerns are
> shared by others.** [Emphasis added]

See Exhibit 27.

309.    Based on Fairfield's marketing materials, Sentry investors were under the

assumption that Fairfield was rigorously and continuously reviewing Madoff Investments

to make sure that Madoff Investments was properly investing the assets of the Sentry

Funds.

310.    However, whenever an investor had a question about Madoff it appears that

Fairfield worked with Madoff to come up with something to tell the client to assuage

those concerns and to protect assets under management--instead of Fairfield, on its own

behalf, making sure that its client's concerns (some of which proved to be precisely on

point) were not legitimate.

      3.    *Fairfield's Sharing of Proprietary Business Information with
Madoff*

311.    Noel testified that Fairfield felt that it had to "show our loyalty to Madoff".

312.    In order to curry favor with Madoff, Fairfield repeatedly gave him proprietary
information.

313.    For example, in a conversation in October 2008, Amit Vijayvergiya informed
Madoff of the amount of redemptions that had come in.

314.    They went through a detailed discussion of which Sentry investors had submitted
redemption requests and why.

315.    During a different conversation in October 2008, Fairfield personnel called
Madoff to assuage any concerns he might have had in connection with reports in the
press that Fairfield was having difficulty with it fund of funds business and was laying
off personnel. Fairfield, fearful that Madoff might cut off their access to him, went to
great lengths to assuage Madoff's concerns.

316.    In that call, Fairfield personnel even told him that they were suspending
redemptions in two of their funds (the Irongate Fund and the Chesterfield) fund before
Fairfield told the investors in those funds of the intended suspension of redemptions.

      4.    *Fairfield Principals Put Money in at the End to try to Keep
Madoff Afloat*

317.    In October, November and December of 2008, Madoff reversed his longstanding
policy with Fairfield of strictly limiting the amount of money Fairfield could invest with

him and, instead, began to react angrily when Fairfield gave him information regarding a

significant amount of redemptions in the Sentry fund. See Exhibit 44.[15]

318.    In response, Fairfield provided its sales team with "a short internal-use-only

Sentry talking points presentation that we are providing you in raising Sentry assets and

defending against Sentry redemptions over the coming two months." See Exhibit 42.[16]

319.    In addition, Fairfield personnel quickly worked with Madoff to set up new

funds—the Emerald Funds--to funnel money to Madoff.

320.    There were two Emerald Funds, BBHF Emerald and Greenwich Emerald.

321.    BBHF Emerald was described as an enhanced version of the Sentry fund. The

salient difference between this fund and the Sentry funds was (supposedly) that the SSC

for the Emerald funds would be structured such that the risk profile and volatility was

going to be greater and the potential returns would be greater. See Composite Exhibit 43.

322.    According to Tucker, Madoff told him in November 2008 that he had been

modeling the returns of the Emerald funds for about a year.

323.    BBHF Emerald accepted investments from Fairfield-affiliated and outside

investors. See Exhibit Composite Exhibit 43.[17]

324.    McKenzie testified that the BBHF Emerald fund was going to be administered by

Olympia Capital, but the Greenwich Emerald Fund was going to be self-administered to

save fees.

---

[15] Fairfield's assets under management with Madoff appear to have dropped to under $6 billion in
December, as a result of redemptions. See Exhibit 55.
[16] The attachment to Exhibit 42 was not produced by Fairfield.
[17] Exhibit 43 contains a response to an interrogatory requesting, for each Emerald investor who
invested in an Emerald fund, the exact name of the fund; when the fund was created; the name of
each investor that held shares in the fund; the amount invested by each investor and the date of
such investment; and a list of any and all investors who redeemed from the fund since its
inception.

325.    The Greenwich Emerald fund was set up entirely for investments from Fairfield

insiders.

326.    In the words of Walter Noel, one of Fairfield's founding partners, "we tried to

help stem things" and "we thought, well, we can help him a bit if we give him some more

money".

327.    In contrast, Jeffrey Tucker testified that he and his wife put money into the new

Fairfield fund on December 1 because they thought it was a good investment.

328.    However, the Tuckers committed to making an investment without any due

diligence, without having seen any offering document, without the Emerald funds having

picked an auditor or custodian, and without having received any information about the

funds other than a one-page sheet of supposed performance results from Madoff and

having had a five minute conversation with Madoff in which he described the fund.

329.    Despite the fact that Fairfield was able to solicit $14,800,000 in investments in

the Greenwich Emerald Fund, no offering documents for that fund ever existed.

330.    The Tuckers and other Fairfield insiders never even signed subscription

agreements for the Greenwich Emerald Fund. They simply wired their money to an

intermediary for it to be forwarded Madoff. They never even retained a piece of paper

indicating that they own an interest in the fund.

331.    Fairfield took no steps to check the one-page sheet of supposed performance of

the Emerald Fund.

332.    Specifically, on this point, Tucker testified as follows:

    Q.    What checking did Fairfield do to go kind of behind these
    returns to make sure that he had in – that Madoff had, in fact, obtained
    these returns?

A.      I'm not aware of any.

Q.      Okay. Is there any due diligence that Fairfield did with respect to
– prior to Fairfield individuals investing in the Emerald Fund and
Fairfield offering the BBHF Fund to some investors, is there any due
diligence that Fairfield undertook with respect to the fund other than
having received Madoff's list of returns that he provided you with?

A.      For me just the conversation I had with him [Madoff] about the
strategy. I'm not aware of what anybody else did.

333.    Tucker testified that conversation lasted only five or ten minutes.

334.    Fairfield at the same time worked to reduce the small amount in the Sentry funds

allocated to non-Madoff-related investments to zero, presumably to funnel that money to

Madoff.

335.    In a subpoena dated March 13, 2009, for which a response was due March 27,

2008 and for which no extension or agreement for rolling production was provided, the

Division asked the following question: "Provide all Documents evidencing

communications made between October 1, 2008 and December 31, 2008, between

Fairfield Personnel and personnel at Madoff Investments relating to BBH Emerald Ltd."

336.    The response was comprised of the three pages attached hereto as Exhibit 56.

337.    The March 13 subpoena also asked for "all Documents evidencing

communications made between October 1, 2008 and December 31, 2008, between

Fairfield Personnel and personnel at Madoff Investments relating to Greenwich Emerald,

LLC.

338.    The response was comprised of the three pages attached hereto as Exhibit 57.

339.    "A very angry Bernie" berated Fairfield for what he viewed as its inadequate

performance in replacing redemptions. See Exhibit 44.

340. Fairfield's desperate efforts to prop up Madoff in the end are chronicled in a

letter from Jeffrey Tucker to Madoff dated December 10, 2008.

341. The letter states:

> We have taken a number of steps with our other funds in order to put all
> of our investable capital in Sentry and the new split-strike strategy which
> we call Emerald. While the full results of this strategy will take a few
> months to take effect, they will include:
>
> - investments in Sentry by existing Fairfield funds (~$100 mm)
> - liquidating other Fairfield funds and transferring the assets to Sentry and
>   Emerald (up to ~200mm)
> - purchase by the firm of Sentry positions from clients rather then having
>   them redeem from Sentry (~150mm)
> - investments by individual partners of the firm in Sentry and Emerald
>   (~50mm)
> - new UCITS III fund, launch Feb 2009 (target ~$500mm in 12 months)
>
> We are aggressively cutting effective fees for new subscriptions through
> offering significant fee-sharing incentives to our clients, agents and
> finders.

See Exhibit 2.

342. Investors in the Sentry and Emerald funds were not made aware of Fairfield's

desperation.

343. Right up until the end, potential investors were aggressively being told to

purchase the Sentry funds and Emerald funds because they were good investments.

G.    Harm to Investors; Fairfield's Continued Payments to its Partners

344. Investors in The Commonwealth of Massachusetts invested millions of dollars

through the Sentry funds.

345. Those investors paid Fairfield performance fees, as described above, for its

supposed monitoring of and due diligence with respect to the Sentry Funds

63

346.    Because of Fairfield's lack of meaningful due diligence, as described above, and

the lack of an arms-length relationship between Fairfield and Madoff Investments,

Fairfield failed to discover that Madoff Investments was, in fact, nothing more than a

giant Ponzi scheme.

347.    Fairfield's misrepresentations to its customers were geared towards convincing

customers that Madoff's operation was legitimate, when in fact it did not know very

much at all about key aspects of that operation and had its own doubts. Those

misrepresentations induced Massachusetts investors to invest in the Sentry funds and

prevented investors from redeeming their investments.

348.    The Massachusetts investors who trusted Fairfield and invested with Sentry lost

their entire investments.

349.    As of December 12, 2008, less than $100 million remained of the Sentry funds'

over $7 billion in assets under management. See Exhibit 45.

350.    Fairfield has not offered to repay the enormous performance fees it reaped, even

though it now knows that the performance upon which those fees are based was fictitious.

351.    After Madoff was arrested, Fairfield continued to make sizable payments to its

partners. See Exhibit 58.

352.    Fairfield also expedited payments to certain partners. See Exhibit 59.

353.    Within days after Madoff's arrest, Lipton sent an email stating: "My wife needs

to open a brokerage accont today in only her name. And I would like to transfer my

munis and Treasuries into it." See Exhibit 60.

354.    Fairfield has not offered to make its investors whole.

64

355.    On December 13, 2008, Manuel Gomez, associated with Fairfield Sigma (which

is a class of the Sentry funds), sent an email to Kim Perry, a member of Fairfield's U.K.

group.

356.    In that email, Gomez stated: "You mentioned that Fairfield used to get copies of

some trades done by Madoff. In order to cover my ass, can I get some copies of those

trades? I need to show to people who invested in Sigma that I was doing due diligence in

what is the largest scam in financial history." Exhibit 46. Perry forwarded the email to

Vijayvergiya stating "Please see below. I know that this is a sensitive time but if we can

help it would be appreciated."

## VI.  VIOLATIONS OF SECURITIES LAWS AND LEGAL CONCLUSIONS

### A.  COUNT I: VIOLATIONS OF § 204(a)(2)(G)

357.    Section 204(a)(2)(G) of the Act provides in pertinent part:

> (a) The secretary may by order impose an administrative fine or censure
> or deny, suspend, or revoke any registration or take any other appropriate
> action if he finds (1) that the order is in the public interest and (2) that the
> applicant or registrant or, in the case of a broker-dealer or investment
> adviser, any partner, officer, or director, any person occupying a similar
> status or performing similar functions, or any person directly or
> indirectly controlling the broker-dealer or investment adviser:–
>
> (G) has engaged in any unethical or dishonest conduct or practices in the
> securities, commodities or insurance business.

358.    The Division herein re-alleges and restates the allegations and facts set forth in

paragraphs 1-356 above.

359.    The conduct of Respondents, as described above, violated of M.G.L. c. 110A,

§ 204(a)(2)(G).

### B.  COUNT II: VIOLATIONS OF § 204(a)(2)(J)

360.    Section 204(a)(2)(J) of the Act provides in pertinent part:

The secretary may by order, deny, suspend, or revoke any registration if
he finds (1) that the order is in the public interest and (2) that the
applicant of registrant

(J) has failed to reasonably to supervise agents, investment adviser
representatives, or other employees to assure compliance with this
chapter.

361.    The Division herein re-alleges and restates the allegations and facts set forth in

paragraphs 1-356 above.

362.    Respondents failed to supervise its agents or other employees to assure

compliance with the Act.

363.    The conduct of Respondents, as described above, constituted a violation of

M.G.L. c.110A, § 204(a)(2)(J).

## VII. ORDER

Fairfield Greenwich Advisors, LLC and Fairfield Greenwich (Bermuda) LTD

consent to the entry of this Order,

**IT IS HEREBY ORDERED**:

The Respondents, in full settlement of these matters, and neither admitting nor denying

the Division's allegations of fact set forth in Sections III, IV and V herein and

conclusions of law set out in Section VI herein, make the following representations and

agree to the undertakings herein as part of the Order:

(a)    Respondents agree to permanently cease and desist from violations of the
Act;

(b)    Respondents agree to be censured by the Division;

(c)    Contemporaneously with the entry of this Order, Respondents shall pay a
civil penalty commensurate with the costs of the Division's investigation

in the amount of five hundred thousand dollars ($500,000). Payment shall be (a) made by United States postal money order, certified check, bank cashiers check, bank money order, or wire (b) made payable to The Commonwealth of Massachusetts; and either (c) hand-delivered or mailed to One Ashburton Place, Room 1701, Boston, MA 02108; or (d) wired per Division instructions, and (e) submitted under cover letter that identifies the Respondent(s) making the payment and the docket number of the proceedings.

(d)     Respondents agree to provide restitution to all investors consistent with the amounts and names of investors identified in Exhibit 1 ("Investors") (appended hereto). Exhibit 1, including footnotes therein, is incorporated by reference and made a part of the agreement.

    a.     Respondents agree that within ten (10) business days after reasonable verification of the Investor's investment identified in Exhibit 1, Respondents shall provide restitution to those Investors. Respondents agree that investors identified in Exhibit 1 shall be provided written notification that the investor has the right to opt out of receiving restitution.

    b.     Documentation necessary for reasonable verification may be in the possession of the Division, Respondents, investors or third parties. Reasonable verification should be completed no later than thirty (30) days after the Division's Order is issued, however additional time may be necessary and any extension needed will be allowed to the extent necessary if communicated to or by the Division prior to the thirty (30) days expiring.

    c.     Respondents agree to provide the Division with a detailed accounting of the computation and distribution of all amounts paid to the investors identified in Exhibit 1 pursuant to the Order within thirty (30) days of the last payment to Investors identified in Exhibit 1.

    d.     Respondents agree that any denial of restitution owed to any investor identified in Exhibit 1 is subject to approval and consent by the Division. The Division shall promptly and reasonably review Respondents' request.

(e)     Respondents shall preserve for a period not less than six (6) years from the end of the fiscal year last used, the first two (2) years in an easily accessible place, any record of Respondents' compliance with the undertakings set forth herein.

67

(f)     Respondents agree that it shall not seek or accept, directly or indirectly, reimbursement or indemnification, including, but not limited to, any payments made pursuant to any insurance policy, with regard to civil penalties that Respondents shall pay pursuant to the Division's Order.

(g)     Respondents further agree that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any state, federal, or local tax for civil penalties that Respondents shall pay pursuant to the Division's Order; and

(h)     Respondents agree that upon issuance of an Order by the Division that contains the terms as set forth above, if Respondents fail to comply with any of the terms set forth in the Division's Order, the Enforcement Section may institute an action to have this agreement declared null and void. Upon issuance of an appropriate Order, after a fair hearing, the Enforcement Section may re-institute the actions and investigations referenced in this Order

**WILLIAM FRANCIS GALVIN**
**SECRETARY OF THE COMMONWEALTH**


By: _____
        Diane Young-Spitzer
        Acting Director
        Massachusetts Securities Division
        One Ashburton Place, 17th Floor
        Boston, Massachusetts 02108

Issued: September _X_, 2009

68