**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-04932 (SMB) |
| Plaintiff, | |
| v. | |
| JPMORGAN CHASE CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD., | |
| Defendants. | |

**DECLARATION OF RICHARD LEVIN REGARDING APPLICATION OF THE EQUAL TREATMENT PROVISION TO THE SETTLEMENT AGREEMENT BETWEEN THE TRUSTEE AND JPMORGAN CHASE & CO., et al.**

CRAVATH, SWAINE & MOORE LLP,
Attorneys for SPV Optimal SUS Ltd.
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

I, Richard Levin, declare under 28 U.S.C. § 1746:

1.      I am a partner in the law firm of Cravath, Swaine & Moore LLP and the head of its bankruptcy and restructuring practice group. I have practiced creditors' rights, bankruptcy, and restructuring law for over 30 years. I have personal knowledge of all of the facts stated in this Declaration and could competently testify thereto.

2.      I am the lawyer at Cravath principally responsible for having negotiated and documented the May 22, 2009 settlement agreement (the "**Agreement**") between the Trustee and Cravath's clients, Optimal Strategic U.S. Equity Ltd. ("**SUS**") and Optimal Arbitrage Ltd. ("**Arbitrage**"), and for administering the agreement for SUS and Arbitrage.

3.      This Declaration has four parts: an overview of the Equal Treatment provision to provide context for the description that follows; a description of the drafting and document management process; a description of the substantive changes to prior drafts that the parties made during the negotiation and drafting of the Equal Treatment provision; and my recollection of the reasons for the changes and their significance to the present dispute.

A.      **Overview of the Equal Treatment Provision**

4.      The Agreement required SUS and Arbitrage to pay the Trustee 85% of the amount of the transfers that the Trustee sought to avoid under his avoiding powers and allowed their claims as customer claims in this liquidation proceeding. Paragraph 13 of the Agreement, entitled "Equal Treatment for SUS and Arbitrage with Other Similar Customers," requires the Trustee to refund to SUS and Arbitrage a portion of their settlement payments if the Trustee later settles with a single defendant or group of defendants for more than $40,000,000 in circumstances that are similar to the circumstances underlying the Agreement, if the settlement amount is less than 85% of the Trustee's Avoiding Power Claims.

**B.     The Agreement's Drafting and Document Management Process**

5.      Cravath took responsibility for the initial draft of the Agreement and for

managing the document drafting and revision process. I was personally involved in negotiating

and drafting the Agreement and managed the document drafts for Cravath.

6.      Cravath uses a computer-based document management system. The system

allows successive versions of a document to be associated with prior versions by assigning each

saved document a document number and a version number. I saved each draft of the

Agreement as a new version of the same document and took care to maintain prior versions

intact, primarily to enable creation of accurate "redline" comparisons of successive versions of

the draft. My references below to "versions" are to the numbered versions of the drafts that

became the Agreement.

7.      I first met with Trustee's counsel, Mark Cymrot and Thomas Lucchesi on March

24, 2009 to propose a settlement of the Trustee's avoiding power claims against SUS and

Arbitrage. I had several other meetings and conference calls with Mr. Cymrot, Mr. Lucchesi and

others before I prepared and sent to Trustee's counsel a full draft of a Settlement Agreement on

April 13, 2009. SPV Exhibit 1 is a true and correct copy of the draft, which is version 3 of the

document on Cravath's document management system. (Versions 1 and 2 were internal drafts

and were revised based on internal and client comment before version 3 was ready to send to

Trustee's counsel.)

8.      I had discussed an Equal Treatment provision with Trustee's counsel in our

meetings and conference calls. Trustee's counsel expressed reservations about including such a

provision for the reason that we would be unable to define clearly the parameters of such a

provision. Nevertheless, they agreed to consider it. Accordingly, version 3 contained an Equal

Treatment provision in paragraph 12, which I had drafted with input from SUS and Arbitrage,

but the provision was in brackets, to indicate that it was tentative. SPV Exhibit 1 is a true and

3

correct copy of version 3. Paragraph 12 was a slight revision of a prior version of the Equal Treatment provision that I had sent to Trustee's counsel on April 6, 2009, though I had not received any comments from Trustee's counsel on the prior version.

9.  Trustee's counsel continued to express concern over the Equal Treatment provision and told me that they were not ready to comment on the draft provision right away. As a result, Trustee's counsel and I exchanged drafts of the Agreement without comment from the Trustee on the Equal Treatment provision, until they sent me a proposal on May 4 as part of a general mark-up of the draft Agreement. I saved that draft to Cravath's document management system as version 8 of the document. SPV Exhibit 2 is a true and correct copy of version 8. Trustee's counsel's revision of the Equal Treatment provision, now in paragraph 13, was substantial.

10.  I met with Trustee's counsel on May 6 and 11 to discuss the Agreement and negotiate its terms, and we exchanged email communications in the interim. I sent revised drafts to Trustee's counsel after each meeting, version 10 on May 7 and version 12 on May 13. Cravath's clients and I were still considering the Trustee's revision to the Equal Treatment provision when I sent version 10 of the draft. I showed our continuing consideration of the provision by adding brackets around the provision in that version. I then proposed a revised paragraph 13 in version 12. (Version 11 was an internal Cravath draft that was not shared with Trustee's counsel.) SPV Exhibit 15 is a true and correct copy of version 12.

11.  Version 12 became the final version of the Equal Treatment provision, except:

(a) in version 13, the notice requirement in paragraph 13(e) was revised and the amount that would qualify a settlement for consideration under the Equal Treatment provision was finalized at $40,000,000;

(b) in version 14, the Trustee's avoiding power claims were increased to $151,831,876 from $150,000,000 for SUS and to $125,087,004 from

4

$125,000,000 for Arbitrage to reflect the Debtor's payment to the IRS on

SUS's and Arbitrage's behalf of withholding taxes,[1] and;

> (c)  in <u>version 15</u>, the phrase "(or a group of defendants taken as a whole)" was added to the paragraph 13(c) comparison of factors between SUS and Arbitrage on the one hand and the defendants in a future settlements, on the other hand, to conform to the formulation used in paragraph 13(b)(i).

SPV Exhibits 4, 5, and 6 are true and correct copies of versions 13, 14, and 15, respectively.

## C.    Substantive Changes During the Equal Treatment Provision's Drafting

12.    There were three principal versions of the Equal Treatment provision. The first, proposed by Cravath in version 3 dated April 13, 2009, read:

---

**Cravath Draft of April 13, 2009 (v.3)**

12.    <u>Equal Treatment for SUS and Arbitrage with Other Similar Customers.</u>

[If:

(a) a former BLMIS customer (the "<u>Customer</u>) had an account at BLMIS with a balance stated on the Customer's BLMIS-provided account statement in excess of $100 million at any time;

(b) the Customer received transfers from BLMIS that are in excess of $25 million in the aggregate either as fictitious profits (calculated on a cash in-cash out basis) or after September 11, 2008 and that are recoverable under Bankruptcy Code section 544, 547, 548 or 550 (the "<u>Total Recoverable Amount</u>" of the Customer);

(c) the Trustee has or makes a claim against the Customer for any amounts that the Customer received from BLMIS other than the Total Recoverable Amount and the amount of the Trustee's claim for such other amounts is less than 50% of the Total Recoverable Amount;

---

[1] In late 2010, the Trustee reached a settlement of his avoiding power claims against the Internal Revenue Service under which the IRS paid the Trustee all amounts that the debtor had withheld from SUS and Arbitrage, among others. The Trustee and SUS and Arbitrage later agreed to adjust the Agreement to reflect the Trustee's recovery from the IRS, so SPV's position is that the avoiding power claim amounts in paragraph 13(b)(i) of the Agreement should be read to exclude the withholding tax payments: $150,000,000 for SUS and $125,000,000 for Arbitrage.

(d) the Customer, as of December 10, 2008, had sufficient assets to pay the Total Recoverable Amount to the Trustee;

(e) the Customer pays the Trustee an amount (the "Settlement Amount") in settlement of the Trustee's claim for recovery of all or any portion of the Total Recoverable Amount, under a settlement made before the commencement of a trial or a hearing on a contested motion for summary judgment;

(f) the percentage ("Other Settlement Percentage") of the Total Recoverable Amount that the Settlement Amount represents is less than 85%; and

(g) the Customer's jurisdictional contacts with the United States are less than SUS's or Arbitrage's contacts, as determined in the Trustee's reasonable judgment;

then the Trustee shall return to SUS and to Arbitrage a portion of SUS's and Arbitrage's payments made under this Agreement so that the net amount that the SUS and Arbitrage will have paid (net after all such returns) as a percentage of $150,000,000 and of $125,000,000, respectively, is equal to the Other Settlement Percentage, and the allowed amounts of SUS's and Arbitrage's customer claims shall be reduced by the amount that the Trustee returns to SUS and Arbitrage, respectively.  This paragraph may be applied more than once if the circumstances set forth herein are satisfied more than once.]

13.     The second, proposed by Trustee's counsel in version 8 dated May 4, 2009, read:

**Trustee's Draft of May 4, 2009 (v.8)**

13.     Equal Treatment for SUS and Arbitrage with Other Similar Customers.
Pursuant to the terms of this settlement, SUS and Arbitrage agree to pay to the Trustee an amount equal to 85% of the amount of transfers received by each of SUS and Arbitrage within the 90 days before the Filing Date (the "Settlement Amount").  It is the intent and agreement of the parties that this 85% amount be established as a "benchmark" and that unless the Trustee deems another settlement to be a MFN Opt Out (as defined below), SUS and Arbitrage shall be entitled to the return of some portion of the Settlement Amount if the Trustee, prior to the commencement of a trial or briefing on motion for summary judgment, settles or compromises a Similar Claim (as defined below) against any Similarly Situated Person or Entity (as defined below) on More Favorable Terms (as defined below) (a "MFN Trigger Event").  For the purposes of this paragraph, "Similar Claim" means a claim by the Trustee against a former BLMIS customer (the "Customer") for at least $100 million on account of avoidable transfers (pursuant to Bankruptcy Code section 544, 547, 548 or 550) made within the 90 days before the Filing Date, including for fictitious profits (calculated on an cash in-cash out basis).  For the purposes of this paragraph, "More Favorable Terms" refers to a compromise and settlement agreed to by the Trustee that is less than 85% of the amount of the avoidable transfers received by the Similarly Situated Person or Entity within 90 days before the Filing Date.  For purposes of this paragraph, "Similarly Situated Person or Entity" means a person or entity meeting each of the following criteria: (a) had direct or indirect control over no more than a single account at BLMIS or if it had more than one account at BLMIS, there were no transfers between accounts; (b) had an account at BLMIS with a balance stated on the Customer's BLMIS-provided account

statement in excess of $1.0 billion as of the Filing Date; (c) in connection with their dealings with BLMIS invested or deposited the funds of other persons or entities (such as in the nature of a feeder fund or a fund of funds); (d) has, at the time of the settlement, remaining assets sufficient to pay in full the claim of the trustee for the avoidable transfers received within 90 days before the Filing Date; (e) has or had, in the Trustee's reasonable judgment, minimum contacts with the United States that are no less than those of SUS and Arbitrage; and (f) are citizens and/or residents of a jurisdiction that, in the Trustee's reasonable judgment, allows for enforcement of a judgment of a court of the United States to no less a degree than the jurisdictions that would be relevant if the Trustee were required to enforce a judgment against SUS or Arbitrage.  For purposes of this paragraph, a "MFN Opt Out" shall occur when, with respect to a settlement that would otherwise constitute a MFN Trigger Event, the Trustee determines that the circumstances are sufficiently different than the situation giving rise to the settlement contained in this Agreement such that there should be no MFN Payment.  The Trustee shall give written notice to SUS and Arbitrage of the exercise of a MFN Opt Out.  The Trustee shall have the right to declare a MFN Opt Out no more than [six] times.  Upon the occurrence of a MFN Trigger Event and in the event that the Trustee does not deem the settlement subject to the MFN Trigger Event to be a MFN Opt Out, the Trustee shall return to SUS and to Arbitrage a portion of SUS's and Arbitrage's payments made under this Agreement so that the net amount that the SUS and Arbitrage will have paid (net after all such returns) as a percentage of $150,000,000 and of $125,000,000, respectively, is equal to that contained in the other settlement.  The Trustee shall have no obligation to provide to SUS or Arbitrage any information or discovery with respect to another settlement that is or could give rise to a MFN Trigger Event.

14.    The third, proposed by Cravath in version 12 dated May 13, read:

**Cravath Draft of May 13, 2009 (v.12)**

13.    Equal Treatment for SUS and Arbitrage with Other Similar Customers. (a) Under this Agreement, SUS and Arbitrage are paying the Trustee an amount equal to 85% of the amounts received by each of SUS and Arbitrage either within the 90 days before the Filing Date or as fictitious profits (the "Settlement Amount").  The parties intend and agree that this 85% percentage be established as a benchmark for future settlements by the Trustee in the SIPA Proceeding of Avoiding Powers Claims that are similar to the Avoiding Power Claims the Trustee asserted against SUS and Arbitrage.

(b)(i)  If the Trustee settles one or a related series of Avoiding Power Claims against a single defendant or group of defendants that are under common control for an aggregate settlement amount of [$40,000,000] or more (a "Qualifying Settlement"), (ii) if the amount of the Qualifying Settlement is less than the benchmark 85% of the Avoiding Power Claims, and (iii) if the circumstances of the Avoiding Power Claims and the Qualifying Settlement are similar to the circumstances underlying this Agreement, then the Trustee shall return to SUS a portion of the consideration paid under paragraph 3 or reduce of a portion of the consideration to be paid by Arbitrage, or return to Arbitrage a portion of the consideration paid, as the case may be, under paragraph 5, so that the net amount that SUS and Arbitrage will have paid (net after all such returns) as a percentage of [$150,000,000] and of [$125,000,000], respectively, is equal to that contained in the Qualifying Settlement.

(c)  The following non-exclusive factors shall be taken into account in

determining whether the circumstances of the Avoiding Power Claims and the Qualifying Settlement are "similar":  (i) the ability of the defendant to pay, (ii) the nature of the Avoiding Power Claims (such as whether they are for recovery of a preference or for recovery of principal or fictitious profits), (iii) the jurisdictional connections of the defendant with the United States and the enforceability of a judgment of a court of the United States against the defendant in its domiciliary jurisdiction, (iv) the defendant's knowledge of or complicity in the fraud that BLMIS perpetrated on its customers, and (v) the stage of any litigation by the Trustee against the defendant.

(d)  If the Parties do not agree whether circumstances are similar as described in this paragraph 13, the Bankruptcy Court shall resolve any such dispute.  The Partiers do not intend to generate collateral litigation over whether a particular settlement is under similar circumstances.  To that end, (i)  any proceeding before the Bankruptcy Court on such a dispute shall be heard in a summary fashion; (ii) the Trustee shall provide SUS and Arbitrage factual information about a Qualifying Settlement that in the Trustee's reasonable discretion is of the same kind and detail as would be appropriate in a motion for approval of a single settlement under Federal Rule of Bankruptcy Procedure 9019, including factual information about the total amount of the Avoiding Power Claim or Claims being settled and factual information relevant to the factors set forth in paragraph 13(c); and (iii) the Trustee shall not be subject to discovery in any such matter.

(e)  If the Trustee is under any confidentiality obligation with respect to any of the information that the Trustee is required to provide under paragraph 13(d)(ii), the Trustee shall provide the information to SUS and Arbitrage upon SUS and Arbitrage entering into a reasonable confidentiality agreement with the Trustee with respect to the information.  The Trustee agrees not to enter into any confidentiality agreement that would prevent him from honoring his information sharing obligations under paragraph 13(d)(ii).

(f)  This paragraph 13 may be applied more than once if there is more than one Qualifying Settlement.

15.  The following is a comparison of the Equal Treatment provision trigger factors in the Cravath original draft, the Trustee's initial revision, and the Cravath near-final version:

| Cravath Original Proposal (April 13, v.3) | Trustee's Initial Revision (May 4, v.8) | Cravath Near-Final Version (May 13, v.12) |
| --- | --- | --- |
| account statement in excess of $100 million at any time | account statement in excess of $1.0 billion as of the Filing Date | |

| | | |
|---|---|---|
| transfers from BLMIS that are in excess of $25 million in the aggregate either as fictitious profits (calculated on a cash in-cash out basis) or after September 11, 2008 and that are recoverable under Bankruptcy Code section 544, 547, 548 or 550 (the "Total Recoverable Amount" of the Customer) | a claim by the Trustee against a former BLMIS customer (the "Customer") for at least $100 million on account of avoidable transfers (pursuant to Bankruptcy Code section 544, 547, 548 or 550) made within the 90 days before the Filing Date, including for fictitious profits (calculated on an cash in-cash out basis) | one or a related series of Avoiding Power Claims [any claims under 11 U.S.C. §§ 542, 544, 547 or 550] against a single defendant or group of defendants that are under common control for an aggregate settlement amount of [$40,000,000] |
| the percentage of the Total Recoverable Amount that the Settlement Amount represents is less than 85% | less than 85% of the amount of the avoidable transfers received by the Similarly Situated Person or Entity within 90 days before the Filing Date | the amount of the Qualifying Settlement is less than the benchmark 85% of the Avoiding Power Claims |
| | | the nature of the Avoiding Power Claims (such as whether they are for recovery of a preference or for recovery of principal or fictitious profits) |
| the Customer, as of December 10, 2008, had sufficient assets to pay the Total Recoverable Amount to the Trustee | has, at the time of the settlement, remaining assets sufficient to pay in full the claim of the trustee for the avoidable transfers received within 90 days before the Filing Date | the ability of the defendant to pay |
| the Customer pays the Trustee in settlement of the Trustee's claim before the commencement of a trial or a hearing on a contested motion for summary judgment | Settles prior to the commencement of a trial or briefing on motion for summary judgment | the stage of any litigation by the Trustee against the defendant |

| | | |
|---|---|---|
| the Customer's jurisdictional contacts with the United States are less [sic] than SUS's or Arbitrage's contacts, as determined in the Trustee's reasonable judgment; | has or had, in the Trustee's reasonable judgment, minimum contacts with the United States that are no less than those of SUS and Arbitrage<br><br>are citizens and/or residents of a jurisdiction that, in the Trustee's reasonable judgment, allows for enforcement of a judgment of a court of the United States to no less a degree than the jurisdictions that would be relevant if the Trustee were required to enforce a judgment against SUS or Arbitrage | the jurisdictional connections of the defendant with the United States and the enforceability of a judgment of a court of the United States against the defendant in its domiciliary jurisdiction |
| the Trustee has or makes a claim against the Customer for any amounts that the Customer received from BLMIS other than the Total Recoverable Amount and the amount of the Trustee's claim for such other amounts is less than 50% of the Total Recoverable Amount | | |
| | had direct of indirect control over no more than a single account at BLMIS or if it had more than one account at BLMIS, there were no transfers between accounts | |
| | in connection with their dealings with BLMIS invested or deposited the funds of other persons or entities (such as in the nature of a feeder fund or a fund of funds) | |
| | | the defendant's knowledge of or complicity in the fraud that BLMIS perpetrated on its customers |

16.    The comparison table shows that four similarity factors (account size, number of

accounts, nature of investor and potential non-avoiding power liability) were omitted from the

final version. Two factors (the nature of the Avoiding Power Claims and the defendant's

knowledge or complicity) were added.

**D.    The Reasons for and Significance of the Revisions to the Equal Treatment Provision**

17.    Under paragraph 13(b) of the Agreement, the Equal Treatment provision applies,

and the Trustee must refund a portion of the SUS and Arbitrage settlement payments if the

Trustee settles Avoiding Power Claims against a single defendant or group of related

defendants for more than $40,000,000 and less than 85% of the Avoiding Power Claims and "if

the circumstances of the Avoiding Power Claims and the Qualifying Settlement are similar to

the circumstances underlying this Agreement." Paragraph 13(c) of the Agreement contains a

non-exclusive list of five factors to determine whether the circumstances are "similar."

18.    In the two earlier drafts, the factors were not drafted to test whether settlement

circumstances were similar but instead were express binary conditions to the Equal Treatment

provision's application.  For example, the earlier drafts did not consider "ability to pay" as a

factor, but applied the Equal Treatment provision only if the defendant, generally speaking, was

able to pay. In the final version, the only condition (other than size of recovery) was that the

settlements occurred under "similar circumstances." Whether the circumstances of a settlement

were similar to the circumstances of the SUS and Arbitrage settlements could be judged as a

whole, guided by a nonexclusive list of factors. The parties agreed on this approach because

they could not agree on an exclusive list of conditions or factors.

19.    In addition, I proposed and favored the factors approach because it permitted

consideration of a range of possibilities, rather than limiting the Equal Treatment provision's

application only to situations in which all of a list of conditions were met. In that way, the

parties could assess similarity on a sliding scale by assessing the extent to which the Trustee's

leverage to negotiate a settlement with another defendant compared with the Trustee's leverage

in his Spring 2009 negotiations with SUS and Arbitrage. As a result, a weak fit on one factor

would not disqualify a settlement, as the "conditions" approach would have done, if other factors for which the fit was stronger suggested the Trustee had even greater leverage in negotiating a settlement than he had in negotiating the SUS and Arbitrage settlement.

20.    The factors approach resulted in a draft in which some of the factors pointed in different directions. A closer fit or more on the scale of some factors implied stronger negotiating leverage, while a closer fit or more on the scale of other factors implied weaker negotiating leverage. When I drafted the factors, I did not realize this "bi-directional" quality of the factors and therefore did not intend that they operate all in the same direction.

21.    To the best of my recollection, the following are the considerations that affected the negotiation and drafting of the five similarity factors recited in paragraph 13(c):

(a)    **Ability to pay.** The earlier drafts applied the Equal Treatment provision only if the defendant could pay. The Trustee did not want the provision to apply if the defendant (or group of defendants) could not pay a judgment. Therefore, SUS and Arbitrage agreed that a defendant's ability to pay was a factor in determining whether the settlement circumstances were similar. SPV has reviewed other settlements since the Agreement and did not object to one settlement in particular at a percentage below the benchmark percentage because the defendant appeared unable to pay more.

(b)    **The nature of the Avoiding Power Claims.** Originally, the Trustee sought to limit the Equal Treatment provision to settlement of claims to avoid transfers made within 90 days before bankruptcy, because the SUS and most of the Arbitrage transfers were made within 90 days before bankruptcy. However, I objected, because I realized that if the Trustee had clawback claims for transfers both within and outside of the 90-day period, the Trustee could evade the Equal Treatment provision by attributing a high settlement

12

percentage to the 90-day transfers and a lower percentage to the 2-year or 6-year transfers, even though the overall percentage would still be less than 85%. I specifically discussed with Trustee's counsel my concern over this possibility and explained that to prevent a settlement of 90-day and 2-year or 6-year claims from evading scrutiny under the Equal Treatment provision, I expanded the scope of claims that were subject to the provision to include all avoiding power claims. I included the Trustee's turnover power (section 542), because the Trustee at the time was making the argument, since overruled, that any property of the debtor transferred before bankruptcy remained property of the estate and must be turned over, and the Trustee's recovery power (section 550), no matter when the transfer occurred.[2]

To the best of my recollection, assisted by my review of the earlier drafts, I included the "nature of the Avoiding Power Claims" factor to identify the difficulty the Trustee might have in pursuing an Avoiding Power Claim against another defendant and, with it, the concomitant reduction of the Trustee's settlement negotiating leverage. If the claim was easier to pursue, such as a 90-day transfer or a fictitious profits transfer, then the Trustee would enjoy more leverage, making the circumstances of any resulting settlement more similar to the circumstances of the SUS and Arbitrage settlement. But if the claim was more difficult to pursue, such as to avoid a

---

[2] Apparently as a drafting convenience rather than an intended substantive change, I used the already-defined term "Avoiding Power Claims," rather than reciting the relevant Bankruptcy Code avoiding power sections 544, 547, 548 and 550. The defined term referred only to the claims against SUS and Arbitrage, which had been asserted only under the sections referenced in the defined term. The defined term, however, did not include section 548 (federal fraudulent transfer avoiding power). I believe that the omission of section 548 from the definition for purposes of the Equal Treatment provision was unintentional and inadvertent.

2-year or 6-year transfer that was a return of principal, then the Trustee would have less settlement negotiating leverage, making the circumstances less similar. This factor would operate to some extent in tandem with the "knowledge or complicity" factor, which similarly affected the Trustee's ability to recover 2-year and 6-year transfers.

(c) **Jurisdictional connections and enforceability.** Under the Trustee's May 4 draft, the Equal Treatment provision would apply only if the defendant had "no less" jurisdictional contacts with the United States than SUS or Arbitrage had.[3] One factor driving the SUS and Arbitrage settlement, which the Trustee stated in his motion for approval of the Agreement, was that SUS and Arbitrage might have jurisdictional defenses to any avoiding power litigation that the Trustee might bring, making the Trustee's pursuit of the litigation more complicated and expensive, and enforcement in foreign courts might be difficult and uncertain. If a defendant had jurisdictional defenses, the Trustee had less negotiating leverage, which might force the Trustee to settle for a lower percentage of the Trustee's full Avoiding Power Claims. Thus, we included jurisdiction and enforceability as factors in determining whether the settlement circumstances were similar.

(d) **Defendant's knowledge or complicity.** This factor appeared only in the last draft, which Cravath proposed only after the expansion of the Equal Treatment provision's scope to include 2-year and 6-year transfers. Again, I proposed the expansion to prevent the Trustee from settling Avoiding Power Claims covering several transfers in a way that allocated portions of

---

[3] The Cravath original April 13 draft said "less," not "no less." This now appears to be a drafting error; "no less" was intended.

the settlement to 90-day claims, to 2-year claims, and to 6-year claims. Under the narrower formulation, the Trustee could, for example, settle the 90-day claims for 85% and 2-year claims for substantially less, so that the overall percentage was below 85%, even though the Trustee might have a solid case on the 2-year transfers under section 548(a)(1)(A) and section 548(c) (lack of good faith) based on the defendant's knowledge or complicity. The Trustee agreed in paragraph P of the Agreement that SUS and Arbitrage did not know of and were not complicit in the BLMIS fraud and therefore did not pursue Arbitrage for a $35 million, 2-year transfer that was a return of invested principal. If another defendant knew or was complicit or otherwise did not meet the good faith requirement of section 548(c) as a defense to a 2-year or 6-year claim for return of principal, the Trustee would have leverage in negotiating a settlement that was at least as strong as the leverage he had when negotiating with SUS and Arbitrage, making the circumstances of any resulting settlement more similar.

(e)    **The stage of the litigation.** SUS and Arbitrage approached the Trustee for a settlement very early in the SIPA proceeding, after the Trustee had informed them of his claim but before the Trustee had brought litigation. As is common in settling preference litigation with a trustee, I argued that an early settlement, which reduced the resources the Trustee would have to marshal to pursue recovery, warranted a settlement more favorable to SUS and Arbitrage than one reached after lengthy litigation. The Trustee apparently agreed, settling for 85% of the Avoiding Power Claims against SUS. I wanted that factor to be considered in determining whether the Equal Treatment provision should apply, so that if a defendant settled early in the litigation

15

process, this factor would be neutral. But if the settlement occurred after, or well after, the Trustee's commencement of litigation, then the factor would weigh in favor of application of the Equal Treatment provision, and an early-settlement discount should not be available.

In the earlier drafts, the Equal Treatment provision applied only if the Trustee settled before trial or before hearing (Cravath original draft) or briefing (Trustee's draft) a summary judgment motion. The condition was binary. I proposed the broader, more general "stage of litigation" factor instead to reflect that settlements can happen at any stage of litigation or, as with the Agreement, before litigation. But the purpose was the same, to take account of the common practice in bankruptcy cases that early settlements of avoiding power litigation are usually for less than settlements at later stages.

I declare under penalty of perjury that the foregoing is true and correct.

April _9_, 2014.

Richard Levin

## Certificate of Service

I hereby certify that on the 27th day of June, 2014, I caused true and correct copies of the foregoing Declaration to be served upon the following counsel of record:

David J. Sheehan, Esq.
Seanna R. Brown, Esq.
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
*Counsel for Irving H. Picard, Trustee*

Gary Svirsky
Emily Chepiga
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
*Counsel for Solus Recovery Fund LP*

Bryant Yu