# EXHIBIT 7

[~~Draft~~BH Comments of ~~April 13,~~May 4, 2009]

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (this "Agreement"), dated as of ~~April~~May [●], 2009, is made by and among IRVING H. PICARD, in his capacity as Trustee for the liquidation under the Securities Investor Protection Act of ~~1970~~1970, as amended ("SIPA") of Bernard L. Madoff Investment Securities LLC (the "Trustee"), on the one hand, and OPTIMAL STRATEGIC U.S. EQUITY LIMITED, a Bahamas corporation ("SUS"), and OPTIMAL ARBITRAGE LIMITED, a Bahamas corporation ("Arbitrage"), on the other hand (each of the Trustee, SUS and Arbitrage, a "Party").

## BACKGROUND

A.   Bernard L. Madoff Investment Securities LLC ("BLMIS") was a registered broker-dealer and a member of the Securities Investor Protection Corporation ("SIPC").

B.   On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against BLMIS and Bernard L. Madoff ("Madoff"). On December 12, 2008, the District Court entered an order which among other things appointed a receiver (the "Receiver") for the assets of BLMIS~~.~~ (No. 08-CV-10791(LSS)).

C.   On December 15, 2008, pursuant to section 5(a)(4)(A) of the Securities Investor Protection Act ("SIPA"), the Commission consented to a combination of its own action with the application of SIPC.  Thereafter, SIPC filed an application in the District Court under section 5(a)(3) of SIPA alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On December 15, 2008, the District Court granted the SIPC application and entered an order under SIPA, which, in pertinent part, appointed the Trustee for the liquidation of the business of BLMIS under section 5(b)(3) of SIPA and removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under section 5(b)(4) of SIPA, where it is currently pending as Case No. 08-01789 (BRL) (the "SIPA Proceeding").  The Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

D.   On December 11, 2008, Madoff was arrested by federal agents for criminal securities laws violations~~,~~ including~~,~~ *inter alia*~~,~~ securities fraud, investment adviser fraud, and mail and wire fraud.  At a plea hearing on March 12, 2009 in the case captioned United States v. Madoff, Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]" and engaged in fraud in the operation of BLMIS.

E.   SUS and Arbitrage are trading companies that are owned by Optimal Multiadvisors Limited, which is a Bahamas multi-portfolio investment company and Standard Fund ("OML").  All of OML's ordinary voting shares are owned by Optimal Investment Services, S.A., a Swiss société anonyme ("OIS"), which is an indirect wholly-owned subsidiary of ~~and~~ Banco Santander, S.A., a [Spanish banking corporation] ("Santander").  Optimal

[[NYCORP:3137863v3̶6:REMOTE_RLEVIN:04/~~13~~21/09--~~10~~11:4̶135 p]]
300010758.4, Optimal Settlement Agreement
DRAFT 5/4/09
[[NYCORP:3137863v8:REMOTE_RLEVIN:05/06/09--11:06 p]]

OPTIMALMFN00000083

~~2~~

Multiadvisors (Ireland) plc is an Irish public limited company authorized by the Irish Financial Services Regulatory Authority and constituted as an umbrella fund comprised of a number of segregated liability sub-funds ("<u>OMI</u>"). OIS owns 50% of the ordinary shares of OMI (the other 50% of which are owned by an indirect subsidiary of Santander). OIS acts as the investment manager [and investment advisor] of OMI and of OML. OIS, OMI, OML, SUS and Arbitrage are referred to collectively as the "<u>Optimal Companies</u>".

      F.      Investments in the funds operated by OMI and OML are represented by participating shares, which are held by numerous investors ("<u>Investors</u>"), many of whom may be customers of Santander or one or more of its affiliates.

      G.      HSBC Securities Services (Ireland) Limited, an Irish limited liability company ("<u>HSSI</u>"), serves as administrator for OMI, OML, SUS and Arbitrage; HSBC Institutional Trust Services (Ireland) Limited, an Irish limited liability company ("<u>HITS</u>"), serves as custodian for OMI, OML, SUS and Arbitrage.

      H.      SUS (either directly or through a customer agreement between OML or its predecessor and BLMIS) was a customer of BLMIS and maintained a customer account (the "<u>SUS Account</u>") with BLMIS, commencing in January 1997. Between then and the Filing Date, SUS had deposited into the SUS Account a total of $1,462,433,500 in excess of the amount of withdrawals that SUS had made from the account. Among other withdrawals, SUS withdrew $150,000,000 from the account in November 2008, within 90 days before the Filing Date, but did not withdraw any other amount from the SUS Account after November 2002. The amount of the SUS Account reflected on SUS's BLMIS account statement for the period ended November 30, 2008, which is the last available account statement, is $3,007,958,117.70, not including option positions. **[BH AND CSM STILL WORKING TO RECONCILE AMOUNTS]**

      I.      Arbitrage (either directly or through a customer agreement between OML or its predecessor and BLMIS) was a customer of BLMIS and maintained a customer account (the "<u>Arbitrage Account</u>") with BLMIS, commencing in February 1996. Between then and the Filing Date, Arbitrage had withdrawn from the Arbitrage Account a total of [$90,000,000] in excess of the amount that Arbitrage had deposited into the Arbitrage Account. Among other withdrawals, Arbitrage withdrew $100,000,000 from the Arbitrage Account in November 2008 and $25,000,000 in September 2008, both within 90 days before the Filing Date, and an additional $20,000,000 in October 2007 and $15,000,000 in February 2003, but did not withdraw any other amount from the Arbitrage Account after November 2002. The amount of the Arbitrage Account reflected on Arbitrage's BLMIS account statement for the period ended November 30, 2008, which is the last available account statement, is $15,006,949.02, not including options positions. **[BH AND CSM STILL WORKING TO RECONCILE AMOUNTS]**

      J.      As a result of agreements between Santander or one or more of its affiliates and numerous former Investors in SUS who were private banking clients of Santander or its banking subsidiaries, Santander and some of its affiliates have succeeded to the interest of such former Investors in SUS. **[ANY AGREEMENTS WITH ARBITRAGE INVESTORS?]**

2

300010758.4, Optimal Settlement Agreement
DRAFT 5/4/09
[[NYCORP:3137863v~~3~~8:REMOTE_RLEVIN:~~04~~05/~~13~~06/09--~~10~~11:~~41~~06 p]]

OPTIMALMFN00000084

~~3~~

K. SUS and Arbitrage have asserted that they are each entitled to allowance of a customer claim in the BLMIS liquidation proceeding in an amount reflected on their respective BLMIS account statements for the period ended November 30, 2008.  The Trustee has disputed that SUS and Arbitrage are entitled to allowance of customer claims in the amounts reflected on their respective BLMIS account statements.

L. The Trustee has advised the Optimal Companies of his position that only SUS and Arbitrage, as the direct customer account holders at BLMIS, are entitled to the allowance of customer claims or to the benefit of SIPC advances under section 9 of SIPA in the SIPA Proceeding on account of the SUS Account and the Arbitrage Account, respectively, and only upon compliance with the applicable provisions of SIPA and the Bankruptcy Code.

M. The Trustee has asserted that SUS and Arbitrage are liable to the BLMIS estate under 11 U.S.C. §§ ~~547,~~ 547 and 550 for the withdrawals that each of them received within the 90 days before the Filing Date.  The Trustee has also asserted that Arbitrage also may be liable to the BLMIS estate under 11 U.S.C. §§ 544(b)~~,~~ and 550 and the New York Uniform Fraudulent Conveyance Act (New York Debtor and Creditor Law §§ 270 - 281) for $35,000,000, which Arbitrage withdrew in 2003 and 2007 (any claims under 11 U.S.C. §§ 542, 544, 547 or 550, "Avoiding Power Claims").  In connection therewith, the Trustee issued a subpoena to OML under Fed. R. Bankr. Proc. 2004 on February 27, 2009 (the "Subpoena"), seeking documents related to the SUS Account and the Arbitrage Account, among other things.

N. SUS and Arbitrage have disputed any liability to the estate.  SUS and Arbitrage also have disputed that either of them is subject to the jurisdiction of the Bankruptcy Court under principles of United States law and that any judgment that the Trustee might obtain against either of them in the Bankruptcy Court would not be enforced against either of them by a court in The Bahamas, based on lack of jurisdiction over them in the United States.  SUS and Arbitrage also have disputed that OML is subject to the jurisdiction of the Bankruptcy Court for the purpose of enforcement of the Subpoena.

O. The Trustee, on the one hand, and SUS and Arbitrage, on the other hand, wish to settle their disputes about the matters described above without the expense, delay and uncertainty of litigation.

P. As a condition to settling the disputes, which involves releasing claims against the Optimal Companies and their affiliates and the allowance of customer claims in favor of SUS and Arbitrage in the SIPA Proceeding, the Trustee conducted a confirmatory investigation~~, including~~ which included review of documents the Optimal Companies and their affiliates made available to him on a confidential basis~~, and~~ by the Optimal Companies.  On the basis of such review, the Trustee concluded that the Optimal Companies and ~~its~~their affiliates were not ~~in any way complicit~~actively involved in the fraud that BLMIS or Madoff perpetrated on its customers~~, did not have any knowledge of the fraud or any reason to know or suspect that BLMIS or Madoff was conducting a fraudulent operation and conducted adequate due diligence in~~ their dealings with BLMIS ~~to assure themselves within reason that BLMIS and Madoff were not engaging in fraud with respect to its customer accounts and that the conduct, acts and omissions of the Optimal Companies and their affiliates do not provide any ground to assert any~~

3

300010758.4, Optimal Settlement Agreement
DRAFT 5/4/09
[[NYCORP:3137863v~~3~~8:REMOTE_RLEVIN:~~04~~05/~~13~~06/09--~~10~~11:~~41~~06 p]]

OPTIMALMFN00000085

-4

~~claims against the Optimal Companies or any of their affiliates (other than Avoiding Power Claims), or to disallow any claim that SUS or Arbitrage may have against BLMIS or its estate~~.

NOW, THEREFORE, in consideration of the foregoing, of the mutual covenants, promises and undertakings set forth herein, and for good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the Trustee, SUS and Arbitrage agree:

**AGREEMENT**

1.      SUS and Arbitrage Agreement to Bankruptcy Court Jurisdiction.  For the purpose of this Agreement only (including with respect to paragraph 23), SUS and Arbitrage agree that the agreements with BLMIS that they each signed in connection with the SUS Account and the Arbitrage Account ~~respectively~~ and their respective communications and trading activities with respect to the Accounts, submit them to the jurisdiction of the Bankruptcy Court for the purpose of the SIPA Proceeding and any ~~avoiding power action~~ Avoiding Power Claims that the Trustee may bring against them under section 544, 547 and/or 550 of the Bankruptcy Code.  SUS's and Arbitrage's agreement to Bankruptcy Court jurisdiction under this paragraph does not constitute consent by any other Optimal ~~Company or Santander~~ Company to the Bankruptcy Court's jurisdiction or an agreement that any of them is subject to the Bankruptcy Court's jurisdiction.

2.      SUS Payment to Trustee.  SUS shall pay the Trustee the sum of $127,500,000 by wire transfer at the Closing (as defined in paragraph 11), in full and final settlement of all Avoiding Power Claims and other claims of the Trustee or the BLMIS estate against SUS .

3.      Allowance of SUS Customer Claim.  ~~SUS's customer claim in the BLMIS liquidation proceeding shall be allowed in the amount of $1,589,933,500, without the need for SUS's filing of a~~ Upon the filing of a timely claim by SUS, the execution of a Partial Assignment and Release in the form annexed hereto (the "Partial Assignment") and the occurrence of the Closing (as defined below), SUS shall have an allowed customer claim in ~~addition to this Agreement,~~ the SIPA Proceeding in the amount of $1,589,933,500 and shall be entitled to the full benefit of SIPC customer advances under section 9 of SIPA.  The Bankruptcy Court's order approving this Agreement shall provide for the allowance of SUS's customer claim as provided in this paragraph.  The Trustee shall make a distribution to SUS on account of its allowed claim in the ~~full~~ amount of ~~SIPC customer advances under section 9 of SIPA~~ $500,000 in respect of the customer advance to the Trustee under section 9 of SIPA, as provided in paragraph 11.  Payment of the customer advance under Section 9 of SIPA and any other payments made to SUS on account of SUS's customer claim shall be made by the Trustee and received by SUS subject to and in accordance with all applicable Bankruptcy Code orders or other protocols, restrictions or limitations in force and effect at the time of payment.

4.      Arbitrage Payment to Trustee.  Arbitrage shall pay the Trustee the sum of $106,250,000 by wire transfer, in full and final settlement of all Avoiding Power Claims and other claims of the Trustee or the BLMIS estate against Arbitrage, in a single payment of

4

~~5~~

$16,250,000 at the Closing and in five installments of $18,000,000 each 30 days after the Closing or the prior payment (each, an "Arbitrage Deferred Payment").

5.    Allowance of Arbitrage Customer Claim.  ~~Arbitrage's customer claim in the BLMIS liquidation proceeding shall be~~ Upon the filing of a timely claim by Arbitrage, the execution of a Partial Assignment, and the occurrence of the Closing, Arbitrage shall have an allowed customer claim in the SIPA Proceeding in the amount of [$16,250,000]~~, without the need for Arbitrage's filing of a customer claim in addition to this Agreement,~~ and shall be entitled to the full benefit of SIPC customer advances under section 9 of SIPA.  The Bankruptcy Court's order approving this Agreement shall provide for the allowance of Arbitrage's customer claim as provided in this paragraph.  The Trustee shall make a distribution to Arbitrage on account of its allowed claim in the ~~full~~ amount of ~~SIPC customer advances under section 9 of SIPA~~ $500,000 in respect of the customer advance to the Trustee under section 9 of SIPA, as provided in paragraph 11. Payment of the customer advance under Section 9 of SIPA and any other payments made to Arbitrage on account of Arbitrage's customer claim shall be made by the Trustee and received by Arbitrage subject to and in accordance with all applicable Bankruptcy Code orders or other protocols, restrictions or limitations in force and effect at the time of payment.

6.    Filing of Customer Claims.  SUS and Arbitrage agree that only SUS and Arbitrage (as the only BLMIS customer account holders among the Optimal Companies and ~~its~~their affiliates and as investment funds not acting as agents for the Investors) may file customer claims in the SIPA Proceedings on account of the SUS Account and the Arbitrage Account.

7.    Withdrawal of Subpoena.  The Trustee shall withdraw the Subpoena and shall not ~~to~~ seek any other discovery, by subpoena or otherwise, from any of the Optimal Companies or any of the Optimal Third-Party Releasees (as defined below) for anything relating to the SUS Account or the Arbitrage Account or the relationship between the Optimal Companies or ~~its~~their affiliates and BLMIS or Madoff~~.~~; provided, however, that the provisions of this paragraph shall extend to the Optimal Third-Party Releasees only to the extent of their relationship with the Optimal Companies and not in any other context or capacity.  Nothing in this paragraph shall prevent the Trustee from requesting that the Optimal Companies or any of the Optimal Third-Party Releasees produce documents relating specifically to individuals or entities (other than the individuals or entities released by this Agreement) with respect to claims or possible claims against any individual or entity not released by this Agreement.  The Optimal Companies, on behalf of themselves and the Optimal Third-Party Releasees, agree to cooperate and, to the extent permitted by the jurisdiction in which the documents are located, produce such documents.  The Trustee reserves the right to issue a subpoena for any document so requested by the Trustee that has not been produced voluntarily, and the Optimal Companies and the Optimal Third-Party Releasees reserve all rights to contest any such subpoena other than as relates to jurisdiction.

8.    [Release of Custodial Accounts.  The Trustee shall advise HSSI and HITS promptly after the date on which this Agreement become effective that the Trustee and the BLMIS estate do not assert any interest in any of the funds or accounts that HSSI or HITS holds

5

300010758.4, Optimal Settlement Agreement
DRAFT 5/4/09
[[NYCORP:3137863v~~3~~8:REMOTE_RLEVIN:~~04~~05/~~13~~06/09--~~10~~11:~~41~~06 p]]

OPTIMALMFN00000087

or controls for any of the Optimal Companies and shall not in the future assert any interest in any such funds.]

9. Release. [Upon SUS's and Arbitrage's payments of the amounts required to be paid under paragraphs 2 and 4 of this Agreement, in by Trustee. In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to any rights arising under this Agreement, the Trustee does hereby release, remise and forever discharge the Optimal Companies and each of their respective past or present officers, directors, employees, agents, legal representatives, privies, representatives, accountants, attorneys and each of their respective past or present direct or indirect stockholders, affiliates, limited partners, investors or other equity holders and each of their successors, assigns and transferees (and each of their respective past or present officers, directors, employees, agents, legal representatives, privies, representatives, accountants, attorneys (collectively, the "Optimal Third-Party Releasees" and with the Optimal Companies, the "Optimal Releasees"), from any and all past, present or future claims or causes of action (including any suit, petition, demand, or other claim in law, equity or arbitration) and from any and all allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect, in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty or otherwise (including attorneys' fees, costs or disbursements), known or unknown, that are, have been, could have been or might in the future be asserted by the Trustee against any of the Optimal Releasees and that aremeet both of the following conditions: (a) they are based on, arise out of or relate in any way to the affairs of BLMIS and (b) they are based on, arise out of or relate in any way the Optimal Releasee's actions, statements, conduct, or omissions in connection with one or more of the Optimal Companies and not in any other context or capacity.]

10. Release by SUS and Arbitrage. In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to the claims set forth in paragraphs 3 and 5 and any rights arising under this Agreement, each of SUS and Arbitrage, on behalf of themselves and each of the Optimal Releasees, hereby releases, acquits and absolutely discharges the Trustee and all his agents, BLMIS and its estate, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or unknown, now existing or arising in the future, arising out of or in any way related to BLMIS.

11. 10. Timing of Actions. SUS, Arbitrage and the Trustee shall take and complete the actions required under paragraphs 3, 5, 7 and 8 of this Agreement within 10 calendar days after the date on which this Agreement becomes effective. SUS and Arbitrage shall take and complete the actions required under paragraphs 2 and 4 of this Agreement within 10 calendar days after the date on which HSSI and HITS make funds of SUS and Arbitrage, respectively, available to make the payments to the Trustee.Closing. [SUS and Arbitrage shall

~~7~~

use its best efforts to determine, and shall notify the Trustee promptly of, the date on which HSSI and HITS make funds of SUS and Arbitrage, respectively, available to make the payments to the Trustee under this Agreement.]  There shall be a closing (as "Closing") within 10 days after such notice, on a date agreed by the Parties, at the offices of Trustee's counsel in New York, NY.  At the Closing, (a) SUS shall make the payment required under paragraph 2; (b) Arbitrage shall make the first payment required under paragraph 4, (c) SUS will execute and deliver to the Trustee a Partial Assignment; (d) Arbitrage will execute and deliver to the Trustee a Partial Assignment; (e) SUS shall file a customer claim in the SIPA Proceeding by delivery of the claim to the Trustee in the amount specified in paragraph 3, (f) Arbitrage shall file a customer claim in the SIPA Proceeding by delivery of the claim to the Trustee in the amount specified in paragraph 4, (g) upon the delivery of such claims to the Trustee, the Trustee shall pay SUS and Arbitrage each $500,000 from SIPC advances under section 9 of SIPA, which amounts may be paid by setoff against the payments required under paragraph 2 with respect to SUS and with respect to Arbitrage, the last of the Arbitrage Deferred Payments under paragraph 4, (h) the Trustee's withdrawal of the subpoena under paragraph 7 of this Agreement shall become effective, without any further action by any of the Parties, (i) the releases contained in paragraphs 9 and 10 shall become effective without any further action by any of the Parties, except as to Arbitrage, as to which the Trustee's release of Arbitrage shall become effective only upon Arbitrage's completion of payments required under paragraph 4.

12.    ~~11.~~ Bankruptcy Court Approval; Effective Date; Termination.  This Agreement is subject to, and shall become effective and binding on the Parties (except as provided in paragraph 11) upon and only upon, the Bankruptcy Court's approval of this Agreement in the SIPA Proceeding by an order that is no longer subject to appeal, review or rehearing.  The form of the approval order shall be subject to SUS's and Arbitrage's reasonable approval.  The Trustee shall use his best efforts to obtain such approval as promptly as practicable after the date of this Agreement.  The Trustee shall provide SUS and Arbitrage a draft of any motion to the Bankruptcy Court for approval of this Agreement, which shall be subject to SUS's and Arbitrage's reasonable approval.  If this Agreement has not become effective as provided in this paragraph within 45 days after the date of this Agreement (or within such additional time as SUS and Arbitrage permit), then (a) this Agreement (other than this paragraph and paragraphs 20 and 21 ~~of this Agreement~~) shall terminate and be void, (b) all of the statements, admissions, consents and agreements contained in the Agreement (other than this paragraph and paragraphs 20 and 21 of this Agreement) shall be void and (c) neither the Trustee nor any of the Optimal Companies or its affiliates may use or rely on any such statement, admission, consent or agreement in any public statement or litigation involving the SIPA Proceedings, any case or proceeding relating to the SIPA Proceeding or any case or proceeding relating to BLMIS or Madoff.  There shall be no other basis for termination of this Agreement by either Party.

13.    ~~12.~~ Equal Treatment for SUS and Arbitrage with Other Similar Customers.  ~~[If~~ Pursuant to the terms of this settlement, SUS and Arbitrage agree to pay to the Trustee an amount equal to 85% of the amount of transfers received by each of SUS and Arbitrage within the 90 days before the Filing Date (the "Settlement Amount").  It is the intent and agreement of the parties that this 85% amount be established as a "benchmark" and that unless the Trustee deems another settlement to be a MFN Opt Out (as defined below), SUS and

7

300010758.4, Optimal Settlement Agreement
DRAFT 5/4/09
[[NYCORP:3137863v~~3~~8:REMOTE_RLEVIN:~~04~~05/~~13~~06/09--~~10~~11:~~41~~06 p]]

OPTIMALMFN00000089

~~8~~

Arbitrage shall be entitled to the return of some portion of the Settlement Amount if the Trustee, prior to the commencement of a trial or briefing on motion for summary judgment, settles or compromises a Similar Claim (as defined below) against any Similarly Situated Person or Entity (as defined below) on More Favorable Terms (as defined below) (a "MFN Trigger Event"). For the purposes of this paragraph, "Similar Claim" means a claim by the Trustee against a former BLMIS customer (the "Customer") for at least $100 million on account of avoidable transfers (pursuant to Bankruptcy Code section 544, 547, 548 or 550) made within the 90 days before the Filing Date, including for fictitious profits (calculated on an cash in-cash out basis). For the purposes of this paragraph, "More Favorable Terms" refers to a compromise and settlement agreed to by the Trustee that is less than 85% of the amount of the avoidable transfers received by the Similarly Situated Person or Entity within 90 days before the Filing Date. For purposes of this paragraph, "Similarly Situated Person or Entity" means a person or entity meeting each of the following criteria: (a) had direct of indirect control over no more than a single account at BLMIS or if it had more than one account at BLMIS, there were no transfers between accounts; (b) had an account at BLMIS with a balance stated on the Customer's BLMIS-provided account statement in excess of $1.0 billion as of the Filing Date; (c) in connection with their dealings with BLMIS invested or deposited the funds of other persons or entities (such as in the nature of a feeder fund or a fund of funds); (d) has, at the time of the settlement, remaining assets sufficient to pay in full the claim of the trustee for the avoidable transfers received within 90 days before the Filing Date; (e) has or had, in the Trustee's reasonable judgment, minimum contacts with the United States that are no less than those of SUS and Arbitrage; and (f) are citizens and/or residents of a jurisdiction that, in the Trustee's reasonable judgment, allows for enforcement of a judgment of a court of the United States to no less a degree than the jurisdictions that would be relevant if the Trustee were required to enforce a judgment against SUS or Arbitrage. For purposes of this paragraph, a "MFN Opt Out" shall occur when, with respect to a settlement that would otherwise constitute a MFN Trigger Event, the Trustee determines that the circumstances are sufficiently different than the situation giving rise to the settlement contained in this Agreement such that there should be no MFN Payment. The Trustee shall give written notice to SUS and Arbitrage of the exercise of a MFN Opt Out. The Trustee shall have the right to declare a MFN Opt Out no more than [six] times. Upon the occurrence of a MFN Trigger Event and in the event that the Trustee does not deem the settlement subject to the MFN Trigger Event to be a MFN Opt Out, the Trustee shall return to SUS and to Arbitrage a portion of SUS's and Arbitrage's payments made under this Agreement so that the net amount that the SUS and Arbitrage will have paid (net after all such returns) as a percentage of $150,000,000 and of $125,000,000, respectively, is equal to that contained in the other settlement. The Trustee shall have no obligation to provide to SUS or Arbitrage any information or discovery with respect to another settlement that is or could give rise to a MFN Trigger Event.

(a) ~~a former BLMIS customer (the "Customer) had an account at BLMIS with a balance stated on the Customer's BLMIS-provided account statement in excess of $100 million at any time;~~

(b) ~~the Customer received transfers from BLMIS that are in excess of $25 million in the aggregate either as fictitious profits (calculated on a cash in-cash out basis) or after September 11, 2008 and that are recoverable~~

8

300010758.4, Optimal Settlement Agreement
DRAFT 5/4/09
[[NYCORP:3137863v~~3~~8:REMOTE_RLEVIN:~~04~~05/~~13~~06/09--~~10~~11:~~41~~06 p]]

OPTIMALMFN00000090

~~9~~

~~under~~ Bankruptcy Code section 544, 547, 548 or 550 (the "Total Recoverable Amount" of the Customer);

(c) ~~the Trustee has or makes a claim against the Customer for any amounts that the Customer received from BLMIS other than the Total Recoverable Amount and the amount of the Trustee's claim for such other amounts is less than 50% of the Total Recoverable Amount;~~

(d) ~~the Customer, as of December 10, 2008, had sufficient assets to pay the Total Recoverable Amount to the Trustee;~~

(e) ~~the Customer pays the Trustee an amount (the "Settlement Amount") in settlement of the Trustee's claim for recovery of all or any portion of the Total Recoverable Amount, under a settlement made before~~ the commencement of a trial or ~~a hearing on a contested~~ motion for summary judgment;

(f) ~~the percentage ("Other Settlement Percentage") of the Total Recoverable Amount that the Settlement Amount represents is less than 85%; and~~

(g) ~~the Customer's jurisdictional contacts with the United States are less than SUS's or Arbitrage's contacts, as determined in the Trustee's reasonable judgment;~~

~~then~~ the Trustee shall return to SUS and to Arbitrage a portion of SUS's and Arbitrage's payments made under this Agreement so that the net amount that the SUS and Arbitrage will have paid (net after all such returns) as a percentage of $150,000,000 and of $125,000,000, respectively, is equal to the Other Settlement Percentage, and the allowed amounts of SUS's and Arbitrage's customer claims shall be reduced by the amount that the Trustee returns to SUS and Arbitrage, respectively. This paragraph may be applied more than once if the circumstances set forth herein are satisfied more than once.]

14.    New Information.  If the Trustee obtains new information after the date of this Agreement that gives the Trustee reasonable cause to believe that SUS and/or Arbitrage knew or should have known of the fraud at BLMIS, the Trustee shall provide such information to SUS and Arbitrage and permit SUS and Arbitrage to respond to such new information within ten business days.  If after reviewing the SUS and Arbitrage response, the Trustee reasonably believes that the new information materially affects the Trustee's conclusions stated in paragraph P or the Trustee's decision to enter into this Agreement, the Trustee may, on written notice to SUS and Arbitrage, declare this Agreement and the settlement set forth herein, including the release given under paragraph 9, void, and the Trustee shall, within ten days of providing such notice, return the amounts paid under paragraphs 2 and 4 to SUS and Arbitrage.  Thereafter, each of the parties shall have all rights and defenses as though this Agreement had never been executed.

15.    ~~13.~~ SUS and Arbitrage Authority.  SUS and Arbitrage represent and warrant to the Trustee as of the date hereof that each of them is duly organized, validly existing

9

300010758.4, Optimal Settlement Agreement
DRAFT 5/4/09
[[NYCORP:3137863v~~3~~8:REMOTE_RLEVIN:~~04~~05/~~13~~06/09--~~10~~11:~~11~~06 p]]

OPTIMALMFN00000091

~~10~~

and in good standing under the laws of its jurisdiction of formation and that each of them has the full power, authority and legal right to execute and deliver, and to perform its respective obligations under, this Agreement and has taken all necessary action to authorize the execution and delivery of, and the performance of its respective obligations under, this Agreement.

16.    ~~14.~~ Further Assurances.  The Trustee, SUS and Arbitrage shall execute and deliver any document or instrument reasonably requested by any of them after the date of this Agreement to effectuate the intent of this Agreement.

17.    ~~15.~~ Entire Agreement.  This Agreement and any confidentiality agreement between the Trustee and any of the Optimal Companies constitute the entire agreement and understanding between and among the Parties and supersede all prior agreements, representations and understandings concerning the subject matter hereof.

18.    ~~16.~~ Amendments, Waiver.  This Agreement may not be terminated, amended or modified in any way except in a writing signed by all the Parties.  No waiver of any provision of this Agreement shall be deemed to constitute a waiver of any other provision hereof, whether or not similar, nor shall such waiver constitute a continuing waiver.

19.    ~~17.~~ Assignability.  No Party hereto may assign its rights under this Agreement without the prior written consent of each of the other Parties hereto.

20.    ~~18.~~ Successors Bound.  This Agreement shall be binding upon and inure to the benefit of each of the Parties and their successors and permitted assigns.

21.    ~~19.~~ No Third Party Beneficiary.  Except as expressly provided in paragraphs ~~7~~7, 9 and ~~10 of this Agreement,~~10, the Parties do not intend to confer any benefit by or under this Agreement upon any person or entity other than the Parties hereto and their respective successors and permitted assigns.

22.    ~~20.~~ Applicable Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

23.    ~~21.~~ Exclusive Jurisdiction.  The Parties agree that any action for breach or enforcement of this Agreement may be brought only in the Bankruptcy Court.  No Party shall bring, institute, prosecute or maintain any action pertaining to the enforcement of any provision of this Agreement in any court other than the Bankruptcy Court.

24.    ~~22.~~ Captions and Rules of Construction.  The captions in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.  Any reference in this Agreement to a paragraph is to a paragraph of this Agreement.  "Includes" and "including" are not limiting.

25.    ~~23.~~ Counterparts; Electronic Copy of Signatures.  This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same document.

10

300010758.4, Optimal Settlement Agreement
DRAFT 5/4/09
[[NYCORP:3137863v~~3~~8:REMOTE_RLEVIN:~~04~~05/~~13~~06/09--~~10~~11:~~41~~06 p]]

OPTIMALMFN00000092

~~11~~

The Parties may evidence their execution of this Agreement by delivery to the other Parties of scanned or faxed copies of their signatures, with the same effect as the delivery of an original signature.

[*Signature page follows*]

11

300010758.4, Optimal Settlement Agreement
DRAFT 5/4/09
[[NYCORP:3137863v~~3~~8:REMOTE_RLEVIN:~~04~~05/~~13~~06/09--~~10~~11:~~41~~06 p]]

OPTIMALMFN00000093

      IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

                IRVING H. PICARD, Trustee

                _____

                OPTIMAL STRATEGIC U.S. EQUITY FUND LIMITED

By:   _____
       Name:
       Title:

                OPTIMAL ARBITRAGE LIMITED

By:   _____
       Name:
       Title:

~~BANCO SANTANDER, S.A.~~

~~008330-0058-10692-Active.11552870~~          ~~Schedule 1 to~~ 12
300010758.4, Optimal Settlement Agreement ~~(475 Fifth Avenue)~~
DRAFT 5/4/09
[[NYCORP:3137863v~~3~~8:REMOTE_RLEVIN:~~04~~05/~~13~~06/09--~~10~~11:~~41~~06 p]]

OPTIMALMFN00000094

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789-BRL<br><br>SIPA Liquidation |

**PARTIAL ASSIGNMENT AND RELEASE**

**KNOW ALL MEN BY THESE PRESENTS,** that _____, located at _____ (hereinafter referred to as the "Assignor") in consideration of the payment of $500,000.00 to satisfy in part [his/her/its] claim for customer protection (the "Customer Claim", having been designated Claim #___) filed in the liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §78aaa et seq. ("SIPA") *(see* §§78fff-2(b), 78fff-2(d), and §78fff-3(a)(1) of SIPA), does for [himself/herself/itself] hereby assign, transfer and set over to Irving H. Picard as SIPA Trustee (the "SIPA Trustee") for the liquidation of BLMIS (see §78fff-2(b) of SIPA), and the Securities Investor Protection Corporation ("SIPC"), as subrogee to the extent of its cash advances to the SIPA Trustee for the satisfaction of the aforementioned Customer Claim (see §78fff-3(a)(1) of SIPA), any and all rights, including causes of action or claims, that Assignor now may have against BLMIS and/or any third party arising out of or relating to any fraudulent or illegal activity with respect to Assignor's BLMIS account (Account No. _____, the "BLMIS

Account"), which gave rise to the allowed Customer Claim for securities filed by Assignor against BLMIS.  Such assignment is only to the extent that Claimant has received satisfaction of the Customer Claim as set forth above.

Further, Assignor has not previously compromised or assigned any claim, cause of action or other right against BLMIS, its principals or agents or any third party arising out of or related to any fraudulent or illegal activity giving rise to the Customer Claim.

Upon reasonable request of the SIPA Trustee or SIPC, Assignor agrees to cooperate with the SIPA Trustee or SIPC in connection with any efforts of either to recover from the principals or agents of BLMIS or anyone else for amounts advanced by SIPC or paid by the SIPA Trustee to satisfy in part Assignor's Customer Claim in this SIPA liquidation proceeding.  Such efforts to recover by the SIPA Trustee or SIPC, either to demand or pursue or to prosecute or settle any collection effort, action or proceeding therefore, shall be at the sole cost of the SIPA Trustee or SIPC.

Effective immediately and without further action, contingent only upon Assignor's receipt from the SIPA Trustee or his agent of a check in the amount of $500,000.00 as set forth in the SIPA Trustee's Notice of Determination of the Customer Claim dated _____, 2009, (the "Trustee's Determination"), and upon receipt by the SIPA Trustee of this executed and notarized Partial Assignment and Release, the Assignor does for Assignor's executors, administrators, heirs and assigns hereby remise, release and forever discharge the SIPA Trustee and SIPC, as subrogee to the extent of its cash advances for the satisfaction of the Customer Claim, and, as the case may be, its officers, directors, professionals, employees, agents, successors and assigns, of and from any and all claims arising out of or relating to the Assignor's BLMIS Account, the Customer Claim filed with the SIPA Trustee as protected by the provisions

008330-0058-10692-Active.11552870                                    Schedule 1 to Settlement Agreement (475 Fifth Avenue)
[[NYCORP:3137863v8:REMOTE_RLEVIN:05/06/09--11:06 p]]

OPTIMALMFN00000096

of SIPA, and any and all circumstances giving rise to said Customer Claim which the Assignor now has, or hereafter may have, for or by any reason, cause, matter or thing whatsoever from the beginning of the world to the date of the execution of this Partial Assignment and Release, only to the extent that the SIPA Trustee and/or SIPC has paid monies to the Assignor to satisfy Assignor's Customer Claim.

Assignor acknowledges the sufficiency of the consideration to be received in accordance with the SIPA Trustee's Determination and under this Partial Assignment and Release.

[The undersigned acknowledges that he or she is authorized to execute this Partial Assignment and Release on behalf of _____.]

**IN WITNESS WHEREOF,** the undersigned has on this day set forth below duly executed this Partial Assignment of Assignor's Customer Claim and Release, intending to be legally bound hereby.

By: _____
    _____
       [NAME]

Sworn and subscribed before me this ____ day of _____, 2009.

_____
    ~~Name:~~Notary Public                     ~~Title:~~

Document comparison by Workshare Compare on Wednesday, March 05, 2014 11:30:03 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://NYDMS/NYCorp/3137863/3 |
| Description | #3137863v3<NYCorp> - Optimal-Picard Settlement Agrmt |
| Document 2 ID | interwovenSite://NYDMS/NYCorp/3137863/8 |
| Description | #3137863v8<NYCorp> - Optimal-Picard Settlement Agrmt |
| Rendering set | Standard (Workshare) |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 113 |
| Deletions | 88 |
| Moved from | 9 |
| Moved to | 9 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 219 |

OPTIMALMFN00000098