1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-01789-smb

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   SECURITIES INVESTOR PROTECTION CORPORATION,

8                   Plaintiffs,

9           v.

10   BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, ET AL,

11

12                   Debtor.

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15

16                   U.S. Bankruptcy Court

17                   One Bowling Green

18                   New York, New York

19

20                   June 19, 2014

21                   10:40 AM

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    HEARING RE:   Inter-Account Transfers -- Trustee's Motion

2    Affirming Application of Net Investment Method to Inter-

3    Account Transfers

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Nicole Yawn

```
 1   A P P E A R A N C E S :

 2   KLEINBERG KAPLAN

 3        Attorneys for Claimant, Elin

 4        551 Fifth Avenue

 5        New York, NY 10176

 6

 7   BY:  MATTHEW J. GOLD, ESQ.

 8        LAWRENCE ELIN, ESQ.

 9

10   BAKER HOSTETLER

11        Attorneys for the Trustee

12        45 Rockefeller Plaza

13        New York, NY 10111

14

15   BY:  NICHOLAS J. CREMONA, ESQ.

16        SEANNA R. BROWN, ESQ.

17        AMY E. VANDERWAL, ESQ.

18

19   BECKER & POLIAKOFF

20        Attorney for Various Claimants

21        45 Broadway

22        8th Floor

23        New York, NY 10006

24

25   BY:  HELEN DAVIS CHAITMAN, ESQ.
```

Page 4

1    K&L GATES, LLP

2         Attorney for 62 Claimants

3         1601 K Street NW

4         Washington, DC 20006-1600

5

6    BY:  RICHARD A. KIRBY, ESQ.

7

8    MINTZ & GOLD, LLP

9         Attorney for Pro Se Claimant

10        470 Park Avenue South

11        New York, NY 10016

12

13   BY:  ELLIOT G. SAGOR, ESQ.

14

15   LOEB & LOEB, LLP

16        Attorney for Upsher (ph) Laboratories

17        345 Park Avenue

18        New York, NY 10154

19

20   BY:  WALTER H. CURCHACK, ESQ.

21

22

23

24

25

```
 1   MILBERG, LLP

 2         Attorney for

 3         One Pennsylvania Plaza

 4         New York, NY 10119

 5

 6   BY:  MATTHEW A. KUPILLAS, ESQ.

 7

 8   SECURITIES INVESTOR PROTECTION CORPORATION

 9         Attorney for SIPA

10         805 15th Street, NW

11         Suite 800

12         Washington, DC 20005-2215

13

14   BY:  LAUREN T. ATTARD, ESQ.

15

16   HUNTON & WILLIAMS

17         Attorney for

18         200 Park Avenue

19         New York, NY 10166-0091

20

21   BY:  ROBERT A. RICH, ESQ.

22

23

24

25
```

Page 6

1   WINDELS MARX LANE & MITTENDORF, LLP

2        Attorney for

3        156 West 56th Street

4        New York, NY 10019

5

6   BY:  YANI INDRAJANA HO, ESQ.

7

8   LAW OFFICES OF JOEL L. HERZ

9        Attorney for

10        3573 East Sunrise Drive

11        Suite 215

12        Tucson, AZ 85718-3206

13

14   BY:  JOEL L. HERZ, ESQ.

15

16   ALSO APPEARING:

17   TRISHA KEERP (ph)

18   PAULA WORMITZ (ph), Stimmon (ph), Wormitz, P.C

19   JUSTIN BRASS, STONE LION CAPITAL PARTNERS (TELEPHONIC)

20   GAYTRI KACHROO, KACHROO LEGAL SERVICES, P.C. (TELEPHONIC)

21   JASON B. SANJANA, REORG. RESEARCH (TELEPHONIC)

22

23

24

25

Page 7

1                    P R O C E E D I N G S

2              THE COURT:  Madoff?

3              MS. VANDERWAL:  Good morning, Your Honor.

4              THE COURT:  Good morning.

5              MS. VANDERWAL:  Amy Vanderwal, Baker Hostetler,

6    for the trustee.  We're here today on the trustee's motion

7    seeking this Court's approval of the application of the net

8    investment methods inter-account transfers.  We have one

9    housekeeping matter before we get started that we'd like to

10   address.  It relates to a letter sent to Your Honor by

11   Mr. Gold on behalf of his client, Laurence Elin a couple

12   days ago raising issues related to two IRA accounts.

13             We have spoken with Mr. Gold, and he has agreed

14   with us that the issues he raised in the letter and in his

15   papers are outside the scope of this motion, and we have

16   agreed to work with him separately on resolving the issues

17   that he raised as they relate to his IRA accounts.  Mr. Gold

18   has agreed that he will not participate in this hearing and

19   will not be bound by this proceedings, with the exception of

20   there was one inter-account transfer many years ago that is

21   unrelated to the issues that he raised in his letter.  So

22   that would be affected by this --

23             THE COURT:  I guess I don't understand what you're

24   saying.  The issue is whether or not the trustee should

25   basically drill down to the transferor accounts and apply

Page 8

1   the net investment benefit in determining how much has been

2   transferred.

3            MS. VANDERWAL:  That's our issue today.

4            THE COURT:  Are you saying that Mr. Erins (sic)

5   falls into that category?

6            MS. VANDERWAL:  No, Mr. Elins (sic) raised a

7   different issue of the treatment of two IRA accounts, and,

8   as he set out in the letter that he submitted and in his

9   pleadings, he had an IRA account.  He closed it.  He took

10  his money out.  He later reinvested, and it's just a

11  completely different issue that we need to resolve,

12  unrelated to inter-account transfers.

13           THE COURT:  But I thought you said there was

14  something about this motion which did bind him.

15           MS. VANDERWAL:  The only aspect that could

16  potentially implicate Mr. Elin's account is that a separate

17  account had an inter-account transfer.  He has agreed that

18  this motion would apply to that transfer.

19           THE COURT:  Okay.  I guess I understand Go ahead.

20           MS. VANDERWAL:  Okay.  Thank you, Your Honor.

21           Getting back to the matter at hand, --

22           THE COURT:  Yes.  Wait.

23           MR. GOLD:  Excuse me, Your Honor.  Matthew Gold,

24  Kleinberg & Kaplan.  I just want to add one clarifying

25  point, that the trustee has agreed that they will not be

1    contending that the transfer into the second IRA account was

2    an inter-account transfer.

3            THE COURT:  I thought he closed one account and

4    then, a year later, opened up another account.

5            MR. GOLD:  That's correct.

6            THE COURT:  Okay.  And he is a claimant with

7    respect to the second account?

8            MR. GOLD:  That's correct.

9            THE COURT:  So what's the issue with it?

10           MS. VANDERWAL:  We agree that that is not an

11   inter-account transfer.  That's why we have agreed that it's

12   not relevant to today's motion.

13           THE COURT:  Okay.

14           MR. GOLD:  And we hope there may be no issue.

15   We'll working with the trustee.  We are going to carry this

16   to the next omnibus date.

17           THE COURT:  That's beyond the scope of the matter

18   before me then.

19           Go ahead.

20           MS. VANDERWAL:  Thank you, Your Honor.  But as

21   Your Honor mentioned, the trustee has applied the net

22   investment method approved by the Second Circuit to

23   transfers between accounts at BLMIS.  The Second Circuit

24   approves this approach under which the customer's net equity

25   is calculated by subtracting an amount withdrawn from an

Page 10

1    account from principal deposited it.  The method looks only

2    to cash in and cash out and ignores the fictitious profit

3    reported on BLMIS customer statements.

4           In the account transfer setting, when an account

5    transfer occurred at BLMIS, meaning that no new funds came

6    in, there was merely a book entry that credited one account

7    and debited the other.  The trustee has given credit to the

8    transfer up to the amount of principal in the transferor

9    account.

10          THE COURT:  Does the trustee have books and

11   records regarding the transferor account that showed the

12   deposits and withdrawals?

13          MS. VANDERWAL:  Yes.

14          THE COURT:  Because the determination letters just

15   gave a number for the amount transferred and didn't show how

16   that amount was computed.

17          MS. VANDERWAL:  The determination letters related

18   to the transferee accounts and showed the money coming in

19   for the transferor accounts.  So, in calculating that

20   amount, we examined the deposits and withdrawals in the

21   transferor account to determine the --

22          THE COURT:  Because the reason I raise it is, in

23   the trustee's response or perhaps in the objection, he said

24   a couple of times that he had given ample evidence to the

25   claimants regarding the amount of -- regarding, among other

Page 11

1   things, I guess -- or I read it to mean the computation of

2   how much was transferred, and that's just not in the

3   determination letters.

4           MS. VANDERWAL:  Correct.

5           THE COURT:  It's not the subject of this hearing,

6   but I just mention that.

7           MS. VANDERWAL:  Yeah, and those calculations were

8   completed, and that's how the net equity was determined.

9           The trustee submits that the approach adopted in

10  this matter is the only method that's consistent with the

11  net equity decision entered by the Second Circuit, the

12  district court's antecedent debt decision as well as New

13  York law.  With respect to the net equity decision, as this

14  Court noted in ruling on a motion a few weeks back involving

15  Fishman Trust, there's no practical difference between a

16  withdrawal and a transfer for calculations of net equity.

17  In both cases, funds are leaving the account, and the

18  balance of that account is reduced.

19          Accordingly, the rationale for the net equity

20  decision applies equally here.  The Second Circuit noted

21  that Madoff's so-called profits are after-the-fact

22  constructs that were arbitrarily and unequally distributed

23  among customers, and, accordingly, the net investment method

24  was superior.  The Court also stated that allowing the

25  recovery of fictitious profits would affect the limited

1    amount available for distribution from the customer funds

2    and that only the net investment method would allow the

3    trustee to make payments based on withdrawals and deposits,

4    which could be confirmed by the books and records and would

5    result in the appropriate distribution of customer property

6    under SIPA.

7         The same is true here, and the trustee has

8    adjusted the transfers out of the transferor accounts in the

9    same manner as account withdrawals are adjusted.  This

10   approach was also considered by the district court in its

11   antecedent debt decision, and the district court

12   specifically looked at inter-account transfers and

13   determined that the net investment approach should be

14   applied to those transfers.  The district court relied on

15   Judge Hardins' (ph) decision in Bayou (ph) and found that

16   shifting fictitious profits from one account to another did

17   not change those fictitious profits into actual principal.

18        Some claimants suggested that the district court's

19   finding isn't relevant here because it was in the avoidance

20   contracts, but, as Your Honor stated in the context of the

21   Fishman motion, there is no reason why these calculations

22   should be different in the claims context, and, indeed, the

23   calculation of a claim and the calculation of an avoidance

24    liability both involve the (sic) calculation and are flip

25   sides of the same plan.

Page 13

1              The trustee's approach is also consistent with New

2       York law.  It's long been recognized that a transferee

3       cannot acquire more than the transferor is able to give,

4       and, in this instance, the Second Circuit upheld the

5       transferor does not have a right to fictitious profit and

6       can, therefore, not transfer that profit to the recipient.

7              A few of the claimants also raised a statute of

8       limitations issue.  This issue was dismissed by the district

9       court and the antecedent debt decision, finding that it was

10      entirely proper to include transfers going back beyond 2

11      years before the filing date, and, accordingly, section

12      546(e) of the code provides no assistance to the claimants

13      on this issue, that neither could use calculated (sic) over

14      the life of the account.

15             The Second Circuit found that to be appropriate.

16      The district court found that to be appropriate.  Other

17      circuits -- the Donald (ph) decision in the Ninth Circuit

18      found that to be appropriate, and it makes sense because

19      there is no other way to figure out when withdrawals started

20      exceeding deposits, so when fictitious profits started to

21      exist in that account.

22             Claimants also argued that the funds could have

23      been withdrawn and reinvested, and, in some cases, that

24      would have given them the advantage of the statute of

25      limitations and state that the trustee is elevating form

Page 14

1    over substance in this regard, but, to the contrary,

2    Your Honor, looking at the substance of the transfers, the

3    taxes (sic) of the transfers did stay in the BLMIS and that

4    the substance of those transfers was fictitious profit.

5    Just because the transfer occurred more than two years ago,

6    it doesn't transform that into principal.  I would also add

7    that the argument made in several oppositions that general

8    policies in favor of finality in appropriate transactions

9    undercut the trustee's approach are essentially statute of

10   limitations arguments, which don't really succeed for the

11   same reasons just mentioned.

12             I just want to address two other issues that were

13   raised regarding SIPA and the series (sic) 100 rules.

14   Certain claimants have argued that the trustee is improperly

15   combining accounts, and that is in violation of the series

16   100 rules.  The series 100 rules state, you know, when an

17   account should be -- claimant has multiple accounts and when

18   they're treated in one capacity and when they're treated in

19   separate capacities, but, in this case, the accounts have

20   not been combined, and that equity in each account was

21   determined separately.

22             Withdrawals and deposits were debited and credited

23   separately, and the only relation between the account is the

24   transfer, and the transfer was tracked between the two

25   accounts.  So the mere tracking of a transfer does not

Page 15

1   combine the two accounts, in violation of the series 100

2   rules.

3            There is also -- some claimants also asserted that

4   the trustee is improperly redefining that equity through his

5   approach, but, as the Second Circuit determined, because

6   there were no securities purchased, the trustee had to look

7   to the books and records to determine what assets actually

8   existed and what comes (sic) to a customer property.  It did

9   the same thing in this instance as it did in the net equity

10  instance, and there has been no attempt to redefine that

11  equity.

12           I would just end by saying as the scheduling order

13  and (sic) as this matter stated, it's purely a legal inquiry

14  whether the net investment method should be applied to

15  inter-account transfers.  So many of the oppositions raised

16  account-specific issues, and the trustee tried to categorize

17  and summarize those issues in his reply brief.  None of the

18  issues raised are relevant here today or change the

19  appropriateness of the method, nor do they need to be

20  resolved for the trustee to move to rule on this motion.

21  They're either disguised legal issues that have no bearing,

22  or they're issues that will be adjusted in later proceedings

23  such as claims and pooled accounts or shared accounts.

24           In closing, as has been said many times in this

25  case before, a Ponzi scheme is a zero sum game, and any

Page 16

1    award of a fictitious profit means less principal to be

2    shared among those who invested more than they withdrew.

3              THE COURT:  Thank you.

4              MS. ATTARD:  Good morning, Your Honor.  Lauren

5    Attard, for the Securities Investor Protection Corporation.

6              First, I'd just like to talk about the burden of

7    proof in a SIPA liquidation.  Customer claims --

8              THE COURT:  Is this what I have to decide in

9    connection with this motion?

10             MS. ATTARD:  Customers have raised it in their

11   objections in that the trustee -- they're stating that the

12   trustee had not satisfied his burden of proof, but, to the

13   extent it's a legal issue, I agree.  I don't think it's

14   relevant to this motion.  I just want to make sure that it's

15   clear that the customers' burden of proof -- it is the

16   burden (sic).

17             THE COURT:  But, under the statute, when the

18   trustee receives a claim, --

19             MS. ATTARD:  Uh-huh.

20             THE COURT:  -- he's got to pay it, to the extent

21   he can determine or he agrees that that's the net equity,

22   based on the books and records or however else he determines

23   it.  So, if he doesn't pay the claim he receives, doesn't he

24   have some burden to at least explain initially why he hasn't

25   paid it?

1          MS. ATTARD:  He has a burden to explain to

2     determine the claim, and that's the part of the claims

3     procedures order that's in this case and that's been in

4     every civil liquidation.

5          THE COURT:  Right.

6          MS. ATTARD:  And he can determine the claim based

7     on the books and records of the debtor but to the

8     satisfaction of the trustee ultimately, and so, the trustee

9     can determine that a claim is denied.

10          THE COURT:  Let me give you -- and this has been

11     raised by a couple of the claimants.  When you look at the

12     determination letters, as I've mentioned, they don't really

13     say how the trustee came up with the value of the transferor

14     account at the time of the transfer.

15          MS. ATTARD:  Right.

16          THE COURT:  Are you say that it's the claimant's

17     obligation to show that that one number isn't correctly

18     computed, or is it the trustee's obligation in the first

19     instance to show how he came up with that number?

20          MS. ATTARD:  Sure.  I believe it's the claimant's

21     obligation whenever we are -- the trustee receives a

22     discovery request, the trustee has been providing

23     documentation to the extent necessary.  The claims go

24     through such a review.  There's so many steps in the review

25     of those claims.  So --

1           THE COURT:  But doesn't the trustee have to show

2    that in the first instance?

3           MS. ATTARD:  So you're suggesting that the trustee

4    would have to provide more information than his

5    determination letters?

6           THE COURT:  Wouldn't he have to make a prima facie

7    showing of some sort that --

8           MS. ATTARD:  As --

9           THE COURT:  -- the claim that they submitted was

10   not correct, and here is why I think it's correct?

11          MS. ATTARD:  Sure.  As Judge Broadsman (ph) held

12   in the Stratton Oakmont case, no.

13          THE COURT:  Go ahead.

14          MS. ATTARD:  I can give you the cite, but -- 228

15   B.R. 278.

16          THE COURT:  I know the case.

17          MS. ATTARD:  She talks about how it's similar to a

18   priority claim in bankruptcy.  Judge Garrity in Adler

19   Coleman also talked about the same, that it's the customer's

20   burden because a customer claim is a priority claim.  It's

21   the customer's burden to show that the customer is entitled

22   to customer property and that what the customer is seeking

23   is customer property.

24          It's important -- actually, this becomes really

25   important in other cases like MF Global, where there are

1    customers who had full securities claims and commodities

2    claims, which are not protected by SIPA.  So I think it's an

3    important distinction that it is the customer's burden, but

4    obviously, to the extent we have documents, we do not

5    withhold those documents.  We try to provide as much as we

6    can to customers, to the extent that they think that there's

7    documents that are going to prove their case, but we're not

8    going to put something in a determination letter that we

9    don't have the backup to --

10           THE COURT:  And I should take your word for that,

11   right?

12       (Laughter)

13           MS. ATTARD:  I guess maybe our 40 years of doing

14   this, maybe.  Maybe that counts.

15           THE COURT:  Because the government never makes a

16   mistake.

17           MS. ATTARD:  Well, we're not the government, but

18   --

19           THE COURT:  That's true.

20           MS. ATTARD:  So --

21           THE COURT:  All right.

22           MS. ATTARD:  And the other thing I just want to

23   bring up, even though I think this was dealt with in our

24   papers, but it just comes up.  Madoff has been in existence

25   since 1960 (indiscernible - 53:35) with the SEC changed to

Page 20

1  an LLC, as many entities did, from self-rock (sic) to an LLC

2  in 2001.  There's been no change.  He's been a member since

3  1970 since SIPA started.  So thank you.

4          THE COURT:  Thank you.

5          Who wants to go first?

6          MR. KIRBY:  Your Honor, Richard Kirby, K&L Gates,

7  on behalf of 62 claimants who have filed an omnibus

8  objection in this matter.

9          I think it would be useful first to describe our

10 clients and a common theme among the parties that are

11 raising this objection.  Our clients are each the recipients

12 of inter-account transfers.  The people who are objecting on

13 this are no the people who transferred or the transferors.

14         Each got at the time of the claim determination

15 little or no information about the transfer, how it was

16 computed.  All they simply got was a statement that said

17 your claim is denied because -- and there was a writedown

18 for that amount, and how it came to be that it was written

19 down wasn't explained.

20         And at this point in this motion, the trustee

21 hasn't also sought out to explain other than, as Ms. Attard

22 stated, --

23         THE COURT:  Well, let's the issue I raised just

24 now, but, assuming that the trustee explains to your

25 satisfaction how he computed your clients' claims, do you

Page 21

1   object to the application of the net investment method?

2          MR. KIRBY:  Yes.

3          THE COURT:  Okay.  So the fact that you don't know

4   how he did it doesn't matter?

5          MR. KIRBY:  Right.

6          THE COURT:  Okay.  So let's go (sic).

7          MR. KIRBY:  I agree.  The burden of proof issue is

8   not before the Court at this time.

9          THE COURT:  Okay.

10          MR. KIRBY:  It's a pure legal issue.  We believe

11   the trustee's method is flawed for four reasons.  First, he

12   fails to give effect to the transfer that he admits was

13   recorded on the books and took place.

14          THE COURT:  But isn't that true under the net

15   investment method?

16          MR. KIRBY:  No, because the net investment method

17   didn't deal -- and the Second Circuit didn't address the

18   issue of inter-account transfer.

19          THE COURT:  No, but it dealt with the issue of

20   whether or not you credit the transfer of profit, fictitious

21   profits, didn't it?

22          MR. KIRBY:  Transferor, yes, but it was the

23   transferee.  This is a transferee.  This is a separate

24   account.

25          THE COURT:  So why is it different?

1              MR. KIRBY:  It's different because the customer on

2     the recipient is a separate account holder who has separate

3     rights, and, when you think through the process, okay, what

4     the step that took place when the transfer took place, the

5     transferor is, in effect, exercising dominion and control

6     over the assets in order to authorizes the deposit into the

7     transferee account.  What that means is that, once they

8     exercise dominion and control over it, then the transfer is

9     -- and the recipient account -- it's as if the transferor

10    took the cash out and deposited it in the transferee

11    account.

12              And so, what we are saying is fully consistent

13    with the net equity investment method.  Okay?  And fully

14    consistent with the statute that what the way this needs to

15    be treated is in the recipient account, the cash that was

16    recorded on the books as deposited is what the recipient

17    has.  Now, if --

18              THE COURT:  Including the fictitious profits?

19              MR. KIRBY:  Your Honor, we use -- there's a term

20    used, fictitious profits.

21              THE COURT:  Well, we all know what it means.

22              MR. KIRBY:  Okay.  We understand what it means,

23    but the statute gives the trustee a remedy a deal with them,

24    and the problem is what the trustee is not following the

25    statute, which says if I don't -- I think a transfer is

```
 1    invalid.  He has to set about and avoid it.  Once he --

 2              THE COURT:  But he's not avoiding the transfer.

 3    He's just -- your clients have made claims against the

 4    estate, and he's computing the amount of the claim.  That's

 5    all.

 6              MR. KIRBY:  But he is, in effect, avoiding the

 7    transfer.

 8              THE COURT:  Well, I --

 9              MR. KIRBY:  And he's trying to pretend that it

10    didn't happen.  And what he is doing that is erroneous here

11    is that he's first not following the instructions of the

12    statute that, if you're going to disregard a transfer that

13    he admits took place -- I mean, it's different if there was

14    a dispute about whether the transfer took place, but here,

15    in his claim determination, he's admitted that a transfer --

16              THE COURT:  But isn't there a dispute about

17    whether there's a transfer of fictitious profits?  In other

18    words, your argument is essentially that the transferee got

19    what was depicted on the statement at the time.

20              MR. KIRBY:  Correct.

21              THE COURT:  Including all the stocks that were

22    depicted on the statement at the time, but they didn't

23    exist.  So why can't the trustee ignore the fiction when

24    he's computing the net equity of the account?

25              MR. KIRBY:  He can for the transferor, but, for
```

1    the transferee, who has separate rights under the statute,

2    he can't do that.  What he --

3              THE COURT:  Okay.  That's what I'm not

4    understanding.

5              MR. KIRBY:  Okay.

6              THE COURT:  Why he can't do that.

7              MR. KIRBY:  Because what the statute provides is

8    that what the customer -- to take a look at it from the

9    perspective of the transferee or the recipient account.

10   What he gets recorded and the statute -- not stocks, because

11   cash is recorded as being deposited in this account.  That's

12   how we understand the books and records recorded it.  Okay?

13             But then, the transferee gets assets that he makes

14   some decisions to keep in Madoff.  He enters into -- in

15   entering into an account.  We assume that, in each case, and

16   certainly, for our clients that we're talking about, each

17   client had a standard customer agreement with Madoff that

18   gave him discretion to invest it, and that recipient

19   account, if there were fictitious profits or profits that

20   were earned on that based upon the principal of his deposit,

21   then that investment decision controls how that is to be

22   computed.

23             But where we draw the line and we think that it's

24   important that the trustee follow the statute is that, once

25   you accept the principle that there is a transfer and the

Page 25

1    books and records reflect that, then the trustee has to take

2    step, which he is not doing, and that is the step he needs

3    to bring a proceeding to avoid the transfer.  That gives the

4    defendants the right to raise such issues as may be

5    appropriate in response.

6            Now, we have some good understanding as to why the

7    trustee wants to not take that step, because many of these

8    transfers took place in the '80s and '90s, and he has

9    problems.  We have clients that go back into the '80s when

10   these transfers took place, and so, the trustee uses this

11   method that is an end run, essentially, around the avoidance

12   obligations under the statute.

13           Our point is this.  The SIPA statute incorporates

14   by reference chapter five of the statute, and the statute

15   says that chapter five applies and if the trustee wants to

16   avoid an obligation or a transfer, he is empowered to do

17   that.  A SIPA trustee is also empowered to do that, but he

18   has to take that step.

19           That is also consistent with the provision in the

20   statute that requires each account holders that's a separate

21   account holder to be treated distinctly.  And, while my

22   colleague today says well, this is really not a collapse in

23   the accounts, but fundamentally, that is a collapse in the

24   accounts.

25           THE COURT:  Okay.

1              MR. KIRBY:  Okay?  So we have taken a look at

2    Your Honor's decision in the Fishman case, and --

3              THE COURT:  Well, Fishman is a slightly different

4    factual situation.  They were claiming the transfer never

5    occurred.

6              MR. KIRBY:  Agreed, and the party that wasn't

7    before you, which is our clients, which were the recipient

8    parties, and so, while we don't disagree with the conclusion

9    that the Court made, vis-à-vis the transferor account, the

10   net equity decision has decided what the transferor had the

11   power to decide to transfer.  But, with respect to the

12   recipient account, it's a very different situation, and so,

13   we do not see any issue with that.

14             Now, we heard my colleague this morning talk about

15   the Second Circuit decision in net equity.  It did not

16   address this issue.  Whether the facts weren't presented to

17   the Court and the Court did not address the issue.  What the

18   Court looked to is the statute.  When you look to the net

19   equity definition, it's very clear that separate account

20   holders are to be treated separately, and what that means

21   is, when you apply the statute, is that the trustee must

22   take the steps necessary in order to avoid the transfers.

23             Now, I'd also like to address for a minute

24   Judge Rakoff's decision on antecedent debt.  We believe that

25   that case is readily distinguishable, and that is because,

Page 27

1    first of all, as Judge Rakoff has reiterated on several

2    times, the issue before him was not the question of how you

3    interpret a SIPA claim and how you calculate net equity.  In

4    fact, he has consistently remanded that issue back to the

5    bankruptcy court for determination.

6           It would not be in the ordinary course of the kind

7    of issue that would be before district court on a stern --

8    what I will use the recent Sprinkler (ph) case calls a stern

9    type case.  It's not an avoidance case.  What he was

10   deciding is value and how to treat it for value purposes,

11   and that had nothing to do with the question of how a SIPA

12   trustee must go about determining net equity in a separate

13   account.  So we don't believe that statute, that provision

14   is applicable.

15          It's our position, therefore, that the trustee, in

16   determining net equity, must take the cash that was recorded

17   on the customer -- recipient/customer's account as cash.

18   That's the starting place for our clients' net equity claim.

19   If he is going to write that claim down, he has to take the

20   step to do that, which the statute requires, provides for,

21   and there's nothing in SIPA that would be inconsistent with

22   the requirement that the trustee take a step to avoid the

23   obligations or the transfers that are recorded on the books.

24          It's one thing that what was presented to the

25   Second Circuit, which was the books and records were false

Page 28

1    with respect to so-called profits or fictitious profits or

2    securities.  But, when the trustee admits that there was a

3    transfer as recorded on the books and when he admits that

4    there is -- the transferee account is the recipient of that

5    money, then, once you take that step, then the trustee must

6    take the steps provided in the statute in order to set those

7    aside.  Otherwise, the customers are going to be left with

8    where we are today.

9           We have no idea, for most of our customers, what

10   the circumstances of the transfer account were.

11          THE COURT:  That's an issue of proof, and I asked

12   you at the beginning if you knew --

13          MR. KIRBY:  I understand that.

14          THE COURT:  -- it'd make a difference to you.

15          MR. KIRBY:  But --

16          THE COURT:  You said no.

17          MR. KIRBY:  But that would allow -- in such a

18   proceeding, that would flush out those issues.

19          THE COURT:  But that would be true in a claims

20   determination proceeding also.

21          MR. KIRBY:  Well, yes, but remember, Your Honor.

22   Under the SIPA statute, the trustee's number one obligation

23   is to promptly decide these customer claims.  Because, you

24   know, the whole purpose of the SIPA statute is to expedite

25   returning customer property to customers.  Here we are, soon

1    be six years, five-and-a-half years --

2            THE COURT:  And some litigation (indiscernible -

3    1:16:58).

4            MR. KIRBY:  Understand.

5            THE COURT:  The issues that affect that --

6            MR. KIRBY:  Understand, Your Honor.  But the point

7    is is to suggest that, somehow at this late date, the

8    customers have the obligation to try to figure out why the

9    trustee --

10           THE COURT:  That's a different issue.

11           MR. KIRBY:  Okay.

12           THE COURT:  And you said it doesn't matter to your

13   argument, because, even if he could show you how he did it,

14   it wouldn't make a difference.

15           MR. KIRBY:  And that's my point.  Okay?  Our point

16   is straightforward and simple that, until the trustee takes

17   the steps provided in the statute, he has to treat the

18   recipient account as a distinct holder who received cash as

19   recorded on the books, and that's not disputed, that cash

20   was recorded on the books as it deposited in the customer's

21   account.

22           Okay.  Once you accept that that's not disputed,

23   then it flows that it's the legal equivalent of what took

24   place here, which was the transfer, exercise dominion,

25   control, and authorized the transfer.  If trustee wants to

1    choose to try to unwind that transaction, the statute gives

2    him prerogatives to do that, but we think they're

3    (indiscernible - 1:08:14).  That's our position.

4             THE COURT:  Thanks.

5             MS. CHAITMAN:  Good morning, Your Honor.  Helen

6    Davis Chaitman, Becker & Poliakoff, on behalf of all of the

7    customers listed on the Exhibit A to our papers.

8             In addition to the argument that's just been made,

9    Your Honor, I just want to emphasize two points.  First,

10   unlike the issue that was before the Second Circuit when the

11   November 30th, 2008 statements of all the customers

12   reflected ownership of securities, in this situation, every

13   transfer was in cash.

14            The transferor's account was depleted of the cash.

15   The transferee's account was credited with the cash, and

16   we're talking about transfers that went back into the 1970s,

17   '80s and '90s.  We have not seen the documentary records

18   which support those transfers.

19            THE COURT:  I'll ask you the same question I asked

20   Mr. Kirby.  Would it make a difference if the trustee showed

21   you how he did it?

22            MS. CHAITMAN:  Well, the fact of the matter is,

23   Your Honor, that I don't believe the trustee has the records

24   going back that far.

25            THE COURT:  Well, that may be the trustee's

1   problem, but, if he did -- and let's take more recent -- for

2   instance, if he has the records and he can show you to your

3   satisfaction the cash that went into a transfer account and

4   the cash that came out, would that make a difference to your

5   argument?

6           MS. CHAITMAN:  Well, it wouldn't for this reason,

7   Your Honor.  When the transfer is made, it has tax

8   consequences.  If a transfer for $1 million is made from

9   customer a to customer b, it's either a state taxable event,

10  a gift taxable event.

11          The money that is in the transferee's account and

12  the transferee is paying taxes on the income attributable to

13  that account.  If you just say 10 percent, it's $1 million,

14  and 10 percent a year, and you're paying short-term capital

15  gains rates taxes on that.  So, for a period of 10 or 20

16  years, the transferee, who the Court is now discrediting

17  with all that money, has paid nonrecoverable taxes.

18          THE COURT:  But isn't that -- I mean, it's an

19  unfortunate result, but isn't that true of all of the

20  litigation, even without the inter-account transfers?

21  People paid taxes on fictitious profits, and now, the

22  trustee is suing them for clawback money.

23          MS. CHAITMAN:  That's right, but, when the

24  trustee, who, after all, is a fiduciary to the customers,

25  Your Honor, not to SIPA.  The trustee's duties are to the

1    customers, and we're talking about --

2            THE COURT:  Isn't he also a fiduciary of the

3    estate?

4            MS. CHAITMAN:  Well, but the --

5            THE COURT:  Because, if that were true, he could

6    never sue a customer.

7            MS. CHAITMAN:  He has a duty to the customers at

8    large that constitute the estate, and, of course, he can sue

9    a customer for the benefit of the other customers, but the

10   issue here, Your Honor, is that SIPA was formed pursuant to

11   the Securities Investor Protection Act, which was intended

12   to enhance protections to customers.  There is no support

13   for the proposition that a customer of an SEC-regulated

14   broker is not entitled to the transfer value in his account,

15   and, going back -- here, what's happening is, with all of

16   the cases, without regard to the statute of limitations,

17   without regard to the New York policy that there has to be

18   finality in commercial transactions for the economy to work

19   effectively, the trustee is saying to Mr. Blecker (ph), for

20   example, my 100-year-old client --

21           THE COURT:  He's the one who had corporate checks

22   on his --

23           MS. CHAITMAN:  Yeah, and the trustee, without

24   producing anything, has suggested that the trustee's records

25   indicate that these funds were deposited into Mr. Blecker's

Page 33

1    account.

2                THE COURT:  Have you preserved his testimony in a

3    deposition?

4                MS. CHAITMAN:  We have not, Your Honor, and we

5    will do that, but the thing is, Your Honor, these checks

6    were made out to Coca-Cola.

7                THE COURT:  But those are individual

8    determinations of the account.  The question ultimately is,

9    in that case of Mr. Blecker, whether he got those checks and

10   cashed them, and I guess if he says I never got them and the

11   trustee doesn't have any other proof, Mr. Blecker will win.

12               MS. CHAITMAN:  Well, I just hope he lives to get

13   to that point.  We --

14               THE COURT:  I wasn't being facetious when I

15   suggested that you take his deposition to preserve his

16   testimony.

17               MS. CHAITMAN:  No, I think that's a very good

18   idea, Your Honor.  You see, this, unlike the issue that was

19   before the Second Circuit, which was, if you have a

20   statement dated November 30th which shows securities in the

21   account and there were no securities, well, then it's a

22   fiction, but the trustee has not suggested that Madoff's own

23   records don't show the cash transfers, because they do.

24               So it's not a fictitious transfer.  It was an

25   actual transfer at the time, just as 15 years ago, a client

Page 34

1    could have withdrawn funds or any client could have

2    withdrawn funds from their account, and then, there wouldn't

3    be an issue as to what the value of their claim was because

4    they might no longer be a customer, but that transfer is on

5    the debtor's books and records.

6           There's no basis for the trustee to say that the

7    inter-account transfers are not on the debtor's books and

8    records.  It would be different if it were a transfer by the

9    M stock, but that was never the case.  These were all

10   transfers of cash, and this issue was never before

11   Judge Rakoff.  It wasn't before the Second Circuit, and the

12   trustee places great reliance on the Denelle (ph) case in

13   the Ninth Circuit.  It wasn't before the Ninth Circuit.  It

14   wasn't a question in the Ninth Circuit case of inter-account

15   transfers.  I really believe this is an issue of --

16          THE COURT:  Wasn't it a question on buyout (sic)?

17          MS. CHAITMAN:  It did occur on buyout.  You're

18   absolutely right.  Thank you very much, Judge.

19          THE COURT:  Thank you.

20          MS. KEERP:  Good morning, Your Honor.

21          THE COURT:  Good morning.  Trisha Keerp, from Skip

22   (ph), Dooney (ph) & Morris, on behalf of Brian Ross (ph).

23   Your Honor, Brian Ross invested with Madoff by two accounts.

24   The first was a shared account.

25          THE COURT:  Okay, but this is the argument where

1  the trustee has to separately compute net investment for

2  every participant in a multi-party account?

3          MS. KEERP:  As opposed to an account as a holder

4  (sic).

5          THE COURT:  And that's an issue that I have to

6  decide in connection with this motion?

7          MS. KEERP:  Well, Your Honor, the problem here is

8  that the trustee says that we're saying is irrelevant

9  because it's really a customer claim issue, whether he's a

10  customer or not.

11          THE COURT:  Okay.

12          MS. KEERP:  As opposed to -- right, as opposed to

13  the applicability of the net investment method to inter-

14  account transfers, but the trustee's whole wiping away of

15  Mr. Ross' claim is based on this very objection, the

16  application of the cash in, cash out to his --

17          THE COURT:  But isn't the problem that somebody

18  else took the cash that Mr. Ross invested?

19          MS. KEERP:  Well, Your Honor, and the trustee

20  raises it that, therefore, Mr. Ross should go after those

21  individuals on the account.  But then, the trustee should

22  have done that as an avoidance action against those other

23  individuals.

24          THE COURT:  Well, --

25          MS. KEERP:  The thing is is that everyone treated

Page 36

1     this first account separately.  There is documentation of

2     the deposits and the withdrawals, and, if it is an issue of

3     whether there is -- of a customer claim -- whether this

4     individual was -- whether Mr. Ross was a customer, well,

5     then that should have been the basis for the trustee's

6     wiping out of that claim rather than the application of the

7     cash in/cash out method to the net --

8              THE COURT:  Are you contending Mr. Ross is a

9     customer?

10             MS. KEERP:  Well, Your Honor, we would -- if that

11    was the basis for their objection to that claim, then at

12    least we would have the opportunity to brief that out and to

13    address that issue.

14             THE COURT:  But haven't you briefed that issue?

15    Your argument is that, in a multi-party account, the trustee

16    has to do a net investment analysis for every participant in

17    that account.

18             MS. KEERP:  Your Honor, we haven't --

19             THE COURT:  That's the legal issue that you raise.

20             MS. KEERP:  And we haven't had an opportunity to

21    properly address that because the trustee's objection to

22    Mr. Ross' claim was -- well, first of all, in the

23    determination letter, we don't know --

24             THE COURT:  But haven't you addressed it in your

25    opposition?

Page 37

1          MS. KEERP:  We have raised it, Your Honor, but not

2    to the full extent that it would be appropriate to present

3    it to the Court.

4          THE COURT:  This issue -- and I don't know if I

5    have to decide it.  The trustee said that I didn't.  This

6    issue about multi-party accounts, whether in the ERISA

7    context or in some other context.  I know it was raised by

8    many of the parties, and I question whether I can decide the

9    issue that the trustee says I should decide without also

10   deciding that issue.  That's all.

11         MS. KEERP:  Your Honor, who is going (sic) to be a

12   customer is an issue for another day, and we, as part of the

13   multi-payment briefing, will be addressing objections based

14   on those facts.  It doesn't have anything to do with whether

15   factitious profit should be included in transfers between

16   accounts.  It really has to do with whether, you know, under

17   the Morgan-Kennedy factors, someone had sufficient context

18   for him, but he only has to be considered a customer, and

19   that's just not an issue that's before you today.

20         But then, Your Honor, then we would ask that then

21   this issue not affect us negatively then when it does come

22   to determining Mr. Ross' claim then.  This application of

23   the net investment -- this application of not crediting

24   fictitious profits, because our position is that, for Brian

25   Ross, it wasn't a moving around of fictitious profits,

1   because he himself did, in fact, make those deposits with

2   his funds and withdrawal.

3            THE COURT:  Would it be fair to say that you don't

4   object to the net investment method?  What you object to is

5   the trustee's basically netting out all of the withdrawals

6   and the deposits in the transferor account, regardless of

7   who made those withdrawals or deposits?

8            MS. KEERP:  That's right, Your Honor.  And, to the

9   extent that the trustee is attempting to wholesale use that

10  position to disallow Mr. Ross' claim as opposed to really

11  entrust (sic), say, on that other issue that we're talking

12  about right now.

13           THE COURT:  No individual claims are going to be

14  allowed or disallowed in the context of this motion.  I just

15  question how I can decide the motion that the trustee raised

16  without deciding how to treat these multi-party accounts or

17  deal with the argument that's been raised by several people

18  based on the ERISA or some other principle that I have to

19  separately consider, you know, what each individual put into

20  the account and took out of the account.

21           MS. KEERP:  Your Honor, I don't think it changes

22  basically the whole principle as to whether fictitious

23  profits can be transferred.  In Brian Ross' case, if he were

24  to later be found as part of the multi-claimant action to be

25  an account holder, a customer, you know, the cash in/cash

1   out would be calculated based on his cash in and his cash

2   out.

3            THE COURT:  Okay.

4            MS. KEERP:  And so, that doesn't impact on whether

5   the transfers are being treated appropriately, Your Honor.

6            Your Honor, we would then again ask to make sure

7   then that Mr. Ross is being then treated according to that

8   other process that we (sic) then have set up for that

9   pleading.

10           THE COURT:  What other process?

11           MS. KEERP:  As far as the multiple -- as far with

12  regards to the ERISA and the other issue that is going to be

13  presented then.

14           THE COURT:  I don't know if that issue is being

15  presented.  I mean, I've gotten a lot of argument on it, but

16  that's what I'm trying to --

17           MS. VANDERWAL:  We're working through the multiple

18  payment issues.  We haven't, I don't think, gotten to this

19  specific issue, but we are getting there.  We've had ERISA.

20  We've had heater (ph) funds.  There's another multi-payment

21  issue that's been briefed before you currently, and we're

22  working through in some (sic) of the various issues related

23  to the context (sic).

24           THE COURT:  Well, she's concerned how a decision

25  -- if I agree with you, how that decision was going to

1    affect Mr. Ross' claims.  So tell me how it's going to

2    affect it and how it's not going to affect it.

3              MS. VANDERWAL:  To the extent Mr. Ross is found to

4    be a customer, if he can satisfy the standards for a

5    customer, it would not impact on him.  If the larger account

6    is the customer, the transfers within the account will be

7    treated as were discussed today.

8              THE COURT:  So this motion doesn't raise the issue

9    of whether multiple parties in what appears to be a single

10   account on the BLMIS books and records are customers?

11             MS. VANDERWAL:  No.

12             THE COURT:  Okay.

13             MS. KEERP:  And, just to be clear, because the

14   determination letter that we received never raised that

15   issue.  So we were concerned whether Mr. Ross would then be

16   part of the trustee's consideration of whether he is a

17   customer or not.

18             THE COURT:  It sounds to me like implicit in the

19   determination letter is the position that it was a single

20   account, but he's not a customer of that single account.

21             MS. KEERP:  I mean, there was never a reference to

22   the fact that he's not a customer.

23             THE COURT:  I mean, he has his own account now,

24   but --

25             MS. KEERP:  Right.

1              THE COURT:  -- the argument is that the transfer

2     came from a single account, and, in computing what was

3     transferred, the trustee just looked at all of the

4     distributions and the deposits into that earlier account

5     without regard to who made them or who took the money out.

6              MS. KEERP:  Right, Your Honor.

7              THE COURT:  So that issue -- you don't have to

8     deal with that issue because that's the trustee's position.

9              MS. KEERP:  Right.  So we would reserve our rights

10    on that, and, because that we are part of that participation

11    (sic).

12             THE COURT:  Okay.

13             MS. KEERP:  We (indiscernible - 1:22:05).

14             THE COURT:  Thank you.

15             Anyone else?

16             MR. SAGOR:  Your Honor, I'd like to go last since

17    I have, I think, the subset of the smallest issue.  So, when

18    it all gets fleshed out, I think you'd understand me the

19    best.  If I may go last, I would like to be heard.

20             THE COURT:  You could always go last, Mr. Sagor.

21             MR. SAGOR:  I don't think I'm -- what?

22             THE COURT:  I know Mr. Sagor from the U.S.

23    Attorney's Office.  So I see him once every couple of years

24    at the association (sic) events (sic).

25             MR. SAGOR:  Do you want me first now?

Page 42

1          THE COURT:  What's your question?

2          MR. SAGOR:  I'd prefer to go last.

3          THE COURT:  He wants to go last.

4          Anybody object to that?

5          MR. HERZ:  I'll go.

6          THE COURT:  Okay.

7          MR. HERZ:  Good morning, Your Honor.  Joel Herz,

8    on behalf of the Sandia (ph) Family L.P. (ph) Partnership.

9    I want to -- I listened to the question you asked my

10   colleague was why can't the trustee do this, and I want to

11   bring it down to really sort of the most basic level of what

12   the statute says and what is really happening to my client

13   and I think many of the others.

14          And let's go back to 1990, where roughly my

15   client's transfers supposedly happened from account one to

16   account two, and let's make the facts something different,

17   which is let's assume that I have an account with Madoff.

18   Okay?  I have $3 million in that account, and my account,

19   according to the trustee, that entire $3 million is

20   overdrawn already, which is from fictitious profits, and

21   let's --

22          THE COURT:  This is the transferor account?

23          MR. HERZ:  This is the transferor account that's

24   overdrawn by, let's just call it, $4 million, for argument's

25   sake.  Okay?  You also at that same time have a Madoff

Page 43

1   account, and you have $1 in your account.  Okay?  It's

2   exactly that same dollar.  Nothing has changed.  You're net

3   even.  No withdrawals, only one deposit for $1.

4          We decide, you and I, to enter into a transaction

5   by which I decide to buy your home.  You decide to sell me

6   your home, and let's make the purchase price -- maybe this

7   is unrealistic for the 1990s -- $3 million.  Okay?  You get

8   my Madoff account of that entire $3 million on the books and

9   records that the trustee has.  It shows an account from Joel

10  Herz's account to Judge Bernstein's account.

11         Okay?  And you're happy with Madoff.  I happily to

12  this day, living in your house.  Maybe I sell it to somebody

13  else along the way, and we're now to roughly 6 years ago,

14  2009, when this whole thing blows up.  You don't make any

15  further touches to your account.  No withdrawals, nothing.

16  Okay?

17         You make your claim, and let's say from the time

18  value of money, which I know has been addressed elsewhere,

19  your account has now mushroomed to $14 million.  You are

20  expecting to retire with that $14 million, and you make your

21  claim, and the trustee writes back and says sorry,

22  Judge Bernstein, you're out of luck.  The transfer --

23         THE COURT:  I wouldn't be hearing this case, if I

24  were you.

25         MR. HERZ:  Return it to one of your clerks.  Okay?

Page 44

1    Sorry, Judge Bernstein, you're out of luck.  Okay?  The $3

2    million home that you gave to me has a 0 value to you

3    because the other account that was transferred in to you,

4    okay, had a negative $4 million, and, in fact, not only do

5    you get SIPA, let's assume you put more money in.  You would

6    get subtracted on that because it's a transfer from account

7    a to account b.

8           And the question is why -- and that's what they're

9    trying to do in some different forums.  Why can't they do

10   that, and the answer is really very simple.  It's just it's

11   what the statute says, 11 U.S.C., Section 7(a)(lll),

12   Subsection 11.  In determining net equity under this

13   paragraph, which is the paragraph they're operating under,

14   accounts held by a customer in separate capacity shall be

15   deemed to be accounts on separate customers.  Okay?

16          We then turn to the next place, and I believe, in

17   some way, the trustee agrees with me, and that is, if you

18   look at footnote 5 on paragraph 13 of their reply brief, it

19   specifically says examples of separate capacities are

20   individual accounts, joint accounts, individual retirement

21   accounts, and it goes on from there, and it says

22   specifically -- this is the last sentence.

23          It's the same person with two different accounts.

24   Let's just say you had Judge Bernstein individually account

25   a, Judge Bernstein individually account b.  One had an over.

Page 45

```
 1    One had an under.  Then they're combining those accounts,

 2    and I'm not arguing that it's all in the same name, same

 3    person.

 4              Go on to the last sentence of their footnote on

 5    page 13, footnote 5.  If, however, claimant has an

 6    individual Canton (ph) IRA account (sic), those are separate

 7    capacities and are they would be entitled to separate SIPA

 8    protection to a half million dollars for each account for

 9    the two claims in this property.

10              And so, that's essentially -- I could speak for,

11    however, my client.

12              THE COURT:  What does this have to do with the

13    sale of the house?

14              MR. HERZ:  Well, because it comes back -- what

15    their argument's going to be -- well, wait a second,

16    Mr. Herz.  Okay?  There was no sale of the house.  This was

17    -- and then, we'll come to my client's situation.  Okay?

18    Which is --

19              THE COURT:  You mean there was no sale of the

20    house?

21              MR. HERZ:  In my --

22              THE COURT:  I thought where you were going with

23    this was you thought you were getting x amount of dollars

24    for your house, and it turned out you weren't getting x

25    amount of dollars for your house, because the Madoff account
```

Page 46

1    wasn't worth what you thought it was.  And then, maybe you

2    have a claim against your transferor based on the stay

3    (sic).

4                MR. HERZ:  Which is now long gone.

5                THE COURT:  Right.

6                MR. HERZ:  It's now -- and the same in my case.

7    Where we're going with this is very simple, which is the

8    Congress has set up separate rules as to when people are to

9    be treated for purposes of SIPA as separate customers with

10   separate accounts, and the answer to this of why we go there

11   is you're --

12               THE COURT:  I don't think the trustee is arguing

13   that the transferor accounts and the transferee accounts are

14   separate accounts.  Is he?  Otherwise, we wouldn't even be

15   having this conversation.

16               MS. VANDERWAL:  That's correct, Your Honor.

17               THE COURT:  Okay.  So all right.  So where do we

18   go from there?

19               MR. HERZ:  And so, that's my answer to my client

20   is they're separate customers.  One was Samuel Diane Messing

21   (ph), tenants in common.  Okay?  The customer of today is

22   Sandia Partnership L.P.  There are two separate customers.

23               THE COURT:  Right.

24               MR. HERZ:  With two separate accounts that can't

25   be merged together because --

```
 1            THE COURT:  He's not merging them.  He's just

 2   computing the value -- according to his method, his argument

 3   is I'm just computing the value of what was transferred

 4   ignoring (sic) fictitious profits.  He's not combining

 5   accounts for purposes of the $500,000 or anything like that.

 6            MR. HERZ:  Then again, we come back to your issue,

 7   which is, under that theory, you get nothing, even though

 8   you've sold your house.

 9            THE COURT:  And that may be, and, you know, that's

10   what happened to Mr. Sincton (ph) in his case before the New

11   York Court of Appeals, and the Court concluded that, at

12   least in the divorce context, because it would have

13   disturbed that transaction, but it's essentially a dispute

14   between the transferor and the transferee.

15            MR. HERZ:  Yeah, except --

16            THE COURT:  And I don't mean to make light of it,

17   but there are a lot of unfortunate consequences about what

18   occurred here.  People paid taxes on profits they never

19   really got.  There was another instance of estate taxes

20   being paid.

21            MR. HERZ:  Which have all been paid by my client,

22   but the distinction here is unless the -- what came from

23   account a of a different customer is now being treated as if

24   it's the same customer or if it's the same account, and

25   they're coming back and looking back beyond what the
```

Page 48

1    clawback period is to treat something differently from a

2    different customer, and that, I believe, very clearly -- the

3    statute says if there's different customers, okay, they

4    can't be merged together.  Each is entitled to separate

5    protection.

6              THE COURT:  I got it.  Thank you.

7              MR. HERZ:  Thank you, Your Honor.

8              MS. WORMITZ:  Good morning, Your Honor.

9              THE COURT:  Good morning.

10             MS. WORMITZ:  Paula Wormitz, Stimmon, Wormitz,

11   P.C.  I represent the customer, Michael Most.  I only have

12   one client.

13             He was the beneficiary of three ERISA-protected

14   pension plans, two with Madoff, one with BLMIS.  He received

15   final distributions from two of the pension plans in 1994

16   and 1998.  So, if the trustee chose to bring a clawback

17   action against the pension plans to recover the fictitious

18   profits, they'd be barred by the statute of limitations, and

19   these funds were put into his IRA account, and the trustee

20   has discounted his IRA account by $1.5 million.

21             THE COURT:  Based on the rollover of the pension

22   plan?

23             MS. WORMITZ:  Correct.

24             THE COURT:  So you're making the statute of

25   limitations argument, which others have made?

1           MS. WORMITZ:  Right.  I have other arguments.

2           THE COURT:  Okay.

3           MS. WORMITZ:  Okay.

4           THE COURT:  Go ahead.  Go ahead.

5           MS. WORMITZ:  One is that the distributions from a

6   protected ERISA plan are protected by the anti-alienation

7   provision.  The trustee argued that IRAs are not protected

8   by ERISA, but it's actually the distributions from the

9   pension plans that are being discounted.

10          THE COURT:  I didn't understand how the anti-

11  alienation provision, assuming it applied, had any

12  significance in the trustee's motion.

13          MS. WORMITZ:  Well, --

14          THE COURT:  What is the anti-alienation provision?

15  What does it prevent?

16          MS. WORMITZ:  The ERISA, section 206(d)(1)

17  mandates that a pension plan governed by the statute, which

18  I claim my three pension plans do --

19          THE COURT:  Okay.

20          MS. WORMITZ:  -- shall provide the benefits

21  provided under the plan may not be assigned or alienated.

22          THE COURT:  So what does that have to do with this

23  case?  These are voluntary transfers, right?

24          MS. WORMITZ:  Well, there were distributions --

25  there were distributions from a pension plan that he

1    received certain amount of cash, and now, the trustee is

2    saying no, that cash is not worth that.  It's worth

3    something else.

4            THE COURT:  Right.

5            MS. WORMITZ:  And, to me, that's alienating part

6    of his distribution from the pension plan.

7            THE COURT:  (Indiscernible - 1:32:22.)

8            MS. WORMITZ:  The trustee also raised a case of

9    the Second Circuit case, Milgram against the Orthopedic

10   Associates.

11           THE COURT:  Uh-huh.

12           MS. WORMITZ:  666 F3d. 68 as supporting their

13   position.  But actually, it supports my position, because,

14   first of all, it notes the anti-alienation provision, and

15   then, it also notes that, where you sue an ERISA plan and

16   recover a judgment, you can only collect that judgment

17   against the plan.  You cannot go against the beneficiaries.

18           THE COURT:  But he's not -- you've made a claim in

19   the (indiscernible - 1:33:02).  He's not suing -- you're

20   suing him, essentially.  You've made a claim in the case.

21           MS. WORMITZ:  I made a claim in the case.

22           THE COURT:  Okay.

23           MS. WORMITZ:  But what I'm saying is had he

24   brought a clawback action against the retirement plans and

25   said you got fictitious profits, even if he got a judgment

Page 51

1    in the clawback action against the plan, he is limited by

2    statute --

3           THE COURT:  But he's not doing that.

4           MS. WORMITZ:  -- for recovery.

5           THE COURT:  You're asking for money from him.

6    He's not asking for any money from him.

7           MS. WORMITZ:  Well, that's --

8           THE COURT:  I understand the argument that, if you

9    had withdrawn the money more than two years ago or more than

10    six years ago and then redeposited it, it would be treated

11    differently.  I understand that argument.  Is that the

12    argument that you're making?

13           MS. WORMITZ:  Okay.  Well, I just feel that this

14    has special protection, other than just normal withdrawals

15    from the one account and putting it into another account.

16           THE COURT:  I understand that ERISA --

17           MS. WORMITZ:  The fact that it's ERISA.

18           THE COURT:  -- funds may have special protections,

19    but I don't understand how that relates to the trustee's

20    motion.

21           MS. WORMITZ:  Well, because the trustee is not

22    giving my client credit for the full amount he received from

23    the distribution from the ERISA plans.

24           THE COURT:  And how does ERISA bear on that

25    question?

Page 52

1              MS. WORMITZ:  I feel that that's -- the trustee

2       is, in fact, trying to alienate my client from the money.

3              THE COURT:  Okay.

4              MS. WORMITZ:  The other thing is, first of all, I

5       adopt the arguments of the other claimants, and especially

6       the fact that this is not a transfer between my client in

7       one form and my client in another form.  These are two

8       different customers.  These are pension plans of which he

9       was a beneficiary and my client's IRA.  They're not inter-

10      account transfers.

11             And finally, you raised --

12             THE COURT:  Why wouldn't they be inter-account

13      transfers?

14             MS. WORMITZ:  Because, for the purpose of net

15      equity, as the gentleman had stated, each customer account

16      is supposed to be treated separately.

17             THE COURT:  And I thought that the pension account

18      was transferred to the IRA.

19             MS. WORMITZ:  Not the pension account.  My

20      client's distribution from the pension plan.

21             THE COURT:  Okay.

22             MS. WORMITZ:  There were other beneficiaries in

23      the pension plan.

24             THE COURT:  All right.  Fair enough.  So what are

25      you --

Page 53

1            MS. WORMITZ:  They got distributions, and they did

2      whatever they did with theirs.  So there was a pension plan.

3      There was various beneficiaries.

4            THE COURT:  Okay.

5            MS. WORMITZ:  My client got a distribution of part

6      of it, of his share of the distribution, and he invested it

7      with Madoff.

8            And then, finally, just on the issue of the

9      disclosure, I noted the problems I've had trying to get

10     disclosure on this issue.  I have no idea if these numbers

11     that the trustee used are correct.  I sought disclosure on

12     the clawback action, and I was told I was not entitled to

13     the documents.  The trustee has now said they will provide

14     me with the documents.  So --

15           THE COURT:  I think that's a wise position for the

16     trustee to take.

17           MS. WORMITZ:  Yes, yes.

18           THE COURT:  Okay.

19           MS. WORMITZ:  So, just so you know, I am hopefully

20     going to get the documents.

21           THE COURT:  Okay.

22           MS. WORMITZ:  All right.  Thank you, Your Honor.

23           THE COURT:  Thank you.

24           Mr. Sagor, I guess it's you.

25           MR. SAGOR:  I've been waiting a few years to

1    address this Court, and I was hoping to be before

2    Judge Lifland.  My condolences.  I'm equally happy to be

3    before Your Honor.

4            And I'm glad to see Mr. Pickard (ph) here.  I was

5    hoping that by now, they would have seen the equity of what

6    I had to say and all I asked -- all I've asked for since

7    I've learned a little bit was to ask me to get -- ask them

8    to give me my cash back.  I don't want a penny of fictitious

9    profit.  I --

10           THE COURT:  So you're not objecting to the net

11   investment method?

12           MR. SAGOR:  Only in so far as at least it works

13   for me and maybe others.  I want to be generous in it.  It

14   doesn't work exactly.  Judge Jakobs (ph) tells us what the

15   answer is in the Second Circuit opinion.  Differing fact

16   patterns will inevitably call for different approaches.

17           Take the following hypothetical, which I was

18   sitting here in wonderment because Your Honor has really

19   started -- has dug down into the weeds here.  Supposing one

20   day, when I was the small fry in my omnibus law firm account

21   where you only had to be a favorite of my senior partner to

22   have the honor of investing in Madoff -- if I took $175,000

23   in the account that day, that account was a net winner.

24   Apparently, the widows of Howard Squadron and others took

25   out of the squadron account.  I was a little person.  I had

1   my pension in that waiting for a time when I'd get very old.

2            I think that time has come.  I think I've been

3   hostage for a few years by Mr. Pickard.  I think from a

4   reputable law firm to have 4(k)(1) showing that you put

5   $175,000, which I so represent to the Court, I would like

6   this Court my $175,000 back.

7            THE COURT:  Mr. Sagor?  Mr. Sagor, address me.

8            MR. SAGOR:  Forgive me, Your Honor.  It's a long

9   time, and it's painful.  Maybe it's not much money for him.

10  Mr. Sheehan (ph) says these are nuances that -- I'm under

11  control, Your Honor.  Maybe he says that nuances that have

12  not been determined by the -- but let me get to my

13  hypothetical.

14            THE COURT:  I guess I don't understand.  What is

15  your objection?

16            MR. SAGOR:  My objection is that the way the net

17  equity works when you have a net -- an account that is a net

18  winner -- if you are looking at a net loser -- I am the net

19  loser in every respect.  I didn't take out a penny.  All I'm

20  asking for is my cash back.

21            THE COURT:  So you want an individual --

22            MR. SAGOR:  You get zero credit --

23            THE COURT:  This is another one of those multi-

24  party accounts.

25            MR. SAGOR:  Yes.

1          THE COURT:  Where you want an individual

2     determination --

3          MR. SAGOR:  Yes.

4          THE COURT:  -- regarding your ins and outs?

5          MR. SAGOR:  Yes, but not exactly, Your Honor.

6     Because whether there was no money left, that's a serious

7     argument to say that I'm now going to be -- it's bad enough

8     to be victimized by Mr. Madoff.  I don't want to be

9     victimized by other people who took money out of the

10    account.

11         I'm told I could go sue the widows.  I'm not going

12    to do that.  And it doesn't matter.

13         Supposing I put in $175 on Monday, and then, I got

14    my account which my law firm says you have to have your own

15    account.  So one of the Madoff apperatatchniks (ph), I

16    thought graciously, said oh, you can have your own account,

17    even if you're a small person.  Under their way they do the

18    template, when I would go to my next account, 1SO437, they'd

19    say you can't have any money from the old account because

20    that account was a net winner.  That shows you the poverty

21    of the situation.

22         The Second Circuit says that what other customers

23    did should not aggregate what Madoff did.  I have my own

24    account number, fortunately.  I'm lucky, right?  I'm account

25    1SO437.  Evaluate me in terms of whether you're giving me

Page 57

1   back any fictitious profit or not.  The answer is no, and

2   give me back what I put in.

3           Now, I don't know whether the Madoff shows this,

4   but I could represent that this is money.  In 1990, I put in

5   $50,000.  That meant a lot to me, and I thought it was being

6   put in a k(1) for my old age and pension.

7           In 1993, I put 20,000 and in 1995, 65,000 and in

8   1997, 40,000.  Say what you want about Madoff, but, when he

9   said from the joint account that when I received -- I bought

10  some 600,000, they say I got 0 credit for my cash then.

11  Madoff wasn't giving me this money for charitable purposes.

12  Obviously, there had to be money in.

13          What difference does it make?  I hate to use the

14  phrase what difference it makes because it's now politically

15  important.  It shouldn't make any difference.  I shouldn't

16  be victimized by what someone took out of that account.  I

17  should get my cash back, and I think a nudge from you, a

18  nudge from the Second Circuit, everybody in this case to say

19  that the highest point of evaluation is what was your cash

20  in.  What is your principal?

21          The whole idea here is to give people back the

22  full extent possible of their principal.  Now, Mr. Pickard

23  says he wants to be generous.  Mr. Sheehan says he wants to

24  be generous.  That creativity -- and I have high regard for

25  Mr. Pickard.  That creativity should go towards at least

Page 58

1   when people have their own account to evaluate that account

2   on a full basis of determining what that person put in.

3           And I put in $175,000.  Forget about getting

4   interest on it or other things, I want that.  And all I want

5   to have coming out of this, Your Honor, is for you not to

6   let my little brief get lost in the battle of the giants

7   here.  Please look at my case individually.  It's time, and

8   I hope my passion means something.  I hope that they would

9   say he has a one off case, give him his money already --

10          THE COURT:  Well --

11          MR. SAGOR:  -- it's been years.  And it makes a

12   difference to me --

13          THE COURT:  I'm being --

14          MR. SAGOR:  -- to have $175,000 back.

15          THE COURT:  I understand that.  I'm being told by

16   the trustee that that is not an issue raised by the motion,

17   in other words whether --

18          MR. SAGOR:  Well, they told me when I called them

19   not to give things out of --

20          THE COURT:  Let me --

21          MR. SAGOR:  -- school that this motion would

22   affect me and I'd better well get on it and they were

23   gracious to let me put in a brief.  Before today when this

24   representative, the trustee, got up, I thought I was going

25   to be off with their heads, throw the baby out with the

1    bathwater, and off with the heads approach.  And this is

2    expeditious.  It saves SIPA money, but it's not right in

3    individual cases.

4              THE COURT:  Thank you.

5              MR. SAGOR:  Thank you.

6              MS. VANDERWAL:  I just want to address, Your

7    Honor, a few of the points made starting with Mr. Kirby who

8    referred frequently to the statute, but the statute doesn't

9    require an avoidance action to determine a claim.  A statute

10   requires that we look --

11             THE COURT:  Well, what he's arguing is that

12   everybody agrees that what occurred between the first

13   account -- the earlier account and the later account was a

14   transfer.  Once you call it a transfer, you have to go

15   through the procedures that the Bankruptcy Code incorporated

16   into SIPA said, and you have to avoid it.  That's what his

17   argument is.

18             MS. VANDERWAL:  I understand that, Your Honor.

19   First, the -- it would not be a fraudulent transfer, the

20   money never left BLMIS.  It was a transfer within BLMIS.  It

21   was just a book entry from one account --

22             THE COURT:  But it's a transfer of rights.

23             MS. VANDERWAL:  -- to another.

24             THE COURT:  It's certainly a transfer of rights.

25             MS. VANDERWAL:  That's correct.

1              THE COURT:  Yeah.

2              MS. VANDERWAL:  And -- but New York state law

3     provides that you can only transfer what you have a right

4     to.  And in this case, the transferor did not have a right

5     to the fictitious profit in that account and could not

6     transfer it on.

7              THE COURT:  But the transfer was of actual cash,

8     right?

9              MS. VANDERWAL:  We agree that the books and

10    records of BLMIS indicate that a transfer occurs.  And the

11    fact of a transfer is indicated in the amounts --

12             THE COURT:  Also the amount is indicated?

13             MS. VANDERWAL:  Right, but the amount is not --

14    it's fictitious.  It's a created amount --

15             THE COURT:  Well, the --

16             MS. VANDERWAL:  -- based on fictitious securities'

17    activities in the account that gave rise to an account

18    balance that was not real.  And I'd just like to refer the

19    Court back again to (indiscernible - 1:45:00) decision and

20    Bayou where the Court noted that giving credit for these

21    transfers is just piling fiction upon fiction upon fiction.

22    It's fictitious profits in the transferor account.  It

23    continues to be fictitious profits as it passes to the

24    transferee account.

25             I think, as Your Honor noted, Ms. Chaitman raised

1    issues about paying taxes and other impacts.  That's no

2    different than in the withdrawals' setting.  People pay

3    taxes on fictitious profits they received as withdrawals.

4    It's no different in the transferor setting and there's no

5    reason to make that distinction.

6             Extremely briefly, I want to recite, Your Honor,

7    there's no avoidance action here.  ERISA doesn't implicate

8    on the calculation of claims and even if it did, ERISA has a

9    subordination provision built into it which makes it --

10   which provides that it can have no impact on any other

11   statute.  So, to the extent it would require a result

12   different from SIPA that it would be subordinated to SIPA.

13             Mr. Sagor falls into the same category as

14   Mr. Ross.  He's an investor in a shared, pooled account.

15   His issue is whether or not he's a customer that's not an

16   issue --

17             THE COURT:  Well, what is --

18             MS. VANDERWAL:  -- for today.

19             THE COURT:  As I understand it, his argument is a

20   little more nuanced and he's saying, look, I can show you

21   how much I put in and how much I took out, and that should

22   be what I'm entitled to.  And the fact that other people

23   took money out of that original transfer account shouldn't

24   affect that determination.  I guess it's the same argument

25   that several people have made.

1             And you're telling me I don't have to deal with

2    that now and I don't know how I avoid it, because implicit

3    in the rejection of all of these claims is that position.

4    So why don't you just file a supplemental briefing and let

5    anybody brief that issue and deal with it.

6             MS. VANDERWAL:  We do intend to brief that issue,

7    but it doesn't impact on whether a transfer includes

8    fictitious profit or not.  Mr. -- his issue is what -- is

9    whether or not he is a customer or he is an investor in a

10   customer.  It doesn't affect whether the net investment

11   method should be applied.

12            THE COURT:  All right.

13            MS. VANDERWAL:  I just -- I'd also like to --

14   Ms. Chaitman raised the trustee's duty to various investors.

15   And the trustee, in fact, as Your Honor mentioned, his duty

16   isn't to the entire estate.  It has to determine what's

17   equitable for everyone here.  And we -- there are -- the

18   trustee is sympathetic to the issues that have been raised

19   today.

20            Unfortunately, arguments that are based solely on

21   the equities, as the Second Circuit stated in Packer Wilbur,

22   cannot succeed.  The trustee cannot reduce other people's

23   principal to allow people to retain fictitious profit.  It's

24   just not the appropriate approach for all of the customers

25   of this (indiscernible - 1:47:57).

Page 63

1            THE COURT:   Thank you.   I'll reserve decision.

2     Thank you very much.

3         (Whereupon these proceedings were concluded at 11:50

4     AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 64

1                  C E R T I F I C A T I O N

2

3    We, Nicole Yawn and Jamie Gallagher, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6
     Nicole Yawn
7                              Digitally signed by Nicole Yawn
                               DN: cn=Nicole Yawn, o=Veritext,
8                              ou, email=digital@veritext.com,
                               c=US
9                              Date: 2014.06.20 16:49:17 -04'00'

     Nicole Yawn

10
     Jamie
11
     Gallagher                 Digitally signed by Jamie Gallagher
12                             DN: cn=Jamie Gallagher, o=Veritext,
                               ou, email=digital@veritext.com, c=US
13                             Date: 2014.06.20 16:51:38 -04'00'

14   Veritext

15   330 Old Country Road, Suite 300

16   Mineola, NY 11501

17

18   Date:  June 20, 2014

19

20

21

22

23

24

25