**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05383 (SMB) |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT** |
| STANLEY SHAPIRO, individually, as general partner of S&R Investment Co., as trustee for LAD Trust, as trustee for David Shapiro 1989 Trust, as amended, and as trustee for Leslie Shapiro 1985 Trust, as amended, | |
| RENEE SHAPIRO, individually, as general partner of S&R Investment Co., as trustee for LAD Trust, as trustee for David Shapiro 1989 Trust, as amended, and as trustee for Leslie Shapiro 1985 Trust, as amended. | |

S&R INVESTMENT CO.,

LAD TRUST,

DAVID SHAPIRO, individually and as trustee for
Trust f/b/o ██████ ██████ [W.P.S.] & ██████
██████ [J.G.S.],

RACHEL SHAPIRO,

DAVID SHAPIRO 1989 TRUST, as amended,

TRUST F/B/O ██████ ██████ [W.P.S.] &
██████ ██████ [J.G.S.],

LESLIE SHAPIRO CITRON,

LESLIE SHAPIRO 1985 TRUST, as amended,

TRUST F/B/O ██████ ██████ [A.J.C.],
██████ ██████ [K.F.C.], and ██████ ██████
[L.C.C.], as amended, and

KENNETH CITRON, individually and as trustee
for Trust f/b/o ██████ ██████ [A.J.C.],
██████ ██████ [K.F.C.], and ██████ ██████
[L.C.C.], as amended,

Defendants.

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), and the substantively consolidated estate of Bernard L.

Madoff, individually, by and through his undersigned counsel, for this Second Amended

Complaint against Stanley Shapiro, Renee Shapiro, S&R Investment Co. ("S&R"), LAD Trust,

David Shapiro, Rachel Shapiro, David Shapiro 1989 Trust, as amended ("David Shapiro Trust"),

Trust f/b/o ██████████ [W.P.S.] & ██████████ [J.G.S.] ("Trust f/b/o David

Shapiro's Children"), Leslie Shapiro Citron (*née* Leslie Shapiro), Leslie Shapiro 1985 Trust, as

amended ("Leslie Shapiro Trust"), Trust f/b/o ██████████ [A.J.C.], ██████████

[K.F.C.], and ██████████ [L.C.C.], as amended ("Trust f/b/o Leslie Shapiro Citron's

Children"), and Kenneth Citron (collectively, "Defendants"), states as follows:

## INTRODUCTION

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Bernard L. Madoff ("Madoff") with the assistance of others inside, as well as outside, of BLMIS.

When the Ponzi scheme collapsed in 2008, Madoff had defrauded many hundreds of customers,

who had invested in BLMIS's investment advisory business (the "IA Business"), out of billions

of dollars.

2.      Defendant Stanley Shapiro ("Shapiro") was no unwitting investor.  He knew that

the IA Business was predicated on fraud and that he and his family were benefitting from

fabricated trading activity reported in their investment accounts at BLMIS.  Since March 1981,

the Shapiro family collectively received nearly $54 million from more than 15 different accounts

that they held with BLMIS.  Given that they invested no more than $3.75 million with BLMIS,

the family withdrew – often entirely on margin – more than $50 million in fictitious profits from

Madoff's Ponzi scheme, all of which was other people's money.  Shapiro and his wife, Renee,

(the "Shapiros") also received a host of other benefits from BLMIS, ranging from salary

payments to free rides on the BLMIS jet used by Madoff and his family.

3.      Shapiro's relationship with Madoff spanned more than forty years; he first invested

with BLMIS in the 1960s.  Shapiro thereafter developed a close friendship with Madoff.  The

two, together with their wives, socialized often; the two couples dined out, attended charity

events, and even took luxurious trips together.  By 1995, Shapiro was ostensibly working as a

part-time consultant and proprietary trader at BLMIS.

4.      Shapiro thus had extraordinary access to Madoff as well as others at BLMIS who

were involved in the IA Business, including Annette Bongiorno ("Bongiorno") who personally

3

managed the Shapiro family's Core Accounts (as defined below) at BLMIS.  Shapiro could – and did – direct Bongiorno to "cancel" trades and to generate specific "gains" and "losses" in the Core Accounts.  Bongiorno often fulfilled Shapiro's directives by blatantly backdating trades.  In the early 2000s, Shapiro asked for even more.  During 2002, the reported value of the Core Accounts plummeted due to the burst of the dot-com bubble and the high margin balances that the family carried in the Core Accounts.  To remedy the situation, and at Shapiro's request, BLMIS generated revised backdated account statements for the Core Accounts for nearly every month of 2002.  In these statements, BLMIS reported a slew of newly fabricated short sales which improved the reported value of the Core Accounts by more than $60 million.  (*See* Section A, Section C(i) & (ii), and Section D(i) below.)

5.      This fiction – of backdating short sales to erase huge paper losses and margin balances in the Core Accounts – generated tens of millions of dollars in fictitious gains and had significant tax consequences for the Shapiro family.  After paying millions in taxes for the 2002 calendar year, the family appeared to face an even larger liability in early 2003.  With Shapiro's knowledge, BLMIS took care of this issue as well.  Over the balance of 2003, BLMIS fabricated more than $40 million in short-term losses in the Core Accounts, essentially wiping out the family's tax liability for the year.  These purported losses were not "realized" by reportedly selling off long-held positions whose value had declined, but rather were created out of thin air for the sole purpose of reducing the family's tax exposure.  (*See* Section D(ii) below.)

6.      Shapiro played an instrumental role in the planning and execution of the scheme to fabricate these groups of backdated trades in 2002 and 2003.  Shapiro, after learning of the magnitude of the paper losses reported in the Core Accounts in late 2002, asked Madoff and Bongiorno to fabricate new backdated trades that would restore the value in the Core Accounts.

4

He then was actively involved in the plan to fabricate losses through the latter part of 2003 to

offset massive gains reportedly realized in the Core Accounts in early 2003.  Shapiro even took

steps to eliminate evidence of the fraud in which he and BLMIS had engaged, by returning

account statements that he had originally received from BLMIS in exchange for revised ones.

Unfortunately for Shapiro, Bongiorno never destroyed the statements he had returned.  On

several of them, Shapiro had made handwritten notes, irrefutable proof that he had an active

hand in the fraud perpetrated at BLMIS. (*See* Section D below.)

## JURISDICTION AND VENUE

7.    This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, Adv. Pro. No. 08-01789 (SMB) (the "SIPA Proceeding"), is

pending.  The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding"), and was

referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28

U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

8.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

The Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

9.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

10.    This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-2(c)(3),

11 U.S.C. §§ 105(a), 502(a), (b) and (d), 510(c), 544(b), 547, 548(a), 550(a) and 551, the New

York Fraudulent Conveyance Act (N.Y. Debt & Cred. §§ 270 *et seq.* (McKinney 2001)), and other applicable law.

## BACKGROUND, THE TRUSTEE, AND STANDING

11.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

12.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

13.    By orders dated December 23, 2008, and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.

14.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the Chapter 7 estate of Madoff into the SIPA Proceeding.

## THE PONZI SCHEME

15.    Madoff founded BLMIS in or about 1960 as a sole proprietorship, and on January 1, 2001, he reorganized BLMIS as a single member limited liability company under the laws of the state of New York.  For most of its existence, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York (the "Lipstick Building").  As founder, sole owner, chairman, and chief executive officer, Madoff operated BLMIS with several family members and other key employees.

6

16.    On March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-

CR-213(DC), Madoff pleaded guilty to an eleven-count criminal information filed against him

by the United States Attorney's Office for the Southern District of New York.  At the plea

hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side

of [BLMIS]."

17.    At a plea hearing on August 11, 2009, in the case captioned *United States v.*

*DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali ("DiPascali"), a former BLMIS employee,

pleaded guilty to a ten-count criminal information charging him with participating in and

conspiring to perpetuate the Ponzi scheme.  At the hearing, DiPascali admitted that no purchases or

sales of securities took place in connection with BLMIS customer accounts and that the Ponzi

scheme had been ongoing at BLMIS since at least the 1980s.

18.    At a plea hearing on November 21, 2011, in a case captioned *United States v.*

*Kugel*, Case No. 10-CR-228 (LTS), David Kugel ("Kugel"), another former BLMIS employee,

pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying

the records of BLMIS, conspiracy, and bank fraud.  At his plea hearing, Kugel admitted to

helping create fake, backdated trades in BLMIS customer accounts beginning in the early 1970s.

19.    On March 24, 2014, former BLMIS employees Bongiorno, Daniel Bonventre

("Bonventre"), Jo Ann Crupi ("Crupi"), George Perez, and Jerome O'Hara were convicted of

fraud and other crimes in connection with their participation in the Ponzi scheme.

20.    Over the course of the Ponzi scheme, BLMIS reported to its customers that their

investment advisory accounts were invested in one or more of several different strategies.  As of

the early 1970s and continuing over more than twenty years, BLMIS falsely reported to many of

its customers that their accounts were invested in a convertible arbitrage strategy.  Specifically,

7

BLMIS reported that it had purchased long convertible securities on or near the same date that it

sold short positions in the underlying common stock.  BLMIS thereafter represented that it had

converted the long positions to common stock and then delivered that stock to cover the short

positions.  This purported trading activity was entirely fictitious and was engineered by BLMIS

to achieve predetermined fictitious profits for its customers.  In the early years of investing with

BLMIS, the Shapiros held numerous accounts which were purportedly invested in the

convertible arbitrage strategy.  Similar to what BLMIS had fabricated for other insiders (*e.g.,*

Bongiorno, Irwin Lipkin, and Bonventre), nearly every pair of convertible arbitrage transactions

reported on the Shapiro family's account statements yielded the same rate of return, specifically

2.5% over a four-week period which equated to an annual rate of return of 32.5%.

21.    For certain other accounts in the IA Business, BLMIS purported to participate in a

capital appreciation/depreciation strategy, depending on whether the customer sought to generate

gains or losses.  BLMIS generally executed the strategy by purporting to purchase small groups

of securities near lows and then purporting to sell those same securities years later at highs, or by

purporting to short-sell securities near highs and then purporting to cover those short positions

near lows.  If a purported loss was sought, BLMIS often would do just the opposite.  Starting in

the early 1980s and continuing through BLMIS's collapse in 2008, the Core Accounts held by

the Shapiros and their children were reportedly invested in this fictitious long-term, buy and hold

strategy, which in many years yielded annual returns of more than 50%.

22.    Beginning in the 1990s, Madoff outwardly ascribed the consistent success of

BLMIS's IA Business to his "split-strike conversion" ("SSC") investment strategy.  Madoff

claimed his strategy would produce steady returns without the volatility in the stock market.

Madoff generally reported that investors' funds would be invested in a basket of common stocks

within the Standard & Poor's 100 Index ("S&P 100 Index") which is a collection of the hundred

largest, publicly traded companies, as determined by Standard & Poor's Index Committee.  The

basket of stocks was designed to correlate to the movement of the S&P 100 Index.  The strategy

also involved selling call options and buying put options on the S&P 100 Index, which is

commonly referred to as a "collar."  All options relating to the companies within in the S&P 100

Index, including options based on the S&P 100 Index, clear through the Options Clearing

Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any

trades in any exchange-traded listed options.

23.    Because Madoff claimed that he would carefully time purchases and sales to

maximize value, customer funds would intermittently be out of the market.  During those times,

Madoff claimed that the funds were invested in U.S. Treasury securities or mutual funds invested

in U.S. Treasury securities.  There is no record of BLMIS clearing a single purchase or sale of

securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation,

the clearing house for such transactions, or any other trading platform on which BLMIS could

have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded

securities using the SSC strategy.  The Shapiro family held numerous accounts purportedly

invested in the SSC strategy.

24.    Madoff operated the IA Business as a Ponzi scheme.  BLMIS commingled all of the

funds received from IA Business investors in a single BLMIS account maintained at JPMorgan

Chase Bank.  The money received from IA Business customers was used primarily to make

distributions to, or payments for, other customers.  The falsified monthly account statements

made it appear that the IA Business accounts included substantial gains on customers' principal

investments.  The Ponzi scheme collapsed in December 2008, when the requests for redemptions overwhelmed the flow of new investments with BLMIS's IA Business.

25.    Since at least the 1970s, BLMIS fraudulently claimed to engage in securities trades for IA Business customers that did not occur.  Basic market data reveals that those purported trades did not, and could not, have taken place as reported on BLMIS customer statements.  For example, there are many instances where the total number of securities purportedly traded by BLMIS significantly exceeded the entire reported market volume for that particular security on that particular day.  Even where BLMIS purportedly traded securities within normal market volumes, there are many instances where the prices of those trades were outside the daily market price range for that security.  In many other examples, BLMIS account statements reported trades of a particular security when actual market reports show that particular security simply did not change hands in the market on that reported date.

26.    Since at least 1983, BLMIS financial reports filed with the SEC fraudulently omitted the existence of the billions of dollars of customer funds held by BLMIS.  BLMIS did not register as an investment adviser with the SEC until August 2006.  At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts and assets under management of $11.7 billion.  Thereafter, BLMIS filed a Form ADV annually with the SEC, the latest of which was filed in January 2008.  In that filing, BLMIS represented that it had 23 customer accounts with assets under management of $17.1 billion.  In fact, at that time BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion under management.

27.     Contrary to standard practice in the investment advisory industry, BLMIS did not charge the IA Business customers a fee for investment advisory services.  Madoff knew others who solicited investors for BLMIS or who, directly or indirectly, funded customer accounts, charged hundreds of millions of dollars for investment advisory services attributed to BLMIS.  Instead of investment advisory fees, BLMIS purported to accept commissions for the purported trades, as reflected in the fraudulent IA Business customer statements.

28.     BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person accounting firm in Rockland County, New York.  Of the three employees at the firm, one employee was an administrative assistant and one was a semi-retired accountant living in Florida.  On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.

29.     At all relevant times, BLMIS was insolvent because: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## THE DEFENDANTS

30.     Shapiro and his wife maintain their principal residence in New York, New York (the "Shapiros' Home Address").

31.     S&R is a partnership formed under the laws of the state of New York.  Its principal place of business is located at the Shapiros' Home Address.  The Shapiros are the general partners of S&R.  Shapiro managed and controlled all of the business and other affairs of S&R.

32.     David Shapiro and his wife, Rachel Shapiro, maintain their primary residence in New York, New York.  David Shapiro is the Shapiros' youngest child.

11

33.    Kenneth Citron and his wife, Leslie Shapiro Citron, maintain their primary residence in Aspen, Colorado.  They formerly resided in New York, New York.  Leslie Shapiro Citron is the Shapiros' daughter.

34.    LAD Trust was a trust established by the Shapiros for the benefit of their children. The Shapiros served as trustees of the LAD Trust.

35.    David Shapiro Trust and Leslie Shapiro Trust were each formed in 1985 for the benefit of, respectively, David Shapiro and Leslie Shapiro Citron, and were later amended.  The Shapiros served as trustees of said trusts.

36.    Trust f/b/o David Shapiro's Children is a trust established in 2007 for the benefit of David and Rachel Shapiro's two children, J.G.S. and W.P.S.  David Shapiro is a trustee of said trust.

37.    Trust f/b/o Leslie Shapiro Citron's Children is a trust established in 2007 for the benefit of the three children of Kenneth Citron and Leslie Shapiro Citron, A.J.C., K.F.C., and L.C.C.  Kenneth Citron is a trustee of said trust.

## THE DEFENDANTS' BLMIS ACCOUNTS

38.    Over the years, Defendants held more than 20 different investment accounts at BLMIS (again, the "Accounts").  A list of all known Accounts is set forth in Exhibit A hereto.

39.    Upon information and belief, the Shapiros opened the first of the Accounts (No. 1-03009-1-1) jointly in their names during the mid-1960s.  Shapiro later changed the name on the account to "S&R Investment Co."  Between 1980 and 1983, Shapiro opened several additional investment accounts at BLMIS and held them either personally (No. 1-02047-1-5), with his wife through S&R (Nos. 1-03013-3-0, 1-03039-1-5, 1-03058-1-1, and 1-03069-1-8) or in the name of the "Stanley Shapiro Trust" (Nos. 1-03043-1-9 (which was renumbered 1-03033-3-0)). Eventually, all of these accounts were combined into a single account held by S&R (No. 1-

03013-3-0 (which was renumbered 1SH014)) with the address reported as the Shapiros' Home

Address. Account 1SH014 was the largest of the four accounts which herein are collectively

referred to as the Core Accounts.

40.    After 1983, S&R held two additional accounts at BLMIS (Nos. 1SH079 and

1SH172), with the address for each reported as the Shapiros' Home Address. Account 1SH079

was opened in the name of S&R in September 1995 entirely on margin. Account 1SH079 is the

second of the Core Accounts held by S&R. Account 1SH172 was opened in April 2003 with a

transfer of fictitious profits from Account 1SH014. Shapiro managed and otherwise exercised

dominion and control over all of the BLMIS accounts held in the name of S&R as well as those

accounts that he held either in his own name, jointly with his wife or in the name of the Stanley

Shapiro Trust.

41.    The Shapiros also held numerous BLMIS accounts for the benefit of their children.

They held several accounts as trustees of trusts established for their children's benefit, including

the LAD Trust (Nos. 1-03034-1-0 (which was renumbered 1-03012-1-0 and then 1-03012-3-0)),

the David Shapiro Trust (Nos. 1-03047-1-0 (which was renumbered 1SH027) and 1-03065-3-0

(which was renumbered 1SH028)), and the Leslie Shapiro Trust (Nos. 1-03046-1-0 (which was

renumbered 1SH029) and 1-03066-3-0 (which was renumbered 1SH030)). Accounts 1SH028

and 1SH030, together with Accounts 1SH014 and 1SH079, were the largest four accounts held

by the Shapiro family, and are collectively referred to herein as the "Core Accounts." Renee

Shapiro also held several accounts at BLMIS as custodian for her children (Nos. 1-03045-1-7, 1-

03046-1-6, 1-3044-1-8, and 1-03048-1-4 (which was renumbered 1-03029-1-0)). The last of

these custodial accounts was divided and poured into the accounts held by the David Shapiro

Trust (No. 1-03047-1-0) and the Leslie Shapiro Trust (No. 1-03046-1-0). Shapiro managed and

otherwise exercised dominion and control over these custodial accounts as well as all of the accounts held either in the name of the LAD Trust, the David Shapiro Trust or the Leslie Shapiro Trust.

42.     At one time or another, David Shapiro held three accounts at BLMIS (Nos. 1S0306, 1SH027, and 1SH028). The address of Accounts 1SH027 and 1SH028 was reported as the Shapiros' Home Address. The address of Account 1S0306 was originally reported as the Shapiros' Home Address and then was changed to David and Rachel Shapiro's home address in New York, New York with duplicate statements sent to the Shapiros' Home Address. Account 1SH028 (originally numbered 1-03065-3-0 ) was opened in February 1990 with a transfer of fictitious profits from Account 1-03012-3-0, and was first held in the name of the David Shapiro Trust before it was changed into the name of "David Shapiro" in 2008. Account 1SH027 (originally numbered 1-03047-1-0) was opened in June 1985 with a transfer of fictitious profits from Account 1-03029-1-0, and was first held in the name of "David Shapiro, Renee Shapiro Custodian." Account 1S0306 was opened in May 1997 with a transfer of fictitious profits from Account 1SH027. Shapiro managed and otherwise exercised dominion and control over all of the Accounts held in David Shapiro's name or for his benefit.

43.     The Trust f/b/o David Shapiro's Children held one BLMIS account (No. 1S0540), with the account address reported as David and Rachel Shapiro's home address in New York, New York. Account 1S0540 was opened with a transfer of fictitious profits from S&R Account 1SH172. Upon information and belief, the Shapiros thereafter funded Account 1S0540 largely, if not completely, with subsequent transfers of fictitious profits they received in connection with one or more of their BLMIS accounts. Shapiro received duplicate monthly statements for Account 1S0540.

44.    At one time or another, Leslie Shapiro Citron held four accounts at BLMIS (Nos. 1SH029, 1SH030, 1SH171, and 1C1251).  Account 1SH029 (originally numbered 1-03046-1-0) was originally held by the Leslie Shapiro Trust, with a reported address of the Shapiros' Home Address, and later was held jointly by Leslie Shapiro Citron and Kenneth Citron, with a reported address of the former home address of Kenneth Citron and Leslie Shapiro Citron in New York, New York.  Account 1SH029 was opened in June 1985 with a transfer of fictitious profits from Account 1-03029-1-0.  Account 1SH030 (originally numbered 1-03066-3-0) was opened in February 1990 with a transfer of fictitious profits from Account 1-03012-3-0, and was first held in the name of the Leslie Shapiro Trust Citron before it was changed into the name of "Leslie Shapiro Citron" in 2006.  The reported address of Account 1SH030 was the Shapiros' Home Address.  Account 1SH171 was opened in April 2003 with a transfer of fictitious profits from Account 1SH030.  Shapiro managed and otherwise exercised dominion and control over Account 1SH030, 1SH029, 1SH171, and certain other of the accounts held in the name of Leslie Shapiro Citron or for her benefit.

45.    Kenneth Citron and Leslie Shapiro Citron also held a BLMIS account in the name of "Kenneth & Leslie Shapiro Citron" (No. 1C1251), with the address of the account reported as their former home address in New York, New York.  Account 1C1251 was opened in May 1997 with a transfer of principal and fictitious profits from Leslie Shapiro Citron's Account 1SH029. Kenneth Citron also held a BLMIS account in the name of "Kenneth Citron" (No. 1C1214), with the account address reported as his former home address in Boston, Massachusetts.  Account 1C1214 was opened in June 1994, and closed in early 1995.

46.    Kenneth and Leslie Citron held a custodial account at BLMIS for their children (No. 1C1327), with the account address reported as the former home address of the Citrons in

New York, New York.  The Citrons opened Account 1C1327 in 2004.  In 2007, the Citrons

instructed BLMIS to transfer the holdings in Account 1C1327 into an account they opened in the

name of the Trust f/b/o Leslie Shapiro Citron's Children (No. 1C1345).  The address on Account

1C1345 was also listed as the Citrons' former address in New York, New York.  Upon

information and belief, the Shapiros largely funded Accounts 1C1327 and 1C1345 with

subsequent transfers of fictitious profits they received in connection with one or more of their

BLMIS accounts.  Shapiro received duplicate monthly statements for Accounts 1C1327 and

1C1345.

### SHAPIRO KNEW OF FRAUD AT BLMIS

47.    Shapiro knew that Madoff's IA Business was predicated on fraud and that he and

the other Defendants were benefitting from fraudulent activity reported in the family's accounts

at BLMIS.  By virtue of his decades-long relationships with Madoff and Bongiorno, Shapiro

could, and frequently did, direct Bongiorno to "cancel" trades or to achieve specific "gains" or

"losses" in his family's accounts.  Bongiorno generally satisfied Shapiro's directives by

backdating short-term buy and sell transactions to purportedly produce the very gains or losses

sought by Shapiro.  These reported transactions had numerous hallmarks of fraud.

48.    In 2002 and 2003, Shapiro went a step further, and took a more active role in the

fraud at BLMIS.  After the stock market suffered a sharp downturn in 2002, Bongiorno

backdated, at Shapiro's request, a significant number of fictitious trades in all but one of the Core

Accounts.  The fabricated backdated trades wiped out substantially all of the paper losses

reportedly suffered in the accounts during 2002 and entirely eliminated more than $75 million in

margin balances reportedly carried in the accounts.  Bongiorno reported the newly fabricated

trades in sets of revised account statements which BLMIS provided to Shapiro only after he had

returned his original statements to BLMIS.  Then, in the middle of 2003, BLMIS began

16

fabricating, with Shapiro's knowledge, more backdated trades, this time to minimize the apparent sizable tax liability faced by the Shapiro family. Many of these backdated trades were reported in sets of revised account statements. Since Shapiro managed and otherwise exercised dominion and control over nearly all of Accounts, including but not limited to the Core Accounts, his actual knowledge of fraud at BLMIS is imputed to all of the members of his family.

A.    **SHAPIRO ENJOYED UNUSUAL ACCESS TO MADOFF AND OTHERS INVOLVED IN THE IA BUSINESS.**

49.    Shapiro met Madoff and began investing with BLMIS in the mid-1960s. Over the next several decades, Shapiro forged a close relationship with Madoff through which he enjoyed extraordinary access to him as well as to Bongiorno and others involved in the IA Business. Shapiro was part of a small privileged group of BLMIS investors with whom Madoff appeared to place his trust and to whom Madoff gave special treatment. Bongiorno personally managed many of the accounts held by the Shapiro family, including all of the Core Accounts. She also managed the accounts of some of the most significant, long-time investors at BLMIS, including Stanley Chais, Jeffry Picower, Carl Shapiro, Ed Blumenfeld, and Norman Levy.

50.    Shapiro made his career in the garment industry. For years, he worked for Kay Windsor, Inc., a once nationally recognized dress manufacturer, which was owned and operated by Carl Shapiro. Stanley Shapiro went on to serve as the president of Kay Windsor for approximately twenty years. As president, he helped take the company public in 1960 and played a significant role in the company's later acquisition by V.F. Corp. ("Vanity Fair"). Through his decades as a senior officer at Kay Windsor and then Vanity Fair, Shapiro developed an acute business sense.

51.    Over the years, Shapiro sought advice from others who had substantial investments in the IA Business or who were otherwise connected to BLMIS.  It was Carl Shapiro who recommended that Shapiro invest money with BLMIS.  Shapiro thereafter sought advice from another long-time BLMIS investor, Ed Kostin, regarding tax issues relating to his family's investments with BLMIS.  In the early 1970s, at Carl Shapiro's recommendation, Shapiro hired a bookkeeper to assist him in regularly monitoring the accounts that he and his family held at BLMIS.

52.    In or about 1995, Madoff hired Shapiro to serve as a part-time consultant and proprietary trader at BLMIS.  BLMIS paid Shapiro a salary and provided the Shapiros with health care coverage.  Shapiro eventually shared an office with Kugel, a key player in the fraud at BLMIS.  Their office was located on the 19th Floor of the Lipstick Building and was directly adjacent to the office used by Madoff.

53.    Despite the fact that Shapiro was not registered to trade securities, Madoff allowed Shapiro to use BLMIS capital to trade, using BLMIS's 19th floor proprietary trading desk, in shares of public companies involved in the clothing and fashion industry.  Shapiro appeared to use a buy and hold strategy in his proprietary trading at BLMIS, but he also shorted stocks and even traded options at times.  He had some measure of success in his trading, generating profits of approximately $245,000 in 1999, $385,000 in 2000, $360,000 in 2001, $850,000 in 2004, and $530,000 in 2006.  In other years, he lost money for BLMIS, including approximately $185,000 in 1998, $150,000 in 2005, and $775,000 in 2007.

54.    At Madoff's direction, Shapiro hired Paul Konigsberg ("Konigsberg") in 1996 to provide tax and other advice relating to the Accounts.  Konigsberg had many other clients who held accounts at BLMIS, some of whom were among BLMIS's largest individual investors,

including Norman Levy.  On June 24, 2014, Konigsberg pleaded guilty to a three-count

superseding criminal information for his role in the fraud at BLMIS.  At his plea hearing,

Konigsberg admitted that he conspired with others to falsify the books and records of BLMIS

and to obstruct the administration of federal tax law.

55.    As Shapiro's bookkeeper had done earlier, Konigsberg and his firm, Konigsberg

Wolf & Co. ("Konigsberg Wolf"), regularly provided Shapiro with detailed schedules of the

purported unrealized and realized gains and losses in the Core Accounts.  Konigsberg Wolf

prepared these schedules based on duplicate accounts statements that it received from BLMIS.

56.    Shapiro met often with Madoff to discuss the Accounts.  Telephone records show

that he spoke with Madoff dozens of times from his residences in Manhattan and

Bridgehampton, Long Island.  BLM Air Charter LLC records reveal that Shapiro and his wife

travelled with Madoff or other Madoff family members on the private jet used by BLMIS on

more than 25 occasions between October 2002 and December 2008.  The Shapiros joined

Madoff, his wife, and others on many luxurious trips sponsored an organization that hosts events

for members of stock exchanges around the world.

57.    Shapiro spoke frequently with Bongiorno regarding the Core Accounts.  Key card

records reveal that on more than 150 occasions from 2005 through 2008, Shapiro visited the 17th

floor of the Lipstick Building, the floor on which Bongiorno worked and to which only a select

number of BLMIS employees had access.  Bongiorno purportedly employed a long-term, buy

and hold strategy for the Core Accounts, except in instances where Shapiro needed to achieve

particular gains or losses in the accounts.

58.    Madoff and Bongiorno allowed the Shapiro family to carry significant margin

balances on the Core Accounts.  Generally, whenever BLMIS reported that it had purchased

securities in the Core Accounts, it did so entirely on margin. When the Shapiro family withdrew

funds from any of the Core Accounts, BLMIS simply increased the margin balance on the

account in an amount equal to the withdrawal. Beyond violating Federal Reserve Regulation T

and NASD Rule 2520, which respectively govern initial margin and margin maintenance

requirements in brokerage accounts, these practices led the Shapiro family to accrue significant

margin balances in the Core Accounts, which climbed as high as $75 million in 2002.

### B.    THE ACCOUNTS EARNED IMPLAUSIBLE RATES OF RETURN.

59.    The rates of return in the Accounts held by the Shapiro family at BLMIS were not

possible through legitimate securities trading. As of March 1981, the reported value of the

several accounts that the Shapiro family held at BLMIS totaled approximately $1.75 million.

Over the next twenty-seven years, the family deposited less than $2 million into these and other

accounts they opened at BLMIS. The last deposit that the Shapiros ever made into any of the

several accounts held by S&R (Nos. 1-03069-1-8, 1-03058-1-1, 1-03009-1-1, 1-03013-3-0

(which was renumbered 1SH014), 1SH079, and 1SH172) was in March 1982. Thereafter, they

withdrew more than $37 million in cash from these accounts – most often entirely on margin –

and still had reported equity in excess of $50 million in November 2008. The BLMIS accounts

established by the Shapiros for the benefit of their children (Nos. 1SH028, 1SH030, 1SH171, and

1S0306) exhibited a similar pattern. While after 1982 only limited deposits were made into any

of these accounts, Leslie Shapiro Citron and David Shapiro withdrew more than $13 million

from the accounts in the ensuing 26 years. Nearly all of what the Shapiros and their children

withdrew constituted fictitious profits from the Ponzi scheme and was other people's money.

60.    The rates of return purportedly achieved in the Accounts were extraordinarily

consistent and implausibly high. During some of the earlier years of investing with BLMIS, the

convertible arbitrage accounts held by the Shapiros and the LAD Trust received the identical rate

of return – 2.5% over a four-week period – on virtually every transaction reported in the accounts. In later years, the purported returns in the Shapiro family's long-term, buy and hold accounts were implausibly high.

61.    For many years, BLMIS reported to Shapiro that its "benchmark rate of return" for each of the Core Accounts was 29.00%. Starting in 2003, BLMIS lowered that rate to 20.00%. Nevertheless, BLMIS regularly reported to Shapiro that it had achieved extraordinary rates of return for the Core Accounts, often well above the "benchmark" rate. S&R Account 1SH014 reportedly achieved a positive rate of return every year from 1999 through 2008. In 1999, BLMIS reported that the account achieved an "annualized return" of more than 68%. Schedules prepared by Konigsberg Wolf and year-end BLMIS account statements reported that the net value of 1SH014 increased nearly every year by millions of dollars. The Core Accounts held by the David Shapiro Trust and the Leslie Shapiro Trust likewise reportedly achieved high rates of return and increased significantly in value almost every year. These extraordinary and implausible rates of return reportedly achieved in the Core Accounts were inconsistent with legitimate trading activity.

C.    **SHAPIRO CLOSELY MONITORED AND MANAGED HIS FAMILY'S ACCOUNTS AND REGULARLY DIRECTED BLMIS TO GENERATE SPECIFIC GAINS AND LOSSES.**

62.    Over the years, Shapiro closely monitored how his and his family's BLMIS accounts were reportedly performing. He did so by, *inter alia,* regularly reviewing monthly account statements and portfolio management reports provided by BLMIS as well as quarterly schedules of realized and unrealized gains and losses prepared first by his bookkeeper and then later by Konigsberg Wolf. He paid particularly close attention to his and his family's anticipated tax liability. Near the end of many calendar years, Shapiro directed Bongiorno to achieve specific gains or losses in one or more of the Core Accounts so as to minimize or altogether

eliminate his family's apparent tax liability.  Additionally, he directed that funds be transferred

among the Accounts, and he requested and received millions of dollars in distributions from the

Accounts.

### i.    Shapiro Could "Cancel" Trades Reported In The Core Accounts.

63.    Shapiro had the ability to direct BLMIS to "cancel" purported trades in the Core

Accounts after they already had appeared on account statements.  In February 2000, Shapiro

spoke to Bongiorno about his desire to cancel a number of trades that BLMIS reportedly had

made approximately six weeks earlier in each of the Core Accounts.  In a letter sent by Shapiro

to Konigsberg by facsimile from the Royal Poinciana in Palm Beach, Florida, Shapiro explained:

*Figure 1*

A transcription of this letter appears below. [1]

64.    Although Bongiorno gave Shapiro the option to cancel all of the trades, he decided
to cancel only one of the trades that had appeared on the January 2000 account statements.  The
cancellation appears on the face of the February 2000 account statement for S&R Account
1SH079.  By cancelling the reported trade, Shapiro not only knowingly engaged in fraud with
BLMIS, but he apparently also committed tax fraud.

### ii.    Shapiro Directed BLMIS To Generate Short-Term "Gains" And "Losses" In The Core Accounts.

65.    Shapiro was ever mindful of his and his family's tax exposure.  Near the end of
every year, Shapiro reviewed his and his family's purported realized and unrealized gains and
losses in their Core Accounts, conveyed through schedules prepared first by his bookkeeper and
then by Konigsberg Wolf, to gauge their projected tax liability.  On numerous occasions, Shapiro
directed BLMIS to arrange, for tax purposes, that particular "gains" or "losses" be realized in
one or more of the Core Accounts.

66.    BLMIS purportedly used a long-term, buy and hold investment strategy for the
Core Accounts.  Each of these accounts therefore reportedly held numerous securities for
extended periods.  Over time, the reported value of most of these positions increased while a few
declined.  Generally when Shapiro sought a specific "gain" or "loss" in one of the Core

---

[1]    Dear Paul

    As per our conversation, here are Jan. statements indicating <u>trades</u> covering short
positions and I believe creating losses.  I am fairly certain these are "old" and "grandfathered"
positions.  Why should we do these?  (note there are (2) S&R accts SH014 and SH079.[)]

    Please call me as soon as possible as it is my thinking that we would like to <u>cancel</u>
these trades.

    Annette gave me a "deadline" of today – but I will try to postpone until Monday.
Get to me as soon as possible <u>or</u> you can call Annette if [you] care to.

                    Love + xxx
                    Stanley

Accounts, Bongiorno did not report that she had sold one the account's long-held positions to generate a specific gain or loss. Instead she fabricated backdated "purchases" that were then quickly "sold" (or vice-versa if a stock was shorted) to achieve roughly the gain or loss sought by Shapiro. These short-term investments bore numerous hallmarks of fraud and occurred over many years.

67.    For example, Shapiro sent a note to Bongiorno on November 10, 2000, requesting particular losses in several of his family's Core Accounts. In the note, Shapiro wrote, as to S&R Account 1SH014, that he needed a "loss of about $50,000" and he suggested the loss could be realized through the sale of Abercrombie & Fitch Co. which was reportedly held in the account. Rather than following Shapiro's suggestion, BLMIS generated the requested "loss" by reporting on the November 2000 statement for Account 1SH014 that it had purchased a block of Oracle Corp. stock (5,000 shares at $34.50 per share) on October 27, 2000 (which settled on November 1, 2000) and then sold the block at a much lower price ($25.00 per share) just two weeks later for an apparent loss of $47,500, just "about" the $50,000 loss that Shapiro had requested.

68.    In the same note to Bongiorno, Shapiro wrote that he needed a "loss of about $100,000/110,000" in Account 1SH030 held by the Leslie Shapiro Trust and a "loss of about $60,000" in Account 1SH028 held by the David Shapiro Trust. As to both accounts, he suggested that BLMIS sell Proctor & Gamble stock reportedly held in each account. In the November 2000 statement for Account 1SH030, BLMIS reported that it had done exactly what it had done for S&R Account 1SH014 – an intra-month buy and sell of a block of Oracle stock (5,000 shares at prices of $34.50 and $25.00) for a $47,000 loss. BLMIS additionally reported that within the span of three weeks, it had also purchased and sold a block of Gateway, Inc. stock (4,000 shares) at prices ($52.75 and $37.25) for an additional $62,000 in losses. These two sets

of transactions reportedly yielded a loss of $109,000, just "about" what Shapiro had requested. For the David Shapiro Trust Account 1SH028, BLMIS had an easier exercise; it reported that it had bought and sold a slightly larger block of Oracle stock (6,000 shares) at the same prices as reported in the other Core Accounts ($34.50 and $25.00) resulting in a loss of $57,000, just "about" the $60,000 loss that Shapiro had requested.

69.    These reported short-term investments bore the hallmarks of fraud on several levels. First, BLMIS purportedly employed a long-term, buy and hold investment strategy for the Core Accounts and thus typically held securities for years, not weeks.  Second, BLMIS reported that it bought each of the blocks of stock on a date before Shapiro had even requested the losses.  Third, BLMIS reported that it had gone out into the market to generate the requested loss rather than liquidating one of the several positions reportedly held by the Shapiros with unrealized losses. Fourth, the share prices of Oracle and Gateway declined enough in value over a few weeks to achieve just "about" the amount of losses sought by Shapiro.  It is preposterous that any trader would be able to buy and then sell weeks later an isolated block of stock consisting of a specific number of shares at precisely the right prices to achieve even one of the requested losses, much less in all three of the accounts.  Finally, although the Oracle and Gateway shares were purportedly purchased and then sold weeks later, the trades were recorded on the account statements with consecutive transaction numbers, indicating that BLMIS had reportedly executed each side of the buy and sell at essentially the same time.

70.    In 2001, Shapiro was at it again.  This time, he wanted to realize a certain gain in one of the Core Accounts, and BLMIS again obliged his request by manufacturing a pair of backdated trades.  In a note dated November 1, 2001, Shapiro told Bongiorno that he was in "need" of a "$360,000 gain" in S&R Account 1SH014.  Based on a schedule of unrealized gains

25

and losses prepared by Konigsberg Wolf, Shapiro knew that S&R reportedly held many securities with unrealized gains which BLMIS could purport to sell to realize a gain of $360,000. Instead, BLMIS reported to Shapiro that it had purchased of a block of Sabre Holdings on October 31, 2001 (which settled on November 2) and sold the same block less than three weeks later at much higher price, generating a short-term gain of $360,770, which was almost exactly the gain Shapiro had requested from Bongiorno.

71.    About a month later, in a note dated December 12, 2001, Shapiro advised Bongiorno that he now was in "need" of a "$125,000 loss" in S&R Account 1SH014 "in this year."  In the December 2001 statement for Account 1SH014, BLMIS reported to Shapiro that it had purchased a block of Too Inc. on November 30, 2001 (which settled December 5) and sold the same block less than two weeks later at a much lower price, generating a loss of $124,380. Once again, BLMIS generated the loss requested by reporting to Shapiro that it had purchased the perfect-sized block of stock – before he even had alerted BLMIS that he needed the loss – and then the value of the stock declined just enough in a few weeks to generate the loss requested.

72.    Shapiro knew that these and earlier trades reported in the Core Accounts were fabrications.  He was actually aware that the trades were fraudulent or he intentionally chose to blind himself and his family to the red flags associated with these trades that suggested a high probability of fraud at BLMIS.

**D.    DURING 2002 AND 2003, SHAPIRO CAUSED BLMIS TO FABRICATE LARGE GROUPS OF BACKDATED TRADES IN THE CORE ACCOUNTS.**

73.    In 2002 and 2003, Shapiro took an active hand in the fraud at BLMIS.  At his request, Bongiorno fabricated a slew of backdated short-against-the-box sales to offset huge paper losses purportedly suffered in the Core Accounts over the course of 2002.  The short sales

were reported in sets of revised account statements BLMIS issued to Shapiro as well as

Konigsberg.  In early 2003, when Shapiro realized that he and his family might face an even

higher tax liability than they did in 2002 as a result of all the backdated short sales, Bongiorno

manufactured massive trading losses in the Core Accounts at Shapiro's request.  These fabricated

trades essentially wiped out the family's apparent 2003 tax liability.  Shapiro played a key and

active role in the creation of these and the earlier fabricated trades and in the effort to eliminate

evidence of the fraud in which he and BLMIS had engaged.

> **i.** **At Shapiro's Request, BLMIS Fabricated Revised 2002 Monthly Statements For The Core Accounts To Reverse Millions In Previously-Reported Paper Losses.**

74.    Given the strategy purportedly employed by BLMIS for the Core Accounts,

Bongiorno had to regularly monitor the accounts because if left unattended, the value of

securities reportedly held in them could be impacted by fluctuations in the market.  This is

exactly what happened in 2002.  During 2002, the stock market suffered a significant downturn,

caused largely by the implosion of the dot-com bubble.  Over the first nine months of the year,

the S&P 100 Index declined by more than 30%; the Dow Jones Industrial Average and

NASDAQ Composite reached five-year lows on October 9, 2002.  The monthly statements that

BLMIS issued to Shapiro and Konigsberg for the Core Accounts over this same period reported

minimal trading activity, and the reported value of these accounts thus plummeted.

75.    For example, the value of the securities reportedly held in S&R Account 1SH014

fell from approximately $71 million at the start of 2002 to $40 million at the end of September

2002, a drop of $31 million or nearly 45% of the securities' reported value.  The reported value

of the holdings in Accounts 1SH028 and 1SH030 were similarly affected.   In total, the value of

the securities reportedly held in the Core Accounts collectively dropped by more than $50

million over the first three quarters of 2002.

27

76.    At the same time, the reported margin balances on most of the Core Accounts were extremely high.  The margin balance on 1SH014 stood at more than $46 million as of September 2002.  Given that the reported value of the account's holdings had declined to approximately $40 million as of September 2002, the "net value" of Account 1SH014 – the value of all holdings and credits less margin balance and short liabilities as reported by BLMIS – had fallen to well below zero.  The net value of each of the Core Accounts held by the David Shapiro Trust and the Leslie Shapiro Citron Trust likewise was well below zero.  Nevertheless, BLMIS did not issue a margin call to the family as required under NASD Rule 2520, which would have forced them to provide BLMIS with tens of millions of dollars in cash or actual securities to satisfy minimum margin maintenance requirements for the Core Accounts.  Instead, something altogether different happened.

77.    In late 2002, Shapiro was advised by Konigsberg of the significant impact that the stock market's crash had on the reported value of the Core Accounts.  Konigsberg told Shapiro that he should meet with Madoff, and he did.  At their meeting, Madoff told Shapiro that he would fix the problem and that Shapiro should go see Bongiorno.  Shapiro then, together with Konigsberg, met with Bongiorno on BLMIS's 17th Floor, where they devised a scheme to restore the value that had been reportedly lost in the Core Accounts due to the stock market's decline throughout the year.

78.    Bongiorno, with the help of Crupi and others at BLMIS, thereafter began the process of generating, through a computer program referred to as "STMTPro," revised account statements for the Core Accounts which would report that BLMIS had made numerous short-against-the-box sales over the first few months of 2002, *i.e.,* before the stock market's decline. A short-against-the-box sale is a type of hedge in which an investor sells short the same size

28

block of a particular stock that he already holds long, which allows him to lock in paper profits (or losses) on his long position without selling that position. By using STMTPro to backdate short sales to early 2002, BLMIS created sets of revised account statements for Shapiro and his family that gave the illusion that the family had survived the burst of the dot-com bubble by hedging most of their holdings in the Core Accounts earlier in the year.

79.    For example, the Shapiros reportedly held 345,000 shares of Siebel Systems, Inc. in Account 1SH014. The share price of Siebel dropped precipitously in 2002, from a peak of more than $37 in late January to a year-to-date low of less than $6 at the close of September. As a result, as originally reported to Shapiro, the value of the Siebel stock reportedly held in Account 1SH014 had declined by more than $11 million between its January high and its October close. Amazingly, one of the newly fabricated short-against-the-box sales reported by BLMIS on the January 2002 STMTPro statement for 1SH014 was a short sale of 345,000 shares of Siebel at a price of more than $37 per share. This newly fabricated short sale alone improved the reported value of Account 1SH014 as of September 2002 by nearly $11 million, transforming a paper loss of nearly $5.5 million into a $5.5 million fully hedged, unrealized gain. BLMIS backdated more than 25 additional short-against-the-box sales in the STMTPro statements for Account 1SH014, eliminating all of the account's paper losses for the year.

80.    BLMIS also prepared STMTPro statements for 1SH030 and 1SH028, the Core Accounts respectively held by the Leslie Shapiro Trust and the David Shapiro Trust. The revised statements for these accounts similarly included numerous newly fabricated short-against-the-box sales dating back to early 2002, which wiped out the paper losses reflected in the account statements that BLMIS had originally issued to Shapiro and Konigsberg. Two of the newly fabricated trades were short sales of Broadcom Corporation and Intel Corporation, which both

accounts reportedly held long.  In the originally-issued statements for each of the accounts, the collective value of the purported holdings in Broadcom and Intel had dropped dramatically over the first three quarters of 2002, falling from about a peak of approximately $7.0 million in the middle of January 2002 to approximately $2.0 million as of the close of September 2002.  In late 2002 and early 2003, BLMIS entirely eliminated this apparent drop in value by generating STMTPro statements for both 1SH028 and 1SH030 that reported short sales of 75,000 shares of Broadcom and 85,000 shares of Intel in the middle of January 2002.  The pair of fictitious backdated short sales improved the reported value of each account by nearly $5 million, turning what first appeared to be $1 million in unrealized losses into fully hedged, unrealized gains of nearly $4 million.

81.    The newly fabricated short sales in the STMTPro statements for 1SH014, 1SH028, and 1SH030 wiped out all of the paper losses reflected in the original account statements that BLMIS had issued to Shapiro and Konigsberg in 2002.  According to the original September 2002 statement for S&R Account 1SH014, for example, its reported holdings and other assets totaled around $43.5 million and its margin balance stood at more than $46 million.  Its net value thus was a negative $2.5 million.  As the chart in Figure 2 below illustrates, the newly fabricated backdated short sales reported in the STMTPro statements increased the reported net value of Account 1SH014, as of September 30, 2002, by more than $40 million.

*[remainder of page left intentionally blank]*

30

*Figure 2*



The newly fabricated backdated short sales added to the STMTPro statements for the accounts

held by the Leslie Shapiro Trust and the David Shapiro Trust increased the reported net value of

each account by more than $12 million.

82.    After preparing the STMTPro statements for the Core Accounts, BLMIS needed

assistance from Shapiro and Konigsberg to conceal the paper trail of the fraud.  The two still had

the monthly account statements for the Core Accounts that they had originally received from

BLMIS.  Before issuing the STMTPro statements to Shapiro and Konigsberg, BLMIS asked

them to return their original statements.  Shapiro and Konigsberg did their part and returned all

of their original Core Account monthly statements.  Bongiorno and others at BLMIS, however,

were not as diligent.  They preserved many of BLMIS's internal records which reveal the process

by which they generated the STMTPro statements for the Core Accounts.  They also retained the

original account statements that Shapiro and Konigsberg returned.  On several of the statements

that Shapiro returned, he had made various handwritten notes. The first page of one of the

31

statements is depicted in Figure 3.

*Figure 3*



The first page of the March 2003 STMTPro statement for 1SH014, which Shapiro received in exchange for the statement above, is depicted in Figure 4.

*Figure 4*



83.    Although Konigsberg also returned the duplicate Core Account statements he had originally received from BLMIS, he retained a copy of the September 2002 quarterly schedule of unrealized gains and losses in S&R Account 1SH014 that his office had prepared based on the initial duplicate monthly account statements received from BLMIS.  That schedule reflected that the Shapiros' margin balance on Account 1SH014 as of September 30, 2002 was more than $3.5 million higher than the value of its reported holdings and other assets.  The schedule contained none of the backdated trades that were subsequently fabricated through STMTPro.

    **ii.**    **At Shapiro's Request, BLMIS Fabricated Numerous Groups Of Trades In The Core Accounts In 2003 To Generate Millions In Reported Losses To Eliminate An Apparently Huge Tax Liability.**

84.    Although the newly fabricated short sales restored the value of the Core Accounts, the manufactured trades led to unfortunate tax consequences for the Shapiro family. BLMIS reported in the STMTPro statements for the Core Accounts for the month of December 2002 that it had delivered a number of securities that it had held long in the accounts to cover many of the backdated short positions.  The reported delivery of these securities in Account 1SH014 generated approximately $25 million in fictitious long-term gains.  As a result, rather than having little to no reported tax liability for year 2002, the Shapiros paid more than $7 million in taxes for the year.

85.    The tax consequences of the backdated STMTPro short sales spilled into 2003. According to a February 2003 schedule of realized gains and losses that Konigsberg Wolf provided to Shapiro for Account 1SH014, the Shapiros reportedly realized short-term capital gains of more than $27 million in January of 2003 as a result of having to purportedly cover short positions generated from the backdated short sales reported in the 2002 STMTPro statements.  The situation for Leslie Shapiro Citron and David Shapiro and their respective trust

accounts was no different, as each appeared to have faced significant tax exposure for fictitious

trades reported in their accounts in early 2003.

86.    Despite their massive tax exposure, the Shapiros paid nothing toward their 2003

estimated taxes in the first quarter of 2003.  Instead, Shapiro devised another plan with Madoff

and Bongiorno.  In a note to Konigsberg, Shapiro wrote:

A transcription of the note appears below. [2]  The "problems that <u>we</u> have" to which

Shapiro alluded in his note to Konigsberg were the significant tax liabilities Shapiro and

his family faced as a result of BLMIS having reported in January 2003 that it had covered

many of the prior year's backdated short-against-the-box trades.

87.    Within a few weeks of Shapiro writing this note, Bongiorno and others at BLMIS

began the process of fabricating significant short-term fictitious losses in the Core Accounts to

eliminate, either entirely or in large measure, the tax liability that the family apparently faced as

a result of the short-term gains reported in January 2003.  Some of the losses were fabricated

with the benefit of a month's hindsight while others were manufactured near year's end through

use of STMTPro.

88.    For example, in the April 2003 statement for S&R Account 1SH014, BLMIS

reported – using consecutive transaction numbers – that it had purchased and then sold a few

weeks later a block of HCA Inc. for a loss of more than $1.5 million.  In subsequent monthly

statements for Account 1SH014, BLMIS reported that in May it sold short a block of KB Homes

and then covered the short position in June for a loss of more than $3.1 million.  BLMIS also

reported in June that it purchased a block of National Semiconductor Corp. and then reportedly

sold the same block early the following month for a short-term loss of approximately $1.5

million.  BLMIS also created significant short-term fictitious losses in Account 1SH079, another

Core Account held by S&R.  In the account's November 2003 statement, BLMIS reported that it

---

[2]    Paulie Dear,
        Here is copy of note on details I worked with Annette.  Both Bernie + Annette are aware of problems <u>we</u> have.
        June is target for action[.]  Please don't 3-putt in Vegas.
                        Regard[,]
                        Stanley

had purchased and then quickly sold large blocks of shares of Apple Computers Inc., Delta

Airlines, Inc., and Priceline.com Inc. for a collective short-term loss of approximately $2.5

million.

89.    These fictitious short-term losses pale in comparison, however, to the short-term

losses fabricated by BLMIS in late 2003 from using STMTPro to backdate the short sale and a

subsequent cover of Sears Roebuck & Co. in a newly created subaccount of Account 1SH079.

BLMIS did not create this subaccount until late 2003, and thus the subaccount did not appear on

the schedule of unrealized gains and losses that Konigsberg Wolf prepared and provided to

Shapiro for Account 1SH079 for the first two quarters (*i.e.,* January through June) of 2003.

When BLMIS later generated the STMTPro statements for the newly-created subaccount, it

reported that it had sold 325,000 shares of Sears Roebuck short in March 2003 for approximately

$6 million.  Between March and November 2003, the share price of Sears Roebuck increased

significantly, nearly tripling in value.  In the November 2003 statement for the new subaccount,

BLMIS reported that it covered the short position by purchasing and delivering 325,000 shares

of Sears Roebuck at a cost of approximately $18 million.  The reported short sale and cover of

Sears Roebuck thus generated a fictitious short-term loss of nearly $12 million for the Shapiros.

As illustrated in the chart in Figure 5 below, BLMIS reported over $27 million in short-term

gains in January 2003 and then $20 million in short-term losses in Account 1SH014 and Account

1SH079 over the last nine months of 2003.

*Figure 5*

| Account | Purchase Date | Sale Date | Security | Profit/Loss |
|---|---|---|---|---|
| 1SH014-7 | 1/4/2003 | 1/14/2002 | Network Appliance | $4,345,800.00 |
| 1SH014-7 | 1/7/2003 | 1/31/2002 | Siebel Systems | $10,302,070.00 |
| 1SH014-7 | 1/7/2003 | 1/10/2002 | Time Warner Telecom | $2,481,010.00 |
| 1SH014-7 | 1/7/2003 | 3/11/2002 | Centex | $925,500.00 |
| 1SH014-7 | 1/29/2003 | 1/15/2002 | Circuit City Stores | $3,300,927.00 |
| 1SH014-7 | 1/29/2003 | 1/15/2002 | Broadcom | $4,144,100.00 |
| 1SH014-7 | 1/29/2003 | 7/2/2002 | CNF | $414,450.00 |
| 1SH014-7 | 1/29/2003 | 1/15/2002 | CarMax | $1,186,424.00 |
| 1SH014-3 | 4/4/2003 | 4/22/2003 | HCA | ($1,531,250.00) |
| 1SH014-8 | 6/20/2003 | 5/8/2003 | KB Homes | ($3,137,150.00) |
| 1SH079-3 | 11/4/2003 | 11/20/2003 | Priceline | ($1,608,500.00) |
| 1SH079-3 | 11/4/2003 | 11/24/2003 | Delta Airlines | ($405,000.00) |
| 1SH079-3 | 11/4/2003 | 11/26/2003 | Apple | ($342,500.00) |
| 1SH079-8 | 11/25&26/2003 | 3/12&14/2003 | Sears Roebuck | ($11,770,900.00) |
| 1SH014-8 | 12/12/2003 | 7/24/2003 | Advanced Micro Devices | ($623,700.00) |

90.    These massive reported short-term losses were not the product of the purported realization of paper losses on long-term holdings, but rather were fabricated out of whole cloth over the short term.  Again, Shapiro was supplied with revised account statements that BLMIS generated through its STMTPro computer program.  The fabricated losses substantially resolved the tax problem that the Shapiros had faced in early 2003.  In the end, they only owed $85 in federal taxes for the 2003 tax year.  After considering taxes withheld during the year, they actually received a $629 refund from the federal government.

91.    Bongiorno also created numerous fictitious short-term losses during the final nine months of 2003 in Core Accounts held by the David Shapiro Trust and the Leslie Shapiro Trust to offset the large short-term gains the accounts reportedly realized in January 2003.  For example, BLMIS reported an intra-month buy and sell of a block of Sony Corp. stock in the April 2003 statement for each account, generating a purported loss of nearly $635,000.  BLMIS

thereafter reported numerous transactions in each of the accounts that resulted in millions of dollars in additional losses. The largest of these reported losses involved the fabricated short sale of a large block of Amazon shares followed by the cover of the short position after the stock had nearly doubled in value, generating a reported loss of nearly $3 million. All of these reported losses substantially resolved the tax problem that David Shapiro and Leslie Shapiro faced earlier in the year as a result of the millions in fictitious gains reported in their respective Core Accounts at BLMIS.

92.    While the fabricated losses served their intended purpose, they did negatively impact the reported value of the Core Accounts. To resolve this issue, Bongiorno fabricated, through the use of STMTPro, a number of additional backdated trades in the Core Accounts in late 2003 to prop up the value of the accounts on paper. For instance, Bongiorno backdated the purchase of Genentech, Inc. stock in Account 1SH079 to March 2003. Given that between March and December 2003, Genentech nearly tripled in value, Bongiorno artificially increased the reported value of Account 1SH079 by nearly $13 million. As was the case with the backdated short sale of Sears Roebuck, the Konigsberg Wolf schedule of unrealized gains for Account 1SH079 through the first two quarters of 2003 did not show any position in Genentech.

93.    For years, Shapiro had been content to merely direct BLMIS to generate comparatively small losses and gains in his and his family's Core Accounts at BLMIS. The financial times of 2002 and 2003 forced Shapiro to take a more significant and an active role in the fraud at BLMIS. He was involved in the creation of revised account statements containing scores of newly fabricated backdated short trades. When the apparent effect of the fiction proved too great, he and BLMIS were at it again, this time fabricating heavy losses in the Core Accounts to avoid a hefty tax liability for the family.

38

E.    **SHAPIRO'S KNOWLEDGE OF FRAUD AT BLMIS MUST BE IMPUTED TO ALL DEFENDANTS.**

94.    Shapiro had actual knowledge of fraud at BLMIS and knew that he and his family were benefitting from fictitious trades in the Accounts.  In 2002 and 2003, he was actively involved in fabricating backdated trades in the Core Accounts and in attempting to eliminate evidence of the fraud in which he and BLMIS had engaged.  Even without his active involvement in fraud at BLMIS, Shapiro willfully blinded himself to circumstances suggesting a high probability of fraud at BLMIS.  To the extent that the other Defendants did not have knowledge of fraud at BLMIS, Shapiro's knowledge is imputed to each of them.

95.    Shapiro was the agent of all of the other Defendants.  They authorized Shapiro to act as their agent in managing and controlling not only their respective interests in the Core Accounts but many of their other Accounts at BLMIS including, but not limited to, Accounts 1S0306 and 1SH171.  All actions undertaken by Shapiro relating to each of these Accounts fell within the scope of his responsibilities as agent, and Shapiro's knowledge of fraud at BLMIS was acquired based on facts that occurred within the scope of his agency relationship with the other Defendants.  As an agent, Shapiro communicated with and provided direction to BLMIS regarding the Accounts.

96.    Shapiro also exercised dominion and control over each of the Core Accounts as well as many of the other Accounts including, but not limited to, Accounts 1S0306 and 1SH171.  He reviewed the monthly statements of these Accounts, directed the purported purchase and sale of securities reported in the Core Accounts, requested backdated and fraudulent trades in the Core Accounts, and had access to funds in the Core Accounts as well as many of the other Accounts including, but not limited to, Accounts 1S0306 and 1SH171.  Shapiro formed S&R for the benefit of himself and his wife.  He established the David Shapiro Trust and Leslie Shapiro

Trust for his children's respective benefit.  Shapiro served as a general partner of S&R and

trustee for the David Shapiro Trust and Leslie Shapiro Trust.  Shapiro made every major decision

regarding the Core Accounts held by S&R, the David Shapiro Trust, and the Leslie Shapiro

Trust.  Given the above, Shapiro's knowledge of the fraud at BLMIS is imputed to each of the

other Defendants.

### CUSTOMER CLAIMS

97.     On December 23, 2008, this Court entered an Order on Application for Entry of an

Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures

for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims

Procedures Order" (Adv. Pro. No. 08-01789, Docket No. 12)), setting forth certain procedures with

respect to the filing of claims against the estate, including the time by which a claimant must file

and serve any objection to the Trustee's determination of a claim.

98.     On or about June 29, 2009, certain Defendants filed customer claims relating to

certain of their Accounts ("Customer Claims"), which the Trustee designated as Claims # 012227,

# 012228, # 012386, # 012387, and # 013658.  These Customer Claims referenced Accounts

1SH172, 1SH014, 1S0306, 1SH028, and 1C1251, respectively.  On or about June 30, 2009, certain

Defendants filed two additional Customer Claims, which the Trustee designated as Claims

# 015644 and # 015645, and which referenced Accounts 1SH171 and 1SH030, respectively.  *See*

Exhibit A.

99.     On May 25, 2010, the Trustee issued a Notice of Trustee's Determination of

Claim (a "Claim Determination") denying Customer Claim # 013658, and on or about June 16,

2010, the Trustee issued a Claim Determination denying Customer Claims # 012227, # 012386,

# 012387, # 015644, and # 015645.  On October 7, 2010, the Trustee issued a Claim

Determination denying Customer Claim # 012228, and on November 10, 2010, the Trustee

issued a revised Claim Determination denying Customer Claim # 012228.

100.     On or about June 23, 2010, Kenneth Citron filed with the Court an objection to

the Claim Determination for Customer Claim # 013658.  On or about July 1, 2010, Kenneth

Citron withdrew this objection and filed an amended objection to the Claim Determination for

Customer Claim # 013658.  The contested Customer Claim is pending.

101.     Defendants filed no objections relating to the Claim Determinations for Customer

Claims # 012227, # 012228, # 012386, # 012387, # 015644, and # 015645.  Having failed to file

an objection to the Trustee's Claim Determinations for Customer Claims # 012227, # 012228,

# 012386, # 012387, # 015644, and # 015645, the Trustee's Claim Determinations are final, and

the Claims are disallowed for all purposes under the Claims Procedure Order.

102.     Defendants Trust f/b/o David Shapiro's Children and Trust f/b/o Leslie Shapiro

Citron's Children held Accounts 1S0540 and 1C1345 at BLMIS (collectively, the "Related

Accounts").  Upon information and belief, the Related Accounts were funded with subsequent

transfers of customer property from Defendants.  Customer Claims relating to the Related

Accounts were filed on March 3 and 4, 2009, which the Trustee designated as Customer Claims

# 005116 and # 005656, respectively.  Because of a typographical error in Customer Claim

# 005116, certain Defendants filed three additional Customer Claims related to Account 1C1345,

which the Trustee designated as Customer Claims # 012211, # 012212, and # 012213 (together,

with Customer Claims # 005116 and # 005656, the "Related Account Customer Claims").

103.     On December 17, 2010, the Trustee issued a Claim Determination denying

Related Account Customer Claims # 012211, # 012212, and # 012213.  Defendants filed no

objections relating to these Claim Determinations, and under the Claims Procedures Order, the

Claim Determinations are final and are disallowed for all purposes.

104.    Related Account Customer Claims # 005116 and # 005656 are presently

unresolved.

105.    The Trustee seeks to have the contested and unresolved Customer Claim # 13658

and the Related Account Customer Claims # 005116 and # 005656 adjudicated in this

proceeding.

## THE TRANSFERS

106.    Prior to the Filing Date, BLMIS made payments or other transfers (collectively,

the "Initial Transfers") to or for the benefit of Stanley Shapiro, Renee Shapiro, S&R, the LAD

Trust, David Shapiro, the David Shapiro Trust, Leslie Shapiro, the Leslie Shapiro Trust, and

Kenneth Citron (collectively, the "Initial Transferee Defendants") totaling $53,778,486.  Of this

amount, $50,398,126 constituted non-existent profits ("Fictitious Profits") supposedly earned in

the Accounts, and $3,380,360 constituted the return of principal.  The Fictitious Profits received

by the Initial Transferee Defendants were other people's money.  The Initial Transfers include,

but are not limited to, the transfers listed in Column 9 of the schedules attached as Exhibit B.

107.    The Initial Transfers are avoidable and recoverable under §§ 544, 548, 550(a),

and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-

2(c)(3), applicable provisions of N.Y. C.P.L.R. 203(g) and 213(8) (McKinney 2001), and N.Y.

Debt. & Cred. §§ 273–279 (McKinney 2001).

108.    Of the Initial Transfers, BLMIS made payments to or for the benefit of the Initial

Transferee Defendants of at least $41,066,486 during the six years prior to the Filing Date (the

"Six Year Transfers").  Of the Six Year Transfers, $39,939,486 constituted Fictitious Profits

from the Ponzi scheme.  The remaining $1,127,000 constituted the return of principal.  The Six

Year Transfers are listed in Column 10 of the schedules attached as Exhibit B.

109.    Of the Six Year Transfers, BLMIS made payments to or for the benefit of the

Initial Transferee Defendants of at least $9,482,424 during the two years prior to the Filing Date

(the "Two Year Transfers").  Of the Two Year Transfers, $9,475,424 constituted Fictitious

Profits and $7,000 constituted the return of principal.  The Two Year Transfers are listed in

Column 11 of the schedules attached at Exhibit B.

110.    Based on the Trustee's investigation to date, the Initial Transferee Defendants

subsequently transferred a portion of the $53,778,486 received from BLMIS (the "Subsequent

Transfers") to Defendants Stanley Shapiro, Renee Shapiro, LAD Trust, David Shapiro, David

Shapiro Trust, Rachel Shapiro, Trust f/b/o David Shapiro's Children, Leslie Shapiro Citron,

Leslie Shapiro Trust, Trust f/b/o Leslie Shapiro Citron's Children, and Kenneth Citron

(collectively, the "Subsequent Transferee Defendants").  To the extent the funds transferred from

BLMIS were to or for the benefit of any of the Subsequent Transferee Defendants, said

Subsequent Transferee Defendants are the initial transferees of such transfers and are included in

the definition of the Initial Transferee Defendants for purposes of the allegations herein.

111.    The Subsequent Transfers, or the value thereof, are recoverable from Subsequent

Transferee Defendants pursuant to § 550(a) of the Bankruptcy Code.

112.    To the extent that any of the recovery counts may be inconsistent with each other,

they are to be treated as being pleaded in the alternative.

113.    The Trustee's investigation is ongoing and the Trustee reserves the right to

(i) supplement the information regarding the Initial Transfers, the Subsequent Transfers and any

additional transfers, and (ii) seek recovery of such additional transfers.

**COUNT ONE**
**FRAUDULENT TRANSFER – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550, AND 551**

114.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

115.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

116.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

117.    Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two Year Transfers to or for the benefit of the Initial Transferee Defendants in furtherance of a fraudulent investment scheme.

118.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee under § 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Initial Transferee Defendants under § 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-(2)(c)(3).

119.    As a result of the foregoing, and pursuant to §§ 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Initial Transferee Defendants:  (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the BLMIS estate, (d) directing the Initial Transferee Defendants, to the extent allowable by law, to disgorge any and all profits relating to or arising from the Two Year Transfers, (e) disallowing Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656

against BLMIS until such time as the Two Year Transfers are repaid to the Trustee, (f) awarding

attorneys' fees and costs from the Initial Transferee Defendants, and (g) awarding any other

relief the Court deems just and appropriate.

## COUNT TWO
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550, AND 551

120.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

121.    Each of the Two Year Transfers was made on or within two years before the

Filing Date.

122.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in

property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and 15 U.S.C.

§ 78fff-2(c)(3).

123.    BLMIS received less than a reasonably equivalent value in exchange for each of

the Two Year Transfers.

124.    At the time of each of the Two Year Transfers, BLMIS was insolvent or became

insolvent as a result of the Two Year Transfers.

125.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business

or a transaction, or was about to engage in a business or a transaction, for which any property

remaining with BLMIS was an unreasonably small amount of capital.

126.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or

believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts

matured.

127.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee under § 548(a)(1)(B) of the Bankruptcy Code, which is recoverable from the Initial Transferee Defendants under § 550(a) and 15 U.S.C. § 78fff-(2)(c)(3).

128.    As a result of the foregoing, and pursuant to §§ 105(a), 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Initial Transferee Defendants:  (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the BLMIS estate, (d) directing the Initial Transferee Defendants, to the extent allowable by law, to disgorge any and all profits relating to or arising from the Two Year Transfers, (e) disallowing Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656 against BLMIS until such time as the Two Year Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from the Initial Transferee Defendants, and (g) awarding any other relief the Court deems just and appropriate.

## COUNT THREE
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278 AND/OR 279 AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551

129.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

130.    At all times relevant to the Six Year Transfers, there has been one or more creditors who has held and still holds matured or unmatured unsecured claims against BLMIS that are allowable under § 502 of the Bankruptcy Code or not allowable only under § 502(e) of the Bankruptcy Code.

131.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under N.Y. Debt. & Cred. § 270.

46

132.    Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Initial Transferee Defendants in furtherance of a fraudulent investment scheme.

133.    Each of the Six Year Transfers was received by the Initial Transferee Defendants with actual intent to hinder, delay, or defraud creditors or future creditors of BLMIS at the time of each of the Six Year Transfers.

134.    As a result of the foregoing, and pursuant to N.Y. Debt. & Cred. §§ 276, 276-a, 278, and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Initial Transferee Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the BLMIS estate, (d) directing the Initial Transferee Defendants, to the extent allowable by law, to disgorge any and all profits relating to or arising from the Transfers, (e) disallowing Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656 against BLMIS until such time as the Six Year Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from the Initial Transferee Defendants, and (g) awarding any other relief the Court deems just and appropriate.

## COUNT FOUR
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279 AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551

135.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Second Amended Complaint as if fully rewritten herein.

136.    At all times relevant to the Six Year Transfers, there has been one or more creditors who has held and still holds matured or unmatured unsecured claims against BLMIS

that are allowable under § 502 of the Bankruptcy Code or not allowable only under § 502(e) of
the Bankruptcy Code.

137.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined
under N.Y. Debt. & Cred. § 270.

138.    BLMIS did not receive fair consideration for the Six Year Transfers.

139.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the
alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

140.    As a result of the foregoing, and pursuant to N.Y. Debt. & Cred. §§ 273, 278,
and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3),
the Trustee is entitled to a judgment against the Initial Transferee Defendants:  (a) avoiding and
preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c)
recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants
for the benefit of the BLMIS estate, (d) directing the Initial Transferee Defendants, to the extent
allowable by law, to disgorge any and all profits relating to or arising from the Six Year
Transfers, (e) disallowing Customer Claim # 013658 and Related Account Customer Claims
# 005116 and # 005656 against BLMIS until such time as the Six Year Transfers are repaid to
the Trustee, (f) awarding attorneys' fees and costs from the Initial Transferee Defendants, and
(g) awarding any other relief the Court deems just and appropriate.

## COUNT FIVE
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§274, 278 AND/OR 279 AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551

141.    The Trustee incorporates by reference the allegations contained in the previous
paragraphs of the Second Amended Complaint as if fully rewritten herein.

142.    At all times relevant to the Six Year Transfers, there has been one or more
creditors who has held and still holds matured or unmatured unsecured claims against BLMIS

that are allowable under § 502 of the Bankruptcy Code or not allowable only under § 502(e) of the Bankruptcy Code.

143.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under N.Y. Debt. & Cred. § 270.

144.     BLMIS did not receive fair consideration for the Six Year Transfers.

145.     At the time of each of the Six Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small amount of capital.

146.     As a result of the foregoing, and pursuant to N.Y. Debt. & Cred. §§ 274, 278, and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Initial Transferee Defendants:  (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS, (d) directing the Initial Transferee Defendants, to the extent allowable by law, to disgorge any and all profits relating to or arising from the Six Year Transfers, (e) disallowing Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656 against BLMIS until such time as the Six Year Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from the Initial Transferee Defendants, and (g) awarding any other relief the Court deems just and appropriate.

### COUNT SIX
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 275, 278 AND/OR 279 AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551

147.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Second Amended Complaint as if fully rewritten herein.

148.    At all times relevant to the Six Year Transfers, there has been one or more creditors who has held and still holds matured or unmatured unsecured claims against BLMIS that are allowable under § 502 of the Bankruptcy Code or not allowable only under 502(e) of the Bankruptcy Code.

149.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under N.Y. Debt. & Cred. § 270.

150.    BLMIS did not receive fair consideration for the Six Year Transfers.

151.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay as the debts matured.

152.    As a result of the foregoing, and pursuant to N.Y. Debt. & Cred. §§ 275, 278, and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Initial Transferee Defendants:  (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the BLMIS estate, (d) directing the Initial Transferee Defendants, to the extent allowable by law, to disgorge any and all profits relating to or arising from the Six Year Transfers, (e) disallowing Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656 against BLMIS until such time as the Six Year Transfers are repaid to the Trustee, (f) awarding attorneys' fees and costs from the Initial Transferee Defendants, and (g) awarding any other relief the Court deems just and appropriate.

## COUNT SEVEN
## RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

153.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

154.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

155.    At all times relevant to the Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under § 502 of the Bankruptcy Code or not allowable only under § 502(e) of the Bankruptcy Code.

156.    Each of the Initial Transfers prior to the six years before the Filing Date constituted a conveyance by BLMIS as defined under N.Y. Debt. & Cred. § 270.

157.    Each of the Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Initial Transfers to or for the benefit of the Initial Transferee Defendants in furtherance of a fraudulent investment scheme.

158.    Each of the Initial Transfers was received by the Initial Transferee Defendants with actual intent to hinder, delay, or defraud creditors or future creditors of BLMIS at the time of each of the Transfers.

159.    As a result of the foregoing, and pursuant to N.Y. C.P.L.R. 203(g), 213(8), N.Y. Debt. & Cred. §§ 276, 276-a, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Initial Transferee Defendants:  (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be set aside, (c) recovering the Initial Transfers, or the value thereof, from the

Initial Transferee Defendants for the benefit of the BLMIS estate, (d) directing the Initial

Transferee Defendants, to the extent allowable by law, to disgorge any and all profits relating to

or arising from the Transfers, (e) disallowing Customer Claim # 013658 and Related Account

Customer Claims # 005116 and # 005656 against BLMIS until such time as the Initial Transfers

are repaid to the Trustee, (f) awarding attorneys' fees and costs from the Initial Transferee

Defendants, and (g) awarding any other relief the Court deems just and appropriate.

### COUNT EIGHT
### RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 276-a AND 278, AND 11 U.S.C. §§ 105(a) AND 550(a)

160.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

161.    Each of the Initial Transfers is avoidable under §§ 544 and 548 of the Bankruptcy

Code, N.Y. Debt. & Cred.§§ 273-276, and 15 U.S.C. § 78fff-2(c)(3).

162.    The Subsequent Transfers were transferred by the Initial Transferee Defendants to

the Subsequent Transferee Defendants.

163.    Each of the Subsequent Transfers was made directly or indirectly to one or more

of the Subsequent Transferee Defendants.

164.    The Subsequent Transferee Defendants are immediate or mediate transferees from

the Initial Transferee Defendants.

165.    The Subsequent Transferee Defendants received the Subsequent Transfers with

knowledge of and/or willfully blind to BLMIS's fraudulent scheme.

166.    As a result of the foregoing, and pursuant to N.Y. Debt. & Cred. §§ 278 and/or

279, § 550(a) of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a

judgment against Subsequent Transferee Defendants:  (a) recovering the Subsequent Transfers,

or the value thereof, from the Subsequent Transferee Defendants for the benefit of the BLMIS

estate, (b) directing the Subsequent Transferee Defendants, to the extent allowable by law, to

disgorge any and all profits relating to or arising from the Transfers, (c) awarding attorneys' fees

and costs from the Subsequent Transferee Defendants, and (d) awarding any other relief the

Court deems just and appropriate.

<u>COUNT NINE</u>
<u>OBJECTION TO AND DISALLOWANCE OF CERTAIN CUSTOMER CLAIMS</u>

167.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

168.    Kenneth Citron, Trust f/b/o David Shapiro's Children, and Trust f/b/o Leslie

Shapiro Citron's Children, through their agent Shapiro, acted with knowledge of fraud at BLMIS

at the time they invested with BLMIS.  By their inequitable conduct, Kenneth Citron, Trust f/b/o

David Shapiro's Children, and Trust f/b/o Leslie Shapiro Citron's Children enabled Madoff to

perpetuate the fraud at BLMIS.

169.    Alternatively, Kenneth Citron, Trust f/b/o David Shapiro's Children, and Trust

f/b/o Leslie Shapiro Citron's Children, through their agent Shapiro, acted with explicit awareness

of numerous and serious indications of fraud at BLMIS, as described in this Second Amended

Complaint.

170.    By their conduct, and the conduct of Shapiro acting as their agent, Kenneth

Citron, Trust f/b/o David Shapiro's Children, and Trust f/b/o Leslie Shapiro Citron's Children

cannot assert that they justifiably relied on the fact that BLMIS was a legitimate business, and

they do not have a claim for restitution or any other valid claim against the BLMIS estate.

171.    As a result of  Shapiro's, Kenneth Citron's, Trust f/b/o David Shapiro's

Children's, and Trust f/b/o Leslie Shapiro Citron's Children's conduct, as described above, and

pursuant to § 502(a) of the Bankruptcy Code, the Trustee objects the Related Account Customer

53

Claims and Customer Claim # 13658, which should be disallowed, not entitled to restitution of

principal investments, and not entitled to equitable distribution from the BLMIS estate under

§ 502(b)(1) of the Bankruptcy Code.

## COUNT TEN
## EQUITABLE SUBORDINATION OF DEFENDANTS' CUSTOMER CLAIMS

172.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

173.    Kenneth Citron, Trust f/b/o David Shapiro's Children, and Trust f/b/o Leslie

Shapiro Citron's Children, through their agent Shapiro, engaged in and benefitted from

inequitable conduct, including the conduct described in this Second Amended Complaint, and

benefited by the withdrawal of approximately $54,472,654 in the years prior to the Filing Date.

174.    Based on Shapiro's, Kenneth Citron's, Trust f/b/o David Shapiro's Children's, and

Trust f/b/o Leslie Shapiro Citron's Children's inequitable conduct, BLMIS's customers have been

misled as to the true financial condition of BLMIS and have been induced to invest without

knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and

creditors are less likely to recover the full amounts due to them.

175.    Shapiro's, Kenneth Citron's, Trust f/b/o David Shapiro's Children's, and Trust f/b/o

Leslie Shapiro Citron's Children's conduct enabled Madoff to prolong the Ponzi scheme that

resulted in injury to all customers and creditors of the BLMIS estate and conferred an unfair

advantage on Defendants.

176.    The Court should exercise the full extent of its equitable powers to ensure that

claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by Kenneth

Citron, Trust f/b/o David Shapiro's Children, and Trust f/b/o Leslie Shapiro Citron's Children

directly or indirectly against the estate—specifically the Related Account Customer Claims and

Customer Claim # 13658, and only to the extent such claims are allowed— are subordinated for

distribution purposes pursuant to §§ 510(c) and 105(a) of the Bankruptcy Code to the allowed

claims of all other customers and creditors of BLMIS.

177.    Equitable subordination, as requested herein, is consistent with the provisions and

purposes of the Bankruptcy Code.

**COUNT ELEVEN**
**EQUITABLE DISALLOWANCE OF DEFENDANTS' CUSTOMER CLAIMS**

178.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

179.    Kenneth Citron, Trust f/b/o David Shapiro's Children, and Trust f/b/o Leslie

Shapiro Citron's Children, through their agent Shapiro, engaged in and benefited from

inequitable conduct and acted with knowledge of fraudulent activity at BLMIS, including the

conduct described in this Second Amended Complaint.  By Shapiro's, Kenneth Citron's, Trust

f/b/o David Shapiro's Children's, and Trust f/b/o Leslie Shapiro Citron's Children's conduct,

they have taken unconscionable advantage of, resulting in injury to, innocent customers and

other creditors of the BLMIS estate.

180.    Based upon Shapiro's, Kenneth Citron's, Trust f/b/o David Shapiro's Children's,

and Trust f/b/o Leslie Shapiro Citron's Children's failure to deal fairly and in good faith, as

described above, all customers and other creditors of BLMIS have been injured, including by

being:  (a) misled as to the true financial condition of the debtor, (b) induced to invest with BLMIS

without knowledge of BLMIS's financial condition, and (c) hindered and delayed in recovering the

full amounts due to them.  Kenneth Citron, Trust f/b/o David Shapiro's Children, and Trust f/b/o

Leslie Shapiro Citron's Children, through their agent Shapiro, have further enabled Madoff to

continue the Ponzi scheme.

181.    As Kenneth Citron's, Trust f/b/o David Shapiro's Children's, and Trust f/b/o

Leslie Shapiro Citron's Children's agent, Shapiro's conduct was so egregious that Kenneth

Citron, Trust f/b/o David Shapiro's Children, and Trust f/b/o Leslie Shapiro Citron's Children

should not be allowed to share in any equitable distribution made by the Trustee to innocent

customers holding allowed claims against BLMIS.

182.    The Court should exercise the full extent of its equitable powers to ensure that

claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by

Kenneth Citron, Trust f/b/o David Shapiro's Children, and Trust f/b/o Leslie Shapiro Citron's

Children against the estate, are disallowed.

183.    Equitable disallowance is consistent with the provisions and purposes of the

Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor

of the Trustee and against Defendants as follows:

*i.*    On the First Claim for Relief, pursuant to §§ 105(a), 502(d), 548(a)(1)(A), 550(a),

and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3):  (a) avoiding and preserving the

Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering

the Two Year Transfers, or the value thereof, from the Initial Transferee Defendants for the

benefit of the estate of BLMIS;

*ii.*    On the Second Claim for Relief, pursuant to §§ 105(a), 502(d), 548(a)(1)(B),

550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3):  (a) avoiding and

preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and

(c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferee

Defendants for the benefit of the estate of BLMIS;

*iii.*    On the Third Claim for Relief, pursuant to N.Y. Debt. & Cred. §§ 105(a), 502(d), 276, 276-a, 278, and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3):  (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Initial Transferee Defendants;

*iv.*    On the Fourth Claim for Relief, pursuant to N.Y. Debt. & Cred. §§ 273, 278, and/or 279, §§ 105(a), 502(d), 544(b), 550, and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3):  (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS;

*v.*    On the Fifth Claim for Relief, pursuant to N.Y. Debt. & Cred. §§ 274, 278, and/or 279, §§ 105(a), 502(d), 544(b), 550, 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the state of BLMIS;

*vi.*    On the Sixth Claim for Relief, pursuant to N.Y. Debt. & Cred. §§ 275, 278, and/or 279, §§ 105(a), 502(d), 544(b), 550, and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3):  (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS;

*vii.*    On the Seventh Claim for Relief, pursuant to N.Y. C.P.L.R. 203(g) and 213(8), N.Y. Debt. & Cred. §§ 276, 276-a, 278 and/or 279, §§ 105(a), 502(d), 544(b), 550(a), and 551 of

the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3):  (a) avoiding and preserving the Initial

Transfers, (b) directing that the Initial Transfers be set aside, (c) recovering the Initial Transfers,

or the value thereof, from the Initial Transferee Defendants, and (d) recovering attorneys' fees;

viii.    On the Eighth Claim for Relief, as a result of the avoidance of the within

Transfers, pursuant to N.Y. Debt. & Cred. §§ 273-279, §§ 105(a) and 550(a) of the Bankruptcy

Code, and 15 U.S.C. § 78fff-2(c)(3):  (a) recovering the Subsequent Transfers, or the value

thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS and

(b) recovering attorneys' fees from the Subsequent Transferee Defendants;

ix.    On the Ninth Claim for Relief, sustaining the Trustee's objections to the Related

Account Customer Claims and Customer Claim # 13658 pursuant to § 502(a) of the Bankruptcy

Code and disallowing such claims pursuant to § 502(b)(1) of the Bankruptcy Code;

x.    On the Tenth Claim for Relief, subordinating the Related Account Customer

Claims and Customer Claim # 13658 for purposes of distribution to all allowed claims of

BLMIS's customers and creditors due to Defendants' inequitable conduct pursuant to §§ 105(a)

and 510(c) of the Bankruptcy Code, such that no claim of Kenneth Citron, Trust f/b/o David

Shapiro's Children, and Trust f/b/o Leslie Shapiro Citron's Children is paid ahead of the allowed

claim of any customer or creditor of BLMIS;

xi.    On the Eleventh Claim for Relief, pursuant to this Court's equitable power,

disallowing each and every claim that Kenneth Citron, Trust f/b/o David Shapiro's Children, and

Trust f/b/o Leslie Shapiro Citron's Children assert against BLMIS, all of which are unlawful

under principles of restitution and other applicable state law;

*xii.* On all Claims for Relief, directing Defendants to disgorge to the Trustee all profits, including any and all compensation and/or remuneration received by Defendants related to, arising from, or concerning the Transfers from BLMIS to Defendants;

*xiii.* On all Claims for Relief, pursuant to federal common law and N.Y. C.P.L.R. 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

*xiv.* On all Claims for Relief, establishment of a constructive trust over all Transfers and their proceeds, product, and offspring in favor of the Trustee for the benefit of the estate of BLMIS;

*xv.* On all Claims for Relief, assignment of Defendants' income tax refunds from the United States, state, and local governments paid on fictitious profits during the course of the scheme;

*xvi.* On all Claims for Relief, awarding the Trustee attorneys' fees, all applicable interest, costs, and disbursements of this action; and

*xvii.* Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Date:  July 8, 2014
       New York, New York

Of Counsel:

**BAKER & HOSTETLER LLP**
PNC Center
1900 E. 9th Street, Suite 3200
Cleveland, Ohio 44114
Telephone:  (216) 621-0200
Facsimile:  (216) 696-0740
James H. Rollinson
Email:  jrollinson@bakerlaw.com

By:  /s/ Ona T. Wang
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Fernando A. Bohorquez, Jr.
Email:  fbohorquez@bakerlaw.com
Ona T. Wang
Email:  owang@bakerlaw.com
Torello H. Calvani
Email:  tcalvani@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
substantively consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
and the estate of Bernard L. Madoff*