Hearing Date:  November 19, 2014
Time:  10:00 am
Opposition Deadline:  September 19, 2014
Time:  5:00 pm
Reply Deadline:  October 31, 2014

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani
Robert S. Loigman
Rex Lee
Xochitl S. Strohbehn
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Telecopier:  (212) 849-7100

*Counsel to Joint Liquidators of Kingate Global*
*Fund Ltd. and Kingate Euro Fund Ltd.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>PLAINTIFF-APPLICANT,<br><br>V.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>DEFENDANT. | NO. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(SUBSTANTIVELY CONSOLIDATED) |
| IN RE:<br>BERNARD L. MADOFF,<br>DEBTOR. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC<br><br>PLAINTIFF<br><br>V.<br><br>FEDERICO CERETTI, *ET AL.*<br><br>DEFENDANTS. | Adv. Pro. No. 09-1161 (SMB) |

**KINGATE GLOBAL FUND LTD. AND KINGATE EURO
FUND LTD.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .........................................................................................................6

    A.    The Relevant Parties ..................................................................................6

    B.    The Trustee's Sparse Allegations Concerning The Kingate Funds' Actual
        Knowledge Of Or Willful Blindness To The BLMIS Fraud ................................7

ARGUMENT ...........................................................................................................11

I.    UNDER SECTION 546(e), THE KINGATE FUNDS' WITHDRAWALS FROM
    BLMIS ARE SAFE HARBORED FROM AVOIDANCE UNDER MOST OF
    THE TRUSTEE'S CLAIMS ...........................................................................12

    A.    The Trustee Faces A High Burden Of Pleading Under *Cohmad* ...........................12

    B.    The Trustee's Allegations Do Not Satisfy *Cohmad* ...............................................14

        1.    The Trustee's Allegations Of "Impossible Trading Activity" And
            "Badges Of Fraud" Are Really Just Hindsight Conclusions ...................15

        2.    The Trustee Cannot Explain Why Public Information About
            BLMIS Informed The Kingate Funds That There Was Fraud .................18

        3.    The Trustee's Manager-Related Allegations Do Not Show Actual
            Knowledge .......................................................................................19

    C.    The Trustee Cannot Impute The Other Defendants' Knowledge To The
        Funds .......................................................................................................24

II.    THE TRUSTEE HAS FAILED TO STATE A CLAIM FOR INTENTIONAL
    FRAUDULENT CONVEYANCE UNDER SECTION 548(a)(1)(A) ...........................26

III.    THE TRUSTEE HAS FAILED TO STATE A CLAIM FOR EQUITABLE
    SUBORDINATION ...........................................................................................29

    A.    The Trustee Has Failed To Allege That The Funds Acted Inequitably ................29

    B.    The Trustee Has Not Alleged That The Kingate Funds Harmed Other
        Customers ...............................................................................................31

    C.    The Trustee Does Not Have Standing .................................................................32

D.      The Trustee's Claim Is Barred By The *Wagoner* Rule And The Doctrine
        Of Unclean Hands ................................................................................................. 33

IV.    THE TRUSTEE HAS FAILED TO STATE A CLAIM FOR DISALLOWANCE .......... 35

A.      The Trustee Cannot State A Claim For Disallowance Under Section
        502(b)(1) ............................................................................................................... 35

B.      There Is No Claim For "Equitable Disallowance" ................................................ 37

V.     THE FOURTH AMENDED COMPLAINT SHOULD BE DISMISSED WITH
       PREJUDICE ...................................................................................................................... 38

CONCLUSION .......................................................................................................................... 39

# TABLE OF AUTHORITIES

**Page**

## Cases

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank
(In re 80 Nassau Assocs.)*, 169 B.R. 832 (Bankr. S.D.N.Y. 1994).........................................30

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..........................................................................................11

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010).....................................................................22, 28

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*,
792 F. Supp. 969 (S.D.N.Y. 1992) ...............................................................................34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).....................................................................................................11

*Bankers Servs., Inc. v. Ernst & Young (In re CBI Holdings, Co.)*,
529 F.3d 432 (2d Cir. 2008)..........................................................................................25

*In re Bayou Grp.*,
439 B.R. 284 (S.D.N.Y. 2010).....................................................................................26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................................11

*In re Blockbuster Inc.*, No. 10 Adv. Pro. 5524,
2011 WL 1042767 (Bankr. S.D.N.Y. Mar. 17, 2011) ...............................................30

*Buckley v. Deloitte & Touche USA LLP*,
No. 06 Civ. 3291, 2007 WL 1491403 (S.D.N.Y. May 22, 2007)...............................25

*In re Gander Mountain, Inc.*,
29 B.R. 260 (Bankr. Wis. 1983) ..................................................................................37

*Granite Partners L.P. v. Bear Stearns & Co., Inc.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998)......................................................................34, 35

*Harbinger Capital Partners LLC v. Ergen (In re LightSquared, Inc.)*,
504 B.R. 321 (Bankr. S.D.N.Y. 2013) ....................................................................36, 37

*In re Hydrogen LLC*,
431 B.R. 337 (Bankr. S.D.N.Y. 2010)..........................................................................30

*Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*,
413 B.R. 115 (Bankr. S.D.N.Y. 2008)......................................................................30, 32

*Kirschner v. Grant Thornton LLP*, No. 07 Civ. 11604,
2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009)..............................................................34

*Kirschner v. KPMG LLP*, 626 F.3d 673 (2d Cir. 2010)...................................................................34

*Koch Refining v. Farmers Union Cent. Exch., Inc.*,
    831 F.2d 1339 (7th Cir. 1987) ...........................................................................................33

*Law v. Siegel*,
    134 S. Ct. 1188, 2014 WL 813702 (Mar. 4, 2014) ...........................................................36, 37

*In re Loucheschi LLC*, No. 11 Adv. Pro. 4122,
    2013 WL 6009947 (Bankr. D. Mass. Nov. 13, 2013)...............................................................36

*MLSMK Inv. Co. v. JPMorgan Chase & Co.*,
    737 F. Supp. 2d 137 (S.D.N.Y. 2010)...........................................................................18, 21

*MLSMK Inv. Co. v. JPMorgan Chase & Co.*,
    431 Fed. App'x. 17 (2d Cir. 2011)......................................................................................18

*Marshall v. Picard*,
    740 F.3d 81 (2d Cir. 2014)...............................................................................................32

*Meridian Horizon Fund, LP v. KPMG*,
    487 Fed. App'x. 636 (2d Cir. 2012).....................................................................................18

*In re New Times Secs. Servs.*,
    371 F.3d 68 (2d Cir. 2004)...............................................................................................17

*O'Connell v. Arthur Anderson LLP (In re Alphastar Ins. Grp. Ltd.)*,
    383 B.R. 231 (Bankr. S.D.N.Y. 2008) ................................................................................12

*Off. Comm. of Unsecured Creditors of Sunbeam Corp. v.
    Morgan Stanley & Co. (In re Sunbeam Corp.)*,
    284 B.R. 355 (Bankr. S.D.N.Y. 2002)..................................................................................30

*Off. Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.
    (In re BH S&B Holdings)*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009) .........................................30

*Page v. Rogers*,
    211 U.S. 575 (1909).......................................................................................................36

*Papasan v. Allain*,
    478 U.S. 265 (1986).......................................................................................................11

*Picard v. HSBC*,
    454 B.R. 25 (S.D.N.Y. 2011)...........................................................................................34

*Picard v. JPMorgan Chase & Co.*,
    721 F.3d 54 (2d Cir. 2013)...............................................................................................33

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011)................................................................................. *passim*

*Raleigh v. Ill. Dep't Rev.*,
    530 U.S. 15 (2000).........................................................................................................36

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ..................................................................................12

*In re SI Restructuring, Inc.*,
   532 F.3d 355 (5th Cir. 2008) ................................................................................32

*Saltz v. First Frontier LP*,
   782 F. Supp. 2d 61 (S.D.N.Y. 2010) ...............................................................18, 28

*Saltz v. First Frontier LP*,
   485 Fed. App'x. 461 (2d Cir. 2012) ......................................................................18

*Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
   476 B.R. 715 (S.D.N.Y. 2012) .........................................................................13, 14

*Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
   No. 12-MC-115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ....................... *passim*

*Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
   No. 12-MC-115, 2014 WL 1651952 (S.D.N.Y. Apr. 27, 2014) .................4, 26, 27

*Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
   No. 12-MC-115, 2014 WL 2925175 (S.D.N.Y. June 30, 2014) ......................13, 36

*In re Shared Techs. Cellular, Inc.*,
   281 B.R. 804 (Bankr. D. Conn. 2002) ..................................................................37

*In re Shared Techs. Cellular, Inc.*,
   293 B.R. 89 (D. Conn. 2003) ................................................................................37

*Sharp Int'l Corp. v. State Street Bank & Trust Co.*,
   403 F.3d 43 (2d Cir. 2005) ...................................................................................12

*Shearson Lehman Hutton, Inc. v. Wagoner*,
   944 F.2d 114 (2d Cir. 1991) .................................................................................38

*South Cherry St., LLC v. Hennessee Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009) ...................................................................................16

*Spool v. World Child Int'l Adoption Agency*,
   520 F.3d 178 (2d Cir. 2008) .................................................................................11

*Stephenson v. Citco Grp. Ltd.*,
   700 F. Supp. 2d 599 (S.D.N.Y. 2010) ..................................................................28

*Stephenson v. PricewaterhouseCoopers, LLP*,
   768 F. Supp. 2d 562 (S.D.N.Y. 2011) ..................................................................21

*Stephenson v. PricewaterhouseCoopers, LLP*,
   482 Fed. App'x. 618 (2d Cir. 2012) ......................................................................21

*Swanson v. First Wisconsin Fin. Corp. (In re Universal Foundry Co.)*,
   163 B.R. 528 (E.D. Wis. 1993) .............................................................................30

*In re Tremont Sec. Law, State Law, and Ins. Litig.*,
    No. 10 Civ. 9061, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013) ...........................................21

*In re Tremont Secs. Law, State Law and Ins. Litig.*,
    703 F. Supp. 2d 362 (S.D.N.Y. 2010) ...................................................................................28

*United States v. Dial*,
    757 F.2d 163 (7th Cir. 1985) ................................................................................................20

*United States v. Mahaffy*,
    No. 05 CR 613, 2006 WL 2224518 (E.D.N.Y. Aug. 2, 2006) ...............................................20

*Zutty v. Rye Select Broad Market Prime Fund, L.P.*,
    No. 113209/09, 2011 WL 5962804 (N.Y. Sup. Ct. Apr. 15, 2011) ........................................16

## Rules / Statutes

11 U.S.C. § 502(b)(1) ...............................................................................................................35

11 U.S.C. § 546(e) ............................................................................................................. 12-13

11 U.S.C. § 548(c) ...................................................................................................................26

Federal Rule of Bankruptcy Procedure 7012 .............................................................................1

Federal Rule of Civil Procedure 9(b)........................................................................................12

Federal Rule of Civil Procedure 12(b)(6) .............................................................................1, 11

The Joint Liquidators for defendants Kingate Global Fund Limited ("Kingate Global") and Kingate Euro Fund Limited ("Kingate Euro" and, together with Kingate Global, the "Kingate Funds" or "Funds") respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure 12(b)(6) as incorporated in this proceeding by Federal Rule of Bankruptcy Procedure 7012, to dismiss with prejudice the Fourth Amended Complaint (the "Fourth Amended Complaint" or "4th Am. Compl.") filed by plaintiff Irving Picard (the "Trustee").

## PRELIMINARY STATEMENT

The Kingate Funds—and, through the Funds, their investors—are massive net losers, having lost close to $800 million as the result of Bernard Madoff's fraud and the collapse of Bernard L. Madoff Investment Securities LLC ("BLMIS"). They did not profit from Madoff's Ponzi scheme; they were victims of it. Because of the losses they suffered from the fraud, the Funds are now in liquidation. Despite these undisputed facts, the Trustee seeks to increase the Funds' losses by bringing this case to claw back $900 million in "safe harbored" redemptions the Funds withdrew in good faith from BLMIS and to subordinate or disallow the Funds' claims against the Estate—outcomes that, in these proceedings, should be reserved only for those who actually participated in the fraud.

Case law rightfully imposes a substantial burden on the Trustee under these circumstances to plead detailed facts showing that the Funds acted with fraudulent intent when investing in BLMIS. The Trustee does not come close to meeting this burden. Instead of pleading detailed facts, the Trustee relies on publicly-available information, widely-known observations of Madoff's business and a healthy amount of 20/20 hindsight that the Trustee dresses up as "impossible" trading results to assert that the Kingate Funds, not unlike the rest of the world, should have investigated BLMIS more closely because its consistently strong returns

1

were simply too good to be true. Yet, even if the Kingate Funds were naïve, a trait they seemingly would have shared with other net losers whom the Trustee has not sued and who, unlike the Funds, have been allowed to collect partial distributions, that still falls well short of the particularized knowledge the Trustee must allege to state a plausible claim. As a result, as to the Kingate Funds, the Fourth Amended Complaint should be dismissed with prejudice.

*First*, there is no dispute that most of the Trustee's avoidance claims (Counts I, III-VIII) concern transfers that fall squarely within the "safe harbor" of section 546(e) of the Bankruptcy Code and are therefore shielded from avoidance. As the District Court explained in the *Cohmad* decision,[1] among other cases, the only way the safe harbor would not apply to protect the Kingate Funds' withdrawals at this stage is if the Trustee alleges specific facts showing that the Funds had "actual knowledge" that BLMIS did not actually conduct securities trading. *See infra*, § I.A. The Trustee, however, alleges the complete opposite, conceding that the Kingate Funds did in fact believe that BLMIS traded securities. This admission is fatal to the Trustee's claims and warrants dismissal on its own. *See infra*, § I.B.

Yet, even setting aside this unmistakable concession, the Trustee still fails to allege that the Funds had actual knowledge because, at most, he alleges only that in hindsight the Funds should have been more diligent about BLMIS. Indeed, the vast majority of the Trustee's allegations do not relate to circumstances that the Funds were actually aware of at the time. Rather, they are merely findings the Trustee makes from aggregating BLMIS trades over years, placing them side-by-side with each other and comparing them and then comparing them further with historical market data, a process in which the Trustee's advisors no doubt spent hundreds of hours of professional time. The result is that the Trustee may be able to show why his

---

[1]  *Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, No. 12-MC-115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").

comparisons of BLMIS's trading activity look suspicious now, but he cannot show why those trades were obviously fraudulent then.  These sorts of allegations fall far short of satisfying the Trustee's burden under *Cohmad*.  They also defy common sense.  If the Trustee were correct and the Funds learned of the fraud from the commonly-known facts he contends were "red flags," then the number of market participants who had access to the same information and consequently must have had actual knowledge of the fraud too would be legion.  It is also simply implausible, and nothing in the Trustee's allegations suggests, that the Funds actually knew BLMIS was a Ponzi scheme—and that to profit from it they had to get out early—yet nonetheless remained investors in BLMIS for more than a decade, right through the very end, earning their current title as two of the largest net losers in BLMIS.  That the Funds were long-term investors and *net losers* of over $800 million rendering them insolvent seriously undermines any suggestion that they were in on the fraud.  *See infra*, § I.B.1.-B.3.

Further, even if the Trustee had alleged specific facts that led to a plausible inference of actual knowledge, his allegations address only conduct by, or the knowledge of, the other defendants, not the Funds themselves.  If these defendants, the Funds' managers and advisors, acted with fraudulent intent, as the Trustee contends, then they would have been doing so solely to inflate the management fees they extracted from the Funds.  In that case, if the Trustee is correct, then these managers and advisors would have been acting adversely to the Funds and whatever knowledge they may have had cannot be imputed to the Funds.  As a result, the Trustee still does not allege the *Funds'* actual knowledge, and section 546(e) precludes his claims.  *See infra*, § I.C.

*Second*, the Trustee's remaining avoidance claim (Count II), for actual fraudulent transfer under section 548(a)(1)(A) of the Bankruptcy Code, should be dismissed because the transfers at

3

issue were "for value" and received in "good faith" and are therefore protected from avoidance by section 548(c).  To state a claim in spite of section 548(c), the Trustee must allege that the Kingate Funds "lacked good faith" at the time of their withdrawals.[2]  In the recent *Good Faith Decision*, Judge Rakoff made clear how demanding that burden is.  The Court instructed that, to show a lack of good faith, the Trustee must allege "particularized" facts showing at a minimum that the Kingate Funds "willfully blinded" themselves to the fraud.  Merely alleging that the Funds learned of suspicious circumstances and failed to investigate the matter further will not do. Yet, the Trustee's fraud-by-hindsight allegations do not even accomplish that.  As a result, the Trustee has not alleged the Funds' lack of good faith, and he fails to state a claim under section 548(a)(1)(A).  *See infra*, § II.

*Third*, the Trustee's claim in Count XI—to equitably subordinate the Kingate Funds' $800 million in claims of net losses against the Estate should be dismissed for multiple, independent reasons.  As a threshold matter, because the Trustee has not alleged (and cannot allege) the Funds' fraudulent intent in respect of his conveyance claims, his equitable subordination claim must also fail because he comes nowhere close to alleging the kind of "egregious" misconduct required to justify the drastic remedy of equitable subordination.  *See infra*, § III.A.  Critically, the Trustee also cannot establish injury to other creditors because he fails to show that the Funds—undisputed losers in the BLMIS fraud—actually harmed BLMIS's other customers who lost money in any way.  *See infra*, § III.B.  Next, even if the Trustee has sufficiently alleged that the Funds harmed other customers, that injury is to specific (unidentified) customers, not the Estate, and, as a result, the Trustee does not have standing to pursue this claim. *See infra*, § III.C.  Lastly, having stepped into BLMIS's shoes, the Trustee is precluded by the

---

[2]    *Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, No. 12-MC-115, 2014 WL 1651952 (S.D.N.Y. Apr. 27, 2014) (the "*Good Faith Decision*").

*Wagoner* rule and the doctrine of unclean hands from seeking an equitable remedy against the Funds for a fraud in which BLMIS (and thus, as successor to its conduct, the Trustee) undeniably participated. *See infra*, § III.D. Put simply, although it strains logic to assert a net loser's transactions with BLMIS harmed any other customers, it is unsustainable for the Trustee to be the one to assert a generalized equitable subordination claim.

*Finally*, the Trustee's disallowance claims (Counts X and XII) should be dismissed. In Count X, the Trustee seeks disallowance of the Kingate Funds' bankruptcy claims under section 502(b)(1) of the Bankruptcy Code on the purported ground that the Funds acted inequitably by furthering Madoff's scheme. This claim fails for the same reason the others do. Further, the Trustee's reliance on section 502(b)(1) is entirely misplaced because, under that section, there is no "inequitable behavior" ground on which to disallow a claim. Rather, that section permits disallowance only in specific situations, none of which involves inequitable behavior or otherwise applies here. *See infra*, § IV.A. Turning to the Trustee's seemingly "catch-all" claim in Count XII, the Trustee seeks "equitable disallowance" of the Funds' claims. Even if "equitable disallowance" were a real cause of action, despite it appearing nowhere in the Bankruptcy Code, the claim should be dismissed because it is an even more drastic remedy than the equitable subordination claim the Trustee is unable to establish. Moreover, the Trustee cannot seek an equitable remedy having himself stepped into BLMIS's inequitable shoes. *See infra*, § IV.B.

For these reasons, the Trustee's claims against the Kingate Funds should be dismissed in their entirety and with prejudice.

## BACKGROUND[3]

### A.    The Relevant Parties

Kingate Global was formed in the British Virgin Islands in 1994.  (4th Am. Compl. ¶ 2.) In January 1996, Kingate Euro was created as a sub-fund of Kingate Global to handle investments made in Deutsche Marks and later became a separate legal entity to handle investments denominated in Euros.  (*Id.* at ¶ 41.)  The Kingate Funds were separate companies with separate boards of directors.  (*Id.* at ¶ 42.)  Following their formation, the Kingate Funds sold subscriptions to investors, using the proceeds of those subscriptions to invest in BLMIS.  (*Id.* at ¶ 2.)  The Kingate Funds' investment accounts with BLMIS were governed by three securities contracts: a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options.  (*Id.* at ¶¶ 39 & 41.)  Pursuant to these documents, the Kingate Funds added and withdrew principal over the period of their investment with BLMIS, ultimately depositing approximately $1.7 billion with BLMIS and over time withdrawing approximately $900 million.  (*Id.* at ¶¶ 3 & 8.)

As passive investment vehicles, the Kingate Funds did not interact with BLMIS other than to transfer principal into or out of the investment accounts.  From the outset, the Funds retained service providers that handled every aspect of managing their investors' money.  In particular, the Funds entered into management agreements with defendant Kingate Management Limited ("KML"), under which KML was responsible for, among other things, providing management services to the Funds, arranging for accounting and administrative services, and deciding the timing and manner of the Funds' investment transactions.  (*See id.*

---

[3]    This Background is drawn largely from the allegations in the Fourth Amended Complaint, which the Kingate Funds accept as true solely for purposes of this motion to dismiss.

¶¶ 106, 115 & 116.)[4] KML in turn retained defendant FIM Limited and later defendant FIM Advisers LLP (collectively, with FIM Limited, "FIM") to provide consulting and advisory services in connection with the Funds.[5] (Id. at ¶ 5, 110.) The Funds did not charge their investors performance fees but instead charged a management fee based on a percentage of their net asset value and then distributed these fees to KML and FIM.[6] (Id. at ¶¶ 107-110.) KML and FIM were created, beneficially owned or managed by defendants Federico Ceretti ("Ceretti") and Carlos Grosso ("Grosso"). (Id. at ¶¶ 32-37 & 44-45.)

The Kingate Funds are currently in liquidation proceedings in the British Virgin Islands and Bermuda. (Id. at ¶ 43.) Applying the Trustee's "net equity" methodology (i.e., subtracting out from total investments the total withdrawals from BLMIS), the Funds were significant "net losers," having lost nearly $800 million, or nearly half, of the total principal that they invested with BLMIS. (See id. at ¶ 3.) In connection with their liquidation proceedings, the British Virgin Islands and Bermuda courts appointed liquidators, who are charged with gathering assets for distribution to the Kingate Funds' creditors, including, most notably, their investors whose hope of recovering a portion of their investments depends in large part on the Kingate Funds' ability to recover the net unpaid sums invested with BLMIS.

**B.    The Trustee's Sparse Allegations Concerning The Kingate Funds' Actual Knowledge Of Or Willful Blindness To The BLMIS Fraud**

On April 17, 2009, the Trustee brought this adversary proceeding against the Kingate Funds, among others. Since then, the Trustee has received voluminous discovery, including

---

[4] Until 2005, Kingate Global was also co-managed by Tremont (Bermuda) Limited. (Id. ¶¶ 106, 113-14.)

[5] The Kingate Funds also retained defendant HSBC Bank of Bermuda Limited, as custodian, PriceWaterhouseCoopers, LLP ("PwC"), as auditor, and defendant Citi Hedge Fund Services, as administrator. (Id. at ¶¶ 73-76, 135, & 243.)

[6] More accurately, the management fees were paid by the Kingate Funds—not by shareholders in the Funds—to their managers.

hundreds of thousands of pages from FIM and its affiliates (including documents that they maintained with respect to Grosso and Ceretti). The Funds have also provided documents voluntarily to the Trustee. The Trustee has amended his complaint several times; this is his fourth attempt to state a claim against the Kingate Funds, the most recent amendment done purportedly to embellish the Trustee's allegations to meet the "actual knowledge" standard that Judge Rakoff clarified in *Cohmad* for purposes of section 546(e)'s safe harbor. To plead the Funds' knowledge, the Trustee relies on four categories of allegations.

First, the Trustee alleges what he calls "impossible trading activity at BLMIS." (*See id.*, Section IX at 33.) These allegations do not refer to specific communications between the Kingate Funds' managers and advisors, on the one hand, and BLMIS, on the other hand, nor do they rely on communications internal to these manager and advisors. Rather, these allegations are based on the Trustee performing comparisons of BLMIS's trading activity with historical market activity. Unlike, for example, a comparison of monthly returns against an index, the Trustee's work is nothing like what an investor would do in the normal course. The Trustee also purports to rely on information that the Funds themselves discovered in 2010, almost a year and half after Madoff was arrested, when performing a review of their BLMIS accounts in connection with their liquidation proceedings. (*Id.* at ¶¶ 170-77.) Applying hindsight to this data, the Trustee alleges generally that (i) the Funds' returns from BLMIS were remarkably consistent over the years (*id.* at ¶¶ 147-154); (ii) the Funds purportedly engaged in greater than normal options and equity trading (*id.* at ¶¶ 155-169); and (iii) BLMIS purported to sell equities and options at higher than normal prices and buy equities at lower than normal prices (*id.* at ¶¶ 170-182).

Second, the Trustee asserts that the Kingate Funds were aware of certain "badges of fraud." Much like the first category, these "badges of fraud" do not relate to circumstances that the Trustee claims the Funds actually recognized were unusual at the time. Rather, in alleging these "badges of fraud," the Trustee again contrasts information in the Funds' account statements with BLMIS with what he contends were prevailing industry practices at the time to suggest that had the Funds done then the same thing as he did now they would have known that BLMIS deviated from industry norms. In that regard, he alleges that the Funds' account statements or records with BLMIS showed that (i) BLMIS liquidated investments at quarter- and year-end (*id.* at ¶¶ 183-85); (ii) BLMIS sometimes did not follow its stated "split-strike conversion" strategy (*id.* at ¶¶ 186-190); (iii) BLMIS's options contracts sometimes settled more than one business day after the trade date (*id.* at ¶¶ 191-93); (iv) BLMIS received dividends from money market funds on an intra-month basis (*id.* at ¶¶ 194-98); and (v) the Funds occasionally had negative cash balances with BLMIS suggesting that BLMIS traded on margin even though the Funds did not have a margin account (*id.* at ¶¶ 199-205).

Third, the Trustee alleges that information about BLMIS's business that was widely known by its investors and the Securities and Exchange Commission—and, indeed, in most cases was publicly available to the rest of the world—informed the Kingate Funds that BLMIS was perpetrating a fraud. In particular, he alleges that (i) BLMIS lacked scalability (or that the market was not large enough for BLMIS to invest effectively) (*id.* at ¶¶ 206-210); (ii) BLMIS did not identify the counterparties to its OTC options trades (*id.* at ¶¶ 211-216); (iii) BLMIS lacked independent oversight and reported in its regulatory filings to the SEC that it had insufficient staffing for internal controls (*id.* at ¶¶ 217-222); (iv) public analysts questioned BLMIS's transparency (*id.* at ¶¶ 223-227); (v) BLMIS's systems were technologically out of

date (*id.* at ¶¶ 228-233); (vi) BLMIS used a minor-league auditor (*id.* at ¶¶ 234-238); and (vii)

BLMIS charged commissions rather than management fees (*id.* at ¶¶ 239-241).

Finally, the Trustee makes a few allegations that are specific to the Kingate Funds'

investment manager, KML, their advisor, FIM, and Ceretti and Grosso, the beneficial owners of

FIM and KML.  Notably, the Trustee does not allege conduct by, or the knowledge of, the

Kingate Funds themselves.  Rather, all of these allegations (and thus the Trustee's claims) are

based entirely on conduct allegedly undertaken by other defendants.[7]  And, if anything, these

allegations show that FIM, KML, Ceretti and Grosso believed that BLMIS conducted actual

securities transactions.  In particular, the Trustee alleges that (i) Grosso was given a tour of

BLMIS's offices, which included a stop at the 17th floor, where BLMIS conducted its trades on

antiquated systems (*id.* at ¶ 100); (ii) Ceretti and Grosso called BLMIS frequently, socialized

with Madoff and communicated with entities affiliated with him (*id.* at ¶¶ 101-02); (iii) Ceretti

and Grosso recognized that Madoff rarely communicated directly with investors (*id.* at ¶¶ 119-

120); (iv) FIM did not perform all of its standard due diligence procedures on BLMIS (*id.* at

¶¶ 128-134); (v) during the Funds' audit in 2008, their auditor, PwC, relied on BLMIS and had

not completed examining the Funds' controls and cash movements (*id.* at ¶¶ 135-36); and (vi)

Ceretti and Grosso attributed Madoff's success to what the Trustee mischaracterizes as "illegal

front running" in securities trading (*id.* at ¶¶ 137-141).

On the basis of these allegations, the Trustee asserts 11 causes of action against the

Kingate Funds.  In seeking to claw back the Funds' redemptions from BLMIS, the Trustee

asserts one claim for preferential transfer under section 547(b) (Count I); two claims for

intentional fraudulent transfer under section 548(a)(1)(A) and state law (Counts II and IV); and

---

[7]    As demonstrated below (*see infra*, § I.C.), there is no basis for imputing this conduct to the
Kingate Funds.

five claims for constructive fraudulent transfer under sections 544 and 548(a)(1)(B) and state law (Counts III, V-VIII).  The Trustee also seeks to equitably subordinate and disallow the Funds' claims against the Estate (Counts X-XII).

## ARGUMENT

The Trustee's Fourth Amended Complaint fails to state any valid cause of action against the Kingate Funds and should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

Under Rule 12(b)(6), a claim must be dismissed if it fails to allege "sufficient factual matter" that, if "accepted as true, . . . 'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible only if the "factual allegations [are] sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  By contrast, a complaint cannot be sustained if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555) (citations omitted) (alteration in original).

Although the Court must accept all well-pleaded factual allegations as true, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (citations omitted); *see also Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) ("Although we construe the pleadings liberally, 'bald assertions and conclusions of law will not suffice.'") (citation omitted).  The plausibility standard is intended to avoid the "potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support [plaintiff's] claim." *Twombly*, 550 U.S. at 559-560 (internal quotation marks omitted).

In addition, where, as here, a plaintiff alleges fraudulent knowledge or misconduct, the allegations must satisfy the heightened pleading standard under Federal Rule of Civil Procedure

9(b). *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'"); *O'Connell v. Arthur Anderson LLP (In re Alphastar Ins. Grp. Ltd.)*, 383 B.R. 231, 259-264 (Bankr. S.D.N.Y. 2008) (dismissing plaintiff's fraud-based claims on grounds that they failed to meet the Rule 9(b) standard). "Even where fraud is not an element of the claim, the allegations must satisfy Rule 9(b) if, [as here,] the claim is based on fraudulent conduct." *In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. at 257 ; *see also, e.g.*, *Sharp Int'l Corp. v. State Street Bank & Trust Co.*, 403 F.3d 43, 55 (2d Cir. 2005) (applying Rule 9(b) to claims under section 548(a)(1)(A) of the Bankruptcy Code and state law).

## I.    UNDER SECTION 546(e), THE KINGATE FUNDS' WITHDRAWALS FROM BLMIS ARE SAFE HARBORED FROM AVOIDANCE UNDER MOST OF THE TRUSTEE'S CLAIMS

The Trustee's claims for preferential transfer, constructive fraudulent transfer and actual and constructive fraudulent transfer under state law (Counts I & III-VIII) should be dismissed because the Kingate Funds' withdrawals are shielded from avoidance by section 546(e)'s safe harbor, and the Trustee cannot plead the limited exception to these protections. First, as the District Court explained in *Cohmad*, the pleading standard for alleging the facts necessary to avoid application of section 546(e)'s safe harbor is exacting and requires the Trustee to allege with particularity that the Funds had "actual knowledge" that BLMIS did not actually conduct securities transactions. Second, the Trustee's repeatedly-amended allegations fall far short of demonstrating that sort of specific knowledge on the part of the Funds. Finally, even if the Trustee had alleged actual knowledge (which he does not), he has done so only with respect to the other defendants, not the Funds themselves, and that knowledge cannot be imputed the Funds.

### A.    The Trustee Faces A High Burden Of Pleading Under *Cohmad*

Customer withdrawals from BLMIS, such as those the Trustee seeks to avoid here, are protected from avoidance by section 546(e)'s safe harbor as either (i) a "settlement payment. . .

made by or to a stockbroker or . . . (ii) a transfer by or to a stockbroker in connection with a securities contract." *See Picard v. Katz*, 462 B.R. 447, 451-53 (S.D.N.Y. 2011) *abrogated on other grounds, Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, No. 12-MC-0115, 2014 WL 2925175 (S.D.N.Y. June 30, 2014) (holding that section 546(e) precludes the Trustee from recovering transfers made by BLMIS to its customers except in the case of actual fraud); *Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC* ("<u>Greiff</u>"), 476 B.R. 715, 723 (S.D.N.Y. 2012) (holding that customer withdrawals from BLMIS were "in connection with" a securities contract or were "settlement payments" from a "stockbroker" under section 546(e)).

The lone exception to these particular categories of section 546(e)'s safe harbor is exceedingly limited. As Judge Rakoff explained recently in *Cohmad*, the safe harbor for settlement payments or transfers made in connection with a securities contract between BLMIS and its customer applies unless, at the time of the transfer, the customer actually knew that BLMIS was a Ponzi scheme and was not conducting any actual securities transactions. *Cohmad*, 2013 WL 1609154, at *3-4. Judge Rakoff explained that, if the customer had such actual knowledge, then the customer would know that its "securities contract" with BLMIS, or the "settlement payment" it received from BLMIS, was a complete sham. *Id*. at *3*. And, in that situation, the customer could not reasonably expect to receive the benefit of section 546(e)'s protections, which relate to genuine "securities contracts" and "settlement payments." *Id*. at *4*.

Thus, for the Trustee to avoid application of section 546(e)'s safe harbor, "the burden is on the Trustee" to show, "at a minimum," that the Kingate Funds "had *actual knowledge* that there were no actual securities transactions being conducted" by BLMIS. *Id*. at *4 (emphasis added). Under this stringent standard, neither "willful blindness" nor a lack of "good faith" will suffice, because, as Judge Rakoff explained, a securities customer, such as the Kingate Funds,

"has no duty to inquire as to his broker's *bona fides*." *Id.* at *4 n.2. In addition, because there is

no general "fraud" exception to section 546(e), the Trustee must allege more than that the

Kingate Funds knew BLMIS may have been engaged in some kind of undefined scheme or

illegal conduct. *See id.* at *3 (holding that there is no "illegal conduct" or "fraud" exception to

section 546(e)'s safe harbor); *Greiff*, 476 B.R. at 721 (same). Rather, the type of actual

knowledge *Cohmad* requires is specific: that BLMIS was not trading securities. This is so

because it is only when that precise sort of knowledge is present that the customer knows its

agreement with BLMIS was a pretense and is not permitted to invoke that sham arrangement as a

basis for the safe harbor. *Cohmad*, 2013 WL 1609154, at *3-4.

B.    **The Trustee's Allegations Do Not Satisfy *Cohmad***

The Trustee's Fourth Amended Complaint falls far short of alleging with specificity that

the Kingate Funds had actual knowledge that BLMIS did not conduct real securities transactions.

As an initial matter, rather than allege that the Funds believed BLMIS did not conduct

actual securities transactions, the Trustee alleges the complete opposite—that the Funds in fact

believed BLMIS was trading securities. For example, he alleges that the Kingate Funds believed

BLMIS experienced a "massive amount of order flow" and that it accounted for "about 15% of

all equity transactions in the United States." (4th Am. Compl. ¶¶ 137-141.) The Trustee also

alleges that the Funds should have known that BLMIS used the Funds' accounts to trade on

margin and that the Funds knew BLMIS entered into option contracts that sometimes settled

more than one business day after the trade date. (*Id.* at ¶¶ 191-93, 199-205.) He further alleges

that Grosso, who was an officer at FIM and an advisor to the Kingate Funds, was given a tour of

BLMIS's offices, including the 17th floor, where BLMIS conducted its trading activity. (*Id.* at

¶ 100.) These fatal concessions, which the Trustee plainly alleges in the Fourth Amended

Complaint, completely undermine any notion that the Funds actually knew BLMIS did not

14

conduct securities trading, and the Trustee's claims that are subject to the safe harbor should be dismissed for this reason alone.

Even setting aside the Trustee's fatal admissions, the Trustee's remaining allegations do not give rise to a plausible inference that the Funds actually knew BLMIS did not engage in any genuine securities transactions.  As explained above (*see supra*, at 7-10), the Trustee relies on four categories of factual allegations, none of which is sufficient, individually or collectively, to establish the Kingate Funds' actual knowledge.  Indeed, three of those four categories barely even reference information that is particular to any defendant in this case.

    1.      The Trustee's Allegations Of "Impossible Trading Activity" And "Badges Of Fraud" Are Really Just Hindsight Conclusions

In the first two categories, which account for the vast majority of the Trustee's allegations purportedly relating to the Kingate Funds' knowledge, the Trustee alleges that the Funds were aware of "impossible trading activity at BLMIS" and certain "badges of fraud."  In terms of the "impossible trading activity," the Trustee alleges that the Funds' returns from BLMIS were too consistent over the years; the Funds purportedly engaged in greater than normal options and equity trading; and BLMIS supposedly transacted in equities and options at better than market prices.  (4th Am. Compl. ¶¶ 147-182.)  Turning to the "badges of fraud," the Trustee alleges that BLMIS liquidated investments at quarter- and year-end; BLMIS sometimes did not follow its stated investment strategy; BLMIS's options trades sometimes settled more than one business day after the trade date; BLMIS received dividends from money market funds on an intra-month basis; and the Funds' accounts suggested that BLMIS traded on margin even though the Funds did not have a margin account.  (*Id.* at ¶¶ 183-205.)

These allegations do not come close to alleging the Kingate Funds' actual knowledge with specificity because, as a threshold matter, the Trustee does not allege facts showing that

these "impossible" trades or "badges of fraud" were circumstances the Funds actually recognized at the time as unusual.  *See Zutty v. Rye Select Broad Market Prime Fund, L.P.*, No. 113209/09, 2011 WL 5962804, at *12 (N.Y. Sup. Ct. Apr. 15, 2011) (dismissing Madoff-related fraud claims and noting that "allegations of scienter based on red flags must include facts showing both that the defendant was actually aware of the alleged flags and that the flags were 'so obvious[ly]' indicative of misconduct 'that the defendant must have been aware of [the wrongdoing]' and desirous of furthering it.") (citing *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009)) (omitting other internal citations).

Tellingly, other than alleging that the Funds' managers compared the Funds' returns to those of the S&P 500 Index (certainly a common task for investors) (*see* 4th Am. Compl. ¶ 148), the Trustee's allegations are not based on internal documents or communications among Ceretti, Grosso, FIM and KML—the Funds' managers and advisors—or between them and BLMIS. Rather, the allegations are really just the Trustee taking *years* worth of BLMIS's trades and comparing that with publicly-available market data over the same time, or what the Trustee considers to have been industry practices, to reach the *post hoc* conclusion that BLMIS's trading activity was "impossible" or a "badge of fraud."  Missing from the Trustee's allegations is any showing that BLMIS's trades were contemporaneously indicative of fraud without having to study, analyze and place them side-by-side with each other and against independent market data, as the Trustee no doubt spent hundreds of hours of professional time to do in preparing his Fourth Amended Complaint.  The 20/20 nature of the Trustee's allegations is further illustrated by the fact the Trustee relies on information that the Funds themselves discovered in 2010, almost a year and a half after Madoff was arrested, when performing a review of their BLMIS accounts for their liquidation proceedings.  (*See id.* at ¶¶ 170-77.)

16

The entirety of the Trustee's allegations relating to "impossible" trades and "badges of fraud" is thus that the Kingate Funds should have done then what he did after learning BLMIS was a Ponzi scheme. But what the Kingate Funds "should have done" does not amount to "actual knowledge" under *Cohmad*. Nor is it of any other consequence because securities customers, like the Funds, have absolutely no obligation to investigate their brokers' conduct. *See Katz*, 462 B.R. at 455 ("A securities investor has no inherent duty to inquire about his stockbroker, and SIPA creates no such duty.") (citing *In re New Times Secs. Servs.*, 371 F.3d 68, 87 (2d Cir. 2004)).

The Fourth Amended Complaint is also devoid of plausible explanations for why these "impossible" trades or "badges of fraud" were fraudulent on their face. For example, the Trustee alleges that, because BLMIS sometimes transacted at better than market prices, these trades must have been "impossible," but he never says why. Indeed, as the Trustee must concede, securities trade at off-market prices all the time without a specter of fraud. In another example, the Trustee does not explain why BLMIS's quarter- and year-end liquidations so clearly informed the Kingate Funds that BLMIS did not conduct any actual securities trades. (*See* 4th Am. Compl. ¶¶ 183-86). If anything, these liquidations again compel the inference that the Funds believed BLMIS conducted real securities trading. Moreover, if, as the Trustee alleges, BLMIS liquidated its accounts at the end of reporting periods to avoid SEC-reporting requirements, then presumably such liquidations would have been conducted for many—or, more likely, all—of BLMIS's customers (otherwise the SEC requirements would have been triggered). Yet the Trustee does not explain why these liquidations were so obviously fraudulent to the Funds but not everyone else.

Moreover, these sorts of fraud-by-hindsight allegations—concerning irregular trading activity, Madoff's surprisingly consistent returns, and inconsistencies with the market—have routinely fallen flat.  *See MLSMK Inv. Co. v. JPMorgan Chase & Co.*, 737 F. Supp. 2d 137, 143-44 (S.D.N.Y. 2010) (finding that fraudulent intent could not be inferred from facts that defendant "became aware of Madoff's fraud after (1) noticing unusually high returns on Madoff investment-linked funds; (2) figuring out that the BMIS market making business could not support Madoff's alleged $7 billion investment advisory operation; and (3) learning that BMIS' account records at [defendant] . . . showed unusual activity during the summer of 2008 and low cash balances which was uncharacteristic of Madoff's banking practices . . . [and defendant] liquidated its investment in a Madoff-linked fund . . . .") (omitting internal citations and quotation marks), *aff'd in relevant part*, 431 Fed. App'x. 17, 20 (2d Cir. 2011); *Saltz v. First Frontier LP*, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010), *aff'd*, 485 Fed. App'x. 461, 464-65 (2d Cir. 2012) ("An inference of scienter based on publicly available red flags is simply not as cogent and compelling as the opposing inference of nonfraudulent intent."); *Meridian Horizon Fund, LP v. KPMG*, 487 Fed. App'x. 636, 640-41 (2d Cir. 2012) (rejecting allegations of "fraud by hindsight").  If the allegations in the Fourth Amended Complaint accomplish anything, it is only to confirm that the Kingate Funds genuinely believed that BLMIS conducted actual securities trades, a fact which on its own precludes the Trustee from satisfying the "actual knowledge" standard in *Cohmad*.

2.    <u>The Trustee Cannot Explain Why Public Information About BLMIS Informed The Kingate Funds That There Was Fraud</u>

The Trustee's third category of allegations is equally unconvincing.  In these allegations, the Trustee asserts that clear indications of fraud came from BLMIS's general structure and business practices.  He alleges that BLMIS lacked scalability, did not identify the counterparties

to its OTC options trades, lacked independent oversight, reported that it had insufficient staffing for internal controls, had its transparency questioned by public analysts, used old trading systems, relied on a "strip-mall" auditor, and charged commissions rather than management fees. (4th Am. Compl. ¶¶ 206-241).

These allegations do not plausibly give rise to a strong inference of actual knowledge because they relate to information that was available to other investors, the SEC, and in fact the rest of the world. If the Trustee were correct and the Funds learned that BLMIS was a Ponzi scheme from these facts, then the number of those who knew the same things and therefore must have participated in the fraud too would be innumerable. Despite this, the Trustee does not have a plausible explanation for why these facts show that the Kingate Funds were in on the fraud but the rest of the world was not. And, yet again, these allegations only further confirm that the Funds believed BLMIS was actually in the business of trading securities.

3.    The Trustee's Manager-Related Allegations Do Not Show Actual Knowledge

With respect to the fourth category of allegations, the Trustee fares no better with the few additional facts he pleads that actually relate to the Kingate Funds' advisors and managers. For example, he alleges that Grosso was given a tour of BLMIS's offices, which included a stop at the 17th floor, where BLMIS allegedly conducted its trades on antiquated systems that were not connected to the Internet. (4th Am. Compl. ¶ 100.) So what. The Trustee does not allege *why* Grosso's stop on the 17th floor would have informed him that BLMIS was not trading securities or was otherwise engaged in a Ponzi scheme, or *how* Grosso would possibly have known that the systems were not connected to the Internet. The only plausible inference from this allegation is that, having been told that the 17th floor was BLMIS's trading floor, Grosso had been told that BLMIS traded securities, a fact which is again fatal to the Trustee's claims.

19

The Trustee also contends that Ceretti and Grosso attributed Madoff's success to what the Trustee misconstrues as "illegal front running." The Trustee's factual allegations belie his conclusory contention. According to the Trustee, Ceretti and Grosso believed that Madoff "sees the flows" because BLMIS was a "large market maker" and had a "massive amount of order flow." (*Id.* at ¶¶ 139-40.) The Trustee mischaracterizes this to mean that Ceretti and Grosso believed that Madoff engaged in "illegal front running." But it means no such thing. Being a market maker is entirely distinct from "illegal front running," which refers to a form of insider trading in which a stockbroker seeks to exploit his advance knowledge of pending trades for his own benefit (i.e., the broker sells a certain stock in his own account first before executing a large customer order to sell the same stock, so that he can sell his at a higher price[8]) and which Madoff has never been accused of doing. Even if Ceretti and Grosso's comments had anything to do with "illegal front running," they still would not show actual knowledge for purposes of section 546(e) because they would only confirm that Ceretti and Grosso believed BLMIS conducted real trades, a fact which, once again, warrants dismissal of claims subject to the safe harbor.

The Trustee's remaining allegations relating to the Kingate Funds' advisors and managers similarly fail to show "actual knowledge that there were no actual securities transactions being conducted." *Cohmad*, 2013 WL 1609154, at *4. Specifically:

- The Trustee summarily concludes that the Kingate Funds "shielded" Madoff from outside scrutiny. (*See* 4th Am. Compl. ¶¶ 119-20.) The Trustee's non-conclusory fact allegations, however, suggest nothing conspiratorial. They do not describe a single action by the Funds to prevent investors from contacting Madoff, but rather reflect Ceretti and Grosso's recognition that Madoff was difficult to contact. (*See id.*) The mere recognition of Madoff's lack of availability does not support a plausible finding of actual knowledge that BLMIS was not trading securities. If it did, it would implicate the entire market.

---

[8] *See United States v. Mahaffy*, No. 05 CR 613, 2006 WL 2224518, at *14 (E.D.N.Y. Aug. 2, 2006) (describing the elements of a "front running" scheme) (citing to *United States v. Dial*, 757 F.2d 163, 165-66 (7th Cir. 1985)).

- The Trustee alleges that FIM once recommended liquidating an investment in a fund because the fund manager *in that deal* was reluctant to meet with investors. (*See id.* at ¶ 120.) The allegation is completely irrelevant to this case because, as the Trustee alleges, FIM made that recommendation in a different deal, with a different fund, which had absolutely nothing to do with Madoff or BLMIS. (*See id.*) Nor does the Trustee's allegation plausibly suggest that the Funds' managers were aware of fraud, either in connection with the investment they recommended liquidating or at BLMIS. *See, e.g.*, *MLSMK*, 737 F. Supp. 2d at 143-44 (finding that fraudulent intent could not be inferred from fact that defendant "liquidated its investment in a Madoff-linked fund") (omitting internal citations and quotation marks).

- The Trustee alleges that FIM did not perform sufficient due diligence and that it recognized it was "impossible to go inside" BLMIS for a more complete process. (*See* 4th Am. Compl. ¶¶ 128-134.) These allegations are plainly insufficient to show actual knowledge because the Funds, or their advisors, had "no inherent duty to inquire about" BLMIS. *See Katz*, 462 B.R. at 455; *see also Cohmad*, 2013 WL 1609154, at *4 n.2 ("[A] securities customer has no duty to inquire as to his broker's *bona fides*."). Further, these allegations do not show that FIM failed to do any due diligence; rather, they show that FIM did what diligence it could, a fact which does not support an inference of fraudulent intent. *See Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 573 (S.D.N.Y. 2011) (concluding allegation that defendant would have learned the truth if it had "performed "the 'due diligence' it promised" was insufficient to show knowledge) (omitting citation), *aff'd*, 482 Fed. App'x. 618 (2d Cir. 2012); *In re Tremont Sec. Law, State Law, and Ins. Litig.*, No. 10 Civ. 9061, 2013 WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013) (finding that "criticism" of defendant's due diligence process did not support a claim for securities fraud); *see also MLSMK*, 737 F. Supp. 2d at 144 (rejecting allegations of fraudulent intent even if "it may be true that Defendants could have connected the dots to determine that Madoff was committing fraud").[9]

- The Trustee alleges that Ceretti and Grosso had a "close" relationship with Madoff. But the factual allegations do not support this conclusory assertion (nor would such allegations show actual knowledge in any event). The Trustee's argument is based on allegations that Grosso met with Madoff twice a year, Ceretti, Grosso and their wives had dinner with Madoff a few times, Ceretti and Grosso sometimes spoke to Madoff's colleagues and, most oddly, Ceretti, Grosso and all of the other employees of FIM, which advised the Kingate Funds, telephoned BLMIS 286 times over a four-year period—or about once a week. (*See* 4th Am. Compl. ¶¶ 98-103.) None of these allegations suggests that Ceretti and Grosso had unique access to Madoff and his inner workings or that their relationship with Madoff was unusual in the context of a multi-billion dollar customer account. The allegations show only that Ceretti and Grosso had a normal arm's-length business relationship with the stockbroker investing their clients' money.

---

[9] Notably, the conclusion reached by one of FIM's employees that BLMIS was a "scam" is in an e-mail from *after* Madoff's arrest. (4th Am. Compl. ¶ 134.) The Trustee cannot point to any similar conclusion from before the collapse of BLMIS.

- The Trustee alleges (in an argument heading) that the Kingate Funds knew that a "proper audit" by PwC of the Kingate Funds would expose fraud at BLMIS (*see id.* at ¶¶ 135-36), but his allegations do not—and could not possibly—support that assertion. PwC was the Funds' auditor; it did not audit BLMIS, which had its own auditor. The Trustee's allegations show that the Funds' managers were critical of some aspects of PWC's audit work, as clients sometimes are of their advisors. The Trustee does not, because he cannot, allege facts showing that the Funds' managers knew a more comprehensive audit would uncover fraud at BLMIS. And, as noted, the Kingate Funds were not obligated to ferret out fraud at BLMIS, including by instructing their own auditors to do so.

- The Trustee alleges that Madoff's dual role as broker and manager was indicative of fraud and that, when a potential investor expressed concerns about this, Ceretti instructed to "keep them away." (*See id.* at ¶¶ 219-20.) Yet, the fact that BLMIS lacked independent oversight was well known to the market, and conceded in the Fourth Amended Complaint. (*See id.* at ¶ 221 ("According to its regulatory filings with the SEC, BLMIS lacked the staff necessary to perform its purported investment adviser functions ….").) As a result, that fact cannot plausibly be a basis from which to infer that the Funds actually knew BLMIS was not actually trading securities. *See Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 453 (S.D.N.Y. 2010) (finding that knowledge of the fact that "[a]ll of the Funds' assets were managed by Madoff, who acted as investment advisor, broker-dealer, and custodian of those assets—a highly unusual arrangement with no checks and balances" was not indicative of fraudulent intent). The allegation that Ceretti wanted to "keep . . . away" investors concerned about Madoff's dual role shows only that Ceretti did not want to waste time with someone who was not eager to invest in the Funds.

In sum, none of these allegations plausibly gives rise to a strong inference—let alone alleges with particularity—that the Kingate Funds had actual knowledge that BLMIS was not conducting actual securities trading. Significantly, the Trustee's failure to allege the Funds' actual knowledge is not due to a lack of discovery since the Trustee has received voluminous document productions from the Funds' managers and advisors, as well as the Funds themselves. The Trustee's inability to state a claim against the Funds is instead due to the simple fact that the Funds were victims of, not participants in, Madoff's fraudulent scheme.

A comparison of the allegations in *Cohmad* with the Trustee's allegations here is instructive. In *Cohmad*, the District Court concluded that the particular facts of that case, which are not present here, gave rise to a plausible inference that the Cohmad defendants had actual knowledge of, and "indeed participation in, every aspect of Madoff's Ponzi scheme that . . .

would negate applicability of Section 546(e)." *Cohmad*, 2013 WL 1609154, at *6.  In particular, the District Court's conclusion was based on the fact that, unlike here, the Cohmad defendants maintained a cash database that had been developed by BLMIS and that tracked the true and fictitious balances of its customers.  *Id.*  That fact alone distinguishes *Cohmad* from this case and provided a strong inference that the defendants in that case had actual knowledge of its customers' fictitious profits and thus of BLMIS's fraudulent activities.

Many of the other facts in *Cohmad* are also not alleged in this case.  Those facts included that (i) Cohmad was co-formed by Madoff himself (indeed, the "mad" in Cohmad referred to *Mad*off); (ii) members of Madoff's family served as Cohmad's officers and directors; (iii) Cohmad used BLMIS for administration of its benefits plans; (iv) Cohmad shared office space with BLMIS, and nothing suggested that the two companies were distinct; (v) unlike Grosso in this case, Cohmad's co-owner had not merely seen the 17th floor but had regular and independent access to it; (vi) Madoff investors understood Cohmad and BLMIS to be one and the same; (vii) Madoff paid millions of dollars directly to Cohmad's co-founder; (viii) BLMIS made payments of over $100 million to Cohmad, sometimes for no reason at all; and (ix) another co-owner of Cohmad had a sham arrangement with Madoff under which he received undocumented, fictitious payments based on, among other things, back-dated trades.  *Id.* at *5-6.  Unlike in *Cohmad*, the Trustee cannot allege specific facts showing that the Kingate Funds had actual access to true customer information, shared office space and, in fact, identities with BLMIS, or had fraudulent agreements with Madoff under which Madoff paid them for doing nothing.  These are the types of facts that give rise to a strong inference of fraudulent intent, and none of them is present here.

23

Indeed, it is simply implausible that the Kingate Funds actually knew that BLMIS was a Ponzi scheme. *They were net losers in the scheme*. Common sense says that a Ponzi scheme benefits non-insider investors only if they get in first and then get out early before the house of cards falls. If, as the Trustee contends, the Funds actually knew that BLMIS was not in the business of trading securities, they would have redeemed their investments fully and much sooner than they did. In reality, the Funds did not redeem their investments fully, kept their principal at BLMIS for almost fifteen years and ended up among the largest net creditors in the bankruptcy. Given the massive losses the Funds suffered, the notion that the Funds were in on the fraud is unsustainable.

### C.    The Trustee Cannot Impute The Other Defendants' Knowledge To The Funds

The Fourth Amended Complaint does not contain a single factual allegation concerning conduct by, or the knowledge of, the Kingate Funds themselves. This is not surprising given that the Funds were passive investment vehicles that aggregated assets invested by their various investors. As a result, even if the Trustee had sufficiently alleged actual knowledge of misconduct—which, for the reasons just reviewed, he has not—he does so only with respect to the other defendants, not the Kingate Funds. Even in that case, his claims are still barred by section 546(e) because any actual knowledge on the part of the other defendants cannot be imputed to the Funds.

To the extent the other defendants knowingly perpetuated Madoff's fraud, then it would be solely to increase the management fees they took *from the Kingate Funds*. As the Trustee alleges, the Funds did not charge their investors performance fees but instead charged a management fee based on a percentage of the Funds' net asset value. (4th Am. Compl. ¶¶ 107-10.) These management fees were not retained by the Kingate Funds but were instead paid to

24

KML and ultimately distributed to the other defendants, including FIM, Ceretti, and Grosso.  (*Id.* at ¶¶ 107-10 & 254-56)  As a result, the Funds gained nothing from investing in BLMIS.  If the other defendants were involved in the fraud, however, they stood to increase their fees from the Kingate Funds artificially by perpetuating the fictitious nature of the Funds' net asset value.[10]

Thus, assuming the Trustee's allegations were true, and even assuming further that the other defendants were agents of the Funds, the other defendants were not acting in the scope of their duties but were acting directly adverse to the Funds.  In this scenario, any actual knowledge of misconduct the other defendants had cannot be imputed to the Funds.  *See Buckley v. Deloitte & Touche USA LLP*, No. 06 Civ. 3291, 2007 WL 1491403, at *6-7 (S.D.N.Y. May 22, 2007) (holding that where an agent is not acting for the principal's benefit and is adverse to it, the agent's knowledge cannot be imputed to the principal); *see also Bankers Servs., Inc. v. Ernst & Young (In re CBI Holdings, Co.)*, 529 F.3d 432, 448 (2d Cir. 2008) ("[W]hen an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person … he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose ….").  Because the Trustee does not allege a single fact concerning the knowledge of the Kingate Funds themselves, and the knowledge of the other defendants cannot be imputed to them, the Trustee does not allege the Funds' actual knowledge of Madoff's fraud, and his claims against the Funds are precluded by section 546(e)'s safe harbor.[11]

---

[10]    In fact, the Joint Liquidators of the Kingate Funds have sued the other defendants for more than $360 million in management fees that those defendants collected from the Funds.

[11]    The Kingate Funds may also qualify as a "financial participant" and thus be entitled to receive the protections of section 546(e) under a different category of the safe harbor that applies regardless of what the Funds are alleged to have known.  *See Cohmad*, 2013 WL 1609154, at *8-9.  In the event this motion is denied, the Funds reserve all rights to assert this defense as the facts are developed.

## II.    THE TRUSTEE HAS FAILED TO STATE A CLAIM FOR INTENTIONAL FRAUDULENT CONVEYANCE UNDER SECTION 548(a)(1)(A)

The Trustee's claim for intentional fraudulent transfer under section 548(a)(1)(A) of the Bankruptcy Code should be dismissed because section 548(c) precludes avoidance of the Kingate Funds' withdrawals as transfers (i) "for value" that were (ii) taken "in good faith." *See* 11 U.S.C. § 548(c). The Trustee has failed adequately to plead otherwise.

Regarding the first component, there can be no question that the Kingate Funds' withdrawals from BLMIS were transfers "for value." As the Trustee concedes, the Funds were net losers and thus all of their withdrawals from BLMIS were returns of invested principal. *See Katz*, 462 B.R. at 453 ("[T]he principal invested by any of Madoff's customers 'gave value to the debtor,' and therefore may not be recovered by the Trustee absent bad faith"); *In re Bayou Grp.*, 439 B.R. 284, 309 (S.D.N.Y. 2010) ("[T]he 'value' component of Section 548(c) is not in dispute: [where transferees] gave value in the form of their initial investments, and have tort claims of rescission to recover all of their initial investment based on fraudulent inducement.").

Regarding the second component, "good faith," Judge Rakoff recently held that, to state a claim for intentional fraudulent conveyance in the context of this SIPA proceeding, the "burden" is on the Trustee to plead the transferee's "lack of good faith." *Good Faith Decision*, 2014 WL 1651952, at *4-5. As Judge Rakoff explained, "in a SIPA proceeding such as this, a lack of good faith requires a showing that a given defendant acted with *willful blindness*, that is, he intentionally [chose] to blind himself to the red flags that suggest a high probability of fraud." *Id.* at *2 (omitting citation and internal quotation marks; emphasis added). The Court further explained that it would not be sufficient, as here, to allege only that the transferee was on "inquiry notice," knew of "suspicious circumstances," or learned of information that would have caused a reasonable person to investigate the matter further. *Id.* at *2-3. A mere objective

26

failure to inquire is not enough, Judge Rakoff explained, because to show a lack of "good faith" in a SIPA proceeding, which is informed first by federal securities law and then the Bankruptcy Code, the Trustee must allege "particularized" facts showing "fraudulent intent." *Id.* at *3 & 5; *see also Katz*, 462 B.R. at 455-56 (same).

Here, the Trustee has not alleged "particularized" facts showing that the Kingate Funds acted with fraudulent intent and willfully blinded themselves to Madoff's fraud.  The purported "red flags" on which the Trustee relies are unpersuasive in showing that the Funds knew there was a "high probability" that BLMIS was a Ponzi scheme yet looked the other way.  As an initial matter, as explained above (*see supra*, § I.B.), the vast majority the Trustee's claimed red flags are either "impossible trading activity" or "badges of fraud" that are in reality hindsight conclusions the Trustee draws by now comparing BLMIS trading data with historical market data.  These impossible trading activities and badges of fraud are not circumstances of which the Trustee alleges the Funds were actually aware at the time or that were highly suggestive of fraud *on their face*.  Rather, they are purported findings that the Trustee alleges the Funds should have deduced if they had been as diligent as he has been after being told BLMIS was a Ponzi scheme. This gives rise only to the inference that the Funds failed to further investigate certain matters— notably, matters that scores of others did not perceive as necessitating investigation.  As the *Good Faith Decision* explains, this plainly misses the mark.  Compounding the deficiencies, the Trustee does not allege facts showing why the Funds' managers would have been fraudulently motivated not to have performed the same hindsight comparisons on which the Trustee relies in his complaint.  *See Saltz*, 782 F. Supp. 2d at 72 (finding that mere incentive to earn management fees was insufficient to show fraudulent intent).

The Trustee's allegations relating to information that was widely known about BLMIS's business and operations—such as BLMIS's lack of scalability, out-of-date trading systems, and strip-mall auditor—are equally unconvincing. Indeed, these very same allegations have been routinely rejected by courts and found not to be indicative of a high probability of fraud. *See Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 623-24 (S.D.N.Y. 2010) (finding that the following red flags were not so obvious as to infer knowledge: "BMIS' transactions were at variance with market evidence; . . . BMIS did not permit access to its computers, and many of its reported trades could not have actually taken place at the prices reported; . . . BMIS' independent auditor, Friehling and Horowitz, was small, not well known, and not properly certified"); *Anwar*, 728 F. Supp. 2d at 452-53 (rejecting the following red flags, if known to auditor, as indicative of intent to deceive: "Madoff did not provide electronic confirmations to the Funds that he managed, and instead gave them delayed, paper confirmation of supposed trades[;] . . . Madoff purport[ed] to turn consistent investment returns during good times and bad times in the market[;] . . . All of the Funds' assets were managed by Madoff, who acted as investment advisor, broker-dealer, and custodian of those assets—a highly unusual arrangement with no checks and balances").[12]

Of the few allegations that remain and actually relate to FIM, KML, Ceretti and Grosso, and that are not *post hoc* comparisons or information that was broadly available to the market, none plausibly gives rise to a strong inference of willful blindness. Rather, as explained above (*see supra*, § I.B.), these allegations challenge the sufficiency of the due diligence conducted by the Funds' managers. They do not come close to even suggesting the type of conscious avoidance of facts that is at the core of willful blindness. Accordingly, the Trustee has not

---

[12]    *See also In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) (finding no scienter where "plaintiffs do not assert that the [defendants] knew that Madoff's returns could not be replicated by others, and plaintiffs do not claim that investors who elected not to deal with Madoff informed the [defendants] of their decisions").

pleaded fraudulent intent through willful blindness with particularity, and his section 548(a)(1)(A)

should be dismissed.[13]

## III.    THE TRUSTEE HAS FAILED TO STATE A CLAIM FOR EQUITABLE SUBORDINATION

In Count XI, the Trustee seeks to equitably subordinate the Kingate Funds' claims for the

$800 million in losses that they indisputably suffered as loss of their investment in BLMIS.  This

claim should be dismissed for four independent reasons.  First, the Trustee does not allege that

the Funds engaged in any "egregious" or inequitable misconduct.  Second, the Trustee has failed

to allege how any conduct by the Kingate Funds—who themselves lost over $800 million by

investing in BLMIS—caused injury to other BLMIS customers.  Third, even if the Trustee has

sufficiently alleged that the Funds harmed other customers, that injury is to specific customers,

not the Estate as a whole, and, as a result, the Trustee does not have standing to pursue this claim.

Fourth, having stepped into the shoes of BLMIS, which the Trustee must concede acted

inequitably, the Trustee is precluded from seeking an equitable remedy against the Funds.

### A.    The Trustee Has Failed To Allege That The Funds Acted Inequitably

To state a claim for equitable subordination under section 510(c) of the Bankruptcy Code,

the Trustee must allege specific facts showing that (i) the Kingate Funds "engaged in inequitable

conduct; (ii) the misconduct caused injury to the creditors or conferred an unfair advantage to

[the Funds]; and (iii) bestowing the remedy of equitable subordination is not inconsistent with

bankruptcy law."  *In re Blockbuster Inc.*, No. 10 Adv. Pro. 5524, 2011 WL 1042767, *3-4

(Bankr. S.D.N.Y. Mar. 17, 2011).  Further, where, as here, the inequitable conduct alleged is in

---

[13]    The Trustee's section 548(a)(1)(A) claim should also be dismissed because, even if the Trustee has pleaded willful blindness, it is only with respect to the Kingate Funds' advisors and managers.  As shown earlier, that knowledge cannot be imputed to the Funds.  *See supra*, § I.C. (explaining that an agent's knowledge cannot be imputed to the principal if the agent is acting adversely to the principal).

the nature of fraud, the allegations must again satisfy the heightened pleading standard under Federal Rule of Civil Procedure 9(b). *Swanson v. First Wisconsin Fin. Corp. (In re Universal Foundry Co.)*, 163 B.R. 528, 538-41 (E.D. Wis. 1993), *aff'd on other grounds*, 30 F.3d. 137 (7th Cir. 1994) (unpublished).

Because "[e]quitable subordination is an extraordinary remedy that is to be used sparingly," courts routinely dismiss such claims at the pleading stage. *Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd*, 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009) (dismissing equitable subordination claim on motion to dismiss); *In re Hydrogen LLC*, 431 B.R. 337, 362 (Bankr. S.D.N.Y. 2010) (same); *Off. Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings)*, 420 B.R. 112, 156-57 (Bankr. S.D.N.Y. 2009) (same); *In re Universal Foundry*, 163 B.R. at 538-541 (same).

The Trustee's pleading burden is even greater where, as here, he seeks to subordinate the claim of a non-insider of the debtor. In that situation, "[t]he conduct required has been described as 'substantial misconduct tantamount to fraud, misrepresentation, overreaching or spoilation [sic].'" *Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002) (citations omitted). The misconduct must be so egregious that it "shocks one's good conscience." *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994). As a result, "[f]ew cases find that non-insider, non-fiduciary claimants meet this standard." *Sunbeam*, 284 B.R. at 364.

The Trustee's claim is not the exception. The Trustee has not alleged particularized facts showing that the Kingate Funds engaged in any inequitable conduct whatsoever, let alone the type of egregious conduct sufficient to support an equitable subordination claim against a non-

insider.  Indeed, the Trustee's conclusory allegation that the Kingate Funds acted inequitably to other customers begs the question of how, if the Funds achieved some inequitable result, they ended up among the largest net losers in the bankruptcy and thus occupy the least enviable positions among all of BLMIS's customers.  That the Kingate Funds—themselves in insolvency proceedings—are among the most adversely affected of BLMIS customers plainly contradicts the Trustee's contention that they have somehow acted inequitably to disadvantage other customers.

Further, the Trustee's equitable subordination claim cannot be saved by his reliance on the same factual assertions underlying his fraudulent conveyance claims, namely his assertions that the Funds purportedly defrauded other customers by furthering Madoff's Ponzi scheme. (*See* 4th Am. Compl. ¶¶ 328-333.)  As explained above, the Trustee has not alleged specific facts that plausibly give rise to a strong inference that the Funds had actual knowledge of or were willfully blind to BLMIS's fraudulent activities.  *See supra*, §§ I-II.  Because the Trustee's fraudulent conveyance claims are inadequate, the equitable subordination claim—which must be grounded on a detailed pleading of even more egregious conduct—must be dismissed.

### B.     The Trustee Has Not Alleged That The Kingate Funds Harmed Other Customers

Even if the Trustee has alleged that the Kingate Funds acted inequitably, his subordination claim should still be dismissed because he has not alleged that the misconduct caused injury to BLMIS's customers or conferred an unfair advantage to the Funds.  Without a basis to allege that the Funds' conduct actually harmed other customers, the Trustee cannot sustain a claim for equitable subordination.  *See In re SI Restructuring, Inc.*, 532 F.3d 355, 357 & 361 (5th Cir. 2008) (recognizing that "in the absence of actual harm, equitable subordination is inappropriate" and reversing bankruptcy court order equitably subordinating claimant where

the bankruptcy trustee "did not demonstrate . . . harm [to] either the debtor or the general creditors . . . ."); *In re Kalisch*, 413 B.R. at 133 ("In all cases concerning equitable subordination actual harm to creditors is a necessary component to application of the doctrine.").

Notably, the Trustee does not allege that the Funds took any affirmative action toward other customers or failed to act despite having a duty to do so. He does not allege that the Funds improperly maneuvered themselves to the front of the line. Nor does he allege facts showing that the Funds were responsible for fraudulently inducing other customers to invest in BLMIS. Put simply, the Trustee does not provide any basis for even suggesting that the Funds did anything to anyone.

The Trustee's entire claim is seemingly that the Funds harmed other customers merely by investing in BLMIS. There is no basis in law or logic from which to conclude that the Funds, having lost the majority of their investment principal in BLMIS, caused harm to any BLMIS customer. This would be true even if the Trustee had alleged that the Kingate Funds had actual knowledge of Madoff's fraud. *See Marshall v. Picard*, 740 F.3d 81, 93 (2d Cir. 2014) ("Allegations that [defendants] knowingly reaped the benefits of Madoff's scheme through fraudulent withdrawals, and effected such withdrawals through backdating trades and recording fictional profits, does not amount to a particularized claim that they directly participated in defrauding BLMIS customers by inducing them to invest."). Because the Trustee has failed to allege that the Funds did something other than merely invest in BLMIS, which alone does not establish harm to customers, he cannot state a claim for equitable subordination.

## C.    The Trustee Does Not Have Standing

The Trustee's claim for equitable subordination should be dismissed for the independent reason that the Trustee does not have standing to pursue this claim. According to the Trustee's conclusory allegations, the Kingate Funds' inequitable conduct harmed customers by inducing

32

them to invest in BLMIS without knowledge of BLMIS's true financial condition.  (4th Am. Compl. ¶ 330.)  Even assuming there were merit in the Trustee's hypothesis—and there is no basis for such an assumption—the Funds are alleged to have harmed only a subset of customers. For example, the Funds surely could not have harmed net winners (who by definition gained at the expense of the Funds).  Nor could the Funds have fraudulently induced customers that had already invested in BLMIS before the Funds invested.  As a result, the purported harm underlying the Trustee's claim was suffered only by certain unidentified "mystery" customers. He does not have standing to bring such a claim even if such customers exist.

Case law makes clear that a trustee lacks standing to assert claims for particularized injuries suffered by individual creditors.  *Picard v. JPMorgan Chase & Co.*, 721 F.3d 54, 70 (2d Cir. 2013); *see Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1347-48 (7th Cir. 1987), *cert. denied,* 485 U.S. 906 (1988) (a trustee does not have standing to bring personal claims of creditors).  A harm is "personal" to a creditor if that creditor is injured and no other creditor has an interest in a claim arising from that injury.  *Koch*, 831 F.2d at 1348-49.  That is precisely the type of injury the Trustee alleges here because the Funds are not plausibly alleged to have injured all customers generally but only some unidentified subset of them.  As a result, the Trustee does not have standing to assert the equitable subordination claim, and it should be dismissed.

### D.    The Trustee's Claim Is Barred By The *Wagoner* Rule And The Doctrine Of Unclean Hands

The Trustee's claim for equitable subordination should be dismissed for the additional and independent reason that he is precluded by both the *Wagoner* rule and the doctrine of unclean hands from obtaining a remedy against the Kingate Funds.

33

Under *Shearson Lehman Hutton, Inc. v. Wagoner*, "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." 944 F.2d 114, 118 (2d Cir. 1991); *accord Kirschner v. Grant Thornton LLP*, No. 07 Civ. 11604, 2009 WL 1286326, *10 (S.D.N.Y. Apr. 14, 2009), *aff'd*, 626 F.3d 673 (2d Cir. 2010) (dismissing trustee's claims against third parties where debtor "participated in, and benefitted from, the very wrong for which it seeks to recover"). "[B]ecause a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Kirschner*, 2009 WL 1286326, at *5; *see also Picard v. HSBC*, 454 B.R. 25, 37-38 (S.D.N.Y. 2011) (dismissing Trustee's claims at the pleading stage under the doctrine of *in pari delicto*).

The doctrine of unclean hands is to the same effect. Under that well-established rule, courts will not use their equitable powers to help a party whose own wrongful misconduct is related to the claim on which it seeks to recover. *Aris–Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 969 (S.D.N.Y. 1992). *Granite Partners L.P. v. Bear Stearns & Co., Inc.*, 17 F. Supp. 2d 275 (S.D.N.Y. 1998), is instructive. There, the debtor investment fund and its brokers conducted reckless trading activity and failed to monitor the fund's investment accounts properly, among other misconduct. The trustee in that case sued the brokers, asserting equitable subordination claims. The District Court dismissed the claims, holding that they were unsustainable because the debtor's wrongful conduct was "intrinsically related to the claims for which the [plaintiff] seeks to recover . . . ." *Id.* at 310-311.

So too here, the misconduct with which the Trustee charges the Kingate Funds is inexorably linked to BLMIS's fraud. For example, the Trustee alleges that the Funds' "conduct enabled Madoff to prolong the Ponzi scheme." (4th Am. Compl. ¶ 331.) That Ponzi scheme is

34

attributable to the Trustee by virtue of his having stepped into the shoes of BLMIS. Because the Trustee's equitable subordination claim seeks a remedy against the Funds for the very same scheme in which the Trustee (through BLMIS) participated, the Trustee is precluded from asserting it. The claim should be dismissed for this independent reason.

## IV.    THE TRUSTEE HAS FAILED TO STATE A CLAIM FOR DISALLOWANCE

In Count X, the Trustee seeks disallowance of the Kingate Funds' bankruptcy claims under section 502(b)(1) of the Bankruptcy Code, and, in Count XII, the Trustee asserts a novel claim for "equitable disallowance." Neither claim has merit, and both should be dismissed.

### A.    The Trustee Cannot State A Claim For Disallowance Under Section 502(b)(1)

The Trustee's claim for disallowance under section 502(b)(1) is expressly based on "the Kingate Funds' inequitable conduct." (4th Am. Compl. ¶ 323.) "Inequitable conduct," however, does not appear anywhere in section 502(b)(1), and it is not a ground on which the Court may disallow a claim under that section, or anywhere else in the Bankruptcy Code. As a result, the Trustee fails to identify any valid basis for disallowance under section 502(b)(1), and the claim should be dismissed.

Under a plain reading of Section 502(b)(1), the Court "*shall allow* [a creditor] claim . . . *except to the extent* that (1) such claim is unenforceable against the debtor and property of the debtor, *under any agreement or applicable law* . . . ." 11 U.S.C. § 502(b)(1) (emphasis added). The section continues by listing eight other exceptions to allowance, none of which involves "inequitable conduct" or other wrongdoing. As courts have explained, section 502(b)(1) "does not provide an independent basis for disallowing a claim; it merely recognizes that bankruptcy law will not permit a claim to be allowed if an agreement or nonbankruptcy law renders the claim unenforceable." *See, e.g.*, *In re Loucheschi LLC*, No. 11 Adv. Pro. 4122, 2013 WL 6009947, at *13 (Bankr. D. Mass. Nov. 13, 2013).

Attempts to read general considerations of equity into section 502(b)(1), such as the

Trustee asserts here, are consistently rejected. *See Harbinger Capital Partners LLC v. Ergen (In*

*re LightSquared, Inc.)*, 504 B.R. 321, 336 (Bankr. S.D.N.Y. 2013) (finding that section 502(b)

contains "no catch-all equities exception" to the allowance of a claim, "nor any language

directing the court to inquire into the good faith of the claimant or, more broadly, to consider the

interests of justice" (internal citation omitted)); *see also Raleigh v. Ill. Dep't Rev.*, 530 U.S. 15,

24-25 (2000) ("Bankruptcy courts are not authorized in the name of equity to make wholesale

substitution of underlying law controlling the validity of creditors' entitlements, but are limited

to what the Bankruptcy Code itself provides."); *cf. Law v. Siegel*, 134 S. Ct. 1188, 2014 WL

813702, *6 (Mar. 4, 2014) ("federal law provides no authority for bankruptcy courts to deny an

exemption on a ground not specified in the Code."). Because the Trustee seeks disallowance

where section 502(b)(1) does not expressly permit it, this claim must be dismissed.[14]

---

[14]    In each of his conveyance claims, the Trustee seeks disallowance of the Funds' claims under section 502(d) of the Bankruptcy Code, until the Kingate Funds return the entirety of their withdrawn principal to the Trustee. The Kingate Funds, however, have been rendered insolvent by BLMIS's fraud, and are now subject to their own court-ordered and supervised liquidation proceedings. Continued application of section 502(d)—in the event the Trustee succeeds on any of his avoidance claims—would therefore frustrate the Funds' interests as legitimate creditors of the BLMIS estate. Courts have concluded that set-off is more appropriate in such circumstances because it fully protects the estate without imposing an excessive penalty on the creditor. *See, e.g., Secs. Investor Protection Corp. v. Bernard L. Madoff Inv. Secs. LLC*, Civ. No. 12 MC 115, 2014 WL 2925175, at *8 n.3 (S.D.N.Y. June 30, 2014) ("One situation in which the equities may suggest a modified outcome is where the defendant is itself a bankrupt entity and cannot pay the amount for which it is liable, in which case a set-off of the amount owed might be more appropriate than disallowance of that customer's claim entirely." (citation omitted)); *Page v. Rogers,* 211 U.S. 575, 581 (1909) (holding it "entirely practicable to avoid the circuitous proceeding of compelling the defendant to pay into the bankruptcy court the full amount of the preference which he has received, and then to resort to the same court to obtain part of it back by way of dividend"); *see also In re Gander Mountain, Inc.*, 29 B.R. 260, 264-65 (Bankr. Wis. 1983); *cf. In re Shared Techs. Cellular, Inc.*, 281 B.R. 804, 808-809 (Bankr. D. Conn. 2002), *aff'd* 293 B.R. 89 (D. Conn. 2003) (affirming relief from stay permitting trustee from another bankruptcy to prosecute preference claim against debtor, subject to limitation that trustee could not use debtor's failure fully to pay any resulting judgment to disallow debtor's proof of claim in the other bankruptcy).

### B.    There Is No Claim For "Equitable Disallowance"

Finally, the Trustee's claim for so-called "equitable disallowance" should be dismissed because the Bankruptcy Code does not recognize any such claim.  Indeed, this claim merely represents a continuation of what the Trustee attempts to do with his section 502(b)(1) disallowance claim, which is to graft onto the Bankruptcy Code a general catch-all equities exception to the allowance of a creditor's claim.  There is simply no statutory basis for such an exception in the Bankruptcy Code.  *See In re Lightsquared*, 504 B.R. at 336, 339-342 (holding that "equitable disallowance is not permitted under the Bankruptcy Code."); *see also id.* at 344 ("The task of resolving the dispute over the meaning of a Bankruptcy Code section begins where all such inquiries must begin:  with the language of the statute itself. . . .  This is also where the inquiry should end, for where, as here, the statute's language is plain, . . . the sole function of the courts is to enforce it according to its terms.").  Nor do the Court's equitable powers under section 105(a) permit it to disallow a claim without having a statutory basis for doing so.  *See Siegel*, 2014 WL 813702 at *5 (rejecting the argument that section 105(a) permits courts to fashion exceptions to the plain statutory text of the Bankruptcy Code).

Even if there were a way to read an "equitable disallowance" claim into the Bankruptcy Code, which there is not, it still would not apply to the circumstances of this case.  Again, the Trustee cannot allege facts that plausibly give rise to a strong inference that the Kingate Funds participated in the fraud, and he does not allege any other purportedly "inequitable conduct." *See infra*, § I-III.  Given the Trustee's inability to establish a basis for equitable subordination, he cannot have a colorable claim for what would be an even more dramatic remedy in the form of equitable disallowance.  In all events, even if equitable disallowance were a cognizable claim, the Trustee would again be precluded from seeking it against the Funds under the *Wagoner* rule and the doctrine of unclean hands.  S*ee infra*, § III.C.

37

## V.   THE FOURTH AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

This case has been pending for over *five years*, and the Trustee has had access to ample discovery during this time.  The current complaint is the Trustee's fourth attempt to state a claim against the Kingate Funds, and he prepared the Fourth Amended Complaint specifically to respond to the District Court's "actual knowledge" rulings in *Cohmad*.  Equally important, the Kingate Funds are currently in liquidation proceedings as a result of the massive losses they suffered from BLMIS's collapse, and this case has both cast a cloud over the Funds' ability to wind up their affairs efficiently and completely and prevented the Funds from collecting on their most valuable assets (i.e., their claims against the BLMIS estate for the massive losses they suffered) and making distributions to the innocent investors in the Funds (who the Department of Justice has recognized are victims of BLMIS).  Accordingly, the dismissal of the Trustee's claims should be with prejudice.

## <u>CONCLUSION</u>

For these reasons, the Fourth Amended Complaint should be dismissed with prejudice as

against the Kingate Funds.

Dated: New York, New York
   July 18, 2014

         QUINN EMANUEL URQUHART &
          SULLIVAN, LLP

       By:  /s/ Robert S. Loigman    
          Susheel Kirpalani
          Robert S. Loigman
          Rex Lee
          Xochitl S. Strohbehn

          51 Madison Avenue, 22nd Floor
          New York, New York  10010
          (212) 849-7000

          *Counsel to Joint Liquidators of Kingate*
          *Global Ltd. and Kingate Euro Ltd.*