UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

                    Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 10-04336 (SMB) |
| Plaintiff, | |
| v. | |
| THE ESTATE (SUCCESSION) OF DORIS IGOIN, LAURENCE APFELBAUM, individually and in her capacities as executor and beneficiary of the Estate (Succession) of Doris Igoin, and EMILIE APFELBAUM, | |
| Defendants. | |

**MEMORANDUM OF LAW IN RESPONSE TO THE TRUSTEE'S
SUPPLEMENTAL MEMORANDUM OF LAW AND IN FURTHER
SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION AND FOR FORUM NON CONVENIENS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 1

I.    DEFENDANTS' MINIMAL CONTACT WITH THE UNITED STATES IS
      INSUFFICIENT TO CONFER PERSONAL JURISDICTION ......................................... 1

      A.    Jurisdictional Discovery Has Confirmed That There Are Insufficient
            Minimum Contacts With This Forum To Establish Personal Jurisdiction
            Over Laurence Or Emilie Apfelbaum ..................................................... 1

            1.    Laurence Apfelbaum Communicated Minimally With BLMIS
                  Employees And Was Unfamiliar With BLMIS's Investment
                  Strategy ................................................................................. 2

            2.    Laurence And Emilie Apfelbaum Did Not Benefit From
                  Withdrawing Money From Their BLMIS Accounts ................................. 7

            3.    Laurence And Emilie Apfelbaum Executed Unique BLMIS French
                  Language Contracts That Are Subject To French Law ............................ 8

      B.    The New York Court Of Appeals' Decision in *Licci* And Judge Lifland's
            Holding In *BLI* Are Distinguishable And Do Not Undermine Defendants'
            Position That Jurisdiction Over Laurence And Emilie Apfelbaum Is
            Unwarranted ................................................................................... 10

      C.    Laurence Apfelbaum's Alleged Jurisdictional Contacts Cannot Be
            Imputed To Emilie Apfelbaum And The Estate ................................................ 12

II.   EVEN AFTER JURISDICTIONAL DISCOVERY, THE TRUSTEE CANNOT
      DEMONSTRATE THAT LAURENCE OR EMILIE APFELBAUM HAD ANY
      KNOWLEDGE OF OR INVOLVEMENT WITH THE *MAGNIFY*
      PROCEEDING ........................................................................................ 13

III.  BY FILING SIPA CUSTOMER CLAIM FORMS, LAURENCE AND EMILIE
      APFELBAUM DID NOT CONSENT TO PERSONAL JURISDICTION ................... 16

IV.   THERE IS NO BASIS FOR THE TRUSTEE'S ARGUMENT THAT
      DEFENDANTS' CONDUCT IN THIS PROCEEDING WARRANTS THE
      EXERCISE OF PERSONAL JURISDICTION ............................................................ 18

CONCLUSION .................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aurora Mgmt. Partners, Inc. v. GC Fin. Servs., Inc.*,
    429 B.R. 856 (D.S.C. 2010)................................................................16

*China Nat'l Chartering Corp. v. Pactrans Air & Sea, Inc.*,
    882 F. Supp. 2d 579 (S.D.N.Y. 2012)....................................................18

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010)................................................................13

*Hamilton v. Atlas Turner, Inc.*,
    197 F.3d 58 (2d Cir. 1999)................................................................19

*Hanson v. Denckla*,
    357 U.S. 235 (1958).........................................................................15

*In re Faleck & Margolies, Ltd.*,
    No. 90 CIV. 1356 (SWK), 1990 WL 170542 (S.D.N.Y. Nov. 1, 1990)................18

*Licci v. Lebanese Canadian Bank, SAL*,
    No. 10-1306-cv, 2012 WL 688809 (2d Cir. Mar. 5, 2012).........................10

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327, 984 N.E.2d 893, 960 N.Y.S.2d 695 (2012)...................... 10-11

*Picard v. Access Mgmt. Lux., S.A. (In re Bernard L. Madoff Inv. Secs. LLC)*,
    Nos. 12 MC 115(JSR), 12 Civ. 5597(JSR), 2013 WL 4077586 (S.D.N.Y. Aug. 2,
    2013) ...........................................................................................18

*Picard v. Bureau of Labor Ins. (In re Bernard L. Madoff Inv. Secs. LLC)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) ............................................ 11-12

*Picard v. Chais (In re Bernard L. Madoff Inv. Secs. LLC)*,
    440 B.R. 274 (Bankr. S.D.N.Y. 2010) .................................................12

*Picard v. Cohmad Secs. Corp. (In re Bernard L. Madoff Inv. Secs. LLC)*,
    418 B.R. 75 (Bankr. S.D.N.Y. 2009) ...................................................9

*Picard v. Stahl (In re Bernard L. Madoff Inv. Secs. LLC)*,
    443 B.R. 295 (Bankr. S.D.N.Y. 2011) .................................................16

*Rates Tech. Inc. v. Nortel Networks Corp.*,
    399 F.3d 1302 (Fed. Cir. 2005).........................................................18

*Smith v. Matias (In re IFS Fin. Corp.)*,
     No. 02-39553, 2007 WL 2692237 (Bankr. S.D. Tex. Sept. 11, 2007) ...................................13

*Zaremba v. Pheasant*,
     No. 3:06CV02394, 2007 WL 5964307 (N.D. Ohio Sept. 19, 2007) ......................................16

<u>**PRELIMINARY STATEMENT**</u>

Defendants The Estate (Succession) of Doris Igoin, Laurence Apfelbaum, individually and in her capacities as executor and beneficiary of the Estate (Succession) of Doris Igoin, and Emilie Apfelbaum (collectively, "Defendants"), by and through their undersigned counsel, submit this memorandum of law in response to the Trustee's Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and for *Forum Non Conveniens* [Dkt. No. 92] ("Supplemental Memorandum" or "Pl.'s Supp. Mem.").

<u>**ARGUMENT**</u>

**I.    DEFENDANTS' MINIMAL CONTACT WITH THE UNITED STATES IS INSUFFICIENT TO CONFER PERSONAL JURISDICTION**

**A.    Jurisdictional Discovery Has Confirmed That There Are Insufficient Minimum Contacts With This Forum To Establish Personal Jurisdiction Over Laurence Or Emilie Apfelbaum**

The Trustee's Supplemental Memorandum has again tried to portray the Apfelbaums as "anything but ordinary investors" based on the "magnitude of their withdrawals" and "preferential treatment from BLMIS." (Pl.'s Supp. Mem. at 2.) The Trustee alleges several "undisputed facts" that he claims "conclusively establish personal jurisdiction" over Laurence and Emilie Apfelbaum. (*Id.* at 13.) However, the testimony and documents from jurisdictional discovery simply do not support the Trustee's broad, sweeping statements. After 18 months of jurisdictional discovery, the Trustee cites to only one new document allegedly showing Laurence and Emilie Apfelbaum's connection to New York, and either mis-states or overstates the deposition testimony.

Jurisdictional discovery has confirmed that this case is a French-centric matter in which Bernard Madoff traveled to Paris, France to convince Laurence Apfelbaum, a

psychoanalyst, to invest with BLMIS the inheritance that she and her then-minor daughter received from Albert Igoin, Laurence Apfelbaum's father.  Two French language contracts were negotiated and signed in France governing their BLMIS investments.  Laurence Apfelbaum signed one contract individually; she and her husband signed the other on behalf of their daughter Emilie, which was required and approved by a French Judge.  Laurence Apfelbaum then communicated only minimally with BLMIS employees, and Laurence and Emilie never visited the United States with respect to their accounts or had any other U.S. connections.  (*See* Cooperman Decl.[1] Ex. 1 at 125:6-25; 262:2-12; Declaration of Laurence Apfelbaum [Dkt. No. 21] ("Apfelbaum Decl.") at ¶ 22, Exs. A, B; Declaration of Ona T. Wang in Support of the Trustee's Memorandum of Law in Opposition to Defendants' Motion to Dismiss [Dkt. No. 31] ("Wang Decl."), Ex. A.)  These facts do not support a finding of personal jurisdiction.

> 1.   Laurence Apfelbaum Communicated Minimally With BLMIS Employees And Was Unfamiliar With BLMIS's Investment Strategy

The Trustee claims that Laurence and Emilie Apfelbaum "actively managed direct accounts with BLMIS" and that they "actively controlled their investments, communicating regularly with BLMIS to discuss trading activity and holdings in the Accounts."  (Pl.'s Supp. Mem. at 13-14.)  The Trustee states that Laurence Apfelbaum testified that she spoke directly with Bernard Madoff in New York on "several occasions."  (*Id.* at 14.)  The facts do not support these statements.

There is no evidence whatsoever that Emilie Apfelbaum ever met or spoke with Mr. Madoff or anyone from BLMIS.  With respect to Laurence Apfelbaum, the only time she met with Mr. Madoff anywhere aside from France was in 1981, which was 14 years before her

---

[1]   "Cooperman Decl." refers to the Declaration of Jonathan K. Cooperman in Further Support of Defendants The Estate (Succession) of Doris Igoin, Laurence Apfelbaum, and Emilie Apfelbaum's Motion to Dismiss Based on Jurisdictional Discovery, dated June 23, 2014 [Dkt. No. 96].

father Albert Igoin's death in 1995.  (Cooperman Decl. Ex. 1 at 124:25-125:25; 177:3-6;

Apfelbaum Decl. at ¶ 14.)  During that 1981 visit, her father simply arranged for Mr. Madoff to

give Ms. Apfelbaum and her husband a tour of the New York Stock Exchange when they were

passing through New York to attend her husband's scientific conference.  (Cooperman Decl. Ex.

1 at 124:25-125:25.)  At that time, Laurence Apfelbaum only thought that Mr. Madoff was a

business acquaintance of her father and did not know that her father had any money indirectly

invested with BLMIS.  (*Id.* at 67:4-11; 125:18-25.)  It was only when her father died that

Laurence Apfelbaum first learned of her father's investment with BLMIS through a French bank.

(*Id.* at 64:5-67:11.)

The only other times that Laurence Apfelbaum met with Bernard Madoff was in

Paris, France.  Upon her father Albert Igoin's death in 1995, Ms. Apfelbaum did not, as the

Trustee claims, "persuade[] Madoff to come to Paris, guarantee profits and otherwise comply

with particular requirements to enable them to maintain their BLMIS investments."  (*See* Pl.'s

Supp. Mem. at 13.)  The evidence shows that it was Madoff who came to Paris in an effort to

persuade the Apfelbaums to invest their inherited monies with BLMIS.

In 1995, Emilie Apfelbaum was only 11 years old when she and her mother

Laurence Apfelbaum inherited 50 percent of Albert Igoin's estate.  Since Emilie Apfelbaum was

a minor, French law required that a French Guardianship Judge be appointed to oversee her

inheritance.  (Cooperman Decl. Ex. 1 at 170:3-22; 173:15-174:21.)  That French Judge, Judge C.

Standish, ordered that one-half of Emilie Apfelbaum's inherited money be placed in French

treasury bonds.  (*Id.*)  Judge Standish was hesitant to allow Emilie Apfelbaum to invest the

remainder of the money at a French Bank, Finama, formerly known as Banque Pour l'Industrie

Francaise or BIF, which in turn invested with BLMIS.  Judge Standish would only allow that

3

investment if BLMIS agreed to certain conditions.  (*Id.* at 80:19-81:11; 174:7-21.)  Thus, the

French Guardianship Judge required that BLMIS agree to guarantee the security of the

investment by ensuring that the investment would not lose more than five percent in any year.

(*Id.* at 80:19-81:11; 174:7-21; 188:7-189:5.)

   Had Madoff not provided that guarantee, the Apfelbaums would not have invested

their inherited monies with BLMIS.  (*Id.* at 174:11-21.)  Thus, Laurence Apfelbaum testified that

she only asked Madoff to come to Paris "so that he could be part of a discussion and provide

some guarantees."  (*Id.* at 174:14-16.)  She further testified that "[i]f Madoff hadn't consented to

do that, provide his guarantee, we would have had to invest somewhere else."  (*Id.* at 174:18-21.)

Accordingly, Mr. Madoff traveled to Paris and engaged in direct discussions with a French

Notaire about a suitable guaranty and contract that would satisfy the French Guardianship Judge.

(*Id.* at 177:3-19; 189:7-21.)[2]  Only after Madoff signed a French-language contract prepared by

the French Notaire that was approved by the French court did the Apfelbaums agree to invest

their inherited money with BLMIS through the French bank Finama.  (*Id.* at 76:25-77:19.)

   The only other times that Laurence Apfelbaum met Madoff was when Madoff

came to Paris for purely social visits.  (*Id.* at 125:18-25.)  Ms. Apfelbaum did not regularly call

Mr. Madoff in New York, with the exception that she "may have called" Madoff in the 1990s

when Bank Finama told her about the tax treatment issue of the Treasury Bills and in 2005 to

inform him of her mother's death.  (*Id.* at 126:1-7.)

---

[2] The Trustee states that Laurence Apfelbaum "enlisted her notary to draft such a
guarantee," (*see* Pl.'s Supp. Mem. at 7), but the cited deposition testimony (174:2-6;
189:7-21) does not in any way state that Ms. Apfelbaum enlisted her notary or was even
involved in the guarantee.  Ms. Apfelbaum simply testified that Madoff and the Notaire
discussed the terms of the guarantee and "agreed on it" and that she "wasn't involved in
these technical aspects."  (Cooperman Decl. Ex. 1 at 189:7-21.)

The only other individual from BLMIS with whom Laurence Apfelbaum had contact was Frank DiPascali, and the Trustee again overstates the nature of that contact. (*See* Pl.'s Supp. Mem. at 9-10, 14.) Laurence Apfelbaum never met Frank DiPascali. (Cooperman Decl. Ex. 1 at 91:25-92:3.) She only contacted him when the Treasury bills listed on her account statements were nearing maturity, and she testified that most of those contacts would have been by fax. (*Id.* at 93:16-20; 153:12-154:21.) Significantly, the Trustee on this motion has identified a total of four faxes sent by Ms. Apfelbaum to Mr. DiPascali, and three of those date back to the 1990s. (*See* Wang Decl. Exs. C, D, E; Pl.'s Supp. Mem. at 14; *see also* Jurisdictional Memorandum of Law in Further Support of Defendants' Motion to Dismiss [Dkt No. 95] ("Defs.' Jurisdictional Mem.") at 19-21.) Three of those faxes from the 1990s were identified in the 2012 initial briefing on this motion. Accordingly, after 18 months of jurisdictional discovery, the Trustee has managed to identify just one other writing by Defendants to BLMIS evidencing what the Trustees claims was the Apfelbaums "actively control[ing] their investments." (*See* Pl.'s Supp. Mem. at 14.)

Moreover, contrary to the Trustee's assertion, the facts do not remotely substantiate the Trustee's claim that the Apfelbaums "actively managed" or "actively controlled" BLMIS investments or that the Apfelbaums regularly corresponded with BLMIS. Rather, the few contacts identified by the Trustee relate to French tax law. At some point, the French bank Finama, which held the Apfelbaum accounts, took the initiative of consulting with a French law firm, Bureau Francis Lefebvre, and informed Laurence Apfelbaum that Treasury Bills held to maturity were taxed in France at a much higher rate than Treasury Bills sold before maturity (even a day before maturity). (Cooperman Decl. Ex. 1 at 92:4-93:5.) Ms. Apfelbaum only contacted Mr. DiPascali to ensure that the Treasury bills were sold prior to maturity when it

5

appeared from account statements that BLMIS had "left it to the last week" to sell a Treasury bill. (Cooperman Decl. Ex. 1 at 154:19-21.) This only "[m]aybe [] happened twice in the given year and then it didn't happen for several years." (*Id.* at 154:16-17.)

In the first May 10, 1999 fax cited by the Trustee, Laurence Apfelbaum simply wrote to Mr. DiPascali to inform him that the French tax authorities had mistakenly under-calculated her family's taxes, forgetting one zero and making "a huge difference in the amount [they] had to pay," and that she would therefore need to "draw[] huge amounts" in order to pay her revised French wealth tax bill that she had "finally received." (Wang Decl. Ex. D; Cooperman Decl. Ex. 1 at 95:21-96:10.)

In the second October 12, 1999 fax cited by the Trustee, Ms. Apfelbaum wrote to Mr. DiPascali stating that she had not received notice concerning whether certain treasury bills in Emilie Apfelbaum's account were sold, and asked Mr. DiPascali to confirm that this had happened. (Wang Decl. Ex. C.) At her deposition, Ms. Apfelbaum testified that she sent this fax to verify that Mr. DiPascali had sold the Treasury bill ahead of maturing, "[a] matter that only concerns [taxes in] France," (Cooperman Ex. 1 at 109:21-110:9), as opposed to "actively manag[ing]" their investments as the Trustee now claims, (*see* Pl.'s Supp. Mem. at 13).

The newly cited 2005 letter, (*see id.* at 205:2-206:21; Pl.'s Supp. Mem. at 14), merely informed DiPascali of a conversation Laurence Apfelbaum had with Bernard Madoff and forwarded instructions for opening the Doris Igoin Succession Account. This account was not opened for investment strategy purposes, but because Ms. Apfelbaum asked that her mother's account be segregated into the "Succession Account" so that estate taxes could be paid. (*Id.* at 45:19-46:1; 61:2-22.) When the taxes were paid, the account was closed. (*Id.* at 44:9-46:17.)

6

Further unsupported is the Trustee's statement that Ms. Apfelbaum, a psychoanalyst with no financial experience or training, was "acutely aware of the purported activity in the Accounts and acted deliberately to ensure BLMIS ran them efficiently and with maximum profit-making potential." (*See* Pl.'s Supp. Mem. at 14.)  In fact, Ms. Apfelbaum testified that she lacked any financial training or background, (Cooperman Decl. Ex. at 34:20-35:1; 189:13-15), and that she was not familiar with BLMIS's trading and investment strategy, (*id.* at 94:23-95:19.)

> I've never known exactly what the strategy was.  I've only noticed that on the monthly statements there were dividends or equity. . . . I don't know anything about [the] Stock Exchange.  All I know is that I was told that they were either treasury bills or equities. Stocks.  I've never seen anything else.

(*Id.* at 94:23-95:19.)[3]

2.    Laurence And Emilie Apfelbaum Did Not Benefit From Withdrawing Money From Their BLMIS Accounts

The Trustee claims that Laurence and Emilie Apfelbaum "benefitted from millions of dollars' worth of transfers," (Pl.'s Supp. Mem. at 13), as if this is another reason to find New York jurisdiction.  In fact, it is undisputed that the overwhelming majority of the money from the accounts was withdrawn for the sole purpose of allowing Laurence and Emilie Apfelbaum to pay French taxes based upon the Apfelbaums' presumed wealth.  (*Id.* at 104:18-

---

[3]    Likewise unsupported by the cited deposition testimony is the Trustee's statement that Laurence Apfelbaum "regularly monitored the purported status of the Treasury bills in the Accounts," (*See* Pl.'s Supp. Mem. at 9), implying an active engagement with BLMIS. In fact, Ms. Apfelbaum testified that she merely reviewed her account statements and would infrequently contact Mr. DiPascali in the event that she noticed that a maturing Treasury Bill had not been sold – that "[m]aybe [] happened twice in the given year and then it didn't happen for several years." (Cooperman Decl. Ex. 1 at 154:16-17.)  In the Trustee's cited testimony, it was the Trustee's counsel who asked if Ms. Apfelbaum "regularly" verified and called Frank DiPascali regarding the sale of Treasury Bills. After a short answer not directly on point, Ms. Apfelbaum later clarified her response in detail, concluding by stating that "I didn't call him on a regular basis." (*Id.* at 153:1-154:21.)

105:6; 228:8-12.)  Likewise, Laurence Apfelbaum set up the Doris Igoin Succession to pay estate

taxes on behalf of her mother.  (*Id.* at 45:19-46:1; 61:2-22.)[4]  In sum, the Apfelbaums did not

reap a substantial personal windfall, and the fact that Laurence and her daughter withdrew

money to pay French taxes again demonstrates the French-centric nature of this matter.

### 3. Laurence And Emilie Apfelbaum Executed Unique BLMIS French Language Contracts That Are Subject To French Law

The Trustee claims that jurisdiction is valid because Laurence and Emilie

Apfelbaum "executed unique and personalized account agreements with Madoff . . . and were

charged less-than-customary commissions."  (Pl.'s Supp. Mem. at 13.)  The Trustee does not

explain how these unique contracts support a finding of New York jurisdiction.  Indeed, what

was "unique and personalized" about the contracts the Apfelbaums signed is that they were not

the standard BLMIS customer agreements subjecting them to New York jurisdiction and choice

of law.  Rather, they were French language contracts negotiated and signed in France and subject

to French law.  (Defs.' Jurisdictional Mem. at 16-17.)

It is undisputed that Madoff traveled to Paris to negotiate and sign French-

language contracts for Laurence and Emilie Apfelbaum.  (*See* Apfelbaum Decl. Exs. A, B; Wang

Decl. Ex. A.)  Because these contracts were signed in France, it is also undisputed that they are

governed by French law.  (Declaration of Bruno Quint [Dkt. No. 22] ("Quint Decl.") at ¶ 6.)

Emilie Apfelbaum's contract also specifically stated that it was subject to approval by a French

court.  (Apfelbaum Decl. Ex. B; Wang Decl. Ex. A; Quint Decl. at ¶ 6.)

---

[4]     The Trustee alleges that the Defendants "withdrew more than $350 million in fictitious profits over the life of their accounts."  (*See* Pl.'s Supp. Mem. at 1.)  In fact, accounting documents attached to the Trustee's own Complaint show that substantially less than that amount was withdrawn from those accounts from the time that Laurence and Emilie Apfelbaum inherited money.  (*See* Am. Compl. [Dkt. No. 27-2].)

8

These contracts differed from the standard four-page BLMIS Customer Agreements, which contained a New York choice of law clause and designated a New York agent for service of process. *See, e.g.*, *Picard v. Cohmad Secs. Corp.* (*In re Bernard L. Madoff Inv. Secs. LLC*), 418 B.R. 75 (Bankr. S.D.N.Y. 2009) ("*Cohmad*"). The standard BLMIS Customer Agreements also included several technical contractual provisions including a severability clause, a waiver clause, provisions on liquidations and covering positions, and an arbitration clause. (*See Cohmad*, Adv. Pro. No. 09-1305, Customer Agreement [Dkt. No. 71-8].) None of these provisions are contained in Laurence and Emilie Apfelbaum's French language contracts.

The fact that Madoff charged Laurence and Emilie Apfelbaum less-than-customary commissions on a French language contract subject to French law has no bearing on whether the Court can find New York personal jurisdiction. To the contrary, this was likely an attempt to satisfy the requirement of the French Guardianship judge that Emilie Apfelbaum be provided with an appropriate guaranteed return on investment. (*See* Cooperman Decl. Ex. 1 at 80:19-81:11; 174:7-21.) Madoff negotiated that provision in Paris with a French Notaire, which was part of the larger contract subject to the approval of the French Guardianship Judge. The context of that provision confirms that this case should be resolved in France, and the fact remains that the contracts were signed in France, were governed by French law, and were remarkably different from the standard BLMIS customer agreements. (Apfelbaum Decl. Ex. B; Wang Decl. Ex. A; Quint Decl. at ¶ 6.)

Furthermore, Laurence and Emilie Apfelbaum never even saw the standard BLMIS customer agreements. Laurence testified that when Finama shut down its foreign operations in 1999, and Defendants' accounts came to be administered by BLMIS, she does not

9

recall being asked to sign any BLMIS account forms.  (Cooperman Decl. Ex. 1 at 112:24-113:8; 121:17-22; 193:19-194:8.)

**B.      The New York Court Of Appeals' Decision in *Licci* And Judge Lifland's Holding In *BLI* Are Distinguishable And Do Not Undermine Defendants' Position That Jurisdiction Over Laurence And Emilie Apfelbaum Is Unwarranted**

In their moving memorandum, Defendants cited several cases holding that the "maintenance of a bank account in New York is usually insufficient to confer personal jurisdiction over a non-domiciliary defendant even in suits arising from the account." (Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss [Dkt. No. 23] ("Moving Mem") at 15-16.)  Defendants also noted that *Licci v. Lebanese Canadian Bank, SAL*, No. 10-1306-cv, 2012 WL 688809 (2d Cir. Mar. 5, 2012) had been certified to the New York Court of Appeals on the issue of whether maintaining a New York correspondent bank account created personal jurisdiction, although Defendants noted that the *Licci* case "involved a greater degree of activity than pled against the Defendants, with the Lebanese bank allegedly using New York to assist a terrorist organization."  (Moving Mem. at 17.)

The Trustee now cites *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 984 N.E.2d 893, 960 N.Y.S.2d 695 (2012) for the proposition that maintaining a "correspondent bank account" in New York suffices to confer personal jurisdiction.  (*See* Pl.'s Supp. Mem. at 16.)  In fact, the *Licci* Court held that a Court needs "to closely examine the defendant's contacts for their quality" and "distinguish[ed] the 'maintenance' of an account from its active use."  20 N.Y.3d at 338.

In *Licci*, Lebanese Canadian Bank ("LCB") used its correspondent bank account located in New York to transfer several million dollars by means of dozens of international wire transfers through the Shahid Foundation, the financial arm of the terrorist organization Hizballah.

*Id.* at 332.  LCB knew that Hizballah was a terrorist organization and that Shahid was part of its financial arm.  The allegations were that the wire transfers in New York "caused, enabled and facilitated the terrorist rocket attacks" that injured the plaintiffs and their families and that Hizballah required wire transfer services in order to operate, plan, prepare for, and carry out such terrorist attacks.  *Id.*  The plaintiffs also alleged that LCB's official policy "continuously supports and supported Hizballah and its anti-Israel program, goals and activities" and that LCB carried out the wire transfers in New York "to assist and advance Hizballah's goal of using terrorism to destroy the State of Israel."  *Id.*

In contrast, Laurence and Emilie Apfelbaum at best simply maintained an account at BLMIS.  (Apfelbaum Decl. at ¶ 22.)  They did not know anything about the BLMIS fraudulent scheme and took no part in any fraudulent activity.  They were not even familiar with BLMIS's investment and trading strategy.  (Cooperman Decl. Ex. 1 at 94:23-95:19; 189:13-15.)  They are unsophisticated investors with little connection to this forum.  In *Licci*, the New York Court of Appeals stated that "a foreign bank's repeated use of a correspondent account in New York on behalf of a client – in effect, a 'course of dealing' – show[s] purposeful availment of New York's dependable and transparent banking system . . . and the predictable jurisdictional and commercial law of New York and the United States."  20 N.Y.3d at 339.  Here, Laurence and Emilie Apfelbaum signed French-language contracts in France that were subject to French law.  Those contracts do not at all state that their accounts would be maintained in New York, but only state that BLMIS would "invest these funds in securities listed on the United States stock market," (Wang. Decl. Ex. A), which of course could have been accomplished outside of New York.

The Trustee also cites to *Picard v. Bureau of Labor Insurance (In re Bernard L. Madoff Investment Securities LLC)*, 480 B.R. 501 (Bankr. S.D.N.Y. 2012) ("*BLI*"), for the

proposition that Defendants "directed their investment towards the forum State, thereby purposefully availing themselves of the benefits and protections of New York laws." (Pl.'s Supp. Mem. at 16 (citing *BLI*, 480 B.R. at 517 n.14).)  However, *BLI* is also distinguishable as the defendant was a self-proclaimed "Professional Investor" who hired a company to conduct diligence regarding its BLMIS investment strategies.  The defendant was furnished with a BLMIS private placement memorandum and other related information regarding BLMIS investment strategy and past results and trades.  480 B.R. at 517.  It then signed a BLMIS agreement that contained a New York choice of law clause and a New York forum selection clause.  *Id.* at 517 n.15.

In contrast, Laurence and Emilie Apfelbaum are not sophisticated investors.  They had no knowledge of BLMIS strategy, (Cooperman Decl. Ex. 1 at 94:23-95:19; 189:13-15), and have few connections to New York.  They signed French language contracts governed by French law that contained neither a New York choice of law clause nor a New York forum selection clause.  (*See* Apfelbaum Decl. Exs. A, B; Wang Decl. Ex. A.; Quint Decl. at ¶ 6.)

### C.    Laurence Apfelbaum's Alleged Jurisdictional Contacts Cannot Be Imputed To Emilie Apfelbaum And The Estate

The Trustee seeks to impute Laurence Apfelbaum's alleged jurisdictional contacts with New York to Emilie Apfelbaum.  (*See* Pl.'s Supp. Mem. at 17-18.)  The Trustee is apparently making this argument since he cannot identify any relevant contacts by Emilie Apfelbaum with this New York forum.  The Trustee also seeks to impute Laurence Apfelbaum's New York contacts to the Estate of Doris Igoin.  (*Id.*)

The Trustee cites three cases in support of this agency theory, (Pl.'s Supp. Mem. at 17), all of which are distinguishable from the case at bar.  First, in *Picard v. Chais (In re Bernard L. Madoff Investment Securities LLC)*, 440 B.R. 274 (Bankr. S.D.N.Y. 2010), the

defendant's agent was her father-in-law located in New York.  *Id.* at 279.  Similarly, in *Smith v. Matias (In re IFS Financial Corp.)*, No. 02-39553, 2007 WL 2692237 (Bankr. S.D. Tex. Sept. 11, 2007), the defendant gave his agent power of attorney to act on the defendant's behalf personally and with respect to the corporate defendants owned by the individual defendant.  *Id.* at *12.  The defendant's agent had extensive contact with the United States, and Texas, in particular, by maintaining a spot on the company's advisory board, making investment and business decisions, and authorizing all monetary transfers.  *Id.*  The advisory board met in Texas, and the transfers involved and/or affected Texas entities.  *Id.* at *13.  In *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010), the court found that the defendant-company Queen Bee's contacts could be imputed to the company's principal because the defendant shared in the profits of the bags sold, had joint access to the company's bank account, used the company's revenue to pay his rent, and shared in the decision-making and execution of the purchase and sale of the company's handbags.  *Id.* at 169.

Here, in contrast, Laurence Apfelbaum is not located in New York, has had no sufficient contact with New York, and has not profited from any withdrawals made from the BLMIS accounts of Emilie Apfelbaum or the Estate of Doris Igoin.  *See supra* Part I.A.  Thus, there is no basis by which Ms. Apfelbaum's contacts with the United States could be imputed to Emilie or the Estate.

## II.    EVEN AFTER JURISDICTIONAL DISCOVERY, THE TRUSTEE CANNOT DEMONSTRATE THAT LAURENCE OR EMILIE APFELBAUM HAD ANY KNOWLEDGE OF OR INVOLVEMENT WITH THE *MAGNIFY* PROCEEDING

Nowhere does the Trustee explain how events concerning the *Magnify* Adversary Proceeding are relevant to the Trustee's claim that Laurence and Emilie Apfelbaum are subject

to the jurisdiction of this Court.[5]  While the Trustee states that he has received conflicting

discovery regarding Laurence and Emilie Apfelbaum's connection to Magnify and the

defendants in *Picard v. Magnify, Inc., et al.*, Adv. Pro. No. 10-05279(SMB) (Pl.'s Supp. Mem. at

5), no effort is made to link the cited Israeli handwritten notes, (*see id.* at 5 (citing Apfelbaum

Dep. Exs. 31-33)), to a theory for New York jurisdiction.

Moreover, the Trustee's assertion about co-called "conflicting discovery" is just

wrong.  After 18 months of discovery in this case and in the *Magnify* proceeding, there is no

evidence whatsoever that Laurence and Emilie Apfelbaum either knew about, or had any

personal involvement with, the Magnify trust, or that they knew any of the defendants in that

proceeding.[6]  The Trustee claims that certain defendants in the separate *Magnify* action produced

handwritten documents purporting to show that when Laurence Apfelbaum's father, Albert

Igoin, created Magnify, he listed his now deceased wife Doris, his daughter Laurence, and his

granddaughter Emilie as beneficiaries.  (*Id.* at 5-6.)  The Trustee also claims that Doris Igoin and

Laurence Apfelbaum were for a time authorized signatories of the Trust.  (*Id.* at 1, 6.)  However,

the Trustee cites to no evidence (documents or testimony) that Laurence and Emilie Apfelbaum

were ever informed about the Trust, not even after the death of Doris Igoin, when Laurence and

Emilie Apfelbaum supposedly were the only remaining beneficiaries.  Indeed, the Trustee points

---

[5]    At the October 23, 2012 Court conference, Judge Lifland did not suggest that Defendants "withdraw the Motion," (*see* Pl.'s Supp. Mem. at 3-4), which is not at all reflected in the Court Minutes, (*see* Minutes of Proceedings [Dkt. No. 45].)  Rather, Judge Lifland stated that jurisdictional discovery was warranted, and that he was especially interested in the Trustee's allegation about the *Magnify* adversary proceeding.

[6]    Particularly off-base is the Trustee's statement that Laurence Apfelbaum "has invoked the French 'blocking statute' to withhold financial information that could allow the Trustee to confirm or rebut her claims" that she lacked any knowledge about Magnify. (*See* Pl.'s Supp. Mem. at 1.)  Ms. Apfelbaum redacted certain dollar or euro amounts from the financial statements, but not the identity of these investments.  If the documents she produced references Magnify, the Trustee would have seen that.  Moreover, the Magnify accounts were invested at BLMIS, and the Trustee has the BLMIS financial documents.

to no evidence that Laurence or Emilie Apfelbaum ever knew of the existence of Magnify, much less that they knew they were somehow beneficiaries of the Magnify Trust.  As the Trustee concedes, when Laurence Apfelbaum was shown the documents at her deposition, she had no knowledge of any facts relating to Magnify.  (*Id.* at 1, 6.)  Assuming that, unbeknownst to Laurence and Emilie Apfelbaum, they were listed by Albert Igoin as beneficiaries of an Israeli trust, that does not create New York jurisdiction over them, as they had not in any way purposefully availed themselves of this New York forum.  *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

Indeed, jurisdictional discovery has demonstrated that there is no evidence that Laurence or Emilie Apfelbaum knew anything about any of the events involved in the *Magnify* case or any of the *Magnify* defendants.  (Cooperman Decl. Ex. 1 at 221:5-22; 223:6-224:18; 263:10-269:5.)  During her deposition, Ms. Apfelbaum testified that her father had never discussed Magnify with her and that she was not familiar with any of the individuals and investment funds associated with the events involved in the *Magnify* case.  (*Id.*)

The Trustee also fails to discuss the testimony of Kurt Brunner, the Swiss attorney who established the Magnify trust in 1983, which is fully consistent with Ms. Apfelbaum's testimony.  Dr. Brunner, who was deposed in the *Magnify* case on November 7-8, 2012 in London, testified that Doris Igoin and Laurence Apfelbaum were originally listed in the trust document as being able to give Dr. Brunner instructions regarding the Magnify accounts.  (Cooperman Decl. Ex. 2 at 66:14-68:4.)  However, Dr. Brunner testified that trust document was amended in 1989 to exclude Doris Igoin and Laurence Apfelbaum.[7]  (*Id.* at 96:2-24.)  During the six-year period when Ms. Apfelbaum hypothetically could have given instructions to Dr.

---

[7]    At no time was Emilie Apfelbaum authorized to give instructions to the Trust. (Cooperman Decl. Ex. 2 at 260:15-19.)

Brunner, Dr. Brunner testified that he never received instructions from them, never had any contact with them, and had no knowledge of whether they even knew about the Magnify trust. (*Id.* at 66:6-71:13; 262:2-21.)

In short, the Trustee has still not provided any evidence of any relation between Defendants and the events and allegations described in the *Magnify* complaint. Thus, any alleged connections that the *Magnify* defendants may have had with New York do not serve as a proper basis for jurisdiction over Laurence and Emilie Apfelbaum.

## III.    BY FILING SIPA CUSTOMER CLAIM FORMS, LAURENCE AND EMILIE APFELBAUM DID NOT CONSENT TO PERSONAL JURISDICTION

Jurisdictional discovery has confirmed that the Apfelbaums are not sophisticated investors and that they did not know that submitting a SIPA claim form could subject them to a lawsuit in the United States.  (Cooperman Decl. Ex. 1 at 19:4-6; 39:8-25; 50:13-20.)  The Trustee claims that he has established beyond any doubt that filing a claim in a SIPA proceeding amounts to a consent to personal jurisdiction.  (Pl.'s Supp. Mem. at 18.)  However, none of the Trustee's cited cases at all involve whether submitting a SIPA claim form subjects a person to personal jurisdiction.  (*See* Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss [Dkt. No. 34] ("Reply Mem.") at 4-5.)

In *Aurora Management Partners, Inc. v. GC Financial Services, Inc.*, 429 B.R. 856 (D.S.C. 2010), the court found jurisdiction based on a traditional minimum contacts analysis, not based upon a finding that a Bankruptcy Proof of Claim subjected the defendant to jurisdiction.  *Id.* at 861-64.  *Zaremba v. Pheasant*, No. 3:06CV02394, 2007 WL 5964307 (N.D. Ohio Sept. 19, 2007), did not even concern personal jurisdiction, but rather involved whether filing a SIPA claim would result in a waiver of trial by jury.  *Id.* at *1.  Lastly, in *Picard v. Stahl*, 443 B.R. 295 (Bankr. S.D.N.Y. 2011), the Trustee sought to enjoin a number of "Third Party

Plaintiffs" from proceeding with their cases against Bernard Madoff and his family. The court did not discuss the issue of personal jurisdiction. From the Court's decision, it does not appear that any of these Third Party Plaintiffs challenged personal jurisdiction, much less claimed that a SIPA form filed by a foreign investor in Texas is insufficient to establish New York jurisdiction.

The Trustee offers no proof whatsoever for his claim that Defendants were "well aware of the Bankruptcy Court's involvement when they filed their SIPA claims." (*See* Pl.'s Supp. Mem. at 19.) Laurence Apfelbaum's deposition testimony confirms that she did not understand the SIPA process or know the consequences of filling out the SIPA customer claim forms. She only believed that she was required to fill out the form and that she had to respond quickly. (Cooperman Decl. Ex. 1 at 39:8-25; 50:13-20.)

The Trustee does not challenge that the SIPA Notice sent to Defendants did not provide any information on the consequences of mailing a customer claim form to the claims facility in Texas, nor suggested that recipients seek legal counsel. (Reply Mem. at 6-7.) It did not advise investors (especially unsophisticated foreign investors) that mailing a SIPA form from France to Texas would subject them to the jurisdiction of New York Bankruptcy Court proceedings. Rather, the SIPA form only advised investors that they simply would be protected by SIPA. (Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss [Dkt. No. 23] ("Moving Mem.") at 10-11.) Because Laurence and Emilie Apfelbaum are not sophisticated investors, and because the SIPA Notice did not notify them that returning the claim forms would subject them to a U.S. Bankruptcy Court proceeding, (*see* Cooperman Decl. Ex. 1 at 19:4-6; 39:8-25; 50:13-20; Apfelbaum Decl. at ¶ 24; Moving Mem. at 10-12; Reply Mem. at 5-9), the facts of the case do not equitably allow a finding of jurisdiction. (Reply Mem. at 6 (quoting *In re Petrucci*, 256 B.R. 704, 706 (Bankr. D.N.J. 2001).)

17

## IV.    THERE IS NO BASIS FOR THE TRUSTEE'S ARGUMENT THAT DEFENDANTS' CONDUCT IN THIS PROCEEDING WARRANTS THE EXERCISE OF PERSONAL JURISDICTION

The Trustee incorrectly claims that Defendants' participation in various pretrial proceedings demonstrates an acquiescence to the Court's personal jurisdiction.  First, Defendants' filing of their motion to withdraw the reference does not serve as a basis for conferring personal jurisdiction.  In *Picard v. Access Management Luxembourg, S.A. (In re Bernard L. Madoff Investment Securities LLC)*, Nos. 12 MC 115(JSR), 12 Civ. 5597(JSR), 2013 WL 4077586 (S.D.N.Y. Aug. 2, 2013), the defendants moved to withdraw the reference of the action to the Bankruptcy Court with respect to various issues at the same time that they moved to dismiss for lack of personal jurisdiction.  *Id.* at *1.  Judge Rakoff held that "determining personal jurisdiction over the defendants here is well within the ken of the Bankruptcy Court."  *Id.* at *3; *see also In re Faleck & Margolies, Ltd.*, No. 90 CIV. 1356 (SWK), 1990 WL 170542, at *1 (S.D.N.Y. Nov. 1, 1990) (court considered defendant's motion to dismiss for lack of personal jurisdiction after previously granting motion to withdraw the reference of the adversary proceeding to the district court).

Although courts have diverged about the effect of a counterclaim or other requests for affirmative relief by a defendant who simultaneously objects to the court's personal jurisdiction, "the trend in more recent cases is to hold that no Rule 12(b) defense is waived by assertion of a counterclaim [or other affirmative defense], whether permissive or compulsory."  *China Nat'l Chartering Corp. v. Pactrans Air & Sea, Inc.*, 882 F. Supp. 2d 579, 590-91 (S.D.N.Y. 2012) (noting that claims for affirmative relief filed contemporaneously with objections to personal jurisdiction should "be treated as conditional, their assertion being hypothecated upon an adverse ruling on the defendant's jurisdictional defenses"); *see also Rates Tech. Inc. v. Nortel Networks Corp.*, 399 F.3d 1302, 1309 (Fed. Cir. 2005) ("While a party may

consent to personal jurisdiction by extensively participating in the litigation without timely

seeking dismissal, . . . [h]ere, [the defendant] did not dally, but moved to dismiss on

jurisdictional grounds at its earliest opportunity.").

Second, the fact that Defendants submitted a Reply Memorandum in Further

Support of Defendants' Motion to Dismiss on March 17, 2014 does not warrant the exercise of

personal jurisdiction over Laurence and Emilie Apfelbaum. Defendants submitted a short

memorandum in response to the Trustee's March 10, 2014 omnibus opposition to pending

motions to dismiss certain adversary proceedings, which listed the current case. Defendants

responded with the memorandum only to clarify the status of their pending motion to dismiss

and the law on personal jurisdiction and to inform the Court of the pending jurisdictional

discovery. (*See* Reply Memorandum of Law in Further Support of Defendants' Motion to

Dismiss [Dkt No. 79].) Furthermore, Defendants then removed themselves from the briefing

pending jurisdictional discovery.

Also distinguishable is the Trustee's citation to *Hamilton v. Atlas Turner, Inc.*,

197 F.3d 58, 61 (2d Cir. 1999), for its statement that "participation in various pretrial

proceedings demonstrates an acquiescence to the Court's personal jurisdiction." In *Hamilton*,

the defendant participated in years of pretrial proceedings, but never moved to dismiss for lack of

personal jurisdiction "despite several clear opportunities to do so during the four-year interval

after filing its answer." *Id.* at 62. Here, however, the Apfelbaums filed a motion to dismiss at

their first opportunity, never answered the Trustee's Complaint, and participated in no pretrial

proceedings, except for Court-ordered discovery on the issue of jurisdiction.

For these reasons, Defendants' conduct thus far in these proceedings does not

warrant the exercise of personal jurisdiction over Laurence and Emilie Apfelbaum.

## <u>CONCLUSION</u>

For all of the reasons set forth above, as well as those stated in Defendants'

Motion to Dismiss, Reply in Further Support of Defendants' Motion to Dismiss, and

Jurisdictional Memorandum of Law in Further Support of Defendants' Motion to Dismiss, the

motion to dismiss Defendants The Estate (Succession) of Doris Igoin, Laurence Apfelbaum,

individually and in her capacities as executor and beneficiary of the Estate (Succession) of Doris

Igoin, and Emilie Apfelbaum for lack of personal jurisdiction and for *forum non conveniens*

should be granted in all respects.

Dated:  July 18, 2014                    **KELLEY DRYE & WARREN LLP**

By:     <u>s/ Jonathan K. Cooperman</u>
        Jonathan K. Cooperman
        Jessica L. Klarfeld
        101 Park Avenue
        New York, New York  10178
        (212) 808-7800

        *Attorneys for Defendants The Estate
        (Succession) of Doris Igoin, Laurence
        Apfelbaum, and Emilie Apfelbaum*

20