# **EXHIBIT D**

MARTIN J. AUERBACH, ESQ.
1185 Avenue of the Americas
31st Floor
New York, New York 10036
Telephone:  (212) 704-4347

*Attorney for Defendant*

William P. Weintraub
Kizzy L. Jarashow
FRIEDMAN KAPLAN SEILER
   & ADELMAN LLP
7 Times Square
New York, New York 10036-6516
Telephone:  (212) 833-1100

*Attorneys for Defendant*

Laura E. Neish
ZUCKERMAN SPAEDER LLP
1185 Avenue of the Americas
31st Floor
New York, New York 10036
Telephone:  (212) 704-9600

*Attorneys for Defendant*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

2680684.1

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>v.<br><br>JEFFREY HINTE,<br><br>    Defendant. | Adv. Pro. No. 10-04450 (BRL) |

## MEMORANDUM OF LAW IN
## SUPPORT OF DEFENDANT'S MOTION
## TO WITHDRAW THE REFERENCE

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT

I.      The Standard For Mandatory Withdrawal Of The Reference ............................................. 9

II.     Withdrawal Of The Reference Is Mandatory Because – As This Court Has
        Already Determined – Key Issues In This Adversary Proceeding Require
        Substantial Consideration Of Non-Bankruptcy Federal And State Securities Laws ........ 11

        A.      The Trustee's Interpretation Of SIPA Conflicts With Section 546(e)
                Of The Bankruptcy Code And Requires Withdrawal Of The Reference ............. 12

        B.      The Trustee's Interpretation That SIPA Retroactively Imposes A Duty
                Of Inquiry On Customers Mandates Withdrawal Of The Reference ................... 13

        C.      The Trustee's Interpretation Of SIPA As Authorizing Avoidance Of
                Payments By BLMIS To Discharge Its Legal Obligations To Customers
                Requires Withdrawal Of the Reference ................................................................ 15

        D.      The Trustee's Use Of The Net Investment Method As A Basis For
                Fraudulent Transfer Liability Impermissibly Avoids Transfers That
                Occurred Outside Applicable Reach-Back Periods .............................................. 18

        E.      Whether In Light Of The *Stern* Decision The Bankruptcy Court Has
                Jurisdiction To Enter Final Orders Resolving BLMIS Fraudulent Transfer
                Actions Is An Issue For Which The Reference Must Be Withdrawn ................... 20

III.    This Court Should Withdraw The Reference Of This Entire Proceeding For
        Cause Under The *Orion* Test, As Adapted As A Result Of *Stern* ................................... 21

        A.      The Orion Test Must Be Modified, Yet Is Still Applicable, Post-*Stern* ............ 22

        B.      The Adapted *Orion* Factors Support Permissive Withdrawal Of The
                Reference .............................................................................................................. 23

CONCLUSION .................................................................................................................... 25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Enron Creditors Recovery Corp.* v. *Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011).................................................................12, 13

*Arizona v. California*,
    460 U.S. 605 (1983).................................................................11

*Bear, Stearns Sec. Corp. v. Gredd*,
    2001 WL 840187 (S.D.N.Y. July 25, 2001) .................................................................10

*In re Bernard L. Madoff Inv. Securities LLC*,
    654 F.3d 229 (2d Cir. 2011).................................................................17, 18

*Boston Trading Group, Inc. v. Burnazos*,
    835 F.2d 1504, 1509 (1st Cir. 1987) .................................................................15

*Bourdeau Bros., Inc. v. Montagne (In re Montagne)*,
    2010 WL396252 (Bankr. D. Vt. Jan. 25, 2010).................................................................12

*In re Cablevision S.A.*,
    315 B.R. 818 (S.D.N.Y. 2004).................................................................10

*Cohen v. Bucci*,
    905 F.2d 1111 (7th Cir. 1990) .................................................................12

*Development Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*,
    462 B.R. 457 (S.D.N.Y. 2011).................................................................22, 23, 24

*Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron Corp.)*,
    388 B.R. 131 (S.D.N.Y. 2008).................................................................10

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989).................................................................20, 21

*Grippo v. Perazzo*,
    357 F.3d 1218 (11th Cir. 2004) .................................................................16

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995).................................................................15

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006).................................................................16

2680684.1

*Nathel v. Siegal*,
    592 F. Supp. 2d 452 (S.D.N.Y. 2008) .......................................................................17

*In re New Times Sec. Servs., Inc.*,
    371 F.3d 68 (2d Cir. 2004) ........................................................................................14

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
    4 F.3d 1095 (2d Cir. 1993) ........................................................................9, 21, 22, 23

*Picard v. Avellino*,
    2012 WL 826602 (S.D.N.Y. Feb. 29, 2011) ....................................................... *passim*

*Picard v. Flinn Inv., LLC*,
    463 B.R. 280 (S.D.N.Y. 2011) ........................................................................... *passim*

*Picard v. HSBC Bank PLC*,
    450 B.R. 406 (S.D.N.Y. 2011) ..............................................................................9, 10, 11

*Picard v. Katz*,
    2012 WL 691551 (S.D.N.Y. Mar. 5, 2012) ...............................................................8

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011) ........................................................................... *passim*

*Picard v. MAXAM Absolute Return Fund, L.P.*,
    Case No. 11-cv-7428 (JSR) (S.D.N.Y.) ..............................................................8, 13

*Sharp Int'l Corp. v. Street Bank and Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005) .........................................................................................15

*Stern v. Marshall*,
    564 U.S. ----, 131 S. Ct. 2594 (2011) ................................................................ *passim*

**STATUTES AND RULES**

17 C.F.R. § 240.10b-10 (2010) .......................................................................................16

11 U.S.C. § 546(e) .................................................................................................1, 8, 12, 13

11 U.S.C. § 548(a)(1)(A) ...............................................................................................8, 19

11 U.S.C. § 548(c) ...........................................................................................8, 14, 15, 19

11 U.S.C. § 548(d)(2)(A) ..................................................................................................15

11 U.S.C. § 550(a)(1) ........................................................................................................10

11 U.S.C. § 550(a)(2) .......................................................................................................2, 7

2680684.1

11 U.S.C. §550(b)(1) ........................................................................................14

11 U.S.C. § 550(d) ...........................................................................................2

15 U.S.C. § 78fff-3(a) ......................................................................................17

15 U.S.C. § 78lll(11) ........................................................................................17

28 U.S.C. § 157 ...................................................................................... *passim*

28 U.S.C. § 157(b) ................................................................................... 22, 23

28 U.S.C. § 157(b)(2)(C) .................................................................................20

28 U.S.C. § 157(b)(2)(H) .................................................................................22

28 U.S.C. § 157(d) .................................................................................. *passim*

28 U.S.C. § 157(e) ...........................................................................................24

28 U.S.C. § 1292(b) .........................................................................................13

NYUCC Article 8 ......................................................................................16, 18

NYUCC § 8-102(a)(17) ...................................................................................16

NYUCC § 8-501 *et seq.*...................................................................................16

NYUCC § 8-501(b)...........................................................................................16

NYUCC § 8-501(c)...........................................................................................16

NYUCC § 8-503 cmt. 2 ....................................................................................16

Rule 10b-5 of the Securities Exchange Act of 1934.................................16, 18

Section 10(b) of the Securities Exchange Act of 1934 ............................16, 18

2680684.1

Jeffrey Hinte, the defendant in the above-captioned adversary proceeding ("Defendant")[1] respectfully submits this memorandum of law in support of his motion (the "Motion") pursuant to 28 U.S.C. § 157(d) to withdraw the reference to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") of adversary proceeding No. 10-04450 (BRL) (the "Adversary Proceeding"). This Adversary Proceeding is one of the many actions filed by Irving H. Picard (the "Trustee"), the trustee overseeing the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), seeking to, *inter alia*, avoid transfers made by BLMIS to its customers prior to December 11, 2008 (the "Filing Date"). As set forth below, the requirements for mandatory and permissive withdrawal of the reference are satisfied in this case and the Adversary Proceeding should be adjudicated in the United States District Court for the Southern District of New York (the "Court").

## **PRELIMINARY STATEMENT**

This Adversary Proceeding was commenced by the Trustee on November 12, 2010, by filing a complaint to recover up to $36,150,000 from Defendant as allegedly fictitious profits (the "Complaint"). The Complaint asserts claims based on theories of fraudulent transfer under the Bankruptcy Code and New York law and preference under the Bankruptcy Code.

The Court should withdraw the reference because the Adversary Proceeding raises many of the exact same legal issues as *Picard v. Katz* and other BLMIS clawback proceedings that have been withdrawn to this Court. These issues include the application of Bankruptcy Code section 546(e), the effect of the United States Supreme Court's recent decision

---

[1] Mr. Hinte's full name is Jeffrey Kusama-Hinte, but he is referred to as Jeffrey Hinte in the Complaint. A copy of the Complaint is attached as Exhibit A to the Declaration of William P. Weintraub (the "Weintraub Decl."), filed herewith.

in *Stern v. Marshall*, 564 U.S. ----, 131 S. Ct. 2594 (2011) ("*Stern*"), on the Bankruptcy Court's

ability to make a final determination in the Adversary Proceeding, whether there is antecedent

debt based upon the customer statements provided to Defendant in the ordinary course of

business, and the willful blindness standard for determining bad faith.  The Court has already

determined these issues require significant interpretation of SIPA and other non-bankruptcy

statutes, and withdrawal of the reference is therefore mandatory in this proceeding as well.

   Withdrawal is also warranted in this case because of certain issues that are unique

to Defendant.  In particular, the Trustee, in structuring a $220 million settlement agreement with

parties other than Defendant, inserted terms that appear intended to isolate Defendant, make him

a more vulnerable litigation target, and prejudice defenses that are distinct to him.  The impact of

SIPA on those defenses makes it particularly appropriate that the reference of this proceeding be

withdrawn.

   Through the Complaint, the Trustee seeks to recover $36,150,000 that Defendant

withdrew from his BLMIS account, alleging that all of Defendant's withdrawals constitute

fictitious profits that originated in another customer's account.  *See* Complaint at ¶¶ 2, 34-35.  By

stipulation, Defendant has not yet responded to the Complaint.  However, as will be set forth in

greater detail at the appropriate time, the amounts withdrawn from Defendant's account are not

subject to avoidance and recovery by the Trustee because either (i) the payments by BLMIS to

Defendant are protected by Bankruptcy Code section 546(e), (ii) the funds consist entirely of

principal or should be treated the same as principal, (iii) the payments are subject to Defendant's

subsequent transferee defenses under Bankruptcy Code section 550(a)(2), and/or (iv) the

payments are subject to Defendant's other defenses such as the single satisfaction rule of

Bankruptcy Code section 550(d).  The interplay between SIPA and the foregoing bankruptcy

2

defenses and the Trustee's approach to the Levy Settlement Agreement (defined below) make this case appropriate for withdrawal to the District Court.

As part of their Ponzi scheme, Madoff and BLMIS perpetrated a particular fraud against Defendant by fraudulently preventing Defendant's then-wife Jeanne Levy ("Levy") from withdrawing funds from her BLMIS account to satisfy her obligations to Defendant under the court-approved divorce settlement reached by them in 2002 -- six years before Madoff's Ponzi scheme was revealed. The Trustee now seeks to perpetuate that fraudulent and tortious conduct, and to disturb what has long been a "final" decree of divorce.

In November 2002, Defendant and Levy entered into a Separation Agreement (the "Separation Agreement") setting forth the terms of the dissolution of their marriage. Pursuant to the Separation Agreement, Levy agreed to pay Defendant $50 million in two installments of $25 million each. The Separation Agreement expressly provided that both payments were to be paid to Defendant "by check or wire transfer to his banking account."

Upon information and belief, in or about June 2003, Madoff learned that Levy intended to begin withdrawing $50 million from her account at BLMIS to make payment by check or wire transfer to Defendant's banking account, in order to satisfy her obligation to Defendant under the Separation Agreement. To prevent Levy from performing under the Separation Agreement -- which would have produced cash withdrawals of some $50 million from BLMIS -- Madoff and BLMIS fraudulently and tortiously intervened in the legal and contractual relationship between Defendant and Levy, inducing Levy not to write checks or send wire transfers from BLMIS to Defendant for the $50 million she owed to him. Instead, Madoff said that he and BLMIS would facilitate the required payment to Defendant by opening an account in his name to receive funds from Levy.

3

Case 1:12-cv-02404-UA   Document 3   Filed 03/30/12   Page 8 of 34

Madoff and BLMIS represented that Levy had sufficient funds in her BLMIS account to satisfy her obligation to Defendant, and that once payment was made in accordance with Madoff's mechanism, BLMIS would invest the funds in the account that Madoff said he would open for Defendant at BLMIS.  In reliance on these representations, and having no reason to suspect that Madoff and BLMIS were engaged in a fraud, Defendant acceded to the alternative payment mechanism.  On or about July 1, 2003, in furtherance of their fraudulent scheme and tortious interference, Madoff and BLMIS caused an account, number 1L0211 (the "Account"), to be opened at BLMIS in Defendant's then-married name, Jeffrey Levy-Hinte, to receive cash deposits from Levy.

Levy made an initial cash payment of $27,301,369.86 to the Account on or about July 1, 2003 (the "2003 Payment").  That payment is reflected as a cash deposit on a BLMIS credit advice and an account statement, provided to Defendant in or about July and August 2003. Defendant thereafter received monthly statements showing the balance of the Account.  The 2003 Payment was reflected on those statements as investment principal.  The account statements also reported Defendant's profit on those investments.

Based on the information provided in the credit advice and account statements, Defendant believed that Levy was satisfying her obligations to him.  Accordingly, Defendant consented to a Judgment of Divorce entered on January 6, 2004 in the Supreme Court of the State of New York in a proceeding captioned *Jeanne Levy-Hinte v. Jeffrey Levy-Hinte*, Index No. 315190/03 (the "Judgment").  The Judgment is final and irreversible.

On about January 14, 2004, Defendant received the second payment called for by the Separation Agreement and the Judgment, in the amount of $25,575,342.47 (the "2004

4

Case 1:12-cv-02404-UA    Document 3    Filed 03/30/12    Page 8 of 35

Payment" and, together with the 2003 Payment, the "Deposits").[2]  The 2004 Payment is reflected as a cash deposit on a BLMIS credit advice and an account statement for the Account, provided by Madoff and BLMIS to Defendant in or about January and February 2004.  The 2004 Payment brought Defendant's account balance to $53,309,209.33.[3]

By acceding to the alternative payment mechanism and not demanding immediate payments by check or wire of $52,876,712.33, Defendant contributed and bestowed value in the principal amount of $52,876,712.33 on BLMIS.  Because Defendant believed Levy had paid the amount owed to him under the Separation Agreement, he did not look to other assets held by Levy outside BLMIS to satisfy her obligation to him.

After the 2004 Payment, Defendant continued to receive monthly account statements from BLMIS reflecting his initial Deposits and the profit earned on that investment. In reliance on the statements he received, and the profits they reflected, Defendant continued to leave substantial portions of his original investment at BLMIS.  At no time did Madoff or BLMIS indicate that they were engaged in a Ponzi scheme, insolvent, about to become insolvent or in any other way unworthy of Defendant's continued trust.

From time to time, Defendant made withdrawals from the Account.  By November 30, 2008, Defendant had withdrawn $36,150,000 of the $52,876,712.33 originally deposited, leaving a remaining principal balance of $16,726,712.33 in the Account.  Notably, with respect to Bankruptcy Code section 546(e), Defendant only withdrew $10,900,000 of the $36,150,000 in the two years prior to the Filing Date.

---

[2] Because the payments from Levy to Defendant were delayed from the dates set by the Separation Agreement, Levy made payments greater than the amount originally called for.

[3] The $53,309,209.33 account balance was comprised of $52,876,712.33 in principal (representing the Deposits into the Account) and $432,497 in profit.

2680684.1

Following the Filing Date, the Trustee continued to perpetuate Madoff's and

BLMIS's attack on Defendant when the Trustee entered into a settlement with the Levy family in

2010 that settled all of the Trustee's claims relating to the Levy family accounts but purported to

carve-out and preserve the claims that the Trustee subsequently asserted against Defendant,

despite the fact that all of the funds on deposit in Defendant's Account came from Levy's

account at BLMIS -- an account specifically included in the Levy Settlement.

Specifically, on February 18, 2010, the Bankruptcy Court approved a settlement

entered into between the Trustee and the Levy family (the "Levy Settlement Agreement"),[4]

pursuant to which the Levy family agreed to pay to the BLMIS estate "all of the net amounts

withdrawn" by the Levy family -- $220 million.  In exchange for the $220 million payment plus

forbearance on a $250 million claim against the Estate, the Trustee released the Levy family

from all claims "based on, arising out of or related in any way to" the Levy family accounts.  By

carving out Defendant from the Levy Settlement Agreement,[5] the Trustee attempted to isolate

Defendant from the releases granted under the Levy Settlement Agreement in order to make

Defendant an easier target for future litigation.  That litigation was later commenced and is now

the subject of this Motion.

The Levy family paid $220 million to the Trustee and was released from all

claims for fictitious profits in their accounts.  Because every dollar that was deposited in

Defendant's Account in connection with the divorce settlement originated in Levy's BLMIS

---

[4] After the Bankruptcy Court approved the Levy Settlement Agreement and the time to appeal
had expired, a group of customers (unaffiliated with Defendant) moved to set aside the
Bankruptcy Court's order (the "Motion to Set Aside"). The Motion to Set Aside was denied and
the claimants filed an appeal in the United States District Court.  On February 16, 2012, the
District Court rejected the claimants' motion and upheld the Levy Settlement Agreement.
[5] Pursuant to the Levy Settlement Agreement, the Trustee releases "any person related by blood
or marriage . . . to any of the Levy Releasees (other than Mr. Levy's former son-in-law). . . ."
Levy Settlement Agreement, ¶ 13.

6

Case 1:12-cv-02404-UA   Document 3   Filed 03/30/12   Page 15 of 34

account and the Trustee released all of his claims against the Levy family relating to all of the

Levy family's BLMIS accounts, any effort to recover from Defendant would represent more than

one satisfaction for the Trustee from the same set of transactions.[6]  Moreover, it would be

manifestly unfair for the Trustee to use the Levy Settlement Agreement to enhance his case

against Defendant because there is no allegation in the Complaint that negates the appropriate

assumption that at the time Levy paid her obligation to Defendant she used principal.[7] Nor

should the Trustee be permitted to artificially decree -- using a settlement agreement that he

structured -- that only alleged fictitious profits were transferred by Levy to Defendant.  Indeed,

the presumption should be exactly the opposite -- namely, that Levy transferred principal to

Defendant in order to properly discharge her court-ordered obligation to him.  And, lastly, the

Trustee's continuation of Madoff's initial fraud on Defendant is inconsistent with the Trustee's

role as a SIPC trustee.  It would be a perversion of the intersection of SIPA and Defendant's

defense under Bankruptcy Code sections 550(a)(2) and 550(d) to permit the Trustee to use the

Levy Settlement Agreement to support his mischaracterization of Defendant as an initial

transferee from BLMIS rather than as a subsequent transferee from Levy.

The purpose of this Motion is to ensure that this litigation is lodged in the proper

forum.  As this Court has recognized on multiple occasions in connection with similar BLMIS

clawback actions, resolution of various important legal issues raised by the Trustee's Complaint

requires substantial interpretation of federal non-bankruptcy law and 28 U.S.C. § 157(d)

mandates that the reference be withdrawn from the Bankruptcy Court so this Court can

---

[6] Whether the funds transferred were principal in Levy's account, and remained such in
Defendant's Account, or were fictitious profits in Levy's account, claims as to which were
released, the net result is the same -- those funds are not subject to clawback.

[7] Likewise, there is no allegation in the Complaint that negates the defense that any "profits"
included among the funds used by Levy to pay Defendant were profits earned outside any
applicable reach-back period and therefore should be treated as principal.

7

adjudicate such issues. *Picard v. Katz*, 462 B.R. 447, 450 n.1 (S.D.N.Y. 2011) ("*Katz* MTD Opinion"); *Picard v. Flinn Inv., LLC*, 463 B.R. 280 (S.D.N.Y. 2011) ("*Flinn*"); *Picard v. Avellino*, 2012 WL 826602 (S.D.N.Y. Feb. 29, 2011) ("*Avellino*"); Weintraub Decl. at Ex. B (Order entered March 14, 2012 in *Picard v. MAXAM Absolute Return Fund, L.P.*, Case No. 11-cv-7428 (JSR) (S.D.N.Y.) ("*MAXAM*") [Docket No. 22]).

        Specifically, Defendant seeks mandatory withdrawal of the reference with respect to the following legal issues:

1. Whether the safe harbor provided in section 546(e) of the Bankruptcy Code applies to prevent the Trustee from avoiding all transfers BLMIS made to Defendant except avoidable transfers under section 548(a)(1)(A) of title 11 to the United States Code (the "Bankruptcy Code");

2. Whether SIPA and other securities laws alter the standard that the Trustee must meet in order to show that Defendant did not receive transfers from BLMIS in "good faith" under section 548(c) of the Bankruptcy Code;

3. Whether the Trustee is prohibited from avoiding transfers that satisfied antecedent debts that, under applicable securities laws, were created upon BLMIS issuing to Defendant customer statements reflecting purported securities trades;[8] and

4. Whether the Supreme Court's decision in *Stern* mandates that final resolution of this avoidance action requires exercise of judicial powers by an Article III court.

This Court has already determined that each of these issues requires mandatory withdrawal of the reference in other BLMIS clawback actions and Defendant respectfully requests that this Court withdraw the reference on these issues in this Adversary Proceeding as well.

---

[8] Closely related to the "antecedent debt" issue is the issue of whether the Trustee's use of the "Net Investment Method" for calculating fraudulent transfer liability impermissibly avoids transfers that occurred outside the applicable reach-back periods under the Bankruptcy Code and state fraudulent transfer law. *See Katz* MTD Opinion, 462 B.R. at 454 n.6 ("Footnote 6"). This Court had indicated that it would decide the appropriate method for calculating "profits" in connection with the *Katz* proceedings. *See id.*; *Picard v. Katz*, 2012 WL 691551, *1 (S.D.N.Y. Mar. 5, 2012). Due to the proposed settlement in that matter, this might no longer be the case. For the sake of consistent application of the law to similar facts, the Court should withdraw the reference on the Footnote 6 issue in this Adversary Proceeding also.

8

In addition to mandatory withdrawal of the reference on the foregoing issues, this Court may withdraw the reference of this Adversary Proceeding in its entirety for cause, as it did in *Katz*.[9]  Withdrawal of the entire Adversary Proceeding from the Bankruptcy Court is appropriate because the factors for permissive withdrawal set forth in *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993) ("*Orion*") are satisfied in this case.[10]  Withdrawal will promote (i) the efficient use of judicial and litigant resources, (ii) uniform application of bankruptcy and other laws to nearly identical facts, and (iii) an expedited bankruptcy process. *See Orion*, 4 F.3d at 1101.

## **ARGUMENT**

## **I.**

## **THE STANDARD FOR MANDATORY WITHDRAWAL OF THE REFERENCE**

Mandatory withdrawal of the reference is governed by 28 U.S.C. § 157(d), which provides as follows:

> The district court *shall*, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d) (emphasis added).

As stated by this Court in its decision withdrawing the reference in *Picard v. HSBC Bank PLC*, "a litigant can mandate withdrawal of the bankruptcy reference where the

---

[9] By order entered on July 1, 2011, this Court withdrew the reference in *Katz* to address three threshold legal issues. *See* Weintraub Decl., Ex. C ("*Katz* MTW Tr.") at 32-34.  The Court later withdrew the reference in its entirety. *See Katz* MTD Opinion, 462 B.R. at 450 n.1.

[10] Defendant is aware that this Court has deferred ruling on similar requests for permissive withdrawal of the reference until after it resolved the issue of the Bankruptcy Court's power to adjudicate fraudulent transfer claims. *See Avellino*, 2012 WL 826602, *2 n.3.  This Motion requests withdrawal of the reference "for cause" in order to preserve the issue of permissive withdrawal in this Adversary Proceeding as well.

9

Case 1:12-cv-02404-UA   Document 3   Filed 03/30/12   Page 16 of 31

movant shows that, absent the withdrawal, the bankruptcy judge would be obliged 'to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statute.'"  *Picard v. HSBC Bank PLC*, 450 B.R. 406, 409 (S.D.N.Y. 2011) ("*HSBC*"). *See also Flinn*, 463 B.R. at 283.

This Court has previously held in the context of BLMIS's SIPA case that, because SIPA is codified under Title 15 as a securities law, a "substantial issue under SIPA is therefore, almost by definition, an issue 'the resolution of [which] requires consideration of both title 11 and other laws of the United States.'"  *HSBC*, 450 B.R. at 410 (quoting 28 U.S.C. § 157(d)).  In so ruling, this Court rejected the Trustee's and SIPC's arguments that SIPA is "effectively a bankruptcy statute" and that "even if substantial interpretation of SIPA were required, it is entirely appropriate for the bankruptcy court to engage in such interpretation."  *Id.  See also Flinn*, 463 B.R. at 283 (citing *HSBC* with approval and noting "SIPA has both bankruptcy and non-bankruptcy aspects and purposes"); *Avellino*, 2012 WL 826602 at *1 (same).

In addition, where significant interpretation of the securities laws has been required, withdrawal has been found mandatory.  *See, e.g.*, *Bear, Stearns Sec. Corp. v. Gredd*, No. 01 CIV 4379, 2001 WL 840187, at *4 (S.D.N.Y. July 25, 2001) (withdrawal mandatory where SEC rule potentially precluded application of the Bankruptcy Code avoidance provisions because debtor would not have an interest in the subject property); *In re Cablevision S.A.*, 315 B.R. 818, 821 (S.D.N.Y. 2004) (withdrawal mandatory where the interplay between the federal securities laws and the ancillary proceeding section of the Bankruptcy Code was required); *Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron Corp.)*, 388 B.R. 131, 140 (S.D.N.Y. 2008) (withdrawal mandatory where trustee's theory of secondary liability under Section 550(a)(1) of

10

Case 1:12-cv-02404-UA    Document 3    Filed 03/30/12    Page 18 of 32

the Bankruptcy Code, if it were reached, involved substantial and material consideration of the Securities Act).

And, lastly, where there appears to be a conflict between the Bankruptcy Code and other federal laws, withdrawal of the reference is also mandatory. *See HSBC*, 450 B.R. at 410 (deeming a conflict between SIPA and bankruptcy law as "something that itself warrants withdrawal of the bankruptcy reference").

Because adjudication of the Complaint requires resolution of significant issues of non-bankruptcy securities and constitutional law and conflicts between SIPA, the Bankruptcy Code, and federal and state securities laws, withdrawal of the reference in this case is mandatory.

## II.

**<u>WITHDRAWAL OF THE REFERENCE IS MANDATORY BECAUSE – AS THIS COURT HAS ALREADY DETERMINED – KEY ISSUES IN THIS ADVERSARY PROCEEDING REQUIRE SUBSTANTIAL CONSIDERATION OF NON-BANKRUPTCY FEDERAL AND STATE SECURITIES LAWS</u>**

The Complaint, and the interpretations of the Bankruptcy Code, SIPA and other securities laws embedded in the Complaint, raise the same important legal issues that mandated withdrawal of the reference in *Katz* and the other BLMIS adversary proceedings for which the reference has already been withdrawn.

The doctrine of "law of the case" is also implicated here. That doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). Because this Motion and the Complaint -- which was brought in the context of BLMIS's SIPA case -- raise the exact same legal issues as *Katz* and other BLMIS clawback actions for which this Court has already withdrawn the reference, under the "law of the case" doctrine, this Court should withdraw the reference here without revisiting issues previously determined. *See*

11

Case 1:12-cv-02404-UA   Document 3   Filed 03/30/12   Page 18 of 31

*Bourdeau Bros., Inc. v. Montagne (In re Montagne)*, 2010 WL396252 (Bankr. D. Vt. Jan. 25,

2010) ("[s]ince different adversary proceedings filed in the same main case do not constitute

different 'cases,' it would follow that the law of the case doctrine as articulated in one adversary

proceeding would apply in another adversary proceeding filed in the same case."). *See also*

*Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir. 1990) ("[a]dversary proceedings in bankruptcy

are not distinct pieces of litigation; they are components of a single bankruptcy case[.]").

### A.    The Trustee's Interpretation Of SIPA Conflicts With Section 546(e) Of The Bankruptcy Code And Requires Withdrawal Of The Reference

This Court has held -- and it is law of the case -- that section 546(e) of the

Bankruptcy Code protects customers from avoidance of all transfers received from BLMIS

unless such transfers are intentional fraudulent transfers made within two years of the Filing

Date.  *Katz* MTD Opinion, 462 B.R. at 451-52.  In dismissing the majority of the Trustee's

avoidance claims against the *Katz* defendants, this Court unambiguously held that any payment

by BLMIS -- a stockbroker -- to its customers clearly satisfied the Bankruptcy Code's

"extremely broad" definition of settlement payment and, at a minimum, qualified as a transfer

made in connection with a securities contract.  *Katz* MTD Opinion, 462 B.R. at 452 (quoting

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011)

("*Enron*")).  Applying the plain language of the statute, the Court dismissed the Trustee's

clawback claims as falling within the ambit of section 546(e), except for transfers made by

BLMIS with actual fraudulent intent within two years of the Filing Date.  Consequently, the

Court dismissed all preference or constructive fraud claims under the Bankruptcy Code, as well

as the fraudulent transfer claims the Trustee asserted under New York law.  *Id.* at 453.

Notwithstanding the foregoing, the Trustee has made public his intention to

appeal the Court's rulings in the *Katz* MTD Opinion and has indicated that he will continue to

argue that section 546(e) does not apply in the context of BLMIS clawback actions.[11]  As this

Court has already recognized, the Trustee's position that section 546(e) is not an available

defense to avoidance in the context of the BLMIS SIPA liquidation raises important issues

involving the interplay between Bankruptcy Code section 546(e) and non-bankruptcy securities

law.  *Katz* MTD Opinion, 462 B.R. at 451 (quoting *Enron*, 651 F.3d at 347 (internal citation

omitted) ("[b]y restricting a bankruptcy trustee's power to recover payments that are otherwise

avoidable under the Bankruptcy Code, the [section 546(e)] safe harbor stands 'at the intersection

of two important national legislative policies on a collision course-the policies of bankruptcy and

securities law.'")); *Flinn*, 463 B.R. at 285 (same).  Accordingly, whether section 546(e) protects

BLMIS's customers is a determination that must be made by a district court and withdrawal of

the reference on this issue is mandatory.

**B.**     **The Trustee's Interpretation That SIPA Retroactively Imposes A Duty Of Inquiry On Customers Mandates Withdrawal Of The Reference**

In *Katz*, this Court ruled that withdrawal of the reference is mandatory on the

question of whether securities laws, including SIPA, alter the standard that the Trustee must meet

in order to show that defendants did not receive transfers in "good faith."  *Katz* MTW Tr. at 33.[12]

Indeed, after withdrawing the reference on this issue, this Court held that applicable securities

laws do in fact alter the standard and require that the Trustee show that a customer either actually

---

[11] In support of his motion seeking entry of final judgment on and certification for interlocutory appeal of the Court's rulings in *Katz* MTD Opinion, the Trustee has unambiguously indicated that he will continue to oppose the application of the 546(e) defense in BLMIS clawback actions. *See* Weintraub Decl., Ex. D (Trustee's Memorandum of Law in Support of Motion to Direct Entry of Final Judgment Under Federal Rule of Civil Procedure 54(b) and for Certification Under 28 U.S.C. § 1292(b) at 15, *Katz* Docket No. 47) ("Applying § 546(e) to shield from recovery fraudulent transfers made in furtherance of Madoff's Ponzi scheme" would have an "absurd effect.")).  There is no reason to believe the proposed settlement of the *Katz* proceeding will change the Trustee's position on section 546(e).

[12] This Court has consistently followed its ruling in *Katz* and withdrawn the reference on this issue in other BLMIS proceedings.  *See Avellino*, 2012 WL 826602, at *1-2; *MAXAM Order* at 1.

13

knew of BLMIS's fraud or "willfully blinded" itself to such fraud.  *Katz* MTD Opinion at 455-56

(citing *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 87 (2d Cir. 2004)); *Avellino*, 2012 WL

826602, at *1.  The Court's decision to require actual knowledge or "willful blindness" in order

to deprive a defendant of a "good faith" defense under section 548(c) of the Bankruptcy Code

was based on the Court's determination that securities investors "have no inherent duty to inquire

about his stockbroker, and SIPA creates no such duty."  *Katz* MTD Opinion at 455.

    Although the Trustee has not alleged in the Complaint that Defendant received

any of the transfers in bad faith, withdrawal is necessary in this Adversary Proceeding because a

number of Defendant's defenses will require a showing of good faith.  These defenses include,

*inter alia*, that Defendant was a subsequent transferee from Levy under Bankruptcy Code

sections 550(a)(2) and (b)(1), and that the payments made by Levy to Defendant's Account are

principal (or should be treated as principal) that cannot be recovered from Defendant based upon

his good faith and for value defense under Bankruptcy Code section 548(c).  Defendant believes

that the "willful blindness" standard should apply because this Court has recognized that the

securities laws (including SIPA) do not impose a duty on brokerage customers to investigate

their SEC-regulated broker dealer to ensure that no fraud is being committed and SIPA does not

retroactively impose duties that Defendant would not have had at the time he withdrew funds

from his Account.  Whether SIPA can be interpreted to impose an unprecedented retroactive

duty on brokerage customers to investigate their broker raises a substantial question of non-

bankruptcy federal law, and requires withdrawal of the reference.

**C.    The Trustee's Interpretation Of SIPA As Authorizing
Avoidance Of Payments By BLMIS To Discharge Its Legal
Obligations To Customers Requires Withdrawal Of the Reference**

In *Katz* and multiple other adversary proceedings brought by the Trustee in the
context of BLMIS's SIPA case, this Court has already held that withdrawal of the reference is
mandatory on the question of whether SIPA can be interpreted to authorize the avoidance of
payments by a regulated broker to discharge its legal obligations to its customers.  *Flinn*, 463
B.R. at 285; *Avellino*, 2012 WL 826602, at *2.  There is no asserted difference between the issue
as it arises in this Adversary Proceeding and the issue as it arises in the other adversary
proceedings in which withdrawal has already occurred.  Therefore, withdrawal of the reference is
likewise mandatory here.

In this regard, the Trustee's Complaint seeks to avoid transfers to Defendant that
occurred as far back as January 2004.  These transfers, however, cannot be avoided as fraudulent
because -- as Defendant intends to argue at the appropriate time -- he gave value for the transfers
from BLMIS because (i) as a securities customer, Defendant had a valid claim against BLMIS
for the customer securities balance reflected in his account statement, and (ii) any money
transferred from BLMIS to Defendant on account of such claim was received "for value"
because the transfer satisfied an antecedent debt.[13]

Applicable securities laws provide that a valid antecedent debt arises in favor of a
brokerage customer upon issuance of an account statement by a registered broker-dealer.
Specifically, Rule 10b-10, promulgated under the Securities Exchange Act of 1934 (the

---

[13] "Value" for purposes of protecting a transfer from avoidance under section 548(c) of the
Bankruptcy Code is provided when a transfer satisfies a valid antecedent debt to the transferee.
11 U.S.C. § 548(d)(2)(A); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 624 (2d Cir. 1995)
(quoting *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987)); *Sharp
Int'l Corp. v. Street Bank and Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 54 (2d Cir. 2005).

15

"Exchange Act"), requires registered broker-dealers to provide customers with written trade

confirmations of securities transactions.  *See* Rule 10b-10, 17 C.F.R. § 240.10b-10 (2010)

(Confirmation of Transactions).  Article 8 of the New York Uniform Commercial Code

("NYUCC") also establishes that a customer's rights against its broker stem from the broker's

obligations as created by the issuance of such account statements.  *See* NYUCC § 8-501 *et seq*.

A customer's "security entitlement" is statutorily defined as "the rights and property interest of

an entitlement holder with respect to a financial asset [including a security]."  *See* NYUCC § 8-

102(a)(17).  *See also* NYUCC § 8-503 cmt. 2 (defining a customer's security entitlement as "a

package of rights and interests that a person has against the person's securities intermediary and

the property held by the intermediary.").  The customer's security entitlement is established

when the security intermediary "(1) indicates by book entry that a financial asset has been

credited to the person's securities account . . . or (3) becomes obligated under other law,

regulation, or rule to credit a financial asset to the person's securities account."  NYUCC § 8-

501(b).  Once the customer's security entitlement is established, the broker-dealer owes the

customer the securities referenced on the customer's account statements even if the broker dealer

did not actually purchase the securities.  NYUCC § 8-501(c).

       Customers are similarly protected by federal laws when a security entitlement

right is established by the customer rendering payment to the broker dealer for the issuance of an

account statement that illustrates the broker dealer's debt to the customer.  *Merrill Lynch, Pierce,*

*Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 n.10 (2006) ("[A] broker who accepts payment for

securities that he never intends to deliver . . . violates § 10(b) and Rule 10b-5.").  *See also*

*Grippo v. Perazzo*, 357 F.3d 1218, 1223-24 (11th Cir. 2004) (finding a broker accepted and

deposited customer funds as payment for securities satisfied the "in connection with" the

purchase/sale of securities element for a securities fraud claim); *Nathel v. Siegal*, 592 F. Supp. 2d

452, 464 (S.D.N.Y. 2008) (finding a broker's false promise to a customer to purchase securities

when the broker never intended to do so satisfied the "in connection with" the purchase/sale of

securities element for a securities fraud claim).  This legal framework protects customers, like

Defendant, who invest through registered and SEC-regulated broker-dealers.

       The Trustee, however, seeks to alter established federal and state securities law

precedent by claiming BLMIS does not owe customers the amount referenced on their last

written statement because BLMIS was operating a Ponzi scheme.  It is anticipated that the

Trustee will continue to argue that the Second Circuit's decision in *In re Bernard L. Madoff Inv.*

*Securities LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision") permits him to

disregard Defendant's BLMIS statements when determining whether Defendant has fraudulent

transfer liability.  The Net Equity Decision, however, merely addressed whether the Trustee's

"Net Investment Method" -- *i.e.*, cash deposits into a BLMIS account minus withdrawals over

the lifetime of an account -- was a legally sound method of calculating "net equity" for purposes

of determining whether customers had a valid claim *against* the pool of BLMIS customer

property and an advance from the SIPC fund under section 78fff-3(a) of SIPA.  Net Equity

Decision, 654 F.3d at 231.  The "net equity" definition is relevant only after a SIPA case

commences.  *See* 15 U.S.C. § 78lll(11) (defining "Net Equity" as "the sum which would have

been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase *on the*

*filing date*, all securities positions of such customer[.]") (emphasis added).  Before a SIPA

liquidation is commenced, SIPA does not apply, and no customer has a "net equity" claim.

       In contrast to the issues presented when a brokerage firm is liquidated under SIPA

and an unpaid customer follows the statutory procedure for filing a proof of claim against the

17

Case 1:12-cv-02404-UA    Document 3    Filed 03/30/12    Page 25 of 35

firm in liquidation for that customer's *pro rata* share of the fund of customer property, which is a

claim *by* the customer for its net equity, the Complaint asserts litigation claims *against* a

customer.  This alone distinguishes the Net Equity Decision from the issues at play when an

innocent customer is defending against a fraudulent transfer action in a SIPA case.  The

Complaint also challenges transactions that occurred long before SIPA was applicable, during a

period of time when the broker's obligations were governed by Article 8 of the NYUCC and an

array of federal securities laws, including Section 10(b) and Rule 10b-5 of the Exchange Act.

Under those laws, BLMIS was obligated to its customers for the securities reflected on their

brokerage statements, and the customers were legally entitled to make withdrawals from those

accounts.  No provision of SIPA, or any other law, alters these obligations or legal entitlements

simply because a SIPA liquidation is commenced.[14]

> The foregoing makes clear that whether the Trustee can avoid transfers between a

broker and its customer that satisfy an antecedent debt requires significant interpretation of SIPA

and other securities laws.  Accordingly, as this Court has already recognized numerous times,

this issue warrants mandatory withdrawal of the reference.

**D.    The Trustee's Use Of The Net Investment Method As A Basis For Fraudulent Transfer Liability Impermissibly Avoids Transfers That Occurred Outside Applicable Reach-Back Periods**

> In addition to withdrawal based on the question of whether the challenged

transfers satisfied an antecedent debt, the Court should also withdraw the reference with respect

to an issue embedded in the "antecedent debt" question that the Court identified in Footnote 6 of

---

[14] In addition, because Defendant received his funds from Levy's account with BLMIS, there is also the question of whether the funds that originated with Levy (even if such funds were "profits" as to Levy) were beyond avoidance at the time Levy paid Defendant, whether by operation of Bankruptcy Code section 546(e) as applied to Levy or because the transfers to Levy from BLMIS occurred outside the reach-back period applicable to Levy.

Case 1:12-cv-02404-UA   Document 3   Filed 03/30/12   Page 25 of 31

its *Katz* MTD Opinion:  namely, whether SIPA allows the Trustee to calculate "profits" over the lifetime of an account in a manner that results in the avoidance of transfers that were made and obligations that were incurred outside the applicable reach-back periods.  *See Katz* MTD Opinion, 462 B.R. at 454 n.6 ("the Court does not resolve on this motion whether the Trustee can avoid as profits only what defendants received in excess of their investment during the two year look back period specified by section 548 or instead the excess they received over the course of their investment with Madoff.")

In its *Katz* MTD Opinion, this Court dismissed all avoidance claims against the defendants except for those asserted under 11 U.S.C. § 548(a)(1)(A).  *Id.* at 451-52.  Under Section 548(a)(1)(A), only intentionally fraudulent transfers that occurred within two years of an insolvency filing are avoidable, subject to the transferee's defense that the transfer was taken by it "for value" and "in good faith."  11 U.S.C. § 548(c).  The Trustee has no power to disregard a customer's account balance immediately before the start of the two-year period, or to avoid any transfer made before that period.  In other words, a transfer is "for value" during the two-year period if the value of the customer's account balance as reflected on his account statement immediately before the commencement of the two-year period, when added to deposits within the period (if any), is greater than the amount of withdrawals during the two-year period.

But the Trustee takes a contrary view, failing to give customers (and, specifically, Defendant) any credit for funds on deposit prior to the two-year period.  The Trustee wrongly asserts that, as of the beginning of the reach-back period, Defendant's Account had a principal balance of zero and, thus, any withdrawals made by Defendant from the Account during the two-year period were withdrawals of "fictitious profits."  *See* Complaint at ¶¶ 2, 34-35.  The effect of the Trustee's approach is to avoid transfers that are outside the two-year window -- which is

19

beyond the avoidance powers granted to him and end-run around the relevant statutes of

limitation for avoidance of fraudulent transfers.[15]

        The Trustee contends that SIPA permits him to use the Net Investment Method in

this way to determine fraudulent transfer liability.  Because the Trustee's interpretation of SIPA

conflicts with the reach-back periods for fraudulent transfer liability set forth in the Bankruptcy

Code, withdrawal of the reference is required for this issue as well.

**E.**    **Whether In Light Of The *Stern* Decision The Bankruptcy Court Has
Jurisdiction To Enter Final Orders Resolving BLMIS Fraudulent
Transfer Actions Is An Issue For Which The Reference Must Be Withdrawn**

        In other BLMIS clawback cases this Court has already withdrawn the reference

on the issue of whether, after the Supreme Court's *Stern* decision, the Trustee's fraudulent

transfer claims require the exercise of judicial power by an Article III court.  *See Flinn*, 463 B.R.

at 287-88; *Avellino*, 2012 WL 826602, at *2.  The Court should do so here as well.

        In *Stern*, the Supreme Court held that a bankruptcy court could not hear and

determine a "private right" counterclaim that would augment the bankruptcy estate through

recovery on a state law cause of action because adjudication of that dispute by an Article I court

would violate Article III of the Constitution even though the counterclaim was designated as

"core" under 28 U.S.C. § 157(b)(2)(C).  The essential holding of *Stern* is that a bankruptcy court

lacks the constitutional authority to exercise the judicial power of the United States to make final

determinations in disputes that do not involve "public rights" of the type that may be adjudicated

by a non-Article III court.  *Stern*, 131 S.Ct. at 2604, 2618.  In so holding, the Court relied upon

and reaffirmed its prior holding in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), where

the Court held that fraudulent conveyance suits did not fall within the "public rights exception"

---

[15] *See* footnote 14, *supra*.

that might otherwise enable the bankruptcy court to hear and determine disputes because
fraudulent conveyance actions are "'quintessentially suits at common law that more nearly
resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy
estate than they do creditors' hierarchically ordered claims to a *pro rata* share of the bankruptcy
res.'" *See Stern*, 131 S.Ct. at 2614 (quoting *Granfinanciera*, 492 U.S. at 56). Because the
Supreme Court has again recognized that fraudulent transfer actions do not implicate public
rights, and that they should be decided by an Article III court, a bankruptcy court's constitutional
ability to enter a final order in a fraudulent transfer action is in doubt. This Court should resolve
that doubt by withdrawing the reference of this Adversary Proceeding.

Unlike the case with many other defendants in BLMIS clawback actions,
Defendant has *not* filed a proof of claim in these cases. As such, there can be no argument here
that Defendant has submitted to the jurisdiction of the Bankruptcy Court or otherwise consented
to a non-Article III court's final adjudication of fraudulent transfer claims against him.

Based on the foregoing, the Court should withdraw the reference to determine if
the Bankruptcy Court has the power to issue final orders in this Adversary Proceeding.

### III.
### THIS COURT SHOULD WITHDRAW THE REFERENCE
### OF THIS ENTIRE PROCEEDING FOR CAUSE UNDER
### THE *ORION* TEST, AS ADAPTED AS A RESULT OF *STERN*

In addition to mandatory withdrawal of the reference, this Court should withdraw
the reference of this adversary proceeding in its entirety "for cause shown" pursuant to the
permissive withdrawal provisions of 28 U.S.C. § 157(d). Indeed, the *Orion* factors for

permissive withdrawal of the reference -- which, as set forth below, are still applicable post-*Stern* -- weigh in favor of withdrawing this entire proceeding.[16]

**A.**     **The Orion Test Must Be Modified, Yet Is Still Applicable, Post-*Stern***

In *Orion*, the Second Circuit held that when a district court is asked to permissively withdraw the reference under 28 U.S.C. § 157(d), the district court should "first evaluate whether the claims is core or non-core" and, "once a district court makes the core/non-core determination, it should weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *Orion*, 4 F.3d at 1101. Judge McMahon has issued a decision that explains how the *Orion* test must be "adapted to the lessons of *Stern*." *Development Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 464 (S.D.N.Y. 2011) ("*DSI*").

In *DSI*, Judge McMahon held that, after *Stern*, fraudulent conveyance actions clearly implicate private rights and that, absent "fully knowing" consent by the defendant, such actions must be determined on a final basis by district courts, notwithstanding that under 28 U.S.C. § 157(b)(2)(H) fraudulent conveyance actions are designated "core." *Id.* at 468-73. In other words, Congress's statutory designation of a matter as "core" does not eliminate the inherent constitutional issue of whether the bankruptcy court has jurisdiction to enter a final order. Judge McMahon recognized that the original purpose of the *Orion* test to allocate to the district courts those matters that constitutionally belong in the district courts was still valid, but held that the former *Orion* allocation that relegates to the bankruptcy court all causes of action listed as "core" in 28 U.S.C. § 157(b) was no longer tenable after *Stern*:

---

[16] This Court withdrew the reference in its entirety for the *Katz* adversary proceeding. *See Katz* MTD Opinion, 462 B.R. at 450 n.1. Because the legal issues in this Adversary Proceeding and *Katz* are similar, this Court should withdraw the reference in its entirety here as well.

> So after *Stern*, one can still apply the *Orion* [sic] but not looking at
> whether the matter can be classified as "core" under 28 U.S.C.
> § 157, but rather at whether, under Stern, the Bankruptcy Court has
> the final power to adjudicate it.  If it does not have that power,
> there will be no advantage to allowing the matter to be heard in
> Bankruptcy Court, because this Court will eventually need to
> review the Article I Court's determinations *de novo* review [sic] --
> *i.e.*, as the statute would have them treated if they were "non-core."
> Thus, where the Bankruptcy Court lacks final adjudicative
> authority, the remaining *Orion* considerations will often tend to
> point toward withdrawal, for the same reasons they did when the
> question asked was whether or not the actions were core.

*Id.* at 467.  Put another way, the *Orion* test is still good law so long as the test for whether a

matter is "core" is not whether it is listed in section 157(b), but instead, is whether, consistent

with *Stern*, the matter can be constitutionally finally determined by the bankruptcy court.  The

balance of the *Orion* factors are unchanged.  Applying the adapted *Orion* test in that case, Judge

McMahon withdrew for cause the reference of fraudulent conveyance and other claims involving

"private rights."  *Id.* at 469-73.

**B.**     **The Adapted *Orion* Factors Support Permissive Withdrawal Of The Reference**

The adapted *Orion* factors strongly weigh in favor of full withdrawal of the

reference in this case.  As set forth above, the Complaint involves "private rights" that must be

finally adjudicated by an Article III court and Defendant has not consented to the Bankruptcy

Court's entry of final orders in this proceeding, so the first part of the adapted *Orion* favors

withdrawal.  As to the balance of the *Orion* factors, judicial economy and uniformity of the

application of bankruptcy law would be better served by withdrawal of the reference.  Permissive

withdrawal would promote uniformity in BLMIS's SIPA case because it would prevent the

Trustee from seeking rulings from the Bankruptcy Court that are inconsistent with those made by

this Court in *Katz* and other clawback actions that are already pending before this Court.

23

Case 1:12-cv-02404-UA   Document 3   Filed 03/30/12   Page 35 of 35

Withdrawal at this early stage will also promote the efficient use of judicial

resources and the expeditious and economical resolution of these actions. The Adversary

Proceeding is still at a preliminary stage. No answer or motion to dismiss has been filed, there

has been no discovery, no case management plan or other course of proceeding has been agreed

on, and, to date, the Bankruptcy Court has had no substantive involvement with this Adversary

Proceeding. This Court is uniquely familiar with and positioned to decide on a final basis the

issues that will be litigated in this proceeding. This Court has already withdrawn the reference in

actions that raise legal issues identical to those raised by this Motion and this Court has already

overseen extensive briefing and oral argument of the legal issues raised in this Motion.[17]

Notwithstanding this Court's Amended Standing Order of Reference,[18] which

permits the Bankruptcy Court to submit proposed findings of fact and conclusions of law in core

matters that require final adjudication by an Article III court, Defendant submits that it would be

wasteful and inefficient for this action to proceed before the Bankruptcy Court under the

circumstances here -- including this Court's deep familiarity with all of the legal issues raised by

this Motion. This Court should reach the same conclusion as Judge McMahon did in *DSI*:

> Withdrawal will promote judicial economy. Because the
> Bankruptcy Court is not able to finally determine these
> proceedings without the consent of the [defendants] -- which does
> not appear to be forthcoming -- any recommendations it makes will
> need to be reviewed *de novo* in this Court. It would be inefficient
> to allow these proceedings to go forward, knowing that they will
> have to be substantially repeated.

*Id.* at 472.

---

[17] In addition, the movants anticipate that the Trustee and/or Defendant will request a jury trial in
this action which will necessitate the involvement of this Court pursuant to 28 U.S.C. § 157(e),
which is another factor that weighs in favor of withdrawal of the reference. *See id.* at 472 (the
fact that one defendant had requested a jury trial was among the factors Judge McMahon relied
upon in  withdrawing the reference in *DSI*).

[18] *See* Amended Standing Order of Reference (M10-468) (S.D.N.Y. Jan. 31, 2012).

## CONCLUSION

As discussed above, the Trustee's claims against Defendant require significant interpretation of constitutional and federal non-bankruptcy law, which mandates withdrawal of the reference. Moreover, in light of the *Stern* decision and its impact on the Bankruptcy Court's jurisdiction to adjudicate these claims as well as the fact that withdrawal of the reference would promote judicial economy and uniformity among the many BLMIS fraudulent transfer adversary proceedings, Defendant respectfully requests that the Court withdraw the reference of this Adversary Proceeding in its entirety.

Dated: New York, New York
March 29, 2012

FRIEDMAN KAPLAN SEILER &
ADELMAN LLP

_____/s/William P. Weintraub_____
William P. Weintraub
Kizzy L. Jarashow
7 Times Square
New York, New York 10036-5616
(212) 833-1100

*Attorneys for Defendant*

ZUCKERMAN SPAEDER LLP

_____/s/Laura E. Neish_____
Laura E. Neish
1185 Avenue of the Americas
31st Floor
New York, New York 10036
(212) 704-9600

*Attorneys for Defendant*

MARTIN J. AUERBACH, ESQ.

_____/s/Martin J. Auerbach_____
Martin J. Auerbach
1185 Avenue of the Americas
31st Floor
New York, New York 10036
(212) 704-4347

*Attorney for Defendant*

2680684.1