# **<u>EXHIBIT G</u>**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>       Plaintiff,<br><br>       v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>       Defendant. | 12-MC-0115 (JSR) |
| In re:<br><br>MADOFF SECURITIES | |

**CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS REGARDING ANTECEDENT DEBT**
**ISSUES ON BEHALF OF WITHDRAWAL DEFENDANTS,**
**AS ORDERED BY THE COURT ON MAY 12, 2012**

*Filed by*

       Richard A. Kirby
       K&L GATES LLP
       1601 K Street
       Washington D.C. 20006
       (202) 778-9000 (Telephone)
       (202) 778-9100 (Facsimile)

*on behalf of all counsel listed below*

# TABLE OF CONTENTS

**Page**

INTRODUCTORY NOTE ........................................................................................... 1

SUMMARY OF THE ARGUMENT ........................................................................... 2

ARGUMENT ............................................................................................................... 4

I.     Provisions of SIPA and the Bankruptcy Code, Not Previously Addressed
by the Court, Preserve Antecedent Debts that Defendants May Assert as
Value Under Section 548(c) ........................................................................... 4

     A.     Established federal and state law remedies allow each Defendant to
retain amounts above original principal deposits under Section
548(c), and SIPA expressly incorporates rather than displaces these
remedies .................................................................................................. 4

          1.     SIPA expressly preserves federal and state law claims ................. 5

          2.     Defendants have federal and state law rights to retain
interest in addition to principal under Section 548(c) .................... 6

          3.     Defendants' claims also entitle them to retain additional
amounts under Section 548(c), such as lost opportunity
costs ............................................................................................... 11

          4.     Congress did not expand the SIPA trustee's avoidance
powers beyond those accorded bankruptcy trustees
generally ........................................................................................ 13

               a.     SIPA's Section 8(c) is consistent with Section
548(c) of the Bankruptcy Code ......................................... 13

               b.     SIPA does not redefine the meaning of "antecedent
debt." ................................................................................. 17

               c.     Even assuming a Ponzi Scheme exception to the
Bankruptcy Code exists, it does not apply to
Defendants who are customers of a registered
broker-dealer, rather than equity investors in the
Ponzi Scheme .................................................................... 18

     B.     Because the Trustee cannot avoid obligations older than the
applicable reach-back period, customers should be credited for
their account balances as of the beginning of the reach-back period ....... 23

Case 1:12-mc-00115-JSR    Document 199    Filed 06/28/12    Page 3 of 60

II.    Value Issues Not Previously Considered by the Court Require Dismissal .......... 26

    A.    Defendants are entitled to a credit for new deposits made
        with Madoff Securities during the Reach-Back Period ................ 26

        1.    A credit for new deposits is mandated by the
            statutory Reach-Back Period............................................. 27

        2.    There is no basis in the law for the Trustee to apply
            Reach-Back Period deposits in satisfaction of time-
            barred potential fraudulent transfers ................................. 28

        3.    An illustrative hypothetical exposes the flaws in the
            Trustee's approach ........................................................... 30

        4.    The Replenishment Credit Method yields the logical
            and fair result ..................................................................... 32

        5.    The Replenishment Credit Method is supported by
            Section 550(d) of the Bankruptcy Code and
            relevant case law ............................................................... 33

    B.    Inter-account transfers to Defendants outside the Reach-
        Back Period should be treated the same as principal
        deposits ............................................................................................. 36

        1.    The Trustee's failure to treat inter-account transfers
            to Defendants outside the Reach-Back Period as
            principal ignores the statutory Reach-Back Period.......... 37

        2.    Inter-account transfers established new customer-
            broker relationships under federal securities law and
            should be treated as principal............................................. 40

        3.    The cases to which Greiff cited are not applicable to
            inter-account transfers outside the Reach-Back
            Period. .............................................................................. 41

III.    Defendants Raise and Preserve the Value Arguments This Court
    Previously Rejected ................................................................................. 44

CONCLUSION.................................................................................................... 47

## TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Abrahamson v. Fleschner,*
  568 F.2d 862 (2d Cir. 1978) ................................................................ 41

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.,*
  189 F.3d 1017 (9th Cir. 1999) .............................................................. 8

*American Gen. Ins. Co. v. Equitable Gen. Co.,*
  493 F. Supp. 721 (E.D. Va. 1980) ........................................................ 9

*Armstrong v. Collins,*
  2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ..................................... 23

*B.E.L.T., Inc. v. Wachovia Corp.,*
  403 F. 3d 474 (7th Cir. 2005) ............................................................. 22

*Barnhill v. Johnson,*
  503 U.S. 393 (1992)............................................................................. 45

*Bass v. Janney Montgomery Scott, Inc.,*
  152 F. App'x 456 (6th Cir. 2005) ......................................................... 8

*Bear, Stearns Sec. Corp. v. Gredd,*
  275 B.R. 190 (S.D.N.Y. 2002)............................................................. 45

*BFP v. Resolution Trust Corp.,*
  511 U.S. 531 (1994)............................................................................. 45

*Boston Trading Grp., Inc. v. Burnazos,*
  835 F.2d 1504 (1st Cir. 1987)........................................................ 15, 20

*Brick v. Dominion Mortg. & Realty Trust,*
  442 F. Supp. 283 (W.D.N.Y. 1977)....................................................... 8

*Brown v. Gardner,*
  513 U.S. 115 (1994)............................................................................. 17

*Butner v. United States,*
  440 U.S. 48 (1979)........................................................................ passim

*Camps Newfound, Owatonna, Inc. v. Town of Harrison, Maine,*
  520 U.S. 564 (1997)............................................................................. 17

*Cant v. A.G. Becker & Co., Inc.,*
  384 F. Supp. 814 (N.D. Ill. 1974) ........................................................ 9

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994)............................................................................. 45

*Donell v. Kowell,*
  533 F.3d 762 (9th Cir. 2008) .......................................................... passim

*Donovan v. Bierwirth*,
   754 F.2d 1049 (2d Cir. 1985) ................................................................. 12

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
   651 F.3d 329 (2d Cir. 2011) ................................................................. 45

*Gelles v. TDA Indus., Inc.*,
   44 F.3d 102 (2d Cir. 1994) ............................................................ 40, 41

*Goldman Sachs Execution & Clearing, L.P. v. Official Unsecured Creditors' Committee
   of Bayou Group*,
   758 F. Supp. 2d 222 (S.D.N.Y. 2010) ................................................. 35

*Grippo v. Perazzo*,
   357 F.3d 1218 (11th Cir. 2004) .......................................................... 7, 40

*HBE Leasing Corp. v. Frank*,
   48 F.3d 623 (2d Cir. 1995) ................................................................. 32

*In re Adelphia Commc'ns Corp.*,
   2006 WL 687153 (Bankr. S.D.N.Y. Mar. 6, 2006) .............................. 31

*In re Asia Global Crossing, Ltd.*,
   333 B.R. 199 (Bankr. S.D.N.Y. 2005) ................................................. 24

*In re Bassett*,
   221 B.R. 49 (Bankr. D. Conn. 1998) ................................................... 33

*In re Bayou Group, LLC*,
   439 B.R. 284 (S.D.N.Y. 2010) ............................................................ 21

*In re Bayou Grp., LLC*,
   362 B.R. 624 (Bankr. S.D.N.Y. 2007) ................................................. 16

*In re Bernard L. Madoff Inv. Secs. LLC*,
   654 F.3d 229 (2d Cir. 2011) ................................................................ 5

*In re Carrozzella & Richardson*,
   270 B.R. 92 (Bankr. D. Conn. 2001) .............................................. 20, 43

*In re Centennial Textiles, Inc.*,
   220 B.R. 165 (Bankr. S.D.N.Y. 1998) ................................................. 33

*In re Champion Enters., Inc.*,
   2010 WL 3522132 (Bankr. D. Del. Sept. 1, 2010) .............................. 15

*In re Clarkston*,
   387 B.R. 882 (Bankr. S.D. Fla. 2008) ................................................. 33

*In re Clayton Magazines, Inc.*,
   77 F.2d 852 (2d Cir. 1935) ................................................................. 29

*In re Cybridge Corp.*,
   312 B.R. 262 (D.N.J. 2004) ........................................................... 31, 34

*In re Gober*,
   100 F.3d 1195 (5th Cir. 1996) ............................................................ 29

*In re Hedged Invs. Assocs., Inc.*,
84 F.3d 1286 (10th Cir. 1996) ................................................................... 20, 21, 43

*In re Hedged-Invs. Assocs.*,
84 F.3d 1286 (10th Cir. 1996) ............................................................................... 43

*In re Independent Clearing House Co.*,
77 B.R. 843 (D. Utah 1987) ............................................................................ 21, 28

*In re Jackson*,
318 B.R. 5 (Bankr. D.N.H. 2004), *aff'd* 459 F.3d 117 (1st Cir. 2006) .............. 33, 34

*In re Kingsley*,
2007 WL 1491188 (Bankr. S.D. Fla. May 17, 2007) ....................................... 33, 35

*In re Lease-A-Fleet, Inc.*,
155 B.R. 666 (E.D. Pa. 1993) .............................................................................. 31

*In re Murel Holding Corp.*,
75 F.2d 941 (2d Cir. 1935) .................................................................................. 12

*In re Patts*,
470 B.R. 234 (Bankr. D. Mass. May 4, 2012) ...................................................... 33

*In re PCH Assocs.*,
949 F.2d 585 (2d Cir. 1991) ................................................................................ 43

*In re Sawran*,
359 B.R. 348 (Bankr. S.D. Fla. 2007) ............................................................ 34, 35

*In re Sharp Int'l Corp.*,
403 F.3d 43 (2d Cir. 2005) ......................................................................... 15, 16, 20

*In re Unified Commercial Capital, Inc.*,
260 B.R. 343 (Bankr. W.D.N.Y. 2001) ........................................................... 22, 25

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
534 U.S. 124 (2001) ........................................................................................... 13

*Johnson v. Railway Express Agency, Inc.*,
421 U.S. 454 (1975) ........................................................................................... 40

*Johnson v. Studholme*,
619 F. Supp. 1347 (D. Colo. 1985), *aff'd sub nom. Johnson v. Hendricks*, 833 F.2d 908
(10th Cir. 1987) ................................................................................................. 22

*Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*,
130 S. Ct. 2433 (2010) ........................................................................................ 13

*Kingsley v. Wetzel*,
518 F.3d 874 (11th Cir. 2008) ............................................................................. 31

*Lowenbraun v. L.F. Rothschild*,
685 F. Supp. 336 (S.D.N.Y. 1988) ....................................................................... 10

*Mallis v. Bankers Trust Co.*,
717 F.2d 683 (2d Cir. 1983) ................................................................................ 10

*Matsushita Elec. Indus. Co., Ltd. v. Epstein*,
   516 U.S. 367 (1996) ................................................................................................ 6

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006) .................................................................................................. 7

*Mills v. Electric Auto-Lite Co.*,
   396 U.S. 375 (1970) ................................................................................................ 9

*Morton v. Mancari*,
   417 U.S. 535 (1974) .............................................................................................. 13

*Murphy v. Gallagher*,
   761 F.2d 878 (2d Cir. 1985) ................................................................................... 6

*O'Melveny & Myers v. FDIC*,
   512 U.S. 79 (1994) ................................................................................................ 17

*Ormond v. Anthem, Inc.*,
   2008 WL 906157 (S.D. Ind. Mar. 31, 2008) ......................................................... 7

*Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
   603 F.3d 144 (2d Cir. 2010) ................................................................................. 45

*Pan Am Corp. v. Delta Air Lines, Inc.*,
   175 B.R. 438 (S.D.N.Y. 1994) ............................................................................. 43

*Pepper v. Litton*,
   308 U.S. 295 (1939) .............................................................................................. 42

*Picard v. Greiff*,
   -- F.Supp.2d --, 2012 WL 1505349 (S.D.N.Y. Apr. 30, 2012, Supplementing Opinion
   May 15, 2012) ............................................................................................... passim

*Picard v. HSBC Bank PLC*,
   454 B.R. 25 (S.D.N.Y. 2011) ............................................................................... 13

*Picard v. Katz*,
   11 Civ. 3605, Order at 2 (S.D.N.Y. Mar. 5, 2012) .............................................. 40

*Picard v. Katz*,
   462 B.R. 447 (S.D.N.Y. 2011) ...................................................................... passim

*Picard v. Merkin (In re Bernard L. Madoff Inv. Secs.)*
   440 B.R. 243 (Bankr. S.D.N.Y. 2010) ................................................................ 14

*Pinter v. Dahl*,
   486 U.S. 622 (1988) .............................................................................................. 45

*Raleigh v. Ill. Dep't of Revenue*,
   530 U.S. 15 (2000) ................................................................................................ 25

*Randall v. Loftsgaarden*,
   478 U.S. 647 (1986) ........................................................................................... 8, 9

*Redstone v. Goldman, Sachs & Co.*,
   583 F. Supp. 74 (D. Mass. 1984) ......................................................................... 19

*Reves v. Ernst & Young,*
494 U.S. 56 (1990) ......................................................................................................... 7

*Rolf v. Blyth, Eastman Dillon & Co., Inc.,*
637 F.2d 77 (2d Cir. 1980) ...................................................................................... 7, 11

*Rotella v. Wood,*
528 U.S. 549 (2000) ...................................................................................................... 28

*Savino v. E.F. Hutton & Co., Inc.,*
507 F. Supp. 1225 (S.D.N.Y. 1981) ............................................................................ 40

*Scheve v. Clark,*
596 F. Supp. 592 (E.D. Mo. 1984) ................................................................................ 9

*Schnorr v. Schubert,*
2005 WL 20198785 (W.D. Okla. Aug. 18, 2005) ........................................................ 7

*Scholes v. Lehmann,*
56 F.3d 750 (7th Cir. 1995) ................................................................................... 20, 21

*Schott v. Maidsville Coal Min. P'ship,*
1979 WL 1245 (S.D.N.Y. Sept. 7, 1979) ...................................................................... 8

*SEC v Edwards,*
540 U.S. 389 (2004) ....................................................................................................... 7

*SEC v. Howey,*
328 U.S. 293 (1946) ....................................................................................................... 7

*SEC v. Zandford,*
535 U.S. 813 (2002) ....................................................................................................... 7

*Stevens v. Abbot, Proctor & Paine,*
288 F. Supp. 836 (E.D. Va. 1968) .............................................................................. 11

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.,*
549 U.S. 443 (2007) ............................................................................................... passim

*USPS v. Phelps Dodge Refining Corp.,*
950 F. Supp. 504 (E.D.N.Y. 1997) ............................................................................. 10

*Visconsi v. Lehman Bros.,*
244 F. App'x 708 (6th Cir. 2007) ................................................................... 19, 41, 42

*Westinghouse Elec. Corp. v. '21' Intern. Holdings, Inc.,*
821 F. Supp. 212 (S.D.N.Y. 1993) ............................................................................... 8

*Wright v. Union Central Life Ins.,*
304 U.S. 502 (1938) ..................................................................................................... 37

*Zeller v. Bogue Elec. Mfg. Corp.,*
476 F.2d 795 (2d Cir. 1973) ........................................................................................ 11

**STATE CASES**

*105 East Second St. Assocs. v. Bobrow*,
175 A.D.2d 746 (N.Y. App. Div. 1991) ................................................................. 12

*Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*
18 N.Y.3d 341 (N.Y. 2011) ................................................................................. 10

*Banque Worms v. BankAmerica Int'l*,
77 N.Y.2d 362 (1991) ......................................................................................... 45

*Big Apple Car, Inc. v. City of New York*,
204 A.D.2d 109 (N.Y. App. Div. 1994) ................................................................ 9

*Commodity Future Trading Comm'n v. Walsh*,
17 N.Y.3d 162 (N.Y. 2011) ........................................................................... 20, 45

*DeLong Corp. v. Morrison-Knudsen Co., Inc.*,
14 N.Y.2d 346, 348 (N.Y. 1964) ......................................................................... 10

*DeLong Corp. v. Morrison-Knudsen Co., Inc.*,
20 A.D.2d 104 (N.Y. App. Div. 1963) .................................................................. 9

*Flamm v. Noble*,
296 N.Y. 262 (N.Y. 1947), *aff'd*, 14 N.Y.2d 346 (N.Y. 1964) ............................ 10

*In re Estate of Newhoff*,
107 Misc.2d 589 (N.Y. Surrogate's Ct. 1980) ...................................................... 11

*NML Capital v. Republic of Argentina*,
17 N.Y.3d 250 (N.Y. 2011) ................................................................................. 11

*Prager v. New Jersey Fid. & Plate Glass Ins. Co.*,
245 N.Y. 1 (N.Y. 1927) ....................................................................................... 10

*Purcell v. Long Island Daily Press Publ'g Co.*,
9 N.Y.2d 255 (N.Y. 1961) ................................................................................... 10

*Scalp & Blade, Inc. v. Advest, Inc.*,
309 A.D.2d 219 (N.Y. App. Div. 2003) ............................................................... 44

*Simkin v Blank*,
19 N.Y.3d 46 (N.Y. 2012) ................................................................................... 36

*Wolf v. Rand*,
258 A.D.2d 401 (N.Y. App Div 1999) ................................................................. 10

**FEDERAL STATUTES**

11 U.S.C. § 101 ............................................................................................... 4, 36

11 U.S.C. § 541(a)(3) ........................................................................................... 14

11 U.S.C. § 544(b)(1) ........................................................................................... 23

11 U.S.C. § 546(e) ......................................................................................... *passim*

11 U.S.C. § 547 ............................................................................................. 15, 24

11 U.S.C. § 548 ................................................................................................ *passim*

11 U.S.C. § 550 ................................................................................................ *passim*

11 U.S.C. § 726 .......................................................................................................... 14

15 U.S.C. § 12(a)(2) ................................................................................................. 8, 9

15 U.S.C. § 17 ................................................................................................................ 8

15 U.S.C. § 28(a) ............................................................................................... *passim*

15 U.S.C. § 29(b) ................................................................................................ 4, 9, 17

15 U.S.C. § 77l(a)(2) .................................................................................................... 8

15 U.S.C. § 78aaa ......................................................................................................... 1

15 U.S.C. § 78bb(a)(2) ................................................................................................. 5

15 U.S.C. § 78bbb ........................................................................................................ 5

15 U.S.C. § 78cc(b) ...................................................................................................... 9

15 U.S.C. § 78fff-1(a) ........................................................................................... 13, 23

15 U.S.C. § 78fff-1(b) ............................................................................................... 23

15 U.S.C. § 78fff-2(c)(1) ............................................................................................ 14

15 U.S.C. § 78fff-2(c)(3) ................................................................................. 14, 15, 23

## STATE STATUTES

N.Y. C.P.L.R. § 5001 .................................................................................................. 10

N.Y. C.P.L.R. § 5004 .................................................................................................. 11

N.Y. U.C.C. § 8-501 ................................................................................................... 44

## OTHER AUTHORITIES

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203,
§§ 767, 774, 124 Stat. 1799, 1802 (2010) ............................................................. 5

H.R. Rep. No. 95-595, at 177-78 (1977), reprinted in 1978 U.S.C.C.A.N. 5963 ......... 15

Peter A. Zisser, "Madoff and Net Investment Method; Equity Goes Where the Law Fears
to Tread," 23 Bankr. L. Rep. (BNA) (Vol. 44) 1438, 1439 (2011) .......................... 32

RESTATEMENT (SECOND) OF CONTRACTS § 354(1) (1981) .............................................. 8

RESTATEMENT (SECOND) OF TORTS § 874 Cmt. b (1979) ............................................... 12

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 53(4) (2010) ................... 8

Defendants, whose motions to withdraw the reference and joinders therein were granted by the Antecedent Debt Order,[1] respectfully submit this memorandum of law in support of their consolidated motion to dismiss the Complaints filed against them by Irving H. Picard, the trustee (the "Trustee") appointed under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa, *et seq.*, for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("Madoff Securities"), substantively consolidated with the estate of Bernard L. Madoff ("Madoff"), to recover allegedly fraudulent transfers (the "Avoidance Actions").

### INTRODUCTORY NOTE

This brief is structured to comply with the Court's instruction that the parties not repeat arguments made and decided in *Picard v. Greiff*, -- F.Supp.2d --, 2012 WL 1505349 (S.D.N.Y. Apr. 30, 2012, Supplementing Opinion May 15, 2012) ("*Greiff*"). Accordingly,

- Section I addresses antecedent debt issues based on SIPA and Bankruptcy Code provisions not previously presented to the Court.

- Section II presents issues believed to be of first impression – *i.e.*, the treatment of new deposits and inter-account transfers – that were not briefed by the parties in *Greiff*.

- Section III incorporates by reference arguments previously made to this Court, to preserve such issues for appellate review.

---

[1]  This consolidated brief is submitted, or deemed submitted, on behalf of all Defendants who are parties to the Antecedent Debt Order and addresses issues contemplated thereby. *See* Order, *In re Madoff Secs.*, No. 12-mc-0115 (S.D.N.Y. May 16, 2012), ECF No. 107 (the "Antecedent Debt Order"). A copy of the Antecedent Debt Order is filed herewith as Exhibit A to the Declaration of Richard A. Kirby in Support of Consolidated Motion to Dismiss ("Kirby Decl."). Not all Defendants are similarly situated and therefore they join in only those arguments applicable to them. As provided in paragraph 12 of the Antecedent Debt Order, nothing in this consolidated brief waives, limits, or impairs any argument, issue, or defense that has not been raised herein, specifically including any defense a defendant could raise in a motion under Fed. R. Civ. P. 12.

Case 1:12-mc-00115-JSR   Document 499   Filed 08/28/14   Page 12 of 60

## SUMMARY OF THE ARGUMENT

The law of this case limits the Trustee's Avoidance Actions to those permitted by Section 548(a)(1)(A) of the Bankruptcy Code.  Section 548(c) provides an affirmative defense to the avoidance of fraudulent transfers where, as here, defendants took such transfers for "value and in good faith."[2]  Value includes satisfaction of an antecedent debt, such as liability on claims.  11 U.S.C. § 548(d)(2)(A).

Although this Court decided in *Greiff* that "value" should be limited to only principal invested, statutory and decisional law not raised in *Greiff* show that value under substantive federal and state law should not be so limited.  Specifically, Section 28(a)(2) of the Securities Exchange Act of 1934 (the "1934 Act"), of which SIPA is a part, expressly preserves all of Defendants' rights and remedies – including federal and state claims for rescission and damages arising from the massive fraud that the Trustee admits was perpetrated on Madoff Securities customers.  These include claims for interest, consequential damages, and lost opportunity costs, all of which constitute recognized antecedent debts and hence value.  Section 548(c) of the Bankruptcy Code permits Defendants to retain these additional amounts from their withdrawals from Madoff Securities.  That these additional claims constitute value is supported by strong public policy considerations and is fully consistent with the Second Circuit's Net Equity decision.  *See* Section I.A.

Whatever power the Trustee has to avoid obligations incurred by Madoff Securities is limited by the statutory reach-back period.  Absent avoidance, each Defendant has the right to

---

[2]    Because the Trustee concedes that the vast majority of Madoff Securities customers – including most Defendants – acted in good faith, this brief treats all Defendants as presumptively good faith transferees.  *E.g.* Ex. C. to the Kirby Decl. (Amended Complaint, *Picard v. Estate of Doris M. Pearlman* (*In re Madoff*), No. 10-ap-04504, (Bankr. S.D.N.Y. Jan. 30, 2012), ECF No. 18 ("Amended Complaint Example")) (failing to allege any bad faith conduct by defendant).

credit against payments received any obligations of Madoff Securities incurred before the reach-back period as part of his or her Section 548(c) defense. The Trustee's position improperly reads out of the Bankruptcy Code the avoidance-of-obligations provisions of Section 548(a)(1) and the reach-back period found in that statute. *See* Section I.B.

An issue of first impression is a Defendant's entitlement to credit for new deposits made with Madoff Securities during the two-year reach-back period. As properly held by this Court, the Trustee cannot pursue transfers made earlier than the two-year reach-back period. Yet, the Trustee urges a computational method that would permit him to circumvent this statutory limitation and to indirectly avoid and recover time-barred transfers by applying deposits during the reach-back period against those old transfers. The Trustee's proposed method has no doctrinal or legal support, produces unfair and absurd results, and should be rejected. Instead, new deposits during the reach-back period should be applied as a credit against potentially avoidable transfers during the reach-back period. This approach produces fair, logical results that are fully consistent with the Court's ruling on the statutory reach-back period and is supported by analogous statutory and decisional law. *See* Section II.A.

A second issue of first impression is the appropriate treatment of inter-account transfers made from one customer to another outside the reach-back period. Just as transfers outside the reach-back period are not subject to avoidance, inter-account transfers from one customer to another may not be avoided if made outside the reach-back period. Consequently, such inter-account transfers should be treated the same as deposits of principal in the recipient's account, and withdrawals by such customer up to the amount of those inter-account transfers should be deemed "for value" (*i.e.*, payment of an antecedent debt). *See* Section II.B.

3

Defendants ask the Court to dismiss in whole or in part the Trustee's Avoidance Actions because each of the foregoing claims, as well as those set forth in Section III, limit or bar the Trustee's avoidance powers.

## ARGUMENT

I.  **Provisions of SIPA and the Bankruptcy Code, Not Previously Addressed by the Court, Preserve Antecedent Debts that Defendants May Assert as Value Under Section 548(c).**

A.  <u>Established federal and state law remedies allow each Defendant to retain amounts above original principal deposits under Section 548(c), and SIPA expressly incorporates rather than displaces these remedies.</u>

*Greiff* limits the Avoidance Actions to intentional fraudulent transfers under Section 548(a). *Greiff*, 2012 WL 1505349, at *2. Under Section 548(c), Defendants can retain such transfers where they were taken for "value." 11 U.S.C. § 548(c). Section 548(d)(2)(A) defines "value" as "satisfaction" of a "present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). Debt is defined as "liability on a claim," and claim is a "right to payment." *See* 11 U.S.C. §§ 101(5)(A), (12).

While *Greiff* analyzed the Section 548(c) defense, material issues concerning that defense were not fully presented to the Court, which warrant consideration:

- SIPA was enacted as part of the 1934 Act, which contains an express savings clause and "Rule of Construction" in Section 28(a)(2) that preserves all rights and remedies at law and equity.

- Defendants have federal and state claims for interest in addition to their original principal investment. The 1934 Act contains an express statutory remedy of rescission in Section 29(b) as well as the implied rescission remedies available under Rule 10b-5, both of which require payment of interest in addition to principal. SIPA cannot fairly be read to displace those federal claims, since they are in the very statute of which SIPA was made a part. Likewise, Defendants' state law claims for interest in addition to principal are respected by SIPA's incorporation of Section 28(a).

- These same principles apply to Defendants' other federal and state remedies, including claims for lost opportunity costs in addition to principal.

4

- Congress gave SIPA trustees identical avoidance powers against transfers as those afforded to bankruptcy trustees, and the Bankruptcy Code's statutory limitations on those powers apply equally to a SIPA trustee.

- Regardless of whether a general Ponzi scheme exception to Section 548(c) exists, such an exception has no application to Defendants, as they were not equity investors in the Madoff Securities business, but deposited their funds as brokerage customers in a regulated business for the purchase and sale of securities.

The Court should rule that substantive non-bankruptcy claims are "value" even where they allow Defendants to retain more than a customer's principal deposits. In addition to the plain language of the statutes at issue, Defendants' position is supported by strong public policy considerations and is entirely consistent with the Second Circuit's Net Equity decision.[3]

### 1.    SIPA expressly preserves federal and state law claims.

SIPA preserves federal and state law rights and remedies available in a bankruptcy proceeding. SIPA expressly incorporates the provisions of the 1934 Act: "[e]xcept as otherwise provided in this chapter, the provisions of the Securities Exchange Act of 1934 apply as if this chapter constituted an amendment to, and was included as a section of such Act." 15 U.S.C. § 78bbb. Section 28(a)(2) of the 1934 Act contains a "Rule of Construction" that explicitly preserves state law rights and remedies. See 15 U.S.C. § 78bb(a)(2) ("The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity."). Congress reaffirmed these principles by recodifying them in the Dodd-Frank legislation. See Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 767, 774, 124 Stat. 1799, 1802 (2010).

---

[3]    These substantive rights and remedies constitute "value" for Section 548(c) purposes and are distinct from the question – not before this Court – of whether the calculation of a customer's net equity claim should be adjusted to account for inflation, sometimes referred to as the "Constant Dollar" issue. See In re Bernard L. Madoff Inv. Secs. LLC, 654 F.3d 229, 235 n.6 (2d Cir. 2011) ("We express no view on whether the Net Investment Method should be adjusted to account for inflation or interest . . . .") (the "Net Equity decision").

In enacting Section 28(a), "Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions." *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 383 (1996). Likewise, the Second Circuit recognizes that the 1934 Act preserves all state law claims: "in enacting the Securities Acts, Congress was aware of the long-established state securities acts and the well-developed common law of fraud. Consequently, Congress carefully preserved all existing remedies at law or in equity." *Murphy v. Gallagher*, 761 F.2d 878, 885 (2d Cir. 1985). The Trustee's position that SIPA displaces customer remedies beyond return of principal cannot be squared with the statute. To the contrary, SIPA should be construed to preserve these remedies to the maximum extent.

>    **2.      Defendants have federal and state law rights to retain interest in addition to principal under Section 548(c).**

This Court has recognized, and the Trustee has conceded, that a customer's principal is within the scope of value contemplated by Section 548(c). Indeed, it is indisputable that every Madoff Securities customer had a right to rescission and to return of principal based on the admissions by the Trustee and Bernard Madoff of widespread fraud.[4] But value under Section 548(c) is not limited to the customer's principal. To the contrary, the customer's rescission rights include interest, which falls squarely within the definition of value under Section 548(c).

Each customer undeniably had a federal securities claim against Madoff Securities from the inception of the relationship, as the relationship itself was procured by fraud. The Trustee admits that Madoff Securities received payments in connection with the purchase and sale of securities but did not purchase any securities, instead sending brokerage statements to its customers that contained lies. These admissions establish that each customer had a Rule 10b-5

---

[4]      Nothing herein waives any Defendant's right to dispute the actual scope and dimension of the fraud.

claim from the time of the original deposit of funds with the broker.[5]   In this context, it is
irrelevant whether the false representations related to the securities ostensibly to be purchased[6] or
instead concerned the fraudulent investment contracts entered into with each Madoff Securities
customer regarding the investment advisory services to be provided.[7]   Thus, each customer had a
federal claim to address these admitted violations of Rule 10b-5.   The remedies for securities
fraud, and therefore the value of such a claim, include rescission of the transaction, recovery of
principal, *and* compensation for the loss of the time value of money, expressed here as an award
of interest.[8]

---

[5]      "[A] broker who accepts payment for securities that he never intends to deliver . . .
violates § 10(b) and Rule 10b-5." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S.
71, 85 n.10 (2006); *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (same); *see also Grippo v.
Perazzo*, 357 F.3d 1218, 1220-24 (11th Cir. 2004) ("A plaintiff does not need to identify a
specific security, or demonstrate that his money was actually invested in a security" to be
afforded the protection of Rule 10b-5.).

[6]      The defrauded customer has a federal claim for securities fraud whether or not a broker
actually purchases the contemplated securities, in part because the customer has no means to
confirm a transaction other than the account statement that the broker issues. *Schnorr v.
Schubert*, 2005 WL 2019878, at *5 (W.D. Okla. Aug. 18, 2005) ("[*U*]*nfulfilled* promises to
purchase securities qualify as *actual* purchases" for purposes of Rule 10b-5.); *see also Ormond v.
Anthem, Inc.*, 2008 WL 906157, at *13 (S.D. Ind. Mar. 31, 2008) (Rule 10b-5 protects plaintiff
who "thought they had purchased or sold a security.").

[7]      An "investment contract" is any "contract, transaction or scheme whereby a person
invests his money in a common enterprise and is led to expect profits solely from the efforts of
the promoter or a third party, it being immaterial whether the shares in the enterprise are
evidenced by formal certificates or by nominal interests in the physical assets employed in the
enterprise." *SEC v. Howey*, 328 U.S. 293, 298-99 (1946). "Congress' purpose in enacting the
securities laws was to regulate *investments*, in whatever form they are made and by whatever
name they are called." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). Congress enacted a
broad definition of "security," sufficient "to encompass virtually any instrument that might be
sold as an investment." *Id*; *SEC v Edwards*, 540 U.S. 389, 393-94 (2004); *Greiff*, 2012 WL
1505349, at *4 (Madoff Securities customer agreements were "securities contracts").

[8]      *See, e.g., Rolf v. Blyth*, *Eastman Dillon & Co., Inc.,* 637 F.2d 77, 87 (2d Cir. 1980) ("In
view of the high inflation rates that beset this period [during which the defendant exercised
control over the defrauded plaintiff's investment], a damage award without prejudgment interest
(or, indeed, even one that does include it) would not give [Plaintiff] full compensation for the
losses he suffered at the hands of his fiduciary.").

The Securities Act of 1933 ("1933 Act") provides an express remedy for rescission in the case of misrepresentations in connection with the sale of securities.  15 U.S.C. § 77l(a)(2).  Section 12(a)(2) of the 1933 Act provides that the victim may recover from the person who sold the security the "consideration paid for such security with interest thereon, less the amount of any income received thereon. . . ."[9]  15 U.S.C. § 77l(a)(2).  In *Randall v. Loftsgaarden*, the Supreme Court found that the rescission remedy for Rule 10b-5 cases should be construed consistently with the express remedy in the 1933 Act.  478 U.S. 647, 662-63 (1986).  Thus, not only is the rescission remedy well-settled for a violation of Rule 10b-5, but the inclusion of interest within its contours is fixed by the 1933 Act's express remedies.[10]

---

[9]      The meaning of this provision is well-established.  In adopting the rescission remedy in Section 12(a)(2), Congress borrowed from the existing common law, which recognized the right to interest in addition to return of principal as a remedy for rescission.  *See Schott v. Maidsville Coal Min. P'ship*, 1979 WL 1245, at *4 (S.D.N.Y. Sept. 7, 1979) (finding that plaintiff is entitled to the purchase price of the securities, less any distributions made, plus interest on his § 12(a)(2) claim); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 53(4) (2010) ("Liability in restitution based on the payment or receipt of money normally includes prejudgment interest (a) from the date of payment to a conscious wrongdoer, a defaulting fiduciary, or a recipient otherwise at fault in the transaction concerned."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 354(1) (1981) ("If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.").  An interest award is necessary because the law recognizes a time value of money loss that must be compensated to make the victim of fraud whole.  *Id.*

[10]     *See, e.g., Bass v. Janney Montgomery Scott, Inc.*, 152 F. App'x 456, 458 (6th Cir. 2005) (rescission in Rule 10b-5 case includes return of consideration paid with interest thereon); *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1031 (9th Cir. 1999) (true rescission in a Rule 10b-5 case involves the return of consideration furnished plus interest); *see also Brick v. Dominion Mortg. & Realty Trust*, 442 F. Supp. 283, 303-04 (W.D.N.Y. 1977) (New Jersey blue sky statute providing for recovery of consideration paid for a security plus 6% interest effectively provides same recovery as Rule 10b-5); *see also Westinghouse Elec. Corp. v. '21' Intern. Holdings, Inc.*, 821 F. Supp. 212, 220 (S.D.N.Y. 1993) ("the legal standards to be applied in determining whether an injured party is entitled to rescission for violation of Rule 10b-5 and §§ 12(a)(2) and 17 are essentially the same as the standards developed in the common law fraud cases.") (internal cites omitted).

As a complement to their Rule 10b-5 claims, Section 29(b) of the 1934 Act also entitles Defendants to void their investment contracts and receive ancillary remedies.[11]

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . .

15 U.S.C. § 78cc(b).[12]  Where Section 29(b) is invoked, the available remedy is rescission,[13] including return of the consideration paid and "interest thereon."

Defrauded Madoff Securities customers are also entitled to substantive state law tort remedies, including interest.[14]  Indeed, New York law **compels** the award of interest under the circumstances here:  "It has been the settled rule that interest must be allowed as a matter of right on recoveries for intentional tort with respect to property and property rights."  *DeLong Corp. v. Morrison-Knudsen Co., Inc.*, 20 A.D.2d 104, 107 (N.Y. App. Div. 1963) (citing *Flamm v. Noble*,

---

[11]      *See, e.g.*, *American Gen. Ins. Co. v. Equitable Gen. Co.*, 493 F. Supp. 721, 767-68 (E.D. Va. 1980) (holding that plaintiffs were entitled to rescission and prejudgment interest from the date of the initial fraudulent transfer under 29(b)); *Cant v. A.G. Becker & Co., Inc.*, 384 F. Supp. 814, 816 (N.D. Ill. 1974) ("A failure to assess interest . . . would have the affect [sic] of allowing parties to speculate with the funds of innocent persons, without fully compensating such victims for the unlawful use of their assets."); *Scheve v. Clark*, 596 F. Supp. 592, 594 (E.D. Mo. 1984) (proper remedy in federal securities claims includes pre-judgment interest at a rate "which will adequately compensate the plaintiffs for the loss of the use of their money.").

[12]      *See also Mills v. Electric Auto-Lite Co*., 396 U.S. 375, 387-88 (1970) (reading "void" in Section 29(b) to mean "voidable at the option of the innocent party").

[13]      The same damage principles that govern the express rescission remedy in Section 12(a)(2) of the 1933 Act govern the parallel rescission remedy set forth in Section 29(b) of the 1934 Act.  *See Randall*, 478 U.S. at 662-63 and discussion *supra*.

[14]      New York courts have long recognized that fraud victims are entitled to either (i) disaffirm the contract by a prompt rescission; or (ii) stand on the contract and maintain an action at law for damages attributable to the fraud.  *Big Apple Car, Inc. v. City of New York*, 204 A.D.2d 109, 110-11 (N.Y. App. Div. 1994).

9

296 N.Y. 262 (N.Y. 1947), *aff'd*, 14 N.Y.2d 346 (N.Y. 1964)), *aff'd*, 200 N.E.2d 557 (N.Y. 1964); *see also Purcell v. Long Island Daily Press Publ'g Co.*, 9 N.Y.2d 255, 257-58 (N.Y. 1961).

New York has codified and expanded this rule.  *See* N.Y. C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded . . . because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property"); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 694-95 (2d Cir. 1983) (statutory enactment did not constrict common law rule); *see also DeLong Corp. v. Morrison-Knudsen Co., Inc.*, 14 N.Y.2d 346, 348 (N.Y. 1964).  It is "New York's prevailing policy, interwoven into § 5001, that '[i]nterest must be added [in actions where persons are deprived of the use of money] if we are to make the plaintiff whole." *Mallis*, 717 F.2d at 695 (quoting *Prager v. New Jersey Fid. & Plate Glass Ins. Co.*, 245 N.Y. 1. 6 (N.Y. 1927).

Likewise, Madoff Securities customers held claims for breach of fiduciary duties from the inception of their relationship with Madoff Securities.[15]  These claims also entitle Madoff Securities customers to interest in addition to principal;[16] indeed, the New York Court of Appeals

---

[15]     The New York Court of Appeals has recently reaffirmed the viability of the common law claim for breach of fiduciary duty in the securities context, rejecting the notion that it is preempted by the Martin Act.  *See Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341, 351 (N.Y. 2011).  In New York, a "broker who has discretionary powers over an account owes his client fiduciary duties."  *Lowenbraun v. L.F. Rothschild*, 685 F. Supp. 336, 343 (S.D.N.Y. 1988).  Where such a relationship exists, a broker's failure to invest in securities, thereby "abusing the position as broker-agent to gain profits at the client's expense," gives rise to a damages claim against the faithless fiduciary.  *Id.*

[16]     New York law recognizes that a breach of fiduciary duty entitles a claimant to pre-judgment interest.  *Wolf v. Rand*, 258 A.D.2d 401, 403-04 (N.Y. App Div. 1999).  Courts award prejudgment interest on equitable claims such as rescission because the plaintiff should be "compensated for being deprived of the use of its money."  *USPS v. Phelps Dodge Refining Corp.*, 950 F. Supp. 504, 518 (E.D.N.Y. 1997).  Similarly, courts applying the Restatement frequently provide interest payments in breach of fiduciary duty cases.  *E.g., In re Estate of*

recently confirmed that compensation for loss of the time value of money is mandatory. *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 265-66 (N.Y. 2011).[17] New York's statutory interest rate is 9%. N.Y. C.P.L.R. § 5004.

### 3. Defendants' claims also entitle them to retain additional amounts under Section 548(c), such as lost opportunity costs.

Defendants' legal claims carry rights in addition to rescission and recovery of principal with interest. While the amount of any given defendant's damages claim will vary depending on the facts, the existence of valid underlying legal claims for amounts in excess of principal cannot reasonably be disputed.

Federal securities fraud claims also include consequential damages, including out-of-pocket costs and lost opportunity damages. *See, e.g., Rolf,* 637 F.2d at 86-87; *Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 803 (2d Cir. 1973) (consequential damages are available for federal securities law claims when they are established with certainty); *cf. Stevens v. Abbot, Proctor & Paine*, 288 F. Supp. 836, 850-51 (E.D. Va. 1968) (finding that percentage of capital gains taxes due to defendant's fraudulent conduct were recoverable as actual damages).

Likewise, New York courts have long recognized that fraud victims are entitled to recover consequential damages attributable to the fraud. *Big Apple Car, Inc*, 204 A.D.2d at 110-

---

*Newhoff*, 107 Misc.2d 589, 595-96 (N.Y. Surrogate's Ct. 1980) (measure of damages where initial investments of trust monies are found imprudent is "the amount of funds invested *plus the legal rate of interest* from the date of investments with appropriate credits for the moneys received on account of such investments.") (emphasis added).

[17]     In *Capital*, the court recognized a distinct injury for the loss of use of funds, separate and apart from the obligation to return principal, because "plaintiffs are entitled to be compensated for the loss of the time value of that money – which can be accomplished only by awarding them statutory interest on the unpaid interest only payments." 17 N.Y.3d at 266. The court explained that "[a]bsent this component of damages, plaintiffs would be reimbursed only for their loss of use of the principal – and not for loss of use of the periodic interest payments, a separate injury." *Id.*

11. In New York, a breach of fiduciary duty claim carries lost opportunity damages. *See 105 East Second St. Assocs. v. Bobrow*, 175 A.D.2d 746, 747 (N.Y. App. Div. 1991) (damages for breach of fiduciary duties include "lost opportunities for profit . . . by reason of the faithless fiduciary's conduct").[18] In an analogous scenario, the Second Circuit applied the Restatement (Second) of Trusts to conclude that "[o]ne appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) (remedies for breach of fiduciary duties under ERISA). All of these claims for damages constitute value under Section 548(c).[19]

SIPA preserves these claims and remedies through Section 28(a)(2) of the 1934 Act. Thus, they are part of the fabric of SIPA for evaluating the statutory defense by a good faith transferee to an avoidance action by the SIPA Trustee. The Trustee's avoidance powers under SIPA are subject to these statutory limitations, as discussed below.[20]

---

[18]     *See also* RESTATEMENT (SECOND) OF TORTS § 874 Cmt. b (1979) (stating that remedies for breach of fiduciary duty may include "tort damages for harm caused by the breach," "restitutionary recovery," and "profits that result to the fiduciary from his breach of duty").

[19]     Other state law and UCC contract claims, which the Court specifically rejected in *Greiff*, are referenced below in Section III.

[20]     All of these claims are consistent with the undeniable economic truth that a dollar deposited many years ago is worth more than a dollar deposited today. *See Metro. Life Ins. Co. v. Murel Holding Corp.* (*In re Murel Holding Corp.*), 75 F.2d 941, 942 (2d Cir. 1935) ("payment ten years hence is not generally the equivalent of payment now"). Madoff Securities' use of Defendants' money, and the benefit of the time value of that money, constitutes value under Section 548(c).

**4.    Congress did not expand the SIPA trustee's avoidance powers beyond those accorded bankruptcy trustees generally.**

    *a.    <u>SIPA's Section 8(c) is consistent with Section 548(c) of the Bankruptcy Code.</u>*

*Greiff* held that a transferee's use of Section 548(c) must be limited to preserving principal to avoid interfering with the policies undergirding Section 8(c)(3) of SIPA.  *Greiff*, 2012 WL 1505349, at *9-10.  But SIPA does not displace any part of Section 548(c).  Rather, the two provisions reflect a Congressional balance between the goal of empowering bankruptcy trustees to recover fraudulent transfers and the competing policy considerations of promoting stability and finality of transactions in Section 548(c).

Courts have a duty to reconcile provisions in related federal statutes, not to find a conflict between them.  *Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*, 130 S. Ct. 2433, 2447 (2010) (statutes should be construed to be consistent with one another where the text permits).  Only in the extreme case where it is impossible to reconcile two federal statutes may a court conclude that one is to be preferred over the other.  *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141-42 (2001) (irreconcilable conflict between two statutes required for implied repeal); *Morton v. Mancari*, 417 U.S. 535, 550 (1974) (absent affirmative demonstration of intention to repeal, implied repeal is only permissible where statutes are irreconcilable).

There is nothing on the face of SIPA that conflicts with Section 548(c), which permits innocent customers to retain the amounts provided by federal and state substantive law as remedies for fraud.  The SIPA statute borrows from the avoidance powers established by the Bankruptcy Code.  *See* 15 U.S.C. § 78fff-1(a) (SIPA Trustee is "vested with the same powers . . . as a trustee in a case under title 11."); *Picard v. HSBC Bank PLC*, 454 B.R. 25, 30 (S.D.N.Y. 2011) (finding that "the powers of a SIPA trustee are still, as indicated, cabined by Title 11")

(citing 15 U.S.C. § 78fff-2(c)(3)); *Greiff*, 2012 WL 1505349, at *6 n.7 ("SIPA expressly incorporates the limitations Title 11 places on [a] trustee's powers . . .").

SIPA's Section 8(c)(3) has the limited purpose of granting a SIPA Trustee standing to recover customer property. *Picard v. Merkin* (*In re Bernard L. Madoff Inv. Secs.*), 440 B.R. 243, 272 (Bankr. S.D.N.Y. 2010) (Section 8(c)(3) "creates a fiction that grants the trustee standing to bring avoidance actions under the Code."). Where the trustee is able to recover property that had been taken from the pool of customer property at the broker, the statute permits the trustee to return it to that pool for the benefit of customers when there is a shortfall of customer property.[21] Section 8(c)(3) employs the same language as Section 7 in granting to the trustee the powers to "recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent such transfer is voidable or void under the provisions of

---

[21]     Both SIPA and the Bankruptcy Code separate the distribution of property of the estate from questions of recovery. *Compare* SIPA, Section 8(c)(1), 15 U.S.C. § 78fff-2(c)(1) *with* Bankruptcy Code, Section 726, 11 U.S.C. § 726. A transfer that a trustee avoids under Section 548 and recovers under Section 550 becomes the property of the estate available for distribution to general creditors. *See* 11 U.S.C. §§ 541(a)(3), 550(a). Similarly, under SIPA, once a transfer is avoided and recovered it becomes part of the fund of customer property and is eligible for priority distribution to customers pursuant to Section 8(c)(1).

Like its bankruptcy analog, Section 726, Section 8(c)(1) of SIPA contains a priority scheme for distributions. Customer net equity claims have the highest priority, and if funds remain after satisfying these priority claims and reimbursing SIPC, they are available for distribution to unsecured creditors. This is no different from the Bankruptcy Code, which provides for payment of priority claims and costs of administration before payment of unsecured claims.

There is no question that claims of any priority constitute value under Section 548(c) in a typical bankruptcy case. Because the recovery and priority schemes of SIPA and the Bankruptcy Code are entirely consistent with one another, there is no basis to rule that a legitimate debt must also satisfy the Trustee's "net equity" definition to constitute value in a SIPA case. In the bankruptcy context, this would be equivalent to finding that where it is likely that only priority creditors will receive distributions, only priority or administrative claims constitute value under Section 548(c). This is obviously improper, because it conflates recovery and priority in a way not contemplated by the Code.

14

title 11" of the United States Code. 15 U.S.C. § 78fff-2(c)(3). Title 11 limitations on the trustee's powers undisputedly include the defenses in Section 548(c).

In contrast, the Section 548(c) defense reflects the policy and purpose of the fraudulent transfer provisions of the Bankruptcy Code. As this Court noted in *Greiff*, these provisions are not intended to address or enhance equality of treatment of creditors. *Greiff*, 2012 WL 1505349, at *6 n.8; *see also Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987) ("The basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them."). That is the purpose of the bankruptcy preference provisions. *See* H.R. Rep. No. 95-595, at 177-78 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6138 ("The preference provisions facilitate the prime bankruptcy policy of the equality of distribution among creditors of the debtor."). For this reason, Congress deliberately chose a much shorter reach back period (ninety days for non-insiders) for preferences made to creditors. *See* 11 U.S.C. § 547. The longer two-year reach back period for fraudulent transfer actions reflects the very different goal of those provisions: to prevent the debtor from colluding with others to dismember the estate.

There is thus no statutory conflict between Section 8(c)(3) and Section 548(c). *See Greiff*, 2012 WL 1505349, at *9-10. Where an avoidance defendant acted in good faith, and has received payments on account of valid debt, the fraudulent transfer provisions have no application. This is the core of the Second Circuit's holding in *In re Sharp Int'l Corp.*, 403 F.3d 43, 54-56 (2d Cir. 2005) (under analogous state law, a conveyance that satisfies an antecedent debt is not fraudulent, "even if its effect is to prefer one creditor over another"); s*ee also In re Champion Enters., Inc.*, 2010 WL 3522132, at *20 (Bankr. D. Del. Sept. 1, 2010) (dismissing

15

Case 1:12-mc-00115-JSR   Document 499   Filed 06/25/12   Page 26 of 60

fraudulent transfer claims where plaintiff did not plead bad faith).[22]  Put differently, it is irrelevant whether debt is senior or junior; as long as the debtor is paying a legitimate claim, the recipient has given value to the debtor in exchange for the claim.  These policy concepts are enshrined in Section 548(c).

If Congress had wished to limit the availability of the Section 548(c) defense in SIPA avoidance actions, it could easily have said so.  *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 445 (2007) ("where Congress has intended to provide . . . exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly") (internal citation omitted).  But it did not.  The same policy considerations underpin this Court's holding that Section 546(e) limits a SIPA Trustee's avoidance powers.  *Greiff*, 2012 WL 1505349, at *2-5.

No public policy justifies granting to a SIPA trustee broader avoidance powers than bankruptcy trustees.  Indeed, the Trustee's position leads to an untenable conclusion:  that Congress expressly adopted the Bankruptcy Code but tacitly supplanted some of its provisions.  Under this reading, the Code is merely advisory, not conclusive regarding the Trustee's powers.  This reading is inconsistent with basic principles of statutory construction.  The policy considerations underlying Section 548(c), which permit Defendants to retain amounts paid on account of legitimate debts, must be honored.

---

[22]    *Sharp's* actual holding, as noted in *Greiff*, is that the trustee in that case had not properly pled a fraudulent conveyance claim under New York law.  *See In re Bayou Grp., LLC*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007).  For purposes of this brief only, Defendants do not argue that the Trustee has not properly pled an avoidance claim.  Rather the issue presented here is the scope of the statutory defense of good faith, an issue not addressed by *Sharp*.  *Sharp's* review of the purpose of the fraudulent transfer statutes remains good law.

b.    *SIPA does not redefine the meaning of "antecedent debt."*

*Greiff* appears to hold that some rights to payment do not fall under the statutory definition of "claims" constituting "value" within the meaning of Section 548(c). *Id.* at *7-8. But the notion that SIPA somehow preempts valid state claims for recovery of more than principal cannot be reconciled with the express statutory savings provision in Section 28(a) of the 1934 Act (not cited in *Greiff*), which applies to SIPA and expressly preserves all claimants' state law rights and remedies. Likewise, Congress could not have intended for SIPA to displace the express rescission remedy of Section 29(b) or the well-established implied remedies under Rule 10b-5 for recovery of principal and interest, when SIPA is a part of the very statute (the 1934 Act) that gives rise to those claims. *Supra* pp. 5-6.

Because SIPA does not expressly override any remedies and, in fact, incorporates the relevant portion of the 1934 Act that preserves them, there is no basis to conclude that SIPA implicitly repeals some remedies but preserves others. *See Brown v. Gardner*, 513 U.S. 115, 121 (1994) ("[C]ongressional silence lacks persuasive significance" on preemption question) (internal citation omitted); *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994) ("[M]atters left unaddressed in [a comprehensive and detailed federal] scheme are presumably left subject to the disposition provided by state law"); *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564, 616 (1997) ("[O]ur pre-emption jurisprudence explicitly rejects the notion that mere congressional silence on a particular issue may be read as pre-empting state law").

Nor can any judicial "perceptions of the demands of equity" justify overriding these state and federal law claims. *See Butner v. United States*, 440 U.S. 48, 55-56 (1979) ("undefined considerations of equity provide no basis" for federal courts to reject state law in the absence of "congressional command" or "identifiable federal interest"); *Travelers*, 549 U.S. at 452

17

(rejecting judicially-created exclusion of state remedies, where no "provision of the Bankruptcy Code . . . provid[ed] support for the new rule").[23]

> c. *Even assuming a Ponzi Scheme exception to the Bankruptcy Code exists, it does not apply to Defendants who are customers of a registered broker-dealer, rather than equity investors in the Ponzi Scheme.*

*Greiff* concluded that transfers in excess of a customer's principal were not made for value because they did not reflect a true return on investment and were instead intended by Madoff Securities to further the Ponzi scheme. *Greiff*, 2012 WL 1505349, at *7. Yet the statutory language does not permit a reading that makes the intent of the transferor determinative as to whether the transferee gave value to the debtor.

*Greiff* relies on a line of bankruptcy and receivership cases that invoke a Ponzi scheme exception to limit avoidance defendants to recovery of their principal. Unlike almost every case noted by the Trustee, however, the customers of Madoff Securities were not equity investors in the business of Madoff Securities, but were customers who deposited money with the registered broker for the purpose of purchasing and selling securities. Whatever the merits of the Ponzi scheme exception, it does not apply to the facts of these cases. It is one thing to say that the claims of investors who place their funds at risk as capital in a fraudulent business should be limited. It is another thing to say that brokerage customers who deposit their funds in a regulated entity should lose under SIPA – the very statute intended to protect them – all the legal rights and protections designed by state and federal law.

---

[23]    In both cases, the Court looked to the *text of the Bankruptcy Code* to determine whether Congress had identified a sufficiently compelling federal interest to abrogate particular state law rights in the context of a bankruptcy proceeding. *Butner*, 440 U.S. at 54 ("Congress has not chosen to exercise its power to fashion any such rule."); *Travelers*, 549 U.S. at 452 ("The absence of textual support is fatal for the [judicially created] rule.").

The closest analogous precedent is the Sixth Circuit decision in *Visconsi v. Lehman Bros.*, 244 F. App'x 708 (6th Cir. 2007).  There is no meaningful distinction between the facts in *Visconsi* and those here.  There, an official at Lehman perpetrated a Ponzi scheme by soliciting customer deposits of more than $21 million, and sending fictitious account statements to the customers who ultimately withdrew $25.8 million over several years.  *Id.* at 710.  Their broker eventually admitted that he had operated a Ponzi scheme and that the customers' actual account balances were negative, rather than the amount listed on their account statements.  *Id.* at 709-10.  The Sixth Circuit upheld an arbitration award against Lehman for $10 million in excess of the amount withdrawn, flatly rejecting the broker's argument that plaintiffs could not recover the amount shown on their statements:

> . . . the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages.  Had [the broker] invested Plaintiffs' money as requested, their funds would have likely grown immensely . . . Plaintiffs thus . . . were entitled to the full $37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals.

*Id.* at 713-14;[24] *see also Redstone v. Goldman, Sachs & Co.*, 583 F. Supp. 74, 76-77 (D. Mass. 1984) (denying motion to dismiss customer breach of contract claims against broker-dealer seeking benefit-of-the-bargain damages).

The Trustee seeks to avoid any payments beyond original principal based on his allegation that to make such payments Madoff Securities used funds that it derived from new

---

[24]    The Trustee's distinction of *Visconsi* – reflected in *Greiff* – that the difference in the scope of the respective frauds between those cases justifies benefit of the bargain damages in *Visconsi*, but not in this case, does not address the additional alternative federal and state remedies also available to victims like Visconsi discussed above.  Even assuming that benefit of the bargain damages are unavailable for the reasons stated by the Court, there is no reasoned justification to ignore the other well-established remedies that are preserved by Section 548(c).

19

Case 1:12-mc-00115-JSR   Document 499   Filed 06/25/12   Page 30 of 60

customers deposits rather than from investment revenues.[25]  But in the absence of bad faith by

the recipient, the source of Madoff Securities' funds is irrelevant to a Section 548(c) defense.

Under time-honored principles, a payment that discharges a valid debt does not harm the payor's

creditor body, making the origin of funds irrelevant.  *Commodity Future Trading Comm'n v.*

*Walsh*, 17 N.Y.3d 162, 173 (N.Y. 2011) ("to permit in every case of the payment of a debt an

inquiry as to the source from which the debtor derived the money, and a recovery if shown to

have been dishonestly acquired, would disorganize all business operations and entail an amount

of risk and uncertainty which no enterprise could bear") (internal citation omitted); *Sharp*, 403

F.3d at 54-55; *Boston Trading Grp.,* 835 F.2d at 1508 (fraudulent conveyance law has a different

lineage and purpose than the equitable doctrines of restitution); *see also Daly v. Parete (In re*

*Carrozzella & Richardson)*, 270 B.R. 92, 97 (Bankr. D. Conn. 2001) (a transaction's illegality

does not deprive the exchange of value).

The term "Ponzi scheme" does not appear in any statutory provision at issue here, nor is

there any statutory exception for so-called "fictitious profits" under Section 548(c).  Nonetheless,

*Greiff* relies on *Donell, Scholes*, and *Hedged-Investments*, stating that "every circuit court to

address this issue has concluded that an investor's profits from a Ponzi scheme, whether paper

profits or actual transfers, are not 'for value.'"  *Greiff*, 2012 WL 1505349, at *8.  Yet, none of

these cases involved customers of a brokerage firm.  To the contrary, every defendant in those

cases intended to place his capital at risk in a business enterprise, whether in a debt scheme or a

hedge fund.  *Donell* had nothing to do with a broker relationship, but rather involved an investor

who was financing a receivable factoring operation.  *Donell v. Kowell*, 533 F.3d 762 (9th Cir.

---

[25]     Defendants note that the Trustee's premise, that one Madoff Securities' customer
received redemptions out of another customer's funds, has not been established.  *See also* n. 4.

2008). Both *Hedged-Investments* and *Scholes* involved sales of limited partnerships in an investment vehicle that was operated as a Ponzi scheme. *Hedged Invs. Assocs., Inc. v. Buchanan* (*In re Hedged Invs. Assocs., Inc.*), 84 F.3d 1286 (10th Cir. 1996); *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995).

This is a crucial distinction. The 1934 Act was designed to foster confidence in, and protect the integrity of, the securities markets; one of its central tenets was to protect customers of a broker-dealer, especially as the securities markets migrated from paper securities to the electronic book-entry system that is the heart of modern markets.[26] This is the very reason why Congress enacted SIPA and made it part of the reforms of the securities laws that facilitated the national market system. To read SIPA to displace the federal securities laws that provide special protection to brokerage customers is to misread the policies that undergird those laws. More importantly, Congress did not leave it to courts to divine SIPA's purpose. Congress was express in making it clear through Section 28(a)(2) of the 1934 Act – and making SIPA part of that Act – that it intended to preserve rights and remedies, not displace them.[27]

Furthermore, the invocation of equity ignores the complexities that would be involved in any true attempt to balance the equities here. As one court noted:

---

[26]     *See* Section 2 of the 1934 Act.

[27]     Other cases that attempted to engraft an exception to standard bankruptcy law in the case of Ponzi schemes are equally unpersuasive. None involves customers of a broker-dealer who deposited funds for the purpose of purchasing securities. *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843 (D. Utah 1987), and its progeny erroneously found that investors in a Ponzi scheme who were not customers of a registered broker were not entitled to more than their initial investment based on a perceived public policy of equality of treatment among investors. *Merrill's* equity analysis ignores the plain language of the Bankruptcy Code discussed above and the admonition in *Butner* that bankruptcy courts must recognize the substantive rights of the parties afforded by state law. *See Butner*, 440 U.S. at 56 (a creditor must be "afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued."). Similarly, *In re Bayou Group, LLC*, 439 B.R. 284, 338 (S.D.N.Y. 2010), did not involve a broker-dealer.

21

> Some investors who received "fictitious profits" may have spent the money on
> education or other necessities many years ago.  What else in equity and good
> conscience should plaintiffs who received money in good faith pursuant to an
> "investment contract" have done?   In contrast, some investors who lost money
> may have been speculators who were prepared to lose their investments.   There is
> simply no neat answer to the various equities involved here where the investors
> never knew each other and were equally at fault for trusting [the fraudster].

*Johnson v. Studholme*, 619 F. Supp. 1347, 1350 (D. Colo. 1985), *aff'd sub nom. Johnson v.*

*Hendricks*, 833 F.2d 908 (10th Cir. 1987).  Such court decisions make policy determinations that

are better left to Congress:

> [b]y forcing the square peg facts of a 'Ponzi' scheme into the round holes of the
> fraudulent conveyance statutes in order to accomplish a further reallocation and
> redistribution to implement a policy of equality of distribution in the name of
> equity, I believe that many courts have done a substantial injustice to those
> statutes and have made policy decisions that should be made by Congress.

*In re Unified Commercial Capital, Inc.*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001); *see also*

*Butner*, 440 U.S. at 54; *Travelers*, 549 U.S. at 451 (courts cannot look to undefined equitable

considerations to avoid application of federal statute).[28]

Finally, the Second Circuit's Net Equity decision on the "net equity" calculation has no

bearing on Section 548(c) defenses.  The Second Circuit's determination of whether a customer

has a priority claim under the SIPA statute is irrelevant to the question of whether that customer

has a defense to a bankruptcy avoidance action under Section 548(c).  There, addressing the

provisions of SIPA that speak to calculating the amount of a customer claim from the books and

records of the broker-dealer, the Court simply held that the Trustee's interpretation of the term

"net equity" was within his discretion.  That issue is irrelevant to a Section 548(c) defense.  It is

---

[28]      While some courts recognize that investors in a Ponzi scheme are limited in what they
may recover, others who deal with the Ponzi scheme but are not direct investors are protected in
their transfer to the extent that they dealt with the enterprise in good faith. *B.E.L.T., Inc. v.
Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005) ("Someone who sells a car at the market
price to Charles Ponzi is entitled to keep the money without becoming liable to Ponzi's victims
for the loss created by his scheme.").

inappropriate to extrapolate from that limited holding a rule sharply restricting the value defense, and it is inconceivable that the scope of a statutory affirmative defense would be subject to the Trustee's discretion.

The issue in these avoidance actions is whether the payments by Madoff Securities satisfied obligations that existed *at the time the payments were made*, rather than how obligations *at the time of a later SIPA liquidation* might eventually be treated. *Armstrong v. Collins,* 2010 WL 1141158, at *20 (S.D.N.Y. Mar. 24, 2010) ("The critical time to determine whether a debtor received reasonably equivalent value is the time of the transfer."). The Second Circuit's analysis did not address whether Section 548(c) applies to avoidance claims, because it arose under different statutory provisions with distinct policy considerations from those in the bankruptcy avoidance process.

> B.  <u>Because the Trustee cannot avoid obligations older than the applicable reach-back period, customers should be credited for their account balances as of the beginning of the reach-back period.</u>

Underlying the Trustee's calculation of amounts owed in his lawsuits against customers is the unstated premise that he can avoid Madoff Securities' account statement obligations to its customers. Avoidance of obligations is governed by Bankruptcy Code Section 548(a)(1), which allows a trustee to avoid not just a fraudulent "transfer" but also any fraudulent "obligation . . . incurred." [29]  The account statements are obligations of Madoff Securities. *See* Section III. They

---

[29]    Defendants do not concede that the Trustee has the authority to avoid obligations incurred by the Debtor, because SIPA expressly limits his avoidance powers. Section 78fff-1(a) provides only that "[a] trustee shall be vested with the same powers and title with respect to the debtor and the property of the debtor, *including the same rights to avoid preferences*, as a trustee in a case under [the Bankruptcy Code]*." 15 U.S.C. § 78fff-1(b) (italics added). Section 78fff-2(c)(3), moreover, speaks only of the SIPA trustee's power to recover "property *transferred* by the debtor ... if and to the extent that such *transfer* is voidable or void" under the Bankruptcy Code. *See* 15 U.S.C. § 78fff-2(c)(3) (emphasis added); *compare* 11 U.S.C. §§ 548(a)(1), 544(b)(1)) (which empower a bankruptcy trustee to avoid both transfers and "obligations

may be potentially avoidable obligations, but until and unless they are avoided they are valid obligations – just as transfers are valid until shown to be avoidable.

The Trustee has now apparently come to the belated recognition that his litigation framework is structurally defective: he indeed must avoid Madoff Securities' obligations in order to vitiate Defendants' value defenses based on those statements. Presumably motivated by this recognition, the Trustee recently started to overhaul his complaints by amending them to assert that the Madoff Securities' obligations incurred with respect to its account statements should be avoided. *Compare* Kirby Ex. C (Amended Complaint Example) at ¶ 3 *with* Kirby Ex. B (Original Complaint Example) at 2 (original complaint seeks to avoid transfers, making no mention of avoiding obligations).

However, the Trustee's amended complaints highlight a hole in his theory: that is, the Trustee's power to avoid obligations is subject to the applicable reach-back period set by law. The Trustee simply has no authority to avoid obligations that go back decades before the petition date. Those obligations are as immune from avoidance as are transfers to Defendants that occurred long before the applicable reach-back period. The Trustee's position simply reads out of the Bankruptcy Code the avoidance-of-obligations provisions of Section 548(a) and the statutory reach-back period for avoidance of obligations actions.

---

incurred"). SIPA's single reference to avoidance of "preferences" must be read in light of the scope of the power to avoid preferences under Section 547 of the Bankruptcy Code, 11 U.S.C. § 547, which refers only to avoidance of "transfers." *See In re Asia Global Crossing, Ltd.*, 333 B.R. 199 (Bankr. S.D.N.Y. 2005) (plain language of Section 547 reaches only transfers, not obligations). For the purposes of this brief, however, Defendants assume without conceding that the Trustee has such authority, subject to the limitations of Sections 548(c) and 546(e). Certain Defendants may seek to be heard on the statutory restrictions on the Trustee's power to avoid obligations.

This limitation on the Trustee's power to avoid obligations is in no way inappropriate or unfair. The limitation simply reflects the same statutory policies of repose and certainty that are incorporated into any statute of limitation. Thus, even if all Madoff Securities obligations incurred during the applicable reach-back period were avoided, Defendants would still be entitled to assert as an antecedent debt defense those obligations that arose prior to the reach-back period – including obligations based on Madoff Securities account statements.

The Trustee can assert no principled reason why his power to avoid obligations – unlike his power to avoid transfers – would be temporally unrestrained. Neither the statute nor the case law allows such an inference. *See, e.g., Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 24-25 (2000) ("Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are limited to what the Bankruptcy Code itself provides."); *Lustig v. Weisz & Assocs. (In re Unified Commercial Capital, Inc.),* 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001) ("[T]he fraudulent conveyance statutes cannot and should not be utilized by courts as a super preference statute to effect a further reallocation and redistribution that should be specifically provided for in a statute enacted by Congress."). Indeed, the Trustee's approach was found objectionable by this Court in *Greiff.* 2012 WL 1505349, at *6 n. 7 (criticizing Trustee position to extent it would have the "'absurd effect' of displacing even statutes of limitation . . ."). *See also* Section II.A.2, below.

The Trustee seeks to recover indirectly withdrawals that he has no authority to pursue. The Trustee should not be permitted to undermine the clear legislative determination that only obligations incurred within the applicable statutory reach-back period are subject to avoidance.

## II.   Value Issues Not Previously Considered by the Court Require Dismissal.

A.   <u>Defendants are entitled to a credit for new deposits made with
Madoff Securities during the Reach-Back Period</u>.

This Court has twice ruled that Bankruptcy Code Section 546(e) limits the Trustee to

pursuing only actual fraudulent transfers occurring within the two-year reach-back period (the

"Reach-Back Period") of Section 548(a)(1).   *Picard v. Katz*, 462 B.R. 447, 454-56 (S.D.N.Y.

2011) ("*Katz*"); *Greiff*, 2012 WL 1505349, at *11.

An open question remains as to how to calculate a defendant's potential liability during

the Reach-Back Period.  Defendants recognize that the Court in *Greiff* answered that question by

incorporating the Trustee's proposed approach (the "Trustee Method").  However, *Greiff* did not

address an issue critical for a large subset of Defendants:  those who deposited new money with

Madoff Securities during the Reach-Back Period.  The Trustee Method has the effect of applying

those new deposits against transfers to Defendants that the Trustee cannot pursue under *Katz* and

*Greiff*, rather than against transfers within the Reach-Back Period that the Trustee can pursue.

*See, e.g.*, Kirby Ex. D ("New Deposit Complaint Example") at ¶ 2 (reflecting netting of deposits

and withdrawals over life of relationship, notwithstanding two-year Reach-Back Period).

Notably, the treatment of new money deposits was not briefed by any party in *Greiff*, and the

single decision cited by the Court in support of the Trustee Method, *Donell v. Kowell*, 533 F.3d

762 (9th Cir. 2008), did not involve or address this issue.

The Court should adopt an approach that gives credit to Defendants who replenished the

Madoff Securities estate with new money during the Reach-Back Period (the "Replenishment

Credit Method").  As discussed below, this is the only way to determine potential liability that is

consistent with the applicable statutory Reach-Back Period, Section 550(d)'s prohibition against

a trustee's double recovery and relevant case law.  The Replenishment Credit Method also

produces fair and reasonable results. In contrast, the Trustee Method, when applied to customers with Reach-Back Period deposits, would permit the Trustee to circumvent the statutory Reach-Back Period recognized by this Court in *Katz* and *Greiff* and would generate anomalous and unfair results, all as discussed below.

Defendants believe that the replenishment scenario, and its interplay with the statutory Reach-Back Period, is an issue of first impression. Although this issue may affect only a subset of Defendants, the aggregate amounts at stake are likely to be considerable, given the thousands of customers sued by the Trustee.

### 1.   A credit for new deposits is mandated by the statutory Reach-Back Period.

Section 548(a)(1) of the Bankruptcy Code provides that the "trustee may avoid any [fraudulent] transfer . . . that was made . . . on or within 2 years before the date of the filing of the petition[.]" 11 U.S.C. § 548(a)(1). Congress made a clear legislative determination that a transferee has no liability to a bankruptcy trustee after two years has elapsed after a transfer.

As a result, no transfer to a Defendant occurring outside the Reach-Back Period is avoidable or recoverable by the Trustee. Put another way, as of the commencement of the Reach-Back Period, no Defendant had any liability to the Trustee, regardless of how much a Defendant had previously withdrawn. Only withdrawals made during the Reach-Back Period could arguably be subject to avoidance and recovery.

The Trustee Method, if applied to Defendants with Reach-Back Period deposits, would functionally permit the Trustee to sidestep the Reach-Back Period and indirectly avoid and recover withdrawals made by Defendants years or even decades prior to the Reach-Back Period. The Trustee has no statutory or other authority to pursue time-barred transfers directly and

27

should not be given the power to do so indirectly by applying Reach-Back Period deposits against old withdrawals.

The Trustee has argued that the Trustee Method is the only way to "socialize the losses" suffered by Madoff Securities customers and is somehow required under the Second Circuit's Net Equity decision.  However, this Court has already ruled that neither the Trustee's belief as to what is equitable nor the Net Equity decision justifies ignoring the applicable Reach-Back Period.  *Greiff*, 2012 WL 1505349, at *6 n. 7 ("Taken literally, moreover, the Trustee's position would have 'the absurd effect' of displacing even statutes of limitation, which prevent the Trustee from recovering any fictitious profits that a client received more than six years prior to the date on which Madoff Securities filed for bankruptcy.  [The Net Equity decision] does not permit the Trustee to suspend the whole legal order in pursuit of a result he regards as equitable.").[30]  The Trustee should not be given license to extend indefinitely the two-year statutory Reach-Back Period, thus thwarting the salutary policies underlying Section 548(a) 's reach-back – repose, certainty and finality.  *See Rotella v. Wood*, 528 U.S. 549, 555 (2000) ("basic policies" underlying "all limitations provisions:  repose, elimination of stale claims and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities.").

### 2.    *There is no basis in the law for the Trustee to apply Reach-Back Period deposits in satisfaction of time-barred potential fraudulent transfers.*

The Trustee has articulated no doctrinal basis in support of the Trustee Method, likely because there is none.   Indeed, a fatal flaw to the Trustee's approach is that time-barred

---

[30]    Other courts have agreed that the reach-back period must be respected, including in Ponzi scheme cases.  *See*, *e.g.*, *In re Independent Clearing House Co.*, 77 B.R. 843, 887 (D. Utah 1987) (even though in a Ponzi scheme "by definition, *all* transfers by the debtor are fraudulent," the bankruptcy trustee was limited to recovering transfers only within the reach-back period of Section 548 because "[s]uch a bright-line standard, like a statute of limitation or repose, gives certainty and finality to business transactions.").

08-01789-cgm2-mc-00115-JSR Filed 07/28/14 Entered 07/28/14 16:18:53 Exhibit G
Case 9:12-mc-00115-JSR Document 1499 Filed 06/25/14 Page 39 of 60
Pg 40 of 61

fraudulent transfer claims would be used offensively to increase the maximum fraudulent transfer exposure of Defendants – a result that is routinely rejected by other courts. *See, e.g., In re Clayton Magazines, Inc.*, 77 F.2d 852, 853 (2d Cir. 1935) (disallowing setoff of time-barred claim: "[O]ne against whom set-off is claimed must still be under the legal obligation to pay the amount of the set-off to the claimant."); *In re Gober*, 100 F.3d 1195, 1208 (5th Cir. 1996) (setoff "subject to the applicable statute of limitations").

In prior papers,[31] the Trustee cited *Donell* as precedent for his approach. But neither *Donell* nor any other case cited previously by the Trustee deals with the proper treatment of brokerage customers who, like many Defendants here, deposited funds during the applicable Reach-Back Period.

*Donell* itself involved a one-shot investment in a Ponzi scheme. The defendant invested $22,858 and subsequently received a total of $73,290, for a net profit of $50,431. *Donell*, 533 F.3d at 773. The Ninth Circuit noted with approval that "[t]he District Court properly limited the Receiver's recovery to amounts transferred to [defendant] within the statutory period[.]" *Id.*

There is no suggestion in *Donell* that the defendant made any investment other than his initial outlay. And there is certainly no discussion of the consequences of a new deposit of principal. The computational rule in *Donell* was not formulated with any consideration of how to treat deposits made within the statutory Reach-Back Period or of the complexities of the new investment scenario in light of the Reach-Back Period issue. Those issues simply were not

---

[31] This issue was briefed by certain Defendants on an *amicus* basis in *Katz*. However, that case settled before any decision was rendered on the issue. Neither the Trustee nor the *Greiff* defendants raised this issue in *Greiff*.

present in the case.   Nor, to Defendants' knowledge, has this issue ever been presented or

analyzed in any other reported decision.[32]

>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>

### 3.    *An illustrative hypothetical exposes the flaws in the Trustee's approach.*

Given its dubious legal underpinnings, it is not surprising that the Trustee's approach to

deposits yields illogical and unfair results.   As illustrated by a simple hypothetical involving

three good-faith customers (Customers A, B and C) below, the Replenishment Credit Method

avoids these difficulties and fairly reconciles the competing interests within the constraints of the

Reach-Back Period and the Court's rulings in *Katz* and *Greiff*.

| Customer name | Amount deposited in 1988 | Amount with-drawn in June 2006 (outside Reach-Back Period) | Amount with-drawn in January 2007 (within Reach-Back Period) | Amount deposited in June 2007 | Subse-quent deposits/ with-drawals during Reach-Back Period | Effect on estate of transactions in Reach-Back Period | Results under Replenish-ment Credit Approach | Results under Trustee Method |
|---|---|---|---|---|---|---|---|---|
| Customer A | $200,000 | $400,000 | $50,000 | $50,000 | None | No effect | Customer not liable | Customer liable for $50,000 |
| Customer B | $200,000 | $400,000 | $50,000 | None | None | Estate diminished by $50,000 | Customer liable for $50,000 | Customer liable for $50,000 |
| Customer C | $200,000 | $400,000 | $50,000 | $100,000 | $100,000 withdrawn; $100,000 deposited | Estate enriched by $50,000 | Customer not liable | Customer liable for $150,000 |

**Customer A** deposits $200,000 with Madoff Securities in 1988 and withdraws $400,000

in June 2006 (outside the two-year Reach-Back Period), thereby resulting in a $200,000 potential

---

[32]      The dearth of relevant case law on this issue is not surprising.  Few fraudulent investment schemes prior to Madoff Securities were sufficiently long-lasting and seemingly successful as to (i) generate significant long-term additional deposits, and (ii) produce starkly different results based on application of the Reach-Back Period.

exposure before the two-year period.[33]  In January 2007 (within the two-year period), Customer A withdraws another $50,000 and shortly thereafter deposits $50,000 with Madoff Securities.

Under the Trustee's approach, Customer A's liability would be calculated as total withdrawals ($450,000) less total deposits ($250,000) over the 20-year life of the relationship, resulting in $200,000 excess of withdrawals over deposits.  The Trustee's recovery would then be limited to the $50,000 actually received by Customer A during the two-year period.  *See* Chart, last column.

But Customer A should have no liability, because the estate was not harmed during the applicable two-year Reach-Back Period.  The transactions were a wash ($50,000 withdrawn but then re-invested).  *See, e.g., In re Lease-A-Fleet, Inc.*, 155 B.R. 666, 672 (E.D. Pa. 1993) (dismissing fraudulent transfer claims because "most of the transfers to the [insiders] were characterized as 'circles of cash' in which the same or nearly the same amount of funds flowed . . . back to the Debtor[.]"); *In re Adelphia Commc'ns Corp.*, 2006 WL 687153, at *15 (Bankr. S.D.N.Y. Mar. 6, 2006) (holding it "the ultimate exercise in the elevation of form over substance" to void transfers that ultimately returned to debtor); *In re Cybridge Corp.*, 312 B.R. 262, 270-71 (D.N.J. 2004) (barring recovery of transfers defendant had restored to estate on grounds that, under Bankruptcy Code § 550(d), "the trustee is entitled to only a single satisfaction under" § 550(a)); *Kingsley v. Wetzel*, 518 F.3d 874, 878 (11th Cir. 2008) (recovery of funds defendant used to pay debtor's bills "would result in an inequitable windfall" for the estate).

---

[33]     Even though doubling one's money sounds impressive, this return over the 18 years from 1988 to 2006 represents only a 4% compounded interest rate – a modest investment result during the years in question.

Notably, although Customer A's transactions had no effect on the estate during the relevant two-year period, **Customer B's** transactions depleted the estate by $50,000. Yet the Trustee would treat these two customers identically. Even more absurdly, **Customer C's** transactions *enriched* the estate by $50,000 over the two-year period, yet Customer C would end up owing the Trustee $150,000 – *three times* the amount owed by either of the other customers. Such anomalous, arbitrary results violate the touchstone of fraudulent transfer jurisprudence: whether the estate was "unfairly diminished." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).

### 4.    *The Replenishment Credit Method yields the logical and fair result.*

The Replenishment Credit Method avoids all these problems and reaches the fair and intuitively correct result. As illustrated by the chart above, these three hypotheticals resolve exactly as one would expect:  Customer A ($50,000 redeemed, $50,000 deposited during the two-year period) would have no liability; Customer C ($150,000 redeemed, $200,000 deposited during the two-year period) would have no liability; and Customer B ($50,000 redeemed, with no additional deposits during the two-year period) would be liable for $50,000, subject to any other applicable defenses. *See also* Peter A. Zisser, "Madoff and Net Investment Method; Equity Goes Where the Law Fears to Tread," 23 Bankr. L. Rep. (BNA) (Vol. 44) 1438, 1439 (2011) (in SIPA recovery context, the Trustee "should be prohibited from netting any payments to customers done more than a maximum of two years ago against deposits made by a customer less than two years ago").

The Replenishment Credit Method also fairly treats the customer whose first Reach-Back Period transaction is a deposit, not a withdrawal. That customer would, by definition, enter the first day of the two-year Reach-Back Period with no liability. So if a new-money deposit was

32

the first transaction, it would simply be considered a principal investment and treated as "antecedent debt" value, just like any other deposit.

<em><strong>5.    The Replenishment Credit Method is supported by Section 550(d) of the Bankruptcy Code and relevant case law.</strong></em>

The Replenishment Credit Method is well supported by longstanding statutory and case law principles.  It is axiomatic that the goal of fraudulent transfer law is restitution, not punishment.  *See, e.g., In re Centennial Textiles, Inc.*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) (Section 550(a) enacted "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.") (citations omitted); *In re Patts*, 470 B.R. 234, 2012 WL 1570812, at *8-9 (Bankr. D. Mass. May 4, 2012) (holding that there can be no recovery when there is no loss to the estate).

Congress was careful to specify in Section 550(d) that "[t]he trustee is entitled to only a single satisfaction under subsection (a) of this section."  11 U.S.C. § 550(d). Courts have consistently held that a good faith recipient of a fraudulent transfer that gives value to the debtor during the applicable Reach-Back Period must be given a credit to the extent of that replenishment.  Thus, a trustee cannot recover "'from a transferee that has already returned to the estate that which was taken in violation of the Code.'"  *In re Kingsley*, 2007 WL 1491188, at *3 (Bankr. S.D. Fla. May 17, 2007) (citations omitted), *aff'd* 518 F. 3d 874 (11th Cir. 2008).[34]

In *In re Jackson*, the defendant used proceeds from the sale of fraudulently transferred property to pay certain of the debtor's expenses.  318 B.R. 5, 27-28 (Bankr. D.N.H. 2004), *aff'd* 459 F.3d 117 (1st Cir. 2006).  The court ruled that "in the absence of any finding of actual fraud,

---

[34]    *Accord Belford v. Cantavero (In re Bassett)*, 221 B.R. 49, 55 (Bankr. D. Conn. 1998) (avoidance claim satisfied, so any additional recovery would constitute a windfall to the estate); *In re Patts,* 2012 WL 1570812, at *9 (same); *In re Clarkston,* 387 B.R. 882, 891 (Bankr. S.D. Fla. 2008) (defendant entitled to credit for pre-petition payment to debtor).

33

it would be a windfall to the estate to allow the [p]laintiff full recovery . . . without making an equitable adjustment to account for the proceeds the [d]efendant used to pay the Debtor's bills and cover the family expenses." *Id.* at 27-28. It was held "equitable" under the facts of the case "to credit the [d]efendant for the expenditures she made that the Debtor could have legitimately made if the constructively fraudulent transfers had not occurred." *Id.* at 28.

In *In re Cybridge Corp.,* 312 B.R. 262, 271 (D.N.J. 2004), a secured receivables lender (with no knowledge of the Chapter 11 filing) continued post-petition to advance money to the debtor and collect on the debtor's receivables. *Id.* The District Court affirmed the bankruptcy court's ruling that the lender should have no liability, noting that the trustee's "right to recover under Section 550(a) had already been satisfied" because the factor advanced to the debtor more than it collected from accounts receivable. *Id.* at 271-72. As an alternative holding, the court ruled that it was proper, under the court's equitable power under Section 105(a), to give an "equitable credit" to the factor to avoid a windfall to the estate. *Id.* at 272-73.

Defendants were entitled to a similar credit in *In re Sawran*, 359 B.R. 348, 350 (Bankr. S.D. Fla. 2007). There, the debtor gave proceeds of a personal injury settlement to her father. He, in turn, transferred a portion of the funds to other children and instructed them to disburse money back to the debtor. The court reduced the trustee's recovery against the defendants by the amount that had been returned to the debtor pre-petition. The court was careful to note that defendants were "innocent of wrongdoing and deserve[d] protection under [the] circumstances," and "were not motivated by personal gain." *Id.* at 354. The court also noted that to allow the trustee to recover the full amount "would create a windfall . . . that violates the single satisfaction rule of section 550(d)." *Id.* at 352-53. The court also held that Section 105(a) of the Bankruptcy Code provided an alternative basis for giving a credit to the defendant for pre-petition payments to the debtor. *Id.* at 353.

In some settings, even defendants who acted in bad faith have been given a credit under Section 550(d). For example, in *In re Kingsley*, 518 F.3d 874, 878 (11th Cir. 2008), even though there had been a finding of actual fraud, the Eleventh Circuit upheld a ruling that the "recovery of the pre-petition transfers would result in an inequitable windfall to the bankruptcy estate." *Id.* To be sure, this Court has held that the *Sawran* and *Kingsley* line of cases "are not controlling in this District." *Goldman Sachs Execution & Clearing, L.P. v. Official Unsecured Creditors' Committee of Bayou Group*, 758 F. Supp. 2d 222, 228 (S.D.N.Y. 2010). However, the Court also made clear that the arbitration panel found that Goldman Sachs "far from being totally innocent of wrongdoing, failed to engage in the diligent investigation that would have revealed [the] fraud. **This is especially relevant to application of the double recovery theory, which is based on principles of equity that a court (or in this case the arbitration panel) may apply (or not apply) with considerable discretion.**" *Id.* at 229 (emphasis added).

Here, with respect to those Defendants whom the Trustee has conceded are innocent investors, and those Defendants as to whom the Court determines acted in good faith, Sections 550(d) and 105(a) should be applied to reduce Defendants' exposure by the amounts they deposited into their accounts during the Reach-Back Period.[35]

---

[35]    Additional support for the Replenishment Credit method derives from Bankruptcy Code § 548(d)(2)(B): "a . . . stockbroker . . . that receives a . . . settlement payment, as defined in section 101 or 741 of this title, **takes for value** to the extent of such payment[.]") (emphasis added). If BLMIS receives "value" for deposits made by customers within two years of the filing, it logically follows that the customer gave "value" for that deposit.

The Trustee will no doubt claim that Section 548(d)(2)(B) was designed to protect only institutional creditors, not customers. However, a similar argument was properly rejected in *Katz*, when the Trustee argued that the safe harbor of Section 546(e) should protect only stockbrokers, not customers. This Court, finding no support for that limitation on the face of the statute, declined to "ignore the breadth of the statutory language." 462 B.R. 447, 452 and n. 3 (S.D.N.Y. 2011). Similarly, Madoff Securities customer deposits of new money within the Reach-Back Period unquestionably fit within the broad definition of "settlement payments" that

35

B.    <u>Inter-account transfers to Defendants outside the Reach-Back Period should be treated the same as principal deposits</u>.

The Trustee has taken the position that inter-account transfers from one customer (the "sender") to another customer (the "recipient") consisting of the sender's account balance in excess of principal deposited are not principal in the account of the recipient, regardless of whether such transfers occurred outside the Reach-Back Period. However, to label the funds or account balances transferred by the sender to the recipient as avoidable, the Trustee must first employ "netting" (cash-in/cash-out) as to the sender's account. By doing so for inter-account transfers that occurred <u>outside</u> the Reach-Back Period, the Trustee indirectly avoids transfers that he could not otherwise directly avoid. Transfers by Madoff Securities are not *void*, but are only *voidable* under certain limited circumstances within the boundaries of the avoidance statute. If an inter-account transfer was made <u>outside</u> the Reach-Back Period, the Trustee cannot avoid a subsequent transfer to the recipient. The sender could have withdrawn cash and delivered it to the recipient. The fact that the sender's "withdrawal" took the form of an inter-account transfer does not change the nature of the transaction, nor should it grant the Trustee new powers to avoid the transfer or ignore the Reach-Back Period.[36]

The Trustee's approach is clearly at odds with this Court's prior rulings that the Trustee may not avoid transfers that occurred more than two years before the commencement of these

---

were made to Madoff Securities, a "stockbroker." Section 548(d)(2)(B) defines those deposits as being received for value. It would be peculiar if the very same payment – which must be seen as full "value" to the recipient/stockbroker – was ignored as value when asserted as a credit by the depositor/customer against any liability arising during the Reach-Back Period.

[36]    Inter-account transfers readily satisfy the definition of "transfer" in Section 101(54) of the Bankruptcy Code as the sender "parts" with an interest in his Madoff account, which constituted "an interest in property" under applicable law at the time of the transfer. *See Simkin v. Blank*, 19 N.Y.3d 46, 54-56 (N.Y. 2012) (transfer of Madoff account as part of property settlement upheld against claim that account had no value at the time of transfer).

cases[37] and it violates the due process rights of Defendants.[38]  Because inter-account transfers

outside the Reach-Back Period are not subject to avoidance by operation of the statutory

limitations on the Trustee's avoidance powers, such inter-account transfers should be considered

principal in the recipient's account, and that withdrawals by such customer up to the amount of

those inter-account transfers should be deemed for value (*i.e.*, payment of an antecedent debt)

under Sections 548(c) and (d)(2)(A).[39]

> **1.    The Trustee's failure to treat inter-account transfers to Defendants outside the Reach-Back Period as principal ignores the statutory Reach-Back Period.**

Simply stated, if an account was funded by means of an inter-account transfer between

customers that occurred <u>outside</u> the Reach-Back Period:  (i) the amount or account balance

transferred should be deemed to be (or treated the same as) principal in the account of the

recipient; (ii) the recipient should be treated as if he or she made a deposit with Madoff

Securities in the amount or account balance transferred; (iii) the recipient should be treated as

holding a claim against Madoff Securities in the amount or account balance transferred; and

(iv) the recipient's withdrawal of all or any portion of the amount or the account balance

---

[37]    *See Greiff*, 2012 WL 1505349, at *6; *Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y. 2011) ("*Katz*").

[38]    The Supreme Court has held that Congress "may authorize the bankruptcy court to affect . . . property rights, <u>provided</u> the limitations of the due process clause of observed."  *Wright v. Union Central Life Ins.*, 304 U.S. 502, 518 (1938) (emphasis added).

[39]    Defendants seek dismissal of the Avoidance Actions with respect to transfers protected by the inter-account transfer argument herein.  Some Defendants intend to further argue that they are, or should be, treated as subsequent transferees under Section 550(b), that particular inter-account transfers were made by wire transfers of cash rather than by book entries, and/or that inter-account transfers were used by customers to settle debts between them.  Nothing herein waives any Defendant's right to assert subsequent transferee defenses or to address any particular facts and circumstances in their respective adversary proceedings, all of which are expressly reserved.

transferred to it via inter-account transfer should be deemed for value (as satisfaction of antecedent debt), even if the withdrawal occurred <u>inside</u> the Reach-Back Period.

The Trustee's basic position with respect to inter-account transfers between different customers is that if the funds or account balances transferred from one customer to another included amounts in excess of principal with respect to the sender's account, such funds or account balance will continue to be in excess of principal with respect to the recipient's account. However, a straightforward application of this Court's 546(e) ruling in *Greiff* mandates a different result. Because the Trustee's ability to avoid transfers is limited by the Reach-Back Period, inter-account transfers of any funds or account balances that occur outside the Reach-Back Period should be treated as principal in the account credited to the recipient's account, even if subsequently withdrawn by the recipient inside the Reach-Back Period. The Trustee's argument to the contrary is nothing more than an attempt to ignore the Reach-Back Period.[40]

The reason that an inter-account transfer from one customer to another outside the Reach-Back Period should be treated as a principal deposit by the recipient is demonstrated by the

---

[40] The cash-in/cash-out calculation that forms the basis for the Trustee's designation of the sender's account balance as avoidable is itself the product of a netting process that ignores the reach back on avoidance. The cash-in/cash-out calculation enables the Trustee to avoid and recover "ancient" transfers (*i.e.*, transfers that pre-date the 2-year Reach-Back Period) by setting off the amount of unavoidable prior withdrawals against the value of subsequent investments. For example, $1 million might have been transferred by a father to a son in 2001 and the Trustee has only credited the son with the net investment of the father, which might have been zero. The use of the foregoing method of calculation to justify an avoidance action against the recipient of an inter-account transfer is highly prejudicial to the recipient because not only should the recipient have repose for inter-account transfers that pre-date the commencement of the 2-year period, but the clawback is based on a retroactive calculation of another customer's ancient history. In other words, the recipient of an inter-account transfer suffers a double whammy: another customer's ancient transfers are being avoided through netting and the implicit avoidance is being used by the Trustee to deprive the recipient of an inter-account transfer of an investment that it made outside the Reach Back Period. The Trustee cannot ignore the applicable Reach-Back Period.

Case 1:12-mc-00115-JSR    Document 499    Filed 06/25/12    Page 49 of 60

following hypothetical:  It is law of the case that any withdrawals by a customer prior to the commencement of the Reach-Back Period are not subject to avoidance.  *See Greiff*, 2012 WL 1505349, at *2; *Katz*, 462 B.R. at 452.  If this same hypothetical customer ("Customer X") had both withdrawn the funds from his or her account and transferred those funds to a third party ("Customer Y") before the Reach-Back Period (regardless of the reason for the transfer), and Customer Y later deposited those same funds with Madoff Securities, still outside the Reach-Back Period, it is undeniable that the cash on deposit in Customer Y's account would be treated as principal.  This follows because any withdrawal of funds by Customer X outside of the Reach-Back Period would be protected from avoidance by Section 546(e).  Any principal thereafter withdrawn by Customer Y from its account, even if withdrawn inside the Reach-Back Period, is shielded by operation of Section 548(c) because the withdrawal satisfied an antecedent debt owed by Madoff Securities to Customer Y.

The economic substance of the above two-step transaction is no different than if, outside the two-year Reach-Back Period, Customer X made an inter-account transfer to a Madoff Securities account of Customer Y.  The entire balance reflected in Customer X's statement immediately prior to the commencement of the Reach-Back Period was statutorily insulated from avoidance and was readily available for withdrawal by Customer X.  That balance should not lose its protection merely because it was transferred to another customer who later withdrew the transferred amounts.  Yet, the Trustee seeks to recover funds or account balances from Defendants that originated with another customer and that, at the time the funds or account balances were transferred, were not avoidable due to the passage of time.

There is no authority for such treatment by the Trustee.  Like statutes of limitations, reach-back periods are statutes of repose established by legislatures in recognition of the fact that it would be unfair and unreasonable to force a person to litigate a particular issue more than a

certain number of years after the occurrence giving rise to the claim. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 473 (1975) (statute of limitations designed to prevent the unfairness caused by "lost evidence, faded memories, and disappearing witnesses, and to avoid unfair surprise"). By not crediting the transferee for the full value of a transfer made before the Reach-Back Period, the Trustee impairs Defendants' substantive rights. *See Greiff*, 2012 WL 1505349, at *11-12; *Katz*, 462 B.R. at 452.

### 2. Inter-account transfers established new customer-broker relationships under federal securities law and should be treated as principal.

Defendants also seek credit for <u>initial</u> deposits effectuated through inter-account transfers. This Court has already held that "the 'value' the defendants gave to Madoff Securities'…'is equal to the amount of their investment." *See Picard v. Katz,* 11 Civ. 3605 (JSR), Order at 2 (S.D.N.Y. Mar. 5, 2012) [Dkt. No. 142]. As set out more fully in Section I.A.2., federal securities law clearly provides that the establishment of a discretionary securities account constitutes an investment contract,[41] and that there is no requirement that a party "identify a specific security, or demonstrate that his money was actually invested in securities, to be a purchaser of securities within the meaning of . . . Rule 10b-5."[42] Thus, when Defendants funded their accounts, whether through cash deposits or inter-account transfers, these actions triggered the full protections of the federal securities laws. Defendants therefore provided value in the amount of the inter-account transfers that occurred outside the Reach-Back Period.

---

[41]     *See, e.g., Savino v. E.F. Hutton & Co., Inc.*, 507 F. Supp. 1225, 1239-40 (S.D.N.Y. 1981); *see also* n. 7, *supra*.

[42]     *Grippo*, 357 F.3d at 1223; *Gelles v. TDA Indus., Inc.*, 44 F.3d 102, 104 (2d Cir. 1994) (holding that a securities "transaction need not involve cash to constitute a purchase or sale under Rule 10b-5"); *see also* nn. 5 & 6, *supra*.

Significantly, a key question in determining the right of a security holder is whether there has been a change in the nature of the investment relationship. "In determining whether changes in the rights of a security holder involve a purchase or sale, courts must decide whether there has occurred 'such significant change in the nature of the investment . . . as to amount to a new investment.'" *Gelles*, 44 F.3d at 104 (*quoting Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1978)).

Where, as here, one customer transfers funds or an account balance to another customer's account, a significant change in the underlying relationship between the customer and the broker has taken place. Securities in the sending customer's account are liquidated to cash, and new securities are purchased in the account of the receiving customer.[43]  Even in the case of a Ponzi scheme, where securities may not have been purchased, the requisite change has occurred because the identity of the <u>customer</u> changed and, as discussed above, there is no requirement that actual money be invested in securities for there to be a purchase of securities. Thus, when an account transfer takes place between two customers outside the Reach-Back Period, the amount or account balance transferred to the recipient's account should be treated as principal. The sender no longer has a claim or right to payment against the broker with respect to the amount or account balance transferred by it, and the recipient now has the claim or right to payment with respect to the amount or account balance transferred to it.

### 3. The cases to which Greiff cited are not applicable to inter-account transfers outside the Reach-Back Period.

In *Greiff*, this Court distinguished *Visconsi*, 244 F. App'x at 713-14. *Greiff*, 2012 WL 1505349, at *8. As discussed in Section I.A.4(c), however, *Visconsi* directly supports Defendants' value claims. Further, the bases under which this Court distinguished *Visconsi* in

---

[43]   *See* reservation of rights, *supra* n.39.

*Greiff* do not apply to inter-account transfers. Unlike in *Visconsi*, where the court found that benefit of the bargain damages were not measurable, the amount of an inter-account transfer is objectively measurable. Thus, Defendants have a claim for the benefit from their bargain in an amount equal to their deposit via an inter-account transfer that occurred outside the Reach-Back Period. While this Court also noted that the *Visconsi* court focused on the "harm suffered" and that Defendants here "have not shown that th[e] harm in any way corresponds to the amounts reflected on customer statements," *id.* at *9, this is not the case for an innocent customer who is not being credited for deposits made through inter-account transfers that occurred outside the Reach-Back Period.[44] For these Defendants, the harm that would be suffered by reason of the compulsory repayment of funds that were deposited outside the Reach-Back Period is directly proportional to the fraud committed on these Defendants.

Had Madoff's fraud not induced these Defendants into accepting inter-account transfers rather than cash, these Defendants would have received unavoidable cash payments from the customer that made the inter-account transfer. By refusing to treat an inter-account transfer in excess of principal as a principal investment by the recipient, the Trustee's complaints effectively elevate form over substance, against which the courts have repeatedly expressed serious caution. *See*, *e.g.*, *Pepper v. Litton*, 308 U.S. 295, 305 (1939) (courts should take measures to insure that "substance will not give way to form" and that "technical considerations

---

[44] Defendants ask this Court to hold that all deposits by a customer in an account should be treated as principal, regardless of whether the deposit came via cash infusion or inter-account transfer, provided that the inter-account transfer was made by one customer to another customer prior to the commencement of the Reach-Back Period. In other words, in this Section II.B, recipients of inter-account transfers are not asserting a right to payment of anything beyond their principal deposits. However, nothing in this Section II.B is intended to waive or otherwise impair Defendants' rights to the additional claims asserted in Section I.A., *supra*, or to any other claims asserted and rejected by the *Greiff* court (*see* Section III, *infra*).

will not prevent substantial justice from being done"); *Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 597 (2d Cir. 1991) (Courts "may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a bankrupt's estate."); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 498 (S.D.N.Y. 1994) (same).

The *Carrozzella* case is similarly inapplicable with respect to inter-account transfers.[45]  In *Greiff*, this Court focused on the fact that, unlike in *Carrozzella*, the defendants in those adversary proceedings did not contract for a specific rate of return.  *See Greiff*, 2012 WL 1505349, at *9.  The Court's focus was on whether those customers had a claim for amounts in excess of principal.   However, Defendants whose accounts were funded via inter-account transfers are not seeking credit for returns on investments but, instead, seek credit for the inter-account transfers as <u>initial</u> <u>amounts</u> deposited in the amount of inter-account transfers from other customers that occurred outside the 2-year period.

Nor is *Donell* applicable to this argument.  *Donell*, 533 F.3d 762.  *Donell* did not involve inter-account transfers from one customer to another.  The issue here, as contrasted to *Donell,* is the determination of the correct amount of a brokerage customer's entitlement against the broker rather than calculation of an investor's excess of profits over investment.  In addition, unlike the defendant's argument in *Donell*, Defendants are not attempting to establish the provenance of the funds or account balances transferred to them.

---

[45]     The same is true with respect to the facts in *In re Hedged-Invs. Assocs.*, 84 F.3d 1286, 1290 (10th Cir. 1996), where the court effectively permitted the defendant to retain more than her original investment because some of the "excess" payments were made to her outside the applicable Reach-Back Period. Thus, *Hedged Investments* supports the proposition that the Reach-Back Period should be strictly applied.

Finally, it cannot be argued that recognizing claims in excess of principal (for claims predicated on inter-account transfers) conflicts with SIPA. The recipients of inter-account transfers <u>do</u> have "principal" claims because the opening of a securities account qualifies as a purchase of securities or "new deposit" to the customer's account. Thus, in determining that the satisfaction of claims relating to inter-account transfers that occurred before the Reach-Back Period gave value to Madoff Securities, this Court would not be "choosing between creditors."

## III.  Defendants Raise and Preserve the Value Arguments This Court Previously Rejected.

Defendants acknowledge that in prior rulings the Court has rejected arguments by other Madoff Securities customers concerning antecedent debt. On their UCC and state contract claims, Defendants respectfully note that, as a matter of New York law, the monthly statements that Madoff Securities sent to them created an enforceable contract claim against the brokerage firm for the value of the investments reflected on the statements. *See* New York Uniform Commercial Code ("N.Y. U.C.C.") Law § 8-501 (McKinney 2012) *et seq.* ("Article 8").[46] *See also Scalp & Blade, Inc. v. Advest, Inc.*, 309 A.D.2d 219, 225 (N.Y. App. Div. 2003) (viable claims against investment advisor/securities broker include cause of action for breach of contract).

These claims further important policies promoting commercial certainty; brokerage customers must be able to rely on the rights established by non-bankruptcy law when they engage in transactions with their broker.[47] As the Second Circuit recently remarked, "certainty

---

[46]  *See also* N.Y. U.C.C. art 8 at § 8-501(b) & cmt. 2; § 8-501(c).

[47]  Most of the investing public do not take delivery of actual securities but rather rely on their brokers or other financial intermediaries to handle that function. New York law reflects that policy. If customers ran the risk that securities shown on their statement were not as represented, they would have to take delivery of the actual securities, substantially impairing the

and predictability are at a premium" in the area of law governing securities transactions. *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 336 (2d Cir. 2011); *Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 157 (2d Cir. 2010) ("securities law is 'an area that demands certainty and predictability.'") (quoting *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, *N.A.*, 511 U.S. 164, 188 (1994)); *see also Pinter v. Dahl*, 486 U.S. 622, 652 (1988) (same).  Failure to recognize substantive federal and state law customer claims within the bankruptcy context will disrupt the orderly conduct of business in the securities markets and inject an unnecessary level of uncertainty into commercial affairs. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994) (expressing concern that, if the commencement of bankruptcy case caused the validity of a foreclosure sale to be questioned, "[t]he title of every piece of realty purchased at foreclosure would be under a federally created cloud."); *see also Commodity Futures Trading Comm'n*, 17 N.Y.3d at 173 ("to permit in every case of the payment of a debt an inquiry as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear.") (quoting *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 372 (1991)).

These claims, and those discussed in Section I.A., are supported by the Supreme Court's decision in *Butner* and its progeny.  *See Butner*, 440 U.S. at 54-56; *Travelers,* 549 U.S. at 445; *BFP*, 511 U.S. at 544-45; *see also Barnhill v. Johnson*, 503 U.S. 393, 399-400 (1992); *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 195-98 (S.D.N.Y. 2002).  As these cases recognize, the Bankruptcy Code does not override a claimant's substantive claims absent express Congressional intent.

---

efficiency of the securities markets.

By way of further explication, Defendants incorporate by reference the following more detailed briefing and supporting declarations previously presented to the Court:[48]

**_Picard v. Greiff_, 11-cv-3775 JSR**

| Docket Nos. | Date Filed | Documents | Pages of Memoranda |
|---|---|---|---|
| 24 & 25 | 10/06/2011 | Customers' Mem. in Support of Motion to Dismiss, and supporting papers | 11-16 |
| 27 | 10/12/2011 | Response in Support of Motion to Dismiss | All |
| 35 & 37 | 11/01/2011 & 11/02/2011 | Greiff's Reply Mem., and supporting papers | 5-12 |

**_Picard v. Blumenthal_, 11-cv-4293 JSR**

| Docket Nos. | Date Filed | Documents | Pages of Memoranda |
|---|---|---|---|
| 18 & 19 | 11/14/2011 | Defendants' Memorandum of Law in Support of Motion to Dismiss, and supporting papers | 11-20 |
| 25 | 12/09/2011 | Reply Memorandum of Law in Support of Motion | 7-12, 15-16 |

**_Picard v. Hein_, 11-cv-4936 JSR**

| Docket Nos. | Date Filed | Documents | Pages of Memoranda |
|---|---|---|---|
| 19 & 20 | 01/04/2012 | Defendants' Mem. in Support of Motion to Dismiss, and supporting papers | 14-19 |
| 41 | 02/03/2012 | Defendants' Mem. in Reply | 8-13 |

**_Picard v. Goldman_, 11-cv-4959 JSR**

---

[48]      Defendants reserve the right to incorporate other portions of the papers filed in these cases in response to the arguments that may be made here by the Trustee and SIPC.

| Docket Numbers | Date Filed | Documents | Pages of Memoranda |
|---|---|---|---|
| 24, 25, 26 | 01/04/2012 & 01/05/2012 | Mem. in Support of Motion to Dismiss, and supporting papers | 14-22 |
| 49 & 50 | 02/03/2012 | Reply Memorandum and supporting papers | 19-25 |

**CONCLUSION**

For the foregoing reasons, Defendants request that the Court grant the motion to dismiss the complaints in whole or in part to the extent that Defendants are entitled to a defense based on:

- federal and state law claims against Madoff Securities for interest and, where appropriate, consequential damages in addition to recovery of principal;

- any obligations of Madoff Securities cognizable by state law not avoided or avoidable by the Trustee under Section 548(a)(1), including those occurring outside the applicable Reach-Back Period;

- a credit against any asserted liability for all amounts deposited with Madoff Securities during the Reach-Back Period;

- any inter-account transfer from one customer to another customer if the transfer was made outside the 2 year Reach-Back Period of Section 548(a)(1); and

- contract claims valid under state law against Madoff Securities based on amounts stated in customer brokerage statements.

/ / /

/ / /

/ / /

RESPECTFULLY SUBMITTED, this 25th day of June 2012


### K&L GATES LLP


By: /s/ Richard A. Kirby
    Richard A. Kirby
    Laura L. Clinton
    Martha Rodriguez-Lopez
    Catherine A. LaRose

1601 K Street NW
Washington, DC 20006-1600
(202) 778-9000 (Telephone)
Richard.Kirby@klgates.com


### BECKER & POLIAKOFF LLP


By: /s/ Helen Davis Chaitman
    Helen Davis Chaitman

45 Broadway
New York, NY 10006


### FRIEDMAN KAPLAN SEILER & ADELMAN LLP


By: /s/ William P. Weintraub
    William P. Weintraub
    Kizzy L. Jarashow

7 Times Square
New York, New York 10036-6516


48

**KLEINBERG, KAPLAN, WOLFF &
COHEN, P.C.**


By: /s/ Matthew J. Gold
    David Parker
    Matthew J. Gold

551 Fifth Avenue
New York, New York 10176


**KUDMAN TRACHTEN ALOE LLP**


By: /s/ Paul H. Aloe
    Paul H. Aloe
    Matthew H. Cohen
    Evan S. Cowit

The Empire State Building
350 Fifth Avenue, Suite 4400
New York, New York 10118


**LOEB & LOEB LLP**


By: /s/ P. Gregory Schwed
    Walter H. Curchack
    P. Gregory Schwed
    Daniel B. Besikof

345 Park Avenue
New York, New York  10154

*Of Counsel:*

**KASOWITZ, BENSON, TORRES & FRIEDMAN LLP**

Marc E. Kasowitz
Daniel J. Fetterman
David J. Mark
1633 Broadway
New York, New York 10019

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

Elise S. Frejka
Jason Rappaport
1177 Avenue of the Americas
New York, New York 10036

**PRYOR CASHMAN LLP**

Richard Levy, Jr.
7 Times Square
New York, New York 10036-6569

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

Michael V. Ciresi
Thomas B. Hatch
Damien A. Riehl
Thomas F. Berndt
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN 55402–2015

**SNR DENTON US LLP**

Carole Neville, Esq.
1221 Avenue of the Americas
New York, NY 10020