# **<u>EXHIBIT H</u>**

C8K8SECA

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  -------------------------------x

3  SECURITIES INVESTOR PROTECTION
   CORPORATION,
4
                    Plaintiff,
5
                v.                          12 MC 115 (JSR)
6
   BERNARD L. MADOFF INVESTMENT
7  SECURITIES, LLC,

8
                    Defendant.
9
   -------------------------------x
10  In re:

11  MADOFF SECURITIES

12  -------------------------------x

13                                  August 20, 2012
                                    4:10 p.m.
14
   Before:
15
                        HON. JED S. RAKOFF
16
                                    District Judge
17
                          APPEARANCES
18
   BAKER HOSTETLER
19       Attorneys for Trustee
   BY:  OREN J. WARSHAVSKY
20       TATIANA MARKEL

21  YOUNG CONAWAY STARGATT & TAYLOR, LLP
         Attorneys for Trustee
22  BY:  JUSTIN P. DUDA

23  LAUREN T. ATTARD
         Securities Investor Protection Corporation

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

C8K8SECA

1                        APPEARANCES (CONT'D)

2   K&L GATES LLP
            Attorneys for Defendants
3   BY:  RICHARD A. KIRBY
            LAURA K. CLINTON
4           CATHERINE A. LaROSE

5   LOEB & LOEB LLP
            Attorneys for Defendants
6   BY:  P. GREGORY SCHWED

7   FRIEDMAN KAPLAN SEILER & ADELMAN LLP
            Attorneys for Defendants
8   BY:  WILLIAM P. WEINTRAUB
            KIZZY L. JARASHOW

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE DEPUTY CLERK:  Counsel, please state your name for |
| 3 | the record. |
| 4 | MR. WARSHAVSKY:  Oren Warshavsky of Baker Hostetler |
| 5 | for trustee, Irving Picard. |
| 6 | MS. MARKEL:  Tatiana Markel, Baker Hostetler, also for |
| 7 | Irving Picard, trustee. |
| 8 | MS. ATTARD:  Lauren Attard, Securities Investor |
| 9 | Protection Corporation. |
| 10 | MR. DUDA:  Justin Duda, Young Conaway Stargatt & |
| 11 | Taylor, counsel for trustee. |
| 12 | MR. KIRBY:  Richard Kirby, K&L Gates, for the |
| 13 | defendants. |
| 14 | MS. CLINTON:  Laura Clinton, also K&L Gates, for |
| 15 | defendants. |
| 16 | MS. LaROSE:  Catherine LaRose, also K&L Gates, for |
| 17 | defendants. |
| 18 | MR. SCHWED:  Greg Schwed, Loeb & Loeb, representing a |
| 19 | group of defendants. |
| 20 | MR. WEINTRAUB:  William Weintraub, Friedman Kaplan |
| 21 | Seiler & Adelman, for the defendants. |
| 22 | MS. JARASHOW:  Kizzy Jarashow, Friedman Kaplan Seiler |
| 23 | & Adelman, for the defendants. |
| 24 | THE COURT:  Good afternoon, everyone. |
| 25 | There is also some folks who are listening in by |

1  telephone with the Court's permission.  Could they identify

2  themselves now?

3          (Appearances on telephone given)

4          THE COURT:  Thank you.

5          The folks on the phone, if they wanted to be heard

6  orally at this hearing, had to appear in person, but I have no

7  problem with their listening in as they requested.

8          All right.  Now, as usual, I have been furnished by

9  the parties with very helpful briefs, and so while I will be

10  happy to hear from any of the folks here on any issue they want

11  to be heard on, there is really only one issue that I am

12  particularly anxious to hear oral argument on, which is the

13  issue of inter-account transfers.

14          So let me hear first, who wants to speak on that issue

15  from the defendants?

16          MR. WEINTRAUB:  I will, your Honor.

17          May I use the podium?

18          THE COURT:  Yes.

19          MR. WEINTRAUB:  Good afternoon, your Honor.  William

20  Weintraub of Friedman Kaplan Seiler & Adelman for the

21  defendants.

22          Your Honor, we have a very simple proposition that is

23  anchored to the trustee's inability to avoid transfers that

24  predate the commencement of the liquidation by more than two

25  years.  The proposition simply put is the following.  An

| | |
|---|---|
| 1 | inter-account transfer, and by that I mean a transfer by one |
| 2 | customer to another that was initiated and completed outside |
| 3 | the two-year reach-back period, we believe is a deposit in the |
| 4 | recipient's account of cash or securities that is the same as, |
| 5 | which should be treated the same as a principal investment. |
| 6 | THE COURT:  So give me some examples of what these |
| 7 | transfers were, from who to whom? |
| 8 | MR. WEINTRAUB:  This would be a transfer, |
| 9 | hypothetically, your Honor -- |
| 10 | THE COURT:  I don't want hypothetically.  I want real. |
| 11 | MR. WEINTRAUB:  With respect to my particular client, |
| 12 | your Honor, it was a divorce.  The wife had a Madoff customer |
| 13 | account.  The husband did not.  The wife was going to make the |
| 14 | divorce settlement payment pursuant to a judgment. |
| 15 | THE COURT:  Of course, we are at a pleading stage so |
| 16 | it is very difficult for the Court to know, but my guess would |
| 17 | have been these were mostly intra-family transfers, yes? |
| 18 | MR. WEINTRAUB:  I think that they cover the gamut. |
| 19 | THE COURT:  Do they?  Why would someone, for example, |
| 20 | make an inter-account transfer to a total stranger? |
| 21 | MR. WEINTRAUB:  I couldn't answer that, your Honor, |
| 22 | because that's not -- |
| 23 | THE COURT:  I think my answer is they wouldn't, just |
| 24 | logically. |
| 25 | MR. WEINTRAUB:  That would make sense, your Honor. |

C8K8SECA

```
 1   Our point is, regardless of the underlying facts, because of
 2   the application of the two-year limitation on clawbacks, that
 3   the trustee cannot avoid and recover transfers outside the
 4   two-year period, it really doesn't make a difference as to why
 5   the inter-account transfer was made.  Because as a legal
 6   principle, had the transferor basically just taken out the cash
 7   himself or herself, that transfer would be unavoidable.  Had
 8   that same customer taken out that cash and given that cash to
 9   John Doe, for whatever reason, John Doe would not be subject to
10   a clawback because John Doe --
11            THE COURT:  Supposing John Doe was Jane Doe's spouse,
12   you think that would make a difference?
13            MR. WEINTRAUB:  I don't think it would make a
14   difference, your Honor, because as much as the trustee would
15   like to avoid transfers that occurred one day before the
16   commencement of the two-year reach-back period, if a customer
17   had taken out a million dollars, for whatever reason, that
18   transfer would not be subject to avoidance.  And the fact that
19   that customer made an inter-account transfer to someone else
20   should be irrelevant in terms of the legal proposition that the
21   trustee can't reach back further.
22            THE COURT:  I hear you, but I am bothered by your
23   resort to abstractions.  The last I heard the facts drive the
24   law in this and every other court.  So I need to know more.  If
25   these are primarily, hypothetically, transfers say to children,
```

C8K8SECA

| | |
|---|---|
| 1 | someone gives, in effect, a gift to a child, they take what the |
| 2 | trustee would call the fictitious profits and they distribute |
| 3 | them to their three children and set up new accounts for their |
| 4 | children, that seems to me very different from the kind of |
| 5 | situation you're hypothesizing. |
| 6 | MR. WEINTRAUB:  Let me answer that in two ways, your |
| 7 | Honor.  First, I don't think that it does make a difference |
| 8 | that it's an inter-account transfer to a child because a parent |
| 9 | can do whatever it wants with its money, and the fact that it |
| 10 | hypothetically is a return in excess of principal does not make |
| 11 | a difference if you're outside the two-year period. |
| 12 | Now, with respect to my particular client, your Honor, |
| 13 | my client was not a Madoff customer at the beginning of the |
| 14 | two-year period.  My client was not a Madoff customer at the |
| 15 | time of the divorce from his wife.  His wife was going to make |
| 16 | the payment decreed by the judgment of divorce to the husband |
| 17 | and Mr. Madoff interceded and said, you don't need to do that, |
| 18 | I will basically manage the money for your husband.  Let's open |
| 19 | up an account for your husband and make an inter-account |
| 20 | transfer.  And that's how my client got caught in this web. |
| 21 | And that was in satisfaction of an antecedent debt from the |
| 22 | wife to the husband, who I also think that when the husband |
| 23 | within the two-year period took his money out of Madoff's |
| 24 | securities, what he was doing was satisfying an antecedent debt |
| 25 | that Madoff Securities had to him because that transfer should |

1   be treated as principal.

2        THE COURT:  Presumably, you could argue that a

3   transfer from one former spouse to another former spouse is

4   about as arm's length as you can get.

5        MR. WEINTRAUB:  I am not here just for my client,

6   although I think my client has very attractive facts.  I am

7   here for all of the defendants who have inter-account

8   transfers.  And again, we believe that there is a universal

9   principle that should be applicable here, which is because of

10  the operation of the two-year reach-back period, these

11  inter-account transfers should be treated as basically a

12  deposit of principal.  It's, in essence, a withdrawal by the

13  first customer and a transfer of what we believe is an

14  unavoidable right to payment to the recipient.

15       THE COURT:  What case or cases do you think support

16  that position?

17       MR. WEINTRAUB:  Your Honor, we cite cases that talk

18  about what is a transfer.  We referred to the bankruptcy code

19  definition of transfer.  We referred to the bankruptcy code

20  rule of construction as to when a transfer is made.  A transfer

21  is made when it can no longer be upset by a third party to a

22  bona fide purchaser.  We believe that customer B, the

23  recipient, is a bona fide purchaser, and there has been what we

24  call a change in the nature of the investment by virtue of the

25  inter-account transfer.  Because before the inter-account

1  transfer occurred, the right to payment and the right to the

2  account balance was with customer A.  After the transaction is

3  completed, the control of the right to payment and the right to

4  the account balance is now with customer B.  So you have got

5  what the cases require as a change in the nature of the

6  investment.

7      We also relied upon cases that discuss the fact that

8  you do not need to have an actual deposit of cash to open a

9  securities account, that a change in the nature of the

10  investment is all that is sufficient for purposes of

11  securities --

12      THE COURT:  What I am getting at is, I may have missed

13  it in the briefs of the parties, but I don't think this

14  specific issue in this kind of context has been the subject of

15  any case law in the Second Circuit.

16      MR. WEINTRAUB:  I think that's right.  I believe that

17  my able adversaries would cite the *Bayou* case and try to say

18  that the *Bayou* case is dispositive of this, and we think it

19  isn't.  We think *Bayou* involved a completely different issue.

20  In *Bayou*, investors in what was known as the Bayou Fund were

21  given the opportunity to redeem, because the fund was shutting

22  down, or roll the investment over into a new investment in one

23  of the other Bayou hedge funds.  Those customers who took the

24  roll-over option argued that the entire roll-over amount was a

25  new investment based upon cases decided under Rule 10b-5 that a

Case 1:12-mc-00115-JSR   Document 333   Filed 09/12/12   Page 10 of 64

C8K8SECA

```
1    change of investment is the equivalent of a new investment.

2    And those investors lost, your Honor, and in the Bayou case it

3    was determined that it was the same investment.

4              THE COURT:  Yes.  It was the same person.

5              MR. WEINTRAUB:  Right.  The same person.  But in our

6    case, we have two issues.

7              THE COURT:  I will hear from your adversary.  The

8    reason I wanted to hear argument on this matter first is

9    because it seemed to me, subject to hearing from your

10   adversary, that this was not an issue that had been addressed

11   in any prior decision, at least not head on, so to speak.

12             MR. WEINTRAUB:  I think that's right.  As I was

13   saying, the two differences with Bayou is it's a different

14   customer, number one.  But even more importantly, your Honor,

15   they did not address the effect of the reach-back period on the

16   transaction.  And here we think that the effect of the two-year

17   reach-back period is a linchpin of this argument.

18             THE COURT:  OK.  Thank you very much.

19             Let me hear just on this issue from whoever wants to

20   speak from the trustee.

21             MR. WARSHAVSKY:  Good afternoon, your Honor.

22             In fact, we would cite to the Bayou case.

23             THE COURT:  Why?  As was just pointed out, among other

24   things, it's a transfer from one person to himself.

25             MR. WARSHAVSKY:  Well, that's the case in some of the
```

1    situations, but the defendants' argument is inter-account

2    transfers.  They didn't specify one person to another.

3         THE COURT:  So for the sake of argument, we will

4    forget about the transfers that are one person to another.

5    That could easily be distinguished if that was relevant.  So

6    there goes *Bayou*.

7         MR. WARSHAVSKY:  That's right.

8         THE COURT:  Bye-bye *Bayou*.

9         MR. WARSHAVSKY:  Maybe not bye-bye *Bayou* because I

10   think the reasoning of *Bayou* still stands.  And if I can quote

11   just one sentence from *Bayou*, which is, "In no event is it

12   appropriate to pile fiction on fiction by deeming these

13   investors' final Bayou Fund account statements, including

14   fictitious profits, to be the value of their investments.

15        And that's really what we have here.  I know you

16   haven't always agreed -- if I can take a step back.  I know you

17   haven't always agreed with all the trustee's methodologies and

18   our arguments, but I think --

19        THE COURT:  I think in this particular argument,

20   you're wrapping yourself in my opinion in *Greiff*.

21        MR. WARSHAVSKY:  I sure am.  I am wearing it.

22        But I think the one thing we tried to do is maintain

23   consistency, which is to do a full account reconciliation.  It

24   doesn't penalize innocent investors, but it also doesn't credit

25   them with fictitious profits.  And here, moving that concept

1  forward here in the case -- I don't have the facts of the

2  particular case that my adversary cited; however, what is

3  apparent is the original investor, the wife, had gone through

4  her principal.  Under no theory could the amounts that she gave

5  to her husband be principal.  They are fictitious profits.  The

6  husband may have a terrific claim against his wife.

7      THE COURT:  I would think the wife undoubtedly thinks

8  this is poetic justice.

9      Anyway, I understand the point.  What they are saying

10  is that it's, in their view, indistinguishable from if the

11  transferor had taken the money out, let's say put it in a bank

12  account, and a year later -- all of this being beyond the

13  two-year period -- exchanged it for value with the third

14  person, who then created the account, they are saying you

15  wouldn't be able to go after that principal investment.  Why

16  are you able to go after this?

17      MR. WARSHAVSKY:  That's right.  But I think that's a

18  different argument.  The reality is that this person left their

19  money with Madoff.  And ultimately the question is whether or

20  not value was provided to BLMIS.  A transfer in between

21  accounts does not provide value.  And in point of fact, there

22  are times where the trustee has seen that somebody has

23  liquidated his or her account and then opened a new account,

24  and we have treated it separately for just that reason, because

25  the money did leave and because new money came in and it might

1    be difficult to trace, I don't know if it's possible to trace.

2    But the point is that value was added.  Here none was added.

3         We do go back to the *Greiff* opinion, we do go back to

4    the statute and look to what the value they're providing.  Here

5    there is none.  Here there was fictitious profits moving from

6    one account to another.  And in certain cases it is between

7    family members.  My guess is most of the defendants who would

8    raise this defense about moving money from account to account

9    are relatives or -- well, relatives or sometimes we see with

10   business partners moving money back and forth, but ultimately I

11   think this case is the zebra.  It shows one defendant -- I'm

12   sorry, Ms. Markel passed me a note.  We also see gifts -- I am

13   not sure I understand.  Ultimately what we see is we see

14   individuals, sometimes for themselves, moving from an IRA to

15   their savings or to their own discretionary account or vice

16   versa.

17        The other point that I will add here is, I know your

18   Honor is not often fond of the absurd results argument.

19   However, here it really would work an absurd result.  Under the

20   argument my adversary just proffered, what that would mean is

21   that his client would get a customer claim.  If what he is

22   saying is right, his client put in that value and didn't

23   withdraw, only withdrew a portion of that, his client is

24   suddenly entitled to a customer claim.  That can't be how we

25   calculate net equity.  And ultimately, not only do I wrap

1    myself in your Honor's *Greiff* opinion, but I always go back to

2    the Second Circuit opinion, the net investment method, and the

3    only way to look at each account and to reconcile each account

4    is to look at cash in, cash out.

5         THE COURT:  Before we hear from anyone else, does your

6    colleague want to tell me what is in her note?

7         MR. WARSHAVSKY:  It's a good point from my colleague.

8    She points out that in many of these instances it's gifts

9    within the family.  So we are not even talking about bona fide

10   purchasers per value.  So we are even beyond this issue.

11        THE COURT:  OK.  Someone from SIPC wanted to be heard.

12        MS. ATTARD:  Just to add to what Mr. Warshavsky said.

13        To the extent that fictitious profits remained in the

14   Ponzi scheme, it enabled the Ponzi scheme to continue.  And as

15   Judge Posner wrote in *Scholes v. Lehmann*, "A profit is not

16   offset by anything.  It is the residual of income that remains

17   when costs are netted against revenues."  The paying out of

18   profits to the defendant here was not offset by further

19   investments to him and conferred no benefit on the corporation

20   but merely depleted the resources faster.  And I think once we

21   drill down into the actual facts of this case, which is beyond

22   the scope of a motion to dismiss, we will see that those

23   fictitious profits should be treated as such.

24        THE COURT:  All right.  Let me go back then to defense

25   counsel.

1          MR. WEINTRAUB:  Thank you.

2          There was a lot to respond to there, and I will try to

3     be brief, your Honor.

4          I am going to wrap myself in *Greiff* as well.  What the

5     Court said in Greiff was that legitimate expectations of

6     customers acting in good faith should be fulfilled.  And what

7     happened in this instance, your Honor, in every one of these

8     inter-account transfer cases, because there is no allegation of

9     bad faith in any of these complaints, what each one of these

10    sending customers thought they were doing was implementing a

11    securities transaction from one account to another, and each

12    recipient thought that they were receiving a securities

13    transfer.  And each one of those recipients believed that what

14    they were receiving was something that was basically a

15    withdrawal from the first customer that was transferred to the

16    second customer.  So by recognizing that these inter-account

17    withdrawals, if done outside the two-year period, should be

18    treated as principal, you're giving effect to the reasonable

19    expectations of innocent investors.

20         We think, your Honor, as we said earlier, because

21    customer A instructed Madoff Securities to make this

22    inter-account transfer, that this inter-account transfer

23    satisfied an obligation of Madoff Securities to customer A.  It

24    was satisfaction of an antecedent debt.  The company at that

25    point was not in bankruptcy.  Transfers and obligations may be

C8K8SECA

1   voidable, but they are not void.  And this was a securities

2   entitlement under state law at the time that this inter-account

3   transfer occurred, which is more than two years --

4           THE COURT:  I guess I am missing the point here.

5   Wasn't there an offsetting obligation assumed?

6           MR. WEINTRAUB:  Exactly, your Honor.

7           THE COURT:  So in the global sense, it didn't add

8   anything of value to Madoff Securities.  If anything -- and

9   this is the part of what the trustee keeps harping on -- by

10  giving the illusion of Madoff Securities as an ongoing

11  reputable business, it just enabled the fraud to be

12  perpetrated.  In your specific client's case, it seems to be

13  typical of that.  Your client was all set, if I understand it,

14  or your client's spouse was all set to take the money out, and

15  Mr. Madoff, good old Uncle Bernie, said, Why do that, we can do

16  it all for you?  This was just the further perpetration of the

17  fraud.  But I don't see how, in terms of economics, it added or

18  subtracted anything of value to Madoff Securities.

19          MR. WEINTRAUB:  My point, your Honor, was it all

20  balances out.  When the transferor, customer A, makes the

21  withdrawal, that satisfies an antecedent obligation to customer

22  A.  There is now a corresponding deposit in customer B's

23  account, which we believe is principal.  When customer B takes

24  that principal out, the question is, does that customer have

25  the defense under 548(c) for value for payment of an antecedent

C8K8SECA

1    debt?  We believe that it does, because as we said earlier,

2    your Honor, this withdrawal that was effected through an

3    inter-account transfer was done outside the two-year period.

4    It's no different than had customer A taken cash and given it

5    to customer B.  In effect, that's exactly what happened because

6    it was outside the two-year period.

7         So I would argue, your Honor, that there was value

8    given to customer B, and Madoff recognized that value because

9    Madoff wasn't depleted because the cash didn't actually leave.

10   But at the point in time when you do need to look at what the

11   effect on the estate is, the real question is, is what was

12   taken out principal or something in excess of principal?  And I

13   think the two-year reach-back period is the Litmus test for

14   that.

15        I would just like to make one more point.  This is not

16   a net equity argument.  The Second Circuit did not decide this

17   issue when it decided how you calculate what a particular

18   customer is entitled to with respect to an unpaid balance.

19        THE COURT:  I am shocked you would say that because

20   the trustee in every argument we have ever had tells me that

21   that decision decided every question definitively in the

22   trustee's favor.

23        MR. WEINTRAUB:  As you know, that case was very

24   limited, and that case basically, as far as we are concerned,

25   held that as between the last-statement method and the

C8K8SECA

1    cash-in/cash-out method, under the unique facts of this case,

2    the court selected one method over another because it was only

3    given two methods.  I think the court was pretty clear that

4    it's not even certain that the court would apply the

5    cash-in/cash-out method in another case.

6            My point is that the argument that we are making here

7    has nothing to do with a customer's account balance.  We are

8    not taking a position as to whether or not if less than all of

9    a transfer that is in excess of principal was left with

10   customer B, that customer B would have a positive net equity

11   claim.  I think that ship has sailed, your Honor, in terms of

12   how you calculate a net equity claim.  But there is an

13   insidious consequence of blindly importing the cash in, cash

14   out net equity formulation to inter-account transfers between

15   different customers.  Cash in, cash out is a lifetime netting

16   of the specific customer's account history for a specific

17   account.  The purpose of the netting is to establish that

18   customer's right to his remaining balance, his unpaid balance.

19   In other words, does the customer have a claim against the fund

20   of customer property for amounts not yet taken out?  The

21   lifetime netting has nothing to do with avoiding actions.  It's

22   a creature of the claims process and it determines eligibility,

23   in essence, for the insurance payments.  It doesn't want to pay

24   people out of the $500,000 for what it considers to be --

25           THE COURT:  Let me ask you this.  I didn't mean to

1   interrupt, but going back to a point we were discussing

2   earlier.  Do you say that there should be no difference in the

3   treatment, along the lines you're arguing, between transfers

4   from one customer to another customer as opposed to transfers

5   to the same customer just having a different account?

6          MR. WEINTRAUB:  No, your Honor, we are not making that

7   argument.  We think that if it's the same individual but a

8   different account, those accounts, I think, are aggregated as a

9   matter of law.  I am talking about different customers.

10         THE COURT:  I just wanted to be sure of that.  OK.

11         Just to pursue that, and of course we don't know what

12  these are, it is one of the problems I am facing in dealing

13  with this in the abstract.  Supposing it's a transfer from one

14  company wholly owned or substantially controlled by Mr. X to

15  another company wholly owned or substantially controlled by

16  Mr. X?  Would you treat that as the same customer or would you

17  treat it as different?

18         MR. WEINTRAUB:  I think if they are different

19  entities, they are different customers.  Again, the trustee in

20  his papers called this money laundering as though --

21         THE COURT:  I understood that you rightly took offense

22  I think at that characterization, but that's not the question I

23  am asking.  It would be very boring if we didn't have at least

24  one flight of rhetoric from the trustee followed by shouts of

25  wounded innocence from the defendants.  So put all that aside.

```
 1    You're comfortable in taking the position that if it's two

 2    names, two company names, albeit wholly owned by Mr. X, they

 3    should still be treated as the way you would treat

 4    inter-account transfers from one person to a wholly different

 5    person?

 6             MR. WEINTRAUB:  Yes, your Honor.  I think just like in

 7    other areas of law, where the law implies the entity theory, if

 8    the entities are different, they are different.  And father and

 9    son are different.  Company A and company B are different even

10    if owned by the same person.  So it would be consistent and I

11    think it's not an unreasonable position if they are completely

12    different.

13             THE COURT:  OK.  Anything else?

14             MR. WEINTRAUB:  I am not sure I --

15             THE COURT:  I cut you off in mid-flight.

16             MR. WEINTRAUB:  I am not sure where I was in the

17    argument, but what the netting does with respect to a specific

18    customer is lets the trustee basically use unavoidable

19    transfers because you're looking at an entire history, a

20    lifetime history of cash in, cash out.  So you could be looking

21    at transfers that were ten years ago, and when you're doing

22    that netting with respect to a particular customer to get to a

23    net equity claim, you are basically looking at and using an

24    unavoidable transfer, a transfer that happened ten years ago,

25    to negate an investment that may have been made during the
```

1   two-year period that they net out.  And the Second Circuit has

2   said that you can do that for purposes of determining a

3   customer's net equity claim.

4          It would seem to me to be wholly inappropriate to take

5   an ancient transfer that was unavoidable with respect to

6   customer A and use that transfer to negate the inter-account

7   transfer made outside the reach-back period to customer B.

8   You're basically depriving customer B of the benefit of what

9   was transferred to him based upon something that was not only

10  ancient, but ancient with respect to a different customer.  We

11  think that's inappropriate and there is no legal principle that

12  would support doing that.

13         THE COURT:  Thank you very much.

14         So now I am happy to hear from anyone else who wants

15  to be heard on any issue.

16         Go ahead, counsel.

17         MR. KIRBY:  Richard Kirby, K&L Gates, on behalf of

18  defendants.

19         I am going to address two issues today and my

20  colleague Mr. Schwed will address another issue that was

21  briefed on these briefs.

22         I am going to discuss the question of whether tort

23  remedies may be part of the value defense.  That's an issue

24  that was not addressed by this Court in the *Greiff* decision.  I

25  am also going to address the value defense as to inter-account

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    statement obligations that the trustee has not elected to avoid

2    or have not been avoided or outside the reach-back period.

3            Mr. Schwed will address the value defense as it

4    applies to new money deposited after the fact.

5            THE COURT:  Is there anything you're about to tell me

6    that's not in your briefs?

7            MR. KIRBY:  Yes.  There's several points.

8            THE COURT:  Why don't you go to that then.

9            MR. KIRBY:  I think we have to start with the question

10   of what does the statute say, and reach some kind of common

11   understanding as to what the statute says, because the

12   trustee's fundamental argument is that, whatever the statute

13   says, SIPA somehow unwinds that or undoes that.  And I think

14   there are some important statutory provisions that your Honor

15   addressed in the *Greiff* decision that I think we would request

16   that you revisit because of some statutory provisions that were

17   not argued by the parties in that case and were not presented

18   to the Court as far as we are aware.

19           Let me start with the provision of Section 8(c)(3) of

20   the SIPA statute, which the trustee argues alters the trustee's

21   bankruptcy avoidance powers and deprives a customer of remedies

22   that in our view Congress went out of its way to preserve.

23           Our view is that the plain language of the bankruptcy

24   statute preserves all of the value defenses in Section 548(c).

25   That's because SIPA borrows from the bankruptcy statute for

1   purposes of avoidance actions, and therefore we need to first

2   look at the bankruptcy code.

3           What I would ask the Court to do is indulge us, is

4   that there are several provisions of the statute which we refer

5   to and I would like to discuss with the Court, and if I may,

6   with your permission, we have prepared a compendium of key

7   provisions in the statute which I would like to discuss.

8           THE COURT:  Sure.  But so far I am not hearing

9   anything that wasn't fully in your brief.  It's not going to be

10  a good use of your time to just repeat to me what I have

11  already read in your brief.  And you can do that if you'd like,

12  because if I look around this large bench, I'm sure I can find

13  some other good work that I can do while you're doing that.

14          MR. KIRBY:  Let me come right to the point about what

15  we believe needs to be revisited with respect to the question

16  of the SIPA statute, and I would offer these provisions of the

17  code to look at so that we can look at them together, because

18  some of these were not discussed in your Honor's decision.

19          THE COURT:  Hand them up.  It's not a question of what

20  was discussed in my decision.  It's a question of what was

21  discussed in your brief.

22          MR. KIRBY:  I would like to start with tab 11, Section

23  6(b).  We have highlighted the provision.  I have provided this

24  to counsel.  It says, "Application of Title 11," and it says,

25  "To the extent consistent with the provisions of this chapter,

1    a liquidation proceeding shall be conducted in accordance with

2    and as though they were being conducted under chapters 1, 3 and

3    5 and subchapters 1 and 2 of chapter 7." What the statute does

4    is it incorporates the provisions of chapter 5 of the

5    bankruptcy code into the SIPA statute for purposes of decision.

6            I would also like to refer the Court to tab 12, which

7    is the provision of 7(a) which the Court did address in the

8    *Greiff* decision. It says, "The trustee shall be vested with

9    respect to the debtor and the property of the debtor, including

10   the same rights to avoid preferences as the trustee indicates

11   under Title 11."

12           Now, what I would like your Honor to focus on is the

13   provision in tab 2, which is the definition of property of the

14   estate. In tab 2 it says, "The commencement of a case under

15   Title 11 creates an estate, and such estate is comprised of all

16   of the following property, wherever located and by whomever

17   held." Then it's 3. "Any interest in property recovered under

18   Section 550."

19           So what does the bankruptcy statute do? It takes

20   property recovered and makes it part of the general estate.

21           It is with that understanding, because SIPA has now

22   borrowed those provisions, that's how you have to then turn to

23   what the statute says in Section 8(c)(3).

24           That's a provision that this Court spent some time

25   discussing in your Honor's decision. Let's look at the

08-01789-cgm   Doc 7540-8   Filed 07/28/14   Entered 07/28/14 16:18:53   Exhibit H
Pg 26 of 65
Case 1:12-mc-00115-JSR   Document 333   Filed 09/12/12   Page 25 of 64

C8K8SECA

1    language.  It says, "Whenever customer property is not

2    sufficient," and so forth, "the trustee may recover any

3    property transferred by the debtor which, except for such

4    transfer, would have been customer property if," and it says,

5    "if and to the extent such transfer is voidable or void under

6    the provisions of Title 11."

7            The next sentence says, "Such recovered property shall

8    be treated as customer property."

9            Now, why is that there, your Honor?  They had to write

10   that in the statute because in section 6, they have made the

11   provisions of chapter 5 and the definition of property of the

12   estate.  And so they had to undo that with respect to what

13   bucket of property would be -- how the customer property would

14   be treated in the event that they recovered that.  They had to

15   create a special statutory provision to undo the provision that

16   is set out in section 6.  That's all that that provision does.

17   We think it is not appropriate to read that provision as

18   altering the avoidance provisions of the bankruptcy code,

19   because let's go back to what the bankruptcy code allows.

20           It is our view, and if you read our brief you're very

21   familiar with that, that -- let me give you an example of what

22   we are talking about.  I am a Madoff customer and in the year

23   2000 our client invests $100.  In 2007, our client withdraws

24   $200.  Under the trustee's methodology, he sues our client for

25   the $100.  But on what the statute says, the value defense

1    says, given the tort remedies that we have, is that under New

2    York law, we were entitled to 9 percent interest for seven

3    years, and the statute says, Section 548(c) says, we may retain

4    that amount.  So what that means is that we may retain that

5    amount, and, therefore, what we are asking for is that our

6    client would be entitled to keep, nine times seven is 63 under

7    New York statutory interest.

8         THE COURT:  I thought the 9 percent was on debt

9    certain or judgments of law and things like that.

10        MR. KIRBY:  That's not what the New York statute says,

11   your Honor.  The New York Court of Appeals has clarified that

12   in the *Republic of Argentina* case.  And in that respect, the

13   trustee cites the *Bayou* decision in the district court, and

14   that court says under New York law that is not speculative.  In

15   fact, the New York courts have clarified in the *Republic of*

16   *Argentina* case, which we cite in our papers, that interest is

17   mandatory, and that under New York law interest is mandatory

18   from the date when a person defrauds a person and induces them

19   to part with their money until the date when that money is

20   returned.  That's New York statutory law.

21        Federal law is to the same effect.  The federal

22   statute, which is the federal law in the *Randall v.*

23   *Loftsgaarden* case by the Supreme Court, they incorporated the

24   provisions of 12(a)(2) and recognized that a federal rescission

25   remedy is available to a party.  With respect to a rescission

1    claim, they are not only entitled to consideration paid, which

2    is the principal, but interest thereon.  That's what the

3    statute says.

4            So the question is, why would Congress have altered

5    that in anything in SIPA?  It doesn't.  It doesn't.  In fact,

6    Section 28(a) of the 34 Act, which is the rule of construction,

7    and Section 2 of SIPA, which is the provision of SIPA that says

8    that the SIPA provision is part of the 1934 Act, that rule of

9    construction is very specific, and that is, it preserves any

10   and all additional remedies at law and in equity.  That

11   provision is in our statutory appendix.

12           So what we are saying here is --

13           THE COURT:  I must say I saw that in your brief

14   repeatedly.  I am not quite sure I understand the significance

15   of it.  Congress in enacting the 1934 Act and providing certain

16   remedies there said, of course, all the other remedies that are

17   out there still exist.  I don't see how that translates into

18   something about how you characterize something like a claim for

19   interest here.  Either you have that claim under New York law

20   and it's not overwritten by federal law or you don't.  But that

21   would be true regardless of whether that provision was in the

22   34 Act or not.

23           MR. KIRBY:  Well, absent that rule of construction,

24   because the federal statute gives you, as it's now interpreted,

25   you both have the remedy under Section 29(b) of the statute,

1  which is the rescission remedy, the federal rescission remedy

2  in the 34 Act, and you have the implied remedy under 10b-5.

3  Both of those have been interpreted to say that not only do you

4  get your rescission claim, but the rescission claim plus

5  interest.  That's the federal remedy.  Then the question is,

6  what did Congress intend, to preempt the state law or not?

7  What we are saying in 28, and the cases are uniform on this, is

8  that Congress is not intending to preempt that remedy --

9        THE COURT:  But I thought your basic position on

10  preemption was, unless Congress has made crystal clear that

11  something is preempted, it's not preempted.  So that has

12  nothing to do with this catch-all business in the 34 Act.  That

13  is just window dressing.

14        MR. KIRBY:  It actually does because that gives our

15  clients the right to elect --

16        THE COURT:  Would you say, in the absence of the 34

17  Act provision, would your claim for interest, because that's

18  what you're starting with, be preempted?

19        MR. KIRBY:  If Congress was silent on that question?

20        THE COURT:  Yes.

21        MR. KIRBY:  I would say today and with the present

22  Supreme Court, the answer would be no.  But at the time when

23  they wrote it in 1934 --

24        THE COURT:  I am not sure what that answer means.

25        MR. KIRBY:  It's important because the preemption law

C8K8SECA

1    has developed considerably over that, but whether there is an

2    ambiguity or not as to the preemption law, Congress is crystal

3    clear that you both have your state remedies and your federal

4    remedies.

5             THE COURT:  Go ahead.

6             MR. KIRBY:  So what we are saying is that the value

7    defense in Section 548(c), which is a defense that says you

8    have a right to payment, an antecedent debt is a right to

9    payment, and that is a defense to an avoidance claim.

10            Now, the trustee says this was all decided by the net

11   equity decision, but it wasn't.  Many of our clients did not

12   submit claims here.  But our clients are entitled to assert

13   that defense as a right to payment in these avoidance actions.

14   That's how it arises as an antecedent debt.  And what the

15   statute says is they may retain any right to payment as an

16   antecedent debt that occurred at the time there was a transfer

17   to our client.

18            So on my hypothetical, back to my $100-$200 example,

19   when our client pulls out $200, at that time they were entitled

20   to interest on that money, at the New York statutory rate of 9

21   percent for seven years, so they were entitled to $163.

22   Whether they are entitled to additional amounts, $37, is a

23   determination of whether they have additional claims of right,

24   rights to payment under state or federal law.  And we have set

25   forth in our papers the basis for that.  We are here

1    representing many defendants and each defendant should have a

2    right to assert that.

3           THE COURT:  None of whom, I think, invested just $100.

4           Please continue.

5           MR. KIRBY:  I used the example because the arithmetic

6    was simple.

7           THE COURT:  I understood that and with a dumb judge

8    you have to do that.

9           Go ahead.

10          MR. KIRBY:  What we are saying, in going back to that,

11   is that this is a Rule 12 motion.  On the face of the

12   complaint, the trustee has admitted that there was a fraud,

13   that each of our clients were induced to part with their money

14   as part of a fraud, that each of our clients therefore -- that

15   Madoff was a fiduciary.  Our clients had a state law breach of

16   fiduciary duty claim.  They had a fraud claim under Rule 10b-5.

17   They had a claim under Section 29 to undo that transaction,

18   29(b) of the 34 Act.  Those claims they have a right to assert

19   as part of their defense.  And the remedies that are available

20   to them, that is the right to payment that the statute provides

21   for.  And that is what is preserved in Section 548(c) as their

22   defense.

23          What the trustee has argued before is that somehow

24   SIPA undoes that.  But that's not what the SIPA statute says.

25   The provisions we looked at says the trustee has the same

| | |
|---|---|
| 1 | avoidance power as a bankruptcy trustee, and the provisions in |
| 2 | Section 8(c)(3), which are the ones that your Honor addressed |
| 3 | in the *Greiff* decision, says the trustee has the power if and |
| 4 | to the extent the claim is void or voidable under the |
| 5 | provisions of Title 11.  And it is for that reason we say the |
| 6 | powers of avoidance of a SIPA trustee are identical to the |
| 7 | powers of a bankruptcy trustee and a bankruptcy trustee cannot |
| 8 | avoid claims just ipso facto.  They have a right to assert that |
| 9 | defense and such other statutory defenses as they have as part |
| 10 | of their antecedent debt defense.  That's the position we are |
| 11 | taking. |
| 12 | Now, I would like to turn, if I may, your Honor, to |
| 13 | the second point in our papers, the effect of the obligation |
| 14 | provisions in the statute. |
| 15 | THE COURT:  Mr. Kirby, you are a very skilled |
| 16 | attorney.  Everything you say is well worth hearing.  But you |
| 17 | will forgive me if I say that I really think you're just |
| 18 | repeating what is in your brief.  It was well crafted in your |
| 19 | brief.  It's well-spoken here when you presented it orally.  I |
| 20 | appreciate hearing it again, but it's really not what I intend |
| 21 | oral argument to be about.  I guarantee you I have read your |
| 22 | brief.  I will go back before I decide this motion and read all |
| 23 | the briefs and read them carefully again. |
| 24 | The reason I began this argument on the one issue that |
| 25 | I felt perhaps had not been clarified in the briefs to my |

C8K8SECA

1    satisfaction was just that. It well may be that there are

2    other things that I have overlooked that have occurred to you

3    in the interim since the briefing was completed in this case,

4    and your adversary who didn't have the right of a reply paper

5    may have even more along those lines, but that's what I get out

6    of oral argument. It is hearing things that are new. So I

7    apologize for limiting you in that way, but I'd really

8    appreciate it if you would focus on things that are not in your

9    papers that you want to bring to my attention.

10           MR. KIRBY: Your Honor, on the second point, which is

11   the inter-account transfer obligations, where the trustee has

12   not sought to avoid the obligations, I will rest on our papers

13   in light of that, and I will turn the matter over to Mr. Schwed

14   to address you on the new value.

15           THE COURT: Thanks very much.

16           Before we hear on that, let me hear from the trustee

17   on the points that were just addressed.

18           MR. WARSHAVSKY: Your Honor, I think I would start at

19   the statute, and I probably will only go to the statute. Mr.

20   Kirby gave it to us. It's tab 13, 78fff-2. And Mr. Kirby

21   highlighted for your Honor number 3. And that's a legal

22   fiction which your Honor has written about but --

23           THE COURT: Where are you looking again?

24           MR. WARSHAVSKY: I am looking at 10 of 13. The

25   statute is 78fff-2, on the second page of that.

```
1              THE COURT:  Which of the tabs?

2              MR. WARSHAVSKY:  Tab 13.

3              THE COURT:  OK.  I am now with you.

4              MR. WARSHAVSKY:  78fff-2(c)(3) is a legal fiction

5    which your Honor has written about in various opinions at this

6    point.  But the one issue which I think is important to

7    remember here is why the legal fiction operates this way, which

8    is that this was not money -- throughout this case, it was

9    always talked about that the money was theoretically in

10   accounts that Madoff set up.  And so, theoretically, Madoff

11   never took title, as it were, to the money.  The reason that

12   the fiction is in place is so that customer property can be

13   brought back into the estate.  And it's all about customer

14   property and adding back to the estate.

15             What Mr. Kirby didn't cite to -- let me take one step

16   back.  What 78fff-2(c)(3) is based upon is there being a

17   shortfall in 78fff-2(c)(1).  And by the terms of the statute,

18   it says, "Whenever customer property is not sufficient to pay

19   in full the claims set forth in subparagraphs (A) through (D)

20   of paragraph (1), the trustee may recover any property

21   transferred by the debtor," and it goes further.

22             If we turn now to 2(c)(1), it talks about the payment

23   scheme, but what is important --

24             THE COURT:  Just focusing back on what you were

25   reading, "The trustee may recover any property transferred by
```

1  the debtor which, except for such transfer, would have been

2  customer property if and to the extent that such transfer is

3  void or voidable under the provisions of title 11."

4       So your adversary is saying this doesn't fall in that

5  box.

6       MR. WARSHAVSKY: I didn't understand my adversary to

7  be saying it doesn't fall in this box. Actually, I thought

8  that's how he characterized all of our claims. What he said

9  was that he has certain defenses by virtue of being a customer

10  defrauded by Bernard Madoff.

11       THE COURT: That's right.

12       MR. WARSHAVSKY: That's where I turn to 2(c)(1), which

13  has the allocation, which is on the same page at tab 13, right

14  above the highlighted section.

15       THE COURT: I see.

16       MR. WARSHAVSKY: It's the section above. 2(c)(1)

17  actually lists how the trustee is to allocate customer

18  property. But what is important is the last paragraph there,

19  which actually is all the precursor to 2(c)(3). This is

20  2(c)(1). It says, "Any customer property remaining after

21  allocation in accordance with this paragraph shall become part

22  of the general estate of the debtor." We don't have that

23  problem here. We are not getting to a general estate any time

24  soon.

25       So then we turn to the next sentence. "To the extent

1   customer property and SIPC advances pursuant to 78fff-3(a) of

2   this title are not sufficient to pay or otherwise satisfy in

3   full the net equity claims of customers, such customers shall

4   be entitled, to the extent only of their respective unsatisfied

5   net equities, to participate in the general estate as unsecured

6   creditors."

7           So that tells you when and how customers can

8   participate in the general estate.  Under 78fff-2(c)(3), the

9   trustee is proceeding against Mr. Kirby's clients as customers.

10  It is proceeding against customers who are the fund of customer

11  property.  To the extent that Mr. Kirby's clients have a claim

12  back against the fund of customer property, and even against

13  the general estate, it's limited specifically to their claims

14  of net equity.  I know.  It's my favorite thing to bring up.

15  But that's what their claim is circumscribed by.

16          If he wants to come forward later as a tort victim and

17  sue the general estate, that's something separate.  He may or

18  may not have a claim.  That's a factual issue.  That's beyond

19  this point.  There is one case that we cited in our brief.

20  There are two cases that we subsequently found.  I shared them

21  with my adversaries this morning.  Both say the same thing,

22  which is, and I am reading now, and I am happy to provide

23  copies to chambers if you so like, but I am reading from *In re*

24  *Government Securities Corp.*, which is bankruptcy court of

25  Florida, the cite 90 B.R. 539.  I am reading at page 542.

```
 1              THE COURT:  What is the year?

 2              MR. WARSHAVSKY:  1988.  There aren't that many cases.

 3              What it says is about the creditors, "Each may or may

 4    not have a fraud claim should it ever become worthwhile for

 5    them to prove up such a claim as a general creditor, but none

 6    has an unsatisfied customer claim which can be enforced against

 7    the fund of customer property or against that fund as

 8    supplemented by SIPC."  And we cite in our brief In re MV

 9    Securities, which is from the bankruptcy court in this district

10    from 1985.  These cases, and there is a different one from this

11    district which is unpublished from 1975, but they all hold the

12    same thing, which is that SIPA satisfies net equity claims, it

13    doesn't satisfy fraud claims.  A fraud claim can't be asserted.

14    And I understand Mr. Kirby is suggesting it's a defense, but

15    ultimately the inquiry that we have heard throughout today, and

16    that appears throughout my adversary's papers, is what claim

17    could they have asserted against the estate, where does

18    interest start running, etc.  It all has to do with these

19    defendants' affirmative rights against the estate.

20              THE COURT:  So your fundamental point is not that they

21    don't have these claims, but that their claims are only

22    assertable against the general estate, and that under the

23    provision that you have just been referring to, a priority is

24    given to the SIPC trustee with respect to not entitling them to

25    make those claims if they go beyond their net equity.
```

1          MR. WARSHAVSKY:  You said it more concisely than I

2     did.  That's my only response.

3          THE COURT:  Go ahead.

4          MR. WARSHAVSKY:  My one other response would be that

5     ultimately I understand Mr. Kirby's argument that these

6     defenses may be apparent from the pleadings, but all of them

7     are laden with factual issues, and ultimately when there is a

8     request for 9 percent, what ultimately seems to be 9 percent

9     prejudgment interest, number one, I question whether the

10    defendant is entitled to that in this court.  I am not aware of

11    every case issued by the Southern District, but I am not aware

12    of 9 percent prejudgment interest being awarded.

13          THE COURT:  You're wrong.  That's quite standard.

14          MR. WARSHAVSKY:  Is it?  Then I have been unlucky, or

15    maybe lucky as a defendant.

16          But ultimately that's at the end of the case.  Much

17    like an attorneys' fees clause or anything else, that is after

18    the defendants have put on their proofs and actually won their

19    case.

20          THE COURT:  What he is saying is that's true when the

21    actual award is made, but that doesn't mean you don't have a

22    claim for it from the get-go.  I think your first point may be

23    stronger than your second point.

24          MR. WARSHAVSKY:  Then I will leave with my first

25    point.

1          THE COURT:  Let me hear from the SIPC trustee.

2          MS. ATTARD:  Thank you, your Honor.

3          I just want to correct some things about SIPA and

4     about the bankruptcy code.

5          Mr. Kirby suggested that Section 541, property of the

6     estate, in the bankruptcy code somehow refers only to a general

7     estate in a SIPA liquidation.  However, when we look at some of

8     the provisions in SIPA, we see that property of the estate and

9     property of the debtor are kind of used interchangeably and

10    really refer to both the general estate and to the fund of

11    customer property.

12         I want to just point out the definition of customer

13    property is in Section 78lll(4), and I don't believe it's in

14    Mr. Kirby's compendium.  I actually did not check.

15         THE COURT:  That's all right.  Go ahead.

16         MS. ATTARD:  It says, "The term 'customer property'

17    means cash and securities (except customer name securities

18    delivered to the customer) at any time received, acquired, or

19    held by or for the account of a debtor from or for the

20    securities accounts of a customer, and the proceeds of any such

21    property transferred by the debtor, including property

22    unlawfully converted."  And then it goes on and lists five

23    subsections of additional customer property.

24         My point is the definition of customer property is

25    incredibly broad and that these two estates really need to be

1   considered and thought of even in an avoidance action.  Here,

2   if the defendants give back these fictitious profits, every

3   single dollar goes into the fund of customer property, every

4   single dollar goes to the other victims of BLMIS, those who are

5   the so-called net losers, those who have not yet received their

6   principal back.  So while it's easy to try to divorce avoidance

7   actions from the claims process, I think it's very important to

8   look at these two estates as a whole when considering Mr.

9   Kirby's defenses and other points that he is raising.

10          THE COURT:  All right.

11          Mr. Kirby, let me hear from you in response.

12          MR. KIRBY:  I am going to start with the fact that our

13   clients are not submitting claims in the SIPA case.  So the

14   only place that they can assert this defense is in response to

15   the avoidance claim.  The statute says that they have an

16   antecedent debt defense.  The statute doesn't say that's a

17   junior claim or a senior claim.  It says, if there was a debt

18   that was due at the time of the transfer -- and remember what

19   the language says in Section 548(c).  It's probably worth

20   focusing on the language because it says "may retain any

21   interest transfer to the extent that such transferee gave value

22   to the debtor in exchange for such transfer."

23          We said in our papers the time to decide that question

24   is at the time of the transfer.  They gave value as of that

25   time because they had a tort claim for both the principal,

1   which the trustees conceded, and in addition, the tort claim to

2   interest, and they had that at that time.  At the time they

3   received the transfer, they gave up, that was the exchange of

4   value.  What we said in our papers, we cited the cases that say

5   the time to decide that question isn't sometime years later

6   when there was a SIPA proceeding.  Our clients don't have to

7   submit a claim at this point.  They have a right to assert that

8   as a defense in the context of these proceedings.

9          And the definition of customer property for purposes

10   of the avoidance provisions of the bankruptcy code is

11   irrelevant because it says the trustee may avoid a transfer to

12   the extent permitted by the bankruptcy code.  As your Honor

13   pointed out to Mr. Warshavsky, it says, "if and to the extent

14   avoidable or void under Title 11."  So the trustee doesn't have

15   any greater avoidance powers in a SIPA case than any other

16   bankruptcy trustee does.

17          So the only question is, our substantive statutory

18   right to interest, and other claims that we have, where do

19   those get asserted?  We don't need to submit a claim in the

20   bankruptcy case.  We are not part of that case.  They have sued

21   our clients.

22          THE COURT:  Doesn't your approach really undercut the

23   whole point of the allocation priorities that your adversary

24   was reading about before, that one of the points of SIPA

25   legislation was to give customers a super priority in effect

1      and make them have their own champion in the form of the

2      trustee, and enable them to get recoveries with a preference

3      above others, and that is sort of spelled out in the language

4      of 78fff-2(c)(1).  And your approach would undercut that,

5      wouldn't it?

6             MR. KIRBY:  No, your Honor.  You have to look at it

7      this way.  The SIPA process is designed to provide customers

8      who have claims, and they set a priority scheme for those

9      claims.  Our clients don't have claims, many of them didn't

10     even submit claims in the case.  Some did, but many of our

11     clients did not submit claims.  They are not part of that case.

12     The trustee has sued them, and we are saying he sues our

13     clients, which are strangers to that case, as if they were

14     suing anybody else.  They then have such defenses as the

15     bankruptcy statute provides for them.  They are entitled to

16     assert those defenses now because --

17            THE COURT:  I understand that point.  What I am not

18     understanding is, if that point is carried out in the manner

19     you say, which certainly has some support in some of the

20     language of the provisions, but the statutes have to be read as

21     a whole, and isn't the total effect of your approach to really

22     undercut what the whole SIPA statute is designed to achieve?

23            MR. KIRBY:  Your Honor, the answer to that is no.

24     Otherwise why would Congress have said they have the same

25     powers of avoidance as the bankruptcy trustee?  They borrowed

08-01789-cmg   Doc 7548-8   Filed 07/28/14   Entered 07/28/14 16:18:53   Exhibit H
Case 1:12-mc-00115-JSR   Document 333   Filed 09/12/12   Page 43 of 64

Pg 43 of 65

42

C8K8SECA

1    that from the bankruptcy statute.  Why would they have said in

2    the provision that we are looking at, if and to the extent such

3    property is void or voidable?

4              What it is saying is, the way I understand the

5    statute, is if the trustee can avoid a transfer, he can recover

6    it and put it in a bucket of customer property for distribution

7    out.  But our clients are entitled to assert as a defense any

8    right to payment they had at the time of transfer.  That's what

9    the statute says.  It borrows from the bankruptcy code in

10   establishing that.  That's what we are saying.  And that's what

11   the bankruptcy statute allows for.

12             As we have pointed out, there is this long line of

13   Ponzi scheme cases that says, oh, well, that's somehow

14   inequitable.  But we are not dealing with that because there is

15   no exception under 548(c) for Ponzi schemes.  It doesn't say in

16   548(c) except in Ponzi scheme cases.  It's just not written

17   into the statute.

18             THE COURT:  I am sympathetic to the argument, though I

19   am not making any rulings on anything right now, that courts

20   cannot read in a "Ponzi scheme exception" to the literal

21   language of the statute, even though, as you point out, there

22   are quite a few courts that seem to have said that, but that

23   seems to me to be arrogating to the courts a power that the

24   courts don't possess.

25             But I have never understood that to be the trustee's

1    main point, though he occasionally throws it in.  His main

2    point, especially with regard to the issue that we are dealing

3    with now, is that when you have multiple statutes --

4    bankruptcy, securities, SIPA, which is kind of a hybrid, and

5    others -- it is very much the role of the court to try to make

6    them all gel together.  And Congress does its best to make them

7    gel, but Congress doesn't have perfect foreseeability and

8    inevitably situations arise, of which Ponzi scheme situations

9    are one example, where you have to see if there are ways to

10   interpret the statutes collectively that makes sense, that is

11   consistent with the congressional purpose.

12        That's precisely why I withdrew the reference because

13   this did involve the interplay of bankruptcy and non-bankruptcy

14   statutes in a situation that was by no means crystal clear

15   under the case law, and I notice the trustee is always careful

16   to preserve for appeal his opposition to my withdrawing the

17   reference, but in fact the very arguments he makes in this very

18   case show why withdrawal is mandatory.  But that's the issue

19   that you have to grapple with.  It's an issue of making sure

20   that all these things meld together in a way that makes sense.

21        So you are quite properly singling out the literal

22   language of one or two provisions.  That may be the end of the

23   issue.  I don't know.  But I am not sure it's end of the issue

24   because it seems to me to be contrary to the purposes of SIPA.

25        MR. KIRBY:  Your Honor, this is why we referred to

C8K8SECA                                                                    44

```
 1    what -- I understand that SIPA is part of the 1934 Act.  Let me

 2    come back to that point because we raised that before.  What

 3    SIPA says -- and remember the 34 Act has expansive fraud

 4    remedies and preserves the state law remedies that exist.  It's

 5    in that backdrop that you need to read the avoidance

 6    provisions, which it would be very odd for Congress to say

 7    that, Oh, in enacting SIPA, we are going to undo those very

 8    fraud remedies that were recognized available to defendants in

 9    our situation.  That would be an odd reading of the statute.

10          So what we say is that when Congress said that the

11    same avoidance powers that's available to a bankruptcy trustee

12    are available to a SIPC trustee, they meant that.  And what

13    that means is that we are entitled to assert debt value

14    defenses that existed as at the time the transfers took place.

15    Those defenses are preserved.  We think that, based upon my

16    example, on the face of the complaint, we can decide that

17    question as a Rule 12 matter, at least part of it.  But I think

18    a square reading of the statute reconciles those purposes.  It

19    would be an odd reading of the statute, in our view, to say

20    that these fraud remedies -- well, some of the fraud remedies

21    are OK, we will give you principal.  But when a federal statute

22    says principal plus interest, the state statute says that, why

23    should those be written out of the statute, especially when you

24    find that Congress didn't by accident put SIPA into the 34 Act.

25    They did it for a deliberate purpose.  That's our point.
```

1        THE COURT:  OK.  Very good.

2        Does the trustee want to say anything further?

3        MR. WARSHAVSKY:  Just one very small point, which is,

4    if I am understanding Mr. Kirby correctly, and maybe he can

5    answer this for your Honor, he is saying 2(c)(3) will never

6    come into play, this legal fiction created by Congress will

7    never come up.

8        The whole point of the fiction here is actually to

9    take money withdrawn by a customer, and for this purpose only

10   treat that customer as a creditor, and the end here says, "the

11   laws of any state to the contrary notwithstanding."  I wasn't

12   sure what that last bit by Mr. Kirby meant.  I do note that it

13   does trump the state laws because the state laws are being

14   relied upon here.  But I am not clear from Mr. Kirby's last

15   presentation where a trustee would ever be able to move under

16   2(c)(3) if a customer could always come back and say that they

17   were defrauded, they took money out of their account.  This

18   provision would be rendered moot.

19       THE COURT:  All right.

20       Go ahead.

21       MR. KIRBY:  I do want to respond to that point because

22   there is a very obvious point in that last sentence of Section

23   8(c)(3).  It says, "For purposes of such recovery, the property

24   to be so transferred shall be deemed to have been the property

25   of the debtor and, if such transfer was made to a customer or

1    for his benefit, such customer should be a creditor, the laws

2    of any state contrary notwithstanding."

3              What the purpose of that is is that there is a state

4    law that says, when a customer submits money to a broker, that

5    money belongs to the customer, and that's a bailment.  In fact,

6    our friends have argued this bailment theory for a long time as

7    part of their standing point.  But what this is saying, in

8    those states where a customer would have a bailment right, that

9    would not be property of the debtor, and they would not be a

10   creditor because they are simply obtaining their own money.

11   That is the reason why the Congress put in that last sentence

12   of the statute.  It wasn't intended to change the avoidance

13   powers.  The avoidance powers of the statute said, "if and to

14   the extent void or voidable under Title 11."

15             So the way we read the statute is that if there is a

16   shortfall in customer property, they can sue to recover that

17   customer property, if and to the extent that it's void or

18   voidable under Title 11, and when they recover that property,

19   it can be put in the bucket of customer property.  And what

20   they are overwriting in the defense that the customer might

21   make is that's not property of the debtor at all because it was

22   my customer.  That the Congress is clearly overwriting.  So

23   this statute, when you read it carefully, your Honor, is very

24   precise on our rights and what the purpose of the statute was

25   intended to do.

1          THE COURT:  All right.

2          Well, it's, as all these questions, extremely

3     interesting.

4          MS. ATTARD:  I just want to clarify.  I actually

5     wasn't quite sure about what exactly Mr. Kirby was trying to

6     say.

7          THE COURT:  He is saying, as I understand it, with

8     respect to the provision of (C)(3) in tab 13, it says that the

9     trustee may recover any property transferred by the debtor

10    which, except for such transfer, would have been customer

11    property, if and to the extent that such transfer is void or

12    voidable under the provisions of Title 11.  He reads that

13    language as saying that "if and to the extent that such

14    transfer is void or voidable under the provisions of Title 11"

15    means that if there are defenses that can be raised, they can

16    be raised ab initio rather than, as the trustee was arguing,

17    only being raised by making a claim against the general estate.

18    That's the point I think he was making.

19         MS. ATTARD:  I just want to clarify the last sentence.

20    There is state law which says that preferences in fraudulent

21    transfers cannot be recovered unless they are property of the

22    debtor -- unless -- I am getting confused after all of this.

23         THE COURT:  "For purposes of such recovery, the

24    property so transferred shall be deemed to have been the

25    property of the debtor and, if such transfer was made to a

1    customer or for his benefit, such customer shall be deemed to

2    have been a creditor, the laws of any state to the contrary

3    notwithstanding."  He says all that means is that if there is a

4    state law that would deem the property of the debtor to bear,

5    it's the property of the creditor so far as that state law is

6    concerned for these purposes.

7              MS. ATTARD:  I think it's the other way around,

8    because there are state laws which say that to recover it has

9    to be property of the debtor and it has to be from a creditor.

10   And here it's taking a customer and treating a customer as a

11   creditor so that the trustee can recover from the creditor.

12             THE COURT:  I see your point.  OK.

13             MR. KIRBY:  I agree with that reading.

14             THE COURT:  OK.  Good.

15             MR. WEINTRAUB:  If I could just say very briefly that

16   I think that the last sentence of (c)(3) is a red herring.

17             THE COURT:  It's in yellow in the copy I have got.

18             MR. WEINTRAUB:  Yellow herring.

19             I think the purpose of the deeming is just to

20   correlate the language of SIPA which uses the term "customer

21   property."  The language of the bankruptcy code does not use

22   that term but uses the terms "property of the estate" and

23   "property of the debtor."  It's just to let the trustee bring

24   the avoiding action and the deeming is for purposes of having

25   the avoiding action fit within the language of the bankruptcy

1    code.  That doesn't have anything to do with the validity of

2    the defenses that Mr. Kirby has been speaking about.  That's a

3    separate issue, your Honor.

4           THE COURT:  All right.  There was another issue that

5    we were going to hear from counsel.

6           MR. SCHWED:  Thank you, your Honor.  Greg Schwed of

7    Loeb & Loeb speaking on behalf of customer defendants who put

8    new money into Madoff Securities during the two-year reach-back

9    period, and I will try to observe the Court's injunction to not

10   repeat matters that are in our briefs.

11          If I could be permitted just a second to return to the

12   judge's dilemma on the issue you were just talking about,

13   because I think perhaps another perspective in looking at how

14   to square the circle here, it's a lot simpler than perhaps it

15   may appear at first blush.

16          The net equity decision, made a decision about how to

17   distribute property in a fund, and that's been decided by the

18   Second Circuit and it's now fully the law.

19          The provisions that are under tab 13 that talk about

20   how customer property is distributed and who gets a priority to

21   that are very similar to the way property is distributed just

22   in a garden variety bankruptcy case, where, for example, there

23   are priorities for taxes, for unpaid wages, and they get paid

24   first, and ultimately get down to just the general garden

25   variety walking around unsecured claimants, and they get paid

08-01789-cgm    Doc 7540-8    Filed 07/28/14    Entered 07/28/14 16:18:53    Exhibit H
Case 1:12-mc-00115-JSR    Document 333    Filed 09/12/12    Page 50 of 64

Pg 51 of 65

C8K8SECA    50

1    pretty much last.

2            But that's entirely separate from the defenses that

3    one can raise in a case.  In a typical bankruptcy, a trustee

4    can bring a lawsuit for fraudulent transfer and the defendant

5    can say, OK, but I had an antecedent debt.  And let's say it

6    was just an unsecured debt, it was just a loan, but I was

7    repaid a loan.  That is a lay down, walk away defense to that

8    case.  And it makes no difference whether the trustee is

9    representing a rich estate or a poor estate.  It can be an

10   estate with what is called an administrative deficiency, where

11   they can't even pay enough money to pay the trustee or the

12   lawyers.  It doesn't make a difference.  There has never been a

13   case that said, well, if there is not enough money in the case

14   to pay administrative claims or priority claims, then your

15   defense of this plain old low priority unsecured claim is no

16   good anymore.  There is nothing in the statute.  There is

17   nothing in the case law that would suggest such a thing.  And I

18   think that's really the point that Mr. Kirby was making.

19           And Congress, despite it's well-publicized gridlock

20   over the last few years, actually did do something intelligent

21   in this statute, because they specifically deferred to a

22   well-articulated bankruptcy code that's been around since well

23   before the Bankruptcy Act of 1898 and was reformed in 1978.

24   They didn't have to change the defenses.  They knew what those

25   defenses were, and they said it's good enough, and it's pretty

1    incandescently clear.  "If and to the extent that such transfer

2    is voidable or void under the provisions of Title 11."  And

3    Title 11 is the bankruptcy code, nothing to do with SIPA.

4            So it seems as if it's a simple reading of the

5    statute.  By all means the trustee should go out and get

6    anything a regular trustee can get, and then the trustee

7    distributes in accordance with the distribution pattern that is

8    laid out here.  But conflating the two is just wrong and it's

9    not something that is contained in the statute.

10           THE COURT:  So your point is that I really, in that

11   little monologue I gave about having all these statutes work

12   together, should have accused myself of creating a red herring

13   because, at least as you read it, the SIPC trustee, while he is

14   free to sue anyone that a trustee can sue, his special powers,

15   if you will, relate to the distribution.

16           MR. SCHWED:  Exactly, your Honor.  That was the only

17   supplemental point I wanted to make.

18           THE COURT:  I understand.

19           MR. SCHWED:  And again, mindful of the Court's warning

20   not to repeat what is in our papers.

21           I did want to say that this issue that we specifically

22   are focusing on is what happens when a good faith customer,

23   someone where there has been no allegation of any wrongdoing,

24   puts new money into Madoff Securities during the two-year

25   reach-back period.  And it's an issue of substantial importance

1    because this was, to the outside world, all good faith people,

2    a very successful enterprise, and certainly customers would

3    have been tempted to put money back in.  So we don't have a

4    quantification of the number.  It's certainly not every

5    defendant, but it's a lot of them.

6              It is a first impression issue, and I think that's

7    important to point out.  Obviously, skillful counsel, like the

8    trustee in SIPC and hopefully us, try to make everything seem

9    as if it couldn't be more clear, any fool can see that it has

10   to be decided in our direction.  But truth be told, no court,

11   to our knowledge, has ever faced this issue before.  And the

12   reasons are probably fairly straightforward.  Until the Madoff

13   case, the idea of having a fraudulent scheme of this sort last

14   not just for years, but for decades would have been

15   inconceivable, let alone a fraudulent scheme that had this kind

16   of visibility and patina of respectability to it.  So because

17   they typically don't last that long, it doesn't implicate a

18   reach-back period at all.  It sort of happens within six months

19   or a year.  So you have this strange effect, what do you do

20   when somebody puts a million dollars or two million or $100,000

21   in during the two-year reach-back period?

22             What the trustee has said -- again, we think

23   improperly extrapolated from the net equity decision, and it

24   was narrowly crafted.  This is the Court of Appeals.  They are

25   not going to decide something beyond what is in front of them.

1          THE COURT:  They have been known to do that.

2          MR. SCHWED:  I stand corrected.  Although I think that

3     they were trying to circumscribe it because it is a hornet's

4     nest.  There are a lot of issues bound up and this area of law

5     is so far from seamless to not even be believable.  So it just

6     wasn't an issue in the case at all, nor was it in the Darnell

7     case, which your Honor cited, quite properly, for the general

8     rule.  This is really a corollary of the general rule.  It is

9     an issue that the trustee says, well, there was a five page

10    amicus brief that some defendants submitted after getting

11    permission from your Honor in the *Katz* case.  But the *Katz* case

12    settled before the decision was actually made.  I am sure that

13    Mr. Warshavsky will say that this issue was decided in your

14    Honor's decision in *Greiff*, but we don't think it was.  We

15    think the *Greiff* language can be easily modified to accommodate

16    this special but important situation, because this issue was

17    not argued at all, as far as we know, or discussed in *Greiff*.

18          And just in a nutshell, there are two ways really in

19    which a new money investment can be handled.  It can be handled

20    in what we think is -- again, it's Occam's razor, the simplest

21    way.  You look at the money out and you subtract the money in,

22    and there is the potential liability.

23          I should caution by saying, obviously we subscribe

24    entirely to Mr. Kirby's argument that, in addition to the value

25    of the money in, there would an increment as well for time

Case 1:12-mc-00115-JSR    Document 333    Filed 09/10/12    Page 54 of 64    54
C8K8SECA

1    value of the money.  But for the purposes of simplicity, I am

2    just going to refer to it as the money out and the money in

3    during the time frame that the trustee has a legitimate claim.

4            Now, the trustee in SIPC have appealed your Honor's

5    decision on two years.  We obviously think it is correct.  We

6    hope and think it will be affirmed in the Second Circuit.  But

7    it is certainly law of the case right now.  What the trustee

8    would do is say, well, I know you just put a million dollars

9    in.  Let's say you just take a simple example.  You take out a

10   million dollars, which is during two-year time frame.

11           THE COURT:  You sure you don't want to deal with just

12   $100?

13           MR. SCHWED:  In fact, your Honor, we put examples in

14   our brief of customer A, customer B, customer C.  I even have

15   the charts here, if your Honor would like to go through them,

16   to illustrate the illogical and we think absurd result and

17   unfair result that would eventuate from using the trustee's

18   method.  Again, when you're in an area of this sort of terra

19   incognita of first impression case, you sort of have to go the

20   extra mile to think through, what is really the implication of

21   this?  And as we show in our illustration, we have a customer C

22   who actually enriches the estate by putting significantly more

23   money in during the two-year time period who ends up -- your

24   Honor, if you would like --

25           THE COURT:  I just wanted to have it here.  There it

1   is.

2          MR. SCHWED:  What we say is we set out three customers

3   and tried not to make these implausible examples, but rather

4   ones that fit a normal pattern.  They all have the same

5   beginning.  Customer A, customer B, customer C, they all invest

6   $200,000 in 1988, which is not implausible.  They take out

7   $400,000 in June of 2006, a date that was deliberately picked

8   as being outside the two-year reach-back period.

9          Now, in some ways you would say, golly, these guys

10  doubled their money, but they doubled it over 18 years so that

11  was a 4 percent compounded return, which in that time period

12  was not extortionate; that would have been certainly a fair use

13  of the money.  In any event, the double line after the third

14  column is chronologically showing the two-year reach-back

15  period.  So anything after that black line is withdrawals.

16         So, again, all three of these customers then -- now

17  it's live, they can be sued by the trustee under the Court's

18  two-year decision.  And each of them gets $50,000.  We are just

19  going to assume that that is an absolute incontestable voidable

20  claim.

21         Customer A puts the money back in, for whatever

22  reason, puts it back in $50,000, and nothing else happens.

23  Those are the only transactions that occur with customer A.

24  The effect on the estate during the reach-back period, which is

25  the only period where there are live claims available, is there

C8K8SECA

1    is no effect; he or she got money out, put money back in, no

2    effect.  And under what we call the replenishment credit

3    theory, there would be no liability.

4         Under the trustee's calculation, you go right back to

5    the beginning of time and you say, well, these guys were

6    $200,000 overdrawn; therefore, the $50,000 that they put in

7    just gets swept up in the moor of that unrecoverable transfer

8    and they can't use it.  And we think that's just an indirect

9    way of doing what they can't do directly, which is recover a

10   time-barred claim.  They could not go after that $200,000, even

11   it was $2 million, but they are now using it to vitiate a

12   credit that would normally be available for a customer who

13   replenished the estate.

14        Now, the anomaly starts to come up when you look at

15   what happens with customer B.  Customer B is exactly the same,

16   $200,000 in, 400,000 out, so they are withdrawn but not

17   vulnerable for 200,000, and then takes out a $50,000 amount

18   that is live and actionable.  This defendant puts nothing back

19   in.

20        THE COURT:  But he is still liable for the same amount

21   under their approach.

22        MR. SCHWED:  Exactly.  Under our approach, we say, no,

23   there is no reinvestment of new money, so that defendant has to

24   repay that money back, which makes sense.

25        The unfairness and absurdity sort of reaches a fever

1    pitch with customer C.  The math is a little more complicated,
2    but I think it's followable.  Again, the same baseline facts.
3    200,000 in, 400,000 out, not actionable.  50,000 is the first
4    transaction that's actionable.  Now, this defendant deposits
5    $100,000 of new money, very enthusiastic about Madoff
6    Securities.  Then has to take out $100,000 to buy a house or
7    education or whatever the purpose is.  So takes out another
8    100,000, and then deposits another $100,000.  So if you total
9    that up, and I confess I will probably fail in trying to do it,
10   but if you total up the total amount that is in and that is out
11   within the two-year period, the estate actually is enriched by
12   $50,000.  The estate got more than what the defendant took out.

13          Again, this has nothing to do with a claim in the
14   case.  We are not saying that this defendant would be entitled
15   to a claim in the case.  That's ancient history.  It's just a
16   minor demarcation between those two concepts, the distribution
17   of assets from a limited fund, which the trustee has the right
18   and SIPC has a right to call a claim on and defenses under a
19   bankruptcy code in which that statute refers.  But I digressed.

20          Under our replenishment credit theory, this customer C
21   who enriched the estate by $50,000 would have no liability.
22   But under the trustee's method, the customer would be liable
23   for $150,000, three times as much as any of the other two, and
24   bizarrely through the looking glass and for a defendant to
25   actually put money into the estate during the live period.

C8K8SECA

```
 1              THE COURT:  What I don't know, and maybe the trustee
 2     can help me out, is under virtually any approach that one takes
 3     of this kind of situation, there are going to be unfair
 4     results, and even arguably weird results.  The question is,
 5     among other things, would your approach lead to some weird
 6     results too?  Obviously, not on your chart, but could be on
 7     their hypothetical chart.  Because while this is very, very
 8     well done and very interesting, I think there is no way, no way
 9     that any court can fashion a series of rules applying to this
10     kind of situation that will not be unfair in many given
11     individual circumstances.  Because in the end it's victims
12     against victims.  That's what it really comes down to.
13              So I didn't mean to cut you off, but I am anxious to
14     hear from the trustee.
15              MR. SCHWED:  If I could just respond?
16              THE COURT:  Yes.
17              MR. SCHWED:  I think your Honor is obviously correct.
18     The most stark example of an unfairness that comes about is
19     think of a customer who got $20 million more than a customer
20     put in, but it was one day before the two years, and somebody
21     else who got that $20 million one day within the statute of
22     limitations.  In one case the customer has got to give it all
23     back.  In the other case they put the money in their Cayman
24     account and sail off.  And to the layperson, and even to us as
25     lawyers, it has sort of an unfair feeling, but it's really an
```

C8K8SECA

1   inherent part of the statute of limitations, or any limitations

2   period.  And we cite cases that say the policies of

3   predictability are really based into our legal system, and we

4   cite a Supreme Court case that talks about them and an early

5   bankruptcy code case that says that this is just the way it is.

6           THE COURT:  Predictability needs to be seen from the

7   standpoint here of what Congress intended.  If you just take an

8   everyday avoidance action, from the standpoint of an innocent

9   person who has money that they thought was theirs, for example,

10  for their children's education or something like that, caring

11  for their widowed mother, one could go on, and then lo and

12  behold, it's grabbed back under everyday bankruptcy avoidance,

13  and they are saying, gee, that's terribly unfair.  And here is

14  this guy who two years earlier did the same thing and he is not

15  getting anything happen to him.  So the predictability has to

16  be, I think, looked at in terms of congressional intent here,

17  not what the customer viewed as predictability, because no

18  customer viewed it as predictable that they were going to have

19  that money grabbed back from them even a week later.

20          Anyway, I take your point.  Although I suppose, since

21  we are talking about money spent on widows and education, there

22  is also the guy who said, boy, I really need a third yacht, I

23  am going to withdraw my money right now.

24          Anyway, let me hear from the trustee.  Thank you.

25          MR. WARSHAVSKY:  Your Honor, I think your response

1    actually hit upon what the trustee's would be, which is that

2    ultimately what we are looking at here is a transaction -- we

3    try to take, and I know everyone makes fun of us for this, and

4    I have certainly taken a few shots today, but ultimately we try

5    to take one consistent approach throughout and treat every

6    customer who invested the same.  The only way we can do that is

7    by reconciling each account, money in, money out.  What we have

8    heard from the defense here throughout the day are various

9    different iterations of how to keep the money, how to limit the

10   trustee's ability to get that money back, not all of which are

11   necessarily consistent with each other, but the result is that

12   it would result in a variety of different rules.

13          So just here I am not sure what types of rules would

14   be fashioned based upon the chart on page 30 of defendant's

15   briefs.  What happens if a different defendant comes in and

16   just deposited $10 million ahead of time and is only taking

17   money out in the two-year period.  Do we reset that defendant

18   too or do we give him the credit for the 10 million in

19   principal?  The trustee's methodology has always been

20   principal.  The idea being, notwithstanding some of what Mr.

21   Kirby said earlier, the fundamental precept that everybody was

22   putting their money in to what was inherently risky, what was

23   would try to give them back is their capital, but didn't have a

24   right to make money.  They certainly had that expectation, it

25   may have been reasonable, but they didn't have a right to make

1    that money.

2              And so what we tried to do is say, let's give them

3    their money back.  How do we treat all customers, whether they

4    won or they lost, in terms of net equity, perhaps they are all

5    really losers here, how do we treat them as fairly as possible?

6    What is a single methodology that can work across all of them?

7    How do we factor in somebody who -- I guess it's a rhetorical

8    question, but how could the trustee ever adopt a methodology to

9    treat thousands and thousands of victims differently?  We

10   couldn't.  It wouldn't be legally tenable and there would be no

11   way to enforce it, and this case would take even longer.  The

12   result is that there has to be one methodology; we can't go

13   with different methodologies.

14             In terms of what is now called the replenishment

15   credit methodology, I do think we did see that in the

16   *Katz/Wilpon* case where there was the amicus briefing.  I do

17   think it was briefed in *Greiff*.  It was then called reset to

18   zero methodology where new money was treated differently than

19   old money.  And ultimately that's really what Mr. Schwed is

20   asking.

21             THE COURT:  I may in the end be persuaded by your

22   basic approach.  I don't think that you should rely on whether

23   it's being implicitly decided in *Katz*, where there was very

24   limited briefing, or *Greiff*, where there was no briefing.  Even

25   law of the case can be changed by a judge if he, after

| 1 | receiving new briefing, is persuaded he was in error.  So |

1    receiving new briefing, is persuaded he was in error.  So

2    you're right to raise those points, but I wouldn't get too

3    optimistic about that.  I think I am going to reach the merits,

4    so to speak.

5              MR. WARSHAVSKY:  Right.  I rose those cases in that

6    briefing just to raise the point that, while we have changed

7    the name, ultimately the position that we have tried to adopt

8    is that money deposited, whether it's in 1996, 1998, 2000,

9    2004, 2006, or 2007 as in this example, is treated the same.

10             THE COURT:  I understand your point.

11             MR. WARSHAVSKY:  I would like to, because Mr. Schwed

12   did go back to the last point, I would just like to say that

13   notwithstanding what I thought was a very nice way of trying to

14   frame the issue, neither he and, frankly, nor Mr. Kirby do

15   address the point that, first of all, 78fff-2(c)(3) is absent

16   from a typical bankruptcy --

17             THE COURT:  I think we all agree that whoever codified

18   this should be shot.

19             MR. WARSHAVSKY:  Certainly the numbering system.  Just

20   that under the theory being proposed is rendered toothless

21   here; the trustee wouldn't be able to avoid any of these

22   transfers and bring back any money into the estate without it.

23             THE COURT:  All right.  Anything further?

24             MS. ATTARD:  If I may, your Honor?

25             THE COURT:  Absolutely.

1          MS. ATTARD:  Just about Mr. Schwed going back in his

2     elegant solution.  I think it does ignore one key difference

3     between the bankruptcy code and SIPA, which is that under the

4     bankruptcy code there is one estate and in SIPA there are two

5     estates.  So we can see Section 78fff(d) is apportionment, and

6     under that section of SIPA the trustee is directed as to which

7     assets go to the general estate and which assets go to the fund

8     of customer property.  Unfortunately, under Mr. Schwed's

9     solution, it ignores that critical fact.

10          THE COURT:  Please.

11          MR. SCHWED:  Mr. Warshavsky in his first comment

12     seemed to suggest that somehow the approach we are suggesting

13     would involve a hybrid approach or disparate treatment of

14     customers, and he used the example, well, what about somebody

15     who deposits $10 million a day before the two-year time period,

16     what happens to that customer?  We deal with that in the brief.

17     It is the essence of simplicity.  It's an antecedent debt that

18     that customer is entitled to assert against voidable transfers,

19     just as in any garden variety bankruptcy case.  It's not time

20     limited.  There is nothing in the statute that suggests it,

21     nothing in the case law that suggests it.  And so it's not a

22     special pleading or some special rule, it's just what the

23     bankruptcy code absolutely, incandescently provides.

24          All of the trustees' arguments is that there has to be

25     one methodology.  That's nice, but that's really not what the

C8K8SECA

1      statutes say.  It's not even what the Court said in the *Greiff*

2      case, where the Court said that, essentially, the statute of

3      limitations can't all yield to the trustee's notion.  However

4      well-intended that everybody should be treated equally, there

5      are statutory restraints; they are not always conclusively

6      clear, but I think in this case they are.

7              So, again, the statement that somehow by adopting this

8      view the trustee couldn't bring any money, it was rendered

9      toothless, is just silly.  The trustee can sue just like any

10     other trustee can sue for fraudulent transfers, and all the

11     defendants can assert their defenses.  Whether they are

12     effective or not is another question, but he just can't

13     conflate the recovery system and say, well, because the net

14     equity decision said that the transfers will be distributed in

15     this way, somehow that attaches to the defenses to which SIPA

16     expressly defers.

17             THE COURT:  All right.  Thank you very much.

18             All right.  Now, I have also, when we set up this

19     procedure of collective briefing and collective argument,

20     provided that if there is anyone here, any lawyer here in the

21     audience representing a party who wants to be heard on

22     something that hasn't been argued, that opportunity is now.

23     But I am delighted to see there are no takers.

24             I thank all counsel very much for this very helpful

25     argument.