UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X     **FOR PUBLICATION**

In re:                                                     :
                                                           :
BERNARD L. MADOFF INVESTMENT            :     Case No. 08-99000 (SMB)
SECURITIES LLC,                                    :     Adv. Proc. No. 08-01789 (SMB)
                                                           :     SIPA LIQUIDATION
                                  Debtor.          :
------------------------------------------------------------X
IRVING H. PICARD, Trustee for the Liquidation    :
of Bernard L. Madoff Investment Securities LLC,   :
                                                           :
                                  Plaintiff,       :
                                                           :     Adv. Proc. No. 09-01182 (SMB)
                                                           :
J. EZRA MERKIN, GABRIEL CAPITAL, L.P.,     :
ARIEL FUND LTD., ASCOT PARTNERS, L.P.,     :
ASCOT FUND LTD., GABRIEL CAPITAL        :
CORPORATION,                                       :
                                                           :
                                  Defendants.     :
------------------------------------------------------------X

## MEMORANDUM DECISION GRANTING IN PART AND DENYING
## IN PART DEFENDANTS' MOTIONS TO DISMISS

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
*Attorneys for Plaintiff, Irving H. Picard,*
*   Trustee for the Liquidation of*
*   Bernard L. Madoff Investment Securities LLC*
45 Rockefeller Plaza
New York, NY 10111

         Marc E. Hirschfield, Esq.
         Marc D. Powers, Esq.
         David J. Sheehan, Esq.
              Of Counsel

DECHERT LLP
*Attorneys for Defendants J. Ezra Merkin*
*   & Gabriel Capital Corporation*
1095 Avenue of the Americas
New York, NY 10036

Gary J. Mennitt, Esq.
Jonathan D. Perry, Esq.
Neil A. Steiner, Esq.
M. Katherine Stroker, Esq.
        Of Counsel

REED SMITH LLP
*Attorneys for Defendants Gabriel Capital, L.P.*
  *& Ariel Fund Ltd.*
599 Lexington Avenue
New York, NY 10022

Casey D. Laffey, Esq.
James C. McCarroll, Esq.
        Of Counsel

FULBRIGHT & JAWORSKI L.L.P.
*Attorneys for Defendant Ascot Partners, L.P.*
666 Fifth Avenue
New York, NY 10103

Judith A. Archer, Esq.
David L. Barrack, Esq.
Daniel M. Glosband, Esq.
Christopher R. Newcomb, Esq.
David B. Schwartz, Esq.
Joseph A. Schwartz, Esq.
Matthew T. Tulchin, Esq.
Jami Mills Vibbert, Esq.
        Of Counsel

SADIS & GOLDBERG LLP
*Attorneys for Ascot Fund Ltd.*
551 Fifth Avenue, 21ˢᵗ Floor
New York, NY 10176

Douglas R. Hirsch, Esq.
Jennifer A. Rossan, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Irving H. Picard, trustee (the "Trustee") for the liquidation of the estate of Bernard L.

Madoff Investment Securities LLC ("BLMIS"), commenced this adversary proceeding to avoid

and recover fraudulent transfers and disallow and/or subordinate certain defendants' claims.  The

2

defendants are direct or indirect feeder funds that invested in BLMIS and the persons that

managed those funds.  The defendants have moved to dismiss the Trustee's thirteen count

complaint.[1]  For the reasons that follow, the motion is granted to the extent of dismissing Counts

One, Three through Eight and Eleven and Twelve, but is otherwise denied.

## BACKGROUND

### A.    Madoff and BLMIS[2]

The background information is derived from the well-pleaded factual allegations of the

TAC and other information that the Court may consider on a motion to dismiss for failure to

state a claim.  Bernard L. Madoff operated a Ponzi scheme through BLMIS.  Following his arrest

on December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission ("SEC")

initiated a fraud action against Madoff.  (¶ 10.)[3]  Upon application of the Securities Investor

Protection Corporation ("SIPC") made pursuant to the Securities Investor Protection Act of 1970

("SIPA"), 15 U.S.C. §§ 78aaa, *et seq*., the District Court appointed Irving H. Picard, Esq. as

Trustee for BLMIS, and removed the case to this Court.  (¶ 13.)  On March 12, 2009, Madoff

pleaded guilty to an 11-count criminal information, admitting that he "operated a Ponzi scheme

through the investment advisory side of [BLMIS]," and acknowledged that "[a]s I engaged in my

fraud, I knew what I was doing [was] wrong, indeed criminal."  (¶ 16.)  On June 29, 2009,

Madoff was sentenced to 150 years in prison.  (¶ 16.)

---

[1]       Ascot Fund Ltd. also moved to sever the claims asserted against it, but the motion was denied from the bench.

[2]       Headings are derived from the Third Amended Complaint, dated  Aug. 30, 2013 ("TAC").  They are descriptive only, and do not necessarily  imply the Court's views of the allegations.

[3]       The parenthetical notation "(¶ __)" refers to the paragraphs in the Third Amended Complaint.

Madoff professed to engage in an investment strategy known as the "split-strike conversion strategy," or SSC Strategy.  (¶ 26.)  He purported to invest in a basket of stocks within the Standard & Poor's 100 Index ("S&P 100 Index") that was intended to mimic the S&P 100 Index.  (¶ 26.)  He would time the purchases and sales to maximize the strategic timing of trades, and at times, the funds would be out of the market and completely invested in U.S. Treasury securities.  (¶ 26.)  As a hedge, BLMIS would sell call options and buy put options on the S&P 100 Index.  (¶ 26.)

None of this actually happened.  Instead, BLMIS used the money invested by BLMIS customers to make distributions to other BLMIS customers.  (¶¶ 32-33.)  No securities were actually purchased.  (¶¶ 26, 28, 30.)  At the time of Madoff's arrest, BLMIS managed approximately $65 billion of mostly fictitious funds.  (¶ 36.)

## B.    The Defendants

### 1.    Merkin and Gabriel Capital Corporation

The defendant J. Ezra Merkin is a New York resident and investment manager.  He managed several funds, individually or through the defendant Gabriel Capital Corporation ("GCC"), a Delaware corporation.  (¶¶ 3, 42.)  Merkin was the sole director and shareholder of and decision-maker for GCC.  (¶ 43.)  Merkin and GCC are sometimes collectively referred to as the "Merkin Defendants."

### 2.    Gabriel Capital, L.P.

The defendant Gabriel Capital, L.P. ("Gabriel") is a Delaware limited partnership with a principal place of business in New York.  (¶ 44.)  Merkin was the sole general partner of and sole decision-maker for Gabriel, (¶ 45), and the investors were limited partners.  (¶ 46.)  Gabriel

4

maintained an account with BLMIS, and invested between 16% and 30% of its assets with BLMIS during the six years preceding the Petition Date.  (¶ 247.)  As of third quarter 2008, Gabriel had at least 200 investors and managed $1.4 billion.  (¶ 63.)

### 3.    Ariel Fund Ltd.

The defendant Ariel Fund Limited ("Ariel") is a Cayman Islands exempted company with a principal place of business in New York.  (¶ 47.)  GCC owned all the voting shares of Ariel, and the investors owned non-voting shares.  (¶ 49.)  Ariel maintained an account with BLMIS, and invested between 16% and 29% of its assets with BLMIS during the six years preceding the Petition Date.  (¶ 247.)  As of third quarter 2008, Ariel managed $1.3 billion.  (¶ 59.)

### 4.    Ascot Partners, L.P.

The defendant Ascot Partners, L.P. ("Ascot") is a Delaware limited partnership with a principal place of business in New York.  (¶ 50.)  Merkin created Ascot for the principal purpose of investing in BLMIS, and was its sole general partner and sole decision-maker.  (¶¶ 51-52.)  Ascot maintained an account with BLMIS, and invested between 91% and 100% of its assets with BLMIS during the six years preceding the Petition Date.  (¶ 248.)  As of third quarter 2008, Ascot managed $1.8 billion.  (¶ 68.)

### 5.    Ascot Fund Ltd.

The defendant Ascot Fund Ltd. ("Ascot Fund") is a Cayman Islands corporation with a principal place of business in New York.  (¶ 53.)  Until 2003, Ascot Fund invested directly with BLMIS, GCC served as its sole investment advisor and Merkin its sole decision-maker.  (¶¶ 53-54.)  In 2003, Ascot Fund entered into a "master-feeder" relationship with Ascot and invested substantially all of its capital with Ascot.  (¶ 55.)  At about the same time, Ascot Fund transferred

the full balance in its BLMIS account to the BLMIS account of Ascot, and ceased activity in its

BLMIS account.  (¶ 55.)

Gabriel, Ariel, Ascot and Ascot Fund are referred to in this opinion as the Defendant

Funds.

## C.    The Transfers

### 1.    Initial Transfers

The following table lists the aggregate amount of initial transfers made to the Defendant

Funds from their respective BLMIS accounts within two years and six years of the December 11,

2008 Petition Date.  It is derived from Exhibit B attached to the TAC which specifies the

amount, month and year of each transfer.  Because TAC Exhibit B lists the month but not the

date of most of the transfers, it is not possible to tell whether the December 2002 and December

2006 transfers fall within the six year and two year periods, respectively.  Accordingly, separate

columns list these transfers as "borderline" transfers.

| Table 1: Initial transfers ($) | | | | |
|---|---|---|---|---|
| Fund | Amount within two years of December 11, 2008 | Borderline December transfers | Amount transferred within six years of December 11, 2008 | Borderline December transfers |
| Ascot Partners LP | 280,000,000 | 0 | 461,000,000 | 0 |
| Ascot Fund Ltd. | 0 | 0 | 98,042 | 98,042 |
| Ariel Fund Ltd. | 17,576,503 | 179,390 | 19,125,490 | 22,600 |
| Gabriel Capital LP | 17,400,000 | 0 | 0 | 0 |
| **Total** | **314,976,503** | **179,390** | **480,223,532** | **120,642** |

6

2.    **Subsequent Transfers**

The following table lists the subsequent transfers among the Defendant Funds within two years and six years of the Petition Date.  It is derived from Exhibit C attached to the TAC which specifies the amount, month, day and year of each transfer.

| Table 2: Subsequent transfers ($) | | | |
|---|---|---|---|
| From | To | Amount within two years of December 11, 2008 ($) | Amount transferred within six years of December 11, 2008 ($) |
| GCC | Ascot | 0 | 2,060,000 |
| GCC | Gabriel | 0 | 400,000 |
| GCC | Merkin (FBO) | 54,718,691 | 114,533,609 |
| Ascot | GCC | 53,149,800 | 147,088,394 |
| Ascot | Ascot Fund | 22,250,000 | 82,000,000 |
| Ascot | Ariel | 0 | 20,650,000 |
| Ascot | Gabriel | 10,596,699 | 73,221,655 |
| Ariel | GCC | 11,256,830 | 17,681,513 |
| Ariel | Ascot | 18,500,000 | 75,900,000 |
| Ariel | Gabriel | 43,372,177 | 64,997,164 |
| Gabriel | GCC | 75,276,231 | 133,639,449 |
| Gabriel | Ascot | 26,500,000 | 146,948,211 |
| Gabriel | Ariel | 27,206,567[4] | 118,523,200 |
| Gabriel | Merkin | 0 | 4,500,000 |

[4]    This amount includes a Jan. 23, 2009 post-petition transfer of $230,690.

| Subtotal to: | Ariel | 27,206,567 | 139,173,200 |
|---|---|---|---|
| Subtotal to: | Ascot | 45,000,000 | 224,908,211 |
| Subtotal to: | Ascot Fund | 22,250,000 | 82,000,000 |
| Subtotal to: | Gabriel | 53,968,876 | 138,618,819 |
| Subtotal to: | GCC | 139,682,861 | 298,409,356 |
| Subtotal to: | Merkin | 54,718,691 | 119,033,609 |
| **Total** | | **342,826,995** | **1,002,143,195** |

## D.    Merkin and Madoff

Merkin and Madoff shared a close business and personal relationship.  Madoff called

Merkin "a good friend" and "a very good client."  (¶ 82.)  They sat together on the board of

trustees of Yeshiva University.  Madoff attended the bar and bat mitzvahs of Merkin's children.

(¶ 84.)  Merkin had personal access to Madoff and could speak with him directly, including

meeting with Madoff at BLMIS.  (¶¶ 87, 90.)  Merkin stated to others that he was a fiduciary to

Madoff's children and had been investing with BLMIS for decades.  (¶¶ 89-90.)  Madoff

permitted Merkin to open up new accounts with BLMIS in 2000 (for Gabriel and Ariel), even

though Madoff was not accepting new accounts at that time, because Merkin had been "a good

friend" and "a very good client."  (¶ 165.)  Merkin subsequently deposited $74.8 million into

Gabriel's BLMIS account and $84.2 million into Ariel's BLMIS account.  (¶ 165.)

## E.    Merkin's Knowledge of the BLMIS Fraud

Merkin knew that BLMIS "could not have been legitimately engaged in the trading

activity it reported," (¶ 106), the trades were a fraud, (¶ 174), and "Madoff was running a Ponzi

scheme."  (¶ 108.)  Victor Teicher, a money manager, managed parts of the Ariel and Gabriel

portfolios between 1988 to 1994 and between 1998 to 2000.  (¶¶ 102, 104.)  He told Merkin, in

the presence of Jack Mayer, an employee under Teicher, that BLMIS' trading was impossible

and "could be a Ponzi scheme."  (¶¶ 102-03, 105.)  Teicher warned Merkin that BLMIS' "returns

were too consistent," and "just not possible."  (¶ 102.)  Teicher also cautioned Merkin about

BLMIS self-clearing its own trades.  (¶ 103.)  After the fraud was revealed, Merkin

acknowledged that "what made [the fraud] possible was the fact that Madoff was the custodian"

of BLMIS' trades through self-clearing.  (¶ 103.)

        In addition, Merkin kept a Madoff folder that contained a document prepared by a third-

party analyst questioning the possibility of BLMIS' returns.  (¶¶ 106-07.)  According to this

document, BLMIS' returns performed independently of the S&P 500, no matter "whether the

S&P 500 trends up or down."  (¶ 106.)  Madoff's purported strategy depended on the S&P 100,

which correlated to the S&P 500, yet the third-party's chart of BLMIS' Series B showed the

performance of Series B was dramatically higher than the S&P 500.  (¶ 107.)

        Merkin told Research Company A in June 2003 that Madoff's scheme was bigger than

Ponzi, and "Charles Ponze [sic] would lose out because it would be called the 'Madoff

Scheme.'"  (¶ 95.)  He advised this investor of the dangers of investing significant amounts for

the long term with BLMIS, and to "[n]ever go long in a big way."  (¶ 95.)  Merkin acknowledged

the impossibility of the volume of Madoff's trading activity, and specifically, whether there was

enough volume in the market to "accommodate" BLMIS' large option trades.  BLMIS frequently

reported more option trades than were available in the entire exchange market, (¶ 180), and on

ten occasions purportedly executed option trades for the Defendant Funds' accounts when

publically available records showed that no volume traded that day.  (¶ 181.)  Merkin knew that

the volume of daily put and call options BLMIS supposedly bought and sold for the Defendant

9

Funds exceeded the daily volume of the Chicago Board Options Exchange ("CBOE") and were impossible, and demonstrated that BLMIS was not actually making the trades represented on the trade confirmations provided to Merkin.  (¶ 183.)

Merkin specifically acknowledged a list of his concerns with BLMIS to Research Company A, including the lack of separation between BLMIS' investment advisory and market making/proprietary trading businesses, lack of overnight exposure, self-clearing, moving funds to Treasury bonds in a way that was inconsistent with its purported investment strategy, and that BLMIS' trades were at times outside the daily trade price range.  (¶ 97.)  This investor summarized its meeting with Merkin: "Seems to be some probability even in Ezra's [Merkin's] mind that this could be a fraud."  (¶ 98.)

In a meeting with Ivy Asset Management ("Ivy"), Merkin said he was "aware" that there were not enough options in the entire options market to conduct BLMIS' purported trading activities.  (¶ 99.)  When asked by Ivy about BLMIS' consistent returns, Merkin replied,

> "[U]nderstanding Madoff is like finding Pluto . . . you can't really see it . . . you do it through inference, its effect on other objects."  (¶ 100.)  Ivy told Merkin, "Toto is still tugging at the curtain."  (¶ 100.)  Merkin replied, "I would say that the curtain is winning."

(¶ 100.)

## F.    Merkin's Misrepresentations

Gabriel's and Ariel's investments with BLMIS contradicted their investment strategies, and Merkin concealed or failed to disclose Madoff's involvement with these funds.  The Gabriel and Ariel offering memoranda named Merkin as the person with the "ultimate responsibility for the management, operations and investment decisions."  (¶ 110.)  Merkin nevertheless delegated his role to outside managers, including Madoff.  (¶ 111.)  Neither the offering documents nor

GCC's quarterly newsletters disclosed Madoff's involvement with these funds.  (¶¶ 112, 116.)
In addition, the offering memoranda represented that the funds would generally invest in the
securities and debt of distressed companies in chapter 11.  (¶¶ 113-14; *see Gabriel Capital, L.P.
Confidential Offering Memorandum*, dated Mar. 2006 ("*Gabriel Offering Memorandum*")[5] at i,
1, 14, 15, 20; *Ariel Fund Limited Confidential Offering Memorandum*, dated Mar. 2006 ("*Ariel
Offering Memorandum*")[6] at i, 1, 20, 21, 32.)  BLMIS' purported SSC Strategy was inconsistent
with these objectives.  (¶ 115.)  Merkin's newsletters to Ariel and Gabriel investors falsely stated
that distressed debt and risk arbitrage comprised all of the funds' investments.  (¶ 117.)

The offering documents concerning Ascot and Ascot Fund represented that Merkin was
involved as a money manager on a day-to-day and transaction-by-transaction basis and Ascot's
success depended on Merkin's skill as a money manager, (¶ 120), and Merkin, Ascot's general
partner, bore the "ultimate responsibility for the management, operations and investment
decisions made on behalf of the Partnership."  (*Ascot Partners Confidential Offering
Memorandum*, dated Oct. 2006 ("*Ascot Offering Memorandum*"), at i; 3, 13.)[7]

According to the *Ascot Confidential Offering Memorandum*, Ascot was to engage
"primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets
of securities are purchased and/or sold against related securities such as index options or
individual stock options."  (*Ascot Offering Memorandum* at 1, 12.)  Ascot Fund invested all of its

---

[5]    A copy of the *Gabriel Offering Memorandum* is annexed as Exhibit 4 to the *Declaration of Diane N. Princ
in Support of Defendants J. Ezra Merkin's and Gabriel Capital Corporation's Motion to Dismiss Plaintiff's Third
Amended Complaint*, filed Oct. 11, 2013 (the "*Princ Declaration*") (ECF Doc. # 167).

[6]    A copy of the *Ariel Offering Memorandum* is annexed as Exhibit 5 to the *Princ Declaration*.

[7]    A copy of the *Ascot Offering Memorandum* is annexed as Exhibit 3 to the *Princ Declaration.*

capital with Ascot Partners, and therefore, shared the latter's investment strategy.  (*Ascot Fund Confidential Offering Memorandum*, dated Oct. 2006 ("*Ascot Fund Offering Memorandum*"), at i, 1, 16.)[8]

Until March 2006, Ascot's offering documents never disclosed Madoff's or BLMIS' involvement even though Ascot had invested between 91% and 100% of its assets with BLMIS during the six years prior to December 11, 2008.  (¶¶ 121, 123, 248.)  In March 2006 and again in October 2006, Ascot's offering documents first mentioned BLMIS, misrepresenting that it was only a "prime broker" and "custodian."  (¶ 121.)  It was not until September or October 2006 that Ascot Fund's offering documents made the same misrepresentation.  Merkin made similar misrepresentations or withheld disclosure in his dealings with other investors.  (*See* ¶¶ 125- 43.)

## G.    The Merkin Defendants' Due Diligence

Merkin and GCC managed the assets of the Defendant Funds and owed a fiduciary duty to perform due diligence on the third-party money managers to whom they delegated fund assets. (¶ 145.)  This required Merkin and GCC to conduct an investigation of an investment opportunity, assess the quality of the management team overseeing the investment, assess the key risks associated with the opportunity, and continuously evaluate the investment on an ongoing basis.  (¶ 146.)  Merkin acknowledged his duties in a quarterly newsletter to his clients stating that "[o]ur first objective, therefore is to control risk," (¶ 148), and "Investors often look up, enchanted by upside and profits, but that works only if their managers spend time and money looking down."  (¶ 148.)  In his April 19, 2002 newsletter, he wrote, "[o]ur job, as we understand

---

[8]        A copy of the *Ascot Fund Offering Memorandum* is annexed Exhibit B to the *Declaration of Lan Hoang*, dated Jan. 31, 2014 (ECF Doc. # 199).

it, is to keep our guard up at all times." (¶ 207.)  In addition, following the collapse of the Bayou

Group in 2005, Merkin advised other fund managers that it would now be necessary to

investigate investment managers for specific indicators of fraud, including: (i) any investment

that had a self-owned broker-dealer; (ii) any investment that had a questionable auditing firm;

and (iii) any investment that had an unusual pricing or fee structure.  (¶ 222.)  Despite this

advice, Merkin did not make any additional inquiries into BLMIS' operations because he knew

each of these three indicators of fraud applied to BLMIS.  (¶ 222.)

The documents in the Defendants' possession identified numerous trading impossibilities

and suspicious information, including, the following facts that indicated Madoff's fraudulent

scheme:

### 1.    Madoff's Lack of Transparency

Madoff refused to answer questions about assets and other basic questions, key BLMIS

positions were held by Madoff's family, and BLMIS' regulatory filings revealed that it lacked

enough staff to manage the billions of dollars, perform investment advisory functions, including,

research, and execute trades.  (¶¶ 157-58.)  When Merkin asked Madoff which assets BLMIS

managed, Madoff refused to answer.  Merkin did not press him and stated, "I don't really care,

because I've made my peace with Bernie."  (¶ 156.)  In 2002, Merkin told Madoff during a

telephone conversation:

> So I told one person, look, you can ask me how Bernie does it and that's fine, but
> when are you going to ask Bernie? So he [sic] said, look, if I asked him, he'd
> throw me out.  I said, look, all I can tell you is don't ask so many questions.  Sit
> tight.  And that's what I tell everybody . . . .

(¶ 151.)

### 2.    Consistent Returns

Madoff purported to invest in selected stocks and options in the S&P 100 Index.  Yet, from 2000 through 2002, BLMIS was up 45% while the S&P 100 was down 43%.[9]  (¶ 163.) Between 1993 and 2008, the Defendant Funds never had a negative annual return on BLMIS investments.  (¶ 166.)  During that same period, Ascot and Ascot Fund were down only eleven of the 180 months while the S&P 100 Index was down sixty-five out of 155 months from 1996 through November 2008.  (¶ 166.)  No other fund managers had a similar percentage of negative months, and those that attempted to employ the SSC Strategy consistently failed to approximate BLMIS' results.  (¶ 167.)

### 3.    Trades Outside the Daily Range

The Merkin Defendants received and reviewed the Defendant Funds' trade confirmations and monthly account statements which reported trading prices outside of the daily price range of reported trades.[10]  (¶ 168-74.)

### 4.    Lack of Scalability

By 2001, Merkin believed that BLMIS had at least $7 billion in assets, and knew that as assets under management increase, it becomes more difficult to find opportunities of a scale proportional to the growing size of the fund.  (¶ 175.)  The SSC Strategy, which purportedly

---

[9]        During the dot-com bubble burst between April 2000 and March 2001, the Defendant Funds' BLMIS accounts generated returns of about 13% while the S&P 100 Index lost approximately 27%.  (¶ 164.)

[10]        BLMIS reported 323 transactions (33 million shares) in the Defendant Funds' accounts between 2000 and 2008 that traded at a price outside the daily range.  (¶ 169; *see* 170-71.)  During the same period, BLMIS reported 59 options transactions that fell outside the daily price ranges on the CBOE, (¶ 172), yield prices for U.S. Treasury Bills that implied yields outside the yields reported by Bloomberg, over 1000 trades of U.S. Treasury bills outside the daily price range (plus/minus 1 basis point), and more than 200 trades outside the daily price range (plus/minus 10 basis points).  (¶ 173.)

capitalized on inefficiencies in the market, was limited because there were fewer opportunities

for inefficiencies with the most efficiently-traded and tracked stocks in the S&P 100 market and

was further limited by the available volume of stock in S&P 100 companies.  (¶ 177.)  The SSC

Strategy was not scalable for a fund as large as the one Merkin thought Madoff managed because

BLMIS' SSC Strategy would have needed approximately $7 billion in notional value in call

options.  Between 2000 and 2008, there were never enough options on the entire market to

implement the strategy.  (¶ 178.)[11]

### 5.    Impossible Option Volumes

BLMIS owned more put and call options than existed on the CBOE.  (¶¶ 179-83.)  For

every year between 2000 and 2008, BLMIS reported more option trades than the entire market

volume of the CBOE.  (¶ 180.)  Within that time frame, and on ten occasions, BLMIS reported

options trades in the Defendant Funds accounts when there was no volume on that day.  (¶ 181.)

The daily volume of the CBOE is publicly available information.  (*See* ¶ 181.)

### 6.    Impossible Timing of Trades

The Defendant Funds' accounts reflected that BLMIS consistently traded at the day's

optimal price point, *i.e.* purchase prices were consistently in the lower range of the daily price

range and sale prices were consistently in the upper range of the daily price range.  (¶ 184.)

Although Madoff told the defendants that he was buying and selling at specific intervals

throughout the day, and BLMIS' transaction prices should have approximated the reported

---

[11]    This impossibility became more evident in 2006, 2007, and 2008, when BLMIS publicly disclosed in
filings with the SEC that it was managing approximately $11.7 billion as of July 2006, $13.2 billion as of December
2006, and $17.1 billion as of December 2007, respectively.  (¶ 178.)

average prices, BLMIS' reported prices gravitated toward the optimal price point.  (¶ 185.)[12]

BLMIS also sent monthly statements to the defendants that identified equity trades that could not

have occurred because of insufficient trading volume.  (¶ 187.)

### 7.    Option Trades and CUSIP

Options traded on the CBOE have Committee on Uniform Security Identification

Procedures ("CUSIP") identification numbers; over the counter ("OTC") options do not.

(¶ 189.)  All of the BLMIS options trade confirmations contained CUSIP identification numbers,

even the ones marked as OTC transactions.  (¶¶ 189-90.)  In addition, OTC option trades would

have involved counterparties whose identities should have been disclosed in the trade

confirmations, but the BLMIS OTC options trade confirmations did not include the counterparty

information.  (¶ 192.)

### 8.    Negative Cash Balances

Between December 1995 and December 2008, the Defendant Funds' accounts with

BLMIS often had negative cash balances.  These negative cash balances purportedly arose from

purchases, withdrawals or transfers among the Defendant Funds.  (¶¶ 193-94.)  A customer who

purchases assets without sufficient funds generally buys on margin, but the Defendant Funds did

not have margin accounts and could not have traded on margin.  (¶¶ 194-95.)  In addition,

BLMIS never charged margin interest to Defendant Funds, effectively giving them interest-free

loans.  (¶ 196.)

---

[12]    For example, the Defendant Funds' account statements and trade confirmations indicate that, from 1993 to
2008, approximately 77% of equity buys occurred in the lower half of the daily price range and approximately 71%
of equity sells occurred in the upper half of the daily price range.  (¶ 186.)

### 9.    Madoff's Unusual Fee Structure

Typically, a fund manager will charge between a 1% and 2% management fee and between a 10% and 20% performance fee.  (¶ 198.)  BLMIS, however, charged a $0.04 commission per share on stock transactions and a $1 commission per option contract.  (¶ 199.)  It is inefficient for an investment adviser, following the same investment strategy for every account, to implement a fee structure that requires an accounting of fees for every share and option contract.  It is much simpler to charge a management and performance fee to each account.  (¶ 202.)

Furthermore, Merkin and the Defendant Funds paid $38 million less each year under the BLMIS fee structure than they would have paid under a typical fee structure.  (¶ 200.)  When Madoff tried to explain why he did not collect a 20% performance fee, Merkin cut him off, saying , "I know why you don't do it.  Because you're Bernie.  Because that's not the way the good Lord made you.  If he made you a little differently, you would."  (¶ 201.)

### 10.    Lack of Independent Custodian

BLMIS acted as its own investment manager, administrator and custodian of securities owned on behalf of its customers, including the Defendant Funds.  (¶ 203.)  According to industry custom, an independent third-party acts as custodian to reduce the chance of misappropriation.  (¶ 205.)  Merkin knew BLMIS was acting as its own custodian.  (¶ 207.)

### 11.    Lack of Real-Time Electronic Access to Accounts and Trade Confirmations

Contrary to industry custom, BLMIS never provided real-time access to account data via the Internet.  (¶ 212.)  Moreover, BLMIS' marketing materials highlighted that its computerized transaction processing allowed it to deliver customized client reports electronically in whatever

form best suited the customer, (¶ 210), and Madoff boasted to Merkin that BLMIS spent "more

on technology than any hedge fund I know of and more than 99% of the brokerage industry

does." (¶ 211.) In fact, the Defendant Funds' paper trade confirmations were occasionally

received late and contained corrections that altered prior transactions, indicating to Merkin that a

previous trade was done at a different price. (¶ 213.)

### 12.    Strip Mall Auditors

BLMIS' auditor was Friehling & Horowitz, an accounting firm in Rockland, New York.

(¶ 217.) The firm was located in a strip mall and had three employees, only two of whom

worked full-time. (¶ 217.) Joshua Nash, a friend and colleague, warned Merkin that Madoff's

failure to use a large, public accounting firm was a "potential red flag." (¶¶ 133, 221.)

In contrast, Merkin employed BDO Seidman as the auditor for Ascot and Gabriel, and

hired BDO Tortuga as the auditor for Ariel and Ascot Fund. (¶ 215.) The Defendant Funds did

not hire their own auditors to verify BLMIS' transactions, or question BLMIS' choice of auditor.

(¶ 218.)

### 13.    Industry Skepticism and Suspicion

The Defendants ignored the warnings of industry professionals, including Teicher and

Nash. The collapse of the Bayou Group in the fall of 2005 also raised warning signs, prompting

Merkin to tell Madoff, "you know, I always tell people, as soon as there is a scam in the hedge

fund industry, someone is going to call about Bernie [Madoff]. It's guaranteed." (¶ 93.)

### 14.    Liquidity Problems

The TAC alleges, upon information and belief, that Merkin knew by November 2005 that

Madoff was dangerously close to lacking enough liquidity to make requested redemptions,

(¶ 245), and purposely limited the investors' ability to withdraw funds from the Defendant

Funds, in part, because he knew that Madoff needed to maintain capital to perpetuate his fraud.

(¶ 241.)  Prior to early 2006, investors in Gabriel and Ariel could redeem their investments on

relatively short notice (¶¶ 226, 231), but beginning in the first quarter of 2006, new investors had

to keep their money in the funds for two years before they could redeem.[13]  (¶¶ 226, 232.)  In

addition, Merkin apologized to Madoff for withdrawing $76 million from Ascot's BLMIS

account in 2006.  (¶ 246.)

Even before then, Merkin manipulated the Defendant Funds' BLMIS accounts to avoid

large redemptions.  For example, investors in Ascot requested redemptions exceeding $641

million from 2000 to 2005, but during the same approximate period, Ascot (and Ascot Funds)

only redeemed $17 million from their BLMIS accounts.  (¶ 243.)  The Defendant Funds used

intercompany transfers between their BLMIS accounts to avoid redeeming more than $17

million.  (¶ 244.)

**H.      The Merkin Defendants' Management and Incentive Fees**

The Merkin Defendants earned significant management and performance fees from the

Defendant Funds.  Ariel and Gabriel paid GCC and Merkin, respectively, a 1% management fee

and 20% incentive fee for any increase in the net asset value.  (¶¶ 223, 229-30.)  The Merkin

Defendants received $127 million from Ariel between 2000 and 2008, and $24 million of the

$120 million they received from 2000 to 2007 was due to Ariel's BLMIS investments.  (¶¶ 250-

51.)  They also received $191 million from Gabriel between 2000 and 2008, and $37 million of

---

[13]      Ascot also placed greater restrictions on redemptions after early 2006.  (¶¶ 238, 239.)

the $180 million received from 2000 to 2007 was due to Gabriel's BLMIS investments.  (¶¶ 252-53.)

Ascot paid Merkin a 1% management fee, increased to 1.5% in 2003.  (¶¶ 234-35.) Ascot Fund paid GCC a 1% management fee until it became a limited partner of Ascot in 2003. (¶ 236.)  The Merkin Defendants received $194 million in management fees from Ascot and Ascot Fund.  (¶ 249.)

## I.        The Commingling of Assets

Merkin controlled an account at Morgan Stanley (No. xxxx021) that functioned as the main account for GCC (the "Main Account").  (¶ 258.)  Using the Main Account, Merkin commingled his personal money with money belonging to the Defendant Funds, (¶ 260), and disbursed it in similar fashion.  (*See* ¶ 261.)  He also used the Main Account to buy art for himself and his wife, pay personal taxes to the IRS, fund family partnerships, and upon information and belief, pay investor redemptions and invest in margin accounts.  (¶¶ 262-63, 265, 267.)

## J.        Inter-Account Transfers Among the Funds

Merkin directed numerous transfers between the Defendant Funds' BLMIS accounts of at least $361.4 million.  (¶¶ 268-79, 281-91; *see* TAC Ex. C.)  There were no loan documents concerning these transfers.  (¶¶ 280, 291.)

## K.        This Adversary Proceeding

The Trustee commenced this adversary proceeding on May 7, 2009.  In prior proceedings, Judge Lifland dismissed claims alleged in the Second Amended Complaint ("SAC") seeking immediate turnover under Bankruptcy Code § 542 and avoidance of

preferential transfers under Bankruptcy Code § 547(b), but denied the balance of the defendants'

motions to dismiss.  *See Picard v. Merkin* (*In re BLMIS*), 440 B.R. 243 (Bankr. S.D.N.Y. 2010).

The Trustee filed the TAC on August 30, 2013.  The TAC asserts thirteen claims for

relief summarized in the following table:

| Count | ¶¶ | Defendant(s) | Description of Claim(s) |
|-------|-----|--------------|-------------------------|
| 1 | 322-31 | Ascot | Avoid and recover the 90-day preferential transfer, and disallow claims (until repaid), under 11 U.S.C. §§ 105(a), 502(d) 547(b), 550, 551, 15 U.S.C § 78fff-2(c)(3) incurred by the debtor to Ascot. |
| 2 | 332-37 | Defendant Funds | Avoid and recover the two-year actual fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 105(a), 502(b) 548(a)(1)(A), 550(a), 551, 15 U.S.C § 78fff-2(c)(3) incurred by the debtor to Defendants. |
| 3 | 338-46 | Defendant Funds | Avoid and recover the two-year constructive fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 105(a), 502(d) 548(a)(1)(B), 550(a), 551, 15 U.S.C § 78fff-2(c)(3) incurred by the debtor to Defendants. |
| 4 | 347-52 | Defendant Funds | Avoid and recover the six-year constructive fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 105(a), 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 276, 276-a, 278, 279 incurred by the debtor to Defendants. |
| 5 | 353-58 | Defendant Funds | Avoid and recover the six-year constructive fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 105(a), 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 273, 278, 279 incurred by the debtor to Defendants. |
| 6 | 359-64 | Defendant Funds | Avoid and recover the six-year constructive fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 105(a), 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 274, 278, 279 incurred by the debtor to Defendants. |

| | | | |
|---|---|---|---|
| 7 | 365-70 | Defendant Funds | Avoid and recover the six-year constructive fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 105(a), 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 275, 278, 279 incurred by the debtor to Defendants. |
| 8 | 371-77 | Defendant Funds | Avoid and recover the undiscovered actual fraudulent transfers, and disallow claims (until repaid), under 11 U.S.C. §§ 105(a), 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 276, 276-a, 278, 279, N.Y. C.P.L.R. 203(g), 213(8) incurred by the debtor to Defendants. |
| 9 | 378-83 | All defendants | Recover the subsequent transfers under 11 U.S.C. §§ 105(a), 550(a), 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 276-a, 278. |
| 10 | 384-88 | Merkin | Impose general partner and joint and several liability for the obligations of Ascot Partners and Gabriel L.P. |
| 11 | 389-94 | Defendant Funds | Objection to and disallowance of any and all restitution and other claims of Defendant Funds against BLMIS under 11 U.S.C. § 502(a), 502(b)(1), 15 U.S.C. § 78fff(b), 78fff-1(a), Fed. R. Bankr. P. 3007(b). |
| 12 | 395-401 | Defendant Funds | Equitable disallowance of any and all claims of Defendant Funds against BLMIS. |
| 13 | 402-08 | Defendant Funds | Equitable subordination of any and all claims of Defendant Funds against BLMIS under 11 U.S.C. §§ 105(a), 510(c). |

The defendants have moved to dismiss the TAC on several grounds, raising two threshold issues. First, they argue that the TAC fails to plead that Merkin Defendants actually knew that Madoff was running a Ponzi scheme or willfully blinded himself to that fact. Second, even if the Merkin Defendants had the requisite knowledge, the TAC fails to plead a basis for imputing their knowledge to the Defendant Funds. The Trustee must overcome both objections to survive the outright dismissal of the TAC.

22

## DISCUSSION

### A.    Standards Governing the Motion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citations omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 570. Courts do not decide

plausibility in a vacuum. Determining whether a claim is plausible is "a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*,

556 U.S. at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678;

*Twombly*, 550 U.S. at 570. "Where a complaint pleads facts that are 'merely consistent with' a

defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement

to relief."'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

*Iqbal* outlined a two-step approach in deciding a motion to dismiss. First, the court

should begin by "identifying pleadings that, because they are no more than [legal] conclusions,

are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "Threadbare recitals of the

elements of a cause of action supported by conclusory statements" are not factual. *See id.* at 678.

Second, the court should give all "well-pleaded factual allegations" an assumption of veracity

and determine whether, together, they plausibly give rise to an entitlement of relief. *Id.* at 679.

In deciding the motion, "courts must consider the complaint in its entirety, as well as

other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in

particular, documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007).  The court may also consider documents that the plaintiff relied on in bringing suit and

that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Brass v. Am. Film Techs.,*

*Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-

48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992); *McKevitt v. Mueller*, 689 F. Supp. 2d 661,

665 (S.D.N.Y. 2010).  Where the complaint cites or quotes from excerpts of a document, the

court may consider other parts of the same document submitted by the parties on a motion to

dismiss.  *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1532 n.23 (S.D.N.Y. 2010).

## B.    Counts One through Eight (Avoidance Claims)

### 1.    Introduction

Count One seeks to recover a preference from Ascot, and Counts Two through Eight seek

to avoid and recover actual and constructive fraudulent transfers from the Defendant Funds

under New York and federal bankruptcy law.  These Counts also ask the Court to disallow the

claims filed by the Defendant Funds until they return the avoided transfers pursuant to 11 U.S.C.

§ 502(d).[14]  On December 23, 2013, the Trustee and Ascot Fund stipulated to dismiss with

prejudice Counts One through Eight as to Ascot Fund only and only with regard to recovery of

initial transfers from Ascot Fund.  (*Stipulation and Limited Order of Dismissal with Prejudice*,

---

[14]    The TAC does not allege that any of the Defendant Funds submitted claims, but the parties seem to operate
on the assumption that they did.  I therefore assume for the purposes of this opinion that the Defendant Funds have
submitted claims that the Trustee seeks to disallow or subordinate through this adversary proceeding.

filed Dec. 23, 2013 (ECF Doc. # 189).)  The balance of the discussion in this section concerns

Ariel, Gabriel and Ariel (the "Remaining Funds").

The Trustee's ability to avoid and recover transfers has been limited by several decisions

issued by the District Court.  In light of the "safe harbor" provision of Bankruptcy Code §

546(e), the Trustee can only avoid and recover intentional fraudulent transfers under Bankruptcy

Code § 548(a)(1)(A) that were made within two years of the filing date.  *See Picard v. Greiff*,

476 B.R. 715, 718 (S.D.N.Y. 2012); *Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y. 2011)

("*Katz*").  If, however, an initial (or subsequent) transferee had *actual* knowledge of Madoff's

Ponzi scheme, he cannot avail himself of the § 546(e) safe harbor, and the Trustee can avoid and

recover preferences and actual and constructive fraudulent transfers to the full extent permitted

by state and federal bankruptcy law.  *See SIPC v. BLMIS*, No. 12 Misc. 115 (JSR), 2013 WL

1609154, at *6 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").

The transferee's knowledge is also relevant under 11 U.S.C. § 548(c).  Section 548(c)

provides a defense to a fraudulent transfer claim brought under Bankruptcy Code § 548(a) to the

extent the transferee "takes for value and in good faith."  11 U.S.C. § 548(c).  Ordinarily, the

transferee bears the burden of proving the defense, *Christian Bros. High Sch. Endowment v.*

*Bayou No Leverage Fund, LLC* (*In re Bayou Group, LLC*), 439 B.R. 284, 308 (S.D.N.Y. 2010),

and an objective, reasonable investor standard applies.  *Bayou Group*, 439 B.R. at 313; *Bear,*

*Stearns Secs. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 23 (S.D.N.Y. 2007);

*Gowan v. Wachovia Bank, N.A.* (*In re Dreier LLP*), 453 B.R. 499, 513 (Bankr. S.D.N.Y. 2011)

("*Wachovia*").  In the case of BLMIS, however, the District Court has modified the good faith

defense in two ways.  First, the Trustee must plead and prove the transferee's lack of good faith.

*SIPC v. BLMIS*, 12 Misc. 115 (JSR), 2014 WL 1651952, at *5 (S.D.N.Y. Apr. 27, 2014) ("*Good*

*Faith Decision*").  Second, the "good faith" standard is subjective rather than objective "because

the securities laws do not ordinarily impose any duty on investors to investigate their brokers,

[and] those laws foreclose any interpretation of 'good faith' that creates liability for a negligent

failure to so inquire."  *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012); *accord Katz*, 462

B.R. at 455.

The "good faith" issue is not implicated when the Trustee seeks to recover net profits.

Even if the transfer was received in "good faith," the transferee did not give value for the transfer

of net profits, and cannot, therefore, avail himself of the good faith defense.  *See Katz*, 462 B.R.

at 455-56.  The "good faith" issue is, however, implicated where, as here, the Trustee seeks to

recover the repayment of principal to the transferee because the transferee gave value to the

extent it deposited cash with BLMIS.

Thus, in order to meet his burden under Counts One through Eight, the Trustee must

plead and prove that BLMIS made an avoidable transfer and the transferee had actual knowledge

of Madoff's scheme.  If the TAC does not plead actual knowledge, the Trustee can still recover

intentional fraudulent transfers pursuant to Bankruptcy Code § 548(a)(1) under Count Two if he

can plead and prove that the Remaining Funds willfully blinded themselves to the fact that

Madoff was conducting a Ponzi scheme.  *See Good Faith Decision*, 2014 WL 1651952, at *4;

*Katz*, 462 B.R. at 454, 455-56.

The Remaining Funds have not challenged the sufficiency of the allegations that BLMIS

made avoidable transfers.  Instead, they contend that the TAC fails to allege the requisite

knowledge, and the Remaining Funds argue that even if Merkin had actual knowledge or

willfully blinded himself to Madoff's fraud, his knowledge cannot be imputed to the Remaining
Funds.

### 2.    Knowledge

The line between "actual knowledge" and "willful blindness" is difficult to draw.
"Knowledge" is "[a]n awareness or understanding of a fact or circumstance; a state of mind in
which a person has no substantial doubt about the existence of a fact," BLACK'S LAW
DICTIONARY 950 (9th ed. 2009)("BLACK"), or "the fact or condition of knowing something with
a considerable degree of familiarity gained through experience of or contact or association with
the individual or thing so known." WEBSTER'S THIRD INTERNATIONAL DICTIONARY
(UNABRIDGED) 1252 (1981) ("WEBSTER'S"). To "know" is "(1) to apprehend immediately with
the mind or with the senses **:** perceive directly **:** have direct unambiguous cognition of . . . , (2) to
have perception, cognition, or understanding of especially to an extensive or complete
extent . . . , (3) to recognize the quality of **:** see clearly the character of . . . ." *Id.* "Actual
knowledge" is "direct and clear knowledge, as distinguished from constructive knowledge."
BLACK at 950. Thus, "actual knowledge" implies a high level of certainty and absence of any
substantial doubt regarding the existence of a fact.

"Willful blindness," on the other hand, involves two elements: "(1) the defendant must
subjectively believe that there is a *high probability* that a fact exists and (2) the defendant must
take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S. A.*,
131 S. Ct. 2060, 2070 (2011) (emphasis added).[15] If a person who is not under an independent

---

[15]    Willful blindness is equivalent to the criminal law concept of "conscious avoidance." *See United States v.
Samaria*, 239 F.3d 228, 239 (2d Cir. 2001) ("The conscious avoidance doctrine provides that a defendant's
knowledge of a fact required to prove the defendant's guilt may be found when the jury 'is persuaded that the

duty to investigate "nonetheless, intentionally chooses to blind himself to the 'red flags' that

suggest a high probability of fraud, his 'willful blindness' to the truth is tantamount to a lack of

good faith." *Katz*, 462 B.R. at 455; *see United States v. Tusaneza*, 116 F. App'x 305, 306 (2d

Cir. 2004) ("[W]illful blindness" may be inferred from the presence of a pattern of "red flags"

putting defendant on notice of the illegal source of the funds."), *cert. denied*, 546 U.S. 874

(2005). Thus, willful blindness connotes strong suspicion but *some* level of doubt or uncertainty

of the existence of a fact and the deliberate failure to acquire actual knowledge of its existence.

### a.    Actual Knowledge

Paragraphs 91 through 109 of the TAC contain the allegations supporting the Trustee's

contention that Merkin had "actual knowledge of the fraud at BLMIS." The principal

nonconclusory allegations concern a telephone conversation between Merkin and representatives

of Research Company A in June 2003. According to the notes of Research Company A, Merkin

"openly admitted that Madoff appeared to be operating a Ponzi scheme," said that Madoff's

scheme was bigger than Ponzi, and "Charles Ponze [sic] would lose out because it would be

called the 'Madoff Scheme,'" and advised Research Company A of the dangers of investing

significant amounts for the long term with BLMIS, and to "[n]ever go long in a big way."

(¶ 95.) Research Company A summarized its meeting with Merkin as follows: "Seems to be

some probability even in Ezra's [Merkin's] mind that this could be a fraud." (¶ 98.) In addition,

Victor Teicher warned Merkin that BLMIS' performance was impossible, and "could be a Ponzi

scheme," (¶ 102), a conversation confirmed by Jack Mayer, a witness. (¶ 105.)

---

defendant consciously avoided learning that fact while aware of a high probability of its existence.'") (citation
omitted).

The TAC also alludes to other facts implying Merkin's actual knowledge. He admitted to representatives of Ivy Asset Management ("Ivy") that he was unable to adequately investigate BLMIS' legitimacy, and was aware that the options markets lacked the volume necessary to sustain BLMIS' option trading. (¶ 99.) He articulated concerns about fraud to Madoff, (¶ 93), but the TAC does not state what he said. In the fall of 2005 following the disclosure of the Bayou Group Ponzi scheme, he told Madoff that whenever a scam occurred in the hedge fund industry, someone will call about Madoff. (¶ 93.) Finally, Merkin maintained a folder designated "Madoff" that contained documents and analyses noting the lack of correlation between the performances of BLMIS' investments and the S&P 500.

The TAC's allegations do not imply the level of certainty or absence of substantial doubt associated with actual knowledge. Although the TAC paraphrases Research Company A's notes to state that Merkin admitted Madoff "appeared" to be running a Ponzi scheme, other allegations are not as strong. For example, the TAC also alleges that Merkin conceded to Research Company A that BLMIS "might" be a Ponzi scheme, (¶ 94), and quoted Research Company A's notes in which it characterized Merkin's mental state to the effect that there "[s]eems to be *some probability* even in Ezra's mind" that BLMIS was a fraud. (¶ 98 (emphasis added).) These two allegations connote a strong suspicion but not the absence of doubt associated with actual knowledge. Similarly, Teicher's warning to Merkin that BLMIS "could be a Ponzi scheme," (¶ 102), does not imply that BLMIS is a Ponzi scheme or that Merkin agreed with his assessment and accepted Teicher's statement as an established fact. Furthermore, Merkin's quip to Research Company A about renaming the "Ponzi scheme" the "Madoff scheme" and his statement to Madoff after news of the Bayou Group scandal broke seem more like jokes than acknowledgments that BLMIS was a Ponzi scheme. Finally, the allegations regarding the

29

conversations with Ivy and the maintenance of the "Madoff" folder merely confirm Merkin's

suspicions that something was not right with BLMIS.[16]

Accordingly, the Court concludes that the TAC fails to plausibly allege that Merkin had

actual knowledge of Madoff's Ponzi scheme.  Consequently, the safe harbor in 11 U.S.C.

§ 546(e) limits the avoidance claims to those asserted under Bankruptcy Code § 548(a)(1) in

Count Two.  Counts One and Three through Eight are, therefore, dismissed.

### b.    Willful Blindness

In order to sustain his claim under Count Two, the Trustee must initially plead that

Merkin willfully blinded himself to Madoff's fraudulent scheme.  Here, the TAC stands on much

firmer ground.  The conversation with Research Company A in June 2003 confirmed Merkin's

belief of "some probability" that BLMIS was a Ponzi scheme.  Furthermore, the TAC alleges

numerous "red flags" that Merkin saw and appreciated.  He was aware, among other things, that

the volume of options transactions that Madoff reported were impossible and exceeded the total

volume of option trades in the market, he knew that BLMIS' returns were too good to be true

and lacked any correlation to the performance of the S&P 500, he knew that BLMIS cleared its

---

[16]    In contrast, the complaint in *Cohmad* alleged, among other facts, that Cohmad was formed by Madoff and his long time friend and former neighbor, "Sonny" Cohn, to recruit BLMIS investors, their families served as officers and directors of Cohmad and shared a close personal relationship, BLMIS and Cohmad shared office space and a network computer, Cohn's daughter had access to and regularly visited the BLMIS office from which Madoff conducted his fraudulent investment advisory business, many investors understood Madoff and Cohmad to be the same entity, and most important, a database created by a BLMIS employee and maintained by a Cohmad employee monitored the actual cash value of each BLMIS customer account without regard to fictitious profits.  *Cohmad*, 2013 WL 1609154, at *5-6.  The complaint also alleged, *inter alia*, that another Cohmad associate and defendant (Jaffe) directed Madoff to back-date trades to provide him with fictitious gains and losses in almost the exact dollar amounts invested.  *Id.* at *6.  The District Court concluded that the complaint sufficiently alleged the defendants' actual knowledge of and participation in every aspect of Madoff's Ponzi scheme. *Id.*

Although the TAC alleges a close personal and social relationship between Madoff and Merkin, it does not place Merkin in BLMIS' offices, plead that Merkin connived with Madoff to manipulate the records of any transactions or suggest the type of intertwined business operations and bookkeeping that supported the inference of actual knowledge and actual participation in *Cohmad*.

own trades and did not use a third party custodian, he had been warned that Madoff's use of a

strip mall accounting firm was a "red flag," and BLMIS used an unusual fee structure which

allowed the Defendant Funds to pay $38 million less each year than they would have had to pay

under a typical fee structure.  As noted, Merkin specifically acknowledged a list of some of his

concerns with BLMIS to Research Company A, including the lack of separation between

BLMIS' investment advisory and market making/proprietary trading businesses, lack of

overnight exposure, self-clearing, moving funds to Treasury bonds in a way that was inconsistent

with BLMIS' purported investment strategy, and that BLMIS' trades were at times outside the

daily trade price range.  Thus, Merkin was aware of facts that raised a high probability that

BLMIS was a fraudulent operation.

The TAC also alleges that Merkin took deliberate actions to avoid learning the truth

about BLMIS.  When he asked Madoff which assets BLMIS managed, Madoff refused to

answer, and Merkin did not press him, stating, "I don't really care, because I've made my peace

with Bernie."  (¶ 156.)  In 2002, Merkin told Madoff during a telephone conversation:

> So I told one person, look, you can ask me how Bernie does it and that's fine, but
> when are you going to ask Bernie?  So he [sic] said, look, if I asked him, he'd
> throw me out.  I said, look, all I can tell you is don't ask so many questions.  Sit
> tight.  And that's what I tell everybody . . . .

(¶ 151.)  Finally, following the collapse of the Bayou Group in 2005, Merkin advised other fund

managers that it would now be necessary to investigate investment managers for specific

indicators of fraud, including: (i) any investment that had a self-owned broker-dealer; (ii) any

investment that had a questionable auditing firm; and (iii) any investment that had an unusual

pricing or fee structure.  (¶ 222.)  Although Merkin knew that BLMIS met each of his three

warning signs, it does not appear that he followed his own advice when it came to BLMIS.

31

The defendants, primarily through the Merkin Defendants, raise several challenges to the allegations regarding Merkin's level of knowledge.  First, they contend that the TAC omits facts that undercut the inference of knowledge.  For example, the Merkin Defendants assert that Research Company A is an investment advisor whose clients "invested *$28 million in Ascot following the June 2003 conversations with Merkin and maintained those investments through the time of Madoff's confession.*  (*Memorandum of Law in Support of Defendants J. Ezra Merkin's and Gabriel Capital Corporation's Motion to Dismiss Plaintiff's Third Amended Complaint*, dated Oct. 11, 2013 ("*Merkin Memo*"), at 9 (emphasis in original) (ECF Doc. # 166).)  This is meant to imply that Ivy could not have believed that Madoff was running a Ponzi scheme, and hence, that Merkin could not have made the statements that the TAC attributed to him.  In addition, Teicher denied in testimony he gave in another proceeding that he told Merkin that Madoff was running a Ponzi scheme.  (*Id.* at 10 & n.9.)  Merkin also refers to other extraneous facts to undercut the inference that he had actual knowledge or was willfully blind.  (*See id.* at 11-14, 20.)

As is evident, the Merkin Defendants have gone well outside the record in urging that the TAC fails to plead Merkin's actual knowledge or willful blindness.  Furthermore, even if the Trustee had possession of any of documents referred to by the Merkin Defendants, nothing suggests that the Trustee relied on those documents when he drafted the TAC.[17]  As the

---

[17]    The Merkin Defendants contend that the TAC selectively relies on and quotes from the "complete file on Madoff that Merkin maintained" and produced, and suggest that the "Court may consider other portions of the file that were also available to the Trustee when he drafted the TAC."  (*Merkin Memo* at 11 n.11) (citing *Cortec Indus.,* 949 F.2d at 48.  The cited authority supports consideration on a motion to dismiss of documents in the plaintiff's possession or of which he had knowledge "and upon which they relied in bringing suit."  *Id.  Cortec* does not support the statement that once a litigant produces a file that contains various documents, and the plaintiff relies on certain of those documents in drafting the complaint, the Court is free to consider other documents contained in the file on which the plaintiff did *not* rely in drafting the complaint.

defendants have moved to dismiss the TAC for legal insufficiency, I decline to go outside the permissible record to decide their motions.

Second, Merkin contends that his "undisputed" personal exposure of more than $110 million invested with Madoff renders implausible allegations that he knew BLMIS was a Ponzi scheme.  (*Id.* at 3, 14, 19.)  The TAC does not allege that Merkin or his family invested in BLMIS.  Instead, Merkin cites to a decision of District Judge Batts dismissing a securities fraud claim brought against the Merkin Defendants.  (*Id.* at 19.)  In *Croscill, Inc. v. Gabriel Capital, L.P.* (*In re J. Ezra Merkin and BDO Seidman Secs. Litig.*), 817 F. Supp. 2d 346, 357 n.8 (S.D.N.Y. 2011), Judge Batts rejected the argument that Merkin had a motive to engage in securities fraud because he had "significant personal exposure to Madoff's fraud," but the District Court did not state the amount of the exposure.  Furthermore, Judge Batts was considering a motion to dismiss in a different case, and the statement regarding Merkin's exposure cannot be construed as a finding of fact.

Moreover, the Merkin Defendants earned substantial management and incentive fees keyed to the net asset value of the Defendant Funds' investments and the fictitious profits generated by BLMIS increased his fees.  According to the TAC, the Merkin Defendants received $194 million in management fees from Ascot and Ascot Fund and received over $60 million in fees from Gabriel and Ariel during the period 2000 to 2007.  These substantial fees can explain why they would turn a blind eye to a fraud.  *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 410 (S.D.N.Y. 2010) (defendant feeder fund managers' "finer faculties were overcome by the fees they earned and that they turned a blind eye to obvious signs of fraud").

Third, Merkin cites several decisions dismissing securities fraud claims brought against Merkin or others in connection with the Madoff Ponzi scheme that rejected many of the "red flags" the TAC identifies because they were "widely known by or available to the SEC, other regulators, and thousands of sophisticated investors, including Merkin, have been virtually universally rejected as insufficient to allege recklessness or motive and opportunity required to plead scienter for a Section 10(b) violation." (*See Merkin Memo* at 18.)  In other words, the "red flags" fooled everyone else so the only plausible inference is that they also fooled Merkin.

The cases are distinguishable and do not support Merkin.  To state a claim for securities fraud under section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), the plaintiff must "establish that 'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'"  *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir.2003) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). *Scienter* is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); *accord Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  "[T]he inference [of *scienter*] may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud . . . ; (2) engaged in deliberately illegal behavior . . . ; (3) knew facts or had access to information suggesting that their public statements were not accurate . . . ; or (4) failed to check information they had a duty to monitor . . . ." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000); *accord South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009).  A complaint does not allege *scienter* if the factual allegations of obvious fraud are lacking, and the complaint instead alleges that the defendants would have discovered the fraud

34

had they inquired.  *See South Cherry*, 573 F.3d at 112 ("There is no factual allegation in the

Complaint that, prior to that announcement in July 2005, there were obvious signs of fraud, or

that the danger of fraud was so obvious that HG must have been aware of it.  Rather, the

Complaint alleged that '[i]f' Hennessee Group had asked various questions earlier, it would have

further questioned the Bayou Accredited financial records or recognized the need to ask further

questions.")

The Merkin Defendants' authorities reflect that the "red flag" theory of *scienter* in the

securities fraud context will be rejected where the complaint fails to allege specific facts

indicating that the defendant was aware of the red flags.  *Newman v. Family Mgmt. Corp.*, 530 F.

App'x 21 (2d Cir. 2013), *aff'g* 748 F. Supp. 2d 299, 311 (S.D.N.Y. 2010) ("Plaintiffs cursorily

allege the FMC Defendants must have known of the red flags because they were detected by

many investment professionals in the industry, and were 'equally available to each'

Defendant."); *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636 (2d Cir.

2012), *aff'g*, *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406,

413 (S.D.N.Y. 2010) (dismissing complaint that failed to allege that the defendant feeder funds'

auditors were aware of any of the concrete facts that indicated Madoff's fraud and were not hired

to audit BLMIS or render an opinion on its financial statements); *In re J. Ezra Merkin and BDO*

*Seidman Secs. Litig.*, 817 F. Supp. 2d at 356 (declining to impute fraudulent intent to the

defendants because Madoff was able to operate for many years undetected "by some of the most

sophisticated entities in the financial world: the SEC, Wall Street banks, and the like," and the

Court refused to recognize a § 10(b) claim "against those who did business with Madoff, simply

by imputing the suspicions of a few (albeit, wise) people who suspected Madoff's fraud before it

was ever discovered"); *Saltz v. First Frontier LP*, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010) ("This

35

[red flag] theory has been routinely rejected where, as here, Plaintiffs offer no evidence

Defendants were aware of most red flags, and those of which Defendants were aware, were not

so serious as to infer intent to defraud."), *aff'd*, 485 F. App'x 461 (2d Cir. 2012); *In re Beacon*

*Assocs. Litig.*, 745 F. Supp. 2d 386, 414 (S.D.N.Y. 2010) (rejecting "red flag" theory of *scienter*

pleaded against defendant BAMC, where the investment consultant did not advise BAMC of the

risk of investing with Madoff, and "there is no allegation that BAMC was actually aware of the

publicly available red flags"); *In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d

362, 371 (S.D.N.Y. 2010) ("[W]hile plaintiffs identify several purported 'red flags' in the

Complaint, they do not allege that the Auditors were aware of any facts indicative of Madoff's

fraud that they consciously disregarded—plaintiffs do not allege that Markopolos ever discussed

his assessment that Madoff was operating a Ponzi scheme with the Auditors or published it in the

press, plaintiffs do not assert that the Auditors knew that Madoff's returns could not be replicated

by others, and plaintiffs do not claim that investors who elected not to deal with Madoff

informed the Auditors of their decisions.")

The TAC does not allege that Merkin missed the "red flags" or would have or should

have seen them if he had looked.  Instead, it avers that he saw them, understood them and

purposely ignored them.  Where the complaint alleges facts showing that the defendant was

aware of the "red flags" and the probability that Madoff was running a fraudulent scheme, it

sufficiently pleads *scienter.  Beacon*, 745 F. Supp. 2d at 405 (allegations of *scienter* sufficient

against the Ivy defendants where the complaint "persuasively allege[d]" that they knew that (1)

Madoff's records of option trades and their prices were contradicted by publicly available

information, (2) Madoff provided "dubious and shifting explanations of how his business

operated," and Ivy proposed a complete divestment from Madoff, (3) there was a possibility that

36

Madoff was using client money to fund his separate market-making business, (4) Madoff's trades could not be independently verified due to his practice of "self-clearing," and (5) Madoff used a small accounting firm without an established reputation); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 408-10 (S.D.N.Y. 2010) (concluding that the defendant feeder fund managers' "finer faculties were overcome by the fees they earned and that they turned a blind eye to obvious signs of fraud," including the known secrecy of Madoff's operations run by a small circle of family members, the lack of an independent broker or custodian, Madoff's unwillingness to provide electronic records of trade confirmations and his use of delayed paper confirmations that allowed for the falsification of trades, the use of a three-person accounting firm operating out of strip mall in upstate New York, the "uncanny consistency and outsize implausibility" of BLMIS' returns, and the facially fraudulent trade confirmations that showed transactions outside the actual trading range and the trades completed on days when the markets were closed).

The red flags that Merkin saw are precisely the same ones that the District Courts in *Beacon* and *Anwar* relied on in concluding that those complaints adequately alleged *scienter*.  In addition, Merkin cautioned other fund managers following the Bayou Group's collapse in 2005 to investigate investment managers for specific indicators of fraud, including: (i) any investment that had a self-owned broker-dealer; (ii) any investment that had a questionable auditing firm; and (iii) any investment that had an unusual pricing or fee structure.  Yet Merkin apparently failed to follow his own advice and press a secretive Madoff, and the TAC supports the plausible inference that his "finer faculties were overcome by the fees they earned and that they turned a blind eye to obvious signs of fraud."

Furthermore, the fact that the Government and other investors missed the same red flags

does not mean that Merkin did too. Although an investor is not under a duty to investigate his

broker, *see Avellino*, 469 B.R. at 412; *Katz*, 462 B.R. at 455, Merkin was not a mere investor; he

was a general partner or officer of the Remaining Funds, and owed a separate duty of care in

selecting their outside money-managers and their investments. He even touted in newsletters to

the investors that the Merkin Defendants must "spend time and money looking down," (¶ 148),

and "an exceptional run of superior performance in virtually any business is almost impossible to

perpetuate . . . [and] our job, as we understand it, is to keep our guard up at all times." (¶ 207.)

In short, the visibility of "red flags" depends on who is standing sentry, and Merkin agreed to

keep a sharp lookout for fraud.

The final case cited by the Merkin Defendants on this point is *SEC v. Cohmad Secs.

Corp.*, No. 09 Civ. 5680, 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010). There, Cohmad Securities

Corporation ("Cohmad"), a registered broker-dealer, was allegedly paid by Madoff to steer

clients to BLMIS. These "recruiting" fees were the principal source of Cohmad's revenue. The

SEC alleged that Cohmad and the individual defendants who partially owned and ran Cohmad

(Maurice J. Cohn, Marcia B. Cohn and Robert Jaffe) engaged in securities fraud, and that the

defendants' fraudulent intent could be inferred from Cohmad's unusual compensation

arrangement with BLMIS, 2010 WL 363844, at *3, Madoff's request for secrecy in marketing

BLMIS, *id.* at *3-4, Cohmad's failure to disclose the full extent of its relationship with BLMIS

in its regulatory filings and books and records as well as its knowledge that BLMIS failed to

register them as being associated with BLMIS, *id.* at *4-5, and Jaffe's unusual compensation

structure and his ability to request that BLMIS back date the records of his own trades. *Id.* at *5-

6. District Judge Louis L. Stanton ruled that the complaint failed to allege facts that would have

put the defendants on notice of Madoff's fraud, and the complaint supported the inference that Madoff fooled the defendants as he had fooled everyone else. *Id.* at *2.

The Trustee sued the same defendants to avoid and recover fraudulent transfers in the form of $94 million in commissions paid to Cohmad and fictitious profits withdrawn from the customer accounts of individuals associated with Cohmad. *Cohmad*, 2013 WL 1609154, at *5. As discussed in detail in an footnote 17, *supra*, the Trustee alleged facts showing that Cohmad knew that BLMIS customer account statements reflected fictitious profits and Jaffe knew that BLMIS was fabricating trades on its books and records, *Id.* at *6. District Judge Jed Rakoff concluded that these allegations against the same defendants sufficiently alleged *actual* knowledge of, and participation in, Madoff's Ponzi scheme. *Id.* His conclusion is not intended to suggest that Judge Stanton's earlier decision was wrong. Rather, the *Cohmad* decisions illustrate how the outcome of a motion to dismiss involving the same set of transactions will depend on the factual allegations in the complaint.

Accordingly, the TAC adequately pleads willful blindness.

### 3. Imputation

The Remaining Defendants argue that even if the TAC adequately alleges that Merkin willfully blinded himself to Madoff's Ponzi scheme, his knowledge cannot be imputed to the Remaining Funds because Merkin acted outside the scope of his agency, or because the adverse interest exception applies.

Under well-established principles of agency law, "the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals." *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010); *accord Center v.*

39

*Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985) ("The general rule is that knowledge

acquired by an agent acting within the scope of his agency is imputed to his principal and the

latter is bound by such knowledge although the information is never actually communicated to

it.")  The adverse interest rule is a narrow exception to this rule:

> To come within the exception, the agent must have totally abandoned his
> principal's interests and be acting entirely for his own or another's purposes.  It
> cannot be invoked merely because he has a conflict of interest or because he is not
> acting primarily for his principal.

*Center v. Hampton Affiliates, Inc.*, 488 N.E.2d at 830.


    In applying the exception, the law distinguishes between frauds that benefit the principal

and frauds that hurt the principal.  Where the agent defrauds someone else on behalf of the

principal, the law presumes that the agent will communicate what he knows to his principal:

> This rule avoids ambiguity where there is a benefit to both the insider and the
> corporation, and reserves this most narrow of exceptions for those cases—outright
> theft or looting or embezzlement—where the insider's misconduct benefits only
> himself or a third party; i.e., where the fraud is committed against a corporation
> rather than on its behalf.

*Kirschner*, 938 N.E.2d at 952; *accord Picard v. JPMorgan Chase & Co.* (*In re Bernard L.*

*Madoff Inv. Sec. LLC*), 721 F.3d 54, 64 (2d Cir. 2013), *cert. denied*, *sub nom. Picard v. HSBC*

*Bank PLC*, 134 S. Ct. 2895 (2014).  Finally, "any harm from the discovery of the fraud—rather

than from the fraud itself—does not bear on whether the adverse interest exception applies."

*Kirschner*, 938 N.E.2d at 953.  If the company benefits while the fraud remains a secret, the

adverse interest exception will not apply.  *Kirschner*, 938 N.E.2d at 953.[18]

---

[18]    The sole actor exception is an exception to the adverse interest exception, and "applies where the principal and agent are one and the same or, in the corporate context, where the principal is a corporation and the agent is its sole shareholder." *Bankr. Servs., Inc. v. Ernst & Young* (*In re CBI Holding Co., Inc.*), 529 F.3d 432, 453 n.9 (2d Cir. 2008) (quoting *Mediators*, 105 F.3d at 827) (internal quotation marks omitted).  A sole actor cannot avail himself of the adverse interest exception because the party who should have been informed of the agent's behavior

1.      **The Scope of the Agency**

The Merkin Defendants were the agents of the Remaining Funds.  Merkin was the sole

general partner of Gabriel, (¶ 45), and Ascot.  (¶ 51.)  He was also the sole director and sole

shareholder of GCC, and GCC owned all of the voting shares of Ariel.  (¶ 49.)  In addition,

Merkin acted as the investment advisor or money manager to the Remaining Defendants at all

relevant times.  The latter defendants do not contest the Merkin Defendants' agency.

Instead, they maintain that the Merkin Defendants acted outside the scope of their

respective agencies by investing with BLMIS because the investments were inconsistent with the

investment strategies of the Remaining Funds.  Gabriel and Ariel were established to invest in

the securities and debt of distressed companies in chapter 11.  (¶¶ 113-14; *see Gabriel Offering*

*Memorandum* at i, 1, 14, 15, 20; *Ariel Offering Memorandum* at i, 1, 20, 21, 32.)  Ascot was

established to engage "primarily in the practice of index arbitrage and options arbitrage, in which

individual or baskets of securities are purchased and/or sold against related securities such as

index options or individual stock options."  (*Ascot Offering Memorandum* at 1, 12.)  What is

more, the TAC alleges that the Merkin Defendants defrauded the Remaining Funds' investors by

hiding BLMIS' role.

The Remaining Funds' offering memoranda show, however, that the investments with

BLMIS fell within the scope of the Merkin Defendants' agencies.  The Remaining Funds

expressly gave the Merkin Defendants "ultimate responsibility" for all decisions, including

investment decisions, for the funds.  (*See Ariel Offering Memorandum* at i, 2); *Ascot Offering*

---

"was the agent itself albeit in its capacity as principal."  *Mediators*, 105 F.3d at 827.  Because the Court concludes
that the adverse interest exception does not apply it is unnecessary to consider the sole actor exception.

*Memorandum* at i, 3, 13; *Gabriel Offering Memorandum* at i, 3, 16; *see also* ¶¶ 110, 145, 311.) Despite the stated investment strategies, they had wide latitude including the "sole discretion" to seek out investments and even to "engage in investment strategies that are not described herein, but that [Merkin] considers appropriate." (*Ariel Offering Memorandum*, at 20-21; *Ascot Offering Memorandum*, at 13; *Gabriel Offering Memorandum*, at 14-15.) Furthermore, the General Partner (in the case of Gabriel and Ascot) and (the Investment Advisor to the corporation in the case of Ariel) "reserve[d] the right to alter or modify some or all of the Partnership's investment strategies . . . where the General Partner, in his sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors." (*Ascot Offering Memorandum* at 3; *Gabriel Offering Memorandum* at 15; *see Ariel Offering Memorandum* at 21.) Merkin also reserved the right to invest with and delegate investment decisions to other money managers. (*Ariel Offering Memorandum*, at 20, 40-41; *Ascot Offering Memorandum*, at 12-13, 17; *Gabriel Offering Memorandum*, at 14, 28.) In those situations, the Merkin Defendants retained "overall investment responsibility for the portfolio of the Partnership (although not the investment decisions of any independent money managers managing Other Investment Entities). (*Ariel Offering Memorandum*, at 20; *Ascot Offering Memorandum*, at 12-13; *Gabriel Offering Memorandum*, at 14.)

Accordingly, the Merkin Defendants had the discretion to invest funds with BLMIS, and such investment decisions were within the scope of their employment.

### 2.    The Adverse Interest Exception

The Remaining Funds next contend that the adverse interest exception applies because the funds did not benefit from Merkin's actions, and Merkin acted contrary to the Defendant Funds' interests while furthering his own.

During the two years preceding the Filing Date, the Remaining Funds apparently realized

substantial growth and revenue as a result of their investments with BLMIS.  (*See* ¶¶ 5, 249, 251,

253) (discussing the fees earned by the Merkin Defendants).  It is reasonable to infer that the

aura of profitability benefitted the Remaining Funds by attracting more investors, *Hirsch v.*

*Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995) ("The effect of [a Ponzi] scheme

is to put the corporation farther and farther into debt by incurring more and more liability and to

give the corporation the false appearance of profitability in order to obtain new investors.");

*Manhattan Inv. Fund Ltd*., 397 B.R. at 8 (In a Ponzi scheme, "money from new investors is used

to pay artificially high returns to earlier investors in order to create an appearance of profitability

and attract new investors so as to perpetuate the scheme."), and allowing the Funds to survive

and continue to operate.  *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 496, 513 & n.20 (D. Del.

2012) ("The Complaint indicates that the fraud conferred a benefit on DBSI in the form of

bringing in more than $100 million of revenue to DBSI, some of which was used for 'general

corporate purposes.'  Courts have held that when a corporation receives funds from its investors

this is a benefit, even if the corporation received the funds through illegal or inappropriate acts of

its officers.") (citing *In re CitX Corp., Inc.*, 448 F.3d 672, 677-78 (3d Cir. 2006)); *In re NJ*

*Affordable Homes Corp.*, No. 05-60442 (DHS), 2013 WL 6048836, at *26 (Bankr. D.N.J. Nov.

8, 2013) ("Mr. Puff's alleged fraudulent actions caused a direct benefit to the Debtor: revenue

via investment.  Therefore, this Court will impute Mr. Puff's fraud to the Debtor.")  In addition,

during the two years prior to the filing date, Gabriel and Ariel invested between 23% and 25% of

their assets with BLMIS.  (¶ 247.)  Thus, they used the majority of their fictitious profits to make

other investments.  Although Ascot invested virtually all of its assets including its fictitious

profits back into BLMIS, at times it had invested up to 9% of its assets including Ponzi scheme

profits elsewhere.

In short, the TAC alleges facts supporting the inference that the Remaining Funds

benefitted from their investments with BLMIS prior to the discovery of Madoff's fraud.  "So

long as the corporate wrongdoer's fraudulent conduct enables the business to survive—to attract

investors and customers and raise funds for corporate purposes—[the adverse interest exception]

is not met."  *Kirschner*, 938 N.E.2d at 953.  As a result, Merkin's willful blindness will be

imputed to the Remaining Defendants, and the motions to dismiss Count Two as to them are

denied.

## C.    Count Nine (Subsequent Transfer Liability)

Bankruptcy Code § 550(a)(1) and (2) allow the trustee to recover an avoidable transfer

from the initial transferee or "any immediate or mediate transferee of such initial transferee."  If

the initial transfer is subsequently transferred and re-transferred many times, each transfer gives

rise to a separate claim.  For example, if an initial fraudulent transfer of $1.00 is subsequently

transferred 10 times (from transferee 1 to transferee 2, from transferee 2 to transferee 3, from

transferee 3 to transferee 4, *etc.*), the trustee can sue each transferee for $1.00.  For this reason,

the aggregate subsequent transfer claim can greatly exceed the amount of the initial transfer.

Nevertheless, the trustee is entitled to only one satisfaction, 11 U.S.C. § 550(d), and in my

example, can collect no more than $1.00 on account of the initial fraudulent transfer.

To plead a subsequent transfer claim, the trustee must plead that the initial transfer is

avoidable, and that the defendant is a subsequent transferee of that initial transfer.  Rule 9(b) of

the Federal Rules of Civil Procedure governs the portion of a claim to avoid an initial intentional

fraudulent transfer, *Sharp Int'l Corp. v. State Street Bank & Trust Co.* (*In re Sharp Int'l Corp.*),

403 F.3d 43, 56 (2d Cir. 2005); *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 251

(2d Cir. 1987); *Nisselson v. Drew Indus., Inc.* (*In re White Metal Rolling & Stamping Corp.*),

222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998), but Rule 8(a) governs the portion of a claim to

recover the subsequent transfer.  *Picard v. Madoff* (*In re BLMIS*), 458 B.R. 87, 119 (Bankr.

S.D.N.Y. 2011); *Picard v. Merkin* (*In re BLMIS*), 440 B.R. 243, 269 (Bankr. S.D.N.Y. 2010);

*SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 317-18 (Bankr. S.D.N.Y. 1999).  Here, the

defendants do not contend, and could not in light of the "Ponzi scheme presumption,"[19] that the

Trustee has failed to plead an intentional fraudulent transfer claim under 11 U.S.C. § 548(a)(1).[20]

To satisfy his burden to recover the subsequent transfer, the complaint must allege facts

that support the inference "that the funds at issue originated with the debtor," *Silverman v.*

*K.E.R.U. Realty Corp.* (*In re Allou Distribs., Inc.*), 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007);

*accord Picard v. Estate of Chais* (*In re BLMIS*), 445 B.R. 206 (Bankr. S.D.N.Y. 2011), and

contain the "necessary vital statistics—the who, when, and how much" of the purported transfers

to establish an entity as a subsequent transferee of the funds.  *Allou Distribs.*, 379 B.R. at 32;

*accord Gowan v. Amaranth Advisors LLC* (*In re Dreier LLP*), 452 B.R. 451, 464 (Bankr.

S.D.N.Y. 2011).  The plaintiff's burden at the pleading stage "'is not so onerous as to require

"dollar-for-dollar accounting" of "the exact funds" at issue.'"  *Picard v. Charles Ellerin*

---

[19]    "Courts have uniformly recognized a presumption of actual intent to defraud on the part of the transferor in the context of a Ponzi scheme.  Known as the Ponzi scheme presumption, an actual intent to defraud is presumed because the transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Gowan v. Patriot Group, LLC* (*In re Dreier LLP*), 452 B.R. 391, 423 (Bankr. S.D.N.Y. 2011) (internal quotation marks and citations omitted).

[20]    They do, of course, maintain that he failed to plead a lack of good faith, a burden the District Court has placed on the Trustee.

*Revocable Trust* (*In re BLMIS*), Adv. Proc. No. 10-04398, 2012 WL 892514, at *3 (Bankr.

S.D.N.Y. Mar. 14, 2012) (quoting *Allou Distribs.*, 379 B.R. at 30 (citing *IBT Int'l, Inc. v.*

*Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 708 (11th Cir. 2005)).

TAC Exhibit C specifies numerous inter-defendant transfers occurring within two years

of the Filing Date.  To be sure, Exhibit C does not connect each of the subsequent transfers with

an initial, voidable transfer emanating from BLMIS, or a prior subsequent transfer originating

with the initial transfer.  However, several subsequent transfers took place contemporaneously or

shortly after an initial transfer identified in Exhibit B, implying linkage.  For example, Ascot

received four transfers aggregating $280 million during the two year reach back period.  As

depicted in the following chart, on three of those days (12/29/06, 12/31/07 and 10/1/08), Ascot

made contemporaneous transfers to GCC (aggregating $16,604,539) and Ascot Fund ($8.5

million).[21]  In addition, Ascot transferred $1 million to GCC only 22 days after receiving a $50

million transfer from BLMIS, and transferred another $2 million to GCC only 15 days after

receiving a $45 million transfer from BLMIS:

| Initial Transferee | Date of Initial Transfer | Amount ($) | Date of Subsequent Transfer | Amount ($) | Transferee |
|---|---|---|---|---|---|
| Ascot | 12/29/06 | 10,000,000 | 12/29/06 | 10,104,539 | GCC |
| Ascot | 12/31/07 | 175,000,000 | 12/31/07 | 5,500,000 | GCC |
| Ascot | 7/2/08 | 50,000,000 | 7/24/08 | 1,000,000 | GCC |
| Ascot | 10/1/08 | 45,000,000 | 10/1/08 | 8,500,000 | Ascot Fund |
|  |  |  | 10/16/08 | 2,000,000 | GCC |

The TAC also alleges facts implying that GCC retransferred some of the Ascot transfers

to or for the benefit of Merkin.  The next chart shows that within 18 days of receiving

---

[21]    Exhibit C does not identify the timing or order of the contemporaneous transfers.

$10,104,539 from Ascot, GCC transferred $9,618,264 to or for the benefit of Merkin, and on the

same day that GCC received $5.5 million from Ascot it transferred $2,224,261 to or for the

benefit of Merkin:

| Date of First Subsequent Transfer to GCC | Amount ($) | Date of Retransfer to Merkin | Amount ($) |
|---|---|---|---|
| 12/29/06 | 10,104,539 | 1/16/07 | 9,618,264 |
| 12/31/07 | 5,500,000 | 12/31/07 | 2,224,261 |

Finally, Gabriel received a transfer of $17,400,000 on July 7, 2008, and transferred $1

million to Ariel three days later.  Given the short amount of time between the first and second

transfers, it is reasonable to infer in considering a motion to dismiss that some portion of the first

transfer formed part of the second transfer.

Certain other alleged subsequent transfers were separated from the closest initial transfers

by larger time gaps, but were still sufficiently close to support the inference that a portion of the

subsequent transfer originated with BLMIS.  For example, on July 7, 2008, Ariel received a

$16.2 million initial transfer from BLMIS, and received additional transfers aggregating

$205,956 thereafter, including $170,850 in September 2008.  As noted, Ariel transferred $10

million to Gabriel on October 1, 2008, and five days later, Gabriel transferred $5,400,709 to

Ariel.  The latter transfer may have originated with the July 7, 2008 BLMIS transfer to Gabriel

and/or the October 1, 2008 $10 million transfer from Ariel that itself may have originated with

the BLMIS transfer to Ariel on July 7, 2008.

Finally, the TAC alleges that Ariel received two transfers totaling $235,790 from BLMIS

in December 2006 ($179,390) and January 2007 ($56,400).  Ariel, in turn, transferred $18.5

million to Ascot on January 4, 2007.  The TAC does not allege whether the December 2006

47

transfer was made within the two-year period (*i.e.,* on or after December 11, 2006) or whether the January 2007 transfer was made after January 4, 2007.  Nevertheless, the factual allegations plausibly support the inference that some or all of the $235,790 was part of the $18,500,000 transfer from Ariel to Ascot.

The Court's conclusion that the TAC sufficiently pleads at least some subsequent transfers is also informed by the difficulties the Trustee faces in a case such as this.  The subsequent transfer claim must ultimately be proved through the books and records of the defendants.  Where the "trustee's lack of personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases,' and 'even greater latitude' should be afforded" to his pleading.  *Picard v. Cohmad Secs. Corp.* (*In re BLMIS*), 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) (quoting *Stratton Oakmont*, 234 B.R. at 310).  The TAC and Exhibit C support the Trustee's allegations that the defendants commingled their assets, transferring their funds into and out of each other's accounts.  While the Trustee has apparently discovered enough information to track transfers between and among the defendants, he may not be in a position to trace all of the subsequent transfers back to BLMIS.  To do so, he may have to trace all of the deposits into and the disbursements made from the accounts discussed in Exhibit C.

The defendants' principal opposition to the subsequent transfer claims focused on the failure to plead the lack of good faith regarding the initial transfer or the imputation of Merkin's knowledge to the Defendant Funds.  The Court has rejected these arguments as to the Remaining Funds.  Although it does not appear that Madoff's knowledge can be imputed to Ascot Fund which became a feeder fund to Ascot at the beginning of 2003 and severed its direct connection to Merkin at that time, its good faith would not automatically defeat the Trustee's subsequent

48

transfer claim.  A subsequent transferee can defend by proving that it took in good faith and without knowledge of the avoidability of the initial transfer but only to the extent it paid value. 11 U.S.C. § 550(b).  Thus, good faith alone is not enough.  Ascot Fund argues that it also paid value because it invested $802,450,000 with Ascot, withdrew only $182,800,000 from Ascot, and therefore gave value for the funds it received.  (*Memorandum of Law in Support of Defendant Ascot Fund Limited's Notice of Motion to Dismiss the Third Amended Complaint and to Sever*, filed Dec. 20, 2013 ("*Ascot Fund Memo*"), at 16 (ECF Doc. # 183).)  While this may turn out to be the case, Ascot Fund's value defense is not supported by the pleadings and goes outside the record that the Court may consider.

Certain defendants contend that the subsequent transfer claims are time-barred under Bankruptcy Code § 546(a)(1).  (*Ascot Fund Memo* at 21; *Memorandum of Law in Support of Defendant Ascot Partners, L.P.'s Motion to Dismiss the Third Amended Complaint*, dated Oct. 11, 2013, at 20 ("*Ascot Memo*") (ECF Doc. # 169).)  These defendants are mistaken.  The Bankruptcy Code distinguishes between a claim to avoid a transfer and a claim to recover the transfer or its value.  Section 546(a) governs the statute of limitations for avoidance claims brought under Bankruptcy Code §§ 544, 545, 547, 548 and 553.  With certain exceptions, the trustee must commence the estate's avoidance claims against the initial transferee within the earlier of two years of the Petition Date or the time the case is closed or dismissed.  11 U.S.C. § 546(A)(1).  The Trustee asserted his claims to avoid the initial transfers from BLMIS to the Remaining Defendants within two years of the Filing Date, and the avoidance claims are timely.

Bankruptcy Code § 550 governs the period of limitations respecting claims to recover the avoided transfer or its value, including claims against subsequent transferees.  The Trustee must bring the recovery claim within the earlier of one year after the avoidance of the initial transfer

and the time the case is closed or dismissed.  11 U.S.C. § 550(f).  As the Trustee has not yet

avoided the initial transfers and the case remains open, the statute of limitations has not begun to

run on the subsequent transfer claims.[22]

Gabriel and Ariel also argue that the Trustee alleges extensive commingling of the assets

of the Defendant Funds with Merkin's own assets, the assets of GCC, and other business assets,

and consequently, the Trustee will not be able to trace funds received by the subsequent

transferees back to BLMIS.  (*Memorandum of Law in Support of Motion of Bart M. Schwartz, as*

*Receiver of Defendants Ariel Fund Limited and Gabriel Capital, L.P. to Dismiss the Third*

*Amended Complaint*, dated Oct. 11, 2013 ("*Schwartz Memo*"), at 36 (ECF Doc. # **161**).)  While

the tracing burden may prove formidable, the TAC allegations imply that at least some of the

subsequent transfers that Gabriel and Ariel received originated with BLMIS, and it is premature

to cut off the Trustee's opportunity to satisfy his burden on a motion to dismiss because the

burden may be a difficult one to meet.  *See Gowan v. Amaranth Advisors L.L.C.* (*In re Dreier*

*LLP*), Adv. Proc. No. 10-03493 (SMB), 2014 WL 47774, at *15 (Bankr. S.D.N.Y Jan. 3, 2014)

("[T]he [subsequent transferee's] speculation that tracing is "not likely" to reveal a subsequent

transfer . . . hardly justifies granting [their cross-motion for summary judgment].")

Accordingly, the Court concludes that Count Nine adequately pleads subsequent transfer

claims against the defendants based upon initial, avoidable transfers made within two years of

the Filing Date.  Exhibit C provides the defendants with fair notice of the subsequent transfers

---

[22]       Part of the confusion arises from the Trustee's own allegations.  The TAC alleges that each of the
subsequent transfers is avoidable under Bankruptcy Code §§ 544, 547 and/or 548 and recoverable under Bankruptcy
Code § 550(a).  (¶ 379.)  The Trustee does not and cannot "avoid" the subsequent transfers because they do not
involve transfers of the debtor's property.  Instead, he must avoid the initial transfer of the debtor's property, and
then seek to recover some or all of the initial transfer from the subsequent transferee.

that the Trustee has challenged, and the foregoing discussion explains why at least some of the subsequent transfers alleged in TAC Exhibit C may be recoverable.  The Court's discussion, in this regard, is not intended to limit the potential subsequent transfers that the Trustee may recover except that the Trustee obviously cannot recover subsequent transfers that occurred more than two years before the Filing Date because they could not have originated from avoidable transfers during the two-year reach back period.

### D.    Count Ten (General Partner's Liability)

Count Ten asserts a claim against Merkin as the general partner of Gabriel and Ascot. Both are Delaware limited partnerships in which Merkin is the general partner.  Under the Delaware Revised Uniform Limited Partnership Act, a general partner of a limited partnership is personally liable for the debts of the limited partnership.  DEL. CODE ANN. tit. 6 § 17-403(b) ("[A] general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law.") The Court has concluded that the TAC states claims against Gabriel and Ascot as initial and subsequent transferees.  Merkin is liable for their debts under Delaware's limited partnership law, and the motion to dismiss Count Ten is denied.

### E.    Counts Eleven and Twelve (Equitable Disallowance)

#### 1.    Count Eleven

Count Eleven invokes equitable principles under SIPA to disallow the Defendant Funds' claims.  It alleges that the Defendant Funds acted inequitably because they had actual knowledge or strongly suspected that that BLMIS was engaged in fraudulent activity, and they enabled Madoff to perpetuate his Ponzi scheme.  (¶¶ 390-93.)  Under Bankruptcy Code § 502(b)(1), the Court shall disallow a claim if "such claim is unenforceable against the debtor and property of

51

the debtor, under any agreement or applicable law for a reason other than because such claim is

contingent or unmatured." The provision means that "any defense to a claim that is available

outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Sur. Co. of

Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007). The Trustee argues that Defendant

Funds' conduct warrants the disallowance of their claims under SIPA which is incorporated

through § 502(b)(1).

In response to the Defendant Funds' motions to dismiss, the Trustee amplified the legal

basis for the claim. SIPA § 78fff-2(b) provides that a customer's statement of claim for

obligations of the debtor to the customer or net equity must be "ascertainable from the books and

records of the debtor or . . . *otherwise established to the satisfaction of the trustee*." (Emphasis

supplied by Trustee).[23] The Trustee alleges, in substance, that the Defendant Funds cannot

establish their claims to his (or the Court's) satisfaction because they received fraudulent initial

and subsequent transfers with actual knowledge and the awareness of the possibilities and indicia

of fraud at BLMIS, and "concealed, misrepresented, and/or failed to disclose investments with

BLMIS." (*Trustee's Opposition* at 47-48.)

According to the Trustee, the authority to disallow the Defendant Funds' claims under

SIPA for equitable reasons emanates from *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir.

1974) and its progeny. *Packer, Wilbur* concerned a transaction that, the Second Circuit

---

[23]    The Trustee also refers to the *Court's Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing Other Relief* , dated Dec. 23, 2008, at 5 (Adv. Proc. No. 08-01789 ECF Doc. # 12). The latter authorizes the Trustee to "satisfy, within the limits provided by SIPA, those portions of any and all customer claims and accounts which agree with the Debtor's books and records, *or are otherwise established to the satisfaction of the Trustee pursuant to 15 U.S.C. §78fff-2(b), provided that the Trustee believes that no reason exists for not satisfying such claims and accounts* . . . ." (Emphasis added.) The Court's order cannot confer powers on the Trustee that are inconsistent with SIPA.

observed, was "hardly the paradigm of responsible trading in the securities market." *Id.* at 980. There, Arenstein instructed Coggeshall & Hicks, Inc. ("Coggeshall"), a brokerage house, to purchase 2000 shares of Syntex stock for his account. *Id.* Arenstein did not have sufficient funds in his Coggeshall account to pay for the purchase, and Coggeshall made the purchase in reliance on his explicit or implicit promise that he would make full payment and that he did not plan to sell the stock prior to making the payment. *Id.* at 980-81 n.1.

Shortly after Coggeshall made the purchase, Arenstein instructed his other broker, Packer, Wilbur & Co., Inc. ("Packer") to sell 2000 shares of Syntex. Arenstein then directed Coggeshall to deliver the Syntex stock to Packer. Arenstein expected Packer to pay Coggeshall with the proceeds of the sale, and retain the profit ($3,269.28) in Arenstein's Packer account without any cash investment on his part. *Id.* at 981. This type of transaction was known as a "free-ride." *Id.*

Packer, however, had its own devious plan. When Coggeshall delivered the Syntex shares, Packer paid with two faulty checks, and sold the stock to a bona fide purchaser for its own account. *Id.* At the end of the day, Coggeshall was left with the dishonored checks, and Arenstein had neither the Syntex stock nor the net sale proceeds in his Packer account.

Following the appointment of a SIPA trustee for Packer, Coggeshall sought reimbursement from SIPC for $90,933.82, the amount of the dishonored checks, as an open contractual commitment under SIPA § 6(d), 15 U.S.C. § 78fff(d).[24] Arenstein argued that he was

---

[24]    At the time, § 6(d) provided in relevant part that "[t]he trustee shall complete those contractual commitments of the debtor relating to transactions in securities which were made in the ordinary course of debtor's business and which were outstanding on the filing date . . . in which a customer had an interest." *Packer, Wilbur*, 498 F.2d at 981 n.3.

entitled to a $50,000 advance from SIPC, the maximum amount at the time, based on his

underlying customer claim against Packer. *Id.* at 981-82. Thus, both claimants were seeking to

collect from SIPC insurance.

The District Court denied both claims. It ruled that Arenstein had violated the margin

rules and Rule 10b-5 by misrepresenting his intention to make prompt payment, and should be

denied the benefits of the SIPC fund which was intended to protect innocent investors. *Id.* at

982. It also denied Coggeshall's claim because Coggeshall had violated the margin rules. *Id.*

Arenstein did not appeal but Coggeshall did. *Id.*

The Second Circuit disagreed with the District Court's analysis but agreed with its

conclusion. Coggeshall had not violated § 6(d), but its claim to SIPC insurance had to be

rejected based upon its connection to Arenstein. Arenstein had been denied the status of a

"customer" as a result of his fraud. As he was not a "customer," there was no open contractual

commitment in which a "customer" had an interest as required § 6(d). *Id.* at 984. In addition,

Arenstein owed Coggeshall for its purchase of the Syntex stock, and any recovery by Coggeshall

from SIPC would make it whole and inure to Arenstein's benefit. *Id.*[25]

The Court then turned its attention to Arenstein. It observed that the District Court's

determination that Arenstein was not a customer was final because he had not challenged its

ruling that "only innocent customers can claim the special insurance provided by the Act, nor has

Coggeshall challenged that determination." *Id.* at 984. Furthermore, any challenge would fail:

---

[25]    The Court also ruled that the dishonored checks did not represent an "open contractual commitment" within
the meaning of § 6(d). *Packer, Wilbur*, 498 F.2d at 985-86.

> [T]he district court was correct in concluding that "one who engages in a
> fraudulent transaction cannot reap the benefits of the Act's intended protection."
> We cannot believe that Congress intended that an active and sophisticated
> securities investor such as Arenstein, who deliberately engaged in a margin
> violation, should enjoy the benefits of SIPA.[26]

*Id.* at 984-85.  The District Court's findings supported the conclusion that Arenstein had violated

Rule 10b-5 and § 10(b) of the 1934 Act, and it would be "particularly inappropriate" to

reimburse a securities law and margin violator with "public insurance" from a "quasi-public

fund."  *Id.* at 985.  Arenstein was not entitled to the special protection of SIPA, and Coggeshall

should not be permitted to receive the same protection in Arenstein's stead.  *Id.*

The entire discussion in *Packer, Wilbur* concerned access to the SIPC insurance fund.

The Court distinguished the separate claim to customer property, observing:

> By denying Coggeshall any recovery from SIPC funds, we do not deny it
> the prospect of any recovery through prosecution of other remedies.  Presumably
> it may (if it has not already done so) assert a claim under § 6(c)(2)(B), 15 U.S.C.
> § 78fff(c)(2)(B), against the "single and separate fund" composed generally of
> that property held by Packer Wilbur from or for the account of its customers.

*Id.* at 986.

The distinction between a claim to SIPC insurance and a claim to customer property

suggests the limited scope of the holding.  The Court had earlier concluded that Coggeshall could

not recover SIPC insurance because Arenstein, the fraudster, would benefit.  Yet this conclusion

did not disentitle Coggeshall from asserting a claim to customer property even though its

---

[26]      "There is no indication in the legislative history that Congress ever adverted to the possibility of a securities
law violator reaping the rewards of SIPA.  Congressional attention appears to have been preempted by a concern for
the misdeeds of the brokerage community."  *Id.* at 985 n.11 (This footnote appears in the same location in the
original as footnote 11.).

customer claim, to the extent paid, would confer the same benefit on Arenstein. Thus, while *Packer, Wilbur* agreed with the District Court that Arenstein was not a "customer" regarding the claim for SIPC insurance, it does not necessarily mean that Arenstein was not a customer with respect to his claim to customer property.

The distinction was a focus in *SEC v. Provident Secs., Inc.*, 452 F. Supp. 477 (S.D.N.Y. 1978). There, Komons borrowed substantial amounts from Chase in violation, *inter alia*, of the 1934 Act, and used the proceeds to establish trading accounts at Provident Securities in his name and in the name of his wife. *Id.* at 478-79. After a SIPA trustee was appointed to liquidate Provident, the Komonses sought compensation from the special fund established under SIPA. Although the Bankruptcy Court found that the Komonses had violated the 1934 Act, various borrowing regulations and even the Criminal Code, it nevertheless denied the trustee's motion for summary judgment expunging the Komonses claim.

The District Court reversed, observing that *Packer, Wilbur* was not limited to its facts and announced a basic policy that such violators "were not intended to be beneficiaries of the public funds established pursuant to S.I.P.A." *Id.* at 478. The Court, declined, however, to deny the Komonses customer status for all purposes:

> This policy, of course, does not disentitle the Komonses from claiming against the assets of the Bankrupt estate. It has only to do with entitlement to the *special insurance fund* established pursuant to S.I.P.A.

*Id.* at 478 n.2 (emphasis added).

Although neither decision discussed the rationale for distinguishing between customer status for SIPC insurance and customer status for customer property, the distinction makes sense. It is one thing to deny a fraudster reimbursement from the quasi-public SIPC fund, at least to the

extent that the SIPA claim arises from the fraudulent activity.  It is quite another to deny a person

his share of property that he owns because he is a bad person.  In other words, unless the

customer lacked title to the property entrusted to the broker-dealer because of the customer's

fraud or for another reason, there is no basis in equity to disallow his right to his property in a

SIPA proceeding.

Here, the Trustee through Count Eleven is seeking to disallow the Defendant Funds'

claims and not just their right to collect SIPC insurance.  Neither *Packer, Wilbur* nor *Provident

Securities* supports the Trustee's argument for equitable disallowance of their claims under

SIPA, and in fact, *Provident Securities* directly undercuts it.  *But see Mishkin v. Siclari In re

Adler, Coleman Clearing Corp.*), 277 B.R. 520, 559-63 (Bankr. S.D.N.Y. 2002) (disallowing and

subordinating the defendant's claim based on his violation of the federal securities laws.)

Furthermore, while this Court is not required to determine the sufficiency of the allegations that

Merkin and GCC defrauded the Defendant Funds' investors, the District Court has already

dismissed federal securities fraud claims based on substantially the same allegations brought by

investors in Ascot, Gabriel and Ariel against the Merkin Defendants.  *See In re J. Ezra Merkin

and BDO Seidman Secs. Litig*, 817 F. Supp. 2d 346.  Finally, equitable disallowance of the

Defendant Funds' claims would work a substantial inequity by punishing the very investors that

the TAC contends were defrauded by Merkin.

Accordingly, Count Eleven is dismissed.

### 2.    Count Twelve

Relying on the same conduct as Count Eleven, Count Twelve seeks to disallow the

Defendant Funds' claims based on general principles of equity.  (*See* ¶¶ 396-99.)  Bankruptcy

Code § 502(b) provides in pertinent part that the Court shall determine the amount of a claim and

allow it in such amount unless the claim falls within one or more of the exceptions to allowance

set forth in the paragraph.  The Court has already discussed § 502(b)(1) in connection with Count

Eleven.  Count Twelve does not identify which of the delineated exceptions to allowance apply,

and none do.  Instead, the Trustee relies on the Court's inherent equitable power to disallow a

claim that is not subject to disallowance under any of the exceptions to allowance listed in

§ 502(b).

In *Harbinger Capital Partners LLC v. Ergen* (*In re LightSquared*), 504 B.R. 321, 336,

339 (Bankr. S.D.N.Y. 2013), Judge Chapman engaged in a thorough analysis of the question and

concluded that a Bankruptcy Court lacked the power to disallow a claim based on general

principles of equity.  *Id.* at 335-43.  First, § 502(b) required the Court to allow the claim unless it

fell under one of the exceptions, and § 502(b) did not list "equity."  *Id.* at 336, 339-41.  Second,

Bankruptcy Code § 105(a), which permits a bankruptcy court, as a court of equity, to "issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title," did not fill the void.  A Bankruptcy Court can only exercise its equitable powers within the

confines of the Bankruptcy Code, and § 105(a) does not create substantive rights.  *Id.* at 341

(citing *In re Smart World Techs., LLC*, 423 F.3d 166, 184 (2d Cir. 2005)); *see also Norwest Bank

Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the

bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").

This conclusion is bolstered by the Supreme Court's subsequent decision in *Law v. Siegel*, 134 S.Ct. 1188 (2014). There, the Court concluded that the Bankruptcy Court lacked the equitable power to surcharge exempt property under Bankruptcy Code § 105(a). Quoting *Ahlers*, 485 U.S. at 206, the Court observed that the Bankruptcy Court's equitable powers could only be exercised within the confines of the Bankruptcy Code, and surcharging exempt property violated the express terms of Bankruptcy Code § 522 which granted the exemption. *Law v. Siegel*, 134 S. Ct. at 1195. Similarly, the all-inclusive structure of 11 U.S.C. § 502(b) implies that whatever is excluded cannot be supplied through § 105(a).

Third, Bankruptcy Code § 510(c) provides for the remedy of equitable subordination, not equitable disallowance. *LightSquared*, 504 B.R. at 342. Equitable disallowance is inconsistent with equitable subordination, *id.*, and frankly, would eviscerate the principle of equitable subordination by disallowing a claim under the same set of facts.

The Court agrees with the *LightSquared* analysis, concludes that it cannot disallow an otherwise valid claim based on general principles of equity, and accordingly, Count Twelve is dismissed.

## F.    Count Thirteen (Equitable Subordination)

Count Thirteen seeks to equitably subordinate the Defendant Funds' customer claims because they "benefited by the withdrawal of at least $550 million, prior to the Filing Date," (¶ 403), misled customers "as to the true financial condition of BLMIS and . . . induced [them] to invest without knowledge of the actual facts regarding BLMIS' financial condition, and/or customers and creditors are less likely to recover the full amounts due to them," (¶ 404), and "enabled Madoff to prolong the Ponzi scheme that resulted in injury to all customers and

creditors of the BLMIS estate and conferred an unfair advantage on the Defendants." (¶ 405.)  A

Bankruptcy Court "may under principles of equitable subordination, subordinate for purposes of

distribution all or part of an allowed claim to all or part of another allowed claim or all or part of

an allowed interest to all or part of another allowed interest."  11 U.S.C. 510(c).  Inequitable

conduct "encompasses conduct that may be lawful but is nevertheless contrary to equity and

good conscience."  *Katz*, 462 B.R. at 456 (quoting *In re Verestar, Inc.*, 343 B.R. 444, 461

(Bankr. S.D.N.Y. 2006)) (internal quotation marks omitted).  Equitable subordination is

appropriate where the misconduct injured the creditors of the estate or conferred an unfair

advantage on the claimant, and equitable subordination is consistent with bankruptcy law.  *See

Benjamin v. Diamond* (*In re Mobile Steel Co.*), 563 F.2d 692, 700 (5th Cir. 1977); *ABF Capital

Mgmt. v. Kidder Peabody & Co., Inc.* (*In re Granite Partners, L.P.*), 210 B.R. 508, 514 (Bankr.

S.D.N.Y. 1997); *80 Nassau Assocs. v. Crossland Fed. Savs. Bank* (*In re 80 Nassau Assocs.*), 169

B.R. 832, 837 (Bankr. S.D.N.Y. 1994).

The Defendant Funds' are not insiders of BLMIS, and "[a]lthough equitable

subordination can apply to an ordinary creditor, the circumstances are 'few and far between.'"

*Henry v. Lehman Commercial Paper, Inc.* (*In re First Alliance Mortg. Co.*), 471 F.3d 977, 1006

(9th Cir. 2006); *Granite Partners*, 210 B.R. at 515.  "A creditor may generally improve his

position *vis-a-vis* the other creditors provided he does not receive a preference or fraudulent

transfer."  *Granite Partners*, 210 B.R. at 515; *accord In re W.T. Grant Co.*, 699 F.2d 599, 609-10

(2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983).  Thus, the proponent must plead and prove that

the non-insider engaged in "gross and egregious" conduct "tantamount to fraud,

misrepresentation, overreaching or spoliation."  *80 Nassau Assocs.*, 169 B.R. at 838-39 (internal

quotation marks omitted); *accord Official Comm. of Unsecured Creditors v. Bay Harbour*

*Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009); *Official*

*Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.* (*In re Sunbeam*

*Corp.*), 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002); *see Vargas Realty Enters., Inc. v. CFA W.*

*111 St., L.L.C.* (*In re Vargas Realty Enters., Inc.*), 440 B.R. 224, 240-41 (S.D.N.Y. 2010).

The District Court's decision in *Katz* is instructive.  There, the Trustee brought an action

against certain Madoff investors, alleging, *inter alia*, claims sounding in fraudulent transfer and

equitable subordination.  The Court declined to dismiss the claims for intentional fraudulent

transfers brought under Bankruptcy Code § 548(a)(1), concluding that the complaint adequately

pleaded that the defendants had willfully blinded themselves to Madoff's fraudulent scheme.

*Katz*, 462 B.R. at 454-55.  This conclusion also contributed to the decision to deny the motion to

dismiss the equitable subordination claim:

> Because the Amended Complaint adequately alleges that the defendants did not
> receive fraudulent transfers in good faith, it also adequately alleges that they
> engaged in inequitable conduct.  Moreover, this alleged misconduct would have
> injured any investors who invested in Madoff Securities based on the impressive
> returns others appeared to receive.  Thus, while the Trustee cannot disallow the
> defendants' claims against the Madoff Securities' estate, he can potentially
> subordinate them by proving that the defendants invested with Madoff Securities
> with knowledge, or in reckless disregard, of its fraud.

*Katz*, 462 B.R. at 456.

The Court has concluded that the Defendant Funds received the transfers in bad faith, and

consequently, the TAC adequately pleads inequitable conduct.  The balance of the Defendant

Funds' opposition focuses on three points: (1) the Trustee lacks standing to assert claims for

equitable subordination based on injuries to creditors, (2) the TAC does not adequately plead an

injury to creditors or unfair advantage to the Defendant Funds, and (3) if the Trustee recovers on

the fraudulent transfer claims, he will not be entitled to the additional remedy of equitable subordination.

### 1.      Standing

The Defendant Funds' base their challenge to the Trustee's standing on *Picard v. JPMorgan Chase & Co.* (*In re BLMIS*), 721 F.3d 54 (2d Cir. 2013), *cert. denied*, 134 S.Ct. 2895 (2014).  In that case, the Trustee sued several banks alleging, *inter alia*, four common law claims: aiding and abetting Madoff's fraud, aiding and abetting Madoff's breach of fiduciary duty, unjust enrichment, and money had and received.  *Id.* at 62.  The Court of Appeals held that under New York law, the common law claims belonged to the creditors under the principle enunciated in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 63-64 (2d Cir. 1991), and the Trustee lacked standing to assert the creditors' claims.  *Id.* at 66; *see Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 428-29 (1972).

*Picard v. JP Morgan Chase* does not govern the Trustee's standing.  The *Wagoner* rule deprived the Trustee of standing to assert common law claims against the defendant banks because New York law deprived BLMIS of standing to assert those claims, and under Bankruptcy Code § 541(a)(1), the Trustee stood in the shoes of BLMIS and inherited no greater rights.  *Picard v. JPMorgan Chase & Co.* (*In re BLMIS*), 460 B.R. 84, 91 (S.D.N.Y. 2011), *aff'd*, 721 F.3d 54 (2d Cir. 2013), *cert. denied*, 134 S.Ct. 2895 (2014).

Unlike the Trustee's common law claims, a claim based on equitable subordination does not exist or belong to creditors under New York law, and does not become property of the estate under Bankruptcy Code § 541(a)(1).  Instead, equitable subordination is a creature of Bankruptcy Code § 510(c), and the limitations on the causes of action that become property of the estate

under Bankruptcy Code § 541(a) do not apply.  *Stanziale v. Pepper Hamilton LLP* (*In re Student Fin. Corp.*),  335 B.R. 539, 555 (D. Del. 2005).  Furthermore, where the inequitable conduct injures the estate as a whole, the trustee is the person with the standing to assert it.  *See Official Comm. of Unsecured Creditors of AppliedTheory Corp. v. Halifax Fund, L.P.* (*In re AppliedTheory Corp.*), 493 F.3d 82, 87 (2d Cir. 2007).  A creditor may bring an equitable subordination claim only if he can allege a particularized injury resulting from the defendant's inequitable conduct.  *Lyme Regis Partners, LLC v. Icahn* (*In re Blockbuster Inc.*), Adv. Proc. No. 10-05524, 2011 WL 1042767, at *2 (Bankr. S.D.N.Y. Mar. 17, 2011).[27]  This brings us to the next point:  does the TAC adequately allege that the Defendant Funds' inequitable conduct injured the creditors or allowed the Defendant Funds to achieve an unfair advantage.

## 2.    Injury to Creditors/Unfair Advantage

The Defendant Funds' highlight two main deficiencies with the TAC's allegations of creditor injury and unfair advantage.  First, the transfers did not confer an unfair advantage because the Defendant Funds were net losers and each, therefore, withdrew its own money. (*Merkin Memo* at 24; *Schwartz Memo* at 43; *Ascot Fund Memo* at 25.)  Second, pointing to the language in *Katz*, quoted *supra*, they contend that the TAC does not allege that others invested in BLMIS in reliance on the appearance of the impressive returns that the Defendant Funds received, and to the contrary, alleges that Merkin failed to disclose that the Defendant Funds' assets were invested with BLMIS.  (*Schwartz Memo* at 43; *see Ascot Fund Memo* at 25-26.)

---

[27]      As noted, *Katz* ruled that the complaint adequately pled an injury to investors by inducing them to invest based on the appearance of profitability.  *See Katz*, 462 B.R. at 456.  In light of the Court's conclusion that the transfers harmed the estate as a whole, it is unnecessary to consider whether the Trustee also has standing to assert that the defendants induced the investors to invest.

The Court concludes that the TAC adequately pleads that the Defendant Funds' inequitable conduct injured the estate as a whole. According to the Trustee, BLMIS transferred at least $550 million to the Defendant Funds. But for these transfers, this money would have been available for distribution to the other BLMIS investors who now find themselves net losers. Furthermore, an equitable subordination claim is not subject to a statute of limitations, *Anderson v. 9002 Dunes LLC*, (*In re Congaree Triton Acquisitions, LLC*), Adv. Proc. No. 14-80026-JW, 2014 WL 2921086, at *6 (Bankr. D.S.C. May 29, 2014); *Shearer v. Tepsic* (*In re Emergency Monitoring Technologies, Inc.*), 366 B.R. 476, 509 (Bankr. W.D.Pa. 2007); *GNK Enters., Inc. v. ConAgra, Inc.* (*In re GNK Enters., Inc.*), 197 B.R. 444, 449 (Bankr. S.D.N.Y. 1996), or constrained by the limitations place on avoidance claims under Bankruptcy Code § 546(e). Accordingly, the Court may consider all of the transfers made to the Defendant Funds, including the transfers made to Ascot Fund prior to 2003, when Ascot Fund invested directly in BLMIS and GCC acted as Ascot Fund's investment advisor. (*See* ¶ 53.)

### 3.    The Duplicative (and Inferior) Nature of the Remedy

The Defendant Funds' last point is that the Trustee cannot avoid and recover the fraudulent transfers and also equitably subordinate their claims. It is well-settled that equitable subordination is an alternative to a monetary recovery for the creditor's wrongdoing, and the trustee cannot recover damages and equitably subordinate a claim based on the same wrong. *Hirsch v. Pennsylvania Textile Corp.* (*In re Centennial Textiles, Inc.*), 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998); *Granite Partners*, 210 B.R. at 517. If the Trustee proves that the defendants received fraudulent transfers as initial or subsequent transferees, their claims will be disallowed under Bankruptcy Code § 502(d). *SIPC v. BLMIS*, No. 12-mc-115 (JSR), 2014 WL 2925175, at

*5, 8 (S.D.N.Y. June 30, 2014). Disallowance under § 502(d) provides broader relief than equitable subordination. *Granite Partners*, 210 B.R. at 517.

Furthermore, no defendant will be entitled to any distribution unless it returns the fraudulent transfer. *Id.* Once it does, it can assert a claim to the extent permitted by Bankruptcy Code § 502(h).[28] It would seem that the Trustee should not be able to equitably subordinate the § 502(h) claim because the return of the avoided transfer would compensate the estate for the injury caused by the fraudulent transfer, and the estate cannot recover damages and equitable subordination for the same wrong. *Austin v. Chisick* (*In re First Alliance Mortg. Co.*), 298 B.R. 652, 666 n. 2 (C.D. Cal. 2003), *aff'd*, 471 F.3d 977 (9th Cir. 2006); *Wachovia*, 453 B.R. at 517; *Granite Partners*, 210 B.R. at 517; *Century Glove, Inc. v. Iselin* (*In re Century Glove, Inc.*), 151 B.R. 327, 332 (Bankr. D.Del. 1993).

In this sense, the equitable subordination claim is worth pursuing only if the Trustee fails to succeed on his fraudulent transfer claims because of defenses such as the § 546(e) safe harbor or the statute of limitations under § 546(a)(1), but can nonetheless prove inequitable conduct that injured the creditors or conferred an unfair advantage. For present purposes, however, a court should not dismiss an equitable subordination claim for legal insufficiency merely because the plaintiff has also asserted a claim for damages based upon the same conduct. *See In re Century Glove, Inc.*, 151 B.R. at 332.

---

[28]     Section 502(h) states:

A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

65

Accordingly, the motions to dismiss Count Thirteen are denied.

Settle order on notice.  The order should provide that the defendants must file their answers to the TAC within 20 days, comply with FED R. CIV. P. 26(f) and schedule a conference with the Court no later than 60 days from the date the order is signed.

Dated: New York, New York
        August 12, 2014

                                    /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge