# Exhibit 2

**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
~~David J. Sheehan~~
~~Email: dsheehan@bakerlaw.com~~
~~Marc E. Hirschfield~~
~~Email: mhirschfield@bakerlaw.com~~

*Attorneys for Irving H. Picard, Trustee for the ~~Substantively Consolidated~~**substantively consolidated** SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK**

**THIRD AMENDED COMPLAINT**

SECURITIES INVESTOR PROTECTION

SECURITIES INVESTOR PROTECTION CORPORATION,

Plaintiff,

v.

BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

Defendant.

In re:

BERNA

IRVING
Bernard

PETER
MADOF
as Execu
SUSAN
DEBOR

**SECURITIES INVESTOR PROTECTION CORPORATION,**

**Plaintiff,**

**v.**

**BERNARD L. MADOFF INVESTMENT SECURITIES LLC,**

**Defendant.**

**In re:**

**BERNARD L. MADOFF,**

**Debtor.**

**IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment**

**Plaintiff,**

**v.**

**THE ESTATE OF MARK D. MADOFF, ANDREW H. MADOFF, individually and as Executor of the Estate of Mark D. Madoff, and STEPHANIE S. MACK.**

**Defendants.**

Adv. Pro. No. 08-01789

(~~BRL~~**SMB**) SIPA

LIQUIDATION (Substantively

Consolidated)

Adv. Pro. No. 09-1503
(~~BRL~~**SMB**)

SECOND AMENDED COMPLAINT

Irving H. Picard (the "“Trustee"”), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("“BLMIS"”) under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq*. ("SIPA"),[1] and the **consolidated** estate of Bernard L. Madoff ("“Madoff"”), by and through his undersigned counsel, for his Second**Third** Amended Complaint against Peter B**the Estate of Mark D**. Madoff, Andrew H. Madoff, individually, and as Executor of the Estate of Mark D. Madoff, the Estate of Mark D. Madoff, and Shana D. Madoff[2] (collectively, the "Family Defendants"), and Susan Elkin, Mark Madoff s first wife,**“Madoff Brothers”), and** Stephanie S. Mack, Mark Madoff s**Madoff’s** widow, and Deborah Madoff, Andrew Madoff s wife (collectively, the "Spouse Defendants," and,**(“Stephanie Mack” and** collectively with the Family Defendants, the "Family and Spouse**Madoff Brothers, the “**Defendants"”), states as follows:

**NATURE OF PROCEEDING**

1. This adversary proceeding is the next step in the Trustee’s continuing effort to recover Customer Property**customer property** of BLMIS (as defined by SIPA**15 U.S.C.** § 78//**lll**(4)) stolen as part of the massive Ponzi scheme perpetrated by Madoff. Through this action, the Trustee seeks a judgment pursuant to SIPA**15 U.S.C.** §§ 78fff(b), 78fff-1(a)-(b), and 78fff-2(c)(3), sections 105(a), 502(d), 510(c), 544**(b)**, 547, 548(a), 550(a), and 551 of title 11 of the United States Code (the "“Bankruptcy Code"”), the New York Fraudulent Conveyance Act, N.Y. Debt. & Cred. §§ 270 *et seq*. (the "DCL"), New York Civil Practice Law and Rules (McKinney 2011) (the "CPLR"), and New York common law, against certain of Madoff s family members**the Defendants**, resulting from preferential payments,

[1] For convenience, references to provisions of SIPA will omit "15 U.S.C."

[3] Certain transfers to Shana Madoff identified in this Second Amended Complaint were made at a time when her name was Shana Skoller. For ease of reference, all transfers to Defendant Shana Madoff (identified in Exhibits LM, hereto) are described as being made to Shana Madoff, whether they were made to Shana Skoller or to Shana Madoff.

09-01503-bu Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

fraudulent transfers, **and** fraudulent conveyances~~, and subsequent transfers~~ they received; for damages ~~caused~~**cause** by their breaches of fiduciary duties and other tortious conduct that facilitated ~~Madoff s~~**Madoff's** crimes; for an accounting and other equitable relief for their unjust enrichment at the expense of BLMIS customers; and for the imposition of a constructive trust upon property in their possession obtained, directly or indirectly, with ~~Customer Property~~**customer property** of BLMIS.

~~2. The Family Defendants were, and frequently held themselves out to be, business and securities regulatory compliance managers and principals of BLMIS. The Family Defendants' management responsibilities extended through trading operations, customer relationships, and legal and regulatory compliance. Yet the Family Defendants were completely derelict in these duties and responsibilities. As a result, they either failed to detect or failed to stop the fraud, thereby enabling and facilitating the Ponzi scheme at BLMIS. Simply put, if the Family Defendants had been doing their jobs—honestly and faithfully—the Madoff Ponzi scheme might never have succeeded, or continued for so long.~~

~~3~~**2**. BLMIS was operated as if it were the family piggy bank. Each of the ~~Family and Spouse~~ Defendants received, directly or indirectly, huge sums of ~~Customer Property~~**customer property** from BLMIS ~~to fund personal business ventures and~~**for**

personal expenses **(**such as homes, cars, and boats~~. The Family and Spouse~~ **) as well as to fund personal business ventures. The** Defendants' misappropriation of BLMIS ~~Customer Property~~**customer property** ranged from the extraordinary (the use of BLMIS ~~Customer Property~~**customer property** to pay for multi-million dollar vacation homes) to the ~~routine~~**mundane** (the use of BLMIS ~~Customer Property~~**customer property** to pay ~~their~~ monthly credit card charges for restaurants, vacations, and clothing). The means of diverting ~~Customer Property~~**customer property** ranged from the simple (merely transferring money to the ~~Family and Spouse~~ Defendants' ~~own~~ personal bank accounts) to the complex (fabricating the ~~purchases~~**"purchase"** of securities ~~on the Family Defendants' personal BLMIS investment advisory~~**in BLMIS IA** account statements and then **allegedly "**cashing out**"** those

09-01503-brl Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

positions). These transfers necessitate a judgment in favor of the Trustee for the benefit of BLMIS and its defrauded customers.

4. The Trustee's investigation of the obligations incurred by BLMIS, the transfers and subsequent transfers from BLMIS to or for the benefit of the Family and Spouse Defendants, and the extent to which the Family and Spouse Defendants benefited at the expense of BLMIS customers, is ongoing. Through that continuing investigation and discovery in this action, the Trustee may identify further transfers and obligations avoidable and/or recoverable and further amounts by which the Family and Spouse Defendants have been unjustly enriched. All of the factual allegations in this Second Amended Complaint are based upon information available to the Trustee at this time. The Trustee reserves the right, however, to supplement his allegations with respect to the amounts recoverable should further information become available.

**3.This adversary proceeding is unlike any other that the Trustee has commenced because it is directed against the chief fraudster's immediate family members—his sons (the Madoff Brothers) and daughter-in-law (Stephanie Mack). The Madoff Brothers had unique access to the IA business as they were IA customers themselves as well as BLMIS management and securities professionals with decades of experience. The Madoff Brothers were educated by the country's top universities and went on to manage and supervise BLMIS's market-making and proprietary trading businesses for their entire careers. The Madoff Brothers knew, saw, and were simply too intelligent to plausibly feign ignorance about the fraud that was occurring before, by, and around them; a fraud that benefitted them by the many millions of dollars they siphoned from the IA Business through fraudulent IA accounts, fictional deferred compensation, and transfers from the BLMIS bank account disguised as purported loans from their**

**parents so they could fund their lavish lifestyles. Even the market-making and proprietary trading business units they ran were fraudulently propped up with stolen IA customer money. The Madoff Brothers and their families benefitted**

**enormously from this Ponzi scheme at the expense of the defrauded BLMIS customers, and despite the public disclosure of the fraud that devastated and destroyed so many lives, they continue to claim to be entitled to *more*.**

**4. The Madoff Brothers were, and held themselves out to be, business and securities regulatory managers and principals of BLMIS. The Madoff Brothers' management responsibilities extended through BLMIS's market-making and proprietary trading businesses, compliance, and customer relationships. As Madoff's sons, the Madoff Brothers had special access to information about BLMIS's operations and activities, including their own investment accounts, which demonstrated the company was engaged in fraud. They knew of, and willfully blinded themselves to, the clear indicia of fraudulent activity in BLMIS's IA Business for their personal benefit. By their managerial failures, the Madoff Brothers also enabled and facilitated the Ponzi scheme at BLMIS, reaping vast financial benefits for themselves and their families at the expense of the defrauded BLMIS customers. Irrespective of these failures and knowledge, the Madoff Brothers were unjustly enriched from their fictitious IA accounts, excessive compensation, and other transfers from BLMIS at the expense of the defrauded IA victims.**

5. ~~The~~**In this adversary proceeding, the** Trustee ~~has identified and~~ seeks to recover ~~in this action~~**$153,293,116 in avoidable and recoverable transfers comprising BLMIS customer property** for the benefit of the customers of BLMIS ~~at least $255,322,657 in avoidable and recoverable transfers comprising BLMIS Customer Property~~. This amount includes avoidable initial transfers to **and/**or for the benefit of the ~~Family Defendants~~**Madoff Brothers** of: (a) $~~145,206,356~~**88,649,845** during the six-year period prior to ~~Madoff s~~**Madoff's** arrest ~~and the demise of BLMIS~~ on December 11,

2008; (b) $59,874,82635,303,204 during the two-year period prior to December 11, 2008; and (c) $8,691,1523,829,212 during the one-year period prior to December 11, 2008. The Family Defendants also received subsequent transfers of at least $8,981,500. TheThese initial and subsequent transfers to each of the Family Defendants generallyMadoff Brothers described above are set forth in detail in the following exhibits attached to this Second Amended Complaint: Exhibits C-D (Peter Madoff); Exhibits E-F (Mark Madoff); Exhibits I-J (Andrew Madoff); and Exhibits L-M (Shana Madoff).

09-01503-bu Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

6. The Trustee also seeks to recover at least $54,548,463, and property interests of undetermined value, from Stephanie Mack and Deborah Madoff, by which they were unjustly enriched during the Statutory Period,[3] and resulting from their respective marriages to Mark Madoff and Andrew Madoff.[4] The Trustee further seeks to recover at least $3,020,000, and property interests of undetermined value, in subsequent transfers from the Spouse Defendants, also resulting from their respective marriages to Mark Madoff and Andrew Madoff. These transfers to each of the Spouse Defendants, or by which they were unjustly enriched, are set forth in detail in the following exhibits attached to this Second Amended Complaint: Exhibit G (Susan Elkin); Exhibit H (Stephanie Mack); and Exhibit K (Deborah Madoff).

THE PARTIES

7. Defendant Peter B. Madoff is Madoff s brother and was BLMIS' s Senior Managing Director and Chief Compliance Officer ("CCO"). Peter had worked at BLMIS since 1965. He is a graduate of the Fordham University Law School. Peter was an experienced investment professional and held a number of industry licenses, including Series 1 (general securities representative pre-dating Series 7), Series 4 (options principal), and Series 55 (equity trader). Peter was involved professionally as a leader in the securities industry and, as such, gave the appearance of being concerned about improvements in the industry for the benefit of the

[3] On April 4, 2012, the Bankruptcy Court granted the Trustee leave to amend the Amended Complaint, in part, in order to bring unjust enrichment and constructive trust claims against Stephanie Mack and Deborah Madoff covering six years prior to December 23, 2011, when the Trustee sought leave to amend the Amended Complaint (the "Statutory Period"). The Bankruptcy Court also allowed the Trustee to add the Spouse Defendants in connection with subsequent transfer claims, and to add and clarify transfers against the Family Defendants. *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-01503, 2012 WL 1124880, at *10 (Bankr SDNY Apr. 4, 2012) (Dkt. No. 106).

[4] Peter Madoff's wife, Marion Madoff, who received payments from BLMIS for which no services were performed while a purported BLMIS "employee," also received, or benefited from, preferential payments, fraudulent transfers, and fraudulent conveyances from BLMIS. The Trustee commenced a separate adversary proceeding against Marion Madoff styled as *Picard v. Marion Madoff*, Adv. Pro. No. 10-04310 (BRL), and will amend the Complaint

~~in that action (the "Marion Madoff Complaint") as necessary.~~

09-01503-bu Doc 113 Filed 05/04/12 Entered 05/04/12 15:41:05 Main Document

investing public. He was Director of the Securities Industry Financial Markets Association ("SIFMA") and served as a member of the Board of Governors and Executive Committee of the National Stock Exchange. He also served as Vice Chairman of the Financial Industry Regulatory Authority ("FINRA") Board of Governors, on the Executive Committee Board of Governors of NASDAQ, and as a Director of the National Securities Clearing Corporation.

8. Mark D. Madoff, now deceased, was Madoff s son.[5] He held the title of Co-Director of Trading at BLMIS. Mark also held the titles of Controller and Director at Madoff Securities International Ltd. ("MSIL"), a related British entity which helped Madoff and BLMIS create the false impression that BLMIS actively traded shares in its customers' investment accounts. Mark had worked at BLMIS since 1986, upon graduation from the University of Michigan. Mark was an experienced investor and investment professional who directed many of BLMIS's customer relations efforts and, at times, managed both BLMIS's proprietary trading desk and its market-making operations. Mark also held a number of securities licenses with FINRA while working at BLMIS, including Series 7, 24, and 55. He was also involved professionally as a leader in the securities industry and, as such, gave the appearance of being concerned about improvements in the industry for the benefit of the investing public. He was Chairman of the FINRA Inter-Market Committee, Governor of the Securities Traders Association ("STA"), Co-Chair of the STA Trading Committee, a member of the FINRA Membership Committee and Mutual Fund Task Force, President of the STA of New York ("STANY"), Chairman of the FINRA Regulation District Ten Business Conduct Committee, and Chairman of the SIFMA NASDAQ Committee.

[5] In addition to the Trustee's claims in this action against Andrew Madoff individually, the Trustee's claims against Mark Madoff are brought against both Andrew H. Madoff, as Executor for the Estate of Mark D. Madoff, and the Estate of Mark D. Madoff.

09-01503-bu Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

9. Upon information and belief, Defendant Susan Elkin (formerly Susan Madoff) was married to Mark Madoff from September 1989 until their divorce in 2000.[6] During all relevant times, Susan Elkin was an insider of BLMIS.

10. Upon information and belief, Defendant Stephanie S. Mack (formerly Stephanie Madoff) was married to Mark Madoff from October 23, 2004 until Mark's death on December 11, 2010. During all relevant times, Stephanie Mack was an insider of BLMIS.

11. Defendant Andrew H. Madoff is also Madoff s son. He shared the title of CoDirector of Trading at BLMIS with his brother, Mark Madoff. He also held the titles of Controller and Director of MSIL. Andrew had worked at BLMIS since 1988, upon graduation from the University of Pennsylvania. Andrew was an experienced investor and investment professional who supervised trading at BLMIS, managed the trading floor, and directed many audit and compliance projects for BLMIS, including the confirmation and reporting of trades. He held a number of securities licenses with FINRA while working at BLMIS, including Series 4, 7, 24, and 55. Andrew was involved professionally as a leader in the securities industry and, as such, gave the appearance of an involved leader in the securities industry concerned about improvements in the industry for the benefit of the investing public. He was Chairman of the Trading, Trading Issues and Technology, and Decimalization and Market Data Committees and Subcommittees at SIFMA, and a member of the FINRA District Ten Committee and NASDAQ's Technology Advisory Committee.

[6] As official marriage and divorce records are not publicly available, the dates of Mark's marriages to Susan Elkin and Stephanie Mack, and Andrew's marriage to Deborah Madoff, as described in this Second Amended Complaint, are approximated based upon documents available to the Trustee.

**Exhibits B-C (Mark Madoff) and Exhibits E-F (Andrew Madoff) to this Third Amended Complaint.**

**6.** **The Trustee further seeks to recover property interests of undetermined value, in subsequent transfers to Defendant Stephanie Mack, resulting from her marriage to Mark Madoff. These transfers to Defendant Stephanie Mack are set forth in Exhibit D to this Third Amended Complaint.**

~~12. Upon information and belief, Defendants Deborah Madoff and Andrew Madoff were married on January 18, 1992. During all relevant times, Deborah Madoff was an insider of BLMIS.~~

~~13. Defendant Shana D. Madoff is Madoff's niece and Defendant Peter Madoff's daughter. Shana had worked at BLMIS since 1995, upon graduation from Fordham University Law School. At various times, Shana held herself out as Compliance Counsel, in-house Counsel, and Compliance Director of BLMIS. Shana was an experienced investment professional who, along with her father, Peter Madoff, and her uncle, Bernard Madoff, was responsible for overseeing all compliance-related activities at BLMIS. Shana was a member of the SIFMA Compliance and Legal Division Executive Committee, the FINRA Consultative Committee, STANY, the NASD's Market Regulation Committee, the SIFMA Self-Regulatory and SRO Committee, and the SIFMA Continuing Education Committee.~~

**JURISDICTION AND VENUE**

~~14~~**7**. This is an adversary proceeding ~~brought~~**commenced** in this Court, in which the main underlying SIPA ~~case, Adv. Pro.~~**proceeding,** No. 08-01789 (~~BRL~~**SMB**) (the ~~"~~**“**SIPA Proceeding~~"~~**”**), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York ~~(the "District Court")~~ as *Securities ~~Investor Protection Corporation~~**Exchange Commission** v. Bernard L. Madoff*

*Investment Securities LLC* and, with the consent of the Securities and Exchange Commission (the "SEC") under SIPA § 78eee(a)(4)(A), was combined with the SEC's action styled *Securities Exchange Commission vs. Bernard L. Madoff Investment Securities LLC et atal.*, No. 08-CV- CV 10791 (the "“District Court Proceeding"”), and has been referred to this Court. This Court has jurisdiction over the SIPA Proceedingthis adversary proceeding under 28 U.S.C. § 1334(b) and SIPA(e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

158. This is a core proceeding pursuant tounder 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H), and (0O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

09-01503-brl Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

169. Venue in this district is proper under 28 U.S.C. § 1409. GENERAL

**10. This adversary proceeding is brought pursuant to 15 U.S.C. §§ 78fff(b), 78fff-1(a) and (b), and 78fff-2(c)(3), sections 105(a), 502(d), 510(c), 544(b), 547, 548(a), 550(a), and 551 of title 11 of the United States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq*. (McKinney 2001)), and other applicable law.**

09-01503-smb Doc 189-1 Filed 07/15/14 Entered 07/15/14 14:05:49

## BACKGROUND, THE TRUSTEE, AND STANDING

1711. On December 11, 2008 (the "“Filing Date"”), Madoff was arrested by federal agents for **criminal** violations of the criminal**federal** securities laws, including, *inter alia,* securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the SEC filed a complaint in the District Court which**Securities and Exchange Commission (“SEC”)** commenced the District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains**, which is** pending in the District Court. The SEC**SEC’s** complaint alleged**alleges** that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

1812. On December 12, 2008, Judge**the Honorable** Louis L. Stanton of the District Court

entered an order that appointed Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").

1913. On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of**combining** its own action with an application of**by the** Securities Investor Protection Corporation ("“SIPC"”). Thereafter, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia***among other things**, that BLMIS was**could** not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

2014. Also on December 15, 2008, Judge Stanton granted SIPC' s**SIPC’s** application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

**entered an order that:**

**a.** **removed the receiver and** **appointed the Trustee for the liquidation of the**

    ~~a.~~ ~~appointed the Trustee for the liquidation of the~~ business of BLMIS ~~pursuant to~~**under** SIPA § 78eee(b)(3);

b. appointed Baker & Hostetler LLP as counsel to the Trustee ~~pursuant to~~**under** SIPA § 78eee(b)(3); and

c. removed the case to this ~~Bankruptcy~~ Court pursuant to SIPA § 78eee(b)(4).

09-01503-brl Doc 113 Filed 05/04/12 Entered 05/04/12 15:41:05 Main Document

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

2115. By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcythis Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS. In addition, the bankruptcy estate of Madoff, individually, was substantively consolidated into the estate of BLMIS by order of the Bankruptcy Court dated June 9, 2009.

**16. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.**

~~22~~**17**. At a plea hearing on March 12, 2009 **(the "Plea Hearing")**, **in the case captioned** ***United States v. Madoff*, Case No. 09-CR-213 (DC),** Madoff pleaded guilty to an ~~11-count~~**eleven-count** criminal information filed against him by the United States ~~Attorney's Office~~**Attorney** for the Southern District of New York. At the ~~plea hearing~~**Plea Hearing**, Madoff admitted that he ~~"~~**"**operated a Ponzi scheme through the investment advisory side of [BLMIS]~~"~~**," (Plea Hr'g Tr. at 23: 14-17),** and ~~acknowledged that~~ ~~"~~**asserted "**[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal.~~" (Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (Dkt. No. 57).) Instead of being used for the investments Madoff promised his clients, investors' funds were principally deposited into BLMIS' s account at JPMorgan Chase & Co., Account No. xxxxxxxxxxx1703 (the "703 Account).~~**"** (*Id*. at ~~24.~~**23: 20-21**)**.** On June 29, 2009, Madoff was sentenced to ~~a prison term of~~ 150 years **in prison**.

~~23. On August 11, 2009, a former BLMIS employee, Frank DiPascali, Jr. pleaded guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, DiPascali pleaded guilty to a ten-count criminal information. (Plea Allocution of Frank DiPascali at 18-20, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Dkt. No. 11).) Among other things, DiPascali admitted that the Ponzi scheme had been ongoing since at least the 1980's. (*Id.* at 46.)~~

**18. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee,**

pleaded guilty to a ten-count criminal information charging him with participating in, and conspiring to, perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

19. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping to create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

20. At a plea hearing on December 15, 2011, in the case captioned *United States v. Cotellessa-Pitz*, Case No. 10-CR-228 (LTS), Enrica Cotellessa-Pitz, the former BLMIS

09-01503-smb Doc 113 185-1 Filed 05/04/12 07/15/14 Entered 05/04/12

24. On November 21, 2011, David Kugel, a former BLMIS trader and manager, controller, pleaded guilty to a six-count four-count criminal information, charging him with, among other things, participating in a conspiracy to commit her with securities fraud and to falsify BLMIS's books and, falsifying records. (Plea Allocution of David Kugel at 14-16, of BLMIS, and conspiracy.

21. At a plea hearing on December 20, 2012, in the case captioned *United States v. Kugel Peter Madoff*, Case No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011) (Dkt. No. 188).) Kugel admitted to helping create false, backdated trades beginning from the early 1970s to BLMIS's collapse in December 2008 by providing "historical trade information . . . first to Annette Bongiorno, and later to Joanne Crupi, and others which enabled them to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred." (*Id.* at 32.), Peter Madoff, Bernard Madoff's brother and BLMIS's chief compliance officer, pleaded guilty to a two-count criminal information charging him with falsifying records and conspiracy to commit securities fraud. He is serving a 10-year sentence and was required to forfeit $143.1 billion to the U.S. Department of Justice.

22. On March 24, 2014, after a nearly six-month criminal trial, five former BLMIS employees, Annette Bongiorno (IA Employee), Joann Crupi (IA Employee), Daniel Bonventre (Director of Operations), Jerome O'Hara (Computer Programmer), and George Perez (Computer Programmer), were convicted for the roles they played assisting, concealing, and grossly profiting from Madoff's fraud. Charges against the criminal defendants included conspiracy to defraud clients, securities fraud, and falsifying books and records. (*United States v. Bonventre, et al.*, Case No. 10-CR-228

**(LTS)).**

**23. At a plea hearing on June 23, 2014, in the case captioned *United States v. Paul Konigsberg*, Case No. 10-CR-228 (LTS), Paul J. Konigsberg, Madoff's accountant and accountant for many IA customers, pleaded guilty to a three-count criminal information charging him with falsifying books and records of a broker-dealer, falsifying books and records of an investment advisor, and other charges.**

**24. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was**

~~25. On December 19, 2011, Enrica Cotellessa-Pitz, the former BLMIS Controller who primarily worked with the firm's proprietary trading and market-making businesses, pleaded guilty to a four-count criminal information, charging her with, among other things, participating in a conspiracy to falsify the books and records of BLMIS and to make false filings with the SEC. (Plea Allocution of Enrica Cotellessa-Pitz at 14, *United States v. Cotellessa-Pitz,* No. SS-CR-0228 (LTS) (S.D.N.Y. Dec. 19, 2011).) Pitz admitted to perpetuating the fraud by making inaccurate accounting entries in BLMIS's books and records and filing false documents reflecting these false entries with regulators and others from the period 1999 through December 2008. *(Id.* at 29.) These inaccurate entries included improperly booking transfers from BLMIS's investment advisory business (the "IA Business") to the accounts of the proprietary trading and market-making businesses, which "falsely inflated the revenue, increased the profits, and hid the losses of the Proprietary Trading and Market Making businesses and at the same time did not accurately report the financial condition of BLMIS as a whole." *(Id.* at 31-32.)~~

09-01503-bu Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

26. The Trustee has the job of recovering and paying out Customer Property to BLMIS's customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets and the liquidation of BLMIS's assets is well underway. The assets recovered, however, will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from, among others, the Family and Spouse Defendants who received or benefited from money which belonged to BLMIS and its defrauded customers. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

27. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code (in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b)). Chapters 1, 3, 5, and Subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case to the extent consistent with SIPA.

28. Pursuant to SIPA §§ 78fff(b) and 78lll(7)(B), the Filing Date is deemed to be the date of the filing of the petition and commencement of a case under the Bankruptcy Code.

29. The Trustee has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

(a) BLMIS incurred losses as a result of the claims set forth herein;

(b) the Trustee is a bailee of customer funds entrusted to BLMIS for investment purposes;

(c) the Family and Spouse Defendants received Customer Property;

09-01503-smb Doc 113185-1 Filed 05/04/1207/15/14 Entered 05/04/12

consumed by the Ponzi scheme. Absent that and other recovery actions, the Trustee cannot satisfy the customer claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

(d) SIPC has not reimbursed, and will not fully reimburse, the customers for their losses;

(e) the Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have allowed claims in the liquidation proceeding. To the extent the Trustee has received express assignments of certain BLMIS customer claims, which they could have asserted, the Trustee stands in the shoes of persons who have suffered injury in fact, and a distinct and palpable loss for which the Trustee is entitled to seek monetary damages;

SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

(g) the Trustee has the power and authority to avoid obligations, and avoid and recover transfers, pursuant to sections 105(a), 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, applicable state law including the DCL, and applicable provisions of SIPA, including sections 78fff(b), 78fff-1(a)-(b), and 78fff-2(c)(3).

## THE FRAUDULENT PONZI SCHEME

3025. Madoff founded BLMIS is a New Yorkin or about 1960 as a sole proprietorship, and on January 1, 2001, he formed it as a limited liability company that was wholly owned by Madoff. Itunder the laws of the State of New York. For most of its existence, BLMIS operated from its principal place of business in the "Lipstick Building" at 885 Third Avenue, in ManhattanNew York, New York. Madoff, as founder, sole owner, chairman, and chief executive officer, ranoperated BLMIS together with the Family

Defendants. BLMIS was registered with the SEC as a securities broker-dealer under section 15(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(b)). By virtue of that registration, BLMIS is a member of SIPC.

with several family members, including the Madoff Brothers, and other employees, some of whom have been indicted or pleaded guilty to helping Madoff carry out his fraudulent scheme. 31. BLMIS was composed ofhad three business units: ainvestment advisory (the "IA Business"), market-making business, a, and proprietary trading desk, and an investment advisory business. The proceeds of the Ponzi.

26. During the early 1970s through the early 1990s, Madoff claimed to invest customer funds using a "convertible arbitrage investment strategy," by which investors would gain profits from a change in the expectations for the stock or convertible security over time.

27. From about the 1990s forward, Madoff outwardly ascribed the IA Business's consistent investment success to his investment strategy called the "split-strike conversion investment strategy" ("SSC Strategy"). Madoff generally promised investors that their funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100 Index"), which is a collection of the 100 largest publicly traded companies, as determined by Standard & Poor's Index Committee. The basket of stocks was designed to mimic the movement of the S&P 100 Index. Because Madoff claimed that he would carefully time purchases and sales to maximize value, customer funds would intermittently be out of the market. During those times, Madoff claimed that the funds were invested in U.S. Treasury

securities ("Treasury Bills"). There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or on any other trading platform on which BLMIS could have traded securities. There are no BLMIS records that demonstrate that BLMIS traded securities in connection with the SSC Strategy.

28. The second part of the SSC Strategy involved selling call options and buying put options on the S&P 100 Index; this is commonly referred to as a "collar." Madoff purported to purchase and sell option contracts to control the downside risk of price changes in the basket of stocks correlated to the performance of the S&P 100 Index. All options related to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, cleared through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

29. At the Plea Hearing, Madoff admitted that BLMIS purchased none of the securities it claimed to have purchased for IA Business customers.

30. Madoff operated the IA Business as a Ponzi scheme. The money received from IA Business customers was not set aside to buy securities or options, as Madoff claimed, but instead was used primarily to make the distributions to, or payments for, other customers. The falsified monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments. In reality, BLMIS had not invested its customers' funds but paid customers based upon

the inflated amounts reflected in their fake securities transactions, as if those amounts were genuine. The money sent to BLMIS for investment was used to keep the fraudulent scheme operating and to enrich

Madoff, the Madoff Brothers, other family members, associates, and others, until December 2008, when requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

31. BLMIS did not register as an investment adviser with the SEC until in or about August 2006. At that time, BLMIS filed with the SEC Form ADV (Uniform Application for Investment Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts and assets under management of $11.7 billion. Thereafter, BLMIS filed Form ADV annually with the SEC, the latest of which was filed in January 2008. It represented that BLMIS had 23 customer accounts with assets under management of approximately $17.1 billion. In fact, at that time, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion under management.

32. BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person accounting firm in Rockland County, New York. Of the three employees at the firm, one employee was an administrative assistant and one was a semiretired accountant living in Florida. On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. The Madoff Brothers, who used Friehling & Horowitz to prepare their own tax returns, could not have reasonably believed it possible for any such firm to have competently audited an entity the size of BLMIS.

scheme were used to prop up all of the business units – none of which would have been profitable absent the fraudulent scheme from at least fiscal year 2000 forward.

32. For years, the IA Business purported to utilize a "split-strike conversion" strategy to

~~generate enormous and steady financial returns for its customers. In truth, though, BLMIS never implemented this strategy, or any other. At his plea hearing, Madoff admitted that BLMIS never in fact purchased any of the securities it claimed to have purchased for customer accounts. The Trustee's investigation establishes that, to the extent that records are available, BLMIS never carried out an actual IA business; it simply deposited the customers' investment funds in a bank account and used the money to pay other customers' redemptions. The deceptive scheme worked as planned until, inevitably, customers' requests for redemptions overwhelmed the flow of new investments and caused the collapse of the Ponzi scheme in December 2008.~~

~~33. During the operation of the Ponzi scheme, when customers requested and received distributions of the purported "profits" in their accounts, they were paid with the money invested by other customers. When customers redeemed or closed their accounts, they were paid amounts consistent with the fictitious customer statements they had been receiving, fostering the deception that their investments, and the corresponding profits and distributions received, were legitimate. Because BLMIS was no more than a Ponzi scheme, however, the money those customers withdrew was simply the money invested by other customers.~~

~~34. Instead of using Customer Property for investment in the split-strike conversion strategy, BLMIS used those funds to continue operations and pay redemption proceeds to or on behalf of other investors and to make other improper transfers. Thus, due to the siphoning and diversion of new investments to pay requests for payments or redemptions from other account holders, BLMIS did not have the funds to pay customers on account of their new investments.~~

09-01503-brl Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

BLMIS was able to stay afloat only by using new principal invested by customers to pay requests for payments and redemptions. At all times**33. At all** relevant hereto, the**times, BLMIS's** liabilities of BLMIS were **a minimum of millions, and at times billions, of dollars** greater than its assets. BLMIS was insolvent in that**because**: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they

09-01503-smb Doc 185-1 Filed 07/15/14 Entered 07/15/14 14:05:49

came due; and (iii) at the time of the transfers ~~identified in this Second Amended Complaint~~alleged herein, BLMIS was left with insufficient capital.

**THE DEFENDANTS**

**34. Mark D. Madoff, now deceased, was Bernard Madoff's eldest son.[1] He held the title of Co-Director of Trading at BLMIS. From the time he graduated from the University of Michigan in 1986 through his father's arrest in December 2008, Mark Madoff worked at BLMIS. Mark Madoff was an experienced investor and investment professional who directed many of BLMIS's customer relations efforts and, at times, managed both BLMIS's proprietary trading desk and market-making operations. He held a number of securities licenses with the Financial Industry Regulatory Authority ("FINRA") while working at BLMIS, including Series 7 (securities representative), 24 (securities supervisor), and 55 (equity trader). He was also involved professionally as a leader in the securities industry, giving the appearance of being concerned about improvements in the industry for the benefit of the investing public. He was Chairman of the FINRA Inter-Market Committee, Governor of the Securities Traders Association ("STA"), Co-Chair of the STA Trading Committee, a member of the FINRA Membership Committee and Mutual Fund Task Force, President of the STA of New York ("STANY"), Chairman of the FINRA Regulation District Ten Business Conduct Committee, and Chairman of the Securities Industry Financial Markets Association ("SIFMA") NASDAQ Committee.**

**[1] In addition to the Trustee's claims in this adversary proceeding against Andrew Madoff individually, the Trustee's claims against Mark Madoff are brought against both Andrew H. Madoff, as Executor for the Estate of Mark D. Madoff, and the Estate of Mark D. Madoff.**

## BLMIS'S REQUIRED COMPLIANCE AND SUPERVISORY PROCEDURES SHOULD HAVE PREVENTED THE FRAUD

35. The Family Defendants each held senior management positions at BLMIS entailing legal compliance and/or supervisory responsibilities. BLMIS's compliance and supervisory policies (and the laws and regulations mandating those policies) were supposed to ensure that suspicious and irregular activity would be caught, reported, and stopped. Instead, important compliance and supervisory roles were given to the Family Defendants who, rather than approach their jobs with appropriate professional diligence, failed to properly and faithfully carry out their duties and responsibilities. Those policies included BLMIS's "Internal Risk Management Controls" in which BLMIS stated that:

> Bernard L. Madoff Investment Securities LLC ("Madoff') takes very seriously its responsibility to maintain a stringent risk management supervisory system. Risk management includes the continuous identification, management, measurement and oversight of Madoff s various business risks. . . . Senior management . . . [is]. . . directly involved [in oversight through an]
> intricate system of supervision, review, and communication between Madoff s senior management, supervisory, trading, operations and systems personnel.

36. Not one of these assertions, however, was true. Senior management the Family Defendants did not do their jobs. Otherwise, the Ponzi scheme might have been detected and stopped many years ago.

09-01503-brl Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

37. In that same document, BLMIS claimed that it "has established and maintains . . . internal controls to ensure the integrity of the firm's written supervisory and operational procedures." As part of that supervision, "Senior Management" (which included each of the Family Defendants) was to communicate with "department managers on a daily basis to ensure proper procedures are being followed." BLMIS's Internal Audit Committee was also to conduct internal audits on a monthly or quarterly basis. Upon information and belief, none of this consistently occurred with the regularity required.

38. BLMIS did not register with the SEC as an Investment Adviser until August 2006. Due to the large number of its advisory customers, BLMIS should have registered as an Investment Adviser many years before that time. Even after its long-delayed registration, meaningful and accurate internal supervision and regulatory compliance never took place within the IA Business. For example, in or about January 2008, BLMIS filed a Form ADV for Investment Adviser Registration with the SEC. In the application, BLMIS represented that it had 23 customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had over 4,900 open customer accounts with a purported value of approximately $68 billion under management (based on customer account statements reflecting fictitious profits based on trades which, in fact, never took place). Upon information and belief, defendants Peter and Shana Madoff assisted in the completion of this filing with the SEC.

39. The Investment Advisory Manual for the IA Business required responsibilities and layers of oversight which were never fulfilled or implemented. Instead, BLMIS's compliance documents existed only to provide the appearance of compliance efforts, rather than to provide actual compliance with federal securities laws. For example, the September 2006 Compliance Manual stated that:

09-01503-bg Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

- BLMIS and its personnel are committed to serving the interests of its clients with the utmost professionalism and integrity.

- BLMIS and its personnel have a duty to disclose to Clients all material facts that may affect the services that BLMIS provides to the Clients.

  BLMIS and its personnel may not confer a benefit on one client to the disadvantage of another client, but rather must treat all clients equitably.

- BLMIS's records are maintained in a manner that provides for an accurate record of all financial transactions in conformity with generally accepted accounting principles. No false or deceptive entries may be made and all entries must contain an appropriate description of the underlying transaction. All reports, vouchers, bills, invoices, payroll and service records and other essential data must be accurate, honest and timely and should provide an accurate and complete representation of the facts.

- For each security in which either [sic] Client has a current position on any particular day, BLMIS must be able to promptly tell the SEC which Client owns the security and the current amount or interest of the Client in that security.

40. The September 2006 Compliance Manual placed responsibility on the shoulders of the Family Defendants, who each held senior management and supervisory positions at BLMIS:

- BLMIS's supervisory personnel are Bernard L. Madoff and Peter B. Madoff. Please note, however, that any person with the requisite degree of responsibility, ability, or authority to affect the conduct of the employee whose behavior is at issue may be deemed a 'supervisor.' A person's actual authority and responsibility, not merely title and status, determine whether that person is a 'supervisor.'

41. The September 2006 Compliance Manual required supervisory personnel to:

- Monitor (or delegate and supervise the monitoring of) the activities of BLMIS personnel to ensure that the policies and procedures in this manual are being followed;

- Respond to 'red flags' (such as indications that material nonpublic information has been inappropriately communicated or that insider

35. Upon information and belief, Stephanie S. Mack (formerly Stephanie Madoff) was married to Mark Madoff from October 23, 2004 until his death on December 11, 2010.[2]

36. Andrew H. Madoff is Madoff's youngest son. Andrew Madoff worked at BLMIS from his 1988 graduation from the University of Pennsylvania until his father's arrest in December 2008. Andrew Madoff was an experienced investor and investment professional who supervised proprietary trading at BLMIS, managed the trading floor, and directed many audit and compliance projects for BLMIS, including the confirmation and reporting of proprietary trades. He held a number of securities licenses with FINRA while working at BLMIS, including Series 4 (options principal), 7, 24, and 55. Andrew Madoff was involved professionally as a leader in the securities industry and, as such, gave the appearance of being concerned about improvements in the industry for the benefit of the investing public. He was Chairman of the Trading, Trading Issues and Technology, and Decimalization and Market Data Committees and Subcommittees at SIFMA, and a member of the FINRA District Ten Committee and NASDAQ's Technology Advisory Committee.

## OTHER FAMILY MEMBERS

trading has occurred) and reasonably correct problems that may arise;

- Any aberrational activity should prompt close attention. Supervisors should be skeptical of any failure to adhere to BLMIS policies and procedures. Once red flags have been detected, a supervisor has an affirmative duty to investigate any problem and follow up to ensure that the problem has been corrected.

Each of the Family Defendants turned two blind eyes to these duties.

42. These duties and responsibilities were not new to BLMIS due to its 2006 registration as an Investment Adviser. A 1998 Compliance Manual required BLMIS to follow "a

policy of high ethical standards and strictly adhere to the dictates of sound investment principles and policies." The policies enumerated in the 1998 Compliance Manual were "designed to serve the interests of our customers and ensure compliance with all applicable securities regulations" and reminded all registered representatives, including Peter, Mark, and Andrew, that they had "a professional obligation to conduct your business affairs in a moral, ethical and legal manner."

43. The 1998 Compliance Manual designated Madoff as the principal to supervise BLMIS's registered personnel. Those supervisory duties were not exclusive to him, however, both as set forth in the Manual and based upon the duties FINRA-registered principals undertake when they assume such a position. In Madoff s absence, the Manual provided that Peter Madoff had that principal responsibility and, in his absence, "Mark D. Madoff shall be responsible for carrying on the Firm's policy." Later manuals say that Mark and/or Andrew Madoff are in charge in Madoff s absence.

4437. In addition, the 1998 Compliance Manual required weekly compliance meetings by BLMIS's principals with the registered representatives to discuss compliance matters. There is no evidence of these meetings having been regularly held. **to the Defendants named above, Bernard Madoff delegated critical roles to other members of his family whose actions (and inaction) helped facilitate the Ponzi scheme.**

**38. Peter B. Madoff is Bernard Madoff's brother and was BLMIS's Senior Managing Director and Chief Compliance Officer ("CCO"). Peter Madoff had worked at BLMIS since 1967. He is a graduate of the Fordham University Law School. Like his nephews, the Madoff Brothers, Peter Madoff was also an experienced investment professional**

**[2] As official marriage and divorce records are not publicly available, the dates of Mark Madoff's marriage to Stephanie Mack, as described in this Third Amended Complaint, are approximated based upon documents available to the Trustee.**

**Peter Madoff s Compliance Responsibilities**

45. Defendant Peter Madoff's duties and responsibilities were well-defined by law. Yet he failed miserably to meet them, to the financial detriment of the thousands of BLMIS customers victimized by the Ponzi scheme.

46. SEC Rule 206(4)-7 of the Advisers Act, adopted in September 2003, requires each registered adviser to designate a CCO to administer its compliance policies and procedures. The CCO is to be a person competent and knowledgeable regarding the Advisers Act sufficiently senior and empowered with full responsibility and authority to develop and enforce these policies and procedures. Defendant Peter Madoff accepted this designation when the firm became registered as an investment adviser in 2006.

47. FINRA Rule 3130, first adopted in 2004, also required BLMIS, as a broker-dealer, to designate a principal of the firm as a CCO, who would meet at least annually with the CEO to discuss BLMIS's compliance efforts and to identify and address significant compliance problems and plans for emerging business areas. Peter Madoff was also CCO of BLMIS's broker-dealer business, but he did not carry out this responsibility with any degree of diligence or integrity.

48. The supplementary materials to FINRA Rule 3130 describe the CCO' s "unique and integral role" as an "indispensable party" to the firm's compliance certification. These materials explain that the CCO should have expertise in the process of gaining an understanding of the products, services, or line functions that need to be the subject of written compliance policies. The CCO is responsible for oversight of the line managers who are responsible for the execution of compliance policies and for developing programs to test compliance with the firm's policies and procedures.

and held a number of industry licenses, including Series 1 (general securities

representative pre-dating Series 7), 4, and 55. Peter Madoff was involved

professionally as a leader in the securities industry and, as such, gave the appearance

of being concerned about improvements in the industry for the benefit of the

investing public. He was Director of SIFMA and served as a member of the Board of

Governors and Executive Committee of the National Stock Exchange. He also served

as Vice Chairman of the FINRA Board of Governors, on the Executive Committee

Board of Governors of NASDAQ, and as a Director of the National Securities

Clearing Corporation.

39.    Peter Madoff pleaded guilty to conspiracy and falsifying books and records of

an investment adviser in connection with his role in the Ponzi scheme. Peter Madoff

admitted that he knew statements being made to the SEC about the IA business,

including the number of accounts and money under management, were entirely false.

Peter Madoff, "deeply ashamed," also admitted that he "received various fringe

benefits from BLMIS including meals, travel, leased cars, country club [membership],

apartment premiums, payment of household employees and life insurance premiums"

as well as a place for his wife on the BLMIS payroll for a "no-show job." Peter

Madoff agreed to forfeit "all property, real and personal, that constitutes or is derived

from proceeds traceable" to the commission of his offenses. Specifically, Peter Madoff

forfeited $143.1 billion dollars and other assets including his primary residence, his

vacation homes, and his car.

40.    Shana D. Madoff is Bernard Madoff's niece, the Madoff Brothers' cousin, and

Peter Madoff's daughter. Shana Madoff had worked at BLMIS since 1989 and joined the company full-time in 1994, upon graduating from Fordham University Law School. At various times, Shana Madoff held herself out as Compliance Counsel, in-house Counsel, and

Compliance Director of BLMIS. Shana Madoff was an experienced investment professional who, along with her father, Peter Madoff, and her uncle, Bernard Madoff, was responsible for overseeing all compliance-related activities at BLMIS. Shana was a member of the SIFMA Compliance and Legal Division Executive Committee, the FINRA Consultative Committee, STANY, the NASD's Market Regulation Committee, the SIFMA Self-Regulatory and SRO Committee, and the SIFMA Continuing Education Committee. Shana Madoff sold her multimillion dollar vacation home in East Hampton, New York and applied the proceeds of the sale towards her father's forfeiture.

**BASED ON THE ACTIVITY IN THEIR OWN IA ACCOUNTS, THE MADOFF BROTHERS KNEW OF, OR WERE WILLFULLY BLIND TO, MADOFF'S FRAUD**

41. Based on the activity in their own IA accounts—accounts which grossly and unjustly enriched them at the expense of the defrauded IA customers—the Madoff Brothers knew or were willfully blind to the fact that BLMIS's IA Business was a fraud.

42. Mark Madoff held or controlled seven IA customer accounts. Six of these accounts were purported investment accounts and one was a purported deferred compensation account. Of the six IA accounts, two were allegedly invested using the convertible arbitrage and split-strike conversion investment strategies employed by BLMIS on behalf of the majority of IA customers. The SSC Strategy account reported consistent rates of return between 10-20% throughout the life of the account. The four other IA accounts did not employ any discernable trading strategy and two of these accounts in particular purportedly engaged in three discrete, conveniently timed, and highly profitable backdated trades that generated millions of dollars of fictitious

profits for Mark Madoff as detailed below. The Trustee has identified documents purporting to show that Mark Madoff "invested" a mere

09-01503-smb Doc 189-1 Filed 07/15/14 Entered 07/15/14 14:05:49

$381,393 into his six IA accounts but redeemed $18,729,227 from these accounts prior to December 2008.

43. Similarly, Andrew Madoff held or controlled seven IA accounts, including two IA accounts held jointly with his wife, Deborah Madoff. Of the seven accounts, six were purported investment accounts and one was a purported deferred compensation account. Four of Andrew Madoff's six IA accounts purportedly used the convertible arbitrage and split strike conversion investment strategies. The SSC Strategy accounts reported steady returns of 10-20% over the lives of the accounts. The other two IA accounts did not employ a discernible trading strategy but instead purported to engage in three distinct, conveniently timed and highly profitable backdated trades that generated millions of dollars of fictitious profits for Andrew Madoff. The Trustee's investigation to date reveals that Andrew Madoff "invested" only $569,006 into his six IA accounts, yet he redeemed $17,175,854—30 times more than he invested—from the accounts prior to December 2008.

44. The Madoff Brothers each received, filed in their personal offices at BLMIS, and presumably reviewed monthly account statements and trade confirmations purporting to describe the activity in their IA accounts monthly account statements and trade confirmations purporting to describe the activity in their IA accounts, including cash additions, withdrawals, purported trading activity, and overall performance of their investments. However, unlike many of the ordinary IA Business customers who were duped by their account statements, the Madoff Brothers were aware that the purported "profits" described in their IA account statements were entirely fictitious. Based on their senior managerial and supervisory roles at BLMIS, industry experience, and responsibilities as Co-Directors of Trading, the Madoff

**Brothers were aware of the actual real market trades that were being executed by**

**BLMIS's**

market-making and proprietary trading businesses, and knew that no one was effecting these trades for the IA Business, either in House 5 or MSIL. The Madoff Brothers also knew or were willfully blind to the fact that, contrary to industry practices, there was no separate custodian of securities for the IA Business—another indicia of fraud.

**Fictitious And Backdated Trades Generated Millions Of Dollars For The Madoff Brothers**

45.    The Madoff Brothers redeemed the majority of their funds from four IA accounts into which they did not deposit a single penny. These four IA accounts did not even purport to execute a legitimate trading strategy; rather, the purported gains the Madoff Brothers withdrew were generated through nearly identical backdated activity. None of the trades reported in these IA accounts—which created millions of dollars of fictitious profits for the Madoff Brothers—ever took place.

*46.*    Based on BLMIS account opening documents, two of the Madoff Brothers' accounts—Mark Madoff's account 1M0142 and Andrew Madoff's account 1M0140—were opened in July 1998. Although the Trustee has not found any record of any money ever being invested into those accounts, Mark Madoff and Andrew Madoff each redeemed over $14.6 million from these accounts between 1998 and May 2004. Although these accounts were opened only in July 1998, they purport to show the purchase of 5,000 shares of Dell stock *more than eighteen months before the accounts were opened*, on January 2, 1997, and two 2- for-1 stock splits in each account—one settling on July 30, 1997 (one year before the account was opened) and the other settling on March 11, 1998 (four months before the account was opened). Entries dated July 21, 1998 indicate that the Dell shares were "sold," generating a

**"gain" for each account of $1,985,000 on July 16, 1998. Merely days later, on or about July 24, 1998, Mark Madoff and Andrew Madoff each redeemed $1,985,000 from these accounts, *only eight days after the accounts were opened and before any statements for these accounts***

09-01503-smb Doc 189-1 Filed 07/16/14 Entered 07/15/14 14:05:49

*had even been generated*. All of this account activity was entered into the IA computerized system (the "IA system") between July 6, 1998 and August 5, 1998. The account statements for these accounts were generated in October 1998 utilizing a BLMIS program called StatementPro—which was designed to enable BLMIS employees to "fix" statements and was used to create the false appearance that trading activity reflected in the account had taken place contemporaneously. Andrew Madoff transferred his proceeds from this fraudulent transaction to his account at Fidelity.

47. On March 3, 2002 and April 1, 2002, additional "transactions" were entered into the IA system for these accounts, including the purported purchase of $9.9 million of Microsoft stock on December 29, 2000 and the purported sale of these shares on January 8, 2002, generating a false profit of $5,628,860 for each Madoff Brother. These account statements were generated by the IA system utilizing StatementPro for the first time on or around March 28, 2002 (fifteen months after the purported purchase and almost three months after the alleged sale) and were found in Mark Madoff's and Andrew Madoff's offices at BLMIS. Within a week of the creation of the backdated account statements reflecting these fake trades, on April 3, 2002, Mark Madoff and Andrew Madoff transferred substantial portions of the purported profits from these fictitious transactions—$5,331,853 each—to their accounts at Fidelity.

48. Between April 1, 2004 and May 4, 2004, additional transaction data for these accounts was entered into the IA system for the purported purchase of more than $4.5

million of Lucent shares between March 11, 2003 through March 14, 2003 and the sale of these shares between April 15, 2004 through April 20, 2004, generating a false profit of $7.5 million for each of the Madoff Brothers. The account statements reflecting this account

09-01503-smb Doc 185-1 Filed 07/15/14 Entered

activity were created by the IA system utilizing StatementPro for the first time at the end of April 2004 and recovered from Mark Madoff's office and Friehling & Horowitz records maintained for Andrew Madoff. Despite the clearly backdated and fabricated nature of these trading windfalls, Mark Madoff and Andrew Madoff each transferred at least $7.3 million of the proceeds of these fictitious trades to outside bank and brokerage accounts owned and/or controlled by them individually.

49. Indeed, if the Lucent trading activity had been legitimate, the Madoff Brothers would have disclosed these securities holdings on the financial statements they prepared in connection with their respective real estate purchases during this time period. They made no such disclosures, however, because these trades were not fabricated until well after the fact. Specifically, on or around October 10, 2003, Andrew Madoff prepared a financial statement for the purchase of his 10 Gracie Square cooperative apartment. Andrew Madoff's financial statement contained a thorough listing of his purported securities holdings, both in and outside of BLMIS, yet he failed to reference the approximately 2.9 million shares of Lucent valued at $6.3 million that he purportedly then held in account 1M0140 at the end of September 2003. Similarly, in January 2004, Mark Madoff prepared a financial statement in connection with his purchase of real estate located at 457-461 West Broadway in New York City. Although Mark Madoff disclosed his other BLMIS and brokerage accounts, he did not reference the 2.9 million shares of Lucent stock valued at $8.3 million that he purportedly then maintained in account 1M0142 at the end of December 2003.

50. These omissions were not oversights; the Madoff Brothers did not disclose

the

Lucent holdings in their financial statements because the purchases had not yet been fabricated at the time they purportedly took place; they were fabricated thereafter so Madoff

49. BLMIS's own internal compliance policies also clearly set forth Peter Madoff s duties and responsibilities, yet those policies, too, were ignored routinely. Rule 206(4)-7 of the Investment Advisers Act of 1940 requires that registered investment advisers perform an annual review. In a 2007 report of its Annual Review, BLMIS stated the following:

- The firm's Chief Compliance Officer ("CCO"), Peter Madoff, performs the Adviser's annual review. The CCO is qualified to perform such review based upon his knowledge of the Investment Adviser's Act of 1940 . . . and of Madoff s advisory business.

- The CCO . . . reviewed the Adviser's business model in relation to the current written policies and procedures. Since Madoff s advisory business remained the same, the CCO found that the written policies and procedures were adequate.

- Since [BLMIS]'s business model remained unchanged, the CCO found the initial risk identification effective and the risk inventory comprehensive.

  The 2007 annual review assessed whether the firm had effectively implemented the Adviser's written policies and procedures as described in the [Compliance] Manual. The review demonstrated that the firm's written policies and procedures are effectively utilized in the firm.

- The CCO found that the implementation of the compliance procedures reflected good principles of management and control. The firm's existing compliance procedures were effective and no additional compliance procedures. . . are warranted.

- The CCO qualitatively tested the compliance procedures. It was demonstrated to the CCO that the reviews are reasonably designed to detect violations of the Investment Adviser Rules and federal securities laws applicable to the Adviser's business.

50. Peter was also given specific responsibilities in BLMIS's September 2006 Compliance Manual which, upon information and belief, he regularly ignored. For example:

~~BLMIS has designated Peter Madoff as the Chief Compliance Officer ("Compliance Officer") to administer BLMIS's compliance policies and procedures in connection with its investment advisory business.~~

- All trading and operations personnel should alert the Compliance Officer immediately if there is any unusual activity in any account that BLMIS manages. This includes but is not limited to wire transfers, security transfers to unknown/unusual counterparties, transactions in securities away from the perceived market price, or any general unusual activity. Any such matter will be investigated immediately and with the utmost discretion.

In order to verify compliance with [BLMIS's allocation and trade aggregation] policies and procedures, the Compliance Officer will conduct periodic reviews of allocation records in order to verify that order allocations are being made in accordance with the aforementioned allocation procedures. The Compliance Officer will also periodically compare the amount of designations made prior to the entry of an order with the actual allocations made.

Peter Madoff also failed to carry out these duties and responsibilities.

**Shana Madoff s Compliance Responsibilities**

51. Defendant Shana Madoff, the niece of Madoff and the daughter of Defendant Peter Madoff, was, as previously noted, in-house Counsel and Compliance Director at BLMIS. As Compliance Director, Shana was or should have been, had she discharged her duties loyally, diligently, and carefully aware that the IA Business did not, in fact, purchase or sell any securities with the billions of dollars held in customer accounts. Like her father Peter, Shana was responsible for monitoring BLMIS's operations and ensuring its compliance with the federal securities laws and regulations and corresponding FINRA rules and regulations. Shana assisted her father, for example, in drafting the annual review of the IA Business's compliance program. It would seem impossible for her to carry out her compliance duties, year in and year out, without questioning or considering whether BLMIS's IA Business was a fraud.

52. Although Shana enjoyed the title of Compliance Director, it is obvious that she did not do her job. Shana was the sole custodian for most of BLMIS's compliance documents

could launder the stolen proceeds of his Ponzi scheme to his sons. Accordingly, when the Madoff Brothers later received IA account statements in or after April 2004 reflecting the Lucent trades, they knew that these backdated trades—and the millions of dollars they quickly transferred away from BLMIS—were fraudulent. At best, these experienced securities professionals willfully closed their eyes to the clearly fictitious nature of these transactions in order to personally benefit by millions of dollars.

51.    The Madoff Brothers also benefitted from brazenly false and backdated activity in the IA accounts they established and managed for their children. In July 1998, Mark Madoff opened account number 1M0143 in the name of "Children of Mark D. Madoff' and designated his brother Andrew Madoff as the trustee of the account. Similarly, in July 1998, Andrew Madoff opened IA account 1M0141 in the name of "Children of Andrew H. Madoff' and designated his brother Mark Madoff as trustee of the account. The Trustee has found no evidence that any money was ever deposited into these accounts.

52.    The fraudulent Dell transactions described above were duplicated in the IA accounts held in trust for the Madoff Brothers' children. Their children's accounts report the same fabricated and backdated Dell stock activity—purported purchases, stock splits (both of which took place before the accounts were opened), and purported sales of Dell stock in 1997 and 1998. These fictitious backdated trades generated fictitious gains of $1,985,000 for each account. All of the corresponding monthly statements for these IA accounts, which were recovered from Friehling and Horowitz's files, were similarly created by the IA system utilizing StatementPro for the first time in or around October 1998, long after the purported trading activity

**had allegedly occurred. Within a few days of the alleged sales, on or about July 24, 1998, the Madoff Brothers withdrew virtually all of the fictitious profits—$1,985,000**

each—from their children's accounts. The Madoff Brothers knew these trades could

not have occurred in these accounts as they were not even opened when the purported

stock purchases were made, but once again, they quickly diverted the fraudulent

proceeds from these clearly fictitious and backdated transactions away from BLMIS

for their own use.

53.    As sophisticated securities professionals with decades of supervisory

experience between them, the Madoff Brothers knew that the millions in funds they

each withdrew from these four IA accounts were the product of fraud. The fraud

was particularly obvious given that they made *no* deposits or investments into any of

these accounts.

**Millions Of Alleged Equity In Non-Existent Or Closed Accounts Support Andrew Madoff's Real Estate Purchases**

54.    The clear indicia of fraud in the Madoff Brothers' IA accounts were not

limited to backdated trading activity or extraordinary profits without deposits. Indeed,

Andrew Madoff was able to obtain fake account statements showing large balances in

his IA accounts on demand and whenever it suited his needs.

55.    In October 1994, Andrew Madoff received a one-off statement generated by

the IA system utilizing StatementPro for his account 1M0005-2 showing a fictitious

$2,452,172.50 equity balance for his use in obtaining approval for an apartment

purchase that closed in April 1995. The account appears to have been created out of

thin air for this sole purpose. There is no evidence of any account activity—including

deposits, purchases, or sales of securities in this account—or any monthly statements

at any other time, either before or after October 1994. Andrew Madoff knew this

account statement was fabricated as he never reported any gains or losses on the

positions purportedly held on this statement nor did he claim value for these

**purported securities in connection with the BLMIS claims process.**

**56. Similarly, on or around October 10, 2003, Andrew Madoff prepared a financial statement for the purchase of a cooperative apartment located at 10 Gracie Square in New York City. The IA system utilizing StatementPro generated a special one-off statement for Andrew Madoff's account 1M0005-3 showing a fictitious $17.7 million equity balance for his use in connection with the 10 Gracie Square purchase application. Andrew Madoff knew it was impossible for this account to have a $17.7 million balance because the account had been dormant since April 1991. BLMIS records confirm that April 1991 was the last account statement generated for this account, with the sole exception of the October 2003 one-off statement that was created for Andrew Madoff's personal use in connection with the real estate purchase. Andrew Madoff knew these alleged account balances used in connection with real estate purchases were fictitious as he never reported any gains or losses on the positions and did not submit a claim for the value of the purported securities held in the account in connection with the BLMIS claims process.**

**Other Instances Evidencing Fraud In The Madoff Brothers' IA Accounts**

**57. The Madoff Brothers' IA accounts also displayed what any securities professional like them would have recognized as indicia of fraud. At a minimum, the Madoff Brothers intentionally ignored performance anomalies and operational irregularities related to their IA accounts that violated clear industry norms and were simply too good to be true, including:**

**a. From 1987-1997, every purported transaction in the Madoff Brothers' convertible arbitrage IA accounts was "in the money," *i.e.*, every transaction produced a net gain, which was highly unlikely if not impossible for any trading strategy employed over that length of time. In addition, certain traded instruments listed on the Madoff Brothers' convertible arbitrage IA statements were not actually available to be traded in the market on the represented date.**

09-01503-smb Doc 189-1 Filed 07/18/14 Entered 07/18/14 14:09:49

b. From 1992-1997, BLMIS deviated from the convertible arbitrage strategy in the Madoff Brothers' accounts and purportedly invested in companies close in time to stock splits, again resulting in the highly unlikely outcome of a post-split gain in every instance.

c. The Madoff Brothers' SSC Strategy accounts defied overall market performance, including recessions, the dot.com bust, and the terrorist attacks of September 11, 2001 (an event impossible to predict), by generating consistent double-digit positive returns for eleven years from 1997-2008. These accounts generated double-digit positive returns even when the S&P 100 Index—which was designed to be highly correlated with the SSC Strategy—experienced double-digit negative returns.

d. The Madoff Brothers' SSC Strategy accounts also demonstrated the uncanny ability to buy low and sell high on a given day's price range more than three-quarters of the time for equity transactions, 70% of the time for Andrew Madoff's options contracts, and more than half the time for Mark Madoff's options contracts. These accounts also demonstrated impossible instances of equity transactions outside of the applicable daily price ranges, and equities and options transactions settling on weekends when the exchanges were closed or otherwise outside of the standard settlement duration time frame.

e. BLMIS charged its IA customers a flat commission or fee for equity and options trades instead of the industry norm percentage of assets under management and investment performance-based fees. Securities industry professionals like the Madoff Brothers knew this fee structure deprived BLMIS of substantial revenues typically earned by investment advisers.

f. IA accounts could not be accessed online and IA customers did not receive detailed end-of-year tax reporting documents, which was also contrary to standard industry practices. The Madoff Brothers received electronic access and appropriate year-end documentation from other institutions where they maintained funds and investments.

g. The IA Business utilized paper trading confirmations. This outdated practice stood in sharp contrast to Madoff's stated goal of BLMIS being at the forefront of trading technology and its early use of computer-based trading. The lack of real-time electronic access to account information and the delays created by the use of paper confirmations helped facilitate the Ponzi scheme by making it easier to alter trading records than if modern automated methods had been used.

h. BLMIS, which reputedly ran the world's largest hedge fund, had its

annual audits prepared by Friehling & Horowitz, an accounting firm of three employees, one of whom was a receptionist and another who was semi-retired, with offices located in a strip mall. The Madoff Brothers,

who used Friehling & Horowitz to prepare their own tax returns, could not have reasonably believed it possible for any such firm to have competently audited an entity the size of BLMIS.

58. Based on these returns and anomalies and given the Madoff Brothers' sophistication as trading professionals, the Madoff Brothers had to know that BLMIS was engaged in fraud, or they willfully blinded themselves to this obvious fact in order to continue to unjustly enrich themselves and live a luxurious lifestyle on IA customer money.

## THE FICTITIOUS GROWTH AND OTHER INDICIA OF FRAUD IN THE MADOFF BROTHERS' PURPORTED DEFERRED COMPENSATION ACCOUNTS ALERTED THEM TO THE FRAUD

59. Despite the billions in harm BLMIS caused to thousands of victims, Mark Madoff and Andrew Madoff each filed a proof of claim seeking $44,815,520 and $40,624,525, respectively, in deferred compensation from BLMIS. The Madoff Brothers are not entitled to any further compensation from BLMIS, deferred or otherwise. To the contrary, having woefully failed in their managerial and supervisory responsibilities as senior securities professionals at BLMIS, the Madoff Brothers were grossly overpaid by millions of dollars for many years when the IA Business was a fraud and the market-making and proprietary trading businesses were unprofitable. The purported deferred compensation the Madoff Brothers received prior to December 2008 did not comply with industry standards, did not correlate with their performance, and was grounded in an excessive and fraudulent 24% annual rate of return over a nineteen-year period that was devoid of purported trading activity and designed by Madoff to simply benefit his sons with the fruits of the fraud. An early email exchange between Andrew Madoff and Mark Madoff from November 2003, with the subject line "Bonus," is illustrative of the Madoff Brothers' sense of

entitlement to BLMIS funds to support their lavish lifestyles, irrespective of the true performance of the business:

09-01503-smb Doc 189-1 Filed 07/15/14 Entered 07/15/14 14:05:49

**Andrew:** How about $3mm (same as last year)? My apartment closing is Wednesday, December 5. I need the cash.

**Mark:** You've got my proxy. Begin the negotiations on behalf of the two of us.

60. The Madoff Brothers claimed to have maintained BLMIS IA accounts 1M0006 (Andrew Madoff) and 1M0009 (Mark Madoff) as firm-provided deferred compensation accounts. Deferred compensation plans of this nature are not used in the financial services industry (or any other industry) and the Trustee has not uncovered any BLMIS policy or procedure relating to any such plan, such documentation would ordinarily accompany a bona fide deferred compensation program. Instead, these IA styled accounts purportedly received periodic, ad hoc "capital" transfers up until 2000, some internally designated as trader "Net Excess." In fact, the Madoff Brothers directed convicted former employee Annette Bongiorno to make several of these transfers into their purported deferred compensation accounts. While the Madoff Brothers each claim they are entitled to more than $40 million in purported deferred compensation, Andrew Madoff's "capital" transfers totaled no more than $2,613,650 and Mark Madoff's were no more than $2,670,089, a small fraction of the funds reported to be held in those accounts.

61. Contrary to standard deferred compensation plans, which include company stock and vary in value depending on the performance of the company, the growth in the Madoff Brothers' purported deferred compensation accounts resulted from a guaranteed annual rate of return of 24%, beginning one year after the inception of these accounts and continuing unabated for almost twenty years. In 2008, the guaranteed annual rate of return was slightly reduced to 20%. This astronomical growth was reflected in BLMIS's records as well as in documentation recovered from Andrew Madoff's and Mark Madoff's personal offices at BLMIS. The account

**statements indicated that the IA-styled deferred compensation**

09-01503-smb Doc 189-1 Filed 07/16/14 Entered 07/16/14 14:05:49

accounts, for the most part, did not hold securities and did not track capital transfers, balances, or returns. These accounts engaged in only a few fabricated trades over many years and usually maintained equity balances of no more than $28,000. In fact, Mark Madoff's account statements sometimes showed a negative equity balance. In contrast, the BLMIS portfolio management reports reflected a guaranteed 24% annual rate of return for each account and tracked the capital balances that purported to justify that extraordinary fictitious growth.

62. There is no actual securities trading that underlies the purported growth in these alleged deferred compensation accounts. The 24% annual rate of return was nothing more than a fabricated series of book entries created by the collusion between the Madoff Brothers and their father, devoid of any relationship to investment or business performance. Despite the fact that deferred compensation accounts should be tied to the organization's performance, the Madoff Brothers manipulated these IA-styled accounts to unjustly enrich themselves with stolen funds. Indeed, Andrew Madoff's claim for $40,624,525 in deferred compensation is particularly revealing in light of an April 30, 2008 spreadsheet he prepared in connection with his anticipated divorce from Deborah Madoff (as well as other BLMIS documentation) indicating that he withdrew all but $52,173 from this account well before the Filing Date.

63. The Madoff Brothers knew that the fraudulent books and records associated with their IA-styled deferred compensation accounts did not accurately reflect activity occurring in the accounts. For example, Andrew Madoff's more than $25.9 million in withdrawals from his purported deferred compensation account did not appear in the documentation for that account until well after the transfers were made. Andrew Madoff's April 2008 spreadsheet details $25,939,402

**in withdrawals from account 1M0006 that he**

made from 2005-2007. The contemporaneous portfolio management reports for this account recovered from BLMIS, however, do not report these withdrawals. Rather, BLMIS documentation associated with account 1M0006, recovered from Andrew Madoff's office at BLMIS, reveals that the 2005-2008 portfolio management reports were subsequently backdated and altered to reflect the withdrawals. Indeed, when pressed on cross-examination during her criminal trial, convicted former employee Annette Bongiorno admitted that in July 2008 she altered Andrew Madoff's deferred compensation account statements for December 2005, 2006, and 2007—the exact statements that would have been of interest to his wife during their pending divorce proceedings—to show $25,939,402 in withdrawals, resulting in a $33 million decrease in the account balance bringing it down to approximately $200,000. *United States v. Bonventre, et al*., Case No. 10-CR-228 (LTS), Trial Tr. 10486-10498. Annette Bongiorno wrote a memorandum to Andrew Madoff, dated July 9, 2008, in which she detailed the alterations she made to his purported deferred compensation account.

64. Mark Madoff similarly manipulated his purported deferred compensation

account statements when it suited his other investment needs. Indeed, monthly account statements were created out of thin air for Mark Madoff's personal use in 2003 and 2005 despite the fact that there were no monthly statements for this account created after 1996. The monthly statements associated with Mark Madoff's account 1M0009 reflect only a handful of trades and reveal that securities never exceeded $250,000 and went as low as to report negative balances. However, when Mark Madoff needed to show significant assets on a financial disclosure in connection with his purchase of a condominium located at 457-461 West Broadway in Manhattan, $14,651,908 of

securities positions magically appeared on a December 31, 2003 account statement,

nearly seven and a half years after the last known

09-01503-smb Doc 183-1 Filed 07/15/14 Entered 07/15/14 14:05:49

customer statement for this account. The same occurred approximately fifteen months later when Mark Madoff purchased his next condominium located at 583 Broadway in Manhattan, his 1M0009 account statement in March 2005 reflected a $16,299,182 securities balance. In both instances, there is no evidence of deposits, purchases, or securities transactions to support these account balances and no trades were actually effectuated. Instead, these purported account balances, which are not reflected on the account's portfolio management reports, appear out of nowhere and suddenly disappear once the condominium applications were submitted. Tellingly, Mark Madoff never reported any gains or losses on the positions reflected on these account statements in his 2003 and 2005 tax returns.

65. Even aside from the blatantly fraudulent activity described above, no seasoned financial professional, like the Madoff Brothers, could believe that a purported deferred compensation account providing for a consistent 24% annual rate of return over nineteen years was legitimate. Following the public disclosure of the fraud in December 2008, the Madoff Brothers' continued pursuit of these fictitious funds in their proofs of claim in the Bankruptcy Court further demonstrates their willingness to knowingly make one last grab of the funds of defrauded customers for their own further unjust enrichment.

THE MADOFF BROTHERS KNEW OF FRAUDULENT TRANSFERS OF IA FUNDS TO THE OTHER PARTS OF THE BUSINESS THEY MANAGED The Misuse Of IA Funds Permeated All Of BLMIS's Business Units

66. The Madoff Brothers knew the compensation they received was grossly excessive in light of the unprofitable performance of the market-making and proprietary trading business units they were running.

67. These businesses were made to appear profitable through any fraudulent means necessary to enable the Madoff Brothers to continue to siphon IA customer money out of BLMIS to fund the lavish lifestyles to which they had grown accustomed.

68. In addition to running the market-making and proprietary trading business units, the Madoff Brothers also served as controllers and directors of BLMIS's affiliated London entity, MSIL. Records reveal that nearly $800 million was diverted from the IA Business into the market-making and proprietary trading business units (the "IA-derived revenue" transfers), millions of which were transferred through MSIL and then back to the BLMIS trading businesses supervised by the Madoff Brothers. That $800 million of IAderived revenue—which was fraudulently counted towards the profits that wrongly justified the Madoff Brothers' exorbitant compensation—was nothing more than the funds invested by innocent customers of BLMIS's IA Business.

69. The IA-derived revenue transfers were used to make the market-making and proprietary trading units appear profitable at a time when market changes were taking a financial toll on BLMIS's trading business. Between 2000 and 2008, IA-derived revenue accounted for 42%–73% of the total revenue BLMIS reported in its financial statements. Without the IA-derived revenue, the market-making and proprietary trading units would not have been profitable.

~~and regulatory materials, yet she ignored every red flag of the massive fraud taking place right in front of her.~~

~~53. In her role, she plainly understood and clearly communicated that there was no subdivision or segmentation of the compliance function as between the IA Business and~~

BLMIS's market-making and proprietary trading functions. For example, Shana wrote a memo to her cousin, Mark Madoff, on which she copied her father, Defendant Peter Madoff, in which she definitively declared: "The Compliance Departments' [sic] monitoring and oversight of compliance issues extends to all areas of the firm's business."

54. The Trustee has not located or identified any evidence of meaningful compliance or supervisory activities relating to the IA Business, however. Had Peter, as the CCO, or Shana, as Compliance Counsel, done their jobs properly, the fraud might have been revealed years earlier. Either they failed completely to carry out their required supervisory/compliance roles, or they knew about the fraud but covered it up.

**The Sons' Supervisory Responsibilities**

5570. Defendant AndrewIndeed, Madoff and his brother, Mark, were each FINRA-registered securities principals of BLMIS. As such, they had supervisory responsibilities to ensure compliance with BLMIS's policies and procedures as well as with federal securities laws. The Trustee has not located or identified any evidence of meaningful and consistent supervision by either of them, though. Had they made even the slightest attempt to fulfill their supervisory responsibilities, they would have been aware that no actual securities transactions were taking place within the IA Business for the accounts of the customers of BLMIS. Either they failed completely to carry out their supervisory roles, or they did so and, as a result, knew about the fraud but covered it up.**DiPascali both pleaded guilty to charges of money laundering and Cotellessa-Pitz pleaded guilty to falsifying BLMIS's books and records to "hide the losses of the Proprietary Trading and Market Making business." But responsibility for preventing these actions was not theirs alone. The Madoff Brothers knew or willfully blinded themselves to the fact that the majority of the total revenue purportedly earned by the**

09-01503-smb Doc 113185-1 Filed 05/04/1207/15/14 Entered 05/04/12

market-making and proprietary trading businesses they ran, at least for fiscal years 2000 through 2008, was comprised of stolen customer money from the IA Business. The Domestic IA-Derived Revenue Transfers

71. From at least 1999 to May 2005, nearly $500 million was transferred from BLMIS's account at JPMorgan Chase and Co., account no. xxxxxxxxxxx1703 (the "703 account") where IA customer funds were principally deposited, into the Bank of New York account used to operate the market-making and proprietary trading units. Customer funds were transferred either directly from the 703 account or indirectly through wire transfers from BLMIS's brokerage accounts at Morgan Stanley, Bear Stearns, and Lehman Brothers, all of which were funded by the 703 account. These transfers were falsely recorded as trading profits and interest income on BLMIS's books and records.

~~56. Mark and Andrew Madoff were, like their uncle Peter Madoff, general securities principals at BLMIS pursuant to the FINRA Series 24 examination. The exam is designed to ensure that a principal of a broker-dealer has the requisite knowledge and competence, and serves to emphasize the principal's obligations to supervise the operations of a broker-dealer and its employees. Registered principals are responsible to ensure, among other things: (i) firm compliance; (ii) that regulatory requirements are met; and (iii) the establishment, maintenance, and implementation of proper supervisory procedures. In these obligations, Mark and Andrew Madoff (like their uncle Peter) failed the customers who opened accounts and entrusted their money to BLMIS.~~

~~57. Although Mark and Andrew had important roles in BLMIS' s market-making business and at its proprietary trading desk, they each at times played roles in the IA Business as well. Upon information and belief, from time to time, Mark and Andrew had direct,~~

investmentrelated contacts and communications with investors in the IA Business.

**Supervisory And Compliance Failures Relating To MSIL**

5872. Among the charges to which Bernard Madoff pleaded guilty were two counts of money laundering. Frank DiPascali, another BLMIS employee, also pleaded guilty to money laundering charges. These charges arose from the transfer of monies between BLMIS and MSIL, which appeared on the books and records of both firms. Pursuant to the BLMIS**As supervisors of the market-making and proprietary trading businesses, the Madoff Brothers were required to review the transfers described above. For example, BLMIS's December 2006 Written Supervisory Procedures tasked Mark Madoff and Andrew Madoff with monitoring trading activity for unusual and prohibited activity. The March 2007** Supervisory Compliance Procedures Manual, dated March 2007, BLMIS maintained an AntiMoney**which described supervisory personnel's responsibilities to BLMIS's Anti-Money** Laundering compliance program which**,** prohibited the very transactions to which**actions that** Madoff and DiPascali pleaded guilty. The supervisory**admitted to undertaking during their plea hearings. That** manual also required periodic review of large or suspicious transactions to uncover potentially illegal activities of this kind. Here, too, even a**, none of which was effected by the Madoff Brothers, despite their roles as supervisory personnel and registered principals at BLMIS.**

**73. The Trustee has not found any evidence showing that the required periodic supervisory reviews were regularly conducted on an on-going basis by the Madoff Brothers— who were all too happy to benefit from this charade. The Madoff Brothers did not conduct**

minimal level of diligence by the Family Defendants in carrying out their professional obligations might have protected BLMIS and its customers from the continuing fraud.

59. MSIL also maintained its own Compliance Manual which, upon information and belief, was last updated in March 2003. Andrew, Peter, and Mark were all Directors of MSIL and were designated as "Approved Persons" of MSIL by British regulatory authorities. The MSIL manual set forth "Statements of Principle for Approved Persons." These include acting with "due skill, care and diligence in carrying out his controlled function," and taking "reasonable steps to ensure that the business of the firm for which he is responsible. . . is organized so that it can be controlled effectively." The Trustee has been able to find little written documentation evidencing that the required periodic supervisory review was regularly conducted on an on-going basis by Peter, Andrew, or Mark to ensure compliance with law. Again, their failures to discharge their duties enabled and facilitated the Ponzi scheme.

**The Misuse Of IA Funds Permeated All Of BLMIS's Business Units**

60. The money laundering through MSIL was not limited to the IA Business. The purportedly "legitimate" proprietary trading and market-making businesses at BLMIS were involved as well. All of the Family Defendants knew or should have known that the majority of the total revenue purportedly earned by the market-making and proprietary trading businesses, in the aggregate, for at least fiscal years 2000 through 2008, was composed of income "generated" simply by transfers from the IA Business. In fiscal years 2007 and 2008, these amounts were reported as "commission" income. This commission income itself, however, was derived from purported trades which, in fact, never took place and was a term used to disguise the laundering of money from the IA Business. These "commissions" were fraudulently transferred from the IA Business to the market-making and proprietary trading businesses, often through MSIL in transactions which had no legitimate business purpose.

These transactions gave the false and

even the minimum diligence required by their jobs because they knew that the IA Business was engaged in fraud or because they willfully blinded themselves to the fraud and deliberately chose to avoid confirming it.

74. Based on their heavy involvement with BLMIS's market-making and proprietary trading businesses, the Madoff Brothers knew BLMIS's profits were declining and that their businesses could not have generated the revenues reported on BLMIS's financial statements. Indeed, both of the Madoff Brothers kept close track of trading profits and losses in several ways.

75. Each day the Madoff Brothers provided traders in the market-making and proprietary trading business units with hard copy printouts of their daily profits and losses. The traders were required to review, initial, and return the printouts to the Madoff Brothers. Later, traders were required to report their profits and losses to the Madoff Brothers on a daily basis via email. The Madoff Brothers also received and reviewed daily profit and loss reports generated from BLMIS's trading systems. Additionally, the Madoff Brothers could, at any time, review trading activity and profits and losses in real-time on BLMIS's trading systems—and they did.

76. The Madoff Brothers created their own spreadsheets tracking month-to-date and year-to-date profits, losses, and trading expenses for the market-making and proprietary trading units. Though BLMIS reported well over $1 billion in gross revenue on its FOCUS reports between 2000 and 2008, their spreadsheets reveal a very different story.

77. According to the Madoff Brothers' spreadsheets, BLMIS's annual trading revenue sharply declined between 2000 and 2005. For example, the

**market-making and proprietary trading units' net trading revenue declined from $79.4 million in 2000 to $15**

09-01503-smb Doc 185-1 Filed 07/16/14 Entered 07/16/14 14:05:49

million in 2003, and then increased only slightly to $23.8 million in 2005. The Madoff Brothers were both well aware of the decline of their market-making business, and at times even considered eliminating that unit altogether.

78. The Madoff Brothers knew that their businesses were being fraudulently propped up by IA customer funds because the IA-derived revenue transfers were recorded on the books and records of their market-making and proprietary trading businesses. Indeed, nearly $500 million of the IA-derived transfers were falsely recorded as gains on the sale of securities in three distinctive trading accounts associated with the proprietary trading unit. The Madoff Brothers were aware of the existence of these three trading accounts as they were part of a group of ten unique trading accounts that they referred to as the "numbered accounts" or "numeric accounts."[3] At various times, the Madoff Brothers were the assigned traders for these accounts, including the three accounts where the IA-derived revenue transfers were recorded. Upon information and belief, at least two other numbered accounts were also used for improper purposes.[4]

79. Ordinary BLMIS traders were restricted from viewing accounts other than those to which they were assigned, but the Madoff Brothers had visibility into all trading accounts. BLMIS developed a complicated web of trading technology that allowed for manipulation of trading data in one system without disturbing the information contained in

[3] One of many differences between the numbered accounts and BLMIS's other trading accounts is that the numbered accounts were identified by single-digit numbers while all other accounts were identified by single or double letters.

[4] First, in the criminal trial against five former BLMIS employees for their participation in the Ponzi scheme, BLMIS's former controller, Enrica Cotellessa-Pitz, testified that trading account 7 held securities owned by certain IA customers that BLMIS used as collateral to obtain bank loans, representing the securities as its own. *United States v. Bonventre et al.*, 10 Cr. 228 (LTS) (2013), Trial Tr. 3701:21-3702:5. Second, BLMIS trading account 6 held options traded in connection with an improper arrangement between Madoff and former Morgan Stanley stockbroker, Michael Lieberbaum. Under this arrangement, BLMIS allowed Mr. Lieberbaum to trade options in Andrew Madoff's name for his personal benefit. To conceal the scheme, Madoff and Mr. Lieberbaum agreed that BLMIS would later disburse the profits to

**Mr. Lieberbaum upon his retirement from Morgan Stanley. Indeed, upon Mr. Lieberbaum's retirement, BLMIS began making the payments, disguising them as vendor payments. *See Picard v. Lieberbaum*, Adv. Pro. No. 10-05406 (BRL).**

09-01503-smb Doc 183-1 Filed 07/15/14 Entered 07/15/14 14:05:49

other systems. Only certain BLMIS employees could access information from these other systems, including, but not limited to, DiPascali, Cotellessa-Pitz, and the Madoff Brothers.

80. As Co-Directors of Trading for the market-making and proprietary trading businesses at BLMIS, the Madoff Brothers had an obligation to monitor and review activity in all BLMIS trading accounts, including the numbered accounts. If they did, they would have known that millions of dollars from the IA Business were being improperly recorded and falsely characterized as gains on fictitious trades to make the market-making and proprietary trading business units appear profitable. Their attention to the business units they supervised made clear to them that for years these businesses were not profitable but for the stream of IAderived revenue provided by their father.

A 2005 SEC On-Site Cause Examination Forced BLMIS To Change Course

81. The SEC began an on-site cause examination of BLMIS in April 2005. In May 2005, amid increasing pressure from SEC examiners to provide BLMIS's trading data and financial records during the examination, transfers from the 703 account and domestic brokerage accounts ceased. However, despite the intense SEC scrutiny, BLMIS still needed cash to prop up its declining trading business so the IA-derived revenue transfers continued, but this time utilizing BLMIS's London affiliate, MSIL, as a conduit.

82. It is no coincidence that BLMIS began laundering the IA-derived revenue transfers through MSIL during the onsite SEC examination when trading documentation was requested and received.

83. The SEC OIG report revealed that throughout this examination, the

examiners had difficulty obtaining emails and other communications belonging to

various BLMIS

**employees, including Andrew Madoff.[5] In fact, the Madoff Brothers, Madoff family members, and other employees were behind the scenes deleting emails that could have exposed the fraud—or at the very least would have alerted the SEC examiners that the information BLMIS was providing to them was false. It was management's emails (including emails of the Madoff Brothers) that were being deleted because contrary to industry norms and Madoff's stated goal of BLMIS being at the forefront of technology, the IA employees did not have access to email.**

**84. According to DiPascali's sworn testimony, he along with the Madoff Brothers, Peter Madoff, Shana Madoff, and Liz Weintraub, deleted emails from BLMIS's server that they did not want the SEC to discover. *United States v. Bonventre, et al*., Case No. 10-CR228 (LTS), Trial Tr. 5145-5148. To accomplish this task, they printed every incoming and outgoing email for the periods requested by the SEC and each person, including the Madoff Brothers, was assigned various piles of emails to review. Problematic emails were removed from the server and never turned over to the SEC.**

**85. Consistent with DiPascali's testimony, the Trustee has uncovered evidence, including handwritten notes on printed emails, that confirm the Madoff Brothers and other employees reviewed the emails and determined that certain emails were "trash" and would be taken "out" and "delete[d]" from the email server.**

**86. Among the emails the Madoff Brothers concealed from the SEC were:**

**[5] On April 20, 2005, the SEC requested all incoming, outgoing, and deleted electronic communications between April 2004 and April 2005 for Andrew Madoff and four other traders, including the two traders assigned to the RA and ZA accounts—two of BLMIS's largest volume trading accounts. On June 23, 2005, the SEC requested the incoming and outgoing emails of certain employees between January 1, 2005 and June 1, 2005, including Frank DiPascali, Eleanor Plaia (Madoff's secretary), Liz Weintraub (head of IT), and several traders also assigned to the RA and ZA accounts.**

a.     Emails demonstrating a concerted effort amongst Madoff, Andrew Madoff, Shana Madoff, and other employees to alter trading account information that was given to the SEC;

b.     Emails from Andrew Madoff instructing Cotellessa-Pitz to change the titles of the numbered accounts and assign the accounts to him in BLMIS's trading systems;

c.     Emails revealing BLMIS's true trading profits and losses, including emails from Mark Madoff to Andrew Madoff attaching the 2004 and 2005 P&L spreadsheets Mark Madoff created as well as emails from traders reporting the daily and monthly performance of their accounts;

d.     Emails expressing concern about the performance of the market-making business and plans to shift the focus to the proprietary trading business;

e.     Emails demonstrating Andrew Madoff's supervision of MSIL's trading business, including correspondence between Andrew Madoff and MSIL employees as well as automated emails sent daily to the Madoff Brothers reporting MSIL traders' daily, month-to-date, and year-to-date profits and losses;

f.     Emails revealing Mark Madoff's and Andrew Madoff's compliance responsibilities, including the fact that they were in charge of compliance review for new projects in Peter Madoff's and Shana Madoff's absence; and

g.     Emails demonstrating Andrew Madoff's involvement in compliance matters, including automated emails reminding him to "review the Monthly Trading Floor Compliance Reviews."

87.   Perhaps even more indicative of the Madoff Brothers' knowledge of BLMIS's fraudulent activities is the fact that they also concealed emails that connected them to the IA Business. For example, emails deleted by the Madoff Brothers include the following:

a.     On November 19, 2004, a BLMIS trader asked Andrew Madoff whether "[Madoff] is accepting new clients" as his father-in-law's girlfriend wanted to "invest with Bernie." A handwritten note on a hard copy of the email reads, "Be sure to delete this one."

b.     On December 15, 2004, Mark Madoff received a fax from Prospect Capital Partners requesting a withdrawal from its IA customer

account.

c. A January 11, 2005 email to Mark Madoff states: “I spoke with your father; he explained your firm is not geared up for investing accounts of my size...If you see any opening in the future for me to be able to invest

09-01503-smb Doc 189-1 Filed 07/15/14 Entered 07/15/14 14:05:49

with you guys; please let me know as I would like the opportunity. Nice to talk to you yesterday; take good care."

d. January 31, 2005 correspondence between Eleanor Plaia and Andrew Madoff: "Hi Andy, I would like to confirm with you the Picower meeting on Thursday, February 3rd at 9AM." Andrew Madoff responded, "It's confirmed."

e. Email correspondence between S. Donald Friedman and Andrew Madoff on February 1, 2005. Mr. Friedman wrote, "It's done." Andrew Madoff responded, "I'm glad I was able to help. Frank [DiPascali] asked if I would refrain from promising to wire funds in the future,[sic] I told him I would try to restrain myself."

88. Other deleted emails show that the Madoff Brothers reviewed and discussed BLMIS's financial condition and statements with Madoff.

a. On January 16, 2005, Mark Madoff wrote to Andrew Madoff, "How's the OTHER issue going?" to which Andrew Madoff replied, "What issue? Dad hasn't mentioned it,[sic] I guess there's no problem. He'll probably sit us down on Monday to walk us through the Focus."

b. Two days later on January 18, 2005, Andrew Madoff wrote to Mark Madoff, "I spoke with dad who conferred with Danny.[6] Apparently everything is in balance, so we don't need to worry. I love my job. I love my job. I love my job. Oops, Dad's calling me again..."

89. The Madoff Brothers' attempt to conceal these emails from the SEC further demonstrates that they knew the financial and operational information BLMIS reported to the regulatory authorities and to the public was false.

90. As a result of the SEC examination, Madoff was forced to admit—after repeated denials—that he was running an IA business. Shortly after Madoff's admission, Andrew Madoff, other Madoff family members, and employees took affirmative steps to cover the trail of customer money from the IA business to the market-making and proprietary trading units. In June 2005, the IA accounts were

changed from numbers to letters in

[6] Upon information and belief, "Danny" is a nickname for Daniel Bonventre, BLMIS's Director of Operations, who was convicted in the federal criminal trial along with other defendants.

09-01503-smb Doc 183-1 Filed 07/15/14 Entered 07/15/14 14:05:49

BLMIS's trading systems to avoid raising any suspicion about the nature of these accounts. The day after this change was made, Andrew Madoff directed the IT department to suppress the numbered accounts so the profit and loss information for these accounts would not be visible on BLMIS's trading displays. Two weeks later, the stolen IA customer funds began passing to the market-making and proprietary trading units through MSIL.

**The MSIL IA-Derived Revenue Transfers**

91. From June 2005 to November 2008, over $310 million of IA customer funds were transferred from the 703 account to MSIL's account at Barclays Bank and then from MSIL's account to the market-making and proprietary trading units' Bank of New York account. Between June 2005 and July 2006, the IA-derived revenue transfers continued to be recorded as "trading profits." But in August 2006, following BLMIS's registration as an Investment Adviser, the transfers from MSIL began being reported as "commission income" on BLMIS's books and records.

92. The purported "commission income" was nothing more than a means to disguise the laundering of money from the IA Business in order to falsely give the appearance that the market-making and proprietary trading businesses—run by the Madoff Brothers— were generating significant profits. On BLMIS's books and records, the description of the MSIL transfers as purported "commission income" received from MSIL was the thinnest of disguises for what was, in fact, stolen money.

93. As directors of the London entity, the Madoff Brothers reviewed and approved MSIL's financial statements each year and regularly reviewed MSIL's trading profits and losses. They knew that MSIL could not possibly have accrued hundreds of millions of dollars in commission owed to BLMIS, or anyone else for that

matter, because MSIL never utilized more than $40 million of capital in its trading activities. As the Madoff Brothers were well

misleading appearance that the market-making and proprietary trading businesses were generating significant profits.

**aware, MSIL incurred almost no commissions of any sort because that business typically traded for its own accounts as a proprietary trading unit. Andrew Madoff even admitted that if BLMIS's market-making and proprietary trading units did receive commissions, they were infrequent and in immaterial or small sums.**[7]

6194. In fiscal year 2007, approximately $174 million was transferred from the IA Business to an MSIL bank account. During this time period, approximately $103 million was transferred back to bank accounts controlled by BLMIS where it was displayed on financial statements prepared for the market-making and proprietary trading businesses as "commission income." **Based upon financial statements prepared by BLMIS for fiscal year 2007, this redirected commission income represented approximately 60% of the total revenues reported by the market-making and proprietary trading businesses the Madoff Brothers managed and supervised.**

6295. In fiscal year 2008, approximately $90 million was transferred from the IA Business to an MSIL bank account. During this time period, approximately $87 million was transferred back to bank accounts controlled by BLMIS where it was **falsely** displayed on financial statements prepared for the market-making and proprietary trading businesses as "commission income.

" 63. Based upon financial statements prepared by BLMIS for fiscal year 2007, this redirected commission income represented approximately 60% of the total revenues reported by the market-making and proprietary trading businesses. For fiscal year 2008, this re-directed commission income represented more than 70% of the total revenues reported by the marketmakingmarket-making and proprietary trading businesses **managed by the**

**Madoff Brothers**.

6496. The financial statements prepared by BLMIS for fiscal years 2000 through 2008 falsely indicated that the market-making and proprietary trading businessesunits generated tens of millions of dollars in net income. In reality, however, the market-making and proprietary

[7] **Andrew Madoff Re-Amended Defence Statement at ¶ 73.**

trading businesses would have generated millions of dollars in losses had they not been ~~supported by the~~**improperly subsidized with** fraudulent ~~transfer of Customer Property~~**transfers of customer property** from the IA Business.

**97. The Trustee's investigation has not revealed any conceivable business reason that hundreds of millions of dollars in commissions would have been owed to BLMIS by the trading unit at MSIL, as confirmed by Andrew Madoff's admission that commissions were immaterial. The Madoff Brothers ignored the inflow of these unusually large transfers— which made the proprietary trading and market-making units appear profitable where they otherwise would not have been—to justify the outlandish compensation, bonuses, and other transfers that they received from BLMIS, funded by victimized IA customers.**

**DESPITE BLMIS'S DECLINING PROFITS, THE MADOFF BROTHERS CONTINUED TO SIPHON MONEY FROM BLMIS**

**98. As Co-Directors of Trading, the Madoff Brothers knew the true financial condition of the market-making and proprietary trading businesses. Yet, they and other Madoff family members continued to indulge and gorge themselves on excessively high salaries, bonuses, and other compensation lacking any relation to what they knew to be the business's actual performance.**

**99. For example, in 2007, the Madoff Brothers' salaries and bonuses exceeded $20 million. Andrew Madoff received $1,040,000 in salary and a $9,020,000 bonus (of which $8,527,336 was funded by a withdrawal from his purported IA deferred compensation account) and Mark Madoff received $738,650 in salary and a bonus of $9,321,350. But that year (excluding the IA-derived revenue), the market-making and proprietary trading businesses generated $46,196,225 in revenue but with expenses of $104,439,512 as reported on the FOCUS reports, were operating at a net**

loss of $58,243,288. The Madoff Brothers' compensation, equal to about 43% of gross revenues, is grossly excessive under any industry

09-01503-smb Doc 113 185-1 Filed 05/04/12 07/15/14 Entered 05/04/12

standard and gluttonous in light of their knowledge that the company would end the year with more than $58 million in net losses and that the revenue would fall short of covering rent, employee salaries, and other operating expenses. The Madoff Brothers' compensation did not reflect any reasonable measure of their performance but was simply Madoff's attempt to unjustly enrich his sons with funds stolen from the defrauded IA customers.

100. With their fraudster father's blessing, the Madoff Brothers took millions of dollars in unjustified compensation to support their own lavish lifestyles, which was paid with the investment money and life savings of the defrauded IA customers.

~~65. As directors, supervisors, and compliance officers of the market-making and proprietary trading businesses, the Family Defendants either knew, should have known, or deliberately disregarded that the primary source of revenue for the market-making and proprietary trading businesses was, in fact, nothing more than money re-directed from the IA Business. Had they faithfully carried out their compliance, supervisory, and managerial responsibilities, they would have realized that the market-making and proprietary trading businesses were, in fact, incurring millions of dollars in losses and could not afford the exorbitant salaries, bonuses, and other compensation paid to the Family Defendants and others, and, in many cases unjustly, benefiting and enriching the Spouse Defendants.~~

~~66. By virtue of their senior management positions at BLMIS, the Family Defendants also knew, should have known, or deliberately disregarded that there was no trading conducted by the IA Business either at MSIL or at BLMIS which would have generated such commission income. The Family Defendants did not ask any questions or otherwise seek to verify the legitimacy of the hundreds of millions of dollars which, in this manner, were effectively laundered from the IA Business. The Family Defendants ignored~~

these and other obvious red flags in order to continue to enrich themselves and their families, including at times, the Spouse Defendants, at the expense of the customers of BLMIS.

**THE PONZI SCHEME BENEFITED THE FAMILY AND SPOUSE DEFENDANTS**

67**101**. The Madoff Ponzi scheme**As alleged throughout this Third Amended Complaint, the Defendants were** massively enriched **by** the Family and Spouse Defendants**Ponzi scheme**. Each received, directly or indirectly, substantial transfers of Customer Property**money** from BLMIS which properly belonged to the company and, ultimately, its customers. The transfers received by, or for the benefit of, each of the Family and Spouse Defendants, as discovered by the Trustee's investigation **to date**, are identified in Exhibits C-M,**A-F** hereto. Although many of these transfers were effected through paperwork that was falsified, backdated, **and/**or fabricated to make them look

09-01503-bu Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

as if they were based on real business activities, in fact, these transfers **actually** came from the investment funds of **IA** customers for whom BLMIS was supposed to act as an honest investment adviser and fiduciary.

**. The Defendants** 68. In addition, the Family Defendants "invested" in BLMIS's IA Business. Each held numerous IA accounts in their own names and in the names of their immediate family members. Unlike BLMIS's other customers, however, their actual principal investments were often minimal and, in certain cases, nonexistent. They each removed substantial sums from their IA accounts in excess of the principal they invested, making them "net winners" subject to the avoidance claims asserted in this and other proceedings.

69. Like many of BLMIS's IA customers, the Family Defendants each received or viewed monthly account statements purporting to describe the performance of their investments. Unlike many of the ordinary IA Business customers who were duped by their account statements, however, the Family Defendants were – or should have been – aware at all times that the profits described in their IA account statements were a fiction. Each of them held senior managerial and supervisory or compliance roles at BLMIS and were experienced investors and securities professionals with regulatory FINRA licenses. Perhaps most obviously, as CoDirectors of Trading, Andrew and Mark were – or should have been – aware that no one was effecting trades within the IA Business, either in New York or in London, as claimed by Madoff, and/or that the IA Business's purported trades were not attained by the proprietary trading and market-making traders reporting to them who dealt with actual markets, and thus there was a material inconsistency that required investigation.

70. The Family Defendants also breached their fiduciary duties to BLMIS by diverting Customer Property to invest in outside business ventures for their own personal

09-01503-bü Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

enrichment. These obvious breaches of fiduciary duties were also violations of the terms of BLMIS's cynically titled Code of Ethics and Trading Policy prohibiting employees from engaging "in any business other than the employee's employment with BLMIS" absent the prior written consent of the Compliance Officer *(i.e.* Defendant Peter Madoff). This approval was also required pursuant to BLMIS's various compliance manuals. On information and belief, such consent was never obtained – and certainly not consistently with duties of loyalty and care owed to BLMIS. The Family Defendants, all employed by BLMIS, spent considerable time and energy diverting customers' funds and using them in a wide array of outside business ventures, ranging from real estate partnerships to hair salons, for their own personal benefit.

71. The Family Defendants used their IA accounts to funnel BLMIS Customer Property to themselves and their family members, as described in greater detail below. They each withdrew millions more than they invested into those accounts.

72. The Family Defendants failed to sufficiently perform any of the regulatory, supervisory, or compliance roles required of senior managers in a securities firm. They each received huge sums of money from BLMIS without any legitimate business purpose. None of them could **not** have had a good-faith basis to believe either that they were entitled to the money or that it was the result of **any purported** benefit or value they conferred toonto BLMIS. They each failed to note or report any of the blatant irregularities and improbable gains reflected in their own personal IA accounts and in BLMIS's business practices and operations.

**Peter Madoff**

73. The Trustee has identified at least $90,390,500 transferred by BLMIS to

~~Defendant Peter Madoff, or to entities for his benefit, which is avoidable and recoverable through this action. The transfers that compose that total are identified on Exhibit D, hereto.~~

09-01503-brl Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

Between 1993 and 2008, Peter was paid a total of $36,245,000 in salary and bonuses. In addition, he received over $3.8 million paid either directly to him or to vendors on his behalf as a "draw" during that same period. Available bank records reflect that these purported cash "draws" came from BLMIS' s bank accounts. Peter also directly received, and/or benefited from, over $1.5 million in salary from his wife Marion Madoff s "no-show" job with BLMIS.[7]

74. Peter maintained two IA accounts with BLMIS. All the available records reviewed by the Trustee show that Peter invested only $32,146 into his accounts including a grand total of only *fourteen dollars* after December 1995 yet he redeemed $16,252,004. It was or at the very least, should have been obvious to Peter that the gains reflected in his IA account statements did not reflect actual securities transactions or market conditions during that time.

75. In fact, the Trustee has been unable to verify that any money was ever invested into one of Peter Madoff s IA accounts account number 1M0174. Notwithstanding the lack of actual investment, the March 2002 account statement for the first time reflected approximately $15.4 million worth of Microsoft stock being "purchased" in or about December 2000 and "sold" in January 2002, generating a purported gain of $8,752,620. These trades were a complete fabrication. Less than two months later, on or about May 17, 2002, Peter Madoff redeemed nearly $6 million from this account, which included the gains from the fabricated Microsoft transactions. The purchase and sale of Microsoft shares reflected on Peter Madoff s account statements were a complete fiction. They never occurred. They simply appeared on his account statements to justify his withdrawal of nearly $6 million of other people's money.

These purported salary payments for services Marion Madoff did not perform are described in the Marion

~~Madoff Complaint, the factual allegations of which are incorporated by reference as if fully set forth herein.~~

09-01503-brl Doc 113 Filed 05/04/12 Entered 05/04/12 15:41:05 Main Document

76. Defendant Peter Madoff continued to withdraw sums of money far exceeding the invented gains of the fabricated Microsoft transaction. From April 2003 through May 2005, he withdrew an *additional* $6.9 million from the same account.

77. Peter's IA account was again manipulated in September 2005 to create millions of dollars in false gains. The September 2005 statement showed – again for the first time – the purchase of 125,000 shares of Apple Computer ("Apple") stock in January 2004, more than a year and a half earlier. The statement then reflected, on September 19, 2005, the settlement of a stock split in Apple stock on March 2, 2005, and a corresponding credit to Peter's account of an additional 125,000 shares. Finally, the September 2005 statement showed that Peter had "sold" his shares immediately after the split, in March 2005. Despite the earlier dates of these purported trades, the first evidence of this "purchase" of Apple stock does not appear until September 2005.

78. The account statement purports to show a gain from these transactions of $8,117,500. From September 2005 through April 2006, Peter redeemed $3,235,000 from this account, an amount that captured a great deal of the proceeds from the fictitious and backdated transactions in Apple stock. The Apple stock split and sale was designed to create the appearance of profitable trades in Peter's customer account when, in fact, none had occurred. Instead, these transactions served only to justify his redemption of substantial sums of other people's money.

79. In addition to these withdrawals from his "investment" accounts, Peter Madoff received, or benefited from, $3,057,109 in withdrawals from IA accounts numbered 1M0007 and 1M0103, which were ostensibly maintained in the name of his wife, Marion Madoff. Upon information and belief, Peter Madoff directed the flow of money in and out of these accounts and

otherwise controlled the accounts. The withdrawals from these accounts to or for the benefit of Peter Madoff constituted other people's money.

80. Consistent with his level of financial experience and sophistication and his role as CCO, defendant Peter Madoff knew, or should have known, that the amounts withdrawn from his accounts were the product of fictitious and backdated trading activity and that the benefit he received was derived from purported transactions grounded in fraud and deception. He ignored obvious red flags that the profits reflected in account statements could not have been earned legitimately, to the detriment of BLMIS and its other customers. These fabricated profits, however, were only a fraction of the monies Peter was able to misappropriate from BLMIS.

81. In addition, Peter – and entities he owned and controlled – improperly received over $29 million in fraudulently diverted funds from BLMIS and related entities which belonged to BLMIS and, ultimately, to its defrauded customers. Those transfers to Peter, or to others for his benefit, for which BLMIS received no corresponding benefit or value, include the following:

- On December 12, 2007, Madoff "loaned" Peter $9,000,000 at a low interest rate of 4.13%. Although the note in connection with the loan was payable to Madoff, personally, the money for the loan came from the 703 Account. Despite the favorable terms, the Trustee has not discovered any evidence that interest or principal has been paid on this loan;

- On April 14 and June 2, 2004, $450,000 and $4,000,000, respectively, was wired from the 703 Account to Peter in connection with the purchase of an apartment located at 975 Park Avenue, Apt. 6B, New York, NY 10028;

- On May 31, 2002, BLMIS transferred $714,401 in the form of a fraudulent transfer from Marion Madoff s IA account number 1M0103 to HSBC Mortgage Corp. to pay off the mortgage on Peter's home located at 34 Pheasant Run, Old Westbury, NY 11568;

- On May 1, 2001, Peter's sister-in-law, Ruth Madoff, "loaned" him $4.2 million in connection with the purchase of a home located at 200 NW Algoma Road, Palm Beach, FL 33480. That amount, plus

09-01503-bd Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

an additional $44,649, was transferred in three separate installments: $10,000 on March 27, 2001; $365,200 on April 18, 2001; and $3,869,449 on April 30, 2001. Despite being "loaned" by Ruth Madoff, the money was wired directly to Peter's real estate agents and lawyers from various BLMIS operating accounts;

Between 1996 and 2008, BLMIS paid $1,016,623 (in 38 separate payments) from its accounts at the Bank of New York to the Peter B. Madoff Life Insurance Trust, funding a life insurance policy which named his family members as beneficiaries;

Peter was also an investor in four limited partnerships operated by Sterling American Property, Inc. (the "Sterling Partnerships"). Between January 18, 2000 and April 11, 2006, the Sterling Partnerships received twelve payments totaling at least $896,744 from BLMIS for Peter's benefit;

- Peter held a 1% ownership stake in Madoff Brokerage Trading and Technology, LLC, which was financed by a $35,000 payment on January 11, 2001 from a BLMIS operating account at the Bank of New York;
- Peter also held a 1% ownership stake in Madoff Technologies, LLC. On October 31, 2000, his portion of a capital call by that entity — $54,915 — was paid by a transfer from one of BLMIS' s operating accounts;
- On December 18, 1998, Peter's $5 million ownership interest in MSIL was funded by a transfer from BLMIS.
- MSIL paid approximately $274,563 out of its operating account (in four separate payments) to "Robert S. Fountain trading as The Aston Workshop" for Peter's benefit for the purchase and restoration of Peter's Aston Martin automobile;[3]
- On July 20, 1995, BLMIS transferred $140,000 to Peter for his purchase of a Ferrari automobile;
- Between 2002 and 2008, BLMIS funds were used to pay for $744,962 charged to Peter's American Express cards for personal expenses such as wine and luxury clothing;

[3] As of the filing of this Second Amended Complaint, the Trustee has received $225,000 in partial satisfaction of these recoverable transfers.

09-01503-bG Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

- Peter also benefited from the BLMIS funds used to pay for $54,853 in personal expenses charged to his wife Marion Madoff's American Express cards.

82. In addition to benefiting himself, Peter Madoff engaged in activities that diverted BLMIS money for the benefit of his family members. For example, on March 21, 2005, $5 million was wired from the 703 Account to an HSBC bank account held by or for the benefit of Peter as a withdrawal on his IA account number 1M0174. On March 24, 2005, Peter transferred $2.5 million of this amount (in two installments) to or for the benefit of his daughter, Shana Madoff. In addition, on March 28, 2008, a wire transfer in the amount of $300,000 was sent from a BLMIS account to an HSBC bank account held by or for the benefit of Peter. On the same day, $280,000 was sent from this account to Shana Madoff. This payment appears to have been used as a down payment on Shana Madoff's home in East Hampton. On May 8, 2008, another wire transfer in the amount of $2,800,000 was sent from a BLMIS account to an HSBC bank account held by or for the benefit of Peter. The following day, May 9, 2008, $2,619,000, which appears to have been the balance due at closing on Shana Madoff's home, was transferred from this account to a law firm handling the sale. BLMIS received no corresponding benefit for the $8,100,000 transferred to Peter (and the $5,399,000 of these funds subsequently transferred to or for the benefit of Shana Madoff) via the foregoing transactions.

**Mark Madoff, Susan Elkin, And Stephanie Mack**

83. The Trustee has identified at least $81,256,109 transferred from BLMIS to Mark Madoff, or to entities and individuals for his benefit, which is avoidable and recoverable through this action. Also, Mark's former wife, Susan Elkin, directly or indirectly received, or benefited from, at least $2,395,000 in subsequent transfers, resulting from her marriage to Mark. Further, Mark's widow, Stephanie Mack, was unjustly enriched by her direct or indirect receipt of, or

102.    To date, the Trustee has identified at least $80,631,109 in avoidable and recoverable transfers from BLMIS to Mark Madoff, or to entities and individuals for his benefit. Mark Madoff's widow, Defendant Stephanie Mack, through, among other things,

benefit from, transfers totaling at least $27,457,202, and property interests of undetermined value, during the Statutory Period and resulting from her marriage to Mark.deposits into jointly held bank accounts and the purchases of jointly owned homes, benefitted from the transfers received while she was married to Mark Madoff. Defendant Stephanie Mack also received subsequent transfers of property interests of undetermined value, resulting from her marriage to Mark Madoff. The particular transfers that compose thesecomprise those totals are identified onin Exhibits F-H, hereto.B-D.

103. Mark Madoff, Susan Elkin, and Stephanie Mack lived high-end lifestyles with homes in Manhattan, Nantucket, and Greenwich, Connecticut, all paid for by BLMIS with customer funds. BLMIS funds paid for all aspects of Mark'stheir lavish lifestyle,: from the purchases of his high-end homes to the mattress and box spring hetheir multi-million dollar houses, to the mattresses and box springs they slept on, to the television in histheir home gym, and to the outdoor shower in histheir home. In addition, BLMIS provided Mark Madoff with astronomical compensation—between 1993 and 2008, he was paid $33,554,960, including bonuses of $4.8 million in 2006 and over $9 million in 2007—during years when the market-making and proprietary trading business unitsbusinesses would have reported significant losses had they not been artificially propped uppropped-up by funds stolen from the IA Business.

As described above, Mark Madoff also maintained, among 84. Beyond this amount, in a proof of claim filed with the Trustee's claims agent, Mark had sought an *additional* $44,815,520 in purported deferred compensation. However, the Trustee has found no credible evidence of a deferred compensation plan or that Mark was ever entitled to any deferred compensation. In any event, Mark is not entitled to any compensation from BLMIS due to, among other things, his breach of fiduciary duty to the firm.

~~85.~~ ~~Among~~ other accounts, ~~Mark maintained~~ seven **IA** customer accounts ~~with the IA Business~~ for himself and his family members. ~~The Trustee has identified documents purporting to show that Mark invested a total of $381,393 into those accounts. Nonetheless, Mark~~**Mark Madoff** redeemed $18,729,227 from these investment accounts prior to December 2008~~. It was or at~~ **despite having invested a total of only $381,393 over the life of the accounts.**

**104. In addition to Mark Madoff's exorbitant compensation and the massive "profits" he withdrew from his IA accounts, Mark Madoff also received nearly $29 million in fraudulently diverted funds distributed from BLMIS to him, to others for his benefit, and to entities in which he had an interest, for which BLMIS received no corresponding benefit or**

09-01503-brl Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

the very least, should have been—obvious to Mark that the massive gains reflected in his customer account statements did not reflect actual securities transactions or market conditions.

86. One of these accounts-1M0142—was purportedly opened in July 1998. Although the Trustee has not found any record of money invested into that account, Mark redeemed over $14.6 million from that account alone.

87. Mark Madoff received millions of dollars as a result of fictitious and backdated transactions in Mark's IA account. In July 1998, almost immediately after the account was opened, an account statement purports to show that thousands of shares of Dell Computer Corporation ("Dell") stock had been purchased in January 1997, more than *eighteen months before the account was opened*. These purchases appeared on the statement even though the account was never funded with cash or securities. Nonetheless, the July 1998 account statement reflects, on July 21, 1998, two stock splits in Dell: one settling on July 30, 1997, and another settling on March 11, 1998. Both of these splits took place after the shares were purportedly purchased, but before the account was opened. On the same day the stock splits are reflected, an entry purports to show that the Dell shares were "sold," generating a "gain" of $1,985,000. Three days later, on or about July 24, 1998, Mark redeemed $1,956,205 from this account.

88. As of a few years later, no money or securities had been invested in this account. Nevertheless, the March 2002 account statement reflects that $9.9 million worth of stock in Microsoft had been "purchased" over a year earlier, in December 2000, and then "sold" in or about January 2002, creating a tidy "profit" of $5,628,860. Despite the earlier dates of these purported trades, the first evidence of this "purchase" of Microsoft stock does not appear until March 2002. On or about April 3, 2002, a substantial portion of the purported profits of these

09-01503-bll Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

fictitious transactions – $5,331,853 – was transferred from Mark's IA account to an outside account owned and/or controlled by him.

89. Similarly, in April 2004, despite having no money or securities invested in his account, an account statement shows that more than 2.9 million shares of stock in Lucent Technologies had been "purchased" in March 2003 and "sold" in April 2004 for a "gain" of over $7.5 million. Again, although these trades purportedly occurred in 2003, they do not appear in account statements until April 2004. At least $7.3 million of the proceeds of these fictitious trades were transferred from Mark's IA account (number 1M0142) to outside bank and brokerage accounts owned and/or controlled by him.

90. Mark also established a customer account in July 1998 in the name of the "Children of Mark D. Madoff" with account number 1M0143. The account named Mark's brother, Andrew Madoff, as trustee. Upon information and belief, all investment decisions concerning this account were made by Defendant Andrew Madoff and his brother Mark. The Trustee has been unable to verify that any money was ever invested into this account, and upon information and belief, no money was, in fact, invested into this account.

91. In July 1998, the fraudulent transactions in Dell stock described above were repeated in the investment account held in trust for Mark Madoff s children identified above. As in his own investment accounts, falsified purchases, splits, and sales of Dell stock purported to take place in 1997 and 1998, generating fictitious gains of $1,985,000. Just a few days after the alleged sale, on or about July 24, 1998, Mark redeemed $1,956,205 from this account. This financial chicanery enabled Mark Madoff to receive money from BLMIS and its customers by imagined and falsely documented profitable transactions that never took place.

value. These transfers, for which BLMIS received no corresponding benefit or value, are identified in Exhibits B-C, and include:

92. Consistent with his level of financial experience and sophistication and his supervisory position at BLMIS, Mark Madoff knew, or should have known, that the amounts withdrawn from his and his children's accounts were the product of fictitious and backdated trading activity, and that the profits received were derived from transactions that never took place. Mark Madoff ignored the obvious red flags that the profits reflected in these account statements were the product of fraud and deception, to the detriment of BLMIS and its other customers.

93. In fact, however, as set forth in part below, these purportedly massive profits were only a fraction of the money Mark and his former spouses were able to misappropriate from BLMIS:

a. In May and June of 2008, $6,645,000 was transferred from the 703 Account directly to Mark Madoff and Stephanie Mack's real estate attorney for their purchase of a home located at 51 Wanoma Way, Nantucket, MA 02554 (the "“51 Wanoma Way Property"”).

Although this transfer took the form of a purported "loan"“promissory note” from Madoff to Mark Madoff and Stephanie Mack to Madoff with a 3.2% interest rate, the Trustee has found no evidence that this loannote was ever serviced or that any amount was repaid to BLMIS;.

b. In June 2005, Mark'sMark Madoff's mother, Ruth Madoff, purported to “loan him” him at least $5,556,589 pursuant to a “promissory note” in connection with his and Stephanie Mack's purchase of an apartment located at 583 Broadway, Apt. 4M, New York, NY 10021 (the "“583 Broadway Property"”). Those funds, however, originated from the BLMIS 703 Account. The Trustee has found no evidence that this “loan” was ever serviced or that any amount was repaid to BLMIS;.

c. Only a year earlier, in March 2004, Mark'sMark Madoff's mother had purported, Ruth Madoff, had purported to “loan” him at least $2,925,000 to purchase another

Manhattan apartment located at 457-461 West Broadway, Unit 4N, New York, NY 10012 (the ""“457-461 West Broadway Property""”). Once again, however, the money **Mark Madoff received** originated from the 703 Account, and the "loan"**BLMIS** was never serviced or repaid. On or around January 19**February 2**, 2005, Mark **Madoff** subsequently and gratuitously transferred an ownership interest in this apartment to Stephanie Mack;**.**

09-01503-bu Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

d. On February 21, 2001, BLMIS sent four checks from its operating account account totaling $1,232,680 to various entities for Mark'sMark Madoff's purchase of an apartment located at 164 East 72nd Street, #4B, New York, NY 10021. Not surprisingly, Mark Madoff received these funds under a purported $1.3 million "loan"“promissory note” from Madoff that was never serviced or repaid;.

e. In March 2000, Mark Madoff purchased a $2,242,500 home located at 21 Cherry Valley Road, Greenwich, CT 06831. This purchase was, funded by transfers from BLMIS's operating account and Madoff sMadoff's personal account at Bank of New York directly to Mark's law firm handling the transactionMark Madoff's attorneys. Again, some of these payments were documented as a purported "loan"“promissory note” from his motherRuth Madoff, however the Trustee has found no evidence that such a loan wasthe notes were ever serviced or the amounts repaid to BLMIS;.

f. Upon information and belief, BLMIS and/or Madoff funded another purchase of a home by Mark Madoff, located at 411 Stanwich Rd.,

Greenwich, CT, 06830. Mark entered into two ~~loan~~**separate financial** agreements~~, one~~**—a "promissory note"** with Madoff on December 2, 1994 for $600,000, and ~~one~~**a purported secured note** with Ruth Madoff on December 3, 1994 for $1 million~~,~~**—**to fund this home purchase. At least one of these ~~"loans"~~**financial agreements** was purportedly restructured and substituted by another ~~loan~~**"promissory note"** document in favor of Ruth Madoff in the amount of $1.1 million dated March 25, 2000~~;~~**.**

~~BLMIS, from~~**g.** **From** May 31, 1997 to November 30, 1997, **BLMIS** transferred $42,475 to Edrich Fine Arts for the purchase of artwork for one of Mark ~~Madoff s~~**Madoff's** residences~~;~~**.**

**h.** ~~BLMIS, from March 15~~**From April 26**, 2000 to December 14, 2001, **BLMIS also** transferred $~~860,098 to~~**786,484 to Mark Madoff's** interior ~~decorators Vincent~~**decorator, Vicente** Wolf Associates~~, John Colello, and Kinese Barnes Fine Art for the benefit of Mark Madoff;~~**.**

**i.** Mark **Madoff** held a 22.275% ownership stake in Madoff Brokerage Trading and Technology, LLC, which was financed by a January 11, 2001 payment of $779,625 from one of BLMIS's operating accounts~~;~~**.**

**j.** ~~Mark's~~**Mark Madoff's** $5 million ownership interest in MSIL was funded by a December 18, 1998 transfer from BLMIS. **This transfer was made pursuant to at least one "loan" agreement between Madoff and Mark Madoff and was never repaid.**

**k.** ~~BLMIS, on~~**On** January 28, 2004, **BLMIS** transferred $24,939 to Mark **Madoff** for the purchase of a Volkswagen automobile~~;~~**.**

**l.** BLMIS funds were used to pay for $792,816 in personal expenses **charged** ~~charged to Mark's~~**to Mark Madoff's** American Express card between 2002 and 2008 for the benefit of Mark ~~and~~**Madoff and, while she was married to Mark Madoff,** Stephanie Mack.

09-01503-bu Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

~~94~~**105**. Upon Mark ~~Madoff s~~**Madoff's** death, his interests in the 51 Wanoma Way and 583 Broadway Properties were purportedly transferred to **Defendant** Stephanie Mack (the ~~"~~**"**51 Wanoma Way and 583 Broadway Transfers~~"~~**"**). The transfers of the funds to purchase the 51 Wanoma Way and 583 Broadway Properties ~~were fraudulent, and~~**came from the pockets of innocent IA customers in the guise of purported personal loans from his parents, and are** thus avoidable and recoverable ~~as~~ against ~~Andrew Madoff and the~~**The** Estate of Mark Madoff. The subsequent transfers to **Defendant** Stephanie Mack upon ~~Mark's~~**Mark Madoff's** death of the properties for no value were fraudulent, and thus are also recoverable from **Defendant** Stephanie Mack through this action. **Defendant**

09-01503-smb Doc 185-1 Filed 07/15/14 Entered 07/15/14 14:05:49

Stephanie Mack did not provide any value for these transfers and was unjustly enriched. Moreover, at the time of the 51 Wanoma Way and 583 Broadway Transfers, **Defendant** Stephanie Mack was on notice of the avoidability and recoverability of the transfers used to purchase these propertiesProperties because of the pendency of this adversary proceeding.

95**106**. The Trustee filed a Notice of Claim in the probate of the Estate of Mark D. Madoff, File No. 2011-39, currently pending in Surrogate's Court, New York County.

**Andrew And Deborah Madoff**

96**107**. Like Mark, Susan Elkin, **Madoff** and Stephanie Mack, Andrew and Deborah Madoff also lived **a** high-end lifestyles paid for with the investment funds**lifestyle funded by the money** entrusted to BLMIS by its IA customers. The**To date, the** Trustee has discovered at least $73,807,007 transferred**72,662,007 in avoidable and recoverable transfers** from BLMIS to Andrew Madoff, or to entities and**/or** individuals for his benefit, which is avoidable and recoverable through this action. Also, Deborah Madoff was unjustly enriched by the direct or indirect receipt of, or benefit from, transfers in the amount of at least $27,091,261 resulting from her marriage to Andrew during the Statutory Period, and received or benefited from subsequent transfers of at least $625,000 also resulting from her marriage to Andrew**.**

. The transfers that compose these totals are identified on Exhibits J-K, hereto.**108.** Between 1993 and 2008, Andrew **Madoff** was paid $34,217,845 in salary and bonus**, bonuses, and purported deferred compensation**. His compensation included bonuses **and purported deferred compensation** of over $4.8 million in

2006~~,~~ and over $9 million in 2007~~,~~ alone—years when the market-making and proprietary trading business units would have reported significant losses had they not been artificially propped up by funds from the IA Business. ~~Beyond this amount, in a proof of claim filed with this Court, Andrew seeks an *additional* $40,624,525 in purported deferred compensation. Although the Trustee has discovered self-serving documents, created by Andrew, stating that he is owed over $9.5 million in deferred compensation as of March 2008, the Trustee has found no credible evidence of a deferred compensation plan or that Andrew was ever entitled to any deferred compensation. In any case, Andrew is not entitled to any compensation from BLMIS due to, among other things, his breach of fiduciary duty to the firm. Furthermore, in documents filed in connection with Andrew's divorce proceeding with Deborah Madoff, he disclosed that his unpaid deferred compensation was only $52,173.~~**As described above, Andrew Madoff also maintained, among** ~~97. Among~~ other accounts, ~~Andrew maintained~~ seven IA accounts in his name, including two IA accounts held jointly with **his wife,** Deborah Madoff. The Trustee's investigation **to date** shows that Andrew **Madoff** invested only $569,006 into those accounts, yet he redeemed $17,175,854 from the accounts prior to December 2008. ~~It was—or at the very least, should have been—obvious to Andrew that the gains reflected in his customer account statements did not reflect actual securities transactions or market conditions.~~

~~98. Most, but not all, of Andrew's IA account gains were withdrawn from customer account number 1M0140. Although the Trustee has not found that *any* money was invested into this account, Andrew redeemed over $14.6 million between 1998 and May 2004.~~

~~99. The purported profits generated by this customer account were the result of brazenly fabricated transactions. In July 1998, almost immediately after the account was opened, the account statement purported to show that thousands of shares of Dell stock had been~~

09-01503-brl Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

purchased in January 1997, more than *eighteen months before the account was opened.* These purchases occurred even though the account was never funded with cash or securities. In July 1998, the account statements reflected, on July 21, 1998, two stock splits: one settling on July 30, 1997, and another on March 11, 1998, after the shares were purportedly purchased, but before the account was purportedly opened. On the same day the stock splits are reflected, an entry on the account statement shows that the Dell shares were purportedly "sold," generating a gain of $1,985,000. Three days later, on or about July 24, 1998, Andrew redeemed $1,956,205 from this account.

100. As of a few years later, Andrew had still not invested money or securities into this account. Yet, in March 2002, his account statement suddenly reflects that $9.9 million worth of stock in Microsoft had been "purchased" over a year earlier in December 2000 and "sold" in or about January 2002, at a tidy profit of $5,628,860. Despite the earlier dates of these purported trades, the first evidence of this "purchase" of Microsoft stock does not appear until March 2002. On or about April 3, 2002, a substantial portion of the purported profits of these fictitious transactions — $5,331,853 — was transferred from Andrew's IA account to an account at Fidelity.

101. Similarly, in April 2004, again despite not having invested money or securities into his account, an account statement purported to show that more than 2.9 million shares of stock in Lucent Technologies had been "purchased" in March 2003 and "sold" in April 2004 for a gain of over $7.5 million. Although the first of these transactions purportedly took place in 2003, the first evidence of this "purchase" of Lucent stock does not appear on an account statement until April 2004. At least $7.3 million of the proceeds of these fictitious trades were transferred to bank and brokerage accounts controlled by Andrew.

09-01503-bu Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

102. Another account, number 1M0141, was opened in July 1998 in the name of the "Children of Andrew H. Madoff." The account named Andrew's brother, Mark Madoff, as trustee. Upon information and belief, all investment decisions concerning this account were made by Defendant Andrew Madoff and his brother, Mark. The Trustee has been unable to find evidence that any money was ever invested into this account.

103. In July 1998, fraudulent transactions in Dell stock identical to those described above appeared in statements for this account. Falsified purchases, splits, and sales of Dell stock purporting to take place in 1997 and 1998, before the account was opened, generated fictitious gains of $1,985,000. Just a few days after the alleged sale, on or about July 24, 1998, Andrew redeemed $1,956,205 from this account. This financial chicanery enabled Andrew to improperly receive completely fictitious profits created by imagined and falsely documented profitable transactions in his children's IA accounts that never took place.

104. Consistent with his level of financial experience and sophistication and his supervisory position at BLMIS, Defendant Andrew Madoff knew or should have known that the amounts withdrawn from his and his children's IA accounts were the product of fictitious and backdated trading activity and that the redemptions were the product of transactions grounded in fraud and deception. Defendant Andrew Madoff ignored obvious red flags that the profits reflected in his account statements could not have been earned legitimately, to the detriment of BLMIS and its other customers.

105**109**. In addition to his sizeable**excessive** compensation and the fabricated returns on his IA accounts, the Trustee has been able to identify, among others listed in Exhibits J-K, hereto, the following transfers to or for the benefit of Andrew and Deborah Madoff for which BLMIS received no corresponding benefit or value:**Andrew Madoff improperly received more than $22 million in fraudulently diverted funds distributed**

**from BLMIS to him, to third parties for his benefit, and/or to entities in**

**which Andrew Madoff held an interest. These transfers, for which BLMIS received no corresponding benefit or value, are listed in Exhibits E-F, and include:**

**a.** ~~In 2008,~~ Madoff purported to ~~"~~**"**loan~~"~~**"** Andrew **Madoff** at least $4,485,000 **pursuant to a "promissory note" in 2008** for the purchase of an apartment located at 433 E. 74th Street, Apt. 5E, New York, NY 10021. That money, however, was wired directly to ~~Andrew's~~**Andrew Madoff's** real estate agents and lawyers from the 703 Account. The Trustee has not discovered any evidence that this ~~"~~**"**loan~~"~~**"** was ever serviced or repaid. ~~On information and belief, Deborah Madoff also unjustly benefited from this fraudulent transfer;~~

**b.** On November 25, 2003, Ruth Madoff purported to ~~"~~**"**loan~~"~~**"** Andrew **Madoff** $6.8 million to purchase another apartment located at 10 Gracie Square, Apt. 10G, New York, NY 10028**, with his wife Deborah Madoff**. That money, however, was transferred from the 703 Account to a bank account held by Andrew~~, and~~ **Madoff and, despite Andrew Madoff's indication that he used purported deferred compensation to repay this "loan,"** the Trustee has not found any evidence that this ~~"~~**"**loan~~"~~**"** was ever serviced or repaid~~;~~**.**

**c.** ~~On~~**Upon** information and belief, ~~Andrew's~~**Andrew and Deborah Madoff's** purchase of a house located at 57 Tomac Avenue, Old Greenwich, CT 06870 was funded by a transfer of $100,000 on October 17, 1996 from ~~Andrew's~~**Andrew Madoff's** IA account ~~(account number~~ 1M0073~~) and, upon information and belief,~~ **as well as** a $300,000 transfer from BLMIS **and/**or Madoff on October 21, 1996, in the form of a ~~"loan"~~**"promissory note"** from **Andrew Madoff to** Ruth Madoff ~~to Andrew;~~**.**

**d.** On April 17, 1995, Madoff made three payments totaling $1,488,000 to third parties for the purchase of a ~~coop~~**co-op** for Andrew **and Deborah Madoff** located at 131 E. 66th Street, Unit 6/7A, New York, NY 11234. These transfers were, for the most part, the subject of two other purported ~~"loans"~~**"promissory notes"** from **Andrew** Madoff to ~~Andrew~~**Madoff** totaling $1,440,000~~;~~**.**

**e.** Andrew **Madoff** held a 22.275% ownership stake in Madoff Brokerage Trading and Technology, LLC, which was financed by a January 11, 2001 payment of $779,625 from one of ~~BLMIS' s~~**BLMIS's** operating accounts~~;~~**.**

f. ~~Andrew's~~**Andrew Madoff's** $300,000 interest in a business called Blow Styling Salon, LLC was funded with transfers from the 703 Account in May and September of 2008~~;~~**.**

g. ~~Andrew's~~**Andrew Madoff's** $5 million ownership interest in MSIL was funded by a December 18, 1998 transfer from BLMIS~~;~~ **under a "loan" agreement between Madoff and Andrew Madoff. Despite Andrew Madoff's indication that he used purported deferred compensation funds to repay this loan, the Trustee has found no evidence that this "loan" was ever repaid.**

**h.** ~~In 2003, the~~**A** $12,000 down payment on ~~Andrew's~~**Andrew Madoff's** boat **in 2003** was paid with a check issued by one of the BLMIS operating accounts~~;~~**.**

**i.** ~~In 2002,~~ BLMIS paid $68,900 to Beacon Point Marine in Connecticut ~~for Andrew's~~**in 2002 for Andrew Madoff's** benefit~~;~~**.**

09-01503-bli Doc 113 Filed 05/04/12 Entered 05/04/12 19:41:05 Main Document

j. In 2001 and 2002, BLMIS funds were used to pay $75,000 to "Lock and Hackle," for Andrew Madoff's membership in a fly fishing and hunting membership club in Miami, Florida on Andrew's behalf;.

k. Between 2002 and 2008, BLMIS funds were used to pay for $810,419 in personal expenses charged to Andrew'sAndrew Madoff's American Express card such as clothes, boat rentals, and vacation travel for him and his wife and daughters. In addition, BLMIS funds were used to pay for $15,501 in charges to Deborah Madoff sMadoff's American Express card, even though she was never employed by BLMIS.

**THE SHAM LOANS THAT THE MADOFF BROTHERS RECEIVED SHOW THEIR WILLINGNESS TO CONVERT IA CUSTOMER FUNDS FOR THEIR OWN PERSONAL GAIN**

**110. As detailed above, the Madoff Brothers received several gratuitous transfers from BLMIS often disguised as "loans" and/or "promissory notes" from Madoff and/or Ruth Madoff for their purchases of personal real estate and business interests.[8] While these sham loans were often papered over by promissory notes in favor of Madoff or Ruth Madoff, the Madoff Brothers knew or were willfully blind to the fact that the money to fund these sham loans originated from bank accounts under the control of BLMIS, including from BLMIS's 703 account, where IA customer funds were principally deposited.**

**111. For example, on February 22, 2001, Mark Madoff executed a "promissory note" in favor of Madoff for $1.3 million for his use to purchase an apartment located at 164 E. 72nd Street in Manhattan. One day earlier, as reflected in the transaction's closing binder, four checks drawn on a BLMIS bank account in the total amount of $1,232,680 were**

**[8] Peter Madoff and DiPascali both admitted that Madoff gave them substantial sums of money with no expectation of re-payment that was falsely documented as loans in order to avoid gift taxes. *See United States v. Peter Madoff*, Case No. 10-CR-228 (LTS), Tr. 35; *United States v. Bonventre, et al.*, Case No. 10-CR-228 (LTS), Trial Tr. 6105.**

**Shana Madoff**

106. The Trustee has thus far identified at least $15,268,040 transferred from BLMIS to Shana Madoff, or to third parties for her benefit, which are avoidable and recoverable through this action. The transfers that compose these totals are identified on Exhibit M, hereto.

107. Shana Madoff was well-compensated for her work as BLMIS's Compliance Director. Between 1993 and 2008, she was paid $4,601,488 in salary and bonus.

108. Shana maintained five accounts with BLMIS's IA Business for the benefit of herself and certain of her family members. The Trustee has learned that Shana invested $1,306,960 into those accounts, and she redeemed $1,666,436 prior to December 2008. Those redemptions are subject to avoidance and recovery, and should be returned for the benefit of those BLMIS customers who were not so fortunate.

109. In addition to these investment account redemptions, Shana, and entities in which she held an interest, improperly received transfers and/or the benefit of over $9 million in funds fraudulently diverted from BLMIS which belonged, ultimately, to its defrauded customers. The Trustee has identified, among others listed in Exhibit M, hereto, the following distributions to Shana Madoff, for which BLMIS received no corresponding benefit or value:

- On March 28 and May 9, 2008, a total of $2,899,000, originating from the 703 Account, was transferred to a law firm on Shana's

delivered to the sellers, the New York State Department of Tax, and other individuals and entities associated with this purchase. Although the "promissory note's" maturity date was December 31, 2003, Mark Madoff never repaid this money to Madoff or BLMIS.

112.    Andrew Madoff received a $5 million "loan" from Madoff to purchase his interest in MSIL as well as a $6.8 million "loan" from Ruth Madoff to purchase his cooperative at 10 Gracie Square in Manhattan. The funds "loaned" to Andrew Madoff were transferred from BLMIS's bank accounts. Andrew Madoff allegedly used the purported profits in his fictitious deferred compensation accounts to purportedly repay two of his "loans"—in 2006, Andrew applied $5,726,367 of his purported deferred compensation to repay the $5 million "loan" from Madoff and, in 2007, Andrew Madoff applied $7,765,699 of his purported deferred compensation to repay the $6.8 million "loan" from Ruth Madoff— however, Andrew Madoff's purported repayments were merely fraudulent book entries *as no money was actually returned to BLMIS and there was no money in his deferred compensation account to make these payments*. Andrew Madoff knew that these purported repayments were fake as he did not report these purported deferred compensation withdrawals on his 2006 or 2007 tax returns, when the withdrawals allegedly took place.

113.    The Madoff Brothers never intended to, and in fact did not, repay millions of dollars of customer property transferred to them pursuant to these sham loans. Given Mark Madoff's and Andrew Madoff's knowledge of the origin of the transfers, these sham promissory notes and loan agreements were, without question, further indicia of fraud and the Madoff Brothers' unapologetic abuse of BLMIS as their own personal cookie jar.

behalf and used to purchase her home at 8 Barclay Court, East Hampton, NY 11937;

- Shana held a 22.275% interest in Madoff Technologies, LLC. On October 31, 2000, a capital call to that entity attributable to Shana's ownership stake was satisfied by a $1,223,237 transfer from BLMIS's operating account;

- On or about July 2, 2007, Shana purchased a one-third stake in Madoff Energy Holdings, LLC for $2,370,000. $1,700,000 of that amount, however, was taken from BLMIS's operating account and recorded as a purported draw against her father, Peter Madoff s, compensation;

In September and October of 2000, transfers totaling $30,000 were transferred from BLMIS's operating account at the Bank of New York to Shana's interior decorator;

- Between 2002 and 2004, BLMIS paid $241,958 to the Glenwood Management Corporation for rent on Shana's apartment;

- From March 1996 to December 2008, Shana received $12,561 in "vendor" payments from BLMIS;

- Between 2002 and 2008, BLMIS funds were used to pay for $374,860 in personal expenses charged to Shana's American Express card such as clothing, cosmetics, and personal travel for her and her family.

## NATURE OF THE CAUSES OF ACTION AGAINST THE FAMILY AND SPOUSE DEFENDANTS

110. At all times relevant hereto, BLMIS was insolvent in that: (i) its liabilities exceeded the value of its assets by billions of dollars; (ii) it could not meet its obligations as they came due; and/or (iii) at the time of the transfers to or for the benefit of the Family and Spouse Defendants described herein, BLMIS was left with insufficient capital.

111. This adversary proceeding is being brought to avoid obligations and to avoid and recover transfers made to or for the benefit of the Family and Spouse Defendants, and to recover money by which the Family and Spouse Defendants have been unjustly enriched, so that this

customer property can be equitably distributed among the customers of BLMIS in accordance with the provisions of SIPA.

112. The Trustee also seeks an accounting of all monies received by the Family Defendants during their employment at BLMIS, and received by Stephanie Mack and Deborah Madoff during the Statutory Period, and a constructive trust imposed as a result of the past unjust enrichment of and to prevent any further unjust enrichment by the Family Defendants and Stephanie Mack and Deborah Madoff on all assets they acquired directly or indirectly from BLMIS. The Trustee specifically looks to place many of the properties described herein, which were purchased for the Family Defendants and Stephanie Mack and Deborah Madoff with BLMIS funds, in a constructive trust, to prevent their transfer, sale, or other dissipation during the pendency of this action. The accounting and constructive trust are necessary in this case in light of the size of the Ponzi scheme and the amount of money improperly transferred to the Family and Spouse Defendants to finance their personal lives and personal investments.

113. Without regard to the extent to which they knew of Madoff s fraudulent scheme, each of the Family and Spouse Defendants knew or should have known that they were not entitled to these distributions of "free" company money. The Family Defendants were intimately involved with the "family business" and were close relatives of the mastermind of the Ponzi scheme. Together with the Spouse Defendants, they sometimes traveled together, vacationioned together, and spent many holidays together. The Family Defendants all had senior positions at BLMIS. Among other things, and at the very least, the Family Defendants were on notice of the following indicia of irregularity and fraud, and either failed to make sufficient inquiry or knew of the fraud, ignored it, and profited from it:

**IF BLMIS'S COMPLIANCE AND SUPERVISORY PROCEDURES WERE FOLLOWED THEY WOULD HAVE PREVENTED THE FRAUD**

114. The Madoff Brothers, as securities professionals and senior management and supervisory personnel at BLMIS, were not only aware of the indicia of fraud described above and deceitfully siphoned millions of dollars out of BLMIS to fund their personal expenditures, but they also ignored their obligations to ensure that BLMIS was operating lawfully—and in accordance with the company's own policies—in order to continue to exploit the illegal fruits of the IA Business.

115. Specifically, important compliance and supervisory roles were held by the Madoff Brothers who, rather than approach their jobs with appropriate professional diligence, failed to properly and faithfully carry out their duties and responsibilities. Policies dictating their duties and responsibilities included BLMIS's "Internal Risk Management Controls" which proclaimed that:

> Bernard L. Madoff Investment Securities LLC ("Madoff") takes very seriously its responsibility to maintain a stringent risk management supervisory system. Risk management includes the continuous identification, management, measurement and oversight of Madoff's various business risks...Senior management is directly involved [in oversight through an]...intricate system of supervision, review, and communication between Madoff's senior management, supervisory, trading, operations and systems personnel.

116. Not one of these assertions, however, was true. Senior management—the Madoff Brothers—did not do their jobs. Had they not knowingly enabled or chosen to willfully blind themselves to the prevalent fraud permeating BLMIS, they could have stopped the Ponzi scheme many years ago.

117. In that same document, BLMIS claimed that it "has established and maintains...internal controls to ensure the integrity of the firm's written supervisory and

09-01503-smb Doc 189-1 Filed 07/15/14 Entered 07/15/14 14:05:49

operational procedures." As part of that supervision, "Senior Management" (which included the Madoff Brothers) was required to communicate with "department managers on a daily basis to provide guidance to ensure that proper procedures are being followed."

118. These duties existed long before BLMIS's registration as an Investment Adviser in 2006. The 1996 Compliance Manual, which governed all aspects of BLMIS's business, including the IA Business, proclaimed that BLMIS would "always follow a policy of strict adherence to the dictates of sound investment principles and practices and high ethical standards." That manual reminded all registered representatives, which included the Madoff Brothers, of their "professional obligation to conduct [their] business affairs in a moral, ethical and legal manner."

119. Although the 1996 Compliance Manual designated Madoff as a supervising principal, it did not do so exclusively. In Madoff's absence, the 1996 Compliance Manual provided that Peter Madoff had that principal responsibility and, in his absence, that "Mark D. Madoff shall be responsible for carrying on the firm's policy." Later manuals appointed both Mark Madoff and/or Andrew Madoff in charge of the business in Madoff's absence.

120. The 1996 Manual further appointed Mark Madoff as Director of Trading, responsible for the "day to day responsibility of supervising the firm's business of trading and market-making." Andrew Madoff was designated the Director of Over-the-Counter ("OTC") Trading and "responsible for overall supervision of OTC transactions that occur as part of Madoff's business." DiPascali—an instrumental conspirator and 20-plus year accomplice in Madoff's Ponzi scheme who plead guilty

**to a ten-count information in 2009 for his role in the fraud—was listed alongside the Madoff Brothers in this manual and given responsibility over options transactions.**

(a) Mark Madoff and Defendants Peter, Shana, and Andrew Madoff were integrally involved in BLMIS's proprietary trading and market-making operations. Each of them held numerous IA accounts and received monthly IA customer statements. They all were, or should have been, aware of the radically different performance of the IA Business as compared to the performance of the proprietary trading and market-making businesses, which traded in the same markets at the same time.

121. Moreover, the Madoff Brothers were far from ignorant about the operations of the IA Business. In addition to the supervision they were required to exercise across the entire business, they each, at times, played specific roles in the operation and control of the IA Business as well. For example:

a. Andrew Madoff referred customers to the IA Business.

b. Andrew Madoff had direct communications with IA customers about their accounts.

c. Andrew Madoff communicated with IA personnel about customers' requests.

d. The Madoff Brothers were both approached by potential investors that wanted the opportunity to invest with Madoff.

e. Following BLMIS's long-delayed registration with the SEC as an Investment Adviser in August 2006, Andrew Madoff reviewed and corrected Bloomberg's portrayal of the IA Business, noting that it had been improperly characterized.

f. All of BLMIS's business was conducted out of the same floor (18th floor) in Manhattan's Lipstick building until February 1990, when the IA Business moved to the 17th floor. Mark Madoff and Andrew Madoff began working at BLMIS in the 1980's and had full access and visibility into the IA Business for several years before it moved to the 17th floor.

g. Even after the BLMIS office space expanded, the Madoff Brothers had complete and full physical access to the 17th floor where the Ponzi scheme took place.

(b)h. Financial industry press reports, including a May 27, 2001 article in

Barron's entitled "“Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum,"” and a May 2001 article in MAR/Hedge, a newsletter widely-read by hedge fund industry professionals, entitled "“Madoff Tops Charts; Skeptics Ask How,"” raised serious questions about the legitimacy of BLMIS and Madoff. Those articles also questioned BLMIS's ability to achieve the returns purportedly attributable to Madoff s split-strike conversion strategy. Defendant Andrew Madoff and his brother, Mark,**Madoff's SSC Strategy. The Madoff Brothers** read those articles and are alleged to have denied the charges to BLMIS employees.

(c) BLMIS did not provide most of its customers with electronic real-time online access to their accounts, which certainly by the year 2000 was customary in the industry. BLMIS also utilized outmoded technology, such as paper trading confirmations. This outdated practice stood in sharp contrast to Madoff s stated goal of being in the forefront of trading technology and his early use of computer-based trading. The use of paper confirmations helped facilitate the Ponzi scheme by making it easier to alter trading records than if modern automated methods had been used. These and other outdated practices, such as the blanket prohibition on email communication by employees of the IA Business, should have been red flags to Peter, Andrew, Mark, and Shana based on their positions and corresponding responsibilities.

**i. The Madoff Brothers both approved guidelines that were intended to be followed when setting IA employees' salaries and bonuses.**

(d) Defendant Andrew Madoff and his brother, Mark, supervised trading at the company's proprietary trading and market making operations. They were, therefore, aware at all times – or, at the very least, should have been aware – of the trading volume and price ranges of the stocks traded by BLMIS. They knew or should have known that the profits and executions described in customers' account statements, including their own, did not correspond to actual market conditions.

(e) BLMIS functioned as both investment adviser to its customers and custodian of their securities. This arrangement eliminated another frequently utilized check and balance in investment management by excluding segregation of duties between the custodian of securities and the investment adviser. This conflict heightened the potential for fraud and lack of transparency at BLMIS and was another red flag which required heightened scrutiny by the Family Defendants.

BLMIS produced returns that were too good to be true, showing consistent profitability in both good times and bad that was simply not credible. Because of their senior supervisory positions, the Family Defendants should have recognized, for example, that the double digit returns their own IA accounts purported to show were not possible. In fact, other skilled hedge fund managers who attempted to employ the split-strike conversion strategy purportedly used by BLMIS consistently failed to generate anything close to its reported results.

(g) Although BLMIS would have had to execute massive options trades to implement the split-strike conversion strategy, its purported trading failed to have the expected impact such volume would have had on the options market indices. Indeed, there were not enough put option contracts available to place hedges in the size which BLMIS claimed to be implementing. Actual implementation of the purported split-strike conversion strategy based on

j. The Madoff Brothers were both authorized to transact *all* business required for BLMIS.

k. The Madoff Brothers were both authorized to hire and terminate *all* company employees.

l. The Madoff Brothers both had the authority to bind BLMIS to contracts.

m. The Madoff Brothers were held out as the future successors to Madoff with respect to the IA Business.

122. The Madoff Brothers had to know that the representations made by BLMIS in the Form ADV—the form used by investment advisers to register with both the Securities and Exchange Commission and state securities authorities—relating to assets under management and the number of accounts were entirely false. For example, in or about January 2008, BLMIS filed a Form ADV for Investment Adviser Registration with the SEC. In the application, BLMIS represented that it had 23 customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had over 4,900 open customer accounts with a purported value of approximately $68 billion under management (based on customer account statements reflecting fictitious profits for trades which, in fact, never took place). The Madoff Brothers knew, at a minimum, that their personal, family, and friends' IA accounts alone exceeded the 23 accounts reported to the government.

123. The Investment Advisory Manual for the IA Business required responsibilities and layers of oversight that were never fulfilled or implemented and placed responsibility on the shoulders of the Madoff Brothers, who both held senior management and supervisory positions at BLMIS. For example, the September 2006 Investment Advisory Compliance Manual dictates that:

> [A]ny person with the requisite degree of responsibility, ability, or authority to affect the conduct of the employee whose behavior is

at issue may be deemed a 'supervisor.' *A person's actual authority and responsibility, not merely title and status, determine whether that person is a 'supervisor.'*

124. The Investment Advisory Compliance Manual required the Madoff Brothers

to:

a. Monitor (or delegate and supervise the monitoring of) the activities of BLMIS personnel to ensure that the policies and procedures in this manual are being followed;

b. Respond to 'red flags' (such as indications that material nonpublic information has been inappropriately communicated or that insider trading has occurred) and reasonably correct problems that may arise; and

c. Pay 'prompt close attention' to 'any aberrational activity. Supervisors should be skeptical of any failure to adhere to BLMIS policies and procedures. *Once red flags have been detected, a supervisor has an affirmative duty to investigate any problem and follow up to ensure that the problem has been corrected.'*

125. The Madoff Brothers ignored these duties, and in so doing, ensured the survival and proliferation of Madoff's Ponzi scheme, which enabled them to continue to live the lavish lifestyles to which they had become accustomed by spending the IA customers' money.

126. The Madoff Brothers were each FINRA-registered securities principals of BLMIS. As such, they had supervisory responsibilities to ensure compliance with BLMIS's policies and procedures as well as with federal securities laws. The Trustee's investigation has not revealed any evidence of meaningful and consistent supervision by either of the Madoff Brothers to ensure that BLMIS was conducting its business in a lawful manner. This inaction was their disguise, so they could later seek to profess ignorance of the obvious fact that no securities transactions were taking place within the IA Business so they could continue to gorge on the fruits of the IA fraud. This

failure to undertake any semblance of the responsibilities attendant with their roles as supervisors and registered principals was a critical

09-01503-smb Doc 133-1 Filed 07/15/14 Entered 07/15/14 14:05:49

part of the way in which the Ponzi scheme was hidden from BLMIS's customers and the regulators.

127. The Madoff Brothers were—like their uncle Peter Madoff, who has already pleaded guilty to his role in the fraud—registered general securities principals at BLMIS and served in that role at BLMIS pursuant to their maintenance of a FINRA Series 24 registration. The exam is designed to ensure that a principal of a broker-dealer has the requisite knowledge and competence, and serves to emphasize the principal's obligations to supervise the operations of a broker-dealer and its employees. Registered principals are responsible for ensuring, among other things: (i) firm compliance; (ii) that regulatory requirements are met; and (iii) the establishment, maintenance, and implementation of proper supervisory procedures. With respect to these obligations, the Madoff Brothers (like their uncle Peter) failed the customers who opened accounts and entrusted their money to BLMIS.

128. The Madoff Brothers, at a minimum, consciously and willfully turned a blind eye to these and other duties, thus protecting and prolonging the Ponzi scheme that enriched them for many years.

Supervisory Failures Relating To MSIL

129. MSIL also maintained its own Compliance Manual which, upon information and belief, was last updated in January 2004. The Madoff Brothers, and their uncle Peter Madoff, were all Directors of MSIL and were designated as "Approved Persons" of MSIL by British regulatory authorities. The MSIL manual required that "Approved Persons" comply with the Financial Services Authority's "Statements of Principle for Approved Persons." These include acting with "due skill, care and diligence in carrying

out his accountable functions," and taking "reasonable steps to ensure that the business

of the firm for which he is responsible...is organised so that it can be controlled

effectively." The Trustee has not found

the amount of advisory monies purportedly available for investment would have overwhelmed the options market. It certainly would have caused significant changes to market indices. The absence of these market impacts should have been noticed by the Family Defendants.

(h)   BLMIS' s customer statements reflected a consistent ability to trade securities near their monthly highs and lows to generate consistent and unusual profits (or, if requested by investors to generate losses, to do the opposite). No investment professional could have reasonably believed that this could have been accomplished legitimately for so long.

(i)   BLMIS, which reputedly ran the world's largest hedge fund, had its annual audits prepared by Friehling & Horowitz, an accounting firm of three employees, one of whom was semi-retired, with offices located in a strip mall. The Family Defendants, some of whom used Friehling & Horowitz to prepare their own tax returns, could not have reasonably believed it possible for any such firm to have competently audited an entity the size of BLMIS. BLMIS purported to convert all of the holdings for its customers' accounts to cash or United States treasury securities immediately before each quarter ended. This strategy had no practical benefit and could not have been effective in producing the fictitious consistent returns for these accounts, given the vagaries and cycles in the stock and options markets. PROOFS OF CLAIM

evidence that the required periodic supervisory review was regularly conducted on an ongoing basis by the Madoff Brothers to ensure compliance with law. Again, their failures to discharge their duties enabled and facilitated the Ponzi scheme.

130.   As directors and supervisors of the market-making and proprietary trading businesses, the Madoff Brothers knew or willfully blinded themselves to the fact that the primary source of revenue for the market-making and proprietary trading businesses was, in fact, nothing more than customer money redirected from

**the IA Business. Irrespective of their insider status, knowledge, and failure to faithfully carry out their compliance, supervisory, and managerial responsibilities, the Madoff Brothers were compensated excessively over many years even while the trading businesses they managed were incurring millions of dollars in losses and could not afford the millions of dollars in exorbitant salaries, bonuses and other compensation paid to them. The Trustee seeks to recoup this unjust enrichment, and all direct and indirect transfers of those funds that were made to or for the benefit of the Defendants.**

**EVEN AFTER THE FRAUD HAS BEEN REVEALED THE MADOFF BROTHERS' CONTINUE TO SEEK MILLIONS MORE**

~~114~~**131**. In July of 2009, Mark Madoff filed the following non-customer general creditor proofs of claim asserting ~~a claim~~**claims** for ~~purported~~ deferred compensation that allegedly had accrued in his purported deferred compensation account, **as well as purported** unpaid salary, bonuses, and investments in MSIL:

a. Claim Nos. 100328 and 100428 in the **collective** amount of ~~$53,848,721.06. Of that~~

**$53,848,721.06. Of that** amount, $10,950 was sought to be treated as an allowed unsecured priority claim under section 507(a)(4)(A) of the Bankruptcy Code~~;~~[~~4~~]**.**[9]

[9] **Claim No. 100428 is identical to and duplicative of Claim No. 100328.**

09-01503-smb Doc 189-1 Filed 07/15/14 Entered 07/15/14 14:05:49

Copies of these proofs of claim are attached hereto as Exhibit NG.

115132. In July of 2009, Andrew Madoff filed the following non-customer general creditor proofs of claim **also** asserting a claimclaims for purported deferred compensation that allegedly had accrued in his purported deferred compensation account, **as well as purported** unpaid salary, bonuses, and investments in MS1LMSIL:

a. Claim Nos. 100329 and 100427 in the amount of $45,690,776.95, and of that amount, $10,950 was sought to be treated as an allowed unsecured priority claim under section 507(a)(4)(A) of the Bankruptcy Code.[5][10]

Copies of these proofs of claim are attached hereto as Exhibit NG.

116133. In addition, the Family Defendants**Andrew Madoff and Deborah Madoff** filed customer claims with the Trustee (the "“Customer Claims"”). A chart setting forth information contained in the Customer Claims is attached hereto as Exhibit 0H. Exhibit 0H lists the following information for each Customer Claim: (i) the BLMIS account number to which the Customer Claim refers; (ii) the name of the BLMIS account and Customer Claim holder; (iii) the date the Customer Claim was filed; (iv) the Claim Number designated by the Trustee for each Customer Claim; (v) the status of each Customer Claim, including whether the claim was objected to; and (vi) the date an objection, if any, was filed with respect to the Trustee’s determination of each Customer Claim.

[4] Claim No. 100428 is identical to and duplicative of Claim No. 100328.

[5] Claim No. 100427 is identical to and duplicative of Claim No. 100329.

~~117~~**134**. On December 23, 2008, the Court entered an Order on the Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief (the ~~"~~"Claims Procedures Order~~"~~," Dkt. No. 12). The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has

[10] **Claim No. 100427 is identical to and duplicative of Claim No. 100329.**

09-01503-smb Doc 189-1 Filed 07/15/14 Entered 07/15/14 14:05:49

been operating. The Trustee intends to resolve the Customer Claims and any related objections to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

~~118~~**135**. The Trustee seeks disallowance of the **Madoff Brothers'** Customer and ~~Non-Customer~~**NonCustomer** Claims (collectively, the ~~"Family Defendant Claims") of the Family Defendants~~**"Madoff Brothers' Claims")** under Bankruptcy Code ~~section~~**sections 502(a), 502(b)(1), and** 502(d), and also seeks to equitably subordinate the ~~Family Defendants~~**Madoff Brothers**' claims under Bankruptcy Code section 510(c).

**ANY OBLIGATIONS TO THE DEFENDANTS INCURRED BY BLMIS AND/OR ~~THE OBLIGATIONS~~MADOFF ARE AVOIDABLE**

~~119~~**136**. To the extent BLMIS or Madoff incurred obligations ~~to the Family~~**for the benefit of the** Defendants in connection with any IA ~~account documents or any statements or representations made by BLMIS or Madoff, included any claimed~~**accounts, including any purported** deferred compensation, such obligations (collectively, the ~~"~~**"**Obligations~~"~~**"**) are avoidable under sections 105(a), 544(b), and 548(a) of the Bankruptcy Code, applicable provisions of sections 273-279 of the DCL, and applicable provisions of SIPA, including sections 78fff(b) and 78fff-1(a)-(b). BLMIS **and/**or Madoff incurred the Obligations as an integral part and in furtherance of ~~BLMIS' s~~**BLMIS's** Ponzi scheme.

~~120~~**137**. To the extent BLMIS **and/**or Madoff incurred the Obligations to the ~~Family~~ Defendants, such Obligations were incurred with actual intent to hinder, delay, or defraud then existing and/or future creditors.

~~121~~**138**. To the extent BLMIS **and/**or Madoff incurred the Obligations, such Obligations were incurred when BLMIS was insolvent, had unreasonably small capital, and/or was unable to pay its debts as they matured. BLMIS was a massive Ponzi scheme, which, as a matter of law, was insolvent from its inception and, therefore, never capable of fulfilling its obligations to its creditors.

**THE MADOFF BROTHERS RECEIVED AND/OR BENEFITTED FROM TRANSFERS OF IA CUSTOMER MONEY TOTALING MORE THAN $153 MILLION**

THE TRANSFERS

122**139**. Prior to the Filing Date, BLMIS made transfers to or for the benefit of the Family Defendants**Madoff Brothers** totaling at least $251,740,157 (the "Family Defendant**153,293,116 (the "Madoff Brothers** Total Initial Transfers"**"**). A table setting forth **each of** the Family Defendants**Madoff Brothers**' Total Initial Transfers is attached hereto as Exhibit A. The Family Defendants**Madoff Brothers**' Total Initial Transfers **were and continue to be customer property and** are avoidable and recoverable under sections **105(a),** 544, 547, 548(a), 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA**15 U.S.C.** § 78fff-2(c)(3), sections 203(g) and 213(8) of the **NY** CPLR, and applicable provisions of**NY** DCL §§ 273- 279. The Family Defendants**Madoff Brothers**' Total Initial Transfers are also avoidable to the extent they were made on account of the avoidable Obligations.

123**140.** Of the Family Defendants**Madoff Brothers**' Total Initial Transfers constituting IA account withdrawals, $51,739,785**35,116,624** constitutes fictitious profits comprised of other people's money received by the Family Defendants**Madoff Brothers** between the opening dates of their IA accounts and the Filing Date; $2,083,736**788,457** constitutes principal received by the Family Defendants**Madoff Brothers** during the same period. These withdrawals are detailed in Exhibits D,**C and** F, J, and M, hereto.

124**141**. On the Filing Date, the facts supporting this action could, for the first time with reasonable diligence, have been discovered by certain unsecured creditors of BLMIS, including defrauded BLMIS IA customers. Therefore, of the Family Defendants**Madoff Brothers**' Total Initial Transfers, the Trustee seeks to set aside and recover at least

$~~106,533,800~~**64,643,271** in transfers which took place earlier than the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers identified below. These transfers can be

set aside and are recoverable under sections **105(a),** 544, 550~~(a)~~, and 551 of the

Bankruptcy Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), sections

203(g) and 213(8) of the **NY** CPLR, and section 276 of the **NY** DCL.

~~125~~**142**. Of the ~~Family Defendants~~**Madoff Brothers**' Total Initial Transfers, at least $~~145,206,356~~**88,649,845**, as identified on Exhibit A~~, hereto~~, was made to or for the benefit of the ~~Family Defendants~~**Madoff Brothers** during the six years prior to the Filing Date (the ~~"Family Defendants~~**"Madoff Brothers**' Six-Year Transfers~~"~~**"**). The ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers are avoidable and recoverable under sections **105(a),** 544, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly ~~SIPA~~**15 U.S.C.** § 78fff-2(c)(3), and applicable provisions of DCL §§ 273-279. The ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers are also avoidable to the extent they were made on account of the avoidable Obligations.

~~126~~**143**. Of the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers, at least $~~59,874,826~~**35,303,204**, as identified on Exhibit A~~, hereto~~, was made to or for the benefit of the ~~Family Defendants~~**Madoff Brothers** during the two years prior to the Filing Date (the ~~"Family Defendants~~**"Madoff Brothers**' Two-Year Transfers~~"~~**"**). The ~~Family Defendants' Two-Year~~**Madoff Brothers' TwoYear** Transfers are additionally avoidable and recoverable under sections **105(a),** 548(a)(1), 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA ~~§~~ 78fff-2(c)(3). The ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers are also avoidable to the extent they were made on account of the avoidable Obligations.

~~127~~**144**. Of the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers, at least $~~8,691,152~~**3,829,212**, as identified on Exhibit A~~, hereto~~, was made to or for the benefit of the ~~Family Defendants~~**Madoff Brothers** in the one year period prior to the Filing Date (the ~~"Family Defendants~~**"Madoff Brothers**' Preference Period Transfers~~"~~**"**). The ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers are additionally recoverable as avoidable preference payments under sections **105(a),** 547, 550(a), and 551 of the

Bankruptcy Code and applicable provisions of SIPA, including ~~SIPA~~ **15 U.S.C.** § 78fff-2(c)(3).

~~128. Of the transfers identified in this Second Amended Complaint, Stephanie Mack and Deborah Madoff were unjustly enriched by at least $54,548,463 in transfers, and interests in property of undetermined value, they received or benefited from, during the Statutory Period and resulting from their marriages to Mark and Andrew Madoff (the "Statutory Period Transfers"), as set forth in Exhibit B, hereto. The Trustee seeks to recover the Statutory Period Transfers from Stephanie Mack and Deborah Madoff because in equity and good conscience they should not benefit from property unlawfully converted from BLMIS customers.~~

~~129~~**145**. To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

~~130. The Trustee's investigation is ongoing and the Trustee reserves the right to: (i) supplement the information regarding the Obligations and the Family Defendants' Total Initial Transfers, each Family Defendants' initial transfers and, where applicable, their subsequent transfers, the Statutory Period Transfers, and any additional transfers; and (ii) seek the avoidance and recovery of such additional transfers.~~

09-01503-smb Doc 189-1 Filed 07/16/14 Entered 07/16/14 14:05:49

**146. All of the factual allegations in this Third Amended Complaint are based upon information available to the Trustee at this time based on his investigation and discovery to date. The Trustee's investigation of the obligations incurred by BLMIS, the transfers and subsequent transfers from BLMIS to/or for the benefit of the Defendants, and the extent to which the Defendants benefited at the expense of BLMIS customers, remains ongoing. Subject to further leave of the Court, the Trustee reserves the right to supplement his allegations with respect to the facts and amounts recoverable should further information become available.**

**DEFENDANT STEPHANIE MACK RECEIVED AND/OR BENEFITTED FROM ~~THE~~ SUBSEQUENT TRANSFERS OF IA CUSTOMER MONEY**

~~131. Subsequent~~**147. Based on the Trustee's investigation to date, subsequent** transfers ~~were made to or for the benefit of the Family and Spouse Defendants totaling $8,981,500 and~~**of** property interests of undetermined value **were made to Defendant Stephanie Mack** (the ~~"~~**"**Subsequent Transfers~~"~~**"**) that are recoverable under ~~section 550~~**sections 105**(a) **and 550** of the Bankruptcy Code~~ and~~**,** applicable provisions of SIPA, particularly ~~SIPA~~ **15 U.S.C.** § 78fff-2(c)(3)**, and § 278 of the NY DCL**. The Subsequent Transfers are identified on ~~Exhibits A-B, hereto,~~**Exhibit D** and described in the below paragraphs.

~~132. The Trustee has filed an action against Ruth Madoff to avoid and recover initial transfers from BLMIS, styled as *Picard v. Ruth Madoff*, Adv. Pro. No. 09-1391 (BRL) (the "Ruth Madoff Complaint"). The Trustee incorporates by reference the allegations in the Ruth Madoff Complaint as if fully set forth herein.~~

133. BLMIS made transfers to Ruth Madoff, which are avoidable, should be avoided, and are recoverable under sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, application provisions of sections 273-279 of the DCL, CPLR §§ 203(g) and 213(8), and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3) (the "Ruth Madoff Initial Transfers"). Based on the Trustee's investigation, and to the extent not avoidable as initial transfers for the benefit of Mark Madoff and Susan Elkin, on or about March 22, 2000, approximately $2,020,000 of the Ruth Madoff Initial Transfers was subsequently transferred by Ruth Madoff to a law firm handling the purchase of a home for the benefit of Mark Madoff and Susan Elkin (the "Ruth Madoff Subsequent Transfer").[8] The Ruth Madoff Subsequent Transfer is identified on Exhibits F-G, hereto.

134. The Trustee in this action seeks to avoid and recover initial transfers made by BLMIS to Peter Madoff. The Trustee has also filed an action against Marion Madoff to avoid and recover initial transfers from BLMIS (see the Marion Madoff Complaint referenced above). BLMIS made transfers to Peter and Marion Madoff, which are avoidable, should be avoided, and are recoverable under sections 544, 547, 548, 550, and 551 of the Bankruptcy Code, applicable provisions of sections 273-279 of the DCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3) (the "Peter and Marion Madoff Initial Transfers"). Based on the Trustee's investigation, $2.5 million of the Peter and Marion Madoff Initial Transfers was subsequently transferred by Peter and Marion Madoff to and for the benefit of Shana Madoff on March 24, 2005. In addition, on or about March 28, 2008, approximately $280,000 of the Peter and Marion Madoff Initial Transfers was subsequently transferred by Peter and Marion Madoff to Shana Madoff. Finally, on or about May 9, 2008, approximately $2,619,000 of the Peter and

Marion

[8] The Trustee will amend the Ruth Madoff Complaint as necessary.

Madoff Initial Transfers was subsequently transferred by Peter and Marion Madoff to a law firm for the purchase of a home for Shana Madoff (collectively, the "Peter and Marion Madoff Subsequent Transfers"). The Peter and Marion Madoff Subsequent Transfers are identified on Exhibit M, hereto, at pp. 25-26.

135**148**. The Trustee in this action also**adversary proceeding** seeks to avoid and recover from the Estate of Mark D. Madoff, and Andrew Madoff in his capacity as Executor of the Estate of Mark D. Madoff, initial transfers made by BLMIS in connection with the purchase of the 457- 461 West

Broadway, 51 Wanoma Way, and 583 Broadway Properties (the "Mark Madoff InitialTransfers"). Based on the Trustee's investigation **to date**, on or around January 19, 2005, an interest in the 457-461 West Broadway Property was gratuitously transferred by Mark Madoff to **Defendant** Stephanie Mack, and should be recoverable as a subsequent transfer to **Defendant** Stephanie Mack. In addition, Mark's**Mark Madoff's** interests in the 51 Wanoma Way and 583 Broadway Properties should be recoverable as subsequent transfers to Stephanie Mack upon Mark's death (collectively, the "Mark Madoff Subsequent Transfers"). The Mark Madoff Subsequent Transfers are identified on Exhibit H, hereto.

136. Finally, upon information and belief, MSIL' s operations were funded by avoidable and recoverable transfers from BLMIS and Madoff (the "MSIL Initial Transfers"). Based on the Trustee's investigation, from February 3, 2000 to July 16, 2001, $312,500 of the MSIL Initial Transfers were transferred by MSIL as "dividend" payments to Peter Madoff. Over the same time period, "dividend" payments in the amount of $625,000 were made by MSIL to each of Andrew and Mark Madoff and to the benefit of their spouses at the time (collectively, the "MSIL Subsequent Transfers"). The MSIL Subsequent Transfers are identified on Exhibits D, F G, and J K, hereto.

should be recoverable as subsequent transfers to Defendant Stephanie Mack upon Mark's death.

137 149. The Ruth Madoff, Peter and Marion Madoff, Mark Madoff, and MSIL Initial Transfers are avoidable and were subsequently transferred to, or for the benefit of, the Family and Spouse Defendants Defendant Stephanie Mack, and are recoverable from them her, pursuant to section sections 105(a) and 550 of the Bankruptcy Code.

150. To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

138 151. The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Ruth Madoff, Peter and Marion Madoff, Mark Madoff, and MSIL Initial Transfers and, the Subsequent Transfers, and any additional transfers; and (ii) seek avoidance and recovery of such additional transfers.

NATURE OF THE CAUSES OF ACTION AGAINST THE DEFENDANTS

FIRST CAUSE OF ACTION

152. At all times relevant hereto, BLMIS was insolvent in that: (i) its liabilities exceeded the value of its assets by millions, and at times, billions of dollars; (ii) it could not meet its obligations as they came due; and/or (iii) at the time of the transfers to or for the benefit of the Defendants described herein, BLMIS was left with insufficient capital.

153. This adversary proceeding is being brought to avoid obligations and to avoid and recover transfers made to or for the benefit of the Defendants, and to recover money by which the Madoff Brothers have been unjustly enriched, so that this customer property can be equitably distributed among the customers of BLMIS in accordance with the provisions of SIPA.

154. The Trustee also seeks an accounting of all monies received by the Madoff Brothers during their employment at BLMIS, and a constructive trust imposed as a result of the past unjust enrichment of—and to prevent any further unjust enrichment by—the Madoff Brothers on all assets they acquired directly or indirectly from BLMIS. The Trustee

specifically looks to place many of the properties described herein, which were purchased for the Defendants with BLMIS funds, in a constructive trust, to prevent their transfer, sale, or other dissipation during the pendency of this adversary proceeding. The accounting and constructive trust are necessary in this case in light of the insider relationship, size of the Ponzi scheme, and the amount of money improperly transferred to the Defendants to finance their personal lives and personal investments.

155. The Defendants knew or willfully blinded themselves to the fact that they were not entitled to these excessive distributions of "free" company money. The Madoff Brothers were intimately involved with the "family business," holding senior managerial positions for many years, and were the sons of the mastermind of the Ponzi scheme.

**COUNT ONE**

**PREFERENTIAL ~~TRANSFERS~~TRANSFER - 11 U.S.C. §§ 101(31), 101(54), 105(a), 502(d), 547(b), 550, AND 551**

~~139~~156. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this ~~Second~~Third Amended Complaint as if fully rewritten herein.

~~140~~157. At the time of each of the ~~Family Defendants~~Madoff Brothers' Preference Period Transfers, the ~~Family Defendants~~Madoff Brothers were each ~~"~~"creditors~~"~~" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to ~~SIPA~~15 U.S.C. § 78fff-2(c)(3).

~~141~~158. At the time of each of the ~~Family Defendants~~Madoff Brothers' Preference Period Transfers, the ~~Family Defendants~~Madoff Brothers were each ~~"~~"insiders~~"~~" of BLMIS within the meaning of section 101(31) of the Bankruptcy Code.

~~142~~159. Each of the ~~Family Defendants~~Madoff Brothers' Preference Period

Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to ~~SIPA~~**15 U.S.C.** § 78fff-2(c)(3).

09-01503-smb Doc 189-1 Filed 07/15/14 Entered 07/15/14 14:05:49

~~143~~**160**. Each of the ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers was to, or for the benefit of, a ~~Family Defendant~~**Madoff Brother**.

~~144~~**161**. Each of the ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS to the ~~Family Defendants~~**Madoff Brothers** before such transfer was made.

~~145~~**162**. Each of the ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers ~~were~~**was** made while BLMIS was insolvent.

~~146~~**163**. Each of the ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers ~~were~~**was** made during the preference period under section 547(b)(4) of the Bankruptcy Code.

~~147~~**164**. Each of the ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers enabled the ~~Family Defendants~~**Madoff Brothers** to receive more than they would receive if: (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers had not been made; and (iii) each ~~Family Defendant~~**Madoff Brother** received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

~~148~~**165**. Each of the ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the applicable ~~Family Defendant~~**Madoff Brother** pursuant to section 550(a).

~~149~~**166**. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections **101(31), 101(54), 105(a), 502(d),** 547(b), 550, and 551 of the Bankruptcy Code **and 15 U.S.C. § 78fff-2(c)(3)**: (i) avoiding and preserving the ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers; (ii) directing that the ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers be set aside; ~~and~~ (iii) recovering the ~~Family Defendants~~**Madoff Brothers**' Preference Period Transfers, or the value thereof, ~~from the~~

Family Defendants for the benefit of the estate of BLMIS. **estate; (iv) directing the Madoff**

**Brothers, to the extent allowable by**

SECOND CAUSE OF ACTION

law, to disgorge to the Trustee all profits, including compensation or remuneration received by the Madoff Brothers related to or arising from or concerning the Madoff Brothers' Preference Period Transfers from BLMIS to the Madoff Brothers; (v) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Preference Period Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from the Madoff Brothers; and (vii) awarding any other relief the Court deems just and appropriate.

**COUNT TWO**

**FRAUDULENT TRANSFERS AND OBLIGATIONS -**
**11 U.S.C. §§ 105(a), 502(d),**
**548(a)(1)(A), 550(a), AND 551**

150167. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this SecondThird Amended Complaint as if fully rewritten herein.

151168. The Family DefendantsMadoff Brothers' Two-Year Transfers were made and the Obligations were incurred on or within two-years before the Filing Date.

152169. The Family DefendantsMadoff Brothers' Two-Year Transfers and the Obligations were made and incurred by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS' sBLMIS's then-existing or future creditors.

153170. The Family DefendantsMadoff Brothers' Two-Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Family DefendantsMadoff Brothers pursuant to section 550(a) of the Bankruptcy Code and SIPA15 U.S.C. § 78fff-2(c)(3).

154171. The Two-Year Transfers and Obligations are avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and applicable provisions of SIPA

including sections 78fff(b) and 78fff-1(~~a) (~~b).

~~155~~**172**. As a result of the foregoing, pursuant to sections **105(a), 502(d),** 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and ~~SIPA~~**15 U.S.C.** §§ 78fff(b), 78fff-1(~~a) (~~b), and 78~~fff-~~**fff**2(c)(3), the Trustee is entitled to a judgment: (i) avoiding and preserving the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers; (ii) avoiding the Obligations; (iii) directing that the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers and the Obligations be set aside; ~~and~~ (iv) recovering the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers, or the value thereof, from the ~~Family Defendants~~**Madoff Brothers** for the benefit of the ~~estate of~~ BLMIS~~.~~ **estate; (v) directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from or concerning the Madoff Brothers' Two-Year Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Two-Year Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate.**

**COUNT THREE**

**~~THIRD CAUSE OF ACTION~~**
**FRAUDULENT TRANSFERS AND OBLIGATIONS -**
**11 U.S.C. §§ 105(a), 502(d),**
**548(a)(1)(B), 550(a), AND 551**

~~156~~173. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this ~~Second~~Third Amended Complaint as if fully rewritten herein.

~~157~~174. The ~~Family Defendants~~Madoff Brothers' Two-Year Transfers were made and the Obligations were incurred on or within two years before the Filing Date.

~~158~~175. BLMIS received less than a reasonably equivalent value in exchange for each of the ~~Family Defendants~~Madoff Brothers' Two-Year Transfers and the Obligations.

~~159~~176. At the time of each of the ~~Family Defendants~~Madoff Brothers' Two-Year Transfers and the Obligations, BLMIS was insolvent, or became insolvent, as a result of the ~~Family Defendants~~Madoff Brothers' Two-Year Transfers in question.

~~160~~**177**. At the time of each of the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers and at all times relevant to the Obligations, BLMIS was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

~~161~~**178**. At the time of each of the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers, and at all times relevant to the Obligations, BLMIS intended to incur, or believed that it would incur, debts that would be beyond ~~BLMIS' s~~**BLMIS's** ability to pay as such debts matured.

~~162~~**179**. Those ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers identified on Exhibits ~~D,~~**C and** F~~, J, M,~~ hereto~~,~~ as ~~"~~**"**Compensation~~"~~**"** paid to, or for the benefit of, the ~~Family Defendants~~**Madoff Brothers**, were not made by BLMIS in the ordinary course of business.

~~163~~**180**. The ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and

recoverable from the Family DefendantsMadoff Brothers pursuant to section 550(a) of the Bankruptcy Code and SIPA15 U.S.C. § 78fff-2(c)(3).

164181. The Two-Year Transfers and Obligations are avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and applicable provisions of SIPA including sections 78fff(b) and 78fff-1(a) (b).

165182. As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA15 U.S.C. §§ 78fff(b), 78fff-1(a) (b), and 78fff- fff2(c)(3), the Trustee is entitled to a judgment: (i) avoiding and preserving the Family DefendantsMadoff Brothers' Two-Year Transfers; (ii) avoiding the Obligations; (iii) directing that the Family DefendantsMadoff Brothers' Two-Year Transfers and Obligations be set aside; and (iv) recovering the Family Defendants' Two-YearMadoff Brothers' TwoYear Transfers, or the value thereof, from the Family DefendantsMadoff Brothers for the benefit of the estate of BLMIS.

FOURTH CAUSE OF ACTION

estate; (v) directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Two-Year Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Two-Year Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate.

## COUNT FOUR
## FRAUDULENT TRANSFERS AND OBLIGATIONS - NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551

~~166~~**183**. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this ~~Second~~**Third** Amended Complaint as if fully rewritten herein.

~~167~~**184**. At all times relevant to the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers and Obligations, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

~~168~~**185**. The ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers and the Obligations were made and incurred by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers and incurred the Obligations to, or for the benefit of, the ~~Family Defendants~~**Madoff Brothers** in furtherance of a fraudulent investment scheme.

~~169~~**186**. The ~~Family Defendants~~**Madoff Brothers** received the Six-Year Transfers with the actual intent to hinder, delay, or defraud the creditors of BLMIS.

~~170~~**187**. As a result of the foregoing, pursuant to sections 276, 276-a, 278 and/or 279 of the ~~DCL~~**N.Y. Debt. & Cred. Law**, sections **105(a), 502(d),** 544**(b)**, 550(a), and 551 of the

Bankruptcy Code, and ~~SIPA~~**15 U.S.C.** §§ 78fff(b), 78fff-1~~(a)~~ (b), and 78fff-2(c)(3), the Trustee is entitled to a judgment: (i) avoiding and preserving the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers; (ii) avoiding the Obligations; (iii) directing that the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers and the Obligations be set aside; (iv) recovering the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers, or the value thereof, from the ~~Family Defendants~~**Madoff Brothers** for the benefit of the **BLMIS** estate ~~of BLMIS; and~~**;** (v) ~~recovering attorneys' fees from the Family Defendants.~~**directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Six-Year Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Six-Year Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate.**

~~FIFTH CAUSE OF ACTION~~

**COUNT FIVE**

**FRAUDULENT TRANSFERS AND OBLIGATIONS - NEW YORK DEBTOR AND CREDITOR LAW §§ 273~~,~~ AND 278~~,~~ AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550~~(a)~~, AND 551**

~~171~~**188**. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this ~~Second~~**Third** Amended Complaint as if fully rewritten herein.

~~172~~**189**. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

~~173~~**190**. BLMIS did not receive fair consideration for the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers or the Obligations.

~~174~~**191**. BLMIS was insolvent at the time it made each of the ~~Family Defendants~~**Madoff Brothers**' SixYear Transfers and incurred the Obligations or, in the alternative, BLMIS became insolvent as a result of each of the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers and the Obligations.

175192. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 273, 278, and/or 279 of the DCLN.Y. Debt. & Cred. Law, sections 544, 550105(a), 502(d), 544(b), 550, and 551 of the Bankruptcy Code, and SIPA15 U.S.C. §§ 78fff(b), 78fff-1(a) (b), and 78fff fff2(c)(3): (i) avoiding and preserving the Family DefendantsMadoff Brothers' Six-Year Transfers; (ii) avoiding the Obligations; (iii) directing that the Family DefendantsMadoff Brothers' Six-Year Transfers and the Obligations be set aside; and (iv) recovering the Family DefendantsMadoff Brothers' Six-Year Transfers, or the value thereof, from the Family DefendantsMadoff Brothers for the benefit of the estate of BLMIS. estate; (v) directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Six-Year Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Six-Year Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate.

SIXTH CAUSE OF ACTION

**COUNT SIX**

**FRAUDULENT TRANSFERS - NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. 544, 550§§ 105(a), 502(d), 544(b), 550, AND 551**

176193. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this SecondThird Amended Complaint as if fully rewritten herein.

177194. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable

under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

~~178~~**195**. BLMIS did not receive fair consideration for the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers.

~~179~~**196**. At the time BLMIS made each of the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers was an unreasonably small capital.

~~180~~**197**. As a result of the foregoing, pursuant to sections 274, 278, and/or 279 of the ~~DCL~~**N.Y. Debt. & Cred. Law**, sections ~~544, 550~~**105**(a)**, 502(d), 544(b), 550**, and 551 of the Bankruptcy Code, and ~~SIPA~~**15 U.S.C.** § 78fff-2(c)(3), the Trustee is entitled to a judgment: (i) avoiding and preserving the ~~Family Defendants~~**Madoff Brothers**' Six-Year

Transfers; (ii) directing that the Family DefendantsMadoff Brothers' Six-Year Transfers be set aside; and (iii) recovering the Family DefendantsMadoff Brothers' Six-Year Transfers, or the value thereof, from the Family DefendantsMadoff Brothers for the benefit of the estate of BLMIS. estate; (iv) directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Six-Year Transfers from BLMIS to the Madoff Brothers; (v) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Six-Year Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from the Madoff Brothers; and (vii) awarding any other relief the Court deems just and appropriate.

SEVENTH CAUSE OF ACTION

**COUNT SEVEN**

**FRAUDULENT TRANSFERS AND OBLIGATIONS - NEW YORK DEBTOR AND CREDITOR LAW &&§§ 275, 278, AND/OR 279, AND 11 U.S.C. &&§§ 105(a), 502(d), 544(b), 550(a), AND 551**

181198. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this SecondThird Amended Complaint as if fully rewritten herein.

182199. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

183200. BLMIS did not receive fair consideration for the Family DefendantsMadoff Brothers' Six-Year Transfers or the Obligations.

184201. At the time BLMIS made each of the Family DefendantsMadoff Brothers' Six-Year Transfers and incurred the Obligations, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

185202. As a result of the foregoing, pursuant to sections 275, 278, and/or 279 of the DCLN.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA15 U.S.C. §§ 78fff(b), 78fff-1(a) (b), and 78fff-2(c)(3), the Trustee is entitled to a judgment: (i) avoiding and preserving the Family DefendantsMadoff Brothers' Six-Year Transfers; (ii) avoiding the Obligations; (iii) directing that the Family DefendantsMadoff Brothers' Six-Year Transfers and the Obligations be set aside; and (iv) recovering the Family DefendantsMadoff Brothers' Six-Year Transfers, or the value thereof, from the Family DefendantsMadoff Brothers for the benefit of the estate of BLMIS. estate; (v) directing the Madoff Brothers, to the extent allowable by law, to

**disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Six-Year Transfers from BLMIS to the**

EIGHTH CAUSE OF ACTION

Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Six-Year Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate.

**COUNT EIGHT**
**UNDISCOVERED FRAUDULENT TRANSFERS AND OBLIGATIONS - NEW YORK CIVIL PROCEDUREPRACTICE LAW AND RULES 203(2g), AND 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544(b), 550(a), AND 551**

186203. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this SecondThird Amended Complaint as if fully rewritten herein.

187204. At all times relevant to the Family DefendantsMadoff Brothers' Total Initial Transfers and the Obligations, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS, including defrauded IA customers.

188205. At all times relevant to the Family DefendantsMadoff Brothers' Total Initial Transfers and the Obligations, there have been one or more creditors who have held and still holdholding matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code. The Madoff Brothers' Total Initial Transfers constitute conveyances by BLMIS as defined under N.Y. Debt. & Cred. Law § 270.

189206. The Family DefendantsMadoff Brothers' Total Initial Transfers and the Obligations were made and incurred by BLMIS with the actual intent to hinder, delay, or

defraud the creditors of BLMIS. BLMIS made the ~~Family Defendants~~**Madoff Brothers**' Total Initial Transfers and incurred the Obligations to or for the benefit of the ~~Family Defendants~~**Madoff Brothers** in furtherance of a fraudulent investment scheme.

09-01503-smb Doc 189-1 Filed 07/16/14 Entered 07/16/14 14:09:49

~~190~~207. The ~~Family Defendants~~Madoff Brothers received the ~~Family Defendants~~Madoff Brothers' Total Initial Transfers with the actual intent to hinder, delay, or defraud the creditors of BLMIS.

~~191~~208. As a result of the foregoing, pursuant to NY CPLR 203(g) and 213(8), ~~DCL §§~~sections 276, 276-a, 278, and/or 279 of the N.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and ~~SIPA~~15 U.S.C. §§ 78fff(b), 78fff-1~~(a)~~ (b), and 78fff-2(c)(3), the Trustee is entitled to a judgment: (i) avoiding and preserving the ~~Family Defendants~~Madoff Brothers' Total Initial Transfers; (ii) avoiding the Obligations; (iii) directing that the ~~Family Defendants~~Madoff Brothers' Total Initial Transfers and the Obligations be set aside; (iv) recovering the Total Initial Transfers, or the value thereof, from the Madoff Brothers for the benefit of the BLMIS estate; (v) directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Total Initial Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Total Initial Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate.

## COUNT NINE

recovering the Total Initial Transfers, or the value thereof, from the Family Defendants for the benefit of the estate of BLMIS; and (v) recovering attorneys' fees from the Family Defendants.

NINTH CAUSE OF ACTION

**RECOVERY OF SUBSEQUENT TRANSFERS - NEW YORK DEBTOR AND CREDITOR LAW 278§§ 273-279, AND 11 U.S.C. §§ 105(a), 544, 547, 548, 550(a), AND 551**

192209. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this SecondThird Amended Complaint as if fully rewritten herein.

193210. The Trustee has filed lawsuitsthis lawsuit against Ruth Madoff, Peter Madoff, Marion Madoff, and Mark Madoff to avoid and recover initial transfers to themhim pursuant to sections 544, 547(b), 547, 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the DCL, and SIPA15 U.S.C. § 78fff-2(c)(3). Further, the MSIL Initial Transfers and such transfers are avoidable and recoverable pursuant to sections 544, 547(b), 548, 550, and 551 of the Bankruptcy Code, sections 273-279 of the DCL, and SIPA § 78fff-2(c)(3).

~~194~~**211**. The Subsequent Transfers were made **directly or indirectly** to or for the benefit of ~~the Family and Spouse Defendants, and total approximately $8,981,500 and~~**Defendant Stephanie Mack and constitute** interests of undetermined value in property and which are recoverable pursuant to section 550 of the Bankruptcy Code.

**212. Defendant Stephanie Mack was an immediate or mediate transferee of the initial transfers to Mark Madoff.**

~~195. The Family and Spouse Defendants were immediate or mediate transferees of the Ruth Madoff, Peter and Marion Madoff, Mark Madoff, and MSIL Initial Transfers.~~

~~196. Mark Madoff and Shana Madoff received the Subsequent Transfers with the actual intent to hinder, delay, or defraud.~~

~~197~~**213**. As a result of the foregoing, pursuant to **NY** CPLR 203(g) and 213(8), ~~DCL §§~~**sections** 273**-**279 **of the N.Y. Debt. & Cred. Law**, sections **105(a),** 548, 550 and 551 of the Bankruptcy Code, and ~~SIPA~~**15 U.S.C.** § 78fff-2(c)(3), the Trustee is entitled to a judgment against ~~the Family and Spouse Defendants~~**Defendant Stephanie Mack**: (i) recovering the Subsequent Transfers, or the value thereof, from ~~the Family and Spouse Defendants~~**Defendant Stephanie Mack** for the benefit of the **BLMIS estate; (ii) directing Defendant Stephanie Mack, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by Defendant Stephanie Mack related to or arising from, or concerning the Subsequent Transfers; and (iii) awarding any other relief the Court deems just and appropriate.**

**COUNT TEN**

~~estate of BLMIS; and (ii) recovering attorneys' fees from the Estate of Mark D. Madoff, Andrew Madoff as Executor of the Estate of Mark D. Madoff, and Shana Madoff.~~

~~TENTH CAUSE OF ACTION~~

**OBJECTION TO AND DISALLOWANCE OF THE ~~FAMILY DEFENDANTS~~MADOFF BROTHERS' CLAIMS**

~~198~~**214**. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this ~~Second~~**Third** Amended Complaint as if fully rewritten herein.

~~199~~**215**. As of the date hereof, the Trustee is aware of claims filed by ~~Family Defendants~~**Madoff Brothers** Mark Madoff~~,~~ **and** Andrew Madoff, ~~and Shana Madoff. The Family Defendant~~**(collectively, the "Madoff Brothers' Claims"). The Madoff Brothers'** Claims include claims relating to alleged securities positions, deferred compensation, salary and bonus payments, investments in MSIL, customer claims for investment accounts, claims in connection with the assertion of avoidance or similar causes of action against them, and claims based upon avoidance of transfers to them.

~~200. The Family Defendant Claims also should not be allowed as customer claims or as general unsecured claims. The Family Defendants are the recipients of transfers of BLMIS' s property which are avoidable and recoverable under sections 544, 547, 548, and 550 of the Bankruptcy Code, sections 273-279 of the DCL, and SIPA § 78fff-2(c)(3), and the Family Defendants have not returned the Family Defendants' Total Initial Transfers and/or the Subsequent Transfers to the Trustee. As a result, pursuant to section 502(d) of the Bankruptcy Code, the Family Defendant Claims must be disallowed unless and until the Family Defendants return the Family Defendants' Total Initial Transfers and the Subsequent Transfers to the Trustee.~~

~~ELEVENTH CAUSE OF ACTION~~

216. The Madoff Brothers were not innocent investors at the time they invested with BLMIS. As a result of their inequitable conduct, they are not entitled to restitution of their principal investment.

217. The Madoff Brothers acted with actual knowledge of fraudulent activity at BLMIS at the time they invested with BLMIS. The Madoff Brothers' conduct, at the time they invested with BLMIS, enabled Madoff to perpetuate the fraud at BLMIS.

218. Alternatively, the Madoff Brothers acted with explicit awareness of numerous and serious indications of fraudulent activity at BLMIS, as described in this Third Amended Complaint.

219. By the Madoff Brothers' conduct, they could not honestly assert that they justifiably relied on the fact that BLMIS was a legitimate business. Thus, the Madoff Brothers do not have claims for restitution or any other valid claims against the BLMIS estate.

220. As a result of the Madoff Brothers' conduct, as described above, pursuant to section 502(a) of the Bankruptcy Code, the Trustee objects to any and all claims of the Madoff Brothers against the BLMIS estate, which should be disallowed and not entitled to equitable distribution from the estate pursuant to section 502(b)(1) of the Bankruptcy Code.

## COUNT ELEVEN
## EQUITABLE DISALLOWANCE OF CLAIMS

221. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

222. The Madoff Brothers engaged in and benefited from inequitable conduct and with knowledge of fraudulent activity at BLMIS, including the conduct described in this

**Third Amended Complaint. By the Madoff Brothers' conduct, they have taken unconscionable advantage of, resulting in injury to, innocent customers and other creditors of the estate.**

223. Based upon the Madoff Brothers' failure to deal fairly and in good faith, as described above, all customers and other creditors of BLMIS have been injured, including by being (a) misled as to the true financial condition of the debtor; (b) induced to invest with BLMIS without knowledge of BLMIS's financial condition; and (c) hindered and delayed in recovering the full amounts due to them. The Madoff Brothers' conduct further enabled Madoff to continue the Ponzi scheme.

224. The Madoff Brothers' conduct was so egregious that they should not be allowed to share in any equitable distribution made by the Trustee to innocent customers holding allowed claims against BLMIS and/or Madoff.

225. The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the Madoff Brothers against the estate, are disallowed.

226. Equitable disallowance is consistent with the provisions and purposes of the Bankruptcy Code.

**COUNT TWELVE**
**EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS**

~~201~~227. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this ~~Second~~Third Amended Complaint as if fully rewritten herein.

~~202. The Family Defendants~~**228. The Madoff Brothers engaged in inequitable conduct, including the conduct described in this Third Amended Complaint, and benefitted by the withdrawal of $167,837,299 prior to the Filing Date. The Madoff Brothers** each had relationships of trust and confidence with Madoff and BLMIS, held senior managerial, compliance, and/or supervisory responsibilities at BLMIS during the relevant time period, and consequently had

fiduciary duties to act in the best interest of—and for the benefit of—BLMIS and its customers.

~~203. Each of the Family Defendants acted in breach of the fiduciary duties owed to BLMIS and its customers by, among other things, the misuse of corporate assets, self-dealing, mismanagement, corporate waste, failure to prepare, implement and carry out, or deliberately disregarding, compliance and supervisory responsibilities and policies, and breaches of the Family Defendants' duties to act with care, loyalty, and good faith and fair dealing as described above.~~

~~204. Because the Family Defendants were either derelict in their professional duties or complicit in the fraud at BLMIS, BLMIS and its creditors were damaged.~~

~~205. By reason of the above, pursuant to section 510(c) of the Bankruptcy Code, the Trustee is entitled to a judgment subordinating the Family Defendant Claims.~~

~~TWELFTH CAUSE OF ACTION~~

**229. Based on the Madoff Brothers' inequitable conduct, BLMIS's customers have been misled as to the true financial condition of BLMIS and have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them.**

**230. The Madoff Brothers' conduct enabled Madoff to prolong the Ponzi scheme that resulted in injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on the Madoff Brothers.**

**231. The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the Madoff Brothers, directly or indirectly against the estate, and only to**

the extent such claims are allowed, are subordinated for distribution purposes pursuant to sections 510(c) and 105(a) of the Bankruptcy Code to the allowed claims of all other customers and creditors of BLMIS.

232. Equitable subordination, as requested herein, is consistent with the provisions and purposes of the Bankruptcy Code.

## COUNT THIRTEEN
## BREACH OF FIDUCIARY DUTY

206233. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this SecondThird Amended Complaint as if fully rewritten herein.

207234. This claim for breach of fiduciary duty is asserted against eachboth of the Family DefendantsMadoff Brothers, who had relationships of trust and confidence with Madoff and BLMIS, held senior managerial, compliance, and/or supervisory responsibilitiespositions at BLMIS during the relevant time period,

09-01503-smb Doc 189-1 Filed 07/15/14 Entered 07/15/14 14:05:49

and consequently had fiduciary duties to act in the best interest of—and for the benefit of— BLMIS and its customers.

208**235**. The fiduciary duties owed by each of the Family Defendants**Madoff Brothers** included duties of care and loyalty to BLMIS and its customers, and duties to act in good faith. They also had duties not to waste or divert the assets of BLMIS, duties not to exploit corporate opportunities for their own benefit, and duties not to act in furtherance of their own personal interests at the expense of BLMIS and its customers.

209**236**. Each of the Family Defendants**Madoff Brothers** acted in breach of the fiduciary duties owed to BLMIS and its customers by, among other things, the**their** misuse of corporate assets, self-dealing**selfdealing**, mismanagement, corporate waste, failure to prepare, implement and carry out, or deliberately disregarding, compliance and supervisory responsibilities and policies, and breaches of the Family Defendants**Madoff Brothers**' duties to act with care, loyalty, and good faith and fair dealing as described above.

210**237**. As a direct and proximate result of the conduct by the Family Defendants**Madoff Brothers**, BLMIS and its customers were damaged.

211**238**. By reason of the above, the Trustee is entitled to an award of compensatory damages and disgorgement of all sums received by each Family Defendant**Madoff Brothers** from BLMIS in an amount to be determined at trial.

212**239**. The Family Defendants**Madoff Brothers**' conscious, willful, wanton, and malicious conduct also entitles the Trustee to an award of punitive damages in an amount to be determined at trial.

**COUNT FOURTEEN**

THIRTEENTH CAUSE OF ACTION

**UNJUST ENRICHMENT**

213**240**. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second**Third** Amended Complaint as if fully rewritten herein.

09-01503-smb Doc 189-1 Filed 07/16/14 Entered 07/16/14 14:09:49

~~214~~241. The ~~Family Defendants and Stephanie Mack and Deborah Madoff~~Madoff Brothers each benefited directly or indirectly from the receipt of money from BLMIS in the form of loans, payments, and

other transfers which was the property of BLMIS and its customers, and for which the Family Defendants and Stephanie Mack and Deborah Madoff, among other things,**Madoff Brothers** did not adequately compensate BLMIS or provide value.

215**242**. This enrichment was at the expense of BLMIS and, ultimately, at the expense of BLMIS's other customers.

216**243**. Equity and good conscience require full restitution of the monies received by the Family Defendants and Stephanie Mack and Deborah Madoff **Brothers** from BLMIS.

217**244**. In addition, the Family Defendants**Madoff Brothers'** conscious, intentional, and willful tortious conduct entitles BLMIS to recapture profits derived by the Family Defendants**Madoff Brothers** utilizing monies they received from BLMIS including, by way of example and without limitation, profits earned from real estate interests they purchased with BLMIS's customer funds.

218**245**. By reason of the above, the Trustee, on behalf of BLMIS and its creditors, is entitled to an award of compensatory damages in an amount to be determined at trial.

FOURTEENTH CAUSE OF ACTION

**COUNT FIFTEEN**

**NEGLIGENCE**

219**246**. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second**Third** Amended Complaint as if fully rewritten herein.

220**247**. Each**Both** of the Family Defendants**Madoff Brothers** had a duty to protect BLMIS and its customers against unreasonable risks and actions, including without limitation the loss of its customers' assets due to fraud, the self-dealing of management and senior executives, the failure to prepare, implement, and carry out compliance and supervisory responsibilities and policies, and other tortious conduct by or unjust enrichment of the Family Defendants**Madoff Brothers**, Madoff, and others.

~~221 Each of the Family Defendants breached these duties by failing to conform to the appropriate standards of care commensurate with their senior positions at BLMIS.~~

**248.    Both of the Madoff Brothers breached these duties by failing to conform to the appropriate standards of care commensurate with their senior positions at BLMIS.**

~~222~~**249**.    As a direct and proximate cause of the actions of the ~~Family Defendants~~**Madoff Brothers**, BLMIS has been damaged by the ~~Family Defendants~~**Madoff Brothers**' negligence and failure to adhere to standards of appropriate care.

~~223~~**250**.    By reason of the above, the Trustee, on behalf of BLMIS and its creditors, is entitled to an award of compensatory damages in an amount to be determined at trial.

~~224~~**251**.    The ~~Family Defendants~~**Madoff Brothers**' conscious, willful, wanton, and malicious conduct entitles the Trustee, on behalf of BLMIS and its creditors, to an award of punitive damages in an amount to be determined at trial.

~~FIFTEENTH CAUSE OF ACTION~~
**COUNT SIXTEEN**
**CONSTRUCTIVE TRUST**

~~225~~**252**.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this ~~Second~~**Third** Amended Complaint as if fully rewritten herein.

~~226~~**253**.    As set forth above, the assets of BLMIS have been wrongfully diverted as a result of fraudulent conveyances, fraudulent transfers, preferential transfers, breaches of fiduciary duties, and other wrongdoing of the ~~Family Defendants~~**Madoff Brothers** for their own individual interests and enrichment.

~~227~~**254**.    The Trustee has no adequate remedy at law.

~~228~~**255**.    Because of the past unjust enrichment of the ~~Family Defendants and Stephanie Mack and Deborah~~ Madoff **Brothers**, the Trustee is entitled to the imposition of a constructive trust with respect to any transfer of funds, assets, or property from BLMIS as

well as to any profits received by the ~~Family Defendants and Stephanie Mack and Deborah~~

Madoff **Brothers** in the past or on a going forward basis in connection with BLMIS.

09-01503-smb Doc 183-1 Filed 07/15/14 Entered 07/15/14 14:03:49

~~229~~**256**. In addition, upon information and belief, with the sums the ~~Family Defendants and Stephanie Mack and Deborah~~ Madoff **Brothers** unjustly received **from BLMIS** as a result of fraudulent

conveyances, fraudulent transfers, preferential transfers, breaches of fiduciary duties, and other wrongdoing, the Family Defendants and Stephanie Mack and Deborah MadoffMadoff Brothers purchased, or satisfied the mortgages on, the following properties, mentioned previously in this SecondThird Amended Complaint, which should be held in trust for the Trustee's use, benefit, and account: (i) 583 Broadway, Unit 4M, New York, NY 10012; (ii) 433 E. 74th St., Unit 5A, New York, NY 10021; (iii) 10 Gracie Square, Apt. 10G, New York, NY 10028; (iv) 8 Barclay Court, East Hampton, NY 11937; (v) 21 Cherry Valley Road, Greenwich, CT 06870; (vi) 200 NW Algoma Road, Palm Beach, FL 33480; (viiv) 51 Wanoma Way, Nantucket, MA 02554; (viii) 975 Park Avenue, Apt. 6B, New York, NY 10028; (ix) 34 Pheasant Run, Old Westbury, NY 11568; and (xvi) 57 Tomac Avenue, Old Greenwich, CT 06870. The Trustee is entitled to, and demands title, possession, and use, and/or enjoyment of, the foregoing properties, or their value, for the benefit of the estate of BLMIS.

230257. Furthermore, the Trustee seeks a constructive trust imposed uponDefendant Stephanie Mack's interests in the 51 Wanoma Way and 583 Broadway Properties should be held in trust for the Trustee's use, benefit of BLMIS' s customers, and account, as Defendant Stephanie Mack did not provide any value in return for the transfer of these interests to her.

SIXTEENTH CAUSE OF ACTION
**COUNT SEVENTEEN**
**ACCOUNTING**

231258. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this SecondThird Amended Complaint as if fully rewritten herein.

232259. As set forth above, the assets of BLMIS have been wrongfully diverted as a result of fraudulent conveyances, fraudulent transfers, preferential transfers, breaches

of fiduciary duties, and other wrongdoing of the ~~Family Defendants~~**Madoff Brothers** for

their own individual interests and enrichment.

~~233~~**260**.      The Trustee has no adequate remedy at law.

234261. To compensate BLMIS for the amount of monies the Family Defendants and Stephanie Mack and Deborah Madoff **Brothers** diverted from BLMIS for their own benefit, it is necessary for the Family Defendants and Stephanie Mack and Deborah Madoff **Brothers** to provide an accounting of any transfer of funds, assets, or property received from BLMIS, as well as to any profits in the past and on a going forward basis in connection with BLMIS. Complete information regarding the amount of such transfers misused by the Family Defendants and Stephanie Mack and Deborah Madoff **Brothers** for their own benefit is within their possession, custody, and control.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Family and Spouse Defendants as follows:

(a) on**On** the First Cause of Action**Claim for Relief**, pursuant to sections **101(31), 101(54), 105(a), 502(d),** 547(b), 550(a), and 551 of the Bankruptcy Code **and 15 U.S.C. § 78fff-2(c)(3)**: (i) avoiding and preserving the Family Defendants**Madoff Brothers**' Preference Period Transfers; (ii) directing that the Family Defendants**Madoff Brothers**' Preference Period Transfers be set aside; and (iii) recovering the Family Defendants**Madoff Brothers**' Preference Period Transfers, or the value thereof, from the Family Defendants**Madoff Brothers** for the benefit of the estate of BLMIS; **estate; (iv) directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation and remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Preference Period Transfers from BLMIS to the Madoff Brothers; (v) disallowing any claim that the Madoff Brothers may have against the Debtors until such Madoff Brothers' Preference Period Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from the Madoff Brothers; and (vii) awarding any other relief the Court deems just and**

appropriate;

(b) onOn the Second Cause of ActionClaim for Relief, pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA15 U.S.C. §§ 78fff(b), 78fff-1(a) (b), and 78fff-2(c)(3): (i) avoiding and preserving the Family DefendantsMadoff Brothers' Two-Year Transfers; (ii)

09-01503-smb Doc 133-1 Filed 07/15/14 Entered 07/15/14 14:05:49

avoiding the Obligations; (iii) directing that the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers and the Obligations be set aside; ~~and~~ (iv) recovering the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers, or the value thereof, from the ~~Family Defendants~~**Madoff Brothers** for the benefit of the ~~estate of~~ BLMIS~~;~~ **estate; (v) directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from or concerning the Madoff Brothers' Two-Year Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Two-Year Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate;**

**(c) On the Third Claim for Relief, pursuant to sections 105(a), 502(d),**

~~(c) on the Third Cause of Action, pursuant to sections~~ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and ~~SIPA~~**15 U.S.C.** §§ 78fff(b), 78fff-1~~(a)~~ (b), and 78fff-2(c)(3): (i) avoiding and preserving the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers; (ii) avoiding the

Obligations; (iii) directing that the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers and the Obligations be set aside; ~~and~~ (iv) recovering the ~~Family Defendants~~**Madoff Brothers**' Two-Year Transfers, or the value thereof, from the ~~Family Defendants~~**Madoff Brothers** for the benefit of the ~~estate of~~ BLMIS~~;~~ **estate; (v) directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Two-Year Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Two-Year Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate;**

09-01503-smb Doc 189-1 Filed 07/15/14 Entered 07/15/14 14:03:49

(d) ~~on~~**On** the Fourth ~~Cause of Action~~**Claim for Relief**, pursuant to sections 276, 276-a, 278, and/or 279 of the ~~DCL~~**N.Y. Debt. & Cred. Law**, sections **105(a), 502(d),** 544**(b)**, 550(a), and 551 of the Bankruptcy Code, and ~~SIPA~~

**15 U.S.C.** §§ 78fff(b), 78fff-1~~(a)~~ (b), and 78fff-2(c)(3): (i) avoiding and preserving the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers; (ii) avoiding the Obligations; (iii) directing that the ~~Family Defendants' SixYear~~**Madoff Brothers' Six-Year** Transfers and the Obligations be set aside; (iv) recovering the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers, or the value thereof, from the ~~Family Defendants~~**Madoff Brothers** for the benefit of the **BLMIS** estate~~ of BLMIS; and~~**;** (v) ~~recovering attorneys' fees from the Family Defendants;~~**directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Six-Year Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Six-Year Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate;**

(e) ~~on~~**On** the Fifth ~~Cause of Action~~**Claim for Relief**, pursuant to sections 273, 278, and/or 279 of the ~~DCL~~**N.Y. Debt. & Cred. Law**, sections **105(a), 502(d),** 544**(b)**, 550, and 551 of the Bankruptcy Code, and ~~SIPA~~**15 U.S.C.** §§ 78fff(b), 78fff-1~~(a)~~ (b), and 78fff-2(c)(3): (i) avoiding and preserving the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers; (ii) avoiding the Obligations; (iii) directing that the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers and the Obligations be set aside; ~~and~~ (iv) recovering the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers, or the value thereof, from the ~~Family~~

~~Defendants~~**Madoff Brothers** for the benefit of the ~~estate of~~ BLMIS~~;~~ **estate; (v) directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Six-Year Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff**

09-01503-smb Doc 183-1 Filed 07/15/14 Entered 07/15/14 14:05:49

Brothers may have against the Debtors until such time as the Madoff Brothers' Six-Year Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate;

(f) onOn the Sixth Cause of ActionClaim for Relief, pursuant to sections 274, 278, and/or 279 of

the DCLN.Y. Debt. & Cred. Law, sections 105(a), 502(d), 544(b), 550, 551, and 1107 of the Bankruptcy Code, and SIPA15 U.S.C. § 78fff-2(c)(3): (i) avoiding and preserving the Family DefendantsMadoff Brothers' Six-Year Fraudulent Transfers; (ii) directing the Family DefendantsMadoff Brothers' Six-Year Transfers be set aside; and (iii) recovering the Family DefendantsMadoff Brothers' Six-Year Transfers, or the value thereof, from the Family DefendantsMadoff Brothers for the benefit of the estate of BLMIS; estate; (iv) directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Six-Year Transfers from BLMIS to the Madoff Brothers; (v) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Six-Year Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from the Madoff Brothers; and (vii) awarding any other relief the Court deems just and appropriate;

**(g) On the Seventh Claim for Relief, pursuant to sections 275, 278, and/or 279**

~~(g) on the Seventh Cause of Action, pursuant to sections 275, 278, and/or 279 of the DCL~~**of the N.Y. Debt. & Cred. Law**, sections **105(a), 502(d),** 544**(b)**, 550(a), **and** 551~~, and 1107~~ of the Bankruptcy Code, and ~~SIPA~~**15 U.S.C.** §§ 78fff(b), 78fff-1~~(a)~~ (b), and 78fff-2(c)(3): (i) avoiding and preserving the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers; (ii) avoiding the Obligations; (iii) directing that the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers and the Obligations be set aside; ~~and~~ (iv) recovering the ~~Family Defendants~~**Madoff Brothers**' Six-Year Transfers, or the value thereof, from the ~~Family Defendants~~**Madoff Brothers** for the benefit of the ~~estate of~~ BLMIS~~;~~ **estate; (v) directing the Madoff Brothers, to the extent allowable by law, to**

**disgorge to the Trustee all profits, including any and all compensation or remuneration received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Six-Year Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Six-Year Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate;**

(h) on**On** the Eighth Cause of Action**Claim for Relief**, pursuant to CPLR**N.Y.C.P.L.R.** § 203(g**) and 213(8**), sections 276, 276-a, 278, and/or 279 of the DCL**N.Y. Debt. & Cred. Law**, sections **105(a), 502(d),** 544**(b)**, 550(a), and 551 of the Bankruptcy Code, and SIPA**15 U.S.C.** §§ 78fff(b), 78fff-1(a) (b), and 78fff-2(c)(3): (i) avoiding and preserving the Family Defendants**Madoff Brothers**' Total Initial Transfers; (ii) avoiding the Obligations; (iii) directing that the Family Defendants**Madoff Brothers**' Total Initial Transfers and the Obligations be set aside; (iv) recovering the Family Defendants**Madoff Brothers**' Total Initial Transfers, or the value thereof, from the Family Defendants**Madoff Brothers** for the benefit of the **BLMIS** estate of BLMIS; and**;** (v) recovering attorneys' fees from the Family Defendants.**directing the Madoff Brothers, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration, received by the Madoff Brothers related to or arising from, or concerning the Madoff Brothers' Total Initial Transfers from BLMIS to the Madoff Brothers; (vi) disallowing any claim that the Madoff Brothers may have against the Debtors until such time as the Madoff Brothers' Total Initial Transfers are repaid to the Trustee; (vii) awarding attorneys' fees and costs from the Madoff Brothers; and (viii) awarding any other relief the Court deems just and appropriate;**

(i) ~~on~~**On** the Ninth ~~Cause of Action~~**Claim for Relief**, pursuant to **N.Y.C.P.L.R. 203(g) and 213(8),** sections 273-279 of the ~~DCL~~**N.Y. Debt. & Cred. Law**, sections **105(a),** 544**(b)**, 547, 548, 550(a), and 551 of the Bankruptcy Code, and ~~SIPA~~**15 U.S.C.** § 78fff-2(c)(3): (i) recovering the ~~Subsequent Transfers, or the value thereof, from the Family and Spouse Defendants for the benefit of the estate of BLMIS; and (ii) recovering attorneys' fees from the Estate of Mark D. Madoff, Andrew Madoff as Executor of the Estate of Mark D. Madoff, and Shana Madoff;~~

~~on the Tenth Cause of Action, that the Family Defendant Claims be disallowed unless and until the Family Defendants return the Family Defendants' Total Initial Transfers and the Subsequent Transfers to the Trustee;~~

09-01503-smb Doc 113 185-1 Filed 05/04/12 07/15/14 Entered 05/04/12

Subsequent Transfers, or the value thereof, from Defendant Stephanie Mack for the benefit of the BLMIS estate; (ii) directing Defendant Stephanie Mack, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all compensation or remuneration received by Defendant Stephanie Mack related to or arising from, or concerning the Subsequent Transfers; and (iii) awarding any other relief the Court deems just and appropriate;

(j) On the Tenth Claim for Relief, sustaining the Trustee's objections to the Madoff Brothers' Claims pursuant to section 502(a) of the Bankruptcy Code, and disallowing such claims pursuant to section 502(b)(1) of the Bankruptcy Code;

(k) onOn the Eleventh Cause of Action, that the Family Defendant Claims beClaim for Relief, pursuant to this Court's equitable power, disallowing each and every claim that Defendants assert against the Debtor's estate, all of which claims have no lawful existence under principles of restitution and other applicable state law;

(l) On the Twelfth Claim for Relief, subordinating the Madoff Brothers' Claims for purposes of distribution to all allowed claims of BLMIS's customers and creditors due to the Madoff Brothers' inequitable conduct pursuant to sections 105(a) and 510(c) of the Bankruptcy Code, such that no claim of the Madoff Brothers is paid ahead of the allowed claim of any customer or creditor of BLMIS;

subordinated;

(l) on the Twelfth Cause of Action against each of the Family Defendants for

(m) On the Thirteenth Claim for Relief against each of the Madoff Brothers for breaches of fiduciary duty, for compensatory damages, disgorgement of all sums

received by each ~~Family Defendant~~**Madoff Brothers** from BLMIS for the period in which they

were in breach of their fiduciary duties, and punitive damages in an amount to be determined

at trial;

(mn) onOn the Thirteenth Cause of ActionFourteenth Claim for Relief against each of the Family Defendants and Stephanie Mack and Deborah Madoff Brothers for unjust enrichment, for restitution and compensatory damages in an amount to be determined at trial;

(no) onOn the Fourteenth Cause of ActionFifteenth Claim for Relief against each of the Family DefendantsMadoff Brothers for negligence, for compensatory and punitive damages in an amount to be determined at trial;

(op) onOn the Fifteenth Cause of ActionSixteenth Claim for Relief against each of the Family Defendants and Stephanie Mack and Deborahthe Madoff Brothers for the imposition of a constructive trust upon any transfer of funds, assets, or property received from BLMIS, including, without limitation, against those properties the Family and Spouse DefendantsMadoff Brothers purchased, or for which the mortgages were paid, with fraudulently diverted funds located at: (i) 583 Broadway, Unit 4M, New York, NY 10012; (ii) 433 E. 74th St., Unit 5A, New York, NY 10021; (iii) 10 Gracie Square, Apt. 10G, New York, NY 10028; (iv) 8 Barclay Court, East Hampton, NY, 11937; (v) 21 Cherry Valley Road, Greenwich, CT 06870; (vi) 200 NW Algoma Road, Palm Beach, FL 33480; (viiv) 51 Wanoma Way, Nantucket, MA 02554, (viii) 975 Park Avenue, Apt. 6B, New York, NY 10028; (ix) 34 Pheasant Run, Old Westbury, NY 11568; and (xvi) 57 Tomac Avenue, Old Greenwich, CT 06870, including StephanieStephanie's Mack's interests in the 51 Wanoma Way and 583 Broadway Properties, as well as to any profits in the past and on a going forward basis received by the

Madoff Brothers

Family and Spouse Defendants in connection with BLMIS, in favor of the Trustee for the benefit of **the** BLMIS' s estate.**;**

(pq) on**On** the Sixteenth Cause of Action**Seventeenth Claim for Relief** against each of the Family Defendants and Stephanie Mack and Deborah**both of the** Madoff **Brothers** for an accounting of any transfer of funds, assets, or property received from BLMIS as well as to any profits in the past or on a going forward basis received by the Family Defendants and Stephanie Mack and Deborah Madoff **Brothers** in connection with BLMIS;

(q) on all Causes of Action, pursuant to federal common law and CPLR §§ 5001 and 5004 awarding the Trustee prejudgment interest from the date on which any transfer of BLMIS funds, assets, or property were received by each Family and Spouse Defendant;

**(r) On the First through Ninth Claims for Relief, to the extent allowable by law, directing the Madoff Brothers to disgorge to the Trustee all profits, including any and all compensation and remuneration received by the Madoff Brothers related to, arising out of, or**

**concerning the Initial Transfers, the Subsequent Transfers and the Madoff Brothers' BLMIS Accounts;**

**(s) On all Claims for Relief, pursuant to federal common law and NY CPLR 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Initial Transfers were received;**

**(t) On all Claims for Relief, establishing a constructive trust over all Transfers and their proceeds, product and offspring in favor of the Trustee for the benefit of the estate; and**

(~~r~~**u**) **On all Claims for Relief,** awarding the ~~Trustee all applicable~~**Trustee's** attorneys' fees, **all applicable** interest, costs, and disbursements ~~of~~**incurred in** this ~~action~~**adversary proceeding**; and

**(v) Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.**

09-01503-smb Doc 113185-1 Filed 05/04/1207/15/14 Entered 05/04/12

(s) granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Date: New York, New York
May 4July 15, 20122014

BAKER & HOSTETLER LLP

BY: */s/David I J. Sheehan*
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Lauren J. Resnick
Marc E. Hirschfield
Email: lresnick@bakerlaw.com
Keith R. Murphy
Email: mhirschfieldkmurphy@bakerlaw.com
Geraldine E. Ponto
Email: gponto@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**Of Counsel:**

Jimmy Fokas
Email: jfokas@bakerlaw.com
Sammi Malek
Adam B. Oppenheim
Email: smalek@bakerlaw.com
Melissa M. Carvalho
Email: aoppenheimmcarvalho@bakerlaw.com Patrick T. Campbell
Baker & Hostetler LLP
45 Rockefeller Plaza
Email: pcampbell@bakerlaw.com