**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION :
CORPORATION, :
         Plaintiff, :
        :
    – against – :
        : Adv. Pro. No. 08-01789 (SMB)
BERNARD L. MADOFF INVESTMENT : SIPA LIQUIDATION
SECURITIES LLC, : (Substantively Consolidated)
         Defendant. :
------------------------------------------------------------X
In re: :
        :
BERNARD L. MADOFF, : Case No. 09-11893 (SMB)
        :
         Debtor. :
------------------------------------------------------------X

**MEMORANDUM DECISION GRANTING MOTION TO
AFFIRM TRUSTEE'S DETERMINATIONS DENYING CLAIMS
OF CLAIMANTS WHO INVESTED IN CERTAIN ERISA PLANS**

**A P P E A R A N C E S:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
    David J. Sheehan, Esq.
    Jorian Rose, Esq.
    Seanna R. Brown, Esq.
    Bik Cheema, Esq.
    Brian A. Bash, Esq.
    Wendy J. Gibson, Esq.
        Of Counsel

*Attorneys for Irving H. Picard, Trustee for the SIPA Liquidation of
  Bernard L. Madoff Investment Securities LLC*

SECURITIES INVESTOR PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, DC 20005

    Josephine Wang, Esq.
    Kevin H. Bell, Esq.
    Christopher H. Larosa, Esq.
        Of Counsel

*Attorneys for Securities Investor Protection Corporation*

BECKER & POLIAKOFF LLP
45 Broadway
New York, New York 10006

    Helen Davis Chaitman, Esq.
        Of Counsel

*Attorneys for Elizabeth Cavanaugh and Laura Hallick*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

    Some of the victims of the Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme did not invest directly with BLMIS. Instead, they invested in funds, sometimes called feeder funds, and the feeder funds then invested some or all of their assets with BLMIS. Despite the absence of a direct relationship with BLMIS, many of the feeder fund investors have submitted claims as "customers" of BLMIS to Irving H. Picard, Esq. ("Trustee"), the trustee for the SIPA[1] liquidation of BLMIS.

    In the current motion (the "*Motion*"), the Trustee seeks an order affirming his determination to disallow 308 claims[2] filed by claimants (the "Claimants") who invested in four benefit plans that were regulated under the Employee Retirement Income Security Act of 1974

---

[1]     SIPA stands for the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.*

[2]     The 308 claims filed by Claimants are identified in Exhibits 2 and 3 to the *Declaration of Vineet Sehgal in Support of The Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Who Invested in the Daprex, Felsen, Sterling, or Orthopaedic ERISA Plans*, dated April 28, 2014 ("Sehgal Declaration") (ECF Doc. # 6492).

2

("ERISA"). Each of the plans, in turn, invested funds with BLMIS. For the reasons stated below, the *Motion* is granted.

## BACKGROUND

Numerous decisions of this Court, the District Court and the Second Circuit Court of Appeals have detailed the notorious Ponzi scheme carried out by Bernard Madoff through BLMIS, and it is unnecessary to repeat that background. For present purposes, it suffices to say that Daprex Profit Sharing and 401K Plan ("Daprex Plan"), Felsen Moscoe Company Profit Sharing TST DTD 5/8/76 ("Felsen Plan"), Sterling Equities Employees Retirement Plan ("Sterling Plan"), and Orthopaedic Specialty GRP PC Defined Contribution Pension Plan ("Orthopaedic Plan," and together with the Daprex Plan, Felsen Plan and Sterling Plan, the "ERISA Plans") were regulated under ERISA. Each of the Claimants invested money in one of the ERISA Plans, and the ERISA Plans, in turn, invested their assets in accounts they maintained at BLMIS in their own names. (*Sehgal Declaration* at ¶ 32.) Each of the ERISA Plans submitted claims to the Trustee. (*Sehgal Declaration* at ¶ 6, Exs. 7, 11, 15, 19.) The *Motion* does not discuss the disposition of those claims, but other evidence shows that the Trustee denied the claim of the Daprex Plan because it was a net winner. (*See Declaration in Opposition to the Trustee's Motion to Affirm Denial of Claim of Daprex Plan Beneficiaries*, dated May 30, 2014 ("*Cavanaugh Declaration*"), at Ex. E (ECF Doc. # 6873).)

The Claimants also filed a total of 308 claims, (*Sehgal Declaration* at ¶¶ 10-11; Exs. 2, 3), which the Trustee denied presumably for the reason that they did not have accounts with BLMIS. (*See Declaration of David J. Sheehan in Support of the Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Who Invested in the Daprex, Felsen, Sterling, or Orthopaedic ERISA Plans*, dated April 30, 2014 ("*Sheehan Declaration*"), at ¶ 8

3

(ECF Doc. # 6491).) Many of the Claimants filed objections to the Trustee's denial of their claims, (*Sehgal Declaration*, Exs. 2, 3), and as of the filing of the *Motion*, there were 210 outstanding docketed objections. (*Sheehan Declaration* at ¶ 9.) The latter include objections by Laura Hallick and Elizabeth Cavanaugh (the "Objectors"), employees of Daprex, Inc. ("Daprex") and participants in the Daprex Plan.

The Trustee served discovery requests, including Requests for Admission ("RFAs"), on each of the Claimants focusing on their alleged customer status. (*Sheehan Declaration* at ¶ 5 & Exs. 1-3, 5.) None of the Claimants associated with the Felsen Plan, the Sterling Plan or the Orthopaedic Plan responded to the RFAs, (*Sheehan Declaration* at ¶¶ 10-12), and only the Objectors responded. They asserted several general "boiler plate" objections and answered three of the fifteen RFAs. They admitted in response to RFA No. 1 that the Daprex Plan's BLMIS account was not titled in their own names. They nevertheless denied that they did not have an account in their own names at BLMIS in response to RFA No. 2, stating that the name of Daprex Plan's account indicated that it was a profit sharing plan, and hence, that the funds in the account belonged to the employees of Daprex. Finally, they denied in response to RFA No. 3 that they never received correspondence directly from BLMIS, stating that they served as trustees of the Daprex Plan and communicated with BLMIS concerning Daprex Plan's account and the participants in the account. (*Sheehan Declaration*, Ex. 6.) The did not provide any specific responses or objections to RFA Nos. 4 through 15.

Following discovery, the Trustee filed the *Motion*, and once again, only the Objectors opposed the requested relief. Their opposition stated that they were employees of Daprex, and throughout the periods of their employment — Cavanaugh began in January 1985 and Hallick began in June 1991 — Daprex contributed to the Daprex Plan on their behalf. The Objectors

4

were informed that Daprex invested the bulk of its money through BLMIS and chose to leave the bulk of their money with Madoff for the purpose of purchasing securities. (*Cavanaugh Declaration* at ¶ 2; *Declaration in Opposition to the Trustee's Motion to Affirm Denial of Claim of Daprex Plan Beneficiaries*, dated May 30, 2014 ("*Hallick Declaration*"), at ¶ 2 (ECF Doc. # 6874).) When the Daprex Plan was expanded in 1995 to include a 401k plan, the Objectors directed their payroll deferrals to be deposited with Madoff through the plan account, again for the purpose of purchasing securities.[3] (*See Cavanaugh Declaration* at ¶ 3; *Hallick Declaration* at ¶ 3.) In 2001, the Objectors became trustees of the Daprex Plan, and as trustees, were responsible for transmitting funds to and from BLMIS and communicating with BLMIS on behalf of the Daprex Plan and its beneficiaries. (*See Cavanaugh Declaration* at ¶¶ 5-6; *Hallick Declaration* at ¶ 5.)

## DISCUSSION

The disposition of the *Motion* depends on whether the Claimants were "customers" of BLMIS within the meaning of SIPA. SIPA defines "customer" as –

> any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer.
>
> (B) Included Persons
>
> The term 'customer' includes-
>
>   (i) any person who has deposited cash with the debtor for the purpose of purchasing securities;

---

[3]   The Daprex Plan provided that the plan administrator was authorized to establish rules for the investment of each employee's account balance, and with his or her approval, an employee could direct the plan trustee as to the investment of the employee's salary reductions. (*Cavanaugh Declaration*, Ex. A, at IV.7.)

5

>   (ii) any person who has a claim against the debtor for cash, securities, futures contracts, or options on futures contracts received, acquired, or held in a portfolio margining account carried as a securities account pursuant to a portfolio margining program approved by the Commission; and
>
>   (iii) any person who has a claim against the debtor arising out of sales or conversions of such securities.

SIPA § 78*lll*(2). Customer status confers a significant benefit because the Securities Investor Protection Corporation ("SIPC") will advance up to $500,000 to each customer to the extent that the customer's net equity claim[4] exceeds its ratable share of customer property. SIPA § 78fff-3(a). If the debtor is insolvent, the SIPC advance may be the only means of recovering an investment.

---

[4] SIPA § 78*lll*(11) defines "net equity" as follows:

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by--
>
>   (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date--
>
>     (i) all securities positions of such customer (other than customer name securities reclaimed by such customer); and
>
>     (ii) all positions in futures contracts and options on futures contracts held in a portfolio margining account carried as a securities account pursuant to a portfolio margining program approved by the Commission, including all property collateralizing such positions, to the extent that such property is not otherwise included herein; minus
>
>   (B) any indebtedness of such customer to the debtor on the filing date; plus
>
>   (C) any payment by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff-2(a) of this title).
>
> A claim for a commodity futures contract received, acquired, or held in a portfolio margining account pursuant to a portfolio margining program approved by the Commission or a claim for a security futures contract, shall be deemed to be a claim with respect to such contract as of the filing date, and such claim shall be treated as a claim for cash. In determining net equity under this paragraph, accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers.

"Judicial interpretations of 'customer' status support a narrow interpretation of SIPA's provisions." *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006) (internal quotations and citations omitted); *accord Kruse v. Bricklayers and Allied Craftsman Local 2 Annuity Fund* (*In re BLMIS*), 708 F.3d 422, 426 (2d Cir. 2013) ("*Feeder Funds Decision*"). The claimant has the burden to establish his status as a "customer," and "such a showing 'is not easily met.'" *SIPC v. BLMIS*, 454 B.R. 285, 294-95 (Bankr. S.D.N.Y. 2011) (quoting *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003)), *aff'd sub nom. Aozora Bank Ltd. v. SIPC* (*In re BLMIS*), 480 B.R. 117 (S.D.N.Y. 2012), *aff'd sub nom. Kruse v. Bricklayers and Allied Craftsman Local 2 Annuity Fund* (*In re BLMIS*), 708 F.3d 422, 426 (2d Cir. 2013). In short, not every victim of a broker-dealer's fraud is a "customer."

### A. The Feeder Fund Cases

The customer status of persons who invested in feeder funds that invested the funds' assets in BLMIS has already been addressed. In *Feeder Funds Decision*, 708 F.3d 422, the investors purchased interests in funds organized under Delaware limited partnership law that invested their assets in BLMIS. The investors did not have their own accounts with BLMIS, but nevertheless filed customer claims which the Trustee disallowed. The Bankruptcy and District Courts affirmed the Trustee's determination, and the investors appealed to the Second Circuit.

The Court of Appeals affirmed. The Court explained that the "critical aspect" of the customer definition is "the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." *Feeder Funds Decision*, 708 F.3d at 426 (quoting *In re BLMIS*, 654 F.3d 229, 236 (2d Cir. 2011)). The appellants failed to satisfy this "critical" requirement because they "(1) had no direct financial relationship with BLMIS, (2) had no property interest in the assets that the Feeder Funds invested with BLMIS, (3) had no securities accounts with BLMIS, (4)

lacked control over the Feeder Funds' investments with BLMIS, and (5) were not identified or otherwise reflected in BLMIS's books and records." *Id.* at 426-27.

The Court relied upon an earlier Second Circuit decision, *SIPC v. Morgan, Kennedy & Co.,* 533 F.2d 1314 (2d Cir.1976), *cert. denied,* 426 U.S. 936 (1976), in reaching its conclusion. In *Morgan, Kennedy*, employees of Reading participated in a company profit sharing plan pursuant to which a trust fund was created and maintained through employer contributions. The trust established an account with the debtor in the name of the trustees, and the trustees controlled all investment decisions and communicated directly with the debtor. The trust maintained separate accounts for each employee in its own records which were necessary to compute the employee's entitlement payable upon the termination of employment, but the names of the employee-beneficiaries did not appear on the debtor's books and records.

The Court of Appeals concluded that the employee-beneficiaries were not customers:

> The employee-beneficiaries in the case before us made no purchases, transacted no business, and had no dealings whatsoever with the broker-dealer in question respecting the trust account. Indeed, they could not have any such dealings since the broker-dealer held no property belonging to any individual employee, in which such employee could trade or invest. Calculable amounts were payable to Reading's employees only in the event that, pursuant to the terms of the Plan, they became entitled thereto. The argument that, notwithstanding their complete anonymity and total incapacity to have dealings with the broker-debtor, the Reading employees were "customers" of Morgan-Kennedy stretches that term wholly beyond its limits.

*Id.* at 1318.

The Court also rejected the alternative argument that each of the three trustees was a customer. The trust was the "true customer," the number of trustees was "fortuitous," and if the maximum amount of the SIPC advance depended on the number of parties jointly holding an

8

account, individuals could "arbitrarily" expand the number at will, a result "obviously repugnant" to the plain meaning of SIPA and the intent of Congress. *Id.* at 1321.

The feeder fund investors in *Feeder Funds Decision* tried to distinguish their situation from the employee-beneficiaries in *Morgan, Kennedy* by arguing that they maintained a degree of control over the feeder funds' investments in BLMIS. The Court disagreed on the merits, but concluded that it did not matter:

> [E]ven if appellants could demonstrate that they exercised some level of control over the Feeder Funds' investments, that fact, standing alone, would be insufficient to confer "customer" status on appellants given that, individually, they "made no purchases, transacted no business, and had no dealings whatsoever" with BLMIS.

*Feeder Funds Decision,* 708 F.3d at 427 (quoting *SIPC v. Morgan, Kennedy & Co.,* 533 F.2d at 1318).

## B. The ERISA Decision

When the feeder fund dispute first arose, the Bankruptcy Court carved out the question of whether ERISA affects the determination of the customer issue under SIPA. ERISA funds are similar to feeder funds because the participant invests in a plan that invests some or all of the plan's assets with a broker-dealer, here BLMIS. The Bankruptcy Court scheduled a hearing (*see Scheduling Order*, dated Oct. 4, 2011 ("*ERISA Scheduling Order*") (ECF Doc. # 4507)), and the *ERISA Scheduling Order* stated that "[a] claimant's or party-in-interest's failure to file a timely Opposition Brief and supporting documentation will bar her from being heard on the ERISA issue, unless the Trustee agrees or the Court orders otherwise, and the Court's Order on the [motion] will be binding on them." (*Id.*) After the Trustee filed his motion, the District Court withdrew the reference to address the Trustee's contention that "the ERISA Plan Participants are

9

not 'customers' [of BLMIS] under SIPA." (*Order*, dated Apr. 20, 2012 (ECF Doc. # 7 filed in 12 Civ. 1039 (DLC) (S.D.N.Y.).)

The individual plan participants before the District Court attempted to distinguish their employer-funded profit plans from the plans at issue in *Morgan, Kennedy* (the Second Circuit had not yet decided *Feeder Funds Decision*). They argued that they had contributed their own money to their plans, they could control the size of their investments or withdraw or roll them over, their plans kept track of the precise value of their investments, they received statements reflecting the value of their investments, they were known to BLMIS due to its own reporting requirements, they had actual contact with BLMIS, and they could choose among alternatives when directing their plans to invest their respective shares of the plans' assets. *SIPC v. Jacqueline Green Rollover Account*, 12 Civ. 1039 (DLC), 2012 WL 3042986, at *13 (S.D.N.Y. July 25, 2012) (the "*ERISA Decision*"). District Judge Cote concluded that these distinctions did not make them BLMIS customers and affirmed the Trustee's determinations denying their customer claims:

> To the extent these distinctions result from ERISA law, as opposed to the particular factual situation of any particular claimant, they do not alter claimants' customer status. The fact that Individual Claimants participated in defined contribution plans, to which they could contribute their own money, does not change the fact that title to this money passed to their plan when they made such contributions. Participants' ability to control the size of their investments, withdrawals, and rollover funds, and to choose among a limited set of investment alternatives is not equivalent to having a direct financial relationship with or directly entrusting one's own funds to a broker-dealer, or exercising sole control over investment decisions. Nor is any awareness of or contact with the claimants on the part of BLMIS equivalent to the kind of "repeated business dealings" associated with customer status.

*Id.* (citing *Morgan, Kennedy,* 533 F.2d at 1318).

The foregoing authorities show that to qualify as a "person who has deposited cash with the debtor for the purpose of purchasing securities," SIPA § 78*lll*(2)(B)(i), the party asserting that she was a BLMIS customer must show that she entrusted her own assets directly through an account maintained in her own name rather than indirectly through a fund that then entrusted the fund's assets through an account maintained in the fund's name.[5] The fact that she exercised some control over her own investments in the fund or the fund's investments in BLMIS is not sufficient to meet the narrow definition of customer under SIPA. Further, as discussed below, although "repeated business dealings" may confer customer status despite the absence of a BLMIS account maintained in her own name, the business dealings must be of the kind associated with the activities as a customer and not as an agent for another customer, *i.e.*, the fund itself.

C.  **The Claimants**

Only two of the 308 Claimants implicated in this motion filed responses, and the remaining 306 Claimants failed to sustain their burden of proving that they were "customers" of BLMIS. Moreover, they failed to respond to the RFAs and each thereby admitted, *see* FED. R. CIV. P. 36(a)(3), among other things, that he did not maintain accounts with BLMIS in his own name, he did not receive correspondence directly from BLMIS, he never made a cash payment directly to BLMIS for credit to an account in his name or deposited securities directly with BLMIS or withdrew funds directly from BLMIS, and the only funds he received were

---

[5] The Objectors contend that one who does not hold an account with the broker-dealer may nonetheless be a customer under the SIPA definition. The only cases in which a claimant that was not an account holder was found to be a customer involved situations in which a customer account was not opened for the claimant due to misfeasance of the broker-dealer or its agents. *See ERISA Decision*, 2012 WL 3042986, at *14.

The Objectors also argue that SIPA § 78fff-3(a)(5) provides that in certain situations each customer of a broker, dealer, or bank "shall be deemed a separate customer of the debtor." SIPA § 78fff-3(a)(5). This section is inapplicable because the ERISA Plans were not brokers, dealers or banks. *See ERISA Decision*, 2012 WL 3042986, at *15.

11

transmitted to him by his ERISA Plan; he never received any investment statements or tax statements from BLMIS in his own name or entered into any contracts in his own name with BLMIS; his only relationship to BLMIS existed by way of his relationship to his ERISA Plan; he did not exercise any control or investment discretion over any assets at BLMIS; ; and his ERISA Plan had its own bank account and kept its funds separate from his personal funds.

The Objectors did file responses and objections, but they also failed to sustain their burden of proving their status as customers.[6] They admitted in response to RFA No. 1 that they did not maintain accounts with BLMIS in their own names, and nothing in the BLMIS books and records indicates that either Objector deposited funds directly with BLMIS or received any funds directly from BLMIS. (*Sehgal Declaration* at ¶¶ 12-13.) All of their financial transactions were with the Daprex Plan. Thus, they failed to satisfy the "critical requirement," *Feeder Funds Decision*, 708 F.3d at 426, that they entrusted cash to BLMIS, as opposed to the Daprex Plan, for the purchase of securities. In addition, although their denial to RFA No. 2 contended that the Daprex Plan funds invested with BLMIS belonged to the plan's participants, title was vested in the plan's trustees. *LaRue v. DeWolff, Boberg & Assocs., Inc.,* 552 U.S. 248, 262 (2008) (Thomas, J., concurring) ("ERISA requires a plan's combined assets to be held in trust and legally owned by the plan trustees."); *Milgram v. Orthopedic Assocs. Defined Contribution Pension Plan*, 666 F.3d 68, 74 (2d Cir. 2011) ("[A]ll of [an ERISA-regulated] Plan's

---

[6] The Objectors' general, "boiler plate" objections to all RFAs (*e.g.* RFAs vague, ambiguous, subject to privilege, call for legal conclusion, etc.) are insufficient. *See* FED. R. CIV. P. 36(a)(4)(requiring that "the answer must specifically deny" or "state in detail why the answering party cannot truthfully admit or deny. . . ."). However, the Trustee failed to move pursuant to FED. R. CIV. P. 36(a)(6) to challenge the "sufficiency" of the objections or responses. *See* CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, RICHARD L. MARCUS & ADAM N. STEINMAN, FEDERAL PRACTICE AND PROCEDURE § 2263 (3d ed. 2014) ("The matter will come to court only if the party who has requested the admissions moves pursuant to Rule 36(a)(6) to determine the sufficiency of the objections."). Accordingly, the Court will not deem the Objectors to have admitted RFA Nos. 4 through 15 despite their failure to respond.

undistributed assets are legally owned by the trustee and managed for the benefit of all plan participants, with gains and losses shared by them on a pro rata basis. A single participant's 'account' is merely a bookkeeping entry that is used at the time of his retirement to determine what benefits he is entitled to receive.") (internal citations omitted); *ERISA Decision*, 2012 WL 3042986, at *6 ("The Green Individual Claimants allege, without support, that they had an ownership interest in assets held by their plan because these funds were trust funds. The Sterling Individual Claimants make a similar claim. As discussed above, this claim is contrary to the language of *Milgram, Larue,* and even the very provision of ERISA cited by the Green Individual Claimants, 29 U.S.C. § 1103(a), according to which title to the assets of a trust established pursuant to ERISA is held by the trustee.").

The Objectors attempt to distinguish the controlling authorities by arguing that they had control over how the Daprex Plan invested their funds, and they affirmatively steered their investment in the Daprex Plan to BLMIS. Even if true, this fact, standing alone, is insufficient to confer customer status "given that, individually, they 'made no purchases, transacted no business, and had no dealings whatsoever' with BLMIS." *Feeder Funds Decision*, 708 F.3d at 427 (quoting *SIPC v. Morgan, Kennedy & Co.,* 533 F.2d at 1318); *accord ERISA Decision*, 2012 WL 3042986, at *13 ("Participants' ability to . . . choose among a limited set of investment alternatives is not equivalent to having a direct financial relationship with or directly entrusting one's own funds to a broker-dealer, or exercising sole control over investment decisions.").

They also contend that after they became trustees of the Daprex Plan they assumed the responsibility for the transmission of funds on behalf of Daprex employees to and from the Daprex Plan account at BLMIS and terminated the employees' interests in the Daprex Plan as they retired and rolled their funds out of the Daprex Plan account over into IRAs of the

13

employees' choosing. During this same period, the Objectors also spoke regularly with representatives of BLMIS primarily about the transfer of funds belonging to retiring employees and advised BLMIS personnel how many participants there were in the Daprex Plan and that they were participants in the Daprex Plan. (*Cavanaugh Declaration* at ¶¶ 5-6; *Hallick Declaration* at ¶¶ 4-5.) All of the contacts with BLMIS identified by the Objectors occurred in their capacities as trustees of the Daprex Plan and not in their individual capacities concerning individual accounts. Similarly, Cavanaugh provided copies of checks payable to BLMIS that she signed, but each check was written from a Daprex Plan account rather than from her individual account. (*See Cavanaugh Declaration*, Ex. C.)

D. **The ERISA Arguments**

The Objectors' final argument is that the rights of participants in an ERISA fund under SIPA are different from the rights of an investor in a non-ERISA feeder fund, and the *ERISA Decision* decided incorrectly that they were the same. In the first place, this Court lacks subject matter jurisdiction over the Objectors' ERISA arguments. The District Court withdrew the reference of the ERISA/customer question and never re-referred that question back to this Court. Moreover, these arguments are foreclosed by the *ERISA Decision*. The *ERISA Motion*[7] was served on the Objectors, (*see Affidavit of Mailing*, dated Nov. 16, 2011 (ECF Doc. # 4533)),[8] attached the *ERISA Scheduling Order*, (*see ERISA Motion*, Ex 1), and repeated the invitation and warning contained in the *ERISA Scheduling Order*:

---

[7] *See Motion for an Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections*, dated Nov. 14, 2011 (ECF Doc. # 4521).

[8] A partly unredacted copy of the affidavit of service is attached as Exhibit 1 to the *Trustee's Reply Memorandum in Support of Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Who Invested in the Daprex, Felsen, Sterling, or Orthopaedic ERISA Plans*, dated June 17, 2014 (ECF Doc. # 7008).

14

> Any claimant that has a timely objection pending and believes that ERISA and related regulations determine her "customer" status under SIPA may file a timely Opposition Brief and ERISA Documentation in accordance with the ERISA Scheduling Order. *Failure to file a timely Opposition Brief and ERISA Documentation will be[sic] bar claimants from being heard on this issue, unless the Trustee agrees or the Court orders otherwise, and the Court's Order on the [ERISA Motion] will be binding on them.*

*ERISA Motion* at ¶17 (emphasis added). The Objectors chose not to participate in the *ERISA Motion*, but they are nonetheless bound by the decision.

In conclusion, the Trustee's motion for an order affirming his determinations disallowing the Claimants' claims is granted. The Court has considered all of the Objectors' arguments and to the extent not expressly addressed, the Court concludes that they lack merit.

Settle order on notice.

Dated: New York, New York
August 22, 2014

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge