**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>      Plaintiff-Applicant, <br><br>   v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>      Defendant. | No. 08-01789 (SMB) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>      Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>      Plaintiff, <br><br>   v. <br><br> FEDERICO CERETTI, et al., <br><br>      Defendants. | Adv. Pro. No. 09-1161 (SMB) |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**JOINT LIQUIDATORS' MOTION TO DISMISS FOURTH AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STANDARD OF REVIEW ....................................................................................5

ARGUMENT ....................................................................................................7

I.    AS AGENTS OF THE FUNDS, THE ACTS AND KNOWLEDGE OF
      KINGATE MANAGEMENT, FIM, THE ADMINISTRATORS, AND
      CERETTI AND GROSSO ARE IMPUTED TO THE FUNDS.............................7

II.   THE TRUSTEE HAS PLEADED FACTS DEFEATING APPLICATION
      OF SECTION 546(e) TO THE TRUSTEE'S CAUSES OF ACTION FOR
      AVOIDANCE OF INITIAL TRANSFERS UNDER SECTIONS 544(b)(1),
      547, AND 548(a)(1)(B) ...........................................................................11

      A.    Under the *Actual Knowledge Decision*, Section 546(e)'s Safe
            Harbor Only Protects the "Reasonable Expectations of Legitimate
            Investors" ...................................................................................11

      B.    Proving Actual Knowledge is Akin to Proving "Scienter".......................15

      C.    The Funds' Conduct Reveals Their Knowledge of BLMIS's Fraud .........17

            1.    Real-Time Access to Madoff and BLMIS ....................................17

            2.    Real-Time Review and Understanding of Purported
                  Trading Activity That Evidenced BLMIS's Fraud ........................18

      D.    The Court Should Reject the Liquidators' Attempt to Turn a Rule
            12(b)(6) Motion Into a Fact-Finding Exercise...........................................22

III.  THE COMPLAINT ALLEGES A PRIMA FACIE CASE FOR
      AVOIDANCE UNDER SECTION 548(a)(1)(A) AND RECOVERY OF
      ACTUAL FRAUDULENT TRANSFERS FROM THE FUNDS........................24

IV.   THE COMPLAINT STATES A CLAIM FOR EQUITABLE
      SUBORDINATION AND DISALLOWANCE OF THE FUNDS' CLAIMS
      AGAINST THE CONSOLIDATED ESTATE ....................................................27

      A.    The Allegations of the Funds' Inequitable Conduct That Harmed
            All Creditors Are Sufficient to State a Claim for Equitable
            Subordination...........................................................................27

      B.    The Complaint Objects to the Funds' Claims Under Section 502(a)
            and Properly States a Claim for Disallowance Under Section
            502(b)(1) on the Ground That Applicable Non-Bankruptcy Law
            Renders the Funds' Claims Unenforceable Against the
            Consolidated Estate....................................................................34

      C.    The Complaint Properly States a Claim for Equitable Disallowance
            of the Funds' Claims..................................................................37

CONCLUSION...................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*),
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ................................................................27, 28, 29

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ...........................................................................................6

*Adelphia Commc'n Corp. v. Bank of Am.* (*In re Adelphia*),
    365 B.R. 24 (Bankr. S.D.N.Y. 2007), *aff'd in part*, 390 B.R. 64 (S.D.N.Y.
    2008) ......................................................................................................................29, 37

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
    390 B.R. 64 (Bankr. S.D.N.Y. 2008) ...........................................................................8

*In re Adler Coleman Clearing Corp.*,
    198 B.R. 70 (Bankr. S.D.N.Y. 1996) *aff'd sub nom. In re Stratton Oakmont*,
    210 F.3d 420 (2d Cir. 2000) ......................................................................................34

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012), *cert denied*, 133 S. Ct. 846 (2013) ...........................23

*In re Applied Theory Corp.*,
    345 B.R. 56 (S.D.N.Y. 2006), *aff'd,* 493 F.3d 82 (2d Cir. 2007) ...........................33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .....................................................................................................5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ........................................................................................22

*In re Auto. Prof'ls, Inc.*,
    398 B.R. 256 (Bankr. N.D. Ill. 2008) .......................................................................33

*In re Baker & Getty Fin. Servs.*,
    974 F.2d 712 (6th Cir. 1992) .....................................................................................31

*Bankers Serv., Inc. v. Ernst & Young* (*In re CBI Holdings, Co.*),
    529 F.3d 432 (2d Cir. 2008), *cert. denied*, 556 U.S. 1183 (2009) ............................8

*In re Bayou Group, LLC*,
    439 B.R. 284 (S.D.N.Y. 2010) ..................................................................................35

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................5, 22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Bernard L. Madoff Inv. Sec. LLC*,
 654 F.3d 229 (2d Cir. 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *cert.
 denied*, 133 S. Ct. 24 (2012), *cert. denied*, 133 S. Ct. 25 (2012)..............................23

*Block v. First Blood Assocs.*,
 988 F.2d 344 (2d Cir. 1993).................................................................................7

*In re Blockbuster Inc.*, Adv. Pro. No. 10-5524,
 2011 WL 1042767 (Bankr. S.D.N.Y. Mar. 17, 2011) ............................................27

*Buckley v. Deloitte & Touche USA LLP*,
 No. 06 Civ. 3291 (SHS), 2007 WL 1491403 (S.D.N.Y. May 22, 2007)...................8

*Cargo Partner AG v. Albatrans, Inc.*,
 352 F.3d 41 (2d Cir. 2003)...................................................................................5

*Center v. Hampton Affiliates, Inc.*,
 66 N.Y.2d 782 (N.Y. 1985) ...................................................................................9

*Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured
 Claims*,
 160 F.3d 982 (3d Cir. 1981)...........................................................................37, 38

*Cromer Fin. Ltd. v. Berger*,
 245 F. Supp. 2d 552 (S.D.N.Y. 2003)...............................................................8, 11

*Donell v. Kowell*,
 533 F.3d 762 (9th Cir. 2009) ...............................................................................35

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
 720 F.3d 33 (1st Cir. 2013)..................................................................................23

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000)............................................................................................38

*Matter of Fabricators, Inc.*,
 926 F.2d 1458 (5th Cir. 1991) .............................................................................31

*In re First State Sec. Corp.*,
 34 B.R. 492 (Bankr. S.D. Fla. 1983).....................................................................36

*Foman v. Davis*,
 371 U.S. 178 (1962)..............................................................................................6

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
 479 F. Supp. 2d 349 (S.D.N.Y. 2007)...................................................................26

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*,
    452 B.R. 467 (Bankr. S.D.N.Y. 2011) ..................................................................29

*In re Granite Partners*,
    210 B.R. 508 (Bankr. S.D.N.Y. 1997) ..................................................................39

*In re J.P. Jeanneret Assocs., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011) ....................................................................5

*Kirschner v. Grant Thornton LLP*,
    No. 07 Civ. 11604 (GEL), 2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009) .............................32

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (N.Y. 2010) .......................................................................... *passim*

*In re LaBranche Sec. Litig.*,
    333 F. Supp. 2d 178 (S.D.N.Y. 2004) ..................................................................21

*Law v. Siegel*,
    134 S. Ct. 1188 (2014) ..................................................................................37

*In re Le Cafe Creme, Ltd.*,
    244 B.R. 221 (Bankr. S.D.N.Y. 2000) ..................................................................31

*Matter of Lemco Gypsum, Inc.*,
    911 F.2d 1553 (11th Circ. 1990) ......................................................................31

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ............................................................................16

*Matter of Lifschultz Fast Freight*,
    132 F.3d 339 (7th Cir. 1997) ..........................................................................31

*In re LightSquared Inc.*,
    504 B.R. 321 (Bankr. S.D.N.Y. 2013) ..............................................................34, 37

*In re LightSquared Inc.*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) ..............................................................33, 37

*In re Loucheschi LLC*,
    Adv. Pro. No. 11-4122 (MSH), 2013 WL 6009947 (Bankr. D. Mass. Nov. 13,
    2013) .....................................................................................................34

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986) ..............................................................................6

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*In re M. Fabrikant & Sons, Inc.*,
   394 B.R. 721 (Bankr. S.D.N.Y. 2008) .................................................................6

*Mirror Grp. Newspapers v. Maxwell Newspapers, Inc. (In re Maxwell*
   *Newspapers, Inc.)*,
   164 B.R. 858 (Bankr. S.D.N.Y. 1994) ..........................................................8, 9, 11

*In re Mirus*,
   87 B.R. 960 (Bankr. N.D. Ill. 1988) ................................................................36

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
   277 B.R. 520 (Bankr. S.D.N.Y. 2002) .............................................................36

*In re Mobile Steel Co.*,
   563 F.2d 692 (5th Cir. 1977) ..........................................................................27

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ........................................................................................23

*Musso v. Ostashko*,
   468 F.3d 99 (2d Cir. 2006) ..............................................................................39

*Nisselson v. Drew Indus. Inc. (In re White Metal Rolling and Stamping Corp.)*,
   222 B.R. 417 (Bankr. S.D.N.Y. 1998) ...............................................................6

*Northtown Theatre Corp. v. Mickelson*,
   226 F.2d 212 (8th Cir. 1955) ..........................................................................37

*O'Connell v. Penson Financial Services, Inc. (In re Arbco Capital Management,*
   *LLP)*,
   498 B.R. 32 (Bankr. S.D.N.Y. 2013) .......................................................16, 17, 26

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley &*
   *Co. (In re Sunbeam Corp.)*,
   284 B.R. 355 (Bankr. S.D.N.Y. 2002), *appeal dismissed*, 287 B.R. 861
   (S.D.N.Y. 2013) .............................................................................................28

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S*
   *& B Holdings LLC )*,
   420 B.R. 112 (Bankr. S.D.N.Y. 2009), *aff'd as modified by* 807 F. Supp. 2d
   199 (S.D.N.Y. 2011) .......................................................................................28

*In re Old Naples Sec., Inc.*,
   311 B.R. 607 (M.D. Fla. 2002) ........................................................................36

*Pepper v. Litton*,
   308 U.S. 295 (1939) ........................................................................................37

# TABLE OF AUTHORITIES
## (continued)

*Picard v. Greiff*,
  476 B.R. 715 (S.D.N.Y. 2012)..........................................................................................11, 12

*Picard v. HSBC*,
  454 B.R. 25 (S.D.N.Y. 2011)...................................................................................................32

*Picard v. Ida Fishman Revocable Trust et al.*,
  No. 12-2557 (2d Cir. filed Sept. 10, 2012) ............................................................................1

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011)...............................................................................11, 12, 24, 27

*Picard v. Merkin*,
  440 B.R. 243 (Bankr. S.D.N.Y. 2010) ........................................................................... *passim*

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014)............................................................................ *passim*

*Porat v. Lincoln Towers Cmty. Ass'n*,
  464 F.3d 274 (2d Cir. 2006)......................................................................................................6

*Powers v. British Vita, P.L.C.*,
  57 F.3d 176 (2d Cir. 1995)......................................................................................................16

*Renner v. Chase Manhattan Bank, N.A.*,
  85 F. App'x. 782 (2d Cir. 2004) ..............................................................................................15

*Rosner v. Bank of China*,
  No. 06 Civ. 13562 (VM), 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008), *aff'd*,
  349 F. App'x 637 (2d Cir. 2009) .......................................................................................15, 16

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007).......................................................................................................5

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  499 B.R. 416 (S.D.N.Y. 2013)............................................................................................35, 37

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  513 B.R. 437 (S.D.N.Y. 2014)..................................................................................................38

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  No. 12-MC-115 (JSR), 2014 WL 1651952 (S.D.N.Y. April 27, 2014) ............................24, 26

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  No. 12-MC-115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)........................... *passim*

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*,
  229 B.R. 273 (Bankr. S.D.N.Y. 1999) ................................................................34

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*,
  234 B.R. 293 (Bankr. S.D.N.Y. 1999) ..................................................................6

*SEC v. North Am. Planning Corp.*,
  No. 72 Civ. 3158 (IBC), 1975 WL 346 (S.D.N.Y. 1975) ......................................36

*SEC v. Packer, Wilbur & Co., Inc.*,
  498 F.2d 978 (2d Cir. 1974) ..................................................................................36

*SEC v. Provident Sec.*,
  452 F. Supp. 477 (S.D.N.Y. 1978) ........................................................................36

*Shearson Lehman Hutton, Inc. v. Wagoner*,
  944 F.2d 114 (2d Cir. 1991) ..................................................................................32

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994) ..................................................................................16

*In re State St. Bank and Trust Co. Fixed Income Funds Inv. Litig.*,
  842 F. Supp. 2d 614 (S.D.N.Y. 2012) ...................................................................21

*Swanson v. First Wisconsin Fin. Corp. (In re Universal Foundry Co.)*,
  163 B.R. 528 (E.D. Wis. 1993), *aff'd on other grounds*, 30 F.3d 137 (7th Cir.
  1994) (unpublished) ...............................................................................................31

*Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC)*,
  490 B.R. 84 (Bankr. S.D.N.Y. 2013) ...............................................................15, 16

*Tiffany (NJ) Inc. v. eBay Inc.*,
  600 F.3d 93 (2d Cir. 2010)......................................................................................26

*In re Tremont Sec. Law, State Law, and Insurance Litig.*,
  703 F. Supp. 2d 362 (S.D.N.Y. 2010) ...................................................................26

*Vargas Realty Enters., Inc. v. CFA W. 111 St., L.L.C. (In re Vargas Realty
  Enters., Inc.)*,
  440 B.R. 224 (S.D.N.Y.2010) .................................................................................28

**Statutes**

11 U.S.C. § 105(a) ......................................................................................................36

11 U.S.C. § 502(a) ...........................................................................................1, 34, 36, 38

## TABLE OF AUTHORITIES
### (continued)

Page(s)

11 U.S.C. § 502(b) ...................................................................................................34, 35, 37, 38

11 U.S.C. § 502(b)(1) ............................................................................................... *passim*

11 U.S.C. § 502(d) ...................................................................................................32, 38

11 U.S.C. § 502(h) ...................................................................................................38, 39

11 U.S.C. § 510(c) ...................................................................................................27, 31, 33

11 U.S.C. § 541(a) ...................................................................................................33

11 U.S.C. § 544(b)(1) ...............................................................................................1, 11

11 U.S.C. § 546(e) .................................................................................................... *passim*

11 U.S.C. § 547 ........................................................................................................1, 11

11 U.S.C. § 548(a)(1)(A) ..........................................................................................24

11 U.S.C. § 548(a)(1)(B) ..........................................................................................1, 11

11 U.S.C. § 548(c) ...................................................................................................24

11 U.S.C. § 548(d)(2)(A) ..........................................................................................35

15 U.S.C. § 78aaa .....................................................................................................1

15 U.S.C. § 78fff-2(b) ..............................................................................................33, 36

15 U.S.C. § 78fff-2(c)(2) ..........................................................................................39

15 U.S.C. § 78fff(b) ..................................................................................................33, 36

15 U.S.C. § 78*lll*(2) ...................................................................................................36

15 U.S.C. § 78*lll*(11) .................................................................................................33

**Rules**

Fed. R. Bankr. P. 7012 ..............................................................................................5

Fed. R. Civ. P. 8(a)(2) ...............................................................................................5

Fed. R. Civ. P. 9(b) ...................................................................................................5, 6, 31

Fed. R. Civ. P. 12(b)(6) ............................................................................................. *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Fed. R. Civ. P. 54(b) ...................................................................................................................36

## INTRODUCTION

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"), and the estate of Bernard L. Madoff

("Madoff"), by and through the Trustee's undersigned counsel, respectfully submits this

memorandum of law in opposition to the motion filed by the Joint Liquidators (the

"Liquidators") for defendants Kingate Global Fund, Ltd. ("Kingate Global") and Kingate Euro

Fund, Ltd. ("Kingate Euro," and collectively, with Kingate Global, the "Funds") to dismiss with

prejudice (the "Motion") the Trustee's Fourth Amended Complaint (the "Complaint").

## PRELIMINARY STATEMENT

In this proceeding, the Trustee seeks to avoid and recover approximately $926 million in

initial transfers, or their value, made by BLMIS to the Funds during the lifetime of the Funds'

respective customer accounts with BLMIS (the "Avoidance Action").[1]  Compl. ¶¶ 8, 247-48.[2]

The Complaint also incorporates an objection to the allowance of the Funds' claims against the

debtors' consolidated estate under section 502(a), as the resolution of the Funds' claims is

integral to the resolution of the Avoidance Action.  *Id.* ¶ 327.  By that objection, the Trustee

seeks to disallow any and all claims of the Funds against the estate under section 502(b)(1) to the

extent the Funds' claims are unenforceable under applicable non-bankruptcy law and,

alternatively, under equitable principles.  If the Court should allow any portion of the Funds'

---

[1] To preserve all claims until a final determination on appeal, including the separate appeal concerning the applicability of section 546(e) of the Bankruptcy Code to the Trustee's avoidance claims, now pending, *see Picard v. Ida Fishman Revocable Trust et al.*, No. 12-2557 (2d Cir. filed Sept. 10, 2012), the Trustee asserts avoidance claims arising under sections 547, 548(a)(1)(B), and 544(b)(1) of the Bankruptcy Code in this proceeding.

[2] "Compl." refers to the Fourth Amended Complaint in the Avoidance Action filed March 17, 2014 (ECF No. 100), which together with its exhibits is attached as Ex. A to the October 14, 2014 Declaration of Anthony M. Gruppuso.

claims, the Trustee seeks to equitably subordinate such allowed claims to the allowed claims of all other creditors of the estate.

The District Court in *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*[3] applied the safe harbor of section 546(e) to transfers from BLMIS, finding the statute protects the "reasonable expectations of legitimate investors" with BLMIS.[4]  If an investor knew of BLMIS's fraud or knew BLMIS was not trading securities for its account, the safe harbor does not apply to the Trustee's claims.  The facts alleged in the Complaint show the Funds had such knowledge and thus were not "legitimate investors."  Accordingly, the Funds had no reasonable expectation that their reported BLMIS returns resulted from legitimate trading activity, or that their withdrawals from BLMIS would be protected from avoidance by section 546(e)'s safe harbor.

The events relevant here were set in motion in the early 1990s, when Carlo Grosso ("Grosso") was introduced to Madoff by Sandra Manzke, a principal of Tremont.[5]  In 1993, Madoff informed fund managers, including Manzke, that going forward BLMIS would only accept institutional investors as customers for its investment advisory business, limiting the number of customers to which BLMIS and its operations were directly exposed.  Compl. ¶ 95.  Grosso and Federico Ceretti ("Ceretti") then established the Funds and a management company structure through which to achieve the same returns Tremont had achieved with BLMIS.  *Id.* ¶¶ 95-97.

---

[3] No. 12-MC-115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) (the "*Actual Knowledge Decision*").

[4] *Id.* at *4.

[5] "Tremont" means collectively Tremont Group Holdings, Inc., and its U.S. management company, Tremont Partners, Inc., which are the subject of a separate avoidance action, settled by the Trustee.  *See Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y.); Compl. ¶¶ 94-95.

It took virtually no lead time to establish an institutional investment fund for BLMIS, because Grosso and Ceretti already had a wealth of experience in the securities industry and, particularly, asset management, through FIM Limited.  Compl. ¶¶ 34-35, 104.  Grosso and Ceretti created Kingate Global under the laws of the British Virgin Islands for exclusive investment with BLMIS.  *Id.* ¶¶ 38, 96.  Kingate Euro was initially a sub-fund of Kingate Global established for foreign denomination investment, and in 2000, Kingate Euro opened its own account with BLMIS.  *Id.* ¶ 41.

The Funds needed a manager and contracted their management to a start-up company with no experience, formed by Grosso and Ceretti under the laws of Bermuda, which they called Kingate Management Limited ("Kingate Management").  *Id.* ¶¶ 104-06, 111.  Kingate Management was set up solely for the Funds' investments with BLMIS.  *Id.* ¶ 104.  Kingate Management had no infrastructure and inadequate human resources to manage large-scale investment funds.  *Id.* ¶ 105.  The Funds directed Kingate Management to relinquish total control and discretion over the Funds' customer accounts to BLMIS, and to delegate what limited managerial responsibilities remained to FIM Limited, which Ceretti and Grosso formed in 1980, and later FIM Advisers, LLP (collectively, "FIM").  *Id.* ¶¶ 47, 106, 118.

The Funds then hired Hemisphere Management Limited ("Hemisphere"), a predecessor company to Citi Hedge Fund Services Limited ("Citi Hedge"), as the fund administrator (Hemisphere and its successors are collectively referred to as the "Administrators").[6]  Banking services to the Funds were provided initially by Bank of Bermuda Limited, and later through its successor, HSBC Bank Bermuda Limited.  *Id.* ¶¶ 79-80.

---

[6] BISYS Group, Inc. thereafter acquired Hemisphere, and its name was changed to BISYS.  Citi Hedge acquired BISYS in or around 2007.  Compl. ¶¶ 72-78.

With the core structure in place, the Funds began what became a 14-year investment relationship with BLMIS, and Ceretti and Grosso started a close personal relationship with Madoff. Ceretti and Grosso were part of Madoff's inner circle and had direct access to him. Compl. ¶ 98. Madoff publicly acknowledged as much, telling one potential investor that he did not meet with investors, and the investor should meet with Grosso to learn about investment with BLMIS. *Id.* ¶ 98. Madoff used trusted and experienced intermediaries, like the Funds, to shield BLMIS and its investment and operational strategy from unwanted scrutiny. *Id.* ¶¶ 98, 120. Because of the Funds' frequent telephone contacts and personal visits with Madoff, the Funds also became acquainted with and communicated frequently with Cohmad Securities Corporation. *Id.* ¶ 103.

Over the life of the Funds' relationship with Madoff and BLMIS, the Funds' exclusive investments with BLMIS provided them with consistent returns notwithstanding market volatility. Through detailed monthly, analyses of their BLMIS customer account statements and trade confirmations, the Funds knew those consistent returns were based on impossible and, therefore, non-existent securities trades. *Id.* ¶¶ 144, 170. BLMIS's performance came under intense public scrutiny for the impossible returns Madoff generated through a strategy apparently immune to market fluctuations. *Id.* ¶ 137. In response, the Funds defended what they knew to be impossible by representing to investors that Madoff's success rested on an illegal trading practice known as front-running, an explanation they knew was false because even front-running could not have explained Madoff's consistent returns. *Id.* ¶¶ 138-140.

The Funds are not the victims in BLMIS's fraud they portray themselves to be. That argument rests on the Trustee's net equity calculus as of the filing date. The Funds participated in what they knew to be a fraudulent operation. They invested with BLMIS when Manzke

introduced the opportunity, and during the 14-year relationship with Madoff and BLMIS,

received hundreds of millions of fees on the almost two billion dollars invested with BLMIS,

withdrawing almost a billion dollars before Madoff's arrest.  Compl. Ex. B.

For the reasons discussed below, the Court should deny the Liquidators' Motion.

## STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, made applicable to an adversary proceeding under Fed. R. Bankr. P. 7012, the Court

"must liberally construe all claims, accept all factual allegations in the [C]omplaint as true, and

draw all reasonable inferences" in the Trustee's favor.[7]  To survive a motion to dismiss, the

pleading must contain a "short and plain statement of the claim showing that the pleader is

entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The allegations need only meet the "plausibility"

standard, such that they "nudge[] the[] claims across the line from conceivable to

plausible . . . ."[8]  A claim is facially plausible where the plaintiff pleads "factual content [that]

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."[9]

Complaints alleging fraud must also meet the heightened pleading standard of Rule 9(b),

which permits "[m]alice, intent, knowledge, and other conditions of a person's mind" to be

pleaded generally.[10]  However, "this Court is mindful of the vastness and complexity of the

Trustee's investigation of the Madoff Ponzi scheme, and the disadvantage the Trustee faces in

---

[7] *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011) (citing *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007)).

[8] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

[9] *Iqbal*, 556 U.S. at 663.

[10] *Picard v. Merkin*, 440 B.R. 243, 254 (Bankr. S.D.N.Y. 2010) ("*Merkin I*") (quoting Fed. R. Civ. P. 9(b)).

pleading fraud against multiple defendants."[11]  The Trustee is accorded "greater liberality in the

pleading of fraud" because he is a third party outsider to the fraudulent transactions who must

plead the fraud on secondhand knowledge.[12]

And in such circumstances, to dismiss a complaint *with prejudice*, as the Liquidators ask

the Court to do,[13] the law imposes an even greater burden on a defendant.  For a plaintiff

burdened with pleading fraud under Rule 9(b), leave to amend is "almost always" granted.[14]  The

Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a

complaint under Rule 12(b)(6)."[15]  When a defendant contends it would suffer undue prejudice if

leave to replead were given, the defendant must show that the amended complaint would require

"(i) [the defendant] to expend significant additional resources to conduct discovery and prepare

for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from

---

[11] *Id.* at 254.

[12] *Id.*  (quoting *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999)); *Nisselson v. Drew Indus. Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998) (a bankruptcy trustee may plead scienter based upon information and belief because he rarely has personal knowledge of the events preceding his appointment).

[13] Kingate Global Fund Ltd. and Kingate Euro Fund Ltd.'s Memorandum of Law in Support of Their Motion to Dismiss the Fourth Amended Complaint filed July 18, 2014 (ECF No. 112) ("Moving Br.") at 2, 38.

[14] *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (quoting 2A J. Moore & J. Lucas, *Moore's Federal Practice*, ¶ 9.03 at 9-34 (2d ed. 1986)).

[15] *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'"); *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 746 (Bankr. S.D.N.Y. 2008) ("Generally, leave to amend should be freely granted when justice so requires unless it would be futile.") (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995)); *In re White Metal Rolling and Stamping Corp.*, 222 B.R. at 430-31 (leave to amend is appropriate following Rule 12(b)(6) dismissal even though court considered likelihood of subsequently stating a claim to be very low).

bringing a timely action in another jurisdiction."[16]  The Motion does not satisfy those

standards.[17]

## ARGUMENT

**I.    AS AGENTS OF THE FUNDS, THE ACTS AND KNOWLEDGE OF KINGATE MANAGEMENT, FIM, THE ADMINISTRATORS, AND CERETTI AND GROSSO ARE IMPUTED TO THE FUNDS**

The Liquidators contend that the Funds cannot be liable in the Trustee's Avoidance

Action because the Trustee has alleged no knowledge or conduct directly attributable to the

Funds.[18]  And if the Funds' agents—Kingate Management, FIM, the Administrators, Ceretti, and

Grosso[19] (collectively, the "Agents")—had knowledge of BLMIS's fraud or were willfully blind

to it, the Liquidators assert such knowledge and conduct were outside the scope of the Agents'

duties and thus cannot be imputed to the Funds under principles of agency law.[20]  The

Liquidators further attempt to avoid the consequences of imputation by misapplying the "adverse

interest" exception, which negates imputation if the agent's conduct is entirely adverse to the

---

[16] *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

[17] The Motion is the Liquidators' *first* challenge to the sufficiency of any pleading filed by the Trustee.  Since commencing this proceeding, the Trustee has consented 17 times to the Liquidators' requests to extend their time to respond to the Trustee's pleading and postpone the pretrial conference.  Consequently, the Court has not held a pre-trial conference or entered a pre-trial scheduling order, and the parties have not engaged in discovery.  Contrary to the Liquidators' contention that the Trustee's Avoidance Action has interfered with the Funds' liquidations, Moving Br. at 38, the Trustee has not been involved in those proceedings, which are not even publicly accessible.

[18] Moving Br. at 2-3.

[19] The Liquidators do not dispute that Ceretti and Grosso are agents of Kingate Management and FIM.  Ceretti beneficially owned 50% of Kingate Management through the defendant shell holding companies and a trust, all of which held title to assets for Ceretti's benefit.  Ceretti was also an owner and officer of FIM.  Compl. ¶¶ 54-62.  Grosso beneficially owned the other 50% of Kingate Management through different shell holding companies and a separate trust, also defendants, all of which held title to assets for Grosso's benefit.  Grosso was an owner and officer of FIM.  *Id.* ¶¶ 63-71.  For this Motion, the acts and knowledge of Ceretti and Grosso are imputed to the Funds.

[20] Moving Br. at 25; *see also* Compl. ¶¶ 44-53, 72-78 (describing contractual relationships between the Funds, Kingate Management, FIM, Citi Hedge, BISYS, and Hemisphere); *id.* ¶ 83 (asserting agency relationship among the defendants).

principal.[21]  Not only do the Liquidators' arguments require determinations improper at the

motion to dismiss stage,[22] the Liquidators' arguments against imputation all fail on substantive

grounds.

The Funds operated through their Agents.  Compl. ¶¶ 4-6, 46-47, 83, 106, 110-12, 114-

18. "[T]he acts of agents, and the knowledge they acquire while acting within the scope of their

authority, are presumptively imputed to their principals."[23]  Imputation is permitted "even where

the agent acts less than admirably, exhibits poor business judgment, or commits fraud."[24]  If an

act was performed while the agent was doing his principal's work, that act will be imputed to the

principal, "no matter how irregularly, or with what disregard of instructions," such act was

performed.[25]

Here, the Agents acted in accordance with the Funds' instructions.  *See id*. ¶¶ 4-5, 46-47,

51-52, 73, 76, 78, 106, 110-12, 114, 116-18.  There is no evidence to the contrary.  Imputation of

an agent's knowledge and conduct is defeated only when the agent has "totally abandoned his

---

[21] Moving Br. at 25 (citing *Buckley v. Deloitte & Touche USA LLP*, No. 06 Civ. 3291 (SHS), 2007 WL 1491403, at *6-7 (S.D.N.Y. May 22, 2007) (applying Pennsylvania law); *Bankers Serv., Inc. v. Ernst & Young* (*In re CBI Holdings, Co.*), 529 F.3d 432, 448 (2d Cir. 2008) (applying New York law), *cert. denied*, 556 U.S. 1183 (2009)).

[22] Findings requiring a fact-intensive examination of the Agents' and the Funds' motivations, conduct, dealings, and communications, are improper on a motion to dismiss.  *See Merkin I*, 440 B.R. at 260 (noting that the adverse interest exception to the rules of agency, the "'most narrow of exceptions[,]' involves a fact-intensive inquiry into the subjective motivations of the parties, and thus is inappropriate at the motion to dismiss stage") (citing *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467 (N.Y. 2010); *Mirror Grp. Newspapers v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.)*, 164 B.R. 858, 867 (Bankr. S.D.N.Y. 1994); *Merkin I*, 440 B.R. at 260 (also noting that "[t]he sole-actor exception, which allows the Trustee to defeat the adverse interest exception upon a showing that 'the principal and agent are one and the same,' likewise requires a fact-intensive inquiry inappropriate at [the pleading] stage") (citing *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64, 80 (Bankr. S.D.N.Y. 2008)).

[23] *Kirschner*, 15 N.Y.3d at 465; *Maxwell Newspapers, Inc.*, 164 B.R. at 866 (citation omitted).  The Liquidators' moving brief cites to state law.  The Trustee reserves the right to address the proper choice of law at a later stage in this proceeding.  Because the Trustee's allegations establish imputation of the Agents' acts and knowledge to the Funds, regardless of the choice of law, it is unnecessary to address that issue here.

[24] *Kirschner*, 15 N.Y.3d at 465 (citation omitted).

[25] *Cromer Fin. Ltd. v. Berger*, 245 F. Supp. 2d 552, 560 (S.D.N.Y. 2003) (citation omitted).

8

principal's interests" and acted "entirely for his own or another's purposes."[26]  An agent's acts

and knowledge thus will be imputed to the principal when the principal's interests, although

secondary to the agent's, are nevertheless advanced in some way by the agent's conduct[27] and

when the principal has retained the benefits of the agent's acts.[28]

The Funds achieved their investment objectives through the investment structure

designed by Ceretti and Grosso and implemented by the Agents and the Funds working in unison

for a common business purpose—investment with BLMIS.  Compl. ¶ 7.  Ceretti and Grosso

created the Funds to invest exclusively with BLMIS and its split-strike conversion strategy (the

"SSC strategy").  *Id.* ¶ 2.  They further created Kingate Management solely to "manage" the

Funds, but then subcontracted that duty to FIM, also owned by Ceretti and Grosso.  *Id.* ¶¶ 4, 47,

106, 118.  Under Ceretti's and Grosso's control, and with the Funds' knowledge, Kingate

Management delegated to BLMIS full discretion to invest the Funds' customer accounts.  *Id.* ¶¶

47, 82, 116, 218.

The Liquidators do not, and could not, contend that Kingate Management and FIM did

not have authority, as agents for the Funds, to achieve the Funds' purpose of investing with

BLMIS.  The Liquidators provide no examples concerning how and when Kingate Management

and FIM failed to perform within the scope of their authority.[29]

Similarly, the Administrators contracted with the Funds to perform all day-to-day

administrative functions.  *Id.* ¶¶ 77, 78, 143.  The Administrators were authorized to and did

---

[26] *Merkin I*, 440 B.R. at 260 (citing *Kirschner*, 15 N.Y.3d. at 953); *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784-85 (N.Y. 1985) ("To come within the exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes.  It cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal.").

[27] *Merkin I*, 440 B.R. at 260.

[28] *Maxwell Newspapers, Inc.*, 164 B.R. at 867 (citation omitted).

[29] *See* Moving Br. at 24-25.

prepare and distribute monthly reports to shareholders, process new shareholder subscriptions, maintain the Funds' corporate records, disburse dividends, and pay professional fees and salaries. *Id.* ¶ 143. The Administrators calculated the net asset value of the Funds on a monthly basis, a process that required review of all trade confirmations and account statements issued by BLMIS, and verification of the prices and volumes attributed to the securities purportedly traded by BLMIS. *Id.* ¶¶ 142, 144. They documented their findings in spreadsheets identifying the pricing for the Funds' investments with BLMIS, whether each purported purchase or sale fell within the daily low or high prices for the particular security on that particular day, and the volumes purportedly traded on that day. Compl. ¶¶ 171-73. Each of those tasks and actions fell within the scope of the Administrators' authority and the scope of their duties. Those detailed reviews showed that BLMIS was not making the trades it purported to make; in fact, the reported trades were impossible.

Here, the Agents' conduct enabled the Funds "'to survive—to attract investors and customers and raise funds.'"[30] The Agents marketed consistently positive returns that could not be obtained anywhere but with BLMIS, and were virtually immune to market fluctuations.[31] *Id.* ¶¶ 149, 151. This Court found in *Merkin II* that the Merkin agents had the discretion to invest funds with BLMIS and were acting within the scope of their agency when they did so.[32] *Merkin II* also concluded that the adverse interest exception did not apply because the Merkin funds "benefited from their investments with BLMIS prior to the discovery of Madoff's fraud."[33]

---

[30] *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 149 (Bankr. S.D.N.Y. 2014) ("*Merkin II*") (quoting *Kirschner*, 15 N.Y.3d at 468).

[31] *See also Merkin I*, 440 B.R. at 260 ("That Merkin had abandoned the Funds' interests when he continued to invest with BLMIS is certainly not apparent, as the Funds were receiving the benefit of substantial annual returns that were otherwise unavailable.").

[32] *Merkin II*, 515 B.R. at 148.

[33] *Id.*

Here, too, the Agents acted within the scope of their agency by performing services, as directed

by the Funds, for the Funds' investment with BLMIS. The Agents did not act adversely to the

Funds' interests, and the Funds significantly benefited for over a decade from their relationship

with Madoff through substantial returns on the Funds' assets under management with BLMIS.[34]

*Id*. ¶7.

## II. THE TRUSTEE HAS PLEADED FACTS DEFEATING APPLICATION OF SECTION 546(e) TO THE TRUSTEE'S CAUSES OF ACTION FOR AVOIDANCE OF INITIAL TRANSFERS UNDER SECTIONS 544(b)(1), 547, AND 548(a)(1)(B)

### A. Under the *Actual Knowledge Decision*, Section 546(e)'s Safe Harbor Only Protects the "Reasonable Expectations of Legitimate Investors"

The case law developed by the District Court on the applicability of the section 546(e)

safe harbor to transfers from BLMIS began in *Picard v. Katz*[35] and *Picard v. Greiff*.[36]  *Katz* held

that transfers from BLMIS to its customers were "settlement payments" and, alternatively,

"transfer[s] made in connection with a securities contract" falling within the plain language of

section 546(e)'s safe harbor.[37]  *Greiff* explained that because the "good faith" customers before

the District Court had "every reason to believe that Madoff Securities was *actually engaged in*

*the business of effecting securities transactions*, [they] have every right to avail themselves of all

the protections afforded the customers of stockbrokers, including the protection offered by

[section] 546(e)."[38]

---

[34] *Id.*; *see also Kirschner*, 15 N.Y.3d at 468; *Cromer Fin. Ltd.*, 245 F. Supp. 2d at 560; *Maxwell Newspapers, Inc.*, 164 B.R. at 866.

[35] 462 B.R. 447 (S.D.N.Y. 2011).

[36] 476 B.R. 715 (S.D.N.Y. 2012).

[37] 462 B.R. at 452-53.

[38] 476 B.R. at 719-20 (emphasis added); *see also id.* at 722  ("Nothing in the express language of [section] 546(e) suggests that it is not designed to protect the *legitimate expectations of customers*, as well as the securities market in general, even when the stockbroker is engaged in fraud." (emphasis added)).

In the *Actual Knowledge Decision*, however, the District Court created an exception to its rulings in *Katz*[39] and *Greiff*. Finding the safe harbor aims to protect the securities markets and "the reasonable expectations of legitimate participants in these markets," the Court held the safe harbor does not apply when the customer possessed knowledge defeating any reasonable expectation that BLMIS was engaged in legitimate securities trading on its behalf.[40] In the District Court's view, the applicability of the safe harbor turns on the customer's knowledge of BLMIS's legitimate trading activity and the customer's expectations in its dealings with BLMIS.

Section 546(e) protects from avoidance payments "made by a stockbroker in connection with a securities contract" and, alternatively, "settlement payments" within the meaning of section 546(e).[41] The District Court reasoned that "[i]n the context of Madoff Securities' fraud, [section 546(e)'s] goal is best achieved by protecting the reasonable expectations of investors who believed they were signing a securities contract."[42] When a customer had no reasonable expectation that the agreements it entered with BLMIS were legitimate—for example, when the customer knew that BLMIS was engaged in fraud-- the safe harbor does not apply. Similarly, a transferee with "actual knowledge that there were no actual securities transactions being conducted," therefore, "must have known that the transfers [it] received directly or indirectly from Madoff Securities were not 'settlement payments.'"[43]

The *Actual Knowledge Decision*, following the reasoning of *Katz* and *Greiff*, provides exemplars of allegations that may be pleaded to defeat the safe harbor defense. The *Actual*

---

[39] Even in *Katz*, however, the District Court recognized the willful blindness standard may apply where fraud is concerned. *See Katz*, 462 B.R. at 454 (recognizing "if the defendants willfully blinded themselves to the fact that Madoff Securities was involved in *some kind of fraud*, this too might, depending on the facts, constitute a lack of good faith." (emphasis added)).

[40] *Actual Knowledge Decision*, 2013 WL 1609154, at *4.

[41] *Id.* at *2-3.

[42] *Id.* at *4 (citing *Katz*, 462 B.R. at 452).

[43] *Id.* at *3.

*Knowledge Decision* does not hold that the Trustee must plead actual knowledge of the Ponzi

scheme itself to avoid the application of section 546(e).  Instead, the District Court expressly

stated it is sufficient for the Trustee to show a transferee had "actual knowledge" of:

- "the Madoff 'Ponzi' scheme";[44]

- "Madoff Securities' fraud";[45]

- "Madoff's scheme";[46]

- "[the fraud's] workings (and thereby effectively participat[ing] in it by taking advantage of its workings)";[47] **or**

- "no actual securities transactions being conducted."[48]

The District Court's opinions are clear that only legitimate investors who reasonably expected

BLMIS was engaged in legitimate activity may avail themselves of the safe harbor to protect

their transfers from avoidance under section 546(e),[49] and a prima facie showing of knowledge

of any of the foregoing satisfies the test.  The Funds, at a minimum, knew the activity on their

customer statements and trade confirmations could not be the result of legitimate securities

trading by BLMIS, and the safe harbor under section 546(e), therefore, does not insulate the

$926 million in transfers to the Funds from avoidance by the Trustee.

Merkin II does not and should not undermine the sufficiency of the Complaint.  This

Court in *Merkin II* applied a strict definition of "actual knowledge,"[50] and, citing to the District

---

[44] *Id.* at *4.

[45] *Id.* at *7.

[46] *Id.* at *4.

[47] *Id.*

[48] *Id.*

[49] *Id.* ("Neither law nor equity permits [a transferee with such knowledge] to profit from a safe harbor intended to promote the legitimate workings of the securities markets and the reasonable expectations of legitimate investors.").

[50] In *Merkin II*, the Court found the Trustee must plead facts showing that a transferee knew with "a high level of certainty and absence of any substantial doubt" of the existence "of Madoff's Ponzi scheme." 515 B.R. at 139.

Court's decision in *Cohmad*, recognized "the outcome of a motion to dismiss . . . will depend on the factual allegations in the complaint.[51] The Trustee did not allege "actual knowledge" in the *Cohmad* proceeding; the Court properly inferred it from the totality of the Trustee's allegations and from the facts concerning Cohmad Securities Corporation's business.[52]

Contrary to the Liquidators' argument,[53] the facts here need not be identical or even substantially similar to the facts alleged in *Cohmad* to survive dismissal. The Trustee's allegations against the Funds in this Avoidance Action must stand on their own, as they must in each of the Trustee's avoidance actions. The District Court concluded that the Trustee's pleading in *Cohmad* satisfied the standard required by the *Actual Knowledge Decision*. The District Court set forth a general framework of principles for applying section 546(e), and left it to this Court to apply those principles to the specific allegations of each of the Trustee's complaints.[54]

Guided by the District Court's application of the actual knowledge standard in *Cohmad*, the only plausible inference from the facts alleged in the Complaint is the Funds had actual knowledge of fraud at BLMIS and aided that fraud by protecting Madoff from cash withdrawals; using subscription receipts to pay redemptions; preventing due diligence on Madoff and BLMIS knowing the SSC strategy was not the source of the performance reflected on the Funds' customer statements; and knowingly marketing that bogus strategy to investors. Compl. ¶¶ 98, 120-21, 128-141, 147-182, 186-198.

---

[51] *Id.* at 146.

[52] *Id.* at 145-46.

[53] Moving Br. at 22-23.

[54] *See Actual Knowledge Decision*, 2013 WL 1609154, at *8, *9 n.6.

Even under the most restrictive reading of the *Actual Knowledge Decision*, at this stage of the proceeding, the Trustee has sufficiently pleaded facts showing the Funds knew of BLMIS's fraud and participated in it. *Id.* ¶¶ 137-241. The Funds lacked any legitimate expectation of securities transactions and should not be protected by the safe harbor. This Court need not, and should not, extend the safe harbor protection to such *illegitimate* investors.

### B.    Proving Actual Knowledge is Akin to Proving "Scienter"

The *Actual Knowledge Decision* suggests a definition of "actual knowledge" when that standard applies.[55] The District Court analogized the meaning of the "actual knowledge" standard it adopted to the standard for actual knowledge as applied in *Rosner v. Bank of China*,[56] to determine liability for aiding and abetting fraud.[57] In *Rosner*, the district court found that aiding and abetting liability expressly requires a defendant to "'have *actual* knowledge of the primary wrong.'"[58] *Rosner* and the cases on which it relies require examination of the totality[59] of the plaintiff's allegations and whether they establish "a strong inference of fraudulent intent,'" *i.e.*, the alleged facts either show that the defendant "'had both motive and opportunity to commit

---

[55] The "actual knowledge" standard does not apply here, because the Funds were not "mere investor[s]" with BLMIS, but "owed a separate duty of care in selecting their outside money-managers and their investments." *Merkin II*, 515 B.R. at 145. Under the *Actual Knowledge Decision*, the District Court explained that "willful blindness" is sufficient to substitute for "actual knowledge" when a customer has a "duty to inquire into its broker's *bona fides.*" *See Actual Knowledge Decision*, 2013 WL 1609154, at *10 n.2.

[56] No. 06 Civ. 13562 (VM), 2008 WL 5416380, at *7 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009).

[57] *Actual Knowledge Decision*, 2013 WL 1609154, at *10 n.2.

[58] 2008 WL 5416380, at *4 (quoting *Renner v. Chase Manhattan Bank, N.A.*, 85 F. App'x. 782, 784 (2d Cir. 2004)) (emphasis in original); *see also Actual Knowledge Decision*, 2013 WL 1609154, at *10 n.2 ("Indeed, even in situations where the claim is that the recipients of fraudulent and preferential transfers aided and abetted a securities fraud, 'the overwhelming weight of authority holds that actual knowledge is required, rather than a lower standard such as recklessness or willful blindness.'" (quoting *Rosner*, 2008 WL 5416380, at *7)).

[59] *See, e.g., Tese-Milner v. Edidin & Assocs.* (*In re Operations NY LLC*), 490 B.R. 84, 92 (Bankr. S.D.N.Y. 2013).

fraud'" or constitute "'strong circumstantial evidence of conscious misbehavior or recklessness.'"[60]

*Rosner* also provides guidance on the pleading standard, requiring a plaintiff to show "specific facts that give rise to a strong inference of actual knowledge regarding the underlying fraud."[61]  In the *Actual Knowledge Decision*, the District Court described the Trustee's pleading burden under section 546(e) using substantially similar phrasing.[62]  Consistent with the *Actual Knowledge Decision*, therefore, this Court may also rely upon *Rosner* and consider precedents applying the test for scienter when examining whether the Complaint states a prima facie case of the Funds' actual knowledge of BLMIS's fraud.

*O'Connell v. Penson Financial Services, Inc.* (*In re Arbco Capital Management, LLP*) ("*Arbco*"),[63] the only decision from this district (other than *Merkin II*) to consider the *Actual Knowledge Decision*, supports the Trustee's view.  In *Arbco*, Judge Chapman observed that under the *Actual Knowledge Decision*, "[t]ransferees who participated in a fraud, and those with actual knowledge of a fraud—who 'therefore actively participated in [the fraud] by taking advantage of its workings'—stand in a different posture from innocent transferees and are not entitled to invoke the protections of the Safe Harbor Rule."[64]  *Arbco* held that "allegations of 'willful blindness,' in the alleged circumstances, are sufficient to survive the Motion to Dismiss

---

[60] *Id.* at 93-94 (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994), *superseded by statute on other grounds*, Private Securities Litigation Reform Act, Pub. L. No. 104-67, 109 Stat. 737; *see also Rosner*, 2008 WL 5416380, at *4 (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006); *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995)).

[61] *Rosner*, 2008 WL 5416380, at *5 (internal citations and quotation marks omitted).

[62] *Actual Knowledge Decision*, 2013 WL 1609154, at *4.  One who aids and abets a fraud effectively participates in it, and, as discussed below, the District Court recognized that one who "had actual knowledge of [the fraud's] workings (and thereby effectively participated in it by taking advantage of its workings)" would not be protected by section 546(e).  *Id.*

[63] 498 B.R. 32 (Bankr. S.D.N.Y. 2013).

[64] *Id.* at 43 (citing *Actual Knowledge Decision*, 2013 WL 1609154, at *3-4).

16

and may be sufficient, if proven, to constitute actual knowledge."[65]  Judge Chapman understood

the *Actual Knowledge Decision* to prohibit a defendant from taking advantage of section 546(e)'s

safe harbor defense if the Trustee alleges the defendant actually knew of a fraud as opposed to

alleging actual knowledge of a Ponzi scheme.  Applying those principles here compels denial of

the Motion.

### C.    The Funds' Conduct Reveals Their Knowledge of BLMIS's Fraud

The totality of the allegations regarding the Funds' relationship with Madoff and BLMIS

demonstrates that throughout the Funds' existence, they operated with no reasonable expectation

that BLMIS conducted legitimate securities transactions for the Funds' accounts.  The

Liquidators attempt to dismiss the Complaint's red flag allegations of fraud as "hindsight

conclusions"[66] gained by the Trustee from "comparisons of BLMIS's trading activity with

historical market activity."[67]  According to the Liquidators, the Trustee has not alleged facts

"showing that BLMIS's trades were contemporaneously indicative of fraud."[68]  The Liquidators

are wrong.  The Complaint is replete with particularized allegations demonstrating the Funds

possessed—in real time, and usually on a monthly basis—information reflecting impossible

trading activity and other indications of BLMIS's fraud, including but not limited to the

following allegations:

   1.    *Real-Time Access to Madoff and BLMIS*

- •    Grosso met with Madoff in New York or London at least two times a year.
       Compl. ¶ 99.  During those meetings, and the frequent telephone
       conversations that occurred in between, Grosso and Madoff discussed
       various matters, including the performance of BLMIS and the Funds.  *Id.*

---

[65] *Id.* at 44.

[66] Moving Br. at 15.

[67] *Id.* at 8.

[68] *Id.* at 16.

- In 2001, at Madoff's invitation, Grosso met with Madoff and Frank DiPascali (a former BLMIS employee) at BLMIS's office. *Id.* ¶ 100.[69]

- From 2004 to 2008, Ceretti, Grosso, and/or FIM employees participated in no fewer than 286 telephone calls to BLMIS. Compl. ¶ 101.

- Grosso was in close contact with Madoff until the last days before Madoff confessed, speaking with Madoff at length on December 2, 2008.[70] *Id.* ¶ 101.

- Ceretti's and Grosso's relationship with Madoff also included various social engagements, such as dinners in London accompanied by their spouses. *Id.* ¶ 102.

- Between 2005 and 2008, Grosso exchanged 225 phone calls with Jonathan Greenberg of Cohmad Securities Corp., an entity co-owned by Madoff that referred investors to BLMIS. *Id.* ¶ 103.

- In January 2005, Ceretti communicated with Andrés Piedrahita of Fairfield Sentry Limited, a separate BLMIS feeder fund, concerning Credit Suisse's counseling its clients away from Madoff feeder funds because of risk concerns. *Id.* ¶ 103.

2.    *Real-Time Review and Understanding of Purported Trading Activity That Evidenced BLMIS's Fraud*

The Funds and their Agents:

- Tracked the performance of the Funds against the S&P 500 Index, which is highly correlated to the performance of the S&P 100 Index. *Id.* ¶¶ 148, 153.

- Prepared, distributed and marketed solicitation materials that knowingly reflected the lack of correlation between the SSC strategy and the S&P

---

[69] The meeting included time spent on the 17th floor. Compl. ¶ 100. The 17th floor, which housed BLMIS's investment advisory "business," was off limits to all but a few BLMIS employees, select third parties, including Grosso, and Madoff family members. *Id.* The computers on the 17th floor were antiquated IBM AS 400 computers not connected to the internet or even BLMIS's internal network. *Id.* Yet a handful of employees were purportedly executing billions of dollars of trades on a monthly, and sometimes daily, basis with such technology. *Id.* Grosso saw in 2001 that Madoff's investment advisory business operated from this space. *Id.* Given Grosso's sophistication and experience in the investment management industry, it is reasonable for the Court to plausibly infer that BLMIS's entire trading operation looked "wrong" and incapable of executing a multi-billion dollar global investment strategy.

[70] It is only with discovery there would be any hope of knowing exactly what was said during Grosso's last phone call with Madoff. No formal discovery has occurred in this proceeding. The "voluminous discovery" to which the Liquidators refer, Moving Br. at 7, consists of a document production made by FIM under a contested disclosure order issued in the United Kingdom in May 2010, and limited documents shared in settlement discussions.

500 Index (even though the Funds marketed such a correlation to investors).  *Id.* ¶¶ 147, 153.

- Analyzed monthly the Funds' portfolios, reviewing all trade confirmations and customer account statements.[71]  *Id.* ¶ 170.

- Verified monthly the buy and sell pricing of equities on BLMIS customer account statements and trade confirmations against the publicly reported pricing.  *Id.* ¶¶ 170, 172.

- Verified monthly the buy and sell pricing of S&P 100 Index put and call options ("OEX options") reported on BLMIS customer account statements against the same such options actually traded on the Chicago Board Options Exchange ("CBOE").  *Id.* ¶¶ 155, 162.

- Promoted to shareholders the fiction that BLMIS traded options with counterparties over-the-counter, knowing that their customer statements showed only OEX options traded on the CBOE.  *Id.* ¶¶ 155, 214.

- Analyzed monthly the buy and sell pricing for OEX options on the Funds' account statements and trade confirmations against the publicly reported pricing.  *Id.* ¶¶ 162, 170.

- Prepared monthly Excel spreadsheets detailing the trading activity for the Funds' customer accounts, identifying equities, options, Treasury Bills, and dividends.  *Id.* ¶ 171.

- Identified thousands of out-of-range trades for equities and options on the Funds' monthly customer statements (*i.e.*, they saw trades at imaginary prices that literally never existed).  *Id.* ¶ 177.

- Reviewed and recorded thousands of purchases of equities priced at or near the daily low price for such equities through monthly analysis of customer statements and trade confirmations.  *Id.* ¶ 178.

- Reviewed and recorded thousands of sales of equities priced at or near the daily high price for such equities through monthly analysis of customer statements and trade confirmations.  *Id.*

- Reviewed no less than 1,162 options trades reported on their customer statements that exceeded the entire volume of such options actually traded on the CBOE.  *Id.* ¶¶ 155-162.

---

[71] The Funds mischaracterize this allegation by claiming the Trustee relies on information discovered in 2010. Moving Br. at 8, 16.  The allegation is based on information provided in an April 2010 declaration of Grosso describing how FIM conducted, on a monthly basis, extensive, real-time analysis of the Funds' portfolios and trading activity *for the duration of their investment with BLMIS*.  Compl. ¶ 170.

- Between 2006 and 2008, reviewed and verified at least five separate transactions where BLMIS traded over 50% of the shares for a particular equity on the S&P 100 Index.  *Id.* ¶ 168.

- Knew that BLMIS departed from the SSC strategy by investing in Treasury Bills at every quarter-end and year-end.  *Id.* ¶¶ 184-85.

- Reviewed and verified monthly no fewer than 126 purely speculative options trades that were inconsistent with options trading under the SSC strategy.  *Id.* ¶ 186.

- Reviewed and verified monthly hundreds of transactions that settled outside of industry norms.  *Id.* ¶¶ 191-92.

- Reviewed and verified, from December 1995 to November 2008, 442 occasions on which dividends were paid to the Funds inconsistent with industry norms.  *Id.* ¶¶ 195-96.

- Reviewed and verified, from 1998 to 2008, account statements that on no less than 220 occasions showed margin trading when the Funds did not maintain a margin account.  *Id.* ¶ 200.

- Identified a lack of internal controls, lack of independent oversight, compromised independence of the investment advisor, and below standard corporation governance.  *Id.* ¶ 220.

In their totality, the Trustee's allegations show the Funds' real-time access to Madoff and BLMIS and the Funds' knowledge and understanding of BLMIS's fraud.

In May 2001, a *MAR/Hedge* newsletter article titled "Madoff Tops Charts; Skeptics Ask How" stated that experts were bewildered by Madoff's unsurpassed ability to achieve consistent returns.  *Id.* ¶ 137.  The article stated that "others who use or used the strategy are known to have had nowhere near the same degree of success."  *Id.*  Anticipating investor reaction to the article's skepticism about BLMIS's unprecedented investment performance, Grosso drafted a "question and answer" document, labeled "INTERNAL NOTE – NOT FOR DISTRIBUTION."  *Id.* ¶ 138. Grosso predicted shareholders would have questions about the multiple, serious "red flags" of fraud at BLMIS:

(i)     "How can there be such a relative complete lack of volatility in reported monthly returns?"  *Id.*

(ii)    "How can Madoff have the ability to time the market and to turn to cash before market conditions become negative?"  *Id.*

(iii)   "How can Madoff have the ability to buy and sell stocks without noticeably affecting the market?"  *Id.*

(iv)    "Why has no-one been able to duplicate similar results?"  *Id.*

(v)     "How come other Wall Street firms have not become aware of the strategy and traded against it?"  *Id.* ¶ 138.

(vi)    "Why is Madoff willing to earn commissions on trades, but not set up a separate asset management division to offer hedge funds directly to investors?"  *Id.*

(vii)   "Why doesn't Madoff borrow money and manage funds on a proprietary basis?"  *Id.*

The scripted response prepared by Grosso states: "'Madoff benefits from unique market intelligence derived from the massive amount of order flow it handles daily . . . being such a large market maker (Madoff currently accounts for about 15% of all equity transactions in the United States), he sees the flows.'"  *Id.* ¶¶ 138-39.  Grosso was admitting the source of Madoff's performance was not a legitimate trading strategy, but instead the by-product of illegal activity. But even that "explanation" to shareholders was a pretext for Madoff's performance.  The Funds knew all along that front-running could not have produced BLMIS's impossible trading results.[72]

The Funds knew from monthly reports, which relied on data taken from the Funds' customer statements and trade confirmations, that front-running could not explain the consistently positive returns BLMIS was generating.  Although front-running provides

---

[72] Front-running occurs when a stockbroker trades ahead of its customers, seeking to profit from the price differential the execution of its customers' orders would ostensibly generate.  *In re State St. Bank and Trust Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614, 640 n.18 (S.D.N.Y. 2012).  That practice is illegal and inconsistent with an index-based, collared strategy such as the SSC strategy, which would have tracked the performance of the S&P 100 Index within the boundaries imposed by the call-and-put collar.  *In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 180 (S.D.N.Y. 2004).

advantages for market timing, it could not render a collared equities trading strategy immune

from market volatility and shocks, such as the 9/11 attacks, the "pop" in the technology bubble,

and the 2007-08 financial crash.  The Funds knew this, but they continued to tell investors that

BLMIS was immune to such volatility, producing positive returns when the equities market and

the S&P 100 Index were suffering dramatic losses.  Knowing the securities transactions reported

on their account statements were non-existent (in the case of the options trades, they were

impossible), the Funds knew BLMIS was fraudulently reporting non-existent trades and had no

expectation of legitimate trading for their respective accounts.  The only thing the Funds

expected was consistent returns, regardless of how they were obtained.  The Funds chose to

invest with and participate in BLMIS's fraudulent activity—"simply obtaining moneys while

[they] could." [73]  The Funds, therefore, were not "legitimate investors"[74] entitled to the section

546(e) safe harbor.  Far from mere "speculat[ion],"[75] the Trustee's allegations demonstrate the

Funds' actual knowledge of BLMIS's fraud and are sufficient, at the pleading stage, to defeat the

Liquidators' Motion and entitle the Trustee to commence and obtain discovery in this

proceeding.

> ### D.    The Court Should Reject the Liquidators' Attempt to Turn a Rule 12(b)(6) Motion Into a Fact-Finding Exercise

The Liquidators ask the Court, on the face of the Complaint, to reach two primary factual

conclusions:  (1) if awareness of "red flags" were sufficient to establish "actual knowledge," a

"legion" of others would be deemed to know of Madoff's fraud; and (2) if the Funds knew of

---

[73] *Actual Knowledge Deci*sion, 2013 WL 1609154, at *4.

[74] *See id.* (defendants with actual knowledge of Madoff's scheme do not have the reasonable expectations of legitimate investors, and neither law nor equity allows such persons to benefit from the 546(e) safe harbor).

[75] *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)(on a Rule 12(b)(6) motion, allegations must go beyond mere speculation) (quoting *Twombly*, 550 U.S. at 570).

BLMIS's fraud, they would not be net equity "losers."[76] These "conclusions" are, at their core, questions of material fact improperly decided on a motion to dismiss. Fact-specific questions cannot be resolved on the pleadings.[77] The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. The Trustee's allegations present strong, plausible inferences that the Funds knew of fraud at BLMIS. It would be improper for the Court to weigh the Liquidators' inferences in the context of this Motion, which is a function for the ultimate fact-finder based on a full evidentiary record.[78]

The question before the Court is not how many others knew BLMIS was a fraud; the question is whether *the Funds* knew. The Liquidators contend it is implausible the Funds knew of the fraud, because they did not withdraw all of their principal and remained investors "right through the very end."[79] The Liquidators also argue the Funds "had to get out early" to profit from the Ponzi scheme.[80] The Funds' failure to withdraw all of their principal does not mean the Funds did not profit from Madoff's scheme. Nor does their eventual net-loser status equate to the Funds' good faith. The Funds may be "net losers" for purposes of the net equity calculation,[81] but that only describes the status of the Funds' customer accounts on the filing date. The Liquidators' net loser argument ignores the benefits the Funds received during their 14-year relationship with Madoff and BLMIS. Compl. ¶¶ 7, 8, 82. In that time, the Funds

---

[76] Moving Br. at 3.

[77] *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012), *cert denied*, 133 S. Ct. 846 (2013).

[78] *Anderson News, L.L.C.*, 680 F.3d at 184 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 766 n.11 (1984)); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) ("It is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder.") (citing *Monsanto Co.*, 465 U.S. at 766 n.11)).

[79] Moving Br. at 3.

[80] *Id.*

[81] *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233-34, 238-39 (2d Cir. 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *cert. denied*, 133 S. Ct. 24 (2012), *cert. denied*, 133 S. Ct. 25 (2012).

enjoyed 14 years of positive returns, from which they paid billions of dollars to investors. The

Funds also paid Kingate Management more than $370 million in management fees, and Kingate

Management transferred at least $147 million of that sum to accounts for the benefit of Ceretti,

and at least $149 million to accounts for the benefit of Grosso. And in the five months prior to

the Ponzi scheme's collapse, the Funds improved their position by withdrawing $395 million

from BLMIS. These were ample reasons for the Funds to continue to invest with BLMIS until

the very end.

## III.    THE COMPLAINT ALLEGES A PRIMA FACIE CASE FOR AVOIDANCE UNDER SECTION 548(a)(1)(A) AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS FROM THE FUNDS

Relying on *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff

Sec.*),[82] the Liquidators seek dismissal of the Trustee's section 548(a)(1)(A) avoidance claim.

The Liquidators argue the Complaint fails to satisfy the Trustee's burden under the *Good Faith

Decision* to plead "particularized facts" showing the Funds "willfully blinded themselves to

Madoff's fraud."[83] The District Court has defined willful blindness as awareness of

circumstances indicating a high probability of fraud.[84] According to the District Court, that

burden is satisfied by alleging a "modest [factual] basis" showing that "a transferee took a

transfer without good faith."[85]

In *Merkin II*, this Court found that the Trustee's allegations of numerous "red flags"—

which Merkin "saw . . . understood . . . and purposely ignored"—established Merkin's willful

---

[82] No. 12-MC-115 (JSR), 2014 WL 1651952 (S.D.N.Y. April 27, 2014) ("*Good Faith Decision*").

[83] Moving Br. at 27. The Liquidators do not argue the Complaint fails to plead facts establishing the elements set forth in section 548(a)(1)(A), but address only the Trustee's pleading burden under section 548(c). No more is required for the Trustee to state a prima facie claim for avoidance of actual fraudulent transfers. The Trustee reserves all of his rights as to the Liquidators' future arguments on this issue.

[84] *Good Faith Decision*, 2014 WL 1651952, at *2 (citing *Katz*, 462 B.R. at 455).

[85] *Id.* at *6.

blindness to BLMIS's fraud.[86]  The Trustee has alleged here that the Funds, in real time, saw, understood, and purposely ignored significant evidence of fraud.  For example, the Funds knew and ignored: (i) BLMIS's impossibly consistent positive returns; (ii) the impossible volumes of options purportedly traded; (iii) BLMIS's impossible timing of trades; (iv) the hundreds of option and equity trades purportedly conducted at prices outside of the daily reported range; (v) statistically impossible market timing; (vi) lack of scalability to execute the SSC strategy; and (vii) purchases of non-existent securities.   Compl. ¶¶ 137-182, 186-198, 206-210.  Those are not mere suggestions of fraud.  Those are quantitative impossibilities, from which the only reasonable conclusion is that fraud was occurring.

Added to the quantitative evidence of fraud are numerous qualities of the BLMIS operation that together overwhelmingly demonstrate the existence of fraud.  These include: (i) BLMIS's reported trading activity contravened the SSC strategy, including exiting the market on a quarterly basis to avoid SEC reporting requirements and engaging in high-risk speculative options trades (to produce returns that could not be confirmed through review of actual options trading activity); (ii) the receipt of dividend payments on dates and in frequencies completely inconsistent with industry practice; (iii) unauthorized margin trades (when the Funds had no margin accounts with BLMIS); (iv) an investment advisory fee structure that made no sense; (v) Madoff's refusal to identify counterparties for the over-the-counter options contracts purportedly entered into by BLMIS; (vi) BLMIS's lack of oversight and internal control given its role as both prime broker and custodian of customers' assets; (vii) industry skepticism of BLMIS's success; and (viii) the use of an incapable, strip mall auditor.  *Id.* ¶¶ 183-190, 194-98, 199-205, 211-227, 234-241.

---

[86] *Merkin II*, 515 B.R. at 144.

Despite the quantitative and qualitative evidence of fraud, the Funds did not have FIM

conduct any meaningful due diligence, *id*. ¶¶ 122-134, as is evident from the following

statements of Eric Lazear, head of FIM's Operational Due Diligence:

- In a December 12, 2008 email, Lazear stated that he believed BLMIS was a "scam" and that he had emailed Grosso "all the details" to support his beliefs *before* Madoff confessed. He recounted specifically telling Grosso that if Grosso did not own FIM and the Funds, Lazear would have vetoed any investment with BLMIS. Compl. ¶ 134.

- In an email from Lazear to Grosso dated January 7, 2009: "I know we have to do what is right for FIM, but we need to be cognizant of how this portrays our (FIM) process. [Kingate] is not a fund that went through our normal diligence process and I think it should not be depicted as if it had. We all worked hard to build our process to be the best in the industry, which I think it is, and I do not want it to get out there that one slipped past us when it did not." *Id.* ¶ 133.

This non-exhaustive list of evidence of fraud, coupled with the lack of due diligence on Madoff

or BLMIS and the Trustee's additional allegations establishing the Funds' actual knowledge,

presents far more than the "modest [factual] basis" that the District Court requires to plead

willful blindness.[87]

---

[87] *Good Faith Decision*, at *6; *see Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 110 n.16 (2d Cir. 2010) ("The principle that willful blindness is tantamount to knowledge is hardly novel."); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (willful blindness, unlike constructive knowledge, carries with it the requisite state of mind for culpability); *Arbco*, 498 B.R. at 44 ("Applying . . . 'conscious avoidance' analysis in *Fraternity Fund* here compels the conclusion the [defendant] should not be permitted to hide behind its own knowing and purposeful lack of action."). The Liquidators contend that *In re Tremont Sec. Law, State Law, and Insurance Litig.*, 703 F. Supp. 2d 362 (S.D.N.Y. 2010), supports their argument that the Trustee has failed to plead willful blindness. Moving Br. at 28 n.12. *In re Tremont* involved a suit brought by investors in certain BLMIS feeder funds against the funds' auditors (and others) alleging violation of federal securities laws. The district court accordingly applied the "demanding" standard for pleading auditor scienter, which requires a plaintiff to plead that the auditor's audit "amounted to no audit at all" or that "no reasonable accountant would have made the same decisions [as the auditor] if confronted with the same facts." *In re Tremont*, 703 F. Supp. 2d at 370. The investor-plaintiffs did not meet those standards because they failed to allege facts showing that the auditor was actually aware of (rather than only had access to) information indicating fraud. *Id.* at 371. Here, the Trustee has not sued the Funds' auditors, and has alleged particular facts showing the Funds' real-time knowledge of quantitative and qualitative evidence of fraud.

## IV. THE COMPLAINT STATES A CLAIM FOR EQUITABLE SUBORDINATION AND DISALLOWANCE OF THE FUNDS' CLAIMS AGAINST THE CONSOLIDATED ESTATE

### A. The Allegations of the Funds' Inequitable Conduct That Harmed All Creditors Are Sufficient to State a Claim for Equitable Subordination

The Liquidators erroneously contend that the Eleventh Count of the Complaint fails to state a claim for equitable subordination of their claims under section 510(c), because the Trustee has failed to allege: (i) inequitable conduct[88] by the Funds; (ii) the Funds' misconduct injured BLMIS's creditors; and (iii) equitable subordination is consistent with bankruptcy law.[89] Section 510(c) of the Bankruptcy Code permits the Court "under principles of equitable subordination, [to] subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."[90]

Although the District Court in *Picard v. Katz* held the Trustee had sufficiently pleaded an equitable subordination claim by alleging the claimant invested with BLMIS knowing, or in reckless disregard, of its fraud,[91] the Liquidators contend the Trustee must allege more than the Funds' willful blindness to BLMIS's fraud for the Eleventh Count to survive dismissal.[92] In *Merkin II*, this Court recognized that equitably subordinating a non-insider's claim is appropriate

---

[88] Inequitable conduct, even when lawful, is "contrary to equity and good conscience." *Merkin II*, 515 B.R. at 158 (citing *Katz*, 462 B.R. at 456).

[89] Moving Br. at 29-31 (citing *In re Blockbuster Inc.*, Adv. Pro. No. 10-5524, 2011 WL 1042767, at *3-4 (Bankr. S.D.N.Y. Mar. 17, 2011) (requiring that these three conditions must be shown by a preponderance of the evidence to equitably subordinate an insider claim (citing *In re Mobile Steel Co.*, 563 F.2d 692, 701, 717-18 (5th Cir. 1977) ("*Mobile Steel Co.*")); *see also 80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (the claimant's misconduct must have caused injury to creditors or "conferred an unfair advantage on the claimant") (quoting *Mobile Steel Co.*, 563 F.2d at 700)).

[90] 11 U.S.C. § 510(c).

[91] *Katz*, 462 B.R. at 456 (Rule 12(b)(6) motion to dismiss equitable subordination claim denied "[b]ecause the Amended Complaint adequately alleges that the defendants did not receive fraudulent transfers in good faith, it also alleges that they engaged in inequitable conduct . . . injur[ing] any investors who invested in Madoff Securities based on the impressive returns others appeared to receive").

[92] Moving Br. at 31 ("Trustee's equitable subordination claim cannot be saved by his reliance on the same factual assertions underlying his fraudulent conveyance claims. . . .").

upon a showing of "gross and egregious" conduct "tantamount to fraud, misrepresentation, overreaching or spoliation."[93]  Because the customer defendants in *Merkin II* received transfers in bad faith, this Court found the Trustee had sufficiently pleaded the customers' inequitable conduct necessary to overcome dismissal.[94]

The Funds first argue the Complaint fails to show the Funds acted inequitably.[95] However, in numerous, particularized allegations the Complaint shows the Funds' acted in bad faith, their inequitable conduct was gross and egregious, and caused harm to the customer property estate as a whole.[96]  For example, the Complaint alleges:

- In May 2000, the Funds actively sought to contain the concerns of a potential investor about BLMIS's questionable conflict of interest in serving as both broker and manager, by Ceretti ordering employees to "keep them away from now on and let me know if they contact you again."  Compl. ¶ 219.

- Following the May 2001 publication of the *MAR/Hedge* article, and anticipating the Funds' customers would question BLMIS's legitimacy, Grosso prepared for FIM employees scripted answers to potential questions from investors to appease their concerns.  Grosso's script identified the "red flags" of fraud at BLMIS  and attempted to explain the impossible by suggesting BLMIS was engaging in front-running.  Grosso's script shows his sophisticated knowledge of the industry, he knew there were warnings of fraud at BLMIS obvious to the public, and the Funds' willingness to invest in what Grosso knew to be an illegal investment strategy.  *Id.* ¶¶ 138-141.

- The Funds maintained their accounts with BLMIS even after FIM's head of operational due diligence emailed Grosso, sharing the belief that BLMIS was a

---

[93] 515 B.R. at 159 (citing *80 Nassau Assocs.,* 169 B.R. at 838-39) (internal quotation marks omitted); *accord Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S & B Holdings LLC* ), 420 B.R. 112, 155-57 (Bankr. S.D.N.Y. 2009), *aff'd as modified by* 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.* (*In re Sunbeam Corp.*), 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002), *appeal dismissed*, 287 B.R. 861 (S.D.N.Y. 2013); *Vargas Realty Enters., Inc. v. CFA W. 111 St., L.L.C.* (*In re Vargas Realty Enters., Inc.*), 440 B.R. 224, 240-41 (S.D.N.Y.2010)).

[94] *Merkin II*, 515 B.R. at 158-59.

[95] Moving Br. at 29-31.

[96] *See generally*, Compl.

scam operation, *id*. ¶ 134,[97] thereby perpetuating BLMIS's fraud and enabling the Funds to continue to benefit from it.

- Knowing, or, at a minimum, willfully blind to, BLMIS's fraud, the Funds sold billions of dollars in subscriptions knowing no rigorous due diligence had been conducted on Madoff or BLMIS, and that BLMIS had no independent custodian to hold and assure proper segregation of assets, or even to verify the existence of assets, transactions, and their value. *Id*. ¶¶ 128, 129, 218.

- For more than a decade, the Funds received customer account statements from BLMIS that revealed numerous trading impossibilities, including options transactions in fictional volumes and prices that routinely settled later than common practice in the industry, and securities bought and sold at non-existent prices. *Id*. ¶¶ 191-98.

- Beginning in 1994, the Funds deposited approximately $1.7 billion with BLMIS, which enabled BLMIS to perpetuate its fraud for years while serving as a buffer between BLMIS and investors. *Id*. ¶¶ 2-3.

- Although the Funds had delegated to BLMIS total control over the investments purportedly in their customer accounts, the Funds paid Kingate Management, which provided no material services to the Funds, hundreds of millions of dollars in management fees. *Id*. ¶¶ 106-118.

- The Funds withdrew over $900 million from the BLMIS fraud, which could have been available to the fund of customer property for the payment of allowed customer net equity claims. *Id*. ¶ 247.

Going beyond the allegations and delving further into the merits of whether the Funds acted inequitably, unfairly, unjustly, and unconscionably, and requiring a showing as to which creditors were harmed by that conduct and to what extent,[98] would require factual inquiries that are improper to undertake at the motion to dismiss stage.[99]

Next, the Liquidators contend the Funds' net loser customer status in the BLMIS liquidation "plainly contradicts the Trustee's contention that they have somehow acted

---

[97] An email from Eric Lazear, head of FIM's operational due diligence, dated after Madoff's arrest, *see* Moving Br. at 21 n. 9, reflects that Lazear had *previously* notified Grosso that BLMIS was a scam. *See supra*, p. 26.

[98] *See, e.g.*, *Adelphia Commc'n Corp. v. Bank of Am. (In re Adelphia)*, 365 B.R. 24, 69 (Bankr. S.D.N.Y. 2007), *aff'd in part*, 390 B.R. 64 (S.D.N.Y. 2008); *80 Nassau Assocs.*, 169 B.R. at 838.

[99] *Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*, 452 B.R. 467, 483 (Bankr. S.D.N.Y. 2011) (denying motion to dismiss equitable subordination and objection to claim where claimant allegedly was aware of fraud).

inequitably to disadvantage other customers."[100]  That argument is belied by the facts.  Based on

the net equity calculation of the Funds' customer accounts on the filing date, they may be "net

losers," but that, again, ignores the 14 years during which the Funds leveraged their relationship

with Madoff and BLMIS to earn billions of dollars in purported returns and fees calculated on

assets under management, which rewarded the Funds and the other Avoidance Action

defendants.  When BLMIS collapsed, it is not surprising the Funds, FIM and Kingate

Management would also face insolvency.  They were created, operated, dominated, and

controlled by Ceretti and Grosso, and worked together with all other defendants to knowingly,

cohesively, and exclusively feed off of BLMIS's fraudulent operation during their entire

existence.  And the Funds benefited by their participation in BLMIS's fraudulent conduct, which

explains why the Funds continued to invest with BLMIS for as long as they did.  Compl. ¶ 7.

The Funds' aggregate customer claims of approximately $800 million amount to less than the

almost billion dollars that BLMIS transferred to the Funds[101]—money that, in the words of this

Court, should have been available for distribution to customers.[102]  The Funds' net loser status

and their voluntary winding up proceedings are not factors that affect whether the Funds acted in

bad faith during their tenure with BLMIS, prolonged Madoff's Ponzi scheme, and harmed

customers through their conduct.

---

[100] Moving Br. at 31.

[101] Even though "[a] creditor may generally improve his position *vis-a-vis* the other creditors provided he does not receive a preference or fraudulent transfer," *Merkin II*, 515 B.R. at 158, here, the Funds received almost a billion dollars in fraudulent transfers that must be avoided.  Compl. ¶¶ 8, 329 (Funds' withdrawals from their BLMIS accounts amount to approximately $926 million, net of approximately $50 million to take into account a settlement reached between the Trustee and the IRS for withholding tax).

[102] *Merkin II*, 515 B.R. at 161.

Citing to a 1993, unpublished district court decision, affirmed by the Seventh Circuit on other grounds,[103] the Liquidators contend that the Trustee must prove equitable subordination under the heightened pleading standard of Rule 9(b).  This Court did not expressly apply Rule 9(b) in denying dismissal of the equitable subordination count in *Merkin II*.[104]  Here, the Complaint on its face satisfies the gross and egregious conduct[105] standard and states a claim for equitable subordination of the Funds' claims to all allowed claims of the consolidated estate under section 510(c).  If the Court applies Rule 9(b) to the allegations of the Complaint at this stage, the examples alone of particularized allegations of the Funds' actual knowledge of, or willful blindness to, BLMIS's fraud, cited above,[106] satisfy that heightened standard.

The Liquidators also challenge the Eleventh Count on standing grounds, arguing net winners benefited at the Funds' expense, and the injury that resulted did not harm all customers.[107]  In *Merkin II*, this Court found the customer defendants' net loser status was not inconsistent with a finding that the Trustee plausibly alleged the defendants' inequitable conduct injured customers and the estate as a whole.  BLMIS transferred hundreds of millions of dollars to the customer defendants in *Merkin II*, which the Court found otherwise would have been available for distribution, including to net losers.[108]

---

[103] Moving Br. at 30 (citing *Swanson v. First Wisconsin Fin. Corp. (In re Universal Foundry Co.)*, 163 B.R. 528, 538-41 (E.D. Wis. 1993), *aff'd on other grounds*, 30 F.3d 137 (7th Cir. 1994) (unpublished)).

[104] *Merkin II*, 515 B.R. at 157-59; *see also In re Baker & Getty Fin. Servs.*, 974 F.2d 712, 717-18 (6th Cir. 1992) (applying the preponderance of the evidence standard when analyzing equitable subordination of a non-insider's claim); *In re Le Cafe Creme, Ltd.*, 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000) (applying preponderance of the evidence standard to equitable subordination of an insider's claim); *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997); *Matter of Fabricators, Inc.*, 926 F.2d 1458 (5th Cir. 1991); *Matter of Lemco Gypsum, Inc.*, 911 F.2d 1553 (11th Circ. 1990).

[105] *Merkin II*, 515 B.R. at 158-59.

[106] *See supra*, pp. 17-22, 28-29.

[107] Moving Br. at 33.

[108] *Merkin II*, 515 B.R. at 160.

Consistent with this Court's ruling in *Merkin II*, but for the transfers totaling nearly a billion dollars that BLMIS made to the Funds, that money could have been available to satisfy customer claims.  Until all of those transfers are avoided and recovered, and the allowability of the Funds' claims is finally determined,[109] the Trustee will make no distributions on account of the Funds' claims, which are properly disallowed under section 502(d) of the Bankruptcy Code.[110]  Seeking equitable subordination of the Funds' customer claims is not inconsistent with the Trustee's avoidance and recovery claims against the Funds and the other defendants.[111]

The Liquidators' final challenge to the Trustee's claim for equitable subordination is based on the Second Circuit's decision in *Shearson Lehman Hutton, Inc. v. Wagoner*[112] and the doctrine of unclean hands.[113]  The Liquidators assert the Trustee stands in the shoes of BLMIS, which engaged in the Ponzi scheme, and, therefore, the Trustee cannot recover as against the Funds for their alleged misconduct in the same scheme.[114]  In *Merkin II*, this Court rejected the application of *Wagoner*[115] to the Trustee's equitable subordination claim, because it is statutory relief arising under the Bankruptcy Code, and the claim was not property of the estate under

---

[109] *See infra*, pp. 34-39.

[110] *Merkin II*, 515 B.R. at 160 ("Disallowance under [section] 502(d) provides broader relief than equitable subordination.").

[111] *Merkin II*, 515 B.R. at 160 (at the motion to dismiss stage, estate may seek avoidance and recovery of the transfers to the Funds and equitable subordination of the Funds' customer claims).

[112] Moving Br. at 33-34 (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991)).

[113] Moving Br. at 34-35.

[114] *Id*. at 34.

[115] *Kirschner v. Grant Thornton LLP,* No. 07 Civ. 11604 (GEL), 2009 WL 1286326, at *5 (S.D.N.Y. Apr. 14, 2009) and *Picard v. HSBC*, 454 B.R. 25, 37-38 (S.D.N.Y. 2011), also cited by the Liquidators, have the same effect as *Wagoner* and are distinguishable because neither case involved equitable subordination, which is statutory relief under the Bankruptcy Code.  *Kirschner* involved Illinois state law claims the bankruptcy trustee brought against insider defendants for breach of fiduciary duty and malpractice, among other claims.  These causes of action were property of the estate on the filing date in that case.  Similarly, *Picard v. HSBC* dealt with common law claims that were also property of the estate on the filing date, and subject to the limitation of *in pari delicto,* prohibiting the bankruptcy trustee from recovering for a wrong in which the debtor had participated.

section 541(a) on the filing date.[116]  The Trustee does not stand in the shoes of Madoff or BLMIS

for purposes of section 510(c), and defenses based upon the debtors' wrongful conduct do not

apply.[117]  Moreover, because all creditors of the consolidated estate have been harmed[118] and not

some unidentified subset of creditors, as the Liquidators suggest,[119] the Trustee has standing to

seek equitable subordination.[120]  Last, the doctrine of unclean hands, also invoked by the

Liquidators,[121] is an equitable remedy that does not apply to the Trustee's section 510(c)

claim,[122] contravenes *Merkin II*,[123] and would defeat the purpose of section 510(c).[124]  The

reasoning of this Court regarding the Trustee's equitable subordination claim in *Merkin II*

applies equally here.  The Motion to dismiss the Eleventh Count must be denied.

---

[116] *Merkin II*, 515 B.R. at 159.

[117] *Id.*

[118] *Id.* at 160 (addressing the harm alleged by $550 million in transfers to the customer defendants, this Court reasoned "[b]ut for these transfers, this money would have been available for distribution to the other BLMIS investors who now find themselves net losers.").

[119] Moving Br. at 33 (Funds' argument that their misconduct could not have harmed "net winner" customers of BLMIS, who benefited at the Funds' expense, or investors who had invested with BLMIS before the Funds, ignores the impact of the Funds' withdrawals from BLMIS on all net equity claims on the filing date, which is when such claims are determined under 15 U.S.C. §§ 78fff-2(b), and 78*lll*(11); and when the estate is created under 11 U.S.C. § 541(a), and 15 U.S.C. § 78fff(b) (in relevant part, and to the extent consistent with SIPA, applying chapters 1, 3, and 5 of chapter 7 of title 11 to a SIPA proceeding)).

[120] *Merkin II*, 515 B.R. at 159.

[121] Moving Br. at 34-35.

[122] *In re LightSquared Inc.*, 511 B.R. 253, 345 n.151 (Bankr. S.D.N.Y. 2014) (subject to limited exceptions, "[c]ourts generally have not applied common law equitable defenses to causes of action created under Chapter 5 of the Bankruptcy Code") (citing *In re Auto. Prof'ls, Inc.*, 398 B.R. 256, 262 (Bankr. N.D. Ill. 2008)). "[E]quitable subordination focuses only on the actions of guilty creditors and the resulting impact on innocent creditors." *In re Auto. Prof'ls, Inc.*, 398 B.R. at 260. "Inequitable conduct by the debtor is noticeably absent from the list of relevant considerations." *Id.* Thus, consideration of the debtor's conduct, as opposed to the guilty creditor, and allowing the unclean hands defense "would be inconsistent with the traditional test for equitable subordination, the substantial case law allowing subordination despite debtors' participation in wrongdoing, and the purpose of equitable subordination." *Id.*; *accord In re Applied Theory Corp.*, 345 B.R. 56, 59 (S.D.N.Y. 2006), *aff'd*, 493 F.3d 82 (2d Cir. 2007) ("The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of the other creditors.").

[123] *Merkin II*, 515 B.R. at 159.

[124] *In re Auto. Prof'ls, Inc.*, 398 B.R. at 262.

**B.    The Complaint Objects to the Funds' Claims Under Section 502(a) and Properly States a Claim for Disallowance Under Section 502(b)(1) on the Ground That Applicable Non-Bankruptcy Law Renders the Funds' Claims Unenforceable Against the Consolidated Estate**

The Liquidators argue that the Trustee's objection to the Funds' claims is improperly based on their inequitable conduct, which is not one of the enumerated grounds for disallowance under the literal language of section 502(b)(1).[125]  Section 502(b), however, recognizes as valid an objection to a claim when applicable non-bankruptcy law would render the claim unenforceable.  Section 502(b)(1), in part, provides the court shall determine the amount of a contested claim, after notice and a hearing, and allow such claim, "except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, *under . . . applicable law*."[126]  It is true that section 502(b)(1) does not provide an independent basis for contesting the allowability of a claim against the estate.[127]  It is likewise true, however, under the plain language of section 502(b)(1), when an objection to a claim is filed, if applicable non-bankruptcy law renders the claim unenforceable, section 502(b)(1) provides the statutory—not equitable— framework in which to resolve the contested claim.[128]

---

[125] Moving Br. at 35.

[126] 11 U.S.C. § 502(b)(1) (emphasis added); *see also Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 229 B.R. 273, 279 (Bankr. S.D.N.Y. 1999) ("A claim to which an objection has been filed is allowed to the extent the claim is enforceable against the debtor under applicable law"); *In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 74 (Bankr. S.D.N.Y. 1996) *aff'd sub nom. In re Stratton Oakmont*, 210 F.3d 420 (2d Cir. 2000) ("A court must allow a claim to which objection has been made except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under . . . applicable law for a reason other than because such claim is contingent or unmatured.") (internal quotation marks and citation omitted).

[127] *See* Moving Br. at 35 (citing *In re Loucheschi LLC*, Adv. Pro. No. 11-4122 (MSH), 2013 WL 6009947, at *13 (Bankr. D. Mass. Nov. 13, 2013)).

[128] *In re LightSquared Inc.*, 504 B.R. 321, 340 (Bankr. S.D.N.Y. 2013) (section 502(b)(1) cannot be an independent basis for contesting a claim when the claim is otherwise valid under applicable law).  The converse principle is if the claim is unenforceable under applicable law, a trustee must first object to the claim under section 502(a), and then prove that applicable law outside of bankruptcy renders the claim unenforceable under section 502(b)(1).  The elements of applicable law outside of bankruptcy determine the extent to which a claim is unenforceable, without regard to the Bankruptcy Code's exceptions to claim allowance under 11 U.S.C. § 502(b)(2)-(b)(9).

34

In the Tenth Count of the Complaint, the Trustee objected to "*any and all claims of the Kingate Funds against the BLMIS estate, including the Customer Claims*" under section 502(b)(1) and certain provisions of SIPA.  Compl. ¶ 327 (emphasis added).  The Complaint alleges the Funds have no valid claim against the estate based upon their conduct.  *Id*. ¶ 326.  By the objection, the Trustee contests the Funds' right to share, not only in the fund of customer property, but also in any general estate.

The Tenth Count does expressly allege the Funds are not entitled to retain their principal investment with BLMIS under principles of restitution.  *Id*. ¶¶ 323, 326.  This Court in *Merkin II* dismissed the Trustee's count objecting to the customer defendants' claims there, reasoning equity is not a basis for disallowance under section 502(b).[129]  The District Court in this SIPA liquidation, in common briefing on the issue as to what constitutes antecedent debt within the meaning of the definition under section 548(d)(2)(A), agreed that restitution is the basis to recover principal invested in ordinary bankruptcy cases and non-SIPA Ponzi scheme cases.[130]  While concluding that net equity provides the basis for a customer claim in a SIPA liquidation,[131] the District Court further found that other claims held by defendants, such as claims for fraud in the inducement or damages under applicable state and federal law, are preserved against the general estate.[132]

In *Merkin II*, the Court also rejected two other grounds raised by the Trustee under applicable non-bankruptcy law to disallow a customer claim under 502(b)(1).  First, the Court

---

[129] *Merkin II*, 515 B.R. at 156.

[130] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 499 B.R. 416, 422 (S.D.N.Y. 2013) (hereinafter "*SIPC v. BLMIS*") (defendants in such cases "have tort claims of rescission to recover all of their initial investment based on fraudulent inducement") (citing *In re Bayou Group, LLC*, 439 B.R. 284 (S.D.N.Y. 2010); *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2009).

[131] *SIPC v. BLMIS*, 499 B.R. at 423.

[132] *Id*. at 425.

35

was not persuaded that the language of SIPA section 78fff-2(b), which provides a customer

claim must be "ascertainable from the books and records of the debtor or . . . otherwise

established to the satisfaction of the trustee," is a valid basis on which to object.[133]  Next, the

Court was unpersuaded that a claimant that otherwise satisfies the definition of "customer" under

section 78*lll*(2), can be denied recovery from the fund of customer property.[134]  The Court found

that the only valid objection under SIPA could be to the maximum $500,000 SIPC advance,

because it is a "quasi-public" fund.[135]  On this issue as well, other courts have taken a contrary

view, concluding that a claimant's conduct can bar customer status, and it is the claimant's

burden to prove entitlement to a claim.[136]

   The Trustee is not asking this Court for equitable relief independently under section

105(a) of the Bankruptcy Code.  Rather, based upon decisional authority construing sections

78*lll*(2) and 78fff-2(b) of SIPA,[137] the burden is on the customer to establish to the satisfaction of

the Trustee the right to an equitable share of the estate, including the customer property estate—

---

[133] The Court noted the December 23, 2008 order regarding claims procedures "cannot confer powers on the Trustee that are inconsistent with SIPA," *Merkin II*, 515 B.R. at 153 n.23, but the language of that order tracks the language of SIPA §78fff-2(b).  The Trustee submits, therefore, there is no inconsistency between SIPA and the bankruptcy claims procedure.  *In re First State Sec. Corp.*, 34 B.R. 492, 494 (Bankr. S.D. Fla. 1983); *In re Mirus*, 87 B.R. 960, 969 (Bankr. N.D. Ill. 1988).

[134] The Trustee's motion under Rule 54(b) to have the Court direct entry of judgment as to certain claims decided by the August 12, 2014 decision of this Court in *Merkin II* and certify for a direct appeal to the Second Circuit, does not include the Court's order dismissing the count under section 502(a) and (b)(1), or the equitable disallowance count. Until there is a final order on appeal on the claims' issues decided in *Merkin II* or in another avoidance proceeding before this Court, however, the Trustee reserves all rights that disallowance under section 502(b)(1) and equitable disallowance apply to claims against the customer property estate and the general estate.

[135] *Merkin II*, 515 B.R. at 153-56 (construing the holdings in *SEC v. Packer, Wilbur & Co., Inc.*, 498 F.2d 978 (2d Cir. 1974), and *SEC v. Provident Sec.*, 452 F. Supp. 477 (S.D.N.Y. 1978), to deny a customer access only to the SIPC advance and not to a distribution from the fund of customer property).

[136] *See Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 558-59 (Bankr. S.D.N.Y. 2002) (interpreting *Packer, Wilbur* more broadly, and finding the claimant has the burden of establishing entitlement to customer status); *In re Old Naples Sec., Inc.*, 311 B.R. 607, 614-15 (M.D. Fla. 2002) (upholding bankruptcy court's ruling that two claimants should not receive the benefit of customer status); *SEC v. North Am. Planning Corp.*, No. 72 Civ. 3158 (IBC), 1975 WL 346 at *3 (S.D.N.Y. 1975) (court found claimant should have known of a potential securities violation and denied "customer" status under SIPA).

[137] Chapters 1, 3, and 5 of chapter 7 of title 11 apply only "[t]o the extent consistent with the provisions of this chapter. . . ."  15 U.S.C. § 78fff(b).

beyond the SIPC advance.  That issue should be deferred for trial, and the count should not be summarily dismissed.

### C.    The Complaint Properly States a Claim for Equitable Disallowance of the Funds' Claims

The Liquidators also move to dismiss the Twelfth Count of the Complaint seeking equitable disallowance of the Funds' claims, arguing, in reliance on *LightSquared*,[138] there is no equitable ground upon which to disallow a claim, with the only valid grounds to disallow a claim expressly set forth in section 502(b).[139]  The Liquidators argue, alternatively, that if equitable disallowance applies, the Trustee does not allege facts that plausibly give rise to a strong inference the Funds had knowledge of the fraud or engaged in inequitable conduct to justify equitably disallowing their claims.[140]

In *Merkin II*, the Court also dismissed the Trustee's count seeking to equitably disallow the customer defendants' claims, adopting the reasoning in *LightSquared*,[141] and finding that equitable disallowance is inconsistent with equitable subordination.[142]  In doing so, the Court disagreed with other courts recognizing the bankruptcy court's broad equitable power to disallow a claim when, in the rare case, the facts support such relief.[143]  The Twelfth Count of the

---

[138] Moving Br. at 37 (citing *LightSquared,* 504 B.R. at 339-342 (bankruptcy court lacks the power to disallow a claim on general equitable principles)).

[139] *Id.*

[140] Moving Br. at 37.

[141] *Merkin II*, 515 B.R. at 157 (citing *LightSquared*, 504 B.R. at 336, 339, and *Law v. Siegel*, 134 S. Ct. 1188 (2014)); *see also SIPC v. BLMIS,* 499 B.R. at 416.

[142] *Merkin II*, 515 B.R. at 157.

[143] *See Adelphia Commc'n Corp.*, 365 B.R. 24, 71 (Bankr. S.D.N.Y. 2007) (sections 502 and 510 neither expressly permit nor prohibit equitable disallowance of a claim), *aff'd* 390 B.R. 64 (S.D.N.Y. 2008).  *See also Northtown Theatre Corp. v. Mickelson*, 226 F.2d 212 (8th Cir. 1955) (equitable disallowance is a remedy); *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3d Cir. 1981) (citing *Pepper v. Litton*, 308 U.S. 295, 305 (1939) (permitting disallowance and subordination under the bankruptcy court's broad equitable powers)).

Complaint seeks the same relief as count twelve in the Merkin avoidance action, even though predicated on the unique facts alleged in this action.

It is apparent the Court might be inclined to conserve its resources and spare further analysis of the propriety of the counts for disallowance under section 502(b)(1) and equitable disallowance, and the rationale for why they would apply to the facts here (and not in *Merkin II*), and simply dismiss them. *Merkin II*, however, did not address the following points that affect the Court's determination here:

i.    The Tenth and Twelfth Counts object to any and all claims of the Funds. Under the District Court's analysis, the Trustee has the right to object to a claim against the general estate under principles of restitution.[144] Under the District Court's reasoning, at a minimum, the Trustee has stated a claim for relief under the Tenth and Twelfth Counts as to a claim for fraud in the inducement, damages, or any other claim the Funds assert against the general estate.[145] *Merkin II* addressed only customer claims.[146]

ii.   If the Tenth and Twelfth Counts do not survive dismissal, the parties will be forced to address piecemeal on appeal whether the Trustee's claims for disallowance on statutory and equitable grounds may proceed as they apply to the general estate but not to the customer property estate based upon conflicting case law.

iii.  Section 502(d) applies in a SIPA proceeding.[147] This Court stated in *Merkin II* that a defendant that returns the fraudulent transfer has a "claim to the extent permitted by Bankruptcy Code [section] 502(h)" that is not subject to equitable subordination.[148] A claim under section 502(h), however, is determined and allowed in accordance with section 502(a) and (b). If the Court determines the Trustee has no power to use section 502(a) or (b) regarding a SIPA customer claim, in construing the statute harmoniously,[149] that presents a separate issue

---

[144] *See supra* note 130.

[145] *See id.*; *see also supra* note 132.

[146] *See Merkin II*, 515 B.R. at 156 ("Unless the customer lacked title to the property entrusted to the broker-dealer because of the customer's fraud or for another reason, there is no basis in equity to disallow his right to his property in a SIPA proceeding.").

[147] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 437, 445-46 (S.D.N.Y. 2014).

[148] *Merkin II*, 515 B.R. at 160.

[149] *F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

whether a customer would have the right to a claim under section 502(h), which determination is premature and should await resolution of the Avoidance Action.

iv.    BLMIS deposited any cash the Funds handed over to BLMIS into its JPMorgan Chase account, Compl. ¶ 88, where it was fungible with the cash of all customers and any other deposits BLMIS made into that account.  BLMIS also made transfers from that fungible account.  Compl. ¶ 88.  The transfers to the Funds were not made with money they *owned*,[150] therefore, but with other people's money.  Subject to the limitations under section 78fff-2(c)(2) of SIPA, the Funds would have been entitled to securities in their name at BLMIS on the filing date, but there were none.

To the extent the fund of customer property is insufficient to satisfy all customer claims in full, customers holding allowed claims are entitled to an equitable share of the customer property estate.[151]  It is a proper consideration for this Court, therefore, whether customers who have acted grossly and egregiously in bad faith should be permitted to an equitable share of customer property alongside good faith customers.  Accordingly, dismissal of the Tenth and Twelfth Counts at this stage of the proceeding would be improper.[152]

## CONCLUSION

For the reasons set forth above, the Trustee respectfully requests that the Liquidators' Motion be denied.

---

[150] *See Merkin II*, 515 B.R.at 156 ("Unless the customer lacked title to the property entrusted to the broker-dealer because of the customer's fraud or for another reason, there is no basis in equity to disallow his right to *his* property in a SIPA proceeding." (emphasis added)).

[151] A fundamental purpose of the Bankruptcy Code is "equality of distribution of assets among similarly situated creditors."  *Musso v. Ostashko*, 468 F.3d 99, 104 (2d Cir. 2006).

[152] *See In re Granite Partners*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997) ("Dismissal is proper only when plaintiff would not be entitled to any type of relief, even if it prevailed on the merits of its factual allegations.").

Dated:  October 14, 2014
         New York, NY

/s/ *David J. Sheehan*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email:dsheehan@bakerlaw.com
Geraldine E. Ponto
Email:gponto@bakerlaw.com
Anthony M. Gruppuso
Email:  agruppuso@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*substantively consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and estate of Bernard L. Madoff*

Of counsel:

John J. Burke
Mark A. Kornfeld
Gonzalo S. Zeballos