**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05383 (SMB) |
| Plaintiff, | |
| v. | |
| STANLEY SHAPIRO, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE TRUSTEE'S SECOND AMENDED COMPLAINT

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the substantively consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS ....................................................................................3

    A.    Shapiro Was One Of Madoff's Earliest Investors And Opened More Than Twenty BLMIS Accounts For Himself And His Family. ...................................................................................4

    B.    Shapiro Had Extraordinary Access To Madoff, Bongiorno, And Others Involved In The Investment Advisory Business. ...............................................................................6

    C.    Shapiro Closely Monitored, Managed, And Otherwise Controlled The Activity In The Family's Accounts. ...................................7

    D.    Shapiro Was Actively Involved In The Fraud At BLMIS And Thus Had Actual Knowledge That Madoff Was Not Trading Securities In The Family's Accounts And Was Running A Fraudulent Scheme. ...........................................8

        1.    Shapiro Could "Cancel" Trades Reported Weeks Earlier In The Core Accounts. ........................................8

        2.    Shapiro Could Direct BLMIS To Report Specific Gains And Losses. ...........................................8

        3.    Shapiro Conspired With Madoff, Bongiorno, And Konigsberg To Fabricate Sets Of Revised Account Statements For The Core Accounts In 2002 And 2003....................................................9

ARGUMENT .................................................................................................12

    I.    STANDARDS GOVERNING RULE 12(b)(6) MOTIONS ..................................12

    II.    SHAPIRO KNEW OF AND PARTICIPATED IN MADOFF'S SCHEME AND THUS CANNOT INVOKE THE SECTION 546(e) SAFE HARBOR. .....................................................13

    A.    The Section 546(e) Safe Harbor Only Protects Innocent Investors Who Did Not Have Actual Knowledge Of Madoff's Fraud. ...............................................................14

    B.    The Specific Factual Allegations In The Complaint Control Whether The Trustee Has Pleaded Actual Knowledge. .....................17

    C.    The Trustee Has Alleged More Than Enough Evidence Of Shapiro's Actual Knowledge Of Madoff's Scheme. .................................19

    D.    Shapiro's Knowledge Of Madoff's Fraud Is As Powerful, If Not More Powerful, Than That Alleged In *Cohmad*. ................................22

# TABLE OF CONTENTS
## (continued)

**Page**

III. SHAPIRO'S KNOWLEDGE AND CONDUCT SHOULD BE IMPUTED TO THE SHAPIRO FAMILY. ...........................................................24

    A.    Shapiro Served As The Family's Agent. ....................................................26

    B.    Shapiro Acted Within The Scope Of The Agency Relationship And The Adverse Interest Exception Does Not Apply As The Family Benefitted From Millions Of Dollars In Transfers From Their BLMIS Accounts....................................28

    C.    Shapiro Exercised Dominion And Control Over The Shapiro Family's BLMIS Accounts............................................................30

IV. THE DISTRICT COURT ALREADY HAS REJECTED THE SHAPIRO FAMILY'S ANTECEDENT DEBT ARGUMENT. ...........................30

V. THE COMPLAINT PROPERLY PLEADS SUBSEQUENT AND INTER-ACCOUNT TRANSFERS TO AND AMONG THE SHAPIRO FAMILY. ............................................................................32

    A.    The Complaint Adequately Alleges Fair Notice Of The Subsequent Transfers Sought.....................................................32

    B.    The Complaint Adequately Alleges Inter-Account Transfers Among The Accounts. .......................................................36

VI. THE COMPLAINT PROPERLY PLEADS DISALLOWANCE AND, ALTERNATIVELY, SUBORDINATION OF DEFENDANTS' CUSTOMER CLAIMS. ............................................37

    A.    The Trustee May Disallow Defendants' Customer Claims Because Defendants Funded The Accounts With Subsequent Transfers Of Customer Property. ...........................................37

    B.    The Trustee May Equitably Subordinate Defendants' Customer Claims Because Defendants Misconduct Conferred An Unfair Advantage And Injured The BLMIS Estate......................................................................................38

CONCLUSION.....................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*80 Nassau Assocs. v. Crossland Fed. Savs. Bank (In re 80 Nassau Assocs.),*
169 B.R. 832 (Bankr. S.D.N.Y. 1994) ........................................................................39

*Adelphia Commc'ns. Corp. v. Bank of Am., N.A. (In re Adelphia Communications Corp.),*
365 B.R. 24 (Bankr. S.D.N.Y. 2007) ........................................................................38

*Art Fin. Partners, LLC v. Christie's Inc.,*
58 A.D.3d 469 (1st Dep't 2009) ........................................................................26

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................12

*Bankruptcy Servs. Inc. v. Ernst & Young and Ernst & Young LLP (In re CBI Holdings Co., Inc.),*
529 F.3d 432 (2d Cir. 2008) ........................................................................30

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................12

*Benjamin v. Diamond (In re Mobile Steel Co.),*
563 F.2d 692 (5th Cir. 1977) ........................................................................39

*Bigio v. Coca-Cola Co.,*
675 F.3d 163 (2d Cir. 2012) ........................................................................12, 21, 28

*Center v. Hampton Affiliates, Inc.,*
488 N.E.2d 828 (N.Y. 1985) ........................................................................25, 28

*Cromer Fin. Ltd. v. Berger,*
245 F. Supp. 2d 552 (S.D.N.Y. 2003) ........................................................................29

*Enron Creditors Recovery Corp. v. Alfa S.A.B. de C.V.,*
651 F.3d 329 (2d Cir. 2011) ........................................................................14

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.,*
726 F.3d 62 (2d Cir. 2013) ........................................................................12

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,*
479 F. Supp. 2d 349 (S.D.N.Y. 2007) ........................................................................16

*Kirschner v. Bennett (In re Refco Secs. Litig.),*
759 F. Supp. 2d 301 (S.D.N.Y. 2010) ........................................................................13, 17

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Kirschner v. KPMG LLP*,
  938 N.E.2d 941 (N.Y. 2010)......................................................................25, 26, 29

*Mallis v. Bankers Trust Co.*,
  717 F.2d 683 (2d Cir. 1983)......................................................................26

*Marine Midland Bank v. John E. Russo Produce Co., Inc.*,
  50 N.Y.2d 31 (N.Y. 1980) ......................................................................29

*Maurillo v. Park Slope U-Haul*,
  194 A.D.2d 142 (2d Dep't 1993) ......................................................................27

*Mfrs. Hanover Trust Co. v. Jayhawk Assocs.*,
  766 F. Supp. 124 (S.D.N.Y. 1991) ......................................................................26

*Mirror Groups Newspapers, Plc v. Maxwell Newspapers, Inc.* (*In re Maxwell
  Newspapers, Inc.*),
  164 B.R. 858 (S.D.N.Y. 1994)......................................................................29

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
  277 B.R. 520 (Bankr. S.D.N.Y. 2002) ......................................................................39

*O'Connell v. Penson Fin. Servs., Inc. (In re Arbco Capital Mgmt., LLP)*,
  498 B.R. 32 (Bankr. S.D.N.Y. 2013) ......................................................................14, 16

*Pension Committee of University of Montreal Pension Plan v. Banc of America
  Securities, LLC*,
  446 F. Supp. 2d 163 (S.D.N.Y. 2006)......................................................................16

*Picard v. ABN AMRO Bank (Ireland) Ltd.* (*Secs. Investor Prot. Corp. v. Bernard
  L. Madoff Inv. Secs. LLC*),
  505 B.R. 135 (S.D.N.Y. 2013)......................................................................18

*Picard v. Bureau of Labor (In re Bernard L. Madoff Inv. Secs. LLC)*,
  480 B.R. 501 (Bankr. S.D.N.Y. 2012)......................................................................35

*Picard v. Chais (In re Bernard L. Madoff Inv. Secs.)*,
  445 BR 206 (Bankr. S.D.N.Y. 2011) ...................................................................... *passim*

*Picard v. Cohmad Secs. Corp. (In re Bernard L. Madoff Inv. Secs. LLC)*,
  454 B.R. 317 (Bankr. S.D.N.Y. 2011)......................................................................32

*Picard v. Greiff*,
  476 B.R. 715 (S.D.N.Y. 2012)......................................................................15

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Secs. LLC)*,
  *appeal docketed*, No. 12-2557-bk(L) (2d Cir. June 21, 2012)......................................................................15

# TABLE OF AUTHORITIES
## (continued)

*Picard v. Katz,*
  462 B.R. 447 (S.D.N.Y. 2011) ...................................................................... *passim*

*Picard v. Katz,*
  No. 11 Civ. 3605 (JSR), 2012 WL 691551 (S.D.N.Y. Mar. 5, 2012) ....................................31

*Picard v. Madoff (In re Bernard L. Madoff Inv. Secs. LLC),*
  458 B.R. 87 (Bankr. S.D.N.Y. 2011) ......................................................................34

*Picard v. Merkin (In re Bernard L. Madoff Inv. Secs. LLC),*
  440 B.R. 243 (Bankr. S.D.N.Y. 2010) ......................................................25, 28, 30

*Picard v. Merkin (In re Bernard L. Madoff Inv. Secs. LLC),*
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................................... *passim*

*Rosner v. Bank of China,*
  No. 06-13562 (VM), 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008) ......................................16

*S.E.C. v. Ballesteros Franco,*
  253 F. Supp. 2d 720 (S.D.N.Y. 2003) ...............................................................27, 30

*S.E.C. v. Moskowitz,*
  No. 97 Civ. 7174(HB), 1998 WL 524903 (S.D.N.Y. Aug. 20, 1998) ..............................27, 30

*Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. (In re Bernard L. Madoff
  Inv. Secs. LLC)*
  501 B.R. 26 (S.D.N.Y. 2013) ..............................................................................35

*Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Bernard L.
  Madoff Inv. Secs.),*
  499 B.R. 416 (S.D.N.Y. 2014) ...........................................................31, 32, 36, 37

*Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Bernard L.
  Madoff Inv. Secs. LLC),*
  No. 12 Misc. 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ........................ *passim*

*Secs. Inv. Prot. Corp. v. Stratton Oakmont, Inc.,*
  229 B.R. 273 (Bankr. S.D.N.Y. 1999) .....................................................................38

*Secs. Inv. Prot. Corp. v. Stratton Oakmont, Inc.,*
  234 B.R. 293 (Bankr. S.D.N.Y. 1999) .................................................................32, 34

*Silverman v. A-Z Rx, LLC (In re Allou Distribs., Inc.),*
  No. 04-8369-ESS, 2012 WL 6012149 (Bankr. E.D.N.Y. Dec. 3, 2012) ...............................13

# TABLE OF AUTHORITIES
## (continued)

*Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs, Inc.)*,
   446 B.R. 32 (Bankr. E.D.N.Y. 2011)...................................................................13

*Tiffany (NJ) Inc. v. eBay Inc.*,
   600 F.3d 93 (2d Cir. 2010)...............................................................................16

*United States v. Collins*,
   No. 13-2902, slip op. (2d. Cir. Oct. 22, 2014) ...................................................17

*United States v. Goffer*,
   721 F.3d 113 (2nd Cir. 2013)...........................................................................17

## Statutes

11 U.S.C. § 502...................................................................................................37

11 U.S.C. § 502(a) ..............................................................................................38

11 U.S.C. § 502(b)(1) ..........................................................................................38

11 U.S.C. § 510(c) ...............................................................................................38

11 U.S.C. § 544.....................................................................................................2

11 U.S.C. § 544(b) ..............................................................................................13

11 U.S.C. § 546(e) .......................................................................................*passim*

11 U.S.C. § 548.....................................................................................................2

11 U.S.C. § 548(a)(1)(A) ........................................................................13, 14, 30

11 U.S.C. § 548(a)(1)(B) .....................................................................................13

11 U.S.C. § 548(c) ..................................................................................13, 30, 31

11 U.S.C. § 550.....................................................................................................2

11 U.S.C. § 550(a) .........................................................................................13, 32

11 U.S.C. § 550(a)(1)......................................................................................33, 35

11 U.S.C. § 551.....................................................................................................2

15 U.S.C. §§ 78aaa, *et seq.* ..................................................................................1

15 U.S.C. § 78fff-2(b) .........................................................................................37

- vi -

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

N.Y. P'Ship Law § 26(a) ............................................................................................................33

**Rules**

Fed. R. Civ. P. 8......................................................................................................................32, 33

Fed. R. Civ. P. 8(a) ......................................................................................................................32

Fed. R. Civ. P 8(a)(2)....................................................................................................................32

Fed. R. Civ. P. 9............................................................................................................................21

Fed. R. Civ. P. 12(b)(6).................................................................................................................12

**Other Authorities**

H.R. Rep. 97–420, at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583.........................................14

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq*., by and through his undersigned counsel, respectfully submits this Memorandum of Law in Opposition to the motion to dismiss filed by Stanley Shapiro ("Shapiro"), Renee Shapiro (together with Shapiro, the "Shapiros"), S&R Investment Co. ("S&R"), LAD Trust, David Shapiro, Rachel Shapiro, David Shapiro 1989 Trust, as amended ("David Shapiro Trust"), Trust f/b/o W.P.S. & J.G.S. ("Trust f/b/o David Shapiro's Children"), Leslie Shapiro Citron (*née* Leslie Shapiro), Leslie Shapiro 1985 Trust, as amended ("Leslie Shapiro Trust"), Trust f/b/o A.J.C., K.F.C., and L.C.C. ("Trust f/b/o Leslie Shapiro Citron's Children"), and Kenneth Citron (collectively, the "Shapiro Family" or simply the "Family").

## PRELIMINARY STATEMENT

Madoff did not perpetrate his Ponzi scheme for more than thirty years alone. Many employees at BLMIS played critical roles in running the scheme, including Annette Bongiorno ("Bongiorno"), David Kugel ("Kugel"), and Frank DiPascali. Madoff also relied on professionals outside of BLMIS, including Paul Konigsberg ("Konigsberg"), an accountant to whom Madoff steered many BLMIS customers. And Madoff had to place his trust in several of his oldest clients who received special treatment and other perquisites in exchange for their silence. Shapiro was a member of this exclusive group.

Shapiro's relationship with Madoff spanned more than forty years. Shapiro began investing with BLMIS in the mid-1960s. For decades, Bongiorno personally managed the largest accounts that the Shapiro Family held at BLMIS. In 1995, Madoff hired Shapiro out of retirement to serve as a consultant and proprietary trader at BLMIS. At Madoff's direction, Shapiro retained Konigsberg the following year to perform his family's tax work. Shapiro had

ready access to Madoff, Bongiorno, and others involved in the Ponzi scheme. Over the last several years of BLMIS's existence, Shapiro visited the 17th floor of BLMIS, the restricted floor on which BLMIS operated the Ponzi scheme, on more than 150 occasions.

Shapiro took full advantage of his relationship with Madoff and his employment with BLMIS. He directed Bongiorno to "cancel" previously reported trades and to generate fictitious "gains" and "losses" in the Family's accounts, which Bongiorno generally achieved by backdating trades. In 2002, the Shapiro Family's largest accounts at BLMIS held huge margin balances and were, according to account statements, wiped out by the burst of the dot-com bubble. In late 2002, Shapiro colluded with Madoff, Bongiorno, and Konigsberg to increase the reported value of these accounts by more than $60 million by fabricating scores of backdated trades in new sets of account statements. Several months later, Shapiro colluded again with Madoff, Bongiorno, and Konigsberg to create more than $40 million in fictitious losses in the Family's largest accounts. This was done to avoid millions in taxes that the Family apparently faced in 2003 because of the trades they had fabricated for the prior year. The foregoing allegations, which are detailed more fully below, sufficiently allege Shapiro's actual knowledge of, and indeed participation in, Madoff's scheme.

In his Second Amended Complaint[1] (the "Complaint"), the Trustee therefore seeks to avoid and recover nearly $54 million in fraudulent transfers made since March 1981 to or for the benefit of the Shapiro Family under sections 544, 548, 550, and 551 of the Bankruptcy Code (the "Code"). Of this total, more than $50 million constituted transfers of fictitious profits from the Ponzi scheme. In their motion to dismiss, the Shapiro Family argues that they are merely victims

---

[1] Second Amended Complaint, *Picard v. Shapiro, et al. (In re Bernard L. Madoff Inv. Secs. LLC)*, Adv. No. 10-05383(SMB) (Bankr. S.D.N.Y.), ECF No. 33.

2

and owe nothing to the BLMIS estate because all eleven counts brought by the Trustee in the

Complaint fail as a matter of law.

All of the Shapiro Family's arguments are without merit. The well-pleaded allegations of

the Complaint establish, for purposes of the motion to dismiss, that Shapiro actually knew that

no securities were being traded in the Family's BLMIS accounts and that Madoff was running a

Ponzi scheme. The Family cannot avail themselves of section 546(e)'s safe harbor. Given

Shapiro's role in managing and otherwise controlling his and his family's accounts at BLMIS,

his knowledge may be imputed to the other members of the Family. Thus, even under the

heightened pleading standard announced by the District Court and recently applied by this Court,

the Trustee has adequately pleaded all of his avoidance and recovery claims against the Shapiro

Family. Further, the Trustee has both legal and equitable bases to disallow, or alternatively,

subordinate the two customer claims filed by the Shapiro Family, because the Family, with

knowledge of Madoff's scheme, funded the relevant accounts with subsequent transfers of

fictitious profits.

For these reasons and those discussed more fully below, this Court should deny the

Shapiro Family's motion to dismiss in its entirety.

## STATEMENT OF FACTS

The Shapiro Family did not provide a statement of facts in support of their motion to

dismiss. Instead, they simply referred the Court to the allegations contained in the Complaint.[2]

This omission is telling. The facts that the Trustee alleges against the Shapiro Family are

damning: they establish, for purposes of the instant Motion, that Shapiro not only knew BLMIS

---

[2] The Shapiro Family also refers the Court to documents referenced in the Complaint and to other facts of which the Court may take judicial notice. Defendants' Memorandum of Law in Support of Their Motion to Dismiss The Trustee's Second Amended Complaint ("Motion"), *Picard v. Shapiro, et al. (In re Bernard L. Madoff Inv. Secs. LLC)*, Adv. No. 10-05383(SMB) (Bankr. S.D.N.Y.), ECF No. 38, at 6.

was a fraud, but also that no securities were being traded in the Family's BLMIS accounts and that Madoff was running a Ponzi scheme.  Simply put, Shapiro actively participated in the fraudulent scheme for the benefit of himself and his family.  Most notably, the Trustee alleges that in 2002 and 2003, Shapiro conspired with Madoff, Bongiorno, and Konigsberg to fabricate scores of backdated trades in revised account statements for the largest accounts held by the Shapiro Family and thereby increase the reported value of these accounts by more than $60 million, and a short time later conspired to fabricate losses in the accounts to avoid paying taxes on the fictitious gains.  The Shapiro Family completely ignores these allegations which, together with the other allegations in the Complaint, preclude the Family from seeking refuge in section 546(e)'s safe harbor.

      **A.**    **Shapiro Was One Of Madoff's Earliest Investors And Opened More Than Twenty BLMIS Accounts For Himself And His Family.**

Shapiro met Madoff and began investing with BLMIS in the mid-1960s.  (Compl. ¶¶ 3, 49.)  At the time, Shapiro was serving as the president of Kay Windsor, Inc., a once nationally recognized dress manufacturer formerly owned and operated by another long-time BLMIS investor, Carl Shapiro.[3]  (*Id.* at ¶ 50.)  Through his many years in the garment industry, Shapiro developed an acute business sense.  (*Id.*)

In or about 1995, Madoff hired Shapiro to serve as a consultant and proprietary trader at BLMIS.  (*Id.* at ¶ 52.)  Even though Shapiro was not registered to trade securities, Madoff allowed him to trade for BLMIS, through the company's 19th floor proprietary desk, in shares of public companies in the fashion industry.  (*Id* at ¶ 52, 53.)  Shapiro shared an office at BLMIS

---

[3] In 2010, Carl Shapiro (who is unrelated to Stanley Shapiro) and his family agreed to forfeit $625 million to the Trustee and the government relating to their receipt of fraudulent transfers from BLMIS.  *See* Order, dated December 21, 2010, Adv. Pro. No. 08-01789 (BRL) (ECF No. 3551); Settlement Agreement, dated December 7, 2010, Adv. Pro. No. 08-01789 (BRL) (ECF 3310-2).

with David Kugel, another key player in the Ponzi scheme.  (*Id.* at ¶¶ 18, 52.)  In 2011, Kugel

pleaded guilty to his role in the fraud, admitting that he helped to create fake, backdated trades in

the accounts of IA customers beginning in the early 1970s.  (*Id.* at ¶ 18.)  The office that Shapiro

and Kugel shared at BLMIS was adjacent to the office used by Madoff.  (*Id.* at ¶ 52.)

The Shapiro Family held more than twenty accounts at BLMIS over the years.  (Compl.

¶ 38.)  The Shapiros held the largest of the Family's accounts (No. 1SH014) through S&R.[4]

(Compl. ¶ 39.)  Despite having invested no more than $2.5 million with BLMIS over a span of

more than four decades, the Shapiros withdrew almost $38 million—most often entirely on

margin—from their accounts at BLMIS.  (*Id.* at ¶ 59, Exhibit B.)  Shapiro managed and

otherwise controlled all of the business and other affairs of S&R.  (*Id.* at ¶¶ 31, 40.)

Shapiro established numerous accounts at BLMIS for the benefit of two of his children,

David Shapiro and Leslie Shapiro Citron, either through trusts, custodial accounts, or in their

own names.  (Compl.  ¶¶ 41-44.)  The largest two of these accounts were respectively held for

many years through the David Shapiro Trust (No. 1SH028) and the Leslie Shapiro Trust (No.

1SH030)[5] of which Shapiro and his wife served as trustees.  (*Id.* at ¶ 41.)  Shapiro was

responsible for managing and directing the activity in these accounts.  (*Id.* at ¶¶ 42-44.)  He

performed the same role for nearly all other accounts held by his children, including one held by

Leslie Shapiro Citron (No. 1SH171) and one held by David Shapiro (No. 1S0306).  (*Id.*)  While

after 1982 only limited deposits were made into the accounts that Shapiro established, managed,

---

[4] S&R is a partnership created and owned by Shapiro and his wife, Renee.  (*Id.* at ¶ 31.)  S&R held two other
accounts at BLMIS (Nos. 1SH079 and 1SH172).  (*Id.* at ¶ 40.)

[5] These accounts, together with two largest accounts held by S&R (Nos. 1SH014 and 1SH079), are collectively
referred to as the "Core Accounts."  (Compl. ¶ 41.)

and controlled for his children, Shapiro arranged over this same period for BLMIS to disburse more than $13 million from these accounts to his children.  (*Id.* at ¶ 59.)

Two BLMIS accounts were also established for the benefit of Shapiro's grandchildren (Nos. 1S0540 and 1C1345).  (Compl. ¶¶ 43, 46.)  These accounts were funded largely, if not entirely, by the Shapiros with subsequent transfers of fictitious profits they received from BLMIS.  (*Id.*)

### B.    Shapiro Had Extraordinary Access To Madoff, Bongiorno, And Others Involved In The Investment Advisory Business.

Over the years, Shapiro developed a close friendship with Madoff.  (*Id.* at ¶ 3.)  Shapiro, Madoff, and their wives socialized often, dining out, attending charity events, and even taking luxurious trips together.  (*Id.* at ¶¶ 3, 56.)  Between October 2002 and December 2008, Shapiro flew with Madoff or other members of Madoff's family on the private jet used by BLMIS on more than twenty-five occasions.  (*Id.* at ¶ 56.)  And Shapiro met often with Madoff to discuss his family's investment accounts at BLMIS.  (*Id.*)

Shapiro often met with Bongiorno because she personally managed many of the Shapiro Family's accounts at BLMIS, including all of the Core Accounts.  (*Id.* at ¶¶ 4, 49, 57.)  Bongiorno recently was convicted of fraud and other crimes for her role in the Ponzi scheme.  (*Id.* at ¶ 19.)  Beyond the Shapiro Family, Bongiorno managed the accounts of some of the most significant, long-time customers of BLMIS, including Stanley Chais, Jeffry Picower, Carl Shapiro, and Norman Levy.  (*Id.* at ¶ 49.)  Key card records from BLMIS reveal that on more than 150 occasions from 2005 through 2008, Shapiro visited the 17th floor of BLMIS where Bongiorno and others involved in running the Investment Advisory business worked.  (*Id.* at ¶ 57.)  Only a select number of BLMIS employees had access to this floor.  (*Id.*)

### C. Shapiro Closely Monitored, Managed, And Otherwise Controlled The Activity In The Family's Accounts.

Shapiro closely monitored the Family's BLMIS accounts' reported performance. (Compl. ¶ 62.) He did so by regularly reviewing monthly account statements and portfolio reports provided by BLMIS as well as quarterly schedules of realized and unrealized gains and losses prepared first by a bookkeeper and then, after 1995, by Konigsberg and his firm, Konigsberg Wolf & Co. ("Konigsberg Wolf"). (*Id.* at ¶¶ 54-55.) Shapiro hired Konigsberg in 1996 at Madoff's direction. (*Id.* at ¶ 54.) Konigsberg, who had many other clients at BLMIS including some of whom were among its largest customers, recently pleaded guilty for his role in Madoff's Ponzi scheme. (*Id.*) Shapiro was ever mindful of his and his family's tax liability. (*Id.* at ¶ 62.) In many years, Shapiro directed Bongiorno to report specific gains and losses in the Core Accounts to minimize or altogether eliminate either his or one of his children's tax liability. (*Id.*)

Shapiro was part of a small, privileged group of BLMIS customers in whom Madoff placed his trust and to whom Madoff gave special treatment. (Compl. ¶ 49.) BLMIS reported to Shapiro in many years that the "benchmark rate of return" for each of the Core Accounts was 29%. (*Id.* at ¶ 61.) The rates of return reportedly achieved in the accounts held by the Shapiro Family were extraordinarily consistent and implausibly high. (*Id.* at ¶¶ 60-61.) Madoff allowed Shapiro to carry significant margin balances on the Core Accounts, well beyond those allowed under federal regulations. (*Id.* ¶ 58.) Generally, when BLMIS reported that it had purchased securities in these accounts, it reportedly did so entirely on margin. (*Id.*) Similarly, when Shapiro withdrew funds from any of the Core Accounts, BLMIS increased the margin balance on the account rather than reportedly liquidating securities. (*Id.*) By late 2002, the margin balance

7

reportedly held by the Shapiros in their largest BLMIS account (No. 1SH014) was over $46

million.  (*Id.* at ¶ 81.)

**D.      Shapiro Was Actively Involved In The Fraud At BLMIS And Thus Had Actual Knowledge That Madoff Was Not Trading Securities In The Family's Accounts And Was Running A Fraudulent Scheme.**

Shapiro knew that Madoff's Investment Advisory ("IA") business was a fraud and that he

and the other members of the Shapiro Family were benefiting from fictitious trades reported in

their accounts at BLMIS.  (Compl. ¶ 47.)

**1.      Shapiro Could "Cancel" Trades Reported Weeks Earlier In The Core Accounts.**

Shapiro was able to direct Bongiorno to "cancel" purported trades in the Core Accounts

after they had already appeared on account statements.  (Compl. ¶ 63.)  Shapiro did so in late

February 2000.  (*Id.* at ¶¶ 63-64.)  To use Shapiro's own words from a note he sent to

Konigsberg, "As per our conversation, here are Jan. statements indicating <u>trades</u> covering short

positions and I believe creating losses … it is my thinking that we would like to <u>cancel</u> these

trades."  (*Id.* at Fig. 1, p. 22 (emphasis in original).)  According to Shapiro, "Annette gave me a

'deadline' of today" to let her know whether she should "<u>cancel</u> these trades."  (*Id.*)  In the end,

Shapiro decided to cancel only one of the reported trades, which appears on the face of the

February 2000 account statement that he received for Account 1SH079.  (*Id.* at ¶ 64.)

**2.      Shapiro Could Direct BLMIS To Report Specific Gains And Losses.**

Shapiro also directed Bongiorno to arrange, for tax purposes, that particular "gains" or

"losses" be realized in the Core Accounts.  (Compl. ¶ 65.)  For example, in November 2000,

Shapiro sent a note to Bongiorno directing particular losses in the accounts held by S&R (No.

1SH014), the David Shapiro Trust (No. 1SH028), and the Leslie Shapiro Trust (No. 1SH030).

8

(*Id.* at ¶¶ 67-68.)  Bongiorno obliged and fabricated short-term buy and sell transactions[6] to

achieve each of the losses sought by Shapiro.  (*Id.* at ¶¶ 67-69.)  When doing so, Bongiorno

backdated the buy side of each transaction to a date *before* Shapiro had even requested the

losses, and she used consecutive transaction numbers for each side of the transaction when

reporting the trades, even though the trades supposedly occurred weeks apart.  (*Id.*)

In November 2001, a similar sequence of events took place.  (Compl. ¶ 70.)  Shapiro

advised Bongiorno in a note that he "need[ed]" a $360,000 gain in S&R Account 1SH014, and

Bongiorno fabricated a short-term buy and sell transaction with a backdated purchase date to

deliver almost exactly the "gain" Shapiro needed.  (*Id.*)  A month later, in December 2001,

Bongiorno fabricated, again at Shapiro's request, a $125,000 loss in Account 1SH014.  (*Id.* at

¶ 71.)

> **3.      Shapiro Conspired With Madoff, Bongiorno, And Konigsberg To
>            Fabricate Sets Of Revised Account Statements For The Core
>            Accounts In 2002 And 2003.**

In 2002 and 2003, Shapiro took a more active role in Madoff's Ponzi scheme.  (Compl.

¶ 73.)  Over the course of 2002, the stock market suffered a significant downturn and as a result,

the reported value of the Core Accounts dropped by nearly fifty percent.  (*Id.* at ¶¶ 74-75.)[7]  As

of September 2002, the net "paper" value of the Core Accounts—the value of all reported

holdings and credits less margin balance and reported short liabilities—was well below zero.

(*Id.* at ¶ 76.)  For instance, in Account No. 1SH014 held by S&R, the margin balance stood at

---

[6] BLMIS purported to use a long-term, buy and hold strategy in the Core Accounts, and therefore these fabricated short-term transactions were highly unusual. (Compl. ¶ 69.)

[7] The Core Accounts were not reportedly invested in the split-strike conversion strategy; rather, as noted above, Bongiorno purportedly employed a long-term, buy and hold strategy for these accounts.  (Compl. ¶ 57.)  Bongiorno therefore had to regularly monitor the Core Accounts because if left unattended, the value of the securities purportedly held in the accounts could be impacted by fluctuations in the market, as was the case during 2002.  (*Id.* at ¶ 74.)

more than $46 million while the value of securities reportedly held in the account totaled only about $40 million.  (*Id.*)

In late 2002, Konigsberg advised Shapiro of the problem and suggested that Shapiro speak with Madoff.  (Compl. ¶ 77.)  Shapiro did so, and Madoff told him to go see Bongiorno.  (*Id.*)  Shapiro, together with Konigsberg, then met with Bongiorno on BLMIS's 17th floor, where they devised a scheme to restore the value that reportedly had been lost in the Core Accounts by fabricating, though use of a computer program called "Statement Pro" or "STMTPro," backdated short-against-the-box sales to earlier in the year before the market's decline.  (*Id.* at ¶¶ 77-78.)

The newly fabricated trades "restored" the Shapiro Family's fortunes, wiping out all of the year's "paper" losses and significant margin balances, and improving the reported value of the Core Accounts by more than $60 million.  (*Id.* at ¶¶ 78-81.)  After preparing new sets of revised account statements through STMTPro, Bongiorno and others at BLMIS needed assistance from Shapiro and Konigsberg to conceal the paper trail of the fraud, and they asked Shapiro and Konigsberg to return the original account statements they had received from BLMIS.  (Compl. ¶ 82.)  Shapiro and Konigsberg complied and on several of the old statements that Shapiro returned to BLMIS, he had made various handwritten notes, thus confirming that he had the statements in hand and had reviewed them before they were replaced.  (*Id.*)[8]

---

[8] BLMIS retained these statements and the first page of one such statement can be found at Figure 3 of the Complaint.  (Compl. at p. 32.)  The first page of the corresponding STMTPro statement is depicted in Figure 4.  (*Id.*)  Konigsberg also retained a copy of the schedule of unrealized gains and losses that his office had prepared and provided to Shapiro based on the original September 2002 account statement for S&R Account 1SH014.  (*Id* at. ¶ 83.)  Konigsberg's schedule reported that the net value of Account 1SH014 as of September 2002 stood at a *negative* $3.5 million.  (*Id.*)  The scheme devised by Shapiro, Bongiorno, and Konigsberg fixed that problem.  The STMTPro statement for Account No. 1SH014 for the month of September 2002 reflected a net value of nearly $36.5 million, a $40 million increase over that reported in the original statement.  (*Id.* at ¶ 81 and Fig. 2, p. 31.)

In 2003, Shapiro again conspired with Madoff, Bongiorno, and Konigsberg to fabricate new sets of backdated trades, but this time Shapiro sought to wipe out the significant tax liability that he and his children appeared to face in the 2003 calendar year from the backdating of trades in the prior year. (Compl. ¶¶ 84-86.) Bongiorno carried out the plan by fabricating more than $40 million in short-term losses across the Core Accounts. (*Id.* at ¶ 87.) Some losses were manufactured with the benefit of a month's hindsight while others were fabricated near year's end through the use of STMTPro. (*Id.* at ¶¶ 88-90.) The largest of the losses involved the backdating of the short sale in March 2003 and the subsequent cover in November 2003 of a large position in Sears Roebuck & Co. in S&R Account 1SH079, which generated nearly $12 million in fictitious losses for the Shapiros. (*Id.* at ¶ 89.) The short sale did not appear in the schedule of unrealized gains and losses that Konigsberg Wolf prepared and provided to Shapiro in or around July of 2003 for Account 1SH079. (*Id.* at ¶ 92.)

The scheme hatched and executed by Shapiro, Konigsberg, and Bongiorno resulted in the Shapiros owing only $85 in taxes for 2003 calendar year. (*Id.* at ¶ 90.) Likewise, David Shapiro and Leslie Shapiro Citron reaped the benefit of the huge fictitious losses reported in their respective Core Accounts (Nos. 1SH028 and 1SH030)—the fabricated losses wiped out potential tax liabilities from the millions in fictitious gains reportedly realized earlier in the year. (*Id.* at ¶ 91.)

Between March 1981 and the collapse of BLMIS in December 2008, the Shapiro Family received $54 million dollars in transfers from BLMIS, of which more than $50 million was other people's money.

11

## ARGUMENT

## I.    STANDARDS GOVERNING RULE 12(b)(6) MOTIONS

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a court must "accept[] all well-pleaded allegations in the complaint as true and draw[]

all reasonable inferences in the plaintiff's favor." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d

Cir. 2012) (internal marks omitted). "To survive a motion to dismiss, the complaint must plead

'enough facts to state a claim for relief that is plausible on its face.'" *Fed. Treasury Enter.*

*Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 71 (2d Cir. 2013) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible where "the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Determining whether

a claim is plausible is 'a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense.'" *Picard v. Merkin (In re Bernard L. Madoff Inv. Secs.*

*LLC)*, 515 B.R. 117, 137 (Bankr. S.D.N.Y. 2014) ("*Merkin II*") (quoting *Iqbal*, 556 U.S. at 678).

Whereas legal conclusions "are not entitled to the assumption of truth," the "court should give all

'well-pleaded factual allegations' an assumption of veracity and determine whether, together,

they plausibly give rise to an entitlement of relief." *Merkin II*, 515 B.R. at 137 (quoting *Iqbal*,

556 U.S. at 679).

The drawing of reasonable inferences from well-pleaded facts in favor of the plaintiff is

particularly important with respect to causes of action concerning a defendant's knowledge or

state of mind, as such elements are rarely proven by direct evidence:

> To be sure, a defendant's admission of actual knowledge of the underlying fraud
> is likely to be rare. But such direct evidence of actual knowledge is not necessary
> to establish this element of the claim. Rather, actual knowledge may be inferred
> from circumstantial evidence, provided that the central inquiry remains whether

12

the evidence permits a reasonable finder of fact to infer that the defendant actually
knew of the underlying fraud.

*Silverman v. A-Z Rx, LLC (In re Allou Distribs., Inc.)*, No. 04-8369-ESS, 2012 WL 6012149, at

*16 (Bankr. E.D.N.Y. Dec. 3, 2012) (quoting *Silverman v. United Talmudical Acad. Torah

Vyirah, Inc. (In re Allou Distribs, Inc.)*, 446 B.R. 32, 51-52 (Bankr. E.D.N.Y. 2011)); *see also

Kirschner v. Bennett (In re Refco Secs. Litig.)*, 759 F. Supp. 2d 301, 335 (S.D.N.Y. 2010)

("*Refco*") ("actual knowledge may be also be implied from a strong interference of fraudulent

intent" and "a motive can provide part of that inference") (internal marks omitted).

## II.    SHAPIRO KNEW OF AND PARTICIPATED IN MADOFF'S SCHEME AND THUS CANNOT INVOKE THE SECTION 546(e) SAFE HARBOR.

In Counts One through Seven of the Complaint, the Trustee seeks to avoid and recover

nearly $54 million in fraudulent transfers received by the Shapiro Family from BLMIS under

sections 548(a)(1)(A), 548(a)(1)(B), and 550(a) of the Code and the comparable provisions of

the New York Debtor and Creditor Law, applicable under section 544(b) of the Code.[9]  The

Shapiro Family moves to dismiss Counts Two through Seven by claiming that they may avail

themselves of protection under the "safe harbor" provision of 11 U.S.C. § 546(e).

Shapiro and his family cannot avail themselves of the section 546(e) safe harbor.  Section

546(e)'s safe harbor protects "the reasonable expectations of legitimate investors."  *Secs. Inv.

Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Bernard L. Madoff Inv. Secs. LLC)*, No.

12 Misc. 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*") The safe

harbor only applies to innocent customers.  It does not protect defendants, like Shapiro, who

knowingly participate in the fraud for their own personal gain.

---

[9] In Count One of the Complaint, the Trustee seeks to avoid, under section 548(a)(1)(A), actual fraudulent transfers
received by the Shapiro Family within two years of the filing date.  All of these transfers constituted fictitious profits
from Madoff's Ponzi scheme.  *See* Schedules attached at Exhibit B to the Complaint.  As a result, Shapiro's lack of
"good faith" under section 548(c) is not relevant here because, even assuming that the Family received these
transfers in good faith, they did not give value for them.  *See Merkin II*, 515 B.R. at 138.

Taking the Trustee's well-pleaded factual allegations as true, which the Court must do on a motion to dismiss, Shapiro is precisely the kind of defendant that the safe harbor is *not* intended to protect: an investor who knew of the fraud (and indeed participated in it by fabricating securities trades). Such an investor knew that payments from BLMIS were neither "settlement payments" nor "transfers" "in connection with a securities contract," and that such payments therefore fell outside of the safe harbor's protections. *Id.* Among other things, Shapiro collaborated with Madoff and others (all of whom now have pleaded or been found guilty of securities fraud) to conceal a paper trail of fabricated trades to turn back the clock and benefit from multi-million dollar "do-overs." Shapiro cannot claim the safe harbor's protections as the Complaint's non-conclusory, specific factual allegations "provide [more than] enough detail to get the Trustee to trial." *O'Connell v. Penson Fin. Servs., Inc. (In re Arbco Capital Mgmt., LLP)*, 498 B.R. 32, 44 (Bankr. S.D.N.Y. 2013) ("*Arbco*").

A.    **The Section 546(e) Safe Harbor Only Protects Innocent Investors Who Did Not Have Actual Knowledge Of Madoff's Fraud.**

The section 546(e) safe harbor prevents a trustee from avoiding "settlement payment[s] . . . in connection with a securities contract," except in cases of actual fraud under 11 U.S.C. § 548(a)(1)(A). *See Merkin II*, 515 B.R. at 138 (citing *Cohmad*, 2013 WL 1609154, at *6). The safe harbor is intended to "'minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries.'" *Enron Creditors Recovery Corp. v. Alfa S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011) (quoting H.R. Rep. 97–420, at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583). The District Court has held that "in the context of the Madoff Securities' fraud, that goal is best achieved by protecting the reasonable expectations of investors who believed they were signing a securities contract."

*Cohmad*, 2013 WL 1609154, at *4; *see also Picard v. Greiff*, 476 B.R. 715, 719-720 (S.D.N.Y. 2012) ("*Greiff*").[10]

Applying the safe harbor in a trilogy of cases, the District Court held that investors who understood BLMIS to be acting as their stockbroker had agreements with BLMIS that were securities contracts. *See Picard v. Katz,* 462 B.R. 447, 452 (S.D.N.Y. 2011); *Grieff*, 476 B.R. at 719-720; *Cohmad,* 2013 WL 1609154, at *4. The District Court further held that transfers from BLMIS to those customers thus were settlement payments in connection with those securities contracts and fell within the safe harbor of section 546(e). *See Grieff*, 476 B.R at 719-720; *Katz,* 462 B.R. at 452.

Under the District Court's reasoning, the safe harbor in these proceedings protects legitimate investors who reasonably believed that BLMIS was trading securities on their behalf, BLMIS. *See Katz*, 462 B.R. at 452 n.3 ("From the standpoint of Madoff Securities' customers . . . the settlement payments made to them by Madoff Securities were entirely bona fide, and they therefore are fully entitled to invoke the protections of section 546(e)."); *Greiff*, 476 B.R. at 720 ("the defendants here, having every reason to believe that Madoff Securities was actually engaged in the business of effecting securities transactions, have every right to avail themselves of . . . § 546(e)"); *Cohmad*, 2013 WL 1609154, at *4 (the safe harbor is intended to "protect the reasonable expectations of investors who believed they were signing a securities contract").

---

[10] The Trustee appealed the District Court's holding in *Greiff* that the safe harbor applies in this liquidation. *See Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Secs. LLC), appeal docketed*, No. 12-2557-bk(L) (2d Cir. June 21, 2012). Solely for purposes of the Shapiro Family's Motion, the Trustee will assume the holding is correct.

But an investor who had no such belief, like "a defendant [who] had actual knowledge of

Madoff's scheme[,] … stands in a different posture from an innocent transferee, even as

concerns the application of Section 546(e)." *Id.* at *4. As the District Court explained:

> [T]he purpose of [§ 546(e)] is minimizing the displacement caused in the
> commodities and securities markets in the event of a major bankruptcy affecting
> those industries. In the context of Madoff Securities' fraud, that goal is best
> achieved by protecting the *reasonable expectations of investors who believed they
> were signing a securities contract*; but a transferee who had actual knowledge of
> the Madoff "Ponzi" scheme did not have any such expectations, but was simply
> obtaining moneys while he could. Neither law nor equity permits such a person to
> profit from a safe harbor intended to promote the legitimate workings of the
> securities markets and the reasonable expectations of legitimate investors.

*Id.* (emphasis added) (citations and marks omitted). The section 546(e) safe harbor does not

protect "actual participants in the fraud" or those "who had actual knowledge of its workings"

because "unlike innocent customers, they would not have believed that the settlement payments

'were entirely bona fide.'" *Id.* (quoting *Katz*, 462 B.R. at 452 n.3). As Judge Chapman

summarized, when applying *Cohmad* and section 546(e) to another bankruptcy fraud,

"[t]ransferees who participated in a fraud, and those with actual knowledge of a fraud … stand in

a different posture from innocent transferees and are not entitled to invoke the protections of the

Safe Harbor Rule." *Arbco*, 498 B.R. at 43.[11]

---

[11] The District Court's rationale for preventing bad faith investors with actual knowledge of the fraud from invoking
the safe harbor should apply with equal force to bad faith investors who were willfully blind to it. The District
Court rejected willful blindness as a proxy for actual knowledge. *Cohmad*, 2013 WL 1609154, at *4 n.2. But the
general rule in this and others Circuits is that "willful blindness is tantamount to knowledge." *Tiffany (NJ) Inc. v.
eBay Inc.*, 600 F.3d 93, 110 n.16 (2d Cir. 2010) (collecting cases). Indeed, Judge Lewis Kaplan and even Judge
Rakoff have in other cases applied the general rule that willful blindness is a proxy for actual knowledge. To
support its position in *Cohmad*, the District Court cited *Rosner v. Bank of China*, No. 06-13562 (VM), 2008 WL
5416380, at *7 (S.D.N.Y. Dec. 18, 2008), which relied on *Pension Committee of University of Montreal Pension
Plan v. Banc of America Securities, LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006). *Cohmad*, 2013 WL 1609154, at *4
n.2. *Rosner*'s interpretation of *Pension Committee*, which holds "only that *constructive knowledge* is [an]
insufficient" substitute for actual knowledge, has been criticized and rejected. *Fraternity Fund Ltd. v. Beacon Hill
Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (Kaplan, J.) (emphasis added). Judge Kaplan
explained that willful blindness can substitute for actual knowledge because it is freighted with *mens rea*, whereas
constructive knowledge is an imputed state of mind and thus cannot so substitute—and that *Pension Committee* is
not to the contrary. *Id.* at 368. Further, rejecting willful blindness as a proxy for actual knowledge yields the absurd
result that willful blindness can support *criminal* but not *civil* liability—an absurdity noted in *Fraternity Fund* and in

### B.    The Specific Factual Allegations In The Complaint Control Whether The Trustee Has Pleaded Actual Knowledge.

To the extent that Shapiro argues that the safe harbor exception is limited to defendants that the Trustee can show "had actual knowledge of Madoff's *Ponzi scheme*," Motion at 15 (emphasis added), that reading is not supported by the triad of District Court cases summarized above that use terms such as Madoff's "fraud", "scheme", and "Ponzi" interchangeably as exemplars of "actual knowledge" allegations that may by pleaded to defeat the safe harbor defense.[12]  Likewise, this Court also used "scheme" and "Ponzi" interchangeably in describing the standard.[13]

Moreover, the Court's review on a motion to dismiss is driven by the facts alleged.  Each case is unique and stands on its own and the "outcome of a motion to dismiss … will depend on the factual allegations in the complaint."  *Merkin II*, 515 B.R. at 146.  The District Court applied section 546(e) to the facts of participation and coordination in the fraud presented in *Cohmad*,

---

*Refco*, 759 F. Supp. 2d. at 334 ("If conscious avoidance is enough to satisfy a *criminal* charge of aiding and abetting, it should certainly suffice for a civil claim.").  Under the District Court's actual knowledge standard, Shapiro could be charged, convicted, and sent to prison for turning a blind eye to Madoff's fraud, all the while invoking a safe harbor designed to protect legitimate participants in the securities markets to avoid civil liability under the Code. *See, e.g., United States v. Collins*, No. 13-2902, slip op. at *4 (2d. Cir. Oct. 22, 2014) (affirming securities fraud conspiracy conviction based on theory of conscious avoidance); *United States v. Goffer*, 721 F.3d 113, 127 (2nd Cir. 2013) (same).

[12] The District Court in *Cohmad* articulated the following formulations: (1) "the trustee has alleged that the initial transferee had actual knowledge of Madoff Securities' fraud," *Cohmad*, 2013 WL 1609154, at *1; (2) "where the Trustee has adequately alleged that the[] defendants had, not mere suspicions, but actual knowledge of Madoff's scheme," *id.* at *3; (3) "defendants are alleged to have known in effect that the account agreements never led to a transaction for the 'purchase, sale, or loan of a security,'" *id.* at *3 (quoting 11 U.S.C. § 546(e)); (4) "a transferee who had actual knowledge of the Madoff 'Ponzi,'" *id.* at *4; (5) "those who had actual knowledge of [the fraud's] workings" as well as to "'actual participants in the fraud,'" *id.* at *4 (quoting *Katz*, 462 B.R. at 452 n.3); and (6) transferees with "actual knowledge that there were no actual securities transactions being conducted," *id.* at *4.

[13] *See Merkin II*, 515 B.R. at 138 ("If, however, an initial (or subsequent) transferee had *actual* knowledge of Madoff's Ponzi scheme, he cannot avail himself of the § 546(e) safe harbor, and the Trustee can avoid and recover preferences and actual and constructive fraudulent transfers to the full extent permitted by state and federal bankruptcy law."); *id.* at 139 ( the Trustee "must plead and prove that BLMIS made an avoidable transfer and the transferee had actual knowledge of Madoff's scheme."); *id.* at 141 ("In order to sustain his claim under Count Two, the Trustee must initially plead that Merkin willfully blinded himself to Madoff's fraudulent scheme."); *id.* at 144 ("Where the complaint alleges facts showing that the defendant was aware of the 'red flags' and the probability that Madoff was running a fraudulent scheme, it sufficiently pleads scienter.").

and this Court applied the actual knowledge standard to Ezra Merkin's suspicions of a Ponzi scheme as alleged in *Merkin II*. Now this Court must apply the standards to the unique facts of this case, which include Shapiro's direct involvement in fabricating trades and creating revised account statements.

As demonstrated above, the section 546(e) safe harbor inquiry "turn[s] on the investors' understanding of what they had contracted for." *Picard v. ABN AMRO Bank (Ireland) Ltd. (Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC)*, 505 B.R. 135, 142 n.6 (S.D.N.Y. 2013). And in these BLMIS proceedings, an investor with actual knowledge of Madoff's fraud or scheme, or with "actual knowledge that there were no actual securities transactions being conducted," *Cohmad*, 2013 WL 1609154 at *4, could not have expected that his securities contracts with BLMIS were "entirely bona fide" and within the safe harbor. *Katz*, 462 B.R. at 452 n.3. Indeed, it would be an absurd and inequitable result to allow an investor who actually knew his "securities contracts" with BLMIS were premised on fraud to find refuge in a safe harbor reserved for innocent customers.

Clearly, if a transferee knew that Madoff was running a Ponzi scheme, he or she would know that no actual securities were being traded in his or her account. On the other hand, a transferee may have lacked insight into the exact nature of Madoff's fraud (*i.e.,* was it really a Ponzi scheme) but may have known that there were no actual securities being traded in his or her account (*e.g.,* account statements reflected large batches of backdated trades). Under either scenario, the transferee cannot avail himself of section 546(e)'s protections because he had no legitimate expectations that the transfers received from BLMIS were "settlement payments" or "transfers" made "in connection with a securities contract." 11 U.S.C. § 546(e); *Cohmad*, 2013 WL 1609154, at *4.

Rather than addressing the specific facts alleged in the Complaint, Shapiro faults the Trustee for not using the specific words "actual knowledge of Madoff's Ponzi scheme." Motion at 2, 14. However, a complaint's sufficiency depends on the non-conclusory facts alleged and the reasonable inferences drawn therefrom, not conclusory allegations. The District Court in *Cohmad* had no trouble, based on the factual allegations in that complaint, drawing the *inference* of actual knowledge of the Madoff fraud despite the absence of any conclusory allegations that the Cohmad defendants knew Madoff was conducting "a Ponzi scheme." *See Cohmad*, 2013 WL 1609154, at *6 (identifying factual allegations supporting actual knowledge). This Court acknowledged as much when citing approvingly to the alleged facts of participation and coordination "that supported *the inference* of actual knowledge and actual participation in *Cohmad*." *See Merkin II*, 515 B.R. at 141 n.16 (emphasis added). In any event, the totality of facts alleged in the Complaint show Shapiro's actual knowledge of a "Ponzi scheme" and actual participation in the scheme itself. (Compl. ¶¶ 74-83.)

## C. The Trustee Has Alleged More Than Enough Evidence Of Shapiro's Actual Knowledge Of Madoff's Scheme.

In the Complaint, the Trustee not only alleges Shapiro knew that no actual securities transactions were being conducted in the Family's accounts and that Madoff was operating a Ponzi scheme, but that Shapiro actively participated in the scheme. In addition to the facts regarding Shapiro's close personal and social relationship with Madoff, the Complaint is filled with facts regarding: (i) his extraordinary access to Madoff, Bongiorno and others responsible for operating the Ponzi scheme; and (ii) his conspiring with Madoff, Bongiorno, and other participants in the fraud to fabricate trades and new sets of account statements for the Family's most significant accounts at BLMIS. Through these same facts, it is more than plausible, indeed a finder of fact could reasonably infer, that Shapiro actually knew of Madoff's fraud.

19

The Complaint alleges numerous facts regarding the close personal and social relationship between Madoff and Shapiro.  Their relationship spanned more than forty years.  (Compl. ¶¶ 3, 49.)  Shapiro began investing with BLMIS in the mid-1960s.  (*Id.*)  Shapiro and Madoff, together with their wives, socialized often, including dining out, attending charity events, and even taking luxurious trips together.  (*Id.* at ¶ 3.)  Shapiro accompanied Madoff or other Madoff family members on the private jet used by BLMIS on more than twenty-five occasions in the six-year period preceding BLMIS's collapse.  (*Id.* at ¶ 56.)  Madoff even hired Shapiro to serve as a consultant in 1995 and allowed him to trade for BLMIS, even though he was not registered, from BLMIS's 19th floor proprietary desk.  (*Id.* at ¶¶ 52-53.)  BLMIS also paid Shapiro a salary and provided the Shapiros with health insurance coverage.  (*Id.* at ¶ 52.)

The Complaint details that by virtue of his position in Madoff's small circle of long-time customers and his employment at BLMIS, Shapiro had extraordinary access to Madoff, Bongiorno, and others involved in running the Ponzi scheme.  Shapiro worked in BLMIS's offices for more than twenty years.  (Compl. ¶ 52.)  He shared an office with Kugel which was adjacent to Madoff's office.  (*Id.*)  Shapiro met often with Madoff to discuss the Family's accounts at BLMIS.  (*Id.* at ¶ 56.)  Bongiorno, who was convicted for her role in the Ponzi scheme, personally managed many of the Shapiro Family's accounts, including the Core Accounts.  (*Id.* at ¶¶ 4, 49, 57.)  Shapiro frequently met with Bongiorno to discuss the Shapiro Family's accounts.  (*Id.* at ¶ 49)  Shapiro visited the 17th floor, the floor where Bongiorno and others responsible for running the IA business worked and to which only a select number of BLMIS employees had access, on more than 150 occasions from 2005 through 2008.  (*Id.* at ¶ 57)

In the Complaint, the Trustee alleges Shapiro knew that BLMIS was fabricating trades in the Family's accounts at BLMIS.  For example, in February 2000, Shapiro directed Bongiorno to simply "cancel" a trade which had already been reported in one of the Core Accounts.  (Compl. ¶ 64.)[14]  In 2000 and again in 2001, Shapiro directed Bongiorno to generate certain reported gains and losses in the Core Accounts, and Bongiorno then backdated trades to dates before he had even made his requests.  (*Id.* at ¶¶ 65-72.)

In 2002 and 2003, Shapiro conspired with Madoff, Bongiorno, and Konigsberg to fabricate a slew of backdated trades in the largest accounts his Family held at BLMIS.  Shapiro was involved in the planning stages and in the effort to conceal what they had done.  (*Id.* at ¶¶ 73-91.)  There is irrefutable documentary evidence of Shapiro's hand in the fraud—some of the original account statements that he returned to BLMIS contain his handwritten notes.  (*Id.* at ¶ 82.)  The fabricated backdated trades for the 2002 calendar year entirely wiped out the reported margin balance in the Family's Core Accounts and collectively improved the reported value of their accounts by more than $60 million.  (*Id.* at ¶ 81.)  In 2003, the backdated trades erased millions in taxes that the Shapiro Family appeared to have owed because of the backdated trades from the prior year.[15]  (*Id.* at ¶¶ 84-93.)

---

[14] In their Motion, the Shapiro Family tries to spin this fact, arguing that it "elicit[s] the inference" that Shapiro believed that the trades reported in his account were real.  Motion at 16.  The note that Shapiro penned to Konigsberg on this topic refutes this position.  In it, Shapiro writes that the January 2000 account statements he received "indicat[e] <u>trades</u> covering short positions" which he was fairly certain were "'old' and 'grandfathered' positions."  (Compl. ¶ 63 and Fig. 1, p. 22 (emphasis and internal quotations in original).)  Shapiro's word choice in his note is telling.  Furthermore, this fact does not "elicit the inference" that the trades were real, it only shows that Shapiro was willing to have BLMIS backdate trades because he did not want to pay taxes on "'old' and 'grandfathered' positions."  Finally, the Family has lost sight of the bedrock principle that, in connection with a motion to dismiss, it is the plaintiff who is to receive all reasonable inferences in his or her favor.  *See Bigio*, 675 F.3d at 169.

[15] Nevertheless, the Shapiro Family argues that the Trustee has not pleaded fraud with specificity as required under Rule 9 of the Federal Rules of Civil Procedure.  Motion at 13.  This is clearly not the case as the Trustee has alleged specific facts evidencing Shapiro's knowledge of, and participation in, Madoff's scheme.

Based on these and the other allegations of the Complaint, the Trustee has sufficiently alleged that Shapiro knew that no actual securities were being traded in the Family's accounts. Indeed, the Trustee could rely exclusively on the allegation that Shapiro was actively involved in the fabrication of backdated trades in the Core Accounts in 2002 and 2003 to meet his burden under *Cohmad*.[16]  Moreover, accepting these well-pleaded allegations at true and drawing all reasonable inferences in the Trustee's favor, a finder of fact could reasonably infer from this and the other allegations of the Complaint that Shapiro actually knew that Madoff was operating a Ponzi scheme.

### D.    Shapiro's Knowledge Of Madoff's Fraud Is As Powerful, If Not More Powerful, Than That Alleged In *Cohmad*.

In their Motion to Dismiss, the Shapiro Family invites the Court to compare the allegations in *Cohmad* with those alleged against Shapiro in the Complaint.  Motion at 17 ("A comparison of the allegations … is instructive.").  The Trustee entirely agrees.

The District Court found that the Trustee's allegations against the defendants named in *Cohmad*, at least for purposes of pleading, "sufficiently allege[d] actual knowledge of, and indeed participation in, … Madoff's Ponzi scheme that … would negate applicability of Section 546(e)."  2013 WL 1609154, at *6.  The actual knowledge allegations in *Cohmad* that the District Court and this Court found compelling focused on the defendants' access to Madoff as well as their participation in the fraud at BLMIS, namely: that Cohmad was formed in 1985 by Madoff and his friend and former neighbor, Maurice "Sonny" Cohn, for the purpose of recruiting customers to invest in BLMIS; for over two decades, the principals in Cohmad and Madoff

---

[16] Even if the Trustee had not alleged Shapiro's actual participation in the fraud, the allegation that there was massive backdating of trades that instantaneously increased the value of the Family's accounts by $60 million is sufficient evidence from which a finder of fact could reasonably infer that Shapiro actually knew Madoff was not actually trading securities and instead was running a Ponzi scheme.

Securities were intertwined both personally and professionally; Cohmad's president and chief

operating officer, Marcia Cohn, had access to, and regularly visited, BLMIS's 17th floor;

investors understood Madoff and Cohmad to be one in the same; BLMIS developed and Cohmad

maintained a database tracking the cash value of BLMIS customer accounts without regard to

fictitious profits; and that *Cohmad* vice president Robert Jaffe directed Madoff to execute

backdated trades to provide Jaffe with fictitious gains and losses in almost the exact dollar

amounts requested. *Cohmad*, 2013 WL 1609154, at *5-6; *Merkin II*, 515 B.R. at 140 n.16.

The facts alleged against Shapiro present an equally – or even more – compelling case for

an inference of actual knowledge of Madoff's fraudulent scheme. The Complaint not only

alleges Shapiro's decades' long close personal and professional relationship with Madoff, but it

demonstrates extraordinary access to Madoff and Bongiorno, placing Shapiro in the 17th floor of

BLMIS' offices, and pleads that Shapiro connived with Madoff, Bongiorno, and Konigsberg to

manipulate account statements relating to the Core Accounts.[17] The absence of a "cash value

database"[18] as one of the many allegations indicating knowledge of the fraud is of no moment. It

was one fact among many that the District Court relied on to find Cohmad's actual knowledge.

And here, the laundry list of factual allegations includes, among other things, the massive

backdating of trades in the Family's Core Accounts in 2002 and 2003, with Shapiro actively

---

[17] For these reasons, the Shapiro Family's invitation to the Court to compare the allegations here to those in *Merkin* are unavailing and *bolsters* the Trustee's case against them. *See* Motion at 18. The elements of access, participation and coordination that this Court found lacking in Merkin are plainly evident here. *Merkin II*, 515 B.R. at 141 n.16. This Court found that Merkin's "Ponzi" statements were too equivocal on Madoff's fraud to "imply the level of certainty or absence of substantial doubt associated with actual knowledge." *Id.* at 140. Here, Shapiro's *actions* in "conniv[ing] with Madoff to manipulate the records" are anything but equivocal. *Id.* at 141 n.16. Accepting the allegations as true there is no doubt that Shapiro's conduct in this case demonstrates a level of participation and coordination in the fraud far removed from Merkin's supposed Ponzi scheme joke.

[18] The cash value database was used to calculate commissions to Cohmad's brokers and thus is not relevant to Shapiro, because Shapiro apparently did not calculate commissions for managing the Family's accounts with BLMIS.

23

involved with Madoff, Bongiorno, and Konigsberg in the execution of the fraud and the effort to conceal it.

In their motion to dismiss, the Shapiro Family attempts to distinguish this case from *Cohmad* on the basis that, unlike in *Cohmad*, the Complaint here "fails to allege that Mr. Shapiro had knowledge of Madoff's Ponzi scheme." Motion at 18. The Family ignores that in *Cohmad*, the Trustee did not specifically allege that the Cohmad defendants had actual knowledge that BLMIS was not conducting actual security trading or that Madoff was running a Ponzi scheme. Rather, the Trustee alleged sufficient facts to establish by inference the Cohmad defendants' actual knowledge of, and indeed participation in, Madoff's Ponzi scheme. *Cohmad*, 2013 WL 1609154, at *6; *see also Merkin II*, 515 B.R. at 141 n.16.

Finally, in claiming that they may avail themselves of the section 546(e) safe harbor, the Shapiro Family ignores the most significant evidence of Shapiro's knowledge of Madoff's fraud: his active involvement in fabricating backdated trades in the Family's largest accounts at BLMIS in 2002 and 2003. To be sure, the Family acknowledges in their Motion that Shapiro returned account statements to BLMIS at its request. Motion at 16-17. But, they tellingly ignore the rest of the story detailed in the Complaint with non-conclusory allegations. The Family's half-truth defense is another reason why the Court should summarily deny their motion to dismiss and move this case to discovery.

## III. SHAPIRO'S KNOWLEDGE AND CONDUCT SHOULD BE IMPUTED TO THE SHAPIRO FAMILY.

The Trustee has alleged more than enough facts to establish, under basic principles of agency law, that Shapiro's knowledge may be imputed to the other members of the Family. The Shapiro Family's arguments to the contrary are unavailing. The allegations of the Complaint,

taken as true, establish that Shapiro served as his family's agent, that he acted within the scope of his authority, and that the adverse interest exception is inapplicable here.

"Under well-established principles of agency law, 'the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals.'" *Merkin II*, 515 B.R. at 146 (quoting *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010)). "The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it." *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985); *see also Kirschner*, 938 N.E.2d at 951 ("Agency law presumes imputation even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud."). "At the motion to dismiss stage, where the Trustee has not had the opportunity to conduct discovery concerning the relationships between the Moving Defendants, the question is not whether the Trustee has proved the existence of an agency relationship, merely whether he should have the chance to do so." *Picard v. Merkin, (In re Bernard L. Madoff Inv. Secs. LLC)*, 440 B.R. 243, 260 (Bankr. S.D.N.Y. 2010) (citation and marks omitted) ("*Merkin I*").

The adverse interest rule is a narrow exception to the general rule and "[t]o come within the exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes." *Hampton Affiliates, Inc.*, 488 N.E. at 830. "In applying the exception, the law distinguishes between frauds that benefit the principal and frauds that hurt the principal." *Merkin II*, 515 B.R. at 146; *see also Kirschner*, 938 N.E.2d at 952 (finding exception applies when agent's misconduct benefits only himself and not when the misconduct benefits both agent and principal). Finally, "any harm from the discovery of the

25

fraud—rather than from the fraud itself—does not bear on whether the adverse interest exception applies." *Kirschner*, 938 N.E.2d at 953.

### A.    Shapiro Served As The Family's Agent.

The well-pleaded allegations of the Complaint establish that Shapiro acted as the Family's agent in connection with their BLMIS accounts. "A principal-agent relationship may be established by evidence of the consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act even where the agent is acting as a volunteer." *Art Fin. Partners, LLC v. Christie's Inc.*, 58 A.D.3d 469, 471 (1st Dep't 2009) (marks and citation omitted). The Complaint alleges that Shapiro opened BLMIS accounts in the name of partnerships and trusts which he established for the Family's benefit. (Compl. ¶ 41.) Shapiro closely monitored the accounts by regularly reviewing monthly account statements and portfolio management reports provided by BLMIS as well as schedules of realized and unrealized gains and losses prepared by his accountants. (*Id.* at ¶ 62.) And, Shapiro managed the Family's accounts, directing that funds be transferred among them and requesting that millions of dollars be withdrawn from the accounts and distributed to himself and the other members of the Family. (*Id.*)

These are not conclusory statements but detailed allegations about Shapiro's agency and his management and control over the accounts. The Complaint details how Shapiro directed all of the activity in the accounts held by S&R, a partnership of which he and his wife, Renee, were the general partners. (Compl. ¶¶ 31, 39, 40.)[19] As trustee of the David Shapiro Trust and the Leslie Shapiro Trust, Shapiro directed all of the activity in the accounts held by the trusts,

---

[19] As a result, Shapiro's knowledge clearly may be imputed to Renee. *See, e.g., Mallis v. Bankers Trust Co.*, 717 F.2d 683, 689 n.9 (2d Cir. 1983) ("[i]t is a basic tenet of the law of agency that the knowledge of an agent, or for that matter a partner…is imputed to the principal"); *Mfrs. Hanover Trust Co. v. Jayhawk Assocs.*, 766 F. Supp. 124, 127 (S.D.N.Y. 1991) (same).

including directing Bongiorno to achieve specific gains and losses in the trust accounts and to

withdraw millions of dollars from the trust accounts to pay to David Shapiro and Leslie Shapiro

Citron.  (*Id.* at ¶¶ 41, 67, 68.)[20]  Shapiro also managed and controlled a number of other accounts

held in his children's names, including No. 1S0306 (held by David Shapiro) and No. 1SH171

(held by Leslie Shapiro Citron).  (*Id.* at ¶¶ 41-42, 44.)  Based on these facts, it is apparent that his

children and the other members of the Family relinquished the management and control of the

accounts to Shapiro and authorized him to act as their agent in connection with the accounts.  *See*

*Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146 (2d Dep't 1993) ("The agent is a party who

acts on behalf of the principal with the latter's express, implied, or apparent authority.").

   The facts alleged in the Complaint are strikingly similar to those in *Picard v. Chais* (*In re*

*Bernard L. Madoff Inv. Secs.*), 445 BR 206, 224 (Bankr. S.D.N.Y. 2011).  Like Shapiro, Stanley

Chais was the patriarch of his family; he established trusts and other investment entities for his

and his family's benefit and served as trustee or general partner of the numerous entities that

invested with BLMIS.  *Id.*  Like Shapiro, Chais "reviewed and notated customer statements,

directed the purchase and sale of securities, transferred funds and directed payments to and

among various [defendants], and communicated with, and provided direction to, BLMIS."  *Id.*

   Similar to this case, the Chais family moved to dismiss certain avoidance claims asserted

against them, arguing that Chais's knowledge of fraud at BLMIS could not be imputed to them.

The Court denied their motion.  *Id.* at 223-24 (observing that under New York law, "a trust can

be attributed with the knowledge of the individual or entity by which it is controlled or

---

[20] David and Leslie Shapiro appointed Stanley and Renee Shapiro to act as trustees of their respective trusts that had accounts with BLMIS, and given Shapiro's role of trustee, it is his knowledge that controls whether the fraudulent transfers made in connection with these trusts are afforded the protection of the section 546(e) safe harbor.  *See, e.g.,* *S.E.C. v. Ballesteros Franco*, 253 F. Supp. 2d 720, 729 (S.D.N.Y. 2003) ("where an individual so dominates or controls the activities of some entity such as [a] trust, the entity may also be held responsible for the same acts committed by the individual" (citing *S.E.C. v. Moskowitz*, No. 97 Civ. 7174(HB), 1998 WL 524903, at *4 (S.D.N.Y. Aug. 20, 1998)).

dominated" and that "the knowledge of a general partner can be imputed to the limited

partnership").  Relying on nearly identical facts as those found here, the Court concluded that the

Trustee had sufficiently alleged an agency relationship, such that Chais's alleged bad faith could

be imputed to the other defendants.  *Id.*  The facts alleged against the Shapiro Family warrant the

same conclusion.[21]

**B.    Shapiro Acted Within The Scope Of The Agency Relationship And The Adverse Interest Exception Does Not Apply As The Family Benefitted From Millions Of Dollars In Transfers From Their BLMIS Accounts.**

The Shapiro Family alternatively argues, in conclusory fashion, that Shapiro's knowledge

of, and indeed participation in, Madoff's fraud cannot be imputed to them because they claim the

adverse interest exception applies.  Motion at 21.  This argument is without basis.  The

allegations of the Complaint establish that Shapiro acted within the scope of his agency and that

the Family directly benefited from his acts.  Indeed, at Shapiro's direction, the Family received

more than $50 million in fictitious profits from their BLMIS accounts over the years.

For the adverse interest exception to apply, "the agent must have totally abandoned his

principal's interests and be acting entirely for his own or another's purposes."  *Hampton*

*Affiliates, Inc.*, 488 N.E.2d at 830.  Here, the Shapiro Family does not, and cannot, claim that

Shapiro lacked the authority to invest in BLMIS; rather, they contend that he "abandoned [their]

interest . . . by allowing [them] to be invested in the BLMIS fraud, which was contrary to their

investment strategies."  Motion at 21.  The relevant inquiry is whether Shapiro was authorized to

invest the Family with BLMIS.  On this point, the Complaint is clear.  As for the Family's

---

[21] In their motion, the Shapiro Family argues that "[c]ontrary to the Trustee's allegations," Shapiro was not their agent.  Motion at 20.  Although the Family has every right to dispute the factual allegations of the Complaint, they cannot do so on a motion to dismiss.  *See Bigio*, 675 F.3d at 169; *Merkin I,* 440 B.R. at 260.

assertion that they had different "investment strategies," that issue will have to be addressed at
some later stage.[22]

Even if Shapiro had acted outside the scope of his agency, and he did not, the Shapiro
Family has ratified Shapiro's acts by accepting the benefit of Shapiro's agency in the form of
fictitious profits from BLMIS.  *See Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 50
N.Y.2d 31, 44 (N.Y. 1980) ("A principal that accepts the benefits of its agent's misdeeds is
estopped to deny knowledge of the facts of which the agent was aware.").  In *Mirror Groups
Newspapers, Plc v. Maxwell Newspapers, Inc.*, (*In re Maxwell Newspapers, Inc.*), the court
observed that a principal cannot disclaim an agent's acts as unauthorized and yet accept the fruits
of the agent's fraud.  164 B.R. 858, 867 (S.D.N.Y. 1994).  And if the principal retains the fruits
of the fraud, "the principal will be deemed to have ratified the agent's acts."  *Id.*at 867.  The
Shapiro Family cannot retain more than $50 million in fictitious profits and, at the same time,
assert that Shapiro's acts were unauthorized and outside the scope of his agency.

The Family profited from their investments at BLMIS.  They paid taxes on their
investments only because BLMIS provided them with extraordinary profits.  The fact that they
are now liable to the Trustee for the fraudulent transfers received from BLMIS does not trigger
the adverse interest exception.  "If the [principal] benefits while the fraud remains a secret, the
adverse interest exception will not apply."  *Merkin II*, 515 B.R. at 147; *see also Kirschner*, 938
N.E.2d at 953 ("Generally, a fraud will suit the interests of both a company and its insiders for as
long as it remains secret … and leads to negative consequences for both when disclosed.").  In
any event, the adverse interest exception requires a fact-intensive inquiry that focuses on the

---

[22] Indeed, the very cases that the Family cites in their Motion support the principle that factual questions over the
scope of an agency relationship are inappropriate to decide on a dispositive motion.  *See, e.g., Cromer Fin. Ltd. v.
Berger*, 245 F. Supp. 2d 552, 562 (S.D.N.Y. 2003) (denying summary judgment because there was a question of fact
as to whether defendants' agent acquired knowledge within the scope of his agency).

motivation of the parties, *see Bankruptcy Servs. Inc. v. Ernst & Young and Ernst & Young LLP (In re CBI Holdings Co., Inc.)*, 529 F.3d 432, 448 (2d Cir. 2008), and it is improper to determine at the motion to dismiss stage. *See Merkin I*, 440 B.R. at 260.

### C.   Shapiro Exercised Dominion And Control Over The Shapiro Family's BLMIS Accounts.

Shapiro's knowledge of fraud at BLMIS is also imputed to the other members of the Family because Shapiro exercised such dominion and control over Defendants' accounts that, under New York law, he must be recognized as the accounts' equitable owner. *See e.g., Chais,* 445 B.R. at 224 n.16 ("The Trustee has also adequately pled that the Entity Defendants are plausibly alter egos of Stanley Chais, who 'dominated' and used them as a mere instrument to facilitate his personal interests and those of his family members.").  Accordingly, as the de facto owner of many of the accounts, including Accounts 1S0306 and 1SH171, Shapiro's actual knowledge of the fraud at BLMIS is imputed to the other members of the Family.  *See Ballesteros Franco*, 253 F. Supp. 2d at 728 (denying motion to dismiss and imputing defendant's knowledge of fraud to trust defendants he controlled); *Moskowitz*, 1998 WL 524903, at *4.[23]

## IV.   THE DISTRICT COURT ALREADY HAS REJECTED THE SHAPIRO FAMILY'S ANTECEDENT DEBT ARGUMENT.

Count One seeks to avoid and recover actual fraudulent transfers of fictitious profits under Code section 548(a)(1)(A).  The Shapiro Family contends that under section 548(c) each

---

[23] The Shapiro Family argues that the Trustee "concedes" that Shapiro did not exercise control over the accounts held by the Trust f/b/o David Shapiro's Children and the Trust f/b/o of Leslie Shapiro's Children.  Motion at 20. Although the Complaint does not allege that Shapiro exercised dominion and control over these trust accounts, the argument is moot because the Complaint does allege that Shapiro acted as their agent, (Compl. ¶ 95), and that the Shapiro Family funded these accounts with subsequent transfers of customer property.  (*Id.* at ¶ 102.)

transfer was taken "for value" because the transfers were made in satisfaction of an antecedent debt based on state and federal law claims. Motion at 28.[24]

The Shapiro Family (and many others defendants) unsuccessfully made the identical argument before the District Court after the reference was withdrawn. The District Court held that a transferee's claims under state and federal law "cannot provide value against the separate customer property estate" because those claims, if they exist at all, run "against Madoff Securities' general estate, not the customer property estate, and therefore cannot be the basis of the retention of customer property under section 548(c)." *Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Bernard L. Madoff Inv. Secs.)*, 499 B.R. 416, 424-26 (S.D.N.Y. 2014) ("*Antecedent Debt Opinion*") (finding "customer may only seek the protections of section 548(c) to the extent of investments of principal, and federal and state law claims cannot be used to increase the amount to which a customer is entitled from the customer property estate").

The District Court's antecedent debt holding is clear and binding, and it renders the Family's arguments frivolous. Although the Family claims that they "do not rely upon the holdings in Judge Rakoff's [*Antecedent Debt Opinion*]" (Motion at 11), they are bound by it nonetheless and have raised no new legal arguments to suggest otherwise. Notwithstanding the above, the Shapiro Family's counsel also re-raised the same antecedent debt argument in "good faith" cases pending before this Court.[25] In these cases, the argument is fully briefed, and the

---

[24] As noted above, *supra* n.10, the Shapiro Family's purported good or bad faith is irrelevant under Count One because the Family did not receive any transfers of principal during the two years preceding the bankruptcy filing. Count One only seeks to avoid and recover $9,475,424 in transfers of fictitious profits. (Complaint, ¶ 109) *See Merkin II*, 515 B.R. at 138; *Katz*, 462 B.R. at 453-54 (finding transfers in excess of principal may be avoided and recovered regardless of a customers' good faith); *see also Picard v. Katz*, No. 11 Civ. 3605 (JSR), 2012 WL 691551, at *1 (S.D.N.Y. Mar. 5, 2012) (granting summary judgment to avoid and recover transfers of fictitious profits received within two years of the bankruptcy filing).

[25] For example, the Shapiro Family's counsel re-raised the same argument in *Picard v. Fujiwara. See* Memorandum of Law in Support of Defendants John Fujiwara and Gladys Fujiwara's Motion to Dismiss the Trustee's Complaint,

Court heard oral argument on September 17, 2014.  Based on the *Antecedent Debt Opinion*, the

Court should reject the Family's "for value" defense as a matter of law.

## V.    THE COMPLAINT PROPERLY PLEADS SUBSEQUENT AND INTER-ACCOUNT TRANSFERS TO AND AMONG THE SHAPIRO FAMILY.

### A.    The Complaint Adequately Alleges Fair Notice Of The Subsequent Transfers Sought.

In determining whether a claim to recover fraudulent transfers from a subsequent

transferee is adequately pleaded, the Court need only apply a Rule 8 analysis.  *Merkin II*, 515

B.R. at 149; *Secs. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 317 (Bankr.

S.D.N.Y. 1999) ("Recovery under § 550(a) is not subject to a particularized pleading

standard….").  The Trustee must provide only a "short and plain statement of the claim showing

that [he] is entitled to relief."  Fed. R. Civ. P 8(a)(2).  Consistent with Rule 8, the Trustee need

only plead sufficient facts to show, if proved, that the funds at issue originated with the debtor,

and dollar-for-dollar tracing is not required.  *Chais*, 445 B.R. at 235 (acknowledging the Trustee

has a reduced burden in pleading subsequent transfer claims because he is an outsider to the

transactions without first-hand knowledge of the transfers).  Thus, in analyzing the Trustee's

subsequent transferee claims, "the sole consideration should be whether, consistent with the

requirements of Rule 8(a), the complaint gives the defendant sufficient notice to prepare an

answer, frame discovery and defend against the charges."  *Picard v. Cohmad Secs. Corp. (In re

Bernard L. Madoff Inv. Secs. LLC)*, 454 B.R. 317, 332 (Bankr. S.D.N.Y. 2011) (marks and

citation omitted).

Count Eight seeks to recover subsequent transfers from the Shapiro Family.  The

Complaint alleges that Shapiro, Renee Shapiro, S&R, LAD Trust, David Shapiro, David Shapiro

---

*Picard v. Fujiwara (In re Bernard L. Madoff Inv. Secs. LLC)*, 10-04289 (BRL) (Bankr. S.D.N.Y.), ECF No. 30, at 12-19.

Trust, Leslie Shapiro, Leslie Shapiro Trust, and Kenneth Citron (the "Initial Transferee

Defendants") collectively received $53,778,486 in hundreds of separate fraudulent transfers from

BLMIS. (Compl. ¶ 106.) Each of the initial transfers is listed on schedules attached as Exhibit B

to the Complaint, and the schedules detail the transferor, initial transferee, account name,

account number, type of transfer, amount of transfer, and date of transfer going back to March

1981. The Complaint then alleges that the Initial Transferee Defendants subsequently

transferred a portion of the initial transfers to other members of the Shapiro Family.[26] (*Id.* at

¶ 110.) For example, the Complaint seeks to recover subsequent transfers that the Shapiros

received from S&R as general partners or that Rachel Shapiro received from her husband David

Shapiro.[27]

　　Citing to Judge Lifland's opinion in *Chais*, the Shapiro Family argues that Complaint

fails to provide notice of the claims alleged. However, in *Chais*, the Court held that identical

subsequent transferee claims satisfied Rule 8 and provided "fair notice" where, as here, the initial

transfers were set forth in an exhibit—identifying the date, the account number, transferor,

transferee, method of transfer, and amount of each transfer—and where the Trustee alleged that

some or all of those initial transfers were subsequently transferred by defendants to the

subsequent transferee defendants. *Chais*, 445 B.R. at 235-36. In *Chais*, the Court also noted

how the information that defendants argued was missing from the Trustee's complaint was

uniquely in their own possession, and that the Trustee "will need discovery to identify the

specific subsequent transfers by date, amount and the manner in which they were effected."

---

[26] In addition to the Initial Transferee Defendants, the subsequent transferees are Rachel Shapiro (David Shapiro's wife), the Trust f/b/o of David Shapiro's Children, and the Trust f/b/o of Leslie Shapiro's Children.

[27] Alternatively, the Shapiros are liable as general partners of S&R for the fraudulent transfers received by S&R, *see* N.Y. P'Ship Law § 26(a), and discovery may establish that Rachel Shapiro is liable as a "for whose benefit" transferee for transfers received by David Shapiro. *See* 11 U.S.C. § 550(a)(1).

33

*Chais*, 445 B.R. at 236 (internal marks and citation omitted) ("Whether [defendants] received Subsequent Transfers of BLMIS funds from one another is a question to which they alone, have the requisite information to respond.").

The Shapiro Family also argues that, under the holding in *Picard v. Madoff (In re Bernard L. Madoff Inv. Secs. LLC)*, 458 B.R. 87, 120 (Bankr. S.D.N.Y. 2011) ("*Madoff Family*"), the Complaint does not provide "a modicum of specificity" to put the Family on notice of the claims alleged. However, the subsequent transferee claims alleged against the Shapiro Family are very different from the claims the Court found deficient in *Madoff Family*. For example, no exhibits identified the underlying initial transfers to the *Madoff Family* defendants, although this information was in the Trustee's possession. *Id*. at 106-07. By contrast, Exhibit B to the Complaint sets forth in detail each of the hundreds of underlying initial transfers at issue.

The Shapiro Family apparently seeks to hold the Trustee to the same level of specificity with respect to the subsequent transfers that the Trustee has provided with respect to the initial transfers. However, given the unique facts surrounding the Shapiro Family and their many BLMIS accounts and transfers, such a level of specificity is not required here on a motion to dismiss. *See Stratton Oakmont, Inc.*, 234 B.R. at 318 (refusing to dismiss subsequent transferee claim against wives of initial transferees where complaint detailed initial transfers and alleged how and from whom the wives received subsequent transfers).

The Trustee is not seeking to recover subsequent transfers from individuals and entities unrelated to the initial transferees. The Shapiro Family is comprised of closely-related individuals and investment entities that form part of a single family, controlled by Shapiro who managed and directed transfers among the Family's accounts for his and the Family's benefit. *See Chais*, 445 B.R. at 236; *Stratton Oakmont, Inc.*, 234 B.R. at 318. For these reasons, the

Trustee should not be required to plead the "vital statistics," *see Merkin II*, 515 B.R. at 150, at

this stage in the proceeding. Moreover, the details of these subsequent transfers are uniquely

within the Shapiro Family's control. Even so, the Trustee has pleaded where possible the "vital

statistics" of the transfers subsequently received by the Shapiro Family.[28] After discovery is

complete, the Trustee expects that he will be able to provide a similar level of detail with respect

to the subsequent transfers as he has done with the initial transfers.

There is also no merit to the Family's argument that the Trustee's subsequent transfer

claim should be dismissed because "the Trustee has not first obtained a judgment for avoidance

against the initial transferee[s]." Motion at 5. This Court and the District Court already have

held otherwise. *See Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. (In re Bernard L.

Madoff Inv. Secs. LLC)* 501 B.R. 26, 34 (S.D.N.Y. 2013) (rejecting argument that subsequent

transferee claims must be dismissed unless the Trustee first obtained a judgment that avoided the

initial transfer); *Picard v. Bureau of Labor (In re Bernard L. Madoff Inv. Secs. LLC)*, 480 B.R.

501, 522 (Bankr. S.D.N.Y. 2012) (same). The Family's argument is another attempt to re-

litigate issues previously withdrawn and decided by the District Court.

Finally, there is no merit to the Shapiro Family's argument that the Trustee improperly

seeks to circumvent protections afforded to subsequent transferees by pleading that members of

the Family may be beneficiaries of the initial transferees. Motion at 37. Section 550(a)(1)

allows the Trustee to recover transfers made to "the initial transferee . . . or the entity for whose

benefit such transfer was made." 11 U.S.C. § 550(a)(1). The Complaint simply provides the

Family with notice that should discovery show that initial transfers were made for the benefit of

---

[28] For example, the Complaint alleges how the Trust f/b/o of David Shapiro's Children and the Trust f/b/o of Leslie
Shapiro's Children were funded with subsequent transfers from the Shapiro Family, and the Exhibit B attached to
the Complaint details the date and amount of these transfers which were then deposited in the trusts' respective
BLMIS accounts. (Compl. ¶ 102.).

any members of the Family, the Trustee would seek to hold them liable as initial transferees.

The Trustee is not precluded from pleading in the alternative.

      **B.**      **The Complaint Adequately Alleges Inter-Account Transfers Among The Accounts.**

      Although the Shapiro Family contends that the Trustee has not adequately alleged inter-account transfers among the Family's accounts, this contention is simply incorrect.  The schedules attached as Exhibit B to the Complaint set forth a detailed forensic cash flow analysis across all of the twenty-four accounts that the Family held at BLMIS between March 31, 1981 and December 11, 2008.  The schedules provide the Family with principal credit for all the purported credits and securities held in the accounts as of March 1981.  Thus, the Trustee has given the Family the "benefit of the doubt" that the credit reported in each March 1981 statement consisted entirely of principal and was free of any fictitious profits.  The schedules then trace each of the inter-account transfers among the Family's accounts and credit any principal that is transferred from one account to another.

      The Family's argument that they should be given full principal credit for any inter-account transfers of fictitious profits among their accounts is similarly meritless.  After withdrawing the reference, the District Court wholly rejected this argument in the *Antecedent Debt Opinion*, explaining:

> the true substance of transfers of fictitious profits from one account to another remains the same: The funds at issue are still other people's money, and shifting them among accounts, whether those accounts are owned by the same person or entity or, for example, transfers among family members, does not morph those funds into actual new principal.

36

499 B.R. at 428-29.  The Shapiro Family has no basis to raise this argument again as it is plainly

inconsistent with the District Court's decision.[29]

## VI.    THE COMPLAINT PROPERLY PLEADS DISALLOWANCE AND, ALTERNATIVELY, SUBORDINATION OF DEFENDANTS' CUSTOMER CLAIMS.

Count Nine of the Complaint seeks to disallow customer claims filed by the Trust f/b/o

David Shapiro's Children and the Trust f/b/o Leslie Shapiro's Children under Code section 502

and applicable provisions of SIPA, including section 78fff-2(b), based on Shapiro's deliberate

misconduct and participation in Madoff's fraud, which renders the customer claims

unenforceable under applicable non-bankruptcy law.  Alternatively, the Trustee seeks to disallow

the customer claims on equitable grounds under Count Eleven.  If the Court nevertheless allows

any portion of the customer claims, Count Ten seeks to equitably subordinate such allowed

claims to all other allowed claims against the consolidated estate.[30]

### A.    The Trustee May Disallow Defendants' Customer Claims Because Defendants Funded The Accounts With Subsequent Transfers Of Customer Property.

The Shapiro Family's argument for why the Trustee cannot disallow the customer claims

is far from clear, but they appear to argue that the Trustee cannot disallow the claims unless the

Family lacked title to the property entrusted to BLMIS.  Motion at 38.  Quoting *Merkin II*, the

Shapiro Family asserts that "unless the customer lacked title to the property entrusted to the

---

[29] Like the Family's antecedent debt argument, their counsel also re-raised this argument in the "good faith" cases pending before this Court, and the argument does not need to be litigated again in this proceeding.  *See e.g.*, Memorandum of Law in Support of Defendants John Fujiwara and Gladys Fujiwara's Motion to Dismiss the Trustee's Complaint, *Picard v. Fujiwara, (In re Bernard L. Madoff Inv. Secs. LLC)*, Adv. Pro. No. 10-04289 (BRL) (Bankr. S.D.N.Y.), ECF No. 30, at 12-19.

[30] The Complaint also seeks to disallow or subordinate a customer claim filed by Defendants Kenneth Citron and Leslie Shapiro for Account 1C1251.  The Trustee denied the customer claim because the Citrons withdrew more than $143,000 than they deposited into the account.  Kenneth Citron filed an objection to the Trustee's claim determination, and the Trustee seeks to have the Court overrule the objection and uphold the Trustee's determination.

broker-dealer because of the customer's fraud or for another reason, there is no basis in equity to

disallow his right to property in a SIPA proceeding."  Motion at 38 (quoting *Merkin II*, 515 B.R.

at 156).  Yet, this is what the Trustee has alleged—that the Family lacked title to the funds

deposited with BLMIS for these accounts, because the Family, with knowledge of Madoff's

fraud, funded the accounts with subsequent transfers of customer property.  (Compl. ¶ 102,

Exhibit B.)  In other words, the Shapiro Family lacked title to the property as it belongs to the

BLMIS estate for equitable distribution to innocent customers.  This fact also distinguishes the

Shapiro Family from the innocent fund investors Mr. Merkin defrauded.  *See Merkin II*, 515 B.R.

at 157 (finding that disallowing funds' customer claims would work a substantial inequity by

punishing the funds' innocent investors).  The Court therefore should permanently disallow the

customer claims under Code sections 502(a) and (b)(1).[31]  *See Secs. Inv. Prot. Corp. v. Stratton

Oakmont, Inc.*, 229 B.R. 273, 279 (Bankr. S.D.N.Y. 1999) ("A claim to which an objection has

been filed is allowed to the extent the claim is enforceable against the debtor under applicable

law.").

B.    **The Trustee May Equitably Subordinate Defendants' Customer Claims
      Because Defendants Misconduct Conferred An Unfair Advantage And
      Injured The BLMIS Estate.**

A Bankruptcy Court "may under principles of equitable subordination, subordinate for

purposes of distribution all or part of an allowed claim to all or part of another allowed

claim . . ."  11 U.S.C. § 510(c).  Equitable subordination is appropriate where a claimant's

misconduct is "contrary to equity and good conscience," *Katz*, 462 B.R. at 456 (citation and

marks omitted), and injures the creditors of the estate or confers an unfair advantage on the

---

[31] Alternatively, and for the reasons stated above, the Complaint adequately pleads that the Trustee may disallow the
customer claims on general principles of equity.  *See Adelphia Commc'ns. Corp. v. Bank of Am., N.A. (In re
Adelphia Communications Corp.)*, 365 B.R. 24, 68 (Bankr. S.D.N.Y. 2007).  The Trustee seeks to preserve his
equitable disallowance claim appeal.

claimant.  *Merkin II*, 515 B.R. at 158 (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)).  For insiders, the burden is on the claimant to prove good faith and to show that the claim is inherently fair from the viewpoint of the debtor.  *See Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 564 (Bankr. S.D.N.Y. 2002) (noting that a friend of the debtor's principal may be deemed an insider for the purpose of subordinating a claim).  For non-insiders, the Trustee must plead and prove that the claimant "engaged in 'gross and egregious' conduct 'tantamount to fraud, misrepresentation, overreaching or spoliation.'"  *Merkin II*, 515 B.R. at 158, (citing *80 Nassau Assocs. v. Crossland Fed. Savs. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 838-39 (Bankr. S.D.N.Y. 1994)).

Under either an insider or non-insider standard, the Trustee has adequately alleged that the Shapiro Family engaged in inequitable conduct.  Indeed, the Trustee has alleged that the Family had actual knowledge of Madoff's fraud.  *See Katz*, 462 B.R. at 456 ("Because the Amended Complaint adequately alleges that the defendants did not receive fraudulent transfers in good faith, it also adequately alleges that they engaged in inequitable conduct."); *Merkin II*, 515 B.R. 158 ("The Court has concluded that the Defendant Funds received the transfers in bad faith, and consequently, the TAC adequately pleads inequitable conduct.").

The Shapiro Family next asserts that the Complaint does not adequately allege that their conduct caused injury to other customers or conferred an unfair advantage.  Motion at 39-40. However, the Complaint alleges that the Shapiro Family members are "net winners" of more than $50 million in fictitious profits, and they funded the respective trusts with subsequent transfers of these fictitious profits.  (Compl. ¶ 101.)  These fictitious profits have conferred an obvious unfair advantage on the Family that has injured the estate as a whole.  *See Merkin II*, 515 B.R. at 160 (finding transfers to "net loser" funds injured the estate as a whole because "this

39

money would have been available for distribution to the other BLMIS investors who now find themselves net losers"). Accordingly, the Trustee has adequately pleaded a claim for equitable subordination of the Shapiro Family's customer claims.

## CONCLUSION

For the reasons set forth above, the Trustee respectfully requests that the Shapiro Family's Motion to Dismiss be denied in its entirety.

Dated: October 23, 2014              Respectfully submitted,
      New York, New York

By: */s/ David J. Sheehan*

Of Counsel:                      Baker & Hostetler LLP
                              45 Rockefeller Plaza
Baker & Hostetler LLP         New York, New York 10111
PNC Center                    Telephone: (212) 589-4200
1900 E. 9th Street, Suite 3200    Facsimile: (212) 589-4201
Cleveland, Ohio 44114         David J. Sheehan
Telephone: (216) 621-0200      Email: dsheehan@bakerlaw.com
Facsimile: (216) 696-0740      Fernando A. Bohorquez, Jr.
James H. Rollinson           Email: fbohorquez@bakerlaw.com
Email: jrollinson@bakerlaw.com  Ona T. Wang
                              Email: owang@bakerlaw.com
                              Torello H. Calvani
                              Email: tcalvani@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the substantively consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*

40