**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

## TRUSTEE'S TWELFTH INTERIM REPORT
## FOR THE PERIOD ENDING SEPTEMBER 30, 2014

# TABLE OF CONTENTS

**Page**

I.      EXECUTIVE SUMMARY ...........................................................................1

II.     BACKGROUND ....................................................................................3

III.    FINANCIAL CONDITION OF THE ESTATE ...............................................3

IV.     ADMINISTRATION OF THE ESTATE ......................................................4

     A.    Marshaling And Liquidating The Estate Assets .......................................4

V.      CLAIMS ADMINISTRATION ...................................................................5

     A.    Claims Processing ................................................................................5

          i.     Customer Claims ..........................................................................5

          ii.    General Creditor Claims ..............................................................6

          iii.   The Trustee Has Kept Customers Informed Of The Status Of The Claims Process .............................................................................6

          iv.    The Hardship Program ................................................................7

     B.    Objections To Claims Determinations ....................................................9

     C.    Settlements Of Customer Claims Disputes ..........................................10

VI.     PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA .............11

     A.    Net Equity Dispute ...........................................................................11

     B.    Time-Based Damages ........................................................................13

     C.    "Customer" Definition ......................................................................16

VII.    RECOVERIES AND CONTINGENCIES ...................................................21

     A.    Recoveries Accomplished During Prior Report Periods ........................21

     B.    Recoveries Accomplished During This Report Period ...........................21

     C.    Earlier Settlements ...........................................................................21

VIII.   THE TRUSTEE'S ALLOCATION OF FUNDS AND  DISTRIBUTIONS TO CUSTOMERS ...................................................................................22

     A.    The Customer Fund...........................................................................22

     B.    The Trustee's Initial Allocation of Property to the Fund of Customer Property and Authorizing the First Interim Distribution to Customers .................23

     C.    The Trustee's Second Allocation of Property to the Fund of Customer Property and Authorizing the Second Interim Distribution to Customers............24

     D.    The Trustee's Third Allocation of Property to the Fund of Customer Property and Authorizing the Third Interim Distribution to Customers...............26

     E.    The Trustee's Fourth Allocation of Property to the Fund of Customer Property and Authorizing the Fourth Interim Distribution to Customers..............27

## TABLE OF CONTENTS
(continued)

| | | | | Page |
|---|---|---|---|---|
| | F. | The General Estate | | 28 |
| IX. | | LITIGATION | | 28 |
| | A. | The District Court—Motions to Withdraw the Reference, Motions to Dismiss and Related Appeals | | 29 |
| | | i. | Proceedings Relating to Motions to Withdraw | 29 |
| | | | (a) The Administrative Order | 29 |
| | | | (b) Consolidated Briefing Orders | 30 |
| | | | (c) The 546(e) Appeal | 34 |
| | B. | Litigation in the Bankruptcy Court and Related Appeals | | 35 |
| | | i. | Avoidance Actions | 35 |
| | | ii. | Subsequent Transferee Actions | 37 |
| | | iii. | *Picard v. ABN AMRO Bank N.A.* | 39 |
| | | iv. | *Picard v. ABN AMRO (Ireland) Ltd.* | 41 |
| | | v. | *Picard v. Avellino* | 43 |
| | | vi. | *Picard v. BNP Paribas* | 44 |
| | | vii. | *Picard v. Citibank* | 45 |
| | | viii. | *Picard v. Cohmad Sec. Corp.* | 48 |
| | | ix. | *Picard v. Defender* | 49 |
| | | x. | *Picard v. Equity Trading* | 51 |
| | | xi. | *Picard v. Fairfield Greenwich* | 52 |
| | | xii. | *Picard v. Friedman* | 55 |
| | | xiii. | *Picard v. Richard M. Glantz* | 56 |
| | | xiv. | *Picard v. HSBC Bank plc* | 58 |
| | | xv. | *Picard v. JPMorgan Chase* | 60 |
| | | xvi. | *Picard v. Kingate* | 63 |
| | | xvii. | *The Kohn Action* | 65 |
| | | xviii. | *Picard v. Legacy Capital Limited* | 68 |
| | | xix. | *The Luxalpha Action* | 69 |
| | | xx. | *Picard v. Maccabee* | 70 |
| | | xxi. | *Picard v. Andrew H. Madoff* | 71 |
| | | xxii. | *Picard v. Magnify Inc.* | 77 |

# TABLE OF CONTENTS

(continued)

**Page**

xxiii. *Picard v. J. Ezra Merkin* ...................................................................78

xxiv. *Picard v. Merrill Lynch*.....................................................................84

xxv. *Picard v. Nomura Int'l plc* ...............................................................85

xxvi. *Picard v. PJ Administrators* .............................................................88

xxvii. *Picard v Rye/Tremont* .......................................................................88

xxviii. *Picard v. Stanley Shapiro* ................................................................91

xxix. *Picard v Vizcaya* ..............................................................................91

C. Injunction Proceedings.....................................................................93

i. *Picard v. Schneiderman* .................................................................94

ii. *Picard v. Fairfield Greenwich Ltd.*.................................................95

iii. *Goldman Partnership Lift-Stay Motions*.......................................96

iv. *Picard v. Kingate Global Fund, Ltd.* ..............................................98

X. INTERNATIONAL INVESTIGATION AND LITIGATION.........................................98

A. Austria and Italy................................................................................99

B. Bermuda.............................................................................................99

C. BVI and the Cayman Islands ............................................................99

D. England ............................................................................................101

E. Gibraltar ..........................................................................................101

F. Ireland .............................................................................................103

G. Switzerland and Luxembourg .........................................................103

XI. FEE APPLICATIONS AND RELATED APPEALS........................................103

A. Objections to Prior Fee Applications..............................................103

B. Fourteenth Fee Application.............................................................104

C. Fifteenth Fee Application ................................................................104

XII. CONCLUSION........................................................................................105

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, Esq. (the "Trustee"), as Trustee for the substantively consolidated liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the "Debtors"), respectfully submits his Twelfth Interim Report (this "Report") pursuant to SIPA § 78fff-1(c) and this Court's Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief entered on December 23, 2008 (the "Claims Procedures Order") (ECF No. 12).[2]  Pursuant to the Claims Procedures Order, the Trustee shall file additional interim reports every six (6) months.  This Report covers the period between April 1, 2014 and September 30, 2014 (the "Report Period").

## I.    EXECUTIVE SUMMARY

1.     The Trustee has worked relentlessly for nearly six years to recover customer property and distribute it to BLMIS customers.  Through pre-litigation and other settlements, the Trustee has successfully recovered or reached agreements to recover, over $9.8 billion—more than 56% of the currently estimated principal lost in the Ponzi scheme by those who filed claims—for the benefit of all BLMIS customers with allowed claims.[3]

---

[1] For convenience, subsequent references to SIPA will omit "15 U.S.C."

[2] All ECF references refer to pleadings filed in the main adversary proceeding pending before this Court, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. No. 08-01789 (BRL) (Bankr. S.D.N.Y.), unless otherwise noted.

[3] Almost $20 billion of principal was lost in the Ponzi scheme in total.  Of the $20 billion, approximately $17.5 billion of principal was lost by those who filed claims.

2.      On March 25, 2014, the Trustee moved for a fourth allocation and pro rata interim distribution of the Customer Fund.  On April 18, 2014, this Court entered an Order Approving the Trustee's Fourth Allocation of Property to the Fund of Customer Property and Authorizing a Fourth Interim Distribution to Customers, in which the Trustee allocated approximately $482.3 million to the Customer Fund.  On May 5, 2014, the Trustee distributed approximately $351.6 million on allowed claims relating to 1,081 accounts, or 3.180% of each customer's allowed claim, unless the claim was fully satisfied.  Subsequent to May 5, 2014 and through the end of the Report Period, an additional $497,515.83 was distributed as catch-up payments, bringing the total fourth interim distribution amount to $352.1 million.  When combined with the approximately $517.045 million first interim distribution, the $3.752 billion second interim distribution, the $523.9 million third interim distribution, and $814.7 million in advances paid or committed to be paid by the Securities Investor Protection Corporation ("SIPC"),[4] the Trustee has distributed almost $6 billion to BLMIS customers, with 1,129 BLMIS accounts fully satisfied.  The 1,129 fully satisfied accounts represent approximately 52% of accounts with allowed claims, demonstrating that the Trustee has made significant progress in returning customer property to BLMIS customers.

3.      The Trustee and his counsel (including, but not limited to, Baker & Hostetler LLP ("B&H"), Windels Marx Lane & Mittendorf, LLP ("Windels Marx"), and various special counsel retained by the Trustee ("Special Counsel") (collectively, "Counsel"), continued to litigate hundreds of individual cases before this Court, the United States District Court for the Southern District of New York (the "District Court"), the United States Court of Appeals for the

---

[4] SIPC has advanced over $813 million to date to the Trustee to pay allowed claims.  The difference between the amount committed to pay by SIPC and the amount actually advanced to customers depends on whether the Trustee has received an executed assignment and release from the customer. Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims is less than the amount of SIPC advances committed by the Trustee.

Second Circuit (the "Second Circuit"), the United States Supreme Court (the "Supreme Court"), and dozens of international courts.

4.       This Report is meant to provide an overview of the efforts of the Trustee and his team of professionals in unwinding the largest Ponzi scheme in history.  Billions of dollars and thousands of people and entities located across the world were involved in this fraud.  The Trustee continues to work diligently to coordinate the administration, investigation, and litigation to maximize efficiencies and reduce costs.

5.       All Interim Reports, along with a complete docket and substantial information about this liquidation proceeding, are located on the Trustee's website, www.madofftrustee.com.

## II.    BACKGROUND

6.       The Trustee's prior interim reports, each of which is fully incorporated herein,[5] have detailed the circumstances surrounding the filing of this case and the events that have taken place during prior phases of this proceeding.

## III.    FINANCIAL CONDITION OF THE ESTATE

7.       No administration costs, including the compensation of the Trustee and his counsel, are being paid out of recoveries obtained by the Trustee for the benefit of BLMIS customers.  Rather, the fees and expenses of the Trustee, his counsel and consultants, and administrative costs incurred by the Trustee are paid from administrative advances from SIPC.  These costs are chargeable to the general estate and have no impact on recoveries that the

---

[5] Prior reports cover the periods from December 11, 2008 to June 30, 2009 (the "First Interim Report") (ECF No. 314); July 1, 2009 to October 31, 2009 (the "Second Interim Report") (ECF No. 1011); November 1, 2009 to March 31, 2010 (the "Amended Third Interim Report") (ECF No. 2207); April 1, 2010 to September 30, 2010 (the "Fourth Interim Report") (ECF No. 3038); October 1, 2010 to March 31, 2011 (the "Fifth Interim Report") (ECF No. 4072); April 1, 2011 to September 30, 2011 (the "Sixth Interim Report") (ECF No. 4529); October 1, 2011 to March 31, 2012 (the "Seventh Interim Report") (ECF No. 4793); April 1, 2012 to September 30, 2012 (the "Eighth Interim Report") (ECF No. 5066); October 1, 2012 to March 31, 2013 (the "Ninth Interim Report") (ECF No. 5351); April 1, 2013 to September 30, 2013 (the "Tenth Interim Report") (ECF No. 5554); and October 1, 2013 to March 31, 2014 (the "Eleventh Interim Report") (ECF No. 6466).

Trustee has or will obtain. Thus, recoveries from litigation, settlements, and other means will be available in their entirety for the satisfaction of customer claims.

8.      A summary of the financial condition of the estate as of September 30, 2014 is provided in <u>Exhibit A</u> attached hereto.

9.      This summary reflects cash and cash equivalents in the amount of $189,613,688.00 and short-term United States Treasuries in the amount of $4,370,964,063.00.

10.     As detailed in <u>Exhibit A</u>, as of September 30, 2014, the Trustee requested and SIPC advanced $1,835,903,270.75, of which $811,217,064.44 was used to pay allowed customer claims up to the maximum SIPA statutory limit of $500,000 per account,[6] and $1,024,686,206.31 was used for administrative expenses.

## IV.     ADMINISTRATION OF THE ESTATE

### A.      <u>Marshaling And Liquidating The Estate Assets</u>

11.     The Trustee and his Counsel have worked diligently to investigate, examine, and evaluate the Debtor's activities, assets, rights, liabilities, customers, and other creditors. Thus far, the Trustee has been successful in recovering or entering into agreements to recover a significant amount of assets for the benefit of customers, totaling over $9.8 billion through September 30, 2014. For a more detailed discussion of prior recoveries, *see* Section V.B. of the First Interim Report; Section IV of the Second, Amended Third, and Fourth Interim Reports; Section VII of the Fifth Interim Report; Section IV of the Sixth Interim Report; and Section VII of the Seventh, Eighth, Ninth, Tenth and Eleventh Interim Reports.

---

[6] The Trustee must receive an executed assignment and release from each customer before releasing an advance of funds from SIPC. Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims that have been determined is less than the amount of SIPC advances committed by the Trustee. *See supra* note 4.

12.     The Trustee has identified claims in at least eight shareholder class action suits that BLMIS filed before the Trustee's appointment arising out of its proprietary and market making desk's ownership of securities.  As of the Twelfth Interim Report, the Trustee had received distributions from seven of these class action settlements totaling over $91,000.  The Trustee has not and will not receive any distributions from the eighth class action settlement.  In addition, the Trustee has identified claims that BLMIS may have in 175 other class action suits also arising out of its proprietary and market making activities.  The Trustee has filed proofs of claim in 118 of these cases and, based on a review of relevant records, has declined to pursue claims in 44 additional cases.  Subject to the completion of a review of relevant records, the Trustee intends to file claims in the remaining 13 cases.  As of September 30, 2014, the Trustee has recovered $1,288,808.76 from settlements relating to 53 of the 118 claims filed directly by the Trustee, of which $41,415.09 was recovered during the Report Period.

## V.     CLAIMS ADMINISTRATION

### A.     Claims Processing

#### i.     Customer Claims

13.     During the Report Period, the Trustee allowed $18,576,652.00 in customer claims.  This brings the total amount of allowed claims as of September 30, 2014 to $11,420,440,149.75.  The Trustee has paid or committed to pay $814,747,373.62 in cash advances from SIPC.  This is the largest commitment of SIPC funds of any SIPA liquidation proceeding and greatly exceeds the total aggregate payments made in all SIPA liquidations to date.

14.     As of September 30, 2014, there were 150 claims relating to 107 accounts that were "deemed determined," meaning the Trustee has instituted litigation against those accountholders and related parties.  The complaints filed by the Trustee in those litigations set

forth the express grounds for disallowance of customer claims under § 502(d) of the Bankruptcy Code. Accordingly, such claims will not be allowed until the avoidance actions are resolved by settlement or otherwise and the judgments rendered against the claimants in the avoidance actions are satisfied.

### ii.     General Creditor Claims

15.     As of September 30, 2014, the Trustee had received 427 timely and 22 untimely filed secured and unsecured priority and non-priority general creditor claims totaling approximately $1.7 billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. Of these 427 claims and $1.7 billion, the Trustee has received 94 general creditor claims and 49 broker-dealer claims totaling approximately $264.9 million. At this time, the BLMIS estate has no funds from which to make distributions to priority/non-priority general creditors and/or broker dealers.

### iii.     The Trustee Has Kept Customers Informed Of The Status Of The Claims Process

16.     Throughout the liquidation proceeding, the Trustee has kept customers, interested parties, and the public informed of his efforts by maintaining the Trustee Website, a toll-free customer hotline, conducting a Bankruptcy Code § 341(a) meeting of creditors on February 20, 2009, and responding to the multitude of phone calls, e-mails, and letters received on a daily basis, from both claimants and their representatives.

17.     The Trustee Website allows the Trustee to share information with claimants, their representatives, and the general public regarding the ongoing recovery efforts and the overall liquidation. In addition to court filings, media statements, and weekly information on claims determinations, the Trustee Website includes up-to-date information on the status of Customer Fund recoveries, an "Ask the Trustee" page where questions of interest are answered and

updated, a letter from the Chief Counsel to the Trustee on litigation matters, a detailed distribution page, an FAQs page, and a timeline of important events. The Trustee Website is monitored and updated on a daily basis.

18.    In addition, the Trustee Website allows claimants to e-mail their questions directly to the Trustee's professionals, who follow up with a return e-mail or telephone call to the claimants. As of September 30, 2014, the Trustee and his professionals had received and responded to more than 7,000 e-mails via the Trustee Website from BLMIS customers and their representatives.

19.    The toll-free customer hotline provides status updates on claims and responses to claimants' questions and concerns. As of September 30, 2014, the Trustee, B&H, and the Trustee's professionals had fielded more than 8,000 calls from claimants and their representatives.

20.    In sum, the Trustee and his team have endeavored to respond in a timely manner to every customer inquiry and ensure that customers are as informed as possible about various aspects of the BLMIS proceeding.

### iv.    **The Hardship Program**

21.    At the commencement of claims administration, the Trustee established the Hardship Program to accelerate the determination of claims and the receipt of SIPC protection up to $500,000 for individual account holders who were dealing with hardship. An individual could qualify for the Hardship Program if he or she filed a claim and was: (i) unable to pay for necessary living or medical expenses, (ii) over 65 years old and forced to reenter the work force after retirement, (iii) declaring personal bankruptcy, (iv) unable to pay for the care of dependents, or (v) suffering from extreme financial hardship beyond the identified circumstances.

- 7 -

22.    As of December 11, 2010, the Trustee had received 394 Hardship Program applications.  The Trustee obtained advances from SIPC and issued 122 checks to hardship applicants with allowed claims.  The Trustee also worked in good faith with approved applicants to reconcile any disputed portions of their claims.  Of the 394 Hardship Program applications received prior to December 11, 2010, the Trustee assessed the information provided and, in the exercise of his discretion, decided not to commence avoidance actions against 249 hardship applicants.

23.    The Trustee expanded the Hardship Program into a second phase as he instituted avoidance actions.  While the law requires the Trustee to pursue avoidance actions to recover customer property, the Trustee has stated that he will not pursue avoidance actions against BLMIS accountholders suffering proven hardship.  In order to forego an avoidance action, the Trustee needed financial information about the accountholder.  Thus, the Trustee announced in November 2010 that the Hardship Program would focus on avoidance action defendants and requested that accountholders come forward to share information regarding their hardships.  Through this program, the Trustee has worked with a substantial number of hardship applicants who were subject to avoidance actions to confirm their hardship status and forego the pursuit of an avoidance action.

24.    As of September 30, 2014, the Trustee had received 517 applications from avoidance action defendants relating to 328 adversary proceedings.  After reviewing the facts and circumstances presented in each application and, in many cases, requesting additional verifying information, the Trustee dismissed 208 Hardship Program applicants-defendants from avoidance actions.  As of September 30, 2014, there were 69 applications still under review and 240 that were resolved because they were either withdrawn by the applicant, deemed withdrawn

for failure of the applicant to pursue the application, denied for lack of hardship or referred for consideration of settlement. The Trustee has also extended the time for applicants to answer or otherwise respond to avoidance action complaints while their Hardship Program applications are pending.

25. The Trustee established a Hardship Program Hotline with a telephone number and electronic mail address. A large number of potential applicants have been assisted by the Trustee through the use of the Hotline, and the Trustee urges customers to continue using this resource and the Hardship Program if they believe they qualify. Further information and applications are available on the Trustee Website.

**B.   Objections To Claims Determinations**

26. As required by the Claims Procedures Order and described in each determination letter sent by the Trustee ("Determination Letter"), BLMIS claimants have thirty days from the date of a Determination Letter to object to the Trustee's determination of their claim. Claimants who disagree with the Trustee's determination of their claim must file with the Court a written opposition setting forth the grounds of disagreement and provide the Trustee with the same. A hearing date will be obtained by the Trustee, and claimants will be notified of that date. As of September 30, 2014, 2,252 objections (which include duplicates, amendments, and supplements) have been filed with the Court. These objections relate to 3,972 unique claims and 1,139 accounts.

27. The following objections, among others, have been asserted: (i) Congress intended a broad interpretation of the term "customer" and the statute does not limit the definition to those who had a direct account with BLMIS, (ii) the Trustee should determine claims based upon the BLMIS November 30, 2008 statement as opposed to the court-approved cash in-cash out or "Net Investment Method," (iii) claimants should receive interest on deposited

amounts, (iv) the Trustee must commence an adversary proceeding against each claimant in order to avoid paying gains on claimants' investments, (v) claimants paid income taxes on distributions and their claims should be adjusted by adding all amounts they paid as income taxes on fictitious profits, (vi) each person with an interest in an account should be entitled to the SIPC advance despite sharing a single BLMIS account, and (vii) there is no legal basis for requiring the execution of a Assignment and Release prior to prompt payment of a SIPC advance.

28.      The Trustee has departed from past practice in SIPA proceedings and paid or committed to pay the undisputed portion of any disputed claim in order to expedite payment of SIPC protection to customers, while preserving their right to dispute the total amount of their claim.

### C.      Settlements Of Customer Claims Disputes

29.      The Trustee has continued settlement negotiations with customers who withdrew funds from their BLMIS accounts within ninety days of the Filing Date.[7]  Such withdrawals are preferential transfers recoverable by the Trustee under Bankruptcy Code §§ 547(b) and 550(a), which are applicable in this proceeding pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3).  To settle potential preference actions against these customers, the Trustee has proposed that the customers agree to authorize the Trustee to deduct the preferential amount from the initial payment advanced by SIPC pursuant to § 78fff-3(a)(1) of SIPA.  The allowed claim is thus calculated based on the amount of money the customer deposited with BLMIS for the purchase of securities, less subsequent withdrawals, plus the preferential amount.  The customer will be entitled to receive an additional distribution from the Customer Fund based on the total amount of the allowed claim.

---

[7] In this case, the Filing Date is the date on which the SEC commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* § 78*lll*(7)(B) of SIPA, 15 U.S.C. § 78*lll*(7)(B).

30.     As of September 30, 2014, the Trustee had reached agreements relating to 594 accounts and with the IRS (which did not have a BLMIS account), recovering $8,848,879,635.23 in litigation, pre-litigation, and avoidance action settlements.  These litigation, pre-litigation, and avoidance action settlements allowed the Trustee to avoid the litigation costs that would have been necessary to obtain and collect judgments from these customers.

## VI.    PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA

### A.    Net Equity Dispute

31.     For purposes of determining each customer's Net Equity, as that term is defined under SIPA, the Trustee credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn from that BLMIS customer account, also known as the Net Investment Method.  Some claimants argued that the Trustee was required to allow customer claims in the amounts shown on the November 30, 2008 customer statements (the "Net Equity Dispute").

32.     This Court issued a decision on March 1, 2010 upholding the Trustee's Net Investment Method as the only interpretation consistent with the plain meaning and legislative history of the statute, controlling Second Circuit precedent, and considerations of equity and practicality.  (ECF No. 2020); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).  This Court certified an immediate appeal to the Second Circuit (ECF No. 2467), which heard oral argument on March 3, 2011.

33.     On August 16, 2011, the Second Circuit affirmed this Court's decision and the Trustee's Net Investment Method, holding that it would have been "legal error" for the Trustee to discharge claims for securities under SIPA "upon the false premise that customers' securities positions are what the account statements purport them to be."  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 241 (2d Cir. 2011).  Any calculation other than

the Net Investment Method would "aggravate the injuries caused by Madoff's fraud." *Id*. at 235. Instead, the Net Investment Method prevents the "whim of the defrauder" from controlling the process of unwinding the fraud. *Id*.

34.     Under the Second Circuit's decision, the relative position of each BLMIS customer account must be calculated based on "unmanipulated withdrawals and deposits" from its opening date through December 2008. *Id*. at 238. If an account has a positive cash balance, that accountholder is owed money from the estate. As a corollary, if an account has a negative cash balance, the accountholder owes money to the estate. Both the recovery and distribution of customer property in this case are centered on the principle that the Trustee cannot credit "impossible transactions." *Id*. at 241. If he did, then "those who had already withdrawn cash deriving from imaginary profits in excess of their initial investment would derive additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed." *Id*. at 238.

35.     First, the Second Circuit found, "in the context of this Ponzi scheme—the Net Investment Method is . . . more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud . . . and 'avoid[s] placing some claims unfairly ahead of others.'" *Id*. at 242 n.10 (quoting *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 463 (S.D.N.Y. 2001)). Thus, the Trustee is obligated to use the avoidance powers granted by SIPA and the Bankruptcy Code to prevent one class of customers—the "net winners" or those with avoidance liability—from having the benefit of Madoff's fictitious trades at the expense of the other class of customers—the "net losers," or those who have yet to recover their initial investment.

36.     Next, the Second Circuit explained that "notwithstanding the BLMIS customer statements, there were no securities purchased and there were no proceeds from the money entrusted to Madoff for the purpose of making investments." *Id.* at 240.   Therefore any "[c]alculations based on made-up values of fictional securities would be 'unworkable' and would create 'potential absurdities.'" *Id.* at 241 (quoting *In re New Times Sec. Serv., Inc.*, 371 F.3d 68, 88 (2d Cir. 2004)).   Thus, the Second Circuit rejected reliance upon the BLMIS account statements, finding that, to do otherwise, "would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations." *Id.* at 235.

37.     On September 6, 2011, certain claimants filed a petition for panel rehearing, or, in the alternative, for rehearing en banc. *Sterling Equities Assoc. v. Picard*, Adv. No. 10-2378 (2d Cir.) (ECF Nos. 505, 537).   The panel that determined the appeal considered the request for panel rehearing, the active members of the Court considered the request for rehearing en banc, and on November 8, 2011, both denied the petition.  (ECF No. 551).

38.     Three petitions for certiorari were filed with the Supreme Court.  On June 25, 2012, the Supreme Court denied certiorari in two of the petitions. *Ryan v. Picard*, 133 S. Ct. 24 (2012); *Velvel v. Picard*, 133 S. Ct. 25 (2012).   Certiorari was also dismissed with respect to one appeal. *Sterling Equities Assoc. v. Picard*, 132 S. Ct. 2712 (2012).

**B.     Time-Based Damages**

39.     Following the Supreme Court decision denying certiorari regarding the Net Investment Method, the Trustee filed a motion on July 17, 2012 (the "Scheduling Motion") (ECF No. 4920) for an order (the "Scheduling Order") requesting a briefing schedule regarding the question of whether customer claims should be recalculated with an interest factor or a constant dollar adjustment ("Time-Based Damages Issue").   Approximately 1,200 objections raised the

Time-Based Damages Issue.  Claimants raised numerous theories of law, all of which seek some increase in their customer claims based upon the amount of time they invested with BLMIS. Most commonly, they seek an increase in their claims based on the time they were invested with BLMIS using the New York prejudgment rate of 9% per annum, lost opportunity cost damages, or the consumer price index to take inflation into account.  The Trustee is using "Time-Based Damages" as an umbrella term.

40.    Two objections were filed in response to the Trustee's Scheduling Motion by HHI Investment Trust #2 and Blue Star Investors, LLC (collectively, the "HHI Parties") (ECF Nos. 4957, 5004).  Martin, Richard, and Steven Surabian (the "Surabians") also filed an objection. (ECF No. 4952).  Sidney and Ethel Chambers filed a letter.  (ECF No. 4999).  The Trustee filed responses asserting, among other things, a lack of standing by the HHI Parties and the Surabians. (ECF Nos. 5001, 5009).

41.    After a hearing on September 5, 2012, at which the Court heard argument on behalf of non-claimant avoidance defendants, the HHI Parties, it approved the Scheduling Order establishing the scope and schedule for briefing of Time-Based Damages, overruling the objections, and scheduling a hearing on the Trustee's motion (the "Time-Based Damages Motion") to be held on January 10, 2013.  (ECF No. 5022).  In its order, the Court stated that the sole purpose of the Time-Based Damages Motion would be to resolve the legal issues raised in the claims and objections relating to the Time-Based Damages Issue.  *Id.*

42.    On October 12, 2012, the Trustee filed his Time-Based Damages Motion and Memorandum of Law for an Order Affirming Trustee's Calculations of Net Equity and Denying Time-Based Damages.  (ECF Nos. 5038, 5039).  The Trustee's position that customer claims

under SIPA should not include Time-Based Damages was supported by SIPC in its Memorandum of Law filed the same day.  (ECF No. 5036).

43.     On or around December 3, 2012, ten briefs were filed on behalf of various BLMIS customers objecting to the Trustee's Time-Based Damages Motion.  On December 10, 2012, the Securities and Exchange Commission ("SEC") filed its brief on the Time-Based Damages Motion.  (ECF No. 5142).

44.     On or around December 7, 2012, a group of customers similarly situated to the HHI Parties in that they had not filed timely claims, sought to move to intervene in the Time-Based Damages Motion on the same basis that the HHI Parties had objected to the Scheduling Order.  (ECF No. 5141).  The Trustee objected (ECF No. 5184), and the Court denied the request to intervene.  (ECF No. 5185).  After the Court denied the request to intervene, the Trustee and a third group of similarly situated customers in that they had not filed timely claims, stipulated that they were covered by the Court's previous order denying the request to intervene.  (ECF No. 5224).  Appeals were taken by these customers from the Court's denials to intervene.  *See In re Bernard L. Madoff Inv. Sec. LLC*, Adv. No. 13-cv-1300-TPG (S.D.N.Y., Feb. 26, 2013).  On September 10, 2013, the District Court affirmed this Court's denial of the requests to intervene.  (ECF No. 43).

45.     On or around December 17, 2012, certain parties calling themselves the "Customer Group" requested discovery from the Trustee and his professionals in connection with the Time-Based Damages Motion.  (ECF No. 5133).  Thereafter, this Court entered an amended scheduling order that adjourned the remaining deadlines for the Time-Based Damages Motion.  (ECF No. 5212).

46.    On April 29, 2013, the Customer Group filed a supplemental opposition brief. (ECF No. 5332).  On July 18, 2013, the Trustee and SIPC filed their reply briefs.  (ECF Nos. 5415, 5413).  On August 12, 2013, the Customer Group filed an opposition to the Trustee's request to have the testimony of Timothy Hart excluded.  (ECF No. 5444).  The Court held a hearing on the matter on September 10, 2013.

47.    On the same day, this Court issued its Memorandum Decision and Order Granting, To The Extent Set Forth Herein, The Trustee's Motion For An Order Affirming the Trustee's Calculation of Net Equity And Denying Time-Based Damages (the "Time-Based Damages Decision").  (ECF No. 5463).  The Court granted the Trustee's motion, finding that claimants were not entitled to time-based damages as part of their net equity claims against the fund of customer property.

48.    Thereafter, the Trustee, SIPC, and the Customer Group submitted a letter to the Court requesting that the Court certify a direct appeal of the Time-Based Damages Decision to the Second Circuit under 28 U.S.C. § 158(d)(2).  (ECF No. 5488).  On September 24, 2013, the Court certified the Time-Based Damages Decision for a direct appeal to the Second Circuit, (ECF No. 5514), which was accepted on January 22, 2014.  *In re Bernard L. Madoff Inv. Sec. LLC*, No. 14-97(L) (2d Cir. Jan. 22, 2014).  Briefing has been completed before the Second Circuit, and an oral argument took place on October 14, 2014.  The matter is *sub judice*.

C.    **"Customer" Definition**

49.    The Trustee's position consistently has been that only those claimants who maintained an account at BLMIS constitute "customers" of BLMIS, as defined in § 78*lll*(2) of SIPA.  Where it appeared that claimants did not have an account in their names at BLMIS ("Claimants Without An Account"), the Trustee denied their claims for securities and/or a credit balance on the ground that they were not customers of BLMIS under SIPA.

50.      On June 11, 2010, the Trustee filed a Motion For An Order To Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds.  (ECF Nos. 2410–2413, 2416).  The motion addressed only those claimants whose claims emanated from their direct or indirect investments in sixteen so-called feeder funds that, in turn, had accounts with and invested directly with BLMIS.

51.      This Court held a hearing on October 19, 2010.  On June 28, 2011, this Court issued a Memorandum Decision and Order affirming the Trustee's denial of these claims.  (ECF Nos. 3018, 4193, 4209); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011).

52.      This Court found that, in light of the plain language of SIPA and relevant case law, the investor-claimants did not qualify as "customers" under SIPA.  This Court found that the objecting claimants invested in, not through, the feeder funds, and had no individual accounts at BLMIS.  It was the feeder funds who entrusted their monies with BLMIS for the purpose of trading or investing in securities—the touchstone of "customer" status—whereas the objecting claimants purchased ownership interests in the feeder funds.  This Court held that, absent a direct broker-dealer relationship with BLMIS, the objecting claimants sought a definition of "customer" that stretched the term beyond its limits.

53.      Judge Lifland put it succinctly: the objecting-claimants who invested in sixteen feeder funds did not qualify as "customers" because they "had no securities accounts at BLMIS, were not known to BLMIS, lacked privity and any financial relationship with BLMIS, lacked property interests in any Feeder Fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment discretion over Feeder Fund assets invested with BLMIS, received no account statements or other communications from BLMIS and had no transactions reflected

on the books and records of BLMIS . . . ."  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. at 290.

54.     Twenty-seven notices of appeal were filed and assigned to United States District Judge Denise L. Cote.  *See Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, No. 11-cv-05683 (DLC) (S.D.N.Y.).  On January 4, 2012, Judge Cote affirmed the June 28, 2011 order of this Court.  *See Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, 480 B.R. 117 (S.D.N.Y. 2012).  In that decision, Judge Cote determined in light of SIPA, the "most natural reading of the 'customer' definition excludes persons like the appellants who invest in separate third-party corporate entities like their feeder funds, that in turn invest their assets with the debtor." *Id.* at 123.  Thus, the District Court held that the feeder funds were the BLMIS customers and the appellants were precluded from seeking separate recoveries as additional SIPA claimants.  *Id.* at 129–30.

55.     On January 6, 2012, four appeals were taken from Judge Cote's decision to the Second Circuit.  *See Bricklayers and Allied Craftsman Local 2 Annuity Fund v. Sec. Investor Prot. Corp., Irving H. Picard,* No. 12-410 (2d Cir. Jan. 31, 2012)*; Rosamilia v. Sec. Investor Prot. Corp., Irving H. Picard,* No. 12-437 (2d Cir. Feb. 2, 2012)*; Kruse v. Sec. Investor Prot. Corp., Irving H. Picard,* No. 12-483 (2d Cir. Feb. 6, 2012)*; Upstate N.Y. Bakery Drivers and Indus. Pension Fund v. Sec. Investor Prot. Corp., Irving H. Picard*, No. 12-529 (2d Cir. Feb. 3, 2012).  On February 22, 2013, the Second Circuit affirmed the decisions of the District Court and the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  *See Kruse v. Sec. Investor Prot. Corp., Irving H. Picard*, 708 F.3d 422 (2d Cir. 2013).

56.     On another matter involving the interpretation of the "customer" definition, on October 5, 2011, the Trustee moved before this Court for an order establishing a briefing schedule and hearing to affirm his determination that ERISA did not alter his denial of

"customer" status to certain claimants. (ECF No. 4432). This Court entered a scheduling order on November 8, 2011. (ECF No. 4507).

57.    On November 14, 2011, the Trustee filed his Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections. (ECF No. 4521) (the "ERISA Motion"). On or around January 17, 2012, approximately eighteen opposition briefs to the ERISA Motion were filed on behalf of various ERISA claimants. (ECF Nos. 4625–4628, 4631–4633, 4635, 4637–4643, 4652–4654). On March 2, 2012, the Trustee filed his Memorandum in Support of the Trustee's Motion For An Order Affirming Trustee's Determinations Denying Claims Over ERISA-Related Objections. (ECF No. 4703). On April 2, 2012, five replies to the ERISA Motion were filed on behalf of various ERISA claimants. (ECF Nos. 4746, 4748, 4750, 4755, 4756). The Trustee's sur-reply was filed on April 20, 2012. (ECF No. 4781).

58.    During the pendency of the above briefing, certain ERISA claimants also filed motions to withdraw the reference on the ERISA Motion from this Court to the District Court. *See Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, No. 12-cv-01039-DLC (S.D.N.Y. Aug. 6, 2012) (filed on behalf of J. X. Reynolds & Co. Deferred Profit Sharing Plan, Jacqueline Green Rollover Account and Wayne D. Green Rollover Account); *Sec. Investor Prot. Corp. v. I.B.E.W. Local 241 Pension Fund*, No. 12-cv-01139-DLC (S.D.N.Y. Aug. 6, 2012) (filed on behalf of thirty-seven ERISA plan claimants). On February 28, 2012 and March 1, 2012, these motions were accepted as related to the appeals decided by Judge Cote in *Aozora Bank*, 480 B.R. 117 (S.D.N.Y. 2012), discussed above, and were re-assigned to Her Honor. Judge Cote withdrew the reference on April 20, 2012. *Jacqueline Green Rollover Account*, No. 12-cv-01039-DLC (S.D.N.Y.), ECF No. 7.

- 19 -

59.     On July 25, 2012, the District Court granted the Trustee's ERISA Motion.  *See Id.*
(ECF No. 29).  The District Court found that the ERISA claimants were not "customers" under
SIPA because they did not deposit money with BLMIS for the purchase of securities and did not
own the assets of the ERISA plans that were deposited with BLMIS.  *Id.*  No appeal was taken
from this opinion and order.

60.     On June 27, 2013, the Trustee filed the Trustee's Second Motion to Affirm
Trustee's Determinations Denying Claims of Claimants Who Invested in Certain Feeder Funds
and Did Not Have BLMIS Accounts in Their Names.  ECF Nos. 5396, 5397, 5398, 5399, 5438,
5439 (collectively, the "Second Feeder Fund Motion".)  On August 21, 2013, the Court issued
the Second Feeder Fund Decision.  ECF No. 5450.  That decision reaffirmed that "the burden is
on the claimant to establish he is a 'customer' entitled to SIPA protection, and such a showing is
not easily met." *Id.* at 4 (quoting 454 BR at 294).  Also, the Court determined that the claimants
"failed to [meet their burden] because they lack any indicia of a 'customer' relationship with
BLMIS."  In particular, "they had no securities accounts at BLMIS, were not known to BLMIS,
lacked privity and any financial relationship with BLMIS, lacked property interest in any feeder
fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment
discretion over feeder fund assets invested with BLMIS, received no account statements or other
communications from BLMIS and had no transactions reflected on the books and records at
BLMIS." *Id.* at p. 4.  The Second Feeder Fund Decision was not appealed.

61.     On April 30, 2014, the Trustee filed a motion to affirm his determinations
denying claims of claimants who invested in certain ERISA plans.  ECF Nos. 6489, 6491, 6492.
In an opinion rendered on August 22, 2014, the Court determined that the claimants were not
"customers" of BLMIS within the meaning of SIPA.  ECF No. 7761.

- 20 -

## VII.    RECOVERIES AND CONTINGENCIES

### A.    Recoveries Accomplished During Prior Report Periods

62.    In the Sixth Interim Report, Seventh Interim Report, Eighth Interim Report, Ninth Interim Report, Tenth Interim Report and Eleventh Interim Report, the Trustee reviewed the significant settlements entered into during those and prior report periods.  Prior to this Report Period, the Trustee had recovered or reached agreements to recover approximately $9.8 billion for the benefit of BLMIS customers.  *See* Trustee's Sixth Interim Report ¶¶ 52–63 (ECF No. 4529); Trustee's Seventh Interim Report ¶¶ 56–62 (ECF No. 4793); Trustee's Eighth Interim Report ¶¶ 57–61 (ECF No. 5066); Trustee's Ninth Interim Report ¶¶ 59 – 61 (ECF No. 5351); Trustee's Tenth Interim Report ¶¶ 61-62 (ECF No. 5554); and Trustee's Eleventh Interim Report ¶¶ 61-62 (ECF No. 6466).

### B.    Recoveries Accomplished During This Report Period

63.    During this Report Period, the Trustee settled 32 cases for a total recovery of $41,665,099.65.  Currently, the Trustee has successfully recovered or reached agreements to recover over $9.8 billion.

64.    On February 5, 2014, this Court approved a settlement in the adversary proceeding entitled *Picard v. JPMorgan Chase Co., et al.,* Adv. No. 10-4932 (SMB) (Bankr. S.D.N.Y. February 5, 2014), ECF No. 52.  Details of that settlement are reported in Section IX(B)(xv) of this Report.

### C.    Earlier Settlements

65.    In the Eleventh Interim Report, the Trustee reported on the following settlements: Estate of Norman F. Levy, Fairfield, Tremont, Maxam and Picower.  *See* Trustee's Eleventh Interim Report ¶¶ 63-74 (ECF No. 6466).

66.      Through the end of the Report Period, the Trustee recovered $552,633,587.16 as a result of preference and other settlements that were made pursuant to agreements subject to the Net Equity Dispute.  Although the main Net Equity Dispute has been finally determined, ancillary issues, such as Time-Based Damages, remain unresolved.  On September 10, 2013, the Court entered an order denying the request to use Time-Based Damages in making the net equity calculation.  (ECF No. 5463).  The Court further certified the decision denying the use of Time-Based Damages to the Second Circuit for review.   On January 22, 2014, the Second Circuit accepted the petition for immediate appeal of the decision on the use of Time-Based Damages in making the net equity calculation.  Oral argument before the Second Circuit occurred on October 14, 2014.  The matter is *sub judice*.  *See* discussion *supra* Section VI(B).

## VIII.   THE TRUSTEE'S ALLOCATION OF FUNDS AND DISTRIBUTIONS TO CUSTOMERS

### A.      The Customer Fund

67.      In order to protect customers of an insolvent broker-dealer such as BLMIS, Congress established a statutory framework pursuant to which customers of a debtor in a SIPA liquidation are entitled to preferential treatment in the distribution of assets from the debtor's estate.  The mechanism by which customers receive preferred treatment is through the creation of a Customer Fund, as defined in SIPA § 78*lll*(4), which is distinct from a debtor's general estate.  Customers holding allowable claims are entitled to share in the Customer Fund based on each customer's net equity as of the filing date, to the exclusion of general creditors.  SIPA § 78fff-2(c).

68.      In order to make interim distributions from the Customer Fund, the Trustee must determine or be able to sufficiently estimate: (a) the total value of customer property available for distribution (including reserves for disputed recoveries), and (b) the total net equity of all

allowed claims (including reserves for disputed claims).  Each element of the equation—the

customer property numerator and the net equity claims denominator—is inherently complex in a

liquidation of this magnitude.

69.     There are many unresolved issues in this liquidation proceeding that require the

maintenance of substantial reserves.  Nonetheless, the liquidation proceeding progressed to a

stage at which it was possible for the Trustee, on an interim basis, to determine: (a) the allocation

of property to the Customer Fund, or the "numerator" (taking reserves into account), (b) the

amount of allowable net equity claims, or the "denominator" (also taking reserves into account),

and (c) the calculation of each customer's minimum ratable share of the Customer Fund.

**B.     The Trustee's Initial Allocation of Property to the Fund of Customer Property and
Authorizing the First Interim Distribution to Customers**

70.     On May 4, 2011, the Trustee moved for an initial allocation and pro rata interim

distribution of the Customer Fund to customers whose claims had not been fully satisfied

because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit

of $500,000 (respectively, the "First Allocation" and "First Interim Distribution").  (ECF No.

4048).  This motion was unopposed, and the Court entered the Order Approving the Trustee's

Initial Allocation of Property to the Fund of Customer Property and Authorizing An Interim

Distribution to Customers on July 12, 2011.  (ECF No. 4217).

71.     On October 5, 2011, the Trustee distributed $311.854 million, or 4.602% of each

BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Subsequent to

October 5, 2011, an additional $205.191 million was distributed as catch-up payments, bringing

the total First Interim Distribution amount to $517.045 million through the end of the Report

Period.[8]  The First Interim Distribution was made to 1,314 BLMIS accounts,[9] and 39 payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

72.    The First Allocation and First Interim Distribution were initial and interim in nature because the Trustee anticipated recovering additional assets through litigation and settlements, and resolving the issues on appeal that require reserves.

**C.    The Trustee's Second Allocation of Property to the Fund of Customer Property and Authorizing the Second Interim Distribution to Customers**

73.    During the year after the Trustee made the First Interim Distribution, the Trustee recovered significant additional assets through litigation and settlements, as well as the resolution of issues on appeal that required reserves.

74.    In particular, the Supreme Court resolved the Net Equity Dispute on June 25, 2012, and the Trustee received the Picower settlement funds after the final order of forfeiture became final and non-appealable on July 16, 2012.

75.    Thus, the Trustee was prepared to make a second significant distribution to BLMIS customers in an amount as great as $3.019 billion, or 41.826% of each customer's allowed claim, unless the claim had been fully satisfied.  However, in order to maintain adequate reserves for the Time-Based Damages Issue, the Trustee was unable to distribute the entire $3.019 billion.

76.    On July 26, 2012, the Trustee filed a motion seeking entry of an order approving the second allocation of property to the Customer Fund and authorizing the second interim

[8] Subsequent to the Report Period ending on September 30, 2014, an additional $176,353.70 was distributed as catch-up payments, bringing the total First Interim Distribution amount to $517.221 million through October 24, 2014.

[9] Subsequent to the Report Period ending on September 30, 2014, three additional BLMIS accounts were given distributions from the First Interim Distribution, bringing the total number of BLMIS accounts to 1,317.

- 24 -

distribution to customers whose claims have not been fully satisfied because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "Second Allocation" and "Second Interim Distribution").  (ECF No. 4930).

77.    In connection with the Second Interim Distribution, the Trustee proposed holding in reserve an amount sufficient for the Trustee to pay Time-Based Damages assuming an interest rate of three percent (the "3% Reserve") or, in the alternative, nine percent (the "9% Reserve"). Four objections were made to the Trustee's motion, seeking the imposition of the 9% Reserve. (ECF Nos. 4965, 4966, 4971, 4976).

78.    On August 22, 2012, this Court held a hearing and entered an Order Approving the Trustee's Second Allocation of Property to the Fund of Customer Property and Authorizing a Second Interim Distribution to Customers, with a 3% Reserve.  (ECF No. 4997).

79.    Thus, on September 19, 2012, the Trustee distributed $2.479 billion, or 33.556% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Subsequent to September 19, 2012, an additional $1.273 billion was distributed as catch-up payments, bringing the total Second Interim Distribution amount to $3.752 billion through the end of the Report Period.[10]  The Second Interim Distribution was made to 1,300 BLMIS accounts,[11] and 39 payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

---

[10] Subsequent to the Report Period ending on September 30, 2014, an additional $1.160 million was distributed as catch-up payments, bringing the total Second Interim Distribution amount to $3.753 billion through October 24, 2014.

[11] Subsequent to the Report Period ending on September 30, 2014, three additional BLMIS accounts were given distributions from the Second Interim Distribution, bringing the total number of BLMIS accounts to 1,303.

- 25 -

**D.** **The Trustee's Third Allocation of Property to the Fund of Customer Property and Authorizing the Third Interim Distribution to Customers**

80.     During the months after the Second Interim Distribution, the Trustee recovered significant additional assets thorough litigation and settlements, particularly the Tremont settlement. *See* discussion *supra* Section IX(B)(xxvii).

81.     On February 13, 2013, the Trustee filed a motion seeking entry of an order approving the third allocation of property to the Customer Fund and authorizing the third interim distribution to customers whose claims have not been fully satisfied because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "Third Allocation" and "Third Interim Distribution").  (ECF No. 5230).

82.     In connection with the Third Interim Distribution, the Trustee proposed holding reserves in connection with the Levy settlement appeal, the Internal Revenue Service (the "IRS") settlement and net loser accounts currently in litigation. *Id.*

83.     On March 13, 2013, this Court held a hearing and entered an Order Approving the Trustee's Third Allocation of Property to the Fund of Customer Property and Authorizing a Third Interim Distribution to Customers.  (ECF No. 5271).

84.     Thus, on March 29, 2013, the Trustee distributed $506.227 million, or 4.721% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Subsequent to March 29, 2013, an additional $17.674 million was distributed as catch-up payments, bringing the total Third Interim Distribution amount to $523.901 million through the end of the Report Period.[12]   The Third Interim Distribution was made to 1,118 BLMIS accounts,[13] and 26

---

[12] Subsequent to the Report Period ending on September 30, 2014, an additional $114,187.78 was distributed as catch-up payments, bringing the total Third Interim Distribution amount to $524.015 million through October 24, 2014.

[13] Subsequent to the Report Period ending on September 30, 2014, one additional BLMIS account was given distributions from the Third Interim Distribution, bringing the total number of BLMIS accounts to 1,119.

- 26 -

payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

**E.    The Trustee's Fourth Allocation of Property to the Fund of Customer Property and Authorizing the Fourth Interim Distribution to Customers**

85.    During the year after the Trustee made the Third Interim Distribution, the Trustee recovered significant additional assets through litigation and settlements, particularly the JPMorgan settlement.  *See* discussion *supra* Section IX(B)(xv).

86.    On March 25, 2014, the Trustee filed a motion seeking entry of an order approving the fourth allocation of property to the Customer Fund and authorizing the fourth interim distribution to customers whose claims have not been fully satisfied because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "Fourth Allocation" and "Fourth Interim Distribution").  (ECF No. 6024).

87.    In connection with the Fourth Interim Distribution, the Trustee proposed holding reserves in connection with non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements.  *Id.*

88.    On April 18, 2014, this Court entered an Order Approving the Trustee's Fourth Allocation of Property to the Fund of Customer Property and Authorizing a Fourth Interim Distribution to Customers.  (ECF No. 6340).

89.    Thus, on May 5, 2014, the Trustee distributed $351.632 million, or 3.180% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Subsequent to May 5, 2014, an additional $497,515.83 million was distributed as catch-up payments, bringing the total Fourth Interim Distribution amount to $352.130 million through the end of the Report

Period.[14]   Upon completion of the Fourth Interim Distribution, approximately 51% of the allowed customer claims were satisfied.  The Fourth Interim Distribution was made to 1,086 BLMIS accounts,[15] and 25 payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

90.     Final resolution of the remaining appeals and disputes will permit the Trustee to further reduce the reserves he is required to maintain, which will allow for a greater distribution to customers in the future.  The Trustee expects to seek authorization for further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.

**F.     The General Estate**

91.     If the Trustee is able to fully satisfy the net equity claims of the BLMIS customers, any funds remaining will be allocated to the general estate and distributed in the order of priority established in Bankruptcy Code § 726 and SIPA § 78fff(e).

92.     All BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—are deemed to be general creditors of the BLMIS estate.  The Trustee is working diligently on behalf of all creditors and will seek to satisfy all creditor claims.

## IX.     LITIGATION

93.     Other major developments have occurred during the Report Period in the Trustee's avoidance actions and bank/feeder fund litigations.  As the Trustee has more than 1,000 lawsuits pending, this Report does not discuss each of them in detail but instead summarizes those matters with the most activity during the Report Period.

---

[14] Subsequent to the Report Period ending on September 30, 2014, an additional $76,915.30 was distributed as catch-up payments, bringing the total Fourth Interim Distribution amount to $352.207 million through October 24, 2014.

[15] Subsequent to the Report Period ending on September 30, 2014, one additional BLMIS account was given distributions from the Fourth Interim Distribution, bringing the total number of BLMIS accounts to 1,087.

A.    **The District Court—Motions to Withdraw the Reference, Motions to Dismiss and Related Appeals**

94.    Upon the motions of hundreds of defendants, the District Court withdrew the reference in numerous cases and heard numerous motions to dismiss. A total of 485 motions to withdraw and 424 joinders were filed, altogether implicating a total of 807 adversary proceedings.  As of the end of the Report Period, the District Court has returned all proceedings to the Bankruptcy Court.

i.    **Proceedings Relating to Motions to Withdraw**

(a)    **The Administrative Order**

95.    On March 5, 2012, this Court entered the Administrative Order which stated: "[i]n the interest of administrative efficiency, this Court has been informed by Judge Rakoff, and hereby notifies all parties to the Adversary Proceedings, that the District Court will automatically regard untimely any motion to withdraw . . . if such motion is not filed on or before April 2, 2012." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. No. 08-01789 (ECF No. 4707).

96.    On July 10, 2014, the District Court issued an order directing counsel to parties with individual issues not addressed by the Court's decisions in the consolidated withdrawals to inform the Court by letter by July 18, 2014. *See In re Madoff Sec.*, No. 12 MC 00115 (JSR) (S.D.N.Y. July 10, 2014), ECF No. 552.  The District Court received several such letters and addressed the issues they raised in separate orders.  On August 4, 2014, the District Court deemed any remaining motions to withdraw the reference to be denied, referred all the adversary proceedings to be returned to the Bankruptcy Court, and directed the closure of all civil cases seeking to withdraw the reference related to the Madoff matter. *See In re Madoff Sec.*, No. 12 MC 00115 (JSR) (S.D.N.Y. Aug. 4, 2014), ECF No. 557.

**(b)     Consolidated Briefing Orders**

97.     In April 2012, the District Court instituted a protocol for then-pending motions to

withdraw, which consolidated briefing on common issues raised in the motions to withdraw (the

"Common Briefing").  The common issues included:

- whether the Supreme Court's decision in *Stern v. Marshall* (the "Stern Issue") precluded the Bankruptcy Court from entering final judgment on the Trustee's claims and therefore mandated withdrawal of the reference to Bankruptcy Court.  131 S. Ct. 2594 (2011); *see* Order, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 0115 (JSR) (S.D.N.Y. Apr. 13, 2012), ECF No. 4;

- whether the Trustee's claims against certain defendants should be dismissed in light of the defendants' affirmative defense of antecedent debt (the "Antecedent Debt Issue").  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. May 16, 2012), ECF No. 107;

- whether standing issues (the "Standing Issue") bar the Trustee's common law claims against certain defendants by virtue of the doctrine of *in pari delicto* and/or the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), as well as whether the Trustee is entitled to accept assignments or assert the "insider exception" to *in pari delicto*.  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. May 15, 2012), ECF No. 114;

- whether § 546(e) of the Bankruptcy Code precludes the Trustee's claims against certain defendants against whom the Trustee has alleged knew or should have known that Madoff was running a Ponzi scheme (the "Bad Faith § 546(e) Issue").  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. May 15, 2012), ECF No. 119;

- whether the Trustee is entitled to employ § 502(d) of the Bankruptcy Code against defendants accused of receiving avoidable transfers (the "§ 502(d) Issue").  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. June 1, 2012), ECF No. 155;

- whether the Supreme Court's ruling in *Morrison v. National Australia Bank Ltd.*, as applied to SIPA or the Bankruptcy Code, bars the Trustee's claims against certain defendants (the "Extraterritoriality Issue").  130 S. Ct. 2869 (2010); *see* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. June 6, 2012), ECF No. 167; and

- whether SIPA or the securities laws alter the standards for determining good faith under either §§ 548(c) or 550(b) of the Bankruptcy Code (the

"Good Faith Standard Issue").  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. June 23, 2012), ECF No. 197.

98.     The Stern Issue was raised by hundreds of defendants.  Judge Rakoff heard oral argument on June 18, 2012 and issued a decision on January 4, 2013 (the "Stern Opinion and Order"), ruling that the Bankruptcy Court could not issue a final decision on certain of the Trustee's fraudulent transfer claims.  Opinion and Order (ECF No. 427), 460 B.R. 46 (Bankr. S.D.N.Y. 2013).  The Stern Opinion and Order indicates that the Bankruptcy Court may be able to render rulings where a defendant filed a claim.  *Id.* at 19.  In the Stern Opinion and Order, Judge Rakoff found that even in those cases where no claim was filed, the Bankruptcy Court could issue a report and recommendation, and referred the Trustee's cases back to the Bankruptcy Court subject to the other pending rulings.  *Id.*

99.     The Antecedent Debt Issue was also raised by hundreds of defendants, who filed their motion on June 25, 2012.  (ECF No. 196).  Oral argument was held by Judge Rakoff on August 25, 2012.  Judge Rakoff issued a decision on October 15, 2013 (the "Antecedent Debt Opinion and Order"), ruling that the Trustee's avoidance claims against certain defendants should not be dismissed and stating that "[the] pre-reach-back-period inter-account transfers of amounts exceeding principal in the account of the sender continue to be fictitious profits, not principal, in the account of the recipient, and therefore do not constitute antecedent debt for the recipient of the funds."  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 (JSR), 2013 WL 5651285, at *11 (S.D.N.Y. Oct. 15, 2013).

100.     The Standing Issue was raised by various defendants, who filed two sets of moving papers on August 3, 2012.  (ECF Nos. 269, 270, 271).  Judge Rakoff heard oral argument on October 15, 2012 and issued a decision on December 5, 2013 (the "Standing Opinion and Order"), finding that the Trustee "has standing to bring claims on behalf of Madoff

Securities' customers to the extent, but only to the extent, that the customers validly assigned their claims to the Trustee. However, the Court also finds that the Trustee's pursuit of these assigned claims, to the extent that he brings the claims of more than fifty assignors, constitutes a covered class action for purposes of SLUSA." Opinion and Order (ECF No. 509), 987 F. Supp.2d 309 (S.D.N.Y. 2013).

101.    The Bad Faith § 546(e) Issue was raised by various defendants, who filed two sets of moving papers on July 27, 2012. (ECF Nos. 259–261). Judge Rakoff heard oral argument on November 26, 2012 and issued a "bottom line" ruling on February 12, 2013, indicating that under certain circumstances, the Trustee's complaints should not be dismissed at the pleading stage solely on the basis of defendants' invocation of § 546(e) of the Bankruptcy Code. (ECF No. 439). On April 15, 2013, Judge Rakoff issued a decision (the "Bad Faith § 546(e) Opinion and Order"), setting forth the basis for his ruling, and indicated that the Trustee's claims are not precluded under § 546(e) of the Bankruptcy Code in cases where the Trustee "sufficiently alleges that the transferee from whom [the Trustee] seeks to recover a fraudulent transfer knew of [BLMIS's] fraud, that transferee cannot claim the protection of Section 546(e)'s safe harbor." Opinion and Order (ECF No. 460), 491 B.R. 27 (S.D.N.Y. 2013).

102.    Various defendants raised the § 502(d) Issue and joined in moving papers filed on July 13, 2012. (ECF Nos. 231–33). Judge Rakoff heard oral argument on October 9, 2012 and issued a "bottom line" ruling on February 12, 2013, indicating that the Trustee may invoke section 502(d) of the Bankruptcy Code. (ECF No. 439). Judge Rakoff issued a decision on June 30, 2014 (the "§ 502(d) Opinion and Order"), explaining the reasons for that decision and directing further proceedings related thereto to be returned to the Bankruptcy Court. Opinion and Order (ECF No. 549).

103.    The Extraterritoriality Issue was joined by various defendants, who filed moving

papers on July 3, 2012.  (ECF Nos. 234-36).  Judge Rakoff held oral argument on September 21,

2012.  On July 6, 2014, Judge Rakoff issued a decision (the "Extraterritoriality Opinion and

Order") indicating that certain of the Trustee's claims were barred under *Morrison*, and stated

that "section 550(a) does not apply extraterritorially to allow for the recovery of subsequent

transfers received abroad by a foreign transferee from a foreign transferor," and directing further

proceedings related thereto to be returned to the Bankruptcy Court.  Opinion and Order (ECF

No. 551), 513 B.R. 222 (S.D.N.Y. 2014).

104.    The Good Faith Standard Issue was raised by various defendants, who filed two

main sets of moving papers on July 20, 2012.  (ECF Nos. 242, 243).  Judge Rakoff heard oral

argument on October 12, 2012 and issued a decision on April 27, 2014 (the "Good Faith

Standard Opinion and Order"), ruling that "in the context of this litigation and with respect to

both section 548(c) and section 550(b)(1), "good faith" means that the transferee neither had

actual knowledge of the Madoff Securities fraud nor willfully blinded himself to circumstances

indicating a high probability of such fraud."  With respect to the issue of which party bears the

burden of pleading a defendant's good faith or lack thereof, Judge Rakoff further ruled that "a

defendant may succeed on a motion to dismiss by showing that the complaint does not plausibly

allege that that defendant did not act in good faith."  Opinion and Order (ECF No. 524).

105.    Following the entry of the Good Faith Standard Opinion and Order and the

Extraterritoriality Opinion and Order, the Trustee filed an omnibus motion for expedited

discovery related to the good faith issue and for leave to replead regarding the issues of good

faith and extraterritoriality, which affected over 86 adversary proceedings (the "Omnibus

Motion").  ECF No. 7827.  On September 17, 2014, the Bankruptcy Court held a conference to

discuss further proceedings to be conducted pursuant to the Extraterritoriality Opinion and Order and the Omnibus Motion. The Bankruptcy Court directed the parties to confer and devise an efficient procedure and briefing schedule. The Omnibus Motion is being held in abeyance pending the Bankruptcy Court's resolution of issues relating to extraterritoriality.

(c)      <strong>The 546(e) Appeal</strong>

106.    On April 27, 2012 the District Court entered an order dismissing certain claims in 78 adversary proceedings. *See Picard v. Greiff*, Adv. No. 11-03775 (BRL) (Bankr. S.D.N.Y.); *Picard v. Blumenthal*, Adv. No. 11-04293 (BRL) (Bankr. S.D.N.Y.); *Picard v. Goldman*, Adv. No. 11-04959 (BRL) (Bankr. S.D.N.Y.); and *Picard v. Hein*, Adv. No. 11-04936 (BRL) (Bankr. S.D.N.Y.). *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. April 30, 2012), ECF No. 57. These claims included preferences under § 547 of the Bankruptcy Code, constructive fraudulent transfers under § 548(a)(l)(B) of the Bankruptcy Code, and actual and constructive fraudulent transfers or fraudulent conveyances under provisions of the New York Debtor & Creditor Law incorporated by § 544(b) of the Bankruptcy Code (the "Dismissed Claims"). The Dismissed Claims did not include those claims proceeding under § 548(a)(l)(A) and § 550(a) of the Bankruptcy Code.

107.    On April 30, 2012, the District Court entered an Opinion and Order explaining the reasons for its decision. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715 (S.D.N.Y. 2012). On May 15, 2012, the District Court entered a Supplemental Opinion and Order to make explicit that § 546(e) of the Bankruptcy Code applies to the Trustee's claims for avoidance and recovery of preferential transfers under § 547 of the Bankruptcy Code. *See* Supplemental Opinion and Order, No. 12 MC 0115 (JSR) (ECF No. 101).

108.    On June 21, 2012, the Trustee and SIPC each filed notices of appeal in the Second Circuit from these orders.

- 34 -

109.    The Second Circuit held argument on March 5, 2014.  The issue remains *sub judice*.

**B.    Litigation in the Bankruptcy Court and Related Appeals**

110.    During this period of voluminous activity before the District Court on motions to withdraw the reference, motions to dismiss, and trial preparation, adversary proceedings that had not been withdrawn to the District Court proceeded before this Court.  Certain decisions of this Court in the matters described herein were appealed to the District Court and decided by various judges of that Court.  After entry of the Administrative Order, certain defendants in these actions moved to withdraw the reference from this Court.

**i.    Avoidance Actions**

111.    Prior to December 10, 2010, the last date for filing complaints under Bankruptcy Code § 546(a)(1)(A), the Trustee filed approximately 1,000 avoidance actions seeking the return of fictitious profits received by the defendants in those actions (the "Fictitious Profits Litigation").  Since then, and during the Report Period, the Trustee has undertaken a multitude of tasks to prosecute the actions.

112.    As a preliminary matter, many of the defendants in the Fictitious Profits Litigation moved to withdraw the bankruptcy reference on a number of grounds, as discussed in the preceding section.  The Trustee engaged in briefing with respect to whether the reference should be withdrawn, and where the District Court did withdraw the reference on certain issues, the Trustee briefed the motions to dismiss that followed.

113.    Among those issues addressed was the Antecedent Debt Issue.  Judge Rakoff issued the Antecedent Debt Opinion and Order on October 15, 2013, ruling that the Trustee's avoidance claims against certain defendants should not be dismissed, and directed that to the extent certain defendants were not subject to other motions to dismiss pending before the District

Court, such claims should be sent back to the Bankruptcy Court to move forward with litigation. This encompassed nearly 600 adversary proceedings.

114. In those adversary proceedings returned to the Bankruptcy Court, defendants in approximately 100 adversary proceedings filed answers and defendants in approximately 60 adversary proceedings filed motions to dismiss that were due on January 17, 2014.

115. The Bankruptcy Court directed the Trustee to file one omnibus opposition on or before March 10, 2014 in response to all pending motions to dismiss filed by defendants (encompassing a total of 113 motions to dismiss filed as early as January 26, 2011 and as late as March 3, 2014). This Court further directed all participating defendants to reply on or before March 17, 2014. Oral arguments were held on September 17, 2014. *See* Order Scheduling Hearing on Becker & Poliakoff LLP Motions to Dismiss and Motions to Dismiss Listed on Appendix A to the Trustee's February 20 Letter to the Court as Amended, *In re Madoff,* Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. July 24, 2014), ECF No. 7513 (the "Scheduling Order").

116. The Scheduling Order further provided that the Court would not hear arguments particular to specific motions to dismiss, such as lack of personal jurisdiction, improper service of process, or arguments under state-specific non-claim statutes, and directed the parties raising any such arguments to confer with the Trustee to schedule separate hearing dates for these arguments. No such hearings have been scheduled to date.

117. Approximately 30 actions opted out of the omnibus briefing process by withdrawing their motion to dismiss, without prejudice, in order to proceed to mediation as permitted under the Order (1) Establishing Litigation Case Management Procedures for Avoidance Actions and (2) Amending the February 16, 2010 Protective Order, *In re Madoff,*

Adv. Pro. No. 08-01789 (BRL) (Bankr. S.D.N.Y. Nov. 10, 2010), ECF No. 3141 (the "Litigation Procedures Order"), governing the prosecution of BLMIS avoidance actions.

118.    With respect to cases remaining in the Bankruptcy Court, the next responsive pleading deadline is scheduled for January 17, 2015.    Additionally, the Trustee considered hardship applications and where appropriate, agreed to dismiss certain defendants from the actions.  In other cases, the parties engaged in settlement negotiations which led to the resolution of certain actions or a narrowing of the open issues.  Certain defendants requested an early mediation of their cases.  Where the Trustee concurred in that request, the parties engaged in mediations, some of which resulted in a settlement of the actions.  In certain cases, the parties engaged in fact and expert discovery during the Report Period.

### ii.    Subsequent Transferee Actions

119.    To date, the Trustee has brought a total of 82 adversary proceedings seeking recovery of just over $7.2 billion in subsequent transfers from 150 defendants who redeemed money from Fairfield Sentry Limited, Fairfield Sigma Limited, Fairfield Lambda Limited, Harley International (Cayman) Ltd., Kingate Global Fund Ltd., and Kingate Euro Fund Ltd.  The Trustee has completed service of process in all but one adversary proceeding, for which the Trustee is currently in the process of effectuating international service of process on the remaining two defendants.

120.    The subsequent transferee defendants filed motions to withdraw the reference, which were granted by Judge Rakoff and resulted in Common Briefing by the Trustee and the defendants.  Among the issues affecting the subsequent transfer cases are the Extraterritoriality Issue, the Bad Faith § 546(e) Issue, the avoidance of initial transfers through the settlement with Fairfield Sentry, Greenwich Sentry, Greenwich Sentry Partners, and various Tremont funds under Bankruptcy Code § 550, application of SLUSA, and the Trustee's standing to assert claims

assigned to him.   The District Court has issued its rulings on all of the issues affecting

subsequent transferee cases and remanded the cases to this Court for further findings based on

the legal standards set forth in the District Court's decisions.

121.    On August 22, 2014, a number of subsequent transferee defendants, as well as

other defendants, requested a conference with this Court to discuss procedures for motions to

dismiss based on the Extraterritoriality Opinion and Order.  (ECF No. 7766).  On August 28,

2014, the Trustee filed the Omnibus Motion.  (ECF No. 7826).  On September 17, 2014, this

Court held a conference to discuss the extraterritoriality motion to dismiss procedures, which

included discussions regarding the Omnibus Motion.  During the conference, this Court ordered

the parties to confer and submit a report or recommendation prior to the next omnibus hearing

scheduled for October 22, 2014.  The parties submitted an order to the Court for procedures

governing defendants' motions to dismiss and the Trustee's motion for expedited discovery.

Objections to the order are due by November 10, 2014.  If any objections are filed, a hearing will

be held on November 19, 2014.

122.    Two subsequent transferee defendants filed motions to dismiss in the Bankruptcy

Court.  Briefing on one motion has not yet been completed.  In the second motion, *Picard v.*

*Bureau of Labor Insurance*, the defendant sought to dismiss based on the Foreign Sovereign

Immunities Act, lack of personal jurisdiction, improper extraterritorial application of SIPA and

the Bankruptcy Code, the failure to avoid the initial transfers to Fairfield Sentry through the

Fairfield Sentry settlement, and the statute of limitations under Bankruptcy Code § 550.  Adv.

No. 11-02732 (BRL) (Bankr. S.D.N.Y.), ECF No. 8–10.  On October 11, 2012, the Bankruptcy

Court denied the motion to dismiss on all grounds.  (ECF No. 51).

123.    Currently, the response dates to the Trustee's subsequent transfer adversary proceedings have been extended while the parties await this Court's rulings on the procedure for the Defendants' extraterritoriality motions to dismiss and the Trustee's motion for leave to replead for limited discovery.

### iii.    *Picard v. ABN AMRO Bank N.A.*

124.    On December 8, 2010, the Trustee commenced an action against ABN AMRO Bank N.A. (presently known as The Royal Bank of Scotland N.V.) (the "Royal Bank of Scotland"), ABN AMRO Incorporated (collectively the "ABN/RBS Defendants"), Rye Select Broad Market XL Fund, LP, and Rye Select Broad Market XL Portfolio Limited Ltd.  *Picard v. ABN AMRO Bank N.A.*, Adv. Pro. No. 10-05354 (BRL) (Bankr. S.D.N.Y.) (the "ABN/RBS Action").

125.    On September 30, 2011, the ABN/RBS Defendants moved for withdrawal of the reference.  *Picard v. ABN AMRO Bank N.A.*, No. 11 Civ. 6878 (JSR) (S.D.N.Y.), ECF Nos. 1-3.  On January 11, 2012, the Trustee and SIPC opposed the motion.  *Id.*, ECF Nos. 12-14.  On January 27, 2012, the ABN/RBS Defendants filed reply papers.  *Id.*, ECF No. 15.  The District Court granted the motion on May 15, 2012, allowing the ABN/RBS Defendants to move to dismiss as to the issues of 550(a) and 546(g).  *Id.*, ECF No. 21.

126.    On June 18, 2012, the ABN/RBS Defendants filed a motion to dismiss the Trustee's complaint, claiming the safe harbor of Bankruptcy Code section 546(g) bars the Trustee's subsequent transferee claims.  *Id.*, ECF Nos. 29-31.  On August 14, 2012, the Trustee filed an amended complaint.  *Id.*, ECF No. 32.  On September 5, 2012, the ABN/RBS Defendants filed a motion to dismiss the Trustee's amended complaint, again claiming the safe harbor of Bankruptcy Code section 546(g) bars the Trustee's subsequent transferee claims.  *Id.*, ECF Nos. 33-35.  On September 25, 2012, the Trustee and SIPC opposed the motion.  *Id.*, ECF

Nos. 36-37.  On August 28, 2012, the ABN/RBS Defendants filed reply papers.  *Id.*, ECF No. 38.

On March 14, 2013, the District Court issued an order partially denying and partially granting

the 546(g) motion, and stating that an opinion providing the reason for the ruling would follow.

*Id.*, ECF No. 39.    On April 15, 2013, the District Court issued its decision concerning

Bankruptcy Code section 546(e).  *Id.*, ECF No. 40.

127.    On February 27, 2013, the Trustee voluntarily dismissed Rye Select Broad

Market XL Fund, L.P. with prejudice.  *Picard v. ABN AMRO Bank N.A.*, Adv. Pro. No. 10-

05354 (BRL) (Bankr. S.D.N.Y.), ECF No. 56.

128.    On April 27, 2014, the District Court issued the Good Faith Standard Opinion and

Order, upon which ABN/RBS and other defendants had moved to withdraw the reference.

*Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 2014 WL 1651952 (S.D.N.Y.

Apr. 27, 2014).

129.    On July 7, 2014, the District Court issued the Extraterritoriality Opinion and

Order.  *Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 513 B.R. 222 (S.D.N.Y.

2014).  Through the Extraterritoriality Opinion and Order, the ABN/RBS Action was remanded

back to the Bankruptcy Court.  *Picard v. ABN AMRO Bank N.A.*, Adv. Pro. No. 10-05354 (SMB)

(Bankr. S.D.N.Y.), ECF No. 67.

130.    Following the entry of the Extraterritoriality Opinion and Order, the Trustee filed

the Omnibus Motion.  *Id.*, ECF No. 69.  Following a request by certain defendants, on September

17, 2014, the Bankruptcy Court held a conference to discuss further proceedings to be conducted

pursuant to the Extraterritoriality Opinion and Order and the Omnibus Motion.  The Bankruptcy

Court directed the parties to confer and devise an efficient procedure and briefing schedule.  The

Omnibus Motion is being held in abeyance pending the Bankruptcy Court's ruling on the extraterritoriality issues.

131.    On October 2, 2014, the Trustee filed a letter advising that the Trustee and counsel representing the defendants in this and other actions are working together to prepare a mutually acceptable agreed order that will set forth a proposed process and briefing schedule. *Id.*, ECF No. 73.

132.    Currently, response dates in the ABN/RBS Action have been extended while the parties await the Bankruptcy Court's rulings on various issues.

**iv.    *Picard v. ABN AMRO (Ireland) Ltd.***

133.    On December 8, 2010, the Trustee commenced an action against ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Solutions Bank (Ireland) Limited), ABN Custodial Services (Ireland) Ltd. (f/k/a Fortis Prime Solutions Custodial Services (Ireland) Ltd.) (collectively the "ABN (Ireland) Defendants"), Rye Select Broad Market XL Fund, LP, Rye Select Broad Market XL Portfolio Limited.  *Picard v. ABN AMRO (Ireland) Ltd.*, Adv. Pro. No. 10-05355 (Bankr. S.D.N.Y.) (BRL) (the "ABN (Ireland) Action").

134.    On September 30, 2011, the ABN AMRO Defendants moved for withdrawal of the reference.  *Picard v. ABN AMRO (Ireland) Ltd.,* No. 11 Civ. 6877 (JSR) (S.D.N.Y.), ECF No. 1-3.  On January 11, 2012, the Trustee opposed the motion to withdraw the reference.  (ECF Nos. 13-14).  On January 27, 2012, the ABN AMRO Defendants filed reply papers.  (ECF Nos. 15-16).  The District Court granted the motion on May 15, 2012, allowing the ABN (Ireland) Defendants to move to dismiss as to the issue of Bankruptcy Code section 546(g).  (ECF No. 22). The ABN (Ireland) Defendants participated in Common Briefing on the Stern Issue, the Extraterritoriality Issue, the Bad Faith § 546(e) Issue, the Good Faith Standard Issue, and the Antecedent Debt Issue.  *Picard v. ABN AMRO (Ireland) Ltd.,* No. 11 Civ. 6877 (S.D.N.Y.)

(JSR), ECF No. 22.  The District Court has rendered decisions on all of these Common Briefing issues, which are discussed *supra* in Section IX(A)(i)(b).

135.    On June 13, 2012, the ABN (Ireland) Defendants filed a motion to dismiss the Trustee's complaint, claiming the safe harbor of Bankruptcy Code section 546(g) bars the Trustee's subsequent transferee claims.  (ECF Nos. 27-29).

136.    On November 29, 2012, the District Court heard oral argument on the ABN (Ireland) Defendants' motion to dismiss jointly with two other motions raising Bankruptcy Code section 546(g) (the "546(g) Motions").  On February 15, 2013, the District Court issued a bottom line order partially denying and partially granting the 546(g) Motions, with an opinion explaining the bottom line order to follow.  (ECF No. 41).  On April 15, 2013, the District Court issued the Bad Faith § 546(e) Opinion and Order.  (ECF No. 42).  On December 26, 2013, the District Court issued its opinion concerning the 546(g) Motions, confirming and explaining the February 15, 2013 bottom line order.  (ECF No. 43).

137.    On February 27, 2013, the Trustee voluntarily dismissed Rye Select Broad Market XL Fund, L.P. with prejudice.  *Picard v. ABN AMRO (Ireland) Ltd.*, Adv. Pro. No. 10-05355 (BRL) (Bankr. S.D.N.Y.), ECF No. 50.

138.    On April 27, 2014, Judge Rakoff issued the Good Faith Standard Opinion and Order, upon which Nomura and other defendants had moved to withdraw the reference.  *Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 2014 WL 1651952 (S.D.N.Y. Apr. 27, 2014).

139.    In July 2014, Judge Rakoff issued the Extraterritoriality Opinion and Order.  *Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 513 B.R. 222 (S.D.N.Y. 2014).  Through the Extraterritoriality Opinion and Order, the ABN (Ireland) Action was

- 42 -

remanded back to the Bankruptcy Court.  *Picard v. ABN AMRO (Ireland) Ltd.*, Adv. Pro. No. 10-05355 (Bankr. S.D.N.Y.) (SMB), ECF No. 63.

140.    Following the entry of the Extraterritoriality Opinion and Order, the Trustee filed the Omnibus Motion.  *Id.*, ECF No. 65.  Following a request by certain defendants, on September 17, 2014, the Bankruptcy Court held a conference to discuss further proceedings to be conducted pursuant to the Extraterritoriality Opinion and Order and the Omnibus Motion.  The Court directed the parties to confer and devise an efficient procedure and briefing schedule.  The Omnibus Motion is being held in abeyance pending the Bankruptcy Court's ruling on the extraterritoriality issue.

141.    Currently, response dates in the ABN (Ireland) Action have been extended while the parties await the Bankruptcy Court's rulings on various issues.

**v.      _Picard v. Avellino_**

142.    On December 10, 2010, the Trustee commenced an avoidance action against Avellino & Bienes, Frank J. Avellino, Michael S. Bienes, Nancy C. Avellino, Dianne K. Bienes, Thomas G. Avellino, and numerous other trusts and entities (collectively, the "A&B Defendants") seeking the return of over $904 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of the A&B Defendants.  *Picard v. Frank J. Avellino*, Adv. No. 10-05421 (BRL) (Bankr. S.D.N.Y.) (the "A&B Action").

143.    On June 6, 2011, certain A&B Defendants moved to dismiss the complaint in the Bankruptcy Court.  *A&B Action* (ECF Nos. 23-27).  In addition, on June 7, 2011, certain A&B Defendants moved to withdraw the bankruptcy reference in the District Court.  *Id.* (ECF Nos.

28–30); *see also Picard v. Avellino*, No. 11-cv-03882 (JSR) (S.D.N.Y.) (the "A&B Withdrawal Action").

144.   The motion to withdraw the reference was fully briefed in the District Court, and oral argument was held on October 18, 2011.  On February 29, 2012, the District Court issued a Memorandum Order withdrawing the reference on certain issues of law raised by the A&B Defendants and other defendants named in separate adversary proceedings commenced by the Trustee.  *A&B Withdrawal Action* (ECF No. 20).  As a result of the District Court's order, during the period of May 2012 through October 2012, the Trustee and the A&B Defendants joined in consolidated briefing and oral arguments on the withdrawn issues of law.  *See A&B Withdrawal Action* (ECF Nos. 21–23).

145.   Specifically, the A&B Defendants participated in Common Briefing on the Stern Issue, the Bad Faith § 546(e) Issue, and the Antecedent Debt Issue.  *See A&B Withdrawal Action* (ECF Nos. 21-23).  The District Court's disposition of these Common Briefing issues is discussed *supra* in Section IX(A)(i)(b).

146.   Following the disposition of the Common Briefing issues, the Trustee and the A&B Defendants filed a coordinated briefing schedule on August 7, 2014.  Per the schedule, on September 24, 2014, the A&B Defendants filed a Renewed Motion to Dismiss, incorporating their previous June 6, 2011 pleading.  The Trustee has until November 24, 2014 to file either an opposition to the Renewed Motion to Dismiss or an amendment to the original complaint.

### vi.   *Picard v. BNP Paribas*

147.   The Trustee has brought a total of five adversary proceedings seeking the return of approximately $1 billion under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act from BNP Paribas S.A. and its subsidiaries—BNP Paribas (Suisse) S.A., BNP Paribas Arbitrage SNC, BNP Paribas (Canada), BNP Paribas Bank & Trust Cayman Limited,

BGL BNP Paribas Luxembourg S.A., BNP Paribas Investment Partners Luxembourg S.A., BNP Paribas Securities Services—Succursale de Luxembourg, BNP Paribas Securities Services S.A., and BNP Paribas Securities Corp. (collectively, "BNP Paribas")—who redeemed money from feeder funds that invested with BLMIS. *Picard v. BNP Paribas Arbitrage, SNC*, Adv. No. 11-02796 (BRL) (Bankr. S.D.N.Y. 2011); *Picard v. BNP Paribas S.A.*, Adv. No. 12-01576 (BRL) (Bankr. S.D.N.Y. 2011); *Picard v. Legacy Capital Ltd.*, Adv. No. 10-05286 (BRL) (Bankr. S.D.N.Y. 2010); *Picard v. Oreades SICAV*, Adv. No. 10-05120 (BRL) (Bank. S.D.N.Y. 2010); and *Picard v. Equity Trading Portfolio Ltd.*, Adv. No. 10-04457 (BRL) (Bank. S.D.N.Y. 2010) (collectively, the "BNP Paribas Proceedings"). The Trustee has completed service of process in each of the BNP Paribas Proceedings.

148. BNP Paribas filed motions to withdraw the reference, which were granted by Judge Rakoff and resulted in consolidated subject matter briefing pending in the District Court. Among the Common Briefing issues affecting the BNP Paribas Proceedings are the Extraterritoriality Issue, the Bad Faith § 546(e) Issue, the Good Faith Standard Issue, and the avoidance of initial transfers through settlements with feeder funds that invested with BLMIS. The District Court has issued opinions on each of the withdrawn issues and remanded the BNP Paribas Proceedings back to the Bankruptcy Court for proceedings with the District Court's opinions.

149. Currently, the response dates in the BNP Paribas Proceedings have been extended while the parties brief whether the transfers BNP Paribas received from feeder funds requires an exterritorial application of the Bankruptcy Code.

**vii.** *Picard v. Citibank*

150. On December 8, 2010, the Trustee commenced an action against Citibank, N.A., Citibank North America, Inc., and Citigroup Global Markets Limited (collectively, "Citibank")

seeking the return of approximately $425 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent transfers in connection with certain transfers of property by BLMIS to or for the benefit of Citibank. *Picard v. Citibank*, Adv. No. 10-05345 (SMB) (Bankr. S.D.N.Y.) (the "Citibank Action").

151. On November 2, 2011, Citibank moved for withdrawal of the reference. *Picard v. Citibank*, No. 11 Civ. 7825 (JSR) (S.D.N.Y.), ECF Nos. 1–3. On March 2, 2012, the Trustee opposed the motion to withdraw the reference, and oral argument was held on May 1, 2012. (ECF Nos. 13–15). On July 2, 2012, the District Court granted Citibank's motion, allowing Citibank to move to dismiss as to the issues of Bankruptcy Code sections 550(a) and 546(g), and directing Citibank to participate in Common Briefing as to the Bad Faith § 546(e) Issue and the Good Faith Standard Issue. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 12 MC 0115 (JSR) (S.D.N.Y. July 3, 2012), ECF No. 214. The District Court's disposition of these Common Briefing issues is discussed *supra* in Section IX(A)(i)(b).

152. On August 15, 2012, Citibank filed a motion to dismiss, claiming that the safe harbor of Bankruptcy Code section 546(g) bars Trustee's subsequent transferee claims. *Picard v. Citibank*, No. 11 Civ. 7825 (ECF Nos. 25–28). On November 29, 2012 the District Court held oral argument on Citibank's motion to dismiss jointly with two other motions raising the 546(g) issue. On February 15, 2013, the District Court issued a bottom line order partially granting and partially denying the 546(g) motions, noting that a full opinion would follow. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 12 MC 0115 (JSR) (ECF No. 451). The court issued its full decision in an opinion and order on December 26, 2013. *Picard v. Citibank*, No. 11 Civ. 7825 (ECF No. 37).

153.    On October 5, 2012, Citibank filed a motion to dismiss based on § 550 of the Bankruptcy Code, asserting that the Trustee must first obtain a judgment of avoidance as to the initial transferees before pursuing recovery of subsequent transfers from Citibank. *Id.* (ECF No. 384.)  On December 12, 2012, Judge Rakoff issued a bottom line ruling denying defendants' motion to dismiss in its entirety.  (ECF No. 422).  The court issued its full decision in an opinion and order on October 30, 2013.  *Picard v. Citibank*, No. 11 Civ. 7825 (ECF No. 36).

154.    On April 27, 2014, Judge Rakoff issued the Good Faith Standard Opinion and Order, upon which Citibank and other defendants had moved to withdraw the reference. *Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 2014 WL 1651952 (S.D.N.Y. Apr. 27, 2014).  Through this decision, the Citibank Action was remanded back to the Bankruptcy Court.

155.    In July 2014, Judge Rakoff issued the Extraterritoriality Opinion and Order. *Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 513 B.R. 222 (S.D.N.Y. 2014).

156.    Following the entry of the Extraterritoriality Opinion and Order, the Trustee filed the Omnibus Motion.  *Picard v. Citibank N.A., et al.*, Adv. Proc. No. 10-05345, ECF No. 72. Following a request by certain defendants, on September 17, 2014, the Bankruptcy Court held a conference to discuss further proceedings to be conducted pursuant to the Extraterritoriality Opinion and Order and the Omnibus Motion.  The Court directed the parties to confer and devise an efficient procedure and briefing schedule.  The Omnibus Motion is being held in abeyance pending the Bankruptcy Court's ruling on the extraterritoriality issues.

157.    Currently, response dates in the Citibank Action have been extended while the parties await the Bankruptcy Court's rulings on various issues.

viii.    *Picard v. Cohmad Sec. Corp.*

158.    On June 22, 2009, the Trustee commenced an adversary proceeding against Madoff insiders Cohmad Securities Corporation ("Cohmad"), Maurice ("Sonny") J. Cohn ("Sonny Cohn"), Marcia B. Cohn, and several other defendants (collectively, the "Cohmad Defendants") seeking the return of over $245 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances, disallowance of any claims filed against the estate by the Cohmad Defendants, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Cohmad Defendants. *Picard v. Cohmad Sec. Corp.*, Adv. No. 09-01305 (BRL) (Bankr. S.D.N.Y.).

159.    The complaint seeks to avoid and recover the fictitious profits withdrawn by the Cohmad Defendants and the return of commissions and fees transferred directly from BLMIS to Sonny Cohn and Cohmad.  On October 8, 2009, the Trustee filed an amended complaint.  (ECF No. 82).   The Cohmad Defendants filed numerous motions to dismiss, which the Trustee opposed.  (ECF No. 135).

160.    On August 1, 2011, this Court issued its Memorandum Decision and Order Denying Defendants' Motions to Dismiss Trustee's Complaint.  (ECF No. 209).  This Court found that the Trustee had adequately pleaded that the transfers received by the Cohmad Defendants in excess of their principal were not transferred for reasonably equivalent value, and Cohmad and Sonny Cohn lacked good faith in receiving commissions from Madoff. *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 332–34 (Bankr. S.D.N.Y. 2011).

161.    Certain of the Cohmad Defendants filed a motion for leave to appeal. *See Picard v. Cohmad Sec. Corp.*, No. 11 MC 00337 (TPG) (S.D.N.Y.), ECF Nos. 212–13.  The Cohmad Defendants' appeal was denied by Judge Griesa on November 14, 2012.

162.    In March and April 2012, the Cohmad Defendants moved to withdraw the reference from this Court.  *Picard v. Cohmad*, 12-cv-02676 (JSR) (S.D.N.Y.), ECF No. 1.  The Cohmad Defendants have also participated in Common Briefing as to the Bad Faith § 546(e) Issue and the Good Faith Standard Issue.  *See* discussion *supra* Section (IX)(A)(i)(b).  The District Court rendered a decision on the Bad Faith § 546(e) Issue, which indicated that the Trustee adequately pleaded a case against the Cohmad Defendants so that the Cohmad Defendants are not entitled to dismiss the Trustee's complaint at the pleading stage on the basis of Bankruptcy Code Section 546(e).

163.    Meanwhile, the parties have engaged in discovery.  The Trustee has served discovery on all parties, and discovery is ongoing.

### ix.    *Picard v. Defender*

164.    On December 5, 2010, the Trustee commenced an adversary proceeding against Defender Limited, Reliance Management (BVI) Limited, Reliance Management (Gibraltar) Limited, and Tim Brockmann (collectively, the "Foreign Defendants"), and Reliance International Research, LLC, and Justin Lowe (collectively, the "Domestic Defendants," and together with the Foreign Defendants, the "Defendants") seeking the return of over $93 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences, fraudulent transfers, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Domestic Defendants and the Foreign Defendants.  *Picard v. Defender Ltd.*, Adv. No. 10-05229 (SMB) (Bankr. S.D.N.Y.) (the "Defender Action").

165.    On November 29, 2012, the Trustee filed a notice of voluntary dismissal without prejudice of Justin Lowe.  (ECF No. 58).

166.   On April 2, 2012, the Foreign Defendants and the Domestic Defendants separately moved to withdraw the reference.  (ECF Nos. 24, 28).   On May 15, 2012, Judge Rakoff withdrew the reference in part for the Foreign Defendants and the Domestic Defendants to consider the Trustee's standing to assert common law claims and issues related to SLUSA and Bankruptcy Code Section 546(e).  No. 12-cv-02800 (JSR) (S.D.N.Y.), ECF Nos. 7, 8; No. 12-cv-02871 (JSR) (S.D.N.Y), ECF Nos. 7, 9.   In those same orders, Judge Rakoff consolidated these cases with others into Case No. 12 MC 0115 and issued consolidated briefing schedules.   The Foreign Defendants and Domestic Defendants participated in Common Briefing as to the Standing, SLUSA and Bankruptcy Code Section 546(e) issues.   The District Court's disposition of these Common Briefing issues is discussed *supra* in Section IX(A)(i)(b).

167.   On April 27, 2012, defendants Reliance Management (BVI) Limited, Reliance Management (Gibraltar) Limited, and Tim Brockmann (the "Moving Defendants") filed a motion to dismiss for lack of personal jurisdiction.  (ECF No. 36).   The Trustee opposed the motion.  (ECF No. 49).   The Moving Defendants filed their reply brief on October 26, 2012.  (ECF No. 55).   This Court converted the hearing on this motion, scheduled for December 19, 2012, into a Rule 16 conference and directed the parties to meet and confer with respect to the motion.  This motion to dismiss remains pending.

168.   On December 18, 2013, the Trustee and defendants Reliance Management (Gibraltar) Limited, and Tim Brockmann filed a stipulation of dismissal without prejudice of Reliance Management (Gibraltar) Limited, and Tim Brockmann.  (ECF No. 72).

169.   On September 19, 2014 the parties filed a stipulation extending the remaining Defendants' time to respond to the complaint to December 1, 2014.  (ECF No. 86).

x.      *Picard v. Equity Trading*

170.    On December 5, 2010, the Trustee commenced an adversary proceeding against Equity Trading Portfolio Limited, Equity Trading Fund Limited and BNP Paribas Arbitrage, SNC (collectively, the "Equity Trading Defendants"), seeking the return of over $16 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences, fraudulent transfers, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Equity Trading Defendants. *Picard v. Equity Trading Portfolio Limited*, Adv. No. 10-04457 (BRL) (Bankr. S.D.N.Y.) (the "Equity Trading Action").

171.    On October 31, 2011, defendant BNP Paribas Arbitrage, SNC moved to withdraw the reference, and on November 7, 2011, defendants Equity Trading Portfolio Limited and Equity Trading Fund Limited joined that motion. (ECF Nos. 16, 21). On May 15, 2012, Judge Rakoff withdrew the reference in part for the Equity Trading Defendants to consider the Trustee's standing to assert common law claims and issues related to SLUSA and Bankruptcy Code Section 546(e). *Picard v. Equity Trading*, No. 11-cv-07810 (JSR) (S.D.N.Y.), ECF Nos. 13, 14. In those same orders, Judge Rakoff consolidated the cases with others into case number 12 MC 0115 and issued consolidated briefing schedules. The Equity Trading Defendants participated in Common Briefing as to the Standing Issue and the Bad Faith § 546(e) Issue. The District Court's disposition of these Common Briefing issues is discussed *supra* in Section IX(A)(i)(b).

172.    On August 29, 2014, this Court so ordered a stipulation authorizing the Trustee to file an amended complaint by October 30, 2014 and setting forth a schedule for responses to the amended complaint and briefing on any motions the Equity Trading Defendants might file in lieu of an answer. (ECF No. 58).

xi.    *__Picard v. Fairfield Greenwich__*

173.    On May 18, 2009, the Trustee commenced an action against Fairfield Sentry Ltd. ("Sentry"), Fairfield Sigma Ltd. ("Sigma), Fairfield Lambda Ltd. ("Lambda") (collectively, the "Fairfield Funds"), Greenwich Sentry, L.P. ("Greenwich Sentry"), Greenwich Sentry Partners, L.P. ("Greenwich Sentry Partners", and together with Greenwich Sentry, the "Greenwich Funds"), and other defendants seeking the return of approximately $3.5 billion under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Fairfield Funds and the Greenwich Funds.  *Picard v. Fairfield Sentry Ltd. (In Liquidation)*, Adv. No. 09-01239 (BRL) (Bankr. S.D.N.Y. May 18, 2009).

174.    On June 7, 2011, this Court conditionally approved a settlement agreement between the Trustee and the Joint Liquidators for the Fairfield Funds (the "Joint Liquidators").  (ECF No. 95).  On July 13, 2011, this Court entered consent judgments between the Trustee and Lambda in the amount of $52.9 million (ECF No. 108), Sentry in the amount of $3.054 billion (ECF No. 109), and Sigma in the amount of $752.3 million (ECF No. 110).

175.    As part of the Fairfield Funds settlement, Sentry agreed to permanently reduce its net equity claim from approximately $960 million to $230 million.  Additionally, the Joint Liquidators agreed to make a $70 million payment to the Customer Fund.  The Joint Liquidators also agreed to assign to the Trustee all of the Fairfield Funds' claims against the Fairfield Greenwich Group management companies, officers, and partners, and the Trustee retained his own claims against the management defendants.  Further, the Trustee and the Joint Liquidators agreed to share future recoveries in varying amounts, depending on the nature of the claims.

176.    On July 7, 2011, this Court approved a settlement between the Trustee and the Greenwich Funds, wherein this Court entered judgment against Greenwich Sentry in an amount over $206 million and against Greenwich Sentry Partners in an amount over $5.9 million. *Picard v. Fairfield Sentry*, Adv. No. 09-01239 (BRL) (Bankr. S.D.N.Y.), ECF No. 107.  In the settlement, the Greenwich Funds agreed to permanently reduce their net equity claim from approximately $143 million to approximately $37 million, for a combined reduction of over $105.9 million.  Additionally, the Greenwich Funds assigned to the Trustee all of their claims against Fairfield Greenwich Group management and agreed to share with the Trustee any recoveries they receive against service providers.

177.    On April 2, 2012, the remaining defendants in the Fairfield Sentry action filed motions to withdraw the reference on a number of issues that later became subject to Common Briefing and hearings before Judge Rakoff of the District Court.  The Trustee briefed and presented argument at the hearings on these issues before the District Court.  The District Court has issued its opinions providing guidance to this Court and remanded the cases for further findings applying the standards set forth in the District Court's opinions.

178.    On June 6, 2012, the Trustee filed additional recovery actions against entities or persons related to Fairfield Greenwich Group employees or partners entitled *Picard v. RD Trust*, Adv. No. 12-01701 (BRL) (Bankr. S.D.N.Y.), *Picard v. Barrenche Inc*., Adv. No. 12-01702 (BRL) (Bankr. S.D.N.Y.), and *Picard v. Alix Toub*, Adv. No. 12-01703 (BRL) (Bankr. S.D.N.Y.).  The parties in the *Toub* action have entered into a stipulated stay as permitted by this Court.  None of the defendants in the three actions have responded yet to the Trustee's complaints.

179.    On November 6, 2012 in the District Court, in a putative class action filed by former Fairfield Funds investors against several Fairfield Greenwich Group partners and management officials, the plaintiffs and the Fairfield Greenwich Group related defendants filed a motion seeking preliminary approval of a settlement.  *Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 118 (S.D.N.Y.), ECF No. 997.  On November 29, 2012, the Trustee filed an application seeking an injunction against the implementation of the settlement.  *See Picard v. Fairfield Greenwich Ltd.*, Adv. No. 12-02047 (BRL) (Bankr. S.D.N.Y.), ECF No. 2.  On December 21, 2012, the defendants filed a motion to withdraw the reference to the Bankruptcy Court.  (ECF No. 11).  On February 6, 2013, the District Court granted the defendants' motion to withdraw the reference to the Bankruptcy Court, *Picard v. Fairfield Greenwich Ltd.*, 12 Civ. 9408 (VM) (S.D.N.Y.), ECF No. 30.  On March 20, 2013, the District Court denied the Trustee's application seeking an injunction against the implementation of the *Anwar* settlement.  (ECF No. 59).  On April 8, 2013, the Trustee filed a notice of appeal from the District Court's denial of the Trustee's application for an injunction against the implementation of the *Anwar* settlement. (ECF No. 61).

180.    On February 26, 2013, the Trustee filed a letter requesting a pre-motion conference on a motion to intervene in the *Anwar* action.  (ECF No. 1054).  On March 8, 2013, the District Court deemed the pre-motion conference letter to be a motion to intervene and denied the Trustee's request.  (ECF No. 1071).  On April 8, 2013, the Trustee filed a notice of appeal from the order denying his request to intervene in the *Anwar* action.  (ECF. No. 1106).

181.    Briefing on both appeals of the *Anwar* decisions was completed on June 7, 2013. Oral argument on the appeals was held on October 10, 2013.  On August 8, 2014, the Second Circuit denied the Trustee's request for an injunction.  (ECF No. 181).

- 54 -

182.     As of September 30, 2014, the Trustee and the remaining defendants have entered into stipulations extending the response date to the Trustee's complaints while awaiting this Court's rulings on motions to dismiss based on application of the District Court's rulings on extraterritoriality.

### xii.     *Picard v. Friedman*

183.     On December 9, 2010, the Trustee commenced an adversary proceeding seeking the return of more than $19 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent transfers, fraudulent conveyances and recovery in connection with certain transfers of property by BLMIS to or for the benefit of S. Donald Friedman, individually and as a beneficiary of an individual retirement account, Saundra Friedman, Ari Friedman, Broadway-Elmhurst Co. LLC and NTC & Co. LLP (the "Friedman Defendants").  *Picard v. Friedman*, Adv. No. 10-05395 (SMB) (Bankr. S.D.N.Y.).  NTC & Co. LLP was subsequently voluntarily dismissed as a defendant.

184.     The complaint alleges that the Friedman Defendants received fraudulent transfers from BLMIS in bad faith.  The complaint was amended on March 31, 2011 (ECF No. 13) to add allegations concerning newly-discovered transfers after the Friedman Defendants sought to dismiss the action on February 18, 2011.  (ECF Nos. 7, 8).  The Friedman Defendants answered the amended complaint on May 13, 2011.  (ECF No. 26).

185.     On March 30, 2012, the Friedman Defendants moved to withdraw the reference to the District Court.  *See Picard v. Friedman*, No. 12-cv-02343 (JSR) (S.D.N.Y.).  The District Court granted the motion by orders entered on May 16, 2012 and June 25, 2012, allowing the Friedman Defendants to move to dismiss as to the Stern Issue, the Antecedent Debt Issue, the Bad Faith § 546(e) Issue, and the issue of whether the Trustee may avoid mandatory withdrawals from individual retirement accounts.  (ECF Nos. 7, 8).  The Friedman Defendants participated in

Common Briefing on these issues. *See id.* The District Court's disposition of these Common

Briefing issues is discussed *supra* in Section IX(A)(i)(b).

186.    Discovery in the Trustee's action continued to proceed while the motions to

dismiss concerning Common Briefing issues were pending. During the Report Period, the case

management plan was amended. *Picard v. Friedman*, Adv. No. 10-05395 (SMB) (Bankr.

S.D.N.Y.), ECF No. 104. The Trustee issued a non-party subpoena to the Friedman Defendants'

former bookkeeper for accounting files of the Friedman Defendants and is currently reviewing

the production in response to the subpoena. B&H attorneys also reviewed hundreds of

documents produced by a former accountant for the Defendants.

187.    During the Report Period, the Trustee took the deposition of Elaine Nevins, who

provided bookkeeping services to the Friedman Defendants. The Trustee also prepared for the

deposition of Mr. Donald Friedman.

###    xiii.    *Picard v. Richard M. Glantz*

188.    On December 9, 2010, the Trustee commenced an adversary proceeding against

Richard Glantz and several related individuals and entities (collectively, the "Glantz

Defendants"), seeking the return of more than $113 million under SIPA, the Bankruptcy Code,

the New York Fraudulent Conveyance Act, and other applicable law for fraudulent transfers,

fraudulent conveyances and damages in connection with certain transfers of property by BLMIS

to or for the benefit of the Glantz Defendants. *Picard v. Richard M. Glantz*, Adv. No. 10-05394

(BRL) (Bankr. S.D.N.Y. Dec. 9, 2010).

189.    The Trustee alleges that Richard Glantz and his deceased father, Edward Glantz,

created and managed entities that pooled many millions of dollars of investor funds to be

funneled into BLMIS. *See Picard v. Richard M. Glantz*, Adv. No. 10-05394 (BRL) (Bankr.

S.D.N.Y.). The Trustee further alleges that after Richard Glantz, Edward Glantz and entities

they created and managed were permanently enjoined from future securities laws by the SEC, Richard Glantz and Edward Glantz arrived at a new arrangement with Madoff, which resulted in Richard Glantz and Edward Glantz receiving fraudulent side payments. (ECF No. 1). In addition, Richard Glantz continued to funnel his own money, his family's money, and other people's money into BLMIS though new entities. *Id.*

190.    To date, the Trustee has dismissed or settled with twenty Glantz Defendants. Nineteen Glantz Defendants remain in this adversary proceeding. (ECF Nos. 11, 13, 14, 20, 25, 31, 43, 44, 46, 49, 50, 51).

191.    On February 1, 2012, the remaining Glantz Defendants moved in this Court to dismiss the complaint. The Trustee and counsel for the Glantz Defendants subsequently entered into a scheduling stipulation, which was so ordered by the Court on April 2, 2012, providing new dates for the Trustee to amend the complaint and for the Glantz Defendants to supplement their motion to dismiss or file a new one.

192.    Prior to entry of that scheduling stipulation, on March 31, 2012, the remaining Glantz Defendants filed a motion to withdraw the reference. (ECF No. 34). On April 11, 2012, the motion to withdraw the reference was referred to Judge Rakoff. *See Picard v. Glantz*, No. 12-cv-02778 (JSR) (S.D.N.Y.), ECF Nos. 1–3. On May 15, May 16, June 1 and June 25, 2012, the District Court entered orders withdrawing the reference, in part, for the limited purpose of hearing and determining certain Common Briefing issues. (ECF Nos. 7, 9, 10, 11). Certain of those issues remain subject to decisions to be rendered by the Court.

193.    The Trustee and the remaining Glantz Defendants entered into a recent stipulation, which was so ordered by this Court on July 15, 2014, pursuant to which the Trustee has until November 19, 2014 to amend the complaint. *Picard v. Glantz*, Adv. No. 10-05394

(SMB) (ECF No. 58).  The Glantz Defendants may either supplement their motion to dismiss or file a new motion to dismiss by January 14, 2015.

xiv.    *Picard v. HSBC Bank plc*

194.    On July 15, 2009, the Trustee commenced an adversary proceeding against a handful of HSBC entities and international feeder funds in the financial services industry that transferred funds to and from BLMIS.  *Picard v. HSBC Bank plc*, Adv. No. 09-01364 (BRL) (Bankr. S.D.N.Y.) (the "HSBC Action").   After further investigation, the Trustee filed an amended complaint on December 5, 2010, expanding the pool of defendants to thirteen HSBC entities and forty-eight individuals and entities, and alleging that over 33% of all monies invested in Madoff's Ponzi scheme were funneled by and through these defendants into BLMIS.  (ECF No. 35).

195.    The thirteen HSBC-related defendants and, separately, UniCredit S.p.A. and Pioneer Alternative Investment Management Limited, moved to withdraw the reference.   On April 14, 2011, United States District Judge Jed S. Rakoff ("Judge Rakoff") withdrew the reference to consider the Trustee's standing to assert common law claims.  *Picard v. HSBC Bank plc*, No. 11 Civ. 00836 (JSR) (S.D.N.Y.), ECF Nos. 20, 23.

196.    On May 3, 2011, the same defendants filed motions to dismiss.  *Picard v. HSBC Bank plc*, No. 11 Civ. 00836 (ECF Nos. 24–27).  The Trustee and SIPC opposed the motions. (ECF Nos. 32–36).  On July 28, 2011, the District Court dismissed the Trustee's common law claims, holding that the Trustee lacked standing, under any theory, to assert them.  *Picard v. HSBC Bank plc*, 454 B.R. 25, 37–38 (S.D.N.Y. 2011).  The District Court returned the remainder of the HSBC Action to this Court for further proceedings.  *Id.* at 38.

197.    On December 15, 2011, the Trustee appealed the District Court's decision to the Second Circuit.  *See Picard v. HSBC Bank PLC*, No. 11-5175 (2d Cir. 2011); *Picard v. HSBC*

*Bank PLC*, No. 11-5207 (2d Cir. 2011).  Oral argument was held on November 21, 2012.  On

June 20, 2013, the Second Circuit affirmed the decision of the District Court.  (ECF No. 163).

198.    On October 9, 2013, the Trustee filed a petition for a writ of certiorari with the

Supreme Court.  *See Picard v. J.P. Morgan Chase & Co.*, *pet. for cert. filed*, (U.S. Oct. 9, 2013)

No. 13-448.  The Supreme Court denied the petition.

199.    The District Court returned several of the Trustee's bankruptcy claims to this

Court.  However, various defendants in the HSBC Action moved to withdraw the reference from

this Court and those motions have been granted, at least in part, by the District Court.  These

defendants participated in a variety of motions before the District Court on Common Briefing,

including the Bad Faith § 546(e) Issue, the § 502(d) Issue, the Extraterritoriality Issue, and the

Good Faith Standard Issue.  The District Court's disposition of these Common Briefing issues is

discussed *supra* in Section IX(A)(i)(b).  The HSBC Action now has been returned to the

Bankruptcy Court.

200.    Following the entry of the Extraterritoriality Opinion and Order, the Trustee filed

the Omnibus Motion.  ECF No. 7827.  Following a request by certain defendants, on September

17, 2014, the Bankruptcy Court held a conference to discuss further proceedings to be conducted

pursuant to the Extraterritoriality Opinion and Order and the Omnibus Motion.  The Court

directed the parties to confer and devise an efficient procedure and briefing schedule.  The

Omnibus Motion is being held in abeyance pending the Bankruptcy Court's ruling on the

extraterritoriality issues.

201.    The Trustee is engaged in certain foreign proceedings with some of these

defendants.  This includes the Trustee's participation in proceedings against one of the feeder

fund defendants, Primeo, in the Cayman Islands.  *See* discussion *infra* Section X(C).

xv.    ***Picard v. JPMorgan Chase***

202.    On December 2, 2010, the Trustee commenced an action against JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd (the "JPMorgan Defendants"). *Picard v. JPMorgan Chase*, Adv. No. 10-04932 (BRL) (Bankr. S.D.N.Y.) (the "JPMorgan Action"). On February 8, 2011, the JPMorgan Defendants moved for withdrawal of the reference. *Picard v. JPMorgan Chase*, No. 11-cv-00913 (CM) (S.D.N.Y.) (ECF Nos. 1–3) (the "JPMorgan Withdrawn Action"). The District Court granted the motion on May 23, 2011. *JPMorgan Withdrawn Action* (ECF No. 30).

203.    On June 3, 2011, the JPMorgan Defendants filed a motion to dismiss. *JPMorgan Withdrawn Action* (ECF Nos. 32–34). The Trustee filed an amended complaint against the JPMorgan Defendants on June 24, 2011. *JPMorgan Withdrawn Action* (ECF No. 50). On August 1, 2011, the JPMorgan Defendants renewed their motion to dismiss. *JPMorgan Withdrawn Action* (ECF Nos. 56–58). The Trustee and SIPC opposed the motion. *JPMorgan Withdrawn Action* (ECF Nos. 61–66).

204.    On November 1, 2011, the District Court dismissed the Trustee's common law and contribution claims in the JPMorgan Action (the "November 1 Order"). Picard v. J.P. Morgan Chase & Co., 460 B.R. 84 (S.D.N.Y. 2011). The District Court returned the remainder of the JPMorgan Action to this Court for further proceedings. Id.

205.    On November 10, 2011, the Trustee filed a motion for entry of final judgment under Federal Rule of Civil Procedure 54(b) as to counts twenty-one through twenty-eight of the amended complaint. JPMorgan Withdrawn Action (ECF Nos. 71, 72). On November 30, 2011, the District Court held that there was no just reason for delay and certified its November 1 Order as final (the "JPMorgan Rule 54(b) Judgment"). *JPMorgan Withdrawn Action* (ECF No. 74).

The JPMorgan Rule 54(b) Judgment was then entered on December 1, 2011.  *JPMorgan Withdrawn Action* (ECF No. 75).

206.    On February 16, 2012, the Trustee filed his brief appealing the November 1 Order in the JPMorgan Action, and SIPC intervened in the appeal.  *See Picard v. JPMorgan Chase & Co.*, No. 11-5044 (2d Cir.) (ECF Nos. 79–87).  Oral argument before the Second Circuit took place on November 21, 2012.

207.    On June 20, 2013, the Second Circuit affirmed the District Court's November 1, 2011 Order.  *JPMorgan*, No. 11-5044 (ECF No. 166).  On July 11, 2013, the Second Circuit issued its mandate, terminating the Second Circuit's jurisdiction over the JPMorgan Action and transferring jurisdiction back to this Court.  *JPMorgan*, No. 11-5044 (ECF No. 173).

208.    On August 20, 2013, the Supreme Court granted the application for an extension of time within which to file a petition for a writ of certiorari, extending the time to and including October 18, 2013.  *JPMorgan*, No. 11-5044 (ECF No. 174).  On October 9, 2013, the Trustee filed a petition for a writ of certiorari with the Supreme Court.  *See Picard v. J.P. Morgan Chase & Co.*, pet. for cert. filed, (U.S. Oct. 9, 2013) No. 13-448.  Briefing was completed in December 2013, and in January 2014, the Supreme Court called for the view of the Solicitor General.  The Solicitor General has yet to file a brief.

209.    The remaining claims against the JPMorgan Defendants, which were not dismissed and were thus not subject to the appeal, were pending before this Court.

210.    On September 19, 2013, this Court entered a case management plan in the JPMorgan Action.  *JPMorgan Action* (ECF. No. 26).  Shortly thereafter, the parties began settlement negotiations.

211.    On January 7, 2014, the Trustee moved before this Court for approval of recovery agreements totaling approximately $543 million, of which $325 million represents the settlement of the Trustee's avoidance claims brought against the JPMorgan Defendants and $218 million represents the settlement of common law claims brought by certain class action plaintiffs (the "Class Action Settlement"), which mirrored those developed by the Trustee.  Concurrently, the United States Attorneys' Office for the Southern District of New York announced a deferred prosecution agreement with JPMorgan relating to Madoff, resulting in a $1.7 billion civil forfeiture payment.

212.    This Court approved the Trustee's settlement and the Class Action Settlement on February 4, 2014.  *JP Morgan Action*, (ECF Nos. 51 and 52).  The District Court approved the Class Action Settlement on March 21, 2014.  *Hill v. JPMorgan Chase & Co.*, 11-cv-7961 (CM) (S.D.N.Y. Nov. 7, 2011), ECF No. 29.

213.    At the time that the Trustee sought approval of his settlement, SPV Optimal SUS Ltd. ("SPV"), as successor in interest to Optimal Strategic U.S. Equity Limited ("SUS"), and Solus Recovery Fund, LP ("Solus"), as successor in interest to Optimal Arbitrage Limited ("Arbitrage," and together with SUS, "Optimal"), filed a limited objection ("SPV Limited Objection") (ECF No. 42), arguing that Optimal is entitled to a net refund of $7,439,482.40 from the BLMIS estate under the "most favored nation" ("MFN") provision set forth in paragraph 13 of the settlement agreement between Trustee and Optimal dated May 22, 2009 (the "Optimal Settlement" or "Optimal Settlement Agreement").  After the Trustee filed his reply to the SPV Limited Objection (ECF No. 45), Solus filed a joinder (ECF No. 48).

214.    At the February 4, 2014 hearing, this Court determined that at least two factors in the MFN provision were ambiguous.  The Court suggested that extrinsic evidence on these terms

may be necessary.[16]    The parties thereafter exchanged documents, deposed the two principal

negotiators for the Trustee and Optimal during the settlement, and filed briefs with the Court.

On July 30, 2014, the Court held an evidentiary hearing and heard oral argument on these issues.

On October 10, 2014, the court entered Post-Trial Findings of Fact and Conclusions of Law

Denying Application for Partial Refund of Prior Settlement Payments, finding that the JPMorgan

Settlement did not trigger the Applicants' right to refunds.    ECF No. 77, 2014 WL 5106909

(Bankr. S.D.N.Y. Oct. 10, 2014).

### xvi.    *Picard v. Kingate*

215.    On March 17, 2014, the Trustee filed and served a fourth amended complaint

under SIPA, the Bankruptcy Code, New York Debtor and Creditor Law and other applicable law

against Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (collectively, the "Kingate

Funds") and numerous other defendants in the adversary proceeding captioned as *Picard v.*

*Federico Ceretti*, Adv. No. 09-01161 (SMB) (Bankr. S.D.N.Y.), ECF No. 100 (the "Kingate

Fourth Amended Complaint").

216.    On April 17, 2014, the Bankruptcy Court entered an order granting the Trustee's

uncontested motion for leave to file an amended complaint in a separate adversary proceeding

(ECF No. 28) ("Kingate Injunction Action") captioned as *Picard v. Kingate Global Fund, Ltd. et*

*al.*, Adv. No. 12-01920 (Bankr. S.D.N.Y. 2012) (the "Injunction Complaint").    The Kingate

Injunction Action sought entry of an order preserving any recovery by the Joint Liquidators for

the Kingate Funds in the action they commenced in the Supreme Court of Bermuda, Commercial

Court (the "Bermuda Action") against many of the same entities and individuals that the Trustee

---

[16] Hearing Tr. 30:10-21.

has named as defendants in the avoidance action on the ground that any property recovered by the Joint Liquidators would be customer property.

217.    The Joint Liquidators then moved to dismiss the Injunction Complaint under Rule 12(b)(6), made applicable under Federal Rule of Bankruptcy Procedure 7012(b).   Before the Trustee answered that motion, on August 8, 2014, the Second Circuit rendered its opinion in *Picard v. Fairfield Greenwich, et al.*, No. 13-1289-bk (L), 13-1392-cv (CON), 13-1785 (2d Cir. Aug. 8, 2014).   In light of the Second Circuit's opinion, the Trustee voluntarily dismissed without prejudice the Kingate Injunction Action.

218.    On July 18, 2014, the Joint Liquidators for the Kingate Funds filed a motion to dismiss the Kingate Fourth Amended Complaint (the "MTD") (ECF No. 111) in *Picard v. Federico Ceretti*, Adv. No. 09-01161 (SMB) (Bankr. S.D.N.Y.).   The Trustee's deadline to respond to the MTD was extended to October 14, 2014 by the parties' stipulation filed on August 20, 2014 (ECF No. 117).

219.    The District Court's Extraterritoriality Opinion and Order determined that the application of section 550(a)(2) would constitute an extraterritorial application of the statute. Since that date, counsel for foreign subsequent transferee defendants, including the subsequent transferee defendants in the Kingate avoidance action, have requested entry of an order by the Bankruptcy Court establishing procedures and a briefing schedule to facilitate the Bankruptcy Court's application of the Extraterritoriality Opinion and Order to various adversary proceedings and subsequent transferee defendants affected by that opinion.

220.    In light of the above, at the request of certain subsequent transferee defendants in the Kingate avoidance action, the Trustee has agreed to a 60 day extension of their time to

answer or otherwise respond to the Kingate Fourth Amended Complaint, bringing the deadline to mid-December, 2014.

221.    The Trustee and his counsel have continued to prepare for anticipated dispositive motions in the avoidance action on various grounds, and ultimately, for trial.

### xvii.    *The Kohn Action*

222.    On December 10, 2010, the Trustee commenced an adversary proceeding (the "Kohn Action") against Sonja Kohn ("Kohn"), Bank Medici, UniCredit Bank Austria AG ("Bank Austria"), UniCredit S.p.A. ("UniCredit), Pioneer Asset Management ("Pioneer"), Alessandro Profumo ("Profumo"), and dozens of individuals, trusts, and nominee companies (collectively, the "Kohn Defendants").    *Picard v. Kohn*, Adv. No. 10-5411 (BRL) (Bankr. S.D.N.Y.).

223.    On February 22, 2011, UniCredit, Bank Austria, Pioneer, and Profumo moved to withdraw the reference as to certain of the Trustee's claims against them.    *Picard v. Kohn*, No. 11 Civ. 01181 (JSR) (S.D.N.Y.).    The Trustee and SIPC opposed the motion.    (ECF Nos. 15–17). On June 6, 2011, Judge Rakoff granted the motion to consider the Trustee's standing to assert his RICO claims and to determine whether those claims are otherwise barred.    (ECF Nos. 34, 55, 56).

224.    On July 25, 2011, UniCredit, Bank Austria, Pioneer, and Profumo filed motions to dismiss the Trustee's RICO and common law claims.    (ECF Nos. 38–41, 44–47, 49–50).    The Trustee and SIPC opposed the motions to dismiss.    (ECF Nos. 51–54).    On February 22, 2012, Judge Rakoff dismissed the RICO and common law claims as to those defendants and returned the remainder of the claims to this Court.    (ECF No. 69).

225.     On March 21, 2012, the Trustee initiated an appeal within the 30-day time period prescribed by Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure to preserve the Trustee's right to appeal.  (ECF No. 70).

226.     Since entry of the Administrative Order, thirty-two of the Kohn Defendants have moved to withdraw the reference, including UniCredit and Pioneer (*Kohn*, No. 11 Civ. 01181, ECF Nos. 70–75), Bank Austria, Kohn and certain of her family members and related companies (ECF Nos. 89, 94).

227.     On April 6, 2012, the Trustee filed the second amended complaint and amended RICO case statement in this Court.  (ECF No. 97).

228.     On April 10, 2012, the Trustee dismissed Gianfranco Gutty as a defendant in the Kohn Action.  (ECF No. 100).

229.     On May 10, 2012, the Trustee entered into a stipulation to formally dismiss Hassans International Law Firm.  (ECF No. 104).

230.     On August 10, 2012, the Clerk of this Court (the "Clerk") entered a default against defendant Daniele Cosulich, on a request made by the Trustee on August 9, 2012.  (ECF Nos. 114, 112).

231.     On August 31, 2012, the Clerk entered a default against defendants Yakov Lantzitsky and Sharei Halacha Jerusalem, Inc., on a request made by the Trustee on August 30, 2012.  (ECF Nos. 122, 123, 116, 118).

232.     On November 16, 2012, the Trustee filed a motion for judicial assistance for service of process on defendants in Liechtenstein and Austria.  (ECF Nos. 145, 146).

233.    On December 17, 2012, the Court signed an order issuing requests for international judicial assistance for service of process on defendants in Liechtenstein and Austria.  (ECF Nos. 151, 152).

234.    On April 15, 2013, the Clerk entered a default against defendants Brightlight Trading Ltd., Eastview Service Ltd., Fintechnology Ltd., IT Resources Ltd., Marketinc Strategies Ltd., and Systor S.A., on a request made by the Trustee on April 12, 2013.  (ECF Nos. 170, 171, 172, 173, 174, and 175).

235.    On April 25, 2013, the Clerk entered a default against defendants RTH AG, Tonga International S.A., Lifetrust AG, and Starvest Anstalt, on requests made by the Trustee on April 17 and 23, 2013.  (ECF Nos. 183, 184, 185, and 186).

236.    On June 13, 2013, Starvest Anstalt and Lifetrust AG filed a notice of joinder in the motion to withdraw the reference from the Bankruptcy Court.  (ECF No. 198).

237.    On June 18, 2013, the Clerk entered a default against defendants Bank Medici AG (Gibraltar), New Economy Tech S.A., and Paul de Sury on a request made by the Trustee on June 13, 2013.  (ECF Nos. 200, 201, and 202).

238.    On December 17, 2013, Josef Duregger, Peter Fischer, Gerhard Randa, Wilhelm Hemetsberger, Werner Kretschmer, Harald Nograsek, Stefan Zapotocky (the "Bank Austria Individual Defendants") filed a motion to withdraw the reference to the Bankruptcy Court.  (ECF No. 218).  The District Court denied the Bank Austria Individual Defendants' motion to withdraw the reference without prejudice to its being reasserted if the Bankruptcy Court resolves the personal jurisdiction issue in favor of exercising jurisdiction.  *Picard v. Kohn*, No. 13 Civ. 08994 (JSR) (S.D.N.Y.), ECF No. 4.

239.    On May 9, 2014, the Trustee filed a supplemental stipulation with the Second Circuit, withdrawing with prejudice the appeal initiated by the Trustee on March 21, 2012. *Picard v. Kohn*, No. 12-1106 (2d Cir.), ECF No. 61.  This supplemental stipulation states that the appeal, which was initially withdrawn on April 5, 2012 without prejudice, was premature in that some claims remain pending in the District Court and no Fed. R. Civ. P. 54(b) certification has issued. The Trustee agreed with the appellees that this stipulation does not preclude later appeal from a final judgment or an otherwise appealable order.

240.    On July 18, 2014, the Bank Austria Individual defendants filed a motion to dismiss the second amended complaint for lack of personal jurisdiction.  (ECF Nos. 254, 255, 256, and 257).

241.    On July 30, 2014, the District Court returned the defendants' motion to withdraw the reference to the Bankruptcy Court, consistent with his order.  (ECF Nos. 258, 259. 260, 261).

242.    On September 29, 2014, the parties stipulated to extend the Trustee's time to respond to the Bank Austria Individual Defendants' motion to October 29, 2014, and the Bank Austria Individual Defendants' time to reply to December 17, 2014.  (ECF No. 266).

xviii.    ***Picard v. Legacy Capital Limited***

243.    On December 6, 2010, the Trustee commenced an action against Legacy Capital Ltd., Isaac Jimmy Mayer, Rafael Mayer, Khronos LLC, Khronos Capital Research LLC,  HCH Management Co., Montpellier Resources Ltd., BNP Paribas Securities Corp., Inversiones Coque S.A., Aurora Resources Ltd., and Olympus Assets LDC (collectively, the "Legacy Capital Defendants") seeking the return of over $218 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or

for the benefit of the Legacy Capital Defendants. *Picard v. Legacy Capital Ltd.*, Adv. No. 10-05286 (BRL) (Bankr. S.D.N.Y. 2010).

244.    During the Report Period, B&H attorneys reviewed third party productions relevant to the claims against the Legacy Capital Defendants and conducted further interviews and investigations of the Legacy Capital Defendants and related third parties.

        **xix.**   ***The Luxalpha Action***

245.    During the Report Period, the Trustee completed meet-and-confer discussions regarding defendants' coordinated motions to dismiss for lack of personal jurisdiction and/or *forum non conveniens* in the Luxalpha and LIF actions. *Picard v. UBS AG*, No. 10-4285 (SMB) (Bankr. S.D.N.Y.) ("Luxalpha"); *Picard v. UBS AG*, Adv. No. 10-05311 (SMB) (Bankr. S.D.N.Y.) ("LIF").

246.    On December 19, 2012, the Court held a hearing on the motions to dismiss for lack of personal jurisdiction and/or *forum non conveniens*, but rather than hearing oral argument, the Court converted the hearing into a Rule 16 conference and ordered the parties to further meet and confer on the issues in dispute with the goal of narrowing the issues that the Court would ultimately have to determine. That meet-and-confer process, which began in December 2012 and was completed during the Report Period, involved efforts by the Trustee to negotiate with counsel for numerous defendants across the three actions, as well as *Picard v. Defender*, Adv. No. 10-05229 (BRL) (Bankr. S.D.N.Y.), which has defendants in common with the LIF action. The meet-and confer-process has resulted in the resolution of a number of the motions to dismiss via stipulation or notice of dismissal without prejudice.

247.    The Trustee has made continued progress toward narrowing the number of defendants and parties in dispute during the Report Period. On May 20, 2014, the Trustee filed a notice in the Luxalpha action whereby Defendants Access International Advisors Europe

Limited and Access Partners (Suisse) S.A. were dismissed without prejudice. *Luxalpha,* No. 10-4285 (SMB) (Bankr. S.D.N.Y.), (ECF No. 164). The meet-and-confer process is now complete, with certain motions to dismiss for lack of personal jurisdiction and/or *forum non conveniens* remaining pending before the Court.

248. On July 6, 2014, the District Court issued the Extraterritoriality Opinion and Order. *SIPC v. BLMIS*, No. 12-mc-115 (JSR) (S.D.N.Y. July 6, 2014).

249. In addition, on November 1, 2011, the District Court dismissed the Trustee's common law and contribution claims in the Luxalpha action. *Picard v. UBS AG*, No. 11-cv-4212 (CM) (S.D.N.Y.), ECF No. 36. The Trustee appealed the November 1, 2011 Order to the Second Circuit. Briefing was completed in April 2012, and oral argument took place in November 2012.

250. On June 20, 2013, the Second Circuit affirmed the District Court's November 1 order. *See Picard v. Egger*, No. 11-5051 (2d Cir.), ECF No. 167. On October 9, 2013, the Trustee filed a petition for a writ of certiorari with the Supreme Court. *See Picard v. HSBC Bank PLC,* No. 13-448 (U.S. Oct. 9, 2013). On June 30, 2014, the Supreme Court denied the petition for a writ of certiorari. *See Picard v. HSBC Bank PLC,* No. 13-448 (U.S. June 30, 2014).

**xx.** *Picard v. Maccabee*

251. On December 10, 2010, the Trustee commenced an action against the John Greenberger Maccabee and Sherry Morse Maccabee Living Trust (the "Trust"), John Greenberger Maccabee, individually and as trustee of the Trust, and Sherry Morse Maccabee, individually and as trustee of the Trust (collectively, the "Maccabee Defendants") seeking the return of approximately $1.5 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent transfers and fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for

the benefit of the Maccabee Defendants.  *Picard v. John Greenberger Maccabee & Sherry Morse Maccabee Living Trust*, Adv. No. 10-05407 (SMB) (Bankr. S.D.N.Y.).

252.    On April 17, 2014, the Maccabee Defendants filed a motion to dismiss the adversary proceeding.  (ECF No. 21).  The parties thereafter agreed to participate in voluntary mediation and filed a notice of mediation referral on May 16, 2014 (ECF No. 23) and a notice of mediator selection on June 6, 2014 (ECF No. 24.).  The mediation originally was scheduled for July 1, 2014, but was rescheduled for October 3, 2014.

253.    During the Report Period, the Trustee prepared for mediation, including coordinating with opposing counsel and the mediator, reviewing relevant documents, analyzing arguments, and drafting and submitting a mediation statement.

### xxi.    *Picard v. Andrew H. Madoff*

254.    On October 2, 2009, the Trustee commenced an adversary proceeding against Peter Madoff, Andrew Madoff, Shana Madoff, and the late Mark Madoff (the "Family Defendants") seeking the return of approximately $198 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent transfers, fraudulent conveyances and damages for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting in connection with certain transfers of property by BLMIS to or for the benefit of the Family Defendants.  *Picard v. Andrew H. Madoff*, Adv. No. 09-01503 (BRL) (Bankr. S.D.N.Y.).[17]  On March 15, 2010, the Family Defendants filed a motion to dismiss the complaint.  (ECF Nos. 13–19).  The Trustee opposed the motion.  (ECF No. 25).

255.    On September 22, 2011, this Court filed its Memorandum Decision And Order Denying In Part And Granting In Part Defendants' Motion To Dismiss Trustee's Complaint.

---

[17] The case formerly was styled as *Picard v. Peter B. Madoff*, Adv. No. 09-01503.  The caption was revised following the Trustee's consent judgment against Peter Madoff and dismissal with prejudice of Shana Madoff, as discussed herein.

(ECF No. 55); *Picard v. Andrew H. Madoff*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011). This Court upheld the Trustee's common law claims for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting. In so doing, the Court determined that the Trustee's common law claims (i) were not barred by the doctrine of *in pari delicto* or the related *Wagoner* Rule because the Family Defendants were alleged to be insiders and fiduciaries of BLMIS, and (ii) were not preempted by the Martin Act because those claims were unrelated to the fraudulent investment advice given by Madoff to customers of the IA Business. (ECF Nos. 123, 124). This Court also ruled that because the NYAG has no enforcement power under the Martin Act to bring the types of claims asserted in the Trustee's complaint, which do not require proof of scienter, the common law claims would not interfere with the Martin Act's statutory enforcement mechanism. (ECF No. 127).

256. This Court dismissed certain of the Trustee's claims for a failure to identify the transfers with the requisite particularity, noting that "[r]ectifying the majority of these pleading deficiencies upon amendment should not prove to be a Herculean task." *Id.* This Court granted leave to the Trustee to amend his complaint. *Id.*

257. On October 6, 2011, Andrew Madoff and the Estate of Mark Madoff filed a Motion for Leave to Appeal the Bankruptcy Court's decision (ECF Nos. 56–57), which was assigned to United States District Judge William H. Pauley, III. *See Picard v. Estate of Mark D. Madoff*, No. 11 MC 00379 (WJP) (S.D.N.Y.). On December 22, 2011, Judge Pauley issued a decision denying the Motion for Leave to Appeal. (ECF No. 12).

258. On November 7, 2011, the Trustee filed an amended complaint that identified the date and amount of each transfer alleged in the action. *Picard v. Andrew H. Madoff*, Adv. No. 09-01503 (BRL) (Bankr. S.D.N.Y.), ECF No. 64. The amended complaint also increased the

amount sought from the Family Defendants from over $198 million to over $226 million. This increase was due, in part, to the ongoing nature of the Trustee's investigation, which uncovered additional fraudulent transfers to the Family Defendants in various forms.

259.    On December 23, 2011, the Trustee filed a Motion for Leave to File a Second Amended Complaint. (ECF No. 71). In his proposed second amended complaint, the Trustee sought to name as defendants Mark Madoff's widow, Stephanie Mack, Mark Madoff's ex-spouse, Susan Elkin, and Andrew Madoff's wife, Deborah Madoff (collectively, the "Spouse Defendants"). *Id.* The Trustee also sought to add additional fraudulent transfer claims against the Family Defendants, as well as subsequent transferee claims against both the Family Defendants and the Spouse Defendants. *Id.* Lastly, the Trustee sought to make certain clarifications with regard to previously asserted fraudulent transfer claims. *Id.* The Spouse Defendants and Andrew Madoff, individually and as Executor of the Estate of Mark Madoff, opposed the motion. (ECF Nos. 89, 91, 94, 96).

260.    This Court heard oral arguments on the Trustee's motion on April 3, 2012. On April 4, 2012, this Court issued a Memorandum Decision and Order Denying in Part and Granting in Part the Trustee's Motion for Leave to File a Second Amended Complaint. (ECF No. 106). The Court granted the Trustee leave to name Stephanie Mack and Deborah Madoff as defendants with respect to certain common law causes of action as to which the statute of limitation had not yet run. *Id.* The Court denied leave to name the Spouse Defendants as defendants with respect to the bankruptcy causes of action and certain common law causes of action for which the statute of limitation had expired. *Id.* The Court granted the Trustee leave to pursue additional fraudulent transfer claims against the Family Defendants, as well as subsequent transferee claims against both the Family Defendants and the Spouse Defendants. Finally, the

Court granted the Trustee leave to make the necessary clarifications with regard to previously asserted claims. *Id.*

261.    On April 2, 2012, putative defendants Stephanie Mack and Deborah Madoff moved to withdraw the reference in this case, notwithstanding that they were not yet named as defendants.  (ECF Nos. 100, 104).  In their moving papers (ECF Nos. 101, 105), Ms. Mack and Ms. Madoff noted that while they had not yet been named as defendants, they were nevertheless filing the motion to withdraw the reference by the Court-instituted April 2, 2012 deadline out of an abundance of caution.  *Id.*  They both argued, in part, that the cases against them ought to be precluded by the rule of *in pari delicto*, specifically, because they were not insiders of BLMIS, as to whom Courts have recognized a narrow exception to this rule.  *Id.*  While Ms. Mack's motion sought withdrawal of the reference only with respect to the claims against her (ECF No. 101), Ms. Madoff's motion sought to withdraw the reference with respect to the entire case (ECF No. 105).  Ms. Madoff also filed a separate motion to withdraw the reference in the related action filed against her by the Trustee.  *Picard v. Deborah Madoff*, Adv. No. 10-05332 (BRL) (Bankr. S.D.N.Y.), ECF Nos. 22, 23.

262.    The Trustee consented to allow Ms. Mack and Ms. Madoff to submit their briefs to the District Court as part of the consolidated briefing to determine issues related to the Trustee's standing in adversarial proceedings.   Oral argument on the consolidated briefing, including the arguments set forth by Ms. Mack and Ms. Madoff, was heard by Judge Rakoff on October 16, 2012.

263.    On December 6, 2013, the District Court issued an Opinion and Order in which it determined that the Trustee lacked standing to bring common law claims against Ms. Mack and Ms. Madoff.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (JSR) (S.D.N.Y. Dec.

6, 2013), ECF No. 509.  The District Court found that the Trustee was barred from bringing such

claims under the *in pari delicto* doctrine, and that Ms. Mack and Ms. Madoff were not insiders

for the purposes of an exception to the *in pari delicto* doctrine.  *Id*.  Thus, the District Court

dismissed the Trustee's common law claims against Ms. Mack and Ms. Madoff and returned the

remainder of the proceeding to this Court.  *Id*.

264.    On June 29, 2012, Peter Madoff pleaded guilty to a two-count indictment and

consented to the entry of a forfeiture order for $143.1 billion.  Specifically, Peter Madoff pleaded

guilty to one count of conspiracy to commit securities fraud, falsify records of an investment

adviser, falsify records of a broker-dealer, make false filings with the SEC, commit mail fraud,

falsify statements in relation to documents required by ERISA, and obstruct and impede the

lawful governmental function of the IRS.  He also pleaded guilty to one count of falsifying

records of an investment advisor.  *See United States v. O'Hara*, 10 Cr. 228 (LTS) (S.D.N.Y.),

ECF No. 246 (the "Preliminary Forfeiture Order").  Under the Preliminary Forfeiture Order,

Peter Madoff and his wife, Marion Madoff, forfeited substantially all of their assets to the United

States Government.  In addition, the Preliminary Forfeiture Order covered certain significant

property owned by Shana Madoff that was forfeited under the same plea agreement.

265.    On February 6, 2013, Peter Madoff consented to the entry of judgment against

him in the amount of $90,390,500, the full amount of the Trustee's claims against him.  (ECF

No. 145).  Under the consent judgment, the Trustee will forbear from seeking to enforce the

judgment as long as Peter Madoff makes reasonable efforts to cooperate with the Trustee in the

Trustee's efforts to recover funds for the BLMIS estate.  *Id.*

266.    As part of the consent judgment, the Trustee agreed to forbear from seeking

recovery against Shana Madoff and to dismiss the Trustee's action against Marion Madoff.  *Id.*

On February 7, 2013, the Trustee voluntarily dismissed, with prejudice, the adversary proceeding against Marion Madoff. *Picard v. Marion Madoff*, Adv. No. 10-04310 (BRL) (Bankr. S.D.N.Y. Feb. 7, 2013), ECF No. 16. On March 19, 2013, the Court so ordered a stipulation dismissing with prejudice the adversary proceeding against Shana Madoff. *Picard v. Andrew H. Madoff*, Adv. No. 09-01503 (BRL) (ECF No. 148).

267.    On February 4, 2014, the Court so ordered a stipulation dismissing without prejudice the adversary proceeding against The Deborah and Andrew Madoff Foundation. *Picard v. Deborah and Andrew Madoff Foundation*, Adv. No. 10-05330 (SMB) (ECF No. 42).

268.    On February 4, 2014, the Court also so ordered a stipulation dismissing without prejudice the adversary proceeding against Mark and Stephanie Madoff Foundation. *Picard v. Mark and Stephanie Madoff Foundation*, Adv. No. 10-05325 (SMB) (ECF No. 38).

269.    On March 26, 2014, the Trustee voluntary dismissed with prejudice Susan Elkin from Adversary Proceeding 09-01503. *Picard v. Andrew H. Madoff*, Adv. No. 09-01503 (SMB) (ECF No. 177). On the same day, the Trustee voluntarily dismissed with prejudice Susan Elkin, Daniel Madoff and K.D.M. from Adversary Proceeding 10-05328. *Picard v. Stephanie Mack*, Adv. No. 10-05328 (SMB) (ECF No. 56).

270.    On June 27, 2014, the Trustee voluntarily dismissed with prejudice Deborah Madoff from Adversary Proceeding 09-01503. *Picard v. Andrew H. Madoff,* Adv. No. 09-01503 (SMB) (ECF No. 183). On the same day, the Trustee voluntarily dismissed with prejudice Adversary Proceeding 10-05332. *Picard v. Deborah Madoff,* Adv. No. 10-05332 (SMB) (ECF No. 54).

271.    The Trustee filed a Motion for Leave to File a Third Amended Complaint on July 15, 2014. (ECF No. 184). In his proposed third amended complaint, the Trustee sought to

remove all dismissed defendants and the factual allegations and claims asserted against them in the second amended complaint. (ECF No. 185). The Trustee also sought to address altered legal standards and pleading burdens in light of District Court decisions rendered after the second amended complaint was filed. (*Id.*).

272. Andrew Madoff, individually and as Executor of the Estate of Mark Madoff, opposed the motion. (ECF No. 191, 192). A hearing on the Trustee's Motion for Leave to Amend is scheduled for November 19, 2014. (ECF No. 194). Following the death of Andrew Madoff on September 3, 2014, the parties are working on issues related to substitution of the Estate of Andrew Madoff as defendant in this action.

### xxii. *Picard v. Magnify Inc.*

273. On December 6, 2010, the Trustee commenced an action against Magnify, Inc. and several related companies holding BLMIS accounts, individuals acting on behalf of these accounts, and several other recipients of transfers from these accounts (collectively, the "Magnify Defendants") seeking the return of more than $154 million under SIPA §§ 78fff(b) and 78fff-2(c)(3), §§ 105(a), 542, 544, 547, 548(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws for preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Magnify Defendants. *Picard v. Magnify Inc.*, Adv. No. 10-05279 (BRL) (Bankr. S.D.N.Y.). On September 21, 2011, the Trustee filed an amended complaint in the action. (ECF No. 39).

274. On April 2, 2012, defendants Robert H. Book and R.H. Book LLC moved to withdraw the reference to the District Court on several grounds. *See Picard v. Magnify, Inc.*, No. 12-cv-02482 (JSR) (S.D.N.Y.). These defendants have since settled with the Trustee and have been dismissed from the action.

275. Defendant Kurt Brunner moved to dismiss the Trustee's complaint for lack of personal jurisdiction on September 1, 2011, and supplemented this motion with regard to allegations in the amended complaint on November 3, 2011. *Picard v. Magnify*, Adv. No. 10-05279 (BRL) (ECF Nos. 32, 48). On June 14, 2012, this Court held a hearing on Mr. Brunner's motion to dismiss for lack of personal jurisdiction. This Court denied the motion and ordered jurisdictional discovery over Mr. Brunner related to "the degree to which Brunner controlled and profited from [defendants] Magnify, Premero and Strand" and entered an order to this effect on June 15, 2012. (ECF No. 97).

276. Following this order, the Trustee reviewed responses to written discovery served on Mr. Brunner and conducted a deposition of Mr. Brunner on November 7 and 8, 2012. Determination of personal jurisdiction over Mr. Brunner is stayed pending resolution of a motion to dismiss for lack of personal jurisdiction and *forum non conveniens* filed in *Picard v. Estate (Succession) of Doris Igoin*, Adv. No. 10-04336 (BRL) (Bankr. S.D.N.Y.), a pending avoidance action against defendants who have ties to the late founder of several of the Magnify Defendants. The *Igoin* defendants' motion is awaiting disposition by the Bankruptcy Court.

277. In addition to this activity, and pursuant to the parties' case management plan, the Trustee has received and reviewed documents served in response to written discovery requests to several of the Magnify Defendants, prepared documents for production to the Magnify Defendants as part of ongoing discovery, and prepared subpoenas pursuant to Federal Rules of Civil Procedure 45 and motions for the issuance of letters of request pursuant to the Hague Convention to certain third parties who may possess relevant information.

### xxiii. *Picard v. J. Ezra Merkin*

278. On May 7, 2009, the Trustee commenced an adversary proceeding against sophisticated money manager and Madoff associate J. Ezra Merkin ("Merkin"); the investment

management company he solely owned, Gabriel Capital Corporation ("GCC"); and his funds, Gabriel Capital, L.P. ("Gabriel Capital"), Ariel Fund Ltd. ("Ariel Fund"), and Ascot Partners, L.P. ("Ascot Partners") (collectively, the "Merkin Defendants"[18]).  (ECF. No. 1).  The Trustee alleged that Merkin knew or should have known that Madoff's investment advisory business ("IA Business") was predicated on fraud.  Among other things, the Trustee sought the return of nearly $560 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for preferential and fraudulent transfers that were made by BLMIS to or for the benefit of the Merkin Defendants.  *Picard v. J. Ezra Merkin*, Adv. No. 09-01182 (BRL) (Bankr. S.D.N.Y.) (ECF No. 1-2).  On August 6, 2009, the Trustee filed an amended complaint.  (ECF No. 10).

279.    On November 4, 2009, Bart M. Schwartz, as receiver of defendants Ariel Fund and Gabriel Capital (the "Ariel/Gabriel Receiver"), and Merkin and GCC filed separate motions to dismiss the complaint, which the Trustee opposed. (ECF No. 17, 22, 29-31).  The Trustee sought and was granted leave to file a second amended complaint (ECF No. 39, 46), which was filed on December 23, 2009.  (ECF No. 49).  The Ariel/Gabriel Receiver and Merkin and GCC then renewed their motions to dismiss, which the Trustee again opposed.  (ECF Nos. 54-55, 62–63).

280.    On November 17, 2010, this Court entered its Memorandum Decision and Order Granting in Part and Denying in Part Defendants' Motions to Dismiss Trustee's Complaint (the "November 17, 2010 Memorandum Decision and Order").  (ECF No. 84); *see also Picard v. Merkin*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010).  Among other holdings, the Court held that the Trustee sufficiently pleaded his federal and state law claims seeking to avoid and recover actual

---

[18] Ascot Fund Ltd. was added as a defendant on August 30, 2014 and will be included in the definition of "Merkin Defendants" for all events after this date.

and constructive fraudulent transfers.  The Court also held that the defendants who moved to dismiss the second amended complaint were not entitled at the pleading stage to dismissal of the Trustee's actual fraudulent transfer claims pursuant to the Bankruptcy Code's § 548(c) "good faith transferee" affirmative defense.  *Picard v. Merkin*, 440 B.R. at 256–57.  In addition, the Court held that Ariel Fund and Gabriel Capital were not, at the pleading stage, entitled to dismissal of the Bankruptcy Code-based constructive fraudulent transfer claims pursuant to the Bankruptcy Code's § 546(e) "safe harbor" affirmative defense.  *Id.* at 266 n.25.

281.    On December 1, 2010, the Ariel/Gabriel Receiver filed a Motion for Leave to Appeal the Court's November 17, 2010 Memorandum Decision and Order.  (ECF No. 86); *see also Picard v. Merkin*, 11-MC-0012 (KMW) (S.D.N.Y. Jan. 12, 2011).  On August 31, 2011, United States District Judge Kimba M. Wood denied the motion.  *Picard v. Merkin*, No. 11-MC-0012 (KMW), 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011).  Among other findings, Judge Wood determined that there were no "substantial grounds for difference of opinion as to the correctness of the standards relied on by the Bankruptcy Court in its refusal—at the pleading stage—to dismiss on the grounds of [Ariel Fund and Gabriel Capital's] § 546(e) affirmative defense."  *Id.* at *12.

282.    On April 2, 2012, the Ariel/Gabriel Receiver and Merkin and GCC filed motions to withdraw the reference to the Bankruptcy Court.  (ECF No. 120, 125).  On this date, David B. Pitofsky, the former receiver[19] for Ascot Partners (the "Ascot Partners Receiver," and together with the Ariel/Gabriel Receiver, the "Receivers"), filed a Statement of Joinder to the Ariel/Gabriel Receiver's motion to withdraw the reference.  (ECF No. 123).  The District Court subsequently withdrew the reference to the Bankruptcy Court only as to certain issues, including

---

[19] On May 17, 2013, Ralph C. Dawson was appointed to replace David Pitofsky as Receiver for Ascot Partners. (ECF No. 143).  All references to the "Ascot Receiver" for events after this date will refer to Ralph Dawson.

but not limited to, the Bad Faith § 546(e) Issue, the Good Faith Standard Issue, and the § 502(d) Issue. On April 27, 2014, the District Court decided the last of these issues and directed the adversary proceeding back to the Bankruptcy Court for further proceedings. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2014 WL 1651952, at *5 (Bankr. S.D.N.Y. Apr. 27, 2014).

283. In connection with ongoing discovery before the Bankruptcy Court, the parties jointly agreed to appoint former bankruptcy judge Melanie Cyganowski as binding arbitrator. To date, Judge Cyganowski has heard multiple disputes between the parties regarding third party documents and bank records and has resolved disputes on three occasions. On March 15, 2013, Judge Cyganowski issued a ruling ("Arbitration Decision No. 3") granting in substantial part, and denying in part, the Trustee's request to respond to the Trustee's discovery requests. (ECF No. 196). Among other things, Arbitration Decision No. 3 compelled Merkin and GCC to comply with Federal Rule of Civil Procedure 34(b) by identifying how their production corresponded with the Trustee's document requests and required them to produce the underlying financial records that they received banks and other financial institutions.

284. On August 8, 2013, Judge Cyganowski heard oral arguments with regard to various outstanding discovery disputes. Among the matters at issue are the Trustee's pursuit of Rule 2004 discovery from Merkin's wife, Lauren Merkin, who individually and jointly with Merkin received subsequent transfers of funds or was the beneficiary of subsequent transfers to Merkin and other third parties, and discovery deficiencies related to Arbitration Decision No. 3 and the Trustee's Fourth Request for Production of Documents. A decision on these issues remains pending.

285.    On August 30, 2013, the Trustee filed the third amended complaint (the "Third

Amended Complaint"), which alleges that the Merkin Defendants had knowledge of, or were

willfully blind to, the fraud at BLMIS consistent with the District Court's recent decisions.  (ECF

No. 212).  The Third Amended Complaint also asserted subsequent transfer claims against Ascot

Fund Ltd. ("Ascot Fund"), a Cayman fund controlled by Merkin.

286.    On October 11, 2013, the Receivers, Merkin and GCC filed motions to dismiss

the Third Amended Complaint.  (ECF Nos. 160, 166, 168).  On November 15, 2013, the Trustee

filed a consolidated opposition brief in response to these motions to dismiss.  (ECF No. 173).  On

December 20, 2013, the Receivers and Merkin and GCC filed briefs in further support of their

motions to dismiss.  (ECF Nos. 185-188).

287.    The Trustee entered into a stipulation with Ascot Fund extending its time to

move, answer, or otherwise respond to the Third Amended Complaint.  (ECF Nos. 159, 171).

Ascot Fund ultimately filed a motion to dismiss the Third Amended Complaint on December 20,

2013.  (ECF Nos. 182-183).  On December 23, 2013, the Trustee and Ascot Fund entered into a

stipulation which clarified the subsequent transfer counts of the Third Amended Complaint

against Ascot Fund.  (ECF No. 189).  The Trustee filed his opposition to the Ascot Fund motion

to dismiss on January 31, 2014.  (ECF Nos. 198-199).

288.    On April 30, 2014, this Court heard oral arguments on the motions to dismiss.

(ECF No. 210).  Thereafter, on August 12, 2014, this Court entered its Decision Granting in Part

and Denying in Part Defendants' Motion to Dismiss.  (ECF No. 212).  The Court found that the

Third Amended Complaint "adequately pleads willful blindness" and that the Trustee may thus

still pursue avoiding and recovering all of the intentional fraudulent transfers that he brought

under section 548(a)(1)(A) of the Bankruptcy Code.  The Court also found that the Trustee did

not sufficiently plead that the Merkin Defendants had "actual knowledge" of Madoff's fraud.  As a result, the Court held that section 546(e) of the Bankruptcy Code limits the Trustee's avoidance counts to those asserted under section 548(a)(1)(A), and dismissed the Trustee's counts for preferential transfers, constructive fraudulent transfers, and fraudulent transfers under New York Debtor & Creditor law.  The Court also dismissed the Third Amended Complaint's counts of disallowance and equitable disallowance on bases unrelated to actual knowledge.

289.    Following the Court's ruling, on August 26, 2014, the Merkin Defendants filed a proposed order for consideration by Judge Bernstein.  (ECF. No. 218).  On August 29, 2014, the Trustee filed an objection, arguing that an order at this time was impractical and premature and noting that the Trustee was going to seek certification of the decision under Federal Rule of Civil Procedure 54(b) and 28 U.S.C. § 158(d) for the dismissed counts for preferential transfers, constructive fraudulent transfers, and fraudulent transfers under New York Debtor & Creditor law.  (ECF. No. 219).

290.    On September 5, 2014, the Trustee filed a motion requesting that the Court: (i) direct entry of final judgment as against Gabriel Capital, Ariel Fund, and Ascot Partners under Federal Rule of Civil Procedure 54(b) (the "Rule 54(b) Judgment"),[20] on the counts for preferential transfers, constructive fraudulent transfers, and fraudulent transfers under New York Debtor & Creditor law, (ii) expressly determine that there is no just reason for delay, and (iii) certify the Rule 54(b) Judgment for an immediate appeal to the Second Circuit under 28 U.S.C. § 158(d).  (ECF No. 227).  On September 12, 2014, the Receivers, Merkin and GCC opposed the Trustee's motion.  (ECF No. 230-231).  A hearing on the Trustee's motion was held on October 2, 2014, and the matter is *sub judice* before Judge Bernstein.  (ECF No. 232).

---

[20] Made applicable to the adversary proceeding by Federal Rule of Bankruptcy Procedure 7054.

291.    During the Report Period, the Trustee continued preparing for fact witness depositions and expert discovery by conducting extensive and ongoing analysis of documents produced by the Merkin Defendants and from third parties.  In addition, the Trustee continued to issue additional document and other discovery requests to the Merkin Defendants, responded to the Merkin Defendants' discovery requests, and issued subpoenas for documents from other third parties.

### xxiv.  *Picard v. Merrill Lynch*

292.    On December 8, 2010, the Trustee commenced an action against Merrill Lynch International ("MLI") seeking the return of approximately $16 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent transfers in connection with certain transfers of property by BLMIS to or for the benefit of MLI.  *Picard v. Merrill Lynch Int'l*, Adv. No. 10-05346 (SMB) (Bankr. S.D.N.Y. Dec. 8, 2010) ("MLI Action").

293.    On November 22, 2011, the Trustee commenced an action against Merrill Lynch Bank (Suisse), S.A. ("MLBS") seeking the return of approximately $46 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent transfers in connection with certain transfers of property by BLMIS to or for the benefit of MLBS.  *Picard v. Merrill Lynch Bank (Suisse), S.A.*, Adv. No. 11-02910 (SMB) (Bankr. S.D.N.Y. Nov. 22, 2011) ("MLBS Action").

294.    On May 2, 2012, both MLI and MLBS moved for withdrawal of the reference. *Picard v. Merrill Lynch Int'l*, No. 12-cv-03486 (JSR) (S.D.N.Y.), (ECF Nos. 1–2); *Picard v. Merrill Lynch Bank (Suisse) S.A.*, No. 12-cv-03487 (JSR) (S.D.N.Y.), ECF Nos. 1–2.  MLI and MLBS participated in Common Briefing as to the Bad Faith § 546(e) Issue, the Extraterritoriality Issue, § 550(a), the Stern Issue, and the Good Faith Standard Issue.  Judge Rakoff has rendered

decisions on all of these Common Briefing issues, which is discussed *supra* in Section IX(A)(i)(b).

295.    On April 27, 2014, Judge Rakoff issued the Good Faith Standard Opinion and Order, upon which MLI, MLBS, and other defendants had moved to withdraw the reference. *Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 2014 WL 1651952 (S.D.N.Y. Apr. 27, 2014).

296.    In July 2014, Judge Rakoff issued the Extraterritoriality Opinion and Order. Through such order, the MLI and MLBS Actions were returned to the Bankruptcy Court.  *Picard v. Merrill Lynch Int'l*, Adv. No. 10-05346 (SMB) (Bankr. S.D.N.Y.), ECF No. 51; *Picard v. Merrill Lynch Bank (Suisse), S.A.*, Adv. No. 11-02910 (SMB) (Bankr. S.D.N.Y.), ECF No. 41.

297.    Following the entry of the Extraterritoriality Opinion and Order, the Trustee filed the Omnibus Motion. *Picard v. Merrill Lynch Int'l*, Adv. No. 10-05346 (SMB) (Bankr. S.D.N.Y.), ECF No. 53; *Picard v. Merrill Lynch Bank (Suisse), S.A.*, Adv. No. 11-02910 (SMB) (Bankr. S.D.N.Y.), ECF No. 43.  Following a request by certain defendants, on September 17, 2014, the Bankruptcy Court held a conference to discuss further proceedings to be conducted pursuant to the Extraterritoriality Opinion and Order and the Omnibus Motion.  The Court directed the parties to confer and devise an efficient procedure and briefing schedule.  The Omnibus Motion is being held in abeyance until the Bankruptcy Court rules on the extraterritoriality issues.

298.    Currently, response dates in the MLI and MLBS Actions have been extended while the parties await the Bankruptcy Court's rulings on various issues.

### xxv.    ***Picard v. Nomura Int'l plc***

299.    On December 8, 2010, the Trustee commenced an action against Nomura Bank International plc ("Nomura Bank International") seeking the return of approximately $35 million

under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of Nomura. *Picard v. Nomura Int'l plc*, Adv. No. 10-05348 (SMB) (Bankr. S.D.N.Y. Dec. 8, 2010) (the "Nomura Action").

300.    On March 30, 2012, Nomura Bank International moved for withdrawal of the reference. *Picard v. Nomura Bank Int'l plc*, Adv. Pro. No. 10-05348 (Bankr. S.D.N.Y.), ECF No. 20-21; and *Picard v. Nomura Bank Int'l plc*, No. 12 Civ. 2446 (JSR) (S.D.N.Y.), ECF Nos. 1-3.  The Trustee and SIPC opposed the motion as part of Common Briefing on the Antecedent Debt Issue, the Bad Faith § 546(e) Issue, the Extraterritoriality Issue, the Good Faith Standard Issue, and the Stern Issue.

301.    By orders issued by the District Court during the Spring and Summer of 2012, the District Court included Nomura Bank International's motion to withdraw the reference in Common Briefing and oral argument.

302.    On May 16, 2012, the District Court granted the motion to withdraw on the Antecedent Debt Issue, allowing Nomura Bank International, as part of Common Briefing, to move to dismiss.  On May 23, 2012, the District Court granted the motion to withdraw on the Bad Faith § 546(e) Issue, allowing Nomura Bank International, as part of Common Briefing, to move to dismiss.  On June 7, 2012, the District Court granted the motion to withdraw on the Extraterritoriality Issue, allowing Nomura Bank International, as part of Common Briefing, to move to dismiss.  On June 23, 2012, the District Court granted the motion to withdraw on the Good Faith Standard Issue, allowing Nomura Bank International, as part of Common Briefing, to move to dismiss.  On July 12, 2012, the District Court granted the motion to withdraw on the Stern Issue. *Picard v. Nomura Bank Int'l plc*, No. 12-cv-02446 (S.D.N.Y.), ECF Nos. 8-12.  The

District Court's disposition of these Common Briefing Issues is discussed *supra* in Section IX(A)(i)(b).

303.    On June 6, 2012, the Trustee filed an amended complaint adding Nomura International plc ("Nomura") as a defendant ("Nomura Amended Complaint").    *Picard v. Nomura Bank Int'l plc*, Adv. Pro. No. 10-05348 (SMB) (Bankr. S.D.N.Y.), ECF. No. 42. Nomura declined to file a motion to withdraw the reference on the issues listed above.

304.    On July 25, 2012, the Trustee, under Rule 21 of the Federal Rules of Civil Procedure made applicable to this proceeding through Rule 7021 of the Federal Rules of Bankruptcy Procedure, voluntarily dismissed Nomura Bank International without prejudice. *Picard v. Nomura Int'l plc*, Adv. No. 10-05348 (SMB) (Bankr. S.D.N.Y.), ECF No. 45.

305.    On April 27, 2014, Judge Rakoff issued the Good Faith Standard Opinion and Order, upon which Nomura and other defendants had moved to withdraw the reference. *Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 2014 WL 1651952 (S.D.N.Y. Apr. 27, 2014).

306.    In July 2014, Judge Rakoff issued the Extraterritoriality Opinion and Order. *Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 513 B.R. 222 (S.D.N.Y. 2014).    Through the Extraterritoriality Opinion and Order, the Nomura Action was remanded back to the Bankruptcy Court.    *Picard v. Nomura Int'l plc*, Adv. Pro. No. 10-05348 (SMB) (Bankr. S.D.N.Y.), ECF No. 57.

307.    Following the entry of the Extraterritoriality Opinion and Order, the Trustee filed the Omnibus Motion.    *Id.*, ECF No. 59.    Following a request by certain defendants, on September 17, 2014, the Bankruptcy Court held a conference to discuss further proceedings to be conducted pursuant to the Extraterritoriality Opinion and Order and the Omnibus Motion.    The Court

directed the parties to confer and devise an efficient procedure and briefing schedule. The Omnibus Motion is being held in abeyance until the Bankruptcy Court rules on the extraterritoriality issues.

308.     Currently, response dates in the Nomura Action have been extended while the parties await the Bankruptcy Court's rulings on various issues.

### xxvi.  *Picard v. PJ Administrators*

309.     On December 10, 2010, the Trustee commenced an action against American Securities Management, L.P., PJ Associates Group, L.P., and numerous other individuals and entities (collectively, the "PJ Defendants") seeking the return of approximately $91 million, including approximately $10 million in fictitious profits under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the PJ Defendants. *Picard v. American Sec. Mgmt., L.P.*, Adv. No. 10-05415 (BRL) (Bankr. S.D.N.Y.).

310.     During the Report Period, the Trustee and the remaining PJ Defendants entered into a stipulation, filed on July 9, 2014, pursuant to which the remaining PJ Defendants have until January 16, 2015 to respond to the Trustee's amended complaint. The Trustee also undertook additional investigative efforts concerning the PJ Defendants.

### xxvii.  *Picard v Rye/Tremont*

311.     On December 7, 2010 the Trustee commenced an action against Tremont Group Holdings, Inc., Tremont Partners, Inc., Tremont (Bermuda) Ltd., Rye Select Broad Market Fund, and numerous other entities and individuals (collectively, the "Tremont Funds") in which the Trustee sought the return of approximately $2.1 billion under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of

the Tremont Funds.  *Picard v. Tremont Group Holdings, Inc.*, Adv. No. 10-05310 (SMB) (Bankr. S.D.N.Y.) (the "Tremont Litigation").

312.    After the court filing, the parties entered into substantive settlement negotiations. On September 22, 2011, this Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, "Tremont") in the amount of $1.025 billion.  *Picard v. Tremont Group Holdings, Inc.*, Adv. No. 10-05310 (SMB) (Bankr. S.D.N.Y.), (ECF No. 38).  (There were two non-settling defendants at the time, Sandra Manzke ("Manzke") and Rye Select Broad Market XL Portfolio Limited ("XL Portfolio")).

313.    Pursuant to the settlement, Tremont delivered $1.025 billion into an escrow account, which was placed into the Customer Fund, and the Trustee allowed certain customer claims related to Tremont in the approximate amount of $2.9 billion.  Two objections to the settlement agreement were filed by non-BLMIS customers, both of which were overruled by this Court.  This Court entered an Order Granting Trustee's Motion for Entry of Order Approving Agreement.  (ECF No. 38).

314.    Certain objectors filed an appeal of the Tremont settlement on October 18, 2011. *See Picard v. Tremont Group Holdings, Inc.*, No. 11-7330 (GBD) (Bankr. S.D.N.Y.), (ECF No. 1).  Thereafter, Tremont filed a motion to dismiss the appeal, which was subsequently joined by motions filed by the Trustee and parties subject to the settlement.  (ECF Nos. 4, 6, 8, 12, 14). The non-BLMIS customers who commenced the appeal opposed the dismissal.  (ECF Nos. 15, 16).  On June 27, 2012, United States District Judge George B. Daniels granted the motion to dismiss the appeal, and judgment was entered on June 28, 2012.  (ECF Nos. 35, 36).

315.    On July 27, 2012, the non-BLMIS objectors filed an appeal with the Second Circuit. (ECF No. 37).  Prior to submitting any briefing, however, the parties submitted a joint stipulation of dismissal, and the appeal was dismissed on October 25, 2012.  (ECF No. 39).  The terms of the settlement, therefore, have been implemented.

316.    Pursuant to the Tremont settlement, Tremont delivered $1.025 billion into an escrow account on November 6, 2012.  The settlement payment was released from the escrow account to the Trustee on February 8, 2013.  Accordingly, the Trustee allowed certain customer claims related to Tremont.

317.    On February 10, 2012, XL Portfolio settled with the Trustee in connection with the Tremont Litigation, as well as two other actions commenced on December 8, 2010 by the Trustee against XL Portfolio and other defendants.  These other actions are captioned *Picard v. ABN AMRO Bank, N.V. et al.,* Adv. No. 10-05354 (SMB) (Bankr. S.D.N.Y. Dec. 8, 2010) and *Picard v. ABN AMRO (Ireland) Ltd., et al,* Adv. No. 10-05355 (SMB) (Bankr. S.D.N.Y. Dec. 8, 2010).

318.    On September 17, 2013, the remaining defendant in the Tremont Litigation, Manzke, who was also a defendant in the captioned action, *Picard v. Maxam Absolute Return Fund Ltd., et al.,* Adv. No. 10-05342 (Bankr. S.D.N.Y. Dec. 8, 2010), settled and had approved the latter action.   Upon the Maxam settlement, Manzke was dismissed from the Tremont Litigation, and that case closed.

319.    Subsequent to the dismissal of the Maxam and Tremont cases, strategy and investigation for additional evidentiary support for proposed actions and amended proceedings against subsequent transferees has continued.

### xxviii. *Picard v. Stanley Shapiro*

320.    On December 9, 2010, the Trustee commenced an action against Stanley Shapiro, Renee Shapiro, David Shapiro, Rachel Shapiro, Leslie Shapiro Citron, Kenneth Citron, and numerous trusts (collectively, the "Shapiro Defendants") seeking the return of over $54 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Shapiro Defendants.  *See Picard v. Shapiro*, Adv. No. 10-05383 (BRL) (Bankr. S.D.N.Y.).

321.    During the Report Period, the Trustee filed a second amended complaint against the Shapiro Defendants.  On August 28, 2014, the Shapiro Defendants moved to dismiss the second amended complaint on several grounds.  During September 2014, the Trustee commenced preparing his opposition to the Shapiro Defendants' motion, which was filed on October 23, 2014.

### xxix. *Picard v Vizcaya*

322.    After extensive investigation, the Trustee brought both domestic and Gibraltar-based actions against Vizcaya Partners Ltd. ("Vizcaya"), Banque Jacob Safra (Gibraltar) Ltd. ("Bank Safra"), Asphalia Fund Ltd. ("Asphalia"), Zeus Partners Ltd. ("Zeus"), and Siam Capital Management ("Siam").  *Picard v. Vizcaya*, Adv. No. 09-01154 (BRL) (Bankr. S.D.N.Y.).

323.    Vizcaya, Siam, Asphalia, and Zeus failed to appear or answer the Trustee's amended complaint in this Court. Accordingly, this Court granted the Trustee's motion for default judgment on August 3, 2010.  (ECF No. 49).  Thereafter, Zeus and the Trustee entered into a stipulation pursuant to which the Trustee agreed to vacate the default judgment against Zeus.  Zeus agreed not to oppose the Trustee's application to the Supreme Court of Gibraltar for the transfer of over $60 million that had been held in Zeus's account at Bank Safra and was

placed in the custody of the Gibraltar Supreme Court. This Court approved the stipulation on November 23, 2010. (ECF No. 56). The Trustee and Siam reached a settlement, and Siam was dismissed from the domestic and Gibraltar actions.

324.   The Trustee filed an application in the Gibraltar Supreme Court for the repatriation of those funds to the United States, which was granted. Those funds were deposited in the Court's registry on August 8, 2011.

325.   The parties to the U.S. action are presently engaged in discovery, and the Trustee has been preparing document productions which would satisfy his responses to the defendants' document requests to date.

326.   The Trustee also has served a protective action in Gibraltar to preserve his right to sue Vizcaya, Bank Safra, Asphalia, Zeus, Siam, Banque J. Safra (Suisse) SA, and Pictet et Cie for $180 million in transfers received from BLMIS. The parties have agreed to a stay, which was ordered by the Supreme Court of Gibraltar. The stay is in place until further order. The parties may apply for a lift of the stay any time after the expiration of 28 days from the determination of the Judicial Committee of the Privy Council of any appeals or cross appeals brought against the February 7, 2014 Court of Appeal Judgment in the action discussed in the paragraph below.

327.   Following the UK Supreme Court's judgment in *Rubin v. Eurofinance,* defendants Vizcaya and Asphalia moved to dismiss the Trustee's actions in Gibraltar that seek to enforce the default judgment entered against them in the United States, and to release assets that have been frozen by the Gibraltar action. A hearing was held in March 2013 and continued in May 2013. Following the hearing, the Court issued an order denying Vizcaya's motion and denying

Asphalia's motion in part, finding that the Trustee's action involved issues of fact that required a trial. Vizcaya and Asphalia filed an appeal of this order.

328. The appeal was heard by the Court of Appeal on October 7-8, 2013. A judgment was issued on February 7, 2014 (the "Court of Appeal Judgment"). The Court of Appeal Judgment denied Vizcaya's relief in part and granted it in part. On March 28, 2014, Vizcaya filed an application for permission to appeal to the Privy Council. During the Report Period, the Trustee filed a Notice of Objection to Vizcaya's application to appeal, as well as an application for permission to cross-appeal to the Privy Council. On July 28, 2014, the Privy Council informed the parties that Vizcaya's application will be granted and the Trustee's application for permission to cross-appeal will be refused. At a March 24, 2014 hearing, the Supreme Court of Gibraltar stayed this action until an outcome is reached by the Privy Council.

329. In addition, in September 2012, the Trustee filed an action in the Gibraltar courts opposing and seeking to join to the Trustee's existing proceedings in Gibraltar a petition filed by Mr. Robert Faissal against Vizcaya (the "Faissal Action"). The Faissal Action seeks to adjourn the enforcement of a default judgment entered in the BVI against Vizcaya. The Trustee has sought relevant disclosures from third parties. The parties have agreed to a stay of this action, which may be lifted upon application by the parties any time after the expiration of 28 days from the determination of the Privy Council of Vizcaya's appeal brought against the Court of Appeal Judgment.

## C. **Injunction Proceedings**

330. The Trustee has commenced numerous injunction actions seeking to enjoin third party lawsuits brought against defendants who also have been named as defendants in the Trustee's avoidance actions. Through these proceedings, the Trustee has sought to enforce the automatic stay established by § 362 of the Bankruptcy Code and related District Court stays,

and/or to enjoin third party actions under § 105 of the Bankruptcy Code in order to facilitate the orderly administration of the BLMIS liquidation, and to preserve assets from which the Trustee may recover for the benefit of all BLMIS customers.  During the Report Period, there have been developments in the Bankruptcy Court, the District Court, and the Second Circuit with respect to these proceedings.

> ### i. *Picard v. Schneiderman*

331.    On August 1, 2012, the Trustee commenced an adversary proceeding in this Court captioned *Picard v. Schneiderman*, Adv. No. 12-01778 (BRL) (Bankr. S.D.N.Y.), seeking to enjoin a settlement (the "Settlement") by the NYAG and others (the "Settling Parties") with J. Ezra Merkin and related parties (the "Merkin Defendants") purporting to resolve third party actions by the Settling Plaintiffs with the Merkin Defendants.  The Trustee sued the Merkin Defendants to recover fraudulent transfers in a separate proceeding.  *Picard v. Merkin*, Adv. No. 09-01182 (BRL) (Bankr. S.D.N.Y.).

332.    Upon requests by the Settling Plaintiffs and Merkin Defendants, and after oral argument, the District Court withdrew the reference of the Trustee's injunction action.

333.    On April 15, 2013, following a hearing, the District Court issued a decision denying the Trustee's injunction request and dismissing the action.  (ECF No. 53).  The District Court held that the Defendants' claims did not violate the automatic stay, a section 105(a) preliminary injunction was not warranted, and the Trustee's action was barred by the doctrine of laches.

334.    The Trustee appealed the District Court's decision to the Second Circuit and the appeal was heard in tandem with the appeal of the District Court's decision denying the Trustee's request for injunctive relief respecting defendants related to the Fairfield Greenwich Group, described further below.  On August 8, 2014, the Second Circuit issued a decision

affirming the District Court. *Picard v. Fairfield Greenwich Ltd.*, No. 13-1289, 2014 WL

3882481 2d Cir. Aug. 8, 2014). The Court ruled that the Defendants' actions did not violate the

automatic stay and could not be preliminarily enjoined under section 105(a) because the Trustee

had not shown an "immediate" harm to the estate. The Court also ruled that the Trustee had not

shown a likelihood of irreparable harm because he did not show that he was likely to prevail in

his underlying avoidance actions and that he would be unable to recover a judgment in light of

the third party settlements.

   ii.     ***Picard v. Fairfield Greenwich Ltd.***

335.    On November 29, 2012, the Trustee moved to enjoin a proposed class action

settlement in the District Court between the certain class action plaintiffs and managing entities

and principals of feeder funds operated by the Fairfield Greenwich Group (the "Fairfield

Defendants"). If effectuated, the settlement would have recovered the same funds sought by the

Trustee as subsequent transfers in his underlying avoidance action, and would have greatly

decreased the value of the claims against the managing entities and principals which were

assigned to the Trustee by the feeder funds in connection with the Trustee's settlement with the

funds.

336.    The Honorable Victor Marrero, who is overseeing the class action and settlement,

granted defendants' motion to withdraw the reference, and the parties completed briefing of the

injunction application. *Picard v. Fairfield Greenwich Ltd.*, Adv. No. 12-9408 (ECF Nos. 30, 37–

39, 49). Thereafter, on March 20, 2013, without oral argument, Judge Marrero issued a decision

denying the Trustee's injunction application. *Picard v. Fairfield Greenwich, Ltd.*, No. 12 CIV

9408, 2013 WL 1149933 (S.D.N.Y. Mar. 20, 2013). In addition, Judge Marrero denied a

separate motion by the Trustee to intervene in the underlying class action suit that was

proceeding before the District Court.

337.    The Trustee appealed the District Court's decisions to the Second Circuit and the appeal was heard in tandem with the appeal of the District Court's decision denying the Trustee's request for injunctive relief with respect to the Merkin Defendants, described above. On August 8, 2014, the Second Court issued a decision affirming the District Court.  *Picard v. Fairfield Greenwich Ltd.*, No. 13-1289, 2014 WL 3882481 (2d Cir. Aug. 8, 2014).  The Court ruled that the Defendants' actions did not violate the automatic stay and could not be preliminarily enjoined under section 105(a) because the Trustee had not shown an "immediate" harm to the estate.  The Court also ruled that the Trustee had not shown a likelihood of irreparable harm because he did not show that he was likely to prevail in his underlying avoidance actions and that he would be unable to recover a judgment in light of the third party settlements.

### iii.    *Goldman Partnership Lift-Stay Motions*

338.    In December 2011, A.G. Goldman and Pamela Goldman (the "Goldman Plaintiffs") moved before this Court to lift the automatic stay so that they could file putative securities class actions against the Picower estate and related entities.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* No. 08-01789 (BRL) (S.D.N.Y. Dec. 13, 2011), ECF No. 4581.  Some of the attorneys for the named plaintiffs are also representing the Fox Plaintiffs. The Trustee opposed the lift-stay motions on the grounds articulated, among others, by Judge Koeltl in his decision and order affirming the Picower settlement and enforcing the automatic stay and injunction with respect to the Fox Plaintiffs.  (ECF No. 4797).

339.    On June 20, 2012, this Court issued an order denying the Goldman Plaintiffs' motion.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 477 B.R. 351, 352–53 (Bankr. S.D.N.Y. 2012).  The Court reasoned that the Goldman Plaintiffs were using "inventive pleading" to circumvent the automatic stay because their pleadings were identical to the Fox

Plaintiffs' enjoined actions. *Id.* at 354–55. The Court further held that the Goldman Plaintiffs failed to assert any particularized injury suffered by them, and that the plaintiffs were seeking to re-litigate the net equity decision. *Id.* at 357.

340. The Goldman Plaintiffs appealed to the District Court. *See A & G Goldman P'ship v. Picard*, No. 12-cv-06109 (RJS) (S.D.N.Y. Aug. 10, 2012). On September 30, 2013, after oral argument, the District Court issued a decision affirming the Bankruptcy Court's decision and dismissing the appeal. *A & G Goldman P'ship v. Picard*, No. 12 Civ. 6109 (RJS), 2013 WL 5511027 *11 (S.D.N.Y. Sept. 30, 2013). The District Court examined the substance of the Goldman Plaintiffs' claims and found that they were "simply deceptively labeled fraudulent conveyance claims" that were derivative of the Trustee's fraudulent transfer claims. *Id.* at *10. The Court found that the claims hence "c[a]me within the plain scope of the Picower Injunction" and that the Bankruptcy Court had jurisdiction to enjoin them. *Id.* at *10. The Goldman Plaintiffs did not appeal the District Court's decision.

341. On January 6, 2014, the Goldman Plaintiffs filed a new action in the District Court for the Southern District of Florida, seeking to file a new complaint against the Picower Defendants. On March 11, 2014, the Trustee commenced an adversary proceeding in this Court seeking to enjoin the Goldman Plaintiffs from proceeding with their new action in violation of the automatic stay and a permanent injunction entered by this Court. *See Picard v. Marshall*, Adv. Pro. No. 14-01840 (Bankr. S.D.N.Y. filed Mar. 11, 2014). This action also sought to enjoin the Fox Plaintiffs from filing an amended complaint against the Picower Defendants in the Florida District Court. The Fox Plaintiffs moved the Court for a stay of its ruling on the injunction application.

342.    On June 23, 2014, the Bankruptcy Court issued a decision granting the Trustee's application and enjoining the Goldman Plaintiffs' and Fox Plaintiffs' actions.  *Picard v. Marshall*, 511 B.R. 375 (Bankr. S.D.N.Y. 2014).  The Court held that the Goldman Plaintiffs' and Fox Plaintiffs' complaints stated derivative claims barred by the permanent injunction.  The Fox Plaintiffs have appealed the decision to the District Court, *see Marshall v. Picard*, 14-CV-6790 (S.D.N.Y.), and briefing is ongoing.

**iv.    *Picard v. Kingate Global Fund, Ltd.***

343.    On October 22, 2012, the Trustee moved to enjoin an action in Bermuda filed by the Kingate Funds against certain management defendants that the Trustee also named as defendants in the Trustee's action against the Kingate Funds.  *Picard v. Kingate Global Fund, Ltd.*, Adv. No. 12-01920 (BRL) (Bankr. S.D.N.Y.), (ECF No. 1).  On August 14, 2014, the Trustee voluntarily dismissed the action.

## X.    INTERNATIONAL INVESTIGATION AND LITIGATION

344.    The Trustee's international investigation and recovery of BLMIS estate assets involves, among other things: (i) identifying the location and movement of estate assets abroad, (ii) becoming involved in litigation brought by third parties in foreign courts, by appearance or otherwise, to prevent the dissipation of funds properly belonging to the estate, (iii) bringing actions before United States and foreign courts and government agencies to recover customer property for the benefit of the customers and creditors of the BLMIS estate, and (iv) retaining international counsel to assist the Trustee in these efforts, when necessary.  More than seventy of the actions filed in this Court involve international defendants, and the Trustee also has actions pending in the United Kingdom, Bermuda, the British Virgin Islands ("BVI"), Gibraltar, and the Cayman Islands, among other countries.

345.    The following summarizes key litigation involving foreign defendants in the Bankruptcy Court and in foreign courts.

## A.    Austria and Italy

346.    The Trustee has actively investigated certain banks, institutions, and individuals located in these jurisdictions.  The Kohn and HSBC Actions, both discussed *supra*, name several Austrian and Italian defendants, including Sonja Kohn, Bank Austria, and UniCredit S.p.A.

## B.    Bermuda

347.    The Trustee is actively investigating various BLMIS-related entities, their officers and directors, and transfers of funds to and through Bermuda.  In addition, in December 2010, the Trustee filed protective actions in Bermuda against several HSBC-related entities in order to preserve the Trustee's ability to bring causes of action in that jurisdiction, as well as an action in the Bankruptcy Court against Bermuda-based Whitechapel Management Limited.  *Picard v. Whitechapel Mgmt. Ltd.*, Adv. No. 10-05402 (BRL) (Bankr. S.D.N.Y.).  The Trustee is also continuing to actively monitor third party legal proceedings taking place in Bermuda that involve several BLMIS-related entities.

## C.    BVI and the Cayman Islands

348.    The Trustee has discovered and is actively investigating the involvement of no fewer than twenty BVI-based feeder funds that funneled money into the Ponzi scheme.  In particular, the Trustee has investigated and filed complaints in the Bankruptcy Court against BVI-based Kingate Global Fund Ltd., Kingate Euro Fund Ltd., Thybo Asset Management Ltd., Thybo Global Fund Ltd., Thybo Return Fund Ltd., Thybo Stable Fund Ltd., Hermes International Fund Limited, Lagoon Investment Limited, Thema Fund Ltd, Thema Wise Investments Ltd., Lagoon Investment Trust, Defender Limited, Equity Trading Portfolio, and Granadilla Holdings Limited.  *See, e.g.*, *Picard v. Kingate*, Adv. No. 09-01161 (BRL) (Bankr.

S.D.N.Y.); *Picard v. Thybo*, Adv. No. 09-01365 (BRL) (Bankr. S.D.N.Y.); *Picard v. Defender Ltd.*, Adv. No. 10-05229 (BRL) (Bankr. S.D.N.Y.).

349.    The Trustee has investigated and filed complaints in the Bankruptcy Court against Cayman Islands-based Harley International (Cayman) Ltd. ("Harley"), *Picard v. Harley*, Adv. No. 09-01187 (BRL) (Bankr. S.D.N.Y.) (the "Harley Adversary Proceeding"), Herald Fund SPC, and the Primeo Fund, the latter two of which are defendants in the HSBC Action.  The Trustee has also filed a complaint in the Cayman Islands against Harley and the Primeo Fund.  The Trustee's claims against Harley in the Cayman courts were discontinued by mutual consent last year.

350.    A hearing was held in October 2012 for the determination of certain preliminary issues in the Cayman action against the Primeo Fund.  The hearing sought to determine, *inter alia*, whether the Trustee could, as a matter of Cayman law, bring avoidance actions in the Cayman Islands under Cayman and/or United States law.  The court held that the Trustee could bring such actions under Cayman law, but not United States law.  That ruling was subsequently appealed by both parties.

351.    The parties' respective appeals were heard on November 7-8, 2013, at which time the judges reserved judgment on the arguments.  The panel also scheduled a continuation of the appeal to November 2014 for argument on whether the Trustee has the power to avoid transactions in the Cayman Islands under Cayman common law.  Judgment was rendered on the November 2013 appeal hearings earlier this year, with the Court of Appeal ruling that the Trustee is entitled to bring avoidance actions in the Cayman Islands under Cayman insolvency law, but he may not bring causes of action under United States law.  Primeo appealed the former

judgment, while the latter ruling was appealed by the Trustee. Both appeals remain pending
before the Privy Council.

## D.    England

352.    The Trustee currently has protective claims pending in England against Kingate-
related individuals and entities and against HSBC and related entities.

## E.    Gibraltar

353.    After extensive investigation, the Trustee brought both domestic and Gibraltar-
based actions against Vizcaya Partners Ltd. ("Vizcaya"), Banque Jacob Safra (Gibraltar) Ltd.
("Bank Safra"), Asphalia Fund Ltd. ("Asphalia"), Zeus Partners Ltd. ("Zeus"), and Siam Capital
Management ("Siam"). *Picard v. Vizcaya*, Adv. No. 09-01154 (BRL) (Bankr. S.D.N.Y.). The
parties who appeared in the domestic action are presently engaged in discovery.

354.    Vizcaya, Siam, Asphalia, and Zeus failed to appear or answer the Trustee's
amended complaint in this Court. Accordingly, this Court granted the Trustee's motion for
default judgment on August 3, 2010. (ECF No. 49). Thereafter, Zeus and the Trustee entered
into a stipulation pursuant to which the Trustee agreed to vacate the default judgment against
Zeus; Zeus agreed not to oppose the Trustee's application to the Supreme Court of Gibraltar for
the transfer of over $60 million that had been held in Zeus's account at Bank Safra and was
placed in the custody of the Supreme Court of Gibraltar (the "Zeus Funds"). This Court
approved the stipulation on November 23, 2010. (ECF No. 56).

355.    The Trustee subsequently filed an application in the Supreme Court of Gibraltar
for the repatriation of the Zeus Funds to the United States, which was granted. The Zeus Funds
were deposited in the Court's registry on August 8, 2011.

356.    In September 2012, the Trustee reached a settlement with Siam, which was
dismissed from all domestic and foreign proceedings involving the Trustee.

357.    Following the issuance of the default judgment in the Trustee's domestic adversary proceeding, the Trustee moved to enforce the default in Gibraltar.  This enforcement proceeding, which remains pending, was stayed pending the judgment of the UK Supreme Court in a third party case involving related legal issues.  Following this issuance of the UK Supreme Court's judgment in that case, Vizcaya and Asphalia moved the Gibraltar court for an order dismissing the Trustee's enforcement action.  The Gibraltar court held a hearing on that motion in March and May 2013.  On June 19, 2013, the Court issued an order denying Vizcaya's motion and denying Asphalia's motion in part, finding that the Trustee's action involved issues of fact that required a trial.  The defendants appealed from this judgment to the Gibraltar Court of Appeal, which issued a judgment on February 7, 2014.  This judgment denied defendants' relief in part and granted it in part.  On March 28, 2014, Vizcaya filed an Application for Permission to Appeal to the Privy Council.  The enforcement action is now stayed in the Gibraltar Supreme Court pending the judgment of the Privy Council.

358.    In addition to the enforcement action, the Trustee filed a protective action in Gibraltar under substantive U.S. and Gibraltar law to preserve his right to avoid fraudulent transfers from BLMIS to Vizcaya, Bank Safra, Asphalia, Zeus, Siam, Banque J. Safra (Suisse) SA, and Pictet et Cie.  Upon agreement of the parties and the order of the Gibraltar court, the action was stayed until further order.  The parties can apply to lift the stay any time after the expiration of 28 days from the determination by the Privy Council of any appeals or cross appeals brought against the February 7, 2014 Court of Appeal judgment in the enforcement action discussed above.

359.    In addition, in September 2012, the Trustee filed an action in the Gibraltar courts opposing and seeking to join to the Trustee's existing proceedings in Gibraltar a petition filed by

Mr. Robert Faissal against Vizcaya (the "Faissal Action"). The Faissal Action involves the enforcement of a default judgment entered in the BVI in favor of Mr. Faissal against Vizcaya. The parties have agreed to a stay of this action which remains in place as of the date of this report.

**F.    Ireland**

360.    The Trustee investigated Ireland-based Thema International Fund plc and included the feeder fund as a defendant in the HSBC Action. The Trustee has continued to investigate this fund, related litigation and related entities.

**G.    Switzerland and Luxembourg**

361.    In 2010, the Trustee filed two lawsuits in this Court against Switzerland-based UBS AG and other UBS-related entities and various feeder funds, management companies, and individuals, discussed above.

## XI.    FEE APPLICATIONS AND RELATED APPEALS

**A.    Objections to Prior Fee Applications**

362.    Objections were filed to six of the fifteen fee applications submitted by the Trustee and B&H. Discussions of the objections to the first through sixth fee applications, and related motions for leave to appeal the Court's orders granting the Trustee's and B&H's fee applications and overruling those objections, are discussed more fully in the Trustee's Amended Third Interim Report ¶¶ 186–90 (ECF No. 2207); the Trustee's Fourth Interim Report ¶¶ 163–66 (ECF No. 3083); the Trustee's Fifth Interim Report ¶¶ 134–43 (ECF No. 4072); and the Trustee's Sixth Interim Report ¶¶ 131–42 (ECF No. 4529). No decision has been entered on the motion for leave to appeal the Second Interim Fee Order, No. M47-b (DAB) (S.D.N.Y.). The motion for leave to appeal the Sixth Interim Fee Order was withdrawn on September 10, 2014.

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Case No. 11 MC 00265(PGG) (S.D.N.Y.), ECF No. 9.

**B.        Fourteenth Fee Application**

363.    On March 21, 2014, the Trustee and his counsel filed the Fourteenth Application for Interim Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred from August 1, 2013 through and including November 30, 2013 with the Bankruptcy Court.  (ECF No. 5980).  Counsel and international special counsel also filed applications for Interim Professional Compensation.  (ECF Nos. 5982–5986 and 5989–6002).

364.    At the hearing on April 17, 2014, the Trustee, his counsel, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Fourteenth Interim Fee Application was reasonable.  This Court subsequently entered the Fourteenth Interim Fee Order approving the Fourteenth Interim Fee Applications. (ECF No. 6343).  No motion for leave to appeal the Fourteenth Interim Fee Order was filed.

**C.        Fifteenth Fee Application**

365.    On July 21, 2014, the Trustee and his counsel filed the Fifteenth Application for Interim Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred from December 1, 2013 through and including March 31, 2014 with the Bankruptcy Court.  (ECF No. 7470).  Counsel and international special counsel also filed applications for Interim Professional Compensation.  (ECF Nos. 7471-7489).

366.    At the hearing on August 19, 2014, the Trustee, his counsel, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Fifteenth Interim Fee Application was reasonable.  This Court subsequently entered the Fifteenth Interim Fee Order approving the Fifteenth Interim Fee Applications.  (ECF No. 7825).  No motion for leave to appeal the Fifteenth Interim Fee Order was filed.

## XII.    CONCLUSION

The foregoing report represents a summary of the status of this proceeding and the material events that have occurred through September 30, 2014, unless otherwise indicated.  This Report will be supplemented and updated with further interim reports.

Dated:  New York, New York
       October 27, 2014

                                       Respectfully submitted,

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

*/s/ Irving H. Picard*
_____
Irving H. Picard
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Email: ipicard@bakerlaw.com

*Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*