**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>     Plaintiff,<br><br> v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>     Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>     Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>     Plaintiff,<br><br> v.<br><br>A & G GOLDMAN PARTNERSHIP and PAMELA GOLDMAN,<br><br>     Defendants. | Adv. Pro. No. _____ (SMB)<br><br>**COMPLAINT** |

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), and the estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, as and for his Complaint, alleges as follows:

## NATURE OF THE ACTION

1. The Trustee commences this adversary proceeding to prevent Pamela Goldman and A&G Goldman Partnership (collectively, the "Goldman Plaintiffs"), from undermining this Court's continuing jurisdiction over the estate of BLMIS and its customers' property. By filing an action (the "Class Action") and complaint (the "Goldman III Complaint") in the U.S. District Court for the Southern District of Florida ("the Florida District Court"), No. 14-81125 (S.D. Fla. filed Aug. 28, 2014), against the estate of Jeffry M. Picower ("Picower") and Capital Growth Company; Decisions, Inc.; Favorite Funds; JA Primary Limited Partnership; JA Special Limited Partnership; JAB Partnership; JEMW Partnership; JF Partnership; JFM Investment Companies; JLN Partnership; JMP Limited Partnership; Jeffry M. Picower Special Company; Jeffry M. Picower, P.C.; the Picower Foundation; the Picower Institute of Medical Research; the Trust F/B/O Gabrielle H. Picower; Barbara Picower, individually, and as executor of the estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust F/B/O Gabrielle H. Picower (collectively with Picower, the "Picower Parties"), the Goldman Plaintiffs violate the permanent injunction entered by this Court on January 13, 2011 (the "Permanent Injunction") and the automatic stay, impair this Court's jurisdiction, and threaten the orderly administration of the BLMIS estate.

2. Accordingly, the Trustee respectfully requests that the Court enforce the Permanent Injunction and the automatic stay in these proceedings.

2

## JURISDICTION AND VENUE

3. This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791, and was referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

4. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O). The Trustee consents to the entry of final orders or judgments by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgments consistent with Article III of the U.S. Constitution.

5. Venue in this judicial district is proper under 28 U.S.C. §§ 1391(b) and 1409.

6. An action for a declaratory judgment and injunctive relief is properly commenced as an adversary proceeding pursuant to Rules 7001(2), 7001(7), and 7001(9) of the Federal Rules of Bankruptcy Procedure.

7. This court has personal jurisdiction over the Goldman Plaintiffs pursuant to Bankruptcy Rule 7004(f).

## DEFENDANTS

8. Defendant A & G Goldman Partnership ("A&G Goldman") is a named plaintiff in the Goldman III Complaint, *A & G Goldman Partnership, et al. v. Picower, et al.*, Case No. 14-81125 (S.D. Fla. filed Aug. 28, 2014), ECF No. 1, and was a BLMIS customer.

9. Defendant Pamela Goldman is a named plaintiff in the Goldman III Complaint and was a BLMIS customer.

3

## BACKGROUND, THE TRUSTEE, AND STANDING

10. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including, *inter alia*, securities fraud, investment advisor fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court for the Southern District of New York against Madoff and BLMIS, which remains pending in that court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

11. On December 12, 2008, the Honorable Louis L. Stanton of the district court entered an order that appointed Lee S. Richards, Esq., as receiver for the assets of BLMIS.

12. On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the district court alleging, *inter alia*, that BLMIS could not meet its obligations to securities customers as they came due, and, accordingly, its customers needed the protections afforded by SIPA.

13. Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

    a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C. § 78eee(b)(3);

    b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3);

    c.    removed the case to this Court pursuant to 15 U.S.C. § 78eee(b)(4), and removed the receiver.

4

14.     In an order entered on December 15, 2008, the district court declared that "all persons and entities are stayed, enjoined and restrained from directly or indirectly . . . interfering with any assets or property owned, controlled or in the possession of [BLMIS]." *SEC v. Bernard L. Madoff*, 08-CIV-10791 (LLS), ECF No. 4 ¶ IV (reinforcing automatic stay); *see also* Order on Consent Imposing Preliminary Injunction Freezing Assets and Granting Other Relief Against Defendants, Dec. 18, 2008, ECF No. 8 ¶ IX ("no creditor or claimant against [BLMIS], or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the control, possession or management of the assets subject to the receivership"); Partial Judgment on Consent Imposing Permanent Injunction and Continuing Other Relief, Feb. 9, 2009, ECF No. 18 ¶ IV (incorporating and making the December 18, 2008 stay order permanent).  (These orders are collectively referred to as the "Stay Orders.")

15.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

16.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court entered an order substantively consolidating the chapter 7 estate of Madoff into the SIPA Proceeding.

17.     At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (Plea Hr'g Tr. at 23: 14–17.)  Additionally, Madoff

5

asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (*Id*. at 23: 20–21.) On June 29, 2009, Madoff was sentenced to 150 years in prison.

18. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali Jr., a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

19. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent the recovery actions, the Trustee cannot satisfy the claims described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

20. Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code. Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case, to the extent consistent with SIPA.

21. In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA pursuant to 15 U.S.C. §§ 78aaa *et seq*.

6

22. The Trustee is a real party in interest and has standing to bring these claims under 15 U.S.C. § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b) and 704(a)(1), because, among other reasons, the Class Action violates the Permanent Injunction and the automatic stay, impairs this court's jurisdiction, and threatens the orderly administration of the BLMIS estate.

## THE COURT-ORDERED CLAIMS ADMINISTRATION PROCESS

23. On December 23, 2008, this Court entered a Claims Procedure Order, which implemented a customer claims process in accordance with SIPA. The Goldman Plaintiffs participated in this process. The Goldman Plaintiffs filed customer claims in the BLMIS proceeding. A&G Goldman's claim was denied. Pamela Goldman's claims were allowed and have been fully satisfied through SIPC advances and an interim distribution from the customer property fund.

## THE NET EQUITY DECISION

24. In liquidation proceedings, SIPA provides that customers with allowed claims share *pro rata* in customer property to the extent of their net equity, as defined in section 78*lll*(11) of SIPA. Consistent with SIPA, the Trustee determined that each customer's net equity should be calculated by crediting the amount of cash the customer deposited into its BLMIS account, less any amounts withdrawn from the customer's BLMIS account, referred to as the "net investment method." Many customers argued that their net equity should have been calculated based on the last customer statement they received from BLMIS, including whatever fictitious profits were reflected on that statement.

25. The Bankruptcy Court approved the Trustee's use of the net investment method and affirmed the Trustee's calculation of net equity (the "Net Equity Decision"). The Second Circuit affirmed the Net Equity Decision. The Second Circuit affirmed, holding that the

7

Trustee's methodology is "more consistent with the statutory definition of 'net equity' than any other method advocated by the parties or perceived by this Court." On June 25, 2012, the United States Supreme Court denied *certiorari*.

## THE TRUSTEE'S AVOIDANCE ACTION

26. The Trustee filed a complaint against Picower (now deceased) and the other Picower Parties on May 12, 2009 (the "Trustee's Action"). The complaint identified more than $6.7 billion in net withdrawals that the Trustee alleged the Picower Parties had received from BLMIS. The complaint alleged that the Picower Parties knew or should have known that BLMIS was engaged in fraud and sought recovery of the entire amount known at the time of filing to have been transferred from BLMIS to the Picower Parties throughout the history of the Picower Parties' BLMIS accounts.

27. After filing the complaint, the Trustee identified additional transfers from BLMIS to the Picower Parties, bringing the total amount of net withdrawals sought by the Trustee to $7.2 billion.

28. The Trustee's complaint contains numerous allegations that the Picower Parties directed backdating in their BLMIS accounts, had actual knowledge of the Ponzi scheme, were "complicit[] in the fraud," and were compensated for propping up the Ponzi scheme. And in the Trustee's brief in opposition to the Picower Defendants' motion to dismiss, the Trustee stated that Picower propped up the Ponzi scheme by accepting only a fraction of his requested redemptions when Madoff could not pay them. Significantly, with respect to the allegations in Goldman III regarding a $125 million loan in April 2006, the Trustee already alleged a backdating transaction at that time for that amount. The Trustee's Picower complaint also included allegations dealing with margin loans, as also alleged in the Goldman Complaints.

8

## THE PICOWER SETTLEMENT

29.     While the Trustee was pursuing his action against, and potential settlement with, the Picower Parties, the government also was in discussions with the Picower Parties' counsel.

30.     After months of extensive negotiations, the Trustee and the Picower Parties reached an agreement under which the Picower estate agreed to return $5 billion to the BLMIS estate.  Simultaneously, the Picower estate agreed to forfeit the $5 billion and an additional amount of approximately $2.2 billion to the government.  When these amounts were combined in this global settlement, 100 percent of the net withdrawals received by the Picower Parties over the lifetime of their investments with BLMIS became available for eventual distribution to BLMIS victims, without the need for litigation.

31.     The settlement agreement contains a release of all claims that the Trustee brought or could have brought against the Picower Parties in connection with BLMIS.  Because of the importance to the Picower Parties of precluding suits on claims they were settling, the Trustee agreed to use his reasonable best efforts to seek a narrowly tailored Permanent Injunction from the Bankruptcy Court.  The Permanent Injunction would exclude from its scope actions where there is an independent basis on which to bring suit against the Picower Parties.  The injunction was identified by the Picower Parties as an essential part of the settlement.

32.     On December 17, 2010, the Trustee moved for an order approving the settlement agreement and entering the Permanent Injunction under section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure.  Out of the approximately 16,000 creditors of the BLMIS estate, only three objections were filed to this landmark settlement.

33.     The Bankruptcy Court overruled the objections and approved the settlement on January 13, 2011.  The Bankruptcy Court found that the Permanent Injunction was necessary and

9

appropriate to carry out the provisions of the Bankruptcy Code, to prevent any entity from exercising control or possession over property of the estate, to preclude actions that would have a conceivable effect or adverse impact upon the BLMIS estate or on the administration of the liquidation proceeding, and to avoid relitigation or litigation of claims that were or could have been asserted by the Trustee on behalf of all customers and creditors.

34.     The late Judge Lifland of the Bankruptcy Court stated at the hearing on the Trustee's motion to approve the settlement that: "[t]he injunction is narrow. It deals with duplicative and parallel claims of the trustee. . . . And you cannot expect any settlor to make a settlement with a potential possibility of being sued twice over the same causes of action and claims." Accordingly, Judge Lifland approved the settlement agreement and issued the following Permanent Injunction:

> [A]ny BLMIS customer or creditor of the BLMIS estate . . . is hereby permanently enjoined from asserting any claim against the Picower BLMIS Accounts or the Picower Releasees that is duplicative or derivative of the claims brought by the Trustee, or which could have been brought by the Trustee against the Picower BLMIS Accounts or the Picower Releasees . . . .

## BACKGROUND:  THIS COURT, THE DISTRICT COURT, AND THE SECOND CIRCUIT ENFORCE THE PERMANENT INJUNCTION IN THE RELATED FOX AND MARSHALL LITIGATION

35.     Adele Fox ("Fox") and Susanne Stone Marshall ("Marshall")[1] (together, the "Fox Plaintiffs") are putative class action plaintiffs who brought actions against the Picower Parties similar to the Goldman III Complaint. A brief summary of the Trustee's litigation with the Fox Plaintiffs shows that this Court, the district court, and the Second Circuit all rejected the Fox Plaintiffs' complaints as derivative of the Trustee's Action.

---

[1] Russell Oasis and Marsha Peshkin were subsequently added as plaintiffs to the putative class action brought by Fox and Marshall.

10

36. On February 16 and 17, 2010, before the Goldman Plaintiffs first attempted to bring an action against the Picower Parties, Fox and Marshall each filed a putative class action against the Picower Parties in Florida District Court seeking to circumvent the anticipated net equity decision (the "Initial Fox Complaints" and "Initial Fox Actions"). (Counsel for the Goldman Plaintiffs in the Class Action was among the counsel representing Fox in the Initial Fox Actions.) Between them, Fox and Marshall sought to represent a "class" of all BLMIS customers whose claims would not be fully satisfied by the Trustee using his net equity calculation. The complaints' allegations parroted the Trustee's fraudulent transfer allegations against the Picower Parties. Fox and Marshall alleged that they and other BLMIS customers were damaged as a result of the fraudulent transfers that the Picower Parties received from BLMIS. Similar to the Goldman III Complaint, the Fox and Marshall complaints alleged that BLMIS and the Picower Parties engaged in a conspiracy to "steal the funds" of other customers.

37. On May 3, 2010, upon application by the Trustee, this Court held that Fox's and Marshall's complaints violated the automatic stay and at least one stay order of the District Court for the Southern District of New York. On appeal, Judge John G. Koeltl of the district court affirmed, holding that the Bankruptcy Court was "plainly correct in finding that the Florida Actions violated the automatic stay," because they were a "transparent effort" to pursue claims that "were duplicative of claims brought by the Trustee and that belonged to the Trustee on behalf of all creditors of BLMIS." *Fox v. Picard*, 848 F. Supp. 2d 469, 473 (S.D.N.Y. 2012). On January 13, 2014, the Second Circuit affirmed the district court's ruling and upheld the Permanent Injunction as against Fox and Marshall. *See Picard v. Marshall*, 740 F.3d 81 (2d Cir. 2014).

## THE GOLDMAN I CLASS ACTION COMPLAINTS

38. While the Fox and Marshall litigation was proceeding, the Goldman Plaintiffs sought permission from this Court to file two putative class actions in Florida District Court in 2011 (the "Goldman I Actions" and "Goldman I Complaints"). While Pamela Goldman sought to represent so-called "net losers," A&G Goldman sought to represent "net winners." Together, they sought to represent customers and creditors already before the Bankruptcy Court, and for whom the Bankruptcy Court had already determined equitable distributions in accordance with the net equity method approved by the Second Circuit.

39. Instead of alleging fraudulent transfers or a conspiracy to defraud, the Goldman Plaintiffs alleged that Picower was a "control person" under section 20(a) of the Exchange Act with respect to BLMIS and is jointly and severally liable with BLMIS for BLMIS's violations of Rule 10b-5 of the Exchange Act. The purported federal securities laws violations were based on the Picower Parties' withdrawals from BLMIS: "[t]he volume, pattern and practice of the Defendants' fraudulent withdrawals from BLMIS and their control over fraudulent documentation of underlying transactions at BLMIS establishes the Defendants' 'control person' liability under the federal securities laws."

40. The alleged wrongdoing by Picower consisted of his fraudulent transfers from BLMIS, which mirrored allegations in the Trustee's complaint. They also mirrored the allegations in the Initial Fox Complaints by Fox and Marshall, which were already held to be nothing but a rehash of the Trustee's allegations.

12

**This Court Held the Goldman Claims Duplicative and Derivative of Those of the Trustee and Enforced the Automatic Stay and Enjoined the Goldman Plaintiffs from Proceeding**

41. On June 20, 2012, this Court held that the Goldman I Actions violate the Permanent Injunction and the automatic stay. *See In re Madoff*, 477 B.R. 351 (Bankr. S.D.N.Y. 2012).

42. The Court held that the Goldman Plaintiffs were violating the Permanent Injunction and the automatic stay for three main reasons. First, the Court found that despite the "nominal title" of their causes of action, the Goldman I Actions raised issues substantially "identical" to the Trustee's Picower complaint. Specifically, the Court found that "the Plaintiffs' action is based on pleadings that are nearly identical to those of the Trustee," that they "substantially parroted the Trustee's Complaint," and also "mimic those set out in the Fox and Marshall complaints, which this Court found to be duplicative of the Trustee's, a finding the District Court affirmed." The Court recounted numerous examples of overlap between the Goldman Plaintiffs' allegations and those of the Trustee, as well as those of Fox and Marshall, and cited an exhibit, originally submitted by the Trustee, which "substantially reflects and links the cloning of the pleadings."

43. Second, the Bankruptcy Court found the Goldman Plaintiffs' claims to be "derivative of the Trustee's." Indeed, the Court found that the alleged harms are "limited to 'general direction and control and action to the detriment of all [BLMIS's] creditors.'" Thus, the Court found that the Goldman Plaintiffs did not state a particularized injury against the Picower Parties.

44. Third, the Bankruptcy Court found that the Goldman I Complaints, like the Fox and Marshall complaints, were simply "yet another attempt by the same counsel to re-litigate [the] Net Equity Decision."

13

**The District Court Affirmed the Bankruptcy Court's Decision and Order**

45. On September 30, 2013, Judge Richard J. Sullivan of the district court affirmed the Bankruptcy Court's decision and upheld the Permanent Injunction as applied to the Goldman I Complaints. *A&G Goldman P'ship*, 2013 WL 5511027, at *1. The district court held that the Goldman Plaintiffs' claims were derivative of the Trustee's fraudulent transfer claims. The district court held that the Goldman Plaintiffs' claims "are not bona fide securities fraud claims," and found instead that, aside from allegations listing the elements of a securities fraud claim, "all of the allegations in the Complaint refer exclusively to the Picower Parties' fraudulent withdrawals." The district court recognized that the Goldman I Complaints pled "nothing more than that the Picower Parties traded on their *own* BLMIS accounts," allege fraudulent trading activity that BLMIS conducted "*for the Picower Parties*," and that, "[i]n other words, the Complaints plead nothing more than that the Picower Parties fraudulently withdrew money from BLMIS."

46. The district court further held that "the parts of the Complaints that do discuss aspects of the BLMIS fraud unconnected to the Picower Parties' accounts noticeably *lack* any allegation that the Picower Parties were involved in such fraud . . ." and that "with respect to the clearest examples of BLMIS's fraud to other customers, the Goldman Complaints are completely silent about the Picower Parties' involvement."

47. The district court held that the Goldman Plaintiffs had brought "simply deceptively labeled fraudulent conveyance claims." Accordingly, the district court held the claims came "within the plain scope of the [Permanent] Injunction." The Goldman Plaintiffs did not appeal the district court's decision.

14

## THE GOLDMAN II COMPLAINT

48. On January 6, 2014, the Goldman Plaintiffs commenced a new action in the Florida District Court seeking a declaration that neither the Permanent Injunction nor the automatic stay barred the Goldman Plaintiffs from filing a "new" class action complaint against the Picower Parties. The declaratory judgment action attached a draft class action complaint (the "Goldman II Complaint") that the Goldman Plaintiffs sought to have declared not in violation of the automatic stay or the Permanent Injunction.

49. The Goldman Plaintiffs again asserted that their claims rested on different legal theories, had different elements, sought different damages, were subject to different proof, and were subject to a different statute of limitations than the Trustee's claims against the Picower Parties. The Goldman Plaintiffs added a general allegation that the Picower Parties "directly or indirectly induced" BLMIS to make misrepresentations to BLMIS customers.

50. In substance, the Goldman II Complaint was identical to the Goldman I Complaints that were held to be barred under the Permanent Injunction. It again attempted to assert a claim under section 20(a) of the Exchange Act against the Picower Parties for loss in the value of their investment in the "BLMIS Discretionary Trading Program" (their new name for BLMIS's Investment Advisory business). But again, it did not contain any factual allegations that Picower took any specific action with respect to other customers' accounts, or indeed took any action at BLMIS outside of his own accounts.

51. Instead, trying to get around the deficiencies in their prior pleading, the Goldman Plaintiffs more clearly spelled out their theory that Picower knew that the false trading in his own BLMIS accounts would result in false asset values in other BLMIS customers' accounts because those other accounts did not reflect cash transfers from their accounts to Picower. As a result of Picower's activity within his own accounts, the Goldman Plaintiffs alleged, "the account records

15

of other BLMIS customers falsely overstated the assets therein and their investment performance. BLMIS customers consequently unknowingly overpaid for BLMIS securities."

52.     On June 23, 2014, this Court held that the Goldman II Action violated the Permanent Injunction. *Picard v. Marshall*, 511 B.R. 375 (Bankr. S.D.N.Y. 2014). After this Court determined that it had the authority to interpret its own order, and recognizing its jurisdiction to decide if the Goldman II Complaint violated the Permanent Injunction, this Court found that the "conclusory statements" that the Goldman Plaintiffs cobbled together in an attempt to again subvert the Permanent Injunction could not pass muster. Setting aside the Goldman Plaintiffs' conclusory allegations, this Court held that the Goldman II Complaint violated the Permanent Injunction for one main reason: the Goldman II Complaint, "like its predecessors, relie[d] on the Picower Parties' fraudulent withdrawals and fictitious entries in their own accounts, and if these allegations are ignored, there is nothing left." Because the Goldman II Complaint only restated the legal standard for control person liability under section 20(a) without alleging that Picower "was an officer of BLMIS" or including any "particularized allegations that Picower Parties did anything besides fraudulently withdraw money from BLMIS and cause BLMIS to make phony entries in the records of their accounts," this Court found their claim derivative. The Goldman Plaintiffs' voluntarily dismissed their appeal.[2]

## THE GOLDMAN III COMPLAINT

53.     On August 28, 2014, after this Court ruled on the Goldman II Complaint, the Goldman Plaintiffs made their *third* attempt to bring a securities class action against the Picower Parties. As before, the Goldman III Complaint alleges that Picower was a control person under section 20(a) of the Exchange Act. Goldman III makes six types of allegations, namely that

---

[2] In the same decision and order, the Court also considered and rejected a second proposed complaint by the Fox Plaintiffs that was substantially similar to the Goldman II Complaint. The Fox Plaintiffs have appealed. The appeal is currently pending before Judge John G. Koeltl of the district court.

16

Picower: (1) backdated trades; (2) took out margin loans; (3) knew that there was false information in BLMIS' financial disclosures; (4) referred clients to BLMIS; (5) made loans to BLMIS; and (6) agreed to be listed as an options counterparty and further agreed to notify Madoff if a regulator or anyone else asked him about his counterparty status.

54. The first three allegations were already contained in Goldman II, and every single one of these prior allegations has already been held by this Court to be a derivative claim barred by the Permanent Injunction. The fourth allegation, a conclusory statement that Picower referred clients to BLMIS, was previously pled by the Fox Plaintiffs and was held to fail to provide an independent basis for a control person claim.

55. Thus, of all the allegations, only two appear to be "new": that Picower made loans to BLMIS and that Picower agreed to be listed as an options counterparty. The two additions to the Goldman III Complaint appear to be allegations based on inferences drawn from the recent criminal testimony of Enrica Cotellessa-Pitz, Annette Bongiorno, and Frank DiPascali, Jr. These allegations aver that Picower made loans to BLMIS in order to keep it afloat and that Picower agreed to be listed as an options counterparty in BLMIS books and records and inform Madoff if anyone asked Picower about being a counterparty.

56. The essence of these allegations is that Picower propped up the Ponzi scheme, an allegation based on generalized harm to all BLMIS customers and creditors and one that the Trustee has already made in his litigation against the Picower Parties. There are no allegations that the Picower Parties had any contact with the Goldman Plaintiffs. Other than conclusory allegations, the only conduct alleged on the part of the Picower Parties is in connection with their activities *from their own accounts*.

17

57. Allowing the Class Action to proceed would result in the litigation of claims that were or could have been asserted by the Trustee on behalf of all customers and creditors.

58. The Goldman Plaintiffs' claims in the Class Action thus remain duplicative and derivative of the Trustee's Action and, accordingly, the Class Action is barred both by the Permanent Injunction and the automatic stay.

59. For the same reasons, the Class Action also violates the Stay Orders.

60. Further litigation of the Class Action would also allow the Goldman Plaintiffs to circumvent the Permanent Injunction and automatic stay, undermining this Court's jurisdiction and interfering with the administration of the liquidation.

## COUNT ONE
## DECLARATORY RELIEF

61. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully alleged herein.

62. The Trustee seeks a declaration that the Class Action violates the Permanent Injunction. This declaratory relief is warranted because the claims in the Class Action are derivative and duplicative of the Trustee's claims and hence fall within the scope of the Permanent Injunction.

63. The Trustee also seeks a declaration that the Class Action violates the automatic stay provisions under 11 U.S.C. § 362(a) and the Stay Orders, and is therefore void *ab initio*. This declaratory relief is warranted because by seeking to bring claims that are property of the estate, the Goldman Plaintiffs improperly seek to recover on a claim against BLMIS and/or Madoff in violation of 11 U.S.C. § 362(a)(1) and seek to obtain possession of property of BLMIS and/or Madoff in direct violation of 11 U.S.C. § 362(a)(3) and the Stay Orders.

18

64. The Court has authority pursuant to sections 105(a) and 362(a) of the Bankruptcy Code to issue declaratory relief because this controversy is actual and justiciable, and the Court has jurisdiction over matters affecting BLMIS property and the effective and equitable administration of the estate of BLMIS and/or Madoff.

## COUNT TWO
## ENFORCEMENT OF THE PERMANENT INJUNCTION

65. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully alleged herein.

66. The Trustee seeks an Order pursuant to section 105(a) of the Bankruptcy Code, made relevant to this proceeding by section 78fff(b) of SIPA, enforcing the Permanent Injunction and precluding the Class Action. This relief is warranted because the Class Action is derivative and duplicative of the Trustee's claims in the Trustee's Action and hence falls within the scope of the Permanent Injunction.

67. The Trustee requests that this Court preclude the prosecution of the Class Actions for, without limitation, the following reasons:

   a. The Class Action improperly infringes on the jurisdiction of this Court by seeking to side-step this Court's jurisdiction to interpret and enforce the Permanent Injunction

   b. Enforcing the Permanent Injunction will avoid the possibility of inconsistent decisions and will ensure preservation of uniformity of decision.

   c. Enforcing the Permanent Injunction will avoid the risk that it is eroded by incremental exceptions by a court interpreting it other than this Court.

68. Enforcing the Permanent Injunction is necessary and appropriate to carry out the Trustee's duties in accordance with the provisions of SIPA and the Bankruptcy Code and to prevent an adverse impact on the estate and on the administration of the liquidation proceeding

from the Class Action and avoid relitigation of claims that were or could have been asserted by the Trustee on behalf of all customers and creditors.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Goldman Plaintiffs:

*i.*   declaring that the Class Action violates the Permanent Injunction and the automatic stay and therefore is void *ab initio*;

*ii.*   enforcing the Permanent Injunction and automatic stay provisions under 11 U.S.C. §§ 105(a) and 362(a) and the Stay Orders against the Class Action and precluding the Goldman Plaintiffs from pursuing the Goldman III Complaint; and

*iii.*   granting the Trustee such other relief as the Court deems just and proper.

Dated: New York, New York
November 17, 2014

                                         */s/ David J. Sheehan*
                                         Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Tracy L. Cole
Email: tcole@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Amy Vanderwal
Email: avanderwal@bakerlaw.com
Ferve Ozturk
Email: fozturk@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*

20