**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. _____ (SMB) |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ENFORCEMENT OF THE PERMANENT INJUNCTION AND AUTOMATIC STAY** |
| A & G GOLDMAN PARTNERSHIP and PAMELA GOLDMAN, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTS .............................................................................................................................. 4

I.      THE NET EQUITY DECISION ...................................................................... 5

II.     THE GOLDMAN PLAINTIFFS' PARTICIPATION IN THE BANKRUPTCY
        PROCEEDINGS ............................................................................................... 6

III.    THE TRUSTEE'S AVOIDANCE ACTION ...................................................... 7

IV.     THE PICOWER SETTLEMENT AND ISSUANCE OF THE PERMANENT
        INJUNCTION .................................................................................................. 8

V.      THIS COURT AND THE DISTRICT COURT ENFORCE THE PERMANENT
        INJUNCTION AGAINST THE GOLDMAN PLAINTIFFS ............................. 10

        A.      Related Action: This Court, the District Court, and the Second Circuit
                Enforce the Permanent Injunction in the Fox and Marshall Litigation .............. 10

        B.      Goldman I Complaints ........................................................................... 13

        C.      The Bankruptcy Court Holds that the Goldman I Actions Violate the
                Permanent Injunction ............................................................................. 15

        D.      The District Court Holds that the Goldman I Complaints Violate the
                Permanent Injunction ............................................................................. 16

VI.     THIS COURT REJECTS THE GOLDMAN II COMPLAINT AND FINDS
        THAT IT VIOLATES THE PERMANENT INJUNCTION ............................ 18

        A.      The Goldman II Complaint ................................................................... 18

        B.      This Court Holds that the Goldman II Complaint Violates the Permanent
                Injunction ............................................................................................. 19

VII.    THE GOLDMAN III COMPLAINT .............................................................. 20

ARGUMENT:  THE PERMANENT INJUNCTION AND AUTOMATIC STAY BAR
THE GOLDMAN PLAINTIFFS FROM PROCEEDING ........................................... 21

I.      ALMOST ALL OF THE GOLDMAN III COMPLAINT HAS ALREADY BEEN
        HELD TO VIOLATE THE PERMANENT INJUNCTION ............................ 21

        A.      The Goldman Plaintiffs' General Allegations of "Control" Have Been
                Rejected as Conclusory .......................................................................... 21

# TABLE OF CONTENTS
(continued)

**Page**

    B.    Nearly All of the Goldman Plaintiffs' Remaining Allegations Have Been Rejected as Conclusory and Derivative of the Trustee's Claims.........................22

II.    THE FACIALLY NEW ALLEGATIONS ARE NO DIFFERENT FROM THE TRUSTEE'S ALLEGATIONS THAT THE PICOWER PARTIES PROPPED UP THE PONZI SCHEME..................................................................................................26

    A.    The Loan Allegations Are Derivative..................................................26

    B.    The Counterparty Allegations Are Conclusory and Derivative............................29

III.    THE GOLDMAN III COMPLAINT ATTEMPTS TO CIRCUMVENT THE NET EQUITY DECISION AND SEEKS RECOVERY OF ALL FRAUDULENT TRANSFERS..................................................................................................33

IV.    THE GOLDMAN CLASS ACTION VIOLATES THE AUTOMATIC STAY AND IS VOID *AB INITIO*.................................................................................34

CONCLUSION..................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re The 1031 Tax Grp. LLC,*
    397 B.R. 670 (Bankr. S.D.N.Y. 2008)......................................................................................37

*48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.),*
    835 F.2d 427 (2d Cir. 1987)...............................................................................................36

*A&G Goldman P'ship v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),*
    No. 12 Civ. 6109 (RJS), 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013)........................ *passim*

*In re Bernard L. Madoff Inv. Sec. LLC,*
    424 B.R. 122 (Bankr. S.D.N.Y. 2013)..............................................................................4, 5

*In re Bernard L. Madoff Inv. Sec. LLC,*
    654 F.3d 229 (2d Cir. 2011).................................................................................................5

*In re Cabrini Med. Ctr.,*
    No. 09-14398 (ALG), 2012 WL 2254386 (Bankr. S.D.N.Y. June 15, 2012)........................37

*In re Dreier LLP,*
    429 B.R. 112 (Bankr. S.D.N.Y. 2010)...............................................................................35

*FDIC v. Hirsch (In re Colonial Realty Co.),*
    980 F.2d 125 (2d. Cir 1992).........................................................................................35, 36

*Fisher v. Apostolou,*
    155 F.3d 876 (7th Cir. 1998).............................................................................................37

*Fox v. Picard (In re Bernard L. Madoff),*
    848 F. Supp. 2d 469 (S.D.N.Y. 2012)............................................................................ *passim*

*Jackson v. Novak (In re Jackson),*
    593 F.3d 171 (2d Cir. 2010)..............................................................................................35

*Kagan v. Saint Vincents Catholic Med. Ctrs. of NY (In re Saint Vincents Catholic*
    *Med. Ctrs. of NY),*
    449 B.R. 209 (S.D.N.Y. 2011)..........................................................................................35

*Keene Corp. v. Coleman (In re Keene Corp.),*
    164 B.R. 844 (Bankr. S.D.N.Y. 1994)...........................................................................36, 37

*Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),*
    740 F.3d 81 (2d Cir. 2014)............................................................................................ *passim*

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*In re Mrs. Weinberg's Kosher Foods, Inc.*,
    278 B.R. 358 (Bankr. S.D.N.Y. 2002) .................................................................... 35

*Picard v. Fox*,
    429 B.R. 423 (Bankr. S.D.N.Y. 2010) .................................................... 11, 12, 35

*Picard v. JPMorgan Chase & Co.*,
    721 F.3d 54 (2d Cir. 2013) ........................................................................................ 32

*Picard v. Marshall (In re Bernard L. Madoff)*,
    511 B.R. 375 (Bankr. S.D.N.Y. 2014) ............................................................ *passim*

*In re Quigley Co.*,
    676 F.3d 45 (2d. Cir 2012) .................................................................................. 35, 36

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
    Madoff)*,
    477 B.R. 351 (Bankr. S.D.N.Y. 2012) ............................................................ *passim*

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
    884 F.2d 688 (2d Cir. 1989) .......................................................................... 31, 32, 36

*In re Swallen's, Inc.*,
    205 B.R. 879 (Bankr. S.D. Ohio 1997) ................................................................ 37

**Statutes**

11 U.S.C. § 362 ................................................................................................ 35, 36, 37

15 U.S.C. §§ 78aaa *et seq.* ..................................................................................... 1

15 U.S.C. § 78fff-2(c)(1) ......................................................................................... 7

15 U.S.C. § 78*lll*(11) ................................................................................................ 5

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.,* and the estate of Bernard L.

Madoff ("Madoff"), by his undersigned counsel, respectfully submits this memorandum of law

in support of the Trustee's application seeking to enforce the permanent injunction order entered

by this Court on January 13, 2011 (the "Permanent Injunction") and the automatic stay in these

proceedings against plaintiffs Pamela Goldman and A&G Goldman Partnership (the "Goldman

Plaintiffs"), and anyone acting on their behalf, to prevent them from proceeding with their

putative class action (the "Goldman Class Action") against the Picower Parties[1] recently brought

in the United States District Court for the Southern District of Florida (the "Florida District

Court"), No. 14-CV-81125 (S.D. Fla. filed Aug. 28, 2014) (KAM).[2]

## PRELIMINARY STATEMENT

Just two months after this Court's June 23, 2014 ruling that the Goldman Plaintiffs, along

with other third-party plaintiffs Adele Fox ("Fox"), Susanne Stone Marshall ("Marshall"),

Russell Oasis, and Marsha Peshkin (the "Fox Plaintiffs"), were enjoined from bringing their draft

---

[1] The "Picower Parties" are: Capital Growth Company; Decisions, Inc.; Favorite Funds; JA Primary Limited Partnership; JA Special Limited Partnership; JAB Partnership; JEMW Partnership; JF Partnership; JFM Investment Companies; JLN Partnership; JMP Limited Partnership; Jeffry M. Picower Special Company; Jeffry M. Picower, P.C.; the Picower Foundation; the Picower Institute of Medical Research; the Trust F/B/O Gabrielle H. Picower; Barbara Picower, individually, and as executor of the estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust F/B/O Gabrielle H. Picower.

[2] The Picower Parties and Goldman Plaintiffs entered into a stipulation agreeing that the Goldman Class Action would be stayed pending resolution of an injunction application in this court. (Declaration of Keith R. Murphy in Support of Application for Enforcement of the Permanent Injunction and Automatic Stay, dated Nov. 17, 2014 (the "Murphy Decl.") Ex P.) The Picower Parties are filing an injunction application contemporaneously with the Trustee's filing. The Trustee consents to the Picower Parties' motion for a consolidation of the two injunction proceedings and motion practice.

1

amended complaint against the Picower Parties, the Goldman Plaintiffs filed a revised iteration of their complaint in the Florida District Court ("Goldman III") in the hope of evading the reach of the Permanent Injunction on this, their third attempt. With respect to the draft complaint ruled upon in June, this Court found that the allegations related solely to activity in the Picower Parties' own accounts and included no particularized allegations that Picower did anything besides fraudulently withdraw monies from BLMIS and cause BLMIS to make phony entries in the records of his accounts. The allegations were thus derivative of the Trustee's settled fraudulent transfer claims and barred by the Permanent Injunction. Goldman III is little more than a rehash of the earlier complaints. Thus, again, the Goldman Plaintiffs have failed to plead anything but derivative claims and must be enjoined from proceeding.

As the Goldman Plaintiffs would have to concede, the vast majority of the allegations in Goldman III are identical to those that this Court, the district court and the Second Circuit already have held violate the Permanent Injunction. *See Picard v. Marshall (In re Bernard L. Madoff)*, 511 B.R. 375, 395 (Bankr. S.D.N.Y. 2014); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 477 B.R. 351, 358 (Bankr. S.D.N.Y. 2012), *aff'd sub nom.*, *A&G Goldman P'ship v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 12 Civ. 6109 (RJS), 2013 WL 5511027, at *1 (S.D.N.Y. Sept. 30, 2013); *Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 93 (2d Cir. 2014). The Goldman Plaintiffs did not appeal this Court's June 23, 2014 ruling or Judge Sullivan's previous order relating to their first complaint. And their counsel (who was also counsel for some of the Fox Plaintiffs in the Second Circuit in connection with separate putative class actions against the Picower Parties) did not seek reversal of the Second Circuit's decision and order. Goldman III's allegations of backdated trades in the Picower Parties' own accounts, margin loans, the Picower Parties'

unspecified client referrals to Madoff and knowledge of false information in financial documents, (Murphy Decl. Ex. N (Goldman III) ¶¶ 82–96), have already been specifically considered by this Court (and other courts) and have been found to be derivative of the Trustee's claims as a matter of law. These allegations do not and cannot state an independent claim.

The Goldman Plaintiffs presumably rely, therefore, on the remaining "new" allegations. But these allegations, too, fail to identify any specific or independent harm and therefore are derivative of the Trustee's settled claims and violative of the Permanent Injunction. Drawing on testimony from the criminal trials of certain Madoff accomplices, the Goldman Plaintiffs allege that Jeffry Picower made loans to BLMIS to keep it afloat and that Picower agreed to be listed as an options counterparty in BLMIS' books and records. As to the loan allegations, the allegation that deposits into one's own customer account were made to prop up the Ponzi scheme is no different from any of the other allegations found to have been derivative of the Trustee's claims: it is based on the Picower Parties' transfers into and out of their own accounts and the harm alleged is generalized harm to the BLMIS estate. Nor are the counterparty allegations any different. Instead, those allegations are merely that Picower's conduct, again, through alleged actions taken with respect to his own accounts, helped prop up the Ponzi scheme and harmed the BLMIS estate.

It is in the Trustee's interest to enforce the automatic stay and Permanent Injunction to preclude others from usurping his authority to bring and settle fraudulent transfer claims. The Goldman Plaintiffs yet again attempt to arrogate the Trustee's settled claims for the purpose of obtaining for themselves and a putative class money above and beyond their net equity. The derivative nature of their claim is, again, apparent from the face of the Complaint: on behalf of a purported class of all BLMIS investors, they seek damages in the amount of all the fraudulent

3

transfers made by BLMIS.  Recovering fraudulent transfers is precisely the role of the Trustee, as is the administration of the BLMIS estate.  This is the *third* time the Goldman Plaintiffs have pursued a class action complaint stating claims that are derivative of the Trustee's claims, and each prior Goldman complaint has been rejected.  The Trustee respectfully requests that the Court preclude the Goldman Plaintiffs from proceeding.[3]

## **FACTS**

The details of Madoff's Ponzi scheme and the background of the bankruptcy proceedings have been set forth numerous times and will not be repeated here.[4]  The Goldman Plaintiffs' repeated attempts to circumvent the Permanent Injunction and automatic stay also have an extensive history.  The theme is simple and consistent throughout: the Goldman Plaintiffs want to sue the Picower Parties for alleged conduct that harmed every BLMIS customer in the same way, and for which the Picower Parties already settled for $7.2 billion.  But such actions are barred by the Permanent Injunction and automatic stay.

The Goldman Plaintiffs' initial complaints ("Goldman I") were held to be duplicative and derivative of the Trustee's claims against the Picower Parties by both this Court and Judge Richard J. Sullivan of the district court.  *See In re Madoff*, 477 B.R. at 358, *aff'd sub nom.*, *A&G Goldman P'ship*, 2013 WL 5511027, at *1.  The Goldman Plaintiffs did not appeal Judge Sullivan's decision.  Instead, the Goldman Plaintiffs tried again to avoid the Permanent Injunction and automatic stay by seeking to file a new complaint ("Goldman II"), and were again

---

[3] Though mindful of this Court's direction that it is not the "gatekeeper" of actions filed against the Picower Parties that may violate the automatic stay and Permanent Injunction, *Marshall*, 511 B.R. at 395, with what is now a trilogy, the Trustee respectfully echoes the Picower Parties' assertion that "enough is enough."

[4] *See, e.g.*, *Fox v. Picard (In re Bernard L. Madoff)*, 848 F. Supp. 2d 469, 473–77 (S.D.N.Y. 2012); *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 125–32 (Bankr. S.D.N.Y. 2013).

enjoined by this Court. *See Marshall*, 511 B.R. at 395. Now, in Goldman III, which has been filed in Florida District Court, they repeat their previous allegations, allegations that this Court has already twice found to be barred by the Permanent Injunction, together with two seemingly new allegations—conclusory allegations that are generalized as to all customers.

## I.    THE NET EQUITY DECISION

In liquidation proceedings, SIPA provides that customers with allowed claims share *pro rata* in customer property to the extent of their net equity, as defined in section 78*lll*(11) of SIPA. *See In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 124–25 (Bankr. S.D.N.Y. 2013). Consistent with SIPA, the Trustee determined that each customer's net equity should be calculated by crediting the amount of cash the customer deposited into its BLMIS account, less any amounts withdrawn from the customer's BLMIS account, referred to as the "net investment method." *Id.* at 125. Many customers argued that their net equity should have been calculated based on the last customer statement they received from BLMIS, including whatever fictitious profits were reflected on that statement. *See id.*

The Bankruptcy Court approved the Trustee's use of the net investment method to calculate net equity (the "Net Equity Decision"). (*See* Order dated March 8, 2010, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Mar. 8, 2010), ECF No. 2020.) The Second Circuit affirmed, holding that the Trustee's methodology is "more consistent with the statutory definition of 'net equity' than any other method advocated by the parties or perceived by this Court." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 235 (2d Cir. 2011).

## II.    THE GOLDMAN PLAINTIFFS' PARTICIPATION IN THE BANKRUPTCY PROCEEDINGS

On December 23, 2008, this Court entered a Claims Procedure Order, which implemented a customer claims process in accordance with SIPA.  (*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 12.)  By July 2, 2009, the bar date for filing claims under SIPA, the Trustee had received more than 16,000 customer claims.  (Trustee's Amended Third Interim Report at 25, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC. (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Apr. 14, 2010), ECF No. 2207.)  The Goldman Plaintiffs participated in the claims procedure process.

A&G Goldman Partnership submitted a customer claim for its BLMIS account, which was denied by the Trustee because it had withdrawn more funds than it deposited.  (Affidavit of Vineet Sehgal in Support of Application for Enforcement of the Permanent Injunction and Automatic Stay, dated Nov. 13, 2014 (the "Sehgal Aff.") Ex. F.)  Pamela Goldman submitted two customer claims for BLMIS accounts with which she was associated, which the Trustee allowed.  (Sehgal Aff. Exs. A–D.)  Through SIPC advances and an interim distribution from the fund of customer property, Pamela Goldman's allowed claims have been fully satisfied.  (Sehgal Aff. ¶ 3.)

As creditors and customers, the Goldman Plaintiffs are represented by the Trustee.  The customer claims of Pamela Goldman were satisfied.  And although A&G Goldman Partnership's net equity claims were denied because it was a "net winner," like all other net winners, it may still participate in the estate as a general creditor (as could Pamela Goldman, for an amount above her net equity) if the Trustee is able to recover more property than is required to satisfy net

equity claims.  SIPA § 78fff-2(c)(1) ("Any customer property remaining after allocation in accordance with this paragraph shall become part of the general estate of the debtor . . .").

## III.    THE TRUSTEE'S AVOIDANCE ACTION

The Trustee filed a complaint against Jeffry M. Picower (now deceased) and the other Picower Parties on May 12, 2009.  (Murphy Decl. Ex. A.)  The complaint identified more than $6.7 billion in net withdrawals that the Trustee alleged the Picower Parties had received from BLMIS.  (*Id.* ¶¶ 63(b), 67.)  The complaint alleged that the Picower Parties knew or should have known that BLMIS was engaged in fraud and sought recovery of the entire amount known at the time of filing to have been transferred from BLMIS to the Picower Parties throughout the history of the Picower Parties' BLMIS accounts.  (*Id.* ¶¶ 3, 4, 28, 57, 65–67.)

After filing the complaint, the Trustee identified additional transfers from BLMIS to the Picower Parties, bringing the total amount of net withdrawals sought by the Trustee to $7.2 billion.  (*See* Murphy Decl. Ex. B. at 2.)

The Trustee's complaint contains numerous allegations that the Picower Parties directed backdating in their BLMIS accounts, had actual knowledge of the Ponzi scheme, were "complicit[] in the fraud," and were compensated for propping up the Ponzi scheme:

> 63(a).    On information and belief, the high returns reported on Defendants' accounts were a form of compensation by Madoff to Picower for perpetuating the Ponzi scheme by investing and maintaining millions of dollars in BLMIS.

(Murphy Decl. Ex A ¶ 63(a); *see also id.* ¶ 63(i).)  And in the Trustee's brief in opposition to the Picower Defendants' motion to dismiss, the Trustee stated that Picower propped up the Ponzi scheme by accepting only a fraction of his requested redemptions when Madoff could not pay them:

> As to Picower's argument that his withdrawals must have strained the Ponzi scheme, it is worth noting that Picower's largest withdrawals were generally made quarterly.  (*See* Compl. Ex. A.)  Accordingly, BLMIS could anticipate Picower's

withdrawals and there was no need for Madoff to raise money on short notice. It is significant, moreover, that as early as 2003 – even before Madoff's scheme began to unravel – BLMIS could not pay Picower the quarterly sums that he was demanding. Instead, on several occasions starting in September 2003, BLMIS paid Picower only a fraction of the amount that he originally requested. BLMIS' failure to pay Picower sums that purportedly were in his accounts or otherwise available to him is further evidence that Picower knew or should have known of Madoff's fraud. This evidence becomes even more compelling given Picower's apparent lack of complaint about his inability to access billions of dollars reported on his BLMIS account statements.

(Murphy Decl. Ex. B at 4–5.) Significantly, with respect to the allegations in Goldman III

regarding a $125 million loan in April 2006, the Trustee already alleged a backdating transaction

at that time for that amount:

> 63(i). One account combined outrageous returns with backdating to create trades that 'occurred' before the account was even opened by BLMIS. On or about April 24, 2006, Decisions opened a sixth account with BLMIS ("Decisions 6") by wire transfer on April 18 of $125 million. BLMIS promptly began 'purchasing' securities in the account, but it backdated the vast majority of these purported transactions to January 20, 2006. By the end of April, a scant 12 days later, the purported net equity value of the account was over $164 million, a gain of $39 million, or a return of more than 30% in less than two weeks of purported trading.

(Murphy Decl. Ex. A ¶ 63(i).) The Trustee's Picower complaint also included allegations

dealing with margin loans, as also alleged in the Goldman Complaints (*See e.g.*, *id.* ¶ 63(i)(*ii*)

("In December 2005, BLMIS also created backdated 'purchases' on margin . . . ."); Murphy

Decl. Ex. H (Goldman I) ¶¶ 52–55; Murphy Decl. Ex. L (Goldman II) ¶¶ 73–75.)

## IV.    THE PICOWER SETTLEMENT AND ISSUANCE OF THE PERMANENT INJUNCTION

While the Trustee was pursuing his action against, and potential settlement with, the

Picower Parties, the government also was in discussions with the Picower Parties' counsel.

(Murphy Decl. Ex. C at 3.)

After months of extensive negotiations, the Trustee and the Picower Parties reached an

agreement under which the Picower estate agreed to return $5 billion to the BLMIS estate. (*Id.*)

Simultaneously, the Picower estate agreed to forfeit the $5 billion and an additional amount of approximately $2.2 billion to the government. (*Id.*) When these amounts were combined in this global settlement, 100 percent of the net withdrawals received by the Picower Parties over the lifetime of their investments with BLMIS became available for eventual distribution to BLMIS victims, without the need for litigation. (*Id.*)

The settlement agreement contains a release of all claims that the Trustee brought or could have brought against the Picower Parties in connection with BLMIS. (*Id.* at 15.) Because of the importance to the Picower Parties of precluding suits on claims they were settling, the Trustee agreed to use his reasonable best efforts to seek a narrowly tailored Permanent Injunction from the Bankruptcy Court. (*Id.*) The Permanent Injunction would exclude from its scope actions where there is an independent basis on which to bring suit against the Picower Parties. (*Id.*) The Permanent Injunction was identified by the Picower Parties as an essential part of the settlement. (*Id.* at 25–28.)

On December 17, 2010, the Trustee moved for an order approving the settlement agreement and entering the Permanent Injunction under section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure. (Murphy Decl. Ex. C.) Fox and Marshall filed objections. (*Picard v. Picower*, Adv. Pro. No. 09-1197 (Bankr. S.D.N.Y. Jan. 6, 2011) ECF Nos. 32, 34.) Out of the approximately 16,000 creditors of the BLMIS estate (*see* Transcript of Settlement Hearing, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC.*, Adv. Pro. No. 08-01789, (Bankr. S.D.N.Y. Jan. 14, 2011), ECF No. 3815, at 6), only one other objection was filed to this landmark settlement.

Judge Lifland found that the Permanent Injunction was necessary and appropriate to carry out the provisions of the Bankruptcy Code, to prevent any entity from exercising control or

possession over property of the estate, to preclude actions that would have a conceivable effect

or adverse impact upon the BLMIS estate or on the administration of the liquidation proceeding,

and to avoid relitigation or litigation of claims that were or could have been asserted by the

Trustee on behalf of all customers and creditors.  (Murphy Decl. Ex. D at 6–7.)  Judge Lifland

stated at the hearing that: "[t]he injunction is narrow.  It deals with duplicative and parallel

claims of the trustee . . . . And you cannot expect any settlor to make a settlement with a potential

possibility of being sued twice over the same causes of action and claims."  (Transcript of

Settlement Hearing, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC.*, Adv. Pro. No. 08-

01789, (Bankr. S.D.N.Y. Jan. 14, 2011), ECF No. 3815, at 40–41.)  Accordingly, Judge Lifland

overruled the objections and approved the settlement, issuing the following Permanent

Injunction:

> [A]ny BLMIS customer or creditor of the BLMIS estate . . . is hereby permanently enjoined from asserting any claim against the Picower BLMIS Accounts or the Picower Releasees that is duplicative or derivative of the claims brought by the Trustee, or which could have been brought by the Trustee against the Picower BLMIS Accounts or the Picower Releasees . . . .

(Murphy Decl. Ex. D at 7.)

## V.    THIS COURT AND THE DISTRICT COURT ENFORCE THE PERMANENT INJUNCTION AGAINST THE GOLDMAN PLAINTIFFS

### A.    Related Action: This Court, the District Court, and the Second Circuit Enforce the Permanent Injunction in the Fox and Marshall Litigation

In seeking to bring claims against the Picower Parties, the Goldman Plaintiffs asserted

claims similar to a set of third-party plaintiffs represented by Fox and Marshall[5] who brought

multiple similar actions against the Picower Parties.  This Court, the district court, and the

---

[5] Russell Oasis and Marsha Peshkin were subsequently added as plaintiffs in a putative class action brought by Fox and Marshall.

Second Circuit all rejected the Fox Plaintiffs' complaints as derivative of the Trustee's claims, and provide background and precedent for now enforcing the Permanent Injunction against the Goldman Plaintiffs.

On February 16 and 17, 2010, before the Goldman Plaintiffs first attempted to bring an action against the Picower Parties, Fox and Marshall each filed a putative class action against the Picower Parties in Florida District Court seeking to circumvent the anticipated net equity decision. (Murphy Decl. Exs. E–F.) Between them, Fox and Marshall sought to represent a "class" of all BLMIS customers whose claims would not be fully satisfied by the Trustee using his net equity calculation. The complaints' allegations parroted the Trustee's fraudulent transfer allegations against the Picower Parties. Fox and Marshall alleged that they and other BLMIS customers were damaged as a result of the fraudulent transfers that the Picower Parties received from BLMIS. (Murphy Decl. Ex. E (Initial Fox Compl.) ¶¶ 5–9;[6] Murphy Decl. Ex. F (Initial Marshall Compl.) ¶¶ 5–9; *see In re Madoff*, 477 B.R. 351 at Ex. A (chart comparing allegations in Trustee's complaint with the Fox and Marshall complaints).) Similar to the Goldman Plaintiffs' complaints, the Fox and Marshall complaints alleged that BLMIS and the Picower Parties engaged in a conspiracy to "steal the funds" of other customers. (Murphy Decl. Ex. E ¶ 9; Murphy Decl. Ex. F ¶ 9.)

On May 3, 2010, upon application by the Trustee, this Court held that Fox's and Marshall's complaints violated the automatic stay and at least one stay order of the District Court for the Southern District of New York. *Picard v. Fox*, 429 B.R. 423, 437 (Bankr. S.D.N.Y.

---

[6] Fox and Marshall amended their complaints on March 15, 2010, making only clerical changes to the original versions. (*See* Murphy Decl. Ex. E at 29, Ex. F at 29.) References to Exhibits E and F refer to the amended complaints.

2010).  On appeal, Judge John G. Koeltl of the district court affirmed, holding that the

Bankruptcy Court was "plainly correct in finding that the Florida Actions violated the automatic

stay," because they were a "transparent effort" to pursue claims that "were duplicative of claims

brought by the Trustee and that belonged to the Trustee on behalf of all creditors of BLMIS."

*Fox v. Picard*, 848 F. Supp. 2d 469, 473 (S.D.N.Y. 2012).

The district court examined the Fox and Marshall complaints and determined that, "[p]ut

bluntly, the wrongs pleaded in the Florida Actions and in the Trustee's action are the same." *Id.*

at 479.  The factual allegations, which were "virtually identical" to those in the Trustee's

complaint, alleged no act directed specifically toward Fox and Marshall or any duty owed

specifically to them.  *Id.*  Instead, the district court held that the wrongful acts alleged in their

complaints "harmed every BLMIS investor (and BLMIS itself) in the same way:  by

withdrawing billions of dollars in customer funds from BLMIS and thus substantially

diminishing the assets available to BLMIS . . . ." *Id.* at 480.  Accordingly, the court concluded

that the claims asserted by Fox and Marshall could have been asserted by any creditor of

BLMIS.

On January 13, 2014, the Second Circuit affirmed the district court's ruling and upheld

the Permanent Injunction as against Fox and Marshall.  *See Marshall*, 740 F.3d at 84.  The

Second Circuit held that the Fox and Marshall complaints "impermissibly attempt to 'plead

around'" the Permanent Injunction because they "allege nothing more than steps necessary to

effect the Picower Parties' fraudulent withdrawals of money from BLMIS, instead of

'particularized' conduct directed at BLMIS customers." *Id.*  Importantly, it found that "[t]he

only allegations of the Picower [D]efendants' direct involvement in the Ponzi scheme are that

they prepared false documentation, recorded and withdrew fictional profits, and filed false

statements in connection with their tax returns." *Id.* at 92. Citing the district court's decision in

*Goldman*, discussed below, the Second Circuit held that:

> [t]he . . . Complaints plead nothing more than that the Picower Defendants traded on their *own* BLMIS accounts, knowing that such "trades" were fraudulent, and then withdrew the "proceeds" of such falsified transactions from BLMIS. All the "book entries" and "fraudulent trading records" that the Complaints allege refer to nothing more than the fictitious records BLMIS made, *for the Picower Defendants*, to document these fictitious transactions. In other words, the Complaints plead nothing more than that the Picower Defendants fraudulently withdrew money from BLMIS.

*Id.* (citing *A&G Goldman P'ship*, 2013 WL 5511027, at *7). The Second Circuit ruled that the

Fox and Marshall complaints did not contain particularized claims because they "do not allege

that the Picower Defendants made . . . misrepresentations to BLMIS customers," and found

rather that the "alleged injuries are inseparable from, and predicated upon, a legal injury to the

estate namely, the Picower Defendants' fraudulent withdrawals from their BLMIS accounts of

what turned out to be other BLMIS customers' funds." *Id.* The Second Circuit further held that

Fox's and Marshall's complaints "have not alleged that the Picower Defendants took any . . .

'particularized' actions aimed at BLMIS customers," such as making misrepresentations to Fox

and Marshall. *Id.* at 93.

### B.    Goldman I Complaints

In the midst of the Fox /Marshall injunction litigation, in 2011, the Goldman Plaintiffs

sought permission from this Court to file two putative class actions in Florida District Court (the

"Goldman I Actions"). (Murphy Decl. Ex. H) While Pamela Goldman sought to represent so-

called "net losers," A&G Goldman Partnership sought to represent "net winners." (*See id.*)

Together, they sought to represent customers and creditors already before the Bankruptcy Court,

and for whom the Bankruptcy Court had already determined equitable distributions in

accordance with the net equity method approved by the Second Circuit.

The Goldman I Actions alleged that the Picower Parties received billions of dollars of transfers from BLMIS under circumstances that suggest Picower knew that BLMIS was engaged in fraud.  (*See, e.g.*, Murphy Decl. Ex. H, Ex. A thereto ¶¶ 40–51.)  As demonstrated in Exhibit A annexed to the Bankruptcy Court's order in *In re Madoff*, 477 B.R. 351, the Goldman I complaints were virtual carbon copies of the Fox and Marshall Complaints.

The only thing different in the Goldman I Actions was the labeling of the claims as securities fraud claims instead of fraudulent transfers or conspiracy to defraud.  The Goldman Plaintiffs claimed that Picower was a "control person" under section 20(a) of the Exchange Act with respect to BLMIS and is jointly and severally liable with BLMIS for BLMIS's violations of Rule 10b-5 of the Exchange Act.  (*See, e.g.*, Murphy Decl. Ex. H, Ex. A thereto ¶¶ 89–96.)  The purported federal securities laws violations were based on the Picower Parties' withdrawals from BLMIS: "The volume, pattern and practice of the Defendants' fraudulent withdrawals from BLMIS and their control over fraudulent documentation of underlying transactions at BLMIS establishes the Defendants' 'control person' liability under the federal securities laws."  (*Id.* ¶ 41.)

The alleged wrongdoing by Picower consisted of his fraudulent transfers from BLMIS, which mirrored allegations in the Trustee's complaint.  (*See, e.g.*, *id.* ¶ 44 ("Jeffry Picower knew of the existence of [Madoff's] scheme and . . . Jeffry Picower was taking fraudulent profits from the BLMIS customer accounts"); *id.* ¶ 45 ("Picower was able to control BLMIS and use BLMIS as 'a personal piggy bank' by withdrawing funds for various entities he controlled, even if there was no legitimate underlying profitable transaction warranting a distribution of such funds."); *id.* ¶ 51 ("The pattern of transactions in the Defendants' accounts reveals their fraudulent nature. Each quarter, Picower, directly and through the other Defendants and other agents, directed the

withdrawal of large sums of money divided into odd numbers spread over many of the

Defendant accounts."); *see also* Murphy Decl. Ex. A ¶ 66 ("The Transfers were, in part, false

and fraudulent payments of nonexistent profits supposedly earned in the Accounts . . . .").)  The

Goldman I allegations mirrored the allegations in the first Fox and Marshall complaints, which

were already held to be nothing more than a rehash of the Trustee's allegations.  *See In re*

*Madoff*, 477 B.R. at 355–57, Ex. A.

C.    **The Bankruptcy Court Holds that the Goldman I Actions Violate the
       Permanent Injunction**

On June 20, 2012, the Bankruptcy Court held that the Goldman I Actions violate the

Permanent Injunction and the automatic stay.  *See id.* at 352–53.  The Bankruptcy Court

expressed frustration at the tactics of the Goldman Plaintiffs and their counsel, who had

represented the Fox Plaintiffs in their attempts to bring derivative claims against the Picower

Parties.  The Court rejected the Goldman Plaintiffs' attempts to circumvent the Net Equity

Decision and disrupt the *pro rata* distribution provided by SIPA by pleading around the

Permanent Injunction:  "It's *déjà vu* all over again.  The Class Action Plaintiffs are attempting to

use inventive pleading to sidestep the automatic stay and the [Permanent] Injunction."  *Id.* at 354

(internal quotations omitted).  The Bankruptcy Court emphasized that the Goldman Plaintiffs

"have simply repeated, repackaged, and relabeled the wrongs alleged by the Trustee [against the

Picower Parties] in an attempt to create independent claims where none exist."  *Id.*  The Court

found that the Goldman Plaintiffs "re-iterate" the Trustee's allegations "almost verbatim."  *Id.*

The Bankruptcy Court held that the Goldman I Actions violated the Permanent Injunction

and the automatic stay for three main reasons.  First, the Court found that despite the "nominal

title" of their causes of action, the Goldman I Actions raised issues substantially "identical" to

the Trustee's Picower complaint.  *Id.* at 355.  Specifically, the Court found that "the Plaintiffs'

action is based on pleadings that are nearly identical to those of the Trustee," that they "substantially parroted the Trustee's Complaint," and also "mimic those set out in the Fox and Marshall complaints, which this Court found to be duplicative of the Trustee's, a finding the District Court affirmed." *Id.* The Court recounted numerous examples of overlap between the Goldman Plaintiffs' allegations and those of the Trustee, as well as those of Fox and Marshall, and cited an exhibit, originally submitted by the Trustee, which "substantially reflects and links the cloning of the pleadings." *Id.* at 356 n.12, Ex. A.

Second, the Bankruptcy Court held the Goldman Plaintiffs' claims to be "derivative of the Trustee's." *Id.* at 356. Indeed, the Court found that the alleged harms are "limited to 'general direction and control and action to the detriment of all [BLMIS's] creditors.'" *Id.* at 357. Thus, the Court found that the Goldman Plaintiffs did not state a particularized injury against the Picower Parties.

Third, the Bankruptcy Court found that the Goldman I Complaints, like the Fox and Marshall complaints, were simply "yet another attempt by the same counsel to re-litigate [the] Net Equity Decision." *Id.*

### D.   The District Court Holds that the Goldman I Complaints Violate the Permanent Injunction

Judge Sullivan affirmed the Bankruptcy Court and upheld the Permanent Injunction as applied to the Goldman I Complaints. *A&G Goldman P'ship*, 2013 WL 5511027, at *1. The district court held that the Goldman Plaintiffs' claims were derivative of the Trustee's fraudulent transfer claims. *Id.* at *6–11. Rejecting "a purely formalistic approach" that looks only at the nominal title of a cause of action, the court determined that the Goldman Plaintiffs' claims "are not bona fide securities fraud claims," and found instead that, aside from allegations listing the elements of a securities fraud claim, "all of the allegations in the Complaint refer exclusively to

the Picower Parties' fraudulent withdrawals." *Id.* at *6–7. The court recited the standard for

determining the legal sufficiency of a control person claim to determine if they were *bona fide*

securities law claims or merely disguised fraudulent transfer claims, and not because it was

reviewing to determine if the allegations were adequately pled for purposes of a Rule 12(b)(6)

motion. *See id.* at *6. The district court recognized that the Goldman I Complaints pled

"nothing more than that the Picower Parties traded on their own BLMIS accounts," allege

fraudulent trading activity that BLMIS conducted "for the Picower Parties," and that, "[i]n other

words, the Complaints plead nothing more than that the Picower Parties fraudulently withdrew

money from BLMIS." *Id.* at *7.

The district court further held that "the parts of the Complaints that do discuss aspects of

the BLMIS fraud unconnected to the Picower Parties' accounts noticeably lack any allegation

that the Picower Parties were involved in such fraud . . ." and that "with respect to the clearest

examples of BLMIS's fraud to other customers, the Goldman Complaints are completely silent

about the Picower Parties' involvement." *Id.* at *8. Hence, the district court found that:

> [t]his examination of the Goldman Complaints makes clear that Class Action
> Plaintiffs do not in fact claim that the Picower Parties directed BLMIS to make
> misrepresentations above and beyond what was necessary to document the
> Picower Parties' false withdrawals. The fraudulent representations Class Action
> Plaintiffs point to were incident to the fraudulent withdrawals. Regardless of
> what Class Action Plaintiffs call their claims, the Goldman Complaints plead
> fraudulent conveyance claims. Accordingly, they are clearly derivative of the
> Trustee's already-settled claims.

*Id.* at *9. As a result, the court found that the Goldman Plaintiffs had brought "simply

deceptively labeled fraudulent conveyance claims." *Id.* at *10. Accordingly, the district court

held the claims came "within the plain scope of the [Permanent] Injunction" and that the

Bankruptcy Court had jurisdiction to enjoin them. *Id.* at *10–11. The Goldman Plaintiffs did

not appeal the district court's decision.

## VI.    THIS COURT REJECTS THE GOLDMAN II COMPLAINT AND FINDS THAT IT VIOLATES THE PERMANENT INJUNCTION

### A.    The Goldman II Complaint

On January 6, 2014, the Goldman Plaintiffs commenced a new action in the Florida District Court seeking a declaration that neither the Permanent Injunction nor the automatic stay barred the Goldman Plaintiffs from filing a "new" class action complaint against the Picower Parties.  (Murphy Decl. Ex. K.)  The declaratory judgment action attached a class action complaint, the Goldman II Complaint, that the Goldman Plaintiffs sought to have declared not in violation of the automatic stay or the Permanent Injunction.  (*See* Murphy Decl. Exs. K–L.)

The Goldman Plaintiffs again asserted that their claims rested on different legal theories, had different elements, sought different damages, were subject to different proof, and were subject to a different statute of limitations than the Trustee's claims against the Picower Parties.  The Goldman Plaintiffs added a general allegation that the Picower Parties "directly or indirectly induced" BLMIS to make misrepresentations to BLMIS customers.  (Murphy Decl. Ex. L. ¶ 14.)

In substance, the Goldman II Complaint was identical to the Goldman I Complaint that was held to be barred under the Permanent Injunction.  It again attempted to assert a claim under section 20(a) of the Exchange Act against the Picower Parties for loss in the value of their investment in the "BLMIS Discretionary Trading Program" (their new name for BLMIS's Investment Advisory business).  (*Id.* ¶¶ 62, 83–94.)  But again, it did not contain any factual allegations that Picower took any specific action with respect to other customers' accounts, or indeed took any action at BLMIS outside of his own accounts.

Instead, trying to get around the deficiencies in their prior pleading, the Goldman Plaintiffs more clearly spelled out their theory that Picower knew that the false trading in his own BLMIS accounts would result in false asset values in other BLMIS customers' accounts because

those other accounts did not reflect cash transfers from their accounts to Picower.  (*See id.* ¶¶ 65–66.)  As a result of Picower's activity within his own accounts, the Goldman Plaintiffs alleged, "the account records of other BLMIS customers falsely overstated the assets therein and their investment performance.  BLMIS customers consequently unknowingly overpaid for BLMIS securities."  (*Id.* ¶ 66; *see also id.* ¶ 2 (Picower's own transactions in his own accounts "(1) directly resulted in additional material misrepresentations to other BLMIS investors as to their account values and profits and (2) required defalcation of funds from other BLMIS investors to pay Picower and his affiliates."); *id.* ¶ 3 (Picower's knowledge that his transactions would cause other BLMIS customers to be defrauded and Picower's control over BLMIS together "amount to Picower making direct misrepresentations to those customers."); *id.* ¶ 65 ("Picower caused BLMIS to book phony transactions with phony profits in his accounts.  From time to time, Picower withdrew these phony profits from his BLMIS account."); *id.* ¶¶ 69–70, 72–73 (providing specific examples of Picower directing false trading in his own accounts).)

> **B.** **This Court Holds that the Goldman II Complaint Violates the Permanent Injunction**

On June 23, 2014, the Bankruptcy Court held that the Goldman II Action violated the Permanent Injunction.  *See Marshall*, 511 B.R. at 394.  After this Court determined that it had the authority to interpret its own Permanent Injunction order, and recognizing its jurisdiction to decide if the Goldman II Complaint violated that order, this Court found that the "conclusory statements" that the Goldman Plaintiffs cobbled together in an attempt to again subvert the Permanent Injunction could not pass muster.  *Id.* at 392–93.  Setting aside the Goldman Plaintiffs' conclusory allegations, this Court held that the Goldman II Action violated the Permanent Injunction for one main reason: the Goldman II Action, "like its predecessors, relie[d] on the Picower Parties' fraudulent withdrawals and fictitious entries in their own accounts, and if

these allegations are ignored, there is nothing left." *Id.* at 393.  Because the Goldman II

Complaint only restated the legal standard for control person liability under section 20(a) without

alleging that Picower "was an officer of BLMIS" or including any "particularized allegations

that Picower Parties did anything besides fraudulently withdraw money from BLMIS and cause

BLMIS to make phony entries in the records *of their accounts*," this Court found their claim

derivative. *Id.* (emphasis added).  The Goldman Plaintiffs' voluntarily dismissed their appeal of

that decision.[7]

## VII.    THE GOLDMAN III COMPLAINT

On August 28, 2014, after the Second Circuit ruled on the Fox Plaintiffs' action and this

Court ruled on the Goldman II Complaint, the Goldman Plaintiffs made their *third* attempt to

bring a securities class action against the Picower Parties.  As before, the Goldman III Complaint

alleges that Jeffry Picower was a control person under section 20(a) of the Exchange Act.

(Murphy Decl. Ex. N ¶ 1.)  Goldman III makes six types of allegations, namely that Picower: (1)

backdated trades (*id.* ¶¶ 82–87); (2) took out margin loans (*id.* ¶¶ 88–90); (3) knew that there was

false information in BLMIS' financial disclosures (*id.* ¶¶ 91–96); (4) referred clients to BLMIS

(*id.* ¶ 64); (5) made loans to BLMIS (*id.* ¶¶ 10, 67–70); and (6) agreed to be listed as an options

counterparty and further agreed to notify Madoff if a regulator or anyone else asked him about

his counterparty status (*id.* ¶¶ 11, 79–81.).

The first three allegations were already contained in Goldman II, (*compare* Murphy Decl.

Ex. L ¶¶ 65–69, *with* Ex. N ¶¶ 82–87 (alleging backdated trades); *compare* Murphy Decl. Ex. L

---

[7] The Court also considered and rejected a new proposed complaint by the Fox Plaintiffs that was
substantially similar to the Goldman II Complaint in the same decision and order.  The Fox
Plaintiffs have appealed.  The appeal is currently pending before Judge John G. Koeltl of the
district court. *See Marshall v. Picard*, No. 14-CV-06790 (JGK) (S.D.N.Y. 2014).

¶¶ 73–75, *with* Ex. N ¶¶ 88–90 (alleging margin loans); *compare* Murphy Decl. Ex. L ¶¶ 64, 67–

68, 71 *with* Ex. N ¶¶ 91–96 (alleging knowledge of false financial disclosures)), and every single

one of these prior allegations has already been held by this Court to be a derivative claim barred

by the Permanent Injunction. *See Marshall*, 511 B.R. at 391–93.  The fourth allegation, a

conclusory statement that Picower referred clients to BLMIS, was previously pled by the Fox

Plaintiffs and was held to fail to provide an independent basis for a control person claim.

(C*ompare Marshall*, 511 B.R. at 394–95, *with* Murphy Decl. Ex. N ¶ 64.)

Thus, of all the allegations, only two appear to be new: that Picower made loans to

BLMIS and that Picower agreed to be listed as an options counterparty.  The two additions to the

Goldman III Complaint appear to be allegations based on inferences drawn from the recent

criminal testimony of Enrica Cotellessa-Pitz, Annette Bongiorno, and Frank DiPascali, Jr..  (*See*

Murphy Decl. Ex. N at 1–2.)  These allegations aver that Picower made loans to BLMIS in order

to keep it afloat and that Picower agreed to be listed as an options counterparty in BLMIS books

and records (*id.* ¶¶ 68, 70) and inform Madoff if anyone asked Picower about being a

counterparty.  (*Id.* ¶¶ 11, 78–81.)   The essence of these allegations is that Picower propped up

the Ponzi scheme, an allegation based on generalized harm to all BLMIS customers and creditors

and one that the Trustee has already made in his litigation against the Picower Parties.

## ARGUMENT

## THE PERMANENT INJUNCTION AND AUTOMATIC STAY BAR THE GOLDMAN PLAINTIFFS FROM PROCEEDING

**I.    ALMOST ALL OF THE GOLDMAN III COMPLAINT HAS ALREADY BEEN HELD TO VIOLATE THE PERMANENT INJUNCTION**

      **A.    The Goldman Plaintiffs' General Allegations of "Control" Have Been Rejected as Conclusory**

This Court and the district court have specifically considered and rejected the majority of the allegations asserted once again by the Goldman Plaintiffs in the Goldman III Complaint. The essence of the Goldman III Complaint can be found at paragraphs 5, 7 and 12 and are nothing more than bald allegations of Picower's "control" over BLMIS:

> 5. Through his close relationship with Madoff, Picower had uncommon access to BLMIS' books and records, directed the affairs of BLMIS, and became Madoff's de facto partner.

> 7. Picower is liable under Section 20(A) because Picower knew that BLMIS was operating a fraud, and because Picower caused the dissemination of material misrepresentations and documents containing material omissions relied on by BLMIS customers that are the basis of BLMIS' securities law violations.

> 12. In short, Picower directly and indirectly controlled the viability of the Ponzi scheme. Picower caused and directed material misrepresentations and omissions relating to BLMIS' general trading activity, balance sheet, assets, capital, and solvency, all of which gave investors and regulators the false appearance that BLMIS was engaged in profitable and legitimate trading and investment activity, and all of which induced Plaintiffs and the class members to invest or remain invested in BLMIS.

(Murphy Decl. Ex. N ¶¶ 5, 7, 12.) These general allegations are no different from what the Goldman Plaintiffs alleged previously, allegations that were rejected by this Court and the district court. (*See A&G Goldman P'ship*, 2013 WL 5511027, at *6, *8–9; *Marshall*, 511 B.R. at 393; Murphy Decl. Ex. L ¶¶ 2, 63–64, 91–92; Murphy Decl. Ex. H, Ex. A thereto. ¶¶ 2–4, 42.)

The Goldman Plaintiffs contend that their action is different from the Trustee's because the Trustee's action "did not involve allegations that Picower exercised control over BLMIS." (Murphy Decl. Ex. N ¶ 100.) But this Court and the district court have ruled that conclusory allegations of control do not provide enough support for the Goldman Plaintiffs to escape the reach of the Permanent Injunction. *See A&G Goldman P'ship*, 2013 WL 5511027, at *6; *Marshall*, 511 B.R. at 393.

### B. Nearly All of the Goldman Plaintiffs' Remaining Allegations Have Been Rejected as Conclusory and Derivative of the Trustee's Claims

The Goldman Plaintiffs next allege that the Picower Parties: (1) backdated trades in their accounts; (2) took out margin loans; (3) knew about false information in FOCUS Reports; and (4) referred unspecified clients to Madoff.  (Murphy Decl. Ex. N ¶¶ 64, 82–96.)  These allegations are nothing new, and were rejected by this Court and the district court.  (*See A&G Goldman P'ship*, 2013 WL 5511027 at *6–9; *Marshall*, 511 B.R. at 391–94; *see also* Murphy Decl. Ex. L ¶¶ 69–73; Murphy Decl. Ex. H, Ex. A thereto ¶¶ 52–61, 75.)

As to the backdating allegations, the Goldman Plaintiffs again rely on the exact same allegations of backdating made by the Trustee, and use these allegations to contend that the Picower Parties' backdating in their own accounts had an effect on other BLMIS accounts.  For example, paragraph 84 of their complaint alleges that:

> 84.   Picower knew and intended that each phony recording of a fictitious profitable transaction in his accounts resulted directly in the recording of false transactions and false asset values in the accounts of other BLMIS customers, because these customer accounts did not reflect the resulting cash transfer from their accounts to Picower.

(Murphy Decl. Ex. N ¶ 84.  *Compare* Murphy Decl. Ex. A ¶¶ 63(d)–(i), *with* Ex. L. ¶ 65.  *See Marshall*, 740 F.3d at 93.)  The Goldman Plaintiffs also use backdating allegations to further allege that "Picower . . . had extensive contact with BLMIS employees and had the power to direct their actions."  (Murphy Decl. Ex. N ¶ 82.)  This sort of allegation, relying on the transfers in Picower's own accounts to support an inference of greater liability, has been rejected by this Court, the district court, and the Second Circuit.  Indeed, as the Second Circuit held, this sort of harm is quintessentially derivative: "[A]ppellants' claimed damages, also suffered by all BLMIS customers . . . remain mere secondary harms flowing from the Picower Parties' fraudulent withdrawals and the resulting depletion of BLMIS funds."  *Marshall*, 740 F.3d at 93.

23

Paragraph 87 of the Goldman III Complaint deals with the alleged backdating of a $125 million transaction in April 2006, which the Goldman Plaintiffs also use as the basis for a "loan" allegation:

> 87.    Similarly, on or about April 24, 2006, Defendant Decisions Incorporated opened a new account with BLMIS known as 'Decisions, Inc. 6' account.  This account was opened with a wire transfer of $125 million.  Defendants instructed BLMIS to back date trades in this account to January 2006, which was four months prior to the date the account was actually opened.  BLMIS employees carried out Defendants' direct instructions and fabricated and back dated trades in the 'Decisions, Inc. 6' account.  This resulted in the net value of the account increasing by almost $40 million, or 30% in less than two weeks after it opened.

(Murphy Decl. Ex. N ¶ 87.)  This allegation is virtually identical to the Trustee's allegation regarding this transaction:

> 63(e).  On or about April 24, 2006, Decisions opened a sixth account with BLMIS ("Decisions 6") by wire transfer on April 18 of $125 million. BLMIS promptly began "purchasing" securities in the account, but it backdated the vast majority of these purported transactions to January 2006. By the end of April, a scant 12 days later, the purported net equity value of the account was over $164 million, a gain of $39 million, or a return of more than 30% in less than two weeks of purported trading.

(Murphy Decl. Ex. A ¶ 63(e).)  Again, the allegations regarding backdating relate only to Picower's conduct with respect to his own BLMIS accounts, and as such, already have been rejected as providing no independent basis for a third party complaint.  *See Fox*, 848 F. Supp. 2d at 479–80; *Marshall*, 740 F.3d at 93.  Furthermore, this transaction was alleged and therefore considered in connection with the Trustee's settlement with the Picower Parties.

Regarding margin loans, the Goldman Plaintiffs allege that "Picower also directed BLMIS to make a margin 'loan' of approximately $6 billion to Defendant Decisions Inc., even though the account had no trading activity or cash or securities to support such borrowing." (Murphy Decl. Ex. N ¶ 88.)  This allegation is identical to the Goldman Plaintiffs' allegations in the previous iterations of their complaints (*see* Murphy Decl. Ex. L ¶¶ 73–75; Murphy Decl. Ex.

H, Ex. A thereto ¶¶ 52–55), which were already rejected by this Court and the district court as

derivative of the Trustee's claim.  *See A&G Goldman P'ship*, 2013 WL 5511027, at *7–9; *see*

*also* Murphy Decl. Ex. A ¶¶ 63(c)–(d) (describing margin loans).

While the Goldman Plaintiffs' allegations concerning BLMIS's FOCUS reports are not

copied from the Trustee's complaint, they are conclusory and based on the premise that Picower

used backdated trades in his own accounts.  As in the prior iteration of the complaint, the

Goldman Plaintiffs rely on an allegation of Picower's conduct with respect to his own accounts

to support the general inference that he controlled other accounts at BLMIS.  For example, the

Goldman III Complaint alleges:

> 94.    Picower's ability to direct the creation and dissemination of false and
> misleading trading and financial documentation which he knew would be
> incorporated in financial disclosures made by BLMIS, establishes that Picower
> exercised direct and indirect control over the day-to-day operations of BLMIS and
> specifically over the activity that constituted a violation of the securities laws.

(Murphy Decl. Ex. N ¶ 94.)  This is the same conclusory allegation that did not suffice in

previous versions of the Goldman Plaintiffs' complaint, and cannot escape the reach of the

Permanent Injunction now.  *See A&G Goldman P'ship,* 2013 WL 5511027, at *7–9; *Marshall*,

511 B.R. at 394–95.

Finally, the Goldman Plaintiffs allege, as before, that "Picower also used his extensive

connections in Palm Beach and his stature on Wall Street to recruit and refer clients to the

BLMIS scheme, despite his knowledge it was a fraud."  (Murphy Decl. Ex. N ¶ 64.)  This

allegation is entirely conclusory and fails to name a single investor with BLMIS as a result of

Picower's referral.  This allegation was also made before (by the Fox Plaintiffs), and failed to

provide a basis for an independent control person claim.  *See Marshall*, 511 B.R. at 394–95.

In sum, without their conclusory allegations, the Goldman Plaintiffs can solely allege

activity within the Picower Parties' own accounts.  There are no allegations here that are

25

independent of the Trustee's claims.  As this Court held only a few months ago with respect to the last version of the complaint: "[t]he New Goldman Complaint, like its predecessors, relies on the Picower [Parties'] fraudulent withdrawals and fictitious entries in their own accounts, and if these allegations are ignored, there is nothing left." *Marshall*, 511 B.R. at 393; *see also id.* at 392 ("[B]eyond conclusory statements that the Picower [Parties'] fraudulent transactions related to their own accounts caused BLMIS to send false statements to other customers, the *New Goldman Complaint* does not allege that the Picower [Parties] 'directed or were at all involved in the creation or dissemination of these statements to other BLMIS customers.'").

## II.    THE FACIALLY NEW ALLEGATIONS ARE NO DIFFERENT FROM THE TRUSTEE'S ALLEGATIONS THAT THE PICOWER PARTIES PROPPED UP THE PONZI SCHEME

The only allegations in the Goldman III Complaint that do not facially duplicate allegations in the earlier iterations of the complaint are that Picower made loans to BLMIS to keep it afloat, agreed to be listed as an options counterparty in BLMIS' books and records, and agreed to let Madoff know if anyone asked Picower about being a counterparty.  (*See* Murphy Decl. Ex. N ¶¶ 67–74, 78–81.)  The crux of these allegations, however, is that Picower propped up the Ponzi scheme, an allegation made by the Trustee in his settled litigation against the Picower Parties and a claim that, if true, harmed BLMIS and all of its customers and creditors in the same way.  These allegations are thus no less derivative of the Trustee's complaint than the allegations already rejected by this Court and the district court.

### A.    The Loan Allegations Are Derivative

The Goldman Plaintiffs allege that the Picower Parties bolstered the Ponzi scheme through two loans they provided to BLMIS in 1992 and 2006, respectively.  (*Id.* ¶¶ 67–74.)  The Goldman III Complaint alleges:

26

10.   Picower made approximately $200 million in sham "loans" to BLMIS in order to prop up the Ponzi scheme and enable BLMIS to pay off redeeming investors. But for the Picower 'loans,' BLIMS [sic] and the Ponzi scheme would have collapsed long ago. The 'loans' also resulted in direct misrepresentations to BLMIS customers about BLMIS' solvency and financial condition.

67.   In order to prop up the Ponzi scheme, Picower engaged in a series of 'lending' transactions amounting to more than $200 million. But for these "loans," BLMIS would have been unable to pay off redeeming investors and the Ponzi scheme would have collapsed. The loans gave Picower control over BLMIS as his potential to either refuse to make the illicit 'loans' or to call them would have resulted in the end of the Ponzi scheme.

(*Id.* ¶¶ 10, 67.) The Goldman Plaintiffs further allege that these loans demonstrated Picower's control over BLMIS and caused misrepresentations about BLMIS's financial condition to BLMIS customers. (*Id.* ¶¶ 73–74.)

Specifically, the Goldman Plaintiffs allege that Picower gave BLMIS a $125 million loan in April 2006 to bolster the Ponzi scheme during a liquidity crunch:

70.   Picower also made a $125 million 'loan' to BLMIS in April 2006 (without consideration) in order to keep BLMIS afloat when it was short on cash to pay its redeeming customers. Picower was quickly repaid on his 'loan' when BLMIS wired him $125 million in September 2006. Like the earlier 1993 'loan,' this loan was necessary to perpetuate the Ponzi scheme by concealing BLMIS' inability to pay its redeeming customers their fictitious gains.

(*Id.* ¶ 70.) But this allegation merely puts a different spin on the April 2006 backdating allegation already made by the Trustee in 2009. (*Compare* Murphy Decl. Ex. A ¶ 63(i), *with* Ex. N ¶ 87.) Moreover, this allegation concerns purported trading activity—the deposit of $125 million, the withdrawal of $125 million and backdating trades—*in the Picower Parties' own accounts*. Again, such activity has been rejected by the Second Circuit, the district court, and this Court as providing a basis for an independent claim. *Marshall*, 740 F.3d at 93; *A&G Goldman P'ship*, 2013 WL 5511027, at *1; *Marshall*, 511 B.R. at 394.

The Goldman Plaintiffs further allege that Picower made another loan to BLMIS in 1992 in connection with the SEC's investigation of BLMIS feeder fund Avellino & Bienes:

27

> 68.  Specifically, in 1992, one of BLMIS' largest feeder funds, Avellino & Bienes ('Avellino'), failed and was under SEC investigation.  BLMIS needed cash to pay back Avellino investors and deflect suspicion away from the Ponzi scheme.  After conferring with Madoff, Picower sent $76 million worth of securities from a non-BLMIS account to BLMIS, without consideration.

> 69.  The Picower securities were held in a BLMIS general account, and they were then pledged as security to obtain a bank loan (or multiple loans) to repay the Avellino clients who had invested in BLMIS.  BLMIS falsely represented to a lending bank that BLMIS owned the securities.  The securities that Picower 'loaned' to BLMIS perpetuated the fraud and allowed BLMIS to continue to bringing [sic] new victims into the Ponzi scheme.

(Murphy Decl. Ex. N ¶¶ 68–69.)  As a threshold matter, this allegation is contradicted by the testimony of Frank DiPascali, Jr.—testimony upon which the Goldman Plaintiffs rely.  (*See* Transcript of Proceedings, *United States v. Bonventre*, Case No. 10 Cr. 228 (LTS) (S.D.N.Y. Apr. 3, 2014), ECF No. 856, at 4706–07 ("[Madoff] instructed Annette to receive [the securities] into Mr. Picower's account at Madoff . . . .").)  As with the allegations about the loan in April 2006, these allegations aver nothing more than that the Picower Parties bolstered the Ponzi scheme, which mirrors allegations by the Trustee in his litigation against the Picower Parties.  For instance, in the Trustee's brief in opposition to the Picower Parties' motion to dismiss, the Trustee argued that Picower helped further the Ponzi scheme by accepting only a fraction of his requested redemptions when Madoff could not pay them:

> It is significant, moreover, that as early as 2003 – even before Madoff's scheme began to unravel – BLMIS could not pay Picower the quarterly sums that he was demanding.  Instead, on several occasions starting in September 2003, BLMIS paid Picower only a fraction of the amount that he originally requested.  BLMIS' failure to pay Picower sums that purportedly were in his accounts or otherwise available to him is further evidence that Picower knew or should have known of Madoff's fraud.  This evidence becomes even more compelling given Picower's apparent lack of complaint about his inability to access billions of dollars reported on his BLMIS account statements.

(Murphy Decl. Ex. B at 4–5.)[8]  Just like any customer whom the Trustee has alleged to have

invested with BLMIS without good faith or with knowledge of the Ponzi scheme, Picower's

alleged conduct with respect to his own accounts can be (and has been) alleged to have propped

up the Ponzi scheme.[9]  This harm damaged all BLMIS customers and creditors in the same way:

by furthering the fraud and ultimately depleting BLMIS's ability to pay its creditors.  *See Fox*,

848 F. Supp. 2d at 480.[10]

### B.    The Counterparty Allegations Are Conclusory and Derivative

The Goldman Plaintiffs further allege that Picower agreed to be identified in BLMIS's

books and records as a counterparty for purported options transactions:

> 11.  Picower also acted as a 'counterparty' to phony options trading transactions
> on BLMIS' books that were critical to the 'split-strike' options trading strategy
> that Madoff and BLMIS purported to engage in on a day to day basis, and which
> Madoff touted to investors as his primary investment strategy.

> 78.  Madoff was continually concerned that those who BLMIS identified as
> counterparties to the phony options transactions, such as institutional broker-
> dealers throughout the world, would become subject to heightened scrutiny from
> regulators and from large institutions that did business with BLMIS.  Madoff
> believed that BLMIS needed to frequently name new counterparties for its fake

---

[8] The case settled before the Trustee had the chance to amend his complaint accordingly.
Nevertheless, these claims were considered and settled by the Trustee.  (*See* Murphy Decl. Ex.
C.)

[9] Moreover, the Goldman III Complaint does not clearly allege that Picower became a control
person until approximately 1995, well after the alleged 1992 loan, and as such, the 1992 loan
allegations cannot support the control person claim.  (*See* Murphy Decl. Ex. N ¶ 103 ("December
1, 1995 [is] the approximate date that Picower first became a control person of BLMIS"); *id.*
¶ 65 (alleging that Picower was a control person "at least by December 1, 1995").)

[10] These "new" loan allegations were previously raised by the Goldman Plaintiffs in their brief
relating to the Goldman II Complaint.  (Objection to Motion for Enforcement of Permanent
Injunction and Automatic Stay, *Picard v. Marshall*, Adv. Pro. No. 14-01840-smb (Bankr.
S.D.N.Y. Apr. 18, 2014) ECF No. 20, at 23 ("Picower also loaned BLMIS $125 million . . . .").)
They arguably were thus considered by the Court in enforcing the Permanent Injunction in
Goldman II.

option trades to continue tricking regulators, and the public and prospective and existing customers, into believing BLMIS was actually engaged in large scale options trading necessary to implement BLMIS' purported split-strike options strategy.

79.  BLMIS and Picower agreed that Picower, who was a billionaire, would be listed on BLMIS' fabricated books and records as a counterparty for a large volume of options trading.  Picower knew that there was no such options trading, but agreed to participate in this falsification of BLMIS trading records to deceive auditors, regulators, and BLMIS customers and potential investors and to preserve the Ponzi scheme.  Picower expressly agreed not to disclose the counterparty fraud and that he would warn Madoff if he was questioned by regulators or anyone else about the options transactions.

80.  By agreeing to act as a party to fraudulent options transactions, Picower knowingly controlled the falsification of the books of BLMIS and participated in the preparation and dissemination of false information and material omissions about the legitimacy of the split-strike strategy used to induce BLMIS customers to invest.  This also made Picower an essential element of the Ponzi scheme.

81.  These misrepresentations and omissions were not related to cash withdrawals from Picower's BLMIS accounts and are, therefore, not incident to the fraudulent withdrawal of funds from Picower's BLMIS accounts.

(Murphy Decl. Ex. N ¶¶ 11, 78–81.)  In short, Picower allegedly allowed Madoff to falsely use his name and promised Madoff to back up Madoff's misrepresentations.  Notably, no specifics are alleged as to whether such misrepresentations were made, to whom, or in connection with what transactions Madoff allegedly falsely identified Picower as a counterparty.  Nor are there any allegations as to whether Picower was actually "questioned by regulators or anyone else," *id.* ¶ 79, about any alleged transactions.

Mindful that allegations of conduct by Picower related to his own accounts have repeatedly been found insufficient, the Goldman Plaintiffs state that this alleged conduct was "not related to cash withdrawals from Picower's BLMIS accounts."  *Id.* ¶ 81.  But on their face, these allegations, if true, would be consistent with Picower's ability to withdraw billions of dollars from his own accounts.  And, in fact, the testimony relating to use of customers as counterparties that was adduced at the criminal trial, upon which the Goldman Plaintiffs purport

30

to rely, relate to the deposit of fictitious treasury bills in the customers' own accounts. (*See, e.g.*, Transcript of Proceedings, *United States v. Bonventre*, Case No. 10 Cr. 228 (LTS) (S.D.N.Y. Apr. 3, 2014), ECF No. 862, at 5341–46 (discussing Madoff's instruction to DiPascali to internalize option trades by placing "treasury bills" in client accounts).)

Goldman III's allegations that Picower knowingly  permitted Madoff to make misrepresentations about him do not include any facts suggesting that such conduct was directed specifically towards or actually affected any other particular BLMIS customer.  Rather, the suggestion is that Picower's permission to Madoff generally made it easier for Madoff to continue the fraud, thus harming BLMIS and all BLMIS customers and creditors the same way. In sum, the allegations amount to little more than allegations that Picower supported the Ponzi scheme, which the Trustee, too, alleged in his litigation against the Picower Parties. (*See, e.g.*, Murphy Decl. Ex. A ¶¶ 63(a), 63(i).)   Moreover, as with their allegations about "loans" from the Picower Parties to BLMIS, these allegations are generalized—there is no allegation that any BLMIS customer, much less the Goldman Plaintiffs, was harmed in any specific manner by the identification of Picower as a counterparty to options transactions.

Every court that has considered such "generalized" claims has regarded them as claims that belong to the Trustee.  In *Fox*, 848 F. Supp. 2d at 480, Judge Koeltl ruled that the Fox Plaintiffs' claims were derivative because they sought "to recover for an injury that was inflicted not by specific acts of the Picower [Parties] directed toward the Appellants themselves, and not by violating a duty owed directly to the Appellants, but by a single set of actions that harmed BLMIS and all BLMIS customers in the same way and for the same reason."  He reasoned that the "[t]he alleged wrongful acts harmed every BLMIS investor (and BLMIS itself) in the same way: by withdrawing billions of dollars in customer funds from BLMIS and thus substantially

diminishing the assets available to BLMIS to pay its customers and creditors, and to continue to function." *Id.* (citing *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)).  This reasoning was affirmed by the Second Circuit, which held that the Fox Plaintiffs' claims rested on a "secondary effect from harm done to [the debtor]." *See Marshall*, 740 F.3d at 89 (citing *St. Paul Fire & Marine Ins. Co.*); *id.* at 93.

The Second Circuit contrasted the Fox Plaintiffs' claims with the claims by the Trustee against JPMorgan in *Picard v. JPMorgan Chase & Co.*, 721 F.3d 54 (2d Cir. 2013).  There, the Second Circuit recognized that Judge Koeltl found the Fox Plaintiffs' claims "to be 'general' in the sense articulated in *St. Paul*, in that they arose from 'a single set of actions that harmed BLMIS and all BLMIS customers in the same way.'" *Id.* at 70 n.20 (internal citations omitted).[11]

This reasoning applies with equal force to the Goldman III allegations.  Like the Goldman II Complaint, the Goldman III Complaint does not allege any specific acts by the Picower Parties towards any BLMIS customer, much less towards the Goldman Plaintiffs.  They have not cured the deficiency found by this Court: "beyond conclusory statements that the Picower [Parties'] fraudulent transactions related to their own accounts caused BLMIS to send false statements to other customers, the *New Goldman Complaint* does not allege that the Picower [Parties] 'directed or were at all involved in the creation or dissemination of these statements to other BLMIS customers." *Marshall*, 511 B.R. at 393 (quoting *A&G Goldman P'ship*, 2013 WL 5511027, at *8).

---

[11] It contrasted the Trustee's claims against JPMorgan, reasoning that BLMIS customers' claims against JPMorgan would be particularized because the bank "handl[ed] individual investments made on various dates in varying amounts." *Id.* at 70.  Thus, the Second Circuit twice recognized that third-party claims based on common harms to all customers and the estate are derivative.  *See id.*; *see also Marshall*, 740 F.3d at 89.

Like the Fox Plaintiffs' claims reviewed by the Second Circuit, the claims in the Goldman III Complaint are based on alleged acts by Picower to prop up the Ponzi scheme. This alleged misconduct injured all BLMIS customers and creditors, and BLMIS itself, in the same way, by perpetuating the fraud and depleting customer property that constituted assets of the estate. These "alleged injuries are inseparable from, and predicated upon, a legal injury to the estate namely, the Picower [Parties'] fraudulent withdrawals from their BLMIS accounts of what turned out [to] be other BLMIS customers' funds." *Id.* at 393 (quoting *Marshall*, 740 F.3d at 92.)

## III. THE GOLDMAN III COMPLAINT ATTEMPTS TO CIRCUMVENT THE NET EQUITY DECISION AND SEEKS RECOVERY OF ALL FRAUDULENT TRANSFERS

It is little wonder that the Goldman Plaintiffs' claims are generalized. As they did with the previous versions of their complaints, the Goldman Plaintiffs yet again seek to represent a "shadow estate" of BLMIS customers and creditors based on generalized harms. The "damages" allegations in the Goldman III Complaint amount to allegations that the Goldman Plaintiffs should be entitled to recover *for every fraudulent transfer made by BLMIS*, not just those to the Picower Parties:

> 13. The net amount of customer cash lost in the Ponzi scheme was approximately $18 billion. Picower is responsible for *all* $18 billion of the losses suffered by BLMIS customers: not because he stole $7.2 billion of the $18 billion lost, but because he controlled BLMIS and directed the fraud in numerous ways.

(Murphy Decl. Ex. N. ¶ 13.) No doubt worried that their efforts duplicate those of the Trustee, the Goldman Plaintiffs conversely plead that:

> 14. . . . BLMIS investors lost $11 billion that is separate and apart from any amount fraudulently transferred from BLMIS to Picower. This action seeks recovery of this distinct loss.

(*Id.* ¶ 14.) But what is that "distinct loss" if not an amount above the Goldman Plaintiffs' ratable

share under the Net Equity Decision? The Goldman Plaintiffs clearly seek to represent

essentially all customers who did not receive the amounts on their last account statements:

> 103.  The definition of the Plaintiff Class in this action is:  (1) all brokerage
> customers of BLMIS who entrusted securities or cash to BLMIS between
> December 1, 1995, the approximate date that Picower first became a control
> person of BLMIS, and December 15, 2008, the date that BLMIS entered into
> SIPA liquidation ("Class Period"), and who at such time granted to BLMIS or its
> employees or agents trading authority or discretion with respect to assets in such
> brokerage accounts for trading in the BLMIS Discretionary Trading Program; and
> (2) who have not received the full reported account value of their BLMIS
> account(s) as of the date of the BLMIS bankruptcy/SIPC liquidation (the "Class").

(*Id.* ¶ 103.)

The Goldman Plaintiffs have previously endeavored to create a "shadow" estate of all

customers of BLMIS in order to circumvent the Net Equity Decision.  And each time, the ruling

court has rejected their efforts.  *See In re Madoff*, 477 B.R. 351; *Marshall*, 511 B.R. 375.  As the

late Judge Lifland succinctly put it in reviewing the Goldman I Complaint, "this appears to be

yet another attempt by the [counsel for the Goldman Plaintiffs] to re-litigate this Court's Net

Equity Decision." *In re Madoff*, 477 B.R. at 357.  The Goldman Plaintiffs' efforts to usurp the

fraudulent transfer claims brought by the Trustee to recover amounts exceeding their ratable

share of customer property under the Net Equity Decision should be rejected here too.

## IV.    THE GOLDMAN CLASS ACTION VIOLATES THE AUTOMATIC STAY AND IS VOID *AB INITIO*

Because the claims alleged in the Goldman III Complaint are generalized claims that are

duplicative and derivative of those of the Trustee, they violate the automatic stay, 11 U.S.C.

§ 362(a).  (*See Fox*, 848 F. Supp. 2d at 480–81; Murphy Decl. Ex. D ¶ 8 (injunction was issued

under section 105(a) and section 362(a) of the Bankruptcy Code).)[12]  This Court's issuance of the

Permanent Injunction in connection with the Trustee's settlement with the Picower Parties

effectively made the automatic stay permanent as to derivative and duplicative claims brought

against the Picower Parties.  *See In re Dreier LLP*, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010)

(ruling that the Bankruptcy Court has jurisdiction to "make the automatic stay permanent

following the settlement of a fraudulent transfer claim"); *In re Mrs. Weinberg's Kosher Foods,

Inc.*, 278 B.R. 358, 365 (Bankr. S.D.N.Y. 2002) (Bernstein, J.) (holding that a bankruptcy court

in approving a settlement "may enjoin creditors from prosecuting the settled claims derivatively

in another court").  Here, application of the automatic stay would also make the Goldman action

void *ab initio*.  *See FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 137 (2d. Cir

1992).

     As to the application of the automatic stay, section 362(a)(3) bars "any act to obtain

possession of property of the estate or property from the estate or to exercise control over

property of the estate."  11 U.S.C. § 362(a)(3).  "Property of the estate" includes "all legal or

equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C.

§ 541(a)(1), "wherever located and by whomever held," 11 U.S.C. § 541(a), including causes of

---

[12] The Goldman III Complaint also violates certain stay orders entered by the district court.  The
district court issued stay orders on December 15, 2008, December 18, 2008, and February 9,
2009 (the "Stay Orders") to facilitate the administration of the BLMIS estate.  Specifically, on
December 15, 2008, the district court entered a stay order declaring that "all persons and entities
are stayed, enjoined and restrained from directly or indirectly . . . interfering with any assets or
property owned, controlled or in the possession of [BLMIS]."  (*See* December 15 Stay Order
¶ IV, *SEC v. Bernard L. Madoff*, No. 08-CIV-10791 (reinforcing the automatic stay), ECF No. 4;
*see also* December 18 Stay Order ¶ IX ("no creditor or claimant against [BLMIS], or any person
acting on behalf of such creditor or claimant, shall take any action to interfere with the control,
possession, or management of the assets subject to the receivership"), ECF No. 8; February 9
Stay Order ¶ IV (incorporating and making permanent the December 18 Stay Order), ECF No.
18)  *See Fox*, 429 B.R. at 433 (holding that the Fox Plaintiffs' derivative claims violated the
automatic stay and certain of the Stay Orders).

action possessed by the debtor at the time of filing. *Jackson v. Novak (In re Jackson)*, 593 F.3d

171, 176 (2d Cir. 2010). These provisions are sweeping in scope. "Every conceivable interest of

the debtor, future, nonpossessory, contingent, speculative, and derivative, is within reach of

§ 541." *Kagan v. Saint Vincents Catholic Med. Ctrs. of NY (In re Saint Vincents Catholic Med.*

*Ctrs. of NY)*, 449 B.R. 209, 217 (S.D.N.Y. 2011) (quoting *Chartschlaa v. Nationwide Mut. Ins.*

*Co.*, 538 F.3d 116, 122 (2d Cir. 2008)); *see also In re Quigley Co.*, 676 F.3d 45, 57 (2d. Cir

2012) (central purpose of extending bankruptcy jurisdiction to third party actions is to protect the

assets of the estate). Critically, courts look to the substance and not the form of the purported

action to determine whether it would have an adverse impact on the estate and be barred by the

automatic stay. *See 48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse,*

*Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987).

  The Second Circuit has held that the automatic stay "extends to common claims against

the debtor's alter ego or others who have misused the debtor's property in some fashion." *St.*

*Paul Fire & Marine Ins. Co.*, 884 F.2d at 701; *see Keene Corp. v. Coleman (In re Keene Corp.)*,

164 B.R. 844, 854 (Bankr. S.D.N.Y. 1994) (Bernstein, J.) ("The Court cannot sanction a practice

which permits creditors to assert general, indirect claims in order to achieve a greater distribution

on a first come, first serve basis from assets which the trustee has standing to recover, and which,

if recovered, will be available to satisfy the claims of all creditors."); *A&G Goldman P'ship*,

2013 WL 5511027, at *5 n.7. Actions taken in violation of the automatic stay are void *ab initio*.

*In re Colonial Realty Co.*, 980 F.2d at 137.

  Similarly, section 362(a)(1) bars "the commencement or continuation . . . of a judicial . . .

or other action or proceeding against the debtor . . . or to recover a claim against the debtor . . . ."

11 U.S.C. § 362(a)(1). A "claim against the debtor" encompasses claims against third parties

that, as with those at issue here, are tantamount to claims against the debtor, including fraudulent

transfer actions. *See, e.g.*, *In re Colonial Realty Co.*, 980 F.2d at 137. As this Court found in

*Keene*, "[e]ven if [such] claims are not, themselves, property of the estate, they represent

attempts by creditors to collect claims against the debtor from third parties which the trustee is

authorized to recover under his or her 'strong arm' or avoiding powers" and are stayed by

section 362(a)(1). *In re Keene Corp*, 164 B.R. at 855.

The claims in the Goldman III Complaint are, insofar as they are derivative of the

Trustee's claims, property of the estate, and thus they violate the automatic stay under section

362(a)(3). *See, e.g.*, *Fox*, 848 F. Supp. 2d at 479 (Fox Plaintiffs' claims violate section

362(a)(3)); *In re The 1031 Tax Grp. LLC*, 397 B.R. 670, 679 (Bankr. S.D.N.Y. 2008); *In re

Keene Corp.*, 164 B.R. at 850–55; *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998); *In re

Swallen's, Inc.*, 205 B.R. 879, 884 (Bankr. S.D. Ohio 1997); *In re Madoff*, 477 B.R. at 357.

Likewise, to the extent the claims are nothing more than disguised fraudulent transfer claims,

they violate the automatic stay under section 362(a)(1). *See A&G Goldman P'ship*, 2013 WL

5511027, at *11 (the Goldman Plaintiffs' claims are "deceptively labeled fraudulent conveyance

claims that the Trustee already brought and settled.").[13] For all the same reasons Goldman III

violates the Permanent Injunction, it violates the automatic stay and should not be permitted to

proceed.

---

[13] In addition, even claims owned by the Trustee but not brought would be encompassed both by
the automatic stay and the Permanent Injunction, which reaches claims the Trustee "could" have
brought. Accordingly, claims based on alter ego liability (akin to control person claims) would
belong to the Trustee. *See e.g., In re Cabrini Med. Ctr.*, No. 09-14398 (ALG), 2012 WL
2254386, *1 (Bankr. S.D.N.Y. June 15, 2012) (Gropper, J.).

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court declare that the

Class Action violates the automatic stay and thus is void *ab initio*; declare that the Class Action

violates the Permanent Injunction; and specifically enforce the Permanent Injunction and

automatic stay in these proceedings against the Goldman Plaintiffs and anyone acting on their

behalf.

Dated: November 17, 2014
       New York, New York

                                          Respectfully submitted,

                                           */s/ David J. Sheehan*
                                          David J. Sheehan
                                          Email: dsheehan@bakerlaw.com
                                          Deborah H. Renner
                                          Email: drenner@bakerlaw.com
                                          Tracy L. Cole
                                          Email: tcole@bakerlaw.com
                                          Keith R. Murphy
                                          Email: kmurphy@bakerlaw.com
                                          Amy Vanderwal
                                          Email: avanderwal@bakerlaw.com
                                          Ferve Ozturk
                                          Email: fozturk@bakerlaw.com

                                          Baker & Hostetler LLP
                                          45 Rockefeller Plaza
                                          New York, New York 10111
                                          Telephone: (212) 589-4200
                                          Facsimile: (212) 589-4201

                                          *Attorneys for Irving H. Picard, Trustee for the*
                                          *Substantively Consolidated SIPA Liquidation*
                                          *of Bernard L. Madoff Investment Securities*
                                          *LLC and the Estate of Bernard L. Madoff*