# EXHIBIT B

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

David J. Sheehan
Email: dsheehan@bakerlaw.com
Thomas Lucchesi
Email: tlucchesi@bakerlaw.com

Lauren Resnick
Email: lresnick@bakerlaw.com
Tracy Cole
Email: tcole@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT<br>SECURITIES LLC,<br><br><br>Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation<br>of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>JEFFRY M. PICOWER, individually and<br>as trustee for the Picower Foundation, et al.<br><br>Defendants. | Adv. Pro. No. 09-1197 (BRL) |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS UNDER FED. R. BANKR. P. 7012(b) AND 7009

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................ 2

      I.     Picower benefited tremendously from Madoff's fraud and is not a victim. .......... 2

      II.    Picower knew or should have known that he was benefiting from a fraud. .......... 3

SUMMARY OF ARGUMENT ...................................................................................... 11

ARGUMENT ............................................................................................................... 15

I.      THE ALLEGATIONS AGAINST PICOWER ARE PLED WITH SPECIFICITY ....... 15

II.     THE TRUSTEE HAS ADEQUATELY ALLEGED CONSTRUCTIVE FRAUD ........ 18

      A.    Picower has received ample notice pleading of the constructive fraud
           claims. ................................................................................................ 19

      B.    The preference claim is pled in the alternative. .................................... 21

      C.    Fictitious profit does not constitute fair consideration. ....................... 22

      D.    The Net Equity Dispute is irrelevant to the Trustee's claims and cannot be
           determined in a motion to dismiss. ..................................................... 25

III.    THE TRUSTEE HAS ALLEGED FACTS SUFFICIENT TO PIERCE THE
      CORPORATE VEIL AND HOLD PICOWER LIABLE FOR THE TRANSFERS
      TO ALL DEFENDANTS, AND DEFENDANTS FAIL TO CHALLENGE THE
      SUFFICIENCY OF THE TRUSTEE'S AGENCY ALLEGATIONS ......................... 27

      A.    The Trustee has pled facts sufficient to pierce the corporate veil of each
           Defendant and impose alter ego liability upon Picower and other
           Defendants. ......................................................................................... 28

           1.    The determination of whether to ignore the corporate forms
                 requires a fact specific inquiry into the totality of the
                 circumstances. ........................................................................... 30

           2.    The Complaint amply pleads a basis for piercing the corporate veil ....... 32

      B.    Defendants fail to challenge the Trustee's agency allegations. ........... 34

IV.    ALL DEFENDANTS, INCLUDING THE FOUR NOT LISTED ON EXHIBIT B
      TO THE COMPLAINT, RECEIVED AVOIDABLE TRANSFERS ........................ 36

V.      THE TRUSTEE'S TURNOVER CLAIM IS PROPERLY STATED ........................ 36

VI.    THE RELEVANT DATE FOR THE SIX YEAR CONVEYANCES IS
      CORRECTLY ALLEGED ................................................................................. 39

      A.    State law limitations periods are relevant only until the bankruptcy case is
           filed. ................................................................................................... 39

           1.    Picower's argument contravenes 25 years of bankruptcy case law. ........ 41

# TABLE OF CONTENTS
## (continued)

2. There is no evidence of contrary Congressional intent............................ 45

B. The state statute of limitations has not run. ........................................ 46

1. The Bankruptcy case filing stays the running of the statute of limitations under New York law.......................................................... 47

2. Section 108(c) of the Bankruptcy Code also stays the running of the New York statute of limitations. ............................................... 48

3. The state statute of limitations is also equitably tolled as to both real and hypothetical creditors for claims based on actual fraud. ........... 50

VII. THE TRUSTEE HAS SUFFICIENTLY PLED A CAUSE OF ACTION BASED ON THE DISCOVERY RULE ........................................................................ 51

A. There is no requirement at this stage of the action to specifically identify the creditor(s) whose claims are being asserted.......................................... 52

B. While the Trustee has adequately alleged the existence of creditors who could not reasonably have discovered the fraud, evaluation of this issue is premature. ................................................................................................ 55

1. The evaluation of which investors could or could not have discovered the fraud cannot be made on this motion to dismiss. ........... 56

2. Picower is a sophisticated investor who had access to information – including fraud in his own accounts – that other investors lacked. ...... 57

VIII. THE TRUSTEE HAS PROPERLY ALLEGED A CLAIM TO AVOID SUBSEQUENT TRANSFERS.......................................................................... 59

IX. THE TRUSTEE HAS PROPERLY ALLEGED DISALLOWANCE OF DEFENDANTS' SIPA CLAIMS ................................................................... 62

A. The plain language of Section 502(d) defeats Defendants' argument. ............... 63

B. The Net Equity dispute is not properly before the Court in the context of a motion to dismiss. .......................................................................................... 64

X. DEFENDANTS' MOTION TO DISMISS CERTAIN REQUESTED REMEDIES IN THIS CASE IS PROCEDURALLY IMPROPER AND WITHOUT MERIT.......... 65

# TABLE OF AUTHORITIES

**Page**

## Cases

*546-552 West 146th Street LLC v. Arfa*, 863 N.Y.S.2d 412 (1st Dep't 2008)............................ 34

*Acciai Speciali Terni USA, Inc. v. Momene*, 202 F. Supp. 2d 203 (S.D.N.Y. 2002) ............. 29, 30

*Am. Express Travel Related Servs. Co., Inc. v. N. Atl. Resources, Inc.,* 691 N.Y.S.2d 403 (1st Dep't 1999) ....................................................................................................................... 35

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79 (S.D.N.Y. 2004) ..................................................................................................................................... 22

*Andrew Velez Constr., Inc. v. Consolidated Edison Co. of New York (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262 (Bankr. S.D.N.Y. 2007).................................................... 37, 66

*Apollo Fuel Oil v. United States*, 195 F.3d 74 (2d Cir. 1999) ..................................................... 34

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009)................................................................................... 15

*Baldi v. Samuel Son & Co. (In re McCook Metals, LLC)* No. 05 C 2990, 2007 WL 4287507 (N.D. Ill. Dec. 4, 2007), *aff'd*, 548 F.3d 579 (7th Cir. 2008)................................................. 43

*Bano v. Union Carbide Corp.*, 273 F.3d 120 (2d Cir. 2001) ....................................................... 35

*Barnhill v. Johnson*, 503 U.S. 393 (1992) ................................................................................. 22

*Barr v. Charterhouse Group Int'l, Inc. (In re Everfresh Beverages, Inc.)*, 238 B.R. 558 (Bankr. S.D.N.Y. 1999).................................................................................................................... 44

*Bash v. Cunningham (In re Cunningham)*, Adv. No. 07-01146, 2008 WL 2746023 (Bankr. N.D. Ohio July 11, 2008) .............................................................................................................. 44

*Bay State Milling Co. v. Martin (In re Martin)*, 142 B.R. 260 (Bankr. N.D. Ill. 1992)......... 41, 46

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008) ........................................................................................ 17

*Bayou Superfund, LLC v. WAM Long/Short Fund II, LLP (In re Bayou Group, LLC)*, 362 B.R. 624 (Bankr. S.D.N.Y. 2007) ..................................................................................20, 22, 23

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1 (S.D.N.Y. 2007) ..................................................................................................................................... 16

*Belford v. Martin-Trigona (In re Martin-Trigona)*, 763 F.2d 503 (2d Cir. 1985)...................... 49

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)..............................................15, 18, 20, 60

*Bertrum v. Laughlin (In re Laughlin)*, 18 B.R. 778 (Bankr. W.D. Mo. 1982) ............................ 67

*Bloom v. Fry (In re Leach)*, 380 B.R. 25 (Bankr. D.N.M. 2007)................................................ 41

*Brown v. General Elec. Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229 (Bankr. D. Del. 2003) .................................................................................................................................. 29

*Browning v. Williams (In re Silver Wheel Freightlines, Inc.)*, 64 B.R. 563 (Bankr. D. Or. 1986)42

*Buchman v. Am. Foam Rubber Corp.*, 250 F. Supp. 60 (S.D.N.Y. 1965)................................... 44

*Capital Wireless v. Deloitte*, 627 N.Y.S.2d 794 (3d Dep't 1995)................................................ 34

*Carr v. Equistar Offshore Ltd.*, No. 94 Civ. 5567, 1995 WL 562178 (S.D.N.Y. Sept. 21, 1995) 61

*CDS Recoveries L.L.C. v. Davis*, 715 N.Y.S.2d 517 (3d Dep't 2000)........................................ 47

*Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828 (N.Y. 1985)............................................... 34

*Cohen v. Koenig*, 25 F.3d 1168 (2d Cir. 1994)........................................................................... 35

*Collins v. Kohlberg & Co. (In re Southwest Supermarkets, LLC)*, 325 B.R. 417 (Bankr. D. Ariz. 2005) ...................................................................................................................................... 50

*Conley v. Gibson*, 355 U.S. 41 (1957)....................................................................................... 20

*Crigger v. Fahnestock & Co.*, 443 F.3d 230 (2d Cir. 2006)....................................................... 58

*Crosee v. BCBSD, Inc.*, 836 A.2d 492 (Del. 2003) ................................................................... 29

*Dampskibsselskabet AF 1912 v. Black & Geddes, Inc. (In re Black & Geddes, Inc.)*, 16 B.R. 148 (Bankr. S.D.N.Y. 1981) ......................................................................................................... 66

*DelCostello v. Int'l Broth. Of Teamsters*, 462 U.S. 151 (1983)................................................. 40

*DirecTV, Inc. v. Webb*, 545 F.3d 837 (9th Cir. 2008) ................................................................ 40

*Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008), *cert. denied*, 129 S.Ct. 640 (2008) ........... 20, 23

*Doyle v. Paolino (In re Energy Savings Center, Inc.)*, 61 B.R. 732 (E.D. Pa. 1986) ........... 38, 39

*Drenis v. Haligiannis*, 452 F. Supp. 2d 418 (S.D.N.Y. 2006) .................................................. 16

**TABLE OF AUTHORITIES**
(continued)

*Dzikowski v. Friedlander (In re Friedlander Capital Mgmt.)*, Adv. No. 05-03088-PGH, 2009
    WL 1231085 (Bankr. S.D. Fla. Apr. 29, 2009) .................................................................. 44

*Eisenberg v. Feiner (In re Ahead By A Length, Inc.*), 100 B.R. 157 (Bankr. S.D.N.Y. 1989)..... 41

*Erbe v. Lincoln Rochester Trust Co.,* 144 N.E.2d 78 (N.Y. 1957) ............................................. 56

*Erickson v. Pardus*, 551 U.S. 89 (2007) ........................................................................... 19, 59

*ESI, Inc. v. Coastal Power Prod. Co.*, 995 F.Supp. 419 (S.D.N.Y. 1998) .................................. 66

*Espinosa v. Rand*, 806 N.Y.S.2d 186 (1st Dep't 2005) ............................................................ 35

*FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125 (2d Cir. 1992) .....................38, 47, 48

*Feldman v. First Nat'l City Bank*, 511 F.2d 460 (2d Cir. 1975) ................................................ 44

*Fink v. Graven Auction Co. (In re Graven)*, 64 F.3d 453 (8th Cir. 1995) ................................... 43

*First Union Nat'l. Bank v. Gibbons (In re Princeton-New York Inv. Inc.)*, 219 B.R. 55 (D.N.J.
    1998) ............................................................................................................................. 41

*Fitzgibbons v. Thomason (In re Thomason)*, 202 B.R. 768 (Bankr. D. Colo. 1996) ................... 50

*Fletcher v. Atex, Inc.*, 68 F.3d 1451(2d Cir. 1995) ............................................................ 28, 29

*Geyer v. Ingersoll Publications Co.*, 621 A.2d 784 (Del. Ch. 1992) ..................................... 29, 31

*G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612
    (Bankr. D.N.J. 2004) .................................................................................................. 42, 48

*Global Crossing Estate Rep. v. Winnick*, No. 04 Civ. 2558, 2006 WL 2212776 (S.D.N.Y. Aug. 3,
    2006) ........................................................................................................................ 44, 54

*Glosser v. S. & T. Bank (In re Ambulatory Medical & Surgical Health Care)*, 187 B.R. 888
    (Bankr. W.D. Pa. 1995) .................................................................................................. 42

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) .................................................................. 15

*Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409 (2005).. 40

*Granite Partners, L.P. v. Bear, Stearns & Co.,* 58 F. Supp. 2d 228 (S.D.N.Y. 1999)................. 58

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd)*, 359 B.R. 510 (Bankr.
    S.D.N.Y. 2007), *aff'd in part and rev'd in part sub nom. Bear, Stearns Sec. Corp. v. Gredd (In
    re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1 (S.D.N.Y. 2007).................................................. 16

## TABLE OF AUTHORITIES
(continued)

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729 (2d Cir. 1984)) ....................... 58

*Halpert v. Engine Air Serv., Inc.*,116 F. Supp. 13 (E.D.N.Y. 1953) ............................................. 44

*Hassett v. Zimmerman (In re OPM Leasing Servs., Inc.*), 32 B.R. 199 (Bankr. S.D.N.Y. 1983) 16, 43, 51

*Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007) ....................................................................... 26

*Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165 (Bankr. S.D.N.Y. 1998) .. 43, 66

*Hoffenberg v. Hoffman & Pollok*, 288 F.Supp.2d 527 (S.D.N.Y. 2003) ........................................ 51

*Hunter v. Hansen (In re Hansen)*, 114 B.R. 927 (Bankr. N.D. Ohio 1990) ................................. 45

*Ideal Steel Supply Corp. v. Fang*, 767 N.Y.S.2d 644 (2d Dep't 2003) ......................................... 35

*In re Asia Global Crossing, Ltd.*, 333 B.R. 199 (Bankr. S.D.N.Y. 2005) ..................................... 64

*In re Koreag, Controle et Revision S.A.*, 961 F.2d 341 (2d Cir. 1992) ........................................ 66

*In re Mid Atlantic Fund, Inc.*, 60 B.R. 604 (Bankr. S.D.N.Y. 1986) ............................................ 63

*In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514 (Bankr. S.D.N.Y. 1996) ........................................................................................................................... 53, 54

*In re Taubman*, 160 B.R. 964 (Bankr. S.D. Ohio 1993) ...........................................20, 22, 23, 24

*In re Vitreous Steel Prods. Co.*, 911 F.2d 1223 (7th Cir. 1990) ................................................. 50

*Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983 (Del. Ch. 1987) .......................... 29

*Jalbert v. Zurich Am. Ins. Co. (In re Payton Constr. Corp.),* 399 B.R. 352 (Bankr. D. Mass. 2009) ....................................................................................................................................... 21

*Jenkins v. New York City Transit Authority*, --- F. Supp. 2d ---, No. 08 Civ 6814, 2009 WL 1940103 (July 1, 2009) ........................................................................................................... 15

*Kaliner v. Load Rite Trailers, Inc. (In re Sverica Acquisition Corp.),*179 B.R. 457 (Bankr. E.D. Pa. 1995) ............................................................................................................................ 42, 48

*L.A. Clarke & Son, Inc. v. Donald (In re L.A. Clarke & Son, Inc.)*, 59 B.R. 856 (Bankr. D.D.C. 1986) ......................................................................................................................................... 42

*Lawler v. RepublicBank Dallas (In re Lawler)*, 53 B.R. 166 (Bankr. N.D. Tex. 1985) ............. 44

**TABLE OF AUTHORITIES**

(continued)

Page

*Lefkowitz v. Appelbaum*, 685 N.Y.S.2d 460 (2d Dep't 1999) ....................................... 51

*Levit v. Spatz (In re Spatz)*, 222 B.R. 157 (N.D. Ill. 1998) .......................................... 41

*Lippe v. Bairnco Corp.*, 225 B.R. 846 (S.D.N.Y. 1998) ............................................... 51

*Lopresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997) ................................................... 35

*Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, 1998 WL 5492 (Del. Ch. 1988) ................. 30

*Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, CIV.A. No. 8578, 1990 WL 44267 (Del. Ch. Apr. 12, 1990) ......................................................................................... 31

*MacLeod v. Kapp*, 81 F. Supp. 512 (S.D.N.Y. 1948) ................................................. 44

*Mahoney, Trocki & Assocs., Inc. v. Kunzman (In re Mahoney, Trocki & Assocs., Inc.)*, 111 B.R. 914 (Bankr. S.D. Cal. 1990) ................................................................... 40

*Mancuso v. Cont'l Bank Nat'l Ass'n Chicago (In re Topcor, Inc.)*, 132 B.R. 119 (Bankr. N.D. Tex. 1991) ......................................................................................... 41, 45, 46

*Marine Midland Bank v. John E. Russo Produce Co.*, 405 N.E.2d 205 (N.Y. 1980) ................. 35

*Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646 (Bankr. E.D.N.Y. 2008) ... 19, 21, 37, 38, 39

*Mercury Capital Corp. v. Shepherds Beach, Inc.*, 723 N.Y.S.2d 48 (2d Dep't 2001) ................ 47

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) ......................................... 35

*Mi-Lor Corp. v. Gottsegen (In re Mi-Lor Corp.)* 233 B.R. 608 (Bankr. D. Mass. 1999) ........... 41

*Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260 (D. Del. 1989) ........................... 29, 30

*Most v. Monti*, 456 N.Y.S.2d 427 (2d Dep't 1982) ..................................................... 59

*Netjets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168 (2d Cir. 2008) . 30, 31, 32, 33, 34

*O'Connell v. Shallo (In re Die Fleidermaus LLC)*, 323 B.R. 101 (Bankr. S.D.N.Y. 2005) ........ 42

*Official Comm. of Unsecured Creditors v. Reliance Capital Group, Inc. (In re Buckhead America Corp.)*, 178 B.R. 956 (D. Del. 1994) ...................................................... 31

*Old Orchard Bank & Trust Co. v. Josefik (In re Josefik)*, 72 B.R. 393 (Bankr. N.D. Ill. 1987) .. 43

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Orbach v. Pappa,* 482 F. Supp. 117 (S.D.N.Y. 1979) ................................................. 22

*Orr v. Bernstein (In re Bernstein)*, 259 B.R. 555 (Bankr. D.N.J. 2001) .............................. 42, 48

*Pauley Petroleum, Inc. v. Continental Oil Co.,* 231 A.2d 450 (Del. Ch. 1967), *aff'd,* 239 A.2d 629 (Del. 1968) ...................................................................................................... 30

*Phillips v. Levie*, 593 F.2d 459 (2d Cir. 1979) .......................................................... 51

*Polonetsky v. Better Homes Depot, Inc.*, 760 N.E.2d 1274 (N.Y. 2001) .................................. 35

*Publicker Indus. v. Roman Ceramics Corp.,* 603 F.2d 1065 (3d Cir. 1979) .............................. 30

*Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.),* 398 B.R. 761 (Bankr. S.D.N.Y. 2008) ........................................................ 52, 53, 54

*Robertson-Ceco Corp. v. Cornelius*, No. 3:03cv475, 2007 WL 1020326 (N.D. Fla. Mar. 30, 2007) ................................................................................................................. 29

*Rosania v. Haligas (In re Dry Wall Supply, Inc.)*, 111 B.R. 933 (D. Colo. 1990) .......... 40, 41, 46

*Schmidt v. McKay*, 555 F.2d 30 (2d Cir. 1977) ................................................. 51, 56, 57

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) ............................................. 20, 22, 23, 24, 27

*Sears Petroleum & Trans. Co. v. Burgess Constr. Servs., Inc.*, 417 F. Supp. 2d 212 (D. Mass. 2006) .................................................................................................................. 41

*Sec. Investor Protect. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr. S.D.N.Y. 1999) .. 19

*Seligson v. N.Y. Produce Exch.*, 378 F. Supp. 1076 (D.C.N.Y. 1974) ...................................... 44

*Sender v. Buchannan (In re Hedged-Investments Assocs.)*, 84 F.3d 1286 (10th Cir. 1996) . 20, 22, 23, 24

*Shlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91 (2d Cir. 1997) ............................. 58

*Silverman v. K.E.R.U. Realty, Corp. (In re Allou Distribs.),* 379 B.R. 5 (Bankr. E.D.N.Y. 2007) ................................................................................................................... 59

*Simonds v. Simonds*, 380 N.E.2d 189 (N.Y. 1978) ....................................................... 66

*Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647 (S.D. Tex. 2007) ....................................... 41

*Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429 (S.D.N.Y. 2006) ......................................... 58

**TABLE OF AUTHORITIES**
(continued)

*Steege v. Lyons (In re Lyons)*, 130 B.R. 272 (Bankr. N.D. Ill. 1991) ................................... 44, 48

*T.C.I. Ltd. v. Sears Bank & Trust Co. (In re T.C.I. Ltd.)*, 21 B.R. 876 (Bankr. N.D. Ill. 1982) ... 44

*Tab P'ship v. Grantland Fin. Corp.*, 866 F. Supp. 807 (S.D.N.Y. 1994) ............................ 56, 58

*Tabas v. Gigi Advertising Partnership (In re Kaufman & Roberts, Inc.)*, 188 B.R. 309 (Bankr. S.D. Fl. 1995) ............................................................................................................. 42

*Tekinsight.com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503 (Bankr. S.D.N.Y. 2000) ............................................................................................................ 66

*Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46 (Bankr. S.D.N.Y. 2004) ....... 29

*Trepuk v. Frank*, 376 N.E.2d 924 (N.Y. 1978) *rev'd on other grounds*, 437 N.E.2d 278 (N.Y. 1982) ............................................................................................................................ 56

*Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521 (D. Del. 2008) ................................................. 31

*Tsai v. Buildings By Jamie, Inc. (In re Buildings by Jamie, Inc.)*, 230 B.R. 36 (Bankr. D.N.J. 1998) ........................................................................................................................... 41

*Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119 (S.D.N.Y. 1996) .............................. 31

*United States v. Bestfoods,* 524 U.S. 51 (1998) ......................................................................... 28

*United States v. Golden Acres, Inc.*, 702 F. Supp. 1097 (D. Del. 1988), *aff'd*, 879 F.2d 857 (3d Cir. 1989) .................................................................................................................... 31

*Visconsi v. Lehman*, No. 06-3304, 2007 WL 2258827 (6th Cir. Aug. 8, 2007) ................... 23, 24

*Wallace v. Wood*, 752 A.2d 1175 (Del. Ch. 1999) ................................................................... 29

*Wassau Business Ins. Co. v. Turner Const. Co.*, 141 F. Supp. 2d 412 (S.D.N.Y. 2001) ............. 28

*William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir. 1991) ....................................................................................................... 28, 30, 32, 33, 34

*Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*, 881 F.2d 801(9th Cir. 1989) ............... 46

*Woods & Erickson LLP v. Leonard (In re Avi, Inc.)*, 389 B.R. 721(B.A.P. 9th Cir. 2008) ......... 39

*Young v. Paramount Commc'ns, Inc. (In re Wingspread Corp.)*, 178 B.R. 938 (Bankr. S.D.N.Y. 1995) ........................................................................................................................... 53

*Zahn v. Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I. 1998) ................................................ 52, 56

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Zilkha Energy Co. v. Leighton,* 920 F.2d 1520 (10th Cir. 1990) ......................................... 45, 46

*Zubik v. Zubik*, 384 F.2d 267 (3d Cir. 1967)) .......................................................... 30

*Zuckerman v. 234-6 W. 22nd St. Corp.*, 645 N.Y.S.2d 967 (Sup. Ct. 1996) .............................. 47

**Statutes**

11 U.S.C. § 108 (2009) ................................................................. 13, 44, 48, 49, 50

11 U.S.C. § 362 (2009) ................................................................................ 47

11 U.S.C. § 502 (2009) ..................................................... 14, 51, 62, 63. 64

11 U.S.C. § 541 (2009) ................................................................................ 38

11 U.S.C. § 542 (2009) ............................................................................ 37, 38

11 U.S.C. § 544 (2009) ............................................... 13, 37, 39, 40, 41, 42, 43, 44, 45,
.......................................................................46, 47, 48, 49, 50, 51, 52, 54

11 U.S.C. § 546 (2009) ...................................40, 41, 42, 43, 44, 45, 46, 48

11 U.S.C. § 547 (2009) ............................................................................ 37, 63

11 U.S.C. § 548 (2009) ...................................19, 63, 37, 38, 40, 43, 44

11 U.S.C. § 550 (2009) ...................................................59, 63, 66

15 U.S.C. § 78*aaa et seq.* (2009) ................................................................. 11

15 U.S.C. § 78*fff*-2(b) (2009) ...................................................................... 64

15 U.S.C. § 78*fff*-2(c)(3) (2009) .................................................................. 37

15 U.S.C. § 78*lll*(11) (2009) ................................................................. 25, 62

N.Y. C.P.L.R. § 203 (McKinney 2009) ......................................................... 50, 51

N.Y. C.P.L.R. § 204 (McKinney 2009) ......................................................... 47, 48

N.Y. Debt. & Cred. Law § 272 (McKinney 2009) ............................................. 19, 27

N.Y. Debt. & Cred. Law § 273 (McKinney 2009) ................................................. 19

**TABLE OF AUTHORITIES**

(continued)

N.Y. Debt. & Cred. Law § 274 (McKinney 2009)......................................................... 51

N.Y. Debt. & Cred. Law § 275 (McKinney 2009)......................................................... 51

N.Y. Debt. & Cred. Law § 276 (McKinney 2009)......................................................... 51

N.Y. Debt. & Cred. Law § 278 (McKinney 2009)......................................................... 51

N.Y. Debt. & Cred. Law § 279 (McKinney 2009)......................................................... 51

**Rules**

Fed. R. Civ. P. 8 (2009)........................................................................................... 22, 59

Fed. R. Civ. P. 9 (2009)......................................................................................15, 19, 61

Fed. R. Civ. P. 12(b)(6) (2009) .................................................................................. 62

Fed. R. Civ. P. 54(c) (2009) ....................................................................................... 65

**Treatises**

4 *Collier on Bankruptcy* ¶ 544.03[2] (L.King 15th ed. 1989) ...................................... 44

5 *Collier on Bankruptcy* ¶ 544.09 (2009) ................................................................. 44

5 *Collier on Bankruptcy* ¶ 546.02 (2009) ........................................................... 42, 46

5 *Collier on Bankruptcy* ¶ 546.LH (2009)................................................................. 46

5 *Collier on Bankruptcy* ¶ 548.05 (2009) ................................................................. 26

5 *Collier on Bankruptcy* ¶ 550.07 (2009) ................................................................. 39

William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 41.32 (2009)........ 29

Stephen B. Presser, *Piercing the Corporate Veil* § 2.8 (2009) .................................... 28

Wright and Miller, 5 Fed. Prac. & Proc. Civ.3d § 1215 (2009)................................... 60

Wright and Miller, 5 Fed. Prac. & Proc. Civ.3d § 1255 (2009)................................... 65

## PRELIMINARY STATEMENT

Jeffry Picower took from Bernard L. Madoff Investment Securities ("BLMIS") more than

$7 billion of other investors' money under circumstances that, at a minimum, should have put

him on notice of fraud.  In response to the Trustee's avoidance action, Picower (together with the

other Defendants, all of which are controlled by him) has moved to dismiss many of the causes

of action asserted by the Trustee.[1]  Picower's motion, however, is, by its own admission, little

more than a public relations exercise designed to cast Picower as an innocent victim of Madoff's

scheme.[2]

Although his motion presents a myriad of supposed background facts – almost all of

which are irrelevant to the question of whether the Trustee has stated a claim and some of which

are directly contradictory to what is asserted in the Trustee's Complaint – Picower fails to

acknowledge the billions of dollars of other investors' money that he received from BLMIS.

Despite Picower's contention that the Complaint fails to plead fraud properly, Picower also fails

even to acknowledge – let alone respond to – the stark evidence of fraud that occurred in his

BLMIS accounts and that is described throughout the Trustee's Complaint.  The few arguments

---

[1] The Trustee seeks recovery of avoidable transfers from each Defendant.  Based on the evidence available to the Trustee, it is apparent that Picower controlled all of the BLMIS accounts at issue.  In addition to Picower's control of the accounts described herein, and as alleged in the Complaint, Picower and/or Decisions Inc. ("Decisions") (described in Picower's motion as "the principal entity through which Mr. Picower transacts his investment business") is a general partner or director of Capital Growth Company, JA Primary Limited Partnership, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JFM Investment Company, JLN Partnership, JMP Limited Partnership, Jeffry M. Picower Special Co., Favorite Funds, Jeffry M. Picower P.C. (collectively, and together with Decisions, the "Picower Corporate Entities") and a Trustee of the Picower Foundation.  (Compl. ¶¶ 37–49, 53.)  According to publicly available filings with the U.S. Securities and Exchange Commission, Picower is the sole stockholder, sole director, and Chairman of the Board of Decisions.  *See, e.g.*, Alaris Medical System Inc., Statement of Changes in Beneficial Ownership (Form 4) (June 25, 2004) (Jeffry M. Picower), *available at* http://sec.gov/Archives/edgar/data/817161/000090266404001043/xslF345X02/srz04-0471_ex.xml.  Decisions and most of the Picower Corporate Entities maintained an address at 22 Saw Mill River Road, Hawthorne, New York, a store front office where little or no business was conducted.  (Compl. ¶ 37 *et seq.*)  Throughout this response, the Trustee may refer to "Picower" and "the Defendants" interchangeably.

[2] (*See* Def.'s Mot. to Dismiss at 4 n.2 [hereinafter "MTD"] (acknowledging that the "facts provided herein are not offered or relied upon as bases for dismissal of the Complaint.  Rather, these background facts are simply presented to correct and provide context to facts alleged in the Complaint.").)

by Picower that do acknowledge the factual allegations in the Complaint are not cognizable

bases for a motion to dismiss.

Though Picower's alleged facts generally are, as Picower concedes, irrelevant to the

determination of the motion, it would be irresponsible for the Trustee to let the most egregious

misrepresentations stand uncorrected. Accordingly, some of them are addressed in the following

section.

## BACKGROUND

### I.    PICOWER BENEFITED TREMENDOUSLY FROM MADOFF'S FRAUD AND IS NOT A VICTIM.

The theme of Picower's motion to dismiss is that he, like other BLMIS investors, is a

"victim" of Madoff's fraud, suffering "devastating" and "immeasurable" loss. Nothing could be

further from the truth. Many investors were damaged by the BLMIS fraud, but Picower was not

one of them. Based upon the Trustee's investigation to date, Picower was instead the biggest

beneficiary of Madoff's scheme, having withdrawn either directly or through the entities he

controlled more than $7.2 billion of other investors' money. Of this amount, more than $2.4

billion was received by Picower within the past six years alone. The sums received by Picower

are staggering by any measure. Given that Picower withdrew more of other investors' money

than any other customer of BLMIS, Picower's repeated references to himself as a "victim" ring

hollow.

Picower also claims that he is a victim of "overreaching" by the Trustee. Picower

contends that this action is driven by the Trustee's desire to "favor later BLMIS investors over

earlier ones." (MTD at 2.) The Trustee, Picower claims, unfairly paints him as a villain in "a

frenzied effort to deliver to the estate unprecedented sums from one of Madoff's wealthiest

investors." (MTD at 4.) Picower is mistaken. It is the Trustee's obligation to bring actions on

behalf of the estate to recover avoidable transfers.  Seeking the recovery of fictitious profits received by investors in a Ponzi scheme is wholly appropriate.  Indeed, the law is well-settled that the Trustee can recover such payments within the relevant periods regardless of the investors' good faith or lack of knowledge of the scheme.  Even if Picower were, as he claims, "taken in" by Madoff, and even putting aside the evidence of patent fraud discovered by the Trustee and alleged in the Complaint, the Trustee would still be entitled to recover the billions of dollars in false profits – funds obtained from other investors – that BLMIS paid to Picower.  If Picower is correct that recovery by the Trustee in this case will "deliver to the estate unprecedented sums" (*see* MTD at 4), that is only because Picower received an unprecedented amount of other investors' money from BLMIS.

## II.  PICOWER KNEW OR SHOULD HAVE KNOWN THAT HE WAS BENEFITING FROM A FRAUD.

As alleged in the Complaint, Picower's accounts were riddled with blatant and obvious fraud.  The Complaint alleges, among other things, that Picower's accounts reported:  profitable trading before they were opened or funded (*see* Compl. ¶ 63(e)); execution of trading instructions that hadn't yet been given (*see, e.g.*, Compl. ¶¶ 63(f), (h), (i)); inexplicable changes in account positions (*see, e.g.*, Compl. ¶ 63(i)); outlandish returns (*see, e.g.*, Compl. ¶¶ 3, 63(a)-(c), (e)); and – at Picower's direction – the accomplishment of investment results over time periods that already had expired (*see* Compl. ¶ 63(f)).  Indeed, the Complaint alleges purported trading that is so inconsistent with normal trading activity as to compel the conclusion that Picower had to have known that improper trading activity was occurring.  Faced with these allegations of fraud, Picower argues only that his withdrawal of large sums of money is inconsistent with his participation in the Ponzi scheme and challenges certain examples of purported rates of return.  The allegations of irregular account activity are otherwise completely

3

disregarded.  Presumably, this is because the facts alleged in the Complaint indisputably establish, at a minimum, that Picower was – or should have been – on notice that he was participating in a fraud.

### A.    Picower's profit from the Ponzi scheme does not prove his innocence.

Picower makes the paradoxical argument that he could not have been complicit in the Ponzi scheme because he made too much money from it.  His enormous withdrawals, he argues, would have placed a strain on BLMIS because they required BLMIS to raise additional billions of dollars on short notice.  Thus, Picower contends, the fact of his large withdrawals establishes that he must have been unaware of the fraud.  This argument does not speak to the legal sufficiency of the allegations in the Complaint, as is required in a motion to dismiss.  Nonetheless, Picower's premise that making billions of dollars from a Ponzi scheme is a badge of innocence is dubious at best.  And it is not merely the sheer amount of profit he reaped that should have put Picower on notice of fraud.  As alleged in the Complaint, the unusual (if not unlawful) activity in his accounts, including one reported *negative* net cash balance of approximately $6 billion at the time of Madoff's arrest (Compl. ¶ 63(d)), was clear evidence that something was seriously amiss at BLMIS.  No legitimate broker-dealer would allow this investor to maintain such a staggering margin balance.

As to Picower's argument that his withdrawals must have strained the Ponzi scheme, it is worth noting that Picower's largest withdrawals were generally made quarterly. (*See* Compl. Ex. A.)  Accordingly, BLMIS could anticipate Picower's withdrawals and there was no need for Madoff to raise the funds on short notice.  It is significant, moreover, that as early as 2003 – even before Madoff's scheme began to unravel – BLMIS could not pay Picower the quarterly sums that he was demanding.  Instead, on several occasions starting in September 2003, BLMIS paid Picower only a fraction of the amount that he originally requested.  BLMIS' failure to pay

Picower sums that purportedly were in his accounts or otherwise available to him is further

evidence that Picower knew or should have known of Madoff's fraud. This evidence becomes

even more compelling given Picower's apparent lack of complaint about his inability to access

billions of dollars reported on his BLMIS account statements.

**B.  Picower knew or should have known of obvious fictitious activity in his own accounts.**

Picower complains that the Trustee has failed to allege with specificity facts that would

demonstrate that he was on notice of fraud at BLMIS. Among the many flaws in this argument

is that Picower simply ignores the pages of detailed factual allegations in the Complaint

describing patent fraud in his accounts. While not apparent from Picower's lone allusion to

"what the Trustee refers to as Madoff's 'backdating' of certain trades" in certain years (MTD at

16), the Complaint describes numerous examples of conduct specific to Picower's accounts that

should have made it clear that he was participating in a fraud.

Despite Picower's attempts to wave them off, the instances of "backdating" alleged in the

Complaint are far from minor or isolated events. For example, the Complaint alleges that on

April 18, 2006, Picower wired $125 million to BLMIS in order to open an account. (Compl. ¶

63(e).) This deposit constituted more than 1/4 of the total cash that Picower ever invested in

BLMIS. Within two weeks, the $125 million deposit had purportedly grown to $164 million

because of a dramatic "gain" on the securities held in the account – all of which supposedly had

been purchased three months earlier, in January. (Compl. ¶ 63(e).) So Picower, who carefully

monitored these accounts through his own portfolio appraisal system as well as through portfolio

management reports and customer statements received from BLMIS, knew or should have

known that within two weeks after he opened his account, he had made almost $40 million from

trading that supposedly occurred months before the account was opened or funded. Because of

this spectacular – and obviously fictitious – trading success, Picower was able to withdraw his

original $125 million within five months of investing it, leaving a purported $81 million in the

account to enjoy continued "growth" in value.  This is but one example of patently fraudulent

activity.  Numerous other incidents are alleged in the Complaint and otherwise known to the

Trustee based on his continued investigation.  There is no legitimate explanation for these events

nor any possibility that they escaped Picower's notice.

        1.    <u>Picower closely monitored his BLMIS accounts.</u>

As a threshold matter, the Complaint alleges that Picower knew or should have known

about the fraud in Defendants' accounts because he controlled and closely monitored each

account.  The Complaint alleges that Picower directed withdrawals from and transfers among the

various accounts; directed supposed trading activity within the accounts, including direction that

sales or purchases be made for purposes of achieving gains or losses; directed payments to and

among various Defendants from various accounts; and executed customer agreements, trade

authorization agreements and other documentation for the accounts.  (Compl. ¶ 60.)  The

Complaint also alleges that, together with his agent April Freilich, Picower maintained his own

computerized client appraisal or portfolio appraisal system, through which he tracked and

monitored each account, including the securities purportedly held in each account, the date they

were supposedly purchased, the price, the quantity, and the unrealized gain or loss.  (Compl. ¶

61.)  In addition, Picower was one of a select few BLMIS investors who, according to BLMIS

records, received the full "portfolio management report" generated by BLMIS.  Among other

things, these BLMIS reports included a target rate of return (Compl. ¶ 59) against which the

purported actual rate of return, which also was included, could be tracked.  Thus, as alleged in

the Complaint, due to his active involvement in his BLMIS accounts and investments, Picower

was or should have been aware of all of the activity alleged in each of his accounts.

2.    <u>Picower was aware of fraudulent activity in his accounts.</u>

Picower fails to address in any way the Trustee's allegations of specific fraudulent activity in his accounts because they alone suffice to defeat his motion, even without all of the other indicia of fraud alleged in the Complaint. The Complaint identifies specific fraudulent transactions, generally including date, account, and amount at issue, in more than sufficient detail to put Picower on notice of the basis of the Trustee's claims. For example:

• The Complaint alleges that according to BLMIS records, in May 2007, Picower and Freilich asked BLMIS employees to change the trading activity that had supposedly occurred in the Picower Foundation Account for January and February 2006 in order to generate additional gains. (Compl. ¶ 63(f).) After some discussion about the exact amount of gain Picower wanted, and clarification that the gains should be for 2007, Freilich directed BLMIS to generate $12.3 million in gains for January and February.[3] (Compl. ¶ 63(f)(*i*).) Although it was several months too late to make any actual trades in January or February, BLMIS created statements that reported new transactions in January and February 2007 resulting in a purported gain of $12.6 million. (Compl. ¶ 63(f)(*ii*).) Putting aside the fact that Picower and his agent *specifically directed* such fictitious activity, this revisionist history was or should have been obvious to Picower, who monitored these accounts through customer statements, his own portfolio appraisal system, and BLMIS' full portfolio management report. Picower knew or should have known that the Picower Foundation's May 2007 statement reflected different holdings than had been reflected in its account statements for January through April 2007.

---

[3] Although the Complaint specifies that the trades took place in 2007 (Compl. ¶ 63(f)(*ii*) ("transactions for the months of January and February 2007")), elsewhere it suggests that they took place in 2006, consistent with Freilich's original suggestion. (Compl. ¶ 63(f)(*ii*) ("…more than 15 months earlier").) For clarity, the trades were reported by BLMIS as taking place in January and February 2007, three to four months before the conversations at issue.

(Compl. ¶ 63(f)(*ii*).)  The total value of the account was $54.6 million higher on May 31, 2007

than it had been in April 2007 largely because of these newly fabricated holdings and new

history.  (Compl. ¶ 63(f)(*ii*).)  This "new" account information should have been inconsistent

with the information in Picower's own portfolio appraisal system.  These allegations indicate

fraud.

- The Complaint alleges several other examples of evidently fictitious trading

activity.  For example, Picower faxed a letter dated December 1, 2005 directing various sales

across various accounts.  BLMIS reported the sales as having settled on December 2.  This alone

is suspicious, as settlement is typically three business days after the trade date, and the sales

would thus have had to take place before December 1.  But the letter was not actually faxed to

BLMIS on December 1– it was faxed on December 22 and backdated by Picower to December

1.  (Compl. ¶ 63(h).)  In case there was any question as to the timing, attached to the faxed letter

(and referenced in it) was a copy of pages from Picower's portfolio appraisal report dated

December 16.  Picower's own independently maintained records reflect the stock that was

supposedly sold before December 2 was still held by the accounts as of December 16.  (Compl. ¶

63(h).)  In other words, Picower knew or should have known that certain stock was supposedly

held in his accounts on December 16; that on December 22 he faxed a letter (that was backdated

to December 1) requesting that the stock be sold; and that the stock was reported as having been

sold before December 1.  These allegations indicate fraud.

- Similarly, the Complaint alleges that in December 2005, BLMIS created

backdated "purchases" of stock in certain accounts, recording them as having settled almost a

full year earlier– between January 12 and January 20, 2005.  (Compl. ¶ 63(i)(*ii*).)  Along with an

instant unrealized gain of about $79 million, the accounts were instantly credited, in December

2005, with quarterly dividends for March, June and September 2005, totaling about $82,000. (Compl. ¶ 63(i)(*ii*).)  Neither the dividends nor the purchases appear on Picower's 2005 account statements for the months from January 2005 through November 2005 from BLMIS.  (Compl. ¶ 63(i)(ii).)  Nor do the stock positions, which supposedly would have been held since January, appear on the portfolio appraisal system that Picower maintained as of November 30, 2005.  We know this because Picower attached printouts from his system to a fax he sent to BLMIS on December 29, 2005.  (Compl. ¶ 63(i).)  These allegations indicate fraud.

These allegations are separate from and in addition to the other indicia of fraud alleged in the Complaint, including, among other things, implausible reported returns and trading success, an enormous negative equity balance, and specified irregularities in BLMIS' general operations.

### 3.    Picower's accounts reported implausible rates of return.

Instead of engaging in any discussion of the specified fraudulent activity alleged in his accounts, Picower challenges the reported rates of return alleged in the Complaint.  Specifically, he disputes the Complaint's allegations that one account purported to earn over 950% in 1999 and that two other accounts reported annual rates of return over 100% for the years 1996 through 1999.  The account statements for these accounts, he argues, show that the first account only earned a 37.6% return in 1999 and that neither of the other accounts earned an annual return of more than 100% in any of the listed years. (*See* MTD at 14.)

Putting aside the fact that the rates of return reported by these three accounts in these years are only a small fraction of the implausibly high rates of return reported by Picower's more than twenty-four accounts over at least twenty-five years, Picower misses the point.  No account at BLMIS actually "earned" *any* rate of return:  BLMIS did not engage in any securities trading activity.  At issue in this case is what BLMIS told Picower his accounts were earning.  The purported rates of return (both actual and target) for each account were specified on the portfolio

management reports that Picower received from BLMIS.  The Complaint correctly alleges that

these outrageously high fabricated rates of return – including over 100%, over 550%, and over

950% – were reported to Picower on these documents.  (Other accounts, as alleged in the

Complaint, reported wildly low rates of return).  If the rates of return reported in the portfolio

management reports were inconsistent with information contained in Picower's customer

account statements, this in itself was or should have been an independent sign to Picower that

BLMIS was not engaged in legitimate trading activity.

Moreover, if Picower did in fact attempt to calculate his accounts' rates of return based

on the information contained in customer statements, or for that matter his own portfolio

appraisal system, this exercise alone would have emphasized the irregularities in Picower's

accounts.  One of the factors that must be considered in determining an account's rate of return is

the equity that it holds at various points in time.  Since reports of purchases and sales of stock

were created in Picower's accounts months after the transactions that they supposedly described,

he should have had great difficulty calculating comprehensible rates of return based on his

account statements, and any attempt to do so would have emphasized the already obvious

irregularities.

Picower also argues that the returns reported in his accounts, even as alleged in the

Complaint, were not too far out of line with the results of investment managers such as the

legendary James Simons and others – although, as the SEC and the media have widely reported,

James Simons himself found Madoff's investment returns so unusual and suspicious that he

investigated them, withdrew his funds from BLMIS and urged other investors to do so as well.[4]

---

[4]*See* Office of Investigations, U.S. Securities and Exchange Commission, Investigation of Failure of the SEC to
Uncover Bernard Madoff's Ponzi Scheme (Public Version), Rep. No. OIG-509, 145-57 (Aug. 31, 2009), *available
at* http://www.sec.gov/news/studies/2009/oig-509.pdf; Jenny Strasburg and Scott Patterson, *The Madoff Fraud:*

Picower's argument once again fails to address the legal sufficiency of the Complaint.
Moreover, aside from the fundamental flaws in Picower's premise, his own motion demonstrates
the inherent nonsense of this comparison.  As Picower points out, "Defendants' account
statements reflected investments mostly in blue chip corporate equity securities and low-risk
securities such as short-term U.S. Treasury Bills or money market funds" and "did not reflect
any options trading."  (MTD at 7.)  Picower's own argument in defense of the credibility of his
returns, therefore, is that BLMIS purported to surpass the returns achieved by the most
successful investment managers in the world, and purported to do so based entirely on low risk
conservative buy-and-hold investments in blue chip stocks and Treasury Bills.  This is a feat that
has been accomplished by no one.  Picower knew or should have known that this scheme was far
too good to be true.

## SUMMARY OF ARGUMENT

Picower's motion is a concoction of irrelevant counter-facts, arguments that ignore both
the allegations in the Complaint and the relevant legal standards, and factual challenges that are
not properly before the Court on a motion to dismiss.  Picower also makes multiple attempts to
raise here the question of how claims submitted by investors should be evaluated by the Trustee
pursuant to the Securities Investor Protection Act, 15 U.S.C. § 78*aaa et seq.* (2009) ("SIPA").
None of this is a basis for a motion to dismiss the Complaint.

### Point I:  Every Allegation of Fraud in the Complaint is Supported by Specific Facts
(responding to MTD Point I)

Picower challenges the particularity of the allegations of fraud against him, although he
does not identify which allegations he challenges.  The fraud at issue in this case is the fraud

---

*Renaissance Worried About Madoff in '03*, Wall St. J., Sept. 8, 2009, at C3; Aaron Luchetti & Jenny Strasburg,
*Simons' Notion: All In, Then All Out*, Wall St. J., Feb. 25, 2009, at C1.

committed by Bernard Madoff and BLMIS, which is indisputably alleged in the Complaint and

conceded by Picower. Each allegation concerning what Picower knew or should have known

regarding Madoff's fraud is supported by ample factual allegations, most of which are ignored

by Picower in his motion.

### Point II:  The Complaint Alleges Avoidance Claims Based on Constructive Fraud
(responding to MTD Point VII)

Picower also claims that the Trustee's constructive fraud claims are insufficient because

he has not and cannot allege that Picower did not provide "fair consideration" for the Transfers.

Like many other claims challenged by Picower, whether investors provided fair consideration is

a factual determination that is not properly before the Court on a motion to dismiss. But here

again, Picower fails to acknowledge, much less address, the Complaint's allegations, which

establish both that Picower failed to provide reasonably equivalent value for the Transfers in

excess of his investment and that he lacked good faith. The Trustee is entitled to alternatively

plead a preference claim, as he did. Picower's argument based on how net equity should be

calculated under SIPA (the "Net Equity Dispute") is not properly raised in a motion to dismiss

and is already before the Court pursuant to the Scheduling Order dated September 10, 2009.

### Point III:  The Complaint Alleges Picower's Alter Ego Liability
(responding to MTD Point II)

Picower's remaining arguments attempt, with equal futility, to nibble away at the edges

of the Complaint. In Point II of his motion (addressed at Point III herein), Picower argues that

the Trustee has failed to allege an alter ego claim against him. The Complaint alleges facts

sufficient to state a claim that the Defendants, under the dominion and control of Picower, were

both used for fraud and other wrongful conduct and served as mere instrumentalities of Picower.

To the extent that Picower challenges the facts in the Complaint supporting those allegations, his

motion in this regard is not properly before the Court. Notably, Picower does not challenge the

Trustee's agency allegations, which require imputation of his knowledge and conduct to all

Defendants and pursuant to which he is liable for his own conduct.

### Point IV:  All Defendants Received Avoidable Transfers
(responding to MTD Point III)

Picower complains that Exhibit B to the Complaint fails to identify transfers to four

defendants, but ignores the Complaint's allegations that Exhibit B is not exhaustive and that the

Trustee's investigation is continuing; specific transfers to these four defendants have been

identified and are attached to this response as Exhibit 1.

### Point V:  The Trustee's Turnover Claim is Properly Stated
(responding to MTD Point IV)

Picower's argument that the Trustee's turnover claim is not ripe until after the avoidance

claim is decided ignores the express language of SIPA that such property is property of the

debtor, and should also be denied for reasons of judicial economy.

### Point VI:  The Relevant Date for the Six Year Conveyances is Correctly Alleged
(responding to MTD Point V)

Picower's argument that the period for the "six year transfers" should begin six years

prior to May 12, 2009 (the filing of the adversary complaint against Picower) rather than six

years prior to December 11, 2008 (the filing of the SIPA proceeding) is wholly without merit.

Picower's position, as he tacitly concedes, is contradicted by 25 years of case law, and it finds no

support in the statute or legislative intent.  Moreover, it is irrelevant since the state statute of

limitations period has not yet run, having been tolled under New York law, Section 108(c) of the

Bankruptcy Code, and having been equitably tolled under the C.P.L.R. and Section 544(a) of the

Code.

**Point VII: The Trustee Has Sufficiently Alleged
a Cause of Action Based on the Discovery Rule**
(responding to MTD Point VI)

Similarly meritless is Picower's argument that the Trustee may not rely on the discovery rule. The Trustee is not required under the law of this District to identify in the Complaint a specific creditor who could not reasonably have learned of Madoff's fraud. The fact that the Trustee has alleged "red flags" that would have been apparent to investors other than Picower in no way suggests that "every single other BLMIS investor" (*see* MTD at 45) could have discovered – or, like Picower, knew or should have known – of the fraud. Like many of Picower's other challenges, this is a fact-specific inquiry that is not properly before the Court on this motion to dismiss. (MTD at 45.)

**Point VIII: The Complaint Adequately Alleges Subsequent Transfers**
(responding to MTD Point VIII)

Similarly, Picower's argument that the Trustee's subsequent transfer claim must be dismissed ignores that the Defendants are alleged on information and belief to be subsequent transferees based on the pattern of activity, transfers and mutual control within BLMIS, as described in the Complaint. These allegations are sufficient to state a claim.

**Point IX: The Complaint Properly Alleges Disallowance of Defendants' SIPA Claims**
(responding to MTD Point IX)

Picower ignores the fact that the Trustee's cause of action to disallow Picower's SIPA claim is based not only on the inadequacy of the claims but on Section 502 of the Bankruptcy Code, which prevents the transferee of an avoidable transfer from receiving a distribution unless he first returns the transfer. Picower's second attempt to raise the Net Equity Dispute, which is already before this Court and scheduled for a separate hearing involving all interested parties, must also fail.

### Point X: Picower's Motion to Dismiss Certain Remedies is Improper and Without Merit
(responding to MTD Point X)

Finally, a motion to dismiss for facial insufficiency cannot be based on the Trustee's

choice of remedies sought in his prayer for relief, including a constructive trust and the return of

tax refunds, both of which are justified in this action.

### ARGUMENT

In determining whether a motion to dismiss should be granted, a court must analyze

whether a complaint contains "sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*quoting Bell

Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When there are well-pleaded factual

allegations, a court should assume their veracity and then determine whether they plausibly give

rise to an entitlement to relief." *Id.* at 1950. In considering a motion to dismiss under Rule

12(b)(6), "[t]he Court's function . . . is 'not to weigh the evidence that might be presented at [a]

trial but merely to determine whether the complaint itself is legally sufficient.'" *Jenkins v. New

York City Transit Authority*, --- F. Supp. 2d ---, No. 08 Civ. 6814, 2009 WL 1940103, at *1 (July

1, 2009) (*quoting Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

### I.   THE ALLEGATIONS AGAINST PICOWER ARE PLED WITH SPECIFICITY

In Point I of his motion, Picower argues that the Complaint lacks factual support for

claiming that "Mr. Picower was a participant in Madoff's fraud." (MTD at 13.) This argument is

not offered in support of the dismissal of any particular claim; rather, Picower demands that the

Trustee's "fraud allegations" should be dismissed for failure to comply with the particularity

required by Rule 9(b).[5] Fed. R. Civ. P. 9(b) (2009); (MTD at 13-17.) Picower contests the

---

[5] Rule 9(b) is applicable to fraud pleadings in the bankruptcy context, although such pleadings are extended greater
liberality because a trustee is "a third party outsider to the fraudulent transaction, that must plead fraud on

Trustee's allegations regarding reported rates of return (and argues that they are "unremarkable"

in any event (MTD at 15)), argues that his ability to withdraw funds from the Ponzi scheme in

fact shows his innocence, and asserts that the allegations of "backdating" do not support the

inference that Picower knew that Madoff was running a Ponzi scheme.  (MTD at 14-16.)  Given

Madoff's reputation and Picower's pattern of withdrawals, he concludes, the Trustee has failed

to allege facts supporting "claims of complicity" and fraud against Picower.  (MTD at 17.)

Although not apparent from Picower's motion, the Trustee has not brought a claim

seeking damages from Picower as a co-conspirator of BLMIS.  Rather, the Complaint alleges

that BLMIS engaged in fraud (*see, e.g.*, Compl. ¶¶ 1, 14, 19-32) and that Picower knew or

should have known that he was benefiting from and being compensated for fraudulent activity.[6]

(*See, e.g.*, Compl. ¶¶ 3, 4, 59, 63.)  Madoff's fraud is alleged in the Complaint and is conceded

by Picower.  The allegations in the Complaint concerning what Picower knew or should have

known are amply supported by specific factual allegations, as described above.

Picower nonetheless demands that the Trustee's "fraud allegations against Mr. Picower

and the Defendants" be stricken.  (MTD at 17.)  But, since Picower ignores most of the factual

allegations demonstrating his fraudulent intent or knowledge, and since his attempt to contradict

---

secondhand knowledge for the benefit of the estate and all of its creditors."  *Hassett v. Zimmerman (In re OPM Leasing Servs., Inc.)*, 32 B.R. 199, 203 (Bankr. S.D.N.Y. 1983) (Lifland, J.).

[6] Notably, Picower makes no legal argument challenging the sufficiency of the Trustee's claims for avoidance of the Transfers based on actual fraudulent intent.  This is because Picower has no basis to raise any such challenge.  *See, e.g.*, *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (where debtor is engaged in a Ponzi scheme, actual intent to defraud may be presumed as a matter of law); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429 (S.D.N.Y. 2006) (same).  This so-called "Ponzi presumption" is based on the recognition that "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay, or defraud creditors."  *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*, 397 B.R. at 8 (*quoting Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Fund Ltd)*, 359 B.R. 510, 517-18 (Bankr. S.D.N.Y. 2007) (Lifland, J.)).

others is concededly irrelevant to his motion,[7] it is difficult to ascertain what allegations he wishes to strike.  For example, Picower references Paragraph 63(f) of the Complaint and asserts, "[a]s with the Trustee's other unsupported fraud allegations, he pleads no facts to support his rank speculation that the Defendants believed those trades to be fictitious and concluded, based on those trades, that Madoff was running a Ponzi scheme."[8]  (MTD at 16.)  Paragraph 63(f) alleges that Defendants "knew or should have known that they were participating in fraudulent activity" because Picower and his agents "directed fictitious, backdated trades in order to achieve fictitious gains or losses in earlier periods."  (Compl. ¶ 63(f).)  It then details, over more than a page, an example in which Picower and Freilich directed BLMIS to engage in trading activity for a period that had already passed.  There is no "unsupported fraud allegation" in this paragraph that could be stricken.

The one allegation Picower specifically identifies as "conclusory" is the Trustee's allegation on information and belief that Picower was being compensated for perpetuating the Ponzi scheme by investing and maintaining millions of dollars in BLMIS.  (Compl. ¶ 63(a).) Contrary to Picower's argument, the basis for the Trustee's belief is indeed specified in the Complaint.  For clarity, any allegation by the Trustee about what Picower knew or should have known is based not just on any particular sentence in the Complaint but on the totality of all of

---

[7] *See* MTD at 4 n.2, 14 ("Although the Trustee's allegations must be taken as true for purposes of this motion to dismiss, it should be noted that numerous alleged 'facts' in the Complaint are contradicted by [BLMIS account records].").

[8] Picower suggests repeatedly in his motion that the Trustee must prove that Picower was aware of and complicit in the full extent and every aspect of BLMIS' Ponzi scheme.  This is not so.  An investor who becomes aware of circumstances that should trigger further inquiry into whether there is a fraud is deemed to be on "inquiry notice" of the entire fraud.  *See, e.g., Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 845 (Bankr. S.D.N.Y. 2008) ("a transferee may be on 'inquiry notice' without actual knowledge of a fraud or other circumstance.  Rather, a transferee is on 'inquiry notice' if it knew or should have known of information placing it objectively on alert that there was a potential problem . . . such that the transferee should have attempted to learn more") (internal citations omitted; emphasis omitted).  Accordingly, an investor may be on inquiry notice of fraud even if he does not know or suspect the fraud is a Ponzi scheme as opposed to front running, record-keeping violations, or another type of fraud.

the facts alleged. *See, e.g., Iqbal*, 129 S. Ct. at 1949 (noting that "for the purposes of a motion to

dismiss," courts "must take *all* of the factual allegations in the complaint as true") (emphasis

added); *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief

above the speculative level, on the assumption that *all* the allegations in the complaint are true . .

. .") (emphasis added) (internal citations omitted).  These facts include but are not limited to the

facts that Picower profited by billions of dollars of other investors' money; that Picower directed

fraudulent trading in his accounts; that his accounts reported implausibly high and anomalously

low rates of return; and that he was or should have been aware of the multiple instances of

obvious and indisputable fraud specified in the Complaint.

## II.      THE TRUSTEE HAS ADEQUATELY ALLEGED CONSTRUCTIVE FRAUD

In Point VII of his motion, Picower claims that the Trustee's fraudulent conveyance

claims based on constructive fraud are insufficient because the Complaint does not adequately

allege that the relevant transfers were made without "fair consideration" to BLMIS.  (MTD at

45-50.)  Picower is mistaken.  The Trustee has alleged both that Picower failed to provide

reasonably equivalent value for the transfers (as required by the Bankruptcy Code) and that

Picower failed to exchange fair value in good faith (as required by New York Debtor and

Creditor Law), and the ultimate success of these claims will depend on a fact-based inquiry that

cannot be determined on a motion to dismiss.  Picower does not address, much less challenge,

the Trustee's allegations.  Instead, this argument is one of multiple attempts to gratuitously insert

a challenge to the Trustee's methods of determining claims, an issue that is neither ripe nor

relevant to this motion.  Like the rest of Picower's arguments, it fails.

**A.**     **Picower has received ample notice pleading of the constructive fraud claims.**

A transfer may be avoided as constructively fraudulent under the Bankruptcy Code if, among other things, the transferee received money from the debtor for which the transferee did not provide "reasonably equivalent value."  11 U.S.C. § 548(a)(1)(B) (2009).  The parallel provision in the New York Debtor and Creditor Law permits a trustee to avoid a conveyance that was made without "fair consideration."  N.Y. Debt. & Cred. Law § 273 (McKinney 2009).  "Fair consideration" under New York law is defined generally the same as "reasonably equivalent value" under the Bankruptcy Code, except that it also requires that the transferee provided the value or consideration "in good faith."  N.Y. Debt. & Cred. Law § 272 (McKinney 2009); *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646 (Bankr. E.D.N.Y. 2008).  The question of whether the debtor received fair consideration for a transfer is a highly fact based inquiry that requires an examination into the totality of circumstances, and therefore is not properly before the Court on a motion to dismiss.  *See, e.g.*, 5 *Collier on Bankruptcy* ¶ 548.05(1)(b) (2009) ("In order to determine if a fair economic exchange has occurred in a case of a suspected fraudulent transfer, the bankruptcy court must analyze all the circumstances surrounding the transfer in question.").

When a complaint alleges constructive fraud, the heightened requirements of Federal Rule of Civil Procedure 9(b) do not apply.  *See, e.g., Drenis,* 452 F. Supp. 2d at 428-29; *Spanierman Gallery, PSP v. Love*, 320 F. Supp. 2d 108, 113 (S.D.N.Y. 2004);  *Sec. Investor Protect. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319 (Bankr. S.D.N.Y. 1999).  The plaintiff need not provide specific facts to support its allegations, *see Erickson v. Pardus*, 551 U.S. 89, 93 (2007); rather, the plaintiff need only "give the defendant fair notice of what the . . .

claim is and the grounds upon which it rests," *Twombly*, 550 U.S. at 555 (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

It is virtually a universally-accepted rule – indeed, Picower himself concedes – that when investors invest in a Ponzi scheme, payments that exceed their investments are not made for reasonably equivalent value and constitute fraudulent conveyances that may be recovered by the Trustee. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 640 (2008) ("Where causes of action are brought . . . against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers . . . ."); *Sender v. Buchannan (In re Hedged-Investments Assocs.)*, 84 F.3d 1286, 1290 (10th Cir. 1996); *Scholes v. Lehmann*, 56 F.3d 750, 757-58 (7th Cir. 1995) (Posner, J.); *Bayou Superfund, LLC v. WAM Long/Short Fund II, LLP (In re Bayou Group, LLC)*, 362 B.R. 624, 636 (Bankr. S.D.N.Y. 2007) ("Plaintiffs are correct in asserting in their brief that virtually every court to address the question has held unflinchingly that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers.") (internal quotations omitted); *In re Taubman*, 160 B.R. 964, 986 (Bankr. S.D. Ohio 1993).

Each Defendant withdrew fictitious profits in excess of that Defendant's investment in BLMIS. The Trustee has alleged that Picower controlled the accounts of each of the Defendants. (*See* Compl. ¶¶ 60-61.) The Complaint alleges that Picower's accounts withdrew a total of more than $5 billion in fictitious profit (*see, e.g.*, Compl. ¶ 2), and the Trustee's continuing investigation indicates that the actual number is greater than $7 billion. The Trustee has alleged that this entire amount consists of fictitious profit generated by a Ponzi scheme and is, in reality,

nothing more than money obtained from other investors. (*See, e.g.,* Compl. ¶¶ 2, 66.) The

Trustee specified initial dates, methods of payment, and amounts of avoidable Transfers in the

Complaint. (*See* non-exhaustive list of transfers (the "Transfers") included in the Complaint at

Exhibit B and list of Defendants' accounts at Exhibit A.) These allegations put Picower on

ample notice of the claims against him and the basis of these claims, and satisfies the Trustee's

pleading obligations. *See, e.g., Drenis,* 452 F. Supp. 2d at 428-29 ("There is no argument that

plaintiffs' pleadings fail to meet" constructive fraud pleading standard where plaintiffs alleged

that defendants received distributions that exceeded their contributions to a Ponzi scheme);

*Jalbert v. Zurich Am. Ins. Co. (In re Payton Constr. Corp.),* 399 B.R. 352, 365 (Bankr. D. Mass.

2009) (identification of time frame and nature of the transfers sought to be avoided was

sufficient notice to defendant). The Trustee has additionally alleged that the specified Transfers

were made for less than fair consideration because Picower failed to act in good faith. *See In re*

*Jacobs,* 394 B.R. at 662. As discussed above, the Complaint details numerous facts

demonstrating that Picower knew or should have known that he was participating in a fraudulent

enterprise, an enterprise that the debtor has admitted and sworn was a Ponzi scheme. These

allegations are sufficient to show Picower's lack of fair consideration for each transfer alleged.

### B. The preference claim is pled in the alternative.

Picower seizes on the fact that the Trustee has brought a claim to recover transfers made

within 90 days of the filing as voidable preferences.[9] Because a preference exists only when

there is an antecedent debt, Picower argues, the Trustee has conceded the existence of an

antecedent debt for the 90 day transfers – and for every other transfer alleged in the Complaint.

---

[9] Contrary to Picower's claim, the Transfers made during the 90-day preference period include transfers by check
that cleared during the relevant period, even if the check was dated earlier. *See Barnhill v. Johnson,* 503 U.S. 393,

Picower, of course, ignores that this count has been pled "[i]n the alternative" (Compl. ¶¶ 71,

81), as specifically permitted under the Federal Rules of Civil Procedure, *see* Fed. R. Civ. P.

8(b)(2) and (3) (2009).  The ultimate question of whether there was or was not an antecedent

debt is a question of fact to be determined at trial and is not properly before the Court in a motion

to dismiss.  *See, e.g., Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp.

2d 79, 106 (S.D.N.Y. 2004) ("whether a transfer is for reasonably equivalent value is largely a

question of fact") (internal quotation omitted); *Orbach v. Pappa,* 482 F. Supp. 117, 120

(S.D.N.Y. 1979) ("What constitutes fair consideration under this section must be determined

upon the facts and circumstances of each particular case.").  Picower's motion suggests that he

intends to argue that every Transfer was on account of an antecedent debt, regardless of whether

or not the Transfer constituted fictitious profit and although the Trustee has alleged Picower's

lack of good faith.  Accordingly, alternative pleading of these causes of action, to preserve every

alternative claim the Trustee has to these funds, is appropriate.

## C.   <u>Fictitious profit does not constitute fair consideration.</u>

As discussed above, virtually every court to address the issue has held that investors in a

Ponzi scheme, regardless of their good faith, must surrender to the trustee the false profit they

obtained during their participation in the scheme.  *See Donell*, 533 F.3d at 770; *In re Hedged-

Investments Assocs.*, 84 F.3d at 1290; *Scholes*, 56 F.3d at 757-58; *Bayou Superfund, LLC v.

WAM Long/Short Fund II, LLP (In re Bayou Group, LLC)*, 362 B.R. at 636; *In re Taubman*, 160

B.R. at 986.  While a good faith transferee has the right to retain payment for a bona fide

antecedent debt, fictitious profits from a Ponzi scheme do not constitute such a debt.  This is

because an investor in a Ponzi scheme has no legitimate claim to fictitious profits that in fact

---

394-95 (1992) (in determining if a transfer occurred within the 90-day preference period, a transfer made by check

consist of money invested by other investors.  To the extent the debtor promised such profits to

the investor, the promise was fraudulent, and courts will not enforce a fraud to the detriment of

other innocent creditors.  *See Donell*, 533 F.3d at 770; *In re Hedged-Investments Assocs.*, 84

F.3d at 1290; *Scholes*, 56 F.3d at 757-58; *Bayou Superfund, LLC v. WAM Long/Short Fund II,

LLP (In re Bayou Group, LLC)*, 362 B.R. at 636; *In re Taubman*, 160 B.R. at 986.

The single case relied on by Picower is inapposite.  In *Visconsi v. Lehman*, No. 06-3304,

2007 WL 2258827 (6th Cir. Aug. 8, 2007), the circuit court affirmed enforcement of an

arbitration award against what was at the time a solvent entity.  Lehman Brothers was alleged to

have failed to supervise a stockbroker in its employ.  The investor brought an arbitration claim

against Lehman, and the arbitrator was urged to award the investor the full amount of his

expectancy damages as remedy for the broker's fraud.  *Id.* at *4-5.  Picower claims, based on

*Lehman*, that there is some distinction between the trustee's generally accepted right to recover

fictitious profits in a Ponzi scheme, and his rights to recovery "when the Ponzi scheme operator

is a broker dealer."  (MTD at 47.)  But the fact that a Ponzi scheme involves the sale of securities

does not preclude a trustee from recovering fictitious profit.  *See, e.g., Donell,* 533 F.3d at 770;

*In re Hedged-Investments Assocs.*, 84 F.3d at 1290; *Scholes*, 56 F.3d at 757-58; *Bayou

Superfund, LLC v. WAM Long/Short Fund II, LLP (In re Bayou Group, LLC)*, 362 B.R.at 636; *In

re Taubman*, 160 B.R. at 986.

The difference between *Lehman* and the vast body of case law supporting the Trustee's

avoidance claim is not that *Lehman* involved a broker dealer.  It is that *Lehman* had to do with

the enforceability of an arbitrator's award and nothing whatsoever to do with bankruptcy.  The

main issue in *Lehman* was whether the defendants, having fought to enforce the arbitration

should be deemed to occur on the date the drawee bank honors the check).

clause in their contract with the plaintiffs, would be bound by the arbitrator's determination of damages. Enforcing the arbitrator's award was neither against public policy nor to the detriment of other creditors since Lehman was not in bankruptcy and the rights of other creditors were not implicated. *See, e.g., Scholes*, 56 F.3d at 757-58 (argument that it may seem "only fair" that investor be entitled to profits on trades made with his money was true as between investor and Ponzi scheme operator, but was not true as between investor and other investors); *In re Taubman*, 160 B.R. at 986.

The case that is analogous to Picower's situation is not *Lehman* but *In re Hedged Investments Associates*, 84 F.3d 1286 (10th Cir. 1996). There, an investor in an investment fund that turned into a Ponzi scheme attempted to defend against a trustee's avoidance claim for fictitious profit. Like Picower, the investor argued that under applicable law (in her case, Colorado), she would have had a claim for her full expectancy damages and that therefore the full amount of the transfers had been for value. The Tenth Circuit rejected her argument, reasoning that as a matter of public policy, a Colorado state court would not permit an investor in a bankrupt Ponzi scheme to enforce her fraudulent contract with the defendant at the expense of other investors. Since she had no enforceable claim for amounts beyond her initial investment, the debtor had no debt to her for those amounts and she had not provided value for those transfers. *Id.* at 1289. Whatever rights to expectancy damages an investor theoretically may have as a fraud plaintiff, in other words, do not overcome the rule that payments to investors in a Ponzi scheme in excess of the amounts of their investments are avoidable as fraudulent transfers.

> **D.**   **The Net Equity Dispute is irrelevant to the Trustee's claims and cannot be determined in a motion to dismiss.**

Picower also claims that he is entitled to the "expectancy measure of damages" under the SIPA statute, and therefore to establish lack of fair consideration the Trustee must allege that the

08-01789-cgm    Doc 18490-2    Filed 01/17/14    Entered 01/17/14 18:57:21    Exhibit B
Pg 38 of 79

transfers exceeded the value of securities reflected on the accounts' last BLMIS account

statements. This is one of several attempts by Picower to challenge, in the context of this motion

to dismiss, the Trustee's interpretation of "net equity" as defined under Section 78*lll*(11) of SIPA

in its determination of customer claims. *See* 15 U.S.C. § 78*lll*(11) (2009). The Net Equity

Dispute is irrelevant to Picower's argument, and in any event cannot be determined in the

context of this motion.

Like some other investors, Picower claims that each account's "net equity" for purposes

of the SIPA statute is the amount shown on the last customer statement issued by BLMIS.

(MTD at 10, 51-52.) Because those customer statements issued by BLMIS included fictitious

profits and were entirely fraudulent, however, the Trustee is not relying on the account balances

appearing on the customer statements for purposes of claims determinations. Instead, the

Trustee is evaluating claims based on the amounts that a customer actually deposited with

BLMIS, less the amounts that the customer withdrew from the account, sometimes referred to as

the "cash in/cash out" approach. (MTD at 52.)

The issue of "net equity" applies to the determination of all customer claims in this SIPA

liquidation, as well as litigations brought by the Trustee. Accordingly, it will be heard by the

Court, after briefing by interested parties in accordance with this Court's September 10, 2009

Scheduling Order. (*See* Mem. Dec. & Order Granting Trustee's Mot. to Dismiss, Sept. 10, 2009

[hereinafter "Peskin Order"].) As this Court stated in its decision adopting the Scheduling Order

and dismissing a complaint by another investor, "[w]ith more than 15,000 claims filed in the

Madoff proceeding and multi-billions of dollars at stake, the issue of how the Trustee determines

claimants' 'net equity' for distribution purposes is a central question to be determined in this

SIPA liquidation." (Peskin Order at 2.) The Court's reasoning in that decision, dismissing an

investor's complaint for a declaration of the scope of her claims, is equally applicable here:

> The Scheduling Motion will address the concerns of a variety of customers with
> different account histories and balances, including both net winners and net
> losers, and will provide everyone involved with the benefits from the submission
> of a comprehensive and complete record on this issue. Allowing Plaintiffs, who
> represent only one group of customers…to proceed with the adversary proceeding
> to determine the Net Equity Issue that will apply to all customer claims will yield
> an incomplete record that might result in piecemeal litigation on this issue.
> Moreover, Plaintiffs will suffer no prejudice in having the Net Equity Issue
> decided pursuant to the Scheduling Motion while other customers will suffer great
> harm if Plaintiffs are permitted to proceed without their participation.

(*Id*. at 12-13, as amended per the Errata Order dated Sept. 11, 2009.) Moreover, the precise

amount of equity in the customer accounts – under whatever method – is a heavily factual issue

that remains under investigation and cannot be decided in the context of a motion to dismiss.

*See, e.g., Higazy v. Templeton*, 505 F.3d 161, 174 (2d Cir. 2007) ("Where there is a dispute about

the material facts, this question must be resolved by the fact finder.") (citation omitted).

     In any event, whatever remedies Picower may or may not have under SIPA do not answer

the question whether Picower provided "fair consideration" to BLMIS for the transfers at issue.

The concept of fair consideration refers to the value received by the debtor in exchange for the

transfer. The amount of value given by an investor is not altered based on whether or not a

brokerage firm is registered with SIPC, whether or not a SIPA action is commenced, or whether

any or all of the investor's investments are protected under SIPA or for how much, because none

of this affects the value that the investor gave to the debtor in exchange for the transfer. *See,*

*e.g.,* 5 *Collier on Bankruptcy* ¶ 548.05(1)(b) (2009) ("Because the ultimate issue is the impact of

the transfer on the debtor's estate, the court must thus determine whether the debtor, as opposed

to some other entity, received such value."); *Scholes*, 56 F.3d at 757-58 (a party is entitled to

retain profit from a Ponzi scheme only if the payment of that profit, which reduced the net assets

of the estate, was offset by an equivalent value to the estate). The value that Picower gave to

BLMIS and its impact on the BLMIS estate is not greater because this action takes place under

SIPA, regardless of what remedies Picower may ultimately be determined to have under the

statutory scheme.

Finally, in addition to requiring that a transfer be made in satisfaction of an antecedent

debt by the debtor, "fair consideration" under New York law requires both that the transfer be

made "in good faith" and be a "fair equivalent" to the obligation. N.Y. Debt. & Cred. Law §

272. The Trustee has amply alleged that the Transfers to Picower were utterly disproportionate

to any consideration provided by him to BLMIS and that the Transfers were received by him in

bad faith. The motion to dismiss this count therefore should be denied.

### III. THE TRUSTEE HAS ALLEGED FACTS SUFFICIENT TO PIERCE THE CORPORATE VEIL AND HOLD PICOWER LIABLE FOR THE TRANSFERS TO ALL DEFENDANTS, AND DEFENDANTS FAIL TO CHALLENGE THE SUFFICIENCY OF THE TRUSTEE'S AGENCY ALLEGATIONS

Picower incorrectly claims, in Point II of his motion, that the Complaint fails to allege

adequate cause for piercing the corporate veils of the various partnerships, funds, foundations

and other entities named in the Complaint (the "Picower Entities"). (*See* MTD at 17-23.)

Whether or not Picower and the other Defendants are liable under the alter ego theory, like most

of the challenges raised in Picower's motion, requires a fact-specific analysis and cannot be

resolved in a motion to dismiss. But the Complaint amply alleges both that the Picower Entities

were mere instrumentalities of Picower and that they were used to achieve fraud, each of which

constitutes an independent basis for alter ego liability.

In any event, Picower fails to challenge the sufficiency of the Trustee's allegations that

Picower and/or his agent Freilich acted as Defendants' authorized agents in numerous capacities,

including without limitation director, partner, officer and trustee (Compl. ¶¶ 34-54, 60), and that

in such capacities they engaged in transactions with BLMIS that they knew or should have known were false, fraudulent and fictitious (*see id.* ¶¶ 3-4, 28, 53-55, 59-64).  These allegations establish that Picower's knowledge and conduct must be imputed to all Defendants.  They also establish that Picower is personally liable for his own fraudulent and tortious conduct, performed both on behalf of himself and the Picower Entities.

     **A.**     **The Trustee has pled facts sufficient to pierce the corporate veil of each Defendant and impose alter ego liability upon Picower and other Defendants.**

The U.S. Supreme Court has declared that it is a "fundamental principle of corporate law . . . that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *United States v. Bestfoods,* 524 U.S. 51, 62 (1998).  In general, the state of formation of the entity determines whether its form may be disregarded and its liability-limiting veil may be pierced. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).[10]  Under Delaware law, "a court can pierce the corporate veil of an entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner." *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) (shareholder was corporate alter ego where he dealt with substantial corporate assets and obligations as his own).

---

[10] Analysis of Defendants' "alter ego" liability herein is based on Delaware law as expounded by state and federal courts construing Delaware as well as New York law, which are substantially similar.  *See Wassau Business Ins. Co. v. Turner Const. Co.*, 141 F. Supp. 2d 412, 417 (S.D.N.Y. 2001) (Delaware and New York law "substantially similar" on piercing corporate veil).  This is necessary because the "law of piercing the corporate veil has not been as fully developed in Delaware as in many other jurisdictions" and "it is rare for the Delaware courts to spell out in any detail how the determination to pierce the corporate veil is to be made."  Stephen B. Presser, *Piercing the Corporate Veil* § 2.8, at 2-73 & 2-76 (2009).  To the extent that this Court may be required to apply Florida law in imposing alter ego or similar liability on any of the Defendants, it should be observed that such law is also substantially similar to New York and Delaware law.  *See William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 137 (2d Cir. 1991) (New York and Florida law of piercing corporate veil "virtually

The test for piercing the veil is disjunctive:  courts may disregard corporate form either where there is fraud or something like it, as discussed below, or where the entity or entities are used as mere instrumentalities or alter egos of their owner.  *See Acciai Speciali Terni USA, Inc. v. Momene*, 202 F. Supp. 2d 203, 207-208 (S.D.N.Y. 2002) (collecting cases).

Notwithstanding Defendants' assertions to the contrary,[11] it is generally acknowledged that actual intent to defraud is not essential where evidence of constructive fraud or other similar inequitable conduct is present, *see* William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 41.32 (2009) (collecting cases), and conduct short of active intent to deceive required to establish fraud may justify piercing the corporate veil.  *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 987 (Del. Ch. 1987).  Moreover, courts may disregard corporate form and pierce the veil for a wide range of unlawful and inequitable conduct, ranging from fraudulent activity such as that engaged in by Defendants, to contravention of law or contract generally, to public wrong and situations where equitable considerations among members of a corporate entity require it.  *See Mobil Oil Corp.*, 718 F. Supp. at 268 ("fraud or something like fraud," such as injustice or inequity, justifies disregard of corporate form);

---

identical"); *Robertson-Ceco Corp. v. Cornelius*, No. 3:03cv475, 2007 WL 1020326, at *7 n.7 (N.D. Fla. Mar. 30, 2007) (Delaware and Florida law "the same" on the issue of veil-piercing).

[11] Relying on overly broad dicta in *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999), Defendants claim that all of the activities of Picower and the Picower Entities must constitute an unqualified fraud and sham for alter ego liability to attach to him and for the veil of the various entities to be pierced.  (*See* MTD at 19-20.)  This is incorrect.  "[F]raud or a sham, strictly speaking, need not be shown to justify the piercing of a corporate veil under Delaware law."  *Brown v. General Elec. Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229, 236 (Bankr. D. Del. 2003) (*citing Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) and *Fletcher*, 68 F.3d at 1458).  All that the Trustee needs to show is "an overall element of injustice or unfairness."  *Id.* (citations omitted).  The reason why the limited partner plaintiffs' attempt to pierce the corporate veil of their general partner and impose personal liability on its officers in *Wallace v. Wood* failed is that plaintiffs "merely state[d] that the purpose of the General Partner [was] to manage and operate the Partnership" and pled no other "facts that if true would justify disregarding the corporate form of the General Partner."  752 A.2d at 1184.  Defendants are also incorrect when they claim that Delaware courts will not disregard corporate entities unless they are complete shams created solely for the purpose of defrauding others.  (*See* MTD at 18-19 (*citing Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 70 (Bankr. S.D.N.Y. 2004) and *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003).)  As the Second Circuit recently declared, to pierce the corporate veil, "the plaintiff need not prove that the corporation was created

29

*Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, 1998 WL 5492, at *3 (Del. Ch. 1988) (under

Delaware law, fraud is not the only basis to pierce corporate veil); *Pauley Petroleum, Inc. v.*

*Continental Oil Co.,* 231 A.2d 450, 452-53 (Del. Ch. 1967), *aff'd*, 239 A.2d 629 (Del. 1968).

*See also Publicker Indus. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1069 (3d Cir. 1979)

(appropriate to disregard corporate existence when "court must prevent fraud, illegality, or

injustice, or when recognition of corporate entity would defeat public policy or shield someone

from liability for a crime" (*quoting Zubik v. Zubik*, 384 F.2d 267, 272 (3d Cir. 1967))).

In cases where liability is premised, not on fraud or something like it, but on the mere

instrumentality doctrine, a two-prong test must be met. The owner and entity must be shown to

have operated as a single economic unit and an overall element of injustice or unfairness must be

present. *See Acciai Speciali Terni*, 202 F. Supp. 2d at 207; *cf. Passalacqua*, 933 F.2d at 138

(under New York law, corporate veil may be pierced either when corporate form is used to

achieve fraud, or when control and domination of entity by owner are used to commit wrong,

fraud, breach of duty or dishonest or unjust act).

        1.    <u>The determination of whether to ignore the corporate forms requires a fact</u>
<u>specific inquiry into the totality of the circumstances.</u>

The legal test for determining when corporate form should be ignored in equity cannot be

reduced to a single formula. *Irwin & Leighton*, 532 A.2d at 989. No single factor can justify a

decision to disregard the corporate entity but some combination of them is required and, as stated

above, an overall element of injustice or unfairness must be present if the corporate veil is to be

pierced. *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988), *aff'd*, 879

F.2d 857 (3d Cir. 1989). Although courts have variously identified certain considerations that

---

with fraud or unfairness in mind. It is sufficient to prove that it was so used." *Netjets Aviation, Inc. v. LHC*
*Commc'ns, LLC,* 537 F.3d 168, 177 (2d Cir. 2008) (citations omitted).

may be relevant to determining when a parent and subsidiary, or owner and entity, operate as an economic unit for purposes of the instrumentality test, they are not conclusive. *See Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1144-45 (S.D.N.Y. 1996).

Just as there is no talismanic set of factors for determining when it is appropriate to pierce the corporate veil, there is no single test for determining the sufficiency of pleading an alter ego claim. Again, the considerations identified by courts as potentially relevant to determining when a parent and subsidiary, or owner and entity, operate as an economic unit for purposes of the instrumentality test are not conclusive. *See Union Carbide Corp.*, 944 F. Supp. at 1144-45. Moreover, there is no judicial authority requiring dismissal of alter ego allegations where they do not happen to fit the misleading version of Delaware's corporate disregard doctrine that Defendants are attempting to foist upon this Court.[12] *See id.*

Given the intensively factual inquiry required, the nature and extent of Picower's wrongdoing and his dominion and control over the other Defendants are not proper subjects for resolution on a motion to dismiss. *See id.; see also Official Comm. of Unsecured Creditors v. Reliance Capital Group, Inc. (In re Buckhead America Corp.)*, 178 B.R. 956, 975 (D. Del. 1994); *Geyer*, 621 A.2d at 793; *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, CIV.A. No. 8578 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990). The Complaint more than adequately sets forth facts that, if true, establish a basis to pierce the corporate veil under any relevant law; the ultimate success of this claim will depend upon the totality of facts and circumstances discovered through trial.

---

[12] Defendants quote the incomplete and, in part, irrelevant factors set forth in *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528-29 (D. Del. 2008), and then demand that the Trustee conform his Complaint to their theory of the case at risk of dismissal. (*See* MTD at 18-19.) The far more comprehensive and relevant factors discussed in *Netjets Aviation*, 537 F.3d 168, the most authoritative analysis of alter ego liability yet handed down by the Second

2.    <u>The Complaint amply pleads a basis for piercing the corporate veil.</u>

The Complaint pleads facts that amply support alter ego liability.  The Second Circuit recently, and exhaustively, explored many of the factors considered under Delaware law when considering imposing alter ego liability in *Netjets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168 (2d Cir. 2008).  It conducted a similarly thorough analysis of the same issue under virtually identical principles of New York law in *Passalacqua*, 933 F.2d at 139, where the plaintiff sought to pierce the corporate veil of the contracting defendant corporation and impose alter ego liability on its family real estate business owners, operating through a web of partnerships and corporations, all controlled either directly or indirectly by the family members. The Second Circuit reversed the district court's dismissal of plaintiff's claim, finding plaintiff's alter ego allegations sufficient to go to the jury.  The allegations in the Trustee's Complaint are clearly sufficient under the analysis conducted in these cases.  Indeed, they largely track the alter ego indicia that the Second Circuit held sufficient to require that the issue of piercing the corporate veil and imposing alter ego liability be presented to the factfinder.  For example:

> The Complaint asserts that Picower knew or should have known that he was a major beneficiary of Madoff's fraud for over 25 years and withdrew more than $6 billion of Madoff's victims' money. (Compl. ¶¶ 2-4, 28, 53-55, 59-64.)

> The Complaint alleges that Picower knew or should have known that he was engaged, directly and through the other Defendants, which are entities he directly or indirectly owns and/or controls, in profiting from BLMIS's fraud. (*See, e.g.*, Compl. ¶¶ 3-4; compare the collective control and management of affiliates in *Netjets Aviation*, 537 F.3d at 179-80, 182 and *Passalacqua*, 933 F.2d at 139-40.)

> The Complaint avers that Picower and/or one of his agents were the managers of all of the Picower Entities. (*See, e.g.*, Compl. ¶¶ 37-52; compare the limited number of identical directors and officers in *Netjets Aviation*, 537 F.3d at 179 and *Passalacqua*, 933 F.2d at 139-40.)

---

Circuit, are nowhere discussed in Defendant's papers, perhaps, we suggest, because they are too uncomfortably similar to the facts specifically alleged in the Complaint.

The Complaint states that in the course of perpetrating his wrongful conduct –
which for purposes of alter ego theory constitute fraud in law – Picower used his
controlling personal and corporate authority to direct the opening of accounts for
and manage the investments of Defendants. (*See, e.g.*, Compl. ¶¶ 34-52, 55-56,
60; compare the collective accounting methods and lack of arm's length dealing
in *Netjets Aviation*, 537 F.3d at 179-80 and *Passalacqua*, 933 F.2d at 139-40.)

The Complaint alleges that many of the Defendants shared office space and
mailing addresses with each other, including 1410 South Ocean Boulevard, Palm
Beach, Florida; 950 Third Avenue, New York, New York; and/or 22 Saw Mill
River Road, Hawthorne, New York. (*See, e.g.*, Compl. ¶¶ 34-52; compare the
shared office space and employee resources in *Netjets Aviation*, 537 F.3d at 179
and *Passalacqua*, 937 F.2d at 140.)

The Complaint asserts that Picower and his agent maintained a portfolio appraisal
system which enabled Picower to centralize, coordinate and direct all of the
investments of the Defendants with BLMIS. (*See, e.g.*, Compl. ¶ 61; compare the
centralized and intermingled financial management at *Netjets Aviation*, 537 F.3d
at 179-82 and *Passalacqua*, 933 F.2d at 140.)

The Complaint asserts that Picower used one of his BLMIS accounts as the
primary source of cash withdrawals for all of the Defendants, and that he
personally managed and supervised such withdrawals, which totaled more than $6
billion. (*See, e.g.*, Compl. ¶¶ 60, 63(d); compare the similar cash management and
withdrawal systems in *Netjets Aviation*, 537 F.3d at 179-82 and *Passalacqua*, 933
F.2d at 140.)

The Complaint states that Picower engaged in extraordinarily heavy margin call
borrowing to finance his speculative trading positions. (*See, e.g.*, Compl. ¶ 63(c)-
(d); compare the heavy margin and debt positions in *Netjets Aviation*, 537 F.3d at
181-82 and *Passalacqua*, 933 F.2d at 139-40.)

The Complaint alleges that Picower's purported borrowings from BLMIS on
behalf of defendants exceeded $6 billion, which, in light of the fictitious nature of
their assets, raises the overwhelming presumption that they were severely
undercapitalized, if not entirely insolvent (*See, e.g.*, Compl.¶ 63(c)-(d); compare
finding of severe undercapitalization in *Passalacqua, 933* F.2d at 139-40.)

The Complaint avers that Picower directed back-dated, fictitious and fraudulent
trades with BLMIS for his own accounts and the accounts of other Defendants.
(*See, e.g.*, Compl. ¶ 63(e)-(f); compare the deceptive and unlawful accounting
fictions in *Netjets Aviation*, 537 F.3d at 179-83.)

The Complaint affirms that in dealing with BLMIS, Picower exercised complete
dominion over and used the Picower Entities as instruments to advance his
personal interests; accordingly, they functioned as his alter egos and no corporate
veil can be maintained between them. (*See, e.g.*, Compl. ¶ 53; compare the

findings in *Netjets Aviation*, 537 F.3d at 182-84 and *Passalacqua*, 933 F.2d at 140.)

Given the Second Circuit's analysis in *Netjets Aviation* and *Passalacqua,* the allegations of the Complaint are more than sufficient to warrant denial of Defendants' motion to dismiss.

### B.    Defendants fail to challenge the Trustee's agency allegations.

As discussed above, the Complaint is replete with specific allegations of the facts and circumstances giving rise to actual or constructive knowledge on the part of Picower and Freilich regarding their fraudulent transactions with BLMIS.  The Defendants do not attack the sufficiency of the Trustee's allegations that Picower was an agent of the Picower Entities, acting within the scope of his authority, and that all Defendants were the primary beneficiaries of wrongful conduct and in fact accepted and enjoyed the benefits thereof for decades.  (*See, e.g., Compl.* ¶¶ 28, 54.)  Under such circumstances, it is black letter law that the acts and knowledge of agents are imputed to their principals, and that the principals cannot retain the fruits of their agent's conduct.  *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985); *546-552 West 146th Street LLC v. Arfa*, 863 N.Y.S.2d 412, 414 (1st Dep't 2008); *Capital Wireless v. Deloitte*, 627 N.Y.S.2d 794, 797 (3d Dep't 1995); *see also Apollo Fuel Oil v. United States*, 195 F.3d 74, 76-77 (2d Cir. 1999) (when agent acquires knowledge material to employment, such knowledge is imputed to the principal, and corporation can be guilty of knowing violations of law through doctrine of respondeat superior).

Not only does the Complaint establish that Defendants are liable for Picower's conduct, it also establishes that Picower is liable for his own participation in fraudulent or tortious conduct (both on behalf of himself and on behalf of the Picower Entities).  New York law imposes individual personal liability on officers, directors and other corporate agents who engage in fraudulent acts or other torts, even if such conduct is in the course of their duties. *Bano v. Union*

*Carbide Corp.*, 273 F.3d 120, 133 (2d Cir. 2001); *Lopresti v. Terwilliger*, 126 F.3d 34, 42 (2d

Cir. 1997); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1177 (2d Cir. 1993). Moreover, this

liability may be imposed on officers and directors whether they actually participate in the fraud

or tort, or merely have knowledge of it. *See, e.g., Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.

1994); *Polonetsky v. Better Homes Depot, Inc.*, 760 N.E.2d 1274, 1278 (N.Y. 2001); *Marine

Midland Bank v. John E. Russo Produce Co.*, 405 N.E.2d 205, 212 (N.Y. 1980); *Ideal Steel

Supply Corp. v. Fang*, 767 N.Y.S.2d 644, 645 (2d Dep't 2003) (sole shareholders and officers of

corporation that allegedly engaged in fraud necessarily participated in such fraud themselves and

may be individually liable).

Given that Picower has confined his objection to the assertion of liability against him

solely on alter ego grounds (*see* MTD at 17-23), it should be noted that agents who direct,

participate or know of a corporation's fraudulent, tortious or other inequitable conduct are

personally liable irrespective of whether alter ego liability is imposed on them. *Am. Express

Travel Related Servs. Co., Inc. v. N. Atl. Resources, Inc.,* 691 N.Y.S.2d 403, 404 (1st Dep't

1999). Corporate agents who participate in the commission of a tort are held individually liable

regardless of whether they acted on behalf of the corporation in the course of official duties and

regardless of whether the corporate veil is pierced. *Id.*; *see also Espinosa v. Rand*, 806 N.Y.S.2d

186, 187 (1st Dep't 2005). Accordingly, Picower may not escape individual personal liability

for fraudulent and tortious conduct committed by him as an agent of the Defendants in the course

of controlling, directing, or participating in their false, fictitious and fraudulent transactions with

BLMIS, and this liability exists in addition to any alter ego liability the Court may impose upon

him when it pierces, as it is amply justified in doing here, the corporate veil.

## IV.   ALL DEFENDANTS, INCLUDING THE FOUR NOT LISTED ON EXHIBIT B
## TO THE COMPLAINT, RECEIVED AVOIDABLE TRANSFERS

Picower argues in Point III of his motion that four of the defendants should be dismissed

because they are not alleged to have received any transfers.  Here he misreads the Complaint,

which states that the Transfers identified in Exhibit B are not an all-inclusive list of direct

transfers of estate property to defendants.  (Compl.¶ 57.)  Indeed, the Trustee's investigation into

BLMIS' books and records is ongoing, and additional information continues to become

available.  At the time the Complaint was filed, certain accounts were alleged to be transferees

on information and belief based on then available information.  Since filing, the Trustee has

obtained additional information from records going back substantially further in time and now

provides particulars that underlie the fraudulent transfer allegations in the Complaint.

It is telling that Picower stops short of asserting that the "Non-Transferee" Defendants

received no transfers from BLMIS.  As he should be aware, prior to 1995 there were transfers

from BLMIS to each of the Non-Transferee Defendants totaling more than $100 million,

evidence of which the Trustee has discovered since the Complaint was filed.  A list of the initial

dates, methods of payment, and amounts of transfers to these Defendants is attached to this

memorandum as Exhibit 1.  If the Court finds that the allegations against the "Non-Transferee"

Defendants as pleaded in the Complaint, together with the additional particulars provided here,

are insufficient, the Trustee would amend to include these recently-identified transfers.

## V.   THE TRUSTEE'S TURNOVER CLAIM IS PROPERLY STATED

Picower argues in Point IV of his motion that the Trustee's claim for turnover of the

Transfers is not ripe because the Court has not yet avoided those Transfers pursuant to Sections

544, 547, and 548 of the Bankruptcy Code 11 U.S.C. §§ 544, 547-8 (2009).  Each of the

Transfers in question, however, is the subject of separate avoidance counts in this same action. The inclusion of a turnover count, therefore, is appropriate.

Picower's argument also ignores express provisions of the SIPA statute concerning the status of property transferred by a debtor when funds are insufficient to satisfy claims in full. In relevant part, the statute provides:

> …the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11. … For purposes of such recovery, *the property so transferred shall be deemed to have been the property of the debtor*…

15 U.S.C. § 78*fff*-2(c)(3) (2009) (emphasis added). The key here is that the statute makes plain that as to property that was customer property prior to the transfer, that property when "so transferred" is deemed to have been property of the estate prior to the transfer, and therefore subject to the turnover provisions of Section 542. See 11 U.S.C. § 542 (2009). In other words, if there were any doubt about the nature of customer property, this SIPA provision makes it clear that for the purpose of avoidance actions, customer property is always property of the estate. Here, in the context of a Ponzi scheme, it could not be otherwise.

Even aside from the SIPA statute, however, it is appropriate under the Bankruptcy Code to pair a turnover claim with an avoidance action. The core function of a turnover claim pursuant to Section 542 is to permit the Trustee to recover "property that the trustee may use, sell, or lease" from any persons holding that property. *See* 11 U.S.C. § 542(a) . While the case law pertaining to this subject is not uniform, *see, e.g., Andrew Velez Constr., Inc. v. Consolidated Edison Co. of New York (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 273 (Bankr. S.D.N.Y. 2007), a number of cases stand for the proposition that a turnover claim may be properly paired with an avoidance claim. For example, in *In re Jacobs*, the court granted summary judgment to the trustee in an avoidance action and held that a transfer of property from the debtors to the

defendants was both actually and constructively fraudulent. *In re Jacobs*, 394 B.R. at 664-72. In

the same ruling, the court also granted summary judgment on the trustee's turnover and

accounting claim for that property. *Id.* In so ruling, the court observed that by virtue of its ruling

on the avoidance claim, the property was a transfer of property of the debtor and subject to

turnover and avoidance. *Id.* at 674. This basic principle was also set forth in *Doyle v. Paolino*

*(In re Energy Savings Center, Inc.)*, 61 B.R. 732 (E.D. Pa. 1986), where the court noted that:

> A claim made under Section 542, however, is not necessarily distinct from claims
> under other sections. For example, if a particular transfer of property is voidable
> as a fraudulent transfer under Section 548, then this property, now deemed
> property of the estate, becomes subject to the "turnover" authority contained in
> Section 542.

*Id.* at 735.

In challenging the Trustee's claim for turnover, Picower relies on dicta in the Second

Circuit's decision in *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125 (2d Cir. 1992), in

which the Second Circuit noted that only once a transfer is avoided and recovered does the

property that was subject to that claim become "property of the estate" within the meaning of

Section 541(a)(3). *Id.* at 131; 11 U.S.C. § 541(a)(3) (2009). *In re Colonial Realty*, however, was

not a turnover case. Rather, the issue the Court determined in that case was that the automatic

stay applied to a prepetition fraudulent transfer claim regardless of whether the fraudulently

transferred property was, or was not, property of the estate. *In re Colonial Realty Co.*, 980 F.2d.

at 131-2. *In re Colonial Realty* thus does not address the issue here: whether a turnover claim

may be properly paired with an avoidance claim.

The pairing of these claims is appropriate for reasons of judicial economy. By the

Defendants' logic, the Trustee also could not bring a recovery claim under Section 550 until the

transfer is avoided. But it is commonly recognized that this can be done, *see* 5 *Collier's on*

*Bankruptcy* ¶ 550.07 (2009), since requiring the Trustee to bring one adversary proceeding to

avoid the transfer and then a separate proceeding to recover the transfer or its value would be a

waste of resources.  *See generally Woods & Erickson LLP v. Leonard (In re Avi, Inc.)*, 389 B.R.

721, 734-35 (B.A.P. 9th Cir. 2008) (holding that an avoidance and recovery action may be

brought simultaneously to "avoid absurd results" and to "protect the trustee from attempts to

impede recovery" and to "afford[] flexibility when a transferee or its assets have disappeared.").

The same rationale should apply to permit Section 542 claims to be paired with avoidance

claims.

For these reasons, the Trustee requests that this Court follow the SIPA statute, and the

reasoning of *In re Jacobs* and *In re Energy Savings Center,* and deny the Defendants' motion to

dismiss Count One.

## VI.    THE RELEVANT DATE FOR THE SIX YEAR CONVEYANCES IS CORRECTLY ALLEGED

In Point V of his motion, Picower expends much energy in arguing that transfers that

occurred within six years of the filing of the bankruptcy case on December 11, 2008, but more

than six years before the adversary filing on May 12, 2009, should not be recoverable under 11

U.S.C. § 544(b) (2009).  In other words, Picower challenges this basis for recovering transfers

made to him in the period between December 11, 2002 and May 12, 2003.  The motivation for

this argument is understandable, since the Transfers at issue total more than $520 million dollars.

Nonetheless, Picower's argument is illogical and finds no support in the statute or the caselaw.  It

is also irrelevant, since contrary to Picower's assumption, the underlying state law statute of

limitations on such transfers did not actually expire before the adversary proceeding was filed,

having been tolled by, among other things, the very fact of the filing of the bankruptcy petition.

### A.  State law limitations periods are relevant only until the bankruptcy case is filed.

The Bankruptcy Code not only creates the causes of action referred to by 11 U.S.C. §

544(b), it specifically provides the limitations period within which they are to be brought.

Accordingly, the case law properly holds that if the cause of action exists at the petition date, the

only applicable statute of limitations for bringing it thereafter is 11 U.S.C. § 546(a) (2009).

Under New York state law, as in most other states, a transferor cannot avoid its own

transfers – the right belongs to the creditors or, following bankruptcy, debtor in possession.

Consequently, a cause of action for a trustee in bankruptcy is created by the Bankruptcy Code,

and it comes into being at the same time as the bankruptcy case itself. *See, e.g. Mahoney, Trocki*

*& Assocs., Inc. v. Kunzman (In re Mahoney, Trocki & Assocs., Inc.)*, 111 B.R. 914, 920 (Bankr.

S.D. Cal. 1990) ("a fraudulent transfer action maintained by a debtor-in-possession under 11

U.S.C. section 544(b) is clearly the creation of the Bankruptcy Code"); *Rosania v. Haligas (In re*

*Dry Wall Supply, Inc.)*, 111 B.R. 933, 935 n.2 (D. Colo. 1990) (cause of action under Section

546(b) is not one that could have been brought by the debtor).

A federal cause of action is governed by federal statute of limitations, where one exists.

Only if no federal statute of limitations applies do the federal courts look to a state statute. *See*

*e.g., Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 414

(2005); *DelCostello v. Int'l Broth. Of Teamsters*, 462 U.S. 151, 158-161 (1983); *DirecTV, Inc. v.*

*Webb*, 545 F.3d 837, 847 (9th Cir. 2008).  In this instance, 11 U.S.C. § 546 specifically provides

a statute of limitations for, among other things, proceedings under Section 544.  11 U.S.C. §

546(a).  Neither Section 544 nor Section 546, nor any other provision of the Bankruptcy Code,

provides that the Trustee must continue to look to the procedural limitations of state law once the

Trustee has acquired the substantive rights given to him by Section 544 of the Bankruptcy

Code.[13]  Instead, Section 546(a) specifically provides the operative limitations period for the

rights created by Section 544.  In other words, and contrary to the assumption of the Defendants,

Section 544(a) does not so much toll the state statute as supersede it.[14]

     1.    <u>Picower's argument contravenes 25 years of bankruptcy case law.</u>

More than 25 years of case law under the Bankruptcy Code confirms that the state law

statute of limitations does not have any continued effect after the bankruptcy case is filed and the

Trustee's Section 544(b) rights arise.  The following cases are all directly on point and all so

hold:  *Eisenberg v. Feiner (In re Ahead By A Length, Inc.*), 100 B.R. 157, 164 (Bankr. S.D.N.Y.

1989); *Bloom v. Fry (In re Leach)*, 380 B.R. 25, 29-30 (Bankr. D.N.M. 2007); *Smith v. Am.*

*Founders Fin., Corp.*, 365 B.R. 647, 677-78 (S.D. Tex. 2007); *Sears Petroleum & Trans. Co. v.*

*Burgess Constr. Servs., Inc.*, 417 F. Supp. 2d 212, 225 (D. Mass. 2006); *Mi-Lor Corp. v.*

*Gottsegen (In re Mi-Lor Corp.)* 233 B.R. 608 (Bankr. D. Mass. 1999); *Tsai v. Buildings By*

*Jamie, Inc. (In re Buildings by Jamie, Inc.)*, 230 B.R. 36, 45 (Bankr. D.N.J. 1998); *In re*

*Princeton-N.Y. Inv., Inc.*, 219 B.R. at 65-66; *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D.

Ill. 1998); *Bay State Milling Co. v. Martin (In re Martin)*, 142 B.R. 260, 265-66 (Bankr. N.D. Ill.

1992); *Mancuso v. Cont'l Bank Nat'l Ass'n Chicago (In re Topcor, Inc.)*, 132 B.R. 119 (Bankr.

N.D. Tex. 1991); *In re Mahoney, Trocki & Assocs., Inc.*, 111 B.R. at 914, 917-18 ; and *In re Dry*

*Wall Supply, Inc.*, 111 B.R. at 936-37.  In each of these cases, the trustee filed an avoidance

---

[13] The applicable New York statute of limitations, N.Y. C.P.L.R. § 213(8), is strictly a procedural statute of limitations.  *See First Union Nat'l. Bank v. Gibbons (In re Princeton-New York Invs., Inc.)*, 219 B.R. 55, 66 (D.N.J. 1998).  In contrast to provisions such as 11 U.S.C. § 548 (two year reachback from bankruptcy filing date), it does not create a "reachback" period measured by a particular event.  It just sets a time within which, as to any given transfer, an action must be commenced.  Therefore, where a creditor has the right to avoid transfers under the New York Uniform Fraudulent Conveyance Act, the transfers in question continue to be voidable as to that creditor even after the limitations period expires, and if the applicable statute of limitations is waived (such as by the defendant not pleading it), changed, or is otherwise rendered inapplicable, the substantive rights remain.

[14] *Cf. In re Princeton-New York Inv., Inc.*, 219 B.R. at 66, and *Am. Founders Fin., Corp.*, 365 B.R. at 677-78, finding that Section 546(a), because of preemption, provides the only relevant time period within which a trustee

action to overturn a transfer that had taken place longer ago than the period specified by the

primary state statute of limitations.  However, at the time the bankruptcy petition was filed, the

creditors in whose shoes the trustee was standing were not yet barred.  Each of these courts

accordingly held that the trustee's action under Section 544(b) was timely because it was filed

within the period prescribed by 11 U.S.C. § 546(a).

Moreover, numerous cases in other contexts have also stated plainly that so long as the

applicable statute of limitations has not expired prior to the filing of the bankruptcy case, the

trustee may bring a Section 544(b) avoidance action at any point during the period set out in

Section 546(a).  *E.g., O'Connell v. Shallo (In re Die Fleidermaus LLC),* 323 B.R. 101, 107

(Bankr. S.D.N.Y. 2005); *G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I

Holdings, Inc.),* 313 B.R. 612, 646 (Bankr. D.N.J. 2004); *Orr v. Bernstein (In re Bernstein)*, 259

B.R. 555, 558 (Bankr. D.N.J. 2001); *Glosser v. S. & T. Bank (In re Ambulatory Medical &

Surgical Health Care)*, 187 B.R. 888, 901 (Bankr. W.D. Pa. 1995); *Kaliner v. Load Rite Trailers,

Inc. (In re Sverica Acquisition Corp.),*179 B.R. 457, 466 (Bankr. E.D. Pa. 1995); *Tabas v. Gigi

Advertising Partnership (In re Kaufman & Roberts, Inc.)*, 188 B.R. 309, 312, 314 (Bankr. S.D.

Fl. 1995); *Browning v. Williams (In re Silver Wheel Freightlines, Inc.)*, 64 B.R. 563, 568 (Bankr.

D. Or. 1986); *L.A. Clarke & Son, Inc. v. Donald (In re L.A. Clarke & Son, Inc.)*, 59 B.R. 856,

860-862 (Bankr. D.D.C. 1986).  Collier's also agrees unequivocally.  5 *Collier on Bankruptcy* ¶

546.02[1][b] (2009) ("If the state law limitations period governing a fraudulent transfer action

has not expired at the commencement of a bankruptcy case, the trustee may bring the action

---

must bring a Section 544(b) action, even if the time limits are set by state law pursuant to a statute of repose rather
than a statute of limitations.  Under either theory, the result is the same.

pursuant to Section 544(b), provided that it is commenced within the Section 546(a) limitations period.")[15]

Defendants have conceded, as they must, that much case law is against them. What may not be apparent from Defendants' brief, however, is that of the more than 20 cases they rely upon in attempting to make the contrary argument, *not a single one* actually supports their position: not one case considers the Section 546(a) statute of limitations and concludes – even in dicta – that a trustee's right to bring a recovery adversary complaint that existed on the filing date can potentially expire before the time set out in Section 546(a).

Most of the cases Picower relies upon are so far afield that they do not even mention Section 546 and are patently not attempting to make a pronouncement that deals with what happens if the state law statute of limitations expires between the bankruptcy filing date and when the Trustee must bring his or her claim.[16]

---

[15] Defendants make much of the fact that Section 544(a) includes specific reference to the commencement of the case, while Section 544(b) does not. However, this is likely attributable to the fact that they derive from two different Sections of the Act – 70(c) and 70(e) respectively, which historically had similar differences in language –– 70(c), the predecessor of Section 544(a), *see*. e.g., H.R. REP. NO. 95–595, at 371 (1977), defined the trustee's powers and the hypothetical creditors' powers as of the date of the bankruptcy, while Section 70(e), the predecessor of Section 544(b), did not. Section 544(a), and its predecessor, Section 70(c) of the Bankruptcy Act, primarily define powers the precise scope of which are determined by relative priorities among lien creditors, bona fide purchasers, and other secured creditors or claimants. The exact date on which the hypothetical lien or other power arose and attached is crucial to the determination of respective priorities, and thus had to be specified exactly in the statutory language, or the provision could have been rendered wholly ineffectual. Section 544(b), which referenced rights of an actual creditor, did not suffer from the same imperative.

[16] *See, e.g. Baldi v. Samuel Son & Co. (In re McCook Metals, LLC)* No. 05 C 2990, 2007 WL 4287507, *3 n. 7 (N.D. Ill. Dec. 4, 2007) (says only that "The UFTA, however, provides a different timeline than section 548 of the Bankruptcy Code. . . . Under section 6 of the UFTA, an action must be brought within four years of the disputed transfer. . . . There is no allegation here that the Longview Trustee did not bring this action within the proper timeframe."), *aff'd* 548 F.3d 579 (7th Cir. 2008); *Fink v. Graven Auction Co. (In re Graven)*, 64 F.3d 453, 455-56, and n. 5 (8th Cir. 1995) (in a case with no limitations issues, merely commenting, without discussing Section 546, "section 544 may allow the trustee to reach back to transfers made more than one year before the bankruptcy filing, because the statute of limitations from the state or applicable nonbankruptcy law applies and may allow the avoidance of transfers more than one year old."); *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 171 (Bankr. S.D.N.Y. 1998) (in a case without statute of limitations issues or discussions, stating that Section 544(b) incorporates and makes applicable nonbankruptcy law.); *In re O.P.M. Leasing Servs., Inc.*, 32 B.R. at 201-2 (in a case not raising Section 546 issues, stating that a six year statute of limitations applies under Section 544, thus permitting the Trustee to state a cause of action for something that was beyond the Section 548 reachback period.); *Old Orchard Bank & Trust Co. v. Josefik (In re Josefik)*, 72 B.R. 393, 395, 397 (Bankr. N.D. Ill. 1987) (state statute

The few cases cited that mention Section 546 do nothing to further Picower's arguments.

To the contrary, they acknowledge that the state statute of limitations under Section 544 has no

relevance after the bankruptcy petition date.  *See, e.g., Barr v. Charterhouse Group Int'l, Inc. (In

re Everfresh Beverages, Inc.)*, 238 B.R. 558, 571-3 (Bankr. S.D.N.Y. 1999) (refers to Section

546 as the "only relevant" statute of limitations while holding that the plaintiff cannot use the

state statute of limitations or Section 108(a) to extend his time for bringing Section 544(b) suits

past the limit that Section 546 sets); *Global Crossing Estate Rep. v. Winnick*, No. 04 Civ. 2558,

2006 WL 2212776, at *6, *6 n. 6 (S.D.N.Y. Aug. 3, 2006) (citing 4 *Collier on Bankruptcy* ¶

544.03[2] at 544-21, 544-22 (L. King 15th ed. 1989) for the proposition that "[o]nce the case has

commenced, section 546(a) . . . specifies the time within which the trustee must act under section

544(b)" and further commenting at footnote 6, "On the other hand, a state statute of limitations

may be relevant to a section 544(b) claim if it expires before the bankruptcy case commences . . .

."); *Steege v. Lyons (In re Lyons)*, 130 B.R. 272, 278 (Bankr. N.D. Ill. 1991) ("If the creditor into

whose shoes the trustee seeks to step . . . still had time to pursue the remedy at the time of the

petition, the trustee must bring the action within the time fixed by section 546."); *Hunter v.

---

of limitations expired before the filing of the bankruptcy case; §546 neither relevant nor discussed); *T.C.I. Ltd. v. Sears Bank & Trust Co. (In re T.C.I. Ltd.)*, 21 B.R. 876 (Bankr. N.D. Ill. 1982) (does not deal with either Section 544 or Section 546); *Dzikowski v. Friedlander (In re Friedlander Capital Mgmt.)*, Adv. No. 05-03088-PGH, 2009 WL 1231085, *3, *10 n. 1 (Bankr. S.D. Fla. Apr. 29, 2009) (stating only, "Defendants do not dispute the Trustee's assertion that the applicable statute of limitation is four years, or that the Trustee's claim is timely brought" and then reciting in the corresponding footnote, "The applicable state law limitations period applies to actions brought under section 544(b).' 5 *Collier on Bankruptcy* ¶ 544.09 (2009)"); and *Bash v. Cunningham (In re Cunningham)*, Adv. No. 07-01146, 2008 WL 2746023, 2008 Bankr. LEXIS 4125 at *25-26 and n.5 (Bankr. N.D. Ohio July 11, 2008) (in a case expressly disclaiming any statute of limitations issues under either §544 or §548, *id.* at *26 note 5, remarking, without ever mentioning Section 546, "Once a fraudulent transfer is made, a trustee in bankruptcy generally must bring a claim within four years of the transfer, *See* O.R.C. § 1336.09.").  In addition, of course, the Bankruptcy Act cases cited by the defendants also are inapposite to the §546 issue. These include *Buchman v. Am. Foam Rubber Corp.*, 250 F. Supp. 60 (S.D.N.Y. 1965); *Feldman v. First Nat'l City Bank*, 511 F.2d 460 (2d Cir. 1975); *Halpert v. Engine Air Serv., Inc.*,116 F. Supp. 13 (E.D.N.Y. 1953); *Lawler v. RepublicBank Dallas (In re Lawler)*, 53 B.R. 166 (Bankr. N.D. Tex. 1985); *MacLeod v. Kapp*, 81 F. Supp. 512 (S.D.N.Y. 1948); and *Seligson v. N.Y. Produce Exch.*, 378 F. Supp. 1076 (D.C.N.Y. 1974).

*Hansen (In re Hansen)*, 114 B.R. 927, 933 (Bankr. N.D. Ohio 1990) ("The state limitations

period is also extended by § 546(a) when the trustee is proceeding under 544(b) . . . ").

2.    <u>There is no evidence of contrary Congressional intent.</u>

As most of the cases point out, the policies of the Bankruptcy Code also strongly support

allowing the trustee (or debtor in possession as the case might be) adequate time to determine

what causes of action are viable and should be brought.  Otherwise, valuable rights that could be

asserted for the benefit of all the creditors would simply expire without recognition.

No legislative history indicates that Congress intended any other result.  Moreover,

Congress has had many opportunities to "correct" the statute as part of its periodic overhauls of

the Bankruptcy Code if the many, many courts that have ruled on the issue over the decades were

doing so contrary to its intentions – and it has not done so.  Defendants misrepresent the 1994

amendment of Section 546(a) in 1994 as "*shortening* [the two year] limitations period to 1 year

after the appointment or election of the first trustee."  (MTD at 39 (citation omitted).)  The 1994

amendment resolved a dispute among competing lines of cases whether the two year limit of

Section 546(a) was supposed to run from when a bankruptcy case was first filed by a debtor in

possession or whether it was supposed to begin to run only when a trustee was appointed.

*Compare, e.g., In re Topcor, Inc.,* 132 B.R. at 124-25 (statute begins to run when trustee is

appointed) *with Zilkha Energy Co. v. Leighton,* 920 F.2d 1520, 1524 (10th Cir. 1990) (statute

begins to run when a debtor in possession files for bankruptcy).  The compromise provision

confirmed that the statute should be two years from the bankruptcy case filing in most situations

(and not more than three years at the outside), but at the same time ensured that a trustee who

was appointed to take over from a debtor-in-possession within the first two years would have at

least a year's worth of "breathing time" to determine which causes of action to bring.  In certain

factual situations, therefore, the amendment *extended* the statute beyond the strict two year limits

45

that would have been accorded to it by the *Zilkha* line of cases, and in no event restricted the statute to less than two years from the petition date. *See generally 5 Collier on Bankruptcy* ¶ 546.02[1][c], n.10; 546.LH[1][a] (2009). Defendants are simply incorrect to categorize this amendment as evidence of Congress' desire to further cut back the estate's time to sue.

Moreover, Congress did nothing in its 1994 amendments – nor has it at any time since – to alter the interpretation of the Section that had been rendered already by such cases as *In re Martin*, 142 B.R. at 265-66; *In re Topcor, Inc.*, 132 B.R. at 123-24; *In re Mahoney, Trocki & Assocs., Inc.*, 111 B.R. at 917-18; and *In re Dry Wall Supply, Inc.*, 111 B.R. at 936-37. In each of these cases, the court held squarely that a Section 544(b) action could be filed despite the argument that the state statute of limitations had already expired post-petition because the adversary proceeding was filed within the two year limit of Section 546(a). While later amendments are not considered the best evidence of original legislative intent, they still accorded interpretive weight. *See, e.g., Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*, 881 F.2d 801, 808 (9th Cir. 1989) (noting that amendments that dealt with the topic at issue but left existing interpretations undisturbed should be considered when analyzing prior congressional intent).

In short, the many courts who have considered the issue over the last quarter century have found against the Defendants' position, and Congress has never acted to change the effect of such cases, despite repeatedly having the opportunity to do so in other amendments to Section 546. This Court should reject Defendants' position as well.

**B.**      **The state statute of limitations has not run.**

In any event, Picower's entire Section 546 argument is irrelevant because the state law statute of limitations *has not expired*. Defendant's entire argument is falsely premised on the belief that, as to certain transactions, the New York state statute of limitations applicable to

fraudulent transfer expired between the filing of the bankruptcy case and the commencement of the instant adversary proceeding.  Because of the tolling provisions provided by both New York and bankruptcy law, however, no underlying creditor has had his or her New York law avoidance claim expire.  So even if Picower could overcome the vast body of case law discussed above, his argument fails because avoidance actions against transfers occurring more than six years prior to the adversary filing, and less than six years prior to the filing of the instant bankruptcy case, are indisputably timely.

      1.    <u>The Bankruptcy case filing stays the running of the statute of limitations under New York law.</u>

New York law provides that "[w]here the commencement of an action has been stayed by a court or by statutory prohibition, the duration of the stay is not a part of the time within which the action must be commenced."  N.Y. C.P.L.R. § 204 (McKinney 2009).  Section 362 of the Bankruptcy Code, which automatically stays all creditors from filing fraudulent conveyance recovery cases while the bankruptcy case is proceeding as to their debtor, *see In re Colonial Realty Co.*, 980 F.2d 125, is precisely the type of stay that tolls New York statutes of limitations pursuant to N.Y. C.P.L.R § 204(a).  *E.g.*, *Mercury Capital Corp. v. Shepherds Beach, Inc.*, 723 N.Y.S.2d 48 (2d Dep't 2001); *CDS Recoveries L.L.C. v. Davis*, 715 N.Y.S.2d 517, 519 (3d Dep't 2000); *Zuckerman v. 234-6 W. 22nd St. Corp.*, 645 N.Y.S.2d 967, 971 (Sup. Ct. 1996) (automatic stay tolls statutes of limitations under New York law).  Because a creditor's state law fraudulent conveyance action is subject to the automatic stay of the Bankruptcy Code, C.P.L.R. § 204(a) stays the running of the statute of limitations as to that creditor.

When a state law statute of limitations is tolled as to a creditor, a Trustee who is standing in the shoes of that creditor pursuant to 11 U.S.C. § 544(b) likewise gets the benefit of that

tolling.[17]  Because C.P.L.R. § 204(a) stayed the running of the six year statute of limitations

applicable to the Trustee's claims under Section 544(b), that statute of limitations could not have

expired in the period between the commencement of this SIPA case and the filing of the instant

adversary proceeding, no matter which transfers are considered.

> 2.    Section 108(c) of the Bankruptcy Code also stays the running of the New
> York statute of limitations.

The same result is reached pursuant to 11 U.S.C. § 108(c) (2009), which likewise

suspends the running of statutes of limitations against creditors when they are prevented by

Section 362's automatic stay from commencing or continuing a civil action in a court other than

in a bankruptcy court on a claim against the debtor.[18]  The reason for this is set out in *In re*

*Colonial Realty Co.,* 980 F.2d at 127-8.  In that case, the FDIC sought pursuant to its own

statutory avoidance authority to recover assets alleged to have been fraudulently conveyed,

prepetition, by a bankruptcy debtor. *Id*. Although the court concluded that neither the FDIC

action nor the property it sought to recover were technically "property of the estate," it

nonetheless held the action barred because the FDIC was effectively acting "to recover a claim

against the debtor" and the automatic stay therefore applied. *Id.* at 132.

---

[17] *See, e.g., In re G-I Holdings, Inc.*, 313 B.R. at 639-40 (holding a creditor committee standing in the shoes of a trustee could benefit from the one year tolling of the state statute of limitations for asbestos claims); *In re Bernstein*, 259 B.R. at 560 (denying defendant's motion to dismiss because the trustee standing in the shoes of an unsecured creditor may have been able to prove that the unsecured creditor could have availed himself of a one year tolling provision and timely filed its complaint alleging fraudulent transfers as of the petition date); *In re Sverica Acquisition Corp.*,179 B.R. at 470 (noting the common law "adverse domination" tolling doctrine may apply to a trustee standing in the shoes of a creditor); *In re Lyons*, 130 B.R. at 279-81 (stating that the doctrine of equitable tolling could apply to a trustee standing in the shoes of a creditor).

[18] While Defendants cite to many cases holding the tolling provision of 11 U.S.C. § 108(a) is inapplicable to extend the state statutes of limitations relating to fraudulent conveyance cases, neither Defendants nor those cases discuss Section 108(c).  The reason may well be that a discussion of this provision is normally unnecessary because of the courts' universal endorsement of the proposition that Section 546(a) allows Section 544(b) actions to be brought for two years after the petition date so long as the action was viable on the petition date.  See 11 U.S.C. §§ 544(b) & 546(a).

For the same reason, a fraudulent conveyance action, even though the debtor is not a defendant, is an action to recover "a claim against the debtor," within the meaning of Section 108(c), thus triggering the automatic stay. New York state law fixes a period for commencing fraudulent conveyance actions outside of bankruptcy court, and the automatic stay prevents the creditor from bringing such actions. Such an action therefore fits squarely within both the wording[19] and the intended purpose of the Section 108(c) savings provision. Absent such a provision, a bankruptcy filing which is later dismissed could cost a creditor its only chance to file such a fraudulent conveyance recovery action.

The Second Circuit has expressly recognized that during the pendency of a bankruptcy case, Section 108(c) protects a creditor's right to bring a state law fraudulent conveyance action against expiration, and that as a result the trustee's right to bring an action under 11 U.S.C. § 544(a) also is preserved by Section 108(c). In *Belford v. Martin-Trigona* (*In re Martin-Trigona*), 763 F.2d 503 (2d Cir. 1985), a non-debtor defendant argued that the statute of limitations barred a fraudulent conveyance claim because the trustee did not bring the action until 1983, five years after the allegedly fraudulent conveyance and after the three year state law limitations would have expired. *Id.* at 506. The Second Circuit dismissed this argument as invalid because of the effect of Section 108(c), stating "[t]his argument ignores the tolling of the statute of limitations

---

[19] Section 108(c) provides:

   (c) Except as provided in section 524 of this title, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor, or against an individual with respect to which such individual is protected under section 1201 or 1301 of this title, and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of –

       (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

       (2) 30 days after notice of the termination or expiration of the stay under section 362, 922, 1201, or 1301 of this title, as the case may be, with respect to such claim.

11 U.S.C. § 108(c).

on December 2, 1980, when the bankruptcy petition was filed.  The complaint was timely filed."
*Id.* (citing 11 U.S.C. § 108(c) (1982)).

Accordingly, Section 108(c) of the Bankruptcy Code also has prevented the running of
the New York state statute of limitations as to fraudulent conveyance actions that could have
been brought by a creditor up through the bankruptcy filing date.

3.      <u>The state statute of limitations is also equitably tolled as to both real and
hypothetical creditors for claims based on actual fraud.</u>

Finally, the running of the statute of limitations is also equitably tolled under New York
law.  N.Y. C.P.L.R. §§ 213(8) and 203(g)  both permit a plaintiff to assert a fraud claim that
would otherwise be untimely if the plaintiff does so within two years of the time when the
plaintiff discovered the fraud or could with reasonable diligence have done so.  N.Y. C.P.L.R. §§
203(g) & 213(8) (McKinney 2009).  As pled by the Trustee and discussed below, actual creditors
exist who could not reasonably have known of the fraud and, thus, have two years from
discovery to bring their causes of action.

For that matter, the statute also is tolled as to hypothetical creditors, in whose shoes the
Trustee may stand pursuant to 11 U.S.C. § 544(a) (Trustee has the right to "avoid any transfer of
property of the debtor . . . that is voidable by" certain hypothetical creditors, including a creditor
who extends credit and has an execution returned unsatisfied).  Such rights of the Trustee are
"without regard to any knowledge of the trustee or of any creditor."  11 U.S.C. § 544(a).[20]  Both

---

[20] While the provisions of 11 U.S.C. § 544(a) are not commonly used to avoid fraudulent transfers, cases have
acknowledged that fraudulent conveyance actions may also be brought under Section 544(a) by asserting the rights
of hypothetical creditors.  *See, e.g., In re Vitreous Steel Prods. Co.,* 911 F.2d 1223, 1235 n. 5 (7th Cir. 1990) ("The
Trustee may also have additional powers to avoid fraudulent transfers using the 'strong arm clause'. . . ."); *Collins v.
Kohlberg & Co. (In re Southwest Supermarkets, LLC),* 325 B.R. 417, 420, 424-27 (Bankr. D. Ariz. 2005)
(permitting trustee to bring fraudulent conveyance action under Section 544(a)(2) and holding that "the discovery
rule applicable to actual fraudulent transfers prevents the running of limitations against the hypothetical creditor of
Section 544(a)(2), who is statutorily defined to lack knowledge of any wrongdoing"); *Fitzgibbons v. Thomason (In
re Thomason),* 202 B.R. 768, 770 (Bankr. D. Colo. 1996) (rejecting defendant's argument that the trustee's

Sections 275 and 276 of the New York Debtor and Creditor Law make transfers available as to "future creditors," such as a prior claim under 11 U.S.C. § 544(a), and Section 274 makes available as to persons who become creditors during the continuation of the business transaction referenced by that Section. *See* N.Y. Debt. & Cred. Law §§ 274-6 (McKinney 2009).

## VII. THE TRUSTEE HAS SUFFICIENTLY PLED A CAUSE OF ACTION BASED ON THE DISCOVERY RULE

Section 544(b) of the Bankruptcy Code bestows standing on the Trustee to avoid transfers that are voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of the Bankruptcy Code. *See In re OPM Leasing Servs., Inc.*, 32 B.R. at 201. A creditor under New York law may set aside fraudulent conveyances made by a debtor, *see, e.g.*, N.Y. Debt. & Cred. Law §§ 276, 276-a, 278, & 279 (McKinney 2009), and may bring his action within six years from the commission of the fraud, or two years from the time of discovery of the fraud, whichever is later. N.Y. C.P.L.R. § 213(8) & 203(g); *see also Hoffenberg v. Hoffman & Pollok*, 288 F.Supp.2d 527, 535-6 (S.D.N.Y. 2003); *Lefkowitz v. Appelbaum*, 685 N.Y.S.2d 460, 461 (2d Dep't 1999); *Phillips v. Levie*, 593 F.2d 459, 462 n.12 (2d Cir. 1979); *Schmidt v. McKay*, 555 F.2d 30, 36-37 (2d Cir. 1977); *Lippe v. Bairnco Corp.*, 225 B.R. 846, 852-3 (S.D.N.Y. 1998).

Picower claims in Point VI of his motion that the Trustee cannot rely on the "discovery rule" to pursue transfers that took place more than six years prior to the filing date because (i) the Trustee has not named a particular creditor or category of creditor in the Complaint and a basis for why they could not have discovered the fraud; and (ii) the "red flags" identified by the

---

avoidance action, brought under Section 544(b), should be dismissed because Section 544(a) "also provides that the trustee may avoid any transfer of property of the debtor that such a hypothetical perfected lien creditor could avoid," thus making the trustee a creditor by operation of law who has the power to exercise any right that a creditor could exercise, including the right to pursue an action under the Colorado Uniform Fraudulent Transfer Act).

Trustee as putting Picower on notice of Madoff's fraudulent scheme essentially preclude the Trustee from asserting that any investor could not have discovered the fraud. (*See* MTD at 40-41.) Both of these arguments are unavailing and should be rejected by the Court.

**A.** **There is no requirement at this stage of the action to specifically identify the creditor(s) whose claims are being asserted.**

The Complaint alleges that "[a]t all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS" (Compl. ¶ 120) and that "[a]t all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable . . . ." *Id.* ¶ 121. Picower claims that these allegations are insufficient and that the Trustee must further identify the investor(s) whose claim(s) the Trustee is asserting pursuant to Section 544(b) at the very inception stage of this litigation. Picower is incorrect.

The United States Bankruptcy Court for the Southern District of New York recently reiterated that there is no need at the complaint stage to specifically identify the creditor(s) upon whose claims a trustee bases his standing for purposes of Section 544(b). *See Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.),* 398 B.R. 761, 780-81 (Bankr. S.D.N.Y. 2008); *see also Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 673-4 (D.R.I. 1998) ("a probing inquiry into who the creditors are, and what claims they hold, is inappropriate" at the pleading stage; denying motion to dismiss). Picower's concession that "[c]ourts in this District have been reluctant to require trustees to identify the creditor(s) giving rise to the trustee's claims" (MTD at 42) is an understatement. As the *In re Musicland* court stated: "[t]he Court has not been able to locate a case in this district supporting the proposition

that the plaintiff must name the qualifying creditor in the complaint, or suffer dismissal." 398

B.R. at 780.  Nor has any such case been found by the Trustee or, evidently, by Picower.

Nor does the single case from this District relied on by Picower, *Young v. Paramount*

*Commc'ns, Inc. (In re Wingspread Corp.)*, 178 B.R. 938 (Bankr. S.D.N.Y. 1995), support his

argument.  In *In re Wingspread*, the trustee's complaint did not specifically identify any actual

qualifying creditor.  *Id.* at 945.  Rather, during discovery, the Trustee identified categories of

qualifying creditors and listed names of specific creditors.  *Id.*  The defendants moved for

summary judgment, claiming that the trustee had not identified a single unsecured creditor into

whose shoes he could step.  *Id.*  While the *In re Wingspread* court agreed that the trustee

ultimately had to prove the existence of an actual unsecured creditor with standing, the court did

not dismiss the trustee's complaint even though the complaint failed to name any such creditor.

*Id.* at 946.  Nor did it grant summary judgment.  Instead, the court concluded that factual issues

surrounding whether the debtor's hundreds of trade creditors might have such standing precluded

summary judgment, and noted that "at trial, the Trustee must prove the existence of at least one

unsecured creditor" who would have had standing.  *Id.*  "Thus, although the court first framed the

issue as one of pleading, *Wingspread* must be read to mean that the complaint does not have to

name the qualifying creditor, and instead, it is sufficient to prove the creditor's existence at trial."

*In re Musicland*, 398 B.R. at 779.

Contrary to Picower's argument, judicial authority in this District approves of almost the

very language used by the Trustee.  In *In re RCM Global Long Term Capital Appreciation Fund,*

*Ltd.*, 200 B.R. 514 (Bankr. S.D.N.Y. 1996), the court held that the debtor had adequately pleaded

the existence of an unsecured creditor with an allowable claim by pleading that "as of the date of

the purported fraudulent conveyance, the Debtor had at least one or more creditors holding

unsecured claims against it." *Id.* at 519, 522-525.

While the identification of a "category" of creditors has been found to be

"unquestionably enough" to put defendants on notice of the creditors who supply the standing to

sue, *see Global Crossing*, 2006 WL 2212776, at *11 (court held that it was sufficient to refer to a

group of creditor noteholders that engaged in an exchange offer), there is no requirement that any

such category be specified.[21]  In any event, the Complaint provides ample notice to Picower of at

least one category of creditors on whose claims the Trustee founds his standing:  the customers

of BLMIS.  (*See, e.g.,* Compl. ¶ 5 ("The Trustee seeks to set aside such transfers and preserve the

property for the benefit of BLMIS' defrauded customers"); Compl. ¶ 15 ("…the Trustee must

…pursue recovery from customers who received preferences and/or payouts of fictitious profits

to the detriment of other defrauded customers whose money was consumed by the Ponzi

scheme"); Compl. ¶ 18.)  Indeed, Picower can hardly assert that he will have trouble identifying,

for purposes of discovery and trial, a relevant category of potential creditors.  For clarity, the

Trustee reiterates that one category of qualified creditor is defrauded customers of BLMIS –

discussed throughout the Complaint – who had and still hold unsecured claims against BLMIS.

There will be more than sufficient opportunity during discovery for the Defendants to

identify customers to whom the Trustee is referring and/or at trial for the Defendants to put forth

an argument that the identified creditors do not satisfy the requirements of Section 544(b) of the

---

[21] Even though the *In re Musicland* court found that three categories of creditors were identified in the complaint, the court did not mandate such a pleading standard.  Rather, it merely acknowledged that the complaint satisfied the *In re RCM Global* case standard as well as the somewhat more encompassing standard in the *Global Crossing* case. *See In re Musicland*, 398 B.R. at 780-81.  As set forth above, the Complaint here also identifies at least one category of creditor, thus satisfying both the *In re RCM Global* and *Global Crossing* standards.

Bankruptcy Code if the Defendants so desire.  At this stage of the proceeding, the Trustee has

alleged in the Complaint all that is required under the law of this District.

> **B.**     **While the Trustee has adequately alleged the existence of creditors who
> could not reasonably have discovered the fraud, evaluation of this issue is
> premature.**

The Defendants next argue that the Trustee is precluded from relying on the discovery

rule because he does not sufficiently allege and will be unable to establish that there are BLMIS

investors who could not have discovered Madoff's fraud with reasonable due diligence.  First,

Picower claims that the Complaint contains no factual basis from which it could be inferred that

any reasonable investor exists who could not have discovered Madoff's fraud.  Given that

Picower devotes several pages of his motion to hiding behind just those investors, this appears to

be a self-defeating argument.  But more to the point, it is spurious:  the Complaint amply alleges

the operation of the Ponzi scheme and Madoff's steps to conceal it, which were designed to and

did deceive reasonable investors for decades.  (*See, e.g.*, Compl. ¶¶ 19–27, 29–32, 64(b).)

Picower's main argument is that having identified certain "red flags" that were available

to other investors as well as Picower, the Trustee is precluded from arguing that any investor was

misled.  If this information put Picower on notice of fraud, he argues, then "every single other

BLMIS investor" was also on inquiry notice.  (MTD at 45.)  This argument is simply another

attempt by Picower to falsely equate himself with the ordinary investors who have been

financially ruined by BLMIS.  This intent is particularly transparent since the issue of whether

there is an investor who could not have discovered the fraud is a question that cannot be

determined on this motion to dismiss.

1.    <u>The evaluation of which investors could or could not have discovered the fraud cannot be made on this motion to dismiss.</u>

The evaluation of whether there is an unsecured creditor of BLMIS who could not have discovered the fraud is not an analysis that is appropriate to consider in the context of Picower's motion to dismiss.  The question to be determined – whether a specific creditor acting with reasonable diligence could reasonably have inferred the existence of the fraud – is an inquiry involving a mixed question of law and fact that ordinarily should not be disposed of by summary judgment.  *See Schmidt*, 555 F.2d at 37*; Trepuk v. Frank*, 376 N.E.2d 924, 926 (N.Y. 1978) ("Where it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts."), *rev'd on other grounds*, 437 N.E.2d 278 (N.Y. 1982); *Erbe v. Lincoln Rochester Trust Co.,* 144 N.E.2d 78, 80-1 (N.Y. 1957) (reversing order of dismissal because court would not speculate as to sufficiency of evidence at trial).  The determination of what a particular investor should have known requires examination of the totality of the facts and circumstances relating to that individual investor.  This is especially true given that issues such as the level of an investor's experience affects "the extent to which a court may properly conclude that a particular event should have influenced that investor to inquire into the likelihood of fraud involving his or her investment." *See Tab P'ship v. Grantland Fin. Corp.*, 866 F. Supp. 807, 811 n. 3 (S.D.N.Y. 1994)

Given that the Trustee is not required, at this juncture, even to identify any specific creditor upon whose claim he relies, it is premature to delve into what any specific creditor reasonably could or could not have known. *See Zahn*, 218 B.R. at 673 ("a probing inquiry into who the creditors are, and what claims they hold, is inappropriate" in context of motion to dismiss).

56

2.      Picower is a sophisticated investor who had access to information –
        including fraud in his own accounts – that other investors lacked.

As Picower acknowledges, whether an investor could have discovered the fraud for

purposes of the discovery rule depends on whether "*that* creditor was not aware of facts from

which a person of ordinary intelligence reasonably could have inferred the Madoff fraud."

(MTD at 41 (emphasis in original).)  The standing of each creditor, in other words, is evaluated

based on the facts of which he was or should have been aware, and what those facts should have

signified to that creditor assuming he is a person of ordinary intelligence.  *See, e.g., Schmidt*, 555

F.2d at 36-37 (when a plaintiff could have, acting with reasonable diligence, discovered an

alleged fraud depends upon whether he possessed knowledge of facts from which he reasonably

could have inferred the fraud).  Picower fails to recognize, here as throughout his motion, that he

is not the same as "every single other BLMIS investor." (MTD at 45.)  He is differently situated

from other investors, both in the information available to him about BLMIS and his level of

sophistication and experience.

First, as discussed above, the Complaint alleges that the *totality* of information available

to Picower should have put him on notice that he was benefiting from fraud.  The information

available to him was not limited to published articles or any single piece of information that

could have been discovered by others.  Rather, information that indicated or should have

indicated to Picower that he was benefiting from fraud included information obtained because of

his own unusual knowledge of and access to Madoff and BLMIS employees; information

received from the additional reporting from BLMIS that he received for his accounts; the

anomalous rates of return (both high and low) in his own accounts; the prescient stock picking

ability reported by BLMIS in his own accounts; the vast sums of money he was able to extract

from BLMIS in excess of his investment; and, of course, the blatant fraud in his own accounts.

Second, Picower – unlike many other BLMIS investors – is a sophisticated and experienced investor who by his own account netted more than $1 billion in a single corporate transaction.  In determining what facts should have prompted an investor to inquire into the likelihood of fraud in investment transactions, as well as the scope and depth of inquiry that the investor should have undertaken, the sophistication of that investor is critical. *See Tab P'ship.*, 866 F. Supp. at 811 n. 3; *see also Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38, 49 (S.D.N.Y. 2001).

This principle is well-settled both in the securities context and throughout New York law. "The law is indulgent of the simple or untutored; but the greater the sophistication of the investor, the more inquiry that is required." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235-6 (2d Cir. 2006) (Jacobs, J.) (jury was correctly charged that sophisticated investors in a Ponzi scheme had duty to inquire further where guaranteed investment returns were "pretty amazing," investors failed to consult with outside advisers to confirm legitimacy of returns, Ponzi operators refused to issue written offering documents or memoranda and warned investors not to discuss investments with broker-dealer/custodian that allegedly was sponsoring the scheme "on pain of being automatically disqualified from investing."); *see also Granite Partners, L.P. v. Bear, Stearns & Co.,* 58 F. Supp. 2d 228, 260-61 (S.D.N.Y. 1999); *Shlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (New York courts are "particularly disinclined to entertain claims of justifiable reliance" by "sophisticated businessmen" who "engag[e] in major transactions" and "enjoy access to critical information but fail to take advantage of that access." (*quoting Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984))); *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 448 (S.D.N.Y. 2006) (in evaluating duty of full disclosure:  "the more sophisticated the buyer, the less accessible the information must be to be

considered within the seller's peculiar knowledge")(citation omitted); *Most v. Monti*, 456

N.Y.S.2d 427, 428 (2d Dep't 1982) (rejecting as implausible the claim that an experienced

businessman assuming a major interest in a commercial enterprise would rely on verbal

assurances that property was assessed). The Trustee's allegations against any defendant of what

that defendant knew or should have known are based on that defendant's own access to

information and sophistication and do not implicate other investors at BLMIS.[22] Picower was

not like "every single other BLMIS investor" and allegations against him therefore are irrelevant

to the Trustee's ability to rely on the discovery rule in this or any other action.

## VIII.   THE TRUSTEE HAS PROPERLY ALLEGED A CLAIM TO AVOID SUBSEQUENT TRANSFERS

Under the plain language of 11 U.S.C. § 550, a prima facie claim against a subsequent or

mediate transferee requires the pleading of an initial transfer that is avoidable, and that the initial

transfer was later made to – or for the benefit of – the subsequent or mediate transferee. 11

U.S.C. § 550 (2009); *Silverman v. K.E.R.U. Realty, Corp. (In re Allou Distribs.),* 379 B.R. 5, 28-

30 (Bankr. E.D.N.Y. 2007). An exact dollar-for-dollar tracing of funds from the estate is not

required, so long as there are sufficient allegations that the funds at issue originated with the

debtor. *Id. at* 30.

Under Federal Rule of Civil Procedure 8(a), all that is required is that the complaint give

the opposing party "fair notice of what the . . . claim is and the grounds upon which it rests." *Id.*

at 31 (quoting *Erickson*, 551 U.S. at 93)(omission in original); Fed. R. Civ. P. 8(a) (2009). A

complaint has satisfied the pleading requirement under Rule 8(a) if it contains sufficient factual

allegations to enable a defendant to respond. Wright and Miller, 5 Fed. Prac. & Proc. Civ.3d §

---

[22] Contrary to Picower's suggestion that the Trustee seeks to favor later investors over earlier investors (MTD at 2), the length of time an investor was involved with BLMIS is not, in the Trustee's view, dispositive of whether that

1215 (2009).  Put another way, a complaint need plead "only enough facts to state a claim for relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

Here, the Trustee has alleged numerous specific and direct transfers totaling more than $6.7 billion, and identified a subset of those transfers on Exhibit B.[23]  (Compl. ¶ 57.)  As discussed above, all of the Transfers listed on Exhibit B constitute avoidable direct transfers of estate property to or for the benefit of the Defendants.  *Id.*

The Trustee has further alleged that Picower or Decisions controlled each of the other Picower Corporate Entities, which had an address either at 22 Saw Mill River Road, Hawthorne, New York, a store front office where little or no business was conducted, or at 25 Virginia Lane, Thornewood, New York; that Picower and Decisions conducted business through each of the Picower Corporate Entities; and that Picower or Decisions was the general partner or director of each of the Picower Corporate Entities.  (Compl. ¶ 37 *et seq.*)  There is no indication that any of the Picower Corporate Entities engaged in any business of any kind, other than to act as entities that could hold funds derived from BLMIS or conduct Picower's personal investments. The Trustee has further alleged that the Picower Foundation, Picower Institute for Medical Research, and Trust FBO Gabrielle H. Picower were or are nonprofit entities or trusts that have been dominated and controlled by Picower.  (*See* Compl. ¶ 53 and discussion at Point III above.)  The Trustee has alleged that Picower, through Freilich and/or Decisions, controlled and directed withdrawals and transfers of purported cash and securities among and between the Defendants and the Defendants' BLMIS accounts.  Defendants should be well aware of these transfers and

---

investor could have discovered the fraud.
[23] Nor, as explained in the Complaint, is Exhibit B expected to be an all-inclusive list of all transfers of estate property to all of the Defendants.  (Compl. ¶ 57.)

withdrawals because Picower and Freilich routinely directed BLMIS to make them, identifying

the accounts and amounts that should be transferred.

In light of the Picower Entities' common address, common control, apparent lack of

indicia of any other business or profit-making activities, and the backdrop of numerous transfers

directed by Picower and/or Freilich among Picower Entities, the Trustee has plausibly alleged on

information and belief that these entities received and benefited from subsequent transfers of

BLMIS funds.  *See Carr v. Equistar Offshore Ltd.*, No. 94 Civ. 5567, 1995 WL 562178, at *2

(S.D.N.Y. Sept. 21, 1995) (even under heightened pleading standard of Fed. R. Civ. P. 9(b),

"allegations may be based on information and belief when the facts are peculiarly within the

opposing party's knowledge." (*quoting IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049,

1057 (2d Cir. 1993))).

Where, as here, the detailed transactional information regarding transfers outside of

BLMIS is uniquely in the hands of the defendants and not the Trustee, and the Trustee has

identified the nature of the transfers sought to be avoided, dismissal is improper and the parties

should be permitted to proceed with discovery.  *See In re Payton*, 399 B.R. at 365 (denying

motion to dismiss constructively fraudulent transfers; although specific transfers were not

identified, "Jalbert [the trustee] cannot at this stage be required to do more" than "give a time

frame and specify the nature of the transfers" because "[h]e is an outsider to these transactions

and will need discovery to identify the specific transactions by date, amount and the manner in

which they were effected.").  Like the trustee in *In re Payton*, the Trustee here has only very

limited information beyond the documentary evidence in BLMIS' possession, but has identified

the nature of the transfers sought to be avoided.  The information provided in the Complaint is

sufficient to permit the parties "to distinguish the transactions at issue from those that are not."

*Id.* Accordingly, because the pleading is sufficient for the Defendants to frame a response,

Defendants' motion to dismiss the subsequent transfer claims should be denied.

## IX.    THE TRUSTEE HAS PROPERLY ALLEGED DISALLOWANCE OF DEFENDANTS' SIPA CLAIMS

In order to have the opportunity to participate in this SIPA liquidation, BLMIS customers

and creditors must have filed claims with the Trustee in accordance with this Court's December

23, 2008 Order on or before the statutory July 2, 2009 bar date. (Order, Dec. 23 2008 [hereinafter

"Claims Procedures Order"].)  The following Defendants filed timely customer claims for their

BLMIS accounts with the Trustee in accordance with the Claims Procedures Order:  Jeffry

Picower, Barbara Picower, Capital Growth Company, JA Special Limited Partnership, JAB

Partnership, JEMW Partnership, JF Partnership, JLN Partnership, Jeffry M. Picower Special Co.,

and The Picower Foundation.  (MTD at 11.)  No claims were filed with the Trustee on behalf of

the remaining Defendants.  *Id.*  The Trustee's objection in Count Eleven applies only to those

claims that were filed.[24]

The Complaint alleges two separate grounds on which Picower's SIPA claims should be

disallowed:  (i) that the claims are supported neither by the books and records of BLMIS nor the

claims materials submitted, and (ii) that the claims should be disallowed pursuant to Section

502(d) of the Bankruptcy Code.  (Compl. ¶¶ 122-3.); 11. U.S.C. § 502(d) (2009).  Picower does

not acknowledge, much less dispute, the second basis for this claim.  The thrust of Defendants'

argument instead focuses on the Trustee's interpretation of "net equity," as defined under Section

78*lll*(11) of SIPA. *See* 15 U.S.C. § 78*lll*(11).  In addition to presenting factual issues that

preclude dismissal under Rule 12(b)(6), and that should properly be decided in the context of a

---

[24] This Count was included in the Complaint to preserve the Trustee's rights to assert its objections, and to protect against any arguments by Picower based on claim preclusion principles.

claims proceeding, the Net Equity Dispute is squarely before this Court in a separate proceeding

involving all interested parties.  As discussed at Point II, above, the legal issue underlying

Picower's arguments will be decided by this Court in due course in accordance with the Peskin

Order, which established a schedule and guidelines for the consideration of this issue. (Peskin

Order at 16).  Because Count Eleven is sufficient on its face, and the Net Equity Dispute should

not be resolved within the confines of this motion, Count Eleven cannot be dismissed.

### A.        The plain language of Section 502(d) defeats Defendants' argument.

Picower makes the baseless statement that the Trustee "has not pleaded . . . a legal basis

for disallowing Defendants' SIPA claims."  (MTD at 51.)  To the contrary, the Trustee has

pleaded, among other things, that the claims filed by Defendants should be disallowed under

Section 502(d) of the Bankruptcy Code.  (Compl. ¶ 133.)

Section 502(d) explicitly mandates the disallowance of Defendants' claims, as it prevents

the transferee of an avoidable transfer from receiving a distribution unless he first returns the

transfer:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow
> any claim of any entity from which property is recoverable under section 542,
> 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under
> section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such
> entity or transferee has paid the amount, or turned over any such property, for
> which such entity or transferee is liable under section 522(i), 542, 543, 550, or
> 553 of this title.

11 U.S.C. § 502(d).  The purpose of § 502(d) is to "preclude entities that have received voidable

transfers from sharing in the distribution of assets unless or until the voidable transfer has been

returned to the estate."  *In re Mid Atlantic Fund, Inc.*, 60 B.R. 604, 609 (Bankr. S.D.N.Y. 1986).

In his Complaint, the Trustee has brought claims against Defendants for the receipt of

more than $5 billion of transfers of BLMIS's property which are recoverable under Sections 547,

548, and 550 of the Bankruptcy Code. 11 U.S.C. §§ 547-8, 550.  Defendants have not returned

such transfers to the Trustee.  Thus, Section 502(d) clearly applies to any claims filed by

Defendants, as they have failed to repay or turn over property recoverable under Sections 547,

548, and 550 of the Bankruptcy Code.  *See, e.g., In re Asia Global Crossing, Ltd.*, 333 B.R. 199,

202 (Bankr. S.D.N.Y. 2005) (stating that Section 502(d) prevents transferee of an avoidable

transfer from receiving distribution unless he first returns transfer).  Accordingly, the Trustee has

pled a legal basis for disallowing Defendants' SIPA claims, and Defendants' motion to dismiss

this Count should be denied.

### B.    The Net Equity Dispute is not properly before the Court in the context of a motion to dismiss.

Here again, Defendants argue that the Trustee must allow their customer claims in the

amount shown on their last customer statements issued by BLMIS.[25]  (MTD at 10, 51-52.)  As

discussed above, the issue of "net equity" applies to the determination of all customer claims in

this SIPA liquidation, as well as litigations brought by the Trustee, and will be heard by the

Court after briefing by all interested parties in accordance with this Court's September 10, 2009

Order. This Court already has rejected another attempt to raise the Net Equity Dispute outside of

the appropriate forum.  (Peskin Order at 16.)  Moreover, as discussed above, the precise amount

of equity in the customer accounts is a heavily factual issue that remains under investigation and

cannot be decided in the context of a motion to dismiss.  Since Count Eleven is sufficient as a

matter of law in any event, the motion to dismiss this count should be denied.

---

[25] Defendants also assert that the only records relevant under SIPA for purposes of this determination are the customer's last BLMIS statement.  (MTD at 51.)  There is nothing in the statute, however, that limits the Trustee to review of the last customer statement in determining customer claims.  The plain terms of SIPA state that payments to customers may be paid "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the Trustee."  15 U.S.C. § 78*fff*-2(b) (2009).  The "books and records" of a brokerage are comprised of more than merely the last customer account statements and include all of the financial and corporate records of the Debtor.  Finally, in a fraud case such as this, relying on the customer statements as the only source of "books and records" is a nonsensical proposition.

## X. DEFENDANTS' MOTION TO DISMISS CERTAIN REQUESTED REMEDIES IN THIS CASE IS PROCEDURALLY IMPROPER AND WITHOUT MERIT

Picower argues that the Trustee is not entitled to a constructive trust or to an assignment of the Defendants' tax refunds. As a threshold matter, the Trustee has not brought a cause of action for a constructive trust or for Picower's tax refunds; these are merely among the remedies requested on the Trustee's claims for relief. (*See* Compl. ¶ 40, prayers xiii & xiv.) A demand for relief is not a part of the plaintiff's claim, and a prevailing party shall be granted any relief to which it is entitled regardless of whether that relief has been demanded in its pleadings. *See, e.g.*, Fed. R. Civ. P. 54(c) (2009) (except in the case of a default judgment, the "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"); Wright & Miller, 5 Fed. Prac. & Proc. Civ.3d § 1255 (2009) (sufficiency of a pleading is tested by claim for relief and the demand for judgment is not considered part of the claim for that purpose; thus, if pleader is entitled to any relief demand for improper remedy will not be fatal to a party's pleading). As the Trustee has pled numerous causes of action entitling him to relief, no motion to dismiss can be based upon his selection of remedy. He will be entitled to all appropriate remedies, regardless of the Complaint's demand for relief, upon judgment. Fed. R. Civ. P. 54(c).

In any event, the remedies sought by the Trustee are not improper. The imposition of a constructive trust is an equitable remedy that is warranted by the facts of this case, and the Trustee's request for an assignment of tax refunds will not result in a "windfall" to the estate, but rather is a means to ensure recovery of all avoidable transfers received by the Defendants.

Funds transferred to Picower represent the fruits of a long-running and convoluted fraud. As detailed in the Complaint, Picower knew or should have known that he was benefiting from fraud, and the imposition of a constructive trust to assist in the recovery of the ill-gotten gains

held by the Defendants is both supported in law, and required by the circumstances to effect

equity. The elements for a constructive trust relied upon by Defendants are guideposts, *see In re*

*Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352-53 (2d Cir. 1992), and every element need

not be satisfied in all cases. *Tekinsight.com, Inc. v. Stylesite Mktg., Inc.* (*In re Stylesite Mktg.,*

*Inc.*), 253 B.R. 503, 508 (Bankr. S.D.N.Y. 2000); *see ESI, Inc. v. Coastal Power Prod. Co.*, 995

F. Supp. 419, 436-7 (S.D.N.Y. 1998). The overriding purpose of a constructive trust is the

prevention of unjust enrichment, and the Trustee has clearly alleged sufficient grounds

warranting its imposition. *See Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978); *In re*

*Koreag*, 961 F.2d at 354. A simple assertion that a constructive trust should be imposed,

together with sufficient detail giving notice that the money being sought is improperly held as a

matter of equity, sufficiently states a cause of action, *see Dampskibsselskabet AF 1912 v. Black*

*& Geddes, Inc. (In re Black & Geddes, Inc.*), 16 B.R. 148, 152-3 (Bankr. S.D.N.Y. 1981), and

therefore is more than sufficient to support the assertion of a requested remedy.

  As to Defendants' tax refunds, the Trustee is not seeking any double recovery that could

contravene Section 550 of the Bankruptcy Code. To the contrary, the Trustee is trying to ensure

that he can recover all of the property, or the value of property, transferred in accordance with

Section 550. As the Defendants note, Section 550 is intended to restore the estate to the financial

condition that it would have enjoyed if the transfer had not occurred. *In re Andrew Velez*

*Constr., Inc.*, 373 B.R. at 274; *In re Centennial Textiles*, 220 B.R. at 176. The Trustee believes

the income tax refunds sought by the Trustee result from payments made by Defendants to the

United States, state and local governments based on fictitious profits that the Defendants

received from BLMIS. Any overpayment or right to a refund constitutes a return to the

Defendants of these fictitious profits. Recovery of these amounts is therefore necessary to

restore the estate to the financial condition that it would have been in had the transfer not occurred. The Trustee is permitted to recover the full value of an avoidable transfer, even if composite elements of that value must come from more than one transferee. *Bertrum v. Laughlin (In re Laughlin)*, 18 B.R. 778, 781 (Bankr. W.D. Mo. 1982). In this case, the income tax refunds constitute a component of the avoidable transfers and should be returned for the benefit of the estate.

## CONCLUSION

For the reasons discussed above, Picower's motion to dismiss should be denied in its entirety.

Dated: New York, New York
September 30, 2009

*s/Marc E. Hirschfield*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

David J. Sheehan
Email: dsheehan@bakerlaw.com
Thomas Lucchesi
Email: tlucchesi@bakerlaw.com
Lauren Resnick
Email: lresnick@bakerlaw.com
Tracy Cole
Email: tcole@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC*