# EXHIBIT I

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   In Re:  Bernard L. Madoff
     Investment Securities, LLC
 4
     A & G GOLDMAN PARTNERSHIP and
 5   PAMELA GOLDMAN,

 6                  Appellants,

 7           v.                        12 Civ. 6109 (RJS)

 8   IRVING H. PICARD,
                                       Bankruptcy Appeal
 9                  Appellee.

10   ------------------------------x

11                                     New York, N.Y.
                                       September 24, 2013
12                                     2:10 p.m.

13   Before:

14           HON. RICHARD J. SULLIVAN

15                                     District Judge

16
             APPEARANCES
17

18   RICHARD LEE STONE
          Attorney for Appellants
19

20   HERRICK FEINSTEIN LLP
          Attorneys for Appellants
21   BY:  FREDERICK E. SCHMIDT, JR.
          JOSHUA J. ANGEL
22

23   BAKER & HOSTETLER LLP
          Attorneys for Appellee
24   BY:  DAVID J. SHEEHAN
          FERVE E. OZTURK
25
```

```
 1              (Case called)

 2         THE COURT:  Appearances for the appellants?

 3         MR. STONE:  Richard Stone on behalf of the appellants.

 4         THE COURT:  Mr. Stone, you are not on the docket

 5    sheet, right?  I only have Mr. Schmidt, I think, on the docket

 6    sheet.

 7         MR. SCHMIDT:  Frederick Schmidt of Herrick Feinstein,

 8    for the appellants.  Our co-counsel is Mr. Stone.  He was on

 9    the brief.  He should be on --

10         THE COURT:  You have to file a notice of appearance.

11    Did you file a notice of appearance?

12         MR. STONE:  I'm a member of the Southern District bar.

13         THE COURT:  You have to file a notice in this case.

14    Let's do that.  All right.  Mr. Schmidt, Mr. Stone, and?

15         MR. ANGEL:  Joshua Angel.

16         THE COURT:  Mr. Angel, I don't see you on the docket

17    sheet, either.

18         MR. ANGEL:  I'm with Herrick Feinstein.

19         THE COURT:  Still, individual lawyers have to make

20    appearances, not just firms.  Let's do that.  Good afternoon.

21              And for the appellee?

22         MR. SHEEHAN:  David Sheehan, your Honor, of Baker

23    Hostetler, for the trustee.  Ferve Ozturk is with me today.

24         THE COURT:  I don't see Ms. Ozturk on the docket

25    sheet, either.  Let's file a notice of appearance for you as
```

1   well.

2           We are here in connection with the appeal of Judge

3   Lifland's decision.  I, like you, have been waiting to see what

4   the circuit is going to do on what seems to be a somewhat

5   related case involving Judge Koeltl.  I don't know when they

6   are going to do that.  They argued it about ten months ago, I

7   think.  I was expecting it at any point.  Especially since

8   another case came out involving this bankruptcy around June I

9   guess it was, the JPMorgan decision, I assumed this would

10  follow right on the heels, but it hasn't.  We all have to move

11  on with our lives, so that's why scheduled this.

12          What I thought I would do is hear from the appellants

13  first.  Are you the only one arguing, Mr. Stone?

14          MR. STONE:  Yes, your Honor.

15          THE COURT:  I will allow you to reserve a little bit

16  of your time to respond to what the appellees have to say,

17  since it is your appeal.

18          MR. STONE:  Thank you, your Honor.  Good afternoon,

19  Richard Stone for appellant Goldman plaintiffs and the putative

20  class.

21          Appellants position on this appeal is that the Second

22  Circuit decision in Fox may strengthen appellants' position on

23  this appeal but cannot negatively impact appellants' position,

24  and thus that this appeal should be decided now.  Moreover,

25  because the Second Circuit and the Eleventh Circuit, where the

 1    Goldman case is to be filed, have clearly ruled that federal

 2    securities claims of estate creditors which arise out of the

 3    same fraud as claims asserted by the estate as against common

 4    defendants may only be asserted by purchasers of those

 5    securities and the decision below should be reversed.

 6             THE COURT:  It is clear that the trustee can't bring

 7    securities claims.  I will hear from Mr. Sheehan, but I think

 8    he would probably concede that point.  The issue is whether

 9    these security claims are just fraudulent conveyance claims in

10    securities claims' clothing.

11             It wasn't a securities cause of action in the Fox

12    case.  That was a case in which Judge Koeltl said these are

13    state statutory and common law causes of action, state RICO,

14    conspiracy, unjust enrichment I think, and conversion, and

15    although each is a separate, stand-alone cause of action that

16    perhaps wouldn't be available to the trustee, in reality these

17    were derivative of and duplicative of the fraudulent conveyance

18    action.  That is certainly what Judge Koeltl found.

19             You don't think if the circuit affirmed and said, yes,

20    that is exactly what this is, that wouldn't have a pretty much

21    conclusive effect in this case?

22             MR. STONE:  No, your Honor, I think it would have no

23    effect whatsoever.

24             THE COURT:  Why?

25             MR. STONE:  The claims are completely distinct.

1          THE COURT:  Yes, they are completely distinct.  What

2     is the magic of a federal securities claim that makes it

3     different from a state RICO claim.

4          MR. STONE:  A federal securities claim can only be

5     asserted by a purchaser of the security under Blue Chip Stamps.

6     Our class is the purchaser of the security.  BLMIS, the estate,

7     is the issuer of the security.  It is a separate claim because

8     we are the only people that can assert it.  The damages we

9     claim under the 20(a) claim are distinct from fraudulent

10     conveyance claims.  The damages in a securities case would not

11     be the amount of money that --

12          THE COURT:  Do you think the trustee could have

13     asserted a state RICO claim against itself or against its

14     co-conspirators?

15          MR. STONE:  I think he would have been barred by in

16     pari delicto, your Honor.

17          THE COURT:  Right.  I guess I'm not sure what the

18     difference in that is.  In either case the trustee is not in a

19     position to bring the claim.  I think there is no question

20     about that.

21          MR. STONE:  Correct.

22          THE COURT:  Judge Koeltl nonetheless found that even

23     though the trustee couldn't bring the claim, the claim, at

24     least as pled, or in this case potentially pled, is identical

25     to the fraudulent conveyance claim that was in fact brought by

```
1    the trustee.  I guess I don't see what the magic of federal

2    securities law is.

3            MR. STONE:  Judge Koeltl didn't bar the claims under

4    in pari delicto.  He felt that they weren't barred by in pari

5    delicto.  He also found that St. Paul extended those claims

6    which the Second Circuit held opposite in the HSBC v. JPMorgan

7    case that was just decided.

8            THE COURT:  The JPMorgan case does reference Judge

9    Koeltl's case and seems to recognize that Judge Koeltl got it

10   right.  Do you know the footnote I'm referring to?

11           MR. STONE:  Yes, I do, your Honor.

12           THE COURT:  Deal with that.  I think I'm reading tea

13   leaves a little bit.  I don't know what the Second Circuit is

14   going to do any more than you do.  But there is a hint of what

15   they are doing.  That case had just been argued around the time

16   that -- well, no, this case was argued in November.  JPMorgan

17   was argued when, after that?

18           MR. SHEEHAN:  Just before Thanksgiving, your Honor.

19           THE COURT:  In any event, certainly the two are aware

20   of each other, and there is a reference in JPMorgan to Judge

21   Koeltl's decision in Fox.

22           MR. STONE:  Your Honor, we think that footnote stands

23   only for the proposition that if in fact the claims are

24   duplicative and derivative, then there are state claims and

25   nothing more than that.  We don't think it is a finding on
```

1    that.  We are obviously waiting for the Second Circuit's review

2    of that analysis in a decision that hasn't been issued yet.

3           Your Honor, if I could get back to 20(a).  First of

4    all, no court has ever in the history of securities litigation,

5    as far as we know, enjoined a federal securities claim even

6    when the estate brings common law claims.  Negligence,

7    malpractice against its auditors, against its insurance

8    company, overlapping facts, no court has ever enjoined a

9    federal securities claim in that context.

10          I myself and I'm sure this court has had the

11    experience of having contemporaneous litigation of estate

12    claims against an auditor defendant and class action against an

13    auditor defendant.  We just finished the Adelphia case, where

14    there are three such instances.  No court has ever enjoined

15    those claims even though they arise from the same fact pattern

16    and assert similar type fraudulent actions, because securities

17    class actions are distinct from estate claims.  They can only

18    be brought by purchasers of securities.  They seek different

19    damages.

20          In this context the damages we seek exceeds 7.2

21    billion by a substantial amount.  The damages in our case are

22    the amount we overpaid for the securities.  Here apparently

23    there were no underlying securities ever bought, so that can be

24    as much as $18.5 billion, your Honor, substantially in excess

25    of the amount Picower actually stole from the estate, because

 1   other transactions took place while they were in control of

 2   that entity for which they are responsible which depleted the

 3   assets of Madoff.  We have a different claim extending to

 4   different dollars and different activities, not the receipt of

 5   moneys:  The failure to supervise a broker-dealer over whom

 6   they have a federal legal duty, a fiduciary-like duty, to

 7   oversee.

 8        THE COURT:  I think the securities claims are going to

 9   be dead on arrival and if you ever live to go pitch this claim

10   in a federal court.  That's not the inquiry today.  But I do

11   think there is an inquiry as to whether or not the claims you

12   are proposing are derivative.  I'm curious as to what that term

13   means and what authority would be guiding me to decide whether

14   or not the claims that you are seeking to assert are derivative

15   of the fraudulent conveyance claims that have been made and

16   then settled.

17        MR. STONE:  Your Honor, we think "derivative" means

18   they are assertible by the estate.

19        THE COURT:  What is your basis for saying that?

20        MR. STONE:  That is what our understanding of a

21   derivative action is, a claim that is brought by shareholders

22   that is on behalf of the estate that the estate itself could

23   assert but did not.

24        THE COURT:  There is a derivative cause of action

25   which is sort of made by shareholders in the shoes of the

1   corporation where you have faithless directors or whatever.

2   There is also derivative as derived from, which is just plain

3   English and not loaded with Rule 23.1 baggage. You're

4   suggesting that "derivative" means basically a derivative claim

5   brought by shareholders?

6           MR. STONE: No. It means a claim which the

7   corporation could have brought, had standing to bring, but was

8   brought by shareholders in its stead. Under Delaware law, the

9   example you are using is one example of that, yes.

10          THE COURT: The phrase that is used by Judge Koeltl

11  and that is in the settlement agreement is "derivative of and

12  duplicative of," I believe.

13          MR. STONE: That is the language from Judge Lifland's

14  injunction.

15          THE COURT: Right. What am I to make of

16  "duplicative"? Should I be looking at whether a claim is

17  duplicative? If so, what is the standard for deciding whether

18  something is duplicative?

19          MR. STONE: Honestly, your Honor, we are not entirely

20  clear on what the court meant by that. We questioned that at

21  the time. But I don't see how we can find that a federal

22  securities claim seeking to remedy a federal right where an

23  entity has a fiduciary duty directly to shareholders to oversee

24  the proper issuance and maintenance of information concerning

25  the issuance of securities is duplicative of the claim that

1    that entity stole money.

2         We are seeking moneys well beyond the $7.2 billion

3    that Mr. Picower and his entities took.  There were other

4    people that were able to take money because there were phony

5    books and records.  There were other people that were able to

6    get fraudulent conveyances because the records were false and

7    directed by the Picower defendants.

8         THE COURT:  I understand that.  You are not really

9    alleging that the Picower defendants were directing trades or

10   directing communication between the Madoff folks and

11   shareholders, right?

12        MR. STONE:  We are alleging that they directed, forged

13   the preparation of documents which they knew would be delivered

14   to shareholders, yes.

15        THE COURT:  It is difficult for me to see what you are

16   alleging beyond that the documents that supported the

17   fraudulent conveyance were false.

18        MR. STONE:  Your Honor, those weren't the only

19   documents that were false.  The account statements that were

20   received on a monthly basis by all the members of the class

21   were false.  The FOCUS reports and broker-dealer reports filed

22   by BLMIS were false.  The accounting records prepared by BLMIS

23   and made public were false, all because phony trades were

24   booked at the direction of the Picower defendants.

25        THE COURT:  Phony trades were booked at the direction

1    of the Picower defendants, where are you alleging that, that

2    they directed trades?

3            MR. STONE:  We have a draft complaint.  I'll get the

4    draft complaint, if I can, your Honor.

5            THE COURT:  Sure.

6            MR. STONE:  Page 12, your Honor, paragraph 39.  This

7    is the Pamela Goldman draft complaint.

8            THE COURT:  Just read it.

9            MR. STONE:  "The defendants," that's the Picower

10   defendants, "directed BLMIS to prepare fraudulent trading

11   records and fraudulent trading results which affected returns

12   in their accounts based upon transactions which never took

13   place.  Picower, directly and through the other defendants,

14   initiated, directed, coordinated, and caused to be effected

15   false records and backdated records of BLMIS which resulted in

16   the appearance of trading profits in these accounts," meaning

17   customer accounts.  Picower then withdrew these false profits

18   from the defendants' accounts.  The direction of trading

19   activity and the direction and preparation of false trading

20   records over a multiyear period shows control of the specific

21   fraudulent activity which constituted the underlying Ponzi

22   scheme and the underlying violations of 10b-5 engaged in by

23   BLMIS."

24           THE COURT:  What you just read to me doesn't really

25   tell me what are the documents you are talking about.

 1          MR. STONE:  We are talking about the actual trading

 2    records maintained by the broker-dealer BLMIS, the account

 3    statements received by the consumers of BLMIS.

 4          THE COURT:  Picower directed what account statements

 5    got sent to the account holders?

 6          MR. STONE:  No.  Federal law dictates the form of

 7    those.  He dictated what information was contained on that,

 8    which was false.

 9          THE COURT:  Dictated how?  What you are saying now

10    sounds like conclusory statements.  You are suggesting that he

11    told the Madoff defendants what to put in their statements to

12    the account holders?

13          MR. STONE:  That's exactly correct, your Honor.  There

14    are email documents, substantial documents, some of which we

15    have gotten since we filed this draft complaint, which is not a

16    final complaint, which showed that Picower directed through

17    email false trades be recorded on the bank records of Madoff

18    which showed substantial profits that were not occurring.

19          That money, the money that resulted from those false

20    transactions, was wired to Mr. Picower, which constituted the

21    fraudulent conveyance action.  The bank records themselves were

22    thereby false and the monthly statements that customers

23    received were thereby false because those booked transactions

24    never existed, to the tune of billions of dollars.

25          THE COURT:  I don't have the emails.  It seems to me

 1   that Picower is a customer of Madoff and, like other customers

 2   of Madoff, was either a net winner or a net loser.  It's a net

 3   winner.  But it is not clear to me what emails you are

 4   referring to that show that Picower was basically directing

 5   what communications were to be made to other account holders.

 6           MR. STONE:  Your Honor, it is our intention, when we

 7   have the ability to do so, to file an amended complaint

 8   including all of that.  This was a draft complaint filed more

 9   than a year ago.  Information has come out.  Those emails are

10   now public.

11           THE COURT:  One of the other things that Judge Koeltl

12   addresses is the effect of the Metromedia case, which he talks

13   about standing for the proposition that truly unusual

14   circumstances might warrant a different result than in a garden

15   variety case.  I'm not sure what the limiting principle is for

16   that.  Look, Metromedia is controlling precedent.  You can

17   discuss what it means and what truly unusual circumstances

18   would be necessary in order to justify a step like that taken

19   by the bankruptcy court.

20           MR. STONE:  We don't think there are any truly unusual

21   circumstances here, your Honor.  In fact, our continuing of the

22   litigation against the Picower defendants will have no impact

23   on the estate, because they finally settled with them.  What

24   Metromedia is talking about is activities which would prevent a

25   reorganization of a debtor.  None of those exist here.

1    THE COURT:  They will speak for themselves I suppose.

2    At least it could have a chilling effect on future settlements

3    and future bankruptcies, would you agree with that?

4    MR. STONE:  No, your Honor.  We are five years into

5    this litigation.  I believe that the statute of limitations for

6    most of the estate actions has run.  They brought cases against

7    most of the defendants they are going to sue.

8    THE COURT:  Future bankruptcy is what you have.  You

9    have somebody like Picower, a party that is prepared to settle

10   but on the condition that they get sort of peace.  That's what

11   the trustee negotiates and that's what the bankruptcy court

12   approves.  $7.2 billion ultimately is nothing to sneeze at, it

13   seems to me.  Sounds like real money.

14   MR. STONE:  Your Honor, under Metromedia and under

15   subsequent authorities that I think we have briefed quite

16   thoroughly in the case, Manville being the other one, the size

17   and magnitude of the settlement alone cannot be those

18   circumstances that warrant a barring of third party state

19   claims.

20   Three circuit courts have found that section 524 of

21   the Bankruptcy Code doesn't permit it at all.  It may be there

22   is a small exception in the Second Circuit in connection with

23   asbestosis litigation or drug litigation where there is a

24   channeling injunction and other people get money, but it has

25   never been used in this context to justify simply a large

1   settlement, which is the only justification that the trustee

2   offers.

3          Moreover, I would say that Judge Koeltl effectively

4   found that the state law claims were estate assets, so Manville

5   really didn't have a major role in that decision.  Once he

6   found that there were state assets, he did have subject matter

7   jurisdiction.  It's only if they aren't estate assets.

8          THE COURT:  It is an alternative holding, I think.

9          MR. STONE:  I agree, your Honor.

10         THE COURT:  If I were to agree with you but then

11  accept his alternate holding, that would still be the end,

12  right?

13         MR. STONE:  Your Honor, in that event I suggest we

14  wait for the Second Circuit because I think they will address

15  that quite thoroughly.

16         THE COURT:  You just told me not to.

17         MR. STONE:  Of course.  I guess I'm entitled to change

18  my mind.  I think it would be extremely significant for the

19  Court to rule that simply the existence of an estate claim

20  arising out of common facts against a common defendant, even

21  though a very large claim, can serve as a basis for enjoining

22  independent federal securities claim.

23         It's never happened.  To the contrary, the

24  contemporaneous litigation of estate claims and class action

25  claims, including control person claims in Metzger v. Feingold,

 1  which is 367 F.App'x 202.  That is our case.  There was a

 2  fraudulent conveyance, there was money transferred, the

 3  directors were sued by the entity, by the estate, and as

 4  control persons of the entity in a class action.  That's

 5  Eleventh Circuit authority where our case will be pending.

 6          THE COURT:  I'm in the Second Circuit.

 7          MR. STONE:  Yes.

 8          THE COURT:  I take my marching orders from them even.

 9  If I don't think they are right, I have to take my marching

10  orders from them.

11          MR. STONE:  I understand.

12          THE COURT:  Why don't we hear from Mr. Sheehan, and

13  then I'll give you a chance to respond to him.

14          MR. STONE:  Thank you very much, your Honor.

15          THE COURT:  Thanks.

16          MR. SHEEHAN:  Thank you, your Honor.  First of all, I

17  think I'd like to focus on your Honor's question.  The question

18  was whether or not there is a meaningful distinction to justify

19  a different result.  I think our answer is a resounding no.  I

20  know your Honor is not surprised to hear me say that.  Let me

21  explain why I think so.

22          One thing that is interesting here is that no one

23  disputes the fact that the injunction itself against

24  duplicative or derivative causes of action is appropriate.  In

25  other words, Judge Lifland and Judge Koeltl's decisions

1    emphasize the fact that in an orderly administration of the

2    bankruptcy estate it is entirely appropriate, when something is

3    a duplicative or derivative action, to enjoin it.  So the

4    question here today is isn't duplicative or derivative.

5              THE COURT:  How do I define those terms?

6              MR. SHEEHAN:  I think Judge Koeltl's decision, while

7    not binding on your Honor, is very instructive in terms of the

8    exercise one has to go through to make that decision.  When we

9    start comparing the two alleged causes of action, what we find

10   here is this.

11             One of the same things that are in play in both the

12   Fox decision before Judge Koeltl and the Goldman decision

13   before your Honor is the fact that they are both emanating out

14   of the same transactions, the fraudulent conveyance

15   transactions.  Even the description that counsel just offered

16   to you about emails going back and forth between Mr. Picower

17   and BLMIS emanate out of the fraudulent transfers.  He was

18   directing, as we allege, that certain transactions take place.

19             These were not publicized to anyone.  There is no such

20   allegation.  They were publicized only between the BLMIS and

21   Mr. Picower.  Therefore, everything here, everything here, is

22   built on the fulcrum of a fraudulent conveyance.  There is no

23   other way to look at it.  There is no allegation that anything

24   transpired.

25             Mr. Picower had nothing to do with these people.  He

1    was a customer just like they were customers.  Everything they

2    are alleging here is the same as in the earlier lawsuit in this

3    sense.  Judge Koeltl and Judge Lifland both found in the

4    earlier case, when there was a tort claim, it could have been

5    brought by any other customer.  The same is true here.  What

6    does that tell us?  It's a generalized claim.

7              THE COURT:  This suit couldn't be brought by any other

8    creditor.

9              MR. SHEEHAN:  Any other customer.

10             THE COURT:  But not any other creditor.

11             MR. SHEEHAN:  I apologize.  I misspoke.  I meant

12   customer.

13             THE COURT:  I'm not sure you said that.  I'm saying

14   that.  Is that a difference that is meaningful?  Where is a

15   case where any other creditor could bring a claim that is

16   general?

17             MR. SHEEHAN:  Right.

18             THE COURT:  In this case it is not any other creditor,

19   it is only customers.  There are certainly a class of creditors

20   who are not customers, right?

21             MR. SHEEHAN:  That's correct.  As a matter of fact,

22   interestingly enough, I think that reinforces the fact of why

23   you have to have here the statutorily mandated SIPA scheme, the

24   ability to shut down duplicative and derivative causes of

25   action by customers who are trying to hijack the system, which

1   is exactly what is going on here.

2          They don't like the outcome.  They didn't like the net

3   equity decision.  What they want to do is create a cause of

4   action that suggests to your Honor that it somehow is

5   independent.  Independent based on what?

6          THE COURT:  I'm trying to figure out how as a rule of

7   general application I in this case and the next case will be

8   able to discern what is derivative and what is not, what is

9   independent.  If the Picower folks were actually communicating

10  or dictating to Madoff what he should put in correspondence

11  with other customers, would that be enough?

12          MR. SHEEHAN:  I don't think so, not in this situation.

13          THE COURT:  Why not?

14          MR. SHEEHAN:  Because, first of all, with all due

15  respect, and I use this term advisedly, this is a concocted

16  cause of action.

17          THE COURT:  That may be.  I've got a hypothetical, a

18  different one, not this one, a hypothetical in which there is a

19  person who is dictating to Madoff and to his lieutenants what

20  should be included in communications with customers.  Assuming

21  that scenario, that fact pattern, wouldn't the customers have a

22  cause of action against that individual?

23          MR. SHEEHAN:  I don't know.  There is no privity

24  there.  There is no interaction between the two of them.  They

25  are simply customers.  He is a customer who has better access

1  to Mr. Madoff, that's all that is.  Whether that constitutes a

2  cause of action is a wholly different kettle of fish.

3        I understand what your Honor is saying.  My adversary

4  just said it, too.  We are not here on a motion to dismiss.

5        THE COURT:  Are you saying there needs to be privity

6  for a securities fraud?

7        MR. SHEEHAN:  No.  What I'm saying is there has to be

8  some added starter.  It can't simply be that he's talking to

9  Mr. Madoff and somehow that starts a cause of action by the

10  entire creditor body against that individual.  Many, many

11  people talked to Mr. Madoff every day about their accounts.

12  Many of them talked to him in the way that Mr. Picower did.  He

13  was not alone.  That does not mean that there were causes of

14  action against all those individuals.

15        Your Honor, we have to focus on what he did do, what

16  were his acts.  His acts were to take money out from that to

17  the detriment of everyone else.  It's a fraudulent conveyance.

18  That's what they are actually complaining of.  If you want to

19  slice through whether you call it a tort, a securities

20  action --

21        THE COURT:  That is not what he is complaining of.  He

22  is saying the damages go beyond that.  The difference is this.

23  The fraudulent conveyance is challenging and moving on the

24  gains that Picower received.

25        MR. SHEEHAN:  Correct.

1      THE COURT:  A securities fraud action, it seems to me,

2  is moving on the losses resulting from securities transactions

3  that were based on false information.

4      MR. SHEEHAN:  I ask this question rhetorically.  If he

5  had gotten nothing, would there be a cause of action?  I submit

6  to you there wouldn't.  The only reason there is a cause of

7  action is because he got money.  If he had gotten nothing out

8  of that, where does the liability lie?

9      THE COURT:  Wait.  On federal securities law there has

10  to be a loss, you have to show that you have been harmed, but

11  you don't have to show that the person who harmed you gained.

12  I think we have to stay focused on a federal securities action

13  or any securities action in which the claim is that they

14  overstated or falsely stated the bona fides of a particular

15  transaction and based on that false information, I traded.  If

16  that's the case, then the damage is the loss amount, right?

17  It's the inflation caused by the false statements as measured

18  by the drop in the stock price when there is disclosure.

19      MR. SHEEHAN:  There is no stock price.  There is no

20  stock.

21      THE COURT:  Fraudulent conveyance is --

22      MR. SHEEHAN:  If I can create a cause of action

23  nominally out of thin air and all of a sudden I can proceed

24  with that, I think the court, the bankruptcy court, should be

25  entitled to stop that, stop that before it gets out of the

 1   starting gate.  Otherwise, we are going to have multiple

 2   litigations all over the place depending on the imagination of

 3   a lawyer who suggests that somehow this is an independent cause

 4   of action.  I think you have to look at the cause of action.

 5   You can't just ignore it.

 6          THE COURT:  You are insisting that the cause of action

 7   is for the $7.2 million or the money that was fraudulently

 8   conveyed to Picower.

 9          MR. SHEEHAN:  No, that's not what I am saying.

10          THE COURT:  Oh.

11          MR. SHEEHAN:  What I am saying is their cause of

12   action is predicated on the same conduct of Mr. Picower.  That

13   is a fraudulent conveyance, and the appropriate way to deal

14   with that fraudulent conveyance is in the confines of the

15   bankruptcy cause of action, not to come up with causes of

16   action that don't exist and suggest your Honor will allow us to

17   pursue those when they don't.  It's the same.

18          For example, to go back, Judge Koeltl says it a

19   locality better than I do.  I wish I could just read his

20   opinion; I'd do a lot better here.  What he says is nominally

21   you can call it anything.  To quote the Bard, a rose by any

22   other name smells as sweet.

23          The same thing is true here.  Nominally you can call

24   it a tort, you can call it a securities action, you can call it

25   everything else, but essentially the same factual statements

1    are being alleged to constitute their cause of action as the

2    factual statements alleged by the trustee.  Therefore, it is

3    derivative.

4         THE COURT:  That's what I'm groping for.  You're

5    saying that any cause of action that alleges or relies upon the

6    same allegedly fraudulent statements is derivative?

7         MR. SHEEHAN:  Without more.  Without more.

8         THE COURT:  No.

9         MR. SHEEHAN:  What I mean by that is let's assume that

10   Mr. Picower had reached out to these individuals.  There is no

11   such obligation, but let's say he had reached out to a group of

12   customers and said look, this guy Bernie, he's the sure thing,

13   he's done a terrific job for me, you ought to give him a lot of

14   dough.  I don't think I'd be standing here, your Honor,

15   suggesting to you that this is the same cause of action as a

16   fraudulent conveyance.  He is actively engaged in conduct that

17   he should be responsible for.  There is no such allegation.

18   There is no proof.  There is nothing of that.

19        What they have here is Mr. Picower taking money out as

20   a fraudulent conveyance and they are saying, wait a minute,

21   holy cow, that constitutes that he is in some kind of control

22   here and as a result we should have a cause of action, when in

23   fact all that is is rhetoric.  Rhetoric shouldn't be enough to

24   sustain or go around the ability of the bankruptcy court to

25   control what's going on here.

1          THE COURT:  Rhetoric, I don't know.  I have a proposed

2    complaint and now a representation that there will be even a

3    better complaint that they could write that has more facts and

4    less rhetoric presumably.

5          MR. SHEEHAN:  Your Honor, with the complaint or even

6    with the enhanced complaint, I don't see that there is any

7    basis here to suggest that what they are arguing is different

8    than what was in front of Judge Koeltl or is in front of your

9    Honor here today.  They are exactly the same.

10          I don't want to keep repeating myself, your Honor.

11    Let me go to a different tack.  I suggest to your Honor that

12    the Third Circuit has already forecast where they are going --

13    Second Circuit I should say.  Your Honor doesn't have to wait

14    too much longer because of the footnote your Honor referred to,

15    maybe I could read a portion of it.

16          It says, your Honor, referring now to Judge Koeltl's

17    decision, "The customer claims were 'duplicative and derivative

18    of the trustee's fraudulent transfer claim.'  ID 479.

19    Accordingly, the court found the claims to be 'general' in the

20    sense, articulating St. Paul, in that they arose from a single

21    set of actions that harmed BLMIS and all BLMIS customers in the

22    same way," which is what I said at the outset.

23          There is nothing here that these individuals are

24    alleging that is any different than any other customers could

25    so allege.  That being the case, they are indeed generalized

1   claims, they are in fact duplicative of what the trustee has

2   brought, and they should be enjoined.

3            THE COURT:  The Metromedia point, Johns-Manville.

4            MR. SHEEHAN:  Again, I refer to Judge Koeltl's

5   opinion, which articulates it a lot better than I can.  We do

6   have an extraordinary result here.  It is not every day you

7   walk into a courtroom with a $5 billion settlement and an

8   additional $2.2 billion going to the Department of Justice as

9   part of the settlement.  That is an extraordinary event in the

10  context of the case.

11           More importantly, something your Honor pointed out and

12  so did Judge Koeltl, what this does is it arms a bankruptcy

13  trustee with the ability to negotiate and work settlements with

14  other people, not just other bankruptcies, as your Honor

15  alluded to, but also within this case itself.

16           Our ability to offer that kind of relief in the

17  context of a settlement enhances the trustee's ability to bring

18  in the assets to the estate, to create the customer fund that

19  we have created, now over $9 billion, and be able then to

20  satisfy all customer claims hopefully at the end of the day.

21  That is not going to happen unless we are fully armed with all

22  the tools in our kit to be able to do that.

23           THE COURT:  I'm not sure.  In this case you are saying

24  to allow them to go forward with their claims in federal court

25  in Florida is going to somehow scuttle the settlement?

 1            MR. SHEEHAN:  No, it is not going to scuttle the

 2    settlement.  What I am saying is it would disarm the trustee in

 3    future settlements if what were to happen is this injunction is

 4    tossed out.  We go to our next settlement and they say if you

 5    offer us this release, there would be a complete disclosure

 6    here, but that is not what is going to happen, look what

 7    happened in the Picower case.

 8            We need to have that ability in future cases to offer

 9    not only the ability to get relief in terms of their claims

10    being released and what-have-you, getting releases, but also

11    the ability to ensure that when they have paid in all of the

12    money, as happened in Picower, paid all of it, all the money

13    that they took out, at the end of the day that gives them

14    repose.

15            We are limiting this, your Honor.  Let's not confuse

16    estate assets here.  We are not talking about estate assets.

17    What we are talking about here is duplicate and derivative

18    claims.  If these individuals had independent causes of action,

19    we wouldn't be here today.

20            THE COURT:  Judge Koeltl's decision seemed to suggest

21    that even if they are not independent claims, even if they are

22    not derivative claims, Metromedia and the unusual circumstances

23    would still justify a settlement.  Do you agree with that?

24            MR. SHEEHAN:  I agree with that, absolutely.

25            THE COURT:  You're saying that a trustee would have

1    the authority, the bankruptcy court would have the authority,

2    to approve settling a creditor's claims that the trustee

3    couldn't have brought on their own because it's a whopping big

4    bankruptcy?

5         MR. SHEEHAN:  No, of course not.  If I said that, I

6    misspoke.  It has to be in the context of a trustee's bringing

7    a claim such as we did here, the traditional bankruptcy claims,

8    fraudulent conveyance claims, etc.  That's what I'm speaking

9    of, your Honor.  And enhancing the customer fund.  Only then,

10   when we are doing that, coupled with that appropriate cause of

11   action and the group result or great result, then you package

12   together with it the injunctive relief.  You want to fully arm

13   the trustee to be able to do that.

14        THE COURT:  Again, it seems to me that Judge Koeltl

15   was leaving open an alternative basis for approving the

16   injunction and for denying the causes of action.

17        MR. SHEEHAN:  I'm not saying that they are

18   co-dependent, your Honor.  I believe that they are independent.

19   But I believe that rationale behind them flows very nicely in

20   the sense of independently it is a terrific outcome and

21   therefore it should enhance the trustee's ability to get the

22   right result, which includes an injunction in this particular

23   instance.  I agree with Judge Koeltl that it has an independent

24   basis in Metromedia and that's why they decided the case that

25   way.

1          I am also saying that in this situation here I think

2     it is appropriate even without Metromedia in order to have the

3     trustee achieve the outcome that was necessary, because we are

4     limiting it.  The injunction is this, duplicate and derivative.

5     It doesn't mean if they had something else, they couldn't see.

6     It's not like a ban on all causes of action ever against Mr.

7     Picower.  It's very limited.  If it's duplicate and derivative

8     of a fraudulent conveyance claim, it is enjoined.  That's the

9     only reason we are here.

10          THE COURT:  Again, it turns on the definition of

11    "derivative."  What Mr. Stone said was that "derivative" means

12    that it could be brought by the trustee.  You would concede

13    that the trustee can't bring a securities fraud claim, right?

14          MR. SHEEHAN:  I disagree with that statement.  It is

15    derivative of the trustee's cause of action.  If it is

16    derivative of trustee's cause of action, they can't bring it.

17    And there is no question that their transaction derives exactly

18    out of the trustee's cause of action here.

19          THE COURT:  You are using the term "derived" to mean

20    it is based on the same facts?

21          MR. SHEEHAN:  The same conduct of Mr. Picower.  It is

22    based on the same conduct.  Your Honor, does anyone in this

23    courtroom doubt that Mr. Picower didn't engage in these

24    fraudulent conveyances, that he would be subjected to this

25    lawsuit by them?

```
 1          THE COURT:  I don't know.

 2          MR. SHEEHAN:  I think it is pretty obvious:  No

 3  fraudulent conveyance by Mr. Picower, no lawsuit.  It's as

 4  simple as that.

 5          THE COURT:  I assume there would be no lawsuit if Mr.

 6  Picower or his estate or the other defendants who would be

 7  named in a securities class action had no money left.  Then

 8  there would be no suit.  But if there is any thought that there

 9  was any money left, then I'm not so sure.

10          MR. SHEEHAN:  It is still based on what he did, his

11  conduct.  As Judge Koeltl said, look at what he did, don't look

12  at all the hurrah about what the cause of action might be

13  named.  What did he do?  What was the conduct?  That is pivotal

14  here.

15          THE COURT:  That requires me to look, then, very

16  carefully at the complaint, right?  They are saying that the

17  conduct was false statements in connection with the purchase or

18  sale of securities --

19          MR. SHEEHAN:  You don't get there.  I'm sorry.

20          THE COURT:  Let me finish.

21          MR. SHEEHAN:  Yes, your Honor.  I apologize.

22          THE COURT:  -- that the fraud took place at the time

23  the plaintiffs in the securities action purchased the security

24  going forward with their accounts with Madoff, that that is

25  where the damage took place.  It is not about what money went
```

1    to Picower, it is about what money went from the pockets of the

2    plaintiffs into Madoff's and others'.  That is different

3    conduct, right?  Your conduct is about the outflow of money.

4    That's the conduct focused on by the trustee in the fraudulent

5    conveyance action, right?

6            MR. SHEEHAN:  Yes.

7            THE COURT:  Outflow of money.  It seems to me Mr.

8    Stone is saying, no, no, we are focused on different conduct,

9    we are focused on conduct that induced the purchase or sale of

10   the securities in the first place, which is temporal.  If you a

11   time limit, it would be in a different spot, right?

12           MR. SHEEHAN:  Can I read his complaint, your Honor,

13   what he read to you before?

14           THE COURT:  Sure.

15           MR. SHEEHAN:  This is paragraph 49, page 12.  "The

16   defendants directed BLMIS to prepare fraudulent trading records

17   and fraudulent trading results which affected returns of their

18   accounts," that is, the defendants', Picower's, "based upon

19   transactions which in fact never took place.  Picower, directly

20   and through the other defendants, initiated, directed,

21   coordinated, and caused to be effected false records and

22   backdated records at BLMIS," those are all the fraudulent

23   conveyances, "which resulted in the appearance of trade profits

24   in these accounts.  Picower then withdrew those false profits

25   from the defendants' accounts."  That is exactly what they are

1    talking about.

2          THE COURT:  I think it talks about the two steps.  One

3    is creating false records and false documents.  The other, the

4    next step, is then withdrawing funds from the account.  Right?

5          MR. SHEEHAN:  Maybe I'm not making myself clear.

6          THE COURT:  Look, I think they will have a very tough

7    time proving the elements for a securities fraud.  But if they

8    could establish that the fraud was completed with respect to

9    the plaintiffs at the time of the false communications, not the

10   conveyance --

11         MR. SHEEHAN:  There isn't a whisper that these

12   plaintiffs ever heard of Mr. Picower until we sued them.  There

13   is no representation by Mr. Picower to them, none, zero, none

14   alleged.

15         THE COURT:  I get it.  I agree.  I don't think they

16   are alleging that.  They are alleging that the communications

17   that were made which induced purchase or sale were directed by

18   Mr. Picower.  The fact that the victims didn't know who is

19   directing is not an offense of a securities fraud.

20         MR. SHEEHAN:  There is no allegation that he directed

21   BLMIS's representations.

22         THE COURT:  I thought that's what Mr. Stone said the

23   emails were going to show.

24         MR. SHEEHAN:  There is nothing in the complaint and

25   there is no evidence of that.  There is no whisper of it.

1          THE COURT:  But if he amends his proposed complaint

2     and includes emails to show that Picower was telling Madoff

3     exactly what to communicate to his customers so they wouldn't

4     get wise, that would be still derivative?

5          MR. SHEEHAN:  No.  I think you are getting a lot

6     closer to where these guys want to be, but it doesn't exist,

7     which gets back to my point that it is all fine and dandy to

8     suggest we are not here on a motion to dismiss.  But if what

9     they say is, OK, I can make this all up -- which they have

10    done, it is concocted -- and now they fired off, we can't shut

11    that down, they concoct something and we are not going to a

12    motion to dismiss, based on what they said, it doesn't look

13    derivative to me, then we are going to have dozens of these

14    lawsuits all emanating out of what they say are the facts when

15    those facts don't exist, they made them up.

16         THE COURT:  I don't know if there will be dozens, and

17    I think the federal courts can handle those.  These can easily

18    be consolidated into one action before one judge, transferred

19    to me.  I would look at a motion to dismiss.  You seem to have

20    no confidence that the federal courts can handle these things.

21         MR. SHEEHAN:  No, I have much more confidence in the

22    federal courts than that.  My confidence is that they stop and

23    they stop it early, they don't waste a lot of time to do

24    duplicative litigation with a trustee involved all over the

25    country with people coming up with causes of action based

1    upon -- your Honor, take a look at --

2            THE COURT:  Before you say that, it seems to me that

3    the case law is pretty clear that at this stage I and the

4    bankruptcy court are not supposed to be looking at whether or

5    not the complaint can withstand a 12(b)(6) motion.

6            MR. SHEEHAN:  I am not suggesting that is true.  What

7    I am saying is this.  Let me finish with this, your Honor.

8            THE COURT:  OK.

9            MR. SHEEHAN:  Take a look at Judge Lifland's opinion.

10   Take a look at the chart that he attached to this case.

11           THE COURT:  I have looked at all that.

12           MR. SHEEHAN:  They took our complaint, put a caption

13   on it, and filed it.  That's what they did, there is no other

14   way to describe that, tacking on to it a few added starters

15   about securities laws.  But that's what they did.  They took

16   the conduct that we alleged in our complaint and they have

17   tried to make it into a federal securities cause of action.

18   Lifland saw it for what it was, deja-vu all over again, and he

19   tossed it.  The same thing should happen here.

20           Thank you, your Honor.

21           THE COURT:  Thank you.

22           Mr. Stone.  You get the last word.  I guess I get the

23   last word.  Maybe the circuit gets the last word.  I did

24   actually have one question.  I don't know that it matters.

25   There seems to be a dispute as to whether or not Ms. Goldman

1  actually got paid or recovered from the trustee on her claims.

2  They are suggesting she did and you are suggesting she didn't,

3  right?

4          MR. SHEEHAN:  She did.

5          THE COURT:  You are saying she didn't, right?

6          MR. STONE:  Your Honor, I am not in possession of

7  information as to that.  The bankruptcy counsel are aware of

8  that.  Maybe they can address that.

9          THE COURT:  Does it matter, in your view?

10          MR. STONE:  No, I don't think it matters at all.

11          THE COURT:  Do you think it matters?

12          MR. SHEEHAN:  Absolutely.

13          THE COURT:  Why does it matter?

14          MR. SHEEHAN:  It's in Enron.  They didn't like the

15  outcome here.  They don't like the net equity decision and

16  concocted this cause of action to run around it.  Judge Lifland

17  saw that and called it for what it was.

18          THE COURT:  I guess I'm not sure why that would turn

19  on whether or not she got paid or didn't.  The other plaintiff,

20  the corporate entity, didn't make any money.  They didn't get

21  paid by the trustee.  Ms. Goldman apparently did.  Does the

22  fact that one got paid and one didn't get paid make a

23  difference in terms of the analysis?

24          MR. SHEEHAN:  No, it is just a fact.  But the fact

25  that they are both customers and were dealt with within the

1    four corners of that liquidation proceeding does have an impact

2    because what they were trying to do is run around that.  They

3    don't like the outcome, they don't like the net equity

4    decision.  They wanted the last statement, they didn't get it.

5    Now they are trying to do it this way.

6            THE COURT:  I get that.  I was just wondering whether

7    it is there is a legal distinction to be made because one got

8    paid and one didn't.  I don't think there is.

9            Go ahead, Mr. Stone.

10           MR. STONE:  We are not trying to run around a net

11   equity position.  That relates solely to priorities in

12   bankruptcy.  There have been many claims outside of bankruptcy

13   on behalf of people who are direct and indirect creditors of

14   the estate where they have recovered money against feeder funds

15   and the like.  Outside of bankruptcy, people are allowed to

16   bring claims even if they arise out of the similar fact

17   pattern.

18           Ochs v. Lipson, your Honor, a 20(a) case.  The court

19   says, "The 20(a) claim is not derivative in nature, it is a

20   direct shareholder suit.  While the underlying facts in the

21   shareholder action may be similar to those involved in the

22   trustee's mismanagement of the suit, the two lawsuits raise

23   separate and discrete causes of action for breaches of

24   different duties."

25           That is the issue, your Honor.  We are saying they

1   participated in the fraudulent misrepresentations made by BLMIS

2   and in addition had a federally established duty as control

3   persons to make sure that didn't happen.

4          They want to attack our complaint which hasn't been

5   filed yet.  They want to attack our complaint which doesn't

6   have data and information which has come out in the last 18

7   months since we were stayed by the bankruptcy court in a

8   decision that contained no authority.

9          There is no authority for staying a federal securities

10  class action.  It happens routinely.  My practice involves many

11  of these cases.  We have never encountered a court which has

12  entered a stay, your Honor.

13         THE COURT:  What happens that is routine?

14         MR. STONE:  Class actions against common defendants

15  who are sued by the estate, auditors being a classic example,

16  are litigated simultaneously.  Adelphia.  The Adelphia trustee

17  in bankruptcy sued the auditors.  The Adelphia trustee sued the

18  law firm that issued the opinion in the '33 Act registration.

19  So did we as class action attorneys.  We settled, they settled.

20         What the trustee wants is the right to usurp those

21  federal class actions and settle all of them under the guise of

22  Metromedia without adhering to federal law.  He wants to wipe

23  out '34 Act class actions when there is bankruptcy.  That's not

24  the law, your Honor.  That's not the law.

25         THE COURT:  I'm not sure what the law is at this

1   point.  I'm waiting to learn what the law is.  Certainly Judge

2   Koeltl didn't see it your way, right?

3          MR. STONE:  I don't think Judge Koeltl was addressing

4   a 20(a) claim.

5          THE COURT:  He clearly wasn't addressing a 20(a)

6   claim.  But I'm not sure what the magic of a 20(a) claim is

7   that means that it is a different analysis that when it is a

8   state RICO claim.

9          MR. STONE:  It is a different analysis because it

10  relates to different direct duties owed by the defendant.

11  Their argument was those state law causes of action aren't

12  raising duties that were breached by the Picowers.  We are

13  alleging they are.

14         THE COURT:  There are different elements to a state

15  RICO claim, but it is not clear to me why the result would be

16  any different.  Judge Koeltl's analysis didn't turn on the

17  elements of the claim; it turned on the facts of the cases and

18  the facts of the pleading, right?  That was all about really a

19  fraudulent conveyance.  Call it what you want, but it is a

20  fraudulent convince.  That's what Judge Koeltl says.

21         MR. STONE:  In our case it is not, your Honor.  There

22  was a fraudulent conveyance.  That is a fact.  Money was taken.

23  But in addition and separate and distinct from that, the

24  Picowers engaged in directing false bookkeeping, false

25  recordkeeping, and false reporting, which allowed the Ponzi

1    scheme to continue indefinitely, and they had a separate duty

2    as control persons to make sure that didn't happen.

3              THE COURT:  They engaged in false bookkeeping of their

4    own?

5              MR. STONE:  Directing false bookkeeping, your Honor.

6              THE COURT:  Again, that is not really in your

7    complaint other than stated conclusorily.  You are asserting

8    there is no information that you have that would show that?

9              MR. STONE:  Right.  We are comfortable having the

10   district court judge in the Southern District of Florida, where

11   the case would have been initiated had we not been stayed,

12   address that.  Defendants who are not in the courtroom today,

13   the trustee is not the defendant in that case, will have the

14   right to do that.  The trustee won't be bothered by that case.

15   That will be between us and the Picower defendants and their

16   counsel.

17             THE COURT:  I understand that.  As I said, it seems to

18   me that there are going to be a lot of problems with the

19   securities cause of action.  But that is not really the purpose

20   here today.

21             Here they bleed into one another a little bit.  Trying

22   to figure out what "derivative" means and how it applies sort

23   of feels like assessing the merits of the pleading for a

24   securities claim under 12(b)(6).  Feels like it.  But they are

25   distinct analyses.

1         Anything else you want to say?

2         MR. STONE:  I have nothing further.  Thank you very

3    much, your Honor.

4         THE COURT:  Anything you want to say, Mr. Sheehan?  I

5    told him I'd give him the last word, but we finished a little

6    early.

7         MR. SHEEHAN:  No, that's quite all right.  I'm

8    comfortable.  Judge Koeltl said it a lot better than I ever

9    could.  Thank you.

10        THE COURT:  Judge Koeltl said what he said.  It is a

11   thoughtful, well written opinion.  I think there are things

12   that one could disagree with.  As you say, he is not binding on

13   me, he is not binding authority on me.  The circuit would be.

14   The circuit certainly has suggested in the footnote that what

15   Judge Koeltl did was OK, though they haven't found and it is a

16   different panel, so I'm not sure I am in a position to say

17   that.  There was one overlapping member of the two panels, I

18   think.

19        MR. SHEEHAN:  There is one other case, it is not

20   binding because it was not published, the Lautenberg opinion.

21   We cited that.  I don't want to continue this argument much

22   further.  I just commend it to your Honor.  There were

23   statements in there by Senator Lautenberg's foundation that

24   there had been misrepresentations made to them by Peter Madoff,

25   directly to them.  They were enjoined by the Lautenberg Second

 1    Circuit opinion because it was derivative of the cause of

 2    action that we were bringing against the Madoff family,

 3    including Mr. Madoff at that time.

 4         MR. STONE:  Your Honor, may I address that?  This is a

 5    preliminary injunction, not a final injunction barring class

 6    action.  That was entered, as typically a bankruptcy judge

 7    will, during the pendency of a bankruptcy to prevent

 8    interference with the administration of the case, not a

 9    permanent injunction barring an independent claim forever,

10    which has never been done in the case of a securities claim.

11         THE COURT:  I understand the distinctions to be made.

12    I think the reasoning is worth looking at, but it is not on all

13    fours here.

14         MR. SHEEHAN:  No, your Honor.

15         MR. STONE:  That's correct, your Honor.

16         THE COURT:  I am going to reserve.  I would like to

17    rule on this to get it off my docket because it has been

18    sitting around a long time.  I have to report to Congress.  I

19    had thought it was worth waiting for the circuit.  Maybe I'm

20    wrong.  If and when we hear from the circuit, I'm sure I will

21    know it as soon as you do.  If anybody wants to, you can give

22    me notice indicating that the circuit has ruled, and then I

23    will let you know what it means.

24         Thank you.  Make sure everybody remembers to docket

25    their appearances.  I thank the court reporter, as always, for

1    his time and talents.  If anyone needs a copy of this

2    transcript, you can take it up with him after this proceeding

3    or on the website.  If you can get to him quickly, fine.

4    Otherwise, I have another matter starting in a couple of

5    minutes.

6           Thanks very much.  Well argued, well briefed.  It's

7    always a pleasure to have smart lawyers who are responsive and

8    thoughtful.  Thanks for that.

9           (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25